**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

**RESPONSE REPORT OF DR. TIMOTHY REICHERT,**
**In Response to the Reports of Drs. Richard Cooper, Lorraine Eden, and Steven Felgran**
**dated January 24, 2014**
**Economic Partners, LLC**

**February 28, 2014**

# PUBLICALLY FILED VERSION

---

[1]      The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

# Response To:

The Reports of Drs. Richard Cooper, Lorraine Eden, and Steven Felgran dated January 24, 2014

Dr. Timothy Reichert

President, Economics Partners, LLC

Report Date: February 28, 2014



**Economics Partners, LLC**

**HIGHLY CONFIDENTIAL**

# Table of Contents

I.    INTRODUCTION AND EXECUTIVE SUMMARY .................................................... 1
   A.    Summary Overview of the Other Transfer Pricing Experts' Positions .................... 1
   B.    Objectives and Key Characteristics of this Report ................................................ 5
   C.    Organization of this Report ................................................................................... 8
   D.    Summary of the Other TP Experts' Key Positions and My Replies......................... 9
        1.    Routine Returns................................................................................. 9
        2.    Restructuring Costs .......................................................................... 11
        3.    Vendor Financing Losses ................................................................. 13
        4.    Estimated Future Non-GAAP Pension Costs .................................... 15
        5.    Returns to Extraterritorial Activities 2001-2005.............................. 16
        6.    Headquarters and Stewardship Activities ........................................ 18
        7.    Intercompany Loans......................................................................... 18
        8.    Relationship between Legal Agreement and Economic Substance ........... 19
        9.    *Ex Post* versus *Ex Ante* ..................................................................... 21
        10.   The Nature of the Nortel RPS – What Exactly is Being Shared ................ 22
        11.   The Relevance of the Arm's Length Principle to Asset Valuation
              and Allocation ................................................................................ 24
        12.   The Reliability of the Residual Profit Split Method ........................... 25
        13.   Nortel's RPS was Tax Avoidance ...................................................... 26
        14.   'Presumptive' Allocation of Sales Proceeds and Allocation of the
              Alcatel Transaction ......................................................................... 28
   E.    My Engagement .................................................................................................. 29

II.   EXAMINING THE OVERALL QUANTITATIVE IMPLICATIONS OF THE
      OTHER TP EXPERTS' REPORTS ................................................................... 30
   A.    Purpose............................................................................................................... 30
   B.    Dr. Cooper.......................................................................................................... 30
        1.    Cooper Transfer Pricing Report........................................................ 30
        2.    Cooper Allocation Report ................................................................. 41
   C.    Dr. Felgran ......................................................................................................... 44
   D.    Drs. Felgran and Cooper Together (the UK Experts) ........................................... 45
   E.    Dr. Eden.............................................................................................................. 47

III.  ROUTINE RETURNS ........................................................................................ 49
   A.    Overview of Dr. Cooper's Positions Regarding Routine Returns and
         Comparison to Positions in My First Report ....................................................... 49
        1.    Inappropriate Selection of Comparables ........................................... 50
        2.    Misapplication of Working Capital Adjustments ............................... 51
        3.    Mistreatment of Customer Financing as Working Capital .................. 51
        4.    Miscalculation of Extraterritorial Activities ...................................... 51
        5.    Inconsistent Use of Profit Level Indicators ....................................... 51
   B.    Errors in Dr. Cooper's Analysis ......................................................................... 52

|  | 1. | Vendor Financing | 52 |
|  | 2. | The 2001-2005 RONA Covers Extraterritorial Services | 52 |
| C. | Dr. Cooper's Routine Profits Analysis | | 52 |
| D. | Why Working Capital Adjustments are Illogical in this Case | | 53 |

IV. SYSTEMATIC AND HOLISTIC APPROACH TO THE APPLICATION OF TRANSFER PRICING REGULATION AND GUIDANCE TO RESTRUCTURING COSTS, VENDOR FINANCING, AND ESTIMATED FUTURE NON-GAAP PENSION COSTS ... 65

| A. | Systematic and Holistic Approach to the Regulations | | 65 |
| B. | An Evidence-Based Review | | 68 |
|  | 1. | Evidence-Based Strategy | 68 |

V. RESTRUCTURING COSTS: RESPONSE TO DRS. COOPER AND FELGRAN ... 73

| A. | Dr. Cooper's Assertions, their Quantitative Implications, and My Replies | | 74 |
|  | 1. | Failure to Apply *Ex Ante* Approach | 74 |
|  | 2. | Misdirected Focus on Control | 75 |
|  | 3. | Mischaracterization of Operating Expenses | 77 |
|  | 4. | Misunderstanding of Effect of Restructuring | 79 |
|  | 5. | Selective and Misdirected Statements Made by Certain of Nortel's Tax Personnel and Advisors | 80 |
|  | 6. | Misunderstanding of Costs and Benefits | 82 |
|  | 7. | Misunderstanding of Nature of LREs | 82 |
|  | 8. | Incorrectly Reduces Nortel RPS to a Principal-Agent Relationship | 83 |
|  | 9. | Quantitative Implications of Dr. Cooper's Assertions | 84 |
| B. | Dr. Felgran's Assertions, their Quantitative Implications, and My Replies | | 86 |
|  | 1. | Misunderstanding in respect of Decision Making Authority | 86 |
|  | 2. | Misunderstanding of Nature of Restructuring Costs | 87 |
|  | 3. | Misunderstanding of Role of Accounting Characterization | 88 |
|  | 4. | Misunderstanding of Nature of Nortel RPS | 89 |
|  | 5. | Quantitative Implications of Dr. Felgran's Assertions | 89 |
| C. | What Third Parties Do: An Evidence-based Reply | | 91 |
| D. | What Transfer Pricing Regulation and Guidelines Tell Us: Holistic Application of the Regulations | | 93 |

VI. VENDOR FINANCING LOSSES: RESPONSE TO DR. COOPER ... 97

| A. | Response to Dr. Cooper | | 98 |
|  | 1. | Misdirected Focus on Decision Making | 98 |
|  | 2. | Failure to Understand Nature of Vendor Financing Costs | 101 |
|  | 3. | Treat NNL and NNUK Inconsistently | 102 |
|  | 4. | Incorrectly Reduces the Nortel RPS to a Principal-Agent Relationship | 103 |
| B. | Reply to Dr. Felgran | | 103 |
| C. | What Third Parties Do: An Evidence-based Reply | | 103 |
| D. | What the Regulations Tell Us: Holistic Application of the Regulations | | 104 |

VII.    ESTIMATED FUTURE NON-GAAP PENSION COSTS: RESPONSE TO DRS.
        COOPER AND FELGRAN ...................................................................................... 107
        A.    Dr. Cooper's Position on Pension Costs ................................................. 107
        B.    Dr. Felgran's Arguments and the Quantitative Implications Thereof ................ 107
              1.    Selective Use of Non-GAAP Definition of Pension Costs ........................ 107
              2.    Definition of "Ongoing" vs. "Economic" is Judged *Ex Post* .................... 108
              3.    Silent on Question of Control .................................................... 108
              4.    Reduces the Nortel RPS to a Risk Sharing Arrangement ........................ 109
        C.    An Evidence-Based Reply ...................................................................... 109
        D.    Systematic and Holistic Application of the Regulations and Guidance ............. 110
              1.    Application of Flowchart from Section IV ...................................... 110
              2.    Connection to *Xilinx* ............................................................ 111

VIII.   EXTRATERRITORIAL COSTS 2001-2005: RESPONSE TO DR. COOPER ...................... 112
        A.    Dr. Cooper's Assertions and My Replies .................................................. 112
              1.    "Contemporaneous" Third Party Studies Support Returns to
                    Extraterritorial Costs for 2001-2005 ............................................ 113
              2.    Mischaracterization of Appendix I ............................................... 113
              3.    Miscalculation and Mischaracterization of Extraterritorial Services ....... 113
              4.    Double Counting ................................................................... 115
              5.    Inconsistency Regarding Non-EMEA RPEs ........................................ 116
        B.    Dr. Felgran .................................................................................... 116
        C.    An Evidence-Based Reply ...................................................................... 116

IX.     STEWARDSHIP AND HEADQUARTER COSTS: RESPONSE TO DRS. COOPER
        AND FELGRAN ..................................................................................... 118
        A.    Stewardship Costs ............................................................................ 118
              1.    Dr. Cooper's Assertions and My Replies ........................................ 118
              2.    Dr. Felgran's Assertions ......................................................... 121
        B.    Headquarter Costs ............................................................................ 121
              1.    Dr. Cooper's Assertions and My Replies ........................................ 121
              2.    Dr. Felgran's Assertions ......................................................... 122

X.      INTEREST-FREE INTERCOMPANY LOANS: RESPONSE TO DR. FELGRAN ............. 123
        A.    Dr. Cooper's Report .......................................................................... 123
        B.    Dr. Felgran's Assertions and My Replies ................................................ 123
              1.    Summary of Dr. Felgran's Position ............................................. 123
              2.    Miscalculation of Intercompany Loan Amount at End of Period ........... 124
              3.    Failure to Consider Other Nortel Borrowing ................................... 124
              4.    Incorrect Calculation of Foregone Interest Payments ........................ 124

XI.     RESPONSE TO ALLOCATION RELATED ISSUES ........................................... 126
        A.    Response to Dr. Cooper's Allocation Positions ........................................ 126
              1.    Overview of Dr. Cooper's Key Points .......................................... 126
              2.    Response ........................................................................... 128

B.    Response to Dr. Eden's Positions on the Nortel RPS ................................................. 141
      1.    Misunderstanding of the Nature of the Arm's Length Principle ............. 141
      2.    Mischaracterization of the Residual Profit Split Method as a
            Method of Last Resort ................................................................... 142
      3.    Misunderstands Relationship Between R&D Expenditure and Fair
            Market Value ............................................................................... 145
      4.    Mischaracterizes the Nortel RPS as Manipulative and Not Arm's
            Length ........................................................................................ 147
      5.    Misunderstands the Role of the Legal Arrangement and Form of a
            Transaction ................................................................................. 149
      6.    Mischaracterizes the Transition from the Nortel CSAs to the
            Nortel RPS ................................................................................. 151
      7.    Selective Application of the Terms of the MRDA ...................................... 152

(v)

# List of Appendices

APPENDIX A:     SUPPORTING CALCULATIONS

APPENDIX B:     ANALYSIS OF COMPARABLE UNCONTROLLED TRANSACTIONS

APPENDIX C:     ADDITIONAL MATERIALS RELIED UPON

# I.      Introduction and Executive Summary

## A.      Summary Overview of the Other Transfer Pricing Experts' Positions

This report replies to the reports of Dr. Cooper,[1] Dr. Eden,[2] and Dr. Felgran[3] (collectively, the "other TP Experts"), each dated January 24, 2014.

The other TP Experts raise 14 key issues pertaining to Nortel's transfer pricing framework (the "Nortel RPS") with which I disagree.[4] Of these, seven of the issues are quantitative in nature, while the other seven are conceptual or qualitative.

Exhibit I-1 and Exhibit I-2, below, list these issues, and summarize the positions of all of the TP Experts (including mine) with respect to each. Any capitalized terms not defined in the body of this report shall have the meaning ascribed to them in my first report (dated January 24, 2014).

I have carefully reviewed and objectively considered the reports of the other TP Experts.  Where I disagree with their conclusions it is generally because they have made internally illogical points or mathematical errors, have premised their position on a misunderstanding or mischaracterization of sound and governing transfer pricing principles (including in some cases the economic principles that underlie these), and/or have made assertions without offering empirical analysis to test the assertions.

I have attempted to put forth for the Court my responses, and to explain the basis for my response in each case.

As I tried to make clear in my first report, any assessment of the Nortel transfer pricing system should focus on: 1) the choice of transfer pricing method, 2) the design of the transfer pricing method, and 3) the quantification of specific components of the transfer pricing system in its implementation.

With the exception of Dr. Eden, all the transfer pricing experts (including me), ▮▮▮▮▮▮▮▮ and Horst Frisch validate that the choice of method (residual profit split) for Nortel was correct and sound. I address Dr. Eden's criticism of the choice later in this report, but note for the present that even Dr. Eden offers no better alternative in the circumstances of Nortel.

With respect to the design of the Nortel transfer pricing system, I do not see any convincing criticism by way of the other TP Experts, ▮▮▮▮▮▮▮▮ The design was sound.

---

[1] Dr. Cooper filed a report relating to transfer pricing (the "Cooper TP Report), as well as a report relating to allocation (the "Cooper Allocation Report").
[2] Dr. Eden's report is hereinafter referred to as the "Eden Report."
[3] Dr. Felgran's report is hereinafter referred to as the "Felgran Report."
[4] In addition to these 14 key issues, there are other points raised with which I disagree that are also addressed in this report.

With respect to the <u>quantification</u> of various components of the transfer pricing system, where I would recommend changes I have said so in my first report, and I set out the effect of those. Where the other TP Experts have taken issue with quantification components of the transfer pricing system I have considered their positions, and I respond to them on a principled and objective basis in an attempt to assist the Court in assessing these issues.

**Exhibit I-1: Summary of the TP Experts' Quantitative Positions**

| Issue | Reichert | Cooper | Felgran | Eden |
|---|---|---|---|---|
| **QUANTITATIVE** | | | | |
| **Routine Returns** | Operating Margin is an appropriate PLI for distribution and already captures returns to extraterritorial services.<br><br>Return to net PP&E is an appropriate PLI for manufacturing (during 2001-2005, when RPEs had manufacturing activities).<br><br>Working capital adjustments do not increase reliability of results. | 2001-2005: Accepts RONA (which gives returns to working capital and long-term assets), but adds additional markup on extraterritorial services.<br><br>2006-2008: Switches to operating margin, but still adds markup on extraterritorial services.<br><br>Working capital adjustments increase reliability of results. | Does not take issue with Nortel's treatment. | Does not take issue with Nortel's treatment. |
| **Restructuring Costs** | Economic logic, transfer pricing guidance, and third party evidence indicates that restructuring costs should be borne locally (*i.e.*, not shared).<br><br>This is consistent with Nortel's treatment, and what the parties agreed to. | NNL should bear the EMEA RPEs' restructuring costs in full (but non-EMEA RPEs' restructuring costs are left alone). | RPEs should share restructuring costs. | Does not take issue with Nortel's treatment. |
| **Vendor Financing Losses** | Economic logic, transfer pricing guidance, and third party evidence indicates that vendor financing losses would be shared.<br><br>This is consistent with Nortel's treatment, and what the parties agreed to. | EMEA RPEs should get credit for vendor financing (as part of their accounts receivable in his working capital adjustments).<br><br>NNL should bear all losses related to vendor financing for the EMEA RPEs.<br><br>Non-EMEA RPEs' (such as NNL) vendor financing losses are not shared. | Does not take issue with Nortel's treatment. | Does not take issue with Nortel's treatment. |
| **Estimated Future Non-GAAP Pension Costs** | Economic logic, transfer pricing guidance, and third party evidence indicates that pension costs would be shared using a GAAP cost measure.<br><br>This is consistent with Nortel's treatment, and what the parties agreed to. | Does not take issue with Nortel's treatment. | RPEs should share estimated future non-GAAP pension costs. | Does not take issue with Nortel's treatment. |
| **Extraterritorial Services** | Returns for extraterritorial services are already captured in the benchmarked operating margin (the distribution companies perform similar functions, and there is no observable relationship between SG&A intensity and operating margin). | EMEA RPEs should earn additional routine returns for costs deemed to be "extraterritorial." | Does not take issue with Nortel's treatment. | Does not take issue with Nortel's treatment. |
| **HQ Services and Stewardship** | NNL should bear stewardship costs during 2001-2005 (it already bore these costs in 2006-2008). | NNL should bear stewardship costs during 2001-2005; NNL bears certain "excess" HQ services throughout 2001-2008. | Does not take issue with Nortel's treatment. | Does not take issue with Nortel's treatment. |
| **Intercompany Loans** | Intercompany loans should bear interest.<br><br>Loan position overstated due to overcompensation to NNUK during 2001-2005.<br><br>Dr. Felgran's calculation of interest is also overstated by 67 percent per year. | Does not take issue with Nortel's treatment. | NNUK is owed £20 million in interest per year on intercompany receivables positions. | Does not take issue with Nortel's treatment. |

**Exhibit I-2: Summary of the TP Experts' Qualitative Positions**

| Issue | Reichert | Cooper | Felgran | Eden |
|---|---|---|---|---|
| **QUALITATIVE** | | | | |
| **Legal Form and Economic Substance** | Legal arrangement (form) governs, so long as economic substance and arrangement conform, and arrangement among parties is economically rational *ex ante*. | Not specific regarding the precise relationship between legal form and economic substance.<br><br>Views economic substance as the only significant consideration for transfer pricing economists.<br><br>Ignores the parties' terms, the form of the MRDA, and the economic substance of the parties' relationships. | Not specific regarding the precise relationship between legal form and economic substance.<br><br>Views economic substance as the only significant consideration for transfer pricing economists.<br><br>Ignores the parties' terms, the form of the MRDA, and the economic substance of the parties' relationships. | Not specific regarding the precise relationship between legal form and economic substance.<br><br>Views economic substance as the only significant consideration for transfer pricing economists.<br><br>Ignores the parties' terms, the form of the MRDA, and the economic substance of the parties' relationships. |
| *Ex Post* vs. *Ex Ante* | Examines the question of what controlled parties would do from an *ex ante* perspective. | Uses *ex post* reasoning. | Uses *ex post* reasoning. | No position. |
| **The Nature of the Nortel RPS** | The Nortel RPS was a license of specific rights, and limited to specific intangible development area with defined risk sharing. | Cooper Allocation Report, claims parties are all "joint entrepreneurs" and full risk-sharers, and thus entitled to IP-related proceeds from LOB Sales and Residual IP Sale.<br><br>In his TP Report, claims NNL should bear risks and costs related to restructuring, vendor financing, HQ services, etc., with EMEA RPEs shielded from risks. | Characterizes Nortel RPS as "full risk sharing." | Characterizes Nortel RPS as "full risk sharing." |
| **Relevance of Arm's Length to Asset Value** | The arm's length allocation of profits has real (and obvious) connection to value. | No position. | No position. | Argues that there is no connection between the arm's length standard and value. |
| **Reliability of the Residual Profit Split Method** | Residual profit split method is best method given the facts, and was in fact suggested by the tax authorities. | No position. | No position. | Believes the residual profit split method is a "method of last resort" (yet offers no alternative). |
| **Nortel's RPS was Tax Avoidance** | The Nortel RPEs were in fact in high tax jurisdictions, the Nortel RPS was implemented at the request of the tax authorities, and it was jointly developed with them.<br><br>The Nortel RPS had the effect of shifting billions in <u>losses</u> to NNL, not profits. Had Nortel retained the prior CSA, NNI's losses would have been significantly higher. | No position. | No position. | Canada was a "tax haven" for Nortel, and the purpose of the Nortel RPS was to shift billions in revenue to NNL. |
| **Allocation of the Alcatel Transaction** | The Alcatel transaction involved the sale of IP to be used in the same manner as used by Nortel and contained virtually no goodwill. | The Alcatel sale demonstrates that the RPEs (who received shares of the proceeds in proportion with their R&D stocks) should also receive shares of the IP-related proceeds from the LOB Sales and the Residual IP Sale in the same manner. | No position. | No position. |

For the years 2001-2008, Exhibit I-3, below, shows the income allocations, as among the six residual profit entities ("RPEs") in the Nortel RPS,[5] that result from the positions taken by each of the other TP Experts (with the exception of Dr. Eden, who does not quantify any position related to the profits earned from 2001-2008, and therefore her position is not included). The exhibit also includes an additional position – namely, Drs. Cooper and Felgran taken together ("Cooper - Felgran"). This is provided because Drs. Cooper and Felgran are both retained in connection with the interests of NNUK (or its creditors), yet there is little overlap in their positions.[6] While Drs. Cooper and Felgran both address the issue of restructuring costs, they arrive at different conclusions with respect to how this item should be treated. Moreover, aside from restructuring costs, the issues raised in their reports differ. Thus, the positions of Drs. Cooper and Felgran, when combined, represent the positions (in total) in respect of NNUK.

**Exhibit I-3: Quantification of the Other TP Experts' Positions**

| Total Profit / (Loss) to Each RPE: 2001-2008 | | | |
|---|---|---|---|
| Entity | Cooper | Felgran | Cooper-Felgran |
| NNL | (5,955.07) | (4,272.79) | (5,429.45) |
| NNI | (4,389.45) | (5,097.28) | (4,667.46) |
| NNUK | 376.09 | (420.26) | (72.89) |
| NN Ireland | 66.34 | (49.44) | 14.83 |
| NNSA | (615.53) | (1,227.72) | (1,068.61) |
| NN Australia | (61.06) | (35.17) | (29.46) |

While all of the other TP Experts assert that the relationship of the parties to the Nortel RPS was that of "joint entrepreneurs" and "joint risk takers," Exhibit I-3 shows that the quantitative implications of their reports belie this characterization. Dr. Cooper, for example, would have NNUK and NN Ireland collectively earn over $400 million of profit, while the other entities would lose approximately $11 billion. In other words, Dr. Cooper <u>says</u> that the parties are risk sharing and jointly entrepreneurial, but his quantitative analysis indicates NNUK and NN Ireland should earn profit while the other entities bear all of the losses.[7]

## B.    Objectives and Key Characteristics of this Report

This report responds to each of the other TP Experts, for every materially important opinion offered that differs from mine. For cases in which logical and computational errors are

---

[5] NN Australia later left the Nortel RPS.  See Exhibit 22078, NNC-NNL094173.

[6] That is, Dr. Cooper is retained in connection with the interests of NNUK, and Dr. Felgran in connection with the interests of the NNUK pension creditors.

[7] I note that the OECD Guidelines speak directly to the pattern shown above. Chapter 1, Section D.3., addresses allocations of losses. Therein, at 1.70, the OECD Guidelines state that "[w]hen an associated enterprise consistently realizes losses while the MNE group as a whole is profitable, the facts could trigger some special scrutiny of transfer pricing issues." Later in the same section, at 1.71, they state "[t]he fact that there is an enterprise making losses that is doing business with profitable members of its MNE group may suggest to the taxpayers or tax administrations that the transfer pricing should be examined. The loss enterprise may not be receiving adequate compensation from the MNE group of which it is a part in relation to the benefits derived from its activities."

committed (for example, there are numerous errors contained in Dr. Cooper's analysis), I describe these, assess their implications, and correct them.

In this report, I strive to provide the Court with an economic analysis that has four primary characteristics.

First, my analysis is evidence-based and empirical in nature. The arm's length principle is fundamentally predicated upon the idea that third party behavior must serve as a guide to the allocation of income as among controlled parties. The other TP Experts' reports are heavily laden with assertion and conjecture about how the Nortel RPS participants (in particular, the RPEs) would at arm's length decide to treat (share) restructuring and other costs. This report replies by examining how third parties in very similar arrangements actually agree to share (or not) restructuring and other costs.

Second, because the number of specific transfer pricing issues addressed by the other TP Experts is large, this report emphasizes the importance of understanding positions of the experts in whole. As noted earlier, when the positions of the other TP Experts are examined in the aggregate, the result belies their characterizations of the Nortel RPS.

For example, as noted above, despite his insistence in the Cooper Allocation Report that the arrangement among the parties is essentially a "joint venture" and one in which the parties are jointly risk-bearing and entrepreneurial, Dr. Cooper's analysis in the Cooper TP Report arrives at the remarkable result that NNUK should earn nearly $400 million over the 2001-2008 period, while NNL, NNI, and NN Australia should lose $6.0 billion, $4.4 billion, and $61 million, respectively.[8] Dr. Felgran's analysis, while less extreme than Dr. Cooper's, also produces results that are inconsistent with his characterization of the relationship among the RPEs.

Third, I attempt to provide a comprehensive and systematic framework for applying transfer pricing guidance and regulation to the key issues in this case. The OECD Guidelines and regulations such as those pertaining to US Section 482 extend to hundreds of pages of textual guidance regarding the application of the arm's length standard. My view is that the other TP Experts have used elements of this guidance extremely selectively.

This is manifested, for example, in the imprecision in the other TP Experts reports regarding the relationship between the economic substance of the RPEs' arrangement, and their legal agreement. As I discuss at some length in Section IV, the OECD Guidelines and the US regulations are very clear about the relationship between legal arrangements (form) and economic substance. Specifically, they say that legal arrangements are to be respected and "transfer priced" by the taxpayer or tax authority, so long as form is not inconsistent with economic rationality or economic substance. In other words, the purpose of a transfer pricing-related economic analysis is to price the transaction that the taxpayer has constructed, not to

---

[8] I note that Dr. Cooper states that his analysis should be applied to the other Europe, Middle East, and Africa ("EMEA") RPEs, which are NN Ireland and NNSA.

override it and price something else – so long as that transaction passes the test of economic rationality (and form and substance cohere).

This is a bedrock principle in transfer pricing. The obvious reason for this is that administering transfer pricing regulation would be akin to regulating the "Wild West" if the actual legal arrangements were consistently disregarded in favor of conjectures about what the "economic substance" of controlled parties' relationships imply about income allocation, let alone re-invention of the "economic substance." The starting point, and most fundamental form of evidence, used by tax authorities when examining a taxpayer's intercompany transfer pricing is the taxpayer's transfer pricing-related legal arrangements.

The other TP Experts all seem unwilling to cleave to this bedrock principle, in my respectful view. As a prominent example of this, largely missing from their reports is any mention of the words "license" when describing or opining about the legal arrangement that governed the Nortel RPS (the Master Research and Development Agreement, or "MRDA").[9]

As importantly, the OECD Guidelines (and for that matter US transfer pricing regulations) offer a systematic approach for dealing with the question of which controlled party or parties should bear realizations of risk (*i.e.*, costs), particularly in cases where those risks were unforeseen, the parties' legal arrangements were not clear regarding how to deal with risks, or the parties' contractual agreements were inconsistent with substance. That is, the OECD Guidelines seek logical ways to "fill in" contractual terms that were missing *ex ante*,[10] but that need to be filled in *ex post*[11] once a partially or wholly unforeseen risk is realized. In this regard, the OECD Guidelines emphasize the use of uncontrolled contracts, and uncontrolled behavior generally, when deciding how controlled parties would have allocated a risk, had they chosen to address it *ex ante*.

I have summarized the appropriate analytical framework in a simple flowchart, and I apply this to the issues in this case that involve large costs resulting from realized risks (*i.e.*, restructuring costs, vendor financing losses, and estimated future non-GAAP pension costs[12]). This is the same as the approach in Chapter 9 of the OECD Guidelines, which offers a very simple flowchart, or decision tree, for cases in which controlled parties do not have a contract covering a risk, or in which that contract is somehow economically irrational (or form and substance do not cohere).

Fourth, because the *ex ante* risk allocation aspect is such a fundamental facet of any comprehensive and systematic approach to applying the OECD Guidelines to the issues at hand, it is emphasized as a separate characteristic of my analysis. Specifically, my analysis centers on *ex ante* (forward looking) allocations of risk, in contrast to that of the other TP Experts

---

[9] See NNC-NNL06001514.
[10] *I.e.,* on a forward-looking basis.
[11] Retrospectively (*i.e.,* with the benefit of hindsight).
[12] Dr. Felgran's report refers to NNUK's pension costs measured under US GAAP as "GAAP" pension costs. I use the same convention.

who seem to focus only on whether the parties would be "willing to accept" a given cost (such as restructuring, or vendor financing losses) *ex post*.

Because the answer to the question "*ex post*, would an RPE be willing to accept an unforeseen cost?" is in nearly every imaginable circumstance "no," the *ex post* approach is simply not helpful. Obviously, no one ever wants to accept hindsight losses, and everyone wants the largest possible share of windfall gains. The question is not "would an RPE have been willing to accept a loss?" or "would this or that RPE have sought reimbursement?"[13] Rather, the question is how would the RPEs have contracted, *ex ante*, around the realized risk had they chosen to address the issue upfront.

## C.    Organization of this Report

This report contains eleven sections, as follows:

1)    This section, Section I, introduces the issues examined by the other TP Experts, and summarizes the key characteristics of my approach in responding to their positions and my key arguments in response.

2)    Section II summarizes and evaluates the quantitative implications of the other TP Experts' positions.

3)    Section III addresses Dr. Cooper's positions on routine returns – the key issue that applies to both RPEs and pure distributors in the Nortel RPS.

4)    Section IV describes a holistic and systematic approach to the application of transfer pricing regulation and guidance to the issues of restructuring costs, vendor financing losses, and estimated future non-GAAP pension costs.

5)    Section V replies to Drs. Cooper and Felgran on restructuring costs.

6)    Section VI addresses Dr. Cooper on vendor financing losses.

7)    Section VII replies to Dr. Felgran on estimated future non-GAAP pension costs.

8)    Section VIII addresses Dr. Cooper on extraterritorial costs during 2001-2005.

9)    Section IX responds to Dr. Cooper on headquarters and stewardship costs.

10)   Section X replies to Dr. Felgran on intercompany loans.

11)   Section XI addresses allocation-related issues. Section XI.A. addresses the Cooper Allocation Report, and XI.B. addresses the Eden Report.

---

[13] See, for example the Cooper TP Report at page 67.

In the remainder of this section, I summarize the main arguments raised by the other TP Experts, and my main responses to those arguments.

## D.    Summary of the Other TP Experts' Key Positions and My Replies

### 1.    Routine Returns

Dr. Cooper is the only other TP Expert to address routine returns to manufacturing, distribution, and extraterritorial activities.

His analysis contains three primary components.

First, Dr. Cooper asserts that the operating margins of the routine comparable companies should be adjusted (mostly upward) to reflect the fact that the benchmarked routine activities and assets involve more working capital than that held by the comparables (per dollar of revenue). In other words, Nortel's high levels of working capital should imply high routine operating margins.

Second, Dr. Cooper's analysis assumes that vendor financing is <u>productive</u> working capital that increases the routine returns earned by the RPEs, while at the same time asserting that the losses associated with vendor financing should be borne by NNL. That is, while Dr. Cooper treats vendor financing losses as an unproductive cost to be borne by NNL, he simultaneously incorporates the capital that produced these losses into the "productive" routine working capital of RPEs, thereby increasing the routine returns earned by NNUK, NN Ireland, and NNSA.

Third, Dr. Cooper assumes that the return on net assets ("RONA") utilized by Nortel during the 2001-2005 period did not properly reward all of the routine activities of the RPEs during that period. He thus assumes that a market return to a firm's capital base is an insufficient amount of profit for the firm, and that some sort of additional return for "functions" is required.

My response to Dr. Cooper contains four primary components.

First, I demonstrate that working capital adjustments are predicated on assumptions that cannot possibly hold in Nortel's case. Working capital adjustments assume that when we observe relatively high working capital – for example, high receivables balances – we are observing a choice by the company to extend longer days payable to its customers in return for higher prices paid by those customers: in other words, that a perfectly functioning credit market exists inside the goods market.

However, in many cases, higher working capital balances signal that something is wrong. Higher working capital balances often tell us that, for example, customers are requiring extended terms to entice purchasing, not paying on time, not paying at all, or that inventory is building up because it cannot be sold quickly enough. In other words, in the real world, at

arm's length, high working capital intensity is often a bad thing, rather than a form of capital that implies higher prices and operating margins.[14]

In Nortel's case, the conditions encountered during the 2001-2008 period quite clearly imply that the excess working capital balances were not a choice made by Nortel in an attempt to increase the prices paid by its customers. Rather, Nortel's working capital balances resulted in large part from its diminished ability to sell inventory, from customers' inability to pay for goods and services received, and from Nortel's having to resort to very aggressive customer financing tactics.[15]

Further, Dr. Cooper's own sample of routine comparable companies shows us that there is no meaningful relationship between working capital intensity and operating margin. If anything, his sample exhibits an extremely slight, and statistically insignificant, negative relationship between working capital balances and operating margins.

Second, Dr. Cooper's position regarding vendor financing losses is unsupportable on its face. He simultaneously treats vendor financing losses as a pure cost (which he puts to NNL) <u>and</u> vendor financing as a form of productive capital in his calculations of routine returns (which NNUK, NN Ireland, and NNSA benefit from).

Third, Dr. Cooper's assertion that the RONA provided to the RPEs during 2001-2005 was insufficient, and did not cover extraterritorial activities, is also completely unsupportable as a matter of theory and practice. Profit is always the return to <u>capital</u> (that capital may be intangible capital or physical capital). Profit is never, properly speaking, a "markup on costs," or a "margin on sales." Profit may be *measured as* a percentage of sales, total costs, or for that matter value added costs, but it is *defined as* the return to investments in the capital employed by the firm.

Nor is profit a return to "functions." Functions performed are the result of <u>both</u> capital and labor inputs. Indeed, economic theory treats the firm as a "production function," involving labor inputs and capital inputs that are combined to produce an output of some kind. Revenue earned by the firm, less its purchases from other firms, is distributed by labor and capital markets to labor and capital inputs. Labor inputs are paid in the labor market, at an arm's length wage rate. Correspondingly, capital is "paid" in the capital markets, earning profits (equity capital) or interest (debt capital).

Despite the foregoing, Dr. Cooper's position, when he adds an additional routine return to the RPEs for 2001-2005, is to remunerate their supposed extraterritorial services. He thereby <u>double</u>

---

[14] Indeed, as I discuss later in this report, economists generally view inventory build-ups as a leading indicator of macroeconomic downturns. Nearly every company I have been engaged by seeks to reduce its working capital, not increase it.

[15] For purposes of this report, the terms "vendor financing" and "customer financing" are synonyms. Both refer to financing activities performed by Nortel in order to facilitate a customer's purchase. The term "vendor financing" views the activity from Nortel's perspective (the vendor, Nortel, is financing the purchase). The term "customer financing" refers to the same activity, but in reference to the customer being financed.

counts the routine profit associated with extraterritorial activities. Indeed, his analysis seems not to recognize that the reason that extraterritorial activities performed by the RPEs were rewarded by Nortel during the 2006-2008 period is precisely because Nortel switched from a RONA to a margin-based measure of routine profit.

Fourth, I show that Dr. Cooper's routine returns are demonstrably implausible. In some years, his approach would have NNUK earn routine operating margins for distribution-type activities that exceed 20 percent of sales. This is an incredible level of routine profit – much higher than any estimate of routine returns to distribution and similar types of activities that I have seen during my career, and higher than the highest margin ever earned by Nortel.

2.    **Restructuring Costs**

Drs. Cooper and Felgran both address Nortel's restructuring costs.

Dr. Cooper's primary position is that NNL should bear these, with a fallback caveat that perhaps they should be shared, as opposed to being borne locally by each RPE as they in fact were. Dr. Felgran asserts that restructuring costs should be shared.

Dr. Cooper's position is predicated on the following assertions. First, NNL directed and was responsible for the restructuring decisions. Second, the restructuring costs were booked as an operating expense, were ordinary and necessary expenses, and therefore would not be borne individually by the RPEs but would at least be shared. Third, an uncontrolled party would not agree to bear restructuring costs, *ex post*, and would have sought full or partial indemnification. Fourth, restructuring decreases NNUK's (and for that matter NN Ireland's and NNSA's) R&D stock (and future profit-earning potential) in the Nortel RPS.

The main lines of my response to Dr. Cooper can be summarized as follows:

First, basic microeconomic theory tells us that we should not expect to observe uncontrolled parties agreeing to share restructuring costs. The reason for this is that doing so, *ex ante*, would create what economists call "perverse incentives." Specifically, an agreement to share restructuring would be tantamount to a situation in which parties could externalize the costs of their decisions to act inefficiently. It is easy to show that the result would be excess (and inefficient) investments and activity levels (cost levels) by all parties.

Second, I show that the prediction of microeconomic theory bears out in the real world. Rather than merely speculate that an uncontrolled bargain would either force the costs entirely to one party, or that these costs would be shared, I look to actual third party contracts that are similar in structure to the Nortel RPEs' arrangements and the MRDA. As I describe in detail in Sections IV and V of this report, the empirical evidence from a review of several hundred uncontrolled contracts strongly supports my position that restructuring costs would be treated as "private" (*i.e.*, not shared, but retained by the party incurring them in the first instance).

Third, I point out that the identity of the controlled affiliate that made the final, or for that matter the local and immediate, decisions to finance Nortel's customers is not the relevant

question for transfer pricing purposes. Dr. Cooper's core argument related to decision making authority is merely that NNL controlled NNUK. However, the point of the arm's length principle is to <u>abstract from control</u>. When applying the arm's length principle, we do not say "this is a controlled transaction, and therefore we allocate profit according to how much control each of the controlled affiliates exert." Rather, we say "assuming that these controlled entities were <u>uncontrolled</u>, in light of their functions, risks, and assets, how should we allocate profit?"

Fourth, I demonstrate that the question of whether restructuring costs are an "operating expense" for financial reporting purposes is not the relevant question. The Nortel RPS was an agreement to jointly develop, and share in the residual profits from, a specific portfolio of assets called "NN Technology." Thus, the question of cost characterization is not "are restructuring costs an operating expense," but rather "do restructuring costs contribute to NN Technology?" The Cooper TP Report does not address this question in any way.

Fifth, I holistically and comprehensively apply the regulations and guidance to the question of restructuring costs. As I discuss at some length in Section IV, the OECD Guidelines offer a systematic approach for dealing with the question of which controlled party or parties should bear significant (*i.e.*, large) realizations of risk, particularly in cases where those risks were either unforeseen or the parties' contractual arrangements were not entirely clear regarding how to deal with them. That is, the OECD Guidelines seek logical ways to "fill in" contractual terms that were missing *ex ante*, but that need to be filled in *ex post* once a partially or wholly unforeseen risk is realized.

In reply to Dr. Cooper, I apply this framework to the following questions. First, <u>did the parties agree</u>, *ex ante*, on an approach for dealing with restructuring costs, and if so was that approach economically rational (and was the form of the agreement consistent with the economic substance of the parties' relationship)? Second, if the parties did not agree (or if their legal arrangement is unclear), how <u>would they have</u> agreed to share (or not share) restructuring costs, had they chosen to address the issue upfront?

I find that a holistic and comprehensive application of the OECD Guidelines and the body of regulation governing transfer pricing points very clearly to the conclusion that restructuring costs would not be shared. *A fortiori* they would not, *ex post*, be borne entirely by NNL.

This is a fundamentally different approach from that taken by Dr. Cooper. That is, rather than asserting, as does Dr. Cooper, that NNUK (and NN Ireland and NNSA) would not willingly accept customer financing losses – which is always true *ex post* – I attempt to examine the question on a forward looking, or *ex ante*, basis.

Finally, I show that Dr. Cooper's primary assertion – that NNL should indemnify NNUK, NN Ireland, NNSA, and presumably the other RPEs, from restructuring costs – is tantamount to reducing the Nortel RPS to a principal-agent relationship in which NNL is the principal and the other RPEs are mere agents. Indeed, this position is remarkable in light of Dr. Cooper's characterizations – particularly in the Cooper Allocation Report – of the relationship as "jointly entrepreneurial."

Dr. Felgran asserts that: 1) NNL had "final or ultimate decision making authority" pertaining to restructuring, and 2) restructuring costs are ordinary, usual, and recurring operating expenses. My replies to these are essentially the same as my replies to Dr. Cooper.

I note that while Dr. Cooper's conclusion that NNL should indemnify the other RPEs reduces the relationships among them to principal-agent relationships, Dr. Felgran's position is less extreme but still inconsistent with the substance of the Nortel RPS and the parties' legal arrangement. Dr. Felgran's position (that restructuring costs should be shared) expands the Nortel RPS to one in which all risks are shared, and no distinction is made between private risks, costs, and benefits, on the one hand, and public (shared) ones on the other. Despite descriptive language in Schedule A of the MRDA that discusses the parties' risk sharing under the Nortel RPS in a way that, isolated out of context, makes the Nortel RPS appear to expansively share risks, the full context, including the actual calculation – also at Schedule A – make it clear that the Nortel RPS was not primarily a risk sharing arrangement. Rather, it was, as I have said, an arrangement to share in the risks and rewards of a specific activity (NN Technology creation). Indeed, even uncontrolled joint venture agreements carefully define shared versus private costs, and do not reduce the arrangement to pooled insurance for every risk.

### 3.        Vendor Financing Losses

Dr. Cooper addresses vendor financing losses, while Dr. Felgran is silent on this issue.

The vendor financing losses were in fact "shared" by virtue of being included in the determination of the residual profit pool. Dr. Cooper's position is, however, that NNL should have borne 100 percent of the vendor financing losses.

Dr. Cooper's main points are very similar to his assertions pertaining to restructuring costs. He asserts that: 1) decision making regarding vendor financing was centralized in NNL (NNL controlled NNUK and made the decisions to finance customers that led to the vendor financing losses); 2) vendor financing costs are not an operating expense to be deducted against sales when arriving at GAAP operating profit (the starting point for the calculation of residual profit in the MRDA) and; 3) losses associated with vendor financing-related capital can be put to NNL, while at the same time the capital that generated these losses can be viewed analytically as productive capital that gives rise to a benefit for NNUK, NN Ireland, and NNSA (through Dr. Cooper's routine return calculations).

What follows is a summary description of my primary responses to Dr. Cooper.

First, it is simply a mischaracterization of the facts to assert that NNL was the decision-making entity responsible for the vendor financing decisions. As I detailed in my first report, the decision making was clearly joint in nature. In this report I offer additional evidence in this regard.

Moreover, I note that Dr. Cooper's description of NNL's decision-making authority sounds quite similar to stewardship or shareholder-related decision making.  That is, Dr. Cooper's

description of NNL's decision-making authority pertaining to vendor financing losses describes this decision making as oversight over capital investments by subsidiaries – and therefore akin to shareholder or stewardship activity. This would imply that the customer financing losses should either be shared or remain with the RPEs (*i.e.*, not be shared, but remain with the parties to whom the costs accrue in the first instance).  Transfer pricing regulation and guidance is clear that parental oversight does not entail that the parent bear the risks (or be entitled to the rewards) associated with capital outlays by subsidiaries. Therefore, at a minimum, it is incumbent upon Dr. Cooper to explain why NNL's oversight regarding vendor financing decisions – an outlay of capital by NNL's subsidiaries – is <u>not</u> stewardship or shareholder activity.

Second, as with my response pertaining to restructuring costs, I note that the identity of the controlled affiliate that made the final, or for that matter the local and immediate, decisions to finance Nortel's customers is not the relevant question for transfer pricing purposes. Again, at the heart of an economic analysis of any intercompany transaction is abstraction from control, and an emphasis on functions, risks, and capital employed (assets).

Third, the customer financing investments themselves – *i.e.*, the capital employed - were made by the RPEs. If capital employed (assets owned) by the legal entities involved in a controlled transaction is in fact a key consideration when allocating profit in an arm's length manner (and it is, under the OECD Guidelines and virtually all jurisdictions' regulations), then one must recognize that the capital employed in financing customers was the RPEs' – not NNL's.

Fourth, I point out that it is simply illogical, and inconsistent with arm's length considerations, to assume that vendor financing losses can be one party's cost, and vendor financing another party's productive asset. Dr. Cooper agrees with Nortel's RONA-based calculation of the routine returns that should accrue to the RPEs for 2001-2005 – again, with the proviso that an additional return should be layered atop the RONA. This routine return (before Dr. Cooper's additional return for extraterritorial "functions") included the application of a <u>23.6 percent</u> rate of return to vendor financing (a long term receivable). Thus, Dr. Cooper is on one hand allowing vendor financing on NNUK's balance sheet (and NN Ireland's and NNSA's) to earn a 23.6 percent rate of return – a return that accrues to NNUK, NN Ireland, and NNSA. At the same time, Dr. Cooper puts the losses associated with this capital to NNL.[16]

Fifth, I point out that vendor financing losses are properly understood as a deduction against revenue received by the RPEs from making and selling products that embody the NN Technology. Given this, it is logical to believe that the parties would, at arm's length, have treated these costs exactly as Schedule A of the MRDA implies that they would have been treated. Schedule A is clear that the parties begin the profit split with a calculation of operating profit. This operating profit figure would have incorporated a deduction of vendor financing losses.

---

[16] I note, in passing, that this is tantamount to assuming that vendor financing is both a routine and non-routine function at the same time, which is an impossibility.

Sixth, I ask "what would uncontrolled parties do?" In an effort to answer this question, at my direction, Economics Partners, LLC ("EP") examined several hundred third party arrangements that are similar in many respects to the Nortel RPS and the MRDA. This exhaustive search produced no evidence that vendor financing losses would at arm's length be borne by NNL (*i.e.*, solely borne by one party). No evidence was found that, as Dr. Cooper would contend, decision rights determine the allocation of customer financing losses. Further, the evidence that is available seems to indicate that when parties contract over such costs, they agree to share them.

Seventh, I find that a holistic and comprehensive application of the OECD Guidelines and the body of regulation governing transfer pricing points very clearly to the conclusion that vendor financing losses would be shared. They would not be borne entirely by NNL, as Dr. Cooper contends.

Finally, I note that, once again, the practical result of Dr. Cooper's approach is to reduce the relationships among the RPEs to principal-agent relationships, in which NNL is the principal and the other RPEs are agents that are indemnified from risks. Again, this is fundamentally inconsistent with Dr. Cooper's descriptions of the Nortel RPS – particularly in the Cooper Allocation Report.

### 4.    Estimated Future Non-GAAP Pension Costs

Dr. Felgran addresses non-GAAP pension costs, while Dr. Cooper is silent on this issue.

Under the Nortel RPS, GAAP pension costs were shared. Dr. Felgran's position is that: 1) NNUK's pension costs should have been estimated using an "economic method," and 2) the difference between the economic method's estimate of costs and costs per GAAP should be shared. That is, he asserts estimated future non-GAAP pension costs should be shared. Dr. Felgran does little to support his position, other than to say that "as an economist" he agrees that an "economic" measure of pension costs is more accurate than GAAP.

My main replies to Dr. Felgran can be summarized as follows.

First, the question is not whether an "economic" method for pension liability measurement is more or less accurate than other measures. Rather, the question is whether uncontrolled parties would share pension costs, and, if so, how they would compute these costs. Thus, once again, I ask "what would uncontrolled parties do?"

At my direction, EP examined several hundred third party arrangements that are similar in many respects to the Nortel RPS and the MRDA, and the results of this search indicate that uncontrolled parties limit the costs that are to be shared to those costs that are directly related to the intangible development area. In this regard, I note that only approximately 50 percent of the NNUK pension expense for the relevant period related to active NNUK employees. Logically, a large portion of the NNUK pension costs is unrelated to the development of the intangible assets being developed under the MRDA, and should be excluded altogether (and thus borne by NNUK in their entirety).

In addition, after defining which <u>types</u> of expenses are to be shared, the third party agreements specify how the costs are to be measured or quantified. The agreements I reviewed that are specific on the subject of accounting treatment note that the costs are to be measured using "GAAP" or "in a manner mutually agreed upon by the parties."[17] Thus it is clear that third parties either agree to GAAP directly, or agree to find another quantification. The parties <u>did</u> agree on the method of quantification.

Second, I note that Dr. Felgran's logic would, if applied consistently, imply that many other kinds of costs should be measured using some "economic" treatment rather than "accounting" or GAAP costs. For example, his logic might also extend to restructuring costs, which he also addresses in his report but for which he relies on GAAP in that case. This represents an inconsistency in Dr. Felgran's analysis.

Third, I also highlight the fact that "economic" measures of cost, rather than generally accepted measures (under generally accepted accounting principles), are inherently subjective and involve calculations of present value over a long time horizon. Uncontrolled parties would not agree to measure costs in this way because of the possibility of manipulation surrounding such measures.

Fourth, I apply the holistic and comprehensive regulatory framework to estimated non-GAAP pension costs. This analysis also arrives at the conclusion that GAAP costs, not "economic" costs, are the appropriate measure of pension costs in this case.

Finally, I point out that the estimated future non-GAAP pension costs proposed by Dr. Felgran are very similar economically to the stock based compensation costs at issue in the transfer pricing case *Xilinx, Inc., and Consolidated Subsidiaries v. Commissioner of Internal Revenue.*[18] Both are predicated on the equity value of the company and require a speculative valuation (typically a discounted expected future cash flow analysis) to determine their value. Indeed, Dr. Felgran refers to the notion of his "economic" pension costs as being equivalent to a "put option," stating at paragraph 47 of his report that "the pension scheme receives a 'put option' from the sponsoring employer in the event that the expected investment returns do not materialize. In other words, Dr. Felgran treats pension costs, a form of compensation, as economically analogous to an option, and thus a form of stock-based compensation.  As demonstrated in *Xilinx*, unrelated parties would not share these type of costs, being difficult to estimate, unpredictable and potentially large in amount.

## 5.      Returns to Extraterritorial Activities 2001-2005

Dr. Cooper addresses returns to extraterritorial activities during the 2001-2005 period, while Dr. Felgran is silent on this issue.

---

[17] Even those third party agreements that are silent regarding how costs are to be measured are no doubt implicitly assuming GAAP, since by definition these are the <u>generally accepted</u> accounting principles, and thus would be presumed. I found no agreements that specified using "economic" or any other non-GAAP treatment of pension costs.
[18] See 125 TR.C. 37 (2005); affirmed 598 F.3d 1191 (9th Cir. 2010) ("*Xilinx*").

Dr. Cooper's main contentions are as follows: first, if costs related to extraterritorial activities were given a return during the 2006-2008 period, then they should have as well during the 2001-2005 period; second, "contemporaneous" third party transfer pricing studies support this contention that 2001-2005 extraterritorial costs should garner a return.

My replies to Dr. Cooper are outlined below.

First, as discussed earlier, Dr. Cooper assumes that the RONA utilized by Nortel during the 2001-2005 period did not properly reward all of the routine activities of the RPEs during that period. He assumes that a market return to a company's capital base is not a sufficient amount of profit, and that some sort of additional return for "functions" is required. This assertion, though, is completely unsupportable as a matter of economic theory. As noted earlier, profit is always the return to <u>capital</u>. A market return to a company's capital base is, by definition, a market (or arm's length) level of profit for that company. This means that Dr. Cooper's additional return to extraterritorial costs is a <u>double count</u> of the routine profit associated with extraterritorial activities.

Second, the "contemporaneous" studies cited by Dr. Cooper are, in fact, not contemporaneous. Nor do these studies contend that extraterritorial costs were in any way unremunerated during the 2001-2005 period.

Third, as I noted above, I show that Dr. Cooper's routine returns are demonstrably implausible. In some years, Dr. Cooper's approach would have NNUK earning routine operating margins that exceed 20 percent of sales during the 2001-2005 period. This is an incredible level of routine profit – much higher than any estimate of routine returns to distribution and similar types of activities that I have seen during my career, and higher than the highest margin ever earned by Nortel.  It is all the more remarkable in light of the fact that Nortel, on the whole, was generally earning negative operating margins during the 2001-2005 period.

Fourth, I note that Dr. Cooper's estimation of the RPEs' extraterritorial costs is unreliable. Dr. Cooper simply estimates these costs using cost ratios from companies that he deems to be comparable. In the case of excess sales and marketing and excess general and administrative ("G&A") expenses, he assumes that <u>any</u> cost in excess of a ratio taken from his comparables is extraterritorial. In the case of global operating costs ("GOP"), he assumes that any entity with GOP costs in excess of the weighted average for Nortel is incurring extraterritorial GOP.

In all three of these cases, uncontrolled parties, and in my experience tax authorities, would refuse to accept this sort of estimate. A key threshold outlined in the OECD Guidelines, and in most countries' transfer pricing regulations covering services transactions, is that costs charged by one controlled entity to another (whether with markup or not) must "pass the benefit test." That is, one must demonstrate that the costs that one deems to constitute a "service" actually do constitute a service. What is true of the OECD Guidelines, and tax authorities, is also true of uncontrolled parties. Uncontrolled parties would require demonstration that costs contained in an invoice for "services" actually constitute "services." Dr. Cooper's analysis assumes that these costs are beneficial, rather than providing a demonstration of benefit.

6.     **Headquarters and Stewardship Activities**

Dr. Cooper addresses headquarters and stewardship activities. Dr. Felgran is silent on this issue.

Dr. Cooper's main contentions are as follows: first, he simply asserts that 50 percent of his estimate of NNL's headquarter costs represents "excess," or inefficiency; second, he contends that stewardship costs should have been borne by NNL during the 2001-2005 period; finally, he applies the logic underlying his estimate of stewardship costs for 2001-2005 to the 2006-2008 period.

My replies to Dr. Cooper are as follows.

First, Dr. Cooper makes no effort to perform a functional analysis or prove that the headquarter services would fail the benefit test.

Second, Dr. Cooper's quantification of the "excess headquarter costs" lacks even the level of rigor that he employed in estimating extraterritorial services costs. While the transfer pricing services regulations require a specific and reliable quantification of the costs of providing a service, Dr. Cooper's method fails on both counts, as it relies on two data points seven years apart and two arbitrary, sweeping assumptions. Specifically, he takes the total headquarter costs in 2001 and again in 2008 ($1.4 billion and $800 million, respectively), assumes a linear trend between the two, takes NNL's portion (based on the ratio of NNL's G&A headcount to global G&A headcount in 2007), and then simply asserts that half of NNL's amount is "excess" (again, with no analysis to support such an assumption). In this case, Dr. Cooper's analysis assumes that these costs are <u>not</u> beneficial, rather than providing a demonstration of a lack of benefit, and the quantification he provides is highly unreliable.[19]

Regarding stewardship, Dr. Cooper argues that NNL should have borne stewardship during 2001-2005. I agreed with this finding in my first report, and while I estimated those costs in a slightly different manner, I arrived at estimates similar to his. However, Dr. Cooper mistakenly goes another step further in his model and transfers the stewardship costs to NNL during 2006-2008 as well (adding them to NNL's costs and subtracting them from the EMEA RPEs'). This is an obvious mistake, as NNL already bore those costs during 2006-2008, and thus Dr. Cooper's calculation contains a double count.

7.     **Intercompany Loans**

Dr. Felgran addresses interest free intercompany loan balances. Dr. Cooper is silent on this issue.

Dr. Felgran's main contentions are as follows: Dr. Felgran notes that some of the intercompany transfer pricing adjustments calculated by Nortel during the 2001-2008 period (*e.g.,* a payment

---

[19] Cooper TP Report at page 145.

from NNL to NNUK in order to achieve a targeted operating profit under the Nortel RPS) were recorded via an intercompany receivable, but not settled in cash over an extended period of time, essentially creating an interest-free loan between the parties. Dr. Felgran's calculation of the interest is £20 million per year from 2003-2008, and he cites an outstanding balance of $170 million at the end of 2008.

In the absence of any other benefits accruing to NNUK as consideration for its lending activity, on an arm's length basis, an intercompany loan should carry some interest (as with any uncontrolled indebtedness). However, it is not clear that, in this case, a receivable should have existed in the first place. As I calculated in the analysis in my first report, NNUK was overcompensated during 2001-2005 under Nortel's RPS by approximately $231 million.

Further, Dr. Felgran's calculation of the interest is overstated. It is not clear why, but Dr. Felgran appears to rely on a single year's calculation of the interest (2007) and then assumes the same amount would apply across the entire 2003-2008 period. This is despite the fact that the information is available to calculate interest across the entire period using the average receivable balance by month and using Dr. Felgran's own parameters (even before addressing the question as to whether the "loan" is real and should be interest bearing) would be only £12 million per year.

Finally, Dr. Felgran ignores the fact that most of the third party debt held by Nortel was held by NNL and NNI. During a time when the company was struggling with negative cash flows, the interest costs of this external capital obligation was principally borne by NNL, but assisted all of the RPEs in the maintenance of their operations. However, Dr. Felgran does not account for this in his argument. That is, he does not account for this real economic cost, borne by NNL, and any corresponding benefits obtained by other RPEs (including NNUK).

## 8.    Relationship between Legal Agreement and Economic Substance

All three of the other TP Experts make various assertions to the effect that economic substance, rather than legal form, is the primary consideration when evaluating and pricing an intercompany relationship. Unfortunately, the other TP Experts are unclear, incorrect, or both in their descriptions of the relationship between legal arrangement (form) and economic substance. One must be very precise as to the relationship between the two.

Substance operates only as a <u>binding constraint</u> on form. That is, the legal form of an arrangement and the economic substance must conform, and the economic substance must not give rise to an arrangement that is economically irrational. Economic substance is in this sense a threshold test that any intercompany arrangement must meet.

<u>However</u>, once this threshold is met <u>the legal arrangement ("form") prevails</u>. In this case, the <u>role of the transfer pricing economist is to price the transaction as structured by the parties</u>.

The OECD Guidelines are clear on this point. For example, the OECD Guidelines state the following.[20,21]

- 1.64 A tax administration's examination of a controlled transaction ordinarily <u>should be based on the transaction actually undertaken by the associated enterprises as it has been structured by them</u>, using the methods applied by the taxpayer insofar as these are consistent with the methods described in Chapter II (including the residual profit split method). <u>In other than exceptional cases, the tax administration should not disregard the actual transactions or substitute other transactions for them. Restructuring of legitimate business transactions would be a wholly arbitrary exercise the inequity of which could be compounded by double taxation</u> created where the other tax administration does not share the same views as to how the transaction should be structured.

- 1.65 However, <u>there are two particular circumstances in which it may, exceptionally, be both appropriate and legitimate for a tax administration to consider disregarding the structure adopted by a taxpayer in entering into a controlled transaction. The first circumstance arises where the economic substance of a transaction differs from its form. … The second circumstance arises where, while the form and substance of the transaction are the same, the arrangements made in relation to the transaction, viewed in their totality, differ from those which would have been adopted by independent enterprises behaving in a commercially rational manner</u> and the actual structure practically impedes the tax administration from determining an appropriate transfer price.

- 1.67 <u>Associated enterprises are able to make a much greater variety of contracts and arrangements than can independent enterprises because the normal conflict of interest which would exist between independent parties is often absent</u>. Associated enterprises may and frequently do conclude arrangements of a specific nature that are not or are very rarely encountered between independent parties. This may be done for various economic, legal, or fiscal reasons dependent on the circumstances in a particular case. <u>Moreover, contracts within an MNE could be quite easily altered, suspended, extended, or terminated according to the overall strategies of the MNE as a whole, and such alterations may even be made retroactively</u>. In such instances tax administrations would have to determine what the underlying reality is behind a contractual arrangement in applying the arm's length principle.

In short, the OECD Guidelines recognize that a very wide variety of possible controlled arrangements exist, and that these should be respected but for extreme circumstances. At least two of the other TP Experts have merely made sweeping assertions to the effect that "substance" is more important than form, without specifying the proper relationship between substance and form, and the implications of this relationship for the role of the transfer pricing

---

[20] 2010 OECD Guidelines, Chapter 1, ¶ 64, 65, and 67.
[21] Parenthetical and underlined emphases added.

expert. This then gives them great latitude to commit the error, in the words of the OECD Guidelines, of "disregarding the structure adopted by a taxpayer."

Indeed, both Dr. Cooper and Dr. Eden treat the Nortel RPS and the terms of the MRDA as somehow illegitimate, but provide no analysis, let alone demonstration, that the arrangement was economically irrational or inconsistent with the substance of the parties. For example, in his Allocation Report Dr. Cooper asserts, but does not demonstrate, that uncontrolled parties would require residual interests in the NN Technology and Nortel LOB Sales, given that they invested in R&D. My first report emphasized two facts. First, the test for the economic rationality of an investment such as R&D is the net present value ("NPV") criterion – specifically, were the R&D investments and corresponding make-sell rights that stemmed from those investments net present value zero or positive at the time they were made?  Second, the MRDA licensees were in all likelihood *ex ante* better off investing in R&D (the cost of the NN Technology) than paying an arm's length royalty to NNL (the value of the NN Technology).

I also note that, in light of the other TP Experts' views on substance *vis a vis* the legal arrangement, they should have taken (as I do in this report) an empirical approach to the question of "how the Nortel RPS should have operated." This, too, is clear from the OECD Guidelines, which state at 1.68 that "tax administrations may find it useful to refer to alternatively structured transactions between independent enterprises to determine whether the controlled transaction as structured satisfies the arm's length principle."

9.      *Ex Post* versus *Ex Ante*

Drs. Felgran and Cooper frequently make judgments about how to allocate a loss known with hindsight (*i.e.*, the realization of a risk such as vendor financing-related risk, or restructuring risk), rather than asking how parties would have contracted, *ex ante*, around the risk that gave rise to the loss. For example, regarding restructuring costs, Dr. Cooper says that he "would expect an independent third party to seek 100% reimbursement of these costs." Similarly, with regard to vendor financing losses, Dr. Cooper asserts that "I would not expect an independent third party to simply share in the associated losses." Dr. Felgran appears to make similar assertions. For example, in making his argument that pension costs should be measured on an "economic," rather than "ongoing" basis, Dr. Felgran is applying facts that came to light after the Nortel RPS was agreed upon. That is, he uses Nortel's financial condition to assert that the parties would have (apparently with perfect foresight) negotiated for the "economic" method of measuring pension costs.

This *ex post* reasoning is entirely inconsistent with the OECD Guidelines. The OECD Guidelines contain an entire chapter – Chapter 9 – devoted to business restructurings. Central to this Chapter, and to the topic of business restructurings generally, is the question of allocation of risk *ex ante*, versus allocation of the realization of risk (*i.e.*, costs) *ex post*.

The OECD Guidelines are clear that losses associated with business distress and business restructuring are to be examined as risks that should have been allocated *ex ante*, and that the starting point for this analysis is the legal arrangement between the parties. For example, at Chapter 9.10, the OECD Guidelines state that "[r]isks are of critical importance in the context of

business restructurings. An examination of the allocation of risks between associated enterprises is an essential part of the functional analysis." Similarly, at Chapter 9.11, they state that "the examination of risks in an Article 9 context starts from an examination of the contractual terms between the parties, as those generally define how risks are to be divided between the parties. Contractual arrangements are the starting point for determining which party to a transaction bears the risk associated with it."

Nowhere do I find in my reading of the OECD Guidelines a suggestion that losses (the realization of risk) should be allocated by asking the question "*ex post*, would a controlled party be willing to accept an unforeseen cost," or "would one of the controlled parties have sought reimbursement?" Rather, the question is how would the RPEs have contracted, *ex ante*, around the realized risk had they recognized and negotiated the issue upfront.

## 10.    The Nature of the Nortel RPS – What Exactly is Being Shared

The other TP Experts characterize the Nortel RPS as a full sharing in the risks and rewards of Nortel's entire business: in other words, no rights were retained solely by NNL

This is simply an incorrect position, for numerous reasons, some of which are summarized here.

- The MRDA that gives rise to the parties' legal arrangement (and that gives legal form to the Nortel RPS) grants to the non-NNL RPEs a license of make-sell rights.

- The MRDA provides for NNL to retain legal ownership of IP (as do nearly all uncontrolled licenses of technology).

- The MRDA centers on the sharing of the costs, and benefits, of NN Technology. This technology is very clearly conceived of as a specific asset, finite in duration, as evidenced by Article 11, the calculations described in Schedule A, and the behavior of the parties.

- The MRDA specifically states that the agreement is not a joint venture or partnership.

Some of the other TP Experts rely on language in Schedule A which states that "the R&D Allocation [which is the residual profit allocation] provided to Participants under the RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk."

The statement referenced above in no way conflicts with the fact that the MRDA created a license, with the retention of residual interests by NNL. Licensees in uncontrolled licensing arrangements also bear the "full entrepreneurial risks" of the businesses in which they exploit licensed intangibles. Moreover, mathematically, the Nortel RPS, codified in the MRDA, very clearly gave each RPE an interest in residual profit over the finite economic life of the technology investments made by the RPEs. Indeed, as I noted in my first report, the finite duration of the RPEs' interests can be seen both in the parties' behavior with respect to eroding

CSA-related profit interests, and with respect to the erosion of profit interests after one party exits the Nortel RPS (per Article 11, MRDA). In both of these cases, the parties recognized that earlier investments (CSA investments pre-MRDA, or CSA or MRDA investments pre-exit) erode to zero over a finite period of time. These are not behaviors, nor are the Nortel RPS, the MRDA or CSAs, consistent with the accrual of residual or equity interests in the RPE Licensees.

In addition, the MRDA also carved out numerous flows of income and cost that did not pertain directly to the NN Technology. Routine returns are an obvious example of this. However, other examples exist as well, such as gain/loss on sales of businesses, restructuring charges, and stewardship costs. In other words, had the parties fully shared the business (as a going concern), all of these expense and income items would have been shared.

The other TP Experts seem intent on characterizing the relationships among the RPEs as akin to a federation, or a joint venture. The impression they give is of several fully independent and autonomous parties that suddenly realized that it would be more efficient if they all formed a joint venture and shared costs, with NNL holding legal title, as Dr. Cooper asserts, for "administrative convenience only."

This characterization does not comport with the reality, which is that a parent entity (NNL) that traces its roots to 1895, and that likely performed more of the R&D than any other entity over the course of Nortel's history,[22] chose in 2001 to continue to license make-sell rights to affiliates in return for their bearing R&D investment rather than in return for a royalty. I note that Nortel's CSAs, tracing back at least as early as 1983, also involve licenses of make-sell rights in return for bearing R&D rather than in return for a royalty.

<u>Crucially, the fact that NNL and the Licensee RPEs chose the provision of R&D (instead of a royalty) as consideration for the licensed make-sell rights in no way implies that the MRDA created an equity interest (<i>i.e.</i>, something beyond a license) for the RPEs.</u> In this regard, the other TP Experts seem to commit the fallacy of association – assuming that spending investment dollars in R&D meant full ownership – when in fact investment was treated by the MRDA, and the CSAs that preceded it, as a substitute for a royalty. Royalties, after all, also fund investments in R&D. Had the MRDA called for a royalty as the form of consideration (which would have in all likelihood been higher than their R&D burdens, and would have been used by NNL to fund R&D), I strongly doubt that the other TP Experts would be asserting that the MRDA was a joint venture in which residual interests accrued to the other parties.

Finally, I return to the OECD Guidelines. These are clear, as I noted earlier, that "[a]ssociated enterprises are able to make a much greater variety of contracts and arrangements than can independent enterprises because the normal conflict of interest which would exist between independent parties is often absent. Associated enterprises may and frequently do conclude arrangements of a specific nature that are not or are very rarely encountered between independent parties. This may be done for various economic, legal, or fiscal reasons dependent on the circumstances in a particular case."

---

[22] For example during the 2001-2008 period, NNL's R&D investment was $7.4 billion whereas NNI's was $6.3 billion.

Dr. Eden effectively makes the same point when she states that NNL "could have acquired the IP created by the other IEs and then, in turn, licensed back and charged royalties to the IEs for the use of that IP in each jurisdiction." She later says that "[i]nstead … the IEs had economic ownership of the IP in their respective jurisdictions." I note that she appears to imply that this economic ownership entails residual interests.

Dr. Eden does not discuss, however, the immediate implication of her recognition of the flexibility that NNL and the RPEs had to structure the intercompany arrangements: namely, if an arrangement were possible in which NNL owned all of the company's technology (without granting any license interests), and an arrangement were possible in which all interests (including residual interests) were shared, <u>then it was possible for the parties to legitimately negotiate anything in between – which is what they did when they agreed to the MRDA's (and the CSAs' that preceded it) make-sell license arrangement</u>.

## 11.    The Relevance of the Arm's Length Principle to Asset Valuation and Allocation

Dr. Eden asserts that the arm's length principle is not appropriate for use in an allocation or asset valuation context. She states that "transfer pricing is a highly regulated activity," and "if the goal of allocation is to determine the value of the assets sold or relinquished by each selling debtor so that value can be distributed to each debtor's own creditors, then resorting to the firm's transfer pricing arrangements would neither be instructive nor appropriate. These arrangements address entirely different policy considerations."

My mandate does not extend to the allocation issues *per se*, but my understanding is that Dr. Eden may not be accurately appreciating the allocation position of the Canadian debtors. However, I do note that there are, in my view, two problems with Dr. Eden's above statements. First, they represent a distraction from a more relevant question. That more relevant question is "in what way does the arm's length standard relate to the fair market value standard?" Or, similarly, "how do arm's length prices, or arm's length remuneration in a profit-based transfer pricing framework, relate to the economic positions of the entities involved in the controlled transactions at issue?" I discuss later in this report the relationship between these concepts.

Second, her statement that "if the goal of allocation is to determine the value of the assets sold or relinquished by each selling debtor so that value can be distributed to each debtor's own creditors, then resorting to the firm's transfer pricing arrangements would neither be instructive nor appropriate," is unsupported. It is also incorrect.

Dr. Eden, to my knowledge, is not a valuator. In my experience, which includes a large amount of valuation for tax and financial reporting purposes, valuations of subsidiaries, subsidiary chains, and business units, performed for <u>both tax and financial reporting purposes</u>, generally respect the company's transfer pricing structure. In other words, intercompany arrangements have real effect, including for shareholders in cases in which minority interests are held in subsidiaries, or in cases in which other interests such as royalty interests in a subsidiary are affected by a company's transfer pricing.

**12.     The Reliability of the Residual Profit Split Method**

Dr. Eden also asserts that the residual profit split is a method of last resort. She states that profit-based methods generally, and the residual profit split method in particular, are less desirable and reliable than transactional methods (*e.g.*, "the profit split method is considered to be particularly unreliable"). She asserts that the profit split method is "applied only in cases where other methods cannot be applied reliably or cannot be applied at all."

Her objective in making these assertions is apparently to lead the reader to believe, by implication, that the Nortel RPS is somehow unreliable, and/or has no relationship to asset valuation. As with the assertions made by the other TP Experts regarding substance and legal arrangements (form), the question of the relative reliability of the residual profit split must be addressed precisely, rather than by way of broad generalizations.

One might view Dr. Eden's broad statements pertaining to the residual profit split method as a red herring. The question is not whether, in some abstract and general way, we prefer uncontrolled transactional price evidence when pricing controlled transactions – of course, an observed uncontrolled price for the same property as that being conveyed in a controlled transaction is preferable to almost any other kind of price or value evidence. Rather, the question is "in Nortel's case, given the facts on the ground, what is the most reliable method for producing an arm's length allocation of operating profit?"

On this question, Dr. Eden unfortunately demurs. In contrast to my report, which evaluates the alternative methods for pricing Nortel's intercompany arrangement and concludes that the residual profit split method is in fact the most reliable method for assigning an arm's length level of profit for each of the RPEs, Dr. Eden makes no attempt to evaluate the residual profit split method relative to other methods. She does not compare its assumptions, nor the data upon which it relies, to those of other methods.

Further, Dr. Eden's statement that the profit split method is "applied only in cases where other methods cannot be applied reliably or cannot be applied at all" applies equally to the CUT method – or for that matter any method. The method (or methods) chosen to price an intercompany relationship is <u>always</u> chosen because "other methods cannot be applied reliably or cannot be applied at all."

Dr. Eden offers two reasons for her objection to the residual profit split method. However, in both cases, these are offered in a general and absolute way, rather than in light of Nortel's actual facts or as part of a comparison of the <u>relative</u> merits of the alternative methods, given Nortel's facts.

First, Dr. Eden says that the residual profit split method relies on internally generated data (in Nortel's case, R&D investment shares). She asserts that these are subject to manipulation, causing tax authorities to view the method as a "method of last resort to be used when other methods fail."

In reply, I note that the Nortel RPS was developed by Nortel <u>at the request of the US and Canadian tax authorities.</u> ████████████████████████████████████████████████████████████████████ Finally, as Dr. Felgran points out, the OECD Guidelines and US regulations clearly recognize that the residual profit split method can be the <u>most reliable</u> of the available methods in cases where intangible assets are developed by more than one party.

Second, Dr. Eden states that the residual profit split method relies on a residual profit "allocation key" (capitalized R&D cost) that "is not based on valuing the intangible assets created by MNE entities through the R&D alliance – a process that would value the future income stream generated by those assets." Later in the same paragraph she states that "R&D spending does not necessarily bear any relation to the value of each entity's intangible assets."

In reply, I note that in the Nortel RPS, the RPEs' spending does in fact very clearly bear a relation to the value of each Licensee RPEs' economic interest, which is the license make-sell rights and the right to share in the profits therefrom.

The Nortel RPS maps previous R&D investments to their returns in real time, but does so in the aggregate and on the average. In other words, the arithmetic of the Nortel RPS treats all R&D as having the same economic life, and in every year all of the R&D that is in service is treated as being equally productive. Thus, it is true, as Dr. Eden points out, that the residual profit split method uses the controlled parties' relative R&D investment shares to allocate residual profit, and in this way it does not attempt to map each party's investments in R&D to the specific cash flows generated by that R&D. However, this is because <u>it is not possible</u> to do what Dr. Eden is suggesting should be done. It is not possible now, nor was it when Nortel was implementing the Nortel RPS, to determine the specific cash flows associated with each entity's R&D investments, either *ex ante* or *ex post*.

Indeed, for the same reasons, most valuations of intangible asset portfolios performed for financial reporting purposes (in particular, for purposes of a purchase price allocation) do not attempt to map precisely from each R&D investment to the specific cash flows generated by that investment. Rather, these valuations generally assume that previously sunk vintages of R&D all have the same economic life and the same claim over forecasted future cash flows. The only substantive difference, in this regard, between the residual profit split method and a typical technology valuation performed as part of, say, a purchase price allocation is that the residual profit split method operates to allocate residual profit to previously sunk vintages of R&D in real time (in each period), and a valuation performed for purchase price allocation purposes allocates forecast residual profit to the vintages of previously sunk R&D, *ex ante*.

## 13.    Nortel's RPS was Tax Avoidance

Dr. Eden also makes the assertion that Nortel's RPS was motivated primarily by the desire on Nortel's part to avoid taxes. She attempts to support this in several ways, all of which are, in my respectful view, unsupportable.

First, Dr. Eden points out that for Nortel Canada was a low tax jurisdiction (she describes Canada as a "tax haven," which it clearly was not in my view). I note that, in fact, Nortel's low effective tax rate in Canada was primarily the result of its high R&D investment levels, and Canada's R&D tax credit.

Dr. Eden then argues that NNL obtained billions of dollars of cash from NNI by way of the Nortel RPS. She states that "through its transfer pricing arrangements, Nortel shifted billions of dollars of reported revenue from NNI to NNL."

Dr. Eden points to the $2 billion income adjustment from NNL to NNI as evidence of the non-arm's length nature of the Nortel RPS.

Finally, Dr. Eden offers arguments that imply that the R&D CSA which preceded the Nortel RPS might be thought of as a reasonable benchmark against which to compare the Nortel RPS. In this regard, she asserts that the transition to the Nortel RPS from the CSA was tax motivated.

My replies can be summarized as follows.

First, as I noted earlier, the residual profit split method was adopted at the request of the IRS and CRA, and agreed upon as the best method by the IRS.

Second, very importantly, the Nortel RPS represents a transition from a structure in which parties' claims to residual profit were based upon the relative sizes of the national market in which they operated to one in which their claims were based upon the relative size of their investments. In my view, this constitutes a movement toward much more natural and arm's length economic positions for the RPEs. If one agrees that R&D is the primary cause of residual profit for Nortel, then why would one agree to split residual profit based upon market size if relative market size and relative R&D investments differed (which they did very substantially)? One would not; rather one would split profit based upon relative capital investments – investments in R&D.

Dr. Eden's statement that the Nortel RPS "shifted billions of dollars of reported revenue from NNI to NNL," is, respectfully, extremely misleading. The Nortel RPS shifted both revenue and costs (Dr. Eden fails to mention the shifting of costs to NNL which were much greater than the revenue shifted.) The net effect of the Nortel RPS was to migrate heavy losses to NNL. Had Nortel continued forward with the CSA, NNI would have borne much higher losses than it did under the Nortel RPS.

Finally, regarding the $2 billion income adjustment agreed to by the IRS and CRA, I am in agreement that an adjustment was needed. As I showed in my first report, this adjustment was quite possibly well in excess of $1 billion. However, in that report I distinguish (as Dr. Eden does not) among transfer pricing method selection, transfer pricing method design, and transfer pricing quantification. There is little question that the residual profit split method was the most reliable method, and the Nortel RPS was soundly designed. The tax authorities simply responded to the same issue that I address in my first report – that Nortel's RPS was not correctly quantified in certain respects.

**14.    'Presumptive' Allocation of Sales Proceeds and Allocation of the Alcatel Transaction**

The Cooper Allocation Report makes two assertions regarding the relevance of the RPEs R&D stocks for the allocation of Nortel's line of business sales ("LOB Sales") and residual IP sale ("Residual IP Sale").

First, Dr. Cooper asserts that "[w]hen the assets responsible for driving the residual profits are sold, according to transfer pricing and arm's length principles, the sales proceeds should <u>presumptively</u> be allocated on the same basis that annual trading profits and losses from those assets were to have been allocated" [emphasis added]. He goes on to say that "[t]he RPSM applies to both current and future profits generated on the IP, and a sale of the underlying IP is nothing more than the monetization of those future profits. Since the RPSM anticipates that the future profits from the specified assets would be allocated the same way as the current profits, then the same reasoning (and resultant allocation) should <u>presumptively</u> apply to the sales proceeds as well" [emphasis added].

Second, Dr. Cooper asserts that the way in which the proceeds of the Alcatel transaction (the sale of Universal Mobile Telecommunications System ("UMTS") assets to Alcatel) were allocated among the RPEs – *i.e.*, the course of conduct of the parties – is evidence that the RPEs viewed themselves as joint owners of the Nortel business. He notes that "following the pre-insolvency asset sale of Nortel's [UMTS] radio access business to Alcatel in December 2006, Nortel divided the proceeds from the divestiture of the IP assets according the [*sic.*] entrepreneurs relative R&D contributions."

It is important to recognize that Dr. Cooper's first assertion pertains to both Nortel's LOB Sales and its Residual IP Sale.  Correspondingly, his second assertion related only to Nortel's LOB Sales.

As with the issue of substance and legal arrangements (form), the question of what the RPEs were sharing under the Nortel RPS, and many other issues touched upon by the other TP Experts, the question of what, exactly, the Nortel RPS implies for asset allocation must be addressed with precision. It is important to understand what implications for Nortel's LOB Sales and Residual IP Sale flow logically from the Nortel RPS, and what implications do not.

Regarding Dr. Cooper's first assertion, his statements are imprecise and misleading. For example, his statement that "[w]hen the assets responsible for driving the residual profits are sold, according to transfer pricing and arm's length principles, the sales proceeds should <u>presumptively</u> be allocated on the same basis that annual trading profits and losses from those assets were to have been allocated" [emphasis added], even assuming that an appropriate methodology were employed, could only potentially apply with respect to the proceeds associated with the IP in the LOB Sales. Even then, it could only apply to the portion pertaining to the value of the technology IP <u>in existence at the time of the sale</u> and expected to be used by the buyer in making and selling products that embody that IP. Any other IP related proceeds from the LOB Sales (*e.g.*, goodwill, being the net present value of future investments) – represent proceeds from sales of assets in which the RPEs had no license (or other) interests.

With respect to the Residual IP Sale, any proceeds from the sale to the Rockstar Consortium were proceeds from the sales of patents for use in a sphere of activity other than that of the lines of businesses sold. These rights – legal ownership rights identical to those obtained by the Rockstar Consortium – were retained by NNL and did not inhere in the RPEs in the first place. Therefore these proceeds could not be allocated on the basis of R&D stocks. There simply would be no "presumptive" allocation, as Dr. Cooper asserts.

Finally, with respect to Dr. Cooper's second assertion, in fact a closer look at the UMTS sale reveals that its treatment by the RPEs was <u>inconsistent with his views of what the R&D stocks, and the Nortel RPS, imply for the allocation of proceeds from the entirety of the intangibles in respect of the Nortel's LOB Sales</u>. Specifically, the UMTS sale was not a sale of a radio access "business," as Dr. Cooper contends. Rather, the UMTS transaction was a sale of specific assets. It is true that a portion of the UMTS sale proceeds was allocated *pro-rata* according to the parties' R&D stock proportions. However, an examination of the purchase/sale price allocation pertaining to the UMTS sale indicates that the transaction involved essentially zero goodwill (*i.e.*, the net present value of future investments). As a result, what was essentially allocated *pro rata* were proceeds related to identifiable existing intangibles corresponding to make-sell rights. These were in fact what the Licensee RPEs had an economic interest in under the MRDA.

## E.    My Engagement

The particulars of my engagement in the preparation of this report are identical to the terms set out in my first report. My qualifications are set out in my first report.[23]

---

[23] This report was prepared solely for the purpose stated herein and should not be relied on for any other purposes. This report is not to be provided to any other party other than as required in the proceedings referenced herein without our prior written consent. In no event, regardless of whether consent has been provided, shall we have any responsibility to any third party to whom or to which this report is disclosed or otherwise made available.

## II.    Examining the Overall Quantitative Implications of the Other TP Experts' Reports

### A.    Purpose

The purpose of this section is to provide the Court with a calculation of the entity-level operating income implications of the other TP Experts' positions. There are two reasons why this is important. First, the implications of the other TP Experts' positions for the relative profit levels of RPEs are not immediately clear from their reports. Second, simple graphical visualizations of the RPE's economic positions (for example, bar charts showing the relative operating profit levels of the RPEs) provide an important means of evaluating the reasonableness of the other TP Experts' positions in light of their prose descriptions of the relationships among the parties. As an example, Dr. Cooper clearly asserts in the Cooper Allocation Report that the RPEs are joint entrepreneurs, sharing fully in the risks and rewards of the Nortel business. However, the profit allocations resulting from his positions have NNUK earning positive operating profit while the other RPEs earn significant losses.[24] In short, my purpose in this section is to quantify the positions of each of the other TP Experts on an overall basis, in order to evaluate the reasonableness of these in light of the relationship inherent among the RPEs.[25]

### B.    Dr. Cooper

The Cooper TP Report focuses on the Nortel RPS, while the Cooper Allocation Report focuses on the implications of the Nortel RPS for the allocation of the proceeds of Nortel's LOB Sales and Residual IP Sale.

#### 1.    Cooper Transfer Pricing Report

As described in Exhibit I-1, Dr. Cooper's positions in the Cooper TP Report are as follows:

- The EMEA RPEs (NNUK, NNSA, and NN Ireland) should receive higher routine returns than those accorded to them under the Nortel RPS. I note that he does not apply the same methodology to the other, non-EMEA, RPEs, despite the fact that all RPEs earned routine returns using the same method under the Nortel RPS.[26]

- NNL should bear stewardship costs during 2001-2008.[27]

---

[24] I would say that Dr. Cooper gives more than 100 percent of the profit to NNUK, but since there are only losses in the system, he actually manages to create profits where there are none – and then assign them to NNUK.
[25] The detailed calculations in supports of the graphs displayed throughout this section are available at Appendix A.
[26] A consistent application of his routine return methodology to all RPEs would increase the profits of the non-EMEA RPEs and increase residual losses in which the EMEA RPEs would share.
[27] I agree with Dr. Cooper on this point, though in his discussion and calculation of excess headquarter costs, Dr. Cooper "double counts" the stewardship costs of NNL during 2006-2008 when NNL already bore all of these costs.

- NNL should bear "excess headquarter" costs, which he asserts are half of NNL's headquarter costs.

- NNL should bear all restructuring costs borne by the EMEA RPEs.

- NNL should bear all vendor financing losses incurred by the EMEA RPEs.

Before calculating the combined effect of Dr. Cooper's positions I should point out that Dr. Cooper's analysis contains numerous logical and mathematical errors. It is important to note that nearly all of these errors work to the favor of NNUK. These errors, and their quantitative implications, are described below.

- Dr. Cooper includes vendor financing losses as part of NNUK's SG&A expenses, and thus these "expenses" factor into his calculation of extraterritorial services, which then receive a markup in his calculation of additional routine returns due to extraterritorial services. (This particular error is corrected in his summary, but results in an overstatement of the routine returns in the exhibit on page 127 of Dr. Cooper's report.)

- Dr. Cooper allocates stewardship costs to NNL during 2006-2008, despite the fact that NNL already bore all stewardship costs during those years. (This error is also corrected in his summary, but the stewardship costs are double counted in the row "NNL's estimated excess HSC costs" in the exhibit on page 147 of Dr. Cooper's report.)

- In his calculation of extraterritorial services for 2006 for NNI, Dr. Cooper adds Bay US's S&M expenses to NNI's G&A expenses when computing the total NNI G&A.[28]

- When calculating the restructuring costs that should be charged back to NNL, Dr. Cooper fails to charge back to NNL the 75 percent of the EMEA LREs' 2002 restructuring costs that were shared among the RPEs.

- In determining the higher operating margins that Dr. Cooper argues the EMEA RPEs should earn during the 2001-2005 period, Dr. Cooper begins with the same RONA methodology used by Nortel, and adds an additional return to it. Vendor financing constitutes 18.7 percent of the long term assets of NNUK during 2001-2005, and receives a 23.6 percent rate of return in his calculation. Thus, Dr. Cooper's analysis allows the EMEA RPEs to earn very high rates of return on vendor financing, but they bear none of the losses incurred related to vendor financing when this working capital turns out to be unproductive.

The Cooper TP Report is also inconsistent in its application of Dr. Cooper's conceptual positions.

---

[28] Bay US expenses should be added into NNI, but Bay US G&A should be added to NNI G&A, not Bay US S&M. I note that this is caused by a cell reference error in Excel, the Nortel RPS model also include this cell reference error. The impact is of this error *de minimis*.

First, Dr. Cooper's analysis is inconsistent across the RPEs. He takes the position that the EMEA RPEs should earn higher routine returns without acknowledging that this logic should apply to the other RPEs in the system. This is particularly notable because Dr. Cooper did not limit the modeling of his analysis to the EMEA RPEs. In his Excel models, which are derived from the original Nortel RPS models, he adds the calculation of the extraterritorial service expenses for all of the RPEs. However, he only sums up these returns for the EMEA RPEs, while at the same time he hard codes zeroes for the additional routine returns the non-EMEA RPEs should earn given his logic.  An explanation for this inconsistent treatment is not provided.  An example of this can be seen in the two exhibits on the next page.

Exhibit II-1 shows the original Nortel RPS Excel model for 2002,[29] for the tab called "Rona", which is the tab that calculates the residual profit pool and the share attributable to each entity. Other than aligning column widths to make the comparison easier, I have not modified this file from its original state.

Exhibit II-2 shows Dr. Cooper's modified calculation of the RPS for the same year, also from the tab called "Rona". Dr. Cooper built his model directly from the Nortel RPS model, so the formatting and layout of the table is the same. Inside the large blue rectangle, I have highlighted rows that were inserted by Dr. Cooper to calculate the routine returns for extraterritorial services. These are found between the line entitled "'Economic' operating (profit)/loss" and the line entitled "RONA."

In these rows, Dr. Cooper includes his calculation of the extraterritorial services in the lines entitled "Return on COG's"[30], "Return on S&M" and "Return on G&A." As can be seen, Dr. Cooper clearly includes calculations for the extraterritorial services across all RPEs. However, as seen in the blue ovals, only the EMEA RPEs are summed up, while for the non-EMEA RPEs (shown in the green ovals) the totals are hard coded as zero (seen in the red ovals).

---

[29] I use 2002 as an example because it is easier to see (there were more RPEs in 2001, so the table is larger) but the same calculations are found in all of Dr. Cooper's 2001-2005 files.
[30] Though Dr. Cooper labels this line "Return on COG's", the preceding tabs in his model are clear that these are the return to GOP costs – one of the three line items, along with S&M and G&A, that make up Dr. Cooper's definition of extraterritorial services.

## Exhibit II-1: Original Nortel RPS Model (2002)

| R&D CSA Participants | NNL Stat | Distributor's | Total NNL | NN Ireland | France | NN Brazil | NN UK | NN Aus | NNC | NNI | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Earnings - RONA | | | | 4th Restatement | | | | | | | |
| Accounting Income (inc)/loss | 781.5 | 27.3 | 808.8 | (7.3) | 290.9 | (39.2) | (87.9) | 0.9 | (8.9) | 42.3 | 999.6 |
| | | | | | | | | | | | |
| Addback Interim Adjustment (Quarterly TPA's) | 42.9 | 365.8 | 408.7 | (58.1) | (37.1) | - | 305.8 | 30.9 | 10.5 | (660.8) | - |
| Local GAAP Differences | (47.4) | 22.6 | (24.8) | | | 34.2 | | | (9.4) | | - |
| Add R&D CSA allocation less R&D performed | - | - | - | - | - | | - | - | - | - | - |
| | | | | | | | | | | | |
| "Accounting" operating profit | 777.0 | 415.7 | 1,192.7 | (65.3) | 253.8 | (5.0) | 217.9 | 31.8 | (7.7) | (618.5) | 999.6 |
| | | | | | | | | | | | |
| Less: R&D amortization | 976.3 | | 976.3 | 21.2 | 180.7 | 8.7 | 233.6 | 12.7 | 22.0 | 1,461.9 | 2,917.0 |
| Add: R&D expensed (performed) | (879.6) | | (879.6) | (14.8) | (245.6) | (2.5) | (183.8) | (10.5) | - | (869.9) | (2,206.7) |
| | | | | | | | | | | | |
| "Economic" operating (profit)/loss | 873.7 | 415.7 | 1,289.4 | (59.0) | 188.9 | 1.1 | 267.6 | 34.0 | 14.2 | (26.5) | 1,709.8 |
| | | | | | | | | | | | |
| RONA | (427.4) | | (427.4) | (6.0) | (42.4) | (4.8) | (124.6) | (0.8) | (7.1) | (101.6) | (714.8) |
| Distributor Return | | (0.3) | (0.3) | | | | | | | | (0.3) |

## Exhibit II-2: Dr. Cooper's RPS Calculations

| R&D CSA Participants | NNL Stat | Distributor's | Total NNL | NN Ireland | France | NN Brazil | NN UK | NN Aus | NNC | NNI | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Earnings - RONA | | | | | | | | | | | |
| 4th Restatement | | | | | | | | | | | |
| Accounting Income (inc)/loss | 494.7 | 27.3 | 522.0 | (7.3) | 290.9 | (39.2) | (105.2) | 0.9 | (8.9) | (121.4) | 531.8 |
| | | | | | | | | | | | |
| Addback Interim Adjustment (Quarterly TPA's) | 42.9 | 365.8 | 408.7 | (58.1) | (37.1) | - | 305.8 | 30.9 | 10.5 | (660.8) | - |
| Local GAAP Differences | (47.4) | 22.6 | (24.8) | | | 34.2 | | | (9.4) | | - |
| Add R&D CSA allocation less R&D performed | - | - | - | - | - | | - | - | - | - | - |
| | | | | | | | | | | | |
| "Accounting" operating profit | 490.2 | 415.7 | 905.9 | (65.3) | 253.8 | (5.0) | 200.7 | 31.8 | (7.7) | (782.3) | 531.8 |
| | | | | | | | | | | | |
| Less: R&D amortization | 976.3 | | 976.3 | 21.2 | 180.7 | 8.7 | 233.6 | 12.7 | 22.0 | 1,461.9 | 2,917.0 |
| Add: R&D expensed (performed) | (879.6) | | (879.6) | (14.8) | (245.6) | (2.5) | (183.8) | (10.5) | - | (869.9) | (2,206.7) |
| | | | | | | | | | | | |
| "Economic" operating (profit)/loss | 586.9 | 415.7 | 1,002.6 | (59.0) | 188.9 | 1.1 | 250.4 | 34.0 | 14.2 | (190.3) | 1,242.0 |
| | | | | | | | | | | | |
| Distributor Return | | (15.9) | (15.9) | | | | | | | | (15.9) |
| Return on COGs | (10.0) | | (10.0) | - | 0.4 | (0.1) | (9.0) | (0.7) | (0.2) | (13.7) | (33.9) |
| Return on S&M | (14.2) | | (14.2) | - | (5.6) | (1.2) | (8.4) | (3.9) | (1.9) | (58.8) | (94.2) |
| Return on G&A | | | | (0.2) | | (1.9) | (10.8) | (1.3) | (0.7) | (38.3) | (53.2) |
| Return on Sales | | | | - | - | | - | - | | | |
| Total | - | (15.9) | (15.9) | (0.2) | (6.0) | - | (28.2) | - | - | - | (50.2) |
| | | | | | | | | | | | |
| RONA | (427.4) | | (427.4) | (6.0) | (42.4) | (4.8) | (124.6) | (0.8) | (7.1) | (101.6) | (714.8) |
| Distributor Return | | (15.9) | (15.9) | | | | | | | | (15.9) |

Second, Dr. Cooper is inconsistent across time. He uses an operating margin, plus a return to extraterritorial costs, when estimating routine returns for 2006-2008. However, he accepts Nortel's RONA approach during 2001-2005, and yet adds an additional return for extraterritorial services to the RONA.

As I demonstrate below, this switching between approaches to routine returns happens to give NNUK the higher of the two possible routine returns during each of the periods in question. There are two reasons for this. First, the RONA approach incorporates a very high return to NNUK's vendor financing (23.6 percent). Second, because the RONA approach provides a return to the entire capital base of the RPEs, it by definition conveys a return to all of the routine functions of the company. Therefore, adding additional returns (*e.g.,* for "extraterritorial services") is by definition double counting profits.

Dr. Cooper's assertion that the RONA provided to the RPEs during 2001-2005 was insufficient, and did not cover extraterritorial activities, is unsupportable as a matter of theory and practice. Profit is never, properly speaking, a return to "functions." Functions performed are the result of both capital and labor inputs. Indeed, economic theory treats the firm as a "production function," involving labor inputs and capital inputs that are combined to produce an output of some kind. Revenue earned by the firm, less its purchases from other firms, is distributed by labor and capital markets to labor and capital inputs. Labor inputs are paid in the labor market, at an arm's length wage rate. Correspondingly, capital earns a return in the capital markets through operating profit. Thus, the notion that there should be an additional return for extraterritorial functions, atop the return to capital already provided by the Nortel RONA-based routine returns, is not properly speaking correct, and represents a double count.

Given the above, there are four possible ways to address Dr. Cooper's position, which are visualized in Exhibit II-3, below. First, I can take Dr. Cooper's calculations as stated, inclusive of any mathematical or logical errors. Second, I can correct the errors. Third, I can extend Dr. Cooper's logic to be consistent across all RPEs (and not only the EMEA RPEs). Fourth, I can extend Dr. Cooper's logic to be consistent across time.

**Exhibit II-3: Four Ways to Consider Dr. Cooper's Position**



First, I examine his position "as filed," inclusive of any errors. By definition, this represents Dr. Cooper's unfiltered view of how the parties should have shared costs and profits during 2001-2008. A simple graph of how Dr. Cooper believes the parties would have split the profits at arm's length is instructive.

**Exhibit II-4: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**



The results shown in Exhibit II-4 are striking. Despite showing the RPEs losing a combined $10.6 billion during the 2001-2008 period, and yet believing that the RPEs are joint entrepreneurs sharing fully in the risks and rewards of the Nortel business (as he states clearly in the Cooper Allocation Report), Dr. Cooper believes that at arm's length the parties would have allocated NNUK a positive $376 million profit while the rest of the RPEs should have lost a combined $11.0 billion.

While, in my view, this is virtually *prima facie* evidence that Dr. Cooper's position is unreasonable, I employed another methodology to test the consequences of Dr. Cooper's unedited positions. Specifically, I examined the return on capital employed ("ROCE") that Dr. Cooper believed NNUK should have earned, as compared to NNUK's fellow "joint entrepreneurs." This is shown in Exhibit II-5 below.

**Exhibit II-5: Dr. Cooper's Unfiltered View of an Appropriate ROCE for NNUK Compared to the Rest of Nortel**



In words, Dr. Cooper believes NNUK should have earned an average return on capital employed of approximately 6 percent, including more than 30 percent in two of the years (and more than 50 percent in 2005), while the entire Nortel system, in which Dr. Cooper believes NNUK is a joint entrepreneur, was earning a weighted average ROCE of **negative** 35.2 percent.

This is an inherently unlikely result in a profit split arrangement such as Nortel's. It is even more implausible in light of Dr. Cooper's assertions (mostly in the Cooper Allocation Report) that the parties are joint entrepreneurs, fully sharing in the upside and downside risks and rewards of the Nortel businesses.

Second, I examine Dr. Cooper's position with his mathematical and logical errors corrected. Specifically, I correct his calculation related to the addition of Bay US S&M to NNI's G&A in 2006, correct the treatment of the LRE restructuring costs in 2002, and reverse his treatment of the vendor financing losses (*i.e.*, since the RPEs are given a routine return credit for their at-risk

vendor financing capital in the RONA return, then NNL should not bear the losses associated with this capital).[31]

**Exhibit II-6: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected for Mathematical and Logical Mistakes**



Even correcting for mathematical and logical mistakes, the results of Dr. Cooper's position are unreasonable. In the corrected version, Dr. Cooper believes that at arm's length NNUK should have earned $336 million while the rest of the RPEs should have lost $10.9 billion.

Third, I examine Dr. Cooper's position, with corrections, and I extend his logic to be applied consistently across all RPEs, visualized in Exhibit II-7, below. Specifically, since Dr. Cooper believes the EMEA RPEs should earn operating profits of 3 percent for their routine distribution activities, and all of the RPEs are joint entrepreneurs, then, on his logic, all RPEs should earn an operating profit of 3 percent for their routine distribution activities. Similarly, if Dr. Cooper believes the EMEA RPEs should earn a markup on their extraterritorial expenses, then, on his logic, all RPEs should earn a markup on their extraterritorial expenses. For purposes of this

---

[31] Of the five errors I listed earlier, I note that I am only correcting the last three, given that the first two of his errors are corrected in his overall summary of the Cooper TP Report.

illustration, I retain Dr. Cooper's other assumptions (*e.g.*, that restructuring costs should be borne by NNL).

**Exhibit II-7: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected for Mathematical and Logical Mistakes, and Consistently Applied Across Entities**



Under this version, NNUK's profit under Dr. Cooper's position would drop to $246 million, while the rest of the RPES would still lose $11.0 billion, of which nearly $9 billion is borne by NNL.

Fourth, I further extend his logic to be applied consistently across time, visualized in Exhibit II-8, below. Specifically, as I noted above, Dr. Cooper believes that the proper approach to routine returns in 2006-2008 is an operating margin plus a markup on extraterritorial expenses. For 2001-2005, however, he is willing to accept the existing RONA return, which compensates the entire capital base of the RPEs (with one rate for the working capital and a higher rate for the long-term assets). To this RONA return, however, he adds in the markup on extraterritorial services. While the latter is clearly double-counting, it is also instructive to view Dr. Cooper's "switch" in approaches over time.

**Exhibit II-8: Dr. Cooper's View of an Appropriate Routine Return Over Time**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| 2001-2005 method | 29.63% | 22.52% | 19.65% | 17.64% | 11.49% | 4.90% | 5.98% | 5.14% |
| 2006-2008 method | 21.48% | 18.77% | 18.06% | 15.92% | 12.71% | 7.90% | 8.98% | 8.14% |

In the graph above, the blue line represents the RONA method (*i.e.*, a return to working capital and a return to long-term assets) plus Dr. Cooper's additional return to extraterritorial services. The red line represents an operating margin (rather than the return to working capital), the return to long-term assets (similar to the RONA) plus the extra return to extraterritorial services. In Dr. Cooper's analysis, he applies the "blue line" during 2001-2005, but the "red line" during 2006-2008, thus always choosing the result that favors NNUK (with the single exception of 2005, when the results are similar).

As with my earlier extension of Dr. Cooper's logic to apply to all RPEs consistently, I believe Dr. Cooper should be consistent across time as well. Since his stated preferred profit level indicator ("PLI") is the operating margin, and this is the method he chooses in the affirmative for 2006-2008, I extend this method across all years. The results under this final version of Dr. Cooper's position are presented in Exhibit II-9, below.

**Exhibit II-9: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected and Consistently Applied Across Entities and Across Time**



Having corrected all mathematical and logical errors, and requiring that Dr. Cooper be consistent across entities and across time, NNUK's position under Dr. Cooper's analysis would now be only $39 million, with the rest of the RPEs still losing $10.9 billion (NNL bears roughly $9 billion of this). Therefore, of his original conclusion that NNUK should have earned a positive $376 million, approximately 90 percent of this profit is due to errors and logical inconsistencies internal to his analysis.

In the end, with the correction of the errors, and extending the logic across entities and across time, his results remain implausible, in light of the fact that the Nortel profit-split method shared the benefits and burdens of R&D investment (the primary driver of the Nortel business), particularly in light of Dr. Cooper's position in the Cooper Allocation Report that the Nortel RPS involved a federation of joint entrepreneurs, as I discuss later.

**2.      Cooper Allocation Report**

The Cooper Allocation Report asserts that the structure of the Nortel RPS implies that proceeds of Nortel's LOB Sales and Residual IP Sale should be allocated *pro-rata* among the RPEs, according the relative magnitudes of their capitalized R&D stocks. Dr. Cooper never actually

quantifies the share of Nortel's LOB Sales and Residual IP Sale he believes should go to the various parties. In fact, his only quantification is to show the levels of R&D <u>spend</u> during 2001-2008. However, he does argue that the RPEs should share in the LOB Sales and Residual IP Sale based on their "R&D Contribution," which I take to mean the R&D stocks as of the end of 2008. This position is completely inconsistent with Dr. Cooper's own TP Report.

In the Cooper TP Report, the RPEs, or at least the EMEA RPEs in his stated position, should bear little or nothing in the way of risks and costs, such as vendor financing losses and restructuring costs, which he argues should be borne entirely by NNL. In essence, in the Cooper TP Report, he paints NNL as fully controlling the costs, and acting as a principal, while NNUK and the other EMEA RPEs are mere agents directed by and operating on behalf of NNL. By contrast, the Cooper Allocation Report emphasizes a characterization of the parties as joint venturers and "joint entrepreneurs."

The upshot of this self-contradictory approach can be seen in the exhibits below. In Exhibit II-10, I compare the share of R&D spend (*i.e.,* R&D conducted) by each of the RPEs from 2001-2008, their respective shares of the R&D stock in 2008, along with the total profits that Dr. Cooper believes each entity should have earned during 2001-2008, plus an estimate of the LOB and Residual IP Sale that each should receive, as implied by the Cooper Allocation Report.

**Exhibit II-10: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits Compared to R&D Spend and R&D Stock**



In other words, despite NNUK performing and bearing a relatively small share of the R&D costs, Dr. Cooper would allocate significant profits to NNUK, while in his view NNL and NNI, who collectively performed and invested over 80 percent of the total R&D, should bear more than 100 percent of the losses in the system. Exhibit II-11, below, provides calculations in support of Exhibit II-10, above.

**Exhibit II-11: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits Compared to R&D Spend and R&D Stock**

| Line | Description | NNUK | NN Ireland | NNSA | NNL | NNI | NN Australia | Other | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| 1 | R&D Spend (2001-2008) | 912.4 | 149.3 | 1,605.3 | 7,385.0 | 6,482.9 | 45.0 | | 16,580.0 |
| 2 | Share of R&D Spend (2001-2008) | 5.5% | 0.9% | 9.7% | 44.5% | 39.1% | 0.3% | | 100.0% |
| 3 | R&D Stock (2008) | 220.4 | 60.4 | 466.1 | 2,446.4 | 2,226.8 | - | | 5,420.1 |
| 4 | Share of R&D Stock (2008) | 4.1% | 1.1% | 8.6% | 45.1% | 41.1% | 0.0% | | 100.0% |
| 5 | Dr. Cooper's Position on Profits (2001-2008) | 376.1 | 66.3 | (615.5) | (5,955.1) | (4,389.5) | (61.1) | (108.73) | (10,687.4) |
| 6 | Dr. Cooper's Position on LOB and Residual IP Sales (estimated) | 317.2 | 86.9 | 670.8 | 3,520.6 | 3,204.5 | - | | 7,800.0 |
| 7 | Dr. Cooper's Total Profits + LOB/Residual IP Sales | 693.3 | 153.2 | 55.2 | (2,434.5) | (1,184.9) | (61.1) | | (2,778.7) |
| 8 | Dr. Cooper's Position / R&D Spend | 76.0% | 102.6% | 3.4% | -33.0% | -18.3% | -135.7% | | |
| 9 | Dr. Cooper's Position / R&D Stock | 314.5% | 253.8% | 11.9% | -99.5% | -53.2% | N/A | | |

The stark disconnect between the conceptual framework of the Cooper TP Report and that of the Cooper Allocation Report simply cannot hold.

## C.    Dr. Felgran

Dr. Felgran is less comprehensive in his approach than Dr. Cooper, and less extreme. The positions taken by Dr. Felgran are as follows:

- Restructuring Costs: Dr. Felgran believes the restructuring costs should be shared among the RPEs.[32]

- Estimated Future Non-GAAP Pension Costs: Dr. Felgran believes that an estimate of future non-GAAP pension costs should be shared among the RPEs. Dr. Felgran proposes three methods of calculating the additional pension costs: i) ongoing pension costs reflected in "Other Comprehensive Income" on the balance sheet, ii) "economic" pension costs using a 5 year amortization schedule, and iii) "economic" pension costs using a 10 year amortization. For purposes of my comparison, I use the "economic" pension costs with a 10 year amortization, as this produces the median adjustment among the three suggested methods.[33]

- Intercompany Loans: Dr. Felgran believes that certain intercompany balances should have borne interest, which in his estimation would benefit NNUK. I address this particular position in Section X, but do not include this within the context of modeling Dr. Felgran's positions related to transfer pricing.[34]

The exhibit below summarizes Dr. Felgran's position, and the effective profit split given his assumptions, in its entirety.

---

[32] Dr. Felgran actually proposes two possibilities: i) that all restructuring costs be shared, or ii) that only 75 percent of the restructuring costs be shared. For purposes of this discussion, I model his position assuming all restructuring costs are shared.

[33] The alternative pension liability calculations are also discussed in the expert reports of Mr. Bowie and Mr. Seifert.

[34] This is because interest cost is a "below the line" item (*i.e.*, below operating profit) and all of my model calculations pertaining to the positions of the experts are at the operating profit level.

**Exhibit II-12: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**



While less extreme than Dr. Cooper's position, Dr. Felgran's conclusions are also inherently inconsistent with the basic nature of the relationships among the entities. For example, over the 2001-2008 time period, NNUK held an average of 6.4 percent of the R&D stock, and it held 7.4 percent in 2001 and 8.0 percent in 2002 when most of the residual losses occurred. NNUK also had revenues that averaged 6.6 percent of total system revenues during 2001-2008, and conducted 5.5 percent of all R&D during 2001-2008. Yet Dr. Felgran's position would have NNUK bearing a loss of only $420 million (only 3.6 percent) out of total losses of $11.5 billion.[35]

## D.    Drs. Felgran and Cooper Together (the UK Experts)

Because Drs. Felgran and Cooper both support the interests of NNUK's stakeholders, and because there is not perfect overlap in the issues they address, it is instructive to examine the quantitative implications of Drs. Felgran and Cooper together.

---

[35] Dr. Felgran's calculation of total system profits is lower than Dr. Cooper's because he includes additional pension costs in operating expenses.

Taken together, the positions of Drs. Felgran and Cooper are as follows:

- Restructuring Costs: Dr. Cooper believes NNL should bear all of the restructuring costs, while Dr. Felgran believes the restructuring costs should be shared among the RPEs. As Dr. Cooper notes, the sharing of restructuring costs could also be considered (and he uses this in his "Scenario B").  For purposes of creating a "combined view" I treat restructuring costs as being shared among the RPEs.

- Vendor Financing: Dr. Cooper believes NNL should bear all EMEA vendor financing losses. While I point out the logical inconsistency of this position in conjunction with giving the EMEA RPEs credit for their vendor financing in his routine return analysis, I leave this position alone here for purposes of presenting the combined position in as unfiltered a way as possible.

- Estimated Future Non-GAAP Pension Costs: Dr. Felgran believes the estimated future non-GAAP pension costs should be shared among the RPEs. Dr. Cooper does not discuss the sharing of pension costs, but for purposes of the combined view I treat the estimated future non-GAAP pension costs as being shared among the RPEs.

- Routine Returns: Dr. Felgran does not dispute the routine returns applied by Nortel. Dr. Cooper does, though he limits his focus to the EMEA RPEs only. As above, while I have pointed out the logical inconsistency of Dr. Cooper in not extending this treatment to the non-EMEA RPEs, nor using a consistent routine return methodology across time, I leave his position alone to present the combined position in an unfiltered way.

The exhibit below consolidates their positions, highlighting the implications of their positions, in total, for NNUK, NNL, and the other RPEs.

**Exhibit II-13: Cooper-Felgran's Combined View of an Arm's Length Allocation of Profits**



Like their individual positions, taken together Drs. Cooper and Felgran propose a sharing of profits that is implausible in light of the fact that the Nortel profit-split method shared the benefits and burdens of R&D investment (the primary driver of the Nortel business).

## E.    Dr. Eden

Dr. Eden's report is almost entirely devoid of quantitative analysis. The only analysis that she provides that is quantitative in nature is given in Figure 5 of her report, which is replicated below.

**Exhibit II-14: Figure 5 from Dr. Eden's Report**



Dr. Eden asserts that the transition shown in the table above, from one in which NNI had approximately 70 percent of the total R&D amortization under the R&D CSA, to one in which NNI had approximately 45 percent under the Nortel RPS, was prompted by the avoidance of taxes, and was not arm's length. As I discuss in much more detail in Section XI of this report, Dr. Eden avoids the fact that the transition from the CSA to the Nortel RPS was in fact a transition from a regime in which NNI's R&D stock included a significant amount of R&D conducted by NNL to one in which NNI's R&D stock (and for that matter NNL's) consisted of R&D that NNI and NNL actually conducted themselves. In other words, the transition was a transition from an artificial allocation of credit for R&D based upon size of market, to one in which R&D credit arose from actually performing R&D – a transition from an artificial to a more natural set of R&D stocks. As shown in Dr. Eden's Figure 5, NNL actually conducted a very large share of the R&D of the Nortel consolidated enterprise.

Each of the remaining sections of this report discuss or elaborate on a particular issue raised by one or more of the other TP Experts.

## III.    Routine Returns

In applying the residual profit split method, the definition and quantification of routine returns are important determinants of the overall allocation of profits among the participating entities. As noted by all of the other TP Experts, the residual profit split method has two primary steps: 1) the determination and allocation of routine profits, and 2) the allocation of the remaining, or residual, profit. An increase in routine returns may in the first instance increase one party's routine return, but it will also decrease the residual profit pool (or increase the residual loss pool).

The relative intensities of the parties' routine returns and capitalized R&D stocks thus determine whether an increase in routine returns has the net effect of raising or lowering operating profit for any given residual profit split participant. A participant with high levels of routine assets but low levels of R&D stock will likely benefit from an increase in the routine returns, while the opposite is true for a participant with low levels of routine assets and high levels of R&D stock. The dynamics of a residual profit split method are further complicated by the fact that the relative magnitude of the routine profits (in total) compared to the residual profit (in total) also impact the importance of an individual participant's relative intensity of claims over routine profits versus residual profits. Finally, the fact that all of these variables are changing over time means that determining the net impact of a change in routine returns must be modeled with care and cannot be easily predicted.

In general, NNUK and NN Ireland are relatively more concentrated in routine returns than in their claims over residual profit, while NNSA has a larger share of the R&D stock than its share of routine returns. However, as noted above, this is an overly simplistic view, as the relative sizes of the routine and residual profit pools themselves are also important. For example, if a given residual profit split participant has a 10 percent claim over the routine returns and a 5 percent claim over the residual profits, but the total routine profits are $100 and the total residual profits are $400, then that participant is earning more dollars from its residual claim than its routine claim ($20 versus $10), making. changes in its routine claim relatively less important than changes in the residual claim.

Only one of the other TP Experts, Dr. Cooper, chose to address the routine returns.

## A.    Overview of Dr. Cooper's Positions Regarding Routine Returns and Comparison to Positions in My First Report

Exhibit III-1, below, summarizes the differences between Dr. Cooper's approach to benchmarking the returns to routine activities and assets, and mine.

**Exhibit III-1: Comparison of Approaches to Routine Returns**

| | | Cooper | Reichert |
|---|---|---|---|
| 1 | Choice of Comparables | EMEA Only<br>Many small, private | Global<br>Larger, public |
| 2 | Working Capital Adjustments | Yes | No |
| 3 | Treatment of Customer Financing | Counted in working capital, but then charged to NNL | N/A |
| 4 | Extraterritorial Services | Added to returns in 2001-2005<br>(on top of RONA)<br>Added to returns in 2006-2008<br>(on top of OM) | Comparables Analysis indicates that higher SG&A / Sales does not correlate with higher Operating Margin |
| 5 | Choice of Profit Level Indicator | 2001-2005: RONA + extraterritorial<br>(extraterritorial uses Berry ratio)<br>2006-2008: OM + extraterritorial<br>(extraterritorial uses Berry ratio) | Manufacturing: Return to PP&E<br>(only relevant in 2001-2005)<br>Distribution: OM<br>(relevant for 2001-2008) |

As shown, there are five primary dimensions along which Dr. Cooper's analysis of routine profits differs from mine. These are the identity of the comparables themselves, the use of working capital adjustments, the treatment of customer financing, the compensation for extraterritorial services, and the choice of profit level indicator. Each of these is taken up, in turn, below.

**1.     Inappropriate Selection of Comparables**

Dr. Cooper limits his focus to comparable distributors in the EMEA region, and many of his chosen comparables are small, private companies. While his chosen comparables appear to be functionally comparable, he does not appear to give any consideration to the importance of scale. He seems to ignore the fact that the EMEA RPEs were part of a large, global company – one of the largest in the world in the networking technology space – and they have access to products and a global customer base on a scale that is simply not comparable to the companies chosen by Dr. Cooper.

In contrast, I use a set of global, publicly traded distribution companies, which I believe are more comparable to the Nortel RPEs. My search strategy and reasons for inclusion / exclusion from my sample are described in my first report.

2.      **Misapplication of Working Capital Adjustments**

Dr. Cooper performs working capital adjustments to the comparables in order to estimate the operating profit that the comparables would be expected to earn if they had accounts receivable, accounts payable, and inventory levels comparable to the EMEA RPEs.

I do not make working capital adjustments, as they do not improve, and in this case actually decrease, comparability between the tested party and the comparable companies. Later in this section, I explain why working capital adjustments are illogical in this case.

3.      **Mistreatment of Customer Financing as Working Capital**

In the course of developing his routine return estimates for 2001-2005, Dr. Cooper gives the EMEA RPEs "credit" for their full accounts receivable balances (including short and long term accounts receivable which contain short and long term vendor financing). As noted previously, Dr. Cooper later argues that NNL should bear all customer financing losses. It is one thing to argue that unproductive assets deserve to earn a required return (which they do not, as discussed below). It is quite another to argue that NNL should bear the losses on assets that yield a 23.6 percent return for the EMEA RPEs.

4.      **Miscalculation of Extraterritorial Activities**

Dr. Cooper argues that the EMEA RPEs (but for some unexplained reason not the non-EMEA RPEs) should earn an additional return for their "extraterritorial services" during 2001-2005 (as well as during the 2006-2008 period). In order to compensate them for these services, he applies a Berry ratio (essentially a markup) to the portion of certain of their SG&A expenses above certain levels (this is very similar to the way Nortel compensated the RPEs during 2006-2008).

The primary problem with what Dr. Cooper is suggesting is that he is adding the extraterritorial services compensation to the RONA compensation in place during 2001-2005. In addition to the routine returns that are already inflated under the RONA analysis, this represents a double count. I elaborate on this in more detail below in my discussion of the errors in Dr. Cooper's analysis.

5.      **Inconsistent Use of Profit Level Indicators**

Dr. Cooper changed his computation of routine returns for the 2006-2008 period as compared to the calculation for 2001-2005. I detailed this above in Section II, in which I demonstrated that Dr. Cooper's methodology selectively chooses PLIs to maximize the routine returns to NNUK, despite the fact that the routine operating margins in place were already overly generous.

In contrast, as I detailed fully in my first report, I use a consistent PLI across the 2001-2008 period. For manufacturing, I use a return to net PP&E, based on a set of routine manufacturing comparables (this particular routine return component is only relevant for 2001-2005, as all of the RPEs had divested their manufacturing activities by 2006). For distribution, I use an operating margin based on a set of routine distribution comparables.

## B.      Errors in Dr. Cooper's Analysis

A review of Dr. Cooper's analysis reveals several errors, most of which inure to the benefit of NNUK.  These are as follows:

### 1.      Vendor Financing

As noted above, in the course of making his working capital adjustments, Dr. Cooper gives the EMEA RPEs "credit" for their full accounts receivable balances, inclusive of all vendor financing, which is in long term receivables. Dr. Cooper then later argues that NNL should bear all customer financing losses. Obviously, both of these operate in NNUK's favor, and for reasons I discuss elsewhere, neither are warranted.

### 2.      The 2001-2005 RONA Covers Extraterritorial Services

I repeat here that Dr. Cooper seems to subscribe to the idea that profits are a return to "functions" – in this case the EMEA RPEs' purported performance of "extraterritorial services." This idea is completely unsupportable as a matter of theory and practice. Profit is always the return to <u>capital</u> (that capital may be intangible capital or physical capital). Profit is never, properly, a "markup on costs" (such as a Berry ratio – essentially a markup) or a "margin on sales." Nor is profit, properly, a return to "functions." (The statement colloquially made by transfer pricing professionals that profit is the return to functions performed is not in fact correct – profit is <u>associated with</u> functions performed, but it is in fact the payment to the <u>capital input</u> used in support of the functions.)

By remunerating the RPEs for their extraterritorial services for 2001-2005, Dr. Cooper is <u>double counting</u> the routine profit associated with these extraterritorial activities. In other words, he does not recognize that the reason that extraterritorial activities performed by the RPEs were rewarded by Nortel during the 2006-2008 period is precisely because Nortel switched from a RONA-based measure to a margin-based measure of routine profit.

By assigning routine returns to the <u>entire capital base</u> of the RPEs for the 2001-2005 period Nortel fully remunerated all of the routine assets and activities of the RPEs. By definition, <u>there can be no other routine profit to assign</u>. The residual profit (*i.e.*, the profit left over after assigning a routine return to the capital base) is attributable to value of the license rights of the Nortel RPEs, <u>which are not measured in the capital base</u>.

## C.      Dr. Cooper's Routine Profits Analysis

The combination of Dr. Cooper's: 1) treatment of customer financing as a productive asset (while, as discussed, simultaneously treating customer financing as a "loss," or unproductive asset); 2) use of working capital adjustments (despite the fact that the assumptions underlying these adjustments are clearly violated); and 3) addition of routine returns for extraterritorial activities during the 2001–2005 period (despite the fact that these are already compensated through the RONA mechanism) results in routine returns that are simply implausible.

Exhibit III-2, below, shows Dr. Cooper's estimates of routine distribution returns plus routine returns for extraterritorial activities, and routine distribution returns only, for NNUK, NN Ireland, and NNSA, measured as a percentage of sales. I have constructed this by subtracting my estimate of an arm's length return to manufacturing activity from Dr. Cooper's estimate of total routine returns for 2001-2005. For 2006-2008 this adjustment was not necessary as there was no manufacturing during that period.[36]

**Exhibit III-2: Dr. Cooper's Proposed Routine Operating Margins for EMEA RPEs[37]**



As shown above, Dr. Cooper's analysis results in assigning routine returns to the EMEA RPEs well above the upper quartile operating margins of comparable distribution companies during 2006-2008, especially for NNUK.

## D.    Why Working Capital Adjustments are Illogical in this Case

While I recognize, as Dr. Cooper points out, that working capital adjustments are commonly employed by transfer pricing economists, their underlying logic and assumptions simply do not apply to this case. Indeed, it is important to recognize that these adjustments are in no way universally applied by transfer pricing economists, and their applicability in any given case depends upon two things: 1) whether the economic assumptions underlying these adjustments apply to the "tested party" (the functions and assets being benchmarked), and 2) whether the comparables used to benchmark the routine activities and assets exhibit a positive relationship

---

[36] I note that operating profit as a percentage of sales, or operating margin, is Dr. Cooper's chosen PLI for his routine distributor benchmarking exercise.

[37] For purposes of this graph, "ET" refers to extraterritorial services, and "VF" refers to vendor financing.  Therefore, "W/ ET and VF" means the routine returns assigned by Dr. Cooper inclusive of returns for extraterritorial services and the routine returns to vendor financing, which were included in the RPEs' long-term assets that yield a return under the RONA method. Correspondingly, W/ VF Only" include the returns to vendor financing but not the extraterritorial services.

between net working capital and operating profit. This is why the US transfer pricing regulations, and the OECD Guidelines, view working capital adjustments as appropriate only if their application increases comparability.

Thus, working capital adjustments such as those made by Dr. Cooper first require that there be an observable positive relationship between net working capital levels and operating margin. If such a relationship does not exist, then making these adjustments would actually <u>reduce</u> the comparability between the comparables and the tested party.

The theory behind Dr. Cooper's working capital adjustments assumes that there is a hidden, but perfectly functioning, financing market that operates through the goods market. In other words, working capital adjustments ascribe the following meanings to the presence of accounts receivable, inventory, and accounts payable:

1)  Accounts Receivable: A company carrying accounts receivable means that it is extending credit to its customers, and that it is able to capture a return on this financing activity via a (slightly) higher price. Therefore, a company that has more accounts receivable than another otherwise identical company is extending more credit and therefore should have higher operating margins to compensate it for this financing activity.

2)  Inventory: A company carrying inventory means that it is implicitly providing an inventory-holding service (*i.e.*, it is tying up capital in the form of inventory) for its customers, and that it is able to capture a return on this service / implicit financing activity via a (slightly) higher price. Therefore, a company that has more inventory than another otherwise identical company is tying up more of its own capital (thus relieving its customers of the same, and therefore extending more credit) and therefore should have higher operating margins to compensate it for this inventory holding activity.

3)  Accounts Payable: The logic is similar to the logic pertaining to Accounts Receivable, but is reversed. A company carrying accounts payable means that it is implicitly <u>receiving</u> credit <u>from</u> its <u>suppliers</u>, and that it must pay for this financing activity via a (slightly) higher price (its cost of goods sold is higher). Therefore, a company that has more accounts payable than another otherwise identical company is borrowing more and therefore should have lower operating margins to pay for this implicit financing activity.

It should be repeated that the logic described above relies on an assumption of perfect, frictionless, markets. Moreover this logic ignores the following three alternative possibilities that are more realistic and plausible, particularly in this case, yet imply exactly the opposite conclusions:

1)  Accounts Receivable: A company that we observe with high accounts receivable is likely not choosing to extend more credit to its customers as a means of increasing prices. It is more likely that this company may need to extend credit in

order to sell products in the first place, or is having trouble collecting from customers, which will lead to write-offs. In such cases, we would not expect to observe higher operating margins, but rather the opposite (*i.e.*, lower margins).

2)  Inventory: A company that we observe with high inventory levels is likely not choosing to more intensively provide inventory holding services to its customers. Rather, it may simply be having trouble selling its products, which will lead to the need to lower prices or write off inventory. In such cases, we would not expect to observe higher operating margins, but rather the opposite (*i.e.*, lower ones).

3)  Accounts Payable: A company that we observe with high accounts payable levels may not be choosing to receive financing from its suppliers that it must pay for through higher prices. Rather, it may simply be very successful at negotiating better terms from its suppliers – without any implicit interest payment included in the price. In such cases, we would not expect lower operating margins, but rather higher ones.

These alternative possibilities are, in general, more plausible than the belief that there is a perfectly functioning financing market operating within the goods market. After all, companies across all industries spend significant time and energy trying to keep receivables and inventory levels *down*, not up, while at the same time trying to stretch payables out as long as possible. That is simply good cash management, and generally has the effect of increasing a company's return on invested capital.

Another possibility is that the market rewards holding working capital up to a point, but after that, at the margin additional dollars held are unproductive. Given the working capital levels of NNUK (which are quite high relative to the comparable distributors), this is an important consideration because Dr. Cooper is simply assuming a linear relationship that continues to hold regardless of the level of working capital.

Indeed, it is instructive to consider Nortel's working capital intensity and its causes. Nortel was, of course, experiencing declines in revenue throughout the 2001-2008 period. This led to high levels of working capital as a percentage of sales.

The figure below shows NNUK's net working capital as a percentage of sales from 2001-2008, along with the interquartile range of the net working capital as a percentage of sales for Dr. Cooper's own comparables.

**Exhibit III-3: Net Working Capital Intensity for NNUK Compared to Dr. Cooper's Comparables**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| NNUK | 125.8% | 76.2% | 51.8% | 53.2% | 20.2% | 35.9% | 51.3% | 32.4% |
| Cooper 2007 - Upper Quartile | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% | 13.3% |
| Cooper 2007 - Lower Quartile | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% |

As shown, NNUK's net working capital to sales ratios are well above the comparables throughout the 2001-2008 period.  Dr. Cooper adjusts the capital levels of the comparables to Nortel's extremely high working capital intensity (which resulted from significant declines in revenue experienced by the company).  This means that he takes a characteristic of Nortel that is clearly a negative characteristic (high working capital resulting from poor financial performance), and adjusts the comparables to match this characteristic, <u>but in doing so he treats the extremely high working capital intensity as a positive characteristic (because the working capital adjustments treat working capital as always deserving of a return)</u>.

Next, I <u>empirically</u> tested the hypothesis that there is a relationship between working capital and operating margin among the distributors. The purpose of this analysis is to determine whether the logical connection between working capital levels and operating margin that is assumed to exist by Dr. Cooper actually does exist. Dr. Cooper assumes that there is a positive relationship between these two variables, and therefore higher working capital levels lead to higher operating margins.

Dr. Cooper expressly assumes that if the comparable distribution companies had working capital levels similar to those of NNUK (which are much higher than the typical comparable

level) they would earn higher margins – with the additional profit equal to LIBOR + 3 percent of each additional dollar of net working capital. If the comparable companies in fact exhibit a positive (and statistically significant) relationship between net working capital levels and operating margin, then the theory behind the adjustment is confirmed.

As a first step, I calculated the intensities of Accounts Receivable, Inventory, Accounts Payable, Net Working Capital (*i.e.*, as a percent of sales), and the Operating Margins for each of the comparable companies in the routine distributor set that I developed for my first report, for 2001–2008. I then created simple scatter plots for each of the working capital variables and operating margin. These give a high level, visual, depiction of the relationships that exist.

**Exhibit III-4: Relationship Between Accounts Receivable Intensity and Operating Margin for Comparables**



**Exhibit III-5: Relationship Between Inventory Intensity and Operating Margin for Comparables**



**Exhibit III-6: Relationship Between Accounts Payable Intensity and Operating Margin for Comparables**



**Exhibit III-7: Relationship Between Net Working Capital Intensity and Operating Margin for Comparables**



As can be seen, these relationships are the opposite of what Dr. Cooper assumes. The data show that holding high accounts receivable and high inventory levels results in lower operating margins – not higher ones. Only accounts payable goes in the expected direction, but all of the scatter plots show weak relationships, with the $R^2$ statistic always less than 0.15, and usually less than 0.10.[38]

---

[38] For the scatterplots shown, the $R^2$ statistic measures the goodness of fit of the linear relationship. An $R^2$ statistic of 1 means that the fit is perfect, whereas a statistic equal to zero means that there is no relationship between the variable measured on the x-axis and the variable measured on the y-axis.

The corresponding scatter plots for Dr. Cooper's comparables are shown below.

**Exhibit III-8: Relationship Between Accounts Receivable Intensity and Operating Margin for Comparables**



**Exhibit III-9: Relationship Between Inventory Intensity and Operating Margin for Comparables**



**Exhibit III-10: Relationship Between Accounts Payable Intensity and Operating Margin for Comparables**



**Exhibit III-11: Relationship Between Net Working Capital Intensity and Operating Margin for Comparables**



The scatter plots for Dr. Cooper's comparables give a mixed picture, with the accounts receivable positive but statistically insignificant, inventory showing the only statistically significant positive relationship, and accounts payable going in the opposite direction as the

theory would suggest. The total net working capital relationship is positive, but the $R^2$ statistic is quite low.[39]

These simple scatter plots, while useful for visualizing relationships among variables, do not provide a rigorous test of the hypothesis that higher working capital intensity results in higher operating margins. Therefore, in order to test the hypothesis using a more robust statistical technique, I performed a regression analysis to estimate the relationship between the operating margin and NWC/sales.

I performed this test using my set of comparables, Dr. Cooper's set of comparables (from 2007, which is the set he uses to set the routine returns for the RPEs), and a combined set. I also specified the equation in two different ways in order to approach the relationship between operating margin and net working capital comprehensively. In the first version, I included entity-level "fixed effects," which is a way of capturing any company-specific differences among the companies in the sample not captured by the explanatory variable (in this case, NWC/sales). In the second version, I included both company-specific and year-specific fixed effects, which will also capture any differences across time periods. As a general matter, when using panel data (a data set of the same companies across several years), it is a standard procedure to incorporate these fixed effects into a regression model.[40]

The results are shown below.

### Exhibit III-12: Regression Results for Operating Margin and NWC / Sales Relationship

| | Reichert Sample | | | |
|---|---|---|---|---|
| | **Entity Fixed Effects** | | **Entity & Year Fixed Effects** | |
| **NWC/Sales** | *Coefficient* | -0.419277 | *Coefficient* | -0.4337739 |
| | *t-stat* | -2.87 | *t-stat* | -2.89 |
| | *Adj R²* | 0.4037 | *Adj R²* | 0.4381 |

| | Cooper 2007 Sample | | | |
|---|---|---|---|---|
| | **Entity Fixed Effects** | | **Entity & Year Fixed Effects** | |
| **NWC/Sales** | *Coefficient* | -0.0079708 | *Coefficient* | 0.0005689 |
| | *t-stat* | -0.4 | *t-stat* | 0.05 |
| | *Adj R²* | 0.0004 | *Adj R²* | 0.0622 |

| | Combined Sample | | | |
|---|---|---|---|---|
| | **Entity Fixed Effects** | | **Entity & Year Fixed Effects** | |
| **NWC/Sales** | *Coefficient* | -0.080857 | *Coefficient* | -0.0806718 |
| | *t-stat* | -1.05 | *t-stat* | -1.06 |
| | *Adj R²* | 0.0331 | *Adj R²* | 0.0599 |

---

[39] I discuss the implications of this statistical analysis below.
[40] William H. Greene, *Econometric Analysis*, 2nd ed., (New Jersey: Prentice Hall, 1993) at pages 464-465.

In each box above, there are three statistics cited. The coefficient is describing the relationship between NWC/sales and operating margin, and this represents the slope in a linear relationship between the two variables.

The t-statistic, or "t-stat," tells us if the coefficient is "statistically significant," which is another way of saying how confident we can be that our results are meaningful and not just randomly different than zero. If a t-stat is greater than 2 or less than -2, this is generally considered to be statistically significant. Correspondingly, a t-stat between -2 and +2 is generally considered to be statistically insignificant, and the coefficient cannot be statistically distinguished from zero (*i.e.,* a flat line – or no relationship at all, either positive or negative).

Finally, the adjusted $R^2$ is a measure that takes into account the entire model, including the intercept and the fixed effect terms, and tells us approximately what percentage of the total variation of the dependent variable (in this case, operating margin) is explained by changes in the independent variable (in this case, NWC / sales). As noted earlier, adjusted $R^2$ equal to 1 indicates that the model perfectly predicts, or explains, the data (in this case, an adjusted $R^2$ of 1 would mean that NWC/sales, in conjunction with fixed effects, perfectly predicts the operating margins of the companies in the samples examined). Correspondingly, an adjusted $R^2$ equal to zero implies that the model explains nothing (in this case, NWC/sales, in conjunction with fixed effects, does not predict operating margin at all).

If the relationship that Dr. Cooper is assuming existed, we would expect the coefficient for NWC/sales to be positive, and roughly equal to .05 to .10, since he assumes that working capital should equal LIBOR + 3 percent. Instead, for the sample of companies that I used in my first report, I get a strong (*i.e.,* very statistically significant) *negative* relationship. Using Dr. Cooper's 2007 set of companies, the coefficients are effectively zero (slightly negative in the version with only firm-level fixed effects and slightly positive, but only .0006, in the version with both firm and year fixed effects), and the t-stats are highly insignificant, meaning that there is no relationship between NWC/Sales and operating margin for Dr. Cooper's companies.[41]

Similarly, when I combined my set with Dr. Cooper's, the coefficients are slightly negative, but not statistically significant. The adjusted $R^2$ is also low in most cases, except the two regressions with my original sample, which exhibit adjusted $R^2$ statistics of approximately 0.40 to 0.44.

In summary, these results indicate that the relationship assumed by Dr. Cooper to exist between NWC/sales and operating margin either does not exist, or goes in the opposite direction from what Dr. Cooper asserts. Therefore, the working capital adjustments that he performs are not only unnecessary, but actually decrease the reliability of his results.

The comparisons of working capital intensities to operating margins among the comparables suggest that comparables with working capital levels as high as NNUK would have earned

---

[41] While the scatter plot for Dr. Cooper's NWC/sales showed a positive slope, the inclusion of entity-level fixed effects demonstrates that other characteristics of these companies explain the differences in operating margin, and the NWC/sales has no additional explanatory power.

*lower* operating margins, yet Dr. Cooper uses these higher levels of working capital to adjust the operating margins of the comparables *higher*, by assuming a positive relationship that does not actually exist.

## IV.  Systematic and Holistic Approach to the Application of Transfer Pricing Regulation and Guidance to Restructuring Costs, Vendor Financing, and Estimated Future Non-GAAP Pension Costs

### A.  Systematic and Holistic Approach to the Regulations

As noted in Section I of this report, Drs. Eden, Cooper, and Felgran selectively use certain elements of transfer pricing regulation and guidance.  By contrast, in this section I outline what I believe is an impartial and holistic summary of the logical framework that the OECD Guidelines in particular, and in my opinion the US regulations as well, set forth for dealing with questions such as "who should bear restructuring costs?" The logical framework set out in this section will subsequently be applied to restructuring costs (Section V), vendor financing losses (Section VI), and estimated future non-GAAP pension costs (Section VII).

This framework is given in a "flowchart" or "decision tree" format. In fact, the OECD Guidelines themselves offer governments and taxpayers a similar flowchart in Chapter 9.

**Exhibit IV-1: Logical Framework of Transfer Pricing Guidelines**

As can be seen, the first question when pricing an intercompany relationship is to examine the intercompany agreement terms. The first question, therefore, is straightforward: "does the intercompany agreement address the question at issue?"

If the answer is "yes," then the second question is "is the form of the agreement consistent with the substance?" Put another way, "was it economically rational for the parties to enter the agreement?" If this answer is also "yes," then the agreement is dispositive with respect to the issue in question.

The OECD Guidelines are clear on this point. For example, the OECD Guidelines state the following.[42,43]

- 1.64 A tax administration's examination of a controlled transaction ordinarily <u>should be based on the transaction actually undertaken by the associated enterprises as it has been structured by them</u>, using the methods applied by the taxpayer insofar as these are consistent with the methods described in Chapter II (including the residual profit split method). <u>In other than exceptional cases, the tax administration should not disregard the actual transactions or substitute other transactions for them. Restructuring of legitimate business transactions would be a wholly arbitrary exercise the inequity of which could be compounded by double taxation</u> created where the other tax administration does not share the same views as to how the transaction should be structured.

- 1.65 However, <u>there are two particular circumstances in which it may, exceptionally, be both appropriate and legitimate for a tax administration to consider disregarding the structure adopted by a taxpayer in entering into a controlled transaction. The first circumstance arises where the economic substance of a transaction differs from its form</u>. … <u>The second circumstance arises where, while the form and substance of the transaction are the same, the arrangements made in relation to the transaction, viewed in their totality, differ from those which would have been adopted by independent enterprises behaving in a commercially rational manner</u> and the actual structure practically impedes the tax administration from determining an appropriate transfer price.

- 1.67 <u>Associated enterprises are able to make a much greater variety of contracts and arrangements than can independent enterprises because the normal conflict of interest which would exist between independent parties is often absent</u>. Associated enterprises may and frequently do conclude arrangements of a specific nature that are not or are very rarely encountered between independent parties. This may be done for various economic, legal, or fiscal reasons dependent on the circumstances in a particular case. <u>Moreover, contracts within an MNE could be quite easily altered, suspended, extended, or terminated according to the overall strategies of the MNE as a whole, and such alterations may even be made retroactively</u>. In such instances tax administrations would

---

[42] OECD Guidelines at Chapter 1.
[43] Emphasis added, throughout.

have to determine what the underlying reality is behind a contractual arrangement in applying the arm's length principle.

- 6.13 The general guidance set out in Chapters I, II, and III for applying the arm's length principle pertains equally to the determination of transfer pricing between associated enterprises for intangible property. This principle can, however, be difficult to apply to controlled transactions involving intangible property because such property may have a special character complicating the search for comparables and in some cases making value difficult to determine at the time of the transaction. Further, for wholly legitimate business reasons due to the relationship between them, associated enterprises might sometimes structure a transfer in a manner that independent enterprises would not contemplate.

In short, the OECD Guidelines recognize that a very wide variety of possible controlled arrangements exist, and that these should be respected but for extreme circumstances. The other TP Experts have made broad assertions that "substance" is more important than form, without specifying the proper relationship between substance and legal form. This gives them great latitude to, in the words of the OECD Guidelines "disregard the structure adopted by a taxpayer."

It is important to recognize that this second question cannot be repositioned to ask alternative questions such as "are there other economically rational agreements the parties might have tried to negotiate?" The OECD Guidelines and the transfer pricing regulations are clear: as long as the agreement is economically rational, and form and substance cohere, then the agreement stands and the role of the transfer pricing expert is to price the transaction as agreed to. (There is no issue here - nor could there be, given the facts - that the economic substance and the legal form cohere. Accordingly, where I refer to the 'economic substance' element in my discussions, I focus on the 'economic rationality' element.)

Returning to the flowchart in Exhibit IV-1, above, if parties' agreement is silent on a particular item or if the agreement's form is not consistent with substance (or if this is unclear), then the OECD Guidelines and transfer pricing regulations turn to the question, "what do third parties do?" In my view, this question is best answered by reference to empirical evidence of third party behavior, rather than unsupported speculation about what third parties would do. There are several instances where the other TP Experts have asserted, "a third party would not agree to this" or "a third party would seek X" without providing any empirical evidence in support of these claims. In section IV.B below, and elsewhere throughout this response, I attempt to offer this evidence by examining joint development and other third party agreements similar to the MRDA.

If third party evidence indicates that third parties would, or would not, share a particular cost, then, by extension the related parties should do the same. However, if the third party evidence is inconclusive, then we turn to secondary questions, such as "does the cost pertain to the intangible development area in question?"

In this case, the US transfer pricing regulations are clear. For example, the opening paragraph of the US transfer pricing regulations discussion of the residual profit split method begins:

> 1.482–6 Profit split method. (a) In general. The profit split method evaluates whether the allocation of the combined operating profit or loss attributable to one or more controlled transactions is arm's length by reference to the relative value of each controlled taxpayer's contribution to that combined operating profit or loss. The combined operating profit or loss <u>must be derived from the most narrowly identifiable business activity</u> of the controlled taxpayers for which data is available that includes the controlled transactions (relevant business activity). [emphasis added]

Finally, if the costs are related to the intangible development area, then the question becomes, "are the costs excess costs?" In other words, are there inefficiencies included in the costs at issue that uncontrolled parties would be unwilling to share when bargaining at arm's length?

Indeed, as I discuss below, the third party evidence is clear that shared costs that are related to the intangible development area are nearly always subject to limitations on the amount of cost that the parties agree to share. Limitations may be in the form of budget committees, requirements for pre-approval, or simply caps on the cost amounts by category.

## B.    An Evidence-Based Review

The regulatory framework that I outline above is clear that in any case in which the controlled legal arrangements are not dispositive, third party behavior should guide one's analysis. While in my view, the MRDA is likely sufficient when considering the issues of restructuring costs, vendor financing losses, and estimated future non-GAAP pension costs, it is nonetheless instructive to examine third party behavior pertaining to these issues.

To this end, I examine what third parties actually do in contractual arrangements and settings similar to the Nortel RPS. One might view this exercise as an empirical test of theories put forward by the other TP Experts. I note that this approach of examining how third parties contract around a specific cost is precisely the approach taken in the recent transfer pricing case, *Xilinx*.

I describe my overall empirical strategy in this section. However, my specific findings related to each area of dispute (*i.e.,* the treatment of restructuring costs, vendor financing, estimated future non-GAAP pension costs) are described in later sections.

## 1.    Evidence-Based Strategy[44]

At my direction, EP conducted an extensive search to identify agreements that involve the joint funding and development of intangible property, and examined these agreements to evaluate 1) whether and how third parties define and quantify certain costs in joint development-type

---

[44] The methodology in support of this section is available in Appendix B.

arrangements, and 2) how third parties treat shared and non-shared costs – EP then considered the implications for how those same costs would be treated in Nortel's RPS.

In order to identify potential third party joint development arrangements that are expected to be similar to the Nortel RPS, EP conducted three searches using the ktMINE database, a subscription database of intangible property license agreements compiled from the US Securities and Exchange Commission ("SEC") Edgar Archive and other public sources. These three searches are described in turn below.

*(a)    ktMINE Search for Joint Development Agreements in Nortel's Industry and Contiguous Industries*

EP performed a search in the ktMINE database for "joint development" agreements that were classified in Nortel's industry or a contiguous industry. ktMINE allows searches by industry as well as Standard Industrial Classification ("SIC") code. The industry classification is determined by ktMINE in its review of agreements, while SIC codes are assigned based on the industry of the company that files the licensing agreement. Using the ktMINE industry classifications is advantageous for two reasons. First, approximately two-thirds of the agreements in ktMINE have unknown SIC codes because the SIC code is not always included with the filing of the agreement. Therefore, searching exclusively by known SIC codes potentially eliminates a large number of agreements from consideration. Second, since the SIC code is based on the classification of the filing company, it is not always an accurate reflection of the type of technology covered in the agreement. The ktMINE industry classifications are assigned based on a review of the agreement and the intangible property that it covers. For these reasons, EP used these industry classifications rather than SIC codes in the search.

EP searched for "joint development" agreements in the following industries in the ktMINE database:

- Computers: Hardware and Software

- Internet

- Telecommunications

This search yielded 373 agreements that the ktMINE database identified as "joint development" agreements in these three industries.

EP next performed an initial qualitative review of these 373 agreements to determine if the agreement was in fact a joint development agreement.[45] This initial qualitative review removed agreements that were not joint development agreements (*e.g.*, contract R&D services agreements), as well as duplicate agreements.

---

[45] Joint development-type agreements also include agreements that are referred to as "collaboration" agreements, or other similar terms.

This process resulted in 71 joint development agreements in Nortel's industry and contiguous industries, which I reviewed in full. Although EP found relevant information related to the quantification and treatment of costs that I discuss below, we observed that many of the agreements identified by the database did not provide detail related to costs, or that such information was either redacted or not contained in the publicly-available agreement in the database.

Based on my experience and familiarity with the ktMINE database, I know that many of the joint development agreements available publicly are in the pharmaceutical and/or biotechnology industries. This fact is hardly surprising, and is due at least in part to public filing requirements. Obviously, the confidential nature of many of these types of agreements makes it unlikely that companies would publish these agreements unless they were required to do so. Most intangible property agreements (*e.g.,* licensing agreements, joint development agreements, etc.) that are available in the public domain are publicly available because they are classified as "material contracts" and filed with the SEC. For several reasons, a single joint development agreement is more likely to be a material contract for one of the parties in the pharmaceutical or biotechnology sector than one would be for parties in the consumer electronics or software sectors.

Therefore, given that the purpose of this empirical analysis is to understand how third parties engaged in the joint development of intangibles treat shared and non-shared costs, EP also conducted two additional searches to identify publicly available joint development agreements. These searches are described below.

*(b)*      *ktMINE Keyword Searches for Joint Development Agreements*

EP conducted two additional searches to identify potential joint development agreements that are likely to provide useful information for how third parties treat costs when jointly developing a shared intangible, and specifically how third parties define, quantify, and share (or do not share) certain costs. For the reasons noted above, EP expanded its prior search by removing the industry classification screen, meaning that we only required that the agreement be classified as a "joint development" agreement in the ktMINE database.

In order to identify potential joint development agreements that specifically address the treatment of restructuring costs, which is one of the key areas of dispute raised by Drs. Cooper and Felgran, EP conducted a keyword search for joint development agreements in the ktMINE database that mention "restructuring" or some variation thereof anywhere in the agreement. The specific search criteria employed are as follows:

- Agreement Type: Joint Development

- Keyword Search: "Restruct*"[46]

This search resulted in 72 potentially comparable agreements. EP first reviewed each of these agreements to determine how the term "restructuring" (or its variant) was used in the agreement. In each instance, the term was either not used to refer to restructuring costs (*e.g.,* it involved a "standstill" provision), or was not used within the text of an agreement (*e.g.,* the document in the ktMINE database contained a portion of a financial statement, so "restructuring costs" was not used in the context of an actual agreement). Importantly, though not particularly surprising, this initial keyword search provides some evidence that third parties are not explicitly listing restructuring costs as a cost they agree to share in a joint development agreement. The lack of agreements that explicitly discuss restructuring costs does not provide dispositive evidence that third parties do not share these costs, but it comports with economic logic, which suggests that third parties would not agree *ex ante* to share an unforeseen or extraordinary cost like restructuring.

While these 72 agreements do not directly address restructuring costs, these joint development and/or collaboration agreements would still be expected to provide relevant information to examine how third parties treat costs in agreements covering the joint development of shared intangibles. As such, EP examined these 72 agreements to identify which were joint development agreements. Through this process, EP identified 15 joint development agreements.

In order to identify additional joint development agreements that inform how third parties treat costs, and particularly if (and when) third parties agree to share or not share certain costs, EP conducted another keyword search in the ktMINE database. Whereas the first keyword search was specifically directed at the treatment of restructuring costs, this second keyword search was designed to produce a more inclusive set of agreements in which we could observe the treatment of costs more generally. A review of the joint development agreements identified in the initial searches indicated that terms like "development plan" and "own cost" were likely to indicate actual joint development agreements, and provide information on how costs are treated in such agreements.

For these reasons, EP conducted a second keyword search in the ktMINE database using the following search criteria:

- Agreement Type: Joint Development

- Keyword Search: "Development Plan"

- Keyword Search: "Own Cost*"

---

[46] The "*" is a Boolean search operator used by the ktMINE database that searches for variations on the underlying text. In this example, this keyword search would yield terms like "restructure," "restructuring," or "restructured."

This search resulted in 167 potentially comparable agreements. EP then performed an initial qualitative review of these agreements to identify which ones were in fact joint development or collaboration agreements. Through this process, EP identified 76 joint development agreements.

The three searches resulted in a total of 162 potentially comparable agreements, all of which were reviewed in full.

While the ideal would be to find dispositive evidence of how third parties treat each and every line item, this is not always attainable. However, EP did find evidence of how third parties contract around costs in general, including how costs are defined, approval processes are enacted, and cost overruns are dealt with *ex ante*. This evidence has implications related to Nortel's treatment of i) restructuring costs, ii) estimated future non-GAAP pension costs and iii) vendor financing. I discuss the details of my findings for each of these in later sections.

# V.    Restructuring Costs: Response to Drs. Cooper and Felgran

During 2001-2008, Nortel incurred significant restructuring costs driven in large part by the economic turbulence following the bursting of the "dot-com" bubble in 2000-2001. In response to this downturn, Nortel implemented a series of restructuring initiatives between 2000 and its bankruptcy in early 2009, which were primarily focused on workforce reductions that decreased Nortel's workforce by roughly two-thirds. While Nortel did incur restructuring costs in each year from 2001-2008, these costs were concentrated in the immediate aftermath of the bursting of the dot-com bubble in 2001-2002.

The exhibit below summarizes Nortel's annual revenues and restructuring costs for 2001-2008 for all of the RPEs.

**Exhibit V-1: Nortel Restructuring Cost by Year 2001-2008 (In millions of USD)**

| # | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total 2001-2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Restructuring Costs | 2,448.4 | 2,001.6 | 279.9 | 137.0 | 151.7 | 93.6 | 184.4 | 249.0 | 5,545.6 |
| 2 | Third-Party Sales | 18,066.9 | 11,052.9 | 9,652.6 | 8,824.7 | 9,690.0 | 9,574.3 | 8,784.9 | 7,889.0 | 83,535.3 |
| 3 | Restructuring Cost Intensity | 13.6% | 18.1% | 2.9% | 1.6% | 1.6% | 1.0% | 2.1% | 3.2% | 6.6% |

During 2001-2008, the RPEs incurred a total of $5,546 million in restructuring charges, of which 80 percent, or $4,450 million, occurred during 2001 and 2002. As Exhibit V-1 makes plain, the magnitude (and intensity) of such charges were much lower after 2002.

Drs. Cooper and Felgran both assert that NNL should bear certain of these restructuring costs. In Dr. Cooper's view, NNL should reimburse the other Nortel RPEs' restructuring costs in full. Dr. Felgran takes the position that these costs should be shared by the RPEs rather than either being borne locally (per the Nortel RPS) or entirely borne by NNL (as Dr. Cooper proposes).

In this section, I outline the main assertions made by Drs. Cooper and Felgran. It is important to recognize at the outset that Drs. Cooper and Felgran offer very little in the way of support for their assertions from economic logic, an application of the regulations and guidance, or empirical evidence.

It is also important to recognize that Drs. Cooper and Felgran each examine Nortel's treatment of restructuring costs *ex post*, rather than asking the question of how third parties would have agreed to treat such costs *ex ante*. For example, Dr. Cooper asserts that "the relevant question is whether an independent third party would have accepted Nortel's treatment of restructuring costs," and concludes, "I would reasonably expect an independent third party to negotiate for 100% reimbursement of its restructuring costs.[47] Meanwhile, Dr. Felgran devotes considerable time to analyzing the nature of Nortel's restructuring (and NNUK's in particular), asserting (with hindsight) why such costs are "ordinary, usual, and recurring expenses" that should be

---

[47] Cooper TP Report at pages 67 and 75, respectively.

classified as above-the-line operating expenses, and analyzing the *ex post* effects of Nortel's treatment of restructuring costs.

Again, it is easy to assert that no independent party would be willing to "accept" the restructuring charges *ex post*. However, as I discuss in greater detail below, the fundamental question is <u>not</u> whether an entity would have accepted these charges *ex post*, but rather how independent parties operating at arm's length would have agreed to treat restructuring costs *ex ante.*

An evaluation of how independent parties operating at arm's length would agree to treat costs *ex ante* is paramount to properly applying the arm's length principle, particularly in the context of a residual profit split. The OECD Guidelines, for example, state:

> When a tax administration examines the application of the method used ex ante to evaluate whether the method has reliably approximated arm's length transfer pricing, it is critical for the tax administration to acknowledge that the taxpayer could not have known what the actual profit experience of the business activity would be at the time that the conditions of the controlled transaction were established. Without such an acknowledgement, the application of the transactional profit split method could penalize or reward a taxpayer by focusing on circumstances that the taxpayer could not reasonably have foreseen. <u>Such an application would be contrary to the arm's length principle</u>, because independent enterprises in similar circumstances could only have relied upon projections and could not have known the actual profit experience. [Emphasis added]

Answering this question of how independent parties would agree to treat a specific cost such as restructuring *ex ante* requires an evaluation of what economic theory predicts, an application of transfer pricing regulation and guidance, and an evaluation of the available empirical evidence from similar third party arrangements.

The remainder of this section proceeds as follows: in Sections V.A and V.B, respectively, I address each of Drs. Cooper and Felgran's primary assertions regarding the treatment of restructuring costs, and examine their quantitative implications; in Section V.C, I provide empirical evidence for how third parties actually behave in contractual arrangements and settings similar to the Nortel RPS, and the implications of this empirical evidence for how restructuring costs should be treated; finally, in Section V.D, I apply the holistic regulatory framework outlined in Section IV to the issue of the treatment of restructuring costs.

## A.    Dr. Cooper's Assertions, their Quantitative Implications, and My Replies

### 1.    Failure to Apply *Ex Ante* Approach

Dr. Cooper argues that, after the fact, a third party would not be willing to accept restructuring costs. He states, for example, "I would expect an independent third party to seek 100%

reimbursement of these costs."[48] This is clearly an *ex post* evaluation. Dr. Cooper also states that "the relevant question is whether an independent third party would have accepted Nortel's treatment of restructuring costs during the review period."[49] However, this is a misstatement of the question; the correct question is how independent parties would have <u>agreed</u> to treat restructuring costs (not simply what one party would seek), and this must be approached *ex ante*.

In line with the OECD Guidelines, the US transfer pricing regulations are clear that realized risks (*e.g.*, unforeseen costs) should be treated as an issue that the controlled parties should have contracted over *ex ante*. Like the OECD Guidelines referenced above, at Reg. § 1.482-1(d)(3)(iii)(B), the US transfer pricing regulations state the following:

> Identification of taxpayer that bears risk. In general, the determination of which controlled taxpayer bears a particular risk will be made in accordance with the provisions of §1.482-1(d)(3)(ii)(B) (Identifying contractual terms). Thus, the allocation of risks specified or implied by the taxpayer's contractual terms will generally be respected if it is consistent with the economic substance of the transaction. An allocation of risk between controlled taxpayers <u>after the outcome of such risk is known or reasonably knowable lacks economic substance</u>. [Emphasis added]

Dr. Cooper's analysis of restructuring costs is precisely "an allocation of risk between controlled taxpayers after the outcome is known." This is surprising, particularly given that Dr. Cooper recognizes and emphasizes the importance of transfer pricing analyses being on an *ex ante* basis in the Cooper Allocation Report (regarding the choice of allocation keys in an residual profit split method), noting that "a very important point to note is that no one expects the allocation key(s) to be 100% accurate in an *ex post* sense," but that "the allocation keys provide a reasonable *ex ante* basis for sharing the residual profits and losses."[50]

## 2.     Misdirected Focus on Control

Dr. Cooper asserts that NNL directed and controlled Nortel's restructuring activities "with little or no participation by EMEA RPEs or LREs." To support this assertion, Dr. Cooper relies on contemporaneous documents and deposition testimony. According to Dr. Cooper, a former member of the board of directors of NNUK, William Lasalle, testified that restructuring instructions came from the department heads at NNL, and that the NNUK board of directors did not have a role in restructuring decisions. Further, Dr. Cooper cites the testimony of Peter Currie, NNL's CFO, that the ultimate decision-making for restructuring lay with NNL.[51]

Dr. Cooper asserts that because NNL "was the entity that made the business decisions that ultimately led to the restructuring… [NNL] should therefore be responsible for the costs that were subsequently incurred." He goes on to state that "Nortel subsidiaries…had little say or

---

[48] Cooper TP Report at page 65.
[49] Cooper TP Report at page 69.
[50] An "allocation key" is an arithmetic formula for allocation of a financial variable, such as residual profit.
[51] Peter Currie deposition transcript dated October 15, 2013 at page 76.

control as to how their business operations were restructured…[yet] bore the adverse effects of NNL's restructuring initiatives."[52]

There are at least six significant problems with the assertions of Dr. Cooper.

First, consistent with much of his analysis, Dr. Cooper's position that the Nortel "subsidiaries had little say or control as to how their business operations were restructured" is an irrelevant *ex post* assertion. His emphasis on control over the restructuring decisions is an *ex post* examination rather than an *ex ante* examination of how the parties either did, or would have, allocated the <u>risks that were later realized as restructuring costs</u>. Dr. Cooper fails to recognize that the question is "did the entities, *ex ante*, allocate the <u>risks</u> associated with restructuring?" As I discuss later in this section, the answer is that they did – the MRDA is clear that restructuring costs are not shared.

Second, the identity of the controlled affiliate that made the decision to restructure is not the relevant question for transfer pricing purposes. Dr. Cooper's argument regarding control reduces to the idea that NNL controlled NNUK. However, the point of the arm's length principle is to <u>abstract from control</u>. When applying the arm's length principle, we do not say "this is a controlled transaction, and therefore we allocate profit according to how much control each of the controlled affiliates exert." Rather, we say, "assume these entities are <u>uncontrolled</u>, and in light of their functions, risks, and assets, how should we allocate profit?"

Third, evidence exists that his assertions regarding NNL's control are incomplete and selective. In particular, evidence exists that the decision making regarding restructuring was joint in nature, rather than directed solely by NNL. Deposition testimony by Alan Bifield, one of Nortel's CFOs responsible for restructuring and reorganization,[53] indicates that the decisions regarding restructuring were made at a number of different levels. Mr. Bifield's testimony, describing the process of reducing headcount, was that "generally you were going to ask the various areas of the business to see if we can reduce the amount of heads so that we can reduce the cost base of the company,"[54] implying joint decision making with some degree of "veto" authority in the local affiliate. Mr. Bifield follows this up later in his testimony by stating that "at the beginning of the year in session 1… each business would have prepared… its headcount plans." Finally, he states that "the entities that took the people out [*i.e.*, reduced headcount] essentially bore the cost."[55]

Fourth, at least as described by Mr. Bifield, the decision making functions of NNL with respect to restructuring appear similar to stewardship or shareholder activity. In other words, the decisions involve approval of plans pertaining to capital investment – or in this case, disinvestment. The mere fact that a parent company makes such decisions does not imply that it should bear the costs of all of its subsidiaries.

---

[52] Cooper TP Report at page 75.
[53] Bifield deposition transcript dated November 25, 2013, in which Mr. Bifield refers to himself as "global – reorganization global leader" at page 52. Mr. Bifield was also a CFO of Nortel.
[54] Bifield deposition transcript dated November 25, 2013 at page 216.
[55] Bifield deposition transcript dated November 25, 2013 at page 220.

Fifth, it is a poor characterization of the facts to say that there was a "decision" by Nortel at all regarding restructuring. The company was reacting to a sharp downturn in demand for its products. The rapidity and severity of the changes facing Nortel meant that there was no real choice to be made. Restructuring was a business necessity at the time. The question of which entity planned the headcount reductions in the first instance, or which entity approved such headcount reductions, is not particularly relevant.

Sixth, Dr. Cooper ignores the benefits of the restructuring in their entirety. As noted, the restructuring costs were primarily related to reductions in headcount, which mean lower labor costs in the future. NNUK is clearly a beneficiary of lower labor costs for the headcount reductions that occurred at NNUK, and thus it would be illogical for NNL to bear the restructuring costs but then for NNUK to receive the benefit. In this regard, Dr. Cooper's position pertaining to restructuring costs is quite similar to his position pertaining to vendor financing – NNL bears the cost, but benefits are realized elsewhere.

### 3.    Mischaracterization of Operating Expenses

Dr. Cooper attempts to use the fact that Nortel's accounting system classifies restructuring costs as operating expenses as evidence that these costs should be treated as "above-the-line" operating expenses for purposes of the Nortel RPS.

Nortel's MRDA and RPS models did not include restructuring costs as an operating expense when calculating the operating income to be split under the Nortel RPS. Rather, these costs were borne by the entity that incurred the restructuring costs.[56]

Dr. Cooper's statement that Nortel's accounting system classified restructuring costs as operating expenses is true (although I note that NNUK's audited financial statements for the fiscal year ending December 31, 2002 refer to restructuring costs as "exceptional"), but irrelevant. In the context of a residual profit split method, the relevant question is not whether a particular expense is an operating expense from an accounting perspective, but rather whether or not the expense is related to the intangible being shared. Dr. Cooper's analysis answers the first question, but not the second. As I discuss below, by conflating the question of whether or not a cost is classified as an operating expense with the question of whether the cost is related to an intangible being shared, Dr. Cooper does not recognize the fundamental purpose of the residual profit split method in general, and the Nortel RPS in particular.

The residual profit split method is designed to allow parties to jointly fund and share in the profits associated with a specific intangible, as illustrated by the MRDA. Mechanically, applying the residual profit split method involves first defining the combined operating profit <u>associated with the controlled transaction</u>, and then splitting this profit according to each party's routine (*i.e.*, benchmarkable) and non-routine (*i.e.*, not benchmarkable) contributions.

---

[56] As Dr. Cooper notes, the exception to this treatment is that the RPEs shared a portion of the Nortel pure distributors' restructuring expenses in 2002. This treatment and its implications are addressed below.

In light of this, from a purely quantitative standpoint, all operating expenses can be classified as one of three types, as illustrated below.

**Exhibit V-2: Categories of Costs in a Residual Profit Split**



In the calculation of the residual profit to be split, costs that are not pertinent to the intangible being shared are ignored, regardless of whether they are considered to be "operating expenses" from an accounting perspective or not.[57] Only the intangible development costs and closely related (but "routine") costs are included in the determination of residual profit. Each party is remunerated for its routine operating expenses through its routine returns, and then they split the residual profit <u>related to the intangible asset at issue</u> according to their contributions of intangible assets; the residual profit split method is <u>not</u> designed to explicitly share operating expenses.

In Nortel's case, the parties, the tax authorities and Drs. Cooper and Felgran all recognize that R&D investments create the NN Technology that gives rise to residual profit, and therefore the MRDA provides for the joint funding of the R&D, and correspondingly the joint exploitation of the residual profit associated with the RPEs' make-sell rights.

While the preceding discussion demonstrates that the fact that restructuring costs are booked as operating expenses in an accounting system does not lead to the conclusion that such costs should be treated above-the-line in the context of the Nortel RPS, I also considered how third

---

[57] For example, if a company had two business lines – blue widgets and red widgets – but a residual profit split that only covered the blue widget business, then <u>all</u> costs (both operating and non-operating) related to the red widget business would be "unrelated" costs when determining the residual profit earned in the blue widget business for purposes of its residual profit split method calculations.

parties treat restructuring costs in similar arrangements involving the joint development and exploitation of intangibles. Dr. Cooper's assertion that NNL should bear all restructuring costs fails to recognize that third parties routinely limit the scope of the costs governed by the agreement. The empirical evidence, which I discuss later in this section, indicates that uncontrolled parties engaged in the joint development and exploitation of intangible assets explicitly define the costs (and profits) to be shared to correspond directly to the business activity governed by the agreement. This comports with the underpinnings of the Nortel RPS, which draws a correspondence between the jointly funded investments that give rise to the residual profit to be split.

### 4.    Misunderstanding of Effect of Restructuring

Dr. Cooper asserts that Nortel's restructuring initiatives had an adverse effect on the profit-earning capacity of the EMEA RPEs, particularly NNUK. According to Dr. Cooper, Nortel's restructuring initiatives resulted in NNUK suffering "a dramatic cut in its functionality, especially its R&D capacity." Dr. Cooper notes several outcomes of the restructuring, including a decline in NNUK's R&D workforce, the restructuring of the Nortel's optical business, and the sale of certain optical components assets to Bookham Technology plc.[58]

Dr. Cooper cites the decrease in R&D capacity as evidence that Nortel's restructuring reduced NNUK's profit-earning capacity because "Nortel's RPSM allocated residual profit based upon R&D spend." Dr. Cooper claims that "by limiting NNUK's R&D capabilities, NNL had effectively limited NNUK's allocation of Nortel's residual profit." Finally, Dr. Cooper concludes that "since R&D was the primary driver of profits at Nortel…Nortel's restructuring resulted in materially reducing NNUK's 'profit allocation.'" [59]

In asserting that limiting NNUK's R&D capabilities "effectively limited NNUK's allocation of Nortel's residual profit," Dr. Cooper is claiming that Nortel's restructuring stripped NNUK of the right to make (and earn a return on) future R&D investments. Dr. Cooper thus implicitly claims that NNUK owned the right to make future R&D investments (and therefore would own the goodwill associated with those investments), and he "would expect an independent party to be reimbursed for such loss of functionality."[60]

This is not the case. Under the MRDA, NNUK and the other non-NNL RPEs were licensees that were granted a "perpetual" license to "make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology,"[61] that they invested in, but the licensees' claim over residual profit was limited in duration as a result of the fact that the NN Technology had a finite economic life.

The license entitled the non-NNL licensees to a *pro-rata* share of the residual profit earned by Nortel in its manufacture and sale of products in accordance with their prior R&D contributions

---

[58] Cooper TP Report at page 71.
[59] Cooper TP Report at pages 70-75.
[60] Cooper TP Report at page 67.
[61] MRDA (NNC-NNL06001514), Article 5.

(*i.e.,* they were entitled to a return on their historical R&D investments). A licensee is fully compensated for its R&D investment in accordance with the rights granted under the MRDA once it receives its share of residual profit over that R&D investment's economic life. Consistent with this ownership interest, the licensee would have a claim only to the future residual profits associated with its *sunk* R&D investments.

However, the licensees do not have the right to future investment opportunities. This is true under the MDRA, which contains no provision for the right to any other exploitation interests (*e.g.,* the right to make future R&D investments), and is also true under the R&D CSA, under which NNL granted a similar perpetual license with the same limitations in scope and duration as the license granted under the MRDA.

By asserting that NNUK should be reimbursed because Nortel's restructuring initiatives reduced its profit allocation (and future profit-earning potential) under the Nortel RPS, Dr. Cooper mischaracterizes the nature of the economic interest that NNUK owned under the MRDA, and incorrectly assumes that NNUK owned the right to the profits associated with future R&D investments.

## 5.    Selective and Misdirected Statements Made by Certain of Nortel's Tax Personnel and Advisors

To support his conclusions that Nortel did not correctly treat restructuring costs from 2001-2008, Dr. Cooper quotes certain Nortel tax personnel and advisors, including statements regarding the decision to reimburse a portion of the pure distributors[62] restructuring costs in 2002. Dr. Cooper cites statements from Mr. James Gatley, the Transfer Pricing Leader for the Nortel Group, to suggest that Nortel concluded that, because these entities expanded capacity at the direction of NNL, these entities should be reimbursed for a portion of their restructuring costs in 2002.[63]

While Dr. Cooper cites these statements in the context of his discussion of the restructuring costs borne by the EMEA pure distributors, this reasoning mirrors one of the primary arguments that Dr. Cooper puts forth for why the restructuring expenses of the EMEA RPEs should be reimbursed – namely that this restructuring was controlled by NNL.

Dr. Cooper further cites statements by Mr. Ryan Smith (EMEA, Tax Leader), who asserts that the RPEs are "in effect…paying the costs to reduce their share of revenues in the future," and questioned whether it is "economically justifiable for an entity to spend its own money to reduce its future profits."[64] Dr. Cooper also quotes Mr. Kerry Stephens (NNUK, Tax consultant),

---

[62] Dr. Cooper's report uses the term "limited risk entity" or "LRE" to refer to the distribution entities that I refer to as "pure distributors" in this report. It bears noting that I use these terms synonymously in this section to avoid confusion when citing Dr. Cooper's report.

[63] Cooper TP Report at page 80.

[64] Cooper TP Report at page 73.

who questioned why "an individual RPS entity [would] incur 100% of restructuring costs when it is only going to see a proportion of the benefits."[65]

Dr. Cooper believes that these statements indicate that "Nortel's failure to reimburse the RPEs restructuring costs or share these costs within its RPSM was…challenged within Nortel."[66] Dr. Cooper implies that Nortel's treatment of the restructuring costs was therefore incorrect, without offering any assessment of the merits of the arguments.

Mr. Smith's comment regarding an RPE "paying" to reduce its future profits echoes Dr. Cooper's argument that the restructuring reduced NNUK's profit-earning capacity, and likewise relies on the flawed assumption that the non-NNL RPEs owned the right to make future R&D investments. Similarly, the argument that Nortel's tax personnel put forth to rationalize the reimbursement of a portion of the pure distributors' restructuring expenses mirrors Dr. Cooper's own argument applied to the RPEs, despite the fact that these two types of entities face fundamentally different risk profiles.

Such statements highlight why companies hire external professional transfer pricing advisors. Transfer pricing issues often require a careful analysis of economic theory, transfer pricing regulations, and empirical evidence to evaluate how parties would interact at arm's length. In my experience, it is not uncommon for some internal tax personnel to misunderstand the economic implications of their intercompany transactions, or fail to recognize how the arm's length standard should be applied in a particular context, a situation reflected in some of the statements by Nortel tax personnel.

Indeed, some of the statements cited by Dr. Cooper indicate that Nortel is no exception in this regard. For example, in questioning whether it is "economically justifiable" for an entity to incur costs to reduce its future profits, Mr. Smith assumes that the non-NNL RPEs own the right to future investment opportunities, and does not appear to take into consideration whether such rights are indeed granted under the MRDA. Dr. Cooper cites this statement to show that the treatment of restructuring costs was challenged internally at Nortel, but does not point out that the assumption that underpins this statement is not consistent with the rights granted under the MRDA.

Finally, Dr. Cooper quotes selectively from Nortel personnel to support his case, while ignoring other quotations that disagree with his position. For example, in an e-mail to Mr. Mark Weisz (International Tax Director, NNI) on November 20, 2002, on the specific topic of the treatment of restructuring, Mr. Gatley states: "That is, in transfer pricing, it is fairly well recognized that restructuring charges are an item that would normally be considered an extraordinary item and one that would fall below the operating margin line."[67]

---

[65] Cooper TP Report at page 73.
[66] Cooper TP Report at page 74.
[67] EMEAPROD0002337 [emphasis added].

6. **Misunderstanding of Costs and Benefits**

Dr. Cooper argues that requiring an entity to bear its own restructuring costs is inconsistent with the arm's length principle because, he asserts, the costs would be borne individually while the benefits would be shared by the RPEs. Interestingly, Dr. Cooper does not appear concerned that he is suggesting NNL should bear all of the restructuring costs, despite the fact that the other RPEs will benefit from lower labor costs. Dr. Cooper's argument rests on the assumption that these restructuring costs are "public" costs rather than "private" costs. That is to say, Dr. Cooper's argument treats these costs as if they give rise to "public goods" within the firm, meaning that the benefits associated with these costs are diffused throughout the firm.

Dr. Cooper does not offer support for this assumption from either economic theory or empirical evidence. Restructuring costs, by their very nature, tend to be localized and closely related to the operations of the entity undergoing the restructuring. This is true of many of Nortel's restructuring costs, which related primarily to workforce reductions and efforts to reduce overhead and unproductive capacity following the bursting of the dot-com bubble. The benefits of such costs would be expected to inure to the entity incurring these costs as they reduce ongoing costs, operational inefficiencies and unproductive operating expenses and assets. Absent evidence to the contrary – evidence that Dr. Cooper does not offer – it is unclear why Nortel's restructuring costs would be expected to give rise to public goods, the benefits of which would be diffused throughout the firm.

7. **Misunderstanding of Nature of LREs**

Dr. Cooper asserts that, at arm's length, the EMEA LREs would "seek reimbursement" for the restructuring costs they incurred from 2001-2008.[68] Dr. Cooper's rationale is that "the LREs were limited risk entities, and bearing the high, recurring, restructuring costs was inconsistent with that risk profile." To support this conclusion, Dr. Cooper quotes the deposition transcript of Mr. Weisz, who testified that "the risk and functions that an LRD takes is that of a routine corporation," and goes on to state that the Nortel distribution entities "took some risk, but not the inherent risks that were happening within the company."[69]

Dr. Cooper's argument that the LREs should be reimbursed for 100 percent of their restructuring costs is predicated almost entirely on the assertion that the LREs are, in fact, "limited risk" entities. Dr. Cooper offers little in the way of a functional analysis or economic analyses to support his conclusion that these entities were indeed limited risk entities, and relies on the terminology employed by Nortel and the aforementioned testimony of Mr. Weisz to conclude that, because these entities were limited risk entities, bearing such restructuring costs is inconsistent with this risk profile.

As discussed in my first report, the term "limited risk entity" (or "limited risk distributor") was used somewhat colloquially within Nortel, and Dr. Cooper has interpreted Nortel's use of this

---

[68] Cooper TP Report at page 82.
[69] Mark Weisz's deposition dated November 25, 2013 at page 192, as quoted in the Cooper TP Report at page 83.

term to mean that Nortel's transfer pricing policy actually and explicitly limited the risk faced by these entities. Nortel clearly believed that these distribution entities could be benchmarked using third-party distributors, and the distribution agreements bounded the operating margins earned by these entities within relatively wide ranges consistent with the operating margin ranges observed for uncontrolled distributors. For these reasons, as I noted in my first report, the Nortel pure distributors were, in fact, "routine" distributors, rather than limited risk entities as Dr. Cooper assumes.

The very statements from Mr. Weisz that Dr. Cooper cites to support his conclusion that these are "limited risk" entities not only underscore the extent to which terms like "LRD" were used loosely within Nortel, but clearly demonstrate that Nortel erroneously used the term synonymously with "routine." To repeat Mr. Weisz's deposition testimony, "by definition, the risks and functions that an LRD takes is that of a <u>routine</u> corporation"[70] [emphasis added]. Therefore, Dr. Cooper's conclusion that the Nortel distribution entities should be reimbursed for their restructuring expenses because bearing such costs is inconsistent with their risk profile is based on the false premise that these entities are in fact "limited risk" entities.

Uncontrolled "routine," distributors <u>do</u> incur restructuring costs. The fact that the Nortel pure distributors are routine entities (*i.e.*, their risk and functional profile is consistent with uncontrolled companies, and their profitability can therefore be benchmarked) rather than "de-risked" or truly "limited risk" entities does not in any sense suggest that such entities should not bear restructuring costs. Rather, the relevant threshold to consider is empirical: whether the intensity of the below-the-line restructuring costs incurred by the Nortel pure distributors during the 2001-2008 period is consistent with the intensity of below-the-line restructuring expenses incurred by routine distribution companies. As I indicated in my first report, the intensity of the restructuring costs borne by the Nortel pure distributors (taking into account the 2002 reimbursement) was consistent with the intensity of the restructuring costs incurred by comparable routine distribution companies.

### 8.    Incorrectly Reduces Nortel RPS to a Principal-Agent Relationship

Dr. Cooper goes to considerable lengths to suggest a lack of involvement of the EMEA RPEs (and, to a lesser extent the EMEA LREs) in Nortel's restructuring decisions, and to emphasize the degree to which NNL "controlled" and "directed" the Nortel entities to undertake these restructuring initiatives. Dr. Cooper claims that "NNL was the entity that made the business decisions that ultimately led to the restructuring," and that while the EMEA RPEs and LREs had "little say or control as to how their business operations were restructured," they bore "the adverse effects of NNL's restructuring on their profit and loss statements and their future revenue generating abilities."[71] This ignores the more plausible explanation that restructuring was necessitated by market conditions. Furthermore, it ignores the benefits of restructuring enjoyed by the RPEs in the form of lower costs following the restructuring.

---

[70] Mark Weisz's deposition dated November 25, 2013 at p. 192, as quoted in the Cooper TP Report at p. 83.
[71] Cooper TP Report at page 75.

Nevertheless, Dr. Cooper states that he finds it "difficult to comprehend" that "a participant would agree to an arrangement whereby one party restructures another party and changes its functional capabilities without being compensated."[72]

While Dr. Cooper does not go so far as to explicitly assert that the relationship between NNL and the EMEA RPEs was akin to a principal-agent relationship, his position with respect to restructuring costs effectively relies on characterizing the EMEA RPEs as agents operating at the complete direction of NNL. This is in stark contrast to his characterization of the non-NNL RPEs in the Cooper Allocation Report, which goes to great lengths to characterize (and define) the EMEA RPEs as "Entrepreneurs" that bore the full entrepreneurial risk of the business and operated as joint developers (with NNL and the other RPEs) with respect to the R&D activity. These characterizations are completely inconsistent.

Moreover, neither of Dr. Cooper's characterizations of the relationship between NNL and the EMEA RPEs (as a principal-agent relationship in the Cooper TP Report, nor as joint entrepreneurs in the Cooper Allocation Report) are consistent with the parties' own characterization of the relationship as set forth in the MRDA. Article 13 of the MRDA explicitly states that the relationship "shall not constitute a partnership or joint venture for any purpose, nor is one party the agent of another."[73] Rather, as set forth elsewhere in the MRDA, the arrangement creates a license relationship.

## 9.    Quantitative Implications of Dr. Cooper's Assertions

The quantitative implications of Dr. Cooper's position that NNL should bear the restructuring costs for the EMEA RPEs and LREs significantly improves the position of the EMEA RPEs to the detriment of NNL. The exhibit below shows the impact of his approach over the entire 2001-2008 period for NNL and the EMEA RPEs.

---

[72] Cooper TP Report at page 77.
[73] MRDA, Article 13.

**Exhibit V-3: Quantitative Implications of Dr. Cooper's Position With Respect to Restructuring (2001-2008, in millions of USD)[74]**



Dr. Cooper argues that each EMEA RPE and LRE should be reimbursed for the restructuring costs it bore from 2001-2008. During this time, NNUK incurred restructuring costs of $1.06 billion, while NN France and NN Ireland incurred $188.5 million and $28.1 million, respectively.

While Dr. Cooper argues that the EMEA RPEs and LREs should be reimbursed for their restructuring costs, he does not extend his logic to the other Nortel entities. A logically consistent approach would be for NNL to reimburse all of the restructuring costs borne by all of the non-EMEA RPEs and LREs. The quantitative impact of this approach is presented in Exhibit V-4, below.

---

[74] Under Dr. Cooper's approach, NNL <u>also</u> reimburses the restructuring expenses for the EMEA LREs, which is not shown in this chart for simplicity.

**Exhibit V-4: Quantitative Implications of Dr. Cooper's Logically Consistent Approach (in millions of USD)**



If Dr. Cooper were to have applied his logic across all entities, NNI would have received an additional $2.680 billion as reimbursement for its restructuring costs, and NNL's losses would have been higher, totaling $5.5 billion. This is inconsistent with the notion that the parties to the MRDA intended to (and actually did) share in the risks and rewards of NN Technology given that NN Technology was the primary determinant of Nortel's residual profit or loss.

## B.    Dr. Felgran's Assertions, their Quantitative Implications, and My Replies

While Dr. Felgran is somewhat more measured than Dr. Cooper in his assertions with respect to the treatment of restructuring costs, in my respectful opinion, his assertions are not sound.

### 1.    Misunderstanding in respect of Decision Making Authority

Dr. Felgran points to NNL's decision-making role related to restructuring costs to support his conclusions that these costs should be shared by the RPEs rather than borne by the individual entity incurring the expenses. However, Dr. Felgran acknowledges that regional management "had a certain level of autonomy" with respect to restructuring decisions, while "final or ultimate decision-making authority for closing research facilities or reducing headcount resided with top Nortel management in Canada."[75] Dr. Felgran notes that general restructuring directives (*e.g.*, shutting down an R&D facility) would be set forth by top management, and the regional management would be responsible for specific implementation (*e.g.*, selecting the particular lab to be shut down), so the "restructurings that occurred at NNUK and the

---

[75] Felgran Report at page 13.

associated costs reflected the decision-making of Nortel management in light of its overall business strategy."[76]

In short, Dr. Felgran's assertion relies on the same logic as Dr. Cooper's, namely that NNL's decision-making authority in the context of a controlled transaction affects how this transaction should be priced at arm's length. As discussed in Section V.A above, the very purpose of a transfer pricing analysis is to determine how the parties would interact absent the existence of control. For this reason, which party actually made final decisions in a controlled transaction is not relevant, and certainly not dispositive, because such information yields little insight into how the parties would actually behave at arm's length. Dr. Felgran's analysis neglects the more fundamental question of how uncontrolled parties would have agreed to treat these costs *ex ante*.

## 2.        Misunderstanding of Nature of Restructuring Costs

Dr. Felgran states that the "occurrence of frequent, ongoing restructurings and the absorption of their associated costs were part and parcel of Nortel's overall business strategy," and that the restructuring costs were "designed and executed in an attempt to re-align the company with its products and markets, and to benefit the entire group of companies in the future."[77] Dr. Felgran's discussion is short on analysis or empirical evidence to support the assertion that the restructuring costs would "benefit the entire group of companies in the future." Nevertheless, Dr. Felgran argues that "restructuring costs should have been considered part of Nortel's ordinary, usual and recurring operating costs for transfer pricing purposes," and concludes that "the ordinary, usual and recurring nature of Nortel's restructuring activities over this period render them similar to ongoing operating expenses from an economic perspective," and should therefore be included as an above-the-line expense in the Nortel RPS.[78]

Dr. Felgran misstates the fundamental question regarding how a particular cost should be treated under the Nortel RPS, which is not whether the cost is "ordinary, usual and recurring," but rather whether the cost gives rise to revenue that is associated with the intangible that is being shared under the Nortel RPS. Moreover, Dr. Felgran's use of the phase "ordinary, usual and recurring" implies that these restructuring costs were in fact akin to normal operating expenses. As I demonstrate below, while a small portion of Nortel's restructuring costs were indeed "recurring" over the 2001-2008 period, the mere fact that Nortel incurred restructuring costs in every year does not imply that these particular expenses were ordinary and usual. Indeed, an examination of the magnitude and intensity of these costs indicates that it is not appropriate to assume that these costs were akin to normal operating expenses. Indeed, the NNUK audited financial statements for the fiscal year ending December 31, 2002 refer to restructuring expenses as exceptional.[79]

---

[76] Felgran Report at page 13.
[77] Felgran Report at pages 12 and 17.
[78] Felgran Report at pages 17-18.
[79] NNC-NNL10119509.

As I noted in Section V.A above, the Nortel RPS (or any residual profit split method) is not intended as a method in which parties share operating expenses, or any other type of expenses for that matter. Rather, in a residual profit split parties agree to fund investments individually in exchange for a share of the returns from a jointly-created intangible. That is, costs – including the intangible development costs that give rise to the shared intangibles – are incurred privately, and the participants only agree to share the returns from the jointly-developed intangible.

Dr. Felgran points to the fact that Nortel incurred restructuring costs in every year from 2001-2008 as evidence that these costs are "ordinary, usual and recurring." While Nortel did incur restructuring costs in each year during the period, the mere fact that a large multinational corporation restructured its operations in successive years does not imply that these particular restructuring costs are "ordinary, usual and recurring" expenses for transfer pricing. Both the magnitude and intensity (*i.e.*, restructuring costs as a percent of sales) of Nortel's restructuring costs varied significantly over the 2001-2008 period, with the vast majority of these costs coming in 2001 and 2002.

### 3.    Misunderstanding of Role of Accounting Characterization

Dr. Felgran contrasts Nortel's treatment of restructuring costs as below-the-line for transfer pricing purposes "to their 'above-the-line' US GAAP treatment" in Nortel's accounting system.[80] Dr. Felgran characterizes Nortel's accounting treatment of restructuring costs "noteworthy" because he believes it "indicates Nortel management's judgment and representations to the investing public, accepted by its auditor, that these restructuring costs should be considered part of normal operations."[81] However, I note that Nortel's Form 10-K/A for the fiscal year ended December 31, 2002 refers to restructuring expenses as "special charges."[82]

Dr. Felgran focuses on the question of whether such expenses would be treated as operating expenses under US GAAP. As discussed in Section V.A above, the underlying question when determining how to treat a cost under the Nortel RPS is not whether or not the cost is an operating expense, but rather whether or not the cost gives rise to the revenue associated with the intangibles that are shared under the Nortel RPS. The residual profit split method in general, and Nortel's RPS in particular, do not explicitly provide for the sharing of operating expenses. Rather, the very nature of a residual profit split method is that the parties agree to incur intangible development costs individually in exchange for a share of the residual profit associated with the jointly-developed intangibles. Thus, Dr. Felgran's emphasis on restructuring costs as operating expenses fails to address the fundamental question of whether such costs give rise to the revenue associated with the intangibles.

---

[80] Felgran Report at page 13.
[81] Felgran Report at page 18.
[82] NNC-NNL10119509: I note that NNUK's audited financial statements for the year ending December 31, 2002 also refer to restructuring activity as "exceptional."

Dr. Felgran's conflation in this case of expense treatment for transfer pricing purposes and expense treatment for accounting purposes is particularly puzzling in light of his article, published in the BNA Transfer Pricing Report, where Dr. Felgran, correctly, states that "depending on the circumstances, GAAP's treatment of certain restructuring expenses may not mesh with appropriate treatment under Regs. §1.482-5(d)(4), as it is possible that items recorded above the line may be considered restructuring expenses and, thus, should be considered for exclusion to conform to the Section 482 definition."[83] In his conclusion on the treatment of restructuring costs for transfer pricing purposes, Dr. Felgran notes that "it is imperative that transfer pricing professionals turn a discerning eye towards the appropriateness of allowing restructuring expenses to remain in the determination of operating profit employed for CPM [comparable profits method] analyses."[84]

### 4. Misunderstanding of Nature of Nortel RPS

Dr. Felgran concludes that the appropriate arm's length treatment of Nortel's restructuring costs would be for the RPEs to "pool" or "share" the restructuring costs as operating expenses. The effect of this treatment of restructuring expenses is that the RPEs would be effectively "sharing" or "pooling" the risks associated with these restructuring costs. That is, by treating the restructuring expenses as an above-the-line operating expense that would be shared *pro-rata* by the RPEs, Dr. Felgran is *de facto* allowing each RPE to share the risk associated with its own local restructuring expenses. In other words, the effect of Dr. Felgran's treatment of restructuring expenses is to re-characterize the Nortel RPS as a risk-sharing arrangement by which participants would be allowed to pool their restructuring-related risk by treating it as an operating expense.

Such a characterization is inconsistent with the purpose of a residual profit split in general, and inconsistent with Nortel's own RPS, as codified in the MRDA. The scope of a residual profit split is generally not so broad as to allow participants to pool all of their risks, and Nortel's RPS is no exception. The MRDA clearly sets forth that the participants agree to individually incur R&D investments in exchange for a *pro-rata* share of the residual profit associated with the resulting intangibles. The MRDA does not provide for the sharing of other risks.

### 5. Quantitative Implications of Dr. Felgran's Assertions

As noted, Dr. Felgran's position is that the restructuring costs should have been shared by the Nortel RPEs. Rather than each individual entity bearing its own restructuring costs "below-the-line", these costs would be shared in proportion to their R&D capital stocks.  Exhibit V-5, below, provides a comparison between the amount of restructuring costs borne by each entity if the costs are borne natively (*i.e.*, as Nortel treated the restructuring costs) and if the costs are shared (*i.e.*, Dr. Felgran's approach).

---

[83] Felgran, Steven D., Steven D. Harris, Julie R. Briks, and Cherie Lehman, "Treatment of Restructuring Expenses in the Application of CPM," 15 Transfer Pricing Report 755, *Bureau of National Affairs*, February 21, 2007 at page 1.
[84] *Ibid.* at page. 7.

**Exhibit V-5: Quantitative Implications of Dr. Felgran's Approach to Restructuring Costs (in millions of USD)**



The blue columns represent the restructuring costs borne by each entity under Nortel's approach, while the red columns represent the restructuring costs under Dr. Felgran's approach.

**Exhibit V-6: Increase/(Decrease) In Restructuring Costs Borne by Entity (2001-2008, in millions)**

| Entity | Native<br>A | Shared<br>B | Increase / (Decrease) in<br>Restructuring Costs<br>C = B - A |
|---|---|---|---|
| NNL | 1,357.8 | 1,859.3 | 501.5 |
| NNUK | 1,063.8 | 406.6 | (657.2) |
| NNSA | 188.5 | 364.9 | 176.4 |
| NN Ireland | 28.1 | 44.3 | 16.2 |
| NNI | 2,679.9 | 2,623.0 | (56.9) |
| NN Australia | 56.8 | 23.0 | (33.7) |

As shown above, under Dr. Felgran's approach, most of the RPEs are either worse off by sharing the restructuring costs or approximately breakeven. The notable exception is NNUK, which, as a result of decreased restructuring costs, is enriched by $657.2 million under Dr. Felgran's approach.

**C.      What Third Parties Do: An Evidence-based Reply**

In my view, economic theory predicts that we should not expect third parties in a profit sharing arrangement to agree to share restructuring costs. Consider a hypothetical example in which two parties agree *ex ante* to share all of their costs, including their restructuring costs. Because the costs stemming from each of these parties' decisions are partially externalized to other members, both of the parties would have insufficient incentives to control costs, a problem which has been extensively studied by economists and game theorists. This is precisely why, as discussed below, uncontrolled parties in profit sharing arrangements such as joint development agreements carefully define, *ex ante*, the costs that are to be shared.

The question then is whether real world evidence of what third parties do with restructuring costs in situations similar to the Nortel RPS also tells us that these costs would remain local, as they did in my analysis.

To this end, EP examined, at my direction, what third parties actually do in contractual arrangements and settings similar to the Nortel RPS. My search strategy was described above in Section IV.B. My findings and what this empirical evidence tells us about Nortel's treatment of restructuring costs are discussed below.

As I note previously, <u>none</u> of the joint development agreements I reviewed specifically identified restructuring costs as a cost that the parties agreed to share. This fact is instructive as it indicates that third parties would not agree to share unforeseen future costs like restructuring costs *ex ante*.  This is not particularly surprising given the incentives problem discussed above.

It is also instructive to examine how third parties in joint development arrangements define and quantify costs, particularly those that pertain to the intangible development activity covered by the agreement, in order to infer how third parties would approach restructuring costs. The definition of costs, the contractual terms surrounding the sharing of costs, and the types of costs that parties agree to share and not share all provide useful evidence of how restructuring costs would likely be treated at arm's length.

Many third party joint development agreements explicitly define the costs (often referred to as "development costs") that pertain to the intangible property being developed, that will be allocated among the parties in some manner. Not only do many joint development agreements define what constitutes a "development cost" (*i.e.,* what particular expenses a party can and cannot count as a development cost), many agreements define the development costs to be incurred in accordance with a "development plan" and "development budget" that the parties mutually agree to *ex ante*. Of the 162 joint development agreements that I reviewed, there were 53 agreements wherein parties agreed to share costs in some manner related to the development and/or exploitation of intangibles.[85] All 53 agreements provided a definition of "development

---

[85] As a common alternative to explicitly sharing development costs, parties entering a joint development agreement may instead agree to perform defined tasks while keeping their respective costs segregated. In other words, each party is responsible for its own costs.

costs" (or an analogous term) that explicitly limited in some way the expenses that a party could treat as a development cost. Similarly, I found that 52 of the 53 agreements contained provisions whereby the parties agree *ex ante* to conduct development activity in accordance with a mutually agreed development plan and/or budget.

In addition to the fact that third parties in joint development agreements tend to limit the scope of the costs to be shared *ex ante* by defining what expenses constitute development costs and prescribing development plans and budgets for the jointly developed intangible, the contractual terms surrounding the sharing of costs and the conditions under which parties do not share such development costs are also instructive.

Some variation exists in precisely how third parties agree to "share" the costs associated with the jointly developed intangible. A common mechanism is for each party to be assigned to discrete activities under the development plan, with each party using its own resources and initially incurring its own costs. Under this mechanism, the costs are then reallocated to align their costs actually borne with the funding shares set forth in the agreement (*e.g.,* each party bearing 50 percent of the development costs).[86]

Absent any other provisions, this type of cost sharing mechanism could give rise to a monitoring problem because one party would not know whether the other party's costs are actually related to the shared development activity, or if the costs are excessive. As discussed above, third parties address the first issue by explicitly defining the costs that can be shared, and by requiring that each party conduct their assigned development activities pursuant to a jointly-approved development plan and/or budget. In other words, third parties typically require that each party executes its activities in accordance with a pre-approved development plan, and agree to share the costs for an activity insofar as they are consistent with the budgeted amount for that activity.[87]

Finally, my review of the third party joint development agreements indicates that third parties do, in some instances, address the question of whether a cost (even a "development cost" related to the shared intangibles) is an "excess" cost, and whether such excess costs are to be shared. Specifically, some of the third party joint development agreements contemplate "cost overruns" in which the party responsible for a particular development activity incurs costs in excess of the budgeted amount for that activity under the agreed-upon development plan and budget.

Of the joint development agreements reviewed, I found that 28 of the 52 agreements that specify a development plan and/or budget explicitly addressed cost overruns. Of the agreements that did address cost overruns, I found that the parties generally define a *de minimis* or "allowable" threshold (*e.g.,* within 10 percent of the budgeted amount) below which the overrun is included

---

[86] An alternative mechanism assigns each party a task under the development plan, and that party is solely responsible for its completion and its own costs incurred therein.
[87] Of the third party joint development agreements reviewed, I found that 52 describe a development plan and/or budget and require that the parties share costs pursuant to that budget.

in the shared development costs. For cost overruns that exceed the specified threshold, the third party agreements typically require that the excess cost overrun will be borne by the party incurring the expense (*i.e.*, such costs will not be shared), and at a minimum provide that the party incurring the overrun must seek approval before the excess costs could be shared. I found that nearly all of the agreements that do discuss cost overruns specify that the "excess" costs (*e.g.*, the costs above the *de minimis* threshold, or costs deemed to be excess by a joint committee of the parties) will be borne solely by the party incurring the excess, or that the treatment will be decided jointly by the parties on a case-by-case basis.

Thus, the evidence shows that third parties engaged in joint development arrangements often contract around the scope of the costs to the shared, and how to treat excess costs should they arise. This can be used to infer how they would be likely to treat restructuring costs, and the empirical evidence indicates that third parties would not agree *ex ante* to share restructuring costs. As discussed above, third party agreements indicate that the parties agree *ex ante* that costs will be shared if and only if they are specifically related to (or reasonably allocable to) the development activity covered by the agreement. This would imply that restructuring costs would not be shared because such costs are not related to the development of the jointly-developed intangibles under the MRDA.

Moreover, the way in which third parties address "excess" costs indicates that *ex ante* third parties would not have agreed to share restructuring costs. As noted, third parties generally agree to share development-related costs only insofar as these costs are set forth in a mutually agreed upon plan or budget associated with the development of the shared intangible, and do not agree to share "excess" costs *ex ante* even if these costs are related to the development of the shared intangibles. Nortel's restructuring costs are, by their very nature, "extraordinary" or "excess" costs. For these reasons, the empirical evidence from joint development agreements indicates that third parties would not have agreed to share these restructuring costs *ex ante*.

## D.    What Transfer Pricing Regulation and Guidelines Tell Us: Holistic Application of the Regulations

As discussed in Section IV, the OECD Guidelines offer a systematic approach for dealing with the question of which controlled party or parties should bear significant realizations of risk, particularly in cases where those risks were either unforeseen or the parties' contractual arrangements were silent or unclear regarding how to deal with them. The OECD Guidelines seek logical ways to "fill in" contractual terms that were missing *ex ante*, but that need to be filled in *ex post* once a partially or wholly unforeseen risk is realized.

In this Section, I apply that framework to the treatment of restructuring costs. Exhibit V-7, below, reproduces the heuristic flowchart described in Section IV as applied to the treatment of restructuring costs.

**Exhibit V-7: Application of Holistic Regulatory Framework to Restructuring Costs**



In applying this framework to Nortel's restructuring costs, the first question is whether or not the legal agreement (*i.e.*, the MRDA) contains a term covering the cost in question (*i.e.*, restructuring costs). The MRDA clearly states that restructuring charges are <u>not</u> treated as operating expenses for the purposes of computing "adjusted operating earnings/loss."[88] In my view, the MRDA is clear about how these costs should be treated.

Given that the MRDA explicitly addresses this risk of restructuring costs, the next step in applying this holistic regulatory framework is to evaluate whether, *ex ante*, the form of the arrangement is consistent with its substance. In other words, was it economically rational for the participants to enter into this agreement *ex ante*? As I conclude in my first report, the form and substance of the MRDA and Nortel RPS cohere. It would have been economically rational for the participants to enter into the MRDA as, *ex ante*, they would have expected their investments to be NPV positive for their product make-sell rights under the MRDA. Therefore, it is my view that the legal agreement is dispositive of the issue of whether restructuring costs are to be shared under the Nortel RPS.

---

[88] This treatment of restructuring costs was formally addressed in the MRDA with the Third Addendum. Schedule A in the original agreement is not explicit on this point but the parties clearly acted on the basis of this same agreement with respect to the treatment of restructuring costs.

While in my view the agreement is dispositive, in order to fully evaluate how restructuring costs should be treated, I also examine how to treat restructuring costs if (1) the legal agreement had not contained a covering term, (2) the form of the agreement was not consistent with the substance, or (3) it were unclear whether or not the form was consistent with the substance. In any of these instances, the next step in this evaluation is to empirically examine whether or not third parties address how these costs are treated *ex ante*.

Accordingly, EP conducted an extensive review (outlined in Section IV.B, above) of third-party contractual arrangements in settings similar to the Nortel RPS. Through this search, I found that in general third parties do not explicitly allow "restructuring costs" when defining the costs to be shared (or not shared) under the agreement. While the lack of explicit evidence that third parties allow each other to include restructuring costs in the shared cost pool (*i.e.*, the lack of agreements that explicitly mention restructuring costs as an allowable cost to be shared) does indicate that third parties are not in fact sharing these costs (a result consistent with economic theory), the lack of such evidence does not conclusively disprove that such costs could be shared. One could, accordingly, potentially argue that it is "unclear" whether or not third parties share these costs.

Assuming that it is unclear whether or not third parties share restructuring costs, the next question to evaluate is whether the cost in question pertains to the shared intangibles that are the subject of the Nortel RPS. As noted above, the MRDA (and the Nortel RPS) covers the joint development of NN Technology used in the Products business. That is, the shared intangibles that are the subject of the Nortel RPS cover the R&D activity related to the development of the NN Technology. Nortel's manufacturing and distribution related restructuring costs do not pertain to the development of the shared intangibles covered by the Nortel RPS, so these particular restructuring costs would not be shared. As I discuss below, this leaves the R&D-related restructuring costs, which could <u>potentially</u> be related to the shared intangibles covered by the Nortel RPS.

Before turning to the final step in applying the holistic framework, it is instructive to recognize that third parties appear to follow a similar heuristic when determining which costs are and are not shared. That is, many joint development agreements explicitly define the costs associated with the development of the intangibles covered by the arrangement, and require that such "development costs" include only those costs that are specifically attributable to (or reasonably allocable to) the development activities that are set forth in a pre-approved development plan and development budget.

The final step in applying the holistic regulatory framework is to evaluate whether those costs that do or may pertain to the shared intangibles are "excess" costs or not. Economic theory would suggest that parties operating at arm's length would agree to share costs that relate to the development of the shared intangible to the extent that such costs conform to the reasonably anticipated costs required to develop the shared intangibles, but that they would not share excess costs. To this end, empirical evidence from joint development agreements indicates that third parties do indeed define the scope of shared costs to include costs that pertain to the

development of shared intangibles, and moreover often set forth how to treat potential "excess" costs or cost "overruns."

In many joint development agreements, the parties agree to perform development activities set forth in accordance with a jointly-approved development plan and budget, specify what costs can be treated as development costs, and specify how such costs will be shared. Furthermore, many third-party joint development agreements provide mechanisms to address the case where the cost of completing a particular development activity exceeds the pre-approved budget amount for that activity (a cost or budget "overrun"). Those agreements that do address such "excess" costs generally define a *de minimis* or "allowable" threshold (*e.g.,* within 10 percent of the budgeted amount) below which the overrun is included in the shared development costs. For cost overruns that exceed the specified threshold, the third party agreements typically require that the excess cost overrun will be borne by the party incurring the expense (*i.e.,* such costs will <u>not</u> be shared), and at a minimum provide that the party incurring the overrun must seek approval before the excess costs could be shared. This third party evidence indicates that "excess" costs typically are not shared, or at a minimum that the parties will separately negotiate their treatment on a case-by-case basis. In other words, the third parties generally do not agree *ex ante* to share unforeseen excess costs.

In the context of Nortel's R&D-related restructuring costs, the preceding discussion indicates that, even if these specific restructuring costs may be somewhat related to the shared intangibles, they are "extraordinary" or "excess" costs, and therefore would not be shared under the Nortel RPS.

## VI.    Vendor Financing Losses: Response to Dr. Cooper

Nortel's vendor, or customer, financing involved procuring or providing financing to Nortel's customers. Generally, Nortel's customer financing arrangements included financing in connection with the sale of products and services, as well as funding for non-product costs associated with network installation and integration of products and services.

Customer financing is an activity performed by most companies. Indeed, any time that a company provides goods or renders services in return for payment later (a receivable), the seller is providing customer financing.

Companies provide such financing because goods and services sold to customers involve costs borne well before revenue (payment from customers) is received. In order to sell anything, most companies have had to make cash outlays (for example, for labor) in the hope of recovering those cash costs later through the sales of products or services to their customers. In order to alleviate this cash flow timing problem, most companies seek to have their own input suppliers provide inputs (for example, components) on credit. This process filters all the way through the economy, and as a result nearly all firms sell to one another on credit. That is, most firms trade goods or services to their customers in return for a receivable (a promise to pay later).

Due to industry and economic circumstances, many of the customers that entered into customer financing arrangements with Nortel were not able to repay Nortel, which generated losses for the company. These losses were included as part the residual cost pool.■ They are, in reality, amounts of <u>revenue</u> that Nortel expected to obtain following the extension of product or service financing to a customer, but ultimately did not obtain (*i.e.*, customer financing losses are in effect a revenue reduction). When calculating operating profit under GAAP, reduced revenue ultimately leads to a reduction in operating profit, or turns operating profit into losses if the revenue reductions are sufficiently large.

On net, customer financing is not necessarily a cost to the firm. For example, as I discussed earlier in Section III, in theory, when markets function perfectly, a firm that allows customers to purchase on credit will recover the cost of this financing activity (*i.e.*, the capital cost) through higher prices paid by those customers. If the theory held, this would be true of both short and long term accounts receivable (vendor financing was treated as both in Nortel's case). During the 2001-2005 period, much of Nortel's vendor financing activity proved unproductive.

In other words, vendor financing (a form of working capital) is provided in the hope of recovering that financing through a return to the working capital that is embedded in higher prices paid by customers. Therefore the <u>net</u> cost of customer financing is the proper cost to examine – *i.e.*, the losses net of an estimate of the return (if any) to customer financing. This net is reflected in a company's net sales and GAAP operating profit.

---

[89] ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.

Under the RONA-based approach to routine returns, the RPEs received an 8.9 percent rate of return on their net receivables, which included short term vendor financing, and a 23.6 percent rate of return on long term receivables, which included long term vendor financing. The RPEs also bore vendor financing losses corresponding to this capital.

However, Dr. Cooper asserts that NNL should bear 100 percent of the vendor financing losses. Dr. Felgran, on the other hand, has not taken any issue with their treatment under the MRDA and the Nortel RPS.

Dr. Cooper errs quite dramatically in his analysis by putting the <u>cost</u> of customer financing in NNL, while at the same time placing his estimate of the <u>benefit</u> of customer financing in the RPEs (NNUK, NN Ireland, and NNSA in particular).

Dr. Cooper takes the inherently contradictory position that: 1) capital losses should be borne by NNL, and 2) at the same time, the capital that proved to be unproductive (*i.e.*, the losses themselves) is somehow assumed to be *productive* when computing the working capital returns that should accrue to NNUK and the other RPEs for their routine functions. While it is clear that vendor financing was not a very productive asset, even if it were productive, NNUK's losses cannot be placed in NNL while at the same time NNUK accrues the corresponding benefit reflected in the return to working capital.

In what follows, I expand on my response to Dr. Cooper's analysis.

## A.    Response to Dr. Cooper

### 1.    Misdirected Focus on Decision Making

Dr. Cooper argues that NNL made all of the essential decisions pertaining to vendor financing. In particular, Dr. Cooper views the relationship between NNL and the other RPEs as one which is, effectively, a principal-agent relationship.

There are at least three serious problems with Dr. Cooper's control argument.

First, Dr. Cooper's assertions are not borne out when subjected to empirical scrutiny. I discussed the facts surrounding the question of whether NNL or the RPEs made the customer financing decisions in my first report. As I noted there, Nortel's customer financing Corporate Procedure clearly states that NNL Credit Committee approval was only required for some customer financing deals, but certainly not all deals. According to Nortel's customer financing policy, Corporate Procedure No. 302.48 (the "Nortel Customer Financing Policy"), deals were categorized into one of five levels.[90] Levels were determined by a combination of deal size (*i.e.*, dollar amount of financing extended to customer), as well as the credit rating assigned to the

---

[90] Nortel Corporate Procedure No. 302.48: NNC-NNL016088.

customer.[91] Exhibit VI-1, below, specifies the level assignments for customer financing deals as outlined in Nortel's customer financing corporate procedure.[92]

**Exhibit VI-1: Assignment of Customer Financing Levels**

| Amount (US$ millions) | Credit Rating | | | |
|---|---|---|---|---|
| | A | B | C | D |
| $1 to $5 | 1 | 1 | 1 | 1 |
| > $5 to $10 | 1 | 2 | 2 | 2 |
| > $10 to $25 | 2 | 2 | 2 | 3 |
| > $25 to $50 | 3 | 3 | 3 | 4 |
| > $50 to $100 | 3 | 3 | 4 | 5 |
| Over $100 | 5 | 5 | 5 | 5 |

The Nortel Customer Financing Policy only required NNL Credit Committee approval for deals assigned with a rating of Level 3 or higher. Level 1 and 2 customer financing deals were approved by regional and business segment finance and credit management VPs, and in the case of Level 2 deals, the NNL treasurer and NNL controller. Customer financing deals as high as USD $25 million did not require NNL Credit Committee approval.[93] And while Level 3 deals and higher required Nortel Credit Committee approval, they were still subject to the review and approval by geographic region and business segment Finance VPs, as well as the VP of Credit Management.

Dr. Cooper also ignores the fact that the local Nortel entities, including the RPEs, performed most of the crucial functions associated with vendor financing. As discussed in my first report, local entities and the business segments were responsible for (a) identifying potential customers who may require customer financing, (b) conducting initial due diligence on the customer, and (c) developing the terms and conditions for customer financing agreements. Due diligence performed by the local entities and business segment personnel included an initial risk assessment of the customer by reviewing their business plans, as well as a review of their public credit rating.[94] As such, the local Nortel entities and business segments were involved in assessing and establishing these deals well before the NNL Credit Committee reviewed and approved the particular terms. The decision making process associated with structuring and arranging customer financing started with, and required significant involvement by, the local

---

[91] As discussed in Nortel's customer financing corporate procedure, credit rating (A) was assigned to companies with credit risk determined by leading rating agencies such as Moody's and S&P as investment grade. A rating of (B) meant the customer credit risk was either deemed investment grade, or the customer benefited from adequate security/cash flow. A rating of B also meant most or all political, economic, financial, currency availability, and industry/customer specific factors were positive. A (C) rating meant one or more political, economic, financial, currency availability and industry/customer specific factors were uncertain, which could lead to inadequate capacity to repay obligations. A credit rating of (D) meant there was a greater risk of default due to ongoing exposure to political, economic, financial, currency availability, and industry/customer specific factors.
[92] Nortel Customer Financing Policy at Section 4.1(f).
[93] Nortel Customer Financing Policy at Section 4.1(f).
[94] Nortel Draft Responses delivered to IRS regarding Joint Request on September 22, 2006 (NOR_54402905.116 - NOR_54402905.119), in particular, see letter dated September 22, 2006 (NOR_54402905.117).

Nortel entities and the business units. The local entities and business segments were heavily incentivized to be actively involved in identifying these deals, as well as the whole customer financing process, because these deals provided a direct benefit to them in the form of increased revenues.

Dr. Cooper's position that NNL should bear all customer financing losses is also economically inconsistent with additional terms set forth in the Nortel customer financing Corporate Procedure. Specifically, the Corporate Procedure stipulates that NNL was not able to capture the benefits associated with customer financing deals in which it was not a direct selling entity, so it is not economically logical that it should bear all of the costs. To this point, when possible, Nortel's customer financing departments sought to sell finalized customer financing agreements to third parties for collection. This policy removed these arrangements from the balance sheet and provided the selling company with an immediate infusion of cash. Section 4.9(e) of the Nortel Customer Financing Policy states that any third party sale of customer financing agreements that results in a gain or loss will be attributed to the selling entity, not NNL (unless NNL was the selling entity). Thus, the Nortel Customer Financing Policy explicitly recognized that the benefits of customer financing sales should accrue to the local selling entities. If RPEs are to take full credit for their share of the benefits, it only makes economic sense for the RPEs to also bear their share of the losses.

The second – and even more fundamental – problem with Dr. Cooper's control argument is that the identity of the controlled affiliate that made the final, or for that matter the local and immediate, decisions to finance Nortel's customers is not the relevant question for transfer pricing purposes. Dr. Cooper's core argument related to decision making authority is that NNL controlled NNUK.

Again, the very point of the arm's length principle is to <u>abstract from control</u>. When applying the arm's length principle, we do not say, "this is a controlled transaction, and therefore we allocate profit according to how much control each of the controlled affiliates exert." Rather, we say, "assume these entities are <u>uncontrolled</u>, and in light of their functions, risks, and assets, how should we allocate profit?"

Dr. Cooper's approach, however, ignores functionality almost entirely (but for the function of making decisions). Moreover, his approach ignores risks and assets entirely in that it does not view the question of which entity <u>actually lent monies</u> to customers as relevant. The regulations specifically point to assets as a key determinant of arm's length profit[95] (*e.g.*, capital such as vendor financing related loans and working capital), and given that the working capital that later became the customer financing losses was owned by NNL and the other RPEs, vendor financing losses should have been shared.

The relevance of ultimate decision making authority versus local decision making authority is much more limited than Dr. Cooper's arguments would imply. Final decision making authority is not a sufficient condition for the costs and benefits *associated with* certain decisions to accrue to

---

[95] OECD Guidelines, Chapter 6, section B.2.

one party - rather, decision making is only dispositive in conjunction with other considerations. For example, in situations such as controlled contract R&D or contract manufacturing arrangements, in which one entity: 1) owns operating and other intangible assets related to a function, 2) exerts strategic and some tactical decision making and control over the function, 3) funds the function, and 4) contractually bears the risks associated with the function. In these situations, one entity is clearly responsible for 100 percent of losses associated with a given activity.

I note that the OECD Guidelines at Chapter 9 discuss decision making authority and control in relation to related parties' ability to avoid or control a risk.[96] The OECD Guidelines point out that, *ex ante*, two parties might agree that the party with the greater control over a risk, or the greater ability to avoid the realization of that risk, may in some cases agree to bear the cost of the risk, should it be realized. In Nortel's case, as Dr. Cooper points out, it was the sales personnel of the RPEs who had relationships with the customers receiving long term financing, and who proposed and structured the vendor financing deals. As these sales personnel had relationships and localized information pertaining to these customers, it seems logical to conclude that the RPEs had greater knowledge of and control over the risk than NNL. Therefore, if there is an *ex ante* rational alternative to sharing vendor financing losses, it would be that the RPEs themselves would bear these losses, not that NNL would bear them entirely.

Third, given Dr. Cooper's emphasis on decision making and control, it is surprising that he fails to examine the question of whether the decision making in NNL was a form of stewardship activity. His description of NNL's ultimate decision making authority over large financing transactions is <u>quite consistent with the concept of stewardship or shareholder activity</u>. Stewardship and shareholder activities are, as Dr. Cooper defines them in his own report, activities that are of the nature of parental oversight and stewardship of capital investments in or made by subsidiary companies.

If the customer financing decisions are contained in his stewardship costs, or if his definition of stewardship costs would logically include NNL's customer financing-related decision making, then NNL cannot be the "economic owner" of the customer financing losses. Stewardship activities do not make an economic contribution to the activities or assets toward which such stewardship activity is directed.

## 2.    Failure to Understand Nature of Vendor Financing Costs

In his analysis of <u>restructuring costs</u>, Dr. Cooper makes certain assertions about the implications of Nortel's accounting treatment of such costs. Specifically, he argues that Nortel's treatment of restructuring costs as an operating expense implies that these costs should either be borne by NNL (I note that the logical connection here is not at all clear) or shared.

However, Dr. Cooper's discussion of <u>customer financing costs</u> is silent on the implications, if any, of Nortel's accounting treatment of these costs. This is odd, particularly in light of the fact

---

[96] OECD Guidelines, Chapter 9, section B.2.2.1

Section 9.2.1 of the Cooper TP Report details Nortel's corporate accounting and financial policies regarding vendor financing.

Perhaps the reason for Dr. Cooper's silence is that the vendor financing losses are not only an operating expense, but are in effect a necessary reduction of gross sales, needed in order to arrive at net sales. In other words, the terms "customer financing" and "vendor financing" losses mask the reality of what these costs are. They are amounts of <u>revenue</u> that Nortel expected to obtain following the extension of product or service financing to a customer, but ultimately did not obtain.

Given this, it is logical to believe that the parties would, at arm's length, have treated these costs exactly as the MRDA did.  Beginning the profit split calculation with operating profit is entirely consistent with the idea that the parties would have simply reduced revenue by customer financing losses in order to arrive at net revenue – the starting point for computing operating profit.

Indeed, there is a much more direct relationship between customer financing losses and revenue from product sales embodying NN Technology than there is between restructuring costs and product sales, or for that matter estimated economic pension costs and product sales embodying NN Technology. As discussed, one relevant consideration when determining whether a cost would have been shared, at arm's length, under the Nortel RPS is whether that cost pertains to the shared intangibles that are the subject of the Nortel RPS. While the relationship between restructuring costs (or for that matter estimated future non-GAAP pension costs) and the intangibles that are the subject of the Nortel RPS is tenuous at best, the relationship between customer financing losses and those intangibles is quite direct and obvious. Vendor financing losses are a direct reduction in the amount of revenue received from the sale of products embodying the NN Technology.

### 3.        Treat NNL and NNUK Inconsistently

Dr. Cooper's position is that NNL should bear the customer financing losses. At the same time, he asserts that the RPEs should earn routine returns for customer financing-related working capital. Moreover, he treats the customer financing losses as working capital for purposes of his calculation of the working capital return component embedded in his routine return estimate.

In effect, Dr. Cooper allocates his estimate of the benefits (capital returns) of customer financing-related capital outlays to NNUK, NN Ireland, and NNSA, and at the same time he allocates the costs (capital losses) to NNL. This is a fundamental error, for reasons I have already discussed.

One further corollary of this treatment is that it effectively treats customer financing as routine (*i.e.*, as a benchmarkable working capital return) and non-routine (*i.e.*, as a residual loss) at the same time. These two opposing treatments cannot stand together.

4.    **Incorrectly Reduces the Nortel RPS to a Principal-Agent Relationship**

As with his assertion that restructuring costs ought to be borne by NNL, Dr. Cooper's views on vendor financing losses reduce the relationship between NNL and the other RPEs to what is, from an economic perspective, effectively a principal-agent relationship. In Dr. Cooper's schema, NNL is the risk taker in the system, while the RPEs are insulated, mere agents of NNL-as-principal.

This contrasts directly with Article 13 of the MRDA, which states that "[t]he relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose. In addition, no Participant is a fiduciary, an agent, a servant, or subcontractor of any other Participant as a result of this agreement, and no Participant has the right, power, or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein." In other words, the relationship creates neither a joint venture, nor a principal-agent relationship, but rather something in between: a license.

As I discuss elsewhere in this report, Dr. Cooper's effective characterization of the relationship as a principal-agent relationship in which NNL indemnifies NNUK (and the other EMEA RPEs) from risk also contrasts with his later characterization of the parties in his separate allocation report as "joint venture" participants, joint risk takers, and joint entrepreneurs. In other words, when focusing on income allocation, Dr. Cooper's analysis puts losses to NNL by forcing NNL to indemnify NNUK, NN Ireland, and NNSA. On the other hand, when focusing on LOB and Residual IP Sale allocation, Dr. Cooper relies on the very entrepreneurial and risk-taking nature of the EMEA RPEs.

## B.    Reply to Dr. Felgran

Dr. Felgran does not take issue with the treatment of customer financing losses in the Nortel RPS. In my respectful view, in light of my analysis, he is correct in not taking issue.

## C.    What Third Parties Do: An Evidence-based Reply

As with restructuring and pension costs, rather than relying on conjecture or simple assertion as to which entity or entities would have borne these vendor financing losses, a more productive approach is to examine actual third party behavior in contractual arrangements similar to the Nortel RPS. As discussed earlier, in an attempt to provide an evidence-based approach to the questions of which entities should bear restructuring costs, estimated future non-GAAP pension costs, and (relevant to this section) customer financing losses, EP conducted three searches of the ktMINE database. These searches ultimately led to a review of 162 uncontrolled agreements involving the joint development of intangible property.

EP's findings were as follows:

- To the extent that the agreements specify that profit from the joint development activity is to be shared, they generally specify a formula that begins with <u>net</u> sales (*i.e.*, after deduction of bad debts).

- 20 agreements specifically address bad debt expense and explicitly identify these costs as being deductible in the calculation of revenue and/or profits to be shared. In either the context of a license with a royalty on revenue, or in the context of a profit split, this means that the parties are sharing the bad debt expense.

- Not a single agreement defines who should bear bad debt expense as a function of decision making authority over customer financing. This is important, given that in many of these agreements one party is primarily responsible for commercialization and sales (and therefore customer financing decisions).

In short, an exhaustive search produced <u>no empirical evidence that vendor financing losses would, at arm's length, be borne by NNL (*i.e.*, solely borne by one party)</u>. No evidence was found that decision rights determine the allocation of customer financing losses. Further, the evidence that is available indicates that when parties contract over such costs, they share them.

## D.    What the Regulations Tell Us: Holistic Application of the Regulations

As I discussed at some length in Section IV, the OECD Guidelines do offer a systematic approach for dealing with the question of which controlled party or parties should bear significant (*i.e.*, large) realizations of risk, particularly in cases where those risks were either unforeseen or the parties' contractual arrangements were not entirely clear regarding how to deal with them. As stated, the OECD Guidelines seek logical ways to "fill in" contractual terms that were missing *ex ante*, but that need to be filled in *ex post* once a partially or wholly unforeseen risk is realized.

In this section, I apply that framework to the following questions. First, <u>did the parties agree</u>, *ex ante*, on an approach for dealing with customer financing losses, and if so was that approach economically rational (was the form of the agreement consistent with the economic substance of the parties' relationship)? Second, if the parties did not agree (or if their contractual arrangement is unclear), how <u>would they have</u> agreed to share (or not share) customer financing losses, had they chosen to address the issue up front?

I note again that this forward looking approach is fundamentally different from that taken by Dr. Cooper. Rather than asserting that NNL (and NN Ireland and NNSA) would not willingly accept customer financing losses *ex post* – which presumably is always true – I examine the question on an *ex ante*, basis.

The framework presented in Section IV is reproduced below. However, as with the application of this holistic and comprehensive framework to restructuring costs in Section V, the flowchart

below highlights, in light green and light blue, the possible conclusions that can be obtained from this framework.

**Exhibit VI-2: Application of the Holistic Framework to Vendor Financing Losses**



Beginning at the top of Exhibit VI-2, it seems clear that in the case of the Nortel RPS, the MRDA did in fact address the issue of vendor financing. Specifically, Schedule A of the MRDA, which specified the calculation of the residual profit to be shared, begins the calculation of residual profit with operating profit.

As I discussed in my first report, the Nortel RPS and the MRDA terms were in no way economically irrational. I noted therein that it can be mathematically demonstrated that, *ex ante*, a licensee (*i.e.*, the RPEs other than NNL) would almost always prefer an arrangement in which it is licensed make-sell rights to intangible property in return for making the R&D investments in that intangible property, over an arrangement in which the licensee is licensed those make-sell rights and compensates the licensor through royalty payments. Given this, it seems clear that there is nothing economically irrational about the parties' arrangement, and we arrive in the green box at the right of the flowchart – the legal agreement is dispositive, and vendor financing losses would be shared.

Despite the fact that the legal agreement, being consistent with substance, is in my view dispositive, let us suppose that the legal agreement is not sufficient. The question under the

arm's length principle then becomes, very simply, "what do third parties do?" As discussed in the preceding section, empirical evidence suggests they appear to share vendor financing losses. Thus, even if Dr. Cooper were right to ignore the implications of the MRDA for the issue of vendor financing, third party behavior confirms Nortel's sharing of this item.

Going further, let us assume that the uncontrolled agreements described earlier were not dispositive. In this case, because the Nortel RPS is designed to share costs and benefits related to the development and exploitation of technology-related intangible assets, one asks whether vendor financing losses pertain to either the development or exploitation of the parties' make-sell rights. Obviously they do. They are, as I noted above, directly related to the making <u>and selling</u> of Nortel products that embed the NN Technology. Thus, even here we arrive at the same answer – these costs would be shared rather than borne exclusively by to NNL.

Finally, I note that in uncontrolled arrangements, parties are careful to ensure that their counterparties do not have an incentive to be inefficient or to externalize costs that are not expected to give rise to an intended benefit (*i.e.*, force unproductive costs onto their counterparties). Supposing, then, that even if all of the previous considerations were unconvincing, the question is whether the vendor financing losses would, *ex ante*, be understood by the parties to be costs related to the RPEs' inefficiency that should not be shared. It seems logical that the parties would require each participant to bear its own vendor financing losses rather than share them or put them to one party only.

# VII. Estimated Future Non-GAAP Pension Costs: Response to Drs. Cooper and Felgran

## A.    Dr. Cooper's Position on Pension Costs

Dr. Cooper takes no issue with the Nortel RPS treatment of pension costs.

## B.    Dr. Felgran's Arguments and the Quantitative Implications Thereof

### 1.    Selective Use of Non-GAAP Definition of Pension Costs

There is no dispute among the parties or the experts that pension costs were and should be shared among the parties. Dr. Felgran's argument is not that pension costs should be shared (they were shared). His argument is that the pension costs should be redefined as a liability, resulting in an "economic" quantification, rather than the generally accepted accounting treatment of pension costs that the parties agreed upon. By his calculations, this "economic" liability approach results in amounts much higher than either the pension costs recognized by NNUK in its audited financial statements or the actual cash pension costs of NNUK.

Dr. Felgran's argument that pension costs should be recalculated using an "economic" definition is unique to this line item. He does not argue, for example, that the restructuring costs should be redefined using a non-GAAP definition. Nor does he argue that R&D, sales and marketing, or any other costs be computed using a non-GAAP, "economic" definition. Dr. Felgran does not offer any explanation why pension costs should be treated inconsistently from all other costs in the system.

Dr. Felgran acknowledges that "[t]he use of financial statement data that is consistent with US GAAP is standard practice in transfer pricing, unless there is an adjustment needed that might deviate from US GAAP but would increase the reliability of the results for transfer pricing purposes."[97] Since taxable income for NNUK will be calculated using GAAP, and transfer pricing regulations are concerned with the proper determination of taxable income, it is not at all clear why deviating from GAAP, and thus deviating from taxable income, would increase the reliability of the results for transfer pricing purposes. Rather, it would appear to do the opposite.

Dr. Felgran does not explain how, or why, using a measure of "costs" that 1) is contrary to what the parties agreed to, 2) represents neither the actual cash nor recognized costs of NNUK, 3) is different from the costs that were audited both by financial statement auditors and tax authorities, and 4) was calculated *ex post*, would "increase the reliability" of the transfer pricing.

---

[97] Felgran Report at page 47.

## 2.    Definition of "Ongoing" vs. "Economic" is Judged *Ex Post*

Dr. Felgran argues that the use of US GAAP depends on an assumption that the companies were a going concern, while an "economic" measure of pension costs would consider the possibility of bankruptcy and/or financial weakness of the company. However, the email and deposition evidence he cites indicates that Nortel in fact did consider itself to be a going concern.[98] The financial statement auditors, as well as tax authorities, agreed to a GAAP treatment of pension costs.

Dr. Felgran's arguments amount to an *ex post* rationalization, which is directly contrary to transfer pricing principles, which require that one consider how third parties would agree (in this case to share pension costs) *ex ante*. The transfer pricing regulations are clear regarding *ex post* judgments. For example, at IRC Reg. § 1.482-1(d)(3)(iii)(B), the regulations state the following:

> Identification of taxpayer that bears risk. In general, the determination of which controlled taxpayer bears a particular risk will be made in accordance with the provisions of §1.482-1(d)(3)(ii)(B) (Identifying contractual terms). Thus, the allocation of risks specified or implied by the taxpayer's contractual terms will generally be respected if it is consistent with the economic substance of the transaction. An allocation of risk between controlled taxpayers after the outcome of such risk is known or reasonably knowable lacks economic substance. [Emphasis added]

And the OECD Guidelines state at Chapter 3.73:

> The mere existence of uncertainty should not require an ex post adjustment without a consideration of what independent enterprises would have done or agreed between them. [Emphasis added]

Dr. Felgran's argument that shared pension costs should include expected future non-GAAP pension costs is necessarily an *ex post* realization. *Ex ante* (in 2001), the parties would not have viewed themselves as so financially distressed that they would have measured pension costs using the economic method.

## 3.    Silent on Question of Control

Dr. Felgran is also silent on the issue of control over pension costs, despite the fact that he argues restructuring costs were under NNL's supposed control and direction and that NNUK should therefore not have to bear these costs in their entirety. In this case, to the extent that a portion of NNUK's pension costs were legacy pension costs, NNL could not have "controlled" these costs. Yet, not only does Dr. Felgran not argue that NNL and the other RPEs should be relieved of these costs (since they did not control them), he argues that the other RPEs should bear an even greater cost based on a non-GAAP definition of those legacy pension costs.

---

[98] See exhibit 21301; Karina O deposition transcript dated November 9, 2013 at pages 207 and 254; Wally Henderson deposition transcript dated October 4, 2013 at pages 297-298; Mark Weisz deposition transcript dated November 25, 2013 at page 254; Kerry Stephens deposition transcript dated November 8, 2013 at pages 191-197.

4.      **Reduces the Nortel RPS to a Risk Sharing Arrangement**

Dr. Felgran claims that the residual profit split method is a full "risk sharing" arrangement, stating at paragraph 37 of his report: "Collectively they [the RPEs] bear <u>all</u> the upside or downside risks of Nortel's business operations" [emphasis added]. This is a selective representation of the MRDA. A residual profit split method is an agreement to share residual profit associated with *particular* intangible development costs. It is not an all-encompassing "risk sharing" agreement.

In other words, Dr. Felgran's position that an estimate of the present value of net future pension costs should be added to GAAP costs is tantamount to asserting that the RPEs are participants in a reciprocal insurance arrangement in which they each calculate the difference between their actuarially expected pension costs and the return on their pension related assets, and then pool the resulting economic obligation. This sort of reciprocal insurance is economically very distant from the Nortel RPS.

## C.      An Evidence-Based Reply

I discuss the details of my search for third party joint development agreements in Section IV. Fifty-three of these agreements involve the sharing of costs related to the development and exploitation of the shared intangibles, and begin by limiting the costs that are to be shared to those costs that are directly related to the intangible development area. It should be noted that approximately 50 percent of the NNUK pension costs are related to inactive employees. Logically, this portion of the NNUK pension costs is unrelated to the ongoing development of intangible assets under the MRDA, and should be excluded altogether (and thus borne by NNUK in their entirety). However, the RPEs agreed to share these costs.

In addition to defining which *types* of expenses are to be shared, third party agreements will often specify how the costs are to be measured or quantified. The agreements I reviewed that are specific on the subject of accounting treatment of costs note that the costs are to be measured using "GAAP," an international accounting standard (*e.g.,* IFRS), or "in a manner mutually agreed upon by the parties."[99] Thus it is clear that third parties either agree to GAAP directly, or mutually agree *ex ante* to another quantification. In the MRDA, the parties <u>did</u> agree on the method of quantification.

Finally, my review of joint development agreements indicates that third parties do not specifically address pension costs (and their quantification). While some agreements do specifically identify employee benefits expenses as a cost to be shared insofar as it is directly related to the intangible development area, third parties do not appear to treat the quantification of employee benefit costs any differently from the quantification of other costs

---

[99] 35 of the agreements specify GAAP or a mutually agreed upon accounting method. Even those third party agreements that are silent regarding how costs are to be measured are no doubt implicitly assuming GAAP, since by definition these are the <u>generally accepted</u> accounting principles, and thus would be presumed in the absence of express terms. I found no agreements that specified using "economic" or any other non-GAAP treatment of pension costs.

within the agreement. In other words, to the extent third parties do specifically address employee benefit costs, they do not appear to agree to quantify such costs any differently from the accounting standards mutually agreed to elsewhere in the agreement.

In summary, these agreements clearly indicate that at arm's length pension costs would probably be shared, but quantified using GAAP or another mutually agreed upon method.

## D.    Systematic and Holistic Application of the Regulations and Guidance

### 1.    Application of Flowchart from Section IV

As I have noted earlier, the transfer pricing regulations require that one begin by first looking to the actual intercompany agreements in place between the parties, and only if the stated terms are inconsistent with the substantive relationships between the parties or if the agreement is unclear do secondary questions arise. I refer again to the heuristic flowchart first provided in Section IV. This heuristic is applied to the question of whether the RPEs would have agreed to share estimated future non-GAAP pension costs below.

**Exhibit VII-1: Application of the Holistic Framework to Estimated Future Non-GAAP Pension Costs**



The primary response regarding the treatment of pension costs is found in the green box on the right. The MRDA specifies that operating profit is determined using US GAAP, and the MRDA is consistent with the substance of the relationship among the parties.

The other possible alternatives, found in the boxes on the left side of the above exhibit, would be the following. First, if we ignored the MRDA and considered only what third parties do, as discussed above, we find that third parties do not share additional estimated future non-GAAP pension costs. If we ignored that evidence, we then also find that third parties do not share costs that are not directly related to the intangible development area (and, as noted, up to 50 percent of NNUK's pension costs are in respect of inactive employees and are thus not related to the ongoing development of intangibles under the MRDA). If we ignored that evidence as well, then we would still find that parties would not share costs that are in excess of GAAP-recognized costs.

## 2.        Connection to *Xilinx*

As I have pointed out elsewhere in this report, the approach of examining how third parties contract around the treatment of certain costs (such as pension costs) is precisely the approach taken in the recent transfer pricing decision, *Xilinx*. The Court found from evidence from third party agreements that third parties would not share stock option expenses as a cost.

The non-GAAP or "economic" pension costs proposed by Dr. Felgran are economically analogous to the stock-based compensation costs at issue in *Xilinx*. Both are predicated on the equity value of the company and require a speculative valuation (a particular form of discounted cash flow analysis) to determine their value. Dr. Felgran refers to "economic" pension costs as being equivalent to a "put option", stating at paragraph 47: "…the pension scheme receives a 'put option' from the sponsoring employer in the event that the expected investment returns do not materialize." In other words, Dr. Felgran treats pension costs, a form of compensation, as economically analogous to an option, and thus a form of stock-based compensation, which, as shown in *Xilinx*, are non-shared among uncontrolled parties.

# VIII. Extraterritorial Costs 2001-2005: Response to Dr. Cooper

## A.    Dr. Cooper's Assertions and My Replies

Dr. Cooper makes several assertions pertaining to "extraterritorial services" purportedly rendered by the EMEA RPEs during the 2001-2005 period. These include the following.

1) "Contemporaneous" third party studies support returns to extraterritorial costs for 2001-2005 (and, impliedly, no functional analysis need be performed of purported extraterritorial activities to ensure that they exist or pass the benefit test and could be chargeable at arm's length).

2) Appendix I of his report claims to include a "detailed discussion of how Nortel determined the excess portion of S&M, G&A, and GOP costs."[100]

3) Extraterritorial services can be identified using aggregate ratio comparisons of the RPEs' SG&A intensity to that of comparables.

4) Dr. Cooper implicitly asserts that the RONA approach used by Nortel during 2001-2005 does not capture a return to all activities, inclusive of any extraterritorial costs.

5) Other non-EMEA RPEs, such as NNL, who also had "extraterritorial costs" and therefore rendered "extraterritorial services" under Dr. Cooper's definition, should not receive compensation for these activities.

In addition, as I discussed in Section II of this report, Dr. Cooper commits a calculation and logic error on page 127 of his report. In the calculations shown in the exhibit entitled "Excess Cost Returns for the First RPSM Period – European RPEs," he includes vendor financing losses as part of the "extraterritorial costs" that the EMEA RPEs should be paid for. Recall that these vendor financing losses should, according to Dr. Cooper, be borne by NNL. In short, in one section of his report, he puts these costs to NNL, while in another he treats them as a value-added cost of the EMEA RPEs, for which they should be compensated (inclusive of a 15 percent markup).

I discuss these issues in greater detail below.

---

[100] Even Nortel admitted that it does not have a "detailed determination" of the extraterritorial costs. As Dr. Cooper himself quotes: "Nortel attempted to separate the operational costs incurred by each integrated entity between cost centers that support in-country sales and cost centers that support extraterritorial sales. Ultimately the Company determined that bifurcated operational cost information is either not available or unreliable." This is also found in the 2008 APA Request: Exhibit 22078 (PC0184852 – PC0185061 at PC0184898).

1.      **"Contemporaneous" Third Party Studies Support Returns to Extraterritorial Costs for 2001-2005**

Dr. Cooper asserts that "several third party studies" support his assertion that the EMEA RPEs should be compensated an additional amount for their "extraterritorial services" costs incurred during 2001-2005. These third party "studies" actually appear to be two benchmarking searches prepared by E&Y for Nortel's 2008 APA Request.[101] These searches are not contemporaneous with the 2001-2005 time period and thus cannot be relied on in support of his position.

2.      **Mischaracterization of Appendix I**

Dr. Cooper claims that Appendix I of his report includes a "detailed discussion of how Nortel determined the excess portion of S&M, G&A, and GOP costs." In fact it is actually a discussion of how Nortel calculated average SG&A levels for the comparables.  Dr. Cooper then merely asserted that any SG&A above these levels should receive an additional return.

3.      **Miscalculation and Mischaracterization of Extraterritorial Services**

Dr. Cooper defines extraterritorial services by simply asserting that the amount of S&M, G&A, and GOP above (or below) certain levels should earn an additional markup beyond the operating margin attributable to the distribution activities of the RPEs. He quantifies the extraterritorial costs as follows:

1)      S&M expenses above 6.1 percent of sales (the average level from E&Y's set of North American resellers for 2007) are "extraterritorial" and should receive a Berry Ratio (essentially a markup) of 15 percent.

2)      G&A expenses above 3.6 percent of sales (the average level from E&Y's set of North American resellers for 2007) are "extraterritorial" and should receive a Berry Ratio (essentially a markup) of 15 percent.

3)      GOP expenses above 11.6 percent of sales (the average level of GOP from within Nortel's RPEs during 2007) are extraterritorial and should receive a Berry Ratio (essentially a markup) of 15 percent.[102]

First, there is no explanation for why Dr. Cooper uses a set of "North American resellers" to first determine the benchmark for average S&M and G&A costs, but then uses a set of "global value added resellers" to determine the markup on the excess S&M and G&A costs. There is also no explanation for why S&M, G&A, and GOP all receive the same 15 percent markup.

The use of gross ratios (simple averages from comparables) to both define and quantify services costs is counter to the requirements under the transfer pricing regulations for intercompany

---

[101] See 2008 APA Request, Exhibit 22078 (PC0184853 – PC0185061 at PC0184897) and Appendix Q-1 to the 2008 APA Request, (NNI_01015300 – NNI_01015482).

[102] Nortel used a slightly higher average for 2008, but Dr. Cooper uses the 11.6 percent throughout 2001-2005.

services. The services regulations are quite clear that the actual activities performed and services rendered must be examined in detail using a three part analysis, including passing a "benefit test" and a precise quantification of the costs. A summary of the services regulations and the benefit test are described below.[103]

There are three main components of an evaluation of the arm's length nature of an intercompany services transaction. First, the intercompany services should be evaluated against an "economic benefit test" (hereinafter referred to as the "benefit test"), to determine whether or not the activity in question constitutes a service, and thus requires compensation. Second, if the service passes the benefit test, then the best method is selected to determine the arm's length price for the service. Finally, the selected method is applied to evaluate the arm's length nature of the intercompany service transaction.

The benefit test is used to determine whether the services being rendered should be compensated. An activity is considered to provide a benefit to the recipient if the activity directly results in a reasonably identifiable increment of economic or commercial value that enhances the recipient's commercial position, or that may reasonably be anticipated to do so. Equivalently, an activity is generally considered to confer a benefit if, taking into account the facts and circumstances, an uncontrolled taxpayer in circumstances comparable to those of the recipient would be willing to pay an uncontrolled party to perform the same or similar activity on either a fixed or contingent-payment basis, or if the recipient would have otherwise had to perform the same activity or a similar activity.[104]

Finally, the services regulations also require that <u>if</u> it is determined that a given intercompany service passes the benefit test, then the <u>quantification</u> of the costs must be accurate and reliable.

Dr. Cooper's approach offers no functional analysis to determine what the activities are, much less whether they pass the benefit test (and therefore whether they could even be chargeable at arm's length). Furthermore, quantifying the costs as "the part of S&M above 6.1 percent of sales" or "the part of G&A that is above 3.6 percent of sales" is both arbitrary and unreliable.

It is also illogical. If 6.1 percent is the average S&M-to-Sales of the comparable companies, then roughly half of the comparables must have S&M levels of greater than 6.1 percent of sales. The same is true of G&A. When I examine the comparables used by Dr. Cooper to benchmark the returns to extraterritorial costs, I find that <u>these comparables do not exhibit a positive relationship between operating margin and SG&A-to-Sales. Rather, his comparables exhibit the</u>

---

[103] This discussion focused on the US services regulations, which are more detailed than the OECD Guidelines, but the OECD Guidelines contain very similar language.

[104] The OECD Guidelines state that whether or not a service exists "can be determined by considering whether an independent enterprise [under] comparable circumstances would have been willing to pay for the activity if performed for it by an independent enterprise or would have performed the activity in-house for itself. If the activity is not one for which an independent enterprise would have been willing to pay or perform for itself, the activity ordinarily should not be considered as an intra-group service under the arm's length principle." See OECD Guidelines, Chapter 7, section B.7.6.

opposite relationship – there is a negative correlation between SG&A-to-Sales and operating margin.

The same holds true for my comparables. As I discuss in my first report, I examined the relationship between SG&A-to-Sales ratios and operating margin and found no relationship – in fact, if anything the relationship was slightly negative. In other words, the comparables with SG&A-to-Sales above the average on average earned less – not more – yet Dr. Cooper assigns additional profits to these entities.

Finally, as noted above, the comparables used to first set the benchmark levels (*i.e.,* average S&M and G&A-to-Sales levels) and the comparables used to then determine the markup on the excess over those averages are different (one is "North American resellers" and the other is "global value added resellers," although there is some overlap between the sets). Both sets appear to be used by Dr. Cooper to benchmark the activities of all the Nortel RPEs regardless of geography (although the switch in geographic coverage is left unexplained), and it is not clear why the observed operating margins of those companies do not already capture the returns to the RPEs' activities. Based on the analysis I conducted on the relationship between SG&A-to-Sales intensities and operating margin, they do.[105]

In summary, Dr. Cooper's assertions regarding extraterritorial services i) are not supported by a functional analysis, ii) do not address the benefit test (the key component of any intercompany services transfer pricing analysis), iii) rely on an arbitrary quantification of extraterritorial services costs, and iv) are based on a false premise (*i.e.,* that higher SG&A results in higher operating margins at arm's length).

### 4.    Double Counting

Dr. Cooper's approach fails to recognize that the reason Nortel began charging for extraterritorial services only in 2006 was that the earlier RONA method (which is a return to the entire asset base) already covers <u>all</u> of the RPEs' activities (other than their investment in non-routine technology assets) <u>by definition</u>. When the company switched to an operating margin method for distribution in 2006, this <u>had the potential</u> to leave some assets not earning a return.

The company chose to use the extraterritorial services methodology described above for 2006-2008. I demonstrated in my first report that this likely overcompensated the RPEs (including NNL) for their routine functions, as the benchmark distribution companies demonstrate no relationship between SG&A-to-Sales and operating margin, and the overall levels of SG&A-to-Sales for the Nortel RPEs are not inconsistent with the comparables. However, at least in principle, the attempt to compensate for extraterritorial services during 2006-2008 made some logical sense. Again, I do not believe it was necessary because the comparables that I used to benchmark the distribution operating margin already captured a return to the SG&A levels of

---

[105] There is significant overlap among the two sets used by Dr. Cooper (and originally prepared by E&Y) and my set, with approximately half of the companies in each of Dr. Cooper's sets also appearing in my set.

the RPEs. However, I recognize that there was an underlying rationale for Nortel's approach during the 2006-2008 period.

During the earlier 2001-2005 period, the company was correct in <u>not</u> adding an additional routine return for extraterritorial services because its use of a RONA applied to the full capital base of the RPEs (*i.e.*, giving the RPEs a return to their net working capital and to their long-term assets). To add additional routine returns would <u>necessarily double count</u> returns to those same assets, since there are no other productive assets in use (other than the technology assets, but those are the claimants to residual profit). Therefore, Dr. Cooper's position of adding extraterritorial returns to the 2001-2005 period is illogical.

**5.      Inconsistency Regarding Non-EMEA RPEs**

The logic of Dr. Cooper's approach extends to other non-EMEA RPEs as well as the EMEA RPEs. Other non-EMEA RPEs, such as NNL which also had "extraterritorial costs" and therefore rendered "extraterritorial services" under Dr. Cooper's definition, do not receive compensation for these activities in Dr. Cooper's analysis.

In fact, as I discuss in Section II of this report, the Excel model that generates Dr. Cooper's report exhibits includes a calculation of the extraterritorial costs of other non-EMEA RPEs. In these calculations, NNL has very high extraterritorial costs (and under Dr. Cooper's logic, extraterritorial services performed). Dr. Cooper ignores these calculations, however, in his calculation of amounts that NNL purportedly owes to the EMEA RPEs.

# B.      Dr. Felgran

Dr. Felgran does claim that the EMEA RPEs should receive compensation for extraterritorial costs.

# C.      An Evidence-Based Reply

While I presented this evidence in Section II, in the quantification of Dr. Cooper's position, I present again below his estimates of routine operating profit for NNUK, NN Ireland, and NNSA, measured as a percentage of sales for 2001-2008.

**Exhibit VIII-1: Dr. Cooper's Proposed Routine Returns for EMEA RPEs**



Exhibit VIII-1, above, shows Dr. Cooper's estimates of routine distribution and extraterritorial services operating margins for NNUK, NN Ireland, and NNSA, measured as a percentage of sales. I have constructed this exhibit by subtracting my estimate of an arm's length return to manufacturing activity from Dr. Cooper's estimate of total routine returns for 2001-2005. For 2006-2008 this adjustment was not necessary as there was no manufacturing during that period. I note that operating margin is Dr. Cooper's chosen PLI for his routine distributor benchmarking exercise.

As shown above, Dr. Cooper's analysis results in assigning routine returns to the EMEA RPEs (in particular NNUK and NNSA) that are <u>four to six times higher</u> than the interquartile range of operating margins for comparable distribution companies.

As stated in my first report the aggregate SG&A-to-Sales of the RPEs are at levels that are not inconsistent with the SG&A-to-Sales levels of the distribution comparables that I selected. Furthermore, the operating margins earned by the distribution comparables are not positively correlated with SG&A-to-Sales levels (in fact they are slightly negatively correlated). This signifies that the market <u>does not reward higher SG&A levels with additional operating profit</u>. This is empirically observable. Yet Dr. Cooper asserts higher operating margins for the EMEA RPEs on the basis of higher SG&A-to-Sales.

## IX.    Stewardship and Headquarter Costs: Response to Drs. Cooper and Felgran

### A.    Stewardship Costs

#### 1.    Dr. Cooper's Assertions and My Replies

##### (a)    *2001-2005 Stewardship Expenses*

In his report, Dr. Cooper concludes that Nortel's treatment of stewardship costs for the 2001-2005 period did not adhere to the arm's length principle. Dr. Cooper contends that these costs should have been borne by NNL and not shared by the RPEs during this period. Dr. Cooper cites the OECD Guidelines' definition of a stewardship activity as "[a]n activity which is performed by a member of an MNE group (usually the parent company or a regional holding company) solely because of its ownership interest in one or more other group members, *i.e.* in its capacity as a shareholder,"[106] and notes that such activities would not warrant a charge to affiliates.[107]

Dr. Cooper further points out that Nortel's treatment of stewardship costs was inconsistent in the Nortel RPS. In the Nortel RPS models for the 2001-2005 years, stewardship costs were not excluded in the calculation of NNL's Adjusted Operating Earnings/Loss, and therefore the stewardship costs were shared through the Nortel RPS allocations.[108] However, this was changed in the 2006-2008 Nortel RPS models, and NNL's Adjusted Operating Earnings/Loss was calculated after stewardship costs were excluded, leaving the stewardship costs to be borne by NNL rather than shared with other RPEs through a reduction in the available residual profit pool.[109] The change in the treatment of stewardship expenses when calculating the residual profit pool was the result of the Third Amendment to the MRDA, which specified that stewardship costs should not be included in the calculation of the residual profit pool.

Dr. Cooper is correct to assert that stewardship costs should not be charged to affiliates, as transfer pricing regulations and guidance specifically state that such costs would not, at arm's length, be borne by affiliates and would instead remain with the parent company or other entity that is performing the stewardship or shareholder activities.[110] I agree with Dr. Cooper's position, and also came to the conclusion that stewardship costs should have been consistently removed from the calculation of NNL's contribution to the residual profit pool in both the 2001-2005 and 2006-2008 period. While Nortel correctly recognized that stewardship expenses should not be shared by RPEs and amended the MRDA and Nortel RPS to reflect this for 2006-2008, the 2001-2005 Nortel RPS results did not reflect an appropriate treatment of stewardship costs, and I remedied this in my analysis of the Nortel RPS for this period.

---

[106] 1995 OECD Guidelines at G-8.
[107] 1995 OECD Guidelines, Chapter 7.9.
[108] 2001-2005 Nortel RPS Models.
[109] 2006-2008 Nortel RPS Models.
[110] 1995 OECD Guidelines, Chapter 7.9, Treas. Reg. §1.482-9(l)(3)(iv).

While I agree with Dr. Cooper's assertion that stewardship costs should have been removed from NNL's Adjusted Operating Earning/Loss calculation for 2001-2005 as they were in the 2006-2008 calculations, I disagree with the way Dr. Cooper estimated the stewardship costs that should have been excluded from the residual profit pool in 2001-2005. Estimating these costs was necessary as Nortel did not provide its own estimate for expenses related to stewardship activities during this time period.

Dr. Cooper estimated the 2001-2005 stewardship expenses that should have been retained by NNL by examining the ratio of stewardship costs to third party revenue that was reported during the 2006-2008 period. During the 2006-2008 period, NNL's reported stewardship costs amounted to approximately 1.43 percent of NNL's third-party revenue. Dr. Cooper therefore calculated NNL's estimated stewardship costs for the 2001-2005 period as 1.43 percent of NNL's reported third-party revenue for each year during that period. Dr. Cooper's estimates for stewardship expenses are displayed in the exhibit below.

**Exhibit IX-1: Dr. Cooper's Stewardship Cost Estimates (in millions of USD)**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | TOTAL |
|------|-------------|------|------|------|------|------|-------|
| 1 | NNL Third-Party Revenue | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 5,084.2 |
| 2 | Stewardship as % of Third-Party Revenue | 1.43% | 1.43% | 1.43% | 1.43% | 1.43% | 1.43% |
| 3 | Stewardship Estimate as % of Third-Party Revenue (Line 1 x Line 2) | 25.0 | 13.5 | 11.0 | 11.1 | 11.9 | 72.6 |

As shown above, Dr. Cooper excluded a total of $72.57 million in stewardship expenses from the calculation of the residual profit pool for 2001-2005. As such, the residual profit pool in Dr. Cooper's residual profit split model was increased by the amount of stewardship expenses in each year, and the RPEs should have received a share of this increased pool according to their respective residual profit split percentages.

As did Dr. Cooper, in my analysis of the Nortel RPS, I estimated stewardship costs for 2001-2005, and excluded these costs from calculations of the residual profit pool, thereby allowing NNL to bear these costs in their entirety rather than sharing these costs with the RPEs through the Nortel RPS calculations. Unlike Dr. Cooper, however, I estimated the 2001-2005 stewardship cost amounts by examining the 2006-2008 stewardship costs as a percentage of G&A expenses during that same period. It is my opinion that this is a more reliable estimate of stewardship expenses as these expenses are more closely tied to changes in G&A expenses than they are to changes in revenue, especially given the volatility of revenue during this time period.

During the 2006-2008 time period, the weighted-average stewardship expense as a percentage of NNL's G&A expenses was 4.55 percent, as shown in the exhibit below.

**Exhibit IX-2: 2006-2008 Stewardship as a Percentage of G&A Expenses (in millions of USD)**

| Line | Description | 12/31/2006 | 12/31/2007 | 12/31/2008 | Three-Year Weighted Average |
|------|-------------|------------|------------|------------|------------------------------|
| 1 | Stewardship Costs borne by NNL | 14.2 | 14.2 | 10.1 | 12.8 |
| 2 | NNL G&A Expense | 276.1 | 372.3 | 197.3 | 281.9 |
| 3 | *Stewardship as % of G&A* | *5.15%* | *3.82%* | *5.10%* | *4.55%* |

I therefore applied the 4.55 percent to NNL's reported G&A expenses for the 2001-2005 period in order to estimate the stewardship expenses that should have remained with NNL (and not become part of the residual profit pool) during those years. These calculations are displayed below.

**Exhibit IX-3: Estimate of 2001-2005 Stewardship Costs (in millions of USD)**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | TOTAL |
|------|-------------|------|------|------|------|------|-------|
| 1 | NNL G&A Expense | 358.8 | 128.8 | 287.8 | 360.3 | 526.9 | 1,662.6 |
| 2 | Stewardship as % of G&A | 4.55% | 4.55% | 4.55% | 4.55% | 4.55% | 4.55% |
| 3 | Stewardship Estimate as % of G&A (Line 1 x Line 2) | 16.3 | 5.9 | 13.1 | 16.4 | 24.0 | 75.7 |

As shown above, I arrived at an estimate of $75.68 million for total stewardship costs during the 2001-2005 period. While I used a different, and arguably more reliable, method of estimating stewardship expenses, I arrive at a similar result to that of Dr. Cooper for the 2001-2005 period. Therefore, my evaluation of the Nortel RPS for 2001-2005 treats Nortel's stewardship expenses the same way that Dr. Cooper's application does, and the amount excluded for stewardship expenses is relatively consistent between our models.

*(b)*    *Miscalculation of 2006-2008 Stewardship Expenses*

While I agree with Dr. Cooper that stewardship expenses were not excluded from the residual profit pool calculations in the 2001-2005 period and should have been, it bears noting here that Dr. Cooper made an error in his calculation of the residual profit pool in the 2006-2008 period by double counting stewardship expenses, as I noted above in Section II of this report.

As Dr. Cooper notes in his own report, Nortel did correctly exclude stewardship expenses from NNL's contribution to the residual profit pool in 2006, 2007, and 2008. However, in his evaluation of the Nortel RPS for these years, Dr. Cooper mistakenly allocates additional profit to NNUK, NN Ireland, and NN France by adding a share of the reported stewardship expenses to each according to their respective residual profit split percentages in each year. This is unnecessary because the stewardship expenses were already excluded from NNL's contribution to the residual profit pool for 2006-2008, and the RPEs therefore <u>already</u> shared in the increased NNL contribution to the profit pool according to their residual profit split percentages. Adding incremental profit to the RPEs based on the 2006-2008 stewardship costs incorrectly adds income that these entities already received through the original Nortel RPS allocations in these

years, and is an error in Dr. Cooper's model that works to increase profit allocations to the EMEA RPEs.

**2.      Dr. Felgran's Assertions**

Dr. Felgran's report is silent on the issue of stewardship costs.

## B.      Headquarter Costs

**1.      Dr. Cooper's Assertions and My Replies**

In his report, Dr. Cooper asserts that, in addition to the stewardship expenses discussed above, NNL "must have incurred excess headquarter costs."[111] Dr. Cooper contends that an independent third party would not be willing to pay for these expenses, but he provides no evidence to support this claim, simply stating that NNL "must have" had excess costs due to Nortel's history during the review period.

In his discussion of the headquarter costs and determination of whether or not they would, at arm's length, be shared by Nortel RPEs, Dr. Cooper cites the OECD Guidelines. Specifically, Dr. Cooper notes that one must examine "whether an independent enterprise in comparable circumstances would have been willing to pay for the activity performed for it by an independent enterprise or would have performed the activity in-house for itself."[112] However, Dr. Cooper does not apply this guidance in his evaluation of Nortel's headquarter costs. He asserts that the costs should not have been shared, without conducting a functional analysis, applying the benefit test, or providing any evidence that indicates whether or not the activities that are supported by these costs provide benefits to Nortel RPEs for which they would be willing to pay.

The definition of NNL's headquarter costs cited by Dr. Cooper includes global advertising cost, global marketing cost, website management cost, legal and treasury support costs, and leadership costs, along with others.[113] While I have not performed a review of these headquarter costs to determine whether or not they confer an economic benefit on the RPE Licensees, in my experience, the types of activities at issue are generally considered as conferring a benefit to controlled affiliates similarly situated to the RPE Licensees.

Dr. Cooper also acknowledges that information regarding the total amount of headquarter costs incurred by Nortel globally does not exist, let alone the amount borne by NNL and the portion that should be treated as "excess."[114] Nevertheless, Dr. Cooper goes on to apply a series of somewhat simplistic assumptions to estimate the global headquarter costs of Nortel, allocate a portion of these assumed costs to NNL, and ultimately decide that an arbitrary 50 percent of

---

[111] Cooper TP Report at page 144.
[112] 1995 OECD Guidelines, Chapter 7.6.
[113] Nortel's Advance Pricing Arrangement Response to Questions posed by Inland Revenue, Internal Revenue Service, Canada Customs and Revenue Agency, dated September 2003: NNC-NNL002707 at page 20.
[114] Cooper TP Report at page 145.

these assumed, but unverified, costs were excessive "without having any detailed data on this cost base."[115]

While I agree with Dr. Cooper in principle, and acknowledge that a review of the headquarter costs should be conducted in order to determine whether or not all of the costs should be shared by RPEs, evidence has not been provided that would allow such an analysis to be performed. In the absence of evidence upon which to base an analysis, Dr. Cooper asserts that some of the headquarter costs should not be shared, and makes numerous unsubstantiated assumptions to arrive at an amount for "excess" costs that are impossible to verify.

**2.    Dr. Felgran's Assertions**

Dr. Felgran's report is silent on the issue of headquarters costs.

---

[115] Cooper TP Report at page 145.

## X.      Interest-free Intercompany Loans: Response to Dr. Felgran

### A.      Dr. Cooper's Report

Dr. Cooper's report takes no issue with Nortel's treatment of intercompany loans.

### B.      Dr. Felgran's Assertions and My Replies

#### 1.      Summary of Dr. Felgran's Position

Between 2001 and 2008, NNUK was a net recipient of transfer pricing adjustment allocations based on Nortel's application of the Nortel RPS. During the 2001-2008 period, the total amount that NNUK was allocated under the Nortel RPS was $2.1 billion. However, between 2003 and 2007, NNL did not make full cash payments to NNUK for all of these transfer pricing allocations (a portion of the transfer pricing allocations was settled in cash). Instead, NNUK agreed to loan some of its allocation amounts to NNL. The result was a positive loan balance in each year of the 2001-2008 period, to reflect Nortel's view of what NNL owed NNUK. The loan balance peaked in 2007, at £425.7 million.

My understanding is that the intercompany agreements pertaining to these loans specified that they were interest-free loans.[116] Dr. Felgran asserts that the treatment of the R&D allocations as interest-free intercompany loans violated the arm's length principle as the terms of the loans were not consistent with commercial terms that would have been agreed to by unrelated parties.[117] Dr. Felgran asserts, based on Nortel's internal estimates, that NNUK forfeited interest income of approximately £20 million per year and that an outstanding loan balance of approximately $170 million was still owed by NNL to NNUK in 2008.[118]

Dr. Felgran is correct in his assertion that, absent consideration in the form of some other economic benefit accruing to NNUK, an interest-free loan would generally not be considered consistent with the arm's length principle.

However, Dr. Felgran only questions the interest-free nature of the intercompany loans, fails to address other more fundamental questions related to the nature of such loans. He also relies on erroneous information in his assertions regarding the amount of interest forfeited by NNUK.

Specifically, under the adjustments that I proposed to the Nortel RPS in my first report, the total outstanding intercompany loan amount would have differed from the amount assumed by Dr. Felgran. Further, NNUK did not bear any costs related to external debt taken on by NNL and NNI, though it appears to have benefited from this capitalization through capital contributions made by NNL to NNUK. Finally, even if the loan balances in each year are taken as given, the £20 million per year in foregone interest that Dr. Felgran assumes is overstated.

---

[116] Exhibit 21253 (EMEAPROD06029849).
[117] Felgran Report at page 5.
[118] Felgran Report at page 5.

Each of these issues is addressed, in turn, below.

## 2.    Miscalculation of Intercompany Loan Amount at End of Period

In his assessment, Dr. Felgran accepts as given the intercompany loan balances of NNUK, without analyzing whether or not these amounts were actually due to NNUK. Based on the information relied upon by Dr. Felgran, a balance of $170 million remained in 2008.[119]

In my first report, I conclude that NNUK was actually overcompensated by approximately $231 million during the 2001-2005 period under the Nortel RPS. In other words, NNUK actually owed NNL $231 million over that period (net of payments already made to NNUK under Nortel's application of the Nortel RPS). The intercompany loan balances cited by Dr. Felgran should be netted against the $231 million overpayment to NNUK.[120]

## 3.    Failure to Consider Other Nortel Borrowing

Dr. Felgran is only concerned with the terms of the intercompany loans between NNUK and NNL. However, other Nortel entities received financing from external debt during this time period, and NNUK benefited from this financing without incurring the costs related to it.[121]

The external financing was primarily obtained through debt issuances by Nortel entities in Canada and the United States, and these entities bore the interest costs of this financing. An examination of Nortel's financial data for 2001-2008 indicates that NNL bore 82 percent of the external financing costs, and NNI bore 10 percent of the costs.[122] However, other Nortel entities benefited from the debt financing as it was a source of capital for the entire Nortel group.

In fact, NNUK was the recipient of a large amount of cash funding from Canada, particularly in 2001. In December 2001, NNL provided a capital injection to NNUK of approximately $1 billion in cash.[123] Although it had access to cash from NNL when cash was needed, NNUK never paid a dividend back to NNL.[124] NNL effectively relieved NNUK of the burden of interest bearing financing despite NNL having significant interest costs on its external debt capital.

## 4.    Incorrect Calculation of Foregone Interest Payments

Dr. Felgran asserts that NNUK forfeited interest payments of approximately £20 million per year related to the intercompany loan with NNL.[125] Details regarding the calculation of this

---

[119] Felgran Report at page 33.
[120] I have not examined how the intercompany loan amounts would have been impacted on a year-by-year basis under my application of the Nortel RPS, as sufficient data does not exist to do so.
[121] NNUK had a small amount of third-party debt and made interest payments between 2001 and 2008 totalling approximately $476,000. This represents less than 0.04 percent of Nortel's total debt financing cost over this period.
[122] Nortel trial balance data, 2001-2008.
[123] EMEAPROD1647068 at page 2.
[124] EMEAPROD1647068.
[125] Felgran Report at page 5.

interest payment are scarce in Dr. Felgran's report. He relies on "internal estimates" that, in his view, imply £20 million of interest per year.[126]

The only detail that Dr. Felgran provides surrounding the calculation of interest payments is a quote from an NNUK employee stating that a £22 million interest payment was "calculated on an estimated loan balance of GBP 400M at LIBOR plus 1 percent."[127] However, according to Nortel documents, the average intercompany loan balance was far less than GBP 400M during most of the period in question.[128] Therefore, Dr. Felgran's assertion that the foregone interest amounted to £20 million per year appears inaccurate.

The exhibit below displays the average annual balance on the intercompany loan. It also provides a calculation of an arm's length interest payment on that balance based on LIBOR plus one percent, the same rate noted in the calculations that Dr. Felgran.

**Exhibit X-1: Annual Loan Balances NNUK to NNL (in GBP and USD)**

| Line | Description | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | | 2008 |
|------|-------------|---|------|---|------|---|------|---|------|---|------|---|------|
| 1 | Average Loan Balance | £ | 9.4 | £ | 142.4 | £ | 266.5 | £ | 380.8 | £ | 425.7 | £ | 132.3 |
| 2 | One-Year LIBOR + 1.0% | | 2.5% | | 4.1% | | 5.8% | | 6.3% | | 5.2% | | 3.0% |
| 3 | Interest Due (Line 1 × Line 2) | £ | 0.2 | £ | 5.8 | £ | 15.6 | £ | 24.1 | £ | 22.2 | £ | 4.0 |

| Line | Description | | 2003 | | 2004 | | 2005 | | 2006 | | 2007 | | 2008 |
|------|-------------|---|------|---|------|---|------|---|------|---|------|---|------|
| 1 | Average Loan Balance | $ | 16.5 | $ | 261.2 | $ | 482.4 | $ | 702.1 | $ | 851.6 | $ | 246.0 |
| 2 | One-Year LIBOR + 1.0% | | 2.5% | | 4.1% | | 5.8% | | 6.3% | | 5.2% | | 3.0% |
| 3 | Interest Due (Line 1 × Line 2) | $ | 0.4 | $ | 10.7 | $ | 28.2 | $ | 44.4 | $ | 44.5 | $ | 7.4 |

As shown in the exhibit above, I calculate interest payments that are much lower than £20 million in most years at issue, and the average annual interest payment over the time period amounts to £12 million per year. I therefore conclude that Dr. Felgran's assertion that NNUK should have received £20 million in interest payments per year overstates the foregone interest payments by approximately £8 million per year, on average. Moreover, the amounts shown in Exhibit X-1 do not contemplate NNUK's overcompensation under the Nortel RPS, which I estimated in my first report at approximately $231 million for the 2001-2005 period. Netting the loan balances shown against any overpayments to NNUK would significantly reduce the intercompany interest computed in Exhibit X-1.

---

[126] Felgran Report at page 5.
[127] Felgran Report at page 33.
[128] PLD00000208: NNUK Claim Against NNL.

# XI.    Response to Allocation Related Issues

## A.    Response to Dr. Cooper's Allocation Positions

### 1.    Overview of Dr. Cooper's Key Points

The Cooper Allocation Report provides Dr. Cooper's analysis of issues related to the allocation of proceeds from certain sales of Nortel business lines and patents from 2009-2011. These sales include cash proceeds of approximately US$3.3 billion from eight transactions (the "Business Sales" according to Dr. Cooper's terminology - I have adopted the same terminology in this section of my report) and approximately US$4.5 billion from the sale of certain patents and patent applications to a consortium of buyers (the Residual IP Sale).[129] I understand that others are addressing allocation issues *per se*, however since the Cooper Allocation Report makes numerous transfer pricing and economic references, I will focus on Dr. Cooper's opinions as they relate to transfer pricing and underlying economic principles.

In his report, Dr. Cooper provides his opinion "on the consistency of the allocation positions of the EMEA Debtors and the Canadian Debtors with (a) established transfer pricing and arm's length principles, (b) prior representations by Nortel to various tax authorities…, and (c) the business arrangements among the Nortel entities from 2001 forward…."[130] Dr. Cooper summarizes the EMEA Debtors' position that each of the Nortel entities (or "Entrepreneurs" in Dr. Cooper's terminology in the Cooper Allocation Report)[131] that performed R&D activities under the MRDA is entitled to a share of the proceeds from the Residual IP Sale based on their relative contributions to the creation of IP. In addition, Dr. Cooper references that the EMEA Debtors believe the proceeds should be allocated based on the parties' relative "R&D spend" and that the EMEA Debtors contend that Nortel underestimated the useful life of the IP, to the detriment of the EMEA Debtors.

Dr. Cooper agrees with all of the positions adopted by the EMEA Debtors. His opinions regarding allocation can be summarized as follows:

1)    Transfer Pricing and Arm's Length Principles

Dr. Cooper asserts that the residual profit split method was an appropriate method to allocate the non-routine or "residual" profits or losses from the IP assets, the development costs of which the RPEs had shared. Dr. Cooper states that "[w]hen the assets responsible for driving the residual profits are sold, according to transfer pricing and arm's length principles, the sale proceeds

---

[129] The Residual IP Sale may also be referred to as the "Rockstar Transaction" as this consortium of buyers was called Rockstar.
[130] Cooper Allocation Report at pages 3-4.
[131] Namely, Dr. Cooper lists five entities that performed R&D at the time of insolvency - NNUK, NNSA, NN Ireland, NNI, and NNL.

should presumptively be allocated on the same basis that annual trading profits and losses from those assets were to have been allocated."[132]

Dr. Cooper also concludes that it is appropriate to use an alternative calculation of the useful life of the IP for calculating the R&D contributions that would be used for a potential allocation of the proceeds from the sales described above. He bases this alternative calculation on the Expert Report of James E. Malackowski ("Malackowski Report").

2)    Representations to Tax Authorities and Statements of Nortel Personnel

Dr. Cooper asserts that the EMEA Debtors' allocation position is consistent with Nortel's submissions to tax authorities, in which Nortel states that R&D is "critical to the Nortel business and that the Entrepreneurs bore the full risk – including the upside – of the Nortel business."[133] Moreover, Dr. Cooper uses statements from various Nortel tax personnel in an attempt to support his opinion that Nortel intended to allocate the proceeds from IP sales in a manner consistent with the Nortel RPS.

3)    Business Arrangements

Dr. Cooper asserts that the EMEA Debtors' allocation position is consistent with the RPEs' business arrangements in that "each of the Entrepreneurs held an economic interest in the proceeds from the worldwide exploitation of the entire pool of Nortel IP…Those business arrangements were confirmed in the MRDA, which required that the Entrepreneurs divide residual profits in proportion to their respective R&D contributions."[134] Dr. Cooper also notes that, in his view, these business arrangements were confirmed by a sale of UMTS assets (to Alcatel) and the settlement of an IP infringement claim (with Foundry Networks) that occurred prior to Nortel's insolvency, in which proceeds were allocated to the RPEs in accordance with their relative R&D contributions.

After detailing the positions of the EMEA Debtors, Dr. Cooper also summarizes the allocation positions of the Canadian Debtors. Dr. Cooper disagrees with each position taken by the Canadian Debtors, as summarized by the following:

1)    Transfer Pricing and Arm's Length Principles

Dr. Cooper states that the Canadian Debtors "equate the mere holding of legal title with entitlement to all of the economic benefits flowing from the Nortel IP."[135] He proceeds to assert that this position is inconsistent with transfer pricing

---

[132] Cooper Allocation Report at page 7.
[133] Cooper Allocation Report at page 8.
[134] Cooper Allocation Report at page 8.
[135] Cooper Allocation Report at page 9.

principles and that the holding of legal title was for "administrative convenience" only.[136]

2)    Representations to Tax Authorities and Statements of Nortel Personnel

Dr. Cooper states that the Canadian Debtors' position is inconsistent with the representations it made to tax authorities concerning Nortel's IP and its use for certain Advance Pricing Agreements (APAs) with those tax authorities.

3)    Business Arrangements

Finally, Dr. Cooper states that the Canadian Debtors' position is inconsistent with "the business arrangements that governed the RPEs' split of residual profits in the period 2001-2008."[137] He also asserts that their position cannot be reconciled with the Alcatel sale transaction and Foundry Networks litigation settlement that occurred prior to Nortel's insolvency.

## 2.    Response

Dr. Cooper grossly mischaracterizes and misinterprets the nature of the legal and economic rights held by NNL and its Licensees under the MRDA. The rights NNL granted to its Licensees under the MRDA do not provide a blanket entitlement to any and all proceeds from the Nortel IP, as Dr. Cooper suggests.

In addition, Dr. Cooper does not appear to understand the nature of the rights embodied in the Residual IP Sale. Notably, the rights conveyed in the Residual IP Sale were different from those licensed by NNL to the other RPEs. Specifically, the MRDA provided the Licensees only with certain "make-sell" rights with which to actively exploit the IP in producing and selling products and services using the jointly developed NN Technology.

In regard to the Business Sales, it is necessary to examine the underlying economic conditions, and therefore the rights assumed by the acquiring parties, in order to allocate the proceeds from those sales in an arm's length manner. Dr. Cooper simply asserts that the entire value of the IP-related assets in the Business Sales should be allocated among all the Licensees without applying any type of critical analysis to those sales. As an example, it is possible that a significant portion of the value of the IP-related assets in those sales did not represent payment for existing intangible assets, but rather related to future investment opportunities (or "goodwill" in the economic sense – rights other than make-sell rights related to technology with a finite economic life). As I will show in my analysis, the allocation of value paid for existing intangible assets versus value representing goodwill should be very different, based on the contractual and economic relationship between NNL and its Licensees.

---

[136] Cooper Allocation Report at page 9.
[137] Cooper Allocation Report at page 10.

Given my review of the Cooper Allocation Report and my independent analysis of the relationship between NNL and the Licensees with regard to the Residual IP Sale and Business Sales, I offer the following opinions.

1)      The characterization accorded to the NNL Licensees in the Cooper Allocation Report as bearing "full risk" (and therefore entitled to a share of the proceeds from the Residual IP Sale) differs drastically from their characterization in the Cooper TP Report.

2)      Dr. Cooper erroneously diminishes the legal title rights held by NNL in the MRDA as being merely "administrative rights" and also completely misinterprets the narrower "make-sell" rights granted to the RPE Licensees by NNL. In contrast to Dr. Cooper's opinion, these "make-sell" rights do not provide a claim on any and all future income streams that may accrue from the sale of the Nortel technology. Under the MRDA, and the CSAs that predated the MRDA, NNL retains certain important rights distinct from that of its Licensees which conferred additional benefits exclusively to it. Put simply, as the original and primary entrepreneur of the Nortel business, NNL had the ability to "grant" any subsequent rights to its Licensees through the MRDA and the prior CSAs. These additional rights retained by NNL justify the allocation of the Residual IP Sales to it, but not to the Licensees.

3)      Dr. Cooper also conducts an inappropriate application of transfer pricing regulations and arm's length principles to the "form" and "substance" of the relationship between NNL and the Licensees. Notably, Dr. Cooper ignores guidance from both the OECD Guidelines and the US Sec. 482 Regulations that require that legal rights and contractual arrangements (*i.e.*, the "form") be considered <u>first</u> when evaluating the economic substance of an intercompany transaction and whether that substance is consistent with the form. Such an analysis is distinctly different from the analysis proposed by Dr. Cooper, who effects a re-writing of the economic substance and then "determines" the respective rights of arm's length parties.

4)      Dr. Cooper's use of a pre-insolvency transaction (Alcatel) and litigation settlement (Foundry) actually support the position that the Licensees are not entitled to more from the IP component of the Business Sales than the value of their make-sell rights, nor are they entitled to any of the proceeds of the Residual IP Sale. A closer analysis shows that the manner in which the IP was exploited and accounted for there reflected the limited, defined nature of the "make-sell" rights that had been granted to the Licensees under the MRDA but has no bearing on the allocation of the rights that were the subject of the Residual IP Sale, which were all rights that were retained by NNL under the MRDA. These

transactions clearly cannot be used to extrapolate to the inherently different conditions of the Residual IP Sale.[138]

5)      Dr. Cooper misinterprets the representations Nortel made to tax authorities when seeking to obtain Advance Pricing Agreements ("APAs"). As that process related to NNL's and its Licensees' contemporaneous and active exploitation of the Nortel technology (in other words, the "make-sell" rights under the MRDA), these representations are not relevant for the analysis of rights embodied in the Residual IP Sale.

6)      Similarly, Dr. Cooper uses statements from Nortel tax personnel without applying any type of critical analysis to those statements. It is clear that the statements of these personnel were made without a full understanding and application of the legal and contractual arrangements between NNL and its Licensees or that they pertain only to the interests of the Licensees.

7)      Finally, and perhaps most importantly, Dr. Cooper is in error in stating that arm's length parties would never agree to share R&D costs such as those under the MRDA without also obtaining a "residual interest" in the IP. As I indicated in my first report, and as I summarize again below, it is economically rational for arm's length parties to make a shared investment (such as in R&D) as long as they expect to recoup that investment plus a return equal to at least their cost of capital or required rate of return (and nothing more). It is entirely possible for this to occur without the parties having a right to any "residual interest" in the IP.

Each of these points is taken up in more detail below.

*(a)      Differing Characterizations of the Licensees between Two Reports*

Dr. Cooper chose to provide his transfer pricing opinions in two separate reports in this matter. In the Cooper TP Report, he provides his conclusions on a range of topics, including restructuring costs, distribution returns, extraterritorial services, vendor financing, and headquarters and stewardship costs.[139] In the Cooper Allocation Report, he provides a much narrower range of opinions on how the proceeds from the Business Sales and Residual IP Sale should be allocated among NNL and its Licensees.

The two reports reflect very different – and inconsistent - characterizations of the relationship between NNL and the Licensees. This dichotomy, and in particular, the characterization of the Licensees in the Cooper Allocation Report, are what grounds Dr. Cooper's claim that the Licensees are entitled to the proceeds from the IP sales.

---

[138] I am not expressing an opinion here on the precise methodology of allocation used in these transactions.
[139] Cooper TP Report at pages 14-15.

In his Allocation Report, Dr. Cooper attempts to characterize the relationship of the Licensees as one in which they are equal to NNL in terms of their functions and assumption of business and economic risks. For example, in his analysis of the use of the Nortel RPS for NNL and its Licensees, Dr. Cooper states that it is appropriate "[w]here various legal entities of an integrated enterprise share the costs and bear the risks of jointly creating the assets that drive the profitability of the enterprise…"[140] Likewise, when attempting to use Nortel's representations to tax authorities to support his opinion, Dr. Cooper states, "In those submissions, Nortel confirmed that R&D was critical to the Nortel business and that the Entrepreneurs bore the full risk – including the upside – of the Nortel business"[141] [emphasis added]. I interpret these statements as Dr. Cooper's attempt to portray the Licensees as full and equal participants in Nortel's business and therefore entitled to share in the proceeds from any and all subsequent IP sales.

This is in stark contrast to the characterization Dr. Cooper applies to the Licensees in the Cooper TP Report. In his discussion of restructuring costs, Dr. Cooper states that "NNL directed Nortel's restructuring, with little or no participation by EMEA RPEs or LREs"[142] [emphasis added]. Likewise, in his discussion of vendor financing costs in the same report, Dr. Cooper again states that NNL and Nortel Networks Corporation ("NNC" – the Canadian parent company) "controlled all decisions regarding vendor financing," that "certain NNL and NNC executives and the NNL Board of Directors held the decision-making power with respect to Nortel's vendor financing activities, except with respect to very small amounts of funding," and that "NNL had control over other facets of vendor financing such as provisioning and lay offs"[143] [emphasis added].

As a result, especially in his analysis of restructuring and vendor financing costs in the Cooper TP Report, Dr. Cooper attempts to portray the relationship between NNL and the other RPEs as one akin to a principal-agent relationship, in which the principal (NNL) controls and directs the activities of the passive agents (the other RPEs). This characterization would not at all support Dr. Cooper's arguments in the Allocation Report that the Licensees are entitled to a share of the IP sales proceeds. Clearly, it would be difficult for Dr. Cooper to reconcile such a principal-agent relationship with that of the Licensees being "Entrepreneurs." Moreover, such a characterization in the Cooper TP Report seems entirely incompatible with the concept of "Entrepreneurs" bearing "full risk," as Dr. Cooper describes in his Allocation Report.

It is noteworthy that Dr. Cooper uses the term "Entrepreneurs" when describing the Licensees in the Cooper Allocation Report,[144] although he never uses this term in his Transfer Pricing Report. In the Cooper TP Report, Dr. Cooper typically refers to the Licensees as RPEs or even just "Participants," which incidentally is the term used to describe them in the MRDA.[145]

---

[140] Cooper Allocation Report at page 7.
[141] Cooper Allocation Report at page 8.
[142] Cooper TP Report at page 69.
[143] Cooper TP Report at pages 130, 133.
[144] See Cooper Allocation Report at page 6 for the first occurrence of "Entrepreneurs."
[145] See Cooper TP Report at page. 8, for the first occurrences of "RPEs" and "participants."

Clearly, these terms connote very different impressions of the functions and risks undertaken by the same entities.

In any event, a more accurate view is that the MRDA participants were neither equal co-owners nor in a principal-agent relationship. Their roles were delineated by the terms of the MRDA, with NNL being the grantor of licenses and holder of rights not enjoyed by the other participants. Dr. Cooper has created two mutually inconsistent characterizations of NNL's relationship with the other participants.

*(b)*     *Mischaracterization of the "Administrative Rights" under the MRDA and the Rights Granted to the Licensees by NNL*

Dr. Cooper portrays as nominal the rights held by NNL. Notably, he states that the ability of NNL to "hold legal title to IP serves administrative purposes in an enterprise such as Nortel,"[146] and that holding legal title merely "designates which company is administratively responsible for the various government maintenance fees, taxes, and annuities that come due during the term of IP protection."[147] He proceeds to note that "the allocation of economic gain across borders is determined __not__ by legal ownership, which (as here) is usually chosen as a matter of convenience, but rather by the ***economic contributions*** to the factors that led to the creation of that gain, and who made those contributions"[148] [emphasis in original].

My understanding is that the ultimate determination of the legal rights under the MRDA is for the Court. However, given Dr. Cooper's assertions as to the effect of the MRDA's provisions, I will refer to its provisions and to the fundamental economic principles that I believe inform or underlie them.

I do not understand or agree with his assertion that the holding of legal title is merely for "administrative" or "convenience" purposes. The MRDA provides, in "Article 4 – Legal Title to NN Technology":

> Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License with each of the Licensed Participants as set forth in Article 5. [149]

The MRDA continues with "Article 5 – Grant of Exclusive Licenses by NNL," which sets out precisely the rights granted by NNL to the Licensees:

> To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying

---

[146] Cooper Allocation Report at page 33.
[147] Cooper Allocation Report at page 33.
[148] Cooper Allocation Report at page 33.
[149] MRDA, Article 4.

> NN Technology in and for the Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License").[150] [emphasis added]

I believe it is important to note that the grant of these rights is specific and well-defined, not an all-encompassing entitlement to any and all future proceeds resulting from the NN Technology, including a sale of such technology. Specifically, the main rights granted to the License can be summarized as "make-sell" rights that allowed the Licensees to use the Nortel technology in the production (whether by themselves or outsourced to other Nortel entities or third parties) and sale of products and related services.

The MRDA does not state that any other rights are granted to Licensees, including any rights related to the future sale of IP. Nor does it suggest, let alone state, that NNL's ownership is for administrative purposes only.

Prior to the MRDA, the relationship between NNL and its Licensees was governed by various CSAs, which embodied essentially identical terms and conditions as that of the MRDA. Indeed, as I noted in my first report in this matter, I analyzed the conceptual similarity of the Nortel transfer pricing methodology that existed in the CSAs and MRDA (as embodied by the Nortel RPS) from 1978 through 2008. In my first report, I concluded that the Nortel CSA and Nortel RPS were manifestations of the same underlying logic, and essentially the same methodology.

As with the MRDA, the 1992 CSA contained very similar language in that NNL (referred to as "Northern Telecom" in the CSA) grant specific rights to the Participants in the CSA:

> To the extent of its legal right so to do, and subject to the rights of third parties under agreements to which Northern Telecom is a party, Northern Telecom, in consideration of Participant's sharing of the costs of Research and Development pursuant to this Cost Sharing Agreement, as from time to time amended, hereby grants to Participant an exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NT Technology in and for the United States, and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith. [151] [emphasis added]

I note that the rights granted to the Participants – namely, the make-sell rights to the NT Technology – are similar to those granted under the MRDA and are in consideration for the Participants' sharing of R&D costs. In other words, in exchange for the Participants' sharing of costs, they received a finite set of rights that were specifically detailed in the CSA, but, nowhere received an unlimited set of rights to include the value to any future IP sales.

---

[150] Article 5 of the MRDA, as amended.
[151] Amended Research and Development Cost Sharing Agreement, January 1992, Article 5: NNI_00010875.

Similarly, the 1983 CSA contained similar language that granted a limited set of rights to the Licensees, as shown in this excerpt describing the rights granted to Northern Telecom, Inc. ("NTI") from NTL.[152] Although the legal interpretation of the arrangements is for the Court, I can categorically state that these concepts (of NNL being the owner of the IP and granting limited, make-use rights in it to the Licensees) are entirely consistent with economic theory, transfer pricing principles, and arm's length arrangements. There is no economic theory, transfer pricing principle, or "real-world" basis that would suggest, let alone compel, a treatment of NNL's ownership as merely for administrative convenience, or of the license rights incorporating an unstated right to equity or residual interest in the IP, including to proceeds of any sale.

As I describe in detail in Section VII of my first report, it is appropriate to view "ownership" as being divisible into separate rights that govern the benefits and costs of using a valuable resource. I also used the metaphor of a "bundle of sticks" to demonstrate that a contractual arrangement (such as the MRDA) has well defined rights granted to the parties (the Licensees in the case of the MRDA) that do not necessarily encompass everything as stated by Dr. Cooper. As a result, it is possible to divide the rights granted to the Licensees into well-defined categories (or "sticks") and then evaluate whether those rights are being properly compensated in the economic relationship between NNL and the Licensees. For example, one can consider this bundle of sticks as being composed of various rights, such as the right to manufacture and sell products using the technology, the right to sell the technology, the right to license the property, the right to a residual interest in the property, or the right to goodwill attached to the property. After consideration of the rights or "sticks" being granted to another party, the relevant question from an arm's length perspective is whether the compensation paid for those rights is sufficient.

As I stated in my first report, the grant of rights from NNL to the Licensees was limited (1) in scope, in that a specific set of rights was granted that allowed the Licensees to benefit from the Nortel technology being included in "products" made available for sale, and (2) in duration, in that the Nortel technology had a finite economic life. Importantly, there is no provision in the grant of rights by NNL for the Licensees to have the right to any other exploitation interests of the Nortel technology, including future investment opportunities or the rights to proceeds from the sale of the Nortel technology.

*(c)*     ***Inappropriate Application of Transfer Pricing Principles pertaining to "Form" and "Substance"***

Dr. Cooper's misinterpretation of the rights granted to the Licensees by NNL is also highlighted by his inappropriate analysis of the economic substance of the relationship between NNL and its Licensees. Most notably, Dr. Cooper attempts to minimize the importance of the legal form of this relationship by stating that the economic substance must be given paramount

---

[152]Research and Development Cost Sharing Agreement, January 1983: NNC-NNL08002254. In this same agreement, NTL makes a similar grant of rights to Northern Telecom Data Systems Limited, a UK company that was the predecessor company to NNUK.

importance in evaluating the allocation of the Business Sales and Residual IP Sale. As I will demonstrate, such an analysis ignores guidance from global transfer pricing regulations which states that the economic substance must be examined in the context of the legal form of the agreement, not in isolation from it. Dr. Cooper attempts to use the implied economic substance between NNL and its Licensees to construct the form of the relationship that best suits his argument that the IP sale proceeds should be allocated among the Licensees. Such an analysis is obviously inappropriate and in direct conflict with transfer pricing regulations.

Dr. Cooper summarizes his view in this area when he states that the Canadian Debtors believe the "mere holding of legal title" entitles them to "all of the economic benefits flowing from the Nortel IP."[153] In critiquing this position, Dr. Cooper states that "[t]his is inconsistent with transfer pricing principles, which examine the economic substance of the relationships among entities in corporate group in order [sic] determine their respective rights and confirm that relations are conducted on an arm's length basis."[154]

This statement demonstrates that Dr. Cooper misunderstands the relevant "transfer pricing principles" as they relate to legal form and economic substance. I start by noting the guidance from the OECD Guidelines, which are largely followed by tax authorities in the U.K. and most other jurisdictions outside the US. The OECD Revised Discussion Draft on Transfer Pricing Aspects of Intangibles states that "Legal rights and contractual arrangements form the starting point for any transfer pricing analysis of transactions involving intangibles"[155] [emphasis added]. Further, in the next section, it states, "Generally, the registered legal owner of such intangibles has the exclusive legal and commercial right to use the intangible, as well as the right to prevent others from using or otherwise infringing the intangible. These rights may be granted for a specific geographic area and/or for a specific period of time."[156] Similarly, the US Sec. 482 Regulations state that "The contractual terms, including the consequent allocation of risks, that are agreed to in writing before the transactions are entered into will be respected if such terms are consistent with the economic substance of the underlying transactions"[157] [emphasis added].

These excerpts not only demonstrate the importance of analyzing the legal form of a transaction, but they also display the order in which the elements of a transfer pricing analysis should occur. In other words, a transfer pricing analyst must first examine the legal form of an intercompany transaction and then evaluate its economic substance for consistency with that legal form.

In contrast, Dr. Cooper's opinions would have a transfer pricing analyst first analyze the economic substance of a transaction and then construct a legal form based on that economic substance, or at the very least, attempt to force an existing legal form into an economic

---

[153] Cooper Allocation Report at page 9.
[154] Cooper Allocation Report at page 9.
[155] OECD Guidelines, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, Article 67.
[156] OECD Guidelines, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, Article 68.
[157] Sec. 1.482-1(d)(3)(ii)(B)(1).

framework. This is inconsistent with transfer pricing regulations. This leads to an inaccurate characterization of the underlying legal arrangement represented in the relationship between NNL and the Licensees.

### (d)      Misinterpretation of the Alcatel Sale Proceeds and Foundry Patent Litigation

Dr. Cooper asserts that the way in which the proceeds of the Alcatel transaction (the sale of the UMTS business to Alcatel) were allocated among the RPEs is evidence – *i.e.*, the course of conduct of the parties is evidence – that the RPEs viewed themselves as joint owners of the Nortel business. He notes that "following the pre-insolvency asset sale of Nortel's [UMTS] radio access business to Alcatel in December 2006, Nortel divided the proceeds from the divestiture of the IP assets according the [*sic.*] entrepreneurs relative R&D contributions."

In fact, a closer look at the UMTS sale reveals that its treatment by the RPEs was <u>inconsistent with his views of what the R&D stocks, and the Nortel RPS, imply for the allocation of proceeds of all the intangibles in respect of the Nortel's LOB Sales</u>. Specifically, the UMTS sale was not a sale of a radio access "business," as Dr. Cooper contends. Rather, the UMTS transaction was a sale of specific assets. It is true that a portion of the UMTS sale proceeds was allocated *pro-rata* according to the parties' R&D stock proportions. However, an examination of the purchase/sale price allocation pertaining to the UMTS sale indicates that the transaction involved essentially zero goodwill (*i.e.*, the net present value of future investments). As a result, what was essentially allocated *pro rata* were proceeds related to identifiable existing intangibles corresponding to make-sell rights. These were in fact what the Licensee RPEs had an economic interest in under the MRDA. Moreover, I have not seen any evidence that Nortel intended the UMTS transaction to stand as a precedent for all future allocations even under different circumstances.

A purchase price allocation is conducted at the time of a sale or acquisition for purposes of allocating the purchase price into different asset classes for the acquirer's financial statements. The Alcatel PPA shows a total purchase price of approximately $291 million. Of this amount, approximately $287 million (or almost 99 percent) of the total purchase price is allocated to identifiable assets, which includes approximately $47 million for fixed assets, $20 million for inventory, $162 million for intellectual property rights, and $57 million for customer relations.[158] Most importantly, this amount of $287 million (or almost the entire purchase price) represents the amount paid for identifiable assets purchased from Nortel. A "business," to use Dr. Cooper's term, was not conveyed in this transaction.  Rather, assets were conveyed.

In the context of the rights granted the Licensees under the MRDA, these represent those assets which contribute to make-sell rights that are clearly determinable and separable from the value paid for goodwill, which is not covered by the MRDA. Had the Alcatel transaction involved anything other than a *de minimis* amount of goodwill, then any allocation would have had to properly reflect that the Licensees had no interest in that goodwill.

---

[158] Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement dated July 24, 2007: EMEAPROD02318031.

Dr. Cooper also discusses the Foundry litigation, which encompassed a $35 million settlement for patent infringement alleged to have incurred by Foundry Networks, Inc., an unrelated third party to Nortel. Dr. Cooper notes that the proceeds from this settlement were also allocated among the Licensees in accordance with their R&D contributions.[159]

As with the Alcatel transaction, I believe that it was appropriate for the proceeds of the Foundry settlement to have been allocated among the Licensees, although this does not provide any meaningful conclusion with regard to the allocation of the Residual IP Sale. Upon a closer examination of the conditions of the Foundry settlement, it is clear that it represents payment for the use of certain of the Nortel technology in the production and sale of similar telecommunications equipment as that produced and sold by the Licensees under the MRDA.[160] Most notably, the entire payment represented royalties for the "prior use of the Nortel patents" and a "payment for royalties going forward."[161] As a result, the payment represented Foundry's obligation to Nortel in its prior and future *use* or commercial exploitation of the technology (*i.e.*, making and selling products that embodied the NN Technology).

The fact that Foundry had been infringing on the Nortel patents suggests that it had been using them in manufacturing and selling products. It not conceivable that Nortel would have pursued litigation against Foundry had it not believed that Foundry was realizing economic benefits from the use and commercial exploitation of those patents.

(e)    *Inappropriate Use of Communications made to Tax Authorities*

Dr. Cooper attempts to support his claim that the Residual IP Sale and Business Sales should be allocated among NNL and its Licensees by describing several submissions Nortel made to tax authorities as it sought to gain approval of the Nortel RPS through various Advance Pricing Agreements (APAs). In so doing, Dr. Cooper offers an opinion that, because Nortel discussed the importance of R&D to its business in these proceedings, these statements are evidence that it is appropriate to use the R&D investment percentages to allocate proceeds of the IP sales.

This is not sufficient.  Rather, Dr. Cooper should have analyzed the context in which these submissions to the various tax authorities occurred. Most notably, these proceedings were conducted primarily to obtain approval for the Nortel RPS, which covered the exploitation of the NN Technology over a finite period for the manufacture and sale of products by NNL and its Licensees. Indeed, some of the representations made to tax authorities that are quoted by Dr. Cooper support this very point.

For example, he cites Nortel's "Multilateral APA Response to IRS Information and Document Request for a Functional Analysis" which was also provided to the Canadian and UK tax

---

[159] Cooper Allocation Report at page 31.
[160] I note that Foundry Networks was an independent company that designed, developed, manufactured, and sold switching and routing solutions designed for wired and wireless local area networks, metropolitan area networks, and wide area networks.  (Foundry Networks LLC, 2008.  *United States Securities and Exchange Commission form 10-K*. Retrieved from the Capital IQ™ database: https://www.capitaliq.com/home.aspx.)
[161] See NNC-NNL 11029235.

authorities. In explaining Nortel's "success" as a Company, the submission notes that "Nortel's customers choose Nortel products and services because Nortel is viewed as a technology leader in its market and because Nortel is committed to using its R&D resources in providing full proactive services and support to its customers"[162] [emphasis added]. I note that the emphasis in this submission centers clearly on the ability to provide products and services to Nortel's customers, which is entirely consistent with the limited set of make-sell rights granted to the Licensees by NNL through the MRDA.

Dr. Cooper also errs in stating that Nortel "had to rely on economic facts, not the holding of legal title" to justify the Nortel RPS to the tax authorities.[163] Once again, Dr. Cooper confuses the intent of the APA proceedings and wrongfully links his opinion only to the importance of legal title. As I noted above, Nortel relied on the economic facts for the APA proceedings precisely because they were pertinent to the discussion of the allocation of the residual profits from the manufacture and sale of products, as noted in the passage cited above and used by Dr. Cooper himself.

Moreover, Dr. Cooper provides a litany of responses made to tax authorities that discuss the importance of R&D to Nortel's business and the point that each RPE "maintains an economic ownership in the IP."[164] While such statements are not inherently false (for example, I agree that R&D was fundamentally important to Nortel's business), they do not necessarily provide any support for Dr. Cooper's claims that the proceeds of IP sales should be allocated to the RPEs.

Dr. Cooper concludes his section on the representations to tax authorities by stating subjective opinions that have no basis in fact. Dr. Cooper surmises that because of the representations made by Nortel in its APA proceedings, that "if Nortel had sold its IP prior to commencing an insolvency proceeding, it is my opinion that the tax authorities would not have treated NNL as the only entity entitled to the proceeds from the sale for purposes of assessing tax on the gain of sale."[165] He continues by assuming the role of the Canadian Revenue Authority ("CRA") in constructing a hypothetical scenario in the event the Nortel group had remained solvent. In such a situation, Dr. Cooper asserts that "CRA would not insist on NNL obtaining full economic entitlement to the Nortel IP for no consideration, and would agree to payments by NNL to the other Entrepreneurs consistent with Nortel's RPSM."[166]

Dr. Cooper does not cite any regulatory guidance or evidence that would allow him to conclude as such. More importantly, however, he is inherently wrong to conclude as he does. He shortchanges a key aspect needed in his analysis by simply referring to any "sale" of the Nortel IP prior to an insolvency proceeding. As I have stated several times in this report, and reiterate again here, it is necessary to analyze the economic conditions and terms under which a "sale" of

---

[162] Cooper Allocation Report at page 16.
[163] Cooper Allocation Report at page 34.
[164] Cooper Allocation Report at page 27.
[165] Cooper Allocation Report at page 35.
[166] Cooper Allocation Report at page 35.

IP occurs and how those conditions conform (or do not conform) to the conditions underlying the legal and economic arrangements among the parties at issue.

## (f)    *Inappropriate Use of Communications made by  Nortel Tax Personnel*

Similar to his use of representations to tax authorities, Dr. Cooper also cites the statements from various Nortel tax personnel to attempt to support his opinion that the proceeds from the IP sales should be allocated among NNL and its Licensees. As with his statements regarding the tax authority submissions, Dr. Cooper fails to provide a critical analysis of these statements by Nortel's former tax personnel.

Dr. Cooper cites several tax personnel who, according to Dr. Cooper, support the opinion that legal title was "irrelevant" for the relationship between NNL and its Licensees. First, Dr. Cooper cites Mr. Mark Weisz,[167] who said that "the question of who owned legal title to the intellectual property at Nortel was irrelevant…to the way in which the proceeds from exploiting that IP were allocated."[168] I note first that Mr. Weisz's statements do not suggest that legal title was "irrelevant" in isolation but only insomuch as it related to the "proceeds from exploiting" the IP. In this sense, Mr. Weisz is not incorrect, as the economic ownership was the determinant of the allocation of the residual profits and losses from the manufacture and sale (the "exploitation") of the IP. However, Dr. Cooper is incorrect to suggest that this statement necessarily means that legal title is never important when analyzing the grant of rights that NNL made (and did not make) to its Licensees. In this context, legal title and the ability of NNL to grant specific and limited rights to the Licensees (not including the right to proceeds from sales of the residual IP) is quite important, contrary to Dr. Cooper's assertion.

Further, Dr. Cooper cites the testimony of John Doolittle, who formerly held the positions of global head of Tax, global head of Treasury, and post-petition CFO of NNL. Mr. Doolittle testified that the Nortel RPS "mirrored the business" and that "the objective in the MRDA was to accurately reflect the economic realities of how Nortel operated."[169] Somehow, Dr. Cooper views these statements from Mr. Doolittle as supportive of his opinion that legal title was irrelevant and that, by extension, the proceeds from any future IP Sales should accrue to all of the Licensees as well as NNL. The fact that Mr. Doolittle "agreed" that the MRDA was designed to reflect economic realities is entirely consistent with the granting of the make-sell rights for exploitation of the Nortel technology but does not necessarily prescribe anything about the rights to any IP sales.

In summary, it is unclear to me how Dr. Cooper can draw any kind of definitive conclusion about the nature of the proceeds from the IP sales based upon his citations from Nortel's tax personnel. Even a rudimentary critical analysis of those statements shows that they can be literally true without implying anything about the proceeds from the IP sales.

---

[167] As indicated above, Mr. Weisz was a former Director of International Tax for Nortel.
[168] Cooper Allocation Report at page 36.
[169] Cooper Allocation Report at page 36.

*(g)      Misinterpretation of Investment in R&D with respect to Allocation*

Dr. Cooper attempts to justify his claim that the LOB Sales and the Residual IP Sale should be allocated to the Licensees by providing a subjective opinion on the supposed behavior of arm's length parties in such a situation. In an attempt to support his opinion, Dr. Cooper states that "arm's length parties never would have agreed to the arrangement that the Canadian Debtors now put forward."[170] He proceeds to state that "If the Canadian Debtors' argument that they are entitled to 100% of the IP Sale Proceeds were taken as correct, then the other Entrepreneurs would have given the Canadian Debtors the benefit of their investment and received nothing in return."[171]

This argument is inherently flawed, unsupported by the facts, and entirely inconsistent with how arm's length parties evaluate an *ex ante* investment such as that represented by the R&D costs incurred by the Licensees. As I discussed in my first report, the fundamental economic question here is whether the R&D investments at issue would have been expected to return (a) their nominal dollar cost (*i.e.,* the return *of* the invested amount, and (b) a profit over and above the invested amount, equal to the investment's cost of capital or required rate of return (*i.e.,* the return *on* the invested amount). As I noted, investments that meet these two criteria are said to be "net present value zero" (NPV=0) because the cost of the investments equals the present value of the gross profits earned from the investment. Therefore, to be economically rational, the *net* present value (present value of the returns less the investment) must be greater than or equal to zero.

Such a condition is <u>all that is necessary</u> for it to have been economically rational for the Licensees to have agreed to the rights granted them in the MRDA (and the resulting economic benefits that accrued from the accompanying Nortel RPS). There is no requirement that the Licensees needed to have received any other value, including any residual value from the IP Sales, in order to agree to the terms of the MRDA.

Crucially, the fact that NNL and the Licensee RPEs chose to substitute the provision of R&D as consideration for the licensed make-sell rights for a royalty as consideration for the licensed make-sell rights in no way implies that the MRDA created an equity interest (*i.e.,* something beyond a license). In this regard, Dr. Cooper seems to commit the fallacy of association – assuming that spending investment dollars in R&D meant full ownership, when in fact investment was treated by the MRDA, and the CSAs that preceded it, as a substitute for a royalty. Royalties, after all, also fund investments in R&D. Had the MRDA called for a royalty as the form of consideration (which would have in all likelihood been higher than their R&D burdens, and would have been used by NNL to fund R&D) I strongly doubt that Dr. Cooper would be asserting that the MRDA was a joint venture in which residual interests accrued to the other parties.

---

[170] Cooper Allocation Report at page 34.
[171] Cooper Allocation Report at page 34.

## B.    Response to Dr. Eden's Positions on the Nortel RPS

Dr. Eden's report appears to have two primary objectives, namely:

1)    To demonstrate that any, or all, of the following are not appropriate for asset valuation in the context of the allocation of LOB Sales and Residual IP Sale: the arm's length principle, the residual profit split method, and the Nortel RPS.

2)    To establish or imply that NNI is a full owner of the Nortel technology, with full rights and ownership, including the right to any residual interest in the Nortel technology, which NNL did not provide to it under the MRDA.

In support of these objectives, Dr. Eden makes seven primary assertions. These are: 1) the arm's length principle is a regulatory construct that is designed to meet policy considerations unrelated to issues of valuation and allocation, and is therefore an inappropriate basis for both; 2) the residual profit split method is inherently unreliable, and is a "method of last resort"; 3) the residual profit split method is not intended to, and does not, provide an estimate or measure of the value of assets held, sold, or relinquished by the RPEs; 4) tax minimization motivated Nortel's RPS, and as a result it was not arm's length; 5) the legal arrangement and form of an intercompany relationship is of little significance, and therefore economic substance is the only significant consideration for transfer pricing purposes; 6) the transition from the Nortel CSA to the Nortel RPS was artificial and tax motivated; 7) certain MRDA terms can be understood to imply that NNI had the full set of ownership rights, including any residual interests in IP.

I understand that the role of the Nortel RPS in the valuation of the Licensees' allocation is addressed by others. However, I will address Dr. Eden's statements regarding the nature of the arm's length principle, transfer pricing analysis, the residual profit split method, and Nortel's RPS as, in my view, these statements are in large measure fundamentally unsound. Each of Dr. Eden's assertions is addressed in turn, below.

### 1.    Misunderstanding of the Nature of the Arm's Length Principle

The first category of Dr. Eden's assertions centers on the notion that the arm's length principle is a regulatory construct used by governments and corporations for taxing, and tax avoidance purposes, respectively. As for the application of the arm's length principle by corporations, Dr. Eden states that transfer pricing has "various motivations" including that "transfer pricing can be used to take advantage of differences in tax rates across countries," and that transfer pricing can be used for "profit-seeking activities."[172] Dr. Eden states that it is "rational, legal, and normal" for a multinational entity ("MNE") to set its transfer pricing policies "that will minimize the MNE's global tax burden."[173] Dr. Eden does note that MNEs may consider other

---

[172] Eden Report at pages 58-59.
[173] Eden Report at page 59.

factors "such as fiscal and financial incentives and differences in level of political, economic, and financial risk across countries" when establishing transfer pricing policies.[174]

Dr. Eden's characterization of the arm's length principle distracts from much more fundamental issues and questions. The question of whether and how the arm's length principle is relevant to issues of allocation and asset valuation is properly a question of how the arm's length principle relates to the fair market value standard.

The arm's length principle and the fair market value standard are quite similar to one another. As described in my first report, the arm's length principle states that intercompany transactions should be priced within an arm's length range that is consistent with the way in which similarly situated uncontrolled parties bargaining at arm's length would price the transactions. Arm's length prices are values for goods, services, and assets that would be determined in the open market by uncontrolled buyers and sellers. This is essentially identical to the concept of "fair market value," which is sometimes described as the value that would be determined by a "willing buyer" and a "willing seller." In other words, fair market values are those that would be determined in the open market.

As a result, an arm's length transfer pricing analysis is conceptually similar, if not identical in many cases, to that conducted for valuation purposes. Allocations of income that are based on the arm's length principle correspond to the allocation of value over time, as both techniques use essentially identical methods in calculating value. Any other conclusion is untenable.

However, I note that neither transfer pricing principles, their underlying economic principles, nor valuation principles dictate <u>entitlement</u> to proceeds from the sale of an asset: the entitlement is determined by the governing ownership agreed to by the parties (subject to that agreement being consistent with the economic substance of the parties' relationship). The same statement can be made regarding the fair market value standard: the entitlement to proceeds from the fair market sale of an asset is determined by the ownership rights in respect of that asset.

## 2.    Mischaracterization of the Residual Profit Split Method as a Method of Last Resort

Dr. Eden paints the residual profit split as an inferior method and the "method of last resort." She asserts that it is the method "least favored by tax authorities and, of all recognized transfer pricing methods, the one that is typically furthest away from market-based pricing."[175]

Respectfully, this is fundamentally incorrect. The inclusion of the "last resort" reference in the OECD Guidelines and US. Sec. 482 Regulations occurred two decades ago, first in 1994 for the US Sec. 482 Regulations and then in 1995 for the OECD Guidelines. At that time, profit-based methods such as the profit split or comparable profits method ("CPM") were relatively new in their application for intercompany transfer pricing, whereas transaction-based methods had been in existence and use for many decades prior to that point. As a consequence, tax

---

[174] Eden Report at pages 59-60.
[175] Eden Report at pages 4-7.

authorities and other regulatory bodies had little practical experience with profit-based methods.

Indeed, even the 1995 OECD Guidelines explicitly provide support for the profit split method by stating the following:

> Another strength is that under the profit split method, it is <u>less likely that either party to the controlled transaction will be left with an extreme and improbable profit result</u>, since both parties to the transaction are evaluated. This aspect can be particularly important when analysing the contributions by the parties in respect of the intangible property employed in the controlled transactions.[176] [emphasis added]

The OECD issued a comprehensive update of its transfer pricing guidelines in 2010, reflecting the actual practice and realization that the profit split method that had developed in the years following the 1995 Guidelines was reliable. No longer was the profit split (or the transactional net margin method ("TNMM"), another profit-based method) referred to as a method of "last resort." Moreover, the 2010 Guidelines have explicit comments on the <u>strengths</u> of the profit split method:

> The main strength of the transaction profit split method is that it can offer a solution for highly integrated operations for which a one-sided method would not be appropriate….A transaction profit split method may also be found to be the <u>most appropriate method</u> in cases where both parties to a transaction make unique and valuable contributions (*e.g.* contribute unique intangibles) to the transaction, because in such a case independent parties might wish to share the profits of the transaction in proportion to their respective contributions and a two-sided method might be more appropriate in these circumstances than a one-sided method.[177] [emphasis added]

In Dr. Eden's own words from 2005, she notes that for offshored business services "that are knowledge-intensive services…the residual profit split is probably the best approach."[178] Consistent with this, Dr. Felgran notes that the OECD Guidelines and the US Sec. 482 Regulations "suggest that the profit split method may be considered the most reliable method when intangibles are created on both sides of the affiliated transactions…"[179]

I note that the US Sec. 482 Regulations also refer to the CPM as a method of last resort,[180] yet any transfer pricing practitioner who regularly advises companies and prepares transfer pricing reports will acknowledge that the CPM (and its OECD analogue, the TNMM) is easily the dominant transfer pricing method MNEs used for the last decade. Published data from the IRS also supports this point. For example, the most recent APA Annual Report from the IRS shows that taxpayers used the CPM/TNMM in 75% of all APAs executed in 2012 for tangible and

---

[176] OECD Guidelines, section 2.113.
[177] OECD Guidelines, section 2.109.
[178] Lorraine Eden, "Went for cost, priced at cost? An economic approach to the transfer pricing of offshored business services," *Transnational Corporations*, 14.2 (August) at page 33.
[179] Felgran Report at page 7.
[180] "Section 1.482-5" of the Preamble to the Intercompany Transfer Pricing Regulations Under Section 482, Federal Register, July 8, 1994.

intangible property. Moreover, the same APA report indicates that taxpayers used the residual profit split method in 9% of the same set of APAs.[181] In other words, in approximately 84% of all APAs executed in 2012, taxpayers used profit-based methods that two decades ago were labeled methods of last resort.[182] This trend was even evident over ten years ago when examining the APA Annual Report for 2003. Then, taxpayers used the CPM in 54% of APAs executed in 2003 for tangible and intangible property. Likewise, taxpayers used the profit split method in 10% of all executed APAs, for a combined total of 64% of all APAs in 2003 that used a profit-based method. As these data clearly show, despite the tax authorities' initial labeling of profit-based methods, taxpayers have clearly preferred them, and tax authorities have clearly endorsed and accepted them to great effect since their introduction.

Despite her criticisms, Dr. Eden herself offers no alternative method for use in Nortel's transfer pricing.

Dr. Eden states that the residual profit split is the transfer pricing method "typically furthest away from market-based pricing," mainly because in some cases a taxpayer uses internal data (such as historical R&D spending in Nortel) to divide the residual profits or losses, and Dr. Eden considers this a departure from using "market benchmarks."[183]It is a basic transfer pricing tenet, however, that the fact that a residual profit split method may use internal R&D cost information to allocate residual value does not mean that the implementation of the residual profit split does not use "market benchmarks" or does not comport with "market-based pricing." The allocation key is but one component of a residual profit split, and in Nortel's RPS, it is used as a <u>relative</u> indicator of residual value – not, as Dr. Eden suggests, an equivalent measure of the value.

Many of the other components in Nortel's RPS clearly represent "market benchmarks." In order to calculate residual profit, it is necessary to evaluate the returns for routine activities such as distribution and manufacturing, using information from comparable third parties entities in the marketplace. The Nortel RPS employed this market-based data for its routine returns. Moreover, the calculation of the residual profit and loss to which the allocation key is applied obviously originates from market-based data because it represents the results of Nortel's sales to its third-party customers.

Moreover, Dr. Eden's report has ignored the specific facts of Nortel that make the residual profit split especially suited for its transfer pricing. As has been recognized many times in this matter, Nortel was a highly integrated entity, with multiple entities performing significant amounts of R&D that was used by other entities to manufacture and sell products.

---

[181] Announcement and Report Concerning Advance Pricing Agreements, March 25, 2013 at page 11. This amount is all the more relevant when considering the fact that there is a much more limited number of transactions where the facts warrant using a profit split method, as compared to the CPM/TNMM.
[182] I note what may be self-evident in that the existence of an executed APA, by definition, means that the IRS, the same tax authority that first called the profit-based methods a "last resort," agreed to its use.
[183] Eden Report at page 24.

Dr. Eden's statement that Nortel "could have structured" its transfer pricing differently in fact serves to illustrate the appropriateness of the residual profit split method for Nortel. She states that NNL could have acquired all of the IP that had been developed by the other entities performing R&D and "then, in turn, licensed back and charged royalties to the IEs for use of that IP in each jurisdiction."[184] Putting aside the extreme level of administrative complexity and unnecessary transaction costs that this arrangement would have created, charging royalties for the Nortel technology (even if the royalties all accrued to one entity, which is the case in Dr. Eden's example) would have produced nonsensical results from an economic perspective. Because Nortel in some years had consolidated residual losses on its third-party sales, applying a positive amount to royalty transactions would have meant that routine activities such as distribution and manufacturing would have received losses in Nortel's system. In other words, the activities that have a clear opportunity cost in the market such as distribution and manufacturing would receive losses while those activities that are inherently risky, such as R&D, would earn positive profits. Clearly, such a result that provides losses to routine activities would not be closer to "market-based pricing" than the Nortel RPS.

**3.      Misunderstands Relationship Between R&D Expenditure and Fair Market Value**

Dr. Eden expends considerable time on her contention that R&D expenditures are not a proxy for fair market value. I note, first, Dr. Eden mischaracterizes the relevant question. The key concept is not whether the R&D expenditures are themselves a proxy for fair market value, but only whether they are a <u>relative</u> proxy for allocating the residual income in a residual profit split method.

Dr. Eden, to my knowledge, is not a valuator. R&D spending does, in fact, "bear a relation to the value of each entity's intangible assets" (their make-sell rights).The residual profit split method is a "valuation method."

The residual profit split maps previous R&D investments to their returns in real time, but does so in the aggregate and on the average. In other words, the arithmetic of the residual profit split treats all R&D as having the same economic life, and in every year all of the R&D that is in service is treated as being equally productive. Thus, it is true, as Dr. Eden points out, that the residual profit split method uses the controlled parties' relative R&D investment shares to allocate residual profit from R&D activity, and in this way it does not attempt to map each party's investments in R&D to the specific cash flows generated by that R&D. However, this is because it is not possible to do what Dr. Eden is suggesting should be done. It is not possible now, nor was it when Nortel was implementing the Nortel RPS, to determine the specific cash flows associated with each entity's R&D investments, either *ex ante* or *ex post*.

For the same reasons, most valuations of intangible asset portfolios performed for financial reporting purposes (for example, for purposes of a purchase price allocation) do not attempt to map precisely from each R&D investment to the specific cash flows generated by that investment. Almost all valuations of intangible asset portfolios – in my experience, particularly

---

[184] Eden Report at page 55.

those performed for financial reporting purposes – rely upon the assumption that every dollar of R&D has the same economic life.

Further, most of these valuations (for example, applications of the relief from royalty method or the excess earnings method) also implicitly assume that in every year of the forecast period all of the R&D that is in service in that year is equally productive. The only substantive difference between the residual profit split and a typical technology valuation performed as part of, say, a purchase price allocation is that the residual profit split operates to allocate residual profit in real time, a valuation performed for purchase price allocation purposes is performed *ex ante*.

The way in which Nortel's RPS relates to asset valuation can be described graphically. The exhibit below provides a graphical depiction of the way in which the R&D investments of an RPE correspond to current profits, and future profit expectations.

For an RPE that invests in R&D there exists a series of R&D investments in each year *t*. These investments are shown below the horizontal axis to indicate that these investments are negative cash flows (cash outlays) for the firm. Each one of these R&D investments is then shown yielding a "return" for three years after the investment was made (in other words, this example assumes an economic life of three years). These residual profit streams are the return on and of the R&D investment from exercising make-sell rights to the NN Technology. The residual profit streams are shown above the horizontal axis to indicate that they are positive cash flows for the firm.[185]

### Exhibit XI-1: Nortel RPS Mapping of R&D to Residual Profit



The green area shown in Exhibit XI-1 is the profit, as of the current time (in valuation parlance, the "valuation date"), expected by the RPE to be generated by prior R&D investments. The exhibit shows that three "vintages" of past R&D are "in service" yielding profits for the RPE.

---

[185] The exhibit shows profits as positive, because *ex ante* Nortel presumably viewed its investments as NPV≥0. I note that the residual profit shown in the exhibit is gross residual profit (prior to deduction of the current period's R&D, because that R&D is an investment in future profit).

This is true in every period – in each period three vintages are always in service, because the economic life of the R&D is three years (per the assumption in the exhibit). Under the Nortel RPS, the RPE simply earns the profit from these three vintages of past R&D in each period.

However, because the life of the R&D is three years, the RPE has a claim at any point in time over the present value of the entire green shaded area. The RPE economically owns the present value of this green area under the Nortel RPS.

This green area, in present value, is the value to the RPE of its make-sell rights in its previously sunk R&D. Very importantly, the RPE is at any point in time <u>indifferent</u> between being paid that present value, and simply earning the green profit streams in real time as Nortel makes and sells products that embody the NN Technology. In other words, the Nortel RPS allowed the RPEs to earn their share of Nortel's residual profit in real time, but this is exactly economically equivalent to the RPEs stopping their R&D investment at any point in time and being paid the present value of the future return streams (over their finite life) associated with their make-sell rights in NN Technology.

It is precisely because the RPEs are indifferent between remaining in the Nortel RPS and being paid the present value of their sunk investments that <u>the Nortel RPS "bears a relation to the value of each entity's intangible assets,"</u> and is a valuation method.

## 4.    Mischaracterizes the Nortel RPS as Manipulative and Not Arm's Length

Dr. Eden acknowledges that it is "rational, legal, and normal" for MNEs to structure their business affairs so as to minimize taxes while still being in compliance with transfer pricing laws and regulations.[186] In other words, Dr. Eden necessarily argues that an MNE's transfer pricing policies can be designed to minimize taxes <u>and</u> be consistent with arm's length principles. Indeed, Dr. Eden states that "There is nothing nefarious about tax avoidance – as long it remains within the law."[187] In relation to Nortel, she states "Nortel applied its RPS in a manner consistent with group tax avoidance even if intended to meet the constraints imposed by national tax regulations."[188] As I stated in my first report, this is not an accurate characterization in that the RPEs were in high-tax jurisdictions. Nor does this statement acknowledge that the Nortel RPS was carefully examined by tax authorities, and jointly developed with them.

Dr. Eden goes on, however, to state that the "<u>intentional skewing</u> of the transfer pricing policy in NNL's favor for tax avoidance reasons is a strong reason why Nortel's transfer pricing is inappropriate for valuing the assets sold or relinquished by the Nortel selling parties in the Sales"[189] [emphasis added]. This characterization is, put bluntly, bizarre: there is no indicia of a "skewing" of Nortel's RPS to avoid tax. To the contrary, the residual split profit method was first requested of Nortel by the tax authorities themselves, who recognized the interconnected

---

[186] Eden Report at page 59.
[187] Eden Report at page 9.
[188] Eden Report at pages 4-7.
[189] Eden Report at pages 4-7.

nature of Nortel's intercompany transactions, especially its R&D activities, and the need for a method that could accommodate these unique facts. NNI, who engaged Dr. Eden, itself acknowledged that the Nortel RPS was at the behest of the tax authorities.[190]

Nortel employed a high degree of transparency in the administration of the Nortel RPS with various tax authorities. Nortel sought multilateral APAs with tax authorities and prepared detailed transfer pricing reports to document the arm's length nature of its transfer pricing, and specifically, the Nortel RPS. As I noted in my first report, Nortel's main operations were located in countries with some of the most sophisticated and aggressive tax authorities with regard to transfer pricing, including the US., Canada, UK, Australia, and France. Had "tax avoidance" been a motivation of the Nortel RPS, I find it highly unlikely that Nortel would have provided such transparency, especially to tax authorities in these countries.

Dr. Eden also asserts that the Nortel RPS had numerous "flaws" as evidenced by tax authority negotiating positions. That the IRS would have had criticism of Nortel's RPS is not surprising given the large amount of third-party revenue generated by NNI. In my experience, entities that generate significant revenue and are part of an MNE will inevitably attract greater scrutiny from tax authorities. In addition, the critical points raised by the tax authorities are, in my experience, typical of an assessment of the transfer pricing policies of a large MNE such as Nortel, but do not by any means suggest that the residual profit split was not the best method for Nortel's transfer pricing. Having been involved in many tax audits and disputes involving the IRS, I can state that it is not uncommon for tax authorities to provide criticism of a chosen transfer pricing method while agreeing with the appropriateness of the method chosen. The mere presence of any critical views by a tax authority is not *prima facie* evidence that it also believes the method chosen is incorrect or that it believes the method does not meet the arm's length principle. If there is any doubt about that in this case, it is dispelled by the IRS' statement in 2006 that its "APA Team agreed with Nortel that the residual profit split method (RPSM) is the best method,"[191] and the <u>most suitable</u> means of establishing arm's length pricing for Nortel.

---

[190] MRDA, at Schedule A. The evidence supporting the fact that tax authorities first suggested the residual profit split method to Nortel is extensive. For example, an internal Nortel memorandum from July 2000 that discusses the potential transition from the CSA, notes that Bob Kirschenbaum of the IRS "has mentioned residual profit split as an alternative, which he would like to pursue for the upcoming APA renewals." See NNI_00794081.

Later, in a 2004 email from Karina O of Nortel's tax department, she notes that based on her conversation with Marlene Gilbert, "Nortel started investigation of RPS based on a 'strong' suggestion from B. Kirschenbaum, IRS APA counsel. [Ms. Gilbert] indicated Nortel may have received 'almost a threatening' letter/memo that indicated that if Nortel did not use RPS, there would be many difficult issues on the next APA such as buy-ins, etc." See NNC-NNL11148879 / 3.

In a 2005 presentation entitled "Joint IRS/Nortel Tax Meeting," it was noted that "Nortel believes that Residual Profit Split (RSP) methodology makes the most sense" and that "IRS and CRA encouraged adoption of RPS." See NOR_54407140.001 at slide 3.

Finally, in a letter to a Team Leader in the IRS APA Program from 2005, Nortel noted, "Based on discussions with representatives of the IRS and CRA who led prior Nortel APA requests and who were familiar with the highly integrated nature of Nortel's business, and as a result recommended a single Residual Profit Split Method ("RPSM") for all Nortel's controlled transactions…" See NNC-NNL016070.

[191] IRS Memorandum, March 22, 2006 at page 23: Exhibit 11237 (NNC-NNL061995). See also CRA Advance Pricing Agreement Position Paper – Supplementary Analysis, October 2008 (NNC-NNL089532).

In asserting that Nortel's RPS was designed for tax avoidance, Dr. Eden ignores the method's basic premise – one that was jointly developed with the tax authorities. In other words, the Nortel RPS allocated residual profits to the Nortel entities by an objective allocation key, *i.e.,* in relation to the amount of R&D expenditures they incurred. Under the Nortel RPS, residual profit and loss accrue as a result of making investments – just as happens in the open market. Investment of at risk dollars implies the earning of returns (positive or negative) on those dollars – in both the open market and in the Nortel RPS.

Further, the operation of the Nortel RPS allocated loss, not profit, to Canada. In other words, the "tax avoidance" cited by Dr. Eden was an allocation of losses to a country that she asserts is a "low tax jurisdiction." Tax avoidance requires the opposite pattern – allocation of profit to low tax jurisdictions and losses to high tax jurisdictions. I note in this regard that, had Nortel not transitioned from the CSA to the Nortel RPS, which Dr. Eden claims was a tax motivated transition, NNI would have borne a much larger share of the losses and NNL a lower share.

Finally, I note that Dr. Eden's characterization of Nortel's RPS is done without conducting any detailed analysis of its characteristics. In my first report, I noted that one must look at three key factors in evaluating Nortel's RPS or the application of any transfer pricing. First, was Nortel's choice of the residual profit split method itself consistent with transfer pricing regulations and guidance? (I concluded that it was an appropriate method given its transparency to tax authorities, consistency with Nortel's facts including its emphasis on R&D, and the fact that no other alternative method conformed better to Nortel's situation.) Second, was the design of Nortel's RPS consistent with the arm's length principle?(In my assessment, I concluded that there was nothing inherently irrational from an economic perspective for the RPEs to agree to make R&D investments in return for participation in a residual profit split arrangement, and the design was consistent with the arm's length principle.) Finally, I considered the quantification of Nortel's RPS and provided my view as to where I would make adjustments to the calculations of the arm's length returns for the intercompany transactions.

## 5.    Misunderstands the Role of the Legal Arrangement and Form of a Transaction

In several instances, Dr. Eden professes her belief in the supremacy of the economic substance over the legal form of an intercompany transaction (the parties' actual arrangements and agreement). She attempts to show that the emphasis of the transfer pricing regulations on the necessity to examine a transaction's economic substance implies that legal form occupies a lesser role. Moreover, Dr. Eden focuses on the separation of legal title from economic ownership, particularly in the case of Nortel, rather than also analyzing the importance of the legal form to the intercompany transactions.

I have addressed a similar fallacy in Dr. Cooper's approach, earlier in this report. Both Dr. Eden and Dr. Cooper not only suggest that economic substance is the starting point, but that one should effectively recreate the economic substance from a blank slate.

As discussed elsewhere, substance operates as a binding constraint on form. That is, the legal form must not give rise to an arrangement that is economically irrational. All of the parties to an arrangement must agree, *ex ante*, that the formal arrangement being entered into makes them

better off. It is in this specific sense – and <u>only</u> this sense – that substance has primacy over form – substance is a threshold test that any intercompany arrangement must meet. However, once this threshold is met – *i.e.*, once it is clear that the arrangement was economically rational for the parties to have entered into – form prevails. In this case, the role of the transfer pricing economist is to price the transaction as structured by the parties.

Dr. Eden's error may arise from a misinterpretation of the OECD Guidelines. She quotes a passage from the July 2013 Revised Discussion Draft on Transfer Pricing Aspects of Intangibles that the "OECD Transfer Pricing Guidelines on intangibles are very clear that legal title ownership is less important than economic ownership."[192] I have reviewed the passage that Dr. Eden cites, and I fail to see how it can mean that legal title ownership is "less important." The passage notes that "legal ownership is separate from the question of remuneration under the arm's length principle" but there is nothing that states the importance of one over the other.

Dr. Eden appears to have ignored other relevant passages from the same document. For example, the same Discussion Draft, in an earlier section, states that "Legal rights and contractual arrangements <u>form the starting point</u> for any transfer pricing analysis of transactions involving intangibles"[193] [emphasis added]. Further, in the next section, it states, "Generally, the registered legal owner of such intangibles has the exclusive legal and commercial right to use the intangible, as well as the right to prevent others from using or otherwise infringing the intangible. These rights may be granted for a specific geographic area and/or for a specific period of time."[194] Similarly, the US Sec. 482 Regulations state that "The contractual terms, including the consequent allocation of risks, <u>that are agreed to in writing before the transactions are entered into</u> will be respected if such terms are consistent with the economic substance of the underlying transactions"[195] [emphasis added].

As I discuss further below, despite Dr. Eden's assertions that legal form is less important, she nonetheless makes additional statements that contradict her emphasis on economic substance. She states that, in contrast to the arrangement established by the MRDA, Nortel could have structured its intercompany transactions differently. For example, she believes that NNL could have established a type of principal-agent model in which it acquired and owned (from an economic as well as legal basis) all of the IP and licensed it to other Nortel entities in exchange for royalties.[196] She also notes that a similar arrangement could have been implemented in which an entity in a "low-tax jurisdiction" (such as Switzerland) could have been the legal and economic owner of the IP, rather than NNL.[197] Finally, Dr. Eden suggests that the Nortel parties could have simply maintained the CSA that existed prior to the implementation of the MRDA. In noting that "NNL's operations did not undergo appreciable change after the advent of the

---

[192] Eden Report at page 30.
[193] OECD Guidelines, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, Article 67.
[194] OECD Guidelines, Revised Discussion Draft on Transfer Pricing Aspects of Intangibles, Article 68.
[195] Sec. 1.482-1(d)(3)(ii)(B)(1).
[196] Eden Report at page 55.
[197] Eden Report at page 55.

RPSM," she nonetheless believes that the "financial performance of NNL and NNI would be strongly influenced by the change from the CSA to the RPSM."[198]

Through these statements, far from suggesting that economic substance is more important, Dr. Eden strongly implies that the legal form of a transaction *does* matter. Without this implication, I find it impossible to reconcile her opinion that NNL did not have any "appreciable change" before and after implementing the Nortel RPS, yet somehow the CSA conferred a very different "financial performance" to it when compared to the MRDA and accompanying Nortel RPS.

## 6.        Mischaracterizes the Transition from the Nortel CSAs to the Nortel RPS

It appears that one of Dr. Eden's themes is to taint the transition from the CSAs to the Nortel RPS, by characterizing the transition as tax motivated and manipulative.

For example, Dr. Eden states that she believes Nortel's change from the CSAs to the Nortel RPS resulted in "additional income" to NNL, citing her Figure 5. In that Figure, she attempts to show that the "portion of R&D expense booked by NNL for transfer pricing purposes changed from an average of 22% under the CSA to 39% on average under the RPSM."[199]

There are two deep flaws in this assertion. First, by stating that "additional income" accrued to NNL following the transition, Dr. Eden glosses over the fact that this income was negative.

A more accurate statement would have been that "additional losses" accrued to NNL as a result of the transition. Indeed, as for Dr. Eden's statement that the Nortel RPS "shifted billions of dollars of reported revenue from NNI to NNL," the Nortel RPS shifted both revenue and costs (Dr. Eden fails to mention the shifting of costs to NNL which were much greater than the revenue shifted). The net effect of the Nortel RPS was to migrate heavy losses to NNL. I note that, had Nortel continued forward with the CSA, NNI would have borne much higher losses than it did under the Nortel RPS.

Second, the Nortel RPS represents a transition from a structure that was relatively more artificial to one that was in my view much more "natural" given the economic substance of the RPEs. The transition from the CSAs to the Nortel RPS was one in which parties' claims to residual profit were previously based upon the relative size of the national market in which they operated to one in which their claims were based upon the relative size of their investments. In my view, this constitutes a movement toward much more natural and arm's length bargaining positions for the RPEs. If one agrees that R&D is the primary cause of residual profit for Nortel, then why would one agree to split residual profit based upon market size? One would not – rather one would split profit based upon relative capital investments – investments in R&D.

---

[198] Eden Report at page 64.
[199] Eden Report at page 65.

7.      **Selective Application of the Terms of the MRDA**

Despite Dr. Eden's contention that economic substance is more important than legal form (indeed, that "taxation follows substance over form"), she relies on numerous provisions from the MRDA in an attempt to support her opinions. For example, she notes that the MRDA discusses the Licensed Participants "equitable and beneficial ownership of certain exclusive rights" with respect to the Nortel technology after the CSAs had been terminated.[200] She also notes that the MRDA states that the Participants had "a fully paid up 'exclusive, royalty-free license' in perpetuity to NN Technology in its exclusive territory, e.g., the US for NNI, or the U.K. for NNUK."[201] She proceeds to state that if Participants chose to withdraw from the MRDA, they "would be awarded the 'fair market value' of their exclusive licenses to NN Technology."[202] She concludes by stating, "Consistent with the fact that the RPSM does not measure the value of the assets that each entity owns, the MRDA uses the term 'fair market value' to determine the appropriate payment to an IE upon withdrawal from the MRDA and relinquishment of the exclusive licenses in a bankruptcy scenario."[203]

Dr. Eden continues by noting Article 13 of the MRDA, which states the relationship between NNL and the Participants does not constitute a partnership or joint venture.[204] (Dr. Eden mentions this section of the MRDA in an attempt to advance her opinion that the Nortel RPS was tax-motivated because a partnership or joint venture could have had negative tax consequences for Nortel under US law.)

Dr. Eden's own approach demonstrates the vital role of the legal arrangements ("form"). This leads to no other conclusion than that the MRDA indeed creates defined license rights granted by NNL to other Participants, and which do not grant any residual or equity interest in IP to the licensees.

Dr. Eden further notes that "The MRDA specifically provides that the proceeds from a sale of a Nortel business will not be allocated according to the RPSM percentages in Schedule A. Therefore, the MRDA does not appear to contemplate using the RPSM for allocation, which is consistent with the basic premise that transfer pricing should not, as a general matter, be used for that purpose."

---

[200] Eden Report at pages 52-53.
[201] Eden Report at page 53.
[202] Eden Report at page 54.
[203] Eden Report at page 54.
[204] Eden Report at page 56.

Again, Dr. Eden is necessarily recognizing the primary role of legal agreement because she takes no cognizance of prior conduct of Nortel with regard to allocating the proceeds from a sale of a business, where Nortel used the R&D percentages from the Nortel RPS to allocate the proceeds from a significant pre-insolvency sale of a business to Alcatel.

_Timothy A. Reichert_

February 28, 2014

**Appendix A:  Schedules**[1][2]

---

[1]The "Nortel RPSM Files" refers to the following: NOR_553648312 ("2001 RPSM"), NOR_53648037 ("2002 RPSM"), NOR_53648041 ("2003 RPSM"), NOR_53648508 ("2004 RPSM"), NOR_53648130 ("2005 RPSM"), NOR_53648133 ("2006 RPSM"), NOR_53648323 ("2007 RPSM"), and NOR_53648048 ("2008 RPSM").
[2]The "Nortel RONA Files" refers to the following: NOR_00305795 ("2001 RONA"),  NOR_00305802 ("2002 RONA"), and NOR_00305816 ("2003 RONA").

# I.    Residual Profit Split Models

## A.    Dr. Cooper's Unfiltered View

### 1.    By Entity and Year

**NNL: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 2 | Intercompany Revenues | 4,037.3 | 2,138.0 | 2,556.3 | 2,657.7 | 2,889.0 | 2,237.5 | 2,147.3 | 1,827.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 5,789.7 | 3,086.3 | 3,324.1 | 3,438.1 | 3,724.3 | 3,129.4 | 3,162.6 | 2,617.7 |
| 4 | Cost of Revenues | 5,385.5 | 2,750.1 | 2,140.0 | 2,370.7 | 2,002.4 | 2,069.0 | 1,943.8 | 1,383.5 |
| 5 | Gross Profit (Line 3 - Line 4) | 404.3 | 336.2 | 1,184.1 | 1,067.4 | 1,722.0 | 1,060.4 | 1,218.8 | 1,234.1 |
| 6 | Sales and Marketing | 342.5 | 254.7 | 230.5 | 68.0 | 135.1 | 142.0 | 152.8 | 390.5 |
| 7 | General and Administrative | 358.8 | 128.8 | 287.8 | 360.3 | 526.9 | 276.1 | 372.3 | 197.3 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 701.3 | 383.5 | 518.3 | 428.3 | 662.0 | 418.1 | 525.1 | 587.8 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 24.8 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | (18.0) | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 792.9 | 344.4 | 70.7 | 17.1 | 28.2 | 24.1 | 22.0 | 58.5 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.8) | (18.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,501.0 | 727.9 | 588.9 | 445.4 | 690.2 | 442.2 | 530.3 | 627.8 |
| 15 | R&D Performed | 1,107.0 | 849.3 | 823.1 | 839.6 | 811.3 | 896.5 | 841.9 | 817.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (2,203.7) | (1,241.0) | (228.0) | (217.6) | 220.4 | (278.2) | (153.4) | (211.1) |
| 17 | Vendor Financing Loss | 24.3 | 101.9 | 79.9 | (30.0) | (0.2) | - | - | - |
| 18 | Cost Adjustments | 530.9 | 644.4 | 395.7 | 178.7 | (254.5) | 20.7 | (35.4) | 104.6 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,648.5) | (494.7) | 247.6 | (68.9) | (34.3) | (257.5) | (188.8) | (106.4) |
| 20 | Quarterly TP Adjustment | (456.7) | (42.9) | (251.3) | (527.4) | (323.7) | (276.4) | (387.2) | - |
| 21 | Interim Adjustments | 14.1 | 47.4 | (25.6) | (27.4) | 33.7 | 62.2 | (7.4) | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (2,091.1) | (490.2) | (29.3) | (623.7) | (324.3) | (471.7) | (583.4) | (106.4) |
| 23 | (+) R&D Expense | 1,463.0 | 879.6 | 821.5 | 841.7 | 804.0 | - | - | - |
| 24 | (-) R&D Amortization | 888.1 | 976.3 | 938.5 | 906.5 | 881.4 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (1,516.2) | (586.9) | (146.4) | (688.5) | (401.7) | (471.7) | (583.4) | (106.4) |
| 26 | Total Routine Returns | 539.3 | 427.4 | 311.3 | 224.9 | 186.0 | 46.9 | 65.3 | 44.6 |
| 27 | Residual Profit (Line 25 - Line 26) | (2,055.5) | (1,014.3) | (457.7) | (913.4) | (587.7) | (518.6) | (648.7) | (151.0) |
| 28 | Capital Stock | 2,560.1 | 2,790.7 | 2,680.3 | 2,589.5 | 2,519.3 | 2,493.2 | 2,487.4 | 2,446.4 |
| 29 | NNL Capital Stock % of Total | 30.5% | 33.8% | 35.5% | 37.0% | 38.5% | 38.8% | 41.0% | 45.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (1,608.4) | (677.7) | (224.2) | (363.6) | (205.1) | (114.4) | (17.8) | (48.9) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (1,069.1) | (250.3) | 87.1 | (138.6) | (19.2) | (67.5) | 47.5 | (4.4) |
| 32 | Required Adjustment (Line 31 - Line 25) | 447.0 | 336.6 | 233.5 | 549.8 | 382.5 | 404.2 | 630.9 | 102.1 |
| 33 | Headquarters Costs | 182.6 | 171.4 | 160.2 | 149.1 | 137.9 | 126.7 | 115.5 | 104.3 |
| 34 | Stewardship Costs | 25.0 | 13.5 | 11.0 | 11.1 | 11.9 | 14.2 | 14.2 | 10.1 |
| 35 | Restructuring Costs | 1,368.7 | 808.7 | 119.1 | 77.2 | 92.4 | 40.6 | 105.4 | 102.4 |
| 36 | Vendor Financing | 54.0 | 119.1 | 205.6 | (30.2) | (0.2) | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 1,630.3 | 1,112.7 | 495.9 | 207.2 | 242.0 | 181.5 | 235.1 | 216.8 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(3,274.4)** | **(1,266.3)** | **(291.7)** | **(281.0)** | **(183.8)** | **(249.1)** | **(187.6)** | **(221.2)** |
| 39 | **Operating Profit (as reported)** | **(1,734.0)** | **(294.7)** | **110.6** | **(100.1)** | **22.1** | **(87.4)** | **27.0** | **(26.0)** |

Notes:

   (1) Values in millions of USD

   (2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

   (3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

   (4) Headquarters cost from Section II-C of this appendix

   (5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**NNUK: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 2 | Intercompany Revenues | 1,148.1 | 536.2 | 396.5 | 435.5 | 404.8 | 645.7 | 701.2 | 631.0 |
| 3 | Total Revenues (Line 1 + Line 2) | 2,378.0 | 1,214.5 | 879.0 | 885.2 | 936.4 | 1,330.3 | 1,385.7 | 1,261.9 |
| 4 | Cost of Revenues | 2,275.2 | 380.6 | 529.6 | 476.2 | 500.4 | 886.8 | 1,022.4 | 1,031.7 |
| 5 | Gross Profit (Line 3 - Line 4) | 102.8 | 833.9 | 349.3 | 409.0 | 435.9 | 443.4 | 363.3 | 230.2 |
| 6 | Sales and Marketing | 352.7 | 114.5 | 238.5 | 120.2 | 118.4 | 114.8 | 144.0 | 243.0 |
| 7 | General and Administrative | 176.5 | 96.4 | 125.3 | 133.2 | 105.8 | 114.7 | 134.9 | 111.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 529.1 | 211.0 | 363.8 | 253.3 | 224.2 | 229.5 | 279.0 | 354.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 39.5 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 464.5 | 404.1 | 17.6 | 44.4 | 53.5 | 8.8 | 33.6 | 37.2 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 5.2 | 12.7 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,033.2 | 615.0 | 381.4 | 297.7 | 277.8 | 238.3 | 317.8 | 404.4 |
| 15 | R&D Performed | 345.1 | 183.8 | 95.5 | 95.6 | 66.4 | 43.6 | 39.0 | 36.5 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,275.5) | 35.0 | (127.6) | 15.7 | 91.8 | 161.6 | 6.5 | (210.7) |
| 17 | Vendor Financing Loss | 29.7 | 17.2 | 125.7 | (0.2) | - | - | - | - |
| 18 | Cost Adjustments | 557.9 | 52.9 | 130.8 | (46.3) | (38.8) | (103.2) | 57.4 | 220.4 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (688.0) | 105.2 | 128.9 | (30.8) | 52.9 | 58.3 | 64.0 | 9.7 |
| 20 | Quarterly TP Adjustment | (438.8) | (305.8) | (346.1) | (231.7) | (191.0) | (78.6) | (51.1) | - |
| 21 | Interim Adjustments | | | | | | | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (1,126.8) | (200.7) | (217.2) | (262.5) | (138.1) | (20.3) | 12.9 | 9.7 |
| 23 | (+) R&D Expense | 352.3 | 183.8 | 95.3 | 95.6 | 66.4 | - | - | - |
| 24 | (-) R&D Amortization | 218.8 | 233.6 | 205.4 | 172.4 | 145.0 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (993.3) | (250.4) | (327.3) | (339.3) | (216.7) | (20.3) | 12.9 | 9.7 |
| 26 | Total Routine Returns | 364.4 | 152.8 | 94.8 | 79.3 | 61.1 | 54.1 | 61.5 | 51.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (1,357.7) | (403.2) | (422.1) | (418.6) | (277.8) | (74.3) | (48.6) | (41.7) |
| 28 | Capital Stock | 620.1 | 661.9 | 581.9 | 488.5 | 410.8 | 334.3 | 269.1 | 220.4 |
| 29 | NNUK Capital Stock % of Total | 7.39% | 8.01% | 7.71% | 6.98% | 6.28% | 6.12% | 4.99% | 3.59% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (389.6) | (160.7) | (48.7) | (68.6) | (33.4) | (18.0) | (2.2) | (3.9) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (25.2) | (8.0) | 46.1 | 10.7 | 27.7 | 36.1 | 59.3 | 47.4 |
| 32 | Required Adjustment (Line 31 - Line 25) | 968.2 | 242.5 | 373.4 | 350.0 | 244.3 | 56.3 | 46.4 | 37.8 |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(158.6)** | **41.8** | **156.2** | **87.6** | **106.2** | **36.1** | **59.3** | **47.4** |
| 39 | **Operating Profit (as reported)** | **(253.7)** | **(19.8)** | **100.8** | **45.2** | **67.4** | **16.2** | **41.0** | **31.9** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Total Routine Returns from Section II-A-2 of this appendix

**NNI: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 2 | Intercompany Revenues | 755.8 | 373.9 | 319.5 | 436.1 | 459.8 | 379.1 | 629.4 | 625.9 |
| 3 | Total Revenues (Line 1 + Line 2) | 10,861.2 | 6,403.2 | 5,719.5 | 5,142.6 | 5,480.3 | 5,073.7 | 5,265.1 | 4,779.9 |
| 4 | Cost of Revenues | 8,807.5 | 4,604.3 | 3,784.5 | 3,685.8 | 4,143.8 | 3,502.0 | 3,485.6 | 3,313.0 |
| 5 | Gross Profit (Line 3 - Line 4) | 2,053.7 | 1,798.9 | 1,935.1 | 1,456.8 | 1,336.4 | 1,571.8 | 1,779.5 | 1,466.9 |
| 6 | Sales and Marketing | 1,834.6 | 923.8 | 475.8 | 529.5 | 581.0 | 627.0 | 668.3 | 1,131.2 |
| 7 | General and Administrative | 411.2 | 472.7 | 398.6 | 347.1 | 333.1 | 372.4 | 260.1 | 270.5 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 2,245.7 | 1,396.4 | 874.4 | 876.7 | 914.1 | 999.3 | 928.3 | 1,401.7 |
| 9 | Purchased IPR&D | - | 0.0 | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 3,726.1 | 19.3 | - | - | - | 18.8 | - | - |
| 11 | Deferred Compensation Expense | 2.1 | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 13.7 | 1,878.2 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 7,455.9 | 2,076.9 | 1,050.8 | 930.6 | 967.7 | 1,065.9 | 1,013.4 | 3,413.6 |
| 15 | R&D Performed | 1,504.2 | 868.8 | 793.5 | 768.3 | 719.6 | 679.2 | 677.7 | 615.0 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (6,906.4) | (1,146.9) | 90.8 | (242.1) | (350.9) | (173.3) | 88.5 | (2,561.8) |
| 17 | Vendor Financing Loss | 126.2 | 163.8 | (59.8) | 1.3 | (0.8) | - | - | - |
| 18 | Cost Adjustments | 5,353.9 | 1,104.5 | 404.4 | 292.5 | 627.0 | 305.1 | 237.5 | 2,761.5 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,426.3) | 121.4 | 435.3 | 51.7 | 275.3 | 131.8 | 326.0 | 199.7 |
| 20 | Quarterly TP Adjustment | 1,246.7 | 660.8 | 471.8 | 645.2 | 445.7 | 209.2 | 256.4 | |
| 21 | Interim Adjustments | | | | | | | | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (179.6) | 782.3 | 907.1 | 696.9 | 721.0 | 341.0 | 582.4 | 199.7 |
| 23 | (+) R&D Expense | 1,181.2 | 869.9 | 793.5 | 768.3 | 719.6 | - | - | - |
| 24 | (-) R&D Amortization | 1,378.7 | 1,461.9 | 1,272.8 | 1,125.3 | 1,010.9 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (377.1) | 190.3 | 427.8 | 340.0 | 429.8 | 341.0 | 582.4 | 199.7 |
| 26 | Total Routine Returns | 504.5 | 101.6 | 57.3 | 97.6 | 73.1 | 139.1 | 128.7 | 131.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (881.6) | 88.7 | 370.5 | 242.3 | 356.7 | 201.9 | 453.7 | 68.4 |
| 28 | Capital Stock | 3,906.3 | 4,142.0 | 3,606.3 | 3,188.2 | 2,864.1 | 2,599.4 | 2,396.3 | 2,226.8 |
| 29 | NNI Capital Stock % of Total | 46.6% | 50.1% | 47.8% | 45.6% | 43.8% | 43.1% | 40.6% | 38.9% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (2,454.2) | (1,005.8) | (301.7) | (447.6) | (233.2) | (126.9) | (17.7) | (42.1) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (1,949.7) | (904.2) | (244.4) | (350.0) | (160.1) | 12.2 | 111.0 | 89.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | (1,572.6) | (1,094.5) | (672.2) | (690.0) | (589.9) | (328.7) | (471.4) | (110.5) |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 36 | Vendor Financing | 126.2 | 163.8 | (59.8) | 1.3 | (0.8) | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 1,608.1 | 825.0 | 116.6 | 55.2 | 52.7 | 47.8 | 71.3 | 133.6 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(3,360.3)** | **(1,137.2)** | **118.3** | **(48.3)** | **78.4** | **(35.6)** | **39.7** | **(44.5)** |
| 39 | Operating Profit (as reported) | (1,889.5) | (521.7) | 109.1 | (25.4) | 90.0 | (30.8) | 73.5 | 57.0 |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**NN Ireland: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 2 | Intercompany Revenues | 293.8 | 182.3 | 82.1 | 76.5 | 79.0 | 84.1 | 7.6 | 1.2 |
| 3 | Total Revenues (Line 1 + Line 2) | 540.8 | 381.1 | 360.4 | 403.7 | 444.6 | 569.8 | 596.3 | 592.1 |
| 4 | Cost of Revenues | 481.6 | 355.9 | 315.0 | 332.8 | 346.3 | 443.7 | 491.1 | 537.8 |
| 5 | Gross Profit (Line 3 - Line 4) | 59.2 | 25.3 | 45.4 | 70.9 | 98.3 | 126.1 | 105.3 | 54.2 |
| 6 | Sales and Marketing | 11.3 | 8.4 | 6.1 | 8.2 | 7.9 | 8.3 | 11.1 | 16.7 |
| 7 | General and Administrative | 48.1 | 8.2 | 33.9 | 49.4 | 42.8 | 42.5 | 50.5 | 58.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 59.3 | 16.6 | 40.0 | 57.6 | 50.6 | 50.8 | 61.5 | 75.7 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | - | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 23.6 | 1.4 | 0.7 | (0.9) | 0.7 | 1.0 | 1.0 | 0.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | - | (0.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 83.0 | 18.0 | 40.7 | 56.7 | 51.4 | 51.8 | 64.8 | 75.7 |
| 15 | R&D Performed | 16.7 | 14.8 | 18.1 | 17.8 | 17.9 | 19.7 | 25.0 | 24.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (40.4) | (7.5) | (13.4) | (3.5) | 29.1 | 54.6 | 15.4 | (45.9) |
| 17 | Vendor Financing Loss | 0.0 | | | | | | | |
| 18 | Cost Adjustments | 19.9 | 14.8 | 12.2 | (3.4) | (25.4) | (3.1) | 35.2 | 60.3 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (20.5) | 7.3 | (1.2) | (7.0) | 3.7 | 51.5 | 50.6 | 14.4 |
| 20 | Quarterly TP Adjustment | 40.0 | 58.1 | 68.8 | 73.2 | 52.8 | 56.5 | 77.9 | |
| 21 | Interim Adjustments | - | - | - | - | - | - | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 19.5 | 65.3 | 67.6 | 66.2 | 56.5 | 108.0 | 128.5 | 14.4 |
| 23 | (+) R&D Expense | 11.7 | 14.8 | 18.1 | 17.8 | 17.9 | - | - | - |
| 24 | (-) R&D Amortization | 24.6 | 21.2 | 19.7 | 19.2 | 18.8 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 6.6 | 59.0 | 65.9 | 64.8 | 55.6 | 108.0 | 128.5 | 14.4 |
| 26 | Total Routine Returns | 14.5 | 6.2 | 8.7 | 13.7 | 15.1 | 18.3 | 22.1 | 23.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (7.8) | 52.8 | 57.2 | 51.1 | 40.5 | 89.7 | 106.5 | (8.9) |
| 28 | Capital Stock | 69.6 | 59.9 | 55.9 | 54.4 | 53.2 | 53.2 | 56.3 | 60.4 |
| 29 | NN Ireland Capital Stock % of Total | 0.8% | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 0.9% | 1.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (43.7) | (14.6) | (4.7) | (7.6) | (4.3) | (2.3) | (0.4) | (1.2) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (29.3) | (8.4) | 4.0 | 6.1 | 10.8 | 16.0 | 21.7 | 22.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | (35.9) | (67.3) | (61.9) | (58.7) | (44.8) | (92.1) | (106.9) | 7.8 |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(16.4)** | **(2.0)** | **5.7** | **7.5** | **11.7** | **16.0** | **21.7** | **22.2** |
| 39 | **Operating Profit (as reported)** | **(24.7)** | **(5.2)** | **0.2** | **1.3** | **6.5** | **5.5** | **9.1** | **9.5** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Total Routine Returns from Section II-A-2 of this appendix

**NNSA: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 2 | Intercompany Revenues | 469.7 | 445.6 | 560.6 | 703.9 | 589.9 | 425.4 | 206.7 | 146.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 739.6 | 629.0 | 830.3 | 1,102.8 | 1,045.5 | 796.8 | 564.0 | 381.4 |
| 4 | Cost of Revenues | 779.5 | 663.2 | 529.2 | 657.3 | 883.1 | 555.4 | 464.7 | 369.8 |
| 5 | Gross Profit (Line 3 - Line 4) | (39.9) | (34.2) | 301.1 | 445.5 | 162.5 | 241.4 | 99.3 | 11.6 |
| 6 | Sales and Marketing | 79.6 | 48.5 | 51.6 | 54.5 | 44.5 | 42.1 | 28.5 | 42.0 |
| 7 | General and Administrative | (4.8) | (12.5) | 1.4 | 14.4 | 6.1 | 3.8 | 10.6 | 10.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 74.7 | 36.0 | 53.0 | 68.9 | 50.6 | 45.9 | 39.1 | 52.4 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 0.4 | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 65.1 | 46.9 | 18.8 | 7.1 | 4.2 | 3.3 | 39.1 | 4.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.3) | (1.3) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 140.3 | 83.0 | 71.7 | 76.0 | 54.7 | 49.2 | 61.9 | 55.1 |
| 15 | R&D Performed | 226.0 | 245.6 | 266.9 | 267.3 | 256.8 | 223.2 | 67.1 | 55.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (406.2) | (362.8) | (37.5) | 102.2 | (149.0) | (30.9) | (29.7) | (98.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 79.4 | 71.9 | (22.9) | (41.7) | 117.3 | 19.8 | 67.0 | 60.8 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (326.8) | (290.9) | (60.4) | 60.5 | (31.8) | (11.1) | 37.3 | (38.1) |
| 20 | Quarterly TP Adjustment | 109.5 | 37.1 | 1.1 | (12.4) | (0.2) | (27.9) | 46.8 | |
| 21 | Interim Adjustments | | | - | | | | | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (217.3) | (253.8) | (59.3) | 48.1 | (31.9) | (39.0) | 84.2 | (38.1) |
| 23 | (+) R&D Expense | 223.1 | 245.6 | 266.9 | 267.3 | 256.8 | | - | - |
| 24 | (-) R&D Amortization | 157.7 | 180.7 | 203.4 | 222.5 | 234.4 | - | | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (151.9) | (188.9) | 4.2 | 92.9 | (9.5) | (39.0) | 84.2 | (38.1) |
| 26 | Total Routine Returns | 62.5 | 48.4 | 50.9 | 47.7 | 44.7 | 14.8 | 12.4 | 9.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (214.4) | (237.3) | (46.7) | 45.2 | (54.3) | (53.8) | 71.7 | (47.4) |
| 28 | Capital Stock | 446.9 | 512.0 | 576.2 | 630.4 | 664.0 | 668.8 | 591.5 | 466.1 |
| 29 | NNSA Capital Stock % of Total | 5.3% | 6.2% | 7.6% | 9.0% | 10.1% | 10.8% | 12.2% | 11.3% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (280.8) | (124.3) | (48.2) | (88.5) | (54.1) | (31.8) | (5.3) | (12.3) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (218.3) | (75.9) | 2.7 | (40.8) | (9.3) | (17.0) | 7.1 | (3.0) |
| 32 | Required Adjustment (Line 31 - Line 25) | (66.4) | 113.0 | (1.5) | (133.7) | 0.2 | 22.0 | (77.0) | 35.1 |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(283.6)** | **(140.9)** | **(60.8)** | **(85.6)** | **(31.7)** | **(17.0)** | **7.1** | **(3.0)** |
| 39 | **Operating Profit (as reported)** | **(309.3)** | **(172.7)** | **(86.7)** | **(97.3)** | **(44.7)** | **(35.3)** | **(11.2)** | **(17.0)** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Total Routine Returns from Section II-A-2 of this appendix

**NN Australia: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | |
| 2 | Intercompany Revenues | 60.6 | (8.8) | 3.0 | 4.8 | 3.3 | 1.5 | 1.7 | |
| 3 | Total Revenues (Line 1 + Line 2) | 233.4 | 89.4 | 179.6 | 157.0 | 152.7 | 350.7 | 179.3 | |
| 4 | Cost of Revenues | 128.4 | 37.6 | 152.3 | 166.6 | 97.9 | 232.5 | 132.8 | |
| 5 | Gross Profit (Line 3 - Line 4) | 105.1 | 51.8 | 27.3 | (9.6) | 54.9 | 118.2 | 46.5 | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 47.0 | 32.2 | 25.9 | 35.5 | 32.8 | 36.1 | 39.6 | |
| 7 | General and Administrative | 28.4 | 12.4 | 12.2 | 9.8 | 11.7 | 11.7 | 16.5 | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 75.4 | 44.7 | 38.1 | 45.3 | 44.5 | 47.8 | 56.1 | |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | |
| 10 | Total Goodwill and IPR&D | 2.8 | - | - | - | - | - | - | |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | |
| 12 | Restructuring Cost | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 0.2 | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 120.7 | 46.7 | 36.5 | 48.7 | 48.4 | 49.8 | 60.8 | |
| 15 | R&D Performed | 12.5 | 10.5 | 10.3 | 6.4 | 4.5 | 0.0 | 0.0 | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (28.1) | (5.4) | (19.5) | (64.7) | 2.0 | 68.4 | (14.3) | |
| 17 | Vendor Financing Loss | (0.0) | - | - | - | - | - | - | |
| 18 | Cost Adjustments | 33.6 | 4.5 | 18.7 | 29.7 | (17.5) | (43.4) | 23.3 | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 5.4 | (0.9) | (0.8) | (35.0) | (15.5) | 25.0 | 9.0 | |
| 20 | Quarterly TP Adjustment | (64.4) | (30.9) | 16.0 | 33.5 | 13.2 | 77.3 | (0.1) | |
| 21 | Interim Adjustments | | | - | - | - | | - | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (58.9) | (31.8) | 15.2 | (1.5) | (2.3) | 102.3 | 8.8 | |
| 23 | (+) R&D Expense | 13.3 | 10.5 | 10.3 | 6.4 | 4.5 | - | - | |
| 24 | (-) R&D Amortization | 13.1 | 12.7 | 12.0 | 10.9 | 9.3 | - | - | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (58.7) | (34.0) | 13.4 | (6.0) | (7.1) | 102.3 | 8.8 | |
| 26 | Total Routine Returns | 4.1 | 0.8 | (0.4) | 0.1 | 3.6 | 8.2 | 8.9 | |
| 27 | Residual Profit (Line 25 - Line 26) | (62.8) | (34.8) | 13.8 | (6.1) | (10.7) | 94.1 | (0.0) | |
| | | | | | | | | | |
| 28 | Capital Stock | 37.0 | 36.0 | 34.1 | 30.9 | 26.3 | 20.3 | 14.2 | |
| 29 | NN Austrailia Capital Stock % of Total | 0.4% | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.3% | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (23.3) | (8.8) | (2.8) | (4.3) | (2.1) | (1.1) | (0.1) | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (19.1) | (7.9) | (3.3) | (4.2) | 1.5 | 7.1 | 8.7 | |
| 32 | Required Adjustment (Line 31 - Line 25) | 39.6 | 26.0 | (16.7) | 1.8 | 8.5 | (95.2) | (0.1) | |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 36 | Vendor Financing | (0.0) | - | - | - | - | - | - | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(61.9)** | **(7.7)** | **0.1** | **(3.1)** | **2.3** | **5.0** | **4.3** | |
| | | | | | | | | | |
| 39 | Operating Profit (as reported) | (20.7) | (7.6) | (2.7) | (0.0) | 5.9 | 6.7 | 8.4 | |

Notes:
  (1) Values in millions of USD
  (2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files
  (3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report
  (4) Headquarters cost from Section II-C of this appendix
  (5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Acquired Companies: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 139.2 | 14.6 | - | - | - | | | |
| 2 | Intercompany Revenues | 59.8 | 70.8 | 15.5 | 0.4 | 0.3 | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 199.0 | 85.4 | 15.5 | 0.4 | 0.3 | | | |
| 4 | Cost of Revenues | 163.5 | 35.0 | (19.6) | 11.1 | (27.8) | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 35.5 | 50.4 | 35.0 | (10.6) | 28.1 | | | |
| 6 | Sales and Marketing | 76.1 | 13.7 | 9.5 | 11.8 | 11.2 | | | |
| 7 | General and Administrative | 27.7 | 5.1 | 0.6 | 0.6 | (0.3) | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 103.8 | 18.8 | 10.1 | 12.4 | 10.9 | | | |
| 9 | Purchased IPR&D | 15.1 | - | - | - | - | | | |
| 10 | Total Goodwill and IPR&D | 12,772.1 | 138.0 | 97.7 | - | - | | | |
| 11 | Deferred Compensation Expense | 273.5 | 110.0 | 15.9 | 0.0 | - | | | |
| 12 | Restructuring Cost | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 13 | Other Operating Expenses | - | - | - | - | - | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 12,651.7 | 739.4 | 125.1 | 12.8 | 11.0 | | | |
| 15 | R&D Performed | (3.4) | (0.4) | (6.2) | (1.4) | (0.0) | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (12,612.8) | (688.5) | (83.8) | (22.1) | 17.2 | | | |
| 17 | Vendor Financing Loss | - | - | - | - | - | | | |
| 18 | Cost Adjustments | 12,535.1 | 697.4 | 95.7 | 16.8 | (21.3) | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (77.8) | 8.9 | 11.9 | (5.3) | (4.1) | | | |
| 20 | Quarterly TP Adjustment | (37.1) | (10.5) | (13.2) | (11.9) | (11.4) | | | |
| 21 | Interim Adjustments | 15.6 | 9.4 | - | - | - | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (99.3) | 7.7 | (1.3) | (17.2) | (15.5) | | | |
| 23 | (+) R&D Expense | - | - | - | - | - | | | |
| 24 | (-) R&D Amortization | 31.4 | 22.0 | 5.9 | 4.2 | 2.9 | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (130.7) | (14.2) | (7.2) | (21.3) | (18.4) | | | |
| 26 | Total Routine Returns | 13.8 | 7.1 | (1.8) | (1.6) | (0.8) | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (144.5) | (21.3) | (5.5) | (19.7) | (17.6) | | | |
| 28 | Capital Stock | 88.9 | 62.2 | 16.8 | 11.8 | 8.2 | | | |
| 29 | Acquired Companies Capital Stock % of Total | 1.1% | 0.8% | 0.2% | 0.2% | 0.1% | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (55.9) | (15.1) | (1.4) | (1.7) | (0.7) | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (42.0) | (8.0) | (3.2) | (3.3) | (1.5) | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 88.6 | 6.2 | 4.1 | 18.1 | 17.0 | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 36 | Vendor Financing | - | - | - | - | - | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **502.1** | **(458.6)** | **1.4** | **0.4** | **1.3** | | | |
| 39 | **Operating Profit (as reported)** | **(13.8)** | **10.8** | **2.2** | **0.8** | **1.3** | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**NN Brazil: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 77.3 | 12.5 | 24.4 | | | | | |
| 2 | Intercompany Revenues | 54.6 | 65.0 | 15.4 | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 131.8 | 77.5 | 39.8 | | | | | |
| 4 | Cost of Revenues | 70.7 | 25.5 | 30.4 | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 61.1 | 52.0 | 9.4 | | | | | |
| 6 | Sales and Marketing | 23.3 | 9.0 | 0.5 | | | | | |
| 7 | General and Administrative | 19.5 | 13.3 | 6.6 | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 42.9 | 22.3 | 7.1 | | | | | |
| 9 | Purchased IPR&D | - | - | - | | | | | |
| 10 | Total Goodwill and IPR&D | - | - | - | | | | | |
| 11 | Deferred Compensation Expense | - | - | - | | | | | |
| 12 | Restructuring Cost | - | - | - | | | | | |
| 13 | Other Operating Expenses | - | - | - | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 42.9 | 22.3 | 7.1 | | | | | |
| 15 | R&D Performed | 4.4 | 2.5 | 6.6 | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | 13.8 | 27.2 | (4.3) | | | | | |
| 17 | Vendor Financing Loss | 2.0 | - | - | | | | | |
| 18 | Cost Adjustments | (5.8) | 12.0 | (27.0) | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 10.0 | 39.2 | (31.3) | | | | | |
| 20 | Quarterly TP Adjustment | - | - | - | | | | | |
| 21 | Interim Adjustments | 4.2 | (34.2) | (8.2) | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 14.2 | 5.0 | (39.5) | | | | | |
| 23 | (+) R&D Expense | 4.3 | 2.5 | 6.6 | | | | | |
| 24 | (-) R&D Amortization | 10.9 | 8.7 | 7.4 | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 7.6 | (1.1) | (40.3) | | | | | |
| 26 | Total Routine Returns | 4.4 | 4.8 | 9.2 | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | 3.2 | (6.0) | (49.5) | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Brazil Capital Stock % of Total | 0.0% | 0.0% | 0.0% | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | - | - | - | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 4.4 | 4.8 | 9.2 | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (3.2) | 6.0 | 49.5 | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | | | | | |
| 36 | Vendor Financing | 2.0 | - | - | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 2.0 | - | - | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **9.0** | **11.0** | **10.0** | | | | | |
| 39 | **Operating Profit (as reported)** | **11.0** | **11.0** | **10.0** | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**NN Japan: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 155.1 | | | | | | | |
| 2 | Intercompany Revenues | - | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 155.1 | | | | | | | |
| 4 | Cost of Revenues | 102.8 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 52.3 | | | | | | | |
| 6 | Sales and Marketing | 27.0 | | | | | | | |
| 7 | General and Administrative | 20.0 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 47.1 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | 31.8 | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 78.9 | | | | | | | |
| 15 | R&D Performed | 25.7 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (52.2) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 40.2 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.1) | | | | | | | |
| 20 | Quarterly TP Adjustment | 4.9 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (7.2) | | | | | | | |
| 23 | (+) R&D Expense | 0.2 | | | | | | | |
| 24 | (-) R&D Amortization | 4.5 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (11.5) | | | | | | | |
| 26 | Total Routine Returns | 1.6 | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (13.1) | | | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Japan Capital Stock % of Total | 0.0% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | - | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 1.6 | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 13.1 | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 31.8 | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 31.8 | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(25.9)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **5.9** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Bay U.S.: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 796.8 | | | | | | | |
| 2 | Intercompany Revenues | 340.9 | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 1,137.6 | | | | | | | |
| 4 | Cost of Revenues | 744.7 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 392.9 | | | | | | | |
| 6 | Sales and Marketing | 117.3 | | | | | | | |
| 7 | General and Administrative | 88.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 205.9 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | 1,527.1 | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,733.0 | | | | | | | |
| 15 | R&D Performed | 169.0 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,509.1) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 1,496.6 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.5) | | | | | | | |
| 20 | Quarterly TP Adjustment | - | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (12.5) | | | | | | | |
| 23 | (+) R&D Expense | 162.7 | | | | | | | |
| 24 | (-) R&D Amortization | 224.2 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (74.0) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (74.0) | | | | | | | |
| 28 | Capital Stock | 635.2 | | | | | | | |
| 29 | Bay U.S. Capital Stock % of Total | 7.6% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (399.1) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (399.1) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (325.1) | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(337.6)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(359.9)** | | | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Bay Ireland: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 214.1 | | | | | | | |
| 2 | Intercompany Revenues | (65.1) | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 149.0 | | | | | | | |
| 4 | Cost of Revenues | 162.0 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | (13.0) | | | | | | | |
| 6 | Sales and Marketing | 0.7 | | | | | | | |
| 7 | General and Administrative | 8.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 9.2 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 9.2 | | | | | | | |
| 15 | R&D Performed | 13.5 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (35.7) | | | | | | | |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 0.5 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (35.2) | | | | | | | |
| 20 | Quarterly TP Adjustment | 12.5 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (22.7) | | | | | | | |
| 23 | (+) R&D Expense | 15.7 | | | | | | | |
| 24 | (-) R&D Amortization | 7.7 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (14.8) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (14.8) | | | | | | | |
| 28 | Capital Stock | 21.9 | | | | | | | |
| 29 | Bay Ireland Capital Stock % of Total | 0.3% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | (13.8) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (13.8) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 1.0 | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(21.7)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(22.5)** | | | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Nortel Distributors: Dr. Cooper's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 2,907.0 | 1,896.2 | 1,522.8 | 1,538.9 | 1,963.7 | 1,936.4 | 1,325.8 | 1,488.8 |
| 2 | Intercompany Revenues | 94.9 | 55.6 | 35.8 | 121.0 | 163.5 | 94.0 | 264.0 | 398.7 |
| 3 | Total Revenues (Line 1 + Line 2) | 3,001.9 | 1,951.8 | 1,558.5 | 1,659.8 | 2,127.2 | 2,030.4 | 1,589.8 | 1,887.5 |
| 4 | Cost of Revenues | 2,343.4 | 1,377.6 | 1,353.9 | 1,363.6 | 1,791.0 | 1,519.1 | 1,222.3 | 1,458.4 |
| 5 | Gross Profit (Line 3 - Line 4) | 658.5 | 574.2 | 204.6 | 296.2 | 336.3 | 511.2 | 367.5 | 429.2 |
| 6 | Sales and Marketing | 442.9 | 288.4 | 123.3 | 161.0 | 152.3 | 146.2 | 144.3 | 642.6 |
| 7 | General and Administrative | 240.5 | 105.2 | 139.9 | 121.6 | 126.0 | 308.9 | 146.9 | 167.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 683.4 | 393.5 | 263.2 | 282.6 | 278.3 | 455.1 | 291.2 | 810.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 9.9 | - | 0.0 | (0.0) | - | 1.1 | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 58.8 | 78.1 | (3.5) | 11.6 | 7.5 | 5.8 | 13.0 | 15.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 25.3 | 7.1 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 752.1 | 471.6 | 259.8 | 294.2 | 285.8 | 461.9 | 329.4 | 832.5 |
| 15 | R&D Performed | (1.0) | (2.4) | (6.4) | 2.1 | 4.3 | 2.9 | 1.3 | 0.7 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (92.6) | 105.0 | (48.7) | (0.1) | 46.2 | 46.4 | 36.8 | (404.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 150.0 | (132.3) | (104.5) | 7.3 | 25.1 | (23.1) | (57.7) | 502.5 |
| 19 | Accounting Income - Adjusted (Line 16 + Line 18) | 57.3 | (27.3) | (153.3) | 7.2 | 71.3 | 23.3 | (21.0) | 98.4 |
| 20 | Quarterly TP Adjustment | (416.7) | (365.8) | 53.0 | 31.6 | 14.6 | 39.9 | 60.0 | - |
| 21 | Interim Adjustments | (29.0) | (22.6) | 33.8 | 27.4 | (33.7) | (62.2) | 7.4 | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (388.4) | (415.7) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 23 | (+) R&D Expense | - | - | - | - | - | - | - | - |
| 24 | (-) R&D Amortization | - | - | - | - | - | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (388.4) | (415.7) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 26 | Total Routine Returns | 57.4 | 15.9 | 25.3 | 28.8 | 34.4 | 34.6 | 21.8 | 26.2 |
| 27 | Residual Profit (Line 25 - Line 26) | (445.8) | (431.5) | (91.8) | 37.4 | 17.8 | (33.6) | 24.7 | 72.3 |
| 28 | Capital Stock | - | - | - | - | - | - | - | - |
| 29 | Nortel Distributors Capital Stock % of Total | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-A-2) | - | - | - | - | - | - | - | - |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 57.4 | 15.9 | 25.3 | 28.8 | 34.4 | 34.6 | 21.8 | 26.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | 445.8 | 431.5 | 91.8 | (37.4) | (17.8) | 33.6 | (24.7) | (72.3) |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 36.2 | 0.8 | (14.9) | 2.1 | 1.7 | 2.4 | 3.3 | 12.9 |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 36.2 | 0.8 | (14.9) | 2.1 | 1.7 | 2.4 | 3.3 | 12.9 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **21.2** | **15.1** | **40.2** | **26.7** | **32.8** | **32.1** | **18.5** | **13.3** |
| 39 | **Operating Profit (as reported)** | **51.6** | **0.3** | **16.3** | **16.9** | **20.3** | **19.8** | **13.9** | **18.0** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Total routine returns from Exhibit 30 of Dr. Cooper's Transfer Pricing Report

### 2.      System Residual Profit by Year

**System Residual Profit under Dr. Cooper's Unfiltered View**

| Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| System Residual Profit | (5,268.7) | (2,006.9) | (631.7) | (981.9) | (533.0) | (294.6) | (43.5) | (108.4) |

**Notes:**

(1) Values in millions of USD

# B.    Dr. Cooper's View, Corrected

## 1.    By Entity and Year

### NNL: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 2 | Intercompany Revenues | 4,037.3 | 2,138.0 | 2,556.3 | 2,657.7 | 2,889.0 | 2,237.5 | 2,147.3 | 1,827.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 5,789.7 | 3,086.3 | 3,324.1 | 3,438.1 | 3,724.3 | 3,129.4 | 3,162.6 | 2,617.7 |
| 4 | Cost of Revenues | 5,385.5 | 2,750.1 | 2,140.0 | 2,370.7 | 2,002.4 | 2,069.0 | 1,943.8 | 1,383.5 |
| 5 | Gross Profit (Line 3 - Line 4) | 404.3 | 336.2 | 1,184.1 | 1,067.4 | 1,722.0 | 1,060.4 | 1,218.8 | 1,234.1 |
| 6 | Sales and Marketing | 342.5 | 254.7 | 230.5 | 68.0 | 135.1 | 142.0 | 152.8 | 390.5 |
| 7 | General and Administrative | 358.8 | 128.8 | 287.8 | 360.3 | 526.9 | 276.1 | 372.3 | 197.3 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 701.3 | 383.5 | 518.3 | 428.3 | 662.0 | 418.1 | 525.1 | 587.8 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 24.8 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | (18.0) | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 792.9 | 344.4 | 70.7 | 17.1 | 28.2 | 24.1 | 22.0 | 58.5 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.8) | (18.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,501.0 | 727.9 | 588.9 | 445.4 | 690.2 | 442.2 | 530.3 | 627.8 |
| 15 | R&D Performed | 1,107.0 | 849.3 | 823.1 | 839.6 | 811.3 | 896.5 | 841.9 | 817.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (2,203.7) | (1,241.0) | (228.0) | (217.6) | 220.4 | (278.2) | (153.4) | (211.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 530.9 | 644.4 | 395.7 | 178.7 | (254.5) | 20.7 | (35.4) | 104.6 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,672.8) | (596.6) | 167.7 | (38.9) | (34.1) | (257.5) | (188.8) | (106.4) |
| 20 | Quarterly TP Adjustment | (456.7) | (42.9) | (251.3) | (527.4) | (323.7) | (276.4) | (387.2) | |
| 21 | Interim Adjustments | 14.1 | 47.4 | (25.6) | (27.4) | 33.7 | 62.2 | (7.4) | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (2,115.4) | (592.1) | (109.2) | (593.7) | (324.1) | (471.7) | (583.4) | (106.4) |
| 23 | (+) R&D Expense | 1,463.0 | 879.6 | 821.5 | 841.7 | 804.0 | - | - | - |
| 24 | (-) R&D Amortization | 888.1 | 976.3 | 938.5 | 906.5 | 881.4 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (1,540.5) | (688.8) | (226.2) | (658.5) | (401.5) | (471.7) | (583.4) | (106.4) |
| 26 | Total Routine Returns | 539.3 | 427.4 | 311.3 | 224.9 | 186.0 | 46.9 | 65.3 | 44.6 |
| 27 | Residual Profit (Line 25 - Line 26) | (2,079.8) | (1,116.2) | (537.6) | (883.4) | (587.5) | (518.6) | (648.7) | (151.0) |
| 28 | Capital Stock | 2,560.1 | 2,790.7 | 2,680.3 | 2,589.5 | 2,519.3 | 2,493.2 | 2,487.4 | 2,446.4 |
| 29 | NNL Capital Stock % of Total | 30.5% | 33.8% | 35.5% | 37.0% | 38.5% | 38.8% | 41.0% | 45.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (1,664.1) | (751.1) | (276.0) | (352.9) | (204.7) | (114.5) | (17.8) | (48.9) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (1,124.8) | (323.7) | 35.4 | (127.9) | (18.8) | (67.6) | 47.5 | (4.4) |
| 32 | Required Adjustment (Line 31 - Line 25) | 415.8 | 365.1 | 261.6 | 530.5 | 382.7 | 404.2 | 630.9 | 102.1 |
| 33 | Headquarters Costs | 182.6 | 171.4 | 160.2 | 149.1 | 137.9 | 126.7 | 115.5 | 104.3 |
| 34 | Stewardship Costs | 25.0 | 13.5 | 11.0 | 11.1 | 11.9 | 14.2 | 14.2 | 10.1 |
| 35 | Restructuring Costs | 1,368.7 | 844.3 | 119.1 | 77.2 | 92.4 | 40.6 | 105.4 | 102.4 |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 1,576.3 | 1,029.3 | 290.3 | 237.4 | 242.2 | 181.5 | 235.1 | 216.8 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37** | **(3,276.0)** | **(1,256.3)** | **(137.9)** | **(300.5)** | **(183.6)** | **(249.1)** | **(187.6)** | **(221.2)** |
| 39 | **Operating Profit (as reported)** | **(1,734.0)** | **(294.7)** | **110.6** | **(100.1)** | **22.1** | **(87.4)** | **27.0** | **(26.0)** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**NNUK: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 2 | Intercompany Revenues | 1,148.1 | 536.2 | 396.5 | 435.5 | 404.8 | 645.7 | 701.2 | 631.0 |
| 3 | Total Revenues (Line 1 + Line 2) | 2,378.0 | 1,214.5 | 879.0 | 885.2 | 936.4 | 1,330.3 | 1,385.7 | 1,261.9 |
| 4 | Cost of Revenues | 2,275.2 | 380.6 | 529.6 | 476.2 | 500.4 | 886.8 | 1,022.4 | 1,031.7 |
| 5 | Gross Profit (Line 3 - Line 4) | 102.8 | 833.9 | 349.3 | 409.0 | 435.9 | 443.4 | 363.3 | 230.2 |
| | | | | | | | | | |
| 6 | Sales and Marketing | 352.7 | 114.5 | 238.5 | 120.2 | 118.4 | 114.8 | 144.0 | 243.0 |
| 7 | General and Administrative | 176.5 | 96.4 | 125.3 | 133.2 | 105.8 | 114.7 | 134.9 | 111.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 529.1 | 211.0 | 363.8 | 253.3 | 224.2 | 229.5 | 279.0 | 354.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 39.5 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 464.5 | 404.1 | 17.6 | 44.4 | 53.5 | 8.8 | 33.6 | 37.2 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 5.2 | 12.7 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,033.2 | 615.0 | 381.4 | 297.7 | 277.8 | 238.3 | 317.8 | 404.4 |
| 15 | R&D Performed | 345.1 | 183.8 | 95.5 | 95.6 | 66.4 | 43.6 | 39.0 | 36.5 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,275.5) | 35.0 | (127.6) | 15.7 | 91.8 | 161.6 | 6.5 | (210.7) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 557.9 | 52.9 | 130.8 | (46.3) | (38.8) | (103.2) | 57.4 | 220.4 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (717.6) | 87.9 | 3.2 | (30.6) | 52.9 | 58.3 | 64.0 | 9.7 |
| 20 | Quarterly TP Adjustment | (438.8) | (305.8) | (346.1) | (231.7) | (191.0) | (78.6) | (51.1) | - |
| 21 | Interim Adjustments | | | | | | | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (1,156.4) | (217.9) | (342.9) | (262.3) | (138.1) | (20.3) | 12.9 | 9.7 |
| 23 | (+) R&D Expense | 352.3 | 183.8 | 95.3 | 95.6 | 66.4 | - | - | - |
| 24 | (-) R&D Amortization | 218.8 | 233.6 | 205.4 | 172.4 | 145.0 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (1,023.0) | (267.6) | (453.0) | (339.1) | (216.7) | (20.3) | 12.9 | 9.7 |
| 26 | Total Routine Returns | 364.4 | 152.8 | 94.8 | 79.3 | 61.1 | 54.1 | 61.5 | 51.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (1,387.4) | (420.4) | (547.8) | (418.5) | (277.8) | (74.3) | (48.6) | (41.7) |
| | | | | | | | | | |
| 28 | Capital Stock | 620.1 | 661.9 | 581.9 | 488.5 | 410.8 | 334.3 | 269.1 | 220.4 |
| 29 | NNUK Capital Stock % of Total | 7.39% | 8.01% | 7.71% | 6.98% | 6.28% | 6.12% | 4.99% | 3.59% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (403.0) | (178.1) | (59.9) | (66.6) | (33.4) | (18.0) | (2.2) | (3.9) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (38.6) | (25.4) | 34.9 | 12.8 | 27.7 | 36.1 | 59.3 | 47.4 |
| 32 | Required Adjustment (Line 31 - Line 25) | 984.4 | 242.3 | 487.9 | 351.9 | 244.4 | 56.3 | 46.4 | 37.8 |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(172.1)** | **24.4** | **145.0** | **89.6** | **106.3** | **36.1** | **59.3** | **47.4** |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(253.7)** | **(19.8)** | **100.8** | **45.2** | **67.4** | **16.2** | **41.0** | **31.9** |

Notes.

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-2 of this appendix

**NNI: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 2 | Intercompany Revenues | 755.8 | 373.9 | 319.5 | 436.1 | 459.8 | 379.1 | 629.4 | 625.9 |
| 3 | Total Revenues (Line 1 + Line 2) | 10,861.2 | 6,403.2 | 5,719.5 | 5,142.6 | 5,480.3 | 5,073.7 | 5,265.1 | 4,779.9 |
| 4 | Cost of Revenues | 8,807.5 | 4,604.3 | 3,784.5 | 3,685.8 | 4,143.8 | 3,502.0 | 3,485.6 | 3,313.0 |
| 5 | Gross Profit (Line 3 - Line 4) | 2,053.7 | 1,798.9 | 1,935.1 | 1,456.8 | 1,336.4 | 1,571.8 | 1,779.5 | 1,466.9 |
| | | | | | | | | | |
| 6 | Sales and Marketing | 1,834.6 | 923.8 | 475.8 | 529.5 | 581.0 | 627.0 | 668.3 | 1,131.2 |
| 7 | General and Administrative | 411.2 | 472.7 | 398.6 | 347.1 | 333.1 | 372.4 | 260.1 | 270.5 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 2,245.7 | 1,396.4 | 874.4 | 876.7 | 914.1 | 999.3 | 928.3 | 1,401.7 |
| 9 | Purchased IPR&D | - | 0.0 | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 3,726.1 | 19.3 | - | - | - | 18.8 | - | - |
| 11 | Deferred Compensation Expense | 2.1 | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 13.7 | 1,878.2 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 7,455.9 | 2,076.9 | 1,050.8 | 930.6 | 967.7 | 1,065.9 | 1,013.4 | 3,413.6 |
| 15 | R&D Performed | 1,504.2 | 868.8 | 793.5 | 768.3 | 719.6 | 679.2 | 677.7 | 615.0 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (6,906.4) | (1,146.9) | 90.8 | (242.1) | (350.9) | (173.3) | 88.5 | (2,561.8) |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Cost Adjustments | 5,353.9 | 1,104.5 | 404.4 | 292.5 | 627.0 | 305.1 | 237.5 | 2,761.5 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,552.5) | (42.3) | 495.1 | 50.4 | 276.1 | 131.8 | 326.0 | 199.7 |
| 20 | Quarterly TP Adjustment | 1,246.7 | 660.8 | 471.8 | 645.2 | 445.7 | 209.2 | 256.4 | |
| 21 | Interim Adjustments | | | | | | | | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (305.8) | 618.5 | 966.9 | 695.6 | 721.8 | 341.0 | 582.4 | 199.7 |
| 23 | (+) R&D Expense | 1,181.2 | 869.9 | 793.5 | 768.3 | 719.6 | - | - | - |
| 24 | (-) R&D Amortization | 1,378.7 | 1,461.9 | 1,272.8 | 1,125.3 | 1,010.9 | - | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (503.3) | 26.5 | 487.6 | 338.7 | 430.6 | 341.0 | 582.4 | 199.7 |
| 26 | Total Routine Returns | 504.5 | 101.6 | 57.3 | 97.6 | 73.1 | 139.2 | 128.7 | 131.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (1,007.8) | (75.1) | 430.3 | 241.1 | 357.5 | 201.8 | 453.7 | 68.4 |
| | | | | | | | | | |
| 28 | Capital Stock | 3,906.3 | 4,142.0 | 3,606.3 | 3,188.2 | 2,864.1 | 2,599.4 | 2,396.3 | 2,226.8 |
| 29 | NNI Capital Stock % of Total | 46.6% | 50.1% | 47.8% | 45.6% | 43.8% | 43.1% | 40.6% | 38.9% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (2,539.1) | (1,114.8) | (371.3) | (434.4) | (232.8) | (126.9) | (17.7) | (42.1) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (2,034.6) | (1,013.1) | (314.0) | (336.8) | (159.7) | 12.3 | 111.0 | 89.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | (1,531.3) | (1,039.7) | (801.6) | (675.5) | (590.3) | (328.7) | (471.4) | (110.5) |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(3,319.0)** | **(1,082.4)** | **(11.1)** | **(33.8)** | **78.0** | **(35.5)** | **39.7** | **(44.5)** |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(1,889.5)** | **(521.7)** | **109.1** | **(25.4)** | **90.0** | **(30.8)** | **73.5** | **57.0** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**NN Ireland: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 2 | Intercompany Revenues | 293.8 | 182.3 | 82.1 | 76.5 | 79.0 | 84.1 | 7.6 | 1.2 |
| 3 | Total Revenues (Line 1 + Line 2) | 540.8 | 381.1 | 360.4 | 403.7 | 444.6 | 569.8 | 596.3 | 592.1 |
| 4 | Cost of Revenues | 481.6 | 355.9 | 315.0 | 332.8 | 346.3 | 443.7 | 491.1 | 537.8 |
| 5 | Gross Profit (Line 3 - Line 4) | 59.2 | 25.3 | 45.4 | 70.9 | 98.3 | 126.1 | 105.3 | 54.2 |
| | | | | | | | | | |
| 6 | Sales and Marketing | 11.3 | 8.4 | 6.1 | 8.2 | 7.9 | 8.3 | 11.1 | 16.7 |
| 7 | General and Administrative | 48.1 | 8.2 | 33.9 | 49.4 | 42.8 | 42.5 | 50.5 | 58.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 59.3 | 16.6 | 40.0 | 57.6 | 50.6 | 50.8 | 61.5 | 75.7 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | - | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 23.6 | 1.4 | 0.7 | (0.9) | 0.7 | 1.0 | 1.0 | 0.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | - | (0.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 83.0 | 18.0 | 40.7 | 56.7 | 51.4 | 51.8 | 64.8 | 75.7 |
| 15 | R&D Performed | 16.7 | 14.8 | 18.1 | 17.8 | 17.9 | 19.7 | 25.0 | 24.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (40.4) | (7.5) | (13.4) | (3.5) | 29.1 | 54.6 | 15.4 | (45.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 19.9 | 14.8 | 12.2 | (3.4) | (25.4) | (3.1) | 35.2 | 60.3 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (20.6) | 7.3 | (1.2) | (7.0) | 3.7 | 51.5 | 50.6 | 14.4 |
| 20 | Quarterly TP Adjustment | 40.0 | 58.1 | 68.8 | 73.2 | 52.8 | 56.5 | 77.9 | |
| 21 | Interim Adjustments | - | | - | | | | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 19.5 | 65.3 | 67.6 | 66.2 | 56.5 | 108.0 | 128.5 | 14.4 |
| 23 | (+) R&D Expense | 11.7 | 14.8 | 18.1 | 17.8 | 17.9 | - | - | - |
| 24 | (-) R&D Amortization | 24.6 | 21.2 | 19.7 | 19.2 | 18.8 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 6.6 | 59.0 | 65.9 | 64.8 | 55.6 | 108.0 | 128.5 | 14.4 |
| 26 | Total Routine Returns | 14.5 | 6.2 | 8.7 | 13.7 | 15.1 | 18.3 | 22.1 | 23.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (7.9) | 52.8 | 57.2 | 51.1 | 40.5 | 89.7 | 106.5 | (8.9) |
| | | | | | | | | | |
| 28 | Capital Stock | 69.6 | 59.9 | 55.9 | 54.4 | 53.2 | 53.2 | 56.3 | 60.4 |
| 29 | NN Ireland Capital Stock % of Total | 0.8% | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 0.9% | 1.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (45.2) | (16.1) | (5.8) | (7.4) | (4.3) | (2.4) | (0.4) | (1.2) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (30.8) | (10.0) | 3.0 | 6.3 | 10.8 | 16.0 | 21.7 | 22.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | (37.4) | (68.9) | (63.0) | (58.5) | (44.8) | (92.1) | (106.9) | 7.8 |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(17.9)** | **(3.6)** | **4.6** | **7.7** | **11.7** | **16.0** | **21.7** | **22.2** |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(24.7)** | **(5.2)** | **0.2** | **1.3** | **6.5** | **5.5** | **9.1** | **9.5** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-2 of this appendix

**NNSA: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 2 | Intercompany Revenues | 469.7 | 445.6 | 560.6 | 703.9 | 589.9 | 425.4 | 206.7 | 146.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 739.6 | 629.0 | 830.3 | 1,102.8 | 1,045.5 | 796.8 | 564.0 | 381.4 |
| 4 | Cost of Revenues | 779.5 | 663.2 | 529.2 | 657.3 | 883.1 | 555.4 | 464.7 | 369.8 |
| 5 | Gross Profit (Line 3 - Line 4) | (39.9) | (34.2) | 301.1 | 445.5 | 162.5 | 241.4 | 99.3 | 11.6 |
|  |  |  |  |  |  |  |  |  |  |
| 6 | Sales and Marketing | 79.6 | 48.5 | 51.6 | 54.5 | 44.5 | 42.1 | 28.5 | 42.0 |
| 7 | General and Administrative | (4.8) | (12.5) | 1.4 | 14.4 | 6.1 | 3.8 | 10.6 | 10.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 74.7 | 36.0 | 53.0 | 68.9 | 50.6 | 45.9 | 39.1 | 52.4 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 0.4 | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 65.1 | 46.9 | 18.8 | 7.1 | 4.2 | 3.3 | 39.1 | 4.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.3) | (1.3) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 140.3 | 83.0 | 71.7 | 76.0 | 54.7 | 49.2 | 61.9 | 55.1 |
| 15 | R&D Performed | 226.0 | 245.6 | 266.9 | 267.3 | 256.8 | 223.2 | 67.1 | 55.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (406.2) | (362.8) | (37.5) | 102.2 | (149.0) | (30.9) | (29.7) | (98.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 79.4 | 71.9 | (22.9) | (41.7) | 117.3 | 19.8 | 67.0 | 60.8 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (326.8) | (290.9) | (60.4) | 60.5 | (31.8) | (11.1) | 37.3 | (38.1) |
| 20 | Quarterly TP Adjustment | 109.5 | 37.1 | 1.1 | (12.4) | (0.2) | (27.9) | 46.8 |  |
| 21 | Interim Adjustments |  |  | - |  |  |  |  |  |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (217.3) | (253.8) | (59.3) | 48.1 | (31.9) | (39.0) | 84.2 | (38.1) |
| 23 | (+) R&D Expense | 223.1 | 245.6 | 266.9 | 267.3 | 256.8 | - | - | - |
| 24 | (-) R&D Amortization | 157.7 | 180.7 | 203.4 | 222.5 | 234.4 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (151.9) | (188.9) | 4.2 | 92.9 | (9.5) | (39.0) | 84.2 | (38.1) |
| 26 | Total Routine Returns | 62.5 | 48.4 | 50.9 | 47.7 | 44.7 | 14.8 | 12.4 | 9.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (214.4) | (237.3) | (46.7) | 45.2 | (54.3) | (53.8) | 71.7 | (47.4) |
|  |  |  |  |  |  |  |  |  |  |
| 28 | Capital Stock | 446.9 | 512.0 | 576.2 | 630.4 | 664.0 | 668.8 | 591.5 | 466.1 |
| 29 | NNSA Capital Stock % of Total | 5.3% | 6.2% | 7.6% | 9.0% | 10.1% | 10.8% | 12.2% | 11.3% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (290.5) | (137.8) | (59.3) | (85.9) | (54.0) | (31.8) | (5.3) | (12.3) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (228.0) | (89.4) | (8.5) | (38.2) | (9.2) | (17.1) | 7.1 | (3.0) |
| 32 | Required Adjustment (Line 31 - Line 25) | (76.1) | 99.5 | (12.7) | (131.1) | 0.3 | 21.9 | (77.0) | 35.1 |
|  |  |  |  |  |  |  |  |  |  |
| 33 | Headquarters Costs |  |  |  |  |  |  |  |  |
| 34 | Stewardship Costs |  |  |  |  |  |  |  |  |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(293.3)** | **(154.3)** | **(72.0)** | **(83.0)** | **(31.6)** | **(17.1)** | **7.1** | **(3.0)** |
|  |  |  |  |  |  |  |  |  |  |
| 39 | **Operating Profit (as reported)** | **(309.3)** | **(172.7)** | **(86.7)** | **(97.3)** | **(44.7)** | **(35.3)** | **(11.2)** | **(17.0)** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-2 of this appendix

NN Australia: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | |
| 2 | Intercompany Revenues | 60.6 | (8.8) | 3.0 | 4.8 | 3.3 | 1.5 | 1.7 | |
| 3 | Total Revenues (Line 1 + Line 2) | 233.4 | 89.4 | 179.6 | 157.0 | 152.7 | 350.7 | 179.3 | |
| 4 | Cost of Revenues | 128.4 | 37.6 | 152.3 | 166.6 | 97.9 | 232.5 | 132.8 | |
| 5 | Gross Profit (Line 3 - Line 4) | 105.1 | 51.8 | 27.3 | (9.6) | 54.9 | 118.2 | 46.5 | |
| 6 | Sales and Marketing | 47.0 | 32.2 | 25.9 | 35.5 | 32.8 | 36.1 | 39.6 | |
| 7 | General and Administrative | 28.4 | 12.4 | 12.2 | 9.8 | 11.7 | 11.7 | 16.5 | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 75.4 | 44.7 | 38.1 | 45.3 | 44.5 | 47.8 | 56.1 | |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | |
| 10 | Total Goodwill and IPR&D | 2.8 | - | - | - | - | - | - | |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | |
| 12 | Restructuring Cost | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 0.2 | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 120.7 | 46.7 | 36.5 | 48.7 | 48.4 | 49.8 | 60.8 | |
| 15 | R&D Performed | 12.5 | 10.5 | 10.3 | 6.4 | 4.5 | 0.0 | 0.0 | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (28.1) | (5.4) | (19.5) | (64.7) | 2.0 | 68.4 | (14.3) | |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | |
| 18 | Cost Adjustments | 33.6 | 4.5 | 18.7 | 29.7 | (17.5) | (43.4) | 23.3 | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 5.4 | (0.9) | (0.8) | (35.0) | (15.5) | 25.0 | 9.0 | |
| 20 | Quarterly TP Adjustment | (64.4) | (30.9) | 16.0 | 33.5 | 13.2 | 77.3 | (0.1) | |
| 21 | Interim Adjustments | | | | - | - | - | - | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (58.9) | (31.8) | 15.2 | (1.5) | (2.3) | 102.3 | 8.8 | |
| 23 | (+) R&D Expense | 13.3 | 10.5 | 10.3 | 6.4 | 4.5 | - | - | |
| 24 | (-) R&D Amortization | 13.1 | 12.7 | 12.0 | 10.9 | 9.3 | - | - | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (58.7) | (34.0) | 13.4 | (6.0) | (7.1) | 102.3 | 8.8 | |
| 26 | Total Routine Returns | 4.1 | 0.8 | (0.4) | 0.1 | 3.6 | 8.2 | 8.9 | |
| 27 | Residual Profit (Line 25 - Line 26) | (62.8) | (34.8) | 13.8 | (6.1) | (10.7) | 94.1 | (0.0) | |
| 28 | Capital Stock | 37.0 | 36.0 | 34.1 | 30.9 | 26.3 | 20.3 | 14.2 | |
| 29 | NN Australia Capital Stock % of Total | 0.4% | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.3% | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (24.1) | (9.7) | (3.5) | (4.2) | (2.1) | (1.1) | (0.1) | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (20.0) | (8.9) | (3.9) | (4.1) | 1.5 | 7.1 | 8.7 | |
| 32 | Required Adjustment (Line 31 - Line 25) | 38.7 | 25.1 | (17.3) | 1.9 | 8.5 | (95.2) | (0.1) | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 36 | Vendor Financing | - | - | - | - | - | - | - | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(62.7)** | **(8.7)** | **(0.5)** | **(3.0)** | **2.3** | **5.0** | **4.3** | |
| 39 | **Operating Profit (as reported)** | **(20.7)** | **(7.6)** | **(2.7)** | **(0.0)** | **5.9** | **6.7** | **8.4** | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Acquired Companies: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 139.2 | 14.6 | - | - | - | | | |
| 2 | Intercompany Revenues | 59.8 | 70.8 | 15.5 | 0.4 | 0.3 | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 199.0 | 85.4 | 15.5 | 0.4 | 0.3 | | | |
| 4 | Cost of Revenues | 163.5 | 35.0 | (19.6) | 11.1 | (27.8) | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 35.5 | 50.4 | 35.0 | (10.6) | 28.1 | | | |
| 6 | Sales and Marketing | 76.1 | 13.7 | 9.5 | 11.8 | 11.2 | | | |
| 7 | General and Administrative | 27.7 | 5.1 | 0.6 | 0.6 | (0.3) | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 103.8 | 18.8 | 10.1 | 12.4 | 10.9 | | | |
| 9 | Purchased IPR&D | 15.1 | - | - | - | - | | | |
| 10 | Total Goodwill and IPR&D | 12,772.1 | 138.0 | 97.7 | - | - | | | |
| 11 | Deferred Compensation Expense | 273.5 | 110.0 | 15.9 | 0.0 | - | | | |
| 12 | Restructuring Cost | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 13 | Other Operating Expenses | - | - | - | - | - | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 12,651.7 | 739.4 | 125.1 | 12.8 | 11.0 | | | |
| 15 | R&D Performed | (3.4) | (0.4) | (6.2) | (1.4) | (0.0) | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (12,612.8) | (688.5) | (83.8) | (22.1) | 17.2 | | | |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Cost Adjustments | 12,535.1 | 697.4 | 95.7 | 16.8 | (21.3) | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (77.8) | 8.9 | 11.9 | (5.3) | (4.1) | | | |
| 20 | Quarterly TP Adjustment | (37.1) | (10.5) | (13.2) | (11.9) | (11.4) | | | |
| 21 | Interim Adjustments | 15.6 | 9.4 | - | - | - | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (99.3) | 7.7 | (1.3) | (17.2) | (15.5) | | | |
| 23 | (+) R&D Expense | - | - | - | - | - | | | |
| 24 | (-) R&D Amortization | 31.4 | 22.0 | 5.9 | 4.2 | 2.9 | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (130.7) | (14.2) | (7.2) | (21.3) | (18.4) | | | |
| 26 | Total Routine Returns | 13.8 | 7.1 | (1.8) | (1.6) | (0.8) | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (144.5) | (21.3) | (5.5) | (19.7) | (17.6) | | | |
| 28 | Capital Stock | 88.9 | 62.2 | 16.8 | 11.8 | 8.2 | | | |
| 29 | Acquired Companies Capital Stock % of Total | 1.1% | 0.8% | 0.2% | 0.2% | 0.1% | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (57.8) | (16.8) | (1.7) | (1.6) | (0.7) | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (44.0) | (9.7) | (3.5) | (3.2) | (1.5) | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 86.7 | 4.6 | 3.7 | 18.1 | 17.0 | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 36 | Vendor Financing | - | - | - | - | - | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **500.2** | **(460.2)** | **1.0** | **0.5** | **1.3** | | | |
| 39 | **Operating Profit (as reported)** | **(13.8)** | **10.8** | **2.2** | **0.8** | **1.3** | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

NN Brazil: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 77.3 | 12.5 | 24.4 | | | | | |
| 2 | Intercompany Revenues | 54.6 | 65.0 | 15.4 | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 131.8 | 77.5 | 39.8 | | | | | |
| 4 | Cost of Revenues | 70.7 | 25.5 | 30.4 | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 61.1 | 52.0 | 9.4 | | | | | |
| 6 | Sales and Marketing | 23.3 | 9.0 | 0.5 | | | | | |
| 7 | General and Administrative | 19.5 | 13.3 | 6.6 | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 42.9 | 22.3 | 7.1 | | | | | |
| 9 | Purchased IPR&D | - | - | - | | | | | |
| 10 | Total Goodwill and IPR&D | - | - | - | | | | | |
| 11 | Deferred Compensation Expense | - | - | - | | | | | |
| 12 | Restructuring Cost | - | - | - | | | | | |
| 13 | Other Operating Expenses | - | - | - | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 42.9 | 22.3 | 7.1 | | | | | |
| 15 | R&D Performed | 4.4 | 2.5 | 6.6 | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | 13.8 | 27.2 | (4.3) | | | | | |
| 17 | Vendor Financing Loss | - | - | - | | | | | |
| 18 | Cost Adjustments | (5.8) | 12.0 | (27.0) | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 8.0 | 39.2 | (31.3) | | | | | |
| 20 | Quarterly TP Adjustment | - | - | - | | | | | |
| 21 | Interim Adjustments | 4.2 | (34.2) | (8.2) | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 12.2 | 5.0 | (39.5) | | | | | |
| 23 | (+) R&D Expense | 4.3 | 2.5 | 6.6 | | | | | |
| 24 | (-) R&D Amortization | 10.9 | 8.7 | 7.4 | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 5.6 | (1.1) | (40.3) | | | | | |
| 26 | Total Routine Returns | 4.4 | 4.8 | 9.2 | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | 1.2 | (6.0) | (49.5) | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Brazil Capital Stock % of Total | 0.0% | 0.0% | 0.0% | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | - | - | - | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 4.4 | 4.8 | 9.2 | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (1.2) | 6.0 | 49.5 | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | | | | | |
| 36 | Vendor Financing | - | - | - | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **11.0** | **11.0** | **10.0** | | | | | |
| 39 | **Operating Profit (as reported)** | **11.0** | **11.0** | **10.0** | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**NN Japan: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 155.1 | | | | | | | |
| 2 | Intercompany Revenues | - | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 155.1 | | | | | | | |
| 4 | Cost of Revenues | 102.8 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 52.3 | | | | | | | |
| 6 | Sales and Marketing | 27.0 | | | | | | | |
| 7 | General and Administrative | 20.0 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 47.1 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | 31.8 | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 78.9 | | | | | | | |
| 15 | R&D Performed | 25.7 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (52.2) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 40.2 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.1) | | | | | | | |
| 20 | Quarterly TP Adjustment | 4.9 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (7.2) | | | | | | | |
| 23 | (+) R&D Expense | 0.2 | | | | | | | |
| 24 | (-) R&D Amortization | 4.5 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (11.5) | | | | | | | |
| 26 | Total Routine Returns | 1.6 | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (13.1) | | | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Japan Capital Stock % of Total | 0.0% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | - | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 1.6 | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 13.1 | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 31.8 | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 31.8 | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(25.9)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **5.9** | | | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Bay U.S.: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 796.8 | | | | | | | |
| 2 | Intercompany Revenues | 340.9 | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 1,137.6 | | | | | | | |
| 4 | Cost of Revenues | 744.7 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 392.9 | | | | | | | |
| 6 | Sales and Marketing | 117.3 | | | | | | | |
| 7 | General and Administrative | 88.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 205.9 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | 1,527.1 | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,733.0 | | | | | | | |
| 15 | R&D Performed | 169.0 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,509.1) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 1,496.6 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.5) | | | | | | | |
| 20 | Quarterly TP Adjustment | - | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (12.5) | | | | | | | |
| 23 | (+) R&D Expense | 162.7 | | | | | | | |
| 24 | (-) R&D Amortization | 224.2 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (74.0) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (74.0) | | | | | | | |
| 28 | Capital Stock | 635.2 | | | | | | | |
| 29 | Bay U.S. Capital Stock % of Total | 7.6% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (412.9) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (412.9) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (338.9) | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(351.4)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(359.9)** | | | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Bay Ireland: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 214.1 | | | | | | | |
| 2 | Intercompany Revenues | (65.1) | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 149.0 | | | | | | | |
| 4 | Cost of Revenues | 162.0 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | (13.0) | | | | | | | |
| 6 | Sales and Marketing | 0.7 | | | | | | | |
| 7 | General and Administrative | 8.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 9.2 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 9.2 | | | | | | | |
| 15 | R&D Performed | 13.5 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (35.7) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 0.5 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (35.2) | | | | | | | |
| 20 | Quarterly TP Adjustment | 12.5 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (22.7) | | | | | | | |
| 23 | (+) R&D Expense | 15.7 | | | | | | | |
| 24 | (-) R&D Amortization | 7.7 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (14.8) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (14.8) | | | | | | | |
| 28 | Capital Stock | 21.9 | | | | | | | |
| 29 | Bay Ireland Capital Stock % of Total | 0.3% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | (14.3) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (14.3) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 0.5 | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(22.2)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(22.5)** | | | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

**Nortel Distributors: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 2,907.0 | 1,896.2 | 1,522.8 | 1,538.9 | 1,963.7 | 1,936.4 | 1,325.8 | 1,488.8 |
| 2 | Intercompany Revenues | 94.9 | 55.6 | 35.8 | 121.0 | 163.5 | 94.0 | 264.0 | 398.7 |
| 3 | Total Revenues (Line 1 + Line 2) | 3,001.9 | 1,951.8 | 1,558.5 | 1,659.8 | 2,127.2 | 2,030.4 | 1,589.8 | 1,887.5 |
| 4 | Cost of Revenues | 2,343.4 | 1,377.6 | 1,353.9 | 1,363.6 | 1,791.0 | 1,519.1 | 1,222.3 | 1,458.4 |
| 5 | Gross Profit (Line 3 - Line 4) | 658.5 | 574.2 | 204.6 | 296.2 | 336.3 | 511.2 | 367.5 | 429.2 |
| 6 | Sales and Marketing | 442.9 | 288.4 | 123.3 | 161.0 | 152.3 | 146.2 | 144.3 | 642.6 |
| 7 | General and Administrative | 240.5 | 105.2 | 139.9 | 121.6 | 126.0 | 308.9 | 146.9 | 167.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 683.4 | 393.5 | 263.2 | 282.6 | 278.3 | 455.1 | 291.2 | 810.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 9.9 | - | 0.0 | (0.0) | - | 1.1 | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 58.8 | 78.1 | (3.5) | 11.6 | 7.5 | 5.8 | 13.0 | 15.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 25.3 | 7.1 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 752.1 | 471.6 | 259.8 | 294.2 | 285.8 | 461.9 | 329.4 | 832.5 |
| 15 | R&D Performed | (1.0) | (2.4) | (6.4) | 2.1 | 4.3 | 2.9 | 1.3 | 0.7 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (92.6) | 105.0 | (48.7) | (0.1) | 46.2 | 46.4 | 36.8 | (404.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 150.0 | (66.9) | (104.5) | 7.3 | 25.1 | (23.1) | (57.7) | 502.5 |
| 19 | Accounting Income - Adjusted (Line 16 + Line 18) | 57.3 | 38.1 | (153.3) | 7.2 | 71.3 | 23.3 | (21.0) | 98.4 |
| 20 | Quarterly TP Adjustment | (416.7) | (365.8) | 53.0 | 31.6 | 14.6 | 39.9 | 60.0 | - |
| 21 | Interim Adjustments | (29.0) | (22.6) | 33.8 | 27.4 | (33.7) | (62.2) | 7.4 | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (388.4) | (350.3) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 23 | (+) R&D Expense | - | - | - | - | - | - | - | - |
| 24 | (-) R&D Amortization | - | - | - | - | - | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (388.4) | (350.3) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 26 | Total Routine Returns | 57.4 | 15.9 | 25.3 | 28.8 | 34.4 | 34.6 | 21.8 | 26.2 |
| 27 | Residual Profit (Line 25 - Line 26) | (445.8) | (366.1) | (91.8) | 37.4 | 17.8 | (33.6) | 24.7 | 72.3 |
| 28 | Capital Stock | - | - | - | - | - | - | - | - |
| 29 | Nortel Distributors Capital Stock % of Total | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-B-2) | - | - | - | - | - | - | - | - |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 57.4 | 15.9 | 25.3 | 28.8 | 34.4 | 34.6 | 21.8 | 26.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | 445.8 | 366.1 | 91.8 | (37.4) | (17.8) | 33.6 | (24.7) | (72.3) |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | 36.2 | 30.5 | (14.9) | 2.1 | 1.7 | 2.4 | 3.3 | 12.9 |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 36.2 | 30.5 | (14.9) | 2.1 | 1.7 | 2.4 | 3.3 | 12.9 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **21.2** | **(14.7)** | **40.2** | **26.7** | **32.8** | **32.1** | **18.5** | **13.3** |
| 39 | **Operating Profit (as reported)** | **51.6** | **0.3** | **16.3** | **16.9** | **20.3** | **19.8** | **13.9** | **18.0** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total routine returns from Exhibit 30 of Dr. Cooper's Transfer Pricing Report

## 2.    System Residual Profit by Year

### System Residual Profit under Dr. Cooper's View, Corrected

| Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| System Residual Profit | (5,450.9) | (2,224.4) | (777.5) | (953.0) | (532.0) | (294.7) | (43.5) | (108.4) |

Notes:

(1) Values in millions of USD

# C.    Dr. Cooper's View, Corrected and Made Consistent across Entities

## 1.    By Entity and Year

**NNL: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 2 | Intercompany Revenues | 4,037.3 | 2,138.0 | 2,556.3 | 2,657.7 | 2,889.0 | 2,237.5 | 2,147.3 | 1,827.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 5,789.7 | 3,086.3 | 3,324.1 | 3,438.1 | 3,724.3 | 3,129.4 | 3,162.6 | 2,617.7 |
| 4 | Cost of Revenues | 5,385.5 | 2,750.1 | 2,140.0 | 2,370.7 | 2,002.4 | 2,069.0 | 1,943.8 | 1,383.5 |
| 5 | Gross Profit (Line 3 - Line 4) | 404.3 | 336.2 | 1,184.1 | 1,067.4 | 1,722.0 | 1,060.4 | 1,218.8 | 1,234.1 |
| 6 | Sales and Marketing | 342.5 | 254.7 | 230.5 | 68.0 | 135.1 | 142.0 | 152.8 | 390.5 |
| 7 | General and Administrative | 358.8 | 128.8 | 287.8 | 360.3 | 526.9 | 276.1 | 372.3 | 197.3 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 701.3 | 383.5 | 518.3 | 428.3 | 662.0 | 418.1 | 525.1 | 587.8 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 24.8 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | (18.0) | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 792.9 | 344.4 | 70.7 | 17.1 | 28.2 | 24.1 | 22.0 | 58.5 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.8) | (18.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,501.0 | 727.9 | 588.9 | 445.4 | 690.2 | 442.2 | 530.3 | 627.8 |
| 15 | R&D Performed | 1,107.0 | 849.3 | 823.1 | 839.6 | 811.3 | 896.5 | 841.9 | 817.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (2,203.7) | (1,241.0) | (228.0) | (217.6) | 220.4 | (278.2) | (153.4) | (211.1) |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 530.9 | 644.4 | 395.7 | 178.7 | (254.5) | 20.7 | (35.4) | 104.6 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,672.8) | (596.6) | 167.7 | (38.9) | (34.1) | (257.5) | (188.8) | (106.4) |
| 20 | Quarterly TP Adjustment | (456.7) | (42.9) | (251.3) | (527.4) | (323.7) | (276.4) | (387.2) | |
| 21 | Interim Adjustments | 14.1 | 47.4 | (25.6) | (27.4) | 33.7 | 62.2 | (7.4) | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (2,115.4) | (592.1) | (109.2) | (593.7) | (324.1) | (471.7) | (583.4) | (106.4) |
| 23 | (+) R&D Expense | 1,463.0 | 879.6 | 821.5 | 841.7 | 804.0 | - | - | - |
| 24 | (-) R&D Amortization | 888.1 | 976.3 | 938.5 | 906.5 | 881.4 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (1,540.5) | (688.8) | (226.2) | (658.5) | (401.5) | (471.7) | (583.4) | (106.4) |
| 26 | Total Routine Returns | 602.6 | 451.6 | 348.3 | 266.5 | 259.5 | 64.7 | 85.6 | 60.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (2,143.1) | (1,140.4) | (574.5) | (924.9) | (660.9) | (536.5) | (669.1) | (166.8) |
| 28 | Capital Stock | 2,560.1 | 2,790.7 | 2,680.3 | 2,589.5 | 2,519.3 | 2,493.2 | 2,487.4 | 2,446.4 |
| 29 | NNL Capital Stock % of Total | 30.5% | 33.8% | 35.5% | 37.0% | 38.5% | 38.8% | 41.0% | 45.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (1,760.5) | (813.4) | (325.9) | (406.3) | (274.8) | (170.0) | (73.4) | (102.1) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (1,157.9) | (361.9) | 22.4 | (139.8) | (15.3) | (105.2) | 12.3 | (41.8) |
| 32 | Required Adjustment (Line 31 - Line 25) | 382.7 | 326.9 | 248.7 | 518.7 | 386.2 | 366.5 | 595.7 | 64.6 |
| 33 | Headquarters Costs | 182.6 | 171.4 | 160.2 | 149.1 | 137.9 | 126.7 | 115.5 | 104.3 |
| 34 | Stewardship Costs | 25.0 | 13.5 | 11.0 | 11.1 | 11.9 | 14.2 | 14.2 | 10.1 |
| 35 | Restructuring Costs | 2,448.4 | 2,010.6 | 280.4 | 137.0 | 151.7 | 92.9 | 184.4 | 249.0 |
| 36 | Vendor Financing | - | | | | - | | | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 2,656.0 | 2,195.6 | 451.6 | 297.2 | 301.5 | 233.8 | 314.2 | 363.4 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(4,388.7)** | **(2,460.7)** | **(312.2)** | **(372.3)** | **(239.4)** | **(339.1)** | **(301.9)** | **(405.2)** |
| 39 | **Operating Profit (as reported)** | **(1,734.0)** | **(294.7)** | **110.6** | **(100.1)** | **22.1** | **(87.4)** | **27.0** | **(26.0)** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**NNUK: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 2 | Intercompany Revenues | 1,148.1 | 536.2 | 396.5 | 435.5 | 404.8 | 645.7 | 701.2 | 631.0 |
| 3 | Total Revenues (Line 1 + Line 2) | 2,378.0 | 1,214.5 | 879.0 | 885.2 | 936.4 | 1,330.3 | 1,385.7 | 1,261.9 |
| 4 | Cost of Revenues | 2,275.2 | 380.6 | 529.6 | 476.2 | 500.4 | 886.8 | 1,022.4 | 1,031.7 |
| 5 | Gross Profit (Line 3 - Line 4) | 102.8 | 833.9 | 349.3 | 409.0 | 435.9 | 443.4 | 363.3 | 230.2 |
| 6 | Sales and Marketing | 352.7 | 114.5 | 238.5 | 120.2 | 118.4 | 114.8 | 144.0 | 243.0 |
| 7 | General and Administrative | 176.5 | 96.4 | 125.3 | 133.2 | 105.8 | 114.7 | 134.9 | 111.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 529.1 | 211.0 | 363.8 | 253.3 | 224.2 | 229.5 | 279.0 | 354.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 39.5 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 464.5 | 404.1 | 17.6 | 44.4 | 53.5 | 8.8 | 33.6 | 37.2 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 5.2 | 12.7 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,033.2 | 615.0 | 381.4 | 297.7 | 277.8 | 238.3 | 317.8 | 404.4 |
| 15 | R&D Performed | 345.1 | 183.8 | 95.5 | 95.6 | 66.4 | 43.6 | 39.0 | 36.5 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,275.5) | 35.0 | (127.6) | 15.7 | 91.8 | 161.6 | 6.5 | (210.7) |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 557.9 | 52.9 | 130.8 | (46.3) | (38.8) | (103.2) | 57.4 | 220.4 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (717.6) | 87.9 | 3.2 | (30.6) | 52.9 | 58.3 | 64.0 | 9.7 |
| 20 | Quarterly TP Adjustment | (438.8) | (305.8) | (346.1) | (231.7) | (191.0) | (78.6) | (51.1) | |
| 21 | Interim Adjustments | | | | | | | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (1,156.4) | (217.9) | (342.9) | (262.3) | (138.1) | (20.3) | 12.9 | 9.7 |
| 23 | (+) R&D Expense | 352.3 | 183.8 | 95.3 | 95.6 | 66.4 | - | - | - |
| 24 | (-) R&D Amortization | 218.8 | 233.6 | 205.4 | 172.4 | 145.0 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (1,023.0) | (267.6) | (453.0) | (339.1) | (216.7) | (20.3) | 12.9 | 9.7 |
| 26 | Total Routine Returns | 364.4 | 152.8 | 94.8 | 79.3 | 61.1 | 54.1 | 61.5 | 51.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (1,387.4) | (420.4) | (547.8) | (418.5) | (277.8) | (74.3) | (48.6) | (41.7) |
| 28 | Capital Stock | 620.1 | 661.9 | 581.9 | 488.5 | 410.8 | 334.3 | 269.1 | 220.4 |
| 29 | NNUK Capital Stock % of Total | 7.39% | 8.01% | 7.71% | 6.98% | 6.28% | 6.12% | 4.99% | 3.59% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (426.4) | (192.9) | (70.8) | (76.6) | (44.8) | (26.8) | (8.9) | (8.1) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (62.0) | (40.2) | 24.1 | 2.7 | 16.3 | 27.3 | 52.6 | 43.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | 961.0 | 227.5 | 477.1 | 341.8 | 233.0 | 47.6 | 39.7 | 33.5 |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(195.4)** | **9.6** | **134.2** | **79.5** | **94.9** | **27.3** | **52.6** | **43.2** |
| 39 | **Operating Profit (as reported)** | **(253.7)** | **(19.8)** | **100.8** | **45.2** | **67.4** | **16.2** | **41.0** | **31.9** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**NNI: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 2 | Intercompany Revenues | 755.8 | 373.9 | 319.5 | 436.1 | 459.8 | 379.1 | 629.4 | 625.9 |
| 3 | Total Revenues (Line 1 + Line 2) | 10,861.2 | 6,403.2 | 5,719.5 | 5,142.6 | 5,480.3 | 5,073.7 | 5,265.1 | 4,779.9 |
| 4 | Cost of Revenues | 8,807.5 | 4,604.3 | 3,784.5 | 3,685.8 | 4,143.8 | 3,502.0 | 3,485.6 | 3,313.0 |
| 5 | Gross Profit (Line 3 - Line 4) | 2,053.7 | 1,798.9 | 1,935.1 | 1,456.8 | 1,336.4 | 1,571.8 | 1,779.5 | 1,466.9 |
| 6 | Sales and Marketing | 1,834.6 | 923.8 | 475.8 | 529.5 | 581.0 | 627.0 | 668.3 | 1,131.2 |
| 7 | General and Administrative | 411.2 | 472.7 | 398.6 | 347.1 | 333.1 | 372.4 | 260.1 | 270.5 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 2,245.7 | 1,396.4 | 874.4 | 876.7 | 914.1 | 999.3 | 928.3 | 1,401.7 |
| 9 | Purchased IPR&D | - | 0.0 | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 3,726.1 | 19.3 | - | - | - | 18.8 | - | - |
| 11 | Deferred Compensation Expense | 2.1 | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 13.7 | 1,878.2 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 7,455.9 | 2,076.9 | 1,050.8 | 930.6 | 967.7 | 1,065.9 | 1,013.4 | 3,413.6 |
| 15 | R&D Performed | 1,504.2 | 868.8 | 793.5 | 768.3 | 719.6 | 679.2 | 677.7 | 615.0 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (6,906.4) | (1,146.9) | 90.8 | (242.1) | (350.9) | (173.3) | 88.5 | (2,561.8) |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Cost Adjustments | 5,353.9 | 1,104.5 | 404.4 | 292.5 | 627.0 | 305.1 | 237.5 | 2,761.5 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,552.5) | (42.3) | 495.1 | 50.4 | 276.1 | 131.8 | 326.0 | 199.7 |
| 20 | Quarterly TP Adjustment | 1,246.7 | 660.8 | 471.8 | 645.2 | 445.7 | 209.2 | 256.4 | |
| 21 | Interim Adjustments | | | | | | | | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (305.8) | 618.5 | 966.9 | 695.6 | 721.8 | 341.0 | 582.4 | 199.7 |
| 23 | (+) R&D Expense | 1,181.2 | 869.9 | 793.5 | 768.3 | 719.6 | - | - | - |
| 24 | (-) R&D Amortization | 1,378.7 | 1,461.9 | 1,272.8 | 1,125.3 | 1,010.9 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (503.3) | 26.5 | 487.6 | 338.7 | 430.6 | 341.0 | 582.4 | 199.7 |
| 26 | Total Routine Returns | 698.4 | 212.5 | 131.2 | 171.2 | 148.7 | 233.1 | 221.4 | 214.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (1,201.7) | (186.0) | 356.4 | 167.5 | 281.9 | 107.9 | 361.0 | (14.7) |
| 28 | Capital Stock | 3,906.3 | 4,142.0 | 3,606.3 | 3,188.2 | 2,864.1 | 2,599.4 | 2,396.3 | 2,226.8 |
| 29 | NNI Capital Stock % of Total | 46.6% | 50.1% | 47.8% | 45.6% | 43.8% | 43.1% | 40.6% | 38.9% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (2,686.2) | (1,207.3) | (438.5) | (500.2) | (312.4) | (188.5) | (72.7) | (88.0) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (1,987.7) | (994.8) | (307.3) | (329.0) | (163.7) | 44.7 | 148.7 | 126.4 |
| 32 | Required Adjustment (Line 31 - Line 25) | (1,484.5) | (1,021.3) | (794.9) | (667.7) | (594.3) | (296.3) | (433.7) | (73.3) |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(1,790.2)** | **(402.8)** | **172.0** | **27.9** | **127.6** | **44.7** | **148.7** | **126.4** |
| 39 | Operating Profit (as reported) | (1,889.5) | (521.7) | 109.1 | (25.4) | 90.0 | (30.8) | 73.5 | 57.0 |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**NN Ireland: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 2 | Intercompany Revenues | 293.8 | 182.3 | 82.1 | 76.5 | 79.0 | 84.1 | 7.6 | 1.2 |
| 3 | Total Revenues (Line 1 + Line 2) | 540.8 | 381.1 | 360.4 | 403.7 | 444.6 | 569.8 | 596.3 | 592.1 |
| 4 | Cost of Revenues | 481.6 | 355.9 | 315.0 | 332.8 | 346.3 | 443.7 | 491.1 | 537.8 |
| 5 | Gross Profit (Line 3 - Line 4) | 59.2 | 25.3 | 45.4 | 70.9 | 98.3 | 126.1 | 105.3 | 54.2 |
| 6 | Sales and Marketing | 11.3 | 8.4 | 6.1 | 8.2 | 7.9 | 8.3 | 11.1 | 16.7 |
| 7 | General and Administrative | 48.1 | 8.2 | 33.9 | 49.4 | 42.8 | 42.5 | 50.5 | 58.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 59.3 | 16.6 | 40.0 | 57.6 | 50.6 | 50.8 | 61.5 | 75.7 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | - | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 23.6 | 1.4 | 0.7 | (0.9) | 0.7 | 1.0 | 1.0 | 0.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | - | (0.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 83.0 | 18.0 | 40.7 | 56.7 | 51.4 | 51.8 | 64.8 | 75.7 |
| 15 | R&D Performed | 16.7 | 14.8 | 18.1 | 17.8 | 17.9 | 19.7 | 25.0 | 24.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (40.4) | (7.5) | (13.4) | (3.5) | 29.1 | 54.6 | 15.4 | (45.9) |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Cost Adjustments | 19.9 | 14.8 | 12.2 | (3.4) | (25.4) | (3.1) | 35.2 | 60.3 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (20.6) | 7.3 | (1.2) | (7.0) | 3.7 | 51.5 | 50.6 | 14.4 |
| 20 | Quarterly TP Adjustment | 40.0 | 58.1 | 68.8 | 73.2 | 52.8 | 56.5 | 77.9 | |
| 21 | Interim Adjustments | - | - | - | - | - | - | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 19.5 | 65.3 | 67.6 | 66.2 | 56.5 | 108.0 | 128.5 | 14.4 |
| 23 | (+) R&D Expense | 11.7 | 14.8 | 18.1 | 17.8 | 17.9 | - | - | - |
| 24 | (-) R&D Amortization | 24.6 | 21.2 | 19.7 | 19.2 | 18.8 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 6.6 | 59.0 | 65.9 | 64.8 | 55.6 | 108.0 | 128.5 | 14.4 |
| 26 | Total Routine Returns | 14.5 | 6.2 | 8.7 | 13.7 | 15.1 | 18.3 | 22.1 | 23.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (7.9) | 52.8 | 57.2 | 51.1 | 40.5 | 89.7 | 106.5 | (8.9) |
| 28 | Capital Stock | 69.6 | 59.9 | 55.9 | 54.4 | 53.2 | 53.2 | 56.3 | 60.4 |
| 29 | NN Ireland Capital Stock % of Total | 0.8% | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 0.9% | 1.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (47.8) | (17.5) | (6.8) | (8.5) | (5.8) | (3.5) | (1.6) | (2.4) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (33.4) | (11.3) | 1.9 | 5.2 | 9.3 | 14.8 | 20.5 | 21.0 |
| 32 | Required Adjustment (Line 31 - Line 25) | (40.0) | (70.3) | (64.0) | (59.6) | (46.3) | (93.2) | (108.1) | 6.5 |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(20.5)** | **(4.9)** | **3.6** | **6.6** | **10.2** | **14.8** | **20.5** | **21.0** |
| 39 | **Operating Profit (as reported)** | **(24.7)** | **(5.2)** | **0.2** | **1.3** | **6.5** | **5.5** | **9.1** | **9.5** |

Notes:
   (1) Values in millions of USD
   (2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
   (3) Headquarters cost from Section II-C of this appendix
   (4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
   (5) Total Routine Returns from Section II-A-3 of this appendix

**NNSA: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 2 | Intercompany Revenues | 469.7 | 445.6 | 560.6 | 703.9 | 589.9 | 425.4 | 206.7 | 146.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 739.6 | 629.0 | 830.3 | 1,102.8 | 1,045.5 | 796.8 | 564.0 | 381.4 |
| 4 | Cost of Revenues | 779.5 | 663.2 | 529.2 | 657.3 | 883.1 | 555.4 | 464.7 | 369.8 |
| 5 | Gross Profit (Line 3 - Line 4) | (39.9) | (34.2) | 301.1 | 445.5 | 162.5 | 241.4 | 99.3 | 11.6 |
| | | | | | | | | | |
| 6 | Sales and Marketing | 79.6 | 48.5 | 51.6 | 54.5 | 44.5 | 42.1 | 28.5 | 42.0 |
| 7 | General and Administrative | (4.8) | (12.5) | 1.4 | 14.4 | 6.1 | 3.8 | 10.6 | 10.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 74.7 | 36.0 | 53.0 | 68.9 | 50.6 | 45.9 | 39.1 | 52.4 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 0.4 | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 65.1 | 46.9 | 18.8 | 7.1 | 4.2 | 3.3 | 39.1 | 4.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.3) | (1.3) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 140.3 | 83.0 | 71.7 | 76.0 | 54.7 | 49.2 | 61.9 | 55.1 |
| 15 | R&D Performed | 226.0 | 245.6 | 266.9 | 267.3 | 256.8 | 223.2 | 67.1 | 55.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (406.2) | (362.8) | (37.5) | 102.2 | (149.0) | (30.9) | (29.7) | (98.9) |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 79.4 | 71.9 | (22.9) | (41.7) | 117.3 | 19.8 | 67.0 | 60.8 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (326.8) | (290.9) | (60.4) | 60.5 | (31.8) | (11.1) | 37.3 | (38.1) |
| 20 | Quarterly TP Adjustment | 109.5 | 37.1 | 1.1 | (12.4) | (0.2) | (27.9) | 46.8 | |
| 21 | Interim Adjustments | | | - | | | | | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (217.3) | (253.8) | (59.3) | 48.1 | (31.9) | (39.0) | 84.2 | (38.1) |
| 23 | (+) R&D Expense | 223.1 | 245.6 | 266.9 | 267.3 | 256.8 | - | - | - |
| 24 | (-) R&D Amortization | 157.7 | 180.7 | 203.4 | 222.5 | 234.4 | - | - | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (151.9) | (188.9) | 4.2 | 92.9 | (9.5) | (39.0) | 84.2 | (38.1) |
| 26 | Total Routine Returns | 62.5 | 48.4 | 50.9 | 47.7 | 44.7 | 14.8 | 12.4 | 9.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (214.4) | (237.3) | (46.7) | 45.2 | (54.3) | (53.8) | 71.7 | (47.4) |
| | | | | | | | | | |
| 28 | Capital Stock | 446.9 | 512.0 | 576.2 | 630.4 | 664.0 | 668.8 | 591.5 | 466.1 |
| 29 | NNSA Capital Stock % of Total | 5.3% | 6.2% | 7.6% | 9.0% | 10.1% | 10.8% | 12.2% | 11.3% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (307.3) | (149.3) | (70.1) | (98.9) | (72.4) | (47.3) | (21.8) | (25.6) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (244.8) | (100.9) | (19.2) | (51.2) | (27.7) | (32.5) | (9.3) | (16.3) |
| 32 | Required Adjustment (Line 31 - Line 25) | (92.9) | 88.1 | (23.4) | (144.1) | (18.2) | 6.5 | (93.5) | 21.8 |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(310.2)** | **(165.8)** | **(82.7)** | **(96.0)** | **(50.1)** | **(32.5)** | **(9.3)** | **(16.3)** |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(309.3)** | **(172.7)** | **(86.7)** | **(97.3)** | **(44.7)** | **(35.3)** | **(11.2)** | **(17.0)** |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
(3) Headquarters cost from Section II-C of this appendix
(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
(5) Total Routine Returns from Section II-A-3 of this appendix

**NN Australia: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | |
| 2 | Intercompany Revenues | 60.6 | (8.8) | 3.0 | 4.8 | 3.3 | 1.5 | 1.7 | |
| 3 | Total Revenues (Line 1 + Line 2) | 233.4 | 89.4 | 179.6 | 157.0 | 152.7 | 350.7 | 179.3 | |
| 4 | Cost of Revenues | 128.4 | 37.6 | 152.3 | 166.6 | 97.9 | 232.5 | 132.8 | |
| 5 | Gross Profit (Line 3 - Line 4) | 105.1 | 51.8 | 27.3 | (9.6) | 54.9 | 118.2 | 46.5 | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 47.0 | 32.2 | 25.9 | 35.5 | 32.8 | 36.1 | 39.6 | |
| 7 | General and Administrative | 28.4 | 12.4 | 12.2 | 9.8 | 11.7 | 11.7 | 16.5 | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 75.4 | 44.7 | 38.1 | 45.3 | 44.5 | 47.8 | 56.1 | |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | |
| 10 | Total Goodwill and IPR&D | 2.8 | - | - | - | - | - | - | |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | |
| 12 | Restructuring Cost | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 0.2 | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 120.7 | 46.7 | 36.5 | 48.7 | 48.4 | 49.8 | 60.8 | |
| 15 | R&D Performed | 12.5 | 10.5 | 10.3 | 6.4 | 4.5 | 0.0 | 0.0 | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (28.1) | (5.4) | (19.5) | (64.7) | 2.0 | 68.4 | (14.3) | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 33.6 | 4.5 | 18.7 | 29.7 | (17.5) | (43.4) | 23.3 | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 5.4 | (0.9) | (0.8) | (35.0) | (15.5) | 25.0 | 9.0 | |
| 20 | Quarterly TP Adjustment | (64.4) | (30.9) | 16.0 | 33.5 | 13.2 | 77.3 | (0.1) | |
| 21 | Interim Adjustments | | | - | - | - | - | - | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (58.9) | (31.8) | 15.2 | (1.5) | (2.3) | 102.3 | 8.8 | |
| 23 | (+) R&D Expense | 13.3 | 10.5 | 10.3 | 6.4 | 4.5 | - | - | |
| 24 | (-) R&D Amortization | 13.1 | 12.7 | 12.0 | 10.9 | 9.3 | - | - | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (58.7) | (34.0) | 13.4 | (6.0) | (7.1) | 102.3 | 8.8 | |
| 26 | Total Routine Returns | 14.1 | 6.8 | 4.0 | 5.8 | 9.1 | 15.1 | 12.4 | |
| 27 | Residual Profit (Line 25 - Line 26) | (72.8) | (40.7) | 9.4 | (11.8) | (16.2) | 87.2 | (3.6) | |
| | | | | | | | | | |
| 28 | Capital Stock | 37.0 | 36.0 | 34.1 | 30.9 | 26.3 | 20.3 | 14.2 | |
| 29 | NN Austrailia Capital Stock % of Total | 0.4% | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.3% | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (25.5) | (10.5) | (4.1) | (4.9) | (2.9) | (1.6) | (0.6) | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (11.3) | (3.7) | (0.2) | 0.9 | 6.3 | 13.5 | 11.8 | |
| 32 | Required Adjustment (Line 31 - Line 25) | 47.3 | 30.2 | (13.6) | 6.9 | 13.4 | (88.8) | 3.0 | |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | - | - | - | - | - | - | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(11.6)** | **(1.5)** | **1.6** | **5.4** | **11.1** | **13.5** | **11.8** | |
| | | | | | | | | | |
| 39 | Operating Profit (as reported) | (20.7) | (7.6) | (2.7) | (0.0) | 5.9 | 6.7 | 8.4 | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**Acquired Companies: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 139.2 | 14.6 | - | - | - | | | |
| 2 | Intercompany Revenues | 59.8 | 70.8 | 15.5 | 0.4 | 0.3 | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 199.0 | 85.4 | 15.5 | 0.4 | 0.3 | | | |
| 4 | Cost of Revenues | 163.5 | 35.0 | (19.6) | 11.1 | (27.8) | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 35.5 | 50.4 | 35.0 | (10.6) | 28.1 | | | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 76.1 | 13.7 | 9.5 | 11.8 | 11.2 | | | |
| 7 | General and Administrative | 27.7 | 5.1 | 0.6 | 0.6 | (0.3) | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 103.8 | 18.8 | 10.1 | 12.4 | 10.9 | | | |
| 9 | Purchased IPR&D | 15.1 | - | - | - | - | | | |
| 10 | Total Goodwill and IPR&D | 12,772.1 | 138.0 | 97.7 | - | - | | | |
| 11 | Deferred Compensation Expense | 273.5 | 110.0 | 15.9 | 0.0 | - | | | |
| 12 | Restructuring Cost | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 13 | Other Operating Expenses | - | - | - | - | - | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 12,651.7 | 739.4 | 125.1 | 12.8 | 11.0 | | | |
| 15 | R&D Performed | (3.4) | (0.4) | (6.2) | (1.4) | (0.0) | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (12,612.8) | (688.5) | (83.8) | (22.1) | 17.2 | | | |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Cost Adjustments | 12,535.1 | 697.4 | 95.7 | 16.8 | (21.3) | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (77.8) | 8.9 | 11.9 | (5.3) | (4.1) | | | |
| 20 | Quarterly TP Adjustment | (37.1) | (10.5) | (13.2) | (11.9) | (11.4) | | | |
| 21 | Interim Adjustments | 15.6 | 9.4 | - | - | - | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (99.3) | 7.7 | (1.3) | (17.2) | (15.5) | | | |
| 23 | (+) R&D Expense | - | - | - | - | - | | | |
| 24 | (-) R&D Amortization | 31.4 | 22.0 | 5.9 | 4.2 | 2.9 | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (130.7) | (14.2) | (7.2) | (21.3) | (18.4) | | | |
| 26 | Total Routine Returns | 27.4 | 9.7 | (0.3) | 0.3 | 0.9 | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (158.0) | (23.9) | (7.0) | (21.6) | (19.3) | | | |
| | | | | | | | | | |
| 28 | Capital Stock | 88.9 | 62.2 | 16.8 | 11.8 | 8.2 | | | |
| 29 | Acquired Companies Capital Stock % of Total | 1.1% | 0.8% | 0.2% | 0.2% | 0.1% | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (61.1) | (18.1) | (2.0) | (1.8) | (0.9) | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (33.8) | (8.5) | (2.3) | (1.6) | (0.0) | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 96.9 | 5.8 | 4.9 | 19.7 | 18.4 | | | |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | - | - | - | - | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(2.4)** | **13.5** | **3.6** | **2.6** | **2.9** | | | |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(13.8)** | **10.8** | **2.2** | **0.8** | **1.3** | | | |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
(3) Headquarters cost from Section II-C of this appendix
(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
(5) Total Routine Returns from Section II-A-3 of this appendix

**NN Brazil: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 77.3 | 12.5 | 24.4 | | | | | |
| 2 | Intercompany Revenues | 54.6 | 65.0 | 15.4 | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 131.8 | 77.5 | 39.8 | | | | | |
| 4 | Cost of Revenues | 70.7 | 25.5 | 30.4 | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 61.1 | 52.0 | 9.4 | | | | | |
| 6 | Sales and Marketing | 23.3 | 9.0 | 0.5 | | | | | |
| 7 | General and Administrative | 19.5 | 13.3 | 6.6 | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 42.9 | 22.3 | 7.1 | | | | | |
| 9 | Purchased IPR&D | - | - | - | | | | | |
| 10 | Total Goodwill and IPR&D | - | - | - | | | | | |
| 11 | Deferred Compensation Expense | - | - | - | | | | | |
| 12 | Restructuring Cost | - | - | - | | | | | |
| 13 | Other Operating Expenses | - | - | - | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 42.9 | 22.3 | 7.1 | | | | | |
| 15 | R&D Performed | 4.4 | 2.5 | 6.6 | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | 13.8 | 27.2 | (4.3) | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | (5.8) | 12.0 | (27.0) | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 8.0 | 39.2 | (31.3) | | | | | |
| 20 | Quarterly TP Adjustment | - | - | - | | | | | |
| 21 | Interim Adjustments | 4.2 | (34.2) | (8.2) | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 12.2 | 5.0 | (39.5) | | | | | |
| 23 | (+) R&D Expense | 4.3 | 2.5 | 6.6 | | | | | |
| 24 | (-) R&D Amortization | 10.9 | 8.7 | 7.4 | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 5.6 | (1.1) | (40.3) | | | | | |
| 26 | Total Routine Returns | 9.4 | 8.0 | 10.0 | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (3.8) | (9.1) | (50.4) | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Brazil Capital Stock % of Total | 0.0% | 0.0% | 0.0% | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | - | - | - | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 9.4 | 8.0 | 10.0 | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 3.8 | 9.1 | 50.4 | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | - | - | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **16.0** | **14.2** | **10.9** | | | | | |
| 39 | **Operating Profit (as reported)** | **11.0** | **11.0** | **10.0** | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**NN Japan: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 155.1 | | | | | | | |
| 2 | Intercompany Revenues | - | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 155.1 | | | | | | | |
| 4 | Cost of Revenues | 102.8 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 52.3 | | | | | | | |
| 6 | Sales and Marketing | 27.0 | | | | | | | |
| 7 | General and Administrative | 20.0 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 47.1 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | 31.8 | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 78.9 | | | | | | | |
| 15 | R&D Performed | 25.7 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (52.2) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 40.2 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.1) | | | | | | | |
| 20 | Quarterly TP Adjustment | 4.9 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (7.2) | | | | | | | |
| 23 | (+) R&D Expense | 0.2 | | | | | | | |
| 24 | (-) R&D Amortization | 4.5 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (11.5) | | | | | | | |
| 26 | Total Routine Returns | 4.7 | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (16.2) | | | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Japan Capital Stock % of Total | 0.0% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | - | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 4.7 | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 16.2 | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **9.0** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **5.9** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**Bay U.S. : Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 796.8 | | | | | | | |
| 2 | Intercompany Revenues | 340.9 | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 1,137.6 | | | | | | | |
| 4 | Cost of Revenues | 744.7 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 392.9 | | | | | | | |
| 6 | Sales and Marketing | 117.3 | | | | | | | |
| 7 | General and Administrative | 88.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 205.9 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | 1,527.1 | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,733.0 | | | | | | | |
| 15 | R&D Performed | 169.0 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,509.1) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 1,496.6 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.5) | | | | | | | |
| 20 | Quarterly TP Adjustment | - | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (12.5) | | | | | | | |
| 23 | (+) R&D Expense | 162.7 | | | | | | | |
| 24 | (-) R&D Amortization | 224.2 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (74.0) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (74.0) | | | | | | | |
| 28 | Capital Stock | 635.2 | | | | | | | |
| 29 | Bay U.S. Capital Stock % of Total | 7.6% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (436.8) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (436.8) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (362.8) | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(375.3)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(359.9)** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**Bay Ireland: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 214.1 | | | | | | | |
| 2 | Intercompany Revenues | (65.1) | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 149.0 | | | | | | | |
| 4 | Cost of Revenues | 162.0 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | (13.0) | | | | | | | |
| 6 | Sales and Marketing | 0.7 | | | | | | | |
| 7 | General and Administrative | 8.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 9.2 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 9.2 | | | | | | | |
| 15 | R&D Performed | 13.5 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (35.7) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 0.5 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (35.2) | | | | | | | |
| 20 | Quarterly TP Adjustment | 12.5 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (22.7) | | | | | | | |
| 23 | (+) R&D Expense | 15.7 | | | | | | | |
| 24 | (-) R&D Amortization | 7.7 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (14.8) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (14.8) | | | | | | | |
| 28 | Capital Stock | 21.9 | | | | | | | |
| 29 | Bay Ireland Capital Stock % of Total | 0.3% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | (15.1) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (15.1) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (0.3) | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(23.0)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(22.5)** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-3 of this appendix

**Nortel Distributors: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 2,907.0 | 1,896.2 | 1,522.8 | 1,538.9 | 1,963.7 | 1,936.4 | 1,325.8 | 1,488.8 |
| 2 | Intercompany Revenues | 94.9 | 55.6 | 35.8 | 121.0 | 163.5 | 94.0 | 264.0 | 398.7 |
| 3 | Total Revenues (Line 1 + Line 2) | 3,001.9 | 1,951.8 | 1,558.5 | 1,659.8 | 2,127.2 | 2,030.4 | 1,589.8 | 1,887.5 |
| 4 | Cost of Revenues | 2,343.4 | 1,377.6 | 1,353.9 | 1,363.6 | 1,791.0 | 1,519.1 | 1,222.3 | 1,458.4 |
| 5 | Gross Profit (Line 3 - Line 4) | 658.5 | 574.2 | 204.6 | 296.2 | 336.3 | 511.2 | 367.5 | 429.2 |
| 6 | Sales and Marketing | 442.9 | 288.4 | 123.3 | 161.0 | 152.3 | 146.2 | 144.3 | 642.6 |
| 7 | General and Administrative | 240.5 | 105.2 | 139.9 | 121.6 | 126.0 | 308.9 | 146.9 | 167.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 683.4 | 393.5 | 263.2 | 282.6 | 278.3 | 455.1 | 291.2 | 810.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 9.9 | - | 0.0 | (0.0) | - | 1.1 | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 58.8 | 78.1 | (3.5) | 11.6 | 7.5 | 5.8 | 13.0 | 15.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 25.3 | 7.1 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 752.1 | 471.6 | 259.8 | 294.2 | 285.8 | 461.9 | 329.4 | 832.5 |
| 15 | R&D Performed | (1.0) | (2.4) | (6.4) | 2.1 | 4.3 | 2.9 | 1.3 | 0.7 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (92.6) | 105.0 | (48.7) | (0.1) | 46.2 | 46.4 | 36.8 | (404.1) |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Cost Adjustments | 150.0 | (66.9) | (104.5) | 7.3 | 25.1 | (23.1) | (57.7) | 502.5 |
| 19 | Accounting Income - Adjusted (Line 16 + Line 18) | 57.3 | 38.1 | (153.3) | 7.2 | 71.3 | 23.3 | (21.0) | 98.4 |
| 20 | Quarterly TP Adjustment | (416.7) | (365.8) | 53.0 | 31.6 | 14.6 | 39.9 | 60.0 | |
| 21 | Interim Adjustments | (29.0) | (22.6) | 33.8 | 27.4 | (33.7) | (62.2) | 7.4 | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (388.4) | (350.3) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 23 | (+) R&D Expense | | | | | | | | |
| 24 | (-) R&D Amortization | | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (388.4) | (350.3) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 26 | Total Routine Returns | 84.3 | 53.7 | 48.4 | 50.5 | 60.1 | 58.8 | 40.7 | 45.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (472.7) | (404.0) | (114.9) | 15.7 | (7.8) | (57.8) | 5.7 | 53.2 |
| 28 | Capital Stock | | | | | | | | |
| 29 | Nortel Distributors Capital Stock % of Total | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-C-2) | - | - | - | - | - | - | - | - |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 84.3 | 53.7 | 48.4 | 50.5 | 60.1 | 58.8 | 40.7 | 45.3 |
| 32 | Required Adjustment (Line 31 - Line 25) | 472.7 | 404.0 | 114.9 | (15.7) | 7.8 | 57.8 | (5.7) | (53.2) |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **84.3** | **53.7** | **48.4** | **50.5** | **60.1** | **58.8** | **40.7** | **45.3** |
| 39 | **Operating Profit (as reported)** | **51.6** | **0.3** | **16.3** | **16.9** | **20.3** | **19.8** | **13.9** | **18.0** |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
(3) Headquarters cost from Section II-C of this appendix
(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
(5) Total Routine Returns from Section II-A-3 of this appendix

## 2.    System Residual Profit by Year

**System Residual Profit under Dr. Cooper's View, Corrected, and Made Consistent Across Entities**

| Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| System Residual Profit | (5,766.7) | (2,409.1) | (918.2) | (1,097.3) | (714.0) | (437.6) | (179.0) | (226.3) |

Notes:
(1) Values in millions of USD

# D.    Dr. Cooper's View, Corrected and Made Consistent across Entities and across Time

## 1.    By Entity and Year

**NNL: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 2 | Intercompany Revenues | 4,037.3 | 2,138.0 | 2,556.3 | 2,657.7 | 2,889.0 | 2,237.5 | 2,147.3 | 1,827.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 5,789.7 | 3,086.3 | 3,324.1 | 3,438.1 | 3,724.3 | 3,129.4 | 3,162.6 | 2,617.7 |
| 4 | Cost of Revenues | 5,385.5 | 2,750.1 | 2,140.0 | 2,370.7 | 2,002.4 | 2,069.0 | 1,943.8 | 1,383.5 |
| 5 | Gross Profit (Line 3 - Line 4) | 404.3 | 336.2 | 1,184.1 | 1,067.4 | 1,722.0 | 1,060.4 | 1,218.8 | 1,234.1 |
| 6 | Sales and Marketing | 342.5 | 254.7 | 230.5 | 68.0 | 135.1 | 142.0 | 152.8 | 390.5 |
| 7 | General and Administrative | 358.8 | 128.8 | 287.8 | 360.3 | 526.9 | 276.1 | 372.3 | 197.3 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 701.3 | 383.5 | 518.3 | 428.3 | 662.0 | 418.1 | 525.1 | 587.8 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 24.8 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | (18.0) | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 792.9 | 344.4 | 70.7 | 17.1 | 28.2 | 24.1 | 22.0 | 58.5 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.8) | (18.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,501.0 | 727.9 | 588.9 | 445.4 | 690.2 | 442.2 | 530.3 | 627.8 |
| 15 | R&D Performed | 1,107.0 | 849.3 | 823.1 | 839.6 | 811.3 | 896.5 | 841.9 | 817.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (2,203.7) | (1,241.0) | (228.0) | (217.6) | 220.4 | (278.2) | (153.4) | (211.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 530.9 | 644.4 | 395.7 | 178.7 | (254.5) | 20.7 | (35.4) | 104.6 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,672.8) | (596.6) | 167.7 | (38.9) | (34.1) | (257.5) | (188.8) | (106.4) |
| 20 | Quarterly TP Adjustment | (456.7) | (42.9) | (251.3) | (527.4) | (323.7) | (276.4) | (387.2) | |
| 21 | Interim Adjustments | 14.1 | 47.4 | (25.6) | (27.4) | 33.7 | 62.2 | (7.4) | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (2,115.4) | (592.1) | (109.2) | (593.7) | (324.1) | (471.7) | (583.4) | (106.4) |
| 23 | (+) R&D Expense | 1,463.0 | 879.6 | 821.5 | 841.7 | 804.0 | - | - | - |
| 24 | (-) R&D Amortization | 888.1 | 976.3 | 938.5 | 906.5 | 881.4 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (1,540.5) | (688.8) | (226.2) | (658.5) | (401.5) | (471.7) | (583.4) | (106.4) |
| 26 | Total Routine Returns | 560.6 | 487.8 | 361.2 | 282.3 | 274.3 | 64.7 | 85.6 | 60.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (2,101.2) | (1,176.5) | (587.4) | (940.7) | (675.8) | (536.5) | (669.1) | (166.8) |
| 28 | Capital Stock | 2,560.1 | 2,790.7 | 2,680.3 | 2,589.5 | 2,519.3 | 2,493.2 | 2,487.4 | 2,446.4 |
| 29 | NNL Capital Stock % of Total | 30.5% | 33.8% | 35.5% | 37.0% | 38.5% | 38.8% | 41.0% | 45.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (1,767.9) | (911.2) | (412.6) | (481.6) | (362.5) | (170.0) | (73.4) | (102.1) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (1,207.2) | (423.4) | (51.4) | (199.3) | (88.2) | (105.2) | 12.3 | (41.8) |
| 32 | Required Adjustment (Line 31 - Line 25) | 333.3 | 265.4 | 174.8 | 459.2 | 313.3 | 366.5 | 595.7 | 64.6 |
| 33 | Headquarters Costs | 182.6 | 171.4 | 160.2 | 149.1 | 137.9 | 126.7 | 115.5 | 104.3 |
| 34 | Stewardship Costs | 25.0 | 13.5 | 11.0 | 11.1 | 11.9 | 14.2 | 14.2 | 10.1 |
| 35 | Restructuring Costs | 2,448.4 | 2,010.6 | 280.4 | 137.0 | 151.7 | 92.9 | 184.4 | 249.0 |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | 2,656.0 | 2,195.6 | 451.6 | 297.2 | 301.5 | 233.8 | 314.2 | 363.4 |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(4,438.1)** | **(2,522.3)** | **(386.0)** | **(431.7)** | **(312.4)** | **(339.1)** | **(301.9)** | **(405.2)** |
| 39 | **Operating Profit (as reported)** | **(1,734.0)** | **(294.7)** | **110.6** | **(100.1)** | **22.1** | **(87.4)** | **27.0** | **(26.0)** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

**NNUK: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 2 | Intercompany Revenues | 1,148.1 | 536.2 | 396.5 | 435.5 | 404.8 | 645.7 | 701.2 | 631.0 |
| 3 | Total Revenues (Line 1 + Line 2) | 2,378.0 | 1,214.5 | 879.0 | 885.2 | 936.4 | 1,330.3 | 1,385.7 | 1,261.9 |
| 4 | Cost of Revenues | 2,275.2 | 380.6 | 529.6 | 476.2 | 500.4 | 886.8 | 1,022.4 | 1,031.7 |
| 5 | Gross Profit (Line 3 - Line 4) | 102.8 | 833.9 | 349.3 | 409.0 | 435.9 | 443.4 | 363.3 | 230.2 |
| 6 | Sales and Marketing | 352.7 | 114.5 | 238.5 | 120.2 | 118.4 | 114.8 | 144.0 | 243.0 |
| 7 | General and Administrative | 176.5 | 96.4 | 125.3 | 133.2 | 105.8 | 114.7 | 134.9 | 111.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 529.1 | 211.0 | 363.8 | 253.3 | 224.2 | 229.5 | 279.0 | 354.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 39.5 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 464.5 | 404.1 | 17.6 | 44.4 | 53.5 | 8.8 | 33.6 | 37.2 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 5.2 | 12.7 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,033.2 | 615.0 | 381.4 | 297.7 | 277.8 | 238.3 | 317.8 | 404.4 |
| 15 | R&D Performed | 345.1 | 183.8 | 95.5 | 95.6 | 66.4 | 43.6 | 39.0 | 36.5 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,275.5) | 35.0 | (127.6) | 15.7 | 91.8 | 161.6 | 6.5 | (210.7) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 557.9 | 52.9 | 130.8 | (46.3) | (38.8) | (103.2) | 57.4 | 220.4 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (717.6) | 87.9 | 3.2 | (30.6) | 52.9 | 58.3 | 64.0 | 9.7 |
| 20 | Quarterly TP Adjustment | (438.8) | (305.8) | (346.1) | (231.7) | (191.0) | (78.6) | (51.1) | - |
| 21 | Interim Adjustments | | | | | | | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (1,156.4) | (217.9) | (342.9) | (262.3) | (138.1) | (20.3) | 12.9 | 9.7 |
| 23 | (+) R&D Expense | 352.3 | 183.8 | 95.3 | 95.6 | 66.4 | - | - | - |
| 24 | (-) R&D Amortization | 218.8 | 233.6 | 205.4 | 172.4 | 145.0 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (1,023.0) | (267.6) | (453.0) | (339.1) | (216.7) | (20.3) | 12.9 | 9.7 |
| 26 | Total Routine Returns | 264.2 | 127.3 | 87.1 | 71.6 | 67.6 | 54.1 | 61.5 | 51.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (1,287.2) | (394.9) | (540.2) | (410.8) | (284.2) | (74.3) | (48.6) | (41.7) |
| 28 | Capital Stock | 620.1 | 661.9 | 581.9 | 488.5 | 410.8 | 334.3 | 269.1 | 220.4 |
| 29 | NNUK Capital Stock % of Total | 7.39% | 8.01% | 7.71% | 6.98% | 6.28% | 6.12% | 4.99% | 3.59% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (428.2) | (216.1) | (89.6) | (90.8) | (59.1) | (26.8) | (8.9) | (8.1) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (164.0) | (88.8) | (2.5) | (19.2) | 8.4 | 27.3 | 52.6 | 43.2 |
| 32 | Required Adjustment (Line 31 - Line 25) | 859.0 | 178.8 | 450.6 | 319.9 | 225.1 | 47.6 | 39.7 | 33.5 |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(297.4)** | **(39.0)** | **107.6** | **57.6** | **87.0** | **27.3** | **52.6** | **43.2** |
| 39 | **Operating Profit (as reported)** | **(253.7)** | **(19.8)** | **100.8** | **45.2** | **67.4** | **16.2** | **41.0** | **31.9** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

**NNI: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 2 | Intercompany Revenues | 755.8 | 373.9 | 319.5 | 436.1 | 459.8 | 379.1 | 629.4 | 625.9 |
| 3 | Total Revenues (Line 1 + Line 2) | 10,861.2 | 6,403.2 | 5,719.5 | 5,142.6 | 5,480.3 | 5,073.7 | 5,265.1 | 4,779.9 |
| 4 | Cost of Revenues | 8,807.5 | 4,604.3 | 3,784.5 | 3,685.8 | 4,143.8 | 3,502.0 | 3,485.6 | 3,313.0 |
| 5 | Gross Profit (Line 3 - Line 4) | 2,053.7 | 1,798.9 | 1,935.1 | 1,456.8 | 1,336.4 | 1,571.8 | 1,779.5 | 1,466.9 |
| 6 | Sales and Marketing | 1,834.6 | 923.8 | 475.8 | 529.5 | 581.0 | 627.0 | 668.3 | 1,131.2 |
| 7 | General and Administrative | 411.2 | 472.7 | 398.6 | 347.1 | 333.1 | 372.4 | 260.1 | 270.5 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 2,245.7 | 1,396.4 | 874.4 | 876.7 | 914.1 | 999.3 | 928.3 | 1,401.7 |
| 9 | Purchased IPR&D | - | 0.0 | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 3,726.1 | 19.3 | - | - | - | 18.8 | - | - |
| 11 | Deferred Compensation Expense | 2.1 | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 13.7 | 1,878.2 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 7,455.9 | 2,076.9 | 1,050.8 | 930.6 | 967.7 | 1,065.9 | 1,013.4 | 3,413.6 |
| 15 | R&D Performed | 1,504.2 | 868.8 | 793.5 | 768.3 | 719.6 | 679.2 | 677.7 | 615.0 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (6,906.4) | (1,146.9) | 90.8 | (242.1) | (350.9) | (173.3) | 88.5 | (2,561.8) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 5,353.9 | 1,104.5 | 404.4 | 292.5 | 627.0 | 305.1 | 237.5 | 2,761.5 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (1,552.5) | (42.3) | 495.1 | 50.4 | 276.1 | 131.8 | 326.0 | 199.7 |
| 20 | Quarterly TP Adjustment | 1,246.7 | 660.8 | 471.8 | 645.2 | 445.7 | 209.2 | 256.4 | |
| 21 | Interim Adjustments | | | | | | | | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (305.8) | 618.5 | 966.9 | 695.6 | 721.8 | 341.0 | 582.4 | 199.7 |
| 23 | (+) R&D Expense | 1,181.2 | 869.9 | 793.5 | 768.3 | 719.6 | - | - | - |
| 24 | (-) R&D Amortization | 1,378.7 | 1,461.9 | 1,272.8 | 1,125.3 | 1,010.9 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (503.3) | 26.5 | 487.6 | 338.7 | 430.6 | 341.0 | 582.4 | 199.7 |
| 26 | Total Routine Returns | 829.5 | 465.8 | 340.3 | 331.5 | 329.4 | 233.1 | 221.4 | 214.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (1,332.8) | (439.3) | 147.3 | 7.2 | 101.2 | 107.9 | 361.0 | (14.7) |
| 28 | Capital Stock | 3,906.3 | 4,142.0 | 3,606.3 | 3,188.2 | 2,864.1 | 2,599.4 | 2,396.3 | 2,226.8 |
| 29 | NNI Capital Stock % of Total | 46.6% | 50.1% | 47.8% | 45.6% | 43.8% | 43.1% | 40.6% | 38.9% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (2,697.5) | (1,352.4) | (555.2) | (592.9) | (412.1) | (188.5) | (72.7) | (88.0) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (1,868.0) | (886.6) | (214.9) | (261.4) | (82.7) | 44.7 | 148.7 | 126.4 |
| 32 | Required Adjustment (Line 31 - Line 25) | (1,364.7) | (913.1) | (702.5) | (600.1) | (513.3) | (296.3) | (433.7) | (73.3) |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(1,670.5)** | **(294.6)** | **264.5** | **95.5** | **208.5** | **44.7** | **148.7** | **126.4** |
| 39 | **Operating Profit (as reported)** | **(1,889.5)** | **(521.7)** | **109.1** | **(25.4)** | **90.0** | **(30.8)** | **73.5** | **57.0** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

**NN Ireland: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 2 | Intercompany Revenues | 293.8 | 182.3 | 82.1 | 76.5 | 79.0 | 84.1 | 7.6 | 1.2 |
| 3 | Total Revenues (Line 1 + Line 2) | 540.8 | 381.1 | 360.4 | 403.7 | 444.6 | 569.8 | 596.3 | 592.1 |
| 4 | Cost of Revenues | 481.6 | 355.9 | 315.0 | 332.8 | 346.3 | 443.7 | 491.1 | 537.8 |
| 5 | Gross Profit (Line 3 - Line 4) | 59.2 | 25.3 | 45.4 | 70.9 | 98.3 | 126.1 | 105.3 | 54.2 |
| | | | | | | | | | |
| 6 | Sales and Marketing | 11.3 | 8.4 | 6.1 | 8.2 | 7.9 | 8.3 | 11.1 | 16.7 |
| 7 | General and Administrative | 48.1 | 8.2 | 33.9 | 49.4 | 42.8 | 42.5 | 50.5 | 58.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 59.3 | 16.6 | 40.0 | 57.6 | 50.6 | 50.8 | 61.5 | 75.7 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | - | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 23.6 | 1.4 | 0.7 | (0.9) | 0.7 | 1.0 | 1.0 | 0.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | - | (0.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 83.0 | 18.0 | 40.7 | 56.7 | 51.4 | 51.8 | 64.8 | 75.7 |
| 15 | R&D Performed | 16.7 | 14.8 | 18.1 | 17.8 | 17.9 | 19.7 | 25.0 | 24.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (40.4) | (7.5) | (13.4) | (3.5) | 29.1 | 54.6 | 15.4 | (45.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 19.9 | 14.8 | 12.2 | (3.4) | (25.4) | (3.1) | 35.2 | 60.3 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (20.6) | 7.3 | (1.2) | (7.0) | 3.7 | 51.5 | 50.6 | 14.4 |
| 20 | Quarterly TP Adjustment | 40.0 | 58.1 | 68.8 | 73.2 | 52.8 | 56.5 | 77.9 | |
| 21 | Interim Adjustments | - | - | - | - | - | - | - | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 19.5 | 65.3 | 67.6 | 66.2 | 56.5 | 108.0 | 128.5 | 14.4 |
| 23 | (+) R&D Expense | 11.7 | 14.8 | 18.1 | 17.8 | 17.9 | - | - | - |
| 24 | (-) R&D Amortization | 24.6 | 21.2 | 19.7 | 19.2 | 18.8 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 6.6 | 59.0 | 65.9 | 64.8 | 55.6 | 108.0 | 128.5 | 14.4 |
| 26 | Total Routine Returns | 19.4 | 10.6 | 16.9 | 20.2 | 19.8 | 18.3 | 22.1 | 23.4 |
| 27 | Residual Profit (Line 25 - Line 26) | (12.7) | 48.4 | 49.0 | 44.5 | 35.9 | 89.7 | 106.5 | (8.9) |
| | | | | | | | | | |
| 28 | Capital Stock | 69.6 | 59.9 | 55.9 | 54.4 | 53.2 | 53.2 | 56.3 | 60.4 |
| 29 | NN Ireland Capital Stock % of Total | 0.8% | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 0.9% | 1.1% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (48.0) | (19.6) | (8.6) | (10.1) | (7.7) | (3.5) | (1.6) | (2.4) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (28.7) | (9.0) | 8.3 | 10.1 | 12.1 | 14.8 | 20.5 | 21.0 |
| 32 | Required Adjustment (Line 31 - Line 25) | (35.3) | (68.0) | (57.6) | (54.7) | (43.5) | (93.2) | (108.1) | 6.5 |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(15.8)** | **(2.6)** | **9.9** | **11.5** | **13.0** | **14.8** | **20.5** | **21.0** |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(24.7)** | **(5.2)** | **0.2** | **1.3** | **6.5** | **5.5** | **9.1** | **9.5** |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
(3) Headquarters cost from Section II-C of this appendix
(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
(5) Total Routine Returns from Section II-A-4 of this appendix

**NNSA: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 2 | Intercompany Revenues | 469.7 | 445.6 | 560.6 | 703.9 | 589.9 | 425.4 | 206.7 | 146.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 739.6 | 629.0 | 830.3 | 1,102.8 | 1,045.5 | 796.8 | 564.0 | 381.4 |
| 4 | Cost of Revenues | 779.5 | 663.2 | 529.2 | 657.3 | 883.1 | 555.4 | 464.7 | 369.8 |
| 5 | Gross Profit (Line 3 - Line 4) | (39.9) | (34.2) | 301.1 | 445.5 | 162.5 | 241.4 | 99.3 | 11.6 |
| 6 | Sales and Marketing | 79.6 | 48.5 | 51.6 | 54.5 | 44.5 | 42.1 | 28.5 | 42.0 |
| 7 | General and Administrative | (4.8) | (12.5) | 1.4 | 14.4 | 6.1 | 3.8 | 10.6 | 10.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 74.7 | 36.0 | 53.0 | 68.9 | 50.6 | 45.9 | 39.1 | 52.4 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 0.4 | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 65.1 | 46.9 | 18.8 | 7.1 | 4.2 | 3.3 | 39.1 | 4.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.3) | (1.3) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 140.3 | 83.0 | 71.7 | 76.0 | 54.7 | 49.2 | 61.9 | 55.1 |
| 15 | R&D Performed | 226.0 | 245.6 | 266.9 | 267.3 | 256.8 | 223.2 | 67.1 | 55.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (406.2) | (362.8) | (37.5) | 102.2 | (149.0) | (30.9) | (29.7) | (98.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 79.4 | 71.9 | (22.9) | (41.7) | 117.3 | 19.8 | 67.0 | 60.8 |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (326.8) | (290.9) | (60.4) | 60.5 | (31.8) | (11.1) | 37.3 | (38.1) |
| 20 | Quarterly TP Adjustment | 109.5 | 37.1 | 1.1 | (12.4) | (0.2) | (27.9) | 46.8 | |
| 21 | Interim Adjustments | | | - | | | | | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (217.3) | (253.8) | (59.3) | 48.1 | (31.9) | (39.0) | 84.2 | (38.1) |
| 23 | (+) R&D Expense | 223.1 | 245.6 | 266.9 | 267.3 | 256.8 | - | - | - |
| 24 | (-) R&D Amortization | 157.7 | 180.7 | 203.4 | 222.5 | 234.4 | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (151.9) | (188.9) | 4.2 | 92.9 | (9.5) | (39.0) | 84.2 | (38.1) |
| 26 | Total Routine Returns | 63.9 | 60.5 | 66.3 | 66.5 | 59.5 | 14.8 | 12.4 | 9.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (215.8) | (249.4) | (62.1) | 26.4 | (69.1) | (53.8) | 71.7 | (47.4) |
| 28 | Capital Stock | 446.9 | 512.0 | 576.2 | 630.4 | 664.0 | 668.8 | 591.5 | 466.1 |
| 29 | NNSA Capital Stock % of Total | 5.3% | 6.2% | 7.6% | 9.0% | 10.1% | 10.8% | 12.2% | 11.3% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (308.6) | (167.2) | (88.7) | (117.2) | (95.5) | (47.3) | (21.8) | (25.6) |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (244.7) | (106.7) | (22.4) | (50.8) | (36.0) | (32.5) | (9.3) | (16.3) |
| 32 | Required Adjustment (Line 31 - Line 25) | (92.8) | 82.2 | (26.6) | (143.7) | (26.5) | 6.5 | (93.5) | 21.8 |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(310.0)** | **(171.6)** | **(85.9)** | **(95.6)** | **(58.4)** | **(32.5)** | **(9.3)** | **(16.3)** |
| 39 | **Operating Profit (as reported)** | **(309.3)** | **(172.7)** | **(86.7)** | **(97.3)** | **(44.7)** | **(35.3)** | **(11.2)** | **(17.0)** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

**NN Australia: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | |
| 2 | Intercompany Revenues | 60.6 | (8.8) | 3.0 | 4.8 | 3.3 | 1.5 | 1.7 | |
| 3 | Total Revenues (Line 1 + Line 2) | 233.4 | 89.4 | 179.6 | 157.0 | 152.7 | 350.7 | 179.3 | |
| 4 | Cost of Revenues | 128.4 | 37.6 | 152.3 | 166.6 | 97.9 | 232.5 | 132.8 | |
| 5 | Gross Profit (Line 3 - Line 4) | 105.1 | 51.8 | 27.3 | (9.6) | 54.9 | 118.2 | 46.5 | |
| 6 | Sales and Marketing | 47.0 | 32.2 | 25.9 | 35.5 | 32.8 | 36.1 | 39.6 | |
| 7 | General and Administrative | 28.4 | 12.4 | 12.2 | 9.8 | 11.7 | 11.7 | 16.5 | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 75.4 | 44.7 | 38.1 | 45.3 | 44.5 | 47.8 | 56.1 | |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | |
| 10 | Total Goodwill and IPR&D | 2.8 | - | - | - | - | - | - | |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | |
| 12 | Restructuring Cost | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 0.2 | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 120.7 | 46.7 | 36.5 | 48.7 | 48.4 | 49.8 | 60.8 | |
| 15 | R&D Performed | 12.5 | 10.5 | 10.3 | 6.4 | 4.5 | 0.0 | 0.0 | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (28.1) | (5.4) | (19.5) | (64.7) | 2.0 | 68.4 | (14.3) | |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | |
| 18 | Cost Adjustments | 33.6 | 4.5 | 18.7 | 29.7 | (17.5) | (43.4) | 23.3 | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 5.4 | (0.9) | (0.8) | (35.0) | (15.5) | 25.0 | 9.0 | |
| 20 | Quarterly TP Adjustment | (64.4) | (30.9) | 16.0 | 33.5 | 13.2 | 77.3 | (0.1) | |
| 21 | Interim Adjustments | | | - | - | - | - | - | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (58.9) | (31.8) | 15.2 | (1.5) | (2.3) | 102.3 | 8.8 | |
| 23 | (+) R&D Expense | 13.3 | 10.5 | 10.3 | 6.4 | 4.5 | - | - | |
| 24 | (-) R&D Amortization | 13.1 | 12.7 | 12.0 | 10.9 | 9.3 | - | - | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (58.7) | (34.0) | 13.4 | (6.0) | (7.1) | 102.3 | 8.8 | |
| 26 | Total Routine Returns | 23.4 | 12.9 | 13.6 | 13.1 | 13.8 | 15.1 | 12.4 | |
| 27 | Residual Profit (Line 25 - Line 26) | (82.0) | (46.9) | (0.2) | (19.1) | (20.9) | 87.2 | (3.6) | |
| 28 | Capital Stock | 37.0 | 36.0 | 34.1 | 30.9 | 26.3 | 20.3 | 14.2 | |
| 29 | NN Austrailia Capital Stock % of Total | 0.4% | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.3% | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (25.6) | (11.8) | (5.2) | (5.8) | (3.8) | (1.6) | (0.6) | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (2.2) | 1.1 | 8.4 | 7.4 | 10.1 | 13.5 | 11.8 | |
| 32 | Required Adjustment (Line 31 - Line 25) | 56.5 | 35.1 | (5.0) | 13.4 | 17.1 | (88.8) | 3.0 | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | |
| 36 | Vendor Financing | - | - | - | - | - | - | - | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(2.4)** | **3.3** | **10.1** | **11.8** | **14.9** | **13.5** | **11.8** | |
| 39 | Operating Profit (as reported) | (20.7) | (7.6) | (2.7) | (0.0) | 5.9 | 6.7 | 8.4 | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

**Acquired Companies: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 139.2 | 14.6 | - | - | - | | | |
| 2 | Intercompany Revenues | 59.8 | 70.8 | 15.5 | 0.4 | 0.3 | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 199.0 | 85.4 | 15.5 | 0.4 | 0.3 | | | |
| 4 | Cost of Revenues | 163.5 | 35.0 | (19.6) | 11.1 | (27.8) | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 35.5 | 50.4 | 35.0 | (10.6) | 28.1 | | | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 76.1 | 13.7 | 9.5 | 11.8 | 11.2 | | | |
| 7 | General and Administrative | 27.7 | 5.1 | 0.6 | 0.6 | (0.3) | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 103.8 | 18.8 | 10.1 | 12.4 | 10.9 | | | |
| 9 | Purchased IPR&D | 15.1 | - | - | - | - | | | |
| 10 | Total Goodwill and IPR&D | 12,772.1 | 138.0 | 97.7 | - | - | | | |
| 11 | Deferred Compensation Expense | 273.5 | 110.0 | 15.9 | 0.0 | - | | | |
| 12 | Restructuring Cost | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 13 | Other Operating Expenses | - | - | - | - | - | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 12,651.7 | 739.4 | 125.1 | 12.8 | 11.0 | | | |
| 15 | R&D Performed | (3.4) | (0.4) | (6.2) | (1.4) | (0.0) | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (12,612.8) | (688.5) | (83.8) | (22.1) | 17.2 | | | |
| 17 | Vendor Financing Loss | - | - | - | - | - | | | |
| 18 | Cost Adjustments | 12,535.1 | 697.4 | 95.7 | 16.8 | (21.3) | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (77.8) | 8.9 | 11.9 | (5.3) | (4.1) | | | |
| 20 | Quarterly TP Adjustment | (37.1) | (10.5) | (13.2) | (11.9) | (11.4) | | | |
| 21 | Interim Adjustments | 15.6 | 9.4 | - | - | - | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (99.3) | 7.7 | (1.3) | (17.2) | (15.5) | | | |
| 23 | (+) R&D Expense | - | - | - | - | - | | | |
| 24 | (-) R&D Amortization | 31.4 | 22.0 | 5.9 | 4.2 | 2.9 | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (130.7) | (14.2) | (7.2) | (21.3) | (18.4) | | | |
| 26 | Total Routine Returns | 45.2 | 14.4 | 2.0 | 2.5 | 2.7 | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (175.9) | (28.7) | (9.2) | (23.9) | (21.1) | | | |
| | | | | | | | | | |
| 28 | Capital Stock | 88.9 | 62.2 | 16.8 | 11.8 | 8.2 | | | |
| 29 | Acquired Companies Capital Stock % of Total | 1.1% | 0.8% | 0.2% | 0.2% | 0.1% | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (61.4) | (20.3) | (2.6) | (2.2) | (1.2) | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (16.2) | (5.9) | (0.6) | 0.3 | 1.5 | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 114.5 | 8.3 | 6.6 | 21.7 | 19.9 | | | |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | | | |
| 36 | Vendor Financing | - | - | - | - | - | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **15.2** | **16.1** | **5.3** | **4.5** | **4.4** | | | |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(13.8)** | **10.8** | **2.2** | **0.8** | **1.3** | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

**NN Brazil: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 77.3 | 12.5 | 24.4 | | | | | |
| 2 | Intercompany Revenues | 54.6 | 65.0 | 15.4 | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 131.8 | 77.5 | 39.8 | | | | | |
| 4 | Cost of Revenues | 70.7 | 25.5 | 30.4 | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 61.1 | 52.0 | 9.4 | | | | | |
| 6 | Sales and Marketing | 23.3 | 9.0 | 0.5 | | | | | |
| 7 | General and Administrative | 19.5 | 13.3 | 6.6 | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 42.9 | 22.3 | 7.1 | | | | | |
| 9 | Purchased IPR&D | - | - | - | | | | | |
| 10 | Total Goodwill and IPR&D | - | - | - | | | | | |
| 11 | Deferred Compensation Expense | - | - | - | | | | | |
| 12 | Restructuring Cost | - | - | - | | | | | |
| 13 | Other Operating Expenses | - | - | - | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 42.9 | 22.3 | 7.1 | | | | | |
| 15 | R&D Performed | 4.4 | 2.5 | 6.6 | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | 13.8 | 27.2 | (4.3) | | | | | |
| 17 | Vendor Financing Loss | - | - | - | | | | | |
| 18 | Cost Adjustments | (5.8) | 12.0 | (27.0) | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | 8.0 | 39.2 | (31.3) | | | | | |
| 20 | Quarterly TP Adjustment | - | - | - | | | | | |
| 21 | Interim Adjustments | 4.2 | (34.2) | (8.2) | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | 12.2 | 5.0 | (39.5) | | | | | |
| 23 | (+) R&D Expense | 4.3 | 2.5 | 6.6 | | | | | |
| 24 | (-) R&D Amortization | 10.9 | 8.7 | 7.4 | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | 5.6 | (1.1) | (40.3) | | | | | |
| 26 | Total Routine Returns | 11.3 | 6.1 | 4.5 | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (5.7) | (7.2) | (44.8) | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Brazil Capital Stock % of Total | 0.0% | 0.0% | 0.0% | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | - | - | - | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 11.3 | 6.1 | 4.5 | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 5.7 | 7.2 | 44.8 | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | | | | | |
| 36 | Vendor Financing | - | - | - | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **17.9** | **12.2** | **5.3** | | | | | |
| 39 | **Operating Profit (as reported)** | **11.0** | **11.0** | **10.0** | | | | | |

Notes:
 (1) Values in millions of USD
 (2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
 (3) Headquarters cost from Section II-C of this appendix
 (4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
 (5) Total Routine Returns from Section II-A-4 of this appendix

**NN Japan: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 155.1 | | | | | | | |
| 2 | Intercompany Revenues | - | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 155.1 | | | | | | | |
| 4 | Cost of Revenues | 102.8 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 52.3 | | | | | | | |
| 6 | Sales and Marketing | 27.0 | | | | | | | |
| 7 | General and Administrative | 20.0 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 47.1 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | 31.8 | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 78.9 | | | | | | | |
| 15 | R&D Performed | 25.7 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (52.2) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 40.2 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.1) | | | | | | | |
| 20 | Quarterly TP Adjustment | 4.9 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (7.2) | | | | | | | |
| 23 | (+) R&D Expense | 0.2 | | | | | | | |
| 24 | (-) R&D Amortization | 4.5 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (11.5) | | | | | | | |
| 26 | Total Routine Returns | 4.7 | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (16.2) | | | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | NN Japan Capital Stock % of Total | 0.0% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | - | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 4.7 | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | 16.2 | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **9.0** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **5.9** | | | | | | | |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
(3) Headquarters cost from Section II-C of this appendix
(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
(5) Total Routine Returns from Section II-A-4 of this appendix

**Bay U.S.: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 796.8 | | | | | | | |
| 2 | Intercompany Revenues | 340.9 | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 1,137.6 | | | | | | | |
| 4 | Cost of Revenues | 744.7 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 392.9 | | | | | | | |
| 6 | Sales and Marketing | 117.3 | | | | | | | |
| 7 | General and Administrative | 88.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 205.9 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | 1,527.1 | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,733.0 | | | | | | | |
| 15 | R&D Performed | 169.0 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,509.1) | | | | | | | |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Cost Adjustments | 1,496.6 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (12.5) | | | | | | | |
| 20 | Quarterly TP Adjustment | - | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (12.5) | | | | | | | |
| 23 | (+) R&D Expense | 162.7 | | | | | | | |
| 24 | (-) R&D Amortization | 224.2 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (74.0) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (74.0) | | | | | | | |
| 28 | Capital Stock | 635.2 | | | | | | | |
| 29 | Bay U.S. Capital Stock % of Total | 7.6% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (438.7) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (438.7) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (364.7) | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(377.2)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(359.9)** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

**Bay Ireland: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 214.1 | | | | | | | |
| 2 | Intercompany Revenues | (65.1) | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 149.0 | | | | | | | |
| 4 | Cost of Revenues | 162.0 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | (13.0) | | | | | | | |
| 6 | Sales and Marketing | 0.7 | | | | | | | |
| 7 | General and Administrative | 8.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 9.2 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 9.2 | | | | | | | |
| 15 | R&D Performed | 13.5 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (35.7) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Cost Adjustments | 0.5 | | | | | | | |
| 19 | Accounting Income - Adjusted (Sum of Lines 16 - 18) | (35.2) | | | | | | | |
| 20 | Quarterly TP Adjustment | 12.5 | | | | | | | |
| 21 | Interim Adjustments | - | | | | | | | |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (22.7) | | | | | | | |
| 23 | (+) R&D Expense | 15.7 | | | | | | | |
| 24 | (-) R&D Amortization | 7.7 | | | | | | | |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (14.8) | | | | | | | |
| 26 | Total Routine Returns | - | | | | | | | |
| 27 | Residual Profit (Line 25 - Line 26) | (14.8) | | | | | | | |
| 28 | Capital Stock | 21.9 | | | | | | | |
| 29 | Bay Ireland Capital Stock % of Total | 0.3% | | | | | | | |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | (15.1) | | | | | | | |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | (15.1) | | | | | | | |
| 32 | Required Adjustment (Line 31 - Line 25) | (0.4) | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | | | | | | | |
| 36 | Vendor Financing | - | | | | | | | |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | | | | | | | |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **(23.1)** | | | | | | | |
| 39 | **Operating Profit (as reported)** | **(22.5)** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) Headquarters cost from Section II-C of this appendix

(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(5) Total Routine Returns from Section II-A-4 of this appendix

Nortel Distributors: Dr. Cooper's View of an Arm's Length Allocation of Profits, Corrected, and Made Consistent Across Entities and Across Time

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 2,907.0 | 1,896.2 | 1,522.8 | 1,538.9 | 1,963.7 | 1,936.4 | 1,325.8 | 1,488.8 |
| 2 | Intercompany Revenues | 94.9 | 55.6 | 35.8 | 121.0 | 163.5 | 94.0 | 264.0 | 398.7 |
| 3 | Total Revenues (Line 1 + Line 2) | 3,001.9 | 1,951.8 | 1,558.5 | 1,659.8 | 2,127.2 | 2,030.4 | 1,589.8 | 1,887.5 |
| 4 | Cost of Revenues | 2,343.4 | 1,377.6 | 1,353.9 | 1,363.6 | 1,791.0 | 1,519.1 | 1,222.3 | 1,458.4 |
| 5 | Gross Profit (Line 3 - Line 4) | 658.5 | 574.2 | 204.6 | 296.2 | 336.3 | 511.2 | 367.5 | 429.2 |
| | | | | | | | | | |
| 6 | Sales and Marketing | 442.9 | 288.4 | 123.3 | 161.0 | 152.3 | 146.2 | 144.3 | 642.6 |
| 7 | General and Administrative | 240.5 | 105.2 | 139.9 | 121.6 | 126.0 | 308.9 | 146.9 | 167.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 683.4 | 393.5 | 263.2 | 282.6 | 278.3 | 455.1 | 291.2 | 810.5 |
| 9 | Purchased IP'R&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IP R&D | 9.9 | - | 0.0 | (0.0) | - | 1.1 | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 58.8 | 78.1 | (3.5) | 11.6 | 7.5 | 5.8 | 13.0 | 15.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 25.3 | 7.1 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 752.1 | 471.6 | 259.8 | 294.2 | 285.8 | 461.9 | 329.4 | 832.5 |
| 15 | R&D Performed | (1.0) | (2.4) | (6.4) | 2.1 | 4.3 | 2.9 | 1.3 | 0.7 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (92.6) | 105.0 | (48.7) | (0.1) | 46.2 | 46.4 | 36.8 | (404.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Cost Adjustments | 150.0 | (66.9) | (104.5) | 7.3 | 25.1 | (23.1) | (57.7) | 502.5 |
| 19 | Accounting Income - Adjusted (Line 16 + Line 18) | 57.3 | 38.1 | (153.3) | 7.2 | 71.3 | 23.3 | (21.0) | 98.4 |
| 20 | Quarterly TP Adjustment | (416.7) | (365.8) | 53.0 | 31.6 | 14.6 | 39.9 | 60.0 | - |
| 21 | Interim Adjustments | (29.0) | (22.6) | 33.8 | 27.4 | (33.7) | (62.2) | 7.4 | - |
| 22 | Accounting Income - RPS (Sum of Lines 19 - 21) | (388.4) | (350.3) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 23 | (+) R&D Expense | - | - | - | - | - | - | - | - |
| 24 | (-) R&D Amortization | - | - | - | - | - | - | - | - |
| 25 | Economic Operating Income (Line 22 + Line 23 - Line 24) | (388.4) | (350.3) | (66.5) | 66.2 | 52.2 | 1.0 | 46.4 | 98.4 |
| 26 | Total Routine Returns | 84.3 | 53.7 | 48.4 | 50.5 | 60.1 | 58.8 | 40.7 | 45.3 |
| 27 | Residual Profit (Line 25 - Line 26) | (472.7) | (404.0) | (114.9) | 15.7 | (7.8) | (57.8) | 5.7 | 53.2 |
| | | | | | | | | | |
| 28 | Capital Stock | | | | | | | | |
| 29 | Nortel Distributors Capital Stock % of Total | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 30 | Allocated Residual Economic Profit (Line 29 * Line 1 of Section I-D-2) | - | - | - | - | - | - | - | - |
| 31 | Profit Split Economic Profit (Line 26 + Line 30) | 84.3 | 53.7 | 48.4 | 50.5 | 60.1 | 58.8 | 40.7 | 45.3 |
| 32 | Required Adjustment (Line 31 - Line 25) | 472.7 | 404.0 | 114.9 | (15.7) | 7.8 | 57.8 | (5.7) | (53.2) |
| | | | | | | | | | |
| 33 | Headquarters Costs | | | | | | | | |
| 34 | Stewardship Costs | | | | | | | | |
| 35 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 36 | Vendor Financing | - | - | - | - | - | - | - | - |
| 37 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 33 - 36) | - | - | - | - | - | - | - | - |
| 38 | **Operating Profit (Line 22 + Line 32 - Line 37)** | **84.3** | **53.7** | **48.4** | **50.5** | **60.1** | **58.8** | **40.7** | **45.3** |
| | | | | | | | | | |
| 39 | **Operating Profit (as reported)** | **51.6** | **0.3** | **16.3** | **16.9** | **20.3** | **19.8** | **13.9** | **18.0** |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files
(3) Headquarters cost from Section II-C of this appendix
(4) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
(5) Total Routine Returns from Section II-A-4 of this appendix

## 2.    System Residual Profit by Year

### System Residual Profit under Dr. Cooper's View, Corrected, and Made Consistent Across Entities and Time

| Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| System Residual Profit | (5,790.9) | (2,698.6) | (1,162.5) | (1,300.6) | (941.9) | (437.6) | (179.0) | (226.3) |

Notes:
(1) Values in millions of USD

# E.    Dr. Felgran's Unfiltered View

## 1.    By Entity and Year

NNL: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 2 | Intercompany Revenues | 4,037.3 | 2,138.0 | 2,556.3 | 2,657.7 | 2,889.0 | 2,237.5 | 2,147.3 | 1,827.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 5,789.7 | 3,086.3 | 3,324.1 | 3,438.1 | 3,724.3 | 3,129.4 | 3,162.6 | 2,617.7 |
| 4 | Cost of Revenues | 5,385.5 | 2,750.1 | 2,140.0 | 2,370.7 | 2,002.4 | 2,069.0 | 1,943.8 | 1,383.5 |
| 5 | Gross Profit (Line 3 - Line 4) | 404.3 | 336.2 | 1,184.1 | 1,067.4 | 1,722.0 | 1,060.4 | 1,218.8 | 1,234.1 |
| 6 | Sales and Marketing | 342.5 | 254.7 | 230.5 | 68.0 | 135.1 | 142.0 | 152.8 | 390.5 |
| 7 | General and Administrative | 358.8 | 128.8 | 287.8 | 360.3 | 526.9 | 276.1 | 372.3 | 197.3 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 701.3 | 383.5 | 518.3 | 428.3 | 662.0 | 418.1 | 525.1 | 587.8 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 24.8 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | (18.0) | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 792.9 | 344.4 | 70.7 | 17.1 | 28.2 | 24.1 | 22.0 | 58.5 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.8) | (18.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,501.0 | 727.9 | 588.9 | 445.4 | 690.2 | 442.2 | 530.3 | 627.8 |
| 15 | R&D Performed | 1,107.0 | 849.3 | 823.1 | 839.6 | 811.3 | 896.5 | 841.9 | 817.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (2,203.7) | (1,241.0) | (228.0) | (217.6) | 220.4 | (278.2) | (153.4) | (211.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (792.9) | (344.4) | (70.7) | (17.1) | (28.2) | (24.1) | (22.0) | (58.5) |
| 19 | Cost Adjustments | 323.3 | 459.4 | 182.5 | (43.8) | (469.0) | (171.4) | (158.6) | (53.4) |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (2,673.3) | (1,125.9) | (116.1) | (278.4) | (276.9) | (473.8) | (334.0) | (323.0) |
| 21 | Quarterly TP Adjustment | (456.7) | (42.9) | (251.3) | (527.4) | (323.7) | (276.4) | (387.2) | |
| 22 | Interim Adjustments | 14.1 | 47.4 | (25.6) | (27.4) | 33.7 | 62.2 | (7.4) | - |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (3,115.9) | (1,121.4) | (393.0) | (833.2) | (566.9) | (688.0) | (728.6) | (323.0) |
| 24 | (+) R&D Expense | 1,463.0 | 879.6 | 821.5 | 841.7 | 804.0 | - | - | - |
| 25 | (-) R&D Amortization | 888.1 | 976.3 | 938.5 | 906.5 | 881.4 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (2,541.0) | (1,218.1) | (510.1) | (898.0) | (644.3) | (688.0) | (728.6) | (323.0) |
| 27 | Total Routine Returns | 539.3 | 427.4 | 311.3 | 224.9 | 186.0 | 65.9 | 82.7 | 60.2 |
| 28 | Residual Profit (Line 26 - Line 27) | (3,080.3) | (1,645.5) | (821.4) | (1,122.9) | (830.2) | (753.8) | (811.3) | (383.2) |
| 29 | Capital Stock | 2,560.1 | 2,790.7 | 2,680.3 | 2,589.5 | 2,519.3 | 2,493.2 | 2,487.4 | 2,446.4 |
| 30 | NNL Capital Stock % of Total | 30.5% | 33.8% | 35.5% | 37.0% | 38.5% | 38.8% | 41.0% | 45.1% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (2,445.9) | (1,475.6) | (447.4) | (482.9) | (323.6) | (272.6) | (192.6) | (311.0) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (1,906.6) | (1,048.2) | (136.0) | (258.0) | (137.6) | (206.7) | (109.9) | (250.8) |
| 33 | Required Adjustment (Line 32 - Line 26) | 634.4 | 169.9 | 374.1 | 640.0 | 506.7 | 481.2 | 618.7 | 72.2 |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | Operating Profit (Line 23 + Line 33 - Line 38) | (2,481.5) | (951.5) | (19.0) | (193.2) | (60.2) | (206.7) | (109.9) | (250.8) |
| 40 | Operating Profit (as reported) | (1,734.0) | (294.7) | 110.6 | (101.5) | 22.1 | (87.4) | 27.0 | (26.0) |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files
(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**NNUK: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 2 | Intercompany Revenues | 1,148.1 | 536.2 | 396.5 | 435.5 | 404.8 | 645.7 | 701.2 | 631.0 |
| 3 | Total Revenues (Line 1 + Line 2) | 2,378.0 | 1,214.5 | 879.0 | 885.2 | 936.4 | 1,330.3 | 1,385.7 | 1,261.9 |
| 4 | Cost of Revenues | 2,275.2 | 380.6 | 529.6 | 476.2 | 500.4 | 886.8 | 1,022.4 | 1,031.7 |
| 5 | Gross Profit (Line 3 - Line 4) | 102.8 | 833.9 | 349.3 | 409.0 | 435.9 | 443.4 | 363.3 | 230.2 |
| 6 | Sales and Marketing | 352.7 | 114.5 | 238.5 | 120.2 | 118.4 | 114.8 | 144.0 | 243.0 |
| 7 | General and Administrative | 176.5 | 96.4 | 125.3 | 133.2 | 105.8 | 114.7 | 134.9 | 111.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 529.1 | 211.0 | 363.8 | 253.3 | 224.2 | 229.5 | 279.0 | 354.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 39.5 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 464.5 | 404.1 | 17.6 | 44.4 | 53.5 | 8.8 | 33.6 | 37.2 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 5.2 | 12.7 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,033.2 | 615.0 | 381.4 | 297.7 | 277.8 | 238.3 | 317.8 | 404.4 |
| 15 | R&D Performed | 345.1 | 183.8 | 95.5 | 95.6 | 66.4 | 43.6 | 39.0 | 36.5 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,275.5) | 35.0 | (127.6) | 15.7 | 91.8 | 161.6 | 6.5 | (210.7) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (464.5) | (404.1) | (17.6) | (44.4) | (53.5) | (8.8) | (33.6) | (37.2) |
| 19 | Cost Adjustments | 557.9 | 52.9 | 95.5 | (77.2) | (43.5) | (277.8) | (121.9) | 23.3 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (1,182.1) | (316.1) | (49.7) | (105.9) | (5.3) | (125.1) | (149.0) | (224.7) |
| 21 | Quarterly TP Adjustment | (438.8) | (305.8) | (346.1) | (231.7) | (191.0) | (78.6) | (51.1) | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | - |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (1,621.0) | (621.9) | (395.8) | (337.6) | (196.3) | (203.7) | (200.0) | (224.7) |
| 24 | (+) R&D Expense | 352.3 | 183.8 | 95.3 | 95.6 | 66.4 | | | |
| 25 | (-) R&D Amortization | 218.8 | 233.6 | 205.4 | 172.4 | 145.0 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (1,487.5) | (671.7) | (505.9) | (414.4) | (274.9) | (203.7) | (200.0) | (224.7) |
| 27 | Total Routine Returns | 291.1 | 124.6 | 59.7 | 41.9 | 28.2 | 40.4 | 47.8 | 38.7 |
| 28 | Residual Profit (Line 26 - Line 27) | (1,778.6) | (796.3) | (565.6) | (456.3) | (303.1) | (244.0) | (247.8) | (263.4) |
| 29 | Capital Stock | 620.1 | 661.9 | 581.9 | 488.5 | 410.8 | 334.3 | 269.1 | 220.4 |
| 30 | NNUK Capital Stock % of Total | 7.39% | 8.01% | 7.71% | 6.98% | 6.28% | 6.12% | 4.99% | 3.59% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (592.4) | (350.0) | (97.1) | (91.1) | (52.8) | (42.9) | (23.4) | (24.7) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (301.3) | (225.4) | (37.4) | (49.2) | (24.6) | (2.5) | 24.4 | 14.0 |
| 33 | Required Adjustment (Line 32 - Line 26) | 1,186.2 | 446.3 | 468.5 | 365.2 | 250.3 | 201.1 | 224.4 | 238.7 |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(434.8)** | **(175.6)** | **72.7** | **27.6** | **54.0** | **(2.5)** | **24.4** | **14.0** |
| 40 | **Operating Profit (as reported)** | **(253.7)** | **(19.8)** | **100.8** | **44.9** | **67.4** | **16.2** | **41.0** | **31.9** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**NNI: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 2 | Intercompany Revenues | 755.8 | 373.9 | 319.5 | 436.1 | 459.8 | 379.1 | 629.4 | 625.9 |
| 3 | Total Revenues (Line 1 + Line 2) | 10,861.2 | 6,403.2 | 5,719.5 | 5,142.6 | 5,480.3 | 5,073.7 | 5,265.1 | 4,779.9 |
| 4 | Cost of Revenues | 8,807.5 | 4,604.3 | 3,784.5 | 3,685.8 | 4,143.8 | 3,502.0 | 3,485.6 | 3,313.0 |
| 5 | Gross Profit (Line 3 - Line 4) | 2,053.7 | 1,798.9 | 1,935.1 | 1,456.8 | 1,336.4 | 1,571.8 | 1,779.5 | 1,466.9 |
| 6 | Sales and Marketing | 1,834.6 | 923.8 | 475.8 | 529.5 | 581.0 | 627.0 | 668.3 | 1,131.2 |
| 7 | General and Administrative | 411.2 | 472.7 | 398.6 | 347.1 | 333.1 | 372.4 | 260.1 | 270.5 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 2,245.7 | 1,396.4 | 874.4 | 876.7 | 914.1 | 999.3 | 928.3 | 1,401.7 |
| 9 | Purchased IPR&D | - | 0.0 | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 3,726.1 | 19.3 | - | - | - | 18.8 | - | - |
| 11 | Deferred Compensation Expense | 2.1 | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 13.7 | 1,878.2 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 7,455.9 | 2,076.9 | 1,050.8 | 930.6 | 967.7 | 1,065.9 | 1,013.4 | 3,413.6 |
| 15 | R&D Performed | 1,504.2 | 868.8 | 793.5 | 768.3 | 719.6 | 679.2 | 677.7 | 615.0 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (6,906.4) | (1,146.9) | 90.8 | (242.1) | (350.9) | (173.3) | 88.5 | (2,561.8) |
| 17 | Vendor Financing Loss | | | | | | | | |
| 18 | Restructing Addback | (1,481.9) | (661.2) | (176.4) | (53.9) | (53.5) | (47.8) | (71.3) | (133.6) |
| 19 | Cost Adjustments | 5,353.9 | 1,104.5 | 396.8 | 274.9 | 634.4 | 330.9 | 275.2 | 2,763.3 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (3,034.4) | (703.5) | 311.1 | (21.2) | 229.9 | 109.8 | 292.3 | 67.9 |
| 21 | Quarterly TP Adjustment | 1,246.7 | 660.8 | 471.8 | 645.2 | 445.7 | 209.2 | 256.4 | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (1,787.7) | (42.7) | 782.9 | 624.0 | 675.6 | 319.0 | 548.7 | 67.9 |
| 24 | (+) R&D Expense | 1,181.2 | 869.9 | 793.5 | 768.3 | 719.6 | - | - | - |
| 25 | (-) R&D Amortization | 1,378.7 | 1,461.9 | 1,272.8 | 1,125.3 | 1,010.9 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (1,985.2) | (634.7) | 303.6 | 267.1 | 384.4 | 319.0 | 548.7 | 67.9 |
| 27 | Total Routine Returns | 504.5 | 101.6 | 57.3 | 97.6 | 73.1 | 139.2 | 128.7 | 131.3 |
| 28 | Residual Profit (Line 26 - Line 27) | (2,489.8) | (736.3) | 246.3 | 169.4 | 311.3 | 179.8 | 420.0 | (63.4) |
| 29 | Capital Stock | 3,906.3 | 4,142.0 | 3,606.3 | 3,188.2 | 2,864.1 | 2,599.4 | 2,396.3 | 2,226.8 |
| 30 | NNI Capital Stock % of Total | 46.6% | 50.1% | 47.8% | 45.6% | 43.8% | 43.1% | 40.6% | 38.9% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (3,732.1) | (2,190.1) | (601.9) | (594.6) | (367.9) | (302.3) | (190.9) | (268.0) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (3,227.5) | (2,088.5) | (544.6) | (497.0) | (294.8) | (163.0) | (62.2) | (136.7) |
| 33 | Required Adjustment (Line 32 - Line 26) | (1,242.3) | (1,453.8) | (848.2) | (764.0) | (679.1) | (482.0) | (610.9) | (204.5) |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | | | | | | | | |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(3,030.0)** | **(1,496.5)** | **(65.3)** | **(140.0)** | **(3.5)** | **(163.0)** | **(62.2)** | **(136.7)** |
| 40 | **Operating Profit (as reported)** | **(1,889.5)** | **(521.7)** | **109.1** | **(27.1)** | **90.0** | **(30.8)** | **73.5** | **57.0** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**NN Ireland: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 2 | Intercompany Revenues | 293.8 | 182.3 | 82.1 | 76.5 | 79.0 | 84.1 | 7.6 | 1.2 |
| 3 | Total Revenues (Line 1 + Line 2) | 540.8 | 381.1 | 360.4 | 403.7 | 444.6 | 569.8 | 596.3 | 592.1 |
| 4 | Cost of Revenues | 481.6 | 355.9 | 315.0 | 332.8 | 346.3 | 443.7 | 491.1 | 537.8 |
| 5 | Gross Profit (Line 3 - Line 4) | 59.2 | 25.3 | 45.4 | 70.9 | 98.3 | 126.1 | 105.3 | 54.2 |
| 6 | Sales and Marketing | 11.3 | 8.4 | 6.1 | 8.2 | 7.9 | 8.3 | 11.1 | 16.7 |
| 7 | General and Administrative | 48.1 | 8.2 | 33.9 | 49.4 | 42.8 | 42.5 | 50.5 | 58.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 59.3 | 16.6 | 40.0 | 57.6 | 50.6 | 50.8 | 61.5 | 75.7 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | - | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 23.6 | 1.4 | 0.7 | (0.9) | 0.7 | 1.0 | 1.0 | 0.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 2.3 | (0.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 83.0 | 18.0 | 40.7 | 56.7 | 51.4 | 51.8 | 64.8 | 75.7 |
| 15 | R&D Performed | 16.7 | 14.8 | 18.1 | 17.8 | 17.9 | 19.7 | 25.0 | 24.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (40.4) | (7.5) | (13.4) | (3.5) | 29.1 | 54.6 | 15.4 | (45.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (23.6) | (1.4) | (0.7) | 0.9 | (0.7) | (1.0) | (1.0) | (0.6) |
| 19 | Cost Adjustments | 19.9 | 14.8 | 12.2 | (3.4) | (25.4) | (3.1) | 35.2 | 60.3 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (44.2) | 5.9 | (1.8) | (6.1) | 3.0 | 50.5 | 49.6 | 13.8 |
| 21 | Quarterly TP Adjustment | 40.0 | 58.1 | 68.8 | 73.2 | 52.8 | 56.5 | 77.9 | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (4.1) | 63.9 | 66.9 | 67.1 | 55.8 | 107.0 | 127.6 | 13.8 |
| 24 | (+) R&D Expense | 11.7 | 14.8 | 18.1 | 17.8 | 17.9 | - | - | - |
| 25 | (-) R&D Amortization | 24.6 | 21.2 | 19.7 | 19.2 | 18.8 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (17.0) | 57.5 | 65.3 | 65.7 | 54.9 | 107.0 | 127.6 | 13.8 |
| 27 | Total Routine Returns | 8.6 | 6.0 | 5.1 | 8.0 | 10.7 | 8.6 | 10.3 | 11.6 |
| 28 | Residual Profit (Line 26 - Line 27) | (25.6) | 51.5 | 60.1 | 57.7 | 44.2 | 98.4 | 117.3 | 2.3 |
| 29 | Capital Stock | 69.6 | 59.9 | 55.9 | 54.4 | 53.2 | 53.2 | 56.3 | 60.4 |
| 30 | NN Ireland Capital Stock % of Total | 0.8% | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 0.9% | 1.1% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (66.5) | (31.7) | (9.3) | (10.1) | (4.8) | (5.6) | (4.2) | (7.3) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (57.9) | (25.7) | (4.2) | (2.1) | 3.9 | 3.0 | 6.1 | 4.2 |
| 33 | Required Adjustment (Line 32 - Line 26) | (40.9) | (83.2) | (69.5) | (67.8) | (51.0) | (104.0) | (121.5) | (9.6) |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(45.0)** | **(19.3)** | **(2.6)** | **(0.7)** | **4.8** | **3.0** | **6.1** | **4.2** |
| 40 | Operating Profit (as reported) | (24.7) | (5.2) | 0.2 | 1.2 | 6.5 | 5.5 | 9.1 | 9.5 |

**Notes:**
  (1) Values in millions of USD
  (2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files
  (3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**NNSA: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 2 | Intercompany Revenues | 469.7 | 445.6 | 560.6 | 703.9 | 589.9 | 425.4 | 206.7 | 146.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 739.6 | 629.0 | 830.3 | 1,102.8 | 1,045.5 | 796.8 | 564.0 | 381.4 |
| 4 | Cost of Revenues | 779.5 | 663.2 | 529.2 | 657.3 | 883.1 | 555.4 | 464.7 | 369.8 |
| 5 | Gross Profit (Line 3 - Line 4) | (39.9) | (34.2) | 301.1 | 445.5 | 162.5 | 241.4 | 99.3 | 11.6 |
| 6 | Sales and Marketing | 79.6 | 48.5 | 51.6 | 54.5 | 44.5 | 42.1 | 28.5 | 42.0 |
| 7 | General and Administrative | (4.8) | (12.5) | 1.4 | 14.4 | 6.1 | 3.8 | 10.6 | 10.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 74.7 | 36.0 | 53.0 | 68.9 | 50.6 | 45.9 | 39.1 | 52.4 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 0.4 | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 65.1 | 46.9 | 18.8 | 7.1 | 4.2 | 3.3 | 39.1 | 4.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.3) | (1.3) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 140.3 | 83.0 | 71.7 | 76.0 | 54.7 | 49.2 | 61.9 | 55.1 |
| 15 | R&D Performed | 226.0 | 245.6 | 266.9 | 267.3 | 256.8 | 223.2 | 67.1 | 55.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (406.2) | (362.8) | (37.5) | 102.2 | (149.0) | (30.9) | (29.7) | (98.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (65.1) | (46.9) | (18.8) | (7.1) | (4.2) | (3.3) | (39.1) | (4.0) |
| 19 | Cost Adjustments | 79.4 | 71.9 | (22.9) | (41.7) | 117.3 | 19.8 | 67.0 | 60.8 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (391.9) | (337.8) | (79.1) | 53.4 | (35.9) | (14.4) | (1.8) | (42.2) |
| 21 | Quarterly TP Adjustment | 109.5 | 37.1 | 1.1 | (12.4) | (0.2) | (27.9) | 46.8 | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (282.4) | (300.8) | (78.1) | 41.0 | (36.1) | (42.3) | 45.0 | (42.2) |
| 24 | (+) R&D Expense | 223.1 | 245.6 | 266.9 | 267.3 | 256.8 | - | - | - |
| 25 | (-) R&D Amortization | 157.7 | 180.7 | 203.4 | 222.5 | 234.4 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (217.0) | (235.9) | (14.6) | 85.8 | (13.7) | (42.3) | 45.0 | (42.2) |
| 27 | Total Routine Returns | 52.5 | 42.4 | 45.1 | 42.4 | 41.3 | 7.4 | 5.3 | 4.6 |
| 28 | Residual Profit (Line 26 - Line 27) | (269.5) | (278.3) | (59.6) | 43.4 | (55.0) | (49.7) | 39.8 | (46.8) |
| 29 | Capital Stock | 446.9 | 512.0 | 576.2 | 630.4 | 664.0 | 668.8 | 591.5 | 466.1 |
| 30 | NNSA Capital Stock % of Total | 5.3% | 6.2% | 7.6% | 9.0% | 10.1% | 10.8% | 12.2% | 11.3% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (427.0) | (270.8) | (96.2) | (117.6) | (85.3) | (75.8) | (57.1) | (78.0) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (374.4) | (228.3) | (51.1) | (75.2) | (44.0) | (68.5) | (51.8) | (73.4) |
| 33 | Required Adjustment (Line 32 - Line 26) | (157.5) | 7.6 | (36.6) | (161.0) | (30.3) | (26.1) | (96.9) | (31.3) |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(439.8)** | **(293.2)** | **(114.6)** | **(120.0)** | **(66.4)** | **(68.5)** | **(51.8)** | **(73.4)** |
| 40 | **Operating Profit (as reported)** | **(309.3)** | **(172.7)** | **(86.7)** | **(97.6)** | **(44.7)** | **(35.3)** | **(11.2)** | **(17.0)** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**NN Australia: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | |
| 2 | Intercompany Revenues | 60.6 | (8.8) | 3.0 | 4.8 | 3.3 | 1.5 | 1.7 | |
| 3 | Total Revenues (Line 1 + Line 2) | 233.4 | 89.4 | 179.6 | 157.0 | 152.7 | 350.7 | 179.3 | |
| 4 | Cost of Revenues | 128.4 | 37.6 | 152.3 | 166.6 | 97.9 | 232.5 | 132.8 | |
| 5 | Gross Profit (Line 3 - Line 4) | 105.1 | 51.8 | 27.3 | (9.6) | 54.9 | 118.2 | 46.5 | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 47.0 | 32.2 | 25.9 | 35.5 | 32.8 | 36.1 | 39.6 | |
| 7 | General and Administrative | 28.4 | 12.4 | 12.2 | 9.8 | 11.7 | 11.7 | 16.5 | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 75.4 | 44.7 | 38.1 | 45.3 | 44.5 | 47.8 | 56.1 | |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | |
| 10 | Total Goodwill and IPR&D | 2.8 | - | - | - | - | - | - | |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | |
| 12 | Restructuring Cost | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 0.2 | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 120.7 | 46.7 | 36.5 | 48.7 | 48.4 | 49.8 | 60.8 | |
| 15 | R&D Performed | 12.5 | 10.5 | 10.3 | 6.4 | 4.5 | 0.0 | 0.0 | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (28.1) | (5.4) | (19.5) | (64.7) | 2.0 | 68.4 | (14.3) | |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | |
| 18 | Restructing Addback | (42.5) | (2.0) | 1.6 | (3.4) | (4.0) | (2.1) | (4.4) | |
| 19 | Cost Adjustments | 33.6 | 4.5 | 18.7 | 29.7 | (17.5) | (43.4) | 23.3 | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (37.1) | (2.9) | 0.8 | (38.4) | (19.5) | 23.0 | 4.5 | |
| 21 | Quarterly TP Adjustment | (64.4) | (30.9) | 16.0 | 33.5 | 13.2 | 77.3 | (0.1) | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (101.5) | (33.8) | 16.8 | (4.9) | (6.2) | 100.3 | 4.4 | |
| 24 | (+) R&D Expense | 13.3 | 10.5 | 10.3 | 6.4 | 4.5 | - | - | |
| 25 | (-) R&D Amortization | 13.1 | 12.7 | 12.0 | 10.9 | 9.3 | - | - | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (101.2) | (36.0) | 15.0 | (9.4) | (11.1) | 100.3 | 4.4 | |
| 27 | Total Routine Returns | 4.1 | 0.8 | (0.4) | 0.1 | 3.6 | 8.2 | 8.9 | |
| 28 | Residual Profit (Line 26 - Line 27) | (105.3) | (36.8) | 15.4 | (9.5) | (14.7) | 92.1 | (4.5) | |
| | | | | | | | | | |
| 29 | Capital Stock | 37.0 | 36.0 | 34.1 | 30.9 | 26.3 | 20.3 | 14.2 | |
| 30 | NN Australia Capital Stock % of Total | 0.4% | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.3% | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (35.4) | (19.1) | (5.7) | (5.8) | (3.4) | (2.6) | (1.5) | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (31.3) | (18.2) | (6.1) | (5.6) | 0.2 | 5.5 | 7.3 | |
| 33 | Required Adjustment (Line 32 - Line 26) | 70.0 | 17.7 | (21.1) | 3.8 | 11.3 | (94.7) | 2.9 | |
| | | | | | | | | | |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | |
| 37 | Vendor Financing | - | - | - | - | - | - | - | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(31.5)** | **(16.1)** | **(4.3)** | **(1.1)** | **5.0** | **5.5** | **7.3** | |
| | | | | | | | | | |
| 40 | **Operating Profit (as reported)** | **(20.7)** | **(7.6)** | **(2.7)** | **(0.0)** | **5.9** | **6.7** | **8.4** | |

Notes:
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files
(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**Acquired Companies: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 139.2 | 14.6 | - | - | - | | | |
| 2 | Intercompany Revenues | 59.8 | 70.8 | 15.5 | 0.4 | 0.3 | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 199.0 | 85.4 | 15.5 | 0.4 | 0.3 | | | |
| 4 | Cost of Revenues | 163.5 | 35.0 | (19.6) | 11.1 | (27.8) | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 35.5 | 50.4 | 35.0 | (10.6) | 28.1 | | | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 76.1 | 13.7 | 9.5 | 11.8 | 11.2 | | | |
| 7 | General and Administrative | 27.7 | 5.1 | 0.6 | 0.6 | (0.3) | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 103.8 | 18.8 | 10.1 | 12.4 | 10.9 | | | |
| 9 | Purchased IPR&D | 15.1 | - | - | - | - | | | |
| 10 | Total Goodwill and IPR&D | 12,772.1 | 138.0 | 97.7 | - | - | | | |
| 11 | Deferred Compensation Expense | 273.5 | 110.0 | 15.9 | 0.0 | - | | | |
| 12 | Restructuring Cost | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 13 | Other Operating Expenses | - | - | - | - | - | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 12,651.7 | 739.4 | 125.1 | 12.8 | 11.0 | | | |
| 15 | R&D Performed | (3.4) | (0.4) | (6.2) | (1.4) | (0.0) | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (12,612.8) | (688.5) | (83.8) | (22.1) | 17.2 | | | |
| 17 | Vendor Financing Loss | - | - | - | - | - | | | |
| 18 | Restructing Addback | 512.8 | (472.5) | (1.4) | (0.5) | (0.1) | | | |
| 19 | Cost Adjustments | 12,535.1 | 697.4 | 95.7 | 16.8 | (21.3) | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | 435.0 | (463.7) | 10.5 | (5.7) | (4.2) | | | |
| 21 | Quarterly TP Adjustment | (37.1) | (10.5) | (13.2) | (11.9) | (11.4) | | | |
| 22 | Interim Adjustments | 15.6 | 9.4 | - | - | - | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | 413.5 | (464.8) | (2.7) | (17.6) | (15.6) | | | |
| 24 | (+) R&D Expense | - | - | - | - | - | | | |
| 25 | (-) R&D Amortization | 31.4 | 22.0 | 5.9 | 4.2 | 2.9 | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | 382.1 | (486.8) | (8.6) | (21.8) | (18.6) | | | |
| 27 | Total Routine Returns | 13.8 | 7.1 | (1.8) | (1.6) | (0.9) | | | |
| 28 | Residual Profit (Line 26 - Line 27) | 368.3 | (493.8) | (6.9) | (20.2) | (17.7) | | | |
| | | | | | | | | | |
| 29 | Capital Stock | 88.9 | 62.2 | 16.8 | 11.8 | 8.2 | | | |
| 30 | Acquired Companies Capital Stock % of Total | 1.1% | 0.8% | 0.2% | 0.2% | 0.1% | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (85.0) | (32.9) | (2.8) | (2.2) | (1.1) | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (71.1) | (25.8) | (4.6) | (3.8) | (1.9) | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (453.3) | 460.9 | 4.1 | 18.0 | 16.7 | | | |
| | | | | | | | | | |
| 34 | Headquarters Costs | - | - | - | - | - | | | |
| 35 | Stewardship Costs | - | - | - | - | - | | | |
| 36 | Restructuring Costs | - | - | - | - | - | | | |
| 37 | Vendor Financing | - | - | - | - | - | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(39.7)** | **(3.9)** | **1.4** | **0.4** | **1.0** | | | |
| | | | | | | | | | |
| 40 | **Operating Profit (as reported)** | **(13.8)** | **10.8** | **2.2** | **0.8** | **1.3** | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**NN Brazil: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 77.3 | 12.5 | 24.4 | | | | | |
| 2 | Intercompany Revenues | 54.6 | 65.0 | 15.4 | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 131.8 | 77.5 | 39.8 | | | | | |
| 4 | Cost of Revenues | 70.7 | 25.5 | 30.4 | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 61.1 | 52.0 | 9.4 | | | | | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 23.3 | 9.0 | 0.5 | | | | | |
| 7 | General and Administrative | 19.5 | 13.3 | 6.6 | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 42.9 | 22.3 | 7.1 | | | | | |
| 9 | Purchased IPR&D | - | - | - | | | | | |
| 10 | Total Goodwill and IPR&D | - | - | - | | | | | |
| 11 | Deferred Compensation Expense | - | - | - | | | | | |
| 12 | Restructuring Cost | - | - | - | | | | | |
| 13 | Other Operating Expenses | - | - | - | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 42.9 | 22.3 | 7.1 | | | | | |
| 15 | R&D Performed | 4.4 | 2.5 | 6.6 | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | 13.8 | 27.2 | (4.3) | | | | | |
| 17 | Vendor Financing Loss | - | - | - | | | | | |
| 18 | Restructing Addback | - | - | - | | | | | |
| 19 | Cost Adjustments | (5.8) | 12.0 | (27.0) | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | 8.0 | 39.2 | (31.3) | | | | | |
| 21 | Quarterly TP Adjustment | - | - | - | | | | | |
| 22 | Interim Adjustments | 4.2 | (34.2) | (8.2) | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | 12.2 | 5.0 | (39.5) | | | | | |
| 24 | (+) R&D Expense | 4.3 | 2.5 | 6.6 | | | | | |
| 25 | (-) R&D Amortization | 10.9 | 8.7 | 7.4 | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | 5.6 | (1.1) | (40.3) | | | | | |
| 27 | Total Routine Returns | 4.4 | 4.8 | 9.2 | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | 1.2 | (6.0) | (49.5) | | | | | |
| | | | | | | | | | |
| 29 | Capital Stock | | | | | | | | |
| 30 | NN Brazil Capital Stock % of Total | 0.0% | 0.0% | 0.0% | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | - | - | - | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | 4.4 | 4.8 | 9.2 | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (1.2) | 6.0 | 49.5 | | | | | |
| | | | | | | | | | |
| 34 | Headquarters Costs | | - | - | - | | | | |
| 35 | Stewardship Costs | | - | - | - | | | | |
| 36 | Restructuring Costs | | - | - | - | | | | |
| 37 | Vendor Financing | | - | - | - | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | | | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **11.0** | **11.0** | **10.0** | | | | | |
| | | | | | | | | | |
| 40 | **Operating Profit (as reported)** | **11.0** | **11.0** | **10.0** | | | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**NN Japan: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 155.1 | | | | | | | |
| 2 | Intercompany Revenues | - | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 155.1 | | | | | | | |
| 4 | Cost of Revenues | 102.8 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 52.3 | | | | | | | |
| 6 | Sales and Marketing | 27.0 | | | | | | | |
| 7 | General and Administrative | 20.0 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 47.1 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | 31.8 | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 78.9 | | | | | | | |
| 15 | R&D Performed | 25.7 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (52.2) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Restructing Addback | (31.8) | | | | | | | |
| 19 | Cost Adjustments | 40.2 | | | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (43.9) | | | | | | | |
| 21 | Quarterly TP Adjustment | 4.9 | | | | | | | |
| 22 | Interim Adjustments | - | | | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (39.0) | | | | | | | |
| 24 | (+) R&D Expense | 0.2 | | | | | | | |
| 25 | (-) R&D Amortization | 4.5 | | | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (43.3) | | | | | | | |
| 27 | Total Routine Returns | 1.6 | | | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | (44.9) | | | | | | | |
| 29 | Capital Stock | | | | | | | | |
| 30 | NN Japan Capital Stock % of Total | 0.0% | | | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | - | | | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | 1.6 | | | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | 44.9 | | | | | | | |
| 34 | Headquarters Costs | - | | | | | | | |
| 35 | Stewardship Costs | - | | | | | | | |
| 36 | Restructuring Costs | - | | | | | | | |
| 37 | Vendor Financing | - | | | | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | | | | | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **5.9** | | | | | | | |
| 40 | **Operating Profit (as reported)** | **5.9** | | | | | | | |

**Notes:**
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files
(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**Bay U.S.: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 796.8 | | | | | | | |
| 2 | Intercompany Revenues | 340.9 | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 1,137.6 | | | | | | | |
| 4 | Cost of Revenues | 744.7 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 392.9 | | | | | | | |
| 6 | Sales and Marketing | 117.3 | | | | | | | |
| 7 | General and Administrative | 88.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 205.9 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | 1,527.1 | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,733.0 | | | | | | | |
| 15 | R&D Performed | 169.0 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,509.1) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Restructing Addback | - | | | | | | | |
| 19 | Cost Adjustments | 1,496.6 | | | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (12.5) | | | | | | | |
| 21 | Quarterly TP Adjustment | - | | | | | | | |
| 22 | Interim Adjustments | - | | | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (12.5) | | | | | | | |
| 24 | (+) R&D Expense | 162.7 | | | | | | | |
| 25 | (-) R&D Amortization | 224.2 | | | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (74.0) | | | | | | | |
| 27 | Total Routine Returns | - | | | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | (74.0) | | | | | | | |
| 29 | Capital Stock | 635.2 | | | | | | | |
| 30 | Bay U.S. Capital Stock % of Total | 7.6% | | | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (606.9) | | | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (606.9) | | | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (532.9) | | | | | | | |
| 34 | Headquarters Costs | - | | | | | | | |
| 35 | Stewardship Costs | - | | | | | | | |
| 36 | Restructuring Costs | - | | | | | | | |
| 37 | Vendor Financing | - | | | | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | | | | | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(545.4)** | | | | | | | |
| 40 | **Operating Profit (as reported)** | **(359.9)** | | | | | | | |

**Notes:**
  (1) Values in millions of USD
  (2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files
  (3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**Bay Ireland: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 214.1 | | | | | | | |
| 2 | Intercompany Revenues | (65.1) | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 149.0 | | | | | | | |
| 4 | Cost of Revenues | 162.0 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | (13.0) | | | | | | | |
| 6 | Sales and Marketing | 0.7 | | | | | | | |
| 7 | General and Administrative | 8.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 9.2 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 9.2 | | | | | | | |
| 15 | R&D Performed | 13.5 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (35.7) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Restructing Addback | - | | | | | | | |
| 19 | Cost Adjustments | 0.5 | | | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (35.2) | | | | | | | |
| 21 | Quarterly TP Adjustment | 12.5 | | | | | | | |
| 22 | Interim Adjustments | - | | | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (22.7) | | | | | | | |
| 24 | (+) R&D Expense | 15.7 | | | | | | | |
| 25 | (-) R&D Amortization | 7.7 | | | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (14.8) | | | | | | | |
| 27 | Total Routine Returns | - | | | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | (14.8) | | | | | | | |
| 29 | Capital Stock | 21.9 | | | | | | | |
| 30 | Bay Ireland Capital Stock % of Total | 0.3% | | | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | (21.0) | | | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (21.0) | | | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (6.2) | | | | | | | |
| 34 | Headquarters Costs | - | | | | | | | |
| 35 | Stewardship Costs | - | | | | | | | |
| 36 | Restructuring Costs | - | | | | | | | |
| 37 | Vendor Financing | - | | | | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | | | | | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(28.9)** | | | | | | | |
| 40 | **Operating Profit (as reported)** | **(22.5)** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

**Nortel Distributors: Dr. Felgran's Unfiltered View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 2,907.0 | 1,896.2 | 1,522.8 | 1,538.9 | 1,963.7 | 1,936.4 | 1,325.8 | 1,488.8 |
| 2 | Intercompany Revenues | 94.9 | 55.6 | 35.8 | 121.0 | 163.5 | 94.0 | 264.0 | 398.7 |
| 3 | Total Revenues (Line 1 + Line 2) | 3,001.9 | 1,951.8 | 1,558.5 | 1,659.8 | 2,127.2 | 2,030.4 | 1,589.8 | 1,887.5 |
| 4 | Cost of Revenues | 2,343.4 | 1,377.6 | 1,353.9 | 1,363.6 | 1,791.0 | 1,519.1 | 1,222.3 | 1,458.4 |
| 5 | Gross Profit (Line 3 - Line 4) | 658.5 | 574.2 | 204.6 | 296.2 | 336.3 | 511.2 | 367.5 | 429.2 |
| 6 | Sales and Marketing | 442.9 | 288.4 | 123.3 | 161.0 | 152.3 | 146.2 | 144.3 | 642.6 |
| 7 | General and Administrative | 240.5 | 105.2 | 139.9 | 121.6 | 126.0 | 308.9 | 146.9 | 167.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 683.4 | 393.5 | 263.2 | 282.6 | 278.3 | 455.1 | 291.2 | 810.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 9.9 | - | 0.0 | (0.0) | - | 1.1 | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 58.8 | 78.1 | (3.5) | 11.6 | 7.5 | 5.8 | 13.0 | 15.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 25.3 | 7.1 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 752.1 | 471.6 | 259.8 | 294.2 | 285.8 | 461.9 | 329.4 | 832.5 |
| 15 | R&D Performed | (1.0) | (2.4) | (6.4) | 2.1 | 4.3 | 2.9 | 1.3 | 0.7 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (92.6) | 105.0 | (48.7) | (0.1) | 46.2 | 46.4 | 36.8 | (404.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (58.8) | (12.7) | 3.5 | (11.6) | (7.5) | (5.8) | (13.0) | (15.0) |
| 19 | Cost Adjustments | 150.0 | (132.3) | (104.5) | 3.8 | 25.1 | (23.1) | (57.7) | 502.5 |
| 20 | Accounting Income - Adjusted (Line 16 + Line 19) | (1.5) | (40.0) | (149.8) | (7.9) | 63.9 | 17.5 | (33.9) | 83.5 |
| 21 | Quarterly TP Adjustment | (416.7) | (365.8) | 53.0 | 31.6 | 14.6 | 39.9 | 60.0 | |
| 22 | Interim Adjustments | (29.0) | (22.6) | 33.8 | 27.4 | (33.7) | (62.2) | 7.4 | - |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (447.2) | (428.4) | (63.0) | 51.0 | 44.8 | (4.8) | 33.5 | 83.5 |
| 24 | (+) R&D Expense | - | - | - | - | - | - | - | - |
| 25 | (-) R&D Amortization | - | - | - | - | - | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (447.2) | (428.4) | (63.0) | 51.0 | 44.8 | (4.8) | 33.5 | 83.5 |
| 27 | Total Routine Returns | 51.6 | 0.3 | 16.3 | 16.9 | 20.3 | 19.8 | 13.9 | 18.0 |
| 28 | Residual Profit (Line 26 - Line 27) | (498.8) | (428.7) | (79.3) | 34.1 | 24.5 | (24.5) | 19.6 | 65.5 |
| 29 | Capital Stock | - | - | - | - | - | - | - | - |
| 30 | Nortel Distributors Capital Stock % of Total | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-E-2) | - | - | - | - | - | - | - | - |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | 51.6 | 0.3 | 16.3 | 16.9 | 20.3 | 19.8 | 13.9 | 18.0 |
| 33 | Required Adjustment (Line 32 - Line 26) | 498.8 | 428.7 | 79.3 | (34.1) | (24.5) | 24.5 | (19.6) | (65.5) |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **51.6** | **0.3** | **16.3** | **16.9** | **20.3** | **19.8** | **13.9** | **18.0** |
| 40 | **Operating Profit (as reported)** | **51.6** | **0.3** | **16.3** | **16.9** | **20.3** | **19.8** | **13.9** | **18.0** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

## 2.     System Residual Profit by Year

## System Residual Profit under Dr. Felgran's Unfiltered View

| Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| System Residual Profit | (8,011.9) | (4,370.1) | (1,260.4) | (1,304.3) | (840.7) | (701.9) | (469.7) | (689.0) |

**Notes:**

(1) Values in millions of USD

# F.    Dr. Cooper and Dr. Felgran's Combined View

## 1.    By Entity and Year

**NNL: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 2 | Intercompany Revenues | 4,037.3 | 2,138.0 | 2,556.3 | 2,657.7 | 2,889.0 | 2,237.5 | 2,147.3 | 1,827.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 5,789.7 | 3,086.3 | 3,324.1 | 3,438.1 | 3,724.3 | 3,129.4 | 3,162.6 | 2,617.7 |
| 4 | Cost of Revenues | 5,385.5 | 2,750.1 | 2,140.0 | 2,370.7 | 2,002.4 | 2,069.0 | 1,943.8 | 1,383.5 |
| 5 | Gross Profit (Line 3 - Line 4) | 404.3 | 336.2 | 1,184.1 | 1,067.4 | 1,722.0 | 1,060.4 | 1,218.8 | 1,234.1 |
| 6 | Sales and Marketing | 342.5 | 254.7 | 230.5 | 68.0 | 135.1 | 142.0 | 152.8 | 390.5 |
| 7 | General and Administrative | 358.8 | 128.8 | 287.8 | 360.3 | 526.9 | 276.1 | 372.3 | 197.3 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 701.3 | 383.5 | 518.3 | 428.3 | 662.0 | 418.1 | 525.1 | 587.8 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 24.8 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | (18.0) | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 792.9 | 344.4 | 70.7 | 17.1 | 28.2 | 24.1 | 22.0 | 58.5 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.8) | (18.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,501.0 | 727.9 | 588.9 | 445.4 | 690.2 | 442.2 | 530.3 | 627.8 |
| 15 | R&D Performed | 1,107.0 | 849.3 | 823.1 | 839.6 | 811.3 | 896.5 | 841.9 | 817.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (2,203.7) | (1,241.0) | (228.0) | (217.6) | 220.4 | (278.2) | (153.4) | (211.1) |
| 17 | Vendor Financing Loss | 24.3 | 101.9 | 79.9 | (30.0) | (0.2) | - | - | - |
| 18 | Restructing Addback | (792.9) | (344.4) | (70.7) | (17.1) | (28.2) | (24.1) | (22.0) | (58.5) |
| 19 | Cost Adjustments | 530.9 | 644.4 | 353.7 | 116.4 | (319.2) | (44.7) | (43.1) | 50.9 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (2,441.3) | (839.1) | 134.9 | (148.3) | (127.3) | (347.1) | (218.5) | (218.6) |
| 21 | Quarterly TP Adjustment | (456.7) | (42.9) | (251.3) | (527.4) | (323.7) | (276.4) | (387.2) | |
| 22 | Interim Adjustments | 14.1 | 47.4 | (25.6) | (27.4) | 33.7 | 62.2 | (7.4) | - |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (2,883.9) | (834.6) | (142.0) | (703.1) | (417.3) | (561.3) | (613.1) | (218.6) |
| 24 | (+) R&D Expense | 1,463.0 | 879.6 | 821.5 | 841.7 | 804.0 | - | - | - |
| 25 | (-) R&D Amortization | 888.1 | 976.3 | 938.5 | 906.5 | 881.4 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (2,309.1) | (931.3) | (259.0) | (767.8) | (494.7) | (561.3) | (613.1) | (218.6) |
| 27 | Total Routine Returns | 539.3 | 427.4 | 311.3 | 224.9 | 186.0 | 46.9 | 65.3 | 44.6 |
| 28 | Residual Profit (Line 26 - Line 27) | (2,848.4) | (1,358.6) | (570.4) | (992.8) | (680.7) | (608.1) | (678.4) | (263.2) |
| 29 | Capital Stock | 2,560.1 | 2,790.7 | 2,680.3 | 2,589.5 | 2,519.3 | 2,493.2 | 2,487.4 | 2,446.4 |
| 30 | NNL Capital Stock % of Total | 30.5% | 33.8% | 35.5% | 37.0% | 38.5% | 38.8% | 41.0% | 45.1% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (2,355.9) | (1,334.5) | (353.9) | (455.3) | (287.5) | (233.7) | (154.7) | (273.6) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (1,816.6) | (907.1) | (42.5) | (230.4) | (101.5) | (186.9) | (89.3) | (229.1) |
| 33 | Required Adjustment (Line 32 - Line 26) | 492.4 | 24.2 | 216.5 | 537.4 | 393.2 | 374.4 | 523.7 | (10.5) |
| 34 | Headquarters Costs | 182.6 | 171.4 | 160.2 | 149.1 | 137.9 | 126.7 | 115.5 | 104.3 |
| 35 | Stewardship Costs | 25.0 | 13.5 | 11.0 | 11.1 | 11.9 | 14.2 | 14.2 | 10.1 |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | 54.0 | 119.1 | 205.6 | (30.2) | (0.2) | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | 261.6 | 304.0 | 376.8 | 130.0 | 149.6 | 140.9 | 129.7 | 114.4 |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(2,653.1)** | **(1,114.5)** | **(302.3)** | **(295.6)** | **(173.6)** | **(327.8)** | **(219.1)** | **(343.5)** |
| 40 | **Operating Profit (as reported)** | **(1,734.0)** | **(294.7)** | **110.6** | **(100.1)** | **22.1** | **(87.4)** | **27.0** | **(26.0)** |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**NNUK: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 2 | Intercompany Revenues | 1,148.1 | 536.2 | 396.5 | 435.5 | 404.8 | 645.7 | 701.2 | 631.0 |
| 3 | Total Revenues (Line 1 + Line 2) | 2,378.0 | 1,214.5 | 879.0 | 885.2 | 936.4 | 1,330.3 | 1,385.7 | 1,261.9 |
| 4 | Cost of Revenues | 2,275.2 | 380.6 | 529.6 | 476.2 | 500.4 | 886.8 | 1,022.4 | 1,031.7 |
| 5 | Gross Profit (Line 3 - Line 4) | 102.8 | 833.9 | 349.3 | 409.0 | 435.9 | 443.4 | 363.3 | 230.2 |
| 6 | Sales and Marketing | 352.7 | 114.5 | 238.5 | 120.2 | 118.4 | 114.8 | 144.0 | 243.0 |
| 7 | General and Administrative | 176.5 | 96.4 | 125.3 | 133.2 | 105.8 | 114.7 | 134.9 | 111.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 529.1 | 211.0 | 363.8 | 253.3 | 224.2 | 229.5 | 279.0 | 354.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 39.5 | 0.0 | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 464.5 | 404.1 | 17.6 | 44.4 | 53.5 | 8.8 | 33.6 | 37.2 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 5.2 | 12.7 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,033.2 | 615.0 | 381.4 | 297.7 | 277.8 | 238.3 | 317.8 | 404.4 |
| 15 | R&D Performed | 345.1 | 183.8 | 95.5 | 95.6 | 66.4 | 43.6 | 39.0 | 36.5 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,275.5) | 35.0 | (127.6) | 15.7 | 91.8 | 161.6 | 6.5 | (210.7) |
| 17 | Vendor Financing Loss | 29.7 | 17.2 | 125.7 | (0.2) | - | - | - | - |
| 18 | Restructing Addback | (464.5) | (404.1) | (17.6) | (44.4) | (53.5) | (8.8) | (33.6) | (37.2) |
| 19 | Cost Adjustments | 557.9 | 52.9 | 95.5 | (77.2) | (43.5) | (277.8) | (121.9) | 23.3 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (1,152.5) | (298.9) | 76.1 | (106.1) | (5.3) | (125.1) | (149.0) | (224.7) |
| 21 | Quarterly TP Adjustment | (438.8) | (305.8) | (346.1) | (231.7) | (191.0) | (78.6) | (51.1) | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (1,591.3) | (604.7) | (270.1) | (337.8) | (196.3) | (203.7) | (200.0) | (224.7) |
| 24 | (+) R&D Expense | 352.3 | 183.8 | 95.5 | 95.6 | 66.4 | - | - | - |
| 25 | (-) R&D Amortization | 218.8 | 233.6 | 205.4 | 172.4 | 145.0 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (1,457.8) | (654.5) | (380.1) | (414.6) | (274.9) | (203.7) | (200.0) | (224.7) |
| 27 | Total Routine Returns | 364.4 | 152.8 | 94.8 | 79.3 | 61.1 | 54.1 | 61.5 | 51.3 |
| 28 | Residual Profit (Line 26 - Line 27) | (1,822.3) | (807.3) | (475.0) | (493.9) | (336.0) | (257.7) | (261.5) | (276.0) |
| 29 | Capital Stock | 620.1 | 661.9 | 581.9 | 488.5 | 410.8 | 334.3 | 269.1 | 220.4 |
| 30 | NNUK Capital Stock % of Total | 7.39% | 8.01% | 7.71% | 6.98% | 6.28% | 6.12% | 4.99% | 3.59% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (570.6) | (316.5) | (76.8) | (85.9) | (46.9) | (36.8) | (18.8) | (21.7) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (206.2) | (163.7) | 18.0 | (6.6) | 14.2 | 17.3 | 42.7 | 29.6 |
| 33 | Required Adjustment (Line 32 - Line 26) | 1,251.7 | 490.7 | 398.1 | 408.0 | 289.2 | 220.9 | 242.7 | 254.3 |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | Operating Profit (Line 23 + Line 33 - Line 38) | (339.6) | (114.0) | 128.1 | 70.3 | 92.8 | 17.3 | 42.7 | 29.6 |
| 40 | Operating Profit (as reported) | (253.7) | (19.8) | 100.8 | 45.2 | 67.4 | 16.2 | 41.0 | 31.9 |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(7) Total Routine Returns from Section II-A-2 of this appendix

**NNI: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 2 | Intercompany Revenues | 755.8 | 373.9 | 319.5 | 436.1 | 459.8 | 379.1 | 629.4 | 625.9 |
| 3 | Total Revenues (Line 1 + Line 2) | 10,861.2 | 6,403.2 | 5,719.5 | 5,142.6 | 5,480.3 | 5,073.7 | 5,265.1 | 4,779.9 |
| 4 | Cost of Revenues | 8,807.5 | 4,604.3 | 3,784.5 | 3,685.8 | 4,143.8 | 3,502.0 | 3,485.6 | 3,313.0 |
| 5 | Gross Profit (Line 3 - Line 4) | 2,053.7 | 1,798.9 | 1,935.1 | 1,456.8 | 1,336.4 | 1,571.8 | 1,779.5 | 1,466.9 |
| 6 | Sales and Marketing | 1,834.6 | 923.8 | 475.8 | 529.5 | 581.0 | 627.0 | 668.3 | 1,131.2 |
| 7 | General and Administrative | 411.2 | 472.7 | 398.6 | 347.1 | 333.1 | 372.4 | 260.1 | 270.5 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 2,245.7 | 1,396.4 | 874.4 | 876.7 | 914.1 | 999.3 | 928.3 | 1,401.7 |
| 9 | Purchased IPR&D | - | 0.0 | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 3,726.1 | 19.3 | - | - | - | 18.8 | - | - |
| 11 | Deferred Compensation Expense | 2.1 | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 1,481.9 | 661.2 | 176.4 | 53.9 | 53.5 | 47.8 | 71.3 | 133.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 13.7 | 1,878.2 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 7,455.9 | 2,076.9 | 1,050.8 | 930.6 | 967.7 | 1,065.9 | 1,013.4 | 3,413.6 |
| 15 | R&D Performed | 1,504.2 | 868.8 | 793.5 | 768.3 | 719.6 | 679.2 | 677.7 | 615.0 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (6,906.4) | (1,146.9) | 90.8 | (242.1) | (350.9) | (173.3) | 88.5 | (2,561.8) |
| 17 | Vendor Financing Loss | 126.2 | 163.8 | (59.8) | 1.3 | (0.8) | - | - | - |
| 18 | Restructing Addback | (1,481.9) | (661.2) | (176.4) | (53.9) | (53.5) | (47.8) | (71.3) | (133.6) |
| 19 | Cost Adjustments | 5,353.9 | 1,104.5 | 396.8 | 274.9 | 634.4 | 330.9 | 275.2 | 2,763.3 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (2,908.2) | (539.8) | 251.3 | (19.9) | 229.1 | 109.8 | 292.3 | 67.9 |
| 21 | Quarterly TP Adjustment | 1,246.7 | 660.8 | 471.8 | 645.2 | 445.7 | 209.2 | 256.4 | |
| 22 | Interim Adjustments | | | | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (1,661.5) | 121.1 | 723.1 | 625.3 | 674.8 | 319.0 | 548.7 | 67.9 |
| 24 | (+) R&D Expense | 1,181.2 | 869.9 | 793.5 | 768.3 | 719.6 | - | - | - |
| 25 | (-) R&D Amortization | 1,378.7 | 1,461.9 | 1,272.8 | 1,125.3 | 1,010.9 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (1,859.1) | (470.9) | 243.8 | 268.4 | 383.6 | 319.0 | 548.7 | 67.9 |
| 27 | Total Routine Returns | 504.5 | 101.6 | 57.3 | 97.6 | 73.1 | 139.2 | 128.7 | 131.3 |
| 28 | Residual Profit (Line 26 - Line 27) | (2,363.6) | (572.6) | 186.5 | 170.7 | 310.5 | 179.8 | 420.0 | (63.4) |
| 29 | Capital Stock | 3,906.3 | 4,142.0 | 3,606.3 | 3,188.2 | 2,864.1 | 2,599.4 | 2,396.3 | 2,226.8 |
| 30 | NNI Capital Stock % of Total | 46.6% | 50.1% | 47.8% | 45.6% | 43.8% | 43.1% | 40.6% | 38.9% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (3,594.7) | (1,980.7) | (476.1) | (560.6) | (326.8) | (259.2) | (153.3) | (235.8) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (3,090.2) | (1,879.0) | (418.8) | (463.0) | (253.7) | (120.0) | (24.6) | (104.5) |
| 33 | Required Adjustment (Line 32 - Line 26) | (1,231.1) | (1,408.1) | (662.6) | (731.4) | (637.3) | (438.9) | (573.3) | (172.4) |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | | | | | | | | |
| 37 | Vendor Financing | 126.2 | 163.8 | (59.8) | 1.3 | (0.8) | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | 126.2 | 163.8 | (59.8) | 1.3 | (0.8) | - | - | - |
| 39 | Operating Profit (Line 23 + Line 33 - Line 38) | (3,018.9) | (1,450.8) | 120.3 | (107.4) | 38.4 | (120.0) | (24.6) | (104.5) |
| 40 | Operating Profit (as reported) | (1,889.5) | (521.7) | 109.1 | (25.4) | 90.0 | (30.8) | 73.5 | 57.0 |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**NN Ireland: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 2 | Intercompany Revenues | 293.8 | 182.3 | 82.1 | 76.5 | 79.0 | 84.1 | 7.6 | 1.2 |
| 3 | Total Revenues (Line 1 + Line 2) | 540.8 | 381.1 | 360.4 | 403.7 | 444.6 | 569.8 | 596.3 | 592.1 |
| 4 | Cost of Revenues | 481.6 | 355.9 | 315.0 | 332.8 | 346.3 | 443.7 | 491.1 | 537.8 |
| 5 | Gross Profit (Line 3 - Line 4) | 59.2 | 25.3 | 45.4 | 70.9 | 98.3 | 126.1 | 105.3 | 54.2 |
| 6 | Sales and Marketing | 11.3 | 8.4 | 6.1 | 8.2 | 7.9 | 8.3 | 11.1 | 16.7 |
| 7 | General and Administrative | 48.1 | 8.2 | 33.9 | 49.4 | 42.8 | 42.5 | 50.5 | 58.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 59.3 | 16.6 | 40.0 | 57.6 | 50.6 | 50.8 | 61.5 | 75.7 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | - | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 23.6 | 1.4 | 0.7 | (0.9) | 0.7 | 1.0 | 1.0 | 0.6 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 2.3 | (0.6) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 83.0 | 18.0 | 40.7 | 56.7 | 51.4 | 51.8 | 64.8 | 75.7 |
| 15 | R&D Performed | 16.7 | 14.8 | 18.1 | 17.8 | 17.9 | 19.7 | 25.0 | 24.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (40.4) | (7.5) | (13.4) | (3.5) | 29.1 | 54.6 | 15.4 | (45.9) |
| 17 | Vendor Financing Loss | 0.0 | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (23.6) | (1.4) | (0.7) | 0.9 | (0.7) | (1.0) | (1.0) | (0.6) |
| 19 | Cost Adjustments | 19.9 | 14.8 | 12.2 | (3.4) | (25.4) | (3.1) | 35.2 | 60.3 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (44.2) | 5.9 | (1.8) | (6.1) | 3.0 | 50.5 | 49.6 | 13.8 |
| 21 | Quarterly TP Adjustment | 40.0 | 58.1 | 68.8 | 73.2 | 52.8 | 56.5 | 77.9 | - |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | - |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (4.1) | 63.9 | 66.9 | 67.1 | 55.8 | 107.0 | 127.6 | 13.8 |
| 24 | (+) R&D Expense | 11.7 | 14.8 | 18.1 | 17.8 | 17.9 | - | - | - |
| 25 | (-) R&D Amortization | 24.6 | 21.2 | 19.7 | 19.2 | 18.8 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (17.0) | 57.5 | 65.3 | 65.7 | 54.9 | 107.0 | 127.6 | 13.8 |
| 27 | Total Routine Returns | 14.5 | 6.2 | 8.7 | 13.7 | 15.1 | 18.3 | 22.1 | 23.4 |
| 28 | Residual Profit (Line 26 - Line 27) | (31.5) | 51.4 | 56.6 | 52.0 | 39.8 | 88.7 | 105.5 | (9.6) |
| 29 | Capital Stock | 69.6 | 59.9 | 55.9 | 54.4 | 53.2 | 53.2 | 56.3 | 60.4 |
| 30 | NN Ireland Capital Stock % of Total | 0.8% | 0.7% | 0.7% | 0.8% | 0.8% | 0.8% | 0.9% | 1.1% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (64.0) | (28.7) | (7.4) | (9.6) | (6.1) | (4.8) | (3.4) | (6.5) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (49.6) | (22.5) | 1.3 | 4.1 | 9.1 | 13.5 | 18.7 | 16.9 |
| 33 | Required Adjustment (Line 32 - Line 26) | (32.5) | (80.0) | (63.9) | (61.6) | (45.8) | (93.5) | (108.9) | 3.1 |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(36.7)** | **(16.1)** | **3.0** | **5.5** | **10.0** | **13.5** | **18.7** | **16.9** |
| 40 | **Operating Profit (as reported)** | **(24.7)** | **(5.2)** | **0.2** | **1.3** | **6.5** | **5.5** | **9.1** | **9.5** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(7) Total Routine Returns from Section II-A-2 of this appendix

**NNSA: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 2 | Intercompany Revenues | 469.7 | 445.6 | 560.6 | 703.9 | 589.9 | 425.4 | 206.7 | 146.8 |
| 3 | Total Revenues (Line 1 + Line 2) | 739.6 | 629.0 | 830.3 | 1,102.8 | 1,045.5 | 796.8 | 564.0 | 381.4 |
| 4 | Cost of Revenues | 779.5 | 663.2 | 529.2 | 657.3 | 883.1 | 555.4 | 464.7 | 369.8 |
| 5 | Gross Profit (Line 3 - Line 4) | (39.9) | (34.2) | 301.1 | 445.5 | 162.5 | 241.4 | 99.3 | 11.6 |
| 6 | Sales and Marketing | 79.6 | 48.5 | 51.6 | 54.5 | 44.5 | 42.1 | 28.5 | 42.0 |
| 7 | General and Administrative | (4.8) | (12.5) | 1.4 | 14.4 | 6.1 | 3.8 | 10.6 | 10.4 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 74.7 | 36.0 | 53.0 | 68.9 | 50.6 | 45.9 | 39.1 | 52.4 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 0.4 | - | - | - | - | - | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 65.1 | 46.9 | 18.8 | 7.1 | 4.2 | 3.3 | 39.1 | 4.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | (16.3) | (1.3) |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 140.3 | 83.0 | 71.7 | 76.0 | 54.7 | 49.2 | 61.9 | 55.1 |
| 15 | R&D Performed | 226.0 | 245.6 | 266.9 | 267.3 | 256.8 | 223.2 | 67.1 | 55.4 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (406.2) | (362.8) | (37.5) | 102.2 | (149.0) | (30.9) | (29.7) | (98.9) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (65.1) | (46.9) | (18.8) | (7.1) | (4.2) | (3.3) | (39.1) | (4.0) |
| 19 | Cost Adjustments | 79.4 | 71.9 | (22.9) | (41.7) | 117.3 | 19.8 | 67.0 | 60.8 |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (391.9) | (337.8) | (79.1) | 53.4 | (35.9) | (14.4) | (1.8) | (42.2) |
| 21 | Quarterly TP Adjustment | 109.5 | 37.1 | 1.1 | (12.4) | (0.2) | (27.9) | 46.8 | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (282.4) | (300.8) | (78.1) | 41.0 | (36.1) | (42.3) | 45.0 | (42.2) |
| 24 | (+) R&D Expense | 223.1 | 245.6 | 266.9 | 267.3 | 256.8 | - | - | - |
| 25 | (-) R&D Amortization | 157.7 | 180.7 | 203.4 | 222.5 | 234.4 | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (217.0) | (235.9) | (14.6) | 85.8 | (13.7) | (42.3) | 45.0 | (42.2) |
| 27 | Total Routine Returns | 62.5 | 48.4 | 50.9 | 47.7 | 44.7 | 14.8 | 12.4 | 9.3 |
| 28 | Residual Profit (Line 26 - Line 27) | (279.5) | (284.3) | (65.4) | 38.1 | (58.4) | (57.1) | 32.6 | (51.4) |
| 29 | Capital Stock | 446.9 | 512.0 | 576.2 | 630.4 | 664.0 | 668.8 | 591.5 | 466.1 |
| 30 | NNSA Capital Stock % of Total | 5.3% | 6.2% | 7.6% | 9.0% | 10.1% | 10.8% | 12.2% | 11.3% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (411.2) | (244.9) | (76.1) | (110.8) | (75.8) | (65.0) | (45.9) | (68.7) |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (348.7) | (196.5) | (25.2) | (63.1) | (31.0) | (50.2) | (33.5) | (59.4) |
| 33 | Required Adjustment (Line 32 - Line 26) | (131.7) | 39.4 | (10.6) | (148.9) | (17.3) | (7.9) | (78.5) | (17.2) |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(414.1)** | **(261.4)** | **(88.7)** | **(107.9)** | **(53.4)** | **(50.2)** | **(33.5)** | **(59.4)** |
| 40 | **Operating Profit (as reported)** | **(309.3)** | **(172.7)** | **(86.7)** | **(97.3)** | **(44.7)** | **(35.3)** | **(11.2)** | **(17.0)** |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(7) Total Routine Returns from Section II-A-2 of this appendix

**NN Australia: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | |
| 2 | Intercompany Revenues | 60.6 | (8.8) | 3.0 | 4.8 | 3.3 | 1.5 | 1.7 | |
| 3 | Total Revenues (Line 1 + Line 2) | 233.4 | 89.4 | 179.6 | 157.0 | 152.7 | 350.7 | 179.3 | |
| 4 | Cost of Revenues | 128.4 | 37.6 | 152.3 | 166.6 | 97.9 | 232.5 | 132.8 | |
| 5 | Gross Profit (Line 3 - Line 4) | 105.1 | 51.8 | 27.3 | (9.6) | 54.9 | 118.2 | 46.5 | |
| 6 | Sales and Marketing | 47.0 | 32.2 | 25.9 | 35.5 | 32.8 | 36.1 | 39.6 | |
| 7 | General and Administrative | 28.4 | 12.4 | 12.2 | 9.8 | 11.7 | 11.7 | 16.5 | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 75.4 | 44.7 | 38.1 | 45.3 | 44.5 | 47.8 | 56.1 | |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | |
| 10 | Total Goodwill and IPR&D | 2.8 | - | - | - | - | - | - | |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | |
| 12 | Restructuring Cost | 42.5 | 2.0 | (1.6) | 3.4 | 4.0 | 2.1 | 4.4 | |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 0.2 | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 120.7 | 46.7 | 36.5 | 48.7 | 48.4 | 49.8 | 60.8 | |
| 15 | R&D Performed | 12.5 | 10.5 | 10.3 | 6.4 | 4.5 | 0.0 | 0.0 | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (28.1) | (5.4) | (19.5) | (64.7) | 2.0 | 68.4 | (14.3) | |
| 17 | Vendor Financing Loss | (0.0) | - | - | - | - | - | - | |
| 18 | Restructing Addback | (42.5) | (2.0) | 1.6 | (3.4) | (4.0) | (2.1) | (4.4) | |
| 19 | Cost Adjustments | 33.6 | 4.5 | 18.7 | 29.7 | (17.5) | (43.4) | 23.3 | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (37.1) | (2.9) | 0.8 | (38.4) | (19.5) | 23.0 | 4.5 | |
| 21 | Quarterly TP Adjustment | (64.4) | (30.9) | 16.0 | 33.5 | 13.2 | 77.3 | (0.1) | |
| 22 | Interim Adjustments | - | - | - | - | - | - | - | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (101.5) | (33.8) | 16.8 | (4.9) | (6.2) | 100.3 | 4.4 | |
| 24 | (+) R&D Expense | 13.3 | 10.5 | 10.3 | 6.4 | 4.5 | - | - | |
| 25 | (-) R&D Amortization | 13.1 | 12.7 | 12.0 | 10.9 | 9.3 | - | - | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (101.2) | (36.0) | 15.0 | (9.4) | (11.1) | 100.3 | 4.4 | |
| 27 | Total Routine Returns | 4.1 | 0.8 | (0.4) | 0.1 | 3.6 | 8.2 | 8.9 | - |
| 28 | Residual Profit (Line 26 - Line 27) | (105.3) | (36.8) | 15.4 | (9.5) | (14.7) | 92.1 | (4.5) | |
| 29 | Capital Stock | 37.0 | 36.0 | 34.1 | 30.9 | 26.3 | 20.3 | 14.2 | |
| 30 | NN Australia Capital Stock % of Total | 0.4% | 0.4% | 0.5% | 0.4% | 0.4% | 0.4% | 0.3% | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (34.1) | (17.2) | (4.5) | (5.4) | (3.0) | (2.3) | (1.2) | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (30.0) | (16.4) | (4.9) | (5.3) | 0.6 | 5.9 | 7.6 | |
| 33 | Required Adjustment (Line 32 - Line 26) | 71.3 | 19.5 | (19.9) | 4.1 | 11.7 | (94.4) | 3.2 | |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | |
| 37 | Vendor Financing | (0.0) | - | - | - | - | - | - | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | (0.0) | - | - | - | - | - | - | |
| 39 | Operating Profit (Line 23 + Line 33 - Line 38) | (30.2) | (14.2) | (3.1) | (0.8) | 5.4 | 5.9 | 7.6 | |
| 40 | Operating Profit (as reported) | (20.7) | (7.6) | (2.7) | (0.0) | 5.9 | 6.7 | 8.4 | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**Acquired Companies: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 139.2 | 14.6 | - | - | - | | | |
| 2 | Intercompany Revenues | 59.8 | 70.8 | 15.5 | 0.4 | 0.3 | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 199.0 | 85.4 | 15.5 | 0.4 | 0.3 | | | |
| 4 | Cost of Revenues | 163.5 | 35.0 | (19.6) | 11.1 | (27.8) | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 35.5 | 50.4 | 35.0 | (10.6) | 28.1 | | | |
| | | | | | | | | | |
| 6 | Sales and Marketing | 76.1 | 13.7 | 9.5 | 11.8 | 11.2 | | | |
| 7 | General and Administrative | 27.7 | 5.1 | 0.6 | 0.6 | (0.3) | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 103.8 | 18.8 | 10.1 | 12.4 | 10.9 | | | |
| 9 | Purchased IPR&D | 15.1 | - | - | - | - | | | |
| 10 | Total Goodwill and IPR&D | 12,772.1 | 138.0 | 97.7 | - | - | | | |
| 11 | Deferred Compensation Expense | 273.5 | 110.0 | 15.9 | 0.0 | - | | | |
| 12 | Restructuring Cost | (512.8) | 472.5 | 1.4 | 0.5 | 0.1 | | | |
| 13 | Other Operating Expenses | - | - | - | - | - | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 12,651.7 | 739.4 | 125.1 | 12.8 | 11.0 | | | |
| 15 | R&D Performed | (3.4) | (0.4) | (6.2) | (1.4) | (0.0) | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (12,612.8) | (688.5) | (83.8) | (22.1) | 17.2 | | | |
| 17 | Vendor Financing Loss | - | - | - | - | - | | | |
| 18 | Restructing Addback | 512.8 | (472.5) | (1.4) | (0.5) | (0.1) | | | |
| 19 | Cost Adjustments | 12,535.1 | 697.4 | 95.7 | 16.8 | (21.3) | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | 435.0 | (463.7) | 10.5 | (5.7) | (4.2) | | | |
| 21 | Quarterly TP Adjustment | (37.1) | (10.5) | (13.2) | (11.9) | (11.4) | | | |
| 22 | Interim Adjustments | 15.6 | 9.4 | - | - | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | 413.5 | (464.8) | (2.7) | (17.6) | (15.6) | | | |
| 24 | (+) R&D Expense | - | - | - | - | - | | | |
| 25 | (-) R&D Amortization | 31.4 | 22.0 | 5.9 | 4.2 | 2.9 | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | 382.1 | (486.8) | (8.6) | (21.8) | (18.6) | | | |
| 27 | Total Routine Returns | 13.8 | 7.1 | (1.8) | (1.6) | (0.8) | | | |
| 28 | Residual Profit (Line 26 - Line 27) | 368.3 | (493.8) | (6.9) | (20.2) | (17.7) | | | |
| | | | | | | | | | |
| 29 | Capital Stock | 88.9 | 62.2 | 16.8 | 11.8 | 8.2 | | | |
| 30 | Acquired Companies Capital Stock % of Total | 1.1% | 0.8% | 0.2% | 0.2% | 0.1% | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (81.8) | (29.8) | (2.2) | (2.1) | (0.9) | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (68.0) | (22.7) | (4.0) | (3.7) | (1.8) | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (450.2) | 464.1 | 4.6 | 18.1 | 16.8 | | | |
| | | | | | | | | | |
| 34 | Headquarters Costs | - | - | - | - | - | | | |
| 35 | Stewardship Costs | - | - | - | - | - | | | |
| 36 | Restructuring Costs | - | - | - | - | - | | | |
| 37 | Vendor Financing | - | - | - | - | - | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | | | |
| 39 | Operating Profit (Line 23 + Line 33 - Line 38) | (36.6) | (0.7) | 1.9 | 0.5 | 1.1 | | | |
| | | | | | | | | | |
| 40 | Operating Profit (as reported) | (13.8) | 10.8 | 2.2 | 0.8 | 1.3 | | | |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**NN Brazil: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 77.3 | 12.5 | 24.4 | | | | | |
| 2 | Intercompany Revenues | 54.6 | 65.0 | 15.4 | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 131.8 | 77.5 | 39.8 | | | | | |
| 4 | Cost of Revenues | 70.7 | 25.5 | 30.4 | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 61.1 | 52.0 | 9.4 | | | | | |
| 6 | Sales and Marketing | 23.3 | 9.0 | 0.5 | | | | | |
| 7 | General and Administrative | 19.5 | 13.3 | 6.6 | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 42.9 | 22.3 | 7.1 | | | | | |
| 9 | Purchased IPR&D | - | - | - | | | | | |
| 10 | Total Goodwill and IPR&D | - | - | - | | | | | |
| 11 | Deferred Compensation Expense | - | - | - | | | | | |
| 12 | Restructuring Cost | - | - | - | | | | | |
| 13 | Other Operating Expenses | - | - | - | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 42.9 | 22.3 | 7.1 | | | | | |
| 15 | R&D Performed | 4.4 | 2.5 | 6.6 | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | 13.8 | 27.2 | (4.3) | | | | | |
| 17 | Vendor Financing Loss | 2.0 | - | - | | | | | |
| 18 | Restructing Addback | - | | | | | | | |
| 19 | Cost Adjustments | (5.8) | 12.0 | (27.0) | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | 10.0 | 39.2 | (31.3) | | | | | |
| 21 | Quarterly TP Adjustment | - | - | - | | | | | |
| 22 | Interim Adjustments | 4.2 | (34.2) | (8.2) | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | 14.2 | 5.0 | (39.5) | | | | | |
| 24 | (+) R&D Expense | 4.3 | 2.5 | 6.6 | | | | | |
| 25 | (-) R&D Amortization | 10.9 | 8.7 | 7.4 | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | 7.6 | (1.1) | (40.3) | | | | | |
| 27 | Total Routine Returns | 4.4 | 4.8 | 9.2 | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | 3.2 | (6.0) | (49.5) | | | | | |
| 29 | Capital Stock | | | | | | | | |
| 30 | NN Brazil Capital Stock % of Total | 0.0% | 0.0% | 0.0% | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | - | - | - | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | 4.4 | 4.8 | 9.2 | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (3.2) | 6.0 | 49.5 | | | | | |
| 34 | Headquarters Costs | | - | - | - | | | | |
| 35 | Stewardship Costs | | - | - | - | | | | |
| 36 | Restructuring Costs | | - | - | - | | | | |
| 37 | Vendor Financing | | 2.0 | - | - | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | 2.0 | - | - | | | | | |
| 39 | Operating Profit (Line 23 + Line 33 - Line 38) | 9.0 | 11.0 | 10.0 | | | | | |
| 40 | **Operating Profit (as reported)** | **11.0** | **11.0** | **10.0** | | | | | |

**Notes:**
(1) Values in millions of USD
(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files
(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report
(4) Headquarters cost from Section II-C of this appendix
(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files
(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**NN Japan: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 155.1 | | | | | | | |
| 2 | Intercompany Revenues | - | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 155.1 | | | | | | | |
| 4 | Cost of Revenues | 102.8 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 52.3 | | | | | | | |
| 6 | Sales and Marketing | 27.0 | | | | | | | |
| 7 | General and Administrative | 20.0 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 47.1 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | 31.8 | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 78.9 | | | | | | | |
| 15 | R&D Performed | 25.7 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (52.2) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Restructing Addback | (31.8) | | | | | | | |
| 19 | Cost Adjustments | 40.2 | | | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (43.9) | | | | | | | |
| 21 | Quarterly TP Adjustment | 4.9 | | | | | | | |
| 22 | Interim Adjustments | - | | | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (39.0) | | | | | | | |
| 24 | (+) R&D Expense | 0.2 | | | | | | | |
| 25 | (-) R&D Amortization | 4.5 | | | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (43.3) | | | | | | | |
| 27 | Total Routine Returns | 1.6 | | | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | (44.9) | | | | | | | |
| 29 | Capital Stock | | | | | | | | |
| 30 | NN Japan Capital Stock % of Total | 0.0% | | | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | - | | | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | 1.6 | | | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | 44.9 | | | | | | | |
| 34 | Headquarters Costs | - | | | | | | | |
| 35 | Stewardship Costs | - | | | | | | | |
| 36 | Restructuring Costs | - | | | | | | | |
| 37 | Vendor Financing | - | | | | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | | | | | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **5.9** | | | | | | | |
| 40 | **Operating Profit (as reported)** | **5.9** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**Bay U.S.: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 796.8 | | | | | | | |
| 2 | Intercompany Revenues | 340.9 | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 1,137.6 | | | | | | | |
| 4 | Cost of Revenues | 744.7 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | 392.9 | | | | | | | |
| 6 | Sales and Marketing | 117.3 | | | | | | | |
| 7 | General and Administrative | 88.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 205.9 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | 1,527.1 | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 1,733.0 | | | | | | | |
| 15 | R&D Performed | 169.0 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (1,509.1) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Restructing Addback | | | | | | | | |
| 19 | Cost Adjustments | 1,496.6 | | | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (12.5) | | | | | | | |
| 21 | Quarterly TP Adjustment | - | | | | | | | |
| 22 | Interim Adjustments | - | | | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (12.5) | | | | | | | |
| 24 | (+) R&D Expense | 162.7 | | | | | | | |
| 25 | (-) R&D Amortization | 224.2 | | | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (74.0) | | | | | | | |
| 27 | Total Routine Returns | - | | | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | (74.0) | | | | | | | |
| 29 | Capital Stock | 635.2 | | | | | | | |
| 30 | Bay U.S. Capital Stock % of Total | 7.6% | | | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (584.6) | | | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (584.6) | | | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (510.6) | | | | | | | |
| 34 | Headquarters Costs | - | | | | | | | |
| 35 | Stewardship Costs | - | | | | | | | |
| 36 | Restructuring Costs | - | | | | | | | |
| 37 | Vendor Financing | - | | | | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | | | | | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(523.1)** | | | | | | | |
| 40 | **Operating Profit (as reported)** | **(359.9)** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**Bay Ireland: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Third Party Revenues | 214.1 | | | | | | | |
| 2 | Intercompany Revenues | (65.1) | | | | | | | |
| 3 | Total Revenues (Line 1 + Line 2) | 149.0 | | | | | | | |
| 4 | Cost of Revenues | 162.0 | | | | | | | |
| 5 | Gross Profit (Line 3 - Line 4) | (13.0) | | | | | | | |
| 6 | Sales and Marketing | 0.7 | | | | | | | |
| 7 | General and Administrative | 8.6 | | | | | | | |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 9.2 | | | | | | | |
| 9 | Purchased IPR&D | - | | | | | | | |
| 10 | Total Goodwill and IPR&D | - | | | | | | | |
| 11 | Deferred Compensation Expense | - | | | | | | | |
| 12 | Restructuring Cost | - | | | | | | | |
| 13 | Other Operating Expenses | - | | | | | | | |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 9.2 | | | | | | | |
| 15 | R&D Performed | 13.5 | | | | | | | |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (35.7) | | | | | | | |
| 17 | Vendor Financing Loss | - | | | | | | | |
| 18 | Restructing Addback | - | | | | | | | |
| 19 | Cost Adjustments | 0.5 | | | | | | | |
| 20 | Accounting Income - Adjusted (Sum of Lines 16 - 19) | (35.2) | | | | | | | |
| 21 | Quarterly TP Adjustment | 12.5 | | | | | | | |
| 22 | Interim Adjustments | - | | | | | | | |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (22.7) | | | | | | | |
| 24 | (+) R&D Expense | 15.7 | | | | | | | |
| 25 | (-) R&D Amortization | 7.7 | | | | | | | |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (14.8) | | | | | | | |
| 27 | Total Routine Returns | - | | | | | | | |
| 28 | Residual Profit (Line 26 - Line 27) | (14.8) | | | | | | | |
| 29 | Capital Stock | 21.9 | | | | | | | |
| 30 | Bay Ireland Capital Stock % of Total | 0.3% | | | | | | | |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | (20.2) | | | | | | | |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | (20.2) | | | | | | | |
| 33 | Required Adjustment (Line 32 - Line 26) | (5.4) | | | | | | | |
| 34 | Headquarters Costs | - | | | | | | | |
| 35 | Stewardship Costs | - | | | | | | | |
| 36 | Restructuring Costs | - | | | | | | | |
| 37 | Vendor Financing | - | | | | | | | |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | | | | | | | |
| 39 | **Operating Profit (Line 23 + Line 33 - Line 38)** | **(28.1)** | | | | | | | |
| 40 | **Operating Profit (as reported)** | **(22.5)** | | | | | | | |

**Notes:**

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

**Nortel Distributors: Dr. Cooper and Dr. Felgran's Combined View of an Arm's Length Allocation of Profits**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Third Party Revenues | 2,907.0 | 1,896.2 | 1,522.8 | 1,538.9 | 1,963.7 | 1,936.4 | 1,325.8 | 1,488.8 |
| 2 | Intercompany Revenues | 94.9 | 55.6 | 35.8 | 121.0 | 163.5 | 94.0 | 264.0 | 398.7 |
| 3 | Total Revenues (Line 1 + Line 2) | 3,001.9 | 1,951.8 | 1,558.5 | 1,659.8 | 2,127.2 | 2,030.4 | 1,589.8 | 1,887.5 |
| 4 | Cost of Revenues | 2,343.4 | 1,377.6 | 1,353.9 | 1,363.6 | 1,791.0 | 1,519.1 | 1,222.3 | 1,458.4 |
| 5 | Gross Profit (Line 3 - Line 4) | 658.5 | 574.2 | 204.6 | 296.2 | 336.3 | 511.2 | 367.5 | 429.2 |
| 6 | Sales and Marketing | 442.9 | 288.4 | 123.3 | 161.0 | 152.3 | 146.2 | 144.3 | 642.6 |
| 7 | General and Administrative | 240.5 | 105.2 | 139.9 | 121.6 | 126.0 | 308.9 | 146.9 | 167.9 |
| 8 | Total SG&A Expense (Line 6 + Line 7) | 683.4 | 393.5 | 263.2 | 282.6 | 278.3 | 455.1 | 291.2 | 810.5 |
| 9 | Purchased IPR&D | - | - | - | - | - | - | - | - |
| 10 | Total Goodwill and IPR&D | 9.9 | - | 0.0 | (0.0) | - | 1.1 | - | - |
| 11 | Deferred Compensation Expense | - | - | - | - | - | - | - | - |
| 12 | Restructuring Cost | 58.8 | 78.1 | (3.5) | 11.6 | 7.5 | 5.8 | 13.0 | 15.0 |
| 13 | Other Operating Expenses | - | - | - | - | - | - | 25.3 | 7.1 |
| 14 | Total Operating Expenses (Sum of Lines 8 - 13) | 752.1 | 471.6 | 259.8 | 294.2 | 285.8 | 461.9 | 329.4 | 832.5 |
| 15 | R&D Performed | (1.0) | (2.4) | (6.4) | 2.1 | 4.3 | 2.9 | 1.3 | 0.7 |
| 16 | Operating Income (Line 5 - Line 14 - Line 15) | (92.6) | 105.0 | (48.7) | (0.1) | 46.2 | 46.4 | 36.8 | (404.1) |
| 17 | Vendor Financing Loss | - | - | - | - | - | - | - | - |
| 18 | Restructing Addback | (58.8) | (12.7) | 3.5 | (11.6) | (7.5) | (5.8) | (13.0) | (15.0) |
| 19 | Cost Adjustments | 150.0 | (132.3) | (104.5) | 7.3 | 25.1 | (23.1) | (57.7) | 502.5 |
| 20 | Accounting Income - Adjusted (Line 16 + Line 19) | (1.5) | (40.0) | (149.8) | (4.4) | 63.9 | 17.5 | (33.9) | 83.5 |
| 21 | Quarterly TP Adjustment | (416.7) | (365.8) | 53.0 | 31.6 | 14.6 | 39.9 | 60.0 | |
| 22 | Interim Adjustments | (29.0) | (22.6) | 33.8 | 27.4 | (33.7) | (62.2) | 7.4 | - |
| 23 | Accounting Income - RPS (Sum of Lines 20 - 22) | (447.2) | (428.4) | (63.0) | 54.6 | 44.8 | (4.8) | 33.5 | 83.5 |
| 24 | (+) R&D Expense | - | - | - | - | - | - | - | - |
| 25 | (-) R&D Amortization | - | - | - | - | - | - | - | - |
| 26 | Economic Operating Income (Line 23 + Line 24 - Line 25) | (447.2) | (428.4) | (63.0) | 54.6 | 44.8 | (4.8) | 33.5 | 83.5 |
| 27 | Total Routine Returns | 57.4 | 15.9 | 25.3 | 28.8 | 34.4 | 34.6 | 21.8 | 26.2 |
| 28 | Residual Profit (Line 26 - Line 27) | (504.6) | (444.2) | (88.3) | 25.8 | 10.4 | (39.3) | 11.7 | 57.3 |
| 29 | Capital Stock | | | | | | | | |
| 30 | Nortel Distributors Capital Stock % of Total | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 31 | Allocated Residual Economic Profit (Line 30 * Line 1 of Section I-F-6) | - | - | - | - | - | - | - | - |
| 32 | Profit Split Economic Profit (Line 27 + Line 31) | 57.4 | 15.9 | 25.3 | 28.8 | 34.4 | 34.6 | 21.8 | 26.2 |
| 33 | Required Adjustment (Line 32 - Line 26) | 504.6 | 444.2 | 88.3 | (25.8) | (10.4) | 39.3 | (11.7) | (57.3) |
| 34 | Headquarters Costs | - | - | - | - | - | - | - | - |
| 35 | Stewardship Costs | - | - | - | - | - | - | - | - |
| 36 | Restructuring Costs | - | - | - | - | - | - | - | - |
| 37 | Vendor Financing | - | - | - | - | - | - | - | - |
| 38 | Additional Cost Adjustments / (Reimbursements) (Sum of Lines 34 - 37) | - | - | - | - | - | - | - | - |
| 39 | Operating Profit (Line 23 + Line 33 - Line 38) | 57.4 | 15.9 | 25.3 | 28.8 | 34.4 | 34.6 | 21.8 | 26.2 |
| 40 | Operating Profit (as reported) | 51.6 | 0.3 | 16.3 | 16.9 | 20.3 | 19.8 | 13.9 | 18.0 |

Notes:

(1) Values in millions of USD

(2) Lines 1 - 16, 20-21, 23-24, 26, & 28-29 from Nortel RPSM files

(3) 10-Year economic pension costs from page E-2 of the Felgran Transfer Pricing Report

(4) Headquarters cost from Section II-C of this appendix

(5) 2001 - 2005 stewardship costs from Section II-D of this appendix, 2006 - 2008 from the respective Nortel RPSM files

(6) Vendor Financing Losses from page 135 of the Cooper Transfer Pricing Report

(7) Total routine returns from Exhibit 30 of Dr. Cooper's Transfer Pricing Report

2.        System Residual Profit by Year

### System Residual Profit under Dr. Cooper and Dr. Felgran's Combined View

| Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| System Residual Profit | (7,717.1) | (3,952.1) | (997.0) | (1,229.8) | (746.9) | (601.8) | (377.3) | (606.3) |

**Notes:**

(1) Values in millions of USD

## II.    Supporting Data for Residual Profit Models

### A.    Routine Returns

#### 1.    Corrected Extraterritorial Cost Return

##### a)    *Dr. Cooper's Unfiltered View*

| Excess Cost Returns for the First RPSM Period - European RPEs [a][b] ($ millions) | | | | |
|---|---|---|---|---|
| **2001** | **NN Ireland** | **France** | **NNUK** | **Total** |
| Return on COG's / GOP | - | 0.53 | 16.31 | **16.85** |
| Return on S&M | - | 9.47 | 41.65 | **51.11** |
| Return on G&A | 5.87 | - | 19.83 | **25.70** |
| Return on Sales | - | - | - | - |
| **Total Excess Cost Return Owed** | **5.87** | **10.00** | **77.79** | **93.66** |
| | | | | |
| **2002** | | | | |
| Return on COG's / GOP | - | 0.36 | 9.00 | **9.36** |
| Return on S&M | - | 5.60 | 10.97 | **16.57** |
| Return on G&A | 0.16 | - | 10.80 | **10.96** |
| Return on Sales | - | - | - | - |
| **Total Excess Cost Return Owed** | **0.16** | **5.96** | **30.77** | **36.89** |
| | | | | |
| **2003** | | | | |
| Return on COG's / GOP | - | 0.53 | 6.40 | **6.93** |
| Return on S&M | - | 5.27 | 31.36 | **36.63** |
| Return on G&A | 3.58 | - | 16.19 | **19.77** |
| Return on Sales | - | - | - | - |
| **Total Excess Cost Return Owed** | **3.58** | **5.80** | **53.95** | **63.33** |
| | | | | |
| **2004** | | | | |
| Return on COG's / GOP | - | 0.79 | 5.96 | **6.75** |
| Return on S&M | - | 4.52 | 13.91 | **18.43** |
| Return on G&A | 5.64 | 0.01 | 17.55 | **23.20** |
| Return on Sales | - | - | - | - |
| **Total Excess Cost Return Owed** | **5.64** | **5.32** | **37.42** | **48.38** |
| | | | | |
| **2005** | | | | |
| Return on COG's / GOP | - | 0.90 | 7.05 | **7.95** |
| Return on S&M | - | 2.51 | 12.90 | **15.41** |
| Return on G&A | 4.44 | - | 13.00 | **17.44** |
| Return on Sales | - | - | - | - |
| **Total Excess Cost Return Owed** | **4.44** | **3.41** | **32.95** | **40.80** |
| | | | | |
| **Total 2001 -2005** | | | | |
| Return on COG's / GOP | - | 3.12 | 44.72 | **47.84** |
| Return on S&M | - | 27.36 | 110.78 | **138.15** |
| Return on G&A | 19.70 | 0.01 | 77.37 | **97.07** |
| Return on Sales | - | - | - | - |
| **Total Excess Cost Return Owed** | **$ 19.70** | **$30.49** | **$232.87** | **$283.06** |

*Sources / Notes:*

[a] Excess Costs have been calculated by giving 15% return on excess GOP, S&M, and G&A costs for each entity.

[b] Excess Costs were determined by first identifying the routine costs, and then subtracting the routine costs from total costs. Routine Costs for GOP were identified as 11.56% of total GOP Costs, routine costs for S&M were 6.1% of total S&M costs, and routine G&A costs were 3.6% of total G&A costs.

b)      *Dr. Cooper's Corrected View*

**Dr. Cooper's Corrected Excess Cost Returns for EMEA RPEs: 2001 - 2005**

| Description | NNUK | NNSA | NN Ireland | Total |
|---|---|---|---|---|
| **2001** | | | | |
| Return on COGs / GOP | 16.3 | 0.5 | - | 16.8 |
| Return on Sales & Marketing | 37.2 | 9.5 | - | 46.7 |
| Return on General & Administrative | 19.8 | - | 5.9 | 25.7 |
| Total Excess Cost Return | 73.3 | 10.0 | 5.9 | 89.2 |
| **2002** | | | | |
| Return on COGs / GOP | 9.0 | 0.4 | - | 9.4 |
| Return on Sales & Marketing | 8.4 | 5.6 | - | 14.0 |
| Return on General & Administrative | 10.8 | - | 0.2 | 11.0 |
| Total Excess Cost Return | 28.2 | 6.0 | 0.2 | 34.3 |
| **2003** | | | | |
| Return on COGs / GOP | 6.4 | 0.5 | - | 6.9 |
| Return on Sales & Marketing | 12.5 | 5.3 | - | 17.8 |
| Return on General & Administrative | 16.2 | - | 3.6 | 19.8 |
| Total Excess Cost Return | 35.1 | 5.8 | 3.6 | 44.5 |
| **2004** | | | | |
| Return on COGs / GOP | 6.0 | 0.8 | - | 6.8 |
| Return on Sales & Marketing | 13.9 | 4.5 | - | 18.5 |
| Return on General & Administrative | 17.5 | 0.0 | 5.6 | 23.2 |
| Total Excess Cost Return | 37.4 | 5.3 | 5.6 | 48.4 |
| **2005** | | | | |
| Return on COGs / GOP | 7.1 | 0.9 | - | 8.0 |
| Return on Sales & Marketing | 12.9 | 2.5 | - | 15.4 |
| Return on General & Administrative | 13.0 | - | 4.4 | 17.4 |
| Total Excess Cost Return | 32.9 | 3.4 | 4.4 | 40.8 |
| **Total: 2001 - 2005** | | | | |
| Return on COGs / GOP | 44.7 | 3.1 | - | 47.8 |
| Return on Sales & Marketing | 84.9 | 27.4 | - | 112.3 |
| Return on General & Administrative | 77.4 | 0.0 | 19.7 | 97.1 |
| Total Excess Cost Return | 207.0 | 30.5 | 19.7 | 257.2 |

## 2.    Total Routine Returns for EMEA RPEs under Dr. Cooper's Unfiltered View, under Dr. Cooper's Unfiltered View, Corrected, and under Dr. Cooper and Dr. Felgran's Combined View

### NNUK: Total Routine Returns under Dr. Cooper's View

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | 1,547.3 | 517.1 | 250.0 | 239.3 | 107.2 | - | - | - |
| 2 | Long-Term Assets | 652.5 | 333.7 | 159.2 | 87.6 | 79.0 | - | - | - |
| 3 | Excess GOP Cost | 108.8 | 60.0 | 42.7 | 39.8 | 47.0 | 60.5 | 60.5 | 51.9 |
| 4 | Excess Sales & Marketing Expense | 248.0 | 55.9 | 83.3 | 92.9 | 86.0 | 73.0 | 102.3 | 75.4 |
| 5 | Excess G&A Expense | 132.2 | 72.0 | 107.9 | 117.0 | 86.7 | 90.1 | 110.3 | 88.7 |
| 6 | Third-Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 7 | Return on Net Working Capital ∣ 8.86% | 137.1 | 45.8 | 22.2 | 21.2 | 9.5 | - | - | - |
| 8 | Return on Long-Term Assets ∣ 23.60% | 154.0 | 78.8 | 37.6 | 20.7 | 18.7 | - | - | - |
| 9 | Return on GOP ∣ 15.0% | 16.3 | 9.0 | 6.4 | 6.0 | 7.1 | 9.1 | 9.1 | 7.8 |
| 10 | Return on Sales & Marketing ∣ 15.0% | 37.2 | 8.4 | 12.5 | 13.9 | 12.9 | 10.9 | 15.3 | 11.3 |
| 11 | Return on G&A ∣ 15.0% | 19.8 | 10.8 | 16.2 | 17.5 | 13.0 | 13.5 | 16.5 | 13.3 |
| 12 | Distribution Margin ∣ 3.0% | - | - | - | - | - | 20.5 | 20.5 | 18.9 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 364.4 | 152.8 | 94.8 | 79.3 | 61.1 | 54.1 | 61.5 | 51.3 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

### NNSA: Total Routine Returns under Dr. Cooper's View

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | 75.3 | (74.6) | (83.3) | (76.5) | (12.9) | - | - | - |
| 2 | Long-Term Assets | 194.3 | 207.9 | 222.2 | 208.4 | 179.9 | - | - | - |
| 3 | Excess GOP Cost | 3.6 | 2.4 | 3.6 | 5.3 | 6.0 | 4.9 | 4.7 | 6.1 |
| 4 | Excess Sales & Marketing Expense | 63.1 | 37.3 | 35.1 | 30.1 | 16.7 | 19.4 | 6.7 | 6.9 |
| 5 | Excess G&A Expense | (14.5) | (19.1) | (8.3) | 0.1 | (10.3) | (9.6) | (2.3) | 2.0 |
| 6 | Third-Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 7 | Return on Net Working Capital ∣ 8.86% | 6.7 | (6.6) | (7.4) | (6.8) | (1.1) | - | - | - |
| 8 | Return on Long-Term Assets ∣ 23.60% | 45.9 | 49.1 | 52.4 | 49.2 | 42.5 | - | - | - |
| 9 | Return on GOP ∣ 15.0% | 0.5 | 0.4 | 0.5 | 0.8 | 0.9 | 0.7 | 0.7 | 0.9 |
| 10 | Return on Sales & Marketing ∣ 15.0% | 9.5 | 5.6 | 5.3 | 4.5 | 2.5 | 2.9 | 1.0 | 1.0 |
| 11 | Return on G&A ∣ 15.0% | - | - | - | 0.0 | - | - | - | 0.3 |
| 12 | Distribution Margin ∣ 3.0% | - | - | - | - | - | 11.1 | 10.7 | 7.0 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 62.5 | 48.4 | 50.9 | 47.7 | 44.7 | 14.8 | 12.4 | 9.3 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NN Ireland: Total Routine Returns under Dr. Cooper's View**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 28.4 | 17.9 | 1.8 | 36.9 | 71.6 | - | - | - |
| 2 | Long-Term Assets | 25.7 | 18.8 | 21.1 | 20.2 | 18.5 | - | - | - |
| 3 | Excess GOP Cost | (27.0) | (21.8) | (30.5) | (35.8) | (40.0) | (53.2) | (64.5) | (69.3) |
| 4 | Excess Sales & Marketing Expense | (3.8) | (3.8) | (10.8) | (11.8) | (14.4) | (21.3) | (24.9) | (24.7) |
| 5 | Excess G&A Expense | 39.2 | 1.1 | 23.9 | 37.6 | 29.6 | 25.0 | 29.3 | 37.7 |
| 6 | Third-Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 7 | Return on Net Working Capital ǀ 8.86% | 2.5 | 1.6 | 0.2 | 3.3 | 6.3 | - | - | - |
| 8 | Return on Long-Term Assets ǀ 23.60% | 6.1 | 4.4 | 5.0 | 4.8 | 4.4 | - | - | - |
| 9 | Return on GOP ǀ 15.0% | - | - | - | - | - | - | - | - |
| 10 | Return on Sales & Marketing ǀ 15.0% | - | - | - | - | - | - | - | - |
| 11 | Return on G&A ǀ 15.0% | 5.9 | 0.2 | 3.6 | 5.6 | 4.4 | 3.7 | 4.4 | 5.6 |
| 12 | Distribution Margin ǀ 3.0% | - | - | - | - | - | 14.6 | 17.7 | 17.7 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 14.5 | 6.2 | 8.7 | 13.7 | 15.1 | 18.3 | 22.1 | 23.4 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

### 3.    Total Routine Returns for RPEs under Dr. Cooper's View, Corrected and Made Consistent across Entities

**NNL: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 1,066.9 | (87.3) | 114.9 | 86.0 | 115.7 | - | - | - |
| 2 | Long-Term Assets | 1,884.7 | 1,843.7 | 1,276.1 | 920.8 | 744.7 | - | - | - |
| 3 | Excess GOP Cost | 122.6 | 66.4 | 53.7 | 54.6 | 58.4 | 62.4 | 71.0 | 105.7 |
| 4 | Excess Sales & Marketing Expense | 211.2 | 95.0 | 103.8 | 50.4 | 84.4 | 87.6 | 90.9 | 89.1 |
| 5 | Excess G&A Expense | 88.1 | (90.3) | 89.0 | 172.0 | 347.0 | 103.1 | 206.0 | 49.6 |
| 6 | Third-Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 7 | Return on Net Working Capital ǀ 8.86% | 94.5 | (7.7) | 10.2 | 7.6 | 10.2 | - | - | - |
| 8 | Return on Long-Term Assets ǀ 23.60% | 444.8 | 435.1 | 301.2 | 217.3 | 175.7 | - | - | - |
| 9 | Return on GOP ǀ 15.0% | 18.4 | 10.0 | 8.1 | 8.2 | 8.8 | 9.4 | 10.7 | 15.9 |
| 10 | Return on Sales & Marketing ǀ 15.0% | 31.7 | 14.2 | 15.6 | 7.6 | 12.7 | 13.1 | 13.6 | 13.4 |
| 11 | Return on G&A ǀ 15.0% | 13.2 | - | 13.3 | 25.8 | 52.1 | 15.5 | 30.9 | 7.4 |
| 12 | Distribution Margin ǀ 3.0% | - | - | - | - | - | 26.8 | 30.5 | 23.7 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 602.6 | 451.6 | 348.3 | 266.5 | 259.5 | 64.7 | 85.6 | 60.4 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues, net of headquarters and stewardship costs

**NNI: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 1,942.5 | (817.5) | (532.2) | (215.7) | (339.8) | - | - | - |
| 2 | Long-Term Assets | 1,408.6 | 737.6 | 442.6 | 494.7 | 437.2 | - | - | - |
| 3 | Excess GOP Cost | 153.3 | 91.5 | 81.9 | 71.4 | 76.2 | 71.2 | 70.3 | 117.6 |
| 4 | Excess Sales & Marketing Expense | 1,092.0 | 392.2 | 206.2 | 241.2 | 275.6 | 340.6 | 385.5 | 359.8 |
| 5 | Excess G&A Expense | 47.4 | 255.6 | 204.2 | 177.7 | 152.4 | 203.4 | 93.2 | 121.0 |
| 6 | Third-Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 7 | Return on Net Working Capital ǀ 8.86% | 172.1 | (72.4) | (47.1) | (19.1) | (30.1) | - | - | - |
| 8 | Return on Long-Term Assets ǀ 23.60% | 332.4 | 174.1 | 104.4 | 116.7 | 103.2 | - | - | - |
| 9 | Return on GOP ǀ 15.0% | 23.0 | 13.7 | 12.3 | 10.7 | 11.4 | 10.7 | 10.6 | 17.6 |
| 10 | Return on Sales & Marketing ǀ 15.0% | 163.8 | 58.8 | 30.9 | 36.2 | 41.3 | 51.1 | 57.8 | 54.0 |
| 11 | Return on G&A ǀ 15.0% | 7.1 | 38.3 | 30.6 | 26.7 | 22.9 | 30.5 | 14.0 | 18.1 |
| 12 | Distribution Margin ǀ 3.0% | - | - | - | - | - | 140.8 | 139.1 | 124.6 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 698.4 | 212.5 | 131.2 | 171.2 | 148.7 | 233.1 | 221.4 | 214.4 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NNUK: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 1,547.3 | 517.1 | 250.0 | 239.3 | 107.2 | - | - | - |
| 2 | Long-Term Assets | 652.5 | 333.7 | 159.2 | 87.6 | 79.0 | - | - | - |
| 3 | Excess GOP Cost | 108.8 | 60.0 | 42.7 | 39.8 | 47.0 | 60.5 | 60.5 | 51.9 |
| 4 | Excess Sales & Marketing Expense | 248.0 | 55.9 | 83.3 | 92.9 | 86.0 | 73.0 | 102.3 | 75.4 |
| 5 | Excess G&A Expense | 132.2 | 72.0 | 107.9 | 117.0 | 86.7 | 90.1 | 110.3 | 88.7 |
| 6 | Third-Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 7 | Return on Net Working Capital ǀ 8.86% | 137.1 | 45.8 | 22.2 | 21.2 | 9.5 | - | - | - |
| 8 | Return on Long-Term Assets ǀ 23.60% | 154.0 | 78.8 | 37.6 | 20.7 | 18.7 | - | - | - |
| 9 | Return on GOP ǀ 15.0% | 16.3 | 9.0 | 6.4 | 6.0 | 7.1 | 9.1 | 9.1 | 7.8 |
| 10 | Return on Sales & Marketing ǀ 15.0% | 37.2 | 8.4 | 12.5 | 13.9 | 12.9 | 10.9 | 15.3 | 11.3 |
| 11 | Return on G&A ǀ 15.0% | 19.8 | 10.8 | 16.2 | 17.5 | 13.0 | 13.5 | 16.5 | 13.3 |
| 12 | Distribution Margin ǀ 3.0% | - | - | - | - | - | 20.5 | 20.5 | 18.9 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 364.4 | 152.8 | 94.8 | 79.3 | 61.1 | 54.1 | 61.5 | 51.3 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NNSA: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | 75.3 | (74.6) | (83.3) | (76.5) | (12.9) | - | - | - |
| 2 | Long-Term Assets | 194.3 | 207.9 | 222.2 | 208.4 | 179.9 | - | - | - |
| 3 | Excess GOP Cost | 3.6 | 2.4 | 3.6 | 5.3 | 6.0 | 4.9 | 4.7 | 6.1 |
| 4 | Excess Sales & Marketing Expense | 63.1 | 37.3 | 35.1 | 30.1 | 16.7 | 19.4 | 6.7 | 6.9 |
| 5 | Excess G&A Expense | (14.5) | (19.1) | (8.3) | 0.1 | (10.3) | (9.6) | (2.3) | 2.0 |
| 6 | Third-Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 7 | Return on Net Working Capital ¦ 8.86% | 6.7 | (6.6) | (7.4) | (6.8) | (1.1) | - | - | - |
| 8 | Return on Long-Term Assets ¦ 23.60% | 45.9 | 49.1 | 52.4 | 49.2 | 42.5 | - | - | - |
| 9 | Return on GOP ¦ 15.0% | 0.5 | 0.4 | 0.5 | 0.8 | 0.9 | 0.7 | 0.7 | 0.9 |
| 10 | Return on Sales & Marketing ¦ 15.0% | 9.5 | 5.6 | 5.3 | 4.5 | 2.5 | 2.9 | 1.0 | 1.0 |
| 11 | Return on G&A ¦ 15.0% | - | - | - | 0.0 | - | - | - | 0.3 |
| 12 | Distribution Margin ¦ 3.0% | - | - | - | - | - | 11.1 | 10.7 | 7.0 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 62.5 | 48.4 | 50.9 | 47.7 | 44.7 | 14.8 | 12.4 | 9.3 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NN Ireland: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | 28.4 | 17.9 | 1.8 | 36.9 | 71.6 | - | - | - |
| 2 | Long-Term Assets | 25.7 | 18.8 | 21.1 | 20.2 | 18.5 | - | - | - |
| 3 | Excess GOP Cost | (27.0) | (21.8) | (30.5) | (35.8) | (40.0) | (53.2) | (64.5) | (69.3) |
| 4 | Excess Sales & Marketing Expense | (3.8) | (3.8) | (10.8) | (11.8) | (14.4) | (21.3) | (24.9) | (24.7) |
| 5 | Excess G&A Expense | 39.2 | 1.1 | 23.9 | 37.6 | 29.6 | 25.0 | 29.3 | 37.7 |
| 6 | Third-Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 7 | Return on Net Working Capital ¦ 8.86% | 2.5 | 1.6 | 0.2 | 3.3 | 6.3 | - | - | - |
| 8 | Return on Long-Term Assets ¦ 23.60% | 6.1 | 4.4 | 5.0 | 4.8 | 4.4 | - | - | - |
| 9 | Return on GOP ¦ 15.0% | - | - | - | - | - | - | - | - |
| 10 | Return on Sales & Marketing ¦ 15.0% | - | - | - | - | - | - | - | - |
| 11 | Return on G&A ¦ 15.0% | 5.9 | 0.2 | 3.6 | 5.6 | 4.4 | 3.7 | 4.4 | 5.6 |
| 12 | Distribution Margin ¦ 3.0% | - | - | - | - | - | 14.6 | 17.7 | 17.7 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 14.5 | 6.2 | 8.7 | 13.7 | 15.1 | 18.3 | 22.1 | 23.4 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NN Australia: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | (45.8) | (36.0) | (49.0) | (31.1) | (2.4) | - | - | - |
| 2 | Long-Term Assets | 34.6 | 17.0 | 16.7 | 12.3 | 16.2 | - | - | - |
| 3 | Excess GOP Cost | 8.1 | 4.6 | 8.3 | 7.1 | 7.0 | 16.3 | 8.3 | - |
| 4 | Excess Sales & Marketing Expense | 36.5 | 26.2 | 15.2 | 26.2 | 23.6 | 14.8 | 28.8 | - |
| 5 | Excess G&A Expense | 22.1 | 8.9 | 5.8 | 4.3 | 6.3 | (0.9) | 10.1 | - |
| 6 | Third-Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | - |
| 7 | Return on Net Working Capital ∣ 8.86% | (4.1) | (3.2) | (4.3) | (2.8) | (0.2) | - | - | - |
| 8 | Return on Long-Term Assets ∣ 23.60% | 8.2 | 4.0 | 3.9 | 2.9 | 3.8 | - | - | - |
| 9 | Return on GOP ∣ 15.0% | 1.2 | 0.7 | 1.2 | 1.1 | 1.0 | 2.4 | 1.2 | - |
| 10 | Return on Sales & Marketing ∣ 15.0% | 5.5 | 3.9 | 2.3 | 3.9 | 3.5 | 2.2 | 4.3 | - |
| 11 | Return on G&A ∣ 15.0% | 3.3 | 1.3 | 0.9 | 0.6 | 0.9 | - | 1.5 | - |
| 12 | Distribution Margin ∣ 3.0% | - | - | - | - | - | 10.5 | 5.3 | - |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 14.1 | 6.8 | 4.0 | 5.8 | 9.1 | 15.1 | 12.4 | - |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**Acquired Companies: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | (154.5) | (48.7) | (25.3) | (25.7) | (20.5) | - | - | - |
| 2 | Long-Term Assets | 116.6 | 48.3 | 2.0 | 2.8 | 4.2 | - | - | - |
| 3 | Excess GOP Cost | (16.1) | (1.7) | - | - | - | - | - | - |
| 4 | Excess Sales & Marketing Expense | 67.6 | 12.9 | 9.5 | 11.8 | 11.2 | - | - | - |
| 5 | Excess G&A Expense | 22.7 | 4.6 | 0.6 | 0.6 | (0.3) | - | - | - |
| 6 | Third-Party Revenues | 139.2 | 14.6 | - | - | - | - | - | - |
| 7 | Return on Net Working Capital ∣ 8.86% | (13.7) | (4.3) | (2.2) | (2.3) | (1.8) | - | - | - |
| 8 | Return on Long-Term Assets ∣ 23.60% | 27.5 | 11.4 | 0.5 | 0.7 | 1.0 | - | - | - |
| 9 | Return on GOP ∣ 15.0% | - | - | - | - | - | - | - | - |
| 10 | Return on Sales & Marketing ∣ 15.0% | 10.1 | 1.9 | 1.4 | 1.8 | 1.7 | - | - | - |
| 11 | Return on G&A ∣ 15.0% | 3.4 | 0.7 | 0.1 | 0.1 | - | - | - | - |
| 12 | Distribution Margin ∣ 3.0% | - | - | - | - | - | - | - | - |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 27.4 | 9.7 | (0.3) | 0.3 | 0.9 | - | - | - |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NN Brazil: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | 4.5 | 26.0 | 70.9 | - | - | - | - | - |
| 2 | Long-Term Assets | 16.9 | 10.7 | 12.2 | - | - | - | - | - |
| 3 | Excess GOP Cost | (8.9) | (1.4) | (2.8) | - | - | - | - | - |
| 4 | Excess Sales & Marketing Expense | 16.6 | 8.2 | (1.0) | - | - | - | - | - |
| 5 | Excess G&A Expense | 16.8 | 12.8 | 5.7 | - | - | - | - | - |
| 6 | Third-Party Revenues | 77.3 | 12.5 | 24.4 | - | - | - | - | - |
| 7 | Return on Net Working Capital | 8.86% | 0.4 | 2.3 | 6.3 | - | - | - | - | - |
| 8 | Return on Long-Term Assets | 23.60% | 4.0 | 2.5 | 2.9 | - | - | - | - | - |
| 9 | Return on GOP | 15.0% | - | - | - | - | - | - | - | - |
| 10 | Return on Sales & Marketing | 15.0% | 2.5 | 1.2 | - | - | - | - | - | - |
| 11 | Return on G&A | 15.0% | 2.5 | 1.9 | 0.9 | - | - | - | - | - |
| 12 | Distribution Margin | 3.0% | - | - | - | - | - | - | - | - |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 9.4 | 8.0 | 10.0 | - | - | - | - | - |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**Nortel Distributors: Routine Returns under Dr. Cooper's View, Consistent Across Entities**

| Entity | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| NN New Zealand | 0.9 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 |
| NN Luxembourg | 31.3 | 15.5 | 13.6 | 17.9 | 21.3 | 22.4 | - | - |
| NN CALA | 14.5 | 10.1 | 10.7 | 12.6 | 13.5 | 14.7 | 13.6 | 12.5 |
| Singapore | 2.8 | 2.5 | 3.3 | 4.2 | 6.5 | 4.7 | 6.0 | 7.4 |
| Hong Kong | 31.8 | 18.8 | 13.8 | 9.3 | 13.9 | 14.1 | 6.2 | 5.5 |
| NN Japan | 4.7 | 4.9 | 3.0 | 4.3 | 3.2 | 2.2 | 2.1 | 2.7 |
| Brazil | 3.1 | 1.3 | 1.1 | - | - | - | - | - |
| RIHC | - | 0.3 | 0.2 | 0.1 | 0.3 | 0.1 | - | - |
| Bay Ireland | - | - | 1.7 | 1.6 | 0.8 | - | - | - |
| NNI Guatemala | - | - | 0.3 | - | - | - | - | - |
| Ecuador | - | - | 0.3 | - | 0.1 | 0.0 | 0.0 | 0.0 |
| Italy | - | - | - | - | - | - | 2.0 | 1.4 |
| Hungary | - | - | - | - | - | - | 0.2 | 0.2 |
| Czech Republic | - | - | - | - | - | - | 0.3 | 0.3 |
| Slovensko | - | - | - | - | - | - | 0.1 | 0.1 |
| Poland | - | - | - | - | - | - | 1.8 | 1.7 |
| Austria | - | - | - | - | - | - | 0.3 | 0.3 |
| Romania | - | - | - | - | - | - | 0.1 | 0.1 |
| Spain | - | - | - | - | - | - | 2.6 | 2.6 |
| Portugal | - | - | - | - | - | - | 0.3 | 0.3 |
| Switzerland | - | - | - | - | - | - | 0.8 | 0.9 |
| Belgium | - | - | - | - | - | - | 1.1 | 1.6 |
| Holland | - | - | - | - | - | - | 2.1 | 2.9 |
| Australia | - | - | - | - | - | - | - | 4.1 |
| India | - | - | - | - | - | - | 0.4 | 0.2 |
| **Total Routine Return to Nortel Distributors** | **84.3** | **53.7** | **48.4** | **50.5** | **60.1** | **58.8** | **40.7** | **45.3** |

**Notes:**

(1) Values in millions of USD

(2) 2001 total excludes NN Japan

(3) All Nortel distributors given 3% OM for 2001 - 2008, except for RIHC, Romania, and India

(4) NN Luxembourg contains the EMEA LREs

### 4. Total Routine Returns for RPEs under Dr. Cooper's View, Corrected and Made Consistent across Entities and across Time

**NNL: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 1,066.9 | (87.3) | 114.9 | 86.0 | 115.7 | - | - | - |
| 2 | Long-Term Assets | 1,884.7 | 1,843.7 | 1,276.1 | 920.8 | 744.7 | - | - | - |
| 3 | Excess GOP Cost | 122.6 | 66.4 | 53.7 | 54.6 | 58.4 | 62.4 | 71.0 | 105.7 |
| 4 | Excess Sales & Marketing Expense | 211.2 | 95.0 | 103.8 | 50.4 | 84.4 | 87.6 | 90.9 | 89.1 |
| 5 | Excess G&A Expense | 88.1 | (90.3) | 89.0 | 172.0 | 347.0 | 103.1 | 206.0 | 49.6 |
| 6 | Third-Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 |
| 7 | Return on Net Working Capital | 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets | 23.60% | 444.8 | 435.1 | 301.2 | 217.3 | 175.7 | - | - | - |
| 9 | Return on GOP | 15.0% | 18.4 | 10.0 | 8.1 | 8.2 | 8.8 | 9.4 | 10.7 | 15.9 |
| 10 | Return on Sales & Marketing | 15.0% | 31.7 | 14.2 | 15.6 | 7.6 | 12.7 | 13.1 | 13.6 | 13.4 |
| 11 | Return on G&A | 15.0% | 13.2 | - | 13.3 | 25.8 | 52.1 | 15.5 | 30.9 | 7.4 |
| 12 | Distribution Margin | 3.0% | 52.6 | 28.4 | 23.0 | 23.4 | 25.1 | 26.8 | 30.5 | 23.7 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 560.6 | 487.8 | 361.2 | 282.3 | 274.3 | 64.7 | 85.6 | 60.4 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues, net of headquarters and stewardship costs

**NNI: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 1,942.5 | (817.5) | (532.2) | (215.7) | (339.8) | - | - | - |
| 2 | Long-Term Assets | 1,408.6 | 737.6 | 442.6 | 494.7 | 437.2 | - | - | - |
| 3 | Excess GOP Cost | 153.3 | 91.5 | 81.9 | 71.4 | 76.2 | 71.2 | 70.3 | 117.6 |
| 4 | Excess Sales & Marketing Expense | 1,092.0 | 392.2 | 206.2 | 241.2 | 275.6 | 340.6 | 385.5 | 359.8 |
| 5 | Excess G&A Expense | 47.4 | 255.6 | 204.2 | 177.7 | 152.4 | 203.4 | 93.2 | 121.0 |
| 6 | Third-Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 |
| 7 | Return on Net Working Capital | 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets | 23.60% | 332.4 | 174.1 | 104.4 | 116.7 | 103.2 | - | - | - |
| 9 | Return on GOP | 15.0% | 23.0 | 13.7 | 12.3 | 10.7 | 11.4 | 10.7 | 10.6 | 17.6 |
| 10 | Return on Sales & Marketing | 15.0% | 163.8 | 58.8 | 30.9 | 36.2 | 41.3 | 51.1 | 57.8 | 54.0 |
| 11 | Return on G&A | 15.0% | 7.1 | 38.3 | 30.6 | 26.7 | 22.9 | 30.5 | 14.0 | 18.1 |
| 12 | Distribution Margin | 3.0% | 303.2 | 180.9 | 162.0 | 141.2 | 150.6 | 140.8 | 139.1 | 124.6 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 829.5 | 465.8 | 340.3 | 331.5 | 329.4 | 233.1 | 221.4 | 214.4 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NNUK: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 1,547.3 | 517.1 | 250.0 | 239.3 | 107.2 | - | - | - |
| 2 | Long-Term Assets | 652.5 | 333.7 | 159.2 | 87.6 | 79.0 | - | - | - |
| 3 | Excess GOP Cost | 108.8 | 60.0 | 42.7 | 39.8 | 47.0 | 60.5 | 60.5 | 51.9 |
| 4 | Excess Sales & Marketing Expense | 248.0 | 55.9 | 83.3 | 92.9 | 86.0 | 73.0 | 102.3 | 75.4 |
| 5 | Excess G&A Expense | 132.2 | 72.0 | 107.9 | 117.0 | 86.7 | 90.1 | 110.3 | 88.7 |
| 6 | Third-Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 |
| 7 | Return on Net Working Capital | 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets | 23.60% | 154.0 | 78.8 | 37.6 | 20.7 | 18.7 | - | - | - |
| 9 | Return on GOP | 15.0% | 16.3 | 9.0 | 6.4 | 6.0 | 7.1 | 9.1 | 9.1 | 7.8 |
| 10 | Return on Sales & Marketing | 15.0% | 37.2 | 8.4 | 12.5 | 13.9 | 12.9 | 10.9 | 15.3 | 11.3 |
| 11 | Return on G&A | 15.0% | 19.8 | 10.8 | 16.2 | 17.5 | 13.0 | 13.5 | 16.5 | 13.3 |
| 12 | Distribution Margin | 3.0% | 36.9 | 20.3 | 14.5 | 13.5 | 15.9 | 20.5 | 20.5 | 18.9 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 264.2 | 127.3 | 87.1 | 71.6 | 67.6 | 54.1 | 61.5 | 51.3 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NNSA: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Net Working Capital | 75.3 | (74.6) | (83.3) | (76.5) | (12.9) | - | - | - |
| 2 | Long-Term Assets | 194.3 | 207.9 | 222.2 | 208.4 | 179.9 | - | - | - |
| 3 | Excess GOP Cost | 3.6 | 2.4 | 3.6 | 5.3 | 6.0 | 4.9 | 4.7 | 6.1 |
| 4 | Excess Sales & Marketing Expense | 63.1 | 37.3 | 35.1 | 30.1 | 16.7 | 19.4 | 6.7 | 6.9 |
| 5 | Excess G&A Expense | (14.5) | (19.1) | (8.3) | 0.1 | (10.3) | (9.6) | (2.3) | 2.0 |
| 6 | Third-Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 |
| 7 | Return on Net Working Capital | 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets | 23.60% | 45.9 | 49.1 | 52.4 | 49.2 | 42.5 | - | - | - |
| 9 | Return on GOP | 15.0% | 0.5 | 0.4 | 0.5 | 0.8 | 0.9 | 0.7 | 0.7 | 0.9 |
| 10 | Return on Sales & Marketing | 15.0% | 9.5 | 5.6 | 5.3 | 4.5 | 2.5 | 2.9 | 1.0 | 1.0 |
| 11 | Return on G&A | 15.0% | - | - | - | 0.0 | - | - | - | 0.3 |
| 12 | Distribution Margin | 3.0% | 8.1 | 5.5 | 8.1 | 12.0 | 13.7 | 11.1 | 10.7 | 7.0 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 63.9 | 60.5 | 66.3 | 66.5 | 59.5 | 14.8 | 12.4 | 9.3 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NN Ireland: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | 28.4 | 17.9 | 1.8 | 36.9 | 71.6 | - | - | - |
| 2 | Long-Term Assets | 25.7 | 18.8 | 21.1 | 20.2 | 18.5 | - | - | - |
| 3 | Excess GOP Cost | (27.0) | (21.8) | (30.5) | (35.8) | (40.0) | (53.2) | (64.5) | (69.3) |
| 4 | Excess Sales & Marketing Expense | (3.8) | (3.8) | (10.8) | (11.8) | (14.4) | (21.3) | (24.9) | (24.7) |
| 5 | Excess G&A Expense | 39.2 | 1.1 | 23.9 | 37.6 | 29.6 | 25.0 | 29.3 | 37.7 |
| 6 | Third-Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 |
| 7 | Return on Net Working Capital | 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets | 23.60% | 6.1 | 4.4 | 5.0 | 4.8 | 4.4 | - | - | - |
| 9 | Return on GOP | 15.0% | - | - | - | - | - | - | - | - |
| 10 | Return on Sales & Marketing | 15.0% | - | - | - | - | - | - | - | - |
| 11 | Return on G&A | 15.0% | 5.9 | 0.2 | 3.6 | 5.6 | 4.4 | 3.7 | 4.4 | 5.6 |
| 12 | Distribution Margin | 3.0% | 7.4 | 6.0 | 8.3 | 9.8 | 11.0 | 14.6 | 17.7 | 17.7 |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 19.4 | 10.6 | 16.9 | 20.2 | 19.8 | 18.3 | 22.1 | 23.4 |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NN Australia: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | (45.8) | (36.0) | (49.0) | (31.1) | (2.4) | - | - | - |
| 2 | Long-Term Assets | 34.6 | 17.0 | 16.7 | 12.3 | 16.2 | - | - | - |
| 3 | Excess GOP Cost | 8.1 | 4.6 | 8.3 | 7.1 | 7.0 | 16.3 | 8.3 | - |
| 4 | Excess Sales & Marketing Expense | 36.5 | 26.2 | 15.2 | 26.2 | 23.6 | 14.8 | 28.8 | - |
| 5 | Excess G&A Expense | 22.1 | 8.9 | 5.8 | 4.3 | 6.3 | (0.9) | 10.1 | - |
| 6 | Third-Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | - |
| 7 | Return on Net Working Capital | 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets | 23.60% | 8.2 | 4.0 | 3.9 | 2.9 | 3.8 | - | - | - |
| 9 | Return on GOP | 15.0% | 1.2 | 0.7 | 1.2 | 1.1 | 1.0 | 2.4 | 1.2 | - |
| 10 | Return on Sales & Marketing | 15.0% | 5.5 | 3.9 | 2.3 | 3.9 | 3.5 | 2.2 | 4.3 | - |
| 11 | Return on G&A | 15.0% | 3.3 | 1.3 | 0.9 | 0.6 | 0.9 | - | 1.5 | - |
| 12 | Distribution Margin | 3.0% | 5.2 | 2.9 | 5.3 | 4.6 | 4.5 | 10.5 | 5.3 | - |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 23.4 | 12.9 | 13.6 | 13.1 | 13.8 | 15.1 | 12.4 | - |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**Acquired Companies: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | (154.5) | (48.7) | (25.3) | (25.7) | (20.5) | - | - | - |
| 2 | Long-Term Assets | 116.6 | 48.3 | 2.0 | 2.8 | 4.2 | - | - | - |
| 3 | Excess GOP Cost | (16.1) | (1.7) | - | - | - | - | - | - |
| 4 | Excess Sales & Marketing Expense | 67.6 | 12.9 | 9.5 | 11.8 | 11.2 | - | - | - |
| 5 | Excess G&A Expense | 22.7 | 4.6 | 0.6 | 0.6 | (0.3) | - | - | - |
| 6 | Third-Party Revenues | 139.2 | 14.6 | - | - | - | - | - | - |
| 7 | Return on Net Working Capital ǀ 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets ǀ 23.60% | 27.5 | 11.4 | 0.5 | 0.7 | 1.0 | - | - | - |
| 9 | Return on GOP ǀ 15.0% | - | - | - | - | - | - | - | - |
| 10 | Return on Sales & Marketing ǀ 15.0% | 10.1 | 1.9 | 1.4 | 1.8 | 1.7 | - | - | - |
| 11 | Return on G&A ǀ 15.0% | 3.4 | 0.7 | 0.1 | 0.1 | - | - | - | - |
| 12 | Distribution Margin ǀ 3.0% | 4.2 | 0.4 | - | - | - | - | - | - |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 45.2 | 14.4 | 2.0 | 2.5 | 2.7 | - | - | - |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**NN Brazil: Total Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Net Working Capital | 4.5 | 26.0 | 70.9 | - | - | - | - | - |
| 2 | Long-Term Assets | 16.9 | 10.7 | 12.2 | - | - | - | - | - |
| 3 | Excess GOP Cost | (8.9) | (1.4) | (2.8) | - | - | - | - | - |
| 4 | Excess Sales & Marketing Expense | 16.6 | 8.2 | (1.0) | - | - | - | - | - |
| 5 | Excess G&A Expense | 16.8 | 12.8 | 5.7 | - | - | - | - | - |
| 6 | Third-Party Revenues | 77.3 | 12.5 | 24.4 | - | - | - | - | - |
| 7 | Return on Net Working Capital ǀ 8.86% | - | - | - | - | - | - | - | - |
| 8 | Return on Long-Term Assets ǀ 23.60% | 4.0 | 2.5 | 2.9 | - | - | - | - | - |
| 9 | Return on GOP ǀ 15.0% | - | - | - | - | - | - | - | - |
| 10 | Return on Sales & Marketing ǀ 15.0% | 2.5 | 1.2 | - | - | - | - | - | - |
| 11 | Return on G&A ǀ 15.0% | 2.5 | 1.9 | 0.9 | - | - | - | - | - |
| 12 | Distribution Margin ǀ 3.0% | 2.3 | 0.4 | 0.7 | - | - | - | - | - |
| 13 | Total Routine Returns (Sum of Lines 7 - 12) | 11.3 | 6.1 | 4.5 | - | - | - | - | - |

**Notes:**

(1) Net working capital, long-term assets, and third-party revenues from Nortel RPSM files

(2) Excess GOP cost defined as GOP costs in excess of 11.56% of revenues

(3) Excess sales & marketing expense defined as sales & marketing expenses in excess of 6.1% of revenues, net of bad debt expenses

(4) Excess G&A expense defined as G&A expenses in excess of 3.6% of revenues

**Nortel Distributors: Routine Returns under Dr. Cooper's View, Consistent Across Entities and Time**

| Entity | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|
| NN New Zealand | 0.9 | 0.3 | 0.4 | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 |
| NN Luxembourg | 31.3 | 15.5 | 13.6 | 17.9 | 21.3 | 22.4 | - | - |
| NN CALA | 14.5 | 10.1 | 10.7 | 12.6 | 13.5 | 14.7 | 13.6 | 12.5 |
| Singapore | 2.8 | 2.5 | 3.3 | 4.2 | 6.5 | 4.7 | 6.0 | 7.4 |
| Hong Kong | 31.8 | 18.8 | 13.8 | 9.3 | 13.9 | 14.1 | 6.2 | 5.5 |
| NN Japan | 4.7 | 4.9 | 3.0 | 4.3 | 3.2 | 2.2 | 2.1 | 2.7 |
| Brazil | 3.1 | 1.3 | 1.1 | - | - | - | - | - |
| RIHC | - | 0.3 | 0.2 | 0.1 | 0.3 | 0.1 | - | - |
| Bay Ireland | - | - | 1.7 | 1.6 | 0.8 | - | - | - |
| NNI Guatemala | - | - | 0.3 | - | - | - | - | - |
| Ecuador | - | - | 0.3 | - | 0.1 | 0.0 | 0.0 | 0.0 |
| Italy | - | - | - | - | - | - | 2.0 | 1.4 |
| Hungary | - | - | - | - | - | - | 0.2 | 0.2 |
| Czech Republic | - | - | - | - | - | - | 0.3 | 0.3 |
| Slovensko | - | - | - | - | - | - | 0.1 | 0.1 |
| Poland | - | - | - | - | - | - | 1.8 | 1.7 |
| Austria | - | - | - | - | - | - | 0.3 | 0.3 |
| Romania | - | - | - | - | - | - | 0.1 | 0.1 |
| Spain | - | - | - | - | - | - | 2.6 | 2.6 |
| Portugal | - | - | - | - | - | - | 0.3 | 0.3 |
| Switzerland | - | - | - | - | - | - | 0.8 | 0.9 |
| Belgium | - | - | - | - | - | - | 1.1 | 1.6 |
| Holland | - | - | - | - | - | - | 2.1 | 2.9 |
| Australia | - | - | - | - | - | - | - | 4.1 |
| India | - | - | - | - | - | - | 0.4 | 0.2 |
| **Total Routine Return to Nortel Distributors** | **84.3** | **53.7** | **48.4** | **50.5** | **60.1** | **58.8** | **40.7** | **45.3** |

**Notes:**

(1) Values in millions of USD

(2) 2001 total excludes NN Japan

(3) All Nortel distributors given 3% OM for 2001 - 2008, except for RIHC, Romania, and India

(4) NN Luxembourg contains the EMEA LREs

## B.    Corrected Headquarter and Stewardship Cost Adjustment to EMEA RPEs

### 1.    Dr. Cooper's Unfiltered View

**Exhibit 36**
**Calculation of NNL Headquarter and Stewardship Costs**
*In millions USD*

**NNL Headquarter Cost Calculation**

| | | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| Nortel headquarter costs | [a] | 1,400.00 | 1,314.29 | 1,228.57 | 1,142.86 | 1,057.14 | 971.43 | 885.71 | 800.00 |
| *Annual percentage decline* | | *-6.12%* | | | | | | | |
| NNL's proportion | [b] | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% |
| Headquarter costs allocated to NNL | | 365.19 | 342.83 | 320.47 | 298.11 | 275.75 | 253.39 | 231.04 | 208.68 |
| Percentage of excessive headquarter costs | | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% | 50.00% |
| Estimated excessive headquarter costs | | 182.59 | 171.41 | 160.23 | 149.06 | 137.88 | 126.70 | 115.52 | 104.34 |

**NNL Stewardship Cost Calculation**

| | | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| NNL third party revenue | | 1,752.44 | 948.27 | 767.79 | 780.42 | 835.30 | | | |
| Percentage of stewardship costs | [c] | *1.43%* | *1.43%* | *1.43%* | *1.43%* | *1.43%* | | | |
| Estimated stewardship costs | [d] | 25.01 | 13.53 | 10.96 | 11.14 | 11.92 | 14.21 | 14.21 | 10.07 |

**Total NNL HSC Adjustment**

| | | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|---|---|---|---|
| Total NNL HSC adjustment | [e] | 207.61 | 184.95 | 171.19 | 160.19 | 149.80 | 140.91 | 129.73 | 114.40 |

**Notes / Sources:**

[a] According to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants at paragraph 137, p. 48, NNL identified that Nortel's headquarter costs in 2001 were $1.4 billion and declined to $800 million in 2008. Without detailed information for each individual year, a straight-line decline from $1.4 billion to $800 million over the entire period is assumed, and thus yearly costs are calculated accordingly.

[b] NNL's proportion of Nortel headquarter costs is the function of NNL's G&A headcount as a percentage of Nortel's total G&A headcount as of December 31, 2007. This percentage was then multiplied by the Nortel headquarter costs in each year to calculate NNL's headquarter costs. G&A headcount refers to regular full-time employees across the G&A functional area.

[c] The percentage of stewardship costs is the function of NNL's total 2006-2008 stewardship costs as a percentage of NNL's total 2006-2008 third party revenue.

[d] 1.43% was applied to NNL's third party revenue for the years 2001-2005 in order to estimate NNL's stewardship costs for the years 2001-2005 since the RPSM Models for these years did not provide any stewardship cost information. The 2006-2008 stewardships costs are derived from the 2006-2008 RPSM Models.

[e] Estimated excessive headquarter costs plus estimated stewardship costs.

**Additional Amounts Owed to European RPEs as a Result of NNL HSC Adjustments**
*($ in millions)*

| | 2006 | 2007 | 2008 | Total 2006 - 2008 |
|---|---|---|---|---|
| NNL's estimated excess HSC costs | 140.91 | 129.73 | 114.40 | 385.05 |
| [a] | 21.14 | 19.46 | 17.16 | 57.76 |
| **Total** | **162.05** | **149.19** | **131.57** | **442.81** |
| | | | | |
| **NNUK** | | | | |
| Residual profit split percentage | *6.12%* | *4.99%* | *3.59%* | |
| Additional profit owed | | | | |
| Due to NNL headquarter cost adjustment | 8.62 | 6.47 | 4.10 | 19.19 |
| Due to NNL HQ cost effect on excess cost | 1.29 | 0.97 | 0.62 | 2.88 |
| | $   9.91 | $   7.44 | $   4.72 | $      22.07 |
| | | | | |
| **NN France** | | | | |
| Residual profit split percentage | *10.80%* | *12.16%* | *11.33%* | |
| Additional profit owed | | | | |
| Due to NNL headquarter cost adjustment | 15.22 | 15.77 | 12.96 | 43.95 |
| Due to NNL HQ cost effect on excess cost | 2.28 | 2.37 | 1.94 | 6.59 |
| | $ 17.51 | $ 18.13 | $ 14.90 | $      50.54 |
| | | | | |
| **NN Ireland** | | | | |
| Residual profit split percentage | *0.80%* | *0.89%* | *1.06%* | |
| Additional profit owed | | | | |
| Due to NNL headquarter cost adjustment | 1.12 | 1.15 | 1.22 | 3.50 |
| Due to NNL HQ cost effect on excess cost | 0.17 | 0.17 | 0.18 | 0.52 |
| | $   1.29 | $   1.33 | $   1.40 | $        4.02 |

Note:
[a] The removal of NNL's excessive portion of HSC costs from the model impacts the excess cost return by 15% of NNL's HSC cost for each RPE.

## 2.    Dr. Cooper's Corrected View

**Estimate of NNL Excess Headquarter and Stewardship Costs: 2006 - 2008**

| Line | Description | Value | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| | | | | | |
| 1 | Total Global HQ Costs | | 971.4 | 885.7 | 800.0 |
| 2 | Estimated NNL % | Estimated NNL HQ Costs | *26.1%* | 253.4 | 231.0 | 208.7 |
| 3 | Excess Estimated % | NNL Excess HQ Costs | *50%* | 126.7 | 115.5 | 104.3 |
| 4 | Stewardship | | - | - | - |
| 5 | Markup | | 15% | 15% | 15% |
| 6 | NNL Total Estimated Excess Headquarter and Stewardship Costs | | 145.7 | 132.8 | 120.0 |

**Notes:**
(1) Values in millions of USD

**Corrected Cost Adjustment to EMEA RPEs**

| Line | Description | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|
| 1 | NNL Total Estimated Excess HQ Costs and Stewardship | 145.7 | 132.8 | 120.0 |
| 2 | NNUK Share of Capital Stock | 6.12% | 4.99% | 3.59% |
| 3 | Headquarter and Stewardship Cost Adjustment to NNUK (Line 1 * Line 2) | 8.91 | 6.62 | 4.30 |
| 4 | NNSA Share of Capital Stock | 10.80% | 12.16% | 11.33% |
| 5 | Headquarter and Stewardship Cost Adjustment to NNSA (Line 1 * Line 4) | 15.74 | 16.15 | 13.59 |
| 6 | NN Ireland Share of Capital Stock | 0.80% | 0.89% | 1.06% |
| 7 | Headquarter and Stewardship Cost Adjustment to NN Ireland (Line 1 * Line 6) | 1.16 | 1.18 | 1.28 |

Notes:

(1) Values in millions of USD

## C.    Headquarters Cost Estimate

**Dr. Cooper's Estimate of NNL's Excess Headquarters Costs: 2001 - 2008**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|------|-------------|------|------|------|------|------|------|------|------|
| 1 | Total Global Headquarters Cost | 1,400.0 | 1,314.3 | 1,228.6 | 1,142.9 | 1,057.1 | 971.4 | 885.7 | 800.0 |
| 2 | Estimated NNL Share | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% | 26.08% |
| 3 | Total NNL Headquarters Costs (Line 1 * Line 2) | 365.2 | 342.8 | 320.5 | 298.1 | 275.7 | 253.4 | 231.0 | 208.7 |
| 4 | Dr. Cooper's Excess Cost Assumption | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% |
| 5 | Total NNL Excess Headquarters Costs (Line 3 * Line 4) | 182.6 | 171.4 | 160.2 | 149.1 | 137.9 | 126.7 | 115.5 | 104.3 |

Notes:

(1) Values in millions of USD

(2) Estimated NNL share of global headquarters costs based upon NNL's 2007 G&A headcount to Nortel's total 2007 G&A headcount (page 146 of Cooper Transfer Pricing Report)

(3) Dr. Cooper's excess cost assumption from page 146 of the Cooper Transfer Pricing report

## D.    Stewardship Cost Estimate

**Dr. Cooper's Estimate of NNL's Stewardship Costs: 2001 - 2005**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 |
|------|-------------|------|------|------|------|------|
| 1 | NNL Third-Party Revenue | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 |
| 2 | Stewardship as % of Third-Party Revenue | 1.43% | 1.43% | 1.43% | 1.43% | 1.43% |
| 3 | Stewardship Estimate as % of Third-Party Revenue (Line 1 * Line | 25.0 | 13.5 | 11.0 | 11.1 | 11.9 |

Notes:

(1) Values in millions of USD

(2) NNL third-party revenues form Nortel RPSM files

### E.    Long-Term Vendor Financing Receivables as Percentage of Long-Term Assets

**NNUK: Long-Term Vendor Financing Receivables as a Share of Long-Term Assets**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 |
|------|-------------|------|------|------|------|------|
| 1 | Average Long-Term Vendor Financing Receivables | 174.0 | 52.0 | 12.7 | 6.4 | - |
| 2 | Average Long-Term Asset Base | 652.5 | 333.7 | 159.2 | 87.6 | 79.0 |
| 3 | Financing Receivables Share of Long Term Assets (Line 1 / Line 2) | 26.7% | 15.6% | 8.0% | 7.3% | 0.0% |

**Notes:**

(1) Values in millions of USD

(2) Line 1 computed from NNC-NNL06136852, NNC-NNL06136853, NNC-NNL06136855, NNC-NNL06136857, NNC-NNL06136860, and NNC-NNL06136861

(3) Line 2 from Nortel's 2001 - 2005 RPSM files

### F.    NNUK Return on Capital Employed

**Capital Employed Data under Dr. Cooper's Unfiltered View**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Weighted Average |
|------|-------------|------|------|------|------|------|------|------|------|------------------|
| 1 | NNUK Capital Employed | 2,199.8 | 850.8 | 409.3 | 326.9 | 186.2 | 1,400.3 | 1,017.3 | 258.9 | 831.2 |
| 2 | NNUK Profit under Dr. Cooper's Unfiltered View | (158.6) | 41.8 | 156.2 | 87.6 | 106.2 | 36.1 | 59.3 | 47.4 | 47.0 |
| 3 | NNUK Return on Capital Employed (Line 2 / Line 1) | -7.2% | 4.9% | 38.2% | 26.8% | 57.0% | 2.6% | 5.8% | 18.3% | 5.7% |
| 4 | Capital Employed of all RPEs | 8,814.9 | 2,678.0 | 1,840.2 | 1,782.9 | 1,415.0 | 5,087.5 | 4,887.8 | 3,585.5 | 3,761.5 |
| 5 | RPE Profit under Dr. Cooper's Unfiltered View | (7,155.2) | (2,512.3) | (72.2) | (323.0) | (16.9) | (244.6) | (55.5) | (199.0) | (1,322.3) |
| 6 | RPE Return on Capital Employed (Line 5 / Line 4) | -81.2% | -93.8% | -3.9% | -18.1% | -1.2% | -4.8% | -1.1% | -5.6% | -35.2% |

**Notes:**

(1) Values in millions of USD

(2) 2001 - 2005 capital employed values from Nortel's 2001 - 2005 RPSM files

(3) 2006 - 2008 capital employed values constructed from Nortel's 2006 - 2008 trial balances (N NNC-NNL06136866, NNC-NNL06136868, and NNC-NNL06136870, respectively)

# III.    Supporting Data for Intercompany Loans

## A.    Cash to Revenues Data

**Total Cash to Third-Party Revenues: 2001 - 2008**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Weighted Average |
|------|-------------|------|------|------|------|------|------|------|------|------------------|
| 1 | NNL Total Cash | 64.1 | 125.9 | 77.6 | 63.4 | 185.8 | 469.9 | 505.2 | 277.1 | 221.1 |
| 2 | NNL Third-Party Revenues | 1,752.4 | 948.3 | 767.8 | 780.4 | 835.3 | 891.9 | 1,015.3 | 789.9 | 972.7 |
| 3 | NNL Total Cash to Third Party Revenues (Line 1 / Line 2) | 3.7% | 13.3% | 10.1% | 8.1% | 22.2% | 52.7% | 49.8% | 35.1% | 22.7% |
| 4 | NNI Total Cash | 790.4 | 2,037.8 | 1,898.3 | 1,953.1 | 1,486.9 | 1,180.1 | 1,135.6 | 927.9 | 1,426.2 |
| 5 | NNI Third-Party Revenues | 10,105.4 | 6,029.2 | 5,400.0 | 4,706.5 | 5,020.4 | 4,694.6 | 4,635.7 | 4,154.0 | 5,593.2 |
| 6 | NNI Total Cash to Third Party Revenues (Line 4 / Line 5) | 7.8% | 33.8% | 35.2% | 41.5% | 29.6% | 25.1% | 24.5% | 22.3% | 25.5% |
| 7 | NNUK Total Cash | 187.5 | 364.3 | 627.8 | 675.4 | 486.3 | 368.0 | 377.9 | 394.9 | 435.3 |
| 8 | NNUK Third-Party Revenues | 1,229.9 | 678.3 | 482.4 | 449.7 | 531.6 | 684.6 | 684.5 | 630.9 | 671.5 |
| 9 | NNUK Total Cash to Third Party Revenues (Line 7 / Line 8) | 15.2% | 53.7% | 130.1% | 150.2% | 91.5% | 53.8% | 55.2% | 62.6% | 64.8% |
| 10 | NNSA Total Cash | 19.8 | 20.2 | 25.0 | 9.0 | 13.1 | 11.7 | 22.4 | 22.7 | 18.0 |
| 11 | NNSA Third-Party Revenues | 269.9 | 183.4 | 269.7 | 399.0 | 455.7 | 371.4 | 357.3 | 234.5 | 317.6 |
| 12 | NNSA Total Cash to Third Party Revenues (Line 10 / Line 11) | 7.3% | 11.0% | 9.3% | 2.3% | 2.9% | 3.1% | 6.3% | 9.7% | 5.7% |
| 13 | NN Ireland Total Cash | 33.0 | 26.7 | 41.4 | 50.2 | 53.3 | 100.2 | 128.3 | 83.3 | 64.5 |
| 14 | NN Ireland Third-Party Revenues | 247.0 | 198.9 | 278.3 | 327.2 | 365.6 | 485.7 | 588.8 | 590.9 | 385.3 |
| 15 | NN Ireland Total Cash to Third Party Revenues (Line 13 / Line 14) | 13.4% | 13.4% | 14.9% | 15.3% | 14.6% | 20.6% | 21.8% | 14.1% | 16.8% |
| 16 | NN Australia Total Cash | 28.9 | 41.3 | 46.4 | 35.4 | 19.7 | 19.1 | 24.2 | | 30.7 |
| 17 | NN Australia Third-Party Revenues | 172.8 | 98.3 | 176.6 | 152.2 | 149.4 | 349.2 | 177.6 | | 182.3 |
| 18 | NN Australia Total Cash to Third Party Revenues (Line 16 / Line 17) | 16.7% | 42.0% | 26.3% | 23.3% | 13.2% | 5.5% | 13.7% | | 16.8% |

**Notes:**

(1) Values in millions of USD

(2) Total cash for 2001 - 2003 from Nortel's RONA files

(3) Total cash for 2004 - 2008 from NNL-NNC06136860, NNL-NNC06136861, NNL-NNC06136864, NNL-NNC06136866, and NNL-NNC06136868

(4) Third-party revenues from Nortel's RPSM files

## B.  Cash to Total Assets Data

**Total Cash to Total Assets: 2001 - 2008**

| Line | Description | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Weighted Average |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | NNL Total Cash | 64.1 | 125.9 | 77.6 | 63.4 | 185.8 | 469.9 | 505.2 | 277.1 | 221.1 |
| 2 | NNL Total Assets | 33,440.9 | 26,995.1 | 26,153.4 | 25,552.7 | 25,230.5 | 25,231.9 | 25,512.1 | 33,773.9 | 27,736.3 |
| 3 | NNL Total Cash to Total Assets (Line 1 / Line 2) | 0.2% | 0.5% | 0.3% | 0.2% | 0.7% | 1.9% | 2.0% | 0.8% | 0.8% |
| 4 | NNI Total Cash | 790.4 | 2,037.8 | 1,898.3 | 1,953.1 | 1,486.9 | 1,180.1 | 1,135.6 | 927.9 | 1,426.2 |
| 5 | NNI Total Assets | 15,262.3 | 8,574.7 | 6,430.1 | 9,966.4 | 12,833.3 | 13,386.5 | 12,859.8 | 8,781.3 | 11,011.8 |
| 6 | NNI Total Cash to Total Assets (Line 4 / Line 5) | 5.2% | 23.8% | 29.5% | 19.6% | 11.6% | 8.8% | 8.8% | 10.6% | 13.0% |
| 7 | NNUK Total Cash | 187.5 | 364.3 | 627.8 | 675.4 | 486.3 | 368.0 | 377.9 | 394.9 | 435.3 |
| 8 | NNUK Total Assets | 7,953.9 | 3,356.7 | 2,870.2 | 3,213.6 | 3,687.7 | 3,415.8 | 3,603.6 | 2,876.5 | 3,872.2 |
| 9 | NNUK Total Cash to Total Assets (Line 7 / Line 8) | 2.4% | 10.9% | 21.9% | 21.0% | 13.2% | 10.8% | 10.5% | 13.7% | 11.2% |
| 10 | NNSA Total Cash | 19.8 | 20.2 | 25.0 | 9.0 | 13.1 | 11.7 | 22.4 | 22.7 | 18.0 |
| 11 | NNSA Total Assets | 735.1 | 594.0 | 569.4 | 856.6 | 831.8 | 673.5 | 647.8 | 481.9 | 673.8 |
| 12 | NNSA Total Cash to Total Assets (Line 10 / Line 11) | 2.7% | 3.4% | 4.4% | 1.1% | 1.6% | 1.7% | 3.5% | 4.7% | 2.7% |
| 13 | NN Ireland Total Cash | 33.0 | 26.7 | 41.4 | 50.2 | 53.3 | 100.2 | 128.3 | 83.3 | 64.5 |
| 14 | NN Ireland Total Assets | 222.2 | 166.6 | 166.9 | 283.5 | 361.8 | 385.0 | 368.5 | 276.5 | 278.9 |
| 15 | NN Ireland Total Cash to Total Assets (Line 13 / Line 14) | 14.8% | 16.0% | 24.8% | 17.7% | 14.7% | 26.0% | 34.8% | 30.1% | 23.1% |
| 16 | NN Australia Total Cash | 28.9 | 41.3 | 46.4 | 35.4 | 19.7 | 19.1 | 24.2 | | 30.7 |
| 17 | NN Australia Total Assets | 163.8 | 110.7 | 128.7 | 171.0 | 193.5 | 153.3 | 97.6 | | 145.5 |
| 18 | NN Australia Total Cash to Total Assets (Line 16 / Line 17) | 17.7% | 37.3% | 36.0% | 20.7% | 10.2% | 12.4% | 24.8% | | 21.1% |

Notes:

(1) Values in millions of USD

(2) Total cash and assets for 2001 - 2003 from Nortel's RONA files

(3) Total cash and assets for 2004 - 2008 from NNL-NNC06136860, NNL-NNC06136861, NNL-NNC06136864, NNL-NNC06136866, and NNL-NNC06136868

## C.    Calculation of Average Loan Balance

**NNUK Average Monthly Loan Balance: 2003 - 2008**

| Month | 2003 | | | 2004 | | | 2005 | | | 2006 | | | 2007 | | | 2008 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GBP (millions) | Exchange Rate | USD (millions) | GBP (millions) | Exchange Rate | USD (millions) | GBP (millions) | Exchange Rate | USD (millions) | GBP (millions) | Exchange Rate | USD (millions) | GBP (millions) | Exchange Rate | USD (millions) | GBP (millions) | Exchange Rate | USD (millions) |
| January | £ - | 1.62 | $ - | £ 113.0 | 1.82 | $ 205.51 | £ 194.0 | 1.88 | $ 365.01 | £ 349.5 | 1.76 | $ 615.89 | £ 427.7 | 1.96 | $ 837.35 | £ 148.6 | 1.97 | $ 292.58 |
| February | £ - | 1.61 | $ - | £ 113.0 | 1.86 | $ 210.51 | £ 194.0 | 1.89 | $ 366.06 | £ 376.2 | 1.75 | $ 658.01 | £ 455.1 | 1.96 | $ 890.90 | £ 148.6 | 1.96 | $ 291.61 |
| March | £ - | 1.58 | $ - | £ 113.0 | 1.83 | $ 206.44 | £ 230.0 | 1.91 | $ 438.33 | £ 376.2 | 1.74 | $ 656.24 | £ 449.0 | 1.95 | $ 874.22 | £ 125.4 | 2.00 | $ 250.82 |
| April | £ - | 1.57 | $ - | £ 136.7 | 1.81 | $ 247.12 | £ 230.0 | 1.90 | $ 435.92 | £ 376.2 | 1.76 | $ 663.43 | £ 449.0 | 1.99 | $ 891.55 | £ 125.4 | 1.98 | $ 248.59 |
| May | £ - | 1.62 | $ - | £ 136.7 | 1.79 | $ 244.33 | £ 230.0 | 1.86 | $ 427.04 | £ 376.2 | 1.87 | $ 702.33 | £ 449.0 | 1.98 | $ 890.97 | £ 125.4 | 1.97 | $ 246.46 |
| June | £ - | 1.66 | $ - | £ 136.7 | 1.83 | $ 250.12 | £ 268.0 | 1.82 | $ 487.55 | £ 376.2 | 1.85 | $ 694.54 | £ 449.0 | 1.98 | $ 891.10 | £ 134.3 | 1.97 | $ 264.28 |
| July | £ - | 1.63 | $ - | £ 136.7 | 1.84 | $ 252.06 | £ 268.0 | 1.75 | $ 469.70 | £ 376.2 | 1.85 | $ 694.24 | £ 449.0 | 2.03 | $ 912.16 | £ 134.3 | 1.99 | $ 267.25 |
| August | £ - | 1.59 | $ - | £ 136.7 | 1.82 | $ 248.92 | £ 268.0 | 1.79 | $ 480.71 | £ 376.2 | 1.89 | $ 711.36 | £ 449.0 | 2.01 | $ 903.36 | £ 134.3 | 1.89 | $ 254.46 |
| September | £ - | 1.61 | $ - | £ 164.0 | 1.79 | $ 293.92 | £ 268.0 | 1.81 | $ 485.40 | £ 386.2 | 1.89 | $ 728.84 | £ 449.0 | 2.02 | $ 906.37 | £ 130.4 | 1.80 | $ 235.00 |
| October | £ - | 1.68 | $ - | £ 164.0 | 1.81 | $ 296.50 | £ 349.5 | 1.77 | $ 616.94 | £ 386.2 | 1.87 | $ 723.89 | £ 466.8 | 2.04 | $ 953.68 | £ 130.4 | 1.70 | $ 221.60 |
| November | £ - | 1.69 | $ - | £ 164.0 | 1.86 | $ 305.01 | £ 349.5 | 1.74 | $ 606.42 | £ 386.2 | 1.91 | $ 737.22 | £ 466.8 | 2.07 | $ 967.41 | £ 137.8 | 1.54 | $ 211.69 |
| December | £ 113.0 | 1.75 | $ 197.86 | £ 194.0 | 1.93 | $ 374.36 | £ 349.5 | 1.75 | $ 610.05 | £ 427.7 | 1.96 | $ 839.23 | £ 148.6 | 2.02 | $ 300.01 | £ 113.0 | 1.49 | $ 168.20 |
| **Average Monthly Balance** | **£ 9.4** | | **$ 16.5** | **£ 142.4** | | **$ 261.2** | **£ 266.5** | | **$ 482.4** | **£ 380.8** | | **$ 702.1** | **£ 425.7** | | **$ 851.6** | **£ 132.3** | | **$ 246.0** |

**Notes:**

(1) Loan balances calculated from "NNUK claim against NNL.pdf"

(2) Average monthly exchange rates obtained from http://www.oanda.com/

# I.  Initial Searches to Identify Potential Third Party Joint Development Agreements

Economics Partner, LLC ("EP") conducted an extensive search to identify third-party agreements that involve the joint funding and development of intangible property. EP conducted three searches using the ktMINE database, a subscription database of intangible property licensing agreements compiled from the US Securities and Exchange Commission ("SEC") Edgar Archive and other public sources. These searches, which are described in detail in Section IV of my report, are summarized below. Section II of this appendix provides tables summarizing EP's review and conclusions for each of the 162 potential joint development agreements that were identified through the three searches. Finally, Section III provides tables summarizing the initial qualitative reviews for each search that resulted in the 162 agreements that were reviewed in full.

## A.  ktMINE Search #1:  Joint Development Agreements in Nortel's Industry and Contiguous Industries

EP performed a search in the ktMINE database for "joint development" agreements that were classified in Nortel's industry or a contiguous industry using ktMINE's industry classification system.[1] EP searched for "joint development" agreements in the following industries in the ktMINE database:

- Computers: Hardware and Software
- Internet
- Telecommunications

This search yielded 373 agreements that the ktMINE database identified as "joint development" agreements in these three industries.

EP next performed an initial qualitative review of these 373 agreements to eliminate agreements that were clearly not joint development agreements (*e.g.*, contract R&D services arrangements), as well as remove duplicate agreements. This process resulted in 71 potential joint development agreements, which were reviewed in full. A matrix summarizing the 373

---

[1] ktMINE reviews each agreement and classifies it using the ktMINE's industry classification system. Searches can be conducted in the database using either the ktMINE industry classifications or Standard Industrial Classification ("SIC") code. While each agreement in the database is classified in one (or more) ktMINE industry, approximately two-thirds of the agreements in ktMINE have unknown SIC codes because the SIC code is not always included with the filing of the agreement. In addition, the SIC code is based on the classification of the filing company, while the ktMINE industry classification is assigned based on a review of the agreement and the intangible property it covers.

agreements and identifying the 71 potential joint development agreements from the initial qualitative review is provided in Section III of this appendix.

## B.    ktMINE Search #2:  "Restruct*" Keyword Search

EP conducted an additional search to identify potential joint development agreements that are likely to provide useful information for how third parties treat costs when jointly developing a shared intangible, and specifically how third parties define, quantify, and share (or do not share) certain costs.  For the reasons discussed in Section IV of this report, EP expanded its initial search by removing the industry classification screen, meaning that EP only required that the agreement be classified as a "joint development" agreement in the ktMINE database.

In order to identify potential joint development agreements that specifically address the treatment of restructuring costs, EP conducted a keyword search for joint development agreements in the ktMINE database that mention "restructuring" or some variation thereof anywhere in the agreement.  The specific search criteria employed are as follows:

- Agreement Type: Joint Development
- Keyword Search: "Restruct*"

This search identified 72 agreements in the ktMINE database.  As discussed in Section IV of my report, EP first reviewed each of these agreements to determine how the term "restructuring" (or its variant) was used in the agreement.  In addition to evaluating the use of the term "restructuring" in each agreement, EP also examined the 72 agreement to identify which agreements were joint development and/or collaboration agreements that could be expected to provide relevant information to examine how third parties treat costs in agreements covering the joint development of shared intangibles.  Through this process, EP identified 15 potential joint development agreements, which EP reviewed in full.  A matrix summarizing the 72 agreements and identifying the 15 potential joint development agreements from the initial qualitative review is provided in Section III of this appendix.

## C.    ktMINE Search #3:  "Development Plan" and "Own Cost*" Keyword Search

In order to identify additional joint development agreements that inform how third parties treat costs, and particularly if (and when) third parties agree to share or not share certain costs, EP conducted another keyword search in the ktMINE database.  A review of the joint development agreements identified in the initial searches indicated that terms like "development plan" and "own cost" were likely to indicate actual joint development agreements, and provide information on how costs are treated in such agreements.

As such, EP conducted a second keyword search in the ktMINE database using the following search criteria:

- Agreement Type: Joint Development
- Keyword Search: "Development Plan"
- Keyword Search: "Own Cost*"

This search identified 167 agreements in the ktMINE database. EP then performed an initial qualitative review of these agreements to identify which ones were likely to be joint development or collaboration agreements. Through this process, EP identified 76 potential joint development agreements, which were reviewed in full. A matrix summarizing the 167 agreements and identifying the 76 potential joint development agreements from the initial qualitative review is provided in Section III of this appendix.

The initial qualitative reviews conducted for each of these three searches resulted in a total of 162 potential joint development agreements. EP reviewed each of these agreements in full in order to examine how third parties treat costs in joint development arrangements. The results of this review and EP's conclusions are presented in Section II of this appendix.

## II.    Summary and Conclusions for Joint Development Agreements Reviewed in Full

EP reviewed the 162 potential joint development agreements in full to examine how third parties engaged in the joint development of intangible property treat costs like restructuring, pension costs, and customer financing losses, and more generally how third parties contract around and deal with costs *ex ante*.

In examining how third parties in joint development-type arrangements treat costs, the first contractual arrangement to note is that not all joint development arrangements involve the sharing of costs. That is, in some joint development arrangements, the parties agree to perform certain activities related to the development and exploitation of the shared intangibles, and each party is solely responsible for the costs and expenses it incurs related to those activities. In such arrangements, the parties may not share any costs, or may agree to share only very specific costs (*e.g.,* patent filing costs, infringement or litigation costs, etc.). By contrast, other types of joint development arrangements involve the parties not only agreeing to perform specific tasks related to the development and exploitation of the shared intangibles, but also agreeing *ex ante* to share costs in some proportion (*e.g.,* by reallocating the costs incurred by each party to match the agreed shares).[2]

Of the 162 potential joint development agreements, EP found 53 agreements that were characterized by the parties agreeing to primarily share the costs related to the development

---

[2] It bears noting that not all joint development agreements conform to this dichotomy, and the scope and type of costs that are shared (or borne internally) varies and may depend on the specific circumstances of an agreement. However, this paradigm does provide a useful guide for understanding one of the major contractual nodes of joint development agreements – namely, whether parties primarily bear their own costs or share costs related to the development and exploitation of the shared intangible.

and/or exploitation of intangibles in some manner.[3]  It is instructive to note that the majority of the 162 agreements reviewed do not involve third parties explicitly agreeing *ex ante* to share costs, indicating that third parties commonly agree to bear their own costs in exchange for a share of a jointly developed intangible.  The fact that each party bears its own costs in these types of agreements mitigates the need for third parties to carefully contract around the definition (and treatment) of specific costs because the parties are not sharing such costs.

Parties in "cost sharing" joint development arrangements (*i.e.,* the 53 agreements in which the parties appear to share the costs associated with the development and exploitation of a shared intangible) will generally contract around the scope of the costs to be shared, and the definition and treatment of shared (and non-shared) costs.  Cost sharing joint development arrangements typically contain more contractual terms around the treatment of costs than agreements in which each party is responsible for its own costs.  As such, these cost sharing joint development arrangements can be used to examine what costs third parties agree to share *ex ante*, and how they contract around the sharing of these costs.

This section summarizes the findings and conclusions of EP's review of the 162 potential joint development agreements.  For presentation purposes, these findings and conclusions are presented in two tables below.  The first table summarizes the main conclusions for each agreement, and the second table contains detailed notes on each agreement from the qualitative review.  These tables are described and presented in turn in the subsections that follow.

## A.    Table #1:  Summary of Conclusions by Agreement

The table in this section presents the conclusions and summary of the qualitative review for each agreement, as well as summarizes the key findings with respect to restructuring, non-GAAP pension costs, and customer financing losses.  The table is divided into four sections: (1) an agreement summary, (2) Restructuring Costs, (3) Non-GAAP Pension Costs, and (4) Customer Financing.

The agreement summary identifies each agreement by its ktMINE identification number.[4]  For each agreement, the table identifies whether the agreement can primarily be classified as a cost sharing joint development agreement, or if the parties are primarily bearing their own costs.[5]

---

[3] As noted above, even in cases where the parties agree to bear their own respective costs, the parties may agree to share certain expenses like patent costs, infringement, or litigation.  While these agreements may involve sharing some specific costs, these types of arrangements are distinguished from "cost sharing" joint development arrangements wherein the parties share some (or all) of the major costs related to developing and exploiting the shared intangibles.

[4] The tables presented in Section III of this appendix list each agreement and the parties involved by ktMINE ID number.

[5] It bears noting that the set of 162 potential joint development agreements also include agreements in which one party bore all costs, or in which it was unclear how costs were being treated.  Additionally, after a detailed qualitative review, EP determined that some of the agreements were not in fact joint development agreements (*e.g.,* licensing agreements, contract R&D or software development agreements).

(The 53 agreements in which the parties primarily share costs are identified with a "1" in the fifth column of the table.)

The Restructuring Costs section identifies whether and how the parties define the scope of shared costs, and summarizes EP's findings for each agreement.  Each agreement was reviewed to examine whether the parties: (1) define "development costs" and/or other costs related to the development and exploitation of the shared intangibles, (2) define a development plan and/or budget related to the intangible development activity, (3) define "cost overruns" or "excess costs" related to the development activity, and (4) address how such cost overruns or excess costs will be borne by the parties.  Finally, this section summarizes whether the agreement provides either explicit or implicit evidence for how the parties do or would treat restructuring costs.  In the context of restructuring costs, "explicit evidence" would mean that the parties explicitly address the treatment of restructuring costs in the agreement.  "Implicit evidence" would involve parties agreeing *ex ante* to limit the scope of the costs to be shared (*i.e.*, by defining the development costs that can be shared, by agreeing to a development plan and budget, and by agreeing *ex ante* to address excess costs).[6]

The Non-GAAP Pension Costs section identifies whether each agreement mentions pension and/or employee benefits costs, and whether the parties agree to a specific accounting standard (*e.g.*, GAAP, IFRS, another mutually agreed-upon accounting standard).  Finally, the third column in this section identifies those agreements for which the parties are sharing costs and specify an accounting standard specifically for costs.  (The agreements that involve sharing costs and specify an accounting system are denoted with a "1," while agreements that do not specify a cost accounting system are denoted with a "0" and agreements that do not share costs are denoted by "N/A.")

The Customer Financing section identifies the compensation structure for each agreement (*e.g.*, a revenue-based royalty, a profit split, a territorial division or other divisional interest, etc.), and whether the agreement specifically addresses the treatment of bad debt expense.  If the parties explicitly include bad debt expense in either the definition of net sales (*i.e.*, deducting the allowance for bad debts when calculating net sales) or the definition of the costs being shared, it indicates that third parties agree to share bad debt expense.  If the parties agree to split profit (*i.e.*, share revenue and certain expenses), a definition of the shared "profit" that begins with net sales also implies that the parties likely share bad debt expense as the provision for bad debts is expected to be included either in net sales or as an operating expense.

Finally, the bottom of the table summarizes EP's conclusions from this review process.  For restructuring costs, EP found that all 53 of the cost sharing joint development agreements identified define the "development costs" and/or other costs to be shared.  52 of these agreements also defined a development plan and/or development budget related to the development of the shared intangible.  Further 28 of these cost sharing agreements provide

---

[6] The "Explicit Evidence" and "Implicit Evidence" columns are coded as "N/A" in the table if the parties do not appear to be sharing costs, or if the agreement is not a relevant joint development agreement.

some definition of cost overruns and/or excess costs, and 27 address how such overruns or and excess costs will be borne.  Similarly, for the treatment of non-GAAP pension costs, EP found that 35 of the 53 cost sharing agreements specify that the parties account for costs using GAAP or some other mutually agreed-upon accounting standard.  Finally, EP found that 20 of the 162 agreements specifically address the treatment of bad debt expense in the context of either a revenue-based royalty or a profit split.

| # | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Defines Development Costs and/or Other Costs | Defines Development Plan/Budget | Defines Cost Overruns/ Excess Costs | Address Bearer of Cost Overruns/ Excess Costs | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Mentions Pension / Employee Benefits | Agreement Specifies Accounting Treatment | Cost Accounting Specified (1=Yes, 0=No/Unclear, N/A=Not Sharing) | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 50415 | | Each Party Bears Own (exceptions noted) | 0 | Yes | Yes | No | No | N/A (parties bear own) | N/A (parties bear own) | Yes | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 2 | 50151 | | Unclear / Each Party Bears Own | 0 | No | No | No | No | N/A (parties bear own) | N/A (parties bear own) | No | No | N/A | Revenue-based royalty | No | N/A | N/A |
| 3 | 49010 | | Each Party Bears Own | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Fee-Based | No | N/A | N/A |
| 4 | 49527 | | Each Party Bears Own | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Fixed fee per month and revenue sharing | No | N/A | N/A |
| 5 | 49572 | | Each Party Bears Own (see notes) | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty and Divisional Interest | No | N/A | N/A |
| 6 | 67384 | | One Party Bears All | 0 | Yes | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 7 | 68101 | | Share Cost | 1 | Yes | Yes | No | No | No | Yes | No | Yes | 1 | Revenue-Based Royalty | No | N/A (insufficient information) | N/A (insufficient information) |
| 8 | 64036 | | Unclear | 0 | Yes | Yes | Yes | No | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | No | No | N/A | Development Fee | No | N/A | N/A |
| 9 | 64597 | | No Sharing - License Agreement | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 10 | 64604 | | Share Cost | 1 | Yes | Yes | No | No | No | No | No | Yes | 0 | Revenue-Based Royalty | No | N/A | N/A |
| 11 | 63799 | | Share Cost | 1 | Yes | Yes | Yes | Yes | No | No | No | Yes | 0 | Profit Split (Revenue-Based Royalty) | No | N/A | Yes |
| 12 | 63864 | | Each Party Bears Own | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 13 | 9794 | | Share Cost | 1 | No | No | No | No | No | No | No | No | 0 | Revenue-Based Royalty | No | N/A | N/A |
| 14 | 9754 | Yes | | | | | | | | | | | | | | | |
| 15 | 9876 | | Each party bears own | 0 | No | No | No | No | No | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 16 | 11001 | Yes | | | | | | | | | | | | | | | |
| 17 | 11026 | | Unclear/Share Cost | 1 | Yes | Yes | No | No | No | Yes | Yes | Yes | 1 | N/A | No | N/A | N/A |
| 18 | 15974 | | One Party Bears All | 0 | No | No | No | N/A | No | N/A (not sharing costs) | No | No | N/A | Splits Profit | No | N/A | N/A |
| 19 | 15793 | | Unclear/Each party bears own | 0 | No | No | No | N/A | No | N/A (not sharing costs) | No | No | N/A | N/A | No | N/A | N/A |
| 20 | 28260 | | Each party bears own | 0 | No | No | No | N/A | No | N/A (not sharing costs) | No | Yes | 0 | Revenue-Based Royalty | Yes | Yes | N/A |
| 21 | 33337 | | Unclear | 0 | No | No | No | N/A | No | N/A (not sharing costs) | No | Yes | N/A | Profit-based royalty | No | N/A | N/A |
| 22 | 33836 | | Each party bears own | 0 | No | No | No | N/A | N/A | N/A (not sharing costs) | No | No | N/A | N/A | No | N/A | N/A |
| 23 | 35207 | | One Party Bears All | 0 | Yes | Yes | No | | N/A | N/A (not sharing costs) | No | No | N/A | N/A | No | N/A | N/A |
| 24 | 41360 | | Each party bears own | 0 | No | Yes | No | N/A | No | N/A (not sharing costs) | No | No | N/A | N/A | No | N/A | N/A |
| 25 | 46551 | | Share Cost | 1 | Yes | Yes | No | N/A | No | Yes | Yes | Yes | 1 | Splits Profit | No | No | Yes |
| 26 | 51022 | | Unclear/Each party bears own | 0 | No | No | No | N/A | No | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 27 | 50687 | | Each party bears own | 0 | Yes | Yes (Plan) | No | N/A | No | N/A (not sharing costs) | No | Yes | N/A | Milestone payments, royalty | No | N/A | N/A |
| 28 | 54413 | | Unclear/Each party bears own | 0 | No | Yes (Plan) | No | N/A | No | N/A (not sharing costs) | No | Yes | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 29 | 53346 | | One Party Bears All | 0 | No | No | No | Yes | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Development Fee; Revenue-based Royalty | No | N/A (contract software development agreement) | N/A (contract software development agreement) |
| 30 | 54977 | | One Party Bears All | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Development Fee; Per User Fee | No | N/A (contract software development agreement) | N/A (contract software development agreement) |
| 31 | 59378 | | Unclear / Not a JD Agreement | 0 | No | No | No | No | N/A (insufficient information) | N/A (insufficient information) | No | Yes | N/A | Upfront Fee | No | N/A (insufficient information) | N/A (insufficient information) |
| 32 | 58746 | | Each Party Bear Own / Unclear | 0 | No | No | No | Yes | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Divisional Interest | No | N/A | N/A |
| 33 | 58764 | | Unclear (Share specific cost - see notes) | 0 | No | No | No | No | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 34 | 11546 | | Each Party Bears Own / Not a JD Agreement | 0 | No | No | No | N/A | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-based Royalty | No | N/A (revenue-based royalty) | N/A (revenue-based royalty) |
| 35 | 25773 | | Unclear / One Party Bears All (see notes) | 0 | No | No | No | No | N/A (unclear, insufficient information) | N/A (unclear, insuff. info.) | No | No | N/A | Divisional Interest; Revenue-Based Royalty (see | No | N/A | N/A |

| | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | | | NON-GAAP PENSION COSTS | | | CUSTOMER FINANCING | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Defines Development Costs and/or Other Costs | Defines Development Plan/Budget | Defines Cost Overruns/ Excess Costs | Address Bearer of Cost Overruns/ Excess Costs | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Mentions Pension / Employee Benefits | Agreement Specifies Accounting Treatment | Cost Accounting Specified (1=Yes, 0=No/Unclear, N/A=Not Sharing) | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 36 | 25793 | | Each Party Bears Own (see notes) | 0 | Yes | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | Yes | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 37 | 30245 | | Each Party Bears Own | 0 | No | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | Yes | N/A | License Fee and Divisional Interest | No | N/A | N/A |
| 38 | 30774 | | Each Party Bears Own | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 39 | 35752 | | Each Party Bears Own | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Fee Payment / Revenue-Based Royalty | No | N/A | N/A |
| 40 | 35973 | | Each Party Bears Own | 0 | No | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | No | N/A |
| 41 | 38810 | | One Party Bears All | 0 | No | No | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | Yes | Yes | N/A |
| 42 | 42642 | | Each Party Bears Own / Unclear | 0 | No | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Stock Issuance and Royalty and Split Profit | No | N/A | N/A |
| 43 | 43295 | | Each Party Bears Own | 0 | No | Yes | N/A | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 44 | 48152 | | Each Party Bears Own / Unclear | 0 | Yes | Yes | Yes | Yes (see notes) | N/A (not sharing costs) | N/A (unclear, not sharing costs) | Yes | Yes | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 45 | 48567 | | Unclear | 0 | No | No | No | No | N/A (insufficient information) | N/A (insufficient information) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 46 | 63664 | | Each Party Bears Own | 0 | No | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 47 | 60027 | | Each Party Bears Own / Unclear | 0 | Yes | Yes | Yes | Yes (see notes) | N/A (not sharing costs) | N/A (not sharing costs) | No | Yes | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 48 | 60323 | | Each Party Bears Own | 0 | No | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 49 | 60798 | | Each Party Bears Own | 0 | Yes | Yes | N/A | No | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Unknown | No | N/A | N/A |
| 50 | 62201 | | Unclear / Each Party Bears Own (see notes) | 0 | Yes | Yes | N/A | No | N/A (unclear, not sharing costs) | N/A (unclear, not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 51 | 69243 | | One Party Bears All | 0 | Yes | Yes | N/A | N/A | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Other | No | N/A | N/A |
| 52 | 69392 | | Unclear | 0 | No | No | No | No | N/A (unrelated agreement) | N/A (unrelated agreement) | No | No | N/A | Other | No | N/A | N/A |
| 53 | 80088 | | Each Party Bears Own | 0 | Yes | Yes | No | No | N/A (not sharing costs) | N/A (not sharing costs) | No | Yes | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 54 | 102651 | | One Party Bears All | 0 | Yes | Yes | No | Yes | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | N/A |
| 55 | 10723 | | One Party Bears All | 0 | Yes | No | No | Yes | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Revenue-Based Royalty | No | N/A | No |
| 56 | 10827 | Yes | | | | | | | | | | | | | | | |
| 57 | 10828 | | Each Party Bears Own / Unclear | 0 | No | Yes | No | No | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | No | No | N/A | Territorial Division, Revenue-based Royalty | No | N/A | N/A |
| 58 | 11067 | Yes | | | | | | | | | | | | | | | |
| 59 | 11288 | Yes | | | | | | | | | | | | | | | |
| 60 | 24358 | Yes | | | | | | | | | | | | | | | |
| 61 | 25435 | | Unclear | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | Both | No | N/A | N/A |
| 62 | 29957 | | One Party Bears All / Unclear | 0 | | | | | | | No | | N/A | Revenue-based Royalty | No | N/A | N/A |
| 63 | 29970 | | One Party Bears All | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | No | N/A | N/A |
| 64 | 29988 | | Each Party Bears Own | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | No | N/A | N/A |
| 65 | 35740 | | One Party Bears All | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | No | N/A | N/A |
| 66 | 41419 | | Unclear | 0 | No | No | No | No | N/A | N/A (not sharing costs, unclear) | No | No | N/A | Per Unit Royalty | No | N/A | N/A |
| 67 | 41453 | | Unclear / Each Party Bears Own | 0 | No | Yes | N/A | No | N/A | N/A | No | No | N/A | Territorial Division | No | N/A | N/A |
| 68 | 41454 | | Each Party Bears Own | 0 | No | Yes | No | N/A | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Territorial Division | No | N/A | N/A |
| 69 | 47103 | | N/A (unrelated agreement) | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | No | N/A | N/A |
| 70 | 47241 | | N/A (unrelated agreement) | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | No | N/A | N/A |
| 71 | 47489 | | N/A (unrelated agreement) | 0 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | No | N/A | N/A |

| | AGREEMENT SUMMARY | | | | RESTRUCTURING COSTS | | | | | | NON-GAAP PENSION COSTS | | | CUSTOMER FINANCING | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| z | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Defines Development Costs and/or Other Costs | Defines Development Plan/Budget | Defines Cost Overruns/ Excess Costs | Address Bearer of Cost Overruns/ Excess Costs | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Mentions Pension / Employee Benefits | Agreement Specifies Accounting Treatment | Cost Accounting Specified (1=Yes, 0=No, N/A=Not Sharing) | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 72 | 12421 | | Unclear / Each Party Bears Own | 0 | No (see notes) | No | No | No | N/A (not cost sharing) | N/A (not cost sharing) | Yes | Yes | N/A | Revenue-based Royalty | No | N/A | N/A |
| 73 | 10496 | Yes | | | | | | | | | | | | | | | |
| 74 | 70329 | | Unclear / Each Party Bears Own / Some Shared | 0 | No | Yes | No | N/A | N/A (insufficient information) | N/A (insufficient information) | No | Yes | N/A | Revenue-based royalty | Yes | Yes | |
| 75 | 43377 | | Share | 0 | Yes (see notes) | Yes (plan, see notes) | No | N/A | No | Yes | No | No | | Divisional Interest | No | N/A | N/A |
| 76 | 10333 | | Unclear / One Party Bears All | 0 | No | No | No | No | N/A (not cost sharing/insuff. info.) | N/A (not cost sharing/insuff. info.) | No | No | | Revenue-based Royalty | No | N/A | N/A (revenue-based royalty) |
| 77 | 16389 | | Share | 1 | Yes | Yes | Yes | No | Yes | Yes | N/A | Yes | 1 | Revenue-based Royalty | No | N/A | N/A |
| 78 | 37819 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | 1 | Unclear (Splits Marketing Contribution), Revenue-based Royalty | No | N/A (insufficient information) | N/A (insufficient information) |
| 79 | 45837 | | Each Party Bears Own | 0 | No | Yes | N/A | N/A | N/A (not sharing costs) | N/A (not sharing costs) | No | No | N/A | Unclear | No | N/A | N/A |
| 80 | 38029 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | 1 | Splits Profit | Yes | Yes | |
| 81 | 45217 | | Share | 1 | Yes | Yes | No | N/A | No | Yes | Yes | Yes | 1 | Splits Profit | Yes | Yes | |
| 82 | 22390 | | Share | 1 | Yes | Yes | No | Unknown | No | Yes | Yes | Yes | 1 | Splits Profit | Yes | Yes | |
| 83 | 24289 | | Share / Unclear | 1 | Yes | Yes | No | N/A | Yes (see notes) | Yes | Yes | Yes | 1 | Splits Profit | No | N/A (insufficient information) | N/A (insufficient information) |
| 84 | 16865 | | Share | 1 | Yes | Yes | No | N/A | No | Yes | Yes | No (see notes) | 0 | Splits Profit | Yes | Yes | |
| 85 | 26232 | | Share | 1 | Yes | Yes | No | No | No | Yes | Yes | Yes | 1 | Revenue-based Royalty and Profit Split | No | No | Yes |
| 86 | 70104 | | Share | 1 | Yes | Yes | No | N/A | No | Yes | Yes | Yes | 1 | Splits Profit | No | No | N/A |
| 87 | 1220 | | Share | 1 | Yes | Yes | No | N/A | No | Yes | No | Yes | 1 | Revenue-based Royalty | No | N/A | N/A |
| 88 | 9029 | | One Party Bears All | 0 | Yes | Yes | Yes* | Yes* | N/A | N/A | No | No | N/A | Revenue-based Royalty | No | N/A | N/A |
| 89 | 9037 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Revenue-based Royalty | No | N/A | N/A |
| 90 | 9046 | | Unclear | | Yes | Yes | | | N/A | N/A | No | No | N/A | Revenue-based Royalty | No | N/A | N/A |
| 91 | 9346 | | Each Party Bears Own / Unclear | 0 | Yes | Yes | No | N/A | N/A | N/A | No | No | N/A | Revenue-based Royalty | Yes | Yes | |
| 92 | 10530 | | N/A - Joint Venture | | | | | | No | N/A | No | No | N/A | Revenue-based Royalty and Profit Split | No | No | Yes |
| 93 | 11901 | | Share | 1 | Yes | Yes | | | No | Yes | No | Yes | 1 | Revenue-based Royalty and Profit Split | No | No | Yes |
| 94 | 13792 | | Some Shared | 1 | Yes | Yes | | | No | Yes | No | Yes | 1 | Profit Split | Yes | Yes | Yes |
| 95 | 15752 | | Each Party Bears Own / Some Shared | 1 | Yes | Yes | | | No | N/A (unclear; bear own dev costs) | No | Yes (see notes) | 0 | Revenue-based Royalty and Profit Split | No | N/A (insufficient information) | N/A (insufficient information) |
| 96 | 16221 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Profit Split | No | No | Yes |
| 97 | 17096 | | Share | 1 | Yes | Yes | Yes | No | Yes | No | Yes | Yes | 1 | Revenue-based Royalty and Profit Split | No | | Yes |
| 98 | 22168 | Yes | | | | | | | | | | | | | | | |
| 99 | 22443 | | Share / Unclear | 1 | Yes | Yes | No* | N/A* | No | Yes | No | Yes | 1 | Revenue-based Royalty | No | N/A | N/A |
| 100 | 22498 | | Each Party Bears Own | 0 | Yes | Yes | Yes | N/A | N/A | N/A | No | No | N/A | Revenue-based Royalty | Yes | Yes | |
| 101 | 22572 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 0 | Revenue-based Royalty | No | N/A | N/A |
| 102 | 22716 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | 1 | Unclear (redacted), but appears to be revenue-based royalty | No | N/A | N/A |
| 103 | 22721 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | 1 | Revenue-based Royalty and Profit Split | Yes | Yes | N/A |
| 104 | 23102 | | Unclear / One party bears all | 0 | Yes | Yes | Yes | Yes | N/A (not sharing costs) | N/A (not sharing costs) | No | Yes | N/A | Revenue-based Royalty | No | N/A | N/A |
| 105 | 23593 | | Each Party Bears Own | 0 | Yes | Yes | Yes | Yes | N/A | N/A | Yes | Yes | N/A | Revenue-based Royalty | No | N/A | N/A |
| 106 | 23704 | | Each Party Bears Own | 0 | Yes | Yes | Yes | Yes | N/A | N/A | No | No | N/A | Revenue-based Royalty | No | N/A | N/A |
| 107 | 25678 | | One party bears all | 0 | Yes | Yes | | | No | Yes | No | No | 0 | Revenue-based Royalty | No | N/A | N/A |
| 108 | 25920 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Revenue-based Royalty and Profit Split | No | | Yes |
| 109 | 26071 | | Each Party Bears Own | 0 | Yes | Yes | Yes | | No | Yes | No | Yes | 1 | Profit Split | No | | Yes |
| 110 | 26072 | | One party bears all | 0 | Yes | Yes | | | No | Yes | No | Yes | 1 | Revenue-based Royalty | No | | Yes |
| 111 | 26565 | | N/A - Formation of JV | | Yes | Yes | | | No | N/A | No | No | N/A | Revenue-based Royalty | No | | Yes |
| 112 | 27583 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 0 | Profit Split | No | | Yes |
| 113 | 28084 | | Share | 1 | Yes | Yes | Yes | | No | Yes | No | Yes | 1 | Revenue-based Royalty | No | N/A | N/A |
| 114 | 30018 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | 1 | Profit Split | No | | Yes |
| 115 | 31638 | | One Party Bears All | 0 | Yes | Yes | Yes | Yes | No | N/A | No | Yes | 1 | Revenue-based Royalty | No | | Yes |
| 116 | 31943 | | Each Party Bears Own | 0 | Yes | Yes | Yes | Yes | No | N/A | No | Yes | 1 | Revenue-based Royalty and Profit Split | No | | Yes |
| 117 | 35244 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 0 | Revenue-based Royalty | No | N/A | N/A |
| 118 | 35973 | Yes | | | | | | | | | | | | | | | |
| 119 | 36480 | | One Party Bears All | 0 | Yes | Yes | | | No | N/A | No | No | N/A | Profit Split | No | | Yes |
| 120 | 36715 | | Share | 1 | Yes | Yes | | | No | Yes | No | Yes | 0 | Profit Split | Yes | Yes | |
| 121 | 37885 | | Share | 1 | Yes | Yes | | | No | Yes | No | Yes | 0 | Profit Split | No | | Yes |
| 122 | 38280 | | Each Party Bears Own | 0 | Yes | Yes | | | No | N/A | No | No | N/A | Revenue-based Royalty | No | | Yes |
| 123 | 42407 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Profit Split | No | | N/A |
| 124 | 42839 | | Share | 1 | Yes | Yes | | | No | Yes | Yes | Yes | 1 | Profit Split | No | | Yes |
| 125 | 44305 | | Share | 1 | Yes | Yes | | | No | Yes | Yes | Yes | 1 | Profit Split | No | | Yes |
| 126 | 43827 | | One Party Bears All / Unclear | 0 | Yes | Yes | Yes | Yes | N/A (not sharing) | N/A (not sharing) | Yes | Yes | N/A | Other | No | N/A | N/A |
| 127 | 46156 | | Share | 1 | Yes | Yes | | | No | Yes | No | Yes | 0 | Profit Split | No | | Yes |
| 128 | 46920 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Revenue-based Royalty | Yes | Yes | N/A |
| 129 | 49731 | | Share | 1 | Yes | Yes | Yes* | Yes* | No | Yes | No | Yes | 1 | Revenue-based Royalty | No | N/A | N/A |
| 130 | 51583 | | Each Party Bears Own (see notes) | 0 | | Yes | | | N/A (not sharing) | N/A (not sharing) | No | No | N/A | Territorial Division | No | N/A | N/A |

| # | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Defines Development Costs and/or Other Costs | Defines Development Plan/Budget | Defines Cost Overruns/ Excess Costs | Address Bearer of Cost Overruns/ Excess Costs | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Mentions Pension / Employee Benefits | Agreement Specifies Accounting Treatment | Cost Accounting Specified (1=Yes, 0=No/Unclear, N/A=Not Sharing) | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 131 | 51930 | | Shared | 1 | Yes | Yes | | | No | Yes | No | Yes | 0 | Profit Split | No | | Yes |
| 132 | 52087 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | Yes | Yes | 0 | Other | No | N/A | N/A |
| 133 | 56655 | | Unclear / Each Party Bears Own (see notes) | 0 | Yes | Yes (Plan) | | | N/A (cost sharing unclear) | N/A (cost sharing unclear) | Yes | No | N/A | Revenue-based Royalty | Yes | Yes | |
| 134 | 57810 | | Share | 1 | Yes | Yes | Yes | Yes (see notes) | No | Yes | No | Yes | 1 | Profit Split | No | | Yes |
| 135 | 59356 | | One Party Bears All | 0 | Yes | Yes | | | N/A (not sharing) | N/A (not sharing costs) | No | No | N/A | Revenue-based Royalty | No | N/A (not sharing cost) | N/A (not sharing cost) |
| 136 | 62496 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Profit Split | No | | Yes |
| 137 | 64682 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | No | 0 | Profit Split | No | | Yes |
| 138 | 67123 | | Each Party Bears Own | 0 | | Yes | | | N/A (not cost sharing) | N/A (not sharing costs) | No | Yes | N/A | Revenue-based Royalty | No | N/A (not cost sharing) | N/A (not sharing cost) |
| 139 | 68080 | | Unclear | 0 | | Yes | | | N/A (not cost sharing) | N/A (not sharing costs) | No | No | N/A | Revenue-based Royalty | No | N/A (not cost sharing) | N/A (not sharing cost) |
| 140 | 69965 | | Each Party Bears Own / Unclear | 0 | Yes | Yes | | | N/A (insufficient information) | N/A (insufficient information) | No | N/A | N/A | Revenue-based Royalty | No | N/A | N/A |
| 141 | 70368 | | Shared | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Revenue-based Royalty and Profit Split | Yes | Yes | |
| 142 | 70603 | | Each Party Bears Own / Unclear | 0 | Yes | Yes | | | N/A | N/A | No | No | N/A | Revenue-based Royalty | No | N/A | N/A |
| 143 | 70698 | | Each Party Bears Own | 0 | Yes | Yes | | | N/A (not cost sharing) | N/A (not sharing costs) | Yes | Yes | N/A | Revenue-based Royalty | No | N/A (not cost sharing) | N/A (not sharing cost) |
| 144 | 77982 | | Each Party Bears Own / Some Shared | 0 | Yes | Yes | N/A | N/A | N/A (not cost sharing) | N/A (not cost sharing) | No | Yes | N/A | Revenue-based Royalty | No | N/A | N/A |
| 145 | 77993 | | Each Party Bears Own | 0 | | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | No | N/A | Territorial Division | No | N/A | N/A |
| 146 | 78209 | | Each Party Bears Own / Some Share (see notes) | 1 | | Yes | N/A | N/A | No | Yes | No | Yes | 1 | Profit Split | No | | Yes |
| 147 | 78506 | | Each Party Bears Own | 0 | Yes | Yes | N/A | N/A | N/A (not cost sharing) | N/A (not cost sharing) | No | Yes | N/A | Revenue-based Royalty | No | N/A | N/A |
| 148 | 78946 | | Share | 1 | Yes | Yes | | | No | Yes | No | No | 0 | Revenue-based Royalty | No | N/A | N/A |
| 149 | 79470 | | Each Party Bears Own (see notes) | 0 | | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | Yes (see notes) | N/A | Profit Split | Yes | Yes | |
| 150 | 80993 | | N/A - Joint Venture | 0 | | | | | N/A | N/A | No | No | N/A | N/A | No | N/A | N/A |
| 151 | 81165 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Revenue-based Royalty and Profit Share | No | N/A | N/A |
| 152 | 81220 | | Each Party Bears Own / Unclear | 0 | | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | Yes | N/A | Revenue-based Royalty | No | N/A | N/A |
| 153 | 100743 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Revenue-based Royalty and Profit Split | No | | Yes |
| 154 | 100768 | | Each Party Bears Own | 0 | | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | N/A | N/A | Revenue-based Royalty | No | N/A | N/A |
| 155 | 100921 | | Each Party Bears Own | 0 | | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | N/A | N/A | Revenue-based Royalty | No | N/A | N/A |
| 156 | 100989 | | Share | 1 | Yes | Yes | | | No | Yes | No | Yes | 1 | Revenue-Based Royalty and Profit Split | No | | Yes |
| 157 | 101064 | | One Party Bears All | 0 | Yes | Yes | Yes | Yes | N/A (not cost sharing) | N/A (not cost sharing) | No | N/A | N/A | Revenue-based Royalty | No | N/A | N/A |
| 158 | 101648 | | Each Party Bears Own | 0 | Yes | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | N/A | N/A | Revenue-based Royalty | No | N/A | N/A |
| 159 | 101652 | | Each Party Bears Own | 0 | Yes | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | N/A | N/A | Revenue-based Royalty | No | N/A | N/A |
| 160 | 101737 | | Each Party Bears Own | 0 | | Yes | | | N/A (not cost sharing) | N/A (not cost sharing) | No | N/A | N/A | Revenue-based Royalty | No | N/A | N/A |
| 161 | 101786 | | Share | 1 | Yes | Yes | Yes | Yes | No | Yes | No | Yes | 1 | Profit Split | Yes | Yes | |
| 162 | 101813 | | Share | 1 | Yes | Yes | Yes | Yes (see notes) | No | Yes | No | Yes | 1 | Revenue-based Royalty and Profit Split | Yes | Yes | |

**CONCLUSION: RESTRUCTURING COSTS**

# of Agreements Sharing Costs: 53

Of 53 Cost Sharing Agreements, Number of Agreements that:

| Defines Development Costs and/or Other Costs | Defines Development Plan/Budget | Defines Cost Overruns/ Excess Costs | Address Bearer of Cost Overruns/ Excess Costs |
|---|---|---|---|
| 53 | 52 | 28 | 27 |

**CONCLUSION: PENSION COSTS**

Number of Cost Sharing Agreements that:

Specify GAAP or Other Accounting Method for Costs: 35

**CONCLUSION: CUSTOMER FINANCING**

Number of Joint Development Agreements that:

Address Treatment of Bad Debt Expense Either in Royalty or Profit Split: 20

**B.**      **Table #2:  Qualitative Review and Notes by Agreement**

The following table provides the notes for each of the 162 agreements reviewed in the qualitative review.

| | AGREEMENT SUMMARY | | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 1 | 50415 | | Each Party Bears Own (exceptions noted) | 0 | Section 2.2 (Expenses) | Article 2.2: Unless otherwise specified, each party pays its own costs and expenses. (Exceptions include sharing patent/copyright prosecution, certain Cooperative Marketing and Development payments in Article 6.2.) | N/A (parties bear own) | N/A (parties bear own) | Article 2.2 | Each Party agrees to fund and pay for its own costs, including "(i) any and all salaries, employee benefits and other overhead costs for its own employees and facilities involved in the performance of this Agreement..." (2.2). "No discussion of accounting (parties not sharing costs). | N/A (parties bear own) | N/A (parties bear own) | Revenue-Based Royalty | No | Article 1.10 | Macrovision pays TTR 30% of Net Revenues, which has been "reduced by discounts, returns and rebates, but not by cost of goods sold." (1.10) Revenue-based royalty rather than profit split. | N/A | N/A |
| 2 | 50151 | | Unclear / Each Party Bears Own | 0 | Article 3 | "Specifications of the Software, term for development, share for the expenses for development, the amount of the royalty for the Intellectual Property, and any other detailed terms and conditions shall be provided for in the Individual Contracts." (Article 3). Individual Contracts set forth how expenses will be borne for each project, rather than this agreement. Insufficient information to determine if parties share development cost. | N/A (unclear; parties bear own) | N/A (unclear; parties bear own) | N/A | No reporting standard mentioned. Agreement does not address cost sharing | N/A (unclear; parties bear own) | N/A (unclear; parties bear own) | Revenue-based Royalty | No | Individual Contract, Section 2 | Royalties are based on Gross Revenues (Article 2) | N/A | N/A |
| 3 | 49010 | | Each Party Bears Own | 0 | N/A | N/A - Kodak pays R2 a fee for software development for | N/A (not sharing costs) | N/A (not sharing costs) | N/A | N/A | N/A (not sharing costs) | N/A (not sharing costs) | Fee-Based | No | N/A | Kodak to pay R2 a fee for the software development | N/A | N/A |
| 4 | 49527 | | Each Party Bears Own | 0 | 5.1 | Each party shall be solely responsible for supplying and managing its Site(s) at its own expense and neither party shall have any obligations whatsoever with respect to the Site(s) or the other. Each party shall manage, review, delete, edit, create, update and otherwise manage all content and/or services available on or through its respective Site(s). (5.1) | N/A (not sharing costs) | N/A (not sharing costs) | N/A | N/A | N/A (not sharing costs) | N/A (not sharing costs) | Fixed fee per month and revenue sharing | No | 6.1 and 6.2 | MCY pays $25K/month to US West (6.1) plus parties split Net Revenue 50/50 (6.2). Not a comparable compensation structure. | N/A | N/A |
| 5 | 49572 | | Each Party Bears Own (see notes) | 0 | Article 5 | "Odetics and Daimler-Benz pay for their own design costs." (5.29) "Odetics will provide up to 20 C-samples for the purpose of Daimler-Benz customer field testing." (5.3) If both parties work to develop a patent, they will agree on case by case basis who shall bear the costs. (8.2) Article 3: Responsibilities of each party defined. Article 5: Each party will bear its own cost with no liability for cost incurred by other party, with exceptions noted. Budget plan is in Annex 3, System Cost Goals Document. | N/A (not sharing costs) | N/A (not sharing costs) | | No explicit reporting standard mentioned. Parties do not appear to be sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty and Divisional Interest | No | Article 9 | D-B may elect to have Odetics supply the system to D-B (separate supply agreement). Odetics to pay Daimler-Benz a royalty of 3% of net sales for each Systems sold to 3P for use of D-B Application Software for limited time. Compensation structure does not provide information on bad debt expense. | N/A | N/A |
| 6 | 67384 | | One Party Bears All | 0 | 1.6 and Exhibit B2 | S-A pays 100% percent of AM's Non-Recurring Engineering Expense (Exhibit B2). | N/A (not sharing costs) | N/A (not sharing costs) | N/A | N/A | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | NO | N/A - Revenue-based royalty | N/A | N/A |
| 7 | 68101 | 1 | Share Cost | 0 | Article 3.3(a)(i), 3.3(b)(i); Article 3.5 | Article 3.3 - Steritech responsible for all developments costs on certain projects up to a certain date. Article 3.5 - Costs shared 50/50, costs must be in pre-approved budget (Costs to be shared defined in Article 3.5, must be in accordance with pre-approved budget). Article 3.7(a) - Defines Budget Contingencies. Parties will split incremental budget increases 50/50 for new projects and budget revisions. Note that this is a forward-looking statement. Does not address 'excess' costs already incurred. | No | Yes | Article 3.5.a; Article 2 | Article 3.5.a - Employee expenses accounted for (and shared) on a "uniform average cost per FTE basis." Accounting for employee costs treated as agreed by parties. Article 2 specifies GAAP in context of Cost of Goods Sold, which is used when calculating profit share (effectively a shared cost under revenue-sharing mechanism). | Yes | Yes | Revenue-Based Royalty and Development Fee | No | Article 2; Article 7 | Article 2 Net Sales Defined. Article 7 - Parties share Net Sales under specific provisions. The Premium effectively shares profit, so the use of GAAP for COGS is instructive. Indicates that parties are likely sharing profit in accordance with GAAP, but insufficient information to determine with certainty. | N/A (insufficient information) | N/A (insufficient information) |
| 8 | 64036 | | Unclear (see notes) | 0 | Article 4.1, see notes | Article 4.1, Refers to Payment for Deliverables in Exhibit A, but Exhibit has no information. (4.1) Ross developed the Viper technology, which Fujitsu wishes to manufacture and sell. Fujitsu licenses the technology from Ross and pays for ongoing development costs. Appears to be more of a license and contract R&D agreement than a joint development agreement. | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | N/A | N/A | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | Development Fee | No | Article 4 | Fujitsu pays Ross for Deliverables. | N/A | N/A |
| 9 | 64597 | | No-Sharing - License Agreement | 0 | N/A | N/A - Licensing arrangement | N/A (not sharing costs) | N/A (not sharing costs) | N/A | N/A | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | 4.1.2 | Toray pays 6% royalty to TWI (4.1.2), and TWI pays a 1.5% royalty to Toray (5.3.2). Compensation structure not comparable. | N/A | N/A |

| | | | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes, 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Split Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence | | |
| 10 | 64604 | | Share Cost | 1 | Section 6.1 | Describes in detail the process by which Lilly will pay Millennium for development expenses but much of the numerical information has been redacted. | No | No | 1.46 | Reference to using GAAP for calculations of net sales price (1.46). Refers to Lilly paying the 'FTE Rate' for Millennium R&D personnel but no further details provided | No | No | Revenue-Based Royalty | No | Section 6.2 and 6.3 | Revenue-based royalty rather than profit split | N/A | N/A | | |
| 11 | 63799 | | Share Cost | 1 | 4.3 | "PERKIN-ELMER will be responsible for all expenses associated with sales, support and marketing." (3.5) "Within the scope of the Collaboration Agreement, HYSEQ will fully fund, or arrange to fund, development of CHIPS, and PERKIN-ELMER, within the scope of the Collaboration Agreement, will fully fund development of the SYSTEM as described in the Research Plan (except for CHIPS)." (1.6) Both parties to establish a research committee to: 1) prepare the initial Research Plan and to revise it over time, 2) review and evaluate progress under the research plan, 3) prepare the research plan budget for each year [and others] (3.2) "The amounts committed by each of the PARTIES will be subject to adjustment by the Annual Budget contemplated by Article 3; provided, however, that nothing herein shall require either party to commit in excess of the amount set forth in Article 4.1 or 4.2 without such party's... consent." (4.3) | No | No | 4.2; 11.5 | Perkin-Elmer agrees to pay 'burdened cost' (fully loaded) cost for HYSEQ employees agreed by Perkin-elmer to be assigned to and performing services in development of the SYSTEM. For product sales from HYSEQ to Perkin-Elmer, specifies a cost+5% arrangement and the cost to be "calculated in accordance with generally accepted accounting principles." (11.5) | No | No | Profit Split (Revenue-Based Royalty) | No | 1.2, 8.1 | Article 8.1: Perkin-Elmer pays HYSEQ a royalty on Net Sales designed to equally share pre-tax profits (see also Article 1.2), taking into account each party's operating expenses. Effectively a profit split beginning with Net Sales as defined in Article 8.1.1. Indicates that the parties intend to split profit and share expenses. | N/A | Yes | | |
| 12 | 63864 | | Each Party Bears Own | 0 | 3.5 | All development costs and expenses incurred by each party in performing tasks allocated to it under the Development Program shall be borne by that Party, except that for experts sent by SAT in accordance with paragraph 3.3 above, INNOVA shall reimburse SAT for expenses thus incurred at cost (salaries, social charges, travel, lodging and subsistence). (3.5) | N/A (not sharing costs) | N/A (not sharing costs) | N/A | N/A | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Annex 4 | Each party pays lump sums and royalties (not specified) based on the Transfer Price when selling to each other. Compensation structure is revenue-based royalty rather than a profit split, so does not provide information on how customer financing would be treated. | N/A | N/A | | |
| 13 | 9794 | | Share Cost | 1 | 3.3 and 4.3 | Articles 3.3 and 4.3: Parties share development costs of wafers/masks and testing 50/50. | No | No | N/A | N/A | No | No | Revenue-Based Royalty | No | Article 6 | Net Sales Price used for calculation of royalties is net of any "accepted returns from customers and negotiated settlements with customers." Revenue-based royalty rather than profit split. | N/A | N/A | | |
| 14 | 9794 | Yes | | | | | | | | | | | | | | | | | | |
| 15 | 9876 | | Each party bears own | 0 | | | No | N/A (not sharing costs) | | | N/A | N/A | Revenue-Based Royalty | No | | | N/A | N/A | | |
| 16 | 11001 | Yes | | | | | | | | | | | | | | | | | | |
| 17 | 11026 | | Unclear/Share Cost | 1 | Section 2 | Defined Research Program and process for setting the budget | No | Yes | Section 1.14, Section 4 | Specifies that benefits are part of reimbursable costs, and notes GAAP accounting treatment | Yes | No | N/A | No | | Contemplates future JV or licensing arrangement, but not addressed in this agreement | N/A | N/A | | |
| 18 | 15974 | | One Party Bears All | 0 | | | No | N/A (not sharing costs) | | | N/A | N/A | Splits Profit | No | | | N/A | N/A | | |
| 19 | 13793 | | Unclear/Each party bears own | 0 | | Gen-Probe effectively agrees to pay Stratec for the development of a specific product. There is also a related supply agreement under which Stratec will continue to supply Gen-Probe with the product, but there is no sharing of costs. | No | N/A (not sharing costs) | | | N/A | N/A | N/A | No | | Incompatible compensation structure (related supply agreement) | N/A | N/A | | |
| 20 | 28260 | | Each party bears own | 0 | | | No | N/A (not sharing costs) | Section 1.5 | Notes GAAP in definition of net revenue. Each party bears own costs, and GAAP defined in context of costs. | N/A | N/A | Revenue-Based Royalty | Yes | Section 1.5 | Notes bad debt expense in net revenue definition. Parties effectively share bad debt expense through revenue-based royalty | Yes | No | | |
| 21 | 33337 | | Unclear | 0 | | Does not appear to be a joint development agreement, only share in one specific cost | No | N/A (not sharing costs) | Section 4.1 | Specifies international accounting standards | N/A (not sharing costs) | N/A (not sharing costs) | Profit-based royalty | No | | N/A - not a joint development agreement | N/A | N/A | | |
| 22 | 33836 | | Each party bears own | 0 | | Not a relevant agreement | No | N/A (not sharing costs) | | Not a relevant agreement | N/A (not sharing costs) | N/A (not sharing costs) | N/A | | | Not a relevant agreement | N/A | N/A | | |
| 23 | 35207 | | One Party Bears All | 0 | | Not really a joint development agreement; one party licenses technology and funds further development | N/A | N/A (not sharing costs) | | | | | N/A | | | Not a relevant agreement | N/A | N/A | | |
| 24 | 41360 | | Each party bears own | 0 | Section 3.3 | With the exception of one specific cost, each party bears own development costs. Agreement does not really cover the joint development/marketing of product | No | N/A (not sharing costs) | | Each party bears own costs | N/A | N/A | N/A | No | Section 9.3 | No royalties or payments for joint inventions | N/A | N/A | | |

| | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 25 | 46551 | | Share Cost | 1 | Definitions, Section 4.1 | Share development costs specifically attributable to development compound according to development budget. (NOTE: A large equity investment is part of arrangement.) | No | Yes | Section 4.6 | Specifies payments will be calculated according to billing party's standard accounting principles. Article 4.10 specifies that CuraGen's accounting is consistent with U.S. GAAP | Yes | N/A | Splits Profit | No | Article 4.2; Article 4.10; Definitions | Parties split operating income (Article 4.2), which is defined in the definitions section. Note that financial information is generally calculated in accordance with GAAP (or Bayer's accounting standards). GAAP accounting would indicate that bad debt expenses would be treated as an expense, and thus shared by the parties. | No | Yes |
| 26 | 51022 | | Unclear/Each party bears own | 0 | | Appears that each party owns and develops their own technology, simply cooperating to integrate technologies | No | N/A (not sharing costs) | | Each party appears to bear own costs | N/A | N/A | Revenue-Based Royalty | No | | | N/A | N/A |
| 27 | 50687 | | Each party bears own | 0 | Section 3 | Each party shall bear and be responsible for its own expenses (Section 3). Only share patent costs. | No | N/A (not sharing costs) | Section 5 | Specifies GAAP; but only in the context of revenue for royalties | N/A (not sharing costs) | N/A (not sharing costs) | Milestone payments, royalty | No | Article 4 | Compensation structure includes revenue-based royalty and milestones. Not a comparable compensation structure. | N/A | N/A |
| 28 | 54413 | | Unclear/Each party bears own | 0 | Article 1 | Article 1 - Lotus and Interliant have agreed to joint development responsibilities, and will each contribute resources to the development effort. No discussion of cost sharing, so it appears that each party bears own costs | No | N/A (not sharing costs) | Section 3 | Specifies GAAP; but only in the context of revenue for royalties | N/A | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 4 | Revenue-based royalty. Does not explicitly address treatment of bad debt expense | N/A | N/A |
| 29 | 53346 | | One Party Bears All | 0 | Article 3.1-3.2 Article 3.1a | Article 3.1-3.2 One party shall fund development activities. Article 3.1a The party responsible for funding the Development Costs shall not be responsible for funding amounts in excess of what was formally approved. Software Development - Not a joint development agreement | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard. Not a joint development agreement (contract software development) | N/A (not sharing costs) | N/A (not sharing costs) | Development Fee; Revenue-based Royalty | No | Article 4 | Article 4: Momentum reimburses PeopleSoft for its Development Costs (contract development), and PeopleSoft pays Momentum a royalty on products sold or licensed by PeopleSoft using the Developed Technologies. | N/A (contract software development agreement) | N/A (contract software development agreement) |
| 30 | 54977 | | One Party Bears All | 0 | Article 7.1-7.2 | Article 7.1-7.2; eBay pays Nettasi a development fee and a price per unit. Contract Software Development agreement in which one party is bearing all costs. Not a relevant joint development agreement. | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard. Not a joint development agreement (contract software development) | N/A (not sharing costs) | N/A (not sharing costs) | Development Fee; Per User Fee | No | Articles 7.1-7.3 | Article 7.1-7.3: eBay pays Nettasi a development fee plus a fee per registered user. Contract development compensation structure. | N/A (contract software development agreement) | N/A (contract software development agreement) |
| 31 | 59378 | | Unclear / Not a JD Agreement | 0 | Article 4.03 | Agreement is a marketing and distribution agreement wherein IVI grants Ingenico the right to market and distribute its products. Article 4 states that concurrent with this agreement, the parties will enter into a separate Joint Development and Procurement agreement. Article 4.03 states that the parties would share development costs 50-50 on future products. However, this agreement only provides a high-level description of the future joint development arrangement, but does not appear to constitute the actual joint development agreement. | N/A (insufficient information) | N/A (insufficient information) | | Article 1.02 GAAP - This agreement is a marketing and distribution agreement, and refers to a separate prospective joint development agreement. Does not contain sufficient information to conclude on how parties would treat costs under that arrangement, though it may be consistent with this agreement (i.e., GAAP). | N/A (insufficient information) | N/A (insufficient information) | Upfront Fee | No | Article 5.02 | Article 5.02 IVI pays Ingenico a license fee on consideration of technology license agreement. Not a comparable compensation structure. | N/A (insufficient information) | N/A (insufficient information) |
| 32 | 58746 | | Each Party Bear Own / Unclear | 0 | Articles 1-2; Article 13 | Article 1-2 Parties shall carry out the duties listed. Parties seem to bear their own costs. Article 13 VIW will fund any cost overruns that may arise with respect to completing its obligations. Parties do not appear to be sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard. Parties appear to be bearing their own costs. | N/A (not sharing costs) | N/A (not sharing costs) | Divisional Interest | No | Articles 7-11 | AVRI sells its software products to VIW, and grants license to sell to customers. VIW sells Digital Recorder to AVRI, and grants distribution rights to Healthcare and Catalog markets. Each party is receiving a divisional interest, rather than directly splitting profit. Incomparable compensation structure. | N/A | N/A |
| 33 | 58764 | | Unclear (Share specific cost - see notes) | 0 | Articles 3.1-3.3 | Licensee, Developer and TTR perform their respective tasks pursuant to the (redacted) Development Schedule. No discussion of sharing the costs related to these tasks (indicating that each party may be responsible for their own costs). Cost sharing only discussed in the specific context of TTR determines a Test Sample to not be acceptable (Article 3.3). Unclear as to whether parties are each bearing their own costs or are sharing development costs. | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | | No specified reporting standard. Unclear as to whether parties are sharing any costs. | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | Revenue-Based Royalty | No | Article 5.1 | Article 5.1 One party shall pay the other party 50% of the premium charged/received, subject to a minimum per unit royalty of $0.075 per disc. Compensation structure appears to be a royalty on incremental revenue (the premium), and does not seem comparable to an operating profit split. Incomparable compensation structure. | N/A | N/A |

| | | | AGREEMENT SUMMARY | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 34 | 11546 | | Each Party Bears Own / Not a ID Agreement | 0 | | Does not appear to be a joint development. One party develops the product, the other one markets and sells. | N/A (not sharing costs) | N/A (not sharing costs) | Article 16.5d | Article 16.5d GAAP - Only mentioned in context of representations and warranties for financial statement reporting. Parties do not appear to be sharing costs. | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 13.1; Article 1.21; Article 5.5a | Article 13.1 Net revenue split 50-50.  Article 1.21 Net Revenue defined.  Revenue-based royalty (split net revenue) rather than splitting operating profit, so the agreement does not provide sufficient to infer how provisions for bad debt would be treated. | N/A (revenue-based royalty) | N/A (revenue-based royalty) |
| 35 | 25773 | | Unclear / One Party Bears All (see notes) | 0 | Article 2.3; Article 3.6 | Siemens is in charge of developing Software, while Surgivision is in charge of developing catheter technology. Article 2.3: Each party has its own development responsibilities, which are clearly specified.  Article 3.6: Surgivision pays Siemens milestone payments for its Software Development Work. (Agreement does not indicate whether these milestone payments cover all of Siemen's costs or only a portion. Article 15.6 indicates that these payments are intended to reimburse Siemens for its costs.) Surgivision is responsible for its own costs (Article 3.2), but it is unclear whether each party bears all of Siemens' Software Development costs. | N/A (unclear, insufficient information) | N/A (unclear, insuff. info.) | | No specified reporting standard | N/A (unclear, insufficient information) | N/A (unclear, insufficient information) | Divisional Interest; Revenue-Based Royalty (see notes) | No | Preamble; Article 3.10 | Preamble: Siemens is in charge of developing and selling software, while Surgivision is responsible for developing and selling catheter technology and applications (i.e., divisional interests in developed technology). If Siemens exercises the option under Article 3.10, Siemens will pay Surgivision a royalty on net sales of products embodying Surgivision technology.  Note: The compensation structure in this agreement primarily involves a divisional interest rather than a profit split. | N/A | N/A |
| 36 | 25790 | | Each Party Bears Own (see notes) | 0 | Article 2.3-2.4; Article 6.4; Article 5.12 | Article 2.3-2.4 Each party shall bear its own costs. Article 5.12 Each party shall bear its own Audit Costs unless the audit establishes underpayment by certain percent. Article 6.4 Parties shall equally share the cost of Patent Filing on Joint Inventions. With the exception of certain costs (patent filing), each party appears to be bearing its owns costs related to the joint development. | N/A (not sharing costs) | N/A (not sharing costs) | Article 5.10; Article 10.5 | Article 5.10 specifies GAAP, but only in the context of revenue for royalties payable by Nexx to IBM. Each party responsible for costs associated with its own Representatives, including salary/benefits (Article 10.5). Parties do not appear to share costs. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 5-5.20; Article 1.26 | Article 5-5.20 Nexx pays IBM a royalty for all quantities of licensed products sold or transferred to third party (also detailed in Article 4).  Article 1.26 "Selling Price" defined. Revenue-based royalty rather than a profit split, so we cannot determine how the parties would be treating bad debt expense. | N/A | N/A |
| 37 | 30245 | | Each Party Bears Own | 0 | Article 3 | Article 3 One party appears to be responsible for the development of the product while the other is in charge of product testing.  Not a Joint Development agreement. More analogous to a license and distribution arrangement. | N/A (not sharing costs) | N/A (not sharing costs) | Article 6.01 | Article 6.01 GAAP specified in context of maintaining records to document payment obligations under the arrangement. | N/A (not sharing costs) | N/A (not sharing costs) | License Fee and Divisional Interest | No | Article 3.06 | Raymarine party shall pay the other party a one-time fee, which is due in four equal installments. Raymarine is being appointed as the exclusive distributor of RK products. Compensation structure is not applicable because parties are not splitting profit. | N/A | N/A |
| 38 | 30774 | | Each Party Bears Own | 0 | Article 3 | Article 3 Parties shall perform the duties outlined in Article 3. | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 6 Depending on the source of revenue, the revenue split will be split or kept solely by one party. | Net Sales not defined. Revenue split structure does not appear to be analogous to a profit split in a joint development arrangement. | N/A | N/A |
| 39 | 35752 | | Each Party Bears Own | 0 | Article 2.1-2.2 | Article 2 Duties of the parties are clearly defined. | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard. Parties appear to be bearing their own costs. | N/A (not sharing costs) | N/A (not sharing costs) | Fee Payment / Revenue-Based Royalty | No | Article 4.1-4.3 Various fees owed from one party to the other are detailed | Compensation Structure includes fees and revenue split. Not comparable for determining how customer financing-related expenses would be treated. | N/A | N/A |
| 40 | 35973 | | Each Party Bears Own | 0 | Article 2.2; Article 2.3 | Article 2.2 One party will bear cost of development in accordance with development plan.  Article 2.3 Party not bearing development costs will pay other party a milestone payment. Does not appear that the parties are actually sharing development costs. | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard. Parties do not appear to be explicitly sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 3.5; Article 1.2 | Article 3.5 Revenue sharing based on Article 3.5 and referenced in Article 1.2.  Article 1.2: Net Sales defined, but in the context of revenue sharing (or a revenue-based royalty) rather than a profit split. Revenue split does not provide an indication of how parties would be treating customer financing losses. | No | N/A |

| | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| z | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 41 | 38810 | | One Party Bears All | 0 | Article 7 | Article 7 One party shall bear costs of development. Agreement is analogous to a license arrangement rather than a joint development arrangement. Parties are not sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard. Parties not sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | Yes | Article 4a; Article 4b | Article 4a One party owes the other party a royalty equivalent to a certain percent of qualifying sales revenues. Article 4b "Qualifying Sales" defined and mentions bad debt; no revenue base is net of allowance for bad debt (parties share bad debt expense). | Yes | N/A |
| 42 | 42642 | | Each Party Bears Own / Unclear | 0 | Article 1 | Article 1 Parties seem to bear their own costs in Joint Development Program. | N/A (not sharing costs) | N/A (not sharing costs) | | No specified reporting standard. Parties seem to bear own expenses. | N/A (not sharing costs) | N/A (not sharing costs) | Stock Issuance and Royalty and Split Profit | No | Article 14.1; Article 14.2; Article 14.3 | Article 14.1 One party will issue common stock to the other. Article 14.2 One party owes the other party a certain percent of gross revenues derived from certain sources. Article 14.3 Parties will share revenue generated from advertising on website. Article 14.2 Gross revenues are stipulated. Parties are sharing revenue. Accounting treatment and bad debt expense are not mentioned. Not an applicable structure, and cannot determine how parties would treat bad debt expense. | N/A | N/A |
| 43 | 43295 | | Each Party Bears Own | 0 | Exhibit 2, Exhibit 3, Article 2.3, Article 2.8 | Exhibit 2: Initial project plan, Exhibit 3: Initial SOW, Article 2.3: Each party will bear the relevant costs associated with tasks assigned in each SOW. Article 2.8: Any changes that would substantially impact costs must be approved must be reflected in a new SOW and negotiated and agreed upon in writing prior to implementation. "Major Modifications" defined in Article 2.8. | N/A (not sharing costs) | N/A (not sharing costs) | N/A | No explicit reporting standard | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Definitions, Exhibit 5 | Definitions: Net Sales defined (20) (correction from previous record), Exhibit 5: Royalties based on fixed price per unit until 3M units, 2.0% royalty thereafter. Compensation structure is a revenue-based and/or per unit royalty, so the parties are not splitting profit. Structure is not analogous to a profit split. | N/A | N/A |
| 44 | 48352 | | Each Party Bears Own / Unclear | 0 | Article 3.8 | Article 3.8: Parties intend that Baxter and Steritech make "approximately the same financial contribution to the Cooperative Development Work" (Note: The agreement does not address whether the parties are co-funding, or whether their respective activities are designed to target equal funding.) Article 3.8.1: Expense for Baxter will include internal corporate "charge-backs." Only cash expenses approved by the Management Board will be considered as expenses. Article 3.11: Each party will pay half of budget contingency, subject to Steritech's $12.5 million spending threshold. Schedule D contains the Initial Budget. | No | N/A (unclear, not sharing costs) | Definition, Article 3.8.1 | Definitions: Cost of Goods shall be measured based on generally accepted cost accounting procedures, but will not include corporate allocations or amortization of development expenditures. Article 3.8.1: Each company will prepare detailed expense records that accurately identify costs and expenses, including employee fringe benefits. Article 6.2.3: Independent accountants will be retained as needed to audit Baxter's records. | N/A (unclear, not sharing costs) | N/A (unclear, not sharing costs) | Revenue-Based Royalty | No | Definitions, Article 7.1 | Definitions: Net Sales defined, with deductions for rejections or returns, Article 7.1: Revenue-based royalty, so there is not sufficient information to determine how parties would be treating such costs. | N/A | N/A |
| 45 | 48567 | | Unclear | 0 | N/A | No useful data on costs | N/A (insufficient information) | N/A (insufficient information) | N/A | No explicit reporting standard | N/A (insufficient information) | N/A (insufficient information) | Revenue-Based Royalty | No | Definitions | Definitions: Net sales defined based on Net License Fees defined in previous agreement. Revenue-based royalty, so there is not sufficient information to determine how parties would be treating such costs. | N/A | N/A |
| 46 | 63664 | | Each Party Bears Own | 0 | Article 4.1, Article 5.3, Article 8, Article 9 | Article 4.1: A minimum of $80 thousand in expenses to be undertaken (appears to be the implied budget – see Article 12.1). Design specification to be performed and Integrated Product to be produced based on this specification. Article 5.3: Non-recurring engineering work to be provided as needed, with costs specified in Article 12.2. Article 8-9: Each party shall bear relevant costs for specific expenses | N/A (not sharing costs) | N/A (not sharing costs) | N/A | No explicit reporting standard. Parties do not appear to be sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 12.1, Article 12.9 | Article 12.1: Refers to Article 12.9 for use of "most favored customer rates." No definition of net sales | N/A | N/A |

| | | | AGREEMENT SUMMARY | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 47 | 60027 | | Each Party Bears Own / Unclear | 0 | Article 3.1, Article 3.3, Article 3.7, Schedule A | Article 3.1: Budgets are to be provided for various projects. Article 3.3: If costs are less than budget, they shall be applied to New Technologies. Various shares of project expenses noted. Article 3.5: Parties intend to share costs 50/50; however, if funding for any Project is not shared equally, parties will adjust revenue shares. (Indicates that parties bear own costs rather than reallocating, or sharing, costs.) Article 3.7: In the case of budget contingencies, each party will fund 50% of new Project budget, unless otherwise agreed to by parties. Budget provided in Schedule A. | N/A (not sharing costs) | N/A (not sharing costs) | Definitions (Article 2) | Definitions: Cost of Goods shall be measured based on generally accepted cost accounting procedures, with certain items excluded. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Definitions (Article 2), Article 7.1 | Article 7.1: Revenue sharing based on Net Sales, as defined in the agreement. Revenue-based royalty, so the compensation structure is not clear about how these costs would be treated. | N/A | N/A |
| 48 | 60323 | | Each Party Bears Own | 0 | Article 4.1, Article 4.2, Exhibit E. | Article 4.1-4.2: Each party's obligations set forth; each party to bear its own costs. Exhibit D: Sets forth schedule for product development. | N/A (not sharing costs) | N/A (not sharing costs) | N/A | No explicit reporting standard | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 6.1, Exhibit C | Article 6.1: Commission to be based on CI's Standard Sales Terms retail prices. Exhibit C: Commission rates by volume of sales. Revenue-based royalty rather than a profit split, so compensation structure does not provide guidance on how bad debt expense would be treated. | N/A | N/A |
| 49 | 60798 | | Each Party Bears Own | 0 | Article 2, Article 5, Article 13, Schedule A | Article 2, Article 5, Schedule A. Article 2: Work to be governed by SOW (Article 2), joint development. Article 5: Each party will bear labour and other internal costs. Some costs specifically mentioned. Maximum expenses incurred shall be $500,000. Article 13: The relationship of the parties consists of an independent contractor relationship; no party will be liable for obligations of the other party. Schedule A: Work outside of the scope will be considered additions and may require a new SOW. | N/A (not sharing costs) | N/A (not sharing costs) | N/A | No explicit reporting standard. Parties do not appear to be sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Unknown | No | Article 6, Article 7 | Article 6: Ownership of the IMPAC product will be joint. Article 7: Sales of joint product will be governed by the Manufacturing and Sales Agreement. | N/A | N/A |
| 50 | 62201 | | Unclear / Each Party Bears Own (see notes) | 0 | Article 1.2, Article 1.29, Article 2.2.7, Article 2.3.2, Exhibit B | Article 1.2: Allocated costs defined. Article 1.29: OSI/Bayer Annual Operating Plan and Budget defined. Article 3.1: Bayer pays OSI an Annual Commitment. Exhibit B: Operating Plan and Budget (redacted). The agreement indicates that each party will be allocated activities under the OSI/Bayer Annual Operating Plan and Budget. Bayer provides fixed payments to OSI to fund a portion of its R&D (Annual Commitment), but parties do not pool and allocate costs explicitly. The fact that Bayer's Annual Commitments are fixed ex ante indicates that the parties are not agreeing to "share" all of OSI's costs (i.e., OSI cannot pass through a portion of its costs). | N/A (unclear, not sharing costs) | N/A (unclear, not sharing costs) | Article 1.2 | Article 1.2: Allocated costs is determined in accordance with GAAP. Bayer provides funding to OSI through the Annual Commitment (fixed payments), so the parties do not appear to be explicitly sharing the allocated costs. | N/A (unclear, not sharing costs) | N/A (unclear, not sharing costs) | Revenue-Based Royalty | No | Article 1.24, Article 6.1, Article 6.2 | Article 1.28: Net sales defined. Articles 6.1-6.2: Each party receives royalties from the sale of Clinical Research Products of the other party. Compensation structure is a revenue-based royalty rather than a profit split, so cannot determine how costs would be shared. | N/A | N/A |
| 51 | 69243 | | One Party Bears All | 0 | Article 7.1, Article 7.2, Article 7.3 | Article 7.1-7.2: Cableshare to prepare product and project definition. Article 7.3: Current cost estimate is provided. Cost overruns shall be agreed to between the parties or Cableshare may suspend work. | N/A (not sharing costs) | N/A (not sharing costs) | N/A | No explicit reporting standard. Parties do not appear to be sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Other | No | Article 7.3 | Article 7.3: Payment is to be made on a fee basis through installments (i.e., payment independent of ultimate sales of product or results of customer financing). | N/A | N/A |
| 52 | 69392 | | Unclear | 0 | Article 3 | Article 3: Each party to develop or acquire certain technology and then license to the other party. Limited cost data provided. Agreement appears to be more analogous to a cross license arrangement than a joint development arrangement. | N/A (unrelated agreement) | N/A (unrelated agreement) | N/A | No explicit reporting standard. Parties do not appear to be sharing costs. | N/A (insufficient information, unrelated agreement) | N/A (insufficient information, unrelated agreement) | Other | No | Article 3.1 | Article 3.1: All licenses to be fully paid; Article 4.1: Cross licenses granted represent full and fair consideration. (Subject to certain third-party licensing fees in Articles 4.2-4.6). | N/A | N/A |

| | | | | AGREEMENT SUMMARY | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 53 | 80088 | | Each Party Bears Own | 0 | Article 1.30; Article 5.2, Article 5.3a, Article 5.3b, Article 6.3a; Article 6.3b | Article 1.30: Fully-burdened manufacturing cost defined and limited. Article 5.2: Development activities of each party defined. Article 5.3a One party shall bear all costs and expenses incurred in its develop activities. This party shall also bear the costs of filing fees associated with regulations (in Article 5.3b). Article 5.3b The other party shall bear all costs and expenses incurred in its development activities, Schedule 6.1 Commercialization Plan. Article 6.3a One party shall bear all costs associated with its commercialization activities. Article 6.3b The other party shall bear also all costs associated with its commercialization activities. | N/A (not sharing costs) | N/A (not sharing costs) | Section 1.30 | Section 1.30: Fully Burdened Manufacturing Cost to be determined based on Roche's accounting policies, consistently applied. Each party appears to be responsible for all costs and expenses related to its development and commercialization activities (i.e., not sharing costs). | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Section 1.33, Section 8.1, Section 8.2 | Section 1.33, Sections 8.1-8.2: Royalty to be paid based on Incremental Residual Sales, defined in Section 1.33. Sales defined, but in the context of a revenue-based royalty compensation structure rather than a profit split. | N/A | N/A |
| 54 | 102651 | | One Party Bears All | 0 | Article 4b; Article 4c | Article 4b: Development Plan and Budget detailed in Exhibit C and D (redacted). Article 4c One party bears the costs of funding the other party to pursue the R&DP in accordance with the Budget. The same party is also responsible for bearing the costs of research, IT, and other indirect costs. Article 4c If a party goes over budget, the other party has the right to terminate the agreement. Alternatively, the parties can work together to revise the budget. This agreement is effectively a license and contract R&D arrangement, rather than a joint development agreement. | N/A (not sharing costs) | N/A (not sharing costs) | Article 5e.ii | Article 5e.ii provides that COGS will be determined in accordance with U.S. GAAP on products supplied to Sigenia. GAAP is only discussed in this context, and the parties are not sharing costs in this arrangement. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 7a-b; Article 3d iv; Article 1h | Article 7a-b In consideration of licenses, one party shall pay the other a percentage of net sales. This percentage may be adjusted. Article 1(h) Net Sales Defined. Compensation structure of revenue-based royalty rather than a profit split, so cannot tell how bad debt expense would be treated. This arrangement is analogous to a license and contract R&D arrangement rather than a joint development arrangement. | N/A | N/A |
| 55 | 10723 | | One Party Bears All | 0 | Article 1 (b); Article 5 | Article 1 (b): Joint Development plan to be produced subsequent to agreement. Article 5: All costs to be reimbursed by Geoalert (licensee) to RDS. | N/A (not sharing costs) | N/A (not sharing costs) | Article 5 (v) | Article 5 (v): Royalties shall be paid based on gross revenue, as defined by U.S. GAAP. GAAP only defined in the context of revenue (for royalty), rather than for costs. Parties do not appear to be sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Revenue-Based Royalty | No | Article 5a(v) | Article 5a(v): Royalty paid based on gross revenue (i.e., licensee pays full burden of revenue allowances). The agreement is not splitting profit, but a royalty on gross revenue would indicate that the licensee would bear full burden for bad debt. | N/A | No |
| 56 | 10827 | Yes | | | | | | | | | | | | | | | | |
| 57 | 10828 | | Each Party Bears Own / Unclear | 0 | Article 2.1; Article 2.2 | Article 2.1 - MicroStrategy establishes business unit for Development Program. Defined in Work Plan (Exhibits C-D). MicroStrategy is responsible for nearly all aspects of R&D for Developed Products. Article 2.2 - EA pays a $65M License Fee, which is payable in installments that coincide with milestones. Unclear whether this license payment effectively means that EA and MicroStrategy are sharing costs, or if it is meant to fully compensate MicroStrategy (i.e., contract R&D), or it reflects the license for the right to sell products incorporating the MicroStrategy Software. Article 2.2(b) - States that each party will bear own costs. | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | | | N/A (not sharing costs, unclear) | N/A (not sharing costs, unclear) | Territorial Division, Revenue-based Royalty | No | | Parties appear to sell directly to customers, EA pays license fee for right to sell MicroStrategy Software in connection with Developed Products. Parties are not splitting profit, and royalty is only in connection with software support revenue that EA and/or MicroStrategy receive. Compensation structure is not applicable. | | |
| 58 | 11067 | Yes | | | | | | | | | | | | | | | | |
| 59 | 11288 | Yes | | | | | | | | | | | | | | | | |
| 60 | 24358 | Yes | | | | | | | | | | | | | | | | |
| 61 | 25435 | | Unclear | 0 | | Insufficient Information - Amendment to Statement of Work. Document does not contain agreement terms between Lucent and mPhase | N/A | N/A | | Insufficient Information - Amendment to Statement of Work. Document does not contain agreement terms between Lucent and mPhase | N/A | N/A | Both | No | Appendix 83 (Royalties) of original Development Agreement (not contained in this document) | Insufficient Information - Amendment replaces royalty language in Statement of Work, but this amendment does not provide sufficient information without original Statement of Work. The agreement appears to contain both profit split provision and revenue-based royalty provisions, but does not provide full context to determine cost treatment. | N/A | N/A |

| | | | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 62 | 29957 | | One Party Bears All / Unclear | 0 | | MVL conducted initial development. AG is paying MVL the "Research Project Budget" to conduct the Research Project. (This is akin to a contract R&D arrangement, and Schedule 2 provides a detailed budget of MVL's projected costs.) MVL licenses its basic technology to AG in exchange for a revenue-based royalty. The agreement is a technology license rather than a joint development arrangement. | N/A | N/A | | N/A - Agreement is akin to a technology license/contract R&D rather than joint development. | N/A | N/A | Revenue-based Royalty | No | | N/A - License arrangement rather than joint development. | N/A | N/A |
| 63 | 29970 | | One Party Bears All | 0 | Article 3.4 | Article 3.4 - XFM bears all costs within an approved budget. Parties are not sharing costs. SW is providing contract development services to XFM. | N/A | N/A | | Parties are not sharing costs. Contract development arrangement. | N/A | N/A | N/A | No | | Parties are not sharing costs. Contract development arrangement. | N/A | N/A |
| 64 | 29988 | | Each Party Bears Own | 0 | | Wallid develops Content and licenses to Infotec for streaming. Arrangement is analogous to a licensing transaction rather than a joint development agreement. The parties are not jointly developing a product, or sharing costs associated with development. | N/A | N/A | | License arrangement rather than a joint development arrangement. Parties not sharing costs. | N/A | N/A | N/A | No | | Wallid develops content and licenses to Infotec to stream. Analogous to an IP licensing agreement rather than a joint development agreement. | N/A | N/A |
| 63 | 33740 | | One Party Bears All | 0 | | Given Imaging appoints EIS as its sales representative. Not a joint development agreement, but rather a type of distribution agreement. Parties are not jointly developing IP or products. | N/A | N/A | | Not a joint development agreement (sales representation agreement). | N/A | N/A | N/A | No | | N/A - Sales representation agreement | N/A | N/A |
| 66 | 41419 | | Unclear | 0 | | Licensor pays travel/out-of-pocket expenses for Licensor personnel providing technical and development assitance at Licensee's place of manufacture (Article 6.B), but Licensor pays salaries. Article 9 indicates that Licensee is bearing its own costs develop, manufacture, market, and distribute the Product developed under the agreement. Licensee also pays Licensor a Development Fee set forth in Schedule A. The parties appear to mostly bear their owns costs (i.e., the parties do not pool development costs), but share a few specific costs (e.g., travel/expenses for Licensor personnel at Licensee). The Development Fee could indicate Licensee is bearing some portion (or all) of the Licensor's costs, but the agreement does not provide sufficient detail. | N/A | N/A (not sharing costs, unclear) | | Licensee pays Development Fee to Licensor, but parties do not appear to be explicitly sharing costs. Accounting not mentioned. | N/A | N/A | Per Unit Royalty | No | | Not Applicable - Licensor receives per unit royalty. | N/A | N/A |
| 67 | 41433 | | Unclear / Each Party Bears Own | 0 | | Appendix B defines Development Phase/Specification (budget not specified). Articles 9 and 10 outline the responsibilities of USA Tech and MEI. USA Tech responsible for developing the Product, and MEI provides sales force, distribution, and is responsible for developing WAN communication device. Agreement does not contain any explicit cost sharing provision, and would indicate that each party is responsible for its own activities. USA Tech is manufacturing the Product, and selling it to MEI, which sells to third party customers. | N/A | N/A | | Parties appear to bear own costs under agreement. No discussion of accounting standards. | N/A | N/A | Territorial Division | No | Article 7.a | Parties do not split profit. USA manufactures Product and sells to MEI, which sells to third party customers. | N/A | N/A |
| 68 | 41454 | | Each Party Bears Own | 0 | Article 2, Article 3, Article 4.4, Appendices A-B | Parties jointly develop POS reference design/kit to be sold by ZiLOG (Articles 2.1-2.2). Appendices A-B define development programs and specifications. Each party appears to be responsible for its own activities and personnel related to the POS reference design/kit. USAT is solely responsible for all work and expense associated with developing the eZ80 Eport POS Terminal, but purchases eZ80 semiconductor products from ZiLOG (Article 3). ZiLOG is selling the POS reference design/kit while USTA is selling the eZ80 Eport product, each to their respective customers (Article 4.4). Agreement states that USTA is solely responsible for development of eZ80 Eport, and further indicates that parties jointly develop POS reference design/kit with each bearing its own costs. Since each party appears to be bearing its own cost, agreement does not provide further information on sharing of costs. | N/A | N/A (not sharing costs) | | Parties appear to bear own costs under agreement. No discussion of accounting standards. | N/A | N/A | Territorial Division | No | | Not Applicable - Each party receives a divisional interest (i.e., sells products in its respective market), so the parties are not sharing profits or costs. | N/A | N/A |

| | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 69 | 47103 | | N/A (unrelated agreement) | 0 | N/A | Cisco develops products and Ambient may distribute or opt to manufacture for a royalty per product. Not a relevant joint development agreement | N/A | N/A | N/A | Not a relevant joint development agreement | N/A | N/A | N/A | No | N/A | Not a relevant joint development agreement | N/A | N/A |
| 70 | 47241 | | N/A (unrelated agreement) | 0 | N/A | Contract software development. Not a joint development agreement. | N/A | N/A | N/A | Not a relevant joint development agreement | N/A | N/A | N/A | No | N/A | Not a relevant joint development agreement | N/A | N/A |
| 71 | 47489 | | N/A (unrelated agreement) | 0 | N/A | Licensee licensing technology to develop software, paying royalty to licensor for commercialization of said software. Technology license agreement, rather than joint development agreement. | N/A | N/A | N/A | Technology license. Not a relevant joint development agreement | N/A | N/A | N/A | No | N/A | Technology license agreement rather than joint development agreement | N/A | N/A |
| 72 | 12421 | | Unclear / Each Party Bears Own | 0 | Section 4.7, Exhibit B | Section 4.7 & Exhibit B - "Fully Allocated Costs" defined in the context of manufacturing costs, and Exhibit B defines which costs are included and excluded. Parties do not appear to be sharing costs. Agreement is more analogous to a technology license, where in Celgene developed technology and is licensing the right to commercialize to Novartis in exchange for royalties (Article 5.3). | N/A (not cost sharing) | N/A (not cost sharing) | Section 1 Definitions | Section 1 defines "COGS" in accordance with GAAP. GAAP only defined in the context of COGS, and parties do not appear to be sharing costs. | N/A (not cost sharing) | N/A (not cost sharing) | Revenue-based Royalty | No | N/A | N/A - Parties not sharing costs and profits. Celgene is licensing rights to Novartis in exchange for a revenue-based royalty. | N/A | N/A |
| 73 | 10496 | Yes | | | | | | | | | | | | | | | | | |
| 74 | 70329 | | Unclear / Each Party Bears Own / Some Shared | 0 | Article 9.1 | Article 9.1 states that each party will be liable for its own costs, expenses and liabilities, with the exception of Elitech and Wescor being responsible for expenses related to development of New Corgenix Assays and System set forth in Development Plan, including Corgenix's reimbursable expenses. Pursuant to Article 9.2.2(i), parties appear to share a portion of Corgenix's expenses related to development of the New Corgenix IT Assays. However, the agreement provides limited information on the extent of this cost sharing. | N/A (insufficient information) | N/A (insufficient information) | Article 2.10.4 | U.S. GAAP (2.10.4, 7.4), but only in the context of Product price and Manufacturing. Not explicitly discussed in the context of development-related costs or costs that would be shared. | N/A (parties bear own cost; insufficient information on extent of any cost sharing) | N/A (parties bear own cost; insufficient information on extent of any cost sharing) | Revenue-based royalty | Yes | Section 2.10.1 | Net Product Sales defined as gross revenues less credits for returns, rebates, discounts, insurance, transportation costs, bad debt allowance when actually taken, and customs duties. Corgenix pays Elitech royalties on the sale of New Corgenix IT Assays (Article 9.2.3), which are computed on Net Product Sales (Article 2.10). This would mean that the parties are sharing bad debt allowances. | Yes | |
| 75 | 43377 | | Share | 1 | Article 5 | Article 5 outlines Development Funding and Responsibilities. HP is responsible for R&D related to the formatter and system, while Indigo is responsible for R&D related to the ink and engine. HP funds the HP Jericho R&D, and HP and Indigo split the Indigo Jericho R&D. Pursuant to Article 5.4, the parties agree re ante to the level of funding for the Indigo Jericho R&D, which implies that HP's share of funding is capped. This indicates that the parties are limiting the scope of the development costs to be shared. Further, according to Article 4.1, the parties will agree to a Statement of Work and Project Plan. These provisions indicate that the parties agree ex ante to limit the scope of shared costs to those specifically related to the jointly developed product. | No | Yes | N/A | No explicit reporting standard | No | Yes | Divisional Interest | No | N/A | No revenue-based royalty or split of profit - each party shall have right to sell products for any application in any geographical territory in the world. Terms on branded sales (Article 10) redacted and do not provide sufficient information to determine how such costs would be shared. | No | N/A |
| 76 | 10333 | | Unclear / One Party Bears All | 0 | Article 5.1.1 | Article 5.1.1 states that Wescor is responsible for funding R&D Expenses, but the agreement does not appear to address the sharing of costs. | N/A (not cost sharing/insuff. info.) | N/A (not cost sharing/insuff. info.) | N/A | No explicit reporting standard | N/A (not cost sharing/insufficient information) | N/A (not cost sharing/insufficient information) | Revenue-based Royalty | No | N/A | Section 6.2.1 (b) - Defines revenue base, which appears to be analogous to net sales. However, does not specifically address bad debt allowances, and payment structure is a revenue-based royalty rather than a profit split. | N/A | N/A (revenue-based royalty) |
| 77 | 16389 | | Share | 1 | Section 1.41, 5.3, 5.6 | Development Costs are defined in 1.41 and the budget/sharing scheme is defined in 5.3 (though redacted). Overruns are addressed in 5.6. | No | Yes | Article 1.41 | Development Costs determined in accordance with GAAP (Article 1.41). Net Sales defined in accordance with GAAP (Article 1.107). | Yes | Yes | Revenue-based Royalty | No | Section 1.107 c, d | Net sales defined in accordance with GAAP (Article 1.107). Agreement is a joint development agreement followed by a license with a royalty on revenue, so the agreement does not provide sufficient information to determine whether parties would share bad debt expense. | N/A | N/A |

| | | AGREEMENT SUMMARY | | | RESTRUCTURING COSTS | | | | | NON-GAAP PENSION COSTS | | | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 78 | 37819 | | Share | 1 | Article 3.2.3; Article 5.17; Article 4.6 | Article 3.2.4/3.3.4 The JDC/JMC review actual Development Expenses/Marketing Expenses compared to budgeted amounts, and, to the extent that there is an overrun, determine whether the overrun is appropriate, whether it is an isolated event, and whether the budget going forward should be revised. This indicates that third parties will, on a case-by-case basis, evaluate whether costs are "excess" or not, and will not necessarily share "excess" costs. Article 5.17 In the event that Marketing Expenses incurred by a Party exceed the budgeted Marketing Expenses, the Party incurring such excess Marketing Expenses shall be solely responsible for such expenses unless otherwise mutually agreed in writing by the Parties. This clause indicates that "excess" shared costs are generally the responsibility of the Party incurring the cost. Article 4.6 - Parties sharing Development Expenses | No | Yes | Article 6.9 | Article 6.9 - All financial terms used or defined in the agreement governed by US GAAP (for activities in US) and UK GAAP (for activities outside US). Indicates that insofar as parties are sharing expenses, they are accounted for using GAAP. Note: Pension only mentioned in an unrelated context pertaining to the securities owned by the GSK pension. | Yes | Yes | Unclear (Splits Marketing Contribution), Revenue-based Royalty | No | Article 9.7; Article 1.7 | Commercialization - Parties split "marketing contribution" for products. However, the definition of Marketing Contribution (at Article 1.7) is redacted, so it is not clear how profit is being shared. | N/A (insufficient information) | N/A (insufficient information) |
| 79 | 45837 | | Each Party Bears Own | 0 | Article 4.1/4.2 | Article 4.1/4.2 prescribe how expenses and revenues, respectively, will be shared. Each party bears its own expenses related to the Research Plan, but share reimbursable expenses payable to third parties (Article 4.1). The Research Committee is responsible for establishing an annual budget for all activities in the Research. Parties are not sharing costs with the exception of the third party reimbursable expenses, so the agreement does not provide information for how parties share development costs. | N/A (not sharing costs) | N/A (not sharing costs) | N/A | No explicit reporting standard | N/A (not sharing costs) | N/A (not sharing costs) | Unclear | No | | Section 3.9 specifies commercialization plan, and license rights will be developed in the event that plan is executed. Agreement covers a research program to develop potential products, so the parties have not commercialized. | N/A | N/A |
| 80 | 38029 | | Share | 1 | Article 3.2/3.3; Article 3.8; Article 3.5/3.5; Article 6.4; Article 7.7 | Article 3.2/3.3 cover Development Plans and Budgets, and Development Cost Overruns. (Party bears excess if its negligence led to the excess.) Article 3.8 sets forth how development costs will be shared. Article 3.3/5.5 govern Marketing Plans and Budgets and Marketing Cost Overruns in the Co-Promotion Territory. Article 6.4 et. seq provides that the parties will share equally in the cost and profits in the Co-Promotion Territory. The agreement specifies the "Allowable Expenses" for Development, Marketing, and Manufacturing. Article 7.7 The discussion of Manufacturing Costs at Section indicates that the parties have negotiated which costs (e.g., capital equipment, D&A) are allowable, and the method for treating such costs. This provides some evidence that parties explicitly limit how costs are shared. | No | Yes | Section 1.47; Section 5.10(b) | Section 9.2 - All records are to be maintained in accordance with U.S. GAAP, including for Development Costs, Allowable Expenses, Net Sales. Section 5.10(b) - Pension discussed in context of each party's Sales Representatives. Section 5.10(b) stipulates that each party's employees shall not be participants of the other's employee benefits plan. Does not explicitly address quantification of pension expenses. (Note that the FTE Costs of the Sales Representatives appear to be part of Allowable Expenses, and effectively shared.) | Yes | Yes | Splits Profit | Yes | Section 1.75 e | Net Sales excludes amounts repaid, credited, or written off by reason of uncollectible debt, and amounts written off on account of factoring of receivables. | Yes | |
| 81 | 45217 | | Share | 1 | Article 4.3a/b; Article 1.36; Article 1.100 | Article 4.3a/b Parties are splitting costs and profits 50-50 in the US and 80-20 outside the US. Article 1.36 The Development Costs are defined in Article 1.36 (redacted), and the Parties are required to develop and jointly approve Development Plans and Budgets. Article 1.100 "Reimbursable Marketing Expenses" Specifically excludes "internal costs" or either party in the US, and provides that, should one Party be materially adversely impacted by not sharing these internal costs, the Party may petition the JCC to share future "internal marketing direct FTE and medical liaison costs in the US." | No | Yes | Article 1; Article 1.49 | Article 1 - "All accounting terms not otherwise defined in this Agreement...shall have the meanings assigned to them in accordance with [U.S. GAAP]." Article 1.49 - FTE Rate defined to include employee benefit like pension. (Note that the agreement does not appear to specify an alternative to U.S. GAAP for pension costs.) | Yes | Yes | Splits Profit | Yes | Section 1.77 b, d | Net Sales excludes a provision for uncollectible accounts (1.77-d). Parties share operating profit or losses pursuant to Article 4.3, which would indicate that the parties share the provision for bad debt expenses. | Yes | |
| 82 | 22390 | | Share | 1 | Article 1.75, 5.4, 5.43 | Program expenses allocated under the development plan and budget (5.4, 1.75), and limited in 5.4.3. Program expenses and net profit-split equally. Article 5.4.3 indicates that expenses are limited by the development plan and budget, but redacted so cannot determine precisely how excess costs are being treated. | No | Yes | Article 1.43; Article 5.4 | Article 5.4 - "Each Party shall account for Program Expenses in accordance with GAAP and its standard cost accounting practices, in each case as consistently applied." Note - Pension mentioned only in the context of Schedule of Exceptions at Article 3.8(b). | Yes | Yes | Splits Profit | Yes | Section 1.63 | Article 1.63 - Net Sales is calculated net of provision for bad debts, and net sales and costs are calculated in accordance with GAAP. Parties share profits, which indicates that parties are sharing bad debt expenses. | Yes | |

| | | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 83 | 24299 | | Share / Unclear | 1 | Articles 6.3, 6.5 | Alimera bearing 100% development costs (amended - original agreement specified each party bears a certain redacted percent); however, profit split in some manner (50/50 or 80/20 depending on amendment) (Net Sales - commercialization costs), so commercialization costs are being shared. Note: "Direct Costs" (including Direct Development Costs) are defined to exclude "extraordinary and nonrecurring losses customarily deducted by a Party in calculating and reporting consolidated net income." This implies that the parties would not count restructuring costs in the costs to be shared. | Yes (see notes) | Yes | Article 1.37 | Article 1.37 - "Direct Costs" (used to compute Direct Development Costs, Direct Commercialization Costs) specifically includes only current period employee benefits, and excludes deferred compensation. Parties are specifically agreeing to how to quantify costs (and excluding deferred compensation). | Yes | Yes | Splits Profit | No | Article 1.60 | Net sales defined in the context of a net profit split. While net sales includes "reasonable and customary deductions" (Article 1.60), the agreement does not explicitly specify US GAAP treatment, or explicitly mention bad debt expense. Agreement does not provide sufficient information to determine how parties would treat bad debt expense. | N/A (insufficient information) | N/A (insufficient information) |
| 84 | 16865 | | Share | 1 | Section 3.1, 3.6, 7.4, 1.6, Exhibit A. | Development costs and development obligations, as well as cost sharing, spelled out in section 3. Profit sharing detailed in 7.4. (Under Article 3.6, the Parties share Development Expenses for Collaboration Products according to redacted shares. The parties also individually fund certain development activities under Article 3.3.) | No | Yes | Article 1.45; Article Exhibit A; Article 4.10.7 | Article 1.45 - Net Sales defined in accordance with GAAP. GAAP is not explicitly noted in the context of shared costs. Exhibit A ("Determination of Certain Accounting Terms") defines accounting terms, but is redacted. This indicates that the parties mutually agreed to accounting treatment of cost items, though precise definitions are not available to determine treatment of pension costs. Pension only mentioned in Article 4.10.7, which specifies that a Party's Sales Representatives will not be employees of the other Party. | N/A (Unclear, redacted) | Yes | Splits Profit | Yes | Article 1.45 (viii) | Article 1.45(viii) - Net sales is defined to be net of bad debt write-offs. Parties split profit on certain products, which indicates that the parties share such bad debt expenses. | Yes | |
| 85 | 26232 | | Share | 1 | Articles 2.31, 2.35, 3.24; Exhibit A | Pre-commercialization and development costs are shared equally during a pre-launch period (2.3.5, 3.2.4). In addition, net profits are shared (2.3.1, Exhibit A calculates Opex). Note that profits and costs are being shared in the 'Collaboration Territory'. GSK is responsible for development expenses in the GSK Territory (Article 3.2.4). | No | Yes | Exhibit A | Exhibit A defines Operating Expenses, and states that such expenses are determined in accordance with U.S. GAAP and IFRS as applicable. The majority of Exhibit A is redacted, but the reasonable states that costs are being calculated in accordance with accounting standards. (Note: Pension only addressed in the context of the Standstill provision in Article 6). | Yes | Yes | Revenue-based Royalty and Profit Split | No | Exhibit A; Exhibit D | The definition of Net Sales in Exhibit D states that it is to be in accordance with IFRS, and Exhibit D states that expenses are to be calculated in accordance with U.S. GAAP or IFRS. This indicates that bad debt expenses are likely shared by the parties. However, the agreement does not explicitly state that the parties share bad debt. | No | Yes |
| 86 | 70104 | | Share | 1 | Articles 1.16; Article 4.2 | Article 4.2 Development Costs are put forth in the Annual Development Budget, and are shared 50/50. If a Party incurs "excess" Development Costs (i.e., costs that exceed the budgeted amount by more than 10%), such Party shall be responsible for such excess Development Costs. This indicates that parties are responsible for bearing their own "excess" intangible development costs. Article 1.16 - Definition of Development Costs | No | Yes | Article 1.1; Article 1.12; Article 1.16; Article 1.36; Article 4.6 | Article 1.1 defines "Accounting Standards" under the Agreement to be U.S. GAAP and IFRS. Costs, including COGS, Development Costs, and Shared Expenses like sales, marketing and administrative costs, are all to be determined in accordance with the Accounting Standards. | Yes | Yes | Splits Profit | No | Article 1.39; Article 1.48 | Article 1.48 defines Profit/Loss, which is the profit to be split pursuant to Article 4.3(a). As defined in Article 1.48, Profit/Loss is defined as Net Sales less Shared Expenses, where Shared Expenses are calculated in accordance with the Accounting Standards (Article 1.56). Bad debt expense is not explicitly discussed in the agreement, but the profit definition and Accounting Standards imply that this cost would effectively be shared. | No | Yes |
| 87 | 1220 | | Share | 1 | Section 4.1, 4.3 | Development Costs will be shared according to the Joint Development Plan. | No | Yes | Sections 14.1, 1.26, 14.21 | GAAP reporting. | Yes | Yes | Revenue-based Royalty | No | Section 1.42 | Revenue-based royalty. Net sales defined, but in the context of a revenue royalty rather than a profit split. | N/A | N/A |

| | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 88 | 9029 | | One Party Bears All | 0 | Section 4.4, 4.5, 4.6 | Development Expenses will be allocated according to the Development Plan and Budget. Pursuant to Articles 4.4-4.6, Optex is responsible for one component of the development work, but B&L is responsible for reimbursing Optex's development expenses (pursuant to a development plan and budget). B&L is solely funding costs (i.e., parties not sharing costs), but subject to approved development plan/budget. "Excess costs are addressed insofar as B&L's funding obligation shall not exceed $2.5 million (Article 4.6). | N/A | N/A | Section 4.4, 4.5, 4.6, 3.1.9 | B&L bears all costs, so the parties are not sharing costs. No explicit reporting standard. | N/A | N/A | Revenue-based Royalty | No | Section 1.23 | Net sales defined, but solely in context of a revenue-based royalty, rather than a profit split, so the parties are not sharing costs. | N/A | N/A |
| 89 | 9037 | | Share | 1 | Article 1.19, 6, 6.1 | Collaboration Costs will be allocated according to the Development Plan and Budget. Overrun language in Article 6.1, 2.3.2,3.10. Cost share language in 6.1. Overruns borne by party that incurs them, unless they are considered reasonable by the Joint Commercialization Committee. Also agree to share commercialization costs according to the Commercialization Plan and Budget ("Joint Commercialization Activities"). | No | Yes | Section 1.104, 1.63, 6.2 | GAAP reporting | Yes | | Revenue-based Royalty | No | Article 1.114, Article 10 (Product Recall) | Joint development agreement followed by a revenue-based royalty. Net sales defined, but only in the context of a revenue-based royalty. Article 10 covers product recalls. Licensee bears product recall expense, unless the recall resulted from GPC Biotech's breach of obligation/gross negligence/willful misconduct. | N/A | N/A |
| 90 | 9046 | | Unclear | 0 | | No mention of shared development costs. Appears to be a Licensing Agreement, rather than a Joint Development Agreement. | N/A | N/A | | Agreement does not address shared development costs. No explicit reporting standard. | N/A | N/A | Revenue-based Royalty | No | Section 1.18 | Net sales defined | N/A | N/A |
| 91 | 9346 | | Each Party Bears Own / Unclear | 0 | Exhibit B, Section 4.3 | Costs will be borne by QLT according to the Development Plan (material has been redacted here). See 4.3 for overrun language. Articles 4.2-4.3 outline QTL's obligations to carry out the initial Development Plan, and provides that QTL's expenses shall not exceed a spending cap, but does not otherwise address cost overruns. Agreement is not clear on how parties may be sharing other costs/responsibilities. | N/A | N/A | | No explicit reporting standard. | N/A | N/A | Revenue-based Royalty | Yes | Section 1.21 | Revenue-based royalty, but net sales is defined (at Article 1.21) to be net of allowances for bad debts, indicating that parties would share bad debt expenses. | Yes | |
| 92 | 10830 | | N/A - Joint Venture | 0 | Section 9, Appendix H | Agreement covers the formation of a Joint Venture rather than a Joint Development Agreement. All net profits/losses shall be shared by each party of JV in a 50/50 proportion. | N/A | N/A | Appendix H (note 2) | GAAP reporting | N/A | N/A | N/A - Joint Venture | No | | Shareholders split profits of the JV Company 50/50 pursuant to Article 9 and Appendix H. | N/A | N/A |
| 93 | 11901 | | Share | 1 | Article IV | Development costs (defined in Financial Appendix) shared 50/50. | No | Yes | Article 1 | GAAP reporting defined in Article 1 for Cost of Goods Sold | | Yes | Revenue-Based Royalty and Profit Split | No | Article 1; Financial Appendix | Roche pays Genentech a revenue-based royalty on certain products in certain territories, and share operating profit in certain products (Article VI). Agreement and Financial Appendix define certain costs in terms of GAAP, but does not provide a definition of operating profit. Net sales defined, but Financial Appendix does not provide detail on treatment of allowance for bad debt. | No | Yes |
| 94 | 13792 | | Some Shared | 1 | Articles 1.35, 1.112, 3.80, 9.1, Schedule 2 | Sanofi shall be responsible for paying 100% of total Development costs, except for certain Phase III costs, which will be shared according to Article 3.80 in US and worldwide, inclusive of shared commercial expenses, and other shared expenses. | No | Yes | Article 1.75, 14 | IAS/IFRS/GAAP reporting | Yes | | Profit Split | Yes | Article 1.75; Article 1.112; Article 7.6 | Net sales defined (Article 1.75). Bad debt expense is defined as a "shared commercial expense" (Article 1.112). Parties agree to share product recall expenses (Article 7.6) | Yes | Yes |

| | | | AGREEMENT SUMMARY | | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 95 | 13752 | | Each Party Bears Own / Some Shared | 1 | Articles 6, 2.1 | Revenue sharing of product sales (defined in article 6). Development costs borne according to Development Program (Article 2.1, actual development plan redacted). According to Article 2.1, each party bears own costs under Development Program, subject to the fact that Medicis makes an upfront payment pursuant to Article 6.1. Parties do not appear to be sharing development costs. | No | N/A (unclear; bear own dev costs) | Article 1.29; Article 1.31 | Net sales and manufacturing costs defined in accordance with U.S. GAAP (Articles 1.29, 1.31). Parties are not sharing development costs, but split Gross Profit, so they share Manufacturing Costs, Distribution and Sales Costs. Not sharing all costs, but those that are shared use GAAP (provides some implicit support) | No | Yes | Revenue-Based Royalty and Profit Split | No | Article 1.31; Article 6.3 | Parties share Gross Profit (Net Sales - Cost of Sales). Net Sales and Manufacturing Costs defined in accordance with GAAP. Does not explicitly address bad debt expense, but could be included in Cost of Sales. Profit split and GAAP treatment of certain costs indicates that bad debt expenses could be shared or borne by respective parties. Insufficient information to determine treatment. | N/A (insufficient information) | N/A (insufficient information) |
| 96 | 16221 | | Share | 1 | Articles 3.1, 3.2, 3.3, 3.7, 1.37 | Pursuant to the Development Plan, Development Costs will be shared equally. Any party with excess costs over a redacted threshold will be solely responsible for the remainder of those costs. In addition, profits (losses) are shared equally. | No | Yes | Article 1.16; Article 1.37; Article 1.61, Article 1.85 | GAAP reporting for costs defined in agreement | Yes | Yes | Profit Split | Yes | Article 1.92; Article 5.10 | Article 1.92 - Net sales defined to specifically include allowances for bad debt (up to a certain redacted amount), indicating that the parties share (or at least partially share) such expenses. | Yes | |
| 97 | 17096 | | Share | 1 | Articles 6.1, 6.2, 1.26, 1.53, 3.2.4 | Parties share equally in Development Expenses, Marketing Expenses, and Net Profits (Article 6.1). Party incurring inappropriate excess costs will bear them. | No | Yes | Article 1.4 | GAAP/IFRS reporting. Costs are measured in accordance with the parties' Accounting Standards (Article 1.4) | Yes | Yes | Revenue-Based Royalty and Profit Split | No | Article 1.4; Articles 6.1-6.2 | Parties share Net Profits within a territory. Net sales and costs are accounted for in accordance with agreed upon accounting standards. | | Yes |
| 98 | 22168 | Yes | | | | | | | | | | | | | | | | |
| 99 | 22443 | | Share / Unclear | 1 | Section 8.7, Annex 1 | Parties define Development Costs, and agree to a Development Plan and Development Budget (Article 8.7). Note: Agreement is related to a purchase agreement, and the seller's Development Costs are capped at $7 million. Seller's Development Cost Cap could reflect additional consideration for purchase. "Does not explicitly address cost overruns, but development costs are capped." | No | Yes | Section 2.8(d)(vi) | Parties to maintain books in accordance with GAAP (or other international accounting standards), including in relation to Development Costs | Yes | Yes | Revenue-based Royalty | No | Annex 1.1 | Section 2.8(d) - Seller receives a royalty on Net Sales (defined in Annex 1). Agreement also contemplates a gross profit split in other territories pursuant to Section 2.8(d)(i)(C). Revenue-based royalty not sufficient to determine treatment of bad debt expense. | N/A | |
| 100 | 22498 | | Each Party Bears Own | 0 | Article 4.2, 1.47 | Articles 4.2(a), 4.2(b) - Alexza responsible for and funds all development activities for approval of of NDA, while BLS shall be responsible for conducting and funding Phase IV Commitment and/or Post-Marketing Studies. Indicates that each party bearing their own costs related to these respective development activities. Pursuant to Article 4.2(b), if either party's costs exceed a (redacted) amount, the parties will negotiate how to handle such expenses on a case-by-case basis. | N/A | N/A | Article 1.53 | GAAP reporting | N/A | N/A | Revenue-based Royalty | No | Article 1.77 | Net sales defined, explicitly excludes bad debt expense and product recalls | Yes | |
| 101 | 22572 | | Share | 1 | Section 3.3, 1.90 | Joint Development Costs will be shared equally according to the Joint Development Plan. Overruns are borne by the party that incurs them, unless the excess was outside the reasonable control of the incurring party. Profit sharing mechanism outline in section 9.3. | No | Yes | Article 1.70, Article 9.3(c) | GAAP reporting | Yes | Yes | Revenue-base Royalty | No | Article 1.120 | Net sales defined. In context of revenue-based royalty rather than profit split. | N/A | N/A |
| 102 | 22716 | | Share | 1 | Section 1.21, 4.4, 4.4.4 | Territorial Development Costs will be shared equally according to the Development Budget, otherwise Auxilium bears 100 percent of all general development activities, as well as 100 percent of manufacturing development activities. Overruns greater than 10 percent are reviewed and beared determined by committee | No | Yes | Article 1.55 | GAAP reporting | Yes | Yes | Unclear (redacted), but appears to be revenue-based royalty | No | Article 1.55 | Net sales defined, refunds due to product recalls excluded | N/A | N/A |
| 103 | 22721 | | Share | 1 | Article 6.4, Schedule 6, Schedule 13 (heavily redacted). | 50:50 cost and profit sharing agreement. Certain redacted percentage of overruns borne by MERCK, rest borne by ARCHEMIX. | No | Yes | Article 1.80 | GAAP reporting | Yes | Yes | Revenue-based Royalty and Profit Split | Yes | Article 1.122 | Net sales defined | N/A | N/A |
| 104 | 23102 | | Unclear / One party bears all | | Article 3.1 | Sales bears development costs up to 12 million. Costs in excess of 12 million are credited toward future milestone payments. | N/A (not sharing costs) | N/A (not sharing costs) | Article 1.47, 3.4 | GAAP reporting. Parties do not appear to be sharing costs. | N/A | N/A | Revenue-based Royalty | No | Article 1.84 | Net sales defined (heavily redacted) | N/A | N/A |
| 105 | 23593 | | Each Party Bears Own | 0 | Sections 1.39, 4.8 | BLS bears 100% of development costs, excluding (redaction ), includes all regulatory expenses. Overruns are borne by the party that incurs them. | N/A | N/A | Article 1.54 | GAAP/IFRS reporting | N/A | N/A | Revenue-based Royalty | No | Article 1.79 | Net sales defined (heavily redacted) | N/A | N/A |

| | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Undear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 106 | 23704 | | Each Party Bears Own | 0 | Sections 4.3.2, 4.3.3, 5.3.4(b), Appendix C, D | Specific activities are funded by each party (redacted). Sales costs overruns will be funded by the party incurring them. | N/A | N/A | | No explicit reporting standard. | N/A | N/A | Revenue-based Royalty | No | Article 1.31 | Net sales defined | N/A | N/A |
| 107 | 25678 | | One party bears all | 0 | Sections 4.7, Exhibit B (redacted) | Amylin reimburses ACTII for work performed under the Product Development Plan. | N/A | N/A | | No explicit reporting standard. | N/A | N/A | Revenue-based Royalty | No | Article 1.21 | Net sales defined (heavily redacted) | N/A | N/A |
| 108 | 25920 | | Share | 1 | Section 2.7 | R&D costs are shared equally. | No | Yes | Article 1.53 | GAAP reporting, not explicitly in context of pension-related costs. | N/A | Yes | Revenue-based Royalty and Profit Split | No | | Net sales defined specifically, but since GAAP accounting is mentioned and profits are shared, we assume that bad debt expense is shared. | | Yes |
| 109 | 26071 | | Each Party Bears Own | 0 | Exhibit A | Product development work will be executed according to the product development plan (redacted), also see 2.1 showing responsibilities. | N/A | N/A | Section 1 Definition | GAAP reporting | N/A | N/A | Profit Split | No | | Net sales not defined, but profit starting with net sales indicates that bad debt expense would be shared. | | Yes |
| 110 | 26072 | | One party bears all | 0 | Section 6b | Neos paid for development IntelGenX shall be responsible for the first 2 million of development activities set forth in the Development Budget (redacted), other expenses shared equally. | N/A | N/A | Section 4, 6b | GAAP reporting | N/A | N/A | Profit Split | No | Section 4 | Net sales defined | N/A | N/A |
| 111 | 26585 | | N/A - Formation of JV | 0 | Article 3.4 | expenses shared equally. | N/A | N/A | | No explicit reporting standard. | N/A | N/A | Profit Split | No | Article 1 Definitions | Net sales defined | N/A | N/A |
| 112 | 27583 | | Share | 1 | Article 3.8, 3.8.10 | The Development Cost funding obligations for each party are described in section 3.8, though costs are redacted. Overrun language also redacted. Also details commercialization costs. | No | Yes | Articles 1.39, 1.53 | GAAP reporting | N/A | Yes | Profit Split | No | Article 1.54 | Net sales defined in context of profit split, so we expect bad debt expense would be shared | | N/A |
| 113 | 28084 | | Share | 1 | Articles 1.34, 7.3 | Development costs incurred pursuant to the Development Plan will be shared equally. | No | Yes | Article 1.56 | GAAP reporting | Yes | | Revenue-based Royalty | No | Section 1.80 | Net sales defined (heavily redacted) | N/A | N/A |
| 114 | 30018 | | Share | 1 | Articles 3.3, (redacted), 1.17, 8.4, Exhibit A | Genentech bears Development Costs incurred, but commercialization costs are shared. Parties also engage in 50/50 profit share. Redacted overrun language. | No | Yes | Article 1.56 | GAAP reporting | N/A | Yes | Profit Split | No | Article 1.56 | Net sales defined in context of profit split, so we expect bad debt expense would be shared | | N/A |
| 115 | 31638 | | One Party Bears All | 0 | Article 8.3, 8.4 | Acura paid for development, certain reimbursements to Acura shall not exceed budget set forth in Development Plan. | N/A | N/A | Article 1.44 | GAAP reporting | N/A | N/A | Revenue-based Royalty | No | Article 1.59 | Net sales defined | N/A | N/A |
| 116 | 31943 | | Each Party Bears Own | 0 | Articles 4.2, Exhibit A | Each party bears its own R&D expenses pursuant to the Research and Development Plan - each party responsible for its own overruns | N/A | N/A | Article 1 Definitions | GAAP reporting | N/A | N/A | Profit Split | No | Article 1 Definitions | Net sales defined | N/A | N/A |
| 117 | 35244 | | Share | 1 | Articles 4.3, 2.1, Attachment 2.2( b) | Commercialization Costs and Development Costs are shared equally according to a Development Budget. Redacted contingency for overruns. | No | Yes | Article 1 Definitions | GAAP reporting, not explicitly in context of pension-related costs | N/A | Yes | Revenue-based Royalty and Profit Split | No | Article 1 Definitions | Net sales defined in context of profit split, so we expect bad debt | | Yes |
| 118 | 35973 | Yes | | | | | | | | | | | | | | | | |
| 119 | 36480 | | One Party Bears All | 0 | Articles 1.40, 7.1, 8.1 | Parties share equally all profits on sales of developed products, one party pays all development costs. | N/A | N/A | | No explicit reporting standard. | N/A | N/A | Profit Split | No | Article 1.21 | Gross sales defined. Parties are splitting profit, which indicates that bad debt expense would likely be shared | | Yes |
| 120 | 36715 | | Share | 1 | Articles 1.37, 11.2 | Development costs and collaboration revenue will be shared according to the Cost Sharing Ratio. | No | Yes | Article 1.44 | GAAP reporting | | Yes | Profit Split | Yes | Article 1.66 | Net sales defined, adjusted for bad debt expense | Yes | |
| 121 | 37885 | | Share | 1 | Article 3.6 | Development cost will be shared according to the Development Program. | No | Yes | Article 6.5, Schedule B 1.4 | GAAP reporting | | Yes | Profit Split | Yes | Schedule B 1.6 | Gross sales defined, excludes bad debt | Yes | |
| 122 | 38280 | | Each Party Bears Own | 0 | Article 3.6 | Nortec seems to be paid for its development work by Par. | N/A | N/A | | No explicit reporting standard. | N/A | N/A | Revenue-based Royalty | No | Section 1(o) | Net sales defined | N/A | N/A |
| 123 | 42407 | | Share | 1 | Article 7.1, 7.4, 8.1 | Profits and Development costs will be shared between the parties, and overrun costs will be shared equally. | No | Yes | | No explicit reporting standard. | N/A | N/A | Profit Split | No | Section 1.21, 1.8 | Gross sales defined. Deductible expenses defined to include manufacturing, distribution, marketing costs, as well as returns and allowances. Allowance for bad debt not explicitly mentioned, but likely included in distribution expenses or allowances. | | Yes |
| 124 | 42839 | | Share | 1 | Article 3.3, 6.5 | US R&D costs shared pursuant to exercise of profit/loss option, otherwise Genentech bears all. | No | Yes | Article 6.8 | GAAP reporting, notes fully burdened FTE costs, which can assumed to include benefits. | Yes | | Profit Split | No | Exhibit A.1 | Net sales defined | | Yes |

| | | AGREEMENT SUMMARY | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 125 | 44305 | | Share | 1 | Article 6.6, Schedule I, Article 7.c, Article 8.1-8.2 | Article 6.6 - Standard Cost and Budget defined. Article 8.1.c - Overruns must be approved by Steering Committee. Schedule I - Collaboration Costs Shared (Section 8.2). Articles 8.1-8.2 - Parties review/approve Program Plan and Budget, and agree to share Collaboration Expenditures (defined in Schedul I), and share Operating Profit/Loss | No | Yes | Article 8.3 | Parties agree to GAAP accounting for all items within the Operating Profit or Loss account (i.e., Collaboration Expenditures). | Yes | | Profit Split | No | Article A.41 Definitions | Net Sales Defined in accordance with GAAP. Parties split operating profit/loss, which is calculated in accordance with GAAP pursuant to Article 8.3. | | Yes |
| 126 | 43827 | | One Party Bears All / Unclear | 0 | Article 3,4,7, Article 7.3 | Development plan, budget, and costs defined in Articles 3,4 & 7. BML makes payments to TWT to fund the development of the Collaboration Product pursuant to the Development Budget (see Articles 7.2.1-7.2.4). Appears that BML pays 100% of Development Budget, which TWT carries out, but agreement is unclear. Article 7.3 Excess Costs - Excess costs that exceed 5% of the Development Costs are not reimbursed. Development Committee is to confer in good faith as to the means for addressing such cost overruns. Note: Under Article 7, it does not appear that the parties are sharing development costs. TWT contributed technology, so transaction may be more analogous to a license. | N/A (not cost sharing) | N/A (not sharing costs) | Article 1.12, Article 1.18 | Article 1.12 - TWT's reimbursable development calculated in accordance with U.S. GAAP. Article 1.18 - U.S. GAAP for TWT, Japanese equivalent for BML. | N/A (not sharing cost) | N/A (not sharing cost) | Other | No | Article 10.3 | Article 10.3 - Parties enter into a manufacturing and supply arrangement, rather than a revenue or profit-based royalty. | N/A | N/A |
| 127 | 46156 | | Share | 1 | Article 4.7, Exhibit B | Article 1.14 defines the Development Budget/Plan.  Article 4.7 Development Cost Sharing detailed in redacted Tripartite Agreement.  Exhibit B provides guidance on accounting and reporting. | No | Yes | Exhibit B.1 | Exhibit B.1 - Parties accounting of costs will be consistent with U.S. GAAP. | Yes | | Profit Split | No | Exhibit B.9, Exhibit B.4.11 | Exhibit B.9 - Parties share operating profit/loss, which is defined as Net Sales less costs specified in Exhibit B.4.11. Exhibit B.1 specifies U.S. GAAP accounting. | | Yes |
| 128 | 46920 | | Share | 1 | Article 3.2.5, 9.2, Article 9.5 | Article 3.2.5 Development Costs Shared on a 50-50 Basis. Article 9.2 Parties will share Research Costs equally. Article 9.5 Excess costs will not be reimbursed. | No | Yes | Article 1.21; Article 1.30 | Article 1.21 - Costs to be caculated consistent with U.S. GAAP. | Yes | | Profit Split | Yes | Article 1.70; Article 1.49; Article 4.3 | Parties share Net Pretax Profits and Losses (Article 4.3), which is computed pursuant to Article 1.48, and includes Sales, Marketing and Distribution Costs as a shared expense. Article 1.70 defines Sales, Marketing and Distribution Costs to include bad debt allowances. | | |
| 129 | 49731 | | Share | 1 | Article 3.8 | Article 3.8 - Each party shall be responsible for half of all direct costs, provided that these expenses are consistent with the approved budget. *Except as otherwise provided in the agreement, each party assumes full responsibility for its own costs incurred during the development period (i.e., an expense in excess of the approved budget would be borne by the party incurring it). | No | Yes | Article 1.20 | Article 1.20 - Costs (and operating profit) defined in accordance with U.S. GAAP | Yes | | Revenue-based Royalty | No | Article 1.19; Article 1.20 | Article 1.19 - Not Sales defined. Article 1.20 defines Operating Profit as Net Sales less various costs, in accordance with U.S. GAAP | N/A | N/A |
| 130 | 51583 | | Each Party Bears Own (see notes) | 0 | Article 2.2.c, Article 4.1-4.3; Article 5.1-5.2 | Article 2.2.c Each Party is responsible for its own activities under the Compound Development Plan. Article 4.1-4.3 Preclinical testing costs shared. Article 5.1-5.2 Each party responsible for the commercialization costs incurred in its respective territory. With the exception of the specific preclinical testing costs to be shared, each party is responsible for its own costs. | N/A (not cost sharing) | N/A (not sharing costs) | | Parties do not share costs (except as set forth in Articles 4.1-4.3). GAAP only discussed in context of Net Sales (Article 1.19). | N/A (not sharing cost) | N/A (not sharing cost) | Territorial Division | No | Article 5 | Each party has the right to commercialize products in its respective territory. | N/A | N/A |

| | | AGREEMENT SUMMARY | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 131 | 51930 | | Shared | 1 | Article 4.5, Article 5.5, Article 5.6, Article 6.7, Article 7.2 | Article 4.5 Development Costs shared equally. Article 5.5 Regulatory costs shared equally. Article 5.6 Recall costs borne by MAP, which manufactures Product pursuant to Article 7.1 (unless recall is the result of Allergan's gross negligence). Article 6.7 (Commercialization) - Shared Expenses are shared under Article 6.3, but some Commercialization costs are not shared (borne by respective party). (Shared Expenses listed in the redacted Exhibit 1.113) Article 7.2 Manufacturing expenses shared | No | Yes | Article 1.48 | Agreement defines U.S. GAAP specifically in the context of certain shared expenses (e.g., patent expenses). Exhibit 1.113, which identifies Shared Expenses, is redacted. Use of GAAP indicates that the parties would be treating other costs in accordance with GAAP, but it is not explicitly stated in the redacted agreement. | | Yes | Profit Split | No | Article 8.3, Article 5.6 | Parties split gross profit pursuant to Article 8.3. Net sales defined in accordance with GAAP (Article 1.73), and profit split uses Net Sales is the definition of profit. As set forth in Article 5.6, product recalls shall be borne by the manufacturing party (MAP), unless it is the result of gross negligence on the part of Allergan. Indicates that the expense would remain with the party incurring the expense, except in the case of gross negligence. | | Yes |
| 132 | 52087 | | Share | 1 | Article 4.4, Article 4.4.4 | Article 4.4 Parties share equally all development costs. Development Budget defined in Article 4.3. Article 4.4.4 Overruns up to 10% of Development Budget will but automatically included in Development Budget. Overruns exceeding 10% are subject to the approval of the Joint Steering Committee. | No | Yes | Articles 1.51, 1.55, 1.56 | GAAP described in the context of certain costs (Articles 1.51, 1.56) and net sales (Article 1.55). While not explicitly mentioned in the context of development costs, the agreement specifies U.S. GAAP for several costs, indicating that other costs would likely follow similar accounting procedures. | | Yes | Other | No | Article 5.7.2 | Parties form a supply agreement for the Bulk Product (Article 7) rather than splitting profit or a revenue-based royalty. Article 5.7.2 - Parties share recall expenses unless it is the result of a material breach by one party. Indicates that parties would share such expenses. | N/A | N/A |
| 133 | 56655 | | Unclear / Each Party Bears Own (see notes) | 0 | Section 1.01, Section 2.07, Section 3.01-3.02, Section 9.03 | Section 1.01 - "Product Expenses" to be shared defined. (Note: Definition includes out-of-pocket costs and expenses, but excluding a contract sales force, and costs related to supply Samples. However, Article 15.01 provides that each party shall bear its own costs. The scope of costs that are shared versus borne internally is unclear.) Section 2.07 defines Joint Development Program Article 3.01-3.02 - Parties share Product Expenses. Article 9.03 One party bears cost of returned products. | N/A (cost sharing unclear) | N/A (cost sharing unclear) | Article 13.02, Article 15.01 | Article 13.02 - Net Sales and Product Expenses determined under GAAP. Article 15.01 - Each party shall bear its own costs, and neither party shall have "responsibility for hiring, termination or compensation of the other party's employees or for any employee benefits of such employee." | N/A (cost sharing unclear) | N/A (cost sharing unclear) | Revenue-based Royalty | Yes | Article 1.01 | Article 1.01 - Net Sales definition is net of bad debts, so a revenue-based royalty would mean that the parties effectively share this bad debt expense. | Yes | |
| 134 | 57910 | | Share | 1 | Article 4.08, Article 4.08.e | Article 4.08 Development Expenses pursuant to the Development Plan (Article 4.05) shall be shared equally. Article 4.08e Lead development party bears the cost of overruns unless the costs result directly from actions of either party, in which case the costs are borne by the party responsible. Overrun costs may be shared if approved by the Steering Committee. | No | Yes | Article 2.08 | Article 2.08 - GAAP accounting for net sales and expenses | Yes | | Profit Split | No | Article 8; Article 2.08 | Article 8 - Parties share operating profit in collaboration territory, and Ortho pays a royalty to Ergo in royalty territory. Operating Profit is calculated as Net Sales less Allowable Expenses, calculated according to GAAP pursuant to Article 2.08. | | Yes |
| 135 | 59356 | | One Party Bears All | 0 | Article 4.6.1-4.6.2, Article 4.7 | Article 4.6.1-4.6.2 Each party is responsible for its own costs specified in the Development Plan Budget (Article 4); however one party will reimburse the other party for the costs incurred consistent with those specified in the Development Plan Budget. Article 4.7 One party shall not bear more than $2.5 million. If this case arises, the parties shall in good faith discuss whether modifications are appropriate. B&L bears 100% of the ongoing R&D, and reimburses all of Optos's costs under the budget. | N/A (not cost sharing) | N/A (not cost sharing costs) | | | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | | | N/A (not sharing cost) | N/A (not sharing cost) |
| 136 | 62496 | | Share | 1 | Article 4.08a-b, Article 4.08 | Article 4.08a-b Costs of Development shall be shared based on specifications of Article 4. One party funds 60% while the other funds 40%. The maximum cost borne by the party providing 60% of the funds is capped. Article 4.08f The party responsible for funding 40% will bear the cost of overruns unless the overrun was a direct result of the other party (Article 4.08a) or if the Steering Committee approves the overrun, in which case it will be borne in the same 60 : 40 manner. | No | Yes | Article 2.08.b | Article 2.08.b - Net sales and expenses calculated in accordance with U.S. GAAP | Yes | | Profit Split | No | Article 8.01 | Parties share operating profit under Article 8. Net Sales and expenses are calculated in accordance with GAAP, which would indicate that allowances for bad debt are included as an expense to be shared. | | Yes |

| | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| 137 | 64682 | | Share | 1 | Article 5.02; Article 4.02 | Article 5.02a.i Parties split development costs 80 - 20. Article 4.02l Overruns greater than a certain percentage of budget will be reviewed by Global Joint Development Committee | No | Yes | Article 5.02 | Article 5.02(b) - Development costs defined, and shall be accounted for using the accounting methods agreed upon by parties. | N/A (not cost sharing) | Yes | Profit Split | No | Article 1.22; Article 4.06(d) | Article 1.22 - Net Sales Defined, but redacted. Attachment 2 defines Profit, allowable expenses, etc., but redacted. Article 4.06(d) - Recall expenses included in Development Costs or Operating Profit (shared by parties). | N/A (not cost sharing) | N/A (not cost sharing) |
| 138 | 67133 | | Each Party Bears Own | 0 | Article 4.3-4.4 | Article 4.3-4.4 Parties are responsible for costs in respective territories. | N/A (not cost sharing) | N/A (not sharing costs) | Article 1.1 | GAAP | N/A (not cost sharing) | N/A (not sharing cost) | Revenue-based Royalty | No | | | | |
| 139 | 68080 | | Unclear | 0 | Article 9a; Article 6.9 | Article 9a - Parties contemplate an option for SP to obtain rights in additional products, and will negotiate a separate agreement covering the development of such products. Parties do not appear to incurring joint costs to develop product; SP may request research services from HGS, and pay HGS for its fully allocated. Arrangement seems to be a license and contract research arrangement. | N/A (not cost sharing) | N/A (not sharing costs) | | | N/A (not cost sharing) | N/A (not sharing costs) | Revenue-based Royalty | No | | | N/A (not cost sharing) | N/A (not sharing costs) |
| 140 | 69965 | | Each Party Bears Own / Unclear | 0 | Article 4.13 | Article 4.13 All development costs borne by one party, subject to information in 3.3 that has been redacted. Unclear whether or not parties are sharing costs given Articles 4.13 and 4.13 redacted information in Article 3.3 | N/A (insufficient information) | N/A (insufficient information) | Article 1 | Article 1 defines accounting standards, referencing US GAAP and IFRS | N/A (insufficient information) | N/A (insufficient information) | Revenue-based Royalty | No | | Insufficient information to determine whether/how parties are sharing costs | N/A | N/A |
| 141 | 70368 | | Shared | 1 | Article 4.6a; Article 6.5; Article 9.3 | Article 4.6a Development costs shared; the proportions have been redacted. One party is responsible for activities related to the seeking of regulatory approval. Article 6.5 Commercialization costs shared based on specifications in article 9.3-4. One party will bear all commercialization costs related to Royalty Territory and Royalty-Bearing products. Article 9.3(c) - Defines commercialization cost overruns, but specific treatment is redacted. | No | Yes | Article 1.40; Article 2.11; Article 9.18 | Parties account for costs in accordance with mutually agreed accounting procedures.  Article 9.18 prescribes that the parties shall account for net sales and expenses in accordance with GAAP. | Yes | N/A (not sharing costs) | Revenue-based Royalty and Profit Split | Yes | Article 1.65 | Article 1.65 - Net Sales defined to be net of bad debt expenses for sales actually written off in accordance with GAAP. Implication is that parties share bad debt expense. | Yes | |
| 142 | 70603 | | Each Party Bears Own / Unclear | 0 | Article 3.3; Article 4.1 | Article 3.3 One party will bear the cost of conducting the Development Program (detailed in Article 3). Article 4.1 Party not responsible for Development Program will make payments in support of the Research Program (payment schedule redacted). CFFT (the party not conducting Development Program) provides some financial support, but agreement does not appear to involve the sharing of costs. | N/A | N/A | Article 1.25 | GAAP described in the context of the calculation of Net Sales (Article 1.25). Accounting of specific costs not addressed. | N/A | N/A | Revenue-based Royalty | No | | | N/A | N/A |
| 143 | 70698 | | Each Party Bears Own | 0 | Article 3.2d | Article 3.2d Auxilium is responsible for all development costs incurred after June 3, 2004 (the date of the original agreement), and BTC responsible for all development costs prior to that date.  This article indicates that each party is effectively bearing its own development costs (or that Auxilium is responsible for ongoing development costs), rather than sharing costs. | N/A (not sharing costs) | N/A (not sharing costs) | Article 7.7 | Article 7.7 - GAAP (not specific to costs) Employee benefits mentioned in Schedule 1.23 in the context of quantifying Cost of Goods for products manufactured by Auxilium. (Note that Schedule 1.23 does specify U.S. GAAP.) | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 1.53 | N/A - Net Sales defined, but in the context of a revenue-based royalty rather than a profit split. | N/A (not sharing cost) | N/A (not sharing cost) |
| 144 | 77982 | | Each Party Bears Own / Some Shared | 0 | Article 2.2; Article 5.2.2; Article 3.2.2a | Article 2.2 - ChemoCentryx solely responsible for costs and expenses related to Development activities; however, if GSK exercises its Product Option, it shall be solely responsible for development and commercialization costs and expenses. Article 5.2.2 - After GSK exercises its option, ChemoCentryx has an option to co-develop by paying GSK for 35% of the cost of specified Study. Article 3.2.2a If costs exceed amount set forth in Development plan, one party will have the option to cofund the overrun or elect to withdraw from its co-development in licensed product. (Excess cost, but covered in the context of ChemoCentryx's option to co-develop.) Article 3.2 - Early Development Plan defined | N/A (not cost sharing) | N/A (not sharing costs) | Article 3.40(c) | GAAP accounting specified in context of Dossier Study Cost | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 1.80 | Parties are sharing proceeds through a series of milestone payments and revenue-based royalties depending on product options. Net sales is defined at Article 1.80, but the parties are not sharing profit. | N/A | N/A |

| | | | AGREEMENT SUMMARY | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 145 | 77993 | | Each Party Bears Own | 0 | Article 4.2.1; Article 4.2.2; Article 4.2.3 | Article 4.2.1 Except for otherwise noted, parties bear their own expenses under the Development Program. Article 4.2.2 One party shall bear costs of Clinical Development Activities. Article 4.2.3 The other party shall provide a capped amount of money toward the Clinical Development if it is determined necessary by the Joint Committee to support marketing or Regulatory Approval. | N/A (not cost sharing) | N/A (not cost sharing) | Article 1.3.a | All accounting terms shall be construed in conformity with U.S. GAAP. | N/A (not sharing cost) | N/A (not sharing cost) | Territorial Division | No | Article 1.19 | Not Applicable - Development agreement related to production and distribution agreement. Party manufactures and supplies the product to the other for sale to third party customers. | N/A | N/A |
| 146 | 78209 | 1 | Each Party Bears Own / Some Share (see notes) | 1 | Article 4.1; Article 5.2 | Article 4.1 One party shall bear the costs related to research, development and commercialization while the other party shall be responsible for costs related to establishing manufacturing capabilities and facilities. Each party is responsible for the costs related to its own assigned activity during development, but share commercialization costs and profits according to Article 5.2. Article 5.2 - The parties agree to share profit 50/50, and set forth the financial terms for calculating "Allowable Expenses" in Exhibit A. | No | Yes | Article 1.63; Exhibit A | Article 1.63 defines U.S. GAAP. Exhibit A provides financial terms for the "Allowable Expenses" that can be subtracted to calcualte profit. US GAAP specified in the context of net sales and specific costs. | Yes | | Profit Split | No | Article 1.41; Article 5.2; Article 9.3 | Parties share profit (Net Sales Less Allowable Expenses), where Net Sales is calculated in accordance with US GAAP. Product Liability Claims (an similar type of cost) are treated as part of Allowable Expenses and thus shared by the parties, unless it arises as the result of gross negligence or willful misconduct. These two factors indicate that parties would likely share bad debt expense. | | Yes |
| 147 | 78506 | 0 | Each Party Bears Own | 0 | Article 2.2; Article 2.4; Article 2.5 | Article 2.2 One party shall be solely responsible for the cost of the development of the product except for the costs listed in Article 2.4. Article 2.4 The other party shall bear the costs of any additional development activities that are proposed. Article 2.5 The party responsible for the development of the product shall also bear the costs of commercialization. | N/A (not cost sharing) | N/A (not cost sharing) | Article 1.31b | GAAP | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 1.65 | Net Sales Defined, but solely in the context of a revenue-based royalty | N/A | N/A |
| 148 | 78946 | 1 | Share | 1 | Article 9.4b | Article 9.4b Parties are responsible for 50% of the total costs authorized by the Development Plan (Article 3.2). | No | Yes | | No explicit reporting standard. | No | Yes | Revenue-based Royalty | Yes | Article 2.36 | Net Sales defined less bad debt deductions actually written off. Indicates that parties are effectively sharing this expense under a revenue-based royalty. | Yes | |
| 149 | 79470 | 0 | Each Party Bears Own (see notes) | 0 | Article 4.1 | Article 4.1 Oragenics party shall bear all costs associated with the exception of the costs of establishing manufacturing capabilities and facilities (detailed in Article 4.6), costs of basic research, costs of filing patents, and other redacted costs. Intexon shall be responsible for manufacturing capabilities-related costs. Article 1.50, 5.4 - Parties share Product Profit (gross profit), which effectively means they share Cost of Goods Sold. | N/A (not cost sharing) | N/A (not cost sharing) | Article 1.69; Article 4.1 | U.S. GAAP defined, and discussed in the specific context of calculating Fully Loaded Cost of manufacturing Oragenics Product (Article 4.1), which is effectively shared pursuant to Article 5.2. The parties are only sharing Cost of Goods Sold (manufacturing costs), but otherwise appear to bear own. | N/A | | Profit Split | No | Article 1.42 | Net Sales Defined at Article 1.42 in accordance with U.S GAAP. The parties are effectively splitting gross profit (net sales less cost of goods sold), so the treatment of bad debt expense is unclear. | N/A | N/A |
| 150 | 80993 | 0 | N/A - Joint Venture | 0 | Not a relevant agreement - formation of joint venture | | N/A | N/A | Not a relevant agreement - formation of joint venture | | N/A | N/A | | | Not a relevant agreement - formation of joint venture | | N/A | N/A |
| 151 | 81165 | 1 | Share | 1 | Article 4.1; Article 4.9.b.iii; Article 4.8.a | Article 4.1 Each party shall be responsible for its own cost for the development and regulatory approval of the product in its respective field (see Article 4.8 for more information). Article 4.9b.iii As of an Option Exercise Date, parties will share costs of development based on certain percentages Article 4.8a Parties will act in good faith to modify Development Plan to accomodate the costs of an overrun. Agreement has elements of both parties bearing their own costs and sharing costs. The parties bear own costs (subject to separate development plans and budgets), but upon exercise of option agree to share costs. | No | Yes | Article 1.14 | U.S. and French GAAP specified for Development Costs (which are defined at Article 1.14) | Yes | | Revenue-based Royalty and Profit Share | No | Article 4.9; Article 8.3 | Compensation includes revenue-based royalty and profit-sharing components. Profit share for U.S. territory contemplated in Article 4.9, but the parties will enter into a separate agreement covering the profit sharing terms. Given that the profit sharing terms are not available in this agreement, and that the royalty is payable on revenue, it is not clear how bad debt expenses would be treated. | N/A | N/A |

| | | | AGREEMENT SUMMARY | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes; 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 152 | 91220 | | Each Party Bears Own / Unclear | 0 | Article 4.1; Article 4.4 | Article 4.1 Synthetic shall solely bear the costs of the development and commercialization associated with the program with the exception of costs related to basic research, filing of patents, and other redacted costs, which are to be borne by Intrexon. Article 4.4 Party that bears costs of development and commercialization shall also bear the costs of regulatory matters. Article 4.7 - Intrexon may provide contract R&D services to Synthetic, which will compensate Intrexon for its Fully Loaded Cost in connection with such service. | N/A (not cost sharing) | N/A (not cost sharing) | Article 1.23; Article 1.60 | U.S. GAAP defined and specified in the context of Fully Loaded Costs (i.e., the costs associated with Intrexon's contract R&D support services) | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 5.4 | Parties enter into a revenue-sharing agreement to split net sales, rather than a profit and cost sharing compensation structure. | N/A | N/A |
| 153 | 100743 | | Share | 1 | Article 6.2g; Article 6.2h; Article 6.2e | Article 6.2g One party shall reimburse the other for 25% of Past Development Costs. Article 6.2h Parties each bear 50% of Shared Development Costs. Budget detailed in Article 7.2.2. Article 7.2.2d In the event that the EPIZYME is likely to incur a cost overrun, the Joint Steering Committee shall hold an ad-hoc meeting and discuss in good faith what measures to take to address overruns. Article 7.2.2e Overruns over a certain percentage will be borne by EPIZYME. | No | Yes | Article 1.72; Exhibit 14.15 | Exhibit E (Joint Development Agreement Term Sheet) defines revenues and costs for the purposes of calculating profit, and specifies GAAP in several places (Exhibit E, Article 15). Article 14.15 specifies that parties should maintain financial records in accordance with GAAP under this agreement. | Yes | Yes | Revenue-based Royalty and Profit Split | No | Article 1.72; Article 6.1 | Parties share profit on some products in certain territories (pursuant to Article 6.1 and Exhibit E), and net sales is defined at Article 1.72 in accordance with GAAP. Implies bad debt expense would be shared | | Yes |
| 154 | 100768 | | Each Party Bears Own | 0 | Article 4.1; Article 4.4 | Article 4.1 Fibrocell shall bear the costs of development and commercialization. Intrexon responsible for the costs related to the establishing manufacturing capabilities and facilities, basic research, filing patents, and other costs. Article 4.4 The party responsible for the development and commercialization costs shall also be responsible for the costs pertaining to regulatory matters. | N/A (not cost sharing) | N/A (not cost sharing) | Article 1.15 | GAAP accounting specified in the context of COGS | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 1.47; Article 5.3 | Intrexon receives a revenue-based royalty, so while net sales is defined, the agreement is not a cost (and profit) sharing arrangement. | N/A | N/A |
| 155 | 100921 | | Each Party Bears Own | 0 | Article 4.1; Article 4.4 | Article 4.1 - Soligenix shall bear all costs for the costs related to the development and commercialization of the products, while the costs related to costs of establishing manufacturing capabilities and facilities, costs of basic research, cost of filing patents, and other redacted costs will be borne by Intrexon. Article 4.4 - Soligenix shall bear the costs of all regulatory matters. Article 4.7 - Intrexon provides support services (contract R&D) to Soligenix, and is compensated for its Fully Loaded Cost. | N/A (not cost sharing) | N/A (not cost sharing) | Article 1.24 | U.S. GAAP defined and specified in the context of Fully Loaded Cost (i.e., the costs associated with Intrexon's contract R&D support services) | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 5.4 | Parties enter into a revenue-sharing agreement to split net sales, rather than a profit and cost sharing compensation structure. | N/A | N/A |
| 156 | 100989 | | Share | 1 | Article 5.4.2 | Article 5.4.2 A certain percent (redacted) of the Research and Development Costs will be borne by the parties. | No | Yes | Article 1 | Net sales and costs (including Collaboration Costs, Research and Development Costs, etc.) defined in accordance with GAAP. | Yes | Yes | Revenue-Based Royalty and Profit Split | No | Article 5.5.1; Article 1 | Parties share net profit pursuant to Article 5.5.1. Net Sales defined in Appendix A, but redacted. However, definition does state that it is consistent with GAAP, which would indicate that allowances for bad debt would likely be included as a cost. | | Yes |
| 157 | 101064 | | One Party Bears All | 0 | Article 4.3a-b | Article 4.3a-b: Aradigm responsible for development activities, but Grifols reimburses all Development Costs in accordance with the Development Plan and Budget. Effectively, Grifols is bearing all development cost, so this is more analogous to a license and contract R&D arrangement. | N/A (not cost sharing) | N/A (not cost sharing) | | | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 1.71 | Aradigm receives royalties on revenue from Grifols. Parties are not sharing costs. | N/A | N/A |
| 158 | 101648 | | Each Party Bears Own | 0 | Article 4.1; Article 4.3 | Article 4.1 One party shall bear the costs incurred related to the program with the exception of costs related to establishing manufacturing capabilities and facilities, basic research, filing patents, and other redacted costs. Article 4.3 The party responsible for the costs related to the program should also bear the costs associated with Regulatory Matters. | N/A (not cost sharing) | N/A (not cost sharing) | Article 1.26 | GAAP | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 5.1 | Parties share Gross Profit (Net Sales - Cost of Sales). Net Sales and Manufacturing Costs defined in accordance with GAAP. Does not explicitly address bad debt expense, but may be included in Cost of Sales. Insufficient information to determine how parties would treat bad debt expense. | N/A | N/A |

| | | AGREEMENT SUMMARY | | | RESTRUCTURING COSTS | | | | NON-GAAP PENSION COSTS | | | | CUSTOMER FINANCING | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| r | Agreement ID | Duplicate | Share Cost / Each Party Bears Own / One Party Bears All / Unclear | Share Costs (1=Yes 0=No or unclear) | Location | Notes | Restructuring Cost Explicit Evidence | Restructuring Cost Implicit Evidence | Location | Notes | Non-GAAP Pension Costs Explicit Evidence | Non-GAAP Pension Costs Implicit Evidence | Splits Profit, Revenue-Based Royalty, Both, Territorial Division, Other | Mentions Bad Debt Expense? | Location | Notes | Customer Financing Explicit Evidence | Customer Financing Implicit Evidence |
| 159 | 101652 | | Each Party Bears Own | 0 | Article 4.1 | Article 4.1 One party shall bear the costs associated with the program with the exception of costs related to establishing and maintaining manufacturing capabilities, costs of basic research, costs of filing patents, and other redacted costs. Article 4.4 The party responsible for bearing the costs of the program is also responsible for costs related to all regulatory matters. | N/A (not cost sharing) | N/A (not cost sharing) | Article 3.69 | GAAP | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 1.45 | Net Sales Defined, but not in the context of a profit split. | N/A | N/A |
| 160 | 101737 | | Each Party Bears Own | 0 | Article 2.2 | Article 2.2 One party shall fund the research with an amount of funds that has been stipulated. | N/A (not cost sharing) | N/A (not cost sharing) | | No explicit reporting standard. Parties do not appear to be sharing costs. | N/A (not sharing cost) | N/A (not sharing cost) | Revenue-based Royalty | No | Article 1 | Net Sales Defined, but parties do not appear to be sharing costs. | N/A | N/A |
| 161 | 101786 | | Share | 1 | Article 3.2.1f Article 5.12 | Article 3.2.1f All Research and Development Costs incurred by either party will be shared equally (further detailed in Article 3.6). Article 5.12 Commercialization overruns greater than a specified amount of the budget will be reviewed by the Joint Commercialization Committee. If the overruns are deemed appropriate, then the committee will come up with a revised budget. If the overruns are not deemed to be appropriate, then the committee will take actions to remedy the situation. | No | Yes | Article 1; Article 8.5 | GAAP (Article 8.5 specifies GAAP w.r.t. records and books for revenues and expenses). Out-of-pocket R&D expenses calculated in accordance with GAAP (Article 1). Personnel costs, which are a component of the Product Contribution (i.e., the profit being split) described in Schedule B, are defined to include employee benefits. | Yes | | Profit Split | Yes | Article 1; Schedule D | Net Sales defined at Schedule D in accordance with GAAP, and specifically lists an allowance for bad debt as a deduction to be subtracted when computing net sales. Indicates that the allowance for bad debt. | Yes | |
| 162 | 101813 | | Share | 1 | Article 6.1.3 Article 6.1.4 | Article 6.1.3: Parties shall initially bear their own costs and submit their reports to the Joint Development Committee. A composite report will compute the net amount of Development Costs due to each party. Article 6.1.4: The handling of overruns is dependent upon the relative size of the party with the overrun as well as the financial circumstances of that calendar quarter. | No | Yes | Article 1.56; Article 12.4; Exhibit B | Article 12.4 - For all costs or expenses under the agreement, Parties shall maintain books and records in accordance with GAAP. Exhibit B, specifies that "undefined terms shall be construed in accordance with GAAP" to the extent consistent with teh Agreement. According to Exhibit B, the exception to GAAP treatment is the "Sales Force FTE Costs" which are calculated as specified in the exhibit. (Note: The specific treatment of Sales Force FTE Costs does not address pension costs, and does not specify a non-GAAP treatment of pension expenses.) | Yes | | Profit Split | Yes | Article 1.79; Exhibit B | Article 1.79 - Net Sales defined in accordance with GAAP. Specifically, the selling party may "exclude from Net Sales a reasonable provision for uncollectible accounts...determined in accordance with GAAP." Parties split profit as defined Exhibit B, which is generally calculated in accordance with GAAP, and net sales (as defined in Article 1.79) is net of provisions for bad debts. | Yes | |

## III.    Search Matrix for Initial Qualitative Review

### A.    ktMINE Search #1: Joint Development Agreements in Nortel's Industry and Contiguous Industries

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 1 | 509 | UB Business Alliance, UB Foundation Services, Inc., University of Buffalo, The Research Foundation of State University of New York, State University of New York at Buffalo | Biophan Technologies, Inc. | No |
| 2 | 7083 | Two Way TV Limited, Interactive Network, Inc., TWIN Entertainment Inc. | TWIN Entertainment Inc., Interactive Network, Inc., Two Way TV Limited | No |
| 3 | 7478 | Palm Computing, Inc., Sony Corporation, PalmSource, Inc. | Sony Corporation, Palm Computing, Inc., PalmSource, Inc. | No |
| 4 | 7801 | SITEK, INC. | OPTICNET, INC. | No |
| 5 | 8941 | Textron, Inc., Collins & Aikman Corporation, Collins & Aikman Products Co. | Collins & Aikman Corporation, Collins & Aikman Products Co., Textron, Inc. | No |
| 6 | 9678 | Immersion Corporation, LOGITECH, INC. | LOGITECH, INC., Immersion Corporation | No |
| 7 | 9754 | AM Communications, Inc., Scientific-Atlanta, Inc. | AM Communications, Inc., Scientific-Atlanta, Inc. | Yes |
| 8 | 9794 | QuickLogic Corporation | Cypress Semiconductor Corporation | Yes |
| 9 | 9800 | QuickLogic Corporation | Cypress Semiconductor Corporation | No |
| 10 | 9876 | Toray Industries, Inc., THERMA-WAVE, INC. | Toray Industries, Inc., THERMA-WAVE, INC. | Yes |
| 11 | 10205 | Two Way TV Limited, Interactive Network, Inc. | TWIN Entertainment Inc. | No |
| 12 | 10368 | IXION, INC. | ETHICON Endo-Surgery, ETHICON, INC., Johnson & Johnson | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 13 | 10462 | EduLink, Science Applications International Corporation | Science Applications International Corporation, EduLink | No |
| 14 | 10627 | Vocus, Inc. | PR Newswire Association, Inc. | No |
| 15 | 10723 | RDS Tasks of Ohio, Inc., Moonlight R&D, Inc., Geoalert Incorporated | Geoalert Incorporated, Moonlight R&D, Inc., RDS Tasks of Ohio, Inc. | Yes |
| 16 | 10776 | Virtual Reality Laboratories, Inc. | A.I. Soft, Inc. | No |
| 17 | 10777 | MicroTrac Systems, Inc., Restrac, PeopleSoft, Inc. | PeopleSoft, Inc., Restrac, MicroTrac Systems, Inc. | No |
| 18 | 10800 | Virtual Reality Laboratories, Inc. | A.I. Soft, Inc. | No |
| 19 | 10816 | E-Z-EM, INC., Vital Images, Inc. | Vital Images, Inc., E-Z-EM, INC. | No |
| 20 | 10827 | Daimler-Benz Aktlengesellschaft, Odetics, Inc. | Odetics, Inc., Daimler-Benz Aktlengesellschaft | Yes |
| 21 | 10828 | Exchange Applications, Inc., MicroStrategy Incorporated | Exchange Applications, Inc., MicroStrategy Incorporated | Yes |
| 22 | 10829 | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | No |
| 23 | 10837 | Dassault Systemes, PlanetCAD Inc. | Dassault Systemes, PlanetCAD Inc. | No |
| 24 | 10855 | MICROSTRATEGY INCORPORATED, Exchange Applications, Inc. | MICROSTRATEGY INCORPORATED, Exchange Applications, Inc. | No |
| 25 | 10903 | INTERNET SPORTS NETWORK INC., PLAYANDWIN, INC. | PLAYANDWIN, INC., INTERNET SPORTS NETWORK INC. | No |
| 26 | 10910 | Global Enterprise Technology Solutions, LLC | Pegasus Solutions, Inc. | No |
| 27 | 10914 | SOFTWATCH INC., MEDSCAPE, INC., SOFTWATCH, LTD. | MEDSCAPE, INC., SOFTWATCH INC., SOFTWATCH, LTD. | No |
| 28 | 11001 | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | TTR Technologies, Ltd., TTR TECHNOLOGIES, INC., MACROVISION CORPORATION, C-Dilla, Ltd. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 29 | 11011 | The Ministry of Public Security of People's Republic of China, The First Research Institute, Beijing Zhougdun Security Technology Development Company, Detection Systems International, Inc., Hunt Electronic Co., Ltd., Qing Dao Waldorf Real Estate Company | D.S. First Systems (Beijing) Limited | No |
| 30 | 11026 | HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG, NANOGEN, INC. | HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG, NANOGEN, INC. | Yes |
| 31 | 11047 | thinWeb.com Corporation, Agritek Bio Ingredients Corporation | Newco | No |
| 32 | 11067 | Lotus Development Corporation, Interliant, Inc. | Interliant, Inc., Lotus Development Corporation | Yes |
| 33 | 11068 | WonderNet, Ltd., Security Biometrics Inc. | Security BiometricsInc., WonderNet,Ltd. | No |
| 34 | 11069 | SURGICAL SAFETY PRODUCTS, INC., UNITED STATES SURGICAL CORPORATION | UNITED STATES SURGICAL CORPORATION, SURGICAL SAFETY PRODUCTS, INC. | No |
| 35 | 11288 | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | Yes |
| 36 | 11400 | BRINK'S SECURITY INTERNATIONAL, INC., Valores Tamanaco, C.A. | BRINK'S SECURITY INTERNATIONAL, INC., Valores Tamanaco, C.A. | No |
| 37 | 11467 | The Good Guys-California, Inc., goodguys.com, inc. | The Good Guys-California, Inc., goodguys.com, inc. | No |
| 38 | 11545 | Minnesota Mining and Manufacturing Company, Imation Corp., 3M | Imation Corp., Minnesota Mining and Manufacturing Company | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 39 | 11546 | Pearson Television Netherlands, Pearson Television France EURL, Pearson Television, Inc., Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited, E-Pub (Holdings) Ltd., Uproar Inc. | Uproar Inc., Pearson Television, Inc., Pearson Television Netherlands, Pearson Television France EURL, Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited, E-Pub (Holdings) Ltd. | Yes |
| 40 | 11660 | SmithKline Beecham Corporation, Human Genome Sciences, Inc., Synthelabo, N/A | Synthelabo, SmithKline Beecham Corporation, Human Genome Sciences, Inc., N/A | No |
| 41 | 11798 | US WEST INTERACTIVE SERVICES, INC. | SPORTSLINE USA, Inc. | No |
| 42 | 11805 | Restrac, MICROTRAC SYSTEMS, INC., PeopleSoft, Inc. | PeopleSoft, Inc., Restrac, MICROTRAC SYSTEMS, INC. | No |
| 43 | 11969 | 2d Interactive, Inc., Global One Distribution and Merchandising, Inc. | Global One Distribution and Merchandising, Inc., 2d Interactive, Inc. | No |
| 44 | 12020 | Global One Distribution and Merchandising, Inc., 2d Interactive, Inc. | Global One Distribution and Merchandising, Inc., 2d Interactive, Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 45 | 12089 | AVANTIUM B.V., AVANTIUM INTERNATIONAL B.V., Shell International Chemicals B.V., Avantium Technologies B.V., N.V. Koninklijke Nederlandsche Petroleum Maatschappij, Shell Transport and Trading Company plc, GSE SYSTEMS, INC., B.V. LICHT EN KRACHT MAATSCHAPPIJ, SMITHKLINE BEECHAM PLC, S.R. ONE, LIMITED, DELFT UNIVERSITY OF TECHNOLOGY, UNIVERSITY OF TWENTE, EINDHOVEN UNIVERSITY OF TECHNOLOGY, THE GENERICS GROUP LIMITED, ALPINVEST HOLDING NV | B.V. LICHT EN KRACHT MAATSCHAPPIJ, SMITHKLINE BEECHAM PLC, S.R. ONE, LIMITED, GSE SYSTEMS, INC., DELFT UNIVERSITY OF TECHNOLOGY, UNIVERSITY OF TWENTE, EINDHOVEN UNIVERSITY OF TECHNOLOGY, THE GENERICS GROUP LIMITED, ALPINVEST HOLDING NV, AVANTIUM B.V., AVANTIUM INTERNATIONAL B.V., Shell International Chemicals B.V., Avantium Technologies B.V., N.V. Koninklijke Nederlandsche Petroleum Maatschappij, Shell Transport and Trading Company plc | No |
| 46 | 12130 | ACTUATE SOFTWARE CORPORATION, SCHRODER VENTURES FRENCH ENTERPRISE FUND L.P.1, SCHRODER VENTURES FRENCH ENTERPRISE FUND UKLP, SUK VFIV NOMINEES LIMITED, Schroder U.K. Venture Fund IV LP 1, Schroder U.K. Venture Fund IV LP 2, Schroder U.K. Venture Fund IV Trust, Michael BERMAN, Pierre BRAUDE, Patrick CHANCERELLE, Gilles VLIEGEN, TELEPHUS VASTGOED B.V., ACTUATE B.V., ACTUATE HOLDING B.V., Mr. Andrew Ferrier, Actuate France | SCHRODER VENTURES FRENCH ENTERPRISE FUND L.P.1, SCHRODER VENTURES FRENCH ENTERPRISE FUND UKLP, SUK VFIV NOMINEES LIMITED, Schroder U.K. Venture Fund IV LP 1, Schroder U.K. Venture Fund IV LP 2, Schroder U.K. Venture Fund IV Trust, Michael BERMAN, Pierre BRAUDE, Patrick CHANCERELLE, Gilles VLIEGEN, TELEPHUS VASTGOED B.V., ACTUATE B.V., ACTUATE SOFTWARE CORPORATION, ACTUATE HOLDING B.V., Mr. Andrew Ferrier, Actuate France | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 47 | 12168 | Teknik Digital Arts, Inc., Playentertainment, L.L.P., NBC Enterprises, Inc., Joy Tashjian Marketing Group, LLC | Teknik Playentertainment, LLC | No |
| 48 | 12552 | Collins & Aikman Corporation, Collins & Aikman Products Co., Textron, Inc. | Textron, Inc., Collins & Aikman Corporation, Collins & Aikman Products Co. | No |
| 49 | 12875 | IGT, Progressive Gaming International Corporation | Progressive Gaming International Corporation, IGT | No |
| 50 | 12896 | TranSend International, Inc., Oasis Online Technologies Corp | Oasis Online Technologies Corp, TranSend International, Inc. | No |
| 51 | 13276 | LEXICON GENETICS INCORPORATED, THE TEXAS A&M UNIVERSITY SYSTEM, TEXAS A&M UNIVERSITY | TEXAS INSTITUTE FOR GENOMIC MEDICINE, TEXAS A&M HEALTH SCIENCE CENTER | No |
| 52 | 13812 | Current Technology Corporation, Robert Kramer, Harrison Kramer Corporation, The Real Security Company Ltd., Sensorguard LLC | N/A | No |
| 53 | 13821 | Superconductor Investments (Mauritius) Ltd, Hunchun BaoLi Communications Co. Ltd., BAOLI Superconductor Technology Co, Ltd | BAOLI Superconductor Technology Co, Ltd, Superconductor Investments (Mauritius) Ltd, Hunchun BaoLi Communications Co. Ltd. | No |
| 54 | 15492 | Oasis Online Technologies, Corp, SVC Cards, Inc., Allow Card of America, Inc., Card of America, Inc., Flex Wireless, Inc., Flex EFS, COA Holdings, Inc. | SVC Cards, Inc., Allow Card of America, Inc., Card of America, Inc., Flex Wireless, Inc., Flex EFS, COA Holdings, Inc., Oasis Online Technologies, Corp | No |
| 55 | 15769 | DexCom, Inc., Animas Corporation | Animas Corporation, DexCom, Inc. | No |
| 56 | 15793 | STRATEC Biomedical Systems AG, Gen-Probe Incorporated | Gen-Probe Incorporated, STRATEC Biomedical Systems AG | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 57 | 15819 | Gen-Probe Incorporated, Novartis Vaccines & Diagnostics, Inc., Chiron Corporation | Novartis Vaccines & Diagnostics, Inc., Chiron Corporation, Gen-Probe Incorporated | No |
| 58 | 15956 | Huazhong University of Science and Technology, Wuhan Blower Co., Ltd. | Wuhan Blower Co., Ltd., Huazhong University of Science and Technology | No |
| 59 | 15974 | HEALTH DISCOVERY CORPORATION, DCL MEDICAL LABORATORIES, LLC | DCL MEDICAL LABORATORIES, LLC, HEALTH DISCOVERY CORPORATION | Yes |
| 60 | 16225 | GEN-PROBE INCORPORATED, NOVARTIS VACCINES AND DIAGNOSTICS, INC., CHIRON CORPORATION | NOVARTIS VACCINES AND DIAGNOSTICS, INC., GEN-PROBE INCORPORATED, CHIRON CORPORATION | No |
| 61 | 16662 | Primary Knowledge, Inc., Inforte Corp., Ronald Meyer, Jerry Conrad | PROVANSIS LLC, PROVANSIS LLC An Inforte Company | No |
| 62 | 20184 | FAMILYWARE PRODUCTS INC., NIFCO SYNERGY LTD. | NIFCO SYNERGY LTD., FAMILYWARE PRODUCTS INC. | No |
| 63 | 20975 | coolsavings.com inc., FIRST USA BANK, N.A. | FIRST USA BANK, N.A., coolsavings.com inc. | No |
| 64 | 22118 | Yahoo! Inc., Microsoft Corporation | Microsoft Corporation, Yahoo! Inc. | No |
| 65 | 22647 | PASSTIME FLEET, LLC, Gordon · Howard Associates, Inc., Astrata Group Incorporated | PassTime Telematics | No |
| 66 | 23227 | Celera Corporation, Abbott Laboratories, Applera Corporation, Celera Diagnostics LLC | Abbott Laboratories, Celera Corporation, Applera Corporation, Celera Diagnostics LLC | No |
| 67 | 23402 | Intel Corporation, LogMeIn, Inc. | LogMeIn, Inc., Intel Corporation | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 68 | 23473 | Versata Software Inc., Trilogy Software, Inc., Versata Development Group, Inc., Selectica, Inc., Joseph A. Liemandt, Trilogy, Inc., Trilogy Capital Holdings Corporation, Versata Enterprises, Inc., Trilogy Enterprises Inc. | Selectica, Inc., Versata Software Inc., Trilogy Software, Inc., Versata Development Group, Inc., Joseph A. Liemandt, Trilogy, Inc., Trilogy Capital Holdings Corporation, Versata Enterprises, Inc., Trilogy Enterprises Inc. | No |
| 69 | 24358 | INTERNATIONAL BUSINESS MACHINES CORPORATION, NEXX SYSTEMS, INC. | NEXX SYSTEMS, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION | Yes |
| 70 | 24359 | INTERNATIONAL BUSINESS MACHINES CORPORATION, NEXX SYSTEMS INC. | NEXX SYSTEMS INC., INTERNATIONAL BUSINESS MACHINES CORPORATION | No |
| 71 | 25342 | Sandbox Entertainment Corporation, CNNfn Interactive, Cable News Network, Inc. | CNNfn Interactive, Cable News Network, Inc., Sandbox Entertainment Corporation | No |
| 72 | 25345 | Sandbox Entertainment Corporation, CNNfn Interactive, Cable News Network, Inc. | CNNfn Interactive, Cable News Network, Inc., Sandbox Entertainment Corporation | No |
| 73 | 25356 | Brilliant Digital Entertainment, Inc., Brilliant Entertainment, Inc., B3D, Inc., Enewmedia Digital Entertainment Limited, e-New Media Company, N/A | Enewmedia Digital Entertainment Limited, e-New Media Company, N/A, Brilliant Digital Entertainment, Inc., Brilliant Entertainment, Inc., B3D, Inc. | No |
| 74 | 25435 | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | mPHASE TECHNOLOGIES, INC., LUCENT TECHNOLOGIES INC. | Yes |
| 75 | 25602 | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | mPHASE TECHNOLOGIES, INC., LUCENT TECHNOLOGIES INC. | No |
| 76 | 25773 | SURGIVISION, INC., Siemens Aktiengesellschaft | Siemens Aktiengesellschaft, SURGIVISION, INC. | Yes |
| 77 | 25793 | INTERNATIONAL BUSINESS MACHINES CORPORATION, NEXX SYSTEMS, INC. | NEXX SYSTEMS, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 78 | 25968 | SILICON FILM TECHNOLOGIES, INC., APPLIED COLOR SCIENCE, INC. | APPLIED COLOR SCIENCE, INC., SILICON FILM TECHNOLOGIES, INC. | No |
| 79 | 26362 | ipowerUpSoftware, LLC, Star Link Investments, Inc., ipowerUpSoftware, Inc | ipowerFEMATA.com, FEMATA.com | No |
| 80 | 26601 | GUANGDONG PEOPLE'S BROADCASTING STATION, GUANGZHOU SINGSHINE COMMUNICATION CO., LTD., Guangdong Teamnet Co., Ltd. | GUANGZHOU SINGSHINE COMMUNICATION CO., LTD., GUANGDONG PEOPLE'S BROADCASTING STATION, Guangdong Teamnet Co., Ltd. | No |
| 81 | 27080 | Mind Streams, LLC, Significant Education, LLC, Grand Canyon University | Significant Education, LLC, Grand Canyon University, Mind Streams, LLC | No |
| 82 | 27492 | Image Sensing Systems, Inc., Econolite Control Products, Inc. | Econolite Control Products, Inc., Image Sensing Systems, Inc., COHU, Inc. | No |
| 83 | 27843 | InforMedix, Inc., McKesson BioServices Corporation | McKesson BioServices Corporation, InforMedix, Inc. | No |
| 84 | 28066 | Imex International Corp, Quadra Energy Systems Inc. | Carib Green Industries | No |
| 85 | 28254 | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | mPHASE TECHNOLOGIES, INC., LUCENT TECHNOLOGIES INC. | No |
| 86 | 28260 | Microsoft Corporation, Robertson Technologies Licensing LLC | Robertson Technologies Licensing LLC, Microsoft Corporation | Yes |
| 87 | 29957 | MOLECULAR VISION LIMITED, Professor Donal Bradley, Dr. John de Mello, Professor Andrew de Mello, Imperial Innovations Limited, ACRONGENOMICS, INC. | ACRONGENOMICS, INC., MOLECULAR VISION LIMITED, Professor Donal Bradley, Dr. John de Mello, Professor Andrew de Mello, Imperial Innovations Limited | Yes |
| 88 | 29970 | Xinhua Finance Media Limited, Small World Television, LLC, SMALL WORLD PRODUCTIONS LIMITED | Small World Television, LLC, Xinhua Finance Media Limited, SMALL WORLD PRODUCTIONS LIMITED | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 89 | 29988 | INFOTEC BUSINESS SYSTEMS, INC., MMAWL.COM, WALLID ISMAIL, WALLID ISMAIL PROMOCOES E EVENTOS LTDA-EPP | INFOTEC BUSINESS SYSTEMS, INC., MMAWL.COM, WALLID ISMAIL, WALLID ISMAIL PROMOCOES E EVENTOS LTDA-EPP | Yes |
| 90 | 30245 | REMOTE KNOWLEDGE, INC., RAYMARINE plc | RAYMARINE plc, REMOTE KNOWLEDGE, INC. | Yes |
| 91 | 30599 | ETHICON ENDO-SURGERY, INC., InScope Division, GIVEN IMAGING LTD. | GIVEN IMAGING LTD., ETHICON ENDO-SURGERY, INC., InScope Division | No |
| 92 | 30774 | China Mobile Communications Group Corporation, Beijing Enterprise Network Technology Co., Ltd. | Beijing Enterprise Network Technology Co., Ltd., China Mobile Communications Group Corporation | Yes |
| 93 | 33335 | LUNA ENERGY, LLC, Luna Technologies, Inc. | Luna Technologies, Inc., LUNA ENERGY, LLC | No |
| 94 | 33337 | WorldSpace (China) Information Technology Ltd., Xi'an Tongshi Technology Limited | Xi'an Tongshi Technology Limited, WorldSpace (China) Information Technology Ltd. | Yes |
| 95 | 33836 | China Mobile Communications Group Corporation, Beijing Hutong Wuxian Technology Co., Ltd. | China Mobile Communications Group Corporation, Beijing Hutong Wuxian Technology Co., Ltd. | Yes |
| 96 | 35207 | Novint Technologies, Inc., Mr. Thomas G. Anderson, MANHATTAN SCIENTIFICS, INC. | MANHATTAN SCIENTIFICS, INC., Novint Technologies, Inc., Mr. Thomas G. Anderson | Yes |
| 97 | 35415 | Novint Technologies, Inc., Mr. Thomas G. Anderson, MANHATTAN SCIENTIFICS, INC. | MANHATTAN SCIENTIFICS, INC., Novint Technologies, Inc., Mr. Thomas G. Anderson | No |
| 98 | 35522 | TEKNIK DIGITAL ARTS INC., Buddy Rice Racing, Inc. | Buddy Rice Racing, Inc., TEKNIK DIGITAL ARTS INC. | No |
| 99 | 35705 | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 100 | 35740 | Given Imaging Ltd., Ethicon Endo-Surgery, Inc., INSCOPE DIVISION | Ethicon Endo-Surgery, Inc., Given Imaging Ltd., INSCOPE DIVISION | Yes |
| 101 | 35751 | China Mobile Communications Corporation, Beijing G. Feel Technology Co., Ltd | Beijing G. Feel Technology Co., Ltd, China Mobile Communications Corporation | No |
| 102 | 35752 | Beijing Mobile Communication Co., Ltd, Beijing Sohu Internet Information Service Co., Ltd | Beijing Sohu Internet Information Service Co., Ltd, Beijing Mobile Communication Co., Ltd | Yes |
| 103 | 35753 | China Mobile Communications Corporation, Beijing Sohu Online Network Information Service Co., Ltd. | Beijing Sohu Online Network Information Service Co., Ltd., China Mobile Communications Corporation | No |
| 104 | 35924 | FRIEDSHELF 401 (PROPRIETARY) LIMITED, SPAR GROUP INTERNATIONAL, INC., DEREK O'BRIEN, BRIAN MASON, SMD MERIDIAN CC, MERIDIAN SALES & MERCHANDISING (WESTERN CAPE) CC, RETAIL CONSUMER MARKETING CC, MERHOLD HOLDING TRUST | SGRP MERIDIAN (PROPRIETARY) LIMITED | No |
| 105 | 35973 | VYTERIS, INC., B. BRAUN MEDICAL INC. | B. BRAUN MEDICAL INC., VYTERIS, INC. | Yes |
| 106 | 35987 | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | No |
| 107 | 36260 | Satelinx International Inc., Mr. Lew Kim Soon, Mr. Foo Chee Han, Mr. Wong Kim Shin | Satelinx Tracking Systems (Malaysia) Sdn Bhd | No |
| 108 | 36472 | AUTOGEN RESEARCH PTY LTD ACN 074 636 847, AUTOGEN RESEARCH PTY LTD, ACN 074 636 847, AUTOGEN LTD, SOUTHWEST FOUNDATION FOR BIOMEDICAL RESEARCH | SOUTHWEST FOUNDATION FOR BIOMEDICAL RESEARCH, AUTOGEN RESEARCH PTY LTD ACN 074 636 847, AUTOGEN RESEARCH PTY LTD, ACN 074 636 847, AUTOGEN LTD | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 109 | 37361 | ESPRE Solutions Inc., GreaTraX, LLC | GreaTraX, LLC, ESPRE Solutions Inc., StreamTraX Media Group, LLC | No |
| 110 | 37461 | SkyLynx Communications, Inc., PS III HOLDINGS, LLC | PS III HOLDINGS, LLC, SkyLynx Communications, Inc. | No |
| 111 | 37566 | VirtualScopics LLC, Chondrometrics GmbH | Chondrometrics GmbH, VirtualScopics LLC | No |
| 112 | 38174 | Resin Systems International Ltd., Resin Systems Inc., Euro-Projects (LTTC) Ltd. | RSG/EPL Joint Venture | No |
| 113 | 38810 | xSides Corporation, Y3K Secure Enterprise Software, Inc. | Y3K Secure Enterprise Software, Inc., xSides Corporation | Yes |
| 114 | 38867 | xSides  Corporation, Y3K Secure Enterprise Software, Inc. | Y3K Secure Enterprise Software, Inc., xSides Corporation | No |
| 115 | 38928 | Nelnet, Inc., INFINET Integrated Solutions, Inc. | INFINET Integrated Solutions, Inc., Nelnet, Inc. | No |
| 116 | 38963 | Government of Canada, Technology Partnerships Canada, iFire Technology Inc. | iFire Technology Inc., Government of Canada, Technology Partnerships Canada | No |
| 117 | 39539 | E-Z-EM, INC., Vital Images, Inc. | Vital Images, Inc., E-Z-EM, INC. | No |
| 118 | 40416 | SCIENTIFIC GAMES INTERNATIONAL, INC., ELECTRONIC GAME CARD, INC. | ELECTRONIC GAME CARD, INC., SCIENTIFIC GAMES INTERNATIONAL, INC. | No |
| 119 | 40632 | ACTIVEPOINT LTD., WWAP | WWAP, ACTIVEPOINT LTD. | No |
| 120 | 40650 | Karamco, Inc., Telecommunications Overseas Fusion Ltd, Roger Karam | Efonica FC-LLC | No |
| 121 | 41360 | Infineon Technologies AG, Actel Corporation | Actel Corporation, Infineon Technologies AG | Yes |
| 122 | 41419 | Jeecom, Inc., Digital Video Systems, Inc., DV Systems, Inc. | Digital Video Systems, Inc., DV Systems, Inc., Jeecom, Inc. | Yes |
| 123 | 41453 | Mars Electronics International, Inc., USA Technologies, Inc. | USA Technologies, Inc., Mars Electronics International, Inc. | Yes |
| 124 | 41454 | ZiLOG, Inc., USA Technologies, Inc. | USA Technologies, Inc., ZiLOG, Inc. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 125 | 41555 | DYAX CORP., CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED | CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED, DYAX CORP. | No |
| 126 | 41598 | Government of Canada, Technology Partnerships Canada, iFire Technology Inc. | iFire Technology Inc., Technology Partnerships Canada, Government of Canada | No |
| 127 | 41690 | NUWAY MEDICAL, INC., KENYON RASHEED, RASHEED AND ASSOCIATES | NUWAY SPORTS MEDICINE VENTURES LLC | No |
| 128 | 41919 | GSI TECHNOLOGIES USA INC., SN ENTERTAINMENT INC. | SN ENTERTAINMENT INC., GSI TECHNOLOGIES USA INC. | No |
| 129 | 42203 | DYAX CORP., CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED | CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED, DYAX CORP. | No |
| 130 | 42642 | Emory University, Robert W. Woodruff Health Sciences Center, Emory Healthcare, Inc., MD Technologies, Inc. | MD Technologies, Inc., Emory Healthcare, Inc., Robert W. Woodruff Health Sciences Center, Emory University | Yes |
| 131 | 42880 | I-trax Health Management Solutions, Inc., NationsRx, Inc. | NationsRx, Inc., I-trax Health Management Solutions, Inc. | No |
| 132 | 43148 | STEPHEN P. DIAMOND, SUZZANNE DIAMOND, HUNTINGTON TELECOMMUNICATIONS PARTNERS, L.P. | HUNTINGTON TELECOMMUNICATIONS PARTNERS, L.P., STEPHEN P. DIAMOND, SUZZANNE DIAMOND | No |
| 133 | 43288 | Digital Insight Corporation, Member Data Services, Inc. | Member Data Services, Inc., Digital Insight Corporation | No |
| 134 | 43295 | 8x8, Inc., ST Microelectronics, Inc. | ST Microelectronics, Inc., 8x8, Inc. | Yes |
| 135 | 43377 | HEWLETT-PACKARD COMPANY, INDIGO N.V. | INDIGO N.V., HEWLETT-PACKARD COMPANY | No |
| 136 | 44372 | VERTICALNET, INC., MICROSOFT CORPORATION | MICROSOFT CORPORATION, VERTICALNET, INC. | No |
| 137 | 44593 | Digital Descriptor Systems, Inc., I/t(x) information technology solutions, Inc. | Digital Descriptor Systems, Inc., I/t(x) information technology solutions, Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 138 | 44746 | Interactive Outdoors, Inc., Virtual Hunters.com, Inc. | Virtual Hunters.com, Inc., Interactive Outdoors, Inc. | No |
| 139 | 44842 | Edge Sports Team, Inc., Options Talent Group, Options Sports Group, Options Talent, Inc. | Options Talent, Inc., Options Sports Group, Options Talent Group, Edge Sports Team, Inc. | No |
| 140 | 45176 | Interactive Outdoors, Inc., Virtual Hunters.com, Inc. | Virtual Hunters.com, Inc., Interactive Outdoors, Inc. | No |
| 141 | 45363 | PrimeBuy Network.com, Inc., PrimeBuy US, Advantage Marketing Systems | Advantage Marketing Systems, PrimeBuy Network.com, Inc., PrimeBuy US | No |
| 142 | 45849 | ZapMe! Corporation, PCS Education Systems, Inc. | PCS Education Systems, Inc., ZapMe! Corporation | No |
| 143 | 45891 | Retrieval Dynamics Corp., Phone Online, Inc. | Retrieval Dynamics Corp., Phone Online, Inc. | No |
| 144 | 46133 | INFOSPACE.COM, INC., VEQUITY CORPORATION | VEQUITY CORPORATION, INFOSPACE.COM, INC. | No |
| 145 | 46382 | HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG, NANOGEN, INC. | NANOGEN, INC., HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG | No |
| 146 | 46551 | Bayer Corporation, Bayer AG, CuraGen Corporation | CuraGen Corporation, Bayer AG, Bayer Corporation | Yes |
| 147 | 46699 | Science Applications International Corporation, EduLink | EduLink, Science Applications International Corporation | No |
| 148 | 46757 | Switchboard Incorporated, ePresence Inc., Banyan Worldwide, Viacom Inc., CBS Corporation | Switchboard Incorporated, ePresence Inc., Banyan Worldwide, Viacom Inc., CBS Corporation | No |
| 149 | 46791 | HEALTHEON/WEBMD CORPORATION, QUINTILES TRANSNATIONAL CORP. | QUINTILES TRANSNATIONAL CORP., HEALTHEON/WEBMD CORPORATION | No |
| 150 | 46893 | AlphaCom Communications, Inc., ITM, Ltd., AlphaCom International Ltd. | AlphaCom International Ltd., AlphaCom Communications, Inc., ITM, Ltd. | No |
| 151 | 47103 | Cisco Systems, Inc., Ambient Corporation | Ambient Corporation, Cisco Systems, Inc. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 152 | 47136 | INFOSPACE.COM, INC., VEQUITY CORPORATION | VEQUITY CORPORATION, INFOSPACE.COM, INC. | No |
| 153 | 47160 | Cisco Systems, Inc., Ambient Corporation | Ambient Corporation, Cisco Systems, Inc. | No |
| 154 | 47184 | Cisco Systems, Inc., Ambient Corporation | Ambient Corporation, Cisco Systems, Inc. | No |
| 155 | 47241 | NoMatterWare Inc., ACCPAC International, Inc. | ACCPAC International, Inc., NoMatterWare Inc. | Yes |
| 156 | 47368 | Carter-Wallace, Inc., Armkel, LLC | Armkel, LLC, Carter-Wallace, Inc. | No |
| 157 | 47436 | The Good Guys-California, Inc., goodguys.com, inc. | goodguys.com, inc., The Good Guys-California, Inc. | No |
| 158 | 47489 | MAX Internet Communications, Inc., maxpop.com, Inc. | maxpop.com, Inc., MAX Internet Communications, Inc. | Yes |
| 159 | 47592 | Plasmanet, Inc., eLOT, Inc., eLOTTONET Inc. | eLOT, Inc., eLOTTONET Inc., Plasmanet, Inc. | No |
| 160 | 48152 | BAXTER HEALTHCARE CORPORATION, STERITECH, INC. | STERITECH, INC., BAXTER HEALTHCARE CORPORATION | Yes |
| 161 | 48153 | BAXTER HEALTHCARE CORPORATION, STERITECH, INC. | BAXTER HEALTHCARE CORPORATION, STERITECH, INC. | No |
| 162 | 48277 | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | No |
| 163 | 48351 | Prodigy Communications Corporation, SBC Communications Inc. | SBC Communications Inc., Prodigy Communications Corporation | No |
| 164 | 48461 | Prodigy Communications Corporation, SBC Communications Inc. | SBC Communications Inc., Prodigy Communications Corporation | No |
| 165 | 48567 | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | Yes |
| 166 | 48628 | Microcell Labs Inc., OZ.COM Canada Company | OZ.COM Canada Company, Microcell Labs Inc. | No |
| 167 | 48723 | Dassault Systemes, PlanetCAD Inc., Spatial Technology Inc. | Spatial Technology Inc., PlanetCAD Inc., Dassault Systemes | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 168 | 48732 | RDS Tasks of Ohio, Inc., Geoalert Incorporated, Moonlight R&D, Inc. | Geoalert Incorporated, Moonlight R&D, Inc., RDS Tasks of Ohio, Inc. | No |
| 169 | 49010 | R2 Technology, Inc., Eastman Kodak Company | Eastman Kodak Company, R2 Technology, Inc. | Yes |
| 170 | 49389 | uMember, The Golf Network, Inc. | The Golf Network, Inc., uMember | No |
| 171 | 49527 | MCY MUSIC WORLD, INC., U S WEST COMMUNICATIONS SERVICES, INC. | U S WEST COMMUNICATIONS SERVICES, INC., MCY MUSIC WORLD, INC. | Yes |
| 172 | 49572 | Daimler-Benz Aktlengesellschaft, Odetics, Inc. | Odetics, Inc., Daimler-Benz Aktlengesellschaft | Yes |
| 173 | 49591 | 5TH AVENUE CHANNEL CORP., ZACKS Investment Research Incorporated | ZACKS Investment Research Incorporated, 5TH AVENUE CHANNEL CORP. | No |
| 174 | 49697 | CompleteHome Operations, Inc., Century 21 Real Estate Corporation | Century 21 Real Estate Corporation, CompleteHome Operations, Inc. | No |
| 175 | 49698 | CompleteHome Operations, Inc., Coldwell Banker Real Estate Corporation | Coldwell Banker Real Estate Corporation, CompleteHome Operations, Inc. | No |
| 176 | 49699 | CompleteHome Operations, Inc., ERA Franchise Systems, Inc. | ERA Franchise Systems, Inc., CompleteHome Operations, Inc. | No |
| 177 | 49700 | COMPLETEHOME.COM, INC., GETKO GROUP, INC. | GETKO GROUP, INC., COMPLETEHOME.COM, INC. | No |
| 178 | 49703 | INTEGRATED PHYSICIAN NETWORKS, INCORPORATED, D.A.S. VISUAL MEDIA CORPORATION | D.A.S. VISUAL MEDIA CORPORATION, INTEGRATED PHYSICIAN NETWORKS, INCORPORATED | No |
| 179 | 49783 | LendingTree, Inc., priceline.com Incorporated | priceline.com Incorporated, LendingTree, Inc. | No |
| 180 | 49848 | PLAYANDWIN, INC., INTERNET SPORTS NETWORK INC. | INTERNET SPORTS NETWORK INC., PLAYANDWIN, INC. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 181 | 49983 | Cahners Business Information, Reed Elsevier Inc., PartMiner, Inc. | PartMiner, Inc., Cahners Business Information, Reed Elsevier Inc. | No |
| 182 | 49985 | Pearson Television, Inc., Pearson Television Netherlands, Pearson Television France EURL, Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited, E-Pub (Holdings) Ltd. | E-Pub (Holdings) Ltd., Pearson Television, Inc., Pearson Television Netherlands, Pearson Television France EURL, Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited | No |
| 183 | 50143 | Prime Response, Inc., Andersen Consulting LLP | Andersen Consulting LLP, Prime Response, Inc. | No |
| 184 | 50151 | Atlantic Aerospace Electronics Corporation | QuesTec Imaging, Inc. | Yes |
| 185 | 50281 | itarget.com, Inc., Quintel Communications, Inc. | Quintel Communications, Inc., itarget.com, Inc. | No |
| 186 | 50300 | EarthLink Network, Inc., HealthChannel.com | HealthChannel.com, EarthLink Network, Inc. | No |
| 187 | 50311 | Pearson Television, Inc., Pearson Television Netherlands, Pearson Television France EURL, Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited, E-Pub (Holdings) Ltd. | E-Pub (Holdings) Ltd., Pearson Television, Inc., Pearson Television Netherlands, Pearson Television France EURL, Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited | No |
| 188 | 50409 | Excite@Home, Inc., OpenSite Technologies, Inc. | OpenSite Technologies, Inc., Excite@Home, Inc. | No |
| 189 | 50415 | TTR TECHNOLOGIES, INC., TTR Technologies, Ltd., MACROVISION CORPORATION, C-Dilla, Ltd. | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | Yes |
| 190 | 50451 | Cyberworld International Corporation, Stan Lee Media, Inc. | Stan Lee Media, Inc., Cyberworld International Corporation | No |
| 191 | 50687 | HeartSine Technologies, Inc., Cardiac Science, Inc. | Cardiac Science, Inc., HeartSine Technologies, Inc. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 192 | 50721 | Go2Net, Inc., Asymetrix Learning Systems Inc., Click2Learn.com, Inc. | Asymetrix Learning Systems Inc., Click2Learn.com, Inc., Go2Net, Inc. | No |
| 193 | 50740 | Loislaw.com, Inc., CDB Infotek, ChoicePoint Services Inc. | Loislaw.com, Inc., CDB Infotek, ChoicePoint Services Inc. | No |
| 194 | 50935 | MOVE.COM OPERATIONS, INC., GETKO GROUP, INC. | GETKO GROUP, INC., MOVE.COM OPERATIONS, INC. | No |
| 195 | 51022 | Yamar Electronics Ltd., IQ Battery R & D GmbH | IQ Battery R & D GmbH, Yamar Electronics Ltd. | Yes |
| 196 | 51050 | Claudia Security Systems, Ltd., Harrison Digicom, Inc., Meivest Corporation, Kynaston Perreria and Associates | Harrison Digicom, Inc., Claudia Security Systems, Ltd., Meivest Corporation, Kynaston Perreria and Associates | No |
| 197 | 51051 | Venro Petroleum Corporation, Harrison Digicom, Inc. | Harrison Digicom, Inc., Venro Petroleum Corporation | No |
| 198 | 51247 | E-MEDSOFT.COM, PRIME RX.COM., INC. | PRIME RX.COM., INC., E-MEDSOFT.COM | No |
| 199 | 51367 | ABSOLUTE BACKORDER SERVICE INC., ROWECOM INC. | ROWECOM INC., ABSOLUTE BACKORDER SERVICE INC. | No |
| 200 | 51379 | America Online, Inc., PurchasePro.com, Inc. | PurchasePro.com, Inc., America Online, Inc. | No |
| 201 | 51402 | Brilliant Digital Entertainment, Inc., Brilliant Entertainment, Inc., B3D, Inc., Enewmedia Digital Entertainment Limited, e-New Media Company, N/A | N/A, e-New Media Company, Enewmedia Digital Entertainment Limited, B3D, Inc., Brilliant Entertainment, Inc., Brilliant Digital Entertainment, Inc. | No |
| 202 | 51404 | Eurotech, Ltd., N/A, CryptoCom, Inc. | CryptoCom, Inc., Eurotech, Ltd., N/A | No |
| 203 | 51591 | NCT Group, Inc., Advancel Logic, Inc. | Infinite Technology Corporation | No |
| 204 | 51609 | Claudia Security Systems, Ltd., Harrison Digicom, Inc., Meivest Corporation, Kynaston Perreria and Associates | Harrison Digicom, Inc., Claudia Security Systems, Ltd., Meivest Corporation, Kynaston Perreria and Associates | No |
| 205 | 51610 | Venro Petroleum Corporation, Harrison Digicom, Inc. | Harrison Digicom, Inc., Venro Petroleum Corporation | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 206 | 51718 | Hangzhou Kunjiang Education Technology Co., Ltd., Shaoxing Red Green Blue Trading Co., Ltd., Shaoxing China Textile City High School | Shaoxing Red Green Blue Trading Co., Ltd., Shaoxing China Textile City High School, Hangzhou Kunjiang Education Technology Co., Ltd. | No |
| 207 | 52368 | Hangzhou Pengtuo Animation Technology Co. Ltd., Hangzhou Kunjiang Education Technology Co. Ltd. | Hangzhou Kunjiang Education Technology Co. Ltd., Hangzhou Pengtuo Animation Technology Co. Ltd. | No |
| 208 | 52812 | THE MUSIC CONNECTION CORPORATION, Platinum Entertainment, Inc. | Platinum Entertainment, Inc., THE MUSIC CONNECTION CORPORATION | No |
| 209 | 52820 | MULTEX SYSTEMS, INC., REUTERS LIMITED | REUTERS LIMITED, MULTEX SYSTEMS, INC. | No |
| 210 | 53053 | E*TRADE Group, Inc., PRICELINE.COM INCORPORATED | E*TRADE Group, Inc., PRICELINE.COM INCORPORATED | No |
| 211 | 53254 | NANOGEN, INC., HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG | HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG, NANOGEN, INC. | No |
| 212 | 53290 | Internet Liquidators International, Inc., America Online, Inc. | America Online, Inc., Internet Liquidators International, Inc. | No |
| 213 | 53291 | BID.COM INTERNATIONAL INC., ROGERS MEDIA INC. | ROGERS MEDIA INC., BID.COM INTERNATIONAL INC. | No |
| 214 | 53346 | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | Yes |
| 215 | 53424 | IT NETWORK, INC., Source Media, Inc., INTERACTIVE CHANNEL TECHNOLOGIES, INC., Cableshare, Inc., CABLE SHARE INTERNATIONAL, INC., CABLESHARE (U.S.) LIMITED, CABLESHARE B.V. | IT NETWORK, INC., Source Media, Inc., INTERACTIVE CHANNEL TECHNOLOGIES, INC., Cableshare, Inc., CABLE SHARE INTERNATIONAL, INC., CABLESHARE (U.S.) LIMITED, CABLESHARE B.V. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 216 | 53601 | SURGICAL SAFETY PRODUCTS, INC., UNITED STATES SURGICAL CORPORATION | UNITED STATES SURGICAL CORPORATION, SURGICAL SAFETY PRODUCTS, INC. | No |
| 217 | 53732 | VERITAS Holding Corporation, VERITAS Software Corporation, Seagate Software Information and Management Group, Inc. | Seagate Software Information and Management Group, Inc., VERITAS Holding Corporation, VERITAS Software Corporation | No |
| 218 | 53767 | VERITAS Holding Corporation, VERITAS Software Corporation, Seagate Software Information and Management Group, Inc. | Seagate Software Information and Management Group, Inc., VERITAS Holding Corporation, VERITAS Software Corporation | No |
| 219 | 53772 | VERITAS Holding Corporation, VERITAS Software Corporation, Seagate Software Information and Management Group, Inc. | Seagate Software Information and Management Group, Inc., VERITAS Software Corporation, VERITAS Holding Corporation | No |
| 220 | 54019 | Texcel International AB, Texcel Research, Inc., Texcel (UK) Limited, Interleaf, Inc. | Interleaf, Inc. | No |
| 221 | 54046 | InsWeb Corporation, Insurance Information Exchange, LLC | InsWeb Corporation, Insurance Information Exchange, LLC | No |
| 222 | 54155 | Nextel Partners, Inc., Nextel Partners Operating Corp., Nextel WIP Corp., Nextel Communications, Inc. | Nextel WIP Corp., Nextel Partners Operating Corp., Nextel Partners, Inc., Nextel Communications, Inc. | No |
| 223 | 54310 | America Online, Inc., BarnesandNoble.com Inc. | BarnesandNoble.com Inc., America Online, Inc. | No |
| 224 | 54413 | Interliant, Inc., Lotus Development Corporation | Lotus Development Corporation, Interliant, Inc. | Yes |
| 225 | 54455 | Wink Communications, Inc. | Scientific-Atlanta | No |
| 226 | 54456 | Wink Communications, Inc., Toshiba Corporation | Toshiba Corporation, Wink Communications, Inc. | No |
| 227 | 54551 | Commerce One, PeopleSoft, Inc. | PeopleSoft, Inc., Commerce One | No |
| 228 | 54743 | MCI SYSTEMHOUSE CORP., COMMERCE ONE, INC. | COMMERCE ONE, INC., MCI SYSTEMHOUSE CORP. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 229 | 54795 | MEDSCAPE, INC., SOFTWATCH INC., SOFTWATCH, LTD. | SOFTWATCH INC., MEDSCAPE, INC., SOFTWATCH, LTD. | No |
| 230 | 54851 | Netopia, Inc., PhotoLoft.com, Inc. | PhotoLoft.com,  Inc., Netopia, Inc. | No |
| 231 | 54925 | Engage Technologies, Inc., Lycos, Inc. | Lycos, Inc., Engage Technologies, Inc. | No |
| 232 | 54968 | InsWeb Corporation, YAHOO! INC. | InsWeb Corporation, YAHOO! INC. | No |
| 233 | 54977 | Nettaxi  Online Communities, Inc., eBay, EBAY, INC. | eBay, EBAY,  INC., Nettaxi Online Communities, Inc. | Yes |
| 234 | 54979 | InsWeb Corporation, YAHOO! INC. | YAHOO! INC., InsWeb Corporation | No |
| 235 | 54981 | InsWeb Corporation, YAHOO! INC. | YAHOO! INC., InsWeb Corporation | No |
| 236 | 55030 | America Online, Inc., 800 Flowers, Inc. | 800 Flowers, Inc., America Online, Inc. | No |
| 237 | 55091 | America Online, Inc., 800 Flowers, Inc. | America Online, Inc., 800 Flowers, Inc. | No |
| 238 | 55178 | Hollinger Digital, Inc., American Alliance, Inc. | American Alliance, Inc., Hollinger Digital, Inc. | No |
| 239 | 55209 | America Online,  Inc., ModaCad,  Inc. | ModaCad, Inc., America Online, Inc. | No |
| 240 | 55431 | Tunes.com Inc., musicmaker.com, Inc. | musicmaker.com, Inc., Tunes.com Inc. | No |
| 241 | 55637 | Microsoft Corporation, Data Return Corporation | Data Return Corporation, Microsoft Corporation | No |
| 242 | 55733 | MONEYLINE AMERICA, LLC, CAVION TECHNOLOGIES, INC., CAVION.COM | CAVION.COM, CAVION TECHNOLOGIES, INC., MONEYLINE AMERICA, LLC | No |
| 243 | 55853 | WorldSpace Management Corporation, American Mobile Satellite Corporation, American Mobile Radio Corporation, AMRC HOLDINGS, INC. | American Mobile Radio Corporation, AMRC HOLDINGS, INC., WorldSpace Management Corporation, American Mobile Satellite Corporation | No |
| 244 | 55885 | DealTime.com Inc., The BigHub.com, Inc. | The BigHub.com, Inc., DealTime.com Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 245 | 55899 | Aether Technologies International, LLC, Riverbed Technologies Inc. | Riverbed Technologies Inc., Aether Technologies International, LLC | No |
| 246 | 56085 | NETRATINGS, INC., NIELSEN MEDIA RESEARCH, INC. | NIELSEN MEDIA RESEARCH, INC., NETRATINGS, INC. | No |
| 247 | 56086 | NetRatings, Inc., ACNielsen eRatings.com | ACNielsen eRatings.com, NetRatings, Inc. | No |
| 248 | 56092 | RODALE INC., MOTHERNATURE.COM, INC. | MOTHERNATURE.COM, INC., RODALE INC. | No |
| 249 | 56096 | INTERTRUST TECHNOLOGIES CORPORATION, NATIONAL WESTMINSTER BANK PLC | NATIONAL WESTMINSTER BANK PLC, INTERTRUST TECHNOLOGIES CORPORATION | No |
| 250 | 56097 | INTERTRUST TECHNOLOGIES CORPORATION, UNIVERSAL MUSIC GROUP, INC. | UNIVERSAL MUSIC GROUP, INC., INTERTRUST TECHNOLOGIES CORPORATION | No |
| 251 | 56127 | Microsoft Corporation, Data Return Corporation | Data Return Corporation, Microsoft Corporation | No |
| 252 | 56145 | Internet Ventures Oregon, Inc., INFOSTRUCTURE, City of Ashland, Department of Electric Utilities, Ashland Fiber Network Division | Ashland Fiber Network Division, Department of Electric Utilities, City of Ashland, INFOSTRUCTURE, Internet Ventures Oregon, Inc. | No |
| 253 | 56174 | INTERTRUST TECHNOLOGIES CORPORATION, NATIONAL WESTMINSTER BANK PLC | NATIONAL WESTMINSTER BANK PLC, INTERTRUST TECHNOLOGIES CORPORATION | No |
| 254 | 56175 | INTERTRUST TECHNOLOGIES CORPORATION, UNIVERSAL MUSIC GROUP, INC. | UNIVERSAL MUSIC GROUP, INC., INTERTRUST TECHNOLOGIES CORPORATION | No |
| 255 | 56200 | INTERTRUST TECHNOLOGIES CORPORATION, NATIONAL WESTMINSTER BANK PLC | NATIONAL WESTMINSTER BANK PLC, INTERTRUST TECHNOLOGIES CORPORATION | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 256 | 56201 | INTERTRUST TECHNOLOGIES CORPORATION, UNIVERSAL MUSIC GROUP, INC. | UNIVERSAL MUSIC GROUP, INC., INTERTRUST TECHNOLOGIES CORPORATION | No |
| 257 | 56211 | INTERTRUST TECHNOLOGIES CORPORATION, NATIONAL WESTMINSTER BANK PLC | NATIONAL WESTMINSTER BANK PLC, INTERTRUST TECHNOLOGIES CORPORATION | No |
| 258 | 56308 | WorkLife Solutions, Inc., E-Cruiter.com, Inc. | E-Cruiter.com, Inc., WorkLife Solutions, Inc. | No |
| 259 | 56336 | Immersion Corporation, LOGITECH, INC. | Immersion Corporation, LOGITECH, INC. | No |
| 260 | 56346 | RODALE INC., MOTHERNATURE.COM, INC. | MOTHERNATURE.COM, INC., RODALE INC. | No |
| 261 | 56404 | Immersion Corporation, LOGITECH, INC. | Immersion Corporation, LOGITECH, INC. | No |
| 262 | 56437 | Software AG, SAGA SOFTWARE, Inc., SAGA SYSTEMS, Inc. | SAGA SYSTEMS, Inc., SAGA SOFTWARE, Inc., Software AG | No |
| 263 | 56583 | OFFICE.COM INC., ROWECOM INC. | ROWECOM INC., OFFICE.COM INC. | No |
| 264 | 56744 | Telescan, Inc., FREEREALTIME.COM, INC. | FREEREALTIME.COM, INC., Telescan, Inc. | No |
| 265 | 56814 | Networks Associates, Inc., Network Associates, Inc., Beyond.com Corporation, Software.net Corporation, Software.net | Beyond.com Corporation, Software.net Corporation, Networks Associates, Inc., Network Associates, Inc., Software.net | No |
| 266 | 56910 | PURCHASEPRO.COM, INC. | SPRINT COMMUNICATIONS COMPANY L.P. | No |
| 267 | 57023 | NORTHERN TELECOM LIMITED, INTERWAVE COMMUNICATIONS INTERNATIONAL, LTD. | INTERWAVE COMMUNICATIONS INTERNATIONAL, LTD., NORTHERN TELECOM LIMITED | No |
| 268 | 57496 | ViaGrafix Corporation, Street Technologies, Inc. | Street Technologies, Inc., ViaGrafix Corporation | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 269 | 57624 | Electric Media Company-Nevada, Inc., ELECTRIC MEDIA COMPANY, INC., Russel Gerstein, Las Vegas Entertainment Network, Inc. | Electric Media Company-Nevada, Inc., ELECTRIC MEDIA COMPANY, INC., Russel Gerstein, Las Vegas Entertainment Network, Inc. | No |
| 270 | 57719 | TEXAS INSTRUMENTS INCORPORATED, DSP TELECOMMUNICATIONS INC. | DSP TELECOMMUNICATIONS INC., TEXAS INSTRUMENTS INCORPORATED | No |
| 271 | 58135 | PNB EQUITY RESOURCE CORPORATION SDN. BHD., FIBERCORE INC., FEDERAL POWER SDN.  BHD. | FIBERCORE (M) SDN. BHD. | No |
| 272 | 58355 | Document Sciences Corporation, Xerox Corporation | Xerox Corporation, Document Sciences Corporation | No |
| 273 | 58438 | NAVIDEC, INC., IBS/LEE PARTNERS LLC | IBS/LEE PARTNERS LLC, NAVIDEC, INC. | No |
| 274 | 58440 | E-BEAM Services, Inc., MEDICAL STERILIZATION, INC. | E-BEAM Services, Inc., MEDICAL STERILIZATION, INC. | No |
| 275 | 58746 | APPLIED VOICE RECOGNITION, INC., VOICE IT WORLDWIDE, INC. | VOICE IT WORLDWIDE, INC., APPLIED VOICE RECOGNITION, INC. | Yes |
| 276 | 58764 | TTR Technologies Ltd., Doug Carson & Associates Inc., Nimbus CD International, Inc. | Nimbus CD International, Inc., TTR Technologies Ltd., Doug Carson & Associates Inc. | Yes |
| 277 | 59378 | INTERNATIONAL VERIFACT INC., "COMPAGNIE INDUSTRIELLE ET FINANCIERE" INGENICO, SOCIETE ANONYME | N/A | Yes |
| 278 | 59380 | America Online, Inc., CyberSource Corporation, software.net | software.net, CyberSource Corporation, America Online, Inc. | No |
| 279 | 59612 | America Online, Inc., CyberSource Corporation, software.net | software.net, CyberSource Corporation, America Online, Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 280 | 59677 | TOSHIBA CORPORATION, WINK COMMUNICATIONS, INC. | WINK COMMUNICATIONS, INC., TOSHIBA CORPORATION | No |
| 281 | 59678 | Wink Communications, Inc., Toshiba Corporation | Toshiba Corporation, Wink Communications, Inc. | No |
| 282 | 60027 | BAXTER HEALTHCARE CORPORATION, CERUS CORPORATION | CERUS CORPORATION, BAXTER HEALTHCARE CORPORATION | Yes |
| 283 | 60323 | SC Corporation, CyberImaging Systems, Inc. | CyberImaging Systems, Inc., SC Corporation | Yes |
| 284 | 60549 | Galacticomm Technologies, Inc., ExpressWeb, Inc. | ExpressWeb, Inc., Galacticomm Technologies, Inc. | No |
| 285 | 60681 | FirstLink Communications, Inc., WEB Service Company, Inc. | WEB Service Company, Inc., FirstLink Communications, Inc. | No |
| 286 | 60798 | UTMC MICROELECTRONIC SYSTEMS INC., BRAINTECH, INC. | BRAINTECH, INC., UTMC MICROELECTRONIC SYSTEMS INC. | Yes |
| 287 | 60905 | Intel Corporation, Symantec Corporation | Symantec Corporation, Intel Corporation | No |
| 288 | 60906 | NURSEFINDERS, INC., AMEDISYS STAFFING SERVICES, INC., Analytical Medical Enterprises, Inc., AMEDISYS NURSING SERVICES, INC., Nursing Enterprises, Inc., Amedisys Professional Staffing, AMEDISYS HOME HEALTH, INC., AMEDISYS, INC. | AMEDISYS, INC., AMEDISYS HOME HEALTH, INC., Amedisys Professional Staffing, Nursing Enterprises, Inc., AMEDISYS NURSING SERVICES, INC., Analytical Medical Enterprises, Inc., AMEDISYS STAFFING SERVICES, INC., NURSEFINDERS, INC. | No |
| 289 | 60965 | America Online, Inc., DataMark Holding Inc., Digital Courier Technologies, Inc. | Digital Courier Technologies, Inc., DataMark Holding Inc., America Online, Inc. | No |
| 290 | 60989 | America Online, Inc., DataMark Holding Inc., Digital Courier Technologies, Inc. | Digital Courier Technologies, Inc., DataMark Holding Inc., America Online, Inc. | No |
| 291 | 61456 | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 292 | 61458 | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | No |
| 293 | 61590 | Concur Technologies, Inc., Portable Software Corporation, American Express Travel Related Services Company, Inc. | American Express Travel Related Services Company, Inc., Portable Software Corporation, Concur Technologies, Inc. | No |
| 294 | 61697 | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | No |
| 295 | 61938 | Advanced Fibre Communications, Inc., Tellabs Operations, Inc. | Tellabs Operations, Inc., Advanced Fibre Communications, Inc. | No |
| 296 | 62077 | Polybus Systems Corporation, AUGMENT SYSTEMS INCORPORATED | AUGMENT SYSTEMS INCORPORATED, Polybus Systems Corporation | No |
| 297 | 62110 | TEIJIN LIMITED, MOLECULAR SIMULATIONS INCORPORATED | MOLECULAR SIMULATIONS INCORPORATED, TEIJIN LIMITED | No |
| 298 | 62201 | ONCOGENE SCIENCE, INC., BAYER CORPORATION | BAYER CORPORATION, ONCOGENE SCIENCE, INC. | Yes |
| 299 | 62422 | SmithKline Beecham Corporation, Human Genome Sciences, Inc., SmithKline Beecham, p.l.c. | SmithKline Beecham Corporation, Human Genome Sciences, Inc., SmithKline Beecham, p.l.c. | No |
| 300 | 62425 | N/A, Synthelabo, SmithKline Beecham Corporation, Human Genome Sciences, Inc. | Synthelabo, SmithKline Beecham Corporation, Human Genome Sciences, Inc., N/A | No |
| 301 | 62658 | John Royle & Sons, FiberCore Inc. | FiberCore Inc., John Royle & Sons | No |
| 302 | 62668 | Engineering Animation, Inc., EndoVascular Technologies, Inc. | EndoVascular Technologies, Inc., Engineering Animation, Inc. | No |
| 303 | 63601 | Power Spectra, Inc., LandRay Technology, Inc. | LandRay Technology, Inc., Power Spectra, Inc. | No |
| 304 | 63664 | NETSPEAK CORPORATION, ACT NETWORKS, INC. | ACT NETWORKS, INC., NETSPEAK CORPORATION | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 305 | 63679 | Instant Video Technologies, Inc., Vyvx, Inc., Williams Companies Inc. | Vyvx, Inc., Williams Companies Inc., Instant Video Technologies, Inc. | No |
| 306 | 63768 | Voice Powered Technology International, Inc., MobileComm Nationwide Operations, Inc. | MobileComm Nationwide Operations, Inc., Voice Powered Technology International, Inc. | No |
| 307 | 63799 | HYSEQ, INC., THE PERKIN-ELMER CORPORATION | THE PERKIN-ELMER CORPORATION, HYSEQ, INC. | Yes |
| 308 | 63816 | The A Consulting Team, Inc., Kalanit, Center For Marketing Software & Hardware Ltd., Shmuel BenTov | Vianet, Inc. | No |
| 309 | 63864 | INNOVA, SAT (Societe Anonyme de Telecommunications), INNOVA CORPORATION | INNOVA, SAT (Societe Anonyme de Telecommunications), INNOVA CORPORATION | Yes |
| 310 | 63981 | Creator Capital Inc., Interactive Entertainment Limited, Harrah's Interactive Entertainment  Company, Sky Games International, Corp., SGI Holding Corporation Limited | Creator Capital Inc., Interactive Entertainment Limited, Harrah's Interactive Entertainment Company, Sky Games International, Corp., SGI Holding Corporation Limited | No |
| 311 | 63982 | Creator Capital Inc., Interactive Entertainment Limited, Sky Games International, Corp., SGI Holding Corporation Limited, Harrah's Interactive Entertainment Company | SGI Holding Corporation Limited, Sky Games International, Corp., Interactive Entertainment Limited, Creator Capital Inc., Harrah's Interactive Entertainment Company | No |
| 312 | 64036 | ROSS TECHNOLOGY, INC., FUJITSU LIMITED | FUJITSU LIMITED, ROSS TECHNOLOGY, INC. | Yes |
| 313 | 64453 | APACHE Medical Systems, Inc., Vermont Oxford Network, Inc. | Vermont Oxford Network, Inc., APACHE Medical Systems, Inc. | No |
| 314 | 64471 | EyeSys Technologies, Inc., Nidek Co., Ltd. | Nidek Co., Ltd., EyeSys Technologies, Inc. | No |
| 315 | 64597 | THERMA-WAVE, INC., Toray Industries, Inc. | Toray Industries, Inc., THERMA-WAVE, INC. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 316 | 64604 | Millennium BioTherapeutics, Inc., Millennium Pharmaceuticals, Inc., Eli Lilly and Company | Eli Lilly and Company, Millennium Pharmaceuticals, Inc., Millennium BioTherapeutics, Inc. | Yes |
| 317 | 65049 | Software AG, Software AG Americas, Inc. | Software AG Americas, Inc., Software AG | No |
| 318 | 65092 | Sandbox Entertainment Corporation, CNNfn Interactive, Cable News Network, Inc. | Cable News Network, Inc., CNNfn Interactive, Sandbox Entertainment Corporation | No |
| 319 | 65120 | Franklin Internet, Peak Technologies Inc. | Franklin Internet, Peak Technologies Inc. | No |
| 320 | 65370 | Digital Scientific Limited, COLIN GRACE, Vysis, Inc. | Vysis, Inc., COLIN GRACE, Digital Scientific Limited | No |
| 321 | 65581 | MINNESOTA MINING AND MANUFACTURING COMPANY, MICROFIELD GRAPHICS, INC. | MICROFIELD GRAPHICS, INC., MINNESOTA MINING AND MANUFACTURING COMPANY | No |
| 322 | 65715 | HBO & Company of Georgia, HealthDesk(TM) Corporation | HBO & Company of Georgia, HealthDesk(TM) Corporation | No |
| 323 | 65857 | Cable News Network, Inc., CNNfn Interactive, Sandbox Entertainment Corporation | Sandbox Entertainment Corporation, Cable News Network, Inc., CNNfn Interactive | No |
| 324 | 65979 | DELTAPOINT, INC., IDC ACQUISITION CORP., INLET, INC., INLET DIVESTITURE CORP. | INLET DIVESTITURE CORP., INLET, INC., IDC ACQUISITION CORP., DELTAPOINT, INC. | No |
| 325 | 66072 | Intergraph Corporation, Innovative Tech Systems, Inc. | Innovative Tech Systems, Inc., Intergraph Corporation | No |
| 326 | 66727 | MicroTrac Systems, Inc., PeopleSoft, Inc., RESTRAC | PeopleSoft, Inc., MicroTrac Systems, Inc., RESTRAC | No |
| 327 | 66728 | MIT-F/x, INC., LARRY MITCHELL, EVRO CORPORATION | EVRO CORPORATION, MIT-F/x, INC., LARRY MITCHELL | No |
| 328 | 67051 | Microbell, Inc., Aura Systems, Inc. | Microbell Technologies, Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 329 | 67317 | Detection Systems International, Inc., Hunt Electronic Co., Ltd., The Ministry of Public Security of People's Republic of China, The First Research Institute, Beijing Zhougdun Security Technology Development Company, Qing Dao Waldorf Real Estate Company | D.S. First Systems (Beijing) Limited | No |
| 330 | 67384 | AM Communications, Inc., Scientific-Atlanta, Inc. | Scientific-Atlanta, Inc., AM Communications, Inc. | Yes |
| 331 | 67413 | MicroTrac Systems, Inc., PeopleSoft, Inc., RESTRAC | RESTRAC, PeopleSoft, Inc., MicroTrac Systems, Inc. | No |
| 332 | 67418 | Detection Systems International, Inc., Hunt Electronic Co., Ltd., The Ministry of Public Security of People's Republic of China, The First Research Institute, Beijing Zhougdun Security Technology Development Company, Qing Dao Waldorf Real Estate Company | D.S. First Systems (Beijing) Limited | No |
| 333 | 67675 | VISUAL INFORMATION SERVICES CORP., DIGITAL SCIENCES, INC. | DIGITAL SCIENCES, INC., VISUAL INFORMATION SERVICES CORP. | No |
| 334 | 67970 | SmithKline Beecham Corporation, SmithKline Beecham p.l.c., Human Genome Sciences, Inc. | Human Genome Sciences, Inc., SmithKline Beecham p.l.c., SmithKline Beecham Corporation | No |
| 335 | 67973 | N/A, Human Genome Sciences, Inc., Synthelabo, SmithKline Beecham Corporation | Human Genome Sciences, Inc., Synthelabo, SmithKline Beecham Corporation, N/A | No |
| 336 | 68101 | BAXTER HEALTHCARE CORPORATION, STERITECH, INC. | STERITECH, INC., BAXTER HEALTHCARE CORPORATION | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 337 | 68792 | VISUAL INFORMATION SERVICES CORP., DIGITAL SCIENCES, INC. | DIGITAL SCIENCES, INC., VISUAL INFORMATION SERVICES CORP. | No |
| 338 | 69061 | ACCUMED INTERNATIONAL, INC., Alamar Biosciences, Inc., G&G DISPENSING, INC. | G&G DISPENSING, INC., ACCUMED INTERNATIONAL, INC., Alamar Biosciences, Inc. | No |
| 339 | 69243 | CABLESHARE INC., CABLE SHARE INTERNATIONAL INC., CABLESHARE (U.S.) LIMITED, CABLESHARE B.V., IT NETWORK, Inc., Source Media, Inc. | IT NETWORK, Inc., Source Media, Inc., CABLESHARE INC., CABLE SHARE INTERNATIONAL INC., CABLESHARE (U.S.) LIMITED, CABLESHARE B.V. | Yes |
| 340 | 69392 | IAT AG, Texas Instruments Incorporated | Texas Instruments Incorporated, IAT AG | Yes |
| 341 | 69959 | Hangzhou Kunjiang Education Technology Co., Ltd., Pingtan Lanhua Middle & High School | Pingtan Lanhua Middle & High School, Hangzhou Kunjiang Education Technology Co., Ltd. | No |
| 342 | 70432 | Hangzhou Kunjiang Education Technology Co., Ltd., Hefei Meihua Vocational Training School, Hefei Huamei Education Development Co., Ltd. | Hefei Meihua Vocational Training School, Hefei Huamei Education Development Co., Ltd., Hangzhou Kunjiang Education Technology Co., Ltd. | No |
| 343 | 70667 | LifeScan, Inc., Universal Biosensors Pty Ltd | Universal Biosensors Pty Ltd, LifeScan, Inc. | No |
| 344 | 75311 | SURGIVISION, INC., Siemens Aktiengesellschaft | Siemens Aktiengesellschaft, SURGIVISION, INC. | No |
| 345 | 77989 | Hangzhou Kunjiang Education Technology Co., Ltd., Tang Weijiao,Cao Xiaoya, Peng Tuo Information Technology Co., Ltd. | Tang Weijiao,Cao Xiaoya, Peng Tuo Information Technology Co., Ltd., Hangzhou Kunjiang Education Technology Co., Ltd. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 346 | 78886 | Shengzhan Networking Technology Co., Ltd., Shanghai Shulong Technology Development Co., Ltd., Shanghai Shulong Computer Technology Co., Ltd., Nanjing Shulong Computer Technology Co., Ltd., Chengdu Youji Technology Co., Ltd., Tianjin Youji Technology Co., Ltd. | Shanghai Shulong Technology Development Co., Ltd., Shanghai Shulong Computer Technology Co., Ltd., Nanjing Shulong Computer Technology Co., Ltd., Chengdu Youji Technology Co., Ltd., Tianjin Youji Technology Co., Ltd., Shengzhan Networking Technology Co., Ltd. | No |
| 347 | 80088 | Aspreva Pharmaceuticals GmbH, Aspreva Pharmaceuticals Corporation, Hoffmann-La Roche Inc., F. Hoffmann-La Roche Ltd | F. Hoffmann-La Roche Ltd, Hoffmann-La Roche Inc., Aspreva Pharmaceuticals Corporation, Aspreva Pharmaceuticals GmbH | Yes |
| 348 | 80109 | Aspreva Pharmaceuticals GmbH, Aspreva Pharmaceuticals Corporation, Hoffmann-La Roche Inc., F. Hoffmann-La Roche Ltd | F. Hoffmann-La Roche Ltd, Hoffmann-La Roche Inc., Aspreva Pharmaceuticals Corporation, Aspreva Pharmaceuticals GmbH | No |
| 349 | 80952 | Beamz Interactive, Inc., Cypher Entertainment Company, Inc., Beamz Cypher Partnership, LLC | Beamz Cypher Partnership, LLC, Beamz Interactive, Inc., Cypher Entertainment Company, Inc. | No |
| 350 | 81373 | Hangzhou Kunjiang Education Technology Co., Ltd., Shanghi Fuyi Education Information Consulting Co. Ltd, Fenglong Xu, Wei Xu | Shanghi Fuyi Education Information Consulting Co. Ltd, Fenglong Xu, Wei Xu, Hangzhou Kunjiang Education Technology Co., Ltd. | No |
| 351 | 81400 | Hangzhou Kunjiang Education Technology Co., Ltd., Shanghi Fuyi Education Information Consulting Co. Ltd, Fenglong Xu, Wei Xu | Wei Xu, Fenglong Xu, Shanghi Fuyi Education Information Consulting Co. Ltd, Hangzhou Kunjiang Education Technology Co., Ltd. | No |
| 352 | 81511 | Beijing Ninetowns Ports Software and Technology Co., Ltd., Beijing Ninetowns Zhi Fang Software Technology Co., Ltd. | Beijing Ninetowns Zhi Fang Software Technology Co., Ltd., Beijing Ninetowns Ports Software and Technology Co., Ltd. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 353 | 81512 | Beijing Ninetowns Ports Software and Technology Co., Ltd., Beijing Ninetowns Zhi Fang Software Technology Co., Ltd. Shanghai Branch, Beijing Ninetowns Zhi Fang Software Technology Co., Ltd. | Beijing Ninetowns Zhi Fang Software Technology Co., Ltd., Beijing Ninetowns Zhi Fang Software Technology Co., Ltd. Shanghai Branch, Beijing Ninetowns Ports Software and Technology Co., Ltd. | No |
| 354 | 81513 | Beijing Ninetowns Ports Software and Technology Co., Ltd., Shenzhen Ninetowns Enke Software Technology Co., Ltd. | Shenzhen Ninetowns Enke Software Technology Co., Ltd., Beijing Ninetowns Ports Software and Technology Co., Ltd. | No |
| 355 | 81514 | Beijing Ninetowns Ports Software and Technology Co., Ltd., Beijing Ninetowns Xin He Software Technology Co., Ltd. | Beijing Ninetowns Xin He Software Technology Co., Ltd., Beijing Ninetowns Ports Software and Technology Co., Ltd. | No |
| 356 | 81515 | Beijing Ninetowns Ports Software and Technology Co., Ltd., Guangzhou Ninetowns Wang Li Software Co., Ltd. | Guangzhou Ninetowns Wang Li Software Co., Ltd., Beijing Ninetowns Ports Software and Technology Co., Ltd. | No |
| 357 | 81532 | CLAIRNET LIMITED, WIKI FAMILIES, INC. | WIKI FAMILIES, INC., CLAIRNET LIMITED | No |
| 358 | 81566 | Feed the Dog, LLC, Digital Blue Dog, Inc. | Digital Blue Dog, Inc., Feed the Dog, LLC | No |
| 359 | 90131 | CNI Europe (The Netherlands) BV, Stream S.p.A. | Stream S.p.A., CNI Europe (The Netherlands) BV | No |
| 360 | 93265 | WBT Operating LLC, Training Media Operating LLC | Training Media Operating LLC, WBT Operating LLC | No |
| 361 | 95568 | Collins & Aikman Corporation, Collins & Aikman Products Co., Textron, Inc. | Textron, Inc., Collins & Aikman Corporation, Collins & Aikman Products Co. | No |
| 362 | 96448 | International Business Machines Corp., Blue Cross and Blue Shield Association, Empire Blue Cross and Blue Shield, Empire HealthChoice, Inc. | Empire HealthChoice, Inc., Empire Blue Cross and Blue Shield, Blue Cross and Blue Shield Association, International Business Machines Corp. | No |
| 363 | 99565 | Beamz Interactive, Inc., Cypher Entertainment Group LLC | Cypher Entertainment Group LLC, Beamz Interactive, Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 364 | 99602 | Beamz Interactive, Inc., Cypher Entertainment Group LLC | Cypher Entertainment Group LLC, Beamz Interactive, Inc. | No |
| 365 | 100151 | BOYLESPORTS, Boylesports (Isle of Man) Limited, Boylesports Alderney Limited, SEANIEMAC LIMITED | BOYLESPORTS, Boylesports (Isle of Man) Limited, Boylesports Alderney Limited, SEANIEMAC LIMITED | No |
| 366 | 100191 | Players Network, Players Network On Demand, Inc., Comcast Programming Development, Inc. | Comcast Programming Development, Inc., Players Network On Demand, Inc., Players Network | No |
| 367 | 100320 | Blackhawk Network, Inc., Safeway Inc. | Safeway Inc., Blackhawk Network, Inc. | No |
| 368 | 101079 | Cloud Star Corp, APP VENTURES LTD. | APP VENTURES LTD., Cloud Star Corp | No |
| 369 | 102501 | MONSTER ARTS, INC, Intelligent Living Inc. | Intelligent Living Inc., MONSTER ARTS, INC | No |
| 370 | 102510 | MONSTER ARTS, INC, Intelligent Living Inc. | Intelligent Living Inc., MONSTER ARTS, INC | No |
| 371 | 102630 | KELLWOOD COMPANY, LLC, VINCE, LLC | VINCE, LLC, KELLWOOD COMPANY, LLC | No |
| 372 | 102651 | Sgenia Solutiones, S.L., ZENON Biosystem, S.L., Braeden Valley Mines Inc., Sgenia  Solucines, S.L. | Braeden Valley Mines Inc., Sgenia Solutiones, S.L., ZENON Biosystem, S.L., Sgenia Soluciones, S.L. | Yes |
| 373 | 102693 | SENDTONEWS VIDEO INCORPORATED, SYNDICORE ASIA LIMITED | SYNDICORE ASIA LIMITED, SENDTONEWS VIDEO INCORPORATED | No |

## B.    ktMINE Search #2: "Restruct*" Keyword Search

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 1 | 8289 | aaiPharma Inc., aaiPharma, LLC, Xanodyne Pharmaceuticals, Inc. | Xanodyne Pharmaceuticals, Inc., aaiPharma Inc., aaiPharma, LLC | No |
| 2 | 9798 | TEXAS INSTRUMENTS INCORPORATED, LANSTAR SEMICONDUCTOR CORPORATION | TEXAS INSTRUMENTS INCORPORATED, LANSTAR SEMICONDUCTOR CORPORATION | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 3 | 9799 | TEXAS INSTRUMENTS INCORPORATED, LANSTAR SEMICONDUCTOR CORPORATION | TEXAS INSTRUMENTS INCORPORATED, LANSTAR SEMICONDUCTOR CORPORATION | No |
| 4 | 10064 | ARADIGM CORPORATION, Novo Nordisk A/S | NOVO NORDISK A/S, ARADIGM CORPORATION | No |
| 5 | 10065 | ARADIGM CORPORATION | NOVO NORDISK A/S | No |
| 6 | 10333 | INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC., MICROCOR, INC. | MICROCOR, INC., WESCOR INC., INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd. | Yes |
| 7 | 10496 | Celgene Corporation, NOVARTIS PHARMA AG | NOVARTIS PHARMA AG, Celgene Corporation | Yes |
| 8 | 11027 | Optical Coating Laboratory, Inc., Flex Products, Inc. | Optical Coating Laboratory, Inc., Flex Products, Inc. | No |
| 9 | 11233 | DATAMATICS TECHNOLOGIES LIMITED, CADMUS KNOWLEDGEWORKS INTERNATIONAL LTD. | DATAMATICS TECHNOLOGIES LIMITED, KNOWLEDGEWORKS INTERNATIONAL LTD. | No |
| 10 | 11234 | DATAMATICS TECHNOLOGIES LIMITED, CADMUS KNOWLEDGEWORKS INTERNATIONAL LTD. | DATAMATICS TECHNOLOGIES LIMITED, KNOWLEDGEWORKS INTERNATIONAL LTD. | No |
| 11 | 12168 | Teknik Digital Arts, Inc., Playentertainment, L.L.P., NBC Enterprises, Inc., Joy Tashjian Marketing Group, LLC | Teknik Playentertainment, LLC | No |
| 12 | 12421 | Celgene Corporation, Novartis Pharma AG | Novartis Pharma AG, Celgene Corporation | Yes |
| 13 | 13794 | Isis Pharmaceuticals, Inc., Genzyme Corporation | Genzyme Corporation, Isis Pharmaceuticals, Inc. | No |
| 14 | 14879 | Universal Security Instruments, Inc., Lai Kwan Limited, Eyston Company Limited | Eyston Company Limited, Universal Security Instruments, Inc., Lai Kwan Limited | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 15 | 15276 | QLT Inc., Quadra Logic Technologies Inc., Novartis Pharma AG, Novartis Ophthalmics AG, Ciba Vision AG, University of British Columbia, General Hospital Corporation, Massachusetts General Hospital | Novartis Pharma AG, Novartis Ophthalmics AG, Ciba Vision AG, QLT Inc., Quadra Logic Technologies Inc., University of British Columbia, General Hospital Corporation, Massachusetts General Hospital | No |
| 16 | 15985 | UDR TX FUND LLC, FANNIE MAE, UDR WESTERN RESIDENTIAL, INC., LINCOLN TC II, L.P., UDR, Inc. | UDR Texas Ventures LLC, UDR LAKELINE VILLAS LLC | No |
| 17 | 16389 | Acorda Therapeutics, Inc., Elan Pharma International Limited, Biogen Idec International GmbH, Biogen Idec, Inc., Elan Corporation plc | Biogen Idec International GmbH, Biogen Idec, Inc., Acorda Therapeutics, Inc., Elan Pharma International Limited, Elan Corporation plc | Yes |
| 18 | 16865 | SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC, NEW RIVER PHARMACEUTICALS INC., SHIRE PHARMACEUTICALS PLC | NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC, SHIRE PHARMACEUTICALS PLC | Yes |
| 19 | 22390 | MICROBIA, INC., FOREST LABORATORIES, INC. | FOREST LABORATORIES, INC., MICROBIA, INC. | Yes |
| 20 | 23473 | Versata Software Inc., Trilogy Software, Inc., Versata Development Group, Inc., Selectica, Inc., Joseph A. Liemandt, Trilogy, Inc., Trilogy Capital Holdings Corporation, Versata Enterprises, Inc., Trilogy Enterprises Inc. | Selectica, Inc., Versata Software Inc., Trilogy Software, Inc., Versata Development Group, Inc., Joseph A. Liemandt, Trilogy, Inc., Trilogy Capital Holdings Corporation, Versata Enterprises, Inc., Trilogy Enterprises Inc. | No |
| 21 | 24289 | PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC., ALIMERA SCIENCES, INC. | ALIMERA SCIENCES, INC., PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 22 | 24297 | MICROBIA, INC., FOREST LABORATORIES, INC. | FOREST LABORATORIES, INC., MICROBIA, INC. | No |
| 23 | 25423 | PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC., ALIMERA SCIENCES, INC. | ALIMERA SCIENCES, INC., PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC. | No |
| 24 | 25483 | PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC., ALIMERA SCIENCES, INC. | ALIMERA SCIENCES, INC., PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC. | No |
| 25 | 26232 | Valeant Pharmaceuticals International, GlaxoSmithKline | GlaxoSmithKline, Valeant Pharmaceuticals International | Yes |
| 26 | 32596 | Spectrum Pharmaceuticals, Inc., Cell Therapeutics, Inc. | RIT Oncology, LLC | No |
| 27 | 35875 | NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | No |
| 28 | 36132 | SHIRE PHARMACEUTICALS PLC, NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | SHIRE PHARMACEUTICALS PLC, NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | No |
| 29 | 36177 | aaiPharma Inc., aaiPharma, LLC, Xanodyne Pharmaceuticals, Inc. | Xanodyne Pharmaceuticals, Inc., aaiPharma Inc., aaiPharma, LLC | No |
| 30 | 37819 | ADOLOR CORPORATION, GLAXO GROUP LIMITED | GLAXO GROUP LIMITED, ADOLOR CORPORATION | Yes |
| 31 | 38029 | BRISTOL-MYERS SQUIBB COMPANY, CORGENTECH INC. | CORGENTECH INC., BRISTOL-MYERS SQUIBB COMPANY | Yes |
| 32 | 40045 | INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC., MICROCOR, INC. | MICROCOR, INC., INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 33 | 40339 | INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC., MICROCOR, INC. | MICROCOR, INC., INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC. | No |
| 34 | 40385 | Aradigm Corporation, Novo Nordisk A/S | Novo Nordisk A/S, Aradigm Corporation | No |
| 35 | 40588 | INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC., MICROCOR, INC. | MICROCOR, INC., INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC. | No |
| 36 | 40673 | Aradigm Corporation, Novo Nordisk A/S | Novo Nordisk A/S, Aradigm Corporation | No |
| 37 | 40702 | INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC., MICROCOR, INC. | MICROCOR, INC., INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC. | No |
| 38 | 40883 | Genzyme Corporation, BioMarin Pharmaceutical Inc. | BioMarin/Genzyme LLC | No |
| 39 | 43377 | HEWLETT-PACKARD COMPANY, INDIGO N.V. | INDIGO N.V., HEWLETT-PACKARD COMPANY | Yes |
| 40 | 43803 | Dyax Corp., GENZYME CORPORATION | GENZYME CORPORATION, Dyax Corp. | No |
| 41 | 45217 | ELI LILLY AND COMPANY, AMYLIN PHARMACEUTICALS, INC. | AMYLIN PHARMACEUTICALS, INC., ELI LILLY AND COMPANY | Yes |
| 42 | 45715 | Technology Partnerships Canada, Textron Systems Inc., Ballard Material Products Inc. | Textron Systems Inc., Ballard Material Products Inc., Technology Partnerships Canada | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 43 | 45716 | TECHNOLOGY PARTNERSHIPS CANADA, the Government of Canada, BALLARD POWER SYSTEMS INC. | BALLARD POWER SYSTEMS INC., the Government of Canada, TECHNOLOGY PARTNERSHIPS CANADA | No |
| 44 | 45837 | ArQule, Inc., Genome Therapeutics Corporation | Genome Therapeutics Corporation, ArQule, Inc. | Yes |
| 45 | 46133 | INFOSPACE.COM, INC., VEQUITY CORPORATION | VEQUITY CORPORATION, INFOSPACE.COM, INC. | No |
| 46 | 46467 | Celgene  Corporation, Novartis Pharma AG | Novartis Pharma AG, Celgene Corporation | No |
| 47 | 47136 | INFOSPACE.COM, INC., VEQUITY CORPORATION | VEQUITY CORPORATION, INFOSPACE.COM, INC. | No |
| 48 | 49334 | NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION, Gentest, Inc. | Gentest, Inc., NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION | No |
| 49 | 50935 | MOVE.COM OPERATIONS, INC., GETKO GROUP, INC. | GETKO GROUP, INC., MOVE.COM OPERATIONS, INC. | No |
| 50 | 52551 | Flex Products, Inc., Optical Coating Laboratory, Inc. | Optical Coating Laboratory, Inc., Flex Products, Inc. | No |
| 51 | 53290 | Internet Liquidators International, Inc., America Online, Inc. | America Online, Inc., Internet Liquidators International, Inc. | No |
| 52 | 55105 | NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION, Gentest, Inc. | Gentest, Inc., NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION | No |
| 53 | 56086 | NetRatings, Inc., ACNielsen eRatings.com | ACNielsen eRatings.com, NetRatings, Inc. | No |
| 54 | 56161 | NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION, Gentest, Inc. | Gentest, Inc., NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION | No |
| 55 | 56940 | NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION, Gentest, Inc. | Gentest, Inc., NORTH SHORE UNIVERSITY HOSPITAL RESEARCH CORPORATION | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 56 | 57677 | LANSTAR SEMICONDUCTOR CORPORATION, TEXAS INSTRUMENTS INCORPORATED | TEXAS INSTRUMENTS INCORPORATED, LANSTAR SEMICONDUCTOR CORPORATION | No |
| 57 | 63462 | HOECHST MARION ROUSSEL, INC., ARIAD PHARMACEUTICALS, INC. | ARIAD PHARMACEUTICALS, INC., HOECHST MARION ROUSSEL, INC. | No |
| 58 | 65049 | Software AG, Software AG Americas, Inc. | Software AG Americas, Inc., Software AG | No |
| 59 | 66109 | TEXAS INSTRUMENTS INCORPORATED, LANSTAR SEMICONDUCTOR CORPORATION | LANSTAR SEMICONDUCTOR CORPORATION, TEXAS INSTRUMENTS INCORPORATED | No |
| 60 | 70061 | Pacific Entertainment Corporation, Dr. Shulamit Ritblatt | Circle of Education, LLC | No |
| 61 | 70104 | VERENIUM CORPORATION, NOVUS INTERNATIONAL, INC. | NOVUS INTERNATIONAL, INC., VERENIUM CORPORATION | Yes |
| 62 | 70105 | SUMITOMO CHEMICAL COMPANY, LIMITED, THE DOW CHEMICAL COMPANY, Sumitomo Dow Limited | Sumitomo Dow Limited, SUMITOMO CHEMICAL COMPANY, LIMITED, THE DOW CHEMICAL COMPANY | No |
| 63 | 70329 | Corgenix Medical Corporation, Financière Elitech SAS, Wescor, Inc. | Wescor, Inc., Financière Elitech SAS, Corgenix Medical Corporation | Yes |
| 64 | 78036 | NOVUS INTERNATIONAL, INC., VERENIUM CORPORATION | VERENIUM CORPORATION, NOVUS INTERNATIONAL, INC. | No |
| 65 | 80072 | LAB INTERNATIONAL SRL, LAB PHARMA OY, JANSSEN PHARMACEUTICA NV | JANSSEN PHARMACEUTICA NV, LAB INTERNATIONAL SRL, LAB PHARMA OY | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 66 | 81167 | Ludwig Institute for Cancer Research, KaloBios Pharmaceuticals, Inc. | KaloBios Pharmaceuticals, Inc., Ludwig Institute for Cancer Research | No |
| 67 | 96448 | International Business Machines Corp., Blue Cross and Blue Shield Association, Empire Blue Cross and Blue Shield, Empire HealthChoice, Inc. | Empire HealthChoice, Inc., Empire Blue Cross and Blue Shield, Blue Cross and Blue Shield Association, International Business Machines Corp. | No |
| 68 | 101113 | Oculus Innovative Sciences, Inc., Ruthigen, Inc. | Ruthigen, Inc., Oculus Innovative Sciences, Inc. | No |
| 69 | 101796 | MacroGenics, Inc., Gilead Sciences, Inc. | Gilead Sciences, Inc., MacroGenics, Inc. | No |
| 70 | 101838 | Oculus Innovative Sciences, Inc., Ruthigen, Inc. | Ruthigen, Inc., Oculus Innovative Sciences, Inc. | No |
| 71 | 101932 | MacroGenics, Inc., Gilead Sciences, Inc. | Gilead Sciences, Inc., MacroGenics, Inc. | No |
| 72 | 101998 | Oculus Innovative Sciences, Inc., Ruthigen, Inc. | Ruthigen, Inc., Oculus Innovative Sciences, Inc. | No |

## C.    ktMINE Search #3: "Development Plan" and "Own Cost*" Keyword Search

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 1 | 1220 | DURECT CORPORATION, NYCOMED DANMARK APS | NYCOMED DANMARK APS, DURECT CORPORATION | Yes |
| 2 | 7801 | SITEK, INC. | OPTICNET, INC. | No |
| 3 | 9014 | CONNETICS CORPORATION, Genentech, Inc., INTERMUNE PHARMACEUTICALS, INC. | INTERMUNE PHARMACEUTICALS, INC., CONNETICS CORPORATION, Genentech, Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 4 | 9029 | Optex Ophthalmologics, Inc., Bausch & Lomb Incorporated, Storz Instrument Company, Chiron Vision Corporation, Bausch & Lomb Surgical | Bausch & Lomb Surgical, Chiron Vision Corporation, Storz Instrument Company, Bausch & Lomb Incorporated, Optex Ophthalmologics, Inc. | Yes |
| 5 | 9037 | GPC Biotech AG, Pharmion GmbH, Pharmion Corporation | Pharmion GmbH, Pharmion Corporation, GPC Biotech AG | Yes |
| 6 | 9046 | Axonyx Inc., Applied Research Systems ARS Holding N.V. | Applied Research Systems ARS Holding N.V., Axonyx Inc. | Yes |
| 7 | 9047 | Axonyx Inc., Applied Research Systems ARS Holding N.V. | Applied Research Systems ARS Holding N.V., Axonyx Inc. | No |
| 8 | 9212 | CONNETICS CORPORATION, INTERMUNE PHARMACEUTICALS, INC. | INTERMUNE PHARMACEUTICALS, INC., CONNETICS CORPORATION | No |
| 9 | 9256 | SuperGen, Inc., Abbott Laboratories | Abbott Laboratories, SuperGen, Inc. | No |
| 10 | 9278 | GPC Biotech AG, Pharmion GmbH, Pharmion Corporation | Pharmion GmbH, Pharmion Corporation, GPC Biotech AG | No |
| 11 | 9329 | Genentech, Inc., Connetics Corporation | Connetics Corporation, Genentech, Inc. | No |
| 12 | 9346 | QLT Inc., Xenova Limited | Xenova Limited, QLT Inc | Yes |
| 13 | 9575 | ALTAIR NANOTECHNOLOGIES, INC., ALTAIR NANOMATERIALS, INC | WESTERN OIL SANDS INC. | No |
| 14 | 10530 | CRAUN RESEARCH SENDIRIAN BERHAD | MEDICHEM RESEARCH INC. | Yes |
| 15 | 11901 | Genentech, Inc., IDEC Pharmaceuticals Corporation, Scios Nova, Inc., F. Hoffmann-La Roche Ltd, Genentech Biopharmaceutical Limited, GENENTECH EUROPE LIMITED, GENENTECH INTERNATIONAL LIMITED | F. Hoffmann-La Roche Ltd, Genentech, Inc., IDEC Pharmaceuticals Corporation, Scios Nova, Inc., Genentech Biopharmaceutical Limited, GENENTECH EUROPE LIMITED, GENENTECH INTERNATIONAL LIMITED | Yes |
| 16 | 12313 | GPC Biotech AG | Pharmion Corporation | No |
| 17 | 12875 | IGT, Progressive Gaming International Corporation | Progressive Gaming International Corporation, IGT | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 18 | 12936 | DURECT Corporation, NYCOMED Danmark ApS | NYCOMED Danmark ApS, DURECT CORPORATION | No |
| 19 | 13792 | AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC, REGENERON PHARMACEUTICALS, INC. | REGENERON PHARMACEUTICALS, INC., AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC | Yes |
| 20 | 13794 | Isis Pharmaceuticals, Inc., Genzyme Corporation | Genzyme Corporation, Isis Pharmaceuticals, Inc. | No |
| 21 | 15276 | QLT Inc., Quadra Logic Technologies Inc., Novartis Pharma AG, Novartis Ophthalmics AG, Ciba Vision AG, University of British Columbia, General Hospital Corporation, Massachusetts General Hospital | Novartis Pharma AG, Novartis Ophthalmics AG, Ciba Vision AG, QLT Inc., Quadra Logic Technologies Inc., University of British Columbia, General Hospital Corporation, Massachusetts General Hospital | No |
| 22 | 15752 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | Yes |
| 23 | 16221 | Facet Biotech Corporation, Trubion Pharmaceuticals, Inc. | Trubion Pharmaceuticals, Inc., Facet Biotech Corporation | Yes |
| 24 | 16389 | Acorda Therapeutics, Inc., Elan Pharma International Limited, Biogen Idec International GmbH, Biogen Idec, Inc., Elan Corporation plc | Biogen Idec International GmbH, Biogen Idec, Inc., Acorda Therapeutics, Inc., Elan Pharma International Limited, Elan Corporation plc | No |
| 25 | 16865 | SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC, NEW RIVER PHARMACEUTICALS INC., SHIRE PHARMACEUTICALS PLC | NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC, SHIRE PHARMACEUTICALS PLC | No |
| 26 | 17096 | Human Genome Sciences, Inc., Novartis International Pharmaceutical Ltd. | Novartis International Pharmaceutical Ltd., Human Genome Sciences, Inc. | Yes |
| 27 | 22092 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 28 | 22168 | AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC, REGENERON PHARMACEUTICALS, INC. | REGENERON PHARMACEUTICALS, INC., AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC | Yes |
| 29 | 22443 | Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc., Coventry Acquisition, Inc. | Coventry Acquisition, Inc., Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc. | Yes |
| 30 | 22445 | Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc., Coventry Acquisition, Inc. | Coventry Acquisition, Inc., Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc. | No |
| 31 | 22453 | Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc., Coventry Acquisition, Inc. | Coventry Acquisition, Inc., Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc. | No |
| 32 | 22498 | Alexza Pharmaceuticals, Inc., Biovail Laboratories International SRL | Biovail Laboratories International SRL, Alexza Pharmaceuticals, Inc. | Yes |
| 33 | 22572 | MEDIVATION, INC., ASTELLAS PHARMA INC., Medivation Prostate Therapeutics, Inc., Astellas US LLC, The Regents of the University of California | ASTELLAS PHARMA INC., MEDIVATION, INC., Medivation Prostate Therapeutics, Inc., Astellas US LLC, The Regents of the University of California | Yes |
| 34 | 22615 | Facet Biotech Corporation, Trubion Pharmaceuticals, Inc. | Trubion Pharmaceuticals, Inc., Facet Biotech Corporation | No |
| 35 | 22617 | FUELCELL ENERGY, INC., POSCO POWER, POSCO, POSCON, POSMEC, POSCO E&C, POSTEEL | POSCO POWER, FUELCELL ENERGY, INC., POSCO, POSCON, POSMEC, POSCO E&C, POSTEEL | No |
| 36 | 22649 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | No |
| 37 | 22716 | AUXILIUM PHARMACEUTICALS, INC., BioSpecifics Technologies Corp. | AUXILIUM PHARMACEUTICALS, INC., BioSpecifics Technologies Corp. | Yes |
| 38 | 22721 | Archemix Corp., Merck Serono, Merck KGaA | Merck Serono, Merck KGaA, Archemix Corp. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 39 | 23035 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | No |
| 40 | 23102 | Napo Pharmaceuticals, Inc., Salix Pharmaceuticals, Inc., University of Iowa Research Foundation | Salix Pharmaceuticals, Inc., Napo Pharmaceuticals, Inc., University of Iowa Research Foundation | Yes |
| 41 | 23436 | NeurogesX Inc., The Regents of the University of California, LTS Therapie-Systeme AG, Astellas Pharma Europe Ltd, Contract Pharmaceuticals Limited Canada, Formosa Laboratories, Inc. | Astellas Pharma Europe Ltd, NeurogesX Inc., The Regents of the University of California, LTS Therapie-Systeme AG, Contract Pharmaceuticals Limited Canada, Formosa Laboratories, Inc. | No |
| 42 | 23583 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | No |
| 43 | 23593 | ACADIA PHARMACEUTICALS INC., BIOVAIL LABORATORIES INTERNATIONAL SRL | BIOVAIL LABORATORIES INTERNATIONAL SRL, ACADIA PHARMACEUTICALS INC. | Yes |
| 44 | 23704 | BRISTOL-MYERS SQUIBB COMPANY, OTSUKA PHARMACEUTICAL CO., LTD. | OTSUKA PHARMACEUTICAL CO., LTD., BRISTOL-MYERS SQUIBB COMPANY | Yes |
| 45 | 24031 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | No |
| 46 | 25394 | FUELCELL ENERGY, INC., POSCO POWER, POSCO, POSCON, POSMEC, POSCO E&C, POSTEEL | POSCO POWER, FUELCELL ENERGY, INC., POSCO, POSCON, POSMEC, POSCO E&C, POSTEEL | No |
| 47 | 25678 | ALKERMES CONTROLLED THERAPEUTICS INC. II, AMYLIN PHARMACEUTICALS, INC. | AMYLIN PHARMACEUTICALS, INC., ALKERMES CONTROLLED THERAPEUTICS INC. II | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 48 | 25755 | AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC, REGENERON PHARMACEUTICALS, INC. | REGENERON PHARMACEUTICALS, INC., AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC | No |
| 49 | 25920 | AMYRIS, INC., TOTAL GAS & POWER USA BIOTECH, INC. | TOTAL GAS & POWER USA BIOTECH, INC., AMYRIS, INC. | Yes |
| 50 | 26071 | Cornerstone BioPharma, Inc., NEOS Therapeutics, L.P., Coating Place, Inc. | Coating Place, Inc., NEOS Therapeutics, L.P., Cornerstone BioPharma, Inc. | Yes |
| 51 | 26072 | Neos Therapeutics, L.P., Cornerstone Biopharma, Inc. | Cornerstone Biopharma, Inc., Neos Therapeutics, L.P. | Yes |
| 52 | 26232 | Valeant Pharmaceuticals International, GlaxoSmithKline | GlaxoSmithKline, Valeant Pharmaceuticals International | No |
| 53 | 26585 | IntelGenx Corp., Cary Pharmaceuticals Inc. | Cary Pharmaceuticals Inc., IntelGenx Corp. | Yes |
| 54 | 27583 | WARATAH PHARMACEUTICALS INC., ELAN PHARMA INTERNATIONAL LIMITED | ELAN PHARMA INTERNATIONAL LIMITED, WARATAH PHARMACEUTICALS INC. | Yes |
| 55 | 28084 | Dyax Corp., Defiante Farmacêutica S.A. | Defiante Farmacêutica S.A., Dyax Corp. | Yes |
| 56 | 28328 | AMYRIS, INC., TOTAL GAS & POWER USA BIOTECH, INC. | TOTAL GAS & POWER USA BIOTECH, INC., AMYRIS, INC. | No |
| 57 | 28445 | AMYRIS, INC., TOTAL GAS & POWER USA BIOTECH, INC. | TOTAL GAS & POWER USA BIOTECH, INC., AMYRIS, INC. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 58 | 29807 | ONCOGENEX TECHNOLOGIES INC., ISIS PHARMACEUTICALS, INC. | ISIS PHARMACEUTICALS, INC., ONCOGENEX TECHNOLOGIES INC. | No |
| 59 | 30018 | EXELIXIS, INC., GENENTECH, INC. | GENENTECH, INC., EXELIXIS, INC. | Yes |
| 60 | 31638 | Acura Pharmaceuticals, Inc., King Pharmaceuticals Research and Development, Inc., King Pharmaceuticals, Inc. | King Pharmaceuticals Research and Development, Inc., King Pharmaceuticals, Inc., Acura Pharmaceuticals, Inc. | Yes |
| 61 | 31654 | Acura Pharmaceuticals, Inc., King Pharmaceuticals Research and Development, Inc., King Pharmaceuticals, Inc. | King Pharmaceuticals Research and Development, Inc., King Pharmaceuticals, Inc., Acura Pharmaceuticals, Inc. | No |
| 62 | 31943 | VALERA PHARMACEUTICALS, INC., ALPEX PHARMA S.A. | ALPEX PHARMA S.A., VALERA PHARMACEUTICALS, INC. | Yes |
| 63 | 35244 | ICAGEN, INC., McNeil Consumer & Specialty Pharmaceuticals Division of McNeil-PPC, Inc., Children's Medical Center Corporation | ICAGEN, INC., McNeil Consumer & Specialty Pharmaceuticals Division of McNeil-PPC, Inc., Children's Medical Center Corporation | Yes |
| 64 | 35875 | NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | No |
| 65 | 35973 | VYTERIS, INC., B. BRAUN MEDICAL INC. | B. BRAUN MEDICAL INC., VYTERIS, INC. | Yes |
| 66 | 36132 | SHIRE PHARMACEUTICALS PLC, NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | SHIRE PHARMACEUTICALS PLC, NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC | No |
| 67 | 36480 | DMI BioSciences, Inc., Cogenco International, Inc. | Cogenco International, Inc., DMI BioSciences, Inc. | Yes |
| 68 | 36715 | LEXICON GENETICS INCORPORATED, N.V. ORGANON | LEXICON GENETICS INCORPORATED, N.V. ORGANON | Yes |
| 69 | 37819 | ADOLOR CORPORATION, GLAXO GROUP LIMITED | GLAXO GROUP LIMITED, ADOLOR CORPORATION | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 70 | 37885 | ALEXION PHARMACEUTICALS, INC., XOMA (US) LLC, Alexion Antibody Technologies, Inc. | XOMA (US) LLC, ALEXION PHARMACEUTICALS, INC., Alexion Antibody Technologies, Inc. | Yes |
| 71 | 37890 | ALEXION PHARMACEUTICALS, INC., XOMA (US) LLC, Alexion Antibody Technologies, Inc. | XOMA (US) LLC, ALEXION PHARMACEUTICALS, INC., Alexion Antibody Technologies, Inc. | No |
| 72 | 38280 | NORTEC DEVELOPMENT ASSOCIATES, INC., PAR PHARMACEUTICAL, INC. | PAR PHARMACEUTICAL, INC., NORTEC DEVELOPMENT ASSOCIATES, INC. | Yes |
| 73 | 38360 | XOMA (US) LLC, ALEXION PHARMACEUTICALS, INC., Alexion Antibody Technologies, Inc. | ALEXION PHARMACEUTICALS, INC., XOMA (US) LLC, Alexion Antibody Technologies, Inc. | No |
| 74 | 38373 | ALEXION PHARMACEUTICALS, INC., XOMA (US) LLC, Alexion Antibody Technologies, Inc. | Alexion Antibody Technologies, Inc., XOMA (US) LLC, ALEXION PHARMACEUTICALS, INC. | No |
| 75 | 39292 | ICAGEN, INC., McNeil Consumer & Specialty Pharmaceuticals Division of McNeil-PPC, Inc., Children's Medical Center Corporation | ICAGEN, INC., McNeil Consumer & Specialty Pharmaceuticals Division of McNeil-PPC, Inc., Children's Medical Center Corporation | No |
| 76 | 41213 | QLT INC., XENOVA LIMITED | XENOVA LIMITED, QLT INC. | No |
| 77 | 41555 | DYAX CORP., CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED | CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED, DYAX CORP. | No |
| 78 | 42203 | DYAX CORP., CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED | CAMBRIDGE ANTIBODY TECHNOLOGY LIMITED, DYAX CORP. | No |
| 79 | 42407 | DMI BioSciences, Inc., Enhance Lifesciences, Inc. | Enhance Lifesciences, Inc., DMI BioSciences, Inc. | Yes |
| 80 | 42409 | DMI BioSciences, Inc., Enhance Lifesciences, Inc. | Enhance Lifesciences, Inc., DMI BioSciences, Inc. | No |
| 81 | 42839 | GENENTECH, INC., TolerRx, Inc. | TolerRx, Inc., GENENTECH, INC. | Yes |
| 82 | 44305 | AMGEN INC., HYSEQ, INC., HYSEQ PHARMACEUTICALS | HYSEQ, INC., HYSEQ PHARMACEUTICALS, AMGEN INC. | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 83 | 45217 | ELI LILLY AND COMPANY, AMYLIN PHARMACEUTICALS, INC. | AMYLIN PHARMACEUTICALS, INC., ELI LILLY AND COMPANY | No |
| 84 | 45474 | QLT Inc., Xenova Limited | Xenova Limited, QLT Inc. | No |
| 85 | 45827 | Third Wave Technologies, Inc., BML, Inc. | BML, Inc., Third Wave Technologies, Inc. | Yes |
| 86 | 45837 | ArQule, Inc., Genome Therapeutics Corporation | Genome Therapeutics Corporation, ArQule, Inc. | No |
| 87 | 46156 | OSI Pharmaceuticals, Inc., Genentech, Inc. | Genentech, Inc., OSI Pharmaceuticals, Inc. | Yes |
| 88 | 46920 | Chiron Corporation, PathoGenesis Corporation | PathoGenesis Corporation, Chiron Corporation | Yes |
| 89 | 47481 | HUMAN GENOME SCIENCES, INC., Cambridge Antibody Technology, Ltd. | Cambridge Antibody Technology, Ltd., HUMAN GENOME SCIENCES, INC. | No |
| 90 | 49339 | SuperGen, Inc., Abbott Laboratories | Abbott Laboratories, SuperGen, Inc. | No |
| 91 | 49365 | SuperGen, Inc., Abbott Laboratories | Abbott Laboratories, SuperGen, Inc. | No |
| 92 | 49731 | Human Genome Sciences, Inc., Praecis Pharmaceuticals Incorporated | Praecis Pharmaceuticals Incorporated, Human Genome Sciences, Inc. | Yes |
| 93 | 50143 | Prime Response, Inc., Andersen Consulting LLP | Andersen Consulting LLP, Prime Response, Inc. | No |
| 94 | 50404 | SuperGen, Inc., Abbott Laboratories | Abbott Laboratories, SuperGen, Inc. | No |
| 95 | 50486 | Genentech, Inc., Connetics Corporation | Connetics Corporation, Genentech, Inc. | No |
| 96 | 51547 | Abbott Laboratories, SuperGen, Inc. | SuperGen, Inc., Abbott Laboratories | No |
| 97 | 51583 | BIOSEARCH ITALIA, S.P.A., VERSICOR, INC. | BIOSEARCH ITALIA, S.P.A., VERSICOR, INC. | Yes |
| 98 | 51930 | Allergan USA, Inc., Allergan Sales, LLC, Allergan, Inc., Nektar Therapeutics UK Limited, MAP PHARMACEUTICALS, INC. | Allergan USA, Inc., Allergan Sales, LLC, Allergan, Inc., Nektar Therapeutics UK Limited, MAP PHARMACEUTICALS, INC. | Yes |
| 99 | 52083 | Allergan USA, Inc., Allergan Sales, LLC, Allergan, Inc., Nektar Therapeutics UK Limited, MAP PHARMACEUTICALS, INC. | Allergan USA, Inc., Allergan Sales, LLC, Allergan, Inc., Nektar Therapeutics UK Limited, MAP PHARMACEUTICALS, INC. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 100 | 52087 | BioSpecifics Technologies Corp., Auxilium Pharmaceuticals, Inc. | Auxilium Pharmaceuticals, Inc., BioSpecifics Technologies Corp. | Yes |
| 101 | 54385 | Axonyx Inc., Applied Research Systems ARS Holding N.V. | Applied Research Systems ARS Holding N.V., Axonyx Inc. | No |
| 102 | 55046 | TECHNICLONE CORPORATION, SCHERING AG | SCHERING AG, TECHNICLONE CORPORATION | No |
| 103 | 56655 | WARNER-LAMBERT COMPANY, PFIZER INC. | PFIZER INC., WARNER-LAMBERT COMPANY | Yes |
| 104 | 57810 | ERGO Research Corporation, ERGO Science Corporation, The R.W. Johnson Pharmaceutical Research Institute, ORTHO PHARMACEUTICAL CORPORATION, ORTHO-McNEIL Pharmaceutical, Inc., Johnson & Johnson, Cilag AG International, CILAG A.G., INTERNATIONAL | ERGO Research Corporation, ERGO Science Corporation, The R.W. Johnson Pharmaceutical Research Institute, ORTHO PHARMACEUTICAL CORPORATION, ORTHO-McNEIL Pharmaceutical, Inc., Johnson & Johnson, Cilag AG International, CILAG A.G., INTERNATIONAL | Yes |
| 105 | 57817 | BUKWANG PHARM. IND. CO., LTD., TRIANGLE PHARMACEUTICALS, INC. | TRIANGLE PHARMACEUTICALS, INC., BUKWANG PHARM. IND. CO., LTD. | No |
| 106 | 59356 | Optex Ophthalmologics, Inc., Bausch & Lomb Incorporated, Storz Instrument Company, Chiron Vision Corporation, Bausch & Lomb Surgical | Bausch & Lomb Surgical, Chiron Vision Corporation, Storz Instrument Company, Bausch & Lomb Incorporated, Optex Ophthalmologics, Inc. | Yes |
| 107 | 62496 | ORTHO BIOTECH INC., CELL THERAPEUTICS, INC., THE R. W. JOHNSON PHARMACEUTICAL RESEARCH INSTITUTE, ORTHO PHARMACEUTICAL CORPORATION | ORTHO BIOTECH INC., CELL THERAPEUTICS, INC., THE R. W. JOHNSON PHARMACEUTICAL RESEARCH INSTITUTE, ORTHO PHARMACEUTICAL CORPORATION | Yes |
| 108 | 64682 | Agouron Pharmaceuticals, Inc., F. Hoffmann-La Roche Ltd, Hoffmann-La Roche Inc. | Agouron Pharmaceuticals, Inc., F. Hoffmann-La Roche Ltd, Hoffmann-La Roche Inc. | Yes |
| 109 | 67133 | GERON CORPORATION, KYOWA HAKKO KOGYO CO., LTD. | KYOWA HAKKO KOGYO CO., LTD., GERON CORPORATION | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 110 | 68080 | Human Genome Sciences, Inc., Schering Corporation, Schering Plough Ltd., SmithKline Beecham Corporation, SmithKline Beecham, plc | SmithKline Beecham, plc, SmithKline Beecham Corporation, Schering Plough Ltd., Schering Corporation, Human Genome Sciences, Inc. | Yes |
| 111 | 69703 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | No |
| 112 | 69898 | SCRAS S.A.S., Nuvios, Inc. | Nuvios, Inc., SCRAS S.A.S. | No |
| 113 | 69965 | Nymox Pharmaceutical Corporation, Recordati Ireland Ltd. | Recordati Ireland Ltd., Nymox Pharmaceutical Corporation | Yes |
| 114 | 70258 | ELAN CORPORATION, PLC., ACORDA THERAPEUTICS, INC. | ACORDA THERAPEUTICS, INC., ELAN CORPORATION, PLC. | No |
| 115 | 70329 | Corgenix Medical Corporation, Financière Elitech SAS, Wescor, Inc. | Wescor, Inc., Financière Elitech SAS, Corgenix Medical Corporation | No |
| 116 | 70368 | EXELIXIS, INC., EXELIXIS PATENT COMPANY, LLC., BRISTOL-MYERS SQUIBB COMPANY | BRISTOL-MYERS SQUIBB COMPANY, EXELIXIS, INC., EXELIXIS PATENT COMPANY, LLC. | Yes |
| 117 | 70369 | EXELIXIS, INC., EXELIXIS PATENT COMPANY, LLC., BRISTOL-MYERS SQUIBB COMPANY | BRISTOL-MYERS SQUIBB COMPANY, EXELIXIS, INC., EXELIXIS PATENT COMPANY, LLC. | No |
| 118 | 70603 | Cystic Fibrosis Foundation Therapeutics Incorporated, VERTEX PHARMACEUTICALS INCORPORATED | VERTEX PHARMACEUTICALS INCORPORATED, Cystic Fibrosis Foundation Therapeutics Incorporated | Yes |
| 119 | 70698 | BioSpecifics Technologies Corp., Auxilium Pharmaceuticals, Inc. | Auxilium Pharmaceuticals, Inc., BioSpecifics Technologies Corp. | Yes |
| 120 | 70699 | BioSpecifics Technologies Corp., Auxilium Pharmaceuticals, Inc. | Auxilium Pharmaceuticals, Inc., BioSpecifics Technologies Corp. | No |
| 121 | 70701 | BioSpecifics Technologies Corp., Auxilium Pharmaceuticals, Inc. | Auxilium Pharmaceuticals, Inc., BioSpecifics Technologies Corp. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 122 | 70876 | SCRAS S.A.S., Nuvios, Inc. | Nuvios, Inc., SCRAS S.A.S. | No |
| 123 | 74894 | Eisai Co., Ltd., Radius Health, Inc. | Radius Health, Inc., Eisai Co., Ltd. | No |
| 124 | 77982 | ChemoCentryx, Inc., Glaxo Group Limited | Glaxo Group Limited, ChemoCentryx, Inc. | Yes |
| 125 | 77993 | CONMED Corporation, Musculoskeletal Transplant Foundation, Inc. | Musculoskeletal Transplant Foundation, Inc., CONMED Corporation | Yes |
| 126 | 78209 | Intrexon Corporation, Adeona Pharmaceuticals, Inc. | Adeona Pharmaceuticals, Inc., Intrexon Corporation | Yes |
| 127 | 78506 | BAYER HEALTHCARE LLC, ONYX PHARMACEUTICALS, INC. | ONYX PHARMACEUTICALS, INC., BAYER HEALTHCARE LLC | Yes |
| 128 | 78946 | CORONADO BIOSCIENCES, INC., OVAMED GMBH, Dr. FALK PHARMA GMBH | Dr. FALK PHARMA GMBH, OVAMED GMBH, CORONADO BIOSCIENCES, INC. | Yes |
| 129 | 79279 | Senesco Technologies, Inc., Senesco, Inc., BioCorp Ventures LLC | BioCorp Ventures LLC, Senesco Technologies, Inc., Senesco, Inc. | No |
| 130 | 79470 | INTREXON CORPORATION, ORAGENICS, INC. | ORAGENICS, INC., INTREXON CORPORATION | Yes |
| 131 | 80072 | LAB INTERNATIONAL SRL, LAB PHARMA OY, JANSSEN PHARMACEUTICA NV | JANSSEN PHARMACEUTICA NV, LAB INTERNATIONAL SRL, LAB PHARMA OY | No |
| 132 | 80993 | PERF GO-GREEN HOLIDNGS, INC., PERFPOWER CORPORATION, CF Consulting, LLC, Bluefish Group, Inc., Boris Rubizhevsky, Michael Smatt, P.P.H.I. Inc., Jim Murray, Steve Stark, Perf Go-Green, Inc., Perf Go-Green Holdings, Inc. | Perf Go-Green Holdings, Inc., Perf Go-Green, Inc., Steve Stark, Jim Murray, P.P.H.I. Inc., Michael Smatt, Boris Rubizhevsky, Bluefish Group, Inc., CF Consulting, LLC, PERFPOWER CORPORATION, PERF GO-GREEN HOLIDNGS, INC. | Yes |
| 133 | 81165 | KALOBIOS PHARMACEUTICALS, INC., SANOFI PASTEUR S.A. | SANOFI PASTEUR S.A., KALOBIOS PHARMACEUTICALS, INC. | Yes |
| 134 | 81220 | Intrexon Corporation, Synthetic Biologics, Inc. | Synthetic Biologics, Inc., Intrexon Corporation | Yes |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 135 | 99539 | Chiesi Farmaceutici S.p.A., Cornerstone Therapeutics Inc. | Cornerstone Therapeutics Inc., Chiesi Farmaceutici S.p.A. | No |
| 136 | 100743 | Eisai Co., Ltd., Epizyme, Inc. | Epizyme, Inc., Eisai Co., Ltd. | Yes |
| 137 | 100768 | INTREXON CORPORATION, FIBROCELL SCIENCE, INC. | FIBROCELL SCIENCE, INC., INTREXON CORPORATION | Yes |
| 138 | 100871 | Eisai Co., Ltd., Epizyme, Inc. | Epizyme, Inc., Eisai Co., Ltd. | No |
| 139 | 100921 | Intrexon Corporation, Soligenix, Inc. | Soligenix, Inc., Intrexon Corporation | Yes |
| 140 | 100933 | Onconova Therapeutics, Inc., SymBio Pharmaceuticals Limited | Onconova Therapeutics, Inc., SymBio Pharmaceuticals Limited | No |
| 141 | 100989 | EnVivo Pharmaceuticals, Inc., MethylGene Inc. | MethylGene Inc., EnVivo Pharmaceuticals, Inc. | Yes |
| 142 | 100999 | Eisai Co., Ltd., Epizyme, Inc. | Epizyme, Inc., Eisai Co., Ltd. | No |
| 143 | 101059 | ELAN PHARMACEUTICAL RESEARCH CORP., NANOSYSTEMS, ELAN PHARMA INTERNATIONAL LIMITED, JANSSEN PHARMACEUTICA N.V. | JANSSEN PHARMACEUTICA N.V., ELAN PHARMACEUTICAL RESEARCH CORP., NANOSYSTEMS, ELAN PHARMA INTERNATIONAL LIMITED | No |
| 144 | 101064 | ARADIGM CORPORATION, GRIFOLS, S.A. | GRIFOLS, S.A., ARADIGM CORPORATION | Yes |
| 145 | 101065 | ARADIGM CORPORATION, GRIFOLS, S.A. | GRIFOLS, S.A., ARADIGM CORPORATION | No |
| 146 | 101131 | Onconova Therapeutics, Inc., SymBio Pharmaceuticals Limited | SymBio Pharmaceuticals Limited, Onconova Therapeutics, Inc. | No |
| 147 | 101643 | INTREXON CORPORATION, ZIOPHARM ONCOLOGY, INC. | ZIOPHARM ONCOLOGY, INC., INTREXON CORPORATION | No |
| 148 | 101645 | INTREXON CORPORATION, ORAGENICS, INC. | ORAGENICS, INC., INTREXON CORPORATION | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 149 | 101646 | INTREXON CORPORATION, SYNTHETIC BIOLOGICS, INC. | SYNTHETIC BIOLOGICS, INC., INTREXON CORPORATION | No |
| 150 | 101647 | INTREXON CORPORATION, FIBROCELL SCIENCE, INC. | FIBROCELL SCIENCE, INC., INTREXON CORPORATION | No |
| 151 | 101648 | INTREXON CORPORATION, AQUABOUNTY TECHNOLOGIES, INC. | AQUABOUNTY TECHNOLOGIES, INC., INTREXON CORPORATION | Yes |
| 152 | 101651 | Intrexon Corporation, Soligenix, Inc. | Soligenix, Inc., Intrexon Corporation | No |
| 153 | 101652 | INTREXON CORPORATION, BIOLIFE CELL BANK, INC. | BIOLIFE CELL BANK, INC., INTREXON CORPORATION | Yes |
| 154 | 101697 | INTREXON CORPORATION, ZIOPHARM ONCOLOGY, INC. | ZIOPHARM ONCOLOGY, INC., INTREXON CORPORATION | No |
| 155 | 101699 | INTREXON CORPORATION, ORAGENICS, INC. | ORAGENICS, INC., INTREXON CORPORATION | No |
| 156 | 101700 | INTREXON CORPORATION, SYNTHETIC BIOLOGICS, INC. | SYNTHETIC BIOLOGICS, INC., INTREXON CORPORATION | No |
| 157 | 101701 | INTREXON CORPORATION, FIBROCELL SCIENCE, INC. | FIBROCELL SCIENCE, INC., INTREXON CORPORATION | No |
| 158 | 101702 | INTREXON CORPORATION, AQUABOUNTY TECHNOLOGIES, INC. | AQUABOUNTY TECHNOLOGIES, INC., INTREXON CORPORATION | No |
| 159 | 101705 | Intrexon Corporation, Soligenix, Inc. | Soligenix, Inc., Intrexon Corporation | No |
| 160 | 101706 | INTREXON CORPORATION, BIOLIFE CELL BANK, INC. | BIOLIFE CELL BANK, INC., INTREXON CORPORATION | No |
| 161 | 101737 | Savicell Diagnostic Ltd., Ramot at Tel Aviv University Ltd. | Ramot at Tel Aviv University Ltd., Savicell Diagnostic Ltd. | Yes |
| 162 | 101743 | Onconova Therapeutics, Inc., SymBio Pharmaceuticals Limited | SymBio Pharmaceuticals Limited, Onconova Therapeutics, Inc. | No |
| 163 | 101786 | AMGEN INC., CELLTECH R & D LIMITED | CELLTECH R & D LIMITED, AMGEN INC. | Yes |
| 164 | 101813 | Array BioPharma Inc., Oncothyreon Inc. | Oncothyreon Inc., Array BioPharma Inc. | Yes |
| 165 | 101856 | Array BioPharma Inc., Oncothyreon Inc. | Oncothyreon Inc., Array BioPharma Inc. | No |

| # | Agreement ID | Party 1 | Party 2 | Pass Initial Qualitative Screen |
|---|---|---|---|---|
| 166 | 101964 | Senesco Technologies, Inc., Senesco, Inc., BioCorp Ventures LLC | BioCorp Ventures LLC, Senesco Technologies, Inc., Senesco, Inc. | No |
| 167 | 102003 | Senesco Technologies, Inc., Senesco, Inc., BioCorp Ventures LLC | BioCorp Ventures LLC, Senesco Technologies, Inc., Senesco, Inc. | No |

### D.    Summary of Agreements for Full Qualitative Review

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 1 | 50415 | TTR TECHNOLOGIES, INC., TTR Technologies, Ltd., MACROVISION CORPORATION, C-Dilla, Ltd. | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | Industry | Computers: Hardware and Software, Consumer Durables, Entertainment, Internet, Publishing, Business Services, Consumer Services |
| 2 | 50151 | Atlantic Aerospace Electronics Corporation | QuesTec Imaging, Inc. | Industry | Business Services, Broadcast and Cable, Computers: Hardware and Software, Entertainment, Internet |
| 3 | 49010 | R2 Technology, Inc., Eastman Kodak Company | Eastman Kodak Company, R2 Technology, Inc. | Industry | Computers: Hardware and Software, Healthcare: Products and Supplies, Business Services |
| 4 | 49527 | MCY MUSIC WORLD, INC., U S WEST COMMUNICATIONS SERVICES, INC. | U S WEST COMMUNICATIONS SERVICES, INC., MCY MUSIC WORLD, INC. | Industry | Business Services, Broadcast and Cable, Consumer Services, Computers: Hardware and Software, Internet, Entertainment |
| 5 | 49572 | Daimler-Benz Aktlengesellschaft, Odetics, Inc. | Odetics, Inc., Daimler-Benz Aktlengesellschaft | Industry | Computers: Hardware and Software, Transportation Equipment and Parts |
| 6 | 67384 | AM Communications, Inc., Scientific-Atlanta, Inc. | Scientific-Atlanta, Inc., AM Communications, Inc. | Industry | Computers: Hardware and Software, Telecommunications, Broadcast and Cable, Business Services, Internet |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 7 | 68101 | BAXTER HEALTHCARE CORPORATION, STERITECH, INC. | STERITECH, INC., BAXTER HEALTHCARE CORPORATION | Industry | Biotechnology, Chemicals, Computers: Hardware and Software, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 8 | 64036 | ROSS TECHNOLOGY, INC., FUJITSU LIMITED | FUJITSU LIMITED, ROSS TECHNOLOGY, INC. | Industry | Computers: Hardware and Software, Business Services, Semiconductors |
| 9 | 64597 | THERMA-WAVE, INC., Toray Industries, Inc. | Toray Industries, Inc., THERMA-WAVE, INC. | Industry | Computers: Hardware and Software, Consumer Durables, Semiconductors |
| 10 | 64604 | Millennium BioTherapeutics, Inc., Millennium Pharmaceuticals, Inc., Eli Lilly and Company | Eli Lilly and Company, Millennium Pharmaceuticals, Inc., Millennium BioTherapeutics, Inc. | Industry | Healthcare: Pharmaceutical, Biotechnology, Computers: Hardware and Software, Healthcare: Products and Supplies |
| 11 | 63799 | HYSEQ, INC., THE PERKIN-ELMER CORPORATION | THE PERKIN-ELMER CORPORATION, HYSEQ, INC. | Industry | Computers: Hardware and Software, Biotechnology, Healthcare: Products and Supplies, Business Services, Healthcare: Pharmaceutical, Semiconductors |
| 12 | 63864 | INNOVA, SAT (Societe Anonyme de Telecommunications), INNOVA CORPORATION | INNOVA, SAT (Societe Anonyme de Telecommunications), INNOVA CORPORATION | Industry | Telecommunications, Computers: Hardware and Software |
| 13 | 9794 | QuickLogic Corporation | Cypress Semiconductor Corporation | Industry | Computers: Hardware and Software, Semiconductors |
| 14 | 9754 | AM Communications, Inc., Scientific-Atlanta, Inc. | AM Communications, Inc., Scientific-Atlanta, Inc. | Industry | Telecommunications, Computers: Hardware and Software, Business Services, Broadcast and Cable, Internet |
| 15 | 9876 | Toray Industries, Inc., THERMA-WAVE, INC. | Toray Industries, Inc., THERMA-WAVE, INC. | Industry | Consumer Durables, Computers: Hardware and Software, Semiconductors |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 16 | 11001 | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | TTR Technologies, Ltd., TTR TECHNOLOGIES, INC., MACROVISION CORPORATION, C-Dilla, Ltd. | Industry | Entertainment, Internet, Business Services, Consumer Durables, Computers: Hardware and Software, Publishing, Consumer Services |
| 17 | 11026 | HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG, NANOGEN, INC. | HOECHST RESEARCH & TECHNOLOGY DEUTSCHLAND GMBH & CO KG, NANOGEN, INC. | Industry | Biotechnology, Healthcare: Products and Supplies, Computers: Hardware and Software |
| 18 | 15974 | HEALTH DISCOVERY CORPORATION, DCL MEDICAL LABORATORIES, LLC | DCL MEDICAL LABORATORIES, LLC, HEALTH DISCOVERY CORPORATION | Industry | Computers: Hardware and Software, Healthcare: Products and Supplies, Biotechnology, Business Services, Healthcare: Pharmaceutical, Healthcare: Facilities |
| 19 | 15793 | STRATEC Biomedical Systems AG, Gen-Probe Incorporated | Gen-Probe Incorporated, STRATEC Biomedical Systems AG | Industry | Healthcare: Products and Supplies, Biotechnology, Computers: Hardware and Software |
| 20 | 28260 | Microsoft Corporation, Robertson Technologies Licensing LLC | Robertson Technologies Licensing LLC, Microsoft Corporation | Industry | Telecommunications, Consumer Durables, Healthcare: Products and Supplies, Internet, Computers: Hardware and Software, Business Services, Consumer Services, Healthcare: Facilities |
| 21 | 33337 | WorldSpace (China) Information Technology Ltd., Xi'an Tongshi Technology Limited | Xi'an Tongshi Technology Limited, WorldSpace (China) Information Technology Ltd. | Industry | Computers: Hardware and Software, Broadcast and Cable, Telecommunications, Business Services, Consumer Services, Consumer Durables |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 22 | 33836 | China Mobile Communications Group Corporation, Beijing Hutong Wuxian Technology Co., Ltd. | China Mobile Communications Group Corporation, Beijing Hutong Wuxian Technology Co., Ltd. | Industry | Business Services, Consumer Services, Internet, Telecommunications |
| 23 | 35207 | Novint Technologies, Inc., Mr. Thomas G. Anderson, MANHATTAN SCIENTIFICS, INC. | MANHATTAN SCIENTIFICS, INC., Novint Technologies, Inc., Mr. Thomas G. Anderson | Industry | Business Services, Computers: Hardware and Software, Consumer Durables, Consumer Services, Internet |
| 24 | 41360 | Infineon Technologies AG, Actel Corporation | Actel Corporation, Infineon Technologies AG | Industry | Computers: Hardware and Software, Semiconductors |
| 25 | 46551 | Bayer Corporation, Bayer AG, CuraGen Corporation | CuraGen Corporation, Bayer AG, Bayer Corporation | Industry | Biotechnology, Healthcare: Pharmaceutical, Computers: Hardware and Software, Business Services, Healthcare: Products and Supplies |
| 26 | 51022 | Yamar Electronics Ltd., IQ Battery R & D GmbH | IQ Battery R & D GmbH, Yamar Electronics Ltd. | Industry | Computers: Hardware and Software, Business Services, Transportation Equipment and Parts, Alternative and Renewable Energy |
| 27 | 50687 | HeartSine Technologies, Inc., Cardiac Science, Inc. | Cardiac Science, Inc., HeartSine Technologies, Inc. | Industry | Healthcare: Facilities, Healthcare: Products and Supplies, Computers: Hardware and Software, Biotechnology |
| 28 | 54413 | Interliant, Inc., Lotus Development Corporation | Lotus Development Corporation, Interliant, Inc. | Industry | Computers: Hardware and Software, Business Services, Internet |
| 29 | 53346 | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | Industry | Computers: Hardware and Software, Business Services |
| 30 | 54977 | Nettaxi Online Communities, Inc., eBay, EBAY, INC. | eBay, EBAY, INC., Nettaxi Online Communities, Inc. | Industry | Consumer Services, Internet, Retail, Computers: Hardware and Software, Business Services |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 31 | 59378 | INTERNATIONAL VERIFACT INC., "COMPAGNIE INDUSTRIELLE ET FINANCIERE" INGENICO, SOCIETE ANONYME | N/A | Industry | Computers: Hardware and Software, Business Services, Financial Services |
| 32 | 58746 | APPLIED VOICE RECOGNITION, INC., VOICE IT WORLDWIDE, INC. | VOICE IT WORLDWIDE, INC., APPLIED VOICE RECOGNITION, INC. | Industry | Business Services, Computers: Hardware and Software, Healthcare: Facilities, Consumer Services, Consumer Durables |
| 33 | 58764 | TTR Technologies Ltd., Doug Carson & Associates Inc., Nimbus CD International, Inc. | Nimbus CD International, Inc., TTR Technologies Ltd., Doug Carson & Associates Inc. | Industry | Consumer Durables, Computers: Hardware and Software, Publishing, Industrial Equipment and Machinery, Business Services, Entertainment |
| 34 | 11546 | Pearson Television Netherlands, Pearson Television France EURL, Pearson Television, Inc., Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited, E-Pub (Holdings) Ltd., Uproar Inc. | Uproar Inc., Pearson Television, Inc., Pearson Television Netherlands, Pearson Television France EURL, Pearson Television Holdings, Inc., Pearson Television North America, Inc., Pearson Television Limited, E-Pub (Holdings) Ltd. | Industry | Internet, Entertainment, Computers: Hardware and Software, Business Services, Consumer Services, Broadcast and Cable, Advertising |
| 35 | 25773 | SURGIVISION, INC., Siemens Aktiengesellschaft | Siemens Aktiengesellschaft, SURGIVISION, INC. | Industry | Computers: Hardware and Software, Healthcare: Products and Supplies, Biotechnology |
| 36 | 25793 | INTERNATIONAL BUSINESS MACHINES CORPORATION, NEXX SYSTEMS, INC. | NEXX SYSTEMS, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION | Industry | Semiconductors, Computers: Hardware and Software |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 37 | 30245 | REMOTE KNOWLEDGE, INC., RAYMARINE plc | RAYMARINE plc, REMOTE KNOWLEDGE, INC. | Industry | Business Services, Consumer Durables, Consumer Services, Computers: Hardware and Software, Telecommunications, Transportation Equipment and Parts, Internet, Entertainment, Broadcast and Cable, Travel and Recreation |
| 38 | 30774 | China Mobile Communications Group Corporation, Beijing Enterprise Network Technology Co., Ltd. | Beijing Enterprise Network Technology Co., Ltd., China Mobile Communications Group Corporation | Industry | Business Services, Consumer Services, Internet, Telecommunications |
| 39 | 35752 | Beijing Mobile Communication Co., Ltd, Beijing Sohu Internet Information Service Co., Ltd | Beijing Sohu Internet Information Service Co., Ltd, Beijing Mobile Communication Co., Ltd | Industry | Business Services, Internet, Consumer Services, Telecommunications |
| 40 | 35973 | VYTERIS, INC., B. BRAUN MEDICAL INC. | B. BRAUN MEDICAL INC., VYTERIS, INC. | Industry | Healthcare: Pharmaceutical, Biotechnology, Healthcare: Products and Supplies, Computers: Hardware and Software |
| 41 | 38810 | xSides Corporation, Y3K Secure Enterprise Software, Inc. | Y3K Secure Enterprise Software, Inc., xSides Corporation | Industry | Business Services, Computers: Hardware and Software, Telecommunications |
| 42 | 42642 | Emory University, Robert W. Woodruff Health Sciences Center, Emory Healthcare, Inc., MD Technologies, Inc. | MD Technologies, Inc., Emory Healthcare, Inc., Robert W. Woodruff Health Sciences Center, Emory University | Industry | Computers: Hardware and Software, Healthcare: Facilities, Business Services, Internet, Consumer Services |
| 43 | 43295 | 8x8, Inc., ST Microelectronics, Inc. | ST Microelectronics, Inc., 8x8, Inc. | Industry | Semiconductors, Computers: Hardware and Software, Internet, Telecommunications, Business Services |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 44 | 48152 | BAXTER HEALTHCARE CORPORATION, STERITECH, INC. | STERITECH, INC., BAXTER HEALTHCARE CORPORATION | Industry | Biotechnology, Chemicals, Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Computers: Hardware and Software |
| 45 | 48567 | MOMENTUM BUSINESS APPLICATIONS, INC., PEOPLESOFT, INC. | PEOPLESOFT, INC., MOMENTUM BUSINESS APPLICATIONS, INC. | Industry | Business Services, Computers: Hardware and Software |
| 46 | 63664 | NETSPEAK CORPORATION, ACT NETWORKS, INC. | ACT NETWORKS, INC., NETSPEAK CORPORATION | Industry | Business Services, Computers: Hardware and Software, Telecommunications, Internet, Broadcast and Cable |
| 47 | 60027 | BAXTER HEALTHCARE CORPORATION, CERUS CORPORATION | CERUS CORPORATION, BAXTER HEALTHCARE CORPORATION | Industry | Computers: Hardware and Software, Biotechnology, Healthcare: Products and Supplies |
| 48 | 60323 | SC Corporation, CyberImaging Systems, Inc. | CyberImaging Systems, Inc., SC Corporation | Industry | Computers: Hardware and Software, Business Services, Consumer Services, Consumer Non Durables, Retail, Internet, Healthcare: Facilities, Consumer Durables |
| 49 | 60798 | UTMC MICROELECTRONIC SYSTEMS INC., BRAINTECH, INC. | BRAINTECH, INC., UTMC MICROELECTRONIC SYSTEMS INC. | Industry | Business Services, Computers: Hardware and Software, Industrial Equipment and Machinery, Semiconductors, Public Safety |
| 50 | 62201 | ONCOGENE SCIENCE, INC., BAYER CORPORATION | BAYER CORPORATION, ONCOGENE SCIENCE, INC. | Industry | Biotechnology, Chemicals, Healthcare: Products and Supplies, Healthcare: Facilities, Computers: Hardware and Software, Business Services |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 51 | 69243 | CABLESHARE INC., CABLE SHARE INTERNATIONAL INC., CABLESHARE (U.S.) LIMITED, CABLESHARE B.V., IT NETWORK, Inc., Source Media, Inc. | IT NETWORK, Inc., Source Media, Inc., CABLESHARE INC., CABLE SHARE INTERNATIONAL INC., CABLESHARE (U.S.) LIMITED, CABLESHARE B.V. | Industry | Computers: Hardware and Software, Consumer Services, Broadcast and Cable, Entertainment, Business Services, Consumer Durables, Telecommunications, Internet |
| 52 | 69392 | IAT AG, Texas Instruments Incorporated | Texas Instruments Incorporated, IAT AG | Industry | Computers: Hardware and Software, Business Services, Semiconductors |
| 53 | 80088 | Aspreva Pharmaceuticals GmbH, Aspreva Pharmaceuticals Corporation, Hoffmann-La Roche Inc., F. Hoffmann-La Roche Ltd | F. Hoffmann-La Roche Ltd, Hoffmann-La Roche Inc., Aspreva Pharmaceuticals Corporation, Aspreva Pharmaceuticals GmbH | Industry | Healthcare: Pharmaceutical, Computers: Hardware and Software, Biotechnology |
| 54 | 102651 | Sgenia Solutiones, S.L., ZENON Biosystem, S.L., Braeden Valley Mines Inc., Sgenia Soluciones, S.L. | Braeden Valley Mines Inc., Sgenia Solutiones, S.L., ZENON Biosystem, S.L., Sgenia Soluciones, S.L. | Industry | Computers: Hardware and Software, Healthcare: Products and Supplies, Semiconductors, Biotechnology |
| 55 | 10723 | RDS Tasks of Ohio, Inc., Moonlight R&D, Inc., Geoalert Incorporated | Geoalert Incorporated, Moonlight R&D, Inc., RDS Tasks of Ohio, Inc. | Industry | Public Safety, Computers: Hardware and Software, Broadcast and Cable, Business Services, Consumer Services, Education, Entertainment, Internet, Telecommunications |
| 56 | 10827 | Daimler-Benz Aktlengesellschaft, Odetics, Inc. | Odetics, Inc., Daimler-Benz Aktlengesellschaft | Industry | Transportation Equipment and Parts, Computers: Hardware and Software |
| 57 | 10828 | Exchange Applications, Inc., MicroStrategy Incorporated | Exchange Applications, Inc., MicroStrategy Incorporated | Industry | Computers: Hardware and Software, Advertising, Business Services |
| 58 | 11067 | Lotus Development Corporation, Interliant, Inc. | Interliant, Inc., Lotus Development Corporation | Industry | Business Services, Computers: Hardware and Software, Internet |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 59 | 11288 | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | MACROVISION CORPORATION, C-Dilla, Ltd., TTR TECHNOLOGIES, INC., TTR Technologies, Ltd. | Industry | Computers: Hardware and Software, Entertainment, Internet, Publishing, Business Services, Consumer Services, Consumer Durables |
| 60 | 24358 | INTERNATIONAL BUSINESS MACHINES CORPORATION, NEXX SYSTEMS, INC. | NEXX SYSTEMS, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION | Industry | Semiconductors, Computers: Hardware and Software |
| 61 | 25435 | LUCENT TECHNOLOGIES INC., mPHASE TECHNOLOGIES, INC. | mPHASE TECHNOLOGIES, INC., LUCENT TECHNOLOGIES INC. | Industry | Chemicals, Biotechnology, Telecommunications, Consumer Durables |
| 62 | 29957 | MOLECULAR VISION LIMITED, Professor Donal Bradley, Dr. John de Mello, Professor Andrew de Mello, Imperial Innovations Limited, ACRONGENOMICS, INC. | ACRONGENOMICS, INC., MOLECULAR VISION LIMITED, Professor Donal Bradley, Dr. John de Mello, Professor Andrew de Mello, Imperial Innovations Limited | Industry | Biotechnology, Healthcare: Products and Supplies, Computers: Hardware and Software |
| 63 | 29970 | Xinhua Finance Media Limited, Small World Television, LLC, SMALL WORLD PRODUCTIONS LIMITED | Small World Television, LLC, Xinhua Finance Media Limited, SMALL WORLD PRODUCTIONS LIMITED | Industry | Broadcast and Cable, Consumer Services, Internet, Business Services, Entertainment, Publishing, Telecommunications, Consumer Durables, Consumer Non Durables, Advertising |
| 64 | 29988 | INFOTEC BUSINESS SYSTEMS, INC., MMAWL.COM, WALLID ISMAIL, WALLID ISMAIL PROMOCOES E EVENTOS LTDA-EPP | INFOTEC BUSINESS SYSTEMS, INC., MMAWL.COM, WALLID ISMAIL, WALLID ISMAIL PROMOCOES E EVENTOS LTDA-EPP | Industry | Broadcast and Cable, Internet, Entertainment, Consumer Services, Business Services |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 65 | 35740 | Given Imaging Ltd., Ethicon Endo-Surgery, Inc., INSCOPE DIVISION | Ethicon Endo-Surgery, Inc., Given Imaging Ltd., INSCOPE DIVISION | Industry | Healthcare: Products and Supplies, Business Services, Computers: Hardware and Software |
| 66 | 41419 | Jeecom, Inc., Digital Video Systems, Inc., DV Systems, Inc. | Digital Video Systems, Inc., DV Systems, Inc., Jeecom, Inc. | Industry | Computers: Hardware and Software, Telecommunications, Consumer Durables |
| 67 | 41453 | Mars Electronics International, Inc., USA Technologies, Inc. | USA Technologies, Inc., Mars Electronics International, Inc. | Industry | Business Services, Computers: Hardware and Software, Financial Services, Retail, Restaurants, Consumer Services |
| 68 | 41454 | ZiLOG, Inc., USA Technologies, Inc. | USA Technologies, Inc., ZiLOG, Inc. | Industry | Semiconductors, Business Services, Financial Services, Internet, Retail, Computers: Hardware and Software |
| 69 | 47103 | Cisco Systems, Inc., Ambient Corporation | Ambient Corporation, Cisco Systems, Inc. | Industry | Business Services, Computers: Hardware and Software, Telecommunications, Electric Utilities, Internet |
| 70 | 47241 | NoMatterWare Inc., ACCPAC International, Inc. | ACCPAC International, Inc., NoMatterWare Inc. | Industry | Computers: Hardware and Software, Business Services, Internet |
| 71 | 47489 | MAX Internet Communications, Inc., maxpop.com, Inc. | maxpop.com, Inc., MAX Internet Communications, Inc. | Industry | Computers: Hardware and Software, Internet, Broadcast and Cable, Business Services |
| 72 | 12421 | Celgene Corporation, Novartis Pharma AG | Novartis Pharma AG, Celgene Corporation | Restruct* Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 73 | 10496 | Celgene Corporation, NOVARTIS PHARMA AG | NOVARTIS PHARMA AG, Celgene Corporation | Restruct* Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 74 | 70329 | Corgenix Medical Corporation, Financière Elitech SAS, Wescor, Inc. | Wescor, Inc., Financière Elitech SAS, Corgenix Medical Corporation | Restruct* Keyword | Biotechnology, Chemicals, Healthcare: Products and Supplies |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 75 | 43377 | HEWLETT-PACKARD COMPANY, INDIGO N.V. | INDIGO N.V., HEWLETT-PACKARD COMPANY | Restruct* Keyword | Computers: Hardware and Software, Industrial Equipment and Machinery, Consumer Durables, Publishing |
| 76 | 10333 | INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd., WESCOR INC., MICROCOR, INC. | MICROCOR, INC., WESCOR INC., INMEDICA DEVELOPMENT CORPORATION, CHI LIN TECHNOLOGY CO., LTD., Chi Lin Plastics Industrial Co., Ltd. | Restruct* Keyword | Biotechnology, Healthcare: Products and Supplies |
| 77 | 16389 | Acorda Therapeutics, Inc., Elan Pharma International Limited, Biogen Idec International GmbH, Biogen Idec, Inc., Elan Corporation plc | Biogen Idec International GmbH, Biogen Idec, Inc., Acorda Therapeutics, Inc., Elan Pharma International Limited, Elan Corporation plc | Restruct* Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 78 | 37819 | ADOLOR CORPORATION, GLAXO GROUP LIMITED | GLAXO GROUP LIMITED, ADOLOR CORPORATION | Restruct* Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 79 | 45837 | ArQule, Inc., Genome Therapeutics Corporation | Genome Therapeutics Corporation, ArQule, Inc. | Restruct* Keyword | Biotechnology, Chemicals, Healthcare: Pharmaceutical |
| 80 | 38029 | BRISTOL-MYERS SQUIBB COMPANY, CORGENTECH INC. | CORGENTECH INC., BRISTOL-MYERS SQUIBB COMPANY | Restruct* Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 81 | 45217 | ELI LILLY AND COMPANY, AMYLIN PHARMACEUTICALS, INC. | AMYLIN PHARMACEUTICALS, INC., ELI LILLY AND COMPANY | Restruct* Keyword | Healthcare: Pharmaceutical |
| 82 | 22390 | MICROBIA, INC., FOREST LABORATORIES, INC. | FOREST LABORATORIES, INC., MICROBIA, INC. | Restruct* Keyword | Healthcare: Pharmaceutical, Biotechnology, Healthcare: Products and Supplies |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 83 | 24289 | PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC., ALIMERA SCIENCES, INC. | ALIMERA SCIENCES, INC., PSIVIDA, INC., CONTROL DELIVERY SYSTEMS, INC. | Restruct* Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 84 | 16865 | SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC, NEW RIVER PHARMACEUTICALS INC., SHIRE PHARMACEUTICALS PLC | NEW RIVER PHARMACEUTICALS INC., SHIRE LLC, SHIRE PHARMACEUTICALS GROUP PLC, SHIRE PHARMACEUTICALS PLC | Restruct* Keyword | Healthcare: Pharmaceutical, Biotechnology, Chemicals |
| 85 | 26232 | Valeant Pharmaceuticals International, GlaxoSmithKline | GlaxoSmithKline, Valeant Pharmaceuticals International | Restruct* Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 86 | 70104 | VERENIUM CORPORATION, NOVUS INTERNATIONAL, INC. | NOVUS INTERNATIONAL, INC., VERENIUM CORPORATION | Restruct* Keyword | Agribusiness, Foods and Nonalcoholic Beverages, Healthcare: Pharmaceutical, Biotechnology, Consumer Non Durables, Chemicals |
| 87 | 1220 | DURECT CORPORATION, NYCOMED DANMARK APS | NYCOMED DANMARK APS, DURECT CORPORATION | Dev Plan Keyword | Healthcare: Pharmaceutical |
| 88 | 9029 | Optex Ophthalmologics, Inc., Bausch & Lomb Incorporated, Storz Instrument Company, Chiron Vision Corporation, Bausch & Lomb Surgical | Bausch & Lomb Surgical, Chiron Vision Corporation, Storz Instrument Company, Bausch & Lomb Incorporated, Optex Ophthalmologics, Inc. | Dev Plan Keyword | Healthcare: Products and Supplies, Biotechnology |
| 89 | 9037 | GPC Biotech AG, Pharmion GmbH, Pharmion Corporation | Pharmion GmbH, Pharmion Corporation, GPC Biotech AG | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 90 | 9046 | Axonyx Inc., Applied Research Systems ARS Holding N.V. | Applied Research Systems ARS Holding N.V., Axonyx Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 91 | 9346 | QLT Inc., Xenova Limited | Xenova Limited, QLT Inc | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 92 | 10530 | CRAUN RESEARCH SENDIRIAN BERHAD | MEDICHEM RESEARCH INC. | Dev Plan Keyword | Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Biotechnology |
| 93 | 11901 | Genentech, Inc., IDEC Pharmaceuticals Corporation, Scios Nova, Inc., F. Hoffmann-La Roche Ltd, Genentech Biopharmaceutical Limited, GENENTECH EUROPE LIMITED, GENENTECH INTERNATIONAL LIMITED | F. Hoffmann-La Roche Ltd, Genentech, Inc., IDEC Pharmaceuticals Corporation, Scios Nova, Inc., Genentech Biopharmaceutical Limited, GENENTECH EUROPE LIMITED, GENENTECH INTERNATIONAL LIMITED | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 94 | 13792 | AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC, REGENERON PHARMACEUTICALS, INC. | REGENERON PHARMACEUTICALS, INC., AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 95 | 15752 | Medicis Pharmaceutical Corporation, Impax Laboratories, Inc. | Impax Laboratories, Inc., Medicis Pharmaceutical Corporation | Dev Plan Keyword | Healthcare: Pharmaceutical |
| 96 | 16221 | Facet Biotech Corporation, Trubion Pharmaceuticals, Inc. | Trubion Pharmaceuticals, Inc., Facet Biotech Corporation | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 97 | 17096 | Human Genome Sciences, Inc., Novartis International Pharmaceutical Ltd. | Novartis International Pharmaceutical Ltd., Human Genome Sciences, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology, Healthcare: Products and Supplies |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 98 | 22168 | AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC, REGENERON PHARMACEUTICALS, INC. | REGENERON PHARMACEUTICALS, INC., AVENTIS PHARMACEUTICALS INC., SANOFI-AVENTIS AMERIQUE DU NORD, SANOFI-AVENTIS, sanofi-aventis US LLC | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 99 | 22443 | Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc., Coventry Acquisition, Inc. | Coventry Acquisition, Inc., Columbia Laboratories, Inc., Watson Pharmaceuticals, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Biotechnology |
| 100 | 22498 | Alexza Pharmaceuticals, Inc., Biovail Laboratories International SRL | Biovail Laboratories International SRL, Alexza Pharmaceuticals, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Biotechnology |
| 101 | 22572 | MEDIVATION, INC., ASTELLAS PHARMA INC., Medivation Prostate Therapeutics, Inc., Astellas US LLC, The Regents of the University of California | ASTELLAS PHARMA INC., MEDIVATION, INC., Medivation Prostate Therapeutics, Inc., Astellas US LLC, The Regents of the University of California | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 102 | 22716 | AUXILIUM PHARMACEUTICALS, INC., BioSpecifics Technologies Corp. | AUXILIUM PHARMACEUTICALS, INC., BioSpecifics Technologies Corp. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 103 | 22721 | Archemix Corp., Merck Serono, Merck KGaA | Merck Serono, Merck KGaA, Archemix Corp. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 104 | 23102 | Napo Pharmaceuticals, Inc., Salix Pharmaceuticals, Inc., University of Iowa Research Foundation | Salix Pharmaceuticals, Inc., Napo Pharmaceuticals, Inc., University of Iowa Research Foundation | Dev Plan Keyword | Foods and Nonalcoholic Beverages, Healthcare: Pharmaceutical, Biotechnology, Chemicals |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 105 | 23593 | ACADIA PHARMACEUTICALS INC., BIOVAIL LABORATORIES INTERNATIONAL SRL | BIOVAIL LABORATORIES INTERNATIONAL SRL, ACADIA PHARMACEUTICALS INC. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 106 | 23704 | BRISTOL-MYERS SQUIBB COMPANY, OTSUKA PHARMACEUTICAL CO., LTD. | OTSUKA PHARMACEUTICAL CO., LTD., BRISTOL-MYERS SQUIBB COMPANY | Dev Plan Keyword | Healthcare: Pharmaceutical |
| 107 | 25678 | ALKERMES CONTROLLED THERAPEUTICS INC. II, AMYLIN PHARMACEUTICALS, INC. | AMYLIN PHARMACEUTICALS, INC., ALKERMES CONTROLLED THERAPEUTICS INC. II | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 108 | 25920 | AMYRIS, INC., TOTAL GAS & POWER USA BIOTECH, INC. | TOTAL GAS & POWER USA BIOTECH, INC., AMYRIS, INC. | Dev Plan Keyword | Biotechnology, Oil and Gas, Chemicals, Industrial Equipment and Machinery, Consumer Non Durables, Foods and Nonalcoholic Beverages, Healthcare: Pharmaceutical, Alternative and Renewable Energy, Transportation Equipment and Parts |
| 109 | 26071 | Cornerstone BioPharma, Inc., NEOS Therapeutics, L.P., Coating Place, Inc. | Coating Place, Inc., NEOS Therapeutics, L.P., Cornerstone BioPharma, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 110 | 26072 | Neos Therapeutics, L.P., Cornerstone Biopharma, Inc. | Cornerstone Biopharma, Inc., Neos Therapeutics, L.P. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 111 | 26585 | IntelGenx Corp., Cary Pharmaceuticals Inc. | Cary Pharmaceuticals Inc., IntelGenx Corp. | Dev Plan Keyword | Healthcare: Pharmaceutical |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 112 | 27583 | WARATAH PHARMACEUTICALS INC., ELAN PHARMA INTERNATIONAL LIMITED | ELAN PHARMA INTERNATIONAL LIMITED, WARATAH PHARMACEUTICALS INC. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 113 | 28084 | Dyax Corp., Defiante Farmacêutica S.A. | Defiante Farmacêutica S.A., Dyax Corp. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 114 | 30018 | EXELIXIS, INC., GENENTECH, INC. | GENENTECH, INC., EXELIXIS, INC. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 115 | 31638 | Acura Pharmaceuticals, Inc., King Pharmaceuticals Research and Development, Inc., King Pharmaceuticals, Inc. | King Pharmaceuticals Research and Development, Inc., King Pharmaceuticals, Inc., Acura Pharmaceuticals, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical |
| 116 | 31943 | VALERA PHARMACEUTICALS, INC., ALPEX PHARMA S.A. | ALPEX PHARMA S.A., VALERA PHARMACEUTICALS, INC. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 117 | 35244 | ICAGEN, INC., McNeil Consumer & Specialty Pharmaceuticals Division of McNeil-PPC, Inc., Children's Medical Center Corporation | ICAGEN, INC., McNeil Consumer & Specialty Pharmaceuticals Division of McNeil-PPC, Inc., Children's Medical Center Corporation | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 118 | 35973 | VYTERIS, INC., B. BRAUN MEDICAL INC. | B. BRAUN MEDICAL INC., VYTERIS, INC. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology, Healthcare: Products and Supplies, Computers: Hardware and Software |
| 119 | 36480 | DMI BioSciences, Inc., Cogenco International, Inc. | Cogenco International, Inc., DMI BioSciences, Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 120 | 36715 | LEXICON GENETICS INCORPORATED, N.V. ORGANON | LEXICON GENETICS INCORPORATED, N.V. ORGANON | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 121 | 37885 | ALEXION PHARMACEUTICALS, INC., XOMA (US) LLC, Alexion Antibody Technologies, Inc. | XOMA (US) LLC, ALEXION PHARMACEUTICALS, INC., Alexion Antibody Technologies, Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 122 | 38280 | NORTEC DEVELOPMENT ASSOCIATES, INC., PAR PHARMACEUTICAL, INC. | PAR PHARMACEUTICAL, INC., NORTEC DEVELOPMENT ASSOCIATES, INC. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 123 | 42407 | DMI BioSciences, Inc., Enhance Lifesciences, Inc. | Enhance Lifesciences, Inc., DMI BioSciences, Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 124 | 42839 | GENENTECH, INC., TolerRx, Inc. | TolerRx, Inc., GENENTECH, INC. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology, Healthcare: Products and Supplies |
| 125 | 44305 | AMGEN INC., HYSEQ, INC., HYSEQ PHARMACEUTICALS | HYSEQ, INC., HYSEQ PHARMACEUTICALS, AMGEN INC. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 126 | 45827 | Third Wave Technologies, Inc., BML, Inc. | BML, Inc., Third Wave Technologies, Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Products and Supplies |
| 127 | 46156 | OSI Pharmaceuticals, Inc., Genentech, Inc. | Genentech, Inc., OSI Pharmaceuticals, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 128 | 46920 | Chiron Corporation, PathoGenesis Corporation | PathoGenesis Corporation, Chiron Corporation | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Chemicals |
| 129 | 49731 | Human Genome Sciences, Inc., Praecis Pharmaceuticals Incorporated | Praecis Pharmaceuticals Incorporated, Human Genome Sciences, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Biotechnology |
| 130 | 51583 | BIOSEARCH ITALIA, S.P.A., VERSICOR, INC. | BIOSEARCH ITALIA, S.P.A., VERSICOR, INC. | Dev Plan Keyword | Biotechnology, Chemicals, Healthcare: Pharmaceutical |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 131 | 51930 | Allergan USA, Inc., Allergan Sales, LLC, Allergan, Inc., Nektar Therapeutics UK Limited, MAP PHARMACEUTICALS, INC. | Allergan USA, Inc., Allergan Sales, LLC, Allergan, Inc., Nektar Therapeutics UK Limited, MAP PHARMACEUTICALS, INC. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology, Healthcare: Products and Supplies |
| 132 | 52087 | BioSpecifics Technologies Corp., Auxilium Pharmaceuticals, Inc. | Auxilium Pharmaceuticals, Inc., BioSpecifics Technologies Corp. | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology, Healthcare: Products and Supplies |
| 133 | 56655 | WARNER-LAMBERT COMPANY, PFIZER INC. | PFIZER INC., WARNER-LAMBERT COMPANY | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 134 | 57810 | ERGO Research Corporation, ERGO Science Corporation, The R.W. Johnson Pharmaceutical Research Institute, ORTHO PHARMACEUTICAL CORPORATION, ORTHO-McNEIL Pharmaceutical, Inc., Johnson & Johnson, Cilag AG International, CILAG A.G., INTERNATIONAL | ERGO Research Corporation, ERGO Science Corporation, The R.W. Johnson Pharmaceutical Research Institute, ORTHO PHARMACEUTICAL CORPORATION, ORTHO-McNEIL Pharmaceutical, Inc., Johnson & Johnson, Cilag AG International, CILAG A.G., INTERNATIONAL | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 135 | 59356 | Optex Ophthalmologics, Inc., Bausch & Lomb Incorporated, Storz Instrument Company, Chiron Vision Corporation, Bausch & Lomb Surgical | Bausch & Lomb Surgical, Chiron Vision Corporation, Storz Instrument Company, Bausch & Lomb Incorporated, Optex Ophthalmologics, Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Products and Supplies |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 136 | 62496 | ORTHO BIOTECH INC., CELL THERAPEUTICS, INC., THE R. W. JOHNSON PHARMACEUTICAL RESEARCH INSTITUTE, ORTHO PHARMACEUTICAL CORPORATION | ORTHO BIOTECH INC., CELL THERAPEUTICS, INC., THE R. W. JOHNSON PHARMACEUTICAL RESEARCH INSTITUTE, ORTHO PHARMACEUTICAL CORPORATION | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 137 | 64682 | Agouron Pharmaceuticals, Inc., F. Hoffmann-La Roche Ltd, Hoffmann-La Roche Inc. | Agouron Pharmaceuticals, Inc., F. Hoffmann-La Roche Ltd, Hoffmann-La Roche Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical, Chemicals, Biotechnology |
| 138 | 67133 | GERON CORPORATION, KYOWA HAKKO KOGYO CO., LTD. | KYOWA HAKKO KOGYO CO., LTD., GERON CORPORATION | Dev Plan Keyword | Healthcare: Pharmaceutical, Biotechnology |
| 139 | 68080 | Human Genome Sciences, Inc., Schering Corporation, Schering Plough Ltd., SmithKline Beecham Corporation, SmithKline Beecham, plc | SmithKline Beecham, plc, SmithKline Beecham Corporation, Schering Plough Ltd., Schering Corporation, Human Genome Sciences, Inc. | Dev Plan Keyword | Healthcare: Pharmaceutical |
| 140 | 69965 | Nymox Pharmaceutical Corporation, Recordati Ireland Ltd. | Recordati Ireland Ltd., Nymox Pharmaceutical Corporation | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 141 | 70368 | EXELIXIS, INC., EXELIXIS PATENT COMPANY, LLC., BRISTOL-MYERS SQUIBB COMPANY | BRISTOL-MYERS SQUIBB COMPANY, EXELIXIS, INC., EXELIXIS PATENT COMPANY, LLC. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 142 | 70603 | Cystic Fibrosis Foundation Therapeutics Incorporated, VERTEX PHARMACEUTICALS INCORPORATED | VERTEX PHARMACEUTICALS INCORPORATED, Cystic Fibrosis Foundation Therapeutics Incorporated | Dev Plan Keyword | Biotechnology, Chemicals, Healthcare: Pharmaceutical |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 143 | 70698 | BioSpecifics Technologies Corp., Auxilium Pharmaceuticals, Inc. | Auxilium Pharmaceuticals, Inc., BioSpecifics Technologies Corp. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 144 | 77982 | ChemoCentryx, Inc., Glaxo Group Limited | Glaxo Group Limited, ChemoCentryx, Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 145 | 77993 | CONMED Corporation, Musculoskeletal Transplant Foundation, Inc. | Musculoskeletal Transplant Foundation, Inc., CONMED Corporation | Dev Plan Keyword | Biotechnology, Healthcare: Products and Supplies, Business Services, Healthcare: Facilities, Entertainment |
| 146 | 78209 | Intrexon Corporation, Adeona Pharmaceuticals, Inc. | Adeona Pharmaceuticals, Inc., Intrexon Corporation | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 147 | 78506 | BAYER HEALTHCARE LLC, ONYX PHARMACEUTICALS, INC. | ONYX PHARMACEUTICALS, INC., BAYER HEALTHCARE LLC | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 148 | 78946 | CORONADO BIOSCIENCES, INC., OVAMED GMBH, Dr. FALK PHARMA GMBH | Dr. FALK PHARMA GMBH, OVAMED GMBH, CORONADO BIOSCIENCES, INC. | Dev Plan Keyword | Biotechnology, Chemicals, Healthcare: Pharmaceutical |
| 149 | 79470 | INTREXON CORPORATION, ORAGENICS, INC. | ORAGENICS, INC., INTREXON CORPORATION | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 150 | 80993 | PERF GO-GREEN HOLIDNGS, INC., PERFPOWER CORPORATION, CF Consulting, LLC, Bluefish Group, Inc., Boris Rubizhevsky, Michael Smatt, P.P.H.I. Inc., Jim Murray, Steve Stark, Perf Go-Green, Inc., Perf Go-Green Holdings, Inc. | Perf Go-Green Holdings, Inc., Perf Go-Green, Inc., Steve Stark, Jim Murray, P.P.H.I. Inc., Michael Smatt, Boris Rubizhevsky, Bluefish Group, Inc., CF Consulting, LLC, PERFPOWER CORPORATION, PERF GO-GREEN HOLIDNGS, INC. | Dev Plan Keyword | Chemicals, Consumer Durables, Business Services |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 151 | 81165 | KALOBIOS PHARMACEUTICALS, INC., SANOFI PASTEUR S.A. | SANOFI PASTEUR S.A., KALOBIOS PHARMACEUTICALS, INC. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 152 | 81220 | Intrexon Corporation, Synthetic Biologics, Inc. | Synthetic Biologics, Inc., Intrexon Corporation | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Chemicals |
| 153 | 100743 | Eisai Co., Ltd., Epizyme, Inc. | Epizyme, Inc., Eisai Co., Ltd. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies |
| 154 | 100768 | INTREXON CORPORATION, FIBROCELL SCIENCE, INC. | FIBROCELL SCIENCE, INC., INTREXON CORPORATION | Dev Plan Keyword | Biotechnology, Healthcare: Products and Supplies, Healthcare: Pharmaceutical, Chemicals |
| 155 | 100921 | Intrexon Corporation, Soligenix, Inc. | Soligenix, Inc., Intrexon Corporation | Dev Plan Keyword | Biotechnology, Chemicals, Healthcare: Pharmaceutical |
| 156 | 100989 | EnVivo Pharmaceuticals, Inc., MethylGene Inc. | MethylGene Inc., EnVivo Pharmaceuticals, Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |
| 157 | 101064 | ARADIGM CORPORATION, GRIFOLS, S.A. | GRIFOLS, S.A., ARADIGM CORPORATION | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Public Safety |
| 158 | 101648 | INTREXON CORPORATION, AQUABOUNTY TECHNOLOGIES, INC. | AQUABOUNTY TECHNOLOGIES, INC., INTREXON CORPORATION | Dev Plan Keyword | Agribusiness, Biotechnology, Foods and Nonalcoholic Beverages, Consumer Non Durables |
| 159 | 101652 | INTREXON CORPORATION, BIOLIFE CELL BANK, INC. | BIOLIFE CELL BANK, INC., INTREXON CORPORATION | Dev Plan Keyword | Biotechnology, Healthcare: Products and Supplies, Healthcare: Pharmaceutical |
| 160 | 101737 | Savicell Diagnostic Ltd., Ramot at Tel Aviv University Ltd. | Ramot at Tel Aviv University Ltd., Savicell Diagnostic Ltd. | Dev Plan Keyword | Biotechnology, Healthcare: Products and Supplies |
| 161 | 101786 | AMGEN INC., CELLTECH R & D LIMITED | CELLTECH R & D LIMITED, AMGEN INC. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical |

| # | Agreement ID | Party 1 | Party 2 | Search | Industry (ktMINE Classification) |
|---|---|---|---|---|---|
| 162 | 101813 | Array BioPharma Inc., Oncothyreon Inc. | Oncothyreon Inc., Array BioPharma Inc. | Dev Plan Keyword | Biotechnology, Healthcare: Pharmaceutical, Healthcare: Products and Supplies, Chemicals |

**Timothy Reichert – Rule 26(a)(2)(B)(ii)**

The facts or data considered by the witness in forming them

# I.    Productions in the Litigation

| # | DocID | Deposition Exhibit (if applicable) |
|---|-------|-----------------------------------|
| 1. | EMEAPROD1030028 | 11086 |
| 2. | EMEAPROD1030029 | 11086 |
| 3. | EMEAPROD1647068 | 31473 |
| 4. | HORSTFRISCH0005421 | - |
| 5. | HORSTFRISCH0006921 | - |
| 6. | NNC-NNL06136852 | - |
| 7. | NNC-NNL06136853 | - |
| 8. | NNC-NNL06136855 | - |
| 9. | NNC-NNL06136857 | - |
| 10. | NNC-NNL06136860 | - |
| 11. | NNC-NNL06136861 | - |
| 12. | NNC-NNL06136864 | - |
| 13. | NNC-NNL06136866 | - |
| 14. | NNC-NNL06136868 | - |
| 15. | NNC-NNL06136870 | - |
| 16. | NNC-NNL06136872 | - |
| 17. | NNC-NNL06136875 | - |
| 18. | NNC-NNL06136877 | - |
| 19. | NNC-NNL089532 | - |
| 20. | NOR_53648323 | - |
| 21. | NOR_53648508 | - |
| 22. | NOR_54407140.001 | - |

| # | DocID | Deposition Exhibit (if applicable) |
|---|---|---|
| 23. | NNC-NNL08002254 | - |
| 24. | NNC-NNL06001552 | - |
| 25. | NNC-NNL06155163 | - |
| 26. | NNC-NNL07537052 | - |
| 27. | NNC-NNL11148879 | 21401 |
| 28. | NNC-NNL016069 | 11074 |
| 29. | NNC-NNL016070 | 11074 |
| 30. | NNC-NNL016084 | 11074 |
| 31. | NNC-NNL016097 | 11074 |
| 32. | EMEAPRIV0190713 | 31103 |
| 33. | NNI_00494472 | - |
| 34. | EMEAPROD2238127 | - |
| 35. | NNC-NNL06135005 | - |
| 36. | NNI_00794076 | 31206 |
| 37. | NNC-NNL094173 | |
| 38. | EMEAPRIV0109823 | - |
| 39. | NNC-NNL06719185 | - |
| 40. | NNC-NNL10119509 | - |
| 41. | NNC-NNL06001514 | 21003 |
| 42. | EMEAPROD0002337 | - |
| 43. | NNC-NNL089532 | - |
| 44. | NNC-NNL016088 | - |
| 45. | NOR_54402905.116 | - |
| 46. | NOR_54402905.117 | - |
| 47. | NOR_54402905.118 | - |
| 48. | NOR_54402905.119 | - |
| 49. | NOR-CAN00033507 | 21301 |
| 50. | PC0184853 | 22078 |

| # | DocID | Deposition Exhibit (if applicable) |
|---|---|---|
| 51. | NNI_01015300 | - |
| 52. | NNC-NNL002707 | 21080 |
| 53. | EMEAPROD06029849 | - |
| 54. | PLD00000208 | 31466 |
| 55. | NNI_00010875 | - |
| 56. | EMEAPROD02318031 | - |
| 57. | NNC-NNL11029235 | - |
| 58. | NNI_00794081 | - |
| 59. | NNC-NNL016070 | - |
| 60. | NNC-NNL061995 | 11237 |

In addition to the above listed documents, which, to my knowledge, were not reviewed by the other TP Experts, I was also provided with copies of all documents cited by Drs. Cooper, Felgran, and Eden, in their respective reports dated on or about January 24, 2014.

## II.    Deposition Transcripts

Deposition of Alan Bifield, Nov. 25, 2013.

Deposition of Peter Currie, Oct. 15, 2013.

Deposition of Wally Henderson, Oct. 4, 2013.

Deposition of Karina O., Nov. 9, 2013.

Deposition of Kerry Stephens, Nov. 8, 2013.

Deposition of Mark Weisz, Nov. 25, 2013.

## III.   External Resources

### A.   Legislation, Regulations, and Court Cases

#### 1.   United States Transfer Pricing Regulations

Internal Revenue Code of 1986, Title 26A, Chapter 1E, Part III, Section 482.

Treasury Regulation (Title 26, Code of Federal Regulations) §1.482.

#### 2.   Court Cases

*Xilinx, Inc. and Consolidated Subsidiaries v. Commissioner of Internal Revenue* 125 TC 37 (2005); affirmed 598 F.3d 1191 (9th Cir. 2010).

### B.   Secondary Sources

#### 1.   Academic and Research References

Eden, Lorraine.  "Went for cost, priced at cost? An economic approach to the transfer pricing of offshored business services," in *Transnational Corporations* 14, no. 2 (August 2005): 1-52.

Felgran, Steven D., Steven D. Harris, Julie R. Briks, and Cherlie Lehman.  "Treatment of Restructuring Expenses in the Application of the CPM," 15 Transfer Pricing Report 755, *Bureau of National Affairs* (February 21, 2007).

Greene, William H. *Econometric Analysis*.  2nd ed. New Jersey: Prentice Hall, 1993.

Internal Revenue Service.  "2003 APA Statutory Report (Announcement 2004-24)."  March 30, 2004.  Advance Pricing Agreement Program.  Accessed February 28, 2014. http://www.irs.gov/pub/irs-utl/apa03.pdf

Internal Revenue Service.  "Announcement and Report Concerning Advance Pricing Agreements."  Advance Pricing and Mutual Agreement.  March 25, 2013.  Accessed February 28, 2014. http://www.irs.gov/pub/irs-drop/a-13-17.pdf

Organization for Economic Cooperation and Development.  *OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations*.  Organization for Economic Cooperation and Development, July 1995.  ("1995 OECD Guidelines")

Organization for Economic Cooperation and Development.  *OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations*.  Organization for Economic Cooperation and Development, July 22, 2010.  ("2010 OECD Guidelines")

Organization for Economic Cooperation and Development.  "Revised Discussion Draft on Transfer Pricing Aspects of Intangibles."  Organization for Economic Cooperation and Development, July 30, 2013.

Foundry Networks LLC.  (2008).  *United States Securities and Exchange Commission form 10-K.* Retrieved from the Capital IQ™ database: <u>https://www.capitaliq.com/home.aspx</u>

**2.    Databases**

Capital IQ.  "Company business descriptions and financial information."  Standard & Poor's. Retrieved February 2014 from <u>https://www.capitaliq.com/</u>

ktMINE.  "Intangible Property Licensing Agreements."  Retrieved February 2014 from <u>http://www.ktmine.com/</u>

Orbis.  "Company business descriptions and financial information."  Bureau van Dijk. Retrieved February 2014 from <u>http://orbis.bvdinfo.com</u>