**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

**EXPERT REPLY OF SHELDON BURSHTEIN
TO REBUTTAL REPORTS OF
DANIEL R. BERESKIN QC AND BRUCE W. STRATTON**

**March 24, 2014**

# PUBLICALLY FILED VERSION

---

[1]   The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

Court File No. 09-CL-7950

# ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

- and-

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **NORTEL NETWORKS INC., et al.,** | Case No. 09-10138 (KG) |
| **Debtors.** | (Jointly Administered) |

## EXPERT REPLY OF SHELDON BURSHTEIN
## TO REBUTTAL REPORTS OF
## DANIEL R. BERESKIN QC AND BRUCE W. STRATTON

(Submitted by the Monitor)

March 24, 2014

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY
CONFIDENTIAL UNDER THE PROTECTIVE ORDER.  THEREFORE, THIS
REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

## A.   INTRODUCTION

1.   **Retainer.**   I have been retained by Goodmans LLP, counsel to Ernst & Young Inc. ("**E&Y**"), in its capacity as the Monitor for Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

2.   **Mandate.**   I have been retained to review, and provide comments in reply to, the following rebuttal reports:

> (i)   the "Expert Rebuttal Report of Daniel B. Bereskin QC submitted by the United States Debtors" (the "**Bereskin Report**"); and

> (ii)   the "Rebuttal Expert Report of Bruce W. Stratton for the United Kingdom Pension Claimants" (the "**Stratton Report**") (collectively, the "**Reports**").

3.   **Documents Reviewed.**   In preparing this report, I have reviewed the documents listed in Schedule **"A,"** including the Master Research & Development Agreement, dated December 22, 2004 and effective as of January 1, 2001, as amended, (the "**MRDA**") and the other documents referenced herein.

4.   **Compensation.**   My firm is being compensated in this matter at my current regular rate of CAD 950 per hour.   I have been assisted in some legal research activities by Christie Zhou, whose regular rate is CAD 410 per hour and have had the benefit of some comments from Anthony Prenol, whose regular rate is 815 CAD per hour.   Both Ms Zhou and Mr. Prenol are lawyers in my firm.   My firm's compensation is not related in any way to the outcome of this matter.

5.   **Prior Expert Reports.**   I have provided expert reports on Canadian law in an arbitration and in United States legal proceedings but have not testified as an expert.   I have not provided an expert report in the preceding four years except for two reports relating to copyright law in one case, *Corbello v. Devitto*, no. 2:08-cv-00867-RCJ-PAL in the United States District Court for the District of Nevada.   I did not testify in that case.

6.   **Contact Information**.   My contact information is set out in Schedule **"B".**

## B.   STRUCTURE OF REPORT AND KEY CONCLUSIONS

7.   **Structure of Report.**   In this report:

> (i)   Section C sets out my qualifications;

> (ii)   Section D provides some background on licensing law;

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

(iii)    Section E interprets the grant clause in the MRDA;

(iv)    Section F considers other provisions in the MRDA discussed in the Reports;

(v)    Section G addresses some of the comments in the Bereskin Report;

(vi)    Section H addresses some of the comments in the Stratton Report; and

(vii)    this Section B summarizes my conclusions.

8.    **Limited License.**   For the reasons discussed below, on the basis of my review of the MRDA and the other documents referenced, it is my view that the MRDA, properly interpreted under Ontario law, grants a *limited field of use* license of the intellectual property ("IP") rights ("**IPRs**") of the licensor to each Licensed Participant, exclusive for one country and non-exclusive for other countries.  The scope of the license was specifically limited both by the terms of the grant in Article 5(a) and its reference to the definition of "Products".

9.    **Scope of Grant.**   For the reasons discussed below, on the basis of my review of the MRDA and the other documents referenced, it is my view that the license in the MRDA, properly interpreted under Ontario law, only to: (i) manufacture and engage in commercial activities with the Products that use or embody NN Technology, but only with such Products; and (ii) exercise the licensor's IPRs as necessary or appropriate in connection with the activities relating to the Products permitted in (i), again only with such Products.   The definition of Products is specifically limited.   No other right is licensed to the Licensed Participants by the MRDA.

10.    **No Other Provision in MRDA Impacts Limitations of License.**   For the reasons discussed below, on the basis of my review of the MRDA and the other documents referenced, it is my view that none of the following provisions in the MRDA discussed in the Reports, namely: (i) the reference in a recital to "equitable and beneficial ownership of certain exclusive licensed rights"; (ii) the contractual permission of the Licensed Participants to assert rights against third parties; or (iii) the right of the Licensed Participants to sublicense; impacts the language of the MRDA's limited license grant.   More specifically, the MRDA does not convey any ownership interest in the licensed rights to the Licensed Participants.   The right of assertion clause in the MRDA does not operate to broaden the grant of rights to the Licensed Participants.   The right of the Licensed Participants to sublicense their rights does not effectively amount to the right to transfer those rights.   In summary, none of the provisions discussed in the Reports impacts the scope of the grant of the license in Article 5(a) of the MRDA.

11.    **Disagreement with Reports.**   For the reasons discussed below, on the basis of my review of the MRDA and the other documents referenced, other than in respect of the minor points noted below, I do not agree with any of the major conclusions of the Bereskin Report or

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

the Stratton Report as they relate to the interpretation of the MRDA, including the scope of the grant clause.

12.     **Licensor in MRDA Held Significant Residual Rights.**   For the reasons discussed below, on the basis of my review of the MRDA and the other documents referenced, it is my view that under the MRDA, properly interpreted under Ontario law, the licensor in the MRDA has significant residual rights in its IPRs to exploit or to license others to exploit.

## C.     QUALIFICATIONS

13.     **Certified Specialist.**  I am a lawyer qualified in the Province of Ontario.  I am certified by The Law Society of Upper Canada in three disciplines as a Specialist (CS) in Intellectual Property (Patent, Trade-mark and Copyright) Law.

14.     **Professional Education.**  I received a B. (Civ.) Eng. (1974) from McGill University, in Montreal, Quebec.  I also earned my two law degrees, a civil law B.C.L. (1977) and a common law LL.B. (1978), from McGill University.

15.     **Other Professional Qualifications.**  I am a registered professional engineer in the Province of Ontario.  I am also registered as a patent agent and as a trade-mark agent in Canada. In addition, I am registered to practise before the United States Patent and Trademark Office ("**USPTO**") on behalf of Canadian applicants.   I am accredited as a Certified Licensing Professional ("**CLP**").

16.     **Firms.**  I am a partner, and practise in the Intellectual Property and Technology Groups, of Blake, Cassels & Graydon LLP, Barristers & Solicitors and Patent and Trade-mark Agents ("**Blakes**").  I articled at Blakes in 1978-79 and then, after qualification as a lawyer in 1980, practised with the sister IP firms Ridout & Maybee, Patent and Trade-mark Agents, and Hayhurst, Dale and Deeth, Barristers and Solicitors, from 1980 to 1986.  I was a partner of Hayhurst, Dale & Deeth when I returned to Blakes, where I have practised continuously from 1986 until now.

17.     **Scope of Practice**.  I practise exclusively in the fields of IP and technology.  My practice includes the clearance, prosecution, acquisition, commercialization and enforcement of patents, trade-marks, copyright, industrial designs and other forms of IP.  I am significantly involved in counselling on IP as well as electronic commerce and social media issues.

18.     **Licensing Focus.**    My practice particularly emphasizes commercial transactions involving IP and technology, such as the licensing of all types of IP and technology transfer in numerous industries.  Over the course of my career, I have reviewed, advised on, structured, drafted, commented on, negotiated, interpreted or disputed well over a thousand license and technology transfer agreements.  The majority of these agreements have involved parties both

3

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.**
**THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

within Canada and abroad, the foreign parties most often based in the United States.  Some of these agreements have been between or among affiliated companies.  A number of these agreements related to, or my involvement with them has been in the context of, merger and acquisition transactions.  I have also worked with several of my tax partners in matters relating to cross-border IP agreements which have involved transfer pricing taxation issues.

19.    **Professional Organizations**.  I am a member  of many professional organizations in the legal, intellectual property and engineering fields and have chaired and sat on numerous committees in organizations such as the American Bar Association, the Canadian Bar Association, the Intellectual Property Institute of Canada, the International Association for the Protection of Industrial Property, the International Trademark Association and the Licensing Executives Society.  I am a past chair of the Toronto Intellectual Property Group.  I also sat as a member of a committee which drafted provisions that are currently in the Canadian *Copyright Act*.  A list of my organization memberships and the committees on which I currently sit, or have sat, is set out in **Schedule "C".**

20.    **Peer Recognition**.  I have been recognized in just about every domestic and international peer surveys relating to IP and licensing and many surveys relating to technology law.  By way of examples, I have been selected in the following surveys, among others, in most cases continuously since inception of the survey:

- American Lawyer Media/Martindale-Hubbell: *Canada's Top Rated Lawyers*;

- *The Best Lawyers in Canada* (IP Law and Technology Law);

- *The Canadian Legal Lexpert Directory* (IP, Technology Transactions, and Computer & IT Law);

- Chambers Global: *The World's Leading Lawyers for Business* (IP and Information Technology);

- European Counsel Life Sciences Specialist 500: *Top-Ranking Life Sciences Lawyers Worldwide*;

- *IAM Licensing 250: The World's Leading Patent & Technology Licensing Lawyers* (I have been referred to as "the go to guy for licensing in Canada" who "can handle all areas of technology");

- *IAM Patent 1000: The World's Leading Patent Practitioners* (the most recent survey said that my "patent licensing nous is second to none" in Canada and identified me as the leading patent licensing lawyer in Canada);

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

- Law Business Research: *The International Who's Who of Internet, e-Commerce and Data Protection Lawyers*;

- Law Business Research: *The International Who's Who of Patent Lawyers* (I have been recognized as "the most frequently named Canadian patent lawyer");

- Law Business Research: *The International Who's Who of Trade Mark Lawyers* (I have been selected among the top 10 trade-mark lawyers in the world on several occasions);

- Leaders League: *Innovation – Technology and Intellectual Property* (Trade-marks);

- *The Lexpert/American Lawyer Guide to the Leading 500 Lawyers in Canada* (Computer & IT Law, IP; and Technology Transactions);

- Managing Intellectual Property: *World's Leading Copyright Experts* (I have been recognized as "the foremost copyright expert in Canada");

- Managing Intellectual Property: *World's Leading Patent Experts*;

- Managing Intellectual Property: *World's Leading Trade Mark Experts* (I have been selected one of the "Worldwide Leading 25 Trade-mark Experts" on multiple occasions);

- Mondaq: *The World's Leading Intellectual Property Lawyers*;

- PLC: *Cross-Border Handbook* (IP, Life Sciences and Telecom, Media & Technology; I have been recognized as the leading commercial IP lawyer in Canada);

- *Who's Who Legal* (Patents and Trade-marks); and

- *WTR 1000: The World's Leading Trademark Professionals* (I have been named an "Expert's Expert").

21. **Awards.**  I have received several awards relating to IP, including the following:

- the Marie F. Morency Memorial Prize awarded by the Intellectual Property Institute of Canada (then titled the Patent and Trademark Institute of Canada) for the highest national standing in the patent agents drafting examination;

- a Special Recognition of Achievement Award from the Intellectual Property Institute of Canada;

- an Achievement Award from the Licensing Executives Society USA/Canada;

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

- the designation of "Intellectual Property Luminary" by the publishers of *Patent World*, *Trademark World* and *Copyright World*; and

- identification as a "Personality in Canadian Technology".

22.    **Books**.  I have authored several books on Canadian IP law:

- *The Corporate Counsel Guide to Intellectual Property Law* (Canada Law Book);

- *Patent Your Own Invention* (International Self Counsel Press); and

- a three-volume treatise on *The Law of Domain Names and Trade-Marks on the Internet* (Carswell).

I have also co-authored a book on international trade-mark law, *The Use of Another's Trademark* (International Trademark Association).

23.    **Chapters in Books.**  I have contributed chapters to numerous domestic and international books on IP, licensing and technology law, including chapters on licensing, trade-marks, copyright, domain names, other types of IP, merchandising, IP in commercial transactions, IP due diligence, electronic commerce, IP disputes, as well as precedents and pleadings.  A list of these contributions is set out in **Schedule "D".**

24.    **Articles and Papers.**  I have authored hundreds of articles and papers on IP and technology, including many on licensing, law.  I have also authored regular columns in various publications, including a current column on "Licensing Fundamentals", initially in *World Licensing Law Report* and now in its successor *World Intellectual Property Report*.  A list of my publications dated after February, 2004 is also set out in **Schedule "D".**

25.    **Editorial Boards**.  I have been a member of numerous editorial boards of prominent IP, licensing and technology publications.  I am currently a member of the editorial boards of the following publications:

- *Intellectual Property*;

- *The Licensing Journal*; and

- *The Trademark Reporter*.

I have also been a member of the editorial boards of the following publications:

- *Corporate Brief*;

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

- *E-Commerce Law Journal*;

- *Laws of .Com*;

- *Multimedia & Technology Licensing Law Report*;

- *Patent World*;

- *The Intellectual Property Strategist*;

- *The IP Litigator*;

- *The Merchandising Reporter*;

- *The Y2K Advisor*;

- *World Copyright Law Report*;

- *World Internet Law Report*;

- *World Licensing Law Report*;

- *World Media Law Report*; and

- *World Trademark Review*.

26.    **Academic Activities and Other Presentations.**    I annually teach at two McGill University/Intellectual Property Institute of Canada courses, one on trade-marks and the other on copyright.  I have taught in the Osgoode Hall Law School E-commerce LL.M. Program and have lectured in the Osgoode Hall Intellectual Property LL.M. Program and the Osgoode Hall Intensive Program in Business Law.  I also regularly teach, with a former partner, a two-day intensive course on structuring, drafting and negotiating license agreements at The Canadian Institute.  In addition, I have presented on several hundred occasions on matters relating to IP, licensing and technology law.  A list of these presentations after February 29, 2004 is included in the list set out in **Schedule "D".**

## D.    A LICENSING PRIMER

27.    **Licensing Fundamentals**.  In this Section D, I set out some fundamentals of licensing to provide context for subsequent comments in this Report.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

## D.1    Licensing Basics

28.    **Terminology.**  For clarity, in this report, I refer to '**intellectual property**" or "**IP**" to mean inventions, designs, works, trade-marks, know-how and other assets that are generated by the creative and other efforts.  In contrast, I refer to an "**intellectual property right**" or "**IPR**" to refer to the legal right which arises, or is granted, under law to enable the owner of the right to exclude others from exploiting the IP without permission.

29.    **Intellectual Property Exclusionary**.   An IPR, whether granted, like a patent or industrial design registration, or arising automatically by law, like copyright, is exclusionary.  In the case of know-how, an IPR protects against misappropriation.  An IPR is a right to exclude others from exploiting the IP in ways conferred by statute or under applicable law that is the subject of the IPR.  An IPR does not confer on the owner of an IPR the right to exploit the subject IP without licenses from the owners any of other IPRs that may cover the IP.

30.    **Example of Exclusionary Right**.  For example, a patent (the IPR) for a chair (the IP) claiming "a seat, four legs and a back" would enable the owner of the patent, the patentee, to restrain the manufacture, use or sale by others of a chair with a seat, four or more legs, a back, arms and casters on the legs.  This is because the manufacturer's chair includes a seat, four legs and a back.  However, the patentee would not be permitted to make, use or sell a chair with a seat, four legs and a back if a prior unexpired patent of another person claimed "a seat and three legs" because the patentee's chair includes the elements of the prior patent for a stool, namely a seat and three legs.  To make, use or sell its chair, the patentee would need permission, commonly referred to as a "**license**", from the patentee of the stool.  The manufacturer of the chair with casters would also infringe the earlier patent for the stool so it would need licenses under both patents.

31.    **License**.  A license is a permission granted by the owner of an IPR, the licensor, to another, the licensee, to exploit the IP that is the subject of the IPR free from legal recourse by the owner.  A license permits a licensee to do acts with the IP that it would otherwise be prohibited from doing by enforcement of the IPR by the licensor.  A license is merely a covenant by the owner of an IPR not to sue the licensee for activity with the IP that would, but for the license, violate the IPR of the owner.  A license from the owner of an IPR does not eliminate the need for the licensee to obtain a license from the owners of any other relevant IPRs that cover the exploitation of the IP.  A person who owns an IPR does not need a license under its own IPR.

32.    **Activity of Licensee.**  When the activity of a licensee with IP falls within the scope of an IPR licensed to the licensee, the license is a defence to a claim for infringement or other violation of the licensed IPR.  When the activity of a licensee falls within the scope of that IPR, but is outside the scope of the rights granted to the licensee, the licensee may be liable for infringement

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

or other violation of the IPR and, depending on the terms of the license agreement, possibly also breach of the license agreement.

33.  **License is Contract**.  A license of an IPR is a contractual relationship.  In the Province of Ontario, a license is governed by the common law of contract.  A license is interpreted like any other agreement.[1]  A license agreement may be personal to the licensee because the licensor is entitled to select to whom it grants a license and, like other contracts that are personal, may therefore not be inherently assignable or sublicenseable by the licensee without the consent of the licensor.[2]

## D.2    Grant of Rights

34.  **Grant**.  A grant of an IPR under a license may take a multitude of forms and does not always fall neatly into one of a predetermined group of categories.  While some terms have become broadly accepted as categorizing certain types of license grants, such as "non-exclusive", "sole" and "exclusive", one must always consider these terms in the context of the language of the particular license agreement in which such a term is used.

35.  **Non-exclusive License**.  In a "non-exclusive license", the licensor is not contractually restricted from licensing another person to exploit the IP that is the subject of the licensed IPR or doing so itself.  There may be multiple licensees who may have to compete in the marketplace with each other and the licensor.

36.  **Sole License**.  In a "sole license", the licensor is contractually restricted from granting to another person a license of the IPR within the scope of the license but the licensor is not contractually precluded from also exploiting the IP that is the subject of the IPR that is covered by the license.  The restriction on the licensor granting rights to others is limited to the scope of the rights granted by the sole license.

37.  **Exclusive License**.  In an "exclusive license", the licensor is contractually restricted from granting to another person a license of the IPR within the scope of the license, and the licensor is also contractually restricted from exploiting the IP that is the subject of the IPR that is covered by the license.  The restriction on the licensor's exploitation of, or ability to permit others to exploit, the IP is limited to the rights granted by the exclusive license.  The licensor may itself exploit, and grant to others a right to exploit, any IP that is not protected by the IPR that is within the scope of the rights granted to the exclusive licensee.  For example, if a patent owner grants an exclusive license to make, use and sell a patented invention only for use in automotive vehicles, the licensor may not make, use, or sell the invention for use in automotive vehicles but the

---

[1]    *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265.
[2]    *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

licensor may make, use or sell the patented invention for all other uses, including use in aircraft or nautical vessels, or may license others to do so.

38.     **Terms Can be Misleading**.  The use of terms like "exclusive" or "sole" is not always determinative.  One must consider the language of a license agreement to determine the true nature of the grant of rights.  An example of a situation where a license is expressed as a "sole" license but is really not occurs where the licensor excepts a prior license for, or reserves a right to grant another person, the same rights.  Similarly, an example of a situation where a license is expressed as an "exclusive" license but is really not occurs where the licensor excepts a prior license for, reserves a right to exploit, or reserves a right to grant to another person a right to exploit, the same rights.  These examples illustrate that, although some terms or approaches are broadly accepted, the actual language of a license agreement must be examined to identify exactly what has actually been licensed pursuant to the language of the grant.  Therefore, although a license may be expressed to be exclusive, one must examine the language of the grant to determine exactly what is subject to exclusivity.

### D.3     License Not Property Right

39.     **License Not Property in IPR**.  A license of an IPR is independent from the property in the IPR. A license does not constitute, or provide to the licensee, a legal or beneficial property interest in the IPR.  A license is nothing more than a permission to perform an activity with IP that would otherwise be contrary to the rights in the IPR for that IP.  In the case of an exclusive license there is also a covenant by the licensor not to engage in the activities licensed exclusively to the licensee.  A license has often been described as a promise by the licensor not to sue the licensee under the IPR for activity by the licensee with the IP that is the subject of the IPR.

40.     **Exclusive License Not Property in IPR**.  Even an exclusive license is not akin to an assignment of the IPR that is the subject of the license.  This fundamental principle was stated in the English decision *Heap v Hartley*, where Lord Justice Cotton said:[3]

> An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing.

*Heap v. Hartley* has been adopted and followed on multiple occasions by Canadian courts,[4] including the Supreme Court of Canada.[5] *Heap v Hartley* has also been applied in proceedings

---

[3]     (1889) 42 Ch.D. 461, at page 470.
[4]     For example, *Merck & Co. Inc. v. Apotex Inc.,* 2010 FC 1265.
[5]     *Electric Chain Company of Canada Limited v. Art Metal Works Inc.*, [1933] S.C.R. 581; and *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

under the *Companies' Creditors Arrangement Act*[6] and other insolvency proceedings,[7] where the courts have said that an exclusive license confers on an exclusive licensee no interest or property in the licensed IP.  An exclusive licensee does not  receive or enjoy property rights in the IPR.[8] It merely has a contractual promise from the licensor: (i) not to enforce the IPR against the licensee, to the extent that the licensee exploits the subject IP within the scope of the license; and (ii) not to exploit the IP, or license the IPR to another person to exploit the IP, within the scope of the IPR granted in the license.

41.     **Contractual Beneficial Interest.**  It is sometimes said, as the Stratton Report does in Paragraphs 28 and 29, that an exclusive licensee has a "beneficial interest" or an "equitable right" in the licensed IPR.  Under the law of Ontario, this type of interest is contractual.  It does not give to the licensee any of the ownership rights of the owner of the IPR.  It only provides the licensee with immunity from suit and the covenant of the owner of the IPR not to exploit rights in the underlying IP or permit anyone else to do so.  The distinction is perhaps best illustrated by the fact that, upon termination of a license of an IPR, all of the licensee's rights to exploit the underlying IP cease.  The "equitable" right is the right of the licensee to enforce its contractual rights against the licensor.  The reference to "beneficial" recognizes that the licensee may exploit the underlying IP free from intervention by the licensor or other licensees (although, as noted above, not free from other applicable IPRs).  However, use of the term "beneficial" does not derogate from the fact that the interest is contractual.

42.      **Supreme Court of Canada View.**  The Supreme Court of Canada confirmed this view in *Eli Lilly & Co. v. Novopharm Ltd*., in the context of a case relating to sublicensing.[9]

> To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed. 1969), the concept is expressed as follows (at p. 285):
>
>> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. <u>A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an</u>

---

[6]     *Re T. Eaton Co*., [1999] O.J. No. 4216 (Ont. S. C. J. (Commercial List)).

[7]     *Royal Bank v. Body Blue Inc.,* (2008), 42 C.B.R. (5th) 125 (Ont. S. C. J. (Commercial List)).

[8]     *Eli Lilly & Co. v. Novopharm Ltd*., [1998] 2 S.C.R. 129.

[9]     *Eli Lilly & Co. v. Novopharm Ltd*., [1998] 2 S.C.R. 129, para. 49.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added by Court.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis à vis* the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

43.    **No Right Against Others.**  A license does not create any rights between the licensee and third parties, although some IP statutes provide that a licensee may enforce the licensed IPR rights against a third party who infringes or otherwise violates such licensed rights.[10]  Some IP statutes, or judicial interpretations of them, limit the rights of enforcement of a licensee in the licensed IP rights.

## D.4    Limitations to Grant

44.    **Limitations to Licensed Rights**.  The scope of the IPR under a license is limited to, and qualified by, the express terms of the license agreement.  As was said by the Supreme Court of Canada:[11]

The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

45.    **Multitude of Limitations**.  There is a multitude of ways in which rights in a particular IPR may be limited and split in a license, so that rights in such IPR may be reserved by the owner of the IPR and/or granted to one or more other persons.  Even a sole license or an exclusive license may be limited.  The most common ways, among numerous others, in which licensed rights in an IPR may be split are by time, territory, location, rights and field of use.

46.    **Time Limitation**.  As an example of a term limitation, a license may be granted for a fixed term which is less than the full term of protection of the IPR.

47.    **Territorial Limitation**.  As an example of a territorial limitation, a master franchise license of IPRs may be granted for only one province or one region in Canada.

48.    **Location Limitation**.  An example of a location limitation is a license to use a patented process only at a single manufacturing location.

---

[10]    See the discussion below.

[11]    *Eli Lilly & Co. v. Novopharm Ltd*., [1998] 2 S.C.R. 129, at para. 49.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

49.     **Rights Limitation**.  As an example of a rights limitation, the owner of copyright in a musical work may license different rights comprised within the bundle of rights in copyright to different persons or collectives, each licensee being permitted only to exploit the specific licensed right in the work, such as the right to record or the right to perform, and the licensor may even retain certain rights.  An example of a rights limitation in a patent license is where a patent has claims covering a product and a method.  The product claims may be licensed while the method claims may not be.

50.     **Field of Use Limitations**.  There is also a multitude of ways to limit license rights by field of use.  The most common types of field of use limitations are based on activities, products, industries and channels.  The following are examples of such field of use limitations in a license.

51.     **Activity Limitation**.  As an example of an activity limitation, the owner of a patent may grant a license to a person to make and use an invention for research purposes only but not to make or use a product or method embodying the invention for commercial purposes or to market or sell the product or method.

52.     **Product Limitation**.  As an example of a product limitation, the owner of a patent may grant an exclusive license to a person to make, use and sell a patented invention only for use in automotive radios, while retaining all other rights, so that it may make, use or sell the patented invention for use in all other products, including televisions, computers as well as aircraft and nautical vessel radios, or license others to do so.

53.     **Industry Limitation**.   As an example of an industry limitation, consider a pharmaceutical company whose business is entirely limited to pharmaceuticals for animals and is not at all involved in the human pharmaceutical market.  It may license a patent, or specific claims in a patent, to a manufacturer and marketer of human pharmaceuticals, while retaining rights in the product for veterinary uses.

54.     **Channels Limitation**.  As an example of a channels limitation, a patent owner may license rights, even exclusively, to manufacture and sell a product covered by a patent only for resale to original equipment manufacturers, while reserving for itself, or for others by way of license, all other marketing channels.

55.     **Residual Rights**.  In all of these examples, absent another license of the IPR, the licensor is not contractually restricted from itself exploiting the IP that is the subject of the IPR, or licensing others to do so.  As a matter of prudence, or for greater certainty, a licensor may expressly reserve such residual rights in a license agreement but need not do so expressly because the licensor retains all rights in the IPR that are not granted to the licensee.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

**D.5    Grant is Essence**

56.    **Grant is Essence**.  The essence of a license is the grant of the right from the licensor to the licensee.  In fact, a license agreement does not require more than a grant and consideration from the licensee therefor.  Any other provisions in a license agreement typically refine the rights and obligations of the parties but the focus of the agreement is the grant.  For example, an agreement that states only "[Licensor] hereby grants to [Licensee] the right to exercise all rights under Canadian patent no. [XXX] in consideration for [$X]" would be an enforceable license.

57.    **Example of Limited Grant**.  Equally, an agreement that states only "[Licensor] hereby grants to [Licensee] the exclusive right to manufacture and sell [Widgets] using or embodying technology claimed by Canadian patent no. [XXX] in consideration for [$X]" would also effect an enforceable license.  This is the case, even though this license limits the rights under those patents only to manufacturing and selling Widgets that use or embody technology claimed in the patents.  Although such a license grants exclusivity to the licensee "to manufacture and sell [Widgets] using or embodying technology claimed by Canadian patent no. [XXX]", the licensor retains all other rights in the licensed patent.

**D.6    Interpretation of License Agreement**

58.    **Approach to Contractual Interpretation**.  As stated in the passage quoted at Paragraph 24 of the Stratton Report, in interpreting a contract, "[T]he court begins with the words of the contract and presumes that the parties intended what is written in the contract."  As the Supreme Court of Canada said, "[T]he contractual intent of the parties is to be determined by reference to the words they used in drafting the document."[12]  In *Merck & Co. Inc. v. Apotex Inc.*, Justice Snider said in the context of a patent license agreement:[13]

> As I understand the state of the Canadian law of contracts, the express language of the parties to a contract is the core of their contractual obligations. Where the words of a contract are clear and unambiguous, a court need not look beyond those clear words to determine its intent and effect.

59.    **Stratton Report:  No Need for Extrinsic Evidence When Agreement Clear**.  At Paragraph 75 of the Stratton Report states, recourse may only be had to extrinsic evidence if a term in an agreement is held to be ambiguous.  I agree that it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face.

60.    **Interpretation of MRDA**.  My interpretation of the MRDA, particularly the scope of the rights granted to the Licensed Participants, is based on the plain language of the MRDA,

---

[12]    *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129.
[13]    *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265, para. 47.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

particularly the language of the grant clause and the key definition of "Products".  This is consistent with the law of the Province of Ontario, the governing law of the MRDA.

61.     **Bereskin Report and Stratton Report Do Not Focus on Language of MRDA.**  The approaches adopted in the Bereskin Report and the Stratton Report each frequently deviate from the language of the MRDA.  The Bereskin Report repeatedly refers to "custom and practice". The Stratton Report relies often on the "factual matrix" and "extrinsic evidence", even though the Stratton Report states in Paragraph 76 that there is no need for extrinsic evidence to interpret the MRDA.  As will be seen from the discussion below, I am of the view that the Article 5(a) of the MRDA is clear and unambiguous that the license is limited.  The license is restricted to a field of use tied to the definition of "Products".   There is no need to consider any "custom and practice" to interpret the MRDA to reach this conclusion.  I also share the view expressed in the Stratton Report that there is no need for extrinsic evidence to interpret the MRDA.  There is no need for extrinsic evidence to reach my conclusion.  What is needed is a careful analysis of the language of the grant clause, which is something that neither the Bereskin Report nor the Stratton Report undertakes.

## E.     INTERPRETATION OF GRANT CLAUSE IN MRDA

### E.1     Grant

62.     **Keystone**.  As stated above, the grant language is the keystone of any license, and any analysis and interpretation of a license agreement must start with the wording of the grant.  In my experience in negotiating, structuring, drafting, advising on or disputing a license agreement, the most important issue, namely the scope of the licensee's rights, turns on the language of the grant clause, including the defined terms used therein.   In my view, there is no principle of interpretation or custom or practice that a license agreement should be construed by disregarding the words used by the parties to determine their contractual intent.   Therefore, in any interpretation of a license agreement, the grant clause, and its express language, should be the focal point.

63.     **Article 5(a)**.  In the MRDA, the grant language is set out in Article 5(a), as amended:

> *5(a)     To the extent of its legal rights to do so, and subject to the rights of third parties, NNL hereby:*

> *(i)      continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical*

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

*know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and*

(ii)   *grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date") a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").*

64.    **Exclusive/Non-Exclusive**.   The grant to each Licensed Participant is of a license, including a right to sublicense, of certain: (i) exclusive rights in and for the Exclusive Territory for that Licensed Participant; and (ii) non-exclusive rights in and for the Non-Exclusive Territory for that Licensed Participant.   The subject matter of the license is discussed in Sections E.3 and E.4 below.

## E.2    Two Arms of Grant

65.    **Two Arms**.   The grant has two arms:

(i)   "rights to make, have made, use, lease, license, offer to sell, and sell *Products using or embodying NN Technology*"; and

(ii)   "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, *as necessary or appropriate in connection therewith*". (emphasis mine).

66.    **First Arm: Limited to Making and Marketing**.   The first arm comprises the "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology".   The scope of this arm is the performance of an enumerated list of manufacturing and commercial activities with certain products that use or embody certain intangible assets. Those products are defined as "Products" and the intangible assets are defined as "NN Technology".

67.    **"Products" Defined**.   Article 1(g) defines "Products":

*1(g)    "**Products**" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing,*

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

*and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.*

68.    **"NN Technology" Defined**.  Article 1(f) defines "NN Technology":

*1(f)    "**NN Technology**" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.*

69.    **First Arm: Only Enumerated Activities with Products Using or Embodying NN Technology**.  Under the first arm of the grant, a licensee may perform enumerated activities.  However, a licensee is not licensed to perform any activities other than those that are set out in the first arm.  Similarly, a licensee may perform the enumerated activities in respect of Products that use or embody NN Technology but is not licensed to perform those activities in respect of anything other than Products that use or embody NN Technology.  I discuss the definition of "Products" in Section E.3 below.

70.    **Second Arm: Limited to As Necessary or Appropriate.**  Under the second arm of the grant, a licensee may exercise the IPRs "as necessary or appropriate in connection therewith," namely in connection with the rights in the first arm related to the Products.  The word "therewith" cannot refer to anything in the second arm for two reasons.  The first is the placement of the comma immediately before "therewith".  The second reason is that a reference to anything in the second arm would make the second arm circuitous and devoid of meaning.  A licensee is not licensed to do anything other than exercise the IPRs as necessary or appropriate in connection with the performance of the enumerated list of manufacturing and commercial activities with Products that embody the NN Technology.  This is logical as the grant, taken as a whole, immunizes each Licensed Participant from infringement or other violation of the IPRs when it performs permitted activities in the applicable territory with the Products that use or embody the NN Technology.  However, the second arm does not grant rights to the Licensed Participants to exploit the IPRs of the licensor at large.

71.    **Both Arms: Limited to "Products".**  Both arms of the grant are limited by the definition of "Products".  Under the first arm, the Licensed Participant may manufacture and engage in commercial activities with the Products that use or embody NN Technology, but only with Products.  Under the second arm, the Licensed Participant may exercise the IPRs as necessary or appropriate in connection with the activities relating to the Products permitted by the first arm, again only with the Products.  A licensee may sublicense its rights but no other right is licensed to the Licensed Participants.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

### E.3    Products

72.    **Limited Definition**.  The definition of Products is limited.  "Products" are defined as all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing.

73.    **Four Elements**.  The definition of Products consists of the four elements listed below, each of which has limitations:

> (i)    "all products, software and services";

> (ii)    "designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants"; (elements (i) and (ii) together, the "**Included Items**")

> (iii)    "all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing" (the "**Included Parts**"); and

> (iv)    "all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" (the "**Included Improvements**").

74.    **First Element: Limited to Products, Software and Services**.  The first element is limited to products, software and services.  Something other than a product, software or a service is not included.  This view is further evidenced by a comparison of the definition of "Products" to the definition of "R&D Activity" in Article 1(h).    "**R&D Activity**" references the development of not only "Products" but also "methods, processes, procedures and tools relating to manufacturing, operation, interoperability, maintenance and use of Products".  The MRDA clearly contemplates the research and development of more than products, software and services but, subject to my comments below on the Included Parts and the Included Improvements, the license granted to the Licensed Participants is limited to activities with, and rights related to, products, software and services.

75.    **First Element: Methods and Processes**.  The first element does not refer to, among other things, a method or a process.  Therefore a method or a process is not included within the first element.  A limited right to use a method or process to make Products may be included in the first arm of the grant because the grant includes "rights to make, have made, use …Products using…the NN Technology".  However, no other method or process is included in the grant, and

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

any right in a method or process unrelated to the Products is not included because of the limitation in the first element of the definition of "Products".

76.     **Second Element: Limited to Products Actually or Proposed to be Designed, Developed, Manufactured or Marketed by Participants**.  The second element is limited to products, software and services that are, or are proposed to be, designed, developed, manufactured or marketed, at any time by, or for, any of the Participants.  Products are not limited only to those products, software and services that are, in fact, manufactured or marketed.  Products also include those products, software and services that are designed or developed. Products further include those products, software and services that are proposed to be designed, developed, manufactured or marketed.  However, this element of the definition of Products does not include products, software or services that are not actually, or proposed to be, designed, developed, manufactured or marketed.

77.     **Second Element: Limitation on Proposed Products**.   In my experience with businesses, particularly large technology-focused multi-national organizations, an established commercial organization or corporate family, like that of the family of Participants, typically has a defined scope of business and established policies and/or procedures that determine what goods and services the enterprise proposes to pursue by way of design, development or commercial activity, especially for time-consuming and expensive, both in terms of money and other resources, research and development purposes.  Even where an organization proposes to develop an idea or a concept, it may reverse its decision before any development work is done.  I am not familiar with the workings, policies or procedures of the Participants but, based on my experience, I would expect that not every idea or concept that arose during research activity moved to, or was pursuant to such policies and/or procedures even proposed for, design or development, let alone manufacture or marketing.

78.     **Second Element: Breadth of Patent Protection May Exceed Scope of Products**. Based on my experience, claims of patents generally cover more than any product or method that is intended to be, or is actually, designed, developed, manufactured or marketed.  This is because, in drafting the claims in a patent application, a patent agent or a patent attorney strives to obtain the maximum permissible coverage in a patent without limiting coverage to specific products or methods.  Although I have no knowledge of the patent portfolio that was the subject of the MRDA or the products of the Participants, on the basis of my experience, I would expect that, for most products proposed or actually designed, developed, manufactured or marketed, the scope of the claims of the applicable patents in the licensor's patent portfolio are likely broader than any product, software or service actually, or even proposed to be, designed, developed, manufactured or marketed by any of the Participants.  In other words, I expect that, for many patents, the scope of their claims likely exceeds even the broadest definition of products, software and services included in the definition of "Products".

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

79.    **Second Element.  Offensive Patent Protection for Inventions Never Contemplated for Design, Development, Manufacturing or Marketing.**  In my experience, given the amount of research that is conducted in large technology focused research organizations by creative scientists and engineers, it is common that many inventions made within an organization that do not fall within the scope of the organization's scope of business and established policies and/or procedures for determining which inventions to pursue by way of design, development, manufacturing or marketing.  In the increasingly patent-litigious environment, especially in the United States, many organizations pursue patent protection for such inventions, even though they may have no intention at all of designing, developing, manufacturing or marketing products or services that use or embody such inventions.  This is done for many reasons.  One is that the cost of patenting, while not insignificant, is small in relation to the potential value that such inventions may have for others, a value that the organization may realize through assignment or licensing.  A second reason is the possibility that such a patent may be infringed and that revenues may be generated by the assertion of such a patent against one or more infringers.

80.    **Second Element.  Defensive Patent Protection for Inventions Never Contemplated for Design, Development, Manufacturing or Marketing.**  A third reason to pursue patent protection for inventions that are outside an organization's product scope, which may be the most important reason in the highly litigious computer and telecom industries, is the potential to use such patents defensively.  If the organization is alleged to infringe another party's patent, such other party may be incentivized to settle any such claim because it may itself infringe one of the organization's patents or because it may want to purchase or be licensed under a patent of the organization.  I am not familiar with the workings, policies or procedures of the Participants or the patent portfolio of the licensor.  However, based on my experience, I would expect that an organization like that of the Participants had such patents covering inventions that were not related to its actual or contemplated product offering.

81.    **Second Element: Not All Products, Software and Services Included**.  Therefore, it is likely that there are products, services and software that use or embody the NN Technology but which were not, and were not even proposed to be, designed, developed, manufactured or marketed by any of the Participants.

82.    **Third Element: Not All Components, Parts, Sub-assemblies, Features and Software Included**.  The third element is limited to all components, parts, sub-assemblies, features, software *associated with or incorporated in any of the foregoing* (emphasis mine).  The word "foregoing" refers to the Included Items.  Therefore, not all components, parts, sub-assemblies, features and software are Included Parts and qualify within the definition of "Products".  Only components, parts, sub-assemblies, features and software that are "associated with or incorporated in" the Included Items come within the definition of "Products".  If a part, sub-assembly, feature or software is not associated with, or incorporated in, an Included Item, it is not an Included Part and is therefore not within the definition of "Products".

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

83. **Fourth Element: Not All Improvements, Upgrades, Updates, Enhancements or Other Derivatives Included.** The fourth element is limited to all improvements, upgrades, updates, enhancements or other derivatives *associated with or incorporated in any of the foregoing* (emphasis mine). In this case, the word "foregoing" refers to the Included Items and the Included Parts. Not all improvements, upgrades, updates, enhancements or other derivatives are Included Improvements and qualify within the definition of "Products". Only improvements, upgrades, updates, enhancements or other derivatives that are "associated with or incorporated in" the Included Items or the Included Parts are included in the definition of Products. If an improvement, upgrade, update, enhancement or other derivative is not associated with, or incorporated in, an Included Item or an Included Part, it is not an Included Improvement and is therefore not within the definition of "Products".

84. **Definition of Products**. For the reasons discussed above, the definition of "Products" is limited to:

    (i)   the Included Items, as opposed to all products, software and services;

    (ii)   the Included Parts, as opposed to all components, parts, sub-assemblies, features and software; and

    (iii)   the Included Improvements, as opposed to all improvements, upgrades, updates, enhancements or other derivatives.

85. **Grant Suitable for Purposes of Licensed Participants.** The limitations on the definition of "Products" and the limitations on the grant of rights in the license probably did not, in any way, impair the ability of the Licensed Participants to carry out the activities in which they were engaged, namely the design, development, manufacture and marketing of Products. The grant should have operated to immunize the Licensed Participants from infringement or other violation of the licensed IPRs when they performed permitted activities with the Products that used or embodied the NN Technology, but only in respect of such activities with such Products.

86. **Exclusions from Products**. However, in light of the discussion above, there are numerous limitations in the definition of "Products", meaning that there are methods, processes, products, software, services, components, parts, sub-assemblies, features, improvements, upgrades, updates, enhancements and other derivatives that use or embody NNT Technology that are outside the scope of "Products", which is the subject of the rights granted to the Licensed Participants. Although I am not familiar with the workings of the Participants, their product line or the patent portfolio of the licensor, I would expect that the patent portfolio included patents that covered inventions that were not related to the actual or contemplated product offering of the Participants.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

### E.4    Scope of Grant

87.    **Grant Less Than All of IPR**.  As should be clear from the discussion above, the limitations in the definition of "Products" and the limitations in the grant clause itself result in a grant of rights to the Licensed Participants that is limited to less than all of the licensor's IPRs. The Licensed Participants have not been granted rights in the licensor's IPRs across all rights, activities and products.  The license is limited to a field of use.  For the reasons discussed above, there are bound to be significant and meaningful rights in the licensor's IPRs that are reserved to the licensor by virtue of the limitations in the grant.

88.    **All Encompassing License Required Different Grant**.  In my opinion, if the intention of the Participants had been for the licensor to grant an all-encompassing license in the NN Technology to the Licensed Participants, this could have been easily accomplished with different language.  A clause such as the following would have clearly provided a grant of a license to all of the NN Technology for all purposes, including the manufacturing and commercialization of the Products.

> To the extent of its legal rights to do so, and subject to the rights of third parties, NNL hereby:
>
> (i)    continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, of all rights in the NN Technology, including all patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how ("Exclusive License"); and
>
> (ii)   grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date") a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, of all rights in the NN Technology to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how ("Non-Exclusive License").

89.    **All Encompassing Grant with Specific References to Products**.  Even if the Licensed Participants would have wanted, for greater certainty, to have included in the grant clause express reference to certain commercial activities with the Products that use or embody the NN Technology, the grant could have been drafted as follows with the italicized language in the clause below added to the hypothetical grant clause in the previous paragraph:

> To the extent of its legal rights to do so, and subject to the rights of third parties, NNL hereby:

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

(i)     continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, of all rights in the NN Technology, including all patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, *for greater certainty such grant including, without limitation, the rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant,* ("Exclusive License"); and

(ii)    grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date") a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, of all rights in the NN Technology to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, *for greater certainty such grant including, without limitation, the rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory designated for that Licensed Participant* ("Non- Exclusive License").

90.     **Differences between Actual Grant and Hypothetical Grants**.  The differences in the language of the hypothetical grants in the two preceding paragraphs from the language of the grant in Article 5(a) of the MRDA are immediately apparent.  The grant in the MRDA is Product specific while both of my hypothetical clauses are IPR focused.  Both of my hypothetical versions would have granted all rights in the NN Technology to the Licensed Participants, with my second hypothetical version additionally providing for greater certainty that such broad rights include the rights to perform the enumerated activities with Products using or embodying the NN Technology.  By way of contrast, the grant in Article 5(a) is limited by its language to rights only to perform the enumerated activities with Products using or embodying the NN Technology.

91.     **Intention of Parties Clear from Express Terms of Grant**.  The fact that highly sophisticated technology companies such as the Participants, who had negotiated and entered numerous license agreements, did not provide for a grant to the Licensed Participants of all rights in the licensor's IPRs confirms my view, based on the language of the MRDA, that this was not intended.

92.     **Bereskin Report: Limited Field.**  In Paragraph 22 of the Bereskin Report, it is said that the use of a defined term such as "Licensed Field" or "Field of Use" is common practice in a license agreement.  I agree that such an approach is one common practice, and I often use such a defined term in drafting such agreements.  However, there is no need to use such a defined term to limit a license to a particular field of use.  A defined term is frequently not used in a license agreement where: (i) the agreement is relatively short, for example less than 20 pages; and/or (ii)

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

the term that might be defined is not repetitively used in the agreement.   Another common practice is to insert a field of use limitation directly in the language of the grant.  This approach is particularly appropriate in licenses between or among affiliated companies where the licenses are typically directed to ensuring that a licensee has the appropriate rights to conduct its activities and to reflect transfer pricing arrangements.  Therefore the absence of a specific definition of "Field of Use" in the MRDA does not negate the fact that the language of the grant limits the license to a field of use.  The license in the MRDA is limited to a field of use.

93.    **Bereskin Report: Not Grant of All Rights.**  For the reasons discussed above, I disagree with the opinion in Paragraph 39 of the Bereskin Report that the licensor in the MRDA was excluded from directly or indirectly exploiting any of the licensor's rights in relation to the NN Technology in the geographical areas respectively assigned to the Licensed Participants or conferring any portion of such right on any third party.  Also, for the reasons discussed above, I disagree with the opinion in Paragraph 40 of the Bereskin Report that the license granted to each Licensed Participant was of unrestricted scope.  The license grant in the MRDA was limited and the licensor was free to exploit those rights that were outside the scope of the limited grant.

94.    **Bereskin Report: "Custom and Practice" Does Not Replace Express Language in Grant**.  The Bereskin Report reaches its conclusions on the basis of "custom and practice" rather than on the basis of the language of the MRDA.  I do not know to which "custom and practice" the Bereskin Report refers or how any such "custom and practice" would cause the interpretation of the grant clause to deviate from the express language of the grant clause.  To me a "custom and practice" is helpful in determining what may be appropriate where the agreement is unclear or silent on an ancillary term of a license.  For example, where the consideration for a license is an ongoing royalty, it is customary for an agreement to provide that the royalty be paid monthly, quarterly, semi-annually or annually, in my experience most often quarterly.  If an agreement were silent on the frequency of payment, such a "custom and practice" might be helpful in the interpretation of the payment obligations.  However, in my view, there is no custom or practice that is applicable to determining the scope of a grant of rights.  In drafting or reviewing an IP license agreement, especially one for a high volume of IPRs among two or more sophisticated parties, I would not rely upon something as vague as any "custom" or "practice" as a substitute for expressing in the document the terms actually agreed on by the parties, particularly in respect of the scope of the grant clause.

95.    **Stratton Report: Grant Not of All Rights.**.  The discussion at Paragraphs 33 to 42 of the Stratton Report is directed to the view that the license granted in the MRDA was "broad" in respect of the subject patents.  As I have no familiarity with the patent portfolio within the NN Technology or the design, development, manufacturing or marketing activities of the Participants, I cannot comment on the breadth of the portfolio.  (I note that Mr. Stratton, similarly, does not claim such knowledge of this patent portfolio.)  However, for the reasons discussed above, I can say that the license does not extend to cover the full scope of all patents in

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

the portfolio because of the manner in which "Products" is defined and the grant is expressed. To again adopt the words of the Supreme Court of Canada:[14]

> The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

96.    **Conclusion on Grant Clause**.  Therefore, the grant clause in the MRDA clearly grants to each Licensed Participant an exclusive license in its Exclusive Territory and a non-exclusive license in its Non-Exclusive Territory to something less than the entirety of the NN Technology or other IPRs.  I disagree with the contrary views adopted in the Bereskin Report and the Stratton Report.

## F.    ANALYSIS OF OTHER PROVISIONS IN MRDA

97.    **Other Provisions**.  I now consider whether any other provision in the MRDA referenced in the Reports may impact my interpretation, as discussed above, of the scope of the limited grant to each Licensed Participant, as articulated in the grant clause.  In doing so, I consider the other provisions considered in the Bereskin Report and the Stratton Report.  These provisions relate to:

> (i)    beneficial rights, referenced in a recital, discussed in Section F.1;
>
> (ii)   the right to assert, discussed in Section F.2; and
>
> (iii)  the right to sublicense, discussed in Section F.3.

## F.1    Beneficial Rights

98.    **View in Reports: Beneficial Property.**    Both the Bereskin Report and the Stratton Report rely on the reference to "equitable and beneficial ownership of certain exclusive rights" in the second recital in the MRDA for the proposition that the Licensed Participants had equitable or beneficial title to the NN Technology.  I do not agree with this view.

99.    **Article 4(a)**.  Article 4(a) of the MRDA states:

> *Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL.*

This is also reflected in the first recital in the MRDA.

---

[14]    *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, at para. 49.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

100.    **Second Recital**.  The second recital in the MRDA, which is not reflected in any other provision of the MRDA, references "equitable and beneficial ownership of certain exclusive rights".  It provides:

> *WHEREAS each Licensed Participant held and enjoyed equitable and beneficial ownership* of certain exclusive rights *under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights.* (emphasis mine)

101.    **1992 Agreement**.  The Amended Research and Development Cost Sharing Agreement, dated January 1, 1992, (the "**1992 Agreement**"), like the MRDA, provided cost-sharing arrangements among the parties thereto and for the grant of a license from Northern Telecom Limited to Northern Telecom Inc.  There was no mention in the 1992 Agreement of any equitable or beneficial ownership.  The "NT Technology" in the 1992 Agreement is the defined term analogous to the defined term "NN Technology" in the MRDA.

102.    **Beneficial Interest in Licensed Rights**.  In my view, the equitable and beneficial rights referenced in the second recital refer to the rights licensed under the 1992 Agreement rather than to any property interest in the NN Technology.  There are several reasons for this view.

103.    **First Reason:  Beneficial Interest in Rights**.  The first reason is the express language of the recital.  The reference to "equitable and beneficial ownership" is to holding and enjoying "equitable and beneficial ownership *of certain exclusive rights* under NT Technology", namely the licensed rights, rather than to the underlying property in the NT Technology or the NN Technology.  The term "equitable" refers to the right of the licensee to enforce its contractual rights against the licensor.  The reference to "beneficial" recognizes that the licensee may exploit the underlying IP free from competing exploitation of that IP by the licensor or other licensees.  However, use of either the term "equitable" or the term "beneficial" does not derogate from the fact that the interest is contractual.  This view is consistent with the view of the Supreme Court of Canada in *Eli Lilly & Co. v. Novopharm Ltd.*,[15] discussed above.

104.    **Second Reason:  Continuing Rights from 1992 Agreement**.  The second reason is that, given the absence of any mention in the 1992 Agreement of any rights other than a license to the Licensed Participants, the reference in the second recital to "equitable and beneficial ownership of certain exclusive rights under NT Technology", together with the mention that "the Licensed Participants continue…to hold and enjoy such rights" can only mean that the equitable and beneficial rights referenced in the recital refer to the rights in the license under the 1992 Agreement rather than to any property interest in the NT Technology or the NN Technology.

---

[15]    *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

105.    **Third Reason: Recital Cannot Override Body of Agreement**.  The third reason is that a recital cannot override operative contractual provisions.   Reference to a recital as an interpretative aid must always be approached with caution, especially where the operative provisions in an agreement are clear.[16]  Even where a recital may provide interpretive assistance, the terms of the recital cannot trump the operative terms in the body of the agreement.[17]   A recital may not be used for the purpose of reading into the operative part of the agreement a meaning which the operative portion does not reflect when considered on its own.[18]   Most relevantly, it has been held that, where the body of an agreement grants a license, a preamble that might suggest a conveyance of all rights in a patent cannot triumph over the body of the agreement.[19]  For the reasons discussed above, the language of the grant clause clearly grants a limited field of use license.  Therefore, it is my view that the second recital should not be used as an interpretative aid.   Even if the recital were to be so used, the recital may not trump the language of the body of the agreement to convert a limited exclusive license into the beneficial ownership by the Licensed Participants of the licensed NN Technology.

106.    **Fourth Reason: Who is Beneficial Owner Where?**    The fourth reason is that the reference to equitable and beneficial ownership does not deal with territorial issues and other rights of ownership and exploitation.  If the MRDA were meant to address beneficial ownership of the NN Technology, it is not clear which Participant would beneficially own which property in which jurisdiction(s).  In fact, the MRDA would leave many important questions unanswered, including the following:

>    (i)    Would the beneficial ownership of all NN Technology that relates to a particular country be held by the Licensed Participant who has rights in that country?

>    (ii)    Would the beneficial ownership of a specific IP asset or asset group, such as a multiple jurisdiction family of patents for an invention developed by one Licensed Participant, be held by one Licensed Participant around the world (in which case each such Licensed Participant would have to grant licenses to the other Licensed Participants akin to the licenses granted by the MRDA licensor)? and

>    (iii)    Which Licensed Participant would hold the beneficial ownership in territories outside Canada and the various Non-Exclusive Territories?

The position that the second recital reflects beneficial ownership by the Licensed Participants in the NN Technology would create confusion and inconsistency.  The reality is that, if the MRDA

---

[16]    *Merck & Co. Inc. v. Apotex Inc.,* 2010 FC 1265.

[17]    *Lay v. Lay*, [2000] OJ No. 985 (ONCA); cited in *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265.

[18]    *Re Elliot Estate,* [1962] OJ No 164 (ONCA).

[19]    *Lay v. Lay*, [2000] OJ No. 985 (ONCA); cited in *Merck & Co. Inc. v. Apotex Inc.,* 2010 FC 1265.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

had been intended to allocate or reserve beneficial ownership of the Licensed Participants, it would have done so expressly in the operative provisions in the body of the agreement.

107.   **Fifth Reason: Beneficial Ownership Inconsistent with License**.  The fifth reason is that a person who has beneficial ownership of an IPR does not need a license to exploit the underlying IP.  If the MRDA provided to the Licensed Participants equitable and beneficial ownership of the property interest in the NN Technology, there would not have been any need for the grant of any license to the Licensed Participants to the IPRs that relate thereto.

108.   **Sixth Reason: No Cross-Licenses or Restrictions.**  The sixth reason is that the MRDA does not grant cross-licenses.  As a beneficial owner of the NN Technology, a Licensed Participant could exploit it in any manner it desired, subject to any restriction imposed by contract or trust.  If one Licensed Participant, other than another Licensed Participant who was the purported beneficial owner of the NN Technology in a territory, wanted to exploit the NN Technology in that territory, the former would have required a license from the latter.  Or, if one Licensed Participant wanted to restrict another Licensed Participant from exploitation in a particular territory, it would have to have done so by contract.  None of this was done in the MRDA.

109.   **Seventh Reason: Transfer Pricing Influence.**  While I do not practice in the realm of transfer pricing tax law, from my experience in files in which I have worked on cross-border IP structures and agreements involving transfer pricing issues with partners and other colleagues at Blakes who practice transfer pricing tax law, I know that a characterization of one party having some type of beneficial or economic interest, even if only in respect of licensed rights, is common in such agreements.  This may be the reason for the reference to "equitable or beneficial ownership" of the licensed rights in the second recital.

110.   **Beneficial Interest is License**.  Therefore, in considering the MRDA as a whole, it is my view that the reference in the second recital to each Licensed Participant holding and enjoying equitable and beneficial ownership of certain exclusive rights under NN Technology is merely a reference to the benefits of the limited exclusive license contractual rights granted under the 1992 Agreement.

111.   **Bereskin Report: Licensed Participants Not Beneficial Owners of NN Technology.**
For the reasons discussed above, I disagree with the opinion in Paragraph 39 of the Bereskin Report that the second recital provides that the Licensed Participants are the equitable and beneficial owners of the NN Technology or that they even have all commercially important and valuable rights therein.  While the Licensed Participants had exclusive rights, they did not have *all* of the rights.  The Bereskin Report also reaches its conclusion there on the basis of "custom and practice" and not on the basis of the language of the MRDA.  I do not know to which

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"custom and practice" the Bereskin Report refers or how any such "custom and practice" would cause the clear limiting language of the grant clause to be interpreted in a contrary way.

112.    **Bereskin Report: Licensed Participants Do Not Have Beneficial Title in NN Technology**.  In Paragraph 41 of the Bereskin Report, the opinion is expressed that the grant of legal title to the licensor in Article 4(a) of the MRDA connotes that "beneficial title" resides elsewhere.  In Paragraph 42 of the Bereskin Report, the opinion is expressed that the beneficial title in the NN Technology is vested under the MRDA in the Licensed Participants.  For the reasons discussed above, I disagree with the opinion in the Bereskin Report that the beneficial title in the NN Technology is vested in the Licensed Participants by the MRDA.

113.    **Bereskin Report: License Not of Unrestricted Scope**.  In Paragraph 44 of the Bereskin Report, the opinion is expressed that the license grant has a "virtually unrestricted scope in each Territory" because of the reference to "equitable and beneficial ownership" in the second recital.  For the reasons discussed above, I disagree with the opinion in the Bereskin Report that the license grant has a "virtually unrestricted scope in each Territory".  That interpretation cannot be deduced from the grant clause or the second recital.  The Bereskin Report also reaches its conclusion in Paragraph 44 of the Bereskin Report on the basis of "custom and practice" and not on the basis of the language of the MRDA.  I do not know to which "custom and practice" the Bereskin Report refers or how any such "custom and practice" would cause the clear limiting language of the grant clause to be interpreted in a contrary way.

114.    **Stratton Report: Beneficial Interest**.  Paragraph 28 of the Stratton Report quotes a portion of the passage of the Supreme Court of Canada in *Eli Lilly & Co. v. Novopharm Ltd.*[20] that I have quoted above.  The Stratton Report refers to that passage in support of the view that each Licensed Participant received a transfer of an equitable right in the patents by the MRDA.  For the reasons discussed above, I disagree with this view expressed in the Stratton Report.  The Stratton Report does not continue the quoted passage, which then sets out the SCC's position on the law.

> In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.[21]

A licensee of an IPR acquires an economic right by way of the license of rights in the IPR.  It does not acquire beneficial ownership of the licensed IPR.  There is a difference.  The commercially beneficial interest of an exclusive licensee consists of the permission to exploit the

---

[20]    *Eli Lilly & Co. v Novopharm Ltd.*, [1998] 2 S.C.R. 129, at para. 49.
[21]    *Eli Lilly & Co. v Novopharm Ltd.*, [1998] 2 S.C.R. 129, at para. 49.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

licensed IPR without being sued by the licensor, the covenant of the licensor not to exploit the underlying IP or permit anyone else to do so, and the right to enforce those contractual rights against the licensor.

115.    **No Impact of Recital on Grant.**  For the reasons discussed above, the reference in the second recital of the MRDA to "equitable beneficial ownership of *certain exclusive rights* in the NT Technology" does not establish that a Licensed Participant had any right other than the beneficial interests granted by the license in the MRDA or detract from my views on the scope of the limited license grant clause in the MRDA.  I disagree with the contrary views stated in the Bereskin Report and the Stratton Report.  Each of the Licensed Participants had, pursuant to the grant in the MRDA, the commercially beneficial right to exploit the rights in the NN Technology within the limitations of the grant free from suit by the licensor.  This is what a license is intended to provide and this is what the MRDA provided to the Licensed Participants.  For the reasons discussed above, in my view, the language of the second recital does not, in any way, detract from my view that the Licensed Participants had any right other than the limited license granted to them pursuant to Article 5(a).

**F.2    Right to Assert**

116.    **View in Reports: Right to Assert Broadens Grant**.  Both the Bereskin Report and the Stratton Report rely on the right to assert in Article 4(e) of the MRDA for the proposition that, because there is no language that limits the right of the Licensed Participants to enforce IPRs for violation of the NN Technology, the grant of the rights to the Licensed Participants in Article 5(a) must be without limitation.  I do not agree with this view.

117.    **Article 4(e).**  Article 4(e) of the MRDA provides:

> *Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others.*

118.    **Assertion Clause Cannot Broaden Scope of Grant**.  The Bereskin Report and the Stratton Report rely on this right of the Licensed Participants to enforce rights against infringers and other violators of rights in the NN Technology to support the view that the rights granted to the Licensed Participants are all substantial rights to the NN Technology.  I do not agree with this view.  As discussed above, a license is a contractual relationship.  The rights of a licensee are circumscribed by the grant of rights.

119.    **Licensor has Right to Assert**.  Article 4(e) does not preclude the licensor from asserting rights in the NN Technology or recovering compensation or other remedies for infringement or misappropriation thereof.  There is no reference to exclusivity of the Licensed Participants in the

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

right to assert.  Therefore, even on the face of Article 4(e), the Licensed Participants do not even have all rights to assert against infringers or other violators of the NN Technology.

120.    **No Independent Right to Assert**.  As discussed above, a license does not create in the licensee a property interest in the licensed IP.  A licensee has no independent right to assert an IPR against an infringer or other violator of a licensed IPR, even where the licensor so permits.  This is why IP statutes specifically provide for rights of licensees to enforce licensed IPRs.

121.    **Patent Act**.  As an example in the Canadian context, the Canadian *Patent Act* provides that an infringer is liable "to the patentee and to all *persons claiming under the patentee*" (emphasis mine).[22]  A licensee does not claim against the infringer for infringement of the licensee's rights under the license, the licensee claims for the damage the licensee sustains in consequence of the infringer's violation of the patent rights of the licensor.[23]  Further, a licensee may only claim "under the patentee" in respect of encroachment on those rights that are licensed to the licensee.[24]

122.    **Right of Assertion Limited to Licensed Rights.**  In Canada, where a licensee is permitted by a licensor to assert an IPR against an infringer or other violator, it may only do so by claiming under or through the owner of the IPR that has been violated, it may do so only in respect of the licensed right held by the licensee, and it may seek remedies only to the extent of the right held by the licensee.[25]  Even where the owner of an IPR provides an exclusive licensee with the right to assert the IPR against others, the ability to enforce such rights is subject to the applicable statutory provisions.[26]

123.    **United States: Licensing Law**.  Although I am qualified to represent Canadian applicants in the USPTO, I am not qualified to practice law in any state in the United States.  However, by virtue of my involvement in numerous licensing transactions involving rights in the United States, my work with and opposite United States counsel, and the significant amount of reading of United States case law, articles and texts that I do for the purpose of my writing and teaching activities, I have some understanding of licensing issues that are impacted by United States law, particularly patent law.  To some extent, this is recognized by my certification as a CLP.  The following discussion is intended to illustrate that, despite the right to assert provided to the Licensed Participants in the MRDA, an exclusive licensee like a Licensed Participant may face a hurdle in enforcing rights against third parties in the United States.  This issue has arisen

---

[22]     *Patent Act*, R.S.C. 1985, c. P-4, as amended, Subsection 55(1).
[23]     *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907.
[24]     *American Cyanamid Co. v. Novopharm Ltd*., [1972] F.C. 739 (F.C.A.).
[25]     See also *Copyright Act*, R.S.C. 1985, c. C-42, as amended, Section 41.23.
[26]     *Fiberglas Canada Ltd. v. Spun Rock Wools Ltd.,* [1943] S.C.R. 547 and (1946-47) 6 Fox. Pat. C. 39 (P.C.); and *American Cyanamid Co. v. Novopharm Ltd*., [1972] F.C. 739 (F.C.A.).

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

in my practice in the context of the negotiation of cross-border license agreements involving rights in both Canada and the United States.

124.     **United States: Prudential Standing.**  The hurdle is the requirement for standing in the context of an action by an exclusive licensee to enforce rights in a licensed patent.  My understanding is that a plaintiff in a patent infringement action must have standing.  The courts, including the appellate court for patent matters, the Court of Appeals for the Federal Circuit, have rejected the contention that standing to sue can be conferred solely through a contractual standing clause between a licensee and a licensor. Rather, to have standing to make a claim for patent infringement, the plaintiff must either own the patent in issue or possess "all substantial rights" in the patent.  Even if a plaintiff purports to be an "exclusive licensee," it may not have "all substantial rights" to bring the action at all or may be required to join the patent owner to bring the patent infringement lawsuit. [27]

125.     **Right to Assert Limited.**  The foregoing discussion should make it clear that a provision in a license agreement that entitles an exclusive licensee to enforce an IPR is really only a covenant that the licensor will not object to the licensee from asserting those rights where permitted by law.  In Canada, such a provision does not entitle a licensee to sue and obtain remedies, except as permitted by the applicable IP statute.  Where a suit is permitted and recoveries are available, the asserted rights and the recoveries are limited to the scope of the licensee's grant.  Most importantly, a provision permitting a licensee to assert rights in the licensed IPR cannot stretch the scope of the grant clause.

126.     **Right to Assert Cannot Broaden Grant.**  For the reasons discussed above, the right to assert in Article 4(e) does not operate to provide the Licensed Participants with all substantial rights in the NN Technology or effectively to broaden the scope of the grant in Article 5(a).

127.     **Reports: Right to Assert Limited to Grant.**  The Bereskin Report in Paragraphs 35 and 37, and the Stratton Report in Paragraphs 44 and 73, adopt the view that, because there is no language in Article 5(e) that limits the right of the Licensed Participants to enforce rights for violation of the NN Technology, the grant of the rights to the Licensed Participants must be without limitation.  For the reasons discussed above, I cannot agree.  Article 5(e) must be read to provide the right to each Licensed Participant to enforce the rights it was granted pursuant to the grant clause.  The scope of the grant clause cannot be broadened by the inclusion of a right to enforce the licensed rights.

---

[27]     Nguyen, Xuan-Thao, "Patent Prudential Standing", (2013) 21 Geo. Mason L. Rev. 17; and see the decisions discussed and cited therein, including *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333 (C.A.F.C. 2001); *International Gamco, Inc. v. Multimedia Games Inc.*, 504 F. 3d 1273 (C.A.F.C. 2007); *AsymmetRx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314 (C.A.F.C. 2009); *Propat International Corp. v. RPost, Inc.*, 473 F.3d 1187 (C.A.F.C. 2007); and *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation*, 604 F. 3d 1354 (C.A.F.C. 2010).

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

128.   **Bereskin Report: Right to Assert Cannot Broaden Scope of Grant.**  For the reasons discussed above, I disagree with the opinion in Paragraph 37 of the Bereskin Report that the assertion clause in Article 4(e) acts to broaden the scope of the grant in Article 5(a).

129.   **Bereskin Report: Cart Before Horse**.  I partially agree with the comment in Paragraph 40 of the Bereskin Report that the breadth of an exclusive license normally is co-extensive with the breadth of the enforcement provision of the agreement.  In my view this is often, but not normally, the case.  Sometimes, the enforcement provision may be narrower than the scope of the grant.  The right of assertion and the scope of the grant are often co-extensive because a licensor would not permit, and the IP statutes generally do not allow, a licensee to assert against third parties IPRs that are not within the scope of the grant to the licensee and the licensee wants to enforce the IPRs under which it is licensed.  However, for the reasons discussed above, I disagree with the view in Paragraph 40 of the Bereskin Report that effectively says that the assertion clause in Article 4(e) functions to broaden the scope of the grant. The assertion clause is limited by the grant; it would make no sense for the assertion clause to operate to expand the scope of the grant.  This approach would effectively mean that the cart would pull the horse.  Article 4(e) should be limited by the scope of the license granted in Article 5(a) rather than the scope of the license granted in Article 5(a) being expanded by Article 4(e).  I have never heard a suggestion in any contract negotiation or dispute advocacy in which I have been involved that an assertion clause could be interpreted to expand the language in the grant clause of a license.  The law on prudential standing in the United States discussed above further supports my view.

130.   **Stratton Report: Right to Assert Cannot Broaden Scope of Grant.**  Paragraph 44 of the Stratton Report acknowledges that it would be inconsistent if the grant of rights were narrower than the right to assert.  I agree.  However, like the Bereskin Report, the Stratton Report relies on the right to assert provision to stretch the scope of the grant, despite the clear language of the grant.  For the reasons discussed above, I disagree with the view in Paragraph 44 of the Stratton Report that effectively says that the assertion clause acts to broaden the scope of the grant. The assertion clause is limited by the grant; it would make no sense for the assertion clause to operate to expand the scope of the grant.  This approach in the Stratton Report on this issue would also effectively mean that the cart would pull the horse.

131.   **No Impact of Assertion Clause on Grant**.  Therefore the right to assert actions and recover damages in Article 5(e) does not expand the scope of the grant to the Licensed Participants or detract from my views on the scope of the grant clause.

**F.3     Right to Sublicense**

132.   **View in Reports: Right to Sublicense is Effectively Right to Assign.**  The MRDA prohibits the assignment by a Participant of the MRDA without the consent of all of the other Participants.  Both the Bereskin Report and the Stratton Report adopt the view that the right to

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

sublicense rights granted to the Licensed Participants is the functional equivalent of a right to assign the licensed rights.  I do not agree with this view.

133.    **Sublicense.**  Each Participant is permitted to sublicense its rights pursuant to Article 5(a).

134.    **Consent for Assignment**.  Article 14(a) provides that the MRDA may not be assigned by any Participant except with the written consent of each of the other Participants.

135.    **Consent for New Participant.**  Article 10(a) requires the unanimous consent of the Participants to the admission of an Eligible Party as a Participant to the MRDA.

136.    **Related Companies Structure.**  The MRDA, as a whole, reflects a mechanism pursuant to which the Licensed Participants transfer the ownership of the NN Technology developed by the Licensed Participants to the licensor, the licensor grants a limited license back to each Licensed Participant, and the related Participants apply a cost-profit allocation among them that is acceptable for transfer pricing purposes.  The addition of a party, other than another affiliate, to the MRDA, or the replacement of a Participant by way of an assignment of the MRDA to a party other than another affiliate, would upset the carefully designed research and development cost-profit allocation that was also negotiated with the Revenue Authorities.  This is reflected in the requirements for consent discussed in the preceding paragraphs.

137.    **Structure Inapplicable to Others**.  For the reasons discussed above, the structure of the MRDA is really inapplicable to a person that is not affiliated with the Participants.  The transfers of rights to the NN Technology and the financial structure of the MRDA are based on an arrangement among multiple affiliates which includes transfer pricing considerations across multiple borders.  Based on my experience, I expect that each Licensed Participant was likely given the right to sublicense rights so that it could permit other persons to manufacture, and even to market, certain Included Products or Included Parts for it or perform services for it.  Also based on my experience, it is difficult for me to envision how the structure of the MRDA and its relationships would continue to work where a Licensed Participant granted to a person who is not affiliated with the Participants a sublicense to all of the rights licensed to that Licensed Participant.  The non-exclusive license agreements referenced in Paragraph 51 of the Bereskin Report are limited licenses/sublicenses entered by Nortel Networks Limited, the licensor in the MRDA, on behalf of Licensed Participants or together with a Licensed Participant.  They are not inconsistent with the view that the Licensed Participants were permitted to sublicense so that they could have third parties exercise certain limited rights for the purposes of the design, development, manufacture and sale of Products within the scope of the MRDA license, as opposed to sublicensing in fields unrelated to the Products.

138.    **Sublicense Not Equivalent to Assignment.**  For the reasons discussed above, I am of the view that the right of a Licensed Participant to sublicense its rights is not an effective mechanism to transfer or assign the economic benefits of the licensed rights.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

139.   **Bereskin Report: Right to Sublicense Not Alternate Mechanism to Assign**.   The Bereskin Report in Paragraph 45 concludes that the right of the Licensed Participants to sublicense rights is an alternate mechanism to transfer or assign the economic benefits of the license granted in the MRDA.   For the reasons discussed above, I disagree.   The right to sublicense is not an alternate mechanism to transfer or assign the economic benefits of the license.

140.   **Stratton Report – Sublicensing**.   None of the comments in the Stratton Report on the issue of sublicensing impacts my view on this issue for the reasons discussed above.

141.   **Sublicense of No Impact**.   The right of each Licensed Participant to grant a sublicense commensurate with the scope of the license grant does not equate to a right to assign, or an alternative mechanism to transfer or assign, all of the economic benefits of the licensed rights. Therefore the right of a Licensed Participant to sublicense does not detract from my views on the scope of the rights granted to the Licensed Participants pursuant to the MRDA.

## G.   REPLY TO REBUTTAL IN BERESKIN REPORT

142.   **MRDA Did Not Grant All Rights.**   For the reasons discussed above, I disagree with the summary of opinion at Paragraph 6 of the Bereskin Report that a sophisticated business person, based on the custom and practice in the licensing of intellectual property, would understand the MRDA to grant all substantial rights in and to the NN Technology to each Licensed Participant in its specified Territory in perpetuity and on a royalty-free basis.

143.   **NN Technology Not Vested in Licensed Participants**.   For the reasons discussed above, I also disagree with the summary of opinion at Paragraph 6 of the Bereskin Report that the equitable and beneficial ownership of the NN Technology was vested in each Licensed Participant in its Exclusive Territory.

144.   **Purchaser Did Not Need to Obtain Release from Licensed Participants**.   In Paragraph 7 of the Bereskin Report, the view is expressed that prudent counsel would have advised a prospective purchaser that, as a condition to purchasing the patent portfolio of NNL, it should have required that each Licensed Participant either agree to terminate its rights under the MRDA or execute a quit claim or release of its license and enforcement rights thereunder.   While obtaining termination, a quit claim or a release of the rights of the MRDA would have been advantageous to a purchaser, that approach would have only addressed those limited rights in the patent portfolio that were licensed to the Licensed Participants under the MRDA and would not have been required for the residual rights of the licensor in the patents outside the licensed field of use.

145.   **Purchaser Needed to Value Residual Rights**.   For the reasons discussed above, had I been asked by a prospective purchaser about the patent portfolio within the NN Technology, in

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

addition to identifying the limited exclusive perpetual rights of the Licensed Participants, I would have done more.  I would have also counseled the prospective purchaser to carefully assess the value of the rights in the patent portfolio that were excluded from the scope of the licenses granted to the Licensed Participants in calculating the value of a bid for the portfolio in a situation where the licenses to the Licensed Participants were to remain in force.  In other words, I would have explained to the client that some of the rights in the patents had been exclusively licensed in perpetuity on a royalty-free basis (although subject to payment obligations pursuant to Article 3 of the MRDA) but that other rights remained with the owner.  A prospective purchaser had to identify the scope of those residual rights and assess the value of those residual rights as a key factor in determining its bid price for the value of the residual rights.  For example, if the NN Technology includes rights that relate to Internet searching, and the Participants were not involved in Products relating thereto, such NN Technology would be available as part of the residual rights of the licensor.  Most of the comments and conclusions in Paragraphs 46 through 54 of the Bereskin Report are premised on the incorrect view that the grant of rights in the MRDA captures all substantial rights in the patent portfolio.  They repeat, albeit in the context of hypothetical advice to a prospective purchaser of the patent portfolio, the views expressed earlier in the Bereskin Report.  For the reasons discussed above, I am only in limited agreement with the views expressed therein

## H.    REPLY TO REBUTTAL IN STRATTON REPORT

146.    **License Limited**.  For the reasons discussed above, I disagree with the opinion expressed in Paragraph 13 of the Stratton Report that the license granted in the MRDA is not limited.  The license granted in the MRDA is limited significantly.

147.    **Definition of Products Limited.**  For the reasons discussed above, I disagree with the opinion expressed in Paragraph 13 of the Stratton Report that the definition of "Products" is not limited.  The definition of "Products" is limited significantly.

148.    **Sublicense Not Effective to Assign Licensed Rights**.  For the reasons discussed above, I disagree with the opinion expressed in Paragraph 14 of the Stratton report that a sublicense would serve to effectively transfer the patent rights licensed under the MRDA.  The sublicense right would not effectively function to transfer the patent rights licensed by the MRDA, particularly in light of the structure of the MRDA.

149.    **Right to Assert Does Not Broaden Bundle of Granted Rights**.  For the reasons discussed above, I disagree with the opinion implied in Paragraph 14 of the Stratton Report that the right of the Licensed Participants to enforce rights impacts the scope of the bundle of rights licensed by the MRDA.  The right to assert of the Licensed Participants does not broaden the scope of the grant.

* * * * *

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

150.    **Copies of Authorities.**    A copy of each of the authorities referenced or cited in this report is included in **Schedule "E".**

March 24, 2014                                    Sheldon Burshtein
Revised March 29, 2014

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

# SCHEDULE "A"

# DOCUMENTS REVIEWED

## A.1    MRDA

1. Exhibit 21003:  Master R & D Agreement, dated December 22, 2004 and effective as of January 1, 2001, among Nortel Networks Ltd. ("**NNL**"), Nortel Networks Inc., Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks Australia (later amended to Nortel Networks Australia Pty Limited), and Nortel Networks Ireland (later amended to Nortel Networks (Ireland) Limited) (collectively, the "**MRDA Parties**").

2. Addendum to Master R&D Agreement, undated, executed during period October 2005 and June 2006 (the "First Addendum").

3. Addendum to Master R&D Agreement, dated December 14, 2007 (the "Second Addendum").

4. Agreement with respect to Certain NN Technology, effective as of December 30, 2006, among the MRDA Parties (the "Alcatel-related Amendment").

5. Third Addendum to Master R&D Agreement, effective as of January 1, 2006 (the "Third Addendum").

6. Fourth Addendum to Master R&D Agreement, effective December 31, 2008 (the "Fourth Addendum").

   (all of the foregoing, as amended, collectively, the "**MRDA**")

## A.2    Other Agreements Relating to MRDA

7. Acknowledgement Relating to MRDA, dated January 14, 2009, of Nortel Networks Limited.

8. Memorandum of Understanding, effective as of January 1, 2006, among the MRDA Parties.

9. Release Relating to Master R&D Agreement, dated January 1, 2009, among the MRDA Parties.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

10. License Termination Agreement, effective as of the Closing Date, among the MRDA Parties.

## A.3   Other Cost Sharing Agreements

11. Amended Research and Development Cost Sharing Agreement, effective as of January 1, 1985, between Northern Telecom Limited and Northern Telecom Inc.

12. Amended Research and Development Cost Sharing Agreement, effective as of January 1, 1985, between Northern Telecom Limited and Northern Telecom plc.

13. Amended Research and Development Cost Sharing Agreement, effective as of January 1, 1992, between Northern Telecom Limited and Northern Telecom Inc.

14. Amended Research and Development Cost Sharing Agreement, effective as of January 1, 1992, between Northern Telecom Limited and Nortel Australia Pty. Limited..

15. Amended Research and Development Cost Sharing Agreement, effective as of January 1, 1995, between Northern Telecom Limited and Northern Telecom Inc.

16. Amended Research and Development Cost Sharing Agreement, effective as of January 1, 1995, between Northern Telecom Limited and Northern Telecom (Ireland) Limited..

## A.4   Other Agreements

17. Vlan Patent License Agreement, effective June 30, 2002, among Nortel Networks Limited, Nortel Networks Inc. and Overture Networks, Inc.

18. GSMTPLP License Agreement, undated, between Nortel Networks Limited and Sierra Wireless, Inc.,

19. Patent License Agreement, effective January 1, 2001, among Nortel Networks Limited, Nortel Networks Inc. and Accton Technology Corp.

20. License Agreement, effective December 31, 2005, among Nortel Networks Limited, Huawei Technologies Co., Ltd and Huawei Technologies Investment Co. Ltd.

21. Patent Cross-License Agreement, effective April 18, 2003, among Nortel Networks Limited, Nortel Networks Inc. and Redback Networks Inc.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.**
**THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

22.  Interim Funding Settlement Agreement, dated June 9, 2009, among numerous parties, the first ones of which are listed are Nortel Networks Corporaton, Nortel Networks Limited, Nortel Global Networks Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation and Nortel Networks Inc.

23. Asset Sale Agreement, dated as of June 30, 2011, among numerous parties, the first ones of which are listed are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., Nortel Networks (Ireland) Limited and Nortel Networks, S.A.

## A.5    Reports

24. Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups, dated January 24, 2014, of Thomas Britven.

25. Report of Phillip Green Regarding the Allocation of Recoveries among Nortel Entities, dated January 24, 2014.

26. Evaluation and Economic Analysis: The Nortel Network's Group Intercompany Pricing Arrangements, dated January24, 2014, of Timothy Reichert.

27. Report of Mark L. Berenblut and Alan J. Cox, dated January 24, 2014.

28. Expert Report of Jeffrey H. Kinrich, dated January 24, 2014.

29. Expert Report of Raymond Zenkich, dated January 24, 2014.

30. Expert Report of James E. Malackowski, dated January 24, 2014.

31. Allocation of Sales Proceeds to the Nortel Debtor Groups Rebuttal to Reports of Messrs. Kinrich, Zenkich, Malackowski, Huffard, Bazelon, Green, and Berenblut and Cox, dated February 28, 2014, of Thomas Britven.

32. Rebuttal Report of Philip Green Regarding the Allocation of Recoveries among Nortel Entities, dated February 28, 2014.

33. Response to The Reports of Drs. Richard Cooper, Lorraine Eden and Stephen Felgran, dated February 28, 2014, of Timothy Reichert.

34. Reply Report of Mark Berenblut and Alan Cox in Reply to the Reports of Jeffrey Kinrich and Paul Huffard dated January 24, 2014.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

35. Rebuttal Expert Report of Jeffrey H. Kinrich, dated February 28, 2014.

36. Expert Rebuttal Report of Daniel R. Bereskin, Q.C., dated February 28, 2014.

37. Rebuttal Expert Report of Bruce W. Stratton, dated February 28, 2014.

38. Rebuttal Report of James Malackowski, dated February 28, 2014.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

# SCHEDULE "B"

## CONTACT INFORMATION

Born:              Montreal, Quebec, Canada
                   March 13, 1952

Home Address:      320 Hillhurst Blvd.
                   Toronto, Ontario,
                   Canada, M6B 1N2
                   Tel: 416-787-3462

Business Address:  Blake, Cassels & Graydon LLP,
                   Suite 4000, Commerce Court,
                   199 Bay Street,
                   Toronto, Ontario
                   Canada, M5L 1A9
                   Tel:  416-863-2934
                   Fax: 416-863-2653
                   Email: sb@blakes.com

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

## SCHEDULE C

## ORGANIZATION AND COMMITTEE MEMBERSHIPS

### C.1    Legal Organizations

Former member, County of York Law Association.

Former member, The Lawyers Club of Toronto.

Former member, European Community Trademark Association.

Former member, Asia-Pacific Lawyers Association.

Former member, Technology Transfer Society.

Former member, Association des Juristes d'Expression Française de l'Ontario.

Member, American Bar Association: Patent, Trademark and Copyright Section; Franchising Forum.

Member, American Bar Association Sports and Entertainment Forum.

Member, Canadian Bar Association.

Member, Canadian Copyright Institute.

Member, International Association for the Protection of Industrial Property.

Member, Licensing Executives Society.

Fellow, Intellectual Property Institute of Canada.

Member, Toronto Patent and Trademark Group.

Member, Toronto Computer Lawyers Group.

Member, Intellectual Property Owners Association.

Member, Canadian Information Technology Association.

Firm co-representative, International Collegiate Licensing Association.

Firm co-representative, International Trademark Association.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

## C.2    Engineering Organizations

Member, Association of Professional Engineers of Ontario.

Member, Engineering Institute of Canada.

Member, Canadian Society for Civil Engineers.

Member, Canadian Society for Professional Engineers.

Member, Ontario Society for Professional Engineers.

Member, American Society for Civil Engineers.

Member, Structural Engineering Institute.

## C.3    Committee Memberships

Former chair, Licensing Committee, Intellectual Property Institute of Canada.

Former chair, Continuing Legal Education Committee, Intellectual Property Section, Canadian Bar Association.

Former chair, Toronto Patent and Trademark Group.

Former chair, Canada Laws Committee, Licensing Executives Society.

Former chair, Licensing Committee, International Trademark Association.

Former member, Advertising Committee, Intellectual Property Institute of Canada.

Former member, Industrial Design Legislation Committee, Intellectual Property Institute of Canada.

Former member, Writers' Bureau, Public Legal Education Committee, Canadian Bar Association (Ontario).

Former member, Organizing Committee (Intellectual Property Section), 1990 Annual Meeting, Canadian Bar Association, London, England.

Former member, Ad hoc Committee on Proposals of the United States Chamber of Commerce with respect to the United States Intellectual Property Program, Licensing Executives Society.

Former co-chair, Trade Mark Licensing Committee, Licensing Executives Society.

2

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

Former member, Committee on GATT Activities, Licensing Executives Society.

Former member, Ad hoc Committee on International Committee Restructuring, International Trademark Association.

Former member, GATT Committee, Canadian Group, International Association for the Protection of Intellectual Property.

Former member, Speakers' Bureau, Licensing Executives Society USA/Canada.

Former member Franchising Committee, Intellectual Property Section, American Bar Association.

Former member, Internet Subcommittee, Franchising Committee, Intellectual Property Section, American Bar Association.

Former member, Canada Subcommittee, Franchising Committee, Franchising Committee, Intellectual Property Section, American Bar Association.

Former chair, Canada Subcommittee, Franchising Committee, Intellectual Property Section, American Bar Association.

Former chair, Forums and Seminars Committee, Intellectual Property Institute of Canada.

Former member, Education Committee, Intellectual Property Institute of Canada.

Former member, Publications Committee, International Trademark Association.

Former chair, Corporate Series Guide - Search and Clearance Subcommittee, Publications Committee, International Trademark Association.

Former member, Third Party Marks Subcommittee, Publications Committee, International Trademark Association.

Former member, Ecolabel Subcommittee, Publications Committee, International Trademark Association.

Former member, NAFTA Committee, Licensing Executives Society (USA/Canada).

Former member, Strategic Alliances Committee, Licensing Executives Society (USA/Canada).

Former member, Internet Committee, Licensing Executives Society (USA/Canada).

Former chair, Organizing Committee, "Ethics in Intellectual Property Practice", Patent and Trademark Institute of Canada.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

Former co-chair, Trademark Licensing Committee, Licensing Executives Society (USA/Canada).

Former member, Education Supercommittee, Intellectual Property Institute of Canada.

Former member, International Trademark Association Mid Year Meeting Organizing Committee.

Former member, Canada, Legal Advisory Committee, Standards Council of Canada, Committee on Dependability, International ElectroTechnical Commission.

Former member, Electronics/Computer Committee, Licensing Executives Society (USA/Canada).

Former co-chair, Trademarks in Business Transactions 2002 Meeting Committee, International Trademark Association.

Former member, E-Privacy Law Committee, American Bar Association.

Former member, McGill University/Intellectual Property Institute of Canada, Courses Liaison Committee

Former member, McGill University/Intellectual Property Institute of Canada, Copyright Course Committee.

Former member, US/Canada Licensing Field Guide Committee, American Bar Association.

Former member, Nominating Committee, International Trademark Association.

Former member, Domain Name System Subcommittee, Internet Committee, International Trademark Association.

Former member, Online Trademark Issues Committee, American Bar Association, Intellectual Property Law Section.

Member, Intellectual Property Committee, Lex Mundi.

Former member, Internet Committee, International Trademark Association.

Former member, Online Trademark Use Subcommittee, Internet Committee, International Trademark Association.

Former member, Second Life Working Group, Online Trademark Use Subcommittee, Internet Committee, International Trademark Association.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Former member, Centennial Presentation Working Group, *The Trademark Reporter* Editorial Board, International Trademark Association.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

# SCHEDULE "D"

## PUBLICATIONS AND PRESENTATIONS

### D.1    Contributions to, and Chapters in, Books

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, looseleaf text 1990 - 2008, Aspen Law & Business.

Co-author, chapter on "Canada", *Y2K Issues - International Legal Efforts*, Practising Law Institute, 1999; 2nd edition, 2000.

Author, chapter on "Developments in Canadian Licensing Law", *1999 Licensing Update*, Battersby & Grimes, Aspen Law & Business.

Author, chapter on "Licensing in Canada", *Licensing Desk Book,* Battersby & Grimes, Aspen Law & Business, 2000.

Author, chapter on "Developments in Canadian Licensing Law", *2000 Licensing Update*, Battersby & Grimes, Aspen Law & Business.

Author, chapter on "Licensing in Canada", *2001 Licensing Update*, Battersby & Grimes, Aspen Law & Business.

Author, chapter on "Intellectual Property and Technology Due Diligence in Commercial Transactions" in *Intellectual Property Assets in Mergers and Transactions*, Bryer & Simensky, John Wiley & Sons, 2001.

Co-author, Chapter on "Licensing in Canada", 2002 Licensing Update, Battersby & Grimes, Aspen Law & Business, 2002 (with M. Fabbri).

Author, chapter on "Intellectual Property, Technology and E-commerce Due Diligence in E-Commerce Transactions", in *Electronic Commerce: A Practitioner's Guide*, Gahtan and Kratz, Carswell 2002, 2003, 2004, 2005, 2006.

Co-author, Chapter on "Canada", *Trademark Practice and Forms*, Oceana Publications, 2003, 2005, 2007, 2011.

Co-author, Chapter on "Licensing in Canada", 2003 Licensing Update, Battersby & Grimes, Aspen Law and Business, 2003 (with J. Sawicki).

Author, chapter on "Domain Names and Other Internet Trade-mark Disputes" in *Intellectual Property Disputes, Resolutions and Remedies,* Dimock, Carswell 2003, 2005, 2006, 2010.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Co-author, Chapter on "Licensing in Canada", 2004 Licensing Update, Battersby & Grimes, Aspen Law and Business, 2003 (with P. Singh).

Co-author, Chapter on "Licensing in Canada", 2005 Licensing Update, Battersby & Grimes, Aspen Law and Business, 2003 (with Z. King).

Co-author, chapter on "Canada:  Patents", in *Winning Legal Strategies:  Patents*, Aspatore Books, 2004 (with G. Daniel).

Co-author, chapter on "Canada:  Intellectual Property", in *Winning Legal Strategies: International Intellectual Property Law:  A Country-by-Country Look at IP Protection & Litigation*, Aspatore Books, 2005 (with G. Daniel).

Co-author, Chapter on "Licensing in Canada", 2006 Licensing Update, Battersby & Grimes, Aspen Law and Business, 2003 (with S. Arlotto).

Co-author, Chapter on "Licensing in Canada", 2007 Licensing Update, Battersby & Grimes, Aspen Law and Business, 2003 (with C. Schwarz).

Author, chapter on "Copyright:  The Who, What, Where, When and How", *Intellectual Property Benchbook*, published to judiciary, 2006.

Co-author, chapter on "Domain Name Dispute Policy", *Bullen & Leake & Jacob's Canadian Precedents of Pleadings*, 2nd ed., Carswell, 2013 (with A. Turco).

Author, chapter on "Copyright:  The Who, What, Where, When and How", Intellectual Property Benchbook, Carswell, [not yet published], 2013.

Author, chapter on "Intellectual Property and Technology Due Diligence in Biotechnology and Pharmaceutical Commercial Transactions", in *The Law of Biotechnology in Canada*, Kratz, Carswell, [not yet published], 2014.

## D.2    Columns

Columnist, Licensing Fundamentals, *World Intellectual Property Report.*

Former columnist, The View Online, *World Trademark Review*.

Former columnist, Intellectual Property, *Engineering Digest*.

Former columnist, Canada, *The Y2K Advisor*.

Former columnist, Y2K Issues, *The Plant*.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Former columnist, International, *The IP Litigator*.

Former columnist, Patents, *Pharmaceuticals Canada.*

Former columnist, Licensing Fundamentals, *World Licensing Law Report*.

## D.3    Presentations and Publications Subsequent to February 29, 2004

*These publications and presentations are listed by subject matter.   Some publications and presentations are listed under multiple categories.*

### D.3.1   Licensing

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2004 Update, Aspen Law & Business.

"Developments in Canadian Licensing", *2004 Licensing Update,* Aspen Law & Business, (with P. Singh).

"Recent Development in Licensing in Canada", *The Licensing Journal*, April, 2004, (with P. Singh).

"Licensing and Technology Transfer", China Aerospace Engineering Consultation Centre, June, 2004.

"The Dance of Negotiation in Complex International Licensing Transactions", "Advanced Multi-National IP Licensing", Law Seminars International, Reston, October, 2004.

Co-chair, "Negotiating and Drafting Intellectual Property License Agreements", The Canadian Institute, December 2004.

"A Comprehensive Practice Guide to Representations and Warranties in License Agreements", "Negotiating and Drafting Intellectual Property License Agreements, December, 2004.

"Licensing Fundamentals:   Open Source Software Licensing", *World Licensing Law Report*, February, 2005.

"Licensing Fundamentals:   How to Deal with Open Source Software", *World Licensing Law Report*, March, 2005.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2005 Update, Aspen Law & Business.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Developments in Canadian Licensing Law", *2005 Licensing Update*, Aspen Law & Business (with Z. King).

Co-chair, "Negotiating and Drafting Intellectual Property License Agreements", The Canadian Institute, December 2005.

"A Comprehensive Practice Guide to Representations and Warranties in License Agreements", "Negotiating and Drafting Intellectual Property License Agreements, December, 2005.

"Developments in Canadian Licensing Law", *2006 Licensing Update*, Aspen Law & Business (with S. Arlotto).

"Licensing Fundamentals:  Introduction to Trademark Licensing", *World Intellectual Property Report*, March, 2006.

"Licensing Fundamentals:  Trademark Licensing – Need for Control", *World Intellectual Property Report*, April, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Control", *World Intellectual Property Report*, May, 2006.

"Negotiating and Drafting the License Grant and Scope of Use Clauses", The Intensive Course in Intellectual Property License Agreements, Osgoode Hall Law School Professional Development, May, 2006.

"Intellectual Property Transactions", What In-House Counsel Must Know About Intellectual Property, Lexpert Events.

"Licensing Fundamentals:  Trademark Licensing:  Grant", *World Intellectual Property Report*, July, 2006.

"Representations and Warranties in License Agreements", *Intellectual Property & Technology Programme*, August, 2006.

"Ontario Court Upholds Arbitration Clause in Patent – License Dispute", *World Intellectual Property Report*, August, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Licensee Obligations", *World Intellectual Property Report*, August, 2006.

"Exercise Care in Contracting for Technology with Canadian Government", *World Intellectual Property Report*, August, 2006.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Exercise in Care in Contracting for Technology with Canadian Government", *Federal Partners in Technology Transfer*, September, 2006.

"Exercise Care in Contracting for Technology with Canadian Government", *Blakes Bulletin on Intellectual Property*, Fall, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Representations and Warranties", *World Intellectual Property Report*, September, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Product Liability and Indemnification", *World Intellectual Property Report*, October, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Termination Issues", *World Intellectual Property Report*, November, 2006.

"Canadian Court Upholds Arbitration Clause in Patent License Dispute", *Journal of Intellectual Property Law & Practice*, Fall 2006.

Co-Chair, "Negotiating and Drafting Intellectual Property License Agreements", The Canadian Institute, December 2006.

"Ontario Court Upholds Arbitration Clause in Patent – License Dispute", *World Intellectual Property Report*, August 2006.

"A Comprehensive Practice Guide to Representations and Warranties in License Agreements", "Negotiating and Drafting Intellectual Property License Agreements, December, 2006.

"Negotiating and Drafting the License Grant and Scope of Use Clauses", The Intensive Course in Intellectual Property License Agreements, Osgoode Hall Law School, April, 2007.

"Developments in Canadian Licensing Law", *2007 Licensing Update*, Aspen Law and Wolters Kluwer (with C. Schwarz).

Panelist, "Mistakes and Problems in Licensing:  Litigation / Arbitration Considerations When They are Not Avoided", Licensing Executives Society USA/Canada, October, 2007.

"The 10 Leading Canadian Licensing Decisions of the New Century", Licensing Executives Society USA/Canada, October, 2007.

"Licensing Fundamentals:  Franchising Suite of Agreements", *World Intellectual Property Report*, October, 2007.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), November, 2007.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Protecting Your Intellectual Property in Canada and Abroad", Franchise Law:  Practising Locally in a Global Industry, Ontario Bar Association, November, 2007.

"Licensing Fundamentals:  Franchising Regulation", *World Intellectual Property Report*, November, 2007.

"Licensing Fundamentals:  Franchising Disclosure", *World Intellectual Property Report*, December, 2007.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), February, 2008.

"Licensing Fundamentals:  Franchising Territorial Exclusivity", *World Intellectual Property Report*, January, 2008.

"Licensing Fundamentals:  Franchising Premises", *World Intellectual Property Report*, February, 2008.

 "Licensing Fundamentals:  Franchising Standards", *World Intellectual Property Report*, March, 2008.

"Licensing Fundamentals:  Franchising Assistance", *World Intellectual Property Report*, April, 2008.

"Licensing Fundamentals:  Franchising Obligations", *World Intellectual Property Report*, May, 2008.

"Negotiating and Drafting the License Grant and Scope of Use Clauses", The Intensive Course in Intellectual Property License Agreements, Osgoode Hall Law School, June, 2008.

"Licensing Fundamentals:  Franchising Financial Issues", *World Intellectual Property Report*, June, 2008.

"Licensing Fundamentals:  Franchising Advertising and Promotion", *World Intellectual Property Report*, July, 2008.

"Licensing Fundamentals:  Franchising Transfer", *World Intellectual Property Report*, August, 2008.

"Licensing Fundamentals:  Franchising Renewal and Termination", *World Intellectual Property Report*, September, 2008.

"Licensee Loses Rights in Licensor's Insolvency", *World Media Law Report*, September, 2008.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Licensing Fundamentals:  Franchising Multiple-Unit Franchise", *World Intellectual Property Report*, November, 2008.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), November, 2008.

"Licensing and Intellectual Property Transactions", "Intellectual Property:  Year in Review 2008", Law Society of Upper Canada (with N. Milton and M. Kamenetsky), January, 2009.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), January, 2009.

"Licensing Fundamentals:  Franchising Master Franchise", *World Intellectual Property Report*, January, 2009.

"Issues in Software Licensing", "IT Law Spring Training", IT.Can and The Law Society of Upper Canada, Moderator, May, 2009.

"Licensing and Intellectual Property Transactions", "Intellectual Property:  Year in Review 2009", Law Society of Upper Canada (with N. Milton and E. Earon), January, 2010.

"Patent Licensing as a Competitive Strategy", Patents as a Competitive Strategy, Federated Press, May, 2010.

Contributor, "Recommended Resources for Licensing Professionals" (by J. Ramsay with others), *LES Nouvelles*, September, 2010.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), September, 2010.

"Negotiating and Drafting the License Grant and Scope of Use Clauses", The Intensive Course in Intellectual Property License Agreements, Osgoode Hall Law School, October, 2010.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), Vancouver, January, 2011.

"The Buck Doesn't Stop Where You May Think It Does, Franchisor Liability for Acts and Omissions of Franchisees", Best-Laid Plans:  The "Accidental Franchise" and What it Could Mean for You and Your Business, Blakes Business Class, March, 2011.

"Patent Licensing as a Competitive Strategy", Patents as a Competitive Strategy, Federated Press, May, 2011.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Boilerplate: Often the Difference", "Essentials of Commercial Contacts", Federated Press, May, 2011.

"Court Enforces Terms of Use Against Website Scraper", *Blakes Bulletin on Information Technology and Intellectual Property*, October, 2011 (with B. Donovan).

"Comments from a Transactional Perspective", The Power of Patents: Adding Value Through Effective Patent Strategies, Blakes Business Class, November, 2011.

"Technology Licensing Compensation Strategies", Commercializing CleanTech, The Canadian Institute, January, 2012.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), May, 2012.

"Boilerplate: Often the Difference", "Essentials of Commercial Contacts", Federated Press, June, 2012.

"Negotiating and Drafting the License Grant and Scope of Use Clauses", The Intensive Course in Intellectual Property License Agreements, Osgoode Hall Law School, November, 2012.

"Valuing Patents for Licensing", Valuation of Intellectual Property, Intellectual Property: The Year in Review, Law Society of Upper Canada, January, 2013.

Debater, "Resolved IP Protection Should be Strengthened to Stimulate Innovation and Commercialization", Conference Board of Canada, February, 2013.

"Obligations to Defend and Indemnify in a License Agreement", *Blakes Bulletin on Intellectual Property*, March, 2013.

"Obligations to Defend and Indemnify in a License Agreement: Lessons Learned from the Appeal of an Arbitration Award", *Intellectual Property*, Spring, 2013.

"Canadian Court Rules on Obligation to Defend and Indemnify in a License Agreement", *World Intellectual Property Report*, April, 2013.

"To Have, Hold (Harmless), Defend and Indemnify: The Most Difficult Vows in Technology Agreements", IP Hot Buttons, Blake, Cassels & Graydon LLP, May, 2013.

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *The Licensing Journal*, October, 2013 (with C. Ing).

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *World Intellectual Property Report*, December, 2013 (with C. Ing).

"Collaborations for Combination Products in the Life Sciences Industry:  Part 1 – Structuring the Deal and Regulatory Development", *Intellectual Property*, Fall, 2013 (with C. Ing).

Moderator, "Intellectual Property Responses to New Technologies", Intellectual Property Law: 2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "3D Printing:  Do-It-Yourself Intellectual Property Infringement", Intellectual Property Law:  2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

"Developing and Commercializing Combination Products", Blakes *Life Sciences Insights & Developments*, Winter, 2014 (with C. Ing).

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

## D.3.2  Patents

"Patents:  What Rights Does a Patent Provide?", *Pharmaceutical Canada*, Winter, 2004.

"Patents:  Patented Medicines", *Pharmaceutical Canada,* Spring, 2004.

"The Wait is Over – An Appellate Decision on Anticipation", *Blakes Bulletin on Intellectual Property Focus on Patents,* July, 2004 (with C. Hale).

"Patents:  How are Rights Transferred?", *Pharmaceutical Canada*, Fall 2004.

"Patents:  How are Patent Rights Infringed?", *Pharmaceutical Canada*, Winter 2005.

Participant, "Intellectual Property Expert Roundtable on the Economic Implications of Intellectual Property Regimes Involving Human Genetic Materials, Canadian Biotechnology Advisory Committee and Canadian Genetic Diseases Network", January 2005.

"Patents:  How are Patent Rights Enforced?", *Pharmaceutical Canada*, Spring 2005.

 "Experimental Use Exception to Patent Infringement", *Lawyers Weekly*, October 2005.

"Experimental Use Exception to Patent Infringement", *Pharmaceutical Canada*, Fall 2005.

"Technology", What In House Counsel Must Know About Intellectual Property, Lexpert Events, June, 2006.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Experimental Use Exception to Patent Infringement", *Intellectual Property*, Summer 2006.

"Exercise Care in Contracting for Technology with Canadian Government", *World Intellectual Property Report*, August, 2006.

"Ontario Court Upholds Arbitration Clause in Patent – License Dispute", *World Intellectual Property Report*, August, 2006.

"Exercise in Care in Contracting for Technology with Canadian Government", *Federal Partners in Technology Transfer*, September, 2006.

"Canadian Court Upholds Arbitration Clause in Patent License Dispute", *Journal of Intellectual Property Law & Practice*, September, 2006.

"Exercise Care in Contracting for Technology with Canadian Government", *Blakes Bulletin on Intellectual Property*, Fall, 2006.

"Acting in Good Faith"  Is the Doctrine of Inequitable Conduct in the Patent Office Coming to Canada?, *Patent World*, October, 2007.

"Duty of Candour on Patent Applicants May Have Come to Canada", *Inside Counsel*, September 2008 (with K. Daniels).

"Does the Canadian Patent Office Impose a Duty of Candour?  The Door is Ajar", *Intellectual Property*, Fall, 2008.

"The Impact of Technology on Post Confederation Canada", Leo Baeck Day School, October, 2008.

"Patent Licensing as a Competitive Strategy", Patents as a Competitive Strategy, Federated Press, May, 2010.

"Business As Usual?  Business Method Patents", Hot Button Topics in Intellectual Property Law, Blakes, Calgary, March, 2011 (authored by B. Slaney).

"Patent Licensing as a Competitive Strategy", Patents as a Competitive Strategy, Federated Press, May, 2011.

"Door Closes on Post-Patent Attacks Based on Duty of Candour in Canada", *Blakes Bulletin on Intellectual Property*, November, 2011 (with W. So).

"Comments from a Transactional Perspective", The Power of Patents:  Adding Value Through Effective Patent Strategies, Blakes Business Class, November, 2011.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Swinging Door Closes on Duty of Candour Post Grant Attack in Canada", *World Intellectual Property Report*, January, 2012.

Panelist, "IP Goes Digital (What This Means to Solicitors):  Patents, Annual Intellectual Property Law:  The Year in Review:  2011", The Law Society of Upper Canada, January, 2012.

"Technology Licensing Compensation Strategies", Commercializing CleanTech, The Canadian Institute, January, 2012.

"Swinging Door Closes on Duty of Candour Post Grant Attack in Canada, *Intellectual Property*, Spring, 2012 (with W. So).

"Valuing Patents for Licensing", Valuation of Intellectual Property, Intellectual Property:  The Year in Review, Law Society of Upper Canada, January, 2013.

Debater, "Resolved IP Protection Should be Strengthened to Stimulate Innovation and Commercialization", Conference Board of Canada, February, 2013.

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

"Obligations to Defend and Indemnify in a License Agreement", *Blakes Bulletin on Intellectual Property*, March, 2013.

 "Obligations to Defend and Indemnify in a License Agreement:  Lessons Learned from the Appeal of an Arbitration Award", *Intellectual Property*, Spring, 2013.

"Canadian Court Rules on Obligation to Defend and Indemnify in a License Agreement", *World Intellectual Property Report*, April, 2013.

"Degree of Knowledge Required for Induced Patent Infringement", *Managing Intellectual Property*, September, 2013 (with T. Wong).

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *The Licensing Journal*, October, 2013 (with C. Ing).

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *World Intellectual Property Report*, December, 2013 (with C. Ing).

"Collaborations for Combination Products in the Life Sciences Industry:  Part 1 – Structuring the Deal and Regulatory Development", *Intellectual Property*, Fall, 2013 (with C. Ing).

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Moderator, "Intellectual Property Responses to New Technologies", Intellectual Property Law: 2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "3D Printing:  Do-It-Yourself Intellectual Property Infringement", Intellectual Property Law:  2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

"Developing and Commercializing Combination Products", Blakes *Life Sciences Insights & Developments*, Winter, 2014 (with C. Ing).

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

### D.3.3   Trade-marks

 "Domain Names and Trade-marks on the Net:  Current Hot Issues", Netlaw 2004, The Canadian Institute, March, 2004.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2004 Update, Aspen Law and Business.

"Trade-mark Protection Strategies", "Protecting Intellectual Property:  Practical and Business Considerations", "IT Law Spring Training", IT.Can and Law Society of Upper Canada, May, 2004.

"Current Hot Issues in Canadian Domain Name and Internet Trademark Law and the CDRP", "Domain Name Dispute Resolution:  A Global Perspective", American Bar Association Section of Intellectual Property Law, June, 2004.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2004.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2004.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2005 Update, Aspen Law and Business.

"Law Society Lays Down the Law to Domain Name Registrant", *World Trademark Law Report*, November, 2004.

".ca Domain Name Dispute Resolution:  Looking Out for Pitfalls", "The Six Minute Intellectual Property Lawyer", Law Society of Upper Canada, November, 2004, (presented by T. Turco).

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Trademark and Domain Name Related Due Diligence in Business Transactions", "Identifying and Managing Your Internet Rights, International Trademarks Association; November, 2004.

"New Policy Limits Disclosure of Information Through WHOIS Directory", *World Trademark Law Report*, February, 2005.

"Whazup With the WHOIS?", *Canadian Journal of Law and Technology*, March, 2005.

"Who Owns Professional Sports Marks – League, Teams, Players, Players Associations? International Trademark Association, May, 2005.

"What's Up With the WHOIS? - The Global View", *Intellectual Property*, Summer, 2005.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2005.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2005.

"Is a Domain Name Property?", *Journal of Intellectual Property Law and Practice*, Fall, 2005.

"Is a Domain Name Property?", *Canadian Journal of Law and Technology*, Fall, 2005.

"Is a Domain Name Property?", *CircleID.com*, December, 2005.

"What's Up With the WHOIS – The Canadian Situation", *Intellectual Property*, Fall, 2005.

"Licensing Fundamentals:  Introduction to Trademark Licensing", *World Intellectual Property Report*, March, 2006.

"Licensing Fundamentals:  Trademark Licensing – Need for Control", *World Intellectual Property Report*, April, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Control", *World Intellectual Property Report*, May, 2006.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2006 Update, Aspen Law and Business.

"Licensing Fundamentals:  Trademark Licensing:  Grant", *World Intellectual Property Report*, June, 2006.

13

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Branding", What In-House Counsel Must Know About Intellectual Property, Lexpert Events, June, 2006.

"The View Online:  Phloundering Phor Remedies", *World Trademark Review*, July, 2006.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2006.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Termination Issues", *World Intellectual Property Report*, November, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Licensee Obligations", *World Intellectual Property Report*, August, 2006.

"Jurisdiction in Internet Copyright, Trade-mark and Domain Name Disputes", Focus on Extraterritorality:  What Can We Learn From the McBee Case?, Intellectual Property Institute of Canada, September, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Representations and Warranties", *World Intellectual Property Report*, September, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Product Liability and Indemnification", *World Intellectual Property Report*, October, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Representations and Warranties", *World Intellectual Property Report*, November, 2006.

"Sale of Keywords Cause Trade-mark Disputes for Search Engines", *Lawyers Weekly*, November 2006.

"Key Legal Issues for Keyword Advertising", *Intellectual Property*, Fall, 2006.

"Jurisdiction in Internet Trade-mark and Domain Name Disputes", *Intellectual Property Journal*, December, 2006.

"Domain Names at the Intersection of Free Speech and Trade-mark Law on the Internet, *University of New Brunswick Law Journal*, December, 2006.

"The View Online:  Keying in on Potential Liability", *World Trademark Review*, January/February, 2007.

14

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2007.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2007.

"The Domain Name Drive Thru:  Parking and Tasting", *Intellectual Property*, Fall, 2007.

"Virtual Sex and Other Things Your Business Must Know About Virtual Worlds", IP Hot Buttons, Blake, Cassels & Graydon LLP, February, 2007.

"Second Life:  Virtual Property From Concept to Reality", "20th Century Property, 21st Century Rights", Technology and Intellectual Property Group, University of Toronto Law School, March, 2008.

"Trade-mark Issues in Brand Building:  What is the Impact of the Internet",  "Internet Law: Latest Developments, Challenges and Strategies", Insight Information, March, 2008.

"Protecting Your Brand and Trade-marks on the Internet", "Risk Management on the Internet: Best Practices for a Web 2.0 World", The Canadian Institute, April 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Every Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Ambushing Gold in 2010", International Trademark Association, May, 2008.

 "Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2008.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2008.

 "Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Is a Wolf in Grandma's Clothing Confusing or Just Initially Confusing?", *World Trademark Review*, February, 2009 (with T. Turco).

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Internet Trade-mark Law", Trade-marks, Osgoode Hall Law School (presented by G. Daniel), April, 2009.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2009.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2009.

Co-chair, "Anti-Counterfeiting and Brand Protection", Federated Press, October, 2009.

"Protecting Your Brands Against Online Counterfeiting", Anti-Counterfeiting and Brand Protection, Federated Press, October, 2009.

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

"Post No Evil, Know No Evil:  Limiting Website Risk for User Generated Content", "Hot Button Legal Topics:  Social Media and Web 2.0", Blake, Cassels & Graydon LLP, June, 2010.

"First Decision on Keyword Adverting Issued", *World Trademark Review*, June, 2010.

"Keyword Advertising Not Misleading in Canada", *Blakes Bulletin on Intellectual Property*, July, 2010.

"Keyword Advertising Not Misleading in Canada", *Business With Canada*, Blakes, July, 2010.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2010.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2010.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Communications Regulation Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Intellectual Property Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"2010 .ca CDRP Consultation", Intellectual Property Institute of Canada, October, 2010.

"Trade-mark Issues in Social Media", Intellectual Property Institute of Canada", October, 2010.

"Risks of User-Generated Content to Website Operators", *Blakes Bulletin on Intellectual Property: Social*

"Risks of User-Generated Content to Website Operators in Canada", *World Intellectual Property Report*, November, 2010.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2010.

"Out of the Blue:  Unexpected Legal Consequences of Social Media", Social Media:  The New Rules of Engagement, Blakes, February, 2011.

"User Generated Content", Internet Law, Federated Press, Calgary, March, 2011.

"Risks of User-Generated Content to Website Operators", *Internet and E-Commerce Law in Canada*, March, 2011.

Contributor for Canada, "The Intersection of Trademark and Copyright and the Right of Publicity", Navigate the Maze, The Intellectual Property Law Institute, University of Southern California Gould School of Law (C. Lackert), March, 2011.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2011.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August, 2011.

"Specification by Reference to Brand  in Government Procurement", *Blakes Bulletin on Intellectual Property*, September, 2011.

"Specification by Reference to Brand in Government Procurement", *World Intellectual Property Report*, September, 2011.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Keys to Keyword Advertising", The Legal and Practical Guide to Protecting Your Brand on the Web and in Social Media, Osgoode Hall Professional Development, September, 2011.

Moderator, "Branding (and Bonding) Over Breakfast", Blake, Cassels & Graydon LLP, November, 2011.

"Keys to Keyword Advertising", Toronto Computer Lawyers Group, November, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2011.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, July, 2012.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, July, 2012.

"Liability of a Website Operator for User-generated Content – Part 1", *Intellectual Property*, Summer, 2012.

"Liability of a Website Operator for User-generated Content – Part 2", *Intellectual Property*, Fall, 2012.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2012.

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

"Practical Advice in Entering the Expanded Domain Name Universe:  A 'To Do' List", Surviving the Dot Landrush:  What You Need to Know to Protect Your Organization in the New Domain Name Space, Blakes Business Class, April, 2013.

Moderator, "User Names on Social Networking Sites:  Protection and Violation of Rights", International Trademark Association, May, 2013.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, July, 2013.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, July, 2013.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2013.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Moderator, "Intellectual Property Responses to New Technologies", Intellectual Property Law: 2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "3D Printing:  Do-It-Yourself Intellectual Property Infringement", Intellectual Property Law:  2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

## D.3.4   Copyright

 "Bill Gives Clear Picture of How to Protect Copyright in Photos", *World Copyright Law Report,* June, 2004.

"It's a Snap?  A Proposal to Simplify Copyright in Photographs in Canada", *Copyright World*, July, 2004.

"Jewellery Not Protected by Copyright in Canada", *Intellectual Property,* July, 2004.

"Copyright and Design Legislation and Jurisprudence", "Intellectual Property Law 2004:  The Annual Year in Review", The Law Society of Upper Canada, January, 2005 (authored with G. Fisk, P. Narayanan and Z. King).

"Licensing Fundamentals:  Open Source Software Licensing", *World Licensing Law Report*, February, 2005.

"Licensing Fundamentals:  How to Deal with Open Source Software", *World Licensing Law Report*, March, 2005.

"Intellectual Property:  Year in Review – 2004: Copyright and Industrial Designs", "Federal Court of Appeal Judges' Seminar", National Judicial Institute, March, 2005 (authored with G. Fisk, P. Narayanan and Z. King).

"Intellectual Property:  Year in Review – 2004: Copyright and Industrial Designs", International Association for the Protection of Intellectual Property – Canadian Group website, March, 2005 (authored with G. Fisk, P. Narayanan and Z. King).

 "Tune In, Music on the Internet", "Hot Button Issues in Intellectual Property and Technology", Blake, Cassels & Graydon, LLP, May, 2005.

"Questions and Answers on Music on the Internet", BAR-ex Website, June 2005.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2005", "Intellectual Property Law 2005:  The Annual Year in Review", The Law Society of Upper Canada (authored with G. Bloom, T. Remtulla and S. Thampi), January, 2006.

"Copyright and New Media:   2005 in Review", Intellectual Property Institute of Canada (authored with G. Bloom, T. Remtulla and S. Thampi; presented with G. Bloom), April 2006.

"Content", What In-House Counsel Must Know About Intellectual Property, Lexpert Events, June, 2006.

"Jurisdiction in Internet Copyright, Trade-mark and Domain Name Disputes", Focus on Extraterritorality:  What Can We Learn From the McBee Case?, *Intellectual Property Institute of Canada*, September, 2006.

"Jurisdiction in Internet Trade-mark and Domain Name Disputes, Intellectual Property Journal, December 2006.

"Latest Round of Anton Piller Copyright Procedures Clarifies the Rules, *World Copyright Law Report*, February 2007.

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2006", "Copyright Update:  The Year in Review in Less Than Three Hours:  All You Need to Know", Law Society of Upper Canada, January, 2007 (authored with G. Bloom, S. Seiferling and M. Stern).

"Copyright:   The Who, What, Where, When and How", *Intellectual Property Benchbook*, National Judicial Institute, May 2007.

"Canadian Copyright Design and Related Legislation and Jurisprudence", Intellectual Property Institute of Canada, April 2007 (with G. Bloom; also co-authored by S. Seiferling and M. Stern).

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2006", "Intellectual Property Law 2006:  The Annual Year in Review", The Law Society of Upper Canada, Law Society of Upper Canada, January, 2007 (authored with G. Bloom, S. Seiferling and M. Stern).

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2007", "Copyright Update:  The Year in Review:  All You Need to Know", Law Society of Upper Canada, January, 2008 (authored with G. Bloom, S. Seiferling and K. McCaig).

"Copyright:  The Who, What, Where, When and How", "Copyright:  A Primer", Law Society of Upper Canada, February, 2008.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2007", "Copyright Update", Intellectual Property Institute of Canada, April, 2008 (with G. Bloom; also authored with G. Bloom, S. Seiferling and K. McCaig).

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2007", 12th Annual Intellectual Property Law - The Year in Review, Law Society of Upper Canada, May, 2007 (authored with G. Bloom, S. Seiferling and M. Stern).

"Virtual Sex and Other Things Your Business Must Know About Virtual Worlds", IP Hot Buttons, Blake, Cassels & Graydon LLP, February, 2007.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Every Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Issues in Software Licensing", "IT Law Spring Training", IT.Can and The Law Society of Upper Canada, Moderator, May, 2009.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", "Internet Law", Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

"Post No Evil, Know No Evil:  Limiting Website Risk for User Generated Content", "Hot Button Legal Topics:  Social Media and Web 2.0", Blake, Cassels & Graydon LLP, June, 2010.

"Amendments to the Copyright Act:  Is Your Business Ready?", Blakes Bulletin on Intellectual Property, July 2010 (with S. Handa and K. Serry).

"Risks of User-Generated Content to Website Operators", *Blakes Bulletin on Intellectual Property:  Social Media Series*, November, 2010.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Risks of User-Generated Content to Website Operators in Canada",  *World Intellectual Property Report*, November, 2010.

"Risks to Website Operators from User Generated Content Greater in Canada Than in the United States and the European Union", *World Data Protection Report,* January, 2011.

"What's In It for the User?  Users' Rights in Copyright Reform", Intellectual Property Hot Buttons, Blakes, February, 2011.

"Out of the Blue:  Unexpected Legal Consequences of Social Media", Social Media:  The New Rules of Engagement, Blakes, February, 2011.

"What's In It for the User?  Users' Rights in Copyright Reform", Intellectual Property Highlights from 2011 that Businesses Should Consider, Blakes, Vancouver, March, 2011.

"User Generated Content", Internet Law, Federated Press, Calgary, March, 2011.

"Risks of User-Generated Content to Website Operators", *Internet and E-Commerce Law in Canada*, March, 2011.

Contributor for Canada, "The Intersection of Trademark and Copyright and the Right of Publicity", Navigate the Maze, The Intellectual Property Law Institute, University of Southern California Gould School of Law (C. Lackert), March, 2011.

""Foundations of Copyright:  The Who, What, Where, When and How", "Copyright Master Class", McGill University/Intellectual Property Institute of Canada, August, 2011.

"Amendments to the Copyright Act:  Another Attempt", *Blakes Bulletin on Intellectual Property Law*,

"Court Enforces Terms of Use Against Website Scraper", *Blakes Bulletin on Information Technology and Intellectual Property*, October, 2011 (with B. Donovan).

"Canadian Copyright Modernization Legislation Enacted", *World Intellectual Property Report*, July, 2012 (with Sunny Handa).

"All Things Come to Those Who Wait:  Canadian Copyright Modernization Legislation Enacted", *Blakes Bulletin on Intellectual Property*, July, 2012 (with S. Handa).

"Supreme Court of Canada Deals Fair Blows to Copyright Owners, *Blakes Bulletin on Intellectual Property*, July, 2012.

"Supreme Court of Canada Deals Fair Blows to Copyright Owners, *Canadian Corporate Counsel*, September, 2012.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Foundations of Copyright:  The Who, What, Where, When and How", "Copyright Master Class", McGill University/Intellectual Property Institute of Canada, August, 2012.

"Liability of a Website Operator for User-generated Content – Part 1", *Intellectual Property*, Summer, 2012.

"Liability of a Website Operator for User-generated Content – Part 2", *Intellectual Property*, Fall, 2012.

 "Supreme Court of Canada Deals Fair Blows to Copyright Owners", *Internet and E-Commerce Law in Canada*, November, 2012.

Co-chair, "Copyright Law and Practice in Canada Now", Insight, December, 2012.

"Are Parliament and the Supreme Court of Canada Dealing Fairly?", Copyright Law and Practice in Canada Now, December, 2012.

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

"Is Fair Dealing Fair?  The Supreme Court of Canada and the Copyright Modernization Act", Understanding Copyright Law and Reform, Federated Press, May, 2013.

"Foundations of Copyright:  The Who, What, Where, When and How", "Copyright Master Class", McGill University/Intellectual Property Institute of Canada, August, 2013.

"Canadian Supreme Court Piqued by Copyright Infringement of 'Curiosity'", World Intellectual Property Report, January, 2014.

"Supreme Court of Canada Piqued by Copyright Infringement of 'Curiosity'", *Blakes Bulletin on Intellectual Property*, January, 2014.

Moderator, "Intellectual Property Responses to New Technologies", Intellectual Property Law: 2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "3D Printing:  Do-It-Yourself Intellectual Property Infringement", Intellectual Property Law:  2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

### D.3.5   Industrial Designs

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2005", "Intellectual Property Law 2005:  The Annual Year in Review", The Law Society of Upper Canada, January, 2006 (authored with G. Bloom, T. Remtulla and S. Thampi).

"Content", "What In-House Counsel Must Know About Intellectual Property", Lexpert Events, June, 2006.

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2006", "Copyright Update:  The Year in Review in Less Than Three Hours:  All You Need to Know", Law Society of Upper Canada, January, 2007, (authored with G. Bloom, S. Seiferling and M. Stern).

"Canadian Copyright Design and Related Legislation and Jurisprudence", Intellectual Property Institute of Canada, April 2007 (with G. Bloom; also co-authored by S. Seiferling and M. Stern).

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2006", "Intellectual Property Law 2006:  The Annual Year in Review", Law Society of Upper Canada, May, 2007 (authored with G. Bloom, S. Seiferling and M. Stern).

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2007", "Copyright Update:  The Year in Review:  All You Need to Know", Law Society of Upper Canada, January, 2008 (authored with G. Bloom, S. Seiferling and K. McCaig).

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2007", Copyright Update, Intellectual Property Institute of Canada, April, 2008 (with G. Bloom; also authored with G. Bloom, S. Seiferling and K. McCaig).

"Canadian Copyright, Design and Related Legislation and Jurisprudence – 2007", 12the Annual Intellectual Property Law- The Year in Review, Law Society of Upper Canada, May, 2007, (authored with G. Bloom, S. Seiferling and M. Stern).

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

Moderator, "Intellectual Property Responses to New Technologies", Intellectual Property Law: 2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "3D Printing:  Do-It-Yourself Intellectual Property Infringement", Intellectual Property Law:  2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, Commitments to Live With:  IP and IT Representations and Warranties, Intellectual Property Issues in Commercial Transactions, March, 2014.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

### D.3.6   Personality Rights

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2004 Update, Aspen Law and Business.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2005 Update, Aspen Law and Business.

"Who Owns Professional Sports Marks – League, Teams, Players, Players Associations? International Trademark Association, May, 2005.

"Branding", What In-House Counsel Must Know About Intellectual Property, *Lexpert* Events, June, 2006.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2006 Update, Aspen Law and Business.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2007 Update, Aspen Law and Business.

"Virtual Sex and Other Things Your Business Must Know About Virtual Worlds", IP Hot Buttons, Blake, Cassels & Graydon LLP, February, 2007.

"Second Life:  Virtual Property From Concept to Reality", "20th Century Property, 21st Century Rights", Technology and Intellectual Property Group, University of Toronto Law School, March, 2008.

"Protecting Your Brand and Trade-marks on the Internet", "Risk Management on the Internet: Best Practices for a Web 2.0 World", The Canadian Institute, April 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Every Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Ambushing Gold in 2010", International Trademark Association, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Communications Regulation Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Intellectual Property Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Trade-mark Issues in Social Media", Intellectual Property Institute of Canada", October, 2010.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2010.

"Out of the Blue:  Unexpected Legal Consequences of Social Media", Social Media:  The New Rules of Engagement, Blakes, February, 2011.

Contributor for Canada, "The Intersection of Trademark and Copyright and the Right of Publicity", Navigate the Maze, The Intellectual Property Law Institute, University of Southern California Gould School of Law (C. Lackert), March, 2011.

"Keys to Keyword Advertising", The Legal and Practical Guide to Protecting Your Brand on the Web and in Social Media, Osgoode Hall Professional Development, September, 2011.

"Keys to Keyword Advertising", Toronto Computer Lawyers Group, November, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2012.

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

Moderator, "Intellectual Property Responses to New Technologies", Intellectual Property Law: 2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "3D Printing:  Do-It-Yourself Intellectual Property Infringement", Intellectual Property Law:  2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

### D.3.7   Confidential Information

"Technology", What In House Counsel Must Know About Intellectual Property, Lexpert Events, June, 2006.

Moderator, "Intellectual Property Responses to New Technologies", Intellectual Property Law: 2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

Speaker, "3D Printing:  Do-It-Yourself Intellectual Property Infringement", Intellectual Property Law:  2013 – The Year in Review, Law Society of Upper Canada, January, 2014.

### D.3.8   Franchising

"Licensing Fundamentals:  Introduction to Trademark Licensing", World Intellectual Property Report, March, 2006.

"Licensing Fundamentals:  Trademark Licensing – Need for Control", *World Intellectual Property Report*, April, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Control", *World Intellectual Property Report*, May, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Grant", *World Intellectual Property Report*, July, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Licensee Obligations", *World Intellectual Property Report*, August, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Representations and Warranties", *World Intellectual Property Report*, September, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Product Liability and Indemnification", *World Intellectual Property Report*, October, 2006.

"Licensing Fundamentals:  Trademark Licensing:  Termination Issues", *World Intellectual Property Report*, November, 2006.

Panelist, "Mistakes and Problems in Licensing:  Litigation / Arbitration Considerations When They are Not Avoided", Licensing Executives Society USA/Canada, October, 2007.

"The 10 Leading Canadian Licensing Decisions of the New Century", Licensing Executives Society USA/Canada, October, 2007.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Licensing Fundamentals: Franchising Suite of Agreements", *World Intellectual Property Report*, October, 2007.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), November, 2007.

"Protecting Your Intellectual Property in Canada and Abroad", Franchise Law: Practising Locally in a Global Industry, Ontario Bar Association, November, 2007.

"Licensing Fundamentals: Franchising Regulation", *World Intellectual Property Report*, November, 2007.

"Licensing Fundamentals: Franchising Disclosure", *World Intellectual Property Report*, December, 2007.

"Licensing Fundamentals: Franchising Territorial Exclusivity", *World Intellectual Property Report*, January, 2008.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), February, 2008.

"Licensing Fundamentals: Franchising Premises", *World Intellectual Property Report*, February, 2008.

"Licensing Fundamentals: Franchising Standards", *World Intellectual Property Report*, March, 2008.

"Licensing Fundamentals: Franchising Assistance", *World Intellectual Property Report*, April, 2008.

"Licensing Fundamentals: Franchising Obligations", *World Intellectual Property Report*, May, 2008.

"Licensing Fundamentals: Franchising Financial Issues", *World Intellectual Property Report*, June, 2008.

"Licensing Fundamentals: Franchising Advertising and Promotion", *World Intellectual Property Report*, July, 2008.

"Licensing Fundamentals: Franchising Transfer", *World Intellectual Property Report*, August, 2008.

"Licensing Fundamentals: Franchising Renewal and Termination", *World Intellectual Property Report*, September, 2008.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Licensee Loses Rights in Licensor's Insolvency", *World Media Law Report*, September, 2008.

"Licensing Fundamentals:  Franchising Multiple-Unit Franchise", *World Intellectual Property Report*, November, 2008.

"Licensing and Intellectual Property Transactions", "Intellectual Property:  Year in Review 2008", Law Society of Upper Canada (with N. Milton and M. Kamenetsky), January, 2009.

"Licensing Fundamentals:  Franchising Master Franchise", *World Intellectual Property Report*, January, 2009.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), January, 2009.

"Licensing and Intellectual Property Transactions", "Intellectual Property:  Year in Review 2009", Law Society of Upper Canada (with N. Milton and E. Earon), January, 2010.

Contributor, "Recommended Resources for Licensing Professionals" (by J. Ramsay with others), *LES Nouvelles*, September, 2010.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), September, 2010.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), Vancouver, January, 2011.

"The Buck Doesn't Stop Where You May Think It Does, Franchisor Liability for Acts and Omissions of Franchisees", Best-Laid Plans:  The "Accidental Franchise" and What it Could Mean for You and Your Business, Blakes Business Class, March, 2011.

Course co-leader, "Intensive Course in Intellectual Property Licensing Agreements", The Canadian Institute (with C. Hale), May, 2012.

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

"To Have, Hold (Harmless), Defend and Indemnify:  The Most Difficult Vows in Technology Agreements", IP Hot Buttons, Blake, Cassels & Graydon LLP, May, 2013.

"Obligations to Defend and Indemnify in a License Agreement:  Lessons Learned from the Appeal of an Arbitration Award", *Intellectual Property*, Spring, 2013.

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

### D.3.9   Domain Names

"Domain Names and Trade-marks on the Net:  Current Hot Issues", Netlaw 2004, The Canadian Institute, March, 2004.

"Hot Current Issues in Domain Names", "Internet Law", Insight Information, April, 2004.

"Trade-mark Protection Strategies", "Protecting Intellectual Property:  Practical and Business Considerations", "IT Law Spring Training", IT.Can and Law Society of Upper Canada, May, 2004.

"Current Hot Issues in Canadian Domain Name and Internet Trademark Law and the CDRP", "Domain Name Dispute Resolution:  A Global Perspective", American Bar Association Section of Intellectual Property Law, June 2004.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August 2004.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August 2004.

"Whazup With the WHOIS?", *Canadian Journal of Law and Technology*, March 2005.

"Tune In, Music on the Internet", "Hot Button Issues in Intellectual Property and Technology", Blake, Cassels & Graydon, LLP, May, 2005.

Author, "What's Up With the WHOIS? - The Global View", Intellectual Property, Summer 2005.

"Is a Domain Name Property?", *Journal of Intellectual Property Law and Practice*, Fall 2005.

"Is a Domain Name Property?", *Canadian Journal of Law and Technology*, Fall 2005.

"Is a Domain Name Property?", *CircleID.com*, December 2005.

"What's Up With the WHOIS – The Canadian Situation", *Intellectual Property*, Fall 2005.

"Branding", What In-House Counsel Must Know About Intellectual Property, *Lexpert* Events, June, 2006.

"The View Online:  Phloundering Phor Remedies", *World Trademark Review*, July 2006.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Jurisdiction in Internet Copyright, Trade-mark and Domain Name Disputes", Focus on Extraterritorality:  What Can We Learn From the McBee Case?, *Intellectual Property Institute of Canada*, September, 2006.

"Sale of Keywords Cause Trade-mark Disputes for Search Engines", *Lawyers Weekly*, November, 2006.

"Key Legal Issues for Keyword Advertising", *Intellectual Property*, Fall, 2006.

"Jurisdiction in Internet Trade-mark and Domain Name Disputes", *Intellectual Property Journal*, Fall, 2006.

"Domain Names at the Intersection of Free Speech and Trade-mark Law on the Internet, *University of New Brunswick Law Journal*, December, 2006.

"The View Online:   Keying in on Potential Liability", *World Trademark Review*, January/February, 2007.

"The Domain Name Drive Thru:  Parking and Tasting", Intellectual Property, Fall, 2007.

"Trade-mark Issues in Brand Building:  What is the Impact of the Internet",  "Internet Law: Latest Developments, Challenges and Strategies", Insight Information, March, 2008.

"Protecting Your Brand and Trade-marks on the Internet", "Risk Management on the Internet: Best Practices for a Web 2.0 World", The Canadian Institute, April, 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Your Business Must Know About Virtual Worlds", Blakes Bulletin on Information Technology, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", Federated Press, December, 2008.

"Is a Wolf in Grandma's Clothing Confusing or Just Initially Confusing?", *World Trademark Review*, February 2009 (with T. Turco).

"Internet Trade-mark Law", Trade-marks, Osgoode Hall Law School (presented by G. Daniel), April, 2009.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Co-chair, "Anti-Counterfeiting and Brand Protection", Federated Press, October, 2009.

"Protecting Your Brands Against Online Counterfeiting", Anti-Counterfeiting and Brand Protection, Federated Press, October, 2009.

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

"Post No Evil, Know No Evil:  Limiting Website Risk for User Generated Content", "Hot Button Legal Topics:  Social Media and Web 2.0", Blake, Cassels & Graydon LLP, June, 2010.

"First Decision on Keyword Adverting Issued", *World Trademark Review*, June, 2010.

"Keyword Advertising Not Misleading in Canada", *Blakes Bulletin on Intellectual Property*, July, 2010.

"Keyword Advertising Not Misleading in Canada", *Business With Canada*, Blakes, July, 2010.

"Communication on Web Goes 2.0 Ways", *Blakes Bulletin on Intellectual Property:  Social Media Series*, September, 2010 (with T. Turco).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Communications Regulation Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Intellectual Property Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"2010 .ca CDRP Consultation", Intellectual Property Institute of Canada, October, 2010.

"Trade-mark Issues in Social Media", Intellectual Property Institute of Canada", October, 2010.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2010.

"User Generated Content", Internet Law Federated Press, Calgary, March, 2011.

"Keys to Keyword Advertising", The Legal and Practical Guide to Protecting Your Brand on the Web and in Social Media, Osgoode Hall Professional Development, September, 2011.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Keys to Keyword Advertising", Toronto Computer Lawyers Group, November, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2012.

"Practical Advice in Entering the Expanded Domain Name Universe:  A 'To Do' List", Surviving the Dot Landrush:  What You Need to Know to Protect Your Organization in the New Domain Name Space, Blakes Business Class, April, 2013.

Moderator, "User Names on Social Networking Sites:  Protection and Violation of Rights", International Trademark Association, May, 2013.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2013.

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

## D.3.10 Internet and E-Commerce

"Domain Names and Trade-marks on the Net:  Current Hot Issues", Netlaw 2004, The Canadian Institute, March, 2004.

Co-chair, "Internet Law", Insight Information, April, 2004.

"Hot Current Issues in Domain Names", "Internet Law", Insight Information, April, 2004.

"Trade-mark Protection Strategies", "Protecting Intellectual Property:  Practical and Business Considerations", "IT Law Spring Training", IT.Can and Law Society of Upper Canada, May, 2004.

"Current Hot Issues in Canadian Domain Name and Internet Trademark Law and the CDRP", "Domain Name Dispute Resolution:  A Global Perspective", American Bar Association Section of Intellectual Property Law, June 2004.

"Introduction to Trade-marks", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August 2004.

"Trade-mark Use:  The Who, What, Where, When, Why, How and Future", "Understanding Trade-marks:  An Introductory Course", McGill University/Intellectual Property Institute of Canada, August 2004.

"Law Society Lays Down the Law to Domain Name Registrant", *World Trademark Law Report*, November, 2004.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"New Policy Limits Disclosure of Information Through WHOIS Directory", *World Trademark Law Report*, February, 2005.

"Whazup With the WHOIS?", *Canadian Journal of Law and Technology*, March 2005.

".ca Domain Name Dispute Resolution:  Looking Out for Pitfalls", "The Six Minute Intellectual Property Lawyer", Law Society of Upper Canada, November 2004, (presented by T. Turco).

"Trademark and Domain Name Related Due Diligence in Business Transactions", "Identifying and Managing Your Internet Rights", International Trademarks Association; November, 2004.

"Law Society Lays Down the Law to Domain Name Registrant", *World Trademark Law Report*, November, 2004.

"New Policy Limits Disclosure of Information Through WHOIS Directory", *World Trademark Law Report*, February, 2005.

"Whazup With the WHOIS?", *Canadian Journal of Law and Technology*, March 2005.

"Tune In, Music on the Internet", "Hot Button Issues in Intellectual Property and Technology", Blake, Cassels & Graydon, LLP, May 2005.

Author, "What's Up With the WHOIS? - The Global View", *Intellectual Property*, Summer 2005.

"Is a Domain Name Property?", *Journal of Intellectual Property Law and Practice*, Fall 2005.

"Is a Domain Name Property?", *Canadian Journal of Law and Technology*, Fall 2005.

"Is a Domain Name Property?", *CircleID.com*, December 2005.

"What's Up With the WHOIS – The Canadian Situation", *Intellectual Property*, Fall 2005.

"Technology", What In House Counsel Must Know About Intellectual Property, Lexpert Events, June, 2006.

"The View Online:  Phloundering Phor Remedies", *World Trademark Review*, July 2006.

"Jurisdiction in Internet Copyright, Trade-mark and Domain Name Disputes", Focus on Extraterritorality:  What Can We Learn From the McBee Case?, *Intellectual Property Institute of Canada*, September, 2006.

"Sale of Keywords Cause Trade-mark Disputes for Search Engines", *Lawyers Weekly*, November, 2006.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Jurisdiction in Internet Trade-mark and Domain Name Disputes", *Intellectual Property Journal*, Fall, 2006.

"Key Legal Issues for Keyword Advertising", *Intellectual Property*, Fall, 2006.

"Domain Names at the Intersection of Free Speech and Trade-mark Law on the Internet, *University of New Brunswick Law Journal*, December, 2006.

"The View Online:   Keying in on Potential Liability", *World Trademark Review*, January/February, 2007.

"The Domain Name Drive Thru:  Parking and Tasting", Intellectual Property, Fall, 2007.

"Virtual Sex and Other Things Your Business Needs to Know About Virtual Worlds", IP Hot Buttons, Blakes, February, 2008.

"Second Life:  Virtual Property:  From Concept to Reality", "20th Century Property, 21st Century Rights", Technology and Intellectual Property Group, University of Toronto Law School, March, 2008.

"Trade-mark Issues in Brand Building:  What is the Impact of the Internet",  "Internet Law: Latest Developments, Challenges and Strategies", Insight Information, March, 2008.

"Protecting Your Brand and Trade-marks on the Internet", "Risk Management on the Internet: Best Practices for a Web 2.0 World", The Canadian Institute, April, 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Your Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Is a Wolf in Grandma's Clothing Confusing or Just Initially Confusing?", *World Trademark Review*, February 2009 (with T. Turco).

"Internet Trade-mark Law", Trade-marks, Osgoode Hall Law School (presented by G. Daniel).

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Issues in Software Licensing", "IT Law Spring Training", IT.Can and The Law Society of Upper Canada, Moderator, May, 2009.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

Co-chair, "Anti-Counterfeiting and Brand Protection", Federated Press, October, 2009.

"Protecting Your Brands Against Online Counterfeiting", Anti-Counterfeiting and Brand Protection, Federated Press, October, 2009.

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

"Post No Evil, Know No Evil:  Limiting Website Risk for User Generated Content", "Hot Button Legal Topics:  Social Media and Web 2.0", Blake, Cassels & Graydon LLP, June, 2010.

"First Decision on Keyword Adverting Issued", *World Trademark Review*, June, 2010.

"Keyword Advertising Not Misleading in Canada", *Blakes Bulletin on Intellectual Property*, July, 2010.

"Keyword Advertising Not Misleading in Canada", *Business With Canada*, Blakes, July, 2010.

"Communication on Web Goes 2.0 Ways", *Blakes Bulletin on Intellectual Property:  Social Media Series*, September, 2010 (with T. Turco).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Communications Regulation Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Intellectual Property Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"2010 .ca CDRP Consultation", Intellectual Property Institute of Canada, October, 2010.

"Trade-mark Issues in Social Media", Intellectual Property Institute of Canada", October, 2010.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Risks of User-Generated Content to Website Operators", *Blakes Bulletin on Intellectual Property: Social Media Series*, November, 2010.

"Risks of User-Generated Content to Website Operators in Canada",  *World Intellectual Property Report*, November, 2010.

"Protecting Your Brands in Cyberspace", Internet Law, *Federated Press*, December, 2010.

"Risks to Website Operators from User Generated Content Greater in Canada Than in the United States and the European Union", *World Data Protection Report,* January, 2011.

"Out of the Blue:  Unexpected Legal Consequences of Social Media", Social Media:  The New Rules of Engagement, Blakes, February, 2011.

"User Generated Content", Internet Law, Federated Press, Calgary, March, 2011.

"Business As Usual?  Business Method Patents", Hot Button Topics in Intellectual Property Law, Blakes, Calgary, March, 2011 (authored by B. Slaney).

"Risks of User-Generated Content to Website Operators", *Internet and E-Commerce Law in Canada*, March, 2011.

"Keys to Keyword Advertising", The Legal and Practical Guide to Protecting Your Brand on the Web and in Social Media, Osgoode Hall Professional Development, September, 2011.

"Court Enforces Terms of Use Against Website Scraper", *Blakes Bulletin on Information Technology and Intellectual Property*, October, 2011 (with B. Donovan).

"Keys to Keyword Advertising", Toronto Computer Lawyers Group, November, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2011.

Panelist, "IP Goes Digital (What This Means to Solicitors):  Patents, Annual Intellectual Property Law:  The Year in Review:  2011", The Law Society of Upper Canada, January, 2012.

"ReTweeting and Linking:  Avoiding a Chain of Liability", "IP Hot Buttons", Blake, Cassels & Graydon LLP, June, 2012.

"Liability of a Website Operator for User-generated Content – Part 1", *Intellectual Property*, Summer, 2012.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2012.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Liability of a Website Operator for User-generated Content – Part 2", *Intellectual Property*, Fall, 2012.

"Practical Advice in Entering the Expanded Domain Name Universe:  A 'To Do' List", Surviving the Dot Landrush:  What You Need to Know to Protect Your Organization in the New Domain Name Space, Blakes Business Class, April, 2013.

Moderator, "User Names on Social Networking Sites:  Protection and Violation of Rights", International Trademark Association, May, 2013.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2013.

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

## D.3.12 Information Technology

"Domain Names and Trade-marks on the Net:  Current Hot Issues", Netlaw 2004, The Canadian Institute, March, 2004.

"Hot Current Issues in Domain Names", "Internet Law", Insight Information, April, 2004.

"Trade-mark Protection Strategies", "Protecting Intellectual Property:  Practical and Business Considerations", "IT Law Spring Training", IT.Can and Law Society of Upper Canada, May, 2004.

"Current Hot Issues in Canadian Domain Name and Internet Trademark Law and the CDRP", "Domain Name Dispute Resolution:  A Global Perspective", American Bar Association Section of Intellectual Property Law, June 2004.

"Law Society Lays Down the Law to Domain Name Registrant", *World Trademark Law Report*, November, 2004.

"New Policy Limits Disclosure of Information Through WHOIS Directory", *World Trademark Law Report*, February, 2005.

"Licensing Fundamentals:  Open Source Software", *World Licensing Law Report*, February, 2005.

"Licensing Fundamentals:  How to Deal with Open Source Software", *World Licensing Law Report*, March, 2005.

"Is a Domain Name Property?", *Journal of Intellectual Property Law and Practice*, Fall 2005.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Is a Domain Name Property?", *Canadian Journal of Law and Technology*, Fall 2005.

"Is a Domain Name Property?", *CircleID.com*, December 2005.

"What's Up With the WHOIS – The Canadian Situation", *Intellectual Property*, Fall 2005.

"Technology", What In House Counsel Must Know About Intellectual Property, Lexpert Events, June, 2006.

"The View Online:  Phloundering Phor Remedies", *World Trademark Review*, July 2006.

"Y2K An Inherent Vice – Insurance Claim for Remediation Denied", *Blakes Bulletin on Information Technology*, November 2006.

"Canadian Insurance Claim for Remediation Denied", *Internet and Ecommerce Law in Canada*, August, 2006.

"Jurisdiction in Internet Copyright, Trade-mark and Domain Name Disputes", Focus on Extraterritorality:  What Can We Learn From the McBee Case?, *Intellectual Property Institute of Canada*, September, 2006.

"Key Legal Issues for Keyword Advertising", *Intellectual Property*, Fall, 2006.

"Sale of Keywords Cause Trade-mark Disputes for Search Engines", *Lawyers Weekly*, November, 2006.

"Jurisdiction in Internet Trade-mark and Domain Name Disputes", *Intellectual Property Journal*, December, 2006.

"Domain Names at the Intersection of Free Speech and Trade-mark Law on the Internet, *University of New Brunswick Law Journal*, December, 2006.

"Y2K An Inherent Vice-Insurance Claim for Remediation Denied", ZSA.com, December, 2006.

"Canadian Court Upholds Arbitration Clause in Patent License Dispute", *Journal of Intellectual Property Law & Practice*, Fall, 2006.

"The View Online:   Keying in on Potential Liability", *World Trademark Review*, January/February, 2007.

"The Domain Name Drive Thru:  Parking and Tasting", Intellectual Property, Fall, 2007.

"Virtual Sex and Other Things Your Business Needs to Know About Virtual Worlds", IP Hot Buttons, Blakes, February, 2008.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Second Life:  Virtual Property:  From Concept to Reality", "20th Century Property, 21st Century Rights", Technology and Intellectual Property Group, University of Toronto Law School, March, 2008.

"Trade-mark Issues in Brand Building:  What is the Impact of the Internet",  "Internet Law: Latest Developments, Challenges and Strategies", Insight Information, March, 2008.

"Protecting Your Brand and Trade-marks on the Internet", "Risk Management on the Internet: Best Practices for a Web 2.0 World", The Canadian Institute, April, 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Your Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Is a Wolf in Grandma's Clothing Confusing or Just Initially Confusing?", *World Trademark Review*, February 2009 (with T. Turco).

"Internet Trade-mark Law", Trade-marks, Osgoode Hall Law School (presented by G. Daniel).

"Issues in Software Licensing", "IT Law Spring Training", IT.Can and The Law Society of Upper Canada, Moderator, May, 2009.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

Co-chair, "Anti-Counterfeiting and Brand Protection", Federated Press, October, 2009.

"Protecting Your Brands Against Online Counterfeiting", Anti-Counterfeiting and Brand Protection, Federated Press, October, 2009.

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Post No Evil, Know No Evil:  Limiting Website Risk for User Generated Content", "Hot Button Legal Topics:  Social Media and Web 2.0", Blake, Cassels & Graydon LLP, June, 2010.

"First Decision on Keyword Adverting Issued", *World Trademark Review*, June, 2010.

"Keyword Advertising Not Misleading in Canada", *Blakes Bulletin on Intellectual Property*, July, 2010.

"Keyword Advertising Not Misleading in Canada", *Business With Canada*, Blakes, July, 2010.

"First Decision on Keyword Adverting Issued", *World Trademark Review*, June, 2010.

"Communication on Web Goes 2.0 Ways", *Blakes Bulletin on Intellectual Property:  Social Media Series*, September, 2010 (with T. Turco).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Communications Regulation Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Intellectual Property Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"2010 .ca CDRP Consultation", Intellectual Property Institute of Canada, October, 2010.

"Trade-mark Issues in Social Media", Intellectual Property Institute of Canada", October, 2010.

"Risks of User-Generated Content to Website Operators", *Blakes Bulletin on Intellectual Property:  Social Media Series*, November, 2010.

"Risks of User-Generated Content to Website Operators in Canada",  *World Intellectual Property Report*, November, 2010.

"Protecting Your Brands In Cyberspace", Internet Law, *Federated Press*, December, 2010.

"Risks to Website Operators from User Generated Content Creater in Canada Than in the United States and the European Union", *World Data Protection Report,* January, 2011.

"Out of the Blue:  Unexpected Legal Consequences of Social Media", Social Media:  The New Rules of Engagement, Blakes, February, 2011.

"User Generated Content", Internet Law, Federated Press, Calgary, March, 2011.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Business As Usual?  Business Method Patents", Hot Button Topics in Intellectual Property Law, Blakes, Calgary, March, 2011 (authored by B. Slaney).

"Risks of User-Generated Content to Website Operators", *Internet and E-Commerce Law in Canada*, March, 2011.

"Keys to Keyword Advertising", The Legal and Practical Guide to Protecting Your Brand on the Web and in Social Media, Osgoode Hall Professional Development, September, 2011.

"Court Enforces Terms of Use Against Website Scraper", *Blakes Bulletin on Information Technology and Intellectual Property*, October, 2011 (with B. Donovan).

"Keys to Keyword Advertising", Toronto Computer Lawyers Group, November, 2011.

"Swinging Door Closes on Duty of Candour Post Grant Attack in Canada", *World Intellectual Property Report*, January, 2012.

Panelist, "IP Goes Digital (What This Means to Solicitors):  Patents, Annual Intellectual Property Law:  The Year in Review:  2011", The Law Society of Upper Canada, January, 2012.

"ReTweeting and Linking:  Avoiding a Chain of Liability", "IP Hot Buttons", Blake, Cassels & Graydon LLP, June, 2012.

"Liability of a Website Operator for User-generated Content – Part 1", *Intellectual Property*, Summer, 2012.

"Liability of a Website Operator for User-generated Content – Part 2", *Intellectual Property*, Fall, 2012.

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

"Obligations to Defend and Indemnify in a License Agreement", *Blakes Bulletin on Intellectual Property*, March, 2013.

"Obligations to Defend and Indemnify in a License Agreement:  Lessons Learned from the Appeal of an Arbitration Award", *Intellectual Property*, Spring, 2013.

"Practical Advice in Entering the Expanded Domain Name Universe:  A 'To Do' List", Surviving the Dot Landrush:  What You Need to Know to Protect Your Organization in the New Domain Name Space, Blakes Business Class, April, 2013.

"Canadian Court Rules on Obligation to Defend and Indemnify in a License Agreement", *World Intellectual Property Report*, April, 2013.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

Moderator, "User Names on Social Networking Sites: Protection and Violation of Rights", International Trademark Association, May, 2013.

"To Have, Hold (Harmless), Defend and Indemnify: The Most Difficult Vows in Technology Agreements", IP Hot Buttons, Blake, Cassels & Graydon LLP, May, 2013.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2013.

Speaker, "Commitments to Live With: IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

### D.3.13 Social Media

"Virtual Sex and Other Things Your Business Needs to Know About Virtual Worlds", IP Hot Buttons, Blakes, February, 2008.

"Second Life: Virtual Property: From Concept to Reality", "20th Century Property, 21st Century Rights", Technology and Intellectual Property Group, University of Toronto Law School, March, 2008.

"Trade-mark Issues in Brand Building: What is the Impact of the Internet", "Internet Law: Latest Developments, Challenges and Strategies", Insight Information, March, 2008.

"Protecting Your Brand and Trade-marks on the Internet", "Risk Management on the Internet: Best Practices for a Web 2.0 World", The Canadian Institute, April, 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Your Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", *Federated Press*, December, 2008.

"Internet Trade-mark Law", Trade-marks, Osgoode Hall Law School (presented by G. Daniel), April, 2009.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

Co-chair, "Anti-Counterfeiting and Brand Protection", Federated Press, October, 2009.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Protecting Your Brands Against Online Counterfeiting", Anti-Counterfeiting and Brand Protection, Federated Press, October, 2009.

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

"Post No Evil, Know No Evil:  Limiting Website Risk for User Generated Content", "Hot Button Legal Topics:  Social Media and Web 2.0", Blake, Cassels & Graydon LLP, June, 2010.

"Communication on Web Goes 2.0 Ways", *Blakes Bulletin on Intellectual Property:  Social Media Series*, September, 2010 (with T. Turco).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Communications Regulation Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Intellectual Property Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Trade-mark Issues in Social Media", Intellectual Property Institute of Canada", October, 2010.

"Risks of User-Generated Content to Website Operators", *Blakes Bulletin on Intellectual Property:  Social Media Series*, November, 2010.

"Risks of User-Generated Content to Website Operators in Canada",   *World Intellectual Property Report*, November, 2010.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2010.

"Out of the Blue:  Unexpected Legal Consequences of Social Media", Social Media:  The New Rules of Engagement, Blakes, February, 2011.

"User Generated Content", Internet Law, Federated Press, Calgary, March, 2011.

"Business As Usual?  Business Method Patents", Hot Button Topics in Intellectual Property Law, Blakes, Calgary, March, 2011 (authored by B. Slaney).

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Risks of User-Generated Content to Website Operators", *Internet and E-Commerce Law in Canada*, March, 2011.

"Keys to Keyword Advertising", The Legal and Practical Guide to Protecting Your Brand on the Web and in Social Media, Osgoode Hall Professional Development, September, 2011.

"Keys to Keyword Advertising", Toronto Computer Lawyers Group, November, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2011.

"ReTweeting and Linking:  Avoiding a Chain of Liability", "IP Hot Buttons", Blake, Cassels & Graydon LLP, June, 2012.

"Liability of a Website Operator for User-generated Content – Part 1", *Intellectual Property*, Summer, 2012.

"Liability of a Website Operator for User-generated Content – Part 2", *Intellectual Property*, Fall, 2012.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2012.

"Practical Advice in Entering the Expanded Domain Name Universe:  A 'To Do' List", Surviving the Dot Landrush:  What You Need to Know to Protect Your Organization in the New Domain Name Space, Blakes Business Class, April, 2013.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2013.

### D.3.14 Food, Drug and Life Sciences

"Patents:  What Rights Does a Patent Provide?", *Pharmaceutical Canada*, Winter, 2004.

"Patents:  Patented Medicines", *Pharmaceutical Canada,* Spring, 2004.

"The Wait is Over – An Appellate Decision on Anticipation", *Blakes Bulletin on Intellectual Property Focus on Patents,* July, 2004 (with C. Hale).

"Patents:  How are Rights Transferred?", *Pharmaceutical Canada*, Fall 2004.

"Patents:  How are Patent Rights Infringed?", *Pharmaceutical Canada*, Winter 2005.

Participant, "Intellectual Property Expert Roundtable on the Economic Implications of Intellectual Property Regimes Involving Human Genetic Materials, Canadian Biotechnology Advisory Committee and Canadian Genetic Diseases Network", January 2005.

"Patents:  How are Patent Rights Enforced?", *Pharmaceutical Canada*, Spring 2005.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Patents:  What Foreign Issues Must be Considered?", *Pharmaceutical Canada*, Summer 2005.

"Experimental Use Exception to Patent Infringement", *Lawyers Weekly*, October 2005.

"Experimental Use Exception to Patent Infringement"", *Pharmaceutical Canada*, Fall 2005.

"Experimental Use Exception to Patent Infringement", *Intellectual Property*, Summer 2006.

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *The Licensing Journal*, October, 2013 (with C. Ing).

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *World Intellectual Property Report*, December, 2013 (with C. Ing).

"Collaborations for Combination Products in the Life Sciences Industry:  Part 1 – Structuring the Deal and Regulatory Development", *Intellectual Property*, Fall, 2013 (with C. Ing).

"Developing and Commercializing Combination Products", Blakes *Life Sciences Insights & Developments*, Winter, 2014 (with C. Ing).

## Sports and Entertainment

"Collegiate Licensing in Canada and the Statutory Advantage", *Education Law Journal,* March, 1989.

"Injunctive Relief Against Violators of Rights Under Official Marks: Considerations for Collegiate Licensors in Canada", Annual Meeting, Association of Collegiate Licensing Administrators, Baltimore, Maryland, April, 1989 (with C.C. Hale).

Moderator, "Canadian Licensing", Annual Meeting, Association of Collegiate Licensing Administrators, Baltimore, Maryland, April, 1989

"Foreign Collegiate Licensors and Withholding Tax in Canada", Annual Meeting, Association of Collegiate Licensing Administrators, Baltimore, Maryland, April, 1989 (with P. Rubin).

"Collegiate Licensing in Canada and the Statutory Advantage", *Collegiate Licensing Resource Book*, 1989.

Contributor, "Canada", *The Law of Character and Merchandise Licensing,* Battersby & Grimes, 2004 Update, Aspen Law & Business.

Contributor, "Canada", *The Law of Character and Merchandise Licensing,* Battersby & Grimes, 2005 Update, Aspen Law & Business.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Who Owns Professional Sports Marks – League, Teams, Players, Players Associations? International Trademark Association, May, 2005.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2006 Update, Aspen Law & Business.

Contributor, "Canada", *The Law of Character and Merchandise Licensing*, Battersby & Grimes, 2007 Update, Aspen Law & Business.

"Virtual Sex and Other Things Your Business Must Know About Virtual Worlds", IP Hot Buttons, Blake, Cassels & Graydon LLP, February, 2008.

"Second Life:  Virtual Property:  From Concept to Reality", "20th Century Property, 21st Century Rights", Technology and Intellectual Property Group, University of Toronto Law School, March, 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"Ambushing Gold in 2010", International Trademark Association, May, 2008.

"What Every Business Must Know About Virtual Worlds", Blakes Bulletin on Information Technology, May, 2008.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Your Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", Federated Press, December, 2008.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

Co-chair, "Anti-Counterfeiting and Brand Protection", Federated Press, October, 2009.

"Protecting Your Brands Against Online Counterfeiting", Anti-Counterfeiting and Brand Protection, Federated Press, October, 2009.

"Get a Life! Virtual Worlds vs. Real World", *Facts & Findings*, National Association of Legal Assistants/Paralegals, November, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.**
**THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

"Post No Evil, Know No Evil:  Limiting Website Risk for User Generated Content", "Hot Button Legal Topics:  Social Media and Web 2.0", Blake, Cassels & Graydon LLP, June, 2010.

"Communication on Web Goes 2.0 Ways", *Blakes Bulletin on Intellectual Property:  Social Media Series*, September, 2010 (with T. Turco).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Communications Regulation Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Business Must Recognize Trade-mark Challenges as Communication on Web Goes 2.0 Ways", *World Intellectual Property Report*, September, 2010 (with G. Daniel, T. Turco and T. Remtulla).

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2010.

"User Generated Content", Internet Law Federated Press, Calgary, March, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2011.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2013.

"Canadian Supreme Court Piqued by Copyright Infringement of 'Curiosity'", World Intellectual Property Report, January, 2014.

"Supreme Court of Canada Piqued by Copyright Infringement of 'Curiosity'", *Blakes Bulletin on Intellectual Property*, January, 2014.

### D.3.15 Intellectual Property Aspects of Commercial Transactions

"Managing Intellectual Property and Technology:  Audits and Due Diligence", Managing the Intellectual Property Portfolio, Intellectual Property Institute of Canada, February, 2004.

"Trademark and Domain Name Related Due Diligence in Business Transactions", "Identifying and Managing Your Internet Rights, International Trademarks Association; November, 2004.

"Intellectual Property Transactions", What In-House Counsel Must Know About Intellectual Property, Lexpert Events, June, 2006.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Chapter on "Intellectual Property and Technology Due Diligence in Biotechnology and Pharmaceutical Commercial Transactions", in *The Law of Biotechnology in Canada*, Kratz, Carswell, [not yet published], 2006.

Question & Answer, "Canadian IP Law Can Impact M&A With U.S. Companies", The New Environment for M&A, *Executive Counsel*, October, 2007.

"Licensing and Intellectual Property Transactions", "Intellectual Property:  Year in Review 2008", Law Society of Upper Canada (with N. Milton and M. Kamenetsky), January, 2009.

"Licensing and Intellectual Property Transactions", "Intellectual Property:  Year in Review 2009", Law Society of Upper Canada (with N. Milton and E. Earon), January, 2010.

"Boilerplate:  Often the Difference", "Essentials of Commercial Contacts", Federated Press, June, 2012.

Debater, "Resolved IP Protection Should be Strengthened to Stimulate Innovation and Commercialization", Conference Board of Canada, February, 2013.

"Intellectual Property Issues in Cross-Border Deals", International Business Agreements and Commercial Ventures, Insight, February, 2013.

"Obligations to Defend and Indemnify in a License Agreement", *Blakes Bulletin on Intellectual Property*, March, 2013.

"Obligations to Defend and Indemnify in a License Agreement:  Lessons Learned from the Appeal of an Arbitration Award", *Intellectual Property*, Spring, 2013.

"To Have, Hold (Harmless), Defend and Indemnify:  The Most Difficult Vows in Technology Agreements", IP Hot Buttons, Blake, Cassels & Graydon LLP, May, 2013.

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *The Licensing Journal*, October, 2013 (with C. Ing).

"The Challenges of Structuring and Negotiating Collaboration Agreements for Combination Products in the Life Sciences Industry", *World Intellectual Property Report*, December, 2013 (with C. Ing).

"Collaborations for Combination Products in the Life Sciences Industry:  Part 1 – Structuring the Deal and Regulatory Development", *Intellectual Property*, Fall, 2013 (with C. Ing).

"Developing and Commercializing Combination Products", Blakes *Life Sciences Insights & Developments*, Winter, 2014 (with C. Ing).

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

Speaker, "Commitments to Live With:  IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

### D.3.16 Intellectual Property and Corporate Management

"Managing Intellectual Property and Technology:  Audits and Due Diligence", Managing the Intellectual Property Portfolio, Intellectual Property Institute of Canada, February, 2004.

Moderator and panellist, "Hot Button Issues in Intellectual Property", In-House Counsel Congress, The Canadian Institute, November 2005.

"What In-House Counsel Must Know About Intellectual Property", Lexpert Events, June, 2006.

"Virtual Sex and Other Things Your Business Must Know About Virtual Worlds", IP Hot Buttons, Blake, Cassels & Graydon LLP, February, 2007.

"What Every Business Must Know About Virtual Worlds", *Intellectual Property*, Spring, 2008.

"What Your Business Must Know About Virtual Worlds", *Blakes Bulletin on Information Technology*, May, 2008.

"Virtual Worlds With Real World Issues", *Internet and Ecommerce Law in Canada*", December, 2008.

"Protecting Your Brand and Trade-marks on the Internet", "Risk Management on the Internet: Best Practices for a Web 2.0 World", The Canadian Institute, April 2008.

"Protecting Your Brands in Cyberspace", "Internet Law", Federated Press, December, 2008.

"Virtual Worlds with Real World Issues", International Trademark Association, May, 2009.

Co-chair, "Anti-Counterfeiting and Brand Protection", Federated Press, October, 2009.

"Protecting Your Brands Against Online Counterfeiting", Anti-Counterfeiting and Brand Protection, Federated Press, October, 2009.

"Protecting Your Brands in Cyberspace", Internet Law, Federated Press, December, 2009.

"Intellectual Property in Virtual Worlds", *Intellectual Property Digital Guide*, Executive Media, January, 2010.

Moderator, "Branding (and Bonding) Over Breakfast", Blakes, November, 2011.

"Valuing Patents for Licensing", Valuation of Intellectual Property, Intellectual Property:  The Year in Review, Law Society of Upper Canada, January, 2013.

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

Speaker, "Commitments to Live With: IP and IT Representations and Warranties", Intellectual Property Issues in Commercial Transactions, Blakes March, 2014.

## D.3.17 Intellectual Property Policy

Participant, "Intellectual Property Expert Roundtable on the Economic Implications of Intellectual Property Regimes Involving Human Genetic Materials, Canadian Biotechnology Advisory Committee and Canadian Genetic Diseases Network", January 2005.

Roundtable Contributor, "Intellectual Property in the 21st Century", *The Conference Board of Canada*, December, 2009.

Debater, "Resolved IP Protection Should be Strengthened to Stimulate Innovation and Commercialization", Conference Board of Canada, February, 2013.

## D.3.18 Alternative Dispute Resolution

"Domain Names and Trade-marks on the Net: Current Hot Issues", Netlaw 2004, The Canadian Institute, March, 2004.

"Hot Current Issues in Domain Names", "Internet Law", Insight Information, April, 2004.

"Ontario Court Upholds Arbitration Clause in Patent – License Dispute", *World Intellectual Property Report*, August, 2006.

"Canadian Court Upholds Arbitration Clause in Patent License Dispute", *Journal of Intellectual Property Law & Practice*, Fall, 2006.

"Mediation in Intellectual Property Disputes", Ridout & Maybee seminar, June, 2009 (with R. Dimock).

"Mediation in Intellectual Property Disputes", Bereskin & Parr seminar, October, 2010 (with R. Dimock).

"Mediation More Attractive in Ontario", *Blakes Bulletin – Litigation & Dispute Resolution*, January, 2011.

"Ontario Legislation Makes Mediation Attractive for Intellectual Property and Technology Disputes", *IP Neutrals of Canada*, February, 2011.

"Mediation in Intellectual Property Disputes", McCarthy Tetrault seminar, February, 2011 (with R. Dimock; slides co-authored by B. Edmonds).

THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER.
THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL

"Ontario Legislation Makes Mediation Attractive for Intellectual Property and Technology Disputes", British Columbia International Commercial Arbitration Centre.

"Ontario Legislation Makes Mediation Attractive for Intellectual Property and Technology Disputes" *Intellectual Property*, Fall, 2011.

Panelist, "Challenges to Counsel for Successful Mediation", Intellectual Property Institute of Canada, September, 2012.

"Obligations to Defend and Indemnify in a License Agreement", *Blakes Bulletin on Intellectual Property*, March, 2013.

"Obligations to Defend and Indemnify in a License Agreement:  Lessons Learned from the Appeal of an Arbitration Award", *Intellectual Property*, Spring, 2013.

Panelist, "Ethics in Mediation", Intellectual Property Institute of Canada, June, 2013.

Speaker, "Intellectual Property and Technology ADR", Interesting Niches in ADR, Gold Standard, ADR, ADR Institute of Canada / ICC Canada International Arbitration, October, 2013.

Co-author, chapter on "Domain Name Dispute Policy", *Bullen & Leake & Jacob's Canadian Precedents of Pleadings*, 2nd ed., Carswell, 2013 (with A. Turco).

"Ethics in Mediation", *Intellectual Property Institute of Canada Bulletin*, November-December, 2013.

### D.3.19 Law Firm Management

Chair, "Symposium on the Business of Intellectual Property and Information Technology in a Full Service Law Firm", Blake, Cassels & Graydon LLP, October, 2005.

Moderator, "IP/IT Opportunities for Full Service Law Firm", "Symposium on the Business of Intellectual Property and Information Technology in a Full Service Law Firm", Blake, Cassels & Graydon LLP, October, 2005.

**THIS REPORT REFERS TO DOCUMENTS MARKED HIGHLY CONFIDENTIAL UNDER THE PROTECTIVE ORDER. THEREFORE, THIS REPORT IS DESIGNATED HIGHLY CONFIDENTIAL**

# SCHEDULE "E"

# AUTHORITIES REFERENCED OR CITED IN REPORT

| Tab | Decisions |
|---|---|
| 1. | *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265. |
| 2. | *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129. |
| 3. | *Heap v. Hartley*, (1889) 42 Ch.D. 461. |
| 4. | *Electric Chain Company of Canada Limited v. Art Metal Works Inc.*, [1933] S.C.R.581. |
| 5. | *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907. |
| 6. | *Re T. Eaton Co.*, [1999] O.J. No. 4216 (Ont. S. C. J. (Commercial List)). |
| 7. | *Royal Bank v. Body Blue Inc.*, (2008), 42 C.B.R. (5th) 125 (Ont. S. C. J. (Commercial List)). |
| 8. | *Lay v. Lay*, [2000] OJ No. 985 (ONCA). |
| 9. | *Re Elliot Estate,* [1962] OJ No 164 (ONCA). |
| 10. | *American Cyanamid Co. v. Novopharm Ltd.*, [1972] F.C. 739 (F.C.A.). |
| 11. | *Fiberglas Canada Ltd. v. Spun Rock Wools Ltd.*, [1943] S.C.R. 547 and (1946-47) 6 Fox Patent. C. 39 (P.C.). |
| 12. | *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333 (C.A.F.C. 2001). |
| 13. | *International Gamco, Inc. v. Multimedia Games Inc.*, 504 F. 3d 1273 (C.A.F.C. 2007). |
| 14. | *AsymmetRx, Inc. v. Biocare Medical, LLC*, 582 F.3d 1314 (C.A.F.C. 2009). |
| 15. | *Propat International Corp. v. RPost, Inc.*, 473 F.3d 1187 (C.A.F.C. 2007). |
| 16. | *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corporation,* 604 F. 3d 1354 (C.A.F.C. 2010). |
| | **Publications** |
| 17. | Nguyen, Xuan-Thao, "Patent Prudential Standing", (2013) 21 Geo. Mason L. Rev. 17. |

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS
ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

- and-

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re**<br><br>**NORTEL NETWORKS INC., et al.,**<br>**Debtors.** | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**ACKNOWLEDGEMENT OF EXPERT'S DUTY OF SHELDON BURSHTEIN**

1. My name is Sheldon Burshtein. I live in the City of Toronto, Ontario, Canada.

2. I have been engaged by Goodmans LLP, counsel to Ernst & Young Inc. in its capacity as the Monitor for Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation, to provide evidence in the above-noted court proceedings.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

    a. to provide opinion evidence that is fair, objective and non-partisan;

22527011.1

   b.  to provide opinion evidence that is related only to matters that are within my area of expertise; and

   c.  to provide such additional evidence as the courts may reasonably require to determine a matter in issue.

4.  I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose I am engaged.

March 24, 2014

Sheldon Burshtein