DUFF&PHELPS

# Nortel Networks

January 24, 2014

## Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups

000001

# Contents

**Page**

1.0     Introduction..................................................................................1

2.0     Mandate .......................................................................................3

3.0     Executive Summary and Conclusions.................................................4

4.0     Instructions and Assumptions .........................................................14

5.0     Scope of Analysis ........................................................................19

6.0     Question 1: Analysis Based on Ownership .........................................20

7.0     Question 2:  Implied Recovery to Each Key Creditor Group Under Ownership Approach ..................................................................................44

8.0     Question 3: Calculation Based on Alternative Pro Rata Allocation ....................47

9.0     Question 4: Estimated Allocations Based on Parties' Claims ............................48

10.0    Restrictions and Qualifications.........................................................49

**Schedules**                                              **Tab**

Summary of Estimated Allocation to Each Nortel Debtor Group Under Ownership and Alternative Pro Rata Approaches............................................1

Computations Under Ownership Approach ...................................................2

Computations Under Alternative Pro Rata Allocation Approach .....................................3

Purchase Price Allocations and Actual Sales Proceeds  ................................................4

Summary of Assets in Each Debtor Prior to Consideration of Sales Proceeds  ..............5

Summary of Assumed Claims Against Each Nortel Estate .............................................6

Summaries of Source Information used in the Various Approaches ................................7

Summary of Fiscal 2009 RPSM Percentages...................................................................8

## Appendices

Acknowledgement of Expert's Duty ................................................................................. A

Curriculum Vita of Thomas Britven ............................................................................... B

Nortel's Evolution and Decline...................................................................................... C

The Operations of Nortel ............................................................................................... D

The Nortel IP Backbone ................................................................................................ E

The Master Research and Development Agreement ......................................................F

Scope of Analysis.......................................................................................................... G

Glossary of Terms ......................................................................................................... H



---

**PRIVATE & CONFIDENTIAL**

January 24, 2014

Paliare Roland Rosenberg Rothstein LLP
155 Wellington Street W., 35th Floor
Toronto, Ontario  M5V 3H1

Attention:  Mr. Kenneth T. Rosenberg

*For the Superintendent of Financial Services as
the Administrator of the Pension Benefits
Guarantee Fund*

Koskie Minsky LLP
20 Queen Street West
Suite 900
Toronto, Ontario  M5H 3R3

Attention:  Mr. Mark Zigler

*For the former employees of Nortel and the LTD
beneficiaries*

UNIFOR
Legal Department
205 Placer Court
Toronto, Ontario  M2H 3H9

Attention:  Mr. Barry E. Wadsworth

*For the active and retired employees of Nortel*

McCarthy Tétrault LLP
Suite 5300, Toronto Dominion Bank
Tower
Toronto, Ontario  M5K 1E6

Attention:  Mr. Paul Steep

*For Morneau Shepell Ltd. as
administrator of the Nortel Canada
registered pension plans*

Shibley Righton LLP
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario  M5H 3E5

Attention: Mr. Arthur O. Jacques

*For the recently severed Canadian
Nortel employees*

DLA Piper
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801

Attention: Ms. Selinda A. Melnik

Dear Sirs:

**Re:     Expert Report on Valuation and Other Issues Related to the
          Allocation of Sales Proceeds to the Nortel Debtor Groups**

# 1.0   Introduction

You, on behalf of the Canadian Creditors Committee (the "CCC"), have requested our
opinion on certain questions concerning the Sales Proceeds (as later defined) to be

---

000004

distributed among the following groups of Nortel debtors:

- Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation subject to proceedings in Canada under the Canadian Creditors Arrangement Act (collectively the "Canadian Debtors");

- Nortel Networks, Inc. ("NNI") and 14 other entities subject to proceedings in the United States under Chapter 11 of the US Bankruptcy Code (the "US Debtors"); and

- Nortel Networks UK Limited ("NNUK") and 17 other Nortel entities in England, the European States, the Middle East, and other countries subject to administration proceedings in the United Kingdom (collectively "EMEA" and, together with NNUK, the "EMEA Debtors").[1]

1.1    The Canadian Debtors, US Debtors and EMEA Debtors are referred to collectively as the "Nortel Debtor Groups."  An individual Nortel entity that is a member of a Nortel Debtor Group is referred to as a "Nortel Debtor" and the Nortel Debtors as a whole are referred to collectively as "Nortel".

1.2    You have requested our opinion to assist the Courts in the context of joint proceedings before the Ontario Superior Court of Justice and the United States Bankruptcy Court in the District of Delaware to allocate the $7,302 million currently held by JP Morgan and Citibank[2] in accordance with Section 11 of the Interim Funding and Settlement Agreement (the "IFSA").[3]

1.3    For greater certainty the $7,302 million (the "Sales Proceeds") is the sum of:

- The proceeds received from the sale of the former Nortel business units (the "Lines of Business") of $2,848 million (the "Business Sales Proceeds"). We refer to the sales themselves as the "Business Sales"; and

- The proceeds from the sale of the residual patent portfolio (the "Rockstar Transaction") of $4,454 million (the "Rockstar Transaction Proceeds").

---

[1] We understand that the EMEA Debtors are separate estates with a common Administrator and will distribute the collective proceeds amongst themselves.  However, for purposes of our analysis, we have considered them together.  For purposes of reporting to the Courts and for this analysis the various Canadian Nortel entities and US Nortel entities, respectively, have been consolidated.

[2] We understand that interest has accrued and continues to accrue on these proceeds. For purposes of our analysis, we have not included this accrued interest on the assumption that it will be allocated on the same basis as the principal.

[3] Interim Funding and Settlement Agreement, executed June 9, 2009, at Schedule 1, NNC-NNL033801.

1.4     Defined terms in this report are capitalized and summarized in Appendix H.

## 2.0  Mandate

2.1     You have asked us to determine each Nortel Debtor Group's share of the Sales Proceeds, based on the value of the assets owned and/or relinquished by its constituent Nortel Debtors in connection with each of the Business Sales and the Rockstar Transaction (the "Ownership" approach).

2.2     In the alternative, assuming the Ownership approach is not followed, you have asked us to calculate each Nortel Debtor Group's share of the Sales Proceeds, based on the objective that each unsecured Nortel creditor receives a common recovery percentage on its claims (the "Alternative Pro Rata Allocation" approach).

2.3     Specifically, you have requested we address the following questions:

Question 1:  What share of the Sales Proceeds would each Nortel Debtor Group receive based on the value of the assets owned and/or relinquished by its constituent Nortel Debtors in the Business Sales and the Rockstar Transaction (the "Sales")?

Question 2: What is the implied aggregate recovery to each Key Creditor Group,[4] assuming Sales Proceeds are allocated in accordance with the share determined in Question 1, measured as a percentage recovery of its estimated aggregate claims?

Question 3: Applying the Alternative Pro Rata Allocation approach, what share of the Sales Proceeds would each Nortel Debtor Group receive?

Question 4: For comparison purposes: what is the share of Sales Proceeds for each Nortel Debtor Group and the implied recoveries for each Key Creditor Group (measured as a percentage of estimated amounts claimed) based on the various positions of the core parties in the joint proceedings ("Core Parties")?

---

[4] The Key Creditor Groups are the Canadian general unsecured creditors (including the CCC), the bondholders for which guarantees have been provided by members of other Nortel Debtor Groups (the "Guaranteed Bondholders"), the US general unsecured creditors, the EMEA general unsecured creditors and the Nortel Networks UK Pension Trust (the "UK Pension Trust").

2.4    Unless otherwise indicated, all amounts in this report are in millions of US dollars.[5]

# 3.0    Executive Summary and Conclusions

3.1    Subject to our scope of analysis and the instructions, assumptions, restrictions and qualifications set out in this report, our opinions and conclusions to each of the questions above are set forth below.

3.2    Instructions we received and assumptions we made are set forth in Section 4. Restrictions and qualifications are in Section 10.

**Question 1:**

3.3    What share of the Sales Proceeds would each Nortel Debtor Group receive based on the value of the assets owned and/or relinquished by its constituent Nortel Debtors in the Sales?

3.4    The distribution of Sales Proceeds to the owners of the underlying assets is set out in Schedule 2.1 and summarized in Table 1:

| Table 1 Allocation of Fair Market Value of Nortel Debtor Groups' Assets By Owner | | | |
|---|---|---|---|
| US$ millions | | By Debtor | |
| Assets | Canada | US | EMEA |
| Tangible Assets | 59 | 42 | 68 |
| Intangible Assets | | | |
| Customer Relationships | 93 | 393 | 197 |
| IP | 858 | 228 | 57 |
| Purchaser Goodwill | 427 | 316 | 110 |
| Total Business Sales | 1,438 | 979 | 432 |
| Rockstar Transaction | 4,368 | 30 | 57 |
| Total | 5,805 | 1,009 | 488 |

---

[5] Claims have been calculated for illustrative purposes only using the foreign exchange rates in place on January 14, 2009.  This is without prejudice to the position of the CCC that an alternative exchange rate should be applied.

3.5    The essential logic underpinning our conclusion is as follows:

- The value of an asset inures to the owner of the asset, in accordance with fundamental business valuation principles;

- The share of the Sales Proceeds is based on the value of the assets owned and/or relinquished by constituent members of each Nortel Debtor Group;

- The licenses surrendered in connection with the Business Sales reflected, among other things, their lack of transferability, and limited scope and the burden of the Residual Profit Split Method ("RPSM") provisions of the Master Research and Development Agreement, as amended (the "MRDA");

- Under the Surrendered Licenses (as later defined), the Licensed Participants (as later defined) had rights to make, use and sell Products (as later defined) that used the patents and other technology of Nortel. The purchasers of the Lines of Business received new licenses and transfers of patents and other technology that enabled them to carry on the businesses sold.  Accordingly, the Business Sales Proceeds subsumed the value of the Surrendered Licenses; and

- Taking into account that the Rockstar assets were almost entirely owned by NNL and that the value of the Surrendered Licenses was captured within the Business Sales Proceeds, the Rockstar Transaction Proceeds almost entirely inure to NNL.

3.6    For details of our analysis underlying our response to Question 1, see Section 6.0.

**Question 2:**

3.7    What is the implied recovery to each Key Creditor Group, assuming Sales Proceeds are allocated in accordance with the share determined in Question 1 measured as a percentage recovery of its estimated aggregate claims?

3.8   The implied recovery, measured as a percentage recovery of estimated aggregate claims, to each Key Creditor Group as a result of an allocation of Sales Proceeds according to ownership is set out on Schedule 2 and summarized in Table 2, below.[6]

| Table 2 Implied Recovery, Measured as a Percentage Recovery of Estimated Aggregate Claims, to each Key Creditor Group | | | | |
|---|---|---|---|---|
| US$ millions | | Nortel Debtor Group: | | |
| | Canada | US | EMEA | Total |
| Sales Proceeds to Nortel Debtor Groups | 5,805 | 1,009 | 488 | 7,302 |
| Projected treasury cash | 343 | 744 | 438 | 1,525 |
| Total assets to be distributed | 6,148 | 1,753 | 926 | 8,827 |

Resulting distributions to, and recovery by, Key Creditor Groups:

| Key Creditor Groups | Claim | Resulting Direct and Indirect Distribution From: | | | Total Recovery | Recovery Percentage |
|---|---|---|---|---|---|---|
| | | Canada | US | EMEA | | |
| Guaranteed Bondholders | 4,092 | 2,762 | 1,330 | | 4,092 | 100.0% |
| US creditors | 1,300 | 813 | 423 | | 1,235 | 95.0% |
| Canadian creditors | 3,506 | 2,057 | | | 2,057 | 58.7% |
| EMEA creditors | 500 | | | 132 | 132 | 26.5% |
| UK Pension Trust | 3,000 | 516 | | 794 | 1,310 | 43.7% |
| | 12,398 | 6,148 | 1,753 | 926 | 8,827 | |

3.9   As indicated in Table 2, of the $6,148 million available for distribution by the Canadian Debtors, $2,057 million, or 33 percent, is distributed to Canadian-only creditors. The balance is distributable to the Guaranteed Bondholders, the US Debtors and the UK Pension Trust in satisfaction of their assumed claims against the Canadian Debtors.

3.10   Claims have been calculated for illustrative purposes only, using the foreign exchange rates in place on January 14, 2009. This is without prejudice to the position of the CCC that an alternative exchange rate should be applied.

---

[6] The percentage recoveries are computed as the estimated cash distributions as a percentage of the assumed claim amounts listed in Table 2. The estimated cash distributions from the Canadian Debtors include:
   - distributions on creditor claims against that estate
   - distributions on the $880 million UK Pension Trust guarantee claim (which is not admitted by the CCC), and
   - estimated distributions to third party creditors of the US estate which are settled indirectly through the $2,000 million claim by the US Debtor against the Canadian estate.

3.11    For details of our analysis underlying our response to Question 2, see Section 7.0.

## Question 3:

3.12    Applying the Alternative Pro Rata Allocation approach to the Sales Proceeds, what share of the Sales Proceeds would each Nortel Debtor Group receive?

3.13    The recovery to each creditor under the Alternative Pro Rata Allocation approach is 71.2 percent, which is computed as the total distributable assets (comprising Sales Proceeds and treasury cash in all estates) of $8,827 million divided by the total third party claims[7] in all of the estates of $12,398 million.

3.14    The projected treasury cash that will reside with each of the Nortel Debtor Groups as of the date of distribution is assumed not to be redistributed between the Nortel Debtor Groups.  Consequently, the end objective of a common percentage recovery to each unsecured Nortel creditor is performed by determining how much of the Sales Proceeds should be awarded to each of the Nortel Debtor Groups so as to achieve the end objective after recognizing the treasury cash in their possession.

---

[7] Excluding, for the purposes of Question 3, inter-company claims and guarantees as discussed in 4.2(i).

3.15    Based on same, each Nortel Debtor Group requires 71.2 percent of the dollar value of the claims against it to be available for distribution. From this we deduct the treasury cash it is projected to have available in order to compute the required allocation of Sales Proceeds. This is set out on Schedule 3 and summarized in Table 3, below.[8]

| Table 3<br>Allocation of Sales Proceeds<br>Under the Alternative Pro Rata Allocation Approach | | | |
|---|---|---|---|
| US$ millions | | | |
| Nortel<br>Debtor Group | Allocation of<br>Sales Proceeds | Treasury<br>Cash | Resulting Cash<br>For Distribution |
| Canada | 5,067 | 343 | 5,410 |
| US | 182 | 744 | 926 |
| EMEA | 2,054 | 438 | 2,492 |
| | 7,302 | 1,525 | 8,827 |

3.16    For further details of our analysis underlying our response to Question 3, see Section 8.0.

**Question 4:**

3.17    For comparison purposes: what is the share of Sales Proceeds for each Nortel Debtor Group and the implied recoveries for each Key Creditor Group (measured as a percentage of estimated amounts claimed) based on the various positions of the Core Parties?

3.18    Due to incomplete information regarding the manner in which the other Core Parties would apply the principles articulated in their allocation pleadings, we are not providing an estimate of the share of Sales Proceeds and the implied recoveries resulting from the allocation proposals of those parties, at this time. If necessary, we could make assumptions that we believe would be directionally accurate. However, we believe it is more appropriate to permit these parties to more clearly articulate their position through the delivery of their expert reports and through responses to questions on the representative party discoveries/depositions.

---

[8] For purposes of our computations under the Alternative Pro Rata Allocation approach in this report only, we have assumed the Guaranteed Bondholder claim to be a primary claim against the Canadian estate and therefore the full required assets to be distributed to the Guaranteed Bondholders are put into Canada. This assumption should not be taken as an acknowledgement by the CCC as to its validity or enforceability.

**Relevant Points from Business Background Pertaining to Question 1**

3.19    Attached to this report are appendices that detail background topics as follows:

| | |
|---|---|
| Nortel's Evolution and Decline | Appendix C |
| The Operations of Nortel | Appendix D |
| The Nortel IP Backbone | Appendix E |
| The MRDA | Appendix F |

3.20    The key summary observations from these background appendices include the following, each of which has important implications for the value of the assets owned and/or relinquished by each Nortel Debtor:

a)  Intellectual property formed the backbone of Nortel and its Lines of Business and value;

b)  The terms of the MRDA, including the RPSM, inform our determination of the value of the respective assets of each Nortel Debtor and the portion of the Sales Proceeds which each Nortel Debtor Group should receive;

c)  Nortel's financial performance was poor over the years prior to filing for bankruptcy protection. At the time of filing, its economic prospects were not strong and not sufficient to merit Nortel continuing the Lines of Business; and

d)  The Business Sales and the Rockstar Transaction represented orderly dispositions which maximized sales proceeds to the Nortel Debtor Groups.

3.21    Each of the above topics is discussed in more detail below.

**a) Intellectual property formed the backbone of Nortel and its Lines of Business and value.**

3.22    In light of the fundamental importance of Nortel's intellectual property, much of Nortel's value was based on the development and maintenance of intellectual property.[9]

3.23    Nortel spent over $30 billion on R&D from 1996 through 2009.[10]  Annual R&D spending peaked at $4.0 billion in 2000.

---

[9]  Affidavit of John Doolittle, January 14, 2009, at ¶ 10.
[10]  See Appendix E.

3.24    Nortel also acquired some IP through various acquisitions, such as Bay Networks and STC,[11] which included R&D teams, patents and other IP.  NNL typically paid for these acquisitions with NNL stock or debt.[12]

3.25    Nortel's R&D headcount peaked in 2000 at 26,900[13] but, by the end of 2007, had dropped to approximately 10,000, or 36 percent of Nortel's total headcount.[14]

3.26    Nortel's R&D efforts included both basic research and product development.

3.27    Nortel's patents generally fell into three categories: product protection patents, defensive patents, and strategic patents:

- Product protection patents, relating to patented technology used in Nortel products, amounted to approximately 20 percent to 25 percent of overall patent spending;[15]

- Defensive patents included patents covering technologies that Nortel did not make, use, or sell in any product, but that Nortel's competitors did.  Nortel's defensive patent strategy was intended to discourage competitors from litigating patent claims against Nortel; and

- Strategic patents resulted from fundamental research in a number of concepts and areas in respect of which Nortel felt the need to obtain patents well in advance of where the product groups themselves would be going or even had plans to go in the future.  Many of these patents covered technologies not used or contemplated for use by Nortel's Lines of Business.[16]

3.28    Nortel built a substantial intellectual property portfolio amassing over 8,000 patents since 1990.

3.29    Obtaining patents was important to Nortel's business.[17]  As stated by Pascal Debon, past president of Nortel Wireless, "[the development of patents and technology to the wireless business] was key.  It is absolutely the key things,

---

[11] "I certainly remember under the various discussions that a large number of patents and technology came in under acquisition of STC." Deposition of Ian Barton (September 25, 2013), at 100:23-101:2.
[12] CTRL-NORTEL-00000041.
[13] Nortel Networks Corp., Form 10-K, fiscal year ended December 31, 2000, at p. 14, NNC-NNL06001435 / 14.
[14] Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011, October 31, 2008 - Appendix H, at 4, CTRL-NORTEL-00000355; Nortel Networks Corp., Form 10-K, fiscal year ended December 31, 2008, p. 14..
[15] Deposition of Gillian McColgan (November 8, 2013), at 67:19-68:13.
[16] Deposition of Gillian McColgan (November 8, 2013), at 62:4-63:11 and 123:13-127:8.
[17] Deposition of Khush Dadyburjor (October 3, 2013), at 31:15-31:16, and 41:5-41:13.

because otherwise you use patents of your competitor, you have to pay royalties, and you don't have a business."[18]

**b) The terms of the MRDA, including the RPSM, inform our determination of the value of the respective assets of each Nortel Debtor and the portion of the Sales Proceeds that each Nortel Debtor Group should receive.**

3.30    The MRDA determined ownership of NN Technology[19] and included license grants and RPSM provisions.  The parties to the MRDA are NNL, NNI, Nortel Networks Ireland ("NN Ireland"), NNUK, and Nortel Networks SA ("NNSA"), referred to hereinafter collectively as the "Participants".  The Participants other than NNL are referred to hereinafter as the "Licensed Participants".

3.31    In the Business Sales, the purchasers were granted new licenses, which, together with the assigned patents, were practically and economically similar to the Surrendered Licenses for purposes of the Business Sales.[20]  However, the purchasers in the Business Sales were not subject to other MRDA obligations, including vesting of ownership of NN Technology in NNL, and RPSM provisions.

The Business Sale Proceeds included the amounts paid for the new licenses granted to purchasers.

3.32    The MRDA allowed the Licensed Participants to use the NN Technology to make, use and sell Products in their businesses, subject to its terms.

3.33    The purchasers in the Business Sales acquired patents and licenses that enabled them to continue to carry on the Lines of Business purchased without being subject to any of the terms of the MRDA, including ownership of NN Technology and the RPSM obligations.

3.34    Under the RPSM, consolidated operating income or loss attributed to Nortel's development and exploitation of its IP was calculated based on a prescribed methodology and amounts were allocated to each Participant based on the relative weight of each Participant's historical R&D investment to the aggregate of their historical R&D investment.

---

[18] Deposition of Pascal Debon (November 23, 2013), at 41:14-41:20.
[19] Article 1(f) of the MRDA defines NN Technology as follows: "NN Technology shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software, and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."  MRDA at p. 3; NNC-NNL006802.
[20] Where patents were transferred to purchasers, those purchasers acquired ownership, which made licenses to those patents unnecessary.

3.35    These provisions directly affected the potential earnings that the Licensed Participants could have realized under their licenses, which in turn affects the value that is attributable to them.

3.36    As of fiscal 2009, the approximate relative R&D expense shares that would have been used in the application of the RPSM are as set out in Table 4, below:[21]

| Table 4 Fiscal 2009 RPSM Sharing Ratios | |
|---|---|
| Party | RPSM Share, rounded |
| NNL | 49.8% |
| NNI | 38.5% |
| EMEA Debtors (combined) | 11.6% |

**c) Nortel's historical financial performance was poor over the years prior to its filing for bankruptcy protection. At the time of filing, its economic prospects were not strong and not sufficient to merit Nortel continuing the Lines of Business.**

3.37    Nortel had been a celebrated Canadian company but its financial performance was poor and, as of the filing date, Nortel could not sustain a viable leading global telecommunications business.

3.38    Specifically, looking forward from the time of filing:

a)    Nortel's economic prospects were not sufficient to merit Nortel continuing the Lines of Business, which were ultimately sold;

b)    Nortel was unable to maintain sufficient investment in R&D to allow it to retain top customers;[22]

c)    Customers required Nortel to have a strong balance sheet before making major purchases because they wanted to be assured of Nortel's viability as a going concern before committing to acquire Nortel's products.  Nortel's balance sheet was not sufficient to sustain customer confidence;[23] and

---

[21] Schedule 8.
[22] NNC-NNL06001114 / 1.
[23] NNC-NNL06232478, at slide 2 & 3.

d)  We have seen no evidence that the Lines of Business would have produced an adequate return for Nortel as a whole going forward.

3.39    The above perspectives are consistent with and supportive of our analysis concerning (i) the value of the Lines of Business to the US and EMEA Debtors had they continued in business and (ii) the aggregate value of the reporting units of Nortel as determined in connection with the 2008 annual impairment test ("AIT") related to Nortel's Lines of Business.

### d)  The Business Sales and the Rockstar Transaction represented orderly dispositions which maximized sales proceeds to the Nortel Debtor Groups

3.40    After the commencement of the insolvency proceedings and after the Nortel Debtor Groups concluded that a going concern restructuring was not viable, it was determined that Nortel's assets would be sold.

3.41    The Nortel Debtors agreed to an orderly disposal of Nortel's assets.[24] Management within Nortel, outside advisors, and Nortel's creditors endeavoured to maximize the value associated with the dispositions of Nortel's assets.

3.42    Nortel's assets comprising the Lines of Business and the residual patents were sold to the highest bidder in each case.

3.43    In the Business Sales, patents "Predominantly Used"[25] by a single business were transferred to purchasers of that business.  In all, approximately 2,700 patents[26] and patent applications were transferred to purchasers in the Business Sales.

In each Business Sale, licenses were granted to the purchaser for the use of patents they did not acquire that were necessary to operate that business.

Consequently, all of the patented technology required to operate the businesses sold by Nortel was included in the patents transferred and the licenses granted to the purchasers as part of the Business Sales.

3.44    Approximately 7,000[27] patents and patent applications were sold as part of the Rockstar Transaction.

3.45    The Rockstar Transaction conveyed two categories of patents and patent applications that were not assigned or transferred in the Business Sales.

---

[24] See, e.g., Interim Funding and Settlement Agreement (executed June 9, 2009).

[25] Deposition of John Veschi (November 7, 2013), at 285:21-286:9; and defined in Appendix E

[26] See generally Seller Disclosure Schedules, NNC-NNL06001637 (CVAS), NNC-NNL06001811 (CDMA), NNC-NNL06002070 (Enterprise Solutions), NNC-NNL06002257 (MEN), NNC-NNL06002391 (MSS), NNC-NNL06002603 (GSM), and NNC-NNL06002623 (Layer 4-7).

[27] See generally Seller Disclosure Schedule, NNC-NNL06002561.

Collectively these patents and applications are referred to as "Residual Patents."[28]

- Some Residual Patents claimed inventions used in Products that had been made, used or sold by the Lines of Business.  In each Business Sale, these were licensed on a royalty free basis to the purchaser for use in the business.  The scope of the licenses to these patents was sufficient to allow the purchasers in the Business Sales to run their businesses.[29]

- The remainder of the Residual Patents claimed inventions that were not used in Products that had been made, used or sold by the Lines of Business.

3.46    The Business Sales Proceeds were $2,848 million and the Rockstar Transaction Proceeds were $4,454 million, resulting in total Sale Proceeds of $7,302 million.

# 4.0   Instructions and Assumptions

4.1    This report, including the earlier Executive Summary and Conclusions, is necessarily premised on certain assumptions and instructions.  We have not made or adopted any assumptions or instructions which we do not think are reasonable for the purposes of this report.

**Instructions**

4.2    In arriving at our opinions and conclusions herein, we have adopted the following instructions:

a)   With respect to the Interim Funding Settlement Agreement ("IFSA") and the License Termination Agreements executed in connection with the Business Sales and the Rockstar Transaction and related agreements (in each case, an "LTA" or, collectively, the "LTAs"):

- The IFSA states that it "shall not serve as the basis for…allocation of any sale proceeds, or any ownership of intellectual property."[30]  There is no valuation paradigm imposed by this document;

- The parties agreed that the allocations of Sales Proceeds would be determined on the basis contemplated in the IFSA;

---

[28] Deposition of Gillian McColgan (November 8, 2013), at 182:3-183:19.
[29] See Appendix E for a description of the licenses provided to the purchasers in the Business Sales and for a discussion of Nortel's patent characterization efforts.
[30] IFSA, Section 10(c), NNC-NNL033801.

- Parties to each LTA were the Licensed Participants[31] as well as various other entities as set out in the LTAs;[32]

- The Licensed Participants and NNL agreed on June 9, 2009 [33] (the "Valuation Date")[34] that the Licensed Participants would surrender their licenses by virtue of the IFSA.   The licenses were surrendered pursuant to the LTAs and are hereinafter called the "Surrendered Licenses";

- The effect of each LTA was that the Licensed Participants were not to improve or diminish their position from that which they had under the Surrendered Licenses pursuant to the terms thereof.   There is no valuation paradigm imposed by these documents; and

- The parties agreed to negotiate and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of the Sales Proceeds.   These negotiations were unsuccessful and the allocation of the Sales Proceeds is to be determined by the courts in Canada and the US in accordance with the Allocation Protocol Orders;

b)  Under the MRDA:

- Article 4(a) provides that title to any and all NN Technology vested in NNL;[35, 36]

- The MRDA vested in NNL the NN Technology resulting from the R&D of the Licensed Participants.    Under Article 4(b) of the MRDA, "[e]ach Licensed Participant shall execute or cause to be executed such

---

[31] The Licensed Participants as defined in the MRDA included Nortel Networks, Inc., Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks Australia, and Nortel Networks Ireland.  NN Australia had been a Participant to the MRDA, but to our understanding, it was not a Participant as of 2009.  According to a 2009 Transfer Pricing Report (NNC-NNL06001553; NNC-NNL06102121), "Nortel Networks Australia ceased to perform R&D as a result of a sale of its R&D facility in August 2005. Pursuant to an IP development agreement, Nortel Networks Australia retired from the agreement effective December 31, 2007.  Nortel Networks Australia became a LRE on January 1, 2008."  See also CTRL-NORTEL-00000364 (Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, at p. 12).
[32] See BHG0074940, NNI_ICEBERG_00135895, NNSA BHG0073858, BHG0111940, NNI_ICEBERG_00135723, NNC_NNL06002543, NNI_ICEBERG_00135847, NNI_ICEBERG_00136018, GIP_Nortel_001001400, NNC-NNL06002488, NNI_ICEBERG_00135695, GIP_Nortel_00101634, NNI_ICEBERG_00135740.
[33] NNC-NNL033801.
[34] The fact that licenses were surrendered on different dates does not change our analysis.
[35] In practice, there were a few patents that were not assigned to NNL. We understand that the MRDA requires that patents that resulted from R&D under the MRDA be transferred to NNL notwithstanding some were registered in other jurisdictions.
[36] Prior to the MRDA, the MRDA Participants were in cost sharing arrangements that established similar ownership and licensing provisions to the MRDA.

documents reasonably requested by NNL as may be desirable to give effect to, or perfect" the provisions of Article 4(a);[37]

- The licenses granted by NNL to the Licensed Participants pursuant to the MRDA were limited in scope to make, use, and sell products and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed by a Participant ("Products"), that used or embodied the NN Technology, within given territories, and to use the patents and other NN Technology as necessary or appropriate for that purpose;[38,39]

- The licenses were exclusive only within defined territories and field of use for each Licensed Participant.  Each Licensed Participant also held non-exclusive licenses in all territories other than the exclusive territories of the MRDA Participants;

- The Licensed Participants were bound by provisions in the MRDA pertaining to income and loss reallocations under the RPSM;

- The Surrendered Licenses were not transferrable to third parties without the consent of the other parties to the MRDA;

- Each Licensed Participant had a right to sublicense its license rights within the scope and field of use of its other license rights in making, using and selling and marketing Products;

- All rights remained with NNL unless specifically granted to the Licensed Participants. In particular:

   – NNL had the right to assign the patents owned by NNL without the consent of the LPs;

   – NNL retained all rights outside of what was licensed to the Licensed Participants within the exclusive territories.  NNL also retained rights inside and outside of what was licensed to the Licensed Participants in the non-exclusive territories; and

   – NNL retained all rights relating to uses of the NN Technology unrelated to Products;

---

[37]  Master R&D Agreement at p. 6; NNC-NNL006802.
[38] For the exact language of the license grant and the exact definition of Products, see Appendix F.
[39] We sometimes refer to these license rights as the right to "make, use, and sell" Products.

- The Licensed Participants had rights to bring suits and obtain remedies in their respective Territories for the infringement of their exclusive license rights under the MRDA by others; and

- Patents and patent applications within the NN Technology that were not used to make, use or sell Products were not subject to the licenses provided to the Licensed Participants under the MRDA;

c) In the Business Sales, where licenses were granted to the purchasers, those licenses were practically and economically similar to the Surrendered Licenses;[40]

d) Patents, patent applications, and other portions of the NN Technology are owned by the legal entity that holds title to them.  The licenses are held by the licensees thereof – the Licensed Participants;

e) The aggregate of the cash available for distribution at or about June 30, 2014 (the "Date of Distribution") will be approximately $8,827 million;

f) The $8,827 million is the sum of the Sales Proceeds of $7,302 million and the treasury cash of $1,525 million[41] projected to actually be held by the Nortel Debtor Groups at that date;

g) The projected treasury cash is not directly subject to allocation pursuant to the Allocation Protocol Orders and is not subject to the Escrow Agreements but, as part of the cash projected to be available for distribution, is taken into account in computing each Key Creditor Group's recovery and the resulting percentage recovery in our response to Question 2;

---

[40] Where patents were transferred to purchasers, those purchasers acquired ownership, which made licenses to those patents unnecessary.
[41] As estimated on Schedule 5.

h)  For the purposes of our computations under Question 2, we are to include:

- The unsecured claims [42] by the Key Creditor Groups, as detailed in Schedule 6 and summarized below:

|  | US$ millions |
|---|---|
| **Unsecured Third Party Claims** | |
| Guaranteed Bondholder claims[43] | 4,092 |
| Unsecured creditor claims against the US estate[44] | 1,300 |
| Unsecured creditor claims against the Canadian estate | 3,506 |
| Unsecured creditor claims against the EMEA estate[45] | 500 |
| UK Pension Trust claim | 3,000 |
| | $   12,398 |
| | |
| **Inter-estate and UK Pension Trust Guarantee Claims** | |
| US Debtor inter-estate claim against the Canadian estate | 2,000 |
| UK Pension Trust guarantee claim against the Canadian estate (up to) | 880 |

Claims have been calculated for illustrative purposes only, using the foreign exchange rates in place on January 14, 2009.  This is without prejudice to the position of the CCC that an alternative exchange rate should be applied.

The inclusion of these amounts should not be taken as an acknowledgement by the CCC as to their validity, or enforceability or quantum.  We include them only for illustrative purposes.

For the purposes of our computations under Question 2, we are not to include:

i.  The EMEA Debtors' claims asserted in the Joint Proceedings against the Canadian Debtors and the US Debtors;

---

[42] All priority claims are assumed to be paid in full by each estate from its treasury cash.

[43] Claims by the Guaranteed Bondholders against each of the Canadian and US estates.

[44] This number includes the unsecured portion of the claims of the Pension Benefit Guarantee Corporation of $400.  The balance of the claim is treated as a priority claim.  Any potential priority tax claim against the US Debtors has been valued at $0.

[45] We understand that the Canadian Debtors have asserted a claim against the EMEA Debtors in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants which we have been instructed not to include in our analysis.  This should not be taken as an acknowledgment by the CCC as to the appropriateness of its exclusion.

ii. UK Pension Trust claims against the Canadian Debtors and the US Debtors with the exception of the $880 million UK Pension Trust guarantee claims, as noted above, which claims have not been admitted by the CCC;

iii. Any claims for post-filing interest, including by the Guaranteed Bondholders; and

iv. The Canadian Debtors claim against the EMEA Debtors as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims filed on Behalf of the EMEA Claimants (as discussed in footnote 48);

i) For the purposes of our computations under Question 3, we are to include only the five categories of Unsecured Third Party Claims listed above. For greater certainty, in Question 3, we are not to incorporate the inter-estate claims, the claims by the Guaranteed Bondholders against both the Canadian and US estates or the assumed guarantee claim by the UK Pension Trust against the Canadian Debtors; and

j) For purposes of our computations under Question 3, we should take into account each Nortel Debtor Group's treasury cash when computing the required allocation of Sales Proceeds to be received by each Nortel Debtor Group, in order to ensure a common percentage recovery by each creditor within the Key Creditor Group.

4.3   Consequently, the end objective of a common percentage recovery to each unsecured Nortel creditor is performed by determining how much of the Sales Proceeds should be awarded to each of the Nortel Debtor Groups after recognizing the treasury cash in their possession.

## Assumptions

4.4   Our opinions and conclusions are subject to the assumptions noted in this report.

# 5.0   Scope of Analysis

5.1   In preparing our report, we have analyzed and relied upon the documents and information set out in Appendix G. We have not audited or performed any verification procedures on the documents and information in Appendix G.

# 6.0    Question 1: Analysis Based on Ownership

6.1    What share of the Sales Proceeds would each Nortel Debtor Group receive based on the value of the assets owned and/or relinquished by the constituent Nortel Debtors in the Sales?

6.2    Valuation theory [46],[47],[48],[49] supports the same proposition that underpins the allocation of value based on the Ownership approach. [50]

6.3    Our experience and the analysis, conclusions and opinions that follow are consistent with this approach.

---

[46] Shannon P. Pratt and Alina V. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, 5th ed. (New York: McGraw Hill, 2008), p. 70

"The specific methods and procedures for valuing a business or a business interest vary from one situation to another.  However, several basic principles are fundamental to the business valuation discipline:

From a financial point of view, the value of a business or business interest is the sum of the expected future benefits to its **owner** [emphasis added], each discounted back to a present value at an appropriate discount rate.

[47] Henry A. Babcock, Appraisal Principles and Procedures, (Washington, DC: American Society of Appraisers, 1980), pg 26.

"Property Rights – Definition of Property for Valuation Purposes:  The meaning of the word property, when used in connection with value and valuation, is closely associated with the idea of ownership.  In fact, a 'valuation' has been defined as the determination of the monetary value, as some specified date, of the property rights encompassed in an ownership.  These rights are the exclusive rights to possess, to enjoy, and (in some cases) to dispose of a thing.  In general, the rights of ownership are rights which are defined and protected by law."

[48] Appraisal Standards Board, "Standards Rule 9-2," Uniform Standards of Professional Appraisal Practice, 2014-2015 ed. (Washington, DC: The Appraisal Foundation, 2013), pp. U-60-62, accessed from http://www.uspap.org/#/78/.  This standard directs the valuator to carefully consider and understand legal rights and other attributes of associated with ownership of the assets being valued and is consistent with the AICPA standard referred to in the next footnote.

[49] AICPA Consulting Services Executive Committee,  "Ownership Information," Statement on Standard for Valuation Services No. 1, Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset, 2014-2015 ed. (New York: American Institute of Certified Public Accountants, 2007), para. 28, p. 15 from http://www.aicpa.org/interestareas/forensicandvaluation/resources/standards/downloadabledocuments/ssvs_full_version.pdf. This standard directs the valuator to carefully consider the attributes of ownership as consideration of same is essential to the valuation process….

[50] See paragraph 2.1 of this report.

6.4    Under the Ownership approach and considering the combined effect of the LTAs and IFSA, we have concluded that:

- The basis of valuation of the Nortel Debtor Group's assets should be their fair market value recognizing that the Licensed Participants were not to improve or diminish their position from that which they had under the Surrendered Licenses; and

- The value of the Surrendered Licenses should reflect only what was held by the Licensed Participants on or about the date they were surrendered.

6.5    For purposes of this report, we determined the fair market value of the individual assets or asset categories in the context of the whole of the related Line of Business or transaction and not on a piecemeal basis.

6.6    Fair market value means the highest price available in an open and unrestricted market between informed, prudent parties acting at arm's length and under no compulsion to act, expressed in terms of money or money's worth.[51]  This definition is generally accepted by valuation professionals and we understand is accepted by the Canadian courts.  The US definition[52] has the same substantive meaning for purposes of this report.

6.7    For purposes of our analysis, we refer to Operating Assets as Nortel's tangible assets, and as identified intangible assets including customer relationships and IP.

---

[51] Canadian Institute of Business Valuations (accessed at: https://cicbv.ca/glossary).
[52] Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. *United States v. Cartwright*, 411 U.S. 546, 93 S. Ct. 1713, 1716-17, 36 L. Ed. 2d 528, 73-1 U.S. Tax Cas. (CCH) ¶ 12,926 (1973).

6.8    The portion of Sales Proceeds that each Nortel Debtor Group should receive based on ownership, by Asset Category, is as set out in Table 1, which is repeated here for ease of reference.[53]

| Table 1 (repeated) Allocation of Sales Proceeds by Asset Category Under the Ownership Approach | | | |
|---|---|---|---|
| US$ millions | | By Debtor | |
| Asset Category | Canada | US | EMEA |
| Tangible Assets | 59 | 42 | 68 |
| Intangible Assets | | | |
| Customer Relationships | 93 | 393 | 197 |
| IP | 858 | 228 | 57 |
| Purchaser Goodwill | 427 | 316 | 110 |
| Total Business Sales | 1,438 | 979 | 432 |
| Rockstar Transaction | 4,368 | 30 | 57 |
| | 5,805 | 1,009 | 488 |

6.9    In response to Question 1:

In respect of the Business Sales, we:

a)    Determined the value of each category of the Operating Assets owned or held by the constituent members of each Nortel Debtor Group;

b)    Computed the difference between the Business Sales Proceeds and the aggregate value of the Nortel Debtor Group's Operating Assets (the "Purchaser Goodwill") and then assigned the Purchaser Goodwill in proportion to the value of the intangible assets;

In respect of the Rockstar Transaction, we:

c)    Determined the value of the Rockstar assets owned by the constituent members of each Nortel Debtor Group; and

---

[53] See also Schedule 2.

In respect of both the Business Sales and the Rockstar Transaction, we:

d) Computed the aggregate value of the assets owned or held by the constituent members of each Nortel Debtor Group.

Each of the above is discussed in more detail below.

## Question 1(a) - Determine the value of the Operating Assets owned.

6.10 In determining the value of the Operating Assets owned, we performed the following steps:

Step 1:        Identify the assets sold;

Step 2:        Identify the owner(s) of each Operating Asset; and

Step 3:        Determine the value of the Operating Assets.

6.11 Our analysis of the Business Sales focuses primarily on the three largest Business Sales (CDMA & LTE, Enterprise, and MEN), which represent approximately 89 percent of the Business Sale Proceeds and for which the acquirers publicly disclosed the allocation of the related sale proceeds.

## Step 1:   Identify the assets sold in each Line of Business

6.12 The Business Sales involved the transfer or assignment of a collection of both tangible and intangible assets as follows:[54]

- Net tangible assets such as accounts receivable; property, plant and equipment; and inventory, net of certain assumed liabilities; and

- Intangible assets such as patents, licenses, know-how, customer relationships, etc.[55]

6.13 With the exception of the Surrendered Licenses, the categories of the Operating Assets sold in the Business Sales were equivalent to assets owned by the constituents of the Nortel Debtor Groups that were used in the business.

---

[54] The Purchase and Sale Agreements associated with each Business Sale identified these asset classes.
[55] See generally Asset Purchase Agreements, NNC-NNL06001800 (CDMA); NNC-NNL06002187 (MEN); and NNC-NNL06002063 (Enterprise Solutions).

6.14    In this report:

- Given the nature of the Business Sales and the IP being primarily owned by NNL, we do not segment the IP assets (e.g., patents, trademarks, copyright, etc.) and attribute distinct values thereto; and

- Customer relationships mean customer-related intangible assets including customer lists, order backlog, and customer relationships where (a) the company has information about the customer and has regular contact with the customer and/or (b) the customer has the ability to make direct contact with the company – all in the context of a business seeking to make an economic profit.

**Step 2:   Identify the owner(s) of each asset or each asset class**

6.15    We identified the owner of each asset class as described in the paragraphs below.

_Net Tangible Assets_

6.16    To determine ownership of Net Tangible Assets, we traced assets that were transferred or assigned in connection with the Business Sales back to the specific Nortel entity that owned each asset.[56]  Most of these assets were easily identifiable and traceable to specific legal entities using Nortel's business records.

_Intangible Assets_

6.17    To determine ownership of the intangible assets, we tracked the intangible assets transferred or assigned in the Business Sales back to the specific Nortel entity that owned the asset prior to the Business Sales.

6.18    The paragraphs below describe in more detail the entitlement to proceeds based on ownership, in relation to the intangible assets.

_Intangible Assets – IP_

6.19    Patents, patent applications, and other portions of the NN Technology are owned by the legal entity that holds title to them.  The Surrendered Licenses are held by the licensees thereof.

---

[56] We also dealt with liabilities in the same fashion.  The liabilities referred to here are in large part those that normally would be part of working capital.

6.20    Table 5, below, summarizes ownership percentages of Nortel Debtor Groups[57] based on the number of patents and patent applications conveyed in connection with the Business Sales.

| Table 5 Summary of Ownership of Patents and Applications Conveyed in the Business Sales[58] | | | | |
| --- | --- | --- | --- | --- |
| Business Sales | Number of Patents/Apps[59] | Ownership Percentage | | |
| | | Canada | US | EMEA |
| CDMA and LTE | 238 | 100.0% | 0.0% | 0.0% |
| Enterprise | 816 | 98.0% | 1.2% | 0.7% |
| MEN | 1,142 | 99.6% | 0.4% | 0.0% |

6.21    With the exception of the Surrendered Licenses, all IP was apportioned in the same ratio as patent ownership.

*Intangible Assets – Customer Relationships*

6.22    Pursuant to the terms of the MRDA, the Licensed Participants had the exclusive right to sell Products in their respective geographic territories.  We assume that the owner of a customer relationship is the operating entity that entered into the sales contracts with the customer in that geographic area.  We consequently used the ratio of the relative revenues (as a proxy for relative contribution margins)[60] generated by each Nortel Debtor Group to determine the proportion of customer relationships that each would own.

---

[57] See Schedule 7.5.  These percentages likely understate Canada's ownership percentage because allocations were made based on patents and patent applications whereas other types of IP, such as know-how, were 100 percent owned by Canada.

[58] See NNC-NNL06001801 at 12 – 34, NNC-NNL06001637 at 32- 47, NNC-NNL06002086 at 43-84, NOR_54401542 at A-25-A-29, NNC-NNL06002623 at 11-12, NNC-NNL06002189 at 200-236, and NNC-NNL06002391 at 96-100.

[59] The number of patents and patent applications in Table 5 are representative of the approximately 2.700 patents and patent applications transferred in the Business Sales.

[60] As contribution margin information by Line of Business by geography is not available to us, and based on our understanding that the contribution margin percentages do not vary significantly on sales made in Canada, the US and EMEA, we have used the relative revenues as a proxy for the relative contribution margin.

**Step 3:   Determine the value of the Operating Assets**

*Summary*

6.23    To determine the fair market value of the assets owned by the Nortel Debtors, recognizing that the Licensed Participants were not to improve or diminish their position from that which they had under the Surrendered Licenses, we would typically consider, amongst other items: forecasts for the Lines of Business, details of customer orders and relationship history, projections of revenues for each customer under contract or expected relationships, and profit margins for each of these sales, all from both the perspective of the seller and potential notional buyers.

6.24    We would also want to have an overall understanding of the IP, the related business opportunities, and the projected earnings from the IP, again both from the perspective of the seller and potential notional buyers.

6.25    Not all of this detailed information was readily available to us.   There was sufficient information of this nature available to us to allow us to perform the analysis set out at Section 6.49.

6.26    However, this detailed information was available to the purchasers of the Lines of Business, and each of them prepared a Purchase Price Allocation ("PPA") for each of the Business Sales.

6.27    In light of the information base underpinning the PPAs and for other reasons later explained, we have adopted the approach to valuing the assets explained below (the "PPA Approach"):

- For the net tangible assets, we determined their value to be the same as the value of the net tangible assets sold in each Business Sale as determined in the PPAs;

- For the customer relationships, their fair market value is as in the PPAs; and

- For IP, we divided it into two categories:

    – The value of the Surrendered Licenses as described below; and

    – The value of the balance of the IP is the aggregate value of the IP in the PPAs less the value of the Surrendered Licenses.

6.28    The following points are relevant to the PPA Approach:

- A PPA is required for financial reporting purposes under various accounting standards, including, International Financial Reporting Standards ("IFRS")[61] and US Generally Accepted Accounting Principles ("GAAP"), [62] and is independently audited;

- A PPA allocates the purchase price paid across all of the assets purchased;

- It is prepared by the purchaser, either internally or by external independent professional valuators, opining on the fair values of the assessed assets and liabilities;

- The amounts determined under the PPAs are the purchasers' assessments of the fair value ("Fair Value") of the assets acquired by the purchaser.  While prepared by the purchasers, they are an objective assessment of value based on a standard definition.

    Under US GAAP, Fair Value is defined as follows:

    > "The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[63]

    While the term Fair Value as used for the PPAs differs from Fair Market Value, the definition is substantively identical;

- The assumptions and calculations underpinning the PPA are signed off by the purchasing company's independent auditors in their quarterly and annual audit process;

- The resulting values are objective measures and are not specific to the actual acquirer.  Rather, they represent the value to a notional acquirer;

- In view of the poor prospects for the Lines of Business within Nortel as at the Valuation Date or date of each Business Sale, the total PPA Fair Values would generally be higher than that which could have been realized by the Licensed Participants through their continuation in business and sale of Products;

---

[61] International Financial Reporting Standard 3:  Business Combinations.
[62] Accounting Standards Codification (ASC) 805.
[63] "Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC")," FASB.org (accessed here: https://asc.fasb.org/glossarysection&trid=2155951&id=SL7493721-110254).

- We have endeavoured to exclude from our valuations "distress" effects related to the insolvency process, if any, which might impact the notional selling processes in the determination of fair market value. The use of the PPA amounts furthers this objective; and

- Based on the above reasons, in determining value for all the assets except for the components of IP, we utilized the PPAs for individual transactions, where available.[64]

6.29    Had we not had the benefit of the PPAs, and had we had access to additional information, we have no reason to believe that our conclusions regarding the Nortel Debtors Operating Assets would have been materially different.

6.30    While the PPA Approach has some limitations with respect to the Surrendered Licenses, on balance the results of using the PPA Approach are consistent with our review and analysis of the evidence and our years of valuation experience.

6.31    The concepts of (a) the values to a notional buyer as are imbedded in the PPAs, (b) value to the actual buyers of the Lines of Business, and (c) the value in the hands of the Licensed Participants are not interchangeable.

_Value of Surrendered Licenses In Connection With Line of Business Sales_

6.32    In this section, we discuss the value of the Surrendered Licenses.

6.33    In arriving at the value of the Surrendered Licenses, we took into account the following factors, approaches and perspectives, among other considerations. While no one factor is definitive, the aggregate weight of them strongly supports our conclusion:

- The limited scope of the Surrendered Licenses as described in Section 4.2;

- The terms of the MRDA as earlier described in Section 4.2, including:

  - The vesting in NNL of the NN Technology resulting from the research and development of the Licensed Participants;

  - The limited scope of the license to make, use and sell Products;

  - The lack of transferability without consent of the other parties to the MRDA; and

---

[64] Where PPAs for individual transactions were not available (representing approximately 11% of the Business Sales Proceeds), we used the available PPA data to estimate the portion of proceeds attributable to asset classes.

- The fact that the Surrendered Licenses were subject to the RPSM income reallocation provisions of the MRDA;

- Leading up to 2008/9, Nortel was unable to achieve functional returns on its non-IP assets. The prospects were poor for the Lines of Business and Licenced Participants looking forward from the filing date as described earlier; and

- Fair market value is a hypothetical concept determined in a notional world.

6.34    In determining the fair market value of the Surrendered Licenses, we performed the following analyses from (i) the perspective of a purchaser stepping into the shoes of the Licensed Participant; and (ii) from the perspective of the Licensed Participant continuing in the context of Nortel.

*From the perspective of a purchaser stepping into the shoes of the Licensed Participant:*

6.35    The fair market value concept, in order to overcome the transferability restriction, notionally permits a transfer and the notional buyer acquires the asset subject to the same terms as if they were stepping into the shoes of the seller.

6.36    Even if the transferability restriction in respect of the Surrendered Licenses was lifted, the notional purchaser would be subject to the terms  of the MRDA, including the RPSM provisions, the transfer restrictions and the limited scope of the Surrendered Licenses as these are all inseparable from the Surrendered Licenses.

In light of the above, given the numerous restrictions that burden the license, the Surrendered Licenses were of *de minimis* value to a buyer.

*From the perspective of the Licensed Participant continuing in the context of Nortel*:

6.37    Value from the perspective of the Licensed Participants would reflect what they could have earned over time in the context of Nortel by use of the Surrendered Licenses. This value is based on the characteristics inherent in the relevant business perceived by Nortel at the Valuation Date.

6.38    Such value was developed as part of Nortel's AIT and year end December 31, 2008 financial statement process.   This value addressed Nortel's four key reporting units and envelopes all the Lines of Business ("Business Value"). [65]

6.39    In arriving at our conclusion to rely on the above referred to Business Value, we took into account several considerations, including the following:

- The 2008 AIT was subject to audit by KPMG.

  The Q3, 2008 impairment test[66] was conducted[67] with the assistance of PricewaterhouseCoopers ("PWC"). The principles underpinning both the Q3 and Q4 impairment tests would have been very similar.

  Both PWC and KPMG were independent parties very experienced in such matters.  Each impairment test would have been given serious consideration by the Board of Directors of Nortel;

- The Business Value determined in the AIT process was the aggregate of the values of the business reporting units and is a fair value defined in a very similar way to fair value used in the PPA context.  This "fair value is a market-based measurement, not an entity-specific measurement…[It is] based on the assumptions that market participants would use in pricing the asset";[68]

- "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."[69]  It is one that considers all the appropriate risks and rewards.  It is robust and "should include an adjustment for risk if market participants would include one in pricing the related asset or liability, even if the adjustment is difficult to determine.";[70]

- The process of impairment testing and the cash flow projections underpinning the related fair values took[71] into account the directions in the Financial Accounting Board's FAS142, FAS157 and Statement of Accounting Concepts No. 7.   These standards and pronouncements were comprehensive and rigorous;

---

[65] NNC-NNL11665042.
[66] The values developed in the Q3 impairment testing as at September 30, 2008 are supportive of those as at December 31, 2008.
[67] Nortel 2008 Q3 Triggering Event Memo, November 5, 2008, NNC-NNL06137093, page 2.
[68] FASB 157, page 3.
[69] FASB 157, paragraph 5, page 8.
[70] FASB 157, page 3.
[71] Nortel 2008 Q3 Triggering Event Memo, November 5, 2008, NNC-NNL06137093

000033

- FAS157 incorporates that highest-and-best-use concept as a basis for selecting the valuation premise that should be used to measure the fair value of the asset;[72]

- The cash flows underpinning the fair values assumed that Nortel's financial position would be strong enough to keep certain customers over the projection period. They did consider, however, along with the array of other appropriate risks, the likelihood and certain impacts[73] of filing for creditor protection;

- The fair value is as at December 31, 2008 and not as of the time that the licenses were surrendered. This value is at an earlier date and would therefore likely be more optimistic than had it been prepared more contemporaneous with the time the licenses were surrendered;

- The fair values are aggregated at the Line of Business level and do not include allocations of value to underlying assets, including IP;

- The descriptions in Nortel's September 2008 10Q and December 2008 10K[74] summarize the objectives, methods and findings regarding goodwill impairment and the related matters. They are supportive of the Business Value and our expectations as to the standards applied in the preparation thereof; and

- We have not seen all of Nortel's working papers supporting the above referenced Business Value. We have seen only certain supporting schedules and conclusions[75]. We have not seen KPMG's working papers relating to the 2008 AIT but we have seen certain of them regarding Q3 2008 impairment test[76]. What we did review suggests, and we expect that, the above values have been determined and/or audited in compliance with the relevant standards. We have no reason to believe to the contrary.

6.40    As set out in the table below, in utilizing Business Value, we concluded the value of the Surrendered Licenses to be $285 million.

---

[72] FASB 157, paragraph 37, page 42.
[73] Nortel Networks Corporation, FY08-AR Form 10-K for the Period Ending December 31, 2008 (filed Mar. 2, 2009), pp. 137-138, from Thomson One.
[74] Nortel Networks Corporation, FY08-AR Form 10-K for the Period Ending December 31, 2008 (filed Mar. 2, 2009), pp. 94-96, 140-142, from Thomson One.
[75] NNC-NNL11665042
[76] KPMG_0000343; Test of Design and Operation Effectiveness – Goodwill Impairment – Annual Goodwill Impairment Test, December 10, 2008 and updated February 22,2009

| Table 6 Computation of value of Surrendered Licenses Conveyed in the Business Sales | |
| --- | --- |
| **$ millions** | |
| Business Value | 988[77] |
| RPSM share of the combined EMEA Debtor Groups | x 50.2%[78] |
| Business Value of US and EMEA Debtor Groups | = 496 |
| Percentage of Business Value represented by IP | 57.3%[79] |
| Value of Surrendered Licenses to US and EMEA Debtor Groups | **285** |

6.41  Based on the above, we utilized the higher value of $285 million to value the Surrendered Licenses in connection with the Business Sales.  Of this total value, $228 million is allocated to the US Debtor and $57 million to the EMEA Debtor as set out on Schedule 2.5.

*Customer Relationships*

6.42  As described in paragraph 6.22, the value of Customer Relationships associated with each Business Sale was determined using PPAs.

---

[77] NNC-NNL11665042.
[78] 38.5% to US Debtors and 11.6% to EMEA Debtors per Schedule 8, or a total of 50.2% (difference due to rounding).
[79] IP value in the PPAs of $1,143 million divided by Operating Asset values in the PPAs of $1,995 million, per Schedule 2.1.

6.43    The values of the Operating Assets underlying the Business Sales Proceeds are as set out on Schedule 2.1 and summarized in Table 7, below:

| Table 7 Fair Market Value of Operating Assets Underlying the Business Sales Proceeds According to Ownership | | | |
|---|---|---|---|
| US$ millions | | By Nortel Debtor Group | |
| Operating Assets | Canada | US | EMEA |
| Tangible Assets | 59 | 42 | 68 |
| Intangible Assets | | | |
| Customer Relationships | 93 | 393 | 197 |
| IP | 858 | 228 | 57 |
| Total | 1,010 | 663 | 322 |

**Question 1(b): Compute the Purchaser Goodwill and assign it in proportion to the value of the Nortel Debtors Groups' Intangible Assets.**

6.44    As earlier defined, the difference between the Business Sales Proceeds and the fair market value of the Nortel Debtor Groups' Operating Assets, as reflected in Table 7, above, is accounted for the in PPA Goodwill and reflects the "Purchaser Goodwill".

6.45    As of December 2008, prior to the filing and following the 2008 AIT, Nortel wrote off the value of substantially all of the goodwill that it had on its balance sheet. Nortel did not have sufficient value to support any significant goodwill value.

This is consistent with, and demonstrates the fact that Purchaser Goodwill was unique to the purchasers in the Business Sales. The goodwill in the Business Sales relates to the attributes of the buyer, not the attributes of Nortel.

6.46    This Purchaser Goodwill likely includes, among other things, the components described below.[80, 81]  These components  cannot be individually quantified:

- Synergies, economies of scale or competitive advantage of the buyer.[82] This represents the value of the opportunity in the hands of others.  The synergies and economies of scale in this matter, among other things, likely include the benefit of overlapping technologies and economies of scale associated with R&D, marketing, and/or customer service efforts.  By definition, they reflect the unique attributes of the specific buyers of the Lines of Business;[83]

- Goodwill as it is more generally understood – the amalgam of the unidentified intangible factors that make a business a successful going concern.  The going-concern element represents the ability of the established business to earn a higher rate of return on an assembled collection of net assets than would be expected if those net assets had to be acquired separately.[84]  In the context of the sale of the Lines of Business, and the write-off of the goodwill on its balance sheet at December 2008, any goodwill recognized by purchasers in their PPAs does not reflect amounts that could have been realized by the Licensed Participants through the continued operations of their Lines of Business; and

- Assembled workforce generally represents the assembled, trained, and efficient workforce obtained in an acquisition, thereby mitigating the need to hire a readily available pool of human capital.[85]

6.47    For greater certainty, our quantification of Purchaser Goodwill is equivalent to the goodwill[86] in the PPAs.

---

[80] See generally SFAS141R, Appendix A, paragraph A36 to A41, with regards to synergies, economies of scale and assembled workforce.
[81] Purchaser Goodwill was allocated to the various owners of the underlying assets sold in proportion to the value of those assets.  In the aggregate, allocating the Purchaser Goodwill associated with each Business Sale to the owners of the underlying assets associated with each Business Sale is reasonable and is consistent with the Ownership approach.
[82] Ericsson Form 20-F for April 2010 at note C26, CTRL-NORTEL-00005300; Avaya 2010 Form 10-K, at 92-93, CTRL-NORTEL-00005290 / 92-93.
[83] Avaya 2010 Form 10-K, at 93, CTRL-NORTEL-00005290 / 93.
[84] FAS141 issued 2008, Appendix B, paragraph 102
[85] SFAS141R, Appendix A, paragraph A25.
[86] In the PPAs, goodwill is an intangible asset that represents the difference between the aggregate value of a business and the aggregate of those tangible and intangible assets that can be specifically identified and valued.

6.48    Purchaser Goodwill is allocated in proportion to the value of the intangible assets as shown in Schedule 2.1 and summarized in Table 8, below.

| **Table 8**<br>**Allocation of Fair Market Value of Nortel Debtor Groups' Assets By Owner**<br>**With Purchaser Goodwill** | | | |
|---|---|---|---|
| US$ millions | | | |
| | | By Nortel Debtor Group | |
| Assets | Canada | US | EMEA |
| Tangible Assets | 59 | 42 | 68 |
| Intangible Assets | | | |
| Customer Relationships | 93 | 393 | 197 |
| Existing/Developed IP | 858 | 228 | 57 |
| Purchaser Goodwill | 427 | 316 | 110 |
| Total Business Sales | 1,438 | 979 | 432 |

**Further Perspectives**

6.49    Further perspectives can be gleaned by examining the value of the Lines of Business to the US and EMEA Debtors based on the forecasts provided to prospective purchasers (the "Prospective Buyer Forecast Approach").

The Prospective Buyer Forecast Approach requires examination of the cash flows to the US and EMEA Debtor Groups projected or as they would have been projected on or about June 2009 in the hands of prospective purchasers (the "Nortel Buyer Projections").

6.50    Nortel Buyer Projections were provided to potential purchasers of Nortel's Lines of Business for certain Business Sales at dates ranging from July 2009 to February 2010.

6.51    Insofar as these projections directly estimate the cash flows that the Licensed Participants could have realized on a standalone basis, they are subject to the following limitations:

- The projections were prepared for marketing purposes and were not audited;

- The projections are aggregated at the Line of Business level and do not include allocations of value to underlying assets, including IP;

- These projections do not reflect expected cash flows under an assumption of continued Nortel operations, but rather reflect expected revenues and profits

in the hands of a purchaser who would be able to make appropriate investments in the relevant technology.  For example, a presentation related to the MSS Business Sale stated that the management forecast was prepared on the assumption that "revenue declines stabilize in 'safe hands' with investment in portfolio;"[87] and

- Given Nortel's financial condition at the time that the licenses were surrendered, Nortel was likely unable to make such investments.  Thus, it is reasonable to conclude that these projections overstate the expected income that could have been realized by the Nortel entities had they continued to operate.

6.52    The Nortel Buyer Projections represent the whole cash flow anticipated from the Lines of Business and not the cash flow from just the related IP.

The Nortel Buyer Projections are higher than the forecasts used in the Annual Impairment Test.  This is consistent with the belief that Nortel could maximize its value by selling its assets instead of by keeping them.[88]

This is, in large part, because the forecasts provided to the purchasers are based on the assumption that the Lines of Business would be in "safe hands," and "revenue declines stabilize in 'safe hands' with investment in portfolio."[89]   As we understand it, the forecast contemplates a balance sheet that is strong enough to stabilize the revenue declines and enable investment in R&D.

The "safe hands" assumption reflects a circumstance entirely different than Nortel's as of June 2009 and would overstate the potential profits and resulting implied value in the hands of Nortel and the Licensed Participants.

---

[87] See NOR_54180450, page 41, which provides information about the context of these projections. This quote is likely representative of the approach taken by Nortel management when preparing all of these forecasts.
[88] As noted in the IFSA (NNC-NNL033801, at Preamble and Section 11(a),(b))
[89] See NOR_54180450, at page 41.

Further, these cash flows based on the Nortel Buyer Projections form the basis of valuing *all* the assets of the Line of Business including the IP and Surrendered Licenses, as summarized in Table 9, below:

| Table 9<br>Value Allocable to US and EMEA Debtors' Total Amounts Under<br>D&P Analysis and Prospective Buyer Forecast Approach | |
| --- | --- |
| **Basis of Analysis** | **US/EMEA**[90] |
| D&P Analysis (PPA Approach)[91] | ≈ $1.4 billion |
| Prospective Buyer Forecast Approach[92] | ≈ $1.0 billion |

6.53    Table 9 demonstrates that our PPA Approach is favorable to the non-Canadian Nortel Debtor Groups in comparison to the Prospective Buyer Forecast Approach which itself is higher than the Business Value.

**Question 1(c) - Determine the value of the Rockstar Assets owned by each Nortel Debtor Group**

6.54    The response to Question 1(c) follows a similar format to the response to Question 1(a), in that we performed the steps set out below:

Step 1:        Identify the intellectual property assets sold in the Rockstar Transaction;[93]

Step 2:        Identify the owner(s) of each asset sold in the Rockstar Transaction; and

Step 3:        Determine the share of the Rockstar Proceeds for each Nortel Debtor Group based on the ownership of the assets sold.

---

[90] The US/EMEA share of the value under the Prospective Buyer Forecast Approach represents the Licensed Participants' aggregate RPSM share of approximately 51 percent as set out on Schedule 8.
[91] For Business Sales.
[92] The duration of the forecasts provided to prospective buyers by management varied by line of business. We have extended the forecasts based on trends for a 5-year period.  Where the entity was growing or had a terminal value beyond the forecast period, we estimated such terminal value.  Where the entity was in a state of decline and would not reasonably expect to be in existence beyond the forecast period, we assumed a shut-down cost.  All present values were based on an assumed discount rate of 20%, consistent with the discount rates used by PWC in the AIT.
[93] In the case of the Rockstar Transaction no material tangible or other intangible assets were sold.

**Step 1:  Identify the intellectual property assets sold in the Rockstar Transaction**

6.55     The Rockstar Transaction involved the transfer or assignment of a portfolio of Nortel's Residual Patents (including patent applications) [94] subject, in some cases, to the licenses granted to the purchasers of the Lines of Business as part of the Business Sales and other existing licenses to third parties.[95]

6.56     The Rockstar Transaction occurred after the Business Sales and was unrelated to those sales.

**Step 2:  Identify the owner(s) of each asset sold in the Rockstar Transaction**

6.57     The Rockstar portfolio was 98 percent owned by NNL with the balance owned by the US Debtors and EMEA Debtors.[96]

6.58     Table 10, below, summarizes ownership percentages of Nortel Debtor Groups[97] and sets out the number of patents and patent applications acquired or transferred in connection with the Rockstar Transaction.

| Table 10 Summary of Ownership of Rockstar Patents and Applications According to Ownership | | | |
|---|---|---|---|
| | Number of Patents/Apps[98] | Ownership Percentage | |
| | | Canada | US | EMEA |
| Rockstar Transaction | 6,414 | 98.1% | 0.7% | 1.3% |

---

[94] Where appropriate, references to patents should be read to include patent applications.

[95] We understand that a relatively small amount of other assets (i.e., approximately 30 employees, leases, and office equipment) were also part of the Rockstar Transaction. NNC-NNL06002507 / 1-36.   We did not perform a detailed analysis of these additional assets due to their relatively small size.

[96] In practice, there were a few patents that were not assigned to NNL. We understand that the MRDA requires that patents that resulted from R&D under the MRDA be transferred to NNL notwithstanding some were registered in other jurisdictions.

[97] See Schedule 7.5.

[98] The number of patents and patent applications referenced in Table 11 represent the vast majority of patents and patent applications transferred in the Rockstar Transaction.

**Step 3: Determine the share of the Rockstar Proceeds for each Nortel Debtor Group based on the ownership of the assets sold**[99]

6.59    The Rockstar Transaction Proceeds amounted to approximately $4,454 million. These proceeds reflect the fair market value of the assets transferred in the Rockstar Transaction.[100]

6.60    The Rockstar Transaction Proceeds reflected only the value of patents owned by NNL and did not reflect any value attributable to the Surrendered Licenses for the reasons set out below.

6.61    In the Business Sales, patents Predominantly Used[101] by a single business were transferred to purchasers of that business.  Licenses were also granted to those purchasers for the use of patents not acquired by them that were necessary to operate that business.   In all, approximately 2,700 patents and patent applications[102] were transferred to purchasers in the Business Sales.

6.62    Consequently, as part of the Business Sales, access to all of the patented technology required to operate the Lines of Business sold by Nortel were included in the patents transferred or in the licenses granted to the purchasers.

6.63    The Rockstar Transaction conveyed the Residual Patents.  These were patents and patent applications not assigned or transferred in the Business Sales.[103]

- Some Residual Patents claimed inventions used in Products that had been made, used or sold (or proposed to be made, used or sold) by the Lines of Business. These were licensed to the purchasers in Business Sales for use in the businesses acquired under royalty free licenses.[104]  The scope of the licenses to these patents was sufficient to allow the purchasers in the Business Sales to run their businesses.

---

[99] Step 3 includes, as applicable, the allocation of any Purchaser Goodwill applicable to the Rockstar assets, as discussed in Question 1(b).

[100] To the extent that any amount analogous to purchaser goodwill was realized in the Rockstar Transaction, separate treatment of it would have no impact on our calculation.  This is because any such amount would be allocated to same owners in the same proportion as we have allocated the Rockstar Transaction Proceeds.  This is consistent with the principle we used to allocate the Purchaser Goodwill associated with the Business Sales and the Ownership approach.

[101] Deposition of John Veschi (November 7, 2013), at 285:21-286:9.

[102] See generally Seller Disclosure Schedules, NNC-NNL06001637 (CVAS), NNC-NNL06001811 (CDMA), NNC-NNL06002070 (Enterprise Solutions), NNC-NNL06002257 (MEN), NNC-NNL06002391 (MSS), NNC-NNL06002603 (GSM), and NNC-NNL06002623 (Layer 4-7).

[103] Deposition of Gillian McColgan (November 8, 2013), at 182:3-183:19.

[104] See Appendix E for a description of the licenses provided to the purchasers in the Business Sales and for a discussion of Nortel's patent characterization efforts.

- The remaining Residual Patents claimed inventions that were not used in Products that had been made, used or sold (or proposed to be made, used or sold) by the Lines of Business.

    Of patents and patent applications sold as part of the Rockstar Transaction, approximately 59 percent to 66 percent[105] were patents and applications that were not used to make, use or sell Products.

6.64    Any value associated with the Surrendered Licenses is accounted for in the Business Sales proceeds and not the Rockstar Transaction proceeds for the following reasons:

1)    Patents and patent applications previously licensed to the Licensed Participants were subsequently licensed to the purchasers in the Business Sales.

    In the Business Sales, where licenses were granted to the purchasers, those licenses were practically and economically similar to the Surrendered Licenses.[106]

    Regarding the licenses, Table 11, below, compares, at a high level, certain terms of the Surrendered Licenses with terms of the licenses granted to purchasers in the Business Sales.

| Table 11 Comparison of Certain Terms of Surrendered Licenses by Licensed Participants vs. Licenses Conveyed in the Business Sales | |
|---|---|
| **Selected Terms of Surrendered Licenses by Licensed Participants** | **Selected Terms of Licenses Granted to Purchasers in Business Sales** |
| Perpetual | Perpetual |
| No right to assign | Limited right to assign |
| Limited right to sublicense | Limited right to sublicense |

---

[105] NNI_00176133, NNC-NNL06740125, CTRL-NORTEL-00007281. See also, NNI_00627822, NNI_01462625, NNI_01388250, NNI_01392761, NNI_01392759, NNI_00321988, NNC-NNL06740124, NNC-NNL11737781, NNI_00323690, NNI_00627822, NNI_01388250, NNI_01462625, US_Canada_PRIV_00144248.
[106] Where patents were transferred to purchasers, those purchasers acquired ownership which made licenses to those patents unnecessary.

| Table 11 Comparison of Certain Terms of Surrendered Licenses by Licensed Participants vs. Licenses Conveyed in the Business Sales | |
|---|---|
| Exclusive in certain territories, non-exclusive in the rest of the world (among all Licensed Participants) | Limited exclusive rights in some cases; non-exclusive, worldwide |
| License to make, use and sell products of the business sold | License to make, use, and sell product of the business sold (plus a transfer of patents predominantly used in the business sold) |
| Field of use defined in relation to the products of each business[107] | |
| Royalty-free (but subject to MRDA obligations on ongoing R&D and income reallocation tied to R&D funding) | Royalty-free (with no additional obligations) |

The breadth of the licenses granted to the purchasers in the Business Sales was sufficient to allow purchasers to run their businesses, and the licenses do not generate any royalty revenue for the patent owner.[108]  It follows that the value of the licenses provided to the Licensed Participants under the MRDA for these uses is substantially captured in the Business Sales proceeds, and not in the Rockstar Transaction.

The amounts paid in the Rockstar Transaction for the Residual Patents included only the value over-and-above the value associated with both the licenses granted to the purchasers and the transfer of the patents to them in the Business Sales.

2)  Patents and patent applications not licensed to the Licensed Participants were not subsequently licensed to the purchasers in the Business Sales.

The licenses granted to the purchasers in the Business Sales had limitations to restrict the scope of the licenses essentially to the Lines of Business purchased. The Residual Patents covering inventions outside of the scope of the granted licenses were not licensed to the purchasers. The inventions disclosed in these patents were not used in the Lines of Business sold. They

---

[107] The license granted to purchasers in the Business Sales effectively confined the field of use to the same field of use enjoyed by the Licensed Participants before they surrendered their licenses.
[108] See Appendix E for a description of patents conveyed in the Rockstar Transaction.

were therefore not within the scope of the Surrendered Licenses or the licenses granted to purchasers in the Business Sales. Defensive patents[109] and strategic patents[110] were also among the Residual Patents.

Based on the above, it is reasonable to conclude that the Rockstar Transaction proceeds reflected only the value of patents owned by NNL, and did not reflect any value attributable to the Surrendered Licenses.

6.65    Based on Table 12, percentage ownership of number of patents,[111] the distribution of the approximately $4,454 million in Sales Proceeds attributable to the Rockstar Transaction is as set out in Table 12, below.[112]

| Table 12 Rockstar Transaction Proceeds Allocation Based on Ownership | | |
|---|---|---|
| US$ millions | | |
| Nortel Debtor Group | Allocation of Sales Proceeds | Percentage of Proceeds |
| Canada | 4,368 | 98.1% |
| US | 30 | 0.7% |
| EMEA | 57 | 1.3% |
| | 4,454 | 100.0% |

---

[109] Defensive patents: These patents covered technologies for products that Nortel did not make, use, or sell, but that Nortel's competitors did.
[110] These patents resulted from fundamental research in a number of concepts and areas in respect of which Nortel felt the need to obtain patents well in advance of where the product groups themselves would be going or even had plans to go in the future.  Many of these patents covered technologies not used or contemplated for use by Nortel's Lines of Business.
[111] See Section 6.52.
[112] See Schedule 2.6.

**Question 1(d): Compute the aggregate value of the assets attributable to each owner**

6.66    The distribution of Sales Proceeds to the owners of the underlying assets are set out in Schedule 2.2 and summarized in Table 13, below.[113]

| Table 13 Distribution of Sale Proceeds According to Ownership Approach | | | | |
|---|---|---|---|---|
| US$ millions | | By Nortel Debtor Group | | |
| | Sales Proceeds | Canada | US | EMEA |
| Business Sales | | | | |
| CDMA and LTE | 1,053 | 744 | 285 | 24 |
| Enterprise | 843 | 268 | 374 | 201 |
| MEN | 632 | 263 | 214 | 155 |
| Other | 321 | 163 | 105 | 52 |
| Total Business Sales | 2,848 | 1,438 | 979 | 432 |
| Rockstar Transaction | 4,454 | 4,368 | 30 | 57 |
| | 7,302 | 5,805 | 1,009 | 488 |

---

[113] See Schedule 2.2.

000046

# 7.0 Question 2: Implied Recovery to Each Key Creditor Group Under Ownership Approach

7.1 What is the implied recovery to each Key Creditor Group, assuming Sales Proceeds are allocated in accordance with the share determined in Question 1, measured as a percentage recovery of its estimated aggregate claims?

7.2 The recovery, reflecting the instructions set out in Section 4.0, measured as a percentage recovery of estimated aggregate claims, to each Key Creditor Group under the above allocation is set out in Table 14, below.[114]

| Table 14 Recovery by Key creditor Groups Under the Ownership Approach | | |
|---|---|---|
| US$ millions | | |
| Nortel Creditor Group | Assumed Claim Amount | Recovery (percentage of claim[115]) |
| Guaranteed Bondholders | 4,092 | 100.0% |
| US creditors | 1,300 | 95.0% |
| Canadian creditors | 3,506 | 58.7% |
| EMEA creditors | 500 | 26.5% |
| UK Pension Trust | 3,000 | 43.7% |

---

[114] See also Schedule 1.
[115] The percentage recoveries are computed with reference to the assumed claim amounts against the Nortel Debtors as discussed in Section 4.0. Specifically, the Guaranteed Bondholders amount includes pre-filing interest but not post-filing interest.

7.3    The implied recovery, measured as a percentage recovery of estimated claims, to each Key Creditor Group flowing from the above allocation is computed in Schedule 2 and summarized in Table 2, which is repeated below.[116]

| Table 2 (repeated) Implied Recovery, Measured as a Percentage Recovery of Estimated Aggregate Claims, to each Key Creditor Group | | | | |
|---|---|---|---|---|

US$ millions

| | Nortel Debtor Group: | | | |
|---|---|---|---|---|
| | Canada | US | EMEA | Total |
| Sales Proceeds to Nortel Debtor Groups | 5,805 | 1,009 | 488 | 7,302 |
| Projected treasury cash | 343 | 744 | 438 | 1,525 |
| Total assets to be distributed | 6,148 | 1,753 | 926 | 8,827 |

Resulting distributions to, and recovery by, Key Creditor Groups:

| Key Creditor Groups | Claim | Resulting Direct and Indirect Distribution From: | | | Total Recovery | Recovery Percentage |
|---|---|---|---|---|---|---|
| | | Canada | US | EMEA | | |
| Guaranteed Bondholders | 4,092 | 2,762 | 1,330 | | 4,092 | 100.0% |
| US creditors | 1,300 | 813 | 423 | | 1,235 | 95.0% |
| Canadian creditors | 3,506 | 2,057 | | | 2,057 | 58.7% |
| EMEA creditors | 500 | | | 132 | 132 | 26.5% |
| UK Pension Trust | 3,000 | 516 | | 794 | 1,310 | 43.7% |
| | 12,398 | 6,148 | 1,753 | 926 | 8,827 | |

7.4    The process by which the percentage recovery by each Key Creditor Group is computed and described in more detail below.

7.5    As discussed previously, in addition to the allocation of the Sales Proceeds, each estate is projected to have treasury cash on hand which, when combined with its Sales Proceeds will form the total assets to be distributed as set out in the first part of Table 2, repeated above.

---

[116] The percentage recoveries are computed as the estimated cash distributions as a percentage of the assumed claim amounts listed at Section 3.2. The estimated cash distributions from the Canadian Debtors include:
- distributions on creditor claims against that estate
- distributions on the $880 million UK Pension Trust guarantee claim (which is not admitted by the CCC), and
- estimated distributions to third party creditors of the US estate which are settled indirectly through the $2,000 million claim by the US Debtor against the Canadian estate.

7.6     Distributions to the creditors are then best considered as a "waterfall" requiring determination of distributions in the UK and Canada.

7.7     The EMEA Debtors are assumed for the purposes of this report to have no claims against it by other Nortel Debtor Groups,[117] is assumed to distribute its cash first.  The $926 million available for distribution by the EMEA Debtor is paid, pro-rata, to the EMEA creditors and the UK Pension Trust.  As a result of this distribution the EMEA creditors receive $132 million, or a recovery of 26.5 percent.

7.8     Following its receipt of $794 million from the EMEA estate, the UK Pension Trust is assumed to have an $880 million claim remaining against the Canadian estate.

7.9     The assets available for distribution by the Canadian estate are then distributed, pro-rata to all the claims: against this $880 million claim a payment of $516 million; against the $3,506 million claim of the Canadian creditors, a payment of $2,057 million; $2,401 million against the $4,092 million claim of the Guaranteed Bondholders; and $1,174 million against the $2,000 million claim by the US Debtor.

7.10    The further $516 million payment to the UK Pension Trust from the Canadian estate, when added to the $794 million received from the EMEA estate, results in a recovery of $1,310 million or 43.7 percent of its $3,000 million claim.

7.11    The receipt by the Canadian creditors of $2,057 million from the Canadian estate provides for a 58.7 percent recovery of the Canadian creditors claim of $3,506 million.

7.12    The distribution of $1,174 million from the Canadian estate to the US Debtor is added to the $1,753 million that was otherwise available for distribution in the US estate.  This makes $2,927 million available for distribution.

7.13    The $2,927 million is then distributed, pro-rata, to the US creditors and the Guaranteed Bondholders, subject to the constraint that the Guaranteed Bondholders are not able to receive more than 100 percent of their claimed amount as described in paragraph 4.2(h).

---

[117] We understand that a portion of the inter-estate claim by the US Debtors against the Canadian estate is subject to a "snap-back" claim by the Canadian estate against the EMEA Debtors which we have been instructed not to include in our analysis.  This should not be taken as an acknowledgement by the CCC as to the appropriateness of its exclusion.

000049

7.14    This results in a distribution of:

- $1,691 million to the Guaranteed Bondholders - $1,330 million from the US estate and $361 million indirectly from the Canadian estate by way of the US estate's recovery from Canada on its inter-company claim.  The sum of this $1,691 and the $2,401 million received directly from the Canadian estate is $4,092 million or 100 percent recovery of the Guaranteed Bondholders claim of $4,092 million.

- $1,235 million to the US creditors - $423 million of which comes from the US estate and $813 million which comes indirectly from the Canadian estate by way of the US estate's recovery from Canada on its inter-company claim. This results in a 95.0 percent recovery of the $1,300 million of claims.

7.15    As indicated in Table 17, of the $6,148 million available for distribution by the Canadian estate, $2,057 million, or 33 percent, is distributed to Canadian only creditors.

## 8.0    Question 3: Calculation Based on Alternative Pro Rata Allocation

8.1    Applying the Alternative Pro Rata Allocation approach, what share of the Sales Proceeds would each Nortel Debtor Group receive?

8.2    The Alternative Pro Rata Allocation approach has, as its core underlying principle, the objective of ensuring that each unsecured Nortel creditor receives the same percentage recovery on its claim as every other such creditor.  As indicated previously, the assets that are available for distribution comprise the following:

a)    The treasury cash that is projected to be available at the date of distribution, which we have assumed to be June 30, 2014, after consideration of all cash outflows that are expected to occur until that date; and

b)    The Business Sales Proceeds and the Rockstar Transaction Proceeds.

8.3    You have instructed us to assume that the projected treasury cash that will reside with each of the Nortel Debtor Groups at the date of distribution will not be redistributed between the Nortel Debtor Groups.  Consequently, the end objective of a common percentage recovery to each of the creditor groups is performed by determining how much of the sale proceeds should be awarded to each of the Nortel Debtor Groups so as to achieve the end objective after recognizing the treasury cash in their possession.  This computation is set out in Schedule 3.

8.4    For purposes of our calculations, existing third party claims have been divided into five categories as indicated in paragraph 4.2(h).

8.5    Approximately $8,827 million is available for distribution against the aggregate claims of $12,398 million.

8.6    A common percentage recovery to each of the five categories of third party claims would result in a recovery of 71.2 percent to each of the claimant groups – $8,827 million divided by $12,398 million.

8.7    To explain the calculation in Schedule 3 using the Canadian Debtors as an example, the claims against the Canadian Debtors are $3,506 million and the Guaranteed Bondholder claim is $4,092 against the Canadian Debtors.    To provide 71.2 percent to each estate, a total of $5,410 million is needed.  Taking into account the projected treasury cash of $343 million that will reside in the Canadian estate at the date of distribution, assumed to be June 30, 2014, the portion of the Business Sales and Rockstar Transaction proceeds required to be attributed to the Canadian estate is $5,067 million.

## 9.0    Question 4:  Estimated Allocations Based on Parties' Claims

9.1    For comparison purposes: what is the share of Sales Proceeds for each Nortel Debtor Group and the implied recoveries for each Key Creditor Group (measured as a percentage of estimated amounts claimed) based on the various positions of the Core Parties?

9.2    Due to incomplete information regarding the manner in which the other Core Parties would apply the principles articulated in their allocation pleadings, we are not providing an estimate of the share of Sales Proceeds and the implied recoveries resulting from the allocation proposals of those parties, at this time.  If necessary, we could make assumptions that we believe would be directionally accurate.  However, we believe it is more appropriate to permit these parties to more clearly articulate their position through the delivery of their expert reports and through responses to questions on the representative party discoveries/depositions.

# 10.0 Restrictions and Qualifications

10.1   The calculations, factors, perspectives and considerations forming the basis of our opinions and conclusions are made from our vantage point and experience and training as business and intellectual property valuators and restructuring professionals.

10.2   We do not provide an opinion as to the appropriate legal principles to apply in respect of the allocation of the Sales Proceeds.

10.3   In order to ensure that our opinions and conclusions and the related analysis are clearly communicated in this report, we have focused only on material matters.

We are not aware of any matters we have not considered that would materially alter our opinions and conclusions.

10.4   This report constitutes an Expert Report and, for certain sections of the report, an Estimate Report as defined by the Canadian Institute of Chartered Business Valuators (the "CICBV").   This valuation and report were completed in accordance with the National Association of Certified Valuation Analyst Professional Standards for conducting and reporting on business valuations.

10.5   This report was prepared under the supervision of Thomas Britven with the assistance of other professionals at Duff & Phelps, including Stephen Cole, a managing director in the Toronto office of Duff & Phelps.

10.6   This report is not intended for general circulation or publication, nor is it to be reproduced or used for any purpose other than that outlined above without our written permission in each specific instance. We do not assume any responsibility or liability for losses occasioned to you or any other party as a result of the circulation, publication, reproduction or use of this report contrary to the provisions of this paragraph.

10.7   The preparation of a valuation conclusion is a complex process that generally is not susceptible to partial analysis.  Alteration of any one part of the analysis may change the conclusion set out in this report.  We recommend consideration of the conclusions, commentary and calculations as a whole, so that the assets and the valuation can be best understood.

10.8   Our scope of analysis is inherently limited by the nature of the valuation report being provided.   The conclusion expressed may have been different had a Comprehensive Valuation Report been provided, rather than this Estimate Report.  There are three types of Valuation Reports: Comprehensive, Estimate and Calculation.  These Reports are not only distinguished by the Valuator's scope of analysis and amount of disclosure provided, but also by the level of

000052

assurance being provided in the conclusion; with the Comprehensive Valuation Report providing the highest assurance and the Calculation Valuation Report providing the lowest. We have not been engaged to provide you with a Comprehensive Valuation Report. Our Estimate does not constitute a Comprehensive Valuation as defined by the Canadian Institute of Chartered Business Valuators. The provision of a Comprehensive Valuation Report would entail additional information gathering, research, and analysis from that provided in preparing this report.

10.9    In the undertaking of the test of reasonableness, we were limited to the non-public Nortel information that was available in the productions. We reserve the right (but will be under no obligation) to analyze and/or revise any and all assumptions and/or calculations included or referred to in this report and, if we consider it necessary, to revise our calculations in light of any information which becomes known or available to us after the date of this report.

Yours truly,

Thomas Britven
Managing Director
Duff & Phelps

**CCC - Nortel Networks Corporation**

**Schedule 1**

**Summary of Estimated Allocation to Each Nortel Debtor Group Under Ownership and Alternative Pro Rata Approaches**
*($ MM USD)*

| | Assumed Claim Amount Schedule 6 | Ownership Approach Schedule 2 | Alternative Pro Rata Allocation Approach Schedule 3 |
|---|---|---|---|
| **Sales Proceeds allocation to:** | | | |
| Canada | | 5,805 | 5,067 |
| US | | 1,009 | 182 |
| EMEA | | 488 | 2,054 |
| | | 7,302 | 7,302 |
| | | | |
| **Total Assets for Distribution:** | | | |
| Canada | | 6,148 | 5,410 |
| US | | 1,753 | 926 |
| EMEA | | 926 | 2,492 |
| | | 8,827 | 8,827 |
| **Percentage Recovery to:** | | | |
| Guaranteed Bondholders | 4,092 | 100.0% | 71.2% |
| US creditors | 1,300 | 95.0% | 71.2% |
| Canada creditors | 3,506 | 58.7% | 71.2% |
| EMEA creditors | 500 | 26.5% | 71.2% |
| UK Pension Trust | 3,000 | 43.7% | 71.2% |

**CCC - Nortel Networks Corporation**

Schedule 2

**Ownership Approach - Computation of Recovery Percentages by Key Creditor Groups**
*($ MM USD)*

*Purpose:*
The purpose of this schedule is to calculate the recovery rates for the Ownership approach.

**Assets**

|  | Projected Treasury Cash at June 30, 2014, after payment of Secured Claims *Schedule 5* | Allocation of sales proceeds *Schedule 2.1* | Total Assets to be Distributed |  |
|---|---|---|---|---|
| Canada (NNL and subs) | 343 | 5,805 | 6,148 | See Step 2 allocation on next page |
| US (NNI and subs) | 744 | 1,009 | 1,753 | See Step 3 allocation on next page |
| EMEA | 438 | 488 | 926 | See Step 1 allocation on next page |
|  | 1,525 | 7,302 | 8,827 |  |

**CCC - Nortel Networks Corporation**

**Ownership Approach - Computation of Recovery Percentages by Key Creditor Groups**
*($ MM USD)*

*Purpose:*
The purpose of this schedule is to calculate the recovery rates for the Ownership approach.

**Computation of Recovery on Claims**

| | Claims before consideration of guarantees or second claims *Schedule 6* | Step 1: Settlement of claims in EMEA | Residual claims after EMEA | Step 2: Settlement of claims in Canada | Residual claims after EMEA and Canada | Step 3: Settlement of claims in US — From US Debtor Funds | Step 3: Settlement of claims in US — From Claim against Canadian Estate | Step 4: Total recoveries by third party claimants | Step 5: Percentage recovery on Claims |
|---|---|---|---|---|---|---|---|---|---|
| Creditor claims: | | | | | | | | | |
| Canada | 3,506 | | 3,506 | 2,057 | - | | | 2,057 | 58.7% |
| US | 1,300 | | 1,300 | | 1,300 | 423 | 813 | 1,235 | 95.0% |
| EMEA | 500 | 132 | - | | - | | | 132 | 26.5% |
| Claims subject to a guarantee or second claim: | | | | | | | | | |
| UK Pension Trust | 3,000 | 794 | 880 | 516 | - | | | 1,310 | 43.7% |
| Guaranteed Bondholders | 4,092 | | 4,092 | 2,401 | 4,092 | 1,330 | 361 | 4,092 | 100.0% |
| | 12,398 | | 9,778 | | 5,392 | | | 8,827 | 71.2% |
| Intercompany claims against: | | | | | | | | | |
| Canadian estate | 2,000 | | 2,000 | 1,174 | | | | | |
| | | 926 | | 6,148 | | 1,753 | 1,174 | | |

**CCC - Nortel Networks Corporation**                                                                                          Schedule 2

**Ownership Approach - Computation of Recovery Percentages by Key Creditor Groups**
*($ MM USD)*

---

*Purpose:*

   The purpose of this schedule is to calculate the recovery rates for the Ownership approach.

Description of the Steps:

Step 1:

   Distributions to the creditors are best considered as a "waterfall". EMEA, as the Debtor with no claims against it by other Nortel Debtors, distributes its cash first.  The $926 million available for distribution by the EMEA Debtor is paid, pro-rata, to the EMEA creditors and the Nortel Network UK Pension Trust.  As a result of this distribution the EMEA creditors receive $132 million, or a recovery of 26.5%.

   Following its receipt of $794 million from the EMEA Estate, the Nortel Networks UK Pension Trust is assumed to have an $880 million claim remaining against the Canadian Estate.

Step 2:

   The assets available for distribution by the Canadian Estate are then distributed, pro-rata, to all the claims against this $880 million claim a payment of $516 million; against the $3,506 million claims of the Canadian creditors, a payment of $2,057 million; $2,401 million against the $4,092 million claim of the Guaranteed Bondholders; and $1,174 million against the $2 billion claim by the US Debtor.

   The further $516 million payment to the UK Pension Trust from the Canadian Estate, when added to the $794 million received from the EMEA Estate, results in a recovery of $1,310 million or 43.7% of its $3,000 million claim.

   The receipt by the Canadian creditors of $2,057 million from the Canadian Estate, provides for a 58.7% recovery of the Canadian creditors claim of $3,506 million.

Step 3:

   The distribution of $1,174 million from the Canadian Estate to the US Debtor is added to the $1,753million that was otherwise available for distribution in the US Estate.  This makes $2,926 million available for distribution.

   The $2,926 million is then distributed, pro-rata, to the US creditors and the Guaranteed Bondholders, subject to the constraint that the Guaranteed Bondholders are not able to receive more than 100% of their claimed amount until the US creditors have fully recovered their claim.

   This results in a distribution of:

      - $1,691 million to the Guaranteed Bondholders - $1,330 million from the US Estate and $361 million indirectly from the Canadian Estate.  The sum of this $1,691 and the $2,401 million received directly from the Canadian Estate in Step 2 is $4,092 million or 100.0% recovery of the Guaranteed Bondholders claim of $4,092 million.

      - $1,235 million to the US creditors - $423 million of which comes from the US Estate and $813 million which comes indirectly from the Canadian Estate.  This results in a 95.0% recovery of the $1,300 million of claims.

Step 4:

   For those creditors that receive distributions from multiple estates, the distributions are then aggregated in Step 4, to result in the amounts described above.

Step 5:

   The recoveries are then computed as the aggregate recovery from all estates divided by the initial claim as descibed above.

**CCC - Nortel Networks Corporation**                                    **Schedule 2.1**

**Ownership Approach - Summary of Sales Proceeds by Asset Class**
*($ MM USD)*

***Purpose:***
The purpose of this schedule is to summarize the allocation of the Sales Proceeds to each Nortel Debtor by asset class under the Ownership approach.

| Business Component | Source | Sales Proceeds | By Nortel Debtor Group | | |
|---|---|---|---|---|---|
| | | | **Canada** | **US** | **EMEA** |
| Asset Class | | | | | |
| Tangible Assets | *Schedule 2.3* | 169 | 59 | 42 | 68 |
| Intangible Assets | | | | | |
| Customer Relationships | *Schedule 2.4* | 682 | 93 | 393 | 197 |
| IP | *Schedule 2.5* | 1,143 | 858 | 228 | 57 |
| Subtotal - Operating Assets | | 1,995 | 1,010 | 663 | 322 |
| Purchaser Goodwill | *Schedule 2.2* | 853 | 427 | 316 | 110 |
| Total Business Sales | | 2,848 | 1,438 | 979 | 432 |
| Rockstar Transaction | *Schedule 2.6* | 4,454 | 4,368 | 30 | 57 |
| | | **7,302** | **5,805** | **1,009** | **488** |

**CCC - Nortel Networks Corporation**                                                                                     **Schedule 2.2**

**Ownership Approach - Summary of Sales Proceeds by Business Sale**
*($ MM USD)*

**Purpose:**

The purpose of this schedule is to summarize the allocation of the Sales Proceeds from each Business Sale to each Nortel Debtor by asset class under the Ownership approach.

| Asset Class | Source | Sales Proceeds | By Nortel Debtor Group | | |
|---|---|---|---|---|---|
| | | | Canada | US | EMEA |
| **Business Sales** | | | | | |
| **CDMA & LTE** | | | | | |
| Tangible Assets | *Schedule 2.3* | (51) | 15 | (66) | 0 |
| Customer Relationships | *Schedule 2.4* | 102 | 9 | 88 | 6 |
| IP | *Schedule 2.5* | 628 | 474 | 145 | 10 |
| Subtotal – Intangible Assets | | 730 | 482 | 233 | 16 |
| Purchaser Goodwill | *Note 1* | 373 | 246 | 119 | 8 |
| Total | | 1,053 | 744 | 285 | 24 |
| **Enterprise** | | | | | |
| Tangible Assets | *Schedule 2.3* | 29 | (11) | 24 | 16 |
| Customer Relationships | *Schedule 2.4* | 260 | 22 | 156 | 82 |
| IP | *Schedule 2.5* | 170 | 126 | 29 | 15 |
| Subtotal – Intangible Assets | | 430 | 147 | 185 | 98 |
| Purchaser Goodwill | *Note 1* | 384 | 131 | 165 | 87 |
| Total | | 843 | 268 | 374 | 201 |

**CCC - Nortel Networks Corporation**                                                                                       Schedule 2.2

**Ownership Approach - Summary of Sales Proceeds by Business Sale**
*($ MM USD)*

**Purpose:**
  The purpose of this schedule is to summarize the allocation of the Sales Proceeds from each Business Sale to each Nortel Debtor by asset class
  under the Ownership approach.

| Asset Class | Source | Sales Proceeds | By Nortel Debtor Group | | |
|---|---|---|---|---|---|
| | | | Canada | US | EMEA |
| **Business Sales** | | | | | |
| **MEN** | | | | | |
| Tangible Assets | Schedule 2.3 | 172 | 48 | 79 | 45 |
| Customer Relationships | Schedule 2.4 | 243 | 52 | 105 | 86 |
| IP | Schedule 2.5 | 216 | 163 | 30 | 24 |
| Subtotal – Intangible Assets | | 460 | 215 | 135 | 110 |
| Purchaser Goodwill | Note 1 | 0 | 0 | 0 | 0 |
| Total | | 632 | 263 | 214 | 155 |
| **Other Business Sales** | | | | | |
| Tangible Assets | Schedule 2.3 | 19 | 7 | 5 | 8 |
| Customer Relationships | Schedule 2.4 | 77 | 10 | 44 | 22 |
| IP | Schedule 2.5 | 129 | 96 | 24 | 8 |
| Subtotal – Intangible Assets | | 205 | 107 | 68 | 31 |
| Purchaser Goodwill | Note 1 | 96 | 50 | 32 | 14 |
| Total | | 321 | 163 | 105 | 52 |
| **Rockstar Transaction** | Schedule 2.6 | 4,454 | 4,368 | 30 | 57 |
| | | **7,302** | **5,805** | **1,009** | **488** |

*Note 1*      As discussed in Section 6 of the report, the Business Sales Premium is allocated in proportion to the value of the other assets.

**CCC - Nortel Networks Corporation**

**Schedule 2.3**

**Ownership Approach - Net Tangible Assets Proceeds**
*($ MM USD)*

**Purpose:**

The purpose of this schedule is to calculate the allocation of net tangible assets proceeds for Ownership approach.

The output of this schedule is used in the summary of Sales Proceeds for Ownership approach.

| | Actual Proceeds | Source | By Nortel Debtor Group | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Canada | | US | | EMEA | |
| | | | % | $ | % | $ | % | $ |
| | *Schedule 4* | | | | | | | |
| **Business Sales** | | | | | | | | |
| CDMA and LTE | (51) | *Schedule 7.1* | -30.3% | 15 | 130.3% | (66) | 0.0% | - |
| Enterprise | 29 | *Schedule 7.2* | -37.5% | (11) | 83.0% | 24 | 54.5% | 16 |
| MEN | 172 | *Schedule 7.3* | 27.9% | 48 | 46.1% | 79 | 25.9% | 45 |
| Sub-total | 150 | | 35.0% | 53 | 24.8% | 37 | 40.2% | 60 |
| Other Business Sales | 19 | *Note 1* | 35.0% | 7 | 24.8% | 5 | 40.2% | 8 |
| | **169** | | 35.0% | **59** | 24.8% | **42** | 40.2% | **68** |

**Note:**

1.  Allocation of proceeds for Other Business Sales are based on the weighted-average percentages of the CDMA and LTE, Enterprise and MEN Business Sales.

**CCC - Nortel Networks Corporation**

**Ownership Approach - Customer Relationships Proceeds**
*($ MM USD)*

Schedule 2.4

*Purpose:*

The purpose of this schedule is to calculate the allocation of customer relationships proceeds for Ownership approach.
The output of this schedule is used in the summary of Sales Proceeds for Ownership approach.

| | Actual Proceeds | Source | By Nortel Debtor Group | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Canada | | US | | EMEA | |
| | | | % | $ | % | $ | % | $ |
| | *Schedule 4* | | | | | | | |
| **Business Sales** | | | | | | | | |
| CDMA and LTE | 102 | *Schedule 7.4* | 8.3% | 9 | 85.9% | 88 | 5.8% | 6 |
| Enterprise | 260 | *Schedule 7.4* | 8.3% | 22 | 60.0% | 156 | 31.7% | 82 |
| MEN | 243 | *Schedule 7.4* | 21.4% | 52 | 43.2% | 105 | 35.4% | 86 |
| Sub-total | 606 | | 13.6% | 82 | 57.6% | 349 | 28.8% | 174 |
| Other Business Sales | 77 | *Note 1* | 13.6% | 10 | 57.6% | 44 | 28.8% | 22 |
| | **682** | | 13.6% | **93** | 57.6% | **393** | 28.8% | **197** |

*Note:*

1. Allocation of proceeds for Other Business Sales are based on the weighted-average percentages of the CDMA and LTE, Enterprise and MEN Business Sales.

000062

**CCC - Nortel Networks Corporation**                                                                                                        **Schedule 2.5**

**Ownership Approach - IP Proceeds**
*($ MM USD)*

*Purpose:*
The purpose of this schedule is to calculate the allocation of IP proceeds for Ownership approach.
The output of this schedule is used in the summary of Sales Proceeds for Ownership approach.

| | Actual Proceeds | Adjusted Proceeds | Source | By Nortel Debtor Group | | | | | |
| | | | | Canada | | US | | EMEA | |
| | | | | % | $ | % | $ | % | $ |
| | *Schedule 4* | *Note 1* | | | | | | | |
| **Business Sales** | | | | | | | | | |
| CDMA and LTE | 628 | | | | | | | | |
| Surrendered Licenses | | 154 | *Note 2* | 0.0% | - | 93.7% | 145 | 6.3% | 10 |
| Residual IP | | 474 | *Schedule 7.5* | 100.0% | 474 | 0.0% | - | 0.0% | - |
| | | | | | | | | | |
| Enterprise | 170 | | | | | | | | |
| Surrendered Licenses | | 42 | *Note 2* | 0.0% | - | 65.4% | 27 | 34.6% | 14 |
| Residual IP | | 128 | *Schedule 7.5* | 98.0% | 126 | 1.2% | 2 | 0.7% | 1 |
| | | | | | | | | | |
| MEN | 216 | | | | | | | | |
| Surrendered Licenses | | 53 | *Note 2* | 0.0% | - | 55.0% | 29 | 45.0% | 24 |
| Residual IP | | 163 | *Schedule 7.5* | 99.6% | 163 | 0.4% | 1 | 0.0% | - |
| | | | | | | | | | |
| Sub-total | 1,014 | 1,014 | | 75.1% | 762 | 20.1% | 203 | 4.8% | 49 |
| | | | | | | | | | |
| Other Business Sales | 129 | | | | | | | | |
| Surrendered Licenses | | 32 | *Note 2* | 0.0% | - | 74.3% | 23 | 25.7% | 8 |
| Residual IP | | 97 | *Note 3* | 99.1% | 96 | 0.6% | 0.6 | 0.3% | 0.3 |
| | | | | | | | | | |
| | **1,143** | | | 75.1% | **858** | 19.9% | **228** | 5.0% | **57** |

*Notes:*

1. Actual proceeds attributable to IP also includes the estimated value of the surrendered licenses. As a result, we adjusted the proceeds to account for the estimated licenses value as well as the residual IP.

2. The value of the Surrendered Licenses is attributable to both the US and EMEA Debtors. For purposes of our allocation, we have computed that the aggregate value allocable to the Surrendered Licenses of $285 million represents approximately 25% of the total IP value in the PPA. Accordingly, we have allocated 25% of the value of the IP in each Business Sale to the Surrendered Licenses in connection with that business and assumed that this is appropriately allocated between the US and EMEA Debtors based on relative operating profit levels. We understand, and have assumed, that operating margin percentages are similar in the US and EMEA and, accordingly have adopted relative revenue levels for the US and EMEA for each of the Business Sales as computed at Schedule 7.4.

3. Allocation of proceeds for Other Business Sales is based on the weighted-average percentages of the CDMA and LTE, Enterprise and MEN Business Sales. See Schedule 7.5.

000063

**CCC - Nortel Networks Corporation**                                                     Schedule 2.5

Ownership Approach - IP Proceeds                                                          **REVISED**
*($ MM USD)*

*Purpose:*

The purpose of this schedule is to calculate the allocation of IP proceeds for Ownership approach.
The output of this schedule is used in the summary of Sales Proceeds for Ownership approach.

| | Actual Proceeds *Schedule 4* | Adjusted Proceeds *Note 1* | Source | Canada % | Canada $ | US % | US $ | EMEA % | EMEA $ |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **By Nortel Debtor Group** | | | |
| **Business Sales** | | | | | | | | | |
| CDMA and LTE | 628 | | | | | | | | |
|   Surrendered Licenses | | 154 | *Note 2* | 0.0% | - | 76.8% | 119 | 23.2% | 36 |
|   Residual IP | | 474 | *Schedule 7.5* | 100.0% | 474 | 0.0% | - | 0.0% | - |
| | | | | | | | | | |
| Enterprise | 170 | | | | | | | | |
|   Surrendered Licenses | | 42 | *Note 2* | 0.0% | - | 76.8% | 32 | 23.2% | 10 |
|   Residual IP | | 128 | *Schedule 7.5* | 98.0% | 126 | 1.2% | 2 | 0.7% | 1 |
| | | | | | | | | | |
| MEN | 216 | | | | | | | | |
|   Surrendered Licenses | | 53 | *Note 2* | 0.0% | - | 76.8% | 41 | 23.2% | 12 |
|   Residual IP | | 163 | *Schedule 7.5* | 99.6% | 163 | 0.4% | 1 | 0.0% | - |
| | | | | | | | | | |
|   Sub-total | 1,014 | 1,014 | | 75.1% | 762 | 19.1% | 194 | 5.8% | 59 |
| | | | | | | | | | |
| Other Business Sales | 129 | | | | | | | | |
|   Surrendered Licenses | | 32 | *Note 2* | 0.0% | - | 76.8% | 24 | 23.2% | 7 |
|   Residual IP | | 97 | *Note 3* | 99.1% | 96 | 0.6% | 0.6 | 0.3% | 0.3 |
| | **1,143** | | | 75.1% | **858** | 19.1% | **219** | 5.8% | 66 |

**Notes:**

1. Actual proceeds attributable to IP also includes the estimated value of the surrendered licenses.  As a result, we adjusted the proceeds to account for the estimated licenses value as well as the residual IP.

2. The value of the Surrendered Licenses is attributable to both the US and EMEA Debtors.  For purposes of our allocation, we have computed that the aggregate value allocable to the Surrendered Licenses of $285 million represents approximately 25% of the total IP value in the PPA.  Accordingly, we have allocated 25% of the value of the IP in each Business Sale to the Surrendered Licenses in connection with that business and assumed that this is appropriately allocated between the US and EMEA Debtors based on relative operating profit levels.  We understand, and have assumed, that operating margin percentages are similar in the US and EMEA and, accordingly have adopted relative revenue levels for the US and EMEA for each of the Business Sales as computed at Schedule 7.4.  Addendum, April 1, 2014: RPSM percentages should have been applied to the identified value of the Surrendered Licenses.  The effect is shown above.

3. Allocation of proceeds for Other Business Sales is based on the weighted-average percentages of the CDMA and LTE, Enterprise and MEN Business Sales. See Schedule 4.

**CCC - Nortel Networks Corporation**

**Schedule 2.6**

**Ownership Approach - Rockstar Transaction Proceeds**
*($ MM USD)*

*Purpose:*
The purpose of this schedule is to calculate the allocation of Rockstar Transaction Proceeds for Ownership approach.
The output of this schedule is used in the summary of Sales Proceeds for Ownership approach.

| | Actual Proceeds | Source | Canada % | Canada $ | US % | US $ | EMEA % | EMEA $ |
|---|---|---|---|---|---|---|---|---|
| | | | | | **By Nortel Debtor Group** | | | |
| **IP** | 4,454 | *Schedule 7.5* | 98.1% | 4,368 | 0.7% | 30 | 1.3% | 57 |
| | **4,454** | | | **4,368** | | **30** | | **57** |

**CCC - Nortel Networks Corporation**                                                                                Schedule 3

**Alternative Pro Rata Allocation Approach - Computation of Recovery Percentages and Requisite Allocation to Nortel Debtor Groups**
*($ MM USD)*

**Purpose:**
The purpose of this schedule is to calculate the recovery rates for the Alternative Pro Rata Allocation approach.

**Assets**

| | | |
|---|---|---|
| Projected Treasury Cash at June 30, 2014, after payment of Secured Claims | *Schedule 5* | 1,525 |
| Sales Proceeds | | 7,302 |
| Total assets available for distribution | | **8,827** |

**Claims**

| | Claims without consideration of guarantees | Pro rata Recovery by each Key Creditor Group | Equal Percentage Recovery to all Key Creditor Groups | Assets required in each Nortel Debtor Group in order to give effect to these recoveries[1] | | | |
|---|---|---|---|---|---|---|---|
| | | | | Canada | US | EMEA | Total |
| | *Schedule 6* | | | | | | |
| Unsecured claims | | | | | | | |
| Canada (NNL and subs) | 3,506 | 2,496 | **71.2%** | 2,496 | | | 2,496 |
| US (NNI and subs) | 1,300 | 926 | **71.2%** | | 926 | | 926 |
| EMEA | 500 | 356 | **71.2%** | | | 356 | 356 |
| Claims subject to a guarantee or second claim | | | | | | | |
| UK Pension Trust | 3,000 | 2,136 | **71.2%** | - | | 2,136 | 2,136 |
| Guaranteed Bondholders | 4,092 | 2,913 | **71.2%** | 2,913 | - | | 2,913 |
| | 12,398 | 8,827 | 71.2% | **5,410** | **926** | **2,492** | **8,827** |
| Projected Treasury Cash at June 30, 2014, after payment of Secured Claims, by Debtor | *Schedule 5* | | | 343 | 744 | 438 | 1,525 |
| Required allocation of the Sales Proceeds | | | | **5,067** | **182** | **2,054** | **7,302** |

Note 1:    For purposes of our computations under the Alternative Pro Rata Allocation approach in this report only, we have assumed the Guaranteed Bondholder claim to be a primary claim against the Canadian estate and therefore the full required assets to be distributed to the Guaranteed Bondholders are put into Canada.  This assumption should not be taken as an acknowledgement by the CCC as to its validity.

000065

**CCC - Nortel Networks Corporation**                                                                                   Schedule 4

**Purchase Price Allocations and Actual Business Sales Proceeds**
*($ MM USD)*

*Purpose:*

The purpose of this schedule is to reconcile the purchase price allocation to the actual proceeds received.
The output of this schedule is used as the proceeds to be allocated by asset class for the Ownership allocation.

| | Purchase Price Allocations | | | | Actual Proceeds *Note 4* | | | | Other Business Sales Proceeds *Note 5* | |
| | CDMA *Note 1* | Enterprise *Note 2* | MEN *Note 3* | Total | CDMA | Enterprise | MEN | Total | % | $ |
|---|---|---|---|---|---|---|---|---|---|---|
| **Tangible Assets** | $ (59) | $ 32 | $ 184 | $ 158 | $ (51) | $ 29 | $ 172 | $ 150 | 5.9% | $ 19 |
| **Intangible Assets** | | | | | | | | | | |
| Customer relationships | 119 | 288 | 261 | 667 | 102 | 260 | 243 | 606 | 24.0% | 77 |
| IP | 728 | 188 | 232 | 1,137 | 628 | 170 | 216 | 1,014 | 40.1% | 129 |
| Goodwill | 432 | 425 | - | 857 | 373 | 384 | - | 757 | 30.0% | 96 |
| | $ 1,220 | $ 933 | $ 677 | $ 2,819 | $ 1,053 | $ 843 | $ 632 | $ 2,527 | 100.0% | $ 321 |

**Notes:**

1.   Source is CTRL-NORTEL-00005300, at pp. 119-120.  The CDMA - Ericsson transaction closed on November 13, 2009. Capital IQ recorded an exchange rate of 6.842 SEK/USD on that date.

2.   Source is CTRL-NORTEL-00005290, at pp. 92-93

3.   Source is CTRL-NORTEL-00005298, at pp. 69-70

4.   As the actual proceeds received were less than the aggregate purchase price, each amount included in the purchase price allocation has been pro rata reduced accordingly.

5.   The allocation of proceeds by asset class for Other Business Sales Proceeds are based on the weighted-average percentages of the three available purchase price allocations.

6.   The purchase price allocation for MEN attributes $11 million to In Process Research and Development.  For purposes of our analysis, we have included this with IP.

**CCC - Nortel Networks Corporation**                                                                                  **Schedule 5**

**Summary of Assets in Each Debtor Prior to Consideration of Business Sales Proceeds**
*($ MM USD)*

**Purpose:**
The purpose of this schedule is to estimate the projected Treasury Cash at June 30, 2014.
The output of this schedule is added to the Sales Proceeds in determining the assets available for distribution
by each Debtor.

**Assets**

| | Treasury cash as of Dec 31, 2013 before allocation of sale proceeds | Less: anticipated spend until end of litigation | FMV of unrealized assets | Less: Payment of Secured Claims | Projected Treasury Cash at June 30, 2014, after payment of Secured Claims |
|---|---|---|---|---|---|
| | *Schedule 5.1* | *Schedule 5.1* | *Schedule 5.2* | *Schedule 6* | |
| Canada (NNL Entities) | 436 | (91) | 60 | (63) | **343** |
| US (NNI Entities) | 925 | (118) | 74 | (137) | **744** |
| EMEA | 656 | (118) | 0 | (100) | **438** |
| | 2,017 | (326) | 134 | (300) | 1,525 |

**CCC - Nortel Networks Corporation**
Schedule 5.1

**Assets in Each Debtor Prior to Consideration of Sales Proceeds - Treasury Cash and Projected Cash Spend Until End of Trial**
*($ MM USD)*

*Purpose:*
The purpose of this schedule is to summarize the Global Cash Summary of Nortel as of December 31, 2013 as prepared by the Monitor and estimate the projected cash burn rate to June 30, 2014.
The output of this schedule is included in the projected treasury cash on Schedule 5.

| Region | 12-Apr-13 | 26-Apr-13 | 17-May-13 | 31-May-13 | 14-Jun-13 | 28-Jun-13 | 12-Jul-13 | 26-Jul-13 | 9-Aug-13 | 30-Aug-13 | 13-Sep-13 | 27-Sep-13 | 11-Oct-13 | 25-Oct-13 | 8-Nov-13 | 29-Nov-13 | 13-Dec-13 | 31-Dec-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 511 | 515 | 513 | 508 | 500 | 507 | 503 | 501 | 499 | 490 | 487 | 479 | 474 | 471 | 465 | 450 | 441 | 436 |
| CALA | 41 | 41 | 40 | 39 | 39 | 38 | 38 | 37 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 |
| Asia PAC | 131 | 129 | 132 | 129 | 129 | 125 | 128 | 128 | 126 | 122 | 122 | 122 | 125 | 126 | 128 | 127 | 127 | 128 |
| Greater China | 209 | 208 | 209 | 210 | 210 | 203 | 199 | 197 | 197 | 193 | 194 | 192 | 193 | 192 | 190 | 190 | 190 | 189 |
| LG Nortel | | | | | | | | | | | | | | | | | | |
| **NNL Entities** | 892 | 894 | 894 | 886 | 877 | 872 | 867 | 863 | 857 | 840 | 836 | 828 | 825 | 823 | 817 | 801 | 791 | 787 |
| US | | | | | | | | | | | | | | | | | | |
| NGS | | | | | | | | | | | | | | | | | | |
| **NNI Entities** | 1,085 | 1,077 | 1,070 | 1,000 | 995 | 982 | 981 | 980 | 979 | 972 | 971 | 961 | 960 | 959 | 954 | 952 | 941 | 925 |
| UK | 323 | 323 | 328 | 322 | 318 | 317 | 312 | 310 | 304 | 308 | 307 | 298 | 311 | 312 | 298 | 289 | 269 | 268 |
| Europe | 390 | 390 | 390 | 387 | 387 | 387 | 386 | 385 | 384 | 384 | 384 | 383 | 392 | 392 | 395 | 393 | 393 | 387 |
| **EMEA** | 713 | 712 | 718 | 709 | 705 | 705 | 697 | 696 | 688 | 693 | 691 | 680 | 703 | 704 | 693 | 682 | 662 | 656 |
| **Treasury Cash** | 2,689 | 2,684 | 2,682 | 2,595 | 2,577 | 2,559 | 2,545 | 2,539 | 2,524 | 2,505 | 2,498 | 2,469 | 2,488 | 2,486 | 2,464 | 2,435 | 2,394 | 2,367 |

**Actual Cash Burn Rates (net of sale proceeds) per day from indicated date until December 31, 2013**

| | 12-Apr-13 | 26-Apr-13 | 17-May-13 | 31-May-13 | 14-Jun-13 | 28-Jun-13 | 12-Jul-13 | 26-Jul-13 | 9-Aug-13 | 30-Aug-13 | 13-Sep-13 | 27-Sep-13 | 11-Oct-13 | 25-Oct-13 | 8-Nov-13 | 29-Nov-13 | 13-Dec-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canada | 0.40 | 0.43 | 0.47 | 0.46 | 0.45 | 0.46 | 0.47 | 0.49 | 0.49 | 0.43 | 0.46 | 0.43 | 0.48 | 0.54 | 0.57 | 0.46 | 0.24 |
| US | 0.61 | 0.61 | 0.64 | 0.35 | 0.35 | 0.31 | 0.33 | 0.35 | 0.38 | 0.39 | 0.43 | 0.38 | 0.44 | 0.52 | 0.56 | 0.85 | 0.90 |
| EMEA | 0.22 | 0.23 | 0.27 | 0.25 | 0.25 | 0.26 | 0.24 | 0.25 | 0.23 | 0.30 | 0.32 | 0.26 | 0.58 | 0.72 | 0.70 | 0.81 | 0.35 |

**Assumed Daily Cash Burn Rates**

| | Assumed Daily Burn Rates From Jan 1, 2014 To June 30, 2014 | Totals for Period Total to June 30, 2014 |
|---|---|---|
| *($ MM USD)* | | |
| Canada | 0.50 | 91 |
| US | 0.65 | 118 |
| EMEA | 0.65 | 118 |
| **Total** | 1.80 | 326 |

To be read with the Duff & Phelps report dated January 24, 2014

000068

**CCC - Nortel Networks Corporation**

**Schedule 5.2**

**Assets in Each Debtor Prior to Consideration of Sales Proceeds - Proceeds on Non-Treasury Cash Assets**
*($ MM USD)*

**Purpose:**

The purpose of this schedule is to estimate the proceeds on sales from other assets held by each Debtor.
The output of this schedule is included in the projected treasury cash on Schedule 5.

| | **Remaining Unrealized Assets** | | |
|---|---|---|---|
| **Estimated Assets** | **CAD** | **US** | **EMEA** |
| GDNT | 50 | | |
| NIII Recoveries | 10 | 23 | |
| Rabbi trust | | 40 | |
| Net Post-petition intercompany receipts | | 11 | |
| **Estimated Net Unrealized Single Debtor Assets** | **60** | **74** | **0** |

*Source    Per instructions*

**CCC - Nortel Networks Corporation**                                                                    Schedule 6

**Summary of Assumed Claims against each Nortel Estate**
*($ MM USD)*

***Purpose:***
    The purpose of this schedule is to summarize the assumed claims against each Debtor.
    The output of this schedule is used to compute the Alternative Pro Rata Allocation approach and to estimate the percentage recoveries by each
    Key Creditor Group in the Ownership approach.

| Claims Pool | Local Currency | Local Currency Claims | Exchange Rate As of 14-Jan-09 | U.S. Denominated Claims |
|---|---|---|---|---|
| **Unsecured claims - Canada** | | | | |
| Canadian only bonds | USD | 205 | | 205 |
| Canadian unsecured creditors (excluding bonds) | CAD | 3,786 | 1.2222 | 3,098 |
| China & Singapore claims | USD | 203 | | 203 |
| | | | | 3,506 |
| **Unsecured claims - US** | | | | |
| PBGC - unsecured portion | USD | 400 | | 400 |
| US unsecured creditors | USD | 900 | | 900 |
| | | | | 1,300 |
| **Unsecured claims - EMEA** | | | | |
| UK Non-Pension creditors | UK Pound | 204 | 0.6816 | 300 |
| Other EMEA creditors | EUR | 151 | 0.7532 | 200 |
| | | | | 500 |
| **Claims subject to a guarantee or second claim** | | | | |
| UK Pension Trust | UK Pound | 2,045 | 0.6816 | 3,000 |
| Guaranteed Bondholders | USD | 4,092 | | 4,092 |
| **Total** | | | | **12,398** |
| | | | | |
| **Priority / Administrative Claims** | | | | |
| Canada (NNL and subs) (payable to the US) | USD | (63) | | (63) |
| US (NNI and subs) | USD | (137) | | (137) |
| EMEA | USD | (100) | | (100) |
| **Total** | | | | **(300)** |

*Source:   Counsel instructions*

**CCC - Nortel Networks Corporation**                                                                                            **Schedule 7.1**

**Summary of Tangible Assets - CDMA**
*($ MM USD)*

*Purpose:*
    The purpose of this schedule is to summarize the net tangible assets in the CDMA business by geographic location.
    The output of this schedule is used as the basis of allocation for net tangible assets in the Ownership method.

**1. Net Tangible Assets Removed From Books**

|  | Canada | | US | | EMEA | | Total |
|---|---|---|---|---|---|---|---|
|  | $ | % | $ | % | $ | % |  |
| **Tangible Asset** | | | | | | | |
| Inventory | 3 | 14.6% | 20 | 85.4% | - | 0.0% | 24 |
| Other Assets | 31 | 23.2% | 104 | 76.8% | - | 0.0% | 136 |
| Property, Plant and Equipment | 20 | 52.3% | 19 | 47.7% | - | 0.0% | 39 |
| Other Liabilities | (35) | 10.7% | (291) | 89.3% | - | 0.0% | (326) |
|  | 20 | -16% | (148) | 116% | - | 0% | (128) |

**2.  Effect of Mark to Market of Net Tangible Assets**

|  | PPA Value | Canada | | US | | EMEA | | Total |
|---|---|---|---|---|---|---|---|---|
|  |  | % | $ | % | $ | % | $ |  |
| **Tangible Asset** | | | | | | | | |
| Inventory | 27 | 14.6% | 4 | 85.4% | 23 | 0.0% | - | 27 |
| Other Assets | 57 | 23.2% | 13 | 76.8% | 44 | 0.0% | - | 57 |
| Property, Plant and Equipment | 38 | 52.3% | 20 | 47.7% | 18 | 0.0% | - | 38 |
| Other Liabilities | (182) | 10.7% | (19) | 89.3% | (162) | 0.0% | - | (182) |
|  | (59) | -30.3% | 18 | 130.3% | (77) | 0.0% | - | (59) |

Sources:
CTRL-NORTEL-00000031
CTRL-NORTEL-00005300, at pp. 119-120

**CCC - Nortel Networks Corporation**                                                                                                  Schedule 7.2

**Summary of Tangible Assets - Enterprise**
*($ MM USD)*

*Purpose:*

The purpose of this schedule is to summarize the net tangible assets in the Enterprise business by geographic location.
The output of this schedule is used as the basis of allocation for net tangible assets in the Ownership method.

**1. Net Tangible Assets Removed From Books**

|  | Canada | | US | | EMEA | | Total |
|---|---|---|---|---|---|---|---|
|  | $ | % | $ | % | $ | % |  |
| **Tangible Asset** |  |  |  |  |  |  |  |
| Accounts Receivable | 0.2 | -14.0% | 3 | -194.0% | (5) | 308.0% | (1) |
| Inventory | 4 | 3.9% | 66 | 67.9% | 28 | 28.2% | 98 |
| Property, Plant and Equipment | 10 | 17.2% | 36 | 64.5% | 10 | 18.3% | 55 |
| Accounts Payable | 5 | 8.5% | 16 | 25.1% | 42 | 66.3% | 63 |
| Payroll and Benefit Obligations | (21) | 19.8% | (68) | 64.1% | (17) | 16.2% | (107) |
| Deferred Revenue | (20) | 10.0% | (113) | 55.8% | (69) | 34.2% | (202) |
| Other Assets and Liabilities | 17 | 7.2% | 227 | 93.2% | (1) | -0.3% | 244 |
|  | (5) | -3% | 167 | 111% | (12) | -8% | 150 |

**2:  Effect of Mark to Market of Net Tangible Assets**

|  | PPA Value | Canada | | US | | EMEA | | Total |
|---|---|---|---|---|---|---|---|---|
|  |  | % | $ | % | $ | % | $ |  |
| **Asset/Liability** |  |  |  |  |  |  |  |  |
| Cash and Cash Equivalents(1) | 38 | 3.9% | 1 | 67.9% | 26 | 28.2% | 11 | 38 |
| Account Receivable(2) | 47 | 3.9% | 2 | 67.9% | 32 | 28.2% | 13 | 47 |
| Inventory | 115 | 3.9% | 4 | 67.9% | 78 | 28.2% | 32 | 115 |
| Property, Plant and Equipment | 103 | 17.2% | 18 | 64.5% | 66 | 18.3% | 19 | 103 |
| Accounts Payable | (17) | 8.5% | (1) | 25.1% | (4) | 66.3% | (11) | (17) |
| Payroll and Benefit Obligations | (124) | 19.8% | (25) | 64.1% | (79) | 16.2% | (20) | (124) |
| Deferred Revenue | (78) | 10.0% | (8) | 55.8% | (44) | 34.2% | (27) | (78) |
| Other Assets and Liabilities | (52) | 7.2% | (4) | 93.2% | (48) | -0.3% | 0 | (52) |
|  | 32 | -37.5% | (12) | 83.0% | 27 | 54.5% | 17 | 32 |

*Notes:*

1.  Source document does not contain a line item for cash and cash equivalents.  We have used inventory as a reasonable proxy.

2.  Source document indicates a negative amount for accounts receivable.  We have used inventory as a reasonable proxy.

Sources:
CTRL-NORTEL-00000031
CTRL-NORTEL-00005290, at pp. 92-93

**CCC - Nortel Networks Corporation**                                                                    **Schedule 7.3**
**Summary of Tangible Assets - MEN**
*($ MM USD)*

***Purpose:***
    The purpose of this schedule is to summarize the net tangible assets in the MEN business by geographic location.
    The output of this schedule is used as the basis of allocation for net tangible assets in the Ownership method.

**1. Net Tangible Assets Removed From Books**

| | Canada | | US | | EMEA | | Total |
|---|---|---|---|---|---|---|---|
| | $ | % | $ | % | $ | % | |
| **Tangible Asset** | | | | | | | |
| Unbilled Receivables | 0.3 | 12.8% | 0.3 | 12.1% | 2 | 75.1% | 3 |
| Inventories | 4 | 3.8% | 64 | 67.2% | 28 | 29.0% | 96 |
| Prepaid Expenses and Other | 3 | 4.7% | 30 | 55.0% | 22 | 40.3% | 55 |
| Other Long-term Assets | 31 | 89.0% | 0 | 0.5% | 4 | 10.5% | 35 |
| Equipment, Furniture and Fixtures | 34 | 90.0% | 3 | 8.5% | 1 | 1.5% | 38 |
| Deferred Revenue | (6) | 8.2% | (46) | 57.8% | (27) | 34.1% | (79) |
| Accrued Liabilities | (7) | 23.9% | (17) | 57.2% | (5) | 18.9% | (29) |
| Other Long-term Obligations | (2) | 99.2% | (0) | 0.8% | - | 0.0% | (2) |
| | 57 | 49% | 36 | 31% | 24 | 20% | 116 |

**2. Effect of Mark to Market of Net Tangible Assets**

| | PPA Value | Canada | | US | | EMEA | | Total |
|---|---|---|---|---|---|---|---|---|
| | | % | $ | % | $ | % | $ | |
| **Asset/Liability** | | | | | | | | |
| Unbilled Receivables | 7 | 12.8% | 1 | 12.1% | 1 | 75.1% | 5 | 7 |
| Inventories | 146 | 3.8% | 6 | 67.2% | 98 | 29.0% | 42 | 146 |
| Prepaid Expenses and Other | 33 | 4.7% | 2 | 55.0% | 18 | 40.3% | 13 | 33 |
| Other Long-term Assets | 22 | 89.0% | 20 | 0.5% | 0 | 10.5% | 2 | 22 |
| Equipment, Furniture and Fixtures | 41 | 90.0% | 37 | 8.5% | 4 | 1.5% | 1 | 41 |
| Deferred Revenue | (28) | 8.2% | (2) | 57.8% | (16) | 34.1% | (10) | (28) |
| Accrued Liabilities | (34) | 23.9% | (8) | 57.2% | (19) | 18.9% | (6) | (34) |
| Other Long-term Obligations | (3) | 99.2% | (3) | 0.8% | (0) | 0.0% | - | (3) |
| | 184 | 27.9% | 52 | 46.1% | 85 | 25.9% | 48 | 184 |

Sources:
CTRL-NORTEL-00000031
CTRL-NORTEL-00005298, at pp. 69-70

000073

**CCC - Nortel Networks Corporation**                                                    **Schedule 7.4**

**Summary of Customer Relationships**
*($ MM USD)*

*Purpose:*
    The purpose of this schedule is to summarize the revenue by Business Sale by geographic location.
    The output of this schedule is used as the basis of allocation for customer relationships in the Ownership approach.
    The relative share of revenue between the US and EMEA is also used on Schedule 2.5.

|  | Canada | | US | | EMEA | | Total |
|---|---|---|---|---|---|---|---|
|  | Revenue | % | Revenue | % | Revenue | % | Revenue |
| **CDMA and LTE** | 174 | 8.3% | 1,789 | 85.9% | 120 | 5.8% | 2,083 |
| US/EMEA relative share |  |  |  | 93.7% |  | 6.3% |  |
| **Enterprise**[1] | 204 | 8.3% | 1,473 | 60.0% | 778 | 31.7% | 2,455 |
| US/EMEA relative share |  |  |  | 65.4% |  | 34.6% |  |
| **MEN** | 244 | 21.4% | 492 | 43.2% | 404 | 35.4% | 1,140 |
| US/EMEA relative share |  |  |  | 55.0% |  | 45.0% |  |
| **Aggregate US/EMEA relative share** |  |  | 3,754 | 74.3% | 1,302 | 25.7% | 5,056 |

Source:
(1) - NOR_54097223

**CCC - Nortel Networks Corporation**                                                           **Schedule 7.5**

**Summary of Patents Owned**

***Purpose:***

The purpose of this schedule is to summarize the number of patents owned by Debtor.
The output of this schedule is used as the basis of allocation for IP under Ownership approach.

|  | **Canada** | | **US** | | **EMEA** | | **Total** |
|---|---|---|---|---|---|---|---|
|  | # of Patents | % | # of Patents | % | # of Patents | % | # of Patents |
| **Business Sales [1]** | | | | | | | |
| CDMA and LTE | 238 | 100.0% | - | 0.0% | - | 0.0% | 238 |
| Enterprise | 800 | 98.0% | 10 | 1.2% | 6 | 0.7% | 816 |
| MEN | 1,138 | 99.6% | 4 | 0.4% | - | 0.0% | 1,142 |
| **Total for Business Sales** | 2,176 | 99.1% | 14 | 0.6% | 6 | 0.3% | 2,196 |
| **Rockstar Transaction [1]** | 6,414 | 98.1% | 44 | 0.7% | 83 | 1.3% | 6,541 |

***Note:***

1.  The number of patents and patent applications in this schedule is representative of the approximately 2,700 patents and patent applications transferred in the Business Sales; and the approximately 7,000 patents and patent applications transferred in the Rockstar Transaction.

Sources:
CTRL-NORTEL-00000136
CTRL-NORTEL-00000138
CTRL-NORTEL-00007281
GIP_Nortel_00135042
NNC-NNL06001801
NNC-NNL06002086
NNC-NNL06002189
NNC-NNL06002554 at 1-363

**CCC - Nortel Networks Corporation**                                                    **Schedule 8**

**Summary of Fiscal 2009 RPSM Percentages**
*($ MM USD)*

***Purpose:***
The purpose of this schedule is to summarize the Fiscal 2009 RPSM percentages for the Nortel Debtors.
The output of this schedule is used in the computation of the value of the Surrendered Licenses, amongst other things.

| | Canada | US | UK | France | Ireland | Total | Total |
|---|---|---|---|---|---|---|---|
| | | | **EMEA** | | | | |
| **Research and Development Spending** | | | | | | | |
| 2005 | 689 | 617 | 57 | 220 | 15 | 292 | 1,598 |
| 2006 | 782 | 588 | 38 | 193 | 17 | 248 | 1,618 |
| 2007 | 842 | 678 | 39 | 67 | 25 | 131 | 1,651 |
| 2008 | 817 | 615 | 37 | 55 | 24 | 116 | 1,549 |
| 2009 | 597 | 384 | 18 | 37 | 26 | 82 | 1,063 |
| Total 2005 - 2009 | 3,728 | 2,882 | 188 | 573 | 108 | 870 | 7,479 |
| Percentage of Total | **49.8%** | **38.5%** | | | | **11.6%** | **100.0%** |

Source:
NNC-NNL107395

# Appendix A

**Form 53**

**Courts of Justice Act**

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1. My name is Thomas Britven.  I live in Houston, in the State of Texas.

2. I have been engaged by or on behalf of the Canadian Creditors Committee to provide evidence in relation to the court proceeding referenced in the text of my Report.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

    a)  to provide opinion evidence that is fair, objective and non-partisan;

    b)  to provide opinion evidence that is related only to matters that are within my area of expertise; and

    c)  to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

Date         _____January 24, 2014_____

Signature     _____

Note:  This Appendix is provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure.*



**DUFF&PHELPS**

**Thomas W. Britven**
*Managing Director*
*Duff & Phelps, LLC*

<span style="color:red">**P R O F E S S I O N A L   C R E D E N T I A L S**</span>

*Thomas Britven is a Managing Director in the Houston office of Duff & Phelps, LLC. He is also the National Intellectual Property Consulting Practice Leader.*

*Testimony*

- *Tribocor Technologies, Inc. v. Gansam Rai and AirComp LLC,* Cause No. 2009-58465, Deposition and trial before the District Court of Harris County, Texas 165th Judicial District, 2013.

- *Inventio AG v. ThyssenKrupp Elevator Americas Corp.,* Case No. 1:08-cv-00874-ER, Deposition before the United States District Court for the District Court of Texas, 2013.

- *Fujifilm Corporation v. HTC Corporation and HTC America, Inc.,* Case No. H-09-4109, Deposition before the United States District Court for the Southern District of Texas, Houston Division, 2013.

- *Boston Scientific Corp., et al. v. Mirowski Family Ventures, LLC,* Case No. 1:11-cv-00736-WTL(DKL), Deposition before the United States District Court for the Southern District of Indiana, Indianapolis Division, 2012.

- *DataQuill Limited v. High Tech Computer Corp.; HTC Corporation v. DataQuill Limited,* Case No. 08cv543 IEG (BGS), Depositions before the United States District Court for the Southern District of California, 2011 and 2012.

- *Halliburton Energy Services, Inc. v. Weatherford International, Inc.,* Civil Action No. 3:10-CV-02595-N (severed from 3:07-CV-2144-N), Depositions and trial before the United States District Court for the Northern District of Texas, Dallas Division, 2012 and 2011.

- *Weatherford International, Inc., et al. v. Halliburton Energy Services, Inc., et al.,* Civil Action No. 2:09-CV-261(CE), Deposition before the United States District Court for the Eastern District of Texas, Marshall Division, 2012.

- *POM Wonderful LLC, v. OceanSpray Cranberries, Inc. and Does 1-10,* Case No. CV09-565 DDP (RZx), Deposition and trial before United States District Court for the Central District of California, 2011.

- *Quest Software v. Centrify Corporation,* Civil Action No. 2:10-CV-00859-TS , Deposition before the United States District Court for the District of Utah, Central Division, 2011.

- *Conceptus, Inc. v. Hologic, Inc.,* Case No. 09-cv-02280 WHA, Deposition and trial before United States District Court for the Northern District of California, San Francisco Division, 2010 and 2011.

- *Fractus S.A. v. Samsung Electronics Co., Ltd., et al.,* Civil Action No. 6:09-cv-203-LED-JDL, Deposition and trial before the United States District Court for the Eastern District of Texas, Tyler Division, 2011.

- *Broadcom Corporation v. SiRF Technology, Inc. and CSR plc,* Case No. SACV 08-546 JVS (MLGx), Deposition before United States District Court for the Central District of California, Southern Division, 2010.

*Phone: 713-237-5310 ♦ Fax: 713-535-9640 ♦ Mobile: 713-299-6756 ♦ E-mail: thomas.britven@duffandphelps.com*
*1111 Bagby Street, Suite 1900, Houston, TX 77002*

*Testimony*
*(continued)*

- *Quicksilver Resources, Inc. v. Eagle Drilling, LLC,* Civil Action No. H-08-868, Deposition before United States District Court for the Southern District of Texas, Houston Division, 2010.

- *Oceaneering International, Inc. v. GRI Simulations, Inc. and Stephen G. Dodd,* Civil Action No. VC05-0258, Deposition before United States District Court for the Western District of Louisiana, Layayette Division, 2010.

- *ClearValue, Inc. and Richard Alan Haase v. Pearl River Polymers, Inc., Polychemie Inc., SNF Inc., Polydyne, Inc. and SNF Holding Company,* Civil Action No. 6:06 CV 197, Deposition and trial before the United States District Court for the Eastern District of Texas, Tyler Division, 2007 and 2010.

- *Deka Products Limited Partnership v. Cytyc Corporation and Hologic, Inc.,* AAA Case No. 11 Y 133 01686 08, Deposition and Arbitration testimony before the American Arbitration Association, 2009.

- *Widevine Technologies, Inc., v. Verimatrix, Inc.,* Case No. 2:07-cv-00321-TJW-CE, Deposition before United States District Court for the Eastern District of Texas, Marshall Division, 2009.

- *Motorola, Inc. v. VTech Communications, Inc., VTech Telecommunications Ltd.,* Civil Action No. 5:07-cv-00171-DF-CMC, Deposition before United States District Court for the Eastern District of Texas, Texarkana Division, 2009.

- *Quigley Company, Inc., Debtor,* Chapter 11, Case No. 04-15739, Deposition and trial before United States Bankruptcy Court for the Southern District of New York, 2009.

- *Streck, Inc. v. Research & Diagnostic Systems, Inc. and Techne Corporation,* Case No. 8:06CV458, Deposition and trial before United States District Court for the District of Nebraska, 2009.

- *Reid-Ashman Manufacturing, Inc. v. Swanson Semiconductor Service, LLC,* Civil Case No. 4:08-CV-221-A, Deposition before United States District Court for the Northern District of Texas, Fort Worth Division, 2009.

- *MacLean-Fogg Company v. Eaton Corporation,* Civil Action No. 2:07-CV-472-LED, Deposition before United States District Court for the Eastern District of Texas, Marshall Division, 2009.

- *Davis-Lynch, Inc. v. Weatherford International, Inc.,* Civil Case No. 6:07-CV-559, Deposition before United States District Court for the Eastern District of Texas, Tyler Division, 2009.

- *Paradox Security Systems, Ltd., et al. v. ADT Security Services, Inc., et al.,* Case No. 2:06-CV-00462, Deposition before United States District Court for the Eastern District of Texas, Marshall Division, 2009.

- *Custom Nutrition Laboratories, L.L.C. v. Innovation Ventures, L.L.C., et al.,* Case No. CC-07-14515-E, Deposition before County Court at Law Number 5, Dallas County, Texas, 2009.

- *Fishman Transducers, Inc. v. Stephen Paul d/b/a "Esteban," Daystar Productions, and HSN Interactive LLC,* Civil Action No. 07-CA-10071 RCL, Deposition and trial before United States District Court for the District of Massachusetts, 2009 and 2011.

| | |
|---|---|
| ***Publications and Presentations*** | "The Use of Surveys for U.S. Patent Litigation," Kaye Scholer LLP, November 2013. |

"The Use of Surveys for U.S. Patent Litigation," State of California Continuing Legal Education, June 2013.

"A Discussion of Economic Damages and the Entire Market Value Rule," State of Colorado Supreme Court Board of Continuing Legal & Judicial Education, Cooley LLP, 2013.

"A Discussion of Economic Damages and the Entire Market Value Rule," State Bar of Texas Continuing Legal Education, Porter Hedges LLP, 2013.

"Intellectual Property Damages, Putting the Pieces Together," A Discussion of Economic Damages and the Entire Market Value Rule, Southern Methodist University, 2013.

"Impact of the America Invents Act on Business," Group Facilitator, Licensing Executive Society (USA and Canada), Inc. IP100 Executive Forum, 2012.

"Trade Secret Damages," Chapter 9, *Calculating and Proving Damages* (coauthored with Christopher H. Spadea, et al.) (New York: Law Journal Press, 2011, Updated 2013).

"Sharing the Risk: Patent Infringement Liability Indemnification and Insurance" Intellectual Property Litigation, Volume 21, Number 3, Spring 2010 (coauthored with Kim Cauthorn and Tamara Turek).

"Approaches for Valuing Biotechnology/Pharmaceutical Inventions" Practicing Law Institute, Biotechnology Patents & Business Strategies in the New Millennium, San Diego, August 6-7, 2001.

"Patent Valuation from a Business and Litigation Perspective" Licensing Executive Society (U.S.A. and Canada), Inc., Annual Meeting, Chicago, 2002.

| | |
|---|---|
| ***Professional and Business History*** | *Duff & Phelps, LLC,* National Intellectual Property Consulting Practice Leader and Managing Director (2008-present). |

*Lumin Expert Group (merged with Duff & Phelps, LLC),* President (2007-2008); Managing Director (2006-2007).

*LECG, LLC* (2002-2006); positions held include:  Senior IP Practice Director (2006); Governing Board (2002-2006); Managing Director (2002-2006).

*Navigant Consulting, Inc.* and its predecessor companies (1983-2002); positions held include: Director (1999-2002); Vice President (1991-1999); Executive Consultant (1986-1991); Senior Consultant (1983-1986).

*Amsted Industries, Inc.* (1981-1983); positions held include:  Senior in Charge Auditor (1983); Senior Auditor (1982-1983); Staff Auditor (1981-1982).

*Thomas W. Britven*
*Managing Director*
**Page 4**

| | |
|---|---|
| ***Education and Certifications*** | Executive Education, Harvard Business School – currently enrolled, planned completion 2014 |
| | Executive Education, Harvard Business School – March 2009 and February 2010 |
| | B.B.A., Accounting, University of Iowa – May 1981 |
| | Chartered Global Management Accountant – May 2012 |
| | Certified Licensing Professional – May 2010 |
| | Accredited in Business Valuation – 2006 |
| | Certified Valuation Analyst – February 2004 |
| | Certified Fraud Examiner – December 1992 |
| | Certified Public Accountant, Florida – January 1989 |
| | Certified Public Accountant, Texas – February 1984 |
| | Passed Certified Public Accountant Examination, Iowa – February 1982 |

| | |
|---|---|
| ***Professional Associations & Affiliations*** | Board of Directors and President of LES Foundation |
| | Board of Directors and Treasurer of LES Foundation |
| | Member National Association of Certified Valuation Analysts |
| | Associate Member American Bar Association |
| | Examiner to Federal Bankruptcy Court |
| | Member Licensing Executive Society |
| | Member American Institute of Certified Public Accountants |
| | Member Houston Chapter of Texas Institute of Certified Public Accountants |
| | Member Association of Certified Fraud Examiners |

# Appendix C

## Nortel's Evolution and Decline

1.      At its peak in 2000, Nortel was generating $28 billion in annual revenues[118] in over 150 countries.[119]   In contrast, just prior to Nortel's demise in 2008, those revenues had dropped to $10.4 billion.[120]

| Nortel Networks Corporation Revenue From 1994 to 2008[121] (US $MM) | |
|---|---|
| 1994 | 8,874 |
| 1995 | 10,672 |
| 1996 | 12,847 |
| 1997 | 15,449 |
| 1998 | 17,575 |
| 1999 | 19,628 |
| 2000 | 27,931 |
| 2001 | 18,900 |
| 2002 | 11,008 |
| 2003 | 9,932 |
| 2004 | 9,478 |
| 2005 | 10,509 |
| 2006 | 11,418 |
| 2007 | 10,948 |
| 2008 | 10,421 |

Source: NNC 10Ks

2.      From the mid-1980s to 2000, Nortel expanded substantially, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age.   From its Canadian base, North

---

[118] 2002 Nortel Networks Corporation Form 10-K, p. F-2.

[119] Nortel Corporate Backgrounder [Warning Notice 2/2/498].

[120] 2008 Nortel Networks Limited Form 10-K, NNC-NNL07935884.

[121] The table shows restated revenue from 1994 to 2005, and disclosed revenue from 2006 onward. See 1996 Northern Telecom Limited Form 10-K, p. F-2; 1997 Northern Telecom Limited Form 10-K, p. F-2, 1998 Northern Telecom Limited Form 10-K, p. F-2; 1999 Nortel Networks Corporation Form 10-K, p. F-2; 2000 Nortel Networks Corporation Form 10-K, p. F-2; 2001 Nortel Networks Corporation Form 10-K, p. F-2; 2002 Nortel Networks Corporation Form 10-K, p. F-2; 2003 Nortel Networks Corporation Form 10-K, p. F-2; 2004 Nortel Networks Corporation Form 10-K, p. F-4; 2005 Nortel Networks Corporation Form 10-K, p. 124; 2006 Nortel Networks Corporation Form 10-K, p. 90; 2007 Nortel Networks Corporation Form 10-K, p. 88; 2008 Nortel Networks Corporation Form 10-K, p. 110.

000082

American operations were expanded into the United States with the establishment of production and R&D facilities.  At the same time, Nortel moved aggressively into Europe, Asia, Africa and Latin America, becoming a truly global enterprise.[122]

3.    Nortel's management structure evolved throughout this period of international growth.[123]    Until the 1990s Nortel's business was organized principally along geographic lines.[124]   Starting in 1991, Nortel began to restructure its operations around its main lines of business ("LOBs").[125,126]

4.    This integrated management structure, while revised and refined from time to time, continued to be the framework around which Nortel managed its operations up to and after January 14, 2009.   As stated in Nortel's APA application, "[a] combination of technical advancement and changing consumer demand has forced a convergence of voice, data, and video communication, rendering segmentation by mode of communication nearly obsolete. It takes multiple business segments, a true matrix organization, to provide the converged service offering to customers.  No one Business Segment or geographic location can provide the solutions alone."[127]

5.    Nortel's Lines of Business operated across various legal entities.   Nortel's integrated business model was financed through a complex intercompany cash management system that itself was integrated with sales, purchasing, supply and distribution networks.  Nortel employees around the world shared responsibility for the operations of the global enterprise.[128]   Key business decisions were made, resources were allocated, and performance was assessed on the basis of the Lines of Business.[129]   The LOBs were supported by regional sales teams and purchasing hubs which managed customers and placed orders with suppliers around the world, and by corporate resources at both the central and local levels in various functions such as finance, legal, human resources, strategy, R&D, operations, and sales.[130]

---

[122] Exhibit 21540, Declaration of John Doolittle in support of Chapter 11 Petitions and First Day Motions in the United States Bankruptcy Court for the District of Delaware, Executed January 14, 2009, 9
[123] For instance see 1994 Northern Telecom Limited 10-K, p. 3.
[124] 1992 Northern Telecom Limited  10-K, p. 3.
[125]  At various times called business units, leadership categories,  business segments, or operating segments.
[126] 1996 Northern Telecom Limited 10-K, p. 3; PWC-NRTL-00009004.
[127]"Nortel Networks Limited and Nortel Networks Inc. – Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006)", October 31, 2008, Appendix B, p. 2
[128] Exhibit 21540, Declaration of John Doolittle in support of Chapter 11 Petitions and First Day Motions in the United States Bankruptcy Court for the District of Delaware, Executed January 14, 2009, ¶ 26 and 32.26 and 32.
[129] Deposition of Gareth Pugh (October 8, 2013), at 141:22-142:2; 142:20-142:24.
[130] Exhibit 21499 to deposition of Alan Bifield, NNI_00928847.ppt, p. 6.

6.     Following its peak in 2000, Nortel entered into a period of declining revenues, culminating in its formal filing for creditor protection on January 14, 2009.

## Genesis: to 1983

7.     Nortel traces its heritage to 1895 when the Bell Telephone Company of Canada founded the Northern Electric and Manufacturing Company Limited as an equipment provider for Canada's telephone system.[131]

8.     Nortel's growth was accomplished through the continued development of ground-breaking technology – including many industry firsts – in technologies such as digital, optical, wireless, internet protocol, voice-over internet protocol, broadband, multimedia, and ethernet.[132]

9.     The invention which ultimately propelled Nortel beyond Canada and into the global marketplace came in or about the early 1970's, when Nortel brought together microelectronics and its own research and development in digital encoding, transmission, and switching of information.[133] Nortel's adaptation of the core technologies to telecommunications enabled the corporation to become the first manufacturer in the world to deliver a complete range of fully digital switching and transmission systems.[134] By 1984 digital switching equipment was generally specified for all new central office installations.[135]

## Growth:  1984-1995 – Global  Expansion,  Evolution  and  the  Matrix Management Structure

10.    In 1984 Nortel's operations had four main operating companies:

- Northern Telecom Canada Limited ("NT Canada") responsible for Canadian operations;

- Northern Telecom Inc. ("NTI") responsible for U.S. operations;

- Northern Telecom International Limited ("NTIL") which managed operations in certain international markets; and

---

[131] Exhibit 21540, Declaration of John Doolittle in support of Chapter 11 Petitions and First Day Motions in the United States Bankruptcy Court for the District of Delaware, Executed January 14, 2009, ¶ 8.
[132] Exhibit 21540, Declaration of John Doolittle in support of Chapter 11 Petitions and First Day Motions in the United States Bankruptcy Court for the District of Delaware, Executed January 14, 2009, ¶ 8.
[133] 1985 Northern Telecom Limited Annual Report, p. 19.
[134] 1985 Northern Telecom Limited Annual Report, p. 20.
[135] 1985 Northern Telecom Limited Annual Information Form, p. 3, 1987 Northern Telecom Limited Annual Information Form, p. 3.

- Northern Telecom Electronics Limited, headquartered in Mississauga, Ontario, which manufactured custom semiconductor and other component manufacturing.[136]

11. Expansion into global markets increased over the next five years and Nortel's structure continued to evolve along geographic lines.  For example:

- In 1985, Nortel entered the Japanese market, and NT Pacific was established in Tokyo to manage Nortel's activities within the Pacific region.[137]  Nortel's four main operating companies now consisted of NT Canada, which had responsibility for Canada and Caribbean and Latin American operations, NTI, NT Pacific, and Northern Telecom plc ("NT PLC") which was based in London, England;[138]

- In 1986 NT PLC was renamed NT Europe, and had its responsibilities expanded to cover operations in the U.K., Europe, the Near East, the Indian sub-continent and Africa and of NT Pacific expanded to cover Japan, parts of eastern Asia and the far eastern Pacific Rim;[139]

- In 1987, NT Pacific assumed responsibility for Australia and New Zealand. As of December 31, 1987, Nortel also owned approximately 27.5% of the outstanding ordinary shares of STC PLC ("STC"), a British company manufacturing and marketing computers and communications systems;[140] and

- In 1988, NT Canada's responsibilities expanded to include Mexico, and NT World Trade had been established, with its base in Toronto, to manage all of Nortel's activities outside of North and South America.[141]

12. At December 31, 1990, Nortel reported approximately 49,050 employees, with 22,650 in Canada, 21,650 in the U.S., and the balance of 4,750 outside North America.[142]  In 1991, with the acquisition of all of the shares of STC, these numbers had risen to total employees of 57,100, with 21,800 in Canada, 21,600 in the U.S., 10,000 employees in Europe, and 3,700 in other countries.[143]

---

[136] 1984 Northern Telecom Limited Annual Information Form, p. 4.
[137] 1985 Northern Telecom Limited Annual Report, p. 6.
[138] 1985 Northern Telecom Limited Annual Information Form, p. 3.
[139] 1986 Northern Telecom Limited Annual Information Form, p. 3.
[140] 1987 Northern Telecom Limited Annual Information Form p. 3.  In late 1990 – early 1991 Nortel acquired the remaining shares of STC for U.S. $2.6 billion (Northern Telecom Limited Form 10-K December 31, 1990, pp. 7-8).
[141] 1988 Northern Telecom Limited Annual Information Form, p. 3; News Release dated February 13, 1991, pp. 1 and 3.
[142] 1990 Northern Telecom Limited Form 10-K, p. 11.
[143] 1991 Northern Telecom Limited Form 10-K, p. 11.

13.     In 1991, rapid changes in the global telecommunications industry and changing customer demands led Nortel to rethink its structure and announce a significant reorganization of its operations which it viewed as being critical to its future success. Seven new operating units were established:[144]

- The marketing, sales and service activities of Nortel were divided into four geographical areas: NT Canada, NTI, NT Europe, and NT Asia/Pacific, to provide dedicated sales, marketing and service resources for individual customers, customer groups, and national markets;  and

- Responsibility for the development and supply of products to the marketing, sales and service organizations was assigned to three organizations representing the three main product groups – Public Networks, Private Networks and Wireless Systems.

14.     The presidents of each of these seven operating units reported directly to the President and CEO of Nortel.

15.     This reorganization appears to be the inception of the matrix management structure that continued to govern Nortel through to 2009.

---

[144] 1990 Northern Telecom Limited Form 10-K, p. 3.

---

**What is a "Matrix Organization"?**

"The identifying feature of a matrix organization is that some managers report to two bosses rather than the traditional single boss; there is a dual rather than a single chain of command."[145]   A traditional hierarchical structure is organized by division (function or product line) or by region, but not by both.[146]

"A matrix organization is defined as one in which there is dual or multiple accountability and responsibility.   However, the term *matrix* means quite different things to different people and in different industries. In a matrix organization there are usually two chains of command, one along functional lines and the other along project, product, or client lines. Other chains of command, such as geographic location, are also possible."[147]

In addition to the structural or organizational aspect of a matrix organization, there is a cultural element as well.   A matrix organization is often characterized by a culture of performance management and reviews that reinforce and reward the cross-product, cross-functional, and/or cross-regional sense of responsibility.   It is a "bottom up" not "top down" culture, with ideas percolating from the bottom, not driven down from the top level of management.   This behavior is welcomed and rewarded by the company.[148]

In general, the objective of structuring a company as a matrix organization is to facilitate integration across the various levels – business segments/products, functions, and regions.[149]   The components of the company, vertically and horizontally, become truly interdependent.

---

16.     In 1992 a fifth geographic area – the Caribbean and Latin America – was added in respect of the global marketing, sales and service activities of Nortel.[150]

---

[145] Stanley M. Davis and Paul R. Lawrence, Problems of Matrix Organizations, Harvard Business Review (May-June 1978), at p. 3 [text box].

[146] Kevan Hall, et al., People & Strategy, "Revisiting Matrix Management," Vol. 36, Issue 1 (2013), at p. 4.

[147] Linn C. Stuckenbruck, The Implementation of Project Management: the Professional's Handbook (1981), at p. 69.

[148] For an overview of these perspectives on a matrix organization, see generally Transnational Management (2014) [textbook]; Sumantra Ghoshal and Christopher A. Bartlett, Changing the Role of Top Management: Beyond Structure to Processes, Harvard Business Review (January-February 1995); Stanley M. Davis and Paul R. Lawrence, Problems of Matrix Organizations, Harvard Business Review (May-June 1978); Jay R. Galbraith and Guido Quelle, Matrix is the Ladder to Success (2009) (accessed: www.businessweek.com/debateroom/2009/08/matrix_is_the_ladder_to_success.html); Jay R. Galbraith, The Future of Organization Design, Journal of Organization Design (2012); Marvin R. Gottlieb, The Matrix Organization Reloaded: Adventures in Team and Project Management (2007); Kevan Hall, et al., People & Strategy, "Revisiting Matrix Management," Vol. 36, Issue 1 (2013); Erik W. Larson and David H. Gobeli, Matrix Management: Contradictions and Insights, California Management Review, Vol. XXIX, No. 4 (Summer 1987); and Linn C. Stuckenbruck, The Implementation of Project Management: the Professional's Handbook (1981).

[149] See, e.g., Transnational Management (2014), at Chapter 4; Marvin R. Gottlieb, The Matrix Organization Reloaded: Adventures in Team and Project Management (2007).

[150] 1992 Northern Telecom Limited Form 10-K, p. 3.

---

17.    In December 1993 Nortel announced another organization change, which occurred during 1994 and 1995.  It formed two operating groups:

- Nortel North America (which subsumed NT Canada and NTI) had responsibility for marketing and business activities in Canada and the U.S., and had global responsibility for all product manufacturing and product development strategy.  It was organized on a product group basis;[151] and

- Nortel World Trade (which subsumed the remaining geographic areas) had responsibility for the management of the international marketing and business activities in the rest of the world.[152]

## 1996:  Management Realignment

18.    In July 1996, Nortel extended its Nortel North America and Nortel World Trade organizational structure to its business activities in Europe and elsewhere.  Each LOB was responsible for the marketing and business activities in the U.S., Canada, and Europe, and had global responsibility for all product manufacturing and product development strategy, including research and development activities.  The marketing and business activities of Nortel in the Asia Pacific region and in CALA continued to be managed on a geographic basis.[153]

19.    In 1996, the competitive environment in which Nortel operated required Nortel and many of its competitors to provide increasingly significant amounts of long-term customer financing in connection with the sale of products and services.[154]

## 1998/99:  Line of Business Becomes Prime

20.    Through the '80s and '90s, Nortel presented its financial results primarily on a geographic basis.[155]  Research and development costs, as well as equity in net earnings of associated companies, investment and other income, interest charges, foreign currency exchange gains and losses, general corporate expenses, restructuring costs, and provision for income taxes, were not included in the computation of operating earnings for the geographic areas.[156]

---

[151] 1994 Northern Telecom Limited Form 10-K, p. 3.
[152] 1994 Northern Telecom Limited Form 10-K, p. 3.
[153] 1996 Northern Telecom Limited Form 10-K, p. 3.
[154] 1996 Northern Telecom Limited Form 10-K, p. 5.
[155] Northern Telecom Limited Form 10-K for the years 1984 – 1997; specifically, see: 1984 Northern Telecom Limited, Form 10-K at p. 32-33; 1986 Northern Telecom Limited, Form 10-K at p. 34; 1987 Northern Telecom Limited, Form 10-K at p. F-16; 1988 Northern Telecom Limited, Form 10-K at p. F-17 – F-19;
[156] See, for instance, 1992 Northern Telecom Limited Form 10-K, p. F-19; and 1994 Northern Telecom Limited Form 10-K, pg. F-20.

21.    In 1998, Nortel began to provide detailed public reporting of its operating results on the basis of its operating segments.[157]

22.    By December 31, 1999, Nortel was no longer presenting its detailed financial results by geographic regions. Rather, the focus of the management reporting system, and thus the reportable segments for financial statement purposes, was on operating segments thereafter.[158]    Each reportable LOB segment was managed separately with each LOB manager reporting directly to the CEO, who was identified as the chief operating decision maker in assessing the performance of the LOBs and the allocation of resources to them. The CEO relied on the information derived directly from the Nortel management reporting system to assess performance and allocate resources.[159]    Presidents of the LOBs were held accountable for their segment's management earnings before income taxes, a measure that included cost of revenues, selling, general and administrative expense, R&D expense, interest expense, and other attributable expenses.[160]

## 1998 to 2000:  The Boom Years

23.    Nortel initiated a significant phase of growth in 1998.   During the period from 1998 to 2001, Nortel acquired a number of technology companies predominantly funded through Nortel shares.   95 percent of the acquisitions were for stock alone for a total value of $37 billion.

24.    The following table summarizes the business acquisitions over $1 billion made by Nortel over the period from 1998 to 2001 and the type of consideration paid.[161]

---

[157] 1998 Northern Telecom Limited Form 10-K, p. F-9.

[158] 1999 Northern Telecom Limited 10-K, p. F-10 to F-13; NNI_01039199.

[159] Costs associated with shared services, and other corporate costs, were allocated to the segments based on usage determined generally by headcount (see 2002 Nortel Networks Corporation Annual Report, Note 5, pp. 87).

[160] 2006 Nortel Networks Corporation Form 10-K, p. 128; NNI_00218982.

[161] 2000 Nortel Networks Corporation Form 10-K, pp. F-15 and F-16; 2001 Nortel Networks Corporation Form 10-K, p. F-14; 2001 Nortel Networks Limited Form 10-K, p. F-14; 2002 Nortel Networks Corporation Form 10-K, p. F-33

| Summary of Acquisitions of Nortel Group – 1998-2001[162] | | | |
|---|---|---|---|
| Target | Closing date | Amount paid (US$ millions) | Nature of consideration |
| Bay Networks, Inc. | Aug-31-1998 | 9,060 | Stock |
| Qtera Corporation | Jan-28-2000 | 3,004 | Stock |
| Clarify, Inc. | Mar-16-2000 | 2,114 | Stock |
| Xros, Inc. | Jun-02-2000 | 3,227 | Stock |
| CoreTek, Inc. | Jun-23-2000 | 1,411 | Stock |
| Alteon WebSystems, Inc. | Oct-05-2000 | 8,054 | Stock |
| JDS Uniphase AG | Feb-13-2001 | 2,818 | Stock |
| Total acquisitions over $1 billion | | 29,688 | |

25.    As demonstrated by the table below, Nortel's rapid growth in the mid-1990's was characterized by:

- Strong compounded top-line growth;

- Increasing profitability;

- Significant investment in R&D; and

- Positive cash flow from operations.

---

[162] 2000 Nortel Networks Corporation Form 10-K, pp. F-15 and F-16; 2001 Nortel Networks Corporation Form 10-K, p. F-14; 2001 Nortel Networks Limited Form 10-K, p. F-14; 2002 Nortel Networks Corporation Form 10-K, p. F-33

| Key Financial Metrics 1994 to 1997[163] | | | | |
|---|---|---|---|---|
| US$ Millions | **1994** | **1995** | **1996** | **1997** |
| Revenue | 8,874 | 10,672 | 12,847 | 15,449 |
| *Revenue growth %* | *9%* | *20%* | *20%* | *20%* |
| Gross profit | 3,269 | 4,293 | 5,133 | 6,338 |
| *Gross profit margin* | *37%* | *40%* | *40%* | *41%* |
| R&D expense | 1,156 | 1,579 | 1,813 | 2,147 |
| *as a % of revenues* | *13%* | *15%* | *14%* | *14%* |
| Net income (after R&D) | **408** | **473** | **623** | **829** |
| Cash flow from operations | **876** | **-223** | **934** | **795** |

26.  Nortel's exponential growth in 1998, 1999 and early 2000 is detailed in the table below.  It is noteworthy that:

- Nortel almost doubled its revenue in two years and during the same period increased its gross margin from 43 percent to 46 percent in 2000, allowing Nortel to further increase its funding of R&D initiatives;

- Nearly $9 billion was spent on R&D programs between the years 1998 to 2000, which further illustrates that Nortel was a technologically-based organization finding new revenue sources by generating new intellectual property and research; and

- During this period, Nortel was able to fund its significant R&D requirements while still yielding over $2 billion in cash from operations.

We believe this serves to demonstrate the type of R&D investment that was required to sustain Nortel's competitiveness – an investment that Nortel could not sustain after 2000 and certainly not after 2009.

---

[163] 1996 Northern Telecom Limited Form 10-K, pp. F-2 and F-6; 1997 Northern Telecom Limited Form 10-K, pp. F-2 and F-6; 1998 Northern Telecom Limited Form 10-K, pp. F-2 and F-6; 1999 Nortel Networks Corporation Form 10-K, pp. F-2 and F-5.

| Key Financial Metrics 1998 to 2000[164] | | | | |
|---|---|---|---|---|
| *US$ Millions* | **1998** | **1999** | **2000** | **Total 1998 to 2000** |
| Revenue | 16,857 | 19,628 | 27,948 | 64,433 |
| *Revenue growth %* | *107%* | *16%* | *42%* | *59%* |
| Gross profit | 7,212 | 8,847 | 12,834 | 28,893 |
| *Gross profit margin* | *43%* | *45%* | *46%* | *45%* |
| R&D expense | 2,532 | 2,724 | 3,633 | 8,889 |
| *as a % of revenues* | *15%* | *14%* | *13%* | *14%* |
| Net income (after R&D) | **(1,250)** | **(351)** | **(3,470)** | **(5,071)** |
| Cash flow from operations | **1,480** | **1,617** | **824** | **3,921** |

27.  By 2000, Nortel had become a large multinational enterprise with customers in over 150 countries.[165] At its height, Nortel had a market capitalization of over $250 billion, annual revenue approaching $30 billion[166] and approximately 94,500 full-time employees worldwide. Of these 94,500 employees, approximately 25,900 were employed in Canada.[167]

## Retrenchment and Bankruptcy – 2001 to date

28.  From 2001 to 2008, Nortel experienced a period of retrenchment, significant financial losses and restructuring.  The overall health of the telecommunications industry floundered in 2001 and shortly thereafter.  This downturn forced Nortel to re-evaluate its existing global strategies and explore ways to reduce internal costs, while maintaining a continued dedication to R&D, leading to the following changes:

- Overall reduction of employee workforce.  In 2001, Nortel employed in excess of 90,000 employees but reduced this number to about 30,000 by 2008;

- Outsourcing of most manufacturing and production to key suppliers;

---

[164] 2000 Nortel Networks Corporation Form 10-K, pp. F-2 and F-5; 2001 Nortel Networks Corporation Form 10-K, pp. F-2 and F-5; 2002 Nortel Networks Corporation Form 10-K, pp. F-2 and F-5.
[165] Nortel Corporate Backgrounder [Warning Notice 2/2/498].
[166] Exhibit 21540, Declaration of John Doolittle in support of Chapter 11 Petitions and First Day Motions in the United States Bankruptcy Court for the District of Delaware, Executed January 14, 2009, at ¶ 11.
[167]  2000 Nortel Networks Corporation Form 10-K, p. 15, NNC-NNL06001435.

- Consolidation of R&D expertise in Canada and China;

- Disposal or "exit" of non-core businesses, i.e., Nortel's United Mobile Technology Systems business unit;

- Creation or expansion into joint venture relationships; and

- A shift in focus from the traditional supplier of equipment to innovator of cutting-edge hardware and software solutions.[168]

29.   Despite restructuring attempts, Nortel experienced a significant decline in revenues and profitability. As summarized below and evidenced by the table below:

- Revenues declined dramatically from 2000 to 2008 and during all other representative measurement periods;

- There was a cash flow loss from operations before capital expenditures and acquisitions for every year but 2 of the years from 2001 to 2008;

- Nortel's acquisitions program in aggregate gave rise to very substantial loss of value including related losses (in the form of impairment charges and write-offs) in the range of $18 billion; and

- Nortel did not earn an economic return[169] on its intellectual property and other assets from period 2001 to 2008.

---

[168]   Exhibit 21540, Declaration of John Doolittle in support of Chapter 11 Petitions and First Day Motions in the United States Bankruptcy Court for the District of Delaware, Executed January 14, 2000 at ¶ 12-18.
[169]   "Economic returns" are generated when the enterprise generates returns to invested capital in excess of the cost of capital that is appropriate for the enterprises' operations (and the associated risks).

## Summary of Key Financial Metrics for Nortel 2000 to 2008[170]

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | Total 2001 to 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | 27,948 | 18,900 | 11,008 | 9,932 | 9,478 | 10,509 | 11,418 | 10,948 | 10,421 | 92,614 |
| **Gross profit** | | 4,288 | 3,905 | 4,209 | 3,922 | 4,278 | 4,439 | 4,614 | 4,285 | 33,940 |
| Operating expenses | | 26,177 | 4,894 | 2,367 | 2,245 | 5,113 | 2,209 | 2,665 | 4,894 | 50,564 |
| Net operating income (loss) (before R&D) | | (21,889) | (989) | 1,842 | 1,677 | (835) | 2,230 | 1,949 | (609) | (16,624) |
| **R&D expenses** | | 3,131 | 2,083 | 1,968 | 1,975 | 1,874 | 1,961 | 1,723 | 1,573 | 16,288 |
| Net operating income (loss) (after R&D) | | (25,020) | (3,072) | (126) | (298) | (2,709) | 269 | 226 | (2,182) | (32,912) |
| Goodwill and intangible impairment and write-offs | | (15,484) | (595) | 0 | 0 | 0 | 0 | 0 | (2,379) | (18,458) |
| Net income (loss), before tax | | (28,473) | (3,349) | 134 | (283) | (2,656) | 141 | 270 | (2,456) | (36,672) |
| Cash flow from operations (before capital expenditures or acquisitions) | | 206 | (768) | (140) | (185) | (179) | 237 | (403) | (567) | (1,799) |
| Cash | | 3,513 | 3,790 | 3,997 | 3,685 | 2,951 | 3,492 | 3,532 | 2,397 | |
| Other assets | | 17,624 | 13,171 | 12,594 | 14,090 | 15,184 | 15,487 | 13,536 | 6,440 | |
| Total assets | | 21,137 | 16,961 | 16,591 | 17,775 | 18,135 | 18,979 | 17,068 | 8,837 | |
| Operating liabilities | | 11,835 | 9,705 | 8,636 | 10,269 | 13,487 | 13,394 | 6,840 | 8,268 | |
| Long-term debt | | 4,478 | 4,203 | 4,010 | 3,866 | 3,885 | 4,464 | 7,470 | 4,520 | |
| Net equity | | 4,824 | 3,053 | 3,945 | 3,640 | 763 | 1,121 | 2,758 | (3,951) | |
| | | 21,137 | 16,961 | 16,591 | 17,775 | 18,135 | 18,979 | 17,068 | 8,837 | |

[170] 2002 Nortel Networks Corporation Form 10-K, pp. F-2, F-3 and F-5; 2003 Nortel Networks Corporation Form 10-K, pp. F-2, F-3 and F-5; 2004 Nortel Networks Corporation Form 10-K, pp. F-4, F-5 and F-7; 2005 Nortel Networks Corporation Form 10-K, pp. 124, 125 and 127; 2006 Nortel Networks Corporation Form 10-K, pp. 90, 91 and 93; 2007 Nortel Networks Corporation Form 10-K, pp. 88, 89 and 91; 2008 Nortel Networks Corporation Form 10-K, pp. 110, 111 and 113.

## Nortel's Management Structure

30.    Figure 1, below, depicts Nortel's management structure for much of its recent history prior to the filing date.  Each business segment had both cross-functional and local/regional reporting.   Nortel had developed a multiple-line reporting structure often described internally as consisting of both "straight lines" and "dotted lines"[171]

31.    Nortel simultaneously operated across multiple product lines/business segments (Carrier Networks ("CN"), Enterprise Solutions ("ES"), Metro Ethernet Networks ("MEN"), and Global Services ("GS")), multiple functions (including research and development, sales and marketing, operations, and corporate services), and multiple regions (CALA, EMEA, North America, and Asia/Pacific), as Nortel tried to implement integrated and interdependent management and responsibilities.[172]

### Nortel's Management Structure[173]



---

[171] Exhibit 21499 to deposition of Alan Bifield, NNI_00928847, p. 6.
[172] "Nortel Networks Limited and Nortel Networks Inc. – Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011 (with rollback to 2006)", October 31, 2008, p. 11-13, 31-33, 38; Nortel Networks Corp., Form 10-K for fiscal years ending December 31, 2005 to December 31, 2008, specifically, 2008 10-K p. 6-12, 14, 51, and 50, 2007 10-K p. 5-11, 13, 20, and 39, 2006 10-K p. 5-12, and 41, 2005 10-K p. 1, 3, 4, 13, 14, 16, 57, and 58; Deposition of Allan Bifield (November 25, 2013), at 161:2-162:231, 204:11-204:13, 253:22-254:3.
[173] NNI_00928847 / 6.

---

000095

32.   For example, by the time of Nortel's filings, LOBs used the Nortel direct sales force to market and sell to customers around the world.  The global sales force operated on a regional basis, with the head office for Canada and the U.S. located in Texas, for EMEA in the U.K., for the Asia Pacific region in Hong Kong with another office in Beijing for Greater China, and for CALA in Florida. Dedicated sales account teams were located close to major customers' purchasing locations.  In addition, teams within the regional sales groups worked directly with top regional enterprises and managing regional distribution channels. Nortel also had centralized marketing, product management and technical support teams dedicated to providing individual product line support to the global sales and support teams.[174]

33.   In sum, for most of its recent history prior to its filing, Nortel's organizational structure appears to have been that of a matrix cube.  Figure 2 below, adapted from Janicijevic's matrix cube to overlay the business segments, functions, and regions of Nortel, depicts Nortel's matrix cube structure.

### Nortel's Matrix Cube Structure[175]



---

[174] 2002 Nortel Form 10-K, p. 41; NNI_00243995; 2006 Nortel Form 10-K; NNI_00218982,p. 16
[175] Nebojsa Janicijevic and Ana Aleksic, Complexity of Matrix Organisation and Problems Caused by its Inadequate Implementation, 2007, at p. 32 [Figure 1], *adapted to overlay the regions and business segments of Nortel.*

---

000096

34.     On January 1, 2009, Nortel announced a new operating model to consolidate certain management positions and vertically integrate its business units.  Plans for an additional workforce reduction were also put into place to reduce at least 3,500 jobs.[176]  On January 14, 2009, the Nortel entities coordinated a series of formal filings for creditor and bankruptcy protection.

---

[176] Exhibit 21540, Declaration of John Doolittle in support of Chapter 11 Petitions and First Day Motions in the United States Bankruptcy Court for the District of Delaware, Executed January 14, 2009, ¶18.

# Appendix D

## The Operations of Nortel

1.      The purpose of this Appendix is to provide a summary of the Nortel's business and operating structure.

## Overview of Nortel's Business

2.      As of January of 2009, Nortel operated as a supplier of integrated networking solutions through various Lines of Business grouped into three business segments[177] or reporting units.[178]  Brief descriptions of these business segments are provided below.  For ease of reference, the summaries also discuss how the Business Sales were linked to each of the three business segments.  More detail regarding the Business Sales is provided later in this appendix.

Carrier Networks

3.      The Carrier Networks ("CN") business segment provided wireless networking solutions to enable service providers and cable operators to supply mobile voice, data and multimedia communications services to individuals and enterprises using mobile telephones, personal digital assistants, and other wireless computing and communications devices.  It also targeted customers who wanted to provide service across both wireless and wired devices.

4.      Following bankruptcy, the Carrier Networks business segment was broken up into five separate businesses, each of which was sold off separately: CDMA and LTE, GSM, GSM CALA, CVAS and Packet Core.  These are discussed further below.

5.      In order to provide context around the division of each of these Lines of Business into Businesses sold, it is helpful to provide descriptive information about wireless telephone technology through the fourth generation (4G).  Table 1 illustrates how various wireless technologies, and certain of the Carrier Networks businesses, are interrelated.

---

[177] As recently as December 2008, the installation services for each of these three business segments had been aggregated into a fourth business segment, Global Services ("GS").  In 2009, in contemplation of potential business sales, the activities of GS were broken up and transferred into the other three business segments in order to make each a free-standing sales and installation business.
[178] The term "reporting unit" is used for financial reporting purposes but, for purposes of our report, is interchangeable with the term business unit.

| TABLE D1[179] | | | |
|---|---|---|---|
| | General description | Europe and Rest of World | North America |
| First generation | The first-generation of wireless telephone technology, mobile telecommunications - the analog telecommunications standards that were introduced in the 1980s. | | |
| Second generation (2G) | 2G cellular networks were first launched using the GSM standard in Finland in 1991. Benefits of 2G over first generation were: (i) phone conversations were digitally encrypted; (ii) systems used spectrum more efficiently allowing for greater mobile phone penetration levels; and (iii) it introduced data services for mobile, starting with SMS text messages. | Time division multiple access (TDMA) allows users to share the same frequency channel by dividing the signal into different time slots, with each being transmitted in rapid succession.<br><br>Global System for Mobile Communications, (originally *Groupe Spécial Mobile,* or **"GSM"**), is a standard developed by the European Telecommunications Standards Institute for 2G cellular networks using TDMA technology. It became the de facto global standard with over 80% market share.<br><br>Enhanced Data rates for GSM Evolution (**"EDGE"**) were an improved version of GSM that enabled improved data transmission rates. | Code division multiple access (**"CDMA"**) enables multiple digital radios to transmit on the same frequency by changing the codes used by each transmission. CDMA does not directly limit the number of active radios and, consequently, as more phones can be served by smaller numbers of cell-sites, CDMA-based standards have a significant economic advantage over TDMA-based standards<br><br>Interim Standard 95 (IS-95) was the first CDMA-based digital cellular standard by Qualcomm, which went under the brand name cdmaOne |
| Third generation (3G) | 3G networks support services that provide an information transfer rate of at least 200 Kbit/s. Fundamentally, 3G is not significantly different from 2G other than speed. | Universal Mobile Telecommunications System (**"UMTS"**) is a 3G system based on the GSM standard. It was first offered in 2001 and is used primarily in Europe, Japan, China and other regions previously predominated by GSM system infrastructure. UMTS cell phones are typically compatible with GSM networks. | The CDMA2000 system, an enhancement of cdmaOne, was first offered in 2002 and used especially in North America and South Korea |
| Fourth generation (4G) | Long Term Evolution (**"LTE"**), is based on the GSM/EDGE and UMTS network technologies, increasing the capacity and speed using a different radio interface together with core network improvements.<br>The world's first publicly available LTE service was launched in Stockholm and Oslo on December 14, 2009. LTE is the natural upgrade path for carriers with both GSM/UMTS networks and CDMA networks such as Verizon Wireless, which launched the first large-scale LTE network in North America in 2010.<br>LTE is anticipated to become the first truly global mobile phone standard | | |

Enterprise Solutions

6.    The Enterprise Solutions business segment provided communication solutions for enterprise customers to build new networks and transform existing communications networks into more cost-effective, packet-based networks supporting data, voice and multimedia communications. These solutions addressed the headquarters, branch and home office needs of large and small businesses globally across a variety of industries, including healthcare and

[179] The data in this table is summarized from publicly available information as a background guide to the reader. It is intentionally simplistic and should not be considered an authoritative source.

financial service providers, retailers, manufacturers, utilities, educational institutions and government agencies.

7.      In particular, the communications solutions enabled customers to remove barriers between voice, email, conferencing, video and instant messaging by providing reliable, secure and scalable products spanning unified communications, initial protocol and digital telephony, wireless local networks and other multimedia solutions.[180]

8.      Following bankruptcy, the Enterprise Solutions business segment was broken up into two separate businesses, each of which was sold off separately: Enterprise and Layer 4-7.  These are discussed further below.

Metro Ethernet Networks

9.      The Metro Ethernet Networks business segment provided optical networking and carrier grade Ethernet data networking solutions to enable Nortel customers to be able to meet their own customer's needs for higher performance and lower cost emerging video-intensive applications.   Such uses could include the emerging demand for internet video, residential broadcast TV, video on demand, and newer wireless broadband multimedia applications, which drove these significantly increased bandwidth requirements.[181]

10.     Following bankruptcy, the Metro Ethernet Networks business segment was broken up into two separate businesses, each of which was sold off separately: MEN and MSS.  These are discussed further below.

**DETAILS OF BUSINESS SOLD**

11.     Following the bankruptcy of Nortel and the decision to divest the operations, Nortel's operations were split up and sold as discrete businesses.

12.     The assets sold in each business divestiture included the business assets, all customer contracts and relationships, those patents "Predominantly Used" by that business and an Intellectual Property License Agreement granting the buyer a license to other NN Technology as necessary for the conduct of the purchased business.  The buyer also licensed the acquired IP back to Nortel to enable acquirers of other former Nortel businesses to conduct their purchased businesses.

---

[180] Application Under The *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36; Amended Affidavit of John Doolittle, January 14, 2009 ¶ 64.
[181] Application Under The *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36; Amended Affidavit of John Doolittle, January 14, 2009 ¶ 65.

13.     The buyers were also, generally, granted licenses to use the "Nortel" trademark and logo and certain other Nortel marks through any sales of Nortel-branded products and services only for a transitional period of 12 months after the closing but did not receive a full transfer of any Nortel trademarks.[182]

---

[182] See, e.g., LEX1000000084 at 13.

14.    A summary of these divestitures is set out in Table D2 below and each of the individual businesses is discussed in more detail further in this appendix.

| TABLE D2 | | | | | |
|---|---|---|---|---|---|
| Business Unit | Business Sales | Summary Business Description | 2008 Revenues US$m | Acquirer and date | Net Sale proceeds US$m |
| Carrier Networks | CDMA and LTE | This business provides equipment to customers deploying the CDMA technology described in Table D1 above.  It also includes the anticipated future LTE business. | $2,383 | Ericsson Nov 13, 2009 | $1,053 |
| | GSM | This business provides equipment to customers employing the GSM technology described in Table D1 above. | $1,349 | Ericsson March 31, 2010 | $73 |
| | GSM CALA | GSM-R was business specifically targeted at railways. | | Kapsch | $31 |
| | GSM-R | GSM CALA are the operations of GSM in the Caribbean and Latin America (CALA) | | Ericsson | $2 |
| | CVAS | Carrier VoIP Applications and Solutions provides VoIP solutions to wireless carriers | $873 | Genband May 28, 2010 | $140 |
| | Packet Core | Network components to provide data network connectivity for GPRS, UMTS and LTE and increase network bandwidth for multimedia content and applications over wireless networks | n/a | Hitachi Dec 8, 2009 | $10 |
| | Total Carrier Networks | | | | $1,309 |
| Enterprise Solutions | Enterprise | Focuses on the communication needs of large and small businesses by providing integrated voice, e-mail, conferencing, video and instant messaging spanning communications, ethernet routing and IP and digital telephony, amongst others. | $2,787 | Avaya Dec 18, 2009 | $843 |
| | Layer 4-7 | Provides application delivery products to improve performance, application availability and security. | n/a | Radware Mar 31, 2009 | $18 |
| | Total Enterprise Solutions | | | | $861 |
| Metro Ethernet Networks | MEN | Provides optical networking and carrier grade Ethernet data networking solutions to carriers and large enterprise customers to allow for higher speed delivery of internet video, residual broadcast TV, video on demand and wireless broadband multimedia. | $1,325 | Ciena March 19, 2010 | $632 |
| | MSS | The Multi-Service Switch business provides high capacity, high reliability processes that aggregate and route different kinds of data such as data, video, voice and other protocols for transmission in a combined fashion. | $534 | Ericsson March 11, 2011 | $46 |
| | Total Metro Ethernet Networks | | | | $678 |
| Total | | | | | $2,848 |

15.  Following the transaction, each of the buyers prepared a "purchase price allocation" or PPA, in which it allocated the gross price paid[183] to the various tangible and intangible assets acquired for financial reporting purposes.  Where the transaction is significant, or material, to the financial statements of the acquirer, the details of the PPA are included in the publicly disclosed note to the financial statements of the acquirer.

16.  In the case of the above Nortel transactions, these details are available for the CDMA/LTE, Enterprise and MEN divestitures and are summarized at Schedule 4.  Together, these transactions represent approximately 89 percent of the Business Sales Proceeds.

17.  The sections below provide a detailed background on each of the individual businesses ultimately sold by Nortel.

18.  To allow the reader to focus on the more significant businesses from a proceeds allocation perspective, they are listed in order of declining sales proceeds as follows:

| Business Sale | Net Sale Proceeds US$m | Paragraph |
|---|---|---|
| CDMA and LTE | $1,053 | 19 |
| Enterprise | $843 | 28 |
| MEN | $632 | 35 |
| CVAS | $140 | 45 |
| GSM, GSM-R and GSM CALA | $106 | 54 |
| MSS | $46 | 66 |
| Layer 4-7 | $18 | 78 |
| Packet Core | $10 | 86 |

---

[183] The gross price paid by each buyer exceeds the net proceeds to Nortel on account of transaction costs incurred by Nortel.

## CDMA AND LTE

Product Descriptions

19.    LTE enabled wireless networks to support data transfer rates up to 100 megabits per second.  This in turn allows for the fixed-to-mobile migrations of Internet applications such as Voice over Internet Protocol ("VoIP"), video streaming, music downloading, and mobile TV, among others.[184] LTE further provides the capacity to support increased connectivity demands required by consumer devices tailored to mobile applications.[185]

Market Presence (customers and competitors)

20.    The CDMA business was predominantly based in North America and its customers included Verizon, Sprint, USCC, Motorola and Leap.[186]

IP and Historical Development

21.    Both the CDMA and LTE technologies were internally developed by Nortel.

22.    Nortel's CDMA-based product line became commercially available in 1996.[187] At the time, Nortel was the only supplier that offered a complete portfolio of networking solutions around the world in all major digital wireless technologies, including CDMA and GSM.[188] By 2000, Nortel completed a series of landmark 3G wireless calls. Nortel's success represented an aggressive first step to rolling out true, enhanced wireless Internet services to CDMA subscribers.[189]

23.    Commencing in 1998,[190] and continuing throughout the early 2000s, Nortel engaged in activities to further the realization of next-generation wireless

---

[184] "Long-Term Evolution (LTE): The Vision Beyond 3G," Nortel White Paper (accessed: http://www.mobilitytechzone.com/topics/4g-wirelessevolution/articles/Nortel%20LTE%20The%20vision%20beyond%203G.pdf).

[185] "Long-Term Evolution (LTE): The Vision Beyond 3G," Nortel White Paper (accessed: http://www.mobilitytechzone.com/topics/4g-wirelessevolution/articles/Nortel%20LTE%20The%20vision%20beyond%203G.pdf).

[186] NOR54380603

[187] Northern Telecom Limited, Form 10-K 1996, at p. 7, CTRL-NORTEL-0005208 / 7.

[188] "History of Nortel: 1970 to 1999." Nortel Networks Corporation (accessed: http://www.nortel-canada.com/about/history/1970-to-1999/).

[189] "History of Nortel: 2000 to Present," Nortel Networks Corporation, (accessed: http://www.nortel-canada.com/about/history/2000-to-present/).

[190] "Long-Term Evolution (LTE): The Vision Beyond 3G," Nortel White Paper, at 3 (accessed: http://www.mobilitytechzone.com/topics/4g-wirelessevolution/articles/Nortel%20LTE%20The%20vision%20beyond%203G.pdf).

networks.  Nortel managed to develop working prototypes for LTE as early as 2002.[191]

24.     As shown in Table D2, LTE technology was being developed as the next generation wireless technology.  At the time of the CDMA Business Sale, the CDMA business was projected to decline as customers converted to newer technologies.  The LTE business was pre-revenue at the time of the sale and we are not aware of a forecast for the LTE business but one would anticipate that this would enter the market and grow to replace some of the revenue lost in the CDMA business.  This is summarized in the following quote from an article in July 2009:

> "While CDMA is currently a thriving carrier technology, LTE is considered to be the next wave of the future. In the US, Verizon Wireless and Sprint are the leading users of CDMA and Verizon is planning to begin rolling out its LTE service late this year. LTE is more robust than CDMA by an order of magnitude and most of the world's leading carriers plan to eventually switch over to it in the coming years. Most of the world's current carriers use GSM infrastructure but most of them, too, plan eventually to switch to LTE."[192]

Three-Year Financial Results and Outlook

25.     The actual and, where available, projected revenues and operating profit of the CDMA Line of Business are set out below:

| US$m | Actual | | Forecast | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Revenues | | 2,383 | 1,629 | 1,280 | 1,104 | 835 |
| R&D | | 260 | 190 | 142 | 89 | 60 |
| Operating margin | | 785 | 372 | 332 | 328 | 247 |
| Revenue by geographic region | | | | | | |
| • North America | | 1,941 | 1,302 | 1,159 | 1,030 | |
| • EMEA | | 120 | 106 | 52 | 27 | |
| • Other | | 321 | 221 | 69 | 47 | |

Source(s): NOR_54380603, Pages 77 and 81

---

[191]  Deposition of Brian McFadden (October 21, 2013), at 44:25-46:2.
[192]  http://www.informationweek.com/mobile/ericsson-to-acquire-nortels-cdma-lte-units-for-for-$113-billion/d/d-id/1081687.   See also Deposition of Brian McFadden (October 21, 2013), at 44:25-46:2 and Deposition of Andy Jeffries (September 26, 2013), at 103:3 - 104:3 (discussing transition from CDMA to LTE/4G).

Details of Business Sale

26.    The CDMA LTE Access assets were sold to Telefonaktiebolaget LM Ericsson (publ) for net proceeds of $1,053 million.

27.    As part of the purchase, Ericsson extended employment offers to at least 2,500 Nortel employees within the LTE/CDMA business lines.[193]

## ENTERPRISE

Product Descriptions

28.    The Enterprise Solution ("ES") business unit focused on the communication needs of large and small businesses across various industries.  The ES unit provided products and services to a wide range of customers that integrated voice, e-mail, conferencing, video and instant messaging. The ES technology portfolio included products spanning unified communications, ethernet routing and multiservice switching, IP and digital telephony (including phones, wireless LANs, security, IP and SIP contact centers, self-service solutions, messaging, conferencing and SIP-based multimedia solutions).[194]  The ES business was not operated through a single entity or stand-alone division.[195]

IP and Historical Development

29.    Nortel grew its Enterprise Solutions unit– primarily through R&D.  The 1998 acquisition of Bay Networks, an industry leader in worldwide IP networking, further boosted the growth of Nortel's business as a whole and also provided additional value to the ES unit.[196] Other notable acquisitions within the ES unit included:[197]

- STC Plc. on March 31, 1991:

    – Development and supply of communication systems, software, and services to telecommunications network operators;

---

[193]   Nortel Networks Corporation, Form 10-K, for fiscal year ended December 31, 2009, at 43, NNC-NNL06001428 / 47.

[194] Eighteenth Report of the Monitor, July 31, 2009, at ¶ 15. (CCC0020481)

[195] Eighteenth Report of the Monitor, July 31, 2009, at ¶ 14. (CCC0020481)

[196]   "History of Nortel: 1970 to 1999." Nortel Networks Corporation (accessed: http://www.nortel-canada.com/about/history/1970-to-1999/).

[197] S&P Capital IQ Acquisition Database.

- Clarify, Inc. in 2000:

    – Engaged in developing, marketing, and supporting adaptable client/server application software designed to address the external and internal service, support, and product quality needs of the global enterprises;

- Architel Systems Corporation in 2000:

    – Provided software systems that allowed service providers to provide Internet and other next-generation Internet Protocol services;

- Alteon WebSystems, Inc. in 2000:

    – Developed and supported web data center products designed to manage web traffic, as well as provided networking infrastructure solutions;

- Sonoma Systems, Inc. in 2000:

    – Developed and supplied asynchronous transfer mode-based broadband integrated access devices for network service providers; and

- Pingtel Corporation in 2008:

    – US-based designer of software-based unified communications solutions.

30.    By 2009, the ES business unit operated globally in approximately 121 countries.[198]  As of the second quarter of 2009, 4,450 ES employees worked in the United States, 1,084 worked in Canada, 713 worked in the UK, 102 worked in France, 795 worked in other parts of EMEA, and 1,058 worked in other parts of the world.[199]

Market Presence (customers and competitors)

31.    Enterprise Solutions' top North American customers included Verizon, Shared Technologies Inc., SBC Communications, Westcon, Black Box Corporation and Bell Canada Enterprises.[200] The top EMEA customers included BT – Direct, BTC, Swisscom, Beltel, France Telecom/Orange and Siemens.[201]

---

[198] Eighteenth Report of the Monitor. July 31, 2009, at ¶ 17. (CCC0020481)
[199] CTRL-NORTEL-00000199, Page 13.
[200] PC0092062
[201] PC0092062

Three-Year Financial Results and Outlook

32.    The actual and, where available, the projected revenues and operating profit of the ES Line of Business are set out below:

| US$m | Actual | | Forecast |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| Revenues | 2,954 | 2,787 | 1,859 |
| R&D | 9 | 19 | |
| Operating profit | 9 | 19 | |
| Revenue by geographic region | | | |
| • US | 1,561 | 1,473 | 1,083 |
| • EMEA | 836 | 778 | 453 |
| • Canada | 222 | 204 | 133 |

Source(s): NOR_54097223

Details of Business Sale

33.    Following a bidding process that involved bids from Siemens, Silverlake, and Texas Pacific Group, the Enterprise assets were sold to Avaya Inc. for net proceeds of $843 million.

34.    As part of the purchase, Avaya acquired approximately 875 patents and patent applications[202] as discussed further in Appendix E.

---

[202] NNC-NNL06002588.

## MEN

Product Descriptions

35.    Nortel's Metro Ethernet Network ("MEN") business line delivered and serviced communications infrastructure and solutions for the transport of voice, video and data signals for the "Metropolitan" and "Long-Haul" communications markets using innovative optical networking capabilities.[203] The MEN business' solutions were designed to deliver carrier-grade ethernet transport capabilities for higher performance and lower cost communication for emerging video-intensive applications.[204]

IP and Historical Development

36.    The MEN business' top customers included Telefonica, Telus, Bell Canada, Enterprises, AT&T, Comcast, Verizon and NTT Data. Most of these companies were based in the United States and Canada.[205]

37.    The MEN business unit grew through extensive R&D expenditure and involvement in advanced optical IP network applications projects.[206] Like the ES unit, the 1998 acquisition of Bay Networks boosted the growth of the MEN business unit.[207]  Other notable transactions for MEN included:[208]

- Xros, Inc. on June 2, 2000:

    – Developed optical communication switching products that enabled the distribution and management of huge bandwidth within their core network;

- CoreTek, Inc. on June 23, 2000:

    – Provided tunable photonics solutions for optical networks; and

- JDS Uniphase AG on February 13, 2001:

    – Designed and developed optical components and modules for semi-conductor applications.

---

[203] Twenty-Fourth Report of the Monitor, October 13, 2009 at ¶ 14. (CCC0019555)
[204] Twenty-Fourth Report of the Monitor, October 13, 2009 at ¶ 14. (CCC0019555)
[205] NOR54175107.
[206] "History of Nortel: 1970 to 1999." Nortel Networks Corporation (accessed: http://www.nortel-canada.com/about/history/1970-to-1999/).
[207] "History of Nortel: 1970 to 1999." Nortel Networks Corporation (accessed: http://www.nortel-canada.com/about/history/1970-to-1999/).
[208] S&P Capital IQ Acquisition Database.

38.    The MEN business unit by itself once employed upwards of 2,330 full time employees.[209]  Of those 2,330, about 1,450 were located in Canada, with the remaining employees spread out across the United States, the UK, China, and to a lesser degree, various other countries.[210]

39.    The MEN business unit generated IP that was used commercially in numerous patent categories.[211]  This IP was internally developed at various R&D sites primarily located in Ottawa, Ontario, but also in Boston, Massachusetts, Bangalore, India, Bucharest, Romania, Seoul, South Korea, and Beijing, China.[212]

Market Presence (customers and competitors)

40.    The MEN Line of Business operated globally in approximately 44 countries and had an installed base with over 400,000 network elements.[213]

Three-Year Financial Results and Outlook

41.    The actual and, where available, projected revenues and operating profit of the MEN Line of Business are set out below:

| US$m | Actual | | Forecast | |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 |
| Revenues[214] | 1,434 | 1,325 | 1,080 | 1,182 |
| R&D | | 150 | 146 | 140 |
| Operating profit | | 112 | 66 | 132 |
| Revenue by geographic region[215] | | | | |
| • North America | 674 | 613 | 559 | 615 |
| • EMEA | 412 | 403 | 256 | 271 |
| • Other | 349 | 320 | 281 | 302 |

Source(s): NOR_54175107, pages 60 and 61, dated October 2009

---

[209] Twenty-Fourth Report of the Monitor. October 13, 2009, at ¶ 20. (CCC0019555)
[210] Twenty-Fourth Report of the Monitor. October 13, 2009, at ¶ 20. (CCC0019555)
[211] NNC-NNL06001113, Page 37.
[212] NNC-NNL06001113, Page 39.
[213] Twenty-Fourth Report of the Monitor. October 13, 2009, at ¶ 18. (CCC0019555)
[214] The revenues, R&D expenditure and operating profit represents only the Optical business, which represents approximately 97% of the total business revenues.  No forecast was profited for the Carrier Ethernet business which represents the remaining 3% of the business.  See NOR_54175107.
[215] The disclosed revenue by geographic region does not reconcile precisely to the aggregate disclosed revenue.  The difference is unexplained but not significant for this purpose.

Details of Business Sale

42.    Following a bidding process that included bids from One Equity Partners and Infinera Corporation, the MEN assets were sold to Ciena Corporation for net proceeds of $632 million.

43.    As part of the purchase, Ciena acquired approximately 1,180 patents and patent applications [216] (as discussed further in Appendix E) and agreed to offer employment to at least 2,000 employees.[217]

## CVAS

Product Descriptions

44.    Nortel's Carrier VoIP and Application Solutions (CVAS) unit developed VoIP technology, which delivers voice communications and multimedia sessions over IP networks, such as the Internet.[218] This technology lowers call routing costs, simplified maintenance costs, and reduced operating costs from using one, unified network.[219] As of 2009, VoIP remained an unproven technology that was perceived to have a lower voice quality and reliability than the public switched telephone network.[220]

45.    The CVAS business unit operated approximately 774 deployment sites across 48 countries.[221] There were approximately 2,185 full-time employees that worked primarily with the CVAS business.[222] 592 of these employees were located in Canada.[223] The majority of the remaining CVAS employees were located in the United States, the United Kingdom and China.[224]

---

[216] NNC-NNL06002189.
[217] Twenty-Fourth Report of the Monitor, at p. 17. (CCC0019555)
[218] "VoIP Primer: Voice Over Internet Protocol," National Association of State Units on Aging, September 2004 (accessed: http://www.nasuad.org/documentation/I_R/VOIPPRIMER.pdf).
[219] U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, Appendix L, at page 1, NNI_0021292.
[220] U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, Appendix L, at page 1, NNI_0021292.
[221] Thirty-Fourth Report of the Monitor, January 3, 2010, at ¶ 19 (CTRL-NORTEL-00001321).
[222] Thirty-Fourth Report of the Monitor, January 3, 2010, at ¶ 22 (CTRL-NORTEL-00001321).
[223] Thirty-Fourth Report of the Monitor, January 3, 2010, at ¶ 22 (CTRL-NORTEL-00001321).
[224] Thirty-Fourth Report of the Monitor, January 3, 2010, at ¶ 22 (CTRL-NORTEL-00001321).

000111

IP and Historical Development

46.     The development of the CVAS business benefited from the following acquisitions by Nortel:

> a)  STC Plc. on March 31, 1991;

> b)  Sonoma Systems, Inc. on October 19, 2000; and

> c)  DiamondWare, Ltd. on August 19, 2008.

47.     Patents and IP Predominantly Used in Nortel's CVAS business included softswitching, gateways, SIP applications, and TDM products and services.[225]

Market Presence (customers and competitors)

48.     Nortel's CVAS business had customer deployments in all continents and provides VoIP solutions to 80 percent of IDC's worldwide listing of top 20 carriers by revenue, including Verizon Wireless, AT&T, Telus Communications, NTT Communications, Sprint, BT Communications, LG, Bell, Telefonica, and Optus.[226]

49.     Nortel's CVAS business was ranked number one supplier in the Global Carrier VoIP and Softswift markets in 2009, according to analyst firm Dell'Oro.[227]    Nortel further ranked number one as the Global Carrier VoIP and Softswitch leader between 2002 and 2009.[228]

---

[225] "Nortel – Nortel Announces Genband," Bloomberg, February 24, 2010 (accessed: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a_uWdVwMC5Vw).

[226] "Nortel – Nortel Announces Genband," Bloomberg, February 24, 2010 (accessed: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a_uWdVwMC5Vw).    See also CTRL-NORTEL-00000557 / 19; NOR_54380696, at 33-35.

[227] Kerner, Sean, "Genband Builds on Nortel Carrier VoIP Close," Enterprise Networking Planet, June 2, 2010 (accessed: http://www.enterprisenetworkingplanet.com/unified_communications/Genband-Builds-on-Nortel-Carrier-VoIP-Close-3885576.htm).

[228] "Nortel – Nortel Announces Genband," Bloomberg, February 24, 2010 (accessed: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a_uWdVwMC5Vw).

000112

Three-Year Financial Results and Outlook

50.   The actual and, where available, projected revenues and operating profit of the
      CVAS Line of Business are set out below:

| US$m | Actual | | Forecast | | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 |
| Revenues | 1,029 | 873 | 733 | 768 | 811 |
| R&D | 185 | 184 | 140 | 115 | 110 |
| EBITDA | 69 | 11 | 47 | 126 | 172 |
| Revenue by geographic region | | | | | |
| • North America | | 504 | 425 | | |
| • EMEA | | 236 | 196 | | |
| • Other | | 133 | 111 | | |

Source(s): NNI_00163168, pages 91 and 94, dated November 2009

51.   Note that a projection prepared in May 2009[229] had forecast revenues for 2009 of
      $771 million and EBITDA of $62 million.  These forecasts were revised
      downwards by November 2009 as indicated above but the projections for 2010
      and 2011 were unchanged.

Details of Business Sale

52.   Following a bidding process that included bids from Nokia Siemens Networks,
      NEC, and Sonus Networks,[230] Nortel's CVAS business was sold to Genband for
      gross proceeds of $282.6 million.[231]

53.   As part of the purchase, Genband acquired approximately 206 patents and
      patent applications as discussed further in Appendix E and agreed to offer
      employment to at least 1,638 employees.[232]

---

[229] NNC-NNL06001111, pages 1, 77, 78 and 80.
[230] Genband makes "stalking horse" bid for Nortel's CVAS division, Fierce Telecom, December 23, 2009
(accessed:          http://www.fiercetelecom.com/story/genband-makes-stalking-horse-bid-nortels-cvas-
division/2009-12-23).
[231] NNC-NNL06001658 at 13; CTRL-NORTEl-00000226 / 2 and 40th Report of the Monitor, February
26, 2010, ¶ 18, CTRL-NORTEL-00005304..
[232] NNC-NNL06001637 / 201; NNC-NNL001637 at 32-37.

## GSM, GSM-R AND GSM CALA

Product Descriptions

54.     Nortel worked with various operators worldwide to implement high-performance wireless networks using GSM standards[233] and, at one time, was the only mobile technology providing truly global wireless coverage to more than 2.6 billion users worldwide.[234]

55.     Nortel's GSM product line included a wide range of solutions to cellphone service providers that enabled nationwide coverage; voice core solutions that focused on network optimization for cost efficiencies and better voice quality; and packet core solutions that offered network optimization for higher capacity to support data needs.[235]  Within this same business line was the GSM for Railways ("GSM-R") product line, which provided a secure wireless communications system for railways operators.[236]

IP and Historical Development

56.     Nortel grew its GSM business mainly through internal development.[237]  As of 1996, Nortel was the only supplier that offered a complete portfolio of networking solutions around the world in all major digital wireless technologies, including GSM and CDMA.[238]

57.     The Nortel GSM business's value stems from its basic intellectual property in wireless transmission, with the patents being valuable to both carrier and handset vendors.[239]

58.     GSM operations were conducted from Nortel's facilities in Dallas, Texas, Paris, France and in China.[240] Other GSM R&D locations included India and Russia.[241]

59.     Nortel's European and Asian GSM groups focused mainly on Nortel's GSM radio access contracts while the North American group primarily focused on 2G and 3G switching.[242]

---

[233] Twenty-Third Report of the Monitor, October 8, 2009, at ¶ 13. (CCC0022867)

[234] Twenty-Third Report of the Monitor. October 8, 2009, at ¶ 13. (CCC0022867)

[235] Twenty-Third Report of the Monitor. October 8, 2009, at ¶ 13. (CCC0022867)

[236] Twenty-Third Report of the Monitor. October 8, 2009, at ¶ 13. (CCC0022867)

[237] Deposition of Graham Richardson (October 28, 2013), at 23:22-24:11.

[238] "History of Nortel: 1970 to 1999." Nortel Networks Corporation (accessed: http://www.nortel-canada.com/about/history/1970-to-1999/).

[239] Garner, Rochelle, "Nortel Plans to Sell GSM Wireless-Technology Business," Bloomberg, September 30, 2009 (accessed: http://www.bloomberg.com/news/2009-10-01/nortel-plans-to-sell-gsm-wireless-technology-business-update1-.html).

[240] Twenty-Third Report of the Monitor. October 8, 2009, ¶ 16. (CCC0022867)

[241] NNI_00136071-114, at 100.

000114

Market Presence (customers and competitors)

60.    As of May 2009, Nortel maintained the number six position in the GSM public global share and the number one position in the GSM-R global share.[243] Some of the GSM segment's largest clients included AT&T, T-Mobile, AMX, Vodafone, and Orange/FT, among others.[244]  GSM-R's larger clients included China Railway, Deutsche Bahn, Algeria Railway, and ADIF in Spain.[245]

61.    Nortel GSM products were installed and supported by more than 100 GSM public operators worldwide, including seven of the top ten global GSM operators and 14 GSM-R operators.[246]

Three-Year Financial Results and Outlook

62.    The actual and, where available, the projected revenues and operating profit of the GSM Line of Business are set out below:

| US$m | Actual | | Forecast |
| --- | --- | --- | --- |
| | 2007 | 2008 | 2009 |
| Revenues | 1,666 | 1,349 | 725 |
| R&D | 199 | 154 | 79 |
| Operating profit | 220 | 262 | 128 |
| Revenue by geographic region | | | |
| • US | 403 | 396 | 355 |
| • EMEA | 731 | 503 | 198 |
| • CALA | 251 | 167 | 73 |
| • Other | 281 | 284 | 99 |

Source(s): NOR_54275576 / 71-72

63.    Similar to CDMA, the market for GSM was projected to decline as customers converted to newer technologies.  This is summarized in the following quote from an article in July 2009:

---

[242] Fitchard, Kevin, "Ericsson: Nortel GSM deal about the voice core," Connected Planet, November 25, 2009 (accessed: http://connectedplanetonline.com/3g4g/news/ericsson-nortel-gsm-112509/).
[243] NNI_00136071-114, page 79
[244] NNI_00136071-114, page 84.
[245] Nortel Networks Limited, Form 10-K, for fiscal year ended December 31, 2008, p. 8, NNC-NNL06001427.
[246] Twenty-Third Report of the Monitor. October 8, 2009. ¶ 14. (CCC0022867)

"While CDMA is currently a thriving carrier technology, LTE is considered to be the next wave of the future. In the US, Verizon Wireless and Sprint are the leading users of CDMA and Verizon is planning to begin rolling out its LTE service late this year. LTE is more robust than CDMA by an order of magnitude and most of the world's leading carriers plan to eventually switch over to it in the coming years. Most of the world's current carriers use GSM infrastructure but most of them, too, plan eventually to switch to LTE."[247]

Details of Business Sale

64.  Following a bidding process that involved a stalking horse bid from Nokia Siemens Networks and bids from New York's MatlinPatterson Global Advisors, a private equity fund, and Research in Motion,[248] Nortel's GSM business was sold in three separate transactions:

- The GSM business in North America was sold to Ericsson for net proceeds of $73 million;[249]

- The GSM-R business and Nortel's GSM assets in Europe and Taiwan were sold to Kapsch CarrierCom AG for gross proceeds of $33 million, or net proceeds of approximately $31 million; and

- The Caribbean and South American GSM assets (GSM-CALA) were sold to Ericsson for net proceeds of $2 million.

65.  Approximately 71 patents and patent applications[250] and at least 350 employees were included in the sales.[251]

---

[247] See "Ericsson to Acquire Nortel's CDMA, LTE Units for $1.13 Billion," Information Week, July 27, 2009, (accessed at: http://www.informationweek.com/mobile/ericsson-to-acquire-nortels-cdma-lte-units-for-for-$113-billion/d/d-id/1081687?).

[248] "Ericsson to Acquire Nortel's CDMA, LTE Units for $1.13 Billion," Information Week, July 27, 2009, (accessed at: http://www.informationweek.com/mobile/ericsson-to-acquire-nortels-cdma-lte-units-for-for-$113-billion/d/d-id/1081687?).

[249] "Ericsson nabs Nortel's North American GSM business for $70 M," FierceWireless.com, November 25, 2009 (accessed: http://www.fiercewireless.com/story/ericsson-nabs-nortels-u-s-gsm-business-70m/2009-11-25); "Kapsch CarrierCom to acquire GSM business in EMEA and Taiwan and Global GSM-R business from Nortel Networks," Satellite.tmcnet.com, November 30, 2009 (accessed: http://satellite.tmcnet.com/news/2009/11/30/4506954.htm).

[250] NNC-NNL06002391 / 96-100.

[251] NNC-NNL06002603 / 109-114; NOR_54401542 at A-25 to A-29.

## MSS

Product Descriptions

66.     Nortel's Multi-Service Switch ("MSS") business line comprised a high capacity, high reliability multi-service switch process that aggregated and routed different kinds of traffic such as data, video, voice and various other protocols for transmission in a combined fashion.[252]   The multi-service switch process streamlines network operations and management and thereby reduces capital and operating expenses by providing the capability to converge voice, video, and data traffic all on a single infrastructure.[253]   Nortel's MSS portfolio provided customers with the ability to "bridge the gap to the future" by converging PSTN, legacy data, IP data, and wireless networks.[254]

67.     The MSS business was comprised of two divisions, the MSS Data Business and the MSS Platform Business.[255]   Both divisions sold the same hardware products but to different customers for different uses.[256]   The MSS Data Business supplied MSS to network operators and large enterprises for fixed network communication, while the MSS Platform Business provided MSS as a critical input for Nortel's former network equipment solutions in CDMA, GSM, UMTS, and VoIP.[257]

68.     The MSS business delivered products and services principally to telecommunications services providers and multi-system operators.[258]

69.     The MSS business line at one time utilized approximately 330 full-time employees which included approximately 250 individuals directly involved in the MSS business and individuals in other Nortel functions that supported the MSS

---

[252] Fifty-Second Report of the Monitor. August 30, 2010, at ¶ 14. (CCC0065470)

[253] "Portfolio Brief Nortel Multiservice Switch Family for Enterprises," Nortel, 2006 (accessed: http://www.c2ccomm.com/pdf/nortel/Nortel%20Multiservice%20Switch.pdf); "Portfolio Brief Nortel Multiservice Switch Family for Service Providers," Nortel, 2006 (accessed: http://www.1st-computer-networks.co.uk/PDF/Nortel_Multiservice-Switch-Family-for-Service-Providers.pdf).

[254] "Portfolio Brief Nortel Multiservice Switch Family for Service Providers," Nortel, 2006 (accessed: http://www.1st-computer-networks.co.uk/PDF/Nortel_Multiservice-Switch-Family-for-Service-Providers.pdf).

[255] "Regulation (EC) No 139/2004 Merger Procedure," Case No COMP/M.6095 – Ericsson/Nortel Group (MSS & Global Services), February 3, 2011, p. 3 (accessed here: htfp//ec.europa.eu/competition/mergers/cases/decisions/m6095 20110302 20310 1706963 EN.pdf).

[256] "Regulation (EC) No 139/2004 Merger Procedure," Case No COMP/M.6095 – Ericsson/Nortel Group (MSS & Global Services), February 3, 2011, p. 3 (accessed here: htfp//ec.europa.eu/competition/mergers/cases/decisions/m6095 20110302 20310 1706963 EN.pdf).

[257] "Regulation (EC) No 139/2004 Merger Procedure," Case No COMP/M.6095 – Ericsson/Nortel Group (MSS & Global Services), February 3, 2011, p. 3 (accessed here: htfp//ec.europa.eu/competition/mergers/cases/decisions/m6095 20110302 20310 1706963 EN.pdf).

[258] Fifty-Second Report of the Monitor. August 30, 2010, at ¶ 15. (CCC0065470)

business.[259]  Of the 250 individuals directly involved in MSS, approximately 66 were located in Canada.[260]

IP and Historical Development

70.     Nortel built some of the largest carrier and enterprise networks in the world in the 1990s.[261]  In April 1999, Nortel acquired Shasta Networks, a high-end networking equipment start-up company in cash and stock deal valued at $340 million.  The acquisition of Shasta was advantageous to Nortel in the emerging market for technologies that facilitate IP-based services.[262]  Then in July 2000, Nortel merged with Alteon WebSystems, a major networking player that pioneered the concept of Web switching.[263]

71.     According to the Sellers Disclosure Schedule for MSS business segment, approximately 96 patents and patent applications were transferred.[264]  All 96 patents and patent applications were assigned to a Nortel Canadian entity. Additionally, 100 percent of trademarks listed in the Sellers Disclosure Schedule were owned by Nortel Networks Limited.[265]

Market Presence (customers and competitors)

72.     Nortel MSS business supplied MSS switches to other businesses formerly part of Nortel, including GSM and UMTS as well as telephone companies, service providers with global businesses, internet service providers and public utilities.[266] Nortel had deployed its MSS portfolio with more than 25 major wireless operators.[267]

---

[259] Fifty-Second Report of the Monitor. August 30, 2010, at ¶ 18. (CCC0065470)

[260] Fifty-Second Report of the Monitor. August 30, 2010, at ¶ 18. (CCC0065470)

[261] Nortel to Sell Multi Service Switch Business," CNN Money, August 27, 2010 (accessed: http://money.cnn.com/news/newsfeeds/articles/marketwire/0656210.htm).

[262] Heskett, Ben, "Nortel buys start-up Shasta Networks," Cnet.com, April 13, 1999 (accessed: http://news.cnet.com/Nortel-buys-start-up-Shasta-Networks/2100-1033_3-224344.html).

[263] Lewell, John, "Nortel Finalizes Purchase of Alteon WebSystems," Internet News.com, October 6, 2000 (accessed: http://www.internetnews.com/bus-news/article.php/478451/Nortel+Finalizes+Purchase+of+Alteon+WebSystems.htm).

[264] NNC-NNL06002391.

[265] NNC-NNL06002391 / 96-100

[266] "Regulation (EC) No 139/2004 Merger Procedure, Case No COMP/M.6095 – Ericsson/Nortel Group (MSS & Global Services), February 3, at 3-4 (accessed here: http://ec.europa.eu/competition/mergers/cases/decisions/m6095 20110302 20310 1706963 EN.pdf).

[267] "Telefonica Moviles Espana Selects Nortel as Main Multiservice Core Supplier for 3G UMTS Network; New Multiservice Core Supplier for 3G UMTS Network; New Multiservice Network to Improve Efficiency, Service," BusinessWire.com, June 20, 2005 (accessed: http://www.businesswire.com/news/home/20050620005258/en/Telefonica-Moviles-Espana-Selects-Nortel-Main-Multiservice).

Three-Year Financial Results and Outlook

73.    The actual and, where available, the projected revenues and operating profit of the MSS Line of Business are set out below:

| US$m | Actual | | Forecast | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Revenues | 602 | 534 | 348 | 237 | 199 | 183 |
| R&D | | 12 | 1 | 1 | 3 | 2 |
| Operating margin | | 151 | 98 | 53 | 35 | 38 |
| Revenue by geographic region | | | | | | |
| • US | 290 | | | | | |
| • EMEA | 245 | | | | | |
| • Canada | 11 | | | | | |

Source(s): NOR_54180450, page 41; NOR_54097223

74.    Note that the above management forecast was prepared on the assumption that "revenue declines stabilize in 'safe hands' with investment in portfolio".[268]

Details of Business Sale

75.    Following a bidding process that included bids from Marlin Equity Partners and Samnite Technologies, Nortel's MSS business was sold to Ericsson for net proceeds of $46 million.[269]

76.    Approximately 95 percent of the employees were included in the sale.[270]

77.    The acquisition was expected to give Ericsson supply of the MSS platform for the CDMA and GSM business units that Ericsson previously acquired from Nortel.[271]

---

[268] NOR_54180450, page 41
[269]  See  http://www.nortel-canada.com/2011/03/nortel-completes-sale-of-multi-service-switch-business-to-ericsson/ and http://www.nortel-canada.com/2010/08/nortel-to-sell-multi-service-switch-business/.
[270] Fifty-Second Report of the Monitor. August 30, 2010, at ¶ 36 (CTRL-NORTEL-000025302).
[271] "Ericsson Acquires MSS Passport Business from Nortel Networks for $65 Million," Paul Weiss, September 27, 2010 (accessed: http://www.paulweiss.com/practices/transactional/mergers-acquisitions/news/ericsson-acquires-mss-passport-business-from-nortel-networks-for-$65-million.aspx?id=7577).

## LAYER 4-7

Product Descriptions

78.    The Layer 4-7 Business Line sold certain application delivery products, primarily the Nortel Application Switch and Nortel Application Accelerator products,[272] designed to improve application availability, performance, and security through load balancing and acceleration of network traffic giving IT managers greater control over their networks.[273] The Nortel Application Accelerator was designed to reduce server and bandwidth needs and improve the responsiveness of web-based applications thereby reducing overall network costs.[274]

79.    The Layer 4-7 business employed approximately 104 full-time positions, primarily in R&D, technical support, contract administration and sales engineering.[275] Additionally, Layer 4-7 utilized 16 full-time employees in other functional areas of Nortel and 23 contractors.[276]   The majority of employees were located in the United States, India, Canada and Japan with a few employees scattered across Australia, France, Finland, the United Kingdom and Germany.[277]

IP and Historical Development

80.    Nortel added the Application Switch product line as part of its $7.5 billion[278] acquisition of Alteon WebSystem, Inc.[279] in October 2000.  It included four in-process and development projects for, amongst other things, a line of Web optimization tools designed to work in conjunction with Alteon's entire line of Web switches and software that provided integrated traffic control services, such as load balancing, filtering, and bandwidth management.[280]  Nortel's Layer 4-7 Application Delivery business operated under the brand Alteon.[281]

81.    As part of the subsequent sale six patents and patent applications were transferred to the acquirer.[282]

---

[272] Second Report of the Monitor. February 25, 2009. ¶ 18 (CTRL-NORTEL-00000708).
[273] Second Report of the Monitor. February 25, 2009. ¶ 18 (CTRL-NORTEL-00000708).
[274] Second Report of the Monitor. February 25, 2009. ¶ 18 (CTRL-NORTEL-00000708).
[275] Second Report of the Monitor. February 25, 2009. ¶ 21 (CTRL-NORTEL-00000708).
[276] Second Report of the Monitor. February 25, 2009. ¶ 21 (CTRL-NORTEL-00000708).
[277] Second Report of the Monitor. February 25, 2009. ¶ 21 (CTRL-NORTEL-00000708).
[278] S&P CapitalIQ Acquisition Database.
[279] "Radware Enters into Agreement to Acquire Nortel's Layer 4-7," Bloomberg, Feb 19, 2009 (accessed: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=azCzTqqAQkKk).
[280] Nortel Networks Corporation, Form 10-K, for fiscal year ended December 31, 2000, p. 27.
[281] S&P CapitalIQ Acquisition Database; Radware Enters into Agreement to Acquire Nortel's Layer 4-7, PR Newswire, February 19, 2009 (accessed at: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=azCzTqqAQkKk)
[282] NNC-NNL06002623 at 12-13.

Market Presence (customers and competitors)

82.     As of November 2000, Nortel maintained the top position in the worldwide market for Layer 4-7 Web switches according to Dell'Oro Group, with a 43.6 percent share of the worldwide market share, based off of manufacturing revenues.[283]

83.     Customers in 2008 included LG Nortel Co., Ltd.; Fuji Xerox Co., Ltd.; Arec Network Inc.; Azlan Group Plc; Magirus International GmbH; Clarity Technology; Westcon Group European Operations; and Westcon Group North America Inc.[284]

Three-Year Financial Results and Outlook

84.     No forecasts are available for the Layer 4-7 business.

Details of Business Sale

85.     Nortel's Layer 4-7 business was sold to Radware Ltd. for net proceeds of $18 million.[285]

## PACKET CORE

Product Descriptions

86.     The Next Generation Packet Core Assets ("NG-PC") developed network components designed to provide data network connectivity for General Packet Radio Service ("GPRS"), Universal Mobile Telecommunications Systems ("UMTS") and Long Term Evolution ("LTE") wireless technologies and increase network bandwidth for multimedia content and applications over wireless networks.[286]

IP and Historical Development

87.     Nortel was able to leverage the IP technology and services leadership from its acquisitions of both Bay Networks and Shasta Networks to jump ahead of the traditional wireless vendors in the move to the intelligent packet core.  The second wave of packet core equipment was not generally bundled as part of an access sale but was procured on its own merits.  This allowed Nortel's packet

---

[283] "Nortel Networks Captures Top Spot in New Dell'Oro Group Report," Nortel Networks Corporation Press Release, November 2000 (accessed: http://www.prnewswire.co.uk/news-releases/nortel-networks-captures-top-spot-in-new-delloro-group-report-156366315.html).
[284] NNC-NNL06002623 at 53.
[285] Fifth Report of the Monitor, March 26, 2009, at ¶ 7. (CCC0020867)
[286] Twenty-First Report of the Monitor. September 24, 2009, ¶ 12. (CCC0022543)

core products and especially the GGSN to be chosen by many Tier 1 GSM / UMTS operators for deployment.[287]

88.    NG-PC conducted R&D activities to develop the following components:[288]

- A Next Generation Serving GPRS Support Node ("SGSN") on Advance TeleComputing Architecture ("ATCA");

- A Next Generation Gateway GPRS Support Node ("GGSN") on ATCA;

- A Mobility Manager Element ("MME") on ATCA;

- An AGW Serving Gateway on ATCA;

- An AGW Packet Data Gateway on ATCA; and

- A Network Element Manager associated with each of the above.

89.    NG-PC operations were principally conducted out of Nortel's R&D "centre of excellence" in Richardson, Texas.[289] Other NG-PC R&D sites include China and India.[290] As of September 24, 2009, there were approximately 40 Nortel Networks Inc. employees and 95 third-party contractors engaged in NG-PC operations.[291]

Market Presence (customers and competitors)

90.    As of September 24, 2009, Nortel had no customer contracts for its NG-PC business line.[292]

Three-Year Financial Results and Outlook

91.    The revenues for the Packet Core business were $695 million and $544 million in 2007 and 2008 respectively.[293]   No geographic breakdown or forecasts are available.

---

[287] NNI NARNIA 00292690 at 3.

[288] Twenty-First Report of the Monitor. September 24, 2009, ¶ 15. (CCC0022543)

[289] Twenty-First Report of the Monitor. September 24, 2009, ¶ 13. (CCC0022543)

[290] CTRL-NORTEL-00000234, page 21.

[291] Twenty-First Report of the Monitor. September 24, 2009, ¶ 13. (CCC0022543)

[292] Twenty-First Report of the Monitor. September 24, 2009, ¶ 18. (CCC0022543)

[293] Nortel Networks Corporation, Form 10-K, for fiscal year ended December 31, 2007, p. 51 (NNI 00220028) and Nortel Networks Corporation, Form 10-K, for fiscal year ended December 31, 2008, p. 65 (NNC-NNL06001427).

Details of Business Sale

92.     Following a bidding process that involved interest from Alcatel-Lucent, Nokia
        Siemens Networks, and Ericsson, Nortel's Packet Core business was sold to
        Hitachi as the only bidder for net proceeds of $10 million.[294]

---

[294] Twenty-Sixth Report of the Monitor, October 26, 2009, at ¶ 25. (CCC0022788).

# Appendix E

## The Nortel IP Backbone

### Overview

1.      Nortel spent over $30 billion on R&D from 1996 through 2009 combined.[295]  To manage the output of these R&D investments, Nortel established internal departments dedicated to the development and protection of intellectual property. Nortel attempted to obtain patents that matched with its business strategy.

2.      This Appendix details the history, development and disposition of Nortel's IP portfolio through the Business Sales and the Rockstar Transaction.

### History of Nortel's R&D Operations

3.      Nortel initially conducted its research activities at its Ottawa, Ontario facility.

4.      By 2006, Nortel conducted its R&D activities through key "Centers of Excellence" situated around the globe.[296]  In addition to the R&D labs in Ottawa,[297] Nortel had R&D labs in the US, Ireland, France, the UK, India, Korea and other countries.

5.      Nortel's combined R&D spending peaked at $4.0 billion in 2000, dropping to $1.5 billion in 2008.[298]

---

[295] See generally Nortel Networks Corp., Form 10-K for fiscal years ending December 31, 1996 to December 31, 2011, CTRL-NORTEL-00005208 (1996), CTRL-NORTEL-0005209 (1997), CTRL-NORTEL-0005210 (1998), CTRL-NORTEL-0005214 (1999), NNC-NNL06001435 (2000), NNI_00016022 (2001), NNI_00243994 (2002), NNC-NNL06001422 (2003), NNC-NNL06001425 (2005).
[296] Deposition of Ernie Briard (September 23, 2013), at 115:10-116.23.
[297] Deposition of Ernie Briard (September 23, 2013), at 35:4-35:15.
[298] See generally Nortel Networks Corporation, Forms 10-K, for fiscal years ending December 31, 1996-2008.

| Total R&D Expenses by Year (1996-2008)[299] (US$ millions) | |
|---|---|
| 1996 | $1,813 |
| 1997 | $2,147 |
| 1998 | $2,453 |
| 1999 | $2,908 |
| 2000 | $4,005 |
| 2001 | $3,224 |
| 2002 | $2,208 |
| 2003 | $1,960 |
| 2004 | $1,959 |
| 2005 | $1,856 |
| 2006 | $1,939 |
| 2007 | $1,723 |
| 2008 | $1,573 |

## Nortel's IP Came from R&D and Acquisitions

6.    Nortel's IP came from its research efforts, its development efforts, and from acquisitions of IP.  Each of these sources of IP is described below.

   a)  Basic Research:  This includes basic research that technical standards as well as more foundational R&D;

   b)  Development: This includes product protection (translating basic research into a commercial product).  Development also included patenting competing technologies (i.e., technologies that Nortel did not use, but that its competitors did) for defensive purposes; and

   c)  Acquisitions:  Nortel acquired IP through various acquisitions, such as Bay Networks and STC,[300] which netted R&D teams, patents and other IP.  NNL typically paid for these acquisitions with NNC stock or debt.[301]

7.    Nortel divided its R&D efforts between basic research and product development.  About 20 percent of Nortel's R&D budget went toward product development.[302]

---

[299] See generally Nortel Networks Corporation, Forms 10-K, for fiscal years ending December 31, 1996-2008.
[300] "I certainly remember under the various discussions that a large number of patents and technology came in under acquisition of STC." Deposition of Ian Barton (September 25, 2013), at 100:23-101:2.
[301] CTRL-NORTEL00000041.

**Nortel IP Portfolio**

8.     Nortel's patent portfolio generally included three categories of patents: product protection patents, defensive patents, and strategic patents:[303]

- Product protection patents covered technologies being actively used in existing product lines or currently being developed by Nortel and amounted to approximately 20 percent to 25 percent of overall patent spending, including filing fees and maintenance fees:[304]

- Defensive patents included patents covering technologies that Nortel did not actively use, but that Nortel's competitors did.  Nortel's defensive patent strategy was intended as a shield to discourage competitors from litigating against Nortel;[305] and

- Strategic patents protected forward-looking inventions that resulted from fundamental research in a number of concepts and areas that did not reflect existing product lines.  Nortel felt the need to obtain patents in areas well in advance of where the product groups themselves would be going or even have plans to go in the future.  Many of these strategic patents covered technologies not currently used or contemplated for use by Nortel's existing Lines of Business at the time the patent issued.[306]

9.     By 2005, Nortel held 3,877 US patents and 4,972 patents in other countries.[307]

---

[302] Deposition of Gillian McColgan (November 8, 2013), at 67:14-68:13.
[303] Deposition of Gillian McColgan (November 8, 2013), at 62:4-63:11.
[304] Deposition of Gillian McColgan (November 8, 2013), at 67:19-68:13.
[305] Deposition of Chris Cianciolo (October 15, 2013), at 117:16-117:22; Deposition of Angela Anderson (October 31, 2013), at 79:22-80:4.
[306] Deposition of Angela Anderson (October 31, 2013), at 117:22-118:6; Deposition of Gillian McColgan (November 8, 2013), at 62:4-63:11 (discussing strategic patents and "foundational R&D").
[307] Innovation at Galway R&D centre recognized by Nortel, WebWire, June 19, 2006 (accessed at: http://www.webwire.com/ViewPressRel.asp?aId=15356#.UuBmLfTnaIU).

10.    The following table provides a breakdown of the number of active patent and patent applications by owner as of 2009:[308]

| Percent of Patents and Patent Applications Assigned by Legal Entity [1] | | |
|---|---|---|
| Legal Entity | Total | % of Total |
| Nortel Networks Limited | 7,375 | 90.4% |
| Nortel Networks Corporation | 358 | 4.4% |
| Northern Telecom Limited | 96 | 1.2% |
| Nortel Networks France | 63 | 0.8% |
| Matra Nortel Communications | 36 | 0.4% |
| Nortel Matra | 32 | 0.4% |
| Nortel Networks SA | 29 | 0.4% |
| Xros, Inc. | 28 | 0.3% |
| NNL and Bell Canada | 15 | 0.2% |
| Coretek Inc. | 13 | 0.2% |
| Diamondware, Ltd | 10 | 0.1% |
| Other [2] | 106 | 1.3% |
| **Total** | **8,161** | **100.0%** |

Notes:
(1) - Represents a summary of active patents and patent applications as of February 2009. Abandoned and withdrawn patents and patent applications not included.

(2) - Other represents assignees with less than 10 patents.

11.    As of August 2010, after the Business Sales, Nortel's US patent portfolio generally included the following technology groups:[309]

| Patent Groups | Issued US Patents | Pending U.S. Patent Applications |
|---|---|---|
| Wireless | 825 | 430 |
| Wireless 4G (LTE) | 53 | 83 |
| Wired Communications | 1183 | 279 |
| Voice (Carrier & Enterprise) | 176 | 102 |
| Internet Patents | 35 | 10 |
| Service Providers | 226 | 3 |
| Semiconductors | 58 | 2 |
| Other | 102 | 33 |

---

[308] CTRL-NORTEL-00000138.
[309] NNC-NNL06139423 / 16.

000127

### Nortel's IP Portfolio Policies

12.    Prior to 2008, Nortel was not particularly aggressive in licensing or litigating its patent portfolio.[310]   This is reflected by Nortel's total licensing revenues of approximately $225 million through 2007.[311]

### IP in Business Sales

13.    As discussed in Appendix D, after the commencement of insolvency proceedings, Nortel packaged and sold various business assets resulting in proceeds of approximately $2,848 million.[312]

14.    Patents and patent applications that were "Predominantly Used" (i.e., if the patent was used in a business almost exclusively, or largely) in a specific business were bundled and sold with that business's assets.  Predominantly Used patents included patents reading on products that were currently being sold as well as proposed products that the various businesses planned to sell.[313] Approximately 2,700 Predominantly Used patents were transferred in the Business Sales.

15.    The approximately 7,000 patents and patent applications not transferred in the Business Sales fell into two categories:  1) patents that were used, but that did not meet the Predominant Use standard; and 2) patents that were not used in any Line of Business (defined previously as Residual Patents).[314]

16.    The patents that were used by the business, but that did not meet the Predominant Use standard, were licensed to purchasers in the Business Sales.[315]  Though the licenses granted to purchasers in the Business Sales were different, the licenses generally included similar terms.  By way of example, some license terms from the CVAS Business Sale to GENBAND IP Company included the following:[316]

- Perpetual term;

- Limited right to assign;

---

[310] Deposition of John Veschi (November 7, 2013), at 38:6-38:23 and 45:6-45:11 and 47:5-47:25.
[311] NNI_01477974, slide 2.  See also NNI_01474252 at slide 7 which indicates approximately $157 million through 2010
[312] Global Cash Summary of Nortel as at December 31, 2013 as prepared by the Monitor.
[313] Deposition of John Veschi (November 7, 2013), at 184:13 to 184:23 and 285:21 to 286:9; and Deposition of Gillian McColgan (November 8, 2013), at 151:11-151:24
[314] Deposition of Gillian McColgan (November 8, 2013), at 140:1-140:9.
[315] Deposition of Gillian McColgan (November 8, 2013), at 185:3-185:23.
[316] NNL06001658 / 1 – 92. Some other license agreements include LEX1000000084; NNC-NNL06001811; NNC-NNL06001947; and NNC-NNL06002476.

- Limited right to sublicense;

- Non-exclusive;

- Worldwide;

- Royalty-free, fully paid-up;

- Integration Rights;[317]

- Limited Field of Use: certain specified VoIP and applications solutions and supporting network services;

- Patents subject to licenses: all of Nortel's patents that have one or more claims that cover the field of use (with other restrictions), or that are used in the business as of the effective date, or that have one or more claims that cover or are embodied in the CVAS Products or CVAS Services (including Plan of Record products); and

- License back: the acquired patents and intellectual property are subject to licenses back to Nortel to the extent they are or have been used in connection with, or cover, the Nortel retained businesses[318] (including any "plan of record" or "plan of intent" products and services) or are necessary to enable Nortel to fulfill obligations under other contracts.

17.    The licenses conveyed in the Business Sales generally allowed the purchaser/licensee to utilize Nortel's patented technology, as necessary, to build existing products and future products within the scope of each business.[319]  The purchasers also granted licenses to their Predominantly Used patents back to Nortel.[320]

---

[317] The Integration Rights generally include the right to integrate any products and services with or to existing or independently provided customer or external network infrastructure for interoperability purposes within the Field of Use. NNL06001658 / 10.

[318] NNC-NNL06001658 / 12.

[319] CVAS/Genband Intellectual Property License Agreement, Article 1.01(pp), NNC-NNL06001658; CDMA/Ericsson IPLA, Article 1.01(u), NNC-NNL06001811; ES/Avaya IPLA, Article 1.01(gg), NNC-NNL06001947; MEN/Ciena IPLA, Article 1.01(nn), NNC-NNL06002257; and MSS/Ericsson IPLA, Article 1.01(r) ("Nortel Retained Businesses" defined), NNC-NNL06002476.

[320] CVAS/Genband Intellectual Property License Agreement, Article 1.01(pp), NNC-NNL06001658; CDMA/Ericsson IPLA, Article 1.01(u), NNC-NNL06001811; ES/Avaya IPLA, Article 1.01(gg), NNC-NNL06001947; MEN/Ciena IPLA, Article 1.01(nn), NNC-NNL06002257; and MSS/Ericsson IPLA, Article 1.01(r) ("Nortel Retained Businesses" defined), NNC-NNL06002476.

## Rockstar Transaction

18.  After the Business Sales took place, Nortel packaged and sold its remaining patents and patent applications.  These included approximately 7,000 residual patents and patent applications.[321]  All of this remaining IP was ultimately conveyed in the Rockstar Transaction for $4,454 million.[322]

19.  The Rockstar Transaction conveyed two categories of patents and patent applications (defined previously as Residual Patents).

- Some residual patents covered inventions used in products that had been made, used or sold (or proposed to be made, used or sold) by the Lines of Business. These were licensed to the purchasers in Business Sales for use in the businesses acquired under royalty free licenses.  The scope of the licenses to these patents was sufficient to allow the purchasers in the Business Sales to run their businesses;[323,324] and

- Some residual patents covered inventions that were not used in products that had been made, used or sold (or proposed to be made, used or sold) by the Lines of Business.

20.  In May 2011, the US and Canadian Courts entered orders establishing a bidding procedure[325] and auction for these assets.

21.  To facilitate the bidding schedule, Nortel contacted 98 parties likely to be interested in acquiring the residual IP.[326]  At the opening of the bidding there were five qualified bidders:  (i) Apple Inc.; (ii) Rockstar Bidco, LP ("Rockstar"), a consortium of various technology companies; (iii) Intel Corporation; (iv) Norpax LLC; and (v) Ranger.[327]  With each round of bidding the incremental price for new bids rose from $5 million to $100 million.[328]

22.  After a series of bids from the remaining qualified bidders and on the nineteenth round of bidding,[329] on June 30, 2011, Rockstar submitted a winning bid of $4.5 billion.  The entities that participated in Rockstar included:[330]

---

[321] NNC-NNL06740125.

[322] Global Cash Summary of Nortel as at December 31, 2013 as prepared by the Monitor.

[323] See Appendix E for a description of the licenses provided to the purchasers in the Business Sales and for a discussion of Nortel's patent characterization efforts.

[324] See Appendix E for a description of the licenses provided to the purchasers in the Business Sales.

[325]  We understand that Canadian law requires a public bidding process during bankruptcy.

[326] Seventy-first Report of the Monitor, July 6, 2011, at p.5, ¶ 17. (CCC0021822)

[327] Seventy-first Report of the Monitor, July 6, 2011, at p. 5, ¶ 17. (CCC0021822)

[328] Seventy-first Report of the Monitor, July 6, 2011, at p. 7-8, ¶¶ 25-27. (CCC0021822)

[329] Seventy-first Report of the Monitor, July 6, 2011, at p. 8-9, ¶¶ 28-29. (CCC0021822)

[330] Seventy-first Report of the Monitor. July 6, 2011, at ¶¶ 29, 31. (CCC0021822)

- Apple;

- Research in Motion Limited;

- EMC Corporation;

- Telefonaktiebolaget LM Ericsson;

- Sony Corporation; and

- Microsoft Corporation.

23.    The sale of all of these residual patents and patent applications to Rockstar (the Rockstar Transaction) was later concluded on July 11, 2011.[331]

24.    Pursuant to an "Employee Transfer Side Agreement," Rockstar offered at least 16 employees of Nortel continued employment in connection with the oversight of the residual IP.[332]

---

[331] Seventy-eighth Report of the Monitor, December 7, 2011, at pp. 47-48, ¶ 133. (UCC0065635)
[332] Seventy-first Report of the Monitor, July 6, 2011, at p. 11, ¶ 2. (CCC0021822)

# Appendix F

## Nortel's Legal Entity Categorizations and the Master Research and Development Agreement ("MRDA")

1.      The Nortel group of corporate entities comprised more than 150 entities around the world.[333] Nortel operated as an integrated matrix organization.

2.      Given that we are focused on the appropriate allocation of proceeds from the Business Sales and from the Rockstar Transaction, the organizational structure among the entities that comprise the estates of the US, EMEA, and Canadian Debtors is relevant, insofar as it helps to better understand the context of the MRDA that defines the licenses held by the entities that are within each estate. Specifically, each Debtor group contains entities that were Participants to the MRDA, including NNL (within the Canadian Debtor group), NNI (within the US Debtor group) and NNUK, NN Ireland, and NNSA (within the EMEA Debtor group).

3.      Within Nortel's legal entity structure, individual Nortel operating entities can be divided into two categories (with a few exceptions):  Licensed Participants and Limited Risk Entities.[334]

4.      The MRDA Participants were the entities subject to the MRDA (Participants as previously defined).[335]

5.      In addition to the Participants, there were certain Nortel companies that operated as Limited Risk Entities ("LREs").  These entities performed more limited functions, largely associated with the distribution of Nortel product in countries outside of the Participants' geographic territories and, in some cases, the performance of services on behalf of the IEs.[336]

---

[333] Affidavit of John Doolittle, January 14, 2009, at ¶ 2; Report of Ernst & Young, January 14, 2009, at ¶ 10, CTRL-NORTEL-00005209.
[334] Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007-2011, October 31, 2008 at 11-12; CTRL-NORTEL-00000364
[335] MRDA, at 1, NNC-NNL006802.  NN Australia had been a Participant to the MRDA, but to our understanding, it was not a Participant as of 2009.  According to a 2009 Transfer Pricing Report (NNC-NNL06001553; NNC-NNL06102121), "Nortel Networks Australia ceased to perform R&D as a result of a sale of its R&D facility in August 2005.  Pursuant to an IP development agreement, Nortel Networks Australia retired from the agreement effective December 31, 2007.  Nortel Networks Australia became a LRE on January 1, 2008."  See also CTRL-NORTEL-00000364 (Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, at p. 12).
[336] Nortel Networks Limited and Nortel Networks Inc. Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement, October 31, 2008 at 11; CTRL-NORTEL-00000364.

6.      The MRDA establishes the following:

    a)  The ownership of NN Technology and the licenses provided by the owner of the NN Technology (NNL) to the Licensed Participants (NNI, NNUK, NN Ireland, and NNSA);[337] and

    b)  Provisions pertaining to income reallocations among the Participants under the Residual Profit Split Method ("RPSM").  The licenses held by Licensed Participants were subject to the income reallocation provisions of the MRDA.  Consequently, these provisions would have directly affected the potential earnings that Licensed Participants could have realized under their licenses. Therefore, these reallocation provisions are a consideration in the determination of the Sales Proceeds that are allocable to the licenses held by Licensed Participants.[338]

7.      This appendix provides a summary of the MRDA provisions establishing ownership of the NN Technology and the licenses granted to the Licensed Participants.  It also summarizes the income reallocation provisions including a summary of the evolution of those provisions over the course of the MRDA and its amendments.

8.      The discussion of the ownership and licensing provisions of the MRDA in this appendix is intended to reflect the MRDA inclusive of all amendments.

### Summary of Ownership and Licensing Provisions of the MRDA

9.      In 2004, Nortel executed the MRDA.  This Agreement was made retroactive to January 1, 2001.[339]

10.     Certain aspects of the MRDA were amended over time, up through the fourth amendment which had an effective date of December 31, 2008.

11.     Under Article 4(a) of the MRDA, "legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement shall be vested in NNL.  In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5."[340]

---

[337] NNC-NNL006802, at Articles 4 and 5.
[338] NNC-NNL006802, at Schedule A.
[339] NNC-NNL006802.
[340] Third Addendum to Master R&D Agreement at p. 41; NNC-NNL006802.  In practice, there were a few patents that were not assigned to NNL.  Reasons for applicant names other than NNL included "foreign filing requirements, foreign security requirements, particular inventorship issues, joint inventors, joint applicants, all sorts of things."  Deposition of Angela Anderson (October 31, 2013), at 84:3-84:11.

12.     The MRDA required the Licensed Participants to contribute any product of their research and development efforts to NNL.  Under Article 4(b) of the MRDA, "[e]ach Licensed Participant shall execute or cause to be executed such documents reasonably requested by NNL as may be desirable to give effect to, or perfect" the provisions of Article 4(a).[341]

13.     Article 1(f) of the MRDA defined NN Technology (previously defined as "NN Technology") as follows:

> "NN Technology shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software, and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."[342]

14.     In Article 5 of the MRDA, NNL granted licenses to the Licensed Participants to exploit NN Technology to make, use and sell Products and to use the NN Technology as necessary or appropriate for that purpose.  Article 5(a) states:

> "NNL hereby (i) continues to grant to each Licensed Participant an exclusive, royalty-free license including the right to sublicense, which except as hereinafter provided shall be provided in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith".[343]

15.     Exclusive territories were the United States and Puerto Rico (NNI), the United Kingdom (NNUK), France (Nortel Networks SA), Ireland (NN Ireland), and Canada (NNL). [344] Additionally, each Licensed Participant was granted a similar non-exclusive license in territories other than the Participants' exclusive territories.[345]

---

[341]  Master R&D Agreement at p. 6; NNC-NNL006802.

[342]  NNC-NNL006802.

[343]  Third Addendum to Master R&D Agreement at pp. 41-42; NNC-NNL006802.

[344]  Schedule B to the MRDA at p. 20; NNC-NNL006802.  The designation of Canada as NNL's exclusive territory arose in the Third Addendum to Master R&D Agreement.  Prior to that Addendum, NNL's exclusive territory was the entire world except those geographic areas designated to each of the Licensed Participants.  See Article (1)(j) of the MRDA at p. 4, NNC-NNL006802.

[345]  Third Addendum to Master R&D Agreement at p. 42; NNC-NNL006802.

000134

16.     In Article 1(g) of the MRDA, "Products" were defined as follows:

> "'Products' shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing."[346]

17.     Article 14(a) of the MRDA states "[t]his Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants."[347]

## Income Reallocations Among the Participants to the MRDA Under the Residual Profit Split Method "RPSM"

### Introduction

18.     Each Participant to the MRDA agreed to perform R&D and to bear the cost of that R&D. [348]

19.     Income reallocations under the MRDA were made so that each Participant "should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted."[349]

20.     The residual profit split method ("RPSM") reallocated income among the Participants as "the best arm's length measure…of such contributions with reference to such benefits."[350]

21.     In simple language, the MRDA provided, through the RPSM, a sharing of income or loss identified as being attributable to NN Technology among the Participants in proportion to their contribution as measured by research and development expenses under US GAAP.  As discussed in Appendix E, NN Technology was an important driver of Nortel's business.[351]

---

[346]  MRDA at p.4; NNC-NNL006802.
[347]   MRDA at p.12; NNC-NNL006802.
[348]  Articles 2(a) and 2(c) of the MRDA, at pp 4-5, NNC-NNL006802.
[349]  MRDA at p. 2, NNC-NNL006802.
[350]  MRDA at p. 2, NNC-NNL006802.
[351]  See also NNC-NNL06001114.

**Explanation of the General Application of the RPSM**

22.    The RPSM was an income reallocation mechanism among the Participants.

23.    The intent of the RPSM was that each Participant would realize an appropriate share of the income or loss attributable to Nortel's technology development and exploitation efforts (i.e. "residual profit"), where appropriate shares were determined by some measure of the Participant's relative contribution to that development.   In the case of the RPSM, relative contribution was measured through reference to each party's historical research and development expense.

24.    The RPSM completed a series of steps to:[352]

- Determine an appropriate measure of residual profits;

- Determine each Participant's relative contributions to Nortel's Technology; and

- Determine the necessary income reallocations that would be required in order to align each Participant's realized residual profits to their relative contributions to Nortel's Technology.

25.    The steps that were undertaken to accomplish this goal are broadly described below.   In order to illustrate these concepts, simplified calculations from Nortel's 2008 application of the RPSM are presented.[353]   Following this broad description, a discussion of the specific agreement provisions governing the RPSM is provided.

Step 1: Measuring Adjusted Operating Income Subject to the RPSM

26.    The purpose of this step was to determine a "starting measure" of operating income (referred to here as Adjusted Operating Income) that would be used as the basis for identifying the income that would be subject to the RPSM income reallocation provisions.

27.    The adjustments that were made in arriving at Adjusted Operating Income removed certain items of income or expense from the operating income starting point.   The effect of such exclusions was that the excluded items did not get shared (indirectly) among the Participants through the determination of income reallocations.   The table below shows the income adjustments that were made in Nortel's application of the RPSM for 2008.   Please note that the column capturing

---

[352] Third Addendum to Master R&D Agreement, at Schedule A, NNC-NNL006802.
[353] In the interest of easing exposition, the calculations presented in this appendix rearrange certain data from Nortel's RPSM models (and perform certain steps in a manner that rearranges the order of certain mechanical calculations), without fundamentally changing the outcome of the ultimate calculations.

non-Participants is included in the calculation because, in a step described below, those Participants played a role in determining the amount of residual profit that was available for reallocation.[354]

### Illustrative Calculation of Adjusted Operating Income From Nortel's 2008 RPSM Application[355]

| Line | Calculation of Adjusted Operating Income for 2008 (all Figures in $ Millions) | Non-RPS Entities (Largely Distributors) | NNL | Ireland | France | NN UK | NNI |
|---|---|---|---|---|---|---|---|
| (1) | Starting Operating Income/Loss from P&L as of Q4 | ($404.1) | ($211.1) | ($45.9) | ($98.9) | ($210.7) | ($2,561.8) |
| (2) | Reverse Interim 2008 Adjustments Made in Quarters (1) through (3) | $88.0 | ($695.0) | $142.7 | $68.0 | $1.7 | $394.7 |
| (3)=(1)+(2) | Full Year Operating Income Prior to Any Transfer Pricing Adjustments | ($316.1) | ($906.1) | $96.8 | ($31.0) | ($209.0) | ($2,167.1) |
| | Adjustments to Operating Income to Derive Adjusted Operating Income | | | | | | |
| (4) | Reverse Goodwill Impairment & Amortization of Intangibles | $1.6 | $4.3 | $0.0 | $0.0 | $10.0 | $1,887.8 |
| (5) | Reverse Deferred Stock Option Compensation | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| (6) | Reverse Restructuring | $15.0 | $58.5 | $0.6 | $4.0 | $37.2 | $133.6 |
| (7) | Reverse R&D (Distributors only, not reversed for MRDA Participants) | $0.7 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| (8) | Reverse Gain or Loss on the Sale of Business | $1.4 | ($12.6) | ($0.1) | ($3.6) | $1.5 | $1.7 |
| (9) | Reverse Reserve on Intercompany Trade Balances (Acct729905) | $462.9 | $253.3 | $5.4 | $20.7 | $129.1 | $518.0 |
| (10) | Add Royalty Income (Royalty Income is Not Included on Line 1) | $0.0 | $7.6 | $0.0 | ($0.0) | $0.0 | ($0.1) |
| (11) | Reverse Stewardship Costs (Present on NNL's books only) | $0.0 | $10.1 | $0.0 | $0.0 | $0.0 | $0.0 |
| (12) | Reverse Creditor Protection Planning Costs | $0.0 | $4.9 | $0.0 | $0.0 | $0.0 | $0.0 |
| (13) | Transactional FX Gains / Losses (Distributors Only) | $52.2 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| (14) | Reversal of Prior Period Transfer Pricing Adjustments Booked in 2008 | ($31.2) | ($325.8) | $54.4 | $39.7 | $42.5 | $220.5 |
| (15)=Sum of (4)-(14) | Total Adjustments to Operating Income | $502.5 | $0.3 | $60.3 | $60.8 | $220.4 | $2,761.5 |
| (16) = (1)+(15) | Adjusted Operating Income | $186.5 | ($905.8) | $157.1 | $29.8 | $11.3 | $594.3 |

### Step 2: Identification of Routine Returns

28.    The next step of the RPSM sought to isolate returns associated with the development and exploitation of the NN Technology.  This step consisted of:

 a)    Estimating returns attributable to the functions conducted by LREs.  LREs were largely entities that were selling and distributing product outside of the exclusive territories of the Participants under arrangements that limited the financial risk that they would bear with respect to such sales.[356]   In its implementation of the RPSM in 2008, Nortel generally assigned a one percent return to routine distribution functions;[357,358] and

 b)    Identifying routine returns associated with sales, marketing, and other routine functions conducted by the Participants that were not associated with the

---

[354] During the initial years of the MRDA's operation (from 2001 through 2005), another adjustment that was made to operating profits was the exclusion of R&D expense and the inclusion of a measure of amortization of each Participant's R&D capital stock.  The MRDA called this adjusted measure "gross economic profit."  Under the third amendment to the MRDA, this R&D capitalization and amortization adjustment was eliminated effective January 1, 2006.

[355] All numbers in the illustrative tables throughout this section are sourced from spreadsheets within NOR_53648048.

[356] There were a small number of other types of LREs, but their number and size were small relative to the other Nortel operations, so they are not discussed in detail here.

[357] Australia's routine return was calculated as three percent of third party sales.  This, in combination with the routine returns provided to non-distributor LREs accounts for the difference between LRE routine returns and one percent of their third party sales in the table at paragraph 29.

[358] NOR_53648048.

---

development of NN Technology.  In its implementation of the RPSM in 2008, Nortel assigned a one percent return to capture the value of routine distribution functions performed by the MRDA Participants, but also provided an additional return to identified incremental "value added" sales and marketing, operational, and G&A costs to capture the value associated with routine functions being performed by the Participants that were not, in the view of Nortel, being rewarded in the one percent distribution return.  Any identified excess costs associated with these incremental activities were assigned a 15 percent rate of return.[359]

29.     The table below illustrates the application of this step in Nortel's 2008 application of the RPSM.

| | Illustrative Calculation of Functional Returns From Nortel's 2008 RPSM Application | | | | | | |
|---|---|---|---|---|---|---|---|
| Line | Calculation of Routine Returns for 2008 (all Figures in $ Millions) | LRE Entities Total | NNL | Ireland | France | NN UK | NNI |
| (1) | Third Party Sales | $1,548.8 | $789.9 | $590.9 | $234.5 | $630.9 | $4,154.0 |
| (2) | Costs Associated with Additional Sales and Marketing, G&A and Operations Activities Not Captured in Distribution Returns | | $348.7 | $37.7 | $15.0 | $216.0 | $598.4 |
| (3) | Routine Rate of Return on Sales for Distribution Activities* | 1% | 1% | 1% | 1% | 1% | 1% |
| (4) | Routine Rate of Return on Identified Additional Sales and Marketing, G&A and Operations Activities Costs | | 15% | 15% | 15% | 15% | 15% |
| (5) = (1)*(3) | Routine Returns for Distribution* | $18.0 | $7.9 | $5.9 | $2.3 | $6.3 | $41.5 |
| (6)=(2)*(4) | Routine Returns Associated With Identified Additional Sales and Marketing, G&A and Operations Activities | | $52.3 | $5.6 | $2.2 | $32.4 | $89.8 |
| (7) = (5)+(6) | Total Routine Returns | $18.0 | $60.2 | $11.6 | $4.6 | $38.7 | $131.3 |

* See Footnote XX.  Deviations from a strict 1 percent of return on third party sales caused the effective rate on third party sales across all LREs to be approximately 1.16%

Step 3: Estimating Total Residual Profit to be Shared

30.     The difference between the consolidated adjusted operating profit of the Participants and LREs (from step 1) and their aggregate routine returns (from step 2) was a measure of the income or loss attributable to the development and exploitation of NN Technology (i.e., the "residual profit").

---

[359] NOR_53648048.

31.   This residual profit was to be shared among the Participants in proportion to a measure of their relative contribution to the development of NN Technology. The table below illustrates the application of this step in Nortel's 2008 application of the RPSM.  In 2008, Nortel estimated a total residual loss of approximately $191.1 million.

| | | LRE Entities | | | | | Consolidated = |
|---|---|---|---|---|---|---|---|
| Line | Calculation of Total Residual Profit for 2008 (all Figures in $ Millions) | Total | NNL | Ireland | France | NN UK | NNI | Total of Prior Columns |
| (1) = Line (16), Step 1 | Adjusted Operating Income | $186.5 | ($905.8) | $157.1 | $29.8 | $11.3 | $594.3 | $73.3 |
| (2) = Line 7, Step 2 | Total Routine Returns | $18.0 | $60.2 | $11.6 | $4.6 | $38.7 | $131.3 | $264.4 |
| (3) = (1)-(2) | Realized Residual Profit | $168.5 | ($966.0) | $145.6 | $25.3 | ($27.4) | $463.0 | ($191.1) |

**Illustrative Calculation of Residual Profit From Nortel's 2008 RPSM Application**

### Step 4: Estimating Each Participant's Target Share of Residual Profit

32.   Relative R&D expense served as a proxy for relative contribution to NN Technology as earlier noted.  Beginning in 2006,[360] relative contribution was established through reference to the sum of each Participant's R&D expense for the prior five years.

33.   The table below illustrates the application of this step in Nortel's 2008 application of the RPSM:[361]

**Illustrative Calculation of Residual Profit Shares From Nortel's 2008 RPSM Application**

| Line | R&D Expense | NNL | Ireland | France | NN UK | NNI | Consolidated = Total of Prior Columns |
|---|---|---|---|---|---|---|---|
| (1) | 2003 R&D Expense | $ 703.1 | $ 15.5 | $ 228.4 | $ 81.6 | $ 679.2 | $1,707.8 |
| (2) | 2004 R&D Expense | $ 719.0 | $ 15.2 | $ 228.3 | $ 81.6 | $ 656.4 | $1,700.5 |
| (3) | 2005 R&D Expense | $ 689.2 | $ 15.3 | $ 220.1 | $ 56.9 | $ 616.9 | $1,598.4 |
| (4) | 2006 R&D Expense | $ 781.6 | $ 17.0 | $ 193.3 | $ 37.7 | $ 588.3 | $1,618.0 |
| (5) | 2007 R&D Expense | $ 841.9 | $ 25.0 | $ 67.1 | $ 39.0 | $ 677.7 | $1,650.7 |
| (6)= Sum of (1)-(5) | Total R&D 2003-2007 | $3,734.9 | $88.1 | $937.3 | $296.8 | $3,218.4 | $8,275.4 |
| (7) = Entity Line (6)/ Total Line (6) | Share of Total | 45.1% | 1.1% | 11.3% | 3.6% | 38.9% | 100% |

Note: All R&D figures are net of R&D spending that Nortel identified as being associated with its UMTS business, which it disposed of early in 2008

---

[360] For 2001 through 2005, the measure of relative R&D contribution was the R&D capital stock (established in the measurement of gross economic profit in step 1) attributable to each Participant.
[361] NOR_53648048.

*Step 5: Estimating Each Participant's Target and Realized Residual Profit*

34.     Applying relative contribution estimates (from step 4) for each Participant to the total residual profit or loss estimate (from step 3) generated target residual profits for each Participant under the RPSM.[362]

35.     For each Participant, realized residual profit was calculated by reducing adjusted operating income (prior to any RPSM allocations, from step 1) by the estimated functional returns attributed to the Participants' routine functions (from step 2).

*Step 6: Calculating Income Reallocations Under the RPSM*

36.     In the final step, income reallocations (called "R&D Allocation" in the MRDA) among the Participants were calculated by deducting realized residual profits from target residual profits (from Step 5).[363]

37.     The table below illustrates the application of steps 5 and 6 in Nortel's 2008 application of the RPSM.

| Illustrative Calculation of Target vs. Realized Residual Profit And Transfer Pricing Adjustment Under the RPSM From Nortel's 2008 RPSM Application | | | | | | |
|---|---|---|---|---|---|---|
| Line | Description | NNL | Ireland | France | NN UK | NNI |
| (1) = Total Line (3), Step 3 | Total Consolidated Residual Profits | | | ($191.1) | | |
| (2) = Line (7), Step 4 | Residual Profit Share | 45.1% | 1.1% | 11.3% | 3.6% | 38.9% |
| (3) = (1)*(2) | Target Residual Profit | ($86.2) | ($2.0) | ($21.6) | ($6.9) | ($74.3) |
| (4) = Line 3, Step 3 | Realized Residual Profit | ($966.0) | $145.6 | $25.3 | ($27.4) | $463.0 |
| (5)=(3)-(4) | Total Transfer Pricing Adjustment Under RPSM | $879.8 | ($147.6) | ($46.9) | $20.5 | ($537.3) |

## MRDA Language Governing the Application of the RPSM

38.     This section provides a brief overview of the language within the MRDA that governed the application of the steps outlined above for the RPSM. The methodology for determining the payments that was due to or payable by each Participant under the RPSM is set forth in Schedule A to the MRDA.[364]

39.     Schedule A was amended twice. The first amendment (executed in December of 2007) accompanied the Addendum to the MRDA, and had an effective date of January 1, 2006.[365] The second amendment (which was executed by the Participants beginning in December of 2008) also had an effective date of

---

[362] NOR_53648048.
[363] NOR_56348048.
[364] Schedule A to the MRDA, NNC-NNL006802, pp. 18-19.
[365] Schedule A to the MRDA, NNC-NNL006802, pp. 30-31.

January 1, 2006.[366]  Since the second amendment to Schedule A superseded the first amendment and had the same effective date, the first amendment is not presented in this overview.

40.     The table below provides the language in Schedule A that governed the steps outlined above during the 2001-2005 period and during the period after 2006.

| Step(s) | | Period to Which Provisions Applied | |
|---|---|---|---|
| | | 2001-2005[367] | 2006 and after[368] |
| 1 | Adjusted Operating Income Definition | Determine Accounting Operating Profit:<br><br>(a)  Add back R&D Expense<br><br>(b)  Deduct R&D Capital Stock Amortization in order to arrive at gross economic profit | Determine consolidated Nortel operating earnings/loss in accordance with US GAAP. [369] The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations:<br>• Amortization of intangibles<br><br>• Gain/loss on the sale of business<br><br>• Restructuring charges<br><br>• Stewardship costs |
| 2 and 3 | Identification of routine returns and calculation or residual profit | From the gross economic profit,<br><br>(a)  Deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)<br>(b)  Deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer | From the Adjusted Operating Earnings/Loss:<br>• deduct the Functional Routine Return of each Nortel Distribution Entity, and<br><br>• deduct the Functional Routine Returns of each Participant<br><br>in each case as determined by the selected transfer pricing method that establishes such return |

The header of the table reads:

**Specific Language in Schedule A To the MRDA Governing Application of The Residual Profit Split Method**

---

[366] Schedule A to the MRDA, NNC-NNL006802, pp. 48-49.
[367] Schedule A to the MRDA, NNC-NNL006802, pp. 18-19
[368] Schedule A to the MRDA, NNC-NNL006802, pp. 48-49
[369] Schedule A continuously called for the exclusion of certain entities from the RPSM calculation.  Joint ventures were specified exclusions continuously under the MRDA.  The Second Amendment to the MRDA also specifies that the operating earnings/losses of Nortel entities that do not perform the function of distribution of Products containing NN Technology from the RPSM Calculation.

| | Step(s) | Period to Which Provisions Applied | |
|---|---|---|---|
| | | 2001-2005[367] | 2006 and after[368] |
| | | pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority) to arrive at the Residual Profit Pool | based on current industry standards and third party studies, or as may be finally determined by Nortel's negotiations with Revenue Authorities, to determine the amount representing the residual profit or loss ("Residual Pool") |
| 4 | Determination of Share of Residual Profit Pool | Compute each RPSM Participants relative level of R&D Capital Stock; Calculate R&D Allocation attributable to each RPSM Participant equal to the portion of the Residual Profit pool with (sic) bears the same ratio as such Participant's ratio of its R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM Participants | Determine the R&D Allocation for each Participant: Calculate the relative ratios of each Participant's spending on its R&D Activity to the R&D spend of all Participants, by taking e each Participant's total R&D spend over the previous five years as a ratio of the total R&D spend of the previous five years for all Participants |
| 5 - 7 | Remaining steps to determine reallocations | Establish entity level adjustments to reflect arm's length R&D Allocation calculations of profit or loss for each entity. | Apply the ratio determined above to the Residual Pool to determine each Participant's R&D Allocation. Take the R&D Allocation and Functional Routine Return for each Participant and compare it to such Participant's operating earnings/loss [adjusted for the excluded items listed above] to determine whether any "true up" payments are necessary (whereby a Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share. |

## RPSM in Application

41.     In implementing the RPSM, certain steps were subject to further specification. This is particularly true for steps 1 and 2.  The table below provides further detail on the implementation of the RPSM for the two RPSM "regimes" delineated above based upon models used by Nortel to establish reallocations under the RPSM.

| | Step(s) | Period to Which Provisions Applied[370] | |
|---|---|---|---|
| | | 2001-2005[371] | 2006 -2008[372] |
| 1 | Adjusted Operating Income Definition | Items removed from operating income calculation in determining Adjusted Operating Income: | Items removed from operating income calculation in determining Adjusted Operating Income: |
| | | • Goodwill amortization/impairment | • Amortization of intangibles |
| | | • In process R&D writedowns | • Gain/loss on the sale of business |
| | | • Deferred compensation expense | • Restructuring charges |
| | | • Restructuring Costs | • Stewardship costs |
| | | • Reversal (in booking year) of certain income and expenses attributable to other years | • Reversal (in booking year) of certain income and expenses attributable to other years |
| | | • Other miscellaneous adjustments (for instance, adjustments arising from financial audits) | • Other miscellaneous adjustments (for instance, adjustments arising from financial audits) |
| | | R&D expense added back to operating income; Amortization of R&D Capital stock | • In 2008, expenses associated with |

---

[370] The items captured in this table are intended to be representative, but are not necessarily exhaustive.  A fully detailed listing of every income inclusion and exclusion in every year (regardless of materiality) would be contrary to the summarizing intent of this appendix.

[371] RPSM models for years 2001-2005 can be found at NOR_53648312, NOR_53648037, NOR_53648041, NOR_53648508, and NOR_53648130.

[372] RPSM models for years 2006-2008 can be found at NOR_53648133, NOR_53648323, and NOR_53648048.

| | Step(s) | Period to Which Provisions Applied[370] | |
|---|---|---|---|
| | | 2001-2005[371] | 2006 -2008[372] |
| | | balance deducted. R&D capitalization algorithm incorporated a declining balance amortization mechanism, R&D amortized at a rate equal to 30 percent each year, with a half year convention employed. | reserves on intercompany accounts were excluded, as were creditor protection planning costs<br><br>Royalty income was added |
| 2 | Identification of routine returns | Routine returns for distributors were stated as return on sales, routine returns for Participants were stated as a Return on Net Assets ("RONA") | Routine returns for distributors were stated as a return on sales, routine returns for Participants were a combination or distribution returns on sales, plus incremental returns on identified excess operating costs and identified "value added" sales and marketing and G&A costs. |

# Appendix G

## Scope of Analysis

As part of our analysis, we have reviewed, considered and/or relied upon the following:

1.    The database maintained by the CCC of all documents produced in the Proceedings;

2.    The database maintained by the CCC of all deposition transcripts in the Proceedings; and

3.    The documents cited in this report, schedules, and appendices.

# Appendix H

## Glossary of Terms

**ATCA** – Advance TeleComputing Architecture

**Business Sales** – the sale of the former Nortel business units

**Business Sales Proceeds** – the proceeds received from the sale of the former Nortel business units of $2,848 million

**Business Value –** value of Nortel's four key reporting units, enveloping all the Lines of Business

**Canadian Debtors** – Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation

**CCC** – the Canadian Creditors Committee

**CDMA** – Code Division Multiple Access

**CICBV** – the Canadian Institute of Chartered Business Valuators

**CN** – Carrier Networks

**Core Parties** – the parties in the joint proceedings

**Customer relationships** – customer-related intangible assets including customer lists, order backlog, and customer relationships where (a) the company has information about the customer and has regular contact with the customer and or (b) the customer has the ability to make direct contact with the company – all in the context of a business seeking to make and economic profit

**Date of Distribution** – June 30, 2014

**EDGE** – Enhanced Data rates for GSM Evolution

**EMEA** – England, the European States, the Middle East and other countries

**EMEA Debtors** – Nortel Networks UK Limited and 17 other Nortel entities in England, the European States, the Middle East and Africa

**Alternative Pro Rata Allocation** – an approach to compute each Nortel Debtor Group's share of the Sales Proceeds, based on the objective that each Key Creditor Group should receive the same percentage recovery on its claims

**ES** – Enterprise Solutions

**Fair Value** – the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date

**GAAP** – Generally Accepted Accounting Principles

**GGSN** – Next Generation Gateway GPRS Support Node

**Goodwill** – an intangible asset that represents the difference between the aggregate value of a business and the aggregate of those tangible and intangible assets that can be specifically identified and valued

**GPRS** – General Packet Radio Service

**GSM** – Global System for Mobile Communication

**GSM-R** – GSM for Railways

**Guaranteed Bondholders** – those bondholders for which guarantees have been provided by other Nortel Debtor Groups

**IFRS** – International Financial Reporting Standards

**IFSA** – Interim Funding and Settlement Agreement

**IP** – intellectual property

**Key Creditor Groups** – the Canadian general unsecured creditors (including the CCC), the bondholders for which guarantees have been provided by other Nortel Debtor Groups, the US general  unsecured creditors, the EMEA general unsecured creditors and the Nortel Networks UK Pension Trust

**Surrendered Licenses** – the licenses held by the Licensed Participants under the terms of the MRDA that were surrendered on or around June 9, 2009

**Licensed Participants** – NNI, NNUK, NNSA, and NN Ireland.

**Lines of Business** - the individual businesses of Nortel as they were divided up for sale purposes

**LREs** – Limited Risk Entities

**LTAs** – the License Termination Agreements

**LTE** – Long Term Evolution

**MEN** – Metro Ethernet Networks

**MME** – Mobility Manager Element

**MRDA** – the Master Research and Development Agreement

**MSS** – Multi-Service Switch

**NG-PC** – Next Generation Packet Core Assets

**NNC** – Nortel Networks Corporation

**NNI** – Nortel Networks, Inc.

**NN Ireland** – Nortel Networks Ireland

**NNL** – Nortel Networks Limited

**NNUK** – Nortel Networks UK Limited

**NNSA** – Nortel Networks SA

**Nortel Buyer Projections** – the projections provided by Nortel to potential purchasers related to the Business Sales

**Nortel Debtor Groups** – the Canadian Debtors, US Debtors and EMEA Debtors

**NN Technology** – any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software, and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill

**Northern Telecom** – Northern Telecom Limited

**Operating Assets** – Nortel's tangible assets and identified intangible assets including customer relationships and IP

**Ownership** – an approach to compute each Nortel Debtor Group's share of the Sales Proceeds based on the value of the assets owned and/or relinquished by each group in connection with each of the Business Sales and the Rockstar Transaction

**Participants** – the parties to the MRDA comprising NNL, NNI, NN Ireland, NNUK, and NNSA

**PPA** – Purchase Price Allocation

**Prospective Buyer Forecast Approach** – the value of the Lines of Business to the US and EMEA Debtors based on the forecasts provided to prospective purchasers

**Purchaser Goodwill** – The difference between the Sales Proceeds and the fair market value

of the Nortel Debtor Groups' assets

**PWC** – PriceWaterhouseCoopers

**R&D** – Research and Development

**Residual Patents** – Nortel patents that were not transferred in the various Business Sales

**Residual Pool** – residual profit or loss

**Rockstar Transaction** – the sale of Nortel's residual patents

**Rockstar Transaction Proceeds** – the proceeds from the sale of the residual patent portfolio of $4,454 million

**RONA** – Return on Net Assets

**RPSM** – Residual Profit Split Method

**Sales** - the Business Sales and the Rockstar Transaction

**Sales Proceeds** – the sum of the Business Sales Proceeds of $2,848 million and the Rockstar Transaction Proceeds of $4,454 million for a total of $7,302 million

**SGSN** – Next Generation Serving GPRS Support Node

**UK Pension Trust** – The Nortel Network UK Pension Trust

**UK Pension Allocation Group -** The pleading of the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund

**UMTS** – Universal Mobile Telecommunications Systems

**US Debtors** – Nortel Networks, Inc. and 14 other entities in the United States

**Valuation Date** – June 9, 2009

**VoIP** – Voice over IP



000150

**Errata for the Nortel Networks Primary Report, January 24, 2014**

| Page | From |
|---|---|
| Footnote 9 | Affidavit of John Doolittle, January 14, 2009, at ¶9 and ¶10. |
| ¶3.25 | ~~36~~ 38 percent |
| ¶3.27, second bullet | Deposition of Chris Cianciolo (October 15, 2013), at 117:16-117:22. |
| ¶3.28 | Schedule 7.5, footnote 1 |
| Footnote 18 | Deposition of Pascal Debon (November ~~23~~25, 2013), at 41:14-41:20. |
| Footnotes 26 and 102 | See generally Seller Disclosure Schedules, NNC-NNL06001637 (CVAS), NNC-NNL06001801 (CDMA), NNC-NNL06002086 (Enterprise Solutions), NNC-NNL06002189 (MEN),~~NNC-NNL06001811 (CDMA), NNC-NNL06002070 (Enterprise Solutions), NNC-NNL06002257 (MEN),~~ NNC-NNL06002391 (MSS), NOR_54401542(GSM),~~NNC-NNL06002603 (GSM),~~ and NNC-NNL06002623 (Layer 4-7). |
| Footnote 27 | CCC0067164.~~See generally Seller Disclosure Schedule, NNC-NNL06002561.~~ |
| ¶4.2 h) iv. | (as discussed in footnote 45~~48~~) |
| Footnote 73 | pp. 141-142~~137-138~~ |
| Footnote 74 | Nortel Networks Corporation, FY08-AR Form 10-K for the Period Ending December 31, 2008 (filed Mar. 2, 2009), pp. 94-96, 140-142, from Thomas One; Nortel Networks Corporation, Form 10-Q, for the period ending September 30, 2008, at pp. 12-14.~~.~~ |
| Table 6 | RPSM share of the U.S. and EMEA ~~combined EMEA~~ Debtor Groups |
| Table 10 | Number of Patents/Apps: 6,541~~6,414~~ |
| Footnote 98 | Table 11~~10~~ |
| Footnote 116 | ~~at Section 3.2~~in Table 2 |
| ¶7.15 | Table 1~~72~~ |
| Appendix C, ¶3 | Starting in 1996~~1991~~ |
| Appendix C, ¶9 | 1985~~1984~~ |
| Footnote 160 | 2002 Nortel Networks Corporation, Form 10-K, for the fiscal year ended December 31, 2002, Note 5, p. F-20.~~2006 Nortel Networks Corporation Form 10-K, p. 128; NNI_00218982.~~ |
| Appendix C, ¶26 Chart | Revenue growth %:<br>1998: ~~10~~79%, 1998 to 2000: 50%<br>Net income (after R&D): 1998: (1,250~~1,282~~), 1997 to 2000: (5,103)~~071~~) |
| Appendix C, ¶29 Chart | Operating liabilities<br>  2007: 6,840~~9,796~~<br>Long-term debt<br>  2007: 7,470~~4,514~~ |
| Footnote 172 | at 161:2-162:23~~1~~ |
| Footnote 174 | 2002 Nortel Form 10-K, p. 44~~17~~; NNI_00243995; 2006 Nortel Form 10-K; NNI_00218982,p. 16~~11~~ |
| Footnote 182 | See, e.g., ~~LEX1000000084 at 13.~~ US_EMEA_Canada_PRIV_00196952-981, at 978; NNC-NNL06001812. |
| Appendix D, ¶19, 1st Sentence | Insert footnote: "Nortel Networks Corporation, Form 10-K, for fiscal year ended December 31, 2006, at p. 16." |
| Appendix D, ¶25, Chart | NOR_54380603, Pages 77 and 81; CCC0002568-627, at 577 and 589. |
| Appendix D, ¶32 Chart | R&D: 2007: 530~~9~~, 2008: 481~~49~~<br>Operating Revenue: 2007: (578)~~9~~, 2008: (1,438)~~19~~<br>Revenue by geographic region: EMEA 2007: 849~~836~~, Canada 2007: 209~~222~~<br>Sources: NOR_54097223; CCC000249-302 |
| Appendix D, ¶33 | CCC0001962. |
| Footnote 202 | NNC-NNL06002086.~~NNC-NNL06002588.~~ |
| Footnotes 209 & 210 | ¶21~~0~~ |
| Footnote 214 | ~~No forecast was profited for the Carrier Ethernet for the Carrier Ethernet business which represents the remaining 3% of the business.~~ |
| Appendix D, ¶42 | CCC0001962. |

**Errata for the Nortel Networks Primary Report, January 24, 2014**

| | |
|---|---|
| Appendix D, ¶52 | ~~that included bids from Nokia Siemens Networks, NEC, and Sonus Networks,~~ |
| Footnote 232 | NNC-NNL06001637at 32-~~4~~37. |
| Appendix D, ¶64, bullet 2 | $~~73~~70 million |
| Footnote 250 | ~~NNC-NNL06002391 / 96-100~~NOR-54401542, at A-25 to A-29 |
| Footnote 266 | February 3, 2011 |
| Appendix D, ¶73 | Revenue by geographic region: Canada 2007: 12~~11~~ |
| Appendix D, ¶80 | $7.~~75~~ |
| Appendix D, ¶87 | ~~access~~ asset |
| Footnote 290 | CCC0001952.~~CTRL-NORTEL-00000234, page 21.~~ |
| Footnote 297 | at 35:4-3~~6~~5:15 |
| Appendix E, ¶5 chart | 2002: $2,~~20~~83 |
| Appendix F, ¶27, Chart | (16) = (3~~1~~) + (15) |
| Footnote 357 | NOR_53648048 |
| Appendix F, ¶29, Chart | ~~Footnote XX~~ NOR_53648048 |