DUFF&PHELPS

# Nortel Networks

February 28, 2014

Allocation of Sales Proceeds to the Nortel Debtor Groups Rebuttal to Reports of Messrs. Kinrich, Zenkich, Malackowski, Huffard, Bazelon, Green, and Berenblut and Cox

# Contents

**Page**

1.0    Introduction ....................................................................................... 1

2.0    Executive Summary ........................................................................... 3

3.0    Key Terms of the MRDA Not Taken Into Account in Certain Allocation Reports ............................................................................................ 6

4.0    Further Comments on Kinrich Primary Report ................................... 18

5.0    Further Comments on Zenich Primary Report ................................... 23

6.0    Further Comments on Malackowski Primary Report ......................... 24

7.0    Further Comments on Huffard Primary Report .................................. 30

8.0    Further Comments on Bazelon Primary Report ................................. 33

9.0    Further Comments on Green Primary Report .................................... 33

10.0   Comparative Analysis Summary ....................................................... 34

11.0   Restrictions and Qualifications ......................................................... 36

**Schedules**                                                                              **Tab**

Summary of Allocation to the Nortel Debtors and Recovery Percentages under Each Party's Approach ....................................................................... 1

Comparative Analysis – Computations Under Green Position ........................ 2

Comparative Analysis – Computations Under Kinrich Position ...................... 3

Comparative Analysis – Computations Under Malackowski/Huffard Position:

        – License Approach .......................................................................... 4

        – Contribution Approach ................................................................... 5

**Appendices**

Acknowledgement of Expert's Duty .......................................................... A

Curriculum Vitae of Thomas Britven ......................................................... B

Glossary of Terms ................................................................................... C



**PRIVATE & CONFIDENTIAL**

February 28, 2014

Paliare Roland Rosenberg Rothstein LLP
155 Wellington Street W., 35th Floor
Toronto, Ontario  M5V 3H1

<u>Attention:  Mr. Kenneth T. Rosenberg</u>

*For the Superintendent of Financial Services as the Administrator of the Pension Benefits Guarantee Fund*

Koskie Minsky LLP
20 Queen Street West
Suite 900
Toronto, Ontario  M5H 3R3

<u>Attention:  Mr. Mark Zigler</u>

*For the former employees of Nortel and the LTD beneficiaries*

UNIFOR
Legal Department
205 Placer Court
Toronto, Ontario  M2H 3H9

<u>Attention:  Mr. Barry E. Wadsworth</u>

*For the active and retired employees of Nortel*

McCarthy Tétrault LLP
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

<u>Attention:  Mr. Paul Steep</u>

*For Morneau Shepell Ltd. as administrator of the Nortel Canada registered pension plans*

Shibley Righton LLP
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario  M5H 3E5

<u>Attention: Mr. Arthur O. Jacques</u>

*For the recently severed Canadian Nortel employees*

DLA Piper
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801

<u>Attention: Ms. Selinda A. Melnik</u>

Dear Sirs:

**Re:    Allocation of Sales Proceeds to the Nortel Debtor Groups Rebuttal to Reports of Messrs. Kinrich, Zenkich, Malackowski, Huffard, Bazelon, Green, and Berenblut and Cox**

# 1.0   Introduction

1.1    On behalf of the Canadian Creditors Committee (the "CCC"), you requested our opinion as to the Sales Proceeds (as later defined) to be distributed among the Canadian Debtors, US Debtors and EMEA Debtors.

1.2    At your request, we prepared the Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups, dated January 24, 2014 (the "Britven Primary Report").

1.3    Since that time we have received various reports prepared on behalf of the US Debtors, the EMEA Debtors, the UK Pension Trust, and the Canadian Debtors and Monitor.

1.4    For purposes of our rebuttal report, we have focussed on the following reports, all dated January 24, 2014, that address (either directly or indirectly) the allocation of the Sales Proceeds (collectively the "Allocation Reports" and, individually, each "Primary Report"):

- Report of Mr. Jeffrey Kinrich ("Kinrich") on behalf of the US Debtors opining on the allocation of the Sales Proceeds to each of the Nortel Debtors (the "Kinrich Primary Report");

- Report of Mr. Raymond Zenkich ("Zenkich") on behalf of the US Debtors opining on, amongst other things, the value of patents registered in China (the "Zenkich Primary Report");

- Report of Mr. James Malackowski ("Malackowski") on behalf of the EMEA Debtors opining as to allocation of the value of the IP to each of the Nortel Debtors (the "Malackowski Primary Report");

- Report of Mr. Paul Huffard ("Huffard") on behalf of the EMEA Debtors based in part on the Malackowski Primary Report and opining on the allocation of the Sales Proceeds to each of the Nortel Debtors (the "Huffard Primary Report");

- Report of Mr. Coleman Bazelon ("Bazelon") on behalf of the UK Pension Trust opining on the allocation of the Sales Proceeds to each of the Nortel Debtors (the "Bazelon Primary Report");

- Report of Mr. Phillip Green ("Green") on behalf of the Canadian Debtors and Monitor opining on the allocation of the Sales Proceeds to each of the Nortel Debtors (the "Green Primary Report"); and

- Report of Messrs. Mark Berenblut and Alan Cox ("Berenblut and Cox") on behalf of the Canadian Debtors and Monitor opining on the allocation of the Sales Proceeds to each of the Nortel Debtors (the "Berenblut and Cox Primary Report").

1.5    You have asked us to comment on the Allocation Reports.  Our response in this regard is set out in Sections 3 to 9.

In the Britven Primary Report, you asked us to determine each Nortel Debtor Group's share of the Sales Proceeds and the implied aggregate recoveries for each Key Creditor Group (measured as a percentage of the estimated amounts claimed) based on the various positions of the Core Parties.

In the Britven Primary Report, we were unable to respond to this question due to incomplete information regarding the manner in which the other Core Parties would apply the principles articulated in their allocation pleadings.  With the information available to us from the Allocation Reports, we are now in a better position to compute and compare the allocation results of the various positions.  Therefore, this report provides our response to that request.  We refer to the resulting calculations as the Comparative Analysis.

Our response in this regard is set out in Section 10.

1.6    Important background information which may be required to understand this report is included in the Britven Primary Report which should be read in conjunction with this report.  We do not repeat the background information here.

1.7    Where possible, we have adopted the same terms as used in the Britven Primary Report.  Defined terms in the Britven Primary Report, and in this report, are capitalized and summarized at Appendix C.

1.8    Our comments, opinions and conclusions are subject to the assumptions set out in the Britven Primary Report, unless otherwise noted in this report.

1.9    In preparing our report, we have analyzed and relied upon the documents and information set out in the Britven Primary Report at Appendix G, the Allocation Reports and documents cited in this report and schedules.  We have not audited or performed any verification procedures on these documents.

1.10    This report constitutes an Expert Report as defined by the Canadian Institute of Chartered Business Valuators (the "CICBV").  See the Restrictions section of this report for further discussion.

## 2.0    Executive Summary

2.1    Nothing in the Allocation Reports leads us to materially change the conclusions in the Britven Primary Report.[1]

---

[1] We note from the Green Primary Report, at Exhibit D, that there were two wholly owned subsidiaries of NNI for which the full value may be appropriately allocated to the US Debtors and, from the Huffard Primary Report, at 46, that there are five similar EMEA entities for which the full value may be appropriately allocated to the EMEA Debtors.  Making either, or both, of these changes has no material impact, if any, on the

2.2     Based on a review of these Allocation Reports, our core conclusions are as follows.

2.3     <u>First</u>, the conclusions of the Green Primary Report are largely consistent with those in the Britven Primary Report. This is predominantly because Green also takes into account the limitations, restrictions and obligations in the MRDA set out in the Britven Primary Report and explained further in Section 3.

2.4     <u>Second</u>, Kinrich and Malackowski/Huffard[2] fail to address what we understand to be key terms of the MRDA, which leads them to conclude that an undue proportion of the Sales Proceeds should be allocated to the US and EMEA Debtors. In particular, Kinrich, Malackowski and Huffard do not take into account that the licenses held by the Licensed Participants:

    a)     were non-transferable field of use licenses;

    b)     only enabled the Licensed Participants to make, use and sell Products (as defined in the MRDA) of the Lines of Business;

    c)     granted sublicense and enforcement rights in an infringement suit that were circumscribed by the field of use and other restrictions and limitations of the licenses; and

    d)     licensed only those patents and other parts of the NN Technology that were necessary or appropriate to make, use and sell, Products.

2.5     The value associated with the field of use licenses held by the Licensed Participants was substantially realized in the Business Sales. The Rockstar Transaction proceeds were attributable substantially to rights in the patents outside of the licensed field of use. Accordingly, the proceeds of the Rockstar Transaction should be allocated entirely, or almost entirely, to NNL. Kinrich and Malackowski/Huffard overlooked this fact by not focusing on the limitations and restrictions of the licenses in the MRDA.

2.6     In addition, Kinrich and Malackowski/Huffard do not take into account the obligations under the MRDA, including the income reallocation obligations of the Licensed Participants under the RPSM.

    The failure to take these terms of the MRDA into account, in our opinion, renders the conclusions of Kinrich and Malackowski/Huffard unreliable.

---

conclusions set out in the Britven Primary Report and, accordingly, we do not revise our conclusions set out therein.

[2] The Huffard Primary Report expresses an opinion on the allocation of the Sales Proceeds and, in doing so, adopts the conclusions of the Malackowski Primary Report which opines on the value and allocation of the IP. Consequently, we will frequently refer to the Huffard and Malackowski Primary Reports together.

2.7   Third, the Malackowski contribution approach is flawed in that it is computed with reference to the input, rather than the output of the R&D process.  Further, it assumes that: (i) each dollar of R&D spending creates an equal amount of value when there is no basis for this assumption; and (ii) regardless of when the funds were spent, they produce the same future value as of the Valuation Date.  These flaws render the contribution approach unreliable.

2.8   Fourth, irrespective of their failure to address the key terms of the MRDA, Kinrich, Malackowski and Huffard make several other erroneous assumptions and analytical errors that further render their conclusions unreliable.

2.9   Fifth, in the Britven Primary Report, we concluded that we were unable to compute the implied recoveries for each Key Creditor Group (measured as a percentage of the estimated amounts claimed) based on the positions of the Core Parties due to incomplete information. At your instruction, we have now conducted this analysis based on the information available from the Allocation Reports. The results are discussed in our Comparative Analysis in Section 10 and summarized in Table 1, below:[3]

| Table 1 Percentage Recovery by each Key Creditor Group Resulting from each Allocation Report | | | | | | | |
|---|---|---|---|---|---|---|---|
| Pleading party | CCC | Canadian Debtors and Monitor | US Interests | EMEA Debtors | | UK Pension | CCC Alternative Pro Rata |
| | | | | License Approach | Contribution Approach | | |
| Author | Britven | Green | Kinrich | Malackowski / Huffard | | Bazelon | |
| | "Field of Use" approach[4] | | "No Field of Use" approach[4] | License terms not relevant to approach | | | |
| Guaranteed Bondholders | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 71.2% | 71.2% |
| US creditors | 95.0% | 100.0% | 100.0% | 100.0% | 100.0% | 71.2% | 71.2% |
| Canadian creditors | 58.7% | 61.2% | 10.6% | 11.4% | 25.4% | 71.2% | 71.2% |
| EMEA creditors | 26.5% | 19.3% | 47.5% | 76.7% | 50.4% | 71.2% | 71.2% |
| UK Pension Trust | 43.7% | 37.2% | 50.7% | 79.4% | 57.8% | 71.2% | 71.2% |
| | | | | | | | |
| Undistributed cash[5] | n/a | $111m | $1,304m | $248m | $536m | n/a | n/a |

---

[3] We understand that the representative party discoveries are not yet complete.  We reserve the right to revise or expand our opinions, assumptions and/or calculations to reflect any additional opinions we may formulate in light of any information that becomes known or available to us after the date of this report.

[4] Defined in paragraph 3.2, below.

2.10    The remainder of this report is structured as follows.

In **Section 3,** we discuss those key terms of the MRDA which are not taken into account by the Allocation Reports, and the resulting effect on the allocation of the Sale Proceeds.

In **Sections 4 and 5**, we provide specific comments on the Primary Reports of Kinrich and Zenkich delivered on behalf of the US Debtors.

In **Sections 6 and 7**, we provide specific comments on the Primary Reports of Malackowski and Huffard delivered on behalf of the EMEA Debtors.

**Section 8** provides specific comments on the Bazelon Primary Report delivered on behalf of the UKPC.

In **Section 9**, we provide specific comments on the Green Primary Report, with which we substantially agree.

In **Section 10**, we provide the results of our Comparative Analysis.

## 3.0    Key Terms of the MRDA Not Taken Into Account in Certain Allocation Reports

3.1    The Kinrich Primary Report, the Malackowski/Huffard Primary Reports and the Bazelon Primary Report disregard what we understand to be key terms of the MRDA. It is in large part by reading out of the MRDA fundamental terms, or by adding rights that do not exist, that these reports allocate the Sale Proceeds as they do.

3.2    These reports do not take into account that the licenses held by the Licensed Participants (i) were non-transferable field of use licenses, (ii) only enabled the Licensed Participants to make, use and sell Products (as defined in the MRDA) of the Lines of Businesses, (iii) granted sublicense rights and rights to enforce rights in an infringement suit that were circumscribed by the field of use and other limitations and restrictions of the licenses, and (iv) licensed only the patents and other parts of the NN Technology that were necessary or appropriate to make, use and sell, Products.

---

[5] The Undistributed Cash amounts arise because the positions in those Allocation Reports attribute more sales proceeds to the US Debtors than the claims we have assumed exist against the US Debtors. For further discussion, see Section 10.

We will refer to the approach in the Britven, Green, and Berenblut and Cox Primary Reports, where all of these points are taken into account, as the "Field of Use" approach and the approach in the Kinrich and Malackowski/Huffard [6] Primary Reports, do not take these points into account, as the "No Field of Use" approach.

3.3    The MRDA terms that were disregarded or not taken into account in the Kinrich and Malackowski/Huffard and Bazelon reports are summarized in Table 2.[7]

3.4    The No Field of Use approach effectively assumes that the Licensed Participants had unrestricted licenses that were the economic equivalent of full ownership of NN Technology within the exclusive markets of the Licensed Participants. The effect of this approach is to increase the allocation to the US and EMEA Licensed Participants.

3.5    As discussed in further detail below, if the Court finds that the Field of Use approach is appropriate, then the valuation of the Surrendered Licenses in the Primary Reports of Kinrich, Malackowski and Huffard would necessarily be substantially overstated, and the conclusions in these reports would not be reliable.

3.6    Further, the Kinrich and Malackowski/Huffard Primary Reports do not take into account the obligations of the Licensed Participants under the MRDA such as their income reallocation obligations under the RPSM.

3.7    The Malackowski/Huffard (contribution approach) overlooked NNL's ownership of the NN Technology basing their reports on a theory that attempts to measure relative contributions of the MRDA Participants which does not rely on the license terms.

The license terms were also not considered relevant by Bazelon.

---

[6] Malackowski/Huffard adopt two alternative methodologies with respect to determining the allocation of value associated with IP. The first approach (the "license approach") adopts an Ownership approach and an interpretation of the license that is similar to that of Kinrich. The second (and designated preferred) approach is a "contribution approach" that overlooks NNL's ownership of the NN Technology and is based on an attempt to measure relative contributions of the MRDA Participants which does not rely on the license terms. Throughout this section, when discussing the MRDA interpretations of Malackowski/Huffard, we are speaking only to the interpretations employed under the license approach.

[7] The contribution approach in the Malackowski/Huffard Primary Reports and the Bazelon Primary Report do not consider, and are not influenced by, an interpretation of the property interest in NN Technology but are included for reference purposes.

**Table 2**

**Summary of Different Assumptions About the Terms in the MRDA Dealing with NN Technology and the RPSM in Each Allocation Report**

| Pleading Party | | CCC | Canadian Debtors and Monitor | | US Interests | EMEA Debtors | | UK Pension |
|---|---|---|---|---|---|---|---|---|
| Expert | | Britven | Green | Berenblut and Cox | Kinrich | Malackowski / Huffard — License Approach | Malackowski / Huffard — Contribution Approach | Bazelon (License terms not relevant to approach) |
| | | "Field of Use" approach | | | "No Field of Use" approach | | | |
| **Scope of License – Field of Use** | para 3.8 | Field of use for Surrendered Licenses is limited to making, using, and selling Products and patents are licensed only as necessary and appropriate for that purpose | Analysis incorporates similar assumptions to Britven | Analysis incorporates similar assumptions to Britven | No Field of Use Limitations - Surrendered Licenses provided equivalent of full economic ownership of NN Technology in exclusive territory. | No Field of Use Limitations - Surrendered Licenses provided equivalent of full economic ownership of NN Technology in exclusive territory. | | All parties assumed to jointly share in proceeds. Pro-rata allocation is most consistent with the operations of Nortel's business. |
| **Transferability** | para 3.17 | Not Transferable | Not Transferable | Not Transferable | Can effect transferability through sublicensing | Can effect transferability through sublicensing | | |
| **Sublicensing** | para 3.23 | Sublicense ability is limited to rights the licensee otherwise had | Analysis incorporates similar assumptions to Britven | Analysis incorporates similar assumptions to Britven | Effectively unlimited | Effectively unlimited | | |
| **Enforcement: Exclusive Territories** | para 3.29 | Claims cannot exceed infringements within the field of use for patents exclusively licensed to the Licensed Participants | Analysis incorporates similar assumptions to Britven | Not discussed | Unlimited given broad license scope assumption | Unlimited given broad license scope assumption | All parties assumed to jointly share in all proceeds in proportion to contribution proxy measure | |
| **Enforcement: Non-Exclusive Territories** | para 3.29 | Litigation rights held exclusively by NNL. Surrendered Licenses do not detract from rights to sue outside of the field of use or for patents not licensed. | Analysis incorporates similar assumptions to Britven | Not discussed | Litigation rights held exclusively by NNL, but sublicense interpretation yields equivalent rights for all Participants | Litigation rights held exclusively by NNL, but sublicense interpretation yields equivalent rights for all Participants | | |
| **Patents that were Subject to the Licenses** | para 3.34 | Limited to patents necessary and appropriate to make, use and sell Products | Analysis incorporates similar assumptions to Britven | | All | All | | |
| **Role of income reallocation provisions in analysis** | para 3.37 | Relevant factor in determining the value of the Surrendered Licenses | Relevant factor in determining the value of the Surrendered Licenses | Establishes a ceiling on the value of the Business Sale proceeds attributable to the assets surrendered by the US and EMEA Debtors | Disregarded | Disregarded | | |

Scope of License with Respect to Field of Use

3.8    The assumptions made by each author regarding the existence or absence of limitations in the field of use of the licenses held by the Licensed Participants lead to material differences in their conclusions.

3.9    Kinrich and Malackowski/Huffard do not address the field of use of the licenses held by the Licensed Participants at all:

a)    Kinrich states that "each IE received an exclusive, royalty-free license in perpetuity to all NN Technology in its own territory" and that "each of the five IEs had exclusive rights to all NN Technology in its Exclusive Territory". His conclusion that "all the economic value of Nortel's IP in Exclusive Territories was held by the IE in that territory" does not take into account the field of use limitations in the license grants;[8]

b)    The Malackowski license approach (which is relied upon by Huffard), does not take into account the field of use limitations on the licenses held by the Licensed Participants. Malackowski states that "[w]ith respect to the Licenses, I assume that … (ii) the Licenses apply to all the IP that was transferred in each of the Business Sales and the Residual Patent Sale [and] …(iv) the Exclusive Licenses confer upon the Selling Debtors the full beneficial ownership of and economic entitlement to all IP licensed in the Exclusive Territory (i.e., existing and/or registered in the Exclusive Territory)."[9]

3.10    By contrast, the Britven Primary Report and the Green Primary Report value the licenses surrendered by the Licensed Participants based on the recognition that the MRDA granted field of use licenses. These licenses were to make, use, and sell Products.[10] The grant of the license rights to use the NN Technology was not unlimited. It permitted the use of the NNT only where the use was necessary or appropriate in connection with making, using, or selling Products.[11]

3.11    Under Article 4(a) of the MRDA:

> "legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement shall be vested in NNL.  In consideration therefor, NNL agrees to enter

---

[8] Kinrich Primary Report, at 8, 41-42.

[9] Malackowski Primary Report, at 5.

[10] See the definition of "Products" in art. 3.19 of the MRDA.

[11] Britven Primary Report, at 16 and Green Primary Report, at 4.

*into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5."*[12]

3.12    Article 5(a) of the MRDA provides the license grant.  Article 5(a) states:

*"NNL hereby (i) continues to grant to each Licensed Participant an exclusive, royalty-free license including the right to sublicense, which except as hereinafter provided shall be provided in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell **Products** using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."*[13] *(emphasis added)*

3.13    In Article 1(g) of the MRDA, "Products" were defined as follows:

*"'Products' shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing."*[14]

We understand this to mean that "Products" referred to in the MRDA are products (or proposed products) of the Lines of Business that were sold. Products that were not (or were not proposed to be) designed, developed, manufactured, or marketed by Nortel, such as competing products in the market place, or other products in businesses that Nortel did not compete with, or had no plans to compete with, were not "Products."

3.14    The Business Sales conveyed interests in the NN Technology in two ways:

a)    First, when patents within the NN Technology portfolio were determined to be predominantly used in a particular business line, those patents were transferred to the purchaser of that business; and

b)    Second, if a patent was necessary to conduct the business but was not determined to be predominantly used in that business, the purchaser was provided with a limited license to use that patent so that it could conduct the purchased business.

---

[12] Third Addendum to Master R&D Agreement at 41; NNC-NNL006802.  In practice, there were a few patents that were not assigned to NNL.

[13]  Third Addendum to Master R&D Agreement at 41-42; NNC-NNL006802.

[14]  MRDA, at 4; NNC-NNL006802.

When predominant use patents were transferred to the purchasers in the business sales, the transfer of those patents conveyed substantially all rights associated with those patents.[15]

3.15    The field of use limitation influences the determination in the Britven Primary Report that the Licensed Participants held little or no license rights in the NN Technology conveyed in the Rockstar Transaction.  In the Rockstar Transaction, patents not conveyed to the purchasers in the Business Sales were conveyed to the Rockstar consortium. The purchasers in the Business Sales were provided limited licenses to those patents to the extent they were necessary to conduct the purchased business. As the value associated with the field of use licenses held by the Licensed Participants had been substantially realized in the Business Sales and as the Rockstar Transaction proceeds were attributable substantially to rights in the patents outside of the licensed field of use, the proceeds of the Rockstar Transaction should be allocated entirely, or almost entirely, to NNL.

3.16    It is only as a consequence of ignoring the field of use limitation, and the other terms of the MRDA discussed below, that Kinrich, Malackowski and Huffard are able to conclude that substantially all of the economic value associated with the Rockstar Transaction should be allocated to the Licensed Participants.

Transferability

3.17    We understand, and have assumed, that the MRDA prohibits the transfer of the licenses.  Green adopts a similar assumption in that he states that "the MRDA prohibited the transfer of these license rights to third parties."[16]

3.18    The Britven Primary Report also recognizes the practical reality that no third party would take an assignment of the MRDA licenses since they would also have to assume the burdens of the MRDA terms.

3.19    Kinrich and Malackowski assume that a transfer could effectively be undertaken by way of a sublicense.

3.20    The absence of the right of the Licensed Participants to transfer the MRDA substantially reduces the value of the Surrendered Licenses to that value which could have been realized by the Nortel Debtors continuing to operate their businesses.

3.21    The Licensed Participants could only use their licenses in the Nortel business. The Britven Primary Report discusses the declining financial prospects for Nortel.

---

[15]  The purchasers also granted licenses to their predominantly used patents back to Nortel.  See Britven Primary Report, Appendix E, paragraph 17.

[16] Green Primary Report, at 15.

The contractual and practical inability of the Licensed Participants to transfer the licensed rights to a third party (who might be in a better position to realize higher values from exploiting NN Technology than the Licensed Participants could) substantially limits the value of those licenses.

3.22   In respect of the Business Sales, the Britven[17] and Green Primary Reports both conclude that the amount paid by the purchasers substantially exceeds the value that Nortel could have realized through continued operations.  For the Licensed Participants, value received is not equal to the value of what was surrendered. Kinrich and Huffard never independently value what was surrendered by the Participants. This is but one reason why we conclude that the value of the Surrendered Licenses is a fraction of the Business Sale proceeds attributable to NN Technology in total.

Sublicensing

3.23   The Britven Primary Report and the Green Primary Report value the licenses based on the recognition that each Licensed Participant was only permitted to grant sublicenses to third parties that were within the scope of the licenses granted in the MRDA. The Britven Primary Report and the Green Primary Report also value the licenses based on the recognition that the MRDA is not assignable.[18]

3.24   We have assumed that the licenses held by the Licensed Participants were to make, use, and sell Products using or embodying NN Technology pursuant to the terms of the MRDA, which are set out above in paragraphs 3.11-3.13. The Licensed Participants could only sublicense to third parties within the scope of the licenses granted by NNL. NNL retained all rights relating to uses and licensing of the NN Technology outside the scope of the licenses granted to the Licensed Participants. Put simply, the Licensed Participants could not sublicense more than they had.

3.25   As the licenses were non-transferable, the Licensed Participants were unable to transfer rights in the NN Technology to third parties, either directly, or indirectly by sublicensing. Further, as the Licensed Participants had no ability to transfer rights they didn't have, the Licensed Participants could not:

   a)   transfer to third parties rights in the NN Technology outside of the field of use of the licenses; or

   b)   transfer rights to NN Technology to which they did not hold a license.

---

[17] Britven Primary Report, at 34.
[18] Green Primary Report, at 15.

3.26    The assumptions made by Kinrich, Malackowski and Huffard that the License Participants had the ability to effect a transfer (either directly or indirectly through a sublicense) is illogical.  It makes no sense, from a business perspective, that a party would, in one section of an agreement, explicitly disallow a transfer while, in another section of the same agreement, allow an effective transfer by way of a sublicense.   Further, it would not be logical for a parent corporation to allow its subsidiary companies to engage in licensing activities for the subsidiaries' own benefit that would be harmful to the overall organization.

3.27    Kinrich and Malackowski/Huffard ignore these limitations on the licenses held by the Licensed Participants:

a)    Kinrich equates value received to value surrendered. He implicitly assumes that a Licensed Participant could transfer and/or sublicense exclusive rights to exploit any and all NN Technology in its Exclusive Territory to a third party. Kinrich therefore concludes that "the IEs held all of the economic interest in the Patent Portfolio"[19] that was sold in the Rockstar Transaction;

b)    Huffard states that "I consider it of particular significance that the exclusive … licenses held by the RPE's afforded each RPE the right to grant sublicenses";[20] and

c)    Malackowksi (upon whom Huffard relies) states that he assumes that "the Exclusive Licenses confer upon the Selling Debtors the full beneficial ownerships of and economic entitlement to all IP licensed in the Exclusive Territory."[21]

3.28    The failure to address these limitations has a fundamental effect on the conclusions reached by Kinrich, Malackowski and Huffard. For instance:

a)    Malackowski's relief from royalty method uses revenue projections that are not projected revenues "in the hands of Nortel." Therefore, his relief from royalty valuation of the IP incorporates (at least indirectly) an assumption that the full value of the NN Technology could be realized outside of the Nortel business. Accordingly, it is clear that Malackowski did not take into account contractual or practical limitations on sublicensing or transferability. This flawed assumption flows into the Huffard Primary Report as well; and

b)    Both Kinrich and Malackowski ignore the sublicensing limitations when they establish the surrender value of the non-exclusive licenses. They both argue that a Licensed Participant could have undercut NNL's ability to realize the

---

[19] Kinrich Primary Report, at 42.
[20] Huffard Primary Report, at 49.
[21] Malackowski Primary Report, at 5.

value of its patents in these non-exclusive markets by granting sublicenses to any potential third party licensees or infringers that NNL might hope to sue.   However, since the Licensed Participants had no right to grant sublicenses outside of their fields of use, or to any patents to which they were not licensed, they had limited, if any, ability to thwart NNL's enforcement of its exclusive rights against competitors.

Enforcement

3.29    The Britven Primary Report and the Green Primary Report value the licenses based on the recognition that each Licensed Participant had limited rights to sue for infringement of the patent rights in the NN Technology. The rights to sue, to the extent actions for patent infringement could be maintained by the Licensed Participants at all, were circumscribed by the field of use and other limitations of the licenses.

3.30    Kinrich and Malackowski assume that each Licensed Participant had broad and unrestricted rights of enforcement in relation to the NN Technology in its Exclusive Territory:

a)    The Kinrich Primary Report states that the five IEs had the right to "defend a technology from infringement" and that "the rights granted to each IE within its Exclusive Territory were exclusive". Kinrich also makes this assumption implicitly in concluding that the IEs "held all of the economic interest in the patents in the Patent Portfolio that were conveyed in the sale, and hence the IEs are the only entities within each Debtor Group that relinquished value in this sale";[22] and

b)    The Malackowski Primary Report explicitly assumes that the Licensed Participants had the exclusive right to sue for various remedies in their exclusive territories related to any NN Technology.[23]

3.31    The assumed breadth of these enforcement rights had ramifications for the value assigned to the licenses by Kinrich and Malackowski. This is because some portion of any patent value (and a substantial portion of the values associated with the patents conveyed in the Rockstar Transaction) is based on the right to recover revenue through actual or threatened litigation (either through damages or through cross-licenses). However, if the rights of the Licensed Participants to

---

[22] Kinrich Primary Report, at 41-42.

[23] Malackowski Primary Report, at 5 ("Exclusive Licenses confer upon the Selling Debtors the full beneficial ownership of and economic entitlement to all IP licensed in the Exclusive Territory (i.e., existing and/or registered in the Exclusive Territory"); Kinrich Primary Report, at 6 ("each of the IEs had 'the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others.")

sue are much more circumscribed than Kinrich and Malackowski assume, the value of the licenses associated with this right would also be significantly reduced.[24]

3.32    We understand that NNL had exclusive enforcement rights in the non-exclusive territories.[25] However, in their Primary Reports, Kinrich and Malackowski assigned no incremental value to NNL over holders of the non-exclusive licenses who had no right to sue.[26]

3.33    It is incorrect to assume that even though only NNL had the exclusive right to sue to enforce the patents in the NN Technology in the non-exclusive territories, there was no economic value associated with that right for the following reasons:

- First, the ability to enforce IP rights is more valuable than the ability to sublicense a non-exclusive right. Potential licensees have a choice to accept or refuse a sublicense, but infringers generally do not have a choice to avoid litigation for their infringing activities. Furthermore, any sublicense that results in lost sales (and consequently, lost profits) to Nortel, would destroy value to the extent that a royalty is less than the profits of the licensor; and

- Second, the Licensed Participants had no right to grant sublicenses outside of their field of use, or to any patents to which they were not licensed. Accordingly, they had no (or very limited) ability to thwart NNL's enforcement of its exclusive rights against competitors.

---

[24] For example, if the right to sue does not include the right to litigate with respect to NN Technology not used by the licensee to make Products, the value associated with that right would be greatly diminished relative to an unrestrained right to litigate.

[25] All territories other than the exclusive territories of the MRDA Participants.

[26] Malackowski Primary Report, at 51:

> However, this right or option to enforce the patents would not create extra value above that of a sublicensable non-exclusive license. As mentioned, this is due to the fact that if there was an entity competing with the owner of the patents by granting sublicenses to the IP portfolios, that entity would be able to sell a prospective and retrospective sublicense to any company threatened with patent litigation by the owner of the patents. Enforcement, even if it were to be permitted by a court, would be futile unless the sublicensable licenses were retired.

Kinrich Primary Report, at 42-43:

> I conclude that this exclusive right to enforce had very little value because all of the IEs held the non-exclusive right to sub-license in the non-Exclusive Territories. This removes any incremental value associated with the right to enforce. To see this, suppose the Canadian Debtor Group sold off its rights separately. Then either the EMEA Debtor Group or the U.S. Debtor Group could have made the Canadian Debtor Group's exclusive right to enforce worth little by sub-licensing to whomever was a potential target of an enforcement action by the Canadian Debtor Group. As a result, the only valuable rights relinquished by the Debtor Groups in the non-Exclusive Territories were their non-exclusive rights to exploit and sub-license.

Patents that were Subject to the Licenses

3.34    The Britven and Green[27] Primary Reports recognize that the licenses held by the Licensed Participants were to make, use and sell Products and that the license to any particular NN Technology was limited to only those rights that were necessary or appropriate to make, use and sell Products.

3.35    As explained in the Britven Primary Report at paragraph 6.63, approximately 59 to 66[28] percent of the patents conveyed in the Rockstar Transaction were patents and patent applications that were <u>not</u> used to make, use or sell Products.  If those patents were not within the scope of the licenses held by the Licensed Participants, then any value associated with those patents would be attributed entirely to NNL.

3.36    Kinrich and Malackowski/Huffard  assume that <u>all</u> NN Technology is licensed to the Licensed Participants. Kinrich states that "each IE received an exclusive, royalty-free license in perpetuity to *all NN Technology* in its own territory"[29] (emphasis added).  Malackowski states that "[w]ith respect to the Licenses, I assume that… (ii) the Licenses apply to *all the IP* that was transferred in each of the Business Sales and the Residual Patent Sale" (emphasis added).[30] If this assumption is wrong, then even if all of the other assumptions they make and allocation methodologies they employ are correct (which we do not accept), the allocation would still materially overstate the Sale Proceeds attributable to the US and EMEA Debtors.

Applicability of RPSM Provisions

3.37    Kinrich, Malackowski and Huffard (while recognizing that the MRDA granted the licenses held by the Licensed Participants) do not take into account the fact that the MRDA created obligations on the Licensed Participants, including obligations to reallocate income pursuant to the residual profit split method ("RPSM").

3.38    Appendix F to the Britven Primary Report provides a basic description of the operation of the RPSM under the MRDA. Under the RPSM, income that was determined to be "residual income" (a measure of income or loss attributable to Nortel's intangible development and exploitation efforts) was required to be split among the Participants.  Participants who, absent the RPSM, had realized residual income in excess of their RPSM shares were required to make a

---

[27] Green Primary Report, at 64.
[28]    NNI_00176133,    NNC-NNL06740125,    CTRL-NORTEL-00007281.    See also,    NNI_00627822, NNI_01462625,   NNI_01388250,   NNI_01392761,   NNI_01392759,   NNI_00321988,   NNC-NNL06740124, NNC-NNL11737781, NNI_00323690, NNI_00627822, NNI_01388250, and US_Canada_PRIV_00144248.
[29] Kinrich Primary Report, at 6.
[30] Malackowski Primary Report, at 5.

payment (an "R&D Activity Payment") to other Participants (and Participants who had realized less were entitled to receive such payments).  Article 3 of the MRDA provided:

> "(a) For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM…as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.
>
> (b) Each participant hereby accepts and agrees to make the payment determined under the RPSM."[31]

3.39   The Britven Primary Report and in the Green Primary Report acknowledge that these income reallocation provisions are part and parcel of the Surrendered Licenses and are relevant to the determination of the value of the Surrendered Licenses in connection with the Business Sales.[32] They would therefore have significantly reduced the operating profits that the Licensed Participants could have realized through the exploitation of their interests in the NN Technology. NNI, for instance, had an RPSM share of 38.5 percent under the methodology set forth on Schedule A as of fiscal year 2009.[33] Given that NNI's residual profits (prior to R&D Activity Payments) were generally in excess of its target residual profits under the RPSM, NNI generally made R&D Activity Payments during the 2001-2008 period which reduced its profits.

3.40   Kinrich, Malackowski and Huffard (who relies upon Malackowski) completely ignore the obligations set forth in article 3 of the MRDA, and assume that each party had license rights that were free and clear of any obligation to make RPSM payments. The effect of ignoring the RPSM obligations leads to a significant overstatement of the value of the Surrendered Licenses.

---

[31] MRDA, at 5; NNC-NNL006802.
[32] As discussed at paragraphs 6.60 to 6.65 of the Britven Primary Report, any value associated with the Surrendered Licenses is accounted for in the Business Sales proceeds and not the Rockstar Transaction proceeds.
[33] Britven Primary Report, at 12.

## 4.0    Further Comments on Kinrich Primary Report

4.1    For purposes of our specific comments on the Kinrich Primary Report, we will separately address Kinrich's assumptions and methodology in allocating the Business Sales Proceeds and the Rockstar Transaction Proceeds.

**Business Sales Proceeds**

4.2    Kinrich's methodology for allocating the Business Sales Proceeds suffers from two fundamental defects.

4.3    <u>First</u>, Kinrich does not actually perform a valuation of what was owned and/or relinquished by the Licensed Participants. Kinrich indicates that his mandate was "to determine the value relinquished by each of the Nortel entities…"[34] He states that he "determine[s] the value relinquished by the Debtor Groups by applying generally accepted principles of valuation."[35]

Kinrich states that "[a] DCF [discounted cash flow] analysis is a standard valuation technique that applies a discount rate to the expected cash flows from an asset over time to obtain the present value of cash flows from an asset." [36] However, he undertakes no such valuation analysis whatsoever. As can be observed from Table 3, Kinrich's "valuation" is simply a calculation that shares the Sale Proceeds based on 2009 revenues.

The strength of a DCF approach is that it addresses various essential underlying elements of value.  In our view, the approach adopted by Kinrich is inappropriate as it does not address the following:

a)    <u>Cash flows</u> – It is a fundamental cornerstone of valuation theory that value is a function of anticipated future cash flows.  Revenues are not a proxy for cash flows.  The ability of a company, or a division, to generate revenue is not indicative of its ability to generate cash.  In many cases, Nortel's carve out income statements, which represent the financial performance of a Line of Business as if it had operated on a stand-alone basis, show losses;[37]

---

[34] Kinrich Primary Report, at 1.
[35] Kinrich Primary Report, at 11.
[36] Kinrich Primary Report, at 43.
[37] NNI_00577735.

b) Expected future cash flows – Revenues by entity, at a point in time for businesses in various stages of decline or growth, are not a proxy for future income generating capability. For example, Kinrich aggregates the CDMA business and the LTE business. However, the CDMA business was generating revenues in 2009, predominantly in the US.[38] In contrast, the LTE business,[39] was not generating material revenue. The revenue shares of each of the Nortel Debtors for the CDMA business in 2009 is therefore an inappropriate proxy for relative discounted future cash flows associated with the combined CDMA and LTE business lines; and

c) Risk – To determine the value of the assets relinquished by each Nortel Debtor, it would be necessary to employ a discount rate reflective of the risk to each geographic market.

Revenue is not a proxy for the underlying character, quality and profitability, sustainability and other attributes of a business. By allocating the Sales Proceeds based on revenue only, Kinrich ignores all of these factors.

4.4    Kinrich's "valuation" of the assets relinquished in the Business Sales is demonstrated in Table 3, below. It is clear there is no valuation work done but simply a mathematical calculation distributing the Business Sales Proceeds to the Nortel Debtors based on relative 2009 revenues.[40]

---

[38] Kinrich attributes 90.8% of the CDMA/LTE proceeds to the US based on 2009 revenues. See Kinrich Primary Report, at Exhibit 9.

[39] The LTE business was the global next generation replacement for CDMA and GSM and it is therefore reasonable to assume that it represented a significant share, if not a majority of the Sales Proceeds.

[40] Kinrich considers other methods which are simply variations on this approach. See also Kinrich Primary Report, at Exhibits 4 and 8.

| US$ millions | Revenue by jurisdiction and share of total | | | | Sales Proceeds | Proceeds allocated on 2009 revenues | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Canada | EMEA | US | Total | | Canada | EMEA | US | Total |
| **Table 3 — Demonstrative Recreation of Kinrich Business Sales "Valuation"** | | | | | | | | | |
| CDMA and LTE | 80 | 49 | 1,268 | 1,397 | | 5.7% | 3.5% | 90.8% | 100% |
| | 5.7% | 3.5% | 90.8% | 100% | 1,053 | 60 | 37 | 956 | 1,053 |
| Enterprise | 133 | 429 | 1,098 | 1,660 | | 8.0% | 25.8% | 66.1% | 100% |
| | 8.0% | 25.8% | 66.1% | 100% | 843 | 68 | 218 | 558 | 843 |
| MEN | 215 | 236 | 395 | 846 | | 25.4% | 27.9% | 46.7% | 100% |
| | 25.4% | 27.9% | 46.7% | 100% | 631 | 160 | 176 | 295 | 631 |
| CVAS | 96 | 146 | 370 | 612 | | 15.7% | 23.9% | 60.5% | 100% |
| | 15.7% | 23.9% | 60.5% | 100% | 140 | 22 | 33 | 85 | 140 |
| GSM | 20 | 211 | 361 | 592 | | 3.4% | 35.6% | 61.0% | 100% |
| | 3.4% | 35.6% | 61.0% | 100% | 106 | 4 | 38 | 65 | 106 |
| MSS | 5 | 150 | 90 | 245 | | 2.0% | 61.2% | 36.7% | 100% |
| | 2.0% | 61.2% | 36.7% | 100% | 46 | 1 | 28 | 17 | 46 |
| | | | | | | 315 | 532 | 1,977 | 2,824 |
| Next Gen and Layer 4-7 | | | | | | | | | 24 |
| Kinrich conclusions (Exhibit 33, excluding Nortel Networks de Colombia) | | | | | | 338 | 514 | 1,993 | 2,848 |

4.5 <u>Second</u>, Kinrich assumes that an allocation of the Sales Proceeds based on revenue equates to the value relinquished by each Debtor Group. In the section entitled "Valuation Principles", Kinrich states that the "sales of the Lines of Business and the Patent Portfolio required the Debtor Groups to relinquish their economic interests … [and the proceeds from the sales] should be distributed according to the relative economic value relinquished by each Debtor Group".[41] However, valuation principles are not the same as allocation principles. Valuation principles only value what an owner owns – nothing more. Kinrich conflates valuation with allocation. Indeed, in the section entitled "Basis for Determining Value Relinquished by the Debtor Groups", Kinrich incorporates a "simplified example" to allegedly illustrate his methodology with the statement "<u>all else being equal</u>, the value relinquished by each of the subsidiaries in the sale can be derived using the same <u>income multiple</u> that was applied to the entire firm."[42] (emphasis added). As discussed above and in Section 3, this assumption is not appropriate; the contractual rights and opportunities that the respective Nortel Debtors had with respect to the IP were not equal.

---

[41] Kinrich Primary Report, at 11.
[42] Kinrich Primary Report, at 13.

**Rockstar Transaction Proceeds**

4.6    Kinrich's methodology for allocating the Rockstar Transaction Proceeds suffer from six fundamental defects which result in a material overstatement of those proceeds being allocated to the US and EMEA Debtors.

4.7    First, the value associated with the field of use licenses held by the Licensed Participants was substantially realized in the Business Sales. The Rockstar Transaction proceeds were attributable substantially to rights in the patents outside of the licensed field of use.  Accordingly, the proceeds of the Rockstar Transaction should be allocated entirely, or almost entirely, to NNL.

4.8    Second, Kinrich did not value the licenses relinquished by the Licensed Participants in the Residual Patents. Rather, Kinrich allocated the Rockstar Transaction Proceeds based on the assumption that substantially all of the value of the Residual Patents belonged to the Licensed Participants. His analysis in this regard is circular and does not constitute a valuation at all.

4.9    Kinrich purports to apply a DCF (discounted cash flow) approach to allocate the Rockstar Transaction Proceeds.  A DCF uses two inputs; (1) cash flow and; (2) discount rate. Based on these inputs, one output (value) is obtained. Kinrich simply "infers" (i.e., plugs) a discount rate so as to ensure that the resulting value from the DCF equals the purchase price paid for the Residual Patent Portfolio.[43]

4.10    Kinrich justifies his "inferred" discount rate with reference to the median weighted average cost of capital ("WACC") for communications equipment companies reported by Ibbotson in June 2011. However, he recognizes that the hypothetical Nortel licensing business (IPCo) would not have been a communications equipment manufacturer.[44]    The risk, and discount rates, associated with ownership of the Residual Patent Portfolio are wholly different to the risk of operating an equipment manufacturer. Further, the WACCs used are generally for very strong businesses with long-run anticipated profits and cash flows. Accordingly, the median WACC does not provide any justification for the discount rate "inferred" in the Kinrich Primary Report.

4.11    Kinrich states that "we know the projected cash flows",[45] referring to a study by Global IP.  This might suggest these cash flows are essential to his conclusion. However, they are effectively irrelevant because the end result was pre-determined.  Rather, what Kinrich performs is nothing more than a calculation of the share of the proceeds to the Nortel Debtors based on the geographic shares

---

[43] Kinrich Primary Report, at 60.
[44] Kinrich Primary Report, at 59.
[45] Kinrich Primary Report, at 58-59.

of the cash flows set out in the Global IP study.  The analysis in this regard is circular and does not constitute a valuation at all.

4.12  <u>Third</u>, as discussed in Section 3, the Licensed Participants had licenses to make, use and sell Products. The purchasers of the Lines of Business received licenses to and assignments of patents and other technology that enabled them to carry on the business sold.  Accordingly, the full value of the licenses held by the Licensed Participants were realized in the Business Sales and the Business Sales Proceeds subsumed, in their entirety, the value of the Surrendered Licenses, as discussed in further detail in paragraphs 6.60 to 6.65 of the Britven Primary Report.

4.13  <u>Fourth</u>, the IPCo model, if it were to have been implemented by Nortel, would have exposed Nortel to the risk of counterclaims as well as adverse customer repercussions.[46]  This risk was eliminated by severing the Rockstar assets from the operating businesses and selling those assets to the Rockstar Consortium. Further, the consortium members that acquired the Residual Patents would collectively have been willing to pay more for the portfolio than any one individual buyer of the portfolio would have been willing to pay.  This "consortium effect" served to increase the selling price of the portfolio.  Kinrich's use of the IPCo model does not account for these factors.

4.14  <u>Fifth</u>, Kinrich concludes that the fact that most of Nortel's patents were registered in the United States means the value relinquished by the US Debtors was greater than that relinquished by the other Debtor Groups.[47]  The fact that the Residual Patents were registered in the US is of no relevance whatsoever to the allocation of the Rockstar Transaction Proceeds as these patents were owned by NNL and not the Licensed Participants.

4.15  <u>Sixth</u>, Kinrich inappropriately excludes any value associated with patents registered in China, relying on the opinion of Zenkich. Our further comments on the Zenkich Primary Report are discussed below.

---

[46] This appears to have been a controversial strategy at Nortel. See, e.g., Exhibit 22103 (Deposition of John Veschi).
[47] Kinrich Primary Report, at 39-40.

# 5.0  Further Comments on Zenkich Primary Report

5.1    Zenkich opines that in "2009-2010, the market would have generally ascribed little to no value to Chinese patents on the open market."[48] We do not agree with this.

5.2    For the reasons set out below Nortel's Chinese patents and patent applications are likely to be more valuable than the Zenkich Primary Report implies.

5.3    First, it should be noted that Zenkich's analysis is based largely on assumptions and studies regarding the market for Chinese patents in general and not specific to Nortel. Zenkich's opinion does not consider the value attributed by potential buyers of the Chinese patents and patent applications in the Residual Patent Portfolio.

5.4    Second, it is unlikely that Nortel would have dedicated any resources to acquiring patent rights in China if the open market "ascribed little to no value" to these patents.  Instead, the evidence we have seen indicates, and it is logical to think, that Nortel believed there was value in pursuing patents in China. Indeed, Nortel's practice was to be selective about the inventions for which Nortel would seek patent protection "and selective in pursuing international patent protection for its patents, as such protection is relatively costly".[49] As a result, Nortel sought more "bang for the buck" when seeking patent coverage outside the U.S.[50] While Nortel typically filed patent applications for patentable inventions in the U.S., Nortel's IP Group had primary responsibility to select the most important patents from among those for additional filings, and then to decide in which additional countries they would be filed.[51]

5.5    Third, the fact that Nortel retained a significant number of patents in the Residual Portfolio registered in China despite a sustained patent culling effort suggests that its Chinese patents had value. Beginning in 2003, Nortel began culling its patent portfolio (i.e., abandoning patents) to save money.[52]  Nortel increased culling in each year from 2004 until the practice ceased in 2008 at John Veschi's request.[53]  In 2007, a PowerPoint presentation stated that the numbers of issued

---

[48] Zenkich Primary Report, at 2.

[49] See, e.g., Deposition of Angela Anderson (October 31, 2013), at 22:24-24:6, 25:18-25:24, 27:9-27:17, 29:9-29:24, 35:7-35:13, and 94:24-95:3; Deposition of Chris Cianciolo (October 15, 2013), at 127:7 – 127:22. See also: Malackowski Primary Report, at 18.

[50] Deposition of Angela Anderson (October 31, 2013), at 29:9-29:24.

[51] Malackowski Primary Report, at 19.  See also Deposition Exhibit 31304; Deposition Exhibit 21447; and Deposition of Angela DeWilton (November 20, 2013), at 62:10 – 74:6.

[52] NNC-NNL06651440, at Slides 2, 9-11, 13, 15, 17, 18, 33, and 35.

[53] Deposition of John Veschi (November 7, 2013), at 86:18-87:14, and Exhibit 22101.

foreign patents and foreign applications, among others, had been in decline for years due to this culling and also from lower filing rates.[54]

5.6    In all, Nortel's patent portfolio included 338 Chinese patents and patent applications.  All of these patents and patent applications not only survived the standards for patenting inventions outside the U.S., but they also survived Nortel's culling process.  Sixty-seven of the 338 Chinese patents and patent applications were designated as High or Highest Interest in the analyses that were apparently prepared for Nortel upon which Zenich relies.[55]

# 6.0    Further Comments on Malackowski Primary Report

6.1    For purposes of our comments on the Malackowski Primary Report, we will separately address each of the following:

- Foundational bases of the Malackowski Primary Report;

- Methodology and assumptions employed in valuing IP in the Business Sales and the Rockstar Transaction; and

- Methodology and assumptions employed in allocating the value of IP in the Business Sales and Rockstar Transaction to the various Debtors.

**Foundational bases of report**

6.2    Malackowski puts a value on the IP in the Business Sales and Rockstar Transaction and then allocates the value between the Nortel Debtors using two approaches: (i) the license approach; and (ii) the contribution approach.

Both approaches are based on assumptions regarding the ownership of the NN Technology that are inconsistent with the terms set forth in the MRDA.  If our understanding of those terms is correct, both allocations would substantially overstate the value allocated to the Licensed Participants in the Malackowski Primary Report.

6.3    Malackowski's contribution approach is flawed for multiple reasons.  Most significantly, Malackowski uses a proxy for contribution rather than the actual contribution.  The proxy used is flawed in that it assumes (i) each dollar of R&D spending creates an equal amount of value when there is no basis for this assumption; and (ii) regardless of when the funds were spent, they produce the

---

[54] NNC-NNL06651440, at Slide 10.  See also Slides 9-11, 13, 15, 17, 18, 33, and 35; and NNC-NNL11737781 (identifying specific patents that should not be culled).
[55] See NNC-NNL06139434.

same future value as of the Valuation Date.  These flaws are discussed in more detail in paragraph 6.15.

**Methodology and assumptions employed in <u>valuing</u> IP in the Business Sales and the Rockstar Transaction**

6.4    In addition to the above foundational concerns, we disagree with certain assumptions made, and aspects of the methodology employed, in the Malackowski Primary Report which make the conclusions neither meaningful nor reliable.

6.5    The Malackowski Report includes three IP valuations: two valuations associated with the Business Sales ("defensive" and "synergistic" values),[56] and one valuation associated with the Rockstar Transaction. [57]    Each of the three valuations includes many assumptions and the methodology used in each is different.

6.6    We do not concur with Malackowski's valuations for the reasons set out below, among others.

When discussing the value of Nortel's IP, Malackowski claims that the buyer's intent is relevant,[58] yet he does not consider the PPAs which the buyers prepared in connection with the Business Sales, reflecting their view of value.  He speculates as to the buyers' intent, with no reference to any sources.

Malackowski's valuation results fall well below the notional purchaser value placed on those same assets contemplated in the PPAs.  More specifically, the conclusion in the Malackowski Primary Report was less than the PPA values by more than $375 million, and $900 million for the IP in the Business Sales and Rockstar Transaction, respectively.  This disparity calls into question the credibility of the many assumptions used as inputs (or as characterized by Malackowski, a "series of decisions") as well as the results of the Malackowski Residual Patent valuation.

---

[56] Malackowski Primary Report, at 25-30.

[57] Malackowski Primary Report, at 31-38.

[58] Malackowski Primary Report, at 20, 24 and 27. ("The Residual Patent buyer intends to demand royalties from a wide range of market participants. I have therefore calculated the revenue that can be generated from such a licensing campaign around the world.") Malackowski Primary Report, at 20 ("I am not aware of any evidence that the buyers in the Nortel Business Sales intended to engage in an offensive licensing campaign across all industry participants equivalent to what the Rockstar Consortium is doing with the Residual Patent portfolio. As such, I have not based my valuation of the IP sold in the Business Sales on the licensing revenue obtainable from the industry as a whole.") Malackowski Primary Report, at 24.

6.7     Malackowski inappropriately used royalty rates in both "defensive" and "synergistic" Business Sales IP valuations that did not match the underlying IP in those Business Sales.[59]

6.8     The revenue base against which royalties are applied in Malackowski's "defensive" IP valuation represents "the forecasted revenue generated from products embodying the IP. The inputs used to calculate this royalty base, included: 1) forecasted financial information found from the Nortel "deal books" prepared as part of the sales process, including historic income statements and historic balance sheets and, 2) the expected growth rates of each Nortel business."[60] These are not the revenues that the Licensed Participants would have experienced at the valuation date.  They reflect the "safe hands" assumption and the benefit of the circumstances of the notional buyer.

6.9     As discussed in respect of the Kinrich Primary Report in Section 4.0, above, the IPCo model, if it were to have been implemented by Nortel, would have exposed Nortel to the risk of counterclaims as well as adverse customer repercussions. Further, in the course of the attempted restructuring, the Debtors and their stakeholders were not willing to pursue this strategy, presumably for valid business reasons.

**Methodology and assumptions employed in <u>allocating</u> the value of IP in the Business Sales and Rockstar Transaction to the various Debtors**

*The Contribution Method of Allocation*

6.10    After evaluating the license and contribution approaches, Malackowski concludes that "Having considered all of these potential allocation methodologies, it is my opinion that a Contribution Approach that considers R&D spending….is the most appropriate approach."[61]

6.11    The contribution approach disregards the terms and conditions set forth in the MRDA.  Therefore, Malackowski's contribution approach is not reflective of the assets owned and/or relinquished by the MRDA Participants.

6.12    Setting aside whether the contribution approach is an appropriate framework for determining entitlement to proceeds attributable to IP, Malackowski's particular approach to measuring contribution has several flaws, some of which are discussed below.

---

[59] Malackowski Primary Report, at 28.
[60] Malackowski Primary Report, at 25.
[61] Malackowski Primary Report, at 54.

6.13    Malackowski himself acknowledges that contribution should be an ex-post measure of which entities contributed to the IP and in what measure – and we agree:

> Ideally, the contributions of the RPE's labs to the development of the patented technologies could be fully and accurately determined by interviewing all of the firm's R&D staff, and by reviewing all of the documentation related to the firm's research…This process would allow one to determine where the conception of each invention occurred, what resources and data led to the conception of the inventions, and what resources were used to reduce each invention to practice.[62]

He also acknowledges that he cannot calculate the actual contributions to the IP. We agree with Malackowski that this approach is not possible for Nortel's IP due to the size of the portfolio, the limitations on time and the availability of information.

6.14    Malackowski ultimately chooses a proxy based on historical R&D spend over selective time periods.  More specifically, his proxy generally[63] measures the relative undiscounted cumulative total R&D expense borne by each MRDA Participant over some historical period.  For the Business Sales, Malackowski measures the relevant period to compute this sum by identifying the oldest unexpired patent transferred in each Business Sale, and then setting the R&D summation period equal to the year before that patent was issued through 2008. For the Residual Patents, Malackowski's considers four different R&D spending periods, which he concludes generate largely similar relative R&D shares. Malackowski's contribution calculation periods with respect to the Business Sales cover a period of 10 to 20 years ending in 2008.[64]

6.15    Malackowski's R&D-based proxy is unsuitable.  He acknowledges that an optimal measure of contribution would focus on the output of the R&D process[65] and R&D expense is an input measure, not an output measure.

Using the R&D based proxy also assumes that every dollar of R&D was equally productive (or unproductive), regardless of where it was spent, or how long ago the dollar was spent.

---

[62] Malackowski Primary Report, at 39.

[63] We understand that Malackowski acknowledges and assigns an allocation of IP value to certain entities outside of the MRDA.  This description is intended to capture the general nature of the Malackowski contribution calculations in order to assist the reader in understanding this commentary.

[64] Malackowski Primary Report, at 48.

[65] Malackowski Primary Report, at 40.

We understand that, to the extent that Nortel treats R&D dollars as fungible in the MRDA, it is on the basis that the income or loss is also redistributed according to the RPSM formula contained in the MRDA[66] (particularly because we understand the development of the MRDA took several years).[67]  One cannot assume that Nortel would have treated R&D dollars as fungible if one were going to share the economic burdens differently.

6.16    Malackowski's proxy implicitly assumes that, regardless of when the funds were spent, they produce the same future value as of the Valuation Date.  Put another way, he assumes that a dollar spent two years ago has the same future cash flows as a dollar spent twenty years ago.

The value of Nortel's IP is based upon the cash flows that it could generate in the *future*.  One would expect that R&D spent very early in the lookback periods used by Malackowksi, if productive, would have led to patents with shorter remaining lives than R&D spent later in the period.  This means that, all else being equal, older R&D is less valuable than newer R&D.  Malackowski's contribution measure does not reflect any differentiation in the value of R&D based upon age.  One would expect that this failure would tend to overstate the relative value of older R&D to the detriment of the relative value assigned to newer R&D.  Such a bias would work to the benefit of the EMEA and US Debtors given that their portion of total Nortel R&D expenses declined over time.

6.17    Using an output-based proxy, we show the results of an analysis based on the location of inventors listed on the patents compared to the Malackowski R&D contribution calculation.

---

[66] While Malackowski cites Nortel's use of the RPSM as support for the R&D Spend Basis, he then chooses not to use the RPSM methodology (which included a five-year look back period), to which all Participants agreed by entering into the MRDA.

[67] We understand that the MRDA was negotiated, developed and agreed to and approved after years of work by knowledgeable Nortel personnel, tax authorities in multiple jurisdictions and sophisticated outside advisors.

While we do not believe the inventor based proxy is determinative,[68] it is at least as informative as Malackowski's R&D-spend proxy, and produces a substantially different outcome for Canada and the US, as seen in the Table 4, below.

| Table 4 | | | |
|---|---|---|---|
| **All Patents/Applications**<br>**(Business Sales and Rockstar Transaction)** | | | |
| **CAN** | **US** | **EMEA** | **Other** |
| Based on Inventor Analysis: | | | |
| Business Sales[69] | 49.3% | 28.3% | 21.8% | 0.6% |
| Rockstar Transaction[70] | 51.3% | 28.9% | 18.2% | 1.6% |
| Total | **50.8%** | **28.7%** | **19.2%** | **1.3%** |
| Based on Malackowski R&D Contribution | **39.6%** | **43.2%** | **17.2%** | **N/A** |

Furthermore, our analysis shows that 13 of the top 15 most prolific inventors are located in Canada.

6.18    Malackowski inappropriately captures the value of IP obtained through acquisitions rather than developed internally by Nortel.

The License Approach to Allocation

6.19    As noted earlier, Malackowski's licensing approach to allocation suffers from the same foundational shortcomings described earlier in this section.    These shortcomings result in a conclusion that, in their exclusive territories, effectively 100 percent of the value of patents/applications was attributable to Licensed Participants as de facto owners of Nortel's NN Technology.

---

[68] We understand that all inventors, at least for patents in the US, are required to be listed on each patent. This accounts for the collaborative nature of the R&D efforts and allows inventions to be traced to geographies as each inventor receives credit for his or her contribution to the invention.    However, an analysis of the patents based on the location of inventor does not reveal the relative contributions of each inventor or others, the amount and source of funding for each invention, or the ultimate value of each invention claimed in each patent and in all of the patents in the Residual Patent portfolio.

[69]    NNC-NNL06001801 / 12-34 (CDMA); NNC-NNL06001637 / 32-47 (CVAS); NNC-NNL06002603 / 49-52 (MSS); NOR_55401542 at A-25-A-29 (GSM); NNC-NNL06002086 / 43-84 (ES); NNC-NNL06002189 / 200-236 (MEN); NNC-NNL06002623 / 11-12 (Layer 4-7).    Inventor information was pulled from Cardinal IP; uspto.gov; and internet searches.

[70]    GIP_Nortel_00063462; Inventor information was pulled from Cardinal IP; USPTO.gov; and internet searches.

6.20    In addition, in the context of the Licensed Participants' non-exclusive licenses, the Malackowski Primary Report claims that the ability of non-exclusive licensees to "hold up" the Business Sales and the Rockstar Transaction necessitates an equal sharing of IP proceeds related to those territories.[71]    As discussed in Section 3, this approach fails to give appropriate consideration to NNL's exclusive IP enforcement rights in the non-exclusive territories or to the fact that any of the parties to the MRDA, including NNL, could have held up the transactions.

6.21    Furthermore, Malackowski allocated no value to NNL for its exclusive IP enforcement rights in non-exclusive territories.[72]    As described in Section 3 above, this is not correct.

# 7.0    Further Comments on Huffard Primary Report

7.1    Huffard adopts wholesale Malackowski's allocations associated with IP value under the license approach and the contribution approach.    All of the critiques associated with Malackowski's analysis under those approaches are thus also applicable to Huffard's allocation conclusions associated with IP.

7.2    IP value was determined in accordance with the Purchase Price.    Huffard's determination of the value of the categories of assets that he identifies can be summarized as follows:

- Tangible net assets: Net Book Value;

- IP: Based on Malackowksi's analysis; and

- Customer Relationships and Goodwill: Treated as a single category, determined as the residual amount once estimated tangible net asset value and estimated IP value are deducted from the relevant Business Sale or Rockstar Transaction proceeds.

Since Huffard uses a residual approach to determine the value of any intangibles other than IP, non-IP intangibles are incorrectly valued to the extent of any error in valuation of the IP. Factors that contribute to valuation errors in Malackowski's IP analysis are discussed in Section 6 above.

---

[71] Malackowski Primary Report, at 51.  See also, Huffard Primary Report, at 50.  We note that claims of holdup are inconsistent with the Debtors actual behavior and have nothing to do with the underlying value of the assets transferred.

[72] Malackowski Primary Report, at 51.

7.3    In describing intangibles other than IP, Huffard writes that one "important group of Intangible Assets was Nortel's Customer-Related Assets, which was comprised of (i) Nortel's Customer Relationships, and (ii) Nortel's sales, distribution and customer-support infrastructures that enabled the distribution of products to customers."[73] The only other type of intangible discussed by Huffard is Goodwill.  Huffard states that "In most cases involving the purchase of a going concern, there is generally additional residual value in an enterprise in excess of specifically identifiable Tangible or Intangible Assets.  This residual value is generally defined for accounting purposes as 'Goodwill.'"[74]  Huffard does not provide any characterization of what might create goodwill.  Huffard does not attempt to directly value the customer-related assets independently.  Rather, Huffard places a single value on customer-related assets and Goodwill jointly. Huffard writes that "the value of the Customer-Related Assets and Goodwill should be allocated across the Nortel Debtors based on the value transferred by each entity."[75]  When Huffard turns to the question of allocation of the value assigned to this category, he uses relative 2008 revenues within each business line as the allocation key.

a)    Given the lack of characterization of goodwill (or the separate identification of goodwill value relative to customer asset value), the use of revenue to allocate this aggregated category of intangibles is not well motivated.  Given the characterization of goodwill as simply "residual value in excess of identifiable intangible or tangible assets," no rationale is offered for choosing revenue as a proxy for the value transferred by each entity.

b)    Revenue would not be a sensible allocation factor for certain components that typically contribute to goodwill.  Paragraph 6.46 of the Britven Primary Report discusses typical components of goodwill.  Many of the potential components (including components explicitly discussed by the purchasers in their PPAs) would not be allocable on a revenue basis.

For example, proceeds attributable to synergies between the acquirers' existing technology and the purchased technology relates to the attributes of the buyer, not Nortel,[76] and would logically be allocated to the owner of the technology sold.  Proceeds attributable to assembled workforce would logically be allocated to a different owner, their employers.  An allocation based on revenue does not achieve either and has no relevance to this.

---

[73] Huffard Primary Report, at 32.
[74] Huffard Primary Report, at 34.
[75] Huffard Primary Report, at 51.
[76] Britven Primary Report, at 33-34.

c) When Huffard addresses IP allocation, he considers two frameworks – the license approach and the contribution approach. Huffard writes:

> *"allocating the IP portion of the Sale Proceeds in accordance with relative contribution…is also consistent with the legal rights of the RPEs, as articulated in the position papers submitted by the EMEA debtors, including the principle that parties who have participated jointly in the creation of IP obtain, by operation of law, a beneficial ownership interest measured by their respective contributions to the creation of the IP."*[77]

Huffard does not consider two approaches when allocating customer asset and goodwill value. There is only one approach, and that approach is based on relative 2008 revenues. Based on the principle stated above (which we understand to motivate the contribution approach) it would seem reasonable to assume that the contribution approach would also require a separate determination of contributions to customer assets and goodwill. Huffard does not appear to undertake any such analysis. Under Huffard's approach to allocating proceeds attributable to customer assets and goodwill, for example, NNL is assigned only its revenue share. Under the cited principles referenced by Huffard, one would think that NNL should receive an allocation of customer assets and goodwill Value in consideration of NNL's significant contributions to customer relationships in excess of their realized revenue.

The use of revenue as an allocation factor gives no recognition to these contributions.

7.4 The valuation analyses of Malackowski and Huffard disregard the PPA analyses conducted by the purchasers in the business transactions.

7.5 Huffard states that the PPAs prepared by the buyers are not reliable as they are likely to have been motivated by their own individual tax and accounting circumstances.[78] In our view, the PPAs contain information that is relevant, reliable and meaningful to the valuation of the assets transferred to the purchasers in the Business Sales. While we understand that there are limitations associated with the PPAs, we concluded that the PPAs are relevant for the following reasons[79] among others:

- The PPAs were contemporaneously prepared in the ordinary course for reasons unrelated to the matter at hand;

---

[77] Huffard Primary Report, at 47.
[78] See Huffard Primary Report, at 37.
[79] These points were contained in the Britven Primary Report, at 27-28 and are repeated here to assist the reader.

- While prepared by the purchasers, PPAs are an objective assessment of value based on a standard definition of value;[80]

- The assumptions and calculations underpinning the PPA are signed off by the purchasing company's independent auditors in their quarterly and annual audit process; and

- The resulting values are objective measures and are not specific to the actual acquirer.  Rather, they represent the value to a notional acquirer.

## 8.0  Further Comments on Bazelon Primary Report

8.1  The Bazelon Primary Report essentially ignores the MRDA for purposes of the methodology underlying its conclusions.

8.2  Specifically, the Bazelon Primary Report states that the MRDA was "developed to ensure that the company was in compliance with tax requirements" and, "many of Nortel's senior managers were only barely aware of the existence of the MRDA".[81]  Bazelon states that, accordingly, the Ownership approach[82] "relies on certain assumptions, including concerning the ownership interests of NNL as compared to those of the RPEs".[83]

8.3  Our 'assumption' as to legal ownership is premised on NNL being the owner of the NN Technology and on the licenses granted under the MRDA.

8.4  We interpret the general principles of the Bazelon Primary Report to be broadly consistent with those reflected in the CCC's Alternative Pro Rata approach.

## 9.0  Further Comments on Green Primary Report

9.1  As discussed in Section 3, the Green Primary Report adopts essentially identical assumptions as to the terms of the MRDA to that which we adopted in the Britven Primary Report.

9.2  In our view, Green's treatment of certain asset categories, such as customer relationships, may understate the value of the assets surrendered by the Licensed Participants in the Business Sales.  His treatment of other asset categories, such as net tangible assets, may overstate the value of surrendered

---

[80] "Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC")," FASB.org (accessed via: https://asc.fasb.org/glossarysection&trid=2155951&id=SL7493721-110254).
[81] Bazelon Primary Report, at 24.
[82] Which Bazelon refers to as the Legal Title Approach.
[83] Bazelon Primary Report, at 24.

assets.    However, Green's conclusions regarding the value of assets surrendered, in aggregate, by each of the Nortel Debtors are similar to our conclusions.

# 10.0 Comparative Analysis Summary

10.1    In the Britven Primary Report, you asked us to compute the share of Sales Proceeds for each Nortel Debtor Group and the implied recoveries for each Key Creditor Group (measured as a percentage of the estimated amounts claimed) based on the various positions of the Core Parties.  We were unable to respond to this question due to incomplete information regarding the manner in which the other Core Parties would apply the principles articulated in their allocation pleadings.

10.2    With the information now available to us from the Allocation Reports, you have asked us to now respond to the above question.

10.3    The allocation of proceeds between the Nortel Debtor Groups in each Allocation Report is set out on Schedule 1 and summarized in Table 5.[84]

For ease of reference, we have also included the allocation of proceeds determined in the Britven Primary Report under the Ownership approach and under the Alternative Pro Rata Allocation approach:

| Table 5 Allocation of Proceeds Among the Nortel Debtor Groups set out in each Allocation Report[85] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Pleading party | CCC | Canadian Debtors and Monitor | US Interests | EMEA Debtors | | UK Pension | CCC Alternative Pro Rata |
| | | | | License Approach | Contribution Approach | | |
| Author | Britven | Green | Kinrich | Malackowski / Huffard | | Bazelon | |
| | "Field of Use" approach | | "No Field of Use" approach | | License terms not relevant to approach | | |
| Canada | 5,805 | 6,070 | 772 | 834 | 2,318 | 5,067 | 5,067 |
| US | 1,009 | 1,031 | 5,304 | 4,200 | 3,637 | 182 | 182 |
| EMEA | 488 | 236 | 1,226 | 2,247 | 1,325 | 2,054 | 2,054 |
| | 7,302 | 7,337 | 7,302 | 7,281 | 7,280 | 7,302 | 7,302 |

---

[84] Our computations are premised on the quantitative allocation conclusions set out in the Allocation Reports and, in respect of the Bazelon Primary Report, our understanding of that party's position on allocation.  To the extent that the parties revise those positions, or our interpretation is incorrect, our computations are subject to change.

[85] All figures in Table 5 are in millions of US dollars.  The total proceeds allocated by Green and Malackowski/Huffard differ slightly from the other reports.  This has no material impact on the ultimate recoveries by the Key Creditor Groups.

10.4   We interpret the general principles of the Bazelon Primary Report to be consistent with those set forth in the CCC's alternative allocation position.

For this reason, and because Bazelon does not provide any estimates of allocation under those principles, we have assumed that allocation under Bazelon's analysis would match those reflected in the CCC Alternative Pro Rata Allocation computed in the Britven Primary Report.

10.5   Following from the above, the implied resulting percentage recoveries by each Key Creditor Group is set out in Table 1, which is repeated below:

| Table 1 Resulting Percentage Recovery by Each Key creditor Group | | | | | | | |
|---|---|---|---|---|---|---|---|
| Pleading party | CCC | Canadian Debtors and Monitor | US Interests | EMEA Debtors | | UK Pension | CCC Alternative Pro Rata |
| | | | | License Approach | Contribution Approach | | |
| Author | Britven | Green | Kinrich | Malackowski / Huffard | | Bazelon | |
| | "Field of Use" approach | | "No Field of Use" approach | | License terms not relevant to approach | | |
| Guaranteed Bondholders | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 71.2% | 71.2% |
| US creditors | 95.0% | 100.0% | 100.0% | 100.0% | 100.0% | 71.2% | 71.2% |
| Canadian creditors | 58.7% | 61.2% | 10.6% | 11.4% | 25.4% | 71.2% | 71.2% |
| EMEA creditors | 26.5% | 19.3% | 47.5% | 76.7% | 50.4% | 71.2% | 71.2% |
| UK Pension Trust | 43.7% | 37.2% | 50.7% | 79.4% | 57.8% | 71.2% | 71.2% |
| | | | | | | | |
| Undistributed cash[86] | n/a | $111m | $1,304m | $248m | $536m | n/a | n/a |

10.6   For the purposes of ensuring a meaningful comparison of the effect of the allocation positions, we have adopted a common set of assumed claims by creditors against each Nortel Debtor Group and assumed treatment of the inter-estate claims or guarantees as described more fully in the Britven Primary Report at page 18.[87]   We understand that the CCC has made efforts to obtain updated

---

[86] The Undistributed Cash amounts indicated on Table 1 arise because the positions in those Allocation Reports attribute more sales proceeds to the US Debtors than the claims we have assumed exist against the US Debtors.   Accordingly, the distribution of that surplus depends on the outcome of the Courts determination of such claims.

[87] In the Britven Primary Report, the projected Treasury Cash was determined with reference to the cash that existed at December 31, 2013 and the rate of cash burn to that point.  We have since received details of the cash on hand at January 31, 2014 and the rate of cash burn to that point.  To assist the reader we have continued to adopt the figures employed in the Britven Primary Report as the differences are not material to the overall interpretation of the effect of the allocation positions.

information with respect to assets and claims in each jurisdiction but has been unable to do so to date.  Should this data be provided, we reserve the right to update our analysis in this regard.

10.7    Our computations in respect of the Resulting Percentage Recovery by each Key Creditor Group are described in more detail in the Schedules.

# 11.0 Restrictions and Qualifications

11.1    The calculations, factors, perspectives and considerations forming the basis of our opinions and conclusions are made from our vantage point and experience and training as business and intellectual property valuators and restructuring professionals.

11.2    We do not provide an opinion as to the appropriate legal principles to apply in respect of the allocation of the Sales Proceeds.

11.3    To ensure that our opinions and conclusions and the related analysis are clearly communicated in this report, we have focused only on material matters.

We are not aware of any matters we have not considered that would materially alter our opinions and conclusions.

11.4    This report constitutes an Expert Report as defined by the Canadian Institute of Chartered Business Valuators (the "CICBV").

11.5    This report was prepared under the supervision of Thomas Britven with the assistance of other professionals at Duff & Phelps, including Stephen Cole, a senior advisor in the Toronto office of Duff & Phelps.

11.6    This report is not intended for general circulation or publication nor is it to be reproduced or used for any purpose other than that outlined above without our written permission in each specific instance. We do not assume any responsibility or liability for losses occasioned to you or any other party as a result of the circulation, publication, reproduction or use of this report contrary to the provisions of this paragraph.

11.7    In the undertaking of the test of reasonableness, we were limited to the non-public Nortel information that was available in the productions.  We reserve the right (but will be under no obligation) to analyze and/or revise any and all assumptions and/or calculations included or referred to in this report and, if we consider it necessary, to revise our calculations in light of any information which becomes known or available to us after the date of this report.  We also reserve the right to provide additional rebuttal opinions and testimony in this matter, to create demonstratives for use at trial based upon the information contained in this report and attachments, and generally to utilize other graphical depictions as aids in the presentation of our findings.

Yours truly,

Thomas Britven
Managing Director
Duff & Phelps

**CCC - Nortel Networks Corporation**                                                                                                          **Schedule 1**

**Summary of Allocation to the Nortel Debtors and Recovery Percentages Under Each Party's Approach**
*($ MM USD)*

| | | CCC | Canadian Debtors and Monitor | US Interests | EMEA Debtors | | UK Pension Allocation Group | CCC |
|---|---|---|---|---|---|---|---|---|
| | | Ownership Approach | Ownership Approach | Enhanced License | License Approach | Contribution Approach | Pro-Rata | Alternative Pro Rata Allocation Approach |
| | | "Field of Use" approach | | "No Field of Use" approach | License terms not relevant to approach | | | |
| **Author(s) of Expert Report** | | Note 1 | Schedule 2 | Schedule 3 | Schedule 4 Malackowski/ Huffard | Schedule 5 Malackowski/ Huffard | Note 2 | Note 1 |
| | | **Britven** | **Green** | **Kinrich** | **Huffard** | | **Bazelon** | **Britven** |
| **Sales Proceeds allocation to:** | | | | | | | | |
| Canada | | 5,805 | 6,070 | 772 | 834 | 2,318 | 5,067 | 5,067 |
| US | | 1,009 | 1,031 | 5,304 | 4,200 | 3,637 | 182 | 182 |
| EMEA | | 488 | 236 | 1,226 | 2,247 | 1,325 | 2,054 | 2,054 |
| | | 7,302 | 7,337 | 7,302 | 7,281 | 7,280 | 7,302 | 7,302 |
| **Total Assets for Distribution:** | | | | | | | | |
| Canada | | 6,148 | 6,413 | 1,115 | 1,177 | 2,661 | 5,410 | 5,410 |
| US | | 1,753 | 1,775 | 6,048 | 4,944 | 4,381 | 926 | 926 |
| EMEA | | 926 | 674 | 1,664 | 2,685 | 1,763 | 2,492 | 2,492 |
| | | 8,827 | 8,862 | 8,827 | 8,806 | 8,805 | 8,827 | 8,827 |
| | **Assumed Claim Amount** | | | | | | | |
| **Percentage Recovery to:** | | | | | | | | |
| Guaranteed Bondholders  *Note 3* | 4,092 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 71.2% | 71.2% |
| US creditors | 1,300 | 95.0% | 100.0% | 100.0% | 100.0% | 100.0% | 71.2% | 71.2% |
| Canada creditors  *Note 3* | 3,506 | 58.7% | 61.2% | 10.6% | 11.4% | 25.4% | 71.2% | 71.2% |
| EMEA creditors | 500 | 26.5% | 19.3% | 47.5% | 76.7% | 50.4% | 71.2% | 71.2% |
| UK Pension Trust | 3,000 | 43.7% | 37.2% | 50.7% | 79.4% | 57.8% | 71.2% | 71.2% |
| **Undistributed Cash**  *Note 4* | | 0 | 111 | 1,304 | 248 | 536 | 0 | 0 |

*Notes:*
1.   Britven Primary Report, Schedule 1.
2.   The proposed Pro Rata Distribution Model reflected in the Bazelon Primary Report does not explicitly address the treatment of the Treasury Cash, how the allocation of the
      Guaranteed Bondholder claims should be assigned to the Canadian or US Debtors, the treatment of the $2 billion intercompany debt owing from the Canadian Debtors
      to the US Debtors or the treatment of the UK Pension Trust claim against the Canadian Debtors.  Alternate treatment of these items could have very significant impacts on
      the ultimate assets available for distribution by each Nortel Debtor Group and the percentage recovery by each Key Creditor Group.
      For purposes of this chart, we have assumed that the intent is substantially the same as the Alternative Pro Rata Allocation Approach of the CCC.
3.   The percentage recovery may ultimately increase depending on the resolution of the dispute regarding the allocation of undistributed cash. See Note 4.
4.   The additional amount available for distribution to the bondholders and/or Canadian creditors subject to resolution of a dispute on a claim for interest by the Guaranteed Bondholders.

**CCC - Nortel Networks Corporation**                                                                                                  **Schedule 2**

**Comparative Analysis – Computations Under Green Position - Computation of Recovery Percentages**
*($ MM USD)*

***Purpose:***
    The purpose of this schedule is to calculate the recovery rates for the Canadian Debtors and Monitor's Ownership approach.
    The output of this schedule is used in the overall summary schedule of different approaches.

**Assets**

| | Projected Treasury Cash at June 30, 2014, after payment of Secured Claims<br>*Note 1* | Allocation of sales proceeds<br>*Schedule 2.1* | Total Proceeds Allocated | |
|---|---|---|---|---|
| Canada (NNL and subs) | 343 | 6,070 | 6,413 | See Step 2 allocation on next page |
| US (NNI and subs) | 744 | 1,031 | 1,775 | See Step 3 allocation on next page |
| EMEA | 438 | 236 | 674 | See Step 1 allocation on next page |
| | 1,525 | 7,337 | 8,862 | |

**CCC - Nortel Networks Corporation**                                                                                              **Schedule 2**

**Comparative Analysis – Computations Under Green Position - Computation of Recovery Percentages**
*($ MM USD)*

**Purpose:**
    The purpose of this schedule is to calculate the recovery rates for the Canadian Debtors and Monitor's Ownership approach.
    The output of this schedule is used in the overall summary schedule of different approaches.

**Computation of Recovery on Claims**

| | Claims before consideration of guarantees or second claims *Note 2* | Step 1: Settlement of claims in EMEA | Residual claims after EMEA | Step 2: Settlement of claims in Canada | Residual claims after EMEA and Canada | Step 3: Settlement of claims in US – From US Debtor Funds | From Claim against Canadian Estate | Step 4: Total recoveries by third party claimants | Step 5: Percentage recovery on Claims |
|---|---|---|---|---|---|---|---|---|---|
| Creditor claims: | | | | | | | | | |
|   Canada | 3,506 | | 3,506 | 2,146 | - | | | 2,146 | **61.2%** |
|   US | 1,300 | | 1,300 | | 1,300 | 428 | 872 | 1,300 | **100.0%** |
|   EMEA | 500 | 96 | - | | - | | | 96 | **19.3%** |
| Claims subject to a guarantee or second claim: | | | | | | | | | |
|   UK Pension Trust | 3,000 | 578 | 880 | 539 | - | | | 1,117 | **37.2%** |
|   Bondholders | 4,092 | | 4,092 | 2,504 | 4,092 | 1,347 | 241 | 4,092 | **100.0%** |
| | 12,398 | | 9,778 | | 5,392 | | | 8,751 | 70.6% |
| Intercompany claims against: | | | | | | | | | |
|   Canada (NNL and subs) | 2,000 | | 2,000 | 1,224 | | | | | |
| Undistributed cash *Note 3* | | | | | | | 111 | | |
| | | 674 | | 6,413 | | 1,775 | 1,224 | | |

Description of the Steps:

    The same steps described in the Britven Primary Report, Schedule 2 are followed in this schedule.

**Notes:**
1. Britven Primary Report, Schedule 5.
2. Britven Primary Report, Schedule 6.
3. The additional amount available for distribution to the bondholders and/or Canadian creditors subject to resolution of a dispute on a claim for interest by the bondholders.

**CCC - Nortel Networks Corporation**                                                                    Schedule 2.1

**Comparative Analysis – Computations Under Green Position - Summary of Sale Proceeds to Nortel Debtor Groups**
*($ MM USD)*

**Purpose:**

The purpose of this schedule is to present the distribution of Sales Proceeds to each Debtor by asset class under the Canadian Debtors and Monitor's Ownership approach.
The output of this schedule is used in the recovery rate calculation for the Canadian Debtors and Monitor's Ownership approach.

| | Allocated Proceeds | Source | By Nortel Debtor Group | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Canada | | US | | EMEA | |
| | | | % | $ | % | $ | % | $ |
| **Business Sales** | | | | | | | | |
| Tangible Assets | 534 | *Note 1* | 22.8% | 122 | 59.5% | 318 | 17.8% | 95 |
| IP Rights and Customer Relationships | 1,982 | *Note 1* | 71.4% | 1,415 | 23.6% | 468 | 5.0% | 100 |
| In-Place Workforce | 255 | *Note 1* | 30.8% | 79 | 52.8% | 135 | 16.4% | 42 |
| Wholly-Owned Businesses | 111 | *Note 1* | 0.0% | - | 100.0% | 111 | 0.0% | - |
| Sub-total | 2,883 | *Note 1* | 56.0% | 1,615 | 35.8% | 1,031 | 8.2% | 236 |
| **Rockstar Transaction** | 4,454 | *Note 2* | 100.0% | 4,454 | 0.0% | - | 0.0% | - |
| Total | 7,337 | | 82.7% | 6,070 | 14.1% | 1,031 | 3.2% | 236 |

**Notes:**

1. Green Primary Report, at 61.
2. Green Primary Report, at 65.

**CCC - Nortel Networks Corporation**                                                                                                          Schedule 3

**Comparative Analysis – Computations Under Kinrich Position - Computation of Recovery Percentages**
*($ MM USD)*

***Purpose:***
   The purpose of this schedule is to calculate the recovery rates for the U.S. Interests' Enhanced License approach.
   The output of this schedule is used in the overall summary schedule of different approach.

**Assets**

|  | Projected Treasury Cash at June 30, 2014, after payment of Secured Claims *Note 1* | Allocation of sales proceeds *Schedule 3.1* | Total Proceeds Allocated |  |
|---|---|---|---|---|
| Canada (NNL and subs) | 343 | 772 | 1,115 | See Step 2 allocation on next page |
| US (NNI and subs) | 744 | 5,304 | 6,048 | See Step 3 allocation on next page |
| EMEA | 438 | 1,226 | 1,664 | See Step 1 allocation on next page |
|  | 1,525 | 7,302 | 8,827 |  |

**CCC - Nortel Networks Corporation**                                                                                                                    **Schedule 3**

**Comparative Analysis – Computations Under Kinrich Position - Computation of Recovery Percentages**
*($ MM USD)*

**Purpose:**
    The purpose of this schedule is to calculate the recovery rates for the U.S. Interests' Enhanced License approach.
    The output of this schedule is used in the overall summary schedule of different approach.

**Computation of Recovery on Claims**

| | Claims before consideration of guarantees or second claims *Note 2* | Step 1: Settlement of claims in EMEA | Residual claims after EMEA | Step 2: Settlement of claims in Canada | Residual claims after EMEA and Canada | Step 3: Settlement of claims in US — From US Debtor Funds | From Claim against Canadian Estate | Step 4: Total recoveries by third party claimants | Step 5: Percentage recovery on Claims |
|---|---|---|---|---|---|---|---|---|---|
| Creditor claims: | | | | | | | | | |
|   Canada | 3,506 | | 3,506 | 373 | - | | | 373 | **10.6%** |
|   US | 1,300 | | 1,300 | | 1,300 | 1,300 | - | 1,300 | **100.0%** |
|   EMEA | 500 | 238 | - | | - | | | 238 | **47.5%** |
| Claims subject to a guarantee or second claim: | | | | | | | | | |
|   UK Pension Trust | 3,000 | 1,426 | 880 | 94 | - | | | 1,520 | **50.7%** |
|   Bondholders | 4,092 | | 4,092 | 435 | 4,092 | 3,657 | - | 4,092 | **100.0%** |
| | 12,398 | | 9,778 | | 5,392 | | | 7,523 | 60.7% |
| Intercompany claims against: | | | | | | | | | |
|   Canada (NNL and subs) | 2,000 | | 2,000 | 213 | | | | | |
| Undistributed cash *Note 3* | | | | | | 1,091 | 213 | | |
| | | 1,664 | | 1,115 | | 6,048 | 213 | | |

Description of the Steps:

    The same steps described in the Britven Primary Report, Schedule 2 are followed in this schedule.

**Notes:**
1.  Britven Primary Report, Schedule 5.
2.  Britven Primary Report, Schedule 6.
3.  The additional amount available for distribution to the bondholders and/or Canadian creditors subject to resolution of a dispute on a claim for interest by the bondholders.

**CCC - Nortel Networks Corporation**                                    **Schedule 3.1**

**Comparative Analysis – Computations Under Kinrich Position - Summary of Sale Proceeds to Nortel Debtor Groups**
*($ MM USD)*

*Purpose:*

    The purpose of this schedule is to present the distribution of Sales Proceeds to each Debtor by asset class under the U.S. Interests'
    Enhanced License approach.

    The output of this schedule is used in the recovery rates calculation for the U.S. Interests' Enhanced License approach.

| | Actual Proceeds | Source | Canada % | Canada $ | US % | US $ | EMEA % | EMEA $ |
|---|---|---|---|---|---|---|---|---|
| **Business Sales** | 2,848 | *Note 1* | 11.9% | 340 | 70.0% | 1,995 | 18.0% | 513 |
| **Rockstar** | 4,454 | *Note 1* | 9.7% | 432 | 74.3% | 3,310 | 16.0% | 713 |
| Total | **7,302** | | 10.6% | **772** | 72.6% | **5,304** | 16.8% | **1,226** |

*Note:*

1.   Kinrich Primary Report, at 73.

**CCC - Nortel Networks Corporation**                                                                                                    **Schedule 4**

**Comparative Analysis – Computations Under Malackowski/Huffard Position: License Approach - Computation of Recovery Percentages by Nortel Creditor Groups**
*($ MM USD)*

***Purpose:***
The purpose of this schedule is to calculate the recovery rates for EMEA Debtor's License approach.
The output of this schedule is used in the overall summary schedule of different approaches.

**Assets**

| | Projected Treasury Cash at June 30, 2014, after payment of Secured Claims *Note 1* | Allocation of sales proceeds *Note 2* | Total Proceeds Allocated | |
|---|---|---|---|---|
| Canada (NNL and subs) | 343 | 834 | **1,177** | See Step 2 allocation on next page |
| US (NNI and subs) | 744 | 4,200 | **4,944** | See Step 3 allocation on next page |
| EMEA | 438 | 2,247 | **2,685** | See Step 1 allocation on next page |
| | 1,525 | 7,281 | 8,806 | |

**CCC - Nortel Networks Corporation**                                                                                          Schedule 4

**Comparative Analysis – Computations Under Malackowski/Huffard Position: License Approach - Computation of Recovery Percentages by Nortel Creditor Groups**
*($ MM USD)*

***Purpose:***
    The purpose of this schedule is to calculate the recovery rates for EMEA Debtor's License approach.
    The output of this schedule is used in the overall summary schedule of different approaches.

**Computation of Recovery on Claims**

| | Claims before consideration of guarantees or second claims *Note 3* | Step 1: Settlement of claims in EMEA | Residual claims after EMEA | Step 2: Settlement of claims in Canada | Residual claims after EMEA and Canada | Step 3: Settlement of claims in US — From US Debtor Funds | From Claim against Canadian Estate | Step 4: Total recoveries by third party claimants | Step 5: Percentage recovery on Claims |
|---|---|---|---|---|---|---|---|---|---|
| Creditor claims: | | | | | | | | | |
|   Canada | 3,506 | | 3,506 | 401 | - | | | 401 | **11.4%** |
|   US | 1,300 | | 1,300 | | 1,300 | 1,300 | - | 1,300 | **100.0%** |
|   EMEA | 500 | 384 | - | | - | | | 384 | **76.7%** |
| Claims subject to a guarantee or second claim: | | | | | | | | | |
|   UK Pension Trust | 3,000 | 2,301 | 699 | 80 | - | | | 2,381 | **79.4%** |
|   Bondholders | 4,092 | | 4,092 | 468 | 4,092 | 3,624 | - | 4,092 | **100.0%** |
| | 12,398 | | 9,597 | | 5,392 | | | 8,558 | 69.0% |
| Intercompany claims against: | | | | | | | | | |
|   Canada (NNL and subs) | 2,000 | | 2,000 | 229 | | | | | |
| Undistributed cash *Note 4* | | | | | | 20 | 229 | | |
| | | 2,685 | | 1,177 | | 4,944 | 229 | | |

Assets distributed by US Debtor comprise:
    Total Assets to be Distributed
    Additional proceeds from intercompany claim against Canadian Debtor

Description of the Steps:

    The same steps described in the Britven Primary Report, Schedule 2 are followed in this schedule.

***Notes:***
1.  Britven Primary Report, Schedule 5.
2.  Huffard Primary Report, at 5. The aggregate totals in the Huffard Report do not reconcile to the sum of the individual allocations set out on Schedule 4.1. For purposes of this calculation, we have adopted his end conclusions.
3.  Britven Primary Report, Schedule 6.
4.  The additional amount available for distribution to the bondholders and/or Canadian creditors subject to resolution of a dispute on a claim for interest by the bondholders.

**CCC - Nortel Networks Corporation**                                                    **Schedule 4.1**

**Comparative Analysis – Computations Under Malackowski/Huffard Position: License Approach - Summary of Sale Proceeds to Nortel Debtor Groups**
*($ MM USD)*

***Purpose:***
The purpose of this schedule is to present the distribution of Sales Proceeds to each Debtor by asset class under the EMEA Debtor's License approach.
The output of this schedule is used in the recovery rates calculation for the EMEA Debtor's License approach.

| | Allocated Proceeds | Source | By Nortel Debtor Group | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Canada | | US | | EMEA | |
| | | | % | $ | % | $ | % | $ |
| **Business Sales** | | | | | | | | |
| Tangible Assets | 118 | *Note 1* | 33.1% | 39 | 89.8% | 106 | -22.9% | (27) |
| Intangible Assets | | | | | | | | |
| IP | 764 | *Note 2* | 13.4% | 102 | 43.2% | 330 | 43.5% | 332 |
| Customer-Related Assets and Goodwill | 1,986 | *Note 3* | 10.2% | 202 | 69.2% | 1,375 | 20.6% | 409 |
| Sub-total | 2,868 | | 12.0% | 343 | 63.1% | 1,811 | 24.9% | 714 |
| **Rockstar** | 4,454 | *Note 4* | 11.0% | 488 | 55.4% | 2,470 | 33.6% | 1,497 |
| Total | 7,322 | | 11.3% | 831 | 58.5% | 4,281 | 30.2% | 2,211 |

**Notes:**
1. Huffard Primary Report, at 45.
2. Huffard Primary Report, at 51.
   Canada = 39 + 31 + 14 + 10 + 6 + 1 + 0 + 1 = 102
   US = 95 + 118 + 55 + 39 + 10 + 1 + 9 + 3 = 330
   EMEA = 123 + 95 + 44 + 31 + 33 + 2 + 4 = 332
3. Huffard Primary Report, at 53.
4. Huffard Primary Report, at 56.

**CCC - Nortel Networks Corporation**                                                                                     **Schedule 5**

**Comparative Analysis – Computations Under Malackowski/Huffard Position: Contribution Approach - Computation of Recovery Percentages by Nortel Creditor Groups**
*($ MM USD)*

***Purpose:***
    The purpose of this schedule is to calculate the recovery rates for EMEA Debtor's Contribution approach.
    The output of this schedule is used in the overall summary schedule of different approaches.

**Assets**

| | Projected Treasury Cash at June 30, 2014, after payment of Secured Claims *Note 1* | Allocation of sales proceeds *Note 2* | Total Proceeds Allocated | |
|---|---|---|---|---|
| Canada (NNL and subs) | 343 | 2,318 | 2,661 | See Step 2 allocation on next page |
| US (NNI and subs) | 744 | 3,637 | 4,381 | See Step 3 allocation on next page |
| EMEA | 438 | 1,325 | 1,763 | See Step 1 allocation on next page |
| | 1,525 | 7,280 | 8,805 | |

**CCC - Nortel Networks Corporation**                                                                                          **Schedule 5**

**Comparative Analysis – Computations Under Malackowski/Huffard Position: Contribution Approach - Computation of Recovery Percentages by Nortel Creditor Groups**
*($ MM USD)*

*Purpose:*
    The purpose of this schedule is to calculate the recovery rates for EMEA Debtor's Contribution approach.
    The output of this schedule is used in the overall summary schedule of different approaches.

**Computation of Recovery on Claims**

| | Claims before consideration of guarantees or second claims Note 3 | Step 1: Settlement of claims in EMEA | Residual claims after EMEA | Step 2: Settlement of claims in Canada | Residual claims after EMEA and Canada | Step 3: Settlement of claims in US From US Debtor Funds | From Claim against Canadian Estate | Step 4: Total recoveries by third party claimants | Step 5: Percentage recovery on Claims |
|---|---|---|---|---|---|---|---|---|---|
| Creditor claims: | | | | | | | | | |
| Canada | 3,506 | | 3,506 | 890 | - | | | 890 | **25.4%** |
| US | 1,300 | | 1,300 | | 1,300 | 1,300 | - | 1,300 | **100.0%** |
| EMEA | 500 | 252 | - | | - | | | 252 | **50.4%** |
| Claims subject to a guarantee or second claim: | | | | | | | | | |
| UK Pension Trust | 3,000 | 1,511 | 880 | 223 | - | | | 1,735 | **57.8%** |
| Bondholders | 4,092 | | 4,092 | 1,039 | 4,092 | 3,053 | - | 4,092 | **100.0%** |
| | 12,398 | | 9,778 | | 5,392 | | | 8,269 | 66.7% |
| Intercompany claims against: | | | | | | | | | |
| Canada (NNL and subs) | 2,000 | | 2,000 | 508 | | | | | |
| Undistributed cash Note 4 | | | | | | 28 | 508 | | |
| | | 1,763 | | 2,661 | | 4,381 | 508 | | |

Assets distributed by US Debtor comprise:
    Total Assets to be Distributed
    Additional proceeds from intercompany claim against Canadian Debtor

Description of the Steps:

    The same steps described in the Britven Primary Report, Schedule 2 are followed in this schedule.

*Notes:*
1.  Britven Primary Report, Schedule 5.
2.  Huffard Primary Report, at 4. The aggregate totals in the Huffard Report do not reconcile to the sum of the individual allocations set out on Schedule 4.1. For purposes of this calculation, we have adopted his end conclusions.
3.  Britven Primary Report, Schedule 6.
4.  The additional amount available for distribution to the bondholders and/or Canadian creditors subject to resolution of a dispute on a claim for interest by the bondholders.

**CCC - Nortel Networks Corporation**                                                Schedule 5.1

**Comparative Analysis – Computations Under Malackowski/Huffard Position: Contribution Approach - Summary of Sale Proceeds to Nortel Debtor Groups**
*($ MM USD)*

**Purpose:**

The purpose of this schedule is to present the distribution of Sales Proceeds to each Debtor by asset class under EMEA Debtor's Contribution approach.

The output of this schedule is used in the recovery rates calculation for the EMEA Debtor's Contribution approach.

| | Allocated Proceeds | Source | Canada % | Canada $ | US % | US $ | EMEA % | EMEA $ |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **Business Sales** | | | | | | | | |
| Tangible Assets | 118 | *Note 1* | 33.1% | 39 | 89.8% | 106 | -22.9% | (27) |
| | | | | | | | | |
| Intangible Assets | | | | | | | | |
| IP | 765 | *Note 2* | 41.2% | 315 | 42.6% | 326 | 16.2% | 124 |
| Customer-Related Assets and Goodwill | 1,986 | *Note 3* | 10.2% | 202 | 69.2% | 1,375 | 20.6% | 409 |
| Sub-total | 2,869 | | 19.4% | 556 | 63.0% | 1,807 | 17.6% | 506 |
| **Rockstar** | 4,454 | *Note 4* | 39.4% | 1,757 | 42.9% | 1,912 | 17.6% | 785 |
| Total | 7,323 | | 31.6% | 2,313 | 50.8% | 3,719 | 17.6% | 1,291 |

(Table header: "By Nortel Debtor Group" spanning Canada, US, EMEA)

**Notes:**

1. Huffard Primary Report, at 45.
2. Huffard Primary Report, at 48.

    Canada = 105 + 99 + 46 + 36 + 20 + 2 + 4 + 3 = 315
    US = 109 + 107 + 49 + 31 + 21 + 2 + 4 + 3 = 326
    EMEA = 42 + 39 + 18 + 13 + 8 + 1 + 2 + 1 = 124

3. Huffard Primary Report, at 53.
4. Huffard Primary Report, at 55 and 57. The value allocation is based on the R&D contribution percentages for the period of 1991-2006 as calculated in the Huffard Primary Report.

To be read with the Duff & Phelps report dated February 28, 2014

# Appendix A

**Form 53**

**Courts of Justice Act**

**ACKNOWLEDGMENT OF EXPERT'S DUTY**

1. My name is Thomas Britven.  I live in Houston, in the State of Texas.

2. I have been engaged by or on behalf of the Canadian Creditors Committee to provide evidence in relation to the court proceeding referenced in the text of my Report.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   a) to provide opinion evidence that is fair, objective and non-partisan;

   b) to provide opinion evidence that is related only to matters that are within my area of expertise; and

   c) to provide such additional assistance as the court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.


Date              February 28, 2014


Signature        _Tom Britven_


Note:  This Appendix is provided for the purposes of subrule 53.03(1) or (2) of the *Rules of Civil Procedure*.

# Appendix B



**Thomas W. Britven**
*Managing Director*
*Duff & Phelps, LLC*

# DUFF&PHELPS

## PROFESSIONAL CREDENTIALS

*Thomas Britven is a Managing Director in the Houston office of Duff & Phelps, LLC. He is also the National Intellectual Property Consulting Practice Leader.*

*Testimony*

- *Tribocor Technologies, Inc. v. Gansam Rai and AirComp LLC,* Cause No. 2009-58465, Deposition and trial before the District Court of Harris County, Texas 165th Judicial District, 2013.

- *Inventio AG v. ThyssenKrupp Elevator Americas Corp.,* Case No. 1:08-cv-00874-ER, Deposition before the United States District Court for the District Court of Texas, 2013.

- *Fujifilm Corporation v. HTC Corporation and HTC America, Inc.,* Case No. H-09-4109, Deposition before the United States District Court for the Southern District of Texas, Houston Division, 2013.

- *Boston Scientific Corp., et al. v. Mirowski Family Ventures, LLC,* Case No. 1:11-cv-00736-WTL(DKL), Deposition before the United States District Court for the Southern District of Indiana, Indianapolis Division, 2012.

- *DataQuill Limited v. High Tech Computer Corp.; HTC Corporation v. DataQuill Limited,* Case No. 08cv543 IEG (BGS), Depositions before the United States District Court for the Southern District of California, 2011 and 2012.

- *Halliburton Energy Services, Inc. v. Weatherford International, Inc.,* Civil Action No. 3:10-CV-02595-N (severed from 3:07-CV-2144-N), Depositions and trial before the United States District Court for the Northern District of Texas, Dallas Division, 2012 and 2011.

- *Weatherford International, Inc., et al. v. Halliburton Energy Services, Inc., et al.,* Civil Action No. 2:09-CV-261(CE), Deposition before the United States District Court for the Eastern District of Texas, Marshall Division, 2012.

- *POM Wonderful LLC, v. OceanSpray Cranberries, Inc. and Does 1-10,* Case No. CV09-565 DDP (RZx), Deposition and trial before United States District Court for the Central District of California, 2011.

- *Quest Software v. Centrify Corporation,* Civil Action No. 2:10-CV-00859-TS , Deposition before the United States District Court for the District of Utah, Central Division, 2011.

- *Conceptus, Inc. v. Hologic, Inc.,* Case No. 09-cv-02280 WHA, Deposition and trial before United States District Court for the Northern District of California, San Francisco Division, 2010 and 2011.

- *Fractus S.A. v. Samsung Electronics Co., Ltd., et al.,* Civil Action No. 6:09-cv-203-LED-JDL, Deposition and trial before the United States District Court for the Eastern District of Texas, Tyler Division, 2011.

- *Broadcom Corporation v. SiRF Technology, Inc. and CSR plc,* Case No. SACV 08-546 JVS (MLGx), Deposition before United States District Court for the Central District of California, Southern Division, 2010.

*Phone:  713-237-5310 ♦ Fax:  713-535-9640 ♦ Mobile:  713-299-6756 ♦ E-mail:  thomas.britven@duffandphelps.com*
*1111 Bagby Street, Suite 1900, Houston, TX 77002*

*Thomas W. Britven*
*Managing Director*
**Page 2**

*Testimony*
*(continued)*

- *Quicksilver Resources, Inc. v. Eagle Drilling, LLC,* Civil Action No. H-08-868, Deposition before United States District Court for the Southern District of Texas, Houston Division, 2010.

- *Oceaneering International, Inc. v. GRI Simulations, Inc. and Stephen G. Dodd,* Civil Action No. VC05-0258, Deposition before United States District Court for the Western District of Louisiana, Layayette Division, 2010.

- *ClearValue, Inc. and Richard Alan Haase v. Pearl River Polymers, Inc., Polychemie Inc., SNF Inc., Polydyne, Inc. and SNF Holding Company,* Civil Action No. 6:06 CV 197, Deposition and trial before the United States District Court for the Eastern District of Texas, Tyler Division, 2007 and 2010.

- *Deka Products Limited Partnership v. Cytyc Corporation and Hologic, Inc.,* AAA Case No. 11 Y 133 01686 08, Deposition and Arbitration testimony before the American Arbitration Association, 2009.

- *Widevine Technologies, Inc., v. Verimatrix, Inc.,* Case No. 2:07-cv-00321-TJW-CE, Deposition before United States District Court for the Eastern District of Texas, Marshall Division, 2009.

- *Motorola, Inc. v. VTech Communications, Inc., VTech Telecommunications Ltd.,* Civil Action No. 5:07-cv-00171-DF-CMC, Deposition before United States District Court for the Eastern District of Texas, Texarkana Division, 2009.

- *Quigley Company, Inc., Debtor,* Chapter 11, Case No. 04-15739, Deposition and trial before United States Bankruptcy Court for the Southern District of New York, 2009.

- *Streck, Inc. v. Research & Diagnostic Systems, Inc. and Techne Corporation,* Case No. 8:06CV458, Deposition and trial before United States District Court for the District of Nebraska, 2009.

- *Reid-Ashman Manufacturing, Inc. v. Swanson Semiconductor Service, LLC,* Civil Case No. 4:08-CV-221-A, Deposition before United States District Court for the Northern District of Texas, Fort Worth Division, 2009.

- *MacLean-Fogg Company v. Eaton Corporation,* Civil Action No. 2:07-CV-472-LED, Deposition before United States District Court for the Eastern District of Texas, Marshall Division, 2009.

- *Davis-Lynch, Inc. v. Weatherford International, Inc.,* Civil Case No. 6:07-CV-559, Deposition before United States District Court for the Eastern District of Texas, Tyler Division, 2009.

- *Paradox Security Systems, Ltd., et al. v. ADT Security Services, Inc., et al.,* Case No. 2:06-CV-00462, Deposition before United States District Court for the Eastern District of Texas, Marshall Division, 2009.

- *Custom Nutrition Laboratories, L.L.C. v. Innovation Ventures, L.L.C., et al.,* Case No. CC-07-14515-E, Deposition before County Court at Law Number 5, Dallas County, Texas, 2009.

- *Fishman Transducers, Inc. v. Stephen Paul d/b/a "Esteban," Daystar Productions, and HSN Interactive LLC,* Civil Action No. 07-CA-10071 RCL, Deposition and trial before United States District Court for the District of Massachusetts, 2009 and 2011.

| | |
|---|---|
| ***Publications and Presentations*** | "The Use of Surveys for U.S. Patent Litigation," Kaye Scholer LLP, November 2013. |
| | "The Use of Surveys for U.S. Patent Litigation," State of California Continuing Legal Education, June 2013. |
| | "A Discussion of Economic Damages and the Entire Market Value Rule," State of Colorado Supreme Court Board of Continuing Legal & Judicial Education, Cooley LLP, 2013. |
| | "A Discussion of Economic Damages and the Entire Market Value Rule," State Bar of Texas Continuing Legal Education, Porter Hedges LLP, 2013. |
| | "Intellectual Property Damages, Putting the Pieces Together," A Discussion of Economic Damages and the Entire Market Value Rule, Southern Methodist University, 2013. |
| | "Impact of the America Invents Act on Business," Group Facilitator, Licensing Executive Society (USA and Canada), Inc. IP100 Executive Forum, 2012. |
| | "Trade Secret Damages," Chapter 9, *Calculating and Proving Damages* (coauthored with Christopher H. Spadea, et al.) (New York: Law Journal Press, 2011, Updated 2013). |
| | "Sharing the Risk: Patent Infringement Liability Indemnification and Insurance" Intellectual Property Litigation, Volume 21, Number 3, Spring 2010 (coauthored with Kim Cauthorn and Tamara Turek). |
| | "Approaches for Valuing Biotechnology/Pharmaceutical Inventions" Practicing Law Institute, Biotechnology Patents & Business Strategies in the New Millennium, San Diego, August 6-7, 2001. |
| | "Patent Valuation from a Business and Litigation Perspective" Licensing Executive Society (U.S.A. and Canada), Inc., Annual Meeting, Chicago, 2002. |
| ***Professional and Business History*** | *Duff & Phelps, LLC,* National Intellectual Property Consulting Practice Leader and Managing Director (2008-present). |
| | *Lumin Expert Group (merged with Duff & Phelps, LLC),* President (2007-2008); Managing Director (2006-2007). |
| | *LECG, LLC* (2002-2006); positions held include:  Senior IP Practice Director (2006); Governing Board (2002-2006); Managing Director (2002-2006). |
| | *Navigant Consulting, Inc.* and its predecessor companies (1983-2002); positions held include: Director (1999-2002); Vice President (1991-1999); Executive Consultant (1986-1991); Senior Consultant (1983-1986). |
| | *Amsted Industries, Inc.* (1981-1983); positions held include:  Senior in Charge Auditor (1983); Senior Auditor (1982-1983); Staff Auditor (1981-1982). |

*Thomas W. Britven*
*Managing Director*
**Page 4**

| | |
|---|---|
| ***Education and Certifications*** | Executive Education, Harvard Business School – currently enrolled, planned completion 2014 |
| | Executive Education, Harvard Business School – March 2009 and February 2010 |
| | B.B.A., Accounting, University of Iowa – May 1981 |
| | Chartered Global Management Accountant – May 2012 |
| | Certified Licensing Professional – May 2010 |
| | Accredited in Business Valuation – 2006 |
| | Certified Valuation Analyst – February 2004 |
| | Certified Fraud Examiner – December 1992 |
| | Certified Public Accountant, Florida – January 1989 |
| | Certified Public Accountant, Texas – February 1984 |
| | Passed Certified Public Accountant Examination, Iowa – February 1982 |
| | |
| ***Professional Associations & Affiliations*** | Board of Directors and President of LES Foundation |
| | Board of Directors and Treasurer of LES Foundation |
| | Member National Association of Certified Valuation Analysts |
| | Associate Member American Bar Association |
| | Examiner to Federal Bankruptcy Court |
| | Member Licensing Executive Society |
| | Member American Institute of Certified Public Accountants |
| | Member Houston Chapter of Texas Institute of Certified Public Accountants |
| | Member Association of Certified Fraud Examiners |

# Appendix C

## Glossary of Terms

**Allocation Reports** – the reports prepared on behalf of the US Debtors, the EMEA Debtors, the UK Pension Trust, and the Canadian Debtors and Monitor that address (either directly or indirectly) the allocation of the Sales Proceeds

**Alternative Pro Rata Allocation** – an approach to compute each Nortel Debtor Group's share of the Sales Proceeds, based on the objective that each Key Creditor Group should receive the same percentage recovery on its claims

**ATCA** – Advance TeleComputing Architecture

**Bazelon Primary Report** – Report of Mr. Coleman Bazelon ("Bazelon") on behalf of the UK Pension Trust opining on the allocation of the Sales Proceeds to each of the Nortel Debtors

**Berenblut and Cox Primary Report** – Report of Messrs. Mark Berenblut and Alan Cox on behalf of the Canadian Debtors and Monitor opining on the allocation of the Sales Proceeds to each of the Nortel Debtors

**Britven Primary Report** – Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups, filed on behalf of the Canadian Creditors Committee

**Business Sales** – the sale of the former Nortel business units

**Business Sales Proceeds** – the proceeds received from the sale of the former Nortel business units of $2,848 million

**Business Value** – Value of Nortel's four key reporting units, enveloping all the Lines of Business

**Canadian Debtors** – Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation

**CCC** – the Canadian Creditors Committee

**CDMA** – Code Division Multiple Access

**CICBV** – the Canadian Institute of Chartered Business Valuators

**CN** – Carrier Networks

**Comparative Analysis** – each Nortel Debtor Group's share of the Sales Proceeds and the implied aggregate recoveries for each Key Creditor Group (measured as a percentage of the estimated amounts claimed) based on the various positions of the Core Parties

**Core Parties** – the parties in the joint proceedings

**Customer relationships** – customer-related intangible assets including customer lists, order backlog, and customer relationships where (a) the company has information about the customer and has regular contact with the customer and or (b) the customer has the ability to make direct contact with the company – all in the context of a business seeking to make and economic profit

**Date of Distribution** – June 30, 2014

**EDGE** – Enhanced Data rates for GSM Evolution

**EMEA** – England, the European States, the Middle East and other countries

**EMEA Debtors** – Nortel Networks UK Limited and 17 other Nortel entities in England, the European States, the Middle East and Africa

**ES** – Enterprise Solutions

**Fair Value** – the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date

**Field of Use approach** – the approach to valuation and allocation whereby the factors set out in paragraph 3.2 are taken into account

**GAAP** – Generally Accepted Accounting Principles

**GGSN** – Next Generation Gateway GPRS Support Node

**Goodwill** – an intangible asset that represents the difference between the aggregate value of a business and the aggregate of those tangible and intangible assets that can be specifically identified and valued

**GPRS** – General Packet Radio Service

**Green Primary Report** – Report of Mr. Phillip Green on behalf of the Canadian Debtors and Monitor opining on the allocation of the Sales Proceeds to each of the Nortel Debtors

**GSM** – Global System for Mobile Communication

**GSM-R** – GSM for Railways

**Guaranteed Bondholders** – those bondholders for which guarantees have been provided by other Nortel Debtor Groups

**Huffard Primary Report** – Report of Mr. Paul Huffard on behalf of the EMEA Debtors based in part on the Malackowski Primary Report and opining on the allocation of the Sales Proceeds to each of the Nortel Debtors

**IFRS** – International Financial Reporting Standards

**IFSA** – Interim Funding and Settlement Agreement

**IP** – Intellectual property

**Key Creditor Groups** – the Canadian general unsecured creditors (including the CCC), the bondholders for which guarantees have been provided by other Nortel Debtor Groups, the US general  unsecured creditors, the EMEA general unsecured creditors and the Nortel Networks UK Pension Trust

**Kinrich Primary Report** – Report of Mr. Jeffrey Kinrich filed on behalf of the US Debtors opining on the allocation of the Sales Proceeds to each of the Nortel Debtors

**Licensed Participants** – NNI, NNUK, NNSA, and NN Ireland.

**Lines of Business** – the individual businesses of Nortel as they were divided up for sale purposes

**LREs** – Limited Risk Entities

**LTAs** – the License Termination Agreements

**LTE** – Long Term Evolution

**Malackowski Primary Report** – Report of Mr. James Malackowski on behalf of the EMEA Debtors opining as to allocation of the value of the IP to each of the Nortel Debtors

**MEN** – Metro Ethernet Networks

**MME** – Mobility Manager Element

**MRDA** – the Master Research and Development Agreement

**MSS** – Multi-Service Switch

**NG-PC** – Next Generation Packet Core Assets

**NN Ireland** – Nortel Networks Ireland

**NN Technology** – Any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software, and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill

**NNC** – Nortel Networks Corporation

**NNI** – Nortel Networks, Inc.

**NNL** – Nortel Networks Limited

**NNSA** – Nortel Networks SA

**NNUK** – Nortel Networks UK Limited

**No Field of Use approach** – the approach to valuation and allocation whereby the factors set out in paragraph 3.2 are taken not into account

**Nortel Debtor Groups** – the Canadian Debtors, US Debtors and EMEA Debtors

**Northern Telecom** – Northern Telecom Limited

**Operating Assets** – Nortel's tangible assets and identified intangible assets including customer relationships and IP

**Ownership** – an approach to compute each Nortel Debtor Group's share of the Sales Proceeds based on the value of the assets owned and/or relinquished by each group in connection with each of the Business Sales and the Rockstar Transaction

**Participants** – the parties to the MRDA comprising NNL, NNI, NN Ireland, NNUK, and NNSA

**PPA** – Purchase Price Allocation

**Primary Report** – each individual Allocation Report

**Prospective Buyer Forecast Approach** – the value of the Lines of Business to the US and EMEA Debtors based on the forecasts provided to prospective purchasers

**Purchaser Goodwill** – The difference between the Sales Proceeds and the fair market value of the Nortel Debtor Groups' assets

**PWC** – PriceWaterhouseCoopers

**R&D** – Research and Development

**Residual Patents** – Nortel patents that were not transferred in the various Business Sales

**Residual Pool** – Residual profit or loss

**Rockstar Transaction** – the sale of Nortel's residual patents

**Rockstar Transaction Proceeds** – the proceeds from the sale of the residual patent portfolio of $4,454 million

**RONA** – Return on Net Assets

**RPSM** – Residual Profit Split Method

**Sales** – the Business Sales and the Rockstar Transaction

**Sales Proceeds** – the sum of the Business Sales Proceeds of $2,848 million and the Rockstar Transaction Proceeds of $4,454 million for a total of $7,302 million

**SGSN** – Next Generation Serving GPRS Support Node

**Surrendered Licenses** – the licenses held by the Licensed Participants under the terms of the MRDA that were surrendered on or around June 9, 2009

**UK Pension Trust** – The Nortel Network UK Pension Trust

**UK Pension Allocation Group** – The pleading of the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund

**UMTS** – Universal Mobile Telecommunications Systems

**US Debtors** – Nortel Networks, Inc. and 14 other entities in the United States

**Valuation Date** – June 9, 2009

**VoIP** – Voice over IP

**WACC** – Weighted average cost of capital

**Zenkich Primary Report** – Report of Mr. Raymond Zenkich filed on behalf of the US Debtors opining on, amongst other things, the value of patents registered in China



**Errata for the Nortel Networks Rebuttal Report, February 28, 2014**

| Page | From |
|------|------|
| Footnote 8 | Kinrich Primary Report, at ~~68~~, 41-42. |
| Footnote 10 | See the definition of "Products" in art. 1(g)~~3.19~~ of the MRDA. |
| Footnote 65 | Malackowski Primary Report, at ~~40~~39. |