**M E M O R A N D U M**

| | |
|---|---|
| To: | The Honourable Mr. Justice Newbould<br>The Honorable Kevin Gross, Bankruptcy Judge |
| Copies To: | Core Parties |
| From: | Ernst & Young Inc., in its capacity as Monitor of the Nortel Canadian Debtors |
| Date: | June 23, 2014 |
| Re: | Reply Memorandum of the Monitor to the Memorandum of the US Parties Regarding Bondholder Claims Issues |

Recoveries are what really matter for the vast majority of creditors. An allocation of sale proceeds disconnected from any meaningful estimate of creditors' outcomes has little chance of shortening these proceedings. The determination of whether post-petition interest is payable on the bondholders' claims in each of the US and Canadian estates and, if so, at what rate, would give the parties a significantly improved ability to estimate ultimate outcomes, and could expedite resolution of this case. The US Parties (as defined in their June 20, 2014 Memorandum [Dkt. No. 13883]) seek to avoid the resolution of these issues by objections that elevate process and form over substance and at the expense of the opportunity for a more timely and cost-effective solution. None of these objections presents a real impediment to the Courts proceeding as the Monitor has requested.

The Common Bond Claim Issues (as defined in the Monitor's June 19, 2014 Memorandum [Dkt. No. 13880]) are ripe now, notwithstanding the US Parties' contention that the allocation dispute must be resolved by the Courts first. The ripeness analysis mandated by the United States Supreme Court and the Third Circuit Court of Appeals considers both the amenability of an issue to judicial resolution and the practical utility to the parties of a

declaration of their rights (or hardship of proceeding in the face of uncertainty).  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Pittsburgh Mack Sales & Service, Inc. v. Int'l Union of Operating Engineers, Local Union No. 66*, 580 F.3d 185, 190-91 (3d Cir. 2009).  That test is satisfied here because the issues are purely legal, the parties are adverse in interest and the resolution will be of assistance to the parties' negotiations by providing greater clarity about distributions from the US and Canadian estates.

As the US Court has repeatedly recognized, the presence of some element of contingency[1] does not negate ripeness where, "[w]ithout a determination of the [issue], the [parties] will be frustrated in their efforts to proceed any further in their bankruptcy, to formulate a plan as well as to negotiate with creditors."  *In re Powermate Holding Corp.*, 394 B.R. 765, 770 (Bankr. D. Del. 2008) (Gross, J.); *see also In re Midway Games, Inc.*, 428 B.R. 327, 332 (Bankr. D. Del. 2010) (Gross, J.); *In re Caribbean Petro. Corp.*, 444 B.R. 263, 267 (Bankr. D. Del. 2010) (Gross, J.).  Nor does Canadian procedure require delay—the US Parties erroneously assert that these issues must await a plan process, but in fact issues such as these may be addressed at any convenient time in the proceedings.  Absent some change in circumstances, there is a great risk that the parties will continue to expend resources litigating allocation in these Courts and appellate courts.  Until the parties know the resolution of the Common Bond Claim Issues and the ultimate outcomes, these cases are more likely to continue with no final allocation

---

[1] Notably, the Proofs of Claim filed by indenture trustee BNY, which has joined with the US Debtors in opposing resolution at this time, do not frame the interest claims against NNI as contingent, but rather assert non-contingent unliquidated claims. Proof of Claim 3971 ("In addition to any and all other amounts due and owing by NNI as guarantor under the Indenture and Notes . . . a claim in an unliquidated amount for the continuing postpetition [] accrual of interest (including interest upon the overdue installments of interest)."); Proof of Claim 3972 (same).  The asserted contingency is also at odds with the US Debtors' Allocation Position which, combined with assets already held by the US Debtors, would result in over $6.2 billion being available to satisfy approximately $5.5 billion in claims. US Debtors' Monthly Operating Report No. 60 at 3 [Dkt.  No. 13431].

decisions for years to come while the parties exhaust their appeals and deplete the assets of the estates. The Monitor submits that the Common Bond Claim Issues are ripe for determination and their determination at this time could very well provide the needed change.

Even if form prevails over substance and the Courts do not decide the Common Bond Claim Issues prior to resolution of the allocation dispute, the issues should be heard now and decision rendered simultaneously with the allocation decision. Scheduling the briefing and argument when the salience of the issue is clear, the parties' counsel are gathered and the technology for joint argument is in place would be an efficient use of the estates' resources, eliminate any delay following the allocation decision and permit the issues to be appealed as a single unit. The US Debtors opposed consideration of the Wilmington Objection on the basis that "litigation on the issue of post-petition interest before the conclusion of the Allocation and Claims Litigation will divert the critical attention of the parties and this Court"[2]—with the last day of testimony one day away, and the US Debtors no longer involved in the claims litigation at all, they should not further impede resolution of this crucial issue.[3]

Proceeding to brief and argue this issue now, whether or not decision is delayed, also presents no due process concern. The Common Bond Claim Issues are far from unknown to either the Core Parties or creditors of NNI more generally. As the US Parties concede, the potential availability of post-petition interest has been a live and significant issue since the successful conclusion of the Rockstar transaction in 2011 and it is not unreasonable to expect them to be prepared for argument on that purely legal issue in relatively short order. The

---

[2] Joint Request of US Debtors and UCC to Adjourn Hearing and Set Briefing Schedule at 5 [Dkt. No. 12351]. The Monitor and Canadian Debtors reserved all rights in connection with the Wilmington Objection. Statement and Reservation of Rights of the Monitor on Behalf of the Canadian Nortel Debtors [Dkt. No. 12374].

[3] A motion for reconsideration is unnecessary because the issue is being revisited at the request of the Courts and the US Court "possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so." *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973) (citation omitted).

Monitor remains open to the Courts' direction (and availability) to schedule any required briefing and argument in the near term so as to ensure that due process is met here.

The US Parties raise a further form objection to the Common Bond Claim Issues being heard by joint hearing, suggesting that convening a joint hearing would somehow infringe on the Courts' application of the law applicable in each jurisdiction.  Although many joint hearings have been held on issues of far less monetary and substantive import to the parties, the US Parties would have the Courts separately hear the question of the interest payable on the very same claims by the very same parties with respect to the very same debt against the US and Canadian estates.  Indeed, the amounts at issue are greater than the proceeds from each of the line of business sales approved by both Courts.  Such a separation would be contrary to the character of the proceedings to date (including the contemplated coordinated trial of intercompany claims), resulting in wasteful duplication of effort on an issue material to all creditors worldwide, and would deprive Courts of the benefit of a full airing of all issues under both US and Canadian law.  As counsel for the US Debtors argued in support of adoption of the Allocation Protocol,

> all of the arguments whether they're about U.S. Law or Canadian Law or any of these agreements or any procedural issues that might arise in either Court are appropriately heard together in the fullness of a joint hearing. Indeed, that's what the cross-border protocol is about. And certainly, the Judges both have the ability to distinguish what is essential and what is not essential and what you need to pay more attention to or less attention to. But the fact is, Your Honor, I think all of us in both Courts and both countries need to hear everything.

(Submission by J. Bromley, June 27, 2011 Tr. 23:12-21 [Dkt. No. 5643])  So too the Common Bond Claim Issues merit a joint hearing canvasing all aspects of the issues for decision by each Court and in keeping with the comity and cooperation that have characterized these proceedings.