Court File No.: 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

- and -

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re | Chapter 11 |
|---|---|
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**STATEMENT OF NORTEL NETWORKS UK PENSION TRUST LIMITED AND THE
BOARD OF THE PENSION PROTECTION FUND IN SUPPORT OF
DETERMINATION OF POST-PETITION INTEREST ISSUE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

{BAY:02523334v1}

1.     Nearly a year and a half ago, the U.S. and Canadian courts (the "**Courts**") recognized that these cases had reached a "critical juncture" after the third round of court-ordered mediations had ended unsuccessfully. They requested that the parties identify the issues that remained outstanding. In response to the Courts' request, as the parties took the first steps down the path toward the current Allocation Litigation,[2] the Board of the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, the "**UK Pension Claimants**") noted that the "controversial" issue of whether the creditors represented by the Ad Hoc Bondholder Group (the "**Bondholders**") were entitled to an award of post-petition interest and, if so, at what rate (the "**Post-petition Interest Issue**"), was critical to the successful resolution of these proceedings.[3]

2.     When this issue was raised again late last year in connection with the objection filed by Wilmington Trust NA ("**Wilmington Trust**") to certain Bondholder claims filed against the U.S. Debtors (the "**Wilmington Trust Objection**"), the UK Pension Claimants were the only party that supported the Wilmington Trust Objection. The UK Pension Claimants reiterated their position that resolution of this narrow question of law was "very important" because the difference between payment of post-petition interest at the lower federal judgment rate and the higher contract rate – which the Canadian Monitor has calculated as nearly $1.6 billion[4] – was a

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Allocation Pre-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund, dated May 2, 2014 [U.S. D.I. 13550] (the "**UKPC Allocation Pre-Trial Brief**").

[3]     See Submission of the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund in Response to the Court's January 31, 2013 Order, dated February 8, 2013 [U.S. D.I. 9396], at ¶ 10.

[4]     The Canadian Monitor's figures are calculated as of December 31, 2013. Therefore, the current post-petition interest figures are approximately 10% higher.

"very significant number," which had previously presented a major stumbling block toward the parties' settlement efforts.[5]

3.  Although the U.S. Parties[6] continue to resist guidance from the Courts on this issue, asserting largely technical procedural objections to a determination at this time, there are substantive reasons that support determining this issue at this stage of these complex and interrelated proceedings. With just two days remaining in the Allocation Litigation trial, this portion of the record will be adjourned. The Courts will have had before them all of the fact and expert testimony on which they will base their allocation decision. In these circumstances, the U.S. Parties' expressed concern with the Courts rendering an "advisory opinion" is without substance. This is an unprecedented global dispute, the resolution of which requires flexibility, not rigidity, within the bounds of due process. The Post-petition Interest Issue is sufficiently ripe for the Courts to consider this issue now.

4.  The Cross-Border Protocol on the Resolution of Claims approved by the Courts on September 16, 2010 includes specific provision for a joint hearing of the Canadian and U.S. Courts to determine the claims of the Bondholders (defined therein as "Overlapping Claims"). As a result, there is no procedural impediment to determining the Post-petition Interest Issue now. The Courts may consider it relevant to the Allocation Litigation or as a stand-alone issue that is appropriate to determine in respect of the single largest claim in the global proceeding. The Courts would be entirely justified in considering the Post-Petition Interest Issue as a significant consideration in their determination of the Allocation Litigation.

---

[5] Nov. 15, 2013 Hr'g Tr. at 13:6-14:3.

[6] As stated in the Memorandum of the US Parties Regarding Interest Issues, dated June 20, 2014 [U.S. D.I. 13883] ("**US Parties Reply**"), the "US Parties" are the US Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of Bondholders, and the Bank of New York Mellon and Law Debenture Trust Company of New York, as indentured trustees.

5. Further delay simply imposes more costs on Nortel's most vulnerable constituents. The professional fees in these cases have drawn frequent and justified criticism. But these professional fees are only a portion of the total costs that continue to mount with each passing day. If, following the Allocation Litigation, NNI is awarded an allocation from the Lockbox Funds that has the effect of rendering it solvent, such that all NNI creditors receive payment in full on their claims, then the Bondholders (and indeed, all creditors of NNI) will seek payment of post-petition interest. If the Bondholders are found to be entitled to post-petition interest at the contract rate, that interest is accruing at the rate of <u>approximately $27 million per month, or nearly $1 million per day</u>.[7]

6. Any award of post-petition interest to the Bondholders will reduce the amount of surplus cash in NNI's estate that would otherwise flow to its insolvent parent and shareholder NNL, for distribution to NNL's creditors. It is therefore creditors of NNL – namely, the former employees, pensioners, pension plans (including the UK Pension Claimants) and trade creditors – who will ultimately bear this financial burden. An award of post-petition interest will directly affect the Lockbox Funds allocated to each estate for the benefit of their creditors.

7. The Courts should consider the collateral effects of the U.S. Parties' opposition to having the Post-petition Interest Issue decided at this time. If the issue were decided now, settled case law in the District of Delaware, as well as persuasive authority from the majority of other courts that have addressed the issue, would dictate that, in the event NNI is solvent as a result of its Lockbox allocation, the Bondholders would be entitled to post-petition interest at no more than

---

[7] Even if post-petition interest only accrues at the lower federal judgment rate, this would amount to approximately $1.5 million per month accruing for the benefit of the Bondholders.

the federal judgment rate, not the contract rate.[8] Leaving the issue undecided introduces uncertainty into both the Courts' determination of the Allocation Litigation and any attempts by the parties to resolve some or all of the issues before the Courts.[9]

8.  The entire Nortel matter has been plagued by a series of moral hazards which are the result of misaligned incentives. The Post-petition Interest Issue is confounded by a number of collateral considerations. First, by agreement with the Monitor, the Bondholders' professional fees and expenses are being paid by the Canadian estate, including fees incurred in litigating positions directly adverse to the Canadian estate.[10] As a result, unlike the UK Pension Claimants, who have suffered a shortfall of approximately 60% in the funded status of their pension plan assets and are the only party that has been funding their own litigation expenses throughout the entire five years of this process, the Bondholders (as _unsecured_ creditors) are not coming "out of pocket" to fund the positions they have taken in the Allocation Litigation. Second, other than the Pro Rata Distribution Model advanced by the UK Pension Claimants and the Canadian Creditors' Committee ("**CCC**"), whereby each creditor receives a similar recovery

---

[8] Three cases in the District of Delaware have addressed the Post-petition Interest Issue, and each has held that the federal judgment rate – and not the higher contract rate - is the applicable rate of post-petition interest. See In re W.R. Grace & Co., 475 B.R. 34, 200 (D. Del. 2012) (stating "[t]he majority approach taken by most courts today is the federal judgment rate approach" and affirming bankruptcy court's decision applying the federal judgment rate approach); In re Washington Mutual, Inc., 461 B.R. 200, 244-47 (Bankr. D. Del. 2011), vacated, in other part, on other grounds, 2012 WL 15163880 (Bankr. D. Del. Feb. 24, 2012); In re Coram Healthcare Corp., 315 B.R. 321, 346 (Bankr. D. Del. 2004).

[9] At the time Wilmington Trust's objection was outstanding, the Post-petition Interest Issue had been briefed and argued before the U.S. Court of Appeals for the Third Circuit in the W.R. Grace appeal, and an appellate decision was pending. Given the lower courts' prior decisions in W.R. Grace, which were unfavorable from the Bondholders' perspective, it is understandable why the Bondholders were eager to postpone any consideration of the Post-petition Interest Issue while the possibility of a favorable Third Circuit ruling remained. The W.R. Grace appeal was ultimately settled before the Third Circuit issued its decision.

[10] 70th Report of the Monitor, dated June 24, 2011, ¶¶ 97-101 (referring to arrangements for payment of Bondholder fees and expenses since 2009, and subsequently negotiated arrangements under the Bondholder Funding Letter); Bondholder Funding Letter, dated June 23, 2011 (appended to the 70th Report of the Monitor as Appendix D); order of Justice Morawetz, dated June 30, 2011, at ¶ 6 (approving Bondholder Funding Letter); Transcribed Endorsement of Justice Morawetz, dated June 30, 2011.

and no estate is solvent (avoiding the Post-petition Interest Issue and others), each of the other allocation methodologies that have been proposed by the parties appear to provide the Bondholders with a recovery of at least par.[11] As a result, unless the Courts adopt the Pro Rata Distribution Model, or some variant of it, the Bondholders are incentivized, without bearing their costs, to hold out for an outcome, whether litigated or otherwise, that provides them with substantial post-petition interest since the lower bound they could expect to receive would be full recovery of the principal amount of their claims.

9.  These incentives are further misaligned by the fact that the Lockbox Funds have been deposited in the least risky investment vehicle which, for all intents and purposes, is a non-interest bearing escrow account. Thus, while the Allocation Litigation continues unresolved, the Bondholders are protected against any downside market risk of principal loss on their $4 billion claims.

10. At the same time, they have been granted a funded option to pursue post-petition interest at the contract rate (as high as 10.75% per annum), a rate that would represent a remarkable investment return. As a result, there is absolutely no incentive for the Bondholders to end the Allocation Litigation and give up a cost-free option that may have substantial value. While the Bondholders maintain this privileged position, the Lockbox Funds, from which everyone else is hoping to benefit, are being further eroded with each passing day.

11. The issues of Allocation among estates and ultimate creditor recovery are closely related. The estates, in the end, have no independent interest in the outcome of the Allocation or Claims Litigation. This is a liquidating insolvency in which there will be no continuing corporations.

---

[11]   Rebuttal Report of Thomas Britven, dated February 28, 2014, at p. 5 (Table 1).

{BAY:02523334v1}                                        - 6 -

All of the steps being taken by the Courts are for the benefit of the creditors. If the Courts are to consider each of the allocation methodologies proposed by the parties in determining a fair and equitable allocation of the Lockbox Funds, they are entitled to understand the practical effect of each allocation methodology: based on the available information, how much of the Lockbox Funds would be allocated to each estate under each allocation methodology and what that means for creditor recoveries in each estate.

12. The U.S. Parties' argument that the current request for determination of the Post-Petition Interest Issue seeks reconsideration of the U.S. Court's decision on the Wilmington Trust Objection and that the standard for deciding the request is the standard applicable to motions to reconsider in the U.S. is without merit, for several reasons. First, the objection brought last year was asserted by Wilmington Trust, not the Monitor. The Monitor filed a statement and reservation of rights that recognized the importance of the Post-petition Interest Issue and reserved all rights to be heard in the event the U.S. Court determined to hear the objection. Second, the U.S. Court simply "adjourn[ed] the Objection without date": it did not overrule the Wilmington Trust Objection on the merits.[12] Third, even if the standard for reconsideration were otherwise applicable, circumstances have changed since the U.S. Court adjourned the Wilmington Trust Objection in November 2013. Since that time, the Courts have now sat for all but two remaining days of the evidence phase of the Allocation Litigation trial. By the time they hold a hearing on the Post-petition Interest Issue, the Allocation Litigation trial will have been substantially completed. To the extent that creditor recoveries may inform the Courts' decision on allocation—which the UK Pension Claimants believe they should—the Bondholders'

---

[12] Order, entered Nov. 15, 2013 [U.S. D.I. 12399].

entitlement to post-petition interest and, if so,[13] at what rate, is relevant to the Courts' consideration of the issue.[14] To characterize the Monitor's request as seeking an advisory opinion under these circumstances would elevate form over substance.[15]

13.     The U.S. Parties suggest that the Post-petition Interest Issue is not properly before the Canadian Court as it would normally arise "as part of a plan process subject to a vote among creditors." Put more bluntly, the U.S. Parties are counting on their ability to effect a veto on any plan of arrangement that may be put forward by the Canadian Debtors due to the size of the Bondholder claim (even without the $2 billion intercompany claim in favour of NNI), which gives the Bondholders leverage to negotiate for whatever amount they choose in addition to the principal amount of their claims, as a condition of plan approval. This objection to determination of the Post-Petition Interest Issue is flawed for two reasons, and ought not to cause the Courts to delay a determination of the issue, creating yet another opportunity for deadlock and paralysis in this proceeding.

---

[13]     Under the Pro Rata Distribution Model, no creditors would be entitled to post-petition interest. Lockbox Funds would be allocated to each estate in an amount that would enable allowed unsecured creditors of each estate to receive the same percentage recovery. Rather than allowing the creditors of any one estate (in this case, the U.S. estate) to recover 100% or more on their claims while creditors of the other estates (in this case, the Canadian and EMEA estates) receive much smaller distributions, the equitable distribution scheme embodied in the Pro Rata Distribution Model reflects the nature of the assets that were sold and the integrated manner in which "one Nortel" operated, including the manner in which assets were created and liabilities were incurred.

[14]     In re Lazy Days' RV Center, 724 F.2d 418 (3d Cir. 2013) (advisory opinion is one that "cannot affect the rights of the litigants in the case before them or give[s] opinions advising what the law would be upon a hypothetical state of facts."); In re Outboard Marine Corp., 304 B.R. 844, 860 (Bankr. N.D. Ill. 2004) (determination of validity and priority of lien was not an advisory opinion, stating "[t]here is little d659oubt that [the creditor's] suit is an honest and actual antagonistic assertion of rights, that valuable legal rights will be directly affected to a specific and substantial degree, and that, accordingly, this Court has before it a real case or controversy."); see also Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) (noting that inquiry as to whether an opinion in a declaratory judgment action would be an impermissible advisory opinion is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.")

[15]     The U.S. Parties' contention that the Courts' determination of the Post-petition Interest Issue now would offend due process merits but brief response. The issue of the amount of interest the Bondholders would be entitled to if the U.S. Debtors were solvent is a narrow question of law. The parties have been aware of this issue for years, and they are all represented by experienced and able counsel who have demonstrated little difficulty in meeting far greater challenges over the past year than briefing this narrow legal issue on a reasonable schedule.

14.     First, as set out above, pursuant to the Cross-Border Clams Protocol,[16] the Courts have recognized that acceptance of the Bondholder Claims in the CCAA or Chapter 11 proceeding would be a significant and potentially contentious issue and have already provided for it to be determined at a joint hearing of the Courts prior to acceptance of an allowed claim in either Canada or the U.S.  That determination can occur at any time, and there is no reason to delay it.

15.     Second, the U.S. Parties assume that a plan or arrangement would be necessary in Canada for any distribution to creditors to occur, such that the issue ought not arise or be determined until that time.  However, distributions to creditors of the Canadian Debtors could be made without the necessity and additional expense of a plan of arrangement, and without any vote by creditors under at least two scenarios: (i) an Order for distribution to unsecured creditors being issued by the Court in this or another proceeding, based on claims filed and accepted (or determined by the Court) pursuant to the existing claims process; and (ii) a conversion of the existing CCAA proceedings to a bankruptcy with a distribution by a trustee in bankruptcy based on claims filed in the CCAA proceeding.

16.     Following the Allocation Litigation there will be a sum certain available for distribution to unsecured creditors of the Canadian Debtors (as there are no secured creditors), and nothing more.  There are no operational or other terms that would make a plan necessary in this case – voting is perfunctory, as a vote in favor of or against a plan will not result in any additional sums or more favorable terms being available from the Canadian Debtors to unsecured creditors.  The zero-sum nature of the distribution means that the only way of doing so is to take something away from the general body of unsecured creditors and give it to the Bondholders as a price for

---

[16] See Cross-Border Protocol on the Resolution of Claims [U.S. D.I. 3922], at ¶ 17(e).

their support. The assumption that this will occur is no basis upon which the U.S. Parties should be permitted to avoid a determination of the Post-Petition Interest Issue at this time.

## CONCLUSION

17. The Post-petition Interest Issue is highly relevant to the determination of the Allocation Litigation. The Courts are well within their inherent jurisdiction to resolve that issue at this stage of the litigation. Such determination will substantially assist the process.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 23rd day of June, 2014.

June 23, 2014

*/s/ Michael E. Barrack*
**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario, M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Rebecca Lewis** (LSUC# 61146S)

Tel:    416-304-1616
Fax:    416-304-1313

*/s/ Justin R. Alberto*
**Bayard, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899, U.S.A.

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)

Tel:    (302) 655-5000
Fax:    (302) 658-6395
Email: cdavis@bayardlaw.com
           jalberto@bayardlaw.com

*/s/ Brian E. O'Connor*

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099, U.S.A

**Brian E. O'Connor**
**Sameer Advani**
**Weston T. Eguchi**
**Andrew Hanrahan**

Tel:    212-728-8000
Fax:   212-728-8111