In the Matter Of:

# Nortel Trial

---

# DAY 1

## May 12, 2014

---





1          UNITED STATES BANKRUPTCY COURT

2            FOR THE DISTRICT OF DELAWARE

3     -----------------------------)

4     In Re                        )

5       NORTEL NETWORKS INC.,      )

6       et al.,                    )

7         Debtors.                 )

8     -----------------------------)

9                      - and -

10          Court File No. 09-CL-7950

11                  ONTARIO

12          SUPERIOR COURT OF JUSTICE

13              (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16     AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17   ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

18       NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19      CORPORATION, NORTEL NETWORKS INTERNATIONAL

20      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                  CORPORATION

22      APPLICATION UNDERT PART IV OF THE COMPANIES'

23   CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                  AS AMENDED

25                  ---------



1

2                              --------

3

4    ---- This is the Day 1/Volume 1 of the transcript of

5    the proceedings in the above matter held

6    simultaneously in:

7    Superior Court of          United States Bankruptcy

8    Ontario (Commercial        Court for the District of

9    List)                      Delaware

10   Courtroom 8-1              Courtroom 3

11   330 University Avenue      824 Market Street

12   Toronto, Ontario          Wilmington, Delaware

13

14   on the 12th day of May, 2014, commencing at 9:03 a.m.

15

16                              ---------

17   B E F O R E :

18   The Honorable Judge Kevin Gross (United States)

19   The Honorable Mr. Justice Frank Newbould (Canada)

20

21                              ---------

22

23

24

25

1    A P P E A R A N C E S:

2    CANADIAN DEBTORS

3

4    FOR THE MONITOR, ERNST & YOUNG INC.

5    GOODMANS LLP

6    Bay Adelaide Centre

7    333 Bay Street, Suite 3400

8    Toronto, ON  M5H 2S7

9    PER: Ben Zarnett, Esq.

10        Alan Mark, Esq.

11        Peter Ruby, Esq.

12        Jessica Kimmel, Esq.

13        Graham Smith, Esq.

14

15   FOR THE APPLICANTS

16   GOWLING LAFLEUR HENDERSON LLP

17   Suite 1600, First Canadian Place

18   100 King Street West

19   Toronto, ON  M5X 1G5

20   PER: Jennifer Stam, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   ALLEN & OVERY LLP

24   1221 Avenue of the Americas

25   New York, NY  10020



```
 1    PER: Ken Coleman, Esq.

 2         Paul Keller, Esq.

 3         Jacob Putman, Esq.

 4         Laura Hall, Esq.

 5

 6    FOR THE CANADIAN DEBTORS

 7    BUCHANAN INGERSOLL & ROONEY

 8    1105 North Market Street

 9    Suite 1900

10    Wilmington, DE  19801 1054

11    PER: Kathleen A. Murphy, Esq.

12         Mary F. Caloway, Esq.

13

14    U.S. DEBTORS

15

16    FOR NORTEL NETWORKS INC.

17    TORYS LLP

18    79 Wellington Street West, Suite 3000

19    Box 270, TD Centre

20    Toronto, ON  M5K 1N2

21

22    PER: Sheila Block, Esq.

23         Scott Bomhof, Esq.

24         Molly Reynolds, Esq.

25         Andrew Gray, Esq.
```

```
1        Adam Slavens, Esq.

2

3    FOR THE U.S. DEBTORS

4    MORRIS, NICHOLS, ARSHT & TUNNELL LLP

5    1201 North Market Street, 16th Floor

6    P.O. Box 1347

7    Wilmington, DE  19899 1347

8    PER: Derek Abbott, Esq.

9        Annie Cordo, Esq.

10       Tammy Minott, Esq.

11       Eric Schwartz, Esq.

12

13   FOR NORTEL NETWORKS INC.

14   CLEARY GOTTLIEB STEEN & HAMILTON LLP

15   One Liberty Plaza

16   New York, NY  10006

17   PER: James Bromley, Esq.

18       Lisa Schweitzer, Esq.

19       Howard Zelbo, Esq.

20       Jeffrey Rosenthal, Esq.

21       Avi Luft, Esq.

22       Inna Rozenberg, Esq.

23       Jacqueline Moessner, Esq.

24       Marla Decker, Esq.

25       Matt Gurgel, Esq.
```

```
 1         Darryl Stein, Esq.

 2         Temidayo Aganga Williams, Esq.

 3         Kyle Dandelet, Esq.

 4         Marion deMesion, Esq.

 5         Mark Grube, Esq.

 6         David Herrington, Esq.

 7         Shira Kaufman, Esq.

 8         Alix McCown, Esq.

 9         Ann Nee, Esq.

10         Adam Olin, Esq.

11         Jeremy Opolsky, Esq.

12         Michelle Parthum, Esq.

13         Daniel Queen, Esq.

14         Ben Shartsis, Esq.

15         Jesse Sherrett, Esq.

16         Ashley Siegel, Esq.

17         Brent Tunis, Esq.

18

19    EMEA DEBTORS

20

21    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22    LIMITED

23    DAVIES WARD PHILLIPS & VINEBERG LLP

24    40th Floor

25    155 Wellington Street
```

1    Toronto, ON   M5V 3G7

2    PER: Robin B. Schwill, Esq.

3         Sean Campbell, Esq.

4         James Doris, Esq.

5         Luis Sarabia, Esq.

6         Matthew Milne Smith, Esq.

7         Natasha MacParland, Esq.

8         George Pollack, Esq.

9         Cara Cameron, Esq.

10        Andrew Carlson, Esq.

11        Maureen Littlejohn, Esq.

12        Bryan McLeese, Esq.

13

14   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

15   LIMITED

16   LAX O'SULLIVAN SCOTT LISUS LLP

17   Suite 2750, 145 King Street West

18   Toronto, ON   M5H 1J8

19   PER: Matthew P. Gottlieb, Esq.

20        Tracy Wynne, Esq.

21        Paul Michell, Esq.

22        Arden Beddoes, Esq.

23        James Renihan, Esq.

24

25



```
 1   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 2   LIMITED

 3   HUGHES HUBBARD & REED

 4   One Battery Park Plaza

 5   New York, NY  10004 1482

 6   PER: Derek Adler, Esq.

 7        Neil Oxford, Esq.

 8        Fara Tabatabai, Esq.

 9        Charles Huberty, Esq.

10        William Maguire, Esq.

11        Amina Hassan, Esq.

12        Gabrielle Glemann, Esq.

13        Caroline Parker Beaudrias, Esq.

14        Miles Orton, Esq.

15        Karen Goldberg, Esq.

16        Lena Saltos, Esq.

17        Mei Li Zhen, Esq.

18        Matthew Reynolds, Esq.

19        Ken Katz, Esq.

20        Greta Fails, Esq.

21        Quan Trinh, Esq.

22

23

24

25
```



1    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

2    LIMITED

3    YOUNG CONAWAY STARGATT & TAYLOR LLP

4    Rodney Square

5    1000 North King Street

6    Wilmington, DE  19801

7    PER: Ed Harron, Esq.

8        John Dorsey, Esq.

9        Jaime Chapman, Esq.

10

11   FOR THE EMEA DEBTORS

12   HERBERT SMITH FREEHILLS LLP

13   Exchange House

14   Primrose Street

15   London, England  EC2A 2EG

16   PER: James Norris Jones, Esq.

17       John Whiteoak, Esq.

18       Gary Milner Moore, Esq.

19       Kevin Pullen, Esq.

20       Catherine Emanuel, Esq.

21       Richard Mendoza, Esq.

22       David Russell, Esq.

23       Andrew Cooke, Esq.

24       Oliver Elgie, Esq.

25       Tom Henderson, Esq.

Neeson & Associates
COURT REPORTING AND CAPTIONING INC.    WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

1          Frances Furnivall, Esq.

2          Liam Spender, Esq.

3          Philip Lis, Esq.

4          Kristofer McGhee, Esq.

5          Thomas Turner, Esq.

6

7    FOR THE EMEA DEBTORS

8    DEBEVOISE & PLIMPTON LLP

9    65 Gresham Street

10   London, England

11   ECZV 7NQ

12   PER:  Kevin Lloyd, Esq.

13

14   CANADIAN CREDITORS COMMITTEE

15

16   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

17   BENEFICIARIES

18   KOSKIE MINSKY

19   20 Queen Street West

20   Suite 900

21   Toronto, ON  M5H 3R3

22   PER: Mark Zigler, Esq.

23       Jeff Van Bakel, Esq.

24       Ari Kaplan, Esq.

25       Barbara Walancik, Esq.

```
 1    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 2    COMMITTEE

 3    SHIBLEY RIGHTON LLP

 4    250 University Avenue, Suite 700

 5    Toronto, ON  M5H 3E5

 6    PER: Arthur O. Jacques, Esq.

 7

 8    FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

 9    ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE FUND

10    PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

11    35th Floor

12    155 Wellington Street West

13    Toronto, ON  M5V 3H1

14    PER: Kenneth T. Rosenberg, Esq.

15        Massimo (Max) Starnino, Esq.

16        Lily Harmer, Esq.

17        Karen Jones, Esq.

18        Michelle Jackson, Esq.

19        Megan Shortreed, Esq.

20

21    FOR MORNEAU SHEPELL LIMITED

22    MCCARTHY TETRAULT LLP

23    Suite 5300, Toronto Dominion Bank Tower

24    Toronto, ON  M5K 1E6

25    PER: Ronald Podolny, Esq.
```

```
 1          Sharon Kour, Esq.

 2          Elder C. Marques, Esq.

 3          Paul Steep, Esq.

 4          Byron Shaw, Esq.

 5          Keith Rose, Esq.

 6

 7     FOR THE CANADIAN CREDITORS COMMITTEE

 8     DLA PIPER

 9     919 North Market Street, Suite 1500

10     Wilmington, DE  19801

11     PER: Jason Gerstein, Esq.

12          Richard Hans, Esq.

13          Timothy Hoeffner, Esq.

14          Farah Lisa Whitley Sebti, Esq.

15          Selinda Melnik, Esq.

16          Sarah Tumey, Esq.

17

18     FOR THE CANADIAN CREDITORS COMMITTEE

19     UNIFOR

20     205 Placer Court

21     North York, ON, M2H 3H9

22     PER: Barry Wadsworth, Esq.

23

24

25
```



```
 1   INFORMAL NORTEL NOTEHOLDER GROUP

 2

 3   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 4   BENNETT JONES LLP

 5   1 First Canadian Place

 6   Suite 3400

 7   Toronto, ON  M5X 1A4

 8   PER: Kevin Zych, Esq.

 9        S. Richard Orzy, Esq.

10        Gavin Finlayson, Esq.

11        Richard Swan, Esq.

12        Jonathan Bell, Esq.

13        Amanda McLachlan, Esq.

14

15   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

16   MILBANK, TWEED, HADLEY, MCCLOY LLP

17   1 Chase Manhattan Plaza

18   New York, NY  10005

19   PER: Thomas R. Kreller, Esq.

20        Dennis F. Dunne, Esq.

21        Albert A. Pisa, Esq.

22        Samir Vora, Esq.

23        Andrew M. LeBlanc, Esq.

24        Eric I. Weiss, Esq.

25        Atara Miller, Esq.
```

Neeson & Associates
COURT REPORTING AND CAPTIONING INC.

W&F
WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

```
 1          Tom Matz, Esq.

 2          Nicholas A. Bassett, Esq.

 3          Alexis Chernak, Esq.

 4          Claudia G. Cohen, Esq.

 5

 6   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 7   PACHILSKI STANG ZIEHL & JONES LLP

 8   919 North Market Street

 9   17th Floor

10   Wilmington, DE, 19801

11   PER: Laura Davis Jones, Esq.

12          Peter J. Keane, Esq.

13

14   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

15

16   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

17   CASSELS BROCK & BLACKWELL LLP

18   Suite 2100, Scotia Plaza

19   40 King Street West

20   Toronto, ON  M5H 3C2

21   PER: Shayne Kukulowicz, Esq.

22          Michael Wunder, Esq.

23          Ryan Jacobs, Esq.

24          Geoff Shaw, Esq.

25          Stefanie Holland, Esq.
```



```
 1    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2    RICHARDS LAYTON & FINGER, P.A.

 3    920 North King Street

 4    Wilmington, DE  19801

 5    PER: Christopher Samis, Esq.

 6         Amanda Steele, Esq.

 7

 8    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 9    AKIN GUMP STRAUSS HAUER & FELD LLP

10    One Bryant Park

11    New York, NY  10036

12    PER: Fred S. Hodara, Esq.

13         David H. Botter, Esq.

14         Abid Qureshi, Esq.

15         Robert A. Johnson, Esq.

16         Brad M. Kahn, Esq.

17         Christine Doniak, Esq.

18         Joseph Sorkin, Esq.

19         Jacqueline Yecies, Esq.

20

21    UK PENSION PROTECTION FUND AND NORTEL NETWORKS

22    UK PENSION TRUST LIMITED

23

24

25
```

```
 1    FOR THE UK PENSION PROTECTION FUND AND NORTEL

 2    NETWORKS UK PENSION TRUST LIMITED

 3    THORNTON GROUT FINNIGAN LLP

 4    Suite 3200, 100 Wellington Street West

 5    P.O. Box 329

 6    Toronto, ON  M5K 1K7

 7    PER: Michael E. Barrack, Esq.

 8         D.J. Miller, Esq.

 9         Rebecca Kennedy, Esq.

10         Andrea McEwan, Esq.

11         John L. Finnigan, Esq.

12         Michael Shakra, Esq.

13         Kim Ferreira, Esq.

14

15    FOR THE UK PENSION PROTECTION FUND AND NORTEL

16    NETWORKS UK PENSION TRUST LIMITED

17    WILLKIE FARR & GALLAGHER LLP

18    787 Seventh Avenue

19    New York, NY  10019 6099

20    PER: Brian O'Connor, Esq.

21         Sameer Advani, Esq.

22         Andrew Hanrahan, Esq.

23         Eugene Chang, Esq.

24         Heather Schneider, Esq.

25         Robert Kofsky, Esq.
```

```
 1        Nicholas Chiuchiolo, Esq.

 2        Elizabeth Roache, Esq.

 3        Nicole Humphrey, Esq.

 4        Peter Sluka, Esq.

 5        Weston Eguchi, Esq.

 6        Ashley Moore, Esq.

 7        Megan Fantoni, Esq.

 8

 9   FOR THE UK PENSION PROTECTION FUND AND NORTEL

10   NETWORKS UK PENSION TRUST LIMITED

11   BAYARD, P.A.

12   222 Delaware Avenue, Suite 900

13   Wilmington, DE  19899

14   PER: Charlene D. Davis, Esq.

15        Justin R. Alberto, Esq.

16        Evan T. Miller, Esq.

17

18   FOR THE UK PENSION CLAIMANTS

19   HOGAN LOVELLS INTERNATIONAL LLP

20   Atlantic House, Holbrow Viaduct

21   London, England, EC1A 2FG

22   PER: Angela Dimsdale Gill, Esq.

23        John Tillman, Esq.

24        Crispin Rapinet, Esq.

25        Matthew Bullen, Esq.
```

```
 1        Chris Edwards Earl, Esq.

 2

 3   FOR THE UK PENSION CLAIMANTS

 4   WILBERFORCE CHAMBERS LLP

 5   8 New Square, Lincolns Inn

 6   London, England, WCZA 3QP

 7   PER: Michael Tennet, Esq.

 8

 9   THE BANK OF NEW YORK MELLON

10

11   FOR THE BANK OF NEW YORK MELLON

12   VEDDER PRICE LLP

13   919 North Market Street

14   17th Floor

15   Wilmington, DE, 19801

16   PER: Michael Riela, Esq.

17        Michel Edelman, Esq.

18

19   WILMINGTON TRUST, NATIONAL ASSOCIATION

20

21   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

22   KATTEN MUCHIN ROSENMAN LLP

23   575 Madison Avenue

24   New York, NY  10022 2585

25   PER: Bertrand J. Choe, Esq.
```

 

```
 1        David A. Crichlow, Esq.

 2        Karen B. Dine, Esq.

 3

 4    FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 5    DENTONS CANADA LLP

 6    77 King Street West

 7    Suite 400

 8    Toronto, ON, M5K O41

 9    PER:  Kenneth Kraft, Esq.

10        John Salmas, Esq.

11        Matthew Fleming, Esq.

12        Robert Kennedy, Esq.

13

14    FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

15    COUSINS CHIPMAN & BROWN LLP

16    1007 North Orange Street

17    Suite 1110

18    Wilmington, DE, 19801

19    PER: Scott D. Cousins, Esq.

20        Ann Kashishian, Esq.

21

22    LAW DEBENTURE TRUST COMPANY OF NEW YORK

23

24

25
```



```
 1   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 2   BORDEN LADNER GERVAIS LLP

 3   40 King Street West

 4   Toronto, ON  M5H 3Y4

 5   PER: Edmond F.B. Lamek, Esq.

 6

 7   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 8   PATTERSON BELKNAP WEBB & TYLER LLP

 9   1133 Avenue of the Americas

10   New York, NY  10036

11   PER: Daniel A. Lowenthal, Esq.

12      Brian P. Guiney, Esq.

13      Craig W. Dent, Esq.

14

15   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

16   MORRIS JAMES, LLP

17   500 Delaware Avenue

18   Suite 1500

19   Wilmington, DE

20   19801 1494

21   PER: Stephen M. Miller, Esq.

22

23   BOARDS OF DIRECTORS OF NORTEL NETWORKS

24   CORPORATION AND NORTEL NETWORKS LIMITED

25
```

```
 1    FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

 2    CORPORATION AND NORTEL NETWORKS LIMITED

 3    OSLER HOSKIN AND HARCOURT LLP

 4    100 King Street West

 5    1 First Canadian Place, Suite 6100

 6    P.O. Box 50

 7    Toronto, ON  M5X 1B8

 8    PER: Lyndon Barnes, Esq.

 9         Carey O'Connor, Esq.

10         Betsy Putnam, Esq.

11         Adam Hirsh, Esq.

12         Alexander Cobb, Esq.

13

14

15

16

17         REPORTED BY:  Toronto - Kimberley Neeson

18                    RPR, CRR, CSR, CBC

19             Realtime Systems Administrator

20              Delaware - Lorraine Marino

21                       RDR, CRR

22

23

24

25
```

```
 1                    I N D E X

 2   OPENING STATEMENTS:                              PAGE

 3   On Behalf of Joint Administrators:

 4        By Mr. Maguire                               25

 5        By Mr. Gottlieb                              66

 6   On Behalf of UK Pension Claimants:

 7        By Mr. O'Connor                             119

 8        By Mr. Barrack                              132

 9   On Behalf of the US Estate:

10        By Ms. Block                                161

11        By Mr. Bromley                              175

12        By Mr. Bromley                              222

13        By Ms. Block                                248

14

15

16

17

18

19

20

21

22

23

24

25
```



 1                 --- Upon commencing at 9:03 a.m.

 2                 THE US COURT:  Good morning, everyone.

 3      Thank you.  Please be seated.  I will wait for

 4      Justice Newbould, who should be right in.  It looks

 5      like a classroom.  (Pause)

 6                 THE CANADIAN COURT:  Good morning.

 7                 THE US COURT:  Good morning, Justice

 8      Newbould.

 9                 THE CANADIAN COURT:  Just a couple

10      things.  Good morning, Judge Gross.  Excuse me.

11                 I think the plan is we will sit --

12      start at 9:00.  We will sit till 10:30, take a

13      20-minute break.  And we will go to 12:30, and we

14      will come back at quarter to 2:00.  That will be

15      the daily game plan.  And we will go, depending how

16      things go, 4:30, quarter to 5:00, something like

17      that.  But if there are witnesses and they are just

18      about done, we will see how that works out.

19                 The other thing I would ask counsel is

20      when you stand to speak, would you please say your

21      name for the sake of the reporter here and the

22      reporter in Delaware.  And I would ask counsel in

23      Delaware to do the same --

24                 THE US COURT:  Yes.

25                 THE CANADIAN COURT:  -- for the

1    reporter here.  All right.

2                So who is the captain?  Who starts

3    here?

4                THE US COURT:  Mr. Abbott.

5                MR. ABBOTT:  Your Honor, Derek Abbott

6    from Morris, Nichols, here for the US Debtors.

7    Your Honor, the parties have agreed and conferred,

8    and we believe that EMEA is going to start with

9    opening statements, and so I will cede the podium

10   to them, Your Honor.

11               THE US COURT:  Excellent.  Thank you,

12   Mr. Abbott.

13               Just one quick question.  I received a

14   certification of counsel on the order providing

15   directions and establishing procedures for trial

16   exhibits and so on.  Is that another version or is

17   the one that I docketed early this morning --

18               MR. ABBOTT:  Your Honor, it is my

19   impression that the one you docketed is fine.  I

20   will check on that and let your staff know during a

21   break, Your Honor.

22               THE US COURT:  All right.  Thank you,

23   Mr. Abbott.

24               MR. ABBOTT:  Thank you, Your Honor.

25               THE US COURT:  Good morning.

```
 1   OPENING STATEMENT ON BEHALF OF JOINT ADMINISTRATORS

 2              OF NORTEL NETWORKS UK LIMITED

 3              MR. MAGUIRE:  Good morning, Your Honor.

 4              THE US COURT:  Pleasure to see you.

 5              MR. MAGUIRE:  If it please the Courts,

 6   my name is Bill Maguire, from Hughes Hubbard & Reed

 7   on behalf of the Joint Administrators of the EMEA

 8   parties.  And it is my privilege to appear with my

 9   colleagues, Neil Oxford, Derek Adler, and John

10   Dorsey, here before Your Honor, Judge Gross --

11              THE US COURT:  Thank you.

12              MR. MAGUIRE:  -- in Wilmington and with

13   our colleagues in Justice Newbould's court in

14   Toronto, Matt Gottlieb, Matt Milne-Smith, and Jim

15   Doris.

16              I propose to cover the first part of

17   the opening statement on behalf of the EMEA parties

18   and then to pass the baton to my colleague in

19   Toronto, Matt Gottlieb.

20              THE US COURT:  That's fine.

21              MR. MAGUIRE:  In addressing the

22   question before the Courts, how to divide

23   $7.3 billion in sales proceeds, we propose to start

24   first with Nortel's technology, our intellectual

25   property, and then to move to the next most
```

1    significant asset, which is Nortel customer assets.

2              The technology proceeds, the EMEA

3    Debtors' contribution approach says allocate the

4    proceeds in proportion to each party's

5    contribution, what each party spent, actually

6    spent, to create that technology.  That is the only

7    approach that is consistent with the understanding

8    of the parties, the conduct of the parties, and the

9    rights of the parties.

10             The parties said that they would share

11   the proceeds of a sale on the basis of what they

12   had spent on the technology.  They said that from

13   at least 2002.  Nortel said that is what we will

14   do, and that's what the parties actually did in

15   2006.

16             In 2006 Nortel sold the business, and

17   the parties took the proceeds of that business and

18   they allocated the technology proceeds on the basis

19   of contribution.

20             So we will begin by describing how the

21   parties created a global pool of Nortel technology

22   and how they shared ownership of that technology

23   and its proceeds.

24             We have here a very simplified --

25   hopefully on your monitor, a simplified



1    organization chart.  And it shows Nortel from about

2    2000, when it was spun off as an independent public

3    company from Bell Canada.

4                  THE CANADIAN COURT:  Just a second,

5    Mr. Maguire.  If you say that there is something on

6    the screen, mine is blank.

7                  MR. MAGUIRE:  We appear to have some

8    slight technical difficulties.

9                  THE CANADIAN COURT:  Oh, there we are.

10                 THE US COURT:  We have it.  Thank you.

11                 THE CANADIAN COURT:  Somebody kicked

12   it.

13                 MR. MAGUIRE:  It works every time.

14                 This shows at the top of the chart the

15   Canadian parent company, which became Nortel

16   Networks Corporation.  Its principal subsidiary was

17   Nortel Networks Ltd.  Those two Canadian companies

18   and their subsidiaries are the Canadian Debtors in

19   this proceeding.

20                 Nortel Networks Ltd. also owned the

21   United States company, Nortel Networks Inc.  That

22   was the company through which Nortel did business

23   in the United States.  That company and its US

24   subsidiaries make up the US Debtors.

25                 Nortel Networks Ltd. also owned the

1    United Kingdom company, Nortel Networks UK Ltd.;

2    the French company, Nortel Networks SA; and the

3    Irish company, Nortel Networks Ireland Ltd.  These

4    companies and their subsidiaries make up the EMEA

5    Debtors.

6              Nortel's principal research facilities

7    were located in Canada, the United States, England,

8    France, and Ireland.  Its European research centers

9    included Harlow, England; Galway, Ireland; and

10   Châteaufort, France.

11             Nortel labs around the world worked

12   together to research and develop advanced

13   telecommunications technology.  And the parties

14   created a global pool of intellectual property that

15   was so intertwined that the parties measured their

16   respective contributions by their spending, the

17   actual dollars that each party spent on research

18   and development.  The parties agreed that each

19   dollar spent on R&D had equal value no matter who

20   spent it.

21             Now, the parties were supposed to share

22   the proceeds of Nortel technology fairly,

23   proportionately.  They never agreed that any party,

24   the Canadian parent or anyone else, would get a

25   disproportionate share.  And the parties never even

1    considered allocating a disproportionate share of

2    proceeds to the parent company based on the fact

3    that legal title was held in its name.

4              Since 1991 the parties spent billions

5    of dollars on research and development.  The EMEA

6    parties alone spent billions of dollars.  But the

7    Canadian Estates today say that with respect to

8    Nortel technology, the most valuable asset, the

9    Canadian Estates should get 90 percent of

10   everything; and that of the $4-1/2 billion realized

11   from the sale of patents, both the EMEA and the US

12   parties should get nothing and the Canadian Estates

13   should get everything, 100 percent, as sole owner.

14             Well, the record will show that that

15   was not the deal.  The claim that the Canadian

16   company, Nortel Networks Ltd., is the sole owner of

17   Nortel technology is directly contradicted by the

18   record.

19             From 2001 through as late as 2010, the

20   parties repeatedly affirmed that Nortel Networks

21   Ltd. was not the sole owner and that all parties

22   shared ownership.

23             We will preview the evidence that all

24   parties owned Nortel technology and that they

25   understood the benefits of their ownership would be

 

1    shared fairly, proportionately, based on what each

2    party contributed.  This evidence falls into these

3    categories.

4              First, we will invite the Courts'

5    attention to what the parties told their

6    governments:  that all parties shared ownership.

7              Second, we will preview the documents

8    and the testimony of the Canadian parent company,

9    Nortel Networks, that holding legal title to Nortel

10   technology was a matter of administrative

11   convenience.

12             Third, we will turn to the parties'

13   2004 written contract, which confirmed that all the

14   parties owned Nortel technology.

15             Our friends say that the contract did

16   not cover the sharing of sales proceeds.  Well,

17   guess what the parties did a year or two after

18   entering into that 2004 contract.  They sold the

19   business.  They took the proceeds and they shared

20   the proceeds based on contribution.

21             So we will show how, in the 2006

22   Alcatel sale, the parties answered the question

23   before us today by allocating the proceeds among

24   all the parties based on their contributions.

25             We will confirm that the parties also



1    shared proceeds from licensing and litigating

2    Nortel IP, again based on contribution; how Nortel

3    used its French company's ownership of Nortel IP to

4    avoid taking a write-off on its financial

5    statements; how in a transaction called Project

6    Swift, Nortel affirmed that all the parties owned

7    Nortel IP; how, in preparing for bankruptcy, a top

8    executive acknowledged that the Canadian company

9    owned only a part of Nortel IP and that the

10   proceeds would be allocated based on contribution;

11   how --

12              THE CANADIAN COURT:  Mr. Maguire, can I

13   ask you a question, please?

14              MR. MAGUIRE:  Yes, sir.

15              THE CANADIAN COURT:  There is an issue

16   that has been raised by the Canadian Debtors that

17   all of this kind of evidence under our rules for

18   interpreting contracts are not admissible unless

19   there is some ambiguity.

20              Do you take the position that the MRDA

21   is ambiguous or unambiguous in terms of the

22   ownership?

23              MR. MAGUIRE:  Your Honor, we take the

24   position that that contract is unambiguous and is

25   in our favor.  We fully recognize that other

```
 1   parties take a dramatically different

 2   interpretation of that contract.  As we see that

 3   contract, that contract does not cover the issue

 4   before us.

 5              And actually, I think, all parties

 6   agree that that contract does not cover sales

 7   proceeds.  The Canadian parties take the view that

 8   that means there are no sale proceeds to be shared.

 9              We take a very different view.  We see

10   that contract as addressing one issue by the

11   parties, and that issue was how to allocate annual

12   operating profits.  It did not address sales

13   proceeds.  And the parties confirmed that a year or

14   so after entering into that contract by allocating

15   sales proceeds based on ownership, based on

16   contribution, when they did the Alcatel sale.

17              So, Your Honor, we see that contract as

18   being unambiguous.  We see that contract as

19   governing the annual operating profits that it

20   addresses and not as governing the proceeds that

21   are allocated on a sale, which is the question

22   directly before the Courts; although, as I will get

23   to in a little bit later in my presentation, we do

24   believe that contract directly and clearly confirms

25   that all parties owned Nortel IP.
```



1            We will start with the parties'

2    representations to their governments, and we will

3    start in 2002 with what you will hear referred to

4    as a kickoff meeting.  This was a big meeting with

5    three governments:  the tax authorities of

6    Canada, the United States, and the United Kingdom.

7    A lot of work went into preparing for this meeting.

8    And in the course of that work, the Canadian parent

9    addressed, asked, and answered the very question

10   before the Courts today.

11           The kickoff meeting followed

12   discussions with governments about how Nortel was

13   allocating profits from technology.  And based on

14   those discussions, Nortel decided to move from a

15   cost-sharing arrangement to a profit-sharing

16   arrangement, a new model that they called the

17   residual profit-split methodology.

18           In April 2002 Nortel filed requests

19   with the Internal Revenue Service, the Canadian

20   Revenue Authority, and Her Majesty's Revenue

21   Commissioners seeking approval of something called

22   an advance pricing agreement, or APA.

23           In June 2002 Nortel held the kickoff

24   meeting with the three governments.  In preparing

25   for that, Nortel senior management worked

1    internally and with its consultants from KPMG and

2    Deloitte, anticipating the questions that they

3    would have to address with those governments.  And

4    they put together an important document called a

5    Q&A, a question-and-answer document, that

6    anticipated the questions the governments would ask

7    and the answers that Nortel approved would be given

8    at the meeting to those governments.

9                A Nortel Networks Ltd. representative

10   at the meeting has confirmed that this Q&A document

11   was fully vetted internally at Nortel and that it

12   was an accurate statement of the company's position

13   and that Nortel Networks Ltd. took the document

14   with them to the kickoff meeting with the three

15   governments.

16                That document has 33 questions and

17   answers.  Question 31 is our question:  Who owns

18   Nortel IP and how would Nortel allocate proceeds

19   from the sale of IP?

20                Here is what Nortel said.  The

21   question:  How does Nortel propose to account for

22   any future sale of intellectual property developed

23   prior to or during the term of the APA?  Which

24   entities are considered the legal owner of IP and

25   which are considered the economic owners?



1              And the answer was proceeds from the

2    sale of IP will be allocated to residual

3    profit-split participants on the basis of their

4    economic ownership of the IP; that is, on the basis

5    of their share of total R&D capital stock in the

6    year of sale.  The residual profit-split

7    participants are, of course, the parties before

8    you.

9              Nortel's answer is enlightening.  There

10   is not a word here about legal title determining

11   anything.  There is no word here that Nortel

12   Networks Ltd. is the sole owner of Nortel IP.  What

13   we see here is that all the parties have ownership

14   and all the parties will share in the proceeds.

15             So the parties' sharing of ownership

16   and sharing of sale proceeds based on their

17   ownership is not just EMEA's position in these

18   proceedings today.  It was fact.  It was the

19   reality on the ground, as acknowledged by the

20   Canadian parent, Nortel Networks Ltd., in 2002 and

21   thereafter.

22             In September 2003, the Canadian parent

23   company, the US company, and the UK company

24   prepared a joint response to questions posed by the

25   Canada Customs and Revenue Agency and Inland



1    Revenue.  In the course of that response, they

2    expressly referred to the parties as the owners of

3    the intangible property.

4              Here is that document.  And right in

5    the middle of it you will see a reference to the

6    residual entities as the owners of the intangible

7    property.  And, of course, the residual entities

8    are the parties before you.

9              We can fast-forward to a document that

10   the Canadian parent company and the US company

11   jointly submitted to the Internal Revenue Service

12   and the Canada Revenue Authority in October of

13   2008, just months before Nortel filed bankruptcy.

14   Even at this late stage, Nortel Networks Ltd. was

15   not claiming to be the sole owner of Nortel

16   technology.  Instead, it acknowledged that each of

17   the parties has economic ownership.

18             And here is that document:  "All

19   intellectual property (IP) created from the

20   investment in R&D by the IEs is registered by

21   Nortel Networks Ltd.  Each integrated entity" --

22   that's each of the parties -- "maintains an

23   economic ownership in the IP."

24             The very next year, 2009, after the

25   bankruptcy filings, Nortel Networks Ltd.

1    commissioned a transfer pricing report by

2    Ernst & Young which stated that all the parties,

3    not just the Canadian company, are owners of

4    Nortel's IP.

5              Here is that document.  It says, "The

6    Nortel Group, of which Nortel Networks Corporation

7    is the ultimate parent, operates under the residual

8    profit-split method, whereby certain affiliates,

9    including Nortel Networks Ltd. and other integrated

10   entities" -- that's the parties here -- "are the

11   primary owners of intangibles developed by the

12   Nortel Group and bear the risk of development."

13             Nortel Networks Ltd. prepared this

14   document under Canadian tax laws.  The preparer of

15   the report is significant.  It is the Monitor's

16   firm, Ernst & Young Canada.

17             The timing is significant.  By now

18   Nortel had already begun selling off businesses.

19   And the statement is significant.  It directly

20   contradicts the Canadian Debtors' position that the

21   EMEA and US parties are not owners of Nortel IP.

22             We turn now to Nortel executives, who

23   have confirmed that Nortel Networks Ltd. was not

24   the sole owner of the technology, that the parties

25   shared beneficial ownership.

 

1              Mr. John Doolittle was a senior

2    executive at Nortel Networks Ltd. for about 20

3    years.  He served as the Canadian parent company's

4    treasurer.  He also served as its vice president of

5    tax.  And upon insolvency, Mr. Doolittle became

6    Nortel Networks Ltd.'s senior vice president

7    corporate affairs and its chief financial officer.

8    Mr. Doolittle is currently the chief financial

9    officer of a company in Toronto.

10             The Canadian Estates are not bringing

11   Mr. Doolittle to testify live in this trial, but

12   here is Mr. Doolittle's testimony confirming how

13   Nortel operated and specifically about the

14   distinction at Nortel between legal title and

15   beneficial ownership of IP.

16             Mr. Doolittle was specifically asked

17   about the statement in the report that we just read

18   about the economic ownership that each party

19   maintains in Nortel IP, and he was asked if that

20   was consistent with your business understanding

21   that Nortel Networks Ltd. held legal title to the

22   IP and the parties had beneficial ownership of the

23   IP in their territories.  And his answer was "yes."

24             And he was asked [reading]:  And in the

25   document the phrase "economic ownership" is used,



1    and you used the term "beneficial ownership."  My

2    question to you is, from a tax perspective, are

3    those two terms, "economic ownership" and

4    "beneficial ownership," synonymous or do they have

5    a different meaning?

6              "Answer:  My understanding is that they

7    are synonymous."

8              Mr. Doolittle acknowledged that the

9    notion that Nortel Networks Ltd., or NNL, should

10   get all the proceeds of sales as the legal owner

11   was, in his words, not consistent with the way --

12   with his understanding of the way the company

13   operated.

14             And here is that testimony.

15             "Question:  At any point in your

16             involvement and discussions about IPCo,

17             was it ever suggested by anybody that

18             all of the value associated with the

19             economic and beneficial ownership of

20             Nortel's IP should be attributable to

21             Nortel Networks Ltd.?

22             "Answer:  Yes, there were

23             discussions that I participated in

24             where -- and I don't remember who --

25             but people said that the legal

Neeson & Associates    W&F  WILCOX & FETZER LTD.

1           ownership of the IP rested with NNL and
2           NNL should retain all of the value from
3           the proceeds of those sales.  But,
4           again, that's not consistent with my
5           understanding of the way the company
6           operated."
7           THE CANADIAN COURT:  I see Mr. Zarnett
8    has been watching too much TV.
9           MR. MAGUIRE:  Mr. Zarnett had to get a
10   cameo appearance.
11          Mr. Doolittle, interestingly enough, is
12   the Canadian executive who signed the parties'
13   Master Research and Development Agreement, the very
14   contract, Justice Newbould, that you asked about
15   earlier.
16          THE US COURT:  Did you mean Mr. Zarnett
17   or did you mean Mr. Doolittle?
18          MR. MAGUIRE:  Mr. Doolittle.  I am
19   sorry.  I misspoke.  We would love to have
20   Mr. Zarnett on tape, but --
21          That is the document on which the
22   Canadian Debtors rely to say what the deal is here.
23   And here, specifically, is the executive from the
24   Canadian parent who signed that contract and who
25   has testified in a way that is dramatically



1    inconsistent with the position taken by Nortel

2    Networks Ltd. today.

3              The way that Nortel operated is

4    described in a 2002 Nortel Networks memorandum,

5    which states that Nortel's intellectual property

6    was beneficially owned by the parties.  That

7    memorandum was from another Nortel Networks Ltd.

8    executive, its head of transfer pricing, James

9    Gatley.

10             At the time he was seeking advice from

11   a lawyer at the Osler law firm in Toronto.  The

12   concern at the time was that the French company

13   might leave the profit-sharing arrangement.  The

14   French company contributed huge sums to Nortel's

15   research and development.

16             Now, the French company did not leave

17   the profit-sharing arrangement.  But what is

18   interesting about Mr. Gatley's memorandum is his

19   description of the facts, how Nortel operated at

20   the time.  This is in 2002.  And in the facts

21   section of his memo, he sets forth that the effect

22   of the profit-sharing model is that "The future

23   intangibles developed are beneficially owned by

24   those six former R&D CSA participants" -- again,

25   the parties before you.

 

1               The facts of Nortel's profit-sharing

2     arrangement were that the parties had beneficial

3     ownership.

4               Mr. Gatley was deposed in this case,

5     and he explained what he means by "beneficial

6     ownership," how legal title is different, and how

7     the allocation of proceeds -- what matters is

8     beneficial ownership and not legal title.

9               And this is Mr. Gatley's testimony:

10              Q.   Can you explain to me what you

11              understood the difference between legal

12              and beneficial ownership is as a

13              transfer pricing tax person?

14              A.   Right.  Okay.  My understanding,

15              then, is pretty much the same as my

16              understanding now.  So that will help

17              me say that I don't really know exactly

18              what was going through my head in those

19              days, but the difference is a very

20              transfer pricing-specific concept.

21                 This comes up a lot with our

22              clients.  They don't understand what we

23              are getting at.  Legal ownership is

24              something we are not really concerned

25              with at all.  In fact, less than that,



1                I am not concerned with legal ownership

2                at all when it comes to transfer

3                pricing analysis.  I don't care who

4                owns the intangibles from a legal

5                perspective or the patents.

6                    I have never bothered to look those

7                issues up, never asked the question.

8                If somebody told me, I wouldn't write

9                it down.  That's how much I don't care

10               about legal ownership.  Economic

11               ownership is much different.  It's --

12               Q.   Before you continue, "economic"

13               and "beneficial," are those synonyms?

14               A.   Some people use "beneficial."  It

15               is not proper, I think, to use that

16               term.

17               Q.   Which term?

18               A.   Beneficial.

19               Q.   Okay.  So you prefer to use the

20    term "economic"?

21               A.   Yes, because transfer pricing is

22               comprised of three different

23               disciplines:  law, accounting, and

24               economics, you know, economic

25               ownership.  And what that entails



 1   basically is -- try to explain this

 2   properly -- basically trying to

 3   compensate parties, companies in the

 4   intercompany transactions based on what

 5   would be considered fair, given what

 6   they have contributed either

 7   financially or through their time.

 8      Too vague?

 9   Q.   Let me just read back what you

10   said, or read what you said and see if

11   I do understand it.

12      I am following you, though I am not

13   sure.  How does that tie back to what

14   you think is the difference between

15   legal and economic ownership?

16   A.   Okay.  So here is an example I

17   think that would be easy.  You can have

18   Nortel Canada register all the patents

19   or they could have been registered in

20   the US.  I don't know.  But let's just

21   say for the sake of this example all

22   the patents were registered by Canada.

23      To me that means nothing.  What I am

24   concerned with from a transfer pricing

25   perspective is who contributed to the



1          development of the intangibles

2          associated with that patent.  And that

3          might be R&D undertaken in the UK or

4          R&D undertaken in Australia and Canada.

5             So if those three entities

6          contributed to developing the R&D that

7          allowed Canada to register a patent, I

8          am not concerned with the registration

9          of the patent.  I am concerned with

10         making sure that everybody who helped

11         develop that intellectual property is

12         compensated properly for their efforts

13         through the transfer pricing model.

14         Mr. Gatley could not have been clearer.

15 He couldn't care less whether all the patents were

16 registered in Canada or all the patents were

17 registered in the name of the US company.  It

18 didn't matter to him in whose name it was

19 registered.  It didn't matter to the Canadian

20 parent, Nortel Networks Ltd.  In terms of our

21 issue, proceeds, allocation of proceeds, it was not

22 legal title that mattered.

23         And Mr. Gatley's testimony about the

24 irrelevance, for our purposes, of legal title is

25 confirmed by his company's documents, including two



```
 1   documents specifically explaining why legal title
 2   was kept with the Canadian parent, Nortel Networks
 3   Ltd.:  for administrative simplicity.
 4           Here is the first document which
 5   specifically contains the suggestion to maintain
 6   Nortel Networks Ltd. as intellectual property
 7   rights owner for administrative simplicity.
 8           When you hear us say that Nortel
 9   Networks Ltd. held title for convenience, those are
10   not our words; these are the words of the Canadian
11   parent at the time.
12           The company prepared this document in
13   late 2001, when the parties were considering
14   adopting this new arrangement, this profit-sharing
15   arrangement.  Mr. Timothy Collins, a Nortel
16   Networks Ltd.'s lead counsel for optical networks,
17   and several other executives reviewed and approved
18   the arrangement.  And in the course of his review,
19   Mr. Collins prepared a slide deck, of which this is
20   one of the slides, including the suggestion that
21   the parties keep legal title with the Canadian
22   parent for administrative simplicity.
23           Mr. Walter Henderson was a senior tax
24   counsel at the United States company who reported
25   to Nortel Networks Ltd.  He received Mr. Collins'
```



```
 1    slide that we have just seen, and he testified
 2    about the distinction between legal and beneficial
 3    ownership.  And this is his testimony:
 4                   Q.   Can you explain that, please?
 5                   A.   Legal title is meant to be who is
 6                   the owner of property in the sense of a
 7                   registered name.  That's been my
 8                   experience.  And can be things like
 9                   patent -- any kind of registered IP or
10                   even land or anything else that has a
11                   legal title.
12                      Beneficial ownership refers to who
13                   has the benefits and burdens of the
14                   property and the right to use the
15                   property and often goes to who paid the
16                   cost to develop the property or acquire
17                   the property.
18                   Q.   And so from a tax perspective,
19                   what is the importance of beneficial
20                   ownership?
21                   A.   Beneficial ownership dictates who
22                   should be allocated -- who has the
23                   right to receive the income arising
24                   from either expenditures or property or
25                   something else that they own.  So in
```



 1                    this case of beneficial ownership, many

 2                    times it would be the cost to acquire

 3                    the property or develop the property.

 4                    Whoever has borne that will be deemed

 5                    to have beneficial ownership.

 6                    THE CANADIAN COURT:  Mr. Maguire, can I

 7     ask you another question?

 8                    MR. MAGUIRE:  Yes, sir.

 9                    THE CANADIAN COURT:  Can I ask you

10     another question?  I can understand, for transfer

11     pricing purposes, that form cannot dictate over

12     substance.  The tax authorities wouldn't permit it.

13                    I guess one question I have is, is the

14     transfer pricing regime the regime to use in this

15     case to allocate the benefits?

16                    MR. MAGUIRE:  Yes, Your Honor.  And I

17     say yes for two reasons.  The first reason is that

18     the parties gave and were required to give the

19     transfer pricing legal meaning.  It was not enough

20     for the parties to tell their governments, "Don't

21     worry about it.  We got this.  We are sharing

22     profits in a fair way."

23                    The authorities wanted to see some

24     legal shape to that, at least with respect to the

25     annual operating profits that the parties were

 1    divvying up every year.  So they had to have

 2    agreements, and the agreements had to satisfy the

 3    arm's-length principle.  And that is the principle

 4    that the parties deal fairly and equitably with

 5    each other as if they were parties who were not

 6    under common control.

 7            So the governments required Nortel to

 8    start documenting things and to put things in

 9    writing.  And when they did, as we will see, and

10    they got to their written contract, the parties

11    confirmed beneficial ownership.  It was recognized

12    in a legal document.  They even used the terms

13    "beneficial ownership."  So that's the first

14    reason, Your Honor.

15            The second reason is that when we look

16    at the transfer pricing discussions, we see what

17    the fundamental deal, the fundamental economics,

18    the underlying reality of what the parties'

19    expectations and understandings and rights were.

20            The parties did not go into any of this

21    with some sense of technical "gotcha"; that we are

22    going to do this in some transfer-pricing way, but

23    legally you are exposed, legally you are at peril,

24    legally, if anything goes wrong, you, your

25    pensioners, and all who depend on you will be



1    stiffed.

2              That was never the deal.  The deal was

3    always that the fundamental underlying fairness

4    would be given legal expression and effect.

5              THE CANADIAN COURT:  One minute,

6    please.  Technical difficulty.

7    -- OFF THE RECORD --

8              THE CANADIAN COURT:  Yes, thank you,

9    Mr. Maguire.

10             MR. MAGUIRE:  Thank you, Justice

11   Newbould.

12             About ten days after Mr. Collins sent

13   his email with the slide deck we were just looking

14   at, we have another document from the Canadian

15   parent making the same point about administrative

16   simplicity.  This memorandum, also prepared by

17   Mr. Collins, makes the same point as follows:

18             Under intellectual property rights

19   impact, at the end of a long paragraph, the

20   memorandum states, "While it is not required by the

21   new model" -- that's the new profit-sharing model;

22   there was nothing about the new profit-sharing

23   model that required that legal title be registered

24   with Nortel Networks Ltd -- "for administrative

25   simplicity, it is expected that all of Nortel's



1   intellectual property rights will continue to be

2   owned by Nortel Networks Ltd."

3                Now, a witness who used to work for the

4   United States company as its director of tax is

5   Mr. Mark Weisz.  He confirmed that the parties

6   distinguished between legal title and beneficial

7   ownership and that they expected to share the

8   global proceeds of Nortel IP commensurate with

9   their contributions.

10               Q.   You would agree with me, sir, that

11               the MRDA provided that the

12               residual-profit participants should

13               benefit from their contribution to

14               research and development, commensurate

15               with that contribution?

16               A.   Yes.

17               Q.   And that principle on which the

18               RPS participants should benefit was

19               consistent with the arm's-length

20               principle, was it not?

21               A.   Yes, it was.

22               Q.   And that's because parties who

23               contribute to the development and

24               exploitation of intellectual property

25               would expect to share in the proceeds



1              from the sale of that property;

2              correct?

3              MR. ZELBO:  Objection to form.

4              A.   The folks that were involved in

5              the R&D residual profit split were the

6              risk takers for our company and had the

7              economic rights to exploit the

8              technology.

9              Q.   And they would expect, as a result

10             or in return for -- withdrawn.

11                 The parties who were the risk takers

12             that you just described in that last

13             answer are the residual profit-split

14             entities?

15             A.   Yes, they are.

16             Q.   And those risk takers would expect

17             to have contributed to the development

18             and exploitation of intellectual

19             property to be able to share in the

20             proceeds from the sale of that

21             property; correct?

22             A.   Sale of the technology.  That's

23             correct.

24             MR. MAGUIRE:  I will now turn to the

25       parties' written agreement that we briefly alluded



1    to earlier.

2              Before we do, I think it is important

3    to remember that agreement was executed in late

4    2004 and into 2005.  But the background was that

5    for four years, from 2001 through almost all of

6    2004, the parties were sharing profits without any

7    written agreement.

8              In late 2004 the parties documented one

9    aspect of their ownership, and that was how it was

10   every year they were sharing the annual operating

11   profits.  For that purpose they prepared their

12   Master Research and Development Agreement, and they

13   made it effective three years earlier, back to

14   2001.  The Canadian Debtors' entire case is based

15   on misreading and misapplying this document.

16             To be fair, the agreement does provide

17   that Nortel Networks Ltd. will continue to hold

18   legal title, but the agreement directly contradicts

19   the claim that Nortel Networks Ltd. is the sole

20   owner of the technology.

21             Article 4(a) of the agreement vests

22   only legal title, not ownership, in Nortel Networks

23   Ltd.  And this was not new.  The parties had been

24   putting title in the name of the Canadian company

25   for years.  So the parties continued to hold

 Neeson&Associates   W&F  WILCOX & FETZER LTD.                    www.neesoncourtreporting.com
                                                                         www.wilfet.com

1    technology in the name of Nortel Networks Ltd.  And

2    as the Canadian company itself said, this was for

3    administrative simplicity.

4              So the parties' master agreement did

5    not say that Nortel Networks Ltd. was the sole

6    owner of Nortel IP.  In fact, the agreement

7    expressly acknowledges that all the parties owned

8    the IP.  The third recital to the agreement says,

9    "Whereas each participant bears the full

10   entrepreneurial risks and benefits of the Nortel

11   Networks business."

12             Only owners are exposed to the full

13   entrepreneurial risks and benefits, and one of the

14   benefits is the proceeds of a sale.

15             The sixth recital provides that the

16   parties should benefit from the proceeds of their

17   R&D commensurate with their contributions.  Here it

18   is:

19                  "Whereas each participant believes

20                  that it is appropriate that each

21                  participant should benefit from its

22                  contribution to R&D activity

23                  commensurate with the value of its

24                  contribution to that R&D activity in

25                  the context of the manner in which the



1                       Nortel Networks business is conducted

2                       and that the residual profit-split

3                       methodology is the best arm's-length

4                       measure, in the circumstances of NNL

5                       and the participants, of such

6                       contributions with reference to such

7                       benefits."

8                       This records the parties' belief that

9     everyone would be treated fairly and

10    proportionately and that no one, including the

11    Canadian parent, would get a disproportionate

12    benefit at the expense of anyone else.

13                      The agreement's Schedule A sets out the

14    mechanics for allocating annual operating profits.

15    The schedule expressly recognizes that all the

16    parties owned Nortel IP.  Here is where it

17    expressly says:

18                      "Accordingly, the compensation

19                      provided to the participants under RPSM

20                      reflects the fact that the participants

21                      bear the full entrepreneurial risk of

22                      the Nortel business, such as the risks

23                      attendant with the substantial and

24                      continuance development and ownership

25                      of the NN technology."


Neeson&Associates    W&F
COURT REPORTING AND CAPTIONING INC.    WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

1              Now, the parties made various

2     amendments to this agreement over the years,

3     including one amendment just days before their

4     bankruptcy filings.  But this ownership language

5     never changed.

6              Indeed, in the second addendum which

7     the parties agreed to in 2007, the parties again

8     confirmed that each party held equitable and

9     beneficial ownership of Nortel technology.  That

10    addendum to the parties' master agreement says,

11    "Whereas each participant holds and enjoys

12    equitable and beneficial ownership of Nortel

13    Networks technology."

14              So the master R&D agreement recognized

15    what the parties had been doing since 2001:

16    owning Nortel IP based on their contributions,

17    sharing profits based on their contributions, and

18    measuring contributions by the amount that each

19    party actually spent on R&D.  That meant that if

20    you paid 20 percent, you got 20 percent; if you

21    paid 50 percent, you got 50 percent.  You reap what

22    you sow.

23              And how could it be otherwise?  How

24    could it be otherwise in any agreement that is

25    supposed to be arm's length?  How could any



1    arm's-length agreement possibly provide that the

2    EMEA and the United States parties would contribute

3    most, more than 50 percent of the cost of creating

4    thousands of patents, and on their sale they would

5    get nothing, zero percent?  How, in any fair or

6    equitable agreement, could anyone freely agree to

7    such a perverse result?

8              The Canadian Debtors' argument that

9    everyone agreed that Nortel Networks Ltd. would get

10   more than it contributed is a fiction.  In the more

11   than 3 million documents that have been produced in

12   this case, there is no evidence that anyone ever

13   proposed, let alone agreed, that Nortel Networks

14   Ltd. would get more than what it contributed.  None

15   of the more than 100 fact witnesses had any

16   personal knowledge of any such one-sided deal.

17             The evidence overwhelmingly shows that

18   Nortel Networks Ltd. was not the sole owner.  It

19   held legal title for reasons of administrative

20   convenience and the parties shared ownership, and

21   they divided profits and losses according to their

22   respective financial contributions.

23             On December 31, 2008, just days before

24   filing for bankruptcy, the parties again recognized

25   that all parties owned the IP in their Memorandum



1    of Understanding, or MOU.  Section 3 of that MOU

2    refers to the parties' ownership.  It specifically

3    refers to how the 2004 agreement also [reading]:

4    "memorializes the agreements of NNL and the

5    licensed participants as to the development and

6    deployment of existing and future NN technology and

7    ownership of the NN technology, with NNL holding

8    legal title thereto."

9                The parties expressly distinguished

10   between ownership of NN technology and legal title.

11   Of course, if NNL was the sole owner, there would

12   be no need for any such distinction.

13               Similarly, in Section 6 of the

14   Memorandum of Understanding, there is a reference

15   to the parties' respective ownership interests in

16   the NN technology.  Here it is:

17                    "The participants believe that,

18                    through the date hereof, under the

19                    prior formula and going forward under

20                    the new formula under these amendments,

21                    their respective ownership interests in

22                    the NN technology and their respective

23                    R&D activity have been and will be

24                    adequately and fairly compensated."

25                    Again, if NNL was the sole owner, then

1    why were the parties referring to their respective

2    ownership interests, which they said would be

3    adequately and fairly compensated?

4              Nortel Networks Ltd. did not say it was

5    the sole owner because it wasn't.  As we have seen,

6    the parties were acting as owners, sharing profits,

7    since 2001.

8              The Canadian interests say that sharing

9    operating profits and losses of an ongoing business

10   is not the same as sharing the proceeds of an

11   outright sale.  They also say that the parties'

12   Master R&D Agreement does not cover an outright

13   sale of Nortel IP.  The MRDA does not cover this

14   situation.

15             But in 2006, the parties did deal with

16   the sale with precisely this situation.  The

17   parties shared the proceeds of outright sale of

18   Nortel IP when Nortel sold its UMTS, or 3G

19   business, to Alcatel.

20             The sale to Alcatel is a precedent for

21   applying the contribution approach.  The sale was

22   conducted in 2006, prior to Nortel's insolvency,

23   and it generated $320 million.  The sale was the

24   largest sale of a business line that Nortel

25   conducted.  It was a material transaction, and it



1    was fully vetted by the company's auditors.

2                   What did the parties do with that sale?

3    First, they divided the proceeds according to the

4    categories of assets:  tangible assets,

5    technology, customer contracts, and residual

6    goodwill.

7                   Then Nortel allocated the proceeds

8    among the parties for each category.  How did the

9    parties allocate the technology proceeds?  One

10   word:  contribution.  That was the basis on which

11   Nortel allocated the proceeds.  That was the basis

12   on which the parties recorded their income and

13   taxes.

14                   Here is a Nortel management email that

15   was sent to the company's outside independent

16   auditors.  It refers to IPR, intellectual property

17   rights:

18                   "The value for intellectual property

19                   rights was allocated using" -- this is

20                   a reference to the profit-sharing

21                   percentages.  "Profit-sharing

22                   determines how profits and losses are

23                   shared.  If UMTS access was not sold,

24                   all of the profit-sharing members would

25                   share profits and losses associated



1              with the business.  Since

2              profit-sharing determines the economic

3              relationships between the parties, all

4              rights associated with the intellectual

5              property rights should be shared based

6              on the profit-sharing percentages.

7                  "This is also consistent with

8              Nortel's view that all Nortel

9              intellectual property rights is

10             indistinguishable, such that all value

11             should be shared among the

12             profit-sharing members."

13                 Nortel also prepared a formal

14    memorandum to the auditors.

15                 THE CANADIAN COURT:  Does it matter

16    that that email has come from NNI?

17                 MR. MAGUIRE:  Your Honor, the folks at

18    NNI were at this time -- this is a couple of years

19    prior to bankruptcy -- all reporting to Nortel

20    Networks Ltd.  We hear that, under the lines of

21    business, everybody reported to the person who was

22    in charge of the line of business; and that within

23    the tax function, the ultimate decision-making was

24    made at the headquarters of the Canadian parent,

25    Nortel Networks Ltd., and all decisions ultimately



1    had to be signed off there.

2              One of the witnesses who will testify

3    live at the trial is the author of that memorandum,

4    Nortel Networks Inc.'s Michael Orlando.

5              Another live witness is Nortel Networks

6    Inc.'s Mark Weisz, who reviewed the memorandum,

7    which was ultimately approved by the head of tax

8    for the group.  And that was Nortel Networks Ltd.'s

9    executive, Peter Look.

10             The memorandum describes how Nortel

11   determines to allocate technology proceeds among

12   the parties based on their contributions:

13             "Technology to residual participants

14   proportionate to their individual share of the R&D

15   capital stock under the Master R&D Agreement."

16             The memorandum acknowledged the

17   appropriateness of this allocation because of the

18   parties' ownership of the technology, not legal

19   title.  It said:

20             "While NNL generally is the legal

21             owner of the technology, the Master R&D

22             Agreement determines the economic

23             ownership of it; and thus allocation of

24             the consideration by proportionate R&D

25             capital stock is appropriate."

1            So here we are in early 2007, less than

2     two years before bankruptcy.  The parties

3     considered NNL's legal title to be irrelevant to

4     the question before the Courts:  how to allocate

5     sales proceeds.  The parties agreed to share sales

6     proceeds in accordance with their relative

7     contributions to creating the technology.

8            The same approach should apply here.

9     The proceeds of selling technology belong to those

10    who contributed to that technology in proportion to

11    their actual contributions.  Ownership, not legal

12    title, was the basis for allocating the Alcatel

13    sale proceeds, as you will hear from EMEA's live

14    witness, Mr. Phillippe Albert-Lebrun, the financial

15    controller for the French company.

16            So the EMEA Debtors' allocation

17    approach is the only approach that tracks what the

18    parties actually did when they allocated among

19    themselves the proceeds of the Alcatel sale by

20    contribution, not by license, and certainly not

21    based on legal title.  That was never considered.

22            In the more than 200 pages of pretrial

23    briefing by the Canadian interests, the Monitor and

24    the CCC, nowhere is there a single mention of this

25    precedent, the Alcatel sale.  That silence, we



1    suggest, is deafening.

2                The parties also shared proceeds when

3    Nortel went to court to enforce patents.  Again,

4    they shared the proceeds based on their relative

5    contributions.

6                We will present evidence of licensing

7    litigation against a company called Foundry.  In

8    2004 Nortel obtained $18 million from Foundry for

9    past infringement and an additional $27 million for

10   prospective royalties.  Nortel Networks Ltd. held

11   title to those patents, but it did not get to keep

12   all of the proceeds.  Instead, the parties shared

13   the proceeds based on their contributions.

14               In settling the case, Nortel gave

15   Foundry a license agreement.  In that agreement,

16   drafted around the same time that the parties were

17   entering into their Master Research and Development

18   Agreement, Nortel represented that the patents

19   being infringed were owned by Nortel Networks Ltd.

20   and its subsidiaries, not Nortel Networks Ltd. as

21   sole owner.

22               In the lawsuit Nortel claimed that

23   Foundry was infringing 12 patents.  Nortel later

24   sold seven of those patents to the Rockstar

25   Consortium as part of the $4-1/2 billion sale of



 1    the residual patent portfolio.

 2              Today the Canadian Estate's claim that

 3    only Nortel Networks Ltd. is entitled to the entire

 4    $4-1/2 billion, including all amounts attributable

 5    to those seven patents that were litigated in the

 6    Foundry case.

 7              That is the position of Nortel Networks

 8    Ltd. today.  That is not what Nortel Networks Ltd.

 9    said or did in the Foundry settlement.  Back then,

10    in 2004, Nortel Networks Ltd. said that all the

11    parties were owners; and back then, all the parties

12    shared all the proceeds based on contribution.

13              Of course, the parties understood that

14    they would share all licensing income, not just the

15    royalties from Foundry.  And before filing for

16    bankruptcy, Nortel considered establishing a

17    special intellectual property company, or IPCo, to

18    license Nortel technology.

19              And in bankruptcy the parties

20    recognized that they had two options for

21    capitalizing on the value of Nortel's patents.

22              Option 1 was they could simply license

23    all of the patents and enjoy the annual stream of

24    royalty income, which would all be shared among all

25    of the parties.



1          Option 2 was to sell outright the

2   entire portfolio, which is what they ultimately did

3   in the sale to Rockstar.  But having done that

4   sale, now the Canadian interests say that the EMEA

5   and the US Estates get nothing from that sale and

6   the Canadian Estates take everything.

7          If that were really the case, then the

8   EMEA parties and the US parties could never have

9   agreed to the Rockstar sale.  They could never have

10  agreed to any sale, no matter what the price, where

11  they got nothing from the sale, especially if that

12  meant foregoing the annual royalty income that

13  everyone understands they would have been entitled

14  to under Option 1.

15         So we respectfully submit that position

16  makes absolutely no sense.  And yet, that is the

17  assertion by the Canadian Estates, that that is the

18  deal that the EMEA and US parties agreed to and

19  that the Courts approved.

20         Judge Gross, Justice Newbould, I thank

21  you for your kind attention.  For the balance of

22  EMEA's opening statement, I am going to turn over

23  to my colleague in Toronto, Mr. Matt Gottlieb.

24         THE US COURT:  Thank you, Mr. Maguire.

25         THE CANADIAN COURT:  Thank you, Mr.

1    Maguire.  Mr. Gottleib?

2              MR. GOTTLIEB:  Thank you very much.

3    Good morning, Your Honour, Justice Newbould, good

4    morning, Judge Gross.  It's good to see you so

5    clearly.  I hope you can hear me well.  This is our

6    first try at the microphone up here.

7              THE US COURT:  Very clearly.

8              MR. GOTTLIEB:  Excellent.  I'm going to

9    carry on with the evidence regarding the showing of

10   the joint ownership and I'm going to move on to how

11   Nortel relied on the joint ownership in preparing

12   financial statements.

13              And to start off with, I want to

14   address, if I could briefly, one of Justice

15   Newbould's questions of Mr. Maguire which, I'm not

16   going to phrase it exactly, is the transfer pricing

17   regime the right concept or regime we should be

18   talking about here, something along those lines.

19              And the way I want to address that is

20   this.  The transfer pricing regime, because you are

21   going to hear a lot about it during the testimony

22   in this case, you're going to hear a lot about the

23   transfer pricing regime, a lot about the MRDA, the

24   key to understand about the transfer pricing regime

25   is it has to mirror the way the companies actually



```
 1   operated.
 2              It is not a fiction, it is not a tax
 3   fiction because if it's a tax fiction you're
 4   telling the tax authorities they can rely on you
 5   operating at arm's length when you're really not.
 6              The whole point of the transfer pricing
 7   regime is to tell the tax authorities how you're
 8   operating and why that complies with the arm's
 9   length obligations that related entities have.
10              So underlying any transfer pricing
11   regime is in fact how the company operates.  It has
12   to mirror it, it can't create a fiction.  And the
13   legal rights are obviously a central part of how
14   they operate, which is why that evidence, which we
15   say doesn't violate the parole evidence rule in any
16   way, because, as Mr. Maguire said, you have to
17   recall from '01 to at least the beginning of '05
18   these parties operated without any written
19   agreement, you had to show and explain to the
20   government why you were operating in accordance
21   with proper arm's length principles which includes
22   ownership.
23              So that's why all of that is relevant,
24   that's how it fits into the entire transfer pricing
25   regime.
```



1              The second point before I turn to the

2    financial statement point is that the MRDA itself

3    is a transfer pricing document.  The only purpose

4    of the MRDA was to show the taxation authorities

5    how the company were splitting their profits, how

6    they were carrying on in their operations so that

7    the tax authorities could be satisfied that there

8    was a compliance again with the arm's length

9    principles.

10             And that's why the document is drafted

11   the way it is and that's why Schedule A, which sets

12   out how the proceeds are split, how the revenues

13   are split, is so critical to the document.

14             The whole purpose of the MRDA, and I

15   pause obviously, that the Canadian Estate relies

16   on, is the transfer pricing regime.

17             So, yes, in our respectful submission

18   the whole concept that has been discussed is one

19   that has to be considered as part of this.

20             Now, moving back to the preparing

21   financial statements point, and this is again a

22   real life example, in 2006 Nortel had to determine,

23   based on the current situation of the French

24   company NNSA, whether or not there would have to be

25   a write down with its financial statements.  NNSA,

1    if you recall from the evidence, was a real

2    contributor to R&D, had spent a significant amount

3    on R&D and therefore had to make a decision whether

4    or not there needed to be a write down.

5              The answer was, and this was a Nortel

6    answer because, as you know, the statements are

7    consolidated throughout, and as Mr. Maguire said

8    about the way the company was organized, Nortel's

9    answer was no, it doesn't have to be write down,

10   NNSA doesn't have to be written down because it has

11   a very significant value of its ownership interest

12   in the Nortel intellectual property.  So at the

13   time in 2006, this was decided.

14             And if we look at the next slide, what

15   you'll see is the statements made here regarding

16   the IP assets, and in discussing the issue, and

17   this is an email from Mr. DeCarla (ph) at EMEA to

18   Brian Smith who was at NNI, he was an NNI employee

19   seconded to EMEA, the answer given is:

20             "NNSA owns a significant IP

21              intellectual property asset which has

22              real economic value but which is not

23              recorded in its balance sheet.  It's

24              off the balance sheet but it doesn't

25              mean the value is not there.



1              The next paragraph:

2                  "NNSA participates in R&D and with

3              the other Nortel R&D participants

4              across the world owns a share in the IP

5              that has been generated over the years

6              of R&D.  Globally this IP is valued in

7              the region of $6 billion to $8 billion

8              US and the NNSA share in this is

9              approximately eight to ten percent or

10             US 650 million.  The IP or goodwill

11             asset is not capitalized in Nortel's

12             balance sheet, it is internally

13             generated, but it does have economic

14             value."

15             So this isn't a fiction, this isn't

16    recreation.  Back in '06 a real life decision, a

17    real ownership decision had to be made as to

18    whether or not there would be a write down, and

19    that is a tax issue, it's a financial issue but

20    it's an important reporting issue as well, and the

21    decision made was no, because of the ownership

22    there would not be a write down.

23             It wasn't an issue of revenue, it

24    wasn't an issue of license, it was an issue of

25    ownership and on that basis no write down was



1    taken.

2              Today the Canadians say NNSA had zero

3    value in those very assets.  That is the position

4    that the NNL and other estates take today contrary

5    to that decision made in financial reporting back

6    in 2006.

7              That's not the only time that these

8    types of decisions were made based on ownership.

9    There was a transaction that you may have heard

10   about called Project Swift.  It was in December '07

11   and it was when Nortel Networks Limited sold

12   certain subsidiaries to the Nortel UK, NNUK, as

13   part of the transaction, that was the Project Swift

14   transaction.

15             And very important valuations were

16   considered and had to be done at the time and the

17   valuation was based on many different assumptions,

18   but one of the key assumptions obviously is what is

19   the value of the company and what is the value of

20   the assets.

21             And this is an email from E&Y LLP in

22   the UK to EMEA with respect to a report that was

23   prepared for the value, and this is one of the

24   underlying assumptions of the way these subs were

25   valued.

1              "Value attributed to the NN

2              technology treated as an asset

3              realization is apportioned across the

4              group consistent with the intellectual

5              property profit share agreement."

6         So when they were determining value to

7    give to the underlying asset, they said you have to

8    look at the value of the NN technology, again not a

9    fiction but a real on the ground life decision

10   about how we would deal with it.

11             THE CANADIAN COURT:  Am I right when I

12   read your claims brief that you're attacking that

13   opinion?

14             MR. GOTTLIEB:  I'm not going to use the

15   terminology of attacking the opinion so boldly,

16   Your Honour.  What we're doing with that

17   transaction is looking at the way the entire

18   transaction was presented, importantly how that

19   transaction was considered for the purpose of

20   approving the transaction, but it doesn't change

21   the underlying issue now dealing with how the

22   companies agreed to look at the assets that formed

23   the basis of the subs.

24             But yes, to answer your question, yes.

25   I understood your question on that.



1            But at the time when in 2007 they're

2    looking at the value, they include the very assets

3    we are talking about here today that the Canadian

4    Estate says no one else had a value but them.  It

5    wasn't done on a license basis, it wasn't done on a

6    revenue basis, it was done on an asset realization

7    value basis.

8            And also noted, that while legal

9    ownership of the NN technology is with NNL, so the

10   very thing the Canadians say, Canadians say while

11   legal ownership of the NN technology is with NNL,

12   beneficial ownership is shared across various

13   companies as outlined earlier.

14           And this is exactly the underlying part

15   of the contribution theory that runs exactly

16   contrary to what the Canadian Debtors say about the

17   ownership of the IP.  They say they have legal

18   title, therefore they own it all.  Our contribution

19   theory says on the facts that's not accurate, there

20   was beneficial ownership and this was the basis

21   upon which assets were valued on the ground in

22   2007.

23           And again, I state again it is not a

24   theoretical exercise, it was an important on the

25   ground exercise.

1            And if we move forward, and recall,

2    that's December '07, the companies file in January

3    '09, so it's a year before, just one year before

4    that Nortel took this position globally because it

5    was the assets were being sold and now the position

6    of the Canadians is literally completely

7    contradictory on that.

8            So, the position was the same when

9    Nortel was preparing to file for bankruptcy.  It

10   chose Copperhead as the name, you may have seen

11   that in certain of the briefs and certain of the

12   documents, and Peter Look was one of the employees

13   of the Canadian Debtors, an NN employee since 2006,

14   he was the global company's head of tax, and in the

15   weeks before filing, Mr. Look considered how a

16   possible bankruptcy filing would look in connection

17   with the Nortel ownership.

18           And in December of 2008, a couple of

19   weeks before the filing, Mr. Look was discussing

20   with his colleagues how much it would cost NNL, the

21   Canadian company, to buy out the other parties

22   under the Master Research and Development

23   Agreement, and in doing so, he considered the

24   various interests of the parties in the technology,

25   and what he concluded was that the Canadian Debtors



1    owned only one third of the IP.  He considered what

2    the buyout would be and said there would be only

3    one third.

4              And when you look at what he said in

5    his email, he said:

6              "When PwC did the goodwill valuation

7              for Q3, it ran about 3 billion for the

8              total company."  That's the technology.

9              "After backing out the NNL share, that

10             leaves still about 2 billion sitting

11             outside Canada for total IP."

12             THE CANADIAN COURT:  Can I ask you what

13   was PwC's role at the time?

14             MR. BARRACK:  Pension trustee.

15             MR. GOTTLIEB:  They were advising the

16   pension trustees at the time.

17             THE CANADIAN COURT:  In the UK?

18             MR. GOTTLIEB:  Correct.  That's

19   correct, and they had been around for quite a long

20   time and, put it this way, knew the company quite

21   well.

22             So when we're talking here about the

23   valuation, it's actually the number, the 3 billion,

24   and then how Mr. Look, of the Canadian Debtors,

25   splits it because he says after backing out NNL's

1    share there's still $2 billion sitting outside

2    Canada, meaning Canada has a one third share, and

3    that's his view.  The actual number isn't the

4    critical part, it's that Mr. Look, on behalf of

5    NNL, is acknowledging that Canada doesn't own it

6    all and that's not the starting point.

7                   And if we move at the same time right

8    before filing, two days before filing, the

9    companies were considering a sale of the Enterprise

10   business, one of the Nortel businesses.  And Mr.

11   Look was asked about what he thought about the

12   approach, how would we approach the business sale.

13   And here's the answer he gives, which again is

14   consistent with what Nortel had always said up

15   until the new position of NNL owns everything.

16                   So his answer was:

17                   "Please note that we have a

18                   methodology embedded in the tenets of

19                   the advance pricing arrangement, and

20                   was used in the UMTS sale, that

21                   allocates substantial portion of the

22                   gain to North America using the RPS

23                   percentages."  Back to the Alcatel.

24                   "Remainder is debate over nature of

25                   intangibles, which we will advocate is

1              intellectual property (as opposed to

2              customer intangibles).  The

3              intellectual property portion has the

4              highest likelihood of success of

5              allocating under RPS percentages, the

6              residual profit-split percentages.

7              This part will result in roughly 40

8              percent to Canada and 40 percent to the

9              U.S. for this layer."

10             Which would obviously mean 20 percent

11   for EMEA, which I will come back to, because that's

12   not that far off from the EMEA proposal in this

13   case as to how it's to happen based on the rights.

14             Again importantly, Your Honour, and

15   Judge Gross, is two days before filing, NNL is

16   considering what's going to happen and it doesn't

17   say well, we own all the intellectual property, we

18   own all the technology so on any sale we get a

19   hundred percent of it.  What they say is well,

20   we're going to have to split it based on

21   contribution because that's what the RPS agreement

22   does, that's how it works.  And the position now

23   being taken again goes directly against that.

24             So right before the filing, in two

25   different situations, Mr. Look is asked to look at



1    who owns the technology and how it will be

2    distributed and both of it is consistent with

3    ownership in accordance with RPS with the

4    contribution of each of the parties.  And Mr. Look

5    is not going to be at trial here.

6              Finally, just to continue on with that

7    chronology, Nortel continued to recognize the

8    ownership of IP after the following date.  Mr.

9    Look, for one, his position didn't change after

10   filing.  In March of '09, just two months after the

11   filing date, Mr. Look wrote to the EMEA lawyers in

12   the UK to provide information about the Enterprise

13   business.

14             And this is an email from Mr. Look to

15   the lawyers for the EMEA Debtors regarding

16   potential transaction, and this is the way Mr. Look

17   post-filing discusses the technology and the

18   interests in the technology.  Mr. Look says:

19             "As a non-manufacturing technology

20             company, we do not have a lot of hard

21             assets on the balance sheet, and most

22             of our asset value is in intangible

23             assets, primarily intellectual property

24             rights held (economically) by the RPS,

25             again the residual-profit entities)

1              Canada, US, UK, France and Ireland."

2              And just to say the same broken record

3    again, he doesn't say, but NNL owns it all so I

4    don't know what we're talking about, he doesn't

5    give any theory but the contribution theory.

6              And again after filing, a few months

7    later in October of '09, Mr. Look was dealing with

8    negotiations and seeking cash funding for the

9    Canadian Estate after filing from the US and the US

10   Debtor had claim against the Canadian Estate that

11   you may have heard about, and he's discussing with

12   the various parties about how this will be dealt

13   with.

14             This is an email from Mr. Look of NNL,

15   the Canadian company, to Mr. Wood at the American

16   company, NNI, and here is what Mr. Look says:

17             "Transfer pricing and APA will be

18             part of discussion below.  Everyone is

19             adding issues to make deals contingent

20             on various matters, for example NNI,"

21             the American company, "says Canada must

22             sign APA," that's the agreement with

23             the taxation authorities, "or no

24             funding from the US."

25             And NNL, the Canadian company, says:



1              "...respect R&D Capital Stock for

2              proceeds allocation or we won't sign

3              APA."

4         So Mr. Look is saying that NNL's

5    position, the Canadian Estate position is if the

6    contribution method of allocation is not respected,

7    Canada will not sign the agreement with the

8    taxation authorities.  That's the Canadian position

9    post-filing.  That's not a pre-filing matter.

10        Now, as I said, Mr. Look will not be

11   called to trial by the Canadians.  We've already

12   covered the testimony of him, of Mr. Doolittle.

13   Mr. Doolittle also isn't coming to trial.  Mr.

14   Doolittle was, as you heard before, Nortel's 20

15   year executive and post-filing CFO and he was asked

16   to testify during the deposition about the way the

17   financial statements were to be prepared

18   post-filing, because, as you know, there were asset

19   sales, the very asset sales that are subject to

20   this transaction, and Nortel had to file financial

21   statements.

22        The way the financial statements were

23   to be prepared was in accordance with the R&D

24   contributions.  So, Your Honour, when Nortel had to

25   file its statements post-filing, it had to decide



1    what method to do it and it chose to do it in the

2    contribution approach, the way the EMEA Debtors say

3    it should be done and the way we say Nortel always

4    did it and always said it should be done.

5                      And here's the testimony of Mr.

6    Doolittle who was the treasurer and vice president

7    of tax and the CFO post-filing, and the question

8    asked of him that's up on the screen now is:

9                      "Just so I have your testimony, sir,

10                   after consulting with the Monitor,

11                   legal counsel and the auditors, the

12                   decision was made ultimately by you,

13                   sir, that the proceeds of the sale of

14                   intellectual property and

15                   post-bankruptcy sales would be

16                   allocated for the purposes of NNL's

17                   financial statements according to the

18                   R&D contribution calculations under the

19                   Master Research and Development

20                   Agreement, sir?

21                   "Answer:  I would say that there was

22                   a consistent view that that was the way

23                   we should file it..."

24                    So that's the way the financial

25    statements were filed, the statements had a caveat

1   that said the allocations may be subject to change

2   based on what the court rules.

3                    THE CANADIAN COURT:  Can I just ask you

4   a question, Mr. Gottlieb?

5                    MR. GOTTLIEB:  Of course.

6                    THE CANADIAN COURT:  I'm just trying to

7   understand the circumstances of what was going on

8   at the time.  Was there some decision needed in

9   order to put a note in the financial statements?

10  Or what is he talking about where the question

11  refers to "the decision"?

12                    MR. GOTTLIEB:  The decision as to how

13  to file the financial statements, how to allocate

14  the proceeds from the various sales in the

15  financial statements.

16                    THE CANADIAN COURT:  All right.  Was

17  there a note in the financial statements on this?

18                    MR. GOTTLIEB:  Right.  Like I just

19  said, there was a caveat.  I'm sorry, I called it a

20  caveat as opposed to a note.  There was a note in

21  the financial statement that said this was subject

22  to the court's determination.  This was subject to

23  it.

24                    But the point is that the company had

25  to decide how to do this at the time, it couldn't



 1   wait for the courts to decide.  So the decision was

 2   how should we do it.  And they obviously had to

 3   make a good faith decision as to properly how to

 4   record this on the books, and they didn't use the

 5   legal title theory, they didn't use the license

 6   theory, they used the contribution theory.

 7            And Mr. Doolittle's point is, when

 8   asked the question, it wasn't just Mr. Doolittle

 9   that decided this, that's the decision, the

10   decision was made based on input from the Monitor,

11   legal counsel and auditors.  They got together and

12   said well, how should we do this?

13            And I'm going to say the decision in

14   our respectful view is it was obvious because this

15   is the way the company always operated, this is the

16   way it allocated the proceeds from prior sales.

17            THE CANADIAN COURT:  Just remind me,

18   who were the auditors?

19            MR. GOTTLIEB:  Deloitte at this time, I

20   believe.  Was it still Deloitte?  Yes, Deloitte was

21   still the auditors at the time and the Monitor was

22   E&Y.

23            So that is the right and consistent

24   thing to do.  Doing anything else would have seemed

25   very odd because they had never done it any other



 1   way and they wouldn't make a wholesale change like

 2   this.

 3            So, the point obviously is that that's

 4   the way they decided to do it because it was

 5   consistent with the way they carried on business.

 6            And to conclude that point, to conclude

 7   the evidence that Mr. Maguire and I have taken the

 8   courts through up to this point, is, as you can

 9   see, it's our submission and will be at the trial

10   that when you look at all of the evidence that

11   takes you through from 2001, from the way the

12   company operated, to the statements they made to

13   the taxation authorities, to the statements they

14   made to each other, to the way they conducted

15   business, which is obviously very critical, to the

16   way they allocated proceeds of sale, to the way

17   they financially reported both pre-  and

18   post-filing, it was all consistent, it was all

19   consistent with the contribution approach that has

20   been put forward and that was based on the rights

21   of the parties as they existed and understood to be

22   existing.

23            So that's the evidence that takes us up

24   to the ownership which leads to the contribution

25   approach and we say the evidence is overwhelmingly



 1    consistent.

 2              I have to move to a different topic

 3    that is important to consider when considering the

 4    contribution approach, and that deals with the

 5    useful life of IP.

 6              Your Honour, given the time, it's

 7    10:25, would it be better to take the break now and

 8    come back or should I take the five minutes and

 9    keep going?

10              THE CANADIAN COURT:  Well, if it's a

11    good point for you, that's fine.  How about you,

12    Judge Gross, is that satisfactory?

13              THE US COURT:  That's perfectly fine.

14              THE CANADIAN COURT:  Okay, we'll take

15    20 minutes.  I meant to ask either you or Mr.

16    Maguire, I don't care, when I look at the MOU dated

17    December 22nd, '08, it says that it creates no

18    liability or obligations or rights amongst the

19    parties, right at beginning of that.

20              I'm wondering what is the background of

21    this MOU and what is the purpose of it.

22              MR. GOTTLIEB:  Thank you, Your Honour.

23              THE CANADIAN COURT:  Yes, Mr. Barnes?

24              MR. BARNES:  Can I make a submission?

25              THE CANADIAN COURT:  This is Mr.

```
 1    Barnes?

 2                 MR. BARNES:  Mr. Barnes on behalf of

 3    the Directors and Officers.

 4                 I didn't want to interrupt and take

 5    anybody's clock times.  As both courts know, the

 6    Directors and Officers really are not engaged in

 7    this part of the process.

 8                 THE CANADIAN COURT:  Yes, I was

 9    wondering why you were here.

10                 MR. BARNES:  We're here first of all to

11    ask for your indulgence not to be here, but the

12    reality is --

13                 THE CANADIAN COURT:  It's a free

14    courtroom.  You're free to come and go.

15                 MR. BARNES:  I wanted the court to

16    understand that.  But there is -- a couple of the

17    Directors will be giving evidence during this

18    portion and, as I raised with you at the pretrial,

19    in order to avoid the re attendance of a couple of

20    the European experts, we may be agreeing to be able

21    to do a short cross examination.

22                 THE CANADIAN COURT:  Right.

23                 MR. BARNES:  With those submissions, we

24    will have some vacant chairs from day to day, if

25    that's all right with you.
```

1              THE CANADIAN COURT:  I bid you adieu.

2              THE US COURT:  That is acceptable to

3    the US court as well.

4              THE CANADIAN COURT:  So we'll take 20

5    minutes.

6    -- RECESS AT 10:27

7    -- UPON RESUMING AT 10:50

8              THE CANADIAN COURT:  Yes, Mr. Gottlieb?

9              MR. GOTTLIEB:  Thank you, Your Honour.

10             THE US COURT:  Mr. Gottlieb, may I

11   interrupt with a quick question for you, sir?

12             MR. GOTTLIEB:  Of course.

13             THE US COURT:  And that is, remind me

14   what Project Eagle is.

15             MR. GOTTLIEB:  It was the other name

16   for Project Swift at the time.

17             THE US COURT:  Fine, thank you.

18             MR. GOTTLIEB:  I bet you liked Project

19   Eagle a little bit better for that project, Judge

20   Gross.

21             THE US COURT:  Yes, we do around the

22   Philadelphia area.

23             THE CANADIAN COURT:  But they got rid

24   of it.

25             MR. GOTTLIEB:  Not anymore, Justice

 1   Newbould.

 2           I want to just clear up a couple of

 3   facts about the auditors just because there were

 4   different auditors at different times, Your Honour

 5   and Judge Gross, and I just want to make sure I've

 6   got those right for your notes.

 7           At the time of the Alcatel transaction

 8   the auditor was Deloitte.  Post-filing, the auditor

 9   was KPMG.  And when I was referring to PwC in the

10   context of the email, and I was asking the question

11   about who did PwC represent, I referred to the UK

12   pension.  At the time PwC was acting actually for

13   the entire Nortel Group for the purpose of those

14   types of issues and the like, so PwC's role was

15   broader than that at the time.

16           THE CANADIAN COURT:  At the time means

17   what?

18           MR. GOTTLIEB:  At the time that they

19   were looking in 2006, and I could -- I'm sorry?  To

20   December '08.  To December '08 is when that note

21   happened.

22           THE CANADIAN COURT:  Okay, thanks.

23           MR. GOTTLIEB:  And of course if it

24   would be helpful to nail those dates down for all

25   purposes, I would be happy to get that to Your

 1   Honour and Judge Gross.

 2                You asked before the break for me to

 3   come back with an answer about the Memorandum of

 4   Understanding, so what that's about, and I'll refer

 5   to the third addendum to the MRDA as well, which

 6   you don't have in front of you there but you'll

 7   hear evidence about it.

 8                The original APA discussions with the

 9   taxation authorities was to cover the period, I

10   won't get into the very great details about that,

11   but at the end of the day it was covering the

12   period from '01 beginning to the end of '05, and

13   then there were further discussions with the

14   taxation authorities about how to properly consider

15   and calculate the methodology so that the split

16   would be done in accordance with the arm's length

17   principles, and so further things were discussed

18   between them.

19                The Memorandum of Understanding and the

20   third addendum were signed up right before filing,

21   so in December of '08, and the purpose of that was

22   to be a stopgap for the period of January '06 up to

23   the time of filing because the authorities and

24   Nortel had had further discussions about the proper

25   way to calculate and therefore the old, if I can

1    call it, old regime or old methodology changed or

2    was to change at the beginning of '06 and therefore

3    document or documents were needed to reflect the

4    new methodology.

5              And although the Memorandum of

6    Understanding does a very detailed history and

7    outline of how that new understanding is arrived

8    at, it's the third addendum to the MRDA that

9    actually sets out the workings of that new

10   calculation methodology.

11             And it was backdated to January of '06,

12   but since I have it, the timeframe here right

13   before filing as a result of the MOU, the third

14   addendum is entered into, the third addendum has

15   Schedule A to it which shows how you calculate the

16   RPS.  And the critical language that Mr. Maguire

17   took the Courts to about all of the participants

18   having ownership in NN technology, those were the

19   words, that it referred to the ownership of the

20   technology, that stayed in the third addendum in

21   Schedule A.

22             So notwithstanding the parties had to

23   change Schedule A, the critical language that Mr.

24   Maguire took the Courts through about the ownership

25   of the participants in the NN technology didn't



1      change.

2                    So, Your Honour, that's how the MOU

3      fits in and it's just part of that discussion of

4      the transfer pricing regime.

5                    So I said before the break that I was

6      going to move to a discussion, and this is about a

7      related issue that really is a part of the

8      contribution theory which is the useful life of

9      Nortel technology.

10                   And the purpose of the contribution

11     method is obviously, as you heard, Nortel rewards

12     in accordance with contribution, so it's important

13     to know how to measure that contribution fairly in

14     connection with what I'll call the actual

15     contribution to what was sold.

16                   Therefore, you have to decide what was

17     sold and who contributed to what was sold, and in

18     order to do that, the way parties discuss it is

19     well, what was the useful life of the IP?  What was

20     the useful life of the technology?

21                   And one of the ways to consider that

22     question is the simplest answer is to see what was

23     sold in the business sales and the residual patent

24     sales and count the contributions towards those.

25     And Canadian Estates expert, for example --



1            THE CANADIAN COURT:  Just a second, Mr.

2  Gottlieb.

3            MR. GOTTLIEB:  Justice Newbould, all is

4  working?

5            THE CANADIAN COURT:  The last thing

6  I've got is that's how the MOU fits in.

7  -- OFF THE RECORD

8            THE CANADIAN COURT:  Okay.

9            MR. GOTTLIEB:  Okay, thank you.  So

10  what I was talking about was you have to look at

11  what patents were sold and the sales and count the

12  contributions towards the patents, and there are

13  various ways to put it, but Dr. Reichert, the

14  Canadian Estates expert, said it very well when he

15  said in his deposition, the best way to measure the

16  useful life of an asset is to sell it, and if

17  somebody gives you money for it, it's obviously got

18  a useful life still because someone wouldn't have

19  paid something for nothing.

20            So it therefore makes sense in this

21  context since we know there was so much sold, so

22  much IP sold in the business sales and the residual

23  sales, to look at what was sold and the useful life

24  of it.

25            And as it turns out, and this is the



1   critical point to take away, the majority of the

2   patents sold in the asset sales were older than

3   seven years.  One third of the patents sold in the

4   residual patent sale alone were older than 11

5   years.  And I'll state again what I think is

6   obvious, it takes some time to do R&D work to the

7   creation of the patents, so the work, the R&D work,

8   is even older than that.

9            And so that's just baseline facts of

10  what was sold, when the patents were filed.  We

11  know the R&D was before that so we know one third

12  before 11 years, more than half more than seven

13  years, and again that doesn't even take the R&D

14  time.

15           And another important way that the

16  Courts, in our respectful view, will look at the

17  evidence or should look at the evidence is to look

18  at the most valuable patents and when and how they

19  were created.

20           post-filing, Nortel retained Global IP

21  which is an IP consultant to assess the residual

22  patent portfolio and determine which patents were

23  the most valuable.  And again, here's the critical

24  point.  Global IP concluded that the most valuable

25  patents that ended up being sold to Rockstar in



1    2011, so the most valuable patents and these were

2    designated one or two star patents, were in fact

3    created between 1991 and 2007.

4              So the most valuable patents were

5    created between 1991 and 2007, that's what was sold

6    to Rockstar, because the most innovative period in

7    Nortel from an R&D point of view was the late

8    nineties when some of these highest interest

9    patents were developed and created and that was

10   before obviously Nortel started the downward slide

11   towards an insolvency filing.

12             THE CANADIAN COURT:  As I understand

13   your case, you want to allocate on the basis of the

14   MRDA but change the period of time in which you

15   take a look at the spend on R&D, correct?

16             MR. GOTTLIEB:  Mainly but I'm just

17   going to change the wording.

18             THE CANADIAN COURT:  That's what I'm

19   asking, because the MRDA, at least up until 2005,

20   had a 30 percent amortization?  I'm not sure what

21   it was after that.

22             MR. GOTTLIEB:  Five years dead stop.

23             THE CANADIAN COURT:  So it's roughly

24   the same thing.  How do you rely upon the MRDA for

25   one purpose but ignore it for another?

1              MR. GOTTLIEB:  Great.  That's why I
2    said there was one part of the phrasing that I was
3    going to deal with.  We don't rely on the MRDA for
4    the sales.  In fact, I think all the parties here
5    say that the MRDA doesn't deal with the sale
6    transaction.  I know the Canadian Debtors say that,
7    they say it in their paper, they say it is
8    specifically excluded.
9              What everybody seems to agree on is
10   look at the rights of the parties and then figure
11   out what the value is and divide it up.  So the
12   rights of the parties in the IP in the technology
13   is what Mr. Maguire and I were talking about, so we
14   say the parties have an interest in the IP, in the
15   Nortel technology based on their contribution to
16   it, based on their R&D spend, that's the way it's
17   always been done, that's the way it should be done.
18             We now have a point where -- and a
19   methodology was put in place for transfer pricing
20   operating purposes to best deal with what the arm's
21   length principle was, 30 percent originally, five
22   years immediately before filing with a dead stop,
23   and that's the way they said they were going to
24   backdate it and proposed to deal with it, again for
25   operating purposes.  Based on what they decided was



1    how to pitch it to the taxation authorities.

2             We now are in a situation where in

3    2014, and what we have is actual information on the

4    actual R&D spend that went into the patents that

5    were sold, so there is no reason today, and I'm

6    going to take the court through some more facts, if

7    you, for example, said we're going to do a five

8    year backdated R&D spend, not only would that be a

9    fictitious number, it would be 100 percent contrary

10   to the facts before the court because there is no

11   one who says that what was sold to the Rockstar

12   group, the IP that was sold in the business sales,

13   was developed over the last five years.

14             THE CANADIAN COURT:  Does that mean

15   that it was a fictitious number put to the tax

16   authorities?

17             MR. GOTTLIEB:  No, it wasn't a

18   fictitious number put before the tax authorities.

19   This type of analysis was never done when they were

20   going through the negotiations and the discussions

21   with the tax authorities because it didn't have to

22   be.

23             What they were discussing back then was

24   an arm's length principle for transfer pricing

25   purposes so that they could allocate the income or



1   revenue on a yearly basis, and they decided to do

2   an amortize originally, had further discussions

3   with the taxation authorities, decided to switch it

4   for five years for the period pre-filing.

5              That was their, if I can put it this

6   way, best estimate, best way of looking at it based

7   on the information that they had in front of them,

8   which was nothing like the information in front of

9   this court.  They didn't have Global IP do the

10  analysis, they don't have the parties do the

11  analysis, they didn't have an actual sale to

12  Rockstar on the residual IP.

13             So to answer the question in the

14  reverse, to value it based on a five look back from

15  any point in time really, would completely ignore

16  the reality of the situation, the facts of the

17  situation.

18             If the Courts are supposed to consider

19  contribution, what's the contribution.  If the

20  Courts know that in, pick a year, 1995 a critical

21  advanced technology patent was made, technology was

22  done in that year, that has been bedrock all the

23  way through, sold to Rockstar, sold as part of the

24  business sales, and on the Canadian theory that

25  should be ignored entirely even though it was the



1   bedrock piece of advanced technology that formed

2   the underlying nature to wireless or some other

3   device that was sold and incorporated, the Courts

4   would be missing and going against the facts that

5   are before it.

6            So now that we're at the stage where we

7   have to allocate the proceeds of an actual sale, an

8   actual sale that you got proceeds for, in my

9   respectful submission, it will be our respectful

10  submission in closing to do it ignoring the actual

11  facts that are in front of the court would be

12  questionable.  It wouldn't be the right way to do

13  it on the facts because the facts are before the

14  court.

15           And I'll give you an example and I will

16  come to it in just a moment, but here is again

17  another critical fact.  95 percent of the valuable

18  patents, 95 percent of the valuable patents based

19  on Global IP's high interest designation, that were

20  sold in the residual patent sale, 95 percent of

21  them were older than seven years old.

22           So we know that 95 percent of what

23  Rockstar actually paid $4.5 billion for is older

24  than the five year window and even the filing date

25  of the patents, so for the court to look back five


Neeson&Associates    W&F
WILCOX & FETZER LTD.                    www.neesoncourtreporting.com
                                        www.wilfet.com

1   years, again with respect, it wouldn't make any

2   sense on the evidence.

3              Just so you have this other note, 65

4   percent of the high interest patents were older

5   than 11 years old.  So far more than the majority

6   of patents paid for by Rockstar were filed 11 years

7   before and Rockstar, we know, is currently

8   litigating over patents that are more than nine

9   years old.  That's what Rockstar paid $4.5 billion

10  for, not the stuff that was done in the last couple

11  of years.

12             I mean, remarkably the Canadian Estate

13  takes the position that when you look at five

14  years, the court should look at 2009 2010 as part

15  of the research and development phase.  There was

16  nothing going on in 2009 2010.  The companies were

17  insolvent.  They weren't trying to develop advanced

18  technology.

19             So to look at 2009 2010 all that that

20  would do, to be blunt about it, is push the numbers

21  over to the Canadian Debtors' side because in the

22  last years they were doing more R&D, but it simply

23  goes directly against the facts.

24             So as part of that, when we look at the

25  useful life, Your Honour, because this deals with



1    really the facts, we are going to present the

2    evidence, and you've already seen the report from

3    Mr. Malackowski who is an expert in intellectual

4    property and he'll guide the Courts through this,

5    which is the evidence regarding the value of the

6    patents that were sold in the business sales and in

7    the residual patent sale.

8              And he'll give more detail than I just

9    have about the way they were created and how they

10   were valued, but if you look at the chart in front

11   of you, what you see is the non-high interest

12   residual patents sold, that's the big grey bar, and

13   you see in '08, '07, '06, '05 all of that very --

14   the majority of work done there is in non-high

15   interest patents.  But if you concentrate obviously

16   on the high-interest residual patents, what you see

17   is 2000, 1999, 1998, 1997, 1996.  That is when the

18   real high interest -- and what that means is the

19   real valuable patents were developed.

20             THE US COURT:  Mr. Gottlieb, is it

21   possible that the patents from 2009 and 2010, that

22   their value has just not yet been established?

23             MR. GOTTLIEB:  Is it possible?  I'm

24   going to have to look at what, and I'm using the

25   word, Judge Gross, "patents" were actually



1   registered during that time period because what was

2   mainly done during that time period, not

3   surprisingly, was maintenance work.

4           So the R&D really went to maintenance,

5   not advanced technology.  These businesses were in

6   the process of being sold.  As you know, Judge

7   Gross, before filing there was movement towards

8   selling these businesses and the business sales

9   started immediately after filing in '09.

10          So the last thing Nortel was spending

11  the money it didn't have on at the time, I will

12  point out, the last thing it was spending its money

13  on was advanced R&D research.  That's not what it

14  was geared towards.

15          So I don't think there's any evidence

16  in the record before the court that would suggest

17  that what was happening in '09 and '10, while the

18  businesses were being wrapped up and packaged up

19  and sold, was valuable research and development

20  work.

21          THE US COURT:  Thank you.

22          MR. GOTTLIEB:  Now, as I alluded to,

23  the Canadian expert has said, as you undoubtedly

24  noticed because of your question, we should only

25  look at the five years starting in '09 and '10.  As



 1   I said, in our respectful view that simply flies in

 2   the face of the evidence and would be simply wrong

 3   and the EMEA Debtors would simply oppose any idea

 4   that the Courts are to rely on bad, wrong, old

 5   information and data.  It's just, in our respectful

 6   view, not the right way to do it.

 7             The parties always looked at the

 8   dollars spent as a measure of R&D contribution, and

 9   based on the evidence of Mr. Malackowski and his

10   report, that will be the focus of the way the court

11   should look at the contributions of the various

12   parties and Mr. Malackowski's evidence, in our

13   view, will be very, very helpful in that regard.

14             Excuse me for one moment, please.

15             The last point I'll make about useful

16   life before I move on is the Canadian Dr.

17   Reichert's opinion focuses on the life of products,

18   and obviously that is not the right way to look at

19   what's developed by an R&D company because it's not

20   the product, it's the underlying technology that's

21   the key to consider useful life.

22             R&D in the development of advanced

23   technology, the literature on Nortel throughout its

24   own books and everything it says is it's an

25   advanced technology company, so the example is the



1    phone you have may be obsolete in a matter of

2    months, let alone years, but it's the technology

3    that's developed that underlies what is the phone

4    that lets the phone work.  It includes inventions

5    that go back to the early nineties and before that.

6    That's the technology aspect we're talking about

7    and that's what we'll see.

8                I will point out that the US Estates'

9    experts, Dr. Eden and Dr. Tucker, agree when they

10   say that generally the value of patents can far

11   outlive the products and the products line because

12   it's the underlying technology that's the key.  And

13   Dr. Tucker specifically adopts the EMEA Debtors'

14   useful life analysis as set out in Mr.

15   Malackowski's reports and you'll hear from him on

16   that.

17               So I'm going to move on briefly from

18   useful life to the US license theory, the license

19   theory put forward by the U.S. Debtors.  They're

20   going to speak for themselves about their theory.

21   There is a point in common between the US license

22   theory and the EMEA Debtors' theory which focuses

23   on that we both say the Canadian Debtors did not

24   have sole ownership of the IP, they held just legal

25   title, and that all of the parties shared



1   beneficial ownership in all of the IP and that's

2   the way the arrangements were.

3           The principal difference between our

4   approaches is the U.S. Debtors say the exclusive

5   licenses can be severed from the obligation to

6   share, to share the profits as a result of the work

7   that's gone on.  They say that it can be severed

8   and the sharing asset doesn't apply to the asset

9   sales and they value their licenses based on the

10  expected future revenues to be earned in the

11  jurisdictions.

12          I will point out, as you're going to

13  hear undoubtedly from my friends from the U.S.

14  Debtors, the US generated the most revenue and EMEA

15  Debtors generated the second most revenue, both

16  more than the Canadian Debtors did.

17          So as you know, Your Honour and Judge

18  Gross, it's the EMEA Debtors' position that the

19  EMEA approach is the way you should allocate the

20  proceeds by contribution, the U.S. Debtors say you

21  don't share the proceeds based on contributions,

22  you do it based on the license value.

23          We say, as we said in our paper and our

24  brief, that unlike the Canadian theory, the US

25  license theory has a principled basis to it.  We of

```
 1    course are pushing that in our respectful
 2    submission the contribution theory is the
 3    appropriate way to go given the rights of the
 4    parties, but if the US if the courts, pardon me,
 5    determine that the contribution theory is not the
 6    way to go, notwithstanding our submissions, we say
 7    that the license theory put forward by the US
 8    Debtors is the way to go, subject to what I'm going
 9    to call tweaking or a caveat, because under the US
10    license approach, value is not given to the
11    non-exclusive licenses that the parties had, that's
12    ignored in the US valuation and the license
13    approach put forward by it.
14                These adjustments that we say will be
15    necessary for the Courts to make if the US license
16    approach is taken, they are set out in Mr.
17    Malackowski's rebuttal report which he will testify
18    about, and you will hear that they were important
19    revenues generated in China and the rest of the
20    world, and that those revenues have to be
21    considered or else the license approach will be
22    improperly skewed.
23                So I'm going to move now to the legal
24    theory of the Canadian side which is, what is the
25    legal title theory.
```

 

1                  As you know, Your Honour and Judge

2      Gross, the Canadian Debtors claim 90 percent of the

3      IP proceeds, including 100 percent of the $4.5

4      billion received in the residual sale to Rockstar.

5      And their case rests inordinately on the fact that

6      under the MRDA, they say legal title vests in NNL.

7      Legal title vests in NNL.

8                  As you'll hear from us in closing,

9      that's an extraordinary position to take because we

10     say that it's clear that when parties want to

11     indicate that they are not transferring, when

12     they're not vesting everything in a party, they use

13     the term "legal title."  There are a lot of other

14     terms used, but when you talk about vesting legal

15     title in someone's name, which is what it says in

16     the agreement in the name of NNL, you're actually

17     showing that you don't want to give that party

18     everything.

19                 What we see is that the theory, the

20     legal title theory ignores what we say is all of

21     the evidence, which is the way the parties

22     acknowledge their rights; we also say it ignores

23     the actual terms of the MRDA because the MRDA is

24     completely consistent, when read properly, with the

25     ownership rights of the other parties.  It's

1    acknowledged in the body and in the schedules of

2    the MRDA.

3              And what it mostly ignores is that all

4    the other estates spent billions and billions of

5    dollars over decades towards the creation of the

6    very assets that the Canadian claim they owned 100

7    percent of and all the other estates got back was a

8    share of losses year after year and licenses which

9    the Canadians do say are virtually worthless.

10             So for the billions and billions of

11   dollars spent by the parties, they did that so they

12   could transfer all the value to the Canadian

13   Debtors without getting anything back for it.  In

14   our respectful submission, that just has no merit

15   based on the facts.

16             And what it also ignores, Your Honour

17   and Judge Gross, and this is, in my view, something

18   that's important that it's not glossed over, is

19   that during the life of the arrangement between

20   these parties, NNL, the Canadian Debtors, were in

21   no different position than any other party.

22             Throughout the entire period from 2001

23   until filing, they all shared on the exact same

24   basis.  NNL was never in a position to nor did it

25   say I am the owner, therefore I get more, you're

 1    doing all this work for me.  That's not the way it
 2    worked.  They all shared, they all worked in
 3    accordance with their contribution, and they all
 4    got paid in accordance with their contribution.
 5    And that's what the evidence shows.
 6              What is a little surprising and
 7    inconsistent with the Canadian position here is the
 8    Canadian Debtors expressly say, Your Honour, that
 9    the MRDA does not apply to sales proceeds.  They
10    say it's carved out of the MRDA, yet they rely 100
11    percent on the MRDA in saying that no other estate
12    is entitled to benefit from the sale of the
13    technology.
14              What the Canadian Debtors are trying to
15    do, and you raised this in the question to Mr.
16    Maguire, they're trying to tell the court to ignore
17    all the facts but the MRDA.  As a matter of law, I
18    say and we will submit at the right time that is
19    wrong and that's a matter of law, there is no basis
20    to say that.  But there is a period, Your Honour
21    and Judge Gross, from 2001 to 2005 that there's no
22    MRDA, there just isn't one.  It's not signed up
23    until sometime after the end of December 2004.
24              So we know that for all of '01, '02,
25    '03, '04 there's no MRDA.  Well, the parties had



1    rights during that entire time period, and the

2    parties had had many discussions amongst themselves

3    and with the taxation authorities about what their

4    rights were, where they said we all own the IP

5    together, and that's exactly what the Canadian

6    Debtors are telling you not to look at.

7    Notwithstanding that there was no agreement in

8    place, they're telling you you can't look at what

9    the -- what all the parties said their rights were

10   at the time, what they told the taxation

11   authorities.  And to make that clear, the MRDA is a

12   document put in place to deal with the taxation

13   authorities with respect to the arm's length

14   aspects of transfer pricing.

15            THE CANADIAN COURT:  The MRDA does say,

16   it confirms and formalizes the operating

17   arrangements of the participants added from January

18   1, 2001.

19            MR. GOTTLIEB:  Yes, that's right,

20   because what happened was you've got '01, '02, '03,

21   '04 where the parties are operating, they're

22   operating under the contribution method, they're

23   operating and negotiating at the same time with the

24   taxation authorities about a new advance pricing

25   arrangement with the government authorities, and

 1   they're trying to get an agreement in place that

 2   will be satisfactory, that's the whole point of the

 3   MRDA, to be satisfactory.

 4            So the discussions with the taxation

 5   authorities, for example, it's not parol evidence,

 6   they're telling the taxation authorities how they

 7   operate so that the taxation authorities can either

 8   agree with the arm's length principle that's been

 9   put in place -- pardon me, the way the company

10   deals with the arm's length principle or not agree

11   with it.  It's not to change the words of the MRDA.

12   It's actually the whole essence of the MRDA, that's

13   why they're talking to the taxation authorities.

14   You can't divorce the two.

15            So throughout that entire period of

16   time, '01, '02, '03, '04, the parties have rights,

17   and you've heard our submissions about how those

18   parties expressed those rights, but the Canadians

19   are asking you to ignore all those expressions

20   throughout that entire piece when there's no

21   agreement in time, because all of those documents,

22   all of those submissions to the taxation

23   authorities, all of the correspondence that goes

24   back and forth acknowledges the joint ownership.

25            And the point is after the MRDA is



1    actually signed in either late '04 or the beginning

2    of '05, the parties, we say, up until that point

3    acknowledged their ownership, and then what we say

4    is afterwards the parties continued to acknowledge

5    their ownership, not because the MRDA bound them

6    with respect to the sale of assets of Alcatel, the

7    UMTS transaction, but after the MRDA is signed and

8    that's the important part, they sell assets, they

9    sell IP.

10                  And how do they distribute them?  In

11   accordance with the joint ownership of the IP based

12   on their R&D spend.  That's how they do it

13   afterwards, even though they say the MRDA doesn't

14   apply to that transaction.  We agree.  The way they

15   divvied up the allocation was in accordance with

16   the parties' rights, and that was recognized.

17                  And I know we've stressed it, and I'll

18   stress it one more time and I won't come back to it

19   during the opening, I hope, when you look at the

20   way Alcatel's proceeds were spread across the

21   board, that too, it's not a fictitious issue.  The

22   parties filed their tax documents with their

23   revenue authorities on the basis of that

24   allocation, it was a $320 million US transaction.

25   It was a very material transaction to Nortel.  It

1    actually made the difference between profit and

2    losses on the year.

3              It was a transaction that the auditors

4    paid very, very serious attention to and you'll see

5    that evidence.  It was one that there was

6    significant communication with the auditor about,

7    the auditor acknowledged it was something they had

8    to look at, management had to look at it,

9    management cooperated on it.

10             So they distributed it on that basis,

11   they allocated it on the basis of joint ownership

12   based on a contribution method based on R&D spend

13   and recorded the income in their various books and

14   records.

15             So if that's the case, if the Canadian

16   theory is accepted, then each of those entities,

17   including NNL, NNUK, NNSA, NNI, NN Ireland, they

18   all filed improper tax returns when they accounted

19   for that transaction, because they took into their

20   revenue, revenue they were not allowed as a matter

21   of law, as a matter of their rights, to take.

22             Because one thing we know for sure as a

23   result of transfer pricing, Your Honour, the whole

24   reason there is a transfer pricing regime is you

25   can't do that.  You can't just say I'd like to

 1   allocate revenue over to X country because that

 2   will be the most tax effective way to do it.  You

 3   can't do that.  You have to do it properly, and

 4   that was done properly with respect to the Alcatel

 5   sale.

 6               And you will not hear, as Mr. Maguire

 7   said, a single Canadian witness who will testify

 8   that there was a business decision that was made on

 9   another basis, that NNL gets it all, that everyone

10   was working for NNL.  That wasn't discussed.  You

11   won't hear evidence about it because that didn't

12   happen.

13               So, Your Honour and Judge Gross, I've

14   summed up the points about the allocation and the

15   contribution theory, how it relates to IP and the

16   history of how it relates to IP and how it was

17   reported.  I'm just going to move to the other

18   assets that the court will need to consider when

19   allocating the proceeds from the business sales

20   because those are very material also and I'll go

21   through those, and there is expert evidence

22   obviously on all of those points as well.

23               So the other significant assets with

24   material value that were sold in the business sale

25   included tangible assets, PP&E, other intangible

1    assets like customer contracts and customer

2    relationships which were very valuable, as we'll

3    see, and included the entire infrastructure of the

4    sales and distribution process and the customer

5    support, bedrock of any technology company like

6    this, as well as the employees.

7            And you'll hear from the EMEA Debtors'

8    expert witness, from Blackstone, a Mr. Paul

9    Huffard, who is an expert in asset valuation and

10   restructuring who will provide and guide the Courts

11   through his opinion as to how to value those

12   assets, the tangible assets, the customer assets,

13   and the goodwill and the other asset classes.

14           With respect to the tangible assets

15   first, Mr. Huffard will explain that the net

16   tangible assets should be valued based on their

17   book value and allocated to the parties based on

18   what was held on the balance sheet.  There's really

19   not that much interesting about that particular

20   part of the allocation.

21           Then we get to the customer related

22   assets that were transferred in the business sales.

23   They are a separately identifiable asset class with

24   their own value.  The parties do not agree about

25   those assets, they don't agree about those values.



 1   The Canadian Debtors say you should ignore the

 2   customer asset entirely -- entirely -- it should

 3   just be brought into the valuation of IP.  Their

 4   next sentence, as you are aware, is and they get

 5   all the value from the IP which is why it should be

 6   slid in -- the customer value should be slid into

 7   the IP.

 8              But we say, and the evidence will be

 9   clear, that assets of the customer relationships,

10   the infrastructure, the contracts is a separate

11   class with its own value, and there is significant

12   testimony to support that point from the various

13   witnesses from the estates.

14              And I will point out, before I move off

15   the customer value, that in fact when the business

16   sales are being pitched, when the prospective

17   purchasers are being pitched, not surprisingly it's

18   one of the assets they are being pitched about.  We

19   have terrific customers, we have terrific

20   infrastructure in place to deal with our customers,

21   we have a terrific distribution network and

22   therefore it's an important part of our business

23   and you should give value to that, that's a

24   valuable asset.  When they did their filings, it

25   was also on that basis.



```
 1              And I will point out, I knew I would
 2   break this promise, in Alcatel they do a valuation
 3   based on customer assets as well, and when the
 4   amounts are spread across the categories of assets,
 5   customer assets is one of them and a valuation is
 6   done and that's distributed in accordance with the
 7   same proper customer valuation methodology there.
 8              If I could have just a moment, please.
 9              So, Your Honour and Judge Gross, I will
10   not spend any more time on the customer point other
11   than to say that what you will hear is that you'll
12   hear testimony from the witnesses about the value,
13   you'll hear Mr. Huffard's expert opinion as to why
14   it's a necessary asset class, and you will hear
15   from Mr. Huffard about how in these circumstances
16   to value that class because it's not a simple
17   process of valuing the customer assets because of
18   the situation here, it's grouped with goodwill for
19   the purpose of allocation and then allocated
20   amongst the Debtors.  But you will hear the
21   testimony on that.  They are a very valuable asset
22   and cannot be forgotten.
23              The last slide, Your Honour and Judge
24   Gross, sets out our conclusion as to the position
25   that the various estates put forward, it's the
```



1    allocation position.  The EMEA one is obviously on

2    the left and I remind you back to what Mr. Look

3    said at the time of filing where he thought it

4    would be 40 40 20, the EMEA Debtors give themselves

5    a little bit less than Mr. Look thought that would

6    be attributed, and the Canadians and Americans are

7    off somewhat but the same type of theme is in place

8    there that we're talking about.

9              On the US Debtors' allocation, you see

10   the EMEA Debtors are again in the same range, a

11   little bit less, but not too far off, and the

12   Canadian Debtors' chart, you see there's -- I'm not

13   sure if you can see it, but there is a small amount

14   on the Canadian Debtors' chart that's left but it's

15   there.

16             So in conclusion, Your Honour and Judge

17   Gross, we say that what the court should do and

18   needs to do is look at the records so that you can

19   properly see the rights of the parties, not ignore

20   the facts of this case.  That way you'll properly

21   see the ownership, you'll see the ownership is

22   based on the technology, is based on the

23   contribution and the contribution leads to

24   ownership.  It's well supported by the facts, it's

25   well supported by the legal principles, which we'll



1    talk about obviously at closing, and this is

2    consistent from 2001 until post-filing, even in the

3    Monitor's own words when it creates the tax

4    documents, the proper way to allocate is by

5    contribution to R&D.  Those will be our closing

6    submissions and you'll see that evidence

7    throughout.

8              So we thank the Courts, Justice

9    Newbould and Judge Gross, for your attention and

10   our colleagues for the time and we look forward to

11   spending the next little while.

12             THE CANADIAN COURT:  Thank you, Mr.

13   Gottlieb.

14             MR. GOTTLIEB:  Thank you very much.

15             THE US COURT:  Thank you, Mr. Gottlieb.

16             MR. GOTTLIEB:  Thank you, Judge Gross.

17             THE CANADIAN COURT:  What's next on the

18   menu?

19             MR. BARRACK:  UKPC.

20   OPENING STATEMENT ON BEHALF OF UK PENSION CLAIMANTS

21             MR. O'CONNOR:  Good morning, Judge

22   Gross.  Good morning, Mr. Justice Newbould.  I am

23   Brian O'Connor of Willkie, Farr & Gallagher, LLP,

24   counsel for the UK Pension Claimants, and I will

25   begin the UK Pension Claimants' opening statement

1    and then turn it over to my colleague, Mike Barrack

2    in Toronto, to complete our presentation.

3              As the Courts know, the UK Pension

4    Claimants act on behalf of 36,000 members of the

5    Nortel UK pension plan who were former employees of

6    the Nortel Group.  And as the Courts are aware,

7    NNUK was the sponsor of that plan.  And as of

8    January 14, 2009, the funding deficit in the plan

9    was estimated to be in excess of $3 billion on a

10   buyout basis.

11             The plan is the more than 90 percent

12   creditor of NNUK, due to the debt that NNUK owes

13   the plan for the funding deficit.  The UK Pension

14   Claimants have a very substantial interest in

15   seeing that the lockbox proceeds are allocated on a

16   fair and an equitable basis.

17             The Courts have now had the opportunity

18   to read the parties' pretrial briefs and to hear

19   from the EMEA Debtors, and you likely have already

20   surmised that there are not many genuine issues of

21   material fact in dispute.  Instead, this case is

22   predominantly about the legal conclusions that

23   should be drawn from those largely admitted facts.

24             After over 100 depositions of fact

25   witnesses, over 30 depositions of expert witnesses,

1    and three unsuccessful mediations, the debtors

2    remain hopelessly at odds with each other over what

3    those legal conclusions should be.

4            You have heard from the EMEA Debtors

5    and you will soon hear from the Canadian and the US

6    Debtors.  Each of the debtors advance a primary

7    theory.  Each of these theories is qualitatively

8    and quantitatively divergent.  Interestingly, each

9    of the theories is based for the most part on

10   their --

11           THE US COURT:  "Irreconcilable."

12           MR. O'CONNOR:  -- irreconcilable --

13   couldn't get it out -- irreconcilable

14   interpretations of a single agreement, the MRDA.

15           Now, Canada bases its theory on legal

16   ownership or legal title to the group's IP, while

17   the US bases its theory on beneficial ownership of

18   the IP.  And then they value that beneficial

19   ownership by a revenue metric based on each of the

20   RPEs 2009 revenues.

21           And as you've heard, EMEA adopts a

22   contribution theory that allocates value based on

23   the parties' respective shares of their R&D spend

24   to develop the group's IP.  And you've also heard

25   that EMEA also advances an alternative licensing

1    theory.

2            Now, these competing primary theories

3    produce massive swings in allocable value, as the

4    chart which we just put on the screen demonstrates.

5    This chart is a bar chart.  It essentially is very

6    similar to the one that EMEA just used as a

7    piechart, but it demonstrates the tremendous swings

8    in value depending upon which one of this theories

9    the Courts ultimately adopt.

10           As you'll see, if Canada's theory is

11    adopted -- or strike that.

12           Canada's share of the lockbox,

13    depending on whose theory is accepted, could be as

14    little as 11 percent or as large as 83 percent.

15    The US Debtors share as little as 14 percent or as

16    large as 73 percent, with EMEA's share being as

17    little as 3 percent or as large as 18.2 percent

18    under its contribution theory or 31 percent under

19    its license theory.

20           Now, why are these states advancing

21    allocation theories that produce such massively

22    different allocable values?  That's actually one of

23    the easier questions to answer in this case.  It's

24    because the debtors never entered into an agreement

25    that established how the proceeds of the sale of

 1    the group's assets should be allocated in the event

 2    of a group-wide insolvency.

 3              The MRDA simply doesn't address that

 4    issue.  The MRDA was a tax-driven agreement

 5    designed to satisfy tax authorities that the

 6    group's transfer pricing for goods and services

 7    transferred within the group was appropriate.  It

 8    was based on a going-concern assumption and was

 9    designed to allocate profit and loss among the RPEs

10    in a continuing business.

11              Now NNL, NNI and NNUK, each a signatory

12    to the MRDA, struggle to find guidance in that

13    agreement to answer a question it was never

14    intended to answer.

15              They all agree, for the most part, on

16    how the group operated before insolvency:  that

17    the group consisted of more than 130 entities in

18    more than 100 countries; that it was vertically and

19    horizontally integrated; that it operated as "one

20    Nortel" that alone was headquartered in Canada; it

21    operated according to a multinational matrix

22    structure based on lines of business; that those

23    lines of business spanned both geographic

24    boundaries and legal entities; that the group

25    shared information and performed common tasks

1    across those geographic boundaries and legal

2    entities; and that none of the geographic regions

3    provided the full line of Nortel products and

4    services itself; that the group had to be fully

5    integrated to operate in the fashion that it did.

6                    And of course, they all agree that the

7    crown jewels of the group was its IP.  That was the

8    engine that drove the business.

9                    Then came global insolvency filings,

10   and the debtors continued to be on the same page

11   for the most part.  They agree that the best way to

12   monetize value for creditors was to sell the

13   group's lines of businesses and other assets on a

14   collective basis, to undertake a process to carve

15   out those businesses for sale, and to place the

16   proceeds of those sales in escrow while they sorted

17   out who was entitled to what.

18                    Unfortunately, that's where any

19   semblance of agreement came an abrupt halt.  That

20   formally integrated matrix organization that

21   operated so seamlessly across jurisdictional

22   boundaries and legal entities to develop and

23   exploit the group's IP pre-insolvency and then to

24   sell the group's assets post-insolvency is suddenly

25   disintegrated.



1              It's no longer one Nortel, where all

2    the moving parts worked together for the benefit of

3    the group as a whole, where cash was fungible and

4    deployed within the group where needed, where the

5    group's internal transactions were structured to

6    minimize the group's tax liability as a whole.

7              Today, instead, it's every debtor for

8    itself in a territorial grab for the lockbox

9    proceeds.  And while the debtors fight like jackals

10   over the decaying carcass, the true parties in

11   interest, their creditors, suffer as their

12   recoveries erode with the massive expense of this

13   extraordinary internecine battle.

14              And its creditors, like our clients,

15   the UK pension members, who loaned money to this

16   formerly integrated organization in the form of

17   their deferred compensation, that must painfully

18   watch as their ability to support themselves and

19   their retirement hangs in the balance.

20              The pain our clients feel is twofold as

21   unlike other stakeholders in this case, whose

22   litigation expenses are being funded by the

23   estates, the pensioners are paying to protect their

24   hard-earned entitlements out of their own pockets.

25              They rightfully ask:  How is it



1    possible that this organization, which was so fully

2    integrated pre-insolvency, is so utterly

3    disintegrated post-insolvency?  How is it that the

4    debtors can't agree on the fundamental question of

5    who owned the group's IP?  How is it that they

6    operated under the MRDA for years and suddenly

7    can't agree on its meaning or import?  And how is

8    it that they can't even agree on what rights and

9    property interests were conveyed in the MRDA?  And

10   how is this possible after all the statements the

11   debtors repeatedly made to tax authorities across

12   the globe for years about the parties' respective

13   rights under that agreement?

14            The debtors fail to provide

15   satisfactory answers to these fundamental

16   questions, as you will soon see for yourselves.

17            You will hear from Canada.  Canada will

18   tell you that the question before you is the

19   following:  What is the value of the property

20   rights transferred or surrendered by each debtor in

21   connection with the sales?

22            You will hear Canada tell you that the

23   value of the property rights surrendered by NNL is

24   over $6 billion, or 83 percent of the lockbox

25   proceeds.  Why is that?  Because Canada will tell

1    you NNL owned all of the intellectual property.

2                You will hear Canada tell you that the

3    MRDA granted NNI and NNUK only licenses; that those

4    licenses are contract rights, that they're not

5    ownership interests; that the licenses were limited

6    in scope; that they were restricted to products;

7    that the RPEs could use the group's IP only to

8    make, use, and sell Nortel products that embody

9    Nortel IP.

10                And, as a result, Canada will tell you

11   that the licenses surrendered in the business lines

12   sale should be valued on a contract basis; that

13   they should be valued based upon the operating

14   profit that the RPEs expected to receive from

15   exploiting a limited product license had they

16   continued to operate the business rather than

17   surrendering those licenses in the sales.

18                And then they will tell you that that

19   operating profit they can expected to receive had

20   to be shared among the RPEs under the under the

21   MRDA.

22                And what's the bottom line?  Canada

23   gets virtually every penny of the 4.5 billion of

24   the Rockstar proceeds and 1.6 billion of the

25   proceeds of the business line sales.



1              And when you think about that, that's a

2    remarkable theory.  After the RPEs incurred the

3    expenses of developing the IP, shared in the

4    profits and often the losses of the business while

5    it operated, Canada gets 83 percent of the proceeds

6    when the business shut its doors.  The other RPEs

7    received comparatively de minimus compensation for

8    the rights they surrendered in the sales.

9              Then you will hear from the US, and

10   they will tell you a different story.  They will

11   tell you that Canada is wrong.  They will tell you

12   that NNL really didn't own the group's IP; that

13   they had legal title, but that was vested in NNL

14   under the MRDA only for administrative convenience;

15   that NNL had only nominal or bare legal title; that

16   NNI granted NNL the right to register legal title

17   to the IP in its name only in exchange for an

18   exclusive perpetual royalty-free license to the

19   group's IP in the United States.

20             The US will tell you that the MRDA

21   grants NNI equitable and beneficial ownership of

22   the IP.  And it will tell you that that grant is a

23   very broad grant, not a limited grant; that the

24   RPEs had the rights to sublicense the IP to another

25   party; that they had the right to enforce the

1    group's patents in their exclusive territories; and

2    they will tell you that Canada is wrong about the

3    scope of the license conveyed.

4              They will tell you that the MRDA did

5    not convey a limited license to make or sell a

6    specific collection of products that existed on a

7    particular date, that anything that might be

8    designed or developed or proposed to be designed or

9    developed in perpetuity was covered by the license.

10             You will also hear the US tell you that

11   their construction of the MRDA is confirmed by the

12   repeated representations made by the group to tax

13   authorities around the world as to who owned the

14   economic ownership of the group's IP and what that

15   significance was.  And they'll tell you that the

16   Monitor's position is a belated litigation strategy

17   that's inconsistent with the position it had taken

18   earlier in the case.

19             They'll tell you that all of the

20   estates understood that they would be sharing in

21   the proceeds of the IP sales, including the

22   residual IP portfolio.

23             And, finally, they will tell you that

24   if NNI had known that NNL would take the position

25   it's taking now, NNI would never have agreed to

1    surrender the license in the sales transactions.

2              You've heard already from EMEA this

3    morning.  What did they tell you?  They also told

4    you that Canada is wrong.  They told you again that

5    the legal ownership theory is wrong because the

6    RPEs had beneficial ownership, and that's what

7    counts.  Like the US, they tell you that Canada

8    only held nominal legal ownership for

9    administrative convenience.

10             But you also heard EMEA tell you that

11   the US's revenue approach is wrong.  It's wrong,

12   they told you, because the group's IP was developed

13   collectively by the RPEs and that the lockbox

14   should be allocated in proportion to the value of

15   the contribution each RPE made to the creation of

16   that IP.

17             EMEA told you that the best measure of

18   their proportional contribution is their respective

19   R&D spend over the useful life of the IP, 15 years,

20   which EMEA told you is the way the RPEs shared

21   profits and losses under the MRDA.

22             So where does all this leave us?  It

23   leaves us with the debtors unable to agree on any

24   one allocation methodology, the same place we have

25   been in for the last several years, mired in a



 1    seemingly intractable litigation.

 2              And it's in the context of this

 3    fundamental disagreement and in the absence of a

 4    governing contract, a statute, or precedential case

 5    law that the Courts are asked to untie this

 6    proverbial Gordian knot.

 7              The UK Pension Claimants respectfully

 8    submit that, after hearing all the evidence and the

 9    parties' arguments, you will likely conclude there

10    is no facile way out of this morass.

11              But at least two things are more than

12    clear:  The bickering and squabbling has to come to

13    an end so the proceeds of the lockbox can be put in

14    the hands of the true parties in interest, the

15    creditors, as soon as possible.  And having waited

16    this long while the debtors fought amongst

17    themselves, the lockbox allocation must be fair and

18    equitable to the creditors.

19              And that is why the UK Pension

20    Claimants are here and why they've formulated an

21    allocation position, a position which we hope will

22    assist the Courts in achieving those two important

23    objectives.

24              And with that, I'll thank the Courts

25    and cede the podium to my colleague, Michael

 

 1    Barrack, in Toronto.

 2                    THE US COURT:  Thank you, Mr. O'Connor.

 3                    THE CANADIAN COURT:  Thank you,

 4    Mr. O'Connor.

 5                    Mr. Barrack.

 6                    THE CANADIAN COURT:  Thank you, Mr.

 7    O'Connor.  Mr. Barrack?

 8                    MR. BARRACK:  Good morning Judge Gross.

 9    Good morning Justice Newbould.  I am Mike Barrack,

10    Canadian counsel to the UK Pension Claimants, from

11    Thornton Grout Finnigan.  What I intend to do is

12    review the reasons why the pro rata approach is the

13    legally and equitably correct approach.

14                    In broad terms, I will review the

15    factual background and it supports pro rata.  As

16    Mr. O'Connor said, and I think you probably know

17    from reading the briefs, there aren't many facts in

18    dispute.

19                    What I will then do is address these

20    Courts on why pro rata is on solid legal ground and

21    why you would be on solid legal ground to allocate

22    on that basis.

23                    Finally, I will address the specific

24    criticisms which have been raised against pro rata.

25                    There are two fundamental points which

```
 1   have caused the Courts to consider the pro rata
 2   approach.  The first is that it is the allocation
 3   approach which most closely reflects the manner in
 4   which Nortel operated its business, both before and
 5   after insolvency.  And second, it is the only
 6   allocation approach which will ensure that a
 7   precedent is created which will avoid the
 8   significant depletion in assets that has occurred
 9   in this case as a result of this inordinately
10   complicated litigation.  Litigation, which at the
11   end of the day, is only aimed at dividing a common
12   fund arising from the sale of common assets.
13              Now, you judges are well aware that
14   every lawyer who gets up here is going to give you
15   a position that represents the self-interest of
16   their clients, and the self-interest of the 35,000
17   UK pensioners that I represent is this:  that other
18   creditors can't take value out of the patents
19   created by my clients and the other pensioners and
20   walk away from billions of dollars of pension debt.
21              So let me go to the basis, the factual
22   basis on which pro rata is based.  Of fundamental,
23   absolutely fundamental fact is that prior to
24   insolvency there was no agreement between the
25   various Nortel corporations on how the proceeds of
```



1    the common asset sales would be divided.

2                You've seen the fourth addendum to the

3    MRDA.  It said the MRDA does not apply to asset

4    sales.  And as you go through and try and divine

5    the decision tree you're going to have to follow in

6    this case, you will come to see why that is.

7                It is because the MRDA did not deal

8    with the situation before the court.  Everyone will

9    tell you that Nortel operated prior to insolvency

10   as a single worldwide highly integrated business.

11   Everyone will tell you that the patents which were

12   created were the most -- created the most value in

13   the lock box.  They will tell you that they were

14   created by efforts of Nortel employees around the

15   world working together in a highly collaborative

16   manner.  Everyone will tell you that the nature of

17   the technology business Nortel operated depended on

18   its ability to use those patents in a highly and

19   creative way.  You take out your smart phone,

20   there's probably a bunch of those patents in your

21   smart phone.

22                The Monitor and the Canadian Debtors

23   filed the report of Timothy Reichert and he stated:

24                "Nortel operated as an integrated

25                business with multiple entities

```
 1                    performing various responsibility for
 2                    R&D.  Nortel's products and services
 3                    were sold in large, complex bundles,
 4                    making it very difficult for Nortel to
 5                    assign revenue and profits from its
 6                    projects in a non-arbitrary manner.
 7                    Revenue was often associated with
 8                    global clients or with large regional
 9                    clients.  It involved a large portfolio
10                    of technology and technology based
11                    solutions.  R&D investments were highly
12                    interrelated and were often transferred
13                    from one R&D centre to another during
14                    the development cycle.  And it was
15                    because of this extreme degree of
16                    integration that Nortel always acted as
17                    a single worldwide enterprise."
18                    That degree of integration eventually
19         becomes an entanglement and this process is the
20         foundation of the pro rata approach.
21                    I would ask that when you're looking at
22         the exhibits that will be presented in court to
23         note the use of a single Nortel logo, reference to
24         the enterprise as Nortel Networks and the absence
25         of reference to any specific legal entity.  This is
```

 1    how the enterprise represented itself both

 2    internally and among its employees and externally

 3    including presentation to tax authorities, to

 4    investors and suppliers.  Nortel branded itself as

 5    a single worldwide entity.

 6              So then when we came to insolvency, the

 7    parties recognized the benefits of this extreme

 8    degree of integration when selling the Nortel

 9    assets collectively.  It was only as a collective,

10    only as one Nortel that the benefits of a joint

11    sale be achieved.  A liquidation of the assets on

12    an entity by entity or country by country basis

13    could not have been done.

14              Sharon Hamilton of the Canadian Monitor

15    wrote in her reply affidavit:

16              "The lines of business operated

17              across jurisdictional boundaries and

18              the assets, contracts and employees

19              relevant to the operation of a

20              particular line of business were owned

21              or employed by various individual

22              Nortel legal entities.  This was the

23              reason it was necessary for each of the

24              estates among the other non-debtor

25              Nortel affiliates to participate in a



1            line of business sales to effect their

2            orderly sale and transition to

3            purchaser."

4        There could be no single pool of funds

5    in the lock box unless the integrated and entangled

6    businesses and assets of Nortel were sold on a

7    common basis.

8        And as the court knows, those joint

9    sales efforts resulted in a significant amount

10   being recovered, far beyond what was anticipated in

11   advance.  The value from the asset sales came

12   primarily from selling intellectual property in the

13   form of patents.  The parties recognized at the

14   time of the sale that there was an intractable

15   problem of attempting to assign the value of the

16   assets, primarily with patents, to any individual

17   entity.

18        Their response to that intractable

19   issue was to defer the question until after the

20   sale of the assets.

21        Subsequent to the sale, what do we

22   have?  Parties have developed divergent theories.

23   Each of those theories is designed to support an

24   allocation of an inordinately share of the lock box

25   in favour of the party advocating the theory.


Neeson & Associates
COURT REPORTING AND CAPTIONING INC.        W&F
                                           WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

1            These asymmetrical theories, especially

2      the Canadian and U.S. Debtor positions, are based

3      primarily upon the false assumption that there was,

4      in fact, an agreement as to allocation prior to

5      insolvency and that that agreement now dictates the

6      uncertainty in the insolvency context, and Mr.

7      O'Connor has addressed that point.

8            The cost of the litigation to advance

9      these late developing and artificial theories has

10     been enormous and should not set the precedent for

11     future international insolvencies of these types.

12           The positions taken by the bankruptcy

13     estates in this litigation have simply perpetuated

14     a geographic tug of war.  It has also been

15     exacerbated by the underlying dispute between

16     pensioners and Bondholders.  The CCC which

17     represents 20,000 Canadian pensioners and the

18     35,000 remaining UK pensioners each support pro

19     rata either as a primary or ultimate position.

20           The unsecured bondholders, in contrast,

21     are seeking to advance two separate $4 billion

22     claims for the same $4 billion debt against a

23     single pool of assets.  They also expect to be paid

24     substantial post-petition interest in addition to

25     the principal of their debt.  The pensioners,

 1    however, submit that pari passu unsecured creditors

 2    should be treated equitably.

 3              So is the pro rata approach to

 4    allocation from the lock box a legally sound

 5    approach and will it withstand appellate scrutiny?

 6    That is a very legitimate question for the Courts

 7    to ask.

 8              The starting proposition is there is no

 9    binding authority on these Courts sitting together

10    which demands any approach to allocation be

11    favoured over another.  Pro rata is consistent with

12    domestic legal principles in both jurisdictions.

13    The bedrock legal premise in insolvency is pro rata

14    pari passu recovery by all creditors of the same

15    priority.

16              The issue here is to allocate on a

17    basis which will allow for fair treatment of all of

18    Nortel's unsecured creditors wherever situated.

19    None of the creditors -- none of the creditors

20    took security over Nortel's assets, and in the

21    absence of a clear agreement between the parties

22    prior to insolvency, any allocation method which is

23    premised on an economically irrational premise

24    should be rejected as unjust and inequitable.

25              The extreme positions of the Canadian

 1    and US Debtors are economically irrational.  They

 2    are entirely rational from the party who gets the

 3    benefit.  They are entirely economically irrational

 4    from the party who gets the detriment.

 5                For instance, no entity would agree to

 6    give up its contribution to the creation of IP if

 7    it was told you would have no entitlement to it in

 8    an insolvency context.  That is what the Canadian

 9    Monitor and Debtor suggest.

10                Similarly, no entity would agree to

11    give up the value of its contribution to the

12    creation of IP, to the creation of the IP -- would

13    agree -- sorry, it would get no value for the

14    creation of its IP because the allocation was going

15    to be derived on revenue without recognizing the

16    costs associated with earning that revenue.

17                And for the pensioners, that comes down

18    to a simple case.  The US is saying we will take

19    all the revenue and strand your pension debt.  That

20    would be economically irrational.

21                The contribution theory advanced by the

22    EMEA Debtors, while not economically irrational, is

23    difficult to implement because of the hopeless

24    entanglement of the assets which gave rise to the

25    value in the lock box.  The pro rata approach is

 1    analogous to many other situations in which US,

 2    Canadian and UK courts use flexible concepts such

 3    as constructive trust where there is a receipt of a

 4    benefit, prevent unjust enrichment and to ensure

 5    equity between claimants.

 6              In the domestic and insolvency law of

 7    both jurisdictions, when the task of disentangling

 8    the ownership of assets cannot be undertaken with

 9    confidence, the alternative is to order pro rata

10    recovery among all the unsecured creditors.  The

11    assets which gave rise to the lock box were

12    extremely intermingled.  It was not possible to

13    identify which parts of these common assets were

14    owned by individual entities.

15              There was no agreement on how the

16    proceeds of the asset sales were to be divided.

17    The MRDA specifically stated it did not apply to

18    asset sales.  If there was no prior agreement on

19    how to allocate the proceeds of the sales of the

20    common assets of Nortel among its entities, and if

21    the courts are going to attempt to assign parts of

22    the value to the various Nortel entities, first the

23    value of the assets needs to be disentangled and

24    assigned to the various entities.  But that's not

25    the end of the exercise.

1              Second, unpaid costs associated with

2    creating the assets which created the value have to

3    be disentangled as well, and it's the impossibility

4    of undertaking that task which leads to the

5    hopeless entanglement.

6              Simply put, the other creditors can't

7    take the value of the patents created by my clients

8    and the other pensioners and walk away from

9    billions of dollars in pension debt.

10             The recognition of costs prior to

11   allocating residual profits was the basis on which

12   Nortel operated under the MRDA.  There is nothing

13   inconsistent between a pro rata allocation approach

14   and the MRDA.  The basic proposition of the MRDA is

15   that worldwide debts and obligations were paid

16   before any residual profit was allocated to

17   licensed participants.

18             A pro rata allocation does exactly the

19   same thing.  It ensures that the value arising from

20   the sale of assets is dedicated first to the

21   payment of amounts owing to creditors on a

22   worldwide basis.  It is exactly the same method.

23             This is consistent with the way Nortel

24   operated prior to insolvency.  Before it was

25   insolvent, it would never say we have a bunch of



1  debts and obligations but we're going to divide our
2  revenues between the entities.  There was nothing
3  to distribute other than losses until the debts and
4  liabilities were paid in each year.
5             Here, there are not sufficient assets
6  to pay the creditors.  There is no surplus or net
7  profit to be distributed or allocated.  The primary
8  step of paying the creditors should similarly take
9  precedence over a residual profit-sharing formula.
10            Now, as both of you judges know, pro
11 rata distributions are commonly made by courts in
12 both jurisdictions, often on a consensual basis.
13 As the Ad Hoc Committee of Bondholders points out
14 at page 32, paragraph 67 of their submissions, pro
15 rata is appropriate in circumstances where there
16 are benefits to all creditors.
17            They cite the United States Court of
18 Appeal for the Third Circuit in Owens Corning for
19 the proposition that pro rata is appropriate where
20 there are benefits to creditors and they cite the
21 following quote:
22            "The benefit to creditors should be
23            from cost savings that make assets
24            available rather than the shifting of
25            assets to benefit one group of

 Neeson&Associates  W&F
COURT REPORTING AND CAPTIONING INC   WILSON & FELTZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

1                    creditors at the expense of another.

2                    The wasted expense of this allocation

3                    proceeding is testament to the wisdom

4                    of the pro rata approach.  Had the pro

5                    rata approach been adopted from the

6                    outset, there would have been savings

7                    of close to a billion dollars by

8                    avoiding this allocation trial.  This

9                    money would have been available to all

10                   creditors and it's false logic to say

11                   because we've already wasted all of the

12                   money that this approach should be

13                   rejected."

14                    The importance of this court saying

15    loudly and clearly "never again" cannot be

16    understated.  If we examine the quote that I just

17    read, the benefit to creditors from pro rata should

18    be from cost savings from the assets available

19    rather than shifting of assets to benefit one group

20    of creditors at the expense of another, the extreme

21    allocation approaches are nothing more than that,

22    facile attempts to shift the benefit of the

23    proceeds of a common pool of assets from one group

24    of creditors at the expense of another group of

25    creditors and to incur unsupportable levels of



1    costs in the process.

2              Now, there have been significant and

3    vigorous and vociferous criticisms levelled at pro

4    rata and we suggest they are not sustainable.  We

5    stand back, this Nortel insolvency is not analogous

6    to any other bankruptcy proceeding due to a number

7    of factors, and there is some repetition here, the

8    nature of its assets, the degree of integration and

9    entanglement and the fact that the proceeds of sale

10   have been consolidated in a single pool that arose

11   through a collective sale process.

12             While this case is a matter of

13   precedence in one sense, it will be a limited

14   precedent in another sense because of the very

15   complex nature of the Nortel business and the

16   assets which gave rise to the value.  This is a

17   case where the assets, especially the patents, were

18   hopelessly entangled.

19             Hopeless entanglement is one of the

20   reasons for the pro rata approach adopted by courts

21   and international bodies.  There is no reason to

22   believe that in future group bankruptcy it will

23   only be possible to liquidate the assets on a

24   collective basis.  But if in future cases there are

25   such entangled assets, then in those limited



1    circumstances it would be equally inappropriate for

2    courts to encourage that estate assets be

3    subsequently depleted through self-serving attempts

4    to impose allocation theories created after the

5    fact to segregate assets on an entity by entity

6    basis.

7              The evidence, as I have spoken to, will

8    demonstrate the unique nature of the underlying

9    patent assets.  You'll hear this described by the

10   people who worked at Nortel creating these

11   assets -- sorry, these patents.  You will have the

12   evidence of experts like Coleman Bazelon, a

13   telecommunications economist who undertook an

14   analysis of the patents that were sold.

15             Virtually all of the fact and expert

16   witnesses agree on the extreme integration of the

17   patents.  This degree of entanglement of the assets

18   combined with the extremely large costs of

19   attempted disentanglement support the

20   well-recognized basis for the adoption of a pro

21   rata approach among unsecured creditors on both

22   sides of the border.

23             The other criticism, another criticism

24   that is levelled is that it is substantive

25   consolidation, or substantive consolidation,



1    depending on which side of the boarder you are on.

2    Pro rata is not local substantive consolidation.

3    There is no suggestion that the current estates be

4    replaced with a single insolvency administrator in

5    one jurisdiction, which is the essence of sub. con.

6    The global entities are not treated as one.

7              Individual estates will determine

8    whether to accept or reject claims within their

9    respective jurisdictions and no order is sought

10   affecting any of the assets currently in any of the

11   estates.  The only task of this court is to

12   allocate the lock box funds to the estates.

13             While the pro rata approach is not

14   substantive consolidation, as just indicated, there

15   are many instances in which substantive

16   consolidation is appropriate within domestic

17   jurisdictions, and it's almost certain that within

18   this proceeding, within the individual domestic

19   Nortel estates, substantive consolidation will

20   occur.

21             If the Canadian view of legal title

22   ownership prevails, then NNL will be the only one

23   of five Canadian Debtors that is entitled to any

24   allocation from the lock box.  Other Canadian

25   Debtors, such as NN Technology which employed 50

1    percent of the employees in Canada including the

2    R&D scientists, would have no legal right to the

3    proceeds other than through the substantive

4    consolidation of NNL.

5              I suspect you will not get an

6    undertaking that that will not be given -- that

7    will not be suggested to the court.

8              The next criticism is that pro rata is

9    difficult to carry out by these courts.  Pro rata

10   is simple to carry out.  How it operates is funds

11   are allocated to each estate.  That's the work of

12   the court.  And they are allocated in an amount

13   that allows for each unsecured creditor to receive

14   broadly the same percentage recovery on an accepted

15   claim.

16             In order to do this, the allocating

17   court has to determine the amount to be allocated

18   to each estate which, when combined with the funds

19   currently in the estate, allow for an approximate

20   pro rata distribution to unsecured creditors from

21   the estate.

22             Remember, we're not asking for funds to

23   be taken out of the estates, but to be topped up to

24   allow pro rata to occur.  So what is raised is the

25   complication, that's easy enough, the complication



1    is that the facts -- the claims are not finally

2    known, but that is no impediment.  An interim

3    allocation can be made prior to the settlement of

4    the claims process based on the estates' current

5    best estimates of their assets and claims position.

6    When the claims are known, a final allocation can

7    be made.

8                    This process, once a direction is given

9    by the courts, can be carried out by the court

10   appointed officers in the three estates.  There

11   would be no need to return to court.  There may be

12   an approval motion, but it would not be a contested

13   motion, it would simply be implementation of the

14   formula.

15                   And that is no different than any of

16   the allocation scenarios before you.  All creditors

17   in all estates will have to await the final claims

18   determination every day in this court.  Your

19   Honour, you deal in CCAA and other proceedings with

20   interim distributions, finalize the claim, have a

21   hold back and then do your final distribution.

22   It's absolutely no different than the garden

23   variety work of this court.

24                   The next criticism that's levelled is

25   that pro rata is inconsistent with creditor

1    expectations.  Well, let's start with the

2    pensioners.  The employees never expected to be

3    creditors.  As involuntary creditors, they believed

4    and were told that they worked for Nortel, a single

5    enterprise.  They did not buy into an insolvent

6    Nortel at a discount and after the filing.  The

7    employees continued to work after the insolvency

8    filings and continued to create value for all

9    creditors.  Unlike any of the other Nortel --

10   sorry, unlike any of the other Nortel pension

11   plans, my clients, the UK pensioners, were required

12   at all times to contribute their own money into the

13   pension plans.

14              You will hear that Nortel as an

15   employer did not contribute to the UK plan for

16   several years because it was in surplus.  All

17   during this period of this Nortel contribution

18   holiday the UK Pensioners contributed their own

19   money.

20              The majority of employees did not

21   concern themselves with transfer pricing mechanisms

22   of the corporations.  They worked in multi-national

23   teams based upon business lines, not geographic

24   location.  They all worked for the common good of a

25   single Nortel enterprise that made all of its



1    decisions on that basis.  They were told that their

2    pensions were transferable between entities.  The

3    people administering the Nortel pension plans set a

4    goal for themselves of treating all pensioners

5    across the entire enterprise equitably.

6              As employees of a single enterprise

7    Nortel, there was an expectation that the value

8    they created for the entire enterprise would be

9    shared, would be equitably shared.

10             What about Bondholder expectations?

11   Bondholder expectations are respected in a pro rata

12   distribution, and there is much written and you

13   will hear much about how Bondholder expectations

14   are not respected.

15             All of the bonds were unsecured bonds.

16   None had an exclusive claim to any of Nortel

17   assets.  The risk of substantive consolidation was

18   specifically mentioned in the cross border

19   insolvency protocol filed at the time of filing and

20   in NNL's 2008 form 10K dated March 2, 2009.

21             Most of the bonds were purchased after

22   insolvency when the risk of pro rata was or should

23   have been known.  We have no affidavits, no

24   testimony from any Bondholders as to their

25   expectations.

 

1           Most of the current Bondholders not
2    only took the risk of insolvency but sought to
3    benefit from it.
4           So what did the guarantees associated
5    with the bonds give them?  The guarantees
6    associated with the bonds gave them the right to
7    have access to the assets of more than one of
8    Nortel's affiliated corporations, simply that.  Pro
9    rata gives access to the Bondholders to the assets
10   jointly owned by the specific affiliated
11   corporations the bonds bargained for, plus all
12   other Nortel entities' assets.  Not only do the
13   bonds get access to the NNL and NNI assets, they
14   get access to every other Nortel entities' assets.
15          The key flaw in the Bondholder
16   position, and admitted by their experts on cross
17   examinations, is that the guarantees did not
18   restrict the ability of Nortel to allow any of its
19   creditors to have claims against the assets of the
20   affiliated corporations which owned the bond debt.
21          At any time the corporations who owed
22   the bond debt could have guaranteed the obligations
23   of any other Nortel entity.  This in fact happened
24   when NNL guaranteed the pension debt of NNUK, yet
25   in the claims litigation that will follow this



 1   allocation proceeding, remarkably NNL on its court

 2   appointed Monitor now seek to walk away even from

 3   those guarantees.

 4            What the Bondholders are in effect

 5   asking for is to be put in the position they would

 6   have been had they taken security.

 7            The evidence will demonstrate that

 8   prior to insolvency, various bond pricing data,

 9   including applicable spreads and yields, gave no

10   weight to the guarantees.  The rating agencies

11   rated all of the Nortel debt regardless of a

12   guarantee at the same level.  Pro rata will not

13   break bring the financial world to an end even on

14   the evidence of the Bondholders' experts.

15            So then the final criticism that's

16   raised is that pro rata allocation does not require

17   a plan to be approved, requires a plan to be

18   approved in either court.  And in our submission,

19   on the facts of this case, that is not the case.

20            The CCAA proceedings in this court have

21   been recognized by the US court in a Chapter 15

22   proceeding.  The Chapter 11 US Bankruptcy

23   Proceedings have been recognized in Canada under

24   section 18.6 of the CCAA.  The UK Insolvency

25   Proceedings have been formally recognized under

Chapter 15 of the Bankruptcy Code. Each of EMEA and UKPC have filed claims into Canada and have sought and obtained status as core parties in the allocation of litigation. And, in addition, the UCC and Bondholders, among others, have been recognized by court order as core parties in the allocation litigation.

As both Courts are well aware, bankruptcy involves in rem jurisdiction on the worldwide assets of the debtor company. Recognition by foreign courts assists in facilitating the efficient administration and realization of those assets. The bankruptcy is, by its nature, in rem.

In addition to the in rem jurisdiction over worldwide assets in a bankruptcy, there is in this case in persona jurisdiction. Anyone was entitled on the orders establishing the allocation litigation to seek and obtain status as a core party to the allocation dispute. This court has in persona jurisdiction over all parties who submitted the allocation matter for determination, including the Bondholders.

The court appointed officers on behalf of each of the three estates are the

1    representatives of creditors, their respective

2    estates.  In addition, the UCC that is part of this

3    proceeding acts in a fiduciary capacity for the

4    general unsecured creditors in the US, and the

5    Canadian Creditors Committee plays a similar role

6    for the creditors in Canada.

7              The parties including the Bondholders

8    approved the IFSA and agreed to be bound by its

9    terms.  They submitted themselves to the

10   jurisdiction of the Canadian and US courts for any

11   matter relating to the IFSA.

12             Section 16(b) of the IFSA provides that

13   any party seeking any relief whatsoever to the

14   extent relating to the matters agreed to in this

15   agreement must be commenced in a joint hearing of

16   both Canadian and US courts and both courts are

17   aware that that vesting of jurisdiction has been

18   tested and upheld.

19             Similarly, the cross border insolvency

20   protocol provides that the courts may jointly

21   determine that other cross border matters that

22   arise should be dealt with under the protocol and

23   they did so in establishing this allocation

24   litigation.

25             As a result of the cross border claims



1    protocol, if the courts adopt the pro rata

2    distribution model they have jurisdiction to

3    determine at a joint hearing how the guarantee

4    claims will be treated as any part of any pro rata

5    calculation.

6            The court is not fettered in its

7    discretion in that regard.  The court in making the

8    pro rata calculation can consider whether the

9    guarantee claims will be treated as a single claim

10   or separate claims in each of the principal debtor

11   and the guarantor corporations or otherwise craft a

12   solution that produces an equitable result.  Pro

13   rata does not tie the hands of the court.  A pro

14   rata allocation approach is well within the

15   jurisdiction of these courts.

16           So in conclusion, as we stated in our

17   written submission, this is a case without

18   precedent and will set the benchmark for

19   international insolvencies of integrated

20   multinational enterprises for years to come.

21           In the early years following Nortel's

22   global insolvency filings, there was great success.

23   The courts and the parties came together to realize

24   the assets of the worldwide enterprise of Nortel in

25   a unified manner.  This allowed for the benefits of



1   collective action to be shared by all of the

2   creditors of the Nortel enterprise.

3              Following that great success, and

4   unfortunately perhaps fuelled by that great

5   success, the estates and some of the parties became

6   blinded by self-interest.  Allocation theories were

7   developed which had never been previously

8   articulated.  The MRDA was used for purposes it was

9   explicitly stated not to apply to.  Assertions were

10  made that entities had agreed prior to insolvency

11  on how to allocate the proceeds of sale of common

12  assets in insolvency.  Some of these alleged

13  agreements were based on parties to them acting in

14  an economically irrational manner.

15             An inordinate and indefensible amount

16  has been spent in an attempt to simply divide the

17  proceeds of the sale of common assets along

18  geographic or entity lines.  The vast expense of

19  this allocation exercise is borne directly by

20  creditors.  It is borne directly by UK pensioners

21  who are unfunded in this litigation who worked to

22  create the very assets that give rise to this

23  value.  It will not be borne by any of the Estates.

24             Estates in Nortel entities have no

25  ultimate economic interest in the funds which are



1    now being allocated.  They are not harmed by the

2    inordinate expense of this proceeding.  There is

3    only one method of allocation that properly

4    reflects the unique nature of the way the Nortel

5    enterprise operated and the unique nature of its

6    assets.  There is only one method of allocation

7    which will ensure that these wasteful expenditures

8    do not happen again.

9              The current UK retirees and pensioners,

10   over 5,000 of whom have passed since this case

11   began five years ago, urge the courts to accept the

12   jurisdictional challenges of this case and order

13   the pro rata allocation approach be applied.  This

14   is the only manner in which the allocation process

15   will reflect the pre- and post-insolvency realty of

16   Nortel.

17             I speak on behalf of the pensioners in

18   identifying the self-interest.  Simply put, the

19   other creditors can't take the value of the patents

20   created by my clients and the other pensioners and

21   walk away from billions of dollars in pension debt.

22             Subject to any questions, those are my

23   submissions.

24             THE CANADIAN COURT:  Mr. Barrack, if

25   one were to accept the pro rata distribution model,



 1    what happens and how do you deal with the $2

 2    billion claim of the US Estate against the Canadian

 3    Estate that's been court approved?

 4              MR. BARRACK:  In its purest form,

 5    intercompany claims, so they come out.  Having said

 6    that, as I said about the guarantees, the courts

 7    can hear submissions on that and there is no reason

 8    that they can't, with respect to any particular

 9    claim, find that there are valid reasons to accept

10    or reject it.

11              THE CANADIAN COURT:  It's already

12    received court approval so how does the court --

13              MR. BARRACK:  It received court

14    approval in the context of -- I haven't thought

15    that one through completely, but if it is there as

16    a claim, you could allow the claim in a pro rata

17    context.  You could determine what that means in a

18    pro rata context.  Remember, it's an estate claim,

19    it's not a creditor claim, right?

20              And so it's an estate claim that will

21    move monies from one estate to another estate.  And

22    so you could simply do the math to figure out what

23    is the effect of allowing that claim and then how

24    much money has to be moved around to effect a pro

25    rata creditor result.

1              The pro rata approach means pro rata

2    recovery by creditors, not pro rata recovery by

3    Estates.  So you may be able to do the math in a

4    way that -- you would be able to do the math in a

5    way that results in pro rata creditor recovery and

6    take into account the inter Estate claim.

7              You may also take the view that the

8    court -- that the court retains a plenary

9    jurisdiction in a CCAA context, recognizing that

10   that is a claim not of an ultimate creditor but of

11   an estate in this unique joint process where these

12   questions of jurisdiction are open, and if the

13   courts were to come to the conclusion that but for

14   that claim pro rata was best, I believe there is

15   sufficient jurisdiction in the courts to effect a

16   pro rata distribution in the face of it.

17              THE CANADIAN COURT:  Okay.  Thank you.

18              MR. BARRACK:  Judge Gross?

19              THE US COURT:  No questions, thank you.

20   Thank you very much, Mr. Barrack.

21              THE CANADIAN COURT:  Thank you, Mr.

22   Barrack.  Who is on deck?  Who is next up?

23              MS. BLOCK:  I believe we are next for

24   the US.

25              THE CANADIAN COURT:  Does it make sense



1    for you to start or does it make sense to start the

2    lunch now?

3              MS. BLOCK:  Let's start the lunch now.

4              THE CANADIAN COURT:  Judge Gross, how

5    can you turn down a smile like that?

6              MS. BLOCK:  Mr. Bromley and I will be

7    going back and forth.

8              THE CANADIAN COURT:  Why don't we come

9    back at quarter to 2:00.  Is that satisfactory,

10   Judge Gross?

11             THE US COURT:  That's fine, that's

12   fine, Justice Newbould.  All right, everyone, enjoy

13   lunch and we'll stand in recess.

14   -- LUNCHEON RECESS AT 12:25

15   -- UPON RESUMING AT 1:46

16             THE US COURT:  We're back.

17             THE CANADIAN COURT:  Judge Gross.  Ms.

18   Block?

19      OPENING STATEMENT ON BEHALF OF THE US ESTATE

20             MS. BLOCK:  My name is Sheila Block

21   from Torys for the US Estate.  I am accompanied by

22   my colleagues from Cleary, Howard Zelbo, Jeff

23   Rosenthal and Lisa Schweitzer.

24             MR. ROSENTHAL:  Good afternoon, Your

25   Honour.

1              THE CANADIAN COURT:  Good afternoon.

2              THE US COURT:  They've gone over to the

3      other side.

4              MS. BLOCK:  And Judge Gross is graced

5      with Jim Bromley, who will be splitting this

6      opening with me.

7              I have prepared a bundle for you and

8      the first slide shows you how we have divided the

9      presentation.  And we'll be going back and forth, I

10     hope that that will lessen the burden of boredom if

11     nothing else, but we'll try and make it efficient.

12             So let me start with the introduction.

13     NNI contributed all of its exclusive rights to IP

14     in the US to the residual patent sale, all of its

15     tangible and intangible assets, rights and lines of

16     business to the lines of business sale, and these

17     sales were all conducted cooperatively in all of

18     the Estates and resulted in the $7.3 billion held

19     in escrow.  More than half of that, as you know, is

20     from the residual patent sale.

21             And the Monitor says only the Canadian

22     Estate is entitled to all of the residual patent

23     proceeds of 4.5 billion and that NNI and EMEA get

24     nothing.  And the Monitor says in relation to the

25     2.8 billion in the lines of business sales, that

1    Canada gets 1 billion off the top based on its

2    value in use theory which we vigorously oppose and

3    will be addressing later.

4              NNI seeks a determination from both

5    Your Honours that Canada's position is wrong, that

6    in fact each estate should receive full

7    reimbursement for the value transferred or the

8    rights relinquished in the sales by each of the

9    estates.  If one estate transferred more value, it

10   must recover a greater allocation from the escrow.

11             It is NNI's case that the 7.3 billion

12   in escrow was received because the US Estate

13   contributed its rights, assets and businesses worth

14   5.3 billion, 1.99 billion from the line of business

15   and 3.31 from the patent portfolio.

16             In assessing what each estate

17   contributed to the sales between 2009 and 2011 that

18   generated the 7.3 billion is the central task for

19   the court.

20             Now, leading up to the petition date in

21   January 2009, the financial backbone of the Nortel

22   Group of companies was NNI, the US company, one of

23   five integrated entities, and as you'll hear from

24   Mr. Bromley, from 2000 to 2005 NNI produced on

25   average 70 percent of the revenue, total revenue of

1   all of the integrated entities, and this chart

2   gives you the balance which was between 64 and 70

3   percent up to 2009.

4                NNI was the location and headquarters

5   of the two largest lines of business, the

6   Enterprise Solutions and the Carrier Networks,

7   indeed the Carrier Networks generated 41 percent of

8   Nortel's global revenue in 2008, Enterprise 23

9   percent.  Three of the five top customers for NNI

10  worldwide were in the US.

11               At the petition date, January '09, NNI

12  had 10,000 employees in 80 locations in the US, it

13  had four primary R&D facilities with 2,300 R&D

14  employees, and just before filing had cash on hand

15  of $606 million.

16               The Canadian business, on the other

17  hand, could not support itself.  NNI was the entity

18  relied on by Canada for liquidity and credit

19  support, and it should be no surprise that the

20  majority of value contributed to the sales at issue

21  here came from NNI.

22               As Canadians, we know that Canada is a

23  very small market.  The US was the largest and most

24  lucrative market for Nortel's products and services

25  and NNI had the exclusive right to carry on



1    business in that market.  NNL could not operate in

2    that territory.

3              Once in insolvency, NNL's only access

4    to the value owned by NNI was as its shareholder,

5    and in insolvency, equity takes last.

6              NNL's claim to all of the 4.5 billion

7    for the residual patent sales and the billion extra

8    for the line of business sales is based on its

9    holding of legal title to intellectual property

10   sold in both the line of business sales and the

11   residual patent sale.

12             NNL claims as a result of this legal

13   title holding that it, and it alone, "owned" the

14   IP.

15             You will see in its brief it speaks of

16   ownership being the full panoply of rights, the

17   right to use, the right to possess, the right to

18   exclude.

19             The problem with the Monitor's claim to

20   that kind of ownership is that it did not have it.

21   It belonged to NNI in relation to the US.  NNL had

22   it in respect to Canada for sure.  The IP in the US

23   territory was owned in all those important ways,

24   the right to possess, to exclude, to use, by NNI.

25   NNL's holding of legal title did not give it the



 1    right to possess the IP in the US to use it or to

 2    exclude others.

 3              So it had nothing of value to transfer

 4    to the purchasers who were actually buying it to

 5    use, possess and exclude others from using in the

 6    US and in the EMEA geographies.

 7              So NNL can call its legal title holding

 8    ownership all it wants but that's not what was sold

 9    which generated the 7.3 billion or 4.5 billion in

10    relation to what Rockstar paid for.  Legal title

11    alone could not grant the ability to use the IP

12    either affirmatively or defensively in the US, to

13    exclude others from using it or to be able to

14    enforce against anyone infringing in the US.  Only

15    NNI had those valuable rights.

16              And as the sellers, and Mr. Bromley

17    will walk you through this, it was not just NNL

18    that was the seller contributing legal title it

19    held, but the sellers were NNI and the other

20    estates, who had the same rights exclusively in

21    their respective territories.  And as sellers, they

22    were to terminate their licenses and in return

23    receive a right to allocation, not a right to make

24    a claim for allocation, a right to allocation, and

25    Mr. Bromley will take you through the IFSA

 1   agreement.

 2              But these Estates, NNI, NNUK, et

 3   cetera, were giving the value of IP in their

 4   territories and were to receive that value from the

 5   proceeds.  Not zero.  In NNI's case it's worth

 6   billions.

 7              So when the Monitor tells you at the

 8   time of the sales that whatever rights the selling

 9   Debtors may have had before they had nothing to

10   sell because they terminated their license, that's

11   an unsustainable conclusion.  It's contrary to the

12   deal made with NNL.  It's contrary to the reality

13   of accomplishing the Rockstar sale, the transfer of

14   the IP to those willing to pay billions, and the

15   purchasers were not paying billions to the holder

16   of legal title with no rights to exploit in the

17   lucrative territories.

18              Indeed, the Monitor's own expert, Cox,

19   was asked whether anybody would have paid for just

20   legal title, and his answer you'll see is:

21              "Well, I thought about it and

22              amongst the possibilities I thought

23              that they would pay a relatively small

24              amount, certainly a lot less than what

25              was paid in the Rockstar transaction,

1          possibly nothing."

2          Possibly nothing, Your Honour, because

3   bare legal title with no right to possess, no right

4   to exclude, no right to use in the crucial

5   geographies, which most importantly included the

6   US, gives the purchaser nothing of value and NNI --

7   NNL could not transfer that value, only NNI could

8   and the EMEA entities in their respective

9   territories.

10         One last point on this.  The Monitor's

11  quote from Ziff at page 86 about ownership

12  embracing the full panoply of rights, you saw in

13  their opening brief, it leaves out an important

14  point that Ziff makes at page 5.  He says:

15              "...it is sometimes fruitless to try

16              to single out one person as the owner

17              of a particular thing.  The law accepts

18              that two or more persons may co own

19              Blackacre; a tract of land belonging to

20              A may be encumbered with a right of use

21              held by B; both a landlord and a tenant

22              have a proprietary interest in land

23              that is held under a lease; and one

24              person may have title to Blackacre for

25              life, with others being entitled to



```
1                    possession once the life estate ends.
2                    Ownership is divisible, indeed
3                    infinitely so."
4                    In this case, legal title alone would
5     not have produced the funds, only the possessory
6     rights held by the integrated entities, the
7     licensed participants under the MRDA had real value
8     in the real world and it is the real world we are
9     going to address in our opening.
10                   So let me move to the second point on
11    our list, what the case is about and what it's not
12    about, and let me start with points that I don't
13    expect will be, at the end of the day, in issue.
14                   The first is that the parties
15    cooperated to obtain the highest value they could
16    for the rights, assets and businesses of each of
17    the Estates.  And selling together was done with
18    the intention of bringing in the highest amount of
19    money, and the aim of the process for each estate
20    was to maximize the recovery.  That's because it
21    was understood by all that each had its own
22    creditors.  It was accepted by all that each estate
23    was bound to recover the best price it could for
24    the rights, assets and businesses contributed to
25    each of the sales.
```



1              The creditors of each of those estates

2     have legitimate expectations that the assets and

3     values contributed to those sales by the Nortel

4     entity each creditor lent to will be accounted for

5     by that debtor and distributed to the creditors of

6     that estate.

7              There is no issue that creditors lent

8     to distinct corporate entities, and you'll be

9     hearing evidence on this.  The Monitor, in fact, in

10    its reply report puts it this way:

11              "The Nortel companies had separate

12              and distinct existence.  Employees were

13              employed by the specific company they

14              worked for.  Trade creditors contracted

15              with specific Nortel entities.

16              Bondholders invested with or lent to

17              specific Nortel members of the Nortel

18              Group.  Where applicable, guarantees

19              were negotiated from specific Nortel

20              Group members."

21              And you'll hear that many of the

22    guarantees were given by NNI.

23              "The ... ex post facto

24              characterization of creditors dealing

25              indiscriminately with members of the

 Neeson&Associates    W&F
COURT REPORTING AND CAPTIONING INC.    WILCOX & FETZER LTD.

1             Nortel Group is entirely incorrect and

2             unsubstantiated."

3             And I should say that the three dots

4    there refer to the UKP's position that the Monitor

5    is vigorously disagreeing with and in this one case

6    we agree vigorously with the Monitor.

7             In the case of NNI, it is liable to

8    account for claims of over $5 billion, claims that

9    run the gamut of guarantees, of loans, of trade --

10   trade accounts, long term debt, pension and retiree

11   medical, employee obligations.  That's

12   pre-petition.  And then, in addition, the tax

13   liability is as yet undetermined.

14            So NNI was and is duty bound to act in

15   the best interests of its creditors and obtain

16   value for the rights and assets and business it

17   contributed to the sales.  The EMEA Debtors had the

18   same obligations and the Canadian Debtors similarly

19   to their respective creditors.

20            Now --

21            THE CANADIAN COURT:  Is this

22   post-petition tax liability that you're referring

23   to there, an issue of transfer pricing post 2005?

24            MS. BLOCK:  I don't know what the

25   specifics are.  Ms. Schweitzer could give you

1    chapter and verse.  All I know is that it could be

2    between 400 million and a billion dollars,

3    depending on when the money comes in, how it gets

4    distributed and so on.  It's a complicated

5    question --

6              THE CANADIAN COURT:  It may not have

7    anything to do with transfer pricing, it may just

8    have to do with US taxing issues?

9              MS. BLOCK:  We're one integrated team.

10             MS. SCHWEITZER:  Your Honour, transfer

11   pricing is a method --

12             THE CANADIAN COURT:  Perhaps you could

13   identify yourself for the reporter.

14             MS. SCHWEITZER:  I apologize.  Lisa

15   Schweitzer from Cleary Gottlieb.  Transfer pricing

16   is a method for accounting for the way you're

17   reporting your income and your costs into the

18   taxes.  What you actually owe is tax on your

19   income.

20             So NNI hasn't yet finalized its tax

21   reporting for the post-petition periods, so without

22   getting into the details of any claim, this is

23   post-petition taxes that would be owed to the

24   government at the end of the sale process.

25             THE CANADIAN COURT:  Thank you.

1              MS. BLOCK:  Ms. Schweitzer is a

2    bankruptcy expert and any of your technical

3    questions --

4              THE CANADIAN COURT:  Did you get some

5    sleep Saturday night?

6              MS. SCHWEITZER:  Absolutely.

7              MS. BLOCK:  Now, what the case is not

8    about.  You've heard from the UKP a great deal

9    about the global Nortel companies, how they

10   operated before insolvency, and Mr. Bromley will be

11   putting some of that history into context.

12             But as interesting as may have been the

13   global operations of the matrix organization of

14   Nortel before insolvency, the intricacies of those

15   global operations have no relevance to the task at

16   hand, and the way profits or losses were split in

17   which the other companies were operating does not

18   apply here.

19             This is a liquidation.  This is a

20   snapshot in time taken at the end of the corporate

21   entities when the assets and rights of each of the

22   entities were converted into cash.  And the

23   question for the courts is, how to split up that

24   cash, the cash that represents each estate's share

25   of the purchase price paid; in other words, the



     1    value that was sold by each estate.  And there's no

     2    different principle in the US and Canada that

     3    equity comes last, and each estate should receive

     4    full payment for the value it contributed to

     5    generate the cash in escrow.

     6              No one estate can expropriate value

     7    from another estate because that value belongs to

     8    the creditors of the estate the creditors lent to

     9    or worked for and have claims against.

    10              Once the bankruptcy filings occurred

    11    and the decisions were made to sell assets, the

    12    entities no longer continued to operate as a

    13    multinational group of companies.  And so the

    14    preexisting ongoing operations of that

    15    multinational group of companies stopped and each

    16    estate had to amass and collect the value which its

    17    creditors were entitled to share in accordance with

    18    the governing bankruptcy laws, and the evidence

    19    will show that that duty started even before the

    20    filing.

    21              Estates like NNI and the EMEA entities

    22    were no longer at the service of the Canadian

    23    parent.  NNL and NNC could not reach down into

    24    their subsidiaries to have value transferred up to

    25    the Canadian parent.  And equity goes to the back



1    of the line.  If all of the US creditors are paid

2    in full, my friends to the right will have their

3    position as the equity holder.

4              This case is about the rights of

5    separate creditors to each estate.

6              With that, let's move to the history,

7    and I'll cede to Mr. Bromley.

8              MR. BROMLEY:  Good afternoon, Judge

9    Gross.  Good afternoon, Justice Newbould.  Thank

10   you, Ms. Block.  It is a pleasure to be here today.

11             As Ms. Block mentioned, I will spend a

12   bit of time on the history of Nortel.  But before I

13   do that, I wanted to put into context the

14   allocation theory that the US Debtors are pursuing.

15             Already today we have heard it

16   described as a revenue theory and as a license

17   theory.  And we will come back and describe it at

18   the end of our presentation.

19             But just to put it right up front, our

20   allocation theory is a fair market value theory.

21   The Nortel business worldwide has to be valued on a

22   fair market value basis.  And, indeed, we did that

23   here in this court and the Canadian court through a

24   series of sale transactions.  We know the fair

25   market value of the global Nortel business was



1    $7.3 billion.

2                Our theory says that each of the

3    integrated entities, each of the entities that's a

4    participant in the MRDA, has exclusive licenses;

5    and, therefore, owns the businesses in five

6    separate jurisdictions.  For NNI, that is the

7    United States; for NNL, that's Canada; and so on.

8                The rest of the world we split.  And

9    that means that EMEA -- because there are five

10   integrated entities -- gets three-fifths of the

11   rest of the world, the US gets one-fifth, and

12   Canada gets one-fifth.

13               And the question that we present in our

14   expert reports is a valuation of the fair market

15   value of each of the businesses in those five

16   jurisdictions, as well as the rest of the world, in

17   effect, divided in fifths.  Very simple.  That's

18   what our allocation theory is about.

19               Now, the history of Nortel.  Why should

20   we spend any time talking about the history of

21   Nortel?  Well, it is very important, frankly, to do

22   that.

23               But before I say that, I would actually

24   like to point out to the Court, both here and in

25   Canada, that our principal officer, Mr. Ray, is

 1   present in the courtroom.  And he will be a witness

 2   later on in the case, but I just wanted to make the

 3   Courts aware that he is here today for the

 4   openings.

 5            But why is the history of Nortel

 6   important?  There are certain preconceived notions

 7   and myths that have crept in and always creep in.

 8   One of the witnesses that has submitted a statement

 9   here, Mr. Clive Allen, talks about the storied

10   history of Nortel as a Canadian company.  The fact

11   is that 50 years ago that might have been true, but

12   that stopped being true 30 years ago.  The Nortel

13   that filed for insolvency proceedings around the

14   world in 2009 was truly a global, multinational

15   enterprise.

16            The evidence will show that the key

17   documents in this case, the MRDA, of which you have

18   already heard, and the cost-sharing agreements

19   which preceded it, were documents of a particular

20   time and a particular place.  And those times and

21   places changed materially over time as Nortel

22   changed.  So the history is important.

23            Nortel was originally part of the Bell

24   system, and that was the case through 1956.  So

25   effectively, Nortel and Bell Canada were both



1    subsidiaries of AT&T, the US-based company.  And

2    Nortel, then known as Northern Electric, was

3    effectively a subsidiary of Western Electric.  And

4    almost all of the technology and the R&D that

5    Northern Electric had at the time was obtained from

6    Western Electric, a US company.

7                    In 1956 the US Department of Justice

8    forced a breakup of the Bell system at that point,

9    meaning that AT&T needed to divest itself of both

10   Bell Canada and Nortel, Northern Electric at the

11   time.

12                   So effectively from 1956 until the

13   mid-'70s, Northern Electric, eventually Northern

14   Telecom, was owned entirely by Bell Canada.

15                   They formed the monopoly in the

16   telephone business in Canada, with Bell Canada

17   supplying service and Nortel, or Northern Electric

18   at the time, providing equipment and telephones.

19                   In 1971 two things happened:  Northern

20   Telecom, Incorporated, was formed; NTI, as it was

21   then known, became eventually NNI.  It is the

22   predecessor of the US Debtor, the lead US Debtor in

23   these cases.

24                   In 1971 as well, Nortel founded BNR,

25   Bell Northern Research, which is a subsidiary of

1    both Bell Canada and Northern Electric, and

2    conducted the R&D that was being conducted in

3    Canada.  So the first independent R&D that was

4    being conducted in Canada and Northern Telecom were

5    both founded in 1971.

6              In 1972 the first US factory opened in

7    Michigan.  In 1974 Northern Electric has an IPO.

8    Bell Canada continues to control it but floats a

9    portion of its stock on the Toronto Stock Exchange.

10   And you will see, in 1974 it even then noted that

11   the technology that Northern Electric was operating

12   with was based on the technology that it had

13   obtained from Western Electric.

14             So as late as 1974, when it went

15   public, Nortel's technological footprint was a

16   footprint that was traced to the United States and

17   Western Electric.

18             In 1973 less than 10 percent of group

19   revenues came from the United States.

20             In 1975 Northern Electric lists in New

21   York as well, on the New York Stock Exchange.

22             In 1975 there are now six manufacturing

23   facilities in the United States.  R&D begins for

24   the first time in Palo Alto, California, in the

25   Silicon Valley.



1              And in 1975, only four years after

2    being founded, NNI, which was then NTI, has 1300

3    employees.

4              And in 1976 the corporate group changes

5    its name, recognizing that it has moved from

6    telephones and switches into a voice-based company

7    known as Northern Telecom.

8              Let's go forward a few years into 1982.

9    This is the 1982 annual report.  It mentions that

10   NTI was founded in 1971 and in the first year of

11   full operations, $35 million of revenues had been

12   generated.  It indicates that substantial capital

13   had been invested into building, research and

14   development, manufacturing, marketing, sales, and

15   service organizations in the United States; and

16   that by the end of 1982, Northern Telecom in the US

17   employed over 13,000 employees -- 13,000 -- in 13

18   manufacturing plants, in 13 R&D centers that were

19   affiliated with the manufacturing facilities or

20   with Bell Northern Research.

21             In 1982 Northern Telecom in the United

22   States recorded dramatic growth in US revenues.

23   Revenues in 1982 constituted 48.2 percent of total

24   group revenues.  Just ten years after the company

25   had been founded in the United States, nearly half

```
 1    of the revenue generated by Nortel worldwide was
 2    generated in the United States.
 3              And you will see that in 1982 another
 4    milestone was passed, as revenues from customers in
 5    the US for the first time exceeded revenues from
 6    customers in Canada.  That would never change.
 7    From 1982 onward, the United States would always
 8    generate more revenue than Canada would.
 9              If you go forward the next year, into
10    1983, the annual report notes again Canadian
11    revenues down 14 percent, US revenues up 27
12    percent.
13              1982 was also the year in which, for
14    the first time, US revenues generated more than
15    half of worldwide revenue.  So 1982 it went past
16    Canada.  In 1983 it went past the rest of the
17    world.  Again, this would never change.
18              Now, why are these dates important?
19    Well, you might recall that the Bell system in the
20    United States broke up.  In 1982 there was a
21    consent decree entered that broke up the Bell
22    system, and it went effective on January 1, 1984.
23    AT&T and seven so-called Baby Bells were created;
24    and Nortel, Northern Telecom at the time, in its
25    annual reports continually noted the huge
```



 1    opportunities that the US market presented.

 2                    Now let's look at 1985.  This is an

 3    important year in the history of Nortel, and we

 4    will come back to it in a bit when we talk about

 5    some of the key documents.

 6                    What was going on in 1985?  There were

 7    25 manufacturing plants in Canada, 15 in the United

 8    States.  Total group employees, 46,500; 22,000 of

 9    them in the United States, 21,000 in Canada.

10                    Let's look at R&D.  3500 R&D employees

11    in Canada in eight facilities, 1300 in the United

12    States in five facilities.

13                    We are not talking about a small

14    subsidiary not doing substantial work.  We are

15    talking about effectively an equal partner in the

16    operation.

17                    Now let's look at revenues.  In 1985

18    Canadian revenue was 1.6 billion, less than

19    30 percent of the total group revenue.  US revenue:

20    3.9 billion, almost 70 percent.  All of these

21    numbers are taken out of the annual reports and

22    10-Ks.

23                    Nortel decided to move from being just

24    a North American company, with operations in Canada

25    and the United States, beyond North America.

```
 1              You have heard a lot this morning from
 2    my friends representing the EMEA entities and the
 3    pensioners in EMEA.  Well, in 1987 and then again
 4    in 1991, Nortel acquired first a substantial
 5    portion and then all of a UK-based company known as
 6    STC.
 7              STC had a long history, a storied
 8    history, if you will, and tens of thousands of
 9    retirees.  When the acquisition was completed in
10    1991, almost all of the retirees that we are
11    talking about were already employed at STC or
12    already retired from STC.  Between 1992 and 2000
13    the Matra Communications business in France was
14    acquired.
15              So in 1991 what did Northern Telecom
16    say in its annual report?  It says, "The company
17    has grown rapidly from a Canadian subsidiary of
18    Bell Canada into a North American company that is
19    now truly a global corporation."
20              Fast-forwarding again into 1995, what
21    did Nortel look like?  This time they are already
22    around the world:  36 manufacturing sites
23    worldwide; 48 warehouses worldwide; almost 60,000
24    employees, US employees still 22,000, Canadian
25    employees, 21,000, and now European employees
```

1     almost 10,000.

2                 There are now 32 separate R&D sites in

3     seven countries with 15,000 employees around the

4     world.  6300 of them are in Canada and 4,000 of

5     them are in the United States.

6                 And what do the revenues look like?

7     54 percent of revenues in the United States,

8     24 percent in Europe, and 14 percent in Canada.

9                 As Ms. Block showed you in terms of the

10    decade just prior to the bankruptcy filings, that's

11    effectively the sort of breakdown you had, except

12    that the US revenue share went up almost to

13    70 percent in the 2000s.

14                Moving to the next stage of Nortel's

15    history, again, this is important when you go

16    back -- we go back later and look at the

17    documentation that was in place at the time and

18    what was going on.  We are no longer talking about

19    Northern Telecom; we are now talking about Nortel.

20                In 1998 there was a huge change.  The

21    acquisition of a US-based company, Bay Networks,

22    for approximately $9 billion.  The assets and the

23    businesses of Bay Networks were absorbed into NNI

24    in the United States.  Bay Networks referred to

25    San Francisco Bay and Massachusetts Bay Colony.



1            Facilities in Santa Clara, California,

2   and facilities in Billerica, Massachusetts, turned

3   Nortel from a telephone-type company into a

4   networking and data company.  And it was with the

5   acquisition of Bay Networks that, for the first

6   time, Bell Canada's ownership fell below 50

7   percent, and Northern Telecom renamed itself Nortel

8   Networks.

9            Then-CEO John Roth referred to it as a

10  right-angle turn, a move from taking Nortel from

11  the old telephone business it was in into the

12  future that the Internet provided.

13            Now, in this period of time, this is

14  the Nortel that most people think of these days:

15  Nortel riding the top of the dot-com boom, sales

16  climbing through the ceiling, acquisitions

17  happening all of the time.

18            Now, it is interesting that one of the

19  witnesses the Monitor is calling in this trial is a

20  Mr. Clive Allen.  He had been the general counsel

21  of Nortel for many years, and he retired actively

22  in 1998.

23            And in 1999 he wrote an article in the

24  Canada-United States Law Journal, and there was an

25  interview afterwards.  And in that interview

 1   Mr. Allen said:

 2                    "In the case of Nortel, bear in mind

 3                that this is a difficult business in

 4                which to survive in Canada.  Canada has

 5                fewer telephones than the state of

 6                California.  I know of no company in

 7                our business that could survive on the

 8                amount of business that is available in

 9                Canada alone."

10                    That's what Nortel was in that period

11   of time.  It was truly a global company, not a

12   Canadian company.

13                    Let's look at Nortel at the pinnacle.

14   Its market capitalization in 2000 was nearly

15   $260 billion.  It had nearly 100,000 employees,

16   with almost 37,000 of those employees in the United

17   States, over 11,000 more than were in Canada at the

18   time.  Group revenue was almost $30 billion, and US

19   revenue was almost $17 billion.

20                    Look at R&D.  We talk an awful lot in

21   this case and will continue to talk about

22   intellectual property and R&D.  In the United

23   States 10,500 R&D employees in 2000; 12,600 in

24   Canada, virtually even.  But that didn't last very

25   long.

1                 In 2002 -- or by 2002, what had been

2     nearly 100,000 employees had reduced to nearly

3     40,000 employees.  The market capitalization had

4     collapsed to 2 billion.  Nortel suffered through

5     four financial restatements in 2003, '5, '6, and

6     '7.  Multiple investigations by the Securities and

7     Exchange Commission and the Ontario Securities

8     Commission resulted in mayhem in the executive

9     suite in Canada.

10                And there was a revolving door at that

11    point in time within the Canada executive suite.

12    From 1998 to 2009, when the filings took place,

13    there were four chief executive officers, three

14    general counsel or chief legal officers, four chief

15    financial officers, two treasurers, four directors

16    of tax, and five chief technology officers.

17                Three of those executives were

18    dismissed for cause and criminally prosecuted over

19    a ten-year period.  They were ultimately acquitted,

20    but nevertheless, the tone that was set in the

21    executive suite in Toronto during that 10-year or

22    11-year period had an absolutely devastating effect

23    on Nortel group-wide.  And as we all know, the

24    insolvency filings took place on January 14, 2009.

25                We put together a couple of graphs that

1    are worthwhile looking at.  And this is only

2    comparing the US and Canada.

3            The first graph is, through the years,

4    the number of employees that were employed by NNL

5    or NNI or their predecessor companies.

6            And you can see the divergence.  In the

7    early part of the period, Canada had more

8    employees.  It leveled out in the mid-'80s to the

9    mid-'90s and then substantially increased.

10           Why was that?  Well, the business in

11   the United States was enormous.  As Ms. Block

12   mentioned, the two largest business unions --

13   Enterprise Solutions and Carrier Networks -- were

14   located in RTP, in North Carolina and in

15   Richardson, Texas.  The largest customers were in

16   the United States.

17           Let's look at the R&D through the

18   years.  While Canada continued to have more in

19   terms of R&D employees, the numbers that were in

20   the United States are very substantial.  By 2000,

21   10,000 versus 12,000; in 1998, 9200 versus 7700.

22   These are not small numbers, and they are critical

23   numbers to understand and remember when we are

24   going through the documentation that gives rise to

25   the rights that we are talking about in this trial.

1                 And then, Your Honors, there is

2     revenue.  Between 1980 and 2000 there could not be

3     a more dramatic depiction of the differences

4     between what was happening within NNI and what was

5     happening within NNL.  In 2000 the distance is

6     striking.

7                 Now, Your Honors, there is something

8     that we have talked about a bit already and we will

9     continue to talk about a lot through the course of

10    this trial, and that's transfer pricing.  And if

11    you will indulge me for a moment, I would like to

12    go through transfer pricing just a little bit.  And

13    I understand that Your Honors are both familiar

14    with it, but it is important to set the stage for

15    some of the things that will come later.

16                The evidence will show, as we are

17    talking about transfer pricing, that when we are

18    talking about corporate goals, we can all agree on

19    what those goals are.  Whether it is for a

20    corporation, a group, a board, or management, the

21    goal is to maximize shareholder value.

22                When a company is not insolvent, that

23    is the number one goal:  maximize shareholder

24    value.  And the number one point of reference for

25    that is share price, maximizing the share price.

1              Going hand in hand with that is

2      minimizing group taxes.  When a company is

3      generating $30 billion in revenue, as Nortel was at

4      its peak, the impact of tax and where tax is paid

5      around the world is critical.

6              You will hear from witnesses in this

7      case, whether through deposition or live, that tax

8      minimization was an important corporate policy at

9      Nortel.  And several of the witnesses are not going

10     to appear live but they will appear through their

11     deposition testimony:  Mr. Look, the vice president

12     of tax at the bankruptcy filing; Mr. Doolittle, who

13     you heard about this morning, who was vice

14     president of tax -- he was also treasurer; he was

15     post-filing CFO -- Karina O, a senior tax official

16     at NNL.

17              None of them are going to appear, but

18     you will hear through their deposition testimony

19     that tax minimization was a critical element to

20     what they were doing on a day-to-day basis.  And

21     the transfer pricing policies and the transfer

22     pricing procedures that they put in place were

23     driven by that.

24              The real question is, in what

25     jurisdiction should you pay taxes?



1              Now, what you have in front of you,

2     Your Honors, is a chart that is a depiction of

3     another chart.  This is a visual depiction that

4     appears in the report of our transfer pricing

5     expert, Lorraine Eden.  As you can see, there's two

6     things that are depicted.  One is the statutory

7     rate in the lightly shaded; and the dark shading is

8     the effective tax rate.

9              You will see that the statutory rate in

10    Canada at the time in 2002 was 34 percent.  The

11    statutory rate in the United States, 39 percent.

12    There is a difference, not that big a difference.

13             But the effective tax rate is

14    substantially different:  11 percent in Canada, 37

15    percent in the US.  And why is that?

16             Well, there is something known as R&D

17    tax credits, credits that are given to taxpayers

18    for conducting certain types of activities; in this

19    case, conducting research and development.

20             There was a substantial movement and

21    pressure within Canada to generate R&D tax credits

22    to make sure that high-tech development would take

23    place in Canada.  The tax rates, the effective tax

24    rates that would have to be paid after application

25    of those R&D tax credits, are reflected in this

1    chart.

2              You will hear that there was a

3    substantial change in the transfer pricing

4    methodologies that Nortel utilized, and that

5    occurred in 2002.  And that change shifted income,

6    taxable income, in the billions out of the United

7    States and into Canada.

8              Now, you are going to hear about

9    transfer pricing from Ms. Eden.  Ms. Eden has a

10   Ph.D. in economics.  She is a Canadian-educated

11   leading expert in transfer pricing.  She is a

12   professor at Texas A&M University.  She is also an

13   instructor for the Canadian Revenue Agency on

14   transfer pricing.

15             Now, again, when you are talking about

16   taxes and you are talking about transfer pricing,

17   remember, the group goal is tax minimization, as

18   you will hear from several of our witnesses.  You

19   will also hear from our witnesses that the goal of

20   the tax authority is revenue generation.  So that

21   means the tax authorities; in our case, the

22   Internal Revenue Service.

23             THE CANADIAN COURT:  Do we need

24   authorities to tell us that?

25             MR. BROMLEY:  We just want to button

1    that down, Your Honors.  I think we can all

2    stipulate to that.

3                   THE CANADIAN COURT:  Yes.  Well,

4    April 30 is buttoned down.

5                   MR. BROMLEY:  You are lucky if you only

6    have April 30th.

7                   So let's look at the reason that the

8    tax agencies are worried about this.

9                   There are thousands, if not millions,

10   of individual intercompany transactions that take

11   place in a group like Nortel.  There are

12   transactions that relate to goods, services,

13   support, research and development, advertising, and

14   so on.

15                  A transfer price is the price that is

16   paid to one group member for another group member

17   for a good or service.  And the question that the

18   taxing authorities ask is, is that price an

19   accurate representation of the economic reality?

20                  And we have to step back for a second

21   and say, when you are talking about intercompany

22   transactions, we have to recognize a few things.

23   The parties to those intercompany transactions are

24   related parties.  They are controlled.  They are

25   affiliated.  They are captive.  And their



1    transactions and their prices and the documents

2    that they sign are all subject to that framework.

3    None of them are the product of arm's-length

4    bargaining.

5              You will see, as we go through the

6    actual documents that were created here in Nortel,

7    there is not a single example of arm's-length

8    bargaining, actual arm's-length bargaining, on any

9    transfer pricing document.  That is why the law --

10   the law recognizes that.  The law in the United

11   States, the law in Canada, the law in every one of

12   the jurisdictions of the integrated entities

13   recognizes that.  So that's why they have put in

14   place something that is known as the arm's-length

15   standard.

16             You will hear from Ms. Eden.  You will

17   also hear from our expert, Catherine Tucker, who is

18   a professor at MIT Sloan and an expert in the

19   economics of high-tech organizations, about what an

20   arm's-length transaction should be.

21             Because, remember -- you will see this

22   later on in our presentation -- it is a question of

23   what arm's-length third parties would expect if

24   they were bargaining freely.  And you will see that

25   billions of dollars were transferred out of the US,

1    out of NNI, directly into the hands of NNL.

2              And the question is, is a transaction

3    and a structure that would allow all of that money

4    to be transferred and nothing to be received in

5    return when the product of those transfers is sold,

6    is that an arm's-length transaction?  Is that an

7    arm's-length bargain?  We believe the answer is

8    absolutely clear that it is not.

9              Now, the other thing that we need to

10   understand in connection with transfer pricing is

11   that there is a beast out there.  It is called an

12   advance pricing agreement, an APA.

13             The APA is a document that exists

14   between -- as Your Honors have heard, I think, over

15   the weekend -- in connection with negotiations

16   between taxing authorities and taxpayers.  Rather

17   than have an audit every single year about the

18   transfer pricing methodology, the taxpayer and the

19   tax authority try to get together and agree that,

20   at least with respect to the transfer pricing

21   methodology, there will not be any dispute.

22             Advance pricing agreements were new in

23   the 1990s.  They were only authorized first in the

24   United States in 1991 and in Canada in 1994.  And

25   you will hear in 1996 perhaps the first advance

 1   pricing agreements between US and Canadian

 2   companies were entered into between NNL, on the one

 3   hand, and the Canadian tax authority on the other;

 4   and between NNI and the IRS on the other hand.

 5            You are also going to hear that Nortel

 6   had two types of transfer pricing methodologies

 7   that it used.  The first, cost-sharing, began in

 8   the mid-1970s and ended in 2001.  The second came

 9   into play first in 2002 and ended in 2009, when the

10   companies filed for Chapter 11.

11            The first ones were subject to a series

12   of agreements known as cost-sharing agreements; and

13   the second, the RPSM, the residual profit-split

14   methodology, was subject to the MRDA.

15            You will hear that the cost-sharing

16   agreements, at least the last one, actually yielded

17   a signed-and-agreed-to APA with each of Canada and

18   the US tax authorities in 1996.  You will also hear

19   that the MRDA yielded seven years of constant,

20   difficult negotiations with the tax authorities;

21   and the only time the APA was actually signed,

22   which was in 2010, was as the result of orders

23   issued by the US and Canadian courts after the

24   insolvency filings.

25            Now, Your Honors, let's start at the

1    1978 cost-sharing agreement.  You will see that

2    this is dated as of January 1, 1978, Montreal,

3    Canada, where Nortel at the time was headquartered.

4    It is a bilateral agreement between Northern

5    Telecom Ltd., now NNL, and Northern Telecom,

6    Incorporated, now NNI.

7                Now, remember, we have heard about the

8    MRDA already.  The MRDA was signed at the end --

9    beginning to be signed at the end of 2004.  This is

10   now back in 1978.

11               You have heard about the term "legal

12   title."  Let's look at the first cost-sharing

13   agreement.  Article 4:

14                   "Rights to patents and technical

15                   information.  The parties acknowledge

16                   that all Northern Telecom technical

17                   information and patents are and shall

18                   continue to be the property of Northern

19                   Telecom."

20               That's what it said in 1978.  If you

21   read the Monitor's brief, that's what the Monitor

22   thinks it says today.  But that's what it said in

23   1978.

24               Now, going on in Article 4, it says:

25                   "In consideration of NTI's sharing

1                    of the costs of research and

2                    development, NTL grants to NNI" -- and

3                    this is important -- "a nonexclusive

4                    right to use the technical information

5                    and patents for the manufacture, use,

6                    lease, and sale of products within the

7                    United States."

8                    Nonexclusive.  1978.

9                    Products, which you will hear about

10   during this trial, in 1978 are defined almost as

11   they might be defined in a catalog:  Central office

12   switching systems, equipment, subscriber switching

13   equipment, and the like, wire and cable.

14                   Continuing on, the right to use is for

15   a five-year period.  It is not perpetual.  It is

16   for five years.

17                   There is an insolvency termination

18   provision, a fairly standard one at the time, that

19   if either party becomes insolvent, the other may

20   terminate.

21                   I note this here because there will be

22   an insolvency termination provision later on in the

23   MRDA that is critical to understand to our theory.

24                   This is an important provision as well:

25                   "Northern Telecom" -- that is NNL --

1            shall have the right to terminate this

2            agreement in its discretion at any time

3            by giving 90 days' prior written

4            notice."

5            So in 1978, you had a five-year

6    agreement of a nonexclusive license.  NNL says that

7    all of the patents and technical information are

8    its property and that agreement can be terminated

9    at any time on 90 days' written notice.

10            Now let's fast-forward to 1985.  There

11    was another version in 1980.  It wasn't

12    particularly different from the one in 1978.

13            But fast-forwarding to 1985, again, it

14    is bilateral.  But remember, before it said "rights

15    to patents," Article 4.  Now it says Article 4:

16    "Legal title to intangible technological property."

17    This is the first time you see the phrase "legal

18    title" appear.

19            It says "Legal title to all of the

20    intangible technological property shall be vested

21    in Northern Telecom Ltd."

22            So as the first two documents said, the

23    intellectual property is the property of NNL.  This

24    says that the legal title of the intellectual

25    property shall be vested in Northern Telecom Ltd.



 1    It doesn't say it is owned by it.  It doesn't say

 2    it has been bought by it, acquired by it.  It is

 3    vested in it.

 4              Article 5 follows.  This is the first

 5    time the word "license" appears.  And it is

 6    important to note how it appears:  "Participant's

 7    exclusive royalty-free license to intangible

 8    technological property."

 9              This is the license, the first license

10    that is given.  The first one in '78 and '80 was a

11    right to use, nonexclusive, terminable at will,

12    five-year period.

13              Now we are in 1985.  It is an

14    exclusive, royalty-free license, including the

15    right to sublicense, in and for the United States.

16    That's a substantial change.  It is a watershed in

17    the way that NNI and NNL related to each other.

18              The definition of products has been

19    expanded as well.  It no longer looks like a

20    catalog.  It says, "All products, software, and

21    services manufactured or marketed or proposed to be

22    manufactured or marketed at any time."

23              And remember, at the time, Nortel was

24    primarily a manufacturing business with dozens of

25    factories that existed all over the world.  But the



1    definition of "products" is not particularly

2    limited to one or two or three things like it was

3    originally.

4              This perhaps is the most important

5    change that appears in this document:

6              "Participants shall have the primary

7              right and obligation to bring and

8              defend in and for the United States at

9              its own expense and for its own benefit

10             any proceedings relating to alleged

11             infringement of its rights to the

12             intellectual property by a third

13             party."

14             Why is that important?  Well, if Your

15   Honors were to go to the website for the US Patent

16   Office and click on "Patents," or the website for

17   the Canadian Intellectual Property Office and click

18   on "Patents," you would find that the definition of

19   "patents" is that a patent is an intellectual

20   property right granted -- this is the US version --

21   granted by the Government of the United States of

22   America to an inventor to exclude others from

23   making, using, offering for sale, or selling the

24   invention throughout the United States.

25             The language in Canada is almost



1    identical.  Because it is absolutely important,

2    when we are thinking about the residual patent

3    portfolio, to understand what a patent is and what

4    rights the parties had in respect of those patents.

5                    The law says that patents are

6    geographical creatures.  They only have validity

7    and existence within a geography.  A patent issued

8    by the US Patent Office is only good in the United

9    States, and a patent issued by the Canadian

10    Intellectual Property Office is only good in

11    Canada.  And the only thing it is good for is to

12    prevent other parties from using your invention.

13                    A patent doesn't grant you the right to

14    use your own invention.  You have that right.  A

15    patent says you have the right to prevent someone

16    else from using it.

17                    In 1985, in this cost-sharing

18    agreement, this agreement gives NNI the primary

19    right and obligation to bring and defend any

20    proceedings relating to an alleged infringement of

21    the intellectual property of the Nortel group in

22    the United States.

23                    It is at this point in time that there

24    is a fundamental change in the relationship between

25    the two parties.  This is not a relationship of



1    dependency and superiority; it is a relationship of

2    equality.

3              And why have they done that?  Because

4    from a tax perspective, it makes absolute sense.

5    If you didn't vest in your subsidiary in the United

6    States full rights in respect of the intellectual

7    property, you would have to pay taxes for having

8    your own establishment in the United States.

9              So when Ms. Block talks about NNL

10    owning NNI and taking last as equity, effectively

11    what we are talking about here -- and this never

12    changed -- is in 1985 and for every year after that

13    NNL, continued to own the intellectual property in

14    the United States only through its ownership of

15    NNI.

16              NNI was NNL's most valuable asset.  And

17    any rights that NNI had to exploit the technology

18    in the United States were owned by NNL only through

19    its equity ownership.  And when NNL, in the 2000's,

20    made the very conscious decision to substantially

21    encumber the balance sheet of NNI with guarantees

22    of its own debt, it decided that we were going to

23    have this trial.

24              Article 10 in 2008 -- 1985 -- I'm

25    sorry -- has another important provision, which is

1    that, upon the expiration or termination of the

2    CSA, that the parties shall be -- the participants

3    shall be deemed to have acquired a fully paid-up

4    license.

5              So recall, this didn't exist under the

6    prior versions.  What this means is that if the

7    agreement cancels or terminates, NNI, as the

8    participant, has a fully paid-up license to

9    exercise all of the rights granted in the agreement

10   in perpetuity without having to pay another nickel.

11   That is important because that exact thing happened

12   in 2001.

13             There is another bankruptcy insolvency

14   provision in 1985.  Now, why is it important to

15   think about 1985?

16             Remember when we were going through the

17   history, this is the point in time, between 1982,

18   '83, '84, '85, when NNI moved ahead of NNL in terms

19   of the number of employees, in terms of the

20   revenue, in terms of the size of the business, of

21   the customer base.  This is when NNL and NNI truly

22   became equal partners in the Nortel business.

23             And the equation that is built into the

24   cost-sharing agreement and was built into the MRDA

25   is that NNI had the full and complete exclusive

1    right to the Nortel business in the geography of

2    the United States of America.

3                   In 1992 there was a further CSA.  The

4    only reason I mention that is that there were two

5    advance pricing agreements that were entered into

6    in 1996.  And while the cost-sharing agreement in

7    1992 is dated 1992, it was actually drafted in

8    1996, as you will hear from Mr. Henderson.

9                   And it was drafted in 1996 because it

10   was only drafted at the time that the advance

11   pricing agreements were agreed to.  And remember,

12   the advance pricing agreements, relatively new

13   beasts at that time.  The first one, between

14   Northern Telecom Ltd. and the competent authority

15   for Canada, has within it certain understandings.

16                  Now, remember, this is the subject or

17   the result of negotiations between the taxpayer and

18   the taxing authority.  And the understandings are

19   based on the representations made to the tax

20   authority by the taxpayer.

21                  This here is the Canadian version.

22   These are based on the representations made by NNL

23   to the Canadian tax authority.

24                  All benefit derived from R&D expenses,

25   very broadly defined:

1                    "Is recognized either in the selling

2                    of a finished product to an unrelated

3                    customer or from the licensing of the

4                    technology resulting from the R&D

5                    expenses (the benefit) within a defined

6                    geographical market by a cost-sharing

7                    participant."

8              The taxpayer, as a CSP, a cost-sharing

9     participant, is entitled to all benefits in all

10    geographical markets except for the parts granted

11    to another CSP.  NTI, which is NNI, is also a CSP,

12    and its geographical market is the United States of

13    America and the Commonwealth of Puerto Rico.

14              This is an agreement between the

15    taxpayer and NNL.  And this agreement says that the

16    exclusive rights within the geography of the United

17    States and Puerto Rico belongs to NTI, now NNI.

18              There was also one with the Internal

19    Revenue Service, effectively the same.

20              Then we come up to the termination.  At

21    the end of 2001 there were a couple of things

22    changing in Nortel's history.  2000 was the

23    watershed, the pinnacle, the highest point for

24    revenue, the highest point for employees; but

25    losses began quickly in early 2001.  The dot-com



1    bubble burst in March of 2001, and it became very

2    clear that Nortel was facing a period, perhaps an

3    extended period, of operating losses.

4              It also was facing the fact that the

5    APAs that had covered the CSAs from 1996 had

6    expired.  They wanted to try to create a new

7    transfer pricing methodology.  In connection with

8    that, they terminated the CSAs, and they terminated

9    them effective December 31, 2001.

10             Under the terms of the CSAs that were

11   in place, that meant that each of the integrated

12   entities -- and that would be all of the parties

13   here today -- NNI, NNUK, NNSA, NN Ireland -- had as

14   of that date fully paid-up licenses for all

15   intellectual property exclusive in their

16   jurisdiction.

17             So every bit of intellectual property

18   ever created by anyone within the Nortel Group,

19   through and including December 31, 2001, fully

20   paid-up, permanent, perpetual licenses.  That's

21   what this termination meant.

22             THE CANADIAN COURT:  Mr. Bromley,

23   presumably we will be given chapter and verse of

24   where we find that.

25             MR. BROMLEY:  Absolutely, Your Honor.

1    It is actually fairly simple.  If you look at the

2    1996 cost-sharing agreement, which will obviously

3    be entered into evidence, and this termination

4    agreement, the two of them together reach that

5    conclusion.

6              Now, in the fall of 2001, as we

7    mentioned, there were a lot of conversations about

8    changing the transfer pricing methodology.  One of

9    the issues that Nortel, as a group, was facing was

10   that, because the relative tax rate, effective tax

11   rate, in the United States was so high, they were

12   paying a lot of taxes in the United States.

13             In December of 2001, there was a

14   meeting in Toronto.  You will hear from

15   Mr. Henderson, who was the author of this

16   presentation which I have just pulled up -- it is

17   an overview of transfer pricing APA -- they are

18   looking for a new APA and recommendations.

19             If you go to page 12 of that

20   presentation, it is a snapshot.

21             "Benefits of the new proposed

22             method" -- that's the RPSM -- "from a

23             tax perspective.  Historically, the

24             approximate split of residual profits

25             has been as follows:  18.6 percent in



1                Canada, 72.4 percent in the United

2                States."

3                So under the CSA regime, the vast

4     majority of profits were reported in the United

5     States; therefore, the vast majority of operating

6     income and, therefore, taxable income was located

7     in the United States.  So more tax paid in the US,

8     less tax paid in Canada.

9                As we talked about in transfer pricing,

10    we are always trying to find a way to put taxable

11    revenue in the lower-taxing jurisdiction.

12                The next entry shows the approximate

13    split of R&D performed:  43 percent in the US,

14    43 percent in Canada.

15                Here is the benefits of the proposed

16    new method on the next page.  These are estimated

17    impacts.  These were estimates as of 2000, looking

18    forward into 2005.  They were assuming that they

19    would make money again.

20                But look at the difference.  The

21    operating income in Canada, once the RPSM was put

22    into place, would increase over that five-year

23    period, according to their estimates, by

24    $4.2 billion; and the income in the United States

25    would be reduced by $3.3 billion.

1              Now, these estimates didn't come out
2    exactly as planned.  But as you will see later on,
3    effectively what happened under the RPSM, which was
4    adopted, was a massive shift of operating income
5    from the United States into Canada to take
6    advantage of the lower effective tax rate.
7              In connection with that exercise, the
8    Nortel tax group hired an economics firm in
9    Washington, D.C., known as Horst Frisch.  They were
10   a well-known transfer pricing economics firm, and
11   they prepared an economic analysis of Nortel
12   Networks' intercompany transactions.
13             This is dated as of March 14, 2002.
14   This is three months after the CSAs, the
15   cost-sharing agreements, had been terminated.
16             As my friends from EMEA had mentioned,
17   there is no transfer pricing agreement in place at
18   this point in time.  The prior transfer pricing
19   agreements had been canceled.  No transfer pricing
20   agreements would come into existence, actually
21   signed, until late in 2004.
22             The Horst Frisch document is attached
23   to three letters, as Ms. Block will go through, and
24   this analysis is sent to three taxing authorities:
25   the IRS, the Canadian Revenue Agency, and Inland



 1    Revenue in the UK.

 2              What do they say about ownership

 3    rights?

 4                   "From an economic standpoint, each

 5                   R&D cost-sharing participant could be

 6                   considered to own the NT technology as

 7                   it related to its specific region."

 8              This is a description in the Horst

 9    Frisch report.  It is submitted to each of the

10    taxing authorities as a representation of the

11    taxpayers.

12              Fast-forward down to the conclusions.

13    In talking about their proposed new transfer

14    pricing methodology, the RPSM, there are two

15    elements to it, and you will hear a lot about this.

16              The first is that certain elements of

17    the Nortel business are routine, and the routine

18    nature of certain Nortel distribution affiliates

19    are going to provide one level of payment under

20    this system.  So, effectively, furnish a

21    distribution entity -- and a lot of the EMEA

22    Debtors are distribution entities -- you will get a

23    fixed return.

24              The valuable, nonroutine,

25    technology-related intangibles developed by the old



1    CSPs under the prior R&D CSA, these old CSPs will

2    continue to perform R&D and consequently continue

3    to develop valuable intangible assets.

4              So when you are looking at the march

5    through from the '70s until the 2002 period, there

6    is a steady move from a subsidiary that is a

7    start-up in early the 1970s to an entity that is a

8    partner, a virtual equal, if not more so, by 1985,

9    with full and complete ownership.  The panoply of

10   rights that the Monitor talks about in his brief,

11   that panoply of rights was granted to NNI starting

12   in 1985.

13             Now I am going to turn the podium back

14   over to Ms. Block, who is going to go a little bit

15   more of the background.

16             THE CANADIAN COURT:  Just before you do

17   that, Mr. Bromley, looking at what happened

18   afterwards and the eventual settlement with the

19   IRS, is it fair to say that the IRS wasn't fully

20   buying Dr. Horst's report?

21             MR. BROMLEY:  I think that's fair, Your

22   Honor, yes.

23             THE US COURT:  Thank you, Mr. Bromley.

24             MS. BLOCK:  We're now moving to the

25   MRDA, the document that of course is central to

1    this case, and let me start with some of the

2    background and Mr. Bromley will go through the

3    actual provisions.

4              There were, of course, five integrated

5    entities:  NNL, NNI and the three EMEA entities,

6    UK, France and Ireland, and they all engaged in

7    substantial R&D, they took business risks and they

8    agreed to pool the fruits of their inventions and

9    their R&D activities, having legal title held by

10   NNL, and each of the other integrated entities

11   having equitable and beneficial ownership to all

12   the IPs, in other words having all of the

13   attributes that were of value, attributes of

14   ownership that were commercially important and

15   valuable, including the right to sublicense and

16   including the right to enforce in respect of all IP

17   in their respective territories.

18             And the whole point of the MRDA, as NNL

19   acknowledged repeatedly, was that NNL and the other

20   participants would each develop IP alone and at

21   times together, it would be funded through transfer

22   pricing payments.  And you will see that NNI in

23   fact paid $7 billion worth of transfer pricing

24   payments, funding much of this R&D in the last 10

25   years.  And then the title in exchange for the



1    exclusive perpetual royalty free licenses to each

2    integrated entity in its own territory.

3              Now, the Monitor well knew of this

4    division of ownership.  In 18 separately filed

5    reports before these two courts, and reports

6    seeking court approvals of significant milestones,

7    the Monitor consistently confirmed that NNL held an

8    interest in the IP or held "legal title" and that

9    the other integrated entities held exclusive

10   licenses in their respective territories.  So legal

11   title was subject to these licenses.

12             And let me just show you from the fifth

13   report, one version of it from the Monitor, that

14   the applicants, NNL and NNC, have an interest in

15   the intellectual property which in turn is subject

16   to various intercompany licensing agreements, in

17   some cases on an exclusive basis.

18             THE CANADIAN COURT:  Ms. Block, when it

19   says, for example, the applicants, to whom was the

20   Monitor referring to when the Monitor used the

21   words "the applicants"?

22             MS. BLOCK:  NNL and NNC, the Canadian

23   parents.

24             THE CANADIAN COURT:  Okay.

25             MS. BLOCK:  And then in the 71st report

 1   for example, here's the other configuration you see

 2   often:  NNL holds legal title to the residual IP

 3   which, in turn, is subject to intercompany license

 4   agreements, in some cases exclusive.

 5              And you'll see this in 18 different

 6   reports filed before the court.

 7              Now, there's two reasons for this

 8   division of ownership.  One is the way R&D was done

 9   by the Nortel entities in the modern era, and the

10   second was, as Mr. Bromley says, to have

11   arrangements among the integrated entities that

12   would reflect a transfer pricing regime that was

13   acceptable to the IRS, the CRA and Inland Revenue

14   and, as Mr. Gottlieb said, it had to be real, it

15   wasn't a fiction.

16              And the way R&D was done, you heard

17   about the march south and starting up after the

18   breakup with AT&T and R&D went along with that and

19   there are the four principal sites in the US.  And

20   we've seen from the Monitor's brief that the

21   Monitor says in paragraph 41 that there was no

22   source of rights for the integrated entities in

23   connection with IP except from the MRDA, but that's

24   not so.  They make it, they own it, and then they

25   agreed to share it.  They made inventions and did

1    R&D in each of the IEs and indeed through 2000 to

2    2009 in very many sites around the world.

3                So we see a substantial part of the

4    Nortel IP done in the US and it's certainly not a

5    case where Ottawa did it all.

6                Indeed, if we look in the 2008 joint

7    request for an APA that NNL and NNI sought, you'll

8    see that the transfer pricing analysis was prepared

9    by Ernst & Young, and the underlying report that in

10   fact gets incorporated into the APA application,

11   this is from the E&Y report that gets incorporated,

12   shows you the R&D of all of the various integrated

13   entities.

14               And you'll see that in respect of NNL

15   in terms of head count, 4,294 R&D employees.  At

16   the same time NNI is very close to that with 3,500.

17   Indeed, the regular full time employee percentage

18   is 26 percent for NNL and 40 percent for NNI.

19               This is also from the same report that

20   gets plucked right into the APA application, where

21   Ernst & Young quotes the OECD guidelines defining

22   the term "intangible property."  And you'll see it

23   includes rights to use assets such as patents, et

24   cetera, and clearly the IEs had the rights to use,

25   and indeed to exclude, as you'll see when we come

 1    to the MRDA, anyone else from using in the

 2    territories that were assigned to them, and of

 3    course intangible property includes intellectual

 4    property and these licenses captured that.

 5              It goes on to say:

 6              "In the case of the Nortel IEs, as

 7              emphasized in the R&D functional

 8              analysis, each of the IEs is actively

 9              involved in activities which contribute

10              valuable technology (i.e. patents,

11              inventions ... etc.).  The integrated

12              entities produce R&D related

13              intangibles and strong customer

14              relationships."

15              It's important that you keep in mind

16    that Ernst & Young was aware of all this, indeed

17    was assisting Nortel both before and after the

18    filings, and it well knew how NNL and the other IEs

19    set up their ownership and sharing of IP among

20    them.  And I'll be asking you to keep that in mind,

21    both courts, when you assess the Monitor's very

22    different positions before you, different from the

23    fact that E&Y knew and we will say were obliged to

24    disclose in their role as officer of the court.

25              You also will be hearing from Michael



1    Orlando, a senior tax person at NNI, and just to

2    give you some of the expenditures that you see, NNL

3    expenditures from 2001 to 2008 amounted to 7.3

4    billion in R&D, but NNI very close behind at 6.4

5    billion in those eight years.

6              Now, the Monitor has told you in

7    paragraph 38 that the MRDA arrangement gave NNL

8    control over the use of the IP.  That's not so.

9    The control over the use was exclusively in the

10   hands of the integrated entities in their own

11   territories.  So yes, NNL in Canada controlled IP,

12   but not in the US, not in the UK.

13             The Monitor says that the subsidiaries

14   avoided upfront costs for IP.  To the extent that

15   the Monitor is suggesting that NNL did it all,

16   you've seen from Mr. Bromley's charts and from

17   these facts and also from the evidence you will

18   hear, even the evidence from their own witnesses,

19   by the mid 1980s the technology of old telephone

20   and cables was no longer the focus and R&D was

21   being done, as you've seen, throughout the world

22   with NNI, as I say, paying close to 7 billion in 10

23   years to other entities to fund their R&D.

24             After the petitions were filed, the

25   Monitor in 2010 worked with NNL and NNI on transfer

1    pricing reports, and we'll come back to these a bit
2    later, but you'll see that in the report prepared
3    with the Monitor's input for the IRS, the slide
4    describes NNI and NNL both as fully integrated
5    companies that perform the functions of research
6    and development, and I'll leave the rest with you,
7    but the point is that this is not some -- NNI is
8    not some weak sibling or child, it was an
9    equivalent and indeed in many respects, as I say,
10   the driver of the financial backbone of the --
11           THE CANADIAN COURT:  Is this transfer
12   pricing report, was that prepared for the tax
13   authorities?
14           MS. BLOCK:  It was.  It didn't get
15   filed but it was prepared and it was prepared with
16   the Monitor's involvement, and they did one for NNI
17   and one for NNL, and we'll come back to see what --
18   what they said.
19           Now, the Monitor said in opening that
20   5(a) of the MRDA was the only source for the
21   integrated entities to IP, and you'll see that
22   submission in paragraph 41 of their opening.
23           THE CANADIAN COURT:  Ms. Block, can you
24   just tell us when it's convenient to stop for the
25   break?

 

1               MS. BLOCK:  Right.

2               THE CANADIAN COURT:  The reporters have

3     been working hard.

4               MS. BLOCK:  Right.  So let me just

5     finish this one point and then I'll --

6               THE CANADIAN COURT:  All right.

7               MS. BLOCK: -- stop, because it is a

8     short point.  They say that the only source of the

9     rights to IP was the MRDA, but in fact, as the IEs

10    were creating the IP, they initially owned it and

11    NNL would not have legal title without the MRDA and

12    wouldn't have been given legal title without having

13    ensured that the integrated entities in return were

14    receiving the perpetual royalty free license in

15    consideration for the granting of legal title, and

16    that's what they were to get.

17              So why don't I stop here.

18              THE CANADIAN COURT:  All right.

19              MS. BLOCK:  And we'll take a break.

20              THE CANADIAN COURT:  Take a 15 minute

21    break.  Is that fine, Judge Gross?

22              THE US COURT:  That's fine, 15 minutes,

23    so we'll be back about 20 after.

24              THE CANADIAN COURT:  Right.

25    -- RECESS AT 3:05

1   -- UPON RESUMING AT 3:20

2                   THE CANADIAN COURT:  Ms. Block.

3                   THE US COURT:  Ms. Block, we are ready.

4                   MS. BLOCK:  Thank you, Your Honour,

5   Judge Gross.

6                   On that APA, that submission that we

7   just looked at in 2010, the same language that I

8   showed you is also in the 2008 APA submission as

9   well.

10                  Let me turn to the second reason why

11  beneficial ownership was placed in the IEs' hands

12  and that was of course to have a system in reality

13  that would satisfy the tax authorities.

14                  The point I make here, Your Honour, is

15  that NNL chose to hold its interest in these

16  separate companies through shareholders.  It could

17  have had divisions of NNL working all around the

18  world, in which case it would have owned all the

19  IP, both legal and beneficial title; but it was too

20  clever for that.  It was rightly for business

21  reasons setting itself up on the economics, as Mr.

22  Bromley has shown you, setting up separate

23  companies, and it is those separate entities before

24  the courts.

25                  NNL chose to take its ownership through

1    shares and not directly own the businesses of these

2    separate entities, and those separate companies

3    created IP owned by them, not owned by the parent

4    company, and then entered into this arrangement

5    that Mr. Bromley will take you through in a moment.

6              So it made good business sense from the

7    economics, from the tax point of view, and this

8    methodology of legal title in NNL and beneficial

9    ownership in each territory with the separate

10   companies operating in those territories avoided

11   valuation issues.

12             If IP had been bought and sold among

13   the IEs, it avoided withholding tax and the

14   valuation issues in relation to royalties.  It was

15   not designed to give NNL control of the assets and

16   the valuable rights of these separate companies in

17   bankruptcy.  Indeed, it gives NNL no more rights in

18   bankruptcy than are afforded an equity owner, which

19   is what NNL is.

20             So let me turn the podium back to

21   Mr. Bromley to address number 7 in our outline, the

22   terms of the MRDA.

23             MR. BROMLEY:  Thank you, Ms. Block.

24   Thank you, Judge Gross and Justice Newbould.

25             The MRDA, as you have been hearing and



1    will hear ad nauseam throughout this trial, sits at

2    the center of the dispute that we are dealing with.

3    Therefore, I think it is very important that when

4    we are talking about the MRDA, we talk about the

5    right document.

6              So the Monitor's pretrial brief

7    actually has attached to it something known as what

8    they describe as Schedule C.  It is referenced on

9    page 16, footnote 4, paragraph 42, and indicates

10   that it has been created by the Monitor and is

11   being included to assist the Courts.

12             And I respectfully suggest, Your

13   Honors, that rather than looking at what is

14   ultimately an artificial contrivance, a good-faith

15   one, I have no doubt, but one that did not exist in

16   reality and was never a document that anyone looked

17   at, that we actually turn to the document that

18   appeared in every one of our hundred some-odd

19   depositions and the document that we have been

20   dealing with throughout all of the briefing.

21             And I have -- we have taken the liberty

22   of putting together a booklet that has the MRDA and

23   all of the various pieces of it.

24             And if I could just approach Your Honor

25   here and ask for my colleagues in Toronto to do the

1    same.

2              THE US COURT:  Certainly.  Thank you,

3    Mr. Bromley.

4              THE CANADIAN COURT:  I have already

5    done it earlier.  The problem with, I'll call it

6    the amalgamated version, Mr. Bromley, is it doesn't

7    take into account timing differences and the like.

8              MR. BROMLEY:  Your Honor, by the

9    "amalgamated version," you mean the one that the

10   Monitor has attached?

11             THE CANADIAN COURT:  Yes.

12             MR. BROMLEY:  I think that there are

13   probably two fundamental problems with it.  One is,

14   by trying to create what is an amended and restated

15   document, it avoids the repetition of certain

16   statements, key statements, about beneficial

17   ownership that appear in multiple versions.  I

18   think it also takes away from the flow of the

19   document.

20             You will recognize, I think, once you

21   take a look at how it has been put together in our

22   booklet, that the MRDA was something that continued

23   to evolve from virtually the moment that it was

24   signed in the end of 2004.

25             THE CANADIAN COURT:  Okay.

1            MR. BROMLEY:  More importantly, Your

2    Honors, if I could just point you to something that

3    is near and dear to my heart, the Interim Funding

4    and Settlement Agreement.

5            The MRDA is already defined in the

6    Interim Funding and Settlement Agreement.  It is

7    also defined in the final Canadian Funding and

8    Settlement Agreement, both of which have been

9    approved by the US and Canadian Courts.

10            And I will point to Annex A to the

11    IFSA, which is Annex A, which appears right under

12    the tab index in your booklet.  It lists all of the

13    amendments to and related understandings regarding

14    the Master Research and Development Agreement and

15    defines all of these documents together as the

16    MRDA.  That is the document that we have all been

17    working through.  And since --

18            THE CANADIAN COURT:  Is there a book I

19    am supposed to be handed?

20            MR. BROMLEY:  Oh, I am sorry, Your

21    Honor.  Yes.  If I could ask one of my colleagues

22    in Toronto to hand you the book.

23    -- OFF THE RECORD --

24            MS. BLOCK:  The Exhibit is 21003.  We

25    have additional copies.

1                    MR. BROMLEY:  May I proceed, Your

2       Honor?

3                    THE US COURT:  Yes.

4                    MR. BROMLEY:  Okay.  So as I was

5       saying, Your Honor, we have the MRDA.  It sits at

6       the center of this trial.  And it is important to

7       understand exactly what it is.

8                    There is the original MRDA, the Master

9       R&D Agreement, that was signed beginning at the end

10      of 2004.  And I say "beginning" because it did take

11      a while for it to be signed by all the integrated

12      entities.

13                   The second document you have is an

14      addendum to the Master R&D Agreement.  That was

15      signed about a year later, in 2005.  Then there is

16      a document that is entitled "Agreement with Respect

17      to Certain NN Technology."

18                   THE CANADIAN COURT:  Just a second.  I

19      have got the MRDA at the beginning of this brief.

20      Then I have got an index, and the first one are

21      amendments to and related understandings.

22                   Is that what I am supposed to have?

23                   MR. BROMLEY:  That's correct, Your

24      Honor.

25                   THE CANADIAN COURT:  Okay.



1              MR. BROMLEY:  And I will just go back

2    for a second.

3              THE CANADIAN COURT:  Oh, I see.  That's

4    the index of what follows.  All right.  Okay.

5    Sorry.  Yes, go ahead.

6              MR. BROMLEY:  And that Annex A -- that

7    appears as attached to the Annex A to the Interim

8    Funding and Settlement Agreement.  And it defines

9    the entirety of the MRDA.

10             So the first addendum, which is at

11   Tab 1, was dated as of the end of 2005.  The second

12   document under Tab 2 is "Agreement with Respect to

13   Certain NN Technology."  That is the document that

14   was referred to by my friends from EMEA earlier

15   this morning as the Alcatel agreement.

16             Then there is another document which is

17   under Tab 3.  It also is called Addendum to Master

18   R&D Agreement.  It is a little confusing, because

19   it is now the second document with the same title.

20   We have been referring to it as the second

21   addendum.

22             Then there is a third addendum to the

23   Master R&D Agreement.  You have heard earlier from

24   Mr. Gottlieb and Mr. Maguire about this document.

25   This was one of the ones that was put together on

1    the eve of bankruptcy in 2008.

2            The fourth addendum is under Tab 5,

3    that document as well put together around the same

4    time as the third.  There was a flurry of sort of

5    frantic activity relating to the MRDA in the weeks

6    prior to the insolvency filings.

7            The next document is an acknowledgment

8    relating to the MRDA, which basically is just

9    between the Canadian Debtors and the EMEA Debtors,

10   and in particular the Joint Administrators.

11           Under Tab 7 appears a release of

12   certain claims that might exist.  That was

13   January 1, 2009.

14           And then the final document relating to

15   the MRDA is the Memorandum of Understanding which

16   was discussed this morning, and we will discuss

17   that in sequence.

18           So when you start off with the MRDA,

19   the parties are referred to as participants, and

20   that includes NNL.  So there are six parties,

21   originally included Nortel Networks Australia.  It

22   dropped out.  So we will say good-bye to Australia

23   for the moment and simply focus on the five

24   integrated entities.  They are referred to in the

25   MRDA as "participants," and the participants that



1    are licensed under the MRDA are referred to as the

2    "licensed participants."

3              Now, if you go to the recitals, the

4    first recital is one that we have seen before:

5    "Whereas legal title to all NN technology is held

6    in the name of NNL."

7              The next recital is "Whereas each

8    licensed participant held and enjoyed equitable and

9    beneficial ownership of certain exclusive rights

10   under NT technology for a specified territory

11   pursuant to the cost-sharing agreement."

12             Now, those are two statements that you

13   have seen repeated in a number of documents and

14   included in representations to and agreements with

15   the taxing authorities.

16             Here is some new language which appears

17   in the MRDA for the first time:  "Whereas each

18   participant bears the full entrepreneurial risks

19   and benefits for the Nortel Networks business."

20             You will hear from our experts in

21   transfer pricing that the term "full

22   entrepreneurial risks and benefits" are transfer

23   pricing lingo for actually having all of the upside

24   and all of the downside in a particular business.

25   So when you are talking about the beneficial



1    ownership of the business, of the Nortel Networks

2    business, "full entrepreneurial risks and benefits"

3    from a transfer pricing perspective is the

4    equivalent phrase.

5                    The next thing that we see is, if you

6    flip to the end of the MRDA, there is something

7    called Schedule A.  Schedule A actually contains

8    the mathematical computation of the RPSM, of the

9    residual profit-split methodology.  And this is, in

10   effect, the meat and potatoes of what a tax

11   authority would be looking at.  And it is a

12   calculation of arm's-length R&D calculation to each

13   participant."

14                   The fourth paragraph down says:

15                   "Accordingly, the compensation

16                   provided to participants under the RPSM

17                   reflects the fact that the participants

18                   bear the full entrepreneurial risk of

19                   the Nortel business, such as the risks

20                   attendant with the substantial and

21                   continuous development and ownership of

22                   the NN technology.  Mathematically, the

23                   RPSM accords the participants all the

24                   upside risk in the Nortel business as

25                   well as the downside risk in such



1              business."

2                   There are no limitations on these

3    descriptions.  These descriptions in Schedule A and

4    in the recitals continue throughout the history of

5    the MRDA.  And they are clear as can be that these

6    are indications that the participants own equitable

7    and beneficial ownership of the Nortel business in

8    each of their exclusive jurisdictions.  As

9    Ms. Block said at the very beginning, for NNI, that

10   meant the entirety of the Nortel business in the

11   United States, including all rights to all

12   technology, was owned beneficially by NNI.

13                  There is a distinction drawn in the

14   next paragraph, which says, on the other hand,

15   there are certain other Nortel entities not subject

16   to the Master R&D Agreement; i.e., Nortel

17   distribution entities, generally the least complex

18   entities in the group.  They do not perform R&D and

19   generally perform routine activities.

20                  Now, why do I mention this and call it

21   out specifically?  Well, if you actually read the

22   Monitor's position, right now, effectively, all of

23   the other integrated entities post-sale

24   transactions in the eyes of the Monitor are

25   effectively the nonroutine distribution entities.



1            We have no rights under the allocation

2    theories propounded by the Monitor to any of the NN

3    technology that was sold for $4.5 billion; and,

4    based on the legal theories or allocation theories

5    espoused by the Monitor's experts, on the line of

6    business, we are not entitled to very much of that

7    either.

8            THE US COURT:  That doesn't include

9    NNI, though; is that correct?  Because it refers to

10   other Nortel entities.

11           MR. BROMLEY:  Well, what I am pointing

12   out, Your Honor, is that NNI would be included in

13   the first paragraph.

14           THE US COURT:  Yes.

15           MR. BROMLEY:  NNI would not be included

16   in the second paragraph.

17           THE US COURT:  Right.

18           MR. BROMLEY:  But according to the

19   Monitor's position, we are being described as if we

20   were in the second paragraph.

21           THE US COURT:  I see your point.

22           MR. BROMLEY:  Now, when you go into the

23   document itself, there is a familiar structure.  It

24   relates very similarly to the CSA from 1985 and

25   1992.  Article 4 starts out with legal title to NN

1    technology.

2            Now, the first paragraph here is a

3    little different than what we saw before, and not

4    in a good way for the Monitor.  It says, "Except as

5    otherwise specifically agreed, legal title to any

6    and all NN technology shall be vested in NNL."

7            Okay.  That sounds roughly the same as

8    what we had before, but I will ask you to keep in

9    mind "except as otherwise specifically agreed,"

10   because we will come back to that.  But, again, it

11   is legal title.  It doesn't say property; it

12   doesn't say ownership.

13           Then you go to the next sentence.  And

14   this is exactly what Ms. Block has been focusing

15   on.  "In consideration therefor, NNL agrees to

16   enter into an exclusive license with each of the

17   licensed participants as set forth in Article 5."

18           If there is a bargain in this document,

19   it is contained in A; right?  So what happens is

20   each one of the integrated entities is conducting

21   R&D and creating intellectual property in its home

22   jurisdiction.  As Ms. Block just showed you,

23   billions of dollars were spent in the US alone on

24   the creation of intellectual property.

25           What happened to that intellectual

1   property?  Patents that were either created or

2   added to in the United States, know-how that was

3   used to install the Verizon 3G network, that kind

4   of intellectual property was created by NNI in the

5   United States.  It was owned by NNI once it was

6   created.

7            How did it get over to NNL?  It got

8   over to NNL through 4(a).  Vested in NNL, but in

9   consideration therefor you get an exclusive license

10  back, an exclusive license to exploit in the United

11  States in perpetuity on a royalty-free basis.

12           And that's what happens when you go to

13  Article 5.  You can see exclusive royalty-free

14  license, including the right to sublicense and in

15  perpetuity, defined as "exclusive license."

16           Now, the Monitor makes a great deal

17  about Article 5.  And, indeed, the middle of

18  Article 5 is, in our view, the sum and substance of

19  the entirety of the Monitor's argument, and,

20  indeed, all of the Monitor's allocation theories

21  and expert reports rely on this, which is that the

22  word "products," as it appears in the middle of

23  Article 5(a), is a limiting word; and that word and

24  that word alone limits everything that was granted

25  in the MRDA to the ability to sell products that



1    were made by Nortel at a particular point in time.

2                   Now, when you break down Article 5, you

3    will see that it is impossible for that reading to

4    hold any water.

5                   So one of the things you have to do

6    when you are looking at a contract is recognize

7    that defined terms are used to save space.  And the

8    term "products" is a capital P, products and it is

9    a defined term.

10                  Now, the Monitor would like the word

11   "products" to mean products with a small P and

12   nothing more.  It would like it to mean products as

13   it was defined in the 1978 CSA, which was a catalog

14   of products, of particular things that you could

15   buy off a shelf.

16                  But let's look at the definition of

17   "products."  The definition of "products" is "all

18   products, software, and services designed,

19   developed, manufactured, or marketed or proposed to

20   be designed, developed, manufactured, or marketed."

21   And I will stop there for a moment.

22                  There are words that have been added to

23   that part of the definition of "products" since

24   1985 and since 1992.  And those words are "designed

25   and developed."  So when you are looking at 5(a) in



1   the MRDA, the words "designed and developed" were

2   added.

3             They are added for a reason.  And it is

4   because, by that point in time, it is absolutely

5   crystal clear that we are talking about anything

6   that could ever be created using NN technology:

7   designed, developed, manufactured, or marketed or

8   proposed to be designed, developed, manufactured,

9   or marketed.

10            Then the next words:  "at any time."

11  "At any time" means then, now, maybe in the future,

12  whenever.  It doesn't say it stops.  It doesn't say

13  it starts.  It says at any time.

14            Then it continues on.  "At any time by

15  or for any of the participants."

16            Now, before, it used to say "by or for

17  the group."  Now we are talking about by or for any

18  participant.  Any participant, any of the five,

19  have the right, using NN technology at any time, to

20  design, develop, or propose to design or develop

21  anything, any products, software, or service.

22            But what does that encompass?  It

23  encompasses everything.  In particular, we talk in

24  a little bit about IPCo, Intellectual Property

25  Company, it is described consistently as a



1    licensing services business.  The alternative to

2    selling the IP was to engage in a services

3    business, licensing intellectual property.

4              So when you continue on, there is

5    another -- the next words after the definition are

6    "using or embodying NN technology."  "NN

7    technology" is also a defined term.  Let's see what

8    that says.

9                   "Using or embodying any and all

10                  intangible assets, including but not

11                  limited to patents, industrial designs,

12                  copyrights, and applications thereof,

13                  derivative works, technical know-how,

14                  drawings, reports, practices,

15                  specifications, designs, software, and

16                  other documentation or information

17                  produced or conceived as a result of

18                  research and development by or for any

19                  of the participants, but excluding

20                  trademarks and associated goodwill."

21             It is virtually impossible to imagine a

22    broader definition of NN technology.

23             So when we are talking about what we,

24    NNI, or any of the integrated entities have the

25    right to do, we have the right to, basically, do



 1    anything with any of the NN technology.  That's
 2    what Article 5 says.  It is an exclusive right.
 3    You have to read these terms with the definitions
 4    writ large.
 5              And just because the defined term
 6    "products" has an interpretation in normal-course
 7    conversation, that shouldn't be taking us in the
 8    wrong direction.  God knows, we have enough legal
 9    power in this room to recognize that "products"
10    with a capital P doesn't mean "products" with a
11    small P.
12              And why is it in there?  It is
13    incredibly important that it be in there for
14    purposes of the arm's-length nature of the
15    transaction.
16              Remember, as Ms. Block has said, and as
17    you will see again, billions of dollars were
18    generated in the United States and transferred
19    directly to NNL, billions and billions of dollars
20    in cash and billions and billions of dollars -- I
21    feel like Carl Sagan -- of dollars were spent on
22    R&D in the United States and the intellectual
23    property created by that R&D in the United States,
24    legal title vested in NNL.  It is not an
25    arm's-length transaction if you do all of that and



1    get nothing in return.

2              These are terms that were added in the

3    MRDA, specifically talking about patents,

4    industrial designs, copyrights, applications.

5    There was a conscious decision made to further

6    expand the license in the MRDA, and that's exactly

7    what happened.  This is just the definition of

8    "products" as it appears.  We already inserted it

9    in.  This is the definition of NN technology as it

10   appears in the document.

11             Now, let's continue on.  Remember, I

12   asked you when we were talking about Article 4(a)

13   to keep in mind the "except as otherwise

14   specifically agreed."  That's a phrase that lawyers

15   use very often when drafting legal documentation.

16             And if you go down to the end of

17   Article 4, there is what was otherwise specifically

18   agreed.  So Article 4 is where legal title to NN

19   technology is vested in NNL, and there is an

20   express exception to that vesting.

21             What it says is:

22                  "Licensed participants have the

23                  right to assert actions and recover

24                  damages or other remedies in their

25                  respective territories for infringement



1              or misappropriation of NN technology by

2              others."

3              This is an enforcement provision.  It

4    is a much broader enforcement provision than

5    existed in the 1992 CSA.  That enforcement

6    provision said we had the primary right and

7    obligation in the United States to do it, but it

8    also said that if we didn't do it, NNL could step

9    in.  This is completely unqualified.

10             So when you are looking at this

11   document from a corporate-structure perspective and

12   you are talking about clarity, except as otherwise

13   specifically agreed, legal title that is vested in

14   NNL does not include the right to enforce in any of

15   the exclusive territories.  It simply does not.

16             Now, earlier we talked about what we

17   would like to title our allocation theory, and we

18   said fair market value.  And it is a term that you

19   have heard in court many times.  And we did not

20   choose it lightly.  And the reason we chose it is

21   because the MRDA actually uses it.

22             The MRDA has a provision in it that

23   deals with what happens in the event of an

24   insolvency.  It is not exactly what has happened

25   here.  It doesn't say when everyone becomes

```
 1    insolvent.  But it is very instructive.

 2              So remember, in the early versions of

 3    the CSA it would say in the event of an insolvency,

 4    give notice, it terminates.  Notwithstanding the

 5    automatic stay or whatever implications, that's

 6    what the contracts would say back then.

 7                   In the MRDA it doesn't say that at

 8    all.  It says:

 9                   "In the event of an elective or

10                   forced retirement" -- and a forced

11                   retirement includes an insolvency -- "a

12                   retiring participant's rights in the NN

13                   technology will terminate and any and

14                   all NNL exclusive licenses with such

15                   participant will be canceled; and in

16                   consideration thereof, such participant

17                   requirement shall be entitled to

18                   retirement allocation from NNL."

19              What is a retirement allocation?  A

20    retirement allocation is the fair market value of

21    the exclusive license, simply put.  That's why our

22    allocation theory is known as the fair market value

23    theory, because the MRDA says quite clearly that,

24    in the event of an insolvency and anyone is

25    exiting, the parties exiting get the fair market
```

1    value of the exclusive license.

2              So it is not the license theory; it is

3    not the revenue theory.  It is the fair market

4    value which is derived directly from the definition

5    of "retirement allocation" in the MRDA.

6              Now, again, the MRDA continues to have

7    the fully paid-up license in the event of a

8    termination, which is different than a

9    bankruptcy/insolvency forced retirement.

10             And the MRDA, remember, was signed

11   before there was an APA.  So it also says that --

12   there is a representation that says, "Whereas the

13   participants acknowledge that as a result of the

14   collective review, the calculation may need to

15   change."

16             So when we are sitting and looking at

17   the MRDA, it is important to keep in mind those key

18   provisions:  unlimited enforcement rights,

19   unlimited license rights, and in the event of a

20   termination, fair market value of that license.

21             And that's effectively what we are

22   asking for in our allocation methodology:  The five

23   integrated entities should get the fair market

24   value of the Nortel business in each of their

25   exclusive jurisdictions, and we should split the



1    rest on an equal basis.

2              Now let's talk about one of the

3    addendums.  The first addendum just deals with

4    minor errors.

5              The second addendum, we put this in --

6    Justice Newbould, you asked why we were concerned

7    about the Monitor's amended and restated version.

8    Well, the second addendum specifically states,

9    again, in a whereas clause that each participant

10   holds and enjoys equitable and beneficial ownership

11   of NN technology.

12             THE CANADIAN COURT:  So if you don't

13   get it the first time, you might get it the second.

14             MR. BROMLEY:  Exactly.

15             THE CANADIAN COURT:  And in the next

16   tab, the third.

17             MR. BROMLEY:  I think you have been

18   reading ahead, Your Honor.

19             THE CANADIAN COURT:  Well, I have read

20   these before.

21             MR. BROMLEY:  If you look at the second

22   addendum, again in Schedule A, the terminology

23   relating to the "full entrepreneurial risk" appears

24   again.

25             Now, this is a document, which is -- I

1    would like to leave the integrated entities for a

2    moment and go to Warsaw.  This is an addendum to

3    the distribution agreement with the Polish limited

4    risk distributor.  This is entered into in 2006,

5    and it is entered into without any involvement of

6    NNI.  It is entered into because there is an audit

7    going on from the Polish tax authorities.

8                The first line, "Whereas NNL has vested

9    in it legal title to all valuable intangible assets

10   associated with NN products."

11               And then it follows:

12                   "Whereas NNL and certain NNL

13                   affiliates, defined as the NNL

14                   entrepreneurial entities, assume all

15                   the expenses and risks of ownership

16                   associated with the development and

17                   exploitation of such intangible assets,

18                   including, without limitation, research

19                   and development activities,

20                   manufacturing activity, manufacturing

21                   oversight, and development costs for

22                   the intangible assets, such as

23                   patents" -- so on -- "defined to be NN

24                   technology."

25               What this is doing, in a contract that



```
 1   NNI has nothing to do with, it's making absolutely
 2   clear that the understanding within the Nortel
 3   group is exactly the understanding that we have
 4   seen in all of the other documents, which is that
 5   NNL and the other integrated entities, here defined
 6   to be the NNL entrepreneurial entities, own the NN
 7   technology.
 8            It continues on to say that they own or
 9   perform the risk associated with the manufacturing
10   activities and the other functions and risks as
11   part of their global business.
12            When you look at the Alcatel agreement,
13   there is similar language --
14            THE CANADIAN COURT:  Could I just ask a
15   second, are you trying to find in this book -- you
16   had up on the screen page 110 of your book.
17            MR. BROMLEY:  Yes.  I am sorry, Your
18   Honor.
19            THE CANADIAN COURT:  I have been trying
20   to find where in this book that I have been handed
21   that I find that.  And am I right?  I don't find
22   it?
23            MR. BROMLEY:  You are right, Your
24   Honor.  It is not -- the Polish addendum is not in
25   the MRDA book.  That goes back to our presentation
```

1   slide deck.

2              THE CANADIAN COURT:  Yes, thanks.

3              MR. BROMLEY:  Thank you.

4              So then this goes back to our book, the

5   Alcatel agreement.  And again, this has a little

6   bit different phraseology, but it is essentially

7   the same thing, which is that this is a document

8   regarding the sale of the specific NNL global

9   business, beneficially owned by the participants in

10  their respective territories, in accordance with

11  the terms of the MRDA.

12             The third addendum continues on.  There

13  is not much in there.

14             But if you go to the Schedule A once

15  again, just Schedule A, the calculations.  And it

16  is important for two reason.  One, if you look at

17  the recitals which appear -- this is in Tab 4 near

18  the end.  The second paragraph again talks about

19  the participants under the RPSM bearing the full

20  entrepreneurial risk.

21             But this is important if you can flip

22  to the next page.  This would be page 7.  And I

23  don't have a slide on this.  I apologize.  We have

24  a lot but, not on this.

25             On page 7 it talks about the



1    calculation of the R&D allocation.  And what it

2    says in (iii)2 at the top of page 7 is that you do

3    not include in the calculation of the R&D

4    allocation any gain and loss on the sale of the

5    business.

6                So what you have heard from my friends

7    from EMEA earlier today is that the MRDA

8    specifically says that you don't take into account

9    the gain or loss on the sale of a business in the

10   RPSM calculation.  That's where it appears, right

11   on that document, on page 7, attached to the third

12   addendum to the Master R&D Agreement.

13               The fourth addendum was signed just

14   prior to the bankruptcy filing.

15               And then let's go to the MOU.  I know,

16   Justice Newbould, you had a couple of questions

17   about the MOU.  And it does say it creates no

18   liability or obligations or rights amongst the

19   parties hereto.  It begs the question then, why in

20   the world does it exist?

21               The document -- and you will see, the

22   evidence will show -- was the result of frantic

23   effort just prior to the filing, members within the

24   Canadian tax group, to try to address an issue that

25   related to the way business was being operated and



1    how it might be able to be construed to constitute

2    a partnership.  And I think it is fair to say that

3    some folks had taken their eye off the ball in

4    terms of the way that sales were being made into

5    certain jurisdictions.

6              That's not the issue in today's

7    litigation by any stretch of the imagination, but

8    it is important to note that there are provisions

9    in this that are, again, very similar to the ones

10   that we have already read out.  And I know

11   Ms. Block will deal with them in a bit.

12             So if I could just take one moment, I

13   think I am ready to hand it back to Ms. Block in

14   Toronto.

15             THE CANADIAN COURT:  Ms. Block.

16             THE US COURT:  Thank you, Mr. Bromley.

17             THE CANADIAN COURT:  Ms. Block?

18             THE US COURT:  Thank you, Mr. Bromley.

19             MS. BLOCK:  Your Honours, before

20   leaving the MRDA terms, I just want to make two

21   points.  And I've got the 5(a) section up there

22   with the definition of NN Technology imported into

23   it.  Instead of just saying NN Technology, this is

24   what that defined term means in the middle of the

25   page.



1                  And you will have read that the Monitor

2      in paragraph 109 of its submissions says that after

3      this products clause, 5(a) goes on to provide that

4      the licensees may use Nortel IP as necessary in

5      connection with making, using or selling products.

6      And this is clearly wrong.

7                  You'll see that the products clause,

8      the one in the middle, already gives all rights to

9      patents, industrial designs, copyrights,

10     applications and technical know-how in connection

11     with products.  It's right in that middle clause.

12     And then it goes:  Comma, and, this is what the

13     exclusive royalty free license includes, right to

14     sublicense, rights to make and use, and all rights

15     to patents, industrial designs, copyrights,

16     applications and technical know-how.

17                 So no restriction whatsoever, and

18     you'll see in the Monitor's own submissions, and I

19     submit that this is correct --

20                 THE CANADIAN COURT:  I hate to say it

21     but you've lost me.  Go back to your prior screen.

22     Okay, where do I find this in the agreement?

23                 MS. BLOCK:  This is 5(a), Article 5(a),

24     and you'll see Article 5(a) gives, in the middle,

25     the right to make, have made, use, lease, et

1   cetera, all products, and then Mr. Bromley has

2   shown you the definition of products which includes

3   services and so on.

4                    THE CANADIAN COURT:  Yes.

5                    MS. BLOCK:  Embodying NN Technology.

6   And NN Technology is a defined term.

7                    THE CANADIAN COURT:  Um hmm.

8                    MS. BLOCK:  Which is as set out here.

9   It includes --

10                   THE CANADIAN COURT:  Oh, I see.

11                   MS. BLOCK: -- patents, industrial

12  designs, copyright, applications, technical

13  know-how.  So in relation to products, that clause

14  already carries with it the right to use and access

15  NN Technology products, patents, industrial

16  designs, copyrights, applications, technical

17  know-how.  That's already incorporated by reference

18  in the rights to have -- to make, have made, use,

19  lease in relation to products.

20                   THE CANADIAN COURT:  And you say this

21  is in answer to what?

22                   MS. BLOCK:  To the Monitor's pre-trial

23  brief tells the courts that a contract is to be

24  interpreted as a whole in a manner that gives

25  meaning to all of its terms and avoids an

1   interpretation that would render one or more of its

2   terms ineffective.

3              And if you go back to Article 5, you'll

4   see --

5              THE CANADIAN COURT:  Which paragraph --

6   no, which paragraph of the Monitor's brief do you

7   say it answers?

8              MS. BLOCK:  It's 77.

9              THE CANADIAN COURT:  Pardon?

10             MS. BLOCK:  It's paragraph 77.  I'm

11  actually saying it doesn't answer it, but paragraph

12  77 tells you that their theory has got to be wrong

13  because in paragraph 77 they tell you you've got to

14  give everything meaning.

15             THE CANADIAN COURT:  Okay.

16             MS. BLOCK:  You go back and look at the

17  clause, and you'll see after the rights in relation

18  to products, there is another set of rights that

19  are granted as part of the exclusive license, all

20  rights to patents, industrial designs, copyrights,

21  applications, technical know-how as necessary or

22  appropriate in connection therewith.  This isn't in

23  relation to products.  This is comma, and, it is a

24  third set of rights, the right to sublicense, the

25  rights to make, have made, sell, in relation to

Neeson & Associates    W&F
                                              www.neesoncourtreporting.com
                                              www.wilfet.com

1    products and all rights to patents, industrial

2    designs, copyrights, applications and technical

3    know-how.

4              In paragraph 109 of the Monitor's

5    pre-trial brief they told you that Article 5 goes

6    on after the products clause to make it clear that

7    you can use patents, industrial designs,

8    copyrights, applications and technical know-how.

9    Well, that's wrong to say it is from that last

10   clause because it's already embedded in the

11   products clause.

12             So in addition to products, which is a

13   broad term, in any event, in addition to that there

14   are unrestricted, unrestricted to products, all

15   rights to patents, industrial designs, copyrights,

16   applications and technical know-how; otherwise you

17   are offending the principle that my friends rightly

18   cite to you that you have to give meaning to the

19   clauses, to all words.  You don't render that third

20   branch ineffective because it's already in, in

21   relation to products.  So this is unrestricted to

22   products.

23             So let me turn to the ninth part of our

24   presentation, the evidence regarding the MRDA, and

25   I will try and clip through this efficiently.



1    There are a lot of slides there but some of them

2    you've already seen and I can summarize a number of

3    them.

4              But you will know that NNL and its

5    personnel working with NNI and NNUK sought the

6    imprimatur of the tax authorities on these MRDA

7    arrangements, the ones which divided the legal

8    title holding from the beneficial holding,

9    beneficial ownership.

10             Let me just give you some highlights

11   from NNL and I'll start with Mr. Doolittle whom

12   you've heard of, and of course he was NNL's primary

13   witness in seeking the CCAA order in this court in

14   Ontario in January '09 and was the VP tax, the

15   senior NNL officer.

16             And you'll see that he confirms that

17   the understanding of this arrangement was that we

18   had provided each of the RPS participants

19   beneficial ownership but not legal.

20             THE CANADIAN COURT:  Is that admissible

21   evidence, what somebody's subjective understanding

22   is?

23             MS. BLOCK:  This is consistent with

24   the -- this was an undisclosed -- first of all,

25   it's not parol evidence, it's not undisclosed

1    intention at the time.  It's a description of what,

2    and you will see, what was presented to the tax

3    authorities as part of the factual matrix.

4              THE CANADIAN COURT:  I understand all

5    that but when someone says my understanding of what

6    that was, isn't that just subjective evidence

7    that's not admissible?

8              MS. BLOCK:  It's totally consistent

9    with what these arrangements show, what you've

10   already seen in the documents, and the fact that

11   NNL is stating that this is -- this is a senior NNL

12   officer who is telling you this is how -- how it

13   works, and indeed it's part of, in my submission,

14   part of the factual matrix.

15             THE CANADIAN COURT:  The old standby.

16             MS. BLOCK:  Contracts are not to be

17   interpreted in a vacuum.  We have been so

18   instructed by the Supreme Court of Canada.

19             Let me move to an email exchange that

20   Mr. Doolittle had, if we can pull up, 124.  And

21   this is an email series, the first message is from

22   Mr. Doolittle to Giovanna Sparagna and she was the

23   lawyer that NNL and NNI hired to work on and draft

24   the MRDA, and he's asking her to confirm where we

25   ended up on the rights to IP for each RPS

1    participant.  There was a time when they were

2    thinking a non-exclusive licenses globally or

3    exclusive, of course they went with the exclusive,

4    and Ms. Sparagna responds to Doolittle saying:

5                    "Before I got involved Nortel was

6                    going down the path of collective

7                    ownership of the worldwide intangibles

8                    by the RPS participants.  When Mark,"

9                    that's Mark Weisz who you'll be hearing

10                   from, "and I started drafting, we

11                   reversed that strategy.  Our strategy

12                   was to have each RPS participant be the

13                   exclusive beneficial owner of their

14                   respective geographic locations.  Any

15                   locations not owned by another RPS

16                   participant was beneficially owned by

17                   Nortel Canada.  So Nortel Canada is the

18                   beneficial owner of rights outside of

19                   Canada not owned by other RPS

20                   participants.

21                      In form however, Nortel Canada is

22                   the formal legal owner of all worldwide

23                   registered intangibles.  We

24                   accomplished the transfer of all

25                   beneficial ownership of a specific

 Neeson&Associates    W&F
COURT REPORTING AND CAPTIONING INC.    WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

```
 1                  geographic location to each RPS
 2                  participant by having Nortel Canada
 3                  granting each of the RPS participants
 4                  an exclusive license in their
 5                  respective specified territories."
 6              And that's what you've seen.
 7              Mr. Doolittle writes to Mark Weisz, who
 8  as I say, you'll be hearing from:
 9                  "Mark, if this is accurate, I do not
10                  think that Canada's IP is worth much!"
11              And Weisz responds:
12                  "What Giovanna states below is
13                  correct."
14              And then the slides 128 to 130 are Ms.
15  Sparagna's deposition where she confirms that the
16  IEs held equitable and beneficial ownership, and
17  I'll leave those with you and go to slide 131, if I
18  may.
19              And Mr. Gottlieb talked about Karina O,
20  the senior tax -- NNL tax person, and again you'll
21  see on the last Q and A asked her understanding of
22  the nature of the beneficial or economic rights.
23  These participants, in other words the IEs, had
24  exclusive rights to exploit the intellectual
25  property rights in their jurisdiction of
```



```
 1   incorporation.
 2              And this again is a senior NNL tax
 3   official.  And all of this information is available
 4   to the Monitor.  The Monitor comes in, has all of
 5   these people available, has all of these records
 6   available, and in my respectful submission has to,
 7   as an officer of the court, put all of this before
 8   you, not come up with a theory three years later
 9   that says we own it all and they get nothing.
10              You've already heard from Mr. Gottlieb
11   about Mr. Look and this is the email, he's emailing
12   some in house lawyers about what would happen if
13   there was a termination as a result of insolvency
14   and this is what leads up to the fourth addendum
15   which keeps the MRD going and here's his email
16   where he talks about two thirds of the value being
17   with people other than the Canadian -- the Canadian
18   entity.
19              So legal title was put in NNL for
20   administrative simplicity reasons and you've
21   already heard that.  I will leave the slides from
22   134 to 138.  Mr. Gottlieb has gone through some of
23   them but they're all to the same effect.  And let
24   me move to the selling of the arrangement to the
25   tax authorities, again NNL involved in saying
```



1    here's how we're running it, here's why you should

2    give us an APA, and over several years NNL

3    described how the MRDA worked and that the pitch

4    which was both delivered by NNL and received by the

5    tax authorities was that the Nortel entities that

6    conducted R&D, like NNI and the EMEA entities,

7    owned the technology in their respective

8    territories.

9              And here's the 2008 APA application and

10   you will see that it sets out the percent of R&D

11   expenditures by each of the IEs and you'll see

12   Canada and very close behind the US in terms of the

13   expenditures, keeping in mind, of course, that the

14   US was funding everybody else's expenditures with

15   the $7 billion they paid over eight years, but they

16   tell the tax authorities:

17              "All intellectual property created

18              from the investment in R&D by the IEs

19              is registered by NNL.  Each IE

20              maintains an economic ownership in the

21              IP."

22              And they go on to say in that first

23   highlighted section that the IEs have economic

24   rights to intellectual property, and then in Roman

25   I:

1                    "Integrated entities ... are parties

2                    to an IP development agreement and have

3                    historically, and continue to develop,

4                    valuable intangible property by

5                    conducting R&D.  They bear the risks

6                    associated with the continuing value of

7                    that IP.  The IEs maintain their

8                    historical IP and continue to develop

9                    new IP from which they anticipate

10                   sharing in the future benefits."

11          So this is the entrepreneurship, the

12   risk taking, the ownership of the intellectual

13   property which they have developed, and it goes on

14   to say they have historically and they continue to

15   develop this intangible property, and they're fully

16   integrated companies.  And it talks about in the

17   last two lines:

18                   "The transactions proposed for the

19                   APA involve tangible and intangible

20                   property, as well as services, provided

21                   by and between the integrated

22                   entities."

23          So they are all property owners.

24          THE CANADIAN COURT:  Ms. Block, can I

25   just ask you, I think I understand but perhaps I



 1   don't, they were trying to move profits up into

 2   Canada from the US because of R&D credits up here.

 3   Saying that NNI has all these ownership interests I

 4   guess doesn't do that unless what was key here was

 5   the amortization period or the five year span; is

 6   that right?  If it was spread out longer, you

 7   wouldn't be moving the profits up to Canada fast

 8   enough?  Am I right about that?

 9            MS. BLOCK:  Someone nodding yes?

10            MR. BROMLEY:  Your Honour, if I could

11   respond to that?

12            THE US COURT:  Certainly.

13            MR. BROMLEY:  The answer is absolutely

14   yes, Your Honour, that the accelerated depreciation

15   with respect to the amortization with respect to

16   the R&D was a very intentional way of shifting it

17   coming to Canada and accelerated it.

18            THE CANADIAN COURT:  Emphasizing the

19   ownership interest of the IP in NNI doesn't do it.

20   In fact, it seems to be counterintuitive to what

21   you're doing or what Horst Frisch was doing so it

22   all comes down to the amortization of the IP that

23   makes this worthwhile if it worked.  I think people

24   said I think I've got it right.

25            MS. BLOCK:  But the evidence about the

 1   ownership split is key when you come to take the

 2   snapshot at the end of the integrated --

 3                 THE CANADIAN COURT:  I understand all

 4   that.

 5                 MS. BLOCK:  That's why I'm talking

 6   about it.

 7                 THE CANADIAN COURT:  I understand all

 8   that.

 9                 MS. BLOCK:  Let me show you one

10   other -- briefly one other document and this,

11   because it involves the Monitor, and you'll see

12   I've highlighted in this NNL Transfer Pricing

13   Report there is an email showing that a Sean Kruger

14   from Ernst & Young was involved.  He worked on

15   transfer pricing for Nortel.  He has also shown up

16   on the depositions here in this case, come to

17   depositions.  He's working with the Monitor, was

18   fully conversant with the transfer pricing and the

19   ownership structure of the IP, and the report, as I

20   say, that was prepared and as I understand it, and

21   we'll get more details from you, I don't want to go

22   out on a limb here, but as I understand it the

23   Monitor or the parties in bankruptcy proceedings

24   had to prepare these documents after the petitions

25   and the CCAA filing to have on hand.  Whether they

1    were -- as I understand it, they weren't submitted

2    but they had to be there available should the tax

3    authorities want them.  And the Monitor worked on

4    this report, as we can see from the cover email,

5    and you'll see that it describes the RPSM and says

6    that certain affiliates, including NNL and other

7    IEs, in other words NNI, are the primary owners of

8    intangibles developed by the Nortel Group.

9              So this is the knowledge of the Monitor

10   after insolvency, sir, where they know this is the

11   case.  And we see the same language we've seen

12   before that E&Y has used before that they're

13   participating in the ongoing benefits from their

14   historical IP and the risks associated with the

15   continuing value of that IP, that they continue to

16   develop intangibles and it's obviously the same

17   parties that are before you.

18             But here's a very interesting chart

19   that is prepared again with the Monitor's knowledge

20   and involvement, and it is setting out the

21   activities of all of the IEs.  And X means local

22   and territorial, the activities in support of local

23   and territorial revenues, and Y means it's local

24   only.

25             So you'll see R&D, they're all doing

1    R&D in support of local and extra territorial

2    revenues.  You'll see intellectual property

3    ownership, that's all local.  And that's the

4    structure.  Each one owned it in its own territory.

5    And then registration of intellectual property,

6    only one of them, NNL, has the registration of

7    intellectual property, but the ownership is

8    territorial by each of the IEs.

9              And then at 152 I have given you the US

10   version.  It's obviously a crib from the Canadian

11   version, it's almost identical except it has that

12   additional phraseology we saw earlier about NNI and

13   NNL being both fully integrated functional.  You'll

14   see that at 157.  John, can you put up 157?

15             But again, this is Ernst & Young

16   involved in this and it's the same chart, the same

17   information as we've looked at but plus it has this

18   reference to the fact that NNI and NNL can both be

19   characterized as fully integrated companies that

20   perform the functions of R&D.

21             THE CANADIAN COURT:  Both these reports

22   were prepared but not filed with the tax

23   authorities?

24             MS. BLOCK:  Yes.  And as I've been

25   informed, and I'll track it down before we finish

1    the case, that you --

2                    THE CANADIAN COURT:  You have lots of

3    time.

4                    MS. BLOCK:  I gather.  You're required

5    to do it, put it in the drawer, if they come

6    knocking you have to be able to say here's the

7    story on where we were.  But it's the fact that the

8    Monitor is involved, that Ernst & Young is fully

9    aware of this.

10                   And then I've just given you another

11   document, this is from the IRS where it is writing

12   to the taxpayer saying this is what we understand

13   you've been telling us:

14                       "Under the R&D Cost Share Agreement,

15                       each of the cost share participants

16                       were treated as owning the technology

17                       created by all CSPs and were entitled

18                       to use that technology in their

19                       respective geographic markets."

20                       This is the same --

21                   THE CANADIAN COURT:  Sorry, what's this

22   document?

23                   MS. BLOCK:  This is the IRS writing

24   to -- they sent it to Ms. Sparagna, actually.

25                   THE CANADIAN COURT:  And this is a

1    response to the IRS?

2                MS. BLOCK:  This is the IRS saying this

3    is what you told us, tell us whether we have it

4    right or wrong.  This shows that the message was

5    getting through.  This is under the CSA, the cost

6    sharing agreement, but it's the same division that

7    you see.  And then I just wanted to give you one

8    for the UK.

9                THE CANADIAN COURT:  Is there an answer

10   to this?

11               MS. BLOCK:  Not specifically that I am

12   aware of.  This was spent to Ms. Sparagna, it's a

13   notice of proposed adjustment and they say here's

14   the facts which we're relying on.  It wouldn't have

15   been contested because this is exactly as you've

16   seen throughout the whole file, this is exactly

17   what they were saying internally to the tax

18   authorities and it's just another indication of the

19   fact that the message was getting through.

20               THE CANADIAN COURT:  Okay.

21               MS. BLOCK:  But here's another example

22   in the UK, a letter from NNUK, this is from Ian

23   Barton, an NNUK employee, who says:

24                    "Although Nortel Canada has legal

25                    ownership of Nortel's IP, each



1                    participant has beneficial ownership

2                    within their country of incorporation."

3            So this was what everyone thought and

4    acted on and it was the reality that was presented

5    to the tax authorities.  And Mr. Barton says where

6    he gets this information is that it would have come

7    from Canada.

8            And then you've heard about the Horst

9    Frisch report and if we can go to 166, it goes

10   to -- it goes for quite a few pages but let me give

11   you 166, where Horst Frisch says:

12                   "Each R&D cost sharing participant

13                   could be considered to 'own' the NT

14                   technology as it related to its

15                   specific region."

16            You've seen this reference before and

17   I'll leave the other references to you -- for you.

18   But let me go to 169 and it talks about the old

19   CSPs under the CSA possessing and will continue to

20   possess valuable intangible property.

21            And then 171:

22                   "These old CSPs will continue to

23                   perform R&D and consequently continue

24                   to develop valuable intangible assets."

25                   This is what gets continued in the



 1    MRDA, and slides 177 -- 172 to 177 are just cover

 2    letters showing you that the Horst Frisch report

 3    was the foundational document that was sent to the

 4    CRA, the IRS, the Inland Revenue, and then the tax

 5    authorities would ask various questions.

 6              If I can give you 178, this is in the

 7    APA, the 2003 APA, and in one of the responses the

 8    taxpayers say:

 9                   "Generally, the underlying economic

10                   rationale is this:  The residual

11                   entities..."

12              And it refers to them as the owners of

13    the IP in answering one of the tax department's

14    questions.

15              So repeatedly these statements were

16    made to the tax authorities and there will be

17    others that you will see in the evidence and my

18    friends will not be able to point to a

19    representation that denies that the integrated

20    entities all had economic ownership rights to the

21    IP in their respective territory.

22              And of course the Nortel people, sir,

23    who were including the NNL people knew they had to

24    tell the truth to the tax authorities, I think it's

25    an offense when you don't, but in any event, in

    1   responsible companies you don't go to these

    2   authorities and not tell the truth.  I expect they

    3   would, to a person, say they weren't lying to the

    4   authorities when they were making these

    5   representations and describing what actually

    6   happened.

    7              It's only in this court and in Judge

    8   Gross' court that the Monitor, on behalf of NNL, is

    9   telling a different story and wants you to accept

   10   that NNL owned all valuable rights so that it can

   11   claim all of the 4.5 billion.

   12              And then the MOU, I'll leave that with

   13   you, you've seen the references in there to

   14   ownership in clause 3.  And in clause 6, and this,

   15   of course, is a language of ownership, of exclusive

   16   territory, of all the value being in the respective

   17   territories of each of the participants, and this

   18   is how NNL and NNC chose to set up these

   19   businesses, through separate companies, separate

   20   interests and rights, and the ownership of

   21   intangible and tangible property lodged in those

   22   separate companies, NNL didn't own it all and it's

   23   our case that the Monitor's position to the

   24   contrary is, at the very least, unsustainable.

   25              Now I see it's 4:25.  I don't know how

1   you two sit there all day listening to all of us.

2              THE CANADIAN COURT:  It's so

3   scintillating.

4              MS. BLOCK:  You see I haven't made the

5   move to the other side of the bench.  It's a skill

6   to be able to do it.  I don't know if you want to

7   go on?

8              THE CANADIAN COURT:  Is this a

9   convenient time?

10              MS. BLOCK:  This would be a convenient

11   time.

12              THE CANADIAN COURT:  We're moving into

13   the IFSA.  This is what Mr. Bromley said was near

14   and dear to his heart?

15              MS. BLOCK:  Yes.

16              THE CANADIAN COURT:  He doesn't sound

17   like a very romantic person if that's the case.

18              MS. BLOCK:  He's an Irishman, come on.

19              THE CANADIAN COURT:  Are you happy,

20   Judge Gross, to stop for the day?

21              THE US COURT:  I'm sure that

22   Mr. Bromley has a good deal of time to deal with

23   the IFSA.  Is that right, Mr. Bromley, more than

24   half an hour do you think?

25              MR. BROMLEY:  I'm thinking I should

1    phone my wife right now.  I think that would be a

2    good idea, Your Honour.

3              THE US COURT:  All right.  Then we will

4    adjourn for the evening and we'll be back tomorrow

5    morning at nine.

6              THE CANADIAN COURT:  Nine a.m.

7              THE US COURT:  For the IFSA.  Good

8    evening, everyone.  Enjoy your evening as much as

9    you can.  We are in recess.

10   -- WHEREUPON COURT ADJOURNED AT 4:26 P.M.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 REPORTER'S CERTIFICATE

 2

 3                 I, KIMBERLEY A. NEESON, RPR, CRR,

 4     CSR, CCP, CBC, Certified Shorthand Reporter,

 5     certify;

 6                 That the foregoing proceedings were

 7     taken before me at the time and place therein set

 8     forth, at which time the witness was put under oath

 9     by me;

10                 That the testimony of the witness

11     and all objections made at the time of the

12     examination were recorded stenographically by me

13     and were thereafter transcribed;

14                 That the foregoing is a true and

15     correct transcript of my shorthand notes so taken.

16

17

18                 Dated this 31st day of March, 2014

19

20

21     _____

22     NEESON & ASSOCIATES

23     COURT REPORTING AND CAPTIONING INC.

24     PER:KIM NEESON, RPR, CRR, CSR, CCP, CBC

25     CERTIFIED REAL-TIME REPORTER
```

*Kimberley Neeson*



1          REPORTER'S CERTIFICATE

2

3               I, Gail Inghram Verbano, RDR, CRR, CSR,

4    Court Reporter, do hereby certify that the

5     foregoing proceedings were stenographically

6     recorded by me and thereafter reduced to

7     typewritten form by computer-assisted transcription

8     under my direction and supervision; and that the

9     foregoing transcript is a true and accurate record

10     of the proceedings.

11               I further certify that I am neither

12     counsel for, related to, nor employed by any of the

13     parties to this action in this proceeding, nor

14     financially or otherwise interested in the outcome

15     of this litigation.

16

17               *Gail Inghram Verbano*

18          GAIL INGHRAM VERBANO

19

20

21

22

23

24

25



**$**

**$17** 186:19

**$18** 64:8

**$2** 159:1

**$260** 186:15

**$27** 64:9

**$3** 120:9

**$3.3** 209:25

**$30** 186:18 190:3

**$320** 59:23
112:24

**$35** 180:11

**$4** 138:21,22

**$4-1/2** 29:10
64:25 65:4

**$4.2** 209:24

**$4.5** 99:23 100:9
232:3

**$5** 171:8

**$6** 71:7 126:24

**$606** 164:15

**$7** 213:23 258:15

**$7.3** 25:23
162:18 176:1

**$8** 71:7

**$9** 184:22

**(**

**(iii)2** 247:2

**0**

**01** 68:17 90:12
109:24 110:20
111:16

**02** 109:24 110:20
111:16

**03** 109:25 110:20
111:16

**04** 109:25 110:21
111:16 112:1

**05** 68:17 90:12
101:13 112:2

**06** 71:16 90:22
91:2,11 101:13

**07** 72:10 75:2
101:13

**08** 86:17 89:20
90:21 101:13

**09** 75:3 79:10
80:7 102:9,17,25
164:11 253:14

**1**

**1** 65:22 66:14
110:18 163:1
181:22 197:2
227:11 228:13

**1.6** 127:24 182:18

**1.99** 163:14

**10** 102:17,25
179:18 213:24
218:22

**10,000** 164:12
184:1 188:21

**10,500** 186:23

**10-ks** 182:22

**10-year** 187:21

**100** 29:13 57:15
97:9 107:3 108:6
109:10 120:24
123:18

**100,000** 186:15
187:2

**109** 249:2 252:4

**10:25** 86:7

**10:27** 88:6

**10:30** 23:12

**10:50** 88:7

**10K** 151:20

**11** 94:4,12 100:5,
6 122:14 153:22

**191:14 196:10**

**11,000** 186:17

**11-year** 187:22

**110** 245:16

**12** 64:23 208:19

**12,000** 188:21

**12,600** 186:23

**124** 254:20

**128** 256:14

**12:25** 161:14

**12:30** 23:13

**13** 180:17,18

**13,000** 180:17

**130** 123:17
256:14

**1300** 180:2
182:11

**131** 256:17

**134** 257:22

**138** 257:22

**14** 120:8 122:15
181:11 184:8
187:24 210:13

**15** 130:19 153:21
154:1 182:7
220:20,22

**15,000** 184:3

**152** 263:9

**157** 263:14

**16** 223:9

**16(b)** 155:12

**166** 266:9,11

**169** 266:18

**171** 266:21

**172** 267:1

**177** 267:1

**178** 267:6

**18** 214:4 215:5

**18.2** 122:17

**18.6** 153:24
208:25

**1956** 177:24
178:7,12

**1970s** 212:7

**1971** 178:19,24
179:5 180:10

**1972** 179:6

**1973** 179:18

**1974** 179:7,10,14

**1975** 179:20,22
180:1

**1976** 180:4

**1978** 197:1,2,10,
20,23 198:8,10
199:5,12 235:13

**1980** 189:2
199:11

**1980s** 218:19

**1982** 180:8,9,16,
21,23 181:3,7,13,
15,20 204:17

**1983** 181:10,16

**1984** 181:22

**1985** 182:2,6,17
199:10, 200:13
202:17 203:12,24
204:14,15 212:8,
12 235:24

**1987** 183:3

**1990s** 195:23

**1991** 29:4 95:3,5
183:4,10,15
195:24

**1992** 183:12
205:3,7 232:25
235:24 240:5

**1994** 195:24

**1995** 183:20

**1996** 101:17
195:25 196:18
205:6,8,9 207:5
208:2

**1997** 101:17

**1998** 101:17
184:20 185:22
187:12 188:21

**1999** 101:17
185:23

**1:46** 161:15

**2**

**2** 66:1 76:10
151:20 187:4
227:12

**2,300** 164:13

**2.8** 162:25

**20** 38:2 56:20
78:10 81:14 86:15
118:4 220:23

**20,000** 138:17

**20-minute**
23:13

**200** 63:22

**2000** 27:2 101:17
163:24 183:12
186:14,23 188:20
189:2,5 206:22
209:17 216:1

**2000's** 203:19

**2000s** 184:13

**2001** 29:19 46:13
53:5,14 56:15
59:7 85:11 108:22
109:21 110:18
119:2 196:8
204:12 206:21,25
207:1,9,19 208:6,
13 218:3

**2002** 26:13 33:3,
18,23 35:20 41:4,
20 187:1 191:10
192:5 196:9
210:13 212:5

**2003** 35:22 187:5
267:7

**2004** 30:13,18
53:4,6,8 58:3 64:8
65:10 109:23



197:9 210:21
224:24 226:10

**2005** 53:4 95:19
109:21 163:24
171:23 209:18
226:15 227:11

**2006** 26:15,16
30:21 59:15,
69:22 70:13 72:6
75:13 89:19 244:4

**2007** 56:7 74:1,
22 95:3,5

**2008** 36:13 57:23
75:18 151:20
164:8 203:24
216:6 218:3 221:8
228:1 258:9

**2009** 36:24
100:14,16,19
101:21 120:8
151:20 163:17,21
164:3 177:14
187:12,24 196:9
216:2 228:13

**2010** 29:19
100:14,16,19
101:21 196:22
218:25 221:7

**2011** 95:1 163:17

**2014** 97:3

**21,000** 182:9
183:25

**21003** 225:24

**22,000** 182:8
183:24

**22nd** 86:17

**23** 164:8

**24** 184:8

**25** 182:7

**26** 216:18

**27** 181:11

**2:00** 23:14 161:9

---

**3**

**3** 57:11 58:1 76:7,
23 227:17 268:14

**3,500** 216:16

**3.31** 163:15

**3.9** 182:20

**30** 95:20 96:21
120:25 177:12
182:19 193:4

**30th** 193:6

**31** 34:17 57:23
122:18 207:9,19

**32** 143:14 184:2

**33** 34:16

**34** 191:10

**35,000** 133:16
138:18

**3500** 182:10

**36** 183:22

**36,000** 120:4

**37** 191:14

**37,000** 186:16

**38** 218:7

**39** 191:11

**3:05** 220:25

**3:20** 221:1

**3G** 59:18 234:3

---

**4**

**4** 197:13,24
199:15 223:9
232:25 239:17,18
246:17

**4(a)** 53:21 234:8
239:12

**4,000** 184:4

**4,294** 216:15

**4.5** 162:23 165:6
166:9 268:11

---

**40** 78:7,8 118:4
216:18

**40,000** 187:3

**400** 172:2

**41** 164:7 215:21
219:22

**42** 223:9

**43** 209:13,14

**46,500** 182:8

**48** 183:23

**48.2** 180:23

**4:25** 268:25

**4:26** 270:10

**4:30** 23:16

---

**5**

**5** 168:14 187:5
200:4 228:2
233:17 234:13,17,
18 238:2 251:3
252:5

**5(a)** 219:20
234:23 235:25
248:21 249:3,23,
24

**5,000** 158:10

**5.3** 163:14

**50** 56:21 57:3
147:25 177:11
185:6

**54** 184:7

**5:00** 23:16

---

**6**

**6** 58:13 187:5
268:14

**6.4** 218:4

**60,000** 183:23

**6300** 184:4

**64** 164:2

---

**65** 100:3

**650** 71:10

**67** 143:14

---

**7**

**7** 187:6 218:22
222:21 228:11
246:22,25 247:2,
11

**7.3** 163:11,18
166:9 218:3

**70** 163:25 164:2
182:20 184:13

**70s** 212:5

**71st** 214:25

**72.4** 209:1

**73** 122:16

**77** 251:8,10,12,13

**7700** 188:21

**78** 200:10

---

**8**

**80** 164:12 200:10

**83** 122:14 126:24
128:5 204:18

**84** 204:18

**85** 204:18

**86** 168:11

---

**9**

**90** 29:9 107:2
120:11 199:3,9

**9200** 188:21

**95** 99:17,18,20,22

**9:00** 23:12

**9:03** 23:1

---

**A**

**A&m** 192:12

**a.m.** 23:1 270:6

**Abbott** 24:4,5,
12,18,23,24

**ability** 152:18
166:11 234:25

**abrupt** 124:19

**absence** 131:3
135:24 139:21

**absolute** 203:4

**absolutely**
66:16 133:23
149:22 173:6
187:22 195:8
202:1 207:25
236:4 245:1
260:13

**absorbed**
184:23

**accelerated**
260:14,17

**accept** 147:8
158:11,25 268:9

**acceptable**
88:2 215:13

**accepted**
113:16 122:13
148:14 169:22

**accepts** 168:17

**access** 60:23
152:7,9,13,14
165:3 250:14

**accompanied**
161:21

**accomplished**
255:24

**accomplishing**
167:13

**accordance**
63:6 68:20 79:3
81:23 90:16 92:12
109:3,4 112:11,15
117:6 174:17

---

 Neeson&Associates
COURT REPORTING AND CAPTIONING INC.          W&f
WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

246:10

**accords** 230:23

**account** 34:21
160:6 171:8 224:7
247:8

**accounted**
113:18 170:4

**accounting**
43:23 172:16

**accounts**
171:10

**accurate** 34:12
193:19 256:9

**achieved**
136:11

**achieving**
131:22

**acknowledge**
107:22 112:4
197:15 242:13

**acknowledged**
31:8 35:19 36:16
39:8 62:16 108:1
112:3 113:7
213:19

**acknowledges**
54:7 111:24

**acknowledgin
g** 77:5

**acknowledgme
nt** 228:7

**acquire** 47:16
48:2

**acquired** 183:4,
14 200:2 204:3

**acquisition**
183:9 184:21
185:5

**acquisitions**
185:16

**acquitted**
187:19

**act** 120:4 171:14

**acted** 135:16
266:4

**acting** 59:6
89:12 157:13

**action** 157:1

**actions** 239:23

**actively** 185:21
217:8

**activities**
191:18 217:9
244:19 245:10
262:21,22

**activity** 54:22,24
58:23 228:5
244:20

**acts** 155:3

**actual** 28:17
63:11 77:3 92:14
97:3,4 98:11 99:7,
8,10 107:23
194:6,8 213:3

**ad** 143:13 223:1

**added** 110:17
234:2 235:22
236:2,3 239:2

**addendum**
56:6,10 90:5,20
91:8,14,20 134:2
226:14 227:10,17,
21,22 228:2
243:3,5,8,22
244:2 245:24
247:12,13 257:14

**addendums**
243:3

**adding** 80:19

**addition** 138:24
154:4,15 155:2
252:12,13

**additional** 64:9
225:25 263:12

**address** 32:12
34:3 67:14,19
123:3 132:19,23
169:9 222:21
247:24

**addressed** 33:9
138:7

**addresses**
32:20

**addressing**
25:21 32:10 163:3

**adequately**
58:24 59:3

**adieu** 88:1

**adjourn** 270:4

**ADJOURNED**
270:10

**adjustment**
265:13

**adjustments**
106:14

**Adler** 25:9

**administering**
151:3

**administration**
154:12

**administrative**
30:10 46:3,7,22
50:15,24 54:3
57:19 128:14
130:9 257:20

**administrator**
147:4

**Administrators**
25:1,7 228:10

**admissible**
31:18 253:20
254:7

**admitted** 120:23
152:16

**adopt** 122:9
156:1

**adopted** 122:11
144:5 145:20
210:4

**adopting** 46:14

**adoption**
146:20

**adopts** 104:13
121:21

**advance** 33:22
77:19 110:24

121:6 137:11
138:8,21 195:12,
22,25 205:5,10,12

**advanced** 28:12
98:21 99:1 100:17
102:5,13 103:22,
25 140:21

**advances**
121:25

**advancing**
122:20

**advantage**
210:6

**advertising**
193:13

**advice** 41:10

**advising** 76:15

**advocate** 77:25

**advocating**
137:25

**affairs** 38:7

**affecting** 147:10

**affidavit** 136:15

**affidavits**
151:23

**affiliated** 152:8,
10,20 180:19
193:25

**affiliates** 37:8
136:25 211:18
244:13 262:6

**affirmatively**
166:12

**affirmed** 29:20
31:6

**afforded** 222:18

**afternoon**
161:24 162:1
175:8,9

**agencies**
153:10 193:8

**Agency** 35:25
192:13 210:25

**agree** 32:6 51:10

57:6 104:9 111:8,
10 112:14 115:24,
25 123:15 124:6,
11 126:4,7,8
130:23 140:5,10,
13 146:16 171:6
189:18 195:19

**agreed** 24:7
28:18,23 56:7
57:9,13 63:5 66:9,
10,18 73:22
129:25 155:8,14
157:10 205:11
213:8 215:25
233:5,9 239:14,18
240:13

**agreeing** 87:20

**agreement**
33:22 40:13 52:25
53:3,7,12,16,18,
21 54:4,6,8 56:2,
10,14,24 57:1,6
58:3 59:12 62:15,
22 64:15,18 68:19
73:24 75:8 78:21
80:22 81:7 82:20
107:16 110:7
111:1,21 121:14
122:24 123:4,13
124:19 126:13
133:24 138:4,5
139:21 141:15,18
155:15 167:1
195:12 197:1,4,13
199:2,6,8 202:18
204:7,9,24 205:6
206:14,15 208:2,4
210:17 225:4,6,8,
14 226:9,14,16
227:8,12,15,18,23
229:11 231:16
244:3 245:12
246:5 247:12
249:22 259:2
264:14 265:6

**agreement's**
55:13

**agreements**
49:2 58:4 157:13
177:18 195:22
196:1,12,16
205:5,11,12
210:15,19,20

 

214:16 215:4
229:14

**agrees** 233:15

**ahead** 204:18
227:5 243:18

**aim** 169:19

**aimed** 133:11

**Albert-lebrun**
63:14

**Alcatel** 30:22
32:16 59:19,20
63:12,19,25 77:23
89:7 112:6 114:4
117:2 227:15
245:12 246:5

**Alcatel's** 112:20

**alleged** 157:12
201:10 202:20

**Allen** 177:9
185:20 186:1

**allocable** 122:3,
22

**allocate** 26:3
32:11 34:18 48:15
60:9 62:11 63:4
95:13 97:25 99:7
105:19 114:1
119:4 123:9
132:21 139:16
141:19 147:12
157:11

**allocated** 26:18
31:10 32:21 35:2
47:22 60:7,11,19
63:18 85:16
113:11 115:17
117:19 120:15
123:1 130:14
142:16 143:7
148:11,12,17
158:1

**allocates** 77:21
121:22

**allocating** 29:1
30:23 32:14 33:13
55:14 63:12 78:5
114:19 142:11
148:16

**allocation** 42:7
45:21 62:17,23
63:16 81:2,6
112:15,24 114:14
115:20 117:19
118:1,9 122:21
130:24 131:17,21
133:2,6 137:24
139:4,10,22
140:14 142:13,18
144:2,8,21 146:4
147:24 149:3,6,16
153:1,16 154:4,7,
18,20,22 155:23
156:14 157:6,19
158:3,6,13,14
163:10 166:23,24
175:14,20 176:18
232:1,4 234:20
240:17 241:18,19,
20,22 242:5,22
247:1,4

**allocations**
83:1

**allowed** 45:7
113:20 156:25

**allowing** 159:23

**alluded** 52:25
102:22

**alternative**
121:25 141:9
237:1

**Alto** 179:24

**amalgamated**
224:6,9

**amass** 174:16

**ambiguity**
31:19

**ambiguous**
31:21

**amended**
224:14 243:7

**amendment**
56:3

**amendments**
56:2 58:20 225:13
226:21

**America** 77:22
182:25 201:22

205:2 206:13

**American**
80:15,21 182:24
183:18

**Americans**
118:6

**amortization**
95:20 260:5,15,22

**amortize** 98:2

**amount** 56:18
70:2 118:13 137:9
148:12,17 157:15
167:24 169:18
186:8

**amounted**
218:3

**amounts** 117:4
142:21

**analogous**
141:1 145:5

**analysis** 43:3
97:19 98:10,11
146:14 210:11,24
217:8

**Annex** 225:10,
11 227:6,7

**annual** 32:11,19
48:25 53:10 55:14
65:23 66:12 180:9
181:10,25 182:21
183:16

**answering**
267:13

**answers** 34:7,
17 126:15 251:7

**anticipate**
259:9

**anticipated**
34:6 137:10

**anticipating**
34:2

**anybody's** 87:5

**anymore** 88:25

**APA** 33:22 34:23
80:17,22 81:3
90:8 195:12,13

196:17,21 208:17,
18 216:7,10,20
221:6,8 242:11
258:2,9 259:19
267:7

**APAS** 207:5

**apologize**
172:14 246:23

**Appeal** 143:18

**appearance**
40:10

**appeared**
223:18

**appears** 191:4
200:5,6 201:5
225:11 227:7
228:11 229:16
234:22 239:8,10
243:23 247:10

**appellate** 139:5

**applicable**
153:9 170:18

**applicants**
214:14,19,21

**application**
191:24 216:10,20
258:9

**applications**
237:12 239:4
249:10,16 250:12,
16 251:21 252:2,
8,16

**applied** 158:13

**apply** 105:8
109:9 112:14
134:3 141:17
157:9 173:18

**applying** 59:21

**appointed**
149:10 153:2
154:24

**apportioned**
73:3

**approach** 26:3,
7 59:21 63:8,17
77:12 82:2 85:19,
25 86:4 105:19

106:10,13,16,21
130:11 132:12,13
133:2,3,6 135:20
139:3,5,10 140:25
142:13 144:4,5,12
145:20 146:21
147:13 156:14
158:13 160:1
223:24

**approaches**
105:4 144:21

**appropriatene
ss** 62:17

**approval** 33:21
159:12,14

**approvals**
214:6

**approved** 34:7
46:17 62:7 66:19
153:17,18 155:8
159:3 225:9

**approving**
73:20

**approximate**
148:19 208:24
209:12

**approximately**
71:9 184:22

**April** 33:18
193:4,6

**area** 88:22

**argument** 57:8
234:19

**arguments**
131:9

**arise** 155:22

**arising** 47:23
133:12 142:19

**arm's** 56:25
68:5,8,21 69:8
90:16 96:20 97:24
110:13 111:8,10

**arm's-length**
49:3 51:19 55:3
57:1 194:3,7,8,14,
20,23 195:6,7
230:12 238:14,25



**arose** 145:10

**arrangement**
33:15,16 41:13,17
42:2 46:14,15,18
108:19 110:25
218:7 222:4
253:17 257:24

**arrangements**
105:2 110:17
215:11 253:7
254:9

**arrived** 91:7

**article** 53:21
185:23 197:13,24
199:15 200:4
203:24 232:25
233:17 234:13,17,
18,23 238:2
239:12,17,18
249:23,24 251:3
252:5

**articulated**
157:8

**artificial** 138:9
223:14

**aspect** 53:9
104:6

**aspects** 110:14

**assert** 239:23

**assertion** 66:17

**Assertions**
157:9

**assess** 217:21

**assessing**
163:16

**asset** 26:1 29:8
70:21 71:11 73:2,
7 74:6 79:22
81:18,19 93:16
94:2 105:8 115:9,
13,23 116:2,24
117:14,21 134:1,3
137:11 141:16,18
203:16

**assets** 26:1 60:4
70:16 72:3,20
73:22 74:2,21
75:5 79:21,23

112:6,8 114:18,
23,25 115:1,12,
14,16,22,25
116:9,18 117:3,4,
5,17 123:1
124:13,24 133:8,
12 136:9,11,18
137:6,16,20
138:23 139:20
140:24 141:8,11,
13,20,23 142:2,20
143:5,23,25
144:18,19,23
145:8,16,17,23,25
146:2,5,9,11,17
147:10 149:5
151:17 152:7,9,
12,13,14,19
154:10,13,16
156:24 157:12,17,
22 158:6 162:15
163:13 169:16,24
170:2 171:16
173:21 174:11
184:22 212:3
216:23 222:15
237:10 244:9,17,
22 266:24

**assign** 135:5
137:15 141:21

**assigned**
141:24 217:2

**assist** 131:22
223:11

**assisting**
217:17

**assists** 154:11

**assume** 244:14

**assuming**
209:18

**assumption**
123:8 138:3

**assumptions**
72:17,18,24

**asymmetrical**
138:1

**AT&T** 178:1,9
181:23 215:18

**attached** 210:22
223:7 224:10

227:7 247:11

**attacking** 73:12,
15

**attempt** 141:21
157:16

**attempted**
146:19

**attempting**
137:15

**attempts** 144:22
146:3

**attendance**
87:19

**attendant** 55:23
230:20

**attention** 30:5
66:21 113:4 119:9

**attributable**
39:20 65:4

**attributed** 73:1
118:6

**attributes**
213:13

**audit** 195:17
244:6

**auditor** 89:8
113:6,7

**auditors** 60:1,16
61:14 84:11,18,21
89:3,4 113:3

**Australia** 45:4
228:21,22

**author** 62:3
208:15

**authorities**
33:5 48:12,23
68:4,7 69:4,7
80:23 81:8 85:13
90:9,14,23 97:1,
16,18,21 110:3,
11,13,24,25
111:5,6,7,13,
112:23 123:5
126:11 129:13
136:3 192:21,24
193:18 195:16
196:18,20 210:24

211:10 221:13
229:15 244:7
253:6 254:3
257:25 258:5,16
262:3 263:23
265:18 267:5,16,
24 268:2,4

**authority** 33:20
36:12 139:9
192:20 195:19
196:3 205:14,18,
20,23 230:11

**authorized**
195:23

**automatic**
241:5

**average** 163:25

**avoid** 31:4 87:19
133:7

**avoided** 218:14
222:10,13

**avoiding** 144:8

**avoids** 224:15
250:25

**await** 149:17

**aware** 116:4
120:6 133:13
154:8 155:17
177:3 217:16
264:9 265:12

**awful** 186:20

---

**B**

**Baby** 181:23

**back** 23:14 44:9,
53:13 65:9,11
69:20 71:16 72:5
77:23 78:11 86:8
90:3 97:23 98:14
99:25 104:5
108:7,13 111:24
112:18 118:2
145:5 149:21
161:7,9,16 162:9
174:25 175:17
182:4 184:16
193:20 197:10
212:13 219:1,17

220:23 222:20
227:1 234:10
241:6 245:25
246:4 248:13
249:21 251:3,16
270:4

**backbone**
163:21 219:10

**backdate** 96:24

**backdated**
91:11 97:8

**background**
53:4 86:20 212:15
213:2

**backing** 76:9,25

**bad** 103:4

**balance** 66:21
70:23,24 71:12
79:21 115:18
125:19 164:2
203:21

**ball** 248:3

**bankruptcy**
31:7 36:13,25
56:4 57:24 61:19
63:2 65:16,19
75:9,16 138:12
145:6, 153:22
154:1,9,13,16
173:2 174:10,18
184:10 190:12
204:13 222:17,18
228:1 247:14
261:23

**bankruptcy/
insolvency**
242:9

**bar** 101:12 122:5

**bare** 128:15
168:3

**bargain** 195:7
233:18

**bargained**
152:11

**bargaining**
194:4,8,24

**Barnes** 86:23,24


Neeson & Associates
COURT REPORTING AND CAPTIONING INC.

W&F
WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

87:1,2,10,15,23

**Barrack** 76:14
119:19 132:1,5,7,
8,9 158:24 159:4,
13 160:18,20,22

**Barton** 265:23
266:5

**base** 204:21

**based** 29:2 30:1,
20,24 31:2,10
32:15 33:13 35:16
44:4 53:14 56:16,
17 61:5 62:12
63:21 64:4,13
65:12 69:23 72:8,
17 78:13,20 83:2
84:10 85:20
96:15,16,25 98:6,
14 99:18 105:9,
21,22 108:15
112:11 113:12
115:16,17 117:3
118:22 121:9,19,
22 123:8,22
127:13 133:22
135:10 138:2
149:4 150:23
157:13 163:1
165:8 179:12
205:19,22 232:4

**baseline** 94:9

**bases** 121:15,17

**basic** 142:14

**basically** 44:1,2
228:8 237:25

**basis** 26:11,18
35:3,4 60:10,11
63:12 71:25 73:23
74:5,6,7,20 95:13
98:1 105:25
108:24 109:19
112:23 113:10,11
114:9 116:25
120:10,16 124:14
127:12 132:22
133:21,22 136:12
137:7 139:17
142:11,22 143:12
145:24 146:6,20
151:1 175:22
190:20 214:17

**baton** 25:18

**battle** 125:13

**Bay** 184:21,23,
24,25 185:5

**Bazelon** 146:12

**bear** 37:12 55:21
186:2 230:18
259:5

**bearing** 246:19

**bears** 54:9
229:18

**beast** 195:11

**beasts** 205:13

**bedrock** 98:22
99:1 115:5 139:13

**began** 158:11
196:7 206:25

**begin** 26:20
119:25

**beginning**
68:17 86:19 90:12
91:2 112:1 226:9,
10,19 231:9

**begins** 179:23

**begs** 247:19

**begun** 37:18

**behalf** 25:1,7,17
77:4 87:2 119:20
120:4 154:24
158:17 161:19
268:8

**belated** 129:16

**belief** 55:8

**believed** 150:3

**believes** 54:19

**Bell** 27:3 177:23,
25 178:8,10,14,
16,25 179:1,8
180:20 181:19,21
183:18 185:6

**Bells** 181:23

**belong** 63:9

**belonged**
165:21

**belonging**
168:19

**belongs** 174:7
206:17

**bench** 269:5

**benchmark**
156:18

**beneficial** 37:25
38:15,22 39:1,4,
19 42:2,5,8,12
43:13,14,18 47:2,
12,19,21 48:1,5
49:11,13 51:6
56:9, 74:12,20
105:1 121:17,18
128:21 130:6
221:11,19 222:8
224:16 229:9,25
231:7 243:10
253:8,9,19
255:13,18,25
256:16,22 266:1

**beneficially**
41:6,23 231:12
246:9 255:16

**benefit** 51:13,18
54:16,21 109:12
125:2 140:3 141:4
143:22,25 144:17,
19,22 152:3 201:9
205:24 206:5

**benefits** 29:25
47:13 48:15
54:10,13,14
136:7,10 143:16,
20 156:25 206:9
208:21 209:15
229:19,22 230:2
259:10 262:13

**bet** 88:18

**bickering**
131:12

**bid** 88:1

**big** 33:4 191:12

**bilateral** 197:4
199:14

**belonged** 165:21

**Bill** 25:6

**Billerica** 185:2

**billion** 25:23
29:10 64:25 65:4
76:7,10,23 77:1
99:23 100:9 107:4
120:9 126:24
127:23,24 138:21,
22 144:7 159:2
162:18,23,25
163:1,11,14,18
165:6,7 166:9
171:8 172:2 176:1
182:18,20 184:22
186:15,18,19
187:4 190:3
209:24,25 213:23
218:4,5,22 232:3
258:15 268:11

**billions** 29:4,6
108:4,10 133:20
142:9 158:21
167:6,14,15 192:6
194:25 233:23
238:17,19,20

**binding** 139:9

**bit** 32:23 88:19
118:5,11 175:12
182:4 189:8,12
207:17 212:14
219:1 236:24
246:6 248:11

**Blackacre**
168:19,24

**Blackstone**
115:8

**blank** 27:6

**blinded** 157:6

**Block** 160:23
161:3,6,18,20
162:4 171:24
172:9 173:1,7
175:10,11 184:9
188:11 203:9
210:23 212:14,24
214:18,22,25
219:14,23 220:1,
4,7,19 221:2,3,4
222:23 225:24
231:9 233:14,22
238:16 248:11,13,

15,17,19 249:23
250:5,8,11,22
251:8,10,16
253:23 254:8,16
259:24 260:9,25
261:5,9 263:24
264:4,23 265:2,
11,21 269:4,10,
15,18

**blunt** 100:20

**BNR** 178:24

**board** 112:21
189:20

**boarder** 147:1

**bodies** 145:21

**body** 108:1

**boldly** 73:15

**bond** 152:20,22
153:8

**Bondholder**
151:10,11,13
152:15

**bondholders**
138:16,20 143:13
151:24 152:1,9
153:4 154:5,23
155:7 170:16

**Bondholders'**
153:14

**bonds** 151:15,21
152:5,6,11,13

**book** 115:17
225:18,22 245:15,
16,20,25 246:4

**booklet** 224:22
225:12

**books** 84:4
103:24 113:13

**boom** 185:15

**border** 146:22
151:18 155:19,21,
25

**boredom**
162:10

**borne** 48:4
157:19,20,23

 

Nortel Trial
DAY 1 on May 12, 2014

Index: bothered..Canadian

**bothered** 43:6

**bottom** 127:22

**bought** 200:2
222:12

**bound** 112:5
155:8 169:23
171:14

**boundaries**
123:24 124:1,22
136:17

**box** 134:13
137:5,24 139:4
140:25 141:11
147:12,24

**branch** 252:20

**branded** 136:4

**break** 23:13
24:21 86:7 90:2
92:5 117:2 153:13
219:25 220:19,21
235:2

**breakdown**
184:11

**breakup** 178:8
215:18

**Brian** 70:18
119:23

**briefing** 63:23
223:20

**briefly** 52:25
67:14 104:17
261:10

**briefs** 75:11
120:18 132:17

**bring** 153:13
201:7 202:19

**bringing** 38:10
169:18

**broad** 128:23
132:14 252:13

**broader** 89:15
237:22 240:4

**broadly** 148:14
205:25

**broke** 181:20,21

**broken** 80:2

**Bromley** 161:6
162:5 163:24
166:16,25 173:10
175:7,8 192:25
193:5 207:22,25
212:17,21,23
213:2 215:10
221:22 222:5,21,
23 224:3,6,8,12
225:1,20 226:1,4,
23 227:1,6
232:11,15,18,22
243:14,17,21
245:17,23 246:3
248:16,18 250:1
260:10, 269:13,
22,23,25

**Bromley's**
218:16

**brought** 116:3

**bubble** 207:1

**building** 180:13

**built** 204:23,24

**bunch** 134:20
142:25

**bundle** 162:7

**bundles** 135:3

**burden** 162:10

**burdens** 47:13

**burst** 207:1

**business** 26:16,
17 27:22 30:19
38:20 54:11 55:1,
22 59:9,19,24
61:1,21,22 77:10,
12 79:13 85:5,15
92:23 93:22 97:12
98:24 101:6
114:8,19,24
115:22 116:15,22
123:10,22,23
124:8 127:11,16,
25 128:4,6 133:4
134:10,17,25
136:16,20 137:1
145:15 150:23
162:16,25 163:14
164:5,16 165:1,8,

10 171:16 175:21,
25 178:16 183:13
185:11 186:3,7,8
188:10,12 200:24
204:20,22 205:1
211:17 213:7
221:20 222:6
229:19,24 230:1,
2,19,24 231:1,7,
10 232:6 237:1,3
242:24 245:11
246:9 247:5,9,25

**businesses**
37:18 77:10
102:5,8,18
124:13,15 137:6
163:13 169:16,24
176:5,15 184:23
222:1 268:19

**button** 192:25

**buttoned** 193:4

**buy** 75:21 150:5
235:15

**buying** 166:4
212:20

**buyout** 76:2
120:10

---

**C**

**cable** 198:13

**cables** 218:20

**calculate** 90:15,
25 91:15

**calculation**
91:10 156:5,8
230:12 242:14
247:1,3,10

**calculations**
82:18 246:15

**California**
179:24 185:1
186:6

**call** 91:1 92:14
106:9 166:7 224:5
231:20

**called** 31:5
33:16,21 34:4

64:7 72:10 81:11
83:19 195:11
227:17 230:7

**calling** 185:19

**cameo** 40:10

**Canada** 27:3
28:7 33:6 35:25
36:12 37:16
44:18,22 45:4,7,
16 76:11 77:2,5
78:8 80:1,21 81:7
121:15 123:20
126:17,22,25
127:2,10,22
128:5,11 129:2
130:4,7 148:1
153:23 154:2
155:6 163:1
164:18, 165:22
174:2 176:7,12,
177:25 178:10,14,
16 179:1,3,4,8
181:6,8,16 182:7,
9,11,24 183:18
184:4,8 186:4,9,
17,24 187:9,11
188:2,7,18
191:10,14,21,23
192:7 194:11
195:24 196:17
197:3 201:25
202:11 205:15
209:1,8,14,21
210:5 218:11
254:18 255:17,19,
21 256:2 258:12
260:2,7,17 265:24
266:7

**Canada's**
122:10,12 163:5
185:6 256:10

**Canada-united**
185:24

**Canadian** 23:6,
9,25 27:4,9,11,15,
17,18 28:24 29:7,
9,12,15 31:8,12,
15,16 32:7 33:8,
19 35:20,22 36:10
37:3,14,20 38:3,
10 40:7,12,22,24
45:19 46:2,10,21
48:6,9 50:5,8,

53:14,24 54:2
55:11 59:8 61:15,
24 63:23 65:2
66:4,6,17,25
69:15 73:11 74:3,
16 75:13,21,25
76:12,17,24 80:9,
10,15,25 81:5,8
83:3,6,16 84:17
86:10,14,23,25
87:8,13,22 88:1,4,
8,23 89:16,22
92:25 93:1,5,8,14
95:12,18,23 96:6
97:14 98:24
100:12,21 102:23
103:16 104:23
105:16, 106:24
107:2 108:6,12,20
109:7,8,14 110:5,
113:15 114:7
116:1 118:12,14
119:12,17 121:5
132:3,6,10 134:22
136:14 138:2,17
139:25 140:8
141:2 147:21,23,
24 155:5,10,16
158:24 159:2,11
160:17,21,25
161:4,8,17 162:1,
21 164:16 171:18,
21 172:6,12,25
173:4 174:22,25
175:23 181:10
182:18 183:17,24
186:12 192:13,23
193:3 196:1,3,23
201:17 202:9
205:21,23 207:22
210:25 212:16
214:18,22,24
219:11,23 220:2,
6,18,20,24 221:2
224:4,11,25
225:7,9, 226:18,
25 227:3 228:9
243:12,15,19
245:14,19 246:2
247:24 248:15,17
249:20 250:4,7,
10,20 251:5,9,15
253:20 254:4,15
257:17 259:24
260:18 261:3,7
263:10,21 264:2,



21,25 265:9,20
269:2,8,12,16,19
270:6

**Canadian-educated** 192:10

**Canadians** 72:2
74:10 75:6 81:11
108:9 111:18
118:6 164:22

**canceled** 210:19 241:15

**cancels** 204:7

**capacity** 155:3

**capital** 35:5
62:15,25 81:1
180:12 235:8
238:10

**capitalization** 186:14 187:3

**capitalized** 71:11

**capitalizing** 65:21

**captain** 24:2

**captive** 193:25

**captured** 217:4

**carcass** 125:10

**care** 43:3,9 45:15
86:16

**Carl** 238:21

**Carolina** 188:14

**carried** 85:5
149:9

**Carrier** 164:6,7
188:13

**carries** 250:14

**carry** 148:9,10
164:25

**carrying** 69:6

**carve** 124:14

**carved** 109:10

**case** 42:4 48:1,

15 53:14 57:12
64:14 65:6 66:7
67:22 95:13 107:5
113:15 118:20
120:21 122:23
125:21 129:18
131:4 133:9 134:6
140:18 145:12,17
153:19 156:17
158:10,12 163:11
167:5 169:4,11
171:5, 173:7
175:4 177:2,17,24
186:2,21 190:7
191:19 192:21
213:1 216:5 217:6
221:18 261:16
262:11 264:1
268:23 269:17

**cases** 145:24
178:23 214:17
215:4

**cash** 80:8 125:3
164:14 173:22,24
174:5 238:20

**catalog** 198:11
200:20 235:13

**categories** 30:3
117:4

**category** 60:8

**Catherine** 194:17

**caused** 133:1

**caveat** 82:25
83:19,20 106:9

**CCAA** 149:19
153:20,24 160:9
253:13 261:25

**CCC** 63:24
138:16

**cede** 24:9 131:25
175:7

**ceiling** 185:16

**center** 223:2
226:6

**centers** 28:8
180:18

**central** 68:13
163:18 198:11
212:25

**centre** 135:13

**certification** 24:14

**cetera** 167:3
216:24 250:1

**CFO** 81:15 82:7
190:15

**chairs** 87:24

**challenges** 158:12

**change** 73:20
79:9 85:1 91:2,23
92:1 95:14,17
111:11 181:6,17
184:20 192:3,5
200:16 201:5
202:24 242:15

**changed** 56:5
91:1 177:21,22
203:12

**changing** 206:22 208:8

**chapter** 153:21,
22 172:1 196:10
207:23

**characterizatio
n** 170:24

**characterized** 263:19

**charge** 61:22

**chart** 27:1,14
101:10 118:12,14
122:4,5 164:1
191:2,3 192:1
262:18 263:16

**charts** 218:16

**check** 24:20

**chief** 38:7,8
187:13,14,16

**child** 219:8

**China** 106:19

**choose** 240:20

**chose** 75:10
82:1 221:15,25
240:20 268:18

**chronology** 79:7

**Châteaufort** 28:10

**Circuit** 143:18

**circumstances** 55:4 83:7 143:15
146:1

**cite** 143:17,20
252:18

**claim** 29:15
53:19 65:2 80:10
107:2 108:6
148:15 149:20
151:16 156:9
159:2,9,16,18,19,
20,23 160:6,10,14
165:6,19 166:24
172:22 268:11

**claimants** 119:20,24 120:4,
14 131:7,20
132:10 141:5

**Claimants'** 119:25

**claimed** 64:22

**claiming** 36:15

**claims** 73:12
138:22 147:8
149:1,4,5,6,17
152:19,25 154:2
155:25 156:4,9,10
159:5 165:12
171:8 174:9
228:12

**Clara** 185:1

**clarity** 240:12

**class** 115:23
116:11 117:14,16

**classes** 115:13

**classroom** 23:5

**clause** 243:9
249:3,7,11 250:13
251:17 252:6,10,

11 268:14

**clauses** 252:19

**clear** 89:2 107:10
110:11 116:9
131:12 139:21
195:8 207:2 236:5
245:2 252:6

**clearer** 45:14

**Cleary** 161:22
172:15

**clever** 221:20

**click** 201:16,17

**clients** 42:22
125:14,20 133:16,
19 135:8,9 142:7
150:11 158:20

**climbing** 185:16

**clip** 252:25

**Clive** 177:9
185:20

**clock** 87:5

**close** 144:7
216:16 218:4,22
258:12

**closely** 133:3

**closing** 99:10
107:8 119:1,5

**Code** 154:1

**Coleman** 146:12

**collaborative** 134:15

**collapsed** 187:4

**colleague** 25:18
66:23 120:1
131:25

**colleagues** 25:9,13 75:20
119:10 161:22
223:25 225:21

**collect** 174:16

**collection** 129:6

 

**collective** 124:14 136:9 145:11,24 157:1 242:14 255:6

**collectively** 130:13 136:9

**Collins** 46:15,19 50:12,17

**Collins'** 46:25

**Colony** 184:25

**combined** 148:18

**comma** 249:12 251:23

**commenced** 155:15

**commencing** 23:1

**commensurate** 51:8,14 54:17,23

**commercially** 213:14

**Commission** 187:7,8

**commissioned** 37:1

**Commissioners** 33:21

**Committee** 143:13 155:5

**common** 49:6 104:21 123:25 133:11,12 134:1 137:7 141:13,20 144:23 150:24 157:11,17

**commonly** 143:11

**Commonwealth** 206:13

**communication** 113:6

**Communications** 183:13

**companies** 27:17 28:4 44:3 67:25 73:22 74:13 75:2 77:9 100:16 163:22 170:11 173:9,17 174:13, 15 188:5 196:2,10 219:5 221:16,23 222:2,10, 259:16 263:19 268:1,19, 22

**company** 27:3, 15,21,22,23 28:1, 2,3 29:2,16 31:8 35:23 36:10 37:3 38:9 39:12 40:5 41:12,14,16 45:17 46:12,24 51:4 52:6 53:24 54:2 63:15 64:7 65:17 68:11 69:5,24 70:8 72:19 75:21 76:8, 79:20 80:15, 16,21,25 83:24 84:15 85:12 103:19,25 111:9 115:5 154:10 163:22 170:13 177:10 178:1, 180:6, 182:24 183:5,16,18 184:21 185:3,4 186:6,11,12 189:22 190:2 222:4 236:25

**company's** 31:3 34:12 38:3 45:25 60:1,15 75:14

**comparatively** 128:7

**comparing** 188:2

**compensate** 44:3

**compensated** 45:12 58:24 59:3

**compensation** 55:18 125:17 128:7 230:15

**competent** 205:14

**competing** 122:2

**complete** 120:2 204:25 212:9

**completed** 183:9

**completely** 75:6 98:15 107:24 159:15 240:9

**complex** 135:3 145:15 231:17

**compliance** 69:8

**complicated** 133:10 172:4

**complication** 148:25

**complies** 68:8

**comprised** 43:22

**computation** 230:8

**con** 147:5

**conceived** 237:17

**concentrate** 101:15

**concept** 42:20 67:17 69:18

**concepts** 141:2

**concern** 41:12 150:21

**concerned** 42:24 43:1 44:24 45:8,9 243:6

**conclude** 85:6 131:9

**concluded** 75:25 94:24

**conclusion** 117:24 156:16 160:13 167:11 208:5

**conclusions** 120:22 121:3

211:12

**conduct** 26:8

**conducted** 55:1 59:22,25 85:14 162:17 179:2,4 258:6

**conducting** 191:18,19 233:20 259:5

**conferred** 24:7

**confidence** 141:9

**configuration** 215:1

**confirm** 30:25 254:24

**confirmed** 32:13 34:10 37:23 45:25 49:11 51:5 56:8 129:11 214:7

**confirming** 38:12

**confirms** 32:24 253:16 256:15

**confusing** 227:18

**connection** 75:16 92:14 126:21 195:10,15 210:7 215:23 249:5,10 251:22

**conscious** 203:20 239:5

**consensual** 143:12

**consent** 181:21

**consideration** 62:24 197:25 233:15 234:9 241:16

**considered** 29:1 34:24,25 44:5 63:3,21 65:16 69:19 72:16 73:19 75:15,23 76:1 106:21 211:6 266:13

**consisted** 123:17

**consistent** 26:7 38:20 39:11 40:4 51:19 61:7 73:4 77:14 79:2 82:22 84:23 85:5,18,19 86:1 107:24 119:2 139:11 253:23 254:8

**consistently** 214:7 236:25

**consolidated** 70:7 145:10

**consolidation** 146:25 147:2,14, 16,19 148:4 151:17

**Consortium** 64:25

**constant** 196:19

**constitute** 248:1

**constituted** 180:23

**construction** 129:11

**constructive** 141:3

**construed** 248:1

**consultant** 94:21

**consultants** 34:1

**consulting** 82:10

**contained** 233:19

**contested** 149:12 265:15

**context** 54:25 89:10 93:21 131:2 138:6 140:8 159:14,17,18 160:9 173:11 175:13

 

**contingent**
80:19

**continually**
181:25

**continuance**
55:24

**continue** 43:12
51:1 53:17 79:6
186:21 189:9
197:18 212:2
237:4 239:11
259:3,8,14 262:15
266:19,22,23

**continued**
53:25 79:7 112:4
124:10 127:16
150:7,8 174:12
188:18 203:13
224:22 266:25

**continues**
179:8 236:14
242:6 245:8
246:12

**continuing**
123:10 198:14
259:6 262:15

**continuous**
230:21

**contract** 30:13,
15,18 31:24 32:2,
3,6,10,14,17,18,
24 40:14,24 49:10
127:4,12 131:4
235:6 244:25
250:23

**contracted**
170:14

**contracts** 31:18
60:5 115:1 116:10
136:18 241:6
254:16

**contradicted**
29:17

**contradictory**
75:7

**contradicts**
37:20 53:18

**contrary** 72:4
74:16 97:9

167:11,12 268:24

**contrast** 138:20

**contribute**
51:23 57:2
150:12,15 217:9

**contributed**
30:2 41:14 44:6,
25 45:6 52:17
57:10,14 63:10
92:17 150:18
163:13,17 164:20
169:24 170:3
171:17 174:4

**contributing**
166:18

**contribution**
26:3,5,19 30:20
31:2,10 32:16
51:13,15 54:22,24
59:21 60:10 63:20
65:12 74:15,18
78:21 79:4 80:5
81:6 82:2,18 84:6
85:19,24 86:4
92:8,10,12,13,
96:15 98:19 103:8
105:20 106:2,5
109:3,4 110:22
113:12 114:15
118:23 119:5
121:22 122:18
130:15,18 140:6,
11,21 150:17

**contributions**
28:16 30:24 51:9
54:17 55:6 56:16,
17,18 57:22 62:12
63:7,11 64:5,13
92:24 93:12
103:11 105:21

**contributor**
70:2

**contrivance**
223:14

**control** 49:6
218:8,9 222:15

**controlled**
193:24 218:11

**controller** 63:15

**convenience**
30:11 46:9 57:20
128:14 130:9

**convenient**
219:24 269:9,10

**conversant**
261:18

**conversation**
238:7

**conversations**
208:7

**converted**
173:22

**convey** 129:5

**conveyed** 126:9
129:3

**cooperated**
113:9 169:15

**cooperatively**
162:17

**copies** 225:25

**Copperhead**
75:10

**copyright**
250:12

**copyrights**
237:12 239:4
249:9,15 250:16
251:20 252:2,8,15

**core** 154:3,6,19

**Corning** 143:18

**corporate** 38:7
170:8 173:20
180:4 189:18
190:8

**corporate-
structure**
240:11

**corporation**
27:16 37:6 183:19
189:20

**corporations**
133:25 150:22
152:8,11,20,21
156:11

**correct** 52:2,21,
23 76:18,19 95:15
132:13 226:23
232:9 249:19
256:13

**corresponden
ce** 111:23

**cost** 47:16 48:2
57:3 75:20 138:8
143:23 144:18
264:14,15 265:5
266:12

**cost-sharing**
33:15 177:18
196:7,12,15
197:1,12 202:17
204:24 206:6,8
208:2 210:15
211:5 229:11

**costs** 140:16
142:1,10 145:1
146:18 172:17
198:1 218:14
244:21

**counsel** 23:19,
22 24:14 46:16,24
84:11 119:24
132:10 185:20
187:14

**count** 92:24
93:11 216:15

**counterintuitiv
e** 260:20

**countries**
123:18 184:3

**country** 114:1
136:12 266:2

**counts** 130:7

**couple** 23:9
75:18 87:16,19
89:2 100:10
187:25 206:21
247:16

**court** 23:2,6,7,9,
24,25 24:4,11,22,
25 25:4,11,13,20
27:4,9,10,11
31:12,15 40:7,16
48:6,9 50:5,8

61:15 64:3 66:24,
25 67:7 73:11
76:12,17 83:2,3,6,
16 84:17 86:10,
13,14,23,25 87:8,
13,15,22 88:1,2,3,
4,8,10,13,17,21,
23 89:16,22 93:1,
5,8 95:12,18,23
97:6,10,14 98:9
99:11,14,25
100:14 101:20
102:16,21 103:10
109:16 110:15
114:18 118:17
119:12,15,17
121:11 132:2,3,6
134:8 135:22
137:8 143:17
144:14 147:11
148:7,12,17
149:9,11,18,23
153:1,18,20,21
154:6,20,24
156:6,7,13 158:24
159:3,11,12,13
160:8,17,19,21,25
161:4,8,11,16,17
162:1,2 163:19
171:21 172:6,12,
25 173:4 175:23
176:24 192:23
193:3 207:22
212:16,23 214:6,
18,24 215:6
217:24 219:11,23
220:2,6,18,20,22,
24 221:2,3 224:2,
4,11,25 225:18
226:3,18,25 227:3
232:8,14,17,21
240:19 243:12,15,
19 245:14,19
246:2 248:15,16,
17,18 249:20
250:4,7,10,20
251:5,9,15
253:13,20 254:4,
15,18 257:7
259:24 260:12,18
261:3,7 263:21
264:2,21,25
265:9,20 268:7,8
269:2,8,12,16,19,
21 270:3,6,7,10

 

Nortel Trial
DAY 1 on May 12, 2014

Index: court's..decision-making

**court's** 83:22

**courtroom**
87:14 177:1

**courts** 25:5,
32:22 33:10 63:4
66:19 84:1 85:8
87:5 91:17,24
94:16 98:18,20
99:3 106:4,15
115:10 119:8
120:3,6,17 122:9
131:5,22,24
132:20 133:1
139:6,9 141:2,21
143:11 145:20
146:2 149:9
154:8,11 155:10,
16,20 156:1,15,23
158:11 159:6
160:13,15 173:23
177:3 196:23
214:5 217:21
221:24 223:11
225:9 250:23

**Courts'** 30:4

**cover** 30:16
32:3,6 59:12,13
90:9 262:4 267:1

**covered** 81:12
129:9 207:5

**covering** 90:11

**Cox** 167:18

**CRA** 215:13
267:4

**craft** 156:11

**create** 26:6
68:12 150:8
157:22 207:6
224:14

**created** 26:21
28:14 94:19 95:3,
5, 101:9 133:7,19
134:12,14 142:2,7
146:4 151:8
158:20 181:23
194:6 207:18
222:3 223:10
234:1,4, 236:6
238:23 264:17

**creates** 86:17
119:3 247:17

**creating** 57:3
63:7 142:2 220:10
233:21

**creation** 94:7
108:5 130:15
140:6,12,14
233:24

**creative** 134:19

**creatures** 202:6

**credit** 164:18

**creditor** 120:12
148:13 149:25
159:19,25 160:5,
10 170:4

**creditors**
124:12 125:11,14
131:15, 133:18
139:1,14,18,19
141:10 142:6,21
143:6,8,16,20,22
144:1,10,17,20,
24,25 146:21
148:20 149:16
150:3,9 152:19
155:1,4,5,6 157:2,
20 158:19 160:2
169:22 170:1,5,7,
14,24 171:15,19
174:8,17 175:1,5

**credits** 191:17,
21,25 260:2

**creep** 177:7

**crept** 177:7

**crib** 263:10

**criminally**
187:18

**critical** 69:13
77:4 85:15 91:16,
23 94:1,23 98:20
99:17 188:22
190:5,19 198:23

**criticism** 146:23
148:8 149:24
153:15

**criticisms**
132:24 145:3

**cross** 87:21
151:18 152:16
155:19,21,25

**crown** 124:7

**crucial** 168:4

**crystal** 236:5

**CSA** 41:24 204:2
209:3 212:1
232:24 235:13
240:5 241:3 265:5
266:19

**CSAS** 207:5,8,10
210:14

**CSP** 206:8,11

**CSPS** 212:1
264:17 266:19,22

**current** 69:23
147:3 149:4 152:1
158:9

**customer** 26:1
60:5 78:2 115:1,4,
12,21 116:2,6,9,
15 117:3,5,7,10,
17 204:21 206:3
217:13

**customers**
116:19,20 164:9
181:4,6 188:15

**Customs** 35:25

**cycle** 135:14

---

**D**

**D.C.** 210:9

**daily** 23:15

**damages**
239:24

**dark** 191:7

**data** 103:5 153:8
185:4

**date** 58:18 79:8,
11 99:24 129:7
163:20 164:11
207:14

**dated** 86:16
151:20 197:2

205:7 210:13
227:11

**dates** 89:24
181:18

**day** 87:24 133:11
149:18 169:13
269:1,20

**day-to-day**
190:20

**days** 42:19 50:12
56:3 57:23 77:8
78:15 185:14

**days'** 199:3,9

**de** 128:7

**dead** 96:22

**deafening** 64:1

**deal** 29:15 40:22
49:4,17 50:2
57:16 59:15 66:18
73:10 96:3,5,20,
24 110:12 116:20
134:7 149:19
159:1 167:12
173:8 234:16
248:11 269:22

**dealing** 73:21
80:7 170:24
223:2,20

**deals** 80:19 86:4
100:25 111:10
240:23 243:3

**dealt** 80:12
155:22

**dear** 225:3
269:14

**debate** 77:24

**debt** 120:12
133:20 138:22,25
140:19 142:9
152:20,22,24
153:11 158:21
171:10 203:22

**debtor** 80:10
125:7 126:20
138:2 140:9
156:10 170:5
178:22

**debtors** 24:6
27:18,24 28:5
31:16 40:22 74:16
75:13,25 76:24
79:15 82:2 96:6
103:3 104:19,23
105:4,14,15,16,20
106:8 107:2
108:13,20 109:8,
14 110:6 116:1
117:20 118:4,10
120:19 121:1,4,6
122:15,24 124:10
125:9 126:4,11,14
130:23 131:16
134:22 140:1,22
147:23,25 167:9
171:17,18 175:14
211:22 228:9

**Debtors'** 26:3
37:20 53:14 57:8
63:16 100:21
104:13,22 105:18
115:7 118:9,12,14

**debts** 142:15
143:1,3

**decade** 184:10

**decades** 108:5

**Decarla** 70:17

**decaying**
125:10

**December**
57:23 72:10 75:2,
18 86:17 89:20
90:21 109:23
207:9,19 208:13

**decide** 83:25
84:1 92:16

**decided** 33:14
70:13 84:9 85:4
96:25 98:1,3
182:23 203:22

**decision** 70:3
71:16,17,21 72:5
73:9 82:12 83:8,
11,12 84:1,3,9,10,
13 114:8 134:5
203:20 239:5

**decision-
making** 61:23




**decisions** 61:25
72:8 151:1 174:11

**deck** 46:19 50:13
160:22 246:1

**decree** 181:21

**dedicated**
142:20

**deemed** 48:4
204:3

**defend** 201:8
202:19

**defensively**
166:12

**defer** 137:19

**deferred** 125:17

**deficit** 120:8,13

**defined** 198:10,
11 205:25 225:5,7
234:15 235:7,9,13
237:7 238:5
244:13,23 245:5
248:24 250:6

**defines** 225:15
227:8

**defining** 216:21

**definition**
200:18 201:1,18
235:16,17,23
237:5,22 239:7,9
242:4 248:22
250:2

**definitions**
238:3

**degree** 135:15,
18 145:8 146:17

**Delaware** 23:22,
23

**delivered** 258:4

**Deloitte** 34:2
84:19,20 89:8

**demands**
139:10

**demonstrate**
146:8 153:7

**demonstrates**
122:4,7

**denies** 267:19

**Department**
178:7

**department's**
267:13

**depend** 49:25

**depended**
134:17

**dependency**
203:1

**depending**
23:15 122:8,13
147:1 172:3

**depicted** 191:6

**depiction** 189:3
191:2,3

**depleted** 146:3

**depletion** 133:8

**deployed** 125:4

**deployment**
58:6

**deposed** 42:4

**deposition**
81:16 93:15
190:7,11,18
256:15

**depositions**
120:24,25 223:19
261:16,17

**depreciation**
260:14

**Derek** 24:5 25:9

**derivative**
237:13

**derived** 140:15
205:24 242:4

**describe** 175:17
223:8

**describes**
62:10 219:4 262:5

**describing**
26:20 268:5

**description**
41:19 211:8 254:1

**descriptions**
231:3

**design** 236:20

**designated**
95:2

**designation**
99:19

**designed** 123:5,
9 129:8 137:23
222:15 235:18,20,
24 236:1,7,8

**designs** 237:11,
15 239:4 249:9,15
250:12,16 251:20
252:2,7,15

**detail** 101:8

**detailed** 91:6

**details** 90:10
172:22 261:21

**determination**
83:22 149:18
154:22 163:4

**determine**
94:22 106:5 147:7
148:17 155:21
156:3 159:17

**determines**
60:22 61:2 62:11,
22

**determining**
35:10 73:6

**detriment** 140:4

**devastating**
187:22

**develop** 28:12
45:11 47:16 48:3
100:17 121:24
124:22 212:3
236:20 259:3,8,15
262:16 266:24

**developed**
34:22 37:11 41:23
95:9 97:13 103:19
104:3 129:8,9
130:12 137:22

157:7 211:25
235:19,20,25
236:1,7,8 259:13
262:8

**developing**
45:6 128:3 138:9

**development**
28:18 29:5 37:12
40:13 41:15 45:1
51:14,23 52:17
53:12 55:24 58:5
64:17 75:22 82:19
100:15 102:19
103:22 180:14
191:19,22 193:13
198:2 219:6
225:14 230:21
237:18 244:16,19,
21 259:22

**device** 99:3

**dictate** 48:11

**dictates** 47:21
138:5

**difference**
42:11,19 44:14
105:3 113:1
191:12 209:20

**differences**
189:3 224:7

**difficult** 135:4
140:23 148:9
186:3 196:20

**difficulties** 27:8

**difficulty** 50:6

**direction** 238:8

**directions**
24:15

**directly** 29:17
32:22,24 37:19
53:18 100:23
157:19,20 222:1
238:19 242:4

**director** 51:4

**directors** 87:3,
6,17 187:15

**disagreeing**
171:5

**disagreement**
131:3

**disciplines**
43:23

**disclose** 217:24

**discount** 150:6

**discretion**
156:7 199:2

**discuss** 92:18
228:16

**discussed**
69:18 90:17
114:10 228:16

**discusses**
79:17

**discussing**
70:16 75:19 80:11
97:23

**discussion**
80:18 92:3,6

**discussions**
33:12,14 39:16,23
49:16 90:8,13,24
97:20 110:2 111:4

**disentangled**
141:23 142:3

**disentanglement**
146:19

**disentangling**
141:7

**disintegrated**
124:25 126:3

**dismissed**
187:18

**disproportionate**
28:25 29:1
55:11

**dispute** 120:21
132:18 138:15
154:20 195:21
223:2

**distance** 189:5

**distinct** 170:8,
12

**distinction**

 

38:14 47:2 58:12
231:13

**distinguished**
51:6 58:9

**distribute**
112:10 143:3

**distributed**
79:2 113:10 117:6
143:7 170:5 172:4

**distribution**
115:4 116:21
148:20 149:21
151:12 156:2
158:25 160:16
211:18,21,22
231:17,25 244:3

**distributions**
143:11 149:20

**distributor**
244:4

**divergence**
188:6

**divergent** 121:8
137:22

**divest** 178:9

**divide** 25:22
96:11 143:1
157:16

**divided** 57:21
60:3 134:1 141:16
162:8 176:17
253:7

**dividing** 133:11

**divine** 134:4

**divisible** 169:2

**division** 214:4
215:8 265:6

**divisions**
221:17

**divorce** 111:14

**divvied** 112:15

**divvying** 49:1

**docketed** 24:17,
19

**document** 34:4,
5,10,13,16 36:4,9,
18 37:5,14 38:25
40:21 46:4, 49:12
50:14 53:15 69:3,
10,13 91:3 110:12
194:9 195:13
201:5 210:22
212:25 223:5,16,
17,19 224:15,19
225:16 226:13,16
227:12,13,16,19,
24 228:3,7,14
232:23 233:18
239:10 240:11
243:25 246:7
247:11,21 261:10
264:11,22 267:3

**documentation**
184:17 188:24
237:16 239:15

**documented**
53:8

**documenting**
49:8

**documents**
30:7 45:25 46:1
57:11 75:12 91:3
111:21 112:22
119:4 177:17,19
182:5 194:1,6
199:22 225:15
229:13 245:4
254:10 261:24

**dollar** 28:19

**dollars** 28:17
29:5,6 103:8
108:5,11 133:20
142:9 144:7
158:21 172:2
194:25 233:23
238:17,19,20,21

**domestic**
139:12 141:6
147:16,18

**Doolittle** 38:1,5,
8,11,16 39:8
40:11,17,18
81:12,13,14 82:6
84:8 190:12
253:11 254:20,22
255:4 256:7

**Doolittle's**
38:12 84:7

**door** 187:10

**doors** 128:6

**Doris** 25:15

**Dorsey** 25:10

**dot-com** 185:15
206:25

**dots** 171:3

**doubt** 223:15

**downside**
229:24 230:25

**downward**
95:10

**dozens** 200:24

**draft** 254:23

**drafted** 64:16
69:10 205:7,9,10

**drafting** 239:15
255:10

**dramatic** 180:22
189:3

**dramatically**
32:1 40:25

**drawer** 264:5

**drawings**
237:14

**drawn** 120:23
231:13

**driven** 190:23

**driver** 219:10

**dropped** 228:22

**drove** 124:8

**due** 120:12 145:6

**duty** 171:14
174:19

---

**E**

---

**E&y** 72:21 84:22
216:11 217:23
262:12

**Eagle** 88:14,19

**earlier** 40:15
53:1, 74:13
129:18 224:5
227:14,23 240:16
247:7 263:12

**early** 24:17 63:1
104:5 156:21
188:7 206:25
212:7 241:2

**earned** 105:10

**earning** 140:16

**easier** 122:23

**easy** 44:17
148:25

**economic**
34:25 35:4 36:17,
23 38:18,25 39:3,
19 43:10,12,20,24
44:15 52:7 61:2
70:22 71:13
129:14 157:25
193:19 210:11
211:4 256:22
258:20,23 267:9,
20

**economically**
79:24 139:23
140:1,3,20,22
157:14

**economics**
43:24 49:17
192:10 194:19
210:8,10 221:21
222:7

**economist**
146:13

**Eden** 104:9
191:5 192:9
194:16

**effect** 41:21 50:4
137:1 153:4
159:23,24 160:15
176:17 187:22
230:10 257:23

**effective** 53:13
114:2 181:22
191:8,13,23 207:9
208:10 210:6

**effectively**
177:25 178:3,12
182:15 184:11
203:10 206:19
210:3 211:20
231:22,25 242:21

**efficient** 154:12
162:11

**efficiently**
252:25

**effort** 247:23

**efforts** 45:12
134:14 137:9

**elective** 241:9

**Electric** 178:2,3,
5,6,10,13,17
179:1,7,11,13,17,
20

**element** 190:19

**elements**
211:15,16

**else's** 258:14

**email** 50:13
60:14 61:16 70:17
72:21 76:5 80:14
89:10 254:19,21
257:11,15 261:13
262:4

**emailing** 257:11

**embedded**
77:18 252:10

**embody** 127:8

**embodying**
237:6,9 250:5

**embracing**
168:12

**EMEA** 24:8 25:7,
17 26:2 28:4 29:5,
11 37:21 57:2
63:16 66:4,8,18
70:17,19 72:22
78:11,12 79:11,15
82:2 103:3
104:13,22 105:14,
18,19 115:7
118:1,4,10 120:19
121:4,21,25 122:6,
130:2,10,17,20

Neeson & Associates
COURT REPORTING AND CAPTIONING INC.

W&F
WILCOX & FETZER LTD.

www.neesoncourtreporting.com
www.wilfet.com

140:22 154:1
162:23 166:6
168:8 171:17
174:21 176:9
183:2,3 210:16
211:21 213:5
227:14 228:9
247:7 258:6

**EMEA'S** 35:17
63:13 66:22
122:16

**emphasized**
217:7

**Emphasizing**
260:18

**employed**
136:21 147:25
170:13 180:17
183:11 188:4

**employee** 70:18
75:13 171:11
216:17 265:23

**employees**
75:12 115:6 120:5
134:14 136:2,18
148:1 150:2,7,20
151:6 164:12,14
170:12 180:3,17
182:8,10 183:24,
25 184:3 186:15,
16,23 187:2,3
188:4,8, 204:19
206:24 216:15

**employer**
150:15

**encompass**
236:22

**encompasses**
236:23

**encourage**
146:2

**encumber**
203:21

**encumbered**
168:20

**end** 50:19 90:11,
12 109:23 131:13
133:11 141:25
169:13 172:24

173:20 175:18
180:16 197:8,9
206:21 224:24
226:9 227:11
230:6 239:16
246:18 261:2

**ended** 94:25
196:8,9 254:25

**ends** 169:1

**enforce** 64:3
128:25 166:14
213:16 240:14

**enforcement**
240:3,4,5 242:18

**engage** 237:2

**engaged** 213:6

**engine** 124:8

**England** 28:7,9

**enjoy** 65:23
161:12 270:8

**enjoyed** 229:8

**enjoys** 56:11
243:10

**enlightening**
35:9

**enormous**
138:10 188:11

**enrichment**
141:4

**ensure** 133:6
141:4 158:7

**ensured** 220:13

**ensures** 142:19

**entails** 43:25

**entangled**
137:5 145:18,25

**entanglement**
135:19 140:24
142:5 145:9,19
146:17

**enter** 233:16

**entered** 91:14
122:24 181:21
196:2 205:5 208:3

244:4,5,6

**entering** 30:18
32:14 64:17

**enterprise** 77:9
79:12 135:17,24
136:1 150:5,25
151:5,6,8 156:24
157:2 158:5
164:6,8 177:15
188:13

**enterprises**
156:20

**entire** 53:14 65:3
66:2 68:24 73:17
89:13 108:22
110:1 111:15,20
115:3 151:5,8

**entirety** 227:9
231:10 234:19

**entities** 34:24
36:6,7 37:10 45:5
52:14 68:9 79:25
113:16 123:17,24
124:2,22 134:25
136:22 141:14,20,
22,24 143:2 147:6
151:2 157:10,24
163:23 164:1
168:8 169:6
170:8,15 173:21,
22 174:12,21
176:3,10 183:2
207:12 211:22
213:5,10 215:9,
11,22 216:13
217:12 218:10,23
219:21 220:13
221:23 222:2
226:12 228:24
231:15,17,18,23,
25 232:10 233:20
237:24 242:23
244:1,14 245:5,6
258:5,6 259:1,22
267:11,20

**entities'** 152:12,
14

**entitled** 65:3
66:13 109:12
124:17 147:23
154:18 162:22
168:25 174:17

206:9 226:16
232:6 264:17

**entitlement**
140:7

**entitlements**
125:24

**entity** 36:21
135:25 136:5,12
137:17 140:5,10
146:5 152:23
157:18 164:17
170:4 211:21
212:7 214:2
257:18

**entrepreneuria
l** 54:10,13 55:21
229:18,22 230:2,
18 243:23 244:14
245:6 246:20

**entrepreneurs
hip** 259:11

**entry** 209:12

**equal** 28:19
182:15 204:22
212:8 243:1

**equality** 203:2

**equally** 146:1

**equation** 204:23

**equipment**
178:18 198:12,13

**equitable** 56:8,
12 57:6 120:16
128:21 131:18
156:12 213:11
229:8 231:6
243:10 256:16

**equitably** 49:4
132:13 139:2
151:5,9

**equity** 165:5
174:3,25 175:3
203:10,19 222:18

**equivalent**
219:9 230:4

**era** 215:9

**Ernst** 37:2,16
216:9,21 217:16

261:14 263:15
264:8

**erode** 125:12

**errors** 243:4

**escrow** 124:16
162:19 163:10,12
174:5

**espoused**
232:5

**essence** 111:12
147:5

**essentially**
122:5 246:6

**established**
101:22 122:25

**establishing**
24:15 65:16
154:18 155:23

**establishment**
203:8

**estate** 69:15
74:4 80:9,10 81:5
100:12 109:11
146:2 148:11,18,
19,21 159:2,3,18,
20,21 160:6,11
161:19,21 162:22
163:6,9,12,16
169:1,19,22 170:6
174:1,3,6,7,8,16
175:5

**estate's** 65:2
173:24

**estates** 29:7,9,
12 38:10 66:5,6,
17 72:4 92:25
93:14 108:4,7
116:13 117:25
125:23 129:20
136:24 138:13
147:3,7,11,12,19
148:23 149:10,17
154:25 155:2
157:5,23,24 160:3
162:18 163:9
166:20 167:2
169:17 170:1
174:21

**estates'** 104:8



149:4

**estimate** 98:6

**estimated**
120:9 209:16

**estimates** 149:5
209:17,23 210:1

**Europe** 184:8

**European** 28:8
87:20 183:25

**eve** 228:1

**evening** 270:4,8

**event** 123:1
240:23 241:3,9,24
242:7,19 252:13
267:25

**eventual** 212:18

**eventually**
135:18 178:13,21

**evidence** 29:23
30:2 31:17 57:12,
17 64:6 67:9
68:14,15 70:1
85:7,10,23,25
87:17 90:7 94:17
101:2,5 102:15
103:2,9,12 107:21
113:5 114:11,21
116:8 119:6 131:8
146:7,12 153:7,14
170:9 174:18
189:16 208:3
218:17,18 247:22
252:24 253:21,25
254:6 260:25
267:17

**evolve** 224:23

**exacerbated**
138:15

**exact** 108:23
204:11

**examination**
87:21

**examinations**
152:17

**examine** 144:16

**exceeded** 181:5

**Excellent** 24:11
67:8

**exception**
239:20

**excess** 120:9

**exchange**
128:17 179:9,21
187:7 213:25
254:19

**exclude** 165:18,
24 166:2,5,13
168:4 201:22
216:25

**excluded** 96:8

**excluding**
237:19

**exclusive** 105:4
128:18 129:1
151:16 162:13
164:25 176:4
200:7,14 204:25
206:16 207:15
214:1,9,17 215:4
229:9 231:8
233:16 234:9,10,
13,15 238:2
240:15 241:14,21
242:1,25 249:13
251:19 255:3,13
256:4,24 268:15

**exclusively**
166:20 218:9

**Excuse** 23:10
103:14

**executed** 53:3

**executive** 31:8
38:2 40:12,23
41:8 62:9 81:15
187:8,11,13,21

**executives**
37:22 187:17

**exercise** 74:24,
141:25 157:19
204:9 210:7

**Exhibit** 225:24

**exhibits** 24:16
135:22

**exist** 204:5
223:15 228:12
247:20

**existed** 85:21
129:6 200:25
240:5

**existence**
170:12 202:7
210:20

**existing** 58:6
85:22

**exists** 195:13

**exiting** 241:25

**expand** 239:6

**expanded**
200:19

**expect** 51:25
52:9,16 138:23
169:13 194:23
268:2

**expectation**
151:7

**expectations**
49:19 150:1
151:10,11,13,25
170:2

**expected** 50:25
51:7 105:10
127:14,19 150:2

**expenditures**
47:24 158:7
218:2,3 258:11,
13,14

**expense** 125:12
144:1,2,20,24
157:18 158:2
201:9

**expenses**
125:22 128:3
205:24 206:5
244:15

**experience**
47:8

**expert** 92:25
93:14 101:3
102:23 114:21
115:8,9 117:13
120:25 146:15

167:18 173:2
176:14 191:5
192:11 194:17,18
234:21

**experts** 87:20
104:9 146:12
152:16 153:14
229:20 232:5

**expiration**
204:1

**expired** 207:6

**explain** 42:10
44:1 47:4 68:19
115:15

**explained** 42:5

**explaining** 46:1

**explicitly** 157:9

**exploit** 52:7
124:23 167:16
203:17 234:10
256:24

**exploitation**
51:24 52:18
244:17

**exploiting**
127:15

**exposed** 49:23
54:12

**express** 239:20

**expressed**
111:18

**expression**
50:4

**expressions**
111:19

**expressly** 36:2
54:7 55:15,17
58:9 109:8

**expropriate**
174:6

**extended** 207:3

**extent** 218:14

**externally**
136:2

**extra** 165:7
263:1

**extraordinary**
107:9 125:13

**extreme** 135:15
136:7 139:25
144:20 146:16

**extremely**
141:12 146:18

**eye** 248:3

**eyes** 231:24

---

**F**

**face** 103:2
160:16

**facile** 131:10
144:22

**facilitating**
154:12

**facilities** 28:6
164:13 179:23
180:19 182:11,12
185:1,2

**facing** 207:2,4
208:9

**fact** 29:2 35:18
42:25 54:6 55:20
57:15 68:11 95:2
96:4 99:17 107:5
116:15 120:21,24
133:23 138:4
145:9 146:5,15
152:23 163:6
170:9 177:10
207:4 213:23
216:10 217:23
220:9 230:17
254:10 260:20
263:18 264:7
265:19

**facto** 170:23

**factories** 200:25

**factors** 145:7

**factory** 179:6

**facts** 41:19,20
42:1 74:19 89:3

 

94:9 97:6,10
98:16 99:4,11,13
100:23 101:1
108:15 109:17
118:20,24 120:23
132:17 149:1
153:19 218:17
265:14

**factual** 132:15
133:21 254:3,14

**fail** 126:14

**fair** 44:5 48:22
53:16 57:5 120:16
139:17 175:20,22,
24 176:14 212:19,
21 240:18 241:20,
22,25 242:3,20,23
248:2

**fairly** 28:22 30:1
49:4 55:9 58:24
59:3 92:13 198:18
208:1

**fairness** 50:3

**faith** 84:3

**fall** 208:6

**falls** 30:2

**false** 138:3
144:10

**familiar** 189:13
232:23

**Farr** 119:23

**fashion** 124:5

**fast** 260:7

**fast-forward**
36:9 199:10
211:12

**fast-
forwarding**
183:20 199:13

**favor** 31:25

**favour** 137:25

**favoured**
139:11

**feel** 125:20
238:21

**fell** 185:6

**fettered** 156:6

**fewer** 186:5

**fiction** 57:10
68:2,3,12 71:15
73:9 215:15

**fictitious** 97:9,
15,18 112:21

**fiduciary** 155:3

**fifths** 176:17

**fight** 125:9

**figure** 96:10
159:22

**file** 75:2,9 81:20,
25 82:23 83:13
265:16

**filed** 33:18 36:13
82:25 94:10 100:6
112:22 113:18
134:23 151:19
154:2 177:13
196:10 214:4
215:6 218:24
219:15 263:22

**filing** 57:24
75:15,16,19 77:8
78:15,24 79:10,11
80:6,9 90:20,23
91:13 95:11 96:22
99:24 102:7,9
108:23 118:3
150:6 151:19
164:14 174:20
190:12 247:14,23
261:25

**filings** 36:25
56:4 116:24 124:9
150:8 156:22
184:10 187:12,
196:24 217:18
228:6

**final** 149:6,17,21
153:15 225:7
228:14

**finalize** 149:20

**finalized** 172:20

**finally** 79:6
132:23 149:1

**financial** 31:4
38:7,8 57:22
63:14 67:12 69:2,
21,25 71:19 72:5
81:17,20,22
82:17,24 83:9,13,
15,17,21 153:13
163:21 187:5,15
219:10

**financially** 44:7
85:17

**find** 123:12 159:9
201:18 207:24
209:10 245:15,20,
21 249:22

**fine** 24:19 25:20
86:11,13 88:17
161:11,12 220:21,
22

**finish** 220:5
263:25

**finished** 206:2

**Finnigan** 132:11

**firm** 37:16 41:11
210:8,10

**fits** 68:24 92:3
93:6

**five-year** 198:15
199:5 200:12
209:22

**fixed** 211:23

**flaw** 152:15

**flexible** 141:2

**flies** 103:1

**flip** 230:6 246:21

**floats** 179:8

**flow** 224:18

**flurry** 228:4

**focus** 103:10
218:20 228:23

**focuses** 103:17
104:22

**focusing** 233:14

**folks** 52:4 61:17
248:3

**follow** 134:5
152:25

**footnote** 223:9

**footprint**
179:15,16

**forced** 178:8
241:10 242:9

**foregoing** 66:12

**foreign** 154:11

**forgotten**
117:22

**form** 48:11 52:3
125:16 137:13
151:20 159:4
255:21

**formal** 61:13
255:22

**formalizes**
110:16

**formally** 124:20
153:25

**formed** 73:22
99:1 178:15,20

**formula** 58:19,
20 143:9 149:14

**formulated**
131:20

**forward** 58:19
75:1 85:20 104:19
106:7,13 117:25
119:10 180:8
181:9 209:18

**fought** 131:16

**foundation**
135:20

**foundational**
267:3

**founded** 178:24
179:5 180:2,10,25

**Foundry** 64:7,8,
15,23 65:6,9,15

**fourth** 228:2
230:14 247:13
257:14

**framework**
194:2

**France** 28:8,10
80:1 183:13 213:6

**Francisco**
184:25

**frankly** 176:21

**frantic** 228:5
247:22

**free** 87:13,14
214:1 220:14
249:13

**freely** 57:6
194:24

**French** 28:2
31:3 41:12,14,16
63:15 69:23

**friends** 30:15
105:13 183:2
210:16 227:14
247:6 252:17
267:18

**Frisch** 210:9,22
211:9 260:21
266:9,11 267:2

**front** 90:6 98:7,8
99:11 101:10
175:19 191:1

**fruitless** 168:15

**fruits** 213:8

**fuelled** 157:4

**full** 54:9,12 55:21
124:3 163:6
165:16 168:12
174:4 175:2
180:11 203:6
204:25 212:9
216:17 229:18,21
230:2,18 243:23
246:19

**fully** 31:25 34:11
60:1 124:4 126:1
204:3,8 207:14,
212:19 219:4
242:7 259:15
261:18 263:13,19
264:8

 

**function** 61:23

**functional** 217:7 263:13

**functions** 219:5 245:10 263:20

**fund** 133:12 218:23

**fundamental** 49:17 50:3 126:4, 15 131:3 132:25 133:22,23 202:24 224:13

**funded** 125:22 213:21

**funding** 80:8,24 120:8,13 213:24 225:3,6,7 227:8 258:14

**funds** 137:4 147:12 148:10,18, 22 157:25 169:5

**fungible** 125:3

**furnish** 211:20

**future** 41:22 58:6 105:10 138:11 145:22,24 185:12 236:11 259:10

---

**G**

---

**gain** 77:22 247:4, 9

**Gallagher** 119:23

**Galway** 28:9

**game** 23:15

**gamut** 171:9

**garden** 149:22

**gather** 264:4

**Gatley** 41:9 42:4 45:14

**Gatley's** 41:18 42:9 45:23

**gave** 48:18 64:14 140:24 141:11 145:16 152:6 153:9 218:7

**geared** 102:14

**general** 155:4 185:20 187:14

**generally** 62:20 104:10 231:17,19 267:9

**generate** 174:5 181:8 191:21

**generated** 59:23 71:5,13 105:14,15 106:19 163:18 164:7 166:9 180:12 181:1,2,14 238:18

**generating** 190:3

**generation** 192:20

**genuine** 120:20

**geographic** 123:23 124:1,2 138:14 150:23 157:18 255:14 256:1 264:19

**geographical** 206:6,10,12

**geographies** 166:6 168:5

**geography** 202:7 205:1 206:16

**get all** 39:10

**Giovanna** 254:22 256:12

**give** 48:18 73:7 80:5 99:15 101:8 107:17 116:23 118:4 133:14 140:6,11 152:5 157:22 171:25 218:2 222:15 241:4 251:14 252:18 253:10 258:2 265:7

266:10 267:6

**giving** 87:17 199:3

**global** 26:21 28:14 51:8 75:14 94:20,24 98:9 99:19 124:9 135:8 147:6 156:22 164:8 173:9,13,15 175:25 177:14 183:19 245:11 246:8

**globally** 71:6 75:4 255:2

**globe** 126:12

**glossed** 108:18

**goal** 151:4 189:21,23 192:17, 19

**goals** 189:18,19

**God** 238:8

**going-concern** 123:8

**good** 23:2,6,7,10 24:25 67:3,4 84:3 86:11 119:21,22 132:8,9 161:24 162:1 175:8,9 193:17 202:8,10, 11 222:6 233:4 269:22 270:2,7

**good-bye** 228:22

**good-faith** 223:14

**goods** 123:6 193:12

**goodwill** 60:6 71:10 76:6 115:13 117:18 237:20

**Gordian** 131:6

**gotcha** 49:21

**Gottlieb** 67:1

**Gottlieb** 25:14, 19 66:23 67:2,8 73:14 76:15,18 83:4,5,12,18

84:19 86:22 88:8, 9,10,12,15,18,25 89:18,23 93:2,3,9 95:16,22 96:1 97:17 101:20,23 102:22 110:19 119:13,14,15,16 172:15 215:14 227:24 256:19 257:10,22

**governing** 32:19,20 131:4 174:18

**government** 68:20 110:25 172:24 201:21

**governments** 30:6 33:2,5,12,24 34:3,6,8,15 48:20 49:7

**grab** 125:8

**graced** 162:4

**grant** 128:22,23 166:11 202:13

**granted** 127:3 128:16 201:20,21 204:9 206:10 212:11 234:24 251:19

**granting** 220:15 256:3

**grants** 128:21 198:2

**graph** 188:3

**graphs** 187:25

**great** 90:10 96:1 156:22 157:3,4 173:8 234:16

**greater** 163:10

**grey** 101:12

**Gross** 25:10 66:20 67:4 78:15 86:12 88:20 89:5 90:1 101:25 102:7 105:18 107:2 108:17 109:21 114:13 117:9,24 118:17 119:9,16,

22 132:8 160:18 161:4,10,17 162:4 175:9 220:21 221:5 222:24 269:20

**Gross'** 268:8

**ground** 35:19 73:9 74:21,25 132:20,21

**group** 37:6,12 62:8 73:4 89:13 97:12 120:6 123:7,16,17,24 124:4,7 125:3,4 129:12 143:25 144:19,23,24 163:22 170:18,20 171:1 174:13,15 179:18 180:4,24 182:8,19 186:18 189:20 190:2 192:17 193:11,16 202:21 207:18 208:9 210:8 231:18 236:17 245:3 247:24 262:8

**group's** 121:16, 24 123:1,6 124:13,23,24 125:5,6 126:5 127:7 128:12,19 129:1,14 130:12

**group-wide** 123:2 187:23

**grouped** 117:18

**Grout** 132:11

**grown** 183:17

**growth** 180:22

**guarantee** 153:12 156:3,9

**guaranteed** 152:22,24

**guarantees** 152:4,5,17 153:3, 10 159:6 170:18, 22 171:9 203:21

**guarantor** 156:11

 

**guess** 30:17
48:13 260:4

**guidance**
123:12

**guide** 101:4
115:10

**guidelines**
216:21

---

**H**

---

**half** 94:12 162:19
180:25 181:15
269:24

**halt** 124:19

**Hamilton**
136:14

**hand** 164:14,17
173:16 190:1
196:3,4 225:22
231:14 248:13
261:25

**handed** 225:19
245:20

**hands** 131:14
156:13 195:1
218:10 221:11

**hangs** 125:19

**happen** 78:13,
16 114:12 158:8
257:12

**happened**
89:21 110:20
152:23 178:19
204:11 210:3
212:17 233:25
239:7 240:24
268:6

**happening**
185:17 189:4,5

**happy** 89:25
269:19

**hard** 79:20 220:3

**hard-earned**
125:24

**Harlow** 28:9

**harmed** 158:1

**hate** 249:20

**he'll** 101:4,8

**head** 41:8 42:18
62:7 75:14 216:15

**headquartered**
123:20 197:3

**headquarters**
61:24 164:4

**hear** 33:3 46:8
61:20 63:13 67:5,
21,22 90:7 104:15
105:13 106:18
107:8 114:6,11
115:7 117:11,12,
13,14,20 120:18
121:5 126:17,22
127:2 128:9
129:10 146:9
150:14 151:13
159:7 163:23
170:21 190:6,18
192:2,8,18,19
194:16,17 195:25
196:5,15,18 198:9
205:8 208:14
211:15 218:18
223:1 229:20

**heard** 72:9 80:11
81:14 92:11
111:17 121:4,21,
24 130:2,10 173:8
175:15 177:18
183:1 190:13
195:14 197:7,11
215:16 227:23
240:19 247:6
253:12 257:10,21
266:8

**hearing** 131:8
155:15 156:3
170:9 222:25
255:9 256:8

**heart** 225:3
269:14

**held** 29:3 33:23
38:21 46:9 56:8
57:19 64:10
104:24 115:18
130:8 162:18
166:19 168:21,23

169:6 213:9
214:7,8,9 229:5,8
256:16

**helped** 45:10

**helpful** 89:24
103:13

**Henderson**
46:23 205:8
208:15

**hereof** 58:18

**hereto** 247:19

**high** 99:19 100:4
101:18 208:11

**high-interest**
101:16

**high-tech**
191:22 194:19

**highest** 78:4
95:8 169:15,18
206:23,24

**highlighted**
258:23 261:12

**highlights**
253:10

**highly** 134:10,
15,18 135:11

**hired** 210:8
254:23

**historical** 259:8
262:14

**historically**
208:23 259:3,14

**history** 91:6
114:16 173:11
175:6,12 176:19,
20 177:5,10,22
182:3 183:7,8
184:15 204:17
206:22 231:4

**hmm** 250:7

**Hoc** 143:13

**hold** 53:17,25
149:21 221:15
235:4

**holder** 167:15
175:3

**holding** 30:9
58:7 165:9,13,25
166:7 253:8

**holds** 56:11
215:2 243:10

**holiday** 150:18

**home** 233:21

**Honor** 24:5,7,10,
18,21,24 25:3,10
31:23 32:17 48:16
49:14 61:17
207:25 212:22
223:24 224:8
225:21 226:2,5,24
232:12 245:18,24

**Honors** 189:1,7,
13 191:2 193:1
195:14 196:25
201:15 223:13
225:2

**Honour** 67:3
73:16 78:14 81:24
86:6,22 88:9 89:4
90:1 92:2 100:25
105:17 107:1
108:16 109:8,20
113:23 114:13
117:9,23 118:16
149:19 161:25
168:2 172:10
221:4,14 260:10,
14 270:2

**Honours** 163:5
248:19

**hope** 67:5
112:19 131:21
162:10

**hopeless**
140:23 142:5
145:19

**hopelessly**
121:2 145:18

**horizontally**
123:19

**Horst** 210:9,22
211:8 260:21
266:8,11 267:2

**Horst's** 212:20

**hour** 269:24

**house** 257:12

**Howard** 161:22

**Hubbard** 25:6

**Huffard** 115:9,
117:15

**Huffard's**
117:13

**huge** 41:14
181:25 184:20

**Hughes** 25:6

**hundred** 78:19
223:18

---

**I**

---

**i.e** 217:10

**i.e.** 231:16

**Ian** 265:22

**idea** 103:3 270:2

**identical** 202:1
263:11

**identifiable**
115:23

**identify** 172:13

**identifying**
158:18

**IES** 36:20 216:1,
24 217:6,8,18
220:9 222:13
256:16,23 258:11,
18,23 262:7,21
263:8

**IES'** 221:11

**IFSA** 155:8,11,12
166:25 225:11
269:13,23 270:7

**ignore** 95:25
98:15 109:16
111:19 116:1
118:19

**ignores** 107:20,
22 108:3,16



**ignoring** 99:10

**imagination** 248:7

**imagine** 237:21

**immediately** 96:22 102:9

**impact** 50:19 190:4

**impacts** 209:17

**impediment** 149:2

**implement** 140:23

**implementatio n** 149:13

**implications** 241:5

**import** 126:7

**importance** 47:19 144:14

**important** 34:4 53:2 71:20 72:15 74:24 86:3 92:12 94:15 108:18 112:8 131:22 165:23 168:13 176:21 177:6,22 181:18 182:3 184:15 189:14 190:8 198:3,24 200:6 201:4,14 202:1 203:25 204:11, 213:14 217:15 223:3 226:6 238:13 242:17 246:16,21 248:8

**importantly** 73:18 78:14 168:5 225:1

**imported** 248:22

**impose** 146:4

**impossibility** 142:3

**impossible** 235:3 237:21

**impression** 24:19

**imprimatur** 253:6

**improper** 113:18

**improperly** 106:22

**inappropriate** 146:1

**Inc.'s** 62:4,6

**include** 74:2 232:8 240:14 247:3

**included** 28:9 114:25 115:3 168:5 223:11 228:21 229:14 232:12,15

**includes** 68:21 104:4 216:23 217:3 228:20 241:11 249:13 250:2,9

**including** 37:9 45:25 46:20 55:10 56:3 65:4 107:3 113:17 129:21 136:3 148:1 153:9 154:22 155:7 200:14 207:19 213:15,16 231:11 234:14 237:10 244:18 262:6 267:23

**income** 47:23 60:12 65:14,24 66:12 97:25 113:13 172:17,19 192:5, 209:6,21, 24 210:4

**inconsistent** 41:1 109:7 129:17 142:13 149:25

**incorporated** 99:3 178:20 197:6 216:10,11 250:17

**incorporation** 257:1 266:2

**incorrect** 171:1

**increase** 209:22

**increased** 188:9

**incredibly** 238:13

**incur** 144:25

**incurred** 128:2

**indefensible** 157:15

**independent** 27:2 60:15 179:3

**index** 225:12 226:20 227:4

**indication** 265:18

**indications** 231:6

**indiscriminatel y** 170:25

**indistinguisha ble** 61:10

**individual** 62:14 136:21 137:16 141:14 147:7,18 193:10

**indulge** 189:11

**indulgence** 87:11

**industrial** 237:11 239:4 249:9,15 250:11, 15 251:20 252:1, 7,15

**ineffective** 251:2 252:20

**inequitable** 139:24

**infinitely** 169:3

**information** 79:12 97:3 98:7,8 103:5 123:25 197:15,17 198:4 199:7 237:16 257:3 263:17

266:6

**informed** 263:25

**infrastructure** 115:3 116:10,20

**infringed** 64:19

**infringement** 64:9 201:11 202:20 239:25

**infringing** 64:23 166:14

**initially** 220:10

**Inland** 210:25 215:13 267:4

**innovative** 95:6

**inordinate** 157:15 158:2

**inordinately** 107:5 133:9 137:24

**input** 84:10 219:3

**inserted** 239:8

**insolvencies** 138:11 156:19

**insolvency** 38:5 59:22 95:11 123:2,16 124:9 133:5,24 134:9 136:6 138:5,6 139:13,22 140:8 141:6 142:24 145:5 147:4 150:7 151:19,22 152:2 153:8,24 155:19 156:22 157:10,12 165:3,5 173:10,14 177:13 196:24 198:17,22 204:13 228:6 240:24 241:3,11,24 257:13 262:10

**insolvent** 100:17 142:25 150:5 189:22 198:19 241:1

**install** 234:3

**instance** 140:5

**instances** 147:15

**instructed** 254:18

**instructive** 241:1

**instructor** 192:13

**intangible** 36:3, 6 79:22 114:25 162:15 199:16,20 200:7 212:3 216:22 217:3 237:10 244:9,17, 22 259:4,15,19 266:20,24 268:21

**intangibles** 37:11 41:23 43:4 45:1 77:25 78:2 211:25 217:13 255:7,23 262:8,16

**integrated** 36:21 37:9 123:19 124:5,20 125:16 126:2 134:10,24 137:5 156:19 163:23 164:1 169:6 172:9 176:3,10 194:12 207:11 213:4,10 214:2,9 215:11,22 216:12 217:11 218:10 219:4,21 220:13 226:11 228:24 231:23 233:20 237:24 242:23 244:1 245:5 259:1,16,21 261:2 263:13, 267:19

**integration** 135:16,18 145:8 146:16

**intellectual** 25:24 28:14 34:22 36:19 41:5 45:11 46:6 50:18 51:1, 24 52:18 60:16,18 61:4,9 65:17 70:12,21 73:4

 

78:1,3,17 79:23
82:14 101:3 127:1
137:12 165:9
186:22 199:23,24
201:12,17,19
202:10,21 203:6,
13 207:15,17
214:15 217:3
233:21,24,25
234:4 236:24
237:3 238:22
256:24 258:17,24
259:12 263:2,5,7

**intend** 132:11

**intended** 123:14

**intention**
169:18 254:1

**intentional**
260:16

**inter** 160:6

**intercompany**
44:4 159:5
193:10,21,23
210:12 214:16
215:3

**interest** 70:11
95:8 96:14 99:19
100:4 101:11,15,
18 120:14 125:11
131:14 138:24
157:25 168:22
214:8,14 221:15
260:19

**interesting**
41:18 115:19
173:12 262:18

**interestingly**
40:11 121:8

**interests** 58:15,
21 59:2,8 63:23
66:4 75:24 79:18
126:9 127:5
171:15 260:3
268:20

**interim** 149:2,20
225:3,6 227:7

**intermingled**
141:12

**internal** 33:19

36:11 125:5
192:22 206:18

**internally** 34:1,
11 71:12 136:2
265:17

**international**
138:11 145:21
156:19

**internecine**
125:13

**Internet** 185:12

**interpretation**
32:2 238:6 251:1

**interpretations**
121:14

**interpreted**
250:24 254:17

**interpreting**
31:18

**interrelated**
135:12

**interrupt** 87:4
88:11

**intertwined**
28:15

**interview**
185:25

**intractable**
131:1 137:14,18

**intricacies**
173:14

**introduction**
162:12

**invention**
201:24 202:12,14

**inventions**
104:4 213:8
215:25 217:11

**inventor** 201:22

**invested** 170:16
180:13

**investigations**
187:6

**investment**
36:20 258:18

**investments**
135:11

**investors** 136:4

**invite** 30:4

**involuntary**
150:3

**involve** 259:19

**involved** 52:4
217:9 255:5
257:25 261:14
263:16 264:8

**involvement**
219:16 244:5
262:20

**involves** 154:9
261:11

**IP** 31:2,3,7,9
32:25 34:18,19,24
35:2,4,12 36:19,
23 37:4,21 38:15,
19,22,23 39:20
40:1 47:9 51:8
54:6,8 56:16
57:25 59:13,18
70:16,20 71:4,6,
10 74:17 76:1,11
79:8 86:5 92:19
93:22 94:20,21,24
96:12,14 97:12
98:9,12 104:24
105:1 107:3 110:4
112:9,11 114:15,
16 116:3,5,7
121:16,18,24
124:7,23 126:5
127:7,9 128:3,12,
17,19,22,24
129:14,21,22
130:12,16,19
140:6,12,14
162:13 165:14,22
166:1,11 167:3,14
213:16,20 214:8
215:2,23 216:4
217:19 218:8,11,
14 219:21 220:9,
10 221:19 222:3,
12 237:2 249:4
254:25 256:10
258:21 259:2,7,8,
9 260:19,22
261:19 262:14,15

265:25 267:13,21

**IP'S** 99:19

**IPCO** 39:16
65:17 236:24

**IPO** 179:7

**IPR** 60:16

**IPS** 213:12

**Ireland** 28:3,8,9
80:1 113:17
207:13 213:6

**Irish** 28:3

**Irishman** 269:18

**irrational**
139:23 140:1,3,
20,22 157:14

**irreconcilable**
121:11,12,13

**irrelevance**
45:24

**irrelevant** 63:3

**IRS** 196:4 210:25
212:19 215:13
219:3 264:11,23
265:1,2 267:4

**issue** 31:15 32:3,
10,11 45:21 70:16
71:19,20,23,24
73:21 92:7 112:21
123:4 137:19
139:16 164:20
169:13 170:7
171:23 247:24
248:6

**issued** 196:23
202:7,9

**issues** 43:7
80:19 89:14
120:20 172:8
208:9 222:11,14

———————

**J**

**jackals** 125:9

**James** 41:8

**January** 75:2
90:22 91:11

110:17 120:8
163:21 164:11
181:22 187:24
197:2 228:13
253:14

**Jeff** 161:22

**jewels** 124:7

**Jim** 25:14 162:5

**John** 25:9 38:1
185:9 263:14

**joint** 25:1,7 35:24
67:10,11 111:24
113:11 136:10
137:8 155:15
156:3 160:11
216:6 228:10

**jointly** 36:11
152:10 155:20

**Journal** 185:24

**Judge** 25:10
66:20 67:4 78:15
86:12 88:19 89:5
90:1 101:25 102:6
105:17 107:1
108:17 109:21
114:13 117:9,23
116:18 119:9,16,
21 132:8 160:18
161:4,10,17 162:4
175:8 220:21
221:5 222:24
268:7 269:20

**judges** 133:13
143:10

**June** 33:23

**jurisdiction**
147:5 154:9,15,
17,21 155:10,17
156:2,15 160:9,
12,15 190:25
207:16 209:11
233:22 256:25

**jurisdictional**
124:21 136:17
158:12

**jurisdictions**
105:11 139:12
141:7 143:12
147:9,17 176:6,16



194:12 231:8
242:25 248:5

**Justice** 23:4,7
25:13 40:14 50:10
66:20 67:3,14
88:25 93:3 119:8,
22 132:9 161:12
175:9 178:7
222:24 243:6
247:16

**K**

**Karina** 190:15
256:19

**keeping** 258:13

**key** 67:24 72:18
103:21 104:12
152:15 177:16
182:5 224:16
242:17 260:4
261:1

**kicked** 27:11

**kickoff** 33:4,11,
23 34:14

**kind** 31:17 47:9
66:21 165:20
234:3

**Kingdom** 28:1
33:6

**knew** 76:20
117:1 214:3
217:18, 267:23

**knocking** 264:6

**knot** 131:6

**know-how**
234:2 237:13
249:10,16 250:13,
17 251:21 252:3,
8,16

**knowledge**
57:16 262:9,19

**KPMG** 34:1 89:9

**Kruger** 261:13

**L**

**labs** 28:11

**land** 47:10
168:19,22

**landlord** 168:21

**language** 56:4
91:16,23 201:25
221:7 229:16
245:13 262:11
268:15

**large** 122:14,16,
17 135:3,8,9
146:18 238:4

**largely** 120:23

**largest** 59:24
164:5,23 188:12,
15

**late** 29:19 36:14
46:13 53:3,8 95:7
112:1 138:9
179:14 210:21

**law** 41:11 43:23
109:17,19 113:21
131:5 141:6
168:17 185:24
194:9,10,11 202:5

**laws** 37:14
174:18

**lawsuit** 64:22

**lawyer** 41:11
133:14 254:23

**lawyers** 79:11,
15 239:14 257:12

**layer** 78:9

**lead** 46:16
178:22

**leading** 163:20
192:11

**leads** 85:24
118:23 142:4
257:14

**lease** 168:23
198:6 249:25
250:19

**leave** 41:13,16
130:22 219:6
244:1 256:17
257:21 266:17
268:12

**leaves** 76:10
130:23 168:13

**leaving** 248:20

**left** 118:2,14

**legal** 29:3 30:9
34:24 35:10
38:14,21 39:10,25
42:6,8,11,23 43:1,
4,10 44:15 45:22,
24 46:1,21 47:2,5,
11 48:19,24 49:12
50:4,23 51:6
53:18,22 57:19
58:8,10 62:18,20
63:3,11,21 68:13
74:8,11,17 82:11
84:5,11 104:24
106:23,25 107:6,
7,13,14,20 118:25
120:22 121:3,15,
16 123:24 124:1,
22 128:13,15,16
130:5,8 132:20,21
135:25 136:22
139:12,13 147:21
148:2 165:9,12,25
166:7,10,18
167:16,20 168:3
169:4 187:14
197:11 199:16,17,
19,24 213:9
214:8,10 215:2
220:11,12,15
221:19 222:8
229:5 232:4,25
233:5,11 238:8,24
239:15,18 240:13
244:9 253:7,19
255:22 257:19
265:24

**legally** 49:23,24
132:13 139:4

**legitimate**
139:6 170:2

**length** 56:25
68:5,9,21 69:8
90:16 96:21 97:24

110:13 111:8,10

**lent** 170:4,7,16
174:8

**lessen** 162:10

**let alone** 57:13
104:2

**lets** 104:4

**letter** 265:22

**letters** 210:23
267:2

**level** 153:12
211:19

**leveled** 188:8

**levelled** 145:3
149:24

**levels** 144:25

**liabilities** 143:4

**liability** 86:18
125:6 171:13,22
247:18

**liable** 171:7

**liberty** 223:21

**license** 63:20
64:15 65:18,22
71:24 84:5
104:18,21 105:22,
25 106:7,10,12,
15,21 122:19
127:15 128:18
129:3,5,9 130:1
167:10 175:16
199:6 200:5,7,9,
14 204:4,8 215:3
220:14 233:16
234:9,10,14,15
239:6 241:21
242:1,2,7,19,20
249:13 251:19
256:4

**licensed** 58:5
142:17 169:7
229:1,2,8 233:17
239:22

**licensees** 249:4

**licenses** 105:5,9
106:11 108:8
127:3,4,5,11,17

166:22 176:4
207:14,20 214:1,
10,11 217:4
241:14 255:2

**licensing** 31:1
64:6 65:14 121:25
206:3 214:16
237:1,3

**life** 69:22 71:16
73:9 86:5 92:8,19,
20 93:16,18,23
100:25 103:16,17,
21 104:14,18
130:19 168:25
169:1

**lightly** 191:7
240:20

**likelihood** 78:4

**limb** 261:22

**limitation**
244:18

**limitations**
231:2

**limited** 25:2
72:11 127:5,15
128:23 129:5
145:13,25 201:2
237:11 244:3

**limiting** 234:23

**limits** 234:24

**lines** 61:20 67:18
123:22,23 124:13
127:11 136:16
150:23 157:18
162:15,16,25
164:5 259:17

**lingo** 229:23

**liquidate** 145:23

**liquidation**
136:11 173:19

**liquidity** 164:18

**Lisa** 161:23
172:14

**list** 169:11

**listening** 269:1



**lists** 179:20
225:12

**literally** 75:6

**literature**
103:23

**litigated** 65:5

**litigating** 31:1
100:8

**litigation** 64:7
125:22 129:16
131:1 133:10
138:8,13 152:25
154:4,7,19 155:24
157:21 248:7

**live** 38:11 62:3,5
63:13 190:7,10

**LLP** 72:21 119:23

**loaned** 125:15

**loans** 171:9

**local** 147:2
262:21,22,23
263:1,3

**located** 28:7
188:14 209:6

**location** 150:24
164:4 256:1

**locations**
164:12 255:14,15

**lock** 134:13
137:5,24 139:4
140:25 141:11
147:12,24

**lockbox** 120:15
122:12 125:8
126:24 131:13,17

**lodged** 268:21

**logic** 144:10

**logo** 135:23

**long** 76:19
131:16 171:10
183:7 186:25

**longer** 125:1
174:12,22 184:18
200:19 218:20
260:6

**looked** 221:7
223:16 263:17

**Lorraine** 191:5

**loss** 123:9 247:4,
9

**losses** 57:21
59:9 60:22,25
108:8 113:2 128:4
130:21 143:3
173:16 206:25
207:3

**lost** 249:21

**lot** 33:7 67:21,22,
23 79:20 107:13
167:24 183:1
186:20 189:9
208:7,12 211:15,
21 246:24 253:1

**lots** 264:2

**loudly** 144:15

**love** 40:19

**lower** 210:6

**lower-taxing**
209:11

**Ltd.'s** 38:6 46:16
62:8

**lucky** 193:5

**lucrative** 164:24
167:17

**lunch** 161:2,3,13

**LUNCHEON**
161:14

**lying** 268:3

---

**M**

**made** 53:13 56:1
61:24 70:15
71:17,21 72:5,8
82:12 84:10
85:12,14 98:21
113:1 114:8
126:11 129:12
130:15 143:11
149:3,7 150:25
157:10 167:12
174:11 203:20

205:19,22 215:25
222:6 235:1 239:5
248:4 249:25
250:18 251:25
267:16 269:4

**Maguire** 25:3,5,
6,12,21 27:5,7,13
31:12,14,23 40:9,
18 48:6,8,16 50:9,
10 52:24 61:17
66:24 67:1,15
68:16 85:7 91:16,
24 96:13 109:16
114:6 227:24

**maintain** 46:5
259:7

**maintains**
36:22 38:19
258:20

**maintenance**
102:3,4

**Majesty's** 33:20

**majority** 94:1
100:5 101:14
164:20 209:4,5

**make** 27:24 28:4
70:3 80:19 84:3
85:1 86:24 89:5
100:1 106:15
110:11 127:8
129:5 143:23
160:25 161:1
162:11 166:23
177:2 191:22
209:19 215:24
221:14 248:20
249:14,25 250:18
251:25 252:6

**makes** 50:17
66:16 93:20
168:14 203:4
234:16 260:23

**making** 45:10
50:15 135:4 156:7
201:23 245:1
249:5 268:4

**Malackowski**
101:3 103:9

**Malackowski's**
103:12 104:15

106:17

**management**
33:25 60:14
113:8,9 189:20

**manner** 54:25
133:3 134:16
135:6 156:25
158:14 250:24

**manufacture**
198:5

**manufactured**
200:21,22 235:19,
20 236:7,8

**manufacturing**
179:22 180:14,18,
19 182:7 183:22
200:24 244:20
245:9

**march** 79:10
151:20 207:1
210:13 212:4
215:17

**Mark** 51:5 62:6
255:8,9 256:7,9

**market** 164:23,
24 165:1 175:20,
22,25 176:14
182:1 186:14
187:3 206:6,12
240:18 241:20,22,
25 242:3,20,23

**marketed**
200:21,22 235:19,
20 236:7,9

**marketing**
180:14

**markets** 206:10
264:19

**Massachusetts**
184:25 185:2

**massive** 122:3
125:12 210:4

**massively**
122:21

**master** 40:13
53:12 54:4 56:10,
14 59:12 62:15,21
64:17 75:22 82:19

225:14 226:8,14
227:17,23 231:16
247:12

**material** 112:25
114:20,24 120:21

**materially**
177:21

**math** 159:22
160:3,4

**mathematical**
230:8

**Mathematically**
230:22

**Matra** 183:13

**matrix** 123:21
124:20 173:13
254:3,14

**Matt** 25:14,19
66:23

**matter** 28:19
30:10 45:18,19
61:15 66:10 81:9
104:1 109:17,19
113:20,21 145:12
154:22 155:11

**mattered** 45:22

**matters** 42:7
80:20 155:14,21

**maximize**
169:20 189:21,23

**maximizing**
189:25

**mayhem** 187:8

**meaning** 39:5
48:19 77:2 126:7
178:9 250:25
251:14 252:18

**means** 32:8 42:5
44:23 89:16
101:18 159:17
160:1 176:9
192:21 204:6
236:11 248:24
262:21,23

**meant** 47:5
56:19 66:12 86:15
207:11,21 231:10



**measure** 55:4
92:13 93:15 103:8
130:17

**measured**
28:15

**measuring**
56:18

**meat** 230:10

**mechanics**
55:14

**mechanisms**
150:21

**mediations**
121:1

**medical** 171:11

**meeting** 33:4,7,
11,24 34:8,10,
208:14

**member** 193:16

**members** 60:24
61:12 120:4
125:15 170:17,20,
25 247:23

**memo** 41:21

**memorandum**
41:4,7,18 50:16,
20 57:25 61:14
62:3,6,10,16 90:3,
19 91:5 228:15

**memorializes**
58:4

**mention** 63:24
205:4 231:20

**mentioned**
151:18 175:11
188:12 208:7
210:16

**mentions** 180:9

**menu** 119:18

**merit** 108:14

**message**
254:21 265:4,19

**method** 37:8
81:6 82:1 92:11
110:22 113:12
142:22 158:3,6

172:11,16 208:22
209:16

**methodologies**
192:4 196:6

**methodology**
33:17 55:3 77:18
90:15 91:1,4,10
96:19 117:7
130:24 195:18,21
196:14 207:7
208:8 211:14
222:8 230:9
242:22

**metric** 121:19

**Michael** 62:4
217:25

**Michigan** 179:7

**microphone**
67:6

**mid** 218:19

**mid-'70s** 178:13

**mid-'80s** 188:8

**mid-'90s** 188:9

**mid-1970s**
196:8

**middle** 36:5
234:17,22 248:24
249:8,11,24

**Mike** 120:1 132:9

**milestone**
181:4

**milestones**
214:6

**million** 57:11
59:23 64:8,9
71:10 112:24
164:15 172:2
180:11

**millions** 193:9

**Milne-smith**
25:14

**mind** 186:2
217:15,20 233:9
239:13 242:17
258:13

**mine** 27:6

**minimization**
190:8,19 192:17

**minimize** 125:6

**minimizing**
190:2

**minimus** 128:7

**minor** 243:4

**minute** 50:5
220:20

**minutes** 86:8,15
88:5 220:22

**mired** 130:25

**mirror** 67:25
68:12

**misapplying**
53:15

**misappropriati
on** 240:1

**misreading**
53:15

**missing** 99:4

**misspoke** 40:19

**MIT** 194:18

**model** 33:16
41:22 45:13
50:21,23 156:2
158:25

**modern** 215:9

**moment** 99:16
103:14 117:8
189:11 222:5
228:23 235:21
244:2 248:12

**monetize**
124:12

**money** 93:17
102:11,12 125:15
144:9, 150:12,19
159:24 169:19
195:3 209:19

**monies** 159:21

**monitor** 26:25
63:23 84:10,21

134:22 136:14
140:9 153:2
162:21,24 167:7
170:9 171:4,6
185:19 197:21
212:10 214:3,7,
13,20 215:21
218:6,13,15,25
219:19 224:10
231:24 232:2
233:4 234:16
235:10 249:1
257:4 261:11,17,
23 262:3,9 268:8

**Monitor's** 37:15
119:3 129:16
165:19 167:18
168:10 197:21
215:20 217:21
219:3,16 223:6
231:22 232:5,
234:19,20 243:7
249:18 250:22
251:6 252:4
262:19 268:23

**monopoly**
178:15

**months** 36:13
79:10 80:6 104:2
210:14

**Montreal** 197:2

**morass** 131:10

**morning** 23:2,6,
7,10 24:17,25
67:3,4 119:21,22
130:3 132:8,9
183:1 190:13
227:15 228:16
270:5

**Morris** 24:6

**motion** 149:12,
13

**MOU** 58:1 86:16,
21 91:13 92:2
93:6 247:15,17
268:12

**move** 25:25
33:14 67:10 75:1
77:7 86:2 92:6
103:16 104:17
106:23 114:17

116:14 159:21
169:10 175:6
182:23 185:10
212:6 254:19
257:24 260:1
269:5

**moved** 159:24
180:5 204:18

**movement**
102:7 191:20

**moving** 69:20
125:2 184:14
212:24 260:7
269:12

**MRD** 257:15

**MRDA** 31:20
51:11 59:13 67:23
69:2,4,14 90:5
91:8 95:14,19,24
96:3,5 107:6,23
108:2 109:9,10,
11,17,22,25
110:11,15 111:3,
11,12,25 112:5,7,
13 121:14 123:3,
4,12 126:6,9
127:3,21 128:14,
20 129:4,11
130:21 134:3,7
141:17 142:12,14
157:8 169:7 176:4
177:17 196:14,19
197:8 198:23
204:24 212:25
213:18 215:23
217:1 218:7
219:20 220:9,11
222:22,25 223:4,
224:22 225:5,16
226:5,8,19 227:9
228:5,8,15,18,25
229:1,17 230:6
231:5 234:25
236:1 239:3,6
240:21,22 241:7,
23 242:5,6,10,17
245:25 246:11
247:7 248:20
252:24 253:6
254:24 258:3
267:1

**multi-national**
150:22

 

**multinational**
123:21 156:20
174:13,15 177:14

**multiple** 134:25
187:6 224:17

**myths** 177:7

---

**N**

**nail** 89:24

**nature** 77:24
99:2 134:16
145:8,15 146:8
154:14 158:4,5
211:18 238:14
256:22

**nauseam** 223:1

**needed** 70:4
83:8 91:3 125:4
178:9

**negotiated**
170:19

**negotiating**
110:23

**negotiations**
80:8 97:20 195:15
196:20 205:17

**Neil** 25:9

**net** 115:15 143:6

**network** 116:21
234:3

**networking**
185:4

**networks** 25:2
27:16,17,20,21,25
28:1,2,3 29:16,20
34:9,13 35:12,20
36:14,21,25 37:6,
9,13,23 38:2,6,21
39:9,21 41:2,4,7
45:20 46:2,6,9,16,
25 50:24 51:2
53:17,19,22 54:1,
5,11 55:1 56:13
57:9,13,18 59:4
61:20,25 62:4,5,8
64:10,19,20 65:3,
7,8,10 72:11

135:24 164:6,7
184:21,23,24
185:5,8 188:13
228:21 229:19
230:1

**Networks'**
210:12

**Newbould** 23:4,
8 40:14 50:11
66:20 67:3 89:1
93:3 119:9,22
132:9 161:12
175:9 222:24
243:6 247:16

**Newbould's**
25:13 67:15

**Nichols** 24:6

**nickel** 204:10

**night** 173:5

**nineties** 95:8
104:5

**ninth** 252:23

**NN** 55:25 58:6,7,
10,16,22 73:1,8
74:9,11 75:13
91:18,25 113:17
147:25 207:13
226:17 227:13
229:5 230:22
232:2,25 236:6,19
237:6,22 238:1
239:9,18 240:1
241:12 243:11
244:10,23 245:6
248:22,23 250:5,
6,15

**NNC** 174:23
214:14,22 268:18

**NNI** 61:16, 70:18
80:16,20 113:17
123:11 127:3
128:16,21 129:24,
25 162:13,23
163:4,22,24
164:4,9,11,17,21,
25 165:4,21,24
166:15,19 167:2
168:6,7 170:22
171:7,14 172:20
174:21 176:6

178:21 180:2
184:23 188:5
189:4 195:1 196:4
197:6 198:2
200:17 202:18
203:10,15,16,17,
21 204:7,18,21,25
206:11,17 207:13
212:11 213:5,22
216:7,16,18
218:1,4,22,25
219:4,7,16 231:9,
12 232:9,12,15
234:4,5 237:24
244:6 245:1 253:5
254:23 258:6
260:3,19 262:7
263:12,18

**NNI'S** 163:11
167:5

**NNL** 39:9 40:1,2
58:4,7,11,25
62:20 72:4 74:9,
11 75:20 76:9
77:5, 78:15 80:3,
14,25 107:6,7,16
108:20,24 113:17
114:9,10 123:11
126:23 127:1
128:12,13,15,16
129:24 147:22
148:4 152:13,24
165:1,12,21
166:7,17 167:12
168:7 174:23
176:7 188:4 189:5
190:16 195:1
196:2 197:5
198:25 199:6,23
200:17 203:9,13,
18,19 204:18,21
205:22 206:15
213:5,10,18,19
214:7,14,22 215:2
216:7,14, 217:18
218:2,7,11,15,25
219:4,17 220:11
221:15,17,25
222:8,15,17,19
228:20 233:6,15
234:7,8 238:19,24
239:19 240:8,
241:14,18 244:8,
12,13 245:5,6
246:8 253:4,11,15

254:11,23 256:20
257:2,19,25
258:2,4,19 261:12
263:6,13,18
267:23 268:8,10,
18,22

**NNL'S** 63:3
76:25 81:4 82:16
151:20 165:3,6,25
203:16 253:12

**NNSA** 69:24,25
70:10,20 71:2,8
72:2 113:17
207:13

**NNUK** 72:12
113:17 120:7,12
123:11 127:3
152:24 167:2
207:13 253:5
265:22,23

**nodding** 260:9

**nominal** 128:15
130:8

**non-arbitrary**
135:6

**non-debtor**
136:24

**non-exclusive**
106:11 255:2

**non-high**
101:11,14

**non-
manufacturing**
79:19

**nonexclusive**
198:3,8 199:6
200:11

**nonroutine**
211:24 231:25

**normal-course**
238:6

**Nortel** 25:2 26:1,
13,16,21 27:1,15,
17,20,21,22,25
28:1,2,3,11,22
29:8,16,17,20,24
30:9,14 31:2,3,6,
7,9 32:25 33:12,
14,18,23,25 34:7,

9,11,13,18,20,21
35:11,12,20
36:13,14,15,21,25
37:6,9,12,13,18,
21,22,23 38:2,6,
13,14,19,21 39:9,
21 41:1,3,4,7,19
44:18 45:20 46:2,
6,8,15,25 49:7
50:24 51:2,8
53:17,19,22 54:1,
5,10 55:1,16,22
56:9,12,16 57:9,
13,18 59:4,13,18,
24 60:7,11,14
61:8,13,19,25
62:4,5,8,10 64:3,
8,10,14,18,19,20,
22,23 65:3,7,8,10,
16,18 67:11 69:22
70:5,12 71:3
72:11,12 75:4,9,
17 77:10,14 79:7
81:20,24 82:3
89:13 90:24 92:9,
11 94:20 95:7,10
96:15 102:10
103:23 112:25
120:5,6 123:20
124:3 125:1
127:8,9 133:4,25
134:9,14,17,24
135:4,16,23,24
136:4,8,10,22,25
137:6 141:20,22
142:12,23 145:5,
15 146:10 147:19
150:4,6,9,10,14,
17,25 151:3,7,16
152:12,14,18,23
153:11 156:24
157:2,24 158:4,16
163:21 170:3,11,
15,17,19 171:1
173:9,14 175:12,
21,25 176:19,21
177:5,10,12,21,
23,25 178:2,10,
17,24 181:1,24
182:3,23 183:4,21
184:19 185:3,7,
10,14,15,21
186:2,10,13
187:4,23 190:3,9
192:4 193:11
194:6 196:5 197:3

200:23 202:21
204:22 205:1
207:2,18 208:9
210:8,11 211:17,
18 215:9 216:4
217:6,17 228:21
229:19 230:1,19,
24 231:7,10,15,16
232:10 235:1
242:24 245:2
249:4 255:5,17,21
256:2 258:5
261:15 262:8
265:24 267:22

**Nortel's** 25:24
28:6 35:9 37:4
39:20 41:5,14
42:1 50:25 59:22
61:8 65:21 70:8
71:11 81:14 135:2
139:18,20 152:8
156:21 164:8,24
179:15 184:14
206:22 265:25

**North** 77:22
182:24,25 183:18
188:14

**Northern** 178:2,
5,10,13,17,19,25
179:1,4,7,11,20
180:7,16,20,21
181:24 183:15
184:19 185:7
197:4,5,16,18
198:25 199:21,25
205:14

**note** 77:17 83:9,
17, 89:20 100:3
135:23 198:21
200:6 248:8

**noted** 74:8
179:10 181:25

**notes** 89:6
181:10

**notice** 199:4,9
241:4 265:13

**noticed** 102:24

**notion** 39:9

**notions** 177:6

**notwithstanding** 91:22 106:6
110:7 241:4

**NT** 211:6 229:10
266:13

**NTI** 178:20 180:2,
10 206:11,17

**NTI'S** 197:25

**NTL** 198:2

**number** 76:23
77:3 97:9,15,18
145:6 188:4
189:23,24 204:19
222:21 229:13
253:2

**numbers**
100:20 182:21
188:19,22,23

---

**O**

**O'connor**
119:21,23 121:12
132:2,4,7,16
138:7

**Objection** 52:3

**objectives**
131:23

**obligation**
105:5 201:7
202:19 240:7

**obligations**
68:9 86:18 142:15
143:1 152:22
171:11, 247:18

**obliged** 217:23

**obsolete** 104:1

**obtain** 154:19
171:15

**obtained** 64:8
154:3 178:5
179:13

**obvious** 84:14
94:6

**occur** 147:20
148:24

**occurred** 133:8
174:10 192:5

**October** 36:12
80:7

**odd** 84:25

**odds** 121:2

**OECD** 216:21

**offending**
252:17

**offense** 267:25

**offering** 201:23

**office** 198:11
201:16,17 202:8,
10

**officer** 38:7,9
176:25 217:24
253:15 254:12
257:7

**officers** 87:3,6
149:10 154:24
187:13,14,15,16

**official** 190:15
257:3

**older** 94:2,4,8
99:21,23 100:4

**one-fifth**
176:11,12

**one-sided**
57:16

**ongoing** 59:9
174:14 262:13

**Ontario** 187:7
253:14

**onward** 181:7

**open** 160:12

**opened** 179:6

**opening** 24:9
25:1,17 66:22
112:19 119:20,25
161:19 162:6
168:13 169:9
219:19,22

**openings** 177:4

**operate** 68:14

**occurred** 111:7 124:5
127:16 165:1
174:12

**operated** 39:13
40:6 41:3,19 68:1,
18 84:15 85:12
123:16,19, 124:21
126:6 128:5 133:4
134:9,17,24
136:16 142:12,24
158:5 173:10
247:25

**operates** 37:7
68:11 148:10

**operating**
32:12,19 48:25
53:10 55:14 59:9
68:5,8, 96:20,25
110:16,21,22,23
127:13,19 173:17
179:11 207:3
209:5,21 210:4
222:10

**operation**
136:19 182:16

**operations**
69:6 173:13,15
174:14 180:11
182:24

**opinion** 73:13,
15 103:17 115:11
117:13

**opportunities**
182:1

**opportunity**
120:17

**oppose** 103:3
163:2

**opposed** 78:1
83:20

**optical** 46:16

**Option** 65:22
66:1,14

**options** 65:20

**order** 24:14 83:9
87:19 92:18 147:9
148:16 154:6
158:12 253:13

**orderly** 137:2

**orders** 154:18
196:22

**organization**
27:1 124:20
125:16 126:1
173:13

**organizations**
180:15 194:19

**organized** 70:8

**original** 226:8

**originally** 96:21
98:2 177:23 201:3
228:21

**Orlando** 62:4
218:1

**Osler** 41:11

**Ottawa** 216:5

**outline** 91:7
222:21

**outlined** 74:13

**outlive** 104:11

**outright** 59:11,
12,17 66:1

**outset** 144:6

**oversight**
244:21

**overview**
208:17

**overwhelmingly** 57:17 85:25

**owe** 172:18

**owed** 152:21
172:23

**Owens** 143:18

**owes** 120:12

**owing** 142:21

**owned** 27:20,25
29:24 30:14 31:6,
9 32:25 41:6,23
51:2 54:7 55:16
57:25 64:19 76:1
108:6 126:5 127:1
129:13 136:20

 

141:14 152:10,20
165:4,13,23
178:14 200:1
203:18 220:10
221:18 222:3
231:12 234:5
246:9 255:15,16,
19 258:7 263:4
268:10

**owner** 29:13,16,
21 34:24 35:12
36:15 37:24 39:10
46:7 47:6 53:20
54:6 57:18 58:11,
25 59:5 64:21
108:25 168:16
222:18 255:13,18,
22

**owners** 34:25
36:2,6 37:3,11,21
54:12 59:6 65:11
259:23 262:7
267:12

**ownership**
29:22,25 30:6
31:3,22 32:15
35:4,13,15, 36:17,
23 37:25 38:15,
18,22,25 39:1,3,4,
19 40:1 42:3,6,8,
12,23 43:1,10,11,
25 44:15 47:3,12,
20,21 48:1,5
49:11,13 51:7
53:9,22 55:24
56:4,9,12 57:20
58:2,7,10,15,21
59:2 62:18,23
63:11 67:10,11
68:22 70:11
71:17,21,25 72:8
74:9,11,12,17,20
75:17 79:3,8
85:24 91:18,19,
104:24 105:1
107:25 111:24
112:3,5, 113:11
118:21,24 121:16,
17,19 127:5
128:21 129:14
130:5,6, 141:8
147:22 165:16,20
166:8 168:11
169:2 185:6

203:14,19 211:2
212:9 213:11,14
214:4 215:8
217:19 221:11,25
222:9 224:17
229:9 230:1,21
231:7 233:12
243:10 244:15
253:9,19 255:7,25
256:16 258:20
259:12 260:3,19
261:1,19 263:3,7
265:25 266:1
267:20 268:14,15,
20

**owning** 56:16
203:10 264:16

**owns** 34:17 43:4
70:20 71:4 77:15
79:1 80:3 176:5

**Oxford** 25:9

---

**P**

**P.M.** 270:10

**packaged**
102:18

**pages** 63:22
266:10

**paid** 47:15 56:20,
21 93:19 99:23
100:6,9 113:4
138:23 142:15
143:4 166:10
167:19, 173:25
175:1 190:4
191:24 193:16
209:7,8 213:23
258:15

**paid-up** 204:3,8
207:14,20 242:7

**pain** 125:20

**painfully** 125:17

**Palo** 179:24

**panoply** 165:16
168:12 212:9,11

**paper** 96:7
105:23

**paragraph**
50:19 71:1 143:14
215:21 218:7
219:22 223:9
231:14 232:13,16,
20 233:2 246:18
249:2 251:5,6,10,
11,13 252:4

**pardon** 106:4
251:9

**parent** 27:15
28:24 29:2 33:8
35:20,22 36:10
37:7 38:3 40:24
45:20 46:2,11,22
50:15 55:11 61:24
174:23,25 222:3

**parents** 214:23

**pari** 139:1,14

**parol** 111:5
253:25

**parole** 68:15

**part** 25:16 31:9
64:25 68:13 69:19
72:13 74:14 77:4
78:7 80:18 87:7
92:3,7 96:2 98:23
100:14,24 112:8
115:20 116:22
121:9 123:15
124:11 155:2
156:4 177:23
188:7 216:3
235:23 245:11
251:19 252:23
254:3,13,14

**participant**
54:9,19,21 56:11
176:4 204:8
206:7,9 211:5
229:8,18 230:13
236:18 241:15,16
243:9 255:1,12,16
256:2 266:1,12

**participant's**
200:6 241:12

**participants**
35:3,7 41:24
51:12,18 55:5,19,
20 58:5,17 62:13
71:3 91:17,25

142:17 169:7
201:6 204:2
213:20 228:19,25
229:2 230:16,17,
23 231:6 233:17
236:15 237:19
239:22 242:13
246:9,19 253:18
255:8,20 256:3,23
264:15 268:17

**participate**
136:25

**participated**
39:23

**participates**
71:2

**participating**
262:13

**parties** 24:7
25:8,17 26:8,9,10,
14,17,21 28:13,
15,18,21,25 29:4,
6,12,20,21,24
30:5,6,14,17,22,
24,25 31:6 32:1,5,
7,11,13,25 35:7,
13,14 36:2,8,17,
22 37:2,10,21,24
38:22 41:6,25
42:2 44:3 46:13,
21 48:18,20,25
49:4,5,10,20 51:5,
22 52:11 53:6,8,
23,25 54:7, 55:16
56:1,7,15 57:2,20,
24,25 58:9 59:1,6,
15,17 60:2,8,9,12
61:3 62:12 63:2,5,
18 64:2,12,16
65:11,13,19,25
66:8, 68:18 75:21,
24 79:4 80:12
85:21 86:19 91:22
92:18 96:4,10,12,
14 98:10 103:7,12
104:25 106:4,11,
107:10,21,25
108:11,20 109:25
110:2,9,21
111:16,18 112:2,
4,22 115:17,24
118:19 125:10
131:14 136:7

137:13,22 139:21
154:3,6,21 155:7
156:23 157:5,13
169:14 193:23,24
194:23 197:15
202:4,12,25 204:2
207:12 228:19,20
241:25 247:19
259:1 261:23
262:17

**parties'** 30:12
33:1 35:15 40:12
49:18 52:25 54:4
55:8 56:10 58:2,
15 59:11 62:18
112:16 120:18
121:23 126:12
131:9

**partner** 182:15
212:8

**partners** 204:22

**partnership**
248:2

**parts** 125:2
141:13,21 206:10

**party** 26:5 28:17,
23 30:2 38:18
56:8,19 107:12,17
108:21 137:25
140:2,4 154:20
155:13 198:19
201:13

**party's** 26:4

**pass** 25:18

**passed** 158:10
181:4

**passu** 139:1,14

**past** 64:9 181:15,
16

**patent** 45:2,7,
47:9 65:1 92:23
94:4,22 98:21
99:20 101:7 146:9
162:14,20,22
163:15 165:7,11
201:15,19 202:2,
3,7,8,9,13,15

**patents** 29:11
43:5 44:18,22

 

45:15,16 57:4
64:3,11,18,23,24
65:5,21,23 93:11,
12 94:2,3,7,10,18,
22,25 95:1,2,4,9
97:4 99:18,25
100:4,6,8 101:6,
12,15,16,19,21,25
104:10 129:1
133:18 134:11,18,
20 137:13,16
142:7 145:17
146:11,14,17
158:19 197:14,17
198:5 199:7,15
201:16,18,19
202:4,5 216:23
217:10 234:1
237:11 239:3
244:23 249:9,15
250:11,15 251:20
252:1,7,15

**path** 255:6

**Paul** 115:8

**pause** 23:5
69:15

**pay** 143:6
167:14,23 190:25
203:7 204:10

**paying** 125:23
143:8 167:15
208:12 218:22

**payment** 142:21
174:4 211:19

**payments**
213:22,24

**peak** 190:4

**penny** 127:23

**pension** 76:14,
16 89:12 119:20,
24,25 120:3,5,13
125:15 131:7,19
132:10 133:20
140:19 142:9
150:10,13 151:3
152:24 158:21
171:10

**pensioners**
49:25 125:23
133:17,19 138:16,

17,18,25 140:17
142:8 150:2,11,18
151:4 157:20
158:9,17,20 183:3

**pensions** 151:2

**people** 39:25
43:14 146:10
151:3 185:14
257:5,17 260:23
267:22,23

**percent** 29:9,13
56:20,21 57:3,5
71:9 78:8,10,19
95:20 96:21 97:9
99:17,18,20,22
100:4 107:2,3
108:7 120:11
122:14,15,16,17,
18 126:24 128:5
148:1 163:25
164:3,7,9 179:18
180:23 181:11,12
182:19,20 184:7,
8,13 185:7
191:10,11,14,15
208:25 209:1,13,
14 216:18 258:10

**percentage**
148:14 216:17

**percentages**
60:21 61:6 77:23
78:5,6

**perfectly** 86:13

**perform** 212:2
219:5 231:18,19
245:9 263:20
266:23

**performed**
123:25 209:13

**performing**
135:1

**peril** 49:23

**period** 90:9,12,
22 95:6,14 98:4
102:1,2 108:22
109:20 110:1
111:15 150:17
185:13 186:10
187:19,22 188:7
198:15 200:12

207:2,3 209:23
260:5

**periods** 172:21

**permanent**
207:20

**permit** 48:12

**perpetual**
128:18 198:15
207:20 214:1
220:14

**perpetuated**
138:13

**perpetuity**
129:9 204:10
234:11,15

**person** 42:13
61:21 168:16,24
218:1 256:20
268:3 269:17

**persona** 154:17,
21

**personal** 57:16

**personnel**
253:5

**persons** 168:18

**perspective**
39:2 43:5 44:25
47:18 203:4
208:23 230:3
240:11

**perverse** 57:7

**Peter** 62:9 75:12

**petition** 163:20
164:11

**petitions** 261:24

**ph** 70:17

**Ph.d.** 192:10

**phase** 100:15

**Philadelphia**
88:22

**Phillippe** 63:14

**phone** 104:1,3,4
134:19,21 270:1

**phrase** 38:25
67:16 199:17
230:4 239:14

**phraseology**
246:6 263:12

**phrasing** 96:2

**pick** 98:20

**piece** 99:1
111:20

**pieces** 223:23

**piechart** 122:7

**pinnacle** 186:13
206:23

**pitch** 97:1 258:3

**pitched** 116:16,
17,18

**place** 96:19
110:8,12 111:1,9
116:20 118:7
124:15 130:24
177:20 184:17
187:12,24 190:22
191:23 193:11
194:14 207:11
209:22 210:17

**places** 177:21

**plan** 23:11,15
120:5,7,8,11,13
150:15 153:17

**planned** 210:2

**plans** 150:11,13
151:3

**plants** 180:18
182:7

**play** 196:9

**plays** 155:5

**pleasure** 25:4
175:10

**plenary** 160:8

**plucked** 216:20

**pockets** 125:24

**podium** 24:9
131:25 212:13
222:20

**point** 50:15,17
68:6 69:1,2,21
77:6 83:24 84:7
85:3,6,8 86:11
94:1,24 95:7
96:18 98:15
102:12 103:15
104:8,21 105:12
111:2,25 112:2
116:12,14 117:1,
10 138:7 168:10,
14 169:10 176:24
178:8 187:11
189:24 202:23
204:17 206:23,24
213:18 219:7
220:5,8 221:14
222:7 225:2,10
232:21 235:1
236:4 267:18

**pointing** 232:11

**points** 114:14,22
132:25 143:13
169:12 248:21

**policies** 190:21

**policy** 190:8

**Polish** 244:3,7
245:24

**pool** 26:21 28:14
137:4 144:23
145:10 213:8

**portfolio** 65:1
66:2 129:22 135:9
163:15 202:3

**portion** 77:21
78:3 87:18 179:9
183:5

**posed** 35:24

**position** 31:20,
24 34:12 35:17
37:20 41:1 65:7
66:15 72:3 75:4,5,
8 77:15 78:22
79:9 81:5,8
100:13 105:18
107:9 108:21,24
109:7 117:24
118:1 129:16,17,
24 131:21 133:15
138:19 149:5
152:16 163:5



171:4 175:3
231:22 232:19
268:23

**positions**
138:2,12 139:25
217:22

**possess**
165:17,24 166:1,5
168:3 266:20

**possessing**
266:19

**possession**
169:1

**possessory**
169:5

**possibilities**
167:22

**possibly** 168:1,
2

**post** 171:23

**post-bankruptcy**
82:15

**post-filing**
79:17 81:9,15,18,
25 82:7 85:18
89:8 94:20 119:2
190:15

**post-insolvency**
124:24 126:2
158:15

**post-petition**
138:24 171:22
172:21,23

**post-sale**
231:23

**potatoes** 230:10

**potential** 79:16

**power** 238:9

**PP&E** 114:25

**practices**
237:14

**pre-** 85:17 158:15

**pre-filing** 81:9

98:4

**pre-insolvency**
124:23 126:2

**pre-petition**
171:12

**pre-trial** 250:22
252:5

**preceded**
177:19

**precedence**
143:9 145:13

**precedent**
59:20 63:25 133:7
138:10 145:14
156:18

**precedential**
131:4

**precisely** 59:16

**preconceived**
177:6

**predecessor**
178:22 188:5

**predominantly**
120:22

**preexisting**
174:14

**prefer** 43:19

**premise** 139:13,
23

**premised**
139:23

**prepare** 261:24

**prepared** 35:24
37:13 46:12,19
50:16 53:11 61:13
72:23 81:17,23
162:7 210:11
216:8 219:2,12,15
261:20 262:19
263:22

**preparer** 37:14

**preparing** 33:7,
24 67:11 69:20
75:9

**present** 64:6
101:1 176:13

177:1

**presentation**
32:23 120:2 136:3
162:9 175:18
194:22 208:16,20
245:25 252:24

**presented**
73:18 135:22
182:1 254:2 266:4

**president** 38:4,
82:6 190:11,14

**pressure**
191:21

**pretrial** 63:22
120:18 223:6

**pretty** 42:15

**prevails** 147:22

**prevent** 141:4
202:12,15

**preview** 29:23
30:7

**previously**
157:7

**price** 66:10
169:23 189:25
193:15,18

**prices** 194:1

**pricing** 33:22
37:1 41:8 42:13
43:3,21 44:24
45:13 48:11,14,19
67:16,20,23,24
68:6,10,24 69:3,
16 77:19 80:17
92:4 96:19 97:24
110:14,24 113:23,
24 123:6 150:21
153:8 171:23
172:7,11,15
189:10,12,17
190:21,22 191:4
192:3,9,11,14,16
194:9 195:10,12,
18,20,22 196:1,6
205:5,11,12 207:7
208:8,17 209:9
210:10,17,18,19
211:14 213:22,23
215:12 216:8

219:1,12 229:21,
23 230:3 261:12,
15,18

**pricing-specific** 42:20

**primarily** 79:23
137:12,16 138:3
200:24

**primary** 37:11
121:6 122:2
138:19 143:7
164:13 201:6
202:18 240:6
253:12 262:7

**principal** 27:16
28:6 105:3 138:25
156:10 176:25
215:19

**principle** 49:3
51:17,20 96:21
97:24 111:8,10
174:2 252:17

**principled**
105:25

**principles**
68:21 69:9 90:17
118:25 139:12

**prior** 34:23 58:19
59:22 61:19 84:16
133:23 134:9
138:4 139:22
141:18 142:10,24
149:3 153:8
184:10 199:3
204:6 210:18
212:1 228:6
247:14,23 249:21

**priority** 139:15

**privilege** 25:8

**pro** 132:12,15,20,
24 133:1,22
135:20 138:18
139:3,11,13
140:25 141:9
142:13,18 143:10,
14,19 144:4,17
145:3, 146:20
147:2,13 148:8,9,
20,24 149:25
151:11,22 152:8

153:12,16 156:1,
4,8,12, 158:13,25
159:16,18,24
160:1,2,5,14,16

**problem** 137:15
165:19 224:5

**problems**
224:13

**procedures**
24:15 190:22

**proceed** 226:1

**proceeding**
27:19 144:3 145:6
147:18 153:1,22
155:3 158:2

**proceedings**
35:18 149:19
153:20,23,25
177:13 201:10
202:20 261:23

**proceeds** 25:23
26:2,4,11,17,18,
23 28:22 29:2
30:16,19,20,23
31:1,10 32:7,8,13,
15,20 34:18 35:1,
14,16 39:10 40:3
42:7 45:21 51:8,
25 52:20 54:14,16
59:10,17 60:3,7,9,
62:11 63:5,6,9,13,
19 64:2,4,12,13
69:12 81:2 82:13
83:14 85:16 99:7,
8 105:20,21 107:3
109:9 112:20
114:19 120:15
122:25 124:16
125:9 126:25
127:24,25 128:5
129:21 131:13
133:25 141:16,19
144:23 145:9
148:3 157:11,17
162:23 167:5

**process** 87:7
102:6 115:4
117:17 124:14
135:19 145:1,11
149:4,8 158:14
160:11 169:19
172:24



**produce** 122:3,
21 217:12

**produced** 57:11
163:24 169:5
237:17

**produces**
156:12

**product** 103:20
127:15 194:3
195:5 206:2

**products**
103:17 104:11
124:3 127:6,8
129:6 135:2
164:24 198:6,9
200:18,20 201:1
234:22,25 235:8,
11,12,14,17,18,23
236:21 238:6,9,10
239:8 244:10
249:3,5,7,11
250:1,2,13,15,19
251:18,23 252:1,
6,11,12,14,21,22

**professor**
192:12 194:18

**profit** 73:5 113:1
123:9 127:14,19
142:16 143:7

**profit-sharing**
33:15 41:13,17,22
42:1 46:14 50:21,
22 60:20,21,24
61:2,6,12 143:9

**profit-split**
33:17 35:3,6 37:8
52:13 55:2 78:6
196:13 230:9

**profits** 32:12,19
33:13 48:22,25
53:6,11 55:14
56:17 57:21 59:6,
9 60:22,25 69:5
105:6 128:4
130:21 135:5
142:11 173:16
208:24 209:4
260:1,7

**project** 31:5
72:10,13 88:14,
16,18,19

**projects** 135:6

**promise** 117:2

**proper** 43:15
68:21 90:24 117:7
119:4

**properly** 44:2
45:12 84:3 90:14
107:24 114:3,4
118:19,20 158:3

**property** 25:25
28:14 34:22 36:3,
7,19 41:5 45:11
47:6,14,15,16,17,
24 48:3 50:18
51:1,24 52:1,19,
21 60:16,18 61:5,
9 65:17 70:12,21
73:5 78:1,3,17
79:23 82:14 101:4
126:9,19,23 127:1
137:12 165:9
186:22 197:18
199:8,16,20,23,25
200:8 201:12,17,
20 202:10,21
203:7,13 207:15,
17 214:15 216:22
217:3,4 233:11,
21,24 234:1,4
236:24 237:3
238:23 256:25
258:17,24 259:4,
13,15,20,23
263:2,5,7 266:20
268:21

**proportion** 26:4
63:10 130:14

**proportional**
130:18

**proportionate**
62:14,24

**proportionatel
y** 28:23 30:1
55:10

**proposal** 78:12

**propose** 25:16,
23 34:21 236:20

**proposed** 57:13
96:24 129:8
208:21 209:15

211:13 235:19
236:8 259:18
265:13

**proposition**
139:8 142:14
143:19

**propounded**
232:2

**proprietary**
168:22

**prosecuted**
187:18

**prospective**
64:10 116:16

**protect** 125:23

**protocol** 151:1
155:20,22 156:1

**proverbial**
131:6

**provide** 53:16
57:1 79:12 115:10
126:14 211:19
249:3

**provided** 51:11
55:19 124:3
185:12 230:16
253:18 259:20

**providing** 24:14
178:18

**provision**
198:18,22,24
203:25 204:14
240:3,4,6,22

**provisions**
213:3 242:18
248:8

**public** 27:2
179:15

**Puerto** 206:13,
17

**pull** 254:20

**pulled** 208:16

**purchase**
173:25

**purchased**
151:21

**purchaser**
137:3 168:6

**purchasers**
116:17 166:4
167:15

**purest** 159:4

**purpose** 53:11
69:3,14 73:19
86:21 89:13 90:21
92:10 95:25
117:19

**purposes** 45:24
48:11 82:16 89:25
96:20, 97:25
157:8 238:14

**pursuant**
229:11

**pursuing**
175:14

**push** 100:20

**pushing** 106:1

**put** 34:4 49:8
76:20 83:9 85:20
93:13 96:19
97:15,18 98:5
104:19 106:7,13
110:12 111:9
117:25 122:4
131:13 142:6
153:5 158:18
175:13,19 187:25
190:22 194:13
209:10, 224:21
227:25 228:3
241:21 243:5
257:7,19 263:14
264:5

**puts** 170:10

**putting** 53:24
173:11 223:22

**Pwc** 76:6 89:9,
11,12

**Pwc's** 76:13
89:14

**Q**

**Q&a** 34:5,10

**Q3** 76:7

**qualitatively**
121:7

**quantitatively**
121:8

**quarter** 23:14,16
161:9

**question** 24:13
30:22 31:13 32:21
33:9 34:17,21
39:2,15 48:7,10,
13 63:4 73:24,25
82:7 83:4,10 84:8
88:11 89:10 92:22
98:13 102:24
109:15 123:13
126:4,18 137:19
139:6 172:5
173:23 176:13
190:24 193:17
194:22 195:2
247:19

**question-and-
answer** 34:5

**questionable**
99:12

**questions** 34:2,
6,16 35:24 67:15
122:23 126:16
158:22 160:12,19
173:3 247:16
267:5,14

**quick** 24:13
88:11

**quickly** 206:25

**quote** 143:21
144:16 168:11

**quotes** 216:21

**R**

**R&d** 28:19 35:5
36:20 41:24 45:3,
4,6 52:5 54:17,22,
24 56:14,19 58:23
59:12 62:14,15,
21,24 70:2,3 71:2,
3,6 81:1,23 82:18
94:6,7,11,13 95:7,



15 96:16 97:4,8
100:22 102:4,13
103:8,19,22
113:12 119:5
121:23 130:19
135:2,11,13 148:2
164:13 178:4
179:2,3,23 180:18
182:10 184:2
186:20,22,23
188:17,19 191:16,
21,25 205:24
206:4 209:13
211:5 212:1,2
213:7,9,24 215:8,
16,18 216:1,12,15
217:7,12 218:4,
20,23 226:9,14
227:18,23 230:12
231:16,18 233:21
238:22,23 247:1,
3,12 258:6,10,18
259:5 260:2,16
262:25 263:1,20
264:14 266:12,23

**raised** 31:16
87:18 109:15
148:24 153:16

**ran** 76:7

**range** 118:10

**rapidly** 183:17

**rata** 132:12,15,
20,24 133:1,22
135:20 138:19
139:3,11,13
140:25 141:9
142:13,18 143:11,
15,19 144:4,5,17
145:4,20 146:21
147:2,13 148:8,9,
20,24 149:25
151:11,22 152:9
153:12,16 156:1,
4,8,13,14 158:13,
25 159:16,18,25
160:1,2,5,14,16

**rate** 191:7,8,9,11,
13 208:10,11
210:6

**rated** 153:11

**rates** 191:23,24

**rating** 153:10

**rational** 140:2

**rationale** 267:10

**Ray** 176:25

**reach** 174:23
208:4

**read** 38:17 44:9,
10 73:12 107:24
120:18 144:17
231:21 238:3
243:19 248:10
249:1

**reading** 38:24
58:3 132:17 235:3
243:18

**ready** 221:3
248:13

**real** 69:22 70:1,
22 71:16,17 73:9
101:18,19 169:7,8
190:24 215:14

**reality** 35:19
49:18 87:12 98:16
167:12 193:19
221:12 223:16
266:4

**realization** 73:3
74:6 154:13

**realize** 156:23

**realized** 29:10

**realty** 158:15

**reap** 56:21

**reason** 48:17
49:14,15 97:5
113:24 136:23
145:21 193:7
205:4 221:10
236:3 240:20
246:16

**reasons** 48:17
57:19 132:12
145:20 159:9
215:7 221:21
257:20

**rebuttal** 106:17

**recall** 68:17 75:1
181:19 204:5

**receipt** 141:3

**receive** 47:23
127:14,19 148:13
163:6 166:23
167:4 174:3

**received** 24:13
46:25 107:4 128:7
159:12,13 163:12
258:4

**receiving**
220:14

**recess** 88:6
161:13,14 220:25
270:9

**recital** 54:8,15
229:4,7

**recitals** 229:3
231:4 246:17

**recognition**
142:10 154:11

**recognize**
31:25 79:7 193:22
224:20 235:6
238:9

**recognized**
49:11 56:14 57:24
65:20 112:16
136:7 137:13
153:21,23,25
154:6 206:1

**recognizes**
55:15 194:10,13

**recognizing**
140:15 160:9
180:5

**recommendati
ons** 208:18

**record** 29:14,18
50:7 80:2 84:4
93:7 102:16
225:23

**recorded** 60:12
70:23 113:13
180:22

**records** 55:8
113:14 118:18
257:5

**recover** 163:10
239:23

**recovered**
137:10

**recoveries**
125:12

**recovery** 139:14
141:10 148:14
160:2,5 169:20

**recreation**
71:16

**reduced** 187:2
209:25

**Reed** 25:6

**refer** 171:4

**reference** 36:5
55:6 58:14 60:20
135:23,25 189:24
250:17 263:18
266:16

**referenced**
223:8

**references**
266:17 268:13

**referred** 33:3
36:2 89:11 91:19
184:24 185:9
227:14 228:19,24
229:1

**referring** 59:1
89:9 171:22
227:20

**refers** 47:12
58:2,3 60:16
83:11 232:9
267:12

**reflect** 91:3
158:15 215:12

**reflected** 191:25

**reflects** 55:20
133:3 158:4
230:17

**regard** 103:13
156:7

**regime** 48:14
67:17,20,23,24
68:7,11,25 69:16

**recover** 163:10
91:1 92:4 113:24
209:3 215:12

**region** 211:7
266:15

**regional** 135:8

**regions** 124:2

**register** 44:18
45:7 128:16

**registered**
36:20 44:19,22
45:16,17,19 47:7,
9 50:23 102:1
255:23 258:19

**registration**
45:8 263:5,6

**regular** 216:17

**Reichert** 93:13
134:23

**Reichert's**
103:17

**reimbursemen
t** 163:7

**reject** 147:8
159:10

**rejected** 139:24
144:13

**relate** 193:12

**related** 68:9 92:7
115:21 193:24
200:17 211:7
217:12 225:13
226:21 247:25
266:14

**relates** 114:15,
16 232:24

**relating** 155:11,
14 201:10 202:20
228:5,8,14 243:23

**relation** 162:24
165:21 166:10
222:14 250:13,19
251:17,23,25
252:21

**relationship**
202:24,25 203:1



**relationships**
61:3 115:2 116:9
217:14

**relative** 63:6
64:4 208:10

**release** 228:11

**relevance**
173:15

**relevant** 68:23
136:19

**relied** 67:11
164:18

**relief** 155:13

**relies** 69:15

**relinquished**
163:8

**rely** 40:22 68:4
95:24 96:3 103:4
109:10 234:21

**relying** 265:14

**rem** 154:9,14,15

**remain** 121:2

**Remainder**
77:24

**remaining**
138:18

**remarkable**
128:2

**remarkably**
100:12 153:1

**remedies**
239:24

**remember**
39:24 53:3 148:22
159:18 188:23
192:17 194:21
197:7 199:14
200:23 204:16
205:11, 238:16
239:11 241:2
242:10

**remind** 84:17
88:13 118:2

**renamed** 185:7

**render** 251:1
252:19

**repeated** 129:12
229:13

**repeatedly**
29:20 126:11
213:19 267:15

**repetition** 145:7
224:15

**replaced** 147:4

**reply** 136:15
170:10

**report** 37:1,15
38:17 72:22 101:2
103:10 106:17
134:23 170:10
180:9 181:10
183:16 191:4
211:9 212:20
214:13,25 216:9,
11,19 219:2,12
261:13,19 262:4
266:9 267:2

**reported** 46:24
61:21 114:17
209:4

**reporter** 23:21,
22 24:1 172:13

**reporters** 220:2

**reporting** 61:19
71:20 72:5
172:17,21

**reports** 104:15
176:14 181:25
182:21 214:5
215:6 219:1
234:21 237:14
263:21

**represent** 89:11
133:17

**representation**
193:19 211:10
242:12 267:19

**representations**
33:2 129:12
205:19,22 229:14
268:5

**representative**
34:9

**representatives** 155:1

**represented**
64:18 136:1

**representing**
183:2

**represents**
133:15 138:17
173:24

**request** 216:7

**requests** 33:18

**require** 153:16

**required** 48:18
49:7 50:20,23
150:11 264:4

**requirement**
241:17

**requires** 153:17

**research** 28:6,8,
12,17 29:5 40:13
41:15 51:14 53:12
64:17 75:22 82:19
100:15 102:13,19
178:25 180:13,20
191:19 193:13
198:1 219:5
225:14 244:18

**residual** 33:17
35:2, 36:6, 37:7
52:5,13 55:2 60:5
62:13 65:1 78:6
92:23 93:22 94:4,
21 98:12 99:20
101:7,12,16 107:4
129:22 142:11,16
143:9 162:14,20,
22 165:7,11
196:13 202:2
208:24 215:2
230:9 267:10

**residual-profit**
51:12 79:25

**respect** 29:7
48:24 72:22 100:1
110:13 112:6
114:4 115:14
159:8 165:22

195:20 202:4
203:6 213:16
216:14 226:16
227:12 260:15

**respected** 81:6
151:11,14

**respectful**
69:17 84:14 94:16
99:9 103:1,5
106:1 108:14
257:6

**respectfully**
66:15 131:7
223:12

**respective**
28:16 57:22
58:15,21,22 59:1
121:23 126:12
130:18 147:9
155:1 166:21
168:8 171:19
213:17 214:10
239:25 246:10
255:14 256:5
258:7 264:19
267:21 268:16

**respects** 219:9

**respond** 260:11

**responds** 255:4
256:11

**response** 35:24
36:1 137:18 265:1

**responses**
267:7

**responsibility**
135:1

**responsible**
268:1

**rest** 106:19
176:8,11, 181:16
219:6 243:1

**restated** 224:14
243:7

**restatements**
187:5

**rested** 40:1

**restrict** 152:18

**restricted** 127:6

**restriction**
249:17

**restructuring**
115:10

**rests** 107:5

**result** 52:9 78:7
91:13 105:6
113:23 127:10
133:9 155:25
156:12 159:25
165:12 196:22
237:17 242:13
247:22 257:13

**resulted** 137:9
162:18 187:8

**resulting** 206:4

**results** 160:5

**RESUMING**
88:7 161:15 221:1

**retain** 40:2

**retained** 94:20

**retains** 160:8

**retired** 183:12
185:21

**retiree** 171:10

**retirees** 183:9,
10

**retirement**
125:19 241:10,11,
18,19,20 242:5,9

**retiring** 241:12

**return** 52:10
149:11 166:22
195:5 211:23
220:13 239:1

**returns** 113:18

**revenue** 33:19,
20 35:25 36:1,11,
12 71:23 74:6
98:1 105:14,15
112:23 113:20
114:1 121:19
130:11 135:5,7
140:15,16,19
163:25 164:8




175:16 181:1,8,15
182:18,19 184:12
186:18,19 189:2
190:3 192:13,20,
22 204:20 206:19,
24 209:11 210:25
211:1 215:13
242:3 267:4

**revenues** 69:12
105:10 106:19,
121:20 143:2
179:19 180:11,22,
23,24 181:4,5,11,
14 182:17 184:6,7
262:23 263:2

**reverse** 98:14

**reversed** 255:11

**review** 46:18
132:12, 242:14

**reviewed** 46:17
62:6

**revolving**
187:10

**rewards** 92:11

**Richardson**
188:15

**Rico** 206:13,17

**rid** 88:23

**riding** 185:15

**right-angle**
185:10

**rightfully**
125:25

**rightly** 221:20
252:17

**rights** 26:9 46:7
49:19 50:18 51:1
52:7 60:17,19
61:4,5,9 78:13
79:24 85:20 86:18
96:10,12 106:3
107:22,25 110:1,
4,9 111:16,18
112:16 113:21
118:19 126:8,13,
20,23 127:4
128:8,24 162:13,
15 163:8,13

165:16 166:15,20
167:8,16 168:12
169:6,16,24
171:16 173:21
175:4 188:25
199:14 201:11
202:4 203:6,17
204:9 206:16
211:3 212:10,11
215:22 216:23,24
220:9 222:16,17
229:9 231:11
232:1 241:12
242:18,19 247:18
249:8,14 250:18
251:17,18,20,24,
25 252:1,15
254:25 255:18
256:22,24,25
258:24 267:20
268:10,20

**rise** 140:24
141:11 145:16
157:22 188:24

**risk** 37:12 52:6,
11,16 55:21
151:17,22 152:2
230:18,24,25
243:23 244:4
245:9 246:20
259:12

**risks** 54:10,13
55:22 213:7
229:18,22 230:2,
19 244:15 245:10
259:5 262:14

**Rockstar** 64:24
66:3,9 94:25 95:6
97:11 98:12,
99:23 100:6,7,9
107:4 127:24
166:10 167:13,25

**role** 76:13 89:14
155:5 217:24

**Roman** 258:24

**romantic**
269:17

**room** 238:9

**Rosenthal**
161:23,24

**Roth** 185:9

**roughly** 78:7
95:23 233:7

**routine** 211:17
231:19

**royalties** 64:10
65:15 222:14

**royalty** 65:24
66:12 214:1
220:14 249:13

**royalty-free**
128:18 200:7,14
234:11,13

**RPE** 130:15

**RPES** 121:20
123:9 127:7,14,20
128:2,6,24 130:6,
13,20

**RPS** 51:18 77:22
78:5,21 79:3,24
91:16 253:18
254:25 255:8,12,
15,19 256:1,3

**RPSM** 55:19
196:13 208:22
209:21 210:3
211:14 230:8,16,
23 246:19 247:10
262:5

**RTP** 188:14

**rule** 68:15

**rules** 31:17 83:2

**run** 171:9

**running** 258:1

**runs** 74:15

---

**S**

**SA** 28:2

**Sagan** 238:21

**sake** 44:21

**sale** 29:11 30:22
32:8,16,21 34:19,
22 35:2,6,16 52:1,
20,22 54:14 57:4
59:11,13,16,17,

20,21,23,24 60:2
63:13,19, 64:25
66:3,4,5,9,10,11
77:9,12,20 78:18
82:13 85:16 94:4
96:5 98:11 99:7,8,
20 101:7 107:4
109:12 112:6
114:5,24 122:25
124:15 133:12
136:11 137:2,14,
20,21 142:20
145:9, 157:11,17
162:14,16,20
165:11 167:13
175:24 198:6
201:23 246:8
247:4,9

**sales** 25:23
30:16 32:6,12,15
39:10 40:3 63:5
81:19 82:15 83:14
84:16 92:23,24
93:11,22,23 94:2
96:4 97:12 98:24
101:6 102:8 109:9
114:19 115:4,22
124:16 126:21
127:17,25 128:8
129:21 134:1,4
137:1,9,11
141:16,18,19
162:17,25 163:8,
17 164:20 165:7,
8,10 167:8 169:25
170:3 171:17
180:14 185:15
248:4

**San** 184:25

**Santa** 185:1

**satisfactory**
86:12 111:2,3
126:15 161:9

**satisfied** 69:7

**satisfy** 49:2
123:5 221:13

**Saturday** 173:5

**save** 235:7

**savings** 143:23
144:6,18

**scenarios**
149:16

**schedule** 55:13,
15 69:11 91:15,
21,23 223:8 230:7
231:3 243:22
246:14,15

**schedules**
108:1

**Schweitzer**
161:23 171:25
172:10,14,15
173:1,6

**scientists** 148:2

**scintillating**
269:3

**scope** 127:6
129:3

**screen** 27:6 82:8
122:4 245:16
249:21

**scrutiny** 139:5

**seamlessly**
124:21

**Sean** 261:13

**seated** 23:3

**seconded**
70:19

**section** 41:21
58:1,13 153:24
155:12 248:21
258:23

**Securities**
187:6,7

**security** 139:20
153:6

**seek** 153:2
154:19

**seeking** 33:21
41:10 80:8 138:21
155:13 214:6
253:13

**seeks** 163:4

**seemingly**
131:1

 

Nortel Trial
DAY 1 on May 12, 2014

Index: segregate..slides

**segregate** 146:5

**self-interest** 133:15,16 157:6 158:18

**self-serving** 146:3

**sell** 66:1 93:16 112:8,9 124:12,24 127:8 129:5 167:10 174:11 251:25

**seller** 166:18

**sellers** 166:16, 19,21

**selling** 37:18 63:9 136:8 137:12 167:8 169:17 201:23 206:1 237:2 249:5 257:24

**semblance** 124:19

**senior** 33:25 38:1,6 46:23 190:15 218:1 253:15 254:11 256:20 257:2

**sense** 47:6 49:21 66:16 93:20 100:2 145:13,14 160:25 161:1 203:4 222:6

**sentence** 116:4 233:13

**separate** 116:10 138:21 156:10 170:11 175:5 176:6 184:2 221:16,22,23 222:2,9,16 268:19,22

**separately** 115:23 214:4

**September** 35:22

**sequence** 228:17

**series** 175:24 196:11 254:21

**served** 38:3,4

**service** 33:19 36:11 174:22 178:17 180:15 192:22 193:17 206:19 236:21

**services** 123:6 124:4 135:2 164:24 193:12 200:21 235:18 237:1,2 250:3 259:20

**set** 104:14 106:16 138:10 151:3 156:18 187:20 189:14 217:19 233:17 250:8 251:18,24 268:18

**sets** 41:21 55:13 69:11 91:9 117:24 258:10

**setting** 221:21, 22 262:20

**settlement** 65:9 149:3 212:18 225:4,6, 227:8

**settling** 64:14

**severed** 105:5,7

**shaded** 191:7

**shading** 191:7

**shape** 48:24

**share** 26:10 28:21,25 29:1 35:5,14 51:7,25 52:19 60:25 62:14 63:5 65:14 71:4,8 73:5 76:9 77:1,2 105:6,21 108:8 122:12,15,16 173:24 174:17 184:12 215:25 264:14,15

**shared** 29:22 30:1,6,19 31:1 32:8 37:25 57:20 59:17 60:23 61:5, 11 64:2,4, 65:12,

24 74:12 104:25 108:23 109:2 123:25 127:20 128:3 130:20 151:9 157:1

**shareholder** 165:4 189:21,23

**shareholders** 221:16

**shares** 121:23 222:1

**sharing** 30:16 35:15,16 48:21 53:6,10 56:17 59:6,8,10 105:8 129:20 197:25 217:19 259:10 265:6 266:12

**Sharon** 136:14

**sheet** 70:23,24 71:12 79:21 115:18 203:21

**Sheila** 161:20

**shelf** 235:15

**shift** 144:22 210:4

**shifted** 192:5

**shifting** 143:24 144:19 260:16

**short** 87:21 220:8

**show** 29:14 30:21 68:19 69:4 174:19 189:16 214:12 247:22 261:9

**showed** 184:9 221:8 233:22

**showing** 67:9 107:17 261:13 267:2

**shown** 221:22 250:2 261:15

**shows** 27:1,14 57:17 91:15 109:5 162:8 216:12 265:4

**shut** 128:6

**sibling** 219:8

**side** 100:21 106:24 147:1 162:3 269:5

**sides** 146:22

**sign** 80:22 81:2,7 194:2

**signatory** 123:11

**signed** 40:12,24 62:1 90:20 109:22 112:1,7 196:21 197:8,9 210:21 224:24 226:9,11, 15 242:10 247:13

**signed-and-agreed-to** 196:17

**significance** 129:15

**significant** 26:1 37:15,17,19 70:2, 11,20 113:6 114:23 116:11 133:8 137:9 145:2 214:6

**silence** 63:25

**Silicon** 179:25

**similar** 122:6 155:5 245:13 248:9

**similarly** 58:13 140:10 143:8 155:19 171:18 232:24

**simple** 117:16 140:18 148:10 176:17 208:1

**simplest** 92:22

**simplicity** 46:3, 7,22 50:16,25 54:3 257:20

**simplified** 26:24,25

**simply** 100:22

103:1,2, 123:3 138:13 142:6 149:13 152:8 157:16 158:18 159:22 228:23 240:15 241:21

**single** 63:24 114:7 121:14 134:10 135:17,23 136:5 137:4 138:23 145:10 150:4,25 151:6 156:9 168:16 194:7 195:17

**sir** 31:14 48:8 51:10 82:9,13,20 88:11 262:10 267:22

**sit** 23:11,12 269:1

**sites** 183:22 184:2 215:19 216:2

**sits** 223:1 226:5

**sitting** 76:10 77:1 139:9 242:16

**situated** 139:18

**situation** 59:14, 16 69:23 97:2 98:16,17 117:18 134:8

**situations** 78:25 141:1

**sixth** 54:15

**size** 204:20

**skewed** 106:22

**skill** 269:5

**sleep** 173:5

**slid** 116:6

**slide** 46:19 47:1 50:13 70:14 95:10 117:23 162:8 219:3 246:1,23 256:17

**slides** 46:20 253:1 256:14 257:21 267:1

 

**slight** 27:8

**Sloan** 194:18

**small** 118:13
167:23 182:13
188:22 238:11

**smart** 134:19,21

**smile** 161:5

**Smith** 70:18

**snapshot**
208:20 261:2

**so-called**
181:23

**software** 200:20
235:18 236:21
237:15

**sold** 26:16 59:18
60:23 64:24 72:11
75:5 92:15,17,23
93:11,21,22,23
94:2,3,10,25 97:5,
11,12 98:23 99:3,
20 101:6,12
102:6,19 114:24
135:3 137:6
146:14 165:10
166:8 174:1 195:5
222:12 232:3

**sole** 29:13,16,21
35:12 36:15 37:24
53:19 54:5 57:18
58:11,25 59:5
64:21 104:24

**solid** 132:20,21

**solution** 156:12

**solutions**
135:11 164:6
188:13

**some-odd**
223:18

**somebody's**
253:21

**someone's**
107:15

**sort** 184:11 228:4

**sorted** 124:16

**sought** 147:9
152:2 154:3 216:7
253:5

**sound** 139:4
269:16

**sounds** 233:7

**source** 215:22
219:20 220:8

**south** 215:17

**sow** 56:22

**space** 235:7

**span** 260:5

**spanned** 123:23

**Sparagna**
254:22 255:4
264:24 265:12

**Sparagna's**
256:15

**speak** 104:20
158:17

**speaks** 165:15

**special** 65:17

**specific** 129:6
132:23 135:25
152:10 170:13,15,
17,19 211:7 246:8
255:25 266:15

**specifically**
38:13,16 40:23
46:1,5 58:2 96:8
104:13 141:17
151:18 231:21
233:5,9 239:3,14,
17 240:13 247:8
265:11

**specifications**
237:15

**specifics**
171:25

**spend** 95:15
96:16 97:4,8
113:12 117:10
121:23 130:19
175:11 176:20

**spending** 28:16
102:10,12 119:11

**spent** 26:5,6,12
28:17,19,20 29:4,
6 56:19 70:2
103:8 108:4,11
157:16 233:23
238:21 265:12

**split** 52:5 69:12,
13 78:20 90:15
173:16,23 176:8
208:24 209:13
242:25 261:1

**splits** 76:25

**splitting** 162:5

**spoken** 146:7

**sponsor** 120:7

**spread** 112:20
117:4 260:6

**spreads** 153:9

**spun** 27:2

**squabbling**
131:12

**staff** 24:20

**stage** 36:14 99:6
189:14

**stakeholders**
125:21

**stand** 23:20
145:5 161:13

**standard**
194:15 198:18

**standby** 254:15

**standpoint**
211:4

**star** 95:2

**start** 23:12 24:8
25:23 33:1,3 49:8
67:13 161:1,3
169:12 196:25
213:1 228:18
253:11

**start-up** 212:7

**started** 95:10
102:9 174:19
255:10

**starting** 77:6
102:25 139:8
212:11 215:17

**starts** 24:2
232:25 236:13

**state** 74:23 186:5

**stated** 37:2
134:23 141:17
156:16 157:9

**statement** 25:1,
17 34:12 37:19
38:17 66:22 69:2
83:21 119:20,25
161:19 177:8

**statements**
24:9 31:5 67:12
69:21,25 70:6,15
81:17,21,22,25
82:17,25 83:9,13,
15,17 85:12,13
126:10 224:16
229:12 267:15

**states** 27:21,23
28:7 33:6 41:5
46:24 50:20 51:4
57:2 122:20
128:19 143:17
176:7 179:16,19,
23 180:15,22,25
181:2,7,20 182:8,
9,12,25 184:5,7,
185:24 186:17,23
188:11,16,20
191:11 192:7
194:11 195:24
198:7 200:15
201:8,21,24
202:9,22 203:6,8,
14,18 205:2
206:12,17 208:11,
12 209:2,5,7,24
210:5 231:11
234:2,5,11
238:18,22,23
240:7 243:8
256:12

**stating** 254:11

**status** 154:3,19

**statute** 131:4

**statutory** 191:6,
9,11

**stay** 241:5

**stayed** 91:20

**STC** 183:6,7,11,
12

**steady** 212:6

**step** 143:8
193:20 240:8

**stiffed** 50:1

**stipulate** 193:2

**stock** 35:5
62:15,25 81:1
179:9,21

**stop** 96:22
219:24 220:7,17
235:21 269:20

**stopgap** 90:22

**stopped** 174:15
177:12

**stops** 236:12

**storied** 177:9
183:7

**story** 128:10
264:7 268:9

**strand** 140:19

**strategy** 129:16
255:11

**stream** 65:23

**stress** 112:18

**stressed** 112:17

**stretch** 248:7

**strike** 122:11

**striking** 189:6

**strong** 217:13

**structure**
123:22 195:3
232:23 261:19
263:4

**structured**
125:5

**struggle** 123:12

**stuff** 100:10

 

**subject** 81:19
83:1,21,22 106:8
158:22 194:2
196:11,14 205:16
214:11,15 215:3
231:15

**subjective**
253:21 254:6

**sublicense**
128:24 213:15
249:14 251:24

**submission**
69:17 85:9 86:24
99:9,10 106:2
108:14 153:18
156:17 219:22
221:6,8 254:13
257:6

**submissions**
87:23 106:6
111:17,22 119:6
143:14 158:23
159:7 249:2,18

**submit** 66:15
109:18 131:8
139:1 249:19

**submitted**
36:11 154:21
155:9 177:8 211:9
262:1

**subs** 72:24 73:23

**subscriber**
198:12

**Subsequent**
137:21

**subsequently**
146:3

**subsidiaries**
27:18,24 28:4
64:20 72:12
174:24 178:1
218:13

**subsidiary**
27:16 178:3,25
182:14 183:17
203:5 212:6

**substance**
48:12 234:18

**substantial**
55:23 77:21
120:14 138:24
180:12 182:14
183:4 191:20
192:3 200:16
213:7 216:3
230:20

**substantially**
188:9 191:14
203:20

**substantive**
146:24,25 147:2,
14,15,19 148:3
151:17

**success** 78:4
156:22 157:3,5

**suddenly**
124:24 126:6

**suffer** 125:11

**suffered** 187:4

**sufficient** 143:5
160:15

**suggest** 64:1
102:16 140:9
145:4 223:12

**suggested**
39:17 148:7

**suggesting**
218:15

**suggestion**
46:5,20 147:3

**suite** 187:9,11,21

**sum** 234:18

**summarize**
253:2

**summed** 114:14

**sums** 41:14

**superiority**
203:1

**suppliers** 136:4

**supplying**
178:17

**support** 115:5
116:12 125:18
137:23 138:18

146:19 164:17,19
193:13 262:22
263:1

**supported**
118:24,25

**supports**
132:15

**supposed**
28:21 56:25 98:18
225:19 226:22

**Supreme**
254:18

**surmised**
120:20

**surplus** 143:6
150:16

**surprise** 164:19

**surprising**
109:6

**surprisingly**
102:3 116:17

**surrender**
130:1

**surrendered**
126:20,23 127:11
128:8

**surrendering**
127:17

**survive** 186:4,7

**suspect** 148:5

**sustainable**
145:4

**Swift** 31:6 72:10,
13 88:16

**swings** 122:3,7

**switch** 98:3

**switches** 180:6

**switching**
198:12

**synonymous**
39:4,7

**synonyms**
43:13

**system** 177:24
178:8 181:19,22
211:20 221:12

**systems** 198:12

---

**T**

**tab** 225:12
227:11,12,17
228:2,11 243:16
246:17

**takers** 52:6,11,
16

**takes** 85:11,23
94:6 100:13 165:5
224:18

**taking** 31:4
129:25 203:10
238:7 259:12

**talk** 107:14 119:1
182:4 186:20,21
189:9 223:4
236:23 243:2

**talked** 189:8
209:9 240:16
256:19

**talking** 67:18
74:3 76:22 80:4
93:10 96:13 104:6
111:13 118:8
176:20 182:13,15
183:11 184:18,19
188:25 189:17,18
192:15,16 193:21
203:11 211:13
223:4 229:25
236:5,17 237:23
239:3, 240:12
261:5

**talks** 203:9
212:10 246:18,25
259:16 266:18

**tangible** 60:4
114:25 115:12,14,
16 162:15 259:19
268:21

**tape** 40:20

**task** 141:7 142:4
147:11 163:18

173:15

**tasks** 123:25

**tax** 33:5 37:14
38:5 39:2 42:13
46:23 47:18 48:12
51:4 61:23 62:7
68:2,3,4, 69:7
71:19 75:14 82:7
97:15,18,21
112:22 113:18
114:2 119:3 123:5
125:6 126:11
129:12 136:3
171:12,22 172:18,
20 187:16 190:4,
7,12,14,15,19
191:8,13,17,21,
23,25 192:17,20,
21 193:8 195:19
196:3,18,20 203:4
205:19,23 208:10,
23 209:7,8 210:6,
8 218:1 219:12
221:13 222:7,13
230:10 244:7
247:24 253:6,14
254:2 256:20
257:2,25 258:5,16
262:2 263:22
265:17 266:5
267:4,13,16,24

**tax-driven**
123:4

**taxable** 209:6,10

**taxation** 69:4
80:23 81:8 85:13
90:9,14 97:1
110:3,10,12,24
111:4,6,7,13,22

**taxes** 60:13
172:18,23 190:2,
25 192:16 203:7
208:12

**taxing** 172:8
193:18 195:16
205:18 210:24
211:10 229:15

**taxpayer** 195:18
205:17,20 206:8,
15 264:12

**taxpayers**



191:17 195:16
211:11 267:8

**team** 172:9

**teams** 150:23

**technical** 27:8
49:21 50:6 173:2
197:14,16 198:4
199:7 237:13
249:10,16 250:12,
16 251:21 252:2,
8,16

**technological**
179:15 199:16,20
200:8

**technology**
25:24 26:2,6,12,
18,21,22 28:13,22
29:8,17,24 30:10,
14 33:13 36:16
37:24 52:8,22
53:20 54:1 55:25
56:9,13 58:6,7,10,
16,22 60:5,9
62:11,13,18,21
63:7,9,10 65:18
73:2,8 74:9,11
75:24 76:8 78:18
79:1,17,18,19
91:18,20,25 92:9,
20 96:12,15 98:21
99:1 100:18 102:5
103:20,23,25
104:2,6,12 109:13
115:5 118:22
134:17 135:10
147:25 178:4
179:11,12 187:16
203:17 206:4
211:6 217:10
218:19 226:17
227:13 229:5,10
230:22 231:12
232:3 233:1,
236:6,19 237:6,7,
22 238:1 239:9,19
240:1 241:13
243:11 244:24
245:7 248:22,23
250:5,6,15 258:7
264:16,18 266:14

**technology-
related** 211:25

**Telecom**
178:14,20 179:4
180:7,16,21
181:24 183:15
184:19 185:7
197:5,16,19
198:25 199:21,25
205:14

**telecommunic
ations** 146:13

**telephone**
178:16 185:11
218:19

**telephone-type**
185:3

**telephones**
178:18 180:6
186:5

**telling** 68:4
110:6,8 111:6
254:12 264:13
268:9

**tells** 167:7
250:23 251:12

**ten** 50:12 71:9
180:24

**ten-year** 187:19

**tenant** 168:21

**tenets** 77:18

**tens** 183:8

**term** 34:23 39:1
43:16,17,20
107:13 171:10
197:11 216:22
229:21 235:8,9
237:7 238:5
240:18 248:24
250:6 252:13

**terminable**
200:11

**terminate**
166:22 198:20
199:1 241:13

**terminated**
167:10 207:8
210:15

**terminates**

204:7 241:4

**termination**
198:17,22 204:1
206:20 207:21
208:3 242:8,20
257:13

**terminology**
73:15 243:22

**terms** 31:21 39:3
45:20 49:12
107:14,23 132:14
184:9 188:19
204:18,19,20
207:10 216:15
222:22 235:7
238:3 239:2
246:11 248:4,20
250:25 251:2
258:12

**terrific** 116:19,
21

**territorial** 125:8
262:22,23 263:1,8

**territories**
38:23 129:1
166:21 167:4,17
168:9 213:17
214:10 217:2
218:11 222:10
239:25 240:15
246:10 256:5
258:8 268:17

**territory** 165:2,
23 214:2 222:9
229:10 263:4
267:21 268:16

**testament**
144:3

**tested** 155:18

**testified** 40:25
47:1

**testify** 38:11
62:2 81:16 106:17
114:7

**testimony** 30:8
38:12 39:14 42:9
45:23 47:3 67:21
81:12 82:5,9
117:12,21 151:24
190:11,18

**Texas** 188:15
192:12

**theme** 118:7

**Then-ceo** 185:9

**theoretical**
74:24

**theories** 121:7,9
122:2,8,21
137:22,23 138:1,9
146:4 157:6
232:2,4 234:20

**theory** 74:15,19
84:5,6 92:8 98:24
104:18,19,20,22
105:24,25 106:2,
5,7,24,25 107:19,
20 113:16 114:15
121:7,15,17,22
122:1,10,13,18,19
128:2 130:5
137:25 140:21
163:2 175:14,16,
17,20 176:2,18
198:23 240:17
241:22,23 242:2,3
251:12 257:8

**therefor** 233:15
234:9

**thereof** 237:12
241:16

**thereto** 58:8

**therewith**
251:22

**thing** 23:19
74:10 84:24 93:5
95:24 102:10,12
113:22 142:19
168:17 195:9
204:11 230:5
246:7

**things** 23:10,16
49:8 90:17 131:11
178:19 189:15
191:6 193:22
201:2 206:21
235:5,14

**thinking** 255:2
269:25

**thinks** 197:22

**thirds** 257:16

**Thornton**
132:11

**thought** 77:11
118:3,5 159:14
167:21,22 266:3

**thousands** 57:4
183:8 193:9

**three-fifths**
176:10

**tie** 156:13

**till** 23:12

**time** 27:13 41:10,
12,20 44:7 46:11
61:18 64:16 70:13
72:7,16 74:1
76:13,16,20 77:7
83:8,25 84:19,21
86:6 88:16 89:7,
12,15,16,18 90:23
94:6, 95:14 98:15
102:1,2,11 109:18
110:1,10,23
111:16,21 112:18
117:10 118:3
119:10 137:14
151:19 152:21
167:8 173:20
175:12 177:20,21
178:5,11,18
179:24 181:5,14,
24 183:21 184:17
185:6,13,17
186:11,18 187:11
191:10 196:21
197:3 198:18
199:2,9,17 200:5,
22, 202:23 204:17
205:10,13 210:18
216:16,17 228:4
229:17 235:1
236:4,10,11,13,
14,19 243:13
255:1 264:3
269:9,11,22

**timeframe**
91:12

**times** 48:2 87:5
89:4 150:12
177:20 213:21
240:19

 

**timing** 37:17
224:7

**Timothy** 46:15
134:23

**title** 29:3 30:9
35:10 38:14,21
42:6,8 45:22,24
46:1,9,21 47:5,11
50:23 51:6 53:18,
22,24 57:19 58:8,
10 62:19 63:3,12,
21 64:11 74:18
84:5 106:25
107:6,7,13,15,20
121:16 128:13,15,
16 147:21 165:9,
13,25 166:7,10,18
167:16,20 168:3,
24 169:4 197:12
199:16,18,19,24
213:9,25 214:8,11
215:2 220:11,12,
15 221:19 222:8
227:19 229:5
232:25 233:5,11
238:24 239:18
240:13,17 244:9
253:8 257:19

**today** 29:7 30:23
33:10 35:18 65:2,
8 72:2,4 74:3 97:5
125:7 175:10,15
177:3 197:22
207:13 247:7

**today's** 248:6

**told** 30:5 43:8
110:10 130:3,4,
12,17,20 140:7
150:4 151:1 218:6
252:5 265:3

**tomorrow** 270:4

**tone** 187:20

**top** 27:14 31:7
163:1 164:9
185:15 247:2

**topic** 86:2

**topped** 148:23

**Toronto** 25:14,
19 38:9 41:11
66:23 120:2 132:1

179:9 187:21
208:14 223:25
225:22 248:14

**Torys** 161:21

**total** 35:5 76:8,11
163:25 180:23
182:8,19

**totally** 254:8

**traced** 179:16

**track** 263:25

**tracks** 63:17

**tract** 168:19

**trade** 170:14
171:9,10

**trademarks**
237:20

**transaction**
31:5 59:25 72:9,
13,14 73:17,18,
19,20 79:16 81:20
89:7 96:6 112:7,
14,24,25 113:3,19
167:25 194:20
195:2,6 238:15,25

**transactions**
44:4 125:5 130:1
175:24 193:10,12,
22,23 194:1
210:12 231:24
259:18

**transfer** 37:1
41:8 42:13,20
43:2,21 44:24
45:13 48:10,14,19
67:16,20,23,24
68:6,10,24 69:3,
16 80:17 92:4
96:19 97:24
108:12 110:14
113:23,24 123:6
150:21 166:3
167:13 168:7
171:23 172:7,10,
15 189:10,12,17
190:21 191:4
192:3,9,11,14,16
193:15 194:9
195:10,18,20
196:6 207:7
208:8,17 209:9

210:10,17,18,19
211:13 213:21,23
215:12 216:8
218:25 219:11
229:21,22 230:3
255:24 261:12,15,
18

**transfer-
pricing** 49:22

**transferable**
151:2

**transferred**
115:22 123:7
126:20 135:12
163:7,9 174:24
194:25 195:4
238:18

**transferring**
107:11

**transfers** 195:5

**transition** 137:2

**treasurer** 38:4
82:6 190:14

**treasurers**
187:15

**treated** 55:9
139:2 147:6
156:4,9 264:16

**treating** 151:4

**treatment**
139:17

**tree** 134:5

**tremendous**
122:7

**trial** 24:15 38:11
62:3 79:5 81:11,
13 85:9 144:8
185:19 188:25
198:10 203:23
223:1 226:6

**true** 125:10
131:14 177:11,12

**trust** 141:3

**trustee** 76:14

**trustees** 76:16

**truth** 267:24
268:2

**Tucker** 104:9,13
194:17

**tug** 138:14

**turn** 30:12 37:22
52:24 66:22 120:1
161:5 185:10
212:13 214:15
215:3 221:10
222:20 223:17
252:23

**turned** 185:2

**turns** 93:25

**TV** 40:8

**tweaking** 106:9

**twofold** 125:20

**type** 97:19 118:7

**types** 72:8 89:14
138:11 191:18
196:6

---

**U**

**U.S.** 78:9 104:19
105:4,13,20 138:2

**UCC** 154:5 155:2

**UK** 25:2 28:1
35:23 45:3 72:12,
22 76:17 79:12
80:1 89:11
119:20,24,25
120:3,5,13 125:15
131:7,19 132:10
133:17 138:18
141:2 150:11,15,
18 153:24 157:20
158:9 211:1 213:6
218:12 265:8,22

**UK-BASED**
183:5

**UKP** 173:8

**UKP'S** 171:4

**UKPC** 119:19
154:2

**ultimate** 37:7
61:23 138:19
157:25 160:10

**ultimately**
61:25 62:7 66:2
82:12 122:9
187:19 223:14

**UMTS** 59:18
60:23 77:20 112:7

**unable** 130:23

**unambiguous**
31:21,24 32:18

**uncertainty**
138:6

**underlies** 104:3

**underlying**
49:18 50:3 68:10
72:24 73:7,21
74:14 99:2 103:20
104:12 138:15
146:8 267:9

**understand**
42:22 44:11 48:10
67:24 83:7 87:16
95:12 188:23
189:13 195:10
198:23 202:3
226:7 254:4
259:25 261:3,7,
20,22 262:1
264:12

**understanding**
26:7 38:20 39:6,
12 40:5 42:14,16
58:1,14 90:4,19
91:6,7 228:15
245:2,3 253:17,21
254:5 256:21

**understanding
s** 49:19 205:15,18
225:13 226:21

**understands**
66:13

**understated**
144:16

**understood**
29:25 42:11 65:13
73:25 85:21
129:20 169:21



**undertake** 124:14

**undertaken** 45:3,4 141:8

**undertaking** 142:4 148:6

**undertook** 146:13

**undetermined** 171:13

**undisclosed** 253:24,25

**undoubtedly** 102:23 105:13

**unfunded** 157:21

**unified** 156:25

**unions** 188:12

**unique** 146:8 158:4,5 160:11

**United** 27:21,23 28:1,7 33:6 46:24 51:4 57:2 128:19 143:17 176:7 179:16,19,23 180:15,21,25 181:2,7,20 182:7, 9,11,25 184:5,7, 24 186:16,22 188:11,16,20 191:11 192:6 194:10 195:24 198:7 200:15 201:8,21,24 202:8,22 203:5,8, 14,18 205:2 206:12,16 208:11, 12 209:1,4,7,24 210:5 231:11 234:2,5,10 238:18,22,23 240:7

**University** 192:12

**unjust** 139:24 141:4

**unlike** 105:24 125:21 150:9,10

**unlimited** 242:18,19

**unpaid** 142:1

**unqualified** 240:9

**unrelated** 206:2

**unrestricted** 252:14,21

**unsecured** 138:20 139:1,18 141:10 146:21 148:13,20 151:15 155:4

**unsubstantiate d** 171:2

**unsuccessful** 121:1

**unsupportable** 144:25

**unsustainable** 167:11 268:24

**untie** 131:5

**upfront** 218:14

**upheld** 155:18

**upside** 229:23 230:24

**urge** 158:11

**US'S** 130:11

**US-BASED** 178:1 184:21

**utilized** 192:4

**utterly** 126:2

---

**V**

**vacant** 87:24

**vacuum** 254:17

**vague** 44:8

**valid** 159:9

**validity** 202:6

**Valley** 179:25

**valuable** 29:8

94:18,23,24 95:1, 4 99:17,18 102:19 115:2 116:24 117:21 166:15 203:16 211:24 212:3 213:15 217:10 222:16 244:9 259:4 266:20,24 268:10

**valuation** 72:17 76:6,23 106:12 115:9 116:3 117:2,5,7 176:14 222:11,14

**valuations** 72:15

**valued** 71:6 72:25 74:21 101:10 115:16 127:12,13 175:21

**values** 115:25 122:22 170:3

**valuing** 117:17

**variety** 149:23

**vast** 157:18 209:3,5

**Verizon** 234:3

**verse** 172:1 207:23

**version** 24:16 199:11 201:20 205:21 214:13 224:6,9 243:7 263:10,11

**versions** 204:6 224:17 241:2

**versus** 188:21

**vertically** 123:18

**vest** 203:5

**vested** 128:13 199:20,25 200:3 233:6 234:8 238:24 239:19 240:13 244:8

**vesting** 107:12, 14 155:17 239:20

**vests** 53:21 107:6,7

**vetted** 34:11 60:1

**vice** 38:4, 82:6 190:11,13

**view** 32:7,9 61:8 77:3 82:22 84:14 94:16 95:7 103:1, 6,13 108:17 147:21 222:7 234:18

**vigorous** 145:3

**vigorously** 163:2 171:5,6

**violate** 68:15

**virtual** 212:8

**virtually** 108:9 127:23 146:15 186:24 224:23 237:21

**visual** 191:3

**vociferous** 145:3

**voice-based** 180:6

**VP** 253:14

---

**W**

**wait** 23:3 84:1

**waited** 131:15

**walk** 133:20 142:8 153:2 158:21 166:17

**Walter** 46:23

**wanted** 48:23 87:15 175:13 177:2 207:6 265:7

**war** 138:14

**warehouses** 183:23

**Warsaw** 244:2

**Washington** 210:9

**wasted** 144:2,11

**wasteful** 158:7

**watch** 125:18

**watching** 40:8

**water** 235:4

**watershed** 200:16 206:23

**ways** 92:21 93:13 165:23

**weak** 219:8

**website** 201:15, 16

**weekend** 195:15

**weeks** 75:15,19 228:5

**weight** 153:10

**Weisz** 51:5 62:6 255:9 256:7,11

**well-known** 210:10

**well-recognized** 146:20

**Western** 178:3,6 179:13,17

**whatsoever** 155:13 249:17

**wholesale** 85:1

**wife** 270:1

**Willkie** 119:23

**Wilmington** 25:12

**window** 99:24

**wire** 198:13

**wireless** 99:2

**wisdom** 144:3

**withdrawn** 52:10

**withholding** 222:13



**withstand**
139:5

**witnesses**
23:17 57:15 62:2
116:13 117:12
120:25 146:16
177:8 185:19
190:6,9 192:18,19
218:18

**wondering**
86:20 87:9

**Wood** 80:15

**word** 35:10,11
60:10 101:25
200:5 234:22,23,
24 235:10

**wording** 95:17

**words** 39:11
46:10 91:19
111:11 119:3
173:25 213:12
214:21 235:22,24
236:1,10 237:5
252:19 256:23
262:7

**work** 33:7,8 51:3
94:6,7 101:14
102:3,20 104:4
105:6 109:1
148:11 149:23
150:7 182:14
254:23

**worked** 28:11
33:25 125:2
146:10 150:4,22,
24 157:21 170:14
174:9 218:25
258:3 260:23
261:14 262:3

**working** 93:4
114:10 134:15
220:3 225:17
253:5 261:17

**workings** 91:9

**works** 23:18
27:13 78:22
254:13

**world** 28:11 71:4
106:20 129:13
134:15 153:13

176:8,11,16
177:14 181:17
183:22 184:4
190:5 200:25
216:2 218:21
221:18 247:20

**worldwide**
134:10 135:17
136:5 142:15,22
154:10,16 156:24
164:10 175:21
181:1,15 183:23
255:7,22

**worried** 193:8

**worry** 48:21

**worth** 163:13
167:5 213:23
256:10

**worthless**
108:9

**worthwhile**
188:1 260:23

**wrapped** 102:18

**writ** 238:4

**write** 43:8 69:25
70:4,9 71:18,22,
25

**write-off** 31:4

**writes** 256:7

**writing** 49:9
264:11,23

**written** 30:13
49:10 52:25 53:7
68:18 70:10
151:12 156:17
199:3,9

**wrong** 49:24
103:2,4 109:19
128:11 129:2
130:4,5,11 163:5
238:8 249:6
251:12 252:9
265:4

**wrote** 79:11
136:15 185:23

---
**Y**
---

**year** 30:17 32:13
35:6 36:24 49:1
53:10 75:3 81:15
97:8 98:20,22
99:24 108:8 113:2
143:4 180:10
181:9,13 182:3
195:17 203:12
226:15 260:5

**yearly** 98:1

**years** 38:3 53:5,
13,25 56:2 61:18
63:2 71:5 94:3,5,
12,13 96:22 97:13
98:4 99:21 100:1,
5,6,9,11,14,22
102:25 104:2
126:6,12 130:19,
25 150:16 156:20,
21 177:11,12
180:1,8,24 185:21
188:3,18 196:19
198:16 213:25
218:5,23 257:8
258:2,15

**yielded** 196:16,
19

**yields** 153:9

**York** 179:21

**Young** 37:2,16
216:9,21 217:16
261:14 263:15
264:8

---
**Z**
---

**Zarnett** 40:7,9,
16,20

**Zelbo** 52:3
161:22

**Ziff** 168:11,14

