



WILCOX & FETZER LTD.

FOR EXCELLENCE IN COURT REPORTING

```
 1                UNITED STATES BANKRUPTCY COURT

 2
                    FOR THE DISTRICT OF DELAWARE
 3
      ----------------------------)
 4
      In Re                       )
 5
           NORTEL NETWORKS INC.,   )  Case No.
 6
           et al.,                 )  09-10138 (KG)
 7
      Debtors.                     )
 8
      ----------------------------)
 9

10                          - and -

11                Court File No. 09-CL-7950

12                          ONTARIO

13                SUPERIOR COURT OF JUSTICE

14                    (COMMERCIAL LIST)

15       IN THE MATTER OF THE COMPANIES' CREDITORS

16    ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17       AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18    ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19         NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20        CORPORATION, NORTEL NETWORKS INTERNATIONAL

21        CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                        CORPORATION

23       APPLICATION UNDERT PART IV OF THE COMPANIES'

24    CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                        AS AMENDED
```



1                        - - - - - - - - -
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



```
 1
 2                          --------
 3
 4    ---- This is the Day 2/Volume 2 of the transcript of the
 5    proceedings in the above matter held simultaneously in:
 6    Superior Court of          United States Bankruptcy
 7    Ontario (Commercial        Court for the District of
 8    List)                      Delaware
 9    Courtroom 8-1              Courtroom 3
10    330 University Avenue      824 Market Street
11    Toronto, Ontario           Wilmington, Delaware
12
13    on the 13th day of May, 2014, commencing at 9:02 a.m.
14
15                          ---------
16    B E F O R E:
17    The Honorable Judge Kevin Gross (United States)
18    The Honorable Mr. Justice Frank Newbould (Canada)
19
20                          ---------
21
22
23
24
25
```



```
 1   A P P E A R A N C E S:

 2   CANADIAN DEBTORS

 3

 4   FOR THE MONITOR, ERNST & YOUNG INC.

 5   GOODMANS LLP

 6   Bay Adelaide Centre

 7   333 Bay Street, Suite 3400

 8   Toronto, ON  M5H 2S7

 9   PER: Ben Zarnett, Esq.

10        Alan Mark, Esq.

11        Peter Ruby, Esq.

12        Jessica Kimmel, Esq.

13        Graham Smith, Esq.

14

15   FOR THE APPLICANTS

16   GOWLING LAFLEUR HENDERSON LLP

17   Suite 1600, First Canadian Place

18   100 King Street West

19   Toronto, ON  M5X 1G5

20   PER: Jennifer Stam, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   ALLEN & OVERY LLP

24   1221 Avenue of the Americas

25   New York, NY  10020
```



```
 1    PER: Ken Coleman, Esq.

 2         Paul Keller, Esq.

 3         Jacob Pultman, Esq.

 4         Laura Hall, Esq.

 5

 6    FOR THE CANADIAN DEBTORS

 7    BUCHANAN INGERSOLL & ROONEY

 8    1105 North Market Street

 9    Suite 1900

10    Wilmington, DE  19801 1054

11    PER: Kathleen A. Murphy, Esq.

12         Mary F. Caloway, Esq.

13

14    U.S. DEBTORS

15

16    FOR NORTEL NETWORKS INC.

17    TORYS LLP

18    79 Wellington Street West, Suite 3000

19    Box 270, TD Centre

20    Toronto, ON  M5K 1N2

21    PER: Sheila Block, Esq.

22         Scott Bomhof, Esq.

23         Molly Reynolds, Esq.

24         Andrew Gray, Esq.

25         Adam Slavens, Esq.
```



```
 1   FOR THE U.S. DEBTORS

 2   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 3   1201 North Market Street, 16th Floor

 4   P.O. Box 1347

 5   Wilmington, DE  19899 1347

 6   PER: Derek Abbott, Esq.

 7        Annie Cordo, Esq.

 8        Tammy Minott, Esq.

 9        Eric Schwartz, Esq.

10

11   FOR NORTEL NETWORKS INC.

12   CLEARY GOTTLIEB STEEN & HAMILTON LLP

13   One Liberty Plaza

14   New York, NY  10006

15   PER: James Bromley, Esq.

16        Lisa Schweitzer, Esq.

17        Howard Zelbo, Esq.

18        Jeffrey Rosenthal, Esq.

19        Avi Luft, Esq.

20        Inna Rozenberg, Esq.

21        Jacqueline Moessner, Esq.

22        Marla Decker, Esq.

23        Matt Gurgel, Esq.

24        Darryl Stein, Esq.

25        Temidayo Aganga Williams, Esq.
```



```
1        Kyle Dandelet, Esq.

2        Marion deMesion, Esq.

3        Mark Grube, Esq.

4        David Herrington, Esq.

5        Shira Kaufman, Esq.

6        Alix McCown, Esq.

7        Ann Nee, Esq.

8        Adam Olin, Esq.

9        Jeremy Opolsky, Esq.

10        Michelle Parthum, Esq.

11        Daniel Queen, Esq.

12        Ben Shartsis, Esq.

13        Jesse Sherrett, Esq.

14        Ashley Siegel, Esq.

15        Brent Tunis, Esq.

16

17    EMEA DEBTORS

18

19    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

20    LIMITED

21    DAVIES WARD PHILLIPS & VINEBERG LLP

22    40th Floor

23    155 Wellington Street

24    Toronto, ON  M5V 3G7

25    PER: Robin B. Schwill, Esq.
```



```
 1        Sean Campbell, Esq.

 2        James Doris, Esq.

 3        Luis Sarabia, Esq.

 4        Matthew Milne Smith, Esq.

 5        Natasha MacParland, Esq.

 6        George Pollack, Esq.

 7        Cara Cameron, Esq.

 8        Andrew Carlson, Esq.

 9        Maureen Littlejohn, Esq.

10        Bryan McLeese, Esq.

11

12   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

13   LIMITED

14   LAX O'SULLIVAN SCOTT LISUS LLP

15   Suite 2750, 145 King Street West

16   Toronto, ON  M5H 1J8

17   PER: Matthew P. Gottlieb, Esq.

18        Tracy Wynne, Esq.

19        Paul Michell, Esq.

20        Arden Beddoes, Esq.

21        James Renihan, Esq.

22

23

24

25
```



```
 1   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 2   LIMITED

 3   HUGHES HUBBARD & REED

 4   One Battery Park Plaza

 5   New York, NY  10004 1482

 6   PER: Derek Adler, Esq.

 7        Neil Oxford, Esq.

 8        Fara Tabatabai, Esq.

 9        Charles Huberty, Esq.

10        William Maguire, Esq.

11        Amina Hassan, Esq.

12        Gabrielle Glemann, Esq.

13        Caroline Parker Beaudrias, Esq.

14        Miles Orton, Esq.

15        Karen Goldberg, Esq.

16        Lena Saltos, Esq.

17        Mei Li Zhen, Esq.

18        Matthew Reynolds, Esq.

19        Ken Katz, Esq.

20        Greta Fails, Esq.

21        Quan Trinh, Esq.

22

23

24

25
```



```
 1   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 2   LIMITED

 3   YOUNG CONAWAY STARGATT & TAYLOR LLP

 4   Rodney Square

 5   1000 North King Street

 6   Wilmington, DE  19801

 7   PER: Ed Harron, Esq.

 8        John Dorsey, Esq.

 9        Jaime Chapman, Esq.

10

11   FOR THE EMEA DEBTORS

12   HERBERT SMITH FREEHILLS LLP

13   Exchange House

14   Primrose Street

15   London, England  EC2A 2EG

16   PER: James Norris Jones, Esq.

17        John Whiteoak, Esq.

18        Gary Milner Moore, Esq.

19        Kevin Pullen, Esq.

20        Catherine Emanuel, Esq.

21        Richard Mendoza, Esq.

22        David Russell, Esq.

23        Andrew Cooke, Esq.

24        Oliver Elgie, Esq.

25        Tom Henderson, Esq.
```



```
 1        Frances Furnivall, Esq.

 2        Liam Spender, Esq.

 3        Philip Lis, Esq.

 4        Kristofer McGhee, Esq.

 5        Thomas Turner, Esq.

 6

 7   FOR THE EMEA DEBTORS

 8   DEBEVOISE & PLIMPTON LLP

 9   65 Gresham Street

10   London, England

11   ECZV 7NQ

12   PER:  Kevin Lloyd, Esq.

13

14   CANADIAN CREDITORS COMMITTEE

15

16   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD BENEFICIARIES

17   KOSKIE MINSKY

18   20 Queen Street West

19   Suite 900

20   Toronto, ON  M5H 3R3

21   PER: Mark Zigler, Esq.

22        Jeff Van Bakel, Esq.

23        Ari Kaplan, Esq.

24        Barbara Walancik, Esq.

25
```



```
 1   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 2   COMMITTEE

 3   SHIBLEY RIGHTON LLP

 4   250 University Avenue, Suite 700

 5   Toronto, ON  M5H 3E5

 6   PER: Arthur O. Jacques, Esq.

 7

 8   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

 9   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE FUND

10   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

11   35th Floor

12   155 Wellington Street West

13   Toronto, ON  M5V 3H1

14   PER: Kenneth T. Rosenberg, Esq.

15        Massimo (Max) Starnino, Esq.

16        Lily Harmer, Esq.

17        Karen Jones, Esq.

18        Michelle Jackson, Esq.

19        Megan Shortreed, Esq.

20

21

22

23

24

25
```



```
 1   FOR MORNEAU SHEPELL LIMITED

 2   MCCARTHY TETRAULT LLP

 3   Suite 5300, Toronto Dominion Bank Tower

 4   Toronto, ON  M5K 1E6

 5   PER: Ronald Podolny, Esq.

 6        Sharon Kour, Esq.

 7        Elder C. Marques, Esq.

 8        Paul Steep, Esq.

 9        Byron Shaw, Esq.

10        Keith Rose, Esq.

11

12   FOR THE CANADIAN CREDITORS COMMITTEE

13   DLA PIPER

14   919 North Market Street, Suite 1500

15   Wilmington, DE  19801

16   PER: Jason Gerstein, Esq.

17        Richard Hans, Esq.

18        Timothy Hoeffner, Esq.

19        Farah Lisa Whitley Sebti, Esq.

20        Selinda Melnik, Esq.

21        Sarah Tumey, Esq.

22

23

24

25
```



```
 1   FOR THE CANADIAN CREDITORS COMMITTEE

 2   UNIFOR

 3   205 Placer Court

 4   North York, ON, M2H 3H9

 5   PER: Barry Wadsworth, Esq.

 6

 7   INFORMAL NORTEL NOTEHOLDER GROUP

 8

 9   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

10   BENNETT JONES LLP

11   1 First Canadian Place

12   Suite 3400

13   Toronto, ON  M5X 1A4

14   PER: Kevin Zych, Esq.

15        S. Richard Orzy, Esq.

16        Gavin Finlayson, Esq.

17        Richard Swan, Esq.

18        Jonathan Bell, Esq.

19        Amanda McLachlan, Esq.

20

21   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

22   MILBANK, TWEED, HADLEY, MCCLOY LLP

23   1 Chase Manhattan Plaza

24   New York, NY  10005

25   PER: Thomas R. Kreller, Esq.
```



```
 1        Dennis F. Dunne, Esq.

 2        Albert A. Pisa, Esq.

 3        Samir Vora, Esq.

 4        Andrew M. LeBlanc, Esq.

 5        Eric I. Weiss, Esq.

 6        Atara Miller, Esq.

 7        Tom Matz, Esq.

 8        Nicholas A. Bassett, Esq.

 9        Alexis Chernak, Esq.

10        Claudia G. Cohen, Esq.

11

12   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

13   PACHILSKI STANG ZIEHL & JONES LLP

14   919 North Market Street

15   17th Floor

16   Wilmington, DE, 19801

17   PER: Laura Davis Jones, Esq.

18        Peter J. Keane, Esq.

19

20

21

22

23

24

25
```



```
 1   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2

 3   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 4   CASSELS BROCK & BLACKWELL LLP

 5   Suite 2100, Scotia Plaza

 6   40 King Street West

 7   Toronto, ON  M5H 3C2

 8   PER: Shayne Kukulowicz, Esq.

 9        Michael Wunder, Esq.

10        Ryan Jacobs, Esq.

11        Geoff Shaw, Esq.

12        Stefanie Holland, Esq.

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   RICHARDS LAYTON & FINGER, P.A.

15   920 North King Street

16   Wilmington, DE  19801

17   PER: Christopher Samis, Esq.

18        Amanda Steele, Esq.

19

20   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

21   AKIN GUMP STRAUSS HAUER & FELD LLP

22   One Bryant Park

23   New York, NY  10036

24   PER: Fred S. Hodara, Esq.

25        David H. Botter, Esq.
```



```
 1        Abid Qureshi, Esq.

 2        Robert A. Johnson, Esq.

 3        Brad M. Kahn, Esq.

 4        Christine Doniak, Esq.

 5        Joseph Sorkin, Esq.

 6        Jacqueline Yecies, Esq.

 7

 8   UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 9   UK PENSION TRUST LIMITED

10   FOR THE UK PENSION PROTECTION FUND AND NORTEL NETWORKS UK

11   PENSION TRUST LIMITED

12   THORNTON GROUT FINNIGAN LLP

13   Suite 3200, 100 Wellington Street West

14   P.O. Box 329

15   Toronto, ON  M5K 1K7

16   PER: Michael E. Barrack, Esq.

17        D.J. Miller, Esq.

18        Rebecca Kennedy, Esq.

19        Andrea McEwan, Esq.

20        John L. Finnigan, Esq.

21        Michael Shakra, Esq.

22        Kim Ferreira, Esq.

23

24

25
```



```
 1   FOR THE UK PENSION PROTECTION FUND AND NORTEL NETWORKS UK

 2   PENSION TRUST LIMITED

 3   WILLKIE FARR & GALLAGHER LLP

 4   787 Seventh Avenue

 5   New York, NY  10019 6099

 6   PER: Brian O'Connor, Esq.

 7        Sameer Advani, Esq.

 8        Andrew Hanrahan, Esq.

 9        Eugene Chang, Esq.

10        Heather Schneider, Esq.

11        Robert Kofsky, Esq.

12        Nicholas Chiuchiolo, Esq.

13        Elizabeth Roache, Esq.

14        Nicole Humphrey, Esq.

15        Peter Sluka, Esq.

16        Weston Eguchi, Esq.

17        Ashley Moore, Esq.

18        Megan Fantoni, Esq.

19

20   FOR THE UK PENSION PROTECTION FUND AND NORTEL NETWORKS UK

21   PENSION TRUST LIMITED

22   BAYARD, P.A.

23   222 Delaware Avenue, Suite 900

24   Wilmington, DE  19899

25   PER: Charlene D. Davis, Esq.
```



```
 1        Justin R. Alberto, Esq.

 2        Evan T. Miller, Esq.

 3

 4   FOR THE UK PENSION CLAIMANTS

 5   HOGAN LOVELLS INTERNATIONAL LLP

 6   Atlantic House, Holbrow Viaduct

 7   London, England, EC1A 2FG

 8   PER: Angela Dimsdale Gill, Esq.

 9        John Tillman, Esq.

10        Crispin Rapinet, Esq.

11        Matthew Bullen, Esq.

12        Chris Edwards Earl, Esq.

13

14   FOR THE UK PENSION CLAIMANTS

15   WILBERFORCE CHAMBERS LLP

16   8 New Square, Lincolns Inn

17   London, England, WCZA 3QP

18   PER: Michael Tennet, Esq.

19

20

21

22

23

24

25
```



1   THE BANK OF NEW YORK MELLON

2

3   FOR THE BANK OF NEW YORK MELLON

4   VEDDER PRICE LLP

5   919 North Market Street

6   17th Floor

7   Wilmington, DE, 19801

8   PER: Michael Riela, Esq.

9       Michel Edelman, Esq.

10

11  WILMINGTON TRUST, NATIONAL ASSOCIATION

12

13  FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14  KATTEN MUCHIN ROSENMAN LLP

15  575 Madison Avenue

16  New York, NY  10022 2585

17  PER: Bertrand J. Choe, Esq.

18       David A. Crichlow, Esq.

19       Karen B. Dine, Esq.

20

21  FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

22  DENTONS CANADA LLP

23  77 King Street West

24  Suite 400

25  Toronto, ON, M5K O41



```
 1   PER:  Kenneth Kraft, Esq.

 2        John Salmas, Esq.

 3        Matthew Fleming, Esq.

 4        Robert Kennedy, Esq.

 5

 6   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 7   COUSINS CHIPMAN & BROWN LLP

 8   1007 North Orange Street

 9   Suite 1110

10   Wilmington, DE, 19801

11   PER: Scott D. Cousins, Esq.

12        Ann Kashishian, Esq.

13

14   LAW DEBENTURE TRUST COMPANY OF NEW YORK

15   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

16   BORDEN LADNER GERVAIS LLP

17   40 King Street West

18   Toronto, ON  M5H 3Y4

19   PER: Edmond F.B. Lamek, Esq.

20

21   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

22   PATTERSON BELKNAP WEBB & TYLER LLP

23   1133 Avenue of the Americas

24   New York, NY  10036

25   PER: Daniel A. Lowenthal, Esq.
```


Neeson & Associates    W&F

```
 1   Brian P. Guiney, Esq.

 2   Craig W. Dent, Esq.

 3

 4   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 5   MORRIS JAMES, LLP

 6   500 Delaware Avenue

 7   Suite 1500

 8   Wilmington, DE

 9   19801 1494

10   PER: Stephen M. Miller, Esq.

11

12   BOARDS OF DIRECTORS OF NORTEL NETWORKS

13   CORPORATION AND NORTEL NETWORKS LIMITED

14

15   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

16   CORPORATION AND NORTEL NETWORKS LIMITED

17   OSLER HOSKIN AND HARCOURT LLP

18   100 King Street West

19   1 First Canadian Place, Suite 6100

20   P.O. Box 50

21   Toronto, ON  M5X 1B8

22   PER: Lyndon Barnes, Esq.

23        Carey O'Connor, Esq.

24        Betsy Putnam, Esq.

25        Adam Hirsh, Esq.
```



1    Alexander Cobb, Esq.

2

3

4

5

6    REPORTED BY:  Toronto - Kimberley Neeson

7              RPR, CRR, CSR, CBC

8        Realtime Systems Administrator

9          Delaware - Lorraine Marino

10                  RDR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Neeson&Associates    W&F

1                    I N D E X

2                                              Page

3   On Behalf of the US Estate (cont'd)

4        By Mr. Bromley                        297

5        By Ms. Block                          324

6        By Mr. Bromley                        334

7   On Behalf of the UCC

8        By Mr. Qureshi                        338

9   On Behalf of ad hoc group of Bondholders

10        By Mr. Leblanc                       359

11  On Behalf of the Monitor and Canadian Debtors

12        By Mr. Coleman                       392

13        By Mr. Zarnett                       411

14  On Behalf of Wilmington Trust National Association

15        By Mr. Crichlow                      490

16  On Behalf of Law Debenture Trust Company

17  of New York

18        By Mr. Lowenthal                     498

19  On Behalf of Bank of New York as Indenture

20  Trustee

21        By Mr. Riela                         501

22

23

24

25



```
 1   --- Upon commencing at 9:02 a.m.

 2              THE US COURT:  Good morning, everyone.

 3   Thank you.  Please be seated.

 4              THE CANADIAN COURT:  Good morning.

 5   Good morning, Judge Gross.

 6              THE US COURT:  Good morning, Justice

 7   Newbould.

 8              THE CANADIAN COURT:  So in this tag

 9   team, who is next?

10              MS. BLOCK:  Mr. Bromley is going to

11   deal with IFSA.

12              THE US COURT:  Justice Newbould, good

13   morning.

14              THE CANADIAN COURT:  Good morning.

15              THE US COURT:  Mr. Bromley, I think, is

16   going to speak passionately about IFSA this

17   morning.

18              THE CANADIAN COURT:  We can't hear you.

19   -- OFF THE RECORD --

20              THE US COURT:  I am ready, Mr. Bromley.

21   Thank you.

22      OPENING STATEMENT ON BEHALF OF THE US ESTATE

23                      (CONT'D)

24              MR. BROMLEY:  Good morning, Judge

25   Gross.  Good morning, Justice Newbould.
```



1               Picking up where we left off yesterday
2    afternoon, this portion of the presentation will
3    deal with two critical documents that are from the
4    post-filing period:  the Interim Funding and
5    Settlement Agreement, known as the IFSA, and the
6    Final Canadian Funding and Settlement Agreement,
7    known as the FCFSA, with a silent "F."  My
8    apologies.
9               Starting with the IFSA, you have to go
10   back in time to the beginning of the Chapter 11
11   proceedings.  In early March and April of 2009,
12   about two months after the Chapter 11 filings and
13   the CCAA filings, Canadian management recommended
14   to all of the interested parties that a process
15   commence to sell the businesses, the operating
16   businesses, of Nortel around the world.  The view
17   was that the business climate and the prospects
18   were simply too challenging to allow for a
19   worldwide reorganization, and so the exercise of
20   multiple sales started.
21               Now, there were two questions that the
22   parties had to address at that point in time:
23   First, how can one do sales of businesses that are
24   located around the world without agreeing first on
25   a purchase price allocation beforehand; and the



1    second, and equally important, was how to continue

2    to have enough funding go into NNL, the operating

3    company in Canada, to allow it to continue to

4    operate through the closing of these transactions.

5              In early 2009, the transfer pricing

6    system that had funneled so much cash into Canada

7    was shut down.  The Chapter 11 proceedings, the

8    administration proceedings and the CCAA proceedings

9    erected ring fences around each of our estates,

10   preventing the cash from flowing the way it had in

11   the pre-petition period.

12             There was a series of very intense

13   negotiations that were occurring simultaneously

14   with efforts to try to generate interest in certain

15   of the business units, and these negotiations

16   resulted in the Interim Funding and Settlement

17   Agreement.  When I say they were simultaneous, they

18   truly were simultaneous.  Indeed, the hearing for

19   the approval of the IFSA was the same hearing that

20   we had for the approval of the stalking horse

21   transaction for the first large sale, the CDMA

22   transaction with NSA, Nokia Siemens Networks,

23   eventually won in an auction by Ericsson, and that

24   was at the end of June of 2009.

25             The IFSA has already been the subject



 1   of litigation, as we all know, and there are other
 2   issues that have been raised in the context of this
 3   litigation.  And there are really three parts for
 4   this trial that the IFSA matters for.
 5              The first one -- there is the first
 6   page of the IFSA.  The first part of it has to do
 7   with funding.  As was mentioned earlier, the
 8   Canadian Debtor, operating debtor, NNL, was facing
 9   severe liquidity constraints.  And we were informed
10   by the Monitor and Canadian management -- and when
11   I say "we," I mean the US Debtors as well as the
12   Joint Administrators -- that without continued
13   funding, the Canadian Estate would run out of cash.
14              So the agreement provided first in
15   Part A for funding.  And it says that NNI shall pay
16   to NNL a sum total of 157 million, the total
17   payment, in five equal installments.  It should be
18   noted that that 157 million was in addition to
19   another 30 million that had already been paid in
20   January, before the transfer pricing payment system
21   had been shut down.  So, in fact, the IFSA approved
22   payments post-petition by NNI to NNL in connection
23   with any potential transfer pricing obligations of
24   nearly $200 million.
25              The second key provision in the IFSA



```
 1   had to do with the entry into sale transactions,

 2   and that is in Section 12.  Other parts of Section

 3   12 we have gone over in detail.  Section (a),

 4   however, of Section 12 is critically important,

 5   particularly when taking into account the Canadian

 6   experts' views on the allocation methodology that

 7   should be applied.  Section 12(a) says very clearly

 8   that [reading]:  Each debtor agrees that its

 9   execution of definitive documentation with a

10   purchaser, or the closing of any sale of material

11   assets of any of the debtors to which such debtor,

12   a selling debtor, is proposed to be a party, shall

13   not be conditioned upon reaching an agreement as to

14   allocation or an agreement as to the procedure as

15   to allocation.

16            The key phrase here is "selling

17   debtor."  Any Nortel entity that participates in

18   the sale and signs onto a sale agreement or

19   releases any rights, including license rights,

20   becomes a selling debtor for purposes of the IFSA.

21   And once you are a selling debtor, you are entitled

22   to a right to allocation.

23            Now, when you move on in Section 12, in

24   Section 12(e) there is a very clear provision which

25   we have been referring to, as has the Monitor,
```



```
 1   certain of the Monitor's witnesses, as the a
 2   "fiduciary out."  It says, "Notwithstanding" --
 3                THE CANADIAN COURT:  May I stop you for
 4   a second, please?
 5                MR. BROMLEY:  Yes, sorry.
 6                THE CANADIAN COURT:  You said that
 7   12(a) -- you say the effect of 12(a) is that once
 8   you are a selling debtor, you are entitled to
 9   allocation?  Did I hear you right?
10                MR. BROMLEY:  Yes, entitled to a right
11   to allocation.
12                THE CANADIAN COURT:  Okay.  What
13   language in 12(a) do you say gives rise to that?
14                MR. BROMLEY:  Excuse me, Your Honor.  I
15   will have to grab the IFSA itself.
16                We don't have a slide for this, Your
17   Honor, but it is in Section 11(d) of the IFSA.  It
18   says, "Where any debtor enters into an appropriate
19   license termination in accordance with this Section
20   11" -- and Section 11 deals with license
21   terminations -- "such debtor shall be deemed to be
22   a selling debtor."
23                THE CANADIAN COURT:  Yes.
24                MR. BROMLEY:  And if we go to the prior
25   slide, it actually does appear at the carryover.
```



```
 1                    THE CANADIAN COURT:  All right.  But
 2      when I looked at 12(a), I didn't see anybody having
 3      a right to an allocation:  It shall not be
 4      conditioned upon agreement regarding allocation.
 5                    MR. BROMLEY:  Your Honor, it is in the
 6      IFSA.  I have to say I don't have it right at my
 7      hand at the moment, but we will find that for you.
 8                    THE CANADIAN COURT:  All right.  Thank
 9      you.
10                    MR. BROMLEY:  So moving back to 12(e),
11      this is the fiduciary out, which is that:
12                         "No debtor shall be required to
13                         enter into a sale transaction so long
14                         as such debtor reasonably determines,
15                         acting in good faith, after
16                         consultation with the other parties to
17                         this agreement, that such sale
18                         transaction is not in the best economic
19                         interests of its creditors generally."
20                         Now, this fiduciary out, which is
21      embodied in the IFSA, is also accompanied by the
22      obligations that, in connection with any sale
23      transaction, each of the debtors needed to seek
24      approval, to the extent necessary, from whatever
25      body they needed to seek approval from.
```



```
 1                  So for purposes of the US Debtors, for
 2      instance, any sale transaction was obviously
 3      subject to the Section 363 sale process, and a
 4      finding of the Court and entry of an order that the
 5      sale transaction was the highest and best
 6      transaction available for the assets generally and
 7      that the same sort of finding would be necessary
 8      under Canadian law to permit the Canadian Debtors
 9      to do the same.
10                  THE US COURT:  And Justice Morawetz and
11      I sat jointly in these hearings.
12                  MR. BROMLEY:  Correct, Your Honor.  And
13      we had multiple hearings on every single sale
14      transaction, including the residual patent
15      portfolio transaction, where evidence was adduced
16      as to the sale process and whether or not the price
17      that was being obtained for the assets being
18      transmitted by each of the debtors was the highest
19      or best under the circumstances.
20                  THE US COURT:  Right.
21                  MR. BROMLEY:  Now, the IFSA document as
22      well provided that there were certain consents that
23      were going to be required by the Creditors'
24      Committee and the Bondholders Committee, and those
25      consents were required both of actions that had to
```

Neeson & Associates    W&F

 1  be taken by the US Debtors and the Canadian

 2  Debtors.

 3          Now, that was in June of 2009.

 4  $187 million had been transmitted by NNI to NNL in

 5  connection with claims that the transfer pricing

 6  amounts and other things were owed by NNI to NNL,

 7  and the process proceeded.  Sales took place.

 8          The first sale transaction was the CDMA

 9  transaction, the first large one.  Then we followed

10  that up with the Enterprise Solutions transaction;

11  the first one a $1.1 billion transaction, the

12  second one nearly a billion dollars.  And as we

13  were moving through the end of 2009, there were

14  transactions in place or in process for virtually

15  all of the business lines of the Nortel businesses

16  around the world.

17          Two things happened in the fall of

18  2009.  The first was that the Canadian Debtors, in

19  particular NNL and the Monitor, came to the other

20  parties once again and said that the Canadian

21  Debtors, and NNL in particular, were suffering a

22  liquidity crisis and that additional funding was

23  required.

24          Second, the Internal Revenue Service

25  and the Canadian Revenue Agency came to each of NNI



1    and NNL separately and said that there had been an

2    agreement reached between the two taxing

3    authorities, an agreement that had been reached

4    with the open audits and the APA process that we

5    had discussed yesterday for the period of 2001 to

6    2005.

7                    And in connection with that, the IRS

8    and the CRA informed the parties that they believed

9    that a $2 billion adjustment was required to the

10   operating income that had been reported by each of

11   NNL and NNI for the periods of 2001 to 2005.

12                   These two issues came to a head at the

13   same time, and both needed to be resolved.  The

14   transactions that we had entered into and had not

15   yet closed required that NNL stay in business and

16   continue to have cash, and the issues that had been

17   raised by tax authorities required immediate

18   attention.  They had given us a very strict

19   deadline.

20                   So what had happened at that point in

21   time is negotiations started and the FCFSA, the

22   Final Canadian Funding and Settlement Agreement,

23   was the result of those negotiations.  One major

24   difference between the IFSA and the FCFSA are the

25   EMEA Debtors are not parties to the second

 Neeson&Associates   W&F

 1   agreement.  It is only between the US Debtors and

 2   the Canadian Debtors.

 3              So let's look at the FCFSA.  It is

 4   structured similarly to the IFSA, and the first

 5   provision is funding.  You will see that NNI would

 6   pay to NNL, in accordance with the schedule,

 7   another $190 million.  So together with the 190

 8   million that was approved in the IFSA, you had

 9   another 190 million, for a total of $380 million in

10   cash that would be paid in the post-petition period

11   from NNI to NNL.

12              That would be seen as a maximum payment

13   in full and final settlement of any obligations

14   that the US Debtors could ever owe to the Canadian

15   Debtors.  This was a very important element of the

16   negotiations.  And the definition of "covered

17   obligations" makes clear that it is any claims for

18   corporate overhead, research and development costs,

19   or any other alleged payment or cost reimbursement

20   under any legal theory, including, without

21   limitation, pursuant to transfer pricing

22   agreements.  And transfer pricing agreements

23   include claims related to the MRDA.

24              The FCFSA also provides -- the Final

25   Canadian Funding and Settlement Agreement also has



1    provisions relating to the advance pricing

2    agreements.  These are the agreements with the IRS

3    and the CRA.

4              Part C in paragraph 9 provide that each

5    of NNL and NNI will enter into advance pricing

6    agreements that memorialize the $2 billion

7    agreement, the $2 billion income adjustment.

8              Now, just so that we are clear, what

9    that meant was that the CRA and the IRS together

10   had agreed that, during the period of 2001 to 2005,

11   NNI had overpaid NNL by $2 billion in terms of

12   transfer pricing payments.

13             Now, that had an important impact on

14   NNI.  What had to happen was that tax returns

15   needed to be restated and refiled, and there would

16   be a serious deterioration in tax attributes that

17   NNI would have.  Net operating loss carryforwards

18   in particular were to be consumed by reversing the

19   income.

20             And what this meant was that, as a

21   result of this, the IRS and the CRA considered that

22   the $2 billion that had been overpaid should be

23   considered to be a dividend that had been paid by

24   NNI, the subsidiary, to NNL, the parent, a deemed

25   dividend.  And as a result of that, a withholding



1    tax would be payable.

2            Now, withholding taxes are interesting.

3    Technically, they are owed by the party that

4    receives the payment, in this case NNL; but because

5    withholding taxes are owed by an entity that is

6    outside of the jurisdiction, the obligation to

7    actually pay the withholding tax resides with the

8    entity within the jurisdiction.  So the withholding

9    tax, technically while owed by NNL, under US law,

10   would have to be paid by NNI.

11           So when you go back to the FCFSA, the

12   Final Canadian Funding and Settlement Agreement,

13   the result of the $2 billion adjustment was a

14   claim, a $2 billion claim that the US Debtors, NNI

15   in particular, would have against NNL.  And it is

16   embodied in Part D, paragraph 10 of the Final

17   Canadian Funding and Settlement Agreement that the

18   parties hereby agree that a prefiling claim filed

19   against NNL, the priority of which is described, is

20   in the aggregate amount of $2.0627 billion.  And

21   that is for full and final settlement of the

22   following claims, and it lists those claims.

23           It makes very clear in the Final

24   Canadian Funding and Settlement Agreement that the

25   claim cannot be challenged, that it is allowed



```
1   immediately.  It is documented in two notes.  It is
2   not subject to setoff, and it includes a waiver of
3   all pre-petition claims prior to January 14, 2009,
4   that the Canadian Debtors could have at all against
5   the US Debtors.  These were critical elements --
6               THE CANADIAN COURT:  Pardon me,
7   Mr. Bromley.  Can I just ask you a question?  What
8   would the withholding tax rate be in the US on
9   that?  What was the rate?
10              MR. BROMLEY:  It was either 5 or 10
11  precent, Your Honor.
12              THE CANADIAN COURT:  Okay.
13              MR. BROMLEY:  There was also a very
14  critical provision of the Final Canadian Funding
15  and Settlement Agreement that appeared in paragraph
16  28, and that is the Master R&D Agreement
17  standstill.  The title says a lot, but it also
18  says:
19                  "Neither the Canadian Debtors nor
20                  the US Debtors will exercise a right of
21                  termination under the Master R&D
22                  Agreement without the prior written
23                  consent of the other parties to the
24                  agreement, the Creditors' Committee,
25                  and the Bondholders Committee."
```



1                    This provision was negotiated very

2     specifically to prevent any tinkering with any of

3     the license rights that existed under the MRDA,

4     because remember, at this point in time it is

5     December of 2009.  The sale process, as you will

6     hear in a moment, with respect to the residual

7     patent portfolio was in full bloom, and the

8     exercise with respect to the IPCo business model

9     was in full bloom.

10                    The parties were keenly aware of the

11    importance of the license rights, and we did not

12    want to have any questions about the entitlement to

13    those license rights and, in particular, did not

14    want to have any risk that the Canadian Debtors

15    would take the position that the license rights

16    could somehow be terminated through a rejection or

17    otherwise challenging the MRDA.  That is the reason

18    that the standstill was there.

19                    So when you take these two agreements

20    together, what we have is the US Debtors in the

21    post-petition period paying $380 million in cash to

22    the Canadian Debtors.  You have a $2 billion claim,

23    which will obviously recover cents on the dollar,

24    being lodged against and admitted against NNL in

25    the Canadian proceedings, and you have a very clear

Neeson & Associates    W&F

 1   standstill, a freezing of all rights under the

 2   MRDA.

 3            Your Honor, Justice Newbould, while I

 4   was going through that, I was able to have my

 5   colleagues put together the information to answer

 6   your question.  So if I could go back to that for a

 7   moment.

 8            And I apologize.  I have not given you

 9   in slide form the entirety of the Final Canadian

10   Funding and Settlement Agreement.  But in Section

11   11(a) what it says is -- this has to do with the

12   relinquishment of intellectual property licenses,

13   which is an issue that is raised by the Monitor's

14   experts.  It says that each of the US Debtors and

15   the EMEA Debtors agrees to enter into an

16   appropriate license termination for the purpose of

17   facilitating, and in consideration of a right to,

18   an allocation, to be determined in accordance with

19   this Section 11.

20            Section 11(d) -- I am sorry, Your

21   Honor.  This is in the IFSA, not the FCFSA.  This

22   is in the Interim Funding and Settlement Agreement.

23            THE US COURT:  Yes.

24            MR. BROMLEY:  And then in Section 11(d)

25   it says, "Where any debtor enters into an



```
 1    appropriate license termination in accordance with
 2    the provisions of this Section 11, such debtor
 3    shall be deemed to be a selling debtor."
 4              The provisions of the IFSA were
 5    carefully crafted, clearly done by corporate
 6    lawyers, to connect the dots that in the event of a
 7    sale transaction, including the --
 8              THE CANADIAN COURT:  You mean there are
 9    too many words?
10              MR. BROMLEY:  I am sorry, Your Honor?
11              THE CANADIAN COURT:  You mean there are
12    too many words?
13              MR. BROMLEY:  They are well-chosen
14    words.
15              THE CANADIAN COURT:  Don't answer that.
16              MR. BROMLEY:  So that's the link to it,
17    Your Honor.
18              So, Your Honor, when we are looking at
19    the $2 billion claim, it is important to understand
20    how that $2 billion claim came into being.
21              From 2001 to 2005 there were transfer
22    pricing payments made under the MRDA or the RPSM,
23    because the MRDA wasn't signed until the end of
24    Year 4, which was 2004.  And you can see by this
25    chart that we had $1.5 billion paid in 2001, 1.1
```

 Neeson & Associates    W&F

1    billion in 2002, and so on.

2              It is important to note the decreasing

3    numbers are not as a result of any readjustment of

4    the relationship between the parties.  They merely

5    reflect a deterioration of the general business

6    within Nortel.

7              So from 2001 to 2005, these are cash

8    payment transfers made under the transfer pricing

9    regime, almost $5 billion from NNI to NNL.  That is

10   what was under consideration between the IRS and

11   the CRA.

12             And so when you look at the next slide,

13   you will see that the total amount transferred is

14   nearly 5 billion.  The adjustment demanded by the

15   tax authorities was 2 billion, which means that the

16   tax authorities had determined that approximately

17   40 percent of all transfer pricing payments made

18   during the 2001 to 2005 period needed to be

19   reversed.  40 percent of those transfer pricing

20   payments were determined by the IRS and the CRA to

21   be a dividend, not to be compensation for R&D

22   expenses.

23             And it is worth noting as well that the

24   $2 billion number was the product of negotiation

25   between the tax authorities.  We will not know,



1    ever, exactly how they came to the number

2    $2 billion because the competent authority process,

3    which takes place between the tax authorities, is

4    covered by treaties that have been entered into by

5    both countries, and the treaties provide for

6    confidentiality.

7                However, we have been able to determine

8    that the IRS, you will recall, Your Honor, filed a

9    $3 billion claim in August of 2009 against the US

10   Debtors, which implied a much higher income

11   adjustment.

12               So we believe that 2 billion is the

13   product of negotiation between the two taxing

14   authorities.  We believe, as we said in the fall of

15   2009, that if we did not sign --

16               Sorry, Your Honor.

17               THE CANADIAN COURT:  Was that 2009

18   claim for the years 2001 to 2005?

19               MR. BROMLEY:  That's correct, Your

20   Honor.

21               THE CANADIAN COURT:  Thank you.

22               MR. BROMLEY:  So if you move and look

23   at this in the context of NNI's financial support

24   for NNL during the period, the ten-year period

25   prior to the bankruptcy filing, it is very

 Neeson&Associates    W&F

```
 1    instructive.
 2              THE CANADIAN COURT:  I have another
 3    question for you.  I am sorry.
 4              MR. BROMLEY:  Yes.
 5              THE CANADIAN COURT:  The 4.9 billion
 6    transferred from 2001 to 2005, you say were
 7    transfer pricing payments under the MRDA.  I am
 8    just wondering if you could point to me in the MRDA
 9    where that is covered, where it is covered that
10    these payments are to be made.
11              MR. BROMLEY:  Well, Your Honor, that is
12    an interesting question, because the way it works
13    is that the MRDA is based on something called the
14    RPSM, the residual profit-split methodology.  And
15    from a transfer pricing perspective, the word
16    "profit" means exactly what you might think:
17    Profit.
18              And so in a profit situation, you would
19    be a good situation in transferring cash happily.
20    What Nortel had during that ten-year period was a
21    loss situation.  So effectively the RPSM became a
22    residual loss-sharing mechanism rather than a
23    residual profit-sharing mechanism.
24              So you are not finding in the MRDA a
25    specific statement that says, in a loss event, NNI
```



1    will be sending a lot of money to NNL.  What you

2    are finding is, in Schedule A of the MRDA -- and

3    that is, if you look at the booklet that we handed

4    out yesterday it is at the end of the first

5    document, the last two pages, pages 15 and 16,

6    there is a formula that begins at the bottom of

7    page 15.

8              The formulaic steps for calculating the

9    R&D allocation to each participant is as follows --

10             THE CANADIAN COURT:  Yes.

11             MR. BROMLEY:  Your Honor, we will be

12   able to provide you in evidence the worksheets that

13   show the calculations and the inputs that generated

14   the numbers that appear on the sheet.  But it is

15   this formula, for the period of 2001 to 2005, that

16   yielded the $4.9 billion payments between the years

17   2001 to 2005.

18             Now, you will note that the way the

19   document is phrased is that there is an R&D

20   allocation to each participant; and, again, it is a

21   residual profit-split methodology.

22             We will show you in another slide the

23   way that the money moved.  But effectively, under

24   this system, once imposed in 2001, there was never

25   a year where NNI received any cash from any other



1    participant.  In fact, NNI was the overwhelming

2    payor in the system.

3            Now, the other payors in the system

4    were France and Ireland, and there were two

5    recipients, NNL and NNUK.  And as you will hear in

6    the evidence from my friends from EMEA, the moneys

7    that were earmarked to go to EMEA actually never

8    went there; the cash, that is.

9            Notwithstanding provisions of the MRDA

10   that would prevent this, the NNL did not send the

11   cash to NNUK.  It, rather, created an ever-accruing

12   interest-free loan.  So when you look at the cash

13   that went into the RPS system that the US

14   contributed, some of it was supposed to go to NNUK,

15   and the cash never did.

16           THE CANADIAN COURT:  Are you saying

17   essentially that what you ended up with was a

18   residual-loss pool instead a residual-profit pool?

19           MR. BROMLEY:  That is exactly right,

20   Your Honor.

21           If you look at the path from the 2000

22   to 2009, it is instructive.  In 2001, as we saw,

23   there were $1.9 billion in transfer pricing

24   payments in cash made by NNI to NNL.  In 2001 NNI

25   provided NNL with a revolving credit facility.  The



1    original amount was 1.5 billion.  It fluctuated in

2    terms of maximum amount over time between 2 billion

3    and 1 billion, but it remained in place during this

4    entire ten-year period.

5            You will hear from Ms. Kate Stevenson,

6    who was the treasurer of Nortel in the mid-2000s,

7    that without this facility and without the

8    continued liquidity provided by NNI, that NNL would

9    not have been able to operate.

10           In 2002 $1.1 billion in transfer

11    pricing payments, again in cash, were made.  In

12    2003, 857 million; in 2004, 722 million; in 2005,

13    631 million.

14           In 2006 something happened, which

15    wasn't cash.  In 2006 NNI borrowed $1.3 billion

16    from JPMorgan Chase and a consortium of banks.  It

17    was a relatively short period of time that the loan

18    facility was outstanding, but it was instructive.

19    The 1.3 billion was used to repay outstanding NNL

20    debt and for certain NNL operating expenses.

21           In 2006 the first issue of notes, the

22    notes that are at issue in this trial, were issued.

23    2 billion of notes were issued by NNL and

24    guaranteed by NNI.  You will hear that the

25    guarantee by NNI was critical to the issuance of



1    these notes.

2              The proceeds of this first $2 billion,

3    1.3 billion was used to repay the loan agreement

4    that I had just mentioned.  Another 600 million was

5    used in connection with a series of transactions

6    that happened at the same time to pay almost $600

7    million in cash to settle securities class action

8    claims against NNC's officers and directors.

9              In 2006 371 million in cash and

10   transfer pricing payments were made.  In 2007

11   1.15 billion in senior notes were issued with NNL

12   issuing them and NNI guaranteeing them.

13             It is worth noting that these issuance

14   of notes in the 2006-2007 period are not

15   coincidental.  Nortel was not able, was prohibited

16   from going to the public markets prior to 2006

17   because of the restatements.  They did not have any

18   audited financials that would permit them to issue

19   public debt in the United States or in Canada until

20   2006, after the conclusion of the last restatement.

21             Until 2007 there was another

22   $500 million in cash and transfer pricing payments;

23   and in 2008 1.19 billion in notes issued by NNL

24   with NNI guarantees.

25             2008, 537 in transfer pricing payments.



1    On the petition date, 75 million was loaned in a

2    post-petition loan; 30 million transfer pricing

3    payment, as we have referenced under the IFSA; 157

4    million authorized in the IFSA; 190 million

5    authorized in the Final Canadian Funding and

6    Settlement Agreement.

7              So as of today, since 2000, total cash

8    and liability support provided by NNI to NNL

9    totaled $11 billion.

10              Now I will move quickly through the

11   transactions.  In the post-petition period we had a

12   series of transactions, which are summarized on

13   this next chart.  As you can see, the transactions

14   were successful.

15              Now, the one that was the most

16   successful, as you can see, was the patent

17   portfolio transaction at 4.5 billion, and it was in

18   the context of that transaction that we have a

19   series of debates as to whether or not there should

20   be an independent intellectual property company,

21   called IPCo, or whether or not we should sell the

22   patents.

23              Now, obviously, when you look at the

24   4.5 billion, you can see that it made sense to sell

25   the patent portfolio.



 1                On the other hand, Your Honors, there

 2    was an 18-month process relating to IPCo.  Experts

 3    were hired, an extensive examination of the patent

 4    portfolio was done, and only when the stalking

 5    horse bid was seen by all of the collective

 6    parties -- and that included the Bondholders and

 7    the Creditors' Committee -- that that stalking

 8    horse transaction from Google was likely to

 9    generate more money than would be generated under

10    an IPCo scenario was it decided to pursue that.

11                Now, you will hear from Mr. Ray and

12    Ms. Hamilton somewhat contrary views as to how the

13    IPCo process went forward, but we are confident

14    that what you will see is a very intense and

15    important exercise that went forward and a critical

16    decision that was made on a very credible business

17    model.

18                I am going to turn it back to Ms. Block

19    at this point, Your Honor.

20                THE US COURT:  All right.

21                THE CANADIAN COURT:  Can I just ask you

22    one more question, please, Mr. Bromley?  Was any

23    consideration given by NNI to recapitalizing and

24    going it alone?

25                MR. BROMLEY:  Your Honor, I think the



```
 1    answer to that is throughout the process with
 2    respect to IPCo, the question of who had the
 3    ability to fund IPCo was focused on the United
 4    States.  We had approximately a billion dollars in
 5    cash at the time, and when we were talking about
 6    the financial ability to reorganize around IPCo, it
 7    was focused on the assets of NNI at the time.
 8                THE CANADIAN COURT:  IPCo would have
 9    involved Nortel Canada as well as EMEA, the EMEA
10    Debtors?
11                MR. BROMLEY:  That's how it was
12    contemplated, Your Honor.
13                THE CANADIAN COURT:  My question was a
14    little bit different, and that is whether or not
15    NNI, under Chapter 11, ever considered
16    recapitalizing itself and carrying on.
17                MR. BROMLEY:  Well, I think you will
18    hear from Mr. Ray when he testifies that that
19    opportunity was available at the time.  And this is
20    an important issue, which was what was being
21    discussed among the parties was critical.  And
22    there was never a mention made at any time during
23    this exercise that there was no value available to
24    any of the US or EMEA Debtors in respect of the
25    patent portfolio.
```



 1                    There was an 18-month process about

 2    IPCo and about the sale.  And if ever once that

 3    prospect had been raised, the opportunity to

 4    operate independently or to pursue another path was

 5    always available to the US Debtors.

 6                    THE US COURT:  In other words,

 7    Mr. Bromley, no one said at that time there is no

 8    value for the US entities.

 9                    MR. BROMLEY:  That is the testimony

10    that you will hear, Your Honor.  It was not brought

11    up until after the failure of the last mediation.

12                    THE US COURT:  Ms. Block, good morning.

13                    MS. BLOCK:  Good morning, Judge Gross

14    and Justice Newbould.  I am going to deal with item

15    number 12 on our list and this is my last

16    submission to you both in opening.

17                    But let me preface it with a response

18    on the parol evidence question that I was asked

19    yesterday because it is relevant to my point about

20    the Monitor's role.

21                    The only purpose of the MRDA was to put

22    down in writing what these companies were doing,

23    what they had been doing under the CSA and then the

24    four-year interregnum 2001 to 2004 when they were

25    operating after terminating the last CSA with


Neeson & Associates    W&F WILSON & PETERS LTD.

```
 1   outputting the MRDA in writing before the tax
 2   authorities.  This is what was happening on the
 3   ground.  And then, of course, there were
 4   adjustments to the MRDA throughout, right up until
 5   December 31, '08.
 6              So we know as a fact, and this is not
 7   parol evidence, that major R&D was done in the US,
 8   it was being done in other places around the world.
 9   We know that R&D was not done in isolation,
10   everyone wanted to have everyone else's R&D and
11   each was willing to offer up its own in return, and
12   the arrangements were made to divide the ownership
13   that for administrative simplicity NNL had title.
14              They chose to share the benefit and
15   burden of the R&D by having NNL set up divisions,
16   by having NNL not -- they didn't share -- they
17   didn't decide to share the benefit and the burden
18   by having NNL run divisions.  They in fact set up
19   the companies long before as separate companies.
20              These are facts on the ground.  They're
21   all relevant facts.  They're not parol evidence.
22   And they did this because, again, part of the
23   evidence you will hear is the adverse tax
24   consequences to a structure that would have had NNL
25   owning everything, they ran this -- these companies
```

Neeson&Associates    W&F

```
 1   in this way for good and valid business reasons,

 2   and this isn't parol evidence.  These are evidence

 3   of the facts.

 4              So having those separate companies

 5   doing R&D, splitting ownership where they all put

 6   their R&D on the table and share it under the MRDA

 7   was done so they were not purchasing each other's

 8   R&D with the tax consequences deemed dividends that

 9   were just handed over to NNL, as we saw with the $2

10   billion, royalties would have to be deemed or paid.

11              So it wasn't given away for nothing.

12   If that had happened, billions of dollars of R&D

13   for nothing given to NNI -- NNL, there would have

14   been adverse tax consequences.

15              So the tax people at NNL whose

16   testimony you will hear, and it's the tax people,

17   the business people, who are running these

18   businesses in this way, who are sorting it out for

19   good and valid business reasons and tax reasons,

20   when they are quoted before you as saying here's

21   what we were doing on the ground --

22              THE CANADIAN COURT:  That wasn't the

23   question that prompted my question, but, in any

24   event --

25              MS. BLOCK:  Sorry, I've gone off on a
```



```
 1    complete tangent then.  But the Doolittle question
 2    was, what is it you were doing?  And he later on
 3    said in the other quotes, this was the economic
 4    reality.  He's not saying when I sat at the table
 5    before I signed the MRDA and looked at these words
 6    I decided it meant in my mind X.  He's saying
 7    here's how we ran the business, the RPS entities
 8    were getting ownership in their territories of all
 9    the IP, and NNL was getting legal title, that's how
10    we ran it on the ground.
11                 And so, the tax people who tell you
12    what the deal was, what they are telling you,
13    here's how we operated and they paper it with the
14    MRDA.
15                 So, you know, Karina O, senior tax
16    person, Doolittle, senior tax person, Peter Look in
17    2008 saying there's $2 billion worth of the 3
18    billion outside of Canada.  He's talking about the
19    facts on the ground.
20                 And that is completely admissible.  And
21    I say this because when my friend gets up, my
22    learned friend gets up in a few moments to address
23    you, he'll be talking about how you can't listen to
24    any of this, which in my submission it's completely
25    admissible saying here's how we run and then they
```

Neeson&Associates    W&F

 1    go to the tax department and say here's how we run.

 2                    And if NNL had walked in with the MRDA

 3    and slapped that down and said here's our deal,

 4    please give us approval, good-bye, you know, the

 5    tax people would have said, hold on here, we have

 6    10,000 questions, let's look at the reality of how

 7    you run.  Who does the R&D?  Who is taking the

 8    risk?

 9                    Those are the facts that these tax

10    people are talking about.  It is not the IP people

11    who can tell you this, actually, because they're

12    registering patents and so on.  It's the tax people

13    and the business people who are running the

14    business in this way for financial and tax reasons.

15                    So, when my friend comes to ask you to

16    give an interpretation in a vacuum, which is really

17    to resile from the deal and say NNI own nothing,

18    EMEA own nothing, we get all of the 4.5 billion,

19    the deal on the ground is what you have seen and

20    heard and will see and hear in this evidence and a

21    split in the ownership by territory.

22                    And if we could have slide 158, it's

23    this split that we saw with research and

24    development being done by everybody and

25    intellectual property, the ownership being done by

 Neeson & Associates    W&F

1    everyone, and the Monitor preparing this under the

2    Monitor's watch, preparing this report which under

3    -- I've found the regulations and we'll get them

4    into the evidence, that you are required within

5    three months to prepare this for the tax

6    authorities should they request it.

7              This is the reality and that's the

8    evidence.  And, you know, I can imagine if NNL or

9    the Monitor came to the tax authorities and say

10   well, everything we've told you about the split in

11   ownership and entrepreneurship and the licenses

12   being property in the territory for each of the

13   IEs, that's -- by the way, on our pretrial

14   submission we're going to tell you they actually

15   had no value, that they were worthless.  That would

16   be what my colleague Andrew Gray politely calls

17   approbating and reprobating.

18              As well, all of this evidence would be

19   admissible for other reasons, the arm's length

20   issue, the tax consequences of the way they

21   operated and, as I say, it's relevant in relation

22   to the conduct of the Monitor which is the point I

23   want to move to now and let me explain.  This is

24   one last issue on the sales, the role of the

25   Monitor.



```
 1                  The Monitor comes before these courts
 2     and says the exclusive licenses had no value, NNL
 3     owned everything outright, and all the Rockstar
 4     proceeds belong to the Canadian Estate.
 5                  And I expect the evidence will show
 6     first that the Monitor's view that the other
 7     estates were entitled to no allocation was never
 8     disclosed.  Secondly, that that view would have
 9     been highly material, and Judge Gross will form his
10     own opinion because he sat there and approved this
11     transaction, but highly material to the other
12     debtor estates as they cooperated on the sales,
13     highly relevant to all of the creditors, highly
14     relevant to Judge Gross and Justice Morawetz as
15     they considered approval of the Rockstar
16     transaction, and it would have been particularly
17     crucial for the US court because it was assessing
18     whether the Rockstar sale was the "highest and best
19     available" for the US Estate.
20                  And the US court would have wanted
21     before approving to be told by the Monitor and the
22     Canadian Estate appearing before it in a joint
23     hearing before both courts that the US Debtors were
24     about to surrender their remaining license rights
25     for no consideration.
```

 Neeson & Associates   W&P Wilson & Petzer Ltd.

1              And you saw in 11(a) of the IFSA the
2    termination of the license was in consideration of
3    a right to allocation, 11(a), a right to allocation
4    under the IFSA.
5              What the Monitor did present was its
6    reports.  The 71st report was the report before
7    both courts, and it referenced back to the 63rd
8    report, both of them say that NNL didn't have
9    unencumbered title, NNL held title -- held legal
10   title and that legal title, they say, was subject
11   to the exclusive licenses.  And that was still the
12   representation being made at the Rockstar approval.
13             Now, our courts typically have a high
14   expectation that the Monitor has a duty to take a
15   neutral, balanced approach in their reports to the
16   court; the Monitor is an officer of the court
17   required to act with candor and transparency,
18   taking into account the interests of all the
19   creditors and stakeholders; and is obliged, as an
20   officer of the court -- and remember, the Rockstar
21   sale was before my friends became super Monitor,
22   but even after super Monitor they're still an
23   officer of the court, and that obligation is to
24   bring the relevant facts to the court's attention.
25             The person in charge of the Monitor in



1    this case is Murray McDonald.  He will not be

2    testifying before Judge Gross and Justice Newbould

3    at this trial, although you will learn of his

4    testimony because he was deposed.

5                    And the evidence you will hear and read

6    will show you that Mr. McDonald, as head of the

7    Monitor, admits these duties I have just reviewed

8    that the Monitor has, and that the Monitor well

9    knew, and he well knew, that the estates were all

10   cooperating to sell all their assets and obtain

11   value for their rights.  And they did that so they

12   could discharge their individual fiduciary duties

13   to each of their sets of creditors, to maximize

14   recovery.

15                   And one thing that I expect will be

16   clear from the evidence you've already seen in the

17   opening, that the Monitor would know from NNL's

18   files that were available to the Monitor, to people

19   like Doolittle, Karina O, Peter Look that were

20   available to the Monitor, from the Monitor's own

21   involvement with these matters, Ernst & Young in

22   relation to transfer pricing and these reports that

23   they did in 2010, they knew that the integrated

24   entities held valuable, exclusive, perpetual rights

25   to the IP.  Indeed, Ernst & Young's long-standing

 Neeson&Associates    W&F WILSON & PETYZER LTD.

 1   work with Nortel before this engagement as Monitor,
 2   as you've seen, shows that.
 3              So I expect that the evidence will show
 4   that the no-value assertion that is the foundation
 5   of the case the Monitor is bringing before these
 6   courts, and is the reason we're here, is a
 7   litigation argument invented three years after all
 8   of these events.
 9              You will hear and will have seen in the
10   briefs that Mr. McDonald admits he never heard of
11   this until after the third mediation, that's May
12   2013.  Never heard that there was no value in the
13   licenses.  After these sale approvals, after three
14   extensive mediations and the theory before you is
15   not advanced based on the facts in the file, facts
16   that the Monitor knows, and in my submission is
17   obliged to put before you, it's not a question of
18   parol evidence, he is obliged to bring those facts
19   before the court.  And this is an issue that we
20   have raised and it is one we will be pursuing in
21   this case.
22              Mr. Bromley will now address the
23   valuation methodology issues.
24              THE US COURT:  Whenever you are ready,
25   Mr. Bromley.



```
 1                    MR. BROMLEY:  And in summation, we have
 2       started with a valuation theory.  We discussed it
 3       at the very beginning and referred to it correctly
 4       as the fair market value theory.  And it is to that
 5       to which we must return.
 6                    The US position on allocation is
 7       principled, it is straightforward, and it is
 8       understandable.  Each selling entity should receive
 9       the fair market value for the assets sold or
10       relinquished in the sale transactions.  We know
11       that total fair market value because of
12       market-tested auctions that took place in both of
13       these Courts.
14                    The issue is what is the fair market
15       value that each estate contributed to those sales?
16       And that is the value of their exclusive territory
17       plus the value of their nonexclusive right in the
18       rest of the world.
19                    Simply put, there is no question that
20       NNI owns the Nortel business in the United States;
21       and similarly so, there is no question that NNL
22       owns the Nortel business in Canada.  And so on.
23                    The fact that the value of the Nortel
24       business in the United States is substantially
25       higher than the Nortel business in any other
```



1    jurisdiction is a function of the jurisdiction, the

2    size of it, the size of the market, the importance

3    of the customers, and, indeed, the effort that had

4    taken place to grow that business over a 50-year

5    period.

6              The $7.3 billion to be allocated is the

7    specific result of the estates' agreement to enter

8    into joint consensual sales.  It is important to

9    mention the word "consensual" again and put

10   emphasis on it.  We would not be where we are with

11   7.3 billion to split up if the parties had not

12   consensually cooperated.

13             Now, our valuation methodology

14   correctly applies accepted income-based valuation

15   approaches, discounted cash flows, and revenue

16   multiples that are very familiar to courts around

17   the world and particularly in these two

18   jurisdictions.  And that valuation methodology is

19   applied to the exclusive territories and the

20   nonexclusive territories based on future revenue

21   and cash flows that are expected to be generated.

22             That is what the purchasers bought.

23   Avaya bought the Nortel business in the United

24   States.  Ericsson bought the CDMA business in the

25   United States, as it bought the CDMA business in



1    Canada.  But we have to figure out what the two of

2    them are worth.  It is not that difficult based on

3    traditional value-based methodologies.

4                 The Monitor, on the other hand, has

5    created a valuation fiction.  We take $4.5 billion

6    off the table immediately because of a legal

7    conclusion, not a valuation methodology.  It is not

8    yours; you don't get any money for it.

9                 When you are looking at the business

10   lines, the Monitor's experts operate on a second

11   fiction, which is that the businesses and the

12   intellectual property rights relating to the

13   businesses could not be transferred by the sellers

14   without consent.

15                It is a funny point, and it is hard for

16   me to even grasp.  But the argument that is being

17   made that presents the lion's share in the

18   value-and-use argument to the Monitor relies

19   substantially on the point that the parties were

20   without the right to transfer their intellectual

21   property rights.

22                So how is that?  Well, the MRDA very

23   clearly says that it can be done on consent, and

24   there was consent.  The transactions clearly took

25   place.  The Monitor's experts are operating on a



```
 1   fiction.  What we should do in terms of valuing the
 2   business lines is pretend that the business lines
 3   hadn't been sold and we should value them as if
 4   they were continuing in the same broken-down Nortel
 5   business model.  It simply isn't supported.
 6              And when you look at the values of the
 7   businesses in each of the exclusive jurisdictions
 8   and the share of the nonexclusive businesses around
 9   the world, what that means is out of the
10   7.3 billion, the Canadian business is worth and
11   their share of the rest of the world .77; EMEA 1.2;
12   and the US, 5.3.  That's the value of the
13   businesses that were sold in the jurisdictions in
14   which they were sold.
15              It is not difficult to read and
16   understand the methodologies advanced by the US
17   Debtors.  And when Mr. Kinrich comes to the stand,
18   he will make it very clear as well.  These are
19   tried and true, and they are simple approaches.
20              But the fact that they are simple
21   doesn't mean they are simple-minded.  They are
22   simple because they make sense, and they are simple
23   because that's what the agreements require:  fair
24   market value.  The only valuation terminology that
25   appears in any document that is before this Court
```

 Neeson&Associates    W&F WILSON & PETERSON LTD.

1    as a piece of evidence is the term "fair market

2    value," and those are the words that appear in the

3    MRDA.

4              Your Honors, we also have heard a lot

5    about the contribution theory by the EMEA Debtors.

6    With all due respect, we think that there is a

7    misconception under the contribution theory.  First

8    and foremost, you have to take into account the

9    contribution that was made by the billions of

10   dollars of transfer pricing payments that were made

11   by the US Debtors to properly account for what is

12   "contribution."

13             Second, the MRDA makes it very clear

14   that what you get for your contribution is your

15   exclusive license.  And so that is exactly what the

16   debtors, US Debtors, are valuing:  the exclusive

17   license, the business in the United States, which

18   was the exclusive property of NNI.

19             Thank you, Your Honors.  I will now

20   pays pass it over to Mr. Qureshi in Toronto for the

21   UCC.

22        OPENING STATEMENT ON BEHALF OF THE UCC

23             MR. QURESHI:  Thank you.  Good morning

24   Justice Newbould, good morning, Judge Gross.  Abid

25   Qureshi of Akin Gump Strauss Hauer & Feld for the



1    Official Committee of Unsecured Creditors.

2              Judge Gross, I should be easy to spot

3    this morning.  I am the one person in the courtroom

4    without a robe.

5              THE US COURT:  Yes.

6              MR. QURESHI:  First, I will just

7    briefly, Justice Newbould, explain the committee

8    and who we are.  The Unsecured Creditors Committee

9    is the court-appointed fiduciary of all unsecured

10   creditors in the US Estate.  We have three members,

11   the two indentured trustees of various bond

12   issuances as well as the Pension Benefit Guarantee

13   Corporation, a governmental entity in the US that

14   is the trustee for Nortel's 22,000 or so retirees

15   in the United States.

16             Your Honours, I am going to spend my

17   time this morning addressing the pro rata

18   distribution theory that you heard about yesterday

19   from the UK Pension Claimants and I will then turn

20   it over to Mr. Leblanc on behalf of the Bondholders

21   in Delaware to conclude the opening statements of

22   the US interests.

23             So the pro rata distribution theory is,

24   as its name suggests, a theory about distribution

25   to creditors and not a theory about allocation to



1    debtors.  That, however, is simply not the issue

2    before the courts in this proceeding.

3              Now I'm going to refer to the IFSA for

4    a moment and Mr. Bromley pointed you to the

5    provision of the IFSA that says if you relinquish

6    your license rights you're entitled to an

7    allocation.

8              Now, all good corporate lawyers

9    apparently not only use too many words to say what

10   they mean, but they also say it twice, and they did

11   the same thing in the IFSA, Your Honours.

12             And if you look at section 12(b), what

13   you have in section 12(b) is a prohibition on any

14   distribution out of the escrow unless it is paid to

15   all selling debtors.

16             So this is simply the flip side of the

17   other point.  The selling debtors here relinquished

18   license rights, relinquished assets, the proceeds

19   realized from those sales went into an escrow

20   account and cannot come out of that escrow account

21   unless paid to each selling debtor.

22             Now, it's no surprise that four years

23   later, when we entered into the allocation

24   protocol, the allocation protocol says exactly the

25   same thing, that there should be an allocation of



```
 1   sale proceeds among selling debtors.
 2              By the way, I should have mentioned
 3   that the slides I'm going through are behind tab 1
 4   of the big book that you were all given by
 5   Mr. Bromley earlier.
 6              Now, Your Honours, if we can turn to
 7   slide 3, the UK Pension Claimants and the Canadian
 8   Creditors Committee are very clear in their
 9   pretrial briefs, that their theory is one of
10   distribution to creditors and not allocation to
11   debtors.
12              What they seek is an order from these
13   courts that has the effect of fixing creditor
14   recoveries such that all creditors receive the same
15   recovery on their claims regardless of the estate
16   against which those claims have been asserted.
17              Now, not surprisingly, Your Honours,
18   they're experts, and there are four of them in
19   total, do the same thing.  Each of those experts,
20   Judge Clark and Professor Westbrook and the two
21   economists, Bazelon and Britven, all opine only on
22   the question of distribution to creditors.
23              Your Honour will not find in any of
24   those reports a suggested allocation of the sale
25   proceeds to selling debtors.
```



```
 1                    Now, I want to focus for a minute --
 2                    THE CANADIAN COURT:  Can I just ask you
 3      about that.  Let me ask you a question on that.  I
 4      have read that and I've read it in briefs as well,
 5      the argument you make.
 6                    Is it a question of language, if the
 7      court says we allocate on the basis necessary for a
 8      pro rata distribution, can it be said that that's
 9      not an allocation being made?
10                    MR. QURESHI:  That's correct, Your
11      Honour, that absolutely is not an allocation being
12      not and we'll get into this --
13                    THE CANADIAN COURT:  Why not?
14                    MR. QURESHI:   -- in more detail.  The
15      reason is because what the UK Pension Claimants and
16      the CCC suggest is that the allocation of proceeds
17      be used merely as a tool to achieve the result that
18      they want, which is equal recoveries for all
19      creditors.
20                    THE CANADIAN COURT:  You want an
21      allocation -- you want an allocation to achieve
22      what you want too, but why isn't it an allocation?
23      It's a different way of doing it but why can you
24      say it's not allocating it?
25                    MR. QURESHI:  It's not an allocation,
```

1    Your Honour, because it has no relationship

2    whatsoever to the value of the rights that were

3    relinquished.

4              THE CANADIAN COURT:  That's a different

5    argument.

6              MR. QURESHI:  That's what the IFSA

7    says.  And if I can just return to the IFSA for a

8    minute, because it's a really important point, Your

9    Honour.

10              The Creditors Committee was one of the

11    parties, along with the Bondholders, that had

12    effectively approval rights over the IFSA.  The US

13    Debtor could not have entered into it without the

14    approval of the Creditors Committee.

15              As the fiduciaries for all of the

16    unsecured creditors in the US, including the

17    pensioners, I can assure Your Honour we would not

18    have allowed the US Debtors to enter into an

19    agreement that relinquished all of our rights, that

20    gave up all of our assets without having ironclad

21    assurances that we had the ability to get those

22    assets and the value -- the value, I should say,

23    from those assets back into the US estate for

24    ultimate distribution to the US creditors.  That is

25    the only source of our recovery.

Neeson & Associates    W&F

```
1                    And so, what the US -- or the UKP and
2       the CCC experts offer, it's just not an allocation
3       for that reason.  And I think, actually, Your
4       Honour, their experts admit as much.
5                    So Judge Clark, he is a former United
6       States bankruptcy judge in the District of Texas,
7       and he admitted in his deposition that their
8       report, the report he submitted along with
9       Professor Westbrook, who is a law professor at the
10      University of Texas, does not propose any division
11      of lock box assets whatsoever.
12                   And Professor Westbrook, the co-author
13      of that report, he was asked about the relevance of
14      their report to the allocation question, and, Your
15      Honour, here's what Professor Westbrook had to say.
16                   "Question:  Okay.  So if the court
17                   makes the decision to allocate among
18                   entities, then your report doesn't
19                   speak to that decision at all.  Is that
20                   right?
21                   "Answer:  Well, that decision by the
22                   court would be inconsistent with my
23                   opinion about what would be the best
24                   course forward in this case.
25                   "Question:  All right.  And so if
```



1                     that was the decision made by the

2                     court, then there's nothing else in

3                     your report that would be relevant to

4                     how to allocate among the various

5                     entities.  Is that right?

6                     "Answer:  Yes."

7                     MR. QURESHI:  Now, Your Honours, in the

8     cross-examination that you will hear of the two

9     economists that are offered in support of this

10    theory, Bazelon and Britven, Your Honours are going

11    to hear the same admissions, the reports just don't

12    address that question.

13                    Now, these experts also don't tell

14    these courts how it is that their theory might

15    actually be implemented.  Now, the UK Pension

16    Claimants in their pretrial brief attached in

17    Appendix A, and in this Appendix A they have what

18    they call a proposed mechanism for a pro rata

19    distribution, and as Your Honours can see from this

20    particular excerpt, again what they're proposing is

21    that the escrow account, the lock box, be used only

22    as a source to top up cash and assets already in

23    existence at each estate today.

24                    Now, Your Honours, that simply cannot

25    be reconciled with what Your Honours were told



1   yesterday.  You were told yesterday by the UK

2   Pension Claimants that the pro rata approach will

3   not affect any of the assets currently in any of

4   the estates.  Well, respectfully, Your Honours,

5   that's just not right, and the easiest way to

6   illustrate it is a simple example with cash.

7               So we know it's undisputed that the US

8   Estate presently has several hundred million

9   dollars more in cash than either the Canadian

10  Estate or the EMEA Estate.  The numbers I believe

11  are in Britven's report.

12              And what the UK Pension Claimants are

13  proposing is that when proceeds are taken out of

14  the lock box, they are used only to top up.  And so

15  what does that mean for the US Estate?  It means

16  that because we have several hundred million more

17  in cash, we get several hundred million less out of

18  the lock box, all for the purpose of achieving

19  equal recoveries for all creditors in every

20  jurisdiction regardless of where creditors have

21  filed their claims.  That's just not an allocation

22  to selling debtors, Your Honours, and moreover,

23  there's just no legal basis to do it.

24              Now, the pension claimants and the CCC

25  in their briefing and in their argument will tell



1    Your Honours that the pro rata distribution they

2    seek is not global substantive consolidation.  And

3    you heard yesterday what amount to a number of

4    procedural differences between what would happen

5    when estates are substantively consolidated and

6    what they say should happen if their pro rata

7    approach is implemented here.

8            But respectfully, Your Honours, these

9    procedural differences really amount to nothing

10   more than semantics because the important point is

11   the result, and what's not disputed is the end

12   result, the implementation of a pro rata

13   distribution theory is no different than what would

14   happen if estates were substantively consolidated.

15           So if we turn again to Judge Clark,

16   here's what Judge Clark had to say in his

17   deposition on that issue.

18               "Question:  Does the domestic law,

19               the US domestic law on substantive

20               consolidation have any relevance to

21               what the courts should do in this case?

22               "Answer:  If I were in Judge Gross'

23               position, and, of course I'm not, but

24               if I were in Judge Gross' position, I

25               worthy it did."



1               MR. QURESHI:  And Your Honours, very

2       briefly here's what professor Westbrook had to say

3       about the result that they are seeking here.

4                    "Question:  And how, if at all, does

5                    your opinion relate to the concept of

6                    substantive consolidation?

7                    "Answer:  Only in the sense that

8                    substantive consolidation could result

9                    in a similar result as to the

10                   single-pool rule that I'm suggesting."

11              MR. QURESHI:  So, Your Honours,

12      whatever label is attached to the theory, the

13      simple fact is that there's no legal basis to

14      accomplish it.  None has been cited to Your Honours

15      that would allow this and, in fact, there is an

16      existing body of case law in both the United States

17      and in Canada that we submit actually forbids it.

18              Let's return for a minute to their

19      Appendix A and look at one other aspect of how the

20      UK Pension Claimants propose that this could

21      actually be implemented.  They actually give a

22      number of alternatives in their Appendix A but both

23      involve essentially two steps, interim

24      distributions and then ultimately a true-up, but

25      there is no dispute, Your Honours, that what they



1   ask in this trial is that these courts make a

2   decision that will have the effect of fixing

3   creditor recoveries in both jurisdictions.

4           Now, US law and we would submit

5   Canadian law is equally clear, this just can't be

6   done outside of the plan process.  When creditor

7   distributions are determined, when creditor rights

8   are compromised, creditors are entitled to the

9   protections of the voting and the solicitation

10  provisions in the Bankruptcy Code and in the CCAA.

11  They're effectively skipping that entire step and

12  asking these courts to fix the result.

13          Now, it's ironic, Your Honours, that

14  the argument then goes well, both courts have

15  equitable jurisdiction, Judge Gross under section

16  105 of the Code and the inherent equitable

17  jurisdiction of the courts in Canada.  But,

18  respectfully, Your Honours, equitable jurisdiction

19  cannot be used in a manner that contravenes the

20  statutory framework.  They're saying use equity to

21  impose a result that has the effect of subverting

22  the plan process and of overriding the creditor

23  protections in both the United States and Canada.

24  Respectfully, Your Honours, that just can't be

25  done.



 1                    Now, I want to return for a minute if I
 2    could to Judge Clark and Professor Westbrook and to
 3    why we don't think, Your Honours, that their
 4    reports should be accorded any weight.
 5                    They're quite candid that what they
 6    would like Your Honours to do in this case is to
 7    create new law.  Well, why?  They explain in their
 8    report at paragraph 24 that they think the current
 9    state of the law is "deeply flawed," and then in
10    their report they ask these courts to "point the
11    way to the future of international insolvency
12    jurisprudence."
13                    And Your Honours heard yesterday from
14    the UK Pension Claimants that one of the reasons
15    the courts ought to adopt the pro rata approach
16    here is precisely because it would set a benchmark,
17    I think was the phrase that they used, in future
18    multinational insolvencies for years to come.
19                    Well, Your Honours, respectfully that's
20    not why we're here.  We're not here to create new
21    law, we are here to accomplish what the IFSA says
22    must be accomplished, which is to allocate sale
23    proceeds among selling debtors.  It's just not the
24    role of these courts to create a new framework for
25    future cases.

 Neeson & Associates     W&P

 1                    THE CANADIAN COURT:  Is common law
 2    fixed?
 3                    MR. QURESHI:  I'm sorry?
 4                    THE CANADIAN COURT:  Is common law
 5    fixed?
 6                    MR. QURESHI:  Common law most certainly
 7    is not fixed but we don't believe, Your Honours,
 8    that there's any new doctrine that is required in
 9    order to achieve the result that we are seeking
10    here.
11                    Ultimately this case really involves
12    two disputed issues, Your Honours.
13                    The first is the MRDA and its proper
14    interpretation and that certainly is a matter for
15    which no new law is required in order to get to the
16    result; and the second thing that is required is a
17    valuation of assets, and that's something that both
18    courts routinely engage in, the methodologies to do
19    so are well known to both courts, and there's just
20    no new law that is required to do it.
21                    But the other point, Your Honours, is
22    Professor Westbrook and Judge Clark, they actually
23    can't even agree among themselves as to what the
24    new law is that they're asking you to make.
25                    THE CANADIAN COURT:  I saw that.

 Neeson & Associates    W&F

```
1              MR. QURESHI:  What they propose in
2     their report is that Your Honours create a new
3     presumption that they acknowledge does not exist in
4     the United States or in Canada or anywhere else,
5     that in every multinational insolvency there should
6     be an automatic presumption that recovery is on a
7     single pool basis with the burden being upon the
8     creditors to overcome that.
9              Now, Professor Westbrook, as I would
10    have expected, in his deposition said yes, that's
11    my opinion, I stand by it, I adopt it.  Judge
12    Clark, however, he completely disavowed it.  He
13    said that that's a presumption, that's an aspect of
14    his report that he absolutely wants to change.  Not
15    only did he say that the presumption goes too far,
16    but he actually said it's not appropriate, not only
17    is it not appropriate as some omnibus new rule to
18    apply in every case, it's not appropriate to apply
19    in the case of Nortel.
20             So Your Honours are being told make new
21    law and if you make new law it will be good for
22    future cases and that's a reason to apply the pro
23    rata theory here.  And you're left with two experts
24    who signed one report and who now don't agree on
25    what it says and don't agree on what the new rule
```

 Neeson & Associates    W&F

1    should be.  We don't think that's helpful to Your

2    Honours and we don't think it should be given any

3    weight.

4              Very quickly, two economists, Bazelon

5    and Britven.  Bazelon is an economist and what Your

6    Honours will hear when he is cross-examined is he

7    doesn't actually apply any theories of economics

8    that would suggest that a pro rata result ought to

9    be achieved here.  Instead he opines on the facts

10   of how Nortel operated and essentially concludes

11   that it would therefore be fair to allocate on a

12   pro rata basis.

13             Britven, the expert for the CCCs, he

14   includes in his report a chart and what that chart

15   -- we have excerpted a page of it here, and what

16   that chart proposes to do or purports to do is to

17   show recovery calculations.  He tries to do some

18   math to suggest what recoveries would look like

19   based on the application of each of the theories.

20             And just two quick points with respect

21   to that, Your Honours.  First is it's utterly

22   irrelevant.  The outcome, what a particular

23   allocation methodology yields in terms of creditor

24   recoveries, that is just not relevant to the

25   question of the allocation that the estates are

 Neeson & Associates    W&F Wilson & Peyser Ltd.

 1   entitled to.  The table that he does is just based

 2   on assumptions and the critical assumption behind

 3   it is of course what are claims in every

 4   jurisdiction?

 5              Britven doesn't know.  So he relied

 6   solely on numbers that his counsel gave him and he

 7   admitted that if those claim numbers end up being

 8   different, his numbers all materially change.  So

 9   you'll see when Britven is cross-examined that --

10              THE CANADIAN COURT:  That's obvious.  I

11   suppose, I haven't read the report, but I suppose

12   -- yet, but I will, but I suppose that he's saying

13   is if you take my suggestion here's what numbers

14   could look like.  Obviously he can't be -- can't be

15   final because, as you point out, the claims aren't

16   known.  I guess they are in the US but they're

17   certainly not known in Canada.

18              MR. QURESHI:  It's certainly the case

19   that the numbers aren't known and so --

20              THE CANADIAN COURT:  That's not

21   surprising.

22              MR. QURESHI:  That's not surprising and

23   that's why it's also not a useful exercise.  It

24   just doesn't help Your Honours with anything.

25              Now, finally, Your Honours, I want to



 1    turn to the factual testimony.  And what Your

 2    Honours are going to hear from witnesses the UK

 3    Pension Claimants are going to put on the stand is

 4    that Nortel operated as a highly integrated,

 5    multinational enterprise.  It was globally

 6    integrated and, Your Honours, that's largely

 7    undisputed and it's not surprising.  That's how

 8    many multinationals operate and we don't take issue

 9    with it.

10              But what they're confusing, Your

11    Honours, is operational integration from corporate

12    separateness.  They're different concepts.  And

13    operational integration is irrelevant to a

14    traditional substantive consolidation analysis.

15    The issue here is, are Nortel's assets so scrambled

16    that they cannot be divided up among the estates?

17    And that's just not the case.

18              Your Honours are going to hear from

19    fact witnesses that work for Nortel all over the

20    globe that Nortel always respected corporate

21    separateness.  We certainly understand that that's

22    the view of the Canadian Monitor, which, by the

23    way, as we understand it, the Monitor does not

24    support the pro rata theory.  That's also the view

25    of the EMEA Debtors and they too, as far as we can



```
1    understand, do not support the pro rata theory.
2              So if you look at Peter Currie, for
3    example, his affidavit, he is a former CFO and he
4    testified that each Nortel entity prepared its own
5    financial statements, those financial statements
6    were audited and approved by local boards.
7              Mr. Binning, also a former CFO, with
8    respect to intercompany loans explained that those
9    loans were always documented and they were always
10   approved by the relevant Boards of Directors.
11             And finally, Mr. Doolittle, we've heard
12   a lot from Mr. Doolittle over the past couple of
13   days, and his prior titles included treasurer and
14   he testified that Nortel's policies and procedures
15   required that the movement of assets between Nortel
16   entities be properly documented, and it was, Your
17   Honours, and this is simply uncontroverted.
18             Finally, with respect to cash,
19   Mr. Doolittle explained that all the cash was
20   notionally pooled such that Nortel would get the
21   benefit of interest rate calculations, it was
22   always kept separate on a legal entity basis.  He
23   could not be more clear, Your Honours, that there
24   was no intermingling of any entity's cash with any
25   other entity's, and so this is absolutely not the
```



```
 1   case of the egg that can't be unscrambled; quite to
 2   the contrary, Your Honours.
 3             And so, I'd like to wrap up with this
 4   issue.  Yesterday the UK Pension Claimants were
 5   asked, how can the pro rata theory be reconciled
 6   with the fact that these courts have already
 7   approved and allowed a $2 billion claim by NNI
 8   against NNL?
 9             Your Honours, it's not a new issue,
10   we've raised it in briefing, we have confronted
11   their experts with it, and so we were rather
12   surprised to hear that it's just not an issue they
13   have given a lot of thought to.
14             Well, we certainly have, and the bottom
15   line, Your Honours, is the two just can't be
16   reconciled.  The whole purpose of the pro rata
17   theory is to fix recoveries for all creditors
18   across the globe so that they are the same.
19             And as was admitted to Your Honours
20   yesterday, in its purest form what that means is
21   all intercompany claims go away because the theory
22   is one of recovery to creditors and not
23   distributions to entities.  But of course there is
24   no legal basis to undo a final non-appealable order
25   allowing these claims.  It just can't be done.
```



```
 1                    And so, what Your Honours are left with
 2     is vague notions of well, you can take into account
 3     the existence of guarantees or the existence of
 4     allowed claims through how you distribute money out
 5     of the lock box, but none of the experts explain
 6     precisely how that can be done.  The lawyers don't
 7     explain precisely how that can be done.  What
 8     you're left with is well, it's fair and equitable.
 9                    Well respectfully, Your Honours, it's
10     anything but fair and equitable.  For US creditors,
11     again, we made the decision in connection with the
12     IFSA for the benefit of the -- the ultimate
13     benefit, we believe, of everybody to relinquish
14     rights and relinquish assets in the sale process
15     because we believed that was the path that
16     maximized value.
17                    We bargained for in the IFSA the right
18     to have the value from the sales come back to us
19     through an ultimate allocation out of the lock box
20     either by agreement or, as it turns out, through an
21     order of these courts.
22                    It would be anything but fair and
23     equitable to take away from us the benefit of that
24     bargain that we struck and to undertake a
25     distribution scheme that we respectfully think has
```



1   no legal support whatsoever.

2             So, unless the courts have any

3   questions, that concludes my comments.  If the

4   courts prefer to take a break now before we turn it

5   over to Mr. Leblanc or continue --

6             THE CANADIAN COURT:  Why don't we

7   continue.  I'm prepared to continue.  Thank you,

8   Mr. Qureshi.

9             MR. QURESHI:  Thank you.

10            THE US COURT:  Thank you, Mr. Qureshi.

11            Mr. Leblanc, good morning.

12   OPENING STATEMENT ON BEHALF OF AD HOC GROUP OF

13                    BONDHOLDERS

14            MR. LEBLANC:  Good morning, Your Honor.

15   Good morning, Mr. Justice Newbould.  Good morning,

16   Judge Gross.  Andrew Leblanc of Milbank, Tweed,

17   Hadley & McCloy, on behalf of the ad hoc group of

18   Bondholders.

19            Your Honor, over the course of the next

20   six weeks or so, you will meet many of my

21   colleagues who are here in the courtroom.  As I

22   think we have stated to the Court before, we stand

23   in a somewhat unique position in that we stand as

24   the representatives of $2.2 billion worth of bonds.

25            The bonds totaling more than $4.1



1  billion in principal amount as of the petition date

2  stand as the largest single creditors of the US

3  Estate and also, we expect, as the largest single

4  creditors of the Canadian Estate once the claims

5  resolution process runs its course there.

6          Your Honor, Judge Gross, you will

7  recall that the Bondholder Group has been an active

8  participant in these cases from their very infancy.

9  I think I have the distinction among only a handful

10  of people in these courts, in either of them, as

11  actually appearing at the first-day hearings.

12  Mr. Bromley, Ms. Schweitzer, Mr. Abbott certainly

13  can lay claim to that, but I can as well.

14          And we appeared as the Bondholder Group

15  at that first-day hearing to argue in support of

16  the separateness of the corporate entities and of

17  respecting the separateness of these corporate

18  entities, recognizing that we have claims against

19  both of these entities, both the Canadian Estates

20  and the US Estates.

21          And it was our objection to the US

22  Estates' interest in providing a $200 million loan

23  to the Canadian Estates on the first day of these

24  cases as effectively debtor-in-possession financing

25  from one debtor to another that led to that loan



1    being limited to the 75 million Mr. Bromley

2    referred to earlier.

3              So we have, from that point forward,

4    been focused singularly on ensuring that the

5    corporate separateness of these entities is

6    preserved.  And that's not a position that came new

7    to the Bondholders in this case, and I will talk

8    about the evidence in a moment.  But a lot has been

9    said already in this court, and we will expect to

10   hear more later today.  And even on the steps of

11   the courtrooms in Canada with press conferences

12   that were held yesterday, a lot has been said about

13   the motivations of the Bondholders.  So let me try

14   to be quite clear.

15             The Bondholders in this proceeding

16   share the interests of the US Debtors and the

17   unsecured Creditors' Committee of desiring an

18   allocation of the proceeds pursuant to a fair

19   market value approach.  We think that is the right

20   approach to allocating these assets to the various

21   estates.

22             As Mr. Qureshi talked about a moment

23   ago, the consequences of that allocation on

24   distributions to creditors, what people will

25   receive, we recognize -- and I think, Judge Gross,



```
 1   Your Honor recognized just a few months ago -- that
 2   the consequences of the allocation are an issue
 3   that is going to have to be decided later.
 4              As Mr. Qureshi alluded to, Your Honor,
 5   courts in bankruptcy cases in the United States and
 6   in Canada do not determine how distributions are
 7   made to creditors in the absence of a liquidation.
 8   Instead, courts approve plans that are negotiated
 9   between stakeholders in bankruptcies.
10              That process of negotiating a
11   resolution to this case hasn't yet begun because
12   the parties don't know what assets each estate has
13   to allocate to creditors or to distribute to
14   creditors ultimately.  That's the purpose of this
15   process, is simply to do that allocation so that we
16   could then turn to the question of resolving the
17   plans that have to be resolved in each
18   jurisdiction.
19              So there was mention made yesterday,
20   and I expect we will hear much more of it today,
21   about the concept of post-petition interest.
22   That's not an issue before these Courts.  The
23   question before these Courts is how to allocate
24   these proceeds.
25              And I want to follow up very briefly on
```

 Neeson&Associates    W&F

1    a point that Mr. Bromley made, because we addressed

2    this in our brief.  He alluded to the contribution

3    approach, which is the approach supported by the

4    EMEA Debtors.  And Mr. Bromley made the point that

5    if you are going to approach the contribution idea,

6    which we don't agree with -- we believe the right

7    approach to it is the fair market value -- you have

8    to do that using accurate numbers.

9              And Justice Newbould has asked some

10   questions about the IRS process that led to the

11   $2 billion adjustment to NNI's income for the

12   period of 2001 through 2005.  Obviously, that

13   reflects an understanding or an appreciation by the

14   two revenue authorities that the MRDA did not

15   adequately allocate the proceeds in the RPSM as

16   between those two various estates.

17             The US Debtors, the US interests, in

18   particular, the UCC, has advanced an expert, Loreen

19   Ryan, who takes the contribution approach that is

20   advanced by the EMEA Debtors and adjusts it to

21   reflect not just the contributions that were

22   actually spent in each jurisdiction, but rather the

23   actual contributions to R&D spending, both direct

24   and indirect.  And she concludes what the

25   allocation would be if Your Honors decided that the



1    EMEA Debtors' contribution approach was the right

2    approach but nonetheless had to correct for the

3    failings, if you will, of the MRDA.

4              Your Honor, I really want to talk about

5    two different issues -- or I want to say, I guess

6    now, three different issues as it relates to the

7    pro rata approach, because that is really what we

8    intended to focus on.

9              There was a lot of discussion, and I

10   think, Your Honor, Justice Newbould had asked a

11   question just of Mr. Qureshi, "Well, aren't we

12   common law courts?"  And the answer to that is, of

13   course, you are.  But common law courts are

14   intended to address the issue that is before them.

15             Now, Mr. Barrack made the statement

16   that never again should we be faced with a

17   situation of $1.3 billion having been spent on

18   professional fees to get to this point.

19             Now, we would submit, Your Honor, that

20   if positions that have been taken in this

21   litigation that were advanced for the first time

22   after mediations, if those positions hadn't been

23   advanced, maybe we wouldn't be in this position.

24             But more importantly, Your Honor, you

25   have to decide the case that is before you.  And

 Neeson&Associates    W&F

```
 1    the relevant standard for substantive consolidation
 2    under either jurisdiction looks to the question of
 3    whether there is hopeless entanglement, which
 4    Mr. Qureshi talked about, and what were the
 5    expectations of creditors.  Those are the two
 6    elements that the courts look to.
 7                Now, Mr. Barrack talked yesterday about
 8    you should ignore the fact that the $1.3 billion
 9    has already been spent.
10                You can't do that.  That is the money
11    that was spent for the purpose of untangling these
12    entities.  At least in substantial part, that was
13    the purpose of this.
14                Now, at the conclusion of these trials,
15    Your Honor, and in particular when Justice Newbould
16    concludes his trial on the claims issues, there
17    will be no more entanglement between these estates.
18                Mr. Qureshi talked about the $2 billion
19    already-allowed claim by the US Estate against
20    Canada.  And in the FCFSA, with the silent F, that
21    agreement provides that the Canadian Estates are
22    waiving their claims against the United States.
23                But I also want to mention, Your Honor,
24    don't forget, just a short while ago, this Court,
25    Your Honor, Judge Gross, you approved a settlement
```



```
 1   between the EMEA estates and the US Estates of
 2   their claims as between them.  And not only -- that
 3   didn't result in an allowed claim.
 4                And, Justice Newbould, for your
 5   benefit, that resulted in an indefeasible payment
 6   being made, and not just to the EMEA Estates but to
 7   the UK pension interests as well.  They received a
 8   payment of $37.5 million in respect of their
 9   intercompany claims against the US Estate, or
10   their -- not intercompany, but their claims against
11   the US Estate.  And EMEA has received indefeasibly
12   a payment of 37.5 million in respect of its claims.
13                Now, conveniently, the UKPI would ask
14   these Courts to enter into a distribution theory
15   that would simply eliminate the effect of those
16   intercompany claims conveniently having been paid
17   already for one of those intercompany claims.
18                So, Your Honor, I think the point is
19   that by the conclusion of these trials, when
20   Justice Newbould hears and decides the claims as
21   between the EMEA Estates and the Canadian Estates
22   and also the claims by the UKPI against the
23   Canadian Estates, the entanglement will be
24   completed, unentangled.  You will no longer have
25   hopeless entanglement as a prospective concept.
```



1    You will have estates that have resolved all of

2    their claims as against one another.  So that's

3    issue number one.

4              And now issue number two, and that is

5    where I really want to spend of couple of minutes

6    on, and that is the creditor expectations.  Your

7    Honors are going to hear from Robert Kilimnik, who

8    is an expert retained by the bonds and by the US

9    Debtors jointly.

10             Mr. Kilimnik will tell the Courts that

11   bond guarantees are, and I will quote from his

12   report, "an essential element of the structural

13   security package being offered to help reduce the

14   risk exposure of lenders over the term of the

15   loans."

16             That concept that guarantees are

17   actually important to lenders is not a new concept.

18   It is not something that was foreign even to these

19   debtors, and -- foreign to these debtors or to

20   their senior financial officers.

21             The very first witness you are going to

22   hear from tomorrow, Mr. Peter Currie, is a former

23   CFO of Nortel.  Now, if we could just show what he

24   is going to say, what he has said, with respect to

25   the need for the guarantees.

Neeson&Associates   W&F

```
1                   And, Your Honor, it is up on your

2      screen.  Do we have a clip there?

3      (Video played:)

4                   Q.   Why was it that NNI was a

5                   guarantor of this note?

6                   A.   We found that, based on advice

7                   from our capital markets consultants,

8                   we found that would be more

9                   advantageous from a structuring

10                  perspective to have NNL as an issuer

11                  and NNI as the guarantee.

12                  Q.   Why?

13                  A.   Simply because we could end up,

14                  frankly, getting a slightly better rate

15                  by doing it that way based on the

16                  domicile of the ultimate lenders.

17                  Q.   Was there also a better rate

18                  because of NNI's credit rating?

19                  A.   Yes.  It had -- you mean -- is

20                  your question to do with the presence

21                  or a lack of presence of NNI as a

22                  guarantor?

23                  Q.   Yes.

24                  A.   Yes.  Had NNI not guaranteed, it

25                  would have been a different discussion
```

 Neeson & Associates   W&F

```
 1                  with the lenders.
 2             Q.   Was there any discussion of asking
 3             for a guarantee from NNUK?
 4             A.   No.
 5             Q.   Why not?
 6             A.   NNUK was not the repository of
 7             either significant hard assets, nor the
 8             source of significant revenues.
 9             Now, Your Honor, the point of that
10   clip -- and we will show another one in a second
11   of Mr. Currie explaining what he means by "a
12   different discussion," but the point of that clip
13   is that the discussions that were had with lenders
14   at the time of the issuance made clear that they
15   relied upon the separateness of those entities.
16             Now, Mr. Barrack -- and I assume it was
17   an attempt to cast an aspersion that you are not
18   going to hear from a Bondholder.  There is a little
19   bit of a playing both sides of the fence there.
20             The case law in both jurisdictions, we
21   believe, is clear, is that the relevant
22   expectations are the expectations that are put in
23   place at the time on a pre-petition basis, not on a
24   post-petition basis.  And on a pre-petition basis,
25   let's look again at what Mr. Currie -- at what he
```

 Neeson&Associates    W&F

1   said about how it would be a different discussion.

2   (Video played:)

3                   Q.   And when you said that if NNI had

4                   not been a guarantor, that it would

5                   have been a different discussion with

6                   the lenders, could you clarify what you

7                   meant by that.

8                   A.   The rate would have been higher,

9                   and then the principal amount may have

10                  been lower.

11                  Q.   Okay.

12                  A.   It became clear to us early on

13                  that NNI would have needed to be

14                  involved in the transaction, so we

15                  structured the deal around that.

16                  Q.   Right.  In order to get the amount

17                  of financing that you needed and also

18                  to get a more --

19                  A.   At the rate and the covenant

20                  structure, yes.

21                  MR. LEBLANC:  Your Honors, Mr. Currie,

22  the CFO at the time of some of the issuances, makes

23  clear that NNI needed to be involved.  In other

24  words, they couldn't issue debt just at the

25  parent-company level.



```
 1                    Mr. Bromley talked about the issues
 2    that they had arising in the early 2000s with the
 3    securities issues, the inability to issue financial
 4    statements.  The end result of that, and the
 5    evidence on this is quite clear, that they
 6    couldn't -- Nortel couldn't raise debt without
 7    offering guarantees.
 8                    So in other words, the underwriters of
 9    those loans and the people that were lending that
10    money, they necessarily relied upon those
11    guarantees.
12                    You would get similar testimony, if we
13    could just go to the slides of --
14                    THE CANADIAN COURT:  Mr. Leblanc?
15                    MR. LEBLANC:  Yes, Your Honor.
16                    THE CANADIAN COURT:  Could I just ask
17    you a question?
18                    MR. LEBLANC:  Of course.
19                    THE CANADIAN COURT:  How long do you
20    plan to be?  I am wondering if this is an
21    appropriate time for the break for the reporters or
22    whether we can finish with you.
23                    MR. LEBLANC:  Your Honor, I would
24    expect probably no more than another ten minutes or
25    so.  So I leave it to the Court.
```



```
 1                It is probably best if we just take a
 2    quick break, Your Honor.  That way everybody can
 3    get a break, and I will just coordinate and
 4    consolidate my notes.
 5                THE CANADIAN COURT:  Is that fine with
 6    you, Judge Gross?
 7                THE US COURT:  That is fine with me.
 8                THE CANADIAN COURT:  We will take a
 9    20-minute break.
10                THE US COURT:  Be back around 11:00.
11    -- RECESS AT 10:37 a.m. --
12    -- UPON RESUMING AT 11:00 a.m. --  11:02 a.m.
13                THE CANADIAN COURT:  Mr. Leblanc.
14                THE US COURT:  You may proceed.
15                MR. LEBLANC:  Thank you, Your Honor.
16    Your Honor, just at the break we were talking about
17    the testimony of Mr. Currie, one of the CFOs.
18                THE US COURT:  Yes.
19                MR. LEBLANC:  There is similar
20    testimony from CFO after CFO after CFO or senior
21    financial officers of the company.  And I will save
22    the Court the time of the clips, because you are
23    going to see many of these witnesses live.
24                But if you will just pull up Slide 3,
25    Pavi Binning, another witness who will be
```



1   testifying on behalf of the Canadian Monitor -- and

2   I will just read from the middle of the quote that

3   is up on the slide, Your Honor.

4              "And creditors were looking for

5              those guarantees because they wanted to

6              look at the assets of NNI as a support

7              for lending to NNL, for example?

8              "Answer:  That's right."

9              If we move to the next CFO of the

10  company, Doug Beatty, at the bottom of this quote:

11             "And in your experience generally,

12             how would the presence of a parent

13             company guarantee influence, in this

14             instance, the rate?"

15             He says, "It would lower the rate.

16             "And if such a guarantee were

17             offered and the rate were lowered,

18             would that provide a benefit to the

19             Nortel entity receiving the financing?

20             "Answer:  Yes, it would."

21             Mr. Williams, the former director of

22  corporate finance for NNL, focusing on his answer

23  to the first question:

24             "The high-yield market is now highly

25             focused on entities.  And so we would



1          have liked to have done NNL and that
2          was it.  But that wasn't going to be
3          good enough.  So we needed to attach an
4          NNI guarantee."
5          And if you move down further in the
6  testimony:
7               "Okay.  Were you talking to
8               investment banks at the time?
9               "Yes.  I would not have been able to
10              come up with this without feedback from
11              investment banks, likely JPMorgan and
12              Citibank, who were the lead on the
13              facility itself.
14              "Okay.  Do you recall whether either
15              Citibank or JPMorgan specifically
16              requested a guarantee from NNI?
17              "Answer:  Yes."
18          And, Your Honors, it is not only the
19  Bondholders who were focused on nsuring that they
20  had access to separate entities for the purpose of
21  ensuring that they could be repaid on their
22  obligations.  Ironically, and this is another
23  ironic position for the UK pension interests to be
24  in, the UK pension interests twice went to the well
25  to seek and did obtain guarantees from NNL.

 Neeson & Associates    W&F

 1                  Now, presumably, the very same

 2     guarantees that they would suggest to the Courts

 3     today should not be enforced if they do -- if the

 4     Courts do a pro rata distribution.

 5                  If we could pull up Slide 6.

 6                  So twice, in connection with the

 7     funding obligation and, secondly, in connection

 8     with the Project Swift transaction, the trustees of

 9     the UK Pension Trust demanded as consideration for

10     either the funding decision in the first instance

11     or for their agreement to enter into Project Swift

12     or for their consent, for the companies to enter

13     into Project Swift, they demanded a guarantee from

14     NNL, the Canadian parent.

15                  They did that because they understood

16     that they had claims only against one entity.  And

17     now for purposes of this litigation, they suggest

18     to the Courts that the Courts should apply, or at

19     least apply something like, the law of substantive

20     consolidation and conclude that creditors didn't

21     rely on the separateness of these entities when

22     they themselves expressly relied on it.

23                  If we go to the next slide.

24                  THE CANADIAN COURT:  Mr. Leblanc,

25     wouldn't bankers -- I mean, bankers want assets



```
 1   backing up their security.  The fact that NNI was a
 2   separate legal entity from NNL in itself wouldn't
 3   be important to the bankers, would it?  Rather, it
 4   is the assets underneath it that were important to
 5   the bankers.
 6             MR. LEBLANC:  Well, Your Honor, in the
 7   instance of unsecured debt, having access to two
 8   different entities to claim against is
 9   extraordinarily important.  There are even
10   provisions -- and there is testimony in this from
11   Mr. Williams, the senior financial officer of NNL
12   whose testimony I showed you.  Earlier in that
13   answer he noted that there was a provision that if
14   they were investment-grade borrowers at the time,
15   that they wouldn't have had to have a subsidiary
16   guarantee.  But because they were not
17   investment-grade, they needed to offer access to
18   claims against entities other than just the
19   Canadian parent, because the Canadian parent, its
20   only assets are the equity that it holds in the
21   subsidiaries.
22             And what was important to the
23   lenders -- and the testimony on this is
24   uncontroverted and unrebutted.  What was important
25   to the parties they were negotiating at the time
```



1    they were getting this debt was that the lenders

2    wanted access directly to the subsidiaries that

3    actually held the assets.

4            Now, it is not -- and Mr. Barrack

5    suggested yesterday that the companies -- there

6    were no protections from the companies engaging in,

7    effectively, a pre-petition subcon by guaranteeing,

8    by NNL -- or NNI, for example, guaranteeing the

9    debt of all other Nortel entities.  And in that

10   instance he suggested, well, the Bondholders

11   weren't protected from that because they were not

12   secured; the Bondholders weren't protected.

13           And there are two responses to that.

14   The first is that statement is true of any

15   unsecured debt that has a guarantee.  So unless the

16   Courts were to conclude, as is actually suggested

17   by Professor Westbrook, for example, that in any

18   instance of a multinational enterprise, an

19   unsecured guarantee of a bond debt is of no

20   value -- that is his testimony; you will hear that

21   on the stand.  But unless the Courts were to

22   conclude that, you are concluding that there is a

23   very substantial change in the capital markets,

24   because Bondholders or lenders of any sort could no

25   longer rely on unsecured guarantees.

 Neeson & Associates    W&F

```
 1                    The second fallacy of Mr. Barrack's
 2    contention is by negotiating to have a separate
 3    claim against NNI, the Bondholders get a very, very
 4    important statutory protection.  NNI could simply
 5    not have gone out and guaranteed all of the debt of
 6    the Nortel entities because it would have rendered
 7    itself insolvent.
 8                    We had at the time a statutory cause of
 9    action that would preclude NNI, the entity that we
10    had claims against, from entering into fraudulent
11    transfers; for example, guaranteeing all the debt
12    of its parent and its affiliated -- and the
13    parent's affiliated subsidiaries simply for the
14    purpose of creating a global subcon world.
15                    That couldn't have ever happened,
16    because if that had happened and they were rendered
17    insolvent, then we would have a fraudulent transfer
18    claim, even outside of bankruptcy, under state law
19    in the United States.
20                    And so it is a fallacy to suggest that
21    the guarantees were of no value.  And I will talk
22    in a moment about the evidence of that even in the
23    post-petition world.  The market recognizes these
24    guarantees as having tremendous value, and Your
25    Honor is going to hear that testimony as the trial
```



1   goes on.  And these Courts can't, with a pen

2   stroke, simply eviscerate the value of the

3   guarantees that are negotiated.

4              And these are not unique.  These are

5   not unusual.  Nobody has suggested they are

6   different from the corporate guarantees that are

7   issued on an unsecured basis by dozens and dozens

8   or, more likely, thousands and thousands of

9   multinational enterprises.

10             And we are talking about trillions of

11  dollars of debt that is similarly structured to

12  this, as to which they would have you apply

13  something that they plainly understand to be

14  fundamentally different than what the law would

15  provide today.

16             So to answer Your Honor's question, the

17  claims that we gained have tremendous value.  It is

18  to have access to those debtors and to stand

19  ahead -- this is the important thing, and I think

20  Ms. Block talked about this yesterday.  It is to

21  stand ahead of the equity claim of NNL.  That's

22  what we get by having a claim at NNI, the

23  subsidiary, as to where all of the value or

24  substantially all of the value resides.

25             And other creditors recognize the



1   importance of having guarantee claims.  I mentioned

2   the UKP.  There is testimony on the screen of

3   Mr. John Hern, one of the trustees of the pension

4   trust who negotiated for that.  And I won't go

5   through it.  It is in the slide.

6            And, ultimately -- if we turn to

7   Slide 8 [reading]:  Ultimately these were reflected

8   in the offering memoranda that were made available

9   to the public for the bonds, that the issuers'

10  subsidiaries are separate and distinct legal

11  entities, and any subsidiary that is not a

12  guarantor will have no obligation.  That was made

13  clear to everybody.

14            And in addition to the two that I

15  highlighted, the bonds and the UK pension, there

16  are other creditors.  Export Development Canada,

17  for example, which is a Crown corporation in

18  Canada.  When it lent money to the company, to NNL,

19  it required an NNI guarantee, which was given to

20  it.  And there are other examples that, Your Honor,

21  are in the record already today of other creditors

22  recognizing the separateness of these corporate

23  entities.

24            And so they fail on prong 1 or prong 2,

25  depending on how you set up the test.  But

 Neeson&Associates   W&F

 1   certainly, they fail on any test for substantive

 2   consolidation, whether it is on the hopeless

 3   entanglement prong or on the reliance of creditors.

 4              Now, I mentioned a moment ago, the

 5   important reliance question is on the pre-petition

 6   basis.  But mention has been made of whether or not

 7   there was reliance on a post-petition basis.

 8              If we could go to Slide 9.

 9              Slide 9, Your Honors, reflects a chart

10   reflecting the pricing of the various issuances of

11   Nortel debt from the petition date forward.  And

12   what this reflects, because it reflects the market

13   prices, it tells us what the market understands

14   about the value of guarantees.

15              If you look at the yellow line at the

16   bottom of the chart, the yellow line that is below

17   everything, and you look to the bottom right

18   corner, you can see that is the one series of

19   publicly issued bonds that does not have a

20   guarantee.  It does not have a guarantee.  It

21   traded from every point in time at a significant

22   discount to every other bond that had the guarantee

23   from NNI.

24              We think that is instructive, Your

25   Honor, because what it demonstrates is entirely



```
 1   consistent with what everyone would expect.  The
 2   guarantees have tremendous value, and the market
 3   understands that.  And these Courts shouldn't just
 4   eliminate that value with the stroke of a pen.
 5               Now, Your Honor, you could even --
 6               THE CANADIAN COURT:  Can I ask you a
 7   question, Mr. Leblanc?
 8               MR. LEBLANC:  Of course, Your Honor.
 9               THE CANADIAN COURT:  I am just trying
10   to understand.  You said no guarantee.  At the
11   bottom of the chart on the left it says
12   "Guarantors."  There is a 1 and a 2.
13               MR. LEBLANC:  Yes, Your Honor.
14               THE CANADIAN COURT:  What does that
15   mean, when you go over to the last one, the 6.875
16   bonds?
17               MR. LEBLANC:  Yes.
18               THE CANADIAN COURT:  What does it mean
19   by NNC?  Is that -- that's the issuer?
20               MR. LEBLANC:  No, Your Honor.
21   Mr. Maguire, I think, showed you a chart yesterday.
22   NNC is the parent corporation --
23               THE CANADIAN COURT:  I'm just wondering
24   what the word "guarantors" over on the left means.
25               MR. LEBLANC:  Yes, Your Honor.  I
```



1    believe NNL is the issuer of that debt.  One

2    second, Your Honor.  I have the chart.

3              NNL, Your Honor, the Canadian entity,

4    is the issuer of that debt.  That debt is

5    guaranteed by NNC, which is just an intermediate

6    holding company.

7              The point, though, Your Honor, there is

8    no meaningful difference between the assets of NNL

9    and NNC.  The senior parent company's only asset is

10   the equity of the intermediate holdco, and then the

11   intermediate holdco is what holds the equity

12   interest in the various subsidiaries.

13             But the important point is that last

14   issue, that last, the yellow line, is the one that

15   reflects an issue of the bonds that does not have a

16   guarantee that has access to the US Estates'

17   assets.  And what you can see from this, this

18   reflects the value that the market places in having

19   a guarantee that gives you access to the US assets

20   and gives you claims against the US Estate.  That's

21   the point of this chart.

22             And so what it simply confirms, because

23   it is not relevant in and of itself to the

24   substantive consolidation analysis that the Owens

25   Corning court directed this Court in the US, and to



1    the similar analysis that is followed by courts in

2    Canada; but instead what it demonstrates is that,

3    as you would expect, the guarantees that were

4    negotiated for, were provided, and that the CFOs

5    and the senior financial people at Nortel talked

6    about, have tremendous value as reflected in the

7    marketplace, even as of today.

8              One other point that I will make as we

9    have this chart up here, because there is an

10   argument made by the CCC, that you can see that

11   when the market disclosed that -- that there was a

12   reaction to May of 2013 when they made public their

13   argument that substantive consolidation was a real

14   risk.  And they want to suggest to the Courts that

15   the marketplace was really concerned about this or

16   thought that that argument had value.

17             But what you can see from these spreads

18   is that the spread actually widens from that point

19   forward, suggesting that the marketplace is

20   assessing that risk at something different than

21   what the CCCs, the Canadian-only creditors, would

22   suggest the Courts would do.

23             And one last point on creditor

24   expectations, because it is an argument that is

25   made by the Canadian Creditors' Committee, and that



1    is that -- and it was referenced yesterday quickly

2    in Mr. Barrack's remarks.  I think it is worth

3    looking at the actual evidence.

4              If we could turn to Slide 10.

5              There was an argument that, at least as

6    of the petition date, everybody should have been

7    aware that there was a risk of global substantive

8    consolidation, and there was reference made to the

9    10-K that was issued for 2008.

10             The 10-K issued for 2008, of course

11   would have come after January 14 of 2009, the

12   petition date in this instance.  So this was a

13   post-petition 10-K.

14             In that post-petition 10-K there is a

15   risk factor that is introduced for the first time

16   that says that there is a risk that any of the US

17   Debtors or any interested party in the Chapter 11

18   proceedings, including any of the US Debtors, could

19   request that the assets and liabilities of NNI or

20   those of other US Debtors be substantively

21   consolidated with those of one or more other US

22   Debtors.

23             So even on a post-petition basis this

24   does not suggest the risk that the Courts would

25   eliminate the value of the guarantees in full by



1   consolidating all of the global entities; but,

2   rather, it reflects simply the state of the law in

3   the US, and certainly in the Third Circuit, that

4   there is a possibility, however remote, that one

5   could ask for substantive consolidation within the

6   United States.  So this hardly could be read to put

7   on notice any party that you could have a risk of

8   global subcon.

9           And it is even more important, Your

10  Honor, to remember that on January 15 or maybe

11  January 16 -- I forget which day the first-day

12  hearings were -- the Bondholders were actually here

13  arguing to preserve the separateness of those

14  entities, as I referred to at the beginning.

15          Now, Your Honor, I want to just make

16  one last point and then I will conclude, but I

17  think it is an important one.

18          You will hear throughout, I expect, the

19  course of today -- you heard a little bit yesterday

20  and I expect you will hear an awful lot more --

21  that you should consider the prices at which

22  parties traded in the bonds.  And not just the

23  chart that I showed from Professor McConnell, an

24  expert that we retained, but rather that you should

25  consider in making your allocation decisions

Neeson&Associates   W&F

1    whether or not Bondholders paid less than in full.

2    That is an argument that you will hear, I think,

3    repeatedly.

4              And the law on this is unbelievably

5    clear.  We went back in history a little bit, and I

6    hesitated to do this because it is a US historical

7    figure whose quote we are going to put up on the

8    screen.

9              THE CANADIAN COURT:  Well,

10   Mr. Leblanc --

11             MR. LEBLANC:  Yes, Your Honor.

12             THE CANADIAN COURT:  -- one of my

13   heroes in US history is Thomas Jefferson, and he

14   had no use whatsoever for Alexander Hamilton.  He

15   thought Alexander Hamilton was a problem for the

16   new United States.

17             MR. LEBLANC:  It is great that you

18   mentioned that, because that will allow me, if Your

19   Honor will indulge me for a moment, to give you the

20   history of this particular episode in the US, very,

21   very briefly.

22             After the Revolutionary War in the

23   United States, there were war bonds that had been

24   issued, and there was a debate between the

25   Jeffersonians and the Hamiltonians as to whether or



```
 1   not those that had purchased the bonds should be

 2   paid at their par value, the face value of the

 3   debt, or they should be paid at their purchase

 4   price.

 5            And the reason is relevant.  This is

 6   one of the few instances, I think, that actually

 7   President Jefferson lost to Alexander Hamilton.

 8   Alexander Hamilton was, of course, the first

 9   Secretary of the US Treasury.  And the decision was

10   made at that time that, notwithstanding the fact

11   that people had purchased the debts at times for

12   pennies on the dollar, that the US was obligated to

13   repay them in the full face amount of their debt.

14            And I don't think even on his deathbed

15   on July 4, I don't think even Thomas Jefferson

16   would question the intelligence of that decision

17   having been made by Secretary Hamilton.

18            So the point of this is that as long as

19   the US has existed, it has been understood that

20   parties are entitled to be repaid based upon the

21   face amount of their claim.  It is not relevant

22   what they paid for their claim.  It may be relevant

23   when you stand on the courtroom steps talking to

24   the press in the court of public opinion, but in

25   the courtroom that has absolutely no bearing.  And
```

 Neeson&Associates    W&F

 1   the case law on this is absolutely clear.  There is

 2   no question.

 3            But that concept, at least in the US,

 4   was introduced as early as the founding of our

 5   country in the repayment of the Revolutionary War

 6   debts.  And you don't even have to take my word for

 7   it, because the UKP, again, offered Professor

 8   Westbrook.

 9            And if we can show Professor

10   Westbrook's clip.

11            He expressed his own views on this

12   question.

13   (Video played:)

14            Q.   Does the fact that some creditors

15            may have bought their debt on the

16            secondary market, does that affect your

17            views of what --

18            A.   No.

19            Q.   -- a fair distribution is?

20            A.   No.

21            Q.   And you agree that equities should

22            not weigh against parties that purchase

23            debt in the secondary markets; right?

24            A.   I think parties that purchase in

25            the secondary market perform a useful



1              economic function.

2                   Q.   And there is nothing improper

3              about note holders acquiring notes at a

4              discount?

5                   A.   No.

6                   Q.   And so is there anything about the

7              Nortel case that you think makes

8              relevant the prices at which claims may

9              have traded on the secondary market?

10                   A.   No.

11              Now, Your Honors, it simply bears no

12    relevance to this case what claims may have traded

13    at in the secondary market.  And that's true

14    whether you follow Thomas Jefferson and prefer

15    Professor Westbrook or whether you want to follow

16    Secretary Hamilton.  That is true.  It has been

17    true in the courts of these countries since our

18    founding.  And the same, we believe, is true in

19    Canada.  It simply bears no relevance.

20              For that reason, Your Honor may recall

21    that we objected -- during the representative

22    deposition process, we objected to producing

23    pricing information.  So you are not actually going

24    to hear prices at which the Bondholders paid --

25    bought their debt, because that information was



1   never produced.

2              Instead, what you are going to hear is

3   what amounts they held at various times and what

4   they can try to infer or imply from the holdings at

5   various times.  That entire issue has no relevance

6   whatsoever to the determination of the allocation

7   question.

8              Your Honor, I am pleased to stand here

9   as the last person on the US interests.  And if I

10  can be so bold as to speak on behalf of my

11  colleagues and ask the Courts to enter a judgment

12  at the conclusion of this case that allocates the

13  assets on a fair market value, which is the only

14  way that's appropriate to be done under the law.

15             And we thank the Court for your time.

16             THE US COURT:  Thank you, Mr. Leblanc.

17             THE CANADIAN COURT:  Now down to you,

18  Mr. Zarnett.

19             MR. ZARNETT:  You are going in the

20  right direction.  Mr. Coleman, in Delaware, is

21  going to lead off for our team and then pass it

22  back to me.

23             THE US COURT:  Hello, Mr. Coleman.

24             MR. PULTMAN:  Good morning, Judge

25  Gross.  Good morning, Justice Newbould.  May I



```
 1   approach, Your Honor?

 2              THE US COURT:  Yes, Mr. Coleman,

 3   please.

 4              MR. COLEMAN:  Your Honor, we are

 5   handing up a compendium of exhibits and excerpts

 6   that have been passed around the court here and in

 7   Justice Newbould's courtroom that we will refer to

 8   during our opening.

 9              THE US COURT:  Very well.  Thank you.

10              MR. COLEMAN:  Your Honor, by the way,

11   on the historical pitch that we just got from

12   Mr. Leblanc, I am not sure of this but I think that

13   Jefferson actually had a portfolio of those bonds

14   that he got at less than par.  I am not sure about

15   that.

16              THE CANADIAN COURT:  I think that's

17   right.

18              MR. COLEMAN:  We can possibly check

19   that out.

20              THE US COURT:  All right.

21   OPENING STATEMENT ON BEHALF OF THE CANADIAN DEBTORS

22              MR. COLEMAN:  It was not an entirely

23   disinterested point of view.

24              Your Honor, just for the record, Ken

25   Coleman, Allen & Overy, US counsel for the Monitor
```



```
 1   and the Canadian Debtors.  If I might make a couple

 2   of introductions very briefly.  With me today in

 3   Wilmington are Alan Mark of Goodmans, LLP, Canadian

 4   counsel --

 5              THE US COURT:  Good morning.  Welcome.

 6              MR. COLEMAN:  -- Canadian counsel to

 7   the Monitor and the Canadian Debtors, and my

 8   partner, Jacob Pultman, whom Your Honor is familiar

 9   with.

10              MR. PULTMAN:  Good morning, Your Honor.

11              MR. COLEMAN:  In Justice Newbould's

12   courtroom are Ben Zarnett, Jessica Kimmel, and

13   Peter Ruby of the Goodmans firm; and my partner,

14   Paul Keller.

15              Your Honor, our plan for --

16              THE CANADIAN COURT:  You missed one

17   important person.  You missed Ms.  Jennifer Stam.

18              MR. COLEMAN:  And I am sure I will hear

19   quite a bit about that later, Justice Newbould.

20   Thank you for kicking off the conversation, though.

21              Your Honor, I think that the plan here

22   is for me to start and then to hand over to

23   Mr. Zarnett to take you through our position.

24              Your Honor, the Canadian Estate is

25   pleased to have an opportunity to explain to these
```



 1    Courts our position on allocation.  We thought,

 2    however, that it was important to start the

 3    presentation by trying to deal first with an issue

 4    that came up in some of the pretrial briefs, and as

 5    was mentioned to some extent on the record here

 6    yesterday and then again today, and that is some

 7    rather unseemly and highly personalized attacks on

 8    the Monitor and the Monitor's conduct in this case,

 9    particularly with respect to the Rockstar

10    transaction.

11               And what I am going to ask both Courts

12    is that when you consider our position on

13    allocation, that you do so on the basis of the

14    conduct that you have observed from our side during

15    the more than five years of this case.  And I think

16    that if you do that, you will find that the Monitor

17    has acted in the best interest of the Canadian

18    Estate, has done so ethically, responsibly, and

19    tirelessly.

20               And we ask that you not be distracted

21    when hearing your position or, indeed, when hearing

22    the rest of this trial by these personalized

23    attacks on the Monitor.  There is just no place for

24    it.  And with that, I would like to start my

25    portion of this.



```
 1                   We agree, Your Honors, we agree with
 2      the proposition that the question before both of
 3      these Courts is what did each estate contribute to
 4      the sales and what was that property interest
 5      worth.
 6                   An argument against the Canadian
 7      allocation position is that this very large group
 8      of world-class legal talent feels duped by our
 9      reading of the MRDA, the MRDA, which is undoubtedly
10      the most well-read document in this case.  Indeed,
11      I will venture to say it is the most well-read
12      document in the storied history of Nortel that you
13      heard quite a bit about yesterday.
14                   At the end of our presentation on the
15      MRDA, we think that the Courts will be able to
16      conclude that our reading of it, which brings us to
17      our position regarding our entitlements in
18      allocation, should not have come as a surprise to
19      anyone in this case.
20                   Now, what is more troubling about these
21      positions that were raised in the pretrial briefs
22      is that they say that we tricked Your Honor into
23      concluding that the Rockstar transaction was in the
24      best interests of the US Estate, that we should
25      have stood up and said, "Judge, wait a second.
```



1    Three years from now we are going to file papers

2    that say that we are entitled to those IP sale

3    proceeds because we owned the IP.  We are entitled

4    to those IP proceeds because the document that

5    describes the rights, the MRDA, says that we have

6    the title and explains what the licensing

7    arrangements are in great detail."

8                You will hear from Mr. Zarnett on the

9    parsing of that very critically important document.

10               But they say that because we didn't

11   stand up and do that, that even if these two Courts

12   agree that we are right on our reading of the MRDA,

13   that you cannot give us that allocation.

14               Now, I think it is interesting to note

15   that at that very hearing on the approval of the

16   Rockstar transaction, no one stood up in Justice

17   Morawetz's courtroom and said, "Wait a second,

18   Justice Morawetz.  We should tell you that three

19   years from now we are going to file papers that say

20   the Canadian Estate, despite owning the IP, as it

21   says in the MRDA, despite that, the Canadian Estate

22   is going to be entitled, in our view, to less than

23   10 percent of those proceeds."  Nobody said that

24   either.

25               There was no reference to entitlements



1    to allocation at that time, because five years ago

2    all the parties agreed that it was in their best

3    interest to work together to sell assets jointly,

4    to maximize asset values and leave for another day

5    the difficult question of allocation.  The

6    agreement that set that out was the Interim Funding

7    and Settlement Agreement, and both Courts approved

8    that.

9              Now, the IFSA makes it clear that the

10   parties were going to work together to sell assets

11   and preserve the allocation dispute for a later

12   time.  Your Honors' order approving that agreement

13   is in our compendium at Tab 4 at Section 8.

14              And you will recall, Your Honor, that

15   Section 8 of that order was something that was

16   insisted upon, I think, by the US Trustee's office,

17   and all the parties agreed that, of course, this

18   was a correct statement of the IFSA, that nothing

19   in the order or the interim funding agreement

20   "shall determine the allocation of proceeds from a

21   sale transaction among the selling debtors or shall

22   constitute a protocol for determining the

23   allocation of proceeds from a sale transaction."

24   And then it goes on to say that there will need to

25   be a court-approved process for the allocation

 Neeson & Associates    W&P

1    phase of the case.

2              Those procedures were established by

3    the two courts.  The milestones were set, and the

4    date for putting your cards on the table for your

5    position on allocation was last May.  We did that

6    at the same time the other parties did that.

7              Now, the IFSA also expressly provides

8    that with respect to the entry into each sale

9    transaction, no party's rights in the allocation

10   process would be prejudiced by a sale transaction.

11             Now, that is expressed at

12   paragraph 12(f) of the IFSA, and it is at Tab 3 of

13   our compendium.  It is not highlighted, but it is

14   on page 12 of that document.  And 12(f) -- Section

15   12, of course, dealt with the whole sale process

16   and how it was going to be conducted and the

17   various estates would work together to sell.  12(f)

18   says:

19                  "Nothing in this Section 12 shall

20                  prejudice the rights of any party or

21                  otherwise constitute an amendment,

22                  modification, or waiver of the rights

23                  of any party to seek its entitlement to

24                  sale proceeds from any sale

25                  transaction."



1            Now, to make sure the point was being

2   driven home, in the Final Canadian Funding and

3   Settlement Agreement, we have appended at Tab 14,

4   paragraph 23 says that:

5                    "Nothing in this agreement shall

6                    bar, prohibit, or in any way hinder the

7                    rights of the parties to this agreement

8                    to present any arguments,

9                    methodologies, legal or factual

10                   theories in support of a proposed

11                   allocation of the proceeds of any sale

12                   transaction or IP transaction."

13           Now, missing from the very

14  comprehensive set of exhibits that we got from the

15  US interests today is any mention of these

16  reservation of rights in those two documents.

17           Now, my good friend, Mr. Bromley -- and

18  I mean that sincerely -- said that there were three

19  parts of the IFSA that mattered.  Not one of those

20  that he mentioned was the reservation of rights.

21  But, of course, Your Honor, in order to achieve

22  what the IFSA set out to achieve, which is, let's

23  get these parties to work together --

24           MR. MARK:  Sir, we have been

25  disconnected.



1    -- OFF THE RECORD --

2                THE US COURT:  All right.  We are back

3    on the record.

4                MR. COLEMAN:  Okay.  All right.  So the

5    IFSA and the reservation of rights.

6                Now, it wasn't among the three

7    important parts that were described to you earlier,

8    but it was critically important, because in order

9    to get the estates to work together to accomplish

10   the main mission, which is, let's sell these assets

11   and maximize overall asset value; of course,

12   everyone's rights to argue whatever they could

13   argue for allocation needed to be preserved.

14               Now, these two Courts approved that

15   agreement for that same reason, because you found

16   that it was in the best interest of each estate to

17   put that issue of allocation for another day and

18   work jointly to maximize asset value.

19               And that principle was recited

20   throughout each sale transaction in each motion, on

21   the record of each hearing, and in each order.  In

22   fact, last week I think Your Honor commented at a

23   hearing about the number of times that rights were

24   reserved in this proceeding.  Right?  We might as

25   well write it on the cornerstone of this building

Neeson & Associates    W&F

1   it was said so often.

2                THE CANADIAN COURT:  Mr. Coleman, can I

3   just ask you a question?

4                MR. COLEMAN:  Yes, sir.

5                THE CANADIAN COURT:  Was this final

6   agreement also approved by both Courts?

7                MR. COLEMAN:  Indeed, it was.

8                THE CANADIAN COURT:  Thank you.

9                MR. COLEMAN:  Now, in each of the sale

10  transactions that occurred in this case and that

11  were approved by the two Courts, the Courts'

12  findings and conclusions with respect to those

13  transactions were consistent with the overall

14  purpose of that agreement, which is to maximize

15  overall asset value.

16                That's what you were concluding when

17  you concluded that these transactions made good

18  business sense, because the objective, indeed the

19  whole launching pad for the case, was, let's work

20  together to sell assets.  Let's create the largest

21  pot possible for the parties either to agree to

22  divide, which we couldn't do, or for the Courts to

23  impose an allocation with respect to, which is

24  where we are now.

25                Each of the orders -- and we have



1   appended them to this compendium.  Each of the

2   orders said --

3                I don't really need to take your time.

4   You are familiar with them.  The parties are

5   familiar with them.  They are in there.  They

6   recite every one back to the IFSA for each one of

7   these transactions, the entire document.

8                The record also speaks for itself.

9   Each time there is a sale transaction, there is a

10  reference to a reservation of rights, and

11  importantly, a reference to allocation being for

12  another day.

13               Now, those are generalized reservation

14  of rights.

15               Then we come to the Rockstar

16  transaction.  Now, specifically with respect to the

17  Rockstar transaction, the parties could not have

18  been clearer on reservation of rights.  And if you

19  turn to Tab 8 in our compendium, it is a portion of

20  the sale motion.  And it is page 66 of -- pardon

21  me -- page 36, paragraph 57, which describes the

22  side agreement.

23               And in the side agreement, it says:

24                    "The side agreement also makes clear

25                    that the seller's understanding that



 1                    complying with their obligations under

 2                    Section 5.13(b) of the stalking horse

 3                    agreement," which had to do with the

 4                    surrender of licenses, "will not have

 5                    any impact, positive or negative, on

 6                    the rights of the sellers with respect

 7                    to the allocation of the proceeds of

 8                    the sale or the proceeds of any other

 9                    transaction."

10              Then you turn to the side letter

11    itself, which is at Tab 9.  And in Section 12 -- I

12    am sorry if I am blasting through this a little too

13    quickly for you to find the document.  But this one

14    is important.

15              Section 12 says:

16                    "Nothing in Section 5.1(b)(iii) of

17                    the stalking horse agreement or the

18                    amendments or modification to the

19                    transfer pricing agreements resulting

20                    therefrom or the actions taken as a

21                    result thereof shall bar, prohibit,

22                    terminate or in any way hinder or

23                    enhance the rights of the parties to

24                    this agreement to present any

25                    arguments, methodologies, legal or



1              factual theories, in support of a

2              proposed allocation of the IP sale

3              proceeds or the proceeds of any other

4              transaction."

5              Crystal clear.

6              Now, in June of 2011, just to highlight

7    the importance of the IFSA and those bedrock

8    documents, this was a hearing in connection with an

9    allocation protocol.  And we have appended this at

10   Tab 8.  And the US Debtors, looking back, you know,

11   with the benefit of some hindsight, they looked

12   back and they say -- this is Mr. Bromley speaking.

13   He is talking about how -- this is at page 36,

14   lines 16 to 24 of the transcript of that hearing.

15              He is describing --

16              THE CANADIAN COURT:  Which tab are we

17   looking at?

18              MR. COLEMAN:  Pardon me, Justice

19   Newbould.  That's Tab 10.

20              THE CANADIAN COURT:  Thank you.

21              MR. COLEMAN:  And the agreement is

22   described as the linchpin of the proceedings.  And

23   later on, at page 43, lines 18 to 24, also

24   describes the import of the IFSA as "allowing the

25   parties to sell assets at their highest and best

 Neeson&Associates    W&F

 1   value."

 2              Then at the actual hearing to approve

 3   the sale, which occurred after there was a great

 4   deal of debate in the courts regarding the

 5   allocation protocol and how that was to be

 6   conducted -- you recall that hearing.  So there was

 7   a great deal of discussion about how allocation was

 8   going to be determined.

 9              And then we come back for approval of

10   the Rockstar transaction.  And if you look to

11   Tab 11, at page 51, there's some comments by

12   Mr. Botter on behalf of the Creditors' Committee,

13   you know, very aptly put, saying that the IFSA

14   contemplated cooperation amongst the parties "in an

15   effort to maximize value without reference to any

16   allocation disputes, of which we heard so much

17   about the last time."  In other words, the

18   objective here was to put off to another day, and

19   that's exactly what happened.

20              So notwithstanding the vast record

21   reserving rights on allocation and the parties'

22   understanding that there was no assurance as to

23   recoveries, the US interests, including the bonds,

24   say that our rights, the Canadian Estate's rights,

25   were nonetheless eroded over time with each sale



1    transaction and that their rights were somehow

2    enhanced with each sale transaction and the hearing

3    to approve the sale transaction.

4              And, moreover, they are saying that

5    when Your Honor approved the sale transaction, you

6    were actually guaranteeing a minimum allocation to

7    the US Estate.  How that could be is obviously

8    beyond all of us, but that's, in effect, what they

9    are saying:  That by approving the transaction, you

10   guaranteed them an allocation.  I don't think Your

11   Honor had that in your mind.

12             Nothing that happened in this case

13   guaranteed any party a minimum allocation.  There

14   is a right to an allocation based on the value of

15   the property transferred as determined either by

16   agreement by the parties, or ultimately by the

17   Courts if no agreement could be reached.  And

18   again, we agree with the proposition here that the

19   question before the Courts is what was transferred,

20   what was contributed, and what was the value

21   contributed.  That's what we are here to determine.

22             Now, you know, it is interesting that

23   the Bondholders take the position that even though

24   everyone agreed that May 2013 was the date to put

25   your cards on the table, they are saying that was



1    actually too late for the Canadians.  The Canadians

2    should have done that much sooner.

3              It is interesting, in light of that

4    position, to note that the US Debtors were keeping

5    their options wide open even beyond that date.  And

6    you see that in Tab 13.  You see that in Tab 13,

7    which is the deposition of Mr. John Ray, at

8    pages 106 to 108 of that deposition.  He is being

9    asked to look at the US allocation position, and he

10   is --

11             THE CANADIAN COURT:  Could you tell me

12   who he is?  I am sorry.  Could you just tell me who

13   Mr. Ray is?

14             MR. COLEMAN:  Pardon me, Justice

15   Newbould.  He is the chief officer of the US

16   Debtors.  And he is being asked if he can tell us

17   what the amount of Canadian allocation is, and he

18   said no.  And later on he is asked whether he is

19   able to tell us whether the Canadian allocation is

20   more than zero.  He said, "No, I can't."

21             So, you know, there is a bit of, you

22   know, kettle/pot syndrome going on here, Your

23   Honor.  They kept their options open, but for some

24   reason we were supposed to put our allocation

25   position on the table -- I don't know at what

Neeson&Associates   W&P

1   point.

2             The US interests also try to make a big

3   deal about the Monitor's reports.  We heard that a

4   little earlier today.  And we have taken a

5   statement -- we have taken the usual format of the

6   Monitor's explanation of MRDA and IP and licenses

7   and appended it at Tab 15.

8             Now, what they don't tell you, they

9   don't give you the entire package, because, yes,

10  the Monitor's reports do talk about NNL's legal

11  title and intercompany licensing arrangements, but

12  then goes on in detail to say there is the IFSA,

13  there is no allocation agreement, and it will be

14  allocated based on an agreement or by the Courts

15  ultimately, and it refers back to the IFSA.  So it

16  is a fair portrayal of the circumstances.  It is

17  not misleading.

18             Now, in any case, Your Honor, put aside

19  the reservation of rights, put aside the milestones

20  that were established for putting your cards on the

21  table and leaving allocation for another day.  In

22  any case, from the evidence, you will see that our

23  theory of allocation with respect to IP ownership

24  was, in fact, discussed by the parties, and you

25  will see that -- and there will be disputes about



1    this, but you will see this from the affidavit of

2    Sharon Hamilton, which is appended at Tab 16, where

3    she talks about conversations, before the Rockstar

4    transaction really kicks off, about the nature and

5    scope of the Canadian interests.

6              You will see that from the deposition

7    of Mr. Murray McDonald of Ernst & Young, appended

8    at Tab 17, where he says quite clearly that he made

9    it clear that Canada can take the position that it

10   owned all the intellectual property and should get

11   the proceeds.  And that was a conversation that

12   occurred in May of 2010.

13             And then there is the deposition

14   testimony of Mr. John Doolittle that Mr. Maguire

15   pointed you to yesterday and that you heard a bit

16   more about today, and that is at Tab 18.  What

17   Mr. Maguire didn't take you to is when that

18   conversation happened.

19             If you look at page 150 of that

20   transcript, line 25, carrying over to page 151,

21   there is a question-and-answer section where

22   Mr. Doolittle says that post-petition there were

23   conversations regarding NNL's entitlement to the IP

24   proceeds, to the exclusion of the other estates.

25             And then later on there is a question



1    about when that conversation happened in relation

2    to when Mr. Doolittle left the company, and it is

3    clear that it happened well before the Rockstar

4    transaction.

5                    Now, Your Honor, just to conclude this

6    and then turn it over to Mr. Zarnett to take you

7    through the real merits of our position here, based

8    on what really happened in this case and the goal

9    of the sale process, the extensive reservation of

10   rights, and the agreed timetable for resolving

11   these issues, estoppel is not a relevant topic, and

12   they know that.

13                   And if they really believed that

14   estoppel was a viable response, they would have

15   pleaded it when they were supposed to, which was in

16   their responsive papers.  We could have tested it.

17   We could have tested it in the discovery process.

18   They didn't do that.  This case is not about

19   estoppel.

20                   So the gamesmanship, the personal

21   attacks, and the rest of it need to be put aside,

22   and these two Courts need to consider our position

23   which is being brought before you with the utmost

24   of good faith.

25                   And with that, I will turn it over to



1    Mr. Zarnett, unless the Courts have any questions.

2              THE US COURT:  I do not.

3              THE CANADIAN COURT:  No, thank you.

4              THE US COURT:  Thank you, Mr. Coleman.

5              THE CANADIAN COURT:  Mr. Zarnett?

6              MR. ZARNETT:  Thank you, Justice

7    Newbould, and good morning, Judge Gross.

8              THE US COURT:  Good morning.

9              MR. ZARNETT:  I would like to describe

10   from the perspective of the Canadian Debtors and

11   the Monitor, which I'm going to run together to say

12   the Canadian position for brevity, the central

13   issues which the allocation case requires be

14   decided and how the nature of those issues informs

15   how the court should view various contentions and

16   competing theories that the parties are advancing.

17             I preface my remarks by simply noting

18   that the Canadian Estate, especially NNL, is the

19   one most creditors vie to be significant creditors

20   of.  The US creditors have already described how

21   they have an allowed claim against NNL which they

22   describe as the single largest allowed claim to

23   date.  The Bondholder group describes themselves as

24   the largest creditor constituency of not only the

25   US but of Canada.  More than 20,000 Canadians,



1    including pensioners and former employees hold

2    approximately $3 billion worth of claims against

3    the Canadian Estate, according to the CCCs brief,

4    which is not to mention that in the claims portion

5    of this trial, the EMEA Debtors and the UK Pension

6    Claimants will also be trying to become substantial

7    creditors of the Canadian Estate.

8              The simple point that flows from that

9    is that getting the allocation to NNL and the

10   Canadian Estate right clearly has a direct effect

11   on the interests of many creditors, ranging across

12   a spectrum from the most savvy and sophisticated

13   financial investors to the most vulnerable

14   categories of creditors.

15             The issue, of course, as Mr. Coleman

16   has described and others have as well, is how to

17   allocate the $7.3 billion in sale proceeds.

18             Under the allocation protocol that was

19   approved by the courts in April of 2013, in

20   paragraph 4 which directed pleadings, it was noted

21   that "there shall be no restriction on the ability

22   of any core party to advance or oppose any theory

23   of allocation."

24             And when the Canadian Debtors came

25   forward with their theory in their pleading, it was



1   and it still is the proceeds should be allocated

2   based on the value of property rights transferred

3   or surrendered in connection with each business

4   sale and the Rockstar or residual IP sale.

5              Now, the Canadian Debtors' position is

6   not we get all the proceeds because we own the IP.

7   That's not true in the line of business sales where

8   the allocation proposes $1.3 billion of proceeds to

9   the US and EMEA combined, a little more than 1

10  billion to the US; nor is it even accurate with

11  respect to the value of the IP in those sales which

12  is also allocated.

13             It is rather that the value of the

14  rights needs to be determined after a correct

15  determination of the nature and scope of them.  The

16  same approach is taken with respect to the Rockstar

17  sale.  It is only after a review and consideration

18  of the nature of the IP and the IP rights that one

19  can properly value them and an allocation result is

20  reached.

21             Now, the Canadian formulation of the

22  question is similar to that of the US Debtors,

23  which is that each selling debtor is entitled to

24  receive the fair market value of the assets and

25  rights it sold or relinquished.  They simply



1    contend for a better result to the US.

2              It's also similar to the EMEA position

3    as articulated in their allocation pleading,

4    paragraph 45, where they describe ascertaining the

5    assets, valuing them and then identifying who owned

6    them or was otherwise entitled to them, but EMEA

7    also contends for a better result to themselves.

8              But in our submission, the right result

9    is based on a correct understanding of the rights

10   transferred, and that is where the parties really

11   come apart.  Because the allocation approach is a

12   two-step approach.  First, identify and correctly

13   characterized the rights transferred or surrendered

14   including their scope, and then value those rights

15   as correctly identified.

16             Now, the fundamental asset sold in the

17   sales, the most valuable one was IP.  There is

18   general accord about that.  Everyone agrees that it

19   generated a significant portion of the business

20   sale proceeds and of course all of the residual IP

21   sales.

22             And indeed, a comparison of the

23   residual IP amount and the business sale proceeds

24   shows that the IP in that sale raised more than the

25   sale of all the operating lines of business



1   combined.

2              And it's about IP, obviously, that the

3   parties' differences are the most significant, and

4   in my submission, the court will ultimately -- the

5   courts will ultimately have to decide the following

6   questions.

7              The first is, what is the nature of

8   NNL's interest in the intellectual property?  Is it

9   legal ownership or is it bare or nominal legal

10   title?

11              The second question, what is the nature

12   of the EMEA Debtors and the US interests, US

13   Debtors' rights in the intellectual property?  Is

14   it equitable or beneficial ownership of the

15   intellectual property or license rights?

16              And then third, if they are license

17   rights, what's the scope of the license?

18              Now, because those are the issues, the

19   MRDA lies at the heart of this case.  It's not

20   accurate to say, as the submissions on behalf of

21   EMEA contended yesterday, that Canada says the MRDA

22   does not apply.  On the contrary, we say the MRDA

23   determines the most critical questions in play

24   here:  The nature and scope of the rights relating

25   to IP, so that the question then remains, how to



1    value them.

2            What EMEA confuses is that the RPSM

3    sharing mechanism that applies under the MRDA to

4    operating results and not to sale proceeds, and

5    that is relevant in a way that I will explain a

6    little later.

7            Now, the MRDA, as the courts know, is

8    an Ontario law contract and Ontario principles of

9    interpretation apply to it.  The general principles

10   are well known to this court and won't be

11   surprising to Judge Gross' court.

12           And the most fundamental ones in play

13   here are we start with the words of the contract,

14   we give effect to the words on the basis that the

15   parties intended what they said; evidence of

16   subjective intention is not permitted; parol

17   evidence cannot add, subtract or vary the written

18   agreement; and there is a limited role that a

19   recital in an agreement can play in its

20   interpretation, especially with respect to its

21   effect on the operative language, it can't change

22   the operative language.

23           And this all is reinforced by the fact

24   that the MRDA itself has an entire agreement

25   clause, so the parties' intent, one looks within



1    its four corners for their rights and obligations.

2                    So with those principles in mind, I

3    wonder if I could take you to the MRDA which you

4    will find -- in the compendium I handed up, it's at

5    tab 2, but if you already have a favourite copy,

6    I'll do my best to navigate through it.

7                    THE CANADIAN COURT:   Calling it a

8    favourite copy is really a misnomer.   How about the

9    most used copy?

10                    MR. ZARNETT:   The first question the

11   courts have to ask about the MRDA is, what are the

12   provisions in it that bear on the nature of NNL's

13   interest?

14                    And the first consideration there is,

15   what's not there?   And there are three things that

16   are not there.   One is the word "bare" modifying

17   legal title.   The second is the word "nominal"

18   modifying either legal title or legal ownership.

19   And the third is "ownership for administrative

20   convenience only."

21                    None of those words appear in what the

22   parties said was their entire agreements, and

23   despite those terms being thrown around in the EMEA

24   and US submissions, the MRDA does not use them and

25   no attempt should be allowed to vary the contract



1   to insert them.

2          Now, what does it say about ownership?

3   Well, if you look at the MRDA and go to the first

4   "whereas" clause, it says that:

5              "Legal title to all NN Technology is

6              held in the name of NNL."

7          And legal title, absent other terms

8   that would suggest there is some beneficial

9   ownership in someone else, is ownership.  Title

10  according to law.

11         Article 4(a), which was in the original

12  agreement and got reworded slightly but not on this

13  point in the third addendum, says:

14             "Except as otherwise specifically

15             agreed, legal title to any and all NN

16             technology, whether now in existence or

17             acquired or developed pursuant to the

18             terms of this agreement, shall be

19             vested in NNL."

20         Now, there are several provisions also

21  contained in Article 4 that reinforce the effect of

22  that.  Paragraph 4(b) requires the other

23  participants, known as licensed participants, to

24  execute documents necessary to perfect title in the

25  name of NNL.  And paragraph 4(c) requires the

 Neeson&Associates   W&F

```
 1   provision of documentation relating to the
 2   technology to be given to NNL.
 3            Then paragraph 4(d) is of critical
 4   importance, because you'll recall, as I believe it
 5   was Mr. Bromley pointed out yesterday, a patent is
 6   something issued by the government which gives
 7   rights upon its issuance.  The only party who had a
 8   right to obtain a patent, a right, not an
 9   obligation, was NNL, and you'll see that in
10   paragraph 4(d), and that is a critical right, the
11   only right to obtain the patent without any
12   obligation to anyone else to do so which is
13   consistent with ownership and not with the holding
14   of title on behalf of someone else.
15            Now, Article 5 found in the original of
16   the MRDA and amended slightly in the third addendum
17   but not in a manner that's material to this point,
18   makes the only grantor of a license NNL.  NNL
19   grants the exclusive license that is the source of
20   the rights of the EMEA Debtors and the US Debtors.
21   And the only grantor of a license is NNL.
22            Now, in order to give the extensive
23   rights that are conveyed, NNL had to have them.
24   The license would be of no effect if NNL did not
25   have the right to grant these extensive rights.
```



1   The very nature of a license is that it's a consent

2   by the owner of a right to allow the licensee to do

3   something that would otherwise be a breach of the

4   owner's rights.

5               So the very grantor of the license, and

6   the fact that the only grantor of licenses is NNL,

7   is consistent only with the idea that NNL is the

8   owner of the NN technology.

9               And if you consider for a moment R&D

10  performed by EMEA, which results in something for

11  which a patent could be obtained, and for which a

12  patent is then obtained in the United States, only

13  NNL grants a license to those patent rights to NNI.

14  NNL must have had -- EMEA doesn't, there is no

15  grant by EMEA of any license rights, so NNL must

16  have had before it granted the license the sole

17  right to create rights in NNI.

18               Now, if I asked --

19               THE CANADIAN COURT:   Isn't the issue

20  what's the effect after having done that?

21               MR. ZARNETT:   Yes, yes.  However, the

22  argument from EMEA and from the US is that this

23  notion of beneficial ownership or equitable

24  ownership exists somehow informing the courts'

25  interpretation of the nature of the rights, the



```
1    nature of the license, and therefore in my
2    submission it's important to drill down on who is
3    the owner, is there a beneficial ownership or
4    equitable ownership, and then what's the nature of
5    the license?  Because that's where we end up doing
6    some hedge-clearing here.
7              If you look at, and I have to ask you
8    to find the third addendum for this, if you have
9    it, there are some page numbers on the bottom right
10   and 39 should be the last two numbers.  That begins
11   the third addendum, and if you go over to the next
12   page of that addendum, there is a definition of
13   non-exclusive territory, because in this addendum,
14   the licenses that have been granted were extended
15   from just being exclusive licenses to being
16   non-exclusive licenses in other parts of the world,
17   and therefore a definition of non-exclusive
18   territory was added.
19             You'll see in that definition of
20   non-exclusive territory -- Judge Gross, maybe I'll
21   just read it so we can catch up --
22             THE US COURT:  Sure.
23             MR. ZARNETT:  -- later.  The
24   definition of non-exclusive territory is:
25                   "...for each Licensed Participant,
```



```
1                    the entire world except (i) Canada
2                    where NNL retains its exclusive
3                    rights..."
4               And if you consider that for a moment,
5     there is no license granted to NNL by anyone; the
6     source of NNL's exclusive rights in Canada must be
7     its ownership of the NN technology, otherwise it
8     wouldn't have exclusive rights in Canada.
9               So that particular definition and that
10    particular setup -- Judge Gross, if it assists you,
11    if you have the version that the US interests
12    handed up.
13               THE US COURT:  Oh, yes, okay.
14               MR. ZARNETT:  Tab 4 is the third
15    addendum.
16               THE US COURT:  Yes.
17               MR. ZARNETT:  I am encouraged it's not
18    your favourite version.  And the definition that I
19    am referring to is on the second page of the third
20    addendum.
21               THE US COURT:  All right.
22               MR. ZARNETT:  I'm sorry, Judge Gross,
23    it's -- there was a version of the master -- of the
24    MRDA that was handed up separately bound and there
25    are just a few number of tabs on it.
```



1                    THE US COURT:  Got it.  Now I'm with
2    you.  Got it.
3                    MR. ZARNETT:  Tab 4 is the third
4    addendum, and I was directing the courts' attention
5    to the definition of non-exclusive territory.
6                    THE US COURT:  Yes.
7                    MR. ZARNETT:  And the reference in it
8    to NNL having exclusive rights in Canada, the only
9    source of which could be the ownership of the NN
10   technology.
11                   Now, ownership of anything, but in
12   particular of intellectual property, has a
13   particular valuation consequence that is important
14   here, and it's well-described by the US Debtors,
15   trying to make a different point, on page 12 of
16   their pretrial submissions.  And the point is, an
17   owner is entitled to do anything that -- an owner
18   is entitled to whatever an asset will fetch, even
19   if by maintaining the asset, the owner couldn't
20   earn that amount themselves.
21                   So, even an inefficient owner of an
22   asset who left to their own devices can't avoid
23   walking into a sharp object, can't make any money
24   out of it, doesn't know how to exploit it, if
25   someone else comes along and says I believe I can



1    find a way to make money out of that and I'm

2    prepared to pay X, the owner is entitled to that

3    regardless of whether the owner could say well, if

4    I kept it myself, I could earn those amounts.

5              But that is something that is

6    particular about ownership and the right to

7    transfer, and does not necessarily apply to bundles

8    of rights that don't include all of the aspects of

9    ownership which may have restrictions, for example,

10   on transferability or what you can do to exploit

11   the right.

12             Now, let me turn then to what the MRDA

13   says about the nature of the US and EMEA interests

14   in the intellectual property.

15             Following the same approach, it's

16   important to focus on what it doesn't say.  It

17   doesn't contain an operative provision that says

18   equitable and beneficial ownership of the

19   intellectual property is granted to NNI or the EMEA

20   Debtors.

21             So, for example, when page 87 of the US

22   interests' pretrial brief says MRDA, and it's a

23   heading on that page, "MRDA Granted Equitable and

24   Beneficial Ownership of Nortel Technology to NNI in

25   the US," those words do not appear.  That kind of



1    grant does not appear and can't be added.

2                Now, if you look at the MRDA, and in

3    particular at Article 13, and this is in the

4    original version, never changed, the MRDA expressly

5    disclaims the kinds of relationships that otherwise

6    would be thought of as some -- as existing where

7    beneficial ownership of an asset is held by one

8    person with title in someone else's name.

9                So Article 13, which is on page 12 of

10   the MRDA, states that the relationship of the

11   participants, NNL on the one hand, NNI and the EMEA

12   Debtors, the relationship of the participants is

13   not a partnership or a joint venture, vehicles

14   where sometimes one person holds on behalf of

15   others, and, even more importantly, no participant

16   is a fiduciary of any other, and the relationship

17   of bare legal title holder to beneficial owner of

18   any asset is a trust under Ontario law, and trusts

19   are per se fiduciary relationships.

20                The disclaimer of any fiduciary

21   relationship is completely inconsistent with the

22   notion that you have the bare legal title,

23   beneficial owner kind of paradigm that is being

24   advanced in this case.

25                Now, the MRDA also contains express



1   provisions --

2                  THE CANADIAN COURT:  Why do you say

3   that?  Why do you say it's inconsistent?

4                  MR. ZARNETT:  The relationship between

5   trustee and beneficiary, title holder and

6   beneficiary, if the title holder is holding for a

7   beneficial owner is a trust.  It's a fiduciary

8   relationship.

9                  THE CANADIAN COURT:   That isn't the

10  only way you can get beneficial ownership to

11  someone else, is it, by a trust?

12                 MR. ZARNETT:  That particular

13  relationship, where all I have, if I'm the bare

14  legal title holder, is an obligation to hold it for

15  someone else who holds it beneficially, it will be

16  our argument that that is a trust kind of

17  relationship, and if it is, it's a fiduciary

18  relationship.

19                 So when the parties say, we owe no

20  obligations to each other of the utmost good faith,

21  duties to account, all the things that go with a

22  trust relationship --

23                 THE CANADIAN COURT:  How about a

24  mortgage?

25                 MR. ZARNETT:  A mortgage?

 Neeson & Associates   W&F

```
 1                    THE CANADIAN COURT:  Owner of a

 2   property gives a mortgage to a bank.

 3                    MR. ZARNETT:  Then you have an owner

 4   and an encumbrance.

 5                    THE CANADIAN COURT:  Who has the

 6   beneficial interest?

 7                    MR. ZARNETT:  Well, I think the owner

 8   has both the beneficial title and the legal title.

 9   There would be no separation of those two -- those

10   two interests, and the creditor has a charge.

11                    Sometimes you have a title held,

12   though, in a nominee on behalf of others and that

13   is either -- it's always a trust, it may also be an

14   agency which the agreement also speaks to, but

15   there is, in my submission, no well-known mechanism

16   to have bare legal title, title held on behalf of

17   another, and beneficial ownership in someone else

18   of the type that is being discussed, other than a

19   relationship of trust and confidence, fiduciary

20   relationship, agency perhaps, all of which are

21   disclaimed by this.

22                    So the parties clearly didn't think

23   they were trying to set up that kind of a

24   relationship.

25                    Now, EMEA in particular, but the US
```



```
 1   interests as well, make the argument that doing
 2   research and development, the performance of
 3   research and development which led to the creation
 4   of IP is consistent with joint or beneficial
 5   ownership.  You heard that yesterday from my
 6   colleagues arguing for EMEA and it weaves into the
 7   arguments of the US interests when they talk about
 8   how much they contributed over the years to
 9   research and development and how much revenue they
10   generated under transfer pricing payments they
11   made.
12            Let me take you to some provisions of
13   the MRDA that bear on that proposition that we were
14   doing research and development together and the
15   deal was we would all own it and we would all share
16   in the proceeds, on the EMEA theory, in accordance
17   with those contributions, but that was a joint
18   ownership, a beneficial ownership kind of
19   arrangement.
20            So the place to start, and we can look
21   at these in the original, is with a couple of the
22   recitals that are relied on for that theory.
23            If you look at the recitals on page 2
24   of the MRDA, the third recital, and I'll point it
25   out to you:
```



```
1                    "Each Participant bears the full

2                    entrepreneurial risks and benefits for

3                    the Nortel Networks business."

4          The next recital says:

5                    "Each Participant has performed, in

6                    the past, and intends to continue to

7                    perform R&D Activity with respect to

8                    the Nortel Products."

9          And then skipping over one recital:

10                   "Each Participant believes that it

11                   is appropriate that each [Participant]

12                   should benefit from its contribution to

13                   R&D activity commensurate with the

14                   value of its contribution to that R&D

15                   activity in the context of the manner

16                   in which Nortel Networks business is

17                   conducted..."

18         And then it goes on to say, and the

19   RPSM method is the best arm's length measure of

20   those contributions.

21              That's the recital.  And you were taken

22   to a couple of those, parts of those, but you have

23   to go over to a couple of other provisions to see

24   where that beginning of the path ends up.

25              So if you go to page 4, you'll see a
```



```
 1   definition of --

 2               THE CANADIAN COURT:  Just a second.

 3               MR. ZARNETT:  If you go to page 4,

 4   there is a definition of R&D activity and it's

 5   defined to mean all R&D activity.

 6               And then Article 2 of the agreement,

 7   Article 2(a) obliges each participant to use its

 8   best efforts to perform R&D activity, which means

 9   all R&D activity, consistent with past practices

10   and ongoing needs.

11               And then the payoff and the deal, this

12   aspect of the deal, because especially the EMEA

13   Debtors put it to you that the deal was we all

14   contribute to R&D and we all share in the proceeds,

15   the deal, though, as reflected by the parties in

16   their entire agreement is in Article 3(a) which

17   says:

18                    "For and as a consequence of the

19                    performance of R&D Activity, each

20                    Participant shall be entitled to

21                    receive a payment in an amount equal to

22                    the allocation determined under the

23                    RPSM ... as the measure of the benefit

24                    to which it is entitled commensurate

25                    with the performance of and
```



 1                    contribution to R&D Activity."

 2                    So there's the quid pro quo that for

 3     doing R&D, you don't get an interest in the

 4     property, you don't get a beneficial interest in

 5     the property, you get an entitlement to a

 6     particular payment equal to the allocation

 7     determined under the RPSM method.

 8                    And if you go over, and noting the time

 9     I'll just try to finish this point if I might, if

10     you could find your way back to the third addendum,

11     it has a Schedule A to it which has the most

12     updated version of the RPSM, the schedule is at, I

13     believe, page 6 of the third addendum, there are

14     two things noteworthy about the RPSM methodology.

15                    First, it's directed at operating

16     earnings or loss, which is on the first page of the

17     addendum, page 6 of the document, noted in

18     paragraph 2, that we're looking at operating

19     earnings or loss; and if you go over to the next

20     page, Romanette (ii) of paragraph 3, something that

21     is specifically excluded is gains and losses on

22     sale, and the courts were told yesterday that the

23     RPSM doesn't apply to the proceeds of sale.

24                    So the deal, as the parties reflected

25     it, was do R&D and in exchange we'll sign up for



1   the RPSM sharing of operating earnings, but that

2   won't reach either the property, because it's done

3   in exchange for this payment plan, and it doesn't

4   reach sale proceeds.

5            Now, there wasn't a word about this in

6   the EMEA submission to you yesterday, but it is, in

7   my submission, a very fundamental obstacle to the

8   contribution theory that's being advanced by

9   anyone.

10           The RPSM and the MRDA as a whole also

11  shows that the parties expected that there would be

12  revenues, they expected that there would be

13  transfer pricing payments, and they didn't specify

14  any consequence to the ownership of the

15  intellectual property that would flow from that.

16           So, in my submission, the inquiry that

17  you're being asked to undertake either about the

18  contributions giving rise to some joint ownership

19  or to look at historical contributions over a

20  period of time of funding by NNI are, with respect,

21  a mug's game.

22           On the funding issue, it all depends

23  how far back you go.  If we reach back into the

24  late 1990s there are billions of dollars of

25  acquisitions of businesses, including Bay Networks



1   for $9 billion funded by Canada and with the

2   businesses rolled into the US.

3              So, the agreement means that we don't

4   have to look at, in this corporate family

5   relationship in terms of the value of intellectual

6   property, at who did what for who when, just as we

7   like to avoid doing that in all family

8   relationships.  The debate can be endless but the

9   agreement doesn't mandate it, the agreement doesn't

10  allow it.

11             Justice Newbould and Judge Gross, I

12  note the time.  If this is a convenient spot for a

13  break, I'm in your hands.

14             THE CANADIAN COURT:  If it's

15  convenient, it's fine with me.  Is it fine with

16  you, Judge Gross?

17             THE US COURT:  Fine with me.

18             THE CANADIAN COURT:   So what time do

19  we come back, quarter to 2:00?

20             THE US COURT:  That sounds good,

21  Justice Newbould.  We'll stand in recess until

22  quarter to 2:00.

23  -- LUNCHEON RECESS AT 12:32 --

24  -- UPON RESUMING AT 1:47 --

25             THE CANADIAN COURT:  Mr. Zarnett?



1           MR. ZARNETT:  Good afternoon, Justice

2    Newbould, Judge Gross.  I was dealing before lunch

3    with several counter-indicators in the agreement

4    for the proposition that beneficial or equitable

5    ownership was granted and I now want to turn to the

6    most important counter indicator, and that is what

7    in fact was granted to the US Debtors and the EMEA

8    Debtors in the MRDA about intellectual property.

9           If I could ask you to turn up the MRDA

10   again.  What is granted is a license and the

11   agreement is full of that intention.

12          The seventh recital on the second page

13   reflects the intention of the participants to enter

14   into a license agreement to reflect the way they

15   have operated and everyone other than NNL is called

16   a license participant; two very strong indicators

17   of the nature of the relationship.

18          You'll see that in Article 4, and

19   Article 4 is reworded a bit in one of the addendums

20   but for this purpose it doesn't matter, but in

21   paragraph 4(a), the paragraph I took you to in

22   order to demonstrate the granting of legal title or

23   the agreement that legal title was held by NNL, it

24   goes on to say that in consideration for that, NNL

25   agrees to enter into an exclusive license with the



1    licensed participants.

2                And Article 5 then goes on to grant the

3    exclusive license and to indicate that, in fact, it

4    is a continuation of a grant of a license because

5    -- it picks up in the first sentence, the second

6    line, saying:

7                     "...NNL hereby continues to grant

8                     each Licensed Participant an exclusive,

9                     royalty-free license," et cetera.

10               So there can't be any reasonable

11   argument that what we should be dealing with here,

12   when we look at allocation, is a license.  License

13   rights and ownership rights, those are the two

14   rights in play about intellectual property.

15               Now, one particular feature about a

16   license is that it is only an entitlement to do

17   what the license permits.  It's a self-evident

18   proposition but our Supreme Court of Canada has

19   dealt with it, and in our opening brief, paragraphs

20   89 to 91, we summarize some of the law about that.

21               But because it's a contractual right, a

22   serious right but a contractual one, it is

23   necessary to see what the license permits.

24   Anything that it doesn't permit is reserved to the

25   grantor of the license, here to the owner, to NNL.

 Neeson & Associates   W&F

```
 1                    So we are trying to, on our implicit

 2      Venn diagram, to find out how much the circles

 3      overlap between what has been granted to the

 4      licensees and then everything else is retained by

 5      NNL.

 6                    Now, there is a recital, while you're

 7      in the MRDA, and it's the second recital and I

 8      don't want to pass by it before I get to the scope

 9      of the license, but the second recital that begins

10      "Whereas each Licensed Participant held and enjoyed

11      equitable and beneficial ownership," is important

12      because of what it says and, of course, what it

13      doesn't say.

14                    What it says is that what was held was

15      equitable and beneficial ownership of certain

16      exclusive rights under NT technology for a

17      specified territory pursuant to, and then there is

18      a specific contract referred to.  And it goes on to

19      say:

20                         "...it is the intent of NNL and the

21                    Licensed Participants that the Licensed

22                    Participants continue ..."

23      to hold such rights.

24                    That is not a grant of equitable and

25      beneficial ownership of Nortel's intellectual
```



 1   property.  It's a reference to ownership of certain

 2   exclusive rights under pursuant to specific

 3   agreement.

 4              And before we go back to that agreement

 5   to see what those rights were, it's important as

 6   well to note that this recital, the only grant in

 7   the agreement is not a grant of equitable and

 8   beneficial ownership of anything, it is a grant of

 9   a license.  So the recital read with the other

10   recitals ends up with an intention to enter into a

11   license agreement, and then a license is granted.

12              But if you look back at the agreement

13   that this one is referring to, to the description

14   of the rights in that, it's in my compendium at tab

15   1, it's a cost-sharing agreement that preceded the

16   MRDA, but you'll see that in Article 4 of this

17   agreement, the parties agreed that legal title to

18   NT technology, the old name for NN technology, the

19   legal title to the technology was vested in

20   Northern Telecom, the predecessor of NNL, and if

21   you go to Article 5, you'll see that what was

22   granted was a license, exclusive license on

23   particular terms.

24              So when we reference back that recital

25   to what it's referring to, the equitable and



 1   beneficial ownership is of license rights and there

 2   is no confusing this with a grant of beneficial or

 3   equitable ownership of the NN Technology itself.

 4   If that had been the intention, it would have been

 5   granted in this agreement, it wasn't granted in the

 6   prior agreement and it's not granted in this

 7   agreement.

 8              A recital cannot change the operative

 9   word "grant," but here it doesn't have to; the

10   reference to the previous rights is clearly a

11   reference to the same kind of owner/licensee

12   arrangement that we see in the MRDA.

13              So, let me take a step back for a

14   moment and just ask the courts as you listen to the

15   evidence and as you listen to the arguments that

16   will continue to be advanced, not to let that

17   discussion of beneficial and equitable ownership of

18   the technology, which is what -- Nortel IP, which

19   is what creeps in or informs the US and EMEA

20   positions, obscure the correct question.

21              The Monitor does not say NNL had

22   ownership and NNI and EMEA had nothing.  It says

23   correctly, NNL had ownership and the others had

24   licenses.  And what's important is to pay attention

25   to the scope of their license because that directly



```
 1   affects the correct way to value.

 2              And in a way EMEA and the US Debtors

 3   throw around the words equitable and beneficial

 4   ownership like it was Hamburger Helper, sort of

 5   beefs up the terms of the document that we should

 6   actually be looking at.

 7              THE CANADIAN COURT:  Who came up with

 8   that?

 9              MR. ZARNETT:  I think Hamburger Helper

10   was a Heinz product.

11              THE CANADIAN COURT:  That wasn't quite

12   my question but...

13              MR. ZARNETT:  So, instead of trying to

14   fatten up the interest, the license can stand on

15   its own, must be valued on its own.

16              The next question, the next critical

17   question is, what is the scope of this license?

18              Now, the MRDA by its terms and since it

19   is clearly an operating relationship, the whole

20   RPSM sharing is of operating profits and losses.

21   It is talking about companies who are doing R&D in

22   an operating relationship.

23              The license is -- the critical question

24   about the license is does it grant all rights to NN

25   Technology?  That's fundamental to the position
```



1    advanced by the US interests.

2            We heard Mr. Bromley this morning

3    saying we valued -- you do the valuations on the

4    basis that the US owned everything about its

5    business and in particular the intellectual

6    property in connection with it in the United States

7    to the total exclusion of NNL.  That's only right

8    if the exclusive license were read as being

9    co-extensive with NNL's ownership of NN Technology.

10            In other words, if we read the license

11    to say that title that's vested in you, all of it,

12    everything is now licensed back exclusively,

13    perpetually, royalty-freely to NNI for the United

14    States, to the EMEA Debtors or EMEA.

15            Now, that would be a relatively easy

16    thing to accomplish in terms of words.  If you look

17    back at Article 4 of the MRDA, they knew exactly

18    how to describe what was being given to NNL

19                "...any and all NN Technology..."

20                I'm in paragraph 4(a).

21                "..any and all NN Technology whether

22                now in existence or acquired or

23                developed pursuant to the terms of this

24                Agreement shall be vested in NNL."

25                And one could craft in not too many



1   words a paragraph that said:  All of that, any and

2   all NN Technology, is exclusively licensed.

3           You have to contrast that with the

4   number of words that are actually used because the

5   argument is notwithstanding all the words used, the

6   two defined terms, "products" -- the defined term

7   "products" incorporated in it, you end up in the

8   same result, and the problems with that proposition

9   are as follows.  And for this I need you to look at

10  the third addendum unfortunately where the license

11  rights are finally stated.

12          So if you go in the third addendum

13  which is on page 3, and this is Article 5.  You'll

14  see in what is by this addendum Article 5(a)(i), a

15  continuing grant to each licensed participant of an

16  exclusive royalty-free license, including, and then

17  it goes on.

18          THE CANADIAN COURT:  Just a minute.  I

19  haven't got it.  Where are we looking?  I've got

20  the third addendum.  Where do I go?

21          MR. ZARNETT:  Page 3 of the third

22  addendum.

23          THE CANADIAN COURT:  Yes.

24          MR. ZARNETT:   And it's near the bottom

25  and it's headed up Article 5.



    1                    THE CANADIAN COURT:  Yes.  Which part
    2   of that do you want me to look at?
    3                    MR. ZARNETT:  So you have to look at
    4   those words first, and contrast them --
    5                    THE CANADIAN COURT:  Which words?
    6                    MR. ZARNETT:  Sorry, that's a good
    7   question.  5(a)(i).
    8                    THE CANADIAN COURT:  5(a)(i).
    9                    MR. ZARNETT:  Yes, which says to the
   10   extent of its legal right to do so, subject to the
   11   rights of relevant third parties, NNL hereby
   12   continues to grant each licensed participant on an
   13   exclusive royalty -- an exclusive royalty-free
   14   license, including the right to sublicense, which
   15   except as hereinafter provided shall be in
   16   perpetuity, rights to make, have made, et cetera.
   17                    So rights to make, have made, use,
   18   lease, license, offer to sell and sell products, a
   19   defined term, using or embodying NN Technology in
   20   and for the exclusive territory.
   21                    Let me stop there.  The words
   22   themselves are different than we give you an
   23   exclusive license for all NN Technology.  Instead,
   24   it's related to products.  Just stay, keep your
   25   finger there and move back to the definitions in

Neeson&Associates   W&F

1   the MRDA.  "Products" is itself a defined term.

2   You'll see this on page 4 of the MRDA.  And the

3   definition of products, right at the top of the

4   page, is "all products, software and services

5   designed, developed, manufactured or marketed," or

6   proposed to be any of those things, at any time,

7   and then the important words, "by or for any of the

8   Participants."

9            So, the definition of "products,"

10  rather than the world of all potential products

11  which could come into existence at any time by any

12  means, is limited in two ways.

13           One, it has to actually have been

14  designed, developed, manufactured or marketed or

15  proposed to be any of those things at some time.

16  It has to fit into one of those categories, there

17  has to be something designed, developed,

18  manufactured or proposed to be one of those things;

19  that's one limitation on the absolute universe.

20           And the second, which is very

21  important, very understandable in the

22  circumstances, it has to be one of those things by

23  or for a participant.  It can't be something using

24  the patent but designed by someone else for someone

25  else.  It has to be for Nortel, a Nortel



1    participant.

2                THE CANADIAN COURT:  Can I ask you a

3    question?  Is it suggested that some of this IP

4    sold to Rockstar was IP never intended for any of

5    the participants?

6                MR. ZARNETT:  It may have been intended

7    when it was developed to have a use for the

8    participants, but the fact that the IP has that

9    intention surrounding it doesn't take you all of

10   the way when you're looking at the value of the

11   license.  Because unless it had progressed to the

12   state of a product developed, manufactured,

13   marketed or proposed, and Nortel had processes to

14   move things forward towards actuality, and unless

15   the intention, the realized intention was to do it

16   by or for any of the participants, you have a

17   potential activity that's outside of the license.

18                So if someone wanted to take that

19   license system, wanted to take a patent and make --

20                THE CANADIAN COURT:  What's it mean by

21   software proposed to be designed at any time?

22                MR. ZARNETT:  It means something more

23   than the idea.  It means software proposed and some

24   actuality about it, we have a proposal about

25   software, but it also has to be and continue to be

 Neeson & Associates    W&P

1    something that is going to be by or for the

2    participants.

3                    THE CANADIAN COURT:  Who else would it

4    be for?

5                    MR. ZARNETT:  Well, even if at the

6    conceptualization stage someone was thinking about

7    this for Nortel, the point is to actually implement

8    it and derive value from it, you have to have a

9    license that would allow you to do that so it has

10   to continue to be something by or for a

11   participant, which while Nortel was all together in

12   an operating relationship, this was all the

13   participants needed.  They were only doing things

14   for themselves and for their sibling/parent

15   corporations.

16                   But where this becomes a critical

17   valuation issue, and this is -- this is why we

18   underscore this, is that when you're talking about

19   how you would value this license right in

20   connection with patents --

21                   THE CANADIAN COURT:  You're saying

22   Rockstar is not a participant?

23                   MR. ZARNETT:  Rockstar for sure isn't a

24   participant.  So if you're talking about how does

25   someone realize value on these, one thing the



1   licensees could not do is put this set of rights

2   into a third party's hands, not Nortel or a Nortel

3   participant, and have a -- have them be a licensee

4   to carry on that activity.

5            They can't say Cisco, Ericsson, here

6   are our rights, you can now utilize them and

7   maximize value out of this license, because not

8   being a participant they wouldn't -- Cisco wouldn't

9   be doing this by or for any of the participants.

10           That is the difficulty, that is the

11  scope of the license that's carved out of the

12  ownership.  The ownership of the patents allows you

13  to put it into anyone's hands.  The license is

14  restricted to maximizing value out of doing things

15  by or for the participants.

16           Now, that interpretation, and I'll just

17  highlight this because obviously I think I have

18  wandered into this courtroom for the last few days

19  of final argument rather than opening --

20           THE CANADIAN COURT:  The thought

21  crossed my mind.

22           MR. ZARNETT:  One of my predecessors

23  asked for judgment, I'm sure I heard them do that.

24  I thought they were getting a little ahead of

25  themselves.



1                    But let me highlight this issue because
2    obviously these words will be back and forth, but I
3    hope you kept your spot in the third addendum to
4    the term of the license, because really there's --
5    in addition to quarreling over what products means,
6    which I'm sure you'll hear a lot more about,
7    there's two other arguments the US Debtors advance
8    to say there's no restriction on this.
9                    One is that the word "including"
10   appears relatively early on, the word, "continues
11   to grant to each Licensed Participant an exclusive
12   royalty-free license including..."
13                   THE CANADIAN COURT:  Where are you
14   looking at right now?
15                   MR. ZARNETT:  Sorry, I'm at the bottom
16   of page 3 of the third addendum, back at 5(a)(i).
17                   THE CANADIAN COURT:  Yes.
18                   MR. ZARNETT:  And in some formulations
19   the word "including" is seen as -- not as a
20   limitation on what goes before, but that argument
21   doesn't work here for two reasons.
22                   First, what's included is the right to
23   sublicense; only the right to sublicense.  But
24   second, if you stopped reading before you got to
25   the word "including" you wouldn't have a license



1   because there's no definition or description of

2   what the license relates to.  It's only when you

3   get past the word "including" that you're told what

4   the license permits.  That's the first point that's

5   made to you and that ultimately we will ask you to

6   reject.

7              The second has to do with the

8   concluding words because -- and if you're on the

9   second -- if you're on page 4 of the third addendum

10  now near the top, you'll see after the language

11  that talks about products, there is a phrase that

12  begins "and all rights to patents," and the US

13  Debtors particularly want you to read that as

14  freestanding.

15             THE CANADIAN COURT:  Where are you?

16             MR. ZARNETT:  On the top of page 4 of

17  the third addendum, carrying on at 5(a)(i), and

18  four words from the top of the page, after the

19  reference to products embodying NN Technology,

20  there is a comment that says "and all rights to

21  patents" and then it refers to other forms of

22  intellectual property.

23             But that can't be read as anything

24  freestanding because the concluding words are "as

25  necessary or appropriate in connection therewith,"

 Neeson & Associates    W&F WILSON & PETERS LTD.

1    which clearly takes that phrase and doubles it back

2    to what goes before it.

3              So, it's not a grant of exclusive

4    rights with respect to products and all patents as

5    though they're two separate things; it relates one

6    to the other for clarity and certainty.

7              Now, the last thing about the patent --

8    about the MRDA is it is contained in a

9    non-transferable agreement.  It's not assignable

10   without consent, and, as a matter of fact, in the

11   sales, the licenses were terminated; terminated on

12   the terms that you've seen, license termination

13   agreements delivered pursuant to the IFSA, but what

14   was sold was ownership of the patents with the

15   licenses being terminated, the purchaser didn't

16   need ownership and these licenses, they needed

17   ownership unencumbered by any licenses.

18             Now, before I get to the valuation

19   methodology that flows from that and describe for

20   you how the valuation methodologies are affected by

21   this analysis and these issues, I wanted to briefly

22   address one area that has to do with the

23   interpretation of the MRDA, and that is whether you

24   ought to be considering parol evidence.

25             THE CANADIAN COURT:  Before you get to



1    that --

2                MR. ZARNETT:  Sure.

3                THE CANADIAN COURT:  Could you turn to

4    Schedule A of the MRDA.  It's at page 15.  Put

5    against you is the fourth paragraph which says:

6                    "Accordingly, the compensation

7                    provided to Participants under RPSM

8                    reflects the fact that the Participants

9                    bear the full entrepreneurial risk of

10                   the Nortel business such as the risks

11                   attendant with the substantial and

12                   continuous development and ownership of

13                   the NN Technology."

14               And the word "ownership" is emphasized

15   there.

16               MR. ZARNETT:  I think there's two

17   answers to that.  First of all, that paragraph has

18   to be read in the context of the entire agreement

19   which talks about ownership and license.  It would

20   be a very odd construction for, in a statement like

21   that, to create a whole separate set of undefined

22   ownership rights.  How would they exist alongside

23   the license rights?

24               Second, we know from the structure of

25   the RPSM that all of the rights, all the rights



1    arising out of investment and taking risk in

2    connection with anything about the IP are

3    compensated by the RPSM formula and nothing else.

4              So this paragraph doesn't grant

5    ownership and there is no grant of ownership for it

6    to recognize.  It doesn't change the essential

7    contractual relationship.

8              Now, I wanted to say about the parol

9    evidence that this case may be an excellent example

10   of why important rights like a stake in this case

11   ought to be determined from the documents and not

12   by views about what the document was intended to

13   mean or meant to other people in other disciplines.

14             So let me take some of the examples of

15   the parol evidence, and by no means all of them,

16   but I just wanted to group them into a couple of

17   categories and show you what I think some of the

18   flaws are in trying to use this for the intention

19   of interpreting the agreement or changing what it

20   means.

21             So let me start with at tab 20 of my

22   compendium, and this is an excerpt from the Horst

23   Frisch transfer pricing economic analysis, and this

24   is one of the bits of parol evidence relied on and

25   in fact it starts a bit of a cascade of the use of



1    certain terms.

2            But on page 10, which is duplicated

3    here, you'll see that the author, who is an

4    economist, refers to the cost sharing agreements

5    that existed prior to 2000, including the one that

6    I took you to a little earlier, the 1992 cost

7    sharing agreement, and then says, under the

8    arrangements each cost sharing participant has the

9    right to use the intangible property developed

10   pursuant to the R&D cost sharing arrangement in its

11   respective market.

12           Now, that's an innocuous enough

13   statement about a document that is a license, but

14   with great respect to the economist, they have

15   their own language, not our language, because they

16   then go on to say "from an economic standpoint each

17   R&D cost sharing participant could be considered to

18   'own'," in quotation marks, "the NT Technology as

19   it related to its specific region."

20           That may be a perfectly legitimate

21   application of some aspect of economics to an

22   agreement for economic transfer pricing purposes,

23   but one thing it can't be used for is to change

24   what the clear language of that agreement is, which

25   is a license, into ownership.  The economist's view



 1   can't insert words and, in fairness to the

 2   economist, he did put the word in quotation marks

 3   indicating he was using it in another sense than

 4   one might ultimately expect.

 5            Now, if you go over to tab 21, we have

 6   some evidence that I say stands for the proposition

 7   that transfer pricing has its own language, it has

 8   its own terminology, some of which overlaps with

 9   legal terminology but not in the same sense, and

10   that couldn't be more graphic than the excerpt from

11   Mr. Gatley's examination that you were referred to

12   yesterday, where he says, and if you look at page

13   250 for example, around line 15, he's asked to

14   explain the difference between legal and beneficial

15   ownership as a transfer tax person, and he then

16   says on page 251:

17                 "'Legal ownership' is something we

18                 are not concerned with..."

19            He's less than not concerned with, he

20   says on page 251.  In transfer pricing it doesn't

21   matter.

22            And if you look over to pages 278 and

23   279, which are at the end of the excerpt, you will

24   see that Mr. Gatley says I don't know what legal

25   ownership and beneficial ownership means in the



 1   context of what judges do about those terms.

 2            So, whatever terminology the transfer

 3   pricing world is using, it's not terminology that's

 4   helpful to either you, Justice Newbould, or you,

 5   Judge Gross.  It's its own language and it can't be

 6   used to change the contractual language.

 7            Now, it's perfectly clear from the

 8   evidence that when transfer pricing people were

 9   speaking about beneficial ownership in the course

10   of their depositions, they made it clear that they

11   were speaking about it for tax and transfer pricing

12   context and not in any other sense, which they

13   disclaimed any knowledge of what those terms mean

14   in the legal context.

15            And you'll see that in Mr. Weisz, the

16   excerpt from Mr. Weisz at tab 22, and Ms. Sparagna

17   at tab 23, who indicate that they're not

18   knowledgeable about this terminology so when they

19   use it, they use it in the tax law senses and not

20   other senses.

21            Now, another point that comes out of

22   this and which the transfer pricing witnesses are

23   pretty clear about is they considered the MRDA the

24   actual source of the rights and obligations.

25   Whatever they had been talking about and whatever



1    terminology they had used, a legal document was

2    drafted with the intention of it being the

3    governing legal document.  And you get that from

4    Mr. Sparagna's evidence at tab 23, pages 190 to

5    192, and from Mr. Weisz's evidence at tab 22, page

6    67.

7                    The other point that comes out of this

8    is that when someone tries to take those concepts

9    and apply them to what the courts have to deal

10   with, even the transfer pricing witnesses say our

11   terminology won't help you.  And you get that from

12   Mr. Weisz, if you look at tab 22.  If you look at

13   page 127 at the top, there was a question being put

14   that begins at the page before with:

15                    "Would you agree with me, sir, that

16                    if NNL were to claim entitlement of a

17                    hundred percent of the proceeds of the

18                    sale of Nortel intellectual property on

19                    the basis that it had legal title to

20                    that IP, that would be inconsistent

21                    with the economic substance of the

22                    transactions between the RPS entities?"

23                    And I'm still in my television phase.

24                    THE CANADIAN COURT:  I see several

25   people were.



1               MR. ZARNETT:  Yes.  But you'll see the
2    answer then goes on, Mr. Weisz answers:
3                    "I don't think I'm capable of giving
4                    an opinion on it, because the residual
5                    profit split and the economics were
6                    really based on an operating model, not
7                    sales of our technology..."
8               So all of their talk about beneficial
9    ownership and risk-takers, et cetera, is all in the
10   context that you ultimately see reflected in the
11   MRDA which is we share operating profits and
12   losses, but not -- but the concept, the economic
13   model, the substance does not reach sales.
14              So the evidence -- but that conclusion
15   should be reached from the MRDA, not what people
16   think about it, which is why this parol evidence is
17   a rabbit hole of different views expressed in
18   different contexts at different times by different
19   people.
20              Now, in this evidence, one thing is
21   made clear and that's that the MRDA was given to
22   the tax department as the agreements.  Mr. Weisz
23   says that in his deposition.  Which means that all
24   of the discussion about well, if you had told the
25   tax department that this was your position, the



1    heavens would have opened.  The fact is the tax

2    department had the MRDA as the legal arrangement.

3              And just on one final point and that

4    is, is the characterization for legal purposes the

5    one that we should care about?  I say yes.  And

6    Mr. Coleman this morning took you to the Monitor's

7    characterization which was always careful in the

8    Monitor's reports, legal title, intercompany

9    licenses, those were the two rights in IP, and that

10   is, in fact, the same characterization that the US

11   Debtors applied.

12             If you look at tab 26, tab 26 is an

13   excerpt from the motion that was filed by the US

14   Debtors about IFSA.  And if you look over at

15   paragraph 14 you'll see the statement:

16              "Within the Nortel Group, NNL is the

17              owner of the vast majority of Nortel's

18              intellectual property assets and in

19              accordance with the Master R&D

20              Agreement, NNL licenses its

21              intellectual property," et cetera.

22             Nothing about beneficial ownership,

23   equitable ownership, anything like that.  And

24   you'll see the same kind of statement made in

25   paragraph 16 at the end, which also describes the



```
 1    two bundles of rights.

 2              So that's the way the parties speak in

 3    legal terms to the courts about it, it's the right

 4    terminology, it's a confusion to enter into another

 5    world with different words that have different

 6    meaning, and certainly wrong to do that, to change

 7    the effect of the MRDA.

 8              So, let me then turn to what the

 9    valuation issues are the courts will deal with.

10    You will hear from a number of valuators, and the

11    US Debtors say on page 8 of their brief that the

12    allocation must account for termination of the

13    licenses.  And we agree with them.  It must,

14    absolutely.  That accounting is properly done based

15    on the scope of the license, valued appropriately.

16              The valuation approach that's taken by

17    the experts you will hear on behalf of the

18    Canadians are consistent and the one that I'll

19    outline for you is from Mr. Green, but he does it

20    in a number of steps.  He refers to this as the

21    business line valuations.  He says:  First, let's

22    look at the tangible assets that were transferred,

23    and we can identify ownership of those by the

24    financial statements, we can value those with their

25    net book value, and we can attribute the values to
```



1    each estate.  The amounts in doing that are not

2    insignificant.  There was a significant allocation

3    to both the US and to EMEA as well as to Canada

4    from the tangible assets.

5              The second thing he looks at is

6    something called in-place workforce, which is

7    employees move over, that saves the purchaser the

8    cost of replacing an organized workforce, and there

9    is a value to that and he allocates that among the

10   three estates in accordance with who had what

11   employees.  Again, significant amounts are

12   allocated.

13             He then looks at the licenses that were

14   surrendered, and given the terms of the licenses

15   which he's asked to assume, it's not the valuator's

16   job to do that, it's ours, if the licenses are

17   interpreted in the manner that the Canadians

18   contend for, what has to be looked at is what value

19   were the -- was being given up when the license was

20   being surrendered?  Because one thing you could

21   have done is keep the license, carry on in business

22   together.

23             That, in valuator's language, is

24   something called value in use.  When I can get

25   value out of something but I can't transfer that

 Neeson&Associates   W&F

1   right to anyone else, so my value is what I can do

2   with it by or for the participants.  And he does

3   that valuation and he attributes the results to the

4   US and EMEA based on what they could have earned

5   exploiting those licenses to the full extent

6   possible, but given the scope of the license and

7   given that in an operating relationship the RPSM

8   sharing would apply.

9           And then the balance, and that includes

10  the value of customer relationships because they

11  are in the same cash flows, so the balance then

12  falls into the category of the different uses that

13  transferring ownership can convey, because if you

14  accept the paradigm that the license was not all of

15  the rights, there is a residual right that's

16  transferred, that's paid for, and that would come

17  to Canada.

18          And that's the valuation of the -- of

19  the lines of business, and it contrasts to the US

20  approach in this way.  The US assumes the licenses

21  are all the economic value; it ignores any

22  obligation to share any operating revenue under the

23  RPSM; and it then uses historical revenues.

24          THE CANADIAN COURT:  Obligation to

25  share, what did you say, the profits?  Did you



1    mean --

2              MR. ZARNETT:  The profits and losses.

3    And it then uses historical revenue proportionately

4    to simply divide the proceeds.  And we say, and

5    these are the issues you will have to decide, that

6    the valuation with anything, you don't really use

7    historical revenue as a valuation metric without,

8    and is a right to ignore the sharing and have you

9    interpreted the license too broadly.

10             The Rockstar transaction is approached

11   by Mr. Green following the same methodology except

12   there is no tangible assets.  There is some small

13   workforce which is allocated but then the license

14   rights have to be valued given what those patents

15   are, we'll hear evidence about those, and how do

16   you value them if the scope of the license is as

17   described.  And that is how the result is arrived

18   at.

19             The alternative, the one you'll have to

20   consider whether this has validity, is the US says

21   there was an alternative, and that is that an IPCo

22   could have gone forward, and the US expert uses the

23   IPCo projections to derive the shares that he says

24   flow, and the issues about that will be were the

25   license rights sufficient to participate in IPCo?



1    Will the evidence satisfy you that IPCo was real

2    enough, because Nortel never operated it, to

3    suggest a value?  How do you project this value,

4    what discount rate do you use, and then should the

5    RPSM be applied to these projected revenues from

6    this hypothetical business, which is something that

7    the US expert ignores?

8              So those will be the interesting

9    valuation issues that you will have to wrestle with

10   and which I say are informed by the extent of the

11   property interests.

12             I hope that assists with at least

13   organizing the issues to help appreciate the

14   evidence.  And that's my opening.  Thank you very

15   much.

16             THE US COURT:  Thank you, Mr. Zarnett.

17   I have a few comments perhaps but I am reminded

18   this is not the closing argument, this is the

19   opening argument.  This is your case that you are

20   describing to me and I appreciate your argument.

21             MR. ZARNETT:  Thank you very much.

22             THE CANADIAN COURT:  Mr. Steep?

23             MR. STEEP:  Good afternoon, Your

24   Honour.  Good afternoon, Justice Gross.

25             THE US COURT:  Good afternoon.



```
 1            MR. STEEP:  My name is Paul Steep.  I
 2    have not had the pleasure of appearing before you.
 3    I act for the Canadian Creditors Committee.  I want
 4    to introduce my co-counsel, Mark Zigler, Ken
 5    Rosenberg, Barry Wadsworth.  Justice Gross, Lily
 6    Harmer is before you in your courtroom in Delaware.
 7            So just briefly, Your Honours, the
 8    Canadian Creditors Committee is composed of the
 9    following:  Former employees and pensioners of the
10    Nortel Canadian Debtors for whom there are three
11    court-appointed representatives; in all there are
12    approximately 20,000 people involved who have
13    pension claims, supplementary health benefits,
14    pension benefits, self-insured disability payments
15    and other lost employment benefits.
16            I personally act for Morneau Shepell
17    Limited who is the wind-up administrator for
18    Nortel's two Canadian pension plans.  They have
19    been appointed by the Province of Ontario to
20    administer the wind-up and to recover part of the
21    $2 billion shortfall in that claim.
22            My friend Mr. Rosenberg acts for the
23    Superintendent of Pensions of Ontario.  As people
24    here in this courtroom will be familiar, the
25    Superintendent of Pensions will be responsible for
```

 Neeson&Associates   W&P

```
 1   at least part of the shortfall in the pension

 2   plans.  And then finally Mr. Wadsworth, who is

 3   UNIFOR for the Canadian Autoworkers who represents

 4   some of the retired employees of Nortel who are

 5   members of the Canadian Autoworkers.  And I am

 6   reminded that my colleague Tim Hoeffner from DLA

 7   Piper is also before you, Justice Gross, in

 8   Delaware.

 9                So those are the interests that are

10   represented here before you, Justice Newbould,

11   Justice Gross.  They are obviously an important

12   constituency comprising a great many pensioners who

13   have suffered significant losses since NNL was put

14   into receivership in January of 2009.

15                I'm going to address two issues before

16   you because we join with the Monitor in saying that

17   allocation should be done by way of ownership; that

18   ownership is codified in the MRDA, particularly in

19   Article 4; that my friends to the left representing

20   the US Debtors have a licensed right only.  That

21   licensed right was largely compensated for in the

22   sale of the businesses.  I'll take you through that

23   briefly.  And that as a consequence, what was left

24   over in what's commonly referred to as the residual

25   IP, the Rockstar sale, will accrue to the Canadian
```



1   estate.

2            Virtually all of the core parties agree

3   that the ownership principle for allocation, and

4   the dispute is largely over who owns what, or in

5   the case of the license, what is the scope of the

6   license that was actually terminated.

7            So because that's the nature of the

8   disagreement, I agree that the first step under the

9   law of Ontario is to interpret the MRDA in

10  accordance with the language that the parties

11  actually used for their agreement.

12            We don't dispute that there may have

13  been tax or transfer pricing issues that set the

14  context for the MRDA, but it is indisputable that

15  there were IP ownership issues that were also

16  codified in the MRDA, particularly in Articles 4

17  and 5.

18            The economic interests that may

19  underlie legal ownership I say should be brushed

20  aside.  It's not an issue which informs the

21  interpretation of the MRDA.

22            The principal task for you, Justice

23  Newbould, and you, Justice Gross, is to construe

24  that contact by using the actual language of the

25  contract, and that means you describe the interest



1    of the licensed participants and that's how they're

2    described in the MRDA, and with that language, and

3    what they have is a license.

4              I'm not going to construe the agreement

5    because Mr. Zarnett has already done that.  I have

6    my own compendium and I want to add just a few

7    points to what you have already heard.

8              Justice Gross, this compendium will be

9    handed to you as well.  So my friend Mr. Zarnett

10   showed you the connection between the cost sharing

11   agreement of January 1992, and I want to take you

12   to what is also Article 4 in that cost sharing

13   agreement.  You'll find that at tab 2 of the brief

14   I put before you.

15             And go to page 7.  Mr. Zarnett took you

16   to the first sentence of Article 4:

17             "The Parties hereto acknowledge

18             that, except as otherwise specifically

19             agreed, legal title to all NT

20             Technology whether now in existence or

21             developed pursuant to the terms of this

22             Cost Sharing Agreement, except patents

23             owned by Participant on January 1,

24             1980, shall be vested in Northern

25             Telecom."

 Neeson & Associates    W&F

1           The balance of that paragraph is also

2    of interest because it is the same language that

3    you will see reflected in the MRDA, the same regime

4    of the ownership whereby the licensed participants

5    do not have the right to prosecute patent

6    applications; that accrues only to NNL.

7                "With respect to patentable

8                inventions and copyrightable property

9                encompassed by NT Technology, Northern

10               Telecom shall have the exclusive right

11               but not the obligation to file and

12               prosecute applications in its name for

13               patent or copyright protection in every

14               country of the world.  Participant

15               shall execute or cause to be executed

16               such documents reasonably requested by

17               Northern Telecom as may be necessary or

18               desirable to give effect to the

19               foregoing."

20           Those terms are important because they

21    are consistent with ownership and they impose on

22    the licensed participants mandatory obligations to

23    assist NNL in perfecting its ownership.

24           Now, the only other provision that I

25    want to take you to is found in the master license



```
1    agreement.  And, Justice Gross, I'm happy to use
2    that black volume that Mr. Bromley handed up to
3    you.
4              If you turn to the first tab, and go to
5    page 10 --
6              THE CANADIAN COURT:  Sorry, where are
7    we looking at?
8              MR. STEEP:  I'm going to the Master
9    Research and Development Agreement, the MRDA.
10             THE CANADIAN COURT:  Page what?
11             MR. STEEP:  Page 10.  You're using the
12   copy that Mr. Bromley handed up.  And I want to
13   take you to Article 11 which deals with retirement
14   of participants.
15             And if you go to subparagraph (e) on
16   page 10, you will see that:
17                  "The obligations of a retiring
18                  Participant under Article 4 (Legal
19                  Title to NN Technology) acquired or
20                  developed by such retiring Participant
21                  pursuant to this Agreement from the
22                  Effective Date of this Agreement up to
23                  and including such retiring
24                  Participant's retirement date, Article
25                  6 and Article 7 of this Agreement shall
```



```
1                    survive notwithstanding the retirement

2                    of the Participant."

3                    Now, with respect to Article 4, that's

4        significant because if you go back to Article 4, as

5        a participant leaves, all of the research and

6        development, all the documentation necessary to

7        perfect title will pass up to NNL.

8                    So the final and only repository of

9        title under this regime of ownership is NNL.

10                   Now, I want to --

11                   THE CANADIAN COURT:  Well, it says the

12       obligations of a retiring participant, the

13       obligation to Article 4, isn't it to sign any

14       document necessary?

15                   MR. STEEP:  Yes.

16                   THE CANADIAN COURT:  So somebody who

17       leaves still has an obligation in spite of the

18       retirement to continue to sign documents.  Does

19       that section say anything more than that?

20                   MR. STEEP:  Well, Your Honour, if you

21       go back to section 4, and that's the heart of it --

22                   THE CANADIAN COURT:  Yes.

23                   MR. STEEP:   -- and you go to the

24       definition of NN Technology, you will see it

25       includes all know-how, research, books, drawings,
```


Neeson&Associates    W&F

     1    et cetera.

     2                    THE CANADIAN COURT:  Right.

     3                    MR. STEEP:  So whatever the retiring

     4    participant has that falls into that category, they

     5    will be obliged to do everything to transfer that

     6    up to NNL.  This belies any notion that there are

     7    ownership rights intrinsic to the IP or the R&D

     8    residing down in the participant.  The whole nature

     9    of this regime is to have ownership from beginning

    10    to end up in NNL.

    11                    THE US COURT:  Well, Mr. Steep, I'm

    12    confused, why in the world was I signing all of

    13    those sale orders?

    14                    MR. STEEP:  I beg your pardon?

    15                    THE US COURT:  This is Judge Gross.

    16    Why was I signing all of those sale orders in this

    17    case if there was no ownership residing in the US

    18    Debtor?

    19                    MR. STEEP:   I was not present but you

    20    were signing them pursuant to approvals that were

    21    sought by the Monitor and, as I understand it, the

    22    US Debtors.

    23                    THE US COURT:  All right.

    24                    MR. STEEP:  Now I want to show you,

    25    Judge Gross and Justice Newbould, how that regime



```
1    operated in fact.  And to do that I'm going to take
2    you to some testimony of Eric Jensen, who is an IP
3    lawyer with NNI, and some assignment documents
4    which he identified on his examination.
5              These come from the year 2000, and you
6    will see them under tab 8 of that compendium.
7              If you would go to the back of that
8    compendium, the last two pages are an assignment.
9    You will see that the assignment in the recital
10   identifies the inventors.  The invention is called
11   "Backhauling of Call Signalling For Multiple
12   Protocols."  And you'll see in the next full
13   recital, Nortel Networks Limited, a Canadian
14   company, is the assignee and it is desirous of
15   acquiring the entire right, title and interest in
16   and to said invention.
17             If you go down to the first operative
18   term, in the fourth line down you'll see that that
19   occurs.
20             "...by these presents does sell,
21             assign and transfer unto the Assignee,
22             its successors and assigns, the entire
23             right, title and interest in and to the
24             invention and the application herein
25             identified,  and all Letters Patents
```

 Neeson & Associates    W&P

```
1                    that may issue..."
2                    And then if you go back a couple of
3    pages, you will see the patent application January
4    24th, 2001.  It again lists the assignors and the
5    assignee as Nortel Networks Limited.  That's
6    consistent with the regime Mr. Zarnett took you
7    through in Article 4.
8                    THE CANADIAN COURT:  Well, I mean, this
9    is just an assignment between the inventor and
10   Nortel, so the inventor gives up everything that
11   the inventor has to Nortel.
12                   MR. STEEP:  Right.  And not --
13                   THE CANADIAN COURT:  It doesn't deal
14   with what the terms of the license are, including
15   Nortel and EMEA and NNI.
16                   MR. STEEP:  No, but this goes to the
17   actual practice that they had at the time and it
18   extends over the period of time of the MRDA which
19   is what I am about to show you.
20                   So if you go to tab 7, and go to page
21   144, which is the second page in, what precedes
22   that, Your Honours, is that he is simply
23   identifying the documents that I have taken you to.
24   Go to line 12:
25                        "In answer to my friends' questions,
```



```
 1              you referred to there being a practice
 2              of assigning the rights from the
 3              invention to Nortel.  Is this the type
 4              of document that was used in your
 5              experience?
 6                  "Answer:  Yes.
 7                  "Question:  And you'll agree with me
 8              in this case, the three individuals
 9              have assigned their rights to Nortel
10              Networks Limited, correct?
11                  "Answer:  Yes."
12              If you go to the second recital, he
13      takes you through the same recitals that I have
14      taken you to.  And then if you go over to page 145,
15      line 15:
16                  "And would you agree with me that
17              during the period of time that you were
18              employed by Nortel between 2000 --
19              sorry, 1998 and 2007, it was the
20              practice to execute assignments like
21              this from the inventors to Nortel
22              Networks Limited?"
23              There is an objection, and:
24                  "As far as I know.  And my
25              recollection is that that is correct."
```



1            Now the effect of that practice was to
2   give all right, title and interest in those
3   inventions that are up to NNL exactly in accordance
4   with the interpretation that has been put to you on
5   Article 4.
6            Let me then turn to the limited scope
7   of the license which Mr. Zarnett has taken you
8   through, and I'll do this very quickly.
9            There are a number of phrases that
10  clearly limit the scope of the license.  The first
11  is that it does not use the phrase "NN Technology,"
12  it uses the phrase "products embodying Nortel
13  Technology."  It must be by or on behalf of Nortel
14  participants.
15           And finally, with respect to the grant
16  of the license, any license rights giving access to
17  patents must be as necessary or appropriate in
18  connection therewith, clearly referring back to
19  products using or embodying NN Technology.
20           That last phrase, as Mr. Zarnett has
21  said, is important because there is a position put
22  by the US Debtors that you could somehow assign or
23  sublicense and in effect create a transfer to a
24  purchaser through a sublicense, by and for the
25  participants being Nortel you could not.  And I



 1   point out in addition to that, Article 14(a) which

 2   prohibits an assignment under the MRDA.

 3              Now, our valuation methodology -- our

 4   valuation technology -- or, sorry, our valuation

 5   methodology starts first with valuing the

 6   surrendered licenses, and it values them on the

 7   basis of the interpretation that has been put

 8   before you about the limited scope.

 9              I know you haven't read the Britven

10   report, you have a lot of reading to do, but I'm

11   going to summarize some evidence that will give you

12   some context to that.

13              When the business, the lines of

14   business were sold during the sale process, the

15   patent segmentation exercise was undertaken by John

16   Veschi and another Nortel employee, Gillian

17   McColgan, and what that meant was they segregated

18   the patents that went with the business.

19              THE CANADIAN COURT:   One, two and

20   three, didn't they?

21              MR. STEEP:  Well, they segregated them

22   on the basis of what was predominantly used in the

23   business and what was shared, and you've obviously

24   read enough from the fact that they have been filed

25   before you to understand that there were no

Neeson & Associates    W&F

1    disputes between any of the lines of business about

2    what was predominantly used in which business and

3    what was shared.

4              And that means that once those patents

5    were identified as going with the business, it

6    would identify the patents that used or embodied NN

7    Technology, the scope of the license.  And there

8    were some shared patents, and when the licenses

9    were surrendered, new licenses were granted to the

10   purchasers out of the residual IP so that the

11   purchasers would have the benefit of those shared

12   patents going forward to manufacture the products.

13             Now, in our submission, that process is

14   important because that necessarily means that once

15   that segmentation was done, once those assets,

16   patents and licenses were transferred to the

17   purchasers, what remained in the residual IP had

18   not been licensed under the Article 5 licenses and

19   was residual IP that was owned by NNL and we valued

20   it accordingly.

21             This does not mean that the licenses

22   are not given their true value.  They are.  It

23   means that the licenses are valued and the

24   compensation is received through the sale of the

25   lines of business.



 1                  Now, there were some patents that were
 2      not registered in the name of NNL, not many, but
 3      some, and under our valuation methodology, those
 4      patents are given value to whoever the owner
 5      happened to be.
 6                  THE CANADIAN COURT:  What caused them
 7      not to be registered in the name of NNL?
 8                  MR. STEEP:  I'm sorry, Your Honour, I
 9      couldn't hear.
10                  THE CANADIAN COURT:  What caused them
11      not to be registered in the name of NNL?
12                  MR. STEEP:  There is not evidence on
13      all of them, Your Honour.  Some of them were
14      because of acquisitions and they remained a
15      subsidiary or in NNI after the acquisition, our
16      surmise likely for tax purposes, but we don't know,
17      and there's not a significant number.
18                  Now let me turn to the issue of the
19      Monitor's role in this because from the point of
20      view of the pensioners, this is an important issue.
21                  I also had flagged the sections that
22      you have been directed to from the June 2009 motion
23      record of the US Debtors where they say clearly
24      that NNL is the owner of the intellectual property.
25      I want to add to that by going to tab 10 which is



1    the filing that was made by the Joint

2    Administrators in January of 2009 when they

3    appeared before the High Court.

4              If you turn to tab 10, and this is a

5    document that was filed January 14th, 2009, to

6    paragraph 3.3, this was what was represented to the

7    UK court.

8              "Secondly, all intellectual property

9              rights belong to NNL, the Canadian

10             company, irrespective of which Group

11             company originally carried out the

12             research and development activity which

13             generated the IP."

14             This is exactly the reading of the MRDA

15    that Mr. Zarnett read earlier today.

16             "A pool of operating profits

17             generated by the Group, after allowing

18             for a level of operating profit for

19             each company, is divided amongst the

20             Nortel Group companies that contribute

21             to research and development costs.

22             These companies are known as Residual

23             Profit Sharing companies.  There are

24             three RPS companies in the EMEA region,

25             being NNUK, NN France, NN Ireland."



1              There is not the least suggestion of
2    any property right, equitable, beneficial in the IP
3    or the Nortel Networks technology.  It's explicit
4    that the compensation for the R&D wherever it is
5    done is exactly as my friend, Mr. Zarnett, has
6    said:  the RPSM profit sharing.
7              So I say with respect there was never a
8    controversy about NNL's ownership of the IP, and if
9    you take the chronology that Mr. --
10             THE CANADIAN COURT:  There is today, so
11   when you say there was never, never was when?
12             MR. STEEP:  Never was during this
13   crucial period in 2009 when the parties were
14   cooperating with one another to sell the
15   businesses, and the IFSA is June of 2009, they're
16   deep into this.  They were first retained in
17   December of 2009 or 2008 in the UK and in the US;
18   the filings are made in early January; and people
19   by that time have had an awfully long time to
20   consider their rights under the MRDA.  And if you
21   look --
22             THE CANADIAN COURT:  You said when they
23   were first retained.  Who is "they"?
24             MR. STEEP:  I'm talking about the legal
25   counsel, chief operating officer and the Joint



1    Administrators.  Same would be true in Canada.  And

2    I say it was never a controversy about ownership in

3    that period of time because if you go to paragraphs

4    14 and 16 and for the sake of time I won't take you

5    back --

6                    THE CANADIAN COURT:  14 and 16 of what?

7                    MR. STEEP:  14 and 16 of the motion

8    record that was filed.  If you want to look at it

9    you can find it at tab 9 of my compendium.  14 is

10   really an interesting paragraph.

11                   THE CANADIAN COURT:  Isn't this what

12   Mr. Zarnett referred us to?

13                   MR. STEEP:   Yes, he did, he took you

14   to the first sentence which is why I said I wasn't

15   going to go back there.

16                   THE CANADIAN COURT:  All right.

17                   MR. STEEP:  Now that you have it in

18   front of you, if you look right after they say that

19   Nortel, NNL was the owner of the vast majority of

20   Nortel's intellectual property, it then goes on to

21   say what the transfer pricing regime is, and

22   there's no suggestion in that paragraph that the

23   transfer pricing regime is somehow negatively

24   impacted by the fact that NNL owns the vast

25   majority of Nortel's intellectual property.



```
 1                    Now, I wanted to address the Monitor's
 2    conduct because from the pensioners' point of
 3    view --
 4                    THE CANADIAN COURT:  Just before you go
 5    on, how long do you plan to be?  Is this a
 6    convenient time for the afternoon break?
 7                    MR. STEEP:   If it's convenient for
 8    you, it's convenient for me.
 9                    THE CANADIAN COURT:  Judge Gross?
10                    THE US COURT:  Yes.
11                    THE CANADIAN COURT:  Let's take 15
12    minutes.
13    -- RECESS AT 3:15 --
14    -- UPON RESUMING AT 3:35 --
15                    THE US COURT:  We're back.
16                    THE CANADIAN COURT:  We are.
17    Mr. Steep?
18                    MR. STEEP:  Thank you, Your Honour.
19    Justice Gross, if I can just return to your
20    question briefly, breaks are useful to be reminded
21    of things.
22                    THE US COURT:  Sure.
23                    MR. STEEP:   On the approvals, all of
24    the Estates were designated as selling Debtors.
25                    THE US COURT:   Right.
```



```
 1              MR. STEEP:  Under the IFSA.  Though the
 2    allocation portions that we are now involved in and
 3    whose rights had what value had been postponed
 4    until now, for purposes of those approvals,
 5    everyone would have been before both courts.
 6              Just before the break I wanted to say a
 7    quick word from the pensioners' point of view about
 8    the Monitor.  We independently viewed the MRDA to
 9    give the ownership rights that we have argued for
10    to NNL.  In that circumstance the Monitor would
11    have no choice, provided it agreed, put forward in
12    good faith that interpretation and that's all
13    that's occurred here.  To the extent that there's
14    any disagreement, it's not a conduct issue, it's an
15    interpretation of an Ontario contract issue.  That
16    issue should be swept aside.
17              So Justice Newbould, Judge Gross, the
18    CCC has also put forward an alternative allocation
19    position and that is pro rata, and I want to be
20    very clear about how we come at this.
21              All the parties have been invited
22    before the court to put forward their allocation
23    theories.  This is not a case that would typically
24    come to trial with a plaintiff and defendant where
25    there is an onus on one party to prove something or
```



1    on another party to defeat a proposition put before

2    the court.  Basically you have the parties coming

3    forward and affirmatively putting forward various

4    allocation theories.

5              Now, as you know from listening to

6    people describe the outcomes, and I'm going to take

7    you to the outcomes across the board, it is fair to

8    say that there are wide variances in how assets

9    might be given to any of the Estates.  And there

10   are significant variances on the legal theory.

11             If at the end of the day you are not

12   persuaded that any of those theories, ownership,

13   revenue contribution which are the shorthands for

14   those theories, provide an adequate basis for an

15   allocation, there is really only one alternative

16   left, and that is why we put forward as an

17   alternative pro rata.

18             Now, the first point is that we would

19   submit that this is clearly an allocation position.

20   It is, as you suggested this morning, Justice

21   Newbould, a question of language.  The proposition

22   is a simple one.  The court puts forward an order

23   that allocates to each of the estates, taking

24   account of the assets in the estate, the cash or

25   other assets, sufficient proceeds from the lock box



1   so that there could be a pro rata distribution to

2   the recognized claims.

3              Now, that's allocation.  I have

4   described how an amount of money would make its way

5   into each estate from the lock box.  It does not

6   interfere with any court's jurisdiction to decide

7   how it wants to handle the claims.

8              There are a number of reasons, some of

9   which you have heard, why this is fair and

10  equitable.  The 7.5 billion that in the lock box is

11  derived from the sales of the business and the sale

12  of the residual IP, you're going to hear experts on

13  where that value came from, and those experts are

14  going to conflict.

15             I'm talking about an alternative where

16  you have decided that listening to those experts

17  you don't opt for any one of the theories that have

18  been put before the court.  One of the reasons that

19  you may not opt is that you feel that the value

20  attributable to that IP cannot be easily sorted out

21  amongst the claimants.

22             An allocation that yields a pro rata

23  outcome in those circumstances recognizes that

24  management, line employees, research and

25  development, in fact all of the employees of Nortel



 1    essentially collaborated cross-borders to create

 2    the company and the IP.

 3                Until the litigation, and people have

 4    said this expressly in their submissions to you,

 5    there were no freestanding silos within Nortel, and

 6    Justice Morawetz, when he's been dealing with this,

 7    has recognized that the cross-border nature of this

 8    dispute and the difficulties it has raised in

 9    effecting a distribution is a matter of public

10    interest and that public interest, in his

11    description, is international in scope.

12                Pro rata has the virtue of addressing

13    the public interest issue that is raised by that.

14                Now, if you look at the revenue theory

15    that is proposed by the US Debtors, the recoveries

16    on that, in our submission, are disproportionately

17    in favour of the US Debtors.  It leaves the

18    Canadian Estate, for example, about 10 percent.

19                And there are a number of criticisms

20    that can be levelled in that, particularly with

21    respect to R&D.  You're going to hear early in this

22    trial from the chief technology officer Brian

23    McFadden that a disproportionate share of the R&D

24    occurred in Canada.  It was the mothership, so to

25    speak, and somehow that's got to be recognized in a

 Neeson&Associates   W&F

1    manner that the revenue theory does not.

2            If we turn to the contribution theory,

3    the contribution theory purports to be derived from

4    the RPSM, but, as you know, Justice Newbould, they

5    don't actually follow the RPSM and they redesign

6    their own contribution methodology.  It's put to

7    you that the Alcatel sale is a precedent but EMEA

8    doesn't follow the allocation of the Alcatel sale.

9            If any of these theories are adopted,

10   they're going to have an impact on creditors in

11   each of the estates that is detrimental, and I want

12   to address this because in trying to

13   compartmentalize the claims process from the

14   allocation process, I say to you that that is not a

15   fair reading of what the court ordered.

16           The only point to an allocation is to

17   ultimately satisfy claims.  While this is not a

18   trial on those claims, to have regard to what the

19   outcomes will be for the estates in the allocation

20   process is not by any means an inappropriate

21   factor.

22           Now, in the brief that I have filed

23   with you are some charts from Mr. Britven's report

24   and I want to take you to them just to illustrate

25   pro rata against the other theories.



1                    If you go to tab 11, which is entitled
2       "Table 1," you see a table entitled "Percentage
3       Recovery by Each Key Creditor Group Resulting From
4       Each Allocation Report":  CCC, Canadian Debtors and
5       the Monitor, the US interests, the EMEA Debtors and
6       the UK Pension.
7                    Now, what he's done here is to show
8       what the estimated outcomes are after the
9       allocations are done according to the various
10      theories that have been put before you.
11                   Now, it's been argued several times
12      before you that the position put forward by the
13      Monitor and the CCC is unfair because all of the
14      value or nearly all of the value of the residual
15      IP, the Rockstar sale, would reside in the Canadian
16      estate.
17                   But if you look at the outcomes, what
18      the expert describes as a waterfall and you work
19      through how it would work, you see that the
20      guarantee Bondholders would recover about a hundred
21      percent, US creditors at 95 percent under the CCC,
22      a hundred percent under the slightly different
23      methodology of the Monitor, Canadian Creditors
24      about 58 percent, 26 percent to EMEA, 43 to the UK
25      Pension Trust.



1              Now, that's to be contrasted with what

2    will happen under the allocation position put

3    forward by the US Debtors.  Again, the Bondholders

4    and the US creditors recover at a hundred percent;

5    the Canadian Creditors at 10.6 percent; EMEA at 47;

6    UK Pension Trust at 50.

7              You'll see the same disproportion if

8    you go to the EMEA Debtors' approach.  They have,

9    too, the license approach, and in fairness to

10   Mr. Malackowski, Mr. Malackowski will admit that

11   the license approach is not the right approach.

12   But again, if you go down to the recovery for the

13   Canadian creditors, you see under a licensed

14   approach 11.4 percent, while EMEA recovers 76.7, UK

15   Pension Trust at about 80 percent.

16             If you go to the contribution approach,

17   the Canadian Creditors recover about 25 percent and

18   the EMEA creditors at 50, UK Pension Trust at 57.8.

19             So if you then follow over to the pro

20   rata theories, Bazelon under the UK Pension Trust

21   and the CCC under the alternative proposal, you see

22   recoveries across the board at about 71 percent.

23             Now, having listened to people for the

24   better part of two days put forward these

25   conflicting theories with these conflicting



 1   outcomes as a direct consequence of allocation,

 2   it's an opening, I raise it no higher that as

 3   Justice Morawetz says, this raises an international

 4   public issue and there is some merit in looking at

 5   that last column of a pro rata allocation.

 6              Now, at various points parties have

 7   raised objections to how this might be done.  I

 8   would describe them broadly as technical objections

 9   that in almost all other circumstances in

10   bankruptcy courts are solved.

11              Both courts can craft orders that

12   preserve its rights to deal with its creditors

13   under the proposed plans, provide for interim

14   distributions while still aiming to achieve a pro

15   rata outcome.  If any court takes the corpus of

16   what would otherwise be a pro rata outcome, and

17   within the confines of its jurisdiction says that's

18   what I've been allocated but I don't want to

19   distribute it on a pure pro rata basis, I'm going

20   to go through a claims process and allocate it

21   according to claims that are admitted, they're free

22   to do so.

23              But to suggest that it's not an

24   allocation theory because it strives to reach an

25   equitable outcome in the result is just a question



1    of semantics.

2              THE CANADIAN COURT:  Well, you've said

3    that a couple of times now.  If I understand what

4    you've said, Mr. Barrack said the same thing, so

5    let's move along.

6              MR. STEEP:  All right.  With that

7    advice and unless you have some questions, I'll

8    close.

9              THE CANADIAN COURT:  Thank you.

10             THE US COURT:  No questions from this

11   end, Justice Newbould.  Thank you, Mr. Steep.

12             MR. STEEP:  Thank you, Judge Gross.

13             THE CANADIAN COURT:  What is this,

14   speak now or forever hold your peace?

15             THE US COURT:  I think he'll speak now.

16             THE CANADIAN COURT:  Oh, I'm sorry.

17             THE US COURT:  I have someone who is

18   going to speak now, I think.

19    OPENING STATEMENT ON BEHALF OF WILMINGTON TRUST

20                  NATIONAL ASSOCIATION

21             MR. CRICHLOW:  Good afternoon, Justice

22   Newbould.  Good afternoon, Judge Gross.  David

23   Crichlow from Katten Muchin Rosenman, on behalf of

24   Wilmington Trust National Association as one of the

25   indenture trustees with respect to one of the NNL

 Neeson&Associates      W&P

1    notes offerings.

2              Before I begin, I would like to tell

3    you that I will be brief, and this time I can keep

4    that promise because the indenture trustees were

5    only given 15 minutes, so I will hold fast and true

6    to that.  But before I begin my presentation, I

7    would like to introduce some people who are in the

8    courtroom and some people who are up in Canada with

9    Justice Newbould.

10             In the courtroom with me today is

11   Wilmington Trust's Canadian counsel from Dentons,

12   John Salmas, Your Honor; and in the Canadian court

13   with you, Justice Newbould, is Mr. Salmas's

14   partner, Kenneth Kraft from Dentons, and my

15   partner, Karen Dine.

16             I should probably begin by telling you

17   what Wilmington Trust's role is and why we are

18   here.  Wilmington Trust is acting solely in its

19   capacity as the indenture trustee for $200 million

20   in a notes offering issued by NNL in 1988, with

21   notes maturing in 2023.

22             The notes offering is one that is not

23   guaranteed by NNI or any other subsidiary.  So as a

24   result, Judge Gross -- this will be interesting to

25   you -- I represent a client in a constituency that

 Neeson&Associates    W&F

1    is a creditor in the Canadian Estate.  We are an

2    unsecured creditor in the Canadian Estate, and to

3    keep this interesting, as much of this case has

4    been, it is subject to a US indenture with a US

5    Trustee and an indenture governed by New York law.

6             Now, I rise in large part, recognizing

7    the late time of day and that Your Honors have

8    heard quite a bit of information.  So I don't want

9    to belabor that which you have already heard, but I

10   would like the Courts to know that Wilmington Trust

11   joins in the position of the Monitor and

12   Mr. Zarnett's discussion particularly about the

13   MRDA and the IP ownership view.

14             I would respectfully submit that the

15   MRDA is perfectly clear on its face and its terms

16   are unambiguous with respect to the ownership of

17   the IP, what NNL's rights were, the fact that the

18   participants were granted a license, as has been

19   stated, in the agreement itself and well-delivered

20   to the Court by Mr. Zarnett; and that the agreement

21   itself is clear on its terms as to what the

22   participants were entitled, to whether they have

23   received what they were entitled; and to at what

24   point that agreement either applies or does not

25   apply to a sale.



```
 1                  Now, the Court has heard and will hear
 2    quite a bit of information, thousands of pages of
 3    testimonial evidence, documentary evidence from the
 4    US interests, the EMEA, suggesting that the MRDA
 5    says something that it does not, and much of that
 6    is parol evidence.  I don't use that term
 7    disparagingly, but it is going to be for the Courts
 8    to determine whether that parol evidence is
 9    admissible or not.  There is no question it is
10    parol evidence because it is unrelated to the
11    agreement itself and it is outside of the agreement
12    itself, and that is a call for the Court.
13                  What I would respectfully suggest to
14    the Court is that a lot of what you are hearing is
15    a request to effectively rewrite the MRDA based on
16    the 20/20 hindsight that these interests, the US
17    interests, the EMEA interests have in 20/20 to
18    benefit themselves with a better deal than the
19    agreement itself gave them.
20                  Now, fortunately, I think, as
21    Mr. Zarnett described, that the Court can begin and
22    end its analysis on who owns the IP assets,
23    particularly with respect, and perhaps expressly
24    with respect, to the Rockstar sale.  And as
25    Mr. Zarnett said, fortunately, the ownership rights
```



 1    are easy to determine, because the parties put them

 2    in clear writing, and the evidence is going to show

 3    that that agreement is clear, unambiguous, and

 4    governed by Ontario law.

 5              I am also mindful, having said that, of

 6    the fact that the Court has heard a lot in the

 7    parol evidence that it has been delivered, a lot

 8    about equitable and beneficial ownership.

 9    "Effective economic ownership" is another term.

10    Participants being treated as owners is something

11    else we hear.  In earlier agreements participants

12    could be deemed to be owners.

13              And I acknowledge that that could be

14    confusing.  And as a result, in the event that the

15    Court is to disagree or comes to a conclusion that

16    it cannot determine the proper ownership interests

17    in the IP, Wilmington Trust -- this hasn't been

18    talked about a lot, but the Court should be aware,

19    Wilmington Trust also offered an alternative theory

20    and promoted the pro rata theory.  And I just want

21    to take a second to be clear that that was not an

22    11th-hour joinder with the CCC out of expediency or

23    convenience.  In our initial allocation pleading

24    before joining the CCC, we independently came to

25    that conclusion.



1              And I would briefly note that the

2    support for our alternative pro rata theory is the

3    following:

4              I would respectfully submit, Your

5    Honors, that the overwhelming evidence that the

6    Court will receive will reveal that the pro rata

7    approach reflects the true nature of Nortel's

8    business.

9              When we talked about the MOU that was

10   issued in December of 2008, you need go no further

11   than that document and several others where Nortel

12   itself describes its business.  It is an integrated

13   economic unit that was designed in a manner to

14   maximize the value of the Nortel Group as a whole.

15   The MOU itself says, and I am quoting, that it is a

16   "highly integrated and interconnected nature of the

17   worldwide business of the Nortel group of

18   companies" that they are discussing.

19              You will hear evidence, and you have

20   heard in presentations earlier, that in public

21   documents Nortel itself described itself as a

22   matrix organization, saying that they were

23   vertically and horizontally integrated.  Employees

24   were compensated not by the value they gave to

25   their specific legal business entity or line of



1    business, but they were compensated according to

2    the performance of the global enterprise as a

3    whole.

4              You are going to hear evidence that no

5    single R&D location or entity was responsible for

6    all components that made up a Nortel product.  And

7    the US Debtors themselves, as the CCC noted in its

8    opening brief, have acknowledged in pleadings in

9    this case that Nortel is a global, integrated

10    business model.

11              Now, the US interests have made several

12    presentations from just about every represented

13    constituency that suggests pro rata can't be used,

14    Your Honor.  It can't be.  That's what they tell

15    you.  They say it can't be because it finds no

16    support in the law.  And in making the argument,

17    they turn what is being requested into a global

18    substantive consolidation approach, and that's not

19    what is being offered here.

20              I will make an observation that I don't

21    think is too controversial.  This case itself is

22    unprecedented in scope, magnitude, and process.

23    Yet here we are, in a case that is jointly

24    administered by a US Bankruptcy Court, a foreign

25    court of a different jurisdiction with similar



```
 1   bankruptcy rules but different rules of process,
 2   different rules of evidence, different rules of
 3   procedure.
 4                And I would respectfully submit that
 5   the Courts and the parties here made a very
 6   pragmatic and sensible decision to follow this
 7   approach in order to expediently resolve an
 8   allocation dispute that has been going on too long
 9   at the expense of creditors and reach an equitable
10   and just result.
11                My point is you can look at any case
12   law, any treatise, probably here in the United
13   States or in Canada, and you will not find the
14   basis for this process.  As I said, it was a
15   pragmatic and sensible approach.
16                It may very well be that the remedy for
17   allocation here needs to reflect a similar
18   pragmatic sensibility, and a pro rata approach
19   would do just that.  And it would do just that
20   without doing violence at all to the precepts of
21   either the US Bankruptcy Code or what my
22   understanding is of Canadian bankruptcy process.
23   To reach an equitable and fair allocation result,
24   this Court can use its equitable powers to do.
25                Now having said that, and in
```



```
 1    conclusion, I would like to add, so that I am clear

 2    on Wilmington Trust's position, is at the

 3    conclusion of trial, once all of the evidence is in

 4    and it has all been considered by Your Honors,

 5    Wilmington Trust expects to be back before this

 6    Court joining in the argument that the Monitors

 7    made that the Court need not stretch to find such a

 8    pragmatic solution because it must find that NNL

 9    owned the intellectual property as a matter of law

10    and as a result is entitled to all or substantially

11    all of the assets and the proceeds that it received

12    with respect to the sale of the residual IP.

13                 And with that, Your Honors, I would

14    like to thank you for your time and your attention.

15                 THE US COURT:  Thank you, Mr. Crichlow.

16    Good to see you again.

17                 THE CANADIAN COURT:  Thank you,

18    Mr. Crichlow.

19                 I would say, Judge Gross, that silence

20    is golden.

21                 THE US COURT:  Yes.  I think we have

22    one more.

23                 MR. LOWENTHAL:  I think I am going to

24    break that silence, but just for a few minutes,

25    Your Honor.
```



1                    THE US COURT:  Mr. Lowenthal, good

2    afternoon.

3                    MR. LOWENTHAL:  Good afternoon, Your

4    Honor, Judge Gross and Justice Newbould.  Dan

5    Lowenthal from Patterson Belknap Webb & Tyler in

6    New York.  We represent Law Debenture Trust Company

7    of New York.  We are a core party.  And in court

8    today with me is our counsel from Delaware, Steve

9    Miller from the Morris, James firm, and up in the

10   Canadian courtroom is Edmond Lamek of the Borden

11   Ladner firm.

12                   Mr. Qureshi for the Creditors'

13   Committee earlier today mentioned in the Canadian

14   court in his opening that the US Creditors'

15   Committee has three members:  two indenture

16   trustees and the PBGC.  Law Debenture is one of

17   those indenture trustees, and Law Debenture, along

18   with the Bank of New York and the PBGC, have been

19   involved in this case from day one from the very

20   outset.  And that is significant because all of the

21   US creditors, the Bondholders, the pensioners, the

22   unsecured creditors all in the US from day one have

23   been working together towards a common goal, and

24   that says a lot, and towards a common result in

25   this case.

 Neeson&Associates   W&F

```
 1                   Now, as Mr. Crichlow said, the

 2      indenture trustees have all been allotted 15

 3      minutes for their openings, but I won't take all of

 4      that time.  We have submitted a succinct pretrial

 5      brief that sets forth our views on the allocation

 6      theories that are before your court.  And we will

 7      stand on that paper, because we think it is right

 8      to the point and consistent with the positions set

 9      forth of the US Debtors, the Creditors' Committee,

10      and the Bondholders.  And counsel for the US

11      Debtors, along with Mr. Qureshi, Mr. Leblanc today,

12      have detailed why, why at the end of this trial we

13      will all demonstrate that the correct method of

14      valuation is fair market value, fair market

15      valuation.

16                   So therefore, I won't speak anymore to

17      the merits right now.  We have heard a lot

18      yesterday and today.  We look forward to hearing

19      and seeing the evidence that will be submitted in

20      the days and weeks ahead.  But we also did want to

21      introduce ourselves and our clients to the Courts,

22      particularly to Justice Newbould, who we have not

23      appeared before before, and so therefore you will

24      know us if and when we question witnesses during

25      the course of the trial.
```



```
1                    So thank you.
2                    THE US COURT:  Thank you,
3    Mr. Lowenthal.
4                    THE CANADIAN COURT:  Thank you,
5    Mr. Lowenthal.
6                    MR. RIELA:  Good afternoon, Judge
7    Gross, Justice Newbould.  My name is Michael Riela,
8    from Vedder Price.  I represent the Bank of New
9    York as an indenture trustee.  We are the trustee
10   for about $4 billion of bonds that were issued by
11   Nortel entities in Canada and guaranteed by NNI in
12   the United States.  We are also one of the members
13   of the three-member Unsecured Creditors' Committee.
14   And as the indenture trustee, we are the trustee,
15   the voice for all of the Bondholders, those who are
16   part of a group who are otherwise represented here
17   and those who are not represented here.
18                    I only rise, just like Mr. Lowenthal
19   did, to introduce myself, introduce also my
20   colleague, Michael Edelman from Vedder Price.  My
21   Canadian co-counsel, Cheryl Segal, is not in Court
22   in Toronto today, but she will be appearing as
23   necessary.  We are trying to conserve some
24   resources, perhaps a drop in the bucket.
25                    But as we mentioned in the joinder that
```



```
 1   we filed --
 2              THE CANADIAN COURT:  That's a
 3   refreshing attitude.
 4              MR. RIELA:  As we mentioned in our
 5   joinder, Bank of New York joins in the submissions
 6   of the US Debtors, the US interests, and the ad hoc
 7   Bondholders for all of the reasons that were
 8   mentioned in the pretrial briefs.  And we also join
 9   in the opening submissions over the last two days
10   from the US Debtors, the Unsecured Creditors'
11   Committee, and ad hoc Bondholders.
12              We also believe that the fair market
13   value approach is the only approach that has been
14   mentioned here today that has support in both the
15   facts and the applicable law.
16              And again, I just wanted to introduce
17   myself and my colleagues.
18              THE US COURT:  Thank you, Mr. Riela.
19              MR. RIELA:  Thank you.
20              THE US COURT:  Good to see you.  Good
21   to see you.
22              THE CANADIAN COURT:  Thank you,
23   Mr. Riela.
24              THE US COURT:  Turn out the lights.
25              THE CANADIAN COURT:  Thank you,
```

 Neeson & Associates    W&P

```
 1   counsel.  I guess we start tomorrow morning at --

 2   now, the batting order -- I was told there may be a

 3   change in the order of Canadian witnesses.  Am I

 4   right?

 5             MR. ZIGLER:  Your Honor, if I may

 6   assist you there, because we will be leading,

 7   Mr. Currie will go first.

 8             THE CANADIAN COURT:  Mr. Currie, yes.

 9             MR. ZIGLER:  There's no change there.

10   It is Mark Zigler.  Judge Gross, good afternoon.

11             THE US COURT:  Good afternoon.

12             MR. ZIGLER:  I thought you had heard

13   enough of lawyers for the last two days, so I will

14   be brief.

15             But the order is to have Mr. Currie go

16   first.  The intention is Mr. Allen goes second.

17   There may be an issue with Mr. Allen.  It is a

18   health issue pertaining to his wife, but he may

19   be -- he is intending to come.  After that I

20   believe it is Mr. McFadden and Ms. DeWilton.  So

21   those are the first four that we have on the

22   batting order, and we will update you further after

23   that.

24             Certainly with respect to the first

25   three, we have no issues with respect to
```


Neeson&Associates    W&P
WILSON & PETERS LTD.

```
 1    confidentiality or anything being redacted, so you
 2    will be pleased to know about that.  And I think
 3    their affidavits have been filed with the exhibits
 4    unredacted with both Courts, and we will have
 5    copies for everyone tomorrow.  But I think those
 6    affidavits were served on all the parties a long
 7    time ago.
 8              THE CANADIAN COURT:  Is it possible
 9    that all four will be in and out tomorrow?
10              MR. ZIGLER:  I don't know.
11              THE CANADIAN COURT:  I understand that.
12              MR. ZIGLER:  I can't control my
13    friends' cross-examinations or the length of time
14    on their chess clocks that they wish to use.
15    Certainly in leading the witnesses, the intent was
16    that we would put forth affidavits so that we would
17    not spend a lot of time.  I think the maximum we
18    have with any witness is 30 minutes, and I can
19    assure you we will not be using those 30 minutes.
20              THE CANADIAN COURT:  Thank you,
21    Mr. Zigler.
22              MR. ZIGLER:  Thank you, Judge Gross.
23    Thank you, Your Honor.
24              THE US COURT:  Thank you.
25              THE CANADIAN COURT:  Very well.  Then I
```



1   guess we will adjourn now until 9:00 tomorrow

2   morning.

3              THE US COURT:  All right.  Good

4   evening, all.  Enjoy your evening.

5    -- Whereupon court adjourned at 4:09 p.m

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    REPORTERS' CERTIFICATE

 2

 3             I, KIMBERLEY A. NEESON, RPR, CRR, CSR,

 4   CCP, CBC, Canadian Certified Shorthand Reporter,

 5   Realtime Systems Administrator, and I, LORRAINE B.

 6   MARINO, RDR, CRR, US Certified Shorthand Reporter,

 7   certify;

 8             That the foregoing proceedings were taken

 9   before us at the time and place therein set forth;

10             That the entire proceedings of the

11   hearing date were recorded stenographically

12   individually by each of us and were thereafter

13   transcribed;

14             That the foregoing is a true and correct

15   transcript of our shorthand notes so taken.

16

17        Dated this 13th day of May, 2014.

18   PER:                 PER:

19   Lorraine B. Marino    Kimberley Neeson

20   LORRAINE B. MARINO    KIMBERLEY NEESON

21   WILCOX & FETZER       NEESON & ASSOCIATES

22   WILMINGTON, DE USA    TORONTO, ON  CANADA

23

24

25
```





































































