



```
 1              UNITED STATES BANKRUPTCY COURT

 2                FOR THE DISTRICT OF DELAWARE

 3      ------------------------)

 4      In Re                   )

 5        NORTEL NETWORKS INC., )  Chapter 11

 6        et al,                )  Case No.

 7            Debtors.          )  09-10138(KG)

 8      ------------------------)

 9                          - and-

10                          Court File No. 09-CL7950

11                          ONTARIO

12             SUPERIOR COURT OF JUSTICE

13                  (COMMERCIAL LIST)

14        IN THE MATTER OF THE COMPANIES' CREDITORS

15     ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17      ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18     NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19       CORPORATION, NORTEL NETWORKS INTERNATIONAL

20       CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                      CORPORATION

22        APPLICATION UNDER PART IV OF THE COMPANIES'

23     CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                      AS AMENDED

25                      --------
```



```
 1                          --------

 2

 3   --- This is the Day 3/Volume 3 of the transcript of

 4   proceedings in the above matter held simultaneously

 5   in:

 6   Superior Court of         United States Bankruptcy

 7   Ontario (Commercial       Court for the District of

 8   List)                     Delaware

 9   Courtroom 8-1             Courtroom 3

10   330 University Avenue     824 Market Street

11   Toronto, Ontario          Wilmington, Delaware

12

13   on the 14th day of May, 2014, commencing at 9:11 a.m.

14

15                          --------

16   B E F O R E:

17   The Honourable Judge Kevin Gross (United States)

18   The Honourable Mr. Justice Frank Newbould (Canada)

19

20                          --------

21

22

23

24

25
```



```
 1   A P P E A R A N C E S:

 2   CANADIAN DEBTORS

 3

 4   FOR THE MONITOR, ERNST & YOUNG INC.

 5   GOODMANS LLP

 6   Bay Adelaide Centre

 7   333 Bay Street, Suite 3400

 8   Toronto, ON  M5H 2S7

 9   PER:  Ben Zarnett, Esq.

10         Alan Mark, Esq.

11         Peter Ruby, Esq.

12         Jessica Kimmel, Esq.

13         Graham Smith, Esq.

14

15   FOR THE APPLICANTS

16   GOWLING LAFLEUR HENDERSON LLP

17   Suite 1600, First Canadian Place

18   100 King Street West

19   Toronto, ON  M5X 1G5

20   PER:  Jennifer Stam, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   ALLEN & OVERY LLP

24   1221 Avenue of the Americas

25   New York, NY  10020
```



```
 1    PER:  Ken Coleman, Esq.

 2          Paul Keller, Esq.

 3          Jacob Pultman, Esq.

 4          Laura Hall, Esq.

 5

 6    FOR THE CANADIAN DEBTORS

 7    BUCHANAN INGERSOLL & ROONEY

 8    1105 North Market Street

 9    Suite 1900

10    Wilmington, DE  19801 1054

11    PER:  Kathleen A. Murphy, Esq.

12          Mary F. Caloway, Esq.

13

14    U.S. DEBTORS

15

16    FOR NORTEL NETWORKS INC.

17    TORYS LLP

18    79 Wellington Street West, Suite 3000

19    Box 270, TD Centre

20    Toronto, ON  M5K 1N2

21    PER:  Sheila Block, Esq.

22          Scott Bomhof, Esq.

23          Molly Reynolds, Esq.

24          Andrew Gray, Esq.

25          Adam Slavens, Esq.
```

 Neeson&Associates   W&F

```
 1   FOR THE U.S. DEBTORS

 2

 3   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 4   1201 North Market Street, 16th Floor

 5   P.O. Box 1347

 6   Wilmington, DE  19899 1347

 7   PER: Derek Abbott, Esq.

 8        Annie Cordo, Esq.

 9        Tammy Minott, Esq.

10        Eric Schwartz, Esq.

11

12   FOR NORTEL NETWORKS INC.

13   CLEARY GOTTLIEB STEEN & HAMILTON LLP

14   One Liberty Plaza

15   New York, NY  10006

16   PER:  James Bromley, Esq.

17        Lisa Schweitzer, Esq.

18        Howard Zelbo, Esq.

19        Jeffrey Rosenthal, Esq.

20        Avi Luft, Esq.

21        Inna Rozenberg, Esq.

22        Jacqueline Moessner, Esq.

23        Marla Decker, Esq.

24        Matt Gurgel, Esq.

25        Darryl Stein, Esq.
```



```
 1          Temidayo Aganga Williams, Esq.

 2          Kyle Dandelet, Esq.

 3          Marion deMesion, Esq.

 4          Mark Grube, Esq.

 5          David Herrington, Esq.

 6          Shira Kaufman, Esq.

 7          Alix McCown, Esq.

 8          Ann Nee, Esq.

 9          Adam Olin, Esq.

10          Jeremy Opolsky, Esq.

11          Michelle Parthum, Esq.

12          Daniel Queen, Esq.

13          Ben Shartsis, Esq.

14          Jesse Sherrett, Esq.

15          Ashley Siegel, Esq.

16          Brent Tunis, Esq.

17

18     EMEA DEBTORS

19

20     FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

21     LIMITED

22     DAVIES WARD PHILLIPS & VINEBERG LLP

23     40th Floor

24     155 Wellington Street

25     Toronto, ON  M5V 3G7
```



```
 1   PER:  Robin B. Schwill, Esq.

 2         Sean Campbell, Esq.

 3         James Doris, Esq.

 4         Luis Sarabia, Esq.

 5         Matthew Milne Smith, Esq.

 6         Natasha MacParland, Esq.

 7         George Pollack, Esq.

 8         Cara Cameron, Esq.

 9         Andrew Carlson, Esq.

10         Maureen Littlejohn, Esq.

11         Bryan McLeese, Esq.

12

13   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

14   LIMITED

15   LAX O'SULLIVAN SCOTT LISUS LLP

16   Suite 2750, 145 King Street West

17   Toronto, ON  M5H 1J8

18   PER:  Matthew P. Gottlieb, Esq.

19         Tracy Wynne, Esq.

20         Paul Michell, Esq.

21         Arden Beddoes, Esq.

22         James Renihan, Esq.

23

24

25
```



1

2    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

3    LIMITED

4    HUGHES HUBBARD & REED

5    One Battery Park Plaza

6    New York, NY  10004 1482

7    PER:  Derek Adler, Esq.

8          Neil Oxford, Esq.

9          Fara Tabatabai, Esq.

10         Charles Huberty, Esq.

11         William Maguire, Esq.

12         Amina Hassan, Esq.

13         Gabrielle Glemann, Esq.

14         Caroline Parker Beaudrias, Esq.

15         Miles Orton, Esq.

16         Karen Goldberg, Esq.

17         Lena Saltos, Esq.

18         Mei Li Zhen, Esq.

19         Matthew Reynolds, Esq.

20         Ken Katz, Esq.

21         Greta Fails, Esq.

22         Quan Trinh, Esq.

23

24

25

 Neeson & Associates    W&P

```
 1   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 2   LIMITED

 3   YOUNG CONAWAY STARGATT & TAYLOR LLP

 4   Rodney Square

 5   1000 North King Street

 6   Wilmington, DE  19801

 7   PER:  Ed Harron, Esq.

 8         John Dorsey, Esq.

 9         Jaime Chapman, Esq.

10

11   FOR THE EMEA DEBTORS

12   HERBERT SMITH FREEHILLS LLP

13   Exchange House

14   Primrose Street

15   London, England  EC2A 2EG

16   PER:  James Norris Jones, Esq.

17         John Whiteoak, Esq.

18         Gary Milner Moore, Esq.

19         Kevin Pullen, Esq.

20         Catherine Emanuel, Esq.

21         Richard Mendoza, Esq.

22         David Russell, Esq.

23         Andrew Cooke, Esq.

24         Oliver Elgie, Esq.

25         Tom Henderson, Esq.
```



```
 1          Frances Furnivall, Esq.

 2          Liam Spender, Esq.

 3          Philip Lis, Esq.

 4          Kristofer McGhee, Esq.

 5          Thomas Turner, Esq.

 6

 7   FOR THE EMEA DEBTORS

 8   DEBEVOISE & PLIMPTON LLP

 9   65 Gresham Street

10   London, England

11   ECZV 7NQ

12   PER:  Kevin Lloyd, Esq.

13

14   CANADIAN CREDITORS COMMITTEE

15

16   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

17   BENEFICIARIES

18   KOSKIE MINSKY

19   20 Queen Street West

20   Suite 900

21   Toronto, ON  M5H 3R3

22   PER:  Mark Zigler, Esq.

23          Jeff Van Bakel, Esq.

24          Ari Kaplan, Esq.

25          Barbara Walancik, Esq.
```

 Neeson & Associates · W&F Wilcox & Fetzer Ltd.

```
 1
 2   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
 3   COMMITTEE
 4   SHIBLEY RIGHTON LLP
 5   250 University Avenue, Suite 700
 6   Toronto, ON  M5H 3E5
 7   PER:  Arthur O. Jacques, Esq.
 8
 9   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS
10   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE
11   FUND
12   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP
13   35th Floor
14   155 Wellington Street West
15   Toronto, ON  M5V 3H1
16   PER:  Kenneth T. Rosenberg, Esq.
17         Massimo (Max) Starnino, Esq.
18         Lily Harmer, Esq.
19         Karen Jones, Esq.
20         Michelle Jackson, Esq.
21         Megan Shortreed, Esq.
22
23
24
25
```



```
 1   FOR MORNEAU SHEPELL LIMITED

 2   MCCARTHY TETRAULT LLP

 3   Suite 5300, Toronto Dominion Bank Tower

 4   Toronto, ON  M5K 1E6

 5   PER:  Ronald Podolny, Esq.

 6         Sharon Kour, Esq.

 7         Elder C. Marques, Esq.

 8         Paul Steep, Esq.

 9         Byron Shaw, Esq.

10         Keith Rose, Esq.

11

12   FOR THE CANADIAN CREDITORS COMMITTEE

13   DLA PIPER

14   919 North Market Street, Suite 1500

15   Wilmington, DE  19801

16   PER:  Jason Gerstein, Esq.

17         Richard Hans, Esq.

18         Timothy Hoeffner, Esq.

19         Farah Lisa Whitley Sebti, Esq.

20         Selinda Melnik, Esq.

21         Sarah Tumey, Esq.

22

23

24

25
```

 Neeson & Associates    W&P WILCOX & FETZER LTD.

```
 1   FOR THE CANADIAN CREDITORS COMMITTEE

 2   UNIFOR

 3   205 Placer Court

 4   North York, ON, M2H 3H9

 5   PER:  Barry Wadsworth, Esq.

 6

 7   INFORMAL NORTEL NOTEHOLDER GROUP

 8

 9   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

10   BENNETT JONES LLP

11   1 First Canadian Place

12   Suite 3400

13   Toronto, ON  M5X 1A4

14   PER:  Kevin Zych, Esq.

15        S. Richard Orzy, Esq.

16        Gavin Finlayson, Esq.

17        Richard Swan, Esq.

18        Jonathan Bell, Esq.

19        Amanda McLachlan, Esq.

20

21   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

22   MILBANK, TWEED, HADLEY, MCCLOY LLP

23   1 Chase Manhattan Plaza

24   New York, NY  10005

25   PER:  Thomas R. Kreller, Esq.
```



```
 1          Dennis F. Dunne, Esq.

 2          Albert A. Pisa, Esq.

 3          Samir Vora, Esq.

 4          Andrew M. LeBlanc, Esq.

 5          Eric I. Weiss, Esq.

 6          Atara Miller, Esq.

 7          Tom Matz, Esq.

 8          Nicholas A. Bassett, Esq.

 9          Alexis Chernak, Esq.

10          Claudia G. Cohen, Esq.

11

12   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

13   PACHILSKI STANG ZIEHL & JONES LLP

14   919 North Market Street

15   17th Floor

16   Wilmington, DE, 19801

17   PER:  Laura Davis Jones, Esq.

18          Peter J. Keane, Esq.

19

20

21

22

23

24

25
```

Neeson&Associates   W&F

```
 1   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2

 3   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 4   CASSELS BROCK & BLACKWELL LLP

 5   Suite 2100, Scotia Plaza

 6   40 King Street West

 7   Toronto, ON  M5H 3C2

 8   PER:  Shayne Kukulowicz, Esq.

 9        Michael Wunder, Esq.

10        Ryan Jacobs, Esq.

11        Geoff Shaw, Esq.

12        Stefanie Holland, Esq.

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   RICHARDS LAYTON & FINGER, P.A.

15   920 North King Street

16   Wilmington, DE  19801

17   PER:  Christopher Samis, Esq.

18        Amanda Steele, Esq.

19

20   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

21   AKIN GUMP STRAUSS HAUER & FELD LLP

22   One Bryant Park

23   New York, NY  10036

24   PER:  Fred S. Hodara, Esq.

25        David H. Botter, Esq.
```



```
 1          Abid Qureshi, Esq.

 2          Robert A. Johnson, Esq.

 3          Brad M. Kahn, Esq.

 4          Christine Doniak, Esq.

 5          Joseph Sorkin, Esq.

 6          Jacqueline Yecies, Esq.

 7

 8     UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 9     UK PENSION TRUST LIMITED

10     FOR THE UK PENSION PROTECTION FUND AND NORTEL

11     NETWORKS UK PENSION TRUST LIMITED

12     THORNTON GROUT FINNIGAN LLP

13     Suite 3200, 100 Wellington Street West

14     P.O. Box 329

15     Toronto, ON  M5K 1K7

16     PER:  Michael E. Barrack, Esq.

17          D.J. Miller, Esq.

18          Rebecca Kennedy, Esq.

19          Andrea McEwan, Esq.

20          John L. Finnigan, Esq.

21          Michael Shakra, Esq.

22          Kim Ferreira, Esq.

23

24

25
```



```
 1   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 2   NETWORKS UK PENSION TRUST LIMITED

 3   WILLKIE FARR & GALLAGHER LLP

 4   787 Seventh Avenue

 5   New York, NY  10019 6099

 6   PER:  Brian O'Connor, Esq.

 7        Sameer Advani, Esq.

 8        Andrew Hanrahan, Esq.

 9        Eugene Chang, Esq.

10        Heather Schneider, Esq.

11        Robert Kofsky, Esq.

12        Nicholas Chiuchiolo, Esq.

13        Elizabeth Roache, Esq.

14        Nicole Humphrey, Esq.

15        Peter Sluka, Esq.

16        Weston Eguchi, Esq.

17        Ashley Moore, Esq.

18        Megan Fantoni, Esq.

19

20   FOR THE UK PENSION PROTECTION FUND AND NORTEL

21   NETWORKS UK PENSION TRUST LIMITED

22   BAYARD, P.A.

23   222 Delaware Avenue, Suite 900

24   Wilmington, DE  19899

25   PER: Charlene D. Davis, Esq.
```



```
 1          Justin R. Alberto, Esq.

 2          Evan T. Miller, Esq.

 3

 4    FOR THE UK PENSION CLAIMANTS

 5    HOGAN LOVELLS INTERNATIONAL LLP

 6    Atlantic House, Holbrow Viaduct

 7    London, England, EC1A 2FG

 8    PER:  Angela Dimsdale Gill, Esq.

 9          John Tillman, Esq.

10          Crispin Rapinet, Esq.

11          Matthew Bullen, Esq.

12          Chris Edwards Earl, Esq.

13

14    FOR THE UK PENSION CLAIMANTS

15    WILBERFORCE CHAMBERS LLP

16    8 New Square, Lincolns Inn

17    London, England, WCZA 3QP

18    PER:  Michael Tennet, Esq.

19

20

21

22

23

24

25
```



```
 1   THE BANK OF NEW YORK MELLON

 2

 3   FOR THE BANK OF NEW YORK MELLON

 4   VEDDER PRICE LLP

 5   919 North Market Street

 6   17th Floor

 7   Wilmington, DE, 19801

 8   PER:  Michael Riela, Esq.

 9        Michel Edelman, Esq.

10

11   WILMINGTON TRUST, NATIONAL ASSOCIATION

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022 2585

17   PER:  Bertrand J. Choe, Esq.

18        David A. Crichlow, Esq.

19        Karen B. Dine, Esq.

20

21   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

22   DENTONS CANADA LLP

23   77 King Street West

24   Suite 400

25   Toronto, ON, M5K O41
```



```
 1   PER:  Kenneth Kraft, Esq.

 2         John Salmas, Esq.

 3         Matthew Fleming, Esq.

 4         Robert Kennedy, Esq.

 5

 6   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 7   COUSINS CHIPMAN & BROWN LLP

 8   1007 North Orange Street

 9   Suite 1110

10   Wilmington, DE, 19801

11   PER:  Scott D. Cousins, Esq.

12         Ann Kashishian, Esq.

13

14   LAW DEBENTURE TRUST COMPANY OF NEW YORK

15   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

16   BORDEN LADNER GERVAIS LLP

17   40 King Street West

18   Toronto, ON  M5H 3Y4

19   PER:  Edmond F.B. Lamek, Esq.

20

21   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

22   PATTERSON BELKNAP WEBB & TYLER LLP

23   1133 Avenue of the Americas

24   New York, NY  10036

25   PER:  Daniel A. Lowenthal, Esq.
```

```
 1        Brian P. Guiney, Esq.

 2        Craig W. Dent, Esq.

 3

 4   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 5   MORRIS JAMES, LLP

 6   500 Delaware Avenue

 7   Suite 1500

 8   Wilmington, DE

 9   19801 1494

10   PER:  Stephen M. Miller, Esq.

11

12   BOARDS OF DIRECTORS OF NORTEL NETWORKS

13   CORPORATION AND NORTEL NETWORKS LIMITED

14

15   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

16   CORPORATION AND NORTEL NETWORKS LIMITED

17   OSLER HOSKIN AND HARCOURT LLP

18   100 King Street West

19   1 First Canadian Place, Suite 6100

20   P.O. Box 50

21   Toronto, ON  M5X 1B8

22   PER:  Lyndon Barnes, Esq.

23        Carey O'Connor, Esq.

24        Betsy Putnam, Esq.

25        Adam Hirsh, Esq.
```



1    Alexander Cobb, Esq.

2

3

4

5

6   REPORTED BY:  Toronto - Kimberley Neeson

7              RPR, CRR, CSR, CBC

8       Realtime Systems Administrator

9       Toronto - Terry Wood, CSR, RPR

10        Delaware - Gail Verbano, RDR, CRR, CSR

11       Realtime Systems Administrator

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    I N D E X

2                                                              Page

3    PETER CURRIE

4          Examination In-chief/Direct Examination by     534

5          Mr. Zigler

6          Cross-Examination by Mr. Rosenthal             543

7          Cross-Examination by Mr. Gottlieb              562

8          Cross-Examination by Mr. Finnigan              590

9          Re-Cross-Examination by Mr. Rosenthal          601

10   CLIVE ALLEN

11         Examination In-chief/Direct Examination by     603

12         Mr. Zigler

13         Cross-Examination by Mr. Zelbo                 607

14         Cross-Examination by Mr. Barrack               630

15   BRIAN MCFADDEN

16         Examination In-chief/Direct Examination by     633

17         Mr. Steep

18         Cross-Examination by Ms. Schweitzer            640

19         Cross-Examination by Mr. Milne-Smith           659

20   ANGELA DEWILTON

21         Examination In-chief/Direct Examination by

22         Mr. Steep                                      732

23         Cross-examination By Ms. Schweitzer            735

24         Cross-examination By Mr. Maguire               757

25         Cross-examination By Mr. Chang                 765



```
 1                    INDEX OF EXHIBITS
 2   EXHIBIT/DESCRIPTION                         Page
 3      1  Affidavit of Peter William Currie, sworn  533
 4      on April 11, 2014.
 5      2  Clive Allen's affidavit sworn April 11,   602
 6      2014.
 7      3  Clive Allen's reply affidavit dated April 602
 8      23, 2014.
 9      4  Affidavit of Brian McFadden sworn April   633
10      10, 2014.
11      5  Reply affidavit of Brian McFadden dated   633
12      April 25, 2014.
13      6  Affidavit of Angela DeWilton dated        732
14      April 11, 2014.
15
16
17
18
19
20
21
22
23
24
25
```



```
 1   --- Upon commencing at 9:11 a.m.

 2              THE CANADIAN COURT:  Good morning,

 3   counsel.  Good morning, Judge Gross.

 4              THE US COURT:  Good morning, Justice

 5   Newbould.  I've had my Saskatoon berries and I'm

 6   ready to go.

 7              THE CANADIAN COURT:  Mr. Zigler.

 8              MR. ZIGLER:  Good morning, Your Honour.

 9   Good morning, Justice Gross.

10              THE US COURT:  Good morning.

11              MR. ZIGLER:  Mark Zigler here in

12   Toronto.  We are ready to proceed with our first

13   witness.  I would like to call up Peter Currie.

14

15              Peter William Currie,

16         having been first duly sworn was

17          examined and testified as follows:

18

19              THE US COURT:  If I may just interrupt.

20   We are not seeing the witness.  Oh, there is

21   Mr. Currie.  Yes.  Good morning, Mr. Currie.

22              THE WITNESS:  Good morning.

23              MR. ZIGLER:  Your Honour, and Judge

24   Gross, we did have a brief direction as to how

25   exhibits and affidavits are to go in.  So, before
```

```
 1   we start, I just wanted to confirm that the witness
 2   does have a hard copy of the affidavit in front of
 3   him, and that both Courts have been provided with
 4   one hard copy for the Court and one for the court
 5   reporter.
 6              I think that is the protocol that we
 7   will be following.
 8              THE CANADIAN COURT:  What are you doing
 9   with the exhibits to the affidavit?
10              MR. ZIGLER:  Your Honour, certainly for
11   the first ones in first few days the exhibits are
12   attached to the affidavit because they are part of
13   the affidavit, but they are also part of the trial
14   record.  I'm in your hands and in Judge Gross'
15   hands as to whether we need to mark those things
16   separately.
17              THE CANADIAN COURT:  What I thought
18   was -- what we discussed yesterday, was that for
19   the registrar's purpose there would be a hard copy
20   affidavit, with hard copy exhibits attached to it,
21   which would be filed, and each affidavit will be
22   marked an exhibit.  The exhibits attached need not
23   be marked as an exhibit.
24              MR. ZIGLER:  That's correct.
25              THE CANADIAN COURT:  And after we get
```



1   going -- so that will happen.

2                   MR. ZIGLER:  Yes.

3                   THE CANADIAN COURT:  And Judge Gross

4   and I are quite willing to look at all of the

5   exhibits electronically, if need be.

6                   MR. ZIGLER:  Right.

7                   For purposes of the witness, Your

8   Honour, he has got everything in front of him in

9   case there are any questions.  That's the

10  understanding.

11                  THE CANADIAN COURT:  I understand.

12                  MR. ZIGLER:  So, just to make sure,

13  everyone has the paper and everybody has the

14  electronic copy and all counsel are responsible for

15  their own copies.

16                  I want to make sure, Your Honour, and

17  Judge Gross, that you each have the hard copy that

18  be will will be entered as an exhibit, as does the

19  reporter, and that, Mr. Currie, you have a copy in

20  front of you.

21                  THE WITNESS:  I do.

22                  THE CANADIAN COURT:  We will mark

23  Mr. Currie's affidavit as Exhibit 1.

24                  THE CANADIAN REGISTRAR:  Exhibit No. 1.

25                      EXHIBIT NO. 1:  Affidavit of Peter



```
 1                    William Currie, sworn on April 11,

 2            2014.

 3  EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY MR. ZIGLER:

 4            Q.    Mr. Currie, you have your

 5  affidavit before you?

 6            A.    I do.

 7            Q.    Can you please indicate to me, if

 8  you go to page 43, whether that is your signature

 9  or a copy of it?

10            A.    It's a copy of it, yes.

11            Q.    Is this your affidavit that you

12  swore on April 11th?

13            A.    It is.

14            Q.    Have you reviewed it before coming

15  in today?

16            A.    I did.

17            Q.    And are there any changes or other

18  modifications to it that you wish to make at this

19  time?

20            A.    Not at this time.

21            Q.    Okay.  Mr. Currie, if I ask you to

22  turn to your affidavit and your history with your

23  career at Nortel starting at paragraph 6, which you

24  cover through to paragraph 11, can you please for

25  the benefit of the Court, advise us of different
```

 Neeson & Associates   W&F Wilson & Peyton Ltd.

```
 1   stints you had at Nortel through your career, when
 2   you came and when you left, and when you came back?
 3              A.   Sure.  Certainly.
 4              Well, I joined Nortel originally in
 5   1979, as indicated in the affidavit, between the
 6   period of 1979 and 1992.  I held a series of
 7   financial management positions of increasing
 8   responsibility at Nortel in the Canadian operations
 9   and the American operations, and in the parent
10   company at that time.
11              In 1992, I left Nortel to become the
12   Executive Vice-President and Chief Financial
13   Officer of North American Life Assurance Company.
14              I was recruited back into Nortel in
15   1994 by the then Chief Executive, Jean Monty, as
16   the Senior Vice-President and Chief Financial
17   Officer of the global corporation.
18              I rejoined in 1994 and spent the
19   following three years deporting my -- my
20   responsibilities as CFO of the company, based in
21   Toronto but with responsibilities worldwide.
22              In 1997 I was recruited from Nortel to
23   the Royal Bank of Canada as Executive
24   Vice-President and Chief Financial Officer, and,
25   soon thereafter, Vice-Chairman of RBC.  I stayed at
```



 1   RBC for about seven-and-a-half years, with various

 2   duties within that organization including finance,

 3   taxation, strategy management and so forth.  I left

 4   RBC in 2004, and soon after I left RBC I was

 5   approached by a representative of the Board of

 6   Directors of Nortel at the time, to inquire if I

 7   would come back to Nortel to lend a hand with the

 8   challenges the company was then facing.  I agreed,

 9   after discussions with those representatives and,

10   subsequently, the Board of Directors, to do that

11   and rejoined in February of 2005.

12                I stayed with Nortel for the following

13   two years, and ultimately left in April of 2007 and

14   I then proceeded to the next phase of my life which

15   was to be semi-retired and work on various

16   corporate and not-for-profit Boards of Directors.

17                Q.   Why you did you leave in 2007?

18                A.   When I joined for my third stint

19   at the company in 2005 it was with four primary

20   objectives in mind.  The objectives were to help

21   the company resolve various issues surrounding its

22   relationships with its securities regulators that

23   had resulted in free trade orders being placed on

24   the company, to solve or help solve the class

25   action litigations facing the company at that time,

 Neeson & Associates     W&P WILSON & PETERS LTD.

1    to work to resolve internal control and governance

2    issues that had resulted in five material

3    weaknesses being observed within the company and

4    which had precluded the issuance of financial

5    results for the proceeding two years, publicly,

6    and, finally, to work with the finance organization

7    to improve its operation and its information

8    systems capability to enhance the ability of the

9    company to utilize financial information within the

10   company.

11          So those four objectives were largely

12   achieved.  By the time the spring of 2007 rolled

13   around, I thought that the company was well on its

14   way to recovery, and so, therefore, decided to move

15   on to the next phase of my life.

16          Q.   For the benefit of both Courts,

17   Mr. Currie, do you have a claim against the Nortel

18   Networks limited estate?

19          A.   I do.  I have a severance -- an

20   unpaid severance claim with the courts right now.

21          Q.   Now, if I can ask you to turn

22   briefly to paragraph 22 of your affidavit.  We may

23   put some of these up on the screen so that people

24   can see them better.

25          It starts with the heading, "Nortel was



 1   a Matrix Organization," and then there are several

 2   paragraphs about that.

 3              In a nutshell, can you tell us what a

 4   matrix organization at Nortel was?

 5              A.   The way it was construed at

 6   Nortel, the matrix was, I would say, three

 7   dimensional.  One dimension was the lines of

 8   business where the product lines and the

 9   conventional product line management concept were

10   configured.

11              The second axis of the matrix was

12   geographic regions, so each of the product lines

13   sold into various regions within the organization

14   geographically, and the third element of the matrix

15   were the financial -- the infrastructural support

16   organizations:  Legal, tax, finance, and so forth,

17   human resources, information technology -- that

18   serviced all the various regions and lines of

19   businesses.

20              So the regions were responsible for

21   selling and marketing product, the lines of

22   businesses were responsible for developing product,

23   having it manufactured, servicing it after the

24   fact, and the support organizations were

25   responsible to supporting all the organizations



```
 1   whether regions or lines of business, regardless of
 2   where they were located in the world.
 3                THE CANADIAN COURT:  Mr. Zigler, I have
 4   read the affidavit and I'm sure Judge Gross has
 5   too.
 6                MR. ZIGLER:  We will be very brief.
 7                BY MR. ZIGLER:
 8                Q.   Within that matrix, Mr. Currie,
 9   where did the subsidiaries fit?
10                A.   Predominantly, they were in the
11   regional organization.  The subsidiaries were
12   restructured in such a way that they followed
13   regional lines very closely whether it was Canada
14   or the United States, or the south American
15   organizations or European, but they were very much
16   in the regions but they were separate.  Regional
17   management was separate from subsidiary management,
18   by and large, at least in terms of job
19   responsibilities.
20                Q.   Within the Nortel business
21   organization during your time in 2005 to 2007,
22   could any of the subsidiaries have been hived off
23   to go it alone?
24                A.   In my view, not in a free standing
25   manner, no.
```

 

```
 1                    Q.    Why is that?
 2                    A.    The subsidiaries were
 3    structured -- well, the subsidiaries themselves
 4    were largely legal entities.  They had no real
 5    strategic process surrounding them.  The regions
 6    themselves were distribution organizations,
 7    primarily.  The lines of business were primarily
 8    development and fabrication organizations.  None of
 9    these were free-standing entities.  This company
10    operated -- this company being Nortel, operated as
11    an integrated, global whole.
12                    Q.    If I can turn you to paragraph 34
13    for a minute briefly, under Nortel Canada.
14                    MR. ROSENTHAL:  I would like to object
15    in that the protocol in place is that the direct
16    testimony was through affidavit.  The witness' last
17    answers and the questions directed towards those
18    had nothing to do with any of the affidavit
19    testimony.
20                    THE CANADIAN COURT:  That's a good
21    reason why you would ask it.  I think you can
22    proceed, Mr. Zigler.
23                    MR. ZIGLER:  Thank you, Your Honour.
24
25
```



```
 1                 BY MR. ZIGLER:
 2                 Q.    If we turn to paragraph 34, you
 3    talk about the debt service costs of the debt and
 4    the raising of money and the debt service costs.
 5                 In the last sentence you reference that
 6    those costs were borne by NNL, and didn't form part
 7    of the profit-splitting formula among the
 8    subsidiaries.  What was the reason for that?
 9                 A.    The policy decision was taken at
10    the -- at NNL and predecessor companies some time
11    ago, that financing would be done by the parent
12    company, that financing would be provided to the
13    subsidiaries, and did not form a part of the
14    operating performance of the subsidiaries.  So, as
15    a result, the transfer costs that were attributed
16    to the subsidiaries or levied on the subsidiaries
17    did not include debt service costs.
18                 Q.    Okay.
19                 And if I can turn you to paragraph 116
20    of your affidavit.
21                 Actually 113, research and development
22    section of the affidavit.
23                 At 116 you reference R&D not being
24    capitalized on the balance sheet.  When you say the
25    "balance sheet", which balance sheet are we talking
```



 1    about?

 2              A.    NNC and, therefore, NNL.

 3              Q.    Which balance sheets were you

 4    responsible for as the CFO?

 5              A.    Directly NNC, and, therefore, NNL,

 6    and indirectly the balance sheets of all the

 7    subsidiaries.

 8              Q.    You say R&D was an expense.  What

 9    was the asset that would have been produced as a

10    result of that expense?

11              A.    Intellectual property.

12              Q.    Was intellectual property

13    recognized on any of the balance sheets?

14              A.    No, not to my knowledge.

15              Q.    Was goodwill recognized on the

16    balance sheet?

17              A.    Yes.

18              Q.    Would there be any element of

19    intellectual property on those sheets?

20              A.    To the extent that goodwill was

21    generated through acquisition of companies, and

22    embedded in those companies, there may have been

23    some element of intellectual property, therefore,

24    there would be some intellectual property embedded

25    in the goodwill, but it was not tracked separately



```
 1   nor was it accounted for separately, nor was it

 2   highlighted on any of the balance sheets of NNC,

 3   NNL or the subsidiaries.

 4                 Q.   Okay.  Thank you.

 5                 I have no further questions.

 6   -- REPORTER'S NOTE:  Technical feed issues addressed.

 7                 MR. ROSENTHAL:  Good morning, Justice

 8   Newbould.  Judge Gross, it's interesting to see you

 9   from this perspective.

10                 THE US COURT:  Good morning,

11   Mr. Rosenthal.

12                 MR. ROSENTHAL:  Justice Newbould, we've

13   met by video.  My name is Jeffrey Rosenthal, with

14   Cleary Gottlieb Steen & Hamilton, and I represent

15   the US Debtors.

16                 THE CANADIAN COURT:  Thank you.

17                 MR. ROSENTHAL:  Good morning, Mr.

18   Currie.

19                 THE WITNESS:  Good morning.

20   CROSS-EXAMINATION BY MR. ROSENTHAL:

21                 Q.   In the begin of your testimony

22   just now you made reference to Nortel being a

23   matrix organization and I would like to ask you

24   some questions in that regard.

25                 First, would you agree with me that
```

Neeson&Associates    W&F WILSON & PETERS LTD.

```
 1   each of the Nortel subsidiaries was organized in

 2   accordance with the requirements of its relevant

 3   jurisdictions?

 4                A.   Yes.

 5                Q.   And each had its own Board of

 6   Directors?

 7                A.   Yes.

 8                Q.   And each subsidiary had its own

 9   corporate structure?

10                A.   Yes.

11                Q.   Each had its own organizational

12   documents such as bylaws, correct?

13                A.   To the best of my knowledge, yes.

14                Q.   And each Nortel subsidiary

15   maintained its own books and records, correct?

16                A.   Yes.

17                Q.   And many of the Nortel group

18   subsidiaries had its own treasury departments which

19   were responsible for certain treasury functions

20   within those subsidiaries, correct?

21                A.   No.  Some did, not all.

22                Q.   Many of them, correct?

23                A.   Some did, not all.

24                Q.   Would you use the word, "many"?

25                A.   No.
```



```
 1                  Q.   Are you aware that you used the
 2   word "many" in your own witness affidavit?
 3                  A.   Thank you for the reminding me.  I
 4   didn't recall that.
 5                  Q.   Okay.  You would say it's not
 6   many, however?
 7                  A.   Well, let me put it in context,
 8   Mr. Rosenthal, Nortel, to my recollection, had
 9   something in the order of 75 or 80 subsidiaries.
10   There may have been five or six that had what I
11   would consider to be treasury departments.
12                  As I recall in the affidavit and in the
13   deposition that proceeded that, there was
14   discussion about the major subsidiaries, and in
15   that context I would say, yes, many of the major
16   subsidiaries had some treasury operations, but I
17   would not say many of the subsidiaries had treasury
18   operations.
19                  Q.   Thank you.
20                  Regardless of whether the business
21   lines operated in a matrix structure, each
22   subsidiary prepared its own financial statement,
23   correct?
24                  A.   Statutorily correct.
25                  Q.   And they were required in
```



```
 1   accordance with the requirements of the

 2   jurisdiction -- they were each prepared in

 3   accordance with the requirements of the

 4   jurisdiction in which the particular subsidiary was

 5   incorporated, correct?

 6              A.   Correct.

 7              Q.   And the financial statements were

 8   audited by local auditors?

 9              A.   Correct.

10              Q.   And they were reviewed and

11   approved by their respective Board of Directors?

12              A.   Correct.

13              Q.   Now, moving to a different topic,

14   as Chief Financial Officer you were obviously

15   familiar with NNL's and NNC's efforts to tap the

16   capital markets, right?

17              A.   We had an ongoing relationship

18   with the capital markets, yes.

19              Q.   You were familiar with that

20   relationship, correct?

21              A.   Yes.

22              Q.   When you returned to Nortel

23   in 2005, the company did not have access to the

24   capital markets, correct?

25              A.   Correct.
```



```
 1                    Q.    And as a result, your concern for
 2     liquidity was higher, right?
 3                    A.    It was higher than if it had had
 4     access, yes.
 5                    Q.    And you sought to maintain as
 6     Chief Financial Officer, a minimum cash position of
 7     approximately $2 billion for the Nortel group,
 8     right?
 9                    A.    Correct.
10                    Q.    And that's because $2 billion was
11     the minimum liquidity required to cushion the
12     Nortel group against future eventualities, correct?
13                    A.    That was my assessment at the time
14     based on the company conditions of the company and
15     the economy.
16                    Q.    And you also believed to $2
17     billion was viewed by the rating agencies and
18     others as the minimum acceptable liquidity for
19     Nortel, correct?
20                    A.    I had reason to believe it was an
21     acceptable level of liquidity.  I don't know if it
22     was the minimum.  It was acceptable.
23                    Q.    You were satisfied that Nortel's
24     cash-burn rate wasn't going to imperil the company
25     as long as it got access to the capital markets,
```



```
 1   right?
 2               A.   I was.
 3               Q.   Now in 2006, NNL issued $2 billion
 4   in bonds, right?
 5               A.   Yes.
 6               Q.   And NNI provided a guarantee for
 7   those bonds?
 8               A.   Yes.
 9               Q.   And NNL also issued $1.15 billion
10   in bonds in 2007, right?
11               A.   Yes.
12               Q.   And NNI provided a guarantee for
13   those as well?
14               A.   To my recollection, yes.
15               Q.   If NNI had not been the guarantor
16   on those bonds the interest rates would have been
17   higher, correct?
18               A.   Quite probably.
19               Q.   And the principal amounts may have
20   been lower, correct?
21               A.   Possibly.
22               Q.   That was your belief that they
23   would be lower?
24               A.   It was my belief they would be
25   different.  They may have been lower, they may have
```



1    been different covenants in the bond structure

2    itself.

3            Q.    In fact, it was your belief in

4    connection with those financings that NNL got a

5    more favourable covenant structure as a result of

6    NNI's guarantee, correct?

7            A.    Yes.

8            Q.    In fact, it was clear to you early

9    on that NNI would need to be involved in those

10   transactions, correct?

11           A.    Perhaps you could clarify for me

12   when you -- what you mean by early on.

13           Q.    Well, early on in the -- in the

14   raising capital process when you were tapping the

15   capital markets.

16           A.    It was -- yes, it was my view that

17   NNI's involvement would be favourable to the

18   outcome, yes.

19           Q.    Not merely favourable.  You came

20   to the conclusion that NNI needed to be involved,

21   right?

22           A.    To get the outcome that we were

23   seeking, yes.

24           Q.    And just so we're clear, none of

25   NNC's or NNL's other subsidiaries besides NNI

 Neeson & Associates   W&P

```
 1   guaranteed these bond offerings, correct?
 2             A.    That's my recollection, yes.
 3             Q.    I want to move on to credit
 4   facilities.  Apart from the bond offerings in 2006
 5   and 2007, the Nortel group gained access to cash
 6   through credit facilities, correct?
 7             A.    Yes.
 8             Q.    In 2006 NNI entered into a credit
 9   facility for $1.3 billion?
10             A.    As I recall, yes.
11             Q.    And NNI entered into that facility
12   so that it could refinance notes that were issued
13   by NNL, correct?
14             A.    Correct.
15             Q.    And NNL also had a credit facility
16   with Export Development Canada?
17             A.    Yes.
18             Q.    And NNL's obligations under that
19   credit facility were also guaranteed by NNI,
20   correct?
21             A.    Yes.  As I recall.
22             Q.    You would agree with me that the
23   EDC facility was an important source of liquidity
24   for the Nortel group, right?
25             A.    Yes, I would.
```



```
 1                    Q.   Both the $1.3 billion credit
 2   facility and the EDC facility were part of Nortel's
 3   liquidity and capital structure strategy, right?
 4                    A.   Yes.
 5                    Q.   Would you agree with me that all
 6   of Nortel's debt offerings and credit agreements
 7   in 2006 and 2007 were subjected to rigorous due
 8   diligence?
 9                    A.   I would agree that those with
10   which I was involved were, yes.
11                    Q.   Sophisticated financial
12   institutions were involved, correct?
13                    A.   Yes, they were.
14                    Q.   They and their lawyers reviewed
15   Nortel's financial position in the context of those
16   offers, correct?
17                    A.   Yes, they did.
18                    Q.   I want to also discuss your views
19   about the difference between bond debt and other
20   liabilities.  Now, bond debt is a liability for a
21   return of a fixed amount of funds actually
22   borrowed, correct?
23                    A.   Correct.
24                    Q.   And bond debt is supported by a
25   series of covenants that have very specific
```



```
 1   repayment terms, correct?
 2              A.   Correct.
 3              Q.   A pension deficit is a contingent
 4   long-term liability, right?
 5              A.   Yes.
 6              Q.   And as Chief Financial Officer,
 7   you agreed that it was not prudent to treat a
 8   pension deficit as a fixed obligation, to pay a sum
 9   certain at a definite point in time, like bond
10   debt, correct?
11              A.   It was my view then and is now
12   that they were fundamentally different forms of
13   obligation, yes.
14              Q.   Insofar as the pension debt is a
15   contingent future liability?
16              A.   A contingent future liability
17   determined -- based on assumptions as opposed to a
18   fixed obligation based upon a covenant structure
19   and specific borrowing, yes.
20              Q.   Would you agree with me that one
21   of the objectives that the Nortel group had was to
22   optimize tax payments globally?
23              A.   Yes.
24              Q.   And this means that it would
25   attempt to match revenues and costs in the most
```

 Neeson & Associates    W&F

 1   tax- advantageous manner possible on a global

 2   basis?

 3            A.    The most tax -- I agree.   The most

 4   tax-advantageous manner consistent with how things

 5   were actually transpiring, yes.

 6            Q.    In fact, that's an objective in

 7   any multinational organization?

 8            A.    Would I presume, yes.

 9            Q.    Given your experience not just at

10   Nortel, your lengthy years of service in the

11   financial rolls, that's your experience that it's

12   common to multinational organizations?

13            A.    It is.

14            Q.    Generally speaking, it's better

15   not to pay production taxes if you don't have to,

16   correct?

17            A.    Yes, I would agree.   For

18   multinationals and individuals.

19            Q.    You made some statements in your

20   direct examination with Mr. Zigler just now about

21   the ability of the subsidiaries to act

22   independently.  Do you recall talking about that a

23   moment ago?

24            A.    I do.

25            Q.    Now, do you know what the term



1    integrated entity means in the context of Nortel?

2              A.   I believe I do.

3              Q.   Had you heard the phrase

4    integrated entity at Nortel?

5              A.   To be honest, I don't recall if I

6    heard it at Nortel, but I have heard it in other

7    contexts.

8              Q.   And are you aware that Nortel made

9    repeated representations to tax authorities that

10   the major subsidiaries like NNI were integrated

11   entities?

12             A.   Yes.

13             Q.   And that Nortel represented that

14   NNI was an entity that performs all of the

15   activities required to fulfil customer contracts,

16   effectively orchestrate Nortel's value chain,

17   and -- as well as the functions of R&D,

18   manufacturing, distribution and extra territorial

19   services?

20             A.   Yeah, I accept your premise, yes.

21   I accept that might -- would have been the case,

22   yes.

23             Q.   Do you agree that that's a fair

24   description of NNI?

25             A.   I agree that's a description of



1    NNI.

2                    Q.    The United States was Nortel's

3    largest market, right?

4                    A.    For a period of time.

5                    Q.    Well, the period of time that you

6    were Chief Financial Officer, for example,

7    from 2005 to 2007?

8                    A.    Correct.

9                    Q.    I want to turn a little bit to

10   R&D.

11                   Is it fair to say that part of the

12   Nortel group's Center of Excellence efforts was to

13   have R&D done at the least cost with qualified

14   personnel?

15                   A.    The concept of -- I will digress

16   or expand here for a minute, with your concession.

17   The Center of Excellence concept was intended to

18   optimize R&D development.  That optimization had

19   three primary legs.  One was, of course, cost, but

20   equally important were qualification of the

21   technologists and timeliness of development chain.

22   So the various labs around the world were engaged

23   in portions of projects typically, that played to

24   their individual strengths.

25                   So yes, cost was important, timeliness



```
 1   was important, and qualification of developers was

 2   important as well.

 3               Q.   Fair to say you don't want to

 4   outsource to a cheap jurisdiction that can't

 5   deliver a quality product on time?

 6               A.   Of course.  Correct.

 7               Q.   But so long as you can ensure both

 8   the quality and the timeliness that meets Nortel

 9   standards, cost effectiveness is an important

10   factor?

11               A.   It is an important factor, yes.

12               Q.   In fact, you would say that you

13   would want to arbitrage wage rates and cycle time

14   improvement in development cycles, correct?

15               A.   Help me understand what you are

16   getting at there, please.

17               Q.   Sure.

18               Do you understand the phrase "to

19   arbitrage wage rates"?

20               A.   Yes.

21               Q.   And cycle time improvement?

22               A.   I understand the term "arbitrage

23   wage rates" and I understand the term "cycle time

24   improvements".  I don't know how you put them

25   together.  Help me understand.
```



```
 1                    Q.   Well, what I mean by that, when I
 2      use that phrase, is to combine the two so that you
 3      get the cost improvement with beneficial wage rates
 4      without losing, to any significant extent, the
 5      quality and the delivery times?
 6                    A.   I think I know where you are
 7      going.  Yes, that's accurate.  It's important to
 8      understand, though, that the primary focus here was
 9      on the quality of the product and the timeliness of
10      the product and if those could be achieved at a
11      slightly higher cost that's what was done.  It
12      wasn't complete slavishness to the wage rate.
13                    Q.   But so long as -- I mean, Nortel
14      wouldn't move R&D to a location without personnel
15      with expertise, but otherwise it would look to save
16      costs?
17                    A.   It would look at that, yes.
18                    Q.   As the chief financial officer,
19      you had oversight of R&D budgets, right?
20                    A.   Yes.
21                    Q.   R&D, you would consider to be a
22      dual stream activity?  Is that right?  Would you
23      consider R&D to be a dual stream activity?
24                    A.   Dual stream being...
25                    Q.   Dual stream meaning there's
```



 1    research and there's development?

 2                    A.    Yes.

 3                    Q.    And research is essentially the

 4    creation of new ideas, the early commercialization

 5    and the testing of those ideas against the market

 6    need, correct?

 7                    A.    Research is the invention,

 8    correct -- is the invention stream; you are

 9    correct.

10                    Q.    And part of the research would be

11    the testing of it against market need, correct?

12                    A.    Part of it.  A big part of that,

13    though, falls in the development cycle.

14                    Q.    So market need kind of falls

15    within both sides of it?

16                    A.    Yes.

17                    Q.    And when we use the term market

18    need we are talking about is there a market for the

19    product?

20                    A.    Correct.  Correct.

21                    Q.    The research portion of R&D

22    requires some degree of risk expenditure for new

23    products to be developed and that was done based

24    upon expected market requirements, right?

25                    A.    Expected market returns, yes.

 Neeson&Associates    W&F WILSON & PEYZER LTD.

```
 1                    Q.    Let's talk about development now.

 2                    Development is the adaptation of the

 3    ideas into commercial products, and the support of

 4    existing products, correct?

 5                    A.    Correct.

 6                    Q.    Development at Nortel was done on

 7    a very comprehensive basis product by product,

 8    correct?

 9                    A.    Correct.

10                    Q.    And you would do this

11    comprehensive product by product analysis to built

12    it up to a level of development spending, correct?

13                    A.    Yes, that's how the budget would

14    be built up.

15                    Q.    And as Chief Financial Officer,

16    you budgeted R&D expenses by line of business,

17    correct?

18                    A.    Yes, we did.

19                    Q.    And the individual R&D

20    initiatives, in fact, were aligned by product line,

21    correct?

22                    A.    They were tracked certainly by

23    product line, yes.

24                    Q.    There were no R&D expenses that

25    were not contained within a specific line of
```

 Neeson & Associates    W&F WILSON & FRITZEN LTD.

1    business, correct?

2              A.    Well, there was a small portion

3    that was loosely referred to as capability funding,

4    that was essentially not assigned or aligned with

5    specific product lines because, of course, that's

6    how product lines began with new ideas.

7              So there was a small pot, in the

8    relative scheme of things, but other than that they

9    were aligned by product lines, yes.

10             Q.    So you have, essentially, a very

11   small part of the R&D budget for development of

12   proposed future products and everything else is

13   in -- already in a specific business line, correct?

14             A.    To my recollection, yes.

15             Q.    Now, in fact, R&D expenses when

16   you were doing the budgeting were not only budgeted

17   by line of business, but they were also

18   specifically allocated by specific product program

19   within each line of business, correct?

20             A.    Yes.

21             Q.    Before I conclude, I want to bring

22   up a -- something this was mentioned yesterday

23   during the opening statements.  If we could pull up

24   page 415 of Mr. Zarnett's opening statement.

25             Mr. Zarnett says that there are three



```
 1   questions for the courts.  He says the courts will
 2   ultimately have to decide the following questions:
 3   The first is what is the nature of NNL's interest
 4   in the intellectual property, is it legal ownership
 5   or is it bare or nominal legal title.  The second
 6   question:  What is the nature of the EMEA Debtors
 7   and US interests, US Debtors' rights in the
 8   intellectual property, is it equitable or
 9   beneficial ownership of the intellectual property
10   or licence rights.  And, third, if they are licence
11   rights, what's the scope of the licence?
12               You submitted to us a 43-page
13   affidavit, correct?
14               A.   Yes.
15               Q.   I don't know if you are aware but
16   do you know that's more than a quarter of the
17   Monitor and Canadian Debtors' entire affidavit
18   submission?
19               A.   I wasn't aware.
20               Q.   So, talking about Mr. Zarnett's
21   three questions that he posed yesterday for this
22   trial, if I were to use the phrase "RPS model", it
23   doesn't ring a bell to you, correct?
24               A.   No, frankly it doesn't.
25               Q.   You are not familiar with the
```



```
1   residual profit split methodology, are you?

2              A.   No.

3              Q.   And, in fact, if I were to say the

4   word MRDA, you are familiar with the acronym but

5   not the agreement itself, correct?

6              A.   Correct.

7              Q.   I have nothing further, Your

8   Honours.

9              THE CANADIAN COURT:  Thank you.  Is

10  there anyone else?

11             MR. GOTTLIEB:  Yes, Your Honour.  Thank

12  you.

13             THE CANADIAN COURT:  Mr. Gottlieb.

14             MR. GOTTLIEB:  Good morning, Your

15  Honour.  Good morning, Judge Gross.

16             THE US COURT:  Good morning.

17  CROSS-EXAMINATION BY MR. GOTTLIEB:

18             Q.   Mr. Currie.  My name is Matthew

19  Gottlieb.  I am counsel for the EMEA debtors and

20  I'm going to have some questions for you this

21  morning.

22             And, Your Honours, I am going to have

23  some the documents to present to the witness and,

24  subject to your direction, because things have

25  changed slightly overnight, I have got hard copies
```



1    here but we have got the ability and we are going

2    to put them up on the screens as well.

3                I'm not sure -- I think the reporter

4    may want a copy, but I'm not sure, so I will follow

5    the direction of whoever tells me that they want it

6    done differently than I'm doing, frankly, if that's

7    okay.

8                THE CANADIAN COURT:  We want it done as

9    easily as possible.

10               MR. GOTTLIEB:  I figured that.

11               THE CANADIAN COURT:  Are you familiar

12   with that phrase, unlike MRDA with Mr. Currie?

13               MR. GOTTLIEB:  I'm going to hear about

14   it if I don't, so thank you.

15               Q.   Good morning.  I just want to get

16   some dates straight.  I want to talk to you a

17   little bit about the time you came back as CFO and

18   that was between '05 and obligation '07, correct?

19               A.   Correct.

20               Q.   You left as CFO effective

21   April 30, 2007, correct?

22               A.   Correct.

23               Q.   And during that period, if I

24   understand your evidence from your affidavit and

25   this morning, you were hired specifically to take

 Neeson&Associates    W&F

1    care of some tasks -- specific tasks, correct?

2    Tasks.  I apologize.  Specific tasks.

3                    A.    I was hired to be the Chief

4    Financial Officer of the organization.  In a broad

5    sense and within that, there were some specific

6    objectives that I outlined and agreed with the

7    board that would be top of the list for me.

8                    Q.    All right.  Those are the ones

9    that you set out in your affidavit?

10                   A.    That's correct.

11                   Q.    You set out those specifically,

12   correct?

13                   A.    Correct.

14                   Q.    And one of the tasks was to

15   resolve certain internal control and corporate

16   governance issues, correct?

17                   A.    Correct.

18                   Q.    Thank you.  And you accomplished

19   that task, correct?

20                   A.    I believe so.

21                   Q.    Okay.  And another task was to

22   deal with the financial information systems and

23   financial organization of the company to improve

24   the timeliness and the importance of the accuracy

25   of the financial reporting, correct?



```
 1                    A.   Yes.

 2                    Q.   And you accomplished that task as

 3   well, correct?

 4                    A.   It was 95 percent accomplished

 5   when I left, but it was on a path to be completed

 6   shortly thereafter, yes.

 7                    Q.   You were comfortable that that

 8   task --

 9                    A.   I was.

10                    Q.   Okay.  Thank you very much.

11                    In that regard, dealing with those

12   tasks, you improved the financial reporting of the

13   company, correct?

14                    A.   I believe I did.

15                    Q.   And you helped put processes in

16   place to make sure that at all levels the financial

17   reporting would be dealt with properly and

18   accurately, correct?

19                    A.   I did, with my colleagues, yes.

20                    Q.   Based on the improvements that you

21   helped make, the financial information that Nortel

22   reported internally and to the public could be

23   trusted, correct?

24                    A.   Yes.

25                    Q.   And you trusted the financial
```



 1   information provided by the Nortel finance

 2   organization, yes?

 3              A.   I came to trust it, yes.

 4              Q.   Okay.  Before you left, is my

 5   point.

 6              A.   Yes.

 7              Q.   Okay.  And the financial reporting

 8   obviously had, to put it this way, serious problems

 9   when you arrived, but those had been alleviated?

10              A.   Yes, well documented.

11              Q.   Okay.  And when you talk about

12   your role as CFO, of course it was beyond just

13   those particular tasks, so I just want to go

14   through some of those tasks.  You oversaw the

15   preparation of NNC, and NNL's books and records to

16   use the term broadly, correct?

17              A.   Yes.  Directly oversaw those and

18   indirectly oversaw the preparation of the books and

19   records of all the entities, yes.

20              Q.   Thank you.  And stating again the

21   obvious, it's important that those books and

22   records were accurate, correct?

23              A.   Yes.

24              Q.   And your view, in your time they

25   were accurate, correct?



```
 1                    A.    Yes.
 2                    Q.    And it was obviously a task that
 3   you took very seriously while were you at Nortel?
 4                    A.    Yes, I certainly did.
 5                    Q.    And in your view the staff, the
 6   people who were under you reporting to you, also
 7   took that task very seriously, correct?
 8                    A.    Yes, they did.
 9                    Q.    All right.  And again, whenever
10   Nortel personnel, you or others who directly or
11   indirectly reported to you, communicated with
12   taxation authorities, it was critically important
13   that that information was accurate, honest and
14   full, correct?
15                    A.    Yes.
16                    Q.    And you made sure there were
17   processes in place to make sure that happened,
18   correct?
19                    A.    I did my best.
20                    Q.    And you believe you achieved that
21   goal?
22                    A.    I do.
23                    Q.    Now, you were also a member of the
24   Board of Directs of certain subsidiaries of NNL,
25   correct?
```

Neeson&Associates    W&F

```
 1                    A.   One subsidiary.
 2                    Q.   All right.  And that was NNUK?
 3                    A.   Correct.
 4                    Q.   You took on that role at the
 5     beginning of 2005, as I understand it?
 6                    A.   Shortly after I joined as Chief
 7     Financial Officer in February of that year, yes.
 8                    Q.   And you kept that role until you
 9     left Nortel?
10                    A.   Shortly -- I relieved --
11     relinquished it shortly before I left, yes.
12                    Q.   From 2005 to 2007 you were in that
13     role as well?
14                    A.   Approximately two years, yes.
15                    Q.   Okay.  Thank you.
16                    And as you referred to before in
17     answering questions, NNUK also maintained its own
18     books and records in statements for financial
19     statutory purposes, correct?
20                    A.   Yes.
21                    Q.   And those accounts were needed so
22     that NNUK as a standalone entity could report
23     income and revenue to its taxation authorities,
24     yes?
25                    A.   Correct.
```



```
 1                    Q.   And, as a member of the board you

 2    had to sign off on those statements, correct?

 3                    A.   Yes.

 4                    Q.   And you did sign off on those

 5    statements while were you there?

 6                    A.   I did as a directer, yes.

 7                    Q.   And obviously you appreciated that

 8    those had to be accurate and you wouldn't have

 9    signed off on them unless you knew they were

10    accurate, correct?

11                    A.   Correct.  And they were duly

12    audited as well by external auditors.

13                    Q.   Perfect.  Okay.

14                    A.   Duly audited by external auditors.

15                    Q.   And for all the Nortel entities,

16    the parent -- the subs -- it was important that

17    revenue was properly recorded in the right

18    company's books and records, correct?

19                    A.   Correct.

20                    Q.   And that was important for

21    taxation purposes, correct?

22                    A.   Yes.

23                    Q.   Okay.  And you oversaw that

24    process as CFO as well?

25                    A.   Yes.
```



```
 1                    Q.   Now NNC and NNL filed reports with
 2    the SEC, are you aware of that?
 3                    A.   Yes.
 4                    Q.   And the reports had to comply with
 5    the securities laws in the United States, when
 6    filing those?
 7                    A.   Correct.
 8                    Q.   That was known as a 10K?
 9                    A.   Well, the securities law has
10    different title but the document we used was a 10K.
11                    Q.   I apologize.  Yes.  You gave a
12    better answer than I asked the question so thank
13    you very much for that.
14                    THE CANADIAN COURT:  That's why we have
15    witnesses, Mr. Gottlieb.  Sometimes the lawyers
16    don't completely control them.
17                    MR. GOTTLIEB:  Thank you, Your Honour.
18                    BY MR. GOTTLIEB:
19                    Q.   I'm going to show you a copy, and
20    we will bring it up on the screen.  It's trial
21    Exhibit 21139.
22                    This, sir, will be the 10K.  You can
23    see the front page there for the year ended -- for
24    2006 -- December 31, 2006 .  Would you prefer me to
25    hand you a hard copy as well?
```



```
 1                    A.   Depends on what your question is.

 2                    Q.   Fair enough.

 3                    A.   If it's the date I can verify from

 4    this.

 5                    Q.   I'm just going to hand you an

 6    excerpt, if you wouldn't mind.

 7                    MR. GOTTLIEB:  Judge Gross, are you

 8    happy with what you've got there?

 9                    THE US COURT:  I've got a hard copy of

10    it here, yes.

11                    MR. GOTTLIEB:  Thank you very much.

12                    BY MR. GOTTLIEB:

13                    Q.   As you see from the front page,

14    this is the 10K for Nortel Networks Corporation for

15    the fiscal year ended December 31, 2006.  And if

16    you flip to just the back page of this little

17    package I gave you, it's page 210 of the document

18    itself --

19                    A.   Yes.

20                    Q.   You see, sir -- and I'm just

21    showing you this for what I believe you would

22    acknowledge any how.  This is a document that you

23    signed in your capacity as the principal financial

24    officer?

25                    A.   Yes.
```



```
 1                    Q.   Okay.

 2                    And this report had balance sheets,

 3     obviously, and consolidated statements, correct?

 4                    A.   Yes.

 5                    Q.   And the assets on, in this

 6     document were broken down in categories, correct?

 7                    A.   Yes.

 8                    Q.   Into asset categories -- I

 9     apologize.

10                    A.   Yes.

11                    Q.   And those categories included

12     goodwill?

13                    A.   Yes.

14                    Q.   And also included intangibles as

15     well, correct?

16                    A.   As I recall, I don't know have the

17     balance sheet in this document but, yes, I recall

18     that.

19                    Q.   All right, thank you.

20                    You recall, sir, that under

21     Sarbanes-Oxley you were required to certify certain

22     things by your signature on the 10K, correct?

23                    A.   Yes.

24                    Q.   And one of the things that you

25     certified when you signed this was that you had
```



```
 1   reviewed the report, correct?

 2               A.   Yes.

 3               Q.   You wouldn't sign it until you had

 4   reviewed it, correct?

 5               A.   Yes.

 6               Q.   You also were confirming that

 7   based on your knowledge there were no material

 8   facts that were misstated in this report, or there

 9   were facts that needed to be stated in this report

10   that whether not stated?

11               A.   Correct.

12               Q.   And you also certified that this

13   report fairly presents in all material respects,

14   the results of the operations, correct?

15               A.   Yes.

16               Q.   And you also certified by your

17   signature that you had designed internal controls

18   to ensure accurate reporting of the financial

19   information, correct?

20               A.   Correct.

21               Q.   And that was, in fact, true.

22   Those processes were in place, correct?

23               A.   They were in place.  They were

24   being enhanced, but they were in place.

25               Q.   And you were comfortable with them
```



```
 1   while you were there, correct?
 2              A.   Yes.
 3              Q.   And you wouldn't have signed this
 4   certifying that unless you were comfortable with
 5   the process?
 6              A.   No, sir, I would not.
 7              Q.   So I would like to confirm before
 8   I move on -- you mentioned before that obviously
 9   there were auditors of all the subsidiaries so as
10   to allow them to have their financial statements
11   audited, correct?
12              A.   Yes.
13              Q.   And they were auditors of NNC and
14   NNL, correct?
15              A.   Yes.
16              Q.   And that was Deloitte, while were
17   you there?
18              A.   Deloitte for the -- for the bulk
19   of the period.  Latterly, it transitioned to
20   another firm.
21              Q.   Okay.  So I'm going to come to
22   that in just a moment.
23              Now, there was a transaction that was
24   conducted called -- that we called the UMTS or the
25   sale to Alcatel of the UMTS business.  You are
```



```
 1   familiar with that?

 2              A.   I am.

 3              Q.   I'm going to ask you, if you

 4   would, please, to turn to page 43 of this document.

 5   It's the second or third page on your package of

 6   this trial exhibit.  And if we can look at the very

 7   top that includes the first couple of paragraphs

 8   there.

 9              And you see, sir, at the top of this

10   page 43, it refers to significant business

11   developments in 2006 and 2007?  Do you see that?

12              A.   Yes.

13              Q.   And divestiture of UMTS access

14   assets is referred to as one of the significant

15   business developments, correct?

16              A.   Yes.

17              Q.   And it refers to the transaction

18   that:

19                   "On December 31, 2006, we

20                   completed the sale of substantially

21                   all of our assets and liabilities

22                   related to our UMTS access products

23                   and services to Alcatel-Lucent.  The

24                   sale structured as an asset and

25                   share transaction resulted in gross
```



```
 1                    proceeds of 320" --  and that's
 2                    obviously $320 million, not $320,
 3                    correct?
 4                    A.   Yes.
 5                    Q.   "Adjusted primarily for warranty
 6                    liabilities."
 7                    And it goes on and it says, "For net
 8      proceeds of $306 million which were received in the
 9      fourth quarter of '06," correct?
10                    A.   Correct.
11                    Q.   And that's obviously while you
12      were there and this took place under your watch as
13      CFO, correct?
14                    A.   Took place while I was there, yes.
15                    Q.   Okay.  And then it refers in the
16      next paragraph below that that:
17                    "As a result of the sale, we
18                    transferred $65 million in net
19                    assets comprised primarily of fixed
20                    assets and inventory, substantially
21                    all existing UMTS assess contracts,
22                    intellectual property and
23                    approximately 1700 employees
24                    attributed to our UMTS access
25                    products."
```



1                    Do you see that?

2                    A.   Yes.

3                    Q.   I'm going to ask -- I apologize --

4    we are going to go down a couple of paragraphs to a

5    little paragraph that says, "We have recorded a net

6    gain of 166 million."

7                    A.   Yes.

8                    Q.   "And deferred income of five,

9                    primarily due to contingent liabilities

10                   relating to a loss sharing

11                   arrangement."

12                   The reason I take you to that is if we

13   go to page 42 now, what you see is this

14   transaction, this Alcatel sale transaction,

15   actually had an impact on the financial results of

16   the NNC in a real way, because if you look at the

17   excerpt on the second last bullet on page 42 -- do

18   you have that there?  What it says is:

19                   "Net earnings (loss) increased to

20                   net earnings of 28 million from a

21                   net loss of 2.610, the increase in

22                   net earnings was driven primarily by

23                   changes in the fair value of our

24                   shareholder class action lawsuit and

25                   again related to the divestiture of



```
1                    certain assets and liabilities

2                    related to our UMTS access

3                    business."

4                    So the point is this transaction was in

5      that sense a material transaction for Nortel.  It

6      had a very serious impact on profit and loss in

7      that year, correct?

8                    A.   It was a material transaction

9      which which is why it was highlighted in the 10K

10     but it was secondary in materiality to the other

11     point in that bullet point.

12                   Q.   I understand.

13                   A.   By a lot.

14                   Q.   Okay.  Thank you.  But it was a

15     material transaction?

16                   A.   Yes, it was above the materiality

17     threshold, yes.

18                   Q.   Okay.  Perfect.  Thank you.

19                   Now with respect to that transaction,

20     it sets out obviously the different amounts.  As

21     you know, there were assets sold from various of

22     the subsidiary corporations as well to Alcatel,

23     correct?

24                   A.   Excuse me?

25                   Q.   As part of this transaction?
```

 Neeson & Associates   W&F

```
 1                    A.    Yes.

 2                    Q.    Yes?

 3                    A.    As I recall, yes.

 4                    Q.    Okay, and therefore the revenue

 5    from the sale had to be allocated across the

 6    various companies that were involved in the sales,

 7    correct?

 8                    A.    Yes.

 9                    Q.    And again that was something that

10    you as CFO would be directly in charge of?  That

11    would be under your responsibility?

12                    A.    I was involved.  I oversaw it, but

13    I was not directly in charge.  That was being

14    handled by another executive at the behest of the

15    CEO.

16                    Q.    I understand, but that came under

17    your rubric of CFO?

18                    A.    Yes.

19                    Q.    And it was under, in effect, your

20    direction, correct?

21                    A.    I was aware of it.  I would not

22    say I directed the disposition of the proceeds.

23                    Q.    I understand, but as CFO of the

24    company you had to make sure it was part of your

25    responsibility to make sure it was done accurately
```



1    and properly?

2               A.   To make sure there were no

3    material mistatements, correct.

4               Q.   Okay.  Perfect.  And that process

5    was undertaken properly in accordance with proper

6    rules and procedures?

7               A.   Right.

8               Q.   Okay.  Now, Deloitte was the

9    company's auditor at this time, at the time of this

10   transaction, with respect to these -- this 10K --

11   with respect to the 2006 tax year.  Do you recall

12   that?

13              A.   Correct.

14              Q.   And you were on Nortel's audit

15   committee at the time as well, correct?

16              A.    No.  I attended the odd committee

17   meetings and presented, but I was not a member of

18   the audit committee.

19              Q.   Okay.  Thank you.  So I'm going to

20   take you -- I'm going to show you another document

21   if I could, and we are going to bring it up on the

22   screen.  And it's Trial Exhibit 44852.

23              MR. GOTTLIEB:  Your Honour, we should

24   probably mark that first exhibit that I handed up

25   as Exhibit 2, I believe that would be.



```
 1                    THE CANADIAN COURT:  That's already
 2   marked.
 3                    MR. GOTTLIEB:  We are not going to do
 4   that?  Okay.
 5                    THE CANADIAN COURT:  Why would we
 6   bother?  It's Trial Exhibit 44852.
 7                    MR. GOTTLIEB:  You're right.  Like I
 8   said, I'm trying to make this simple.
 9                    THE CANADIAN COURT:  I'm trying to help
10   you.
11                    MR. GOTTLIEB:  Thank you, Your Honour.
12                    BY MR. GOTTLIEB:
13                    Q.   So we have this email on the
14   cover, sir.  Do you have that Mr. Currie?
15                    A.   I do.
16                    Q.   You see this is an email from
17   Louise Smith to several people, and you will see
18   that you are a cc'd on it?
19                    A.   Yes, I do.
20                    Q.   You do see that?
21                    And it's dated February 20, 2007.  And
22   this was an audit with respect to an audit
23   committee meeting that -- you weren't a member of
24   the audit committee but as CFO you would be aware
25   of and involved in the discussion about the audit,
```



 1   correct?

 2                A.   Correct.

 3                Q.   I just want to take you to a

 4   couple of pages of this, if we could.  If we could

 5   go to page 4, and the numbers are a little hard to

 6   see just at the bottom of the page.

 7                I'm going to try to get it up on the

 8   screen.  Of the attachment yes.

 9                Your Honour, I should make just for the

10   record -- the attachment is Exhibit Trial 44854.

11   So that's up on the screen right now.

12                BY MR. GOTTLIEB:

13                Q.   And, Mr. Currie, I just want to

14   show you that again, what I expected is obvious, on

15   page 4 Deloitte sets out the audit scope and

16   approach and on the fourth bullet down it says:

17                     "Our auditing procedures

18                     addressed the risks identified in

19                     our Plan.  The following new risk

20                     areas were identified during the

21                     course of our audit:"

22                And the fourth one is the "UMTS Access

23   disposition" which is the Alcatel one we have been

24   talking about, do you see that?

25                A.   I do.



```
 1                    Q.   And that means that obviously
 2   Deloitte was paying attention to that transaction
 3   to ensure that it was reported and dealt with
 4   properly, correct?
 5                    A.   Correct.
 6                    Q.   And if we go to page 23 of the
 7   same exhibit, we'll see there under the heading
 8   "Significant Transactions and Issues," we see:
 9                    "The following were significant
10                    transactions and accounting issues
11                    encountered during our 2006 audit."
12                    It refers to the details on the
13   appendix and it says the first one is the sale of
14   UMTS Access business to Alcatel-Lucent.  Do you see
15   that?
16                    A.   I do.
17                    Q.   And again it's just the same
18   point, that that was a significant transaction as
19   recognized by Deloitte?
20                    A.   Correct.
21                    Q.   And, sir, if we would just go then
22   to page 29 of this exhibit, under the headings
23   "Additional Matters" -- do you have that, sir?
24                    A.   I do.
25                    Q.   Thank you.  It says under the
```



1    heading "Difficulties Encountered in Performing the

2    Audit" it says:

3                    "In our judgment, we received the

4                    full cooperation of the Company's

5                    management and staff and had

6                    unrestricted access to the Company's

7                    senior management in the performance

8                    of our audits."

9                    Which, sir, I assume that was a good

10   thing and that's what you intended, correct?

11                   A.   Correct.

12                   Q.   The next bullet it says:

13                   "Areas where additional focused

14                   management and audit effort occurred

15                   included:"

16                   And the third bullet is the "sale of

17   UMTS Access business to Alcatel."  Do you see that?

18                   A.   I do.

19                   Q.   So what this tells me by reading

20   is that the auditors were very cognizant of the

21   Alcatel transaction, correct?

22                   A.   Yes.

23                   Q.   And that your people, the staff at

24   Nortel, were giving access to the auditors to the

25   necessary information, correct?

 Neeson & Associates    W&F

```
 1                    A.   Correct.

 2                    Q.   And that there was good

 3    communication and the auditors had no concerns at

 4    that point about how this transaction was being

 5    dealt with?

 6                    A.   That's my understanding, yes.

 7                    Q.   Okay.  So -- and, to your

 8    knowledge, to allow that to happen, as it says in

 9    the document, there was management -- your

10    management and staff were cooperating with them and

11    providing information, correct?

12                    A.   Yes, correct.

13                    Q.   So I want to show you a couple of

14    examples of that.  And if we can go to Exhibit

15    TR44312?  If we can bring that up.

16                    THE CANADIAN COURT:  This is leading

17    some place, Mr. Gottlieb?

18                    MR. GOTTLIEB:  Yes?

19                    THE CANADIAN COURT:  You are leading to

20    something?

21                    MR. GOTTLIEB:  I apologize?

22                    THE CANADIAN COURT:  Is this all

23    leading to something?

24                    MR. GOTTLIEB:  Yes, it is.

25                    Well, Your Honour, I'm going to put it
```



1    this way:  As you know, the Alcatel transaction is

2    in our respectful submission important

3    consideration for the --

4                    THE CANADIAN COURT:  I understand that.

5                    MR. GOTTLIEB:  Let me put this way:  We

6    led significant evidence in our material about

7    Alcatel; we referred to it significantly in our

8    opening, as you know, we relied on it; and when we

9    look at the material that was given back, as we

10   said, there was nothing referred to in Alcatel in

11   over two-hundred pages back.  It wasn't referred to

12   in any way, really.

13                   THE CANADIAN COURT:  I'm just wondering

14   what the line of cross-examination is doing for us.

15   That's my only question.

16                   MR. GOTTLIEB:  Well, here's the issue:

17   Alcatel was dealt with properly and it was dealt

18   with with the over sight of the good eyes of

19   Mr. Currie and his staff and with the auditors of

20   the company.

21                   And when we look at the next documents,

22   what you are going to see is that these issues were

23   completely canvassed and thought about, and the

24   idea that somehow it's not a precedent and somehow

25   not relevant to the courts consideration shouldn't



```
 1    really be in the courts consideration.

 2              So there are just two more documents,

 3    Your Honour, if that would be okay.

 4              Pardon me, for a sec.

 5              BY MR. GOTTLIEB:

 6         Q.   So, Mr. Currie, you have got that

 7    Exhibit TR44312 in front of you; do you see that?

 8         A.   I see it.

 9         Q.   What this is is this is a

10    communication, marked as an exhibit already -- it's

11    a communication between Deloitte and the Nortel

12    team -- I will call it -- if that's proper.  Louis

13    Farr -- obviously you are familiar with -- and the

14    others, Rosanne Culina on the email, and it

15    attaches questions raised by the auditors; do you

16    see that?

17              If you go to the next exhibit, which is

18    TR44313, which is the attachment to this, what we

19    have is the questions from the auditor to the

20    Nortel staff, and these are the questions being

21    raised about the Alcatel transaction; do you see

22    that?

23         A.   I see it.

24         Q.   And this, if you can just have a

25    scan of this, this is the normal type of
```



 1   communication that you would expect your staff

 2   would have with the auditor, correct?

 3              A.   Well, let me interject for a

 4   moment.  First of all, this is the first time I've

 5   seen this so I will need to read it.  Secondly, my

 6   staff had a series of communications.  This looks

 7   like a normal -- in the normal course, but there

 8   were other communications, as you can imagine.

 9              Q.   Yes, yes.  We know about those,

10   thank you.  I just want to point you to a couple of

11   points in this document.

12              A.   I need to read it first, okay?

13              Q.   Okay.  Please take your time then.

14              A.   Yes, I have read it.

15              Q.   Thank you, sir, and I just want to

16   take you to a couple of parts of this, to make sure

17   I have the right understanding.  If you look at

18   what Deloitte is asking about here, we see that in

19   the bottom of the first paragraph, it says:

20              "For purposes of the 2006 audit,

21              we would like to review the

22              following working papers in support

23              of the PPA"

24              -- the purchase price adjustment.

25              A.   Correct.

 Neeson&Associates    W&F WILSON & PETZOR LTD.

```
 1                    Q.   Allocation.  Pardon me, Purchase
 2   Price Allocation, as it's defined.
 3                    If you go down to number 6, of what
 4   they are asking for, we have a detailed computation
 5   of taxable income to be reported for each Nortel
 6   entity from the disposition of assets under the
 7   SASA, and we talked about that already.  That would
 8   be something that would have to be done by Nortel,
 9   correct?
10                    A.   Correct.
11                    Q.   And this was being audited by the
12   auditors to make sure that was done appropriately,
13   correct?
14                    A.   Correct.
15                    MR. GOTTLIEB:  Your Honour, if I could
16   have a minute please?  Thank you.
17                    Mr. Currie, pardon me for a minute.
18                    BY MR. GOTTLIEB:
19                    Q.   Mr. Currie, thank you for your
20   time.
21                    Your Honours, thank you.  Those are all
22   my questions.
23                    MR. FINNIGAN:  Good morning, Justice
24   Newbould.  Good morning, Judge Gross.
25                    John Finnigan of Thornton, Grout,
```



1    Finnigan for the UK pension claimants.

2    CROSS-EXAMINATION BY MR. FINNIGAN:

3                    Q.    Good morning, Mr. Currie.

4                    A.    Good morning, sir.

5                    Q.    We met back in October at your

6    deposition.

7                    One of the challenges going forth is

8    that most of the areas I wanted to cover have

9    already been covered only not in exactly the way I

10   wanted to cover them.  So my goal today is just to

11   tease out some facts from you on the areas that

12   have already been covered in your examination.

13                   So, first off, dealing with the

14   reporting of intellectual property on the financial

15   statements.  You told my friend, Mr. Zigler, that

16   R&D spending was tracked on the financial

17   statements, correct?

18                   A.    Yes, correct.

19                   Q.    But that IP was not reported as an

20   asset on the financial statements, correct?

21                   A.    Correct.

22                   Q.    So that a reader of the financial

23   statements would not know the value of the IP

24   globally at the company, in the consolidated

25   statements, correct?



```
 1                    A.    Correct.

 2                    Q.    And would not know the value of

 3     the IP residing individually?

 4                    THE CANADIAN COURT:  Are you talking

 5     about the value or are you talking about the cost?

 6                    MR. FINNIGAN:  No.  I'm talking about

 7     the asset.

 8                    BY MR. FINNIGAN:

 9                    Q.    We know what the cost is because

10     that is recorded in the financial statements -- the

11     annual spend.  What I'm getting at is that a reader

12     of the financial statement would not know the value

13     or the asset value of the IP at the individual

14     entities either, would they?

15                    A.    They wouldn't know the value but

16     they -- there was no individual entity.  The

17     intellectual property was all held by the parent

18     company NNC and NNL.

19                    Q.    Right.  It was jointly developed

20     and reported on the consolidated statements,

21     correct?

22                    A.    Help me understand, sir.  Jointly

23     developed by whom?

24                    Q.    That's a good point to get into.

25     In your affidavit you say that work was done by
```



```
 1   employees across lines of business, correct?

 2                   A.   Correct.

 3                   Q.   Including research and development

 4   work?

 5                   A.   Correct.

 6                   Q.   Right.  And so you would expect

 7   that in a line of business, research scientists

 8   from different entities, different regions might be

 9   working on the same product or or the same

10   technology?

11                   A.   Sorry, would you repeat that for

12   me, please?

13                   Q.   You would expect in this

14   collaborative R&D process, organized by line of

15   business, that research scientists in different

16   entities might be working on the same product or

17   technology?

18                   A.   No, I wouldn't.  I would assume

19   that would actually not be the case.  That's why we

20   set up lines of business.  We didn't have product

21   line and technological overlap so we developed

22   products only once.

23                   Q.   Correct.  We are just missing each

24   other.  Let's talk about the carrier networks line

25   of business.  So it's developing things like
```



 1   digital switches for carrier networks, correct?

 2              A.   Internet protocol switches in the

 3   latter years, yes.

 4              Q.   Right.  That research and

 5   development would be done for that particular

 6   product over a number of different or by a number

 7   of different research labs in that line of

 8   business?

 9              A.   It may have been.

10              Q.   Right.  So --

11              A.   But wasn't necessarily.

12              Q.   Right.  Then help me understand in

13   your affidavit at paragraphs 26, and following, you

14   say there that:

15              "A concise and helpful picture

16              of the Nortel matrix structure can

17              be found in Exhibit 21499, and

18              although this document is from after

19              I left Nortel the chart at page 6

20              illustrates the matrix structure

21              during my second term as CFO.   It

22              shows the way in which the LOBs

23              across the top, the regions along

24              the side, and the corporate

25              functions across the very top worked



```
1                together to develop products and

2                attract and provide services to

3                customers."

4                Right?

5                A.   Correct.

6                Q.   So if we now turn up that exhibit

7      that you referred to, 21449 -- it's found at Tab 2

8      of your affidavit, page 6.  Have you got that, sir?

9                A.   I do.

10                Q.   So this is the matrix chart that

11      you have referred to in paragraph 26 of your

12      affidavit.  So if we focus on the -- across the

13      top, CN, ES, MEN, and GS, those are the various

14      lines of business, correct?

15                A.   Correct.

16                Q.   And then down the left margin,

17      North America, CALA, EMEA and Asia; those are the

18      different regions?

19                A.   Correct.

20                Q.   Right.  And then, in the box at

21      the top under "corporate" you have got a number of

22      different corporate departments, finance, legal

23      et cetera, including central R&D, right?

24                A.   Correct.

25                Q.   So my premise to you is that if we
```



1    are talking about central R&D in the carrier

2    networks line, would there not be various research

3    scientists in the different regions working on

4    carrier network products at a given time?

5            A.    Well, there may have been, but let

6    me clarify.  In the box at the top where it has the

7    various functions including central R&D, you need

8    to recall that research and development had two

9    distinct arms at this stage in the company's life.

10           Q.    Correct.

11           A.    One was what I call the core R&D

12   which developed core technologies that could be

13   applied across multiple products lines, and the

14   other was the adaptive R&D, not to be confused, the

15   distinction between research and development with

16   the adaptive R&D that would be specific to a

17   product line.

18           So the central R&D would have a group

19   of folks who would look at core technologies.  In

20   each of the product lines there would be dedicated

21   engineers who would be looking at technology

22   development for that specific product line.

23           Q.    Right.

24           A.    It was not regionally specific in

25   any way, shape or form.  It was all focused on the



```
 1    product lines.
 2              Q.   Right, but you could have research
 3    people working in the different regions, working on
 4    the same carrier network products, correct?
 5              A.   Different iterations of the
 6    products.  You would not have redundant development
 7    going on.
 8              Q.   Right.
 9              A.   And it would be incidental to be
10    occurring in the regions.  For example, there is no
11    rhyme nor reason as to how the development would
12    have occurred in a regional sense versus product
13    lines sense.  The product line determined what
14    products should be developed when and on what
15    schedule.
16              Q.   Yes.
17              A.   The R&D -- the Chief Technology
18    Officer determined how that was going to be
19    deployed across the various labs worldwide.  So you
20    could have region A -- a lab in region A working on
21    something that had no sales possibility in region
22    A.
23              Q.   Yes.
24              A.   It's just the way it worked out
25    because of the earlier deployment of -- the earlier
```



```
 1   discussed deployment of research and development

 2   people around the world.

 3              Q.   Right.

 4              So we are now in the development stage

 5   of a product in a line of business -- the carrier

 6   network's line of business.  It could be that

 7   scientists or researchers -- developers -- in each

 8   of these jurisdictions could be working on that

 9   same product collaboratively together?

10              A.   Could be.

11              Q.   And did the company track the

12   various contributions made by each region in the

13   development of a product?

14              A.   No.  The regional contributions

15   was actually not of much interest.  It was a

16   function of what was being developed on a product

17   line sense.  So the output of the lab was tracked,

18   for sure.  And it was tracked in a product line

19   context.  But there was -- there was not -- no

20   description of that to a region per se.

21              Q.   Right.  So we could have a

22   situation where different labs in different regions

23   were working on the same product line, working on

24   the same product, all contributing to make that

25   product?
```



```
 1                    A.   You could.  Or it could not have
 2   been the case.  It -- as I say, it was all a
 3   function of the product line development plan, and
 4   it could have occurred across various regions the
 5   way you describe it --
 6                    Q.   Yes.
 7                    A.   -- or it could have happened in a
 8   lab in a specific region which ultimately would
 9   have created a product that would have been sold in
10   another region all together.
11                    Q.   Right.  So, all be done
12   collaboratively for the benefit of the product line
13   that those people were working on.
14                    A.   Correct.
15                    Q.   All right.  You had some questions
16   from both Mr. Zigler and from Mr. Rosenthal about
17   NNI and I want to know how you thought about NNI.
18   Did you think about it as operating a separate
19   business in the US?
20                    A.   Sorry, is there -- is there
21   more -- is that the question?
22                    Q.   That's the first part of the
23   question.
24                    A.   Okay.  No.
25                    Q.   How did you think about it?
```



```
 1                       A.    I thought of NNI as a statutory

 2    entity that had the ability within its geographic

 3    region to sell, market and support products

 4    developed by the corporation.

 5                       Q.    Thank you very much.

 6                       A.    Essentially by NNC, NNL.

 7                       Q.    Thank you very much.  Those are

 8    all my questions.

 9                       THE CANADIAN COURT:  Anyone else wish

10    to ask any questions?

11                       We can't all talk at once -- Mr.

12    Barrack?

13                       MR. BARRACK:  No.  I'm just letting

14    Mr. Finnigan in.

15                       Good morning, Your Honour.

16                       THE CANADIAN COURT:  I knew you had a

17    role down there, Mr. Barrack.

18                       MR. BARRACK:  Doing it well.

19                       MR. ZIGLER:  Your Honour, typically

20    this is time for re-examination, if any -- unless

21    Mr. Rosenthal has something to say...

22                       MR. ROSENTHAL:  I didn't know if

23    Mr. Zigler -- I was just going to suggest that we

24    do have re-examination very briefly if the other

25    parties are done.  Obviously, Mr. Zigler goes
```



```
 1   before us.

 2              THE CANADIAN COURT:  Very good

 3   suggestion.  Mr. Zigler?

 4              MR. ZIGLER:  Perhaps, given the hour,

 5   Your Honour, and maybe to curtail the length of the

 6   re-examination we take the morning break?

 7              THE CANADIAN COURT:  This is

 8   re-examination so it shouldn't take too long.  Why

 9   don't you proceed?

10              MR. ZIGLER:  If I can have a minute

11   just to consult.

12              MR. ZIGLER:  Your Honours, Judge Gross

13   and Justice Newbould, I have no questions on

14   re-examination.

15              THE CANADIAN COURT:  Excellent.  So, as

16   Judge Judy says, Mr. Currie, you are free to go.

17              MR. ROSENTHAL:  Actually, Your Honour,

18   I do have a couple of follow-ups to Mr. Finnigan's

19   questions.

20              THE CANADIAN COURT:  Go ahead.

21              THE WITNESS:  So I'm not free yet.

22              THE CANADIAN COURT:  I misspoke.

23              MR. ZIGLER:  I guess I have to reserve

24   a right, Your Honour.

25              MR. ROSENTHAL:  I think it will be
```



 1    under a minute, Your Honour.

 2    RE-CROSS-EXAMINATION BY MR. ROSENTHAL:

 3                    Q.    Mr. Currie, you had said in

 4    connection with my friends' questions that there is

 5    no value in the IP and individual entities because

 6    it's held by the parent company; do you recall

 7    saying that?

 8                    A.    I recall -- well, I don't recall

 9    saying that precisely.  I think what I said is that

10    the intellectual property was held by the parent

11    company.

12                    Q.    And, in fact, if we want to talk

13    about value, you have no idea about the value or

14    the scope of NNI's IP licence rights because you

15    have never even seen a licence agreement, correct?

16                    A.    Correct.

17                    Q.    And with regard to your answer a

18    moment ago about -- in response to Mr. Finnigan's

19    questions about NNI, and your view of NNI, it is

20    your testimony that NNI was akin to a distributor

21    like NN Poland, for example?

22                    A.    Strategically, yes.

23                    Q.    I have nothing further.

24                    THE CANADIAN COURT:  Thank you.

25                    MR. ZIGLER:  Having reserved my right,

Neeson&Associates    W&F

1    Your Honour, I have nothing further either.

2              THE CANADIAN COURT:  Excellent.  So I

3    think I'm safe to say you may go, Mr. Currie.

4              THE WITNESS:  Thank you, sir.

5              THE CANADIAN COURT:  And we'll take the

6    morning break.

7    -- RECESS AT 10:25 A.M. --

8    -- RESUMING AT 10:54

9                   Clive Victor Allen,

10          having been first duly sworn,

11        was examined and testified as follows:

12              MR. ZIGLER:  And, Judge Gross, Justice

13   Newbould, you should both have Mr. Allen's

14   affidavit of April 11th and his reply affidavit of

15   April 23rd.

16              THE CANADIAN COURT:  So we will mark

17   the April 11th affidavit as Exhibit 2.

18              THE CANADIAN REGISTRAR:  Exhibit No. 2.

19              THE CANADIAN COURT:  And the reply

20   affidavit as Exhibit No. 3.

21              THE CANADIAN REGISTRAR:  Exhibit No. 3.

22                  EXHIBIT NO. 2:  Clive Allen's

23                  affidavit sworn April 11, 2014.

24                  EXHIBIT NO. 3:  Clive Allen's reply

25                  affidavit dated April 23, 2014.



```
 1                    MR. ZIGLER:  I take it, Judge Gross, we
 2     are following the same numbering scheme in
 3     Delaware, 1, 2, 3?
 4                    THE US COURT:  That's correct.
 5                    MR. ZIGLER:  Thank you.
 6     EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY MR. ZIGLER:
 7                    Q.   Mr. Allen, I would like you to
 8     first look at Exhibit 2, your affidavit of
 9     April 11th, 2014, that you have before you.
10                    A.   I do.
11                    Q.   Please turn to the page where you
12     swore the affidavit, at the conclusion.
13                    THE CANADIAN COURT:  Is it necessary to
14     go through all of this, swearing an affidavit?
15                    MR. ZIGLER:  No.
16                    THE CANADIAN COURT:  Can we take this
17     thing as sworn?
18                    MR. ZIGLER:  Yes.
19                    THE CANADIAN COURT:  And just move on?
20                    BY MR. ZIGLER:
21                    Q.   This is your affidavit, Mr. Allen?
22                    A.   This is my affidavit, and --
23                    Q.   And the reply affidavit is your
24     affidavit as well?
25                    A.   It is indeed, and those are --
```



```
 1                    Q.   Are there any --
 2                    A.   -- my signatures, right.
 3                    Q.   Are there any changes to the
 4     documents?
 5                    THE CANADIAN COURT:  Sir, you're
 6     speaking over each other.
 7                    MR. ZIGLER:  Oh, sorry.
 8                    THE WITNESS:  I'm sorry, what was the
 9     question?
10                    BY MR. ZIGLER:
11                    Q.   Are these your affidavits?
12                    A.   Yeah.  I read the affidavit, yes.
13                    Q.   Yes.  Are there any changes to the
14     affidavits --
15                    A.   No.
16                    Q.   -- that you wish to make?
17                    A.   No.
18                    Q.   Looking at your April 11th
19     affidavit, can you please tell us very briefly in a
20     nutshell about your career at Nortel.
21                    A.   I joined Nortel as Chief Legal
22     Officer in 1974 and basically held that position
23     with various titles until I retired in 1999.  As I
24     said at the time, I'm the only person at the
25     company that's had the same job for twenty-five
```

 Neeson&Associates    W&F WILSON & PETERS LTD.

1    years, but nonetheless, it was an enjoyable

2    position.

3              In that role, I had responsibility for

4    all of the legal activities of the company

5    worldwide.  I had responsibility for the patent and

6    licensing functions of the company, again, on a

7    worldwide basis, corporate secretarial matters and,

8    from time to time, other matters, such as

9    insurance.

10             As a senior officer of the company, I

11   was part of the many different management

12   committees that we had over the years, and in that

13   role, in addition to managing the department and

14   providing legal and other advice, I was involved

15   with the corporation's strategy, its budgeting, its

16   activities throughout the world.

17             Q.   And this came up the other day.

18   When was your actual retirement date where you

19   ceased working?

20             A.   I ceased working, at least for the

21   company, on the 30th of June, 1999.  I left on a

22   leave of absence for one year, which expired the

23   following June.

24             Q.   Now, Mr. Allen, I'm going to ask

25   you to turn to your reply affidavit where you are



```
1     replying to the affidavit of Walter T. Henderson.

2     Do you see that, in paragraph 1?

3                    A.   Yes, I do.

4                    Q.   And if we can put up on the screen

5     paragraph 6 of your affidavit.

6                    A.   Six of the reply affidavit.

7                    Q.   Of the reply affidavit, where you

8     say, midway through, about five lines down:

9                         "All technology, including

10                        patents" -- do you see that? --

11                        "patents, no matter where the

12                        invention was made, remained at all

13                        times owned by NNL or its

14                        predecessors.  NNL subsidiaries were

15                        only entitled to use the patents to

16                        manufacture and, for some instances,

17                        sell Nortel product.  NNL

18                        subsidiaries had no ownership in the

19                        technology.  NNL's continued

20                        ownership was not a matter of mere

21                        administrative convenience but

22                        corporate policy."

23                        Referencing the corporate policy, who

24     set that corporate policy?

25                    A.   I established the corporate
```



```
 1   policy.  It was my responsibility for the duration

 2   of my period as an officer of the company.

 3               Q.   And if there was a change in

 4   corporate policy during that tenure, who would

 5   have --

 6               A.   It would come to me for approval,

 7   and I would not have approved anything where there

 8   was a change in the ownership of the technical

 9   information or other aspects of technology,

10   including patents.

11               Q.   Did anybody ever come to you

12   seeking a change in that policy?

13               A.   Nobody would have dared to come to

14   me.

15               MR. ZIGLER:  Thank you, Mr. Allen.  I

16   have no further questions.

17               THE CANADIAN COURT:  Does anybody dare

18   to cross-examine Mr. Allen?

19               MR. ZELBO:  I approach with quite --

20   with a lot of caution.

21   CROSS-EXAMINATION BY MR. ZELBO:

22               MR. ZELBO:  Good morning, Justice

23   Newbould.  I don't think we have met.  Howard Zelbo

24   from Cleary Gottlieb representing the US Debtors.

25               Good morning from afar, Judge Gross.
```



```
 1                    THE US COURT:  Good morning, Mr. Zelbo.
 2                    MR. ZELBO:  Thank you.
 3                    BY MR. ZELBO:
 4               Q.   And good morning, Mr. Allen.
 5               A.   Good morning.
 6               Q.   I will dare to ask a few
 7     questions, but hopefully it won't go too long.
 8                    I believe you testified on direct that
 9     1999 --
10               A.   Could we turn up the volume.  I'm
11     not hearing you that well.
12               Q.   Sure.  I will speak up.  How's
13     that?
14               A.   That's much better.
15               Q.   I believe you testified on direct
16     that you essentially stopped actively working at
17     Nortel in 1999, right?
18               A.   That is correct.
19               Q.   And that was in June, 1999?
20               A.   June 30th, six o'clock.  It was
21     the start of a long weekend and everyone else had
22     gone.  I left some memorandums but knew that
23     everyone would ignore them when they returned after
24     the long weekend, so I went home.
25               Q.   And did that prove correct?
```



```
 1                    A.    It did.

 2                    Q.    And since your retirement,

 3   Mr. Allen, you have had no involvement with Nortel,

 4   is that fair?

 5                    A.    Absolutely none.  I take no

 6   responsibility.

 7                    Q.    And you thoroughly enjoyed your

 8   retirement?

 9                    A.    I enjoyed my career and enjoying

10   my retirement even more.

11                    Q.    I'm glad to hear that.

12                    Mr. Allen, several issues in this case

13   relate to a document that's called a master R&D

14   agreement, and that was signed by Nortel entities

15   in 2004 and 2005, around that time period.

16                    A.    I have no familiarity with that

17   agreement.  It was after my time, and I have not

18   looked at it.  I just don't know -- I'm not able to

19   comment on it.

20                    Q.    Okay.  So you were not involved in

21   the master R&D agreement in any way?

22                    A.    I was not involved in that one,

23   no.

24                    Q.    And so just to be clear, you are

25   not here to give testimony to either --
```



```
 1                    A.   Not here to give testimony on
 2      things I don't know anything about.
 3                    Q.   You know what, that's a very good
 4      rule.  I try to tell witnesses who I work with to
 5      try to follow that rule often.
 6                    A.   It's the only rule, actually.
 7                    Q.   And just let's stick to the time
 8      you were at Nortel.  And just to close this loop,
 9      you don't recall any discussions while you were at
10      Nortel about something called a master R&D
11      agreement, right?
12                    A.   No.
13                    Q.   You don't recall discussions about
14      coming up with a new method, a new transfer
15      price --
16                    THE CANADIAN COURT:  You said it was
17      after his time.  Why do we need all this?
18                    MR. ZELBO:  Fair enough.
19                    THE CANADIAN COURT:  Mr. Allen said he
20      doesn't know anything about it; it was after his
21      time.
22                    BY MR. ZELBO:
23                    Q.   Fair enough.  Let's go to when you
24      were there, okay?
25                    A.   That's correct.
```



```
 1                    Q.   All right.  So is it fair to say

 2    that you were involved in the drafting of the

 3    cost-sharing agreements in the 1970s when they were

 4    first conceived?

 5                    A.   I was involved with (a) the

 6    formulation of policy, the development of corporate

 7    policies to address these issues, and I would have

 8    prepared and been very actively involved with the

 9    preparation and negotiation of the original

10    agreements.

11                    Q.   And the original agreements, sir,

12    were in the 1970s?

13                    A.   In the 1970s, correct.

14                    Q.   And then in later decades -- I'm

15    talking a lot of years so I will go by decades.  In

16    later decades, is it fair to say you had a very

17    large staff and you relied on your staff to -- when

18    there were new iterations of that agreement, but

19    they were to follow the model from the '70s?

20                    A.   I relied on them to do what they

21    knew we wanted to be -- have done.

22                    Q.   Okay.  And you expected them to

23    follow the model from the '70s, correct?

24                    A.   Expected them to generally follow

25    that or to bring alternatives to my attention and
```

Neeson&Associates   W&F

```
 1    seek my approval.
 2             Q.   Fair enough.  And you don't recall
 3    any instance of somebody coming to you with
 4    fundamental changes, if you will, from the model in
 5    the 1970s, right?
 6             A.   Fundamental changes in principle?
 7             Q.   Fair enough.
 8             A.   I think they would have known
 9    better.
10             Q.   I just want to ask you a few
11    questions about the cost-sharing agreement in the
12    '70s.  I can show it to you, but I think it might
13    be quicker if we just go through it this way.  If
14    you feel that you want to see one, I can show it to
15    you.
16             A.   No.
17             Q.   Do you recall that in the 19 --
18    the 1970 cost-sharing agreement is the one that we
19    have, at least.  That's the earliest we have, I'll
20    tell you that.
21             Do you recall at that time that what
22    was then called Northern Telecom Inc. and now
23    NNI --
24             A.   Yes.
25             Q.   -- was given a non-exclusive right
```



```
 1   to use what was then called Northern Telecom

 2   Limited, now NNL's, technology and patents in the

 3   United States?

 4              A.   I recall that we entered into a

 5   series of agreements with a variety of subsidiaries

 6   in order to, in effect, set them up in business,

 7   because they had nothing beforehand.

 8              Q.   Correct.  And do you recall at the

 9   time it was a non-exclusive right to use the

10   patents?

11              A.   At this point, I can't recall

12   whether it was exclusive or non-exclusive.

13              Q.   And do you recall that, in the

14   1970s version of the agreement, the agreement

15   provided that the non-exclusive rights or whatever

16   rights were given were just for a period of five

17   years?

18              A.   I don't recall that it had a

19   limit.  I thought it had a much more extended

20   period.

21              Q.   Do you recall in the 1970s that,

22   when the term ended, NNI had no continuing rights

23   in the technology?

24              A.   I'm sorry, what was that again,

25   please.
```



```
 1                    Q.   Sure.  The 1978 CSA had a term,

 2   right?  It wasn't -- the agreement itself continued

 3   for a period of years, right?

 4                    A.   Yes.

 5                    Q.   And do you recall that there was

 6   no provision in that agreement that said when it

 7   ends, NNI continues to have rights in the

 8   technology; there had to be a new agreement, in

 9   other words?

10                    A.   I would understand that it would

11   continue to have rights.

12                    Q.   Do you recall that, in the 1978

13   agreement, NNI was only granted a right to

14   sublicense with the express written consent of the

15   parent company NNL?

16                    A.   That is possible, yes.

17                    Q.   Do you recall that, in the 1978

18   agreement, NNI was not given any rights to enforce

19   patent rights in the United States?

20                    A.   You must bear in mind that our

21   agreements evolved.  We started off in the 1970s,

22   and over a period of time, they evolved; they

23   become more sophisticated, as indeed the world

24   around us was evolving, and I think our original

25   agreements were based on a state of the art that
```

Neeson&Associates   W&F WILSON & PETZER LTD

```
1    was there in the -- in the early, mid-70s, but

2    changes take place over a period of time, and

3    changes in the business environment as well as the

4    what I will call structural environment occur.

5              Q.   And these changes in the business

6    environment and the structural environment

7    corresponded to changes in evolutions in the CSAs;

8    is that right?

9              A.   Result in an evolution of it.

10             Q.   Okay.  So let me go to what at

11   least the last cost-sharing agreement was with NNI,

12   between NNL and NNI.

13             A.   The last one during my tenure?

14             Q.   During your tenure, yes, sir.

15             A.   Yes.

16             Q.   And that was in 1992.  Again, I

17   can show you the document if you want.

18             A.   That's fine.

19             Q.   I think we are doing fine this

20   way, and it's quicker.

21             Do you recall that, under the 1992

22   agreement, NNI was granted an exclusive licence

23   with respect --

24             A.   That's possibly the case --

25             Q.   -- with respect to tax?
```



```
 1                    A.    -- yes.

 2                    Q.    And that was in the United States,

 3    right?

 4                    A.    Yes.  And I haven't looked at the

 5    agreement recently, and that's my recollection.

 6                    Q.    Okay.  And do you recall that that

 7    was referred to in the agreement as a perpetual

 8    licence?  Do you recall that?

 9                    A.    I suspect it would have been a

10    perpetual licence as long as they were in

11    compliance with the licence.

12                    Q.    And do you recall it also

13    provided --

14                    THE CANADIAN COURT:  Mr. Zelbo, we have

15    the agreement here in the record.  Does it really

16    matter if the witness recalls all this?

17                    MR. ZELBO:  No, it doesn't matter that

18    he recalls all of it; I'm just trying to show the

19    operation.  I can move on, Your Honour.  I'm

20    just -- actually, just -- can I ask one more

21    question about it?

22                    THE CANADIAN COURT:  Sure.

23                    MR. ZELBO:  All right.  I will be

24    quick.

25
```



```
 1                    BY MR. ZELBO:
 2                    Q.   In the '92 agreement, NNI also had
 3   a right to enforce, was granted the right to
 4   enforce?
 5                    A.   It not only had a right to enforce
 6   but it had an obligation to enforce.
 7                    Q.   Okay.
 8                    A.   And that would be a normal
 9   approach in such an agreement, where you in effect
10   have someone managing the use of that in that
11   territory.  Common in every licence.
12                    Q.   Right.  Now, you say in your
13   witness statement -- it's in your reply witness
14   statement -- that:
15                    "None of the cost-sharing
16                    agreements executed during my term
17                    of office provided the subsidiaries
18                    receive the benefits and burdens of
19                    Nortel technology."
20                    You recall that in your witness
21   statement, right?
22                    A.   I recall that.  They -- they had
23   licences.
24                    Q.   Do you recall -- I'm trying to
25   find out if they share the benefits and burdens of
```


Neeson&Associates   W&F

```
 1   the technology, and let me ask it this way.
 2             Do you recall that there came a time in
 3   1996 -- let me back up, actually.  Are you familiar
 4   with an advance pricing agreement?  Do you know
 5   what that is?
 6             A.   I know the concept, but I have not
 7   been involved in negotiations with those.
 8             Q.   Okay.  In fact, you weren't
 9   involved in transfer pricing; is that right?
10             A.   Transfer pricing during the period
11   I was active was mainly a tax issue and concerned
12   with the transfer of products between various
13   jurisdictions to ensure that each jurisdiction got
14   its proper share of revenue, taxable revenue.
15             Q.   Sure.
16             A.   It did not, during my period,
17   apply to technology.
18             Q.   But just to be clear, you weren't
19   involved in transfer pricing?
20             A.   I was not involved.
21             Q.   And no one involved in transfer
22   pricing reported to you?
23             A.   No.
24             MR. ZELBO:  Okay.  Can I have TR46875,
25   please.  Sorry, 46875.  Can I have a copy, please.
```



```
 1                   Justice Newbould, I don't know if you
 2   need or want a hard copy, I'm sorry.
 3                   THE CANADIAN COURT:  I'm sorry, let me
 4   just make a note.
 5                   MR. ZELBO:  Can I trouble you or
 6   somebody on this side of the fence.
 7                   I'm sorry, Your Honour.  A question was
 8   being raised as to everybody's favourite subject of
 9   confidentiality, and it's my understanding, at
10   least, though I haven't been directly involved,
11   that the concerns related to the later APA, not the
12   '96 APA, which is ancient history, so I'm going to
13   keep going.
14                   THE CANADIAN COURT:  I'm not sure where
15   we can go with this, because the witness has said
16   he was never involved in negotiating an APA.
17                   MR. ZELBO:  That's a fair point, Your
18   Honour, which is why I'm going to do this extremely
19   quickly.
20                   THE CANADIAN COURT:  All right.
21                   BY MR. ZELBO:
22              Q.   You have never seen this document,
23   is that fair?
24              A.   I've not seen this document
25   before.  I'm looking at it for the first time.
```



```
 1   I've checked on the date; I'm not sure how accurate
 2   the date is.  I've checked on the signature on
 3   behalf of Northern Telecom, and it is of course
 4   something that has been devised by the tax
 5   department.  It is not a legitimate Northern
 6   Telecom agreement because it's only signed by one
 7   junior officer.  Agreements required signatures by
 8   two officers.  As you will note, if you look at the
 9   agreements, the cost-sharing agreements, signed by
10   two officers.  This one, therefore, is I think
11   something devised by the tax department to meet
12   their needs.  It doesn't satisfy the corporate
13   policies and is, as far as I'm concerned,
14   non-binding, and non-evidence of anything.
15             THE CANADIAN COURT:  Next question.
16             BY MR. ZELBO:
17             Q.   Mr. Allen, I'm inclined to leave
18   it like that, but I do want to just follow up
19   quickly, just to be clear.
20             Mr. Allen, this is titled an agreement
21   between Northern Telecom Limited and the competent
22   tax authority in Canada, right?  You don't know
23   anything about it, but ...
24             A.   Well, I think "competent" is a bit
25   of an oxymoron there.
```



1              Q.   Fair enough.  I won't get into

2     that debate, either on the US side or the Canadian

3     side, sir.  I'll just do it this way.

4              Would it surprise you to learn that

5     this agreement between Nortel Telecom Limited and

6     the competent authority for Canada provides that

7     all the cost-sharing participants share in the

8     benefits from the licensing of technology and

9     Nortel's technology?

10              THE CANADIAN COURT:  What's the -- I

11     don't understand the point of the question, whether

12     he was would be surprised.  How does that help us?

13     He has never seen it.

14              BY MR. ZELBO:

15              Q.   Do you think that Nortel's tax

16     people, in entering into an arrangement with tax

17     authorities, would misstate relevant arrangements

18     at Nortel during your tenure?

19              A.   Sorry, do I think -- what is the

20     question again?

21              Q.   During your tenure.

22              A.   Yes.

23              Q.   While were you at Nortel.

24              A.   Yes.

25              Q.   Okay?  You wouldn't expect, right,



```
 1   Nortel's tax people to make misrepresentations to

 2   tax authorities?

 3             A.   I wouldn't have expected, but I

 4   wouldn't be surprised.

 5             Q.   But you wouldn't want that going

 6   on in your watch, right?

 7             A.   No, and it wouldn't have.

 8             Q.   Now, in your witness statement --

 9   and I'm going to do this very quickly.  In your

10   witness statement, you refer to the fact that:

11                 "Having NNL own NN technology was

12                 a deliberate decision by senior

13                 management of a storied

14                 Canadian-based technology company

15                 that was increasingly beginning to

16                 carry on business through

17                 subsidiaries incorporated in various

18                 jurisdictions throughout the world."

19                 Right?

20             A.   Correct.

21             Q.   Okay.  In the 1970s, NNI, the US

22   entity, right, that was a start-up operation,

23   right?

24             A.   It started operations, yes, with

25   zero in the way of technology.
```



```
 1                    Q.   Correct.  It didn't stay that way,
 2      right?  It didn't stay a start-up --
 3                    A.   No, because of the enormous
 4      availability of technical information, technology
 5      generally, from the parent company.
 6                    Q.   And that was technology developed
 7      in the '70s and earlier, right?
 8                    A.   Some of it went back much earlier,
 9      because it involved manufacturing techniques.  It
10      involved all sorts of things, trade secrets,
11      enormous amount of technical information,
12      technology generally, which, without that, the
13      company would not have had an existence.
14                    Q.   Okay.  And over time, NNI grew,
15      right?
16                    A.   Well, it would have been a
17      disaster if it hadn't after all we had made
18      available to it.
19                    Q.   Correct.  And by 1985, for
20      example, roughly 70 percent of global revenue for
21      Nortel was generated in the United States, is that
22      fair?
23                    A.   That is possible.
24                    Q.   And NNI developed its own
25      technology and intellect -- right?
```



```
 1                    A.   As part of an overall development
 2    program, it was a piece of the puzzle, but the
 3    puzzle was much bigger than a piece.
 4                    Q.   Sure.  But they did develop their
 5    own technology?
 6                    A.   They contributed to it, bearing in
 7    mind the rules under which they were operating.  We
 8    owned the technology.
 9                    Q.   I'm not talking about ownership
10    right now.  I just want to confirm that they
11    developed their own technology and associated
12    intellectual property.
13                    A.   Well, they did as part of a group
14    effort, yes.  And Canada did and a variety of other
15    countries.
16                    Q.   NNUK, the London entity, did as
17    well?
18                    A.   Yes.
19                    Q.   Now, by the 1990s, if not even
20    earlier, Mr. Allen, the -- the research and
21    development needed to develop a product had really
22    grown in size; it was now, you know, billion
23    dollars.  It could be up to a billion dollars to
24    develop things.  It had become quite expensive,
25    right?
```



```
 1                    A.    It could be.
 2                    Q.    Yes.  And by the -- let's talk
 3      about the '90s, right?  Canada couldn't afford that
 4      R&D on its own had it just stayed in Canada with
 5      its operations, is that fair?
 6                    A.    Well, no, but it didn't have to,
 7      because it was a global business.
 8                    Q.    Right.
 9                    A.    The United States couldn't have
10      afforded it, because it was only part of a global
11      business.
12                    Q.    Sure.  By then, it was a global
13      company?
14                    A.    That is correct.
15                    Q.    If it had just stayed a Canadian
16      company, it probably would have died, right?
17                    A.    No, it wouldn't have.  It wouldn't
18      have died; it would have just handled things
19      differently, and the budget that you look at for
20      R&D, that covered things all around the world.  We
21      spent a lot of money developing products for
22      England, for Germany, for all sorts of countries.
23      And it was a group effort.
24                    Q.    Sure.  Do you recall in a 1999
25      discussion panel -- I can show you the document;
```



```
 1    I'm trying to move forward -- where you said:
 2                   "What were the alternatives
 3              available to us at the start of my
 4              career with Nortel as we went off
 5              into this worldwide exercise?  We
 6              could have remained just a Canadian
 7              company and, in effect, died because
 8              we could not afford the R&D to be
 9              competitive."
10              Is that a fair statement?
11              A.   Well, there's no doubt that either
12    spending, as we did, $2 billion a year on R&D, we
13    needed sales of $20 billion or more to justify
14    that, and the market was not there in Canada, it
15    was not there in the US, it was not there in any of
16    the countries.
17              Q.   Do you know --
18              A.   We had to have the collectively of
19    those markets, and this was all driven throughout
20    the whole corporation worldwide.  That's why we ran
21    it as a global corporation.
22              Q.   Sure.  It was a global
23    corporation, and NNI and NNL and NNUK, for example,
24    all engaged in R&D activities at great expense
25    throughout the '80s and throughout the '90s, right?
```



```
 1                      A.   And it all grew from the

 2     technology that we transferred at the start.

 3                      Q.   Well, you don't -- are you aware

 4     of what patents were included in the patent

 5     portfolio sold by Nortel in 2010?

 6                      A.   Are you saying in 2000?

 7                      Q.   In 2010, Nortel sold the patent

 8     portfolio.

 9                      A.   Correct.  I'm aware of that, yes.

10                      Q.   Okay.  You haven't gone through

11     those patents to see what was in those 7,000

12     patents, have you?

13                      A.   I have no knowledge post-June 30,

14     1999, 6 p.m.

15                      Q.   Okay.  Just give me a moment,

16     Mr. Allen.

17                      I'll just ask.  In 1999, Mr. Allen, are

18     you aware of how much NNI spent on R&D versus

19     Canada on R&D?

20                      A.   I don't have the figures.

21                      Q.   Would it -- that's fair.  If I

22     told you the US spent 1.25 billion and Canada spent

23     1.17 billion, would that seem about right, in the

24     ballpark?

25                      A.   Hmm, it would probably be right,
```



```
 1   yes.
 2               Q.   Do you have a view -- do you
 3   believe that the useful life of Nortel's technology
 4   is five years?
 5               A.   No.  No, it's much longer than
 6   that.
 7               Q.   Much longer than that.
 8               A.   Much longer.
 9               Q.   Okay.
10               A.   NTI was using Nortel -- Northern
11   Telecom technology, I'm sure, in 1999 that it got
12   in the 1970s.
13               Q.   Okay.  Now, you do understand that
14   NNL granted an exclusive licence to NNI with
15   respect to the United States, right?
16               THE CANADIAN COURT:  When?
17               MR. ZELBO:  This is just a predicate,
18   and then I only have two questions left.
19               THE CANADIAN COURT:  No, but when?
20   When are you asking him?
21               MR. ZELBO:  That is a fair question.
22   Let's say --
23               THE CANADIAN COURT:  What he said was
24   he couldn't recall before whether it was exclusive
25   or not when he was there.
```

Neeson&Associates    W&F

```
 1                    MR. ZELBO:  That is fine.
 2                    BY MR. ZELBO:
 3               Q.   You do recall at some point -- I
 4     know you don't remember when -- that NNL did give
 5     an exclusive licence to NNI with respect to the
 6     United States, right?
 7               A.   I believe that's the case, yes.
 8               Q.   Okay.  And isn't it true that that
 9     licence gave NNI carte blanche within its territory
10     to use any Nortel technology that was within the
11     domain and available to the parent company?
12               A.   It's a question of how you define
13     "carte blanche".
14                    THE CANADIAN COURT:  It's like beauty
15     in the eyes of the beholder.  I don't understand
16     the question, frankly.  And in any event, the
17     licenses are here and that's an issue for the
18     Court.  This witness's belief, how is that going to
19     help me or Judge Gross?
20                    MR. ZELBO:  That's a fair point.  I'm
21     just quoting a line that Mr. Allen said in his is
22     deposition.
23                    THE CANADIAN COURT:  Well ...
24                    BY MR. ZELBO:
25               Q.   It depends on how you define
```



```
 1   "carte blanche", is that your answer?

 2               A.   I'm sorry.  Again?

 3               Q.   Do you recall using the phrase

 4   "carte blance" in the deposition?

 5               A.   I recall -- the deposition said

 6   that, yes.

 7               MR. ZELBO:  Thank you, Mr. Allen.  I

 8   have no further questions for you.

 9               THE CANADIAN COURT:  Thank you.  Any

10   other cross-examination?

11               MR. GOTTLIEB:  No.  Thank you, Your

12   Honour.

13               MR. BARRACK:  Just a couple of

14   questions, Your Honour.

15   CROSS-EXAMINATION BY MR. BARRACK:

16               Q.   Sir, my name is Mike Barrack, and

17   I'm here for the UK pension people.

18               When you left Nortel, how many

19   subsidiaries were there, approximately?

20               A.   Hmm, well, there were, I would

21   imagine, a hundred-plus.

22               Q.   Okay.

23               A.   And some of those were more paper

24   subsidiaries than real operating businesses.

25               Q.   Did you ever turn your mind to the
```



```
 1   insolvency of the enterprise while you were there?

 2                A.    Which enterprise?

 3                Q.    The Nortel enterprise.

 4                A.    As a group?

 5                Q.    As a group.

 6                A.    I thought it was inconceivable.

 7                Q.    So did you ever draft any

 8   agreement or any policy to deal with it?

 9   Insolvency of the group?

10                A.    I did not draft it.  In our

11   agreements, we would have -- our licence

12   agreements, for example, we would have had

13   provisions anticipating, you know, that there may

14   be a termination on the basis of insolvency or

15   bankruptcy or whatever it may be called, but this

16   was not at that time on our agenda.

17                Q.    So the group-wide insolvency and

18   liquidation of the Nortel enterprise was never a

19   risk you addressed?

20                A.    No.

21                MR. BARRACK:  Thank you.

22                THE CANADIAN COURT:  Any other

23   cross-examinations?

24                Thank you, Mr. Allen.

25                THE WITNESS:  Thank you.
```



```
1              MR. STEEP:  Your Honour, Judge Gross,
2    if you can just indulge us for a minute.  We are
3    getting our witness.  He's not in the courtroom.
4              THE CANADIAN COURT:  Sure.
5              MR. STEEP:  Judge Gross, Justice
6    Newbould, the next witness is Brian McFadden.  We
7    are going to hand up here and in your courtroom,
8    Judge Gross, the affidavit so that we can mark them
9    as exhibits.
10
11              Brian McFadden,
12         having been first duly sworn
13       was examined and testified as follows:
14
15              MR. STEEP:  Justice Newbould, Judge
16   Gross, I'm going to take from your last direction,
17   Justice Newbould, that I can just mark the two
18   affidavits.  I'll identify them for you.
19              THE CANADIAN COURT:  All right.  The
20   first affidavit will be Exhibit 4.
21              THE CANADIAN REGISTRAR:  Exhibit 5,
22   Your Honour.
23              THE US COURT:  Yes.
24              THE CANADIAN COURT:  The first one is
25   Exhibit 4 and the reply is Exhibit 5.
```

 Neeson&Associates   W&P

```
 1                MR. STEEP:  Right.  So the first one is
 2     April 10, second one is April 25th.
 3                     EXHIBIT NO. 4:  Affidavit of Brian
 4                     McFadden sworn April 10, 2014.
 5                     EXHIBIT NO. 5:  Reply affidavit of
 6                     Brian McFadden dated April 25, 2014.
 7     EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY MR. STEEP:
 8                Q.   Mr. McFadden, you have copies of
 9     your affidavits before you, correct?
10                A.   Yes, I do.
11                Q.   You have had a chance to review
12     them, and I understand there are no changes you
13     wish to make to them?
14                A.   That's correct.
15                Q.   Mr. McFadden, I understand that
16     you are by training an electrical engineer?
17                A.   Yes.
18                Q.   I understand that you had a brief
19     stint at Bell Canada and then you became an
20     engineer at Nortel Networks in 1979, correct?
21                A.   Yes.
22                THE CANADIAN COURT:  Can you help us
23     here today?  We are having trouble with the Bell
24     interconnect for the connection.
25                MR. STEEP:  He probably could, Your
```



1    Honour.

2              BY MR. STEEP:

3              Q.   Mr. McFadden, I want to go through

4    your career quickly.  You ended your career as the

5    chief technology officer of Nortel Networks Limited

6    in 2005, correct?

7              A.   Yes.

8              Q.   And I understand that you were

9    appointed the Chief Technology Officer

10   approximately in August of 2004, correct?

11             A.   Yes.

12             Q.   And I understand that, prior to

13   that, you had been President of optical long-haul

14   networks, correct?

15             A.   Yes.

16             Q.   And that you were in that position

17   from about 2001 until your appointment as chief

18   technology officer in 2004?

19             A.   Yes.

20             Q.   I understand that you did two

21   stints abroad in your career but always as an

22   employee of Nortel Networks Limited, one in Seoul,

23   South Korea, and then again in Maidenhead in the

24   United Kingdom; is that correct?

25             A.   Yes, that's correct.



    1                    Q.    All right.  Just a few questions
    2    before I sit down.  In your affidavit, if you turn
    3    up the first affidavit.  Judge Gross, I'm going to
    4    refer the witness to paragraph 22, where you will
    5    see a heading "Advanced Technology Programs".
    6                    A.    Yes.
    7                    Q.    What are advanced technology
    8    programs?
    9                    A.    Advanced technology programs are
   10    programs designed to research the capabilities of
   11    new technologies that are not being used in our
   12    products currently.  They would be various
   13    techniques and new components and software, it
   14    could be -- it could be a multitude of things that
   15    you would investigate to see if they would be
   16    applicable to be used in products in the future.
   17                    Q.    Why did you have those programs?
   18    What relationship did it have to the business?
   19                    A.    Those programs were fundamental to
   20    the future of the business, because you would --
   21    based on those programs, you would work with the
   22    lines of business to decide what the next R&D
   23    thrust should be from a product development point
   24    of view.  Also, many of our customers were very
   25    interested in understanding where we felt the



1    future lay for their networks and their businesses

2    in terms of technology and capabilities, et cetera.

3                Q.    Briefly describe that interface

4    between the advanced technology program and your

5    customers at Nortel.

6                A.    It was very important to the

7    customer relationship.  Most of our major customers

8    had chief technology officers, and they had

9    advanced technology groups of their own, and they

10   were doing their own research into what the future

11   would look like, and they would rely on

12   interactions with the Nortel CTO office and

13   advanced technology team to validate their thoughts

14   or to understand what our thinking was on the

15   future of their business and networks.

16               Q.    Where was Nortel's advanced

17   technology team and CTO located?

18               A.    The majority of it was located in

19   NNL Ottawa.

20               Q.    Why was that?

21               A.    Historical reasons, that the

22   initial teams were built up in Ottawa and we had

23   critical mass there.  Fundamentally, we had three

24   hundred people or so that were very highly skilled

25   in subject -- in their subject matter expertise.



1    Many of them were PhDs, and they were built up
2    over time into a team that -- that could look at
3    customers' business and network technologies as
4    they exist and then extrapolate that into the
5    future to look at what it could be in the future.
6              Q.    When customers interacted with
7    Nortel on these advanced technology programs, where
8    did that take place?
9              A.    Most of it took place in the NNL
10   labs in Ottawa.  When I was CTO, it -- we hosted a
11   major customer approximately once per week, which
12   could have been senior vice-presidents level at the
13   customer or CTO themselves, and we shared -- we had
14   discussions on their plans and -- for future
15   network development and services, and we shared our
16   plans in terms of what we thought new technologies
17   would be required and how they would be used in
18   their networks.
19             Q.    Now, I want to just turn briefly
20   to your reply affidavit.  Would you turn up
21   paragraph 3.
22             A.    Same one?
23             Q.    The second affidavit.
24             A.    Okay.  Yes.
25             Q.    Which is the April 25th affidavit.



1                    If you have that, Judge Gross, it's

2    page 3.

3                    THE US COURT:  Yes.

4                    BY MR. STEEP:

5                    Q.   You refer in paragraph 3 to

6    reviewing the affidavit of Mr. Rae dated April the

7    11th, 2014, and, in particular, reviewing his

8    statement that NNI had all of the administrative

9    and operational functions to operate on a

10   standalone basis.  Did you agree or disagree with

11   that statement?

12                   A.   I disagreed with that statement

13   based on the advanced technology capabilities that

14   were not inside NNI.

15                   Q.   And can you just tell us briefly

16   what technologies or capabilities you are referring

17   to?

18                   A.   Well, I'm referring to -- as said

19   before, a team in the NNL lab in Ottawa that looked

20   at three to five years out from where we were today

21   to decide and to investigate what kind of

22   capabilities our customers would need for their

23   networks and then bring them forward into the

24   corporation and investigate whether they would be

25   applicable to new products and new capabilities



 1   with the customers.  The interaction with the

 2   customers was key, because we had to understand

 3   what the customer wanted to do in terms of their

 4   future capabilities, and they needed to understand

 5   what we felt was possible from a technology point

 6   of view.

 7                 The way I would describe it, they were

 8   network and service specialists and we were

 9   technology and architecture specialists, and we got

10   them together to make sure we were both on the same

11   wavelength, so to say, in terms of the future and

12   where we should invest our R&D dollars going

13   forward.

14                 MR. STEEP:  Thank you Mr. McFadden.

15                 THE CANADIAN COURT:  I don't want you

16   to trip.  One day, we had someone trip in here, and

17   the next day, we had the Minister of Labour all

18   over handing out orders to staff.

19                 MS. SCHWEITZER:  There you go.  I

20   thought you would be excited if a couple of lawyers

21   went down in the room.  I will leave that to

22   someone else to take on that role.

23                 THE CANADIAN COURT:  I'm not going to

24   touch that.

25                 MS. SCHWEITZER:  That's why you get to



1    be the judge, right?

2    CROSS-EXAMINATION BY MS. SCHWEITZER:

3                   Q.    I'm Lisa Schweitzer from Cleary

4    Gottlieb representing the US Debtors, and as I

5    believe you had just testified, you were the

6    president of Nortel's optical network business from

7    2001 to 2004, that's right?

8                   A.    Yes.

9                   Q.    And during those two or three

10   years that you were president of the line of

11   business, the optical business generated about

12   15 percent of Nortel's total revenues; is that

13   right?

14                  A.    Hmm, I don't have the specific

15   numbers, but it sounds approximately right.

16                  Q.    Okay.  In that ballpark --

17                  A.    Yes --

18                  Q.    -- less than 20 percent --

19                  A.    -- yes --

20                  Q.    -- of Nortel's business, right?

21                  A.    -- yes.

22                  Q.    And in addition to the labs in

23   Ottawa doing the optical work, there also were labs

24   in Harlow in the UK?

25                  A.    Yes.



1                    Q.   And in Raleigh and Richardson in
2    the US that were doing optical work; is that right?
3                    A.   Yes, they were doing some work,
4    yes.
5                    Q.   And during your tenure as
6    president of the optical business, a significant
7    portion of the revenues that came out of the
8    optical business came from the US markets; is that
9    right?
10                   A.   Yes.
11                   Q.   In fact, over 50 percent of the
12   revenues from the business came from the US
13   markets?
14                   A.   Sounds about right.
15                   Q.   And the US, therefore, was the
16   biggest market for optical products while you were
17   the president; is that right?
18                   A.   Yes.
19                   Q.   Major customers of Nortel at that
20   time included MCI, AT&T, WorldCom, and Verizon; is
21   that right?
22                   A.   Yes.
23                   Q.   And after that two- or three-year
24   stint as president of the optical business, you
25   moved over to your CTO or CRO role?

 Neeson&Associates   W&F

```
 1                    A.   Yes.

 2                    Q.   And that's right?

 3                    A.   Yes.

 4                    Q.   And you stayed in that role for

 5  about sixteen months before you were terminated

 6  from the company?

 7                    A.   Yes.

 8                    Q.   And you were terminated when the

 9  company decided to change its strategic direction,

10  is that right?

11                    A.   Yes.

12                    Q.   During your time -- I believe in

13  your affidavit, you said that during your time in

14  this CRO/CTO role, you had a business leadership

15  team under you, and you included an org chart, in

16  fact, with that leadership team?

17                    A.   Yes.

18                    Q.   Do you have your affidavit and

19  that org chart in front of you?

20                    A.   I don't know.

21                    Q.   It's page 23.  We can hand it up

22  if you don't.

23                    A.   Which affidavit is that?

24                    Q.   I don't know if we can just pull

25  it on the screen.  It's TR number 45170.
```

 Neeson&Associates    W&F WILSON & PEYTON LTD.

```
 1                    THE CANADIAN COURT:  Where is it
 2  referred to in the affidavit, Ms. Schweitzer?
 3                    MS. SCHWEITZER:  Excuse me?
 4                    THE CANADIAN COURT:  Which paragraph is
 5  it referred to in the affidavit?
 6                    MS. SCHWEITZER:  The exhibit is really
 7  what I'm focussed on, and we have copies if Your
 8  Honour doesn't have that in front of you.
 9                    THE CANADIAN COURT:  I would like to
10  know which paragraph it's in.
11                    MS. SCHWEITZER:  Okay.  Paragraph 13 of
12  the affidavit as well.
13                    THE CANADIAN COURT:  Thank you.
14                    BY MS. SCHWEITZER:
15                    Q.   And I believe, as you say in your
16  affidavit, this org chart represents your research
17  group during the time that you were the chief
18  research officer; is that right?
19                    A.   Yes.
20                    Q.   And you will see in the row right
21  under your name, there are three rows that say
22  "Advanced Technology" with different lines of
23  business underneath?
24                    A.   Yes.
25                    Q.   Those were the senior
```

 Neeson&Associates    W&P

```
 1   vice-presidents of the CTO office assigned to those

 2   different lines of business; is that right?

 3              A.   Yes.

 4              Q.   So Gord Quinn, who was the senior

 5   vice president for the advanced technology business

 6   for the wireline optical line of business, he was a

 7   US employee based in Dallas; is that right?

 8              A.   I believe he worked out of Dallas,

 9   yes.

10              Q.   And he was also a US employee at

11   that time; is that right?

12              A.   I believe so.

13              Q.   And Mr. Hoadley -- am I

14   pronouncing that right?

15              A.   Yes.

16              Q.   Mr. Hoadley, who is the senior

17   vice-president for the advanced technology for the

18   wireless line of business, he also was a US

19   employee based out of Dallas at the time?

20              A.   Yes.

21              Q.   And you're familiar with

22   Mr. Richard Lowe, who is president of CDMA as well?

23              A.   Yes.

24              Q.   And he too was based out of Dallas

25   and was a US employee at that time; is that right?
```



```
 1                    A.   Yes, he was.  But I would state

 2    that the teams that they managed were up in NNL

 3    labs in Ottawa.

 4                    Q.   But you would have considered them

 5    senior leadership of those -- of the wireless

 6    business?

 7                    A.   They were part -- they were part

 8    of my team, yes.

 9                    Q.   Mr. Lowe wasn't part of your team,

10    was he?

11                    A.   Mr. Lowe was not part of my team.

12                    Q.   He in fact was the president of

13    the whole CDMA business?

14                    A.   Yes, that's correct.

15                    Q.   And during the time that you were

16    CTO and CRO, in this 2004-2005 time period, Nortel

17    had a total of about 13,000 research and

18    development employees; is that right?

19                    A.   Sounds about right.

20                    Q.   Okay.  We can pull up the 2004 10K

21    just so you have the numbers in front of you.

22                    Just so it's not a memory quiz.  We

23    just want to make sure these are consistent with

24    your recollection of the employees.

25                    While they are pulling that up, you
```



1    indicated in paragraph 16 of your affidavit that

2    in 2005, about 40 percent of Nortel's R&D work

3    force was in Ottawa; is that right?

4            A.   I believe I said that, yes.

5            Q.   And while they're pulling it up,

6    maybe to move things along, I will read the numbers

7    out to you just so we are not delayed.

8            In the Nortel's 2004 10K, it indicates

9    that about 4,630 employees, or about 39 percent of

10   Nortel's work force, was located in all of Canada.

11   Does that number sound consistent with your

12   recollection?

13           A.   Yes.

14           Q.   And at the same time, at the end

15   of 2004, there were just over 4,630 employees who

16   were doing R&D in the US or about 35, 36 percent of

17   R&D employees.  Does that also sound correct?

18           A.   Yeah.

19           Q.   And there were also at that time

20   over 2,000 employees in EMEA, or Europe and the

21   Middle East, doing research and development.  Does

22   that sound right?

23           A.   I believe so, yes.

24           Q.   Okay.

25           A.   I'm not sure how much that

 Neeson & Associates   W&P WILSON & PETZER LTD.

1    included contract employees, though, or contractor

2    R&D, which would not be employees.

3                Q.   Well, the contracted R&D was in

4    Asia and Europe; is that right?

5                A.   Yes.  There was -- well, there was

6    contract R&D in most regions, but the majority of

7    it would have been in Asia and Europe, yes.

8                Q.   Well, in the 10K, as it's now up

9    on the screen, reports these numbers as regular,

10   full-time R&D employees.

11               A.   Okay.

12               Q.   You have no reason to doubt that

13   those numbers are correct, right?

14               A.   No, I don't have any reason to

15   doubt it.

16               Q.   Okay.  And the 4,000 employees

17   working in the US doing R&D were spread out among

18   various labs across the United States; is that

19   right?

20               A.   Yes.

21               Q.   The labs included Santa Clara in

22   California, Richardson or Dallas in Texas, RTP or

23   Raleigh --

24               A.   Yes.

25               Q.   -- as people referred to in North



```
 1   Carolina?
 2              A.   Yes.
 3              Q.   There's a lab in Long Island and
 4   also in Boston or I believe Billerica; is that
 5   right?
 6              A.   Yes, sounds right.
 7              Q.   And several of these US labs were
 8   also deemed to be centres of excellence for
 9   particular Nortel technologies; is that right?
10              A.   They were centres of excellence
11   for products.  Global products -- a lot of our labs
12   had global product mandates.
13              Q.   And the centres of excellence is
14   because they were R&D employees with particular
15   technical expertise in those areas, right?
16              A.   They would have skill sets in
17   those areas for those products, yes.
18              Q.   Right.  So, for example, for --
19   RTP was the centre of excellence for switching and
20   DSM products; is that right?
21              A.   Yes.
22              Q.   And Richardson, Texas, was the
23   centre of excellence for wireless CDMA technology;
24   is that right?
25              A.   Yes.
```


Neeson&Associates    W&F

```
 1                    Q.   And that was a large portion of

 2    Nortel's business --

 3                    A.   Yes.

 4                    Q.   -- at the time; is that right?

 5                    A.   Yes.

 6                    Q.   And Santa Clara, California, also

 7    was a centre of excellence for certain enterprise

 8    technology, that's right?

 9                    A.   Yes.

10                    Q.   And in your affidavit, you discuss

11    Nortel's R&D work done out of Ottawa lab, but the

12    Ottawa lab regularly collaborated with these US

13    labs and other Nortel labs and R&D projects; is

14    that right?

15                    A.   Yes.  I think there's a point

16    here, though, that we need to explore.  There's --

17    R&D stands for "research and development".  It's

18    two separate functions.  Research involves looking

19    at what could be and what might be with

20    technologies going forward.  Development is the

21    physical act of writing code, designing hardware to

22    a specification that's been defined with customers

23    and delivering that.  You could refer development

24    as to like a factory.  You create software and

25    deliver it on a schedule to a customer similar as
```

 Neeson & Associates    W&F

1    you would other products.

2              The R&D labs in NNI and in NNUK, the

3    majority -- the vast majority of work they did was

4    development of products for customers.  The

5    majority of the research work was done in the NNL

6    lab in Ottawa.

7              Q.   Okay.  And you said the majority

8    of the research work was done in the NNL lab in

9    Ottawa --

10             A.   Yes.

11             Q.   -- but not all of the research

12   work was done in the NNL lab --

13             A.   Not -- not --

14             Q.   -- in Ottawa?

15             A.   -- all of it.  As we said in my

16   affidavit, there was some done in Harlow, there was

17   some done in some of the other labs but relatively

18   smaller amounts.

19             Q.   Okay.  So let's just take some of

20   that in pieces.

21             For the research work that you are

22   talking about, for example, that was done in

23   Ottawa, that would be the initial conceptualization

24   of the next generation of products or technologies?

25             A.   Not necessarily.  It could be the



1   exploration of technologies that may be used for
2   the next generation.  It was not getting into the
3   hard specification of a product.
4              Q.   Right.  And that's a very good
5   point.  So then once that initial technology was
6   conceptualized, then that R&D group would work with
7   a customer or maybe the developers or suppliers to
8   take that technology conceptualization and transfer
9   it into actual products and services?
10             A.   Actually, they would work with a
11  line of business, development teams in the regional
12  labs, and they would pass on what they had
13  discovered in the research phase, and regional labs
14  would -- with the lines of business, would take the
15  lead with the customer to define the product
16  specification.
17             Q.   And it was a symbiotic
18  relationship also because those same customers came
19  back to the research labs to help collaborate on
20  the development of the next generation of
21  technology; is that right?
22             A.   Yes.  It's always iterative.
23             Q.   Okay.  And even with products,
24  once developed and put into the market, there again
25  was more iterations of that product or future



 1   development to be done to satisfy the customer

 2   needs; is that right?

 3              A.   Yeah, a network is like a living

 4   thing.  It grows and it changes over time, and just

 5   because you bought a product yesterday doesn't mean

 6   you don't have to update and refresh that product

 7   tomorrow, and in many cases, those updates and

 8   refreshes would require new advanced technologies

 9   that didn't exist when you first created the

10   product.

11              Q.   And some of that updating and next

12   generations also were done by the R&D labs that

13   were aligned with the lines of business; is that

14   right?

15              A.   Once those technologies had been

16   proven to do what we needed them to do, then that

17   knowhow was passed to the labs and they used that

18   to update the products, yes.

19              Q.   Okay.  And I think that there was

20   the example of development done in one of the US

21   labs that was discussed at your deposition, and I

22   just want to flesh that out to make sure it is

23   consistent with what we are talking about.

24              My understanding is that MCI, one of

25   Nortel's customers, approached Nortel because it



```
 1   wanted to start a friends and family program where
 2   you are in a network and you need to, therefore --
 3   MCI needed to link a US telephone number with
 4   another US telephone number --
 5                A.    Yes.
 6                Q.    -- so that it could build
 7   differently; is that right?
 8                A.    Yes.
 9                Q.    And MCI approached Nortel for this
10   new product that they wanted to develop to meet
11   their customer needs, right?
12                A.    Yeah.  It wasn't a new product; it
13   was -- it was new software put onto the existing
14   DMS product.
15                Q.    Right.  But that new software,
16   fair enough, enabled them to launch new services to
17   their customers that they thought were important to
18   their business; is that right?
19                A.    Yes, but that new software didn't
20   require any new technology or advanced techniques
21   that weren't already known to the development team.
22                Q.    And the software didn't exist
23   before Nortel built it?
24                A.    No, it had to do -- it had to be
25   written, but it was written within the rules of the
```



```
1   product as it existed.
2              Q.   Okay.  And the Richardson lab was
3   the one that wrote that new software and developed
4   it for the customer; is that right?
5              A.   Yes, as far as I know, yes.
6              Q.   Okay.  And to go back to the
7   advanced technology, I think that you had said --
8   but correct me if I'm wrong -- that the advanced
9   technology work was often done on a longer time
10  horizon such that it took a longer time to get the
11  technology from concept to deployment than some
12  other product-related work; is that right?
13             A.   Well, as I said, the difference
14  between research and development, development was
15  typically on a timeline of zero to two years to
16  delivery to a customer; research was done on a
17  timeline typically three to five years, looking
18  further out beyond the products of today.
19             Q.   And an example of that type of
20  forward-looking advanced technology work was the
21  work done to develop the LT technology; is that
22  right?
23             A.   That's correct.
24             Q.   And Nortel saw that problem coming
25  along before every one of us who owned an iPhone in
```



1    that Nortel saw that the advent of the iPhone and

2    the flooding of the market with smart phones was

3    going to jam up the wireless networks; is that

4    right?

5              A.   Yes, we knew smart phones was

6    going to cause a problem with the existing wireless

7    capability.

8              Q.   They might be smart phones, but

9    you guys were a bit smarter, right?

10             A.   Well, you could see the problem,

11   but the question is how do you get to the answer

12   with your customer.

13             Q.   Right.  And how you got to the

14   answer was to have the advanced technology group

15   start working on new technology development in

16   order -- or research in order to get to that answer

17   for it to have new things to market to Nortel's

18   customers; is that right?

19             A.   Yes.

20             Q.   And, in fact, it took about seven

21   or eight years from the initial conceptualization

22   of the issue in 2002 time period until that new

23   technology went to market as a standard in North

24   America; is that right?

25             A.   That's correct.  Wireless is



1    typically longer schedules because of the need to

2    do standards work, and the reason for that is that

3    you can be the network provider, like Nortel or

4    another vendor, but that network provider's

5    equipment must interface with the handsets, which

6    could be Samsung or Apple or RIM, and the

7    interface -- we call it the air-to-air interface --

8    the phone had to talk to the network, so that

9    standard had to be negotiated on a global basis so

10   that everybody's phone could talk to everybody's

11   network.  In wireless, that takes longer than most

12   other wireline or optical projects.

13             Q.   Right.  And the goal of developing

14   that new technology is so you can capture the

15   market for that new wireless technology, correct?

16             A.   Well, we were always in the

17   business of trying to meet customer demand and get

18   return on that.

19             Q.   Right.  And just like the CDMA

20   business, the largest market for -- the LTE market

21   would have been the United States; is that right?

22             A.   No, I think we viewed the largest

23   market for LTE was going to be outside of the

24   United States, because LTE was built upon a

25   combination of GSM, which was the European



```
 1   standard, and CDMA, and the amount of GSM installed

 2   around the world far exceeded CDMA.

 3              Q.   But it wasn't largest in Canada

 4   for sure, right?

 5              A.   It wasn't --

 6              Q.   Canada wasn't going to be the

 7   major market for LTE technology?

 8              A.   Canada was never the major market

 9   for all of our products because of the population

10   size of Canada.

11              Q.   I'd like to turn to the topic of

12   the ownership of Nortel's IP, and I refer you to

13   paragraph 6 of your reply affidavit.

14              A.   Which date, the ....

15              Q.   The second affidavit is --

16              A.   April 25th?

17              MR. STEEP:  It is April 25th.

18              THE WITNESS:  Okay.

19              BY MS. SCHWEITZER:

20              Q.   Do you have it in front of you,

21   paragraph 6?

22              A.   Yes.

23              Q.   And you say in paragraph 6 of your

24   affidavit that while at Nortel you had never heard

25   of any discussions of intellectual property
```

 Neeson & Associates    W&F

```
 1   ownership by NNI, NNUK, or other non-Canadian

 2   Nortel entities, whether economic, beneficial, or

 3   otherwise; that's right?

 4               A.   That's correct.

 5               Q.   And while you were Nortel's chief

 6   technology officer or research officer during

 7   2004-2005 time period --

 8               A.   Yes.

 9               Q.   -- you weren't involved in the

10   drafting or execution of Nortel's master research

11   and development agreement, were you?

12               A.   No, I wasn't.

13               Q.   And, in fact, while you were at

14   Nortel, you had never even heard of the master

15   research and development agreement; is that right?

16               A.   That's correct.

17               Q.   You also didn't have any

18   involvement at all with Nortel's discussions with

19   the Revenue authorities about advanced pricing

20   agreements, did you?

21               A.   No.

22               Q.   And Nortel had a patent review

23   board that was responsible for determining which

24   patents to file by Nortel; that's right?

25               A.   Yes.
```



```
 1                  Q.   And you also, in the same way, did

 2   not have any involvement with the Patent Review

 3   Board and the filing of the patents; is that right?

 4                  A.   Well, I had an arms-length

 5   relationship.  The Patent Review Board was made up

 6   of subject matter experts in the various areas of

 7   technology, and it was chaired I believe by the

 8   legal department, Nick DeRoma's legal patentee.  So

 9   I was aware of it.  I had people that worked for me

10   who were on it, but I didn't -- I was not involved

11   directly with its operations or its decisions.

12                  MS. SCHWEITZER:  Good.  Thank you.  No

13   further questions at this time.

14                  THE CANADIAN COURT:  Thank you,

15   Mrs. Schweitzer.

16   CROSS-EXAMINATION BY MR. MILNE-SMITH:

17                  Q.   I have got three minutes before

18   noon, so I'll say good morning, Mr. McFadden.  Good

19   to see you again.

20                  A.   Good morning.  Yes.

21                  Q.   You'll recall that we met last

22   October at your deposition.

23                  THE CANADIAN COURT:  Could you identify

24   yourself for the record, please.

25                  MR. MILNE-SMITH:  Yes.  Judge Gross, my
```



```
 1   name is Matthew Milne-Smith.  I am one of the
 2   counsel to the EMEA debtors.
 3              THE US COURT:  Thank you.  Good
 4   morning.
 5              BY MR. MILNE-SMITH:
 6              Q.   Mr. McFadden, you described in
 7   your first affidavit how most Nortel laboratories
 8   worked with several different lines of business.
 9   Do you recall that?
10              A.   Yes.
11              Q.   Would you agree it's also true
12   that each line of business worked with several
13   laboratories?
14              A.   Hmm, yes.
15              Q.   And the various laboratories would
16   cooperate on projects?
17              A.   Yes.
18              Q.   They would share information?
19              A.   Yes.
20              Q.   They would build off each other's
21   work?
22              A.   Yes.
23              Q.   And that would also happen across
24   geography, so when I am talking about different
25   laboratories, these might be laboratories in the
```



1    US, Canada, and Europe all working together?

2              A.    Yes.   In some projects, that's

3    true, yes.

4              Q.    Okay.   And, in fact, research on

5    any given point was almost always interrelated with

6    research going on in other areas because of the

7    networking nature of the business?

8              A.    It could be.

9              Q.    Okay.   Nortel was a networking

10   company?

11             A.    Yes, it was.

12             Q.    Okay.   And while there were

13   different business lines, they all had to work

14   together efficiently in certain processes?

15             A.    Well, it was possible that our

16   customers would buy multiple product sets from us

17   to create a network and therefore those products

18   had to work together and -- on a common approach.

19             Q.    Right.   And so Nortel's collective

20   intellectual property was the product of all the

21   labs and all the business lines working together

22   collaboratively?

23             A.    It was the product of the research

24   and development work done across the company, yes.

25             Q.    Right.   You also described in your



1    affidavit -- and I think this actually drew on your

2    deposition testimony -- how laboratories work

3    collaboratively to produce, for example, various

4    different modules that would have to fit together

5    for a given product?

6              A.   Well, the way it worked was,

7    typically, if you had a project and it had

8    consisted of multiple modules, if you want to call

9    them, of different technologies, what typically

10   happened was the director of the R&D for that

11   project would look for the expertise that was

12   available in any given place to work on that

13   module, so it is possible you could do a module in

14   Europe, a module in Canada, a module in the US and

15   bring it together into a product.  It was not the

16   preferred way to do it, but in some cases, the

17   expertise you needed on certain modules may be in a

18   certain location so that you would contract it out,

19   if you want to call it that way, to that lab.

20              Q.   And that would be centrally

21   coordinated through the business lines?

22              A.   That -- lines of business

23   coordinated that through their R&D budgets, and

24   project management.

25              Q.   Right.  Now, I think you have

 Neeson&Associates   W&F

1    already said this morning you became the chief

2    technology officer or CTO of Nortel in August of

3    2004?

4                A.   Yes.

5                Q.   I'm going to hand you,

6    Mr. McFadden, excerpts from trial Exhibit 31355.

7                You will see this is a document titled

8    "Nortel Network's Functional Analysis" for the

9    years ended December 31, 2000 to 2004?

10                A.   Yes.

11                Q.   As CTO, did you have any input

12    into this document?

13                A.   I don't recall any input into this

14    document.

15                Q.   Do you recall seeing this document

16    before?

17                A.   I don't recall seeing this

18    document.

19                Q.   Okay.  Well, let's see what the

20    document says and whether you agree with it or not,

21    given your experience as CTO.

22                Could you start, please, by turning to

23    page 19.

24                A.   Yes.

25                Q.   If you look, you'll see there is a



1    heading "R&D Organization Within Nortel".

2                    A.   Yes.

3                    Q.   And then I want to look at the

4    second paragraph under that heading.  It says:

5                        "The R&D groups operate on the

6                        basis of technology, domain and

7                        program.  Though there are several

8                        excellence centers across the globe,

9                        program plan execution is

10                       coordinated among a virtual team

11                       that is made up of various groups,

12                       in various locations, under various

13                       VPs.  There is no one central

14                       geographic region that supports all

15                       activities."

16                   I take it you would agree with that?

17                   A.   Yeah, I would agree with that.

18                   Q.   Okay.  And you were talking

19   earlier this morning about centres of excellence.

20   We see reference to that phrase in here again.  You

21   mentioned a number of centres of excellence in the

22   US and Canada.  Were you also aware that

23   Châteaufort in France was a centre of excellence

24   for GSM UMTS?

25                   A.   Yes, I was aware.



```
 1                    Q.   And that's the technology you

 2   referred to earlier as being a key component of

 3   LTE?

 4                    A.   Yes.

 5                    Q.   And I believe Galway was also a

 6   centre of excellence for enterprise; is that right?

 7                    A.   I believe they had a mandate for

 8   products out of enterprise, yes.

 9                    Q.   Okay.

10                    A.   I can't remember which one.

11                    Q.   Could you then go forward to

12   page 24.  If you go to the bottom half of that

13   page, after the bullet points.  I just want to read

14   this to you and make sure you are on on the same

15   page as the people that had input into this

16   document.

17                    So it says:

18                        "On an annual basis, there are

19                        approximately 10,000 to 12,000

20                        ongoing R&D projects throughout

21                        Nortel.  Much of Nortel's R&D is

22                        interrelated, and one specific

23                        project may be developed based on

24                        older R&D projects or platforms.

25                        For example, assume that it takes
```



```
 1                two years to develop Product A.  A
 2                year later, a portion of the
 3                information and intellectual
 4                property from Product A is utilized
 5                by R&D personnel to develop
 6                Product B.  Product B takes several
 7                additional years to develop into a
 8                commercially saleable product."
 9                I take it that's consistent with your
10     experience?
11                A.   That's plausible, yes.
12                Q.   Okay.  And it also is entirely
13     plausible or possible that, given the hypothetical
14     set out here, product A might be something that was
15     developed in one country and product B might be
16     something developed in a different country?
17                A.   It's possible, but I would say
18     that it's -- it's not entirely -- it depends on the
19     product.
20                Q.   Right.
21                A.   Okay?  Because if it's a heavy
22     hardware platform product, it wouldn't make sense
23     to have multiple instances around the world.
24                Q.   That's a very fair point, sir.  So
25     it will depend case by case?
```



```
 1                  A.   Yes.
 2                  Q.   Okay.  The next paragraph says:
 3                       "In addition, in some cases, some
 4                  of the knowledge and intellectual
 5                  property obtained from developing
 6                  projects for one specific line of
 7                  business can be used to develop
 8                  projects within another line of
 9                  business."
10                  And I take it you would agree with
11     that, given what we discussed earlier?
12                  A.   Yes.
13                  Q.   Okay.  And it says:
14                       "All R&D projects are ultimately
15                  intended to produce commercially
16                  exploitable products or knowledge;
17                  however, there may be R&D undertaken
18                  for which no recognizable commercial
19                  gain is immediately evident.
20                  Long-term research projects are
21                  undertaken in a somewhat academic
22                  environment with the long-term goal
23                  of producing a commercially
24                  exploitable product.  The
25                  information obtained from those
```



```
1                projects is intellectual property;

2                however, the ability to commercially

3                exploit that knowledge is not yet

4                available."

5                Would you also agree with that?

6                A.   I would agree with that, but the

7    development of a product as an evolution of

8    existing product does not necessarily depend on the

9    invention of new patentable ideas.  It can be just

10   an extension of using existing knowhow to put new

11   capability on the first product.

12               Q.   Well, that's actually an important

13   point, so let me make sure I have it clearly.  So

14   you spoke earlier today about the distinction

15   between research and development, right?

16               A.   Yes.

17               Q.   And so do I take it from your

18   answer that you just gave that a lot of the

19   development work won't necessarily lead to

20   patentable inventions?

21               A.   That's correct.

22               Q.   Right.  It's research that tends

23   to produce patents, correct?

24               A.   Yes.

25               Q.   Okay.  You then skip forward to
```



```
 1    page 29.  I'm just looking at the first paragraph
 2    there.  It says:
 3                   "Generally, the patent life tends
 4                   to be long, while the commercial
 5                   life of the products incorporating
 6                   the patented intellectual property
 7                   tends to be relatively short without
 8                   continuing investment in R&D.
 9                   Continuing investment in R&D is
10                   essential in extending the
11                   commercial life of products
12                   throughout the term of the related
13                   patents."
14                   Would you agree with that?
15             A.   Yes, but I would -- I would add
16    that sometimes the commercialization of those
17    patents takes many years after the patents were
18    written, and -- because the timing of a discovery
19    versus the commercial viability of that patent
20    isn't always coincident.
21             Q.   That's a very good point.  So you
22    may have a situation where R&D is done, and then
23    five, ten years pass before you actually get a
24    product that goes into market?
25             A.   That's correct.
```



```
 1                      Q.   And so given the timelines of
 2     advanced research that you told me about, three to
 3     five years, then you could be talking ten to
 4     fifteen years between when the R&D actually occurs
 5     and when the product hits the market?
 6                      A.   Ten to fifteen is a little long.
 7                      Q.   So call it eight to twelve?
 8                      A.   We leave ten to fifteen to
 9     Negroponte at Media Lab.
10                      Q.   Okay.  But it wouldn't be out of
11     the ordinary at Nortel for R&D spending in year one
12     to produce a product that hits the market in year
13     ten?  That's why it's advanced research, right?
14                      A.   It's possible.
15                      Q.   And LTE was an example of that,
16     correct?
17                      A.   Well, LTE was a little shorter
18     than ten years, yes.
19                      Q.   You gave an example on deposition
20     of Al Javed in Ottawa having a working prototype of
21     LTE in the lab in 2002 or 2003.  Do you recall
22     that?
23                      A.   That's correct.
24                      Q.   And so I take it in order to have
25     a working prototype you'd need to have done some
```



```
 1   research that led up to that?
 2               A.   Yes.
 3               Q.   And it's my understanding that, in
 4   fact, a lot of the advanced research done by the
 5   wireless technology labs in Ottawa and Harlow and
 6   Richardson was taking place in the late '90s that
 7   led to LTE?
 8               A.   Well, my experience is engineers
 9   are very good at creating a one-off prototype to
10   show that they are working on the right thing, and
11   they do that very quickly.  As soon as they have an
12   idea, they want to demonstrate that it's viable,
13   and so the timeline to prototype is relatively
14   short.
15               Q.   Well, let me ask the question more
16   directly.  Were you aware that research that
17   ultimately led to the LTE technology was being done
18   in the late '90s at various labs at Nortel?
19               A.   There was -- as far as I know,
20   there was capabilities that Al curated, if you want
21   to call it, to create LTE out of Harlow and out of
22   Châteaufort and a lot of it out of Ottawa.
23               Q.   And that was taking place as early
24   as the late '90s?
25               A.   Could have been, yes.  I didn't go
```



1    and inspect it.

2              Q.   Okay.  Fair enough.  In fairness

3    to you, you were in optical at the time?

4              A.   At that time, yes.

5              Q.   And just a couple more portions of

6    this document I want to look at.  The next is

7    page 30.  So if you just flip over the page.

8              You will see there is a chart at the

9    top there, which is a summary of patent

10   applications from 1998 to 2002.  And 1998 to 2002,

11   we are talking about sort of peak Nortel, right?

12   You have a little bit of a decline, but that's

13   basically peak Nortel, right?

14             A.   At 2002?

15             Q.   1998 to 2002.

16             A.   Oh '98?  '98, '99, probably, or --

17             Q.   Right, '99, 2000?

18             A.   Yes.

19             Q.   Okay.  So you will see down the

20   left, we have "Country Where Invention Originated",

21   and then across the top, "Country Where Patent

22   Application was Filed".  Now, I'm just interested

23   in the "Country Where Invention Originated".  Do

24   you see that?

25             A.   Yes.



```
 1                    Q.    So it lists Canada, US, UK, ROW?

 2                    A.    Yes.

 3                    Q.    So if you take the "Canada" row

 4    and you go across, you'll see it says "total 3351"?

 5                    A.    Yes.

 6                    Q.    So that means that Canada

 7    originated 3,351 patents for the period '98 to

 8    2002?

 9                    A.    Yes.

10                    Q.    Okay.  So you then see the UK and

11    ROW combined for -- if my math is correct -- 2001?

12                    A.    Yes.

13                    Q.    And ROW would have included

14    countries like France and Ireland?

15                    A.    I guess so.  It would be anybody

16    that's not in the top three.

17                    Q.    Right.  Okay.  And 1500 of those

18    patents are in the UK?

19                    THE CANADIAN COURT:  This may be small

20    potatoes, but this refers to patent applications.

21    It doesn't say it's patents granted.

22                    MR. MILNE-SMITH:  You are quite right,

23    Your Honour.  Thank you for correcting me.

24                    BY MR. MILNE-SMITH:

25                    Q.    So if you combine the UK and ROW,
```



1    you have 2,001 out of total of 8,430.  Again, if my

2    math is right, that's almost 24 percent.  Does that

3    sound correct?

4                    A.    Yes.

5                    Q.    And Canada has 3,351, which is

6    roughly 40 percent out of the total?

7                    A.    Yes.

8                    Q.    And that means the US has about

9    36 percent?

10                   A.    Yes.  The same amount, yes.

11                   Q.    Okay.  Now, there's a bit of an

12   explanatory note to this chart.  If you look at the

13   third paragraph down below, it says:

14                        "The above figures show that the

15                        efforts undertaken by R&D personnel

16                        in Canada" --

17                   THE CANADIAN COURT:  Mr. Milne-Smith,

18   what does "ROW" stand for?  "Rest of

19   something-or-other?"

20                   MR. MILNE-SMITH:  "Rest of world."

21                   THE CANADIAN COURT:  "Rest of world."

22   Okay.

23                   BY MR. MILNE-SMITH:

24                   Q.    So:

25                        "The above figures show that the



1   efforts undertaken by R&D personnel

2   in Canada are producing the greatest

3   number of patent applications,

4   followed by the U.S. and the U.K.

5   This appears to indicate that,

6   perhaps, R&D efforts undertaken by

7   Canada are more 'patentable'.  This

8   may not be the case, however, and it

9   is important to discuss why such an

10  approach is likely incorrect.  Much

11  of Nortel's R&D is interrelated, and

12  one specific project may be

13  developed based upon older R&D

14  projects or platforms.  For example,

15  assume that the U.K. undertakes

16  certain R&D that is not patented

17  (e.g., possibly because it is not

18  yet in a patentable form, or it

19  would not meet the legal

20  requirements to be patented).  A

21  year later, a portion of the

22  information and intellectual

23  property from the U.K.'s R&D is

24  utilized by R&D personnel in Canada.

25  Canada patents the results of its



```
 1                    efforts.  In this example, it is

 2                    difficult to state that the

 3                    patentable invention was purely the

 4                    result of Canada's efforts.

 5                    Clearly, the U.K.'s R&D efforts

 6                    contributed to the patentable

 7                    invention; however, this is not

 8                    reflected in" --

 9                    The table above.

10                    Now, putting aside this specific

11    example, because it go either way:  Canada/UK,

12    UK/Canada, US/whatever --

13                    A.   Well, there's another issue too is

14    I believe some of these patents had authors in

15    different countries.

16                    Q.   That's absolutely right.  Because

17    that goes back to the joint collaborative work we

18    talked about before.

19                    A.   Correct.

20                    Q.   But in general terms, you would

21    agree with the statement here how Nortel put it in

22    its functional analysis?

23                    A.   I have no reason to disagree with

24    what's written here.

25                    Q.   Okay.  Thank you.  And then just
```



1   to finish this off, you will see there's a summary
2   on page 48.
3                  So it says:
4                     "The above examples demonstrate
5                     Nortel's continued commitment to
6                     R&D.  Current R&D has aided Nortel
7                     in developing leading edge
8                     technology and the development of
9                     new and innovative products helps
10                    drive Nortel's current and future
11                    revenue growth.  The RPS
12                    Participants each perform R&D that
13                    contributes to Nortel's innovation
14                    and new products.  Each RPS
15                    continues to share entrepreneurial
16                    risks.  The allocation of the
17                    Company's profit or loss should be
18                    commensurate with its risks
19                    associated with the company's R&D."
20                 I take it, similarly you have no reason
21   to disagree with this?
22                 A.   I -- just the clarification, "RPS"
23   is ...
24                 Q.   I'm sorry.  You are not familiar
25   with the phrase "RPS", correct?



```
 1                    A.    No.
 2                    Q.    Okay.  So "RPS" is residual profit
 3     share if referring to NNL, NNI, NNSA, NNUK, NN
 4     Ireland, and I think at the time of this document
 5     NN Australia.
 6                    A.    Okay.  So ...  What they are
 7     saying is the residual profit share is -- is due to
 8     the participation of R&D across all the
 9     geographies?
10                    Q.    Yes, that's right.  They say:
11                        "Each RPS continues to share
12                        entrepreneurial risks.  The
13                        allocation of the Company's profit
14                        or loss should be commensurate with
15                        its risks associated with the
16                        company's R&D."
17                        Now, you said earlier you weren't
18     involved in the sort of profit sharing.  I just
19     want to make sure you have no reason to disagree
20     with what's stated here.
21                    THE CANADIAN COURT:  Mr. Milne-Smith,
22     this is a document that was submitted to the tax
23     authorities dealing with transfer pricing.  Is it
24     fair to put this to a technology officer?
25                    MR. MILNE-SMITH:  I will withdraw it,
```

Neeson & Associates    W&F

```
 1    Your Honour.  That's fine.

 2              BY MR. MILNE-SMITH:

 3              Q.   Let's move on to a new subject,

 4    then.

 5              Mr. McFadden, you have described the

 6    important role played by Ottawa in Nortel's R&D,

 7    and I don't think anybody would question that.  I'm

 8    correct that you joined Northern Electric, the

 9    predecessor to NNL, in 1979, right?

10              A.   That's correct.

11              Q.   Okay.  And you would agree with me

12    that through the 1980s and '90s Nortel acquired a

13    number of existing and already operating R&D

14    facilities through mergers and acquisitions?

15              A.   Yes.

16              Q.   So, for example, you have referred

17    to Harlow a number of times this morning.  Harlow

18    was acquired via the acquisition of Standard

19    Telephone & Cable or STC?

20              A.   That's correct.

21              Q.   And that happened in -- I think it

22    started in 1987; then they got a hundred percent in

23    1991; is that correct?

24              A.   As far as I recall, yes, '91.

25              Q.   Okay.  And then another major
```



```
 1    acquisition was Bay Networks, in 1998?
 2                  A.    Yes.
 3                  Q.    And that brought in -- I hope I
 4    pronounce this right -- Billerica, Massachusetts?
 5                  A.    Billerica.
 6                  Q.    Billerica.  Okay.
 7                  A.    It's Irish.
 8                  Q.    And Santa Clara, correct?
 9                  A.    I think Santa Clara might have
10    been there before.  The Bay Networks acquisition.
11    I think Bay Networks had people in Santa Clara, but
12    I think Nortel also had people in Santa Clara
13    before that, but I --
14                  Q.    Okay.  But Bay Networks --
15                  A.    -- as I recall.
16                  Q.    Bay Networks is named based on
17    Massachusetts Bay and San Francisco Bay?
18                  A.    Yeah.  There was a previous merger
19    of two companies before that.
20                  Q.    Right.  Okay.  So these obviously
21    weren't labs that were founded by Nortel; these
22    were labs that brought to Nortel an existing body
23    of IP knowhow capabilities?
24                  A.    Yes, it would have been part of
25    the acquisition.
```



1          Q.   And STC was folded into what would

2     eventually become NNUK?

3          A.   As far as I know, yes.

4          Q.   Right.  And same thing, Bay

5     Networks went into NNI?

6          A.   As far as I know, yes.

7          Q.   And we mentioned Châteaufort once

8     earlier today.  Were you also aware that that came

9     out of a collaboration with Matra Communications

10    that Nortel ultimately acquired a hundred percent?

11         A.   Yes, I was aware of that.

12         Q.   I would like to go back and talk a

13    little bit about Harlow.  You spent roughly

14    thirteen years at Nortel in a very senior position

15    in the optical business, right?

16         A.   Yes.

17         Q.   So I take it you are intimately

18    familiar with optical technology and the history of

19    it?

20         A.   Yes.

21         Q.   So I take it you're aware that STC

22    historically had particular expertise in optical

23    technologies?

24         A.   Yes.

25         Q.   So, for example, in 1966, it was



1    STC's Harlow lab that first proved that optical

2    fibres could in fact be used to carry data signals?

3                A.    Yes.   There's a picture of

4    Charlie Kao on the -- on the wall in Harlow.

5                Q.    Right.   And they ultimately won a

6    Nobel Prize for it?

7                A.    That's correct.

8                Q.    And that was essentially the

9    birthplace of modern fibre optic communication?

10               A.    It was one of the first in the

11   world, yes.

12               Q.    Okay.   And am I correct that at

13   least a part of Nortel's growth in the 1990s was

14   based on exploding demand for fibre optic

15   capabilities?

16               A.    Yes.

17               Q.    We've mentioned optical and

18   wireless.   One specific project that I think you're

19   familiar with is an ethernet project, a 40 gigabit

20   ethernet project.   It was advanced research done by

21   Ottawa and Harlow.   Are you familiar with that?

22               A.    I think that may have been after

23   my time, but I'm not sure.

24               Q.    Okay.   You have spoken this

25   morning in your testimony about the advanced

 Neeson & Associates    W&F

1   technology program.

2              A.   Yes.

3              Q.   So you also said earlier that

4   research produces patents?  Out of a division that

5   does R&D, it's research that produces patents?

6              A.   Well, it produces a -- how do you

7   say -- a more proportionate share of patents

8   than -- I mean, we encouraged anybody that had an

9   idea to bring it forward to see if we could patent

10  it.

11             Q.   Right.

12             A.   But because researchers were

13  focussed on looking at the future and things that

14  didn't exist today, proportionately, they would

15  generate more patents than development folks.

16             Q.   And they tended to also produce

17  broader patents, correct?

18             A.   That was the goal, yes.

19             Q.   Right.  And the broader the patent

20  the more valuable it would tend to be, as a general

21  matter?

22             A.   Yes.

23             Q.   Okay.  And the broader the patent,

24  is it fair to say it's more likely to have a longer

25  time horizon, a longer period of time in which it's



```
 1   useful?
 2                 A.   Well, each patent had a time frame
 3   on it, but the broader the patent, the more areas
 4   of use it could address and therefore it
 5   commercially could be more valuable to you.
 6                 Q.   Right.  And if you had a patent
 7   that was tied to a specific product, then if that
 8   product went off the market, then the patent might
 9   lose its value?
10                 A.   Unless someone else used that
11   patent in their product.
12                 Q.   Fair enough.  But a broader
13   advanced research patent would tend to have broad
14   applicability beyond any particular product?
15                 A.   Well, yes, I have seen patents
16   that are quite broad.  As simple as lifting up the
17   handset to answer the phone, if you could get a
18   patent on that, that would cover a lot of areas of
19   use.
20                 Q.   Right.  You spoke earlier this
21   morning about the different timelines for
22   product-related R&D, which you said was zero to two
23   years, and advanced technology was more three to
24   five years, correct?
25                 A.   That's correct.
```



```
 1                    Q.   I just want to make sure I

 2    understand the exact timeline you are talking

 3    about.  Is what you're describing the time from

 4    when you first start work on a project to when

 5    you're first ready to apply for a patent?

 6                    A.   Not necessarily, because we

 7    didn't -- we didn't design programs to produce

 8    patents.  We designed programs to look at outcomes

 9    that we would like to address, such as wireless

10    network congestion.  If we do the sums and say if

11    everybody had a smart phone what's going to happen,

12    and then we would say in five years, we'd like to

13    start -- we'd like to look at these areas to

14    investigate so that in five years we'd be able to

15    answer that problem with a solution that would be,

16    you know, in time for when everybody got a smart

17    phone.  That was -- we knew everybody didn't have

18    one; we knew that everybody was going to have one.

19    We just didn't know exactly when, so we said, okay,

20    in five years, we will have a solution.  What are

21    the areas we've got to look at?  We didn't say we

22    want five patents by tomorrow and thirteen in a

23    year.  That -- patents came out of the work; the

24    work was not defined to produce patents.

25                    Q.   I understand, and that's a helpful
```



```
 1   distinction.
 2              I would like to take you to another
 3   document.  This one is trial exhibit 21213.
 4              A.   Thank you.
 5              Q.   So this is an email dated
 6   August 8, 2005, from Claudio Morfe --
 7              A.   Yes.
 8              Q.   -- to you.  Mr. Morfe, I think we
 9   saw on the organization chart we looked at earlier
10   this morning, he was the legal officer in your CTO
11   organization?
12              A.   Yes.  He worked in Nick DeRoma's
13   legal office and was assigned to the CTO, to
14   support the CTO.
15              Q.   Okay.  So I just want to look at
16   the first paragraph of this document, and you'll
17   see he is describing a -- the slide show, which is
18   attached to this.  What I'm looking at is the
19   sentence in the middle of that paragraph.  He says:
20                  "You probably know that a patent
21                  application takes an average of 4
22                  years from filing to issuance."
23              A.   Yes.
24              Q.   Was that a timeline you were
25   familiar with?
```

 Neeson & Associates   W&F

```
 1                    A.   Didn't have an exact time frame on
 2   it, but I knew it wasn't six months.
 3                    Q.   You had no reason not to take
 4   Claudio's word for it?
 5                    A.   No.  I knew it was slow.
 6                    Q.   So by the time you are ready to
 7   file a patent application, you would already have a
 8   number of years of research that led up to that,
 9   correct?
10                    A.   Not necessarily.  Some people can
11   have -- you know, from concept in their minds to a
12   fleshed-out proposal, could be less than a year.
13                    Q.   Okay.  But it will vary case by
14   case?
15                    A.   Sure.
16                    Q.   Sometimes it might be a matter of
17   a brilliant insight that leads to a patent
18   application?
19                    A.   See, one of the things about
20   research is many of the innovations you come up
21   with are things you weren't looking for.
22                    Q.   Right.
23                    A.   Right?  They are things that
24   happen on the side.  While you were trying to solve
25   this problem, you discovered a solution to another
```



```
 1    problem.
 2                   Q.   Right.
 3                   A.   And so you can't just say that it
 4    takes three years of research to come up with a
 5    patent idea.  It could happen in two months or it
 6    could happen in three years.
 7                   Q.   Right.  And given the discussion
 8    we had earlier, what we saw in the functional
 9    analysis about how inventions build off each other,
10    they spin out from different areas --
11                   A.   Yes.
12                   Q.   -- it's really hard to say exactly
13    what was the research that led to that patent
14    application?
15                   A.   The authors would probably beg to
16    differ with you.
17                   Q.   Right.  But you'd agree with me
18    that isn't it Newton's old saying if I've seen
19    farther than others, it's because I stood on the
20    shoulders of giants?
21                   A.   Yes, you could say that.
22                   Q.   Fair comment for Nortel as well?
23                   A.   Hmm, I -- we didn't measure giants
24    and we didn't measure innovation that way.
25                   Q.   Right.
```



     1                    THE CANADIAN COURT:  Or apples falling
     2     from a tree.
     3                    THE WITNESS:  Well, yeah, and that was
     4     an accident, right?  So you discovered gravity.
     5     You know, did he set out to discover gravity?  I
     6     doubt it.
     7                    BY MR. MILNE-SMITH:
     8            Q.   Right.  The simple point is that,
     9     obviously, given the collaborative and interrelated
    10     nature of research, that it's hard to pinpoint
    11     exactly -- you can't put a number and say this is
    12     when the research that led to this occurred; it's
    13     all interrelated?
    14            A.   There's more art than science.
    15                    MR. MILNE-SMITH:  Yes.  Very fair.
    16            I'm about to move on to a new subject
    17     matter.  I think I'm two minutes before 12:30.
    18     Would Your Honour and Judge Gross like to take the
    19     break or should I keep going?
    20                    THE CANADIAN COURT:  How long do you
    21     plan to be, Mr. Milne-Smith?
    22                    MR. MILNE-SMITH:  I've probably got
    23     another fifteen minutes to half an hour.
    24                    THE CANADIAN COURT:  Okay.  Then I
    25     guess we will take the lunch now till about 1:45.

 Neeson&Associates   W&P

1    Is that fine with you, Judge Gross?

2              THE US COURT:  That's fine.  We will

3    stand in recess until 1:45, everyone.

4    -- RECESS AT 12:28 p.m.

5    -- RESUMING AT 1:50 p.m.

6              THE CANADIAN COURT:  Mr. Milne-Smith.

7              MR. MILNE-SMITH:   Your Honour, Judge

8    Gross, before I continue the cross-examination, it

9    has been suggested to me that I might address a

10   timing/housekeeping on behalf of everyone.

11             The good news is that we are moving

12   faster than anticipated through the witnesses.  The

13   only caveat that comes with that, the Canadian

14   Estate has four witnesses lined up for today.

15             THE CANADIAN COURT:  Has what?

16             MR. MILNE-SMITH:   Has four witnesses

17   lined up for today.  It looks like we might get

18   through the four early.  They told me they're

19   prepared to bring the fifth but they're concerned

20   it might not be fair to the other parties who

21   weren't expecting it until tomorrow.  So the bottom

22   line is we may be ending early today, subject to

23   what everyone else decides.

24             THE CANADIAN COURT:  Judge Gross, would

25   that bother you if we end early today?

Neeson&Associates     W&P

```
 1                    THE US COURT:  I might not know what to
 2    do with myself.
 3                    MR. MILNE-SMITH:  We just wanted to
 4    assure you if we're ending early we will not be
 5    falling behind, we are in fact ahead of schedule.
 6                    THE CANADIAN COURT:  Great, thank you.
 7                    BY MR. MILNE-SMITH:
 8                    Q.   Welcome back, Mr. McFadden.  I
 9    wanted to just come back to one point we discussed
10    before the break.  We were talking about the time
11    it takes for things to get to market.  I just want
12    to quickly ask about the flip side of that.
13                    So, going back to the example we used
14    before of LTE, just so we make sure we're all on
15    the same page, that is what I believe is known as a
16    4G wireless network?
17                    A.   Yes.
18                    Q.   So fourth generation?
19                    A.   Yes.
20                    Q.   So 4G is currently the most recent
21    or the best technology currently on the market,
22    correct?
23                    A.   Yes.
24                    Q.   But 3G is still in use?  I mean,
25    if I walk around Toronto I might see 3G on my phone
```



```
 1   sometimes, correct?
 2            A.   The majority of networks are still
 3   3G.
 4            Q.   Right.  In fact, in some parts of
 5   the world you'll even see 2G?
 6            A.   That's correct.
 7            Q.   So things follow the same pattern.
 8   We can expect to have 4G around in some form or
 9   another for many years to come?
10            A.   Yes.  It's not uncommon to see
11   some of our products in service for 30 years or
12   more.
13            Q.   Right.  Touching on another point
14   from this morning, you'll recall that my friend
15   Ms. Schweitzer took you through the 10K and we had
16   the R&D head counts from 2005, with Canada at 36
17   percent, the US at 30 percent, EMEA at 15 percent,
18   ROW at 19 percent, rough numbers?
19            A.   Yes.
20            Q.   Am I correct that from the period
21   of, say, 2000 to 2005 there had been significant
22   consolidation of head count reductions at Nortel?
23            A.   Yes.
24            Q.   And that included --
25            THE CANADIAN COURT:  Just a second,
```



1    Mr. Milne-Smith.  If I could ask you to stop for a

2    second.  Okay, go ahead.

3                   MR. MILNE-SMITH:   I apologize.

4                   THE CANADIAN COURT:  Don't apologize,

5    it's not your fault.

6                   MR. MILNE-SMITH:  I am the one person

7    who doesn't know when the live stream goes down.

8                   BY MR. MILNE-SMITH:

9                   Q.   And obviously those head count

10   reductions impacted on R&D as well?

11                  A.   Yes.

12                  Q.   Is it fair to say that over that

13   2000 to 2005 time period, all regions were

14   affected?

15                  A.   Yes.

16                  Q.   But EMEA and the US

17   proportionately were affected a little bit more

18   than Canada?

19                  A.   Oh, I don't have any numbers to

20   say yes or no to that.

21                  Q.   Fair enough.  You spoke this

22   morning with Mr. Steep about the role played by R&D

23   with respect to customers.  You recall that?

24                  A.   Yes.

25                  Q.   So you would work -- the R&D teams



1   would work closely with major accounts or lead

2   customers to help develop the products and

3   technologies they needed?

4               A.   Yes.

5               Q.   And a number of these lead

6   customers or major accounts were located in the

7   United States, obviously?

8               A.   Yes.

9               Q.   And presumably there were some in

10  Canada as well?

11              A.   Yes.

12              Q.   And there were also some in

13  Europe?

14              A.   Yes.

15              Q.   So in Europe that would include

16  companies like British Telecom?

17              A.   Yes.

18              Q.   France Telecom?

19              A.   Yes.

20              Q.   Vodafone?

21              A.   I'm not sure Vodafone -- when I

22  was there I'm not sure Vodafone was as big a

23  customer of Nortel that we would like.

24              Q.   Okay.  So they were a customer,

25  you're just not sure --



```
 1                    A.   I'm sure we sold things to them
 2     but I don't think they were what I would call a
 3     lead customer on the latest things we had.
 4                    Q.   I'd like to show you Trial Exhibit
 5     21214.  Just wait for it to come up on the screen.
 6     Trial Exhibit 21214.
 7                    A.   Yes.
 8                    Q.   Sorry, Mr. McFadden, we're just
 9     getting the group's attention.
10                    A.   Okay.
11                    Q.   So this is an email chain from --
12     whoop, we just lost it.  There.  So this is an
13     email chain from April 24, 2005.  You will see that
14     you are copied on it and it's from Damian Bevan?
15                    A.   Yes.
16                    Q.   So to start, the way these email
17     chains work, we have to start at the end, so if we
18     could flip to the last page of this exhibit, I
19     think it's the third page, you'll see this is -- in
20     the signature line that this is from a Damian Bevan
21     who is someone at Harlow.  Are you familiar with
22     the name?
23                    A.   I don't recall Damian but...
24                    Q.   Okay.  Fair enough.  So I just
25     want to read the first paragraph to you.  It says:
```



```
 1                  "Dear All,

 2                  My name is Damian Bevan.  I work

 3              for Andy Jeffries in Nortel's

 4              Wireless Technology Labs (WTL) in

 5              Harlow, UK within the CRO office

 6              under Al Javed/Brian McFadden."

 7              So just to tie us into your earlier

 8   testimony, that's the team we spoke about this

 9   morning, correct?

10              A.   Yes, that's correct.

11              Q.   Doing advanced research in Ottawa

12   and Harlow and the US?

13              A.   Just for clarification, Al Javed

14   was the predecessor to John Hoadley.

15              Q.   Thank you.  It says:

16              "Andy and I were recently

17              approached by Vodafone group R&D

18              (Newbury, UK) to participate in a

19              collaborative R&D program with

20              Vodafone and a UK-based SME called

21              Multiple Access Communications Ltd.

22              The aim of the collaborative program

23              is to study the application of

24              advanced simulation techniques for

25              RF optimization of UMTS networks."
```



```
 1                   So to try to boil that down to a level
 2      that I can understand and hopefully everyone can
 3      understand, we're talking about wireless
 4      technology?
 5                   A.   Yes.
 6                   Q.   Okay.  So if we then go to the
 7      second page of the document, just to follow the
 8      email chain, you'll see Joan Phillips forwards this
 9      to Jean Lapointe and then Jean Lapointe forwards it
10      to Al Javed, copying you?
11                   A.   Jean Lapointe, yes.
12                   Q.   Jean Lapointe.  So Jean asks Al
13      whether he would have any input or recommendations
14      on this request.
15                        "Would you have a view of
16                        expected return on investment based
17                        on the attached?  It looks like
18                        Nortel's share will be 337,000.  Do
19                        we have a view of what future sales
20                        will be or a view on future
21                        customers who may be interested in
22                        this technology.  Also, how does
23                        this fit into overall wireless
24                        portfolio from a technology
25                        perspective."
```

 Neeson&Associates   W&F

1                  So then if we go over to the first page

2      to get the answer to this whole email chain, we

3      have an email sent on behalf of Al Javed.

4                  A.    Um-hmm.

5                  Q.    So I am assume that's his

6      assistant sending it.  And again you are copied.

7      It says:

8                       "Jean, I fully support this

9                       request.  I have reviewed it and

10                      have already given my approval.

11                      This is part of our core technology

12                      program with the investment level

13                      shown here (1.5 man hours per year),

14                      therefore it is not a new

15                      investment.  The benefit of this

16                      collaborative program are, (i) we

17                      get to reduce our investment with 40

18                      percent subsidy; (ii) we get real

19                      data to work on to verify our

20                      algorithm; and (iii) we win mind

21                      share with one of the lead

22                      customers."

23                  So putting exactly how you verified

24     Vodafone as a lead customer or a major account, I

25     don't think that's important.



1               What I want to make sure we're on the
2     same page is that this is the exact same kind of
3     relationship that you spoke about this morning with
4     R&D working with customers?
5               A.   It's very close but I would
6     suggest if they were a real lead customer, our guys
7     wouldn't be approaching them and asking the
8     government to fund part of the project.  And this
9     gets into the definition of lead customer.
10              When you're downsizing R&D people, they
11    get -- they catch on to all the major key words
12    such as I'm working with a lead customer so my job
13    is important.
14              Q.   Right.
15              A.   And so they -- so they will use
16    those kind of things to justify --
17              Q.   Right.
18              A.   -- a project.  And that's fine.
19    Obviously I think Al would say that there was
20    applications for this beyond Vodafone, and
21    therefore if you can get a project partially funded
22    by the government with the -- under the auspices of
23    a major player in the telecom industry such as
24    Vodafone, it would be worthwhile doing.
25              Q.   Just to be clear, the person who



```
 1    referred to Vodafone as the lead customer here was

 2    Al Javed out of Ottawa, correct?

 3                 A.   Yes.  Well, Al knew all the key

 4    words too.

 5                 Q.   And just to close the loop on the

 6    role that R&D and customers play, you'd agree with

 7    me that you need local account teams to work with

 8    customers around the world because, as you put it

 9    before, people buy from people?

10                 A.   Yes.

11                 Q.   And it's important to make sure

12    you're operating locally and be seen as a local

13    interface with a customer?

14                 A.   Yes.

15                 Q.   And that local accounting is also

16    when necessary to speak the local language to the

17    extent English wasn't spoken?

18                 A.   Yes.

19                 Q.   I'd like you, Mr. McFadden, if you

20    could just pull up the email we looked at this

21    morning with Claudia Morfe.  That's the Trial

22    Exhibit 21213.

23                 A.   Yes, I have it.

24                 Q.   So we looked at the first

25    paragraph this morning.  I would like to go down to
```



1    the second paragraph now.  And you'll see in the

2    middle of that paragraph there is a sentence on the

3    right that starts "Another point."

4                    "Another point is that inherent

5                    in a portfolio such as ours is

6                    'soft' value, particularly value

7                    that is hard to quantify but that we

8                    know is clearly there.  We have over

9                    the years conservatively estimated

10                   that our portfolio's real strength

11                   lies in its deterrent or defensive

12                   value, a number approaching upwards

13                   of $500 million and probably more

14                   likely at least twice that.  Now

15                   with the benefit of hindsight, we

16                   can say significantly higher.

17                   Lastly, it is becoming more and more

18                   commonplace that we leverage pieces

19                   of our portfolio in JVs, alliances

20                   and other transactions to consummate

21                   business.  In fact, in a number of

22                   cases that come to mind are RIM,

23                   IBM, and LG, it could be argued that

24                   the IPR was key or instrumental in

25                   attracting the other side."



1                    Just one point of terminology, IPR is

2     referring to IP?

3                    A.   Yeah, I think intellectual

4     property rights.

5                    Q.   Okay.

6                    A.   IPR was used that way.  Just also

7     to clarify, portfolio means the intellectual

8     property portfolio, not a product portfolio.

9                    Q.   That was going to be my second

10    question.  Thank you for that.  So he refers here

11    to a deterrent or defensive value.  Is that a

12    concept that you were familiar with?

13                   A.   Absolutely.

14                   Q.   So if I understand it correctly,

15    this means IP that isn't necessarily incorporated

16    into any Nortel product?

17                   A.   That's correct.

18                   Q.   Instead what it provides --

19                   A.   Well, it could be, it could be

20    either way.

21                   Q.   Okay.  No, you're absolutely

22    right, it's something that could be incorporated

23    into a product but also has value independent of

24    being incorporated into a product; is that right?

25                   A.   Yes.



```
 1                    Q.   So that independent value is, for
 2   example, providing freedom from patent infringement
 3   allegations against Nortel.  That's the deterrence,
 4   correct?
 5                    A.   Freedom is an interesting word.
 6   It's like -- it's like nuclear arms race, I've got
 7   this many, you've got that many, what are we going
 8   to do.
 9                    Q.   Right.  So don't sue me or I'll
10   sue you?
11                    A.   Correct.
12                    Q.   Okay.  And it also enables cross
13   licensing agreements if you're going to be more
14   friendly about it?
15                    A.   That's correct.
16                    Q.   And that provided real value to
17   Nortel.  You agree with the statement here that it
18   provided real value to Nortel?
19                    A.   Absolutely.
20                    Q.   And that value was shared across
21   the entire Nortel Group?
22                    A.   Yes, to the extent -- I mean, I
23   don't count it as a group.  I count Nortel as
24   Nortel.
25                    Q.   Right.
```



```
 1                    A.   I don't recall what group means.
 2                    Q.   In other words, it benefits Nortel
 3   in Canada, it benefits Nortel in the United States,
 4   it benefits Nortel in Europe, it benefits Nortel
 5   everywhere?
 6                    A.   Well, it benefited NNL which was
 7   the holding company, as far as I understood.
 8                    Q.   Right.  But it also, to the extent
 9   you're provided freedom from patent infringement,
10   that's going to help you in all parts of the world?
11                    A.   Well, let's understand a lot of
12   our contracts with major customers had clauses in
13   them that -- where we warranted that we owned the
14   technology that was used in our products and that
15   they would be free from patent infringement if they
16   bought the products from us.
17                    Q.   Right.
18                    A.   Right?  So to the extent that you
19   have a portfolio of intellectual property
20   irrespective of its field of use, you can use that
21   to counter any claims that another party might make
22   on your products.
23                    Q.   Then if you just go to the last
24   page of this exhibit, it shows a graph titled
25   "Technology and IPR Licensing Program Value and
```



1    Cash."  You see it refers -- there's bars and then

2    there's lines, and the line is indicated to be

3    total cash received.  Do you see that?

4                    A.    Yes.

5                    Q.    And so in 2004 it shows total cash

6    received of 57 million in respect of technology and

7    IPR licensing program value?

8                    A.    Yes.

9                    Q.    And then in the notes below,

10   you'll see there is a reference to 2004 patent

11   licensing revenue includes 9 million of the 35

12   million cash settlement from Foundry Networks?

13                   A.    Yes.

14                   Q.    Were you familiar with the Foundry

15   Networks settlement?

16                   A.    I wasn't -- I was aware of it.  I

17   wasn't involved in all the details.

18                   Q.    Okay.  So I take it you weren't

19   involved in allocating the proceeds of that

20   settlement among the various Nortel entities?

21                   A.    No.

22                   Q.    So were you aware that each of

23   NNL, NNI, NNUK, NNSA and NN Ireland all received a

24   share of those proceeds?

25                   A.    No, I was not aware of that.


Neeson & Associates    W&F

```
 1                    MR. MILNE-SMITH:  Thank you,
 2    Mr. McFadden.  Those are my questions.
 3                    THE CANADIAN COURT:  Anybody else?
 4                    MR. MILNE-SMITH:  I want to apologize
 5    to Your Honour because I wasn't sandbagging before
 6    lunch.  I just didn't realize how much I had
 7    already covered in the morning.
 8                    THE CANADIAN COURT:  Don't apologize.
 9                    MR. MILNE-SMITH:  Never apologize for
10    being quick, right?
11                    MR. CHANG:  Justice Newbould, Judge
12    Gross, my name is Eugene Chang, I am with Willkie
13    Farr & Gallagher and I represent the UK Pension
14    Claimants.  It is a pleasure to appear.  This is my
15    first time appearing before you.
16                    THE CANADIAN COURT:  Welcome.
17                    MR. CHANG:  Thank you.
18                    THE US COURT:  Yes, indeed welcome.
19    CROSS-EXAMINATION BY MR. CHANG:
20           Q.   Mr. McFadden, it's good to see you
21    again.  It's been a while since your deposition?
22           A.   Yes.
23           Q.   I'm going to try not to cover
24    territory that's already been covered but I do have
25    some points that I would like to come back to and
```



1    from a slightly different angle.

2              So you testified already about the

3    level of global integration across the various UK

4    -- sorry, across the various labs that Nortel had.

5              A.   Yes.

6              Q.   I'd like to ask you a little bit

7    more about that geographic diversity and how that

8    compares to other high tech companies.

9              In your opening affidavit, Exhibit

10   21188, you refer to it and you rely on it in

11   paragraph 16 of your affidavit.  Let's pull up

12   paragraph 16 of the affidavit first.

13             A.   Is that the April 10th?

14             Q.   That is what's been marked as

15   Exhibit 4 here, and it is --

16             THE CANADIAN COURT:  Yes, April 10th.

17             THE WITNESS:  Okay.  Yes, I have it

18   here.

19             BY MR. CHANG:

20             Q.   Do you have that in front of you?

21             A.   Yes, paragraph 16.

22             Q.   So at the end of paragraph 16 you

23   use Exhibit 21188 of an example of a map showing

24   all of Nortel's research facilities; is that right?

25             A.   Yes, I don't have the exhibit in



```
 1   front of me, but yes.
 2              Q.   Okay.  Let's take a look at
 3   Exhibit 21188 then.
 4              A.   Is that one of the tabs here?
 5              Q.   It is not but I can hand you a
 6   hard copy and it's also on the screen.  You have it
 7   as tab 10 already.
 8              A.   Tab 10?  Okay, yes.
 9              MR. CHANG:  Judge Gross, do you also
10   have it as tab 10?
11              THE US COURT:  Yes, I do.  I have it
12   right in front of me.  Thank you.
13              BY MR. CHANG:
14              Q.   So, if we -- if we turn to page 4
15   of this document, page 4 shows the distribution of
16   the various research labs that Nortel had in 2002;
17   is that right?
18              A.   Yes.
19              Q.   And this is one of the maps that
20   you were -- one of the global maps you were
21   referring to in your affidavit?
22              A.   Yes.
23              Q.   If you turn to the next page, page
24   5, this shows the research labs around the world
25   that were involved specifically in the wireless
```


Neeson & Associates    W&F

1    line of business; is that right?

2                    A.    That's correct.

3                    Q.    And as we go through the other

4    pages, they each show labs that were involved in

5    the other lines of business if we look at --

6                    A.    I think you should just note the

7    numbers on those boxes are head counts or full-time

8    equivalents in those labs, just so people

9    understand.

10                    Q.    Now, what I'd like to do is move

11    to page 9.  Microsoft is a global high technology

12    company, is it not?

13                    A.    Sure is.

14                    Q.    And here your group is depicting

15    that Microsoft does most of its R&D in one

16    centralized location, right?

17                    A.    Yes.

18                    Q.    Most of their R&D is done in

19    Seattle in fact, right?

20                    A.    90 per cent.

21                    Q.    Obviously that's different from

22    the way Nortel did its R&D?

23                    A.    Sure is.  That's part of the

24    problem.

25                    Q.    Okay.  And if you turn to the next



1    page, page 10, you also compare in this

2    presentation the way Nortel did its R&D to the way

3    Cisco did its R&D, right?

4              A.    That's correct.

5              Q.    Cisco was another well-known,

6    established, global high tech company at the time?

7              A.    Yes.

8              Q.    It still is, isn't it?

9              A.    Still is.

10             Q.    And it's involved in

11   telecommunications as well?

12             A.    Yes.

13             Q.    Now, if we can put this side by

14   side with the wireless global R&D that's page 5, I

15   want to draw the contrast.  Is it fair to say that

16   most other global high technology companies at the

17   time did not have the geographic diversity in their

18   R&D that Nortel had?

19             A.    That's correct.

20             Q.    And so, for the wireless product

21   line, here you would have people in the UK

22   collaborating with people in Ottawa collaborating

23   with people in France potentially?

24             A.    Yeah, but just one comment I'd

25   like to make.  I think if you looked at Lucent and



1    Alcatel and Lucent/Alcatel today, I think you would

2    find a lot more diversity than Cisco and Microsoft.

3    So we weren't unique in the way we evolved.

4              Q.    But is it fair to say that there

5    weren't many other global high tech companies that

6    are as geographically diverse as Nortel was?

7              A.    Yeah, any good R&D person will

8    tell you the most efficient lab is the centralized

9    lab with one location.  In fact, they would say all

10   on one floor.

11             Q.    Can I ask you, that symbol in the

12   lower right-hand corner of each of these, that's

13   the Nortel symbol; is that right?

14             A.    Yes.

15             Q.    That's the symbol that Nortel used

16   to -- to represent itself to its customers, its

17   suppliers and the rest of the world?

18             A.    Yeah, I think it was a trademark

19   symbol that we adopted, I can't remember which

20   year, but the marketing guys thought it was a good

21   thing.

22             Q.    And that was to represent the

23   entire Nortel organization, not any particular

24   Nortel legal entity, right?

25             A.    That's right.  It was Nortel



1    Networks and the symbol applied across all of

2    Nortel.

3                Q.    And that's also true for the

4    Nortel Networks name that appears on the lower

5    left-hand corner of these documents?

6                A.    That's correct.

7                Q.    That Nortel Networks did not mean

8    any particular geographical legal entity; it meant

9    the entirety of one Nortel?

10               A.    That's correct.  Certainly that's

11   the way our customers looked at it.

12               Q.    Now, is it fair to say that the

13   collaboration that would happen in any particular

14   business line, like for example the wireless global

15   R&D, the wireless global business line, that

16   collaboration happened both formally and

17   informally?

18               A.    I'm not sure the definition of

19   informal, but certainly there was, over the years,

20   personal relationships would evolve across labs and

21   people would talk -- we had an internal telephone

22   network that worked very well.

23               Q.    And so some of the collaboration

24   could take place orally over the phone or in

25   impromptu meetings between people that are working



```
 1    on similar products, right?

 2                   A.    Sure.

 3                   Q.    And that kind of collaboration

 4    was, in fact, encouraged at Nortel?

 5                   A.    Yes.

 6                   Q.    And that would be true also even

 7    if some of the researchers were in the UK and

 8    others were in Ottawa and others were in the US,

 9    right?

10                   A.    Yes.   At Cisco they'd use a water

11    cooler.   We used telephones.

12                   Q.    And is it true that there is no

13    mechanism for recording the exact contribution of

14    research from any particular legal entity to any

15    particular technology that Cisco invented?

16                   A.    That Cisco invented?

17                   Q.    Sorry, that Nortel invented.

18                   A.    No, there's no -- there's no way

19    to measure informal collaboration across a company.

20                   Q.    Now, I think you testified before

21    that the budgets for R&D were set by line of

22    business; is that right?

23                   A.    Except for the advanced research

24    budget which was set through the CTO office.

25                   Q.    Would you agree with me that there
```



1   was no specific R&D budget set for a legal entity

2   like NNUK?

3                   A.   No, there was no geographical

4   budgeting.  It was done by line of business and the

5   CTO office.

6                   Q.   Now, I want to move to some

7   statements that you made in your reply affidavit

8   which is Exhibit 5.  Let me start by asking, you

9   know Geoffrey Hall, do you not?

10                  A.   Yes, I've met Geoffrey.

11                  Q.   In fact, Geoffrey Hall worked for

12  you?

13                  A.   I think he worked in my group,

14  yes.

15                  Q.   And he, within your group, was

16  responsible for the EMEA region; is that right?

17                  A.   Yes, I think we used him as a

18  liaison with customers in the region on advanced

19  technology subjects.

20                  Q.   If we turn to paragraph 9 of your

21  reply affidavit, which is Exhibit 5, you reviewed

22  the affidavit of Geoffrey Hall in this case; is

23  that right?

24                  A.   I'm not sure if I reviewed

25  Geoffrey Hall's affidavit.  Yes, I did.

 Neeson&Associates    W&P

```
 1                     Q.   I was just going to point you to
 2    the paragraph --
 3                     A.   I reviewed, yes.  Sorry.
 4                     Q.   Okay.  And part of what you say in
 5    this paragraph in the middle is:  In fact -- well,
 6    sorry.
 7                     "In fact, the cost of employing
 8                     R&D personnel was the prevailing
 9                     consideration in the decision-making
10                     process.  R&D was too costly for
11                     Nortel to keep performing
12                     extensively in the UK."
13                     Are those your words?
14                     A.   Yes.
15                     Q.   In support of that you rely on
16    Exhibit 21185; is that right?  Down at the bottom?
17                     A.   21185?  Yes.
18                     Q.   Okay.  Let's pull up Exhibit
19    21185.
20                     THE CANADIAN COURT:  Where do you see
21    that reference?
22                     MR. CHANG:  Sorry, we can move back to
23    it.  The last sentence in paragraph 9 refers to
24    Exhibit 21185.  Exhibit 21185 is tab 3 in the
25    binder.
```

Neeson & Associates   W&F

```
 1                    BY MR. CHANG:
 2                    Q.   So let's turn to page -- are you
 3   at tab 3 of your binder?
 4                    A.   Yeah, but my 3 doesn't seem to
 5   have Exhibit -- am I in the wrong --
 6                    Q.   Exhibit 5?
 7                    A.   Is it 5?
 8                    Q.   If you have Exhibit 5, which is
 9   your reply affidavit, it would be tab 3 behind
10   there.  But I can hand you a copy as well, if that
11   helps.
12                    A.   I don't seem to have it.  Yes.
13                    MR. CHANG:  Your Honours, do you have
14   Exhibit 21185?
15                    THE US COURT:  Yes.
16                    BY MR. CHANG:
17                    Q.   Now, if we turn to page 7 of
18   Exhibit 21185, this is a table showing the head
19   count across the various Nortel research labs; is
20   that right?
21                    A.   I believe so, yes.
22                    Q.   Okay.  And if you look at the
23   second column, the top of the second column says
24   "Total CPP."  Do you see that?
25                    A.   Yes.
```

 Neeson & Associates   W&P

 1                      Q.    Total CPP, that's cost per person,
 2    total cost per person, is it not?
 3                      A.    Yes.
 4                      Q.    So that number represents what is
 5    also sometimes referred to as the loaded labour
 6    rate.  It's the cost for each researcher, that's
 7    the cost per researcher in each of those locations;
 8    is that right?
 9                      A.    Yes.
10                      Q.    Now, if we look down the column,
11    we see that there's a number for the UK; is that
12    right?
13                      A.    Yes.
14                      Q.    The total cost per person in the
15    UK is 167.  And that's in thousands of dollars,
16    right?
17                      A.    Yes.
18                      Q.    Now, let's compare that -- that's
19    in the section that's labelled "Medium Cost" sites?
20                      A.    Yes.
21                      Q.    Let's compare that to some of the
22    other research locations that Nortel had.  The
23    number per person, the total CPP for the UK is less
24    than, for example, Santa Clara, right?
25                      A.    Yes.



```
 1                Q.   And it's less than Boston?

 2                A.   Yes.

 3                Q.   It's less than Research Triangle

 4   Park?

 5                A.   Yes.

 6                Q.   Less than Calgary -- less than

 7   Richardson?

 8                A.   Yes.

 9                Q.   And in fact it's also less than

10   Calgary, right?

11                A.   Yes.

12                Q.   And it's pretty close to Ottawa as

13   well, isn't it?

14                A.   Yes.

15                Q.   You have no reason to believe that

16   these numbers are wrong, do you?

17                A.   No, I have no reason to believe

18   they're wrong.  They would change every year.

19                Q.   You left Nortel in around November

20   2005; is that correct?

21                A.   That's correct.

22                Q.   At the time that you left Nortel

23   R&D was still being done in the UK, wasn't it?

24                A.   Yes.

25                Q.   Let's move to -- let's discuss --
```



1    let's go back to some testimony you gave earlier

2    about LTE.

3                A.   Just one thing I'd like to make a

4    point here.

5                Q.   Sure.

6                A.   On Ottawa.  That 165 was for a

7    facility that was occupied at about 50 percent.  So

8    when you -- when you talk about cost per person of

9    the people that are there, there is a cost.  If you

10   talked about cost per person if you populated that

11   facility, it would be a different number.

12               Q.   Okay.  So you'd agree with me --

13               A.   So -- so, you just -- you know, if

14   you took -- if you consolidated some of the labs

15   into Ottawa, the cost per person would go down

16   because your fixed costs are much higher in Ottawa,

17   or unused fixed costs, if I can use it that way.

18               Q.   But you'd agree with me that the

19   cost per person for the UK was in fact lower than

20   many of the other research locations that Nortel

21   had?

22               A.   Yes.  The US was typically the

23   most expensive.

24               Q.   Thank you.  Now, I'd like to ask

25   you some questions about moving back to LTE



1   technology.  You make reference in paragraph 7 of

2   your reply affidavit, which is Exhibit 5, to -- and

3   I'll let you get there.

4             A.   Again, we're back to April 10th?

5             Q.   No, we're to your --

6             A.   April 25th?

7             Q.   April 25th.

8             A.   And it's paragraph 5?

9             Q.   Paragraph 7.

10            A.   Seven.  Yes.

11            Q.   At the top of page 4 there is a

12   discussion of smart antenna technology?

13            A.   Yes.

14            Q.   Do you see that?

15            A.   Yes.

16            Q.   Now, smart antenna technology,

17   that's a part of LTE technology, isn't it?

18            A.   It could be.  It's not -- it's not

19   absolutely necessary for LTE but it could help LTE

20   perform better.

21            Q.   It was considered at the time to

22   be a very important technology to develop in

23   connection with LTE and wireless; is that right?

24            A.   It was considered an important

25   area to explore, yes.



```
 1                    Q.   And you don't disagree that
 2   researchers in Harlow contributed to smart antenna
 3   technology, do you?
 4                    A.   Yes, Harlow had a history of
 5   working on smart antennas for several years.
 6                    Q.   But you -- you're not aware of the
 7   specifics of what Harlow did with smart antennas,
 8   are you?
 9                    A.   No, I -- I didn't inspect the
10   program down to the work plan, et cetera.  I knew
11   that Al felt that they had expertise that he could
12   leverage in his advanced technology program and so
13   he gave them smart antenna projects to work on.
14                    Q.   Is it fair to say that
15   Mr. Jeffries would know more about the smart
16   antenna technology work that Harlow did than you?
17                    A.   Probably, yes.
18                    Q.   And is it your understanding that
19   researchers in Harlow worked with others in the
20   wireless technology labs around the world,
21   including Ottawa, on LTE technology?
22                    A.   LTE is a big word.  There's lots
23   of technology in there.  Certainly on the smart
24   antennas they participated.  I'm not sure if they
25   participated in the rest of the project.  Smart
```



```
 1   antennas was a piece of it; it was not the major

 2   bulk of the work, as far as I felt.

 3              Q.   In paragraph 7 here, you rely on

 4   Exhibit 21182; is that right?

 5              A.   Yes.

 6              Q.   So let's turn to Exhibit 21182.

 7   It's tab 1.

 8              A.   I have it, thank you.

 9              Q.   If you look at the email at the

10   bottom of the first page, the third paragraph down,

11   there's a paragraph that starts "T-Mobile."  Do you

12   see that?

13              A.   Yes.

14              Q.   It reads:

15                   "T-Mobile is convinced that

16                   adaptive antenna is a must-have now

17                   that technology evolutions have made

18                   this solution more attractive, both

19                   technically and commercially."

20              Do you see that?

21              A.   Yes.

22              Q.   Now, adaptive antenna, that's

23   another word to use for smart antenna technology,

24   right?

25              A.   Yes.
```



1              Q.   And this is an example of Nortel
2    working with its customers like T-Mobile to develop
3    their technology, right?
4              A.   To develop technology to address
5    their -- their network requirements, yes.
6              Q.   And to address customer needs?
7              A.   Yes.
8              Q.   And here at least T-Mobile is
9    convinced that the smart antenna technology is a
10   must-have; is that right?
11             A.   Yes, that's what they say.  I'm
12   not sure they've seen the price or the installation
13   charges or all the things that go around deploying
14   the technology.
15             Q.   Okay, fair enough.  Now, let's
16   move on to -- I'd like to ask you some questions
17   about researchers in the UK that actually ended up
18   listed as inventors on patents in the Nortel patent
19   portfolio.
20             First let me start by asking, you don't
21   dispute that UK inventors and researchers
22   contributed to Nortel's technology across the
23   various business lines, do you?
24             A.   I don't dispute that they've made
25   contributions to our technology.



```
 1                    Q.   And you don't dispute that they

 2    made contributions to Nortel's patent portfolio as

 3    well, do you?

 4                    A.   No, they -- I don't dispute that.

 5                    Q.   From time to time Nortel awarded

 6    patent awards; is that right?

 7                    A.   Yes.

 8                    Q.   Do you know Simon Brueckheimer?

 9                    A.   Yes, I've met Simon.

10                    Q.   He was considered a very prolific

11    inventor within Nortel, right?

12                    A.   Yes, and before Nortel when he was

13    in STC.

14                    Q.   And he was located in the UK,

15    right?

16                    A.   Yes.

17                    Q.   Simon Brueckheimer was generally

18    considered one of the top inventors at Nortel?

19                    A.   Yes.

20                    Q.   Do you recall giving

21    Mr. Brueckheimer awards for his scientific

22    achievements?

23                    A.   I recall there was an award for

24    Simon.  I can't recall the specific place and time,

25    but Simon was on the list of, I forget the title we
```



```
 1   used, but to recognize a prime contributor to

 2   intellectual property.

 3                Q.   I'd like to bring up Exhibit

 4   21196.

 5                A.   Thank you.

 6                Q.   I'd like to hand this up to Your

 7   Honour as well.  And we'll pull it up on screen.

 8   Do you have Exhibit 21196?

 9                A.   Yes, I do.

10                MR. CHANG:  Judge Gross, do you have

11   Exhibit 21196?

12                THE US COURT:  I do, yes.

13                BY MR. CHANG:

14                Q.   The email that's at the bottom of

15   the first of this Exhibit 21196, this is an email

16   that's sent on your behalf, right?

17                A.   Yes.

18                Q.   And it's sent by Joan Phillips who

19   worked with you?

20                A.   Yes, my executive admin.

21                Q.   And this is being sent to Simon

22   Brueckheimer?

23                A.   Yes.

24                Q.   In this you say that:

25                     "It has come to my attention that
```



```
 1              you recently received the

 2              prestigious Royal Academy of

 3              Engineering's silver medal for

 4              Outstanding Contribution to British

 5              Engineering."

 6              Is that right?

 7         A.   Yes.

 8         Q.   And if you look at the last

 9  sentence of that first paragraph, you say:

10              "Without a doubt, your work has

11              played a significant role in

12              establishing Nortel's leadership in

13              a number of areas, including VoIP."

14              Is that right?

15         A.   Yes.

16         Q.   Those are your words?

17         A.   Yes.

18         Q.   VoIP, that is short for voice over

19  IP, right?

20         A.   Voice over internet protocol.

21         Q.   And that is a technology that is

22  still in use today?

23         A.   I think you're struggling with it

24  today, but yes, it's a technology that is in

25  service.
```



```
 1                      Q.   Fair enough.  Is it fair to say
 2    that Mr. Brueckheimer is an example of an inventor
 3    within Nortel UK that was a significant contributor
 4    to Nortel's patent portfolio?
 5                      A.   Yes.
 6                      MR. CHANG:  Thank you very much.  No
 7    further questions.
 8                      THE CANADIAN COURT:  Mr. Steep?
 9                      MR. STEEP:  Thank you, Your Honour,
10    Judge Gross.
11    RE-EXAMINATION BY MR. STEEP:
12                      Q.   Mr. McFadden, don't worry, I'm not
13    going to keep you very long.
14                      A.   Promise?
15                      Q.   You'll be able to drive back.
16    You'll be driving back to Montreal in two minutes.
17                      Mr. McFadden, my friend Mr. Chang took
18    you to some of the slides at tab 10 of your first
19    affidavit, April 10th, 2014.
20                      A.   Yes.
21                      MR. STEEP:  Your Honour, Judge Gross, I
22    need you to turn up tab 10 and go to the fifth page
23    from the back, and I regret that these pages are
24    not numbered, and you should come up with a page
25    that says "Recommendations."
```



```
 1                    THE US COURT:  Yes.
 2                    MR. STEEP:  It was Exhibit number
 3     TR21188.  It is the same slide deck, Judge Gross,
 4     with the core lab from Seattle and the core lab
 5     from San Francisco.
 6                    BY MR. STEEP:
 7               Q.   Do you have that list of
 8     recommendations in front of you, Mr. McFadden?
 9               A.   Yes, I do.
10               Q.   And you'll see that the first one
11     is Nortel platforms should use Ottawa as the
12     default choice.  Why is that?
13               A.   Well, that's a very large area.
14     Platforms, when you have the number of labs that we
15     had and you have the number of product portfolios
16     that we had, most of our product portfolios were
17     built on a base platform.
18                    A base platform could be -- was usually
19     proprietary hardware and software that provided a
20     set of functionality and was called a product,
21     although when it was designated a platform, then it
22     was designed so that you could build variations --
23     product variations on top of that platform for
24     different markets.
25                    For instance, if you built a DMS switch
```



```
 1   platform, which it was, it was a platform, you
 2   would have a different version to use with MCI for
 3   Friends & Family, and you would have another
 4   version that you would use in the UK that would be
 5   customized to work in those networks in a different
 6   manner than -- well, you couldn't take a switch
 7   from the UK and use is it MCI, for instance.
 8               Q.   Where were those platforms?
 9               A.   The platforms were developed in
10   Ottawa, which is quite an extensive bit of work
11   because on top of the base functionality for the
12   hardware and software, you also had to deliver a
13   set of tools to the other labs so that they could
14   build their software on top of the platform.
15               Most of the other labs did software
16   work on the platforms, whether it was DMS or SL1 or
17   DPM for packet or the optical products.  They would
18   tend to be software productizations on top of
19   platforms so they needed to come with a set of
20   tools so the developers could access all the
21   features of the platform with those tools.
22               Q.   Could those labs operate
23   independently without access to the platform in
24   Ottawa?
25               A.   No.
```



```
 1                    MR. STEEP:  Thank you.

 2                    MR. CHANG:  Just a couple -- unless --

 3                    MS. SCHWEITZER:   No.

 4                    MR. CHANG:  Just a couple of follow-up

 5      questions.

 6                    MR. STEEP:  Can I just address this.

 7      Maybe this is protocol and I have overlooked it.

 8      It certainly wouldn't be customary practice for

 9      someone to re --

10                    THE CANADIAN COURT:  I'm going to allow

11      it.  Go ahead.

12      FURTHER CROSS-EXAMINATION BY MR. CHANG:

13                    Q.   Mr. Steep asked you some questions

14      about the recommendations in this -- in this

15      document, Exhibit 21188.

16                    A.   I closed my book.  All right.

17                    Q.   I'll wait until you get there.

18                    A.   I'm trying to remember where it

19      was.  That was April 10th, correct?

20                    Q.   17.  It's page 17 of the document

21      that is attached to the April 10th exhibit.

22                    A.   I have it.

23                    Q.   So these are recommendations that

24      you were making at the time to Nortel management;

25      is that not --
```



```
 1                    A.   Yeah, that was -- those were the
 2   proposals that we had come up with to go forward
 3   with.
 4                    Q.   You never got a chance to
 5   implement those proposals, did you?
 6                    A.   No.
 7                    MR. CHANG:  Thank you.
 8                    THE CANADIAN COURT:  Re-examination?
 9                    MS. SCHWEITZER:  I think everyone is
10   done, Your Honour.
11                    THE CANADIAN COURT:  Thank you.
12                    MR. STEEP:  Thank you, Mr. McFadden.
13                    THE CANADIAN COURT:  Thank you,
14   Mr. McFadden.
15   -- WITNESS EXCUSED --
16
17        ANGELA DEWILTON, having been first
18           duly affirmed, was examined and
19                 testified as follows:
20
21                    MR. STEEP:  Your Honour, Judge Gross,
22   I'd ask that you have before you Ms. DeWilton's
23   affidavit of April the 11th, 2014.
24                    THE CANADIAN COURT:  That will be the
25   next exhibit.  What number is that?
```



```
 1                    THE REGISTRAR:  Exhibit number 6, Your
 2    Honour.
 3                    EXHIBIT NO. 6:  Affidavit of Angela
 4                    DeWilton dated April 11, 2014.
 5    EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY MR. STEEP:
 6                    Q.   Ms. DeWilton, you have a copy of
 7    your affidavit before you?
 8                    A.   I do.
 9                    Q.   And you've had a chance to review
10    it and I understand there are no changes you wish
11    to make to it?
12                    A.   Right.
13                    Q.   Now, Ms. DeWilton, please try to
14    keep your voice up a bit because there are people
15    listening over a mic'd system.  I'll be very brief
16    with you.  We'll just do a short biography and then
17    we'll let you be cross-examined.
18                    Now, I understand that you were trained
19    as a chemical physicist, that was your original
20    degree, correct?
21                    A.   Yes, my B.Sc, correct.
22                    Q.   And then you obtained a Ph.D. in
23    chemistry from Carleton University in Ottawa in
24    1984?
25                    A.   That's correct.
```



```
 1                    Q.   I understand that you did a
 2   post-doctorate type fellowship at Northern Telecom
 3   Electronics Limited, one of the Nortel companies,
 4   correct?
 5                    A.   Yes, I started there in 1985.
 6                    Q.   And you were designated a member
 7   of the scientific staff when you did that work,
 8   correct?
 9                    A.   That's correct.
10                    Q.   And then I understand that
11   subsequently you became a permanent member of the
12   scientific staff of Northern Telecom Electronics
13   Limited?
14                    A.   Yes, yes, I did.
15                    Q.   Now, in 1989 you transferred to
16   the company NNL, Nortel Networks Limited, correct?
17                    A.   It was actually Northern Telecom
18   Limited in those days.
19                    Q.   That's right.  I'm glad you
20   corrected me.  Northern Telecom and it subsequently
21   became NNL?
22                    A.   NNL, yes.
23                    Q.   And when you made that transfer,
24   you became part of the patent law group; is that
25   correct?
```



```
 1                    A.   We were part of the patent group

 2   that was at that point a group within the NTL,

 3   Northern Telecom Limited corporate law group.

 4                    Q.   And then I understand you became a

 5   patent agent in Canada and in the United States in

 6   1991?

 7                    A.   Correct.

 8                    Q.   And at some point, I may not have

 9   the date exactly, you did join the IP Law Group?

10                    A.   I believe that the patent group

11   became the IP Law Group sometime in the mid to late

12   nineties.  I forget the exact dates.

13                    Q.   And while in the IP Law Group, you

14   were the director of intellectual property?

15                    A.   I had several roles as director of

16   intellectual property.  Initially for more local

17   R&D groups and then taking on responsibility for

18   patent activity across the advanced technology

19   program.

20                    Q.   And I understand that in 2001 you

21   took on an advisory role as the director of IP

22   strategy; is that correct?

23                    A.   Yes.

24                    Q.   And that you were in the employ of

25   Nortel in this capacity until 2007; is that
```



 1   correct?

 2              A.   That's correct.

 3              Q.   All right.  And can you just

 4   summarize for His Honour and for Judge Gross what

 5   your responsibilities were in the IP Law Group in

 6   the latter years of your employment?

 7              A.   Okay.  So from the point that Art

 8   Fisher took over the group, which I believe was

 9   around 1999, and I was appointed director of IP, I

10   took on a role in coordinating the IP Law Group in

11   Ottawa, but also in the IP law operations team that

12   coordinated IP activity across -- across geographic

13   boundaries.

14              So for Canadian, US and EMEA R&D

15   groups, and specifically I also had responsibility

16   for the global advanced technology program and

17   patent activity for that program.

18              MR. STEEP:  Thank you, Ms. DeWilton.

19   Those are my questions.

20              THE CANADIAN COURT:  Ms. Schweitzer.

21   CROSS-EXAMINATION BY MS. SCHWEITZER:

22              Q.   Ms. DeWilton, before I start,

23   could I ask you to pick up your microphone a little

24   bit so that we're not asking you to shout in the

25   courtroom.  Thank you.



```
 1                    A.   Is that a little better?
 2                    Q.   Yes, that's perfect.  My name is
 3      Lisa Schweitzer and I'm from Cleary Gottlieb for
 4      the U.S. Debtors.
 5                    I would like to start my examination by
 6      starting with the assignment of patent rights
 7      within Nortel.  And I believe you said, just to get
 8      it right because you gave us a long history, that
 9      Nortel's IP Law Group that you're part of as a
10      formed IP Law Group was for a long period of time,
11      1989 to 2007, in that range?
12                    A.   That's correct.
13                    Q.   And you said that you served in
14      these roles as director of intellectual property
15      and director of IP strategy during that window of
16      time?
17                    A.   That's correct.
18                    Q.   Now, do you have your affidavit in
19      front of you?
20                    A.   I do.
21                    Q.   So turning to page -- paragraph 8
22      of your affidavit, in the second sentence you say
23      at all times during your employment with NNL that
24      you were aware that all employees, whether employed
25      by NNL or a subsidiary, were required to assign,
```



```
 1   directly or indirectly to NNL, any intellectual

 2   property, including any inventions and associated

 3   patent rights which they generated during the

 4   course of their employment in accordance with the

 5   terms of their employment agreements and agreements

 6   between NNL and its subsidiaries.

 7            A.   That's correct.

 8            Q.   That's right?  And that was your

 9   understanding during your tenure?

10            A.   Yes.

11            Q.   There is a lot in that sentence so

12   I would like to unpack that a little bit.  The

13   first thing you are referencing is that there were

14   these employment agreements that existed between

15   the employees on the one hand and their Nortel

16   employer on the other hand; that's right?

17            A.   Yes, at the time of hiring each

18   employee or each contractor would sign an HR

19   employment agreement which included terms for

20   assignment of not just potential patent rights, but

21   all potential IP, information, know-how and work

22   they developed while they were at Nortel.

23            Q.   Right.  And so you, in fact,

24   referenced in your next sentence of your affidavit,

25   paragraph 8 still, you say:
```



```
 1                    "Copies of representative NNL

 2                employment agreements are referenced

 3                below."

 4                And in the footnote you reference two

 5      specific documents, and I'll turn to the specific

 6      documents or at least one of them so we can walk

 7      through it, but your understanding is the documents

 8      that you're referencing are representative of the

 9      employment agreements entered into by NNL during

10      your tenure?

11                A.   Yes, I was shown some sample

12      employment agreements.  I reviewed them and they

13      were familiar to me from many other agreements of

14      that type at the time.

15                Q.   And consistent with your

16      understanding that this was a common practice to

17      have assignments?

18                A.   Yes, even when I originally was

19      hired by Nortel back in 1985, I signed a similar

20      agreement assigning my rights to IP.

21                Q.   To your employer?

22                A.   To my employer, Nortel, yes.

23                Q.   Okay.  And specifically to your

24      employer NNL, correct?

25                A.   Specifically to what was then
```



1   Northern Telecom Limited, yes.

2            Q.   Fair enough.  I appreciate the

3   correction.  And so to turn back to the documents,

4   because it's helpful to have one in front of you,

5   you referenced two.  Let's just pick one.

6            The first document which you list in

7   your footnote is NNC-NNL 11771974.  Because we're

8   in the trial world now the Trial Exhibit is Exhibit

9   TR 45736 and because we speak in plain English it

10  is the agreement that is signed by Mr. Balign; is

11  that right?

12           A.   I see that one, yes.

13           Q.   And do you have that in front of

14  you?

15           A.   I do.

16           MS. SCHWEITZER:  Do Your Honours have

17  that as well?

18           THE US COURT:  Yes.

19           BY MS. SCHWEITZER:

20           Q.   And that's on the screen as well

21  for your reference.  And consistent with what you

22  just explained, if you turn to paragraph 2 of the

23  agreement, it references the assignment again to

24  the company of all these rights and inventions and

25  other discoveries and the like that were conceived,



1    developed or reduced to practice during the period

2    of services with the company.  Do you see that in

3    paragraph 2?

4              A.   Yes, I see that paragraph.

5              Q.   And in accordance with the first

6    sentence of the agreement, that the company is the

7    employer NNL; is that right?

8              A.   Yes, it says collectively by

9    Nortel Networks Limited, hereinafter the company.

10             Q.   Right.  And the employer, it's the

11   employer is the one, NNL is the company because NNL

12   is the employer in a sense; is that right?

13             A.   This would be a standard agreement

14   regardless, I believe, of the specific

15   organization.

16             Q.   Okay.  Well, let's turn down to

17   paragraph 9 of that same agreement.

18             A.   Um-hmm.

19             Q.   And I'll take it -- you can read

20   it directly because it's a long sentence, I'll try

21   to paraphrase it but you should read the exact

22   words yourself, they're on the screen as well, but

23   it says that if your employment with the company,

24   meaning NNL, is succeeded by employment with an

25   affiliate, basically if you were to move from NNL



1    to for example NNI, the US subsidiary, that the

2    terms of the agreement would continue to apply

3    until there is a new agreement signed with the

4    affiliate, the new employer.

5              A.   I see that, yes.

6              Q.   Okay.  And then if you don't sign,

7    if this employee does not sign an agreement with

8    the new affiliate employer, then the terms of this

9    agreement will apply immediately in favour of the

10   new affiliate employer?

11             A.   Of the second entity, yes.

12             Q.   And so if I'm reading that

13   correctly, that means that the paragraph 2

14   assignment of rights of the inventor to the

15   company, if for example you move from NNL as an

16   employer to NNI as an employer, that would mean

17   that the employee from that point forward as an

18   employee of NNI is assigning its rights to NNI as

19   its employer?

20             A.   To NNI and then through to the

21   parent company NNL.

22             Q.   That's not what this document says

23   though.  This document says that the terms of the

24   agreement would apply immediately in favour of the

25   affiliate company, right?  And so that NNI would



1    then be the employer who would the employee would

2    assign the rights to.  Am I reading that correctly?

3              A.   In the event that my employment by

4    the company is succeeded by employment with an

5    affiliate company, the terms of this agreement

6    apply until an agreement relating to this subject

7    matter is signed with the affiliate company.

8              Okay.  So I guess it could be possible

9    that if the terms with the affiliate company were

10   different, the second agreement would take

11   precedence.

12             Q.   And you also in your -- in your --

13   in your affidavit you also similarly make reference

14   to the idea that inventors, in some cases, assign

15   their rights to the local NNL subsidiary that

16   employed them and only after that time was there an

17   assignment from the employer to NNL; is that right?

18             A.   Okay.  Well, the agreement that is

19   signed at the time of new hiring of an employee is

20   clearly referring to potential future rights that

21   will be developed during the employment.

22             When we are talking about patent

23   assignment documents, those are referring to the

24   assignment of a specific invention, patent

25   application or patent, and almost invariably the



1    assignment of a patent document, whether it was an

2    invention, a patent application or an issued

3    patent, was to NNL.

4                Now, in some cases historically there

5    was an assignment from the inventor to their local

6    employer and then the rights from the local

7    employment entity of, say, NNI were then assigned

8    to NNL.

9                But if we look at the assignment

10   records for a large part of the portfolio, I think

11   you'll notice that in other statements in the

12   affidavit I did some analysis of sample groupings

13   of patents and over 95 percent or possibly even 98

14   percent of those patent applications or patents

15   ultimately were assigned to NNL.

16               In the early days I was in the patent

17   group before it became the IP Law Group, we had an

18   organization called Bell Northern Research and

19   inventors did a two-step assignment to Bell

20   Northern Research and then to the parent company,

21   Northern Telecom Limited at the time which was

22   subsequently renamed NNL.

23               Q.   Okay.  So you're saying in the

24   earlier years that you worked in Nortel, you

25   actually had formal two-step assignments, that the



1   employee assigned to the employer and then the

2   employer assigned to NNL?

3                A.   In some instances, and in other

4   instances there was a direct patent assignment and

5   I am talking about not the assignment of general IP

6   and technology in the employment agreement, I am

7   talking about the patent assignment documents.

8                Q.   So for the ease of following this,

9   you're talking about that after an employee has

10  worked at Nortel for a period of time, and that

11  they would then partake in the invention for which

12  a patent was submitted or accepted, that there were

13  sometimes assignment documents within that patent

14  itself that showed an assignment of the invention

15  to NNL; is that right?

16               A.   There were almost invariably

17  patent assignment documents that were executed for

18  each specific patent application near the time of

19  filing.

20               Q.   And that's exactly the point.

21  Those agreements were signed at the time of the

22  patent filing which was after the person had been

23  employed and was working for Nortel for a period of

24  time; is that right?

25               A.   Generally, yes.



```
 1                    Q.   Because by definition they
 2   invented whatever they were working on during the
 3   period of time they were at Nortel?
 4                    A.   Correct.
 5                    THE CANADIAN COURT:  Can I just ask a
 6   question.  Is it not the case that in order to
 7   prosecute a patent application by Nortel, by NNL,
 8   that there has to be an assignment from the
 9   inventor to NNL in order to prosecute that
10   application?
11                    THE WITNESS:  There has to be at least
12   a Power of Attorney, but yes, in order for -- in a
13   US Patent application there has to be at least a
14   Power of Attorney from the inventors, but our
15   policies and procedures set out that our
16   recommended best practice was to obtain the
17   assignment from the inventors around the time of
18   filing of the application.
19                    In some countries, in countries other
20   than the US, the application is generally filed in
21   the name of the applicant, for example in Canada,
22   in which case an assignment is necessary to proceed
23   in the name of the applicant rather than in the
24   name of the inventors.
25                    BY MS. SCHWEITZER:
```



1              Q.    So as a matter of housekeeping and
2     good form along with a patent filing you would put
3     in this assignment from the inventor to NNL as a
4     patent application?
5              A.    Well, the execution of the
6     assignment was required.  The best practice was to
7     do it as soon as possible.
8              Q.    Right.
9              A.    When the patent application was
10    filed.
11             Q.    And turning back to this agreement
12    relating to intellectual property and
13    confidentiality, for example signed by Mr. Balign,
14    this in fact would have been sufficient because Mr.
15    Balign is saying I am assigning my intellectual
16    property rights and inventions to NNL as my
17    employer; that's right?
18             A.    Correct.
19             Q.    And so --
20             A.    Oh, no, excuse me, you've
21    mischaracterized that.  The execution of an
22    employment agreement with assignment of IP rights
23    is not sufficient in and of itself once a patent
24    application is filed.
25                   An assignment document has to be



1   recorded in the patent office, for example the US

2   Patent and Trademark office, to perfect that

3   assignment.

4               So we would not rely on the employee

5   agreement per se.  There would be a specific form

6   of patent assignment except in exceptional cases if

7   the inventor was not available, for example.

8               Q.   So there are different things that

9   happened in the time that someone was employed by

10  Nortel, whether NNL or a subsidiary.  When they

11  first came to the company they would sign an

12  employment agreement, that's right?

13              And the employment agreement, such as

14  the one we have seen at Exhibit TR45736, the

15  employee would assign their rights to their

16  inventions to their employer, and then at a later

17  point in time, when the patent application is

18  filed, there is an assignment filed with that

19  specific patent to NNL; is that right?

20              A.   With the patent application.

21              Q.   With the patent application.

22  Okay.  Now, to turn back to your affidavit

23  paragraph 8 again, that you also reference as part

24  of this assignment process in order to get the

25  rights up to NNL, you also reference certain, in

 Neeson & Associates    W&P

1    the same sentence that we read, that there were

2    certain agreements that existed between NNL and its

3    subsidiaries.

4                    A.    Correct.

5                    Q.    Do you see that?

6                    A.    Yes.

7                    Q.    Now, as a director in the IP Law

8    Group from 1989 to 2007, you don't recall ever

9    seeing a copy of the Master Research and

10   Development Agreement, did you?

11                   A.    Not at the time that I was

12   employed at Nortel.  I was aware of the existence

13   of various agreements over the year -- over the

14   years, but I have subsequently reviewed that

15   document and I wasn't familiar with it.

16                   Q.    Okay.  And so you have heard of,

17   for example, the R&D Cost Sharing Agreement at

18   Nortel?

19                   A.    Correct.

20                   Q.    That's right?

21                   A.    Yes.

22                   Q.    But you also, until your

23   recollection was refreshed, didn't know the actual

24   terms of that agreement either?

25                   A.    No, I was not involved in the



1    formulation of the cost sharing agreement or the

2    Master R&D Agreement.  I was involved at the point

3    where we were ensuring that corporate policies and

4    procedures relating to IP correctly set out how

5    assignments were to be made from inventors to NNL.

6              Q.   Okay.  And when you reference in

7    paragraph 8 that there were the existence of

8    agreements between NNL and its subsidiaries

9    addressing the assignment of rights, what

10   agreements are you referring to in that paragraph?

11             A.   I don't think I had any specific

12   agreements in mind when I wrote those sentences

13   other than the fact that I was aware that there

14   were agreements between NNL and its subsidiaries

15   which required that inventions were assigned to the

16   parent company, NNL.

17             Q.   Okay.

18             A.   Perhaps I should add that it was

19   part of our responsibilities as the IP Law Group to

20   ensure that those assignments were executed by the

21   inventors --

22             Q.   Right.

23             A.   -- at the time of filing.

24             Q.   Thank you.  I'd like you to turn

25   to again your affidavit and you have a section



```
 1    entitled "Source of Patented Inventions," it starts
 2    at page 5.  Do you have that in front of you?
 3                   A.    Okay.  I see it.
 4                   Q.    Okay.  And just to go backwards in
 5    the affidavit because I think that there's a
 6    lead-up to that discussion, is in pages 4 and 5 of
 7    your affidavit you refer to two spreadsheets you
 8    had reviewed in connection with your affidavit; is
 9    that right?
10                   A.    That's correct, two listings of
11    patent information from our patent database.
12                   Q.    Okay.  And each of these
13    spreadsheets, and I'm just trying to find them, is
14    that the -- it's on paragraph 12 you reference
15    them, is the first spreadsheet is NNI-00770079, and
16    then the second spreadsheet you reference on the
17    top of page 5, CC-0067164.  Do you see those?
18                   A.    That's correct.
19                   Q.    And both of those spreadsheets
20    were provided to you by counsel for the Monitor; is
21    that right?
22                   A.    That's correct, by Selina Kim.
23                   Q.    You didn't create either of these
24    spreadsheets, did you?
25                   A.    Those two spreadsheets were dated
```



1    I had left Nortel.

2                    Q.    And so you didn't create them and

3    you are aware that they were prepared after you

4    left?

5                    A.    Yes, they were prepared after I

6    left Nortel.

7                    Q.    And they appear to include or

8    relate to materials contained in the database or

9    possibly entered into the database in the period of

10   time after you left Nortel; is that right?

11                   A.    They are extracts from the patent

12   database in a form that I was very familiar with,

13   similar to the reports that I would have generated

14   myself.

15                   Much of that data would have been in

16   the database before I left Nortel.  So only -- only

17   data that was entered after the period -- after the

18   period that I left Nortel in 2007, there would be

19   new data entered that I wouldn't have been aware of

20   previously.

21                   Q.    And, in fact, consistent with that

22   you don't actually know how the databases were

23   maintained after you left Nortel in 2007?

24                   A.    Well, I would assume that they

25   were similarly maintained as when I was there by



```
 1   the appropriate personnel.

 2              Q.   And because you weren't there,

 3   that's your assumption and you don't have personal

 4   knowledge?

 5              A.   I don't have personal knowledge of

 6   that, no.

 7              Q.   And you also don't know who

 8   prepared these spreadsheets; you just know that

 9   they were given to you; is that right?

10              A.   I don't have personal knowledge of

11   who generated the spreadsheets.

12              Q.   I'd like to turn back to some of

13   Nortel's practices with respect to patent filings

14   and the locations and where the patents were filed.

15   And I believe you have explained that while you

16   were in the IP Law Group you assisted with the

17   preparation and prosecutions of patent filings in

18   that group; that's right?

19              A.   I did.

20              Q.   And you understood that except in

21   limited circumstances, it was Nortel's practice

22   while you were there to file patent applications in

23   the US first except for under limited exceptions,

24   right?

25              A.   Generally, since the US was the
```



1    largest market, we would first file in the US

2    unless the patent law in a particular country

3    required, for example in certain European countries

4    it is required to first file where the invention is

5    made.

6                    Q.    And in those European countries

7    you would file first in the local jurisdiction in

8    accordance with the local rules and then file also

9    in the US; is that right?

10                   A.    Yes, if a patent application was

11   to be filed, it would be filed in the US and then

12   selectively higher value inventions would also be

13   filed in other countries in addition.

14                   Q.    And that was a formal practice

15   that was maintained during your time at Nortel;

16   that's right?

17                   A.    It was a practice that was

18   formalized more thoroughly in the later years that

19   I was there.  In the early years we had a patent

20   committee that met to discuss foreign filings, but

21   that was in the years when we were filing maybe a

22   hundred applications a day -- sorry, a year.  Yeah,

23   a year.

24                   When we ramped up to filing 500, a

25   thousand a year, obviously we had many different



1    committees across the company making those

2    decisions and the process was far more formalized

3    and we set guidelines or quotas for the budget for

4    the foreign filings.

5                    Q.   And the US -- the practice of

6    filing in the US first was a consistent practice

7    during all that time informally and then later

8    formally; is that right?

9                    A.   I believe that in the very early

10   days that I joined the group perhaps we filed

11   equally in Canada and the US, but as soon as we

12   began to ramp up the patent filing program, the US

13   filings were definitely the primary filing.

14                   Q.   And I think you had said one

15   reason for that is because the US is such a

16   significant market, and in fact the most

17   significant market for telecom products; is that

18   right?

19                   A.   It's a very significant market for

20   many different products, but particularly for the

21   telecom industry at the time I was there.

22                   Q.   And another reason was for Nortel

23   particularly, it had a large part of its business

24   and its sales in the US and the patent protection

25   there would help further those sales; is that



 1   right?

 2               A.   I think that that's tied into what

 3   I was saying about the largest market being the US

 4   not only for Nortel but for its competitors as

 5   well.

 6               So there's clearly high value in filing

 7   a patent application in the US or in other markets

 8   which are important both to your own company and to

 9   potential competitors who may be using the

10   technology.

11               Q.   And I believe that you had

12   explained in your deposition as well that the US

13   patent portfolio, you would also want to keep the

14   US patent portfolio in a strong portfolio because

15   the US portfolio is a primary focus for licensing

16   and other business negotiations and, as you said,

17   it's fundamental to most North American companies

18   to keep a strong US portfolio; is that right?

19               A.   I think it's fundamental to most

20   global companies to have a strong US portfolio

21   because the value of US portfolio is not only in

22   protecting your own home market there or

23   discouraging US competitors, it has value more

24   globally because all major telecom players in the

25   global market had to be part of the US market.

1          So the US portfolio also acts as a

2    deterrent to foreign competitors because it would

3    not be cost effective in most cases for them to

4    manufacture a product for the rest of the world if

5    they can't also market it in the US.

6          THE CANADIAN COURT:  Ms. Schweitzer, I

7    am mindful of the reporters.  We've been going for

8    an hour and a half.  Do you or anyone else plan to

9    be more than a few minutes?

10         MS. SCHWEITZER:  You couldn't have

11   asked at a better point because in my outline the

12   next word is "stop."

13         THE CANADIAN COURT:  Keep going.

14         MS. SCHWEITZER:  I never had a judge

15   encourage me to ask more questions but I will stop.

16         THE CANADIAN COURT:  You're misreading

17   me.

18         MS. SCHWEITZER:  With that, I will cede

19   the podium.  I'm fine if people want to take a

20   break.

21         THE CANADIAN COURT:  Are there other

22   counsel who want to conduct some examination?

23         MR. MAGUIRE:  Very briefly, Your

24   Honour.

25         THE CANADIAN COURT:  All right.  Well,



1    why don't we do that and then we can stop for the

2    day.

3              MR. MAGUIRE:   Justice Newbould, Judge

4    Gross, it's Bill Maguire of Hughes Hubbard for the

5    Joint Administrators of the EMEA entities.

6    CROSS-EXAMINATION BY MR. MAGUIRE:

7              Q.   Good afternoon, Ms. DeWilton.

8              A.   Good afternoon.

9              Q.   You mention in paragraph 12 of

10   your affidavit some of the work that the IP group

11   and folks at Nortel were doing in connection with

12   Nortel's patents, and you mention specifically an

13   internally developed database, the global patent

14   system or GPS and that was used to log details of

15   invention disclosure submissions?

16             A.   That's correct.

17             Q.   And there was also a docketing

18   system that Nortel had that you mentioned?

19             A.   Yes, the PC master system.

20             Q.   And those were examples of some of

21   the things that Nortel was doing in terms of

22   administering its patents; is that right?

23             A.   It's fairly standard for a large

24   IP group to have a commercially available database

25   such as PC master to log all important data about



```
 1    new invention disclosures, patent filings, serial

 2    numbers, patent filing dates, all that kind of

 3    information.

 4              Q.   Precisely.  And Nortel had

 5    thousands of patents?

 6              A.   Thousands and thousands, yes.

 7              Q.   And prosecuting those patents,

 8    defending those patents, administering those

 9    patents, there was some substantial amount of work

10    that went into all of that?

11              A.   Yes, and that was all carried out

12    centrally through the IP Law Group.

13              Q.   And you're not familiar with the

14    arrangement among the parties as to how that cost

15    ultimately would be shared among the parties; is

16    that right?

17              A.   The cost of the patent program was

18    funded at a corporate level.  And the IP Law Group

19    was responsible for managing the budget that we

20    received each year from the corporation, from NNL,

21    and allocating that budget amongst patent filing

22    targets for new patent applications, for

23    prosecuting existing patent applications and

24    maintaining issued patents.

25              Q.   My only point is when that had all
```



1   be spent you're not familiar, you personally don't

2   know the arrangements that Nortel Networks Limited

3   had with Nortel France and Nortel Ireland and

4   Nortel UK and Nortel US with respect to sharing

5   those costs?

6                    A.    Are we talking about R&D costs or

7   patenting costs?

8                    Q.    We're talking now simply about the

9   costs that we've been talking about in terms of

10  administering the patents which Nortel Networks is

11  handling centrally, including your IP group, and

12  then when we get above the corporate level to

13  headquarters what the arrangements are between the

14  top executives in Toronto and Nortel Networks

15  Limited and the agreements that they have made with

16  other Nortel companies around the world with

17  respect to the sharing of those costs?

18                   A.    I think that we are confusing two

19  sets of costs here.  There is the R&D program which

20  is funded or was funded across the corporation; and

21  then there's the budget provided to the IP Law

22  Group for administering the patent program per se.

23                   Q.    And are you familiar specifically

24  with the accounting that was then done at the

25  corporate level with respect to the sharing of

 Neeson & Associates   W&F

```
 1   costs among the parties after Nortel Networks
 2   Limited had paid and budgeted and appropriated and
 3   spent the amounts we are talking about now, not on
 4   R&D but specifically on the administration of the
 5   patent portfolio?  Are you specifically
 6   knowledgeable about the agreements between the
 7   parties with respect to how those costs were
 8   shared?
 9            A.   I am a patent agent, I'm not an
10   accountant.  I have no knowledge of what I think
11   you're asking me, but again, I'm confused by your
12   term "costs" because costs could be all kinds of
13   different costs.
14            And I am thinking of the budget that
15   was allocated to the IP Law Group for the work that
16   we were responsible for, for the services we were
17   responsible for, which came out of corporate level
18   funding through NNL.  It was separate from the R&D
19   funding.
20            Q.   Maybe I can withdraw my question
21   and give you a slightly simpler one.  I apologize
22   for confusing you.
23            But you're not familiar with any
24   written contracts among the Nortel companies with
25   respect to how these kinds of costs would be shared
```



1   among them?

2           A.   I'm sorry, are you talking of R&D

3   costs or which specific costs are you referring to?

4           Q.   Written contracts.  For example,

5   you told us, I think, you never saw the Master

6   Research and Development Agreement, or at least you

7   don't have a recollection of ever seeing that.  Is

8   that right?

9           A.   Not during my employment at

10  Nortel, no.

11          Q.   And there were these agreements

12  called cost sharing agreements and I believe you

13  don't have a recollection of seeing those either,

14  right?

15          A.   Okay.  The question started off by

16  asking me about how we budgeted for the patent

17  program.  So if we're now talking about costs under

18  the cost sharing agreement, the Master R&D

19  Agreement, those costs I have no personal knowledge

20  of because I had no personal involvement with those

21  agreements.

22          Q.   Given the time we have to the

23  break, let me stop on that point and move on just

24  briefly to one other point.  And that is, would you

25  agree that with the thousands and thousands of



1    patents that Nortel had, administering those

2    patents, all of the work that went into doing that,

3    there was a convenience in having all of those

4    patents registered in the name of one company,

5    specifically Nortel Networks Limited, rather than

6    having those thousands of patents registered in the

7    name of five companies?

8                    A.   I disagree that it was merely a

9    matter of convenience.  It is a matter of good

10   corporate practice that one entity owns the patent

11   portfolio and therefore has ownership and control

12   over those patent rights.

13                   In a large multinational corporation

14   covering many countries, where patent and IP law

15   rules and laws can differ, you couldn't have one

16   part of the company in one country, another part in

17   another country, or different business units owning

18   separate parts of the portfolio when those patents

19   could be applicable more generally.

20                   So it's standard practice at a

21   corporate level to maintain ownership and control

22   so that the holding company, Nortel Networks

23   Limited, is able to decide what rights, if any, are

24   licensed to other entities.

25                   Q.   I appreciate the very fulsome



1   answer, Ms. DeWilton.  People have very strong

2   views on this so we could spend a lot of time on

3   this.

4                  But there is only one aspect I am

5   asking you about today, and that is very

6   specifically administrative simplicity, and

7   regardless of everything else and all the

8   advantages and disadvantages, the pros and cons of

9   doing things one way or another, really my question

10  is focused on one sliver of information, and that

11  is whether you would agree that with thousands and

12  thousands of patents, all of the work that has to

13  be done in administering them, the disclosure

14  requirements, the filings and everything else,

15  there is an obvious administrative simplicity in

16  having all of them registered in the name of one

17  company rather than being named in five companies?

18                  A.    There are many, many complications

19  generated from situations where there is joint

20  ownership of patents and dilution of rights amongst

21  multiple owners.

22                  And it has been -- it was our corporate

23  policy that all patents would be owned solely by

24  NNL except for a handful of exceptions.

25                  But I would disagree that it was merely



```
1   for administrative simplicity.
2               Q.   I certainly don't want to be
3   disagreeable.  Let me say the courts have seen a
4   number of documents on the subject of
5   administrative simplicity which were prepared by
6   Nortel Networks executive, Mr. Timothy Collins.
7   Did you report to Mr. Collins?
8               A.   Yes, I did.
9               Q.   Thank you.
10              A.   At one time.
11              MR. MAGUIRE:  Nothing further.  Thank
12  you, Your Honour.
13              THE CANADIAN COURT:  Thank you,
14  Mr. Maguire.
15              MR. CHANG:  Your Honour, I do believe I
16  have about 10 or 15 minutes' worth of questions.
17  I'm happy to take a break now.
18              THE CANADIAN COURT:  Why don't we take
19  a short break for the reporters.  They've been
20  going now for quite a while.  We will take 15
21  minutes.
22  -- RECESS AT 3:22 --
23  -- UPON RESUMING AT 3:45 --
24              THE CANADIAN COURT:  Mr. Chang?
25              MR. CHANG:  Thank you, Your Honour.
```



1    CROSS-EXAMINATION BY MR. CHANG:

2              Q.   Ms. DeWilton, good to see you

3    again.  Let me remind you, my name is Eugene Chang.

4    I'm going to ask you some questions on behalf of

5    the UK Pension Claimants.

6              A.   Okay, I understand.

7              Q.   I'd like to start by asking you

8    about the foreign filing policy at Nortel.  I

9    believe you testified earlier that Nortel had a

10   policy whereby not every patent application was

11   filed outside of the US; is that right?

12             A.   There was a policy in which almost

13   all patent applications were filed in the US and

14   then a certain proportion or percentage of specific

15   technologies were filed in specific other

16   countries, depending on the technology in the

17   market.

18             Q.   So, for example, not every patent

19   application would get filed in the UK, right?

20             A.   Correct.

21             Q.   There would be some percentage

22   that get filed in the UK from the applications that

23   were being filed by Nortel?

24             A.   That's correct.

25             Q.   Do you recall that percentage

 Neeson & Associates   W&F

```
 1   target to be around 25 percent?

 2              A.   The 25 percent target for foreign

 3   filings was an overall percentage across the entire

 4   portfolio, not specifically to the UK or any

 5   particular country.  It would depend, for example

 6   if you took wireless technology you would look at

 7   where the market for the wireless technology and

 8   the wireless competitors were, and so it would

 9   depend on the technology covered by the patent

10   application.

11              Q.   So you agree with me, then, that

12   for patents that were invented by UK inventors,

13   only approximately, at most, one out of four or

14   less would get filed in the UK to get a UK patent;

15   is that right?

16              A.   That would be correct for

17   inventors in the UK or the inventors in Canada or

18   other countries other than the US.

19              Q.   Do you recall who Angela Anderson

20   was?

21              A.   Yes.

22              Q.   She was a person in the IP law

23   department responsible for filings in Europe,

24   including the UK?

25              A.   Angela Anderson was director of
```



1    intellectual property responsible for the Harlow

2    intellectual property group and I believe some of

3    the other European locations, and so she would have

4    had quite a bit of first-hand knowledge about the

5    programs in Harlow.

6            Q.    The limiting factor for filing

7    patent applications, one of the key limiting

8    factors was the budget that Nortel provided for --

9    to the IP department; is that right?

10           A.    Yes, it was a determining factor

11   both when we were growing the patent portfolio and

12   when we were cutting it back, yes.

13           Q.    That budget was set by NNL, right?

14           A.    Yes, it was.  The budget was set

15   by NNL and then the IP Law Group allocated that

16   budget to new filings, to patent prosecution and to

17   maintenance fees.

18           Q.    So is it true that if the budget

19   were set to be less, then that would result in

20   fewer UK patents being filed that year?

21           A.    There is not necessarily a strict

22   one-to-one correlation there.  It would depend on a

23   number of factors.  The percentage of foreign

24   filings would be maintained from year to year,

25   although as we were ramping up the program, we had

 Neeson & Associates    W&F

1    a higher percentage of foreign filings.  As Nortel

2    declined and our patent budget declined, we did

3    make steps to reduce the percentage of foreign

4    filings.

5              But whether those foreign filings would

6    go into the UK or China or whatever other country

7    would depend again on the technology.

8              Q.   And it would also depend upon how

9    important and valuable that technology was, right?

10             A.   Absolutely, yes.

11             Q.   All other factors being equal, the

12   fact that the budget was reduced would also reduce

13   the number of patent applications that would get

14   filed in the UK, right?

15             A.   I thought I just answered that

16   question in saying that it's slightly more

17   complicated than a one-to-one correlation between

18   budget and number of filings in the UK.

19             But if we were reducing filings,

20   foreign filings all together as a percentage of our

21   total budget, then the likelihood that the UK would

22   be reduced in proportion to all other countries

23   where we would be foreign filing, but depending

24   again on the technology and market.

25             Q.   Fair enough, thank you.



1                   A.   Sorry, I always make the analysis
2    complicated.
3                   Q.   No, that's a fair answer so I
4    appreciate that.
5                   Are you familiar with a process that
6    Nortel went through called patent culling?
7                   A.   Patent culling is what we refer to
8    as the patent maintenance review process which was
9    as we reduced the budget, highly dependent on the
10   available budget to maintain patents.
11                  So a decision not to maintain a patent
12   when a maintenance fee was due is locally referred
13   to as culling in the patent world, yes.
14                  Q.   So this also was a mechanism
15   within the Nortel IP department that was based on
16   the limited budget that Nortel had in the IP
17   department, right?
18                  A.   It's partly due to limited budget
19   but it's even good practice when there is
20   sufficient budget, even when you're growing the
21   program, to do a review from time to time to ensure
22   that the most important, potentially most valuable
23   patents get maintained and the budget is directed
24   to those and to new filings and new technology and
25   technology that is becoming obsolete or is no

 Neeson&Associates   W&F

```
 1   longer of interest is allowed to lapse from lack of

 2   maintenance.

 3              THE CANADIAN COURT:  When you maintain

 4   a patent, what does that mean?

 5              THE WITNESS:  Okay.  After a patent

 6   issues, in the US maintenance fees are payable at

 7   three and a half years, seven and a half years and

 8   eleven and a half years to maintain the patent in

 9   force.

10              In most countries, there's annual

11   maintenance payments which are called annuities.

12              THE CANADIAN COURT:  This is not

13   extending the patent, it's just paying for it as

14   you go along?

15              THE WITNESS:  Yes.  So failure to pay

16   a maintenance fee results in the patent lapsing and

17   usually there's a period of one year where it can

18   be recovered or reinstated.

19              But no, it's paying to maintain the

20   patent for its full term rather than cutting your

21   losses and saying this patent is now obsolete and

22   decide not to.

23              BY MR. CHANG:

24              Q.   So on an on-going basis Nortel was

25   evaluating whether -- which patents were valuable
```



 1   to Nortel in order to maintain them and continue

 2   them in force; is that right?

 3                A.    Correct.

 4                Q.    So the patents that survived all

 5   the way through to the bankruptcy sale, those would

 6   have gone through this, both -- those would have

 7   gone through the culling process and survived the

 8   culling process?

 9                A.    They would have gone through the

10   portfolio management process and survived culling

11   and been maintained, yes.

12                Q.    Okay.  Thank you for the

13   correction.  So does that also mean that any

14   Chinese patents that persisted in the portfolio

15   were considered through the patent maintenance

16   process to be valuable to Nortel?

17                A.    Any patent that required an annual

18   maintenance fee payment and that was maintained, at

19   least through to the time that I left and

20   presumably after the time that I left, would have

21   been considered to be sufficiently valuable to

22   spend the budget on.

23                Q.    And that would include any Chinese

24   patents that existed at that time?

25                A.    Well, I can't speak about



```
 1   decisions that were made after 2011 when I left,
 2   but that would be my presumption based on the
 3   practice at the time that I left.
 4              Q.   Okay, thank you.  Is it true -- I
 5   believe in your last answer you said you left in
 6   2011.  You actually left in 2007, correct?
 7              A.   If you heard 2011, it was
 8   incorrect.  I believe I said 2007.
 9              Q.   Thank you.  Now, let me ask you
10   about the research and development landscape within
11   Nortel.  Is it true that researchers at different
12   Nortel labs around the globe often collaborated to
13   create inventions at Nortel?
14              A.   Things -- the organization evolved
15   enormously during the time that I was at Nortel.
16   In 1989 when I joined the patent group,
17   subsequently the IP Law Group, research was
18   predominantly done in Ottawa and some in the UK and
19   some in the US.
20              The research program wasn't as global
21   at that point, but, for example, around -- the peak
22   around 2000 there were -- there was a very
23   coordinated advanced technology program or what was
24   referred to as the CTO office program, where there
25   were R&D labs in Ottawa, in Harlow, for example, in
```



1    Richardson, for example, that would be working on

2    similar technology and there would be collaboration

3    between labs working on related technology.

4              Q.   Is it true that Nortel, in general

5    during the time that you were there, encouraged

6    collaboration across the company?

7              A.   We certainly did encourage

8    collaboration in research and in all other aspects

9    of the business.

10             Q.   And is it also true that patents

11   at Nortel often had inventors from different

12   geographic entities, or from inventors at different

13   labs around the world?

14             A.   I would say that a certain

15   percentage of patents had inventors from two or

16   more locations.  A great deal had inventors from

17   one location only, or one region only.

18             Q.   Let's take a look at an example

19   from one of the documents that you rely on in your

20   affidavit.  In footnote 3 of your affidavit, the

21   second document there bears production numbers

22   NNC-NNL11772012.  I don't know if you have those

23   documents with you, but I have copies that I can

24   hand up.

25             It's the second document in group 3,



1   it's paragraph 10.  All right, I apologize, it's

2   tab 5 in the materials that were handed up

3   previously.

4                A.   Okay, I have tab 5.

5                Q.   And this is also Trial Exhibit

6   45738, for the record.  Ms. DeWilton, is this

7   document one of the documents you rely on in your

8   affidavit?

9                A.   Yes, it is.  It's a patent

10  application assignment document.

11               Q.   And this is an assignment document

12  in a US patent application?

13               A.    It refers specifically to a

14  particular US patent application and potentially

15  another patent application filed concurrently.

16               Q.   The inventors, the first inventor

17  is Robert Friskney who was located in the UK; is

18  that correct?

19               A.   That's correct.

20               Q.   And Simon Parry who was also in

21  the UK?

22               A.   He was.

23               Q.   The next inventor is David Allan

24  who was in Ottawa, right?

25               A.    Correct.



1          Q.   And the last inventor was Nigel
2    Bragg who was also in the UK, correct?
3          A.   Yes.  So this is an example of a
4    patent assignment where there were inventors from
5    two locations.
6          Q.   So this is an example of inventors
7    from different research locations within Nortel
8    collaborating together and filing a patent
9    application on their invention?
10         A.   It was an example of inventors
11   from several locations working together on an
12   invention but also, as an example, they all
13   assigned to Nortel Networks Limited regardless of
14   geography.
15         Q.   Just to return to Angela Anderson,
16   you worked together with Ms. Anderson?
17         A.   Yes.  I don't recall specifically
18   which years she was with Nortel.  I believe it was
19   after 2000, but yes, she was another director at
20   the other sites in Europe, so we did collaborate.
21         Q.   And is it fair to say that she
22   would have more first-hand knowledge than you about
23   Nortel's patent activity within EMEA and the UK
24   specifically?
25         A.   Well, it was part of my



```
 1   responsibility to maintain statistics for the
 2   global patent program, the advanced technology
 3   program and also other development work.
 4              So I was responsible for generating the
 5   statistics which are shown in some of the example
 6   charts showing the breakdown of patent applications
 7   filed by region or by disclosure code, but Angela
 8   Anderson would have been responsible for working
 9   first-hand with inventors or part of her team in
10   Harlow would work directly with inventors to draft
11   and prosecute and discuss new inventions, invention
12   review teams and that sort of thing.
13              THE REPORTER:  Keep your voice up,
14   please.  Discuss new inventions?
15              THE WITNESS:  To discuss new inventions
16   and invention review meetings to review those.
17              But at various times when the
18   organization was restructured, it would be
19   possible, for example, that I was working with
20   inventors in Ottawa, in Harlow and in a US
21   location.  It's possible that Angela was also
22   working with inventors from more than one location
23   or more than one European location.  But generally
24   she would have more first-hand knowledge and
25   interaction with the local employees.
```



```
 1              BY MR. CHANG:

 2              Q.   In your affidavit, one of the

 3    analyses that you do is to look at the Nortel

 4    database to identify what patent applications have

 5    inventors from Canada; is that right?

 6              A.   It was an analysis to look at the

 7    origin of inventors or the origin of patent

 8    applications by R&D lab.  So it was to cover the

 9    organization globally, and it was -- in one of the

10    examples given, it was a request by the current CTO

11    to understand some innovation metrics for R&D labs

12    around the world.

13              So those statistics were generated for

14    all locations.  So we looked at Canada, we looked

15    at Harlow, we looked at the various labs in the US

16    as well.

17              Q.   Did you perform the same analysis

18    you performed for Canada for the -- for the UK

19    labs?

20              A.   The analysis was performed for all

21    -- all labs.  It was a single analysis to generate

22    the data for each lab at each location that was

23    active at the time.

24              Q.   Okay.  Do you recall what the

25    percentage of patents and applications that had a
```



```
 1   location code for the UK were for that database?
 2               THE CANADIAN COURT:  Do you have a
 3   period of time in mind?
 4               BY MR. CHANG:
 5               Q.   For the same period of time that
 6   she did her analysis in paragraph 14 of her
 7   affidavit.  I believe that was the 2001 to 2003
 8   timeframe, or 2004?
 9               A.   There was data generated for 2001,
10   2002, 2003 and part of 2004.  So, I'm sorry, could
11   you repeat the question?  I've lost track of that.
12               Q.   Sure.  Do you recall what
13   percentage of patent applications were generated by
14   the UK?
15               A.   The UK specifically?  I'd have to
16   look at the charts to refresh my memory but I have
17   in my mind that over those years the pie charts
18   that I generated showed approximately 50 percent of
19   applications originated from Canada, approximately
20   25 percent from US labs and approximately 25 from
21   what we refer to as EMEA, so the UK labs, France
22   and the rest of the world.
23               I seem to recall that Harlow and the
24   other labs that fell under the ID disclosure code
25   were a large percentage of the EMEA filings, so
```

 Neeson & Associates    W&F

1    those were probably somewhere in the 15 to 20

2    percent.

3              But the charts are in the affidavit, so

4    the numbers are there.

5              MR. CHANG:  Okay, thank you.  No

6    further questions.  Thank you.

7              THE CANADIAN COURT:  Mr. Steep?

8              MR. STEEP:  I have no re-examination,

9    Your Honour.  No re-examination, Judge Gross.  So

10   Ms. DeWilton, you are free to go and we have no

11   plans to call any more witnesses this afternoon.

12             THE CANADIAN COURT:  All right.

13   -- WITNESS EXCUSED --

14             MR. ROSENTHAL:  Nice of you to check

15   with us but we don't have any questions.

16             MR. STEEP:  Mr. Rosenthal, we all had a

17   discussion, so I had checked with everyone before I

18   made that statement.

19             MS. SCHWEITZER:  Your Honour, I think

20   we're finished for the day, is what I think we are

21   agreed on.

22             THE CANADIAN COURT:  It's good there's

23   agreement on something.  All right.  Do I gather

24   we've got the other fact witnesses tomorrow down to

25   Sharon Hamilton?  Is that right?



```
 1                  MR. RUBY:  No, we have three scheduled
 2  for tomorrow in the same order as was provided to
 3  the two courts.
 4                  THE CANADIAN COURT:  Sharon Hamilton
 5  will be the last?
 6                  MR. RUBY:  She will be the last
 7  tomorrow.
 8                  THE CANADIAN COURT:
 9  All right.  Well then, we'll break now until 9:00 a.m.
10  tomorrow.
11  -- Whereupon the court adjourned at 4:10 p.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1                    REPORTERS' CERTIFICATE

 2

 3                    I, TERRY WOOD, RPR, CSR, Canadian

 4   Certified Shorthand Reporter, Realtime Systems

 5   Administrator, and I, KIMBERLEY A. NEESON, RPR,

 6   CRR, CSR, CCP, Canadian Certified Shorthand

 7   Reporter, Realtime Systems Administrator, and I,

 8   GAIL VERBANO, RDR, CRR, CSR, US Certificate

 9   Shorthand Reporter, certify;

10   That the foregoing proceedings were taken before us at

11   the time and place therein set forth;

12   That the entire proceedings of the hearing date were

13   recorded stenographically individually by each of us

14   and were thereafter transcribed;

15   That the foregoing is a true and correct transcript of

16   our shorthand notes so taken.

17

18   Dated this 14th day of May, 2014.

19   PER:                 PER:

20   Gail Inghram Verbano  Kimberley Neeson, Terry Wood

21   GAIL VERBANO          KIMBERLEY NEESON, TERRY WOOD

22   WILCOX & FETZER       NEESON & ASSOCIATES

23   WILMINGTON, DE  USA   TORONTO, ON  CANADA

24

25
```

































































