



**WILCOX & FETZER LTD.**

FOR EXCELLENCE IN COURT REPORTING

```
 1              UNITED STATES BANKRUPTCY COURT

 2             FOR THE DISTRICT OF DELAWARE

 3   ----------------------------)

 4   In Re                       )

 5      NORTEL NETWORKS INC.,    ) Chapter 11

 6      et al,                   ) Case No.

 7             Debtors.          ) 09-10138(KG)

 8   ----------------------------)

 9                        - and -

10                Court File No. 09-CL-7950

11                      ONTARIO

12             SUPERIOR COURT OF JUSTICE

13                 (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16    AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17     ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18   NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19    CORPORATION, NORTEL NETWORKS INTERNATIONAL

20    CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                    CORPORATION

22     APPLICATION UNDER PART IV OF THE COMPANIES'

23   CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                     AS AMENDED

25                     --------
```

 Neeson & Associates   W&F

```
 1
 2                          --------
 3
 4   --- This is the Day 4/Volume 4 of the transcript of
 5   proceedings in the above matter held simultaneously
 6   in:
 7   Superior Court of       United States Bankruptcy
 8   Ontario (Commercial     Court for the District of
 9   List)                   Delaware
10   Courtroom 8-1           Courtroom 3
11   330 University Avenue   824 Market Street
12   Toronto, Ontario        Wilmington, Delaware
13
14   on the 15th day of May, 2014, commencing at 9:05
15   a.m.
16
17                          --------
18   B E F O R E:
19   The Honourable Judge Kevin Gross (United States)
20   The Honourable Mr. Justice Frank Newbould (Canada)
21
22                        ----------
23
24
25
```



```
 1   A P P E A R A N C E S:

 2

 3                    CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER:       Ben Zarnett, Esq.

11              Alan Mark, Esq.

12              Peter Ruby, Esq.

13              Jessica Kimmel, Esq.

14              Graham Smith, Esq.

15

16   FOR THE APPLICANTS

17   GOWLING LAFLEUR HENDERSON LLP

18   Suite 1600, First Canadian Place

19   100 King Street West

20   Toronto, ON  M5X 1G5

21   PER:       Jennifer Stam, Esq.

22

23   FOR THE CANADIAN DEBTORS

24   ALLEN & OVERY LLP

25   1221 Avenue of the Americas
```



```
 1   New York, NY  10020
 2   PER:       Ken Coleman, Esq.
 3              Paul Keller, Esq.
 4              Jacob Pultman, Esq.
 5              Laura Hall, Esq.
 6
 7   FOR THE CANADIAN DEBTORS
 8   BUCHANAN INGERSOLL & ROONEY
 9   1105 North Market Street
10   Suite 1900
11   Wilmington, DE  19801-1054
12   PER:       Kathleen A. Murphy, Esq.
13              Mary F. Caloway, Esq.
14
15                   U.S. DEBTORS
16
17   FOR NORTEL NETWORKS INC.
18   TORYS LLP
19   79 Wellington Street West, Suite 3000
20   Box 270, TD Centre
21   Toronto, ON  M5K 1N2
22   PER:       Sheila Block, Esq.
23              Scott Bomhof, Esq.
24              Molly Reynolds, Esq.
25              Andrew Gray, Esq.
```



```
 1                    Adam Slavens, Esq.

 2

 3    FOR THE U.S. DEBTORS

 4    MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 5    1201 North Market Street, 16th Floor

 6    P.O. Box 1347

 7    Wilmington, DE  19899-1347

 8    PER:       Derek Abbott, Esq.

 9               Annie Cordo, Esq.

10               Tammy Minott, Esq.

11               Eric Schwartz, Esq.

12

13    FOR NORTEL NETWORKS INC.

14    CLEARY GOTTLIEB STEEN & HAMILTON LLP

15    One Liberty Plaza

16    New York, NY  10006

17    PER:       James Bromley, Esq.

18               Lisa Schweitzer, Esq.

19               Howard Zelbo, Esq.

20               Jeffrey Rosenthal, Esq.

21               Avi Luft, Esq.

22               Inna Rozenberg, Esq.

23               Jacqueline Moessner, Esq.

24               Marla Decker, Esq.

25               Matt Gurgel, Esq.
```



```
 1              Darryl Stein, Esq.

 2              Temidayo Aganga-Williams, Esq.

 3              Kyle Dandelet, Esq.

 4              Marion deMesion, Esq.

 5              Mark Grube, Esq.

 6              David Herrington, Esq.

 7              Shira Kaufman, Esq.

 8              Alix McCown, Esq.

 9              Ann Nee, Esq.

10              Adam Olin, Esq.

11              Jeremy Opolsky, Esq.

12              Michelle Parthum, Esq.

13              Daniel Queen, Esq.

14              Ben Shartsis, Esq.

15              Jesse Sherrett, Esq.

16              Ashley Siegel, Esq.

17              Brent Tunis, Esq.

18

19                   EMEA DEBTORS

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   DAVIES WARD PHILLIPS & VINEBERG LLP

24   40th Floor

25   155 Wellington Street
```



```
 1   Toronto, ON  M5V 3G7

 2   PER:       Robin B. Schwill, Esq.

 3              Sean Campbell, Esq.

 4              James Doris, Esq.

 5              Luis Sarabia, Esq.

 6              Matthew Milne-Smith, Esq.

 7              Natasha MacParland, Esq.

 8              George Pollack, Esq.

 9              Cara Cameron, Esq.

10              Andrew Carlson, Esq.

11              Maureen Littlejohn, Esq.

12              Bryan McLeese, Esq.

13

14   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

15   LIMITED

16   LAX O'SULLIVAN SCOTT LISUS LLP

17   Suite 2750, 145 King Street West

18   Toronto, ON  M5H 1J8

19   PER:       Matthew P. Gottlieb, Esq.

20              Tracy Wynne, Esq.

21              Paul Michell, Esq.

22              Arden Beddoes, Esq.

23              James Renihan, Esq.

24

25   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
```



```
 1   LIMITED

 2   HUGHES HUBBARD & REED

 3   One Battery Park Plaza

 4   New York, NY  10004-1482

 5   PER:        Derek Adler, Esq.

 6               Neil Oxford, Esq.

 7               Fara Tabatabai, Esq.

 8               Charles Huberty, Esq.

 9               William Maguire, Esq.

10               Amina Hassan, Esq.

11               Gabrielle Glemann, Esq.

12               Caroline Parker-Beaudrias, Esq.

13               Miles Orton, Esq.

14               Karen Goldberg, Esq.

15               Lena Saltos, Esq.

16               Mei Li Zhen, Esq.

17               Matthew Reynolds, Esq.

18               Ken Katz, Esq.

19               Greta Fails, Esq.

20               Quan Trinh, Esq.

21

22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

23   LIMITED

24   YOUNG CONAWAY STARGATT & TAYLOR LLP

25   Rodney Square
```



```
 1   1000 North King Street

 2   Wilmington, DE  19801

 3   PER:        Ed Harron, Esq.

 4               John Dorsey, Esq.

 5               Jaime Chapman, Esq.

 6

 7   FOR THE EMEA DEBTORS

 8   HERBERT SMITH FREEHILLS LLP

 9   Exchange House

10   Primrose Street

11   London, England  EC2A 2EG

12   PER:        James Norris-Jones, Esq.

13               John Whiteoak, Esq.

14               Gary Milner-Moore, Esq.

15               Kevin Pullen, Esq.

16               Catherine Emanuel, Esq.

17               Richard Mendoza, Esq.

18               David Russell, Esq.

19               Andrew Cooke, Esq.

20               Oliver Elgie, Esq.

21               Tom Henderson, Esq.

22               Frances Furnivall, Esq.

23               Liam Spender, Esq.

24               Philip Lis, Esq.

25               Kristofer McGhee, Esq.
```



1                Thomas Turner, Esq.

2

3   FOR THE EMEA DEBTORS

4   DEBEVOISE & PLIMPTON LLP

5   65 Gresham Street

6   London, England

7   ECZV 7NQ

8   PER:       Kevin Lloyd, Esq.

9

10               CANADIAN CREDITORS COMMITTEE

11

12  FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

13  BENEFICIARIES

14  KOSKIE MINSKY

15  20 Queen Street West

16  Suite 900

17  Toronto, ON  M5H 3R3

18  PER:       Mark Zigler, Esq.

19               Jeff Van Bakel, Esq.

20               Ari Kaplan, Esq.

21               Barbara Walancik, Esq.

22

23  FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

24  COMMITTEE

25  SHIBLEY RIGHTON LLP



```
 1   250 University Avenue, Suite 700

 2   Toronto, ON  M5H 3E5

 3   PER:       Arthur O. Jacques, Esq.

 4

 5   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

 6   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

 7   FUND

 8   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

 9   35th Floor

10   155 Wellington Street West

11   Toronto, ON  M5V 3H1

12   PER:       Kenneth T. Rosenberg, Esq.

13              Massimo (Max) Starnino, Esq.

14              Lily Harmer, Esq.

15              Karen Jones, Esq.

16              Michelle Jackson, Esq.

17              Megan Shortreed, Esq.

18

19   FOR MORNEAU SHEPELL LIMITED

20   MCCARTHY TETRAULT LLP

21   Suite 5300, Toronto Dominion Bank Tower

22   Toronto, ON  M5K 1E6

23   PER:       Ronald Podolny, Esq.

24              Sharon Kour, Esq.

25              Elder C. Marques, Esq.
```

 Neeson&Associates   W&F

```
 1                   Paul Steep, Esq.

 2                   Byron Shaw, Esq.

 3                   Keith Rose, Esq.

 4

 5   FOR THE CANADIAN CREDITORS COMMITTEE

 6   DLA PIPER

 7   919 North Market Street, Suite 1500

 8   Wilmington, DE  19801

 9   PER:        Jason Gerstein, Esq.

10                   Richard Hans, Esq.

11                   Timothy Hoeffner, Esq.

12                   Farah Lisa Whitley-Sebti, Esq.

13                   Selinda Melnik, Esq.

14                   Sarah Tumey, Esq.

15

16   FOR THE CANADIAN CREDITORS COMMITTEE

17   UNIFOR

18   205 Placer Court

19   North York, ON, M2H 3H9

20   PER:        Barry Wadsworth, Esq.

21

22             INFORMAL NORTEL NOTEHOLDER GROUP

23

24   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25   BENNETT JONES LLP
```



```
 1   1 First Canadian Place

 2   Suite 3400

 3   Toronto, ON  M5X 1A4

 4   PER:       Kevin Zych, Esq.

 5              S. Richard Orzy, Esq.

 6              Gavin Finlayson, Esq.

 7              Richard Swan, Esq.

 8              Jonathan Bell, Esq.

 9              Amanda McLachlan, Esq.

10

11   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12   MILBANK, TWEED, HADLEY, MCCLOY LLP

13   1 Chase Manhattan Plaza

14   New York, NY  10005

15   PER:       Thomas R. Kreller, Esq.

16              Dennis F. Dunne, Esq.

17              Albert A. Pisa, Esq.

18              Samir Vora, Esq.

19              Andrew M. Leblanc, Esq.

20              Eric I. Weiss, Esq.

21              Atara Miller, Esq.

22              Tom Matz, Esq.

23              Nicholas A. Bassett, Esq.

24              Alexis Chernak, Esq.

25              Claudia G. Cohen, Esq.
```



```
 1

 2   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 3   PACHILSKI STANG ZIEHL & JONES LLP

 4   919 North Market Street

 5   17th Floor

 6   Wilmington, DE, 19801

 7   PER:       Laura Davis Jones, Esq.

 8              Peter J. Keane, Esq.

 9

10     THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

11

12   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

13   CASSELS BROCK & BLACKWELL LLP

14   Suite 2100, Scotia Plaza

15   40 King Street West

16   Toronto, ON  M5H 3C2

17   PER:       Shayne Kukulowicz, Esq.

18              Michael Wunder, Esq.

19              Ryan Jacobs, Esq.

20              Geoff Shaw, Esq.

21              Stefanie Holland, Esq.

22

23   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

24   RICHARDS LAYTON & FINGER, P.A.

25   920 North King Street
```



```
 1   Wilmington, DE  19801

 2   PER:        Christopher Samis, Esq.

 3               Amanda Steele, Esq.

 4

 5   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 6   AKIN GUMP STRAUSS HAUER & FELD LLP

 7   One Bryant Park

 8   New York, NY  10036

 9   PER:        Fred S. Hodara, Esq.

10               David H. Botter, Esq.

11               Abid Qureshi, Esq.

12               Robert A. Johnson, Esq.

13               Brad M. Kahn, Esq.

14               Christine Doniak, Esq.

15               Joseph Sorkin, Esq.

16               Jacqueline Yecies, Esq.

17

18      UK PENSION PROTECTION FUND AND NORTEL NETWORKS

19                UK PENSION TRUST LIMITED

20

21   FOR THE UK PENSION PROTECTION FUND AND NORTEL

22   NETWORKS UK PENSION TRUST LIMITED

23   THORNTON GROUT FINNIGAN LLP

24   Suite 3200, 100 Wellington Street West

25   P.O. Box 329
```



```
 1   Toronto, ON  M5K 1K7
 2   PER:      Michael E. Barrack, Esq.
 3             D.J. Miller, Esq.
 4             Rebecca Kennedy, Esq.
 5             Andrea McEwan, Esq.
 6             John L. Finnigan, Esq.
 7             Michael Shakra, Esq.
 8             Kim Ferreira, Esq.
 9
10   FOR THE UK PENSION PROTECTION FUND AND NORTEL
11   NETWORKS UK PENSION TRUST LIMITED
12   WILLKIE FARR & GALLAGHER LLP
13   787 Seventh Avenue
14   New York, NY  10019-6099
15   PER:      Brian O'Connor, Esq.
16             Sameer Advani, Esq.
17             Andrew Hanrahan, Esq.
18             Eugene Chang, Esq.
19             Heather Schneider, Esq.
20             Robert Kofsky, Esq.
21             Nicholas Chiuchiolo, Esq.
22             Elizabeth Roache, Esq.
23             Nicole Humphrey, Esq.
24             Peter Sluka, Esq.
25             Weston Eguchi, Esq.
```



```
 1                    Ashley Moore, Esq.

 2                    Megan Fantoni, Esq.

 3

 4    FOR THE UK PENSION PROTECTION FUND AND NORTEL

 5    NETWORKS UK PENSION TRUST LIMITED

 6    BAYARD, P.A.

 7    222 Delaware Avenue, Suite 900

 8    Wilmington, DE  19899

 9    PER:      Charlene D. Davis, Esq.

10              Justin R. Alberto, Esq.

11              Evan T. Miller, Esq.

12

13    FOR THE UK PENSION CLAIMANTS

14    HOGAN LOVELLS INTERNATIONAL LLP

15    Atlantic House, Holbrow Viaduct

16    London, England, EC1A 2FG

17    PER:      Angela Dimsdale Gill, Esq.

18              John Tillman, Esq.

19              Crispin Rapinet, Esq.

20              Matthew Bullen, Esq.

21              Chris Edwards-Earl, Esq.

22

23    FOR THE UK PENSION CLAIMANTS

24    WILBERFORCE CHAMBERS LLP

25    8 New Square, Lincolns Inn
```



```
 1   London, England, WCZA 3QP

 2   PER:       Michael Tennet, Esq.

 3              THE BANK OF NEW YORK MELLON

 4

 5   FOR THE BANK OF NEW YORK MELLON

 6   VEDDER PRICE LLP

 7   919 North Market Street

 8   17th Floor

 9   Wilmington, DE, 19801

10   PER:       Michael Riela, Esq.

11              Michel Edelman, Esq.

12

13

14          WILMINGTON TRUST, NATIONAL ASSOCIATION

15

16

17   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

18   KATTEN MUCHIN ROSENMAN LLP

19   575 Madison Avenue

20   New York, NY  10022-2585

21   PER:       Bertrand J. Choe, Esq.

22              David A. Crichlow, Esq.

23              Karen B. Dine, Esq.

24

25   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
```



```
 1   DENTONS CANADA LLP

 2   77 King Street West

 3   Suite 400

 4   Toronto, ON, M5K O41

 5   PER:        Kenneth Kraft, Esq.

 6               John Salmas, Esq.

 7               Matthew Fleming, Esq.

 8               Robert Kennedy, Esq.

 9

10   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

11   COUSINS CHIPMAN & BROWN LLP

12   1007 North Orange Street

13   Suite 1110

14   Wilmington, DE, 19801

15   PER:        Scott D. Cousins, Esq.

16               Ann Kashishian, Esq.

17

18      LAW DEBENTURE TRUST COMPANY OF NEW YORK

19

20   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

21   BORDEN LADNER GERVAIS LLP

22   40 King Street West

23   Toronto, ON  M5H 3Y4

24   PER:        Edmond F.B. Lamek, Esq.

25
```



```
1    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

2    PATTERSON BELKNAP WEBB & TYLER LLP

3    1133 Avenue of the Americas

4    New York, NY  10036

5    PER:      Daniel A. Lowenthal, Esq.

6              Brian P. Guiney, Esq.

7              Craig W. Dent, Esq.

8

9    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

10   MORRIS JAMES, LLP

11   500 Delaware Avenue

12   Suite 1500

13   Wilmington, DE

14   19801-1494

15   PER:      Stephen M. Miller, Esq.

16

17        BOARDS OF DIRECTORS OF NORTEL NETWORKS

18        CORPORATION AND NORTEL NETWORKS LIMITED

19

20   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

21   CORPORATION AND NORTEL NETWORKS LIMITED

22   OSLER HOSKIN AND HARCOURT LLP

23   100 King Street West

24   1 First Canadian Place, Suite 6100

25   P.O. Box 50
```



```
 1    Toronto, ON  M5X 1B8

 2    PER:        Lyndon Barnes, Esq.

 3                Carey O'Connor, Esq.

 4                Betsy Putnam, Esq.

 5                Adam Hirsh, Esq.

 6                Alexander Cobb, Esq.

 7                        --------

 8

 9

10

11        REPORTED BY:  Toronto - Deana Santedicola

12                     RPR, CRR, CSR

13              Toronto - Kimberley Neeson

14                   RPR, CRR, CSR, CBC

15            Delaware - Lorraine B. Marino

16                     RDR, CRR, CSR

17

18

19

20

21

22

23

24

25
```



1                    I N D E X

2

3                                              PAGE

4    MICHAEL WALTON McCORKLE

5    Examination In-Chief/Direct Examination

6    by Mr. Zigler...........................   810

7    Cross-Examination by Mr. Rosenthal.......   813

8    Cross-Examination by Mr. Doris...........   825

9    Cross-Examination by Mr. Finnigan........   827

10

11   DONALD EARNEST SPROULE

12   Examination In-Chief/Direct Examination

13   by Mr. Zigler...........................   851

14   Cross-Examination by Mr. Rosenthal.......   856

15

16   SHARON HAMILTON

17   Examination In-Chief/Direct Examination

18   by Mr. Zarnett..........................   860

19   Cross-Examination by Ms. Block...........   863

20   Cross-Examination by Mr. Barrack.........   988

21   Cross-Examination by Mr. Kraft...........  1014

22   Further Cross-Examination by Ms. Block...  1016

23

24

25



```
 1                    INDEX OF EXHIBITS

 2

 3   NUMBER/DESCRIPTION                       PAGE NO.

 4    7   Two-volume affidavit of Michael

 5        McCorkle with exhibits                809

 6

 7    8   Affidavit of Donald Sproule, sworn

 8        on April 10, 2014                     851

 9

10    9   Two-volume affidavit of Sharon

11        Hamilton, sworn on April 11, 2014     859

12

13   10   Two-volume affidavit of Sharon

14        Hamilton, sworn on April 25, 2014     860

15

16   11   Demonstrative exhibit prepared by

17        Torys                                 917

18

19   12   104th Report of the Monitor dated

20        March 14, 2014                        993

21

22

23

24

25
```

Neeson&Associates    W&P

```
 1   -- Upon commencing at 9:05 a.m.

 2

 3              THE CANADIAN REGISTRAR:  Good morning,

 4   sir, if you would please remain standing for a

 5   moment.

 6

 7               MICHAEL WALTON McCORKLE,

 8               having been duly affirmed,

 9          was examined and testified as follows:

10

11              THE CANADIAN COURT:  Just before we

12   start, I don't have any feed here.

13              I'm not talking about the transcript,

14   I'm talking about the screen.  I can't see Judge

15   Gross.

16              THE US COURT:  Aren't you lucky.

17              THE CANADIAN COURT:  Does somebody have

18   any idea how to turn this thing on?

19              MR. ZIGLER:  Your Honour, before we

20   start, and good morning, Judge Gross --

21              THE CANADIAN COURT:  Just before you

22   start, just wait a minute.  Is there somebody here

23   who knows how to turn this on?

24              -- OFF THE RECORD DISCUSSION --

25              THE CANADIAN COURT:  There we are.
```



```
 1   Good morning, Judge Gross.
 2              THE US COURT:  Good morning, Justice
 3   Newbould.
 4              MR. ZIGLER:  Good morning, Justice
 5   Newbould.
 6              THE CANADIAN COURT:  Mr. Zigler.
 7              MR. ZIGLER:  Good morning, Judge Gross.
 8              THE US COURT:  Good morning.
 9              MR. ZIGLER:  Before we start with
10   Mr. McCorkle, Mr. Rosenthal has a housekeeping
11   matter he would like to speak to, and then we'll
12   get into the evidence.
13              MR. ROSENTHAL:  Good morning, Justice
14   Gross.
15              Just as a housekeeping matter, I
16   thought I would follow up on directions that the
17   Courts gave last week with regard to the long
18   objection lists that the Courts received, and I am
19   pleased to report that all of the parties have
20   heard the Courts loudly and clearly.
21              The US interests have notified the
22   other parties that they have withdrawn all of their
23   objections to both the exhibits and to deposition
24   designations.
25              There is one remaining one that the UKP
```



 1   has agreed to withdraw the exhibit.  There is also

 2   one that I believe the Bondholders are going to

 3   continue to assert an objection, but otherwise from

 4   the US perspective, they are all withdrawn.

 5              I understand that the EMEA Debtors, and

 6   they can speak for themselves, have likewise

 7   withdrawn all of their exhibit and deposition

 8   objections, and the Canadian allocation group have

 9   narrowed theirs to 48 deposition and exhibit

10   objections that they have given us, and I presume

11   they will give to the Courts at the appropriate

12   time.

13              And I just wanted to advise the Court

14   of I think a favourable development all around.

15              THE CANADIAN COURT:  Thank you, glad to

16   hear it.  Maybe in a little more time, they'll be

17   all gone.

18              MR. ROSENTHAL:  We are glad to work

19   towards that, Your Honour.

20              THE CANADIAN COURT:  Thank you.

21              MS. KIMMEL:  Just before we begin,

22   Justice Newbould, Judge Gross, good morning.  It is

23   Jessica Kimmel for the Canadian allocation group.

24              I just wanted to seek some direction

25   from the Court.  We have some remaining objections,



```
 1   there aren't that many, and they are all of a
 2   similar type.  They have to do primarily with the
 3   lay opinion and parol evidence issue, which you
 4   heard something about in the opening.
 5              I have a brief, and I believe there is
 6   a brief in Delaware that is available to be
 7   provided.
 8              THE CANADIAN COURT:  Why don't you just
 9   leave it to the argument at the end of the case?
10              MS. KIMMEL:  We could do it that way.
11              THE CANADIAN COURT:  It just seems to
12   be a complete waste of time.
13              MS. KIMMEL:  We are content to leave it
14   to argument as long as our position is reserved.
15   That is the only issue that we want to ensure.
16              So if that is the appropriate time to
17   do it, we are happy to deal with it at that time.
18              THE CANADIAN COURT:  Yeah, I have read
19   a bunch of affidavits, I have done a lot of things,
20   and it looks to me like some evidence is not
21   admissible, but hearsay and the like.  It just
22   strikes me in the middle of a case to be arguing
23   stuff like that just seems to be counterproductive.
24              MS. KIMMEL:  We fully agree with that,
25   Your Honour, and in fact, our suggestion to the
```



```
 1  parties was that we defer this to the end of the

 2  case, and we are perfectly content with that

 3  direction.

 4             Thank you.

 5             THE CANADIAN COURT:  All right.

 6             MS. KIMMEL:  Judge Gross, is that

 7  acceptable to the Delaware Court?

 8             THE US COURT:  Perfectly acceptable,

 9  thank you.

10             MS. KIMMEL:  Thank you.

11             MR. ZIGLER:  Good morning again, Judge

12  Gross, and good morning, Justice Newbould.

13             There is a two-volume exhibit that is

14  before you.  Hopefully you both have it.  It is the

15  affidavit of Mr. McCorkle with its exhibits that

16  has been filed in both the Courts.

17             THE CANADIAN COURT:  We'll make that

18  the next exhibit.  What is the next one?

19             THE CANADIAN REGISTRAR:  Exhibit 7,

20  Your Honour.  Do you want it 7A and B?

21             THE CANADIAN COURT:  No, Exhibit 7 is

22  fine.

23             THE CANADIAN REGISTRAR:  Exhibit 7,

24  thank you.

25             EXHIBIT NO. 7:  Two-volume affidavit of
```

Neeson & Associates   W&P WILSON & PETERS LTD.

```
 1                    Michael McCorkle with exhibits.
 2                    MR. ZIGLER:  So we are marking
 3    Mr. McCorkle's affidavit as Exhibit 7 in both
 4    Courts; is that correct?
 5                    THE CANADIAN COURT:  Yes.
 6                    THE US COURT:  That is correct for
 7    here, yes.
 8                    MR. ZIGLER:  Thank you, Your Honour.
 9    EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY
10    MR. ZIGLER:
11                    Q.   Mr. McCorkle, you have your
12    affidavit before you, and it is yours and you have
13    sworn it?
14                    A.   It is.
15                    Q.   No changes since you have sworn
16    it?
17                    A.   No.
18                    Q.   According to your affidavit,
19    Mr. McCorkle, you received both your degrees in the
20    Chicago area from Northwestern and DePaul
21    University?
22                    A.   That's correct.
23                    Q.   And after you got your MBA, you
24    spent 18 years at the First National Bank of
25    Chicago up to the position of Vice-President
```

 Neeson&Associates    W&F

```
 1   Corporate Finance; is that correct?

 2             A.   Correct.

 3             Q.   You came to the Nortel Group in

 4   1997 as an employee of NNI in Richardson, Texas?

 5             A.   Yes.

 6             Q.   What did you do there?

 7             A.   I was Director for Customer

 8   Finance, arranging financings for customers who

 9   were considering purchasing Nortel products.

10             Q.   You got moved to the UK in 1999

11   and what did you do there?

12             A.   The exact same function, but for

13   European clients, at first as an NNI employee and

14   then later converted to a Nortel UK employee.

15             Q.   So in 2003 you became an NNUK

16   employee; is that correct?

17             A.   Correct.

18             Q.   And then in 2005, while you were

19   still an NNUK employee, you moved to Canada?

20             A.   Correct.

21             Q.   Correct?  And assumed the role of

22   Assistant Treasurer?

23             A.   Yes, sir.

24             Q.   And became an employee of NNL?

25             A.   That's correct.
```



1             Q.   So you are the only witness who

2    has had the good fortune of working for all three

3    estates.  As Assistant Treasurer, what did you do?

4             A.   I was responsible for the

5    management of Nortel's global cash, capital markets

6    activity, foreign exchange, derivatives, that type

7    of activity, as well as a few other things,

8    including the customer financing role.

9             Q.   And in August of 2007, after the

10   Treasurer Kate Stevenson departed, you undertook

11   the full-time, the head Treasurer role until

12   mid-2008; is that correct?

13            A.   Correct.

14            Q.   And then you were succeeded by

15   Mr. Doolittle.

16            A.   And went back to becoming

17   Assistant Treasurer again.

18            Q.   You went back to the position of

19   Assistant Treasurer, and you left just prior to the

20   filing under Chapter 11 in the CCAA at the

21   beginning of January of 2009?

22            A.   January 2009.

23            Q.   And what group did you oversee as

24   Assistant Treasurer?

25            A.   The Treasury Group.



```
 1                    Q.   And what were their functions?
 2                    A.   As they were managing the
 3    organization's cash and raising funds and insurance
 4    and derivatives and foreign exchange activities.
 5                    Q.   And by "the organization", what do
 6    you mean?
 7                    A.   The global organization.
 8                    Q.   All right.
 9                    A.   It was a centralized function.
10                    Q.   And where were the treasury
11    employees located?
12                    A.   The majority of them were in
13    Canada.  There were also a staff of seven or eight
14    in the UK and two in Asia and Hong Kong.
15                    Q.   Were there any in the United
16    States?
17                    A.   No, treasury proper, no.  Customer
18    finance people, which were -- reported through, but
19    treasury people, no.
20                    MR. ZIGLER:  I have no further
21    questions, Judge Gross and Justice Newbould.
22                    THE CANADIAN COURT:  Mr. Rosenthal.
23    CROSS-EXAMINATION BY MR. ROSENTHAL:
24                    Q.   Good morning, again, Your Honours,
25    Jeff Rosenthal of Cleary Gottlieb Steen & Hamilton,
```



1    on behalf of the US Debtors.

2                    Good morning, Mr. McCorkle.

3              A.    Good morning.

4              Q.    Mr. McCorkle, you are being paid

5    $400 per hour to testify here; correct?

6              A.    That is true, yes.

7              Q.    Do you know who is paying you?

8              A.    The Nortel Estate, I assume.

9              Q.    Do you --

10             A.    The Monitor.

11             Q.    There is an agreement between the

12   CCC and the Monitor with regard to your fees?

13             A.    I believe so.  Well, it is --

14   sorry, I'm paid by Nortel is the -- Nortel.

15             Q.    Do you have a written agreement

16   regarding the --

17             A.    Yes, I do.

18             Q.    Just one last question on the

19   subject.  Can you just give us an estimate of how

20   much you have been paid or accrued --

21                   THE CANADIAN COURT:  Well, it would be

22   far less than anybody else in the room.  Let's move

23   on.

24                   BY MR. ROSENTHAL:

25             Q.    You know that you have been



```
 1   designated a CCC witness; correct?
 2               A.   Yes.
 3               Q.   And you are aware of what the
 4   CCC's pro rata position is in this case?
 5               A.   Not specifically.
 6               Q.   Are you aware generally that they
 7   have argued as one of their positions in favour of
 8   a pro rata allocation in light of what they assert
 9   is the integrated nature of Nortel's operations?
10               A.   I have been told that, yes.
11               Q.   Now, you understood, though, from
12   your perspective during the time you have worked at
13   Nortel that the Nortel Group had separate legal
14   entities?
15               A.   Had?
16               Q.   Had separate legal entities?
17               A.   Yes.
18               Q.   And each separate Nortel legal
19   entity had its own books and records?
20               A.   Yes.
21               Q.   Each separate Nortel legal entity
22   had its own financial statements?
23               A.   Yes.
24               Q.   Each separate Nortel legal entity
25   had its own bank accounts?
```



```
 1                    A.    Yes.
 2                    Q.    And each separate Nortel legal
 3     entity had its own cash reserves; correct?
 4                    A.    Yes.
 5                    Q.    Now, in your work at Nortel
 6     treasury, treasury forecasted cash needs on a
 7     separate entity-by-entity basis as well; correct?
 8                    A.    Yes.
 9                    Q.    And the separate Nortel legal
10     entities made intercompany loans to each other from
11     time to time; correct?
12                    A.    Some of them, yes.
13                    Q.    And you were ultimately
14     responsible for approving some of these
15     intercompany loans; correct?
16                    A.    All of them.
17                    Q.    All of them, okay.  And would you
18     say that the intercompany loans were developed and
19     finalized by treasury in consultation with the
20     central Nortel tax and Legal Departments and the
21     separate legal entities which were entering into
22     the loan agreements?
23                    A.    Yes, we had regular reviews from
24     all of those groups, including the legal entities
25     as to what amounts should be funded or returned.
```



```
 1                    Q.   And ultimately, the loans were
 2    approved by the Boards of Directors of the separate
 3    legal entities in accordance with the local
 4    governance requirements?
 5                    A.   Yes.
 6                    Q.   Would you say that intercompany
 7    loan decisions were always made in compliance with
 8    local regulatory and legal requirements?
 9                    A.   To my knowledge, yes.
10                    Q.   You are not aware of a single loan
11    that didn't follow that process?
12                    A.   I am not.
13                    Q.   And you understood that the
14    separate subsidiaries were subject to different
15    local laws and regulations in the context of their
16    cash requirements; correct?
17                    A.   Yes.
18                    Q.   And your group ensured that each
19    subsidiary was able to meet those requirements?
20                    A.   Yes.
21                    Q.   And when managing cash, you always
22    ensured that you respected separate legal entities;
23    correct?
24                    A.   Yes, definitely.
25                    Q.   Now, in your role as Assistant
```



1   Treasurer, were you familiar with Nortel's debt

2   financing?

3           A.   I was.

4           Q.   And as Assistant Treasurer, in

5   fact, you were regularly involved in conversations

6   with rating agencies?

7           A.   Yes.

8           Q.   You updated the rating agencies at

9   least annually; correct?

10          A.   Yes.

11          Q.   And you updated the rating

12  agencies also on transaction-by-transaction basis

13  as needed?

14          A.   Yes.

15          Q.   And as Assistant Treasurer, you

16  were closely involved in the refinancing of

17  Nortel's debt that occurred in 2006; correct?

18          A.   I was.

19          Q.   And to secure interim financing,

20  isn't it correct that NNI entered into a one-year

21  interim credit facility in the amount of 1.3

22  billion dollars?

23          A.   That's correct.

24          THE CANADIAN COURT:  Hasn't all this

25  been established?  I mean, what you are asking has



```
 1   been more than established in this case.
 2            MR. ROSENTHAL:  You are correct, Your
 3   Honour, that in fact a lot of this was covered
 4   yesterday during Mr. Currie's examination.
 5   Unfortunately, they are not stipulated to and to
 6   the extent --
 7            THE CANADIAN COURT:  The evidence is
 8   here.  Whether someone stipulates to it or not, it
 9   is now evidence before us.
10            MR. ROSENTHAL:  I understand, but to
11   the extent it is challenged, that is why I'm
12   seeking corroborating evidence from this witness.
13            But if Your Honour wishes, I am happy
14   to move on.
15            THE CANADIAN COURT:  It just seems to
16   me so much of this is time-killing, frankly.
17            BY MR. ROSENTHAL:
18            Q.   Let me ask you a question, though,
19   something that did not come up during Mr. Currie's
20   examination.
21            You are familiar with the offering
22   memoranda specifically that was issued in
23   connection with the bond offerings; correct?
24            A.   Yes.
25            Q.   And Nortel's offering memoranda
```



```
 1    specifically discussed the fact that the Nortel

 2    Group was made up of different legal entities;

 3    correct?

 4                 A.    Yes.

 5                 Q.    And it made clear that other than

 6    NNI, none of NNC's direct subsidiaries would

 7    guarantee the notes; correct?

 8                 A.    NNL, I'm not sure if NNL was a

 9    guarantor also, but --

10                 Q.    Whether NNL was an issuer?

11                 A.    None of the other -- correct.

12                 Q.    And in fact, there were sections

13    within the offering memorandum discussing the

14    nature of the guarantee and that it was only with

15    respect to the subsidiaries that were guaranteeing

16    it, not others; correct?

17                 A.    I'm not sure I understand, sorry.

18                 Q.    Well, they made clear that a

19    subsidiary that was not an issuer or a guarantor

20    would not have responsibility for the bonds;

21    correct?

22                 A.    It was not formally guaranteeing

23    it, yes.

24                 Q.    And you understood from your

25    perspective that potential investors wanted NNI as
```

 Neeson & Associates    W&P WILSON & PETZOR LTD.

```
 1   a guarantor; correct?
 2              A.   Yes, the entities J.P. Morgan and
 3   Citibank and others who arranged the loan told us
 4   that we would get much more better reception, be
 5   able to raise higher amounts and at lower interest
 6   rates with NNI's guarantee.
 7              Q.   And in fact --
 8              A.   Or with NNI's involvement.
 9              Q.   And in fact, based on your
10   discussions, it was your understanding that both
11   NNL and NNI had to be either obligor or guarantor
12   on these bonds; correct?
13              A.   I'm not sure about had to be, but
14   certainly in order to get the transaction of the
15   size and the interest rate that we did, yes.
16              Q.   One thing that didn't come up
17   yesterday is you are aware that on at least two
18   separate occasions the UK Pension Claimants
19   negotiated specific guarantees from NNL of
20   obligations of NNUK; correct?
21              A.   Yes, I am.
22              Q.   Now, as assistant treasurer, can
23   you confirm for me that not only was NNI the Nortel
24   Group's largest business, but that it was also the
25   largest cash flow positive business?
```



```
 1                    A.   Yes, it was definitely the largest
 2      and generally speaking it was --
 3                    THE CANADIAN COURT:  What period of
 4      time are you talking about?
 5                    BY MR. ROSENTHAL:
 6                    Q.   During the period of time that you
 7      were Assistant Treasurer?
 8                    A.   Yes.
 9                    Q.   And generally speaking, during
10      that period of time, NNI was always cash flow
11      positive; correct?
12                    A.   Generally speaking, yes.
13                    Q.   Now, we have heard a little bit
14      about contributions over the past few days, and I
15      would just like to confirm as Assistant Treasurer a
16      few things from you.
17                    It is fair to say that during your
18      period of time as Assistant Treasurer, you were
19      able to use NNI's cash to help fund NNL; correct?
20                    A.   The way we were set up was that
21      all global cash was used as needed, including
22      NNI's, yes.
23                    Q.   And NNL spent money on R&D, for
24      example?
25                    A.   Yes.
```

Neeson & Associates    W&P

```
 1                     Q.   And NNL's expenditures were funded
 2    in part by the movement of cash from other entities
 3    to Canada; correct?
 4                     A.   Yes, that's correct.
 5                     Q.   And that included large amounts of
 6    cash from NNI?
 7                     A.   Yes.
 8                     Q.   Okay, and isn't it fair to say,
 9    Mr. McCorkle, that NNI indirectly funded NNL's R&D?
10                     A.   A portion thereof, yes.
11                     Q.   And is it true that -- can you
12    just tell the Court what a CCBA solvency test is?
13                     A.   That is a Canadian Business --
14    sorry, I can't remember CCBA -- it is a test that
15    we carry -- in Nortel's case, a test we carried out
16    in order to ascertain whether NNL was able to make
17    dividend payments on its preferred shares.
18                     Q.   And is it true that NNL relied on
19    intercompany loans from NNI in order to satisfy the
20    CCBA solvency test each quarter?
21                     A.   Generally speaking, yes.  We set
22    up those preferred shares.  When we set up the
23    preferred shares, we knew that NNL did not normally
24    have sufficient funds for the purpose of the
25    solvency test, so we always made sure that we had
```

 Neeson & Associates   W&F

1    intercompany facilities available that it could

2    access if needed and we used those as part of the

3    calculation and NNI was the largest portion of that

4    for sure.

5              Q.   I want to just close my

6    examination with a few questions, and again, I

7    asked these of Mr. Currie yesterday as well, which

8    is I harken back to the opening statement of the

9    Canadian Debtors' counsel in which he identified

10   three questions that he thought were the questions

11   that the Courts needed to answer with regards to

12   NNL's and NNI's and NNUK's respective interests in

13   the intellectual property.

14             And you are not a transfer pricing

15   expert; correct?

16             A.   That's correct.

17             Q.   And in fact, while you have heard

18   of transfer pricing, you are not familiar with how

19   it worked at Nortel?

20             A.   My familiarity was after all steps

21   were taken, I made sure that all the funding that

22   resulted from it took place.

23             Q.   And in fact, you couldn't describe

24   Nortel's methodology; correct?

25             A.   I could not.



```
 1                    MR. ROSENTHAL:  I have nothing further,
 2     Your Honours.
 3                    THE CANADIAN COURT:  Thank you.
 4                    Anyone else?
 5     CROSS-EXAMINATION BY MR. DORIS:
 6                    Q.   Good morning, Judge Gross, Justice
 7     Newbould, my name is James Doris appearing on
 8     behalf of the EMEA Debtors.
 9                    Good morning, Mr. McCorkle.
10                    A.   Good morning.
11                    Q.   I just have a few questions for
12     you concerning the cash management of the global
13     organization.
14                    Now, one of the ways that Nortel,
15     Nortel Group moved cash was through intercompany
16     loans.
17                    A.   That is correct, yes.
18                    Q.   And another way was through
19     quarterly transfer pricing adjustments?
20                    A.   If quarterly pricing adjustments
21     required cash to be moved, it was done through the
22     intercompany loans, so the intercompany loans were
23     the result of the decisions made as part of the
24     TPA, yes.
25                    Q.   And my understanding is they were
```



1    often used in combination, so you would have a

2    quarterly transfer pricing adjustment.  You

3    determine whether there was surplus cash and you

4    might then loan the surplus cash from one Nortel

5    entity to the other Nortel entity; correct?

6                    A.    Yes, agreed.

7                    Q.    And with respect to the transfer

8    pricing adjustments that were made, they were

9    recorded as book entries?

10                   A.    Yes.

11                   Q.    You didn't actually --

12                   A.    Occasionally they were cash

13   settled but book entries.

14                   Q.    But generally book entries?

15                   A.    Yes.

16                   Q.    And they weren't in fact paid as

17   cash to the party receiving the adjustment?

18                   A.    No, sometimes they were, often

19   not.

20                   Q.    And with respect to the transfer

21   pricing adjustments in favour of Nortel Networks

22   UK, those were rolled into intercompany loans?

23                   A.    Yes, during my time, they were,

24   except for the payments under Project Swift, they

25   always were.



```
 1                    Q.   But before Project Swift --
 2                    A.   Yes.
 3                    Q.   -- the balance on that loan, which
 4     were really in effect transfer pricing adjustments
 5     unpaid was about a billion dollars?
 6                    A.   Under it -- yes.
 7                    MR. DORIS:  Thank you, that is all my
 8     questions.
 9     CROSS-EXAMINATION BY MR. FINNIGAN:
10                    Q.   Good morning, Mr. McCorkle.
11                    A.   Good morning.
12                    Q.   My name is John Finnigan of
13     Thornton Grout Finnigan and I represent the UK
14     Pension Claimants.  I have a few questions for you
15     this morning.  Good morning, Judge Gross.
16                    THE US COURT:  Good morning.
17                    BY MR. FINNIGAN:
18                    Q.   Dealing with something that my
19     friend, Mr. Rosenthal, dealt with first,
20     negotiations with lenders, you were involved in the
21     negotiation of the terms of the bond indentures?
22                    A.   I was.
23                    Q.   And the guarantees provided by NNI
24     for the 2 billion dollar facility we have heard
25     about, that guarantee was conditional; correct?
```



```
 1                    A.    Yes, correct.
 2                    Q.    And if Nortel had returned to
 3     investment grade status, that guarantee would go
 4     away?
 5                    A.    It would fall away during the
 6     period we were investment grade, yes.
 7                    Q.    Right.  And in the prospectus that
 8     accompanied that bond indenture, I believe it is at
 9     tab 11 of your affidavit, there were certain
10     warnings provided to the purchasers of these bonds
11     that the guarantees might not be available in
12     certain circumstances; correct?
13                    A.    Yes, that's correct.
14                    Q.    In particular, parties were warned
15     that the laws of Canada and the US may apply such
16     that the principal and interest of those bonds
17     might not be repaid?
18                    A.    I believe that was what it said,
19     yes.
20                    Q.    In the event of an insolvency?
21                    A.    Yes.
22                    Q.    All right.  So those risks were
23     identified and, for your notes, Your Honour, it is
24     at pages 31 through 33 of the Offering Memorandum
25     at tab 11 of Mr. McCorkle's affidavit.  Those risks
```



```
 1    were identified for the purchasers of those bonds?
 2                 A.   They were.
 3                 Q.   All right.  You have testified in
 4    your affidavit -- it is tab 10, I apologize, tab
 5    10, pages 31 through 33.
 6                 You have testified as to cash
 7    management at Nortel.
 8                 A.   Yes.
 9                 Q.   And I would like to take you to a
10    document and just drill into how that was done and
11    your role in it.
12                 If we could have brought up, please,
13    Trial Exhibit 21176, and this is an email,
14    Mr. McCorkle, from yourself to Simon Freemantle.
15    It is dated 5/24, 2007; do you see that?
16                 A.   Yes, I don't see the earlier
17    emails.  Do you know where it is in my book?
18                 Q.   This is not going to be in your
19    book, I don't think.
20                 A.   Oh, okay, sorry.
21                 Q.   Yes, we do have hard copies.
22                 Would you prefer to look on the screen,
23    sir, or have a hard copy?
24                 A.   I think either way is fine.  I
25    think there is a response to an email that --
```



```
 1              Q.   Yes, there is an email chain
 2   attached here, sir.
 3              A.   Yes.
 4              Q.   So to begin with, who was Simon
 5   Freemantle?
 6              A.   Simon Freemantle -- it was May of
 7   2007.  Simon Freemantle reported to me.  He headed
 8   EMEA cash management, EMEA and Asia and around that
 9   time, I'm not sure of the exact time, he took on
10   the additional role of global cash management.
11              Q.   All right, so Simon Freemantle
12   worked in the EMEA group in the UK and reported to
13   you?
14              A.   Yes, correct.
15              Q.   And you were both in the treasury
16   function?
17              A.   Correct.
18              Q.   And your job then would be to, as
19   you have described in your affidavit, to try to
20   maximize and utilize the cash at Nortel globally in
21   the most efficient way?
22              A.   Yes.
23              Q.   And you would rely on
24   Mr. Freemantle to tell you how much cash EMEA
25   needed from time to time, therefore identifying how
```



```
 1   much cash was excess?

 2              A.   Yes.

 3              Q.   And you would engage with your

 4   colleagues around the world, your treasury

 5   colleagues in that exercise, identifying needed

 6   cash, surplus cash, and then employing that cash in

 7   the most efficient manner?

 8              A.   Yes.

 9              Q.   All right.  So if we look then, if

10   we could just direct your attention, please, to the

11   third page of this document, and it is an email

12   from you to Kate Stevenson April 11, 2007.

13              A.   Okay.

14              Q.   All right, who was Kate Stevenson?

15              A.   She was my boss, the Treasurer at

16   the time.

17              Q.   All right.  And so you begin your

18   email in the first paragraph:

19                   "Kate, this is quite a lengthy

20                   analysis, but the bottom line is

21                   that it supports the basic position

22                   that $2B really is our minimum level

23                   of cash on an ongoing basis, without

24                   any buffer for large projects,

25                   unforeseen events, etc.  I have
```

 Neeson & Associates    W&F

```
 1                    added details so that you can see
 2                    the logic process I went through to
 3                    get to that conclusion."
 4               So that was part of your responsibility
 5     to identify for your superior what the cash needs
 6     were and where the cash was?
 7                    A.   Yes.
 8               Q.   And then if you go over the page
 9     and if I can direct your attention to the chart
10     about just below the midpoint of the page, it
11     begins "From a top down perspective"?
12                    A.   Yes.
13               Q.   So here you have identified in the
14     different areas where cash is and what cash is
15     available.  So for example, NNI, that is the US
16     entity, do I read this correctly, you are
17     identifying it has 688 million dollars in cash
18     available for use by other entities?
19                    A.   Yes.
20               Q.   And similarly, if we go down the
21     line, NNUK, NN Ireland, Holland, France, Germany,
22     those are all entities in the EMEA group; correct?
23                    A.   Yes, correct.
24               Q.   So you have identified that in the
25     subsidiaries, there is about 1.5 billion dollars in
```

Neeson&Associates   W&F WILSON & PETZER LTD.

```
 1    cash available?

 2                    A.    Yes.

 3                    Q.    And I am interested in something

 4    you say in the next paragraph.  You say:

 5                    "There are two governors on how

 6                    much cash we can take out of the

 7                    system.  The first is the basic

 8                    minimum working capital in each

 9                    entity (bottoms up approach) and the

10                    second is an analysis of what is

11                    available at the large entities (top

12                    down).  These should usually come to

13                    the same thing (as they do now with

14                    a rounding error) unless there are

15                    any restrictions making the funds

16                    unavailable.  This could be for any

17                    number of reasons: (1) last year,

18                    the bottoms up approach suggested we

19                    could take X out of the system, but

20                    had we done that it would have taken

21                    NNI below the $500M level, with

22                    which we were uncomfortable; (2)" --

23                    and this is where I'm interested --

24                    "UK pension issues".

25                    So that is a restricting factor, as I
```



 1    read your email.

 2              What were the UK pension issues that

 3    you were referring to in this email?

 4              A.    We were aware at that time that

 5    under new pension regulations that there were

 6    more -- that the regulator was paying more

 7    attention to how much funds were in the UK

 8    relative -- in the UK and how we were funding it

 9    and it became an issue that we paid close attention

10    to, making sure that at any time that we were

11    thinking about moving funds or other capital

12    markets type of activity in the UK, that we were

13    doing it in a way that met the UK pension

14    regulations, and that if it was a large

15    transaction, that the UK Trustees of the pension

16    were aware of it.

17              Q.    So there is a new pension regime

18    in the UK; correct?

19              A.    Yes.

20              Q.    And the pension regulator had some

21    new powers?

22              A.    Yes.

23              Q.    Including in certain circumstances

24    the power to impose certain financial requirements

25    on NNUK and on its parent NNL?



```
 1                    A.   That was my understanding.
 2                    THE CANADIAN COURT:  Mr. Finnigan, you
 3    said there was a new pension regulation or regime.
 4    The email is dated May of '07.
 5                    MR. FINNIGAN:  Yes.
 6                    THE CANADIAN COURT:  When are we
 7    talking about, Mr. McCorkle, when was it new?
 8                    THE WITNESS:  I'm not sure when it was
 9    instituted.  It was around the beginning of '07
10    that it became something that I was aware of.
11                    THE CANADIAN COURT:  So it became an
12    issue for you?
13                    THE WITNESS:  Right.
14                    MR. FINNIGAN:  Your Honour, I believe
15    the evidence will show is that these new
16    regulations came in in 2005.  I believe the
17    Pensions Act was the pensions act of 2004 that
18    became effective in 2005 and other witnesses will
19    give you evidence on that.
20                    THE CANADIAN COURT:  Right.
21                    BY MR. FINNIGAN:
22                    Q.   So under this new pension regime,
23    were you aware that it was increasingly important
24    for the company to negotiate with the Trustees to
25    try to come up with a consensual solution to
```

Neeson & Associates    W&F

```
 1   pension deficit issues?

 2             A.   Yes.

 3             Q.   Because the regulator would look

 4   at Trustee support in deciding whether it might

 5   intervene in a particular circumstance?

 6             A.   Yes.

 7             Q.   All right.  And if I can just turn

 8   back to the document, the exhibit we were referring

 9   to, you have it in front of you, I want to now go

10   up to the email that is just above the one we have

11   just been reading from, and this is an email from

12   yourself, sir, to Mr. Freemantle, May 7, 2007.  Do

13   you have that one?

14             A.   Yes.

15             Q.   And you are reporting here, you

16   are sending Mr. Freemantle your memo on the cash

17   level requirements and I would like you to just

18   scan down to the sixth -- seventh line, the

19   sentence that begins:

20             "Anything from the UK [...]"

21        Do you have that?

22             A.   Yes.

23             Q.   "Anything from the UK would of

24             course further flame the problem we

25             already have and that Swift is trying
```

 Neeson & Associates   W&F WILSON & FILYZOR LTD.

1            to fix."

2            What is the problem that is being

3    further flamed?

4            A.    Because of the new UK pension

5    regulations and our ongoing discussions with the

6    Trustees and our knowledge of needing to stay

7    within those regulations, having the Trustees agree

8    to things we did, that it was the ability to move

9    funds out of the UK was more difficult and had to

10   go through these additional levels of comfort

11   before we would move the funds.

12           Q.    And in particular, the Trustees --

13   let's begin with this.  There was a deficit

14   identified in the UK Pension Plan; correct?

15           A.    Correct.

16           Q.    And the Trustees were negotiating

17   with the company, Nortel, to address that deficit?

18           A.    Correct.

19           Q.    And you were involved in those

20   negotiations either directly or supporting them?

21           A.    Supporting them, yes.

22           Q.    And at one point, you testify in

23   your affidavit at paragraph 54 that the Trustees

24   said something to the effect, hey, there is 300

25   million dollars in cash in NNUK.  Why aren't you



1   using that to pay down this deficit?  Do you recall

2   that?

3                A.   Yes.

4                Q.   And the company's answer was,

5   well, all that cash isn't for NNUK.  We need that

6   for other purposes around the world, something to

7   that effect; is that fair?

8                A.   That was in conformance with the

9   way we managed cash globally, so it was totally

10  consistent with what we had always done cash-wise,

11  yes.

12               Q.   You understood that the Trustees

13  had a fiduciary obligation to their pension

14  members?

15               A.   I did.

16               Q.   And that they -- it was improper

17  for them to press for you greater contributions to

18  reduce the deficit?

19               A.   Yes.

20               Q.   And the company recognized that

21  pension deficit, that that was a debt of the

22  company?

23               A.   We were aware of the deficit, and

24  we were fully determined and -- to pay it off

25  eventually, yes.



```
 1                    Q.   But you recognized it and thought
 2    of it as a debt?
 3                    A.   It was an obligation of NNUK, yes.
 4                    Q.   All right, if we could pull up,
 5    please, trial Exhibit 48995.  And, sir, 48995 was
 6    something I believe that was designated by the
 7    Canadian allocation group last evening, and it is
 8    an -- it starts with an email from Kate Stevenson
 9    June 6th, 2006, to Mike McCorkle re Nortel
10    Networks's UK Pension Plan; have you got that?
11                    A.   Yes, I think there are a couple --
12    well, not --
13                    Q.   It is indeed an email chain.
14                    A.   So the first one was from Jonathan
15    Hazlett.
16                    Q.   Yes, if we go to the back there is
17    an email from Jonathan Hazlett, and I understand
18    Mr. Hazlett was a lawyer at the firm of Osborne,
19    Clarke in the UK; correct?
20                    A.   Yes.
21                    Q.   And he was assisting -- he was
22    acting for the company in these negotiations --
23    acting for Nortel in its negotiations with the
24    Trustees?
25                    A.   Yes.
```



```
 1                    Q.   And the context of this is, I hope
 2    you will remember, that Nortel -- Ms. Stevenson was
 3    going off to meet the pension regulator in the UK
 4    to convince the pension regulator that the
 5    arrangements that were under negotiation with the
 6    Trustees were proper and acceptable so that to get
 7    the pension regulators' support for the efforts
 8    that were being made by the Trustees and the
 9    company to address the deficit?
10                    A.   Yes, certainly to brief the
11    pension regulator on what we were doing, yes.
12                    Q.   And was it the company's plan to
13    get some sort of clearance from the regulator that
14    what the company was proposing to do was going to
15    pass muster with the regulator?
16                    A.    I -- we -- I haven't looked at
17    this email before.  I believe that the position
18    that we were taking was that what we were doing was
19    totally consistent with what we had done in the
20    past and was something that the regulator should
21    not be concerned about and we were going to the
22    regulator to explain what we were doing in full
23    anticipation that the regulator would have no
24    issues with it.
25                    But I don't remember we were looking
```

 

1    for specific approval from the regulator.

2                    Q.    All right, that is fair.  So in

3    the second email down in the first page, this is

4    from you to Hazlett and Stevenson on June the 4th,

5    and you are commenting here, and take as much time

6    as you need to refresh your memory, but you are

7    commenting here on a proposal Hazlett has put

8    together, a written proposal to submit to the

9    regulator and you are giving your input into what

10   he has drafted; does that refresh your

11   recollection?

12                   A.    Yes.

13                   Q.    All right.  And addressing your

14   attention to the first paragraph of your email and

15   you are commenting on when PwC says -- what was

16   PwC's role in this episode?

17                   A.    They were advisors to the

18   Trustees.

19                   Q.    All right, so they are on the

20   other side supporting the Trustees in their

21   negotiations with the company?

22                   A.    Yes.

23                   Q.    So PwC has obviously made some

24   sort of critique that you are addressing in these

25   paragraphs; correct?

 Neeson&Associates    W&F

```
1                    A.    Yes.

2                    Q.    And so:

3                          "When PwC says that we are not

4                    willing to view this obligation as

5                    debt, what they are referring to is

6                    the fact that we are unwilling to

7                    upgrade the obligation from what it

8                    is now (a senior unsecured long term

9                    obligation of NNUK) to an obligation

10                   fully pari passu with whatever

11                   NNL/NNC's most senior debt is from

12                   time to time [...]"

13                   You go down to describe what you have

14         done, including providing a guarantee from NNL, and

15         then you say:

16                         "We believe that this is a huge

17                   movement on our part and clearly

18                   shows we view the obligation as a

19                   serious debt obligation."

20                   So that was an accurate record of how

21         you viewed this obligation, a serious debt

22         obligation?

23                   A.    Yes.

24                   Q.    Then if I can direct your

25         attention, please, over to the next page, in the
```



```
 1   middle of the page where it begins "Comments on PwC
 2   document".  Do you see the second paragraph there,
 3   sir, it says:
 4                  "Page 2 Fifth bullet third
 5             point".
 6             A.   Yes.
 7             Q.   And you say:
 8                  "As per my comments above, we
 9             do indeed agree that the UK pension
10             deficit represents a 'debt' and we
11             are willing and have offered to give
12             the Trustees far more protection
13             than they had previously, including
14             the guarantee of NNUK's parent.  To
15             twist our position to claim that we
16             do not view it as a debt is
17             misleading at best."
18             So again, you are affirming that this
19   is a debt of the company?
20             A.   As -- I think the statement
21   stands, it still sounds accurate to me.
22             Q.   Well, thank you, I am done with
23   that.
24             And in these negotiations then, we
25   ultimately come to something called Project Swift;
```



```
 1   do you recall Project Swift?  You described it in

 2   your affidavit.

 3              A.   I do.

 4              Q.   And just summarize that as briefly

 5   as you can.  What was Project Swift?

 6              A.   Project Swift was a project that

 7   our tax group suggested to us as a means of

 8   reducing the intercompany loan obligation between

 9   NNL and NNUK by selling European assets to NNUK, in

10   the process both reducing the intercompany debt

11   obligation to NNL's advantage and at the same time

12   reducing the NNUK's tax obligations.

13              Q.   Right.

14              A.   Tax expenses.

15              Q.   And that debt obligation from NNL

16   to NNUK had arisen by virtue of the transfer

17   pricing adjustments between those two entities?

18              A.   Correct.

19              Q.   And that debt had ballooned to

20   something like 900 million dollars, to a billion

21   dollars?

22              A.   It was a large number.  I don't

23   remember specifically where it peaked.

24              Q.   So the plan was that the transfer

25   European subsidiaries to NNUK, value those
```



1    subsidiaries and then relieve the debt, reduce the

2    debt owed by that amount?

3              A.    Swap one asset for another, yes.

4              Q.    Right, and in the course of those

5    negotiations, the Trustees expressed concern about

6    what might happen in the event of an insolvency;

7    correct?

8              A.    Yes.

9              Q.    And they came asking for a

10   guarantee for Project Swift?

11             A.    Yes.

12             Q.    And a guarantee was indeed offered

13   and negotiated between NNL and the Trustees?

14             A.    Yes.

15             Q.    And that guarantee was intended to

16   support NNUK's obligations to the Trustees?

17             A.    Up to a specific level, which I

18   remember to be 150 million.

19             Q.    150 million dollars US?

20             A.    Yes.

21             Q.    And did you understand that the

22   Trustees were looking for protection in the event

23   that NNUK became insolvent or unable to pay its

24   obligations?

25             A.    Yes.



```
 1                    Q.   All right.  There was -- there is
 2    another transaction and the last document I want to
 3    take you to is trial Exhibit 41230, if we can get
 4    that on the screen, please.
 5                    A.   Which exhibit is it?
 6                    Q.   Exhibit 41230.
 7                    A.   Thank you.
 8                    Q.   And, sir, this is an email chain,
 9    the first page is to you from Simon -- from Mark
10    Cooper, sent 2/19/2008, and it is re -- the subject
11    is "Spartan and UK Trustees".  And is this an
12    email, sir, that you would have received from
13    Mr. Cooper?
14                    A.   Sorry, I'm trying to see where
15    Mr. Cooper's email begins.
16                    Q.   It starts with an email --
17                    A.   Okay.
18                    Q.   -- at the back --
19                    A.   Yes.
20                    Q.   -- from Mr. -- a lengthy email
21    from Mr. Cooper to Mr. Drinkwater.  So first off,
22    who is Mr. Cooper?
23                    A.   He was -- it was our legal
24    representative of NNUK employee and legal.
25                    Q.   So he is in-house legal at NNUK?
```



```
 1                    A.    Correct.

 2                    Q.    And Mr. Drinkwater was?

 3                    A.    At the time he would have been the

 4    head of legal.

 5                    Q.    The head of legal in Canada?

 6                    A.    Yes.

 7                    Q.    So he was the chief legal officer

 8    for the global entity?

 9                    A.    Yes.

10                    Q.    And you were in your position at

11    this time as Assistant Treasurer?

12                    A.    This would have been February of

13    '08, so I would have been Interim Treasurer.

14                    Q.    Interim Treasurer.  And just very

15    briefly, what was Spartan?

16                    A.    I haven't thought about Spartan

17    for a long time.  I believe it was a transaction we

18    were considering with Siemens.

19                    Q.    All right.  And if I can then just

20    address your attention, please, to the second email

21    in this chain, so second from the front, and it is

22    an email from Mr. Cooper to Mr. Drinkwater Monday,

23    February 18, 2008.  Do you have that one?

24                    A.    Yes.

25                    Q.    All right.  And in the second
```



```
 1   paragraph down, it begins, it says:
 2                  "In the funding discussions
 3                  [...]"
 4                  Do you see that?
 5                  A.   Yes.
 6                  Q.   So Mr. Cooper says to
 7   Mr. Drinkwater, copied to you:
 8                  "In the funding discussions, in
 9                  order to provide us with some
10                  flexibility over NNUK's assets, we
11                  have always said that the Trustees
12                  should look at the strength of the
13                  Nortel Group [...]"
14                  A.   I'm sorry, I apologize -- oh,
15   okay, now I was somewhere else.  Yes.
16                  Q.   Sorry:
17                  "In the funding discussions
18                  [...]"
19                  Do you have that now?
20                  A.   Yes, I do, all right.
21                  Q.   All right.
22                  "[...] in order to provide us
23                  with some flexibility over NNUK's
24                  assets, we have always said that the
25                  Trustees should look at the strength
```



1                    of the Nortel Group rather than NNUK

2                    in isolation.  The Trustees will be

3                    looking more at the strength of the

4                    global covenant."

5                    Now, was that an accurate statement of

6       the position of the company in dealing with the

7       Trustees?

8                    A.   Yes.

9                    MR. FINNIGAN:  Thank you very much,

10      those are all my questions.

11                   THE CANADIAN COURT:  Anyone else?

12                   MS. KIMMEL:  Your Honour, I don't have

13      any questions by way of examination.  I just wanted

14      to point out that some of the examination that

15      Mr. Finnigan in particular has conducted is in

16      relation to claims-related issues pertaining to the

17      pension case, that will be the subject of further

18      evidence in July.

19                   I don't intend to take up any time of

20      Judge Gross' time today with any further

21      elaboration with Mr. McCorkle, but you can expect

22      that there may be some further testimony in July on

23      those pension subjects, and I am told in

24      particular, but this isn't the evidence, that in

25      fact the pension regime, the new pension regime may

 Neeson&Associates    W&F

1    have actually not come into effect in 2005, as

2    Mr. Finnigan has suggested.

3              But I suggest that we keep all of that

4    for the July portion of the trial.  Thank you.

5              THE CANADIAN COURT:  Very well.

6              MR. ZIGLER:  Judge Gross and Your

7    Honour, having led Mr. McCorkle in-chief, I have

8    nothing in re-examination.

9              MR. ROSENTHAL:  We have nothing, Your

10   Honour.

11             If it suits the courts, we would

12   request, though, just a five-minute break before

13   the next witness comes on.

14             THE CANADIAN COURT:  Sure.

15             MR. ROSENTHAL:  Thank you.

16             THE CANADIAN COURT:  Thank you,

17   Mr. McCorkle.

18             THE WITNESS:  Thank you.

19             THE CANADIAN COURT:  So we'll take a

20   five-minute break.

21   -- WITNESS EXCUSED.

22   -- RECESS AT 9:55 A.M.

23   -- UPON RESUMING AT 10:04 A.M.

24

25                  DONALD EARNEST SPROULE,



```
1                having been duly sworn,
2           was examined and testified as follows:
3
4                MR. ZIGLER:  And, Your Honour and Judge
5    Gross, you should have before you the affidavit of
6    Mr. Sproule and exhibits.
7                THE CANADIAN COURT:  That will be the
8    next exhibit.
9                THE CANADIAN REGISTRAR:  Exhibit No. 8.
10               EXHIBIT NO. 8:  Affidavit of Donald
11               Sproule, sworn on April 10, 2014.
12   EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY
13   MR. ZIGLER:
14               Q.   And, Mr. Sproule, that is your
15   affidavit that you swore on April 10th before you?
16               A.   That's correct.
17               Q.   And you have no changes to that
18   affidavit since that time?
19               A.   That's correct.
20               Q.   Mr. Sproule, you are a former
21   employee of Nortel Networks Limited and retired in
22   2005?
23               A.   That's correct.
24               Q.   After 28 years of service?
25               A.   That is correct.
```



1                    Q.   Did you work for Nortel Networks

2    Limited throughout your career?

3                    A.   I did.

4                    Q.   Were you paid by Nortel Networks

5    Limited throughout your career?

6                    A.   I was.

7                    Q.   All right.  Did you ever receive

8    any remuneration from any other entity?

9                    A.   I did not.

10                   Q.   Okay.  And you started in 1974 and

11   you left briefly in 1991; is that correct?

12                   A.   That is correct.

13                   Q.   And you came back a year and a

14   half later and stayed until 2005?

15                   A.   Correct.

16                   Q.   Did you work exclusively in

17   Canada?

18                   A.   I did an ex-pat assignment into

19   Frankfurt, Germany from '93 to '95, but on the

20   payroll of Nortel.

21                   Q.   On the payroll of Nortel Networks

22   Limited?

23                   A.   Nortel Networks Limited, that's

24   correct.

25                   Q.   And did you receive any



```
 1    remuneration from anybody else while you were

 2    there?

 3              A.    I did not.

 4              Q.    All right.  Mr. Sproule, you were

 5    appointed by the Court in this matter with two

 6    others to represent the former employees of Nortel

 7    Networks Limited; is that correct?

 8              A.    That is correct.

 9              Q.    And Susan Kennedy was appointed to

10    represent the disabled beneficiaries?

11              A.    That is correct.

12              Q.    Three others were appointed to

13    represent the employees who were transferred?

14              A.    That is correct.

15              Q.    And you worked together with those

16    groups with Morneau Shepell, the Administrator of

17    the pension fund?

18              A.    Correct.

19              Q.    And the Unifor Union and the

20    Ontario Superintendent of Pensions as part of the

21    CCC; is that correct?

22              A.    Correct.

23              Q.    In your affidavit you indicate

24    that there are two types of claims that your group

25    has in Canada; is that correct?
```



```
 1                    A.    Correct.

 2                    Q.    One being the shortfall in the

 3    pension fund in Canada?

 4                    A.    Correct.

 5                    Q.    Has that affected you?

 6                    A.    I have had -- personally had my

 7    indexing -- indexation for my pension cut back as

 8    of August 2011, and the payout has been cut back to

 9    70 percent of its former value.

10                    Q.    So you are receiving 70 percent of

11    your pension?

12                    A.    I'm an Ontario-based pensioner.

13                    Q.    And what about your members

14    outside of Ontario?

15                    A.    Outside of Ontario, it depends

16    on -- there are two plans.  I was in the managerial

17    plan.  In the managerial plan in Ontario, they were

18    cut back to 70 percent.  Outside of Ontario they

19    were cut back to 59 percent, with indexing still

20    maintained.

21                    For the negotiated plan, Ontario was

22    cut back to 75 percent of their former value, and

23    57 percent outside of Ontario.

24                    Q.    And in all, the pension shortfall

25    you have been told is about 2 billion dollars?
```

Neeson & Associates    W&F

```
 1                    A.    That's correct.
 2                    Q.    And there are other claims of
 3    roughly 900 million to 1 billion dollars Canadian
 4    for other lost benefits and disabled employee
 5    losses; is that correct?
 6                    A.    That's correct.
 7                    Q.    And you are aware of all the other
 8    claims in this proceeding?
 9                    A.    I am.
10                    Q.    And which ones are you aware of in
11    Canada?
12                    A.    In Canada, in addition to the
13    former Nortel Canadian employees, 1 billion for
14    non-pension related claims, 2 billion for the
15    pension fund.  There is an intercompany claim of 2
16    billion from NTI into Canada.  There is a claim
17    of -- from the UK pension trust of 7 to 800 million
18    dollars, and on top of that, there is the unsecured
19    bonds that were cross-guaranteed between Canada and
20    the United States to the tune of I think it is
21    about 4.1 billion dollars.
22                    Q.    And when you add it up, it is
23    roughly, with your claim, it is roughly what?
24                    A.    10 billion.
25                    Q.    Thank you, Mr. Sproule, I have no
```



```
 1   further questions.
 2              THE CANADIAN COURT:  Mr. Rosenthal.
 3   CROSS-EXAMINATION BY MR. ROSENTHAL:
 4              Q.   Good morning, Mr. Sproule.  My
 5   name is Jeff Rosenthal, I am with the law firm of
 6   Cleary Gottlieb Steen & Hamilton on behalf of the
 7   US Debtors.
 8              You had a deposition in this case;
 9   correct?
10              A.   I did.
11              Q.   And do you recall at this
12   deposition you were asked what you knew of that was
13   of any relevance to this allocation proceeding, and
14   you said that you drew a complete blank; correct?
15              A.   At the time, November 30th, I did
16   not have the figures and facts at hand.  Clearly,
17   for this court case, I have got the figures and
18   facts at my hand.
19              Q.   Other than those, you would draw a
20   blank as to what you have that is relevant to this
21   case; is that correct?
22              A.   Sorry, I didn't understand --
23              Q.   Other than the fact -- strike
24   that.
25              Other than the figures and facts that
```



```
 1   you have just mentioned, your testimony at your

 2   deposition was that you have no information

 3   relevant to this proceeding; correct?

 4                A.   Well, we -- there were -- can you

 5   be a little bit more specific?  There were

 6   questions asked about the MRDA and I said I had no

 7   knowledge of the MRDA.  I had no knowledge of

 8   intercompany loans.  I think if you read the

 9   deposition, you will find the details where I said

10   I had no knowledge.

11                THE CANADIAN COURT:  Mr. Rosenthal, I

12   don't know why you are doing this.  He hasn't

13   offered any evidence that is --

14                MR. ROSENTHAL:  Your Honour, those are

15   my questions.

16                THE CANADIAN COURT:  Thank you.

17                MR. MILNE-SMITH:  No questions on

18   behalf of the EMEA Debtors, Your Honour.

19                MR. FINNIGAN:  No questions.

20                THE CANADIAN COURT:  I guess I don't

21   have to ask if there is any re-examination.

22                MR. ZIGLER:  Great.

23                THE CANADIAN COURT:  Apparently not.

24                THE WITNESS:  And I have been told to

25   be quiet, so...
```



```
 1                    THE CANADIAN COURT:  Very well, thank
 2   you very much, Mr. Sproule.
 3                    THE WITNESS:  Thank you.
 4   -- WITNESS EXCUSED.
 5
 6                    SHARON HAMILTON,
 7                having been duly sworn,
 8          was examined and testified as follows:
 9
10                    MR. ZARNETT:  Good morning, Judge
11   Gross, Justice Newbould.
12                    THE CANADIAN COURT:  Good morning,
13   Mr. Zarnett.
14                    MR. ZARNETT:  Both Courts should have
15   Ms. Hamilton's affidavits.  There is an original
16   affidavit of two volumes sworn April 11, 2014, and
17   the distinction between the first volume and the
18   second volume is evident by the tab numbers.
19   Otherwise, the affidavit has been reproduced at the
20   beginning of each, and there is a reply
21   affidavit --
22                    THE CANADIAN REGISTRAR:  We are missing
23   Volume 1 for His Honour, please.  We have two
24   copies of Volume 2.
25                    THE CANADIAN COURT:  I don't seem to
```



 1    have the second volume of the first exhibit.  I

 2    have got tabs 1 to 11.  Is there something else?

 3                THE CANADIAN REGISTRAR:  It looks like

 4    we have the reply affidavit and the first affidavit

 5    sworn April the 11th.  We'll need a set of both,

 6    thank you.

 7                -- OFF THE RECORD DISCUSSION --

 8                MR. ZARNETT:  I hope the Court has --

 9    the Courts have a two-volume affidavit of Sharon

10    Hamilton sworn April 11, 2014 and a two-volume

11    reply affidavit --

12                THE CANADIAN COURT:  I was hoping we

13    would do all this by electronics, but --

14                MR. ZARNETT:  Starting next week,

15    completely.  A two-volume reply affidavit --

16                THE CANADIAN COURT:  The April 11

17    affidavit will be the next exhibit.  That will be

18    Exhibit 9.

19                THE CANADIAN REGISTRAR:  Exhibit 9,

20    Your Honour.

21                EXHIBIT NO. 9:  Two-volume affidavit of

22                Sharon Hamilton, sworn on April 11,

23                2014.

24                THE CANADIAN COURT:  And the April 25

25    affidavit will be Exhibit 10.



```
 1                    THE CANADIAN REGISTRAR:  Exhibit 10,
 2    Your Honour.
 3                    EXHIBIT NO. 10:  Two-volume affidavit
 4                    of Sharon Hamilton, sworn on April 25,
 5                    2014.
 6                    MR. ZARNETT:  And, Judge Gross, I hope
 7    those have arrived in good order before you?
 8                    THE US COURT:  Yes, I have them, thank
 9    you.
10    EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY
11    MR. ZARNETT:
12                    Q.   Thank you very much.
13                    Ms. Hamilton, you have your two
14    affidavits in front of you there?
15                    A.   I do.
16                    Q.   You swore them both?
17                    A.   I did.
18                    Q.   Any changes that you want to make
19    to them?
20                    A.   No.
21                    Q.   You accept them as your evidence
22    in this case?
23                    A.   I do.
24                    Q.   What is your position with Ernst &
25    Young Inc.?
```



```
1              A.   I am a partner with Ernst & Young

2    LLP in Canada and a Senior Vice-President of Ernst

3    & Young Inc., the insolvency and restructuring arm.

4              Q.   And Ernst & Young is the Monitor

5    of the Canadian Debtors?

6              A.   That's correct.

7              Q.   And I understand you are a

8    chartered accountant?

9              A.   I am.

10             Q.   And a Chartered Insolvency and

11   Restructuring Professional?

12             A.   That's right.

13             Q.   And a licensed Trustee in

14   Bankruptcy?

15             A.   That's correct.

16             Q.   You are not a lawyer?

17             A.   I am not a lawyer.

18             Q.   Congratulations.

19             A.   Thank you.

20             Q.   Prior to the insolvency filings of

21   the Nortel entities in January of 2009, did you

22   personally have any involvement in any matter

23   connected to Nortel?

24             A.   I did not.

25             Q.   And does the Nortel parent
```



1    company, Nortel Networks Corporation, NNC,

2    currently have a Board of Directors?

3                A.    It does not.

4                Q.    And when did that occur?

5                A.    The Board of -- the remaining

6    Board members resigned in the fall of 2012.

7                Q.    Right, and did that involve any

8    change in the Monitor's powers here?

9                A.    It did.

10               Q.    And just briefly describe what

11   happened to the Monitor's mandate?

12               A.    Well, at that point in time all

13   the of the lines of business had been sold.  The

14   company had no operating business whatsoever.  The

15   company's only activities were simply to effect the

16   liquidation and wind-down of the businesses.  And

17   as a result, the remaining Directors indicated a

18   desire to resign from their positions, and so it

19   was determined that the best path to allow that to

20   happen was to have the Monitor's powers expanded.

21               And so there was an order granted which

22   vested certain powers of the Board in the Monitor,

23   and specifically authorized the Monitor to take

24   certain additional activities, including directing

25   the remaining liquidation and directing the



```
 1   allocation process.

 2              Q.   All right.  Those are my

 3   questions, Ms. Hamilton, thank you.

 4              A.   Thank you.

 5   CROSS-EXAMINATION BY MS. BLOCK:

 6              Q.   Good morning, Judge Gross, Justice

 7   Newbould.  Sheila Block for the US Estate.

 8              Good morning, Ms. Hamilton.

 9              A.   Good morning.

10              Q.   At paragraph 34 of your first

11   affidavit, Exhibit 9, you say that NNL is the owner

12   of all NN Technology.

13              A.   Sorry, just give me a moment to

14   get to paragraph 34.

15              Okay.

16              Q.   I'm looking at the second

17   sentence, Ms. Hamilton:

18                   "Pursuant to the MRDA, NN is

19                   the owner of all NN Technology."

20              Do you see that?

21              A.   I do.

22              Q.   At paragraph 66 when you speak of

23   the residual patents in the same vein, you say the

24   patents which NNL retained ownership of; correct?

25              A.   That's correct.
```



```
 1                    Q.   And you have chosen those

 2      descriptions and others throughout about ownership

 3      by NNL of these patents.  You have chosen that

 4      description deliberately?

 5                    A.   That's correct.

 6                    Q.   And you are aware that that's a

 7      central issue in this case?

 8                    A.   I am.

 9                    Q.   And you are aware that the MRDA

10      says that NNL has, quote, "legal title"?

11                    A.   I am aware of that.

12                    Q.   And that the legal title is held

13      in the name of NNL; you are aware of that?

14                    A.   Yes.

15                    Q.   And you know that along with legal

16      title, there can be beneficial title, beneficial

17      ownership?

18                    A.   I generally understand the concept

19      of beneficial ownership.

20                    Q.   Right, and you also know that

21      legal title can be encumbered?

22                    A.   I do.

23                    Q.   By the interests of another?

24                    A.   In a general sense, yes, I do.

25                    Q.   And as you say, you are aware of
```

 Neeson & Associates  W&F

```
 1    the concept of beneficial ownership.  Do you know
 2    that the term "beneficial ownership" appears in the
 3    MRDA?
 4                  A.   I believe it appears in a certain
 5    context, yes.
 6                  Q.   All right.  And let's look where
 7    we find that.  If we could turn up exhibit, trial
 8    Exhibit 21003.  That is the MRDA.  It is the
 9    version that -- we'll put it on the screen for you,
10    Ms. Hamilton, so you don't have to fish around.
11                  A.   I believe I have a hard copy in
12    front of me here.
13                  Q.   And it is the version that has all
14    of the various amendments that were made over the
15    years between late 2004 through December 31, 2008.
16    You understand this document was amended a number
17    of times?
18                  A.   I do.
19                  Q.   And if we start at the second
20    page, we can see the first "whereas":
21                       "Whereas legal title to all NN
22                       Technology is held in the name of
23                       NNL".
24                  Do you see that?
25                  A.   I do.
```

 Neeson & Associates  W&P

```
 1                    Q.   And then we see the next

 2   reference:

 3                    "Whereas each Licensed

 4                    Participant held and enjoyed

 5                    equitable and beneficial ownership

 6                    of certain exclusive rights NT

 7                    Technology for a specified

 8                    territory".

 9                    And NT technology becomes NN

10   Technology, and you understood that the MRDA had

11   that reference to beneficial ownership in the hands

12   of the licensed participants?

13                    A.   I see the reference to beneficial

14   ownership of certain exclusive rights.

15                    Q.   And you know that it is referring

16   to NNI, NNUK, NN France and NN Ireland?

17                    A.   Yes.

18                    Q.   And that is just one of five

19   references to ownership in this set of documents

20   that are in front of you; are you aware of that?

21                    A.   I haven't counted the references.

22                    Q.   Well, let's just look them up.

23   Let's look at Schedule A, which is at page 18 of

24   trial Exhibit 21003.  And you will see that

25   Schedule A in the fourth paragraph that starts
```



1    "Accordingly", at the end of that sentence, it

2    says:

3                    "The fact that the participants

4                    bear the full entrepreneurial risk

5                    of the Nortel business such as the

6                    risks attendant with the substantial

7                    and continuous development and

8                    ownership of the NN Technology".

9                    Do you see that?

10                   A.    I see those words.

11                   Q.    And you know the participants

12    there that they are talking about ownership of NN

13    Technology include the licensed participants, the

14    IEs?

15                   A.    I understand what participants

16    refer to.

17                   Q.    So that is reference number two to

18    the licensed participants' ownership of NN

19    Technology?

20                   A.    Well, I disagree that it says that

21    the participants have ownership, but I see the

22    exact words that you read to me.

23                   Q.    Well, you know the participants

24    include NNI -- let's just stick with our client, if

25    I might.  The participants include NNI?



```
 1                   A.   Yes.
 2                   Q.   And it says:
 3                        "The participants bear the full
 4                   risk attendant with the continuous
 5                   development and ownership of NN
 6                   Technology."
 7                        Are you suggesting that that doesn't
 8        mean that NNI has ownership of the NN Technology?
 9                   A.   I'm not sure what "full
10        entrepreneurial risk" means, and it does say "such
11        as".  It does not in my view say that they have
12        ownership.
13                   Q.   All right.  Let's turn to the
14        third reference that we'll see, and that we will
15        find at page 27 of the PDF, numbers, Justice
16        Newbould, trial Exhibit 21003, and I hope, Justice
17        Gross, you have been given hard copies of what I am
18        referring to?
19                        And if you look at this second
20        addendum, this was an amendment made --
21                        THE CANADIAN COURT:  I just want to
22        stop you for a minute, Ms. Block.
23                        The Schedule A that you just referred
24        to in the fourth paragraph refers to
25        "participants".
```


Neeson&Associates    W&F

```
 1                    MS. BLOCK:  Yes.
 2                    THE CANADIAN COURT:  And then I think
 3      you said, you said that refers to the licensed
 4      participants.
 5                    MS. BLOCK:  It refers to all
 6      participants --
 7                    THE CANADIAN COURT:  I thought you said
 8      it refers to the licensed participants, and I was
 9      taking you up on that because "participants" is a
10      defined term and it includes NNL.
11                    MS. BLOCK:  You were rightly taking me
12      up, Justice Newbould, because it includes NNL, but
13      it also includes the licensed participants.
14                    THE CANADIAN COURT:  I understand.
15                    BY MS. BLOCK:
16          Q.   So if we are at page 27 of the
17      PDF, the second addendum, you will see, this is an
18      amendment that is made December 14th, 2007, and if
19      you look at the second paragraph it says:
20                    "Whereas each Participant" --
21                    which as the judge has just pointed
22                    out includes NNL plus all of the
23                    others, the other estates who are
24                    here -- "holds and enjoys equitable
25                    and beneficial ownership of NN
```



```
 1                  Technology as defined in the Prior
 2                  Agreement."
 3                  Do you see that?
 4                  A.   I see those words.
 5                  Q.   All right, and the words include
 6      "ownership" and it means NNI, for example, as one
 7      of those parties that has ownership of NN
 8      Technology?
 9                  A.   And then it goes on to say "as
10      defined in the Prior Agreement", and so my
11      understanding would be you would have to look at
12      the overall context of the agreement and how the
13      agreement works in terms of what rights the
14      participant actually holds.
15                  Q.   All right.  You know that NN
16      Technology is defined in the agreement?
17                  A.   I believe it is.
18                  Q.   All right.  And so it is the NN
19      Technology as defined in the prior agreement that
20      NNI owns, holds and enjoys equitable and beneficial
21      ownership of?
22                  THE CANADIAN COURT:  Isn't that the
23      issue before me?
24                  MS. BLOCK:  Yes, it is.
25                  MR. ZARNETT:  Your Honours, I don't
```

```
 1   want to jump up all the time, but I am wondering
 2   how useful this interpretive exercise would be.
 3              THE CANADIAN COURT:  Well, I think Ms.
 4   Block started because Ms. Hamilton put in her
 5   affidavit that NNL owns it, and so that is what
 6   gave rise to this cross-examination.
 7              But I certainly understand that Ms.
 8   Hamilton, you congratulated her for not being a
 9   lawyer, and she is not a lawyer, and in the end it
10   is going to be for Judge Gross and for me to figure
11   out what that agreement means.  I understand that.
12   You don't have to keep popping up.
13              MR. ZARNETT:  No, and you won't hear me
14   arguing at the end of the case that NNL owns it
15   because Ms. Hamilton said it.
16              THE CANADIAN COURT:  Does that help
17   you, Ms. Block?
18              MS. BLOCK:  It is not going to slow me
19   down, I'm afraid, Justice Newbould.
20              But you picked up exactly the point I'm
21   making.  The witness says we own it, unequivocally,
22   and I'm just exploring the care she took with the
23   MRDA.
24              BY MS. BLOCK:
25              Q.   If we could go to the fourth
```



1    reference at page 30 of the PDF of trial Exhibit

2    21003, the first amendment to Schedule A, this is

3    the amended Schedule A, and we see the same

4    language in the third paragraph of the

5    participants, which include NNI, bearing the full

6    entrepreneurial risk, et cetera, attendant with the

7    ownership of NN Technology.

8                 And you were aware of that when you

9    swore your affidavit?

10                A.   Well, this appears to me to be the

11   exact same words as we discussed a few minutes ago,

12   and so I would have the same response.  I see those

13   words and the same meaning.

14                Q.   Right, and the participants keep

15   describing their relationship this way; you would

16   agree with that?  This is a new amendment and they

17   keep repeating it?

18                A.   This does appear to be a

19   repetition of the words that you previously read to

20   me.

21                Q.   Then let's go to the third

22   addendum at page 48.  This is the fifth time we see

23   that reference.  This was done January 1st, 2006,

24   and we see the "accordingly" paragraph with the

25   same reference to ownership.



1                    And I say it is dated effective January

2    1st, 2006, but it was actually signed by NNI on

3    December 19th, '08, and by NNUK on January 9, '09,

4    so this is right at the point where the filings are

5    about to be done under the CCAA.

6                    A.    Yes.

7                    Q.    And at the same time in those

8    hectic days the parties entered an MOU, are you

9    familiar with that document, dated December 31,

10   2008?

11                   A.    In a very general sense, yes.

12                   Q.    All right, well, we are going to

13   see ownership two more times in the MOU where the

14   parties talk about their relationship, and if we

15   could turn up the trial Exhibit 44357, the MOU?

16                   Mr. Armstrong:  Ms. Block, do you have

17   a hard copy of that?

18                   BY MS. BLOCK:

19                   Q.    And start at page 1, you will see

20   that the title is "Memorandum of Understanding", it

21   says the MOU, gives us the date, December 31 -- a

22   very intense time -- and then it says in the next

23   line "to provide a record of certain operating

24   arrangements and understandings of NNL and the

25   Licensed Participants"?

Neeson&Associates    W&F

```
 1              So these are all the participants, NNL
 2    and the licensed participants, and they are giving
 3    us a record of their operating arrangements and
 4    understandings.
 5              And then if you drop down to paragraph
 6    2 at the bottom of that page, you will see that
 7    they refer to in the first line the Cost Sharing
 8    Agreement and the 1992 agreement, so they are going
 9    back and describing the arrangement they had there,
10    and in the last five lines at "notwithstanding" on
11    the right-hand side, they go on to say:
12                        "Notwithstanding the
13                        termination of the 1992 Agreement,
14                        the fully vested and fully paid
15                        rights of each Licensed Participant
16                        in and to the NN Technology (as
17                        defined therein) granted under the
18                        1992 Agreement survived the
19                        termination of the 1992 Agreement,
20                        and each Licensed Participant
21                        continues to hold such exclusive
22                        rights, as stated in the recitals
23                        [...]"
24              And if we move over to paragraph 3,
25    after having given us the history of the 1992
```



```
 1   agreement and that each of the participants

 2   continued to have fully paid-up rights to the

 3   technology, it moved to the MRDA.  You will see

 4   that at the right-hand side of the first line

 5   talking about the MRDA.

 6              And then in the last four lines it goes

 7   through in that paragraph all of the various

 8   iterations of the MRDA that are in the exhibit we

 9   looked at before, all those amendments and addenda.

10              And it says:

11              "The 2004 Agreement also

12              memorializes the agreements of NNL

13              and the Licensed Participants as to

14              the development and deployment of

15              existing and future NN Technology

16              and ownership of the NN Technology,

17              with NNL holding legal title

18              thereto."

19              Do you see that?

20              A.   I see those words, yes.

21              Q.   So it is specifically saying NNL

22   has legal title and the agreement, the MRDA

23   memorializes the ownership of NN Technology with

24   NNL having the legal title?

25              A.   Well, again, I read this sentence
```



```
 1    as saying that you have to look to the 2004

 2    agreement with respect to these issues.

 3                    Q.   Well, let's just go down and see

 4    what else they say in paragraph 6.  Five lines up

 5    from the bottom it starts:

 6                    "The Participants believe that,

 7                    through the date hereof under the

 8                    prior formula, and going forward

 9                    under the new formula as amended in

10                    the Third Addendum to the 2004

11                    Agreement [...] their respective

12                    ownership interests in the NN

13                    Technology and their respective R&D

14                    Activity have been and will be

15                    adequately and fairly compensated,

16                    as envisioned in the APA discussions

17                    referenced in Paragraph 5 [...]"

18                    So you would agree with me that here it

19    is talking about all of the participants, including

20    the licensed participants, having respective

21    ownership interests in the technology?

22                    A.   I see those words, and again, I

23    think you have to look at the entire context of the

24    agreement and what particular ownership interest

25    they are referring to, which appear to be licensed
```



 1   rights.

 2              Q.   All right, well, stay with me if

 3   you will and give me this much, Ms. Hamilton, if I

 4   can get you to agree with this.

 5              It shows that there are some ownership

 6   interests --

 7              THE CANADIAN COURT:  What do you mean

 8   "it shows"?

 9              MS. BLOCK:  It --

10              THE CANADIAN COURT:  This is a

11   document, a Memorandum of Understanding.

12              BY MS. BLOCK:

13              Q.   It reflects the agreement of the

14   parties as they restate all their arrangements,

15   their operating arrangements and understandings and

16   set them down --

17              THE CANADIAN COURT:  Ms. Block, I have

18   to stop you again, because this doesn't create --

19   it is not an agreement and it says it creates no

20   obligations.

21              MS. BLOCK:  No, it is a document that

22   all of these parties put together to provide a

23   record of the arrangements and understandings of

24   NNL and the licensed participants, so it is a

25   collective declaration.



```
 1                    THE CANADIAN COURT:  It is, yes, I

 2    understand that.  I thought you said so this is an

 3    agreement.  That is why I again took you up on it.

 4                    MS. BLOCK:  It is an MOU, not an MOA,

 5    sorry.

 6                    BY MS. BLOCK:

 7                    Q.   But it indicates that -- but the

 8    section I'm reading, Your Honour, and Ms. Hamilton,

 9    maybe you can see this as well, it is talking about

10    what had been agreed under the 2004 agreement

11    relating to the respective ownership interests in

12    the NN Technology.

13                    THE CANADIAN COURT:  What is the

14    question?

15                    BY MS. BLOCK:

16                    Q.   So I am suggesting to you that it

17    indicates the 2004 agreement reflects ownership

18    interests in the licensed participants.

19                    A.   Again, my only interpretation of

20    this sentence is that it refers you to the actual

21    agreements to determine what those interests are,

22    and I can't say anything more about it than that.

23                    Q.   But you would agree with me it

24    reflects that there are ownership interests in the

25    licensed participants, that the five parties have
```



```
 1   put it down in writing this is what we had agreed

 2   and it reflects our respective ownership interests?

 3                 A.   It refers to some sort of

 4   ownership interest, which again I believe you have

 5   to go back to the original agreement to understand

 6   that more fully.

 7                 Q.   Well, I'll take some sort of

 8   ownership interest.  We have legal title interest

 9   that we know is in NNL; correct?

10                 A.   That is correct.

11                 Q.   And you have told me you also

12   understand there can be beneficial ownership

13   interests?

14                 A.   In a general sense, yes.

15                 Q.   All right, and so the some type of

16   ownership interests, there is some type of

17   ownership interests in the other participants?

18                 THE CANADIAN COURT:  What is the

19   question?

20                 BY MS. BLOCK:

21                 Q.   Do you agree with that?

22                 THE CANADIAN COURT:  Agree with what?

23                 BY MS. BLOCK:

24                 Q.   That there are some type of

25   ownership interests in the other participants, and
```



```
 1   therefore, why do you say NNL is the owner?  That

 2   is the point, but I think that we have looked at

 3   that, sir.

 4              Now, in filing your sworn affidavit,

 5   you did not take into account any of these other

 6   references; is that right?

 7              A.   I would not say that.

 8              Q.   You took them all into account?

 9              A.   Well, I have generally looked at

10   the MRDA over the past five-and-a-half years.

11              Q.   All right.  And when you came to

12   this declaration of all five parties, that there

13   were respective ownership interests, you just

14   ignored it?

15              A.   No.

16              Q.   Now, you can't say why the

17   licenses were in existence in the first place, can

18   you?

19              A.   If your question is was I involved

20   in these agreements, no, I was not.

21              Q.   All right, and you don't have any

22   knowledge of why the licenses were in place in the

23   first place?

24              A.   Well, I can give you some general

25   -- very general understanding.
```



```
 1                    Q.   Well, once E&Y was appointed
 2    Monitor, you had access to Nortel personnel?
 3                    A.   That's correct.
 4                    Q.   You had access to all their files?
 5                    A.   That's correct.
 6                    Q.   And you became aware that the
 7    different estates developed various of these
 8    patents?
 9                    A.   I am aware that Nortel as an
10    overall group develop these patents.
11                    Q.   So that NNI did a lot of R&D, EMEA
12    did R&D, patents came from different entities?
13                    A.   Well, I am aware that there were
14    R&D centres located throughout the world.
15                    Q.   Let's go to an E&Y document, trial
16    Exhibit 50764, it is a 2008 document.  And it is a
17    Transfer Pricing Method Analysis done by --
18                    A.   Do you have a hard copy for me?
19    Sorry to interrupt.
20                    Q.   Yes.  And this is a document, as
21    you will see in the first line, it is a Transfer
22    Pricing Method Analysis, that was prepared by Ernst
23    & Young LLP on behalf of Nortel Networks Limited
24    and Nortel Networks Inc.  It is for use in the APA
25    application with both the CRA and the IRS and you
```



1   are aware that E&Y did transfer pricing work for

2   Nortel?

3                A.   Well, I have never seen this

4   particular document.  I am aware that Ernst & Young

5   prior to the filing did some transfer pricing work

6   for Nortel.

7                Q.   Right, and you are aware from your

8   role as working for the Monitor that there was

9   advance pricing discussions with the CRA and the

10  IRS and Inland Revenue to discuss the transfer

11  pricing arrangements that were put in place by the

12  participants?

13               A.   Very generally, I am aware that

14  there were discussions.  I had no involvement in

15  those discussions.

16               Q.   And if we turn to page 6 in this

17  Ernst & Young analysis, which was --

18               MR. ZARNETT:  Your Honour, I'm sorry to

19  interrupt, but I wonder if my friend could help us

20  with whether this is the complete document or maybe

21  a date.

22               MS. BLOCK:  It is --

23               MR. ZARNETT:  It seems to start at

24  section 3.

25               MS. BLOCK:  So it is an excerpt that I



1   will be hooking into one of the other documents we

2   have already seen, Your Honours, where as you can

3   see from the first line E&Y was preparing this to

4   be used by NNL and NNC in their APA submissions

5   with the tax people, and we'll see that in a

6   moment.

7            And it is -- that APA was done October

8   31, 2008.  So this is in the 2008 era.  It is I

9   believe dated 10/28/08.

10           BY MS. BLOCK:

11           Q.   And page 6 you will see that there

12  is a chart that gives us the head count.  You can't

13  get it up?

14           Have you got that chart, Ms. Hamilton?

15           A.   I do.

16           Q.   And -- oh, this is the full

17  document, apparently.

18           THE CANADIAN COURT:  I don't need it.

19           BY MS. BLOCK:

20           Q.   And you will see the reference to

21  the head count for R&D at the end of 2007; do you

22  see that?

23           A.   I do.

24           Q.   And you will see that NNL had

25  4,294 people doing R&D?



```
 1                    A.   I see that number, yes.

 2                    Q.   And NNI was pretty close behind at

 3     3,554?

 4                    A.   I also see that number, yes.

 5                    Q.   And if you turn to the next page,

 6     you will see that Ernst & Young is quoting the OECD

 7     guidelines about what tangible property

 8     is -- sorry, intangible property, thank you,

 9     Mr. Zarnett.

10                    And it includes rights to use assets

11     such as patents; do you see that?

12                    A.   I see the heading "Intangibles",

13     yes.

14                    Q.   And it also includes intellectual

15     property?

16                    A.   Yes.

17                    Q.   And you understood that the

18     licence participants had exclusive non-royalty

19     bearing perpetual licence rights within their

20     territories to use assets such as patents, use the

21     NN Technology?

22                    A.   Well, as I said, I had nothing to

23     do with this report.  I have never seen it before.

24     And I can tell you I am not a tax person, nor a

25     transfer pricing expert, so I can't speak to
```



 1   anything about these types of transfer pricing

 2   documents.

 3             Q.   Well, what I am going to suggest

 4   to you, Ms. Hamilton, is that this is the

 5   information that was available to you as you had

 6   access to all of Nortel's people, all of Nortel's

 7   files, all of their tax submissions, all of your

 8   own related party Ernst & Young's work done for

 9   Nortel on these things.  You had access to all

10   that; correct?

11             A.   So technically, yes, I do have

12   access.  So you know -- but let me note that

13   speaking in practical terms, Nortel is a pretty

14   huge company.  The volume of documents that would

15   exist are massive.  It wouldn't be possible for one

16   person like me in my lifetime to go around

17   reviewing every single document in existence.

18             My role during most of the first three

19   years of the filing was to supervise the sales

20   transactions, and so I was very focussed on simply,

21   you know, getting out in the market, executing on

22   the sales transactions, generating the best value

23   possible in those transactions.

24             In that respect, I would have asked for

25   and looked at only documents that I believed were



```
 1   relevant to generating those sale proceeds.  I had

 2   no reason to request transfer pricing documents

 3   which are irrelevant to a sales transaction and

 4   which I know nothing about.

 5              THE CANADIAN COURT:  Ms. Block, can you

 6   just tell me when it would be convenient to take

 7   the morning break.

 8              MS. BLOCK:  Oh, sorry, I forgot all

 9   about that.

10              THE CANADIAN COURT:  You are having so

11   much fun.

12              MS. BLOCK:  Let's take the break.

13              THE CANADIAN COURT:  Is it

14   satisfactory, Judge Gross, to take the morning

15   break?

16              THE US COURT:  It is fine with me, sir.

17              THE CANADIAN COURT:  All right, we'll

18   take twenty minutes.

19   -- RECESS AT 10:50 A.M.

20   -- UPON RESUMING AT 11:13 A.M.

21              BY MS. BLOCK:

22              Q.   We were looking at the Ernst &

23   Young transfer pricing analysis at page 7, and you

24   will see that Ernst & Young quote the OECD pricing

25   guidelines -- transfer pricing guidelines as saying
```



```
 1    intangible property includes rights to assets such

 2    as patents, intellectual property, and it goes on

 3    to say in respect of Nortel:

 4                    "[...] each of the IEs is

 5                    actively involved in activities

 6                    which contribute valuable technology

 7                    (i.e., patents [...]).  The

 8                    Integrated Entities produce R&D

 9                    related intangibles [...]"

10                    And you understand that is intangible

11    property that is being talked about by E&Y;

12    correct?

13                    A.   Well, I am reading it for the

14    first time, but I can see what you are referring to

15    here.

16                    Q.   And if -- I take your point that

17    you can't read every document in Nortel, but

18    obviously in this case, the issue of the rights of

19    the various estates in respect of the intellectual

20    property was a key issue; would you agree with

21    that?

22                    A.   It certainly is a key issue.

23                    Q.   And you would want to have access

24    to the people who knew about the licensing?

25                    A.   Correct.
```



```
 1                      Q.   And access in your own group --
 2                      THE CANADIAN COURT:  Yeah, I am not
 3    sure where this is going, Ms. Block, but let me
 4    just -- to me, most of this appears to be a waste
 5    of time, and let me explain it.
 6                      Even if you get Ms. Hamilton to admit,
 7    which I rather doubt you will, but even if you get
 8    her to admit that NNI owned the intellectual
 9    property in the US, that won't influence me.  I
10    realize expert valuers have said in reply, they
11    read the MRDA a different way.  That won't
12    influence me.  I'm sure it won't influence Judge
13    Gross.
14                      So I don't know where we are going with
15    all this.
16                      MS. BLOCK:  Well, the point I am trying
17    to show, Your Honour and Judge Gross, is the point
18    that I opened with about the role of the Monitor.
19                      THE CANADIAN COURT:  Well, I understand
20    that too, but the Monitor -- the Monitor in this
21    case is looking back, so it is hearsay.  Just like
22    Mr. Ray's evidence, a lot of it is hearsay.
23                      How does that help us?  What does it
24    matter what Ms. Hamilton thinks about some
25    agreement or what the Monitor says?  How does that
```



```
 1   help us as to what the agreement means?

 2             MS. BLOCK:  The construction of the

 3   agreement is in the province of the Courts, and I

 4   don't suggest to the contrary and I don't suggest

 5   that if Ms. Hamilton confesses on the stand, I can

 6   sit down and it is over.  Of course, I have a

 7   harder audience than Ms. Hamilton to persuade.  I

 8   understand that.

 9             THE CANADIAN COURT:  You are good, Ms.

10   Block.  I'm not sure you are good enough to get Ms.

11   Hamilton to admit it.

12             MS. BLOCK:  But on the role of the

13   Monitor issue, Judge Gross approved a 4.5 billion

14   dollar transaction in which the Monitor says the

15   estate that he was statutorily obliged to ensure

16   the best interests of and its creditors, that they

17   say no, there is no value there for the Canadians

18   -- except for the Canadians, there is no value

19   there.

20             So if the Monitor has access to

21   information which is to the contrary and as an

22   officer of the Court, because this Monitor went

23   down to Delaware with the imprimatur of this Court

24   and the order of the Court saying this is my

25   Officer, give my Officer assistance, there is a
```



```
1   duty of candour and honesty and transparency, and I
2   am exploring that and I want to pursue it with this
3   witness.
4                THE CANADIAN COURT:  Well, how does it
5   affect the issue here?
6                MS. BLOCK:  If the Monitor was silent,
7   knowing that huge amounts of money were being spent
8   by all the estates to sell a Canadian-only asset,
9   that would be unacceptable behaviour.
10               THE CANADIAN COURT:  And how does that
11  help us decide what the allocation should be?
12               MS. BLOCK:  If -- well, we have to get
13  over the threshold issue that there is no interest
14  in the --
15               THE CANADIAN COURT:  I understand that,
16  but let's assume everything you say is right, and
17  they acted in complete bad faith.  Let's assume
18  that.  How does it help us decide what the
19  allocation is?
20               MS. BLOCK:  It is going to undermine
21  the threshold position that is being put by the
22  Canadian estate and by the Monitor that there is no
23  value in these licenses, that they were all spent.
24  If this is -- if you determine that this is just a
25  mere litigation contrivance, you are not going to
```

Neeson&Associates     W&F

```
 1    follow that line.  You will still have to determine

 2    the allocation.

 3              THE CANADIAN COURT:  I am not

 4    suggesting they did act in bad faith.  I am just

 5    saying on the assumption that you want to make, it

 6    is still going to come down to what the agreement

 7    means.

 8              MS. BLOCK:  Yes, I accept that.

 9              THE CANADIAN COURT:  Okay, I am just

10    letting you know so far as I'm concerned that I'm

11    having real difficulty with the relevance of a lot

12    of this questioning.

13              BY MS. BLOCK:

14              Q.   All right.  Let me turn to the --

15    well, I was about to ask you in terms of transfer

16    pricing, you knew transfer pricing was an issue in

17    this case?

18              A.   At what point in time?  At what

19    point in time?

20              Q.   Yes, if you could keep your voice

21    up --

22              A.   I'm sorry, I know.

23              Q.   We can't hear you.  Well, we see

24    that there was a transfer pricing report October

25    31, '08, if I can have that turned up, Exhibit
```



```
 1    TR22078.  And it is October 31, '08.  It is the

 2    report that the E&Y report that we just looked at

 3    was plugged into.  And if we could go to Exhibit

 4    TR22078, so this is October 21, '08, and if we

 5    could go to page 59 of the PDF.

 6              A.   May I have a hard copy?

 7              Thank you.

 8              Q.   And you will see that under the --

 9    that there is a chart there that shows the IP, the

10    R&D investment in 2007 with the US and Canada

11    pretty close, and then underneath the information

12    that Nortel was providing to the tax department was

13    that:

14              "All intellectual property

15              created from the investment in R&D

16              by the IEs is registered by NNL.

17              Each IE maintains an economic

18              ownership in the IP."

19              So this is documentary evidence that

20    you would have had access to and knowledge of as

21    the Monitor or access to as the Monitor of the

22    ownership issue that became very important in this

23    case; correct?

24              A.   Well, I wouldn't characterize it

25    that way.  I would say that the initial order would
```



```
 1    have given me the right to request access to a

 2    document such as this, but I have never requested

 3    access to a transfer pricing document such as this,

 4    nor have I ever looked at it, because I didn't have

 5    any reason to.

 6              Q.   Was one of the people on your team

 7    Sean Kruger?

 8              A.   Sean Kruger is a tax professional

 9    in Ernst & Young.

10              Q.   Was he working with the Monitor in

11    this case?

12              A.   Sean Kruger was asked at some

13    point in time to look at what was happening with

14    respect to certain transfer pricing issues and to

15    provide the Monitor, primarily myself and Murray

16    McDonald, with a very general update as to what was

17    going on.

18              Q.   And he attended certain

19    depositions in the case?  Were you aware of that?

20              A.   I believe -- I understand he did

21    have a deposition.

22              Q.   And if we could turn up

23    TR48622.01, it is another E&Y-created document.

24    This is the cover email, and you will see there is

25    a reference at the top that Sean Kruger is
```



 1   obtaining it as a -- he is getting a copy, there we

 2   go, Kruger.  It is dated October 29, 2010.  So this

 3   is during your engagement as Monitor; correct?  You

 4   are already Monitor now?

 5              A.    That is correct.

 6              Q.    And you will see the subject is

 7   "Nortel Networks Limited-2009 Canadian transfer

 8   pricing report FINAL".  He is involved with that

 9   process?  You had to prepare a transfer pricing

10   report?

11              A.    I see his name on the email, yes.

12              Q.    And if you turn to page 4 of the

13   PDF, you will see -- sorry, if we could get the --

14   I'm sorry, the 48622.02, which is the actual

15   transfer pricing report, and page 4 of the PDF.

16   This is the email, so it is the next document.  It

17   is TR48622.02.  It is the 2009 transfer pricing

18   report.  And if you turn to page 1 of that

19   document, you will see -- sorry, go to page 4 of

20   the PDF, if you would, page 1 of the actual

21   document.  Sorry, Your Honour, it is further down

22   on the bottom of the page, it says:

23                   "The Nortel Group, of which

24                   Nortel Networks Corporation is the

25                   ultimate parent, operates under the



1              residual profit split method whereby

2              certain affiliates, including NNL

3              and other IEs are the primary owners

4              of intangibles developed by the

5              Nortel Group and bear the risk of

6              development."

7         So this is a document that is made

8    under the Monitor's watch with Mr. Kruger's

9    involvement and it is saying something different

10   than you are saying to the Courts today; correct?

11              A.   Well, let me just say this.  I

12   mean, it has always been my understanding that NNL

13   is the owner of the patents.  It has registered

14   title to the patents.  In my experience in these

15   types of situations, ownership is usually the

16   pretty significant factor in determining whose

17   asset it is.

18              I also understood that the MRDA

19   existed.  I understood that that was the governing

20   document that set out any rights that were given to

21   any of the other parties pursuant to the licence

22   and that was the document that was relevant for

23   purposes of the issue here.

24              I have not reviewed any of these

25   transfer pricing documents because my understanding



```
 1    was that the MRDA is the governing document.
 2                    Q.    We showed a number of other
 3    documents in our opening.  Did you watch our
 4    opening, the openings in this case?
 5                    A.    I watched a portion of them.
 6                    Q.    Right, did you see the US opening?
 7                    A.    I saw a portion of it.
 8                    Q.    Right.  There were a number of
 9    other documents in the opening where we showed that
10    Nortel was saying, NNL was saying the same sort of
11    thing, the IEs have ownership interest in the
12    property, in the intellectual property, and --
13                    A.    So let me clarify.  I listened to
14    the opening.  The video was not working, so I had
15    no ability to actually see any documents, but I
16    listened to some of the submissions being made in
17    the opening.
18                    Q.    And you have seen this document
19    now from 2009 that Sean Kruger was involved in
20    preparing where the Monitor is in control and it
21    says that the IEs are the primary owners of the
22    intellectual property, and yet you come here to say
23    there is no ownership interest, no interest of
24    value that these estates have?  Have I got -- I
25    just want to make sure I have got the clear
```



1    division that we have here.

2              A.   As I said to you, that my

3    understanding has and always has been that the MRDA

4    is the governing document with respect to ownership

5    and licensing rights that have been given to the

6    parties, and I have never looked at these transfer

7    pricing reports because I have never understood

8    them to be relevant to the issue of what the

9    licensing rights granted to other parties was.

10             Q.   In paragraph 68 of your first

11   affidavit, Exhibit 9, you say that efforts

12   commenced in early 2010 to consider the means to

13   maximize the value of the residual patent

14   portfolio?

15             A.   That is correct.

16             Q.   And you understood why these

17   efforts commenced, because just like the line of

18   business sales, each estate you understood had a

19   fiduciary duty to maximize value in its own estate

20   to pay its own creditors?  Did you understand that?

21             A.   That's correct.

22             Q.   And the efforts which you say

23   commenced in early 2010 to maximize value were

24   undertaken cooperatively by each of the estates to

25   get money in the door?



```
1                      A.    That's correct.

2                      Q.    So they could discharge their

3      fiduciary duties?

4                      A.    That is correct.

5                      Q.    And no one suggested that NNI or

6      EMEA should stay out of this process, the residual

7      patent sale process, and everything that led up to

8      it because it all belonged to NNL; would you agree

9      with that?

10                     A.    No, I don't agree with that.  I

11     actually did suggest it at one point.

12                     Q.    You suggested that there was no

13     value in any of these other estates in the residual

14     patents and nobody else should be involved in these

15     sales?

16                     A.    Well, that was no the question you

17     asked me.  You asked me whether it was suggested

18     that the US or EMEA should not be a part of that

19     process.

20                     Q.    All right.  If they have a right

21     to the proceeds, have an interest in the property

22     being sold, the rights of value being included in

23     the sale, they should be involved, don't you think?

24                     A.    But I think that their rights are

25     to be established in this trial.  I don't think
```



1    that they were established at that point.

2              Q.    But I thought you just a moment

3    ago said you thought they shouldn't be involved?

4              A.    So let me clarify.  At the time

5    that we were getting into the sale process and

6    beginning to think through documentation, it was

7    actually my suggestion that, you know, this was

8    different than the line of business sales and that

9    perhaps only NNL needed to be a party to the sale

10   agreement because we were selling patents that all

11   belonged to NNL.

12             And as a result, I asked counsel to the

13   Canadian Debtors to speak to Cleary Gottlieb,

14   counsel to the US Debtors, about this.

15             Q.    So you had -- you talked to

16   somebody who talked to somebody in the US; that is

17   the evidence you are giving us?

18             A.    Well, I can go on to tell you what

19   I know specifically happened after that.

20             Q.    Well, let's just look at what

21   happened in relation to these properties.  And I am

22   going to suggest to you that had you declared that

23   there was no interest, that all of the output of

24   the residual patent sales belonged to NNL, that

25   there would have been vociferous objection by NNI



1    and the EMEA entities and by their creditors?

2                    A.    So first of all, I think if you

3    actually look at our allocation position, it is not

4    exactly zero.  There is a small allocation that is

5    proposed to the US Debtors, and so I don't think it

6    is fair to say no allocation.

7                    Q.    All right, well, let's just walk

8    through what actually happened and test the

9    veracity of that response.

10                    Before there was any residual patent

11   sale process, feelers had been -- before feelers

12   had been put out for a patent sale, you tell us in

13   paragraph 69 that all the parties, including NNI

14   and EMEA, worked on the creation of a new licensing

15   business to licence the residual IP, this is IPCo;

16   correct?

17                    A.    Correct.

18                    Q.    And that was a business where the

19   residual patents would be licensed for money and

20   where litigation could be brought to stop

21   infringement and get the litigation damages?

22                    A.    Yes, I mean, I would just like to

23   clarify that when you say that we worked on

24   creating a new licensing business, we considered

25   the creation of a licensing business.  We didn't



1    actually end up creating it.

2             Q.   Let's just examine this

3    consideration, because indeed even before the

4    insolvency filing, earlier in 2008 John Veschi had

5    been hired to set up a business like this to

6    monetize the patent portfolio of Nortel?

7             A.   So I met with Mr. Veschi within I

8    am going to say, you know, the first couple of

9    weeks, perhaps even days after the filing, and you

10   know, he asked for the meeting with me to introduce

11   himself and talk about what he was doing.

12             As he described it to me in that

13   meeting, he had very recently been employed by

14   Nortel, and he was brought in to consider how

15   Nortel might generate some licensing revenue from

16   its patent portfolio.

17             He did not describe it as creation of

18   an IPCo, and I can tell you as we discuss this, the

19   creation of the IPCo as was later contemplated in

20   the case is not something that would have been

21   practical or something desired when Nortel was an

22   operating company.  You have to appreciate that in

23   this industry, as an operating company, if you take

24   steps to go out and try to assert your patents

25   through litigation against your competitors, you



 1   can pretty much expect that they are going to

 2   counter-sue.

 3              And so you need to be very careful

 4   around what you do.

 5              So a full-blown IPCo like this was not

 6   something that I understood management was

 7   considering at that point in time.  They had

 8   brought him in to see if he could generate some,

 9   you know, additional licensing revenue, but it was

10   nowhere in the scope of IPCo.  IPCo only became

11   something that would be considered after the lines

12   of businesses were sold and there was no operating

13   business, and therefore, you know, the possibility

14   of countersuits were no longer relevant.

15              Q.   So could we see Exhibit TR11150.

16   And could you go to the next page.

17              This happens to me on my iPad all the

18   time.  How do you put it in the other -- you guys

19   can do that, right?

20              Okay, great.

21              "IP Aspects of Residual Co", and this

22   is a presentation July 8, 2009, by Mr. Veschi and

23   Ms. Gillian McColgan.  Do you know Ms. McColgan as

24   well ?

25              A.   I do.

Neeson & Associates   W&F

```
 1                    Q.   All right, and they were -- you
 2   didn't look at any of these slide decks; he was
 3   making presentations on the IP aspect of Residual
 4   Co; did you ever hear about that?
 5                    A.   Yes, could I have a hard copy of
 6   the full presentation.  There were so many
 7   presentations that were made in the course of
 8   Nortel that until I look at it, it is very
 9   difficult to say whether I have looked at this
10   specific one before.
11                    Q.   All right, I don't think I have a
12   hard copy of it, because I wasn't intending to put
13   it to you, until you told me there was nothing to
14   -- well, I don't want to characterize your
15   evidence.  Until your last long answer.
16                    I just wanted to make sure that you
17   understood Mr. Veschi had been preparing
18   presentations to the management about monetizing
19   the IP before the insolvency; correct?
20                    A.   Well, this is dated July 8th,
21   2009.  This is during the insolvency.
22                    Q.   All right.
23                    A.   And this is after the point in
24   time in which Nortel had entered into an agreement
25   to sell CDMA and publicly announced that its
```

 Neeson&Associates  W&P

1    intention was to sell all of its businesses and
2    wind down.

3              Q.   All right.  Absolutely correct, it
4    is in 2009.  It is before the sale of any IP, and
5    indeed, before the sales of -- it was before the
6    sales of any of the lines of business?

7              A.   No, as I said, this is after the
8    period of -- this is after the date in which the
9    stalking horse deal for the CDMA line of business
10   had been executed, made, you know, publicly
11   announced and after the period of time in which
12   Nortel had publicly announced that it was in --
13   taking steps to market and sell all of its lines of
14   business.

15             Q.   So let's go back to IPCo, and
16   could we have the Monitor's 25th report, Exhibit
17   TR49824, and go to page 22.

18             A.   Again, do we have a hard copy?

19             Q.   Yes, someone is going to get you
20   one.

21             A.   There is so many reports.  It is
22   -- I don't have it memorized which number
23   corresponds to which issue.

24             Q.   Maybe over the lunch break, I'll
25   pile up all the ones right here that are coming up.



1    I'm sorry for the delay, Your Honours and Ms.

2    Hamilton.

3               THE CANADIAN COURT:  Well, I am pulling

4    it up on my hard drive, and it takes about the same

5    amount of time.

6               MS. BLOCK:  Right.

7               BY MS. BLOCK:

8               Q.   So the only -- and I think I can

9    do this without you seeing the hard copy, Ms.

10   Hamilton.  The only point was that in that report

11   the Monitor reported to the Courts that Global IP

12   had been jointly engaged by NNL, NNI, NNUK and

13   Nortel Networks Ireland; do you remember that?

14              A.   Yes.

15              Q.   All right, and that was all of the

16   parties hiring Global IP in relation to the IPCo

17   project?

18              A.   Not specifically in relation to

19   IPCo, no.  Global IP was initially retained to

20   conduct what was described as some phase one work

21   which was, you know, again, I'm not a patent

22   expert, so you know, to I guess paraphrase it, to

23   conduct some background work on the patents.  It

24   was to review and evaluate the patent portfolio, to

25   create a patent database, to -- you know, when I



1    say review and evaluate, to start to understand

2    what was covered by the patent portfolio and the

3    applicability of that out in the market.

4              Those were tasks that we viewed as

5    being important and essential background work that

6    needed to be done, no matter how we chose to

7    monetize the patent portfolio, whether that was

8    going to be ultimately through a sale of the

9    patents or through the creation of an IPCo.

10             So it was not specifically with respect

11   to IPCo.

12             Q.   Well, it was in relation to IPCo

13   or --

14             A.   Or.

15             Q.   -- the sale of the patents?

16             A.   Or the sale of the patents.

17             Q.   Or the establishment of IPCo and

18   the sale of IPCo; isn't that right?

19             A.   Yes.  It was background work to

20   all of those.

21             Q.   So when you say it wasn't in

22   relation to IPCo, you mean it was not solely in

23   relation to IPCo; it was partly IPCo, partly the

24   establishment and sale --

25             THE CANADIAN COURT:  Well, but she



1   didn't quite say that, Ms. Block.

2             MS. BLOCK:  Sorry.

3             THE CANADIAN COURT:  She said it was

4   not specifically with respect to IPCo.  That is

5   what I am reading here.

6             BY MS. BLOCK:

7             Q.   I don't want to play word games,

8   and I am sure you don't either.

9             THE CANADIAN COURT:  I understand.

10            BY MS. BLOCK:

11            Q.   But clearly IPCo was one of the

12   things that they were being specifically hired for?

13            A.   Yes, they were there to conduct

14   background work with a view to us being able to

15   consider the different monetization options.

16            Q.   All right.  And let me show you a

17   document we have created.  It is a demonstrative.

18   Can you hand that up and give one to Ms. Hamilton.

19            And, Your Honours, we have created this

20   because we have a mountain of trial exhibits which

21   deal with IPCo that would kill many trees and they

22   are also -- they have confidential information that

23   certain parties don't want in the public record.

24            So rather than get into any of that

25   debate here, I have just tried to summarize, Ms.



```
 1   Hamilton, on the first page that in terms of this
 2   project, we had Lazard, which is a financial
 3   advisor, advising in relation to IPCo?
 4              A.   Among other things, yes, Lazard
 5   was advising.
 6              Q.   Global IP, Mercer, right?
 7              A.   Yes.
 8              Q.   And there was a steering committee
 9   established that considered, among the sale of
10   patents and the steps with IPCo and sale of IPCo,
11   it was considering the running of IPCo; correct?
12              A.   That is correct.
13              Q.   And that included Mr. McDonald who
14   you have told us is the individual who is --
15              THE CANADIAN COURT:  Just so I
16   understand, Ms. Block, did you say the steering
17   committee was set up to deal only with IPCo?
18              MS. BLOCK:  No, it was to deal with
19   three options.
20              THE CANADIAN COURT:  To deal generally
21   with the monetization?
22              MS. BLOCK:  Yes.
23              THE CANADIAN COURT:  Thank you.
24              MS. BLOCK:  One version of which was
25   IPCo -- well, actually two involved IPCo and one
```



1    was the sale.

2                    BY MS. BLOCK:

3                    Q.   So if you go through the steering

4    committee, these are in terms of the personnel such

5    as Mr. McDonald, he was the top person at the

6    Monitor?

7                    A.   So Mr. McDonald is my partner and

8    he is the overall lead engagement partner for

9    Nortel.

10                   Q.   Right, and you have to have an

11   individual who is responsible at the top and that

12   is Mr. McDonald; correct?

13                   A.   In what context are you saying an

14   individual responsible at the top?

15                   Q.   I thought I was quoting your

16   deposition testimony, but I won't drag it out, if I

17   have got it wrong.

18                   A.   He is President of Ernst & Young

19   Inc.

20                   Q.   Right, and you have to name an

21   individual, correct, to have overall responsibility

22   and that is Mr. McDonald?

23                   A.   Well, in the court order, Ernst &

24   Young Inc. is the Monitor.  It is not specifically

25   personally Murray McDonald.



```
 1                    Q.   Right.  But he was the individual
 2   who in your organization was named as the person
 3   responsible for this file; isn't that right?
 4                    A.   Murray is absolutely the partner
 5   that has been leading this file.
 6                    Q.   All right.
 7                    A.   Right from the start.  I have been
 8   working very closely with him, given the size and
 9   number of issues to be dealt with.
10                    Q.   And John Ray was the head of the
11   US Estate?
12                    A.   John Ray was the principal officer
13   in the US Estate.
14                    Q.   And Jowitt, tell Their Honours who
15   Jowitt was?
16                    A.   Robin Jowitt was with Ernst &
17   Young in the UK, so he was representing the EMEA
18   Debtors.
19                    Q.   Right, and he is a senior person?
20                    A.   I believe he is a partner at Ernst
21   & Young in the UK or was.
22                    Q.   And we are going to meet
23   Mr. Binning.  He was high up in the Nortel NNL
24   organization?
25                    A.   Yes.
```



```
 1                    Q.   And John Riedel, who was he?

 2                    A.   He was the Chief Strategy Officer

 3   for Nortel.

 4                    Q.   And we have already been

 5   introduced to Mr. Doolittle who was VP tax, and was

 6   he the CFO at this point?  Or was it Mr. Binning?

 7                    A.   Mr. Doolittle's title changed a

 8   few times over the proceedings, so he was a senior

 9   officer --

10                    Q.   He was a senior Officer?

11                    A.   -- in Nortel.  I can't recollect

12   his exact title.

13                    Q.   And then we have Mr. Tay who was

14   acting from Ogilvy Renault for the Canadian estate

15   and Mr. Bromley who was acting for the US Estate?

16                    A.   Correct.  Now, I would just like

17   to note that when Nortel proposed the steering

18   committee be set up, I mean, these individuals were

19   chosen because the idea was you choose one party

20   from each of the constituents.

21                    After about the first meeting,

22   Mr. McDonald said to me, well, this is in

23   connection with monetizing assets, which is what

24   you are doing, and you have been leading.  You need

25   to be on these calls, not me.
```



```
 1                   And so you know, he effectively
 2   delegated that responsibility to me.  I was the
 3   person that was on most of the steering committee
 4   calls.  Mr. McDonald certainly joined some of them,
 5   but I was certainly on far more of these calls.
 6                   I didn't get into technicalities about
 7   asking Nortel to officially, you know, add my name
 8   to the steering committee list.  I just joined the
 9   calls and we worked from there.
10                   Q.   There was a creditor advisor
11   working group where the creditors weighed in on
12   what was going to happen with the residual IP;
13   correct?
14                   A.   Yeah, the creditors wanted to
15   weigh in on everything, so generally every major
16   issue in Nortel required discussions with the
17   creditors.
18                   Q.   Right, so the Bondholders who had
19   4 billion dollars at stake, they were very
20   interested in what was going to happen?
21                   A.   Yes.
22                   Q.   And the UCC was very interested in
23   what was going to happen for all of the unsecured
24   creditors, including all the pension claims and so
25   on in America?  They were involved?
```



```
 1                     A.    They were absolutely very
 2    interested.
 3                     Q.    And there were various versions of
 4    a model that was done, and if you look at the
 5    second page, we can just see, for example, the
 6    April 28th, the version of the model which
 7    was -- do you remember these models?  This one was
 8    58 pages.  They were substantial documents.
 9                     THE CANADIAN COURT:  Sorry, I don't see
10    the reference to April 28th.
11                     MS. BLOCK:  You don't, sorry, see the
12    reference to what?
13                     THE CANADIAN COURT:  April 28th.
14                     MS. BLOCK:  Oh, sorry, it is on the
15    first slide.  It is Exhibit TR50825, and I am not
16    asking that it be brought up because this is one
17    that the current people running these businesses
18    don't want displayed.
19                     But that was an April 28th version.  I
20    just took --
21                     THE CANADIAN COURT:  Thank you.
22                     BY MS. BLOCK:
23                     Q.    -- one exemplar, and you have
24    agreed they were substantial business modelling
25    documents that Lazard put together?
```

Neeson&Associates   W&F

     1                    A.    They were a number of pages, yes.

     2                    Q.    And if we see the kinds of things

     3    that were in the deck on the second page of this

     4    demonstrative that I have shown you, that is the

     5    business analysis that was being done on the IPCo

     6    model?

     7                    A.    Well, this lists some of the

     8    things that were discussed in there.  Many of these

     9    bullet points might have been a couple of points in

    10    a deck, but it does list the things that were

    11    included.

    12                    Q.    And we can see back on the first

    13    page that there were different iterations that the

    14    people worked through and revised it?

    15                    A.    Yes.

    16                    Q.    And there were updates for

    17    leadership teams in the Board on the dates that are

    18    listed on the first page; correct?

    19                    A.    Yes.

    20                    Q.    And what Mercer was doing was

    21    looking at compensation systems to incentivize

    22    people who would be working for IPCo; do you recall

    23    that?

    24                    A.    Well, yeah, so to put some context

    25    to that, Mr. Veschi, who was leading the IP team at



1    Nortel, and was asked to put together this model

2    with his team, you know, immediately assumed for

3    purposes of the model that he would lead this IPCo.

4    I mean, I think it is fair to say there was some

5    personal self-interest in that, you know, he

6    appointed himself as the leader and was setting up

7    his role.

8                And you know, he made assumptions about

9    people at Nortel that would be part of the team.

10   He was insistent that, you know, there needed to be

11   an incentivized compensation structure in place to

12   reward that team and, you know, he went out and

13   sought some information from Mercer to build into

14   the model.

15               I can't say that I or anyone else

16   really spent a ton of time really looking at this

17   Mercer work, but it was something that he went out

18   and obtained.

19               Q.   And if you go to the third page of

20   this demonstrative, we see the Lazard financial

21   projections, and I have just taken one from the

22   first page to show you the kinds of projections

23   that Lazard was doing.  Do you recall seeing these

24   documents as you filled in for Mr. McDonald from

25   time to time on the stuff that was coming out to



1   the steering committee?

2              A.   When you say Lazard projections, I

3   mean, these are the same as the model that you are

4   referring to, the IPCo model.  It is one and the

5   same.  I mean, the same model was presented by

6   Lazard, with some, you know, Lazard cover page

7   presentation materials.  It was presented by George

8   to the board.  There was one model.  There wasn't a

9   separate set of financial projections.

10             Q.   Well, if we look at -- and I don't

11  ask that this be taken up because I expect there is

12  a confidentiality issue, but the Courts can

13  certainly access Exhibit TR43654, and you would see

14  spreadsheets that can't be printed out because they

15  have so many tabs underneath, like maybe 30 or 40

16  tabs of financial projections.  That is what I am

17  talking about in terms of the Lazard material.  Do

18  you recall that?

19             A.   Yes, I was only making the point

20  that it is the same as the IPCo model on the first

21  page.

22             Q.   And, Your Honours, I don't know if

23  you want to mark this as Exhibit A or so it doesn't

24  get lost in the record, despite one's wishful

25  thinking, perhaps?



1                    THE CANADIAN COURT:  Well, does anybody

2     object to it being marked an exhibit?  If it turns

3     out some of these things are incorrect, I'm sure

4     there is going to be a ton of people going over

5     this, like everything else, and they'll tell me.

6                    MS. BLOCK:  Correct, so may that be

7     Exhibit 11.

8                    THE CANADIAN REGISTRAR:  Exhibit 11,

9     Your Honour.

10                   EXHIBIT NO. 11:  Demonstrative exhibit

11                   prepared by Torys.

12                   MR. ZARNETT:  There is no objection.  I

13    think it has been clearly identified what it is and

14    we can argue about what it means later.

15                   THE CANADIAN COURT:  Right.

16                   BY MS. BLOCK:

17                   Q.   Let me just spend a few more

18    minutes on IPCo.  I have heard what you say about

19    it never having happened.  It clearly wasn't done

20    because the alternative was pursuit of selling the

21    residual patents; correct?

22                   A.   That's correct.

23                   Q.   But let me show you if I could

24    have you bring up Exhibit TR40033.  It is an email

25    from Milbank, August 7, 2010, to various of the



 1   lawyers involved and also Mr. McDonald is on that

 2   email, and it states in the first paragraph about

 3   halfway down:

 4                   "As I explained to Jim [...]"

 5                   it is four lines down in the first

 6                   paragraph:

 7                   "As I explained to Jim and Lisa

 8                   [...]"

 9                   This would be Jim Bromley and Lisa

10   Schweitzer; is that right?

11                   A.   That's correct.

12                   Q.   And they were acting on a number

13   of these deals and were involved with their Cleary

14   partners on the sales and the residual patent sale;

15   correct?

16                   A.   Yes, they were.

17                   Q.   And:

18                   "As I explained to Jim and Lisa

19                   on the phone, these comments left

20                   the impression (and concern) that

21                   the Debtors did not view the IPCo

22                   model as 'viable' or that it was, in

23                   effect, being pursued simply as a

24                   stalking horse for the auction

25                   process.  Our clients are, of



 1                    course, happy to hear your
 2                    confirmation that the concerns
 3                    raised by the comments are unfounded
 4                    and that the Debtors remain
 5                    committed to pursuing both paths, or
 6                    a hybrid of the two, with equal
 7                    vigor.  We look forward to
 8                    continuing to explore these
 9                    alternatives with your team."
10            And as you are not on the email,
11    perhaps Mr. McDonald didn't give this to you.  Were
12    you aware of this communication, Ms. Hamilton, or
13    are you seeing it for the first time?
14                    A.   Well, maybe you can just give me a
15    moment to read it so I can determine whether I
16    recollect having read it.
17                    (Witness reviews document.)
18                    I may have seen this email.  I mean, I
19    certainly -- you know, I saw a lot of emails during
20    this time period.  I can't for certain say that I
21    saw this exact email, but I may have.
22                    Q.   Let me move to one that you wrote.
23    It is Exhibit TR50656, and it is dated September
24    30, 2010, and it is called "Nortel IP/Valuation
25    Protocol", and you see on the front page the second



1    sentence, September 30, 2010, you were saying:

2                        "We need to get through the

3                    next phase of the sale process and

4                    get definitive bids on the table

5                    that we can evaluate as against our

6                    other options (i.e. IPCo etc.)[...]"

7                    That is the same thing we have been

8    talking about, the IPCo option; correct?

9                    A.   That's correct.

10                   Q.   And then you say:

11                       "[...] before we can make

12                   decisions re valuation thresholds or

13                   whether to sell/retain the IP [...]"

14                   So one of the options was to retain the

15   IP and that would have been an IPCo type business;

16   correct?

17                   A.   Yes, that was always one of the

18   potential options.

19                   Q.   Exactly.  And then if you could

20   turn to the next one, also dated September 30, that

21   is Exhibit TR50664 and this is from the lawyers for

22   the UCC.

23                   And you are a recipient of this email,

24   and the second sentence in the first paragraph:

25                       "I would like to note [...]"

 Neeson & Associates   W&F Wilson & Peyton Ltd.

1              On the first line:
2                   "I would like to note that
3              based on what we know now, it
4              appears to us that the value of an
5              IPCo clearly exceeds where we are
6              today with the bids and so we
7              continue to believe that IPCo is a
8              very real option that must continue
9              to be pursued on a dual track."
10             And am I --
11             THE CANADIAN COURT:  I would just ask
12   you, who was --
13             MS. BLOCK:  Mr. Botter.
14             THE CANADIAN COURT:  Who is the
15   proponent of that email and for -- it is written by
16   an Albert Pisa.
17             MS. BLOCK:  Yes, he is the Milbank --
18             THE CANADIAN COURT:  Milbank acted for
19   whom?
20             MS. BLOCK:  Milbank acted for the
21   Bondholders and he is the author of that first
22   email saying I a am glad to hear that I
23   misunderstood that the Debtors weren't all for
24   IPCo.  He wrote the first one and he wrote this
25   one.  Sorry, I talked about Mr. Gump from the UCC.

 Neeson & Associates    W&F

1    He is at the top of this email chain, but it is
2    Mr. Pisa sent to Ms. Hamilton.
3                    BY MS. BLOCK:
4                    Q.   So there were certainly people
5    interested in IPCo that were working in relation to
6    all of these business models and spreadsheets and
7    so on and working with the advisors?
8                    A.   Well, to put some context to this,
9    I think it is fair to say that the Bondholders as
10   one specific group were at the time saying that
11   they were interested in pursuing IPCo.  And I think
12   there were a number of reasons, and one of the
13   particular reasons that was articulated to me was
14   that NNL had some very significant tax losses at
15   the time, just to put it in order of magnitude
16   approximately 3 billion in shred credits, a billion
17   in investment tax credits and operating losses on
18   top of that.
19                   And the Bondholders had indicated that
20   they thought this was an asset that NNL should be
21   attempting to realize upon.  We had all discussed
22   that, you know, in Canada for -- you can't just
23   sell tax losses, right?  It is very difficult to
24   realize upon tax losses in an insolvency situation.
25                   And you know, one of the thoughts that

 Neeson & Associates    W&P

1    the Bondholders had was that, well, if you packaged

2    up these tax losses in IPCo, i.e., ran IPCo out of

3    NNL, and you know, somehow sought to be able to use

4    them in a Licensing Co business, then you could

5    sell the Licensing Co business for significantly

6    more than you might otherwise because a party might

7    be paying a substantial portion of value really for

8    the tax losses.

9                And so, you know, that was one of the

10   reasons why they were pushing.  Certainly they were

11   interested in IPCo, but you know, the fact of the

12   matter was that we had over and over told people

13   that it was -- we didn't believe in the viability

14   of IPCo.  It contained very significant assumptions

15   about going after some very large telecom players

16   in the industry with very, very deep pockets.

17                You know, it is impossible to have a

18   crystal ball and determine whether you can actually

19   realize, you know, awards in litigation against

20   these people and on what kind of time frame.

21                So we had a lot of concerns about it.

22   We also indicated that we were both unwilling and

23   unable to provide funding, and we asked and nobody

24   was willing to provide funding at the time.

25                Having said all of that, it was



1    important to keep IPCo out there as an option

2    because for one thing it provided some tension in

3    the sale process, i.e., we could communicate to

4    potential buyers that, you know, don't low-ball us.

5    We have other options, right.  We could retain this

6    portfolio.

7              But secondly, remember in our sale

8    process, we were trying to structure it with some

9    flexibility in that people could buy just the

10   patents or they could buy the framework for a

11   licensing business, which included some people, et

12   cetera.

13             So again, it was important to keep

14   licensing -- IPCo out there as a framework and

15   potential option, but not once did any party ever

16   come forward and say, we believe in IPCo so

17   strongly that we are willing to put dollars on the

18   table to implement it.

19             Q.   Are you finished?

20             A.   I am.

21             Q.   September 30 you say we have to

22   keep all these options open, including the IPCo

23   option, and we can't yet decide whether to sell or

24   retain the IP; correct?

25             A.   I did, and as I said, we wanted to



 1   keep it open as a potential option to create some

 2   tension in the market and at that point in time we

 3   were also trying to manage the Bondholders'

 4   expectation about not completely shutting down the

 5   idea.

 6              But we had many times articulated that

 7   at the end of the day we didn't see it as viable,

 8   and I think, you know, the first email that you

 9   showed me indicates that the Bondholders were

10   getting the impression from the US Debtors that

11   they didn't think it was viable either.

12              Q.   And your email that I have just

13   quoted from follows that by a month?

14              A.   I understand, and I told you the

15   reasons why I made that statement.

16              Q.   You say, ultimately, each of the

17   estates agreed that a sale of the residual IP was

18   the best way to maximize the value.

19              A.   That is correct.

20              Q.   And the estates were interested in

21   maximizing the value?

22              A.   For the assets, yes.

23              Q.   For each of their own estates?

24              A.   No, I would disagree with that.

25              Q.   You thought they were doing it all



1    for NNL?

2                A.    We had an agreement under IFSA

3    that what we were going to do was work

4    cooperatively, simply sell the assets for the

5    highest and best value and defer any discussion on

6    whose assets it was, how you would allocate the

7    proceeds, until a later date.

8                And so the goal at that time was to

9    simply get the best price for the assets.

10                Q.    We are going to come to IFSA, but

11    let's just stick with why all these people are

12    bothering with the IPCo, Mr. Jowitt, Mr. Ray, the

13    creditors, the UCC, the Bondholders, why all of

14    these people are bothering reading all these

15    business plans, looking at all these enormous

16    spreadsheets and being involved, that is because

17    they thought they had an interest; isn't that

18    right?

19                A.    Well, they may have -- they may

20    have thought they had an interest, yes.

21                Q.    And Mr. McDonald sat on those

22    committees with them; you were involved in these

23    calls.  You weren't saying, look at, guys, why are

24    you wasting all this time and all this money with

25    all these lawyers and financial advisors and so on;



1   this is our property?  You had no interest in it?

2               A.   But, we had always made it clear

3   that NNL had the ownership interest in the patents

4   and we had an agreement amongst all the parties

5   that we weren't going to have those discussions

6   around whose assets it was or deal with allocation

7   until a later date.

8               Everybody explicitly agreed, Cleary

9   Gottlieb, your co-counsel proposed the structure

10  of, you know, selling the assets first and worrying

11  about whose assets they were and how you would

12  allocate proceeds until later.

13              So we were simply, you know, complying

14  with the agreement that the parties made.

15              Q.   Well, after that agreement was

16  made, when there were sales that involved only

17  Canadian assets, you made it very clear stay out of

18  this, it is our show; isn't that right?

19              A.   So some of those deals that I am

20  going to presume you are dealing with, you are

21  referring to, we can discuss them, but they are

22  very, very different in terms of structure.

23  I -- we understood that there would likely be a

24  fight around this sort of deal, the patents.  We

25  understood that people might be asserting some



1    rights pursuant to their licence.

2              With respect to the other deals which I

3    believe you are referring to, they were not nearly

4    as complicated in terms of what the asset was that

5    was being sold.  It was pretty clear that it was a

6    simple Canadian asset and that there weren't any

7    other arguments that anybody really could make or

8    that I heard about them having any ownership

9    rights.

10             Q.   Unlike this situation where we see

11   ownership used five times in the MRDA involving the

12   licensed participants?

13             A.   I don't dispute that other parties

14   have articulated positions with respect to rights

15   or ownership.  I think we all knew that this was

16   going to be a long fight.  That is why we entered

17   into IFSA.  If we thought that we could all sit

18   down and resolve very quickly whose assets they

19   were, then I guess we would have done that before

20   the sales.

21             I understood that people were making

22   arguments, but what everybody proposed and

23   everybody agreed to was that if we get bogged down

24   in dealing with that at the outset, we'll never get

25   the assets sold, the value will diminish.  And so



```
 1   everybody suggested that we sell the assets, get

 2   the best price possible for the assets, that we

 3   defer any discussion on whose assets they were or

 4   allocation until a later date, and there was never

 5   any agreement that anybody was going to get some

 6   minimum allocation or some floor.

 7            People entered into these deals

 8   understanding that.

 9            Q.   They understood that the numbers

10   were not going to be predetermined; isn't that

11   right?  That how much everybody would get was not

12   predetermined?

13            A.   That's correct.

14            Q.   But they did not understand, and

15   it is inconsistent with their conduct if they did,

16   that they would get nothing on the IP sales?

17            THE CANADIAN COURT:  When you say they

18   didn't understand, how could Ms. Hamilton know what

19   they understood unless someone told them or she

20   told them or what.

21            BY MS. BLOCK:

22            Q.   I'm suggesting to you -- sorry,

23   Your Honour, I don't mean to ignore your question,

24   but maybe with my next question I can clean up what

25   I have stepped into.  I'm suggesting to you that
```



1   their conduct was inconsistent with the proposition

2   that you assert, that they thought they weren't

3   getting anything?

4                  A.    Again, I go back to nobody ever

5   sought any minimum allocation -- so first of all,

6   as I said to you, we are not asserting zero on the

7   residual IP sale.  I believe that the amount that

8   we proposed to allocate to the US Debtors is

9   somewhere between 4 and 500,000.

10                 But in any event, nobody ever sought a

11  minimum floor allocation.  And you know what, the

12  US Debtors, the UCC, sought a lot of things.  I

13  mean, throughout the course of these sales, I mean,

14  I was asked to participate in agreeing to side

15  agreement after side agreement after side

16  agreement, reinforcing people's reservation of

17  rights around these issues and there is -- you

18  know, not only was it verbally articulated but you

19  will find it in writing in these side agreements

20  where we say that nothing we are doing in these

21  deals has any bearing on allocation, that every

22  party reserves their rights to, you know, assert

23  any position that they may have later on in

24  allocation.

25                 And so everybody reserved their rights.

Neeson & Associates    W&P

1    Everybody did so knowingly.  People asked for a lot

2    of things but they didn't ask for agreement on any

3    minimum floor allocation and none was given.

4                    Q.   On the IPCo model, if the business

5    had been run, it would mean that the person with

6    rights in the US to enforce the patents in the US

7    would be participating in that business; isn't that

8    right?

9                    A.   Well, I disagree with that as a

10   general statement.

11                   Q.   But wasn't the concept that you

12   would be licensing in your territory, you would be

13   suing people in your territory if anybody used your

14   patents?

15                   A.   Again, I think you have to go back

16   to the MRDA and I know this is the subject of these

17   proceedings and people will have to interpret it,

18   but I think the scope of any licence that the other

19   participants have is as set out in the MRDA and I

20   don't agree that the scope extends to making the

21   assumption that the other participants would

22   necessarily commence that litigation on their own

23   or retain those proceeds.

24                   Q.   And that's why?  Why is that?

25                   A.   I think this takes us back to the



```
 1    entire -- the interpretation of the MRDA and the
 2    scope of the licence.
 3                Q.   But are you telling the Courts
 4    that at the time of these discussions about IPCo,
 5    you had concluded that there was no value in those
 6    licenses?
 7                A.   No, I did not say that.
 8                Q.   All right, so there is value in
 9    those licenses --
10                A.   I did not say that either.
11                Q.   All right, well, we are not going
12    to actually say anything, are we?  What are you
13    saying, was there value or wasn't there?
14                A.   I said I didn't conclude on
15    anything.  What I said to you is that under IFSA we
16    agreed that the focus at the time was to sell the
17    assets --
18                Q.   I am not asking you --
19                A.    -- and defer any discussions on
20    allocation until a later date.  So at that point in
21    time, I had not gone to the time and expense of,
22    you know, going through the MRDA in great detail,
23    understanding exactly how to interpret it and, you
24    know, what people's legal entitlements were because
25    that was not what we agreed to do.  We agreed to
```



1    sell the assets and deal with it later.

2                So the focus at the time was simply

3    getting the best price in the market for the assets

4    and all this would come later.  So I had not

5    concluded anything.

6                Q.   I haven't made myself clear.  I'm

7    back in September 2010 when you are working on IPCo

8    and you are sending emails saying we have to keep

9    it as an option because we don't know if we are

10   going to get any bids that are going to be

11   worthwhile.  That was your position, right?

12               A.   Yes.

13               Q.   So I'll take you back to then and

14   at that point in time everybody is involved working

15   on IPCo, all the estates; correct?

16               A.   That is correct.

17               Q.   And they are doing that because

18   they think that that business would involve the

19   enforcement of patents in the various territories?

20               A.   I don't -- listen, we -- for three

21   years, I mean, we worked around the clock to sell

22   eight lines of business and to sell a patent

23   portfolio.  My focus at the time was to sell the

24   assets and get the best possible price, okay?

25               We had agreed not to sit there and


Neeson&Associates    W&F

1   debate or worry about whose assets they were, what

2   rights people had to those assets, what proceeds --

3   what amount of the proceeds from each of these

4   sales would come to each party.

5               We had agreed not to do that and we had

6   agreed to defer it, and that is what I did.  I

7   focussed my efforts on selling the assets.  I did

8   not spend a ton of time worrying about whose assets

9   they were or concluding either way.  That came

10  later.

11              Q.   And you didn't warn people that

12  they shouldn't be bothering with this process

13  because it was all going to go to the Monitor's

14  client?

15              A.   I just told you that I hadn't

16  concluded either way.

17              Q.   All right, that is -- we are

18  making progress then.

19              The sale of the residual IP was a

20  hugely complex process?

21              A.   I would agree with that.

22              Q.   And Cleary was heavily involved in

23  that for the US Debtors?

24              A.   Yes.

25              Q.   The Google stalking horse bid was



```
 1   a very complicated deal?

 2               A.   Yes.

 3               Q.   And again, Cleary was very

 4   involved in that negotiation?

 5               A.   Yes.

 6               Q.   You would come to various

 7   meetings, but the lawyers would be -- for the

 8   estates would be negotiating with the potential

 9   bidders?

10               A.   I was present in the vast majority

11   of negotiations.  You know, many of the actual

12   agreement negotiations were done by the lawyers,

13   but there were certainly issues that arose in the

14   context of the Canadian companies and Canadian sort

15   of insolvency things, and I certainly had direct

16   conversations with Google about many of those

17   items.

18               Q.   You were physically present in

19   meetings but not conducting the negotiations; isn't

20   that a fair way of describing it?

21               A.   No, I didn't say that.  I was

22   physically present in the meetings.  There were a

23   lot of people in those meetings, they were very

24   large boardrooms.  You know, I didn't take the lead

25   on every single point in the negotiations.  I'm not
```



1    a lawyer.  I don't take the lead in the drafting of

2    all of the language.

3                    But on certain deal points that

4    concerned me, particularly with the Canadian --

5    particularly with respect to the Canadian estates,

6    I certainly had the business negotiations with

7    Google.

8                    Q.    Typically company representatives

9    would have been the lead negotiators?

10                   A.    There were company representatives

11   there as well.

12                   Q.    This language isn't ringing a bell

13   with you, Ms. Hamilton?  This is what you told us

14   on deposition.  I can pull it up.  Do you have a

15   deposition transcript for Ms. Hamilton?

16                   And for His Honour?  And Judge Gross, I

17   hope you are being given a deposition transcript.

18                   Page 182.  Page 182, if you start at

19   line 13:

20                   "What involvement [...]"

21                   Does everybody have that, sorry?

22                   THE CANADIAN COURT:  Just a second.

23                   THE WITNESS:  Sorry, could you repeat

24   the page number?  I think I got it wrong.

25                   BY MS. BLOCK:



```
 1                   Q.    Page 182.

 2                   A.    182, sorry.

 3                   Q.    And I am starting at line 13.

 4     Judge Gross, are you there?

 5                   THE US COURT:  Yes.

 6                   BY MS. BLOCK:

 7                   Q.    Thank you:

 8                         "What involvement did you have

 9                         in direct negotiations with

10                         potential purchasers?"

11                   Do you see that, Ms. Hamilton?

12                   A.    I do.

13                   Q.    And:

14                         "Answer:  I was physically

15                         present in many of the meetings with

16                         the potential purchasers.

17                         Question:  Were you yourself

18                         conducting negotiations or was that

19                         done by company representatives?

20                         Answer:  Typically we -- the

21                         company representatives would have

22                         been the lead negotiator.  On

23                         occasion where an issue might have

24                         come up that they were not, you

25                         know, adequately suited to respond
```



```
 1                    to the issue or where I saw a need
 2                    to provide direct input because it
 3                    was something, you know, often
 4                    insolvency related that they may not
 5                    have been aware of, then I would
 6                    have certainly spoken up and spoken
 7                    directly with the purchasers on
 8                    those issues."
 9             Is that a fair description of your role
10      in these various meetings?
11             A.   Yes, I believe that is completely
12      consistent with what I just said.
13             THE CANADIAN COURT:  I don't understand
14      how this is proper cross-examination.  I don't see
15      anything different in substance from what the
16      witness just said.
17             BY MS. BLOCK:
18             Q.   Then I may have been listening
19      with differently attuned ears.
20             Could we look at the IFSA.  This is
21      Exhibit TR40015.  And if we go to 12(e) of the
22      IFSA, Ms. --
23             THE CANADIAN COURT:  Sorry, what is the
24      number, Ms. Block?
25             MS. BLOCK:  It is TR40015.  40015.
```



```
 1                    THE CANADIAN COURT:  Thank you.

 2               BY MS. BLOCK:

 3               Q.   Now, I'm right that the Monitor

 4     wasn't party to the IFSA; is that right?

 5               A.   That's correct.

 6               Q.   But the parties agreed among

 7     themselves that they had an absolute right to

 8     refuse to enter a transaction if there wasn't value

 9     for its estate, and that is 12(e), isn't it?

10               A.   That's right.

11               Q.   Clause 12(e), that is at page 12

12     of the actual document.  And when you say in your

13     affidavit that the effect of IFSA is that the NNI

14     and NNUK and the other EMEA entities would enter

15     into the sale transactions and would terminate

16     their MRDA licenses without any guarantee of the

17     allocation it would receive, we see that they

18     didn't have to enter it if it wasn't in the best

19     interests of their estates, right?

20               A.   They didn't have to, but they had

21     to make that determination at the time.

22               Q.   And without any guarantee of the

23     allocation it would receive, you agree with me that

24     those estates under the IFSA were promised a right

25     to an allocation; would you agree with that, if you
```



1    look at clause 11(a)?

2                    And you will see it starts by saying:

3                        "Each of the US Debtors and the

4                        EMEA Debtors hereby agrees to enter

5                        into an appropriate licence

6                        termination [...] with respect to

7                        licenses and rights granted by NNL

8                        to such Debtors under or pursuant to

9                        the provisions of the Master R&D

10                       Agreement for the purposes of

11                       facilitating, and in consideration

12                       of a right to an allocation [...]"

13                   It is not a right to a claim to an

14   allocation; correct?

15                   A.   Well, I think you have to read the

16   rest of the sentence, and you know, you have to put

17   it in context of the overall agreement, okay?

18                   What was being agreed here was that,

19   you know, the parties would sell the assets and

20   then there would be a process to determine

21   allocation at a later point.

22                   And obviously, it is contemplated that

23   it may be well a contentious process because there

24   is mention of dispute resolvers and ultimately the

25   courts, but it is, you know, you'll sell the assets

 Neeson & Associates    W&F

 1  and there will be a process to determine

 2  allocation.

 3              There is nothing in here that I see

 4  that says that the amount of each individual

 5  debtor's allocation in each individual sale has to

 6  be greater than zero.

 7              Q.   If we look at 11(d) --

 8              A.   In any event, I'm not sure that is

 9  applicable, because as I have said we don't

10  allocate or propose to allocate zero to you in your

11  allocation theory.

12              Q.   "Where any Debtor enters

13              into any Appropriate Licence

14              Termination [...]"

15              This would be the licence participants

16  in relation to the Rockstar transaction; correct?

17              A.   That is correct.

18              Q.   "Where any Debtor enters into any

19              Appropriate Licence Termination in

20              accordance with the provision of this

21              Section 11, such Debtor shall be deemed

22              to be a Selling Debtor [...]"

23              So they were sellers in the Rockstar

24  transaction?

25              A.   They were defined as sellers under



```
 1   the sale agreement as well.
 2                 Q.   "[...] and the proceeds of such
 3                 Asset Sale shall be deemed to be Sale
 4                 Proceeds [...]"?
 5                 A.   Correct.
 6                 Q.   That is the 4.5 billion?
 7                 A.   Correct, those are the sale
 8   proceeds.
 9                 Q.   And you say that the
10   Monitor -- because IFSA had been signed, the
11   Monitor could remain silent about a plan to have
12   all the proceeds or substantially all of the
13   billions paid to Canada?
14                 A.   As I said to you, the Monitor had
15   not concluded on any particular position at that
16   point in time.  I mean, positions in this
17   litigation were not due to be filed until May 2013.
18   This is -- this far precedes that time.  So the
19   Monitor had not concluded on any allocation.
20                 This simply says to me that you execute
21   an appropriate licence termination, you are going
22   to be a party at the table in determining
23   allocation.  We are not going to say that you can't
24   be, and the sale proceeds are the sale proceeds,
25   and the court or whatever dispute resolver will
```

 Neeson & Associates    W&F Wilcox & Fetzer Ltd.

 1   decide how those proceeds get allocated.  That was

 2   the agreement.

 3              Q.   You agree with me, though, that

 4   the Monitor has a duty of candour and transparency?

 5              A.   In a general sense, yes.

 6              Q.   It has to act fairly?

 7              A.   Yes.

 8              Q.   It has to have concern for the

 9   stakeholders?

10              A.   Yes.

11              Q.   All of the stakeholders of all the

12   estates?

13              A.   Well, the Monitor is the Monitor

14   of the Canadian estates, so the Monitor's role is

15   to maximize the value for the Canadian estate.

16              Q.   But you have to have concern for

17   the stakeholders of all of the estates, don't you?

18              A.   I'm not sure what you mean by

19   "concern".

20              Q.   Let's see if I can remind you.

21   Could I have you turn up your examination for

22   discovery -- or sorry, your deposition at page 174.

23   And this is from one of your reports, I think it is

24   the 63 report that is being quoted to you.  At line

25   4 of page 174, are you there, Ms. Hamilton, with



```
 1    me?

 2                  A.   I am.

 3                  Q.   And it says:

 4                       "Nortel ultimately concluded

 5                  that a sale of residual IP was the

 6                  best method of monetizing the

 7                  residual IP for the benefit of its

 8                  stakeholders."

 9                  Do you see that?

10                  A.   I do.

11                  Q.   And:

12                       "Question:  Is it your

13                  understanding that the last two

14                  words 'its stakeholders' refers to

15                  Nortel stakeholders?

16                       Answer:  Yes.

17                       Question:  And what was the

18                  Monitor's understanding of who the

19                  stakeholders included?

20                       Answer:  It would include all of

21                  the creditors of Nortel.  Generally

22                  any party that might have had an

23                  interest in the proceeds."

24                  And then if you go over to page 175,

25    this is followed up at line 17:
```



1                    "And you'll see that Nortel is

2                    a defined term [...] --

3                    And this is from your report:

4                        "[...] is a defined term that

5                    includes Nortel Networks Corporation

6                    collectively with all its

7                    subsidiaries.  So in that last

8                    paragraph that we just looked at,

9                    will you agree that it's a reference

10                   to all of Nortel's stakeholders

11                   being the defined term of Nortel

12                   including all of its subsidiaries?

13                       Answer:  Yes."

14             THE CANADIAN COURT:  Can I just ask a

15      question, Ms. Block, before you ask the question,

16      what was the date of this document that was being

17      put to Ms. Hamilton?

18             MS. BLOCK:  The 63rd report, it was --

19      let's see, I have got it here somewhere.

20             THE CANADIAN COURT:  I am just

21      wondering when it was in relation to the order

22      augmenting the Monitor's powers.

23             MS. BLOCK:  It was April 14, 2011.

24             THE CANADIAN COURT:  When was that in

25      relation to the order augmenting?



```
 1                    MR. ZARNETT:  Before.

 2                    THE CANADIAN COURT:  Was it a year

 3     before?

 4                    MS. BLOCK:  It is before the super

 5     Monitor, but the Monitor --

 6                    THE CANADIAN COURT:  That answered the

 7     question.

 8                    MS. BLOCK:  All right, I know I'll have

 9     an opportunity to argue I won't say with you,

10     before you, Your Honour.

11                    THE CANADIAN COURT:  I don't mind.

12                    BY MS. BLOCK:

13                    Q.   So in your 63rd report to the

14     Court --

15                    MR. ZARNETT:  If my friend is finished

16     with the passage, the witness had answered about

17     what do you mean by concern?  And Ms. Block has now

18     put to her questions about stakeholders of Nortel

19     as a group but hasn't contradicted the witness on

20     anything about concern.

21                    BY MS. BLOCK:

22                    Q.   Perhaps, Your Honours, I could

23     just stick with the point of paragraph 15 that the

24     sale of residual IP was being undertaken because it

25     was considered to be in the best interest of the
```

1    stakeholders of Nortel and its subsidiaries;

2    correct?

3                  A.   That is the statement there.

4                  Q.   Right, and that means NNI, the

5    EMEA entities and NNL?

6                  A.   So let's look at my answer and put

7    it in context.  I mean, I said generally any party

8    that might have had an interest in the proceeds.

9                  This sentence that you are putting to

10   me comes out of the 63rd report which I believe is

11   the report on -- for approval of the Stalking Horse

12   Agreement, Google.

13                 Q.   Yes.

14                 A.   So what we are saying is that, you

15   know, this is the best deal out there for those

16   assets.  We are not making any comments about whose

17   assets they are.  And when I make the comment

18   "generally any party that might have an interest in

19   the proceeds" what I mean to say is that if you

20   have got an interest in the proceeds, I think this

21   was the best way of monetizing it.  It got 4 and a

22   half billion, and I don't think that you could have

23   got more.

24                 I mean, this -- you can't take anything

25   more out of that than that.



 1                    Q.   No, but you say it is the best

 2   method of monetizing residual IP for the benefit of

 3   its stakeholders?

 4                    A.   The stakeholders being the parties

 5   that ultimately have an interest in those proceeds.

 6                    Q.   All right, and what you really

 7   meant to say to the courts when you filed this

 8   report saying that was, but hey, you should know we

 9   are the only stakeholders who are going to get most

10   of this money?

11                    A.   As I said to you, at that point in

12   time we were not focussed on the allocation.  It

13   was put to another day.

14                    The focus in that report was this is

15   the best price we believe we can obtain for the

16   assets.  That report, you know, reminds the Courts

17   again that there is an IFSA agreement in place,

18   that there is absolutely no agreement amongst the

19   parties on allocation of those proceeds, and that

20   the current state is that the proceeds will be put

21   into escrow and there will be some process at a

22   later date to determine allocation.

23                    So it is my view that everybody

24   understood that what we were doing was selling the

25   assets and that we would determine later whose



 1    assets they were and therefore how the proceeds get

 2    divided.

 3              Everybody took the risk that if

 4    ultimately a Court decides that it wasn't your

 5    assets, then you get zero.  We took those same

 6    risks in every transaction.  I mean, if I go back

 7    to the line of business sales, you know, we -- when

 8    I say "we", the Canadian Debtors incurred

 9    substantial costs in keeping the businesses running

10    for sale.  You know, some of those businesses were

11    burning huge amounts of cash, and you know, there

12    were many instances in which we articulated that it

13    may actually be better to simply shut down the

14    businesses because we were concerned that the cost

15    of keeping them open to get through a sale process

16    and get to closing may well exceed any recovery

17    that we get from these sale processes.

18              But you know what, we knew that we had

19    -- we were taking a risk.  We knew that ultimately

20    somebody is going to decide allocation, a court.

21    We don't know what we are going to get.  It could

22    be zero, it could be a sum less than the costs that

23    we expended in keeping those businesses open, but

24    we all understood that risk and took that risk.

25                        And in certain businesses, and



1   particularly Passport, the Canadian Debtors

2   incurred substantially more in costs to keep the

3   business open, to get to a closing, than the US

4   Debtors proposed to allocate in their allocation

5   theory.

6           So this isn't any different.

7           Q.   You got a lot of funding from the

8   U.S. Debtor to keep you going; correct?

9           A.   And it did not cover the full

10  costs of keeping those businesses open.

11          Q.   Just before we break for lunch,

12  perhaps I could get you to agree with me that you

13  see the Monitor's role as being to provide advice

14  that balances the interests of all stakeholders; is

15  that a fair statement?

16          A.   In a general sense, yes.

17          Q.   To come to the best and reasonable

18  solution for those stakeholders?

19          A.   Yes.

20          Q.   And with that, perhaps I could

21  pick up with the line of business sales after

22  lunch?

23          THE CANADIAN COURT:  Sure.

24          MS. BLOCK:  Your Honour, thank you.

25          THE CANADIAN COURT:  All right, so



```
 1   we'll come back at 1:45.
 2              THE US COURT:  Yes.
 3   -- LUNCHEON RECESS AT 12:31 P.M.
 4   -- UPON RESUMING AT 1:51 P.M.
 5              THE CANADIAN COURT:  Yes.
 6              MS. KIMMEL:  Good afternoon, Justice
 7   Newbould, Judge Gross.  Jessica Kimmel.  We have
 8   been having some scheduling discussions and we were
 9   hoping we could just take a brief moment to take
10   some direction from the courts on how you want to
11   deal with some of the scheduling that we have come
12   up with just to make sure you're okay with what
13   we're proposing.
14              THE CANADIAN COURT:  Um-hmm.
15              MS. KIMMEL:  So the first thing is that
16   for this week, after Ms. Hamilton, the last witness
17   that was scheduled for this week who was to appear
18   tomorrow, he was available only tomorrow, was
19   Mr. Binning.
20              We are told that he is going to be very
21   short in cross-examination, and since there are no
22   other witnesses for this week, the suggestion from
23   all in the room with your concurrence would be that
24   we not sit tomorrow.
25              THE CANADIAN COURT:  We do or do not
```



```
 1   sit?

 2              MS. KIMMEL:  Do not sit tomorrow, and

 3   that Mr. Binning be added to the line-up for

 4   Tuesday.  That would mean we have Mr. Binning and

 5   Mr. Davies on Tuesday, both of whom will be very

 6   short in cross-examination, and all counsel have

 7   conferred and we think we can complete those two

 8   plus the cross-examinations of the two witnesses

 9   from the US side who are scheduled for Tuesday,

10   that would be Mr. Henderson and Mr. Ricaurte.  All

11   would be on the line-up for Tuesday.

12              We will have a full day on Tuesday but

13   we thought that might be preferable to convening

14   court for an hour tomorrow.

15              THE CANADIAN COURT:  I'm shocked that

16   people want to take Friday off on a long weekend.

17   I don't know, maybe Judge Gross wants to insist

18   that we sit tomorrow.

19              THE US COURT:  You know, this does run

20   contrary to my work ethic, but certainly, if the

21   parties are all in agreement, it makes sense.

22              MS. KIMMEL:  Okay.  So that will leave

23   us with hopefully not any longer than a normal

24   court day but a full court day on Tuesday.

25              And then with the court's indulgence I
```



```
 1   know it's important to the US Debtors, they have

 2   committed to their two witnesses that they will be

 3   completed and we will all endeavour to ensure that

 4   happens.

 5              Just to give you a bit of a heads-up of

 6   what's to follow, we expect that the remaining

 7   witnesses that are with the US Debtors will be

 8   completed before the end of the day on Wednesday

 9   next week.  There are two other witnesses,

10   Mr. Orlando and Mr. Ray.

11              THE CANADIAN COURT:  Are you talking

12   about the fact witnesses?

13              MS. KIMMEL:  Yes, the fact witnesses,

14   of course, yes.  And then following that we intend

15   to commence with the EMEA witnesses.  Their first

16   proposed witness is Mr. Lebrun, and Justice

17   Newbould, you'll recall that he is one of the two

18   of the EMEA witnesses who we would be asking the

19   court's indulgence to sit late that day so that we

20   can do that tag on claims only examination.  So we

21   would expect that to be next Wednesday.

22              THE CANADIAN COURT:  Okay.

23              MS. KIMMEL:  Then we will continue

24   through with the remaining fact witnesses next

25   week.  There are two fact witnesses who are not
```



1    available next week from the US and from EMEA.  One

2    of them is Mr. Weisz who would be scheduled the

3    following week, the proposal is on Tuesday the

4    28th, and the other one is Mr. Stevens, you'll

5    recall he is the other EMEA witness who has the

6    claims only component to his testimony.

7              Mr. Stevens, we have been told, also

8    has another difficulty that has arisen on a

9    personal level that means that he is unable to

10   travel to North America, and so with the court's

11   indulgence, the parties have agreed to accommodate

12   Mr. Stevens by having counsel travel to London to

13   conduct his examination in London with the courts

14   being obviously hooked up through the

15   videoconferencing to hear his and observe his

16   testimony.

17             So that is being proposed for Tuesday,

18   the 27th.  And with those two exceptions for fact

19   witnesses, we would then also begin the expert

20   testimony the week starting on the 27th, in the

21   afternoon I expect.

22             THE CANADIAN COURT:  I'm just going to

23   ask you to have someone provide all that to Andrew

24   Max.

25             MS. KIMMEL:  Yes, we will definitely do



1    that.

2              THE CANADIAN COURT:  He keeps track of

3    it for me.  And I guess the same with Judge Gross'

4    clerk.

5              THE US COURT:  Yes, thank you.

6              MS. KIMMEL:  We will make sure that

7    both of the court clerks have the same information

8    from the parties.

9              I'm told that we may have experts only

10   starting on the 28th but we will provide this to

11   you in a schedule so that it's all very clear.

12             The two things that we just wanted to

13   make sure the courts were in agreement with was

14   tomorrow's holiday, if we can call it that, and --

15             THE CANADIAN COURT:  Are you going to

16   do any work?

17             MS. KIMMEL:  I'm sure we'll all just

18   take the day off.  And then the claims only days

19   for the Stevens and Lebrun extensions, we'll just

20   make sure that those are noted for you, Justice

21   Newbould.

22             The other and last thing I will just

23   mention is we think that we may be finished a

24   little bit early next Friday even with the

25   remaining fact witnesses, and we were going to



1    suggest, if the courts are in agreement, that we

2    propose that there be time set aside on Friday in

3    case there are any third party confidentiality

4    motions that need to be brought forward.

5            We are continuing to negotiate about

6    redactions, but if there are any remaining

7    documents that need to -- for which sealing orders

8    need to be sought, we thought we would advise the

9    third parties that there would be -- expected to be

10   time next Friday for that.

11           THE CANADIAN COURT:  That would fit in

12   with Judge Gross' work ethic for Friday.

13           THE US COURT:  That's right.  It's a

14   holiday -- that's a holiday weekend here, but we

15   Americans, we just work through it all.

16           MS. KIMMEL:  Well, we're picking up on

17   that, so we'll make sure that they know that and

18   hopefully it will be down to a very manageable

19   number if we have anything.  Thank you, Your

20   Honour.

21           THE CANADIAN COURT:  Thank you.

22           MS. KIMMEL:  Thank you, Judge Gross.

23           THE CANADIAN COURT:  Mr. Rosenthal?

24           MR. ROSENTHAL:  Your Honour, just a few

25   clarifications.  I believe Ms. Kimmel misspoke.



 1   Mr. Weisz is going to be here on Wednesday, the
 2   28th, not Tuesday, and that's been worked out with
 3   all the parties because he's just unavailable
 4   before then.
 5               With regard to Mr. Stevens, the US
 6   Debtors have no problem at all with him testifying
 7   in London over video but just one clarification
 8   with what Ms. Kimmel said.  I doubt the US Debtors
 9   are going to actually go there to conduct the
10   examination and expect that with the video link-up
11   we can do it just as conveniently here, so I wanted
12   to be clear about that.
13               The only other comment is, you know,
14   with regard to next Tuesday, and I think Ms. Kimmel
15   did say it, which is we have made commitments to
16   two of the out-of-town witnesses that are coming in
17   from the US Debtors, and so long as we can be sure
18   that they can get on and off, we have no problem
19   with the Canadian witnesses.
20               THE CANADIAN COURT:  We'll sit late if
21   we have to.
22               MR. ROSENTHAL:  Thank you very much
23   Your Honour, I appreciate that.
24               MR. FINNIGAN:  Your Honour, just on
25   these housekeeping points.  It's John Finnigan.  We



 1   too don't plan on going to the UK for Mr. Stevens,

 2   we'll just do it remotely.  And there's just one of

 3   our fact witnesses, Mr. Hall, we'll have to talk to

 4   counsel about that.  We may have to adjust his date

 5   because he's only available on the 28th of May, but

 6   let us work that out between counsel and we'll let

 7   the courts know.

 8              THE CANADIAN COURT:  As long as we get

 9   advised through our clerks, that will be fine.

10              MR. FINNIGAN:  Absolutely.

11              THE CANADIAN COURT:  Thank you.

12   Ms. Block?

13              MS. BLOCK:  Thank you.

14              THE US COURT:  Ms. Block, before you

15   move on to the line of business questioning, just

16   let me know because I would like to ask a question

17   relating to the sale of the patents.

18              MS. BLOCK:  Thank you, Judge Gross.  I

19   actually took all my notes and threw them down the

20   stairs and they're in a completely different order

21   right now.  I'm going to finish off the Rockstar

22   transaction, if I can, I hope it's not too choppy,

23   but while we're on it I might as well move to the

24   Rockstar approval.

25              BY MS. BLOCK:



```
 1                      Q.   But let me start, Ms. Hamilton,
 2   with getting your agreement, as I'm sure you will,
 3   that being recognized, having the Monitor
 4   recognized as an officer asking for the US court's
 5   assistance, you accept that as a representative of
 6   the Canadian court, as E&Y, as the Monitor, you had
 7   an obligation to be honest and straightforward with
 8   the US court?
 9                      A.   Yes.
10                      Q.   And not to mislead, not to play it
11   close to the vest?
12                      A.   Yes.
13                      Q.   And not give the US court one
14   impression while harbouring the opposite intention?
15                      A.   Yes.
16                      Q.   And as both you and Mr. McDonald
17   have made clear, your client, when you were
18   appointed Monitor, is the court?
19                      A.   That's correct.
20                      Q.   And your duty is to provide the
21   court with information and objective advice which
22   should be accurate?
23                      A.   That's correct.
24                      Q.   Should include the relevant
25   information?
```



```
 1                    A.    That's correct.
 2                    Q.    Not selectively trying to induce
 3    the court to a particular result by ignoring
 4    relevant information available to the Monitor; do
 5    you agree with that?
 6                    A.    That's correct.
 7                    Q.    And in respect of the Rockstar
 8    transaction, you're not aware of any communications
 9    prior to closing Rockstar where the Monitor
10    informed any representative of the other Nortel
11    Debtors that the patents were not subject to
12    licenses with other Nortel participants in the
13    MRDA?
14                    A.    As I said to you, we were not
15    discussing allocation that time because that was
16    the agreement of the parties.
17                    Q.    Well, I'm going to come to that
18    but I'm just asking quite a specific question and
19    maybe I'm doing it artlessly, but I'm trying to
20    pick up from your language at page 126 of the
21    deposition, if I could have you turn to that, at
22    line 23.
23                    Do you have that at line 23, page 126?
24                    "Are you aware of any
25                    communication prior to the closing
```



```
1                    of the Rockstar sale in which a

2                    representative of the Monitor

3                    informed any representative of the

4                    other Nortel Debtor Estates that the

5                    patents were not subject to licenses

6                    with the other Nortel participants

7                    in the MRDA?

8                       Answer:  No."

9          A.    Yes.

10         Q.    Were you asked that question and

11   did you give that answer?

12         A.    I did.

13         Q.    And it's true?

14         A.    Yes.

15         Q.    And the Monitor never informed any

16   bidder for the residual IP that the patents were

17   not subject to licenses under the MRDA?

18         A.    That's correct.

19         Q.    The Monitor never informed any of

20   the purchasers or bidders for the IP that these

21   intercompany licenses under the MRDA were

22   valueless?

23         A.    That's correct.

24         Q.    And if we turn up your 71st

25   Report, which was the report that you presented to
```



```
 1   both of these courts, Trial Exhibit 21282.

 2              THE CANADIAN COURT:  I don't understand

 3   why this is proper cross-examination.  I haven't

 4   heard any position of the Monitor that the patents

 5   weren't subject to licenses.

 6              MS. BLOCK:  Right, and we're going to

 7   come to --

 8              THE CANADIAN COURT:  Usually you put a

 9   transcript to cross-examine something the witness

10   said, to cross-examine on something inconsistent

11   with the discovery.

12              MS. BLOCK:  Well, I put the very words

13   of the question to the witness and she said I'm not

14   sure what you're saying or something like that, so

15   I thought it would be of assistance for her to see

16   that I'm putting her words.

17              THE CANADIAN COURT:  They're not taking

18   the position that the patents were not subject to

19   licenses?

20              MS. BLOCK:  The position is those

21   licenses were valueless.

22              THE CANADIAN COURT:  That's not what

23   the question you read and had answered said at all.

24   It had nothing to do with that.

25              MS. BLOCK:  It was to set up the next
```

Neeson & Associates    W&P

```
 1    two questions, Your Honour.  I'm sorry if I was

 2    being tedious, but it was the logical flow for me;

 3    one, you didn't say that they weren't subject to

 4    licenses, and then you never said the licenses were

 5    valueless.  I had transcript references for those

 6    if I didn't get the answers, but I got the answers.

 7              And in fact, we will see -- perhaps I

 8    can help you with that right now, sir, that -- can

 9    I have paragraph 56 of the allocation pleading of

10    the Monitor?

11              MR. ARMSTRONG:  Is there a copy for the

12    witness?

13              MS. BLOCK:  We can get one for her.

14    It's one paragraph in the pleading.  No, sorry,

15    this is the wrong -- he's got the wrong document.

16              BY MS. BLOCK:

17              Q.   Have you got the document,

18    Ms. Hamilton?

19              A.   I do.

20              MS. BLOCK:  Your Honour, do you have

21    it?

22              THE US COURT:  Yes.

23              THE CANADIAN COURT:  What, the

24    pleading?

25              MS. BLOCK:  Yes.
```



```
 1                    THE CANADIAN COURT:  I don't have the
 2    pleading in front of me.
 3                    MS. BLOCK:  Could we give one to His
 4    Honour.
 5                    BY MS. BLOCK:
 6                    Q.   In this pleading of the Monitor
 7    you say:
 8                         "In sum, the IP sold in the
 9                         Rockstar transaction was not subject
10                         to any license or other intangible
11                         rights of value of the US Debtors --
12                    THE CANADIAN COURT:  Whereabouts in the
13    pleadings, Ms. Block?
14                    MS. BLOCK:  Oh, I'm sorry, it's
15    paragraph 56, Your Honour.
16                    THE CANADIAN COURT:  66?
17                    MS. BLOCK:  56.
18                    THE CANADIAN COURT:  56?  Thank you.
19                    BY MS. BLOCK:
20                    Q.   Paragraph 56:
21                         "In sum, the IP sold in the
22                         Rockstar transaction was not subject
23                         to any license or other intangible
24                         rights of value of the US Debtors,"
25                         I think it should say "or EMEA
```



```
 1                    Debtors."

 2                    Do you see that pleading?

 3            A.   I do.

 4            Q.   And you're saying the Rockstar

 5     transaction was not subject to any license of the

 6     US Debtors?

 7            A.   No, it's not saying that.  It's

 8     subject -- it's not subject to any license rights

 9     of value.  It's not saying it's not subject to a

10     license.

11            Q.   So you're saying it's any license

12     of value of the US Debtors; that's how you read

13     this sentence?

14            A.   That's how I read the sentence.

15            Q.   And even reading it that way,

16     you're saying the licenses are worthless and that

17     there was no value, subject value encumbering NNL's

18     title?

19            A.   That's right.

20            Q.   And if I could go back to the 71st

21     Report, the report you put before Judge Gross and

22     Justice Morawetz on July -- it's dated July 6th,

23     2011, TR21282, and go to page 18.  Do you have

24     that, Ms. Hamilton?  Paragraph 49?

25            A.   I do.
```



```
 1                    Q.   As noted in the 63rd Report, and
 2      that's the report you put before the courts on the
 3      Google stalking horse bid; do you recall that?
 4                    A.   I believe this is after the
 5      auction.  This is the --
 6                    Q.   The 71st Report is the report that
 7      you're putting forward for approval of the
 8      Rockstar?
 9                    A.   The Rockstar, so not the stalking
10      horse, the auction final bid.
11                    Q.   But you're referring back in
12      paragraph 49 to your 63rd Report?
13                    A.   I'm sorry.
14                    Q.   Which was the Google stalking
15      horse bid.  And you say, as noted in that report,
16      NNL holds legal title to the residual IP which, in
17      turn, is subject to various intercompany license
18      agreements with other Nortel entities, and you say
19      in some cases on an exclusive basis.
20                    That information was absolutely true,
21      wasn't it?
22                    A.   It's subject to a license.  This
23      paragraph does not discuss the value of that
24      license.
25                    Q.   What you're saying there is
```



1    absolutely true, that it was subject to various

2    intercompany licenses, in some cases exclusive,

3    i.e. NNI's licence, for example?

4              A.   Yes.

5              Q.   And, as you know from the MRDA,

6    NNI had the rights to use NN Technology in the US,

7    correct?

8              A.   Within a defined scope or field of

9    use.  I mean, whatever the correct legal

10   terminology is, but within defined terms.

11             Q.   These are the rights the Monitor

12   is telling the court that NNL's title is subject

13   to?  You're not saying it's not subject to any

14   rights; you're saying it's subject to these

15   exclusive licenses, correct?

16             A.   It is subject to a licensing

17   agreement.

18             Q.   And the licensing agreement

19   included NNI's license to a perpetual, exclusive

20   rights to NN Technology in the US territory, to

21   EMEA's in their respective territories?

22             A.   Within certain defined terms.

23             Q.   But you're not saying to the court

24   those licenses are no longer in existence, those

25   licenses are of no value?  You're saying that the



```
 1   legal title is subject to those licenses?

 2                A.   So let's look at the overall --

 3                THE CANADIAN COURT:  That's what it

 4   says but I don't know where -- I'm going to make

 5   the same comment I made this morning.  I'm not

 6   really interested in what Ms. Hamilton's view is of

 7   the legal effects of the agreement.

 8                MS. BLOCK:  All right, let me move on.

 9                BY MS. BLOCK:

10                Q.   You did not make the point to the

11   courts that the purchasers were buying only legal

12   title, correct?

13                A.   The -- the report sets out the

14   terms of the sale agreement, the sale agreement is

15   appended as an exhibit, so I believe that what the

16   purchaser was buying was clearly set out in both

17   the report and through having the actual sale

18   agreement for the courts to review.

19                Q.   Were you at the Rockstar approval

20   hearing?

21                A.   I was.

22                Q.   And did you hear Mr. Tay on behalf

23   of the Canadian Estate make submissions to

24   Mr. Morawetz -- to Justice Morawetz and Judge

25   Gross?
```



```
 1                    A.   I suppose I did.
 2                    Q.   And you never heard him tell Judge
 3     Gross that NNI's licenses were valueless?
 4                    A.   So let's just go back to the
 5     context of this report and --
 6                    Q.   Could you answer my question --
 7     would you answer my question?  I mean, I'm known as
 8     a bit of a minimalist but this is probably the
 9     longest cross-examination I've done in living
10     memory.  I'd like you to just answer my question.
11                    THE CANADIAN COURT:  Ms. Hamilton, just
12     -- put the question again and just answer the
13     question, all right?
14                    BY MS. BLOCK:
15                    Q.   You did not hear Mr. Tay say to
16     Judge Gross, who was there at that hearing, that
17     NNI's licenses were valueless?
18                    A.   I did not.
19                    Q.   And you didn't hear him say that
20     if Judge Gross approved this deal, all of the $4.5
21     billion would go to NNL?
22                    A.   I did not.
23                    Q.   But you'd agree with me that's
24     what the Monitor, acting on behalf of the Canadian
25     Estate, is saying now to Judge Gross and to Justice
```



```
 1   Newbould?

 2                    A.    The Monitor is setting out an

 3   allocation position today and, as I said, it's not

 4   exactly zero, but there is a small allocation

 5   proposed to the US Debtors on this transaction.

 6                    Q.    But that was never disclosed to

 7   the courts when seeking approval for this

 8   extraordinary deal?

 9                    A.    Because that was not the purpose

10   of the motion.  The purpose of the motion was to

11   consider the sale transaction and whether the sale

12   transaction should be approved.  If you read

13   paragraph 50 that you've put in front of me, the

14   courts were reminded that there was no agreement on

15   allocation, that the proceeds were going into

16   escrow and that allocation would be determined at a

17   later point in time.

18                    The Monitor did not have -- had not

19   concluded on any definitive position at that point

20   in time, and so it was -- it couldn't be said at

21   that point in time and shouldn't be said at that

22   point in time.

23                    Q.    You didn't tell the court because

24   it wasn't material or helpful or relevant in your

25   view?
```

 Neeson&Associates    W&P Wilson & Peyter Ltd.

```
 1                    A.   It was not the subject matter of
 2    the motion.
 3                    Q.   In your view, it was not relevant,
 4    the court had already approved the IFSA?
 5                    A.   The court had approved the IFSA
 6    which provided that allocation would be dealt with
 7    at a later date.
 8                    Q.   But that's why it wasn't relevant,
 9    because the court had approved the IFSA?
10                    A.   That's correct.
11                    Q.   And the IFSA provided that you
12    didn't need to deal with allocation or people's
13    claims to entitlement of the proceeds at the time
14    of the sale?
15                    A.   That's correct.
16                    Q.   And when you say the court had
17    already approved the IFSA and therefore you didn't
18    have to disclose the claim for $4.5 billion, this
19    argument that you're making here, you're saying the
20    US judge, Judge Gross who is sitting here today,
21    had no power to reject the deal?
22                    THE CANADIAN COURT:  I don't remember
23    the witness saying that.
24                    MS. BLOCK:  I'm putting that to her.
25                    THE CANADIAN COURT:  You're going over
```



```
 1    and over the same thing you spent a lot of time on

 2    this morning.

 3              MS. BLOCK:  If you'll just bear with

 4    me, Justice Newbould, I think these issues are

 5    particularly pertinent for the US Estate and for

 6    the US bankruptcy court.

 7              THE CANADIAN COURT:  That may be but --

 8              MS. BLOCK:  Let me just deal with this,

 9    if I may.

10              BY MS. BLOCK:

11              Q.   You know that a deal that was of

12    no benefit to creditors of the US Estate was not

13    being suggested to Judge Gross; would you agree

14    with that?

15              A.   I'm saying to you that at the

16    time -- you know, you seem to be suggesting to me

17    that we had some duty to have determined some legal

18    position that we might take in the future to have

19    fully determined it and have disclosed it to a

20    party that may be adverse in interest.  I don't

21    recall the US Debtors or anybody else disclosing to

22    me their legal position that they may take at some

23    point in the future in these proceedings.

24              Q.   Stay with me for a moment and

25    let's go to TR50196 which is the order that was
```



1    obtained in front of Judge Gross, and you'll see on
2    the second page that His Honour makes -- sorry,
3    it's on the next page, the third page.
4                His Honour makes findings.  Do you see
5    where it says "It is hereby found and determined
6    that"; do you see that, Ms. Hamilton?
7                A.   Yes.
8                Q.   Then if you turn to page 13, to
9    EE, one of the determinations that Judge Gross made
10   after hearing from the lawyers for the Monitor and
11   Canadian Estate and the other parties, it says:
12                    "Entry into the sale agreement,
13                    the agreements contemplated thereby
14                    and the consummation of transactions
15                    constitute a good and sufficient
16                    exercise by the Debtors," that's the
17                    US Debtors, "of their sound business
18                    judgment, and such acts are in the
19                    best interests of the Debtors, their
20                    estates and creditors, and all
21                    parties in interest."
22                And I'm suggesting to you that if you
23   had the view that NNL was the only party who was
24   going to benefit, you could not sit there silently.
25   Do you agree with that?



```
 1                      A.    I do not agree with that.

 2                      Q.    All right.

 3                      A.    And my view was and it remains

    that this was the best possible price that could be

    obtained for the assets based on a process

    conducted at the time.  It had not been determined

    whose assets they were or who had an interest in

    them; but that doesn't matter.  Whoever's assets

    they were, that was the best possible price that

10   could be obtained.

11                     Q.    All right.

12                     A.    And that was the matter before the

13   courts at that time.

14                     Q.    You have just told us you didn't

15   think you had to tell Judge Gross that you would be

16   or could be making a claim for all of this and that

17   it might not be in the best interests of the US

18   Debtors?

19                     A.    Well, I'm not sure you can come to

20   that conclusion either way.

21                     Q.    But you heard Judge Gross say that

22   it wasn't every day he could avoid making a $4.5

23   billion mistake, which is what he'd be doing if he

24   approved this, if he failed to approve the sale.

25   Do you remember him making that comment?
```



```
 1                    A.    I do.

 2                    Q.    Because he was finding it was in

 3    the best interests of the US Debtor and its

 4    creditors, which of course it wouldn't be?

 5                    A.    Again, I maintain that it was the

 6    best possible price you could obtain for the

 7    assets, so whoever's assets it was, and the court

 8    will determine that, it was the best decision to

 9    monetize it in that way.

10                    Q.    Well, let me suggest to you that

11    maybe you didn't instruct your counsel to speak up

12    at the hearing because you hadn't thought up this

13    claim yet.

14                    A.    That's a ridiculous allegation.

15                    Q.    Could we see Mr. -- Mr. McDonald's

16    deposition at page 145.  You've read Mr. McDonald's

17    deposition?

18                    A.    Yes.

19                    Q.    Let me just show you one -- a

20    couple of parts of it.  145, line 12:

21                          "And at some point in time you

22                          reached the conclusion that's

23                          reflected in your allocation

24                          position that those intercompany

25                          licenses had no value at the time of
```



1                    the Rockstar sale, correct?

2                         Answer:  Correct.

3                         Question:  When did you first

4                    reach that conclusion?

5                         Answer:  Probably after the

6                    unsuccessful third mediation.

7                         Question:  So prior to the

8                    unsuccessful third mediation --

9                         Answer:  No, I said after.

10                        Question:  Okay.  Prior to the

11                   conclusion of the unsuccessful third

12                   mediation, did the Monitor have any

13                   view on the value of the

14                   intercompany licenses?

15                        Answer:  I think we thought about

16                   that after the failure of mediation

17                   number three.

18                        Question:  And you had no view on

19                   the value of the intercompany

20                   licenses before then; is that fair

21                   to say?

22                        Answer:  Yes."

23                   Now, the MRDA was a critical document;

24        would you agree with that?  From the Monitor's

25        point of view?



 1                    THE CANADIAN COURT:  Just a minute.
 2      You've put a piece of the transcript from
 3      Mr. McDonald.  Are you going to ask about it or is
 4      this -- what are we doing here?
 5                    BY MS. BLOCK:
 6           Q.    Were you able to absorb what
 7      Mr. McDonald was saying there?
 8           A.    Yes.
 9           Q.    And do you agree that he was
10      saying that the allocation position that is
11      reflected in your pleading, that there was no value
12      at the time of the Rockstar sale, was not thought
13      about until after the failure of mediation number
14      three?
15           A.    What I'm saying is at the time --
16           Q.    I'm just asking you about do you
17      understand that's what he's saying.  Do you agree
18      that that's what he's saying?  Look at line 9 on
19      page 146:
20                    "Prior to the conclusion of the
21                    unsuccessful third mediation, did
22                    the Monitor have any view on the
23                    value of the intercompany licenses?
24                    Answer:  I think we thought about
25                    that after the failure of mediation

 Neeson & Associates    W&F WILSON & PETTICH LTD.

1                    number three.
2                         Question:  And you had no view on
3                    the value of intercompany licenses
4                    before then; is that fair to say?
5                         Answer:  Yes."
6              A.    I see that.
7              Q.    And so you understand he's saying
8    he didn't think they were of no value, he didn't
9    form the view that they were of no value until
10   after the third mediation, this argument that's
11   being made now was arrived at after the third
12   mediation?
13             A.    Because as I said to you this
14   morning, we hadn't formed a definitive view in any
15   respect.  It wasn't -- it wasn't a matter to be
16   dealt with at that time.  We had all agreed that it
17   would be put off to a later date and so we had not
18   spent the time or money to do a very detailed
19   analysis and form a definitive view either way.
20             Q.    Well, the IFSA, which was agreed
21   in June '09, correct?
22             A.    Yes.
23             Q.    And you said the IFSA meant we
24   would sell first and deal with this later?
25             A.    That's correct.



```
 1                   Q.   It required the parties under

 2      12(d) to negotiate, correct?

 3                   A.   Correct.

 4                   Q.   40015, paragraph 12(d) which

 5      you've already looked at --

 6                   A.   Yes.

 7                   Q.   -- contemplated, and this is the

 8      order that Judge Gross approved, and Justice

 9      Morawetz, that you'd all sell together and then you

10      would negotiate, you'd attempt to resolve it in

11      good faith.  Correct?

12                   A.   Yes.

13                   Q.   And indeed before the Rockstar

14      approval, there were two court-ordered mediations?

15                   A.   That's correct.

16                   Q.   And so when you say we hadn't

17      thought about this by the time of the Rockstar

18      approval --

19                   MR. ZARNETT:  Your Honour, this appears

20      to me to be a way of trying to get at what went on

21      in mediations, which clearly is outside the bounds

22      of this.

23                   MS. BLOCK:  Well, if you'll bear with

24      me, Your Honour -- Your Honours, if I may respond

25      to this.  I've just read in the evidence of
```



```
 1   Mr. McDonald that he said we didn't think about it
 2   until after the failure of the third mediation.
 3                THE CANADIAN COURT:  Right.
 4                MS. BLOCK:  So there's two mediations
 5   that go on before.
 6                THE CANADIAN COURT:  I don't know what
 7   either side said in the mediations, but Mr. Zarnett
 8   is saying you're trying to get into the mediation
 9   what took place.
10                MS. BLOCK:  No, I'm not trying to get
11   into the mediation what took place.  This witness
12   just said we never thought about it, we didn't put
13   our minds to it, and then they have two
14   court-ordered mediations where under an agreement
15   that she's relying on, she's relying on this
16   agreement, that's why we didn't have to think about
17   it, and yet the court orders two mediations, and
18   were those mediations, Ms. Hamilton, mediations
19   where you had to brief your position.
20                THE CANADIAN COURT:  There you go.
21   You're getting into the mediation.
22                BY MS. BLOCK:
23        Q.   All right.  So let's just see if
24   we can get the timeline though.  The first
25   mediation was in November 2010.  Do you recall
```

 Neeson&Associates    W&F

1    that?

2              A.    Yes.

3              Q.    And the second mediation was in

4    April 2011 at the time of the Google stalking horse

5    bid; you were doing both at the same time?

6              A.    I can't recollect the exact date

7    but it sounds reasonable.

8              Q.    But they were before July 2011

9    when you went before Judge Gross and told him that

10   you had these licenses subject to -- you had this

11   legal title subject to these licenses and that you

12   had a deal for $4.5 billion, right?

13             A.    That's correct.

14             Q.    And you say because you'd never

15   thought about this issue, you didn't have to -- or

16   you hadn't thoroughly thought about this issue, you

17   didn't have to say anything at that point in time?

18             A.    That's correct.

19             Q.    We've seen Mr. McDonald say he

20   didn't think about the value of the licenses, the

21   no-value of the license until after the third

22   mediation failed, and that was in January 2013?

23             MR. ZARNETT:   That's not exactly what

24   Mr. McDonald said.

25             BY MS. BLOCK:



```
 1                    Q.   Well, let's go back to his words.
 2                    "At some point in time you
 3               reached the conclusion that's
 4               reflected in your allocation
 5               position that those intercompany
 6               licenses had no value at the time of
 7               the Rockstar sale?
 8                    Answer:  Correct.
 9                    Question:  When did you reach
10               that conclusion?
11                    Answer:  After the unsuccessful
12               third mediation."
13               And you will accept that that was in
14     January 2013?
15                    A.   That's correct.
16                    Q.   So that's something that came to
17     the Monitor four and a half years after the
18     Monitor's assignment; is that right?
19                    A.   What I'm saying to you is that
20     there was no requirement for anybody to put forward
21     their legal entitlement position in litigation
22     proceedings until May 2013.  We didn't even know
23     whether we were going to end up in -- in a trial
24     like this until, you know, after the conclusion of
25     the third mediation.
```



```
1                    So there was no obligation for us to

2     have spent time flushing out a fulsome legal

3     entitlement position.

4                    Q.   I'm going to suggest to you that,

5     in fact, Mr. McDonald never even heard of this

6     theory.  Let me show you some further evidence from

7     page 172 of Mr. McDonald's transcript.  Let's see

8     if you can agree with me on that.

9                    MR. ZARNETT:  Your Honour, I'm going to

10    rise at this point because despite the questions

11    about relevance, I think we've gone well beyond the

12    breaking point.

13                   THE CANADIAN COURT:  Well, I mean, we

14    had at least an hour of this before lunch, it's the

15    same point again and again.  I'm not sure what the

16    point of it all is.

17                   MS. BLOCK:  This is actually an

18    additional point and I can appreciate that sitting

19    there it may seem like a heap of stuff.  I will

20    turn it into --

21                   THE CANADIAN COURT:  Those are your

22    words.

23                   MS. BLOCK:  I will turn it into bel

24    canto at some point, Your Honour, but, as you

25    know --
```



```
1                    THE CANADIAN COURT:  You can do it now,

2      if you like.

3                    MS. BLOCK:  -- it sometimes takes

4      putting the pieces into place.

5                    BY MS. BLOCK:

6                    Q.   We will not have Mr. McDonald for

7      you to hear from himself, but I want you to hear

8      this piece of his evidence at page 172, starting at

9      line 16:

10                        "Let's put aside what you

11                        learned about that subject.  But

12                        with respect to any limitations on

13                        NNI's exclusive license rights, when

14                        is the first that you heard of it?

15                            Answer:  In relation to?

16                            Question:  To the exclusive

17                        license rights with respect to

18                        Nortel intellectual property?

19                            Answer:  I'm not sure I remember

20                        the exact date on it.

21                            Question:  Is it fair to say it

22                        was after the conclusion of the

23                        third mediation?

24                            Answer:  For me, yes."

25                        And the limitation on NNI's exclusive
```



1    license rights, you say, are that they are of no

2    value as we see in paragraph 56 of the pleading?

3    They are of no value at the time of the Rockstar

4    transaction?

5                    A.    That's right.

6                    MR. ZARNETT:  Sorry, Your Honour, I

7    raised a relevance point.

8                    MS. BLOCK:  She just agreed.

9                    MR. ZARNETT:  Ms. Block said it would

10   somehow be answered by a reference to

11   Mr. McDonald's transcript.  She then makes the

12   reference, doesn't ask the witness a question about

13   it, and questions about when a legal position was

14   formed have no bearing on the validity of the

15   position which is what this proceeding is about.

16                    THE CANADIAN COURT:  It strikes me,

17   Ms. Block, this is just all argument, arguing the

18   case.

19                    MS. BLOCK:  Well, I'm trying to lay a

20   factual foundation, sir.

21                    THE CANADIAN COURT:  You've done it for

22   about an hour before lunch and some time after

23   lunch.

24                    MS. BLOCK:  Right, but Your Honour has

25   been told -- Your Honours have both been told you



 1  don't even need any evidence, this is so clear, you

 2  just open up the MRDA and you can read they have no

 3  value.

 4           THE CANADIAN COURT:  But Ms. Hamilton's

 5  views, speaking for myself, what her views are on

 6  the MRDA is of little relevance.

 7           MS. BLOCK:  But the actions of the

 8  Monitor before the US court, getting the US court's

 9  approval for a transaction that was in the best

10  interests of the US creditors, and sitting there

11  silently and then we get some --

12           THE CANADIAN COURT:  Well, you've

13  cross-examined on that for quite some period of

14  time and Ms. Hamilton's evidence is what it is.

15           MS. BLOCK:  Exactly.  Let me move to --

16  I'm sorry, Judge Gross, you wanted me to tell you

17  when I was moving.

18           THE US COURT:  Yes, I'll violate my

19  general rule that judges should be seen and not

20  heard until they rule, and ask a question.  When I

21  ask a question, it really is a question,

22  Ms. Hamilton.

23           And we're here in this very expensive

24  proceeding, largely over the issue of the ownership

25  of the NN Technology and which you have testified



1    was wholly-owned by NNL.

2              And my question is, do you base --

3              THE CANADIAN COURT:  We can't hear you.

4    -- REPORTER'S NOTE:  No audio in Toronto.

5              MS. BLOCK:  Shall we take a few minutes

6    and sort out the technology?

7              THE CANADIAN COURT:  We're all trying

8    to engage in lip reading.

9              THE US COURT:  Can you hear me now?

10   All right.  I was starting to say, and I'll just

11   repeat myself, that I'll violate my general

12   philosophy that judges should be seen and not heard

13   until they rule, and so I'm going to ask a question

14   because we're all here involved in an extremely

15   expensive, imposing proceeding based largely on the

16   issue of the ownership of the NN Technology and in

17   particular the Monitor's position that that

18   technology is owned solely by NNL.

19             Do you base that on anything other than

20   your reading of the MRDA?

21             THE WITNESS:  I mean, I think that the

22   MRDA is the -- is definitely the main governing

23   document.  You know, I am aware that or I have an

24   understanding that beyond that, that the patents

25   are legally registered in every jurisdiction to



```
 1   NNL, but I believe the MRDA is the main governing
 2   document.
 3            THE US COURT:  All right.  Are there
 4   any other documents that you reviewed in reaching
 5   your conclusion?
 6            THE WITNESS:  Me personally?
 7            THE US COURT:  Yes.
 8            THE WITNESS:  I can't say that there's
 9   any specific documents that I personally reviewed.
10            THE US COURT:  All right.  Thank you.
11            MS. BLOCK:  Those are all my questions.
12   Thank you, Your Honour.
13            THE CANADIAN COURT:  Thank you,
14   Ms. Block.  Mr. Barrack?
15   CROSS-EXAMINATION BY MR. BARRACK:
16            Q.   Ms. Hamilton, you'll be happy to
17   know it's going to be more financial and business
18   than MRDA.  I wonder if we could have TR40136, and
19   this is really an aide memoire for you.  This is
20   the Monitor's Pre-Filing Report.
21            A.   Yes.
22            Q.   Can you go to paragraph 23, page
23   8.  And all I want to do is identify the Canadian
24   Debtors.  And the first one is NNC, the ultimate
25   parent company?  Do you see that?
```



```
 1                    A.    Yes.

 2                    Q.    And it never had active

 3    operations?

 4                    A.    That's my understanding.

 5                    Q.    Executive office in Toronto?

 6                    A.    That's correct.

 7                    Q.    Its principal asset was its

 8    investment in its subsidiary?

 9                    A.    That's correct.

10                    Q.    NNL was the direct subsidiary of

11    NNC, Nortel's principal operating subsidiary, the

12    public company, and under the Canadian allocation

13    theory would be the recipient of all the lock box

14    funds coming to Canada?

15                    A.    I believe that's correct.

16                    Q.    Okay.  And it would be the selling

17    debtor under the IFSA?

18                    THE CANADIAN COURT:  Can I just ask you

19    a question, Mr. Barrack.  You have used many times

20    "the lock box."

21                    MR. BARRACK:  Right.

22                    THE CANADIAN COURT:  Is that just a

23    euphemism for the $7.3 billion?

24                    MR. BARRACK:  Yes.

25                    THE WITNESS:  I mean, there were --
```

Neeson&Associates     W&F

1    there were some assets that were held in other

2    Canadian Debtors such as NNTC.

3                    BY MR. BARRACK:

4                    Q.    Right.

5                    A.    So there was more than just NNL

6    that was a party to many of the sale agreements.

7                    Q.    Okay.

8                    A.    I've really just focused on it

9    from the perspective overall of the Canadian

10   Debtors right now.

11                   Q.    We'll come back to the residual

12   patents.  We're going to talk more about property

13   than legal rights, things as opposed to legal

14   interpretation.

15                   NNTC was the technology company, the

16   purpose was to carry out R&D in Canada, it had

17   about 3,000 employees, and did not produce third

18   party revenue and relied on NNL for all of its

19   funding; is that fair?

20                   A.    That's correct.

21                   Q.    And then there was NN

22   International Corporation, wholly-owned sub of NNL,

23   no business or assets other than a minority equity

24   interest in a number of foreign Nortel companies;

25   is that fair?



```
 1                      A.    That's my understanding.
 2                      Q.    Okay.  And NN Global Corporation,
 3    wholly-owned sub of NNL, no business or assets but
 4    had representative offices outside of Canada and 22
 5    employees in China, payroll was funded by other
 6    Nortel entities; is that fair?
 7                      A.    Again, that's my general
 8    understanding.  I haven't spent a lot of time
 9    personally verifying these details.
10                      Q.    Okay.  And so those are, when we
11    talk about the Canadian Debtors, the Canadian
12    Debtors that Ernst & Young Inc. is the Monitor in
13    respect of; is that fair?
14                      A.    That's correct.
15                      Q.    Okay.  And the Monitor, because
16    you've had these super Monitor powers, has the
17    ability to decide what positions to take on behalf
18    of the Canadian Debtors regarding allocation?
19                      A.    That's correct.
20                      Q.    And the Monitor makes all
21    substantive decisions for the Canadian Debtors
22    because there is no management?
23                      A.    At this time, that's correct.
24                      Q.    Right.  And leaving aside the
25    other stakeholders, but as between these five
```



1    companies, the Monitor has a duty not to prefer the

2    interests of one over another; is that fair?

3              A.    That's fair.

4              Q.    Okay.  Now, have you thought about

5    how the funds that are recovered by the five

6    Canadian Debtors will be split between them?

7              A.    I personally have not.

8              Q.    Have you been part of any

9    discussions about that?

10             A.    No.

11             Q.    Is that like the IFSA, is that a

12   decision that's been deferred until the allocation

13   is known?

14             A.    To be honest, I mean, my

15   involvement has really been focused on the three

16   major estates at this point.  I haven't been

17   involved in any discussions as to the appropriate

18   allocation amongst the individual Canadian Debtors.

19             Q.    Are you involved in the

20   preparation of the reports of the Monitor in recent

21   times?  Even before they go out?

22             A.    No, I don't review every report.

23   I was primarily involved in the sale transactions,

24   and if there's something that I'm dealing with

25   currently, I may be involved in reviewing a very



```
 1   small portion of the more recent reports, but I

 2   don't review all of the current reports.

 3                Q.   Let's look at the 104th Report of

 4   the Monitor that came out on March 14, 2014.  It

 5   doesn't have -- this doesn't have a trial exhibit

 6   number, so I wonder if we could just mark it as the

 7   next exhibit.  I'm only going to take you to one

 8   page of this.

 9                May I take you to page 81.  It's the

10   overall claims status.

11                THE CANADIAN COURT:  What's the next

12   exhibit number?

13                MR. BARRACK:  I think it's 12.

14                THE REGISTRAR:  Exhibit number 12, Your

15   Honour.

16                THE CANADIAN COURT:  Exhibit 12.

17                EXHIBIT NO. 12:  104th Report of the

18                Monitor dated March 14, 2014.

19                THE WITNESS:  Sorry, did you say page

20   81?

21                BY MR. BARRACK:

22                Q.   Page 81 at the top right-hand

23   corner.

24                A.   Okay.

25                Q.   Are you familiar with the claims
```



1    process at all?

2                  A.    I have had no involvement in the

3    claims process.

4                  Q.    The difficulty that we have is

5    that we don't have another witness from the

6    Monitor, so I'm just -- just so that we understand

7    what this document is, this sets out the current

8    claim -- the current estimate of the claims into

9    the Canadian Estate against these various entities,

10   correct?

11                 A.    That's correct.

12                 Q.    And you're familiar with this type

13   of analysis, it's a fairly standard Monitor

14   analysis?

15                 A.    Yes.

16                 Q.    Okay.  And so, let's just focus on

17   one line, the trade claims, so that we see that for

18   NNC there is filed proofs of claims of 76

19   creditors, a billion six under review, so the 24,

20   50 and 2, we take the first column and then that

21   first column is allocated over the subsequent

22   columns to the right; is that fair?

23                 A.    Yes.  I believe so.  They --

24                 Q.    I've done the math.

25                 A.    Yes.



```
 1                    Q.   It doesn't add up by value because
 2   the sum of them aren't, but by number of creditors,
 3   you'll get -- the number of creditors will add up,
 4   the value won't add up.  That's generally how these
 5   work, correct?
 6                    A.   Yes, that's right.
 7                    Q.   So what it does is it tells the
 8   court we've got this many creditors, here's the
 9   status of those creditors' claims?
10                    A.   That's right.
11                    Q.   So, for instance, if we do NNC and
12   we look at trade claims, it tells you in the -- the
13   first column with numbers tells you what the number
14   of claims are, then there's under review, that
15   means it hasn't been allowed or disallowed,
16   accepted or reviewed and unadjusted, 3.1, and then
17   value per notice of dispute, that tells you that
18   there's a certain number that are in dispute that
19   may or may not be pursued?
20                    A.   That's correct.
21                    Q.   Is that fair?
22                    A.   That's fair.
23                    Q.   And so without going through each
24   one, we get down to the bottom and we see, if we go
25   through, for instance, against Global Corporation
```

 Neeson & Associates   W&F

1    there is a billion four in trade claims, against

2    International call it a billion five, against NNL

3    almost a billion six, and against -- sorry, and

4    against Technology a billion five.

5                And if the allocation position of the

6    Monitor is accepted by the courts, all -- the vast

7    majority of the funds from the lock box will go

8    into NNL, correct?

9                A.    Again, you know, I haven't

10   personally been involved in any specific

11   discussions as to how they would be allocated

12   amongst the Canadian Debtors.  So sitting here

13   today, I'm not sure I can answer that question.

14               Q.    Understood.  But before they're

15   allocated between the Debtors, on the theory that

16   we know the simple math is there's 7.2 in the lock

17   box?

18               A.    7.3, yes.

19               Q.    7.3?

20               THE CANADIAN COURT:  Mr. Barrack, is it

21   not in the Pre-Filing Report of the Monitor?  You

22   can pull it out of there.

23               MR. BARRACK:  I just wanted to do the

24   rough math here.  Specifics aren't important.

25               BY MR. BARRACK:



```
 1                    Q.   About 7.3.  We do know about 4.5
 2   of that came from the Rockstar transaction,
 3   correct?
 4                    A.   That's correct.
 5                    Q.   Order of magnitude the 4.5, leave
 6   aside the 400,000 and the small amounts at the end,
 7   the vast majority of that would go to the legal
 8   title holder, correct, under the Canadian Monitor
 9   theory?
10                    A.   That sounds right.
11                    Q.   And the only Canadian Debtor that
12   was the legal title holder was NNL, correct?
13                    A.   Yes.
14                    Q.   Okay.  So that -- and I fully
15   understand, Ms. Hamilton, that you do a
16   restructuring like this, you're not the claims
17   person --
18                    A.   Right.
19                    Q.   -- and you don't have the details.
20   But as you sit here today, as the only witness
21   we're going to have on behalf of the Monitor, there
22   has been, as far as you know, no decision taken as
23   to how that money that would come into NNL is going
24   to be spread among the other Canadian Debtors,
25   correct?
```

Neeson&Associates   W&F

```
 1                    A.    That's correct, I'm not aware of

 2    any such decision.

 3                    Q.    Okay.  And there are a number of

 4    possibilities as a restructuring professional you

 5    know for that, and one of them would be to

 6    substantively consolidate the Canadian Debtors

 7    because they were so intertwined, correct?

 8                    A.    That's correct.

 9                    Q.    And that is something that will be

10    considered by the Monitor in time?

11                    A.    I would say that's right.

12                    Q.    Right.  Now, I'd like to go to

13    another topic.  And I've only got three topics for

14    you, you'll be happy to know.

15                    A.    Okay.

16                    Q.    This is your sweet spot, the

17    liquidation of the Nortel assets.  This is, as I

18    understand what you've been trying to tell us, that

19    was my job?

20                    A.    Yes.

21                    Q.    So, you were significantly

22    involved in the process of liquidating the Nortel

23    assets which have given rise to the funds in the

24    lock box, correct?

25                    A.    That's right.
```

 Neeson & Associates   W&F

 1                    Q.   Were you the principal person, was
 2    that principally your mandate?
 3                    A.   I was the principal person from
 4    the Monitor, yes.
 5                    Q.   From the Monitor.
 6                    A.   Yes.
 7                    Q.   Okay.  So as a first step you had
 8    to review the assets, I take it?
 9                    A.   That's correct.
10                    Q.   And ultimately you sold a number
11    of lines of business?  You sold two things in broad
12    terms, a number of lines of business and a
13    portfolio of patents, correct?
14                    A.   That's correct.
15                    Q.   And these lines of business -- so
16    I want to focus now on the line of business sales,
17    okay?
18                    A.   Okay.
19                    Q.   So the lines of business that you
20    sold, were there seven of them?
21                    A.   I believe we've got eight listed.
22    There is one that is a pretty small, it's the GSM
23    CALA contracts.  It's not really a line of business
24    but -- so we could call it seven.
25                    Q.   So seven principal lines of



```
 1    business of Nortel?
 2                    A.    Yes.
 3                    Q.    So let's focus on those.  The
 4    seven principal lines of business of Nortel
 5    operated across jurisdictional boundaries and in
 6    many cases on a worldwide basis, correct?
 7                    A.    That's correct.
 8                    Q.    And the assets and contracts and
 9    employees relevant to the operations of those
10    particular lines of business were, and I'm going to
11    give you a couple of propositions, were owned or
12    employed -- were owned or employed by various
13    Nortel legal entities?
14                    A.    That's correct.
15                    Q.    Including NNL, NNI and NNUK?
16                    A.    Among others, yes.
17                    Q.    That was going to be the next
18    point.  And there were numerous other entities
19    around the globe that had pieces of some of those
20    businesses as well?
21                    A.    Absolutely.
22                    Q.    And it was your view at the time
23    that a cooperative multi-jurisdictional sale of
24    those lines of businesses was the best way, and
25    indeed the only way, to maximize the value of the
```



1   line of business for creditors?  Line of business

2   sales for creditors?

3                 A.   That's correct.

4                 Q.   And the reason for that is that

5   these were not Canadian businesses or American

6   businesses or English businesses; they were

7   worldwide businesses, correct?

8                 A.   That's correct.

9                 Q.   And not only were they worldwide,

10  but they were highly integrated across the globe,

11  correct?

12                A.   That's correct.

13                Q.   And that value to those businesses

14  derived from that very fact that they were

15  worldwide, global, highly integrated businesses to

16  the purchasers?

17                A.   Yeah, yeah, I think you can say

18  that.

19                Q.   And you could not in your role as

20  the person who was principally from the Monitor

21  responsible for selling those businesses stand back

22  and identify the Canadian business or the American

23  business or the English business as a stand-alone

24  operation, correct?

25                A.   I mean, I guess the way I would



1    put it is there might be specific assets that you

2    could say a particular legal entity owned, for

3    example some inventory, fixed assets, sitting in a

4    legal entity.

5              But the -- but within a specific legal

6    entity, it was not a self-sufficient business,

7    right?  It didn't -- it didn't have, you know, it

8    wasn't a whole -- a self-sufficient business that

9    could operate on its own if the rest of the world

10   disappeared, and so they did operate from an

11   operational perspective on a global basis.

12             Q.   Right.  And you were of the

13   opinion that if anyone attempted to identify

14   geographically separate businesses, that would have

15   led to significant and time-consuming litigation?

16             A.   I think, yes.  I mean, trying to

17   break apart the businesses and somehow make them

18   completely self-sufficient in their own right, with

19   access to everything they needed, would not have

20   been possible in any, you know -- so they really

21   needed to be kept together as a global business to

22   be able to maintain maximum value.

23             Q.   And the reason for that was -- one

24   of the reasons was that that would lead to

25   significant and time-consuming litigation; that's



1   what you said in your Affidavit?

2               A.   Perhaps, yes, yes, it would.

3   Absolutely.

4               Q.   And when you said that in your

5   Affidavit, your concern was that the significant

6   litigation would be over the IP that was embedded

7   in those businesses, correct?

8               A.   Principally, I would agree, yes.

9               Q.   And at the time of the line of

10  business sales, it was clear to you that the

11  ownership question of the IP was, I think as you've

12  said a hundred times today, far from clear?

13              A.   Yeah, I think it's fair to say

14  that we expected that there were going to be very

15  divergent views and probably a fight, if I might

16  call it that, over different positions.

17              Q.   Okay.  Let's go to my third and

18  final topic and this is the residual patents at the

19  time of sale.

20              So we've heard -- we've heard from

21  previous witnesses that prior to insolvency that

22  there were -- there were a number of patents

23  associated with the Nortel business, correct?

24              A.   Yes.

25              Q.   And in this conversation we're



1    going to have, I want to talk about things, not

2    legal rights.  I want to think of those patents as

3    kind of widgets that are used in the business, not

4    output widgets but input widgets.

5              A.   Okay.

6              Q.   Some of those patents, those

7    things, were actually used in the lines of business

8    that were sold, correct?

9              A.   That's right.

10             Q.   And those patents went with the

11   business, went out the door with the businesses

12   when the lines of business were sold?

13             A.   Some of those patents.

14             Q.   Some of those patents?

15             A.   Yes.

16             Q.   And there was some splitting,

17   there was some licensing and various things, but in

18   broad terms some of the patents got associated with

19   businesses and went out the door with them, right?

20             A.   That's correct.

21             Q.   And as we heard from Mr. McCorkle

22   and we might have heard from Ms. DeWilton as well,

23   at all times in Nortel there was a group of patents

24   that were kind of on the shelf that weren't being

25   used in any active business at the time, and those



1    were the residual patents, correct?

2                    A.   The residual patents is made up of

3    two buckets.  So what happened is at the beginning

4    and in early 2009 before the first sale process,

5    Nortel conducted a review of all of its patents and

6    the guiding principle or the decision that was made

7    is that if there is a patent that is used primarily

8    in one business line only, then that patent would

9    be sold with that business line and go along with

10   it.

11                   If there's a patent that is used in

12   multiple business lines or not used at all, it

13   would be retained, a license would be granted to

14   the line of business buyers to allow them to use

15   those patents within their field of use, but it

16   would be retained, because if you sold it with the

17   first deal, you know, the next deal wouldn't be

18   possible.

19                   So when you get to what we've been

20   calling the residual patents, it is made up of the

21   patents that are shared amongst lines of

22   businesses, as well as patents that were not used

23   in any product at the time.

24                   Q.   Okay.  So I want to focus, I'm

25   going to come back to after the sale, but let's go



```
 1   back to Nortel pre-insolvency.  And again, I'm not
 2   going to ask you for determinations of legal
 3   ownership, I just want the mechanics of how various
 4   companies in the Nortel Enterprise got economic
 5   benefit from their activities.  That's how the --
 6   how they did certain things --
 7               A.   Um-hmm.
 8               Q.   -- and they got benefit for doing
 9   those things and they got it through certain
10   routes, and let's just look at the routes at how
11   you did something, how you got a benefit for what
12   you did.  Okay?
13               A.   Okay.
14               Q.   So, prior to insolvency, the RPEs,
15   the residual profit entities, the five RPEs,
16   derived some value -- derived a benefit, an
17   economic benefit from creating patents, correct?
18               A.   Correct.
19               Q.   And so how they would do that is
20   they'd create a thing, a patent?
21               A.   Right.
22               Q.   And that thing would get used in a
23   business, that business would generate profit, and
24   that profit or loss would get split, and that is
25   very simply how you got benefits from the things
```



 1   that were used in the business, correct?

 2              A.   That's generally accurate.  I

 3   mean, we could go into, I'm sure, lots of --

 4              Q.   We could go into all of

 5   Ms. Block's --

 6              A.   -- little details --

 7              Q.   -- documents if you want me to

 8   pull them up.

 9              A.   -- to clarify that, but generally

10   that would be accurate.

11              Q.   That's how it worked.  And so --

12   and on the Monitor's theories, the -- if we come

13   now to the sale of the line of business, what the

14   Monitor says is okay, we sold the things you

15   created with the line of business and what we're

16   going to do is we're going to take the proceeds of

17   those sales of the line of business, we're going to

18   say how much was for the fixed assets, all of those

19   things that you can identify that are there, we're

20   going to -- there is an intermediate category

21   before we get to the patents, I forgot, I lost what

22   it is, but we are going to take the things we can

23   identify that are kind of no-brainers that go with

24   the business, if you've got a lease or you own an

25   office building somewhere, that goes with the line



```
 1   of business too where it exists.
 2                   And then we're going to take those
 3   things, the patents, and what the Monitor says is
 4   well, if we continue to run the business, you two
 5   guys, EMEA and NNI, you would have gotten an
 6   economic benefit from those so we're going to
 7   calculate what economic benefit you would have
 8   gotten under the MRDA, we're going to give you that
 9   and then NNL is going to take what's left over.
10   That's basically the theory?
11                   A.   Generally I guess I would say yes,
12   yeah.
13                   Q.   Okay.  And then we come to the --
14   then we come to those residual patents.  Now,
15   Nortel had no experience in operating a licensing
16   business, correct?
17                   A.   No material experience.  I mean,
18   there were a few small licenses out there, but --
19                   Q.   But for having what turned out to
20   be $4.5 billion in patents --
21                   A.   Absolutely.
22                   Q.   -- there wasn't a business --
23                   A.   Absolutely.
24                   Q.   -- driving an economic benefit
25   from those residual patents, correct?
```



```
 1                      A.    That's correct.
 2                      Q.    And it had very little experience
 3    in licensing generally?
 4                      A.    That's correct.
 5                      Q.    Okay.  So, prior to being sold in
 6    the Rockstar transactions, a significant number of
 7    the residual patents were not creating economic
 8    benefit for Nortel, correct?
 9                      A.    At that point in time.
10                      Q.    At that point in time?
11                      A.    Yes.
12                      Q.    So the only way that an entity --
13                      A.    Let me clarify, though.  I mean,
14    if you're referring to not creating economic
15    benefit because they were not being used in a
16    particular product or service at that time, then I
17    would agree with that.
18                      I don't know that you can say that they
19    were not providing any economic benefit because,
20    you know, what is actually very key in the patent
21    portfolio is when you had such a large patent
22    portfolio as Nortel did --
23                      Q.    Right.
24                      A.    -- it created huge defensive
25    value, right?  So, you know, it was basically a
```



```
 1    prohibition on industry players, you know, suing

 2    you for patent infringement because you had this

 3    huge trove of patents with which to counter-sue.

 4              So it had some defensive value which I

 5    think, I'm not sure we can put a number on it today

 6    but it's certainly a significant value.

 7              Q.   We actually can put a number on

 8    it, thanks to your good work we can put 4.5 billion

 9    on it.  But it did have a value.

10              But you're absolutely right, there was

11    huge value to these things, but if we -- but my

12    question should be made more articulate.

13              When you come to the perspective of an

14    RPE, the RPE had no way on a periodic basis,

15    through the MRDA, from accessing any of that value,

16    correct?

17              A.   Yeah, I'm not -- I'm not sure I

18    understand your question.

19              Q.   Let's break it down.  So, the

20    things are sitting on the shelf?

21              A.   Yeah.

22              Q.   And they've got real value because

23    they're telling the other guys don't you come with

24    us because they're not widgets, they're guns and

25    we're going to take them off, if you start shooting
```



1    at us, we're going to start shooting at you, and

2    maybe the capital markets even say they're all

3    sitting there and we'll give you some money because

4    we know you've got a big gun rack over there that

5    you can come after us with.  But those guns are on

6    the shelf, they're not being used in any activity

7    that's producing periodic income, correct?

8                A.    Income from the sale of products

9    or services, right?  I mean, in an indirect way

10   perhaps it reduces your overall cost, it does all

11   kinds of things, but specific income from products

12   or services.

13               Q.    Specific economic benefit from

14   those, the RPEs don't get that through the MRDA

15   profit split method, correct?

16               A.    Not directly.

17               Q.    So now we come to the sale, and we

18   come to the sale and what the Canadian Monitor's

19   theory is is that when we sell the guns, we get to

20   keep all the profit from the guns because we own

21   the guns, correct?

22               A.    Yes.

23               Q.    Okay.  And what that means is when

24   we go back to what you did and when you got -- how

25   you got an economic benefit for it, is that if you



1    were an RPE that built those guns, on the Canadian

2    Monitor's theory, those residual patents, you don't

3    get any value for them, correct?

4                     A.    Well, I think that the way one has

5    to look at it is that as an RPE, you entered into

6    an agreement, the MRDA, agreeing to transfer title

7    to NNL in exchange for what you got under the

8    agreement, and so --

9                     Q.    I'm not saying --

10                    A.    -- you have to look at the overall

11   transaction and that's what the RPEs got and that's

12   what they bargained for.

13                    Q.    Got you, and you've done that a

14   number of times today, you've given the explanation

15   before you've given the yes or no.  So let's go

16   back to the yes or no.  It might have been a fair

17   bargain, it might have been an unfair bargain, I'm

18   not going to ask you, I'm going to ask these judges

19   at the end of the day.

20                    But the bargain was you didn't get

21   anything.  Even though you might have spent the

22   money to create the guns, you didn't get anything

23   out of the sale from the guns, correct?  That's the

24   Canadian Monitor's theory?

25                    A.    Well, you know, again, I think



1    when -- when I enter into an agreement for, you

2    know, an overall package of benefits, I can't later

3    say that I'm apportioning all the benefits to this

4    piece or to that piece.  I mean, you got an overall

5    package of benefits under an agreement and, you

6    know --

7                    Q.    Right, and we broke down --

8                    A.    -- I don't think anybody is trying

9    to tie it back down to on an individual patent

10   level, so --

11                   Q.    Well, this is the thing.  This is

12   just the thing, Ms. Hamilton, everybody is all

13   balled up in legal ownership, but when you think

14   about the things, there was only some of the

15   things, and it might be a good bargain, bad bargain

16   and I'm not going to argue the case with you, but

17   let's just come to common ground as to what the

18   bargain was.

19                   The bargain was you built the guns, you

20   got money out of the businesses, you didn't get any

21   money when we sold the guns.  Is that fair?

22   Whether it's a good bargain, bad bargain or not?

23                   A.    If you mean that you don't get any

24   attribution of value out of it from the IPCo or the

25   Rockstar sale, then I agree with you.  But you got



1    an overall package of benefits earlier, and --

2                    Q.    We have a lot of experts coming

3    who will break that down.   Thank you very much.

4                    MR. GOTTLIEB:  No questions, Your

5    Honour.

6                    MR. KRAFT:  Good afternoon, Justice

7    Gross, Justice Newbould.   I'm Kenneth Kraft.

8    CROSS-EXAMINATION BY MR. KRAFT:

9                    Q.    Ms. Hamilton, I'm here on behalf

10   of Wilmington Trust and I just have a few questions

11   given the time of day and how long we've been here.

12                    First of all, Ms. Hamilton, I hope

13   you're aware of the arrangements, there are

14   different indentured trustees involved in the

15   Nortel estates and Wilmington Trust is -- has a

16   claim only against the Canadian Estate, the

17   Canadian bonds.

18                    A.    Yes.

19                    Q.    And then the other indentured

20   trustees have claims against both estates.   You're

21   aware of that?

22                    A.    Yes.

23                    Q.    And are you aware of approximately

24   the value of the crossover bonds?

25                    A.    A few hundreds of millions.



```
 1                    Q.   I believe they are approximately
 2  $4 billion.
 3                    A.   Oh, you said the crossover.
 4                    Q.   The crossover ones.  Wilmington
 5  Trust is about 200 million.
 6                    A.   Yes.
 7                    Q.   And is it correct that the US
 8  Estate has an accepted claim in the Canadian Estate
 9  of approximately $2 billion?
10                    A.   Yes.
11                    Q.   And as we said, the crossover
12  bonds have approximately 4 billion claims both in
13  Canada and the United States?
14                    A.   That's correct.
15                    Q.   And if the courts adopted the
16  Monitor's allocation theory, would there still be
17  -- so if the courts accept the Monitor's allocation
18  theory, is it correct that there would still under
19  that scenario, given the recognized claims, be a
20  significant recovery for the US Estate?
21                    A.   I believe -- I believe so.
22                    Q.   So, even under the Monitor's
23  allocation theory you believe that there would be a
24  significant recovery to the US Estate?
25                    A.   Yes.
```

 Neeson&Associates    W&F

```
 1                   MR. KRAFT:  Thank you.  Those are my
 2    questions.
 3                   MR. ZARNETT:  I have no re-examination.
 4                   MS. BLOCK:  I have this wonderful thing
 5    called re-cross.  I only have two points.
 6                   THE CANADIAN COURT:  I saw a play come
 7    in from the bench, so go ahead.
 8                   MS. BLOCK:  Okay, this is inaudible
 9    from Mr. Zelbo.
10    FURTHER CROSS-EXAMINATION BY MS. BLOCK:
11                   Q.   You testified that the parties got
12    what they bargained for in the MRDA when you were
13    talking with Mr. Barrack.  Did I take your evidence
14    correctly?
15                   A.   Yes, in the context of what
16    Mr. Barrack was saying.
17                   Q.   You would agree with me that that
18    was an agreement among related parties, NNL and its
19    own subsidiaries?
20                   A.   That's right.
21                   Q.   And you'd agree that it was
22    drafted for the purposes of transfer pricing
23    purposes to satisfy tax authorities about those
24    arrangements among all those people?
25                   MR. ZARNETT:  The witness would not be
```



```
 1   testifying from personal knowledge at this point.
 2   How can this help?
 3               BY MS. BLOCK:
 4               Q.   Did you understand it?
 5               A.   I wasn't around at the time the
 6   MRDA was drafted.
 7               Q.   My friend Mr. Barrack was asking
 8   you about the integrated businesses and selling the
 9   worldwide businesses.  Can you just turn up
10   paragraph 15 of your Affidavit, Exhibit 9.
11               A.   The first, the April 11th
12   Affidavit?
13               Q.   Yes.  And you make the point there
14   that the lines of businesses did operate across
15   jurisdictional boundaries, and I don't think that's
16   contested in this case.
17               And then you say:
18               "The assets, contracts and
19               employees relevant to the operation
20               of a particular line of business
21               were owned or employed by various
22               individual Nortel legal entities."
23               Do you see that?
24               A.   Yes.
25               Q.   So there was some contracts that
```



1    were -- belonged to NNI, some that belonged to NNL

2    and so on that could be identified in relation --

3              A.   There were certainly contracts

4    that were in the name of a single legal entity

5    within Nortel.  There were contracts that were in

6    the name of multiple legal entities within Nortel.

7              Q.   And there were employees who were

8    employed by each individual entity.  They might

9    work on a worldwide business but they had an

10   employer?

11             A.   They were employees.  Generally, I

12   mean, an employee at a single point in time would

13   have only been employed by one Nortel entity.  It

14   was quite common in my understanding that employees

15   moved around and moved their employment between

16   entities.

17             But for business or operational

18   reasons, most employees described their roles to me

19   as having general Nortel responsibility, they

20   worked within a function or a role across -- across

21   the group.

22             Q.   Employed by -- but they'd have an

23   employment contract?

24             A.   But they would have a paycheque

25   from a single Nortel entity.



```
 1                    Q.   And the fixed assets would belong
 2   to a particular Nortel entity?
 3                    A.   Yes.
 4                    MS. BLOCK:  Thank you.  Those are my
 5   questions.
 6                    THE CANADIAN COURT:  Same?
 7                    MR. ZARNETT:  I now have 20 minutes of
 8   re-examination.  No, I have no questions.
 9                    THE CANADIAN COURT:  Thank you.  Thank
10   you, Ms. Hamilton.
11                    THE WITNESS:  Thank you.
12   -- WITNESS EXCUSED
13                    THE CANADIAN COURT:  So I take it now
14   we're off until Tuesday morning?  We celebrate
15   Queen Victoria's birthday on Monday, Judge Gross.
16   Can't hear you.
17                    THE US COURT:  Wish her a happy
18   birthday for me.
19                    THE CANADIAN COURT:  I will do that.
20   All right, so we'll break now until nine o'clock on
21   Tuesday morning.
22                    THE US COURT:  All right, everyone.
23   Have a good day.  Rest a little bit.
24   -- WHEREUPON COURT ADJOURNED AT 3:10 P.M.
25
```



1                    REPORTERS' CERTIFICATE

2

3                    I, DEANA SANTEDICOLA, RPR, CRR, CSR,

4    and I, KIMBERLEY A. NEESON, RPR, CRR, CSR, CCP,

5    Canadian Certified Shorthand Reporter, Realtime

6    Systems Administrator, and I, GAIL VERBANO, RDR,

7    CRR, CSR, US Certificate Shorthand Reporter,

8    certify;

9                    That the foregoing proceedings were

10   taken before us at the time and place therein set

11   forth;

12                   That the entire proceedings of the

13   hearing date were recorded stenographically

14   individually by each of us and were thereafter

15   transcribed;

16                   That the foregoing is a true and

17   correct transcript of our shorthand notes so taken.

18

19                   Dated this 15th day of May, 2014.

20   PER:                 PER:

21   *Gail Inghram Verbano* *Kimberley Neeson, Deana Santedicola*

22   GAIL VERBANO          KIMBERLEY NEESON and

23   WILCOX & FETZER       DEANA SANTEDICOLA

24   WILMINGTON, DE  USA   NEESON & ASSOCIATES

25                        TORONTO, ON  CANADA

























































