



```
 1               UNITED STATES BANKRUPTCY COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3       ---------------------------)

 4       In Re                      )

 5          NORTEL NETWORKS INC.,   ) Chapter 11

 6          et al,                  ) Case No.

 7                Debtors.          ) 09-10138(KG)

 8       ---------------------------)

 9                             - and -

10                       Court File No. 09-CL-7950

11                             ONTARIO

12                  SUPERIOR COURT OF JUSTICE

13                     (COMMERCIAL LIST)

14         IN THE MATTER OF THE COMPANIES' CREDITORS

15      ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16       AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17        ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18      NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19        CORPORATION, NORTEL NETWORKS INTERNATIONAL

20        CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                          CORPORATION

22        APPLICATION UNDER PART IV OF THE COMPANIES'

23      CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                          AS AMENDED

25                          --------
```



```
 1
 2                              --------
 3
 4    --- This is the Day 15/Volume 15 of the transcript
 5    of proceedings in the above matter held
 6    simultaneously in:
 7    Superior Court of       United States Bankruptcy
 8    Ontario (Commerical     Court for the District of
 9    List)                   Delaware
10    Courtroom 8-1           Courtroom 3
11    330 University Avenue    824 Market Street
12    Toronto, Ontario        Wilmington, Delaware
13
14    on the 16th day of June, 2014, commencing at
15    10:18 a.m.
16
17                              --------
18    B E F O R E:
19    The Honourable Judge Kevin Gross (United States)
20    The Honourable Mr. Justice Frank Newbould (Canada)
21
22                              ----------
23
24
25
```



```
 1   A P P E A R A N C E S:

 2   CANADIAN DEBTORS

 3

 4   FOR THE MONITOR, ERNST & YOUNG INC.

 5   GOODMANS LLP

 6   Bay Adelaide Centre

 7   333 Bay Street, Suite 3400

 8   Toronto, ON  M5H 2S7

 9   PER:       Jay Carfagnini, Esq.

10              Joseph Pasquariello, Esq.

11              Ben Zarnett, Esq.

12              Alan Mark, Esq.

13              Peter Ruby, Esq.

14              Jessica Kimmel, Esq.

15              Chris Armstrong, Esq.

16              Julie Rosenthal, Esq.

17

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22   PER:       Murray McDonald, Esq.

23              Brent Beekenkamp, Esq.

24

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER:       Derrick Tay, Esq.

 7              Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER:       Jacob Pultman, Esq.

14              Ken Coleman, Esq.

15              Paul Keller, Esq.

16              Daniel Guyder, Esq.

17              Laura Hall, Esq.

18              Joseph Badtke-Berkow, Esq.

19              Jonathan Cho, Esq.

20              Nicolette Ward, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   BUCHANAN INGERSOLL & ROONEY

24   1105 North Market Street

25   Suite 1900
```



```
 1   Wilmington, DE  19801-1054

 2   PER:       Kathleen A. Murphy, Esq.

 3              Mary F. Caloway, Esq.

 4

 5                  U.S. DEBTORS

 6

 7   FOR NORTEL NETWORKS INC.

 8   TORYS LLP

 9   79 Wellington Street West, Suite 3000

10   Box 270, TD Centre

11   Toronto, ON  M5K 1N2

12   PER:       Sheila Block, Esq.

13              Andrew Gray, Esq.

14

15   FOR THE U.S. DEBTORS

16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

17   1201 North Market Street, 16th Floor

18   P.O. Box 1347

19   Wilmington, DE  19899-1347

20   PER:       Derek Abbott, Esq.

21              Annie Cordo, Esq.

22

23   FOR NORTEL NETWORKS INC.

24   CLEARY GOTTLIEB STEEN & HAMILTON LLP

25   One Liberty Plaza
```



```
 1   New York, NY  10006
 2   PER:        James Bromley, Esq.
 3               Lisa Schweitzer, Esq.
 4               Howard Zelbo, Esq.
 5               Jeffrey Rosenthal, Esq.
 6               Avi Luft, Esq.
 7
 8                    EMEA DEBTORS
 9
10   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
11   LIMITED
12   DAVIES WARD PHILLIPS & VINEBERG LLP
13   40th Floor
14   155 Wellington Street
15   Toronto, ON  M5V 3G7
16   PER:        Matthew Milne-Smith, Esq.
17               Robin B. Schwill, Esq.
18               Sean Campbell, Esq.
19               James Doris, Esq.
20               Louis Sarabia, Esq.
21
22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
23   LIMITED
24   LAX O'SULLIVAN SCOTT LISUS LLP
25   Suite 2750, 145 King Street West
```



```
 1   Toronto, ON  M5H 1J8

 2   PER:       Matthew P. Gottlieb, Esq.

 3              Tracy Wynne, Esq.

 4              Paul Michell, Esq.

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER:       Derek Adler, Esq.

11              Neil Oxford, Esq.

12              Fara Tabatabai, Esq.

13              Charles Huberty, Esq.

14

15   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

16   LIMITED

17   YOUNG CONAWAY STARGATT & TAYLOR LLP

18   Rodney Square

19   1000 North King Street

20   Wilmington, DE  19801

21   PER:       Ed Harron, Esq.

22              John Dorsey, Esq.

23

24   FOR THE EMEA DEBTORS

25   HERBERT SMITH FREEHILLS LLP
```



```
 1   Exchange House

 2   Primrose Street

 3   London, England  EC2A 2EG

 4   PER:        James Norris-Jones, Esq.

 5               CANADIAN CREDITORS COMMITTEE

 6

 7   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

 8   BENEFICIARIES

 9   KOSKIE MINSKY

10   20 Queen Street West

11   Suite 900

12   Toronto, ON  M5H 3R3

13   PER:        Mark Zigler, Esq.

14               Susan Philpott, Esq.

15               Ari Kaplan, Esq.

16               Barbara Walancik, Esq.

17

18   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

19   REPRESENTED BY THE CAW-CANADA

20   CAW-CANADA

21   Legal Department

22   205 Placer Court

23   Toronto, ON  M2H 3H9

24   PER:        Barry E. Wadsworth, Esq.

25               Lewis Gottheil, Esq.
```



```
 1    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 2    COMMITTEE

 3    SHIBLEY RIGHTON LLP

 4    250 University Avenue, Suite 700

 5    Toronto, ON  M5H 3E5

 6    PER:        Arthur O. Jacques, Esq.

 7                Thomas McRae, Esq.

 8

 9    FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

10    ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

11    FUND

12    PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

13    35th Floor

14    155 Wellington Street West

15    Toronto, ON  M5V 3H1

16    PER:        Kenneth T. Rosenberg, Esq.

17                Massimo (Max) Starnino, Esq.

18                Lily Harmer, Esq.

19                Karen Jones, Esq.

20                Tina Lie, Esq.

21                Michelle Jackson, Esq.

22

23    FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

24    CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

25    2009
```



```
 1    NELLIGAN O'BRIEN PAYNE LLP

 2    50 O'Connor Street, Suite 1500

 3    Ottawa, ON  K1P 6L2

 4    PER:       Janice B. Payne, Esq.

 5               Steven Levitt, Esq.

 6               Christopher Rootham, Esq.

 7               Ainslie Benedict, Esq.

 8

 9    FOR MORNEAU SHEPELL LIMITED

10    MCCARTHY TETRAULT LLP

11    Suite 5300, Toronto Dominion Bank Tower

12    Toronto, ON  M5K 1E6

13    PER:       Barbara J. Boake, Esq.

14               James D. Gage, Esq.

15               Elder C. Marques, Esq.

16               Paul Steep, Esq.

17               Byron Shaw, Esq.

18               Sharon Kour, Esq.

19               Kelly Peters, Esq.

20

21    FOR THE CANADIAN CREDITORS COMMITTEE

22    DLA PIPER

23    919 North Market Street, Suite 1500

24    Wilmington, DE  19801

25    PER:       Selinda A. Melnik, Esq.
```



```
 1              Richard Hans, Esq.
 2              Timothy Hoeffner, Esq.
 3              Farah Lisa Whitley-Sebti, Esq.
 4          INFORMAL NORTEL NOTEHOLDER GROUP
 5
 6   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
 7   BENNETT JONES LLP
 8   1 First Canadian Place
 9   Suite 3400
10   Toronto, ON  M5X 1A4
11   PER:      Kevin Zych, Esq.
12             S. Richard Orzy, Esq.
13             Gavin Finlayson, Esq.
14             Richard Swan, Esq.
15             Sean Zweig, Esq.
16             Jonathan Bell, Esq.
17             Amanda McLachlan, Esq.
18
19   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
20   MILBANK, TWEED, HADLEY, MCCLOY LLP
21   1 Chase Manhattan Plaza
22   New York, NY  10005
23   PER:      Thomas R. Kreller, Esq.
24             Jennifer P. Harris, Esq.
25             Albert A. Pisa, Esq.
```



```
 1              Samir Vora, Esq.

 2              Andrew LeBlanc, Esq.

 3              Michael Hirschfeld, Esq.

 4              Atara Miller, Esq.

 5              Tom Matz, Esq.

 6              Nick Bassett, Esq.

 7              Gabrielle Ruha, Esq.

 8              Rachel Pojunas, Esq.

 9

10    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

11

12  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

13  CASSELS BROCK & BLACKWELL LLP

14  Suite 2100, Scotia Plaza

15  40 King Street West

16  Toronto, ON  M5H 3C2

17  PER:      Shayne Kukulowicz, Esq.

18            Michael Wunder, Esq.

19            Ryan Jacobs, Esq.

20

21  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

22  ASHURST LLP

23  Boardwalk House

24  5 Appold Street

25  London, England  EC2A 2HA
```



```
 1   PER:        Angela Pearson, Esq.

 2               Antonia Croke, Esq.

 3

 4   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 5   RICHARDS LAYTON & FINGER, P.A.

 6   920 North King Street

 7   Wilmington, DE  19801

 8   PER:        Christopher Samis, Esq.

 9

10   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

11   AKIN GUMP STRAUSS HAUER & FELD LLP

12   One Bryant Park

13   New York, NY  10036

14   PER:        Fred S. Hodara, Esq.

15               David H. Botter, Esq.

16               Abid Qureshi, Esq.

17               Robert A. Johnson, Esq.

18               Brad M. Kahn, Esq.

19               Christine Doniak, Esq.

20               Joseph Sorkin, Esq.

21               Jacqueline Yecies, Esq.

22

23      UK PENSION PROTECTION FUND AND NORTEL NETWORKS

24               UK PENSION TRUST LIMITED

25
```



```
 1   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 2   NETWORKS UK PENSION TRUST LIMITED

 3   THORNTON GROUT FINNIGAN LLP

 4   Suite 3200, 100 Wellington Street West

 5   P.O. Box 329

 6   Toronto, ON  M5K 1K7

 7   PER:      Michael Barrack, Esq.

 8             D.J. Miller, Esq.

 9             Rebecca Lewis, Esq.

10             Andrea McEwan, Esq.

11             John Finnigan, Esq.

12             Michael Shakra, Esq.

13

14   FOR THE UK PENSION PROTECTION FUND AND NORTEL

15   NETWORKS UK PENSION TRUST LIMITED

16   WILLKIE FARR & GALLAGHER LLP

17   787 Seventh Avenue

18   New York, NY  10019-6099

19   PER:      Brian O'Connor, Esq.

20             Sameer Advani, Esq.

21             Andrew Hanrahan, Esq.

22

23   FOR THE UK PENSION PROTECTION FUND AND NORTEL

24   NETWORKS UK PENSION TRUST LIMITED

25   BAYARD, P.A.
```



```
 1   222 Delaware Avenue, Suite 900

 2   Wilmington, DE  19899

 3

 4   PER:        Charlene D. Davis, Esq.

 5               Justin Alberto, Esq.

 6

 7               THE BANK OF NEW YORK MELLON

 8

 9   FOR THE BANK OF NEW YORK MELLON

10   MCMILLAN LLP

11   Brookfield Place

12   181 Bay Street, Suite 4400

13   Toronto, ON  M5J 2T3

14   PER:        Sheryl E. Seigel, Esq.

15

16   FOR THE BANK OF NEW YORK MELLON

17   LATHAM & WATKINS LLP

18   885 Third Avenue

19   New York, NY  10022-4834

20   PER:        Michael J. Riela, Esq.

21

22        WILMINGTON TRUST, NATIONAL ASSOCIATION

23

24   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

25   HEENAN BLAIKIE LLP
```



```
 1   Bay Adelaide Centre
 2   333 Bay Street, Suite 2900
 3   P.O. Box 2900
 4   Toronto, ON  M5H 2T4
 5   PER:      John Salmas, Esq.
 6             Kenneth Kraft, Esq.
 7             Sara-Ann Van Allen, Esq.
 8
 9   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
10   KATTEN MUCHIN ROSENMAN LLP
11   575 Madison Avenue
12   New York, NY  10022-2585
13   PER:      Craig A. Barbarosh, Esq.
14             David A. Crichlow, Esq.
15             Karen B. Dine, Esq.
16
17       LAW DEBENTURE TRUST COMPANY OF NEW YORK
18
19   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
20   BORDEN LADNER GERVAIS LLP
21   40 King Street West
22   Toronto, ON  M5H 3Y4
23   PER:      Edmond F.B. Lamek, Esq.
24             James Szumski, Esq.
25
```



```
 1   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 2   PATTERSON BELKNAP WEBB & TYLER LLP

 3   1133 Avenue of the Americas

 4   New York, NY  10036

 5   PER:       Daniel A. Lowenthal, Esq.

 6

 7        BOARDS OF DIRECTORS OF NORTEL NETWORKS

 8        CORPORATION AND NORTEL NETWORKS LIMITED

 9

10   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

11   CORPORATION AND NORTEL NETWORKS LIMITED

12   OSLER HOSKIN AND HARCOURT LLP

13   100 King Street West

14   1 First Canadian Place, Suite 6100

15   P.O. Box 50

16   Toronto, ON  M5X 1B8

17   PER:       Lyndon Barnes, Esq.

18              Edward Sellers, Esq.

19              Betsy Putnam, Esq.

20              Adam Hirsh, Esq.

21              Alexander Cobb, Esq.

22

23

24

25
```



```
 1    REPORTED BY:  Toronto - Kimberley Neeson
 2            RPR, CRR, CSR, CCP, CBC
 3         Realtime Systems Administrator
 4          Delaware - Lorraine B. Marino
 5                 RDR, CRR, CSR
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1                    I N D E X

 2

 3   MARK BERENBLUT

 4                                            PAGE

 5   Examination-in-Chief/Direct Examination

 6    by Mr. Ruby.........................    3607

 7   Cross-Examination by Mr. Rosenthal........  3629

 8   Cross-Examination by Mr. Gottlieb.........  3684

 9   Cross-Examination by Mr. O'Connor.........  3756

10   Re-Examination/Re-Direct Examination by

11    Mr. Ruby...............................    3782

12   Further Cross-Examination by Mr. Gottlieb.  3791

13   Further Cross-Examination by Mr. O'Connor.  3794

14

15

16

17

18

19

20

21

22

23

24

25
```

Neeson&Associates    W&F

1                        INDEX OF EXHIBITS

2

3    NUMBER/DESCRIPTION                          PAGE NO.

4

5      47: Initial Report of Mark Berenblut.     3607

6      48: Rebuttal Report of Mark Berenblut.    3608

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   -- Upon commencing at 10:18 a.m.
 2              THE CANADIAN COURT:  Good morning, Mr.
 3   Ruby.
 4              MR. RUBY:  Our first witness today is
 5   in Toronto.  It is Mr. Berenblut.  If I can ask for
 6   him to be affirmed, please.
 7
 8              MARK LAWRENCE BERENBLUT, HAVING BEEN
 9          FIRST DULY AFFIRMED, WAS EXAMINED AND
10                 TESTIFIED AS FOLLOWS:
11
12              MR. RUBY:  Peter Ruby at Goodmans for
13   the monitor, Your Honours.
14
15   EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY
16   MR. RUBY:
17              Q.   Mr. Berenblut, I take it you
18   prepared two reports in this matter, one an initial
19   report and a rebuttal report?
20              A.   I did.
21              THE CANADIAN COURT:  Make those the
22   next two exhibits.
23              THE REGISTRAR:  Exhibits 47 and 48,
24   Your Honour.
25              EXHIBIT NO. 47:  Initial Report of
```



```
 1                    Mark Berenblut.
 2                    EXHIBIT NO. 48:  Rebuttal Report of
 3                    Mark Berenblut.
 4                    BY MR. RUBY:
 5                    Q.   Thank you.  Mr. Berenblut, did you
 6      also prepare -- did you also prepare slides to
 7      assist the courts today?
 8                    A.   I did.
 9                    Q.   And Your Honours, you should have
10      copies of those slides and they should appear on
11      the screen as well.
12                    THE US COURT:  Yes, Mr. Ruby, thank
13      you.
14                    BY MR. RUBY:
15                    Q.   To start, Mr. Berenblut, did you
16      attach a copy of your curriculum vitae to your
17      initial report?
18                    A.   I did.  It's Appendix A.
19                    Q.   Now, you share certain credentials
20      as a valuator with Mr. Green, so perhaps we can
21      focus on one of the professional designations that
22      we have not yet heard about in this trial.  You are
23      a fellow chartered business valuator; is that
24      correct?
25                    A.   I am.
```

 Neeson & Associates    W&P

```
 1                    Q.    How did you earn that credential?
 2                    A.    To become a member of the Canadian
 3    Institute of Chartered Business Valuators, one has
 4    to have a prerequisite of an amount of time working
 5    in the field of business valuation.  There is a
 6    course of examinations that takes approximately
 7    three years from start to finish, and that is the
 8    process by which one can gain admittance to the
 9    institute.
10                    Q.    And I notice you have the word
11    "Fellow" before "Chartered Business Valuator."
12                    A.    Yes.
13                    Q.    What does that signify?
14                    A.    Fellow is a recognition by the
15    institute of a contribution of the valuation
16    profession, and it is proposed by a number of
17    members and has to be accepted by the accreditation
18    board.
19                    Q.    And is it a designation from a
20    Canadian organization?
21                    A.    It is from the Canadian Institute
22    of Chartered Business Valuators.
23                    Q.    Now, you also have the American
24    ASA designation that we heard a little bit about
25    from Mr. Green; is that right?
```



```
 1                    A.   Correct.
 2                    Q.   And Mr. Berenblut, have you done
 3    substantial valuation work concerning IP and
 4    technology businesses?
 5                    A.   I have.
 6                    Q.   Have you ever been accepted by a
 7    court as a valuation expert?
 8                    A.   I have.
 9                    Q.   In which countries, please?
10                    A.   Principally in the US and Canada.
11                    Q.   And what proportion of your
12    working life is spent on litigation and arbitration
13    matters?
14                    A.   I would say on average 60 to 70
15    percent.
16                    Q.   And other than your work in
17    litigation and arbitration contexts, what relevant
18    kinds of matters do you work on?
19                    A.   Principally valuation for tax
20    purposes that is not litigious, and valuation for
21    mergers and acquisitions, that is for transactions,
22    advising participants either buying or selling
23    businesses.
24                    Q.   Now, your reports in this case
25    were co-authored with Dr. Alan Cox; is that right?
```



```
 1                    A.   That is correct.

 2                    Q.   And is his CV also attached to

 3     your report?

 4                    A.   It is, I think it's in the same

 5     Appendix A.

 6                    Q.   Now, Your Honours, just so you

 7     know by agreement of the parties made last week, in

 8     order to streamline the balance of the trial, Dr.

 9     Cox and four other experts are not going to testify

10     live at trial, although their reports and their

11     deposition transcripts will continue to be offered

12     as part of the trial record.

13                    THE CANADIAN COURT:  Are you able to

14     give me the names of those, Mr. Ruby?

15                    MR. RUBY:  Yes.  It is Dr. Cox,

16     Mr. McGarty -- Mr. McGarty is one of the witnesses

17     for the US Debtors -- and the three lawyers who

18     you've heard so much about, Mr. Burshtein,

19     Mr. Bereskin and Mr. Stratton.  And that of course

20     is subject to the direction of the court.

21                    THE CANADIAN COURT:  Thank you.

22                    BY MR. RUBY:

23                    Q.   Mr. Berenblut, we were talking

24     about the reports you co-authored with Dr. Cox.

25     Are those reports -- pardon me -- are the opinions
```



```
 1   in those reports that you expressed all opinions
 2   that you hold?
 3               A.    They are.
 4               Q.    So perhaps we can turn to talking
 5   about your mandate in this matter.  If we can go to
 6   the next slide, Mr. Berenblut, can you briefly
 7   describe to the courts your mandate?
 8               A.    Yes.  I was posed the question
 9   that is shown on the screen here, and I was asked
10   to provide from an economic and valuation
11   standpoint the appropriate methodology and the
12   component pieces of a methodology to answer this
13   question.
14               Q.    So because I don't want to repeat
15   any testimony that's already been heard, in a few
16   sentences can you please summarize what you see as
17   the correct methodology for answering the
18   allocation question?
19               A.    Yes.  The question is, what is the
20   portion of the proceeds realized in the transaction
21   that is due to the transfer or surrender by the
22   Debtors of the property interests in the assets
23   that were the subject matter of the transaction.
24               So the first question is, what were the
25   property interests in the assets?  And in order to
```



```
 1   do a valuation, the first question one have to ask
 2   is what is it that I'm valuing?
 3             In this case, we're valuing those
 4   property interests being the rights that are
 5   outlined in an agreement between the parties, the
 6   agreement being the MRDA, so principally we're
 7   looking at the license rights and in order to value
 8   the license rights one has to understand the terms
 9   of the license contained in the license, and one
10   has to determine the cash flow and benefits that
11   flow from those rights.
12             They are valued as an income stream
13   using present value methodology and a discount rate
14   in order to arrive at the value that was
15   surrendered by the holders of those rights.
16             In order to make the allocation between
17   the parties there is a formula in the MRDA called
18   the RPSM, and that allows one to determine how the
19   present value of those future cash flows would be
20   apportioned between the parties.
21             Q.   Now, have you read Mr. Green's
22   reports?
23             A.   I have.
24             Q.   And is the methodology you just
25   described essentially the same as Mr. Green puts
```



```
 1    forward?

 2                    A.    I believe it is, yes.

 3                    Q.    Is it a standard valuation

 4    methodology that you just described or something

 5    you developed in collaboration with Mr. Green?

 6                    A.    I think there's two questions

 7    there.

 8                    The first one is, is it a standard

 9    methodology?  The fact is that valuing cash flows

10    and license rights is a standard valuation

11    methodology, and it was not done in collaboration

12    with Mr. Green because I had no knowledge of what

13    Mr. Green was doing until his report was issued.

14                    Q.    So since we're not going to cover

15    the same ground as Mr. Green did in testimony

16    already, I'm just going to ask for your help

17    elucidating a few specific points for the courts

18    today.

19                    A.    Yes.

20                    Q.    The first is if we can turn to

21    transferability, which has come up before as an

22    issue.

23                    Mr. Berenblut, if we can have the next

24    slide, please, your reports mention in several

25    places that the license rights of the US and EMEA
```



```
 1   Debtors were not transferrable; is that right?
 2               A.   Correct.
 3               Q.   Can you highlight for a moment why
 4   you conclude those licenses were not transferable?
 5               A.   There was a term that's shown on
 6   the screen in the MRDA, Article 14 (a), that says
 7   that the agreement is not transferable or
 8   assignable.
 9               Q.   And if we can go to the next
10   slide, please, what is the standard valuation
11   methodology for dealing with a non-transferable
12   asset?
13               A.   If one uses the measure of fair
14   market value for valuing an asset, fair market
15   value assumes an open and unrestricted market
16   between a willing buyer and a willing seller.
17               Obviously if the asset is
18   non-transferable, that in part is in contrast to
19   the requirement of fair market value that you have
20   an open and unrestricted market.  So valuation
21   theory posits that the valuation is done in the
22   following method.
23               One assumes one does what's called lift
24   the transferability restriction; then one values
25   the asset in question; and having valued it, one
```

 Neeson & Associates   W&F

1    reimposes the transferability restriction and

2    applies whatever discount, whatever significant

3    discount that would apply to an asset that cannot

4    be sold or transferred, again by the purchaser.

5                So recognizing the purchaser in theory

6    has purchased an asset which he can no longer

7    transfer, what is the price that would be paid?

8    What is the value that would be ascribed, taking

9    into account that restriction?

10               Q.    And sir, if I can direct your

11   attention to the second to last bullet on the

12   screen that you just spoke to, where it says "the

13   value of the rights subject to the scope of the

14   licenses"?

15               A.    Yes.

16               Q.    I think this is highlighted on the

17   next slide.  Can you just explain to us briefly

18   what you mean by -- sorry, we'll have to go back

19   one.  What you mean by "subject to the scope of the

20   licenses"?

21               A.    Yes.  I think it's important to

22   recognize that the lifting of the restriction of

23   transferability only applies to that particular

24   restriction, being the non-transferability in order

25   to undertake the notional valuation.



1                    All of the other attributes of the

2    asset being valued remain in place, so in this

3    particular case we're valuing a stream of income

4    that comes from a license.

5                    That license, as most licenses, have

6    conditions attached to it.  Those conditions, for

7    example, relate to the requirement to participate

8    in research and development, require -- refers to

9    the requirement to share in profits based on a

10   preestablished formula called the RPSM.

11                   Those and all the other restrictions of

12   the licenses, and conditions of the licenses, stay

13   in place notwithstanding the fact that that one

14   issue with respect to the lack of transferability

15   has been temporarily lifted.

16           Q.    And you're familiar in the MRDA

17   with the products definition and its place in the

18   grant of license?

19           A.    Yes.

20           Q.    Now, is that one of the things

21   that gets lifted or stays in place?

22           A.    It, like all of the other

23   conditions of the license, stay in place.

24           Q.    Now, if we can turn, please, to

25   looking at what is the standard methodology for



```
 1   valuing a non-transferable IP license.

 2                    A.   Yes.  Well, a license,

 3   transferable or not, is frequently valued by the

 4   measure of the cash flows that the licensee can

 5   benefit and receive as a result of holding that

 6   license, and the present value thereof.

 7                    So that value in use, or is sometimes

 8   is called value to owner, is a common methodology

 9   for valuing license rights.

10                    Q.   And for the benefit of the courts,

11   can you compare what you described -- I don't want

12   to put words in your mouth -- but the fair market

13   value type analysis you talked about a moment ago

14   with value in use?

15                    A.   Yes.  I think that the value in

16   use is a methodology to value that sub-component

17   piece of a wider set of business activities.  So a

18   license right is one piece of a larger business

19   consideration which would include from the

20   licensor's perspective the intellectual property in

21   this case and the ownership of the patents.

22                    The value in use is particularly

23   appropriate to this particular case because it does

24   match the requirements of the question that was

25   asked, which was:  What portion of the proceeds
```



1    were surrendered, what property interests and the

2    assets were surrendered?

3                  The property, the interests that were

4    surrendered was the rights received, the income

5    from the license.

6                  So the value in use, which is the

7    income stream from the licenses, matches that

8    description very well, and of course will often and

9    usually exceed the fair market value determination

10   which has in it that large discount for

11   non-transferability.

12                 Q.   Thank you, Mr. Berenblut.  Because

13   I suspect some of or at least one of my friends may

14   put to you evidence given by different individuals

15   or documents about comments made about beneficial

16   or equitable ownership, either between Nortel

17   employees or to tax authorities, can I ask you to

18   assume that statements made on that subject between

19   people at Nortel or to the tax authorities, and

20   explain to us how that would affect your opinion as

21   expressed in your reports?

22                 A.   As a valuator, I have to consider

23   agreements that affect the business terms of an

24   arrangement between parties to the extent that they

25   impact the value considerations.



1              It's not possible as a valuator to look

2     at an agreement and then consider all kinds of

3     extraneous information that is said to impact that

4     agreement because from a valuation perspective one

5     looks at the agreements in place and assumes to the

6     extent the agreements have in there the terms that

7     dictate the business arrangements, that those are

8     the terms that are being valued.

9              If the courts were to tell me, well,

10    for whatever reason we think that such-and-such a

11    piece of information that happened outside the

12    agreement is now to be considered part of the

13    agreement, I would take that into account.

14             But absent that, I would stay with the

15    terms of the agreement.

16             Q.    Turning to a different subject,

17    again related to your report, in your initial

18    report at page 31 in the context of the business

19    sales, you mention an upper and lower bound on the

20    allocation to the US and EMEA licensees?

21             A.    Yes.

22             Q.    What did you mean by that upper

23    bound and lower bound concept?

24             A.    Well, in the thought process that

25    one goes through to do a valuation, you consider

1    the context of the valuation and what the extremes

2    of the value may be, even though that may not be

3    your valuation conclusion.

4                    So on the one hand at the lower bound,

5    the licensed participants owned various fixed

6    assets, tangible assets which they could dispose

7    of.

8                    So absent any value to the license

9    rights, if one were to take an extreme view that

10   non-transferability means that the license rights

11   are zero on a resale basis, then the lower bound of

12   the valuation would be the tangible assets.

13                   The upper bound is one where one says

14   that -- and this is -- the facts of this case are

15   that you've got several parties with different

16   bundles of rights, which is why the allocation

17   question is being posed.

18                   You have parties with different bundles

19   of rights, and if one for the moment would say

20   well, let's set aside those different bundles of

21   rights and just say that we've got proceeds of $2.9

22   billion, they equal the value that has been

23   surrendered by the parties, then -- which obviously

24   is not the conclusion that I come to in my report.

25                   But in doing that one would be saying



```
 1    that those proceeds represent the cash flows that
 2    have been foregone by the Nortel operating units
 3    and the subsidiaries.
 4              And those would -- that would represent
 5    the upper bound of the value that has to be
 6    allocated.  And then obviously in doing that, if
 7    that was the price that was achieved and it
 8    represented the value of those licenses, then the
 9    notional buyer would now be subject to the MRDA
10    provisions.
11              And that -- those proceeds which
12    represent the foregone cash flows would be put
13    through the RPSM in order to determine the amounts
14    that would go to each party, and that's the upper
15    extreme.
16              So there we have two extremes.  One is
17    licence values, no value, and just tangible assets
18    being the valuation; and at upper end we're
19    basically ignoring the provisions of the
20    restrictions of the license and saying the whole
21    value of the proceeds is distributable to the
22    parties and allocated through the RPSM.
23              Q.   Turning once again to a different
24    subject, this time the residual IP sale, you
25    conclude at paragraph 71 of your report that there
```

 Neeson&Associates   W&F

1    were no expected future operating profits from the

2    residual IP from which the US and EMEA Debtors

3    could have benefited; is that right?

4                    A.    That is correct.

5                    Q.    And you also say that Canada gets

6    all the residual IP proceeds absent a demonstration

7    that the license rights and the residual IP had

8    value as of the valuation date?

9                    A.    Correct.

10                   Q.    Now, are you familiar with what's

11   been called the IPCo models?

12                   A.    I am.

13                   Q.    And turning to the next slide,

14   please, if it was demonstrated to the courts that

15   as of the valuation date, IPCo was an operating

16   business with the expected future operating profits

17   described in the IPCo models, and the courts found

18   that the license rights of the EMEA and US Debtors

19   extended to such a licensing business, what, in

20   your opinion, would be the appropriate valuation

21   approach?

22                   A.    With those two condition

23   precedents there, that IPCo was a reality, and that

24   the license rights held by the licensed

25   participants of Nortel did reach into patents and



1    IP that had not been utilized in products or

2    proposed products, then one would look at the IP

3    model, the IPCo model, which was the

4    contemporaneous expectation at the date of

5    valuation of what IPCo could perform, and there was

6    a range of values, present values that the company

7    put on that.

8              And those -- one of those amounts, the

9    appropriate amount, would then be the proceeds of

10   IPCo and would again represent the cash flows that

11   would have, in that notional circumstance, those

12   cash flows would have been for the benefit of the

13   participants and would have flowed through the RPSM

14   and the allocation would flow from that -- for that

15   portion of the Rockstar portfolio sale.

16             Q.   So on the second to last bullet on

17   the screen, you have "highest projection $2.7

18   billion, 25 percent discount rate, a hundred

19   percent success rate."

20             Can you just explain what the 25

21   percent and 100 percent represent?

22             A.   Yes.  If one looks at, and I did

23   on page 8 of my second report, look at the various

24   calculations that were done, the IPCo model is not

25   one model.



```
 1                    There were many, many, many iterations
 2    of it and they come up with different conclusions.
 3    They have ranges.  They make assumptions regarding
 4    litigation success of 60 percent, 70 percent, 100
 5    percent.  They use a low discount rate of 25
 6    percent and a high discount rate of 45 percent.
 7                    Taking the most optimistic set of cash
 8    flows for IPCo, taking the lowest discount rate,
 9    which results in the highest value, and taking the
10    assumption of the highest success rate being a
11    hundred percent, the highest number that the IPCo
12    model comes up with is, as shown on table 2 on page
13    8 of my second report, is approximately $2.7
14    billion.
15                    Obviously as I've said -- well, that is
16    the -- that is what the IPCo model shows.
17                    Q.   And for a business of the IPCo
18    model type, what would you expect a reasonable
19    range for the discount rate to be?
20                    A.   I would expect the range of
21    discount rates to be between 30 and 70 percent,
22    recognizing the fact that this was a contemplated
23    business and recognizing the risks associated with
24    it.
25                    The company itself, as I mentioned,
```



1    used discount rates of 25 to 45 percent.  One of

2    the experts for EMEA and some of the literature

3    talks about discount rates of 30 to 70 percent and

4    that's -- that is consistent with my experience.

5              Q.   Now, turning to a final subject

6    in-chief, we've already heard from Mr. Green about

7    his views of the flaws in the reports of some of

8    the opposing experts.  But since Mr. Kinrich is

9    lucky enough to be scheduled to testify tomorrow,

10   let's highlight at least a couple of your comments

11   about his report.

12             Can you, just because the courts have

13   not yet heard from Mr. Kinrich, can you summarize

14   in a sentence or two the Kinrich report's approach

15   to the business sales?

16             A.   Yes.  Mr. Kinrich basically

17   assumes that the full proceeds of the business

18   sales are available to the participants, although

19   -- and then also assumes that they have equivalent

20   rights in terms of access to those proceeds, and

21   distributes the -- or suggests a distribution

22   between the participants based on the revenues that

23   they achieved in 2009 per geography.

24             That in essence is the approach that is

25   taken.



1                    Q.    And can you share with us a few of

2    your key thoughts about that approach?

3                    A.    Yes.  It is what it is.  It is a

4    suggestion that you take proceeds and you allocate

5    them by geography.  It's certainly not a valuation.

6                    There is a lot of discussion in the

7    report about valuation, but ultimately the approach

8    that is taken is to just to take the proceeds and

9    again to allocate them by 2009 revenues.

10                    That allocation ignores obviously the

11   RPSM; it also has what I would describe a very

12   expansive view of the licensed participants' rights

13   because it basically says that they are uninhibited

14   and unrestricted in what they can do with the IP in

15   their geography.  And it uses the revenue as an

16   allocation key, which I don't think necessarily is

17   that helpful and certainly doesn't correspond with

18   the RPSM.

19                    Q.    Now, turning to the residual IP

20   sales, again, can you summarize for the courts in a

21   sentence or two the Kinrich report's approach to

22   the residual IP sale proceeds?

23                    A.    Summarized, Mr. Kinrich looks at

24   the IPCo sales and income, compares it to the $4.5

25   billion proceeds for the residual portfolio sale,

1    calculates the discount rate that that would imply

2    and says it's between 12 and 15 percent, says he

3    finds that reasonable, and then takes the full $4.5

4    billion of those proceeds and allocates those

5    between the parties.

6            Q.    Now, again, do you have any key

7    comments you can share with the courts about that

8    approach in the lead-up to Mr. Kinrich's testimony

9    tomorrow?

10           A.    Yes.  As we have spoken about

11   earlier, the discount rates for IPCo is, at 12 to

12   15 percent, is in my mind very unrealistic.  As I

13   mentioned, there is much evidence as to what the

14   discount rate for a company or a proposed business

15   such as IPCo would be, which would significantly

16   reduce the present value of the cash flows that are

17   being anticipated in the IPCo.

18           It's inconsistent with the terms of the

19   license in terms of, we know that the patents and

20   IP that were a part of the residual patent

21   portfolio were ones that had not been activated in

22   the most part as part of a product, according to

23   the MRDA.

24           And therefore -- which is why, in my

25   suggested approach, I look at the proceeds from

 Neeson & Associates   W&F

1    Rockstar as being something that isn't included in

2    the license rights that go to the licensed

3    participants.

4              But even if you would, as we discussed

5    earlier, suspend that and say that the license

6    rights of the licensed participants extend into the

7    patent portfolio, the residual patent portfolio,

8    then presumably the proceeds from that, which would

9    represent the foregone cash flows in that

10   theoretical situation, should be put through the

11   RPSM, which they're not in the approach that

12   Mr. Kinrich has taken.

13             MR. RUBY:  Thank you, Mr. Berenblut,

14   Your Honours.  Those are my questions.

15             THE CANADIAN COURT:  Mr. Rosenthal?

16             MR. ROSENTHAL:  Good morning, Justice

17   Newbould, good morning, Judge Gross.  Jeff

18   Rosenthal of Cleary Gottlieb Steen & Hamilton on

19   behalf of the U.S. Debtors.

20

21   CROSS-EXAMINATION BY MR. ROSENTHAL:

22             Q.   Good morning, Mr. Berenblut.

23             A.   Good morning.

24             Q.   I just want to start out by

25   looking at your slides and getting a clear sense of



```
 1   what in them are assumptions so we understand what
 2   in them are actually part of your analysis.
 3               If we start with slide 5, is it fair to
 4   say that this valuation approach, the
 5   non-transferability valuation approach, is
 6   predicated on the assumption that NNI's interests
 7   were not transferable?
 8               A.   Yes.
 9               Q.   And if we turn to slide 6, is it
10   fair to say that this non-transferred valuation
11   approach that you described here is likewise
12   predicated on the assumption you were given that
13   NNI's interests were not transferable?
14               A.   I would reword that slightly.  I
15   would say it was based on the provision in the MRDA
16   that the licenses are not transferable.
17               Q.   And when you talk about the
18   provisions of the MRDA, you are talking about
19   assumptions that you were given by counsel?
20               A.   I think, as I have discussed
21   previously at my deposition, I read the MRDA as I
22   have to do as a valuator as it's one of the -- it's
23   the pertinent contract to understand the terms of
24   the licenses.  I saw in there that the license is
25   not transferable.  I was also advised by counsel
```



```
1    that the license was not transferable.
2              So on both those counts, that is why I
3    assumed the non-transferability.
4              Q.   Now, you understood, however, that
5    you're not a lawyer and that your instructions in
6    this case were to take assumptions from counsel,
7    correct?
8              A.   I do understand that I'm not a
9    lawyer.  I'm not sure what you mean by my
10   instructions were to take assumptions from counsel.
11             Q.   Would you agree with me that in
12   terms of any legal interpretations for purposes of
13   your expert analysis, you're deferring to the
14   lawyers and to the court?
15             A.   I would agree with that.
16             Q.   So if we turn then to slide 7,
17   would you give the same answer regarding
18   assumptions?
19             A.   You'll have to tell me which
20   assumption you're referring to.
21             Q.   The assumption that the licenses
22   are non-transferable when choosing the valuation
23   approach?
24             A.   Yes, as I mentioned, my own
25   reading of the MRDA, there is a clause in there
```



```
 1    that the licenses are not transferable and counsel

 2    has confirmed that the licenses are not

 3    transferable.

 4              And of course it would be the court's

 5    determination as to whether the licenses are

 6    non-transferable.

 7              Q.   If we could turn to slide 8.  You

 8    say here that the buyers would become MRDA

 9    participants.  Do you see that?

10              A.   Yes.

11              Q.   Is that based upon an assumption

12    about the MRDA?

13              A.   No, I think this is an

14    explanation.  I think that if one says, as I have

15    done in this particular case, we're talking about

16    the upper bound, if one says that the total

17    proceeds for the business sales of $2.9 billion are

18    entitlement of the participants, which means that

19    the license holder's rights extend into everything,

20    then by definition what we're valuing, we're no

21    longer valuing just the income stream that comes

22    from the licenses, we're valuing the transfer of

23    that license, and this is notional, fair market

24    value is a notional exercise, but in that notional

25    world, what are you selling?  You're selling the
```



1    right to be a Nortel subsidiary.

2              So you're selling the right for

3    somebody to stand in the place of whichever Nortel

4    subsidiary you're looking at and they would then be

5    subject to the MRDA.

6              Because the question that I'm answering

7    in this case is -- it's the but for situation.  The

8    but for situation is, what is - let's just look at

9    the actual wording here - what portion of the

10   proceeds in the transaction was due to the

11   surrender by the Debtors of the property interests

12   in the assets?

13             So what they surrendered was their

14   participation as licensed participants of the US

15   and EMEA, licensed participants under the MRDA.  So

16   that is what they have given up.

17             And so that is the hypothetical here,

18   that if the proceeds, the total proceeds, represent

19   what they have given up, and what they have given

20   up obviously is in the context of participating in

21   the MRDA.

22             Q.   Mr. Berenblut, I'm sorry, I'm

23   perhaps more confused than before I asked the

24   question.

25             So in your direct testimony, I wrote



1    down that you had said the "notional buyer would be
2    subject to MRDA provisions."
3                    A.    Correct.
4                    Q.    What do you mean that the notional
5    buyer would be subject to the MRDA provisions?
6                    A.    We're talking about a notional
7    transaction in fair market value.  We're talking
8    about a notional transaction.  We're talking about
9    the but for situation, whereby we know that the
10   business lines were sold.  But we're saying that
11   the rights surrendered by the licensed participants
12   -- those rights, what are their rights?  Their
13   rights are through their license.
14                    If they transfer that license and they
15   are entitled to a share of the 2.9, then in the
16   notional marketplace what has been transferred is
17   the right to participate as a licensee.
18                    So now company A has taken over from
19   company B as the licensee and becomes, in all other
20   respects, a participant to the MRDA.  That is the
21   lifting, if you want, of the transferability
22   provision of the MRDA to allow somebody to become,
23   to take that position from the licensed
24   participants.
25                    Q.    Can you give me a provision of the



1    MRDA upon which you base that statement?

2                A.    Which of the statements are you

3    referring to?

4                Q.    The statement that the notional

5    buyer would become an MRDA participant?

6                A.    I think it's fundamental to a

7    valuation.  A valuation is price obtainable in an

8    open and unrestricted market between a willing

9    buyer and a willing seller of the asset in

10   question.

11               What is the asset being surrendered?

12   That's where we started.  When you do a valuation

13   you have to determine what the asset being

14   surrendered is.

15               In this particular case the asset

16   surrendered by the licensed participants is their

17   license.  They are surrendering the license.  We

18   are here assuming -- it doesn't matter what the

19   number is -- we are assuming they receive a proceed

20   for the license.  In that case, whoever steps into

21   that license becomes a subject to the MRDA.  I

22   mean, I think that's pretty straightforward

23   valuation logic.

24               The other approach that was discussed,

25   which is the value in use, which simply values the



1    income stream from the license, which this doesn't,

2    because this is an amount that is greater than the

3    income stream from the license, it puts you into

4    that scenario where you're now treating it as

5    disposing of the asset through lifting the

6    transferability, passing the asset to somebody else

7    and then reimposing the lack of transferability.

8              The in use valuation just looks at the

9    income streams available to the participant and

10   those are the rights surrendered.  This is talking

11   about a slightly different situation, but I think

12   the theory is consistent.

13             Q.   Other than saying that it's

14   fundamental to your valuation, is there an MRDA

15   provision that you can direct us to?

16             A.   No, because the MRDA says the

17   license is not transferable.  So this is as we've

18   said, notional.

19             Q.   Let's take a look at Article 14(a)

20   which is slide 4 that you had put up.  It says:

21             "This Agreement shall not be

22             assigned by any Participant except

23             with the written consent of the

24             other Participants."

25             That's the provision you were referring



1    to when you said it's not transferable, correct?

2                    A.    Yes.

3                    Q.    You understand that NNI, for

4    example, is a participant?

5                    A.    Yes.

6                    Q.    You understand that NNL is, for

7    example, a participant?

8                    A.    Yes.

9                    Q.    So if NNL sells its rights to a

10   third party, does that third party become subject

11   to the MRDA as well?

12                   A.    We're talking about, again, a

13   notional -- a notional transaction.  Some of the

14   rights that NNL owns are outside of the license

15   agreement, and the portion that we're talking about

16   in excess of the present value of the income stream

17   available to the licensed participants is that

18   which Canada owns that is not dictated by the MRDA

19   other than the MRDA records the fact that Canada

20   owns the IP and the technology.

21                   So, and as well, Canada was not a

22   licensed participant, it was a participant.  So I

23   haven't gone as far as to interpret the -- try to

24   interpret the agreement to that extent because they

25   have, as we've spoken about different bundles of



1    rights, Canada was not a licensed participant, it

2    was a participant, so it wasn't subject to the same

3    licenses, so I have no answer to your question.

4                    Q.    Well, assume with me,

5    Mr. Berenblut, that the same agreement that gives

6    NNI its license rights vests title in NNL.  If we

7    take that assumption, then would a notional buyer

8    of NNL's interests be subject to the MRDA?

9                    A.    I don't know the answer to that

10   question.

11                   Q.    Let's move on to slide 9.  So here

12   you start out with given that the residual IP in

13   respect of technology that was either not used in

14   the business or was subject to licenses granted,

15   was in respect of technology either not used or

16   subject to licenses granted to purchasers.  That's

17   an assumption, correct?

18                   A.    I think that's more than an

19   assumption.  I think that's a fact based on the

20   evidence that the company itself went through an

21   exercise of determining which -- which of its

22   licenses and patents was used in the business sales

23   and which weren't.

24                   So the residual IP is, by definition,

25   other than those that were shared -- shared



1   licenses that couldn't be transferred to one of the

2   buyers, by definition the residual IP was not used

3   in the business of the Nortel Group.

4            Q.    Why don't we take a look at your

5   report.  We'll pull up paragraph 49.  I'll repeat

6   my question.  Isn't it true that it was counsel for

7   Monitor that informed you that all of the patents

8   and patent applications transferred in the Rockstar

9   transactions were either not used, or in respect of

10  licenses that had been granted to the purchasers of

11  the business sales?

12           A.    That is correct.  As well as the

13  fact that I saw the testimony and the depositions

14  as to the process the company went through to

15  identify the patents that were a part of the

16  business sales and those which weren't.  So what

17  counsel told me is certainly consistent with what I

18  read myself.

19           Q.    And Mr. Berenblut, with regard to

20  the second half of that, whether the licenses that

21  were in the MRDA were the same scope as the

22  licenses in the business sales, you didn't look at

23  those licenses to compare them, you just took the

24  assumption of counsel, right?

25           A.    That is true.  It is my view as



1    well on reading the license agreement that based on

2    what I've seen in other license agreements that the

3    sublicensing is consistent with the scope of the

4    license that is the subject matter of the license,

5    but certainly again, I think that is the -- one of

6    the issues that will be decided by the court and I

7    have been advised by counsel of that, yes.

8              Q.   So your understanding from looking

9    at both the MRDA and the line of business licenses

10   is that both of them gave the licensee a right to

11   sublicense to the full extent of their license,

12   correct?

13             A.   Again, I want to be careful how I

14   interpret the license in that respect.  I'd have to

15   look at the MRDA again to refresh on the provisions

16   of it.

17             But I don't know whether the, what the

18   full extent of the license is, but certainly the

19   sublicense would normally be one that allows the

20   business to provide licenses to the people who buy

21   equipment that uses its technology so they have a

22   license to use it, a license to use the software,

23   et cetera.

24             I don't want to characterize that as to

25   whether it's the full extent or not the full



```
 1   extent.  It's just a business normality.
 2              Q.   So on your direct examination, you
 3   told Mr. Ruby that you conclude that NNI had no
 4   expected future operating profits from the residual
 5   IP.  Do you recall that testimony?
 6              A.   Not exactly, but I'll assume it's
 7   correct.
 8              Q.   And that's from here, from slide
 9   number 9, the third and fourth lines, correct?
10              A.   Yes.
11              Q.   Now, that conclusion you reach is
12   based entirely on the assumptions you were given
13   that they had no remaining license rights, correct?
14              A.   That they had what?  What was the
15   last piece?
16              Q.   That they had no remaining license
17   rights, correct?
18              A.   I'm not following the logic of
19   that.
20              Q.   Let me ask it a little
21   differently.  Did you seek to value -- strike that.
22              When you say that there were no
23   expected future operating profits from the use of
24   residual IP for the US or the EMEA Debtors, did you
25   base that on the assumption that they had no
```

 Neeson&Associates  W&F

 1    remaining license rights at the time of the IP

 2    sale?

 3                    A.    I'm not sure I'm linking it with

 4    the license rights.  I think the fact is that to

 5    the extent a patent had not been, I'll use the word

 6    activated, in one of the business lines, at the

 7    moment, at the time of valuation -- a valuation is

 8    a moment in time -- at that time, since it wasn't

 9    incorporated in a product or a proposed product,

10    there was no expected revenue or profit stream from

11    that particular patent.

12                    So that it was not subject to the

13    license because the license dictates what the

14    product is and what the license is for.  So I

15    think, I didn't think it was controversial because

16    the company itself went through an exercise of

17    demarking which patent fell into which bucket.

18                    And the patents which weren't used in

19    the business lines that generated the income for

20    the subsidiaries and the licensed participants were

21    put into the bucket called residual IP.  So that's

22    the basis on which I made the statements.

23                    Q.    I think I'm understanding you now.

24    So you've said that it was not subject to a license

25    and then you explain it's because of your product



```
 1    definition.
 2              Just assume with me that at the moment
 3    of the Rockstar sale, there were some patents sold
 4    to Rockstar that were subject to a license.
 5              You haven't sought to analyze whether
 6    or not the US or the EMEA Debtors could expect to
 7    earn future operating profits in that circumstance,
 8    correct?
 9         A.    No, that's not correct.
10         Q.    So whether or not the US Debtors
11    had license rights, there is still no expected
12    future operating profits?
13         A.    I'm not sure I follow the second
14    question from the first.  But let me try to short
15    circuit this.
16         Q.    For this question though, just
17    assume with me that the US Debtors did have license
18    rights at the time of the Rockstar sale.
19         A.    Yes.
20         Q.    Is it still your conclusion that
21    those license rights had no value?
22         A.    Okay.  We have to -- we have to
23    divide this up into pieces.  Number one, we know
24    that in the Rockstar portfolio there was
25    approximately a third of the patents that were used
```



```
 1   in the business lines.  So they certainly are

 2   subject to license, but the value of those has been

 3   captured already in the income stream that the EMEA

 4   and US are receiving.

 5             So that has been taken care of, and the

 6   balance of that portfolio is the ones that are --

 7   have not been used in products or proposed

 8   products.  You're asking, I think, if the court

 9   says that the license rights extend beyond what

10   I've read in the license agreement into those

11   patents which are not used and are in products or

12   proposed products.  I think that is the piece

13   you're referring to; is that correct?

14             Q.   That is my question.

15             A.   Okay.

16             Q.   Are you still saying that's

17   without value?

18             A.   Well, clearly it's not without

19   value because they were sold.  The question is do

20   they have value in terms of the license rights

21   surrendered by the EMEA and US.

22             So again, can you reword your question?

23             Q.   That's my question.  If the US

24   Debtors had license rights in the patents that

25   remained that were sold to Rockstar, can you say
```



1    definitively that those are valueless for the US

2    Debtors?

3                 A.   I feel we're going backwards.  I

4    tried to advance the question by pointing out that

5    there's two pieces to the Rockstar portfolio.  One

6    piece are the patents which are used in several

7    business lines.  Those have already, in the

8    methodology I proposed, those income streams are

9    already included in the income streams that are

10   valued in order to provide the amounts for the

11   license rights surrendered to EMEA and US.  So that

12   piece is taken care of.

13                The other piece, if your proposal is

14   that the license rights extend into patents that

15   were not used in the business lines, obviously, and

16   that was one of the discussions that I think I had

17   in-chief, that if the license rights extend into

18   those, then some of that value would accrue to the

19   licensed participants, yes.

20                Q.   Let's move on to slide 11 where

21   you criticize Mr. Kinrich.  In your comments on the

22   bottom of the page, you say he has an expansive

23   view of the licensed participants' rights.  Do you

24   see that?

25                A.   Yes.



1                    Q.   And that's just a different

2     assumption that you were told to make, correct?

3                    A.   No, I think it's a fact.  I think

4     that Mr. Kinrich's view, both expressly and

5     implicitly in his work, is that there's no

6     restriction on the license rights of the licensed

7     participants, and that they basically are entitled

8     to cash flows that accrue to all activities.  He

9     says it.

10                   Q.   Let me clarify my question.  Your

11    criticism of that is that you were told a different

12    assumption, correct?

13                   A.   As I have already explained, I

14    read -- I read the MRDA, I saw what it said, I was

15    also given instruction.  They didn't contradict

16    what I had read and this is certainly different

17    than my understanding and my instruction.

18                   Q.   And you also say that he does not

19    apply the RPSM.  That is based on your assumption

20    that the RPSM would apply in a sale context,

21    correct?

22                   A.   I think it's a fact he didn't

23    apply the RPSM.  The court will determine whether

24    that is appropriate.

25                   Q.   I'm just saying your criticism of



1    Mr. Kinrich for not applying the RPSM is based upon
2    your assumption that the RPSM would apply in a sale
3    context, correct?
4                    A.    I think that's a logical
5    deduction, yes.
6                    Q.    If we look at page 12 we have the
7    same two criticisms in the bottom two bullets,
8    correct?
9                    A.    Yes.
10                   Q.    I want to focus much of my
11    examination now on your slides 5, 6 and 7, the
12    non-transferability valuation approach.
13                   Now, you started off this morning
14    telling us about some of your valuation
15    credentials.  Is it fair to say that as an
16    experienced valuator you have a number of different
17    methodologies on your shelf that you can choose to
18    apply depending on the circumstances and
19    assumptions of a particular case?
20                   A.    I think in general that is true.
21                   Q.    And you look at all those
22    circumstances and you look at the assumptions that
23    you are given, and you pick which methodology to
24    pull off your shelf and apply, correct?
25                   A.    In general, yes.



1                    Q.   And here you chose the

2    non-transferability valuation approach, correct?

3                    A.   I would phrase it slightly

4    differently.  I didn't -- I didn't write the title

5    to this slide.  The valuation approach is fair

6    market value.  Within fair market value, if there

7    is an issue with respect to non-transferability,

8    there is a way of dealing with it within fair

9    market value.  It is not the other way around.

10                   So we start with fair market value.

11                   Q.   Well, you say you didn't write

12   this slide, but do you agree with slides 5, 6 and 7

13   in the headline that what you've done for the US

14   and EMEA Debtors is apply a non-transferability

15   valuation approach?

16                   A.    I wouldn't call it a

17   non-transferability valuation approach.  It's a

18   valuation approach that takes account of the fact

19   there is non-transferability.

20                   Q.   For shorthand, rather than say a

21   valuation approach that takes into account

22   non-transferability, when I use the phrase on the

23   slides, "non-transferability valuation approach,"

24   I'm going to be referring to what you just said

25   there.  Okay?



```
 1                    A.   Yes.
 2                    Q.   So your methodology says -- is
 3    applied -- strike that.
 4                    You applied the same methodology to the
 5    US Debtors and the EMEA Debtors, correct?
 6                    A.   Yes.
 7                    Q.   You do not apply that methodology
 8    to the Canadian Debtors, correct?
 9                    A.   Well, in theory, to the extent
10    that the Canadian Debtors participate in the
11    business, for that portion of their bundle of
12    rights the same methodology applies, yes.
13                    Q.   What do you mean by "for that
14    portion of their bundle of rights the same
15    methodology," this non-transferability valuation
16    approach, applies?
17                    A.   Perhaps we can turn to a chart in
18    my report to make life a bit easier.
19                    Q.   Is it chart -- figure 3 on page 27
20    perhaps?
21                    A.   Yes.
22                    Q.   But in terms of actual
23    methodology, you have your formula at paragraph 25
24    on page 7, correct?
25                    A.   Yes.
```

```
 1                    Q.   And that formula is that for the
 2   US Debtors you look at the fair market value of the
 3   present value of their future income, correct?
 4                    A.   Yes.
 5                    Q.   And that formula says that for the
 6   EMEA Debtors you look at the present value of the
 7   projected future income for the EMEA Debtors,
 8   correct?
 9                    A.   Correct.
10                    Q.   And then for the Canadian Debtors,
11   you say they get everything else, correct?
12                    A.   Correct.
13                    Q.   Now, the non-transferability
14   valuation approach has three fundamental predicates
15   to it.  The first one is that NNI interests are not
16   transferable, correct?
17                    A.   Correct.
18                    Q.   The second one is that NNL's
19   interests are freely transferable without consent,
20   correct?
21                    A.   No, I don't think that that has
22   been addressed.  To the extent that a
23   non-transferability discount is applicable to that
24   piece of the three entities' cash flows which are
25   derived from the products or proposed products, and
```



1    one applies a transferability discount, the

2    discount presumably would be the same discount, and

3    in that respect the proportional interests in that

4    piece of the assets would still be maintained.

5                So I think it's a neutral issue.

6                Q.   You talk about dividing up NNL's

7    interests into pieces, but if we pull back up

8    paragraph 25(a), the proposed methodology that you

9    say should be applied here doesn't have two

10   different components to the Canadian valuation.  It

11   has one, which is they get everything else,

12   correct?

13               A.   That is true, but if you look, as

14   I asked you to, at figure 3 on page 27, I further

15   explain that to show that it is true that the net

16   is the proceeds to Canada, but the proceeds to

17   Canada are -- have component pieces to them, and

18   those component pieces are shown in figure 3 on

19   page 27.

20               Q.   So one component piece is the

21   present value of Canada's future expected cash

22   flow, and the other component piece is the

23   residual, correct?

24               A.   Correct.

25               Q.   So talking about the residual,



 1    isn't then a fundamental predicate of your

 2    non-transferability valuation approach that Canada

 3    has a free right to transfer without consent the

 4    residual?

 5              A.    To the extent that that residual

 6    is -- is the ownership of the patents and the

 7    technology, I would think, yes.  I don't see that

 8    as being a restriction contained in the MRDA.

 9    Again, if the court finds differently we'll have to

10    re-evaluate it.

11              Q.    If we could pull up paragraph 62

12    of your report.  I just want to make sure that I'm

13    fully clear on what you just said.

14              I really want to talk about your

15    methodology that you propose in this report, and

16    not a hypothetical different methodology.

17              The methodology you propose in this

18    report assumes that the Canadian Debtors' interests

19    are freely transferable without consent, correct?

20              A.    The interests outside of the --

21    whatever -- whatever if anything is controlled by

22    the consideration of the MRDA, yes.

23              Q.    Were you asked to assume that the

24    Canadian Debtors had any interests that were not

25    freely transferable?



```
 1                      A.   As I said, if one considers that
 2    the participation as a participant which Canada is
 3    in the MRDA as opposed to a licensed participant,
 4    and that piece of their business is subject to the
 5    agreement, then it is subject to the same
 6    constraint that the others are.
 7                      Q.   Is there any piece of the Canadian
 8    Debtors' business that is not subject to that
 9    constraint?
10                      A.   I think we discussed that I don't
11    believe -- I believe that their ownership of the
12    patents and their ownership of the technology is
13    not constrained.
14                      Q.   Do you view the Canadian Debtors
15    as having both ownership and a license?
16                      A.   No, the MRDA specifically says
17    that the licensed participants are US and EMEA, but
18    I am -- again, we're talking about hypothetical
19    situations here and we're now I think venturing
20    into some legal niceties that I don't want to
21    express opinions on.
22                      But I said that if the Canadian Debtor
23    is considered for their business -- that element of
24    their business which yields the cash flows from the
25    same part of the business that the US and EMEA has
```

 Neeson&Associates    W&F

```
 1    -- is considered to be within the constraints of
 2    the MRDA, then I'm saying the MRDA provision would
 3    apply to it.
 4               I'd also point out that we're focusing
 5    on this topic but as you know, the valuation
 6    methodology that I have proposed, which is in use
 7    cash flows, does not have to consider this
 8    transferability discount.
 9               I've said that that was the one that
10    matched well the task that, and the question that
11    was posed to me.  So I just point that out because
12    to some extent this is academic in those
13    circumstances.
14               Q.   Now I have to confess that you
15    completely lost me, Mr. Berenblut.  Are you saying
16    that the non-transferability valuation approach is
17    not dependent upon a lack of transferability by
18    anybody?
19               A.   As I explained in-chief, I
20    believe, the value in use, the value to owner takes
21    the -- is the value of a license -- the valuation
22    methodology for a license which looks at the
23    license cash flows and values those, and doesn't
24    consider the imposition of a transferability
25    discount.
```

 Neeson&Associates    W&F

```
 1                  When Mr. Ruby asked me the question, he
 2    asked me to compare the fair market value to the
 3    value in use.  I said the value in use, because it
 4    doesn't have that discount applied to it, would
 5    normally end up with a higher number than the fair
 6    market value of that license will, which has to
 7    take into account the discount for
 8    non-transferability.
 9                  Q.   Let's goes back to this predicate
10    number one that you said.  You still agree with me
11    that your non-transferability valuation approach is
12    predicated on NNI not having the right to transfer,
13    correct?
14                  A.   Correct.
15                  Q.   And if NNL did not have the right
16    to transfer its interests to a third party without
17    consent, do you have any theory under which they
18    could capture any additional value beyond their
19    value in use under the non-transferability
20    valuation approach?
21                  A.   I think that the theory holds.  I
22    think that at the moment, the understanding is that
23    the non-transferability is to the MRDA and the
24    license agreements.
25                  I think you're asking me what happens
```



1    if that non-transferability extends out of the

2    agreements to the residual patent portfolio.  Is

3    that your question?

4              Q.   I'm saying perhaps that you have

5    given a wrong assumption also.  All I want to know

6    here is if you assume with me that NNL cannot

7    transfer these businesses or this residual patent

8    portfolio without the consent of the other

9    participants, does your non-transferability

10   valuation approach still allocate the entire

11   residual to NNL?

12             A.   Yes.

13             Q.   Can you explain why?

14             A.   Because we've said that we're

15   looking at the value of the licenses that have been

16   surrendered by the US and EMEA, those licenses were

17   granted by Canada, and we valued those with or

18   without -- it depends which methodology you use,

19   we're using the value in use, which doesn't have to

20   consider the non-transferability discount.

21             Once we know what those are worth and

22   that the balance -- they own -- the license rights

23   are a subset of the entire Nortel business, the

24   remainder of that business is Canada's, and so by

25   deduction, we can arrive at the part that belongs



 1    to Canada.  And this issue is, as I've said, is I
 2    think a little bit of a red herring.
 3                Q.   Mr. Berenblut, the theory behind
 4    your value in use methodology is that the buyers
 5    are paying some premium that can't be unlocked by
 6    the licensed participants if they were continuing
 7    in business, correct?
 8                A.   No.
 9                Q.   It's not?  Can you explain why
10    not?
11                A.   Because value in use is one that
12    is not really one that you would talk about a buyer
13    in.  Value in use, as we said, I said, is akin to
14    value to owner, so you're looking at the worth of
15    that license to the license holder, which is very
16    appropriate in a situation where we're being asked
17    to say what -- to value what is the value of the
18    rights surrendered.  Those rights surrendered were
19    the rights that were held by the licensed
20    participants, US and EMEA.
21                So we're not talking about a buyer.
22    We're talking about the cash flows that were
23    available to NNI and NN EMEA in situ, and that is
24    what the value in use is doing.
25                Q.   So under your theory, had Nortel



```
1    stayed in business, NNI would not have earned over
2    time more than what its present value would be,
3    correct?
4              A.   I think that's a fact, yes.
5              Q.   And you allocate therefore that to
6    NNI, correct?
7              A.   Correct.
8              Q.   And the EMEA Debtors, if Nortel
9    had stayed in business, would not have earned more
10   than the present value of their future cash flows,
11   correct?
12             A.   I think by definition that is
13   true.
14             Q.   If you assume with me that NNL's
15   interests were not transferable without consent,
16   would -- and had Nortel stayed in business,
17   wouldn't NNL have also earned the present value of
18   its future cash flows?
19             A.   Yes.
20             Q.   So the third predicate to your
21   non-transferability valuation approach is that the
22   sublicense rights of the licensed participants were
23   limited, correct?
24             A.   Sorry, where are you looking at
25   right now?
```



```
 1                  Q.   I'm just asking you.  Do you agree

 2    with me --

 3                  A.   No, you said the third predicate.

 4    Presumably there is a list you are referring to.

 5                  Q.   I'm just seeing if you will agree

 6    with this list that I am making.

 7                  A.   Oh.

 8                  Q.   Don't you agree with me that one

 9    of the predicates of your non-transferability

10    valuation approach is that the licensed

11    participants not only cannot transfer it, but they

12    can't sublicense to a third party that can make

13    more from it, correct?

14                  A.   I believe that the participants

15    have the right to sublicense.  Obviously, one of

16    the questions in debate is what is the extent of

17    that right to sublicense.

18                  I think it would be highly unlikely

19    that they are allowed to sublicense in a way that

20    is outside of the business activity of Nortel, and

21    that they would be sublicensing to others who might

22    compete with Nortel.

23                  But this seems to be an issue before

24    the court at the moment, so I don't know whether

25    you need my view on whether the license -- the
```

 Neeson & Associates    W&P WILSON & PETZER LTD.

1    extent of that sublicense.

2              Q.   I just want to understand your

3    non-transferability valuation approach.  And would

4    you agree --

5              THE CANADIAN COURT:  Is this an

6    appropriate time for the morning break, Mr.

7    Rosenthal?

8              MR. ROSENTHAL:  A couple more questions

9    and it will be a great time, Your Honour.

10             BY MR. ROSENTHAL:

11             Q.   In your non-transferability

12   valuation approach, you assume that NNI and the

13   EMEA Debtors do not have broad sublicense rights,

14   correct?

15             A.   I don't like to comment on the

16   word "broad."  I think the way that I see it is

17   that the Nortel subsidiaries have the right under

18   the MRDA to sublicense.  I see that and I think

19   there's wording in there, sublicense to equipment

20   and manufacturers, they can sublicense to others.

21   I think it is to facilitate and enable the

22   operation of Nortel's business, and that's how I

23   see it.

24             Now, if you're asking me whether they

25   can sublicense to Apple so that Apple can use



1   something that Nortel has, that normally wouldn't

2   be something that a licensor would want his

3   licensee doing.  But if the court determines that,

4   we'll have to work out how to incorporate that in

5   the methodology.

6              Q.   And that's all I wanted to get at,

7   which is that your current methodology that you're

8   proposing does not assume -- assumes that they do

9   not have that breadth of sublicense rights,

10  correct?

11             A.   No.  The methodology that I am

12  assuming says that -- if that was the case, by the

13  way, so let's say you are right and they had a

14  broad, as you term it, a broad right to license,

15  presumably they would have capitalized on that in

16  the past and they would have licensed.  They may

17  well have licensed.

18             So they have licensed and incorporated

19  in their cash flows are the benefits of that broad

20  right to license, and that's what I'm proposing

21  should be valued.

22             So I don't think that it changes the

23  methodology, I think the methodology remains the

24  same because we are just saying whatever it was

25  that they did as a business, presumably they would



1    continue doing as a business, and those are the

2    income streams they have surrendered, and those

3    income streams have a present value, and that

4    present value incorporates all of the benefits and

5    restrictions they had under the license.

6                 One of those was to sublicense.  If

7    they had previously sublicensed in the way you

8    think is the right interpretation, then that is

9    captured in the cash flows.

10               Q.   I just want to finish these couple

11   of questions so we can break, Mr. Berenblut.

12               On slide 10 you say if the IPCo were an

13   operating business and if the license rights in

14   respect of NN Technology were broad enough to cover

15   that licensing business, then you look at the

16   highest projections of what Nortel could have done

17   with the IP for determining the value in use of

18   NNI, correct?

19               A.   Yes.

20               Q.   But that assumes that there is not

21   a party such as Rockstar willing to come along and

22   pay $4.5 billion for a sublicense to do everything,

23   correct?

24               A.   Again, the question that I'm being

25   asked is what was the value of the rights



```
 1   surrendered?  First of all, I proposed a
 2   methodology that I think is correct, and takes into
 3   account everything that we have discussed.
 4               Secondly, if those rights, and I
 5   haven't viewed it as such, but if those rights do
 6   extend into the Rockstar technology, then they
 7   still have surrendered their rights to operate as a
 8   Nortel subsidiary, and the IPCo, if it would have
 9   been a Nortel business, would have been within the
10   confines of Nortel and that would have been what
11   they would have benefited from.
12               The synergy that the external Rockstar
13   consortium can bring to this, recognizing that they
14   are a group of companies with sales, I think, 25
15   times larger than Nortel, with multiple
16   opportunities to do things that Nortel couldn't do,
17   I don't think is a factor in consideration of the
18   rights surrendered by the subsidiaries.
19               MR. ROSENTHAL:  Why don't we take our
20   morning break, Your Honour.
21               -- RECESS AT 11:38 A.M.
22               -- UPON RESUMING AT 12:09 P.M.
23               THE CANADIAN COURT:  Mr. Rosenthal?
24               BY MR. ROSENTHAL:
25               Q.   Mr. Berenblut, I want to turn to a
```



```
 1    slightly different topic.  So when you were
 2    considering the MRDA, you recognized that you can't
 3    state your interpretation of a contract from a
 4    legal perspective, correct?
 5                    A.   Yes.
 6                    Q.   And that's because you don't feel
 7    that, as a non-lawyer, you should say what the
 8    contract says, correct?
 9                    A.   I'm not sure what that means but
10    I'm not a lawyer and so I don't interpret it from a
11    legal perspective, correct.
12                    Q.   And in addition to the MRDA, you
13    looked at a contract called the IFSA in connection
14    with your opinion, right?
15                    A.   Yes.
16                    Q.   And you believe that under the
17    IFSA, NNI surrendered its license rights, correct?
18                    A.   I think the provision of the IFSA
19    was that, as the business sales took place, the
20    participants, subject to reasonability tests, would
21    surrender their rights to effect sales, correct.
22                    Q.   But in fact, when you were
23    preparing your report and doing your analysis, your
24    assumption from reading the IFSA was not merely
25    that they would, in the future, as they sold
```

 Neeson&Associates  W&F

1    businesses terminate their licenses; but that you

2    thought that the licenses were actually terminated

3    on the date of the signing of the IFSA, correct?

4              A.    In my deposition I was put that

5    question and I did incorrectly state that the

6    licenses were surrendered at the time the IFSA was

7    signed.  I just had forgotten the provision of it,

8    the provisions that I was aware of at the time I

9    did my report are, as I stated earlier, that the

10   businesses would -- the subsidiaries would at the

11   time business sales arose, subject to rulings

12   obviously I believe of the bankruptcy courts and in

13   the interests, reviewing to make sure they felt it

14   was in the interests of their constituents, would

15   surrender the licenses.

16             Q.    But in fact it's not merely that

17   you had an idle misstatement at your deposition.

18   You actually thought when you were doing your

19   methodology that for example in January of 2010,

20   NNI was operating the CVAS business, for example,

21   without a license, correct?

22             A.    I don't recall, frankly.

23             Q.    Let me see if I can refresh your

24   deposition -- your recollection with your

25   deposition.  It's going to be page 253, line 16.  I



```
 1   believe, Your Honour and Judge Gross, there should
 2   be somebody to hand it to you up there.
 3              You recall at your deposition my
 4   partner, Ms. Schweitzer, asked you some questions?
 5              A.   I do.
 6              Q.   And if you could look up -- do you
 7   have a copy of your deposition there?
 8              A.   I do not.
 9              Q.   Do we have a copy for the witness?
10   You were being asked about your interpretation of
11   the IFSA and as it related to NNI's license rights,
12   and she asked you on page 253, line 16:
13                  "Question:  Did NNI have any
14                  license rights with respect to any
15                  patents in the residual patent
16                  portfolio on January 1st, 2010?
17                  Answer:  I do not believe so.
18                  Question:  Even though NNI had
19                  not divested all of its lines of
20                  business on January 1, 2010?
21                  Answer:  It had surrendered
22                  everything that -- all license
23                  rights in June 2009."
24              THE CANADIAN COURT:  How is this
25   different from what he said a minute ago?
```



```
 1                    MR. ROSENTHAL:  He just said he didn't

 2     recall.

 3                    THE CANADIAN COURT:  He said he first

 4     answered that way incorrectly.

 5                    MR. ROSENTHAL:  It's the next question,

 6     Your Honour.  I'm giving the predicate.

 7                    BY MR. ROSENTHAL:

 8                    Q.   Question on line 24:

 9                         "So it was your conclusion that

10                         even though NNI was still at that

11                         time operating the CVAS line of

12                         business that had already

13                         surrendered its license rights to

14                         the patents in the patent portfolio?

15                         Answer:  I believe that's what

16                         the IFSA says, yes."

17                    Does that refresh your recollection?

18                    A.   It's the deposition, sir.  Yes, I

19     see it.

20                    Q.   In fact, this assumption that you

21     made from your own interpretation of the IFSA about

22     NNI's termination of its license rights, led you to

23     believe when you were analyzing its rights

24     thereafter that it wasn't even possible that NNI

25     had any enforcement rights in the patents by the
```

Neeson & Associates   W&F WILSON & PRYOR LTD.

```
 1   time we got to the portfolio sale, correct?
 2                  A.   I don't think that's correct.  I
 3   don't think this issue impacts one way or another
 4   the methodology that I suggested.
 5                  Q.   Let's take a look at page 244,
 6   line 10.  And again, my partner, Ms. Schweitzer,
 7   was asking you to get a sense of how you were
 8   looking at NNI's rights at the time of the
 9   portfolio sale, and she asked you at line 10:
10                  "And did you -- and as part of
11                  formulating your opinion, did you
12                  consider whether NNI had any
13                  remaining enforcement rights with
14                  respect to those patents that were
15                  licensed to the lie of business
16                  buyers?
17                   Answer:  Whether NNI had?
18                   Question:  Yes.
19                   Answer:  NNI had surrendered the
20                  license as part of the IFSA.  I
21                  don't think it's possible that they
22                  could have had any enforcement
23                  rights."
24                  Did you give that answer to those
25   questions?
```



```
 1                       A.   I did.  And as I mentioned
 2     earlier, I was incorrect in my recollection at the
 3     time.  I did know at one stage and refreshed my
 4     memory and that that was not accurate, it was as I
 5     had stated that the license rights were
 6     surrendered, at the contemplation of the business
 7     sales.
 8                       However, I don't think that this, one
 9     way or the other, impacts the methodology that
10     we've been discussing.  But that's all I can say
11     about it.
12                       Q.   Let's cover one other subject on
13     this issue here.  Isn't it true that because you --
14     strike that.
15                       Isn't it true that when we got to the
16     residual patent sale, your belief that NNI had
17     already terminated all of its license rights was
18     one of only two reasons that you concluded that NNL
19     had unencumbered patents?
20                       A.   No, I think -- I think I've laid
21     it out clearly that by the time the residual patent
22     sale occurred in 2011, the businesses had been
23     disposed of, so the question as to whether the
24     licenses were terminated at one date or another is
25     now academic.  They had been terminated.
```

Neeson & Associates    W&P

```
 1                    And the consideration of the residual
 2   patent portfolio is based on, as I have stated, the
 3   fact that as far as I read it, NNL owned the
 4   technology, the patents, and the patents, and that
 5   was the basis on which the conclusion that I have
 6   given was prepared with the discussion that we've
 7   also had in terms of the portion of those patents
 8   that were still in use by the business lines.
 9                    Q.   Didn't you conclude that the
10   patents were unencumbered because of just two
11   reasons.  One, NNL's rights to the patents, and
12   two, you had mistakenly believed that the license
13   agreements had been terminated?  Isn't that true?
14                    A.   I'm sorry.  I don't know what
15   impact this has.  You asked me whether by the time
16   the residual patent portfolio was sold, those two
17   things were true.  They were true by the time the
18   patent portfolio was sold.
19                    Q.   They were true that NNL -- NNI's
20   rights had been terminated previously?
21                    A.   It was true that NNI had given up
22   its license rights in the business lines that were
23   sold.
24                    Q.   I'm not talking about the business
25   lines that had been sold.  Mr. Berenblut, I just
```



1    want to know on the eve of the Rockstar

2    transaction, when you looked to see what NNI's

3    rights were in the patent portfolio, and NNL's

4    rights, you concluded that NNL had unencumbered

5    rights for two reasons:  One, the rights that they

6    had for the patents, and two, that NNI's license

7    was terminated.

8              A.    Can you point me to where you're

9    saying I have stated that?

10             Q.    Sure.  Let's look at 309, line 18

11   of your deposition.

12                  "Question:  And you concluded

13                  that the patents were unencumbered

14                  because NNI wasn't realizing value

15                  off its license at the time?

16                  Answer:  No.  I think that they

17                  were...," it says encumbered, we

18                  didn't get an errata from you but I

19                  presume you mean unencumbered,

20                  "because Canada had the rights to

21                  the patents and the license

22                  agreements had been terminated."

23                  Did you give that answer to that

24   question?

25             A.    Well, clearly I did.  It's in the



 1    transcript there.  As I've said, this discussion

 2    that went on the deposition does not appear in my

 3    report, and the fact is it doesn't really matter

 4    whether the license agreements had been terminated

 5    or hadn't been terminated, or whether they

 6    continued.

 7            The question is what was subject to

 8    those license agreements and as I said, I do not

 9    believe that the residual patent portfolio, subject

10    to what we have already discussed, was the subject

11    matter of those licenses.  I think that's the

12    issue.  Whether they were terminated or not is not

13    the question that I have addressed in the report,

14    and the question that I addressed earlier.

15            Q.   Let's probe your statement about

16    relevance, and I want to do it through a

17    hypothetical.  Assume with me that the licenses

18    were not terminated in the IFSA, and let's say that

19    Rockstar went to NNL and told NNL that it wanted to

20    buy NNL's legal title to the patent portfolio.  And

21    NNL agrees to sell all of its rights in the patent

22    portfolio for half a billion dollars to Rockstar.

23    Nobody terminates their license; it's just a

24    one-on-one transaction between NNL and Rockstar,

25    and Rockstar buys the portfolio subject to whatever

 Neeson & Associates   W&F

```
 1   NNI's and whatever the EMEA Debtors' licenses are,

 2   whatever they're worth.

 3             Okay, do you have that background to my

 4   hypothetical?

 5             A.   Sorry, I'm getting confused.  Who

 6   sold?

 7             Q.   NNL sells its rights in the patent

 8   portfolio for half a billion dollars to Rockstar.

 9   There's no termination of the licenses.  Have you

10   got that?

11             A.   Yes.

12             Q.   A year later, Rockstar goes to NNI

13   and NNUK and NN France and NN Ireland and offers

14   them three and a half billion dollars to terminate

15   their licenses and they agree.

16             Are those licensed participants

17   entitled to keep the proceeds of what they were

18   paid by Rockstar to terminate their licenses?

19             A.   Sorry, let me just trace the

20   beginning again.  You said NNL sells to NNI its

21   rights?

22             Q.   NNL sells to Rockstar?

23             A.   Yes.

24             Q.   For half a billion dollars all of

25   its rights to the patent portfolio.
```



```
 1                    A.    Yes.
 2                    Q.    The license agreements of NNI and
 3      the three EMEA Debtors aren't terminated at that
 4      time.
 5                    A.    Yes.
 6                    Q.    A year later, Rockstar goes to the
 7      four licensed participants and says we'll offer you
 8      three and a half billion dollars to terminate your
 9      licenses.
10                    A.    Yes.
11                    Q.    And they agree.
12                    A.    Yes.
13                    Q.    Are the licensed participants
14      entitled to keep the proceeds of what they were
15      paid by Rockstar to terminate their licenses?
16                    A.    I think the situation is akin to
17      some of the things that we've been discussing.  If
18      the -- if Canada is sold to Rockstar with licenses
19      in place, and the subsidiaries had believed that
20      they had been wronged, obviously they could sue for
21      the breach of contract.  The proceeds from that
22      breach of contract would be their loss of profits
23      foregone, which can be calculated if there were no
24      more business lines, then there would be no more
25      profits.
```



1                So if Rockstar chooses to, and now it's

2       bought -- it's bought that patent portfolio, the

3       business lines have been sold, it's buying them

4       subject to that outstanding license which has in it

5       the clause about who owns the technology.

6                I wouldn't advise Rockstar to pay these

7       subsidiaries three and a half billion dollars for

8       those license rights, but if it chooses to, who

9       gets those proceeds?  Well, Canada is no longer in

10      the picture I presume in this hypothetical, I am

11      assuming that Canada is no longer in this picture,

12      and I am assuming that there is a transaction for

13      whatever reason between Rockstar on the

14      subsidiaries.

15               As I say, I think Rockstar, being an

16      astute organization, would likely value those

17      license rights and wouldn't come to the conclusion

18      they were worth three and a half billion, but who

19      receives them?  I don't know in law who receives

20      them.  It would sound like that it could be a

21      transaction between those two -- those three

22      companies.

23               Q.   Let me just turn to one other

24      hypothetical situation, totally different now.  So

25      I want to probe now your expert opinion that NNL is



1   entitled to a hundred percent of the proceeds of

2   the Rockstar sale in light of its legal ownership

3   of the IP, and the assumptions that you were given

4   about the scope of the participants' licenses.

5             So first, you didn't perform any

6   valuation of the patents themselves for which NNL

7   had title, did you?

8             A.   I did not.

9             Q.   Nor do you propose in your report

10  any methodology to value those patents, do you?

11            A.   I'm not sure why a valuation would

12  be required, but no, I haven't.

13            Q.   And you assumed -- so I want to

14  talk a little bit about title, and to probe your

15  assumption about the value of title.

16            So let's say that we had an identical

17  MRDA to what the courts have before them today.

18  But there's one exception to it.  That one

19  exception is that NNI has a subsidiary, and it's

20  called NN Cayman.  And NN Cayman, under the MRDA,

21  is vested with legal title.  It's a tax haven.  It

22  does nothing else other than hold legal title --

23            THE CANADIAN COURT:  I've been

24  listening to all this.  I have no idea how it's of

25  any help whatsoever, these hypotheticals, and it's



```
1    pretty clear in his report what he's done.  I don't
2    understand how this is going to be of any help to
3    me.
4              MR. ROSENTHAL:  Your Honour, I'm happy
5    to explain if you'd like.
6              THE CANADIAN COURT:  Well, we don't
7    have an agreement with a subsidiary, we don't have
8    an agreement with legal title.  We didn't have a
9    sale by Nortel of half a billion dollars to
10   Rockstar.  It seems to me you're just -- this is
11   all legal argument what the agreement means.
12   That's all it is.
13             MR. ROSENTHAL:  It's actually not, Your
14   Honour.  That last set of hypotheticals or the last
15   hypothetical that I gave the witness about his
16   valuation methodology, it really underscores the
17   fact that the alternatives available, had they not
18   terminated the licenses and sold in the way that
19   they sold, because this witness has said that the
20   valuation methodology is, if this didn't happen,
21   how else would they have realized value?  And he
22   says well, they would have realized value by making
23   maybe $2.7 billion in the IPCo business.
24             But another alternative, using his own
25   methodology, is they could have just waited, held
```



```
 1    their licenses and then had them valued separately
 2    and bought separately by Rockstar.
 3              It's his own methodology about what the
 4    alternatives would be.  And obviously we can argue
 5    about what it would have fetched.  I think that's
 6    what Mr. Kinrich's report goes to.
 7              THE CANADIAN COURT:  You can proceed,
 8    but you've certainly -- I don't much see the value
 9    of all this.  It's all argument about what the
10    agreement means, as far as I can see.
11              MR. ROSENTHAL:  I think with respect to
12    Cayman, which is my last hypothetical, Your Honour,
13    it probably makes more sense for me to explain it
14    after the witness has given his answers so they
15    don't influence the answers.
16              THE CANADIAN COURT:  Go ahead.
17              MR. ROSENTHAL:  So I will happily tell
18    you that I'm almost at the end of the examination
19    as well, Your Honour.
20              BY MR. ROSENTHAL:
21              Q.   Mr. Berenblut, so let's say there
22    is a one more entity as part of the MRDA called NN
23    Cayman that has legal title, and the licensed
24    participants with their exclusive territories are
25    NNI, NN Ireland, NNSA, NNUK and NNL for Canada.
```

Neeson & Associates   W&P Wilcox & Fetzer Ltd.

1                    If the patent portfolio then gets sold

2    to Rockstar in an identical transaction that

3    happened here, but with NN Cayman conveying title

4    to the portfolio, and everybody else including NNL

5    terminating their licenses, you would no longer

6    under your methodology propose giving a hundred

7    percent of the proceeds to the legal title holder,

8    would you?

9                    A.   I don't understand what you're

10   talking about.  Number one, NNL is not a licensed

11   participant so not only are you assuming that the

12   Rockstar portfolio is the patents that are in the

13   hand of Cayman, but you are assuming that NNL is a

14   licensed participant which it currently is not.  It

15   is a participant.

16                   And if NN Cayman is the legal holder of

17   the patents, let it get the proceeds when it sells

18   the patents.  I am not sure what the question is.

19                   Q.   Well, isn't it true that at your

20   deposition you said that this would become a

21   complex analysis in which you would have to both

22   value the title and value the patents themselves?

23                   A.   At my deposition I think I was

24   giving too much credit to the question-poser.  When

25   I thought about it afterwards I realized really it



1    was ridiculous and it was quite simple.  If Cayman
2    owns the patents, then let it sell them and get the
3    proceeds.  I don't know what the issue is.
4                    Q.    Let me move on to my last subject,
5    then.  I just want to follow up on where we ended
6    right before the break.
7                    A.    You said that was your last
8    question, though.
9                    Q.    I said I was almost done.
10                   So when you are trying -- your
11   methodology looks to see what the value to be given
12   to NNI is in connection with the residual patent
13   portfolio sale.  You said you give NNI the benefit
14   of its share of the future projections; correct, of
15   Nortel?
16                   A.    Yes.
17                   Q.    And you don't limit NNL in that
18   manner, correct?
19                   A.    We've already discussed that.  I
20   said if you look at the chart on page 27, I
21   believe, it shows that the proceeds to Canada,
22   although they are the net, are derived from both
23   its interest in the business and its interest in
24   ownership.  So we've already discussed that.
25                   Q.    And that residual extra benefit



```
 1   that you give to NNL is because NNL has the right
 2   to transfer, correct?
 3             A.    Has ownership, yes.
 4             Q.    And you, in your methodology,
 5   ignore that NNI could achieve the same result of
 6   transfer through sublicensing, correct?
 7             A.    That's only if you assume that all
 8   these purchases, Avaya and Ericsson and the other
 9   companies who would be viewed as competitors of
10   Nortel and in businesses outside of Nortel's
11   business, is only assuming that the license
12   grantor, being Canada, would have allowed its
13   license holder to start to enter into businesses
14   that were completely outside of the direction that
15   it had set.
16             I mean, that's way beyond this
17   discussion.  That's, again, that's an assumption as
18   to how the -- how what the legal interpretation of
19   the sublicense agreement is.
20             Q.    But if you were to assume that the
21   quid pro quo for NNI and the EMEA Debtors vesting
22   title in the first place with NNL was a broad
23   license in return, if you assume that broad
24   license, you -- your methodology ignores that NNI
25   could achieve the same result as NNL through
```



```
 1    sublicensing, correct?
 2                    A.    No.   You're talking about it as
 3    though these were three independent parties who
 4    came together and decided let's come to a business
 5    deal.   These were subsidiaries of a parent company.
 6    Clearly they were granted license by a licensor.
 7    They are normal, reasonable business practices that
 8    you would assume a licensor would take into account
 9    when it grants a license, more so when it was the
10    parent.   It wasn't three independent bodies coming
11    together to negotiate a license agreement.
12                    I think the hypothetical doesn't work
13    and I think my methodology does contemplate all of
14    these things.
15                    Q.    I'm just asking you not to
16    disagree with the assumption, but please assume
17    with me that NNI and the EMEA Debtors had a broad
18    license that allowed them to sublicense as they saw
19    fit, not limited to products.   Would you please
20    assume that.
21                    Isn't it true that your methodology
22    ignores that NNI could achieve value through
23    sublicensing, correct?
24                    A.    I think I answered before the
25    break that I'm not sure it ignores it because
```



1    presumably they didn't just turn a switch at the

2    time of the litigation and decide they were going

3    to interpret the sublicensees in this particular

4    fashion.

5              They were always entitled to operate as

6    they saw fit with whatever sublicense they

7    negotiated, and presumably those efforts are

8    incorporated in the cash flows the companies had

9    achieved.

10              So to that extent the value is already

11    captured in the cash flows that the subsidiaries

12    have achieved so I can't agree with your

13    proposition.

14              Q.   If the buyer of the patent

15    portfolio is going to achieve excess value relative

16    to what Nortel could earn from the US market, NNL

17    could not deliver that value with the licenses in

18    place, correct?

19              A.   That is not clear one way or the

20    other because it depends on the business lines and

21    whether the business lines competed or not.  I

22    don't know the answer to that.

23              MR. ROSENTHAL:  I have nothing further,

24    Your Honour.

25              THE CANADIAN COURT:  Thank you.  Anyone



```
1   else?
2             MR. GOTTLIEB:  Yes, Your Honour.
3   Justice Newbould, Judge Gross, good to see you.
4
5   CROSS-EXAMINATION BY MR. GOTTLIEB:
6             Q.   Mr. Berenblut, good to see you.
7             A.   Good to see you, Mr. Gottlieb.
8             Q.   I want to go back a little bit and
9   start with your report if I can for a moment just
10  to get some ground rules in place.
11            The reports that you prepared were
12  jointly prepared with Dr. Cox, correct?
13            A.   Correct.
14            Q.   And you are not aware of any
15  opinions in the report where you and Dr. Cox
16  differed, correct?
17            A.   Correct.
18            Q.   And you were under the same
19  instructions and directions from counsel to the
20  Monitor with respect to the preparation of the
21  report, correct?
22            A.   Correct.
23            Q.   And you received the same advice
24  from the Monitor with respect to assumptions and
25  the like as Dr. Cox, correct?
```

```
 1                    A.    Correct.
 2                    Q.    Okay.  Now, in the report you
 3    outline the basis and method for allocating
 4    proceeds that would compensate the estates for the
 5    property interests each surrendered or transferred,
 6    correct?  I took that directly from your report.
 7                    A.    Correct.
 8                    Q.    And therefore, in order for you to
 9    perform the task that was ahead of you, you needed
10    to know, to start with the property interests of
11    each of the parties, correct?
12                    A.    Correct.
13                    Q.    And to understand the property
14    interests, counsel to the Monitor gave you several
15    assumptions that you were told to rely on for the
16    purpose of preparing your report, true?
17                    A.    We've already spoken about the
18    role of counsel and the assumptions.  I'm not sure
19    whether that extends the property interests.  We
20    know what the property interests of the EMEA and US
21    Debtors are in terms of the business that they were
22    running, so I'm not sure, unless you point me to
23    them, what assumptions would affect that.
24                    Q.    Great.  That's what I'm going to
25    do.  I am going to point them to you, because I
```



```
 1   know although you talked about them, I want to be
 2   clear for the courts that these were, in fact,
 3   assumptions made, so I want to deal with those
 4   directly.  So do you have your report up in front?
 5                 A.   I do.
 6                 Q.   So let's go to your first report
 7   and the page 21 of the report.  And there are a few
 8   paragraphs that I want to concentrate on right now.
 9   So the first is paragraph 60 under the heading "The
10   MRDA."  And it said:
11                      "The RPS entities operated
12                      under the contractual terms of the
13                      MRDA."
14                 Do you see that?
15                 A.   Yes.
16                 Q.   And it was actually -- sorry.
17   Pardon me.  And you say:
18                      "We are advised that the MRDA,
19                      among other things, provide," and
20   then you list.
21                 Do you see that?
22                 A.   Yes.
23                 Q.   And before we go into the
24   specifics, sir, flip over to the next page, to
25   paragraph 61.
```



```
1                    A.   Yes.

2                    Q.   And you see it says there:

3                    "We are also advised of the following."

4                    Do you see that?

5                    A.   Yes.

6                    Q.   And it was counsel to the Monitor

7    that advised you of these things, correct?

8                    A.   That is correct.

9                    Q.   Okay.

10                   A.   As I said previously today, and as

11   I said at my deposition, some of these things were

12   obvious to me from reading the materials, but since

13   they were enclosed in legal agreements, I also took

14   the advice of counsel which as I mentioned didn't

15   conflict with my own reading, but I don't want to

16   be the one giving the legal interpretation, only

17   the valuation interpretation.

18                   Q.   Sure.  I understand that, sir, and

19   I understand that is the answer you gave on depo, I

20   understand that's the answer you gave this morning.

21   But I am asking you a specific question, because it

22   is important, which is those were in fact

23   assumptions that you were told to make for the

24   purpose of preparing the report.  That's what you

25   were advised by counsel to do, correct?
```



```
 1                    A.   Yes.  And I can point out those
 2     which I think are just simple facts that come out
 3     of the MRDA.  The assumption is that the MRDA is
 4     applicable.  But some of them are not assumptions
 5     per se.  They are not things that are not already
 6     in there.
 7                    Q.   Okay.  And the terms of the MRDA
 8     were obviously significant to the work that you
 9     were assigned to complete?
10                    A.   I would say they were.
11                    Q.   And I want to go then to the
12     specifics and some of these were covered this
13     morning so we'll move very quickly, but the first
14     one back on page 21 to paragraph 60(a), this is an
15     assumption you were asked to make that "legal title
16     to NN Technology, which includes various forms of
17     intellectual property, such as patents and patent
18     applications, was that of NNL."
19                    So that was an assumption you were
20     asked to make, correct?
21                    A.   Yes.
22                    THE CANADIAN COURT:  Why are you doing
23     this, Mr. Gottlieb?  He's already said, he listed
24     all of them, he went through them.
25                    MR. GOTTLIEB:  Yes, Your Honour. I'm
```



```
 1   going to go --
 2              THE CANADIAN COURT: He went through
 3   them one by one.  He has already said he was told
 4   by counsel to assume that.
 5              MR. GOTTLIEB:  I will, Your Honour, and
 6   I will go through them as quickly as possible.  But
 7   there are various parts of this, for example, about
 8   what I am about to go to that are important for the
 9   questioning that's coming up.  I understand but I
10   will move through.
11              BY MR. GOTTLIEB:
12              Q.  So sir, 60(a), as we said, is an
13   assumption you were asked to make?
14              A.   Yes, as I said to the extent it is
15   stated in the MRDA, it is stated.
16              Q.   And why don't we go down then to
17   the footnote.  You see there is a footnote 56?
18              A.   Yes.
19              Q.   And it says:
20                   ""We are also advised that
21                   legal title and legal ownership are
22                   synonymous."
23              That's also an assumption you were
24   asked to make?
25              A.   Yes.
```



```
 1                    Q.    And you followed that advice in
 2    preparing your report, correct?
 3                    A.    Yes.  I think simply because title
 4    is a legal terminology, ownership is what I would
 5    use in valuations, so I needed some clarification
 6    on that.
 7                    Q.    Okay.  So that, wherever in your
 8    report you refer to the fact that NNL was legal
 9    owner of the IP, that is based on the assumption
10    that you were told to make by the Monitor, correct?
11                    A.    Correct.
12                    Q.    And you have obviously, sir, dealt
13    with situations where --
14                    A.    By the way, I should caveat that
15    answer as I always have to do because you said
16    wherever it's mentioned.  I can't remember all the
17    places that it's mentioned, but I've answered your
18    question in terms of where that legal title and
19    legal ownership are synonymous comes from, so I
20    can't refer to every reference in the report and
21    know what the context of it is.
22                    Q.    Okay.  No reason to believe that
23    that's not the case, that you use different
24    terminology in different places in the report?
25    That's fair?
```



```
 1                    A.   I have no particular reason to
 2    believe that, correct.
 3                    Q.   Thank you.
 4                    You've dealt with situations where
 5    there was a separation between legal and beneficial
 6    ownership in your past valuation work, correct?
 7                    A.   Again, these are loaded words in
 8    this litigation.  You know, I've dealt with
 9    situations of licenses where somebody owns
10    something and gives somebody else the right to use
11    it, yes.
12                    Q.   Sir, you have dealt with
13    situations where there was a separation between
14    legal and beneficial ownership in the past,
15    correct?
16                    A.   I think in general, yes.
17                    Q.   Well, not in general.  You have
18    dealt with that, correct?
19                    A.   I think we discussed that at the
20    deposition.  But --
21                    Q.   Yes, sir.
22                    A.   I think I've answered your
23    question.
24                    Q.   Okay.  But again, you were advised
25    to assume here that NNL held all of the legal
```



```
1    ownership in the IP and that no other party held an
2    ownership interest in the IP, correct?
3              A.   Correct.
4              Q.   Okay.  And in fact, sir, one of
5    the foundations to your opinion is that NNL was the
6    legal owner of the Nortel IP, correct?
7              A.   The foundation is this.  Which
8    piece of the opinion, I think that's important to
9    identify.  Certainly to the extent that the
10   residual IP is that of NNL, yes.  Obviously when
11   we're valuing the license rights surrendered, we're
12   looking at cash flows that come from the license
13   rights.  So that's a separate issue.
14             Q.   Sure.  But with respect to the
15   opinion you gave, the two opinions -- the two
16   reports you gave to the court, and the opinions
17   that you were asked to give and did give, one of
18   the foundations to that opinion, those opinions, is
19   that NNL was the legal owner of Nortel's IP.
20   That's correct, isn't it?
21             A.   I think in general, yes.
22             Q.   Okay.  And you also assumed that
23   as legal owner of the IP, NNL had the right and
24   ability to transfer that IP, correct?
25             A.   Correct.
```



```
 1                    Q.   And that was an assumption also

 2    you were told to make by counsel to the Monitor,

 3    correct?

 4                    A.   Correct.

 5                    Q.   And that right and ability to

 6    transfer the IP was a material assumption for the

 7    purpose of the opinions you and Dr. Cox provided to

 8    the court, correct?

 9                    A.   Well, now we're getting too

10    general.  If you're using the word "material," we

11    have to look at which particular opinion you're

12    referring to and what the issue is and I can tell

13    you whether it's material or not.

14                    Q.   So you, sir, will not concede that

15    the right and ability to transfer the IP was a

16    material assumption for the purpose of the opinion

17    that you and Dr. Cox gave to this court?

18                    A.   No, I think we're going backwards.

19    I think we had that question two times ago.  Your

20    last question was slightly different.  Perhaps

21    you'll read me back the last question?

22                    Q.   Sure.  The right and ability to

23    transfer the IP was a material assumption for the

24    purpose of your opinion.

25                    A.   And I said the word "material" is
```



1    one that I would have to refer to each specific

2    instance to tell you whether it's material or not.

3                 Q.   Okay.  So I can tell you, sir, and

4    I'm happy to bring up the transcript and you can

5    qualify this, but when asked that exact question,

6    Dr. Cox confirmed that that was a material

7    assumption for the purpose of the opinions that you

8    and he gave to the court.

9                 A.   Well, I can't answer that then.

10                Q.   So you are of a different view?

11                A.   I am of the view that I just told

12   you.

13                Q.   Okay.  And next, sir, the only

14   property interest that you say the licensed

15   participants had, that is the EMEA Debtors who are

16   relevant to that, and NNI, the only property

17   interests that they had were licenses to the IP,

18   correct?

19                A.   The only, sorry, what was it

20   again?  The only?

21                Q.   Property interests.

22                A.   No, I think I talked about the

23   fact that they owned tangible assets and those

24   tangible assets would be theirs to dispose of.

25                Q.   I apologize, I should have then



1    finished it again for you so there was no question.

2    The only property interests that they had in the

3    intellectual property were the licenses?

4                    A.   Correct.

5                    Q.   I apologize for not completing.

6    That's correct?

7                    A.   I accept your apology.

8                    Q.   Thank you very much.

9                    And although my friend did discuss this

10   with you this morning, you were advised by the

11   Monitor to assume that the licenses were not

12   transferrable, correct?

13                   A.   We keep on discussing the same

14   thing.  We've been 'round and 'round this.  I've

15   answered the same question four times I think.  We

16   have spoken that it's in the MRDA, they're not

17   transferrable and I was advised they were not

18   transferrable.

19                   Q.   Okay.  So I'm looking at page 22

20   of your report, 61(b), that's what I'm referring to

21   there, sir.  You have no trouble with that,

22   correct?

23                   A.   Correct.

24                   Q.   All right.  And that, sir, too is

25   obviously an important assumption for your opinion,



```
 1    correct?
 2                 A.   As I think I explained, the
 3    approach that yields the highest results for the
 4    licenses is a value in use methodology, and the
 5    value in use methodology does not have to consider
 6    a discount for non-transferability.  So I think
 7    your question has to be answered with that piece of
 8    information.
 9                 Q.   So sir, I'm just going to come
10    back to the question I asked.  It was significant
11    to your report, sir, that the licenses are not
12    transferrable without the consent of the parties,
13    correct?  That's your view?
14                 A.   My report is 40-odd pages long,
15    there's a lot of information in there.  So to make
16    that, I'm not going to agree with that
17    generalization because it's too general.  As I
18    said, with respect, I have already discussed for
19    example with respect to the value in use for the
20    licenses, non-transferability is not a
21    consideration there but I don't know how else to
22    answer your question.
23                 Q.   Well, I'll tell you how you
24    answered it when we were at deposition.  Let's go
25    if we can to page 36 of the deposition transcript
```



1    if we could, please.  And sir, I won't go through

2    the routine but you obviously recall attending at

3    the deposition and you were asked questions and

4    gave answers, correct?

5              A.   That's what happened at the

6    deposition, yes.

7              Q.   Okay.  And if we go to page 36,

8    line 12, the question asked was:

9                   "What about paragraph 61(b),

10                  'the licenses were non-transferable

11                  without the consent of all parties

12                  to the MRDA."  Was that advice of

13                  counsel significant to your report?

14                  Answer:  Again, I think that is

15                  something that's laid out in the

16                  MRDA.  So it is -- it is a fairly

17                  straightforward piece of information

18                  in the context of what we're talking

19                  about.

20                  Question:  Significant?

21                  Answer:  Is what significant?

22                  Question:  Is that significant to

23                  your report?

24                  Answer:  The fact that the

25                  licenses are not transferrable



```
 1                     without consent of all parties?  I
 2                     would say so, yes."
 3                     Sir, those are the questions that you
 4     were asked and the answers that you gave, correct?
 5                     A.   I did, yes, and I'm now giving you
 6     some additional information, because I think --
 7                     Q.   Sir, let me just finish please if
 8     I can.
 9                     A.   I'm in the middle of my answer.
10                     Q.   That was a question -- those were
11     the questions that you were asked and those were
12     the answers that you gave, correct?
13                     A.   I already answered that question.
14                     Q.   And those questions -- pardon me.
15     The answers you gave to those questions were true
16     and accurate, correct?
17                     A.   They are.  And the answer that I
18     just gave you is an expansion on this, so I don't
19     see an issue there.
20                     Q.   Okay.  Now sir, when you valued
21     the property interests of EMEA, the relevant EMEA
22     Debtors and NNI, you did that valuation based on
23     the assumption that the licenses were
24     non-transferable, correct?
25                     A.   We had a long discussion this
```



1   morning on that topic.  We know that the licenses

2   were not transferrable.  We spoke about fair market

3   value and the lifting of non-transferability

4   provisions and the reimposition of them.  We then

5   spoke about value in use which avoids that

6   consideration and is the appropriate methodology

7   for valuing the stream of income that comes from a

8   license.  So we've discussed it.

9            Q.   Sure, sir.  I understand that you

10  discussed that.  But I'd just like to stick with my

11  question and see if you can answer that question

12  which is this.

13           When you did the valuation of the

14  property interests of the EMEA Debtors and NNI,

15  those RPEs, you did that valuation based on the

16  assumptions that the licenses were not

17  transferrable; isn't that correct?

18           A.   That was certainly a

19  consideration, yes.

20           Q.   Well, it's more than a

21  consideration, sir.  That was a significant piece

22  of the information that was bedrocked to your

23  valuation that they were non-transferable licenses,

24  correct?

25           A.    I don't know how to answer your



```
 1    question more than I have already.

 2                   Q.   Okay.  Give me one second, please.

 3    Now sir, if the licenses were, in fact,

 4    transferrable, that would have an impact on your

 5    opinion, correct?

 6                   A.   It would have an opinion -- it may

 7    have an effect on, as I've already said, the value

 8    of a license using the income stream that that

 9    license generates is not impacted by the

10    non-transferability of the license.

11                   So if then you want to compare that to

12    a fair market value valuation, and if they -- with

13    the lifting and the reimposition of the discount, I

14    don't know where that would take you.  Often it

15    takes you to a fact that the present value of the

16    income stream is still -- is still greater than it.

17                   If there's no transferability provision

18    discount to be considered, then one would have to

19    consider how that impacted the valuation in that

20    perspective.

21                   Q.   So the bottom line is if they were

22    transferrable, you would have to review your

23    opinion, correct?

24                   A.   If they were transferrable, it

25    would -- yes.
```



```
 1                  Q.   All right.  And there is no
 2   discount necessary at all when you are doing a
 3   value in use calculation with respect to the
 4   licenses, correct?  They're already being used in
 5   the current income stream?
 6                  A.   That is -- that is what I
 7   testified today, yes.
 8                  Q.   Okay.  So we'll come back to
 9   transferability in a moment.  I just want to go
10   through quickly a couple of the other assumptions
11   if we could.
12                  As you discussed with my friend, there
13   were also limitations on the license rights that
14   you were asked to assume and those are dealt with
15   in your report, correct?
16                  A.   Let's be specific.
17                  Q.   To the scope of the license.
18                  A.   Can you tell me what you're
19   referring to, please?
20                  Q.   Sure.  Are you, sir, not aware
21   that in your report you have as an assumption that
22   the licenses themselves are limited to an extent;
23   that the scope of the licenses are limited?
24                  A.   I just want to see.  You've got on
25   the screen here something, I want to see what
```



```
 1    you're referring to so I can be specific.
 2                   Q.   Okay.  We'll come back then.
 3    Let's go to 60(b) of your report, please.  That,
 4    sir, as I understand it, is what you were advised
 5    by the Monitor to assume as to the scope of the
 6    license; do I have that correctly?
 7                   A.   Yes.
 8                   Q.   Okay.  And another assumption you
 9    were asked to make with respect to the residual
10    property -- residual IP, pardon me, sir -- sale,
11    you were advised to assume that NNI and the
12    relevant EMEA RPEs had no property interest in that
13    residual IP in any way, correct?
14                   A.   Again, in general, yes.  You have
15    to point me to where you're referring to.
16                   Q.   Can you bring up, sir, your
17    rebuttal report and I'm going to ask that we go to
18    page 26, paragraph 87.  The paragraph starts with:
19                        "We understand that the scope
20                        of the license rights the US and
21                        EMEA Debtors held under the MRDA
22                        were such that they had no property
23                        interests in the residual IP..."
24                        See that?
25                   A.   Yes.
```



```
 1                    Q.   When you say you understand that
 2   to be the case, the scope of the licenses, that's
 3   what you were advised by counsel to the Monitor to
 4   assume for the purposes of preparing your report,
 5   correct?
 6                    A.   Yes.
 7                    Q.   Okay.  And sir, I've been through
 8   several of the assumptions.  As I understand it,
 9   based on all of those assumptions, you did not
10   prepare any type of valuation with respect to the
11   property interests held by the parties, correct?
12                    A.   Correct.  As I said, my task was
13   to determine the methodology and approach.  I have
14   not done the numerical valuation.
15                    Q.   Okay.  Now, I want to just go to
16   the business sales, sir, with respect to your
17   report.  For that you say -- we can go to paragraph
18   62 of your report, it's on page 22.  Page 22,
19   paragraph 62:
20                         "Importantly, for the purposes
21                         of the allocation analysis (as
22                         explained further below), the
23                         license rights of the US Debtors and
24                         EMEA Debtors under the MRDA were not
25                         transferrable to third parties.  In
```



1                    contrast, as owners of Nortel's IP,

2                    the Canadian Debtors (specifically,

3                    NNL) were entitled to the benefit of

4                    that IP in its highest and best use

5                    - including from the transfer of

6                    those assets to third parties who

7                    were prepared to pay more for those

8                    assets than the present value of the

9                    operating profits Nortel could have

10                   expected to realize from their use

11                   in its own operations."

12                   Do you see that?

13              A.   Yes.

14              Q.   That really is, sir, what we've

15    been talking about to a significant degree with

16    respect to transferability and non-transferability;

17    that's pretty much what we've been talking about

18    this morning, correct?

19              A.   I think in part, yes.

20              Q.   Okay.  And if NNL -- sorry, just

21    to back up for one moment or move sideways.  It's

22    your opinion that the value attributable to the

23    licenses on the sale doesn't change at all if the

24    sale price for the IP, as part of the business

25    sale, was increased or decreased, correct?



```
 1                    It doesn't matter how high the sale
 2      price was, it would have no change in the value to
 3      the licenses held by NNI and the EMEA Debtors,
 4      correct?
 5                    A.   I think that's correct, because
 6      what we're valuing with the license holders is the
 7      value of their license.  That's the license.  What
 8      we're valuing with the other pieces is the assets
 9      that are held by a different bundle of assets held
10      by somebody else.
11                    So it's an obvious repercussion of
12      that.
13                    Q.   Sure.  So just to hit it home, if
14      the price a purchaser was willing to paid for one
15      of the lines of business was four times as much, no
16      more of that money would go to NNI or the relevant
17      EMEA Debtors, correct, based on your methodology?
18                    A.   Correct.
19                    THE CANADIAN COURT:  Mr. Gottlieb, is
20      this a convenient time?
21                    MR. GOTTLIEB:  Yes, it is.  Thank you,
22      Your Honour.  Thank you, Judge Gross.
23                    THE CANADIAN COURT:  Is 2:15 okay,
24      Judge Gross?
25                    THE US COURT:  Fine.
```



```
 1                    THE CANADIAN COURT:  2:15.

 2                    -- LUNCHEON RECESS AT 1:00 P.M.

 3                    -- UPON RESUMING AT 2:27 P.M.

 4                    THE CANADIAN COURT:  Mr. Gottlieb?

 5                    MR. GOTTLIEB:  Thank you, Your Honour,

 6      Judge Gross.

 7                    BY MR. GOTTLIEB:

 8                    Q.   Mr. Berenblut, before the break we

 9      were talking about the ability and rights to

10      transfer the IP.  I just want to move on a little

11      deeper on that topic before we leave it.

12                    If NNL did not have the ability to

13      transfer the IP to a purchaser, that would

14      obviously impact the value NNI should receive from

15      the proceeds of the sale of IP, correct?

16                    A.   Let me follow that with you again.

17      Did you say if NNL --

18                    Q.   Correct, the Canadian company.

19                    A.   -- the Canadian company did not

20      have the right to transfer the IP, that would

21      affect --

22                    Q.   Would it be easier for you if I

23      went at it a different way?  I don't want to

24      confuse you at all.

25                    A.   Go ahead.
```



```
 1                    Q.   Would that be helpful?  Okay.  I
 2   was hoping not to go back on stuff so I apologize,
 3   let me go back slightly?
 4                    A.   I was just trying to clarify the
 5   question and then I might be able to answer it.
 6                    Q.   Oh, no.  Go ahead, please.  Okay.
 7                    So let me go back at it this way.  You
 8   said before the break and it's dealt with
 9   explicitly in your report at paragraph 62, that
10   because NNI and the EMEA Debtors are not able to
11   transfer their property rights, their licenses, it
12   impacts the value that they should receive with
13   respect to the sale of IP, correct?
14                    A.   Yes.
15                    Q.   Okay.  So my point was if you
16   continue that thought, if there was a restriction
17   or a prohibition on NNL transferring its rights,
18   it, too, would have an impact on the value it could
19   receive from the sale of the IP?
20                    A.   Well, in a hypothetical situation
21   if we impose constraints on one of the parties that
22   wasn't there before, one would have to look at how
23   it impacts the valuation.
24                    Q.   Okay.  So we talked a little bit
25   before about the rights and abilities to transfer.
```



1    So if you want to talk about it as a hypothetical,

2    that's fine.  So let's just stick with that.

3              If, in a hypothetical world as you say,

4    NNL was not able to transfer its rights in the IP,

5    that would negatively impact the value of the

6    proprietary rights in the IP, correct?

7              A.   All other things being equal and

8    depending on the valuation approach taken as we

9    have spoken about, if you look at a value in use

10   approach, then it may not.  If you're looking at it

11   as fair market value with a valuing a restriction

12   on the right to transfer, it may.

13             Q.   All right.  Well, let's talk about

14   the methodology that you are using here, okay?  Can

15   we stick to that, please?

16             A.   Go ahead.

17             Q.   What we have is a situation where

18   you have assumed for the sake of your opinions that

19   NNL has the right to transfer its property interest

20   in the IP, correct?

21             A.   Yes.

22             Q.   I'm asking you to assume that

23   that's not the case, that it doesn't have the

24   ability to transfer its interest in the IP.  I'm

25   putting what I thought, sir, was a fairly simple

 Neeson & Associates    W&F WILSON & PETERSON, LTD.

1    proposition based on your report on your

2    methodology that that would have an impact on the

3    value that NNL should receive in the sale

4    transaction of the IP?

5                    A.    I think I answered the question

6    and obviously one would have to look at the

7    particular aspects of the restriction and I said it

8    may impact the value.

9                    Q.    Well, it has to restrict the value

10   based on your methodology, because you've concluded

11   that because NNI and the EMEA Debtors cannot

12   transfer their IP, you have to use a value in use

13   methodology, correct?

14                   A.    I think that's correct, but I

15   think we're comparing two dissimilar items.  So the

16   analogy is hard to bring, because NNI, NNUK or EMEA

17   have license rights.  That's what we were talking

18   about.  And then you said what happens if NNL can't

19   transfer its rights in the IP?  And so different

20   things than you mentioned the subsidiary's rights

21   in the IP which I'm not sure I can follow that

22   particular description.

23                   So I'm not -- I'm trying to follow you.

24                   Q.    Okay.  I'm going to try again.  If

25   NNL is not able to transfer the IP to a purchaser,



1    if it is unable without consent to transfer the IP

2    to a purchaser, you will give me that that will

3    impact the value of that IP in the hands of NNL,

4    correct?

5              A.   I would think in isolation it

6    would, yes.

7              Q.   Okay.  All right.  And as we

8    looked at in paragraph 62 of your report, your

9    valuation, using your methodology, is based on your

10   assumption that NNL has the right and ability to

11   transfer the IP, correct?

12             A.   Just looking at 62 for a moment.

13             Q.   Yes, sir, we can go back to 62 if

14   that would help.

15             A.   That's what you're referring me

16   to, I believe?

17             Q.   It is.  You say in the third line

18   of 62:

19                  "In contrast, as owner of

20                  Nortel's IP, the Canadian Debtors

21                  were entitled to the benefit of that

22                  IP and its highest and best use,

23                  including from the transfer of those

24                  assets..."

25             A.   Yes.



```
1                    Q.    "...to third parties."
2                    So my point is if they couldn't
3       transfer those assets as you say, then that would
4       impact the value of those assets, correct?
5                    A.    And I think I have answered you
6       that it may, depending on the circumstances.
7                    Q.    Now, we know, sir, that these --
8       this IP was subject to exclusive licenses, correct?
9                    A.    Correct.
10                   Q.    And those exclusive licenses were
11      held in the United States, the UK and Ireland,
12      correct?
13                   A.    Correct.
14                   Q.    And France, correct?
15                   A.    I believe so.
16                   Q.    Okay.  And we know that there were
17      non-exclusive licenses to the rest of the world,
18      correct?
19                   A.    Yes.
20                   Q.    So the fact that those licences
21      existed as a factual and a practical matter,
22      restricted NNL's ability to transfer the IP,
23      correct?
24                   A.    I think we've already discussed
25      that.  Number one, the question that I'm answering
```



```
 1    is what was the value of the rights surrendered,

 2    and that I have done.  The licenses -- and that's

 3    what we're talking about, what is the value of the

 4    license.  We're not talking about a hold-up value

 5    for the licenses that would prevent someone doing

 6    something.  We're being asked, what is the method

 7    to value those property interests that have been

 8    surrendered?  That's what I have done.

 9             Hold-up value is a completely different

10    issue, and the transfer -- as I mentioned earlier,

11    I think, another way of looking at this is that if,

12    whether Nortel or any other licensee/licensor

13    situation, if a licensor breaks a contract, what is

14    the result of that?  The result is they get sued

15    for the loss of profits that they've caused.

16             So in this particular case if NNL

17    inappropriately transfers its interests, and there

18    is a subject licensee there that isn't happy, and

19    they're losing their license revenue, they would

20    sue for that license revenue.  We'd end up in the

21    same position.

22             So these constructs are -- I've

23    considered, and I think that they fit within the

24    parameters of what I have described here.

25                  Q.   I'm going to come back to the
```

 Neeson&Associates   W&F

1    question I asked now and ask you if you can just

2    think about the question I asked.  The question I

3    asked was this, the fact that those licenses

4    existed, the exclusive licenses and the

5    non-exclusive licenses for the rest of the world,

6    as a factual and practical matter, restricted NNL's

7    ability to transfer the IP, correct?

8              A.   Are you saying they legally

9    restricted, that they restricted from a business

10   perspective, or they are restricted from which

11   perspective?

12             Q.   I'll ask the question again,

13   because my question really gave that answer to you,

14   sir.  The fact that those licenses existed as a

15   factual and practical matter restricted NNL's

16   ability to transfer the IP; isn't that correct?

17             A.   No, if we're talking about a

18   practical and business perspective, the behaviour

19   of a purchaser and a vendor, one can anticipate a

20   situation where a vendor with licensees says to a

21   purchaser, I'm selling you this IP, I have got some

22   licensees.  If you don't like them, I'll cut -- put

23   some money in escrow and I'll deal with the

24   litigation that they're going to start against me

25   and I'll settle the litigation and I think the



1    answer would be the same.

2              The net value of the property interest

3    transferred would be the price that the purchaser

4    would pay, having had the vendor dispense with the

5    breach of license agreement that it was faced it.

6    You come up with the same answer in that type of

7    situation.

8              Q.   All right.  So I'm going to break

9    that down into two parts.  As I understood your

10   answer you will not concede for me that the fact

11   there are exclusive licenses in the United States,

12   the UK, France and Ireland would place a

13   restriction on NNL's ability to transfer the IP?

14             A.   I think I've answered that.

15             THE CANADIAN COURT:  One thing -- I

16   understand the question you've asked.  When you say

17   it restricts the ability, it restricts in what way?

18   Can they sell it subject to the licenses?  Can they

19   not sell it subject to the licenses?  I'm not sure

20   what your question is asking.

21             MR. GOTTLIEB:  Thank you, Your Honour,

22   for that.  I appreciate that.

23             BY MR. GOTTLIEB:

24             Q.   What I'm trying to get at, sir, is

25   I think you will agree with me, sir, that that --



1    those licenses would impact the value that NNL

2    could receive on selling the IP, correct?  The fact

3    that they are exclusive and non-exclusive licenses

4    around the world, correct?

5                    A.   If that was the question, I

6    answered it and said yes.

7                    Q.   Okay.  So that's point number one.

8    Point number two is when you go to market to sell

9    IP, my point was that as a practical matter, it

10   will be more difficult to sell the IP when there

11   are licenses already in the United States, massive

12   market in NNUK and in France and in Ireland, all

13   significant markets.

14                   My point was we know it will impact the

15   value, but it will also impact your ability to sell

16   it as a practical matter.

17                   A.   It may well do, depending on the

18   perspective of the purchaser.  I mean, that's a

19   complete unknown.

20                   Q.   Okay.  Well, it's a complete

21   unknown but you say, but when we have the situation

22   that we have in front of you here, what we know is,

23   for example, Rockstar, are you with me on that

24   transaction, sir, correct?  Rockstar required all

25   the licenses to be terminated before it would



1    purchase the IP, correct?  You're aware of that?

2                    A.    If I remember correctly, it wasn't

3    Rockstar that required the termination.  I believe

4    it was Google in the stalking horse that required

5    the termination as a pragmatic matter, because why

6    should they have to deal with the issues we were

7    just talking about before?  They may as well just

8    have them terminated even though it was considered

9    they may not impact the residual IP.  It was just a

10   matter of housekeeping.

11                   Q.    Okay.  Have you looked at the

12   Rockstar sale agreement?

13                   A.    Briefly, yes.

14                   Q.    Are you aware that there is a

15   provision in the Rockstar sale agreement that

16   requires the licenses to be terminated?

17                   A.    I would not be surprised.

18                   Q.    You're not aware of that though?

19                   A.    I said I would not be surprised

20   but as I mentioned, I thought that it had

21   previously been dealt with in the Google offer.

22                   Q.    All right.  So what I'm getting

23   to, sir, is this.  That you said that there had to

24   be a value in use calculation with respect to the

25   licenses because they couldn't be transferred to a



 1    third party, but with respect to NNL, and its

 2    ability or restriction on its ability to transfer

 3    the IP subject to the licenses, you treat it as a

 4    freely saleable asset, when in fact, sir, there are

 5    restrictions on its ability to transfer the asset

 6    because of the licenses, correct?

 7              A.    Counsel, knowingly you are

 8    conflating two completely different issues.  The

 9    first one is we're talking about the MRDA has a

10    license agreement that has a restriction on the

11    ability of the licensee to transfer it.

12              On the other hand, you're asking about

13    the business reality of NNL transferring its freely

14    transferrable interest subject to some unresolved

15    licenses.  Two completely different questions.

16              Q.    With respect, sir, I don't think

17    that's what the record shows, nor do I think that's

18    what the answers give, because the point of the

19    matter is, it is not an unrestricted ability --

20    ability to sell the IP.  Because it is subject to

21    licenses, correct?

22              A.    Well, now you're asking me in an

23    area that I feel that I can comment on because I

24    think we're dealing with something that is outside

25    of the legal arena.  The licenses are constrained



```
 1   within a contract.  The ownership, if, of course,

 2   the court agrees that there is ownership of NN

 3   Technology by NNL, NNL can sell it.

 4             What a buyer perceives in terms of

 5   baggage that goes with it, if it has licenses that

 6   go with it, that's a separate issue but it's not

 7   the same issue that we're talking about with the

 8   contractual restrictions on license transfers.  I

 9   think I'm saying what I said earlier.

10             Q.   Sir, with respect to the residual

11   IP sale, you have no evidence whatsoever, and you

12   don't rely on any such evidence in your report,

13   that a purchaser would have bought the IP from NNL

14   but for the licenses being terminated, correct?

15             A.   Correct.

16             Q.   So I want to turn to paragraph 48

17   of your report, please, and deal with the issue of

18   enforcement rights.

19             In your report, sir, you criticize

20   Mr. Kinrich's report for what you refer to as a

21   broad interpretation of the licensed participants

22   enforcement rights under the MRDA, correct?  It's

23   in the rebuttal report, I apologize.

24             THE CANADIAN COURT:  Where do you want

25   us to look?
```



```
 1              MR. GOTTLIEB:  Rebuttal report,
 2   paragraph 48.
 3              BY MR. GOTTLIEB:
 4              Q.   If you go down five lines you will
 5   see in the centre:
 6                   "In addition, the Kinrich
 7                   report takes a broad interpretation
 8                   of the right to enforce Nortel's IP
 9                   in their exclusive territories,
10                   construing it to be an unfettered
11                   right."
12                   Do you see that?
13              A.   Yes.
14              Q.   And you were advised by counsel to
15   the Monitor that you were to assume the enforcement
16   right was limited to the scope of the licenses,
17   correct?
18              A.   Correct.
19              Q.   And that included that the
20   licences extended only to the use of IP in Nortel's
21   business and to sell products and services,
22   correct?
23              A.   Correct.
24              Q.   And I want to go to the MRDA,
25   please, and the enforcement right.  It's Trial
```



```
 1    Exhibit 21003.  So we've got the MRDA up on the
 2    board and for anybody who needs one we can hand it
 3    around.
 4                   A.   Can I get a copy, please?
 5                   Q.   Yes, of course.  I will wait for
 6    you to get a copy, of course.
 7                   And sir, we were talking about again
 8    Trial Exhibit 21003 4(e), which is on page 6.  If
 9    you can have a read of that, sir.
10                   A.   (Witness reviews document).
11                   Q.   Mr. Berenblut, are you having
12    trouble finding it there?
13                   A.   I've got it.
14                   Q.   Okay, perfect.  Page 6, 4(e):
15                        "Licensed Participants have the
16                        right to assert actions and recover
17                        damages or other remedies in their
18                        respective Territories for
19                        infringement or misappropriation of
20                        NN Technology by others."
21                   Do you see that?  Have I read that
22    correctly?
23                   A.   Yes.  Yes.
24                   Q.   You see on the language it refers
25    to NN Technology, correct?
```



```
 1                     A.    Yes.
 2                     Q.    And it doesn't in any way in the
 3     language there restrict the enforcement right to
 4     products, correct?  Do you see that?
 5                     A.    Yes.
 6                     Q.    And the enforcement right there,
 7     extends to all NN Technology, correct?  There's no
 8     carve-out?
 9                     A.    It says the words "NN Technology."
10                     Q.    Right.  And you're not aware of
11     any NN Technology that is not included in the
12     enforcement right, correct?
13                     A.    There is trademarks and associated
14     goodwill is not included.
15                     Q.    With respect to patents and patent
16     related, you're not aware of any NN Technology not
17     included in the enforcement right, correct?
18                     A.    Not that I am aware of.
19                     Q.    And as you understand it as a
20     general matter, the US and the EMEA entities had
21     the right to go after competitors who were
22     infringing patents and costing them sales in their
23     respective jurisdictions, correct?
24                     A.    I believe they both had the right,
25     I think NNL and the NNI and EMEA as appropriate had
```

 Neeson & Associates   W&F

```
 1   the right, and it would obviously I think I
 2   discussed this at my deposition, it would depend on
 3   the law of the land as to who brings the action,
 4   whether it's the patent owner or the licensee, but
 5   this gives them the right to do whatever they have
 6   the right to do.
 7              Q.   Okay.  Well, that last little
 8   qualification, they had the right to go after
 9   competitors who were infringing patents and costing
10   sales in their respective jurisdictions subject,
11   obviously as you say, to the law of their
12   jurisdictions, correct?
13              A.   Hold on one moment.
14              Q.   Of course.
15              A.   I think that -- yes, you'd expect
16   it for the licensee, yes.
17              Q.   So as you see it the enforcement
18   right is not restricted to products, correct?
19              A.   You're asking me for a legal
20   interpretation of the document.  I can't give you
21   one.
22              Q.   Okay.
23              A.   I see what it says here under
24   "Legal Title to NN Technology."
25              Q.   And the scope of the enforcement
```

 Neeson & Associates   W&F

1    right was the same as the scope of the license,

2    correct?

3                    A.   I'm not sure --

4                    THE CANADIAN COURT:  Isn't this all

5    argument about the agreement?  So much of this is

6    argument about what the agreement means.  I realize

7    what the witness has said here, but...

8                    MR. GOTTLIEB:  Sure.  Your Honour, when

9    it's an assumption and they're relying on the

10   assumption and referring to it in the report and

11   referring to it in the evidence, I appreciate your

12   comment but it's appropriate, in my respectful

13   submission, to deal with.  I am going to move on

14   from the point of this part of the examination.

15   But thank you for that.

16                    BY MR. GOTTLIEB:

17                    Q.   Now, if the assumption regarding

18   the limitation on the right to sue is correct, that

19   is the assumption that you have made for the

20   purpose of your report, that it's restricted to

21   products.  Are you with me?  The enforcement right

22   is restricted to products as you have assumed for

23   the purpose of your report?

24                    A.   Where are you pointing to in my

25   report, please?



```
 1                    Q.   48 of your rebuttal report.
 2                    THE CANADIAN COURT:  Well, it's 47 as
 3      well, isn't it?
 4                    MR. GOTTLIEB:  Thank you, Your Honour,
 5      yes.
 6                    THE WITNESS:  Yes.
 7                    BY MR. GOTTLIEB:
 8                    Q.   All right.  So if that assumption
 9      is correct, sir, then NNI would not be able to sue
10      an infringer in the United States to enforce
11      patents that were not used in the products,
12      correct?
13                    A.   Or proposed products, correct.
14                    Q.   Correct.  NNL could only sue if
15      the --
16                    A.   Sorry, you said NNI could not sue.
17                    Q.   NNI, I apologize, thank you.  Only
18      NNL could sue for such infringement is the point
19      that you were getting at?
20                    A.   It would appear so.
21                    Q.   Okay.  And indeed, your opinion is
22      that such infringement wouldn't harm NNI because it
23      wasn't earning any revenue from such patent if it
24      wasn't included in a product, correct?
25                    A.   Well, I think that's correct and I
```

1    think that the idea is that the licensee, if it's

2    suing for loss of profits for an infringement that

3    doesn't cause it loss of profits, in the local

4    jurisdiction being the US, then what's the remedy

5    available to the patent holder for a royalty claim

6    because somebody's using its patents without paying

7    for it?

8              So it's one or the other depending on

9    the circumstances.

10             Q.   Understand.  Thank you for that.

11   Prior to preparing your report, did you do any

12   investigation whether this assumption was

13   consistent with Nortel's patent enforcement

14   experience?

15             A.   No.

16             Q.   Were you aware at the time you did

17   your report that in patent litigation, NNI had

18   brought patent infringement proceedings in the

19   United States against a company called Kyocera?

20             A.   Yes.

21             Q.   You are aware of that at the time

22   you did your report, correct?

23             A.   I believe so.  I was aware of some

24   litigation that was another litigation called the

25   Foundry litigation.

 Neeson & Associates    W&F

1                    Q.   Yes.  And NNI and NNL were the

2    plaintiffs in this action against Kyocera, correct?

3                    A.   I don't recall but if you're

4    telling me I'll accept it.

5                    Q.   Okay.  Well, you can accept that.

6                    And NNI as plaintiff alleged that it

7    suffered damages as a result of infringement.

8    You're aware of that now?

9                    A.   As I say, you'll have to tell me

10   the facts because I don't know them.

11                   Q.   Okay.  So even today, sitting

12   here, you're not aware of that fact?

13                   A.   The Kyocera litigation?

14                   Q.   Yes.

15                   A.   I don't recall it.

16                   Q.   So therefore you're not aware and

17   weren't at the time you did your report that two of

18   the patent subjects of the Kyocera litigation were

19   not used in the Nortel business and in fact were

20   sold to Rockstar in the residual IP sale, correct?

21   You weren't aware of that fact?

22                   A.   I have no comment on that, no.

23                   Q.   If you assume those facts to be

24   true, that would not be consistent with your

25   assumption that NNI would not be able to enforce



```
 1   patents if not used in the products, correct?
 2                  THE CANADIAN COURT:  Mr. Gottlieb.
 3                  MR. GOTTLIEB:  Yes, Your Honour.
 4                  THE CANADIAN COURT:  I don't see any
 5   Statement of Claim but did this succeed?  What was
 6   the situation?
 7                  MR. GOTTLIEB:  I apologize, Your
 8   Honour.
 9                  THE CANADIAN COURT:  Anybody can make
10   any allegation in a Statement of Claim.  It doesn't
11   mean they have a right to.  Was there any result of
12   that litigation other than settlement?
13                  MR. GOTTLIEB:  In the Kyocera one.  I'm
14   going to move over to the Foundry one now and there
15   has been other evidence put in the record with
16   respect to this litigation.  As you know there were
17   significant depos and documents put into the
18   record, Your Honour, that -- we're not dealing with
19   them all here but they're in the record.
20                  THE CANADIAN COURT:  I just made the
21   comment I did because your question said they would
22   not -- this assumption that NNI would not be able
23   to enforce patents if not used in the products was
24   not correct.  Well, a claim doesn't set rights.  A
25   claim is a claim only.  That's why I'm asking you
```

 Neeson&Associates   W&F

1    was there any result that allowed you to ask that

2    question?

3                    MR. GOTTLIEB:  Well, I'll put it

4    differently and then I'll move on to the second

5    piece of litigation, Your Honour.  But obviously

6    this is a piece of litigation in the United States

7    put forward by NNL and NNI, so the suggestion that

8    NNI didn't have the rights to enforce when it was a

9    joint piece of litigation by NNL and NNI raises the

10   question, because NNL -- pardon me, NNI claimed

11   damages for breach.

12                   THE CANADIAN COURT:  I've heard that

13   before.  I've heard that in this case.

14                   MR. GOTTLIEB:  No doubt.  Again, that

15   evidence is in the record.

16                   BY MR. GOTTLIEB:

17          Q.   Sir, if I understand it correctly,

18   you were also aware of Foundry litigation,

19   litigation by Nortel against Foundry for a breach?

20          A.   Yes.

21          Q.   And I recall at the time -- you

22   were aware of that at the time of your report.  In

23   fact, there are documents referred to in the

24   schedule to your report about Foundry, correct?

25          A.   Correct.



```
 1                    Q.   And you don't refer to the Foundry
 2    litigation anywhere in either of your reports,
 3    correct?
 4                    A.   You just told me I did.
 5                    Q.   No, no, the documents.  The
 6    documents were referred to as documents you
 7    reviewed.
 8                    A.   Correct.
 9                    Q.   But you don't in the body of your
10    report discuss the Foundry litigation, correct?
11                    A.   I don't think I do, no.
12                    Q.   Okay.  And you're aware that that
13    was also litigation in the United States for patent
14    infringement, correct?
15                    A.   Yes.
16                    Q.   And that NNI was a party to that
17    patent litigation?
18                    A.   Yes.
19                    Q.   And it claimed that it suffered
20    damages as a result of the patent infringement,
21    correct?
22                    A.   Yes.
23                    Q.   And there was a settlement of that
24    litigation where there was a payment made with
25    respect to the infringement, correct?
```



```
 1                    A.   There was a payment made that was
 2    partly settlement of the infringement and partly
 3    the purchase of a fully paid-up license by the
 4    Foundry, or by the infringer to continue to use the
 5    patent.
 6                    Q.   All right.  And you're aware, I
 7    take it now, that NNL did not keep all of the
 8    payment that was received with respect to that
 9    infringement, correct?
10                    A.   I believe that it was processed
11    through the RPSM in the most parts, yes.
12                    Q.   And you'll agree with me, sir,
13    that the fact that NNL was a plaintiff and settled
14    that piece of litigation and received payment for
15    the enforcement of that patent infringement is not
16    consistent with the assumption you were asked to
17    make, that NNI could not enforce --
18                    THE CANADIAN COURT:  I think you have a
19    mistake in your question.  I think you meant to say
20    NNI.
21                    MR. GOTTLIEB:  I apologize.  Thank you
22    for everyone in the courtroom correcting me on that
23    one.  Almost everyone I should say.  Sorry about
24    that.
25                    BY MR. GOTTLIEB:
```



```
 1                    Q.   I'll back up one second.  You're
 2      aware now, sir, that seven of the patents that were
 3      the subject matter of that litigation were sold to
 4      Rockstar, correct?  As part of the patent
 5      portfolio?
 6                    A.   I wasn't specifically aware of
 7      that, no.
 8                    Q.   You weren't aware of that at the
 9      time you did your report?
10                    A.   Not specifically, no.
11                    Q.   Okay.  But if, again, sir, if you
12      assume that's the case, that is not consistent with
13      the assumption that you've been asked to make that
14      NNI would not be able to enforce the infringement
15      of patents that did not meet the definition of
16      products, correct?
17                    A.   It's not correct, and you know, I
18      feel that most of this discussion is really one of
19      a legal nature, but I'll just give you my piece on
20      it.
21                    Number one, I did inquire at the time
22      of the review of the Foundry litigation whether
23      those were patents that were actively used in
24      products or proposed products, and some of them
25      were, so there is nothing inconsistent in that.
```



1            There's no way of knowing, from my
2   perspective, which of those patents that were sued
3   upon were the active ones and which were inactive,
4   which ones were yielding income and which ones
5   weren't, but it seemed reasonable to me that if
6   these were patents that were being used in the
7   course of NNI's business, that it did fit into the
8   description that I have given of the license rights
9   and the fact that they could sue where their income
10  stream was being interfered with.
11            Secondly, it seems to me that just from
12  a practical business matter, that when these
13  companies were operating in concert to achieve
14  success together, it would be perfectly normal for
15  the different subsidiaries and the parent company
16  to work together and to issue claims in who's ever
17  name they wanted to issue them to make sure they
18  were covered in court, to make sure that the right
19  person was making the claim when it was worked out
20  who the party was that should be making the claim.
21            So I don't agree with you that that
22  necessarily proves that one has the right to sue or
23  one doesn't have the right to sue, but anyway,
24  that's my observation on it.
25            Q.   Okay.  I'm just going to hit one

 1   point on that and then move on.  You said you were

 2   aware that some of the patents were used in

 3   products and that means you were also aware, sir,

 4   that some of the patents were not used in products,

 5   correct?

 6              A.   No, I was only reacting to the

 7   fact that you told me seven, seven weren't.

 8   Because I'm not sure I went that granular in my

 9   inquiry.

10              Q.   Okay.  All right.  Thank you very

11   much.

12              I want to move on if I could to your

13   rebuttal report on page 26, paragraph 81, please.

14   Go to that.  If we can just bring that up in your

15   rebuttal report.

16              And sir, you can have a look at this

17   paragraph, paragraph 81.

18              A.   Did you say page 26?

19              Q.   25.  I did say 26, yes.  25, thank

20   you.  Have you had a chance to look at that?

21              A.   Yes.

22              Q.   And in this part of the report you

23   criticize Mr. Malackowski of Ocean Tomo for not

24   using a five-year look-back period for determining

25   R&D expenditures when giving his opinion, correct?

 Neeson&Associates   W&F

```
 1                    A.    Yes.
 2                    Q.    And you've obviously read both of
 3      the Ocean Tomo reports?
 4                    A.    Yes.
 5                    Q.    And you were not asked as part of
 6      your task to determine the useful life of Nortel's
 7      IP that was sold, correct?
 8                    A.    Correct.
 9                    Q.    You did not analyze, for example,
10      with respect to the residual portfolio the filing
11      dates of the patents that were sold?
12                    A.    Hold it one moment.  Let me finish
13      the previous answer.  You said I wasn't asked to do
14      it.  That is true, I wasn't asked to do it.
15      However, if it would have been pertinent to the
16      exercise I had been asked to do, I would have done
17      it.  It wasn't pertinent to that.  So I just want
18      to make sure that I answer that fully.
19                    Q.    Of course.  Thank you very much
20      for that clarification.
21                    So you didn't look at, for example, the
22      filing dates of the patents that were sold in the
23      residual patent sale or the business sale, correct?
24                    A.    Correct.
25                    Q.    You didn't look at the issue dates
```

Neeson & Associates   W&P

1  of the patents, correct?

2              A.   Correct.

3              Q.   You didn't look at the expiration

4  dates of the patents in the portfolio, correct?

5              A.   Correct.

6              Q.   And the Ocean Tomo report sets out

7  a great many pieces of the analysis including, for

8  example, the priority dates for the high interest

9  patents.  You didn't review that as part of your

10 task, correct?

11             A.   I reviewed the high interest

12 patents only in the context of the way the company

13 had reviewed them and put them into different

14 buckets.

15             Q.   Okay.  You didn't look at the

16 priority dates for those, correct?

17             A.   As I say, I looked at what the

18 company's view of that was.  I didn't look at it

19 myself.

20             Q.   You didn't, like Ocean Tomo,

21 review the market adoption rates for various

22 technologies, correct?

23             A.   I can't remember what Ocean Tomo

24 did on that.  Anyway, no, I don't think it's

25 relevant.



1                    Q.   So you didn't do that?

2                    A.   Correct.

3                    Q.   Okay.  And did you assess Nortel

4    patents asserted in recent patent litigation among

5    smart phone manufacturers?

6                    A.   No.

7                    Q.   All right.  And you didn't review

8    academic research on value of patents over time?

9                    A.   I certainly looked at

10   certain -- and I am aware of certain literature on

11   patents.  I don't know what I reviewed.  Again, I

12   don't think it's relevant to the question I was

13   asked.

14                   Q.   I understand.  I understand.  You

15   criticize Ocean Tomo for its analysis and I'm just

16   pointing out, sir, that the work they did simply

17   isn't work you did because you weren't asked to do

18   it, correct?

19                   A.   No, that's a mischaracterization

20   and I already said that about two minutes ago.  I

21   said I may not have been explicitly asked to do it,

22   but had it been relevant -- I was given a question

23   to answer from a valuation and economic

24   perspective.  There's lots of things I did that I

25   wasn't asked to do because that's normally not



```
 1    what -- when you're asked to answer a question, you
 2    do what you have to do to answer the question.
 3              The information that you're asking
 4    about in the Malackowski report is not relevant to
 5    the question I was asked or to the opinion that I
 6    gave.  If it would have been, I would have done it
 7    whether I was asked to or not.
 8              Q.  Sir, I'm trying to get to the
 9    point that you're acknowledging you didn't do it.
10    I understand you have a reason, that you say you
11    had a reason why you didn't do it.  I'm just asking
12    for your confirmation that you didn't do that type
13    of work?
14              THE CANADIAN COURT:  Isn't what he did
15    in his report, Mr. Gottlieb?
16              MR. GOTTLIEB:  I'm sorry, Your Honour?
17              THE CANADIAN COURT:  Isn't what he did
18    in his report?
19              MR. GOTTLIEB:  Well, I can tell you
20    he's already given an answer, Your Honour, about
21    something he says he looked at that's not in the
22    report so I'm just trying to nail down a couple
23    what I consider to be fairly simple points of what
24    he didn't do in the report.
25              BY MR. GOTTLIEB:
```

Neeson&Associates   W&F

```
 1                     Q.   And as a final matter, sir, if I
 2   understand reading your report and the work that
 3   you were asked to do, you didn't consider the
 4   implications of a lag between the filing date and
 5   the granting of a patent, correct?  That just
 6   wasn't part of the work you did?
 7                     A.   Correct.
 8                     Q.   Thank you.  All right.
 9                     I want to move to a different topic if
10   I could, please.  In your report, and you can go to
11   paragraph 66 of your initial report, please, and
12   sir, in this paragraph you deal with intangible
13   assets that were sold other than Nortel's
14   intellectual property, correct?
15                     I apologize, take your time in reading,
16   please.
17                     A.   (Witness reviews document).  Yes.
18                     Q.   Okay.
19                     A.   That was "yes" to I read it, not
20   to anything else.
21                     Q.   I've got it.  Thank you very much.
22   You conclude that the value of those non-IP
23   intangibles are incorporated into the license
24   rights associated with the IP, correct?
25                     A.   Yes.
```



```
1                    Q.   And that includes customer
2    contracts and customer relationships, correct?
3                    A.   Correct.
4                    Q.   You say these intangibles should
5    not be valued and allocated separately from the IP,
6    correct?
7                    A.   For the purpose of my work what
8    I'm saying is that the cash flows that we're
9    suggesting are valued are the cash flows that
10   result from the operation of the business which is
11   a technology business, and from the revenues that
12   generates from the customers which are tied up with
13   that technology.  So it's not being ignored, they
14   are being valued.  It's just they are part of that
15   cash flow.
16                   Q.   Well, okay, thank you.  The point
17   was the word "separately."  You say they shouldn't
18   be valued "separately."
19                   A.   I think that is correct.
20                   Q.   And you're not saying, sir, that
21   they can't be valued separately.  You're just
22   saying in your view they should not be valued and
23   allocated separately, correct?
24                   A.   I think it's a very challenging
25   task to value the customer relationships.  It
```



1   always is challenging to us.  I think it's even

2   more of a challenge to us here where, as I've said,

3   the customers are customers of the technology, and

4   they are the customers that result from the R&D.

5   As we know the R&D is incurred in certain locations

6   but then creates revenues to the corporation in

7   proportion to the RPSM formula.

8                So once you have that, you have a

9   situation where they become, as I say, co-mingled

10  in a way that I'm not sure there is a meaningful

11  way to separate them.

12               Q.   So I just want to get to the

13  answer to my question.  Are you saying that they

14  cannot be separately valued, or are you saying they

15  can be but you don't think it's appropriate?  Those

16  are two different things.

17               A.   I think that it's not appropriate

18  that they are and I think that there's not a

19  reliable way of specifically identifying the value

20  of customer relationships.

21               Q.   Now you're aware, sir, for certain

22  that in the only major transaction prefiling at

23  Nortel, that's the UMTS/Alcatel transaction, Nortel

24  did in fact value those customers intangibles

25  separately, correct?

 Neeson&Associates     W&P

```
 1                        A.    If I remember correctly, in that
 2    particular transaction, Alcatel was the one that
 3    chose the categories of the purchase price
 4    allocation, and Nortel had the right within those
 5    categories that were dictated to them by Alcatel,
 6    to attribute those as they saw fit.
 7                        That is what I understand.
 8                        Q.    Okay.  So I'm going to break that
 9    down because this is important.  I want to stick
10    with the point that I asked about.  You're aware
11    that in the Alcatel transaction, as I call it,
12    customer assets, as I will broadly call them, were
13    valued separately, correct?
14                        A.    Frankly I don't recall off-hand.
15    If you want to show me the breakdown I'll look at
16    it but I don't remember what the categories were.
17                        Q.    Okay.  I will tell you what they
18    are then I'll give you a document, but you can
19    really trust me on this one.  The assets were
20    broken down into four separate categories:
21    tangible assets, IP, customer relationships and
22    goodwill.
23                        A.    So, I would comment there --
24                        THE CANADIAN COURT:  Wait, there is no
25    question there.  Just wait for the question.
```



```
 1                    THE WITNESS:  Sorry, Your Honour.
 2                    BY MR. GOTTLIEB:
 3                    Q.   Sir, sitting here now you don't
 4    recall that was the breakdown of the Alcatel sale
 5    from an asset category?
 6                    A.   It sounds familiar.
 7                    Q.   Terrific.  So I won't take you to
 8    a document if you accept that to be the case.
 9                    You said that Alcatel got to do the
10    categorization and sir, there's not a big point on
11    this but I just want to make this clear.  Are you
12    aware that Nortel had the ability to challenge
13    Alcatel's asset class on that?  They didn't have to
14    accept it?  It wasn't simply an Alcatel dictates,
15    correct?
16                    A.   I don't know.
17                    Q.   You're not aware of that fact?
18                    A.   Correct.
19                    Q.   I take it you'll give it to me
20    that if, in a normal transaction, that if the
21    purchaser and vendor disagree with the classes,
22    that's simply a matter that has to get resolved.
23    It can't be simply accepted across the board;
24    correct?
25                    A.   I think you have to understand the
```



1    context that that is done in.  It is done in one

2    where the purchaser is trying to categorize things

3    in the most favourable fashion that it can normally

4    for its cash flow or tax planning purposes, and so,

5    you can't derive conclusions as to the reliability

6    of it one way or the other, because it's motivated

7    by different factors and I don't know when it would

8    be that the vendor would find issue with it.  It

9    may have special sensitivities because of a

10   particular reporting issue or a particular tax

11   issue, but it's very specific to the individual

12   participants in the transaction.

13            It's not a proof of the nature of these

14   assets on a more general fashion.  So I think

15   that's the important factor here.

16            Q.   All right.  Well, I'm going to

17   show you if I can Exhibit TR11259.  And sir, you're

18   obviously not on this.  I don't know if you've seen

19   this document before, but I just want you to take a

20   quick view of it because I'm going to move on from

21   that and show you something that I know you have

22   seen before?

23            A.   What do you mean I'm not on this?

24            Q.   Sorry, this is not a document that

25   obviously that you are an author of, cc'd on,



```
 1   recipient of.  Have you seen this document before?
 2              A.   I've seen several documents
 3   regarding the UMTS/Alcatel transaction.
 4              Q.   Okay.  That's perfect.
 5              A.   I don't know that I have seen this
 6   one before.
 7              Q.   Okay.  The front page is the one I
 8   want you to concentrate on.  It's an email from
 9   Louis Farr of Nortel to Timothy Pickering at
10   Deloitte Touche, who I can tell you is the auditor
11   of the company, and it deals with the subject
12   matter of the UMTS/Alcatel transaction.  And it
13   deals with the breakdown of the asset categories.
14   It deals with the breakdown of the asset
15   categories.  And if you look at 4, number 4, it
16   says:
17                   "Assumptions Underlying the
18                   Asset Allocation Statement Re
19                   Customer Relationship Intangibles,
20                   IPR," which we know what those are,
21                   "and Goodwill."
22              And sir, if you see "A" refers to
23                   Customer Relationship Intangibles
24                   and it says:
25                   "The value of the Customer
```



```
 1                    Relationship Intangible was
 2                    allocated to those entities that
 3                    have the face-to-face relationship
 4                    with the customer.  The allocation
 5                    was based on the revenue that the
 6                    associated customer contract
 7                    produces.  The fact that other
 8                    Nortel entities may have revenue
 9                    from a particular customer contract
10                    was disregarded -- the only reason
11                    why these entities have revenue is
12                    due to Nortel's internal,
13                    local-to-local sales process."
14                    Do you see that?
15             A.   Yes.
16             Q.   That deals obviously with how to
17    allocate the customer assets while they are in
18    Nortel once the money is paid up to Nortel.  So you
19    see that it was done separately as a class at
20    Nortel.  Do you see that?
21             A.   I do, but this is --
22             THE CANADIAN COURT:  No, no, just wait
23    for the question.
24             MR. GOTTLIEB:
25             Q.   So you see that it was done by way
```



```
 1   of a separate class for customer assets, correct?
 2              A.   What is it -- sorry, what is the
 3   question?  What do I see, is that what you're
 4   asking me?
 5              Q.   That the monies that were received
 6   were allocated in different asset categories at
 7   Nortel, and one of those categories was customers.
 8   Customer assets.  That's what I just read you.
 9              A.   As we've already said, these
10   categories, the customer relationship category was
11   determined by Alcatel and now Nortel is deciding
12   what it wants to do with it.
13              Q.   Yes, I understand, and I'm going
14   to move back to that.  I just wanted to show you,
15   sir, that at Nortel itself, it accepted the
16   customer asset category as a category --
17              THE CANADIAN COURT:  Mr. Gottlieb, it
18   may have but I don't think what I'm looking at says
19   that because it starts out in paragraph 1 saying:
20              "Below is the asset acquisition
21              statement that Nortel received from
22              Alcatel via email."
23              MR. GOTTLIEB:  Yes.
24              THE CANADIAN COURT:  So maybe some of
25   the documents Nortel accepted -- from what I'm
```



```
 1   looking at here --

 2               MR. GOTTLIEB:  Of course, and we do

 3   know from the evidence that Nortel did accept the

 4   categorization by Alcatel.

 5               MR. RUBY:  Your Honour, I hesitate to

 6   rise but I don't think that's quite right.  There

 7   is an amending agreement.  I assume we're going to

 8   get to it at some point.

 9               THE CANADIAN COURT:  I'm not sure what

10   the whole point of all this is anyway, frankly.

11               MR. GOTTLIEB:  I'm going to deal with

12   this.  The point of this is obviously what is set

13   out in the report, paragraph 66 of the report, that

14   all of the asset value goes to IP, that's not the

15   way it worked on the only material transaction that

16   took place before filing and now what's being

17   proposed by the Canadian Estate is a different

18   methodology.

19               BY MR. GOTTLIEB:

20               Q.   Let me just go back to a document

21   that I wanted to --

22               THE CANADIAN COURT:  It strikes me this

23   all comes down to argument in the end.

24               MR. GOTTLIEB:  I'm going to put some

25   documents in now, Your Honour, that I think will be
```



```
 1    helpful, frankly --
 2                THE CANADIAN COURT:  Maybe.
 3                MR. GOTTLIEB:  -- for all.
 4                BY MR. GOTTLIEB:
 5                Q.   Let's go to document Exhibit
 6    TR43798.  Now sir, the reason I'm giving you this
 7    document is in your report you refer to it in the
 8    appendices as a document that you had reviewed
 9    prior to doing your report.
10                A.   Yes.
11                Q.   Correct?  Do you recall that?
12                A.   I believe so.
13                Q.   Okay.  So I want to take you to
14    some of this document because you have given the
15    evidence now, and I'm going to paraphrase sir, as
16    opposed to quote you.  It's very difficult to
17    separate the customer relationships, customer
18    contracts out for the purpose of valuation.
19                And this you had in your report, sir,
20    and to put it plainly, you don't refer to this
21    anywhere in your report, correct?  This document?
22                A.   You just told me that I did.
23                Q.   No, sir, in the body of your
24    report you don't refer to it?
25                A.   I don't believe so.
```



```
 1                      Q.   Okay.  So let's go to page 1 of
 2    this document that you had prior to doing your
 3    report and it's from DSC Appraisal Associates Inc.
 4    Do you see that on page 1 of the document?
 5                      A.   Yes.
 6                      Q.   And you'll see from the heading,
 7    and this is a document to Alcatel, that:
 8                           "This letter summarizes the
 9                           results of our analysis and
10                           estimation of the fair value of the
11                           intangible assets associated with
12                           the acquisition of the UMTS radio
13                           access business of Nortel Networks
14                           Corp."
15                           And then it says:
16                           "We understand that this
17                           analysis will be used to assist
18                           Alcatel in allocating the purchase
19                           price among the acquired assets for
20                           financing reporting purposes."
21                           So this is actually done for a
22    financial reporting purposes, do you see that?
23                      A.   Yes.
24                      Q.   You see that, sir?
25                      A.   Yes.
```



    1                    Q.   All right.  Then if you go down,
    2    you'll just see at the bottom of that page it says:
    3                    "Based on our understanding of
    4                    the objectives of this engagement,
    5                    we performed the following."
    6                    And it talks about the various steps
    7    that they took including on-site meeting with
    8    senior management with Alcatel and Nortel.
    9                    Do you see that?
   10                    A.   Yes.
   11                    Q.   And then you see that they have
   12    conclusion on page 2, the next page over, of the
   13    asset categories:
   14                    "Developed Technology &
   15                    Know-How, Customer Relationships
   16                    (Contractual And Non-Contractual)"
   17                    -- where they give over $57 million
   18                    of value to -- and "In-Process
   19                    Research & Development."
   20                    Do you see that?
   21                    A.   Yes.
   22                    Q.   Now what I'd like you to do, sir,
   23    just so you have it, is flip to page 18 of the
   24    report.  Bottom right corner are the pages.  Do you
   25    have that page?



```
 1                    A.   Yes.
 2                    Q.   And you see there is a heading
 3     half-way down the page that says, "Customer
 4     Relationships (Contractual & Non-Contractual)."
 5     And then it goes through what I'm going to call,
 6     sir, a fairly detailed analysis of the financial
 7     considerations that have to be made, it does a
 8     quote from the financial reporting requirements,
 9     and then bullet two says:
10                         "Major existing customers of
11                         Nortel's UMTS solutions include..."
12                    And then it lists a significant number
13     of customers.  Do you see that?
14                    A.   Yes.
15                    Q.   And then on the next page, the
16     first bullet it does a revenue forecast for the
17     acquired customers based on the projected revenues
18     at the top, the first bullet?
19                    A.   Yes.
20                    Q.   Sir, it continues down and by all
21     means, you can read it, but it's a fairly detailed
22     analysis of the forecasts, the projected revenue,
23     the customer base, the sales.  The last two bullets
24     refer to the discounted cash flow analysis that was
25     done in order to come up with the proper analysis,
```



1   the last bullet of the page comes up with the

2   discount rate of 18 percent that was employed.

3              And then if you flip over to page 20,

4   you've got the last bullet before the conclusion

5   that deals with the life of the customer

6   relationships that's assumed for the sake of this,

7   and then you have the conclusion and it says:

8                    "Based on the information

9                    provided and the analysis performed,

10                    the indicated fair value of the

11                    acquired UMTS customer relationships

12                    at December 31, 2006 can reasonably

13                    be represented as..."

14              And then it gives a value of $57.4

15   million.  Do you see that?

16              A.   Yes.

17              Q.   And you looked at that before

18   doing your report, correct?

19              A.   Correct.

20              Q.   So it's not fair to say, sir, that

21   this analysis can't be done, is it?

22              A.   We were talking earlier about the

23   exercise in the context of Nortel as a worldwide

24   business.  UMTS was the sale of a specific business

25   entity within Nortel to a specific purchaser.  And



1    that specific purchaser is now looking at what it
2    thinks the present value of those future customer
3    relationships are based on the contracts.
4              So really it's a subsection of the
5    revenue stream that UMTS is generating.
6              In terms of the work that I have done
7    in my report, those -- those values -- all I'm
8    saying is those values are contained within the
9    cash flows.  All this is doing is breaking down the
10   cash flows further, and it may be easier when
11   you're dealing with a very specific -- one piece of
12   technology, one set of customers in one sale here.
13             My comment was that in the overall
14   activity of Nortel, and the fact that the business
15   is providing R&D and technology that is -- runs
16   through the organization, through business lines
17   across the world, it's difficult to separate out
18   the value that attaches to a particular customer in
19   those circumstances.
20             And I think that's still correct.  I
21   understand what's being done here.  This is being
22   done for tax purposes.  There are ways of doing it.
23   And this one is specific, and because it's valuing
24   contracts, it is valuing the revenue that emanates
25   from those contracts as a subset of the total



1    value.

2                    As I said, the total value in the

3    methodology that I have described is contained in

4    those income streams of the subsidiary that's being

5    valued, and I do think that it's difficult to

6    separate out because of that -- the fact that the

7    individual geography of EMEA and US are simply

8    fragments of the activities of the worldwide entity

9    and the worldwide R&D, it's hard to pull it out.

10   That's my view, that it's hard to pull it out.

11                   It's easier to pull it out in a single

12   transaction like this, and I can't say whether this

13   is done well or not done well, so I have no comment

14   on it.

15                   I don't think just because it was done

16   in this document is -- negates what I have said

17   about the difficulty of doing it in the context of

18   Nortel.

19              Q.   All right.  So just two more

20   points on this.  I just want to get this pure.

21   You're not saying it cannot be done.  You're saying

22   it's difficult to do, correct?

23              A.   In this circumstance it's

24   certainly difficult, yes.

25              Q.   And by not doing it on your



1   methodology, all of that value goes to NNL and

2   doesn't go to either NNI or any of the EMEA

3   Debtors, correct?

4            A.    Incorrect.

5            Q.    I'll ask it more precisely.  All

6   of the residual value, which includes those

7   amounts, sir, those to NNL and not to NNI and the

8   EMEA Debtors, correct?

9            A.    I don't understand the question.

10           Q.    Okay.  Give me one moment, please.

11  Your Honour, just give me one moment, and Judge

12  Gross, give me one moment, please.  Just checking

13  one thing, thank you.

14           MR. GOTTLIEB:  Those are all my

15  questions.  Thank you, Mr. Berenblut.  Thank you,

16  Judge Gross.

17           THE WITNESS:  Thank you.

18           MR. O'CONNOR:  Good afternoon, Justice

19  Newbould.  Good afternoon, Judge Gross.  Justice

20  Newbould, this is my first time in Toronto.

21           THE CANADIAN COURT:  This is your first

22  appearance here.

23           MR. O'CONNOR:  Thank you for the

24  privilege of appearing before you.

25



1   CROSS-EXAMINATION BY MR. O'CONNOR:

2              Q.   Mr. Berenblut, we've met before.

3              A.   Indeed.

4              Q.   Now, Mr. Berenblut, you prepared

5   three expert reports in this matter, two in the

6   allocation proceeding and one in the claims

7   proceeding, correct?

8              A.   Yes.

9              Q.   And what I'd like to do is focus

10  on your initial allocation report, the one that we

11  marked as Exhibit 47.  And I want to take you

12  through that because I want to make sure I follow

13  step-by-step your valuation methodology.  If we

14  could bring up paragraph 18 of the initial report

15  on the screen.

16             Paragraph 18.  Am I correct doctor,

17  rather Mr. Berenblut, that you opine that the

18  lockbox proceeds should be allocated among the

19  selling debtors in a manner that compensates them

20  for the property interest that they surrendered or

21  transferred in the assets sales; is that correct?

22             A.   Yes.

23             Q.   And in looking at paragraph 19,

24  you go on to say that the amount due to the US and

25  EMEA Debtors for the transfer or surrender of the



1    property interests is the fair market value of

2    those interests, correct?

3              A.   Yes.

4              Q.   And back to paragraph 18, you

5    further say that the fair market value of the US

6    and EMEA property interests transferred or

7    surrendered is the present value of the expected

8    economic benefits foregone by the US and the EMEA

9    Debtors as a result of the decision to sell

10   Nortel's assets, rather than continue operating the

11   business, correct?

12             A.   Yes.

13             Q.   You say in paragraph 20 of your

14   report that that is the amount an arm's length

15   party would be prepared to pay to stand in the

16   shoes of the US and EMEA Debtors, correct?

17             A.   Correct.

18             Q.   And you also say in footnote 3 of

19   that same paragraph 20 that that measure of value

20   is referred to as a value, in use value?

21             A.   Yes.

22             Q.   Now, applying your analysis to the

23   Rockstar sale, you conclude that none of the RPEs

24   other than NNL had any property interest in the

25   residual patent portfolio and therefore they had no



1    expectation of the future profits from those assets

2    had the business continued to operate, correct?

3              A.   Generally, correct, yes.

4              Q.   And based on that analysis, you

5    understand that NNL gets 4.5 billion and the US and

6    EMEA entities get zero from the sale of the

7    residual patent portfolio?

8              A.   Correct.

9              Q.   And applying your analysis to the

10   LOB sales, the line of business sales, you conclude

11   that there are two possible bounds of value there.

12   The lower bound would be the value of the tangible

13   assets that the EMEA and US Debtors owned and were

14   sold or surrendered, correct?

15             A.   Yes.

16             Q.   And you say that the upper bound

17   would be their respective shares under the RPSM of

18   the present value of the expected future operating

19   profits had Nortel continued to operate the

20   business with any excess going to NNL as the legal

21   owner of the IP.  That's at paragraph 89 of your

22   report, correct?

23             A.   Yes.

24             Q.   Now let's turn to Dr. Green's

25   report for a moment, because you don't actually



```
1    quantify the amounts that you say should be

2    allocated to the US and EMEA Debtors, correct?

3              A.   Correct.

4              Q.   And Dr. Green does that?

5              A.   Yes.

6              Q.   And he does that applying your

7    value in use methodology?

8              A.   As already has been discussed, he

9    doesn't apply I don't believe anything that I gave

10   him because I don't believe he saw my report before

11   it was issued, so I think he used his value in use

12   methodology, not my value in use methodology.

13             Q.   But you understand his value in

14   use to be the same as your value in use?

15             A.   Well, it's not mine or his.  It's

16   a generally accepted valuation premise for valuing

17   license rights.

18             Q.   Fair enough.  And applying that

19   value in use methodology, you understand that Dr.

20   Green concludes that all of the EMEA debtors in the

21   aggregate are entitled to 236 million, or three

22   percent of the proceeds that are in the lockbox,

23   correct?

24             A.   From memory, approximately so.

25             Q.   Now, I want to turn for a moment
```



1   to the report that you prepared for the claims

2   proceeding.  We know that this is not claims, but

3   there are statements in the claims report and a

4   similar valuation technique that I would like to

5   just briefly go through with the witness.

6                   Now, in that report, you were opining

7   on the value of NNUK's resources at June 30th,

8   2008, correct?

9                   A.   Yes.

10                  Q.   And in that report, you were

11  opining on the value of only NNUK's resources not

12  the collective resources of all the EMEA's

13  entities, correct?

14                  A.   Correct.

15                  Q.   And you understood that there are

16  three RPEs in the EMEA group:  NNUK, NN France and

17  NN Ireland?

18                  A.   I believe so.

19                  Q.   And in your report, you opine that

20  to determine the value of NNUK's resources for the

21  purposes of the insufficient resource test, you

22  were required to determine the amount an arm's

23  length party would pay to stand in the shoes of

24  NNUK and receive the corresponding economic

25  benefits, correct?



```
 1                     A.    I think I need my report in front
 2      of me.
 3                     Q.    Could we bring up Mr. Berenblut's
 4      initial resource report at paragraph 19, please.
 5      We will bring up a hard copy for Your Honour and
 6      Judge Gross as well.
 7                     Turning to paragraph --
 8                     THE CANADIAN COURT:  Just wait,
 9      Mr. O'Connor.
10                     MR. O'CONNOR:  Oh, you don't have it?
11                     THE CANADIAN COURT:  Thank you.
12                     BY MR. O'CONNOR:
13                     Q.    I direct your attention to
14      paragraph 19, and it's the -- I believe it's the
15      last sentence of that paragraph.  You say that:
16                          "The IR test requires
17                          determining the amount an arm's
18                          length party would pay to 'stand in
19                          the shoes' of the NNUK entity and
20                          receive the corresponding economic
21                          benefits flowing to that entity as
22                          part of the Nortel Group."
23                     Correct?
24                     A.    Correct.
25                     Q.    Okay.  And that's the same value
```



1   in use test that you say should be applied for

2   purposes of your allocation report, correct?

3            A.   In general, yes.

4            Q.   And for purposes of your value in

5   use valuation in your insufficient resource

6   report --

7            A.   Let me just respond to your

8   previous question.  I think that the terminology

9   here is used somewhat differently.  The value in

10  use -- I haven't used the word "value in use" --

11  how do you refer to this?

12           Q.   The insufficient resource report.

13           A.   The IR report.

14           Q.   Right.

15           A.   I haven't used the word "value in

16  use."  I think the issue here, I mean we're talking

17  about the context here.  The context here was that

18  I was addressing someone's report who had -- who

19  had come up with a methodology that said they had

20  to break the company apart and move assets out, and

21  that were confronted with the difficulty that they

22  were now dealing with an orphaned product of

23  Nortel.

24           That is the reference that I am making

25  here to "stand in the shoes."  It is a different



```
 1    context and I don't use the word "value in use"
 2    here, I don't believe.
 3              Q.   To use another phrase, the value
 4    of something in situ, is that also the same thing
 5    as saying value in use?
 6              A.   No, value in situ is something
 7    that refers to, for example, if you have a factory
 8    full of equipment and you say what's the fair
 9    market value of that equipment, the fair market
10    value in situ is different than the fair market
11    value if you were to pick it up and move it out of
12    the factory.
13              So that's really when you would use the
14    words "in situ."
15              Q.   Let's bring up Mr. Berenblut's
16    deposition transcript in the insufficient resource
17    deposition at page 277, please.
18              And I asked you a question:
19                   "Okay.  And would you agree
20                   with me that that valuation measure
21                   that you opine on in the allocation
22                   report is the same valuation measure
23                   that you use for purposes of the
24                   insufficiently resourced test?"
25                   And your answer was:
```



```
 1                    "I believe so, yes."

 2              Is that correct?

 3              A.  I see it.  Yes.

 4              Q.   Now, for purposes of your

 5   insufficiently resourced test, in applying your

 6   value in use approach, you started with an

 7   asset-based test in which you valued NNUK based

 8   upon the net book value, correct?

 9              A.   Again, we've got to have some

10   context here.  My valuation in the IR test report

11   was simply to show whether the threshold was met

12   whereby NNUK would, what's known, fail the IR test.

13   And as I said clearly in the report I was giving --

14   at the minimum threshold it failed the test.  I

15   wasn't saying that I had arrived at the final value

16   of the company.  I was saying that the company was

17   worth at least this much.

18              Q.   Sorry, and I understand that.

19              A.   I am sorry, counsel.  That wasn't

20   what was said so I had to fix it.

21              Q.   Let's go back to my question.  My

22   question was for purposes of your insufficiently

23   resourced report, you started out by calculating

24   the net book value of NNUK as of June 30, 2008;

25   correct?
```



```
1                   A.   Where are you looking at now?
2                   Q.   Take a look at your report, it
3      should be paragraph 24.  Would you bring that up?
4                   A.   Yes.
5                   Q.   And if you look at -- I think we
6      just had the table up there a moment ago, I think
7      that was table 1, would you bring that back up?
8      Yeah.
9                        So looking at table 1 in paragraph 41,
10     you concluded that the net book value of NNUK as of
11     June 30th, 2008 was $2.2 billion, correct?
12                  A.   As I said, the test here is a
13     completely different exercise than the IR test.  It
14     is to determine whether the NNUK meets a minimum
15     threshold.  I haven't -- you just said you
16     concluded what the fair market value was.  I didn't
17     conclude what the fair market value value was.
18                       I concluded that its minimum value was
19     the value of its shareholders equity and the IR
20     test requires that you add back the pension
21     liabilities.
22                       So the value of resources as it's
23     referred to in the IR test was at a minimum 2.7
24     billion dollars.
25                  Q.   I'm sorry, I don't think I said
```

 Neeson & Associates   W&P WILSON & PETZER LTD.

```
 1   fair market value.  I think my question was that
 2   you had concluded, applying your asset-based test,
 3   that the net book value of NNUK at June 30th, 2008
 4   was 2.2 billion.  I didn't say the fair market
 5   value.
 6               A.   Correct.
 7               Q.   I said the net book value.  So we
 8   are on the same page?
 9               A.   Correct.
10               Q.   And I think you went further to
11   say, as you did I think a moment ago, that the 2.2
12   billion was a conservative measure of the fair
13   market value of NNUK's net assets at the time?
14               A.   Correct.
15               Q.   In fact in your deposition you
16   told me that in your view, if there had been a
17   hypothetical sale of NNUK's assets on June 30,
18   2008, a buyer would have paid at least the net book
19   value reflected on NNUK's balance sheet on June 30,
20   2008?
21               A.   Correct.
22               Q.   Then what you did is you went on
23   in your insufficient resource report to check on
24   the reasonableness of that conclusion by valuing
25   NNUK's resources using a market approach, correct?
```



```
 1                    A.   I only did that to point out some
 2    of the inaccuracies that were in the report.  This
 3    was a rebuttal report.  I was commenting on the
 4    methodology that had been used by the person who
 5    had written the report that I was commenting on,
 6    and trying to show that the market approach would
 7    apply properly and would come to a different answer
 8    even though I wasn't endorsing it for the purpose
 9    of this exercise.
10                    Q.   Mr. Berenblut, I don't want to
11    know why you did it.  The question was, did you or
12    didn't you do that in your report, and I'll direct
13    you to your report at paragraph -- the IR report at
14    paragraph 48.  The question --
15                    THE CANADIAN COURT:  Mr. O'Connor, can
16    you just explain to me what we're doing here?
17                    MR. O'CONNOR:  Your Honour, I think I
18    need about five more minutes and you'll see exactly
19    what I'm doing, if I may, and then you can
20    decide --
21                    THE CANADIAN COURT:  Does this have
22    something to do with allocation?
23                    MR. O'CONNOR:  It definitely will, I
24    promise you.
25                    THE CANADIAN COURT:  All right.  Five
```



```
 1    minutes is a short period of time.

 2              MR. O'CONNOR:  Okay.  We'll play beat

 3    the clock.

 4              BY MR. O'CONNOR:

 5              Q.   Mr. Berenblut, am I correct that

 6    you did apply a market approach to check the

 7    reasonableness of your asset-based approach?

 8              A.   You'll have to give me a minute to

 9    read it.

10              Q.   Okay.

11              A.   Yes.

12              Q.   And to do that, you needed to

13    select a comparable company to compare to NNUK,

14    correct?

15              A.   Yes.

16              Q.   And you selected NNC as the

17    comparable company?

18              A.   Yes.

19              Q.   That's at your report at paragraph

20    54.  And then having selected NNC as an appropriate

21    comparable, you considered what the implied

22    enterprise value of NNUK was based upon the

23    enterprise value of NNC on June 30th, 2008,

24    correct?

25              A.   Yes.
```



```
 1                      Q.   And to calculate NNC's enterprise

 2    value, you summed up the market capitalization for

 3    the publicly traded equity, the outstanding debt

 4    and pension liabilities, the book value of its

 5    minority interest and you subtracted cash and cash

 6    equivalents and that gave you an approximate

 7    enterprise value for NNC on June 4th, 2008 of $37.4

 8    billion, correct?

 9                      A.   Which table are you looking at?

10                      Q.   I'm looking now, you can look at

11    your report, paragraph 59, and also table -- it

12    should be table 3.

13                      A.   So table 3, I'm not sure because

14    the conclusion of table 3 is $3.3 billion so you're

15    asking me something different?

16                      Q.   Let's go back.  You first

17    calculated the enterprise value, let's go to table

18    3 for a moment.

19                      A.   To page?

20                      Q.   Table 3?

21                      A.   Table 3.

22                      Q.   Table 3.  You see the NNC is the

23    enterprise value at the top of the page, that you

24    calculated as 7.4 billion.  That was based upon the

25    public equity, the public debt, the minority
```



```
 1    interest and then the subtraction of the cash and
 2    cash equivalents, correct?
 3                  A.   Yes.
 4                  Q.   And you would agree with me that
 5    the market value then in NNC on June 30th, 2008 was
 6    on a multiple of its expected future earnings?
 7                  A.   Yes.
 8                  Q.   And that those future expected
 9    future earnings would be generated by the group's
10    assets, correct?
11                  A.   Sorry, which number are you asking
12    me about now?
13                  Q.   The market -- the enterprise value
14    we just confirmed was based upon the market's
15    expectation and multiple for the future earnings of
16    Nortel, correct?
17                  A.   Yes.
18                  Q.   And I asked you then that those
19    expected future earnings would be generated by the
20    Nortel Group's assets, correct?
21                  A.   Yes.
22                  Q.   And that those assets would
23    include the group's tangible and intangible assets?
24                  A.   Yes.
25                  Q.   So it would include intangible IP
```



```
 1   assets?

 2            A.    Yes.

 3            Q.    The intangible non-IP assets,

 4   customer contracts and relationships and the

 5   group's assembled work force, correct?

 6            A.    It would include the whole bundle

 7   of assets.

 8            Q.    Right.  And having calculated

 9   NNC's enterprise value you next selected what you

10   thought was an appropriate multiple with which to

11   determine NNUK's implied enterprise value, correct?

12            A.    Where are you looking now?

13            Q.    Well, you can now turn now to

14   page -- paragraph 57 and 58 of your report.  I

15   think there you decided to use NNUK's operating

16   profit under the RPSM for 2007 as the appropriate

17   multiple.

18            A.    57?

19            Q.    57 and 58.

20            A.    I'm just having a bit of

21   difficulty with your terminology.  Can you ask your

22   question again, please?

23            Q.    Yes.  I think you had concluded,

24   if I'm not correct, that you were looking to find

25   the appropriate multiple with which to calculate
```



1    NNUK's implied enterprise value based upon NNC's

2    enterprise value and the multiple you selected was

3    the operating profit under the RPSM for the year

4    2007?

5              A.   I don't recall off-hand which is

6    why I've got to try and find it in here.  Again,

7    where are you pointing to?

8              Q.   Can we bring up Exhibit D?

9              A.   I don't have the exhibits in here.

10   One of the problems is I don't have the appendices.

11             Q.   We'll give you the appendix.

12             Mr. Berenblut, this is Appendix D to

13   your report in which you calculated what NNUK's

14   share of NNC's operating profits was under the RPSM

15   for 2007, correct?

16             A.   Yes.

17             Q.   Okay.  Then now let's take a look

18   at table 3 on your report.

19             A.   Yes.

20             Q.   Bear with me for a moment while we

21   get our technology squared away.

22             THE CANADIAN COURT:  Just before you

23   get there, Mr. O'Connor, I've been reading a bit

24   back to what you asked a few minutes ago and I was

25   looking in the report for it but I don't see it.  I



```
 1   assume it's on some kind of schedule.
 2              You say to calculate NNC's enterprise
 3   value you summed up the market cap, the outstanding
 4   debt and pension liabilities and book value of its
 5   minority interests, and you subtracted the cash and
 6   cash enterprise value, and that gave you an
 7   approximate enterprise value of 37.4 billion.  I
 8   assume that's in some schedule somewhere, is it?
 9              MR. O'CONNOR:  Your Honour, if you look
10   in the report on page -- paragraph 59, on footnote
11   45, that identifies the various elements that
12   Mr. Berenblut either added or subtracted to arrive
13   at enterprise value.  Then if you look at page 73
14   or rather table 3, which we just had on the screen
15   a moment ago, or if you look at paragraph 59,
16   you'll see that he calculates the enterprise value
17   of NNC as --
18              THE CANADIAN COURT:  7.4.  So you were
19   just referring to footnote 45?  I didn't see that.
20              MR. O'CONNOR:  Correct, correct.
21              THE WITNESS:  Excuse me, Your Honour,
22   it's footnote 47 I believe is what Mr. -- the
23   counsel is really referring to.  Isn't that
24   correct?
25              MR. O'CONNOR:  I thought I was
```

 Neeson&Associates   W&P

1    referring to, I guess I had it wrong, footnote 45.

2              THE WITNESS:  I'm sorry.

3              MR. O'CONNOR:  Here it is, footnote 45,

4    yes.

5              BY MR. O'CONNOR:

6              Q.   Let's make sure where we are.  We

7    have the market capitalization of NNC at 7.4

8    billion.  You then thought that the appropriate

9    multiple to decide to calculate NNUK's implied

10   enterprise value, based upon NNC's enterprise

11   value, was operating profit in the RPSM for 2007.

12             You calculated NNUK's operating profit

13   for 2007 to be 28.9.  And then in table 3 you

14   multiplied NNC's enterprise value of 7.4 billion by

15   28.9 percent, and you arrived at NNUK's enterprise

16   value to be 2.1 billion, correct?

17             A.   Correct.

18             Q.   Now, that was within $100 million

19   of the 2.2 billion net book value that you had

20   calculated for NNUK as of June 30th, 2008, correct?

21             A.   Sorry, that was within what?

22             Q.   100 million.

23             A.   Of?

24             Q.   Of the 2.2 billion in net book

25   value that you calculated for NNUK in your



1    asset-based method?

2              A.    Yes.

3              Q.    Now, you would agree with me,

4    would you not, that NNC's enterprise value as of

5    June 30, 2008 reflected the market's valuation of

6    NNC based on a multiple of the earnings it was

7    expected to generate on its assets of future

8    operations?

9              A.    I think so, yes.

10              Q.    And would you agree with me that

11    the implied enterprise value of NNUK you calculated

12    as of June 30th, 2008 reflects NNUK's share of

13    those expected future earnings of its operations?

14              A.    As a proxy, yes, that's how I have

15    explained it.

16              Q.    And you understand that the

17    lockbox contains approximately 7.3 billion and

18    that's the proceeds of the sale of the group's

19    operating assets, including its IP, correct?

20              A.    Plus cash and other assets.

21              Q.    Just the lockbox.  You understand

22    the lockbox contains the 7.3 billion which is the

23    proceeds of the sale of the group's assets;

24    correct?

25              A.    I'm not familiar with what is in

Neeson&Associates    W&F    WILCOX & FETZER LTD.

1   the lockbox, but if that's what's in the lockbox.

2            Q.   And the 7.3 billion that's

3   included as proceeds in the lockbox, they include

4   the proceeds of the assets of NNUK that were sold?

5            A.   I'm getting distracted by this

6   squeaking here.  I don't know what's causing it.

7            Q.   Yes, and the 7.3 billion in sale

8   proceeds sitting in the lockbox is pretty

9   consistent with 7.4 billion in enterprise value of

10  NNC that you calculated for June 30th, 2008,

11  correct?

12           A.   They are two completely

13  different -- they happen to look like similar

14  numbers but they represent completely different

15  things.

16           Q.   And applying a value in use

17  valuation, Dr. Green concluded that the fair market

18  value of the property interests surrendered by all

19  of the EMEA Debtors in the post-petition sales was

20  236 million or 3.7 percent of the 7.3 billion of

21  proceeds in the lockbox, correct?

22           A.   Well, arithmetically that is

23  correct but that is as far as we can go with that.

24  Sorry.

25           Q.   And you understand that that



1    allocation is for all of the EMEA Debtors and that

2    NNUK would be entitled to only a portion of the 236

3    million?

4                A.    Correct.

5                Q.    But it's also your expert opinion

6    that had NNUK sold all of its assets in June 2008,

7    you would have expected a buyer to have paid at

8    least 2.1 to 2.2 billion at a minimum for those

9    assets, correct?

10                A.    Correct.

11                Q.    And those are the same property

12    interests that NNUK transferred or surrendered in

13    the post petition sales, correct?

14                A.    No.

15                Q.    What's incorrect about that?

16                A.    You're mixing up a whole bundle of

17    different measures here.  In order to compare these

18    on a like-for-like basis, the 2.7 threshold that I

19    used in the IR test, you have to remove the cash

20    and intercompany receivables of 1.2 billion and you

21    come down to $1.5 billion to achieve the same

22    measure on a comparable basis from the proceeds of

23    sales, as you call them.

24                In the lockbox is 7.4, we have to take

25    out Rockstar because it wasn't sitting on the



 1   balance sheets, that's 4.5 billion dollars, we have

 2   to take out the delta between what I have said is

 3   the business line value on the assets surrendered

 4   for all locations, which is approximately $1.6

 5   billion according to the calculations, less the

 6   total proceeds of 2.8, there is a delta of 1.2.

 7              So the 4.5 and the 1.2 has to come off

 8   the 7.4 which will get you down to 1.7 billion, so

 9   the true comparison is -- of the value is the UK.

10   The UK according to the IR test on a comparative

11   value was $1.5 billion as a percentage of 7.4,

12   which was the enterprise value, and then the

13   proceeds, if you say -- I saw in the later slide

14   that was put in front of the court for the EMEA was

15   300 million but you said 236, whatever the number

16   is, has to be compared to the 1.7 to equate it to

17   the IR test calculation, and that those two

18   calculations are in the, say, region that the UK

19   and EMEA are approximately 20 percent of the total

20   proceeds.  So that is the reconciliation.

21              Q.   Well, let's go back.

22              THE CANADIAN COURT:  Mr. O'Connor, I

23   think for the sake of the reporters we should take

24   a break.

25              MR. O'CONNOR:  I literally only have



```
 1    two or three more questions.  If that's okay.
 2                 BY MR. O'CONNOR:
 3                 Q.   I want to make sure that the
 4    record is clear, you did testify that it was your
 5    opinion that had NNUK sold all of its assets in
 6    June of 2008, a buyer would have paid between $2.1
 7    and $2.2 billion for those assets at a minimum,
 8    correct?
 9                 A.   For the UK did you say?
10                 Q.   For NNUK assets?
11                 A.   At 2008 when the market cap of
12    Nortel was $4 billion, yes.
13                 Q.   And you do understand that as part
14    of the asset sales that occurred post-petition, all
15    of NNUK's IP assets were sold as part of that
16    transaction?
17                 A.   Yes.
18                 Q.   And but it's your opinion that
19    although NNUK would have been entitled or would
20    have likely have received at least 2.1 to $2.2
21    billion had it sold its assets in 2008, it is
22    entitled to only a share of 236 million in the
23    post-petition sales?
24                 A.   Right.  So a year has passed, the
25    company has gone bankrupt.  Before it went
```



1   bankrupt, the market price had collapsed from 4

2   billion to $100 million.  The calculations that I

3   have done in the IR test and the calculations that

4   mirror what I've done in my report, when equalized

5   and put on an equal footing, will show that the

6   proportion -- proportionate relationship of UK and

7   EMEA to the total proceeds in the IR test and in

8   the business sale and the total sales are similar,

9   which says that the conclusions are reasonable in

10  both cases.

11              Q.   But again, if you go back to the

12  enterprise value that you used to calculate NNC's

13  enterprise value as of June 30th, 2008, that was

14  7.4 billion, and the amount that was realized by

15  the group in selling all of its assets was 7.3

16  billion, which is now sitting in the lockbox --

17              A.   But that -- sorry.

18              Q.   Correct?  Yes or no?

19              A.   That is correct.  But in order to

20  compare them, you have to remove the 4.5 billion

21  from that lockbox number because that was the

22  Rockstar which was not reflected in any of the

23  valuations, and you have to take out the $1.2

24  billion that was sitting there in the difference

25  that I have spoken about between the value of the



```
 1   cash flows foregone, and the price that was paid

 2   for them, in order to make it comparable.

 3              So it can be made --

 4              THE CANADIAN COURT:  Let's take the

 5   break.

 6              MR. O'CONNOR:  Sorry.

 7              THE CANADIAN COURT:  You're going

 8   around in a circle and we're going around the track

 9   probably the third time now.  The horse is getting

10   tired.  We'll take 15 minutes.

11              -- RECESS AT 4:02 P.M.

12              -- UPON RESUMING AT 4:20 P.M.

13              MR. O'CONNOR:  Thank you, Your Honour,

14   for giving me some leeway on my five minutes.  And

15   with that, I will retire.  Thank you,

16   Mr. Berenblut.

17              THE WITNESS:  Thank you.

18              THE CANADIAN COURT:  Thank you.

19   Anybody else?

20              MR. BARRACK:  Is Mr. Ruby back?

21              THE CANADIAN COURT:  That will shorten

22   things.  Did they send out a search party?

23              MR. ROSENTHAL:  Here he comes.

24              THE CANADIAN COURT:  We've just

25   concluded your redirect, Mr. Ruby.
```



```
 1                    MR. RUBY:  We're having too much fun.

 2     Thank you, Your Honours, and my apologies.

 3                    THE CANADIAN COURT:  It's all right.

 4

 5     RE-EXAMINATION/RE-DIRECT EXAMINATION BY MR. RUBY:

 6                    Q.   Mr. Berenblut, I only want to deal

 7     in re-exam with two points, please.  The first is

 8     you remember being asked several questions about

 9     the Alcatel or UMTS transaction?

10                    A.   Yes.

11                    Q.   I'd like to hand up a document,

12     please.  This is Exhibit TR21161.  And if I can

13     direct you to the second page, please, the email

14     that's in the middle of the page from Kerry

15     Stephens to several other people dated February 13,

16     2007, and I take it you haven't seen this email

17     before?

18                    A.   No.

19                    Q.   So I'd just like to direct you to

20     the second sentence in the first paragraph under

21     "Mike," where it says:

22                    "They put a significant sum, US

23                    $51.8 million to customer contracts,

24                    not an asset class that we would

25                    normally adopt."
```



```
 1                    And my question, Mr. Berenblut, is
 2     simply, is that statement consistent with the
 3     allocation approach you have described to the
 4     courts with respect to IP and customer relations
 5     not being easily separable?
 6                    A.   I think -- I think it's
 7     consistent.
 8                    Q.   Now, based on the information you
 9     have about the UMTS or Alcatel sale, is it fair to
10     say that the exercise that my friend, Mr. O'Connor,
11     asked you about, was a purchase price allocation
12     exercise?
13                    A.   I think I mentioned that, yes.
14                    Q.   And is that the same exercise as
15     you have opined on in this allocation case?
16                    A.   No, it's not.
17                    Q.   And can you explain to the courts
18     why?
19                    A.   Purchase price allocation as I
20     mentioned is simply an exercise that the purchaser
21     has gone through in order to allocate for tax and
22     financial statement purposes the purchase price.
23     It is a different question than the one that we are
24     dealing with here, which is what is the value of
25     the property interests surrendered in the
```



```
 1    transactions.  They're not connected.
 2                The allocation word appears in both of
 3    them, but otherwise there is no connection.
 4                Q.   Thank you.
 5                Turning to a different subject if I
 6    could, you'll recall that my friend, Mr. O'Connor,
 7    as well asked you several questions related to what
 8    we've been calling your IR report?
 9                A.   Yes.
10                Q.   And if I can put it this way, his
11    punch line seemed to be comparing a 7 billion
12    dollar-ish number to a three, or two or $300,000
13    number?
14                A.   300 million, I think.
15                Q.   Million, excuse me, million.  Yes.
16    You started to explain your reconciliation of those
17    numbers but I'd like to very briefly take you
18    through at least a couple of elements of that.
19                So, first of all, in the IR report, I
20    take it from what you said you were assessing
21    enterprise value of NNUK?
22                A.   Initially, yes.
23                Q.   And I think you told my friend
24    that you started with the enterprise value of NNL
25    for that exercise?
```

 Neeson & Associates    W&F

```
 1                      A.    In the -- you said in the IR
 2     report?
 3                      Q.    In the IR report.
 4                      A.    That was one of the measures that
 5     was used.
 6                      Q.    So can you compare for the courts,
 7     please, what you were valuing in the IR report
 8     versus what you're valuing in your allocation
 9     report?
10                      A.    In the IR report I am valuing the
11     minimum threshold value of NNUK, principally on a
12     balance sheet basis but as required by the
13     legislation, it's the net book value plus the
14     add-back of the pension liability, and that's at a
15     minimum.
16                      In the allocation report, the valuation
17     measures being discussed are the earnings of EMEA,
18     including NNUK.  We're dealing with at completely
19     different dates and valuation is at a moment in
20     time.  Date makes a big difference and in this
21     particular matter, date makes a very significant
22     difference because of events that happened in
23     2008-2009.
24                      But as I was pointing out earlier, one
25     has to, in order to compare those two analyses and
```



1    to arrive at something that is comparable,

2    adjustments have to be made to put them on the same

3    footing, in order to do the type of exercise that

4    counsel was putting to me and that is what I was

5    trying to explain but we didn't get all the way

6    there.

7              Q.   Let me put it this way.  In your

8    allocation report with respect to NNUK, what was

9    the asset you were valuing or providing a

10   methodology to value?

11             A.   The license agreement, the license

12   rights that were surrendered by the subsidiaries.

13             Q.   And how does that compare to the

14   asset you were valuing in the IR report?

15             A.    In the IR report, I was valuing a

16   minimum threshold of the, I'll use some generic

17   language, but the assets available to satisfy the

18   pension requirement.

19             Q.   So if we can turn to the IR

20   context again, if we wanted to build up the

21   enterprise value, which is what you were dealing

22   with in the IR report, of NNUK from only its share

23   of the IP license right values, let's see if we can

24   make a little bit of a laundry list for the courts

25   of the things you would have to add to the IP



```
 1   license value.
 2                   So would one of them be cash?
 3           A.    Yes.
 4           Q.    Intercompany receivables?
 5           A.    Yes.
 6           Q.    Other receivables?
 7           A.    Yes.
 8           Q.    The value of subsidiaries of NNUK?
 9           A.    Yes.
10           Q.    Other tangible assets?
11           A.    Yes.
12           Q.    Other items on NNUK's balance
13   sheet that hadn't been disposed of in the business
14   sales or the residual sale?
15           A.    Correct.
16           Q.    Is there anything else you'd want
17   to add to that list?
18           A.    That, I think, covers it in
19   general.
20           Q.    So turning to timing, if we're
21   going to compare the IR report and the allocation
22   report, what was the valuation date for the IR test
23   again?
24           A.    June 30th, 2008.
25           Q.    And what was the valuation date or
```



```
 1   date range for your allocation report?

 2                  A.   The second half of 2009, and the

 3   number that was put to me was a December 31st, 2009

 4   value I believe.

 5                  Q.   And if it matters to comparing

 6   your two analyses that there are two different

 7   valuation dates, can you explain why?

 8                  A.   Yes.  I mean in general,

 9   valuation, one of the requirements of a valuation

10   is that you state the date that you're doing the

11   valuation at.  That is because obviously an asset

12   -- take a piece of real estate for example -- a

13   piece of real estate is the same piece of real

14   estate but may be worth something completely

15   different in the year 2000 than it's worth in the

16   year 2010, so you have to know the valuation date

17   in order for it to be meaningful.

18                  Here we have a significant difference

19   in the state of the world and the state of Nortel

20   between 2008 and 2009 as I mentioned earlier.  The

21   one example is that its market capitalization went

22   from $40 billion in June 30th, 2008 to $100 million

23   prior to the date of filing.  So there's one

24   example.

25                  But I think that's clear why the
```



```
 1   valuation date is important.
 2              Q.   So last point on this comparison,
 3   I think you said in response to a question to my
 4   friend, Mr. O'Connor, that in moving towards making
 5   an allocation comparable as between the IR report
 6   and the allocation report --
 7              A.   Yes.
 8              Q.   -- you would have to back out the
 9   value of the Rockstar proceeds or something to that
10   effect.
11              A.   Yes.
12              Q.   Do you remember that?
13              A.   Yes.
14              Q.   Can you explain why that is?
15              A.   Yes, because I think that the
16   proposition that he was putting to me was
17   misleading and inaccurate in terms of, as I say,
18   not comparing similar items.
19              So for example, to take the $7.4
20   billion of the proceeds and then say well, let's
21   compare that to the market value in 2008, the
22   market value in 2008 obviously did not reflect the
23   $4.5 billion of proceeds on Rockstar, because that
24   was an unknown, so that has to be taken out of the
25   7.4 to get down to what the market was thinking.
```



```
 1                    Then the market also wasn't valuing
 2      surplus on the business lines other than their
 3      operation within Nortel, and we know that that
 4      yields approximately $1.2 billion of surplus value,
 5      so that has to be taken out.
 6                    And if you take those two out, you get
 7      down to 1.7 billion which is the appropriate
 8      comparable to the $300 million of the valuation at
 9      December 2009.
10               Q.   So finally, Mr. Berenblut, did it
11      come as a surprise to you my friend's questions
12      about the IR report?
13               A.   No.
14               Q.   And have you looked carefully at
15      the numbers from your IR report and the numbers
16      related to the EMEA Debtors in the allocation
17      numbers put forward by Mr. Green?
18               A.   Yes.
19               Q.   And have you looked at whether
20      they were reconcilable?
21               A.   Yes.
22               Q.   And are you satisfied for the
23      reasons you have given today that they do reconcile
24      and are not inconsistent?
25               A.   I am satisfied, yes.
```



```
 1                   MR. RUBY:  Thank you, Mr. Berenblut.
 2     Those are my questions.  Judge Gross, Justice
 3     Newbould.
 4                   THE US COURT:  Thank you, Mr. Ruby.
 5                   MR. GOTTLIEB:  Your Honour, I just have
 6     one question, one series of questions out of that,
 7     please.
 8                   THE CANADIAN COURT:  On what basis?
 9                   MR. GOTTLIEB:  Well, under the protocol
10     we are entitled to do a recross on something that
11     was examined on the cross so it's one subject.
12     I'll be brief, Your Honour.
13
14     FURTHER CROSS-EXAMINATION BY MR. GOTTLIEB:
15                   Q.   Mr. Berenblut, Mr. Ruby asked you
16     a question about the Nortel PPA on the Alcatel
17     sale, and you said that the PPA was for tax and
18     financial statement purposes.  Do you recall that?
19                   A.   Yes.
20                   Q.   But did you note, sir, that with
21     respect to the allocation that was done by Nortel
22     on the proceeds, the allocation was actually done
23     on the basis of which Nortel entity, which of the
24     Nortel entities had the relationship and the
25     contract with the customers, and that the price was
```



```
 1    divided up on that basis?
 2                  So it was an allocation done on the
 3    customer contracts, so that the proper entity got
 4    the proper amounts.  Were you aware of that fact,
 5    sir?
 6                  A.   I thought we had covered that
 7    previously and I did answer it and said that in the
 8    case of the UM -- I am just repeating testimony
 9    that I made.
10                  In the case of the UMTS transaction,
11    there was a specific business, specific assets and
12    customers that were transferred to a purchaser.
13    When we're valuing the Nortel business, we're
14    valuing the worldwide business, we're valuing all
15    the things that go into creating the technology
16    that is the driver of the business, and is the
17    driver of the customer relationships, and I said
18    that therefore they are two different things.
19                  So the fact that Nortel did that on the
20    UMTS proceeds that were dictated to them, by the
21    way, they didn't choose to take the 51.8, they
22    wouldn't normally have done it but once they had it
23    they did something with it.  Whatever they did with
24    it, they did with it in 2007, and I pointed out
25    that that is different consideration for this
```

 Neeson&Associates   W&F

```
 1    individual business than it is for the concept of
 2    the intermingled relationship between the customers
 3    and the IT in a worldwide business that the UK has
 4    a fragment of.  I think it's a completely different
 5    issue.
 6              Q.   Mr. Berenblut, I didn't ask you
 7    anything about what you just answered.  I wasn't
 8    asking you about the application to the sales here.
 9    I was talking just about your answer about the PPAs
10    on the Nortel Alcatel sale.  That's all I was
11    asking about.
12              All I was taking you to, sir, was that
13    your answer about that particular PPA the way
14    Nortel allocated the proceeds, was that you said it
15    was for tax and financial statement purposes, and I
16    was pointing out to you, sir, that that answer
17    didn't take into consideration that the way it was
18    allocated at Nortel was actually to ensure that the
19    right company within the Nortel Group got the right
20    money based on the contracts it had.
21              Do you understand that?
22              THE CANADIAN COURT:  So what's your
23    question?  This is just a whole lot of argument.
24              MR. GOTTLIEB:  Okay.
25              THE CANADIAN COURT:  I mean, you people
```



1   dance on the head of a pin.  That's what you're

2   doing in so much of this case.

3            MR. GOTTLIEB:  I'm sorry, Your Honour,

4   I'm asking a question dealing on the last answer.

5            THE CANADIAN COURT:  I don't know what

6   you're asking.

7            MR. GOTTLIEB:  Thank you.  Those are my

8   questions for the witness.

9            THE CANADIAN COURT:  Mr. Berenblut --

10           MR. O'CONNOR:  At the risk of wearing

11  out my welcome may I ask two follow-up questions

12  directly related to the re-direct by Mr. Ruby?  At

13  your convenience, either after you or me.

14           THE CANADIAN COURT:  I would say the

15  same thing.

16           MR. O'CONNOR:  Thank you, Your Honour.

17           THE CANADIAN COURT:  You're dancing on

18  the head of a pin.

19

20  FURTHER CROSS-EXAMINATION BY MR. O'CONNOR:

21           Q.   Mr. Berenblut, the reason

22  valuators use the market approach is because as a

23  general rule they think that the market accurately

24  reflects the value of publicly traded companies?

25  That are markets are efficient?

 Neeson&Associates   W&P

```
 1                    A.    That is one reason.   There are
 2    many other factors involved, but that's one reason.
 3                    Q.    Isn't that certainly the primary
 4    reason?
 5                    A.    It's one reason.
 6                    MR. O'CONNOR:  No further questions,
 7    Your Honour.
 8                    THE CANADIAN COURT:  Mr. Berenblut, I
 9    just have a question for you.  If you could turn to
10    your reply report.
11                    THE WITNESS:  Which report, Your
12    Honour?
13                    THE CANADIAN COURT:  The reply report.
14                    THE WITNESS:  Yes.
15                    THE CANADIAN COURT:  In paragraph 28 on
16    page 7.
17                    THE WITNESS:  Yes, Your Honour.
18                    THE CANADIAN COURT:  You say that, for
19    example, the range of values generated by the
20    various versions of the IPCo model which are based
21    on a range of discoveries between 25 percent and 45
22    percent, also indicates, et cetera.
23                    Are you able to tell me how many models
24    were there in the IPCo work, I will call it, that
25    had this range of discount rates?
```


Neeson & Associates    W&F

1            THE WITNESS:  If you turn the page,
2    Your Honour, I've got the table there that has two,
3    four, six -- seven IPCo models.  There were more
4    than that.  I don't recall off-hand but I believe
5    many or most of them have that range of discount
6    rates, but I can certainly look at the IPCo models.
7            THE CANADIAN COURT:  Can somebody at
8    some point let me know where I can find that
9    information?  What you're saying is IPCo, however
10   number of models they had, they used discount rates
11   of between 25 and 45 percent?
12           THE WITNESS:  Yes.
13           THE CANADIAN COURT:  Thank you.  Any
14   questions arising out of my questions?
15           THE WITNESS:  Is there a follow-up you
16   would like me to do, Your Honour, to give you the
17   information?
18           THE CANADIAN COURT:  Sure, if you'd
19   like to, provide it through Mr. Ruby.  There are a
20   whole bunch of lawyers in the room who will be more
21   than anxious to find it for me, and a whole lot of
22   lawyers who won't be anxious to find it for me.
23           MR. RUBY:  I will find it for you, Your
24   Honour.
25           THE WITNESS:  Thank you, Your Honour.



```
 1                    THE US COURT:  Thank you, Mr.
 2     Berenblut.
 3                    THE WITNESS:  Thank you, Judge Gross.
 4     -- WITNESS EXCUSED --
 5                    MR. RUBY:  Your Honours, we have the
 6     next witness for Canadian Estate available.  I'm
 7     looking at time.  I can tell you that the estimate
 8     I have for direct is significantly over an hour and
 9     so I'm a bit in your hands.
10                    As usual, if you don't want to continue
11     today, we'll try and speed that up tomorrow, but
12     it's completely in the court's hands.
13                    If you want to proceed now, we just
14     need a minute or two to reshuffle.
15                    THE CANADIAN COURT:  Well, what would
16     you prefer, start tomorrow?
17                    MR. RUBY:  I'd prefer to start
18     tomorrow.  The witness has been waiting all day for
19     his moment in the sun, so I think he's better off
20     starting fresh in the morning for all of us.
21                    THE CANADIAN COURT:  Well, unless Judge
22     Gross insists we proceed now, but I rather doubt
23     it.
24                    THE US COURT:  Oh, I've learned better
25     than to insist on such things.  I think tomorrow
```



1    morning will be fine.

2              THE CANADIAN COURT:  By the way, if

3    somebody wants this transcript back?  All right.

4    We'll start tomorrow morning at nine o'clock.

5    -- Whereupon court adjourned on June 16, 2014 at

6    4:40 p.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    REPORTER'S CERTIFICATE

 2

 3               I, KIMBERLEY A. NEESON, RPR, CRR,

 4    CSR, CCP, CBC, Canadian Certified Shorthand

 5    Reporter, Realtime Systems Administrator, and I,

 6    LORRAINE B. MARINO, RDR, CRR, CSR, US Certified

 7    Shorthand Reporter, certify;

 8               That the foregoing proceedings were

 9    taken before us at the time and place therein set

10    forth;

11               That the entire proceedings of the

12    hearing date were recorded stenographically

13    individually by each of us and were thereafter

14    transcribed;

15               That the foregoing is a true and

16    correct transcript of our shorthand notes so taken.

17

18               Dated this 16th day of June, 2014.

19

20

21    PER:                        PER:

22    Lorraine B. Marino          Kimberley Neeson

23    LORRAINE B. MARINO          KIMBERLEY NEESON

24    WILCOX & FETZER             NEESON & ASSOCIATES

25    WILMINGTON, DE USA          TORONTO, ON  CANADA
```

 Neeson & Associates   W&F Wilcox & Fetzer Ltd.



















































