



```
 1              UNITED STATES BANKRUPTCY COURT

 2                FOR THE DISTRICT OF DELAWARE

 3      ------------------------)

 4   In Re                     )

 5      NORTEL NETWORKS INC., )  Chapter 11

 6      et al,                 )  Case No.

 7            Debtors.         )  09-10138(KG)

 8      ------------------------)

 9                         - and-

10                        Court File No. 09-CL7950

11                      ONTARIO

12               SUPERIOR COURT OF JUSTICE

13                   (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15     ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17       ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18     NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19        CORPORATION, NORTEL NETWORKS INTERNATIONAL

20       CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                      CORPORATION

22       APPLICATION UNDER PART IV OF THE COMPANIES'

23     CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                      AS AMENDED

25                      --------
```



```
 1                         --------

 2

 3   --- This is the Day 5/Volume 5 of the transcript of

 4   proceedings in the above matter held simultaneously

 5   in:

 6   Superior Court of        United States Bankruptcy

 7   Ontario (Commercial      Court for the District of

 8   List)                    Delaware

 9   Courtroom 8-1            Courtroom 3

10   330 University Avenue    824 Market Street

11   Toronto, Ontario         Wilmington, Delaware

12

13   on the 20th day of May, 2014, commencing at 9:09

14   a.m.

15

16                         --------

17   B E F O R E:

18   The Honourable Judge Kevin Gross (United States)

19   The Honourable Mr. Justice Frank Newbould (Canada)

20

21                         --------

22

23

24

25
```



```
 1   A P P E A R A N C E S:

 2                          CANADIAN DEBTORS

 3

 4   FOR THE MONITOR, ERNST & YOUNG INC.

 5   GOODMANS LLP

 6   Bay Adelaide Centre

 7   333 Bay Street, Suite 3400

 8   Toronto, ON  M5H 2S7

 9   PER:      Ben Zarnett, Esq.

10             Alan Mark, Esq.

11             Peter Ruby, Esq.

12             Jessica Kimmel, Esq.

13             Graham Smith, Esq.

14

15   FOR THE APPLICANTS

16   GOWLING LAFLEUR HENDERSON LLP

17   Suite 1600, First Canadian Place

18   100 King Street West

19   Toronto, ON  M5X 1G5

20   PER:      Jennifer Stam, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   ALLEN & OVERY LLP

24   1221 Avenue of the Americas

25   New York, NY  10020
```



```
 1   PER:        Ken Coleman, Esq.

 2               Paul Keller, Esq.

 3               Jacob Pultman, Esq.

 4               Laura Hall, Esq.

 5

 6   FOR THE CANADIAN DEBTORS

 7   BUCHANAN INGERSOLL & ROONEY

 8   1105 North Market Street

 9   Suite 1900

10   Wilmington, DE  19801 1054

11   PER:        Kathleen A. Murphy, Esq.

12               Mary F. Caloway, Esq.

13

14                       U.S. DEBTORS

15

16   FOR NORTEL NETWORKS INC.

17   TORYS LLP

18   79 Wellington Street West, Suite 3000

19   Box 270, TD Centre

20   Toronto, ON  M5K 1N2

21   PER:        Sheila Block, Esq.

22               Andrew Gray, Esq.

23

24

25
```



```
 1   FOR THE U.S. DEBTORS

 2   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

 3   1201 North Market Street, 16th Floor

 4   P.O. Box 1347

 5   Wilmington, DE  19899 1347

 6   PER:       Derek Abbott, Esq.

 7              Annie Cordo, Esq.

 8

 9   FOR NORTEL NETWORKS INC.

10   CLEARY GOTTLIEB STEEN & HAMILTON LLP

11   One Liberty Plaza

12   New York, NY  10006

13   PER:       James Bromley, Esq.

14              Lisa Schweitzer, Esq.

15              Howard Zelbo, Esq.

16              Jeffrey Rosenthal, Esq.

17              Avi Luft, Esq.

18

19

20

21

22

23

24

25
```



```
 1                        EMEA DEBTORS

 2

 3   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 4   LIMITED

 5   DAVIES WARD PHILLIPS & VINEBERG LLP

 6   40th Floor

 7   155 Wellington Street

 8   Toronto, ON  M5V 3G7

 9   PER:       Robin B. Schwill, Esq.

10              Sean Campbell, Esq.

11              James Doris, Esq.

12              Luis Sarabia, Esq.

13              Matthew Milne Smith, Esq.

14              Natasha MacParland, Esq.

15              George Pollack, Esq.

16              Cara Cameron, Esq.

17              Andrew Carlson, Esq.

18              Maureen Littlejohn, Esq.

19              Bryan McLeese, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```



```
 1   PER:        Matthew P. Gottlieb, Esq.

 2               Tracy Wynne, Esq.

 3               Paul Michell, Esq.

 4               Arden Beddoes, Esq.

 5               James Renihan, Esq.

 6

 7   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 8   LIMITED

 9   HUGHES HUBBARD & REED

10   One Battery Park Plaza

11   New York, NY  10004 1482

12   PER:        Derek Adler, Esq.

13               Neil Oxford, Esq.

14               Fara Tabatabai, Esq.

15               Charles Huberty, Esq.

16               William Maguire, Esq.

17               Amina Hassan, Esq.

18               Gabrielle Glemann, Esq.

19               Caroline Parker Beaudrias, Esq.

20               Miles Orton, Esq.

21               Karen Goldberg, Esq.

22               Lena Saltos, Esq.

23               Mei Li Zhen, Esq.

24               Matthew Reynolds, Esq.

25               Ken Katz, Esq.
```



```
1              Greta Fails, Esq.

2              Quan Trinh, Esq.

3   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

4   LIMITED

5   YOUNG CONAWAY STARGATT & TAYLOR LLP

6   Rodney Square

7   1000 North King Street

8   Wilmington, DE  19801

9   PER:      Ed Harron, Esq.

10              John Dorsey, Esq.

11              Jaime Chapman, Esq.

12

13  FOR THE EMEA DEBTORS

14  HERBERT SMITH FREEHILLS LLP

15  Exchange House

16  Primrose Street

17  London, England  EC2A 2EG

18  PER:      James Norris Jones, Esq.

19              John Whiteoak, Esq.

20              Gary Milner Moore, Esq.

21              Kevin Pullen, Esq.

22              Catherine Emanuel, Esq.

23              Richard Mendoza, Esq.

24              David Russell, Esq.

25              Andrew Cooke, Esq.
```



```
 1              Oliver Elgie, Esq.

 2              Tom Henderson, Esq.

 3              Frances Furnivall, Esq.

 4              Liam Spender, Esq.

 5              Philip Lis, Esq.

 6              Kristofer McGhee, Esq.

 7              Thomas Turner, Esq.

 8

 9   FOR THE EMEA DEBTORS

10   DEBEVOISE & PLIMPTON LLP

11   65 Gresham Street

12   London, England

13   ECZV 7NQ

14   PER:      Kevin Lloyd, Esq.

15

16              CANADIAN CREDITORS COMMITTEE

17

18   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

19   BENEFICIARIES

20   KOSKIE MINSKY

21   20 Queen Street West

22   Suite 900

23   Toronto, ON  M5H 3R3

24   PER:      Mark Zigler, Esq.

25              Jeff Van Bakel, Esq.
```



```
 1                  Ari Kaplan, Esq.

 2                  Barbara Walancik, Esq.

 3    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 4    COMMITTEE

 5    SHIBLEY RIGHTON LLP

 6    250 University Avenue, Suite 700

 7    Toronto, ON  M5H 3E5

 8    PER:      Arthur O. Jacques, Esq.

 9

10    FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

11    ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

12    FUND

13    PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

14    35th Floor

15    155 Wellington Street West

16    Toronto, ON  M5V 3H1

17    PER:      Kenneth T. Rosenberg, Esq.

18              Massimo (Max) Starnino, Esq.

19              Lily Harmer, Esq.

20              Karen Jones, Esq.

21              Michelle Jackson, Esq.

22              Megan Shortreed, Esq.

23

24    FOR MORNEAU SHEPELL LIMITED

25    MCCARTHY TETRAULT LLP
```



```
 1   Suite 5300, Toronto Dominion Bank Tower
 2   Toronto, ON  M5K 1E6
 3   PER:        Ronald Podolny, Esq.
 4               Sharon Kour, Esq.
 5               Elder C. Marques, Esq.
 6               Paul Steep, Esq.
 7               Byron Shaw, Esq.
 8               Keith Rose, Esq.
 9
10   FOR THE CANADIAN CREDITORS COMMITTEE
11   DLA PIPER
12   919 North Market Street, Suite 1500
13   Wilmington, DE  19801
14   PER:        Jason Gerstein, Esq.
15               Richard Hans, Esq.
16               Timothy Hoeffner, Esq.
17               Farah Lisa Whitley Sebti, Esq.
18               Selinda Melnik, Esq.
19               Sarah Tumey, Esq.
20
21   FOR THE CANADIAN CREDITORS COMMITTEE
22   UNIFOR
23   205 Placer Court
24   North York, ON, M2H 3H9
25   PER:        Barry Wadsworth, Esq.
```



```
 1                    INFORMAL NORTEL NOTEHOLDER GROUP

 2

 3    FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 4    BENNETT JONES LLP

 5    1 First Canadian Place

 6    Suite 3400

 7    Toronto, ON  M5X 1A4

 8    PER:       Kevin Zych, Esq.

 9               S. Richard Orzy, Esq.

10               Gavin Finlayson, Esq.

11               Richard Swan, Esq.

12               Jonathan Bell, Esq.

13               Amanda McLachlan, Esq.

14

15    FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

16    MILBANK, TWEED, HADLEY, MCCLOY LLP

17    1 Chase Manhattan Plaza

18    New York, NY  10005

19    PER:       Thomas R. Kreller, Esq.

20               Dennis F. Dunne, Esq.

21               Albert A. Pisa, Esq.

22               Samir Vora, Esq.

23               Andrew M. LeBlanc, Esq.

24               Eric I. Weiss, Esq.

25               Atara Miller, Esq.
```



```
 1                Tom Matz, Esq.

 2                Nicholas A. Bassett, Esq.

 3                Alexis Chernak, Esq.

 4                Claudia G. Cohen, Esq.

 5

 6    FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 7    PACHILSKI STANG ZIEHL & JONES LLP

 8    919 North Market Street

 9    17th Floor

10    Wilmington, DE, 19801

11    PER:      Laura Davis Jones, Esq.

12                Peter J. Keane, Esq.

13

14       THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

15

16    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

17    CASSELS BROCK & BLACKWELL LLP

18    Suite 2100, Scotia Plaza

19    40 King Street West

20    Toronto, ON  M5H 3C2

21    PER:      Shayne Kukulowicz, Esq.

22                Michael Wunder, Esq.

23                Ryan Jacobs, Esq.

24                Geoff Shaw, Esq.

25                Stefanie Holland, Esq.
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2   RICHARDS LAYTON & FINGER, P.A.

 3   920 North King Street

 4   Wilmington, DE  19801

 5   PER:        Christopher Samis, Esq.

 6               Amanda Steele, Esq.

 7

 8   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 9   AKIN GUMP STRAUSS HAUER & FELD LLP

10   One Bryant Park

11   New York, NY  10036

12   PER:        Fred S. Hodara, Esq.

13               David H. Botter, Esq.

14               Abid Qureshi, Esq.

15               Robert A. Johnson, Esq.

16               Brad M. Kahn, Esq.

17               Christine Doniak, Esq.

18               Joseph Sorkin, Esq.

19               Jacqueline Yecies, Esq.

20

21     UK PENSION PROTECTION FUND AND NORTEL NETWORKS

22               UK PENSION TRUST LIMITED

23

24   FOR THE UK PENSION PROTECTION FUND AND NORTEL

25   NETWORKS UK PENSION TRUST LIMITED
```



```
 1
 2   THORNTON GROUT FINNIGAN LLP
 3   Suite 3200, 100 Wellington Street West
 4   P.O. Box 329
 5   Toronto, ON  M5K 1K7
 6   PER:       Michael E. Barrack, Esq.
 7              D.J. Miller, Esq.
 8              Rebecca Kennedy, Esq.
 9              Andrea McEwan, Esq.
10              John L. Finnigan, Esq.
11              Michael Shakra, Esq.
12              Kim Ferreira, Esq.
13
14   FOR THE UK PENSION PROTECTION FUND AND NORTEL
15   NETWORKS UK PENSION TRUST LIMITED
16   WILLKIE FARR & GALLAGHER LLP
17   787 Seventh Avenue
18   New York, NY  10019 6099
19   PER:       Brian O'Connor, Esq.
20              Sameer Advani, Esq.
21              Andrew Hanrahan, Esq.
22              Eugene Chang, Esq.
23              Heather Schneider, Esq.
24              Robert Kofsky, Esq.
25              Nicholas Chiuchiolo, Esq.
```



```
 1                Elizabeth Roache, Esq.

 2                Nicole Humphrey, Esq.

 3                Peter Sluka, Esq.

 4                Weston Eguchi, Esq.

 5                Ashley Moore, Esq.

 6                Megan Fantoni, Esq.

 7

 8    FOR THE UK PENSION PROTECTION FUND AND NORTEL

 9    NETWORKS UK PENSION TRUST LIMITED

10    BAYARD, P.A.

11    222 Delaware Avenue, Suite 900

12    Wilmington, DE  19899

13    PER:      Charlene D. Davis, Esq.

14                Justin R. Alberto, Esq.

15                Evan T. Miller, Esq.

16

17    FOR THE UK PENSION CLAIMANTS

18    HOGAN LOVELLS INTERNATIONAL LLP

19    Atlantic House, Holbrow Viaduct

20    London, England, EC1A 2FG

21    PER:      Angela Dimsdale Gill, Esq.

22                John Tillman, Esq.

23                Crispin Rapinet, Esq.

24                Matthew Bullen, Esq.

25                Chris Edwards Earl, Esq.
```



```
 1
 2   FOR THE UK PENSION CLAIMANTS
 3   WILBERFORCE CHAMBERS LLP
 4   8 New Square, Lincolns Inn
 5   London, England, WCZA 3QP
 6   PER:       Michael Tennet, Esq.
 7
 8   THE BANK OF NEW YORK MELLON
 9
10   FOR THE BANK OF NEW YORK MELLON
11   VEDDER PRICE LLP
12   919 North Market Street
13   17th Floor
14   Wilmington, DE, 19801
15   PER:       Michael Riela, Esq.
16              Michel Edelman, Esq.
17
18       WILMINGTON TRUST, NATIONAL ASSOCIATION
19
20   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
21   KATTEN MUCHIN ROSENMAN LLP
22   575 Madison Avenue
23   New York, NY  10022 2585
24   PER:       Bertrand J. Choe, Esq.
25              David A. Crichlow, Esq.
```



```
 1                 Karen B. Dine, Esq.

 2   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 3   DENTONS CANADA LLP

 4   77 King Street West

 5   Suite 400

 6   Toronto, ON, M5K O41

 7   PER:        Kenneth Kraft, Esq.

 8               John Salmas, Esq.

 9               Matthew Fleming, Esq.

10               Robert Kennedy, Esq.

11

12   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

13   COUSINS CHIPMAN & BROWN LLP

14   1007 North Orange Street

15   Suite 1110

16   Wilmington, DE, 19801

17   PER:        Scott D. Cousins, Esq.

18               Ann Kashishian, Esq.

19

20        LAW DEBENTURE TRUST COMPANY OF NEW YORK

21

22   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

23   BORDEN LADNER GERVAIS LLP

24   40 King Street West

25   Toronto, ON  M5H 3Y4
```



```
 1   PER:        Edmond F.B. Lamek, Esq.

 2

 3   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 4   PATTERSON BELKNAP WEBB & TYLER LLP

 5   1133 Avenue of the Americas

 6   New York, NY  10036

 7   PER:        Daniel A. Lowenthal, Esq.

 8               Brian P. Guiney, Esq.

 9               Craig W. Dent, Esq.

10

11   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

12   MORRIS JAMES, LLP

13   500 Delaware Avenue

14   Suite 1500

15   Wilmington, DE

16   19801 1494

17   PER:        Stephen M. Miller, Esq.

18

19               BOARDS OF DIRECTORS OF NORTEL NETWORKS

20               CORPORATION AND NORTEL NETWORKS LIMITED

21

22   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

23   CORPORATION AND NORTEL NETWORKS LIMITED

24   OSLER HOSKIN AND HARCOURT LLP

25   100 King Street West
```



```
 1   1 First Canadian Place, Suite 6100

 2   P.O. Box 50

 3   Toronto, ON  M5X 1B8

 4   PER:       Lyndon Barnes, Esq.

 5              Carey O'Connor, Esq.

 6              Betsy Putnam, Esq.

 7              Adam Hirsh, Esq.

 8              Alexander Cobb, Esq.

 9                     ---------

10

11

12

13      REPORTED BY:  Toronto - Terry Wood, CSR, RPR

14             Delaware - Gail Inghram Verbano

15                    RDR, CRR, CSR,

16             Realtime Systems Administrator

17

18

19

20

21

22

23

24

25
```



```
 1                  I N D E X

 2                                              PAGE

 3   GORDON DAVIES

 4        Examination In-chief/Direct Examination by  1045

 5        Ms. Kimmel

 6        Cross-Examination by Mr. Gray               1048

 7   PAVITER BINNING

 8        Examination In-chief/Direct Examination by  1052

 9        Mr. Zarnett

10        Cross-Examination by Ms. Block             1056

11        Cross-Examination by Mr. Gottlieb          1082

12        Cross-Examination by Mr. Barrack           1088

13        Re-Examination/Re-Direct by Mr. Zarnett    1118

14        Cross-Examination by Ms. Block             1119

15   WALTER HENDERSON

16        Examination In-chief/Direct Examination by  1121

17        Mr. Bromley

18        Cross-Examination by Mr. Oxford            1135

19        Cross-Examination by Mr. Finnigan          1143

20        Cross-Examination by Mr. Zarnett           1144

21        Re-Examination/Re-Direct by Mr. Bromley    1191

22        Cross-Examination by Mr. Oxford            1199

23        Cross-Examination by Mr. Finnigan          1204

24   CHRISTOPHER RICAURTE

25        Examination In-chief/Direct Examination by  1209
```



```
 1    Ms. Schweitzer

 2    Cross-Examination by Mr. O'Connor          1215

 3    Cross-Examination by Mr. Pultman           1221

 4    Re-Examination/Re-Direct by Ms. Schweitzer 1242

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    INDEX OF EXHIBITS

2    EXHIBIT/DESCRIPTION                       PAGE NO.

3    13    Affidavit of Gordon Davies              1045

4    14    Affidavit of Paviter Binning sworn April   1052

5        10, 2014

6    15    Reply affidavit of Paviter Binning sworn   1052

7        April 24, 2014

8    16    Declaration of Mr. Henderson, dated April   1120

9        11, 2014

10   17    Reply Declaration of Mr. Henderson, dated   1120

11       April 25, 2014

12   18    Declaration of Christopher Ricaurte, dated 1209

13       April 11, 2014.

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   --- Upon commencing at 9:09 a.m.

 2              THE REGISTRAR:  Good morning,

 3   Mr. Davies.  If you could please remaining standing

 4   for a moment.

 5              THE US COURT:  Good morning, Justice

 6   Newbould.

 7              THE CANADIAN COURT:  Good morning,

 8   Judge Gross.

 9              THE US COURT:  I hope the wild and

10   crazy Canadians behaved themselves over the

11   holiday.

12              THE CANADIAN COURT:  The Canadiens last

13   night did not behave themselves, but that's

14   something different.

15              THE US COURT:  They spell it

16   differently, yes.

17              GORDON ALLEN DAVIES,

18        having been first duly affirmed,

19      was examined and testified as follows:

20              THE US COURT:  Yes, please.  Good

21   morning.  Thank you.

22              MS. KIMMEL:  Justice Newbould and Judge

23   Gross, I think you now both have a copy of

24   Mr. Davies' affidavit.

25              THE CANADIAN COURT:  Yes.  We will make
```



```
 1   it the next exhibit.  What number is that?
 2                THE REGISTRAR:  Exhibit No. 13, Your
 3   Honour.
 4   EXHIBIT NO. 13:  Affidavit of Gordon Davies
 5   EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY
 6   MS. KIMMEL:
 7                Q.   Good morning, Mr. Davies.
 8                A.   Good morning.
 9                Q.   You have a copy of your affidavit
10   in front of you that was sworn on April 11, 2014?
11                A.   Yes, I do.
12                Q.   Do you have any corrections that
13   you wish to make to that affidavit this morning?
14                A.   No, I do not.
15                Q.   Okay.  Now, while you are a
16   lawyer, as you know you are here today to provide
17   factual testimony about matters relating to the
18   Nortel group of companies.  And just by way of
19   introduction, a couple of things.
20                I understand that you became an officer
21   of Nortel Networks Corporation and Nortel Networks
22   Limited in January of 2003 and that you remained in
23   that position until you left in 2009.  Is that
24   right?
25                A.   That's correct.
```



```
 1                     Q.    Okay.  And you have outlined, I
 2     take it, the various positions that you've held
 3     with the Nortel group of companies in your
 4     affidavit; is that right?
 5                     A.    Yes, it is.
 6                     Q.    Okay.  Just a couple of them.
 7     What was your title when you left in 2009?
 8                     A.    Chief legal officer and corporate
 9     secretary.
10                     Q.    Okay.  And was that the most
11     senior legal position?
12                     A.    Yes, it was.
13                     Q.    Okay.  And then if we go back in
14     time to January, prior to January 2003, the
15     positions that you held during the five years that
16     you were in Europe included assistant general
17     counsel and general counsel for EMEA; is that
18     right?
19                     A.    That's correct.
20                     Q.    And were those the two most senior
21     legal positions for the Nortel companies in Europe?
22                     A.    General counsel EMEA was the most
23     senior position in EMEA, yes.
24                     Q.    And were there European qualified
25     lawyers who you worked with when you were in those
```



```
 1   positions in Europe?

 2              A.   Yes, there were, from a number of

 3   countries.

 4              Q.   Okay.  Now, just generally, what

 5   types of matters were you dealing when you were in

 6   Europe?

 7              A.   I dealt generally with three

 8   different types of matters.  I supported the EMEA

 9   business with respect to commercial matters.  I

10   also dealt with governance-related matters for the

11   subsidiaries in Europe.  And I also worked on

12   corporate and corporate development-related

13   activities in Europe.

14              Q.   Okay.  Now, how long were you

15   employed by Nortel Networks Limited over the entire

16   period?

17              A.   A total of just over 16 years.

18              Q.   Okay.  And just one last question.

19   Do you have a claim against Nortel Networks Limited

20   or any of the other Canadian Debtors in the CCAA

21   proceedings?

22              A.   I would have a pension claim and

23   also indemnity claim as an officer of NNL and NNC.

24              Q.   Okay.  Now, we have your

25   affidavit, and I think there are some other people
```



1    in the courtroom that may have a few questions for,

2    so I will let them take over.

3                    THE CANADIAN COURT:    Thank you,

4    Counsel.

5                    Mr. Gray.

6                    MR. GRAY:    Good morning, Justice

7    Newbould.   Good morning, Judge Gross.

8                    THE US COURT:    Good morning.

9                    MR. GRAY:    Andrew Gray from Torys for

10   the US Debtors.

11                   Good morning, Mr. Davies, again.

12                   THE WITNESS:    Good morning.

13   CROSS-EXAMINATION BY MR. GRAY:

14                   Q.    Mr. Davies, you understand that

15   the issue in this trial is the allocation of the

16   proceeds of the sale of Nortel's lines of business

17   and its residual intellectual property?

18                   A.    Yes, I do.

19                   Q.    And that determining the extent

20   and nature of the interest in those proceeds,

21   including ownership interest, is ultimately a

22   matter for the Courts to decide?

23                   A.    Yes, I understand.

24                   Q.    And you understand that the master

25   research and development agreement, which we've all



1    been calling the MRDA, is a central document for

2    that determination?

3              A.   Yes, I do.

4              Q.   In your affidavit, which I

5    understand is in front of you, at paragraph 48 you

6    discuss transfer pricing and the MRDA.  That's on

7    page 16.

8              A.   I see it.

9              Q.   In paragraph 48 you say the

10   transfer pricing arrangements were devised of and

11   driven by the tax department.  Do you see that?

12             A.   Yes.

13             Q.   You didn't supervise any tax

14   lawyers in your various roles as a lawyer at

15   Nortel, did you?

16             A.   No, I did not.

17             Q.   And you were not involved in

18   transfer pricing yourself?

19             A.   No, I was not.

20             Q.   And you were not involved in

21   drafting the MRDA?

22             A.   No, I was not.

23             Q.   And you were not involved in

24   negotiating the MRDA?

25             A.   No, I was not.



```
 1                    Q.   You did, however, sign two addenda
 2    to the MRDA in 2008, correct?
 3                    A.   That's correct.
 4                    Q.   And you did that as a signing
 5    officer of NNL?
 6                    A.   That is correct.
 7                    Q.   And those were Addenda 3 and 4,
 8    correct?
 9                    A.   That is correct.
10                    Q.   And you weren't involved in
11    negotiating the terms of those addenda?
12                    A.   No, I was not.
13                    Q.   You weren't involved in
14    discussions about the need to implement those two
15    addenda?
16                    A.    I was aware of the discussions but
17    not involved in the discussions directly.
18                    Q.   And you weren't involved as a
19    draftsperson with respect to those two addenda?
20                    A.   No, I was not.
21                    Q.   And you weren't involved in
22    conceiving of the addenda?
23                    A.   No, I was not.
24                    Q.   Similarly, you were not involved
25    in the switch from the cost-sharing arrangement or
```

 Neeson&Associates    W&F WILSON & PRYZER LTD.

```
 1    CSA to the residual profit sharing that occurred

 2    with respect to the MRDA, were you?

 3                A.   That's correct.  I was not

 4    involved.

 5                Q.   And that's because that was a tax

 6    matter, correct?

 7                A.   Correct.

 8                Q.   Those are all my questions.

 9                THE CANADIAN COURT:  Short and sweet,

10    Mr. Davies.

11                MR. GOTLIEB:  No questions.

12                MR. FINNIGAN:  We have no questions.

13                THE CANADIAN COURT:  Any

14    re-examination?

15                MS. KIMMEL:  I think we'll decline on

16    that one.

17                THE CANADIAN COURT:  Very wise.  Thank

18    you, Mr. Davies.

19                THE WITNESS:  Thank you.

20    ---  Witness dismissed.

21                MR. ZARNETT:  Good morning,

22    Judge Gross.  Good morning, Justice Newbould.  The

23    next witness is Mr. Binning.

24                    PAVITER BINNING,

25            having been first duly affirmed,
```

 Neeson & Associates   W&P WILSON & PETZER LTD.

```
1              was examined and testified as follows:

2      EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY MR.

3      ZARNETT:

4                  THE CANADIAN COURT:  We'll mark as

5      Exhibit -- his affidavit as Exhibit 14 and his

6      reply affidavit Exhibit 15.

7                  THE REGISTRAR:  14 and 15, Your Honour.

8      EXHIBIT NO. 14:  Affidavit of Paviter Binning sworn

9      April 10, 2014

10     EXHIBIT NO. 15:  Reply affidavit of Paviter Binning

11     sworn April 24, 2014

12                 MR. ZARNETT:  Thank you, Your Honour.

13                 BY MR. ZARNETT:

14                 Q.   Mr. Binning, you have your two

15     affidavits there, one sworn April 10 and one sworn

16     April 24th, both 2014?

17                 A.   I do.

18                 Q.   All right.  And do you accept

19     those affidavits as your evidence for this

20     proceeding?

21                 A.   I do.

22                 Q.   All right.  You're commonly called

23     Pavi?

24                 A.   I am.

25                 Q.   And, sir, I understand between
```



1    November 2007 and March 2010, you were Executive

2    Vice-president and Chief Financial Officer of

3    Nortel Networks Corporation and Nortel Networks

4    Limited?

5              A.   That's right.

6              Q.   And we wouldn't be here except

7    that in January 2009 there were a series of

8    insolvency filings in the Nortel group.  My

9    question is, did that result in any change in your

10   title or job responsibilities?

11             A.   I was asked by the stakeholders

12   after the filing to become chief restructuring

13   officer for the company.

14             Q.   Was that in addition to the two

15   jobs you previously had?

16             A.   It was.

17             Q.   And as chief restructuring

18   officer, briefly your duties were what?

19             A.   To oversee the restructuring of

20   the group of companies.

21             Q.   And how long were you in that

22   position?

23             A.   Until I left in March 2010.

24             Q.   And I understand you're currently

25   president of George Weston Limited?



```
 1                      A.   I am.
 2                      Q.   And that is one of Canada's larger
 3   public companies; is that right?
 4                      A.   It is, yes, that's right.
 5                      Q.   And your background is as an
 6   accountant, I understand.
 7                      A.   It is.
 8                      Q.   And prior to Nortel, had you
 9   worked for any other businesses with global reach?
10                      A.   All the companies I've worked for
11   in my career have been global companies apart from
12   the one I'm in now.
13                      Q.   Sir, just a couple of points.
14   While you were the CRO, did you become familiar
15   with a document called the Interim Funding and
16   Settlement Agreement or, as we have been calling
17   it, the IFSA?
18                      A.   I know of that document.
19                      Q.   All right.  Can you tell us how,
20   if at all, it influenced your approach as CRO?
21                      A.   My objective as CRO was to make
22   sure that we maximized the value of the assets, and
23   we ultimately did that through the disposal of
24   those assets.
25                      We put the arrangement in place, wanted
```



1    to make sure that the Canadian entity continued to

2    operate from a cash point of view and, secondly,

3    that the discussion around proceeds allocation

4    would take place at a later stage.

5                    Q.    Was that of benefit to the

6    restructuring from your perspective?

7                    A.    It was extremely important,

8    because otherwise, what we would have had -- time

9    was against us at that point in time in terms of

10   the asset disposals, and I wanted to make sure that

11   we didn't -- you know, we weren't derailed through

12   discussions in terms of allocation of proceeds, so

13   it was very important.

14                   Q.    Let me give you another acronym.

15   IP Co.  Have you heard that before?

16                   A.    I have.

17                   Q.    All right.  And were you involved

18   in any consideration of something known as IP Co?

19                   A.    In terms of after the sale of the

20   businesses, what we were left with was the IP, and

21   IP Co was one of the possible options in terms of

22   how to deal with the IP as along with the sale of

23   the IP and others.

24                   Q.    All right.  Was Nortel in the

25   licensing business while you were there?



```
 1                    A.   It was not.

 2                    Q.   And what was your -- can you give

 3    us a description of the programs of IP Co as a

 4    concept up to the time you left in March of --

 5                    A.   Very early stages.  It was just an

 6    option.

 7                    Q.   Right.

 8                    Thank you, sir.  Those are my

 9    questions.

10                    MS. BLOCK:  Good morning, Judge Gross.

11    Good morning, Justice Newbould.

12                    THE US COURT:  Good morning, Ms. Block.

13                    MS. BLOCK:  I provided the witness with

14    a group of documents that I may refer to during the

15    examination in order to facilitate this.

16                    Let me start, if I may.

17    CROSS-EXAMINATION BY MS. BLOCK:

18                    Q.   Good morning, Mr. Binning.

19                    A.   Good morning.

20                    Q.   In your affidavit, in paragraphs 8

21    and 9 in the first affidavit, you speak of the

22    corporate separateness of the subsidiaries in that

23    they had separate boards and --

24                    A.   That's right.

25                    Q.   -- complied with local regulations
```

 Neeson&Associates   W&P

1    and so on.

2              You're aware as well that when

3    creditors loaned to legal entities like, for

4    example, NNL, that they would look at NNL's

5    financial statements and deal with the legal entity

6    that was properly licensed in the jurisdiction

7    to -- in order to make their loans to a specific

8    entity?

9              A.    They would look at the entity

10   level first, and then they would look at the chain

11   within which that entity sits.

12             Q.    And you are aware as well, for

13   example, loans to NNL were guaranteed from time to

14   time by NNI, for example?

15             A.    They were, yeah.

16             Q.    And creditors were looking for

17   those guarantees because they wanted to look at

18   assets of NNI as support for lending to NNL?

19             A.    Uhm-hmm.

20             Q.    Is that correct?

21             A.    That's right, hmm.

22             Q.    So they wanted to know what NNI's

23   assets were, its liabilities, how good it was for

24   the covenant?

25             A.    Absolutely.



1                    Q.    Now, in your paragraph 10 of your
2    first affidavit, sir, you say that ownership of IP
3    resided with the parent in Nortel.  That's what you
4    understood?
5                    A.    That's what I understood.
6                    Q.    And it's not something that you,
7    yourself, analyzed in the sense of looking at any
8    original documents regarding the title; is that
9    correct?
10                   A.    The way that I understood that was
11   when I joined the company, or one of the sort of
12   important things for a CFO to understand is the
13   legal entity structure and the tax structure of the
14   group, so it was in that context that I understood
15   and was informed that this was the way that the IP
16   was held in the group.
17                   Q.    Right.  You were informed that,
18   but you didn't look at NNL's records, for example?
19                   A.    No.  I was provided with a
20   presentation and also a copy of the MRDA for
21   information at that stage.
22                   Q.    You didn't consider what NNL had
23   represented to tax authorities for over the years?
24                   A.    No, I did not.
25                   Q.    And when you joined Nortel in



1    November 2007, right from the outset you were

2    working extremely hard?

3              A.    I think it's fair to say that,

4    yes.

5              Q.    There was a lot to do at Nortel in

6    terms of the financial function that you were

7    taking over?

8              A.    That's right.

9              Q.    You had to optimize the capital

10   structure of Nortel?

11             A.    Yes.

12             Q.    By September 2008, you had to

13   ensure that there was sufficient liquidity?

14             A.    That's right.

15             Q.    The top focus for you was to

16   establish a long-term viable capital structure?

17             A.    That was one of the priorities.

18             Q.    And by November 2008, the capital

19   markets had virtually shut down and you had to look

20   at restructuring options?

21             A.    That's right.

22             Q.    And by this point, November 2008,

23   you were working 24/7?

24             A.    I was.

25             Q.    Because the financial issues,



1    liquidity, capital, survival, that was the focus?

2                A.    That was top of mind.

3                Q.    And it was a critical time?

4                A.    That's right.

5                Q.    So no one showed you the

6    historical cost-sharing arrangements, for example?

7                A.    They did not.

8                Q.    And how those dealt with IP

9    ownership among the various estates?

10               A.    That's right.

11               Q.    And the CSA we know was the

12   replaced by the MRDA, but you didn't read the MRDA?

13               A.    I scanned the MRDA.  I did not

14   read it word for word.

15               Q.    And no one told you of the wording

16   in the MRDA in five places that references

17   ownership interests of the licensed participants,

18   such as NNI or NNUK; is that correct?

19               A.    I understood at the time there

20   were licenses in place and that the IP was owned by

21   the parent.  That's what I understood.

22               Q.    Right.  Because with all your

23   responsibilities on the finance side, you were just

24   given a high-level overview?

25               A.    That's right.  The tax function



1    did report in to me.

2              Q.    When you say Canada, quote, owned

3    the IP, you understood that Canada had legal title

4    to the IP?

5              A.    That is exactly right.

6              Q.    And it wasn't your responsibility

7    to know the details of those IP arrangements?

8              A.    It was -- that's what I was

9    advised and -- when I inquired in terms of the

10   ownership and the license arrangements, that's

11   right.

12             Q.    There were others in the

13   organization who were knowledgeable about that, and

14   you were operating at a conceptual level?

15             A.    That's right.  I had a tax

16   department that was responsible for that.

17             Q.    Now, in your reply affidavit,

18   paragraph 7, you talk about R&D being done in

19   different countries?

20             A.    Yes.

21             Q.    And in the last sentence of

22   paragraph 7 you say that you recall that the

23   majority of Nortel's R&D overall employees were

24   located in Ottawa.  That was your recollection?

25             A.    That's right.



```
 1                    Q.   And you accept that the US was
 2    close behind Canada in terms of R&D head count?
 3                    A.   I think it was a little bit less,
 4    but again, there was a big presence in the US.
 5                    Q.   Right.  If we can come back to the
 6    arrangements that were reflected in the MRDA of
 7    which you had been given this high-level briefing,
 8    you understood that those arrangements were
 9    important for tax purposes?
10                    A.   I did.
11                    Q.   There were transfer pricing
12    considerations that went into them?
13                    A.   There were two issues really in
14    terms of, one, the legal ownership and, secondly,
15    transfer pricing and tax arrangements around the
16    group, which is pretty typical in a global company.
17                    Q.   All right.  And you've told us
18    what you had briefed on the legal ownership issue?
19                    A.   That's right.
20                    Q.   The legal title.  But you
21    understand that for transfer pricing purposes,
22    these had to -- these arrangements had to pass
23    muster with the IRS and the CRA?
24                    A.   They did indeed.
25                    Q.   And Inland Revenue?
```



```
 1                     A.   That's right, yeah.
 2                     Q.   And it was in the interests of all
 3     the Nortel entities to minimize tax appropriately?
 4                     A.   That's right.
 5                     Q.   That was one of the functions
 6     that -- of the tax group within the Nortel group of
 7     companies?
 8                     A.   That's right.
 9                     Q.   And we've seen in this trial that
10     Mr. Doolittle signed the original MRDA and was the
11     VP in charge of tax?
12                     A.   He was at one point in time.  And
13     then certainly, during my time, he was the
14     treasurer of the organization.
15                     Q.   Right.  And I think when he signed
16     in 2004, he was the head of tax.
17                     A.   He would have been the head of
18     tax, that's right.
19                     Q.   And you've told us what you knew
20     about the high-level conceptual information you had
21     about legal title, but Mr. Doolittle would know the
22     detail of how ownership was divided?
23                     A.   He was the head of tax, so he
24     would have been involved at the time.
25                     Q.   And that would have been important
```



 1   for transfer pricing and tax reasons?

 2               A.   That's right, yeah.

 3               Q.   Now, you were at NNL when another

 4   document among the estates was signed, and I've put

 5   it in that pile in front of you.  It's the

 6   memorandum of understanding, the MOU.  Do you have

 7   that, sir?

 8               A.   It's called memorandum of -- I do

 9   have it, yes.

10               Q.   And that was again signed by

11   Mr. Doolittle.  It was signed December 31, '08.

12               THE CANADIAN COURT:  Which document are

13   we looking at, Ms. Block?

14               MS. BLOCK:  I'm sorry.  It's trial

15   exhibit 44357.

16               THE CANADIAN COURT:  It's in the bundle

17   here?

18               MS. BLOCK:  It is in the bundle, and

19   it's also one that you have called up on your -- to

20   your computer, if that's more convenient.

21               THE CANADIAN COURT:  I'm just looking

22   for it.

23               MS. BLOCK:  It's the Memorandum of

24   Understanding.

25               THE CANADIAN COURT:  Are you looking



```
 1   for the -- Memorandum of Understanding?
 2              MS. BLOCK:  Yes.  The MOU.
 3              THE CANADIAN COURT:  Okay.  Thank you.
 4              MS. BLOCK:  Probably have your own copy
 5   of it.
 6              THE CANADIAN COURT:  That's fine.
 7              BY MS. BLOCK:
 8              Q.   And this was signed by
 9   Mr. Doolittle and refers to ownership of the IP.
10   And if I could just show you where that is, sir.
11   If you look at page -- sorry -- clause 3, and
12   you'll see in the bottom highlighting on your
13   computer -- I don't know if it's easier for you to
14   see it there.
15              A.   Okay.  Yes.
16              Q.   The 2004 agreement, that's the
17   original MRDA, also memorializes the agreements
18   from NNL and the licensed participants as to the
19   development and deployment of existing and future
20   NN technology and ownership of the NN technology,
21   with NNL holding legal title thereto.
22              And that was the information you had
23   about legal title?
24              A.   That's right.
25              Q.   If you go down to clause 6, you'll
```



```
 1    see the highlighted portion at the bottom says:
 2                   "The participants believe that
 3              under the prior formula," and going
 4              forward under the new formula as
 5              amended in the third addendum to the
 6              MRDA, "their respective ownership
 7              interests in the NN technology will
 8              be adequately and fairly
 9              compensated."
10              So you see that there is a reference to
11    the various participants having respective
12    ownership interests in the NN technology.
13              A.    That's what the document says.
14              Q.    And I expect you weren't involved
15    in putting this document together.  Is that fair?
16              A.    I was not involved in putting this
17    document together.  But what it does do is it talks
18    about -- there's a distinction that I think it is
19    important to recognize, which is the businesses
20    were funding R&D, as I understood it, and for that
21    they were being granted licenses in the R&D.  And
22    the -- and as I said here earlier, that the
23    ownership rested with NNL?
24              So in terms of what this document is
25    referring to, it's the first time I've seen this
```



 1   document, so I can't specifically say what it's

 2   intended to sort of focus on.

 3             Q.   Right.  Let me get it back up, if

 4   I could, and just see if I can help you with that,

 5   because the opening words of the MOU --

 6             THE CANADIAN COURT:  What does it mean?

 7   He says he hasn't seen it before.  What's the point

 8   of this?

 9             MS. BLOCK:  I want to make one point

10   through this witness, if I may, Your Honour.

11             BY MS. BLOCK:

12             Q.   And it would be helpful if I could

13   just direct your attention to the opening words of

14   this document.  You'll see it's entered into on the

15   31st day of December 2008 to provide a record of

16   certain operating arrangements and understandings

17   of NNL and the licensed.

18             A.   That's right.  That's exactly

19   right.

20             Q.   Right.  In, in fact, when you --

21   don't require you to look at, but it goes through

22   all of the MRDA, amendments and so on, reciting

23   what the parties had done.

24             And is it fair to say that a document

25   put together at a time like this and signed by all



 1   the participants, describing what their deal is and

 2   has been, would be expected to receive some

 3   scrutiny?

 4            MR. ZARNETT:  How can the witness

 5   answer?  He said he didn't see it.

 6            MS. BLOCK:  You were -- if I may, Your

 7   Honour, just through the witness.

 8            THE CANADIAN COURT:  I don't understand

 9   what the value of any of this is of this witness.

10            MS. BLOCK:  He was there at the time.

11   He can tell us about the critical events at the

12   time.

13            THE CANADIAN COURT:  Go ahead,

14   Ms. Block.

15            MS. BLOCK:  Thank you, Your Honour.  I

16   appreciate your indulgence.  And I know I'm

17   treading on your patience.

18            THE CANADIAN COURT:  It's not a

19   question of patience, but a question of what's the

20   value of it.

21            MS. BLOCK:  Here is someone who was

22   right in the center of the hurricane.

23            THE CANADIAN COURT:  He's never seen it

24   before.

25            MS. BLOCK:  I know but the fact that



```
 1   you are --
 2              THE CANADIAN COURT:  It didn't draw his
 3   scrutiny.
 4              MS. BLOCK:  All right.
 5              THE CANADIAN COURT:  Go ahead.
 6              BY MS. BLOCK:
 7              Q.   Would you agree that people would
 8   take care to ensure an accurate description at a
 9   time like this, doing a document like this, which
10   is documenting the situation?
11              A.   I'm afraid, you know, until I -- I
12   haven't seen it before, so it's hard for me to
13   comment on.
14              Q.   All right.  Now, in the fall of
15   2008, before the filings of -- Mr. Zarnett talked
16   to you about the insolvency filings.  You describe
17   in paragraph 38 of your affidavit a contact that
18   you had with the UK director, Sharon Rolston?
19              A.   That's right.
20              Q.   And you were looking to have the
21   UK transfer some of its surplus cash to Canada?
22              A.   That was one of the options we
23   were considering from a liquidity point of view.
24              Q.   She told you, because of the UK
25   board's fiduciary duties, it couldn't permit the
```



```
 1    movement of cash back to Canada at that time?
 2              A.    That's right.
 3              Q.    And that those decisions had to be
 4    made in the UK, you understood, in accordance with
 5    the governance requirements for those directions?
 6              A.    Absolutely.
 7              Q.    And the response you got from
 8    Ms. Rolston, you understood, because of the legal
 9    obligations, each of these separate boards of
10    directors to their own creditors?
11              A.    Absolutely.
12              Q.    And you weren't in a position as
13    an executive of Nortel to force them to provide --
14    of NNL to provide cash back to the parent?
15              A.    I understood the responsibilities
16    of each of the legal entities and their boards very
17    well, and I was not in a position to force the
18    movements of cash back.
19              Q.    And so you accepted that response?
20              A.    I did, indeed.
21              Q.    And you understood that each set
22    of boards of directors for each entity knew that
23    creditors had lent to a specific entity?
24              A.    That's right.
25              Q.    And those creditors were counting
```



```
 1   on the entity they lent to to keep their interests
 2   in mind at a critical time like this?
 3               A.    Absolutely.
 4               Q.    And in the situation you were in,
 5   with people concerned about the future of the
 6   company, they thought they had a fiduciary duty not
 7   to pass the cash back to Canada?
 8               A.    That's right.
 9               Q.    Let me move to the post-petition
10   asset sales, if I can, sir.
11               A.    That's right.
12               Q.    You understood that each entity,
13   separate entity with separate creditors, wanted to
14   maximize the value of the rights of value assets it
15   had for its own stakeholders?
16               A.    I did.  They were selling their
17   businesses, so it was important to them.
18               Q.    And the aim of the sales was to
19   maximize the value for all stakeholders?
20               A.    That's right.
21               Q.    And from your point of view, that
22   meant the stakeholders of all the Nortel entities?
23               A.    It did.
24               Q.    And you didn't align yourself with
25   any particular estate?
```

 Neeson&Associates    W&F

```
 1                    A.   I tried to stay independent right
 2    the way through, because that was the only way I
 3    thought I could effectively do my job.
 4                    Q.   As you have said each estate had a
 5    duty to its own creditors, and you understood that?
 6                    A.   That's right.
 7                    Q.   And that duty was to ensure that
 8    the assets and value that belonged to that estate
 9    was maximized and made available to those
10    creditors?
11                    A.   By maximizing the value of the
12    asset sales in their entirety we would be
13    maximizing the value for each of the estates, and
14    that was the principle I operated under.
15                    Q.   You left before the Rockstar sale
16    of 4.5 billion for the patent portfolio?
17                    A.   I did.
18                    Q.   Because you left in March 2010 and
19    that was a sale in 2011?
20                    A.   That's right.
21                    Q.   And there were also some other
22    sales that happened after you left?
23                    A.   They had been agreed to prior to
24    me leaving, and I felt that was the right time for
25    me to move on, because the businesses were going to
```



```
 1    be sold at that point in time.
 2              Q.   Now, in paragraph 40 of your
 3    affidavit, you refer to John Veshi, his hiring?
 4              A.   That's right.
 5              Q.   That happened prior to bankruptcy?
 6              A.   It did.
 7              Q.   In fact, it was in July 2008 that
 8    Mr. Veshi started?
 9              A.   That's right.
10              Q.   He had been hired to develop a
11    licencing option for intellectual property for the
12    Nortel group of companies?
13              A.   He was hired for two reasons, and
14    I was involved in the debate around his hiring.  He
15    was hired, one, to take responsibility for the IP
16    group that we had at the center and to coordinate
17    activities because we thought we could do a better
18    job and, secondly, to look at options for
19    licensing, because Nortel was not at the time
20    participating in the licensing business, whereas in
21    my experience in this industry in the past, there
22    were other players that were.
23              Q.   And you note in your affidavit
24    that no business was commenced, no licensing
25    business was commenced prior to the filings.
```



```
 1                        A.    No, it wasn't.

 2                        Q.    But, in fact, after the filings,

 3    work continued with respect to the possibility of

 4    such a business?

 5                        A.    That's right.

 6                        Q.    And that work had started and was

 7    still ongoing when you left in March of 2010?

 8                        A.    It was.  The reason -- there was

 9    an important reason why it didn't progress very

10    quickly, because we were in the middle of the asset

11    sales.  And in terms of selling assets, the

12    purchasers wanted to make sure that they had

13    acquired the IP that related to their business.

14                        So it wasn't until the residual IP was

15    left that we actually could really seriously begin

16    to think about options.

17                        Q.    Right.  And the other business

18    sales, you were selling businesses as a going

19    concern?

20                        A.    Which would include -- would have

21    included some of the IP.

22                        Q.    So they were more time sensitive

23    then --

24                        A.    Absolutely.

25                        Q.    -- figuring out to do --
```



```
 1                    A.    That's right.
 2                    Q.    And IP Co was a proposed business
 3   being explored?
 4                    A.    By the time that I left, there
 5   were a range of options that were being considered
 6   from the disposal of the remaining IP, because
 7   there was inbound interest from a number of
 8   parties, and IP Co was an idea that one of the
 9   committees in the US had put forward as a potential
10   option.  But it was -- the work was at very, very
11   early stages.
12                    Q.    Right.  At the time you left?
13                    A.    That's right.
14                    Q.    Just before you left, you were on
15   the IP steering committee.  Do you recall that?
16                    A.    I do, yeah.  I was asked by the
17   various stakeholders to join that committee while I
18   was at the company.
19                    Q.    And that steering committee was
20   looking at the sale of the residual patents,
21   development of a business like IP Co and the sale
22   of that, and then the operating of IP Co, three
23   different options?
24                    A.    It was -- plus also it was looking
25   at licensing.  Yeah, it was looking at a range of
```



 1    options.  I think there were three or four options,
 2    that's right.
 3              Q.   And they were alternatives for
 4    monetizing the IP for the benefit of the creditors?
 5              A.   To maximize value, absolutely.
 6              Q.   And the IP Co business was
 7    actually ultimately picked up and pursued by the
 8    successful bidder, Rockstar?  They run a business
 9    like that, an IP?
10              A.   That's right.  As I sort of
11    mentioned earlier, there are participants in this
12    industry that do operate -- what they do is they
13    license out their IP to third parties and earn a
14    revenue stream on that.
15              Q.   Right.  And they get engaged in
16    litigation to prevent infringements and so on?
17              A.   That's right.
18              Q.   And, in fact, Mr. Veshi went with
19    26 of the group that he had at Nortel, and they run
20    that kind of a business at Rockstar?
21              A.   Okay, I'm not familiar with that,
22    because I had left by then.
23              Q.   All right.  As I say, one of the
24    ideas that the IP steering committee was exploring
25    just before you left was potentially running a



```
 1    business like this business Mr. Veshi was
 2    developing and investigating in-house.  That was
 3    one of the ideas?
 4                   A.   It was one of the options.
 5                   Q.   And on the basis where some or all
 6    of the licensed participants NNI, NNUK, NNSA,
 7    et cetera, would become involved?
 8                   A.   Could participate.
 9                   Q.   That standalone business would be
10    based on the residual patents after you sold all
11    the ongoing businesses?
12                   A.   That's right.
13                   Q.   And if bids for the patent
14    portfolio, if you put that out, you understood if
15    those bids were considered too low, some estates
16    and their creditors may have determined that it was
17    worthwhile pursuing IP?
18                   A.   My sort of sense at the time, and
19    I can only -- this is my personal view, I thought
20    all along, even though we were looking at all of
21    the various options, that a sale of the IP would
22    yield the most value, because to try and create an
23    IP company was going to take years in terms of
24    income streams and, as you say, litigation and
25    these types of things.
```

 Neeson & Associates    W&P WILSON & PETZER LTD.

 1                    So it was certainly there for

 2    completeness.  But as a person -- from a personal

 3    point of view, I thought it was a bit of long shot

 4    at that point in time, and I thought the sale was

 5    more likely.

 6                    Q.  If we could just look at some of

 7    the documents that you were involved in, and you --

 8    as you say, you left fairly early in --

 9                    A.  That's right.

10                    Q.  -- in this process.  If we could

11    look at trial exhibit 50634.01.  It should be in

12    your pile there.

13                    A.  Just trying to find the right

14    document.  Could you just repeat the number for me?

15    50634, is that right?

16                    Q.  Yes, .01.  So there's an email

17    with your name at the top.

18                    A.  Okay.

19                    Q.  And this is the IP steering

20    committee discussion materials.  And if you go over

21    to the attachment, TR50634.02 --

22                    A.  Yes.

23                    Q.  -- and on the next page, the

24    Summary Overview, we can see the alternatives being

25    considered, plan A, and plan B, then just plan C is



1     the IPCO.

2                  "[The] licensing of the portfolio

3                  with a longer term view on value

4                  realization, finding support for

5                  near-term finding requirements and

6                  creating a buy-out mechanism for

7                  creditors who might want to opt out

8                  (Plan C)."

9                  That was the idea?

10            A.   I remember that.  That's right.

11            Q.   If we look over at the next page

12    we can see the members of the steering committee.

13    It included the Monitor, Murray McDonald, and

14    John Ray was the head of the US Estate?

15            A.   That's right.

16            Q.   And the UKP -- the EMEA

17    representative became Robin Joulyn (phon.) of E&Y

18    in England.  Do you recall that?

19            A.   I know of him, but I can't recall

20    whether he became the UK member.

21            Q.   I think we will see something

22    else.  Then obviously you have been named to this

23    committee.  And Mr. Riedel was the chief strategy

24    officer?

25            A.   That's right.

Neeson & Associates     W&F

```
 1                    Q.    Then John Doolittle who we have
 2    spoken of?
 3                    A.    That's right.
 4                    Q.    Then the others are advisors from
 5    Lazard, and we see Mr. Bromley and Mr. Tay,
 6    lawyers?
 7                    A.    Absolutely.
 8                    Q.    And it sets out that there were
 9    going to be work teams for various different
10    functions, set up, and steering committee calls and
11    so on.
12                    A.    That's right.
13                    Q.    And if we turn over two pages, we
14    can see they had a time line of when they were
15    going to do various things.  So this is --
16                    A.    That's right.
17                    Q.    -- early on January 22, this is a
18    set up of starting to explore this?
19                    A.    That's right.  That's right.
20                    Q.    And then if we could go over to
21    TR50817.01, a March 10, 2010, very hefty draft of
22    an IPCO update.  The first document is an email
23    that has your name on it as a member of the group
24    exploring this.  And then if you could look just at
25    the draft deck -- I'm not going to take you through
```



```
1    this, but this was the sort of work this was being

2    done.

3              A.    That's right.

4              Q.    If you can flip through the hard

5    copy.

6              So people were spending a lot of time

7    and effort sorting out how to do this business?

8              A.    They were.  We had moved on now

9    from the business disposals, so this was the last

10   remaining asset of significance in the group, and

11   so this would be the type of quality of work around

12   each of the options that I would expect.

13             Q.    Right.  Just for completeness, I

14   have given you TR50637.01.  This is, I think, the

15   last --

16             THE CANADIAN COURT:  I'm flipping

17   through the attachment and I can see why you are

18   not going through it.  Most of it is black.

19             MS. BLOCK:  I have given you the

20   redacted version, because there's confidentiality

21   issues.

22             THE CANADIAN COURT:  I understand.  I

23   understand.

24             MS. BLOCK:  I meant to make that point.

25   The one on your computer I think is probably not --
```



```
 1   not on the slide show here in court, in open court
 2   but the one in the trial exhibit.  I think you have
 3   an unredacted one.
 4              THE CANADIAN COURT:  Oh, I see.
 5              MS. BLOCK:  Just to get a feel for the
 6   kind of things they were investigating but --
 7              THE CANADIAN COURT:  Thank you.
 8              MS. BLOCK:  -- for open court purposes
 9   we are just using the redacted ones at the moment
10   until those things get sorted.
11              BY MS. BLOCK:
12              Q.  So the last one I have given you,
13   sir, I think this was probably TR50637.01 and .02
14   probably the very last involvement before you left?
15              A.  I think that's right.  It's the 22
16   of March and I left on the 31st.
17              Q.  Right.  Thank you, Mr. Binning.
18              A.  Thank you.
19              THE CANADIAN COURT:  Mr. Gottlieb.
20   CROSS-EXAMINATION BY MR. GOTTLIEB:
21              MR. GOTTLIEB:  Thank you, Your Honour.
22   Good morning, Judge Gross.
23              THE US COURT:  Good morning.
24              BY MR. GOTTLIEB:
25              Q.  Good morning Mr. Binning.
```



```
 1                    A.    Good morning.
 2                    Q.    When you were the CRO of NNL, you
 3   were involved, as you said, in various business
 4   sales, correct?
 5                    A.    I was.
 6                    Q.    And one of the things you looked
 7   at was the CDMA business, correct?
 8                    A.    That's right.
 9                    Q.    And whether or not it could
10   continued as a business --
11                    A.    That's right.
12                    Q.    -- in Nortel, correct?
13                    A.    That is right.
14                    Q.    And eventually it was sold, and
15   one of the things that you concluded was that the
16   Verizon situation was an important situation to
17   consider, and I'll explain that, but have I got
18   that correct?
19                    A.    That is correct.
20                    Q.    So what that was, as I understand
21   it, was that Nortel had been contacted by a
22   Verizon, correct?
23                    A.    They had.
24                    Q.    And Verizon had said that it
25   wasn't comfortable supporting Nortel in the CDMA
```



```
 1   business, correct?
 2              A.   That's right.
 3              Q.   It would rather see that business
 4   in what it would call "safe hands" down road?
 5              A.   Those are the words they used.
 6              Q.   That was obviously a very critical
 7   consideration for Nortel as to what to do with the
 8   CDMA business, correct?
 9              A.   That's right.
10              Q.   Because Verizon was, to put it
11   this way, a very important customer for that
12   business at Nortel, correct?
13              A.   That is correct.
14              Q.   It was a very valuable
15   relationship for Nortel, correct?
16              A.   It was an important relationship.
17              Q.   And it said that it wouldn't award
18   LTE contracts at that time to Nortel going forward,
19   if the business stayed in the hands, correct?
20              A.   That is correct.
21              Q.   And obviously the value of that
22   relationship, on that basis, went down
23   significantly to Nortel, correct?
24              A.   If they had not stayed with us,
25   that would have gone down.
```



1                    Q.    Okay.  And there were other
2    customers that had also raised concerns about
3    awarding contracts to Nortel on a go-forward basis
4    at this stage, correct?
5                    A.    That is correct.
6                    Q.    That was, for example -- and I'll
7    just give a couple of examples -- AT&T was one of
8    them?
9                    A.    That's right.
10                   Q.    And Comcast was one of them?
11                   A.    It was.
12                   Q.    Those were also very important and
13   valuable relationships that Nortel had, correct?
14                   A.    That is correct.
15                   Q.    Now many customers, including
16   those three, if we just take those three, had
17   agreements, had contracts are Nortel, correct?
18                   A.    They did.
19                   Q.    And those contractors were
20   considered by Nortel for what I call obvious
21   reasons to be valuable?
22                   A.    That's right.
23                   Q.    And the relationships themselves,
24   the relationships that had been established with
25   those customers were also valuable?



```
 1                    A.   They were valuable.

 2                    Q.   When Nortel was considering

 3    various aspects of its business, it entered into,

 4    for instance -- I'll give you one example, the GSM

 5    business, are you familiar with that?

 6                    A.   I am.

 7                    Q.   That was eventually subject to a

 8    sale agreement with Ericsson?

 9                    A.   That is correct.

10                    Q.   I want to show you a document.

11    It's trial Exhibit 12006.  If we can bring that up.

12    Do you have this on the screen, sir?

13                    A.   It's on the screen, yes.  It's a

14    short document.

15                    Q.   Thankfully it's a short document.

16                    A.   That's right.

17                    Q.   If you see the second e-mail, the

18    main email, the email from a gentleman named Graham

19    Richardson to you?

20                    A.   That's right.

21                    Q.   I would like you to have a look at

22    that.  As you say, it's a short document.  You can

23    have read.

24                    A.   Okay.

25                    Q.   And what we see is that there's a
```



```
 1    sale agreement with Ericsson for the GSM business;

 2    is that right?

 3                  A.    That's right.

 4                  Q.    One of the terms of the agreement

 5    was that 75 percent of the customer contracts get

 6    assigned by the customers to Ericsson, correct?

 7                  A.    That is correct.

 8                  Q.    And, therefore, Nortel had to take

 9    steps to make sure that that occurred so that that

10    condition would be met?

11                  A.    Was met.

12                  Q.    Which obviously shows us that

13    based on your involvement in that transaction,

14    those customer contracts, the relationship that

15    Nortel had with those customers in the GMS

16    business, that was a valuable commodity that was

17    valuable asset for Ericsson?

18                  A.    It was important for the sale of

19    that business.

20                  Q.    Okay.  In that same regard you

21    were involved, sir, as I understand it with

22    presentations for potential purchasers of the

23    business sale, correct?

24                  A.    I was.

25                  Q.    And presentations were made in
```



 1   slides as well?

 2                    A.   They were made in slides as well

 3   as orally.

 4                    Q.   As orally.  And from the documents

 5   I see that customer contracts, customer

 6   relationships were also put forward to those

 7   potential purchasers as valuable assets of Nortel

 8   that should be considered, correct?

 9                    A.   That is correct.

10                    Q.   Okay.  Those are all my questions

11   Mr. Binning.

12                    Thank you very much, Your Honour.

13   Thank you, Judge Gross.

14                    THE US COURT:  Yes.

15                    THE CANADIAN COURT:  Mr. Barrack.

16   CROSS-EXAMINATION BY MR. BARRACK:

17                    Q.   Good morning, Mr. Binning.

18                    A.   Gum.

19                    Q.   We met.  I'm Mike Barrack with the

20   UK Pension Trust.

21                    What I'm going to talk about is bonds,

22   bonds pricing and terms, largely with reference to

23   tab 3 of your affidavit.  But let's start

24   generally.

25                    As an experienced CFO, part of your job



```
 1   was to understand the ability of a corporation to

 2   access public capital markets?

 3                 A.   That's right.

 4                 Q.   And part of that included an

 5   understanding of the bond market?

 6                 A.   That's right.

 7                 Q.   And one of the fundamental

 8   premises of the bond market is that a company can

 9   only sell bonds into the public market if the price

10   of the bond provides a yield to purchasers which is

11   acceptable?

12                 A.   That's right.

13                 Q.   And bond traders typically assess

14   bonds on the basis of yield to maturity?

15                 A.   That's right.

16                 Q.   And that means they take all the

17   payments what would be expected to be made if the

18   bond is held to maturity, and they calculate a

19   percentage yield or return on the bond based upon

20   the price paid on the bond?

21                 A.   That is correct.

22                 Q.   And in that trade -- in that

23   business, what they typically do is compare that

24   yield to government security of similar term?

25                 A.   That's right.
```



```
 1                    Q.   And that is known in the industry

 2   as the spread?

 3                    A.   It is.

 4                    Q.   Right.  And that spread is the

 5   spread between the yield on the bond at a specific

 6   price and the yield on similar government

 7   securities?

 8                    A.   That's correct.

 9                    Q.   And that is seen as a reflection

10   of the risk associated with that particular bond,

11   correct?

12                    A.   It's the credit-worthiness of the

13   company.

14                    THE CANADIAN COURT:  I suppose assuming

15   the bonds aren't issued by Argentina or somebody.

16                    MR. BARRACK:  Well, we're going to come

17   back to that.  We will come to that.

18                    BY MR. BARRACK:

19                    Q.   Because that changes in the area

20   of -- and just on that point, the government

21   securities that they take are Canada US for Nortel

22   bonds, correct?

23                    A.   They do.  They look at the gilt

24   market and -- so that's normal practice.

25                    Q.   Right.  And that's because those
```



1    documents bonds are seen as a proxy for the

2    risk-free rate of return?

3                    A.    That's right.

4                    Q.    Okay.  And now, we will come to

5    this in your presentation.  There is a shift when

6    you come to insolvency.  Bonds get priced on a

7    different basis as you come close to insolvency,

8    correct?

9                    A.    They do.

10                   Q.    So we will come to that in a

11   minute.  So if we could go to tab 3, this is of

12   your affidavit.  This is trial Exhibit 22055.  And

13   I believe there's a black and white version I'm

14   told a colour version at NNC-NNL 06241167.

15                   MR. BARRACK:  These are the coloured

16   versions, Your Honour.

17                   Q.    Do you have a colour version in

18   your --

19                   A.    Thank you.

20                   Q.    One for you.

21                   A.    Great.

22                   Q.    And you referred to this in your

23   affidavit, but just to locate everyone on the first

24   page.  This is a presentation made to the board of

25   directors, "Liquidity and Financing Alternatives,



```
1    September 30, 2008."  Do you recall this document?

2                  A.    I do.

3                  Q.    And if we go to page 3 of this

4    document, these were your key messages.

5                  And your first key message was the

6    "balance sheet is weak.  Must be key part of the

7    strategic plan."  That's self explanatory.  Then

8    you say:

9                       "Market value of all public

10                      securities has traded off

11                      significantly reflecting concerns

12                      about the company's prospects and

13                      its abilities to meet its

14                      obligations.  Moody's changed its

15                      outlook to negative."

16                  And you go down in the fifth point to

17   say:

18                      "No public market financing

19                      alternatives.  Best option may be

20                      with credit facility with EDC and

21                      significant changes (sic)."

22                  A.    That's right.

23                  Q.    Sorry, "challenges."

24                  What I understand you were telling him,

25   and we will come to some of the details in the
```



1    board of directors, was that at this time the bond

2    markets had shifted from the yield maturity

3    analysis to the insolvency analysis, correct?

4                    A.    I don't think they had shifted to

5    the insolvency analysis, because the context for

6    this I think is very important.  What had done

7    is in the middle of September is put out a profit

8    warning.

9                    Q.    Right.

10                   A.    The targets for the year were not

11   going to be met.  The group still had a cash

12   balance, from memory, of just over 2 and a half

13   billion dollars.  I think it was about

14   $2.6 billion.

15                   Q.    Right.

16                   A.    But certainly what had happened

17   is, because of that profit warning, the rating

18   agencies had actually moved their credit rating on

19   us to either credit watch or credit watch with a

20   sort of a negative implication.

21                   So what they wanted to do was a review

22   of the company post the profit warning.  And so

23   what this was, was a time frame whereby he had

24   issued the profit warning and, as a result of that,

25   I was doing a liquidity assessment of the group in

 Neeson & Associates    W&F
WILSON & PETZER LTD.

1    terms of how could we shore up the capital

2    structure of the company.

3              The bonds had traded off because of the

4    movement by the credit rating agencies.  But at

5    that point in time I wouldn't have said that

6    insolvency was top of mind for me.  It wasn't.

7              Q.   Okay.  Not for you.  And it may be

8    an imprecise question.  What you were seeing were

9    changes in the pricing of the bonds in the

10   marketplace that reflected a couple of things.

11   First of all, as you noted, you couldn't go to the

12   public markets at that point.  You couldn't have

13   floated a bond issue at that point?

14             A.   No.  The last one we had done was

15   a few months earlier, but at that point in time we

16   could not have gone, because the capital markets

17   were shot.

18             Q.   Okay.  So let's go on and see what

19   you did observe about the bond market.  Let's look

20   at page 3.  Sorry, page 7.

21             A.   Yes.

22             Q.   And this is where you do your bond

23   trading analysis, correct?

24             A.   That's right.

25             Q.   Right.  And you tracked two series



1    of bonds, the 2011s and 2016s, correct?

2              A.    Yes.

3              Q.    Let's just flip over to page 22,

4    and locate ourselves as to what the bonds were that

5    were out there.  Do you have page 22, sir?

6              A.    Yes.

7              Q.    And this is where you are

8    describing various aspects of the various series of

9    bonds that are outstanding?

10             A.    That's right.

11             Q.    So if we start with the maturity

12   line, the third one down, there were -- and the

13   custom of the trade is to refer to these by their

14   maturity dates; is that correct?

15             A.    That's correct.

16             Q.    So if we look at the maturities of

17   July 2011, July 2013, July 2016, the custom of the

18   trade would be to call those the 11s, 13s and 16s?

19             A.    That's correct.

20             Q.    The next one would be 23s and the

21   26s, correct?

22             A.    Yes.

23             THE CANADIAN COURT:  Mr. Barrack,

24   before you go on, you probably won't know the

25   answer to this, but I'm going to using electronics



1   after this trial.  I'm not picking up paper.  And

2   when I turn up your exhibit number, it's one page,

3   the cover page.  So there must be something else

4   there that -- if somebody can find out.

5            MR. BARRACK:  If you look at the top of

6   the page where it says "NNC, NNL, 0624116."

7            THE CANADIAN COURT:  There's nothing

8   like that in what I have been handed.

9            MR. BARRACK:  There isn't.  Okay.

10           Well, you got me there, Your Honour.

11           THE CANADIAN COURT:  I figured I would,

12   but there will be somebody here I won't have.  So

13   they will be able to figure it out for you.

14           MR. BARRACK:  Yes.  Can I get back to

15   you that on?

16           THE CANADIAN COURT:  Sure.

17           MR. BARRACK:  We can give you an

18   electronic copy after.

19           THE CANADIAN COURT:  Of course.

20           MR. BARRACK:  All I can refer to is

21   this exhibit page 22.

22           THE CANADIAN COURT:  I understand.  I

23   understand.

24           MR. BARRACK:  Okay.  Thanks.

25



```
 1                    BY MR. BARRACK:
 2              Q.    Then we have the 12s and the 14s,
 3    correctly?
 4              A.    That's right.
 5              Q.    At the top we have the principal
 6    amounts because sometimes in the references there's
 7    references to aggregate principal amounts.  The
 8    coupon rates for each of them are listed on the
 9    second column, and then if we go down to Obligor
10    group, what we see is the 11s, 13s, and 16s were
11    issued by NNC and NNL, and guaranteed by NNI,
12    correct?
13              A.    That's right.
14              Q.    The next two, the 23s and 26s, in
15    effectively, were the nonguaranteed bonds; is that
16    right?
17              A.    That's correct.
18              Q.    And the last two, the 12s and the
19    14s were convertibles, debentures and they were
20    guaranteed by NNI as well, correct?
21              A.    That's right.
22              Q.    And then you make a number of
23    observations about the covenants, but we're going
24    to come back to the covenants in a bit.
25                    So if he can go back to page 7 then,
```



```
 1   which is your analysis?

 2                A.   Yes.

 3                Q.   So you have laid out two charts on

 4   the left-hand side of the page:  One that shows

 5   prices and one that shows spreads, correct?  Yields

 6   and spreads?

 7                A.   Uhm-hmm.

 8                Q.   And then you've got some key

 9   company events which are associated with the

10   numbered points on the price's chart, correct?

11                A.   That's right.

12                Q.   Then you've got your observations

13   from those charts that you draw?

14                A.   That's right.

15                Q.   And from these charts you make

16   three observations.  The first is bond prices have

17   traded off significantly since Q3 pre-announcements

18   to distress levels, long dated bonds 23, 26 bonds

19   are bid at 50 percent of par.  So the nonguaranteed

20   bonds were trading at 50 percent of par, correct.

21                A.   That's right.

22                Q.   You then make the observation that

23   bonds are now trading on a dollar basis rather than

24   a yield basis implying that bondholders are now

25   focused on recovery values.
```



```
 1                    "Bondholder queries to the

 2                    company are consistent with the

 3                    above."

 4                    Correct?

 5             A.    That's right.

 6             Q.    So what you are observing and

 7   telling the board there is that the bond trades

 8   aren't doing the yield-to-maturity analysis.  While

 9   you're not thinking about insolvency, the bond

10   market is starting to think about trading these

11   bonds on the basis of what might I recover in an

12   insolvency situation?

13             A.    Either recover or what could I

14   make?  Potentially if the bonds went from par, from

15   50 percent, or whatever the number is, back towards

16   a hundred, so there's two things that would go

17   through the minds of a bond trader at that point in

18   time.  They would do their own analysis, and they

19   would sort of say, are these bonds I could invest

20   in and make a return?  Or could it go the other way

21   at that point in time.  So these are the sort of

22   considerations at that point.

23             Q.    Right.  This is the switch in the

24   bond trading market at this time, instead of yield

25   to maturity --
```



```
1                    A.    It's a value.

2                    Q.    It's a value market?

3                    A.    That's right.

4                    Q.    It becomes an arbitrage market at

5      that point.

6                    A.    That's right.  What they do is

7      they're taking a view in terms of how they think

8      those bonds are going to trade, and the value

9      creation for them is on price potentially.

10                   Q.    Right.  Classic arbitrage market?

11                   A.    That's right.

12                   Q.    So that's why you make the final

13     note that RBC view approximately 50 percent of the

14     debt has traded into the hands of distrusted

15     investors?

16                   A.    That's what you normally find in a

17     situation whereby if the bond value decreases

18     relative to par, the bonds begin to change hands

19     relatively quickly because these people do this for

20     a living.

21                   Q.    Right.

22                   Okay.  What I'd like to show you next

23     is, we've entered into a stipulation in this case

24     about the yield and the spreads at various times on

25     these bonds.  So this has been agreed between the
```



1    parties.  I'm not asking you to recall what bonds

2    prices were, and some of these are before your

3    time.

4                    I'm wondering if I could hand those up,

5    please.

6                    So the first thing I'm going to give

7    you is the -- this is really more for the Court --

8    this is a copy of the actual stipulation that we

9    entered describing what these bond prices are.

10                   A.   Okay.

11                   MR. ZARNETT:  Your Honour and Judge

12   Gross, this is a stipulation only between some of

13   the parties who are listed on the last page;

14   essentially, the US interests and Mr. Barrack's

15   client.

16                   MR. BARRACK:  If Mr. Zarnett wants us

17   to call someone to say what the bonds were quoted

18   at --

19                   MR. ZARNETT:  No, I'm not --

20                   THE CANADIAN COURT:  I'm shocked to

21   hear there are trial tactics going on.  This is a

22   stipulation between whom?

23                   MR. BARRACK:  It's really between the

24   Bondholders and the UKPC.  And it arose out of --

25                   THE CANADIAN COURT:  For the Official



```
 1    Committee of Unsecured Creditors.

 2              MR. BARRACK:  Yes, the UCC.

 3              BY MR. BARRACK:

 4              Q.   If you looking at the stipulation

 5    it says:  The UKPC and the US Debtors -- the UCC to

 6    US Debtors have entered into a stipulation that

 7    certain bond pricing data is authentic and accurate

 8    and reflects the spreads and yields applicable to

 9    various Nortel bonds on the specific dates

10    identified.  That's in the body of the stipulation

11    that I handed up.

12              So, again, sir, I don't anticipate that

13    this is stuff you carry around in your head.

14              A.   That's right.

15              Q.   Particularly is president of

16    George Weston.  I'm sure there are many other

17    things you carry in your head these days.

18              You can see how this table is set up.

19    It identifies the bonds.  If we look at the first

20    page there are two dates, January 31, 2008, and

21    March 31, 2008.  You've got the 11s, the 13s, and

22    the 16s, then the convertibles.

23              What you'll note as we go through this,

24    there is no pricing for the convertibles and you

25    will appreciate that doing spreads on a convertible
```


Neeson&Associates    W&F

```
 1    is more a complex exercise than on the others,

 2    correct?

 3              A.    It is.

 4              Q.    And then we've got the 23s and the

 5    26s that the bottom.  So essentially you have got

 6    the guaranteed bonds at the top, the 11s, 13s, and

 7    16s, because we can't, simply do pricing on the

 8    convertibles.  We don't have any price on the

 9    convertibles.  And the spreads on the guaranteed

10    bonds at the bottom.

11              And if we go through these, and we've

12    got whether it's a guarantor, the trading price,

13    the yield, and then the spreads to the US

14    government yield curve.  As I say, we've agreed on

15    all of these.

16              So if we look at the January 31, '08,

17    and 31 March '08, we notice if we look first at the

18    11s, 13s, and 16s, the 11s go from 718 to 1072, the

19    13s go from 737 to 997, and the 16s go from 753 to

20    926.

21              And that's what you would expect to see

22    as the market was seeing increasing risk with

23    Nortel, correct?

24              A.    This is January 31st, 2008?

25              Q.    Yes.  To March 31.
```



 1                    A.   These spreads reflected the credit

 2   rating of the business at that point in time so

 3   that's why I would expect at that point in time in

 4   January, 2008, the business was not in distress.

 5                    Q.   Right.  And the widening of these

 6   spreads indicates --

 7                    A.   It's view -- the view -- the

 8   market takes the view, so even in March 2008, I

 9   would not, you know, have said at all that the

10   business was in distress.  The market takes a view

11   based on its own information.

12                    Q.   Absolutely.  And I'm not

13   questioning the view.

14                    A.   No.  That's fine.

15                    Q.   This is really more to understand

16   what the market is doing without sort of a

17   qualitative assessment.

18                    A.   Yes.

19                    THE CANADIAN COURT:  I was going to ask

20   you, Mr. Barrack.  For my assistance, is there any

21   relevance to those date in January and March of

22   '08?

23                    MR. BARRACK:  Not specifically.  What

24   is of relevance is the relationship between the

25   guaranteed and nonguaranteed bonds.  What I'm just



1    trying to do is locate events at the time to
2    understand where we are.
3                    THE CANADIAN COURT:  Thank you.
4                    BY MR. BARRACK:
5                    Q.   So the relevant comparison, for my
6    purposes, sir, is if we look at the nonguaranteed
7    bonds, they are actually trading at narrower
8    spreads than the guaranteed bonds, correct?
9                    A.   Uhm-hmm, that's what this piece of
10   paper would show.
11                   Q.   And if these numbers that have
12   been stipulated are correct, that would indicate
13   that the market was at a minimum making, giving no
14   value to the guarantee, correct?
15                   A.   It's hard for me to say that, but
16   that's what these numbers would imply.
17                   Q.   And similarly if we go to page
18   2 --
19                   THE CANADIAN COURT:  You are saying,
20   Mr. Barrack, the top three are guaranteed by NNI
21   and the bottom two are not?
22                   MR. BARRACK:  Yes.  That's what we
23   established when we looked over at page 22 of the
24   presentation.
25



```
 1              BY MR. BARRACK:
 2              Q.   And if we go to the next sheet,
 3    which may have predated your time?
 4              A.   It did, yes.  I wasn't there.
 5              Q.   Right.  So if we simply note we
 6    have the -- and if these numbers are correct, the
 7    guaranteed bonds, the 11s, 13s, and 16s are trading
 8    wider spread showing more risk than the guaranteed
 9    bonds, correct?  Based on these numbers?
10              A.   Based on these numbers.  The only
11    other thing that I would say, and I understand the
12    sort of inference that you are drawing, I've been
13    involved in the bond market for many, many years in
14    my various roles as CFO --
15              Q.   Right.
16              A.   And what people look for, what
17    bondholders look for is there may or may not have
18    been guarantee in place and they may have taken
19    that into account.  But, certainly, in terms of the
20    sort of analysis that I have seen over the years,
21    at this point in time, you know, people sort of
22    making a distinguishing between bonds that had a
23    guarantee and they didn't, they would just be
24    looking at the overall quality of the company.  And
25    that's generally, you know, certainly what happens
```



1    in my experience.

2              Q.    Right.  So the guarantee is kind

3    of neither here nor there?

4              A.    I don't think it is.

5              Q.    Yeah.  When you say you don't

6    think it is, you are agreeing with me the guarantee

7    is neither here nor there?

8              A.    In terms of there may be a

9    guarantee in place, but in terms of, you know

10   certainly when one looks at a company they look at

11   the quality of company and credit ratings and

12   various other things.  They may take into account

13   that there's a guarantee but certainly, at the end

14   of the day, I don't know the sort of point that you

15   are sort of making in terms of does the guarantee

16   have any meaning.  Clearly for those bondholders

17   that invested it was there, but these numbers show

18   what you are saying.

19             Q.    Okay.  Thank you.  So we don't

20   need to go through them all.  We will go through

21   them with the experts.

22             Part of the reason that the guarantees

23   may have had no meaning for these particular bonds

24   is that they were particularly weak covenant bonds,

25   as I understand it.



```
1                    A.    It was a sub-investment grade
2    credit.
3                    Q.    Right.  And if we go back to page
4    22 of your presentation?
5                    THE CANADIAN COURT:  Can I just
6    understand -- Mr. Barrack I understand when you say
7    it was a "sub-investment grade credit."  Can you
8    explain that to me, what you mean?
9                    THE WITNESS:  Normally the various
10   rating agencies, Your Honour, have a rating
11   process, credit rating agency, so as you will be
12   familiar, Moody's, S&P and these type of companies.
13   What they do is they rate the credit and there's a
14   criteria which is investment grade credit and then
15   there is sub-investment grade.  And it
16   distinguishes in terms of they look at a whole
17   series of factors to make that assessment
18   qualitative and quantitative, and typically triple
19   B minus is the threshold of investment grade so any
20   company that's triple B minus or above is viewed in
21   a particular way by the -- the stock market and the
22   bond market, and anything that's sub-investment
23   grade is viewed to be higher risk than, you know,
24   sort of the other companies.
25                    So it literally is an assessment of the
```


Neeson & Associates    W&F

```
 1   credit worthiness of a company.
 2            THE CANADIAN COURT:  What I wasn't
 3   quite sure was whether you were referring to the
 4   sub-investment grade credit as the overall credit
 5   or whether you are referring to the guarantee.
 6            THE WITNESS:  No.  The overall credit.
 7            THE CANADIAN COURT:  Thank you.
 8            BY MR. BARRACK:
 9            Q.   So, sir, if we can go back to page
10   22 of your presentation?
11            A.   Yes.
12            Q.   And as you entitle this, this is
13   your covenant summary.  And the first bullet point
14   you make after the chart that is that the bonds
15   have no maintenance covenants in currents-based
16   only.  Do you see that?
17            A.   That's right.
18            Q.   As I understand it, for example,
19   that means that it does not agree to maintain a
20   debt service, also called a fixed charge coverage
21   ratio correct?
22            A.   That's right.
23            Q.   And, for example, it's
24   consolidated, for instance, if it was going to have
25   a maintenance covenant, the type of covenant would
```



```
1    be that it's consolidated EBITDA and has to be X
2    times its debt service on its --
3                    A.    A debt to EBITDA ratio.  That's
4    right.
5                    Q.    Right.  Or a consolidated tangible
6    worth has to be X times a fixed number; correct?
7                    A.    That's right.
8                    Q.    In any kind of covenant where the
9    numerator is performance- or asset-value-based,
10   that is exposed to the operating results of the
11   issuer?
12                   A.    That's right.
13                   Q.    And -- as opposed to an
14   incurrence, which is within the company's control?
15                   A.    I -- you service the debt.  You
16   service the debt.
17                   Q.    Then your second and third points
18   are 2,000,675 bonds, high yield notes very flexible
19   and that 2.675 are the -- if we see up at the
20   top -- that's the 11s, the 13s, and the 16s,
21   correct?
22                   A.    That's right.
23                   Q.    They are the guaranteed bonds,
24   correct?
25                   A.    Yes.
```



```
1                    Q.    "Very flexible, no limitations on
2                          investment or asset sales other than
3                          substantially all the assets".
4                    So you were commenting there on a
5          relatively weak covenant pattern in those bonds?
6                    A.    When I was commenting on -- they
7          were flexible, and you know, if we sold assets,
8          that we wouldn't have to immediately repay the
9          bonds.
10                   Q.    Okay.  And the same point in the
11         ability to incur:
12                         "Ability to incur secured debt,
13                          current basket $853, (excluding
14                          deferred tax assets $525)"?
15                   A.    So what we were looking at there
16         was to, if we wanted to put secure debt on to the
17         company, what the maximum was that we could put on.
18                   Q.    Okay.  What the guarantees under
19         these bonds essentially gave the bondholders was
20         access to the assets in Canada and in the US
21         without a great degree of comfort as to what those
22         assets would be from time to time.  Correct?
23                   A.    That's -- that's correct.
24                   Q.    All right.  And for instance, NNL
25         or NNI could have guaranteed the debts of its
```

Neeson & Associates   W&F

 1    subsidiaries under these bond indentures, correct?

 2                    A.    It could have.

 3                    Q.    I'd like to show you some pages

 4    from the Offering Memorandum for the 2011, 2013,

 5    and 2016.  I'm only going to take you to one page.

 6    We're not going to -- don't worry -- we're not

 7    going to take a long walk in the park here.

 8                    A.    Thank you.

 9                    Q.    This is Trial Exhibit 40117.  And

10    if you look at the first page here you will see

11    that it is the Offering Memorandum for the 16s, 13s

12    and 11s, and if you look down in the bottom

13    left-hand corner you can see the date is

14    June 29, 2006?

15                    A.    That's right.

16                    Q.    I'd just like to flip over to page

17    29.  We are only going to look at two pages, 29 and

18    30.

19                    You see where it's -- bolded at the

20    bottom of 29, the last statement?  It says:

21                        "The covenants in the indenture

22                        will contain significant exceptions

23                        and "carve-outs" which may provide

24                        less protection to holders of Notes

25                        than indentures governing securities



```
 1                  of comparably rated companies, and
 2                  many of these companies will cease
 3                  to be in effect should the ratings
 4                  on the Notes increase to investment
 5                  grade."
 6             So these were somewhat weaker than even
 7   other distressed debt in terms of protections?
 8                  A.   It's hard for me to comment on
 9   that.  I wasn't there in 2006.
10                  Q.   Okay.
11                  A.   But -- so drawing that parallel I
12   don't know, but certainly it included carve-outs,
13   which is what this says.
14                  Q.   Okay.  And it goes on to say:
15                  "The covenants in the indenture
16                  governing the notes and guarantees
17                  contain significant exceptions and
18                  "carve-outs" in order to provide
19                  significant operating flexibility
20                  for NNC and its subsidiaries.  These
21                  exceptions may provide less
22                  protection to holders of Notes than
23                  indentures governing securities of
24                  non-investment grade rated
25                  companies.  In particular, you
```



1                 should be aware of the indenture

2                 governing the Notes and the

3                 guarantees will: [...]"

4           So in this point they are telling

5     potential bondholders these are even weaker than

6     the usual non-investment grade bonds?

7                 A.   That's what it says.

8                 Q.   Right.  It goes to say that

9     guarantees will:

10                "Not restrict the ability of NNC

11                or its subsidiaries to lend cash or

12                make investments in non-guarantor

13                subsidiaries, joint ventures,

14                customers or other third parties

15                other than in connection with a

16                transfer of all or substantially all

17                of the assets of NNC, the Company or

18                NNI."

19           And was that the case under these

20     bonds.  Were you aware of that at the time?

21                A.   I was not aware.

22                Q.   Okay.  I won't take you through

23     each of these because if you weren't aware of

24     them -- the document speaks for itself.

25                A.   That's right.



```
 1                   Q.   And they would trade on those
 2    terms.
 3                   If I go back then to your page 22, I'll
 4    just pick up some of the concepts off your chart.
 5                   A.   Yes.
 6                   Q.   So if we go to the debt incurrence
 7    covenant basket, do you see that on the chart,
 8    about halfway down?
 9                   A.   I do.
10                   Q.   Okay.  And what you've got is
11    FCCR, that would be financial -- Financial
12    Consolidated Coverage Ratio?
13                   A.   I'm sure that's right.  That's
14    what it is referring to.
15                   Q.   Okay.  And then there's another
16    term there, CNTA, and I believe that stands for --
17    I have got it here -- Consolidated Net Tangible
18    Assets?
19                   A.   Right.
20                   Q.   So, basically what this is saying
21    is that the financial test in the bond indenture
22    that controls the incurrence of funded debt other
23    than permitted funded debt is a consolidated
24    financial metric at the NNC level, correct?
25                   A.   That's correct.
```



```
 1                    Q.   If that test is met, funded debt
 2   could be incurred at the NNI level or at the NNC
 3   level, correct?
 4                    A.   That's right.
 5                    Q.   So there was no separate test at
 6   the NNI level because this is a proforma test
 7   calculated after considering the incurrence in
 8   question, correct?
 9                    A.   That's right.  It was at the group
10   level.
11                    Q.   Okay.  So, if the company could
12   only incur only one more dollar of funded debt
13   under the test, the company could still incur
14   funded debt at the NNI level and repay an
15   equivalent amount of funded debt at the NNC level
16   because it's a consolidated test?
17                    A.   That's right.
18                    Q.   If we look to the next box,
19   "Negative Pledge Percentage of CNTA" which is
20   consolidated net tangible assets, similar the tests
21   governing the incurrence of liens at NNC or its
22   restricted subsidiaries which includes NNI?
23                    A.   It's at a group level, this is.
24                    Q.   Yes, and that's the same point.
25   This is at a group level, and all of the -- all of
```



```
 1   the financial tests would be demonstrated at a
 2   group level?
 3              A.   They would be demonstrated but
 4   clearly if you incur debt at any one of the
 5   entities then you would have to think through the
 6   implications for these particular covenants of the
 7   group level.
 8              Q.   Right.  And that's why, because of
 9   this sufficient flexibility to move assets around
10   to move debt around, is why we see the kind of
11   strong warnings that we see in the Offering
12   Memorandum, that the value of the guarantees might
13   be limited, correct?
14              A.   One of the things in any Offering
15   Memorandum is it's important to set out the risks
16   to whether it's bondholders in this case or equity
17   holders in a different situation, to make sure they
18   understand the risks of investing in a particular
19   organization.
20              Q.   Right.  And one of the risks was
21   that the guarantees may be weak because of the
22   ability to move assets and debt around within the
23   organization, correct?
24              A.   I'm sure that's what was intended.
25              Q.   Okay.  Thank you.
```

 Neeson & Associates   W&F

```
 1                    MR. ZARNETT:  Your Honour, I have a
 2    couple of -- and Judge Gross, I just have a couple
 3    of questions in re-examination.
 4    RE-EXAMINATION/RE-DIRECT BY MR. ZARNETT:
 5                    Q.   Mr. Gottlieb was discussing with
 6    you customers and their relation to the sale of
 7    certain businesses.  Do you recall this discussion?
 8                    A.   I do.
 9                    Q.   Do you have a view on what
10    attracted those customers to Nortel in the first
11    place?
12                    A.   The IP, the products that Nortel
13    had attracted the customers.
14                    Q.   And what would a purchaser need to
15    keep the customer?
16                    A.   It would need to make sure that it
17    had technology that was relevant for that
18    particular customer.
19                    Q.   All right.  And Ms. Block was
20    discussing with you some of the IP Co deliberations
21    while you were there; do you recall that?
22                    A.   I do.
23                    Q.   Was there ever any discussion as
24    to how the different Nortel entities would
25    participate and to what extent?
```



```
 1                    A.   There was not.
 2                    Q.   Thank you.  Those are my
 3      questions.
 4                    THE CANADIAN COURT:  Is that it?
 5                    MS. BLOCK:  May I ask one question?
 6                    THE CANADIAN COURT:  Sure.
 7      CROSS-EXAMINATION BY MS. BLOCK:
 8                    Q.   Sir, are you aware that some of
 9      the buyers wanted to move the Nortel customers to
10      their products and platforms?
11                    A.   I was aware of that.
12                    Q.   Thank you.
13                    THE CANADIAN COURT:  Thank you,
14      Mr. Binning.
15                    THE WITNESS:  Thank you.
16       -- Witness is dismissed.
17                    THE CANADIAN COURT:  If it makes sense,
18      we will take the morning break.
19                    Here's a bundle to give back to
20      Ms. Block.
21                    MS. BLOCK:  When we come back, Your
22      Honour, Mr. Bromley will be here, leading our first
23      US witness.
24                    THE CANADIAN COURT:  All right.  And
25      here's a bundle to give back to Mr. Barrack.  And
```

 Neeson & Associates   W&P WILSON & PEYSER LTD.

```
 1   Mr. Barrack if you could find somewhere where I
 2   could find that because it's only the first page
 3   that exhibit number.
 4              MR. BARRACK:  I understand what you
 5   need.
 6              THE CANADIAN COURT:  All right.  We
 7   will take the morning break for 20 minutes.
 8   -- RECESS AT 10:30 a.m.
 9   -- RESUMING AT 10:55 a.m.
10              THE CANADIAN COURT:  Thank you.
11                WALTER HENDERSON,
12           having been first duly sworn,
13      was examined and testified as follows:
14              THE CANADIAN COURT:  We will mark the
15   declaration of Mr. Henderson the next exhibit which
16   will be...
17              THE CANADIAN REGISTRAR:  Exhibit 16,
18   Your Honour.
19              THE CANADIAN COURT:  Sixteen, then the
20   reply declaration Exhibit 17.
21              THE CANADIAN REGISTRAR:  Exhibit 17.
22              EXHIBIT NO. 16: Declaration of Mr.
23   Henderson, dated April 11, 2014.
24              EXHIBIT NO. 17: Reply Declaration of
25   Mr. Henderson, dated April 25, 2014.
```



```
 1                THE CANADIAN COURT:  Mr. Bromley.
 2     EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY MR.
 3     BROMLEY:
 4                THE US COURT:  Mr. Bromley, what you
 5     are doing up there?
 6                MR. BROMLEY:  Good morning, Your
 7     Honours.  Good morning, Justice Newbould.  It's a
 8     pleasure to be here before you in person.
 9                Good morning, Judge Gross.
10                THE US COURT:  Good morning.
11                MR. BROMLEY:  You look great on a
12     90-inch TV.
13                THE US COURT:  Thank you.
14                BY MR. BROMLEY:
15                Q.   Your Honours, it's my pleasure --
16                MR. ZARNETT:  I object to the flattery
17     but completely agree with what Mr. Bromley said.
18                MR. BROMLEY:  I would note that we in
19     Delaware have a list of Canadian hotties and
20     Mr. Zarnett is number one so far.
21                THE CANADIAN COURT:  I'd say you need a
22     local list.
23                MR. BROMLEY:  I never said any of us
24     had very good taste, Your Honour.
25                So, Your Honours, it is my pleasure to
```

 Neeson & Associates    W&F WILSON & PETZER LTD.

1    begin our case in chief for the US Debtors here in

2    Toronto, with our first witness, Mr. Walter

3    Henderson.  If I may please the Court, begin with

4    the examination.

5                    THE CANADIAN COURT:  Very well.

6                    BY MR. BROMLEY:

7                    Q.   Mr. Henderson, could you state

8    your name for the record, please?

9                    A.   Yes.  Walter Terryl Henderson

10   junior.

11                   Q.   Mr. Henderson, you submitted two

12   declarations in this matter?

13                   A.   Yes, I did.

14                   Q.   One was marked already.  I believe

15   it's in front of you as Exhibit 16, dated on

16   April 11th, 2014, and the second dated April 25th,

17   2014 marked as Exhibit 17.  Do you have those in

18   front of you?

19                   A.   Yes, I do.

20                   Q.   Are those your declarations, sir?

21                   A.   Yes, they are.

22                   Q.   And in connection with your

23   testimony today, have you had a chance to review

24   them?

25                   A.   I have.



```
 1                    Q.   And is there anything you would
 2    like to change in those declarations?
 3                    A.   No.
 4                    Q.   If I could have a bit of leeway
 5    Your Honour just to get some of the preliminaries
 6    out with a leading question, Mr. Henderson, you are
 7    practising lawyer, having graduated from University
 8    of Pennsylvania law school?
 9                    A.   That's correct.
10                    Q.   You were employed by the
11    Sutherland Asbill & Brennan firm in Atlanta,
12    Georgia?
13                    A.   Yes, I was.
14                    Q.   As well as Nortel Networks
15    Incorporated?
16                    A.   That's correct.
17                    Q.   From 2002 to the present you been
18    employed by the General Electric Company?
19                    A.   That's correct.
20                    Q.   Now, Mr. Henderson, when did you
21    start work after law school?
22                    A.   When?
23                    Q.   Yes.
24                    A.   1993, July.
25                    Q.   And with -- was that with the
```

Neeson&Associates    W&F

```
 1   Sutherland firm?

 2               A.   It was with Sutherland, that's

 3   correct.

 4               Q.   What was the first work for Nortel

 5   that you did when you were at the Sutherland firm?

 6               A.   I was -- I worked on a tangible

 7   property transfer pricing report -- transfer

 8   pricing study.

 9               Q.   Was there anyone in particular at

10   Sutherland that you worked closely with?

11               A.   Jerry Cohen.

12               Q.   Who is Mr. Cohen?

13               A.   Jerry Cohen is a partner at

14   Sutherland.  He was former chief counsel to the

15   IRS, and been with Sutherland for maybe 20 years at

16   that point.

17               Q.   While were you at Sutherland did

18   there come a time when you were asked to work on

19   transfer pricing matters for Nortel?

20               A.   Yes.

21               Q.   And were you involved at all in

22   connection with Nortel's advanced pricing

23   agreements in the 1990s?

24               A.   Yes, I was.

25               Q.   Your Honours, I would like to ask
```



```
 1   that the witness be shown the next exhibit, which
 2   is TR50829, if I could call that up.
 3             MR. BROMLEY:  May I approach the
 4   witness, Your Honour?
 5             THE CANADIAN COURT:  Yes, go ahead.
 6             BY MR. BROMLEY:
 7             Q.   I believe we are now to Exhibit
 8   18.  Mr. Henderson, have you seen this document
 9   before?
10             A.   I have, yes.
11             Q.   And what is it?
12             A.   It's the advance pricing agreement
13   between the Northern Telecom Inc, the US subsidiary
14   and the IRS.
15             Q.   Did you have any role in the
16   creation of this document?
17             A.   I did.
18             Q.   And what was that role?
19             A.   I took the primary pen and
20   drafting this from representing Nortel, starting
21   around late '94 to 1995.
22             Q.   And do you recall when this
23   document was actually signed?
24             A.   I believe it was in 1996, if I'm
25   not mistaken.  Yes, 1996.
```



 1                    Q.    And are you looking at page 26 of
 2    the document, which is TR50829?
 3                    A.    Yes.
 4                    Q.    Dated October 8, 1996.
 5                    A.    Yes, I am.
 6                    Q.    And so you worked on this advanced
 7    pricing agreement for over a year?
 8                    A.    Yes, just between the logistical
 9    time of circulating drafts and then clarifying any
10    further issues, these things take time.
11                    Q.    There is a signature that appears
12    on this page which appears on the screen.  Do you
13    know who signed the document?
14                    A.    That is Robert L. Ashby -- Bob
15    Ashby, that -- who was the Vice-President of Taxes
16    for the US entity.
17                    Q.    And who was Mr. Ashby?
18                    A.    He was the Vice-President of taxes
19    for Northern Telecom Inc. at the time, which became
20    Nortel Networks Inc.
21                    Q.    Was it your understanding that Mr.
22    Ashby was authorized to sign this on behalf of
23    Northern Telecom Inc.?
24                    A.    Yes.
25                    Q.    And was it your understanding that



1   this was a binding agreement between Northern

2   Telecom Inc. and the Internal Revenue Service?

3                A.   Yes.

4                Q.   Thank you, Mr. Henderson.  You can

5   put that aside for the moment.

6                I'd like to show you another document

7   which is document marked as TR46875.

8                THE CANADIAN COURT:  What's that

9   number, Mr. Bromley?

10               MR. BROMLEY:  It is TR46875.

11               THE CANADIAN COURT:  Thank you.

12               BY MR. BROMLEY:

13               Q.   Mr. Henderson have you seen this

14   document before?

15               A.   Yes, I have.

16               Q.   And what is it?

17               A.    It's the advance pricing agreement

18   between Northern Telecom Limited, the Canadian

19   operating company, and the CRA.

20               Q.   Did you have any role in the

21   creation of this document?

22               A.    Yes, it was based on -- the

23   substance of this document is based on the -- the

24   US APA, so that we made sure we had mirror terms

25   between the two documents.  So there's a bit of



1    different formatting but the substance of it --
2    most likely the appendix of it -- was where I
3    focused my attention.
4              Q.   Was it your understanding that it
5    was consistent in substance to the APA with the
6    IRS?
7              A.   Yes.
8              Q.   I'd like to turn your attention to
9    page 10 of the document which is TR46875.
10             A.   Okay.
11             Q.   Do you have that in front of you,
12   sir?
13             A.   Yes, I do.
14             Q.   There's a signature date of
15   September 19, 1996 by a Mr. David L. Burn on behalf
16   of Northern Telecom Limited.  Did you know
17   Mr. Burn?
18             A.   I did.
19             Q.   Who was Mr. Burn?
20             A.   He was the Vice-president of Tax
21   for Northern Telecom Limited.  He was an officer of
22   the company.
23             Q.   When you the eventually joined
24   what became NNI, did you ever report to Mr. Burn?
25             A.   I did for a period of time



1    between, I want to say, early 2001.

2                    Q.    Was it your understanding that

3    Mr. Burn was authorized to sign this document on

4    behalf of Northern Telecom Limited?

5                    A.    Yes.

6                    Q.    Do you have any -- did you believe

7    that this was a binding agreement between Northern

8    --

9                    THE CANADIAN COURT:  Is all this

10   necessary?  It's -- it's in the evidence, is it

11   not.

12                   MR. BROMLEY:  Well, Your Honour, these

13   two documents in particular, if I could beg your

14   indulgence for a moment, were not produced until

15   after Mr. Henderson delivered his two declarations.

16   So we didn't address it in his declarations.  We

17   didn't get it until several days after the

18   declarations were filed.  And we have had testimony

19   from Mr. Allen who said that this document in

20   particular pointed to this page was not authorized

21   to be signed on behalf of NTL.

22                   THE CANADIAN COURT:  I see.  All right.

23                   MR. BROMLEY:  So that's why we are

24   bringing it out.  We don't think it is a point of

25   contention but one of the witnesses has made it a



     1  point of contention, and I think, actually, that's

     2  my last question on the document.

     3            THE CANADIAN COURT:  Okay.  Go ahead.

     4            MR. BROMLEY:  I'm sorry I didn't get an

     5  answer.

     6            THE WITNESS:  Can you repeat the

     7  question?  I'm sorry.

     8            BY MR. BROMLEY:

     9        Q.   Yes.  Was it your understanding

    10  that this was a binding agreement between Northern

    11  Telecom Limited and the Canadian Revenue authority?

    12        A.   Yes, that would be my

    13  understanding.

    14        Q.   Thank you, sir.

    15            I'd like to bring up another document,

    16  Mr. Henderson.  This is trial exhibit TR21002.

    17        A.   Thank you.

    18        Q.   Mr. Henderson, have you seen this

    19  document before?

    20        A.   Yes, I have.

    21        Q.   And what is it?

    22        A.   It is the R&D cost sharing

    23  agreement between Northern Telecom Limited and

    24  Northern Telecom Inc.

    25        Q.   Did you have a role in the



```
 1   creation of this document?

 2              A.   Yes, I did.

 3              Q.   What was that role?

 4              A.   Primarily, drafting the document.

 5              Q.   Now, I note at the top of the

 6   document, at the top of the first page it says it's

 7   dated as of January -- the first day of January,

 8   1992.

 9              A.   Yes.

10              Q.   Do you recall when this document

11   was drafted?

12              A.   It would have been after -- it

13   would have been in condition junction with but

14   after the two APAs were file finalized.

15              Q.   So in other words in 1996?

16              A.   Correct, would have been 1996.

17              Q.   And then backdated to 1992?

18              A.   Correct.

19              Q.   Is that common in the transfer

20   pricing world?

21              A.   It is in the APA context because

22   frequently the APAs are not executed until after

23   the period that they cover and there was also the

24   concept of something called a rollback in an APA,

25   which is you file the APA and then, if the tax
```



 1    authorities are in agreement, you can take the

 2    methodology and apply it to even open years pre the

 3    effective date of the filing itself.  So this was

 4    incorporating -- by incorporating in 1992 it was

 5    incorporating the rollback.

 6              Q.   So, Mr. Henderson, if I could ask

 7    you to turn to the fourth page of the document

 8    which is at TR21002, and direct your attention to

 9    article 3 of that document.

10              A.   Yes.

11              Q.   And it goes -- it starts on that

12    page and continues on for roughly three pages.

13              Can you tell me what article 3 does in

14    this document?

15              A.   Article 3 sets out how the, how

16    each year's R&D expenses are to be allocated among

17    the participants.  So there was a three-part

18    formula, part of it was based off of customer

19    sales, part of it based off of royalty income, and

20    then part of it based off of operating income,

21    where the participants would determine how much of

22    the global R&D expense would be borne by

23    participants.  So it was part of the economic

24    substance of the agreement.

25              Q.   So this is the economic substance



1   of the agreement, did you say?

2              A.   Yes.

3              Q.   Now you mentioned the term

4   "royalty income."  What is royalty income in the

5   context of article 3?

6              A.   Well, it's a defined term that

7   references any income that comes from licensing the

8   Nortel technology.

9              Q.   And that's licensing income that

10  would come to the participant; is that correct?

11             A.   Yes.  And, of course, there would

12  be a category which would be total royalty income

13  received globally, and then you would allocate part

14  of the R&D based on each participant's royalty

15  income.

16             Q.   When you say "each participant's

17  royalty income" in the context of this document,

18  where NNI is the participant, would that be NNI's

19  royalty income?

20             A.   Yes, it would.

21             Q.   That would royalty income would be

22  generated how?

23             A.   Through licensing agreements, it

24  could be royalty streams over a period of time, or

25  it could be a lump sum payment that would be



```
 1    treated normally as a royalty.
 2              Q.   Now, Mr. Henderson, when you were
 3    drafting the CSA, you were at Sutherland Asbill; is
 4    that correct?
 5              A.   That is correct.
 6              Q.   Were any of the Nortel entities
 7    that were part of this, the two Nortel entities,
 8    NNLI and NNI independently represented in the
 9    drafting of this agreement?
10              A.   Not that I recall, no.
11              Q.   And Mr. Henderson, do you know a
12    gentleman by the name of Dave Canale?
13              A.   I do, yes.
14              Q.   Who is he?
15              A.   He -- at that time he was with the
16    IRS APA team.
17              Q.   And the IRS APA team that you were
18    working with in connection with the creation of
19    this APA?  The ones that we just looked at?
20              A.   I believe that's correct, yes.
21              Q.   Thank you very much.  We have no
22    further questions at this point, Your Honour.
23              THE CANADIAN COURT:  Any
24    cross-examination?
25
```



1    CROSS-EXAMINATION BY MR. OXFORD:

2             MR. OXFORD:  Yes, Your Honour.  Good

3    morning.  Good morning, Justice Newbould, Judge

4    Gross my name is Neil Oxford from Hughes Hubbard &

5    Reed on behalf of the EMEA Debtors.

6             BY MR. OXFORD:

7             Q.   Good morning, Mr. Henderson.  We

8    met at your deposition back in October

9             A.   Good morning.

10            Q.   You mentioned in your declaration

11   that the parties to the residual profit split

12   mechanism were intended to have beneficial

13   ownership in Nortel's jointly created IP, correct?

14            A.   Yes.

15            Q.   And it has been suggested in this

16   litigation, sir, that the terminology of beneficial

17   ownership under a transfer pricing regime is

18   relevant only for tax purposes, so with that in

19   mind I wanted to ask you a couple of questions

20   about transfer pricing, and in particular transfer

21   pricing at Nortel.

22            Would you agree, with me, Mr. Henderson

23   that transfer pricing focuses on the substance of a

24   transaction over its form?

25            A.   Yes.



```
 1                    Q.   And that's true, is it not
 2    Mr. Henderson, because the tax authorities want to
 3    tax the substance of the transaction, not the form
 4    of the transaction?
 5                    A.   That's correct.
 6                    Q.   We can agree that the transfer
 7    pricing arrangements must reflect substantive
 8    economic reality, correct?
 9                    A.   Yes, that's correct.
10                    Q.   We can also agree that transfer
11    pricing doesn't operate in a vacuum.  It can't be
12    untethered to reality, correct?
13                    A.   That's correct, it needs to
14    reflect economic reality.
15                    Q.   And it's important -- or it was
16    important for the way that Nortel assigned value
17    for tax purposes that that value be aligned with
18    how Nortel actually operated its business, correct?
19                    A.   That's correct.
20                    Q.   Companies can't make one set of
21    arrangements can they, for tax purposes or transfer
22    pricing purposes, and then go off and make a wholly
23    different set arrangements for some other purpose,
24    correct?
25                    A.   That would not be compliant with
```



1   the law.

2               Q.   And that wasn't what Nortel was

3   doing here with the residual profit split

4   mechanism, was it?

5               A.   Can you rephrase the question?

6               Q.   Yeah.  I'll try that a little

7   better.

8               Would you agree that the assignment of

9   value under the residual profit split mechanism at

10  Nortel was aligned with how Nortel actually

11  operated its business?

12              A.   Yes, that was certainly -- yes,

13  that was the intention and just to be clear, the

14  residual profit split came in around the 2001-2

15  time frame, which is about when I left.  But, yes,

16  as drafted and submitted in the APA's request, that

17  was correct.

18              Q.   You were involved in the creation

19  of the residual profit split methodology, correct?

20              A.   That is correct.

21              Q.   You were one of the architects of

22  that methodology, correct?

23              A.   You could say that, yes.

24              Q.   And as one of the architects, it

25  is certainly your understanding that the way that



```
 1    Nortel assigned value under the RPSM was aligned
 2    with the way Nortel operated its business, correct?
 3              A.   That's correct.
 4              THE CANADIAN COURT:  Are you talking
 5    about after the -- introduced the RPSM or before?
 6              MR. OXFORD:  At the time it was
 7    introduced and when it was introduced, which
 8    Mr. Henderson was involved in.
 9              THE CANADIAN COURT:  Again, are you
10    asking him whether the RPSM had been used before it
11    was introduced?  Is that the purport of your
12    question?
13              MR. OXFORD:  My question to the witness
14    is the RPSM as designed by Mr. Henderson and his
15    team, was that intended to reflect the value
16    assigned for tax purposes as aligned with the way
17    Nortel actually operated its business.
18              THE CANADIAN COURT:  Before it
19    introduced it or after?
20              MR. OXFORD:  After.  As and from its
21    introduction.
22              THE WITNESS:  The RPSM was intended to
23    reflect Nortel's business operations -- the
24    economic reality of the business operations.
25
```

 Neeson&Associates   W&P

```
 1                    BY MR. OXFORD:
 2                    Q.   Okay.  I appreciate that answer,
 3  sir.
 4                    A.   Yes.
 5                    Q.   Would you agree with me,
 6  Mr. Henderson, that representations to tax
 7  authorities about how Nortel organized its business
 8  be accurate?
 9                    A.   Yes, that's very important.
10                    Q.   Important also that those
11  representations be complete?
12                    A.   Yes.
13                    Q.   And those representations could
14  not be misleading could they, sir?
15                    A.   Correct, they should not be
16  misleading.
17                    Q.   It's fair to say that companies
18  can get themselves in a lot of trouble for making
19  misrepresentations to tax authorities, correct?
20                    A.   Not just the companies but the
21  people signing the applications as well.  Yes.
22                    Q.   And in your experience, was this
23  importance of making accurate representations to
24  tax authorities well understood at Nortel?
25                    A.   Yes.
```



```
 1                      Q.   And in your experience, Nortel
 2    tried to be accurate when communicating to tax
 3    authorities, correct?
 4                      A.   That's correct.
 5                      Q.   We touched on this a little
 6    earlier, sir, in response to Justice Newbould's
 7    questions.  It's correct that the residual profit
 8    split mechanism was put in place in 2001, isn't it?
 9                      A.   Yes.
10                      Q.   And there was no written agreement
11    in place that reflected the profit split mechanism
12    at the time was implemented in 2001, correct?
13                      A.   That's correct.
14                      Q.   And, in fact, there was no written
15    agreement in place reflecting the residual profit
16    split mechanism when you left Nortel in March 2002,
17     correct?
18                      A.   There was no written agreement
19    between the parties.  There were just the
20    representations which were written, made in the APA
21    applications that this was what the parties
22    intended to do.  But yes, there was no agreement
23    between the parties.
24                      Q.   Just one more set of questions,
25    Mr. Henderson.
```


Neeson&Associates   W&F

```
 1                    Under the residual profit split
 2    mechanism, the Nortel entity shared residual
 3    profits, correct?
 4                    A.    That's correct.
 5                    Q.    Those entities were NNL, the
 6    Canadian operating company, correct?
 7                    A.    That's one of the them.
 8                    Q.    NNI was another one?
 9                    A.    Correct.
10                    Q.    And there were three European
11    entities, NNUK, NNSA the French entity, and NN
12    Ireland, correct?
13                    A.    Yes, that's my recollection.  I
14    think that's what's in my affidavit.
15                    Q.    And it's also your recollection
16    that NNL was the parent company of some of these
17    other profit-sharing entities, correct?
18                    A.    Correct.
19                    Q.    And it's correct, is it not,
20    Mr. Henderson, that under the profit split
21    mechanism, NNL didn't get any special rights to the
22    proceeds under the profit split model as a result
23    of its status as parent, correct?
24                    A.    That is correct.  It would all
25    have been based on the economics and not on its
```

 Neeson & Associates    W&P WILSON & PEYZER LTD.

```
 1   ownership interest.
 2                Q.   And by the --
 3                A.   And the subs.
 4                Q.   And by economics, you mean that
 5   NNL got a share of the residual profits or losses
 6   based on its research and development contribution
 7   just like NNI, for example, and NNUK, correct?
 8                A.   Based on the capital stock and the
 9   other formula drivers.
10                Q.   It's also your understanding, is
11   it not, Mr. Henderson, that under the profit split
12   model, NNL was going to hold legal title to the
13   jointly created intellectual property?
14                A.   Yes, that was our understanding.
15                Q.   We can also agree, Mr. Henderson,
16   that NNL didn't get any special rights to the
17   proceeds of the intellectual property under the
18   profit split model as a result of this holding of
19   legal title, correct?
20                A.   That's correct.
21                Q.   And you understood, did you not,
22   that NNL's holding of legal title was a matter of
23   administrative convenience, correct?
24                A.   That's correct.
25                Q.   Those are my questions, Mr.
```



```
 1   Henderson.
 2                Thank you, Justice Newbould.  Thank you
 3   Mr. Henderson.  Thank you, Judge Gross.
 4                THE CANADIAN COURT:  Mr. Finnigan.
 5                MR. FINNIGAN:  Good morning, Justice
 6   Newbould.  Good morning, Judge Gross.
 7                THE US COURT:  Good morning.
 8                MR. FINNIGAN:  Good morning, Mr.
 9   Henderson.
10                THE WITNESS:  Good morning.
11   CROSS-EXAMINATION BY MR. FINNIGAN:
12                Q.   My name is John Finnigan.  I
13   represent the UK pension claimants.
14                A.   Okay.
15                Q.   Sir, you have testified that you
16   were involved with the team that created the
17   residual profit split methodology, correct?
18                A.   Yes.
19                Q.   And during that process, was any
20   consideration given to how that methodology would
21   work in the event of a liquidation of the Nortel
22   entities?
23                A.   No.
24                Q.   Was any consideration given to how
25   the RPSM would work in a bankruptcy or insolvency
```



1   of any of the entities?

2           A.   No.

3           Q.   And is that because the RPSM was

4   designed as a document to govern the trading

5   relationship between the various Nortel entities?

6           A.   No.  I would say it was because we

7   never thought about that eventuality coming to

8   pass.

9           Q.   Thank you very much.  Those are

10  all my questions.

11  CROSS-EXAMINATION BY MR. ZARNETT:

12          Q.   Mr. Henderson, we met before.  My

13  name is Ben Zarnett, representing the Canadian

14  estate.  I have a few questions for you.

15          When you employed within the Nortel

16  group it was by NNI, correct?

17          A.   That is correct.

18          Q.   That's true both for the

19  January 19, '98 to February '99 period and the

20  September 1,2000, to March 2002 period, correct?

21          A.   That is correct.

22          Q.   And when you were you working in

23  the 1993 to 1997 period at the Sutherland firm,

24  your main client was NNI, correct?

25          A.   Yeah, the engagement letters were



 1   executed with NNI.  We worked collaboratively with

 2   the Nortel tax department globally.

 3            Q.   It's important for a lawyer to

 4   know who their client is and in this case it was

 5   NNI, correct?

 6            A.   Sure, yes.

 7            Q.   And, sir, I take it you never held

 8   any office in NNL?

 9            A.   I did not, no.

10            Q.   And had no authority to change any

11   corporate policies of NNL?

12            A.   That's true.  That's correct.

13            Q.   Now, sir, you said in your

14   declaration and then you said again to Mr. Bromley

15   that you were involved in the drafting of the 1992

16   cost sharing agreement, R&D cost sharing agreement?

17            A.   Yes, I was.

18            Q.   I think in your evidence this

19   morning you said you were the principal

20   draftsperson?

21            A.   For the US agreement, yes.

22            Q.   Okay.  Now I wonder if we could

23   call up the Exhibit TR21002, which is the cost

24   sharing agreement.  I wonder if we go over just --

25   sorry, just before we go over anywhere, when you



1    say you were the principal draftsperson, would that

2    include being responsible for composing the

3    provision about what law governs the agreement?

4              A.   That provision we probably would

5    have incorporated from an earlier draft.

6              Q.   So if we go over to page -- on

7    page 12 of this agreement, to the bottom of article

8    13.

9              A.   Okay.

10             Q.   It says:

11                  "This Cost Sharing Agreement

12                  shall be construed in accordance

13                  with and governed by the laws of the

14                  Province of Ontario, Canada."

15             Do you recall whether you chose those

16   words and inserted that provision?

17             A.   I think that -- I think that would

18   have been a carryover from a prior version.

19             Q.   A prior --

20             A.   Version of this agreement or of an

21   R&D Cost Sharing Agreement.

22             Q.   When you say "a prior version," do

23   you mean an unsigned draft?

24             A.   No.  An earlier version.  I think

25   as you know, there were R&D cost sharing agreements



```
 1    before 1992.
 2                  Q.   All right.  So in 1996 when you
 3    were working on this document governed by the law
 4    of the Province of Ontario, you were a third-year
 5    associate in a law firm; is that right?
 6                  A.   That would be correct, yes.
 7                  Q.   Okay.  You were member of the
 8    Georgia bar?
 9                  A.   I was.  Still am.
10                  Q.   I understand you had about a year
11    of practical experience in transfer pricing by this
12    point?
13                  A.   Maybe two.  I'd say 1994 is when I
14    started.
15                  Q.   You had only worked though in tax,
16    since your call to the bar in Georgia, correct?
17                  A.   I was in the tax department of
18    Sutherland, yes.
19                  Q.   And, to use your terminology, you
20    were a tax guy, right?
21                  A.   I'm a tax guy.
22                  Q.   And you still are a tax guy?
23                  A.   I consider myself a tax guy, yes.
24                  Q.   So, I take you never held yourself
25    out as knowledgeable about the law of Ontario?
```



```
 1                    A.    I have never, no.  I have not.
 2                    Q.    Still not knowledgeable about it?
 3                    A.    That's correct.
 4                    Q.    Now, if you go back, sir, to
 5      article 4 of this agreement, which is titled up
 6      "Legal Title to NT Technology," do you see that?
 7                    A.    Yes.
 8                    Q.    Now, when you said you were the
 9      principal draftsperson of this, did you intend to
10      suggest that you, in fact, had composed the
11      language and selected the words that we see in
12      article 4?
13                    A.    I think the best -- the best way
14      to explain my role was I would have been given the
15      template to work from, we would have read it, we
16      would have all read through the language, and come
17      to a mutual agreement on how it should read.  But,
18      yes, I was the person with the pen, I would say.
19                    Q.    But did you then, to your
20      recollection, select the wording -- compose the
21      wording that we see in article 4?
22                    A.    It would have largely come from a
23      prior -- as I mentioned earlier, largely come from
24      a prior version of the Cost Sharing Agreement.  I
25      can't tell which words I changed and did not
```



1    change.

2                    Q.    What about article 5?  Entitled:

3    "Participant's Exclusive Royalty-Free License to NT

4    Technology"?

5                    A.    I think it -- let me look at this

6    one again.  I think this largely would have been

7    based on a prior version.

8                    Q.    You say "largely based"?

9                    A.    Yes.

10                   Q.    And what about article 6, same

11   answer?  Title up "Confidential Information"?

12                   A.    Yes, I'm reading.  Just making

13   sure that I don't see anything here that rings a

14   bell.

15                   Again, I think this would have been

16   largely based on prior versions.

17                   Q.    And article 10?

18                   A.    Okay.  Certainly on 10 we would

19   have had input because we wanted the term of this

20   to match the APA.  So, that's why you see 1999, for

21   example.

22                   Q.    What about the substantive

23   language, though?

24                   A.    Again, I would assume this would

25   be a carryover in large part, but the best way to



```
 1   tell is to compare it to an earlier version.

 2              Q.   And how about article 11?

 3              A.   That would be the same.

 4              Q.   All right.

 5              A.   Largely a carryover from an

 6   earlier version.

 7              Q.   Now, I wonder if I could ask that

 8   there be called up TR45741.

 9              THE CANADIAN COURT:  Sorry TR457 --

10              MR. ZARNETT:  45741.

11              THE CANADIAN COURT:  Thank you.

12              MR. ZARNETT:  This is a Cost Sharing

13   Agreement between Northern Telecom Limited and

14   Northern Telecom Inc, dated effective January of

15   1985?

16              THE WITNESS:  Uhm-hmm.

17              BY MR. ZARNETT:

18              Q.   Do you see that?

19              A.   I do, yes.

20              Q.   And, sir, if I could ask you to

21   take a look at article 4 of this document.  Headed

22   up, "Legal Title to Intangible Technological

23   Property."

24              A.   Yes.

25              Q.   All right.  Would it surprise you,
```



```
 1   sir, if I told you that this article is identical

 2   to article 4 of the 1992 Cost Sharing Agreement

 3   except the words "Intangible Technological

 4   Property" appear in the 1985 version, and in 1992,

 5   "NT Technology" has been substituted?

 6              A.   No.

 7              Q.   All right.  So, in terms of your

 8   drafting of article 4, do I take it it was limited

 9   to changing a defined term and nothing else was

10   changed from a prior agreement?

11              A.   I'd have -- I would say that would

12   not surprise me.  If you are asking me to confirm

13   it, I need to go word by word.  Is that what you

14   want me to do?

15              Q.   If the words are the same other

16   than the exception I noted, that would not be

17   inconsistent with your recollection?

18              A.   It would not surprise me, no.

19              Q.   And, in fact, sir, that would --

20   that would --

21              THE CANADIAN COURT:  Time's up.

22              MR. ZARNETT:  That sound will happen,

23   Mr. Henderson, at every critical juncture.

24              BY MR. ZARNETT:

25              Q.   Mr. Henderson, it's pretty clear
```



1    that the parties intended to keep and not change

2    what was previously in place, correct?

3              A.   I believe that's correct, yes.

4              Q.   And, sir, if I could ask you to

5    look at article 5 of the 1985 agreements.

6              Again, would it surprise you to know

7    that that's identical to article 5 of the 1992

8    agreement except the same definitional change,

9    "Intangible Technology Property" in 1985 becomes

10   "NT Technology," and in 1985, "Northern Telecom"

11   was used in paragraphs A,B and C, and in 1992 the

12   defined term was "NTL Group."  Other than they are

13   identical.  Does that surprise you?

14             A.   That would not surprise me.

15             Q.   So, do I take it that you had no

16   role in defining the terms of this license?  It was

17   just carried on from a previous agreement?

18             A.   Other than the consideration to be

19   paid, which is the R&D Cost Sharing part, but if

20   your question is did I not really change much in

21   four and five, the answer is correct, yes.

22             Q.   Well it wasn't a question of not

23   changing much.

24             A.   Okay.

25             Q.   All of the operative terms are the



```
 1   same?
 2              A.   Other than the definitions,
 3   correct.
 4              Q.   Yes.
 5              A.   Defined terms.
 6              Q.   That was because the parties
 7   intended to keep in place and not change what had
 8   gone before?
 9              A.   That's correct.
10              Q.   And, sir, if we did the same
11   comparisons with articles 6, 7, and 10, and 11,
12   would you be surprised that the results are the
13   same?  Change in definition, nothing else?
14              A.   Well, let's go to 11.
15              Q.   In article 10 there is a change in
16   dates?
17              A.   Right, so 10 there's a difference.
18   No, it wouldn't surprise me.
19              Q.   All right.  So, sir, it isn't
20   really fair to say, is it, that you are the
21   principal draftsman of the 1992 agreement insofar
22   as pertains to matters like title, licence rights,
23   et cetera.  That principal draftsperson was around
24   in 1985, well before you went to law school,
25   correct?
```

 Neeson&Associates   W&F

```
 1                      A.   I would say that for everything
 2    that was changed I was the principal draftsperson,
 3    yes.  So the way -- the reason I use that phrase is
 4    only because I got sent the template, they asked me
 5    to update it for the APA, I did that.  We sent it
 6    around, we had conversations and comments,
 7    tightened up defined terms and that was it.  But of
 8    the group, I was the principal member of the group
 9    that did that.
10                      Q.   But you weren't trying to suggest
11    to the courts that you had knowledge of what was
12    meant because you selected independently the
13    language about title or licence rights?  You just
14    copy copied them from a previous agreement?
15                      A.   I did not create them at a whole
16    call.  I don't think it would be fair to say I
17    didn't have knowledge of what I was intended.
18                      Q.   I didn't say that.
19                      A.   Okay.
20                      Q.   I said it would wrong for you to
21    portray yourself as the person who composed those
22    terms or selected them, correct?
23                      A.   Correct.  I did not -- I'm not the
24    originator of those terms.
25                      Q.   And, sir, did you perform any
```



1    analysis of the agreements that preceded the 1985

2    agreement?

3              A.   I do not remember doing that.

4              Q.   All right.  And I take it, sir, on

5    matters such as title and the definition of license

6    rights under an Ontario law agreement you would be

7    very diffident to come to any conclusions or

8    opinions as to what an Ontario Court or Ontario law

9    would dictate those would mean, correct?

10             A.   That's correct.

11             Q.   And that was true in 1996, and

12   remains true, correct?

13             A.   Correct.  Can you do me a favour

14   and define the word "diffident."

15             Q.   Yes.  Deferential, respectful --

16   those sort of things?

17             A.   Yeah.  I would not have done that.

18   Thank you.

19             Q.   I take it that in whatever role

20   you had in the drafting of the 1992 Cost Sharing

21   Agreement it didn't involve inserting the words

22   "NNL holds legal title for administrative

23   simplicity"?

24             A.   Into where?  Into the Cost Sharing

25   Agreements.



```
 1                    Q.    Yes?

 2                    A.    I don't believe those words are in

 3       there.

 4                    Q.    It didn't involve inserting the

 5       words "NNI has economic and beneficial ownership of

 6       all interests in NT technology within NNI

 7       territory"?

 8                    A.    Those words are not there,

 9       correct?

10                    A.    I mean the document speaks for

11       itself.

12                    Q.    Okay.  Thank you.

13                    And you, in reviewing the prior

14       agreement, the 1985 agreement, and copying its

15       language about the licence in the 1992 agreement,

16       did not see fit to remove other than define terms

17       and replace those, any other terms about the scope

18       of the licence, correct?

19                    A.    It sounds like they weren't

20       changed so no, we didn't.

21                    Q.    Now, sir, did you have an

22       understanding in the 19 -- under the 1996 agreement

23       as to how NNL got rights to any NT technology in

24       Canada?

25                    A.    How it had rights in Canada?
```

 Neeson & Associates   W&F

```
 1                    Q.    Yes.
 2                    A.    Hmm, the rights that NNI would
 3     have would be through the Cost Sharing Agreement
 4     which is through US and Puerto Rico.
 5                    Q.    How did NNL, the Canadian company,
 6     have rights in Canada?
 7                    A.    Through its contribution to the
 8     cost sharing expenses.
 9                    Q.    Sorry.  Under the Cost Sharing
10     Agreements, the 1992, Cost Sharing Agreement, what
11     gave NNL any rights to NT technology in Canada?
12                    A.    Well, it -- so, let me step back a
13     second.  This agreement governs NNI's licence.  So
14     NNI's rights were derivative of the terms of this
15     agreement, which are its payment of Cost Sharing --
16     payment of R&D expenses pursuant to cost sharing.
17                    Q.    And NNI derives its rights under
18     this agreement through a grant of a licence from
19     NNL, correct?
20                    A.    Correct.
21                    Q.    All right.  Now, did you
22     understand that NNL had rights in Canada?
23                    A.    Rights not just in Canada.  Rights
24     in other jurisdictions as well, through -- by being
25     the gap filler for the rest of the group.
```



```
 1                    Q.   Right.  Did those rights -- they
 2      didn't derive from a licence anyone gave NNL,
 3      correct?
 4                    A.   They did not.
 5                    Q.   So I take it they derived from
 6      NNL's ownership, correct?
 7                    A.   That combined with its
 8      contribution -- it's absorption of the R&D expenses
 9      for the rest of the world.
10                    Q.   But I take it you understood, sir,
11      that to exercise an intellectual property rights
12      against a third party, NNL has to have something as
13      it's rights, correct?
14                    A.   I would think, so yes.
15                    Q.   That was its ownership, correct?
16                    A.   Correct.
17                    Q.   And in order to grant the licence
18      to other parties, NNL would have to have the
19      ability to grant the license; do you agree with
20      that?  It couldn't give to NNI something it didn't
21      have?
22                    A.   I believe that would be correct,
23      yes.
24                    Q.   So you will agree with me you must
25      have understood that NNL had the rights to grant to
```

 Neeson&Associates   W&F

1    NNI in the form of the licence, correct?

2                   A.   Yes.  Yes.

3                   Q.   Now, the Cost Sharing Agreement

4    gets executed in 1996, you told us.  Correct?

5                   A.   Yes.

6                   Q.   And then the next involvement that

7    you -- substantive involvement about these matters

8    that you discuss in your affidavit, has to do with

9    the shift from a Cost Sharing arrangement to what

10   we have been calling the RPSM methodology?

11                  A.   Can you describe what you mean by

12   "these matters," because I did work on other APAs

13   for Nortel that kind of got combined into the same

14   process.

15                  Q.   All right.  But in late 1999, the

16   term of the Cost Sharing Agreement ended, correct?

17   Remember it had a term?

18                  A.   Yes, yes.

19                  Q.   And in that period up to the end

20   of 1999, did you record somewhere in writing, in

21   any document you saw, prior to testifying, the

22   understanding that NNL held title as an

23   administrative convenience?

24                  A.   I don't remember.

25                  Q.   All right.  Or did you record

 Neeson & Associates     W&F

1    anything about beneficial ownership in that period?

2              A.   Certainly, the transfer pricing

3    reports that were prepared at that time would have

4    referenced the fact that economically NNI owns the

5    rights to the US market, and IPs in that

6    jurisdiction.

7              Q.   Sorry, sir, you refer in your

8    affidavit at paragraph 22, to a report to the IRS

9    and CCRA in March of 2002?

10             A.   Uhm-hmm.

11             Q.   And you refer in paragraph 24 to

12   an email from Timothy Collins in November of 2001.

13   Do you see that?

14             A.   I'm in 24.

15             Q.   Paragraph 24?

16             A.   Yes.

17             Q.   All right.  And, sir, neither of

18   those documents are something that you wrote,

19   correct?

20             A.   I certainly didn't write Timothy

21   Collins' email.

22             Q.   Okay.

23             A.   But I would say the report in

24   paragraph 22 was a collaborative effort from both

25   the economists as well as people on the team.



1                    Q.   All right.  We'll come back to

2     that.  But those are dated in 2002 and 2001.  Did

3     you see anything, have you pointed to anything in

4     your affidavit where you, Walter Henderson,

5     recorded an understanding about beneficial

6     ownership?

7                    A.   I did not cite -- I'm assuming I

8     didn't cite anything in the affidavit, no.

9                    Q.   Okay.  Now, I wonder if we could

10    call up TR21026, which is the document you're

11    referring to in paragraph 22.  And, sir, in your

12    declaration, you say that you helped to draft this?

13                   A.   Sure, yes.

14                   Q.   Okay.  And was your role in the

15    drafting of this more or less prominent than it was

16    in the drafting of the 1992?

17                   A.   Less.  Less -- I mean, when I

18    say --

19                   Q.   Less prominent?  Okay.

20                   A.   Yes, less prominent.

21                   Q.   Okay.  I will take that, to use

22    Ms. Block's words.

23                   If you look at the first page of this

24    document.

25                   A.   Where?



```
 1                    Q.   Do you have it?  If we could call
 2     up TR21026.  You are not listed as one of the
 3     authors of this?
 4                    A.   Correct.
 5                    Q.   Right.  And just to clear this up,
 6     if you look at paragraph 33 of your affidavit,
 7     where you refer to the same exhibit, you refer to
 8     it as having been drafted by Horst Frisch?
 9                    A.   Yes.
10                    Q.   So which was it?
11                    A.   This was a document that there
12     were several iterations that were reviewed, and
13     there was language proposed by multiple people,
14     some of which was adopted by Horst Frisch, some of
15     which was not.  I certainly made mark-ups of this
16     document, submitted it to them.  Certain changes
17     they accepted and they were comfortable with,
18     certain changes they weren't, so you can use -- you
19     can define "drafted" however you like.
20                    Q.   The ultimate words were theirs,
21     not yours?
22                    A.   Correct, yes, absolutely.
23                    Q.   And they didn't attribute any of
24     the ideas to you in the end, correct?
25                    A.   Yes.
```



```
 1                    Q.   Now, if we could look at page 10
 2  of the report, which is I think the 16th page of
 3  the document.  If we could call that up.  And it's
 4  the first paragraph under the heading "R&D Cost
 5  Sharing Arrangement APA" that you excerpt in part
 6  in paragraph 22 of your affidavit, correct?
 7                    A.   Yes.
 8                    Q.   And what you don't excerpt is the
 9  reference in the paragraph that refers to the prior
10  cost-sharing agreements, correct?
11                    A.   Correct.
12                    Q.   You don't reference the
13  statement -- no, it's one paragraph up.  I'm still
14  in the same paragraph, first paragraph.
15                    You don't reference that the authors
16  refer to the right to use intangible property,
17  correct?
18                    A.   I did not include that sentence,
19  if that's your question, no.
20                    Q.   And the conclusion that the
21  authors express begins with the words "From an
22  economic standpoint".  Do you see that?
23                    A.   I do.
24                    Q.   And the authors were economists,
25  correct?
```

 Neeson&Associates   W&P

```
 1                    A.    Correct.
 2                    Q.    And you are not an economist,
 3    correct?
 4                    A.    I am not an economist.
 5                    Q.    All right.  And they put the word
 6    "own" in quotation marks, correct?
 7                    A.    Uhm-hmm.
 8                    Q.    And did that suggest to you, at
 9    least, that it was "own" in some special sense?
10                    A.    Hmm, economic and beneficially,
11    yes.
12                    Q.    Sorry, their word was:
13                       "From an economic standpoint,
14                       each R&D cost-sharing participant
15                       could be considered to own" ...
16                    And then they put in quotation marks,
17    correct?
18                    A.    Yes.
19                    Q.    All right.  And when my kids talk
20    to me and sort of make the little quotation mark
21    sign when they make a reference, usually to me,
22    they seem to be indicating that they are using the
23    word in some sense not, for example, the legal
24    sense, correct?
25                    A.    I can't answer how --
```



```
 1                  Q.   Okay.  But you understand that --
 2                  A.   -- your children are using the
 3      words "own".
 4                  Q.   Yes.  Well, maybe we'll talk
 5      after.  But you understood that the authors of this
 6      were not expressing any legal opinion about
 7      ownership?
 8                  A.   I do not believe they were
 9      expressing a legal opinion, no.
10                  Q.   They were distancing themselves
11      from any such suggestion by making it very clear
12      that it was from an economic standpoint, correct?
13                  A.   At some point, you'd have to ask
14      them exactly what they meant, but -- but ...
15                  Q.   And, sir, they were basing that on
16      a right to use, which was the licence, correct?
17                  A.   I think when I read that language,
18      what I'm -- what I understood it to mean is that
19      when you have a fully paid up perpetual exclusive
20      licence, you're effectively the economic owner.
21      That's commonly understood in -- certainly in
22      transfer pricing and I think in general economics.
23                  Q.   Commonly understood --
24                  A.   Yeah.
25                  Q.   -- certainly in your area among
```



```
 1   tax guys?

 2                A.   Well, and economists.  They say it

 3   as well, and they're economists.

 4                Q.   Okay.  Economists and tax guys?

 5                A.   And I would say accountants and

 6   controllers, who are people.

 7                Q.   Who you interact with in the

 8   transfer pricing areas, correct?

 9                A.   Well, as well as in Nortel's books

10   and records and how the stat accounts were prepared

11   and other things as well.

12                Q.   Sorry, just stay with my question,

13   sir?

14                A.   Okay.  Well, I'm --

15                Q.   When you hear the word

16   "economists", when you heard economists talk about

17   an exclusive licence equating to economically

18   owning something, people talk to you about that in

19   the transfer pricing world, correct?

20                A.   I wouldn't limit it to transfer

21   pricing.  I'm not a -- I not only do transfer

22   pricing.

23                Q.   Tax world?

24                A.   They also ask me accounting

25   questions.  I'm a CPA.
```



```
1                    Q.   Would you agree with me that the
2    point has most frequently come up with you as a tax
3    lawyer or on the subject of tax?
4                    A.   They generally start with tax, but
5    they go other places.
6                    Q.   Now, if you look -- if we could
7    call up, please, the email TR11114, which is the
8    document you refer to in your affidavit,
9    paragraph 24.
10                   This e-mail, sir, was sent to you while
11   Nortel was considering moving from cost sharing to
12   RPSM, correct?
13                   A.   Correct.
14                   Q.   All right.  And in the third
15   paragraph of the email, it begins:
16                        "As currently contemplated, the
17                        new proposal would change the way
18                        intellectual property is licensed
19                        within the Nortel group of
20                        companies."
21                   Do you see that?
22                   A.   I do.
23                   Q.   All right.  And I take it you
24   understood that there was currently licensing of
25   the Nortel intellectual property from NNL to
```



```
 1    various subsidiaries?

 2                   A.   Yes.

 3                   Q.   All right.  And in the second

 4    paragraph, it refers to:

 5                        "R&D cost-sharing participants

 6                        assigning ownership to NNL."

 7                   Do you see that?

 8                   A.   You're in the third -- second

 9    sentence?

10                   Q.   Third paragraph, second.

11                   A.   Second sentence, yes, I do.

12                   Q.   And you didn't take issue with

13    that statement in this email?

14                   A.   I did not.  I thought it was

15    referring to legal title.

16                   Q.   But Mr. Collins doesn't use the

17    word "legal title", he uses the word "ownership",

18    correct?

19                   A.   He does use that word.

20                   Q.   All right.  And he then refers to

21    an exclusive right to exploit.  Do you see that?

22                   A.   I'm sorry, I'm reading the rest of

23    the email.

24                   Okay.  I'm sorry, your question again.

25                   Q.   Mr. Collins refers to an exclusive
```



```
 1   right to exploit?
 2              A.   Yes.
 3              Q.   And you understood him, sir, to be
 4   referring to the licence, correct?
 5              A.   The exclusive paid-up perpetual
 6   license, yes.
 7              Q.   And that we find at this time in
 8   the 1992 cost-sharing agreement, correct?
 9              A.   Yes.
10              Q.   And you didn't understand
11   Mr. Collins to be purporting to change any of the
12   terms of that license by the way he worded his
13   email, did you?  It was what it was?
14              A.   You mean in the second sentence or
15   the paragraph he's talking about going to
16   non-exclusive, maybe.
17              Q.   When he describes what currently
18   exists, you didn't understand him to be changing
19   anything, did you, just simply making a short
20   reference to it?
21              A.   I think he certainly intended to
22   only summarize what he understood it to be, which
23   is by using the word "currently".
24              Q.   Now, if you just flip over to the
25   next page of the email where there's a reference to
```



1    a requirement for a valuation of current

2    intellectual property rights.  Do you see that?

3                A.    I'm sorry, you are in the first

4    full paragraph or the second?

5                Q.    I'm on I guess the first paragraph

6    of the second page of the email that begins --

7                A.    Okay.

8                Q.    -- "At a high level".

9                A.    Yes.

10               Q.    Do you see a reference to

11   requiring a valuation?

12               A.    Yes, I do.

13               Q.    All right.  And no valuation was

14   undertaken while you were there, correct?

15               A.    To my knowledge, no.

16               Q.    And Mr. Collins wasn't a valuator,

17   as far as you knew?

18               A.    He was not.

19               Q.    Thank you.  I wonder if we could

20   call up TR11053.

21               And, sir, this, I understand, is a

22   presentation slide deck, and you were involved in

23   the giving of this presentation?

24               A.    Yes, I was.

25               Q.    Okay.  If I could ask you to flip



1    over to slide 22, which I think is the 23rd page.

2                    A.    Okay.

3                    Q.    Right.  The document says "No

4    change of legal ownership of IP is necessary".  Do

5    you see that?

6                    A.    Yes.

7                    Q.    And this was in the context of

8    thinking through how a change to the RPSM method

9    would be implemented, correct?

10                   A.    Yes.

11                   Q.    All right.  And I haven't seen in

12   this document any reference to beneficial ownership

13   residing in anyone.  Have I missed that?

14                   A.    Well, I'll have to reread the

15   whole document, but I'll ...  Do you want me to

16   take time to do that?

17                   Q.    You can take my word for it it's

18   not there.

19                   A.    I'll take your word for it.

20                   Q.    So if that's true, the only

21   reference to ownership is the one we see here,

22   correct?

23                   A.    Correct, and that's a reference to

24   who owns legal title.

25                   Q.    And, sir, do you know anything



1    about the value of the ability to pursue a patent

2    for a patentable invention or technology?

3                    A.    Do I -- I'm -- that's a broad

4    question.  Can you rephrase it one more time.

5                    Q.    Do you agree that the ability to

6    pursue a patent for technology is a valuable right?

7                    A.    Yes.

8                    Q.    The ability to turn an invention

9    or technology into an actual patent has value,

10   correct?

11                   A.    Patent protection has value, if

12   that's your question.

13                   Q.    Sure.

14                   A.    At least my understanding of it

15   is, yes.

16                   Q.    And without the ability to obtain

17   a patent, the value of the technology may be

18   diminished or zero, correct?

19                   A.    I wouldn't say that, no.  I have

20   seen significant dispositions and acquisitions of

21   unpatented technology for very high prices.

22                   Q.    Not my question, sir.

23                   A.    Well, sorry, rephrase it.

24                   Q.    The patent would enhance the value

25   of technology and protect it against the risk that

 Neeson&Associates   W&F

1   it could be diminished?

2              A.    I believe -- I believe that to be

3   true, yes.

4              Q.    And did you believe that NNI had

5   the ability to file and pursue and obtain patent

6   protection in the United States?

7              A.    That wasn't my area; not anything

8   I focussed on.

9              Q.    Do you agree that the ability to

10  make known to third parties the content of

11  technology is a valuable right?

12             A.    I guess it depends upon what you

13  would receive in exchange for that.

14             Q.    For example, if you wanted to sell

15  it, for example, you would have to be able to tell

16  people what was attractive about it, correct?

17             A.    I think -- again, I go back to my

18  original answer.  I think the value of being able

19  to tell anybody anything depends upon what you

20  might receive if they like it and want to buy it,

21  so ...

22             Q.    And a restriction on the right to

23  tell third parties about technology might restrict

24  what someone could do with it?  Do you agree with

25  that?



```
 1                    A.   It would, and it would diminish

 2   value.

 3                    Q.   And did you believe NNI had an

 4   unrestricted right to tell people about NTI

 5   technology?

 6                    A.   It -- again, that's an area of IP

 7   law, but my understanding is it had the right to

 8   licence in its territory.

 9                    Q.   Not my question.

10                    A.   Okay.

11                    Q.   Did you leave --

12                    A.   Well, then I can't answer it,

13   because I don't know what that would include.  I

14   would assume you could communicate with somebody if

15   you're going to licence it, but --

16                    Q.   Did you believe they had an

17   unrestricted right?

18                    A.   I don't know.

19                    Q.   Sir, do you agree that when the

20   cost-sharing agreements expired, there was good

21   reason to move away from a transfer pricing method

22   of cost sharing towards another methodology?

23                    A.   Yes.

24                    Q.   All right.  And did those reasons,

25   sir, include that the relevant APAs had expired?
```



```
1                    A.   Yes.
2                    Q.   Did it include that the CCRA, now
3      the CRA, and the IRS did not wish to renew the APAs
4      on a cost-sharing basis?
5                    A.   Yes.
6                    Q.   Did it include the fact that
7      Nortel was incurring large operating losses and
8      that cost-sharing arrangement didn't adequately or
9      appropriately deal with that?
10                   A.   Yes.
11                   Q.   And did it include the fact that
12     Nortel's operations had changed, including
13     outsourcing manufacturing?  Is that another reason
14     to change?
15                   A.   That certainly could have been one
16     of them, yes.
17                   Q.   And, sir, do you agree that when
18     you were involved from 1999 forward on the change
19     to the transfer pricing methodology that you were
20     animated by a desire to be compliant with all
21     applicable tax laws?
22                   A.   I got lost in your question.  You
23     are asking me if we desire to be compliant with tax
24     laws?
25                   Q.   Not we, you.
```



```
 1                    A.    Me?

 2                    Q.    Yes.

 3                    A.    Of course, yes.

 4                    Q.    Okay.  And your objective was to

 5     both be compliant and have a solid economic

 6     underpinning; is that right?

 7                    A.    Yes.

 8                    Q.    And in the decision to change to

 9     an RPSM methodology, Nortel involved reputable

10     advisers; is that fair?

11                    A.    We did, yes.

12                    Q.    Horst Frisch?

13                    A.    Horst Frisch and Sutherland

14     Asbill.

15                    Q.    Now, if we could call back up

16     TR21026, which was the Horst Frisch report, and if

17     we could take a look at page 3 of the report

18     itself.  Directing your attention to the second

19     paragraph, it says:

20                          "We have determined that a

21                          residual profit split method is the

22                          best method to be used to allocate

23                          income or loss among the various

24                          Nortel entities."

25                          Do you see that?
```



```
 1                    A.    Okay.  Yes.

 2                    Q.    And they go on to say:

 3                          "And for that reason, the

 4                    proposed transfer pricing method TPM

 5                    is a residual profit split method."

 6                    Do you see that?

 7                    A.    Yes.

 8                    Q.    And you supported that conclusion,

 9      correct?

10                    A.    Yes.

11                    Q.    You believed it was very sound,

12      and you were confident it could be sustained?

13                    A.    Yes.

14                    Q.    Right.

15                    A.    Yes.

16                    Q.    And consistent with your desire to

17      be involved in something that was tax-compliant,

18      correct?

19                    A.    That's correct.

20                    Q.    All right.  And that was true with

21      respect to various judgments that had to be made in

22      devising the methodology, correct?  For example,

23      the amortization rate to be used for capital stock?

24                    A.    Your question is our desire was to

25      be compliant?
```



1                    Q.    You desired to be compliant when

2      the amortization rate of R&D capital stock was

3      proposed in the Horst Frisch report?

4                    A.    Sure, yes.

5                    Q.    All right.  And that rate was

6      30 percent?

7                    A.    Hmm, I think that's correct, yes.

8                    Q.    All right.  And if, sir, you look

9      at paragraph 54 of your declaration.

10                   A.    Yes.

11                   Q.    You refer there to an email --

12                   A.    Uhm-hmm.

13                   Q.    -- that you sent to Kriss Bush on

14     your last day on the job.  And I wonder if we could

15     call that up.  It's TR11068.

16                         And, sir, this email is headed up

17     "Mission Accomplished"?

18                   A.    It is, yes.

19                   Q.    So that's where that term came

20     from?

21                   A.    That's one of the many.

22                   Q.    Now, in your declaration, at

23     paragraph 54, you talk about that:

24                         "The application of the RPSM

25                         resulted in a $1.6 billion decrease



```
1                    to NNI's income."

2               Do you see that reference in your

3    declaration?

4               A.   Yes.

5               Q.   All right.  And, sir, in the

6    email, though, when we look at it, it's fair to say

7    you were reporting that as a good thing, correct?

8               A.   Yes.

9               Q.   You mention on the second page of

10   the email, right near the top, that that decrease

11   would result in income flowing primarily into the

12   UK and other subs of NNC.  Correct?  You note that?

13              A.   I see that, yes.

14              Q.   And --

15              A.   And distribution companies, right.

16              Q.   Yes.  And you also go on to say:

17                   "This decrease to NNI's income

18                   will be a key driver of the

19                   refunds."

20              Do you see that?  Next sentence?

21              A.   Yes.

22              Q.   All right.  Now, the switch to

23   RPSM was based on the theory that research and

24   development was the primary contributor to Nortel's

25   success, correct?
```

 Neeson&Associates    W&F    WILCOX & FETZER LTD.

1               A.   Yes, it -- the development of

2     intellectual property and the -- which is the R&D

3     expense, yes.

4               Q.   And the idea of the RPSM method

5     was to match -- subject to routine returns, match

6     the sharing of operating profits or losses with the

7     amount of R&D -- or the percentage of R&D

8     expenditure in each entity, correct?

9               A.   The remaining after amortization

10    is what -- I just -- but, yes, based on the R&D

11    capital stock as amortized.

12              Q.   Sure.  And if that is the best

13    method, better than the no-longer-available

14    cost-sharing method, then that is the way the

15    transfer pricing arrangement should have operated,

16    correct?

17              A.   That was certainly the methodology

18    we proposed.  I would say that the reason we

19    shifted to an RPS -- RPSM was not driven purely by

20    theory but also by administrative simplicity.

21              Q.   Okay.

22              A.   I mentioned that the IRS and CRA

23    didn't want to renew the R&D cost-sharing

24    agreements.

25              Q.   But when you refer to a



```
1    $1.6 billion decrease in NNI's income --

2              A.   Yes.

3              Q.   I just want to understand what we

4    are comparing.  It's a decrease compared to what

5    that income would have been under the cost-sharing

6    arrangement, correct?

7              A.   Correct.

8              Q.   And the cost-sharing arrangement

9    was no longer available and no longer the best

10   method?

11             A.   Well, it would be a combination of

12   the cost-sharing arrangement, the HQ cost-sharing,

13   the headquarters cost-sharing, as well as tangible

14   property APA, so it would be a benchmark against

15   all three.  Tangible property advance pricing

16   agreement.

17             Q.   Taking all those cost-sharing

18   arrangements together, though, the $1.6 billion

19   decrease is simply the result of no longer using

20   the inapplicable methodology but now using the best

21   methodology, correct?

22             A.   Correct.

23             Q.   Now, sir, it was anticipated, was

24   it not, that research and development would

25   increasingly be performed by NNL and its proportion
```



1   of R&D spending relative to the group would

2   increase?

3              A.   I think -- well, I don't know if

4   you are quoting from the email or not.  I'm not

5   sure about the increase, from memory.

6              Q.   Let's take a look at

7   paragraph 52 --

8              A.   Okay.

9              Q.   -- of your declaration.

10             A.   Okay.  Yes, it does say that.

11             Q.   Okay.  And if the RPSM methodology

12  is followed, then one would expect cash profits and

13  losses to flow to Canada so that its proportion of

14  those was commensurate with its R&D capital stock,

15  correct?

16             A.   Yes.

17             Q.   All right.  And if you look -- if

18  we could call back up Exhibit 11053 for a moment.

19             And if I could ask you to look at

20  slide 12.

21             A.   Okay.

22             Q.   That shows us that Canada was

23  historically spending about 43 percent of the total

24  group's R&D, correct?

25             A.   Correct.



```
 1                    Q.    And was only, under the

 2      cost-sharing arrangement, getting 18.6 percent of

 3      the residual profits, correct?

 4                    A.    It didn't receive residual profits

 5      under the cost-sharing agreement, so I just want to

 6      be careful.  The residual profits used in the

 7      formula to allocate the R&D costs -- the R&D costs

 8      were 18.6 percent.  Do you follow what I'm saying?

 9                    Q.    I'm not sure that I do.

10                    A.    All right.  So a cost-sharing

11      agreement is based on -- it's allocating costs

12      based on relative profitability.

13                    Q.    Right.

14                    A.    That's what the top box is.

15                    Q.    Right.

16                    A.    The bottom box is where is the R&D

17      actually being performed.

18                    Q.    So one looking at this can see

19      that the R&D being performed in Canada outstripped

20      its -- what it was receiving as profits, correct?

21                    A.    What it was earning as profits.

22                    Q.    Yes.

23                    A.    And as a result, how much of that

24      was allocated.  So you could also say of the

25      43 percent performed in Canada, 18.6 of it stayed
```



1   in Canada and the rest of it got sent to the US.

2            Q.   Okay.  And that had been in

3   place -- cost-sharing arrangements had been in

4   place for years with moneys being sent to the US

5   based on Canada's research and development

6   agreement?

7            A.   Right.  This formula was in place

8   from 1990 -- what was it? -- '2?  '6?

9            Q.   Yes.

10           A.   '2.  Yeah.  I forget.  I'm getting

11  old.

12           Q.   Back longer than you could

13  remember.

14           A.   Well, no, no, no, no, no.  No, no,

15  no.  Remember, the APA that I worked on changed the

16  formula.

17           Q.   Okay.

18           A.   It was customer sales before that,

19  so residual profits didn't matter.

20           Q.   So in the period that that

21  agreement was in force, 1992 to the end of 1999,

22  the result was directionally --

23           A.   It was generally an --

24           Q.   -- going out of Canada elsewhere?

25           A.   Sending -- no, well, I'm sorry.



1    The cost-sharing agreements generally had cash

2    flowing into Canada.

3             Q.   But not commensurate with its R&D

4    spent?

5             A.   Its R&D spent was dictated by the

6    formulas in the R&D cost-sharing agreement.  So --

7    I used the word "performed".  So performed was

8    43 percent, for example; the actual amount of R&D

9    that it bore ended up being 18.6 with the remainder

10   being shifted to other participants.

11            Q.   Right.  Now, the anticipation was

12   that money would move to Canada after the RPSM went

13   into place, correct?

14            A.   More money would move into Canada,

15   yeah, more money.

16            Q.   And that was entirely appropriate,

17   correct, because it matched residual profit to the

18   R&D capital stock?

19            A.   We felt so, yes.

20            Q.   Yes.  Now, sir, do you agree that

21   the economics underlying the RPSM apply to

22   operations?

23            A.   I don't know what that means.  Can

24   you rephrase it.

25            Q.   Why don't we pull back up



1    Exhibit 21026, which is the Horst Frisch report.

2             If I could ask you to take a look at

3    page 37.

4             A.   Okay.

5             Q.   And if we look at that, it -- it

6    is entitled "Detailed Description of the Residual

7    Profit Split Methodology", and the first item is

8    "Combined Operating Profit".  Do you see that?

9             A.   Yes.

10             Q.   All right.  And it's true, is it

11    not, that what the RPSM method was about was

12    looking at operating profits, performing various

13    calculations on them, and then comparing it to the

14    R&D capital stock for the purpose of making

15    allocations of operating profit or operating loss?

16             A.   It certainly started with

17    operating profit and then went through various

18    steps to allocate that appropriately.

19             Q.   Sure.  And to justify that

20    treatment, Horst Frisch has a discussion about the

21    operations of the Nortel entities in its report.

22    Do you recall that?

23             A.   I'm sure you are correct.  I don't

24    remember it.  I will have to flip through the

25    report.



1               Q.   And can you tell me, in the

2    2001-2002 time period, what inventory NNI sold?

3               A.   I cannot.

4               Q.   But did it have inventory?

5               A.   I believe it did, yes.

6               Q.   And when it made sales of

7    inventory, was that how it generated sales revenue?

8               A.   That would be one way.  It also

9    performed services and other things.

10              Q.   Okay.  But those would all fall

11   under the definition of operations, correct?

12              A.

13              A.   If you're -- are you asking about

14   a defined term or are you asking just in general?

15              Q.   Just in general.  That's what we

16   usually --

17              A.   No, that would be operations I

18   think, yes.

19              Q.   Sure, sure.  And I wonder if we

20   could call up TR22122.

21              THE CANADIAN COURT:  What number is

22   that?

23              MR. ZARNETT:  TR22122.

24              BY MR. ZARNETT:

25              Q.   Sir, there's a series of letters



```
 1   here to the various tax authorities.  There's one
 2   to Inland Revenue, correct, and then there's one to
 3   the Internal Revenue Service, do you see that,
 4   addressed to Sean Foley?
 5                A.   I do, yes.
 6                Q.   All right.  Were you involved in
 7   the preparation of these --
 8                A.   Yes.
 9                Q.   -- cover letters?  And this one is
10   dated March 14, 2002, and that would have sent the
11   Horst Frisch report in with it, is that --
12                A.   Yes, I was certainly involved in
13   the US one.  I was probably involved in the others.
14                Q.   Okay.  And if you look in the
15   first paragraph, about four lines -- well, it
16   says -- the first paragraph says:
17                     "Nortel Networks Inc.
18                     (collectively with its affiliated
19                     subsidiaries ('NNI')) and the other
20                     applicants specified in this letter
21                     respectfully request that the
22                     Internal Revenue Service ('the
23                     Service') enter into an Advance
24                     Pricing Agreement ('APA') concerning
25                     the transfer pricing methodology to
```



1              be used in the global sharing of

2              profits and losses attributable to

3              the manufacture, sale and

4              distribution of tangible inventory

5              property that is or has been

6              produced utilizing technology

7              developed by Nortel Networks

8              affiliates."

9              Do you see that?

10          A.    Yes.

11          Q.    And that was a fair description of

12   what the request was, was it not?

13          A.    I think it's a very generic

14   description of what the request was, yeah.

15          Q.    Now, sir, if I could ask you to

16   take a look at your affidavit, paragraphs 55 to 57.

17   You talk about the state of the play as you were

18   going out the door.  Is that fair?

19          A.    Fifty-five to 57.

20          Q.    Right.  You weren't there for the

21   finalization and implementation of the --

22          A.    No, I was not.

23          Q.    -- of any of the agreements?

24          A.    No, I was not.  No, I was not.

25          Q.    Okay.  So you say there was an



```
1    anticipation of providing each IE with a

2    non-exclusive worldwide license to Nortel IP?

3              A.    Yes.

4              Q.    So that would be NNI would be one

5    of those people receiving that license?

6              A.    That's correct.

7              Q.    All right.  And NNUK would be

8    another person?

9              A.    That would be correct.

10             Q.    And under the anticipation you're

11   describing, NNI could use Nortel IP in the United

12   States but so could NNUK?  Is that right?

13             A.    Correct.  Make sales into that

14   territory, and that was really -- it was really a

15   request from the accounting group to simplify the

16   number of inter-company transactions.

17             Q.    So NNI would have ended up with a

18   non-exclusive license?

19             A.    And it could have sold anywhere in

20   the world.

21             Q.    Anywhere in the world, and so

22   could every other company sell in the United

23   States?

24             A.    Presumably, yes.

25             Q.    And you left not knowing how that
```



```
 1   was going to end up?

 2              A.   That's correct.

 3              Q.   And, sir, on the financial

 4   statements of Nortel, putting your accountant's hat

 5   on for a moment, I understand R&D was expensed, not

 6   capitalized.  Does that accord with your

 7   recollection?

 8              A.   I believe that's correct, yes.

 9              MR. ZARNETT:  Thank you.  Those are my

10   questions thank you very much Mr. Henderson.

11              THE WITNESS:  Sure.

12              THE CANADIAN COURT:  Any other

13   cross-examination?  Any re-examination?

14              MR. BROMLEY:  Does mister -- I have a

15   bit of redirect, Your Honour.

16   RE-EXAMINATION/RE-DIRECT BY MR. BROMLEY:

17              Q.   Could I call up TR22079, which was

18   the email from Mr. Collins that Mr. Zarnett

19   discussed.

20              Now, Mr. Henderson, I'd like to draw

21   your attention first to the original message.  This

22   is the address lines that appear about a third of

23   the way down.  Do you see that?

24              A.   I do.

25              Q.   And then it says "From Timothy
```



```
 1   Collins", and then in the "To" line, the first name
 2   is a Nicholas DeRoma?
 3                A.   Yes.
 4                Q.   Who is Nicholas DeRoma?
 5                A.   The general counsel of Nortel.
 6                Q.   So he was the general counsel in
 7   Canada of Nortel?
 8                A.   He was, yes, in Brampton.
 9                Q.   In Brampton.  And the email
10   address, BRAM, that's indicates a Brampton home, if
11   you will?
12                A.   That's correct, yes.
13                Q.   And Arthur Fisher is the next
14   name.  Do you know who Mr. Fisher was?
15                A.   He was the intellectual property
16   counsel.  I believe he's who Tim reported to.
17                Q.   So he was the head of intellectual
18   property at Nortel Canada --
19                A.   Correct.
20                Q.   -- at the time.  Again, there's a
21   "Brampton".  That's Brampton, Ontario, correct?
22                A.   That is correct.
23                Q.   Okay.  So Mr. Zarnett directed you
24   to the language in the third paragraph that begins
25   with the line "Currently."  Sentence "Currently".
```



```
 1                    A.    Yes.
 2                    Q.    And then through the end, if you
 3    can highlight through the end of that sentence to
 4    "designated territory".
 5                    A.    Yes, I see it.
 6                    Q.    At any point in time, do you know
 7    whether Mr. DeRoma or Mr. Fisher disagreed with
 8    that statement?
 9                    A.    I do not remember seeing anything
10    from them indicating disagreement.
11                    Q.    And do you recall at all ever
12    hearing from Mr. DeRoma or Mr. Fisher that they
13    disagreed with Mr. Collins generally?
14                    A.    No.
15                    Q.    I would like to go to the next
16    page.  This is on TR22079.  The sentence that
17    Mr. Zarnett directed your attention to begins with
18    "I believe the transition."  If you could highlight
19    that sentence.
20                    So it says:
21                        "I believe the transition will
22                        also require a valuation of the
23                        current intellectual property rights
24                        enjoyed by the participants."
25                        Would that include NNI, "participants"?
```



```
 1                    A.    Yes.

 2                    Q.    It says:

 3                          "That they will be giving up as

 4                    part of the new model" -- and then a

 5                    parenthetical says -- "(the most

 6                    valuable being the exclusive right

 7                    to exploit all of Nortel's IPR."

 8                    Does that mean intellectual property

 9       rights?

10                    A.    That's what I understand it to

11       mean, yes.

12                    Q.    Right:

13                          "In the US enjoyed by NNI)."

14                    Now, in the transfer pricing world, is

15       that referred to as a buyout?

16                    A.    Yes, it would be a buyout payment

17       to the extent that a participant is surrendering an

18       interest in property vis-a-vis a commensurate

19       payment.

20                    Q.    Sorry.

21                    A.    Sorry.

22                    Q.    And so when certain rights are

23       held by a participant, if those rights are being

24       taken away, transfer pricing would require that

25       they be paid for the taking away of those rights?
```



```
 1                   A.    Correct, at fair market value.
 2                   Q.    At fair market value.  So that's a
 3      buyout?
 4                   A.    That's a buyout.
 5                   Q.    Okay.  I would like to draw your
 6      attention to another document that Mr. Zarnett
 7      pointed you to, and that is the -- well, maybe he
 8      didn't point you to it, maybe I did.  This would be
 9      TR50829.  This is the advance pricing agreement
10      between Northern Telecom Inc. and the beloved
11      Internal Revenue Service.
12                   MR. ZARNETT:  I'm wondering how this
13      can be proper re-examination if it wasn't touched
14      in cross-examination.
15                   MR. BROMLEY:  These are the exact
16      questions Mr. Zarnett asked and the exact documents
17      I'm just showing him.  This seems to be classic
18      redirect.
19                   THE CANADIAN COURT:  Go ahead.  If you
20      have some issue, Mr. Zarnett, that you want to
21      raise after this --
22                   MR. ZARNETT:  Okay.
23                   THE CANADIAN COURT:  -- let me know.
24                   MR. BROMLEY:  Well, I can tell Your
25      Honour, the --
```




```
 1                    THE CANADIAN COURT:  You go ahead.  You
 2   go ahead, Mr. Bromley.
 3                    MR. BROMLEY:  Thank you.
 4                    BY MR. BROMLEY:
 5                    Q.   If you could turn your attention
 6   under TR50829, and this would be to paragraph
 7   5.2(g), which appears on page 12 of the document.
 8   Sorry, 5.2(f).  And if we could bring that up and
 9   highlight it.
10                    The beginning of 5.2 says:
11                        "The NTL/NTI Cost Sharing
12                        Agreement incorporates the following
13                        principles:  (f) Each Cost Sharing
14                        Participant has the sole right to
15                        all buy-in payments and sole
16                        obligation for all buyout payments
17                        with respect to their respective
18                        geographical territories.  These
19                        payments do not form part of the
20                        Benefits for purposes of the
21                        calculation of the R&D Expenses
22                        attributable to each Cost Sharing
23                        Participant."
24                    Do you see that?
25                    A.   I do, yes.
```



```
 1                     Q.   Is that buy-in/buyout concept the
 2   same one that was referred to in Mr. Collins'
 3   email?
 4                     A.   Yes.
 5                     Q.   And so if the rights of NNI under
 6   the cost-sharing agreement were going to be
 7   terminated as part of the RPSM, NNI would have to
 8   receive a buyout payment, correct?
 9                     A.   That was certainly one of the
10   issues to be discussed, yes.  Yes.
11                     Q.   Now, you were not present at
12   Nortel when the infamous MRDA was drafted, were
13   you, sir?
14                     A.   MRDA?
15                     Q.   The master R&D agreement.
16                     A.   Which years are you referring to,
17   I'm sorry?
18                     Q.   That was the document that
19   actually incorporated the RPSM into a document.
20                     A.   Oh, no, I did not, no.
21                     Q.   And you had left in March of 2002?
22                     A.   I left in 2002.
23                     Q.   And so you are not sure whether
24   the actual transfer pricing document amongst the
25   Nortel entities incorporated an exclusive or a
```



```
 1   non-exclusive license?
 2              A.   Correct, I was not part of that.
 3              Q.   Okay.  Now, Mr. Zarnett asked you
 4   about working on the 1992 cost-sharing agreement as
 5   a third-year associate.  Just to be clear, you were
 6   reporting to Mr. Jerry Cohen at the time?
 7              A.   That's correct, I was.
 8              Q.   And Mr. Cohen was experienced in
 9   transfer pricing matters?
10              A.   Yes, he was.
11              Q.   And could you tell me a little bit
12   about his background.
13              THE CANADIAN COURT:  Wasn't this all
14   gone through in your evidence -- your questioning
15   in direct?
16              MR. BROMLEY:  Hmm, well, I think one
17   answer, and then ...
18              THE WITNESS:  I mean, Jerry was
19   certainly involved in reviewing the work that I
20   did, and -- there goes the camera.
21              You know, he had -- he had had 30 years
22   of tax experience.  I think he started, actually,
23   with Cleary Gottlieb and was a Commissioner of the
24   IRS, APA Tax Section Chair, so he had considerable
25   experience.
```

 Neeson&Associates    W&F WILSON & FLYNN LTD.

```
 1                   MR. BROMLEY:  That's all the questions
 2    I have, Your Honour.
 3                   THE CANADIAN COURT:  Thank you,
 4    Mr. Bromley.
 5                   Sorry, you wanted ...
 6                   MR. OXFORD:  I don't mean to get in the
 7    way of everybody's lunch, Justice Newbould.  I have
 8    about five minutes.  I'm happy to try and do it now
 9    or after lunch.  I'm in the Court's hands.
10                   THE CANADIAN COURT:  Let's do it now
11    for the sake of Mr. Henderson so he can depart.
12                   MR. FINNIGAN:  Your Honour, just so you
13    know, I will have about four or five minutes as
14    well, please.
15                   THE CANADIAN COURT:  About ten more
16    minutes?  Are you happy to keep going, Judge Gross?
17                   THE US COURT:  It's fine with me if
18    it's fine with Mr. Henderson.  He has been on the
19    stand quite a while.
20                   THE WITNESS:  I'm good to go.
21                   THE US COURT:  You're fine?  Okay.
22                   MR. OXFORD:  Okay.  Appreciate that.
23    Could we have called up Exhibit 11114, please.
24    CROSS-EXAMINATION BY MR. OXFORD:
25                   Q.   And could we have it blown up, the
```



```
 1    last paragraph which Mr. Bromley and Mr. Zarnett
 2    talked to Mr. Henderson about.
 3              Mr. Henderson, I'd like to draw your
 4    attention to a couple of sentences that Mr. Zarnett
 5    skipped over.  I'm sure that was inadvertent.
 6              Do you see four lines down, it reads:
 7                 "Under the new model proposed by
 8                 the tax group, each residual
 9                 profit-sharing participant would be
10                 granted a non-exclusive license to
11                 exploit all of the intellectual
12                 property owned by members of the
13                 Nortel group of companies."
14              Do you see that?
15              A.   I do, yes.
16              Q.   And, Mr. Henderson, is that
17    consistent with your understanding of how the new
18    model that was being proposed in Mr. Collins' email
19    functioned?
20              A.   Yes, I think so.
21              Q.   And in particular, when
22    Mr. Collins references a licence to exploit the
23    intellectual property owned by all the members of
24    the Nortel group of companies, did you understand
25    that, sir, to be a reference to the beneficial
```



```
 1   ownership of --
 2              A.   Yes, economic and beneficial
 3   ownership.
 4              Q.   -- NNI, NNUK, et cetera, in the
 5   intellectual property that they jointly created?
 6              A.   That is correct.
 7              Q.   Turning to the last sentence on
 8   that page, Mr. Collins writes:
 9                   "Theoretically, each of the
10                   participants could continue to own
11                   intellectual property it creates,
12                   but continuing to assign all
13                   intellectual property to Nortel
14                   Networks Limited may provide some
15                   administrative simplicity."
16                   Do you see that, sir?
17              A.   I do.
18              Q.   And, sir, is that consistent with
19   your understanding at the time of the --
20              THE CANADIAN COURT:  See, I've got a
21   problem with some of this questioning, because,
22   under the theory, you are -- you are now examining
23   a witness really in interest to you and you're
24   cross-examining and you're asking loaded questions,
25   and they're not very helpful.
```



```
 1                    MR. OXFORD:  I understand Your Honour's
 2     point, and I can keep these questions short.
 3                    THE WITNESS:  I think you were asking
 4     me about the last sentence, and I would say, yes,
 5     that's exactly what that means.  It's Tim's words,
 6     but the idea was legal title was held by NNL for
 7     administrative simplicity, and I think that's what
 8     that last sentence embodies.
 9                    BY MR. OXFORD:
10                    Q.   Thank you.  One more topic.
11     Mr. Zarnett asked you about the 30 percent
12     amortization rate for the R&D capital stock in the
13     Horst Frisch report?
14                    A.   Yes.
15                    Q.   You understood, Mr. Henderson, did
16     you not, that that 30 percent amortization rate
17     that was proposed was subject to change?
18                    A.   Yes, certainly subject to a long
19     negotiation.
20                    Q.   And in fact, you mention that in
21     your declaration to the Court, correct?
22                    A.   Yes.
23                    Q.   So you did not consider that
24     30 percent amortization number to be the
25     amortization number for all --
```



```
 1                    THE CANADIAN COURT:  What I really
 2    think is that if people are going to ask questions,
 3    if they're in interest with the witness, that you
 4    should have been asking your questions before any
 5    cross-examination and not in such a leading
 6    fashion.
 7                    BY MR. OXFORD:
 8                    Q.   Mr. Henderson, we do not -- we
 9    certainly -- I think there are certain aspects of
10    this witness's testimony with which I agree.
11                    THE CANADIAN COURT:  I recognize a
12    softball when I see it.
13                    MR. OXFORD:  But this witness,
14    respectfully, Justice Newbould, is not united in
15    interest with the EMEA debtors.
16                    May I have one moment, Your Honour?
17                    THE CANADIAN COURT:  Go ahead.
18                    BY MR. OXFORD:
19                    Q.   Sir, we met at your deposition in
20    October, correct?
21                    A.   Yes.
22                    Q.   And until saying hello in the
23    corridor this morning, we had not met subsequently?
24                    A.   No.
25                    MR. OXFORD:  Thank you.  Those are my
```



1    questions.  Thank you, Mr. Henderson, thank you,

2    Justice Newbould, thank you, Judge Gross.

3                  THE CANADIAN COURT:  Thank you,

4    Mr. Oxford.

5                  THE US COURT:  Certainly.

6    CROSS-EXAMINATION BY MR. FINNIGAN:

7                  Q.   Hello, sir, it's John Finnigan

8    again.

9                  A.   Hi.

10                 Q.   Just a couple of questions by way

11   of clarification.

12                 You recall that Mr. Zarnett took you to

13   the 1985 amended research and development

14   cost-sharing agreement?

15                 A.   Yes.

16                 Q.   And he took you to compare and

17   contrast with the 1992 cost-sharing agreement?

18                 A.   Yes.

19                 Q.   And he asked you questions about

20   article 4 in each of those documents and suggested

21   to you -- which article 4 was the grant of legal

22   title.

23                 A.   Okay.

24                 Q.   And he suggested to you that you

25   only changed three words in between the two



```
 1    agreements.  Do you recall that?
 2                 A.   Yes, I do remember that, yes.
 3                 Q.   And if we could call up TR45741,
 4    which is the 1985 agreement, and direct your
 5    attention to page 6, article 4.  And in the first
 6    three lines, if we could highlight that.
 7                 THE CANADIAN COURT:  My screen is
 8    black.
 9                 MR. FINNIGAN:  They are working on it.
10                 THE CANADIAN COURT:  There it is.
11                 MR. FINNIGAN:  So page 6, yes, the
12    first three lines of article 4:
13                    "The Parties hereto acknowledge
14                    that, except as otherwise
15                    specifically agreed, legal title to
16                    all Intangible Technological
17                    Property."
18                 And it's the words "intangible
19    technological property" that Mr. Zarnett focussed
20    on, and he suggested to you that in the later
21    agreement those words were changed to
22    "NN technology".
23                 A.   "NT technology."
24                 Q.   "NT technology."  Correct?
25                 A.   I believe he did, yes.
```

 Neeson & Associates   W&F

```
 1                    Q.   Right.  Intangible technological

 2    property is a defined term in the agreement that's

 3    on the screen.  And if I can direct your attention

 4    to page 4.  Subparagraph P, at the top.  So that's

 5    the definition of "intangible technological

 6    property".

 7                    A.   Okay.

 8                    Q.   And if we can then turn up,

 9    please -- if you can keep that page open, at least

10    in your hard copy, then turn up the second

11    agreement, which is 21002, which is the 1992

12    cost-sharing agreement, and if we look at the words

13    "NT technology" in the definitions on page 2,

14    subparagraph K.  So there's a definition of NT

15    technology there that is in different words than

16    the definition of "intangible technological

17    property" in the earlier agreement.  Is that fair?

18                    A.   It looks different, yes, it is

19    different.

20                    Q.   So although only the defined term

21    was changed in article 4, the defined terms use

22    different words, correct?

23                    A.   Yes, they are defined differently.

24                    Q.   And if those words were changed

25    one agreement to the other, would you have had a
```



```
 1   role in that change?

 2              A.   Yes.

 3              Q.   And do you recollect what that

 4   role was?

 5              A.   I would suspect that it was to tie

 6   more closely to the APA, because this agreement was

 7   viewed as an implementing agreement for the APA.

 8              MR. FINNIGAN:  Thank you.  Those are

 9   all my questions.  Thanks.

10              MR. ZARNETT:  I have no

11   re-re-cross-examination.

12              THE CANADIAN COURT:  Okay.  Thank you,

13   Mr. Henderson.

14   ---  Witness dismissed

15              THE CANADIAN COURT:  Why don't we come

16   back -- how's two o'clock, Judge Gross?

17              THE US COURT:  Two o'clock is fine.

18   Our last witness for the day, who I know will be

19   here in the States, will he be a lengthy witness?

20   Ms. Schweitzer?

21              MS. SCHWEITZER:  -- the first testimony

22   in the United States for US debtors.

23              THE US COURT:  All right.  Thank you.

24   And will we be able to finish by five or should we

25   expect to stay a little bit later?
```



```
 1              MS. SCHWEITZER:  Well, the seat is in
 2   the left-hand column here.  The direct will
 3   certainly be short.
 4              CANADIAN SPEAKER:  As will the cross,
 5   Your Honour, on behalf of the Canadian debtors'
 6   monitor.
 7              THE US COURT:  Mr. O'Connor?
 8              ATTORNEY:  Your Honour, very brief.  I
 9   would say five to ten minutes.
10              THE US COURT:  Okay.  So we'll have no
11   trouble.  Thank you, everyone.  We will be back at
12   two.
13   -- LUNCHEON RECESS AT 12:44.
14   -- UPON RESUMING AT 2:04 P.M. --
15              THE US COURT:  Justice Newbould, I
16   think it's over to me.
17              THE CANADIAN COURT:  There is a saying
18   with tag-team matches, I'm tagging you.  It's over
19   to you.
20              THE US COURT:  All right.  Thank you.
21              All right.  Why don't we have the
22   witness sworn.  Ms. Schweitzer, are you ready for
23   us to --
24              MS. SCHWEITZER:  Yes, thank you, Your
25   Honor.
```



```
 1    CCRISTOPHER RICAURTE, having first been duly sworn,
 2         was examined and testified as follows:
 3              THE US COURT:  Thank you, Mr. Ricaurte.
 4              Did I say that correctly?
 5              THE WITNESS:  Yes.
 6              THE US COURT:  Okay.  Ms. Schweitzer,
 7    whenever you're prepared.
 8
 9    EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY
10    MS. SCHWEITZER:
11              MS. SCHWEITZER:  Sure.  Mr. Ricaurte
12    has a declaration dated April 11th, 2014.  I
13    believe we're marking them as trial exhibits.
14              THE US COURT:  Yes.
15              MS. SCHWEITZER:  So this would be trial
16    Exhibit 18, if I'm counting correctly.
17              THE US COURT:  Yes, that's correct.
18              MS. SCHWEITZER:  I have extra copies
19    for the reporters and your clerk.  Would you like
20    one as well?
21              THE US COURT:  Sure, I'll take it from
22    you.  And mark that one.
23
24              EXHIBIT NO. 18:  Declaration of
25              Christopher Ricaurte, dated April 11,
```



```
 1                    2014.
 2     BY MS. SCHWEITZER:
 3                    Q.   Mr. Ricaurte, good afternoon.
 4     It's Lisa Schweitzer, from Cleary Gottlieb, for the
 5     US Debtors, for the record.
 6                    You have before you a copy of your
 7     declaration dated April 11th, 2014. is that
 8     correct?
 9                    A.   That's correct.
10                    Q.   I understand you had a chance to
11     review your declaration since the time you signed
12     it and before coming to court today; is that right?
13                    A.   Yes.
14                    Q.   Are there any corrections or
15     changes you wish to make with respect to your
16     declaration?
17                    A.   No.
18                    Q.   Mr. Ricaurte, you started working
19     at Nortel in April 2007; is that right?
20                    A.   That's correct.
21                    Q.   What was your position at that
22     time?
23                    A.   I was the VP of finance for global
24     operations.
25                    Q.   And you were employed by NNI?
```



```
 1                    A.    That's correct.
 2                    Q.    Where did you work before Nortel?
 3                    A.    Prior to Nortel, I worked for GE
 4     for 20 years in a number of financial positions,
 5     culminating as the CFO of their industrial systems
 6     division in Europe, about a billion-and-a-half-
 7     dollar division.
 8                    After GE I left to be the CFO of a
 9     subsidiary of a company called Brambles, of the
10     subsidiary called CHEP, which was the largest
11     subsidiary of the company.  I was the CFO of their
12     European division.  It was about a little bit north
13     of a billion dollars in revenue.
14                    After that, in 2007, I came to Nortel.
15                    Q.    And the first position you had at
16     Nortel was working in global operations; is that
17     right?
18                    A.    That's correct.
19                    Q.    Could you briefly explain to the
20     court what the role of global operations is within
21     Nortel?
22                    A.    Global operations was the delivery
23     and execution engine of the product and services
24     for Nortel.  It was an end-to-end operation
25     starting with the preorder all the way to the
```



1    deployment of the products and monitoring those

2    products in the customer's network.

3              Q.   How many employees at Nortel were

4    involved in global operations?

5              A.   There were about 3600 in global

6    operations.  They also had a regional operations,

7    which was close to 4,000 employees, that reported

8    in to the global operations head.

9              Q.   And after NNI filed for bankruptcy

10   in 2009, you took on the role of senior vice

11   president of finance for Nortel Business Services;

12   is that right?

13             A.   That's correct.

14             Q.   And Nortel Business Services is

15   also referred to as NBS; is that correct?

16             A.   That's correct.

17             Q.   In February 2010 you became the

18   president of NBS; is that right?

19             A.   That's correct.

20             Q.   Can you briefly explain to the

21   Courts what NBS, or Nortel Business Services, is?

22             A.   Nortel Business Services was

23   essential to facilitate the sale of the lines of

24   businesses to the counterparties that bought them.

25   It was responsible for setting up the TSAs, which



1   is a transfer service agreement, and negotiating

2   those agreements, as well as delivering and

3   executing on the terms included in those

4   agreements.

5           All the agreements had early

6   termination rights; and it employed about 2400

7   employees.  The services it provided were financial

8   services.  It did the entire P&L and balance sheet

9   for the businesses that were bought by the

10  counterparties.  It did IP services, real estate

11  services; and it also did supply chain services as

12  well.

13          Q.   What role did NNI employees play

14  within Nortel Business Services?

15          A.   NNI employees were a critical part

16  of the Nortel Business Services.  A number of the

17  leaders were NNI employees, including myself.  They

18  had -- most -- a number of the NNI employees had

19  critical capabilities that were necessary to

20  provide the services to the counterparties.

21          And the two major contracts that we

22  had, the largest ones were with Avaya and Ericsson

23  for the CDMA business, which were largely US-based

24  contracts, and most of the revenue was US-based.

25  And the services were US-based.



```
 1                    Q.    You also were a director of NNI
 2   and certain NNI subsidiaries and affiliates from
 3   March 2010 to September 2011; is that correct?
 4                    A.    That's correct.
 5                    Q.    And you left Nortel on
 6   September 30th, 2011; is that right?
 7                    A.    That's correct.
 8                    MS. SCHWEITZER:  I have no further
 9   questions.
10                    THE US COURT:  Thank you,
11   Ms. Schweitzer.
12                    If I may just suggest, any parties who
13   are aligned with the US group as to this witness, I
14   would like to proceed next, so that then the
15   cross-examination, what I would call the true
16   cross-examination, would then follow.
17                    All right.
18                    MS. TABATABAI:  The EMEA Debtors have
19   no questions.
20                    THE US COURT:  All right.  Thank you.
21                    Yes, Mr. O'Connor.
22                    MR. O'CONNOR:  I guess if there's
23   nobody else, it's my turn.
24                    THE US COURT:  I guess it's you.
25
```



```
 1                  CROSS-EXAMINATION BY MR. O'CONNOR:
 2                  MR. O'CONNOR:  Good afternoon.
 3    Judge Gross.  Good afternoon, Justice Newbould.
 4
 5    BY MR. O'CONNOR:
 6                  Q.   Good afternoon, Mr. Ricaurte.  We
 7    haven't met before, but I'm Brian O'Connor, from
 8    Willkie Farr & Gallagher, and I represent the UK
 9    Pension Claimants.
10                  I have a brief number of questions for
11    you, one focusing on your time at global operations
12    and the second series at NBS.  So starting with
13    global operations, I understand that you were the
14    CFO of global operations from April 2007 to
15    May 2009?
16                  A.   That is correct.
17                  Q.   And in that capacity, you oversaw
18    all of the financial planning and analysis for the
19    group on a global basis?
20                  A.   That's correct.
21                  Q.   And Peter Look was the vice
22    president of tax for the group and started in
23    April 2007?
24                  A.   That's correct.
25                  Q.   And shortly after you started, you
```



```
 1    spoke with Mr. Look about transfer pricing?

 2                A.   Yes, we had a brief conversation.

 3                Q.   And you understood from Mr. Look

 4    that he was trying to reduce the group's taxes?

 5                A.   No, I didn't understand he was

 6    trying to reduce the group taxes.  I understood

 7    that he was trying to reduce the deferred tax asset

 8    of Canada.

 9                MR. O'CONNOR:  Can we bring up his

10    deposition testimony at Page 33.

11

12    BY MR. O'CONNOR:

13                Q.   Let me direct your attention to

14    Line 12 of your deposition testimony, at Page 33.

15                And the question was:

16                Q.   "Question:  And when you say

17    reduce the tax burden of the company, what company

18    are you referring to?"

19                I think you answered:

20                "Answer  Nortel, the entire company."

21                A.   Yes.

22                Q.   "Answer:  So it was the overall

23    company, the consolidated company.

24                "Question  When you say the entire

25    company, is that the entire multinational
```


Neeson & Associates    W&P

```
 1   enterprise?

 2              "Answer  The consolidated company of

 3   the all the entities."

 4              Does that refresh your recollection

 5   about having a conversation with Mr. Look in which

 6   he indicated that he was attempting to reduce the

 7   entire group's taxes?

 8              A.   Yes, and the vehicle he was doing

 9   that with was what I just described.

10              Q.   And you understood that Mr. Look

11   was using the transfer pricing to achieve that goal

12   of reducing the group's taxes?

13              A.   That was his explanation to me,

14   yes.

15              Q.   And you understood from Mr. Look

16   that he wanted to get more profit into Canada?

17              A.   Yes.

18              Q.   And Mr. Look had asked for your

19   help in that regard; is that correct?

20              A.   Yes, he asked for my help in

21   describing what global operations did to enable

22   that.

23              Q.   And you understood from Mr. Look

24   that Nortel had several billion dollars in unused

25   tax losses and credits in Canada?
```



```
 1                    A.   I don't remember the several

 2    billion dollars.  I knew it was a substantial

 3    amount, but --

 4                    Q.   Can we pull up Trial

 5    Exhibit 11327, please.

 6                    Mr. Ricaurte, I'd like to direct your

 7    attention to the second page of what we've marked

 8    as Trial Exhibit 11327, which is an email from

 9    Peter Look to you and a cc to Joel Hackney -- dated

10    June 1st, 2007.  You see in the first line,

11    Mr. Look says, "Chris, we need your help on

12    something that's probably worth several hundred

13    million dollars to Nortel"?

14                    A.   Yes.

15                    Q.   And he says basically Nortel has

16    several billion in unused tax losses and credits in

17    Canada?

18                    A.   Yes.

19                    Q.   Does that refresh your

20    recollection?

21                    A.   Yes, it does.

22                    Q.   And you understood from Mr. Look,

23    that Nortel was trying to allocate as much profit

24    as possible into Canada to take advantage of those

25    losses and credits?
```



```
 1                   A.    That's what I understood.

 2                   Q.    And you also understood that he

 3    was trying to do that through negotiating an

 4    advance pricing agreement with Canada, the US, the

 5    UK and France?

 6                   A.    Yes, I knew he was trying to do

 7    that.

 8                   Q.    And what Mr. Look wanted from you

 9    was information about global operations, what it

10    did and where it did those things, so that the

11    Nortel tax people could allocate profits from

12    global operations' contributions to the businesses

13    around the globe; is that correct?

14                   A.    That is correct.

15                   Q.    Now, turning to NBS, in May of

16    2009, something called Nortel Business Services was

17    created; correct?

18                   A.    That's correct.

19                   Q.    And you became senior vice

20    president of finance for NBS?

21                   A.    That's correct.

22                   Q.    And NBS was created after Nortel

23    had decided to liquidate and sell all of its

24    assets?

25                   A.    That correct.
```



1                Q.    And NBS included functions for
2    global operations, corporate and finance?
3                A.    Yes, it did.
4                Q.    And those functions supported
5    Nortel's operations across all its business lines?
6                A.    That's correct.
7                Q.    And because those functions could
8    not be separated to be included within the line of
9    business sales, that's why NBS was created?
10               A.    That's correct.
11               Q.    And one thing that NBS did was to
12   enter into transition service agreements?
13               A.    That's correct.
14               Q.    And those were with the purchasers
15   of the lines of businesses so that NBS could
16   provide corporate support for the operations that
17   were sold?
18               A.    That is correct.
19               Q.    And prior to the closing of the
20   LOB sales, another thing that NBS did was to
21   extract data that Nortel had in its IT systems
22   related to each of the lines of business?
23               A.    That's correct.
24               Q.    And, for example, NBS had to
25   extract financial, technology and product



```
 1   information to enable that to be transferred to the
 2   purchasers of the lines of business?
 3                 A.   Yes, they did.
 4                 MR. O'CONNOR:  No further questions.
 5   Your Honor.  Thank you, Mr. Ricaurte.
 6                 THE US COURT:  Thank you, Mr. O'Connor.
 7   Mr. Pultman.
 8                 MR. PULTMAN:  Good afternoon. Your
 9   Honor.
10                 THE US COURT:  Good afternoon.
11                 MR. PULTMAN:  Good afternoon, Justice
12   Newbould.
13   CROSS-EXAMINATION BY MR. PULTMAN:
14   BY MR. PULTMAN:
15                 Q.   Mr. Ricaurte, good to see you
16   again.  I'm Jacob Pultman, on behalf of Canadian
17   Debtors and the Monitor.
18                 Mr. Ricaurte, you were telling us you
19   about the wind-down of Nortel.  By May of 2009, I'm
20   correct that a decision had been made to sell off
21   all of Nortel's businesses; isn't that right?
22                 A.   That's correct.
23                 Q.   And by that time, by May of 2009,
24   the decision had been made to sell off all of
25   Nortel's assets; isn't that right?
```



```
 1                   A.   That's correct.
 2                   Q.   Now, you told us that in or about
 3   May of 2009 you helped join and helped start the
 4   Nortel Business Services called NBS?
 5                   A.   That's correct.
 6                   Q.   At the time you were the No. 2
 7   person at NBS?
 8                   A.   Yes, that's correct.
 9                   Q.   And I'm correct, am I not, that
10   the purpose of NBS was to perform transition
11   services during the TSA period?
12                   A.   That is correct.
13                   Q.   And that was for the divested
14   businesses?
15                   A.   Yes.
16                   Q.   And one of the divested businesses
17   you told us about on your direct testimony was
18   Ericsson; is that correct?
19                   A.   That is correct.
20                   Q.   And there was a TSA with Ericsson?
21                   A.   Yeah, and the divested business
22   was the CDMA and GSM.  Ericsson wasn't the divested
23   business.
24                   Q.   Sure.  So it was the sell sale of
25   the CDMA business to Ericsson?
```

 Neeson&Associates    W&F

```
 1                    A.   Yes.  Right.

 2                    Q.   Thank you.  Why don't we pull up

 3   Exhibit TR44141, and I'm going to show you an

 4   excerpted copy of the TSA.

 5                    MR. PULTMAN:  And it's excerpted, Your

 6   Honor, because there's confidentiality concerns

 7   about substance.  And the purpose of our

 8   examination is really with respect to the signature

 9   pages and the parties to the agreement.

10                    THE US COURT:  Very well.

11

12   BY MR. PULTMAN:

13                    Q.   And I'm going to show you Exhibit

14   TR44141 and the front page of that exhibit.

15                    THE CANADIAN COURT:  Mr. Pultman, I'm

16   waiting for it to come up on the screen.

17                    MR. PULTMAN:  Apologies, Your Honor.

18   Justice Newbould, I hope that you can see it at

19   this point.

20                    THE CANADIAN COURT:  I now can, through

21   the magic of television.

22

23   BY MR. PULTMAN:

24                    Q.   Mr. Ricaurte, can you see that as

25   well?
```



```
 1                     A.   Yes.
 2                     Q.   And is that, in fact, the
 3    transition services agreement between Nortel and
 4    Ericsson?  Why don't we blow up the first paragraph
 5    so you can see that.
 6                     A.   Yes, yes.
 7                     Q.   And am I correct that the parties
 8    to the agreement, when we say it's Nortel, are
 9    actually Nortel Networks Corporation, also known as
10    NNC, Nortel Networks Ltd., known as NNL, and Nortel
11    Networks Inc., known as NNI?
12                     A.   That's correct.
13                     Q.   And the counterparty to that is an
14    Ericsson party.  Am I right about that?
15                     A.   That's correct.
16                     Q.   So even though you said that there
17    was a lot of activity relating to this transition
18    took place in the United States, the actually
19    parties to the agreement were NNC, NNL, NNI and
20    Ericsson?
21                     A.   That's correct.
22                     Q.   And that's because NBS, Nortel
23    Business Services, wasn't an incorporated entity,
24    was it?
25                     A.   Correct.
```



```
 1                    Q.    And that's the case for other
 2   TSAs, too, isn't it?
 3                    A.    That's correct.
 4                    Q.    Now, the TSAs weren't open-ended
 5   contracts, were they?  They had an end date?
 6                    A.    They had an end date and early
 7   termination rights.
 8                    Q.    And in terms of the term, the end
 9   date, for purposes of the Ericsson agreement, was
10   it a two-year term?
11                    A.    I believe it was, yes.
12                    Q.    Let me show you the definition of
13   "term" on the next page.  Below that up and see if
14   you can agree with me that the term of this
15   agreement was 24 months.
16                    A.    Yes.
17                    Q.    Now, that wasn't accidental, was
18   it?
19                    A.    No.
20                    Q.    And the purpose of this was to
21   transition and help provide transition but with a
22   hard stop?
23                    A.    That's correct.
24                    Q.    Now, by the time you left Nortel
25   in September of 2011, NBS had performed nearly all
```



```
 1   of its obligations under the various TSAs; isn't
 2   that right?
 3                A.   That's correct.
 4                Q.   And I'm correct as well that you
 5   were one of the last operations employees out of
 6   Nortel?
 7                A.   I was one of the last.  I wasn't
 8   the last.  Don McKenna was still there when I left.
 9                Q.   And so you were one of the last?
10                A.   Yes.
11                Q.   And I am correct that once the
12   TSAs were all completed, the NBS-related operations
13   were wound down?
14                A.   That's correct.
15                Q.   Now, you mentioned that there were
16   other employees and that there were other people
17   involved.  I'm going to ask you a little bit about
18   your reporting relationship.
19                You told us earlier that you reported,
20   when you started in May of 2009 with NBS, to Joe
21   Flanagan in the US; is that right?
22                A.   That's correct.
23                Q.   And did you also report -- did you
24   have a reporting relationship to Pavi Binning?
25                A.   Yes, I did.
```



```
 1                    Q.   And was Mr. Binning employed by

 2    NNL in Canada, to your knowledge?

 3                    A.   Yes.

 4                    Q.   At some later point in time, in

 5    the US, did you have a reporting relationship to

 6    John Ray?

 7                    A.   Yes.

 8                    Q.   And you understand him to be the

 9    principal officer of NNI?

10                    A.   Yes.

11                    Q.   Now, in addition to the people you

12    reported to, did you report to the Boards of

13    Directors of let's start with NNI?

14                    A.   Yes.

15                    Q.   And did you report to the Boards

16    of NNL?

17                    A.   Yes.

18                    Q.   And NNC?

19                    A.   Yes.

20                    Q.   Now, you also worked with many

21    employees throughout the Nortel network; isn't that

22    right?

23                    A.   Yes.

24                    Q.   Now, I'm going to ask you a little

25    bit about the global operations portion of your
```



1    testimony.

2                    You described it as the delivery and

3    execution engine of products and services at

4    Nortel; is that right?

5                    A.    That's correct.

6                    Q.    And in your declaration you tell

7    us about, in Paragraph 9, a relationship with a

8    company called Flextronics; is that right?

9                    A.    That's correct.

10                   Q.    And there were a series of

11   contracts between Nortel and Flextronics; isn't

12   that right?

13                   A.    That's correct.

14                   Q.    And Flextronics was Nortel's

15   largest supply chain counterparty; am I right about

16   that?

17                   A.    That's correct.

18                   Q.    And for each of these contracts

19   between Nortel, as you describe it, and

20   Flextronics, am I correct that the party, the

21   Nortel party on those contracts, was NNL?

22                   A.    For the Master Agreement, it was.

23                   Q.    For the amended and restated

24   master contract, was NNL the party?

25                   A.    Yes, it was.



```
 1                    Q.   And for the master contract of

 2   September 30, 2003, was Nortel the party?

 3                    A.   I don't recall.  I wasn't there in

 4   2003.

 5                    Q.   But you were familiar with the

 6   Master Agreement that was in place?

 7                    A.   Yeah, yeah.

 8                    Q.   To your knowledge -- let me

 9   withdraw that.

10                    Let me turn you to a document that you

11   provided us, and that is Appendix D.  It's the

12   second document attached to your declaration.  It's

13   referred to as Appendix D, functional analysis of

14   operational activities.  And it bears Trial

15   Exhibit No. 48623.  We'll pull it up on the screen

16   so you can see it.

17                    Do you see that document, Mr. Ricaurte?

18                    A.   Yes, I do.

19                    Q.   And did you attach that document

20   or was that document attached to your declaration?

21                    A.   Yes.

22                    Q.   Is that the entirety of the

23   document or is that an excerpt of a larger

24   document?

25                    A.   I can't see the document with this
```



 1   thing -- there we go.

 2              MS. SCHWEITZER:  Do you have a hard

 3   copy for the witness?

 4              MR. PULTMAN:  Absolutely.  Can we hand

 5   a hard copy to the witness.  Absolutely.

 6              And just for the record, Your Honor,

 7   we're going to hand to the witness, to Your Honor,

 8   the document entitled Exhibit TR22078 --

 9              THE US COURT:  All right.  Thank you.

10              MR. PULTMAN:  -- which is entitled

11   "Joint Request for US-Canada Bilateral Advance

12   Pricing Agreement/Arrangement."

13              THE US COURT:  Do you have a copy,

14   Justice Newbould?

15              THE WITNESS:  Well, no.  You go ahead,

16   though.

17              THE US COURT:  Okay.

18              MS. SCHWEITZER:  The trial exhibit

19   number doesn't match the one you --

20              MR. PULTMAN:  Yes, the Trial

21   Exhibit No. 22078 we can pull up is the entirety of

22   the document.  The trial exhibit number of 48623 is

23   the excerpt that was attached to Mr. Ricaurte's

24   declaration.

25



1    BY MR. PULTMAN:

2                Q.    So on the screen, sir, you have a

3    document that's entitled "Joint Request for

4    US-Canada Bilateral APA."

5                Do you see that?

6                A.    Yes.

7                Q.    And is the document that you

8    appended to your declaration an excerpt or part of

9    this document?

10               A.    I've not seen this document, the

11   one that -- the larger document that you put in

12   front of me.

13               So I saw a document that had more

14   detail on the functional analysis, but it wasn't

15   nearly this size.

16               And the document I saw I don't see

17   within this document.

18               Q.    Well, in that case, let's go back

19   to Appendix D.  I'll put that on the screen, and

20   I'll ask you my questions about that.

21               Trial Exhibit 48623, it's referred to

22   as Appendix D.  So would you agree with me, sir,

23   that the reference to it as an appendix would

24   indicate that it would be attached to something

25   else?



```
 1                        A.   Yes.
 2                        Q.   And the indication of it being
 3    Appendix D, would that indicate to you that there
 4    would be likely three, at least, appendices ahead
 5    of that?
 6                        A.   Yes.
 7                        Q.   To your knowledge, have you ever
 8    seen the document to which Appendix D is appended?
 9                        MS. SCHWEITZER:  Sorry, Mr. Pultman.
10    Is Appendix D in this larger document?
11                        MR. PULTMAN:  I believe it is.
12                        MS. SCHWEITZER:  Can you just refer to
13    the page so he understands what you're talking
14    about?
15                        MR. PULTMAN:  Sure.  But at the moment
16    I'm showing him only Appendix D.
17                        MS. SCHWEITZER:  On the screen.  Does
18    he have a copy in front of him?
19                        MR. PULTMAN:  It's part of his
20    declaration --
21                        THE US COURT:  It will be best if
22    counsel addressed the Court with questions or
23    concerns.
24                        MR. PULTMAN:  My apologies, Your Honor.
25                        THE US COURT:  That's okay.
```



```
 1                    Ms. Schweitzer, did you have a concern
 2      about the document?
 3                    MS. SCHWEITZER:  Your Honor, I
 4      apologize.  I was just saying to Mr. Pultman, he's
 5      asking the witness questions about a document that
 6      it's not clear to me that the document is actually
 7      in front of him as opposed to just being portrayed
 8      on the screen.
 9                    So I was asking Mr. Pultman, if his
10      copy is contained within the larger document, that
11      he do the witness the courtesy of referring to
12      where it is in the larger document.
13                    THE US COURT:  Absolutely.
14                    MR. PULTMAN:  I absolutely shall, Your
15      Honor.
16
17      BY MR. PULTMAN
18                    Q.   In the larger document,
19      Mr. Ricaurte, on page bearing Bates Nos. PC0184981,
20      which is Page 129 of our PDF, if I can put that up.
21                    THE US COURT:  Yes.
22                    THE WITNESS:  If I may, I did now read
23      through this larger document, and I do see the
24      Appendix D and the detail behind Appendix D.  And I
25      am familiar with that detail that was behind
```

 Neeson & Associates   W&F

```
 1   Appendix D, but not the entire document, other than

 2   Appendix D.

 3

 4   BY MR. PULTMAN

 5               Q.   And is Appendix D the document

 6   that you have appended to your declaration?

 7               A.   Yes.

 8               Q.   So let's turn within Appendix D to

 9   the chart that will indicate the numbers of

10   employees in the operational activities.  And

11   that's Page 2.

12               Now, within that chart, do you see the

13   circled section which relates to the operations

14   employees?

15               A.   Yes, I do.

16               Q.   And in the top left corner, do you

17   see the indication of research and development

18   employees?

19               A.   Yes, I do.

20               Q.   Now, when it comes to the research

21   and development employees, do you see that there's

22   an indication that Canada has some 4200-plus

23   employees?

24               A.   Yes.

25               Q.   4294.  And that is the largest
```



1    group within Nortel's R&D?

2                      A.    Yes, I can see that.

3                      Q.    To your knowledge, did Canada have

4    the largest group of R&D employees of the Nortel

5    Group?  Did NNL?

6                      A.    To my knowledge, yes.

7                      Q.    Now, let me ask you about R&D

8    spend.  I'm going to turn you to the document that

9    we had up, in particular to a chart with respect to

10   research and development spend, and that is on --

11   it's from Exhibit TR22078.  And if we can blow up

12   the chart at the bottom.

13                     THE US COURT:  Is that in Appendix D,

14   Mr. Pultman?

15                     MR. PULTMAN:  This is from Appendix B

16   to the document.

17                     THE US COURT:  Okay.

18

19   BY MR. PULTMAN

20                     Q.    Mr. Ricaurte, I'm going to start

21   with you with the section on the right relating to

22   R&D spend by geography for the year ended

23   December 31, 2006.

24                     Do you see the indication that NNL, as

25   a percentage, had 48 percent of the spend?


Neeson&Associates    W&F

```
 1                    A.    Yes, I do.
 2                    Q.    And do you see the indication that
 3    for 2007 that percentage went up to 51 percent?
 4                    A.    Yes, I do.
 5                    Q.    Am I correct that the R&D spend
 6    within the Nortel Group for 2006 and 2007, that NNL
 7    was the single largest part of the R&D spend?
 8                    A.    Yes, according to this document.
 9                    Q.    Is this consistent with your
10    understanding of the R&D spend at Nortel?
11                    A.    I did not work in R&D, so I don't
12    know if it would be consistent with my
13    understanding.  I only knew that there was a large
14    portion of spend in Canada and NNL for R&D spend.
15    I didn't really have any close knowledge of the
16    percentages and what they were.  So it wouldn't be
17    consistent with it because it's the first time I've
18    seen these numbers.
19                    Q.    Let me ask you not about the
20    specifics of it, then.  Let me ask you a general
21    question.
22                    To your understanding, did NNL conduct
23    a disproportionate share of Nortel's R&D activities
24    when compared to revenue generation?
25                    A.    In -- relative to revenue
```

Neeson&Associates   W&F

```
 1    generation, yes.

 2                Q.   Isn't that what NNI told these two

 3    Courts in 2007 when it sought the approval of the

 4    IFSA?

 5                A.   I don't know what they told the

 6    Courts when they sought the approval of the IFSA.

 7                Q.   And that's because you don't have

 8    any knowledge or experience about R&D funding

 9    decisions at Nortel, do you?

10                A.   That's correct.

11                Q.   Am I correct also that you don't

12    have any knowledge or experience with respect to

13    the ownership of IP at Nortel, do you?

14                A.   That's correct.

15                Q.   And I'm correct as well that you

16    have no knowledge or experience in the licensing of

17    Nortel IP, do you?

18                A.   I don't have any experience.  I

19    have knowledge that there was licensing of IP, but

20    I have knowledge but not experience.

21                Q.   Do you have any knowledge or

22    experience about the MRDA, the Master Research and

23    Development Agreement?

24                A.   I only know that it existed, but I

25    wasn't involved with it.
```



1                   Q.   And you aren't involved at all in

2    the RPSM, the Residual Profit Split Model, were

3    you?

4                   A.   That's correct.

5                   Q.   And with respect to transfer

6    pricing, you wouldn't have involvement in transfer

7    pricing from April 2007 to May 2009, did you?

8                   A.   Other than providing information

9    that's in this document, no.

10                  Q.   And with respect to allocation of

11   profits, Mr. O'Connor asked you some questions

12   about a conversation with Mr. Look.

13                  Do you remember that?

14                  A.   Yes.

15                  Q.   And it's fair to say that you had

16   no involvement in determining which entity should

17   receive what allocation of profits at Nortel; isn't

18   that right?

19                  A.   No, I didn't get involved in any

20   of the allocation.

21                  Q.   And when you were in global

22   operations, global operations wasn't responsible

23   for decisions on allocations of profits, was it?

24                  A.   That's correct.

25                  Q.   Now, I'm going to ask you about



```
 1    the lines of businesses sales.  I've got a couple
 2    more questions.
 3              You weren't involved at all in the
 4    allocation of proceeds realized from any
 5    pre-petition sales of Nortel assets, were you?
 6              A.   No.
 7              Q.   And you didn't have any
 8    involvement in the process for post-petition asset
 9    sale of Nortel's residual IP, did you?
10              A.   Any involvement in the
11    post-petition sale?
12              Q.   Yes.
13              A.   I approved it as the director of
14    NNI.  John Ray, the principal officer, advised me
15    of why we should approve that deal.  So that was my
16    involvement.  John Ray led it, but I was involved.
17    I knew what was going on as the director and having
18    fiduciary responsibilities as the director of NNI.
19              Q.   But other than your knowledge of
20    the sale price of the Rockstar sale, you didn't
21    have any knowledge of the post-petition asset sales
22    of Nortel's IP, did you?
23              A.   I mean, I was knowledgeable about
24    the process they were going through.  I sat through
25    boards.  They discussed it on boards.  I wasn't
```

 Neeson&Associates   W&F

1    involved in making decisions on whether or not they

2    were going to try to continue to run IPCo or just

3    sell the asset.  I wasn't involved in those

4    decisions.

5              Q.  Well, I'm going to pull up your

6    deposition transcript here in this case.  Do you

7    recall that you were deposed in the case on

8    November 26th, 2003?

9              A.  Yes.

10             Q.  In fact, that was the day you and

11   I met for the first time?

12             A.  Yes, it was.

13             Q.  And we haven't met since that

14   time, have we?

15             A.  No, we haven't.

16             Q.  At that time you were asked a

17   series of questions and gave a series of answers,

18   didn't you?

19             A.  Yes.

20             Q.  You were sworn to tell the truth?

21             A.  Yes.

22             Q.  I'm going to turn the Courts'

23   attention to part of the transcript that I'm going

24   to put up, which is on Page 136 beginning at

25   Line 6.  And going through Line 17.



```
 1                  Now, there, it indicates the following
 2     question was posed:
 3                  "QuestionReferring again to
 4     post-petition asset sales, do you have any
 5     knowledge of the sale of Nortel's residual
 6     intellectual property?"
 7                  And your answer:
 8                  "AnswerYes, I have limited knowledge.
 9                  "QuestionAnd what do you know about
10     that?"
11                  Mr. Bromley posed an objection.
12                  And your answer was:
13                  "AnswerI only know what it was sold
14     for, the price.
15                  "QuestionDid you have any involvement
16     in the process?
17                  "AnswerNo."
18                  Were those questions asked and those
19     answers given at your deposition?
20                  A.   Yes, they were asked, and those
21     are the answers that I gave.
22                  Q.   Were they accurate then?
23                  A.   Yeah, they were accurate in terms
24     of what I viewed as involvement in the process.  As
25     I said, I knew from periphery what was going on.  I
```



```
 1   wasn't involved in the process, but I knew what was
 2   going on.
 3              MR. PULTMAN:  Thank you, Mr. Ricaurte.
 4   Those are my questions.
 5              THE US COURT:  Thank you, Mr. Pultman.
 6              Anyone else?
 7              MS. SCHWEITZER:  That's just our trial
 8   graphics person.
 9              I have a couple questions on redirect,
10   but obviously --
11              THE US COURT:  Any other
12   cross-examination of the witness?
13              All right.  Ms. Schweitzer, you may
14   proceed.
15
16   REDIRECT BY MS. SCHWEITZER:
17
18   BY MS. SCHWEITZER
19              Q.   Mr. Ricaurte, you were just asked
20   by Mr. Pultman a series of questions regarding the
21   document in front of you, TR22078, that's titled
22   "Nortel Network Limits and Nortel Networks, Inc.
23   Joint Request for the UPS and Canada Bilateral
24   Advance Pricing Agreement and Arrangement."
25              Do you have any role in drafting this
```

 Neeson&Associates   W&F

1    actual document?

2                   A.   No, I did not, other than -- the

3    only role I had in drafting it was my team gave

4    some information to the people who were drafting

5    it.

6                   Q.   And I believe you testified

7    earlier that you became an NNI director in March of

8    2010.  Is that right?

9                   A.   That's correct.

10                  Q.   At the time you became a director,

11   what decisions, if any, had been made with respect

12   to the monetization of Nortel's patents at that

13   time?

14                  A.   There had been no decisions made

15   at that time whether they were going to sell the

16   patents or continue to try to make a business out

17   of it.

18                  Q.   And you said that NNL was the

19   party to the Master Agreement with Flextronics.

20                  Was NNI or Nortel Networks Inc., a

21   party to any agreements with Flextronics?

22                  A.   Yes, it was.  It had a number of

23   purchase contracts with Flextronics.  We were --

24   NNI, we were involved in the negotiation of those

25   contracts with Flextronics.



```
 1                     Q.   And can you describe your specific
 2     role and responsibilities with respect to
 3     Flextronics while you were at Nortel?
 4                     A.   While I was at Nortel in the
 5     global operations/finance role, we were responsible
 6     negotiating the -- any major contracts.  We were
 7     responsible for settling any disputes between
 8     Flextronics and Nortel.  Those disputes were the
 9     responsibility of -- deciding on what the
10     settlement would be was decided by, typically,
11     myself and Joe Flanagan, and we approved those
12     disputes.
13                     We negotiated the prices as well in
14     terms of what they would charge us for the services
15     that they were providing.
16                     MS. SCHWEITZER:  I have no further
17     questions.
18                     THE US COURT:  All right.
19     Ms. Schweitzer.
20                     I think that's all from Mr. Ricaurte.
21                     Thank you.  You may step down, sir.
22     -- WITNESS EXCUSED --
23                     MS. SCHWEITZER:  Your Honor, I believe
24     we are finished for today, unless anyone else has
25     anything for the Court.
```



```
 1                    THE US COURT:  Anyone else?
 2                    MS. BARRACK:  Your Honors, I just want
 3      to alert the Court to an issue.  We've had an issue
 4      with the testimony, the willingness of
 5      Professor Westbrook to testify.  I've spoken to
 6      Mr. Qureshi and Mr. Leblanc.  We're going to
 7      continue to speak about it, see if we can work out
 8      an arrangement.  And if we have to come back to the
 9      Court, we can add it to the list of things for
10      Friday.  But we're going to try to work it out.
11                    MR. QURESHI:  Your Honor, if I may
12      briefly.  Abid Qureshi, Akin Gump, on behalf of the
13      official committee.
14                    So just to put a little more detail on
15      it, we were informed yesterday for the first time
16      that Professor Westbrook is apparently unwilling to
17      come and testify.  We think that that is directly
18      contrary to what is provided for in the various
19      protocols that have been approved by both Courts.
20                    That having been said, I agree with
21      Mr. Barrack, we could use a little more time to
22      react to it, consider what the next step will be.
23      And so we propose to do that over the rest of this
24      week and, if necessary, raise the issue with the
25      Courts on Friday morning.
```



```
 1              My guess is we will need to address it
 2   on Friday, but, again, we think it's worthwhile
 3   trying to meet and confer to see if there's a
 4   resolution.
 5              THE CANADIAN COURT:  Very well.
 6              MR. QURESHI:  Thank you.
 7              THE US COURT:  Justice Newbould, I
 8   guess they don't need us for the rest of the day.
 9              All right.
10              THE CANADIAN COURT:  I'm not personally
11   upset.
12              THE US COURT:  No, no.  I'm not
13   offended at all.
14              We'll see you back here tomorrow
15   morning at 9:00.
16              THE CANADIAN COURT:  Can we know what
17   the game plan is tomorrow with respect to the
18   witnesses?
19              MS. SCHWEITZER:  Sure.  Your Honors, I
20   believe the proposed or updated order had been
21   submitted to Your Honors.  Tomorrow on deck we have
22   Mr. Michael Orlando, who will be --
23              THE US COURT:  He's in Toronto.
24              MS. SCHWEITZER:  -- testifying in
25   Toronto, a US Debtor witness.  John Ray, the
```



1    principal officer for the US Debtors, is testifying

2    in Wilmington; and then the last witness is

3    Philippe Albert-Lebrun, who will be in Toronto as

4    an allocation and also, I understand, as a claims

5    witness.

6              THE US COURT:  All right.  And is it

7    Mr. Lebrun who has some issues that we may have to

8    remain a little bit late to complete his testimony?

9    Is that it, Ms. Schweitzer?

10             MS. SCHWEITZER:  I believe -- I don't

11   know that he has issues.  He's traveling from

12   France.  So I believe that the day was blocked that

13   if he needs to continue to complete his claims

14   testimony, people were willing to stay late to have

15   that done tomorrow.

16             THE US COURT:  Very well.  All right,

17   all.  I wish you a good evening.  We will stand in

18   recess until tomorrow at 9:00.

19             MR. GOTTLIEB:  Sorry, Your Honors.

20   Just so we're all on the same page.  It's Matthew

21   Gottlieb.

22             My understanding is -- and I hope I'm

23   not speaking out of turn -- that if we finish all

24   of those witnesses, there is an additional witness

25   on deck who is available.  Mr. Brueckheimer, I



```
 1   understand, will be available.  So we'll use the
 2   day.  We shouldn't have much spare time.
 3                 That's correct.
 4                 THE CANADIAN COURT:  Thank you,
 5   Mr. Gottlieb.
 6                 THE US COURT:  Okay.  That will work
 7   well.  Thank you, Mr. Gottlieb.
 8                 Anyone else?
 9                 All right.  Good evening to all of you.
10   --Whereupon court adjourned at 2:46 p.m.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1                  REPORTERS' CERTIFICATE

 2

 3              I, TERRY WOOD, RPR, CSR, Canadian

 4   Certified Shorthand Reporter, Realtime Systems

 5   Administrator, and I, GAIL VERBANO, RDR, CRR, CSR,

 6   US Certified Shorthand Reporter, certify;

 7              That the foregoing proceedings were

 8   taken before us at the time and place therein set

 9   forth;

10              That the entire proceedings of the

11   hearing date were recorded stenographically

12   individually by each of us and were thereafter

13   transcribed;

14              That the foregoing is a true and

15   correct transcript of our shorthand notes so taken.

16

17              Dated this 20th day of May, 2014.

18

19   PER:                        PER:

20   Gail Inghram Verbano         Terry Wood

21   GAIL VERBANO                TERRY WOOD

22   WILCOX & FETZER             NEESON & ASSOCIATES

23   WILMINGTON, DE USA          TORONTO, ON

24

25
```



























































