



WILCOX & FETZER LTD.

FOR EXCELLENCE IN COURT REPORTING

```
1                UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE

3    ---------------------------)

4    In Re                      )

5       NORTEL NETWORKS INC.,   ) Chapter 11

6       et al,                  ) Case No.

7             Debtors.          ) 09-10138(KG)

8    ---------------------------)

9                            - and -

10                   Court File No. 09-CL-7950

11                          ONTARIO

12                SUPERIOR COURT OF JUSTICE

13                    (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16    AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17      ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18   NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19     CORPORATION, NORTEL NETWORKS INTERNATIONAL

20     CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                        CORPORATION

22      APPLICATION UNDER PART IV OF THE COMPANIES'

23   CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                        AS AMENDED

25                        --------
```

Neeson & Associates   W&P

```
 1

 2                              --------

 3

 4   --- This is the Day 6/Volume 6 of the transcript of

 5   proceedings in the above matter held simultaneously

 6   in:

 7   Superior Court of        United States Bankruptcy

 8   Ontario (Commercial      Court for the District of

 9   List)                    Delaware

10   Courtroom 8-1            Courtroom 3

11   330 University Avenue    824 Market Street

12   Toronto, Ontario         Wilmington, Delaware

13

14   on the 21st day of May, 2014, commencing at 9:09

15   a.m.

16

17                              --------

18   B E F O R E:

19   The Honourable Judge Kevin Gross (United States)

20   The Honourable Mr. Justice Frank Newbould (Canada)

21

22                              ----------

23

24

25
```



```
 1    REPORTED BY:  Toronto - Kimberley Neeson
 2              RPR, CRR, CSR, CCP, CBC
 3         Realtime Systems Administrator
 4          Delaware - Gail Verbano
 5                  RMR, CRR, CSR
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1   A P P E A R A N C E S:

 2

 3                  CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER:       Jay Carfagnini, Esq.

11              Joseph Pasquariello, Esq.

12              Ben Zarnett, Esq.

13              Alan Mark, Esq.

14              Peter Ruby, Esq.

15              Jessica Kimmel, Esq.

16              Chris Armstrong, Esq.

17

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22   PER:       Murray McDonald, Esq.

23              Brent Beekenkamp, Esq.

24

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER:      Derrick Tay, Esq.

 7             Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER:      Jacob Pultman, Esq.

14             Ken Coleman, Esq.

15             Paul Keller, Esq.

16             Daniel Guyder, Esq.

17             Laura Hall, Esq.

18             Joseph Badtke-Berkow, Esq.

19             Jonathan Cho, Esq.

20             Nicolette Ward, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   BUCHANAN INGERSOLL & ROONEY

24   1105 North Market Street

25   Suite 1900
```



```
 1   Wilmington, DE  19801-1054

 2   PER:        Kathleen A. Murphy, Esq.

 3                    Mary F. Caloway, Esq.

 4

 5                       U.S. DEBTORS

 6

 7   FOR NORTEL NETWORKS INC.

 8   TORYS LLP

 9   79 Wellington Street West, Suite 3000

10   Box 270, TD Centre

11   Toronto, ON  M5K 1N2

12   PER:        Sheila Block, Esq.

13                    Andrew Gray, Esq.

14

15   FOR THE U.S. DEBTORS

16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

17   1201 North Market Street, 16th Floor

18   P.O. Box 1347

19   Wilmington, DE  19899-1347

20   PER:        Derek Abbott, Esq.

21                    Annie Cordo, Esq.

22

23   FOR NORTEL NETWORKS INC.

24   CLEARY GOTTLIEB STEEN & HAMILTON LLP

25   One Liberty Plaza
```



```
 1   New York, NY  10006

 2   PER:       James Bromley, Esq.

 3              Lisa Schweitzer, Esq.

 4              Howard Zelbo, Esq.

 5              Jeffrey Rosenthal, Esq.

 6              Avi Luft, Esq.

 7              Marla Decker, Esq.

 8

 9                   EMEA DEBTORS

10

11   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

12   LIMITED

13   DAVIES WARD PHILLIPS & VINEBERG LLP

14   40th Floor

15   155 Wellington Street

16   Toronto, ON  M5V 3G7

17   PER:       Matthew Milne-Smith, Esq.

18              Robin B. Schwill, Esq.

19              Sean Campbell, Esq.

20              James Doris, Esq.

21              Louis Sarabia, Esq.

22

23   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

24   LIMITED

25   LAX O'SULLIVAN SCOTT LISUS LLP
```



```
 1   Suite 2750, 145 King Street West

 2   Toronto, ON  M5H 1J8

 3   PER:       Matthew P. Gottlieb, Esq.

 4              Tracy Wynne, Esq.

 5              Paul Michell, Esq.

 6

 7   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 8   LIMITED

 9   HUGHES HUBBARD & REED

10   One Battery Park Plaza

11   New York, NY  10004-1482

12   PER:       Derek Adler, Esq.

13              Neil Oxford, Esq.

14              Fara Tabatabai, Esq.

15              Charles Huberty, Esq.

16

17   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

18   LIMITED

19   YOUNG CONAWAY STARGATT & TAYLOR LLP

20   Rodney Square

21   1000 North King Street

22   Wilmington, DE  19801

23   PER:       Ed Harron, Esq.

24              John Dorsey, Esq.

25
```



```
 1   FOR THE EMEA DEBTORS

 2   HERBERT SMITH FREEHILLS LLP

 3   Exchange House

 4   Primrose Street

 5   London, England  EC2A 2EG

 6   PER:        James Norris-Jones, Esq.

 7

 8               CANADIAN CREDITORS COMMITTEE

 9

10   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

11   BENEFICIARIES

12   KOSKIE MINSKY

13   20 Queen Street West

14   Suite 900

15   Toronto, ON  M5H 3R3

16   PER:        Mark Zigler, Esq.

17               Susan Philpott, Esq.

18               Ari Kaplan, Esq.

19               Barbara Walancik, Esq.

20

21   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

22   REPRESENTED BY THE CAW-CANADA

23   CAW-CANADA

24   Legal Department

25   205 Placer Court
```



```
 1   Toronto, ON  M2H 3H9
 2   PER:        Barry E. Wadsworth, Esq.
 3               Lewis Gottheil, Esq.
 4
 5   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
 6   COMMITTEE
 7   SHIBLEY RIGHTON LLP
 8   250 University Avenue, Suite 700
 9   Toronto, ON  M5H 3E5
10   PER:        Arthur O. Jacques, Esq.
11               Thomas McRae, Esq.
12
13   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS
14   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE
15   FUND
16   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP
17   35th Floor
18   155 Wellington Street West
19   Toronto, ON  M5V 3H1
20   PER:        Kenneth T. Rosenberg, Esq.
21               Massimo (Max) Starnino, Esq.
22               Lily Harmer, Esq.
23               Karen Jones, Esq.
24               Tina Lie, Esq.
25               Michelle Jackson, Esq.
```



```
 1

 2   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 3   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 4   2009

 5   NELLIGAN O'BRIEN PAYNE LLP

 6   50 O'Connor Street, Suite 1500

 7   Ottawa, ON  K1P 6L2

 8   PER:       Janice B. Payne, Esq.

 9              Steven Levitt, Esq.

10              Christopher Rootham, Esq.

11              Ainslie Benedict, Esq.

12

13   FOR MORNEAU SHEPELL LIMITED

14   MCCARTHY TETRAULT LLP

15   Suite 5300, Toronto Dominion Bank Tower

16   Toronto, ON  M5K 1E6

17   PER:       Barbara J. Boake, Esq.

18              James D. Gage, Esq.

19              Elder C. Marques, Esq.

20              Paul Steep, Esq.

21              Byron Shaw, Esq.

22              Sharon Kour, Esq.

23              Kelly Peters, Esq.

24

25
```



```
 1   FOR THE CANADIAN CREDITORS COMMITTEE

 2   DLA PIPER

 3   919 North Market Street, Suite 1500

 4   Wilmington, DE  19801

 5   PER:       Selinda A. Melnik, Esq.

 6              Richard Hans, Esq.

 7              Timothy Hoeffner, Esq.

 8              Farah Lisa Whitley-Sebti, Esq.

 9

10             INFORMAL NORTEL NOTEHOLDER GROUP

11

12   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

13   BENNETT JONES LLP

14   1 First Canadian Place

15   Suite 3400

16   Toronto, ON  M5X 1A4

17   PER:       Kevin Zych, Esq.

18              S. Richard Orzy, Esq.

19              Gavin Finlayson, Esq.

20              Richard Swan, Esq.

21              Sean Zweig, Esq.

22              Jonathan Bell, Esq.

23              Amanda McLachlan, Esq.

24

25
```



```
 1    FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 2    MILBANK, TWEED, HADLEY, MCCLOY LLP

 3    1 Chase Manhattan Plaza

 4    New York, NY  10005

 5    PER:      Thomas R. Kreller, Esq.

 6              Jennifer P. Harris, Esq.

 7              Albert A. Pisa, Esq.

 8              Samir Vora, Esq.

 9              Andrew LeBlanc, Esq.

10              Michael Hirschfeld, Esq.

11              Atara Miller, Esq.

12              Tom Matz, Esq.

13              Nick Bassett, Esq.

14              Gabrielle Ruha, Esq.

15              Rachel Pojunas, Esq.

16

17       THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18

19    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

20    CASSELS BROCK & BLACKWELL LLP

21    Suite 2100, Scotia Plaza

22    40 King Street West

23    Toronto, ON  M5H 3C2

24    PER:      Shayne Kukulowicz, Esq.

25              Michael Wunder, Esq.
```



```
 1                Ryan Jacobs, Esq.

 2

 3    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 4    ASHURST LLP

 5    Boardwalk House

 6    5 Appold Street

 7    London, England   EC2A 2HA

 8    PER:        Angela Pearson, Esq.

 9                Antonia Croke, Esq.

10

11    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12    RICHARDS LAYTON & FINGER, P.A.

13    920 North King Street

14    Wilmington, DE   19801

15    PER:        Christopher Samis, Esq.

16

17    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18    AKIN GUMP STRAUSS HAUER & FELD LLP

19    One Bryant Park

20    New York, NY   10036

21    PER:        Fred S. Hodara, Esq.

22                David H. Botter, Esq.

23                Abid Qureshi, Esq.

24                Robert A. Johnson, Esq.

25                Brad M. Kahn, Esq.
```




```
 1              Christine Doniak, Esq.

 2              Joseph Sorkin, Esq.

 3              Jacqueline Yecies, Esq.

 4

 5      UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 6              UK PENSION TRUST LIMITED

 7

 8   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 9   NETWORKS UK PENSION TRUST LIMITED

10   THORNTON GROUT FINNIGAN LLP

11   Suite 3200, 100 Wellington Street West

12   P.O. Box 329

13   Toronto, ON  M5K 1K7

14   PER:     Michael Barrack, Esq.

15              D.J. Miller, Esq.

16              Rebecca Lewis, Esq.

17              Andrea McEwan, Esq.

18              John Finnigan, Esq.

19              Michael Shakra, Esq.

20

21   FOR THE UK PENSION PROTECTION FUND AND NORTEL

22   NETWORKS UK PENSION TRUST LIMITED

23   WILLKIE FARR & GALLAGHER LLP

24   787 Seventh Avenue

25   New York, NY  10019-6099
```



```
 1    PER:        Brian O'Connor, Esq.

 2                Sameer Advani, Esq.

 3                Andrew Hanrahan, Esq.

 4

 5    FOR THE UK PENSION PROTECTION FUND AND NORTEL

 6    NETWORKS UK PENSION TRUST LIMITED

 7    BAYARD, P.A.

 8    222 Delaware Avenue, Suite 900

 9    Wilmington, DE  19899

10

11    PER:        Charlene D. Davis, Esq.

12                Justin Alberto, Esq.

13

14                THE BANK OF NEW YORK MELLON

15

16    FOR THE BANK OF NEW YORK MELLON

17    MCMILLAN LLP

18    Brookfield Place

19    181 Bay Street, Suite 4400

20    Toronto, ON  M5J 2T3

21    PER:        Sheryl E. Seigel, Esq.

22

23    FOR THE BANK OF NEW YORK MELLON

24    LATHAM & WATKINS LLP

25    885 Third Avenue
```



```
 1   New York, NY  10022-4834
 2   PER:       Michael J. Riela, Esq.
 3
 4          WILMINGTON TRUST, NATIONAL ASSOCIATION
 5
 6   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
 7   HEENAN BLAIKIE LLP
 8   Bay Adelaide Centre
 9   333 Bay Street, Suite 2900
10   P.O. Box 2900
11   Toronto, ON  M5H 2T4
12   PER:       John Salmas, Esq.
13              Kenneth Kraft, Esq.
14              Sara-Ann Van Allen, Esq.
15
16   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
17   KATTEN MUCHIN ROSENMAN LLP
18   575 Madison Avenue
19   New York, NY  10022-2585
20   PER:       Craig A. Barbarosh, Esq.
21              David A. Crichlow, Esq.
22              Karen B. Dine, Esq.
23
24
25
```



```
 1              LAW DEBENTURE TRUST COMPANY OF NEW YORK

 2

 3    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 4    BORDEN LADNER GERVAIS LLP

 5    40 King Street West

 6    Toronto, ON  M5H 3Y4

 7    PER:        Edmond F.B. Lamek, Esq.

 8                James Szumski, Esq.

 9

10    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

11    PATTERSON BELKNAP WEBB & TYLER LLP

12    1133 Avenue of the Americas

13    New York, NY  10036

14    PER:        Daniel E. Lowenthal, Esq.

15

16         BOARDS OF DIRECTORS OF NORTEL NETWORKS

17         CORPORATION AND NORTEL NETWORKS LIMITED

18

19    FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

20    CORPORATION AND NORTEL NETWORKS LIMITED

21    OSLER HOSKIN AND HARCOURT LLP

22    100 King Street West

23    1 First Canadian Place, Suite 6100

24    P.O. Box 50

25    Toronto, ON  M5X 1B8
```



```
 1   PER:        Lyndon Barnes, Esq.

 2               Edward Sellers, Esq.

 3               Betsy Putnam, Esq.

 4               Adam Hirsh, Esq.

 5               Alexander Cobb, Esq.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 Neeson & Associates   W&F

1            I N D E X

2

3  WITNESS:                                    PAGE

4  MICHAEL TODD ORLANDO

5  Examination In-Chief/Direct Examination

6     by Mr. Rosenthal......................   1272

7  Cross-Examination by Mr. Oxford..........   1291

8  Cross-Examination by Mr. Barrack.........   1311

9  Cross-Examination by Mr. Zarnett.........   1326

10  Re-Examination/Re-Direct

11     by Mr. Rosenthal......................   1351

12

13  JOHN RAY

14  Examination In-Chief/Direct Examination

15     by Mr. Zelbo..........................   1356

16  Cross-Examination by Mr. O'Connor........   1377

17  Cross-Examination by Mr. Pultman.........   1389

18  Cross-Examination by Mr. Hoeffner........   1455

19  Re-Examination/Re-Direct by Mr. Zelbo....   1457

20  Further Cross-Examination by Mr. Pultman.   1471

21

22  PHILIPPE ALBERT-LEBRUN

23  Examination In-Chief/Direct Examination

24     by Mr. Gottlieb.......................   1476

25  Cross-Examination by Ms. Kimmel..........   1487



```
 1   Re-Examination/Re-Direct

 2     by Mr. Gottlieb........................    1525

 3   Further Cross-Examination by Ms. Kimmel...   1531

 4   Cross-Examination by Mr. Cobb.............   1534

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                    INDEX OF EXHIBITS

 2

 3   NUMBER/DESCRIPTION                       PAGE NO.

 4   19:  Declaration by Mr. Orlando.........    1273

 5   20:  Declaration of John Ray,

 6   dated April 11, 2014....................    1355

 7   21:  Reply declaration of John Ray,

 8   dated April 25, 2014....................    1355

 9   22:  Affidavit of Philippe

10   Albert-Lebrun...........................    1476

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   -- Upon commencing at 9:10 a.m.
 2              THE CANADIAN COURT:  Good morning.
 3              THE US COURT:  Good morning, Justice
 4   Newbould.
 5              THE CANADIAN COURT:  Good morning,
 6   Judge Gross.
 7              MR. ROSENTHAL:  Good morning, Your
 8   Honours.  I get to lead off here today; Jeff
 9   Rosenthal again of Cleary Gottlieb on behalf of the
10   US Debtors, and the first witness we will be
11   calling today is Michael Orlando.
12
13   MICHAEL TODD ORLANDO, having been first duly sworn,
14        was examined and testified as follows:
15
16              MR. ROSENTHAL:  Thank you, Your Honour.
17
18   EXAMINATION IN-CHIEF/DIRECT EXAMINATION
19   BY MR. ROSENTHAL:
20              Q.   Good morning, Mr. Orlando.
21              A.   Good morning.
22              Q.   Mr. Orlando, can you briefly
23   explain your job responsibilities at Nortel?
24              A.   I joined Nortel in 2002 and at
25   that point I was doing federal and state compliance
```



```
 1    through about 2004, and 2004 I began doing

 2    international compliance work, and then sometime in

 3    2005 I joined the transfer pricing group and that's

 4    where I was until I ended my time at Nortel.

 5                    THE CANADIAN COURT:  Just a minute,

 6    Mr. Rosenthal.  I think we should mark the

 7    declaration as the next exhibit.

 8                    THE REGISTRAR:  Exhibit 19, Your

 9    Honour.

10                    THE CANADIAN COURT:  Thank you.

11                    EXHIBIT NO. 19:  Declaration by Mr.

12                    Orlando.

13                    THE CANADIAN COURT:  Yes, go ahead,

14    Mr. Rosenthal.

15                    BY MR. ROSENTHAL:

16                    Q.   When you say compliance, you mean

17    tax compliance?

18                    A.   Tax compliance, that's correct.

19                    Q.   What was your last position at

20    Nortel?

21                    A.   Director of transfer pricing.

22                    Q.   By what Nortel entity were you

23    employed?

24                    A.   Nortel Networks Inc.

25                    Q.   While you were in your positions
```



```
 1   in transfer pricing, to whom did you report?
 2              A.   I reported to Mark Weisz initially
 3   and then I reported to Peter Look.
 4              Q.   Do you have a severance claim
 5   against NNI?
 6              A.   I do.
 7              Q.   I'd like to refer you to the MRDA,
 8   which is Exhibit 21003.  I presume everybody has a
 9   copy.  You should have a copy there, Mr. Orlando.
10              A.   I do.
11              Q.   Are you familiar with the MRDA?
12              A.   Yes, I am.
13              Q.   And how are you familiar with the
14   MRDA?
15              A.   It was the foundational document
16   for our transfer pricing policy.  I've worked with
17   it extensively since my -- since joining the
18   transfer pricing group.
19              Q.   In what ways did you work with it
20   extensively?
21              A.   I represented it to other folks in
22   the tax group and in the US and UK and Canada, to
23   our advisors, Ernst & Young Canada, Ernst & Young
24   US, and to the tax authorities in multiple
25   jurisdictions.
```



1                    Q.   Did you have any involvement with

2      respect to the addenda to the MRDA?

3                    A.   Yes, I did.

4                    Q.   Can you just describe in a

5      sentence or so what the purpose of the MRDA was?

6                    A.   Well, it's a tax document that

7      underscores our transfer pricing policy.

8                    Q.   Did the MRDA formalize ownership

9      of IP?

10                   A.   Yes, it did.

11                   Q.   And how so?

12                   A.   It granted exclusive licenses to

13     each of the participants to the MRDA in exchange

14     for legal title to NNL.

15                   Q.   Was the sharing of on-going

16     profits and losses also incorporated in the MRDA?

17                   A.   Yes, it was.  In Schedule A.

18                   Q.   Can you turn to Schedule A in the

19     MRDA that's before you.

20                   Your Honours, that's on page 15 of the

21     copy of the MRDA.

22                   THE US COURT:  Thank you.

23                   BY MR. ROSENTHAL:

24                   Q.   At the end of the MRDA, Schedule

25     A, is a footnote 2 that says:



```
 1                     "The final R&D allocation for

 2                     any particular year could be

 3                     adjusted upward or downward in order

 4                     to reflect the final determination

 5                     of any taxing authority that would

 6                     affect the RPSM calculations for

 7                     such taxable year."

 8                     Can you explain what's meant by that?

 9               A.   Yes.

10               THE CANADIAN COURT:  Just a minute.  I

11    don't understand this evidence.  Is there some

12    issue about what's meant by it?  It is what it is.

13               MR. ROSENTHAL:  Your Honour, that's

14    true, but also with respect to -- and that's why

15    this last footnote actually is particularly

16    relevant.  The MRDA requires, as part of it,

17    negotiation and approval with the tax authorities.

18               THE CANADIAN COURT:  I understand all

19    that, but the footnote says what it says.  Why do

20    we have to have somebody tell us what it says?

21    There's nothing magical about the language in it.

22               MR. ROSENTHAL:  It's prefatory.  I can

23    move on, Your Honour.

24               BY MR. ROSENTHAL:

25               Q.   For the 2001 to 2005 tax years did
```



```
 1    the tax authorities ever adjust the Schedule A
 2    calculations?
 3              A.   Yes, they did.
 4              Q.   And what was the result?
 5              A.   The result was a $2 billion income
 6    adjustment from NNL to NNI.
 7              Q.   I'd like to show you what's been
 8    marked as Exhibit 22078.  It should be in your pile
 9    right in front of you.
10              A.   Not part of the MRDA?
11              Q.   No.
12              A.   Got it.
13              Q.   Do you recognize this exhibit?
14              A.   Yes, I do.
15              Q.   What is it?
16              A.   This is an APA request, bilateral
17    APA request between the US and Canada taxing
18    authorities.
19              Q.   Did you have any involvement in
20    the preparation of this document?
21              A.   Yes, I did.
22              Q.   What was your role?
23              A.   My primary role was to create the
24    functional analysis that is part of this APA
25    application.
```



```
 1                    Q.   Can you turn then to Appendix A.
 2   And for the record, it's -- in the bottom
 3   right-hand corner it's PC184908.
 4                    A.   184908.  Got it.
 5                    Q.   What is Appendix A?
 6                    A.   It's part of the functional
 7   analysis.
 8                    Q.   Can you tell the courts what a
 9   functional analysis is?
10                    A.   Yeah, it's a representation of the
11   business and how the business operates and how the
12   entities operate with each other.
13                    Q.   Why is a functional analysis part
14   of your APA application?
15                    A.   It's required as part of the APA
16   application by the tax authorities.
17                    Q.   And what is the purpose of it?
18                    A.   To educate the tax authorities on
19   how the business operates.
20                    Q.   And did part of your job involve
21   actually carrying out the functional analysis?
22                    A.   Yes, it did.
23                    Q.   How did you go about ensuring that
24   Nortel's transfer pricing policy reflected how the
25   business actually operated at Nortel?
```



```
 1                    A.   So, what we had to do is we
 2   identify the folks in the business who are most
 3   knowledgeable about the business.  We work with
 4   outside advisors, Ernst & Young US, Ernst & Young
 5   Canada, with economists from Ernst & Young, and we
 6   actually sit down in front of these folks and we
 7   interview them and say look, tell me about what you
 8   do, tell me about what your people do, and how you
 9   interact with other organizations within Nortel,
10   and we document our discussions with them.
11                    We type up all the notes, we tell a
12   story about that particular function, we send it
13   back to the interviewee and we ask them, does this
14   clearly reflect, you know, what we heard?  And
15   typically they would say yes, and then we would
16   bake each one of those interviews into the broader
17   functional analysis which tells a story about the
18   company's operations.
19                    Q.   Was there any approval process
20   within Nortel before it would be submitted to the
21   tax authorities?
22                    A.   Yeah, the ultimate decision-maker
23   would of course approve the document.
24                    Q.   Can you turn to page 11 of this
25   document and the Bates number in the bottom
```



```
1    right-hand corner is PC184863.
2              A.    Got it.
3              Q.    Under "Integrated Entities" it
4    says:
5                    "These entiles are entitled to
6                    participate in the on-going benefits
7                    from their historical IP and bear
8                    the risks associated with the
9                    continuing value of that IP.  The
10                   IEs maintain their historical IP and
11                   continue to develop new IP in which
12                   they anticipate sharing in the
13                   future benefits.  These entities are
14                   responsible for on-going
15                   entrepreneurship and risk-taking
16                   functions with respect to their
17                   on-going IP activities."
18             Did you write that?
19             A.    Yes, I did.
20             Q.    Was that written as a result of
21   yours and Ernst & Young's functional analysis?
22             A.    Yes, it was.  It was our
23   understanding of how the business operates.
24             Q.    When you used phrase "on-going
25   entrepreneurship and risk-taking functions with
```



```
 1    respect to their on-going IP activities," did that

 2    have any meaning in the tax context distinct from

 3    the business context?

 4                    A.   No, not distinct.  The tax context

 5    and the business context would be the same.

 6                    Q.   I'd like to now have you turn to

 7    the page that is 184911 at the bottom.  Do you have

 8    that?

 9                    A.   Yes, I do.

10                    Q.   And right below the chart is a

11    sentence:

12                    "All intellectual property (IP)

13                    created from the investment in R&D

14                    by the IEs is registered by NNL.

15                    Each IE maintains an economic

16                    ownership in the IP."

17                    Did you write that?

18                    A.   Yes, I did.

19                    Q.   When you used the phrase "economic

20    ownership" did that have any meaning in the tax

21    context distinct from the business context?

22                    A.   No.  It has the same meaning in

23    tax and business context.

24                    Q.   If you could turn back two pages,

25    there is a chart on PC184909.  Mr. Orlando, do you
```


Neeson & Associates    W&F

```
 1   recognize this chart?
 2              A.   I do.
 3              Q.   Were you involved in the
 4   preparation of this chart?
 5              A.   I and many others were involved in
 6   the preparation of this chart.
 7              Q.   Was Ernst & Young Canada involved
 8   in the preparation of this chart?
 9              A.   Yes, they were.
10              Q.   Can you explain what the Xs and Ys
11   on this chart mean?
12              A.   Yeah, the X indicates that the
13   Nortel entities are performing this activity for
14   the benefit of their local revenues and global
15   revenues as well.
16              Q.   What about the Ys?
17              A.   The Y represents that the entity
18   is performing that activity in support of local
19   revenues only.
20              Q.   So can you explain what the R&D
21   line indicates?
22              A.   Yeah, the R&D line indicates that
23   each one of these entities is performing R&D on
24   behalf of global revenues.
25              Q.   What does the registration of
```



```
 1   intellectual property line indicate?
 2              A.   That indicates that this
 3   particular entity, in this case I think it's NNL,
 4   is responsible for the registration of intellectual
 5   property on behalf of all the global entities.
 6              Q.   Finally, what does the
 7   intellectual property economic ownership line
 8   indicate?
 9              A.   Well, that has a Y.  That
10   indicates that each one of these entities has
11   intellectual property ownership within its local
12   jurisdiction.
13              Q.   Did you spend a lot of time
14   preparing this chart?
15              A.   Yeah, we did spend a lot of time
16   preparing this chart.
17              Q.   Was it approved by senior
18   management at NNL?
19              A.   Yes, it was.  It would have been
20   approved by Peter Look.
21              Q.   And does this accord with your
22   understanding of Nortel's ownership of IP as a
23   result of your functional analysis?
24              A.   Yes, it does.
25              Q.   Is this chart consistent with what
```



```
 1   Nortel represented to tax authorities?

 2             A.   Yes.  Yes, it is.

 3             Q.   I'd like to just refer you to one

 4   more document and it's also before you, it is

 5   document Exhibit TR47223.01.  Do you recognize this

 6   document?

 7             A.   I do.

 8             Q.   When was this report prepared?

 9             A.   It would have been prepared

10   sometime in 2010.

11             Q.   Was that after Nortel filed for

12   bankruptcy and Ernst & Young Canada was acting for

13   the Monitor?

14             A.   Yes.

15             Q.   Why was this report prepared?

16             A.   Reports like these are required to

17   be prepared to document the company's transfer

18   pricing policy.

19             THE CANADIAN COURT:  Are required by

20   whom?

21             THE WITNESS:  Required by the tax

22   authorities.

23             THE CANADIAN COURT:  Thank you.

24             BY MR. ROSENTHAL:

25             Q.   Are there any penalties associated
```



 1   with either the preparation or the non-preparation

 2   of this document?

 3            A.   Yes.  If the document is not

 4   prepared timely, the taxpayer is subject to

 5   penalty, or if it's incorrect, it doesn't

 6   necessarily represent the business, the company --

 7   the taxpayer could also be subject to penalty.

 8            Q.   Who prepared this report?

 9            A.   It was a joint effort by me, folks

10   on my team, and Ernst & Young Canada.

11            Q.   Was Sean Kruger of Ernst & Young

12   Canada involved?

13            A.   Yes, he was.

14            Q.   I'd like you to turn to page

15   443585, it's under the Executive Summary.

16            A.   Okay.

17            Q.   And we're looking at the bullet at

18   the very bottom of the page:

19                 "The Nortel Group, of which

20                 Nortel Networks Corporation, NNC, is

21                 the ultimate parent, operates under

22                 the residual profit split method,

23                 RPSM, whereby certain affiliates,

24                 including NNL and other integrated

25                 entities, IEs, are the primary



```
1                   owners of intangibles developed by
2                   the Nortel Group and bear the risk
3                   of development."
4                   Does that accurately summarize the
5        result of yours and E&Y's functional analysis of
6        the Nortel Group's IP ownership?
7                   A.   Yes, it does.
8                   Q.   Was this document final?
9                   A.   Yes, it is.
10                  Q.   And did you sign off that this
11       document was final?
12                  A.   I did.
13                  Q.   Did Ernst & Young Canada sign off
14       that this document was final?
15                  A.   Yes, they did.
16                  Q.   Is this something that you were
17       comfortable representing to tax authorities?
18                  A.   Yes.
19                  Q.   If you could turn now to page
20       443623.  Is this the same chart that we saw in the
21       2008 APA request?
22                  A.   Yes, it's substantially similar.
23                  Q.   Would this chart have reflected
24       any updates from the 2008 APA request?
25                  A.   Yes, it likely did.
```



```
 1                    Q.   How would you go about updating
 2    the information in this functional analysis?
 3                    A.   Well, it would be a substantially
 4    similar process that we would reach back out to
 5    those in the know, in the business, and talk to
 6    them, saying look, has anything changed since we
 7    spoke last, and, if so, you know, what has changed,
 8    and, you know, if we find that there were changes
 9    we would have updated this report and this chart to
10    reflect those changes.
11                    Q.   Now, with respect to R&D and
12    intellectual property registration and ownership,
13    does this chart make the same statements about
14    which IEs performed which activities?
15                    A.   Yes.  R&D has an X which would
16    mean that each entity performs R&D to support
17    global revenues.  Registration of intellectual
18    property has an X which means that NNL is
19    responsible for the registration of intellectual
20    property for the global group.  And then
21    intellectual property ownership has a Y, and so it
22    indicates that each entity owns its intellectual
23    property within its jurisdiction.  So it's exactly
24    the same.
25                    Q.   Was there a similar report to this
```



```
 1   exhibit prepared for NNI?
 2             A.   Yes.
 3             Q.   Do you know if it had the same
 4   chart and functional analysis?
 5             A.   Yeah, it would have.
 6             Q.   Based on your interactions with
 7   the tax authorities, was it necessary that the
 8   results of your functional analysis be consistent
 9   with the terms of the MRDA?
10             A.   Yes.
11             Q.   Mr. Orlando, I just have one more
12   short subject before I turn it over to my
13   colleagues here.
14             Did the MRDA address how to allocate
15   proceeds from the sale of any Nortel business?
16             A.   No, it did not.
17             Q.   Did the -- did Nortel ever use the
18   RPSM to allocate proceeds from the sale of Nortel
19   IP?
20             A.   Yes, we did one time that I am
21   aware of.
22             Q.   What was the transaction in which
23   it did?
24             A.   In 2006 or 2007 the company sold
25   its UMTS business to Alcatel.
```



```
 1                    Q.   Did Nortel use the RPSM to
 2    allocate proceeds in connection with the Alcatel
 3    sale because it was required to do so?
 4                    A.   No, the MRDA was silent on how to
 5    allocate proceeds.
 6                    Q.   Why did the group decide to do it
 7    that way?
 8                    A.   For convenience.  It was easy.
 9                    THE CANADIAN COURT:  Just a minute.
10    Have we heard whether this witness was involved in
11    that?
12                    BY MR. ROSENTHAL:
13                    Q.   Were you involved in connection
14    with the Alcatel sale and the allocation of
15    proceeds?
16                    A.   Yes, there was a collaborative
17    effort between me, Kerry Stephens on the UK tax
18    team, some folks from the Canadian tax team.  We
19    came together and said okay, how are we going to
20    allocate these proceeds, what would be an
21    appropriate way to do so, and we netted out on
22    using the RPS percentages as a reasonable --
23                    Q.   Was that done on a consensual
24    basis?
25                    A.   Yes.
```

 

```
 1                      Q.   Did you believe that all sales of

 2     Nortel businesses would have to be allocated in

 3     this way?

 4                      A.   No, no.  There were a number of

 5     ways that it could have been done.  We just

 6     happened to choose this one in this particular

 7     instance.

 8                      Q.   Did the parties document their

 9     agreement to allocate in this way?

10                      A.   Yeah, we would have documented it

11     in a memo to the file.

12                      Q.   Was the MRDA amended at this time

13     to provide that allocations would be made under the

14     RPSM for sales of any Nortel businesses?

15                      A.   It was amended to explicitly

16     exclude gains or losses on the sale of business

17     from the RPSM calculation.

18                      Q.   That was subsequent to the Alcatel

19     sale?

20                      A.   I think it was subsequent to the

21     Alcatel sale.

22                      MR. ROSENTHAL:  Those are my questions,

23     Your Honour.

24                      THE CANADIAN COURT:  Thank you,

25     Mr. Rosenthal.  Anyone of the same interest?
```



1              MR. OXFORD:  Good morning, Justice
2    Newbould, good morning, Justice Gross.
3
4    CROSS-EXAMINATION BY MR. OXFORD:
5              Q.   Good morning, Mr. Orlando.
6              A.   Good morning.
7              Q.   We met at your deposition back in
8    November.
9              A.   We did.
10             Q.   And we haven't met subsequent to
11   that until a couple of minutes before court started
12   this morning.
13             THE CANADIAN COURT:  Would you just,
14   for the reporter, identify yourself again, please.
15             MR. OXFORD:  Oh, I'm sorry, Neil Oxford
16   of Hughes Hubbard & Reed for the EMEA Debtors.
17   Apologies.
18             BY MR. OXFORD:
19             Q.   Mr. Orlando, I would like to
20   direct you initially to your declaration and
21   paragraph 40 of your declaration.  Could we pull
22   that up on the screen, please.
23             A.   Do I have a copy of it here in
24   front of me?
25             Q.   I thought Mr. Rosenthal had given



```
 1   you a copy.  My apologies.
 2              MR. ROSENTHAL:  I don't believe so.
 3              THE WITNESS:  Thank you.
 4              BY MR. OXFORD:
 5              Q.  Do you have the place, sir?  Do
 6   you have paragraph 40?
 7              A.  I'm sorry, yes, paragraph 40.
 8   Okay.
 9              Q.  It's on page 13 of your
10   declaration.
11              A.  Yes, I do.
12              Q.  And it says:
13                  "The transfer pricing work
14                  sheets demonstrate that each
15                  integrated entity's annual R&D
16                  expenditure between the years 2001
17                  and 2008 are as follows."
18              And then overleaf on page 14 you set
19   out those expenditures, correct?
20              A.  That is correct.
21              Q.  And those figures represent the
22   research and development spend by the integrated
23   entities or the residual profit entities during the
24   years that the residual split profit mechanism was
25   in place, correct?
```



```
 1                    A.    That's correct.

 2                    Q.    And those monies represent, do

 3    they not, Mr. Orlando, the monies for example NNI

 4    spent on research and development within the United

 5    States?

 6                    A.    That's correct.  That represents

 7    what NNI would have recorded on their financial

 8    statements.

 9                    Q.    As direct or in-country research

10    and development, correct?

11                    A.    That's correct.  That's my

12    understanding.

13                    Q.    And these figures would then have

14    been used by Nortel to calculate their proportional

15    share of research and development that each of the

16    entities, NNL, NNI, NNUK, et cetera, was

17    contributing, correct?

18                    A.    Their proportional share of R&D

19    expenses, yes.

20                    Q.    And then that proportional share,

21    based on the numbers you have in figure 1, would

22    have been used to calculate the parties' share of

23    residual profits and losses, correct?

24                    A.    Of residual operating profits and

25    losses, that's correct.
```



```
 1                    Q.   Correct.  And you didn't use, just
 2    flipping forward in your declaration, you didn't
 3    use to calculate the shared residual operating
 4    profits and losses the numbers that are in figure 2
 5    of your declaration, correct?
 6                    A.   I'm sorry, can you repeat the
 7    question?
 8                    Q.   Sure.  Let me back up.  In figure
 9    2 of your declaration, which is at the end of
10    paragraph 41, you have another set of figures, do
11    you not, sir?
12                    A.   I do.
13                    Q.   Those are the transfer pricing
14    adjustments that were taking place that were
15    calculated between the same years, 2001 and 2008,
16    correct?
17                    A.   Yes, that's correct.
18                    Q.   And those numbers in figure 2 were
19    not the basis for calculating the parties' share of
20    residual profits and losses of the MRDA --
21                    THE CANADIAN COURT:  The declaration is
22    very clear.  It's the result of it.  I'm not sure
23    what you're doing here.
24                    MR. OXFORD:  Your Honour, if the point
25    is clear, I'm happy to move on.
```



```
 1                    THE CANADIAN COURT:  Well...
 2                    BY MR. OXFORD:
 3                    Q.   In paragraph 41, Mr. Orlando, you
 4      say that each integrated entity received a transfer
 5      adjustment either upwards or downwards and you set
 6      out the numbers in figure 2, correct?
 7                    A.   Yes.  That's correct.
 8                    Q.   And you're not purporting, are
 9      you, sir, to represent that any of these transfer
10      pricing adjustments were actually received in cash
11      payments, are you?
12                    A.   It's my understanding that they
13      would have been received in cash payments, yes.
14                    Q.   But you don't know, you haven't
15      done any work to ascertain whether the transfer
16      pricing adjustments were actually received for
17      example by NNUK?
18                    A.   No, that would have been the role
19      of our treasury organization to move the cash from
20      one entity to another.
21                    Q.   And that wasn't your job, you have
22      no personal knowledge of whether those payments
23      were ever actually made or received, correct?
24                    A.   No, I would have advised them on
25      what payments need to be made and it would have
```

1    been their role to make the payments.

2              Q.    Okay, thank you.  In paragraph 42,

3    sir, you do some math and you note that NNI made

4    6.7 billion of transfer pricing payments to NNL

5    from the years 2001 through 2008, correct?

6              A.    That's correct.

7              Q.    And you don't take account of the

8    $2 billion adjustment that you mentioned when you

9    were answering Mr. Rosenthal's questions?

10             A.    No, this does not consider that

11   adjustment.

12             Q.    Right.  You don't back out that $2

13   billion, correct?

14             A.    I don't believe I backed that out

15   from these numbers, no.

16             Q.    Thank you, that's all I have for,

17   I think, your declaration and that's all I have for

18   that topic.

19             I just have one more topic which

20   Mr. Rosenthal touched on briefly, which is Alcatel.

21   You testified that you were involved in a

22   collaborative effort with certain other members of

23   the tax group to decide how to allocate the

24   proceeds of the intellectual property assets sold

25   to Alcatel, correct?



```
 1                     A.   That is correct.
 2                     Q.   I'd like to show you a document in
 3     connection with that.  Can we have, please, Trial
 4     Exhibit 11259.
 5                     THE CANADIAN COURT:  11 what?
 6                     MR. OXFORD:  259, Your Honour.
 7                     BY MR. OXFORD:
 8                     Q.   Do you see that on your screen,
 9     Mr. Orlando?
10                     A.   I do.
11                     Q.   If you could take us to the second
12     page to the bottom, you'll see that there is an
13     email sent from a Timothy Pickering to Lou Farr.
14     Do you see that, sir?
15                     A.   Yes, I do.
16                     Q.   You can see from the signature
17     block that Mr. Pickering was a senior manager at
18     Deloitte LLP, correct?
19                     A.   Yes, I do.
20                     Q.   And Deloitte were Nortel's
21     auditors at the time of this email, correct?
22                     A.   We had changed auditors at some
23     point and so I have to assume that they were the
24     auditors at this time.
25                     Q.   And Mr. Pickering is requesting
```



 1    here some assistance in the audit of the Alcatel

 2    transaction, is he not?

 3              A.   That we were required to assist in

 4    the Alcatel transaction -- yes.

 5              Q.   Can you turn to the first page of

 6    that email to Mr. Farr's response.

 7              A.   Now, the problem is my glasses

 8    just fell apart so I'll do my best.  I'll do my

 9    best.

10              MR. ROSENTHAL:  He was properly

11    prepared.

12              MR. OXFORD:  Did you rough him up,

13    Jeff?

14              THE CANADIAN COURT:  Do you want mine?

15              THE WITNESS:  I would appreciate that.

16              BY MR. OXFORD:

17              Q.   Perhaps we could blow them up

18    extra big.  You'll see that Mr. Farr writes:

19                   "In response to your request,

20                   Rosanne and I offer the following."

21              A.   Yes.

22              Q.   Do you see that, sir?  Then I'd

23    like to direct your attention to paragraph 4 which

24    reads:

25                   "Assumptions underlying the



```
 1                   asset allocation statement re

 2                   customer relationship intangibles,

 3                   IPR, and goodwill."

 4                   And in particular can we blow up 4B

 5    which relates to IPR.  And you understand,

 6    Mr. Orlando, IPR to relate to intellectual property

 7    rights?

 8                   A.   I do.

 9                   Q.   Mr. Farr sends to Nortel's

10    auditors:

11                   "The value for IPR was

12                   allocated using RPS percentages.

13                   RPS determines how profits and

14                   losses are shared.  If UMTS access

15                   was not sold, all of the RPS members

16                   would share profits and losses

17                   associated with the business.  Since

18                   RPS determines the economic

19                   relationships between the parties,

20                   all rights associated with the IPR

21                   should be shared based on RPS

22                   percentages.  This is also

23                   consistent with Nortel's view that

24                   all Nortel IPR is indistinguishable

25                   such that all value should be shared
```



```
 1                among the RPS members."

 2                Do you see that, sir?

 3           A.   Yes, I do.

 4           Q.   And this is consistent with your

 5   recollection of how the IP proceeds were allocated

 6   amongst the various selling Nortel entities in the

 7   Alcatel transaction?

 8                A.   My understanding is that we

 9   allocated the proceeds from the Alcatel transaction

10   using the RPS percentages, but I'm not sure what

11   Mr. Farr is referring to here when he says "all

12   rights associated with the IPR should be shared

13   based on RPS percentages."  It's unclear to me what

14   he's saying.

15                Q.   Is paragraph 4B consistent with

16   your recollection --

17                THE CANADIAN COURT:  Just before you do

18   that, can you tell me, Mr. Farr was at the Nortel

19   tax department, where was he physically located?

20                THE WITNESS:  He was physically based

21   in Nashville.

22                THE CANADIAN COURT:  He was part of

23   NNI?

24                THE WITNESS:  He was part of NNI.

25                THE CANADIAN COURT:  Thank you.
```



```
1                BY MR. OXFORD:
2                Q.   Mr. Orlando, would you agree with
3    me that what's written here in paragraph 4B was
4    consistent with your recollection of the reason why
5    the RPS percentages were used to allocate the
6    proceeds of intellectual property among the various
7    selling Nortel entities in the Alcatel transaction?
8                A.   No, the proceeds from the Alcatel
9    transaction were simply allocated using the RPS
10   percentages.  It didn't necessarily signify that
11   all IPR should be shared based on RPS percentages.
12   It doesn't look like I was copied on this email, so
13   if I was, I may have corrected him a bit.
14               Q.   Right.
15               A.   Because he did make a
16   representation to our auditors.
17               Q.   Sure.  Let me deal with that
18   answer in a couple of ways.
19               A.   Okay.
20               Q.   Derrick, can I ask you to pull
21   back out the document and go to the top email and
22   blow up the front to -- sorry, one up.  You'll see
23   that Rosanne Culina sends that to you on February
24   2nd, 2007, sir?
25               A.   Yes, I do.
```



```
 1                    Q.   Okay.  Mr. Orlando, you were
 2    deposed in this matter.  We have established that,
 3    haven't we?
 4                    A.   Yes, I believe so.
 5                    Q.   And you were testifying under
 6    oath, were you not?
 7                    A.   Yes.
 8                    Q.   And you swore to tell the truth?
 9                    A.   Yes.
10                    Q.   You were asked questions?
11                    A.   In my deposition?
12                    Q.   Deposition, yes.
13                    A.   I was asked questions, yes.
14                    Q.   And you gave answers?
15                    A.   Yes, I did.
16                    Q.   And those answers were truthful at
17    the time you gave them?
18                    A.   Yes, they were.
19                    Q.   Can we pull up Mr. Orlando's
20    deposition at page 151.
21                    A.   Do I have a copy of that?
22                    Q.   We're going to pull it up on the
23    screen for you, sir.  Okay.  You see, sir, you were
24    asked the question starting at line 5:
25                         "Have you had a chance to read
```



1          paragraph 4B?

2                Answer:  Yes, I have.

3                Question.  Is that consistent

4          with your recollection about how

5          intellectual property assets were

6          allocated between the selling Nortel

7          entities in the UMTS transaction?

8                Answer:  Yes.

9                Question:  Is paragraph 4B also

10         consistent, sir, with your

11         recollection of the reason why the

12         RPS percentages were used to

13         allocate the proceeds of

14         intellectual property assets among

15         the various selling Nortel entities

16         in the Alcatel transaction?

17               Answer:  Yes."

18         Do you see that, sir?

19         A.   With the answer "yes" in line 19,

20    is that what you're referring to?

21         Q.   I'm asking you if you see all of

22    the questions and the answers, those three

23    questions and three answers that I just read to

24    you?

25               A.   Yes.

 Neeson & Associates   W&F

```
 1                    Q.   And those were truthful answers at
 2     the time you gave them, sir?
 3                    A.   Yes, to the best of my
 4     recollection.
 5                    Q.   Now, you and Mr. Stephens drafted
 6     the memorandum that was ultimately sent to Nortel's
 7     auditors in connection with this transaction,
 8     correct?
 9                    A.   I do recall that, yes.
10                    Q.   Okay.  Can we pull up --
11                    THE CANADIAN COURT:  Mr. Stephens?  Who
12     is Mr. Stephens?
13                    MR. OXFORD:  I'm sorry.
14                    BY MR. OXFORD:
15                    Q.   You're familiar with Mr. Kerry
16     Stephens?
17                    A.   I am.
18                    Q.   And who is Mr. Stephens?
19                    A.   He worked for the tax group in the
20     UK, the Nortel tax group in the UK.
21                    Q.   And you and Mr. Stephens as part
22     of this collaborative effort drafted the memorandum
23     that explained the basis on which the Alcatel
24     proceeds were going to be allocated internally
25     within Nortel, correct?
```



```
 1                    A.    That is correct.
 2                    Q.    And can we pull up that memo,
 3      please, which is Trial Exhibit 21165.  It's on your
 4      screen, sir, but Mr. Rosenthal is --
 5                    A.    Okay, I see the email and the
 6      memo.
 7                    Q.    And this is an email from you to
 8      Mr. Look, is it not, requesting approval of the
 9      memo that you and Mr. Stephens have drafted?
10                    A.    (Witness reads document).  Yes,
11      correct.
12                    Q.    And you would agree with me that
13      Mr. Look -- we have the document if necessary, but
14      we can just agree that Mr. Look signed off on this
15      memorandum?
16                    A.    Yes, I believe he did.
17                    Q.    Okay.  Mr. Orlando, you tried to
18      be accurate in all communications with Nortel's
19      auditors, did you not?
20                    A.    Yes, I did.
21                    Q.    And you're aware, sir, are you
22      not, that this -- this memorandum was ultimately
23      sent to Nortel's auditors?
24                    A.    Yes.
25                    Q.    In fact, you personally sent it
```



```
 1   direct to Deloitte, did you not?

 2              A.   Well, it says I would like to send

 3   it by -- to them by the close of business today.  I

 4   have to assume I sent it.

 5              Q.   Okay.  Now, if we can turn to the

 6   memo itself, sir, which is entitled "Project Osiris

 7   files."  Do you have that in front of you, sir?

 8              A.   Yes, I do.

 9              Q.   And Project Osiris was the

10   internal Nortel code name for the Alcatel

11   transaction, correct?

12              A.   I believe it was.

13              Q.   And under the heading

14   "Transaction" you see the last set of bullets that

15   are shown on the page, it says:

16                   "Nortel had the right to

17                   allocate the sale price among

18                   vending entities, its determination

19                   being based on the following basis."

20              A.   I see that, yes.

21              Q.   And then it runs through the

22   following categories of assets, first tangible

23   assets, correct?

24              A.   Correct.

25              Q.   And technology, that's the
```



 1    intellectual property rights that we talked about a
 2    few minutes ago?
 3                 A.    "Technology to the residual
 4    participants proportionate to their individual
 5    share of the R&D capital stock," yes.
 6                 Q.    And the other two categories of
 7    assets that are allocated in Alcatel are goodwill
 8    and customer contracts, correct?
 9                 A.    Correct.
10                 Q.    I'd like to focus on intellectual
11    property rights.  Could you turn, Mr. Orlando, to
12    the next page of the memorandum, there is paragraph
13    4 which has the heading "RPS Impacts."
14                 The first bullet in your memorandum
15    reads:
16                      "Consistent with the prior
17                      operation of the RPS model, the
18                      profit from the UMTS sale included
19                      in gain/loss on sale of assets is
20                      excluded from the operating income
21                      to determine profit for allocation
22                      amongst the residual participants."
23                 Do you see that, sir?
24                 A.    Yes, I do.  I recall the gain or
25    loss on sale of assets was specifically excluded



```
 1   from operating income as part of the RPS

 2   calculation, correct.

 3             Q.   Which means, in other words, that

 4   the MRDA doesn't automatically apply on the profit

 5   split on the gain or loss of business?

 6             A.   Correct.

 7             Q.   Then the next bullet in your

 8   memorandum says:

 9                  "Thus the allocation of the

10                  elements on the gain on sale of UMTS

11                  assets has to be considered in the

12                  context of the RPS arrangements."

13             Do you see that, sir?

14             A.   Yes, I see that.

15             Q.   And that's an accurate statement,

16   is it not?

17             A.   Well, I think the language of "has

18   to be considered" is a little strong.

19             Q.   Okay.  But it was your memorandum,

20   sir, you wrote this memo?

21             A.   At the time I did, yes.

22             Q.   You wrote this memo and you sent

23   it to your boss, did you not?

24             A.   I did.

25             Q.   And you knew that this memorandum
```



```
 1   was going to go to Nortel's auditors, correct?

 2               A.   That is correct.

 3               Q.   And you just told me you tried to

 4   be accurate and complete when you were talking to

 5   Nortel's auditors, correct?

 6               A.   That is correct.

 7               Q.   You knew that was important, did

 8   you not, sir?

 9               A.   Very important.

10               Q.   The next bullet says:

11                    "While NNL generally is the

12                    legal owner of the technology, the

13                    Master Research and Development

14                    Agreement determines economic

15                    ownership of it and thus allocation

16                    of the consideration by

17                    proportionate capital stock" -

18                    sorry - "R&D capital stock is

19                    appropriate."

20                    Do you see that, sir?

21               A.   I do.

22               Q.   And that also is an accurate

23   statement, is it not?

24               A.   It is.  But I think we have to

25   remember that this was a collaborative effort to
```

 Neeson & Associates    W&F

```
 1   allocate proceeds from the sale.  There could have
 2   been -- we could have used many different means to
 3   allocate these proceeds.  We chose R&D capital
 4   stock and deemed it appropriate.
 5             Q.   Could have but did not, sir?
 6             A.   That's correct.
 7             Q.   You didn't allocate it based on
 8   who held legal title to the IP, did you?
 9             A.   No, we did not.
10             Q.   You didn't allocate on who --
11   which entity made the most revenue from exploiting
12   that IP?
13             A.   No, we did not, but, just to be
14   clear, we could have because the MRDA was silent on
15   how to do it.
16             Q.   You could have but you didn't?
17             A.   That's correct.
18             Q.   You chose the most appropriate
19   method, correct?
20             A.   We chose the method that was
21   appropriate, whether or not it was the most
22   appropriate.
23             Q.   Certainly you thought it was the
24   most appropriate method at the time which is why
25   you included it in this memo that went to Nortel's
```



1   auditors, correct?

2             A.   Well, Kerry and I agreed that it

3   was appropriate.

4             Q.   Right.  And Mr. Look agreed it was

5   appropriate?

6             A.   Mr. Look agreed it was appropriate

7   as well.

8             Q.   And that was the allocation that

9   was then sent to Nortel's auditors, correct?

10            A.   That's correct.

11            Q.   And that was the allocation that

12  flowed into Nortel's books and records, correct?

13            A.   That is correct.

14            Q.   That was the allocation that

15  flowed up into Nortel entities' tax returns,

16  correct?

17            A.   That is correct.

18            MR. OXFORD:  May I just have one

19  moment?  I may be done.

20            I have no further questions for you at

21  this time, Mr. Orlando.  Thank you.

22            THE CANADIAN COURT:  Mr. Barrack?

23

24  CROSS-EXAMINATION BY MR. BARRACK:

25            Q.   Good morning, Mr. Orlando.  My



```
 1   name is Mike Barrack.

 2              A.   Good morning.

 3              Q.   Over here.

 4              A.   Sorry.

 5              Q.   I'm Mike Barrack, I'm on for the

 6   UK Pension Claimants.  So what I'd like to talk

 7   about is what the MRDA is not, as much as what it

 8   is.  That's what some of my questions are going to

 9   be aimed at.

10              So let's start.  The transfer pricing

11   mechanism embodied in the MRDA was only a proposed

12   transfer pricing mechanism to competent

13   authorities, correct?

14              A.   Yes, that is correct.

15              Q.   And in the end, it was never

16   accepted in its entirety by any competent tax

17   authority?

18              A.   We don't know if it was or not.

19   We do know that both competent authorities in their

20   position papers deemed it was the best method, but

21   ultimately we don't know what they settled on.

22              Q.   But what you do know is they

23   didn't accept the result of the application of that

24   methodology anywhere in the world, correct?

25              A.   Can you repeat that question?
```



```
 1                    Q.   Well, let's break it down.  Canada
 2   and the US definitely didn't accept the result,
 3   correct?
 4                    A.   They didn't accept the result as
 5   we proposed it, correct.
 6                    Q.   Right.  And it was never
 7   definitively accepted by the UK, Ireland or France,
 8   correct?
 9                    A.   To the best of my knowledge, it
10   was not, but it was reported on their local tax
11   returns, so unless the tax authorities made an
12   adjustment to the tax returns, I think we can
13   assume that they accepted it.
14                    Q.   And you don't know the status of
15   whether they accepted it or not in Ireland, the UK
16   and France, correct?
17                    A.   I don't know if they made
18   adjustments to the tax returns in those years,
19   that's correct.
20                    Q.   So what it is, it is a proposed
21   mechanism for allocating residual profits between
22   the RPEs based upon R&D capital stock, correct?
23                    A.   Schedule A lays out the proposed
24   methodology and I think earlier we looked at
25   footnote 2 saying that this is subject to
```

Neeson&Associates   W&F

```
1    adjustment based on agreement by the tax

2    authorities.

3              Q.   So let's get some nomenclature

4    between us because I accept that point and that's

5    my first point, right, is that what happens is you

6    developed, you know, very simply there is a change

7    in the transfer pricing world, OECD guidelines come

8    out, you go to Horst Frisch and everyone says that

9    for a highly integrated global entity the best

10   guess is an RPSM method, correct, or the closest

11   you can come, and then you hire Horst Frisch and

12   propose to the tax authorities a particular version

13   of an RPSM method?

14             A.   Yes, but I would just correct you

15   that it's not a best guess.  There is a hierarchy.

16             THE CANADIAN COURT:  You sort of buried

17   that in the middle of a long question but he found

18   it.

19             BY MR. BARRACK:

20             Q.   Let's get nomenclature together.

21   It's the best estimate?

22             A.   It was deemed the best method.

23             Q.   Best method.  And in my world,

24   when a method is off by 2 billion maybe it's a

25   guess, but anyway, that doesn't matter.
```



 1                    It's an estimate and you do this

 2    estimate, and the reason, you know, from OECD to

 3    Horst Frisch to Nortel where you go for this type

 4    of business with an RPS type of method is because

 5    of the difficulties allocating profit by geographic

 6    market with any accuracy?

 7                    A.   I think the biggest challenge is

 8    that the intellectual property is so interrelated,

 9    the transactions are so interrelated that we would

10    have difficulty allocating the profits across the

11    different types of technology.

12                    Q.   Okay, let's explore that then.  So

13    the guts of this business is the intellectual

14    property?

15                    A.   It is.

16                    Q.   And the guts of the business --

17    and that intellectual property is created through a

18    collaborative effort around the world, correct?

19                    A.   A collaborative R&D effort, that's

20    correct.

21                    Q.   A collaborative R&D effort.  And I

22    think, as you said in one of the emails that you

23    identified on your deposition, it's virtually

24    impossible to trace R&D in one location to a

25    particular patent?



```
 1                    A.    Yeah, I would agree with that.
 2                    Q.    And so it's because of that
 3    entanglement that you have to come up with a method
 4    to try and divide the profits?
 5                    A.    We -- the rules require that we go
 6    through a hierarchy of methods.
 7                    Q.    Right.
 8                    A.    Right.  And we deemed the residual
 9    profit split, because of the facts as we just spoke
10    about, as the best method to allocate income.
11                    Q.    Okay.  In addition to that
12    technological entanglement --
13                    THE CANADIAN COURT:  Can I just ask a
14    question, Mr. Barrack.  When you say the rules
15    require you to go through a hierarchy, what rules
16    are you talking about?
17                    THE WITNESS:  Well, specifically I was
18    referring to the section 482 of the Internal
19    Revenue Code, but the OECD guidelines also suggest
20    that taxpayers go through that same hierarchy to
21    determine the best method.
22                    THE CANADIAN COURT:  Thank you.
23                    BY MR. BARRACK:
24                    Q.    Let's just divert on that for a
25    second.  The way this operates in the transfer
```



```
 1    pricing world is the OECD is constantly updating
 2    its guidelines for transfer pricing; is that fair?
 3                  A.    It is.  They're in the process of
 4    updating them right now.
 5                  Q.    And then domestic jurisdictions
 6    like Canada and the United States have an eye to
 7    what the OEC is doing, and from time to time
 8    reflect in their transfer pricing either
 9    legislation or rules or policies, they try and --
10    Canada and the United States at least try to stay
11    current with where the OECD is.  Is that broadly
12    true?
13                  A.    That is broadly true.  Many
14    countries around the world have adopted the OECD
15    guidelines.
16                  Q.    So when you say the rules in the
17    transfer pricing world, it's that body of OECD then
18    affecting domestic rule-making power?
19                  A.    That's correct.
20                  Q.    Okay.  And so, in addition --
21    sorry, back to the point, in addition to this
22    technological entanglement that existed in the
23    Nortel business, there was also the fact that as a
24    matrix organization, it was run on line of business
25    as opposed to geography?
```



```
 1                    A.   That is -- that is the way the
 2   leadership looked at their business.  That's how
 3   they evaluated success or failure of their
 4   business, that's right.
 5                    Q.   Right.  And did that line of
 6   business as opposed to running, say, the Canadian
 7   business and the US business, all the businesses,
 8   provide additional challenges to the transfer
 9   pricing people?
10                    A.   That's the fundamental problem, is
11   that the business isn't necessarily aligned
12   geographically.
13                    Q.   So you have the technological
14   entanglement and you have geographic non-alignment
15   that causes you then to look for a proxy method for
16   transfer pricing purposes, correct?
17                    A.   It causes us to look for the best
18   method.
19                    Q.   The best method.  Sir, I'm not
20   challenging --
21                    A.   I know.
22                    Q.   I'm not challenging the RPSM
23   method.
24                    A.   That just gets ingrained in my
25   head.
```



```
 1                    Q.   You're not talking to the tax
 2    authorities today.
 3                    A.   I know.
 4                    Q.   And you can appreciate that what
 5    we're engaged in is a different process than
 6    transfer pricing in this courtroom; is that fair?
 7                    A.   That is fair.  I understand that
 8    we're engaged in a legal matter.
 9                    Q.   Right.  And we know, at least for
10    Canada and the United States -- sorry, a predicate
11    before I go there.
12                    What you're trying to do when you're
13    speaking to the tax authorities and you're putting
14    in these submissions is to -- is to ensure to them,
15    I was going to say convince them, but ensure for
16    them that the method accurately reflects the
17    economic reality of the business, correct?
18                    A.   That is correct.
19                    Q.   Right.  And so that we know for
20    Canada and the US they at least thought it missed
21    the economic reality mark by $2 billion for the
22    years 2001 to 2005?
23                    A.   I'll have to assume that that's
24    the case because they did make a $2 billion
25    adjustment, although I don't know the terms of that
```

 Neeson & Associates    W&F WILSON & PETERSON LTD.

1    adjustment.

2                Q.    That's fair.  And let's just pick

3    up on that.  There was --

4                THE CANADIAN COURT:  You say the terms.

5    You mean the terms or the reasons for?

6                THE WITNESS:  I'm using "terms" and

7    "reasons for" interchangeably.

8                THE CANADIAN COURT:  All right.

9                BY MR. BARRACK:

10               Q.    So you had some idea of what

11   Canada's position was, you had some idea of what

12   the US's position was, but at the end of the day

13   the two competent authorities bartered that deal

14   and came up with the $2 billion?

15               A.    That's right.  They, each of the

16   tax authorities, put together their position paper.

17               Q.    Right.

18               A.    Right?  They shared it with each

19   other, and then they shared it with us as the

20   taxpayer, and then from that point forward it's a

21   government-to-government negotiation under the tax

22   treaty between the two governments to determine how

23   the profits, the operating profits should be

24   allocated.

25               Q.    Right.  And so when you say you



1    don't know the reasons, you don't know their math,

2    whatever math they had in their mind, whatever

3    economic dislocation they felt was in the model is

4    not transparent to you?

5                   A.   Typically they would explain that

6    to us in a normal APA setting.  But in this one

7    they chose not to share it with the taxpayer.

8                   Q.   And in part, this was not a normal

9    situation, I assume, because by the time that

10   settlement had occurred, the company was already

11   insolvent?

12                  A.   That's correct, and I think that

13   was -- that was very frustrating to both taxing

14   authorities.

15                  MR. BARRACK:  Okay.  Your Honour, I'm

16   going to leave that topic.  You asked a question of

17   Mr. Bromley in opening about the percentage tax

18   applicable to the adjustments and various things.

19   I don't fully understand all of the confidentiality

20   restrictions.

21                  What I am told is that there is -- that

22   the agreement that was entered into is subject to a

23   high degree of confidentiality.

24                  Your Honours, I only point out that to

25   the extent that the courts want that on the record,



```
 1    there may be some parts of it that have
 2    implications for things like pricing and that, we
 3    would have to deal with it confidentially.
 4    Otherwise I would go to that area and have
 5    Mr. Orlando explain it, exactly what the mechanism
 6    was of that $2 billion adjustment.
 7              But I'm going to leave it and take
 8    direction, because I don't want to step in a
 9    confidentiality puddle unintentionally.
10              THE CANADIAN COURT:  I'm certainly not
11    and I doubt Judge Gross is either in a position to
12    know what's important for you to give to us.  I
13    can't make that determination, what's important you
14    give to us.  You have to make that determination.
15              MR. BARRACK:  Okay.  I would otherwise
16    give it to you but what I don't want to do is head
17    down that road.  I need some guidance.
18              THE CANADIAN COURT:  Well, I can tell
19    you that the weekend before this case started,
20    there was a lot of discussions going on between --
21    certainly between the Goodmans people and Jennifer
22    Stam and counsel for the CRA, I know that.  So
23    they're the people you'd better talk to.
24              MR. BARRACK:  Okay, let me move on to
25    other topics.  Maybe what I can do is finish off
```



1    what I've got and maybe at the break I can speak to

2    them and just reserve on that topic.

3                   BY MR. BARRACK:

4                   Q.   Let's go to another topic then,

5    and this is in the concept -- this is along the

6    lines of what the MRDA was and what it wasn't.

7                   In the third addendum, there was a

8    second amendment to Schedule A to the MRDA that

9    made the point -- that made explicit what you

10   testified to earlier, that the MRDA did not apply

11   to asset sales.

12                  A.   Correct.

13                  Q.   And that wasn't really a new

14   concept in the sense that what the MRDA was, was an

15   attempt to allocate trading profits or losses from

16   the business between the RPEs, correct?

17                  A.   That's correct.  I refer to those

18   as operating profits.

19                  Q.   And sales of assets were seen as a

20   different type of event than the generation of

21   operating profits?

22                  A.   Yes, we would typically deem those

23   non-operating activities.

24                  Q.   Right.  And if we take it further

25   out, there can be sales of two types of assets;



```
 1   there can be trading assets that give rise to
 2   trading profits, and non-trading assets, and
 3   neither one of that type of asset was to be put
 4   through the MRDA, sales were to go through the MRDA
 5   process, correct?
 6              A.   Well, the financial statements
 7   recorded gain or loss on sale of business.
 8              Q.   Right.
 9              A.   It's not entirely clear to me what
10   exactly was in that line, but we generally
11   understood that to be the sale of non-operating
12   assets.  Non-operating assets.
13              Q.   Something else that the MRDA did
14   not deal with was the risk of insolvency and
15   liquidation of the entire Nortel enterprise,
16   correct?
17              A.   I don't recall how it dealt with
18   insolvency.
19              Q.   There is no provision, I think
20   there's universal agreement that if you look at the
21   MRDA, there is no provision that deals with the
22   insolvency of the entire organization.
23              A.   The entire organization?  Okay, I
24   do recall there being a provision about if one of
25   the participants in the agreement became insolvent,
```



1    but I believe you're right, I don't recall a

2    provision about the entire group becoming

3    insolvent.

4              Q.    And that's not the sort of thing

5    that is commonly a risk allocated in a transfer

6    pricing agreement?

7              A.    I've never seen that, no.

8              MR. BARRACK:  I wonder if I could just

9    take a couple of minutes, Your Honour.  I just want

10   to find out what the status of that APA agreement

11   is and whether or not we can put it to the court

12   and in what manner, just so you have the details of

13   that settlement.

14              I am told that CRA says it has to be

15   sealed.  As you said so many times, the document

16   speaks for itself, so I don't think we have to deal

17   with it now.  When we -- I'll work with Goodmans

18   and Clearys and see if there's a way we can put the

19   document in front of you.

20              THE CANADIAN COURT:  Thank you,

21   Mr. Barrack.

22              MR. BARRACK:  Thank you, Mr. Orlando.

23   Sorry, Ms. McEwen points out to me that Your

24   Honours can have a look at it, it's in the

25   database, it's Trial Exhibit 44766.  It's not that



```
 1   long.
 2                   THE CANADIAN COURT:  There is a whole
 3   lot here we can look at.
 4                   MR. BARRACK:  We know.
 5                   MR. ZARNETT:  In case Your Honours had
 6   excess spare time.
 7
 8   CROSS-EXAMINATION BY MR. ZARNETT:
 9                   Q.   Good morning, Mr. Orlando.  Ben
10   Zarnett acting for the Canadian Debtors and the
11   Monitor.  Good morning, Judge Gross, Justice
12   Newbould.
13                   THE US COURT:  Good morning.
14                   BY MR. ZARNETT:
15                   Q.   Mr. Orlando, you're not a lawyer,
16   correct?
17                   A.   I'm not a lawyer.
18                   Q.   And you indicated that you
19   reported when you moved into the transfer pricing
20   area to Mark Weisz, correct?
21                   A.   That is correct.
22                   Q.   Who is also not a lawyer; is that
23   right?
24                   A.   I don't believe he is an attorney,
25   no.
```



```
 1                    Q.   And then you reported to Peter
 2   Look who was also not a lawyer; is that right?
 3                    A.   I don't think he was an attorney,
 4   no.
 5                    Q.   And just so that we understand, I
 6   understand you had no role in drafting the original
 7   MRDA?
 8                    A.   I did not.
 9                    Q.   And no role in developing the RPSM
10   as codified in the original MRDA; is that right?
11                    A.   I did not.  That was developed by
12   our economists at the time.
13                    Q.   Right.  And, sir, you recognize
14   the MRDA as a legal document?
15                    A.   I recognize it as a tax and
16   transfer pricing legal document, yes.
17                    Q.   But an agreement between the
18   parties, correct?
19                    A.   Yeah, that's correct.
20                    Q.   Sure.  And you agree that the only
21   source of the rights of NNI, for example, in
22   connection with Nortel's intellectual property is
23   the MRDA, correct?
24                    A.   Can you say that again?
25                    Q.   Yes.  The only source of the
```



```
 1   rights of NNI in connection with Nortel's
 2   intellectual property is the MRDA, correct?
 3               A.   It's the only contractual source
 4   that I am aware of, yes.
 5               Q.   Sure.  And when you describe
 6   rights as economic ownership or beneficial
 7   ownership, you are referring to the bundle of
 8   rights contained in the MRDA, correct?
 9               A.   Well, I'm referring to the
10   contractual rights in the MRDA.  I'm also referring
11   to the business reality, you know, what I
12   represented to the tax authorities as how our
13   business operates.
14               Q.   But in terms of the rights, you're
15   not aware of any other legal document that creates
16   a source of ownership or anything like that other
17   than the MRDA, correct?
18               A.   I'm not aware of any other
19   contractual arrangement, no.
20               Q.   And so if we look at your
21   affidavit, sir, paragraph 16, when you refer
22   there - if you're holding it far enough, sir, so
23   you can see it - when you refer to the words
24   "economic and beneficial ownership of Nortel's IP
25   in their respective geographic regions" -- and it's
```

 Neeson & Associates   W&P

```
 1   up on the screen, Mr. Orlando, if that helps.
 2               A.    Yes, thank you.  I see that, yes.
 3               Q.    You're referring to the rights in
 4   the MRDA?
 5               A.    I am referring to the rights in
 6   the MRDA.
 7               Q.    Okay.  Thank you.
 8               A.    Which gave the participants to
 9   this agreement the right to exploit their
10   intellectual property or their rights.
11               Q.    Sure.  As defined in the MRDA?
12               A.    Yes.
13               Q.    Sure.  And in paragraph 21 of your
14   affidavit, where you talk about the MRDA and you
15   say it includes terms with respect to economic and
16   beneficial ownership and licensing rights to
17   Nortel's IP, again you're using those terms but in
18   relation to the MRDA, correct?
19               A.    "Formalized the terms of the
20   transfer pricing policies for 2001 onward," that's
21   correct.
22               Q.    "...including with respect to
23   economic and beneficial ownership and licensing
24   rights to Nortel's IP," all a reference to the
25   MRDA, correct?
```



```
 1                  A.   Yes, that's correct.
 2                  Q.   Sure.  And then, sir, in paragraph
 3    23 of your affidavit you refer to some of the
 4    provisions of the MRDA.  And let's get it up there
 5    for you.
 6                  A.   Okay.
 7                  Q.   One of the provisions that you
 8    refer to in the second sentence has some quotation
 9    marks in it.  Do you see that?
10                       "...thus bore the full
11                       entrepreneurial risks and benefits
12                       for the Nortel Networks business."
13                  Do you see that?
14                  A.   I do see that, yes.
15                  Q.   And do you recall that those are
16    words from a recital to the MRDA?
17                  A.   I don't recall.  I would have to
18    check.
19                  Q.   Do you have it handy there?
20                  A.   I do.
21                  Q.   It's Exhibit TR21003.
22                  A.   Is there a recital you would like
23    me to look at?
24                  Q.   If you look at the second page,
25    sir.  Tell us if it's handier if we make it larger.
```



```
 1   We have to put it up on the screen, sir, and tell
 2   me the smallest line you can read.
 3               THE COURT:  It's not right to make fun
 4   of the visually handicapped.  I'm one of those
 5   persons.
 6               BY MR. ZARNETT:
 7               Q.   So the recital, sir, from which
 8   you have quoted is the third recital.  Do you see
 9   it?
10               A.   "Whereas each participant bears
11                    the full entrepreneurial risks and
12                    benefits for the Nortel Networks
13                    business."
14               Q.   And you then go on in the next
15   sentence to quote from the second recital; is that
16   right?
17               A.   I'm sorry, can you say that again?
18               Q.   Yes.  If you look at the next
19   sentence of your declaration, it says:
20                    "The MRDA also recites..."
21               THE CANADIAN COURT:  There's the answer
22   to your question.
23               BY MR. ZARNETT:
24               Q.   Yes.  You see the quote -- do you
25   see the quote there, "held and enjoyed"?
```



```
 1                    A.   We're going to need to put it on
 2   the screen, I'm sorry.  I got lost in both
 3   documents.
 4                    Q.   Let's put up paragraph 23 of the
 5   declaration.
 6                    A.   Okay.
 7                    Q.   Do you see where you have put a
 8   quote, "held and enjoyed equitable and beneficial
 9   ownership of certain exclusive rights," and then
10   you've stopped the quote?
11                    A.   Yes.
12                    Q.   And you've reverted to your own
13   language; is that right?
14                    A.   That is correct.
15                    Q.   And if you look at the recital
16   itself, which is the second recital -- maybe we can
17   get that up on the screen.
18                    A.   Okay.
19                    Q.   Do you see that where you stop the
20   quote in fact there were different words than the
21   ones you inserted?
22                    A.   Okay.
23                    Q.   And a reference to a prior
24   agreement that defined the rights?  Do you see
25   that?
```



```
 1                      A.   Pursuant to the amended Research
 2   and Development Cost Sharing Agreement, yes.
 3                      Q.   So I'm wondering why, sir, you
 4   chose to quote certain words and leave out others.
 5   What was your intention?
 6                      A.   It was unintentional.
 7                      Q.   So I take it you'll agree with me,
 8   sir, that one would have to look at all the words
 9   of the MRDA; you're not suggesting that one can
10   pick and choose words here and there, are you?
11                      A.   No, that's correct.
12                      Q.   And that wasn't your intention
13   when we see references to some provisions and not
14   others?
15                      A.   No, I was not attempting to parse
16   words.
17                      Q.   All right.  Now, in paragraph 24
18   of your affidavit you refer to legal title for
19   administrative convenience.
20                      A.   Yes.
21                      Q.   All right.  And you'll agree, sir,
22   that those words are not in the MRDA, correct?
23                      A.   I don't recall.
24                      Q.   All right.  And when you worked on
25   amendments to the MRDA, you didn't suggest or
```

 Neeson & Associates    W&F

```
 1   successfully suggest inserting them; is that
 2   correct?
 3                A.   If they're not in there, then I
 4   didn't suggest them.
 5                Q.   And, sir, in paragraph 25 of the
 6   affidavit of the declaration you refer to Articles
 7   9 and 11 of the MRDA.  Do you see that?
 8                A.   Yes, I do.
 9                Q.   And you'll agree with me that what
10   you have described there is with respect to Article
11   9, a license, correct?
12                A.   Yes, that's correct.
13                Q.   And again, with respect to Article
14   11, a circumstance under which a retirement
15   participant would receive fair market value of the
16   license; do you see that?
17                A.   In the event of insolvency, yes,
18   that's correct.
19                Q.   All right.  And there, sir, the
20   license that you're referring to would be the
21   equivalent of the economic ownership; is that
22   right?
23                A.   I believe the license is defined
24   in the MRDA.
25                Q.   Okay.  But when it speaks of a
```



```
 1   licensed participant receiving fair market value of
 2   the license, to your understanding that would pay
 3   out their interest, whatever you called it,
 4   beneficial ownership, economic ownership, George,
 5   whatever you wanted to call it, that would pay it
 6   out fully, correct?
 7                 A.   That's my understanding, yes.
 8                 Q.   Sure, sure.  And if the fair
 9   market value of the license were zero, what would
10   the retirement allocation be?
11                 A.   If the fair market value of the
12   license were zero, then my understanding of the
13   terms of the MRDA would be that the retirement
14   allocation would be zero.
15                 Q.   All right.  Now, could I ask you
16   to look up Exhibit TR22078.  It's a document you
17   discussed with Mr. Rosenthal this morning.  I
18   wonder, sir, if I could ask you to turn to page 39
19   of -- it's page 39 of the document.  We'll see if
20   we can get it up on the screen.
21                 A.   It's got very small print.
22                 Q.   It does, but we can fix that.  So
23   I wonder if we could blow up the text that's under
24   the chart.  Is that on the screen, sir, readable
25   for you?
```



```
 1                    A.    That's perfect, thank you.
 2                    Q.    Thank you.  Now, this document --
 3     this part of the document begins with, under the
 4     heading of "Intangibles," and it refers first of
 5     all to Treasury Regulation is it 482?
 6                    A.    It is 482.
 7                    Q.    And that's one you're familiar
 8     with in your transfer pricing work?
 9                    A.    Yes.
10                    Q.    Part of the IRS Code; is that
11     right?
12                    A.    That's correct.
13                    Q.    And do you see that the definition
14     of intangibles includes in item (1) patents?
15                    A.    I do see that.
16                    Q.    Right.  And do you see that it
17     includes in item (4) licenses?
18                    A.    Yes, I see that.
19                    Q.    And if you go down the page to
20     where it begins "Canada's transfer pricing rules,"
21     do you see that?
22                    A.    I do.
23                    Q.    There is a reference to the CRA's
24     information circular; do you see that?
25                    A.    I do.
```



```
 1                    Q.   And is that something that you
 2   worked with in your transfer pricing job?
 3                    A.   I was less familiar with the CRA
 4   circular.
 5                    Q.   But had some familiarity?
 6                    A.   I did.
 7                    Q.   And do you see that it defines
 8   intangibles to include "rights to use assets such
 9   as patents"?  Do you see that?
10                    A.   I do.
11                    Q.   All right.  And you would
12   understand a license to be a right to use a patent,
13   correct?
14                    A.   Yes.
15                    Q.   Sure.  And if you go over to the
16   next page, sir, page 40 of the document, which
17   we'll get up on the screen for you, there is a
18   reference there at the top - I wonder if we could
19   enlarge that - to the OECD transfer pricing
20   guidelines.  Do you see that?
21                    A.   I do.
22                    Q.   And that is -- those are
23   guidelines that are important in the transfer
24   pricing world, they inform, I understand, how
25   people interpret and implement transfer pricing
```



```
 1   methodologies; is that right?
 2              A.   Yeah, they're guidelines offered
 3   to taxing authorities to base their transfer
 4   pricing policy.
 5              Q.   Sure.  And Nortel took them into
 6   account; I take it that's why they refer to it in
 7   this very document?
 8              A.   That's correct.
 9              Q.   And again they define, you'll see
10   in the first bullet point or arrow, intangible
11   property includes "rights to use assets such as
12   patents."  Do you see that?
13              A.   Guidelines define the term
14   intangible property to include rights to use such
15   patents.
16              Q.   Right.  And those meanings were
17   meanings that were applicable in the -- in dialogue
18   with tax authorities, correct?
19              A.   Yes, they were.
20              Q.   Sure.  And used by Nortel in its
21   submissions and taken into account by Nortel in its
22   dialogue with tax authorities?
23              A.   Yes.  It's in the APA.
24              Q.   Sure.  So, sir, if we go back to
25   your affidavit then in paragraph 27, you make a
```


Neeson&Associates   W&F

```
 1   reference to the Horst Frisch analysis of 2002.
 2              A.   I became familiar with the
 3   economic analysis performed by Horst Frisch, yes.
 4              Q.   And if we could get that, you have
 5   included a partial quotation, correct?  You can see
 6   it on the screen, I think, sir, if that helps.
 7              A.   I don't recall if it's a partial
 8   quotation.
 9              Q.   Okay.  Then let's get Exhibit
10   TR10055 up on the screen.  I'm sorry, Exhibit
11   11055.
12              A.   I do agree it's an excerpt from
13   the document, if that's what you're asking me.
14              Q.   And if I could ask you to look at
15   what is page 10 of the text of the document, I
16   think it might be about 16 pages in.
17              A.   I don't have the document in front
18   of me so I'll rely on what's on the screen.
19              Q.   It's coming.
20              A.   Thank you.  Did you say page 16?
21              Q.   It's page 10 of the document which
22   should be on the screen now, Mr. Orlando, and we'll
23   get it to a size that's comfortable for you.
24              A.   Okay, I see.
25              Q.   Okay.  And you'll see what you
```



1    quoted in your affidavit, sir, was from the last

2    sentence of the first paragraph?

3                    A.    Yes, "from an economic

4    standpoint"?

5                    Q.    Yes.  And if you look at the

6    sentence -- two sentences that preceded that,

7    though, you will see that there was a reference to

8    "prior cost sharing agreements."  Do you see that?

9                    A.    I do.

10                   Q.    And you'll see that -- that's the

11   first sentence, and the second sentence refers to

12   "those arrangements creating a right to use."  Do

13   you see that?

14                   A.    Had the right to use the

15   intangible property, yes.

16                   Q.    All right.  So Horst Frisch was

17   speaking in a language similar to what we see in

18   those tax docs -- in the IRS and CRA and OECD

19   guidelines in looking at a right to use kinds of

20   intangible property as an intangible itself,

21   correct?

22                   A.    That's my understanding.

23                   Q.    Sure.  And if you just flip back,

24   sir, to paragraph 27 of your affidavit again -

25   we'll get it back on the screen - you refer to a



1    2003 submission, so you'll see after the reference

2    to the Horst Frisch report you refer to a 2003

3    submission by Nortel?

4              A.    Yes.

5              Q.    Referring to the owners of

6    intangible property.  Do you see that?

7              A.    Yes, I do.

8              Q.    And again, one would expect that

9    to have been used in the sense that we saw in the

10   regulations and guidelines, correct?  Including a

11   right to use, correct?

12             A.    Well, it says they were the owners

13   of intangible property.

14             Q.    Right.  And we saw that the

15   definition of intangible property included a right

16   to use, correct?

17             A.    It includes a right to use, that's

18   right.

19             Q.    Sure.  So if you own the right to

20   use, if you own a license, you own an intangible,

21   correct?

22             A.    If you own the license you own an

23   intangible, that's correct.

24             Q.    Sure, sure.  And you were never

25   telling the tax authority anything different than



```
 1   that kind of an idea, were you?  You were telling
 2   them that there were license rights that met that
 3   standard, correct?
 4              A.   Well, I was telling them that each
 5   of the parties to this agreement had ownership of
 6   the intellectual property and the full
 7   entrepreneurial risk associated with the
 8   intellectual property and the right to exploit that
 9   property in their jurisdiction.
10              Q.   And by saying all those things,
11   you meant nothing more than what was in the MRDA?
12              A.   I meant what I understood was in
13   the MRDA, that's correct.
14              Q.   And you spoke to the tax
15   authorities within the terms that we saw defined in
16   the 2006 or '7 filing, correct?
17              A.   That's correct.
18              Q.   Sure.  Now --
19              THE CANADIAN COURT:  Mr. Zarnett, when
20   is a convenient time for the morning break?
21              MR. ZARNETT:  This is a fine time, Your
22   Honour, thank you.
23              THE CANADIAN COURT:  We'll take 20
24   minutes.
25   -- RECESS AT 10:35 --
```



```
 1   -- UPON RESUMING AT 11:00 --
 2              THE CANADIAN COURT:  Mr. Zarnett?
 3              BY MR. ZARNETT:
 4              Q.   Mr. Orlando, could I ask you to
 5   take a look at paragraph 28 of your affidavit,
 6   please.  And, sir, the glasses are functioning now?
 7              A.   They are.
 8              Q.   If they are, we won't bring things
 9   from your affidavit up on the screen unless you
10   need to.
11              In that paragraph, sir, you say that
12   the tax authorities were not told that if Nortel
13   sold patents, the proceeds would be recognized
14   exclusively by NNL.  Do you see that reference?
15   First sentence.
16              A.   That's correct.
17              Q.   All right.  And, sir, do you agree
18   that the tax authorities were not told that if the
19   patents were sold, the proceeds would be divided
20   according to the prior year's proportions of
21   revenues?
22              A.   We did not explain that to them
23   either.
24              Q.   Right.  Do you agree that the tax
25   authorities were not told that if patents were
```



1    sold, they would be divided -- proceeds would be

2    divided according to R&D capital stock calculated

3    on a 20-year look-back period?

4                A.    No, we did not tell them that.

5                Q.    Or by a method that gave R&D

6    capital credits for transfer pricing adjustments?

7                A.    No, we did not have that

8    discussion --

9                Q.    All right.

10               A.    -- that I am aware of.

11               Q.    And, sir, you told us that you

12   were involved in the preparation of a transfer

13   pricing report for 2009 for NNI.  I wonder if we

14   could call up document Exhibit TR47221.02.

15               A.    I have the document, yes, I'm

16   sorry.

17               Q.    Thank you.  And it's up on the

18   screen now.  This is dated September 14th, 2010,

19   sir, and do you recall that it was prepared after

20   some line of business sales had already taken place

21   and proceeds had been generated?

22               A.    That is possible, yes.

23               Q.    If you go over to page 20 of the

24   document, towards the bottom of that page --

25               A.    Yes, I see it.



```
 1                    Q.   -- there is a heading "Divestiture

 2   proceeds received," and it talks about $1.9 billion

 3   in connection with sales of businesses, correct?

 4                    A.   Yes, it does.

 5                    Q.   All right.  So as I understand it,

 6   this document was prepared so that someone would be

 7   ready to give it to the tax authorities if they

 8   asked for it, correct?

 9                    A.   That is the requirement, yes.

10                    Q.   So therefore prepared as though

11   they were looking at it immediately?

12                    A.   Correct.

13                    Q.   Sure.  And if you go over to page

14   21, and you look at the first full paragraph that

15   begins "Of the 1.9 billion," do you see that?

16                    A.   Yes, I do.

17                    Q.   In the third line of that

18   paragraph, it's the second sentence, it begins

19   "Although each."

20                    A.   I see that.

21                    Q.   You'll see that the description

22   says that the transactions involved primarily

23   intangible property and the rights to exploit

24   intangible property.  Correct?

25                    A.   Correct.
```



```
1                   Q.   All right.  And it goes on to
2    describe that the sales took place without any
3    attempt to allocate; do you see that?
4                   A.   "Without any attempt to allocate
5    the sale price among the jurisdictions or among the
6    different Nortel legal entities," that's correct.
7                   Q.   If you go to the last sentence of
8    this paragraph, it says:
9                        "The ultimate determination of
10                       the final allocation of such
11                       proceeds among the various Nortel
12                       entities has not yet occurred..."
13                  Do you see that?
14                  A.   I do.
15                  Q.   And if you go to the top of the
16   paragraph, and I should have taken you to this, it
17   reports that the proceeds had been reported in or
18   recognized in NNL for financial reporting purposes.
19   Do you see that?
20                  A.   That's correct.
21                  Q.   All right.  And it goes on to say
22   the final allocation has not occurred and may be
23   materially different from the NNL classification,
24   correct?
25                  A.   That's correct.
```

Neeson & Associates   W&F

```
 1                Q.   All right.  And then if you go to
 2    the next paragraph on the page, it says:
 3                     "Currently, NNI has no right to
 4                     any identifiable portion of the sale
 5                     proceeds and no ability to access
 6                     any portion of them."
 7                Do you see that?
 8                A.   I do see that.
 9                Q.   And towards the bottom it says:
10                     "The courts allowed for the
11                     disposition of the business to be
12                     completed without an allocation."
13                Do you see that?
14                A.   I do.
15                Q.   And there's been no agreement on
16    allocation, correct?
17                A.   The parties have been unable to
18    agree, yes.  I see that.
19                Q.   And there's nothing in this that
20    says to the tax authorities how the proceeds will
21    be allocated, correct?
22                A.   No, it just says they may be
23    materially different from the way we have recorded
24    them on the financial statements.
25                Q.   Right.  And there's nothing that
```



```
 1   says anything one way or the other as to how

 2   whatever interests in intangible property had been

 3   described to the tax authorities, would bear on the

 4   ultimate allocation.  Nothing tells the tax

 5   authorities how that would happen?

 6              A.   That's correct.

 7              Q.   Now --

 8              THE CANADIAN COURT:  Just a minute.

 9              BY MR. ZARNETT:

10              Q.   Now, sir, you were discussing the

11   Alcatel transaction with Mr. Rosenthal and then

12   Mr. Oxford.  I just have a couple of questions for

13   you about it.

14              When RPS shares or R&D capital stock

15   was used in the Alcatel transaction, was it

16   calculated on the five-year-period basis that the

17   MRDA Schedule A contemplated?

18              A.   I don't recall if it was

19   calculated on the five-year rolling research and

20   development calculation or on the R&D capital

21   stock.

22              Q.   Okay.

23              A.   Only because of the time period in

24   which it occurred.

25              Q.   It may have been the 30 -- 30
```



1    percent amortization method that was originally in

2    place, or the five-year?

3                    A.    Exactly.  It's not entirely clear.

4                    Q.    Fair enough.  I take it it didn't

5    use a 20-year look-back period for calculating and

6    giving credit to R&D expenditures?

7                    A.    No, not to my knowledge.

8                    Q.    And it did not give credit as an

9    R&D expenditure adding to someone's capital stock

10   any transfer pricing payments that were made,

11   transfer pricing adjustments from one party to

12   another?

13                   A.    The R&D capital stock is simply

14   the cost incurred for research and development.

15                   Q.    By each entity?

16                   A.    By each entity.

17                   Q.    And no one would get a credit for

18   an indirect contribution because they made a

19   transfer pricing payment and then that entity that

20   received it may have used all or some of those

21   funds for its own R&D.  There was no credit to the

22   party making the transfer pricing adjustment, was

23   it -- was there?

24                   A.    No, no, there was not.

25                   Q.    Sir, in your affidavit, paragraph



```
 1    37, you refer to an email exchange with Mr. Look,

 2    December 2008.

 3              A.   I see that.

 4              Q.   All right.  And do you recall in

 5    that exchange expressing a view to Mr. Look that

 6    his initial assessment of how much the IP was worth

 7    might be too high?

 8              A.   I do recall questioning the value

 9    he determined, yes, or that he responded to me in

10    the email, yes.

11              Q.   And, in fact, sir, neither

12    Mr. Look nor you were valuators, correct?

13              A.   That's correct.

14              Q.   All right.  Those are my

15    questions, sir.  Thank you very much.

16              A.   Thank you.

17              THE CANADIAN COURT:  Any other

18    cross-examination?

19              MR. ROSENTHAL:  I don't know if

20    Mr. Barrack's issues were resolved at all.

21              MR. BARRACK:  I'm going to leave it for

22    now.

23              MR. ROSENTHAL:  Your Honour, I just

24    probably have a couple of minutes.

25              THE CANADIAN COURT:  Go ahead.
```



```
 1
 2    RE-EXAMINATION/RE-DIRECT BY MR. ROSENTHAL:
 3             Q.   Mr. Orlando, earlier in your
 4    testimony Mr. Zarnett asked you about your
 5    reference in paragraph 23 of your affidavit to full
 6    entrepreneurial risks.  Do you recall being asked
 7    about that?
 8             A.   Yes, I do.
 9             Q.   And Mr. Zarnett directed you to
10    the recital in the MRDA as a source for the phrase
11    "full entrepreneurial risks."  Do you recall that?
12             A.   Yes, I do.
13             Q.   If we look in Schedule A of the
14    MRDA, which is page 15 of the MRDA, is full
15    entrepreneurial risk being borne by the
16    participants in Schedule A as well?
17             A.   I see that in the fourth
18    paragraph, yes.
19             THE CANADIAN COURT:  Mr. Rosenthal,
20    cross-examination had to do with what was in quotes
21    and the witness said it came from the recital, so
22    this just strikes me as argument now.  The witness
23    did not say it came from Schedule A, he said it
24    came from the recital.
25             MR. ROSENTHAL:  Your Honour, I believe
```



```
 1   that the follow-up questions though asking about
 2   the meaning and significance did relate to the fact
 3   that it was placed in the recital.
 4               THE CANADIAN COURT:  He just said
 5   that's where he got it from.
 6               BY MR. ROSENTHAL:
 7               Q.   Mr. Zarnett showed you Exhibit
 8   22078 and specifically page 39 of 55 and 40 of 55
 9   with regards to the treasury regulations.
10               A.   Sorry, can you please orient me?
11   Which document?  I've got it.
12               Q.   It's the 2008 request for an APA.
13               A.   The APA request, yes.
14               Q.   I think it's just a matter of
15   imprecise questioning that I want to clarify, but
16   Mr. Zarnett, when he asked about the OECD and
17   referenced you to "right to use," mentioned the
18   word "include" at the top of page 40.  Do you see
19   where it says that?
20               A.   Yes, I do.
21               Q.   At the bottom of page 39, where
22   he's talking about the CRA regs, do you see it also
23   refers to the word "include"?
24               A.   Sorry, can you point me to the
25   specific --
```



```
 1                    Q.   CRA information circular 87-2R,

 2    which provides guidance on international transfer

 3    pricing, defines intangibles to include, and then

 4    among the list is right to use assets?

 5                    A.   Yes.

 6                    Q.   Mr. Zarnett asked in his question

 7    a license is a right to use a patent, and I just

 8    want to clarify, were you defining that -- when you

 9    agreed with his answer, were you defining that

10    exclusively or were you saying that it includes?

11                    A.   No, I'm saying it includes but not

12    limited to the right to use.

13                    Q.   When you reported to tax

14    authorities the results of your functional

15    analysis, did you ever limit ownership to a right

16    to use patents?

17                    A.   No, that's not the way I

18    understood the arrangement between the parties to

19    the agreement.

20                    Q.   When you say that's not how you

21    understood the arrangement between the parties,

22    does that understanding come from the functional

23    analysis that you performed?

24                    A.   Yes.  It would reflect the

25    business operations of the company which was
```



```
 1   reflected in the functional analysis.

 2               MR. ROSENTHAL:  Those are my questions,

 3   Your Honour.

 4               THE CANADIAN COURT:  Thank you,

 5   Mr. Rosenthal.  Thank you very much, Mr. Orlando.

 6               THE WITNESS:  Thank you.

 7   -- WITNESS EXCUSED

 8               THE US COURT:  Are we ready for the next

 9   witness?

10               MR. LUFT: Your Honor, Avi Luft of Cleary

11   Gottlieb.

12               THE US COURT:  Yes, sir.

13               MR. LUFT:  Mr. Ray, the next witness,

14   is on his way back up to the courtroom right now.

15               THE US COURT:  Good morning, Mr. Ray.

16   If you'll remain standing while we have you sworn.

17

18                  JOHN RAY, having first been duly

19      sworn, was examined and testified as follows:

20

21               THE CANADIAN COURT:  I think the next

22   exhibit would be Exhibit 20.

23               THE US COURT:  That's right.

24               THE CANADIAN COURT:  Are there two

25   declarations for Mr. Ray?
```



```
 1                    THE US COURT:  Yes.
 2                    MR. ZELBO:  There are.  There are, Your
 3      Honors.
 4                    THE US COURT:  So they'll be 20 and 21,
 5      I guess.  Is that right, Justice Newbould?
 6                    THE CANADIAN COURT:  I think so.  Do I
 7      have -- is there a copy for me?
 8                    EXHIBIT 20:  Declaration of John Ray,
 9                    dated April 11, 2014.
10                    EXHIBIT 21:  Reply declaration of John
11                    Ray, dated April 25, 2014.
12                    MR. ZELBO:  Yes, we should hand those
13      up in Toronto, please.
14                    THE US COURT:  I do have mine.
15                    MR. ZELBO:  You do already, Judge
16      Gross.
17                    THE US COURT:  Yes.
18                    MR. ZELBO:  Good morning, Justice
19      Newbould, and good morning, Judge Gross.  Nice to
20      see you live.
21                    THE US COURT:  Yes.  Did you say "live"
22      or "alive"?
23                    MR. ZELBO:  Both, both, but I was
24      referring to live.  I did have a wonderful time in
25      Toronto.
```



 1

 2   EXAMINATION IN-CHIEF/DIRECT EXAMINATION

 3   BY MR. ZELBO:

 4              Q.   Mr. Ray, I think you have in front

 5   of you both of your declarations.  Just for the

 6   record, we have a declaration of John Ray dated

 7   April 11th, and we've marked that as Exhibit, I

 8   believe, 20, and then a reply declaration dated

 9   April 25th that I believe we marked as Exhibit 21.

10              Do you have both of those in front of

11   you?

12              A.   Yes, I do.

13              Q.   And those are your sworn

14   declarations submitted in this case; is that right?

15              A.   That's correct.

16   -- OFF THE RECORD --

17              BY MR. ZELBO

18              Q.   Do you have any changes to those

19   declarations, Mr. Ray?

20              A.   No, I do not.

21              MR. ZELBO:  Madam Court Reporter, can

22   you hear me okay now?

23              THE COURT REPORTER:  Yes, thank you.

24              BY MR. ZELBO:

25              Q.   Mr. Ray, I wanted to start off

```
 1   with very briefly --
 2                THE US COURT:  May I just interrupt for
 3   one minute, Mr. Zelbo.  I just want to make
 4   certain, are the signatures on Exhibits 20 and 21,
 5   the signatures -- under your signature, Mr. Ray,
 6   are those your actual signatures?
 7                THE WITNESS:  Yes, they are.
 8                THE US COURT:  Okay.  They look so
 9   different.  But one is what I might have expected,
10   you know, bold, and the other one looks a little
11   smaller, and I just wasn't sure it was the same
12   person.
13                Okay.  Thank you.
14                THE CANADIAN COURT:  Does one reflect a
15   bottle of wine and the other one only a half a
16   bottle of wine?
17                THE WITNESS:  Well, there was bottles
18   of wine involved.
19                MR. ZELBO:  As your counsel, I advise
20   you not to answer that question.
21                BY MR. ZELBO:
22        Q.   Other than the NNI engagement,
23   Mr. Ray, could you briefly describe what if any
24   other restructuring experience you've had?
25        A.   Yes.  I've been involved in the
```


Neeson&Associates   W&F

1    restructuring business for approximately 15 years.

2    I'm currently the chief restructuring officer of

3    Overseas Shipholding Group, which has a case

4    pending in this jurisdiction.

5              I've also been -- participated in and

6    oversaw the bankruptcy of Fruit of the Loom, which

7    is another case in this jurisdiction.  I was also

8    involved in the bankruptcy of Burlington

9    Industries, another Delaware case.

10             And for several years I was the

11   chairman and the CEO of Enron; and I oversaw the

12   $24 billion liquidation of Enron, which was a

13   series of asset sales and collections of

14   settlements and judgments in the prosecution of

15   certain claims by the Enron estate that accumulated

16   in approximately 2009.

17             Q.   And you are currently the

18   principal officer of NNI and the other US Debtors?

19             A.   Yes, I am.

20             Q.   And you became the principal

21   officer on or about December 2009; is that right?

22             A.   That's correct.

23             Q.   What are your responsibilities as

24   principal officer of NNI?

25             A.   In broad terms, to maximize the



1    benefit of the estate on behalf of the creditors of
2    the US Estate, NNI and its affiliates in the United
3    States.
4              Q.   Mr. Ray, I want to ask you a few
5    questions about what we've been referring to here
6    as the residual patents, which are ultimately the
7    Nortel patents that were sold in the Rockstar sale,
8    just so we have a common terminology amongst us.
9              Between the time you became principal
10   officer of NNI and the time of the entering into
11   the Rockstar sale, what options were being
12   considered with respect to monetizing that patent
13   portfolio?
14             A.   There were principally two
15   alternatives or options that were considered.  One
16   was simply the sale of the IP portfolio.  Secondly,
17   there was development of a licensing service
18   company, sometimes referred to as IPCo.
19             There were subalternatives under the
20   IPCo that were notable.  There was consideration to
21   a subset of transactions in which you might have a
22   third party that might invest in IPCo; in effect
23   sort of a mechanism in which a third party would
24   invest dollars into IPCo as part of the business.
25             And then IPCo itself had a few



```
 1    different tiers and approaches in how it would
 2    develop.  There was sort of a harvest approach and
 3    then a couple of different stages of litigation
 4    light, litigation heavy, that were sort of tiered
 5    approaches in the way the business would
 6    effectively run.
 7                 Q.    And what was the harvest approach?
 8                 A.    The harvest approach is to pursue
 9    licensing activities in the various jurisdictions
10    with the customers in those jurisdictions, you
11    know, in exchange for royalty payments versus a
12    more perceived aggressive strategy of beyond
13    putting people simply on notice of filing
14    litigation against a notice of the claim.  Beyond
15    that, pursuing litigation strategies.
16                 Q.    Can you please describe for the
17    Courts the process briefly how the estates
18    developed the IPCo business model, what they did in
19    that regard?
20                 A.    Yes.  The company started out
21    effectively mapping out all of its patents and
22    defining the standard setting of patents that the
23    company had, which were the highest-value patents,
24    approximately 50 in number, as I recall.
25                 The company also began a process of
```


Neeson&Associates      W&F

```
 1   sort of surveying potential parties that it might
 2   put on notice of a claim.
 3               THE CANADIAN COURT:  Mr. Ray, could I
 4   just ask you a question, please?  When you say "the
 5   company," are you referring to any particular
 6   company within Nortel or what are you referring to?
 7               THE WITNESS:  The answer to that is,
 8   when I say "the company," this was a sort of a
 9   collective effort by all of the principal three
10   estates, EMEA, Canada and the US, to develop a
11   process towards defining and evaluating the IP
12   portfolio.
13               THE CANADIAN COURT:  Thank you.
14               THE WITNESS:  So the company, again,
15   defined as the three estates, they were part of a
16   larger steering committee -- and I can explain that
17   one momentarily -- began early in 2009 trying to
18   map out the claims that could be made and developed
19   claim charts for I think over 200-some patents that
20   the company believed were valuable and would be
21   part of a process involving IPCo.
22               And then over time a steering committee
23   was formed.  The principal members of the steering
24   committee included representatives of each of the
25   three estates, included the Monitor in Canada.  It
```



1    included Alan Bloom, the administrator of the UK
2    estate, as well as myself.  There are other members
3    of the steering committee, which included George
4    Riedel, who was the head of our sort of business
5    strategy, an NNI employee.  It also included John
6    Veschi, who was sort of the lead patent lawyer at
7    NNI.  It included other representatives both in
8    Canada and EMEA, counsel for the creditors, the
9    Bondholders, advisers to the Unsecured Creditors
10   Committee for the US estate and other
11   representatives, sort of a very large working
12   group; and a subset included the steering
13   committee, which are the leads of each of the three
14   estates.
15           That steering committee met very often.
16   We had a weekly schedule, sometimes more frequently
17   depending on the activity that was happening in the
18   case.  That group effectively led a process that
19   took place for approximately one-year, during which
20   time we retained a firm by the name of Global IP.
21   Global IP's job was to assist with the company in
22   in defining the different patents, doing research
23   related to the claim charts, mapping out those
24   claims, looking at the standard-setting charts,
25   trying to sort of stratify the patents along



```
 1    different technologies -- for example, say 4G
 2    versus a handset technology -- and effectively
 3    doing all the due diligence necessary to either
 4    support the development of an IPCo company or
 5    ultimately to be used in a sale process.
 6             We also had Lazard developing financial
 7    models related to IPCo.  There was various
 8    iterations of all of those models.  On weekly calls
 9    that we would have, we would collectively make
10    comments through the steering committee and the
11    working group as to various aspects of the model.
12             Late in 2009 -- I'm sorry -- 2010 --
13    some of the attention turned to a sale process.
14    Effectively we were sort of running a dual strategy
15    of continuing to finalize modeling around the IPCo,
16    while at the same time we went out with what are
17    called teasers in mid-2010 to the marketplace to
18    get a view about what would be the interest in the
19    pool of people who might be interested either in
20    buying the IP technology in whole or in part, but
21    also to also solicit interested parties who might
22    be interested in taking some ownership interest in
23    the IPCo as well.
24             That process evolved over the time
25    period from June to a time in September of 2010,
```



1    when we received indications of interest, and that

2    ultimately led up to the stalking horse agreement

3    in April of 2011.

4              Some of the things that we did in terms

5    of IPCo, we went out and looked at some of the

6    other models that were out there, probably the

7    best example of which was Qualcomm.  It was running

8    an IP licensing company that had a litigation

9    strategy.  We looked at a number of other models

10   that were brought to our attention either publicly

11   or through advisers.  We had our employees led by

12   John Veschi look at real estate, look at how he

13   would staff the project, the business, how we would

14   compensate our employees.

15             And so we really were sort of in the

16   ground formation of how we would establish the

17   business model, again either wholly opened by the

18   estates or possibly with a third party.

19             BY MR. ZELBO:

20             Q.   Thank you.

21             Do you recall any discussions about how

22   to structure IPCo in a way that would try to take

23   advantage of NNL's tax attributes, including what

24   we've been calling SHRD credits and NOLs?

25             A.   There was some discussion and



1    analysis that was done related to how we could

2    further improve the value of the portfolio by tax

3    benefits that resided in Canada.

4              The analysis, I think, was fairly

5    short-lived, because ultimately, when you step

6    back, most of the revenue from the enforcement of

7    the exclusive licenses that NNI had would occur in

8    the US and be US income.  And there was no ability

9    that the professionals could divine under which the

10   tax assets in Canada could be used in some way to

11   shelter US income.

12             But clearly there was a view that we

13   looked at every single aspect of how we might

14   maximize value, and certainly that was one of the

15   thoughts.  I don't think we left a lot of stones

16   unturned in developing the strategy for IPCo.

17             Q.   Had the principal estates not

18   decided to go forward with the Rockstar sale, do

19   you believe that -- do you have a view whether the

20   estates could have obtained funding to proceed with

21   IPCo?

22             A.   I do have a view.  The US Estate

23   at that time had approximately somewhere between

24   900 and a billion dollars of cash.  I'm less

25   certain about the funding status and the liquidity



1    of the other two estates.  But we certainly had

2    adequate funding to establish the business.  We had

3    projections that were done in the IPCo model.  And

4    again, it varied depending on whether you're

5    looking at sort of a light or heavy litigation

6    model and whether or not -- depending on how you

7    modeled the business would obviously establish a

8    range of what the funding obligation would be, but

9    certainly was within our wherewithal.

10             And I guess additionally, and as I've

11   indicated, we did look -- and there was at least an

12   expression of interest when we had the indicative

13   bids in the fall of 2010, indicative bids in the

14   fall of 2010, where third parties would come in and

15   invest in IPCo.

16             So we certainly had it in the NNI

17   estate from a liquidity standpoint, certainly there

18   was enough funding there that it could have funded

19   the entirety of IPCo.  But more importantly or

20   equally important is that there was third-party

21   investors, I believe, who were willing to invest

22   money, so there was a source of liquidity there, no

23   doubt.

24             Q.   You testified earlier about at

25   some point in late 2009 a teaser going out to



 1    potential bidders on patents, and you also

 2    mentioned that there are indicative bids received.

 3            Did there come a time that the estates

 4    entered into what's been called a stalking horse

 5    agreement with Google or with respect to the

 6    residual patents?

 7            A.    Yes, that was in approximately

 8    April 2011, I believe April 4, 2011.

 9            Q.    And as a member of the steering

10    committee and also a principal officer of NNI, were

11    you one of the decision-makers involved in whether

12    to enter into that agreement?

13            A.    Yes, I was.

14            Q.    And why did you decide that NNI

15    should enter into the stalking horse agreement?

16            A.    I think the collective view, and

17    certainly my view, was that the stalking horse bid,

18    which was the $900 million, was a substantial

19    amount of cash.  And the history of the Nortel

20    auction process, as we've all come to know, is that

21    the ultimate value of the asset was tripled or

22    quadrupled in all of the sales.  And so the

23    stalking horse was just that.  It was not

24    effectively -- it wasn't really our first offer,

25    and it certainly wasn't our last.

 Neeson&Associates    W&F

```
 1                    And we all had different views about

 2    what it ultimately would sell for if the gavel went

 3    down.  But I guess all of us agreed at least on one

 4    thing, which was the sale was going to be

 5    substantially improved from the stalking horse.

 6    And we knew that for a variety of reasons.  We knew

 7    that there was a lot of interest in being a

 8    stalking horse.  There was a lot of people at the

 9    table.  Some of the indicative bids we know were

10    half of what the stalking horse bid was at.  So

11    just from moving from the indicative bid stage to

12    the stalking horse, we will doubled value.  And

13    there was a lot of interest hanging around.  And so

14    we knew when we got the stalking horse bid done, we

15    knew we were going to have a very, very active

16    auction, and that turned out to be the case.

17                    We also, I think -- we never abandoned

18    the IPCo as a thought process.  At some point we

19    decided in the fall of 2010 that we literally had

20    to go out and test the market.  I mean, we had

21    analyzed IPCo up and down and sideways, but we

22    needed something to compare it to.  And so we

23    continued with that dual strategy really up until

24    the end, so much so that when we ultimately signed

25    up the Google bid, they had a massive concern about
```



1    our pulling the deal off the table and doing IPCo.

2              So ultimately there were certain

3    restrictions on what we could do what we accepted

4    the Google deal.  But it was a pressure point in

5    the deal because this had been a strategy that was

6    tried and tested and been done by other companies,

7    and Google perceived that as a problem, as

8    effectively as their competition as much as any

9    other party who might have bid on the transaction.

10             So this was a very, very vibrant time

11   in the sale process of Nortel.

12             Q.   So is it fair to say that at the

13   time of entering into the stalking horse -- let me

14   ask it in a nonleading way.

15             At the time you entered into the

16   stalking horse bid, did you consider IPCo still to

17   be a viable option?

18             A.   I've always thought IPCo was a

19   viable auction.  I still think it is today, which,

20   as a matter of fact, the Rockstar is effectively

21   doing the same thing.  So I think it is a viable

22   strategy.

23             We recognized, though, that, when we

24   signed up to Google bid, that there was an out for

25   an alternative transaction involving a third party.



1    And I think it was then and it never ceased to
2    be -- I think the collective judgment of everyone
3    was to sell the asset based on all the facts and
4    circumstances that we understood at the time of the
5    bidding.  And I think the results of $4-1/2 billion
6    proved it, proved that, obviously a substantial
7    amount of money, six times over what our stalking
8    horse bid was.
9             Q.   You said Rockstar was essentially
10   running an IPCo-like business.  Do you know who the
11   chairman or head of Rockstar is?
12            A.   It was under us and it continues
13   to be John Veschi and other staff that was working
14   with both the US Estate and other estates.
15            Q.   And John Veschi was a US NNI
16   employee; is that right?
17            A.   John Veschi was a US employee, and
18   he really led the strategy from -- right after the
19   petition date, John as the first one to come in and
20   say, "Hey, we really need to look at this
21   portfolio.  Let's really stake out our ground here
22   and start mapping out claims," et cetera.
23            And frankly, John was hired really
24   pre-petition to employ this licensing strategy, and
25   then circumstances sort of overwhelmed the company,



 1   and that was held in abeyance while we took care of

 2   the things that needed be taken care of with the

 3   other assets sales.  And, of course, the company

 4   was losing large amounts of money.

 5              But ultimately we sort of had to hold

 6   John back from sending out excessive demand notices

 7   and claim notices, because we really wanted to wrap

 8   that into a strategy.  But it really had been a

 9   strategy pre-petition and had been a strategy

10   during the Chapter 11, right up until finally we

11   obviously closed on the Google sale, so never lost

12   sight of the power of that asset.

13              Q.   Now, prior to entering into the

14   stalking horse agreement, do you know, was Google

15   aware of the exclusive royalty-free licenses with

16   respect to NN technology that NNI had in the United

17   States and NNUK had in their territory and NNI

18   Ireland in their territory and NNSA in France?  Was

19   Google aware of those licenses?

20              A.   Yes, it was very aware.  And so

21   much, it became somewhat of a key issue for them as

22   they documented the transaction.

23              Q.   And when you say it was a keen

24   issue, did Google insist on any requirements with

25   respect to those exclusive licenses as a condition



1   with respect to entering into the stalking horse

2   agreement?

3                  A.   Yes.  Google insisted that we

4   enter into agreements to transfer those licenses.

5   That was a requirement of the deal.  And without

6   our ability to transfer those licenses, it would

7   have killed the deal, no doubt.

8                  Q.   So to your knowledge, did Google

9   ever express a willingness to sign up and close the

10  stalking horse agreement if those license

11  agreements, those licenses remained outstanding?

12                 A.   No.  In fact, it was the exact

13  opposite of that.  They insisted that all that had

14  to occur; that we as sellers in the US estate had

15  to be in a position to deliver our asset or we

16  couldn't have closed the transaction.

17                 Q.   Now, prior to May 2013, which is

18  just for reference the date of the filing of

19  allocation briefs in this case, the opening briefs,

20  did the Monitor or its representatives ever inform

21  you that it was the Monitor's position that NNL was

22  entitled to all of the proceeds from the sale of

23  the residual patent portfolio?

24                 A.   No.  I was never told anything

25  like that.



```
 1                      Q.    Prior to May 2013, did the Monitor
 2     ever inform you that it was the Monitor's position
 3     that after the close of the operating business line
 4     sales, NNI's exclusive and royalty-free license in
 5     NN technology was worthless or had no value?
 6                      A.    No.
 7                      Q.    Now, Ms. Hamilton provided
 8     evidence in her witness statement that Mr. McDonald
 9     told you at a meeting in May 2010 that NNL could
10     take everything in the patents because they owned
11     it.
12                      Do you recall that being said to you at
13     that meeting?
14                      A.    I distinctly remember that
15     meeting, very vivid recollection of that meeting,
16     and those words were not spoken.  No recollection
17     of that at all.
18                      In fact, I have a very clear
19     recollection that when we were at that meeting,
20     Monitor's counsel made a statement that if it
21     wanted to, that the Canadian Estate could repudiate
22     our rights.  And then before we could even reply to
23     it, another one of the Monitor's counsel indicated
24     that they had given that right up in the IFSA.
25                      So that was the discussion we had.  It
```



1    was sort of a short-lived discussion; and they all

2    spoke and then retracted based on their

3    recollection of the contract that we had entered

4    into; to the extent that they had any rights to do

5    that, they gave those rights up, and that was a

6    very specific conversation we had.  And there was

7    no other conversation about ownership per se.

8              Q.   And did they give those rights up

9    in what we call the -- I can never pronounce

10   this -- the FCFSA, with the silent F?  Was that the

11   agreement?

12             A.   I believe it was.  I sometimes

13   gets /KPOPB between the FCFSA and the IFSA myself.

14   But I believe it was the FCFSA.

15             Q.   Right.  There is a lot of acronyms

16   here.

17             Mr. Ray, what if anything would you

18   have done differently had the Monitor disclosed

19   prior to the close of the Rockstar sale that it was

20   the Monitor's decision that it was entitled to all

21   of the proceeds from the sale of the residual IP?

22             A.   Well, I guess a couple things.  I

23   mean, first of all, we were a seller.  We had an

24   asset.  We had a seller.  And as I look at that as

25   sort of a businessman, the idea is that we had an



 1   asset to sell.  I knew that Google wouldn't close

 2   on the transaction unless we delivered our asset.

 3           So I certainly wouldn't have proceeded

 4   in the face of someone telling me that I had

 5   absolutely no asset to sell.  In fact, when we did

 6   the transaction, I came here to this court and I

 7   told this Court that the transaction was in the

 8   best interests of the US Estate.  I couldn't have

 9   done that if that was the position that the Monitor

10   had taken.

11           I knew that everyone was reserving

12   their rights relative to how much of the value, the

13   fair market value that we knew we were getting

14   would be allocated amongst the estates.  That was a

15   clear reservation of rights.  But that's a bit

16   different from saying you own something but you're

17   getting nothing for it.

18           And we had left the allocation of the

19   dollars related to that, and as part of the

20   agreements we entered into with the other two

21   estates, we agreed that we would conduct good-faith

22   negotiations over the allocation.  And without

23   getting into -- and I don't want to get anything we

24   said in any of those mediations, but I can tell you

25   that in those good-faith negotiations, we never

 Neeson&Associates    W&F

```
 1   took the position, we never took the position, that
 2   any of the estates are not entitled to value; and
 3   none of the estates took the position that we
 4   weren't entitled to anything in those good-faith
 5   negotiations.
 6              Q.   Mr. Ray, I just have one cleanup
 7   question and then we're done for now.
 8              I may have misheard, but at one point
 9   earlier in your testimony you mentioned that as
10   part of IPCo there was 200 high-value patents.  And
11   I could show you the document but I don't want to
12   take too much time.  There's an IPCo document here,
13   and I think the number was over 2,000.  I just want
14   to -- whatever your recollection is, it is what it
15   is.  But I just want to make sure I didn't mishear.
16              A.   Well, maybe perhaps I wasn't
17   clear.  What I was describing was that we had
18   looked at about 50 standard-setting patents, and
19   then an early sort of Phase 1 approach in the IPCo,
20   we first set out to develop claim charts for about
21   250 patents --
22              Q.   Understood.
23              A.   -- sort of as a first stage.  And
24   clearly those claim charts were amongst the most
25   valuable that we had.
```



```
 1                    MR. ZELBO:  Okay.  Understood.  Thank

 2   you.  I have no further questions at this time,

 3   Your Honors.

 4                    THE US COURT:  Thank you, Mr. Zelbo.

 5                    Cross-examination, anyone?

 6                    THE US COURT:  Mr. O'Connor, good

 7   morning.

 8                    MR. O'CONNOR:  Good morning,

 9   Judge Gross.  Good morning, Justice Newbould.

10

11   CROSS-EXAMINATION BY MR. O'CONNOR:

12                    Q.   Good morning, Mr. Ray.

13                    A.   Good morning.

14                    Q.   Good to see you again.

15                    Now, it's my understanding that it's

16   the US Debtors' position that the sole task before

17   the Courts is to determine the fair market value of

18   the assets that each Debtor sold or relinquished in

19   the sale transactions.  Have I got that correct?

20                    A.   I would state it slightly

21   different.

22                    I think we know what the fair market

23   value is of the assets that were sold.  What I

24   think is at issue here is how we allocate that fair

25   market value amongst the estates.
```



```
1                     Q.   And as I understand, the US
2    position is the only -- the way to allocate that is
3    based upon the parties' respective shares of
4    revenue for the year 2009?
5                     A.   Yeah, obviously our submissions
6    and briefings are much more detailed than that.
7    But essentially that's the position.
8
9                     Q.   And I take it the US Debtors have
10   indicated that they do not agree with the EMEA's
11   contribution theory?
12                    A.   That's correct.
13                    Q.   And the US Debtors have said that
14   what the parties contributed to in the way of
15   creation of group's IP spending is not
16   determinative of how the proceeds of the lockbox
17   should be allocated?
18                    A.   That's correct.
19                    Q.   And I think you have also said --
20   the US Debtors have said that a contribution theory
21   is actually not a valuation theory at all?
22                    A.   I believe that's correct, yes.
23                    Q.   And am I correct that if the US
24   Debtors are successful in their theory, of the US
25   Debtors, only NNI will receive an allocation from
```



```
 1   the lockbox?

 2                 A.   I believe our submissions are

 3   quite clear on what we're suggesting as an

 4   allocation for each of the estates.

 5                 I don't think we take any positions

 6   similar to Canada that we're not entitled to

 7   anything as a result of the sale of the asset.

 8                 Q.   My question is more specific.

 9                 My understanding was that if the US

10   position is successful, the only US Debtor that

11   would receive an allocation out of the lockbox

12   would be NNI.

13                 A.   I'd have to -- I believe that's

14   correct, yes.

15                 Q.   Now, I think I met you for the

16   first time in February of 2010.  And I think that

17   was in connection with a hearing before Judge Gross

18   on the US Debtors' motion to enforce the automatic

19   stay, where the Debtors were seeking to enjoin the

20   UK Pension Claimants from proceeding before the

21   determinations panel against the US Debtors in

22   connection with the obtaining of an FSD, a

23   financial support direction.  Do you recall that?

24                 A.   Yes.

25                 Q.   And you submitted a declaration in
```



```
 1   support of the Debtors' motion as their principal

 2   officer; correct?

 3              A.   I believe that's right, yes.

 4              Q.   And I cross-examined you at that

 5   hearing?

 6              A.   I believe you did.

 7              Q.   And in your declaration you

 8   indicated that you were familiar with the IFSA.

 9              A.   What I have in front of me -- I'll

10   assume you're right.

11              Q.   I call it up if you'd like.  Can

12   we call up --

13              A.   We can assume you're right for

14   that.

15              Q.   Okay.  You also indicated in your

16   declaration that you knew that the US, the Canadian

17   and the EMEA Debtors had agreed to put the proceeds

18   of the sale of the group's assets in escrow?

19              A.   Again, I'll -- I'll -- if you say

20   that's what it says, I'll agree to that.

21              Q.   And you also indicated in your

22   declaration that the parties had agreed to leave

23   those proceeds in escrow until they reached either

24   a consensual agreement on allocation or a litigated

25   determination?
```



```
 1                  THE US COURT:  Mr. Zelbo.

 2                  MR. ZELBO:  Your Honors, I apologize

 3    for rising, but, Your Honors, if he is going to ask

 4    questions quoting from a declaration, I think it

 5    only fair that the witness have the declaration in

 6    front of him.  I know oftentimes advocates want to

 7    test a witness, but this is just becoming a memory

 8    test.  I think it's only fair to show him the

 9    declaration.

10                  MR. O'CONNOR:  I offered to do so, and

11    Mr. Ray said --

12                  THE WITNESS:  Why don't you provide

13    me -- it's been four years, so if you want to

14    provide me with that declaration.

15                  MR. O'CONNOR:  Can we call up Mr. Ray's

16    declaration?

17                  THE US COURT:  Would you like a copy of

18    the declaration?

19                  THE WITNESS:  Yes, I would, sir.  Thank

20    you.

21                  I didn't know how many questions were

22    going to be asked about something that was four

23    years old.

24                  MR. O'CONNOR:  Unfortunately, I didn't

25    think we'd be here four years later, but
```



```
 1   unfortunately, we are.

 2                   THE WITNESS:  Fair point.

 3                   Okay, I've got it in front of me.  What

 4   would you like me to review?

 5                   BY MR. O'CONNOR:

 6                   Q.   Let me direct your attention to

 7   Paragraph 15.

 8                   A.   Okay.

 9                   THE CANADIAN COURT:  Can you just tell

10   me the date of that declaration?

11                   MR. O'CONNOR:  Yes.  That declaration

12   is dated, I believe, in February of 2010.

13                   THE CANADIAN COURT:  Thank you.

14                   THE US COURT:  February 18, Justice

15   Newbould.

16                   THE CANADIAN COURT:  Thank you.

17                   BY MR. O'CONNOR:

18                   Q.   So directing your attention to

19   Paragraph 15, I had ask you earlier whether you had

20   indicated in your declaration that you were

21   familiar with the IFSA.  And I think you said --

22                   A.   Yes.

23                   Q.   And that's the case?  You were

24   familiar with the IFSA?

25                   A.   Yes.
```



 1                    Q.   Okay.  And then I asked you also
 2    whether you had indicated in your declaration that
 3    the Canadian, US and EMEA Debtors had agreed to put
 4    the proceeds of the sales of the group's assets
 5    into escrow.  And I think that's referred to in
 6    Paragraph 15 as well of your declaration.
 7                    A.   Yes, it is.
 8                    Q.   And then I asked you whether or
 9    not you had testified that the parties had agreed
10    to leave those proceeds in escrow until they
11    reached either a consensual agreement on allocation
12    or a litigated determination.  And I think that's
13    in Paragraph 15 as well.
14                    A.   Not in exactly those words, but
15    yes.
16                    Q.   Okay.  And I think you told
17    Judge Gross, did you not, at the time, that the
18    allocation issue -- to address the allocation
19    issue, the contending Debtors might reference
20    Nortel's transfer pricing arrangements.  And I'll
21    direct you to Paragraph 17, if you'd like to
22    refresh your recollection.
23                    A.   Yes.
24                    Q.   That's correct?
25                    A.   Yes.



```
 1                    Q.   And you also told Judge Gross that
 2    they might also reference the MRDA.
 3                    A.   Yes.
 4                    Q.   And you also told Judge Gross that
 5    they might also reference the value of research and
 6    development?
 7                    A.   Yes.
 8                    Q.   And turning to Paragraph 11, you
 9    told Judge Gross that a key issue before the
10    determinations panel would be an assessment of the
11    benefits flowing among the various Nortel Debtors
12    and the compensation received for them; correct?
13                    A.   If you're referring to
14    Paragraph 11, just to put that in context, I was
15    referring to the Pension Act and indicating that
16    there were various factors that the TPR and the
17    determination panel considered in making a
18    reasonableness determination.  And one of those
19    factors is the extent to which the employer
20    provided benefits to the other affiliates.  So what
21    I was referring to was the factors in consideration
22    by the TPR, the determinations panel, relative to
23    the UK --
24                    Q.   Yes, in connection with the UK
25    proceedings.
```



```
 1                     And you also told Judge Gross that the

 2      issue in the UK proceedings was whether and to what

 3      extent NNUK's contributions to the global Nortel

 4      business received inadequate financial recognition

 5      pre-filing so that it was reasonable to impose

 6      financial responsibility on affiliates for the NNUK

 7      plan deficit.  That's in Paragraph 14, if you'd

 8      like to refresh your recollection.

 9                     A.   Yes.

10                     Q.   And you went on to tell

11      Judge Gross that that issue overlapped with one of

12      the overriding issues in 'the US Debtors' cases as

13      well as in the Canadian and the UK insolvency

14      proceedings.

15                     And you told Judge Gross -- and you can

16      take a look at Paragraph 14 -- that that overriding

17      issue was the allocation of the proceeds of the

18      post-petition sale of Nortel's assets; correct?

19                     A.   Yes.

20                     Q.   And you also told Judge Gross, in

21      Paragraph 14, that the allocation of the sale

22      proceeds would be based in part on the factual

23      issues of the respective contributions of the

24      various Nortel entities to the value of the assets

25      sold; correct?
```



```
 1                      A.   Yes.
 2                      Q.   And you went on to tell
 3   Judge Gross that unless he enjoined the UK Pension
 4   Claimants from participating before the
 5   determinations panel, the US Debtors would be -- or
 6   rather, the UK Pension Claimants would be permitted
 7   to determine factual issues, including the benefits
 8   and conferred among affiliates, that are not only
 9   central to the location process but ones that NNUK
10   had agreed must be resolved on a global basis in
11   the single cross-jurisdictional forum; correct?
12                      A.   Correct.
13                      Q.   And you went on to tell
14   Judge Gross that the Debtors were concerned that
15   they faced the risk of collateral estoppel arising
16   from the litigation of the UK pension issues in
17   advance of the allocation process.
18                      A.   Correct.
19                      Q.   And then at the hearing itself I
20   cross-examined.  And can we bring up the transcript
21   of the hearing?
22                      THE CANADIAN COURT:  Before do you
23   that, does someone have a copy of this declaration
24   that they could give me?
25                      THE US COURT:  It is Trial Exhibit
```



```
 1   11367, if that's of any help.
 2              THE CANADIAN COURT:  Yes.  Oh, I see.
 3   Thank you.  All right.
 4              THE US COURT:  I think.  No, no.
 5              THE CANADIAN COURT:  Looks like it,
 6   11367.
 7              THE US COURT:  Yes.
 8              MR. O'CONNOR:  11367, Justice Newbould.
 9              THE CANADIAN COURT:  Yes, thank you.
10              BY MR. O'CONNOR:
11              Q.   And at the hearing on the motion
12   to enjoin the UK Pension Claimants from proceeding,
13   you testified, and I cross-examined you.
14              And in reference to the items that you
15   had identified in Paragraph 17 -- by the way, I'm
16   looking now, Mr. Ray, at Page 91 of that
17   transcript.
18              Actually, if you start out looking at
19   Page 90, you'll see at the bottom of Page 90 I
20   asked you to take a look at Paragraph 17 of your
21   declaration.  That's the paragraph we were just
22   discussing, in which you talked about the
23   allocation issue entailing, among other things,
24   transfer pricing arrangements, research and
25   development.  And then if you follow on Page 91, I
```



```
 1   asked you a series of questions, and I was asking
 2   you, as you'll see, how did you know that those
 3   issues were going to be addressed in the location
 4   proceeding.
 5           And you answered at Line 8 on Page 91:
 6               "Answer:  Yes, I do know with
 7               certainty that any discussion
 8               regarding allocation will involve
 9               each and every one of the things
10               that are listed in that paragraph,"
11               referring to Paragraph 17; correct?
12               A.   Yes, that's what the testimony
13   was.
14               Q.   And then if you look at Line 22,
15   you first answered, in response to a question that
16   I asked you:
17               "Which is that resolution is
18               going to require looking into every
19               one of these issues.  And I can tell
20               you with certainty, because I'll be
21               one of the parties at the table,
22               that I'm going to be raising every
23               one of these issues."
24           And finally, if you look at Page 92, I
25   again asked you the question about the issues
```



```
 1   identified in Paragraph 17, and you said -- your
 2   answer was:
 3                   "I don't know what the
 4                   allocation process will dictate as a
 5                   result.  But I know in order to
 6                   achieve that result, we will have to
 7                   address each and every one of these
 8                   categories," again referring to the
 9   items referenced in Paragraph 17 of your
10   declaration.  Right?
11                   A.   Yes, that is the testimony.
12                   MR. O'CONNOR:  I have no further
13   questions, Your Honor.
14                   THE US COURT:  All right, Mr. O'Connor.
15   Thank you.
16                   THE US COURT:  Good afternoon.
17                   MR. PULTMAN:  Good afternoon, Judge
18   Gross.  Good afternoon, Your Honor, Justice
19   Newbould.
20
21   CROSS-EXAMINATION BY MR. PULTMAN:
22                   Q.   Mr. Ray, my name is Jacob Pultman.
23   I'm with the law firm of Allen & Overy in New York,
24   and we are counsel to the Canadian Debtors and the
25   Monitor.
```

 

```
 1                    Sir, you testified on direct that you

 2    are now the principal officer of NNI and its

 3    affiliates; is that correct?

 4            A.   That's correct.

 5            Q.   And you took on that role

 6    officially in December of 2009?

 7            A.   Yes.

 8            Q.   And you didn't get up and rolling

 9    in the position until January of 2010?

10            A.   That's not quite true.

11                    There was a limited amount of activity

12    that was done in December of 2009.  And one of the

13    things that we did specifically is we had

14    negotiation /* s related to the FCFSA, which first

15    started up in the -- up in Toronto at the company's

16    offices on Day One of a multi-day session.  And

17    then the meeting was moved to New York, where it

18    went on for a couple of days.  And it was

19    effectively sort of the main drafting session for

20    the FCFSA.

21                    And I think then sort of the holidays

22    were upon us, and there was a limited amount of

23    interaction over the holidays.  But to the extent

24    things were going not related to the FCFSA at that

25    time, as far as I was involved.
```



1                    Q.   So if I understand your testimony,

2    you attended meetings with respect to the FCFSA or

3    the FCFSA, as you call it, in December of 2009?

4                    A.   It would be the FCFSA, yes.

5                    Q.   In 2009?

6                    A.   In December, yes.

7                    Q.   And prior to your position with

8    Nortel, you worked in a series of legal positions,

9    did you not?

10                   A.   Actually, no.  I certainly had

11   done legal positions, but I had done other

12   positions as well.  It wasn't limited to legal.

13                   Q.   Okay, so let's start.  You worked

14   at Touche Ross as a lawyer?

15                   A.   Right.  That's correct.

16                   Q.   You worked at Mayer Brown as a

17   lawyer?

18                   A.   That's correct.

19                   Q.   You worked as a lawyer at Fruit of

20   the Loom?

21                   A.   And chief administrative officer.

22                   Q.   And you worked at Waste

23   Management, a Waste Management company?

24                   A.   That was prior to Fruit of the

25   Loom.  Served in multiple capacities, including



```
1    both as a general counsel of certain of the public

2    subsidiaries as well as chief administrative

3    officer of certain of those subsidiaries.

4              Q.   And you worked at a company called

5    OHM, which was related to Waste Management?

6              A.   Yes, it was.  OHM was a Waste

7    Management company; in that capacity served as

8    chief administrative officer and general counsel.

9              Q.   Prior to coming to Nortel, had

10   ever worked at a technology company?

11             A.   No, I had not.

12             Q.   And you have two companies that

13   you're the principal owner of; is that correct?

14             A.   That's correct.

15             Q.   And one of those is a company

16   called Avidity?

17             A.   It's Avidity Partners LLC.

18             Q.   Avidity Partners.  And that's a

19   bankruptcy consulting services company?

20             A.   That's correct.

21             Q.   And the other company that you're

22   primary owner of is a company called Greylock

23   Partners LLC?

24             A.   That's correct.

25             Q.   And that's also a bankruptcy
```



```
 1   consulting services company?
 2                A.   Yes, it is.
 3                Q.   You told us on direct that you'd
 4   spent time some time as the chairman and CEO of
 5   Enron after its reorganization?
 6                A.   After it's exit confirmation from
 7   Chapter 11, yes.
 8                Q.   Now, I want to ask you about your
 9   experience coming into NNI.
10                You weren't an IP specialist, were you?
11                A.   No, I was not.
12                Q.   And prior to your joining NNI, you
13   didn't have any experience with Nortel, did you?
14                A.   No, I did not.
15                Q.   Now, you were invited by lawyers
16   for the UCC to participate in the interview process
17   for the position of principal officer; weren't you?
18                A.   Yes.
19                Q.   And that happened in the fall of
20   2009?
21                A.   Yes.
22                Q.   And you went through a series of
23   three or four interviews before you were retained
24   for that position?
25                A.   Yes.
```



```
 1                    Q.   You were hired to start on
 2    December 7th, 2009; is that right?
 3                    A.   I believe that is the date of the
 4    engagement, yes.
 5                    Q.   And you were told during the
 6    interview process that you had a role respect to
 7    being the principal officer when you would come
 8    into NNI, isn't that true?
 9                    A.   Yes.
10                    Q.   And the role that you had that was
11    described to you was helping to sell off the
12    businesses of Nortel.  Is that one of the roles
13    that was described to you?
14                    A.   Yes.
15                    Q.   And one of the other roles that
16    was described to you was helping to monetize the IP
17    that was within the group; isn't that right?
18                    A.   Yes.
19                    Q.   So let's talk about the first one.
20                    If I can show you a document that is
21    your employment agreement for the position.  And
22    for the record, that document is Exhibit TR11358.
23    And we'll put it up on the screen for you as well.
24    We'll hand you a hard copy.
25                    MR. PULTMAN:  Justice Newbould, I
```



```
 1   apologize, but I'm informed that it will be up

 2   momentarily.

 3              It appears to be up on the screen now.

 4              THE CANADIAN COURT:  I don't think so.

 5              MR. PULTMAN:  Any progress?

 6              THE US COURT:  Yes.

 7              THE CANADIAN COURT:  Yes.

 8              MR. PULTMAN:  Apologies, Your Honor.

 9              BY MR. PULTMAN

10              Q.   Mr. Ray, the document that's been

11   put up, Exhibit TR11358, can you identify this as

12   your engagement letter?

13              A.   Yes, it is.

14              Q.   And it's dated December 7th, 2009?

15              A.   Yes, it is.

16              Q.   I'm correct that this document was

17   drafted by you.  Is that correct?

18              A.   The initial draft, yes.  There

19   were comments and redrafts by others.

20              Q.   And when say comments and redrafts

21   by others, you're talking by people at Nortel?

22              A.   It would be comments from the NNI

23   estate or their representatives as well as comments

24   from creditor representatives, including the

25   Official Committee of Unsecured Creditors as well
```



1    as the Ad Hoc Bondholder Committee.

2             Q.   Okay.  And in the very first page,

3    in the second paragraph, entitled "Scope of

4    Services" -- I'm going to below that up -- it

5    indicates:

6                 "Ray shall become the principal

7                 officer of NNI and each of the US

8                 Debtors and in such officer capacity

9                 shall have the principal, but not

10                sole, responsibility for overseeing

11                and directing the wind-down of the

12                estates of NNI and the other US

13                Debtors with the goal of promptly

14                maximizing the value to be

15                distributed to creditors."

16                Do you see that?

17             A.   Yes.

18             Q.   And was that your overarching goal

19    in working as the principal officer of NNI?

20             A.   Yes.

21             Q.   Now, it goes on to say that you

22    had responsibilities for, in No. 3:

23                 "Receiving periodic reports

24                 from operational management on the

25                 provision of transition services and



```
1                  the winding down of the Nortel

2                  businesses."

3                  Do you see that?

4            A.   Yes.

5            Q.   Now, at the time you joined Nortel

6    in December of 2009, wasn't Nortel well on the way

7    to winding up its US businesses?

8                  A.   The company had either closed or

9    assigned contracts for a few of the principal

10   businesses.  However, the company is, I think as

11   the full record of this case would show, entered

12   into transition support agreements in each of the

13   sales.  And those support agreements continued in

14   existence somewhere between a year and at least in

15   one case maybe two years.  So that service was a

16   significant part of the sale process.

17                 And my job in connection with this

18   particular paragraph was to oversee our operation

19   of those transitional services which are required

20   and needed as part of the sale transaction.

21           Q.   So if I understand your testimony,

22   you've said that Nortel had signed contracts for a

23   few of the principal businesses, for the sale of a

24   few of the principal businesses; isn't that right?

25           A.   Yes.
```

 Neeson & Associates   W&F

```
 1                    Q.   Okay.

 2                    THE CANADIAN COURT:  Mr. Pultman, could

 3    I just ask a question?

 4                    MR. PULTMAN:  Please.

 5                    THE CANADIAN COURT:  Mr. Ray, again,

 6    you said the company had either closed or signed

 7    contracts.

 8                    Is the company you're referring to NNI?

 9                    THE WITNESS:  Yes.  I'm sorry, Your

10    Honor.

11                    NNI was a selling party in all of the

12    major transactions.  But, of course, the other

13    estates were also selling parties.  TSAs were

14    agreements that were entered into on the one hand

15    by the buyer; on the other hand, by the sellers in

16    the transactions.

17                    BY MR. PULTMAN:

18                    Q.   Let's divide that into the two

19    pieces.  Let's first take the sales of the

20    businesses.

21                    By June of 2009, Nortel had decided to

22    sell the lines of businesses; isn't that correct?

23                    A.   Yes.

24                    Q.   And when you came in some six-plus

25    months later, they had already sold or announced
```



```
 1   you described it as a few of the principal
 2   businesses.
 3              A.   Yes.   They had not sold or closed.
 4   They had not signed agreements, they meaning any of
 5   the estates had not signed agreements or closed
 6   agreements on certain of the businesses, which did
 7   not occur until 2010.
 8              Q.   Well, let's test that.
 9              If I can put up a demonstrative, Your
10   Honor, that comes out of the brief that was filed
11   by the US Debtors and your declaration.  And I can
12   go through each of the agreements if that's easier,
13   but I thought in the interest of time, we'd show
14   you the date and ask if you can you can confirm
15   your understanding of the dates of the sales.
16              THE US COURT:  Did you have something
17   to say, Justice Newbould?
18              MR. PULTMAN:  I hope our technology has
19   made it to Toronto, Your Honor.
20              THE CANADIAN COURT:  It has.  What does
21   this come out of?  Is this an exhibit?
22              MR. PULTMAN:  This is a demonstrative
23   exhibit.  The source of it is the pretrial brief of
24   the US interests.
25              THE US COURT:  Mr. Zelbo.
```



```
 1                    MR. ZELBO:  I haven't seen this before,
 2     obviously.  I hear my friend say he took it out of
 3     our briefs.  I don't recall seeing demonstratives
 4     in our briefs, so I just don't know if it is
 5     accurate or not.  I believe -- and my colleague
 6     Mr. Rosenthal, who is much more attuned to the
 7     intricacies of protocol than I am, could confirm.
 8     But I believe there was an agreement that if people
 9     were going to use demonstratives, that they be
10     shared in advance, which is fairly typical,
11     particularly with witnesses, so that one can
12     confirm the accuracy --
13                    THE CANADIAN COURT:  The only purpose
14     of my question was to know whether I can later it
15     pull it up electronically, and if so, where.
16                    MR. ZELBO:  I understand that, Justice
17     Newbould.  And I don't want to make a giant issue
18     about this right now, but I think we had an
19     agreement to share demonstratives in advance.  I
20     haven't seen this.  I think it's a bit unfair.
21                    THE US COURT:  What is the purpose for
22     it?
23                    MR. PULTMAN:  The very simple purpose,
24     Your Honor is to put to Mr. Ray all of the sales of
25     lines of businesses that started from prior to the
```



```
 1   time that he joined the company, including the time
 2   he was at the company; and test the testimony of
 3   Mr. Ray, who just said that a few of the principal
 4   businesses had already been sold.
 5            And I think we can do it in two ways.
 6   One way we can do it is by putting in each the
 7   agreements separately.  Mr. Ray has testified in
 8   his declaration that he's fully familiar and is
 9   well aware of the documents within the files of
10   NNI.  We can did it that way.  Or we can, taking it
11   straight out of the brief of the US Debtors, we can
12   put that factual information up.  If the Court
13   wants, we can make it as an exhibit.  It's for
14   demonstration purposes only and not for evidence.
15            MR. ZELBO:  Your Honors, the purpose --
16   I'm sorry.
17            MR. ROSENTHAL:  Your Honor, Mr. Zelbo
18   referred to me.  We actually did file a protocol on
19   January 24th that had been negotiated with all the
20   parties, and Section 5(f)(iii) explicitly deals
21   with demonstratives.
22            Of course, Mr. Pultman can use a
23   demonstrative, but at 7 o'clock the night before,
24   the parties were required to exchange it so that we
25   could review it for the accuracy before it is put
```



1    to a witness.  That's the agreement that we've been
2    operating under with the parties.
3                    THE CANADIAN COURT:  This document I
4    have been handed has date of hearing, date of a
5    signing, date of closing.  Presumably there's
6    nothing -- there's no rocket science in this piece
7    of paper.  Presumably if there's any problem with a
8    date, someone is going to stand up -- there are
9    enough people in this room, who is going to stand
10   up and say the date is wrong?  Isn't this an easy
11   way just to do this?
12                    MR. PULTMAN:  I would think so, Your
13   Honor --
14                    THE US COURT:  I assume you're not
15   testing the witness' memory as to these specific
16   dates.
17                    MR. PULTMAN:  I am not.  And I hate to
18   respond in kind, but Mr. Rosenthal sent an email
19   that indicated that he's concluded that the parties
20   are not obligated to circulate advance
21   demonstratives.  It was an email that he sent a
22   couple of weeks ago.
23                    So I'm not sure -- I can't speak to
24   chapter and verse of the January 2014 protocol that
25   he's responded to.  I don't believe that this is



1   unfair.  I don't believe that we need to did he

2   belabor it.  I'm happy to either but it put in

3   through the demonstrative or through the witness.

4            MR. ZELBO:  Your Honors, I think I can

5   cut through this.

6            THE US COURT:  Yes.

7            MR. ZELBO:  I do respectfully disagree

8   with the characterization.  The protocol is clear

9   this should have been shared with us at 7 o'clock

10  last night.  I am not going to make an issue of

11  this now.

12            This may very well be a convenient way

13  to do it.  I do think it's unfair to have sprung

14  this on us in this way.  The only thing I will say

15  is I can't sitting here right now vouch for these

16  numbers.  I am pretty sure they are rounded numbers

17  I just don't know.

18            But if he wants to proceed this way,

19  that's fine.  But I do think we had an

20  understanding about sharing demonstratives.  I

21  would like that to be honored going forward.

22            THE US COURT:  All right.  It should be

23  honored going forward, of course.

24            But as for the present, I will allow

25  Mr. Pultman -- perhaps it will assist the witness



1    in answering his questions.

2             MR. ZELBO:  And I take no issue with

3    that.  Thank you, Your Honor.

4             THE US COURT:  But clearly the specific

5    accuracy of these numbers and all is not really

6    present before us.

7             All right, Mr. Pultman.

8             BY MR. PULTMAN

9             Q.   Mr. Ray, going to the

10   demonstrative, are you familiar with a business

11   that was referred to as the Layer 4-7 business?

12            A.   Yes.

13            Q.   In fact, was this business owned

14   by Nortel?

15            A.   Yes.

16            Q.   And was it sold?

17            A.   Yes.

18            Q.   And was it sold prior to the time

19   that you arrived at Nortel?

20            A.   Yes.

21            Q.   Was there a sale hearing on or

22   about March 26th of 2009, to your knowledge?

23            A.   I don't -- I don't recall dates

24   this specifically.  You'd have to show me a

25   document for me to know for certain.  This was

 Neeson&Associates   W&F WILCOX & FETZER LTD.

1    2009.  It's 2014.  All of these dates, you're

2    really challenging the memory at this point.

3                  THE US COURT:  Is it sufficient for you

4    to represent to him?

5                  BY MR. PULTMAN

6            Q.   I will represent to you that the

7    filing of the US Debtors indicates that, in fact,

8    the sale hearing was on March 26th of 2009.

9            A.   Okay.

10           Q.   Were you involved in the sale?

11           A.   No, I was not.

12           Q.   And it preceded your time at

13   Nortel; isn't that right?

14           A.   Yes.

15           Q.   Let's move on to the next sale.

16                  Are you familiar with the sale of the

17   CDMA/LTE businesses?

18           A.   Yes.

19           Q.   And a substantial sale, was it

20   not?

21           A.   Yes, it was.

22           Q.   And you're familiar with the

23   purchaser of that sale, are you not?

24           A.   Yes, I am.

25           Q.   And that was Ericsson?



```
 1                    A.    Yes.
 2                    Q.    To your knowledge, was the sale
 3     signed and the hearing conducted in or about July
 4     of 2009?
 5                    A.    I believe that's approximately
 6     right.
 7                    Q.    And once again, it preceded your
 8     time at the company?
 9                    A.    The signing and closing did, yes.
10                    Q.    And the sale price of
11     $1.13 billion, was that a substantial sale at
12     Nortel?
13                    A.    Yes.
14                    Q.    Let's move on to the next one, the
15     Enterprise sale.  Are you familiar with this
16     transaction?
17                    A.    Yes, I am.
18                    Q.    And the sale hearing and the
19     signing took place several months before you
20     started?
21                    A.    Yes, yes, it did.
22                    Q.    And the closing took place within
23     a couple of weeks after you joined; isn't that
24     correct?
25                    A.    The closing did, yes.
```



```
 1                    Q.    And the buyer was Avaya?
 2                    A.    That's correct.
 3                    Q.    And you're familiar with this
 4      transaction?
 5                    A.    Yes.
 6                    Q.    Let's move on to the next sale.
 7                    The Next Generation Packet Core, are
 8      you familiar with this document transaction?
 9                    A.    Yes.
10                    Q.    Did Nortel sell this business in
11      or about -- did it have a signing in or about
12      October of 2009?
13                    A.    Yes.
14                    Q.    And was there a closing
15      immediately after you joined the company, the day
16      after you joined the company?
17                    A.    Yes.
18                    Q.    And to your knowledge, was this a
19      sale to Hitachi?
20                    A.    Yes, that's right.
21                    Q.    Did you have any involvement in
22      this sale whatsoever?
23                    A.    No.
24                    Q.    And it was already announced
25      before the time that you joined the company?
```



```
 1                    A.    Yes.
 2                    Q.    Let's move on to the next sale.
 3      The MEN sale, the Metro Ethernet Networks sale.
 4      Are you familiar with this sale?
 5                    A.    Yes.
 6                    Q.    And was it announced -- was the
 7      signing prior to the time that you joined Nortel?
 8                    A.    Yes.
 9                    Q.    And the sale hearing, did it occur
10      before you joined Nortel?
11                    A.    Yes, it did.
12                    Q.    And the purchaser Ciena.  Do you
13      recall the sale to Ciena?
14                    A.    Yes.
15                    Q.    And the amount, $775 million, do
16      you recall that amount?
17                    A.    Yes, approximately, yes.
18                    Q.    And the closing took place after
19      you joined Nortel; isn't that right?
20                    A.    That's correct.
21                    Q.    But the sale had already been
22      announced prior to the time you joined?
23                    A.    Yes.
24                    Q.    Let's move on to the next sale,
25      and that's the GSM sale, also in Ericsson sale,
```



1    this one of $103 million.

2              Did this sale, the signing take place

3    before you joined Nortel?

4              A.   Yes, it did.

5              Q.   And the hearing on the sale took

6    place before you joined Nortel?

7              A.   Yes, it did.

8              Q.   And the purchase price was

9    $103 million; is that right?

10             A.   I believe so, yes.

11             Q.   Did you have any involvement in

12   this sale?

13             A.   Not pre-closing, no.

14             Q.   Did you have involvement

15   post-closing?

16             A.   Except to the extent with any of

17   these sales the TSA was involved.

18             Q.   And when you say the TSA, you're

19   talking about the transition services that were

20   provided by NBS?

21             A.   Yes.

22             Q.   Let's move on to the next sale,

23   the CVAS sale.  Was this sale announced just after

24   you joined Nortel in December of 2009?

25             A.   Yes.



```
 1                    Q.   And this is a sale of
 2    $282.6 million to Genband?
 3                    A.   Yes.
 4                    Q.   Did you have any involvement prior
 5    to the sale?
 6                    A.   No.
 7                    Q.   Let's move on to the next sale,
 8    and this is the GSM retained contracts sale.  Now,
 9    this sale is dated in May of 2010.  Were you
10    employed by Nortel at the time that this sale had a
11    hearing?
12                    A.   Yes.
13                    Q.   And were you involved in
14    connection with the sale?
15                    A.   I don't recall to what extent I
16    may have been involved in this.
17                    Q.   And the purchaser here was
18    Ericsson, was it not?
19                    A.   I believe that's right, yes.
20                    Q.   This is a $2 million sale; is that
21    right?
22                    A.   That's right.
23                    Q.   Let's move on to the final sale,
24    and that's the Multiservice Switch sale.  This took
25    place also after you joined Nortel; isn't that
```



```
 1   right?
 2             A.   Yes, it is.
 3             Q.   Is it fair to say that the
 4   Multiservice Switch sale and the GSM retained
 5   contracts sale, those were the two sales that took
 6   place in terms of announcement, closing after you
 7   joined Nortel, is that right?
 8             A.   Yes.
 9             Q.   And the total value of those two
10   sales is $67 million; is that right?
11             A.   Yes.
12             Q.   And the total sales of the seven
13   deals, the seven business transactions that took
14   place prior to the time that you joined Nortel,
15   that was $3.218 billion; isn't that right?
16             A.   I haven't done the math, but if
17   you say so.
18             Q.   Well, if you took a look at the
19   chart that's in front of you, looking at the big
20   sales, like the CDMA sale of 1.13 billion,
21   900 million, the 775 million, 280 million CVAS, by
22   and large, these transactions were concluded before
23   you came to Nortel; isn't that right?
24             A.   Yes.
25             Q.   And you didn't have any
```



 1    involvement in connection with seven out of the

 2    nine transactions?

 3              A.    Except to the extent that I was

 4    involved with the TSAs.

 5              Q.    Well, let's talk about what took

 6    place after you joined Nortel.  Why don't we put

 7    the next sale.  And the next major sale that was in

 8    connection with the sale of assets was the patent

 9    portfolio, which was in June and July of 2011;

10    isn't that right?

11              A.    Yes.

12              Q.    And that was the ultimate sale to

13    Rockstar/Bidco?

14              A.    That is correct.

15              Q.    If we can put up the next slide.

16              MR. PULTMAN:  And, Your Honor,

17    momentarily if we could break for lunch, if I can

18    just finish this couple of questions?

19              THE US COURT:  That's fine Mr. Pultman,

20    certainly.

21              MR. PULTMAN:  Thank you, Your Honor.

22              BY MR. PULTMAN

23              Q.    And the next slide.  And put up on

24    that demonstrative are two dates.  The first date

25    in red is December 7th, 2009.  Do you see that on



```
 1   the demonstrative, sir?

 2             A.   Yes.

 3             Q.   And that's the date you signed

 4   your engagement letter is NNI, isn't it?

 5             A.   That's correct.

 6             Q.   And the day that the US Court

 7   approved your appointment as the principal officer,

 8   that was in January, January 6th of 2010; is that

 9   right?

10             A.   Yes.

11             MR. PULTMAN:  With that, Your Honors,

12   if we could break for lunch.

13             THE US COURT:  Justice Newbould, does

14   that meet with your approval?

15             THE CANADIAN COURT:  Certainly does.

16             THE US COURT:  All right.  So we'll be

17   back at quarter to 2:00.

18             MR. PULTMAN:  Thank you.

19             THE US COURT:  All right.  Thank you.

20   Enjoy your lunch.

21   -- LUNCHEON RECESS TAKEN AT 12:46 P.M.

22   -- UPON RESUMING AT 1:54 P.M.

23             THE US COURT:  We're back.

24             MR. PULTMAN:  May I proceed, Your

25   Honor?
```



```
 1                    THE US COURT:  Are you ready?  You may
 2    proceed, Mr. Pultman.
 3                    MR. PULTMAN:  Thank you.
 4                    BY MR. PULTMAN:
 5                    Q.   Before lunch we showed you a
 6    demonstrative that there was some debate over.  I'm
 7    going to ask that we hand up actually the brief
 8    that the US Debtors filed as an opening brief in
 9    this matter.
10                    And for the Court, we're attaching the
11    cover of the brief and Appendix B.
12                    MR. ZELBO:  I'm pretty sure the brief
13    was a few pages longer.
14                    MR. PULTMAN:  It was, but I can't carry
15    it.
16                    THE US COURT:  I know it was.  Does
17    Justice Newbould have the document as well in
18    Canada?
19                    MR. PULTMAN:  I believe that it is
20    being handed up to Justice Newbould as well.
21                    THE US COURT:  All right.
22                    THE CANADIAN COURT:  Yes, I do.  Thank
23    you.
24                    BY MR. PULTMAN
25                    Q.   Mr. Ray, is this the cover of the
```



```
 1   pretrial brief that was filed by the US interests?
 2              A.   Yes.
 3              Q.   And the attachment to it that is
 4   there at Appendix B.  Do you see that chart?
 5              A.   Yes.
 6              Q.   To the best of your knowledge, is
 7   Appendix B accurate?
 8              A.   Yes.
 9              Q.   Let's put that to the side.
10              Sir, you spent a good amount of time
11   this morning talking about IPCo.  Do you recall
12   that?
13              A.   Yes.
14              Q.   And you told us that there were
15   parallel efforts that were ongoing at Nortel with
16   respect to what to do with the residual patents.
17   Do you recall that?
18              A.   Yes.
19              Q.   And you told us about the
20   possibility of IPCo; is that right?
21              A.   Yes.
22              Q.   And you told us about the
23   possibility of a sale of the patents?
24              A.   Yes.
25              Q.   You told us also about a company
```



1    called Global IP.  Do you remember that?

2              A.    Yes.

3              Q.    Now, Global IP was retained before

4    you came onboard in or about October of 2009; isn't

5    that right?

6              A.    Yes.

7              Q.    And they started to review the

8    portfolio of patents within Nortel; is that right?

9              A.    Yes.

10              Q.    Now, you and Ms. Hamilton have a

11    difference of opinion as to the viability of IPCo;

12    is that fair to say?

13              A.    Yes.

14              Q.    And you believe -- I think the

15    words you said were it was very vibrant; is that

16    right?

17              A.    I would say it's very viable.

18              Q.    Oh, very viable.  Thank you.

19              Now, you both looked at models, both

20    you and Ms. Hamilton, with respect to how much of

21    an investment you'd need to make into IPCo to make

22    it work; isn't that right?

23              A.    Yes.

24              Q.    And Ms. Hamilton took the view

25    that it was going to be a $417 million investment;



```
 1   isn't that right?
 2                  A.   I believe so, yes.
 3                  Q.   And I am correct that you thought
 4   it was going to be less than that as an investment,
 5   and the number you choose was the $269 million?
 6                  A.   That's correct.
 7                  Q.   And there were a variety of models
 8   that you looked at, but there were three
 9   essentially you looked at that you called
10   "harvest," "litigation light" and "litigation
11   heavy"; is that right?
12                  A.   Yes.
13                  Q.   Now, you and Ms. Hamilton debated
14   the amount of time it would take to get IPCo up and
15   running and off the ground?
16                  A.   Yes.
17                  Q.   Now, you said it was going to be
18   three years or less than three years, and she
19   thought it was going to be a four-year investment;
20   isn't that right?
21                  A.   I don't recall exactly what her
22   investment timeline was, but that sounds right.
23                  Q.   Now, you described to the Courts
24   that that was a collective effort by the principal
25   estates in the creation of IPCo; isn't that right?
```



```
 1                    A.    Yes.

 2                    Q.    And you described a larger

 3    steering committee.  Now, Ms. Hamilton sat on that

 4    steering committee?

 5                    A.    I think she was not an official

 6    person.  I think she was the designee of the

 7    Monitor.  I think at that point he was the Monitor.

 8                    Q.    And I'm not going if she's an

 9    official person.  I'm asking if she participated in

10    the IP steering committee that you described.

11                    A.    Yes.

12                    Q.    And I'm correct, am I not, that

13    she sat there on behalf of the Canadian Monitor?

14                    A.    Yes.

15                    Q.    Now, you would agree with

16    Ms. Hamilton, would you not, that IPCo involved a

17    fair amount of risk?

18                    A.    Certainly in any business there is

19    risk.  I think we could debate the risk profile,

20    and I don't think it's as simple as saying the

21    business is very risky or completely risky or not

22    risky at all.  I think it's more granular than that

23    in terms of the patents we had, the markets that we

24    would prosecute in.  I think it's an

25    oversimplification to say it's one or the other.
```



 1                    Q.    Well, my question is, do you

 2    believe that there was any certainty to the returns

 3    that would have come from IPCo.

 4                    A.    I think we did a lot of work to

 5    model it.  We debated extensively the royalty

 6    rates.  We debated discount rates.  We debated the

 7    enforceability of patents.  We actually went out to

 8    law firms and got quotes on fee structures.  We

 9    modeled the cost of the operation.  All the

10    variable that's go into a business we analyzed and

11    put in ranges.

12                    So while any business has risk to it, I

13    feel like we did a very thorough valuation of it,

14    and I think it was a manageable risk.  And I think

15    that people were very comfortable with it in some

16    respects because others had done this.  We were not

17    going to be the first pioneer in this road towards

18    developing the company to license and to prosecute

19    infringement actions.

20                    So there's certainly a record in the

21    United States of patent enforcement, and I think

22    that the patent lawyers that were engaged were

23    confident.  I'm sure that their confidence level

24    would depend on what patents we're talking about

25    and whose patent it is and what the patent was for,



1   so on and so forth.  But I don't think that anybody

2   thought this was some sort of completely risky --

3   sort of like an ice cube factory in Florida.  I

4   don't think so.  I think people thought this was

5   really a business opportunity that people were very

6   interested in pursuing.

7               Q.   Are you done with your answer,

8   sir?

9               A.   I could go on if you like.

10              Q.   I think you've done a fair amount.

11  Thank you.

12              My question is a simple one.  There was

13  no certainty to the returns of IPCo.  Was there any

14  certainty to it?

15              A.   There was certainly a certainty in

16  range of recoveries in IPCo.  Is there an absolute

17  certainty that the actual numbers that were on a

18  piece of paper would ever add up?  They seldom.

19  Sometimes they're more; sometimes they're less.

20  It's just the way business works.

21              Q.   Now, earlier you told us about the

22  court approval of the stalking horse agreement.  Do

23  you recall that?

24              A.   Yes.

25              Q.   And you said that was with Google?



```
 1                    A.   Yes.

 2                    Q.   Or with Google subsidiary Ranger,

 3      Inc.?

 4                    A.   That's correct.

 5                    Q.   And under the stalking horse

 6      agreement, I'm correct that the estates themselves

 7      were contractually prohibited from pursuing IPCo;

 8      isn't that right?

 9                    A.   That's not completely accurate.

10      If I could refer to the document, I can cite the

11      language.  But we were allowed to pursue an

12      alternative transaction involving IPCo.  And we

13      certainly can get that language and look at that.

14                    Q.   Sure.  Why don't I hand you the

15      document.  And for the record, the document is

16      Exhibit TR45578.  And we'll put that up on the

17      screen as well.  And if we could go to Page 93 on

18      the PDF.  In particular, I want to show you

19      Section 5.5(d).

20                    A.   I'm sorry.  Could you repeat that

21      section.

22                    Q.   Sure.  I'm at Section 5.5(d), and

23      it's up on the screen in front of you.  It's on

24      Page 93 of the PDF version.

25                    Mr. Ray, do you see the language on the
```



```
 1   screen, Section 5.5(d)?

 2              A.   Yes.

 3              Q.   And is that the language that you

 4   were referring to that provided a prohibition

 5   against the estates themselves pursuing IPCo?

 6              A.   I believe the language that I was

 7   referring to is in (d)(i), in the parenthetical

 8   inside little (i).

 9              Q.   So it's the "except to the

10   extent"?

11              A.   Yes.

12              Q.   Now, let me ask you about, in your

13   declaration, your reply declaration, in

14   Paragraph 19 you indicated that Google insisted AND

15   the estates ultimately agreed that the Estates

16   would not further pursue the IPCo business model.

17   AND that's your reply declaration, Paragraph 19, on

18   Page 9, and it's the carryover sentence.

19              A.   Yes, I see that.

20              Q.   Do you see where it says:

21                   "Thus, once it was approved by

22                   the Court, the agreement did limit

23                   the estates' prerogative to walk

24                   away from the auction process to

25                   pursue the IPCo business model on
```



```
1                  its own."
2                  Do you see that?
3             A.   Yes, I see.
4             Q.   And you further indicate that:
5                  "The stalking horse agreement
6                  expressly permitted the estates to
7                  consider a proposal by the
8                  Bondholder Group or any other
9                  third-party sponsor of a transaction
10                 that would keep the patent portfolio
11                 within the Nortel Group in order to
12                 establish an IPCo business."
13                 Do you see that?
14            A.   Yes.
15            Q.   So this is consistent with what
16    you testified on direct, that there were third
17    parties out there that might be interested in
18    continuing to pursue the IPCo, together with the
19    estates?
20            A.   That's correct.
21            Q.   Now, when the proposal came to the
22    court for the Google deal, for the Ranger
23    transaction, the stalking horse agreement --
24            A.   Yes.
25            Q.   -- I'm correct, am I not, that the
```



```
 1   amount of that sale was $900 million?

 2              A.   Yes.

 3              Q.   And that there was a breakup fee

 4   of $25 million?

 5              A.   That sounds like an appropriate

 6   amount.  Off the top of my head I couldn't tell

 7   you, but it sounds like a very appropriate amount.

 8              Q.   And at the time that the Courts

 9   approved the Google the stalking horse bid, I'm

10   correct that the Courts also approved a bidding

11   process or a procedure for the residual IP?

12              A.   Yes.

13              Q.   And if I can, I'd like to show you

14   a document that's Exhibit TR50428.  And this is the

15   order from the Court in Canada.  And we will hand

16   up copies as well.

17              And, Mr. Ray, I'm going to turn your

18   attention to Page 9, which says, "Bidding

19   Procedures."  Do you see that?

20              A.   Sorry.  What section are you

21   referring to?

22              Q.   It's actually blown up on the

23   screen, if that makes it's easier.

24              A.   I'm sorry, but the screen is very

25   difficult for me to read.
```



```
 1                    Q.   Well, then let's make it easier.
 2   Why don't we go to the Schedule A to the document,
 3   which you'll find on the ninth page.
 4                    If we could put up on the screen one
 5   page earlier.
 6                    THE US COURT:  It's Schedule A to the
 7   document, Mr. Ray.
 8                    THE WITNESS:  Okay, very good.  Yes.
 9                    BY MR. PULTMAN:
10                    Q.   And following that Schedule A it
11   indicates that there are bidding procedures; isn't
12   that correct?
13                    A.   Yes.
14                    Q.   And you're familiar with the
15   bidding procedures that were in place?
16                    A.   I was at the time, yes.
17                    Q.   And it required, for example, that
18   there be -- parties who wanted to bid had to sign a
19   confidentiality agreement; isn't that correct?
20                    A.   I'm confident, yes, it would.
21                    Q.   That wouldn't be unusual, would
22   it?
23                    A.   No.
24                    Q.   And you can find that on Page 4,
25   Section A, if you care to follow that.
```



```
 1                    A.    Okay.

 2                    Q.    And bidders would also have to

 3   deliver financial statements or other financial

 4   disclosure?

 5                    A.    That's correct.

 6                    Q.    So the executed copy is at the top

 7   in A.  B would require financial statements.  And

 8   if a bidder did this, that might it a qualified

 9   bidder; isn't that right?

10                    A.    Yes.

11                    Q.    And if they became a qualified

12   bidder, they would then get access to due

13   diligence?

14                    A.    Yes.

15                    Q.    They got access to a data room?

16                    A.    Yes.

17                    Q.    Access to management

18   presentations?

19                    A.    Yes.

20                    Q.    And it wasn't enough to be a

21   qualified bidder.  A qualified bidder would have to

22   under these procedures make a qualified bid; isn't

23   that right?

24                    A.    That's right.

25                    Q.    And in order to make a qualified
```



1    bid, there was a list of conditions that had to be

2    met; isn't that right?

3                    A.    Yes.

4                    Q.    The bid had to be irrevocable for

5    a period of time?

6                    A.    Yes.

7                    Q.    And it had to be greater than the

8    value offered under the stalking horse agreement,

9    the 900 million plus 25 million in the breakup fee

10   and 4 million for the expenses.  You'll find that

11   on Page 8 in Section G.

12                   A.    Yes.

13                   Q.    And finally, in order to be a

14   qualified bid, the bid had to be received by the

15   Debtors by no later than the bid deadline of

16   June 13th, 2011; isn't that right?

17                   A.    Yes.

18                   Q.    Now, I'm correct, am I not, that

19   on June 13th, 2011, Apple submitted a qualified

20   bid.

21                   A.    They certainly submitted a

22   qualified bid.  I don't know the exact date of it.

23                   Q.    Well, let's take the date out of

24   it.  Apple submitted a qualified bid?

25                   A.    Yes.



```
 1                     Q.   And I'm correct as well that

 2     Rockstar submitted a qualified bid?

 3                     A.   Yes.

 4                     Q.   And that Intel submitted a

 5     qualified bid?

 6                     A.   Yes.

 7                     Q.   And that Norpax submitted a

 8     qualified bid?

 9                     A.   That's correct.

10                     Q.   So in addition to Google, there

11     were four additional qualified bidders who

12     submitted qualified bids; isn't that right?

13                     A.   That's right.

14                     Q.   Am I right that the Bondholders

15     never submitted a qualified bid?

16                     A.   That's correct.

17                     Q.   And I'm correct as well that the

18     Bondholders never went through the steps to become

19     a qualified bidder either?

20                     A.   That's correct.

21                     Q.   And to your knowledge, I'm correct

22     that despite the viability of IPCo, no third party

23     came in to become a qualified bidder and submitted

24     a qualified bid to work through this alternative

25     transaction with Nortel, did they?
```



```
 1                    A.   Not under these procedures, no.
 2                    Q.   Now, I'd like to turn to a
 3      different subject.  You can put the termination --
 4      you can put that document to the side.
 5                         As principal officer for NNI, you were
 6      in the courtroom last Monday when there were
 7      opening statements in this case; isn't that right?
 8                    A.   Yes.
 9                    Q.   And you heard your lawyers,
10      Ms. Block in Canada give her opening statement?
11                    A.   Yes.
12                    Q.   And you heard Mr. Bromley give a
13      portion of the opening statement?
14                    A.   Yes, I did.
15                    Q.   Now, you heard Ms. Block say the
16      following in the opening:
17                         "The sellers, the sellers were
18                         NNI and the other estates who had
19                         the same rights exclusively in their
20                         respective territories.  And as
21                         sellers they were to terminate their
22                         licenses and in return receive a
23                         right to allocation, not a right to
24                         make a claim for allocation; a right
25                         to allocation."
```



```
 1                    Do you recall her making that statement

 2    in court?

 3                    A.   Yes.

 4                    Q.   And do you recall her saying:

 5                         "But these estates, NNI and

 6                         NNUK, et cetera, were giving the

 7                         value of IP in their territories and

 8                         were to receive that value from the

 9                         proceeds.  Not zero."

10                    Do you recall that?

11                    A.   I don't recall those were her

12    exact words, but that was, I think, the substance

13    of what she was saying.

14                    Q.   Now, let's talk about the

15    termination of those license rights.

16                    First, earlier this morning when you

17    were asked questions about the Google transaction

18    and then the Rockstar transaction, you were asked:

19                         "When you say it was a keen

20                         issue, did Google insist on any

21                         requirements with respect to those

22                         exclusive licenses as a condition

23                         with respect to entering into the

24                         stalking horse agreement?"

25                    You gave the following answer:
```



```
 1                    "Yes.  You know, Google
 2               insisted that we enter into
 3               agreements to transfer those
 4               licenses.  That was a requirement of
 5               the deal, and without our ability to
 6               transfer those licenses, it would
 7               kill the deal, no doubt."
 8               Did you give those answers this
 9     morning?
10               A.   Yes.
11               Q.   And is that accurate?
12               A.   Yes.
13               Q.   Now, to your mind, did a license
14     transfer occur in connection with the Rockstar
15     transaction?
16               A.   I have to go back and look at the
17     documents.  I mean, we can parse through words.
18     But at the end of the day, the company had its
19     exclusive license, and whether those were
20     transferred or terminated in consideration of us
21     getting a part of the sale proceeds, the substance
22     of the transaction was that we delivered our
23     exclusive license in consideration of the sale
24     proceeds.
25               Q.   Well, am I correct that, in fact,
```



1    you didn't transfer any license?  You terminated a

2    license; isn't that right?

3               A.   I believe that that transaction,

4    the form of that involved a termination, but it was

5    with our consent.

6               Q.   And let me show you the document

7    that's entitled "License Termination Agreement."

8    It's Exhibit TR No. 21508.  It indicates on the

9    document that it's an execution document, and I'd

10   like to turn your attention to the signature pages

11   on Page 7 of the document.

12              Do you see a series of signatures,

13   Mr. Ray?

14              A.   Yes.

15              Q.   Are those your signatures?

16              A.   On Page -- yes.

17              Q.   And I won't ask whether it was a

18   full-bottle or half-bottle signature.  But those

19   were your signatures on behalf of NNI?

20              A.   Yes.

21              Q.   Now, on the front page of the

22   document where --

23              THE CANADIAN COURT:  Clearly a full

24   bottle.

25              THE WITNESS:  Okay.



```
 1                    BY MR. PULTMAN
 2              Q.   The document indicates that it is,
 3    in fact, a termination of license that was held by
 4    NNI, isn't that true?
 5              A.   That's true.
 6              Q.   And, in fact, there was no
 7    transfer of any license by NNI, was there?
 8              A.   Yes, this was a license
 9    termination in connection with the sale.
10              Q.   Now, let's go through who else was
11    parties to this.
12              You understood, did you not, that there
13    were various EMEA entities that were parties to
14    this agreement?
15              A.   Yes.
16              Q.   And, for example, Nortel GmbH, the
17    German Nortel entity, was that a party?
18              A.   Yes.
19              Q.   And if you look at Schedule 3, it
20    indicates who the EMEA Debtors are.  Do you see
21    that?  We can pull up that page for you.
22              A.   Yes.
23              Q.   It's Page 33 of the PDF.
24              A.   Yes.
25              Q.   Now, I'm going to show you another
```



1    document which we've seen several times, which is

2    the IFSA.  You're familiar with the IFSA, are you

3    not?

4                    A.    Yes, I am.

5                    Q.    And even though it was signed in

6    June of 2009, which was before your time at the

7    company, you've seen that document many times?

8                    A.    Yes.

9                    Q.    The document is Exhibit TR43794.

10                   Now, in particular, I'm going to turn

11   you to the Schedule 3 on Page 33.  And do you see

12   there on that schedule there's a list of EMEA

13   Debtors, including Nortel GmbH?

14                   A.    Yes.

15                   Q.    And do you see also below that

16   Nortel Networks France, SAS?  Is that another EMEA

17   Debtor?

18                   A.    I'm sorry.  Are you on the same

19   page?

20                   Q.    I am.  And it's blown up on that

21   screen, if that's easier, and highlighted.

22                   A.    Yes, I do.  Sorry.

23                   Q.    And on Page 1 of the IFSA, it

24   indicates, in the first clause, "This Agreement --

25                       "This Agreement" -- at the very



```
1                    top -- "is entered into by and among
2                    Nortel Networks Limited and the
3                    other entities set forth in Schedule
4                    1 attached hereto, Nortel Networks
5                    Inc. And the other entities set
6                    forth in Schedule 2 attached hereto,
7                    and the Joint Administrators and the
8                    entities set forth in Schedule 3
9                    attached hereto," and it defines
10    them as the EMEA Debtors.
11                    A.    Yes.
12                    Q.    So you will agree with me that
13    Nortel GmbH and Nortel Networks France SAS were
14    each parties to the IFSA?
15                    A.    Yes.
16                    Q.    And you will agree with me that
17    each of them were EMEA Debtors?
18                    A.    Yes.
19                    Q.    Now, let's turn to Section 11(a)
20    of the IFSA, which is on Page 9.  And if we can
21    blow up the relinquishment of intellectual property
22    licenses.  And the language reads, and I quote:
23                    "Each of the US Debtors and the
24                    EMEA Debtors hereby agrees to enter
25                    into an appropriate license
```



```
1                    termination (as defined below) with
2                    respect to the licenses and rights
3                    granted by NNL to such Debtors under
4                    or pursuant to the provisions of the
5                    Master R&D Agreement such licenses
6                    and rights ('the IP licenses') for
7                    the purpose of facilitating and in
8                    consideration of a right to an
9                    allocation."
10              Do you see that.
11              A.    Yes.
12              Q.    And that language, "in
13   consideration of a right to an allocation," is the
14   point that was made by Ms. Block in opening, is it
15   not?
16              A.    Yes.
17              Q.    And under Section 11(d) of the
18   IFSA, on Page 11, it indicates, and I quote:
19                    "Where any Debtor enters into
20                    an appropriate license termination
21                    in accordance with the provisions of
22                    this Section 11, such Debtor shall
23                    be deemed to be a selling Debtor and
24                    proceeds of such asset sale shall be
25                    deemed to be sale proceeds for the
```



```
1                    purposes of Sections (b) and (d),

2                    and Sections (b) and (d) shall apply

3                    accordingly."

4                    Do you see that?

5            A.   Yes, I do.

6            Q.   Now, I'm going to show you the

7    document we saw before, which was the license

8    termination agreement for the Rockstar transaction,

9    Exhibit TR21508.

10           A.   Yes.

11           Q.   And you would agree with me that

12   both Nortel GmbH and Nortel France SAS were both

13   EMEA sellers under that definition; isn't that

14   right?

15           A.   Yes.

16           Q.   And now, under Section 2.04,

17   Paragraph 2.04 of the document, when it refers to

18   each "seller," again, it starts with right to

19   allocation of sale proceeds.  And that was again

20   Ms. Block's point.  It says:

21                    "Each Seller shall have a right

22                    to an allocation of a portion of the

23                    sale proceeds from the sale

24                    deposited in escrow."

25                    Do you see that?
```



```
 1                    A.    Yes.
 2                    Q.    And I'm correct then under
 3   Ms. Block's argument and the NNI theory, both of
 4   these EMEA sellers, both GmbH and Nortel SAS
 5   France, they would be entitled to an allocation,
 6   not a right to an allocation but to an allocation
 7   of proceeds; isn't that right --
 8                    A.    Yes.
 9                    Q.    -- under that theory?
10                    A.    Yes.
11                    Q.    I'm going to turn you to a
12   document which is -- and because it's highly
13   confidential, I'm going to give you an excerpted
14   version of it.  And that is a document that was put
15   in in these proceedings by the US.  And it's at
16   Docket No. 13551.  And that is the expert report of
17   a Jeffrey Kinrich.
18                    Have you seen the expert of Mr. Kinrich
19   before?
20                    A.    Yes.
21                    Q.    And Mr. Kinrich is an expert that
22   the US is putting in in this case; isn't that
23   right?
24                    A.    Yes, it is.
25                    Q.    And the document that we're giving
```



```
 1   you contains a cover sheet, the signature page and
 2   then a chart.
 3               MR. PULTMAN:  And the documents for
 4   Your Honor is Exhibit TR11432, if you want to pull
 5   it up.
 6               BY MR. PULTMAN:
 7               Q.   And in particular, I'm going to
 8   turn you to the chart that's the third page.
 9               And if we can blow up the entirety from
10   the top to that portion.
11               Now, I'm correct that this is
12   Mr. Kinrich's analysis as to what the value that
13   was relinquished by each of these sellers was;
14   isn't that right?
15               A.   That's right.
16               Q.   And I'm correct that the reading
17   of this chart is that, under the patent portfolio
18   value relinquished for Nortel GmbH and Nortel
19   Networks France SAS, Mr. Kinrich gives zero
20   allocation to Nortel GmbH and zero allocation to
21   the Nortel Networks France SAS; isn't that right?
22               A.   Yes.
23               Q.   Notwithstanding the fact that both
24   are sellers?
25               A.   Yes, there's a -- there's a reason
```



```
 1   for that.
 2               Q.   I'm quite certain that your
 3   counsel will ask you all about them.
 4               A.   Or I could just explain it to the
 5   Courts now.
 6               Q.   I'm quite certain you'll have an
 7   opportunity?
 8               THE US COURT:  Mr. Ray, limit yourself
 9   to the questions.
10               THE CANADIAN COURT:  There are lots of
11   high-priced lawyers here to argue the case, lots of
12   them.
13               THE WITNESS:  I'm just sticking with
14   the facts.
15               BY MR. PULTMAN:
16               Q.   Mr. Ray, I'm going to take you
17   back to your very first meeting while you were
18   employed by NNI.  Now, you told us earlier today --
19   and we can take down the document -- you told us
20   today that you had a meeting that related to the
21   settlement of a $2 billion claim, and then the
22   approval under FCFSA, or as you called it, FCFSA --
23               A.   That was the final funding
24   agreement.
25               Q.   The meeting you described you say
```



1    took place in December of 2009, when you had just

2    gotten started at the company?

3                    A.    Yes, I believe that's right.

4                    Q.    And was is it a meeting or

5    conference call?

6                    A.    It was a meeting that started up

7    in the Nortel offices prior to their move of the

8    office.

9                    Q.    And you said that you understood

10   that under that final funding agreement, that the

11   $2 billion claim in favor of NNI against NNL was

12   approved.

13                   A.    There's certainly a reference in

14   the final funding agreement to the $2 billion

15   claim.  It's actually slightly more than 2 billion.

16                   Q.    And that slightly more than

17   $2 billion claim , it's not subject to setoff or

18   counterclaim, is it?

19                   A.    That's correct.

20                   Q.    And that's a claim against the

21   Canadian estate?

22                   A.    That's correct.

23                   Q.    And so whatever proceeds are going

24   to go up to Canada, that claim is going to be made

25   against those proceeds; isn't that right?



```
 1                    A.   Yes.

 2                    Q.   And I'm right also that the

 3    Bondholders, the US Bondholders have some

 4    $4 billion worth of claims against the Canadian

 5    estate; isn't that right?

 6                    A.   That's correct.

 7                    Q.   And the Bondholders are the US'

 8    largest creditor?

 9                    A.   Yes.

10                    Q.   Now, I'm going to turn you to a

11    different subject, which is one that you were asked

12    about a little bit this morning, and that's

13    reservation of rights.

14                    Now, we showed you the IFSA before.  In

15    your role as principal officer, you've taken some

16    time to familiarize yourself with the IFSA; isn't

17    that right?

18                    A.   Yes.

19                    Q.   And you understand that the IFSA

20    contains a provision that says:

21                         "Nothing in this section shall

22                         prejudice the rights of any party or

23                         otherwise constitute an amendment,

24                         modification or waiver of the rights

25                         of any party to seek its
```

Neeson & Associates   W&F

```
 1                  entitlements to sale proceeds from

 2                  any sale transaction."

 3                  Are you familiar with that general

 4     concept?

 5                  A.    Excuse me.   Let me refer to the

 6     document.

 7                  Q.    Sure.   Let me blow it up.   And

 8     it's in Section 12(f).   It is on Page 12.   And the

 9     document is Exhibit TR43794.   And we can blow up

10     the section which begins, "Nothing in this

11     Section 12."

12                  Yes, I see that.

13                  Q.    Now, you've seen numerous

14     documents that are very similar to this in terms of

15     the reservation of rights; isn't that right?

16                  A.    Yes.

17                  Q.    And in every way, shape or form

18     imaginable, the parties agreed that nothing in the

19     IFSA or in the order would determine allocation of

20     proceeds from a sale transaction; isn't that right?

21                  A.    Yes.

22                  Q.    And I'm correct that you saw some

23     of those documents before they were entered into;

24     isn't that right?

25                  A.    Yes.
```

 Neeson&Associates    W&P Wilson & Paizer Ltd.

```
 1                    Q.   But not the IFSA, but comparable
 2   documents?
 3                    A.   Yes.
 4                    Q.   And if we wanted to, I could show
 5   you more than a dozen, a stack this high of
 6   documents that have similar reservations of rights;
 7   isn't that right?
 8                    A.   I'm sure, yes.
 9                    Q.   Now, earlier when asked about the
10   reservation of rights, you said you understood
11   that -- pardon me -- let me withdraw that.
12                    You understood that a variety of courts
13   heard argument with respect to the Rockstar
14   transaction?  Both the US Court and the Canada
15   Court heard argument about the Rockstar
16   transaction?
17                    A.   Yes.  Well, there was motions
18   pending in both jurisdictions.
19                    Q.   And I'm correct, am I not, that
20   you believed that the parties had reserved all
21   rights to make any and all arguments a party could
22   muster in its favor under these reservations of
23   rights?  Isn't that right?
24                    A.   Yes.
25                    Q.   I'm correct also that you believed
```



1    that NNI had reserved the right to make any and all

2    arguments that could be made to maximize NNI's

3    recovery out of the allocation; isn't that correct?

4              A.   Yes, but there's a qualifier.

5              Q.   Well, I'm correct that NNI

6    reserved the right to make any and all arguments

7    that could be made to maximize its recovery out of

8    the allocation; isn't that correct?

9              A.   Yes, except there's a qualifier.

10             Q.   Well, I'm not asking for

11   qualifiers.  I'm asking whether it's true for NNI.

12   Is it true for EMEA?

13             A.   It would be true equally for all

14   of them, with a qualifier.

15             Q.   And is it true also that NNL had

16   reserved all of its rights to make every argument

17   it could make in support of an allocation in its

18   favor?

19             A.   Subject to qualification, yes.

20             Q.   Well, first let me ask you, what's

21   the qualification?

22             A.   I guess I could refer you to

23   Section 12(d) of the IFSA.

24             Q.   Okay.  We can put that up on the

25   screen.

 Neeson&Associates    W&F

```
 1                    And that's the qualifier, as you see
 2    it?
 3                    A.    Yes, it is.
 4                    Q.    Okay.  I'm correct, am I not, that
 5    you believe you were operating free of any promise
 6    to any other party about what positions you would
 7    advance with respect to allocation?
 8                    A.    With respect to allocation,
 9    subject to this qualifier.
10                    Q.    And in other words, you were a
11    free agent to take the best position that NNI could
12    take?
13                    A.    Yes.
14                    Q.    And similarly, you assume that
15    that was true for EMEA; isn't that right?
16                    A.    Yes.
17                    Q.    And similarly, you assume that all
18    the other parties, including NNL, were free and had
19    reserved their right to take their best position
20    when they delivered their allocation positions in
21    May of 2013?
22                    A.    Again, subject to all these
23    qualifications.
24                    Q.    And indeed, you didn't feel the
25    need to determine your own allocation position as
```

 Neeson&Associates    W&F

```
 1   recently as December of 2013; isn't that right?
 2              A.   That's actually not correct.
 3   Paragraph (d) required us to take positions much
 4   sooner than that.
 5              Q.   Well, in December of 2013, you
 6   weren't able to say what amount of the allocations
 7   would go to NNI versus NNL; isn't that right?
 8              A.   We certainly did take positions at
 9   that time.  You asked when I thought when we first
10   had to take positions.
11              Q.   No.  I'm asking if you, in
12   December of '13, were able to say what amount of
13   the allocation would go to NNI versus NNL.
14              A.   Yes.
15              Q.   Okay.  If we can -- and in
16   December 13, isn't it true you weren't even able to
17   say whether the allocation would be greater than
18   zero for NNL?
19              A.   We've never taken that position.
20              Q.   Yes.  But my question is, in
21   December 2013, you were not able to say whether the
22   allocation for NNL was greater than zero.
23              A.   With all respect, it wasn't my
24   obligation to do that.
25              Q.   I understand you don't believe it
```



```
 1   was your obligation.  But you'd agree with me that

 2   you, Mr. Ray, were unable, in December of 2013, to

 3   say whether there was anything greater than zero as

 4   an allocation for NNL; isn't that correct?

 5              A.   That's correct.

 6              Q.   Now, in December '13, you

 7   didn't -- December 2013, you didn't feel that there

 8   were any preexisting agreements that required you

 9   to give any assurance to any other party that their

10   percentage would be greater than zero in the

11   allocation; isn't that right?

12              A.   We never took such a position.

13              Q.   I'm not asking whether you took

14   the position.  I'm asking whether you felt that

15   there was a preexisting agreement that required you

16   to give an assurance to any other party that their

17   percentage would be greater than zero.

18              A.   Well, I don't think that would

19   have been in good faith.

20              Q.   And you understood that you were

21   not the beneficiary of any such agreement where

22   someone would disclose to you that the allocation

23   amount to NNI was greater than zero?

24              A.   Again, we're all operating under

25   good faith.
```



```
 1                    Q.   In fact, there was never any
 2    independent assurance among the parties to disclose
 3    whether they would argue that any party was
 4    entitled to zero percent; isn't that right?
 5                    A.   Again, I guess we can go round and
 6    round on this.  But we were a seller.  We sold an
 7    asset.  We knew what the value of the transaction
 8    was.  We didn't think this was some sort of game.
 9    I'm a fiduciary.  The Monitor is a fiduciary.  We
10    both had an obligation to negotiate in good faith
11    over this.
12                    And the concept that this was all some
13    sort of trick and that we weren't going to get any
14    value for the asset never entered my mind.  And I
15    think this good-faith clause has to have some
16    meaning, and I certainly took it to have meaning,
17    which is why we've never taken a position of that
18    nature in any forum in this case.
19                    Q.   Okay.  Let me put up your
20    deposition.  You were deposed in this case?
21                    A.   Yes, I was.
22                    Q.   In this December of 2013?
23                    A.   Yes.
24                    Q.   On December 13th of 2013.  And
25    Mr. Zelbo defended your deposition?
```



```
 1                      A.   Yes.
 2                      Q.   And you were sworn to tell the
 3   truth there?
 4                      And I'm going to turn your attention --
 5                      Oh, wait.  I haven't gotten an answer
 6   to that question.
 7                      Sir, were you sworn to tell the truth
 8   at your deposition?
 9                      A.   Yes, I was.
10                      Q.   If I can turn your attention to
11   Page 110, Line 3 to Line 16.
12                      And, sir, were these questions posed to
13   you:
14                      Q.   "Question:  You didn't give anyone
15                      any assurance, did they, that they
16                      could expect you to -- or they could
17                      hold you to, that they would get
18                      something out of the allocation, did
19                      you?"
20                      And Mr. Zelbo objects to both form and
21   the double negative.
22                      A.   And you indicate:
23                      "There was no independent
24                      assurance agreement.  I guess we --
25                      I sort of assumed the parties would
```

Neeson&Associates   W&F

```
1                    have to respect whatever amendments
2                    were in place and fully enforceable.
3                    Q.   "Question:  Sure, but these
4                    are --"
5      And you indicate:
6                    A.   "Answer:  But there was no
7                    separate assurance agreement, if that's
8                    your question."
9                    Were those questions given and those
10     answers posed?
11                   A.   Yes they were.
12                   MR. ZELBO:  I'm just going to object
13     because it's not inconsistent with anything he said
14     on the witness stand today.  It's not proper
15     impeachment.
16                   THE CANADIAN COURT:  I couldn't hear
17     that.
18                   THE US COURT:  Mr. Zelbo objected on
19     the ground that it was not proper impeachment
20     because there's nothing in conflict with his
21     testimony today.
22                   I think that's correct, so I'll sustain
23     the objection.
24                   BY MR. PULTMAN:
25                   Q.   Okay, I'd like to turn you to
```

```
 1    Exhibit TR13366, and this is the transcript in June
 2    of 2009 for the approval of the IFSA.
 3                    THE US COURT:  Did you say the
 4    transcript or did you mean the motion?
 5                    MR. PULTMAN:  My apologies, Your Honor.
 6    It's the motion.
 7                    THE US COURT:  Okay.
 8                    BY MR. PULTMAN:
 9              Q.    In fact, this is the motion of
10    NNI, is it not, in connection with IFSA?
11              A.    Yes, it is.
12              Q.    And if I can turn you to Page 8.
13    It's Paragraph 16 of the document; in particular,
14    the sentence that's highlighted that says, "Third."
15              A.    Yes.
16              Q.    Now, you understand that NNI told
17    this Court and told Justice Morawetz that, in fact:
18                    "Third, as noted above, NNL is
19                    the legal owner of nearly all of the
20                    group's intellectual property, which
21                    it licenses to its affiliates."
22              A.    Yes.
23              Q.    And you understand that that was,
24    in fact, said earlier in this submission on Page 7
25    as well, in Paragraph 14?
```



```
 1                    A.   Yes.
 2                    Q.   And so the record is complete,
 3   where it indicates:
 4                    "Within the Nortel Group, NNL
 5                    is the owner of the vast majority of
 6                    Nortel's intellectual property
 7                    assets."
 8                    Do you see that?
 9                    A.   I see that it says that, yes.
10                    Q.   Now, I have one final question for
11   you, which is -- or one final area, which is with
12   respect to the Canadian court.  At any point in
13   time, did any of your counsel tell Justice Morawetz
14   that between the Rockstar and lines of business
15   sales, that the allocation that NNI would be
16   proposing would provide under 11 percent to the
17   Canadian estate?
18                    A.   I don't recall.  I have no idea
19   what you're referring to.
20                    Q.   Well, are you familiar with the
21   allocation position of NNI?
22                    A.   Yes, I am.
23                    Q.   And sitting here today, do you
24   know how much NNI is proposing to allocate for the
25   entirety of the lines of business and the Rockstar
```



```
 1   transaction?
 2                 A.   Yes, yes, yes.
 3                 Q.   And what amount is that?
 4                 A.   It's approximately -- the numbers
 5   vary based on the asset.  But it's approximately
 6   10 percent.
 7                 Q.   Okay.  So to your knowledge, did
 8   any of your many lawyers ever tell the Court in
 9   Canada and tell Justice Morawetz that, in fact, the
10   US, prior to your May of 2013 allocation position,
11   did anyone tell Justice Morawetz when he was
12   considering, for example, the Rockstar sale, that
13   the sum total of what under your allocation the
14   Canadian estate was going to get was about
15   10 percent?
16                 A.   No, not before that submission,
17   no.
18                 MR. PULTMAN:  I have no further
19   questions at this time, Your Honor.
20                 THE US COURT:  All right, Mr. Pultman.
21   Thank you.
22                 MR. HOEFFNER:  Good afternoon, Judge
23   Gross, Justice Newbould.  Tim Hoeffner on behalf of
24   CCC.  Just a few follow-up questions.
25
```



1    CROSS-EXAMINATION BY MR. HOEFFNER:

2                Q.   Mr. Ray, we've never met before;

3    correct?

4                A.   That's right.

5                Q.   Am I correct that you knew at the

6    time that the Rockstar transaction closed that the

7    US had a $2 billion claim into the Canadian

8    estates?

9                A.   Yes.

10               Q.   And you also knew at the time that

11   the Rockstar transaction closed that the

12   Bondholders had a $4 billion-plus claim into the

13   Canadian estates?

14               A.   Yes.

15               Q.   So if the proceeds of the Rockstar

16   transaction are allocated to either the US or to

17   the Canadians, the US estate and the Bondholders

18   will still recover significant proceeds from the

19   Rockstar transaction; correct?

20               A.   I'm not sure what you mean by

21   "significant."  But there certainly is a recovery

22   from the bonds in both estates both directly

23   against the US estate and directly against the

24   Canadian estate.

25               Q.   Sir, you understand that there is



```
 1    approximately $10 million of claims into Canada, of
 2    which approximately 6 billion are comprised of the
 3    Bondholder claims and the US claims?
 4              A.    Yes.
 5              Q.    So can we agree that no matter
 6    what the outcome of this allocation proceeding, a
 7    significant portion of the proceeds of the Rockstar
 8    transaction will go to the US estates and will also
 9    go to the Bondholders?
10              A.    Okay.  And you're excluding from
11    this question the over a billion dollars of general
12    unsecured claims in the US estate?  Are you
13    strictly talking about the Bondholder recovery?
14              Q.    I'm focusing on the $4 billion
15    bondholder claim into Canada, and I'm focusing on
16    the $2 billion US estates' claim into Canada.
17              A.    Yes.
18              Q.    So we can agree that no matter
19    what the outcome of this allocation proceeding,
20    whether the proceeds go to Canada or the US, there
21    will be a significant recovery by the US and by the
22    Bondholders?
23              A.    There will be a recovery in both
24    estates.
25              Q.    So when you told this Court that
```



1    the Rockstar transaction was in the best interests

2    of the US estates, you knew that there would be a

3    meaningful or significant recovery to the US

4    creditors from the Rockstar transaction; correct?

5                    A.   Yes.

6                    MR. HOEFFNER:  Thank you.

7                    No further questions.

8                    THE US COURT:  Thank you, Mr. Hoeffner.

9                    Anyone else, besides Mr. Zelbo, of

10   course, on redirect?

11                   All right, Mr. Zelbo.  Thank you, sir.

12                   MR. ZELBO:  Thank you, Judge Gross and

13   Justice Newbould.

14

15   RE-EXAMINATION/RE-DIRECT BY MR. ZELBO:

16                   Q.   Mr. Ray, earlier during your

17   testimony on cross-examination you referred to the

18   section of the IFSA requiring the parties to

19   negotiate in good faith with respect to allocation.

20   Do you recall that testimony?

21                   A.   Yes.

22                   Q.   So the way the IFSA was set up, to

23   your knowledge, wasn't just that the parties would

24   sell the assets and then fight over it and

25   litigate.  They were supposed to negotiate in good



 1   faith; right?

 2              MR. PULTMAN:  Objection, Your Honor, to

 3   the form of the question.  This is still his

 4   witness, and he's leading the witness.

 5              MR. ZELBO:  Your Honor --

 6              THE CANADIAN COURT:  I can't hear that.

 7              THE US COURT:  There was an objection

 8   that Mr. Zelbo was leading the witness.  And I'll

 9   overrule that objection.

10              BY MR. ZELBO:

11              Q.   I don't want you to reveal figures

12   and numbers, Mr. Ray.  But during the negotiations

13   that did occur -- and there were lots of them --

14   did the US Debtors and did you make known to the

15   Monitor the position that the US Debtor believed it

16   was entitled to the fair market value of the assets

17   it sold or relinquished in the various sales?

18              THE CANADIAN COURT:  Is your question

19   relating to the without-prejudice negotiations that

20   took place?

21              MR. ZELBO:  Yes, but it goes to a

22   different issue, which is, Your Honor, there's an

23   inference in the cross-examination questions that

24   the US Debtors took the Monitor by surprise with

25   the position it's saying in allocation.  But that



```
 1   line of questioning, I think they opened the door
 2   to this.  I'm not going to reveal figures, but I
 3   think it's important to make this point
 4             THE US COURT:  I think the questions
 5   related to what was told to Justice Morawetz, as I
 6   recall.
 7             MR. ZELBO:  Well, the point is -- we
 8   aren't saying that -- had the -- look, I hate to
 9   argue in front of the witness on things of
10   substance, but the fact is --
11             THE CANADIAN COURT:  I will tell you
12   what my concern is.  As soon as you start -- and
13   the witness earlier in-chief said he didn't want to
14   get into those negotiations, but then he did get
15   into it a bit.
16             But once you start getting into
17   negotiations, how does it become meaning unless the
18   whole ball of wax is put forward?  And is that
19   really a fair thing to do if they're without-
20   prejudice negotiations in the first place?
21             MR. ZELBO:  Well, Your Honors, I think
22   this isn't going to the issue of liability, if you
23   will.  This isn't going to liability in that sense.
24   This is going to what happened.
25             And there's an argument in this case
```



1   that either the Monitor misled people, frankly, or,

2   more likely, invented a litigation contrivance

3   after four years of litigation here.

4              The parties were required to negotiate

5   in good faith.  The US Debtors have been consistent

6   if their position all along.  There was an

7   inference during the cross-examination that the US

8   Debtors some somehow the Monitor by surprise with

9   its allocation theories, and it's not true.

10             And the Monitor's position that it

11  revealed in May 2013 is absolutely different and,

12  in fact, the opposite of the position they took.

13  And I'm not going to get too far into the details

14  here, but it is important to this.

15             THE US COURT:  We are talking about

16  post-sale discussions, as I understand it; correct?

17             MR. ZELBO:  We are talking about both

18  pre-Rockstar sale discussions and post-Rockstar

19  sale discussions.  There were numerous

20  discussions --

21             THE US COURT:  Mr. Pultman, you're on

22  your feet.

23             MR. PULTMAN:  I'm on my feet for two

24  purposes.

25             MR. ZELBO:  Do you want the mic?



1          MR. PULTMAN:  I want to yell into the

2   mic.

3          MR. ZELBO:  I thought you were going to

4   hockey-check me.

5          MR. PULTMAN:  No, I wouldn't do that.

6          But I have two points.  One is, first,

7   Mr. Zelbo is testifying as opposed to actually

8   asking questions.

9          And second, with respect to the

10  question of without-prejudice negotiations, I do

11  believe that those are without prejudice for a

12  reason.  There was no question that went into what

13  was said at the without-prejudice negotiations.

14  And basically, I agree with Mr. Zelbo that it is

15  all irrelevant, that all of these questions

16  relating to it are irrelevant, but I need to

17  respond it a theory that's been put forward.

18          I don't believe that the theory has any

19  merit.  I don't believe that with the full

20  reservation of rights that any of this matters,

21  because, in fact, my client and NNI were advised by

22  counsel, knew what they were doing, took positions

23  as early as they were required to and didn't need

24  to do any more than that.  And we've made that

25  argument in our opening statement by Mr. Coleman.



```
 1   We'll make it again in closing.  We keep hoping
 2   that it goes away because it really has no legs.
 3   But to the extent that it's here, Your Honor, it
 4   shouldn't be Mr. Zelbo testifying.  It should be
 5   the witness testifying.
 6               THE US COURT:  Sure.  You know what the
 7   definition is of a witness?  That's the person who
 8   sits and nods while his lawyer testifies.
 9               So with that, I think, Mr. Zelbo, I'm
10   not really sure where you're going with this.  But
11   I understand there were inferences made in the
12   cross-examination.
13               MR. ZELBO:  Correct.
14               THE US COURT:  And I'll let you ask a
15   question or two, but keep it very, very limited, so
16   that we don't open up an area of inquiry that we
17   don't want to go into.
18               MR. ZELBO:  I think I can do it in two
19   questions that likely will not prompt an objection
20   from anybody in the room.
21               THE US COURT:  All light.
22               MR. ZELBO:   But one never knows.
23               THE US COURT:  But Justice Newbould is
24   in Canada, so you might hear from him.
25               MR. ZELBO:  I meant the virtual room.
```



```
 1                    THE US COURT:  Yes.
 2                    BY MR. ZELBO:
 3              Q.   Mr. Ray, has the US Debtors'
 4    allocation position been or not been consistent
 5    throughout the time period from the time you got
 6    hired in this case until today?
 7              A.   Yes, it has been.
 8              Q.   You were asked earlier about the
 9    parties not having to put in their litigation
10    filings, their litigation positions and no
11    assurances were given.
12              Did you expect the Monitor during the
13    good-faith negotiations to mislead you?
14              A.   Absolutely not.
15              Q.   That was not your expectation?
16              A.   No, that was not my expectation.
17    As I said, the other Monitor I thought and believed
18    was an officer of the court, and as I am.
19              Q.   You were asked questions about
20    your deposition where you were asked about what
21    were the precise numbers that NNI was alleging it
22    was entitled to an allocation.
23              Are you aware that at that time of your
24    deposition, expert reports that indicated all the
25    numbers were due in one month and were, in fact,
```



```
 1   filed one month later?

 2              A.   Yes, that's correct.

 3              Q.   You were asked a series of

 4   questions on direct and you seemed wanting to add

 5   to your answer, and I was encouraged to give you

 6   the chance now, so I'm going to.  I'm just going to

 7   read the question and answer just to set it up.

 8              A.   Yes.

 9              Q.   You were asked:

10                   "Now, I'm correct that

11                   Mr. Kinrich's analysis as to what

12                   the value that was relinquished by

13                   each of the sellers was; isn't that

14                   right?  And I'm correct that the

15                   reading of this chart is that under

16                   the patent portfolio, value

17                   relinquished for Nortel GmbH and

18                   Nortel Networks France SAS,

19                   Mr. Kinrich gives zero allocation to

20                   those entities.  Is that right?"

21                   And you said yes.

22              A.   That's correct.

23              Q.   And he then said, "Notwithstanding

24   the fact that both were sellers."

25                   And you say, "And there's a reason for
```

 Neeson&Associates   W&F

```
 1   that."
 2              A.   Yes.
 3              Q.   What was the reason for that, in
 4   in your understanding?
 5              A.   Well, the -- and, of course, this
 6   is not going to show up in any of the expert
 7   reports because you sort of had to be there.  But
 8   there was a time when we were doing these sales
 9   that certain estates, I think, took care to
10   identify a patent that were held by certain
11   sellers.  And this is not to undercut any
12   particular estate's position, if you will, or how
13   they reported themselves or how they conducted
14   themselves.  But when it came to certain of the
15   entities -- and I think these entities fall into
16   that category -- they're very, very small entities.
17   I think, frankly, it was almost a rule of -- it was
18   simplification or it was just for ease of
19   documenting the transaction, that certain of these
20   entities that, frankly, may not have held any
21   patents whatsoever were just sort of thrown on a
22   list of signature pages, given the pressure and the
23   time constraints surrounding the documentation of
24   the auction.  And I know for certain that occurred
25   in these EMEA entities.
```



```
 1                    And so now, without the pressure of
 2     time, you go back and look at these entities, and
 3     then you're going to have to look at what patents
 4     they really held and did they actually produce any
 5     income if they held any patents, if they produced
 6     any revenue.
 7                    And I'm not going to get into
 8     Mr. Kinrich's report.  He's the expert and he's
 9     done a lot of investigation in this.  But I think
10     what Mr. Kinrich is reflecting now is that now,
11     with the passage of time, going back and looking at
12     those signatory and what they actually held as
13     patents and what revenue may have been produced by
14     whatever patent they might have had, if they had
15     any at all, is reflecting that there simply no
16     value there.  And it's just a function of the fact
17     that at some point -- and I don't want to suggest
18     that anybody was sloppy or anything, but literally
19     signatures were put on a document.  And a little
20     bit of the due diligence just was impossible to do
21     be done and, frankly, wasn't all that relevant in
22     connection with some of these small entities.
23                    And it may be that someone has a
24     different position on these entities, and I'm not
25     trying to suggest anything other than that.  But it
```

 Neeson&Associates   W&P

```
 1   is just that this was something that was

 2   effectively shorthand in connection with the

 3   documentation and the pressures of getting

 4   something signed urgently to get the sale done,

 5   because obviously, this was a lot of money that

 6   wanted to come into the escrows?

 7              And that's really the back story to it.

 8              Q.   In this litigation we've used the

 9   terms "integrated entities" to refer to the five

10   entities under the MRDA that have exclusive

11   licenses and territories?

12              A.   That's correct.

13              Q.   And then we've talked about

14   limited risk entities or distribution entities.

15              Do you know whether these entities were

16   limited risk entities or integrated entities?

17              A.   Very clear.  These are what are

18   LREs, or limited risk entities.

19              Q.   If we can just turn to

20   Exhibit TR11358, which is your engagement letter.

21   We looked at that earlier.

22              A.   Yes.

23              Q.   And if you could just -- you were

24   asked a couple of questions about this.  Turn to

25   No. 4, (2)(4), which is near in the bottom of the
```



```
 1    first page, one of the things you're supposed to be
 2    doing here.
 3              A.   Yes.
 4              Q.   And it says:
 5                   "Working with all constituents
 6                   to develop and implement plans to
 7                   modify remaining assets."
 8              A.   Yes.
 9              Q.   Do you recall what that referred
10    to?
11              A.   This is in Paragraph 4?
12              Q.   Yeah.  Well, no, I'm sorry.  I
13    misled you there.  Paragraph 2, scope of services.
14              A.   Yes.
15              Q.   And then go to No. 4.
16              A.   Well, look, this language -- this
17    engagement letter was a written at a time --
18    obviously, I had no real knowledge of exactly what
19    was going to be in store for us in connection with
20    the business.  But really Paragraph 4 is -- I take
21    it to essentially be almost sort of a nonexclusive
22    list of the things that I would do to maximize the
23    value of the estate.
24                   And with any one of these restructuring
25    jobs, you get into the company and you do whatever
```



```
 1   it takes to maximize creditor value.  And these

 2   words aside, my obligation was to maximize creditor

 3   values in the US estate, and that's what I'm doing.

 4             Q.   And did you view anything in your

 5   engagement letter as limiting your ability to

 6   maximize -- attempt to maximize recoveries for the

 7   creditors of the US estate?

 8             A.   There was absolutely no restraint

 9   on my ability to maximize value.  And I can assure

10   you that that's the role I placed and the

11   assurances I gave both the official committee as

12   well as the Bondholders.

13             Q.   And would you consider IPCo a plan

14   to monetize assets?

15             A.   Yes, I would.

16             Q.   Did the Monitor ever say to you

17   that, "Wait a minute, Mr. Ray.  You can't work on

18   IPCo because it's not covered in your engagement

19   letter"?  Was that ever said?

20             A.   No, they never took that position,

21   and quite to the contrary, I was part of the

22   steering committee that led that effort.

23             Q.   You can put that document down.

24   Thank you.

25             You were shown earlier Exhibit TR45578,
```



1    which is actually the 63rd report of the Monitor

2    but has attached to it, indeed, the agreement that

3    was being discussed, which is the asset sale

4    agreement, I believe, for the Rockstar sale.  Well,

5    actually the Google sale.  I misspoke.

6              And you were asked some questions about

7    5.5(d) on Page 43.  And you were in particular

8    asked about the passage that says:

9                   "No Seller may affirmatively

10                  take any material steps in

11                  furtherance of an asset retention

12                  transaction except to the extent

13                  that such asset retention

14                  transaction also constitutes an

15                  alternative transaction."

16             Right?

17             A.   Yes.

18             Q.   Was this provision requested by

19    Google?

20             A.   This provision -- clearly, Google

21    had no interest in us pursuing an alternative

22    transaction at all.  And so this was our carve-out

23    to their effective insistence that we not compete

24    with their proposal.

25             Q.   Sorry.  Please continue.



```
 1                       A.    And so our bondholders and our
 2    official committee I think were very adamant about
 3    this carve-out was important to them, and that's
 4    why this provision is here.
 5                       Q.    Did Google ever say in sum or
 6    substance, "We think the IPCo is so unviable, you
 7    don't even have to worry about it.  We're not even
 8    going to bother to put any restrictions in the
 9    agreement on it"?
10                       A.    No.  I think the presence of this
11    provision is evidence that they were very concerned
12    about this.
13                       MR. ZELBO:  I have no further
14    questions.  Thank you, Mr. Ray.
15                       MR. PULTMAN:  Your Honor, may I
16    briefly?
17                       THE US COURT:  Mr. Pultman, yes.
18
19    FURTHER CROSS-EXAMINATION BY MR. PULTMAN:
20                       Q.    And very briefly.  When you were
21    asked about Mr. Kinrich's report and the particular
22    entities that were listed there, you said that for
23    simplification or ease of documenting or pressure
24    of time, the documents contained parties that may
25    not have been appropriate.  Is that correct?
```



```
1                    A.   Yes.  And just clarification, what
2    I was referring to was not Mr. Kinrich's report but
3    the actual sale documents.
4                    Q.   Well, let me turn you to the IFSA.
5    Now, you would agree with me that the IFSA is not a
6    document that didn't have a good amount of
7    scrivening; isn't that correct?
8                    A.   I think that's correct, yes.
9                    Q.   And it's fair to say -- and I can
10   pull up -- why don't we pull up Exhibit TR50886,
11   and that's the allocation protocol hearing
12   transcript from June 7th of 2011.
13                   A.   I'm sorry, but I can't seem to --
14                   Q.   We're going to hand that up to
15   you.  And we're going to put it up on the screen as
16   well.  And in particular, it's the June 7, 2011
17   allocation protocol hearing transcript.  It's
18   Exhibit TR50886.  And in particular I'm going to
19   turn your attention to Page 36, Line 16.  I am on
20   Page 36, Line 16.
21                   THE US COURT:  Are you going to ask the
22   witness to comment on argument made before the
23   Court?
24                   MR. PULTMAN:  I am not.  I'm only
25   asking if he understood that Mr. Bromley told this
```



1    Court that with respect to this particular document

2    that contained these EMEA Debtors, he referred to

3    the IFSA as, "It's important now, I think, to look

4    at the IFSA.  The IFSA is the single most important

5    document in these proceedings.  It's not a casual

6    document."

7               MR. ZELBO:  Your Honor, this is beyond

8    the scope.

9               THE US COURT:  I don't understand the

10   point.

11              MR. PULTMAN:  It's exactly the question

12   of whether or not the entities that are listed on

13   the IFSA, the two EMEA Debtors that Mr. Ray

14   believes should not have been on the IFSA, whether

15   that happened accidentally or whether that was a

16   carefully thought-out document that had the parties

17   in it that was intended.

18              MR. ZELBO:  I really think --

19              THE US COURT:  I have to sustain the

20   objection.  I don't think it's really appropriate

21   to ask this witness, based upon an argument that

22   counsel made --

23              MR. PULTMAN:  Let me withdraw the

24   question, Your Honor.

25                   BY MR. PULTMAN:

 Neeson & Associates    W&P WILSON & PETZER LTD.

```
 1                    Q.   You understand that the IFSA is an
 2    incredibly important document; right?
 3                    A.   Yes, I do.
 4                    MR. PULTMAN:  I have no further
 5    questions.
 6                    THE US COURT:  Very well.
 7                    All right.  Mr. Ray, thank you, sir.
 8    You may step down.
 9                    THE WITNESS:  Thank you, Judge Gross
10    and Justice Newbould.
11    -- WITNESS EXCUSED --
12                    MR. PULTMAN:  Your Honor, if I may,
13    unrelated to Mr. Ray, make a correction to the
14    record.
15                    THE US COURT:  Yes.
16                    MR. PULTMAN:  Which relates to the
17    designation of demonstrative exhibits.  I want to
18    apologize to the Court.  I misspoke earlier when I
19    said that the email I had from Mr. Rosenthal with
20    respect to demonstratives related to every
21    demonstrative.  That have only with respect to
22    demonstratives on openings.  And therefore, we will
23    obviously comply with the requirements of the order
24    and provide all demonstratives the evening before.
25                    THE US COURT:  All right, Mr. Pultman.
```



1    Thank you for that.  That's fine.

2              I think we have a next witness.  Should

3    we take a break before we start with our next

4    witness?  That would be Mr. Albert-Lebrun.

5              MR. GOTTLIEB:  Yes, that's correct,

6    Judge Gross.

7              THE US COURT:  Oh, he is going to be in

8    Toronto.  I'm sorry, Mr. Gottlieb.

9              MR. GOTTLIEB:  I was going to ask the

10   Court whether it wanted to break now or--

11             THE US COURT:  What's your pleasure,

12   Justice Newbould?

13             THE CANADIAN COURT:  Whatever yours is.

14             THE US COURT:  Would it make sense to

15   take a few minutes to get the witness ready and

16   into the courtroom and so soon?  Let's take our

17   afternoon break now.

18             THE CANADIAN COURT:  15 minutes.

19             THE US COURT:  Thank you.

20   -- RECESS AT 3:07 A.M. --

21   -- UPON RESUMING AT 3:27 p.m. --

22             THE CANADIAN COURT:  Mr. Gottlieb?

23             MR. GOTTLIEB:  Your Honour, Judge

24   Gross, we are on behalf of the EMEA Debtors calling

25   our first witness, Philippe Albert-Lebrun.  I have



```
 1   handed up to the registrar the affidavit copy, and

 2   I believe that will be marked as the next exhibit.

 3                   THE REGISTRAR:  Exhibit 22.

 4                   EXHIBIT NO. 22:  Affidavit of Philippe

 5                   Albert-Lebrun.

 6

 7     PHILIPPE ALBERT-LEBRUN, having been first duly

 8      affirmed, was examined and testified as follows:

 9

10   EXAMINATION IN-CHIEF/DIRECT EXAMINATION

11   BY MR. GOTTLIEB:

12                   Q.   Thank you.  We're just going to

13   get some water for Mr. Albert-Lebrun.  Thank you

14   very much.

15                   Good afternoon, sir.

16                   A.   Good afternoon.

17                   Q.   Where do you currently live, sir?

18                   A.   I live in Versailles near Paris,

19   in France.

20                   Q.   Versailles.  And where do you work

21   currently?

22                   A.   I work for Avaya.

23                   Q.   Would you mind spelling that name

24   for us?

25                   A.   Avaya, A-V-A-Y-A.
```



```
 1                    Q.    Where is Avaya located?

 2                    A.    So in France it's located in a

 3     city called Issy-les-Moulineaux.

 4                    Q.    The reporter is not very happy

 5     with that name --

 6                    A.    I'm sorry.

 7                    Q.    -- but we'll deal with that a bit

 8     later, so that's fine.  What business is that

 9     company involved in?

10                    A.    It's a telecom industry.  That

11     company is active in the telecom industry.

12                    Q.    How long have you been there?

13                    A.    More than two years.  I started

14     March 2012.

15                    Q.    What's your current position at

16     the company?

17                    A.    I am the controller for Europe,

18     the Middle East and Africa.

19                    Q.    The controller for EMEA as we know

20     it?

21                    A.    Exactly.

22                    Q.    I want to move back a little bit.

23     I understand that you graduated from what my notes

24     say is HEC Paris.  What is HEC?

25                    A.    It is a business school.  One of
```



```
 1    the most prominent business school in France.
 2                   Q.   And you graduated from there in
 3    1992, as I understand it, with a masters of
 4    business?
 5                   A.   That is correct.
 6                   Q.   And then you spent a few years
 7    working in the structured finance area, correct?
 8                   A.   That is correct, yes.
 9                   Q.   And you did that until about 1996?
10                   A.   Correct.
11                   Q.   All right.  And then I understand,
12    moving on in the chronology, you started to work at
13    the Nortel companies, I'll call them, in '97?
14                   A.   Correct, at the beginning of '97.
15                   Q.   And what company did you work for?
16                   A.   The name of the company at the
17    time was Nortel Matra Cellular and that company
18    subsequently became NNSA.
19                   Q.   NNSA.  How long were you at NNSA?
20                   A.   I was an employee of that company
21    for my entire tenure at Nortel, so from February
22    1997 until -- as an employee until June 2011 and
23    then I continued to work for Nortel for roughly a
24    year after that.
25                   Q.   So you finished in 2012?
```



```
 1                    A.    Indeed.
 2                    Q.    And that whole time from '97 to
 3      2012 you worked at NNSA?
 4                    A.    Again, in the last year I worked
 5      for -- with a small caveat in relation to the last
 6      year, but otherwise yes.
 7                    Q.    Thank you.  And I just want to go
 8      through, so the courts have it, some of the
 9      positions that you held, but my understanding is
10      that you were always in the treasury or control
11      group; is that correct?
12                    A.    That is correct.
13                    Q.    All right.  So I just want to run
14      through and I trust there will be no problem with
15      me just running through the positions.  You were
16      assistant treasurer and then treasurer at NNSA?
17                    A.    For the French entities, actually,
18      not just NNSA.
19                    Q.    Okay.  Then you became the
20      financial controller, correct, at NNSA?
21                    A.    That is correct, and again for the
22      French entities more broadly than just NNSA.
23                    Q.    The French entities?
24                    A.    Um-hmm.
25                    Q.    And you held the financial
```



```
1    controller position from 2003 to 2007?
2              A.   That is correct.
3              Q.   And then you became the controller
4    for the EMEA region?
5              A.   Yes.
6              Q.   And you were in that position from
7    2007 until 2011 effectively; is that correct?
8              A.   Well, '12 effectively.
9              Q.   All the way through to '12?
10             A.   The end of '11, beginning of '12.
11             Q.   Thank you.  And when you were the
12   EMEA controller, you moved to the UK, as I
13   understand it?
14             A.   Indeed.  I was based out of
15   Maidenhead business park.
16             Q.   You were based out of Maidenhead
17   but you were still an employee of NNSA?
18             A.   That's correct.
19             Q.   Now, I just want to touch briefly
20   on a couple of areas of your evidence, if I can.
21   As you set out in your affidavit material, you were
22   involved in dealing with issues surrounding the
23   adoption of the RPSM at NNSA, correct?
24             A.   That is correct, yes.
25             Q.   Why were you involved in that
```



```
 1    issue, the RPSM?
 2                    A.   Because the RPSM was critical to
 3    define the financial balance of NNSA, and it was my
 4    job to understand that, and when it started, so I
 5    had different forms of involvement I guess with the
 6    RPSM.  It changed over time.
 7                    Initially I mainly managed the
 8    consequences of the implementation of the RPSM,
 9    i.e. the fact that it had made the company
10    technically insolvent because the first charge that
11    was received was extremely high and greater, in
12    fact, than the company could bear without becoming
13    technically insolvent.
14                    And then a few years later I worked a
15    lot on explaining to the French tax authorities,
16    you know, what the RPSM was.  By then I had gained
17    a lot of knowledge about the RPSM.  And another
18    involvement that I had with it as well is that the
19    RPSM needed to be accepted by the directors because
20    under French law, if the directors of an entity
21    take a decision that is not in the best interests
22    of that entity, they potentially can run into
23    personal liability.
24                    So clearly that is a very important
25    question to them, and it was not clear when the
```



1    RPSM was implemented that it was the case.

2              Q.    I'm just going to stop you there

3    and I'll come back to that.  You said that part of

4    what you did was explaining to the French tax

5    authorities the RPSM.  How did the French taxation

6    authorities become involved in this issue?

7              A.    So, they started an audit for the

8    years 2001 to 2003.  At the end of 2004, when the

9    statute of limitation was close to be reached, and

10   obviously very quickly found out about the transfer

11   pricing adjustments resulting from the RPSM, and

12   they basically rejected the entire structure

13   initially.

14             Q.    I'm sorry, you said they what the

15   entire structure?

16             A.    They rejected, they said it wasn't

17   appropriate and that it was actually an act of

18   mismanagement and that the charges relating to that

19   system should not be -- it would not be allowed for

20   tax purposes.

21             Q.    And if you can break it down

22   slightly, what were the concerns expressed by the

23   French taxation authority about the RPSM?

24             A.    So there were several.  The fact

25   that it had been implemented at the expense of the



1    cost sharing agreement of -- the R&D Cost Sharing

2    Agreement that previously existed, therefore it had

3    replaced a valuable contract by which the French

4    entity was benefitting from subsidies, if I can

5    call themselves, for its R&D.  That was one thing

6    they didn't like.

7                   They didn't like the fact that NNSA was

8    not owning the -- you know, legally owning the

9    intellectual property that it was creating.

10                  They didn't like the idea that the rest

11   of the group -- that NNSA would effectively have to

12   finance the loss of all the entities in the group

13   and therefore they entirely disallowed the R&D

14   expenses, amongst other things.

15            Q.   Now, you said that it was not

16   clear that the RPSM was in the best interests of

17   NNSA and you have that against the concerns raised

18   by the taxation authorities in France.

19                  How do you deal or how did you deal

20   with those concerns of the French taxation

21   authority and the other issues you've raised?

22            A.   So the original issue, the legal

23   issue that I have mentioned initially was mainly

24   dealt with by offsetting effectively the charge by

25   equity -- various forms of equity investment, and



1    then part of the reason why we thought that it was

2    originally inappropriate and the reason why the tax

3    authorities similarly thought it was inappropriate

4    was because it was unclear from the start that with

5    the RPSM would we get the economic ownership as

6    part of the Nortel Group IP.

7              Once that was understood, that helped

8    us come to term, if I can put it this way, with the

9    RPSM and that helped as well tremendously with the

10   French tax authorities and with the directors, to

11   start up with them, to say well, this is a

12   structure in which yes, we're investing a lot

13   between R&D and all the losses that we need to

14   finance for other entities, and yes, we have

15   abandoned or waived our rights under the previous

16   R&D cost sharing contracts, but now at least we

17   have -- we can expect revenue that are much greater

18   than the ones that we could expect if we were just

19   keeping the French entity isolated, if I can put it

20   that way.

21             So the ownership of the IP would allow

22   us, because we were considered the entrepreneur as

23   it was mentioned in the functional analysis that

24   helped a great deal understand, you know, the

25   change, we would derive significant revenue that we



1   could present as being the offset or the result of

2   the investment that we're making on the other hand.

3            So whereas initially the understanding

4   was that the contract was completely one-sided, we

5   realized over time that there was an opportunity

6   for a profit and therefore it was not one-sided or

7   not as one-sided as it initially looked like.

8            Q.   You said, sir, in that answer that

9   because you were considered entrepreneurs.  Can you

10  just expand on what you mean by that, please, for

11  the courts?

12           A.   So as part of the functional

13  analysis, and just in case, you know, some people

14  don't know what a functional analysis is, it's

15  basically an economic analysis of the entity of

16  what it does, of what the people do in this entity,

17  et cetera, et cetera.

18           So the functional analysis of various

19  entities of the Nortel Group, but certainly of the

20  one of NNSA that I worked on, said -- concluded

21  that the value of Nortel was really the value of

22  its IP, but the rest was important but would not be

23  driving effectively the success or failure of

24  Nortel.

25           So if I can expand a little bit.  You



1    can have the best salespeople in the world; if you

2    don't have the right products, you know, they're

3    not going to be able to succeed, as an example,

4    right?

5              So sales is important.  Obviously if

6    you don't have salespeople you're not going to

7    succeed, but you really have to have the right

8    products and the right products would be coming

9    from the R&D.

10             So the conclusion of the functional

11   analysis was that the R&D was really what was

12   driving the IP and that the IP was the value of

13   Nortel, or most of the value of Nortel, and that

14   the RPS entities or the integrated entities, as

15   they were called, and NNSA was one of them, would

16   effectively jointly own the total intellectual

17   property of the group, and that being an

18   entrepreneur, they would contribute to that IP,

19   invest in that IP, get all the benefit coming from

20   that IP, and suffer the losses if the investment

21   was wrong.

22             MR. GOTTLIEB:  Thank you,

23   Mr. Albert-Lebrun.  Your Honour, and Judge Gross,

24   thank you, those are all my questions now.

25                  THE CANADIAN COURT:  Thank you,



1    Mr. Gottlieb.  Any cross-examination?  Ms. Kimmel?

2

3    CROSS-EXAMINATION BY MS. KIMMEL:

4              Q.    Thank you, Your Honour, Judge

5    Gross.  I'm Jessica Kimmel from Goodmans for the

6    Canadian Monitor and the Canadian Debtors.

7              Sir, in the years that you worked at

8    NNSA and then for -- in Maidenhead, did you ever

9    work in the IP department?

10             A.    No.

11             Q.    In the legal department?

12             A.    No.

13             Q.    In the tax department?

14             A.    No.

15             Q.    And you're not a lawyer?

16             A.    No.

17             Q.    You're not an IP specialist?

18             A.    No.

19             Q.    And you're not a tax specialist?

20             A.    No.

21             Q.    Nor are you a transfer pricing

22   specialist?

23             A.    No.

24             Q.    And just so we have it, you

25   weren't a director of NNSA at any time, were you?

 Neeson & Associates    W&F Wilson & Peyzer Ltd.

```
 1                    A.   No, I was not.
 2                    Q.   And did you have any
 3    decision-making authority for any NNSA or any of
 4    the other Nortel entities in Europe?
 5                    A.   In my area, in my technical area,
 6    yes, in finance, yes.
 7                    Q.   But could you authorize the entry
 8    into of an agreement?
 9                    A.   No.
10                    Q.   Now, you say that you moved to
11    Maidenhead in 2007.  Were you familiar with the
12    fact that there was a tax group for the EMEA Nortel
13    entities that was also situated in the United
14    Kingdom?
15                    A.   Of course.
16                    Q.   Okay.  And were you familiar with
17    the people who were responsible for that group?
18                    A.   Yes.
19                    Q.   Can you tell me who they were in
20    the time you worked for NNSA?
21                    A.   Yeah, they changed a lot but I was
22    talking to them on a regular basis indeed.
23                    Q.   Okay.  So was Mr. Badiani one of
24    those people?
25                    A.   Yes, in the earlier years, yes.
```

 Neeson & Associates   W&F

```
 1                    Q.    Okay.  And Mr. Smith, was he
 2     involved?
 3                    A.    Yes, in the later years.
 4                    Q.    And was Mr. Schofield involved as
 5     well?
 6                    A.    Correct.
 7                    Q.    Is there anyone I've missed?
 8                    A.    Oh, there were many more people
 9     than the ones you've listed.
10                    Q.    Certainly the three that I have
11     listed, you are familiar with all of them?
12                    A.    Yes.
13                    Q.    Now, I think you testified at your
14     deposition, and I just want to confirm this, I was
15     trying to listen to what Mr. Gottlieb was asking
16     you but I just want to make sure I have this.
17                    When you were the controller for all of
18     EMEA, your responsibilities were to manage the cash
19     and ensure that the subsidiaries in EMEA had the
20     liquidity they needed to operate; is that right?
21                    A.    No, I wouldn't put it that way.
22     That's more a treasury responsibility and I had
23     that for France when I was in my French position.
24                    As part of -- as EMEA, if some of my
25     controllers had reported that they had an issue, I
```



1    would of course have worked on it with my treasury

2    colleagues and tax colleagues, but I wouldn't say

3    that it would have been my primary responsibility

4    to address it, and actually I couldn't have done it

5    because in both cases these transactions had to be

6    approved by tax and treasury.

7                    Q.   Okay.  But was that -- just -- I

8    just want to make sure I have this clear.  That was

9    your responsibility when you were with NNSA?

10                   A.   Yes.

11                   Q.   And then when you moved to the

12   position as the controller for all of the EMEA

13   region, people who had that responsibility reported

14   in to you; is that right?

15                   A.   The people reporting in to me had

16   the responsibility to say we have an issue, and

17   then it was people that were more my peers that had

18   the responsibility for fixing it.

19                   Q.   Okay.  And when we're talking

20   about the issue, we're talking about liquidity,

21   correct?

22                   A.   I think you mentioned equity, so I

23   was responding to the equity which I thought was

24   the original question.

25                   The answer probably applies as well to



```
 1    the liquidity question.
 2              Q.   Okay.  The question I did mean to
 3    say liquidity and if you misheard me, but we have
 4    the answer applies to both.  Okay.
 5              Now, when you were at NNSA you were
 6    managing the cash and part of what you did was make
 7    sure they had enough funds to operate, correct?
 8    Those French entities?
 9              A.   Yes.
10              Q.   Okay.  And I take it you were
11    involved in the preparation of financial statements
12    for the French entities when you were in that
13    position?
14              A.   Controller, yes.
15              Q.   And as part of that you would have
16    accounted for transfer pricing adjustments?
17              A.   Yes.  My team would have, to be
18    precise.
19              Q.   Sorry, what did you say?
20              A.   My team would have, to be precise.
21              Q.   But you were responsible for that?
22              A.   Yeah.
23              Q.   Now, just with respect to the tax
24    group, your peers, at least as the ones that you
25    worked with as you knew them in Maidenhead, was it
```



```
 1   their responsibility to look after the EMEA

 2   subsidiaries in terms of their interests with

 3   respect to transfer pricing?  Was that the tax

 4   group's responsibility?

 5              A.   Repeat the question, please.

 6              Q.   The tax group for EMEA, was it

 7   their responsibility to look after the EMEA

 8   subsidiaries with respect to their interests

 9   concerning transfer pricing issues?

10              A.   It was the responsibility to help

11   those entities to document any -- you know,

12   document the transfer pricing rules and help them

13   defend themselves in case of tax audits, yes.

14              Q.   And if they had questions, that's

15   who they would go to to understand the transfer

16   pricing regime?

17              A.   That could have been -- they could

18   have gone to me first and to tax second or to tax

19   directly.  I can't say it was one or the other.  It

20   was -- you know, it's not as clear-cut as that.

21              Q.   They were certainly involved?

22              A.   Sorry, who is "they"?

23              Q.   The tax group?

24              A.   Yes.

25              Q.   Okay.  And you were as well?
```



```
 1                    A.   Yeah, and if it was my team more

 2      likely than not I would have been -- you know, it's

 3      difficult to answer the question in general but

 4      yes, if my team had a question, I would more likely

 5      than not have been involved.

 6                    Q.   Now, just in terms of a couple of

 7      points about your affidavit.  You say, if you want

 8      to turn it up in paragraph 6, you indicate that

 9      where you -- unless otherwise indicated, you have

10      testified to matters within your own knowledge and

11      you said here that where there are facts and

12      matters that are not within your knowledge, that

13      you have identified the source of your information

14      and belief.  Does that --

15                    A.   I mean, it's more that I have

16      forgotten about them.  It's not that I testified

17      about something I didn't know.  I am saying things

18      I had forgotten about and some documents helped me

19      remember.

20                    Q.   I see.  So you've tried to

21      identify the documents in your affidavit that

22      assisted your recollection?

23                    A.   Yeah.

24                    Q.   And have you also identified the

25      people who you might have spoken to who might have
```



```
 1   provided you with information that you have

 2   testified to where you know who those people are?

 3              A.   I didn't speak to anyone apart

 4   from my lawyers, if that's your question.

 5              Q.   We'll come back to that in a

 6   minute.  Let's move ahead to paragraph 15, if we

 7   can.  In paragraph 15 you say that Nortel moved to

 8   the RPSM transfer pricing system in 2001, and you

 9   make it very clear here, you say:

10              "I was neither aware of nor

11              involved in any of the discussions

12              leading up to the decision."

13              Is that correct?

14              A.   Yes.

15              Q.   Okay.  Now, you say in the next

16   sentence:

17              "I understand that the

18              decision-making in this regard was

19              done entirely in North America."

20              A.   Yes.

21              Q.   Now, I take it you don't have any

22   personal knowledge of that, correct?

23              A.   No.  I do have knowledge of that.

24              Q.   Well, I'm sorry, you weren't

25   involved in the decision.  You say you don't have
```



```
 1    -- you weren't aware of or involved in any of the
 2    discussions leading up to it, right?
 3              A.    Um-hmm, yes.
 4              Q.    So you weren't involved in the
 5    actual decision-making with respect to the switch?
 6              A.    Right.  So, sorry, what I was
 7    saying is it is based on my personal knowledge that
 8    no one in France was involved in moving to the
 9    decision.  That's what I meant and that's my
10    personal knowledge, I didn't need to consult any
11    document or any person to figure that out.
12              Q.    Okay.  So what you meant in the
13    last sentence of paragraph 15 is no one in France
14    was involved in the decision; is that what you're
15    saying?
16              A.    Yeah, that is correct, actually.
17    There might have been people in the UK involved at
18    the time.
19              Q.    You anticipated where I was headed
20    with this, sir.  Do you know that there were people
21    involved in the UK at the time?
22              A.    No, I don't know if there were.
23              Q.    Okay.  But if those people were
24    involved, that wouldn't surprise you, I take it?
25              A.    That would have what, sorry?
```



```
 1                    Q.   It wouldn't surprise you that
 2      there were people in the UK who were --
 3                    A.   It would have been -- as a matter
 4      of course, it would have been a good thing to do,
 5      that within the tax team they would have talked to
 6      one another.
 7                    Q.   Okay.  Now, for purposes of
 8      swearing this affidavit, did you speak to anybody
 9      who had previously been involved in the UK in tax
10      matters about the decision-making with regard to
11      the move to the RPSM?
12                    A.   No, as I said, the only people
13      that I talked to about this affidavit were my
14      lawyers.
15                    Q.   Okay.  And do you agree with me,
16      sir, that it was Mr. Badiani in the EMEA tax group
17      who was assigned to look out for NNSA's interests
18      in connection with strategic pricing matters at the
19      time that this decision was being made?
20                    A.   Yes.
21                    Q.   And are you aware that Mr. Badiani
22      sat on something called the APA team that was
23      established either in late 2000 or early 2001?
24                    A.   No, I didn't know that.
25                    Q.   And did you know that that team
```



```
1    was tasked with determining the appropriate

2    transfer pricing policy to propose in the APA

3    processes that were underway?

4              A.   No, I didn't know that.

5              Q.   Okay.  But you have no reason to

6    dispute that, I take it?

7              A.   No, no, it would have made sense.

8              Q.   And are you aware of the fact that

9    Mr. Badiani obtained advice from local advisors in

10   France in July of 2001 about the acceptability of

11   the RPSM before the final shift over?

12             A.   I have read something about that

13   recently.  I was unaware at the time.

14             Q.   Were you aware of that at the time

15   you swore your affidavit?

16             A.   Yes.

17             Q.   Okay.  Now, if we turn to

18   paragraph 7 of your affidavit, I just want to put

19   -- focus your attention initially on a sentence - I

20   just want to find my place here for a second, hold

21   on - if you look at the second to last sentence of

22   this long paragraph that begins "I understood

23   that."

24             A.   Um-hmm.

25             Q.   "I understood that by entering
```



```
 1                    into the RPSM, NNSA would retain a

 2                    form of entrepreneurial right to

 3                    share in the upsides of the creation

 4                    of Nortel's IP while being subject

 5                    to the full risks of making losses."

 6                    That was your understanding at the

 7      time?

 8                    A.   Sorry, at which time?

 9                    Q.   Sorry, in the timeframe after the

10      decision was made to switch to the RPSM model?

11                    A.   No, it came over time.  As I

12      listed in the various points below, what happened

13      is at the time of the change, there was very little

14      explanation or supporting documents that were

15      provided to anyone, to my knowledge, and certainly

16      I didn't see any.

17                    And so, no, that understanding of the

18      entrepreneurship and the IP ownership came much

19      later through the various conversations with the

20      tax team, presentation and preparation of the

21      functional analysis, as I said earlier.  You know,

22      as things developed, my knowledge and understanding

23      grew, but it was certainly not the case at the very

24      beginning in 2001.

25                    Q.   Now, you're speaking from your own
```



```
 1   personal experience and you'll agree with me that

 2   people in the EMEA tax group may well have had a

 3   more fulsome understanding than you did at the time

 4   of the decision, correct?

 5          A.   Certainly -- I mean, ultimately I

 6   gained my knowledge from them, so, you know, we

 7   should be aligned but they could have had earlier

 8   knowledge than I would have had, yes.

 9          Q.   Okay.  Now, you say here that you

10   understood, and you say this is an understanding

11   that came over time, that's fair enough.  What I

12   want to focus on is that you understood that by

13   entering into the RPSM, NNSA would retain a form of

14   entrepreneurial right.  Do you see that language

15   that you've used there?

16          A.   Yes.

17          Q.   The word "retained"?

18          A.   Um-hmm.

19          Q.   And then I'd like you to turn

20   ahead to paragraph 19.  And I want to take you in

21   paragraph 19 to the second sentence which begins

22   "My understanding was..."

23          A.   Um-hmm.

24          Q.   "...that NNSA would continue to

25   have...," do you see those words?
```



 1                    A.    Yes.
 2                    Q.    "...an economic interest."  Okay.
 3   Just in those paragraphs where you use those words
 4   "retain" and "continue to have," I take it what
 5   you're talking about is existing rights that were
 6   there at the time of the switch and that were going
 7   to continue; is that right?
 8                    A.    That was -- let me read.  So no,
 9   in that paragraph 19, no, it's not -- it's not
10   limited.  My understanding is that it's not limited
11   to the IP that existed.  It also relates to the IP
12   that would arise from further R&D investments.
13                    Q.    But just take a step back.  The
14   kinds of rights that you're talking about are
15   rights that you say are associated with investment
16   in R&D, correct?
17                    A.    Yes.  They derive from R&D indeed.
18                    Q.    And as I understood these
19   paragraphs, what you were saying is that there were
20   -- there had been previous R&D that had been
21   conducted by NNSA prior to the switch to the RPS
22   model?
23                    A.    Yes.
24                    Q.    And you considered that there were
25   certain rights that existed at that time in



```
 1   relation to R&D contributions, correct?

 2              A.   Yes.

 3              Q.   And that you understood that

 4   rights in respect of R&D contributions would

 5   continue after the RPSM, correct?

 6              A.   Yeah, they would continue, indeed.

 7   I mean, there was no surrendering of any sorts, to

 8   my knowledge.

 9              Q.   And the rights that existed before

10   the switch to the RPSM model, do you have any

11   knowledge of -- intimate knowledge of the nature of

12   those rights or how they were created?

13              A.   I mean, I know that there were R&D

14   efforts that had been performed for many years at

15   that point in time and that NNSA had even inherited

16   at the time of its foundation from -- rights from

17   its founders, I guess, as it was initially created

18   as a joint venture, so the two parties, Nortel and

19   Matra at that time, both contributed the R&D team

20   of NNC, as it was called, would use -- would need

21   to effectively create the GSM wireless units it was

22   in charge of building effectively.

23              Q.   You spoke of two different kinds

24   of rights.  One set of rights that would have been

25   acquired upon an acquisition or amalgamation with
```



1    another company, correct?

2                    A.    A foundation really, because

3    indeed the company was founded in 1992, I believe,

4    maybe '91, whatever.  And the two shareholders, you

5    know, contributed different things.  And then

6    subsequently that company performed R&D investment

7    up to 2001 when we moved to RPSM and then of course

8    continued after that.

9                    Q.    And leaving aside the ones that

10   were part of the foundation, the R&D that was done

11   and whatever rights or interests you say were

12   associated with that, are you familiar with the

13   arrangements that existed prior to 2001 under cost

14   sharing agreements concerning how those -- the

15   formulation of those rights?

16                   A.    I know of the agreements.  I'm not

17   intimately familiar with them.  It wasn't my job at

18   the time to know those details.

19                   Q.    And I think you've said to us on

20   the deposition, I just want to confirm, that you

21   had no involvement in the cost sharing arrangements

22   that existed before the switch to the RPSM model?

23                   A.    No, that's correct.  I had no

24   involvement.

25                   Q.    Those were under Mr. Badiani's

Neeson&Associates    W&F

```
 1   responsibilities; is that right?

 2              A.   I can't say actually who actually

 3   managed them.

 4              Q.   They weren't your

 5   responsibilities?

 6              A.   No, exactly.

 7              Q.   And did you know that NNSA had

 8   licenses under the cost sharing agreements to use

 9   intellectual property?

10              A.   Yes, that is my recollection.

11              Q.   And was it your intention in your

12   affidavit in those paragraphs that we just looked

13   at a moment ago to suggest that your understanding

14   when there was a switch to the RPSM was that the

15   rights that you had understood existed with respect

16   to or arising out of R&D contributions would

17   continue afterwards; is that what you were

18   intending to say?

19              A.   Yeah, as I said, I was never told

20   that NNSA was losing anything apart from, of

21   course, the cost sharing agreement, but any of its

22   rights that it had previously held.

23              Q.   And I take it from what you told

24   me at the beginning about your particular areas of

25   expertise that you would defer to others in terms
```



1    of how those rights were documented in terms of

2    contracts or other legal arrangements; is that

3    correct?

4                    A.    That is correct, yes.

5                    Q.    Now, when it came time to draft

6    the MRDA, I think you said in your affidavit that

7    you were not close to the drafting of that

8    document?

9                    A.    That's right.  Again, it's a legal

10   document, I'm not a lawyer, I had no reason to be

11   involved in the drafting.

12                   Q.    Right.

13                   A.    Plus my understanding is that the

14   document really existed and was adjusted, so, you

15   know, they were not even starting from scratch.  So

16   I had little reason to be involved in the details.

17                   Q.    Okay.  And your job

18   responsibilities didn't include dealing with any of

19   the intellectual property clauses in the MRDA,

20   right?

21                   A.    No, not really.  No.

22                   Q.    Now, you do mention, if you just

23   turn to your affidavit in paragraph 20 -- well,

24   actually we should start at paragraph 19 because I

25   think that the two go together.



```
 1                    You say in paragraph 19 that:
 2                        "As a consequence and thanks to
 3                    numerous exchanges with the North
 4                    American tax team, both in my
 5                    position as the French treasurer and
 6                    then as controller for France, I
 7                    began to piece together what the
 8                    RPSM meant for NNSA."
 9              A.    Yes.
10              Q.    So can we take it that your
11   testimony as to your understandings about what the
12   MRDA meant in terms of the rights for NNSA, that
13   those understandings came from discussions with
14   other people; is that right?
15              A.    Sorry, I think you're asking two
16   questions.  If I can just split them.
17              Q.    Sure.
18              A.    So yes, my understanding came from
19   discussions with others as it was not my job to run
20   things in this area.  And then I think you said
21   something around the MRDA, I can't remember exactly
22   how you phrased it, but I wasn't in complete
23   agreement with your comment.
24              Q.    Okay.  Well, what you just said is
25   all I was looking for, so that's fine.
```

```
 1                  Now, you say here that it arose from
 2   exchanges with the North American tax team, but you
 3   told me earlier, so I think we have it, that you
 4   gained your knowledge also from the EMEA tax group.
 5   You said that just a few moments ago?
 6                  A.    That's right.  That's right.  The
 7   European tax team were not the experts in transfer
 8   pricing or the MRDA or any of that, but they had,
 9   of course, in-depth knowledge.  So, you know,
10   because of that, I could use them as well indeed to
11   gain knowledge myself.
12                  Q.    So that's another source of your
13   information?
14                  A.    Correct.
15                  Q.    Okay.  And in paragraph 20 you
16   identify one person or two people in particular.
17   First of all, Michael Orlando?
18                  A.    Um-hmm.
19                  Q.    Did you see him when he was here
20   this morning?
21                  A.    I actually run into him at the
22   elevator but that's about it.
23                  Q.    He was someone who you relied on
24   heavily for your understandings with respect to the
25   interests in the --
```



```
 1                    A.   Yeah, I guess the way I would put
 2   it is he would have been the one I would have gone
 3   to when I had technical questions around transfer
 4   pricing adjustments, calculations and things like
 5   that, yes.
 6                    Q.   And you would consider him to be
 7   one of the people with expertise in this area in
 8   the company?
 9                    A.   Yeah, he was running this process.
10   He obviously had an intimate knowledge of, you
11   know, this area.
12                    Q.   And Mr. Schofield as well was a
13   senior person with EMEA who you also utilized as a
14   resource?
15                    A.   Yes.
16                    Q.   And you say that these are people
17   that provided you with information concerning
18   specifically that the effect that the RPSM was
19   based on the distinction between legal ownership
20   and economic ownership.  Do you see that?
21                    A.   Yes.
22                    Q.   So you attribute them as the
23   source of that distinction?
24                    A.   That's my recollection, indeed.
25                    Q.   And I take it you would defer,
```

 Neeson & Associates   W&F

1   let's just take Mr. Orlando as an example, you

2   would defer to Mr. Orlando in terms of his

3   expertise around what he means when he speaks about

4   economic ownership, correct?

5            A.   Yeah.  I mean, as long as his

6   explanation would have made sense, yes.

7            Q.   He was someone who you relied on

8   as a source of that information?

9            A.   Yeah, again, he was running this

10  area.

11           Q.   Okay.  Now, when you speak in your

12  affidavit, and you do in a variety of places and

13  I'm going to take you to a few of the examples, but

14  when you speak, you are always talking about

15  economic ownership, not legal ownership.  You've

16  been very careful to make that distinction; is that

17  right?

18           A.   Yes.

19           Q.   And you said a few moments ago,

20  but I just want to make sure that we have it

21  clearly here, that that economic ownership you tied

22  to contributions to R&D; is that right?

23           A.   I mean, yeah.  I mean, it derives

24  from R&D investments.  How you calculate it is much

25  more than just the R&D investments, but it is



 1   initially derived from R&D investments because they

 2   are what creates, you know, the value.

 3                Q.   Now, I know you're not close to

 4   the drafting of the MRDA, but have you read it?

 5                A.   I did.

 6                Q.   Okay.  And are you aware that the

 7   MRDA grants licenses to NNSA and the other licensed

 8   participants in exchange for their contributions to

 9   R&D?

10                A.   I know that's the way it's

11   drafted, yes.

12                Q.   Now, you responded to Mr. Gottlieb

13   in some of his questioning by mentioning something,

14   I think you referred to entrepreneurial risks and

15   benefits; is that right?

16                A.   Yes.

17                Q.   And is that -- is it the

18   entrepreneurial risks and benefits that you equate

19   with economic ownership; is that your evidence?

20                A.   Well, I guess one is a negative

21   concept and the other is a positive concept, if

22   that makes sense.  So the economic -- I mean,

23   effectively the way I was told the group was

24   operating is that the six or the five RPS entities

25   were owning the entire IP, and that was their

 Neeson&Associates   W&F

1    entrepreneurial investment, that they would bear

2    the risk and the rewards, I guess that's the thing

3    I would add to your question, if you don't mind,

4    the risk and the rewards from that ownership, and

5    once the distributors and other entities were paid

6    off the routine returns, they would get again

7    whatever was left, the profits or the losses from

8    the Nortel Group.

9            Q.   And would you defer to Mr. Orlando

10   in terms of the source of the rights in

11   intellectual property that is derived from these

12   arrangements?  Is he someone who you would defer to

13   as an expert in this area?

14           A.   As I said, I wasn't really looking

15   at it this way.  I was really looking at how do we

16   economically justify that we have a return on our

17   investment.  That's really -- and that's really the

18   core of justifying that we had an entrepreneur,

19   that we had economic ownership and that we had the

20   rewards commensurate with the risks that we were

21   taking.

22           Q.   You're not an economist, correct?

23           A.   No, no, I'm a finance person, but

24   I've studied economy, amongst other things, but I

25   wouldn't call myself an economist.



    1                    Q.   But you say you were looking at
    2   how to economically justify the expenditures?
    3                    A.   Yes.
    4                    Q.   And the phrase that you used
    5   throughout your affidavit is economic ownership; is
    6   that right?
    7                    A.   Yes.
    8                    Q.   Now, are you aware of any contract
    9   or legal agreement that existed that specified that
   10   NNSA and other participants in the MRDA were the
   11   economic owners or economically owned the Nortel
   12   IP?
   13                    A.   Well, I guess that's the purpose
   14   of the MRDA.  Other than the MRDA is your question?
   15                    Q.   Is the MRDA the document that you
   16   would identify in response to that question?
   17                    A.   Yeah, the MRDA is the document
   18   that reports or documents the RPSM, yes.
   19                    Q.   Okay.  So that's the document that
   20   you would link to the economic ownership; is that
   21   right?
   22                    A.   That would -- yeah, that would
   23   clearly be a very important document in documenting
   24   this.
   25                    Q.   And you're not aware of any other



```
 1   documents?

 2               A.   I'm sorry?

 3               Q.   You're not aware of any other

 4   documents?

 5               A.   Well, the MRDA is a contract.  I

 6   would -- you know, I would consider that the amount

 7   of rewards and risks that we received would be part

 8   of it, i.e. the model, if I can use it that way,

 9   would be part of it on top of the MRDA.

10               Q.   But you realize that the risks and

11   rewards, there is a formula under the MRDA for

12   accounting for that, correct?

13               A.   There are principles.  I wouldn't

14   call it a formula, if you don't mind, but there are

15   principles listed there, yes.

16               Q.   And those translated into transfer

17   pricing adjustments on a quarterly and annual

18   basis, correct?

19               A.   Yes, when supplied, they

20   translated into financial flows, indeed.

21               Q.   Okay.  Now, you mentioned that you

22   had to deal with the French tax authority in

23   connection with some of the initial questions that

24   they had about the MRDA.

25               Is it fair to say that you put your --
```

Neeson & Associates    W&F

```
 1    you wanted to put your best foot forward when you
 2    were dealing with the French tax authority
 3    concerning the RPS model?
 4              A.   Of course.  I wanted to, you know,
 5    make sure that things would go as well as possible.
 6              Q.   And --
 7              MR. GOTTLIEB:  I apologize, I think my
 8    friend, Ms. Kimmel, may have misspoken when she
 9    asked that question.  It's not coming up quickly on
10    my screen here.  So I apologize.  Yes, that's
11    right.  She said that -- I believe the question was
12    started to talk to the tax authority with respect
13    to the MRDA, that that was his evidence.  And that
14    wasn't his evidence.  His evidence was dealing with
15    the RPSM, not the MRDA, and there is a very
16    significant --
17              THE CANADIAN COURT:  The question says
18    concerning the RPS model.
19              MR. GOTTLIEB:  I apologize, Your
20    Honour, I'm not seeing it here.
21              The question that I have written down
22    is "Now, you mention that you had to deal with the
23    French tax authority in connection with some of the
24    initial questions that they had about the MRDA."
25              That wasn't discussed.  That was my
```



```
 1    only point.  I am sorry for the interruption.  I
 2    didn't see it on the screen but maybe you could
 3    just clarify that.
 4              THE CANADIAN COURT:  How long do you
 5    plan to be, Ms. Kimmel?
 6              MS. KIMMEL:  I think I'll probably be
 7    about another half hour.
 8              THE CANADIAN COURT:  Well, I think
 9    maybe we can take the break.  You know, I realize
10    what you're dealing with here.  You have an
11    affidavit and this is my understanding, my
12    understanding, my understanding.  We all know the
13    value of an affidavit that says "my understanding
14    is."  This is not the only affidavit that's got
15    that but it's not very helpful to anybody, in my
16    view.  But I realize you're dealing with that.
17              MS. KIMMEL:  We do have to contend with
18    it, Your Honour.
19              THE CANADIAN COURT:  Interpreting that
20    agreement and what one person's understanding is,
21    for what it's worth, and we do have rules of
22    evidence.  I realize what you're dealing with.
23              MS. KIMMEL:  If we were all following
24    precisely the same rules of evidence, I wouldn't
25    have a problem.  But I feel that I need to do a
```

 Neeson & Associates    W&P

1   little bit with this witness, with your permission,

2   Your Honour.

3             THE CANADIAN COURT:  Are you satisfied,

4   Judge Gross, we take the break?  Silence is golden.

5   I can't hear you.

6   -- REPORTER'S NOTE:  Technical difficulties.

7             THE US COURT:  Are we going to about

8   5:30 or 6:00, do you think, Ms. Kimmel?

9             MS. KIMMEL:  No, I think, Judge Gross,

10  I think the arrangement for this witness is that

11  there will be a short part of his testimony that

12  will continue after others who are not part of the

13  claims part of the trial are excused.

14            THE US COURT:  Right.

15            MS. KIMMEL:  I don't expect, subject to

16  what other people have in the room, I don't expect

17  that my examination will go much past 5:00 or maybe

18  5:10 or something like that if we take the break

19  now.

20            I know Justice Newbould's patience is

21  being tested.  We have a very small claims

22  component to examine this witness on that.  If we

23  could have the court's indulgence so that the

24  witness doesn't have to come back, I think

25  everybody would appreciate it.



```
 1                    THE CANADIAN COURT:  Well, I've got a
 2    problem.  I have to be somewhere at five o'clock.
 3    I've got a hearing scheduled at five o'clock,
 4    that's the only thing.  Are there other people
 5    going to want to cross-examine this witness?
 6                    MR. COBB:  Your Honour, I will have a
 7    short examination on the claims, less than five
 8    minutes.
 9                    THE US COURT:  Should we push through
10    to 5:00?
11                    THE CANADIAN COURT:  Let's keep going
12    but I think about ten to 5:00 I'm going to have to
13    call it quits.
14                    MS. KIMMEL:  Okay, Your Honour, I'll
15    try to shorten a few things up here.
16                    BY MS. KIMMEL:
17                    Q.   I just would like, if we could,
18    given -- and I won't necessarily take the witness
19    to every paragraph of his affidavit that these
20    points relate to, but I do want to have the
21    evidence from the witness on a couple of points.
22                    The first thing is if we could take a
23    look, it's Exhibit B to your affidavit, sir, and
24    it's Exhibit TR48641.  If you could just tell me,
25    sir, who was Fidal, is that how you pronounce it?
```



```
 1                    A.   Yes, Fidal and they are a law

 2    firm, a tax law firm related to KPMG.

 3                    Q.   Okay.  And, sir --

 4                    A.   And they were our advisors, yeah,

 5    they were advising us on that tax investigation.

 6                    Q.   And they were advising you and

 7    helping you too in your dealings with the French

 8    tax authorities, correct?

 9                    A.   That is correct.

10                    Q.   Okay.  And if we turn to slide 43,

11    can you just confirm for me that these were the

12    main points that you presented to the French tax

13    authorities in the dealings that you had with them?

14    This is just one example, but just so we don't have

15    to take you through all of them.

16                    A.   Yes.

17                    Q.   Can you just turn over to page 44,

18    the same slide deck.  Part of what you submitted

19    based on these points was that the implementation

20    of the RPS method was not or cannot be qualified as

21    an abnormal act of management; is that correct?

22                    A.   Correct, yes.

23                    Q.   And it was based on the factors

24    that are identified in the slide above; is that not

25    right?
```



```
 1                    A.   I'm not sure it's just what's
 2   limited here, but certainly includes what's listed
 3   in slide 43, yes.
 4                    Q.   And you would have listed the most
 5   important factors in the slide in the conclusion,
 6   wouldn't you?
 7                    A.   Yes.  Probably.  It's hard to --
 8                    Q.   Now, let's also then consider
 9   another point that you make in your affidavit about
10   the Board of Directors which I think you also
11   indicated in your evidence in-chief this morning.
12                    A.   Yes.
13                    Q.   You said you helped the Board to
14   understand the implications of the RPSM; is that
15   right?
16                    A.   The Board members indeed, yes.
17                    Q.   I haven't been able to find any
18   board minutes that record you having made any
19   presentations to the NNSA Board.  You obviously
20   haven't found any either because I don't see any
21   appended to your affidavit?
22                    A.   No, that's right.  My recollection
23   is that it was a presentation separate from the
24   Board meeting itself.  The Board meeting under
25   French law has to be attended by employee
```



1    representatives and the Board members were keen to

2    have a private meeting, if you want, ahead of the

3    Board itself for that reason.

4                    Q.   There is no document that reflects

5    what you presented though, is there?

6                    A.   No, I would have used -- I

7    wouldn't have reinvented the wheel and I would have

8    used slides similar to the ones we used before the

9    French tax authorities.

10                   Q.   Great, thank you.  And I take it

11   the Board members themselves would know ultimately

12   what influenced them to approve the signing and

13   entry into of the MRDA by NNSA, correct?

14                   A.   Sorry, the --

15                   Q.   They would know, they themselves

16   would be the best source of what influenced them to

17   sign or approve the signing of the MRDA?

18                   A.   Yeah.

19                   Q.   And you haven't spoken to any of

20   them in connection with your affidavit, I take it?

21                   A.   No.

22                   Q.   Thank you.  Now, you talked a

23   little bit in your evidence in-chief about the

24   allocation of the sale proceeds from the UMTS sale?

25                   A.   Yes.



```
 1                 Q.   Just so we have it, you were not
 2    responsible for determining how those sales
 3    proceeds got allocated, were you?
 4                 A.   No.
 5                 Q.   And you weren't involved in any of
 6    the decisions about how to allocate those share
 7    sale proceeds, were you?
 8                 A.   No, I was not involved in the
 9    decision.  I was involved in the implementation.
10                 Q.   Right.  So you just -- you were
11    told what share was coming to NNSA and that was
12    implemented by you?
13                 A.   Yes, but I also had to understand
14    and agree with it as I would have been the one
15    defending whatever we were doing in front of the
16    auditors and in front of the tax authorities.
17                 Q.   Now, I think you'll agree with me
18    that there were other people that were also
19    involved in the discussions about that, Mr. Smith
20    being one of them?
21                 A.   Yeah, there were other -- clearly
22    there were other people involved in this, you know,
23    allocation, of course, yes.
24                 Q.   And do you have -- you don't
25    actually have any direct knowledge of whether or
```

 Neeson & Associates   W&F

```
 1   not those sale proceeds were allocated based on an
 2   ownership interest as opposed to having been
 3   allocated based on the RPS model, correct?
 4              A.   No, I don't think it was the RPS
 5   model but it was the RPSM principles that were used
 6   to define this allocation.
 7              Q.   Thank you.  That's your
 8   understanding?
 9              A.   Yes.
10              Q.   Okay, thank you.  Now, there's
11   another point in your affidavit that wasn't touched
12   on in your evidence in-chief.  You give as an
13   example a decision about impairment of an interest
14   that NNIF, the Dutch company, held in the French
15   company NNSA?
16              A.   Correct.
17              Q.   You use that as an example of how
18   you say it bore out the ownership interests that
19   you speak about in your affidavit; is that right?
20              A.   Yes.
21              Q.   Okay.  Now, do you recall that
22   Ryan Smith was involved in your discussions about
23   that particular subject?
24              A.   Yes, and I have read a document
25   about that as well, yes.
```



```
 1                    Q.    A document that's not in your
 2    affidavit that you're referring to, right?
 3                    A.    Might not be.
 4                    Q.    And what I'm getting at is you
 5    attached as an Exhibit E to your affidavit an email
 6    chain, but there's actually a follow-on to that
 7    email where you actually tell Mr. Mccartel that he
 8    should speak to Ryan Smith about this, right?
 9                    A.    Yes.
10                    Q.    That's not in your affidavit but
11    you're aware of that document, and just for the
12    record it's TR - let me just make sure I have the
13    right one - Exhibit TR31562.  We don't need to turn
14    it up.
15                    Do you know what Mr. Smith's testimony
16    is on the subject of that impairment issue?
17                    A.    No.
18                    Q.    Thank you.  Now, I'm not going to
19    take you through each and every one of these, but I
20    have taken on a single piece of paper some
21    statements that you've made in your affidavit and I
22    just have a question I'd like to ask about it, if
23    we could just pull up that summary page.
24                    So, Mr. Albert-Lebrun, here we have
25    under the headings from your affidavit excerpts
```



1    from statements that you made in your affidavit and

2    I have identified them by paragraph number, a

3    selection of different things that you've said

4    about the intellectual property.

5              Without reading them all into the

6    record at pain of punishment, can we just have you

7    look at them and confirm that these are familiar to

8    you as extracts from your affidavit?  I just have a

9    question for you but I don't want to be unfair to

10   you without letting you look at them first.

11             A.   (Witness reads document).  Okay,

12   yeah, no, they do look familiar.

13             Q.   Now, you express things

14   differently in different places in your affidavit,

15   as we see here, but what I really want to just have

16   you confirm, sir, is that all of these things are

17   all talking about the same economic interests that

18   you were referring to in your testimony earlier.

19   You're not intending to talk about different

20   things; you're talking about one thing and that is

21   this economic interest that you are mindful of,

22   right?

23             A.   Yes.

24             MS. KIMMEL:  Can I just have a moment,

25   Your Honour?  It's amazing what people can do when



```
1    they're told they have to.  I don't know if
2    Ms. Block has any questions or not.
3              THE CANADIAN COURT:  There is a
4    gentleman in the back corner who says he has some
5    to ask.
6              MS. KIMMEL:  Those are the claims
7    specific questions.  We might excuse a few of the
8    people -- well, certainly everyone in Delaware and
9    a few of the people in this courtroom before we
10   come to that, but I don't know if other people have
11   questions.
12             THE CANADIAN COURT:  Ms. Block?
13             MS. BLOCK:  I have no questions, thank
14   you.
15             THE CANADIAN COURT:  Ah, excellent.
16             MS. BLOCK:  I want you to remember
17   that.
18             MR. ROSENTHAL:  But I do.
19             MR. GOTTLIEB:  If no one has questions,
20   I might have a couple of re-examination questions,
21   but given the time, I'm just going to ask for five
22   minutes, Your Honour, if we can just stand down for
23   five minutes so I can look at my notes to speed
24   things up, and based on my understanding from
25   Ms. Kimmel about the time, we'll be out of here by
```



```
 1   5:00, so if I can just have five minutes it would
 2   be helpful.
 3                THE CANADIAN COURT:  We have to be out
 4   of here by ten to 5:00.
 5                MR. GOTTLIEB:  Got it.
 6                THE CANADIAN COURT:  I'll give you five
 7   minutes.
 8                MR. GOTTLIEB:  I've got it.  Thank you.
 9   -- RECESS AT 4:28 --
10   -- UPON RESUMING AT 4:35 --
11                MR. GOTTLIEB:  Thank you, Your Honour,
12   thank you, Judge Gross.
13
14   RE-EXAMINATION/RE-DIRECT BY MR. GOTTLIEB:
15                Q.   Mr. Albert-Lebrun, I just have a
16   couple of questions that I'd like to ask you.
17                I'd like to bring up, which is Exhibit
18   B, which is Exhibit TR48641, which is the Fidal
19   document.  I believe everyone should have a copy.
20                Mr. Albert-Lebrun, I'm going to ask you
21   to turn to page 36 of that slide show and, I'm
22   sorry, I'm not exactly sure what other number or
23   page.  Do you have page 36?
24                A.   I do.
25                Q.   And this is a document that Fidal
```



```
 1    -- you assisted with, as I understand it?
 2              A.    That is correct.  It was a joint
 3    effort and I contributed to it.
 4              Q.    Okay.  And the last bullet point
 5    on 36 says:
 6                    "The RPS is the most
 7                    appropriate method to compensate
 8                    NNSA commensurate with its
 9                    functional profile and the
10                    entrepreneurial role it plays in the
11                    Nortel organization."
12              A.    Yes.
13              Q.    And if I understand it correctly,
14    that was something that you told to the tax
15    authorities as well, correct?
16              A.    Absolutely.  The whole
17    presentation was delivered to the tax authorities.
18              Q.    Okay.  Now, when you were talking
19    earlier and my friend, Ms. Kimmel, was asking you
20    certain questions about your understanding of
21    things, how did your understanding of things become
22    relevant to what the tax authorities were told?
23              A.    I guess my understanding was
24    partly derived from preparing the slide pack, the
25    functional analysis and other similar documents
```



 1    that were required as part of the management of the

 2    RPSM.

 3                 Q.    Now, when you talked about your

 4    understanding, and I won't -- it was in connection

 5    with the economic ownership of the IP, that's what

 6    you gave in evidence, was that consistent with what

 7    you were telling the French taxation authorities?

 8                 A.    Yes, it was.

 9                 Q.    All right.  I just want to turn up

10    one other document, Exhibit TR21095.  It's going to

11    come up on the screen in front of you there, God

12    willing.  21095.  And what you'll see is, and I am

13    going to go through this fairly quickly given the

14    time constraints, but this is, as I understand it,

15    and you are copied on this document at the top,

16    this is a presentation made to the French taxation

17    authority in May of 2005?

18                 MS. KIMMEL:  Your Honour, I'm only

19    rising to inquire as to why this is proper

20    re-examination.

21                 THE CANADIAN COURT:  Go ahead,

22    Mr. Gottlieb.  I've heard enough of this today.  It

23    raises a lot of questions why I'm hearing it.  Go

24    ahead, Mr. Gottlieb.

25                 MR. GOTTLIEB:  I'm obviously, Your



1    Honour, not going to argue the case on the merits

2    as to why we say this is highly relevant to the

3    position we put forward about the ownership.  I'm

4    not going to deal with that now but I appreciate

5    the opportunity to go through this tab.

6                   BY MR. GOTTLIEB:

7                   Q.   Slide 3, please, if you can flip

8    to that, please, "key messages" at the top.

9                   A.   This exhibit?

10                  Q.   No, sir, on the one that's in

11   front of you on the screen.  We're going to look at

12   tab 3, the bottom bullet says:

13                       "The RPS is the most

14                       appropriate TP method given NNSA's

15                       entrepreneurial role in the Nortel

16                       organization."

17                  Again, this was a presentation that you

18   provided to the taxation authority?

19                  THE CANADIAN COURT:  Why do you keep

20   asking the same question?  The very first page says

21   it's the taxing authorities.

22                  BY MR. GOTTLIEB:

23                  Q.   And when you were talking about

24   the entrepreneurial role, can you briefly just

25   explain what that meant to you when you were making



```
 1   your presentation to the taxation authorities?
 2                 A.    So the entrepreneurial role meant
 3   that the R&D investment was put at risk and that it
 4   could derive significant benefits if the result of
 5   Nortel in directly coming from that R&D investment
 6   were good, and sustain significant losses, as
 7   actually happened, when the R&D investment was not
 8   sufficient to make or not successful enough to make
 9   the results of Nortel positive.  This in
10   combination, of course, with the R&D efforts of the
11   other entities performing similar roles within the
12   group.
13                 Q.    And was that discussed with the
14   taxation authorities?
15                 A.    Oh, they were very keen to keep
16   NNSA as -- with an entrepreneurial role, and
17   keeping the economic ownership because that's, of
18   course -- that would, of course, mean future
19   profits for NNSA and therefore future tax for them.
20                 Q.    I'm just going to ask you to turn
21   to one more slide, please, that's slide 25.  And
22   you'll see that the second bullet on this page of
23   the presentation, it says:
24                       "NNSA is an entrepreneur.  NNSA
25                       is a Nortel integrated entity
```



```
1                    involved in the activities of the
2                    group.  NNSA engages in major R&D
3                    activities and bears the
4                    corresponding risks."
5                    And then the last bullet with the
6       little arrow is:
7                       "NNSA bears the risks
8                    associated with its activities and
9                    may incur losses if such risks
10                   materialize."
11                   Was that also something that was told
12      to the taxation authorities?
13                   A.   Yes.
14                   THE CANADIAN COURT:  Why do you ask
15      that, Mr. Gottlieb?  The whole thing was given to
16      the tax people.  Why do we keep doing this?  It
17      says right on the first page, it's a thing for a
18      meeting with the French tax authorities, 9 March
19      2006.
20                   MR. GOTTLIEB:  Yes, Your Honour, what
21      I'm trying to join up is that we had discussions
22      about or Ms. Kimmel had discussions about his
23      understanding of the economic role.  This is just a
24      slide deck and I'm moving from the understanding
25      that Mr. Albert-Lebrun says he had to actually the
```



 1   representations that were made in fact to the

 2   taxation authorities, so obviously I'm trying to

 3   probe from the witness whether these were actually

 4   points discussed with the French taxation

 5   authorities.  If the answer is yes, then I'm done

 6   with that.

 7              THE WITNESS:  Yes, they were.

 8              MR. GOTTLIEB:  Those are all my

 9   questions.  Thank you.  Thank you for the

10   indulgence.

11              THE CANADIAN COURT:  Thank you.

12              MS. KIMMEL:  May I ask the witness a

13   question about one of the slides in the slide deck

14   since I skipped over it in my haste?

15              THE CANADIAN COURT:  Go ahead.

16

17   FURTHER CROSS-EXAMINATION BY MS. KIMMEL:

18              Q.   Just while we're pulling up the

19   slide, Mr. Albert-Lebrun, do you see the words

20   "economic ownership" anywhere in this slide deck?

21   I'm sure you've looked at this recently.  Those

22   words don't appear in here anywhere, do they?

23              A.   I think we've used entrepreneur

24   role as in this slide more than economic ownership.

25              Q.   You didn't use economic ownership

 Neeson & Associates   W&F

```
 1   at all, not in these slides?
 2                A.    Probably not.
 3                Q.    Okay, thank you.  Now, I'd like to
 4   show you slide 17 which is sandwiched in between
 5   the slides that my friend took you to.  Since we
 6   are now in the slide deck, I had a question for you
 7   about this that I skipped over earlier.
 8                Just wait for it to be turned.
 9                You say -- was part of the effort that
10   you went through to determine the information to
11   include in this slide, did that include discussions
12   with various people in the tax groups in EMEA and
13   North America that we talked about earlier?
14                A.    Yes, as I said, it was a group
15   joint effort and of course the people in the tax
16   team in North America were part of the team of
17   course.
18                Q.    And the people who were on the --
19   we'll come back to the cover email afterwards
20   because I don't want to move off this slide, but
21   you'll see this slide has two bullets at the
22   bottom, and I want to just focus your attention on
23   the last one.
24                Was part of the joint effort that you
25   went through to determine important information to
```



1   tell the French tax authorities embodied in the

2   last bullet point on this slide that no entity

3   could exist on a stand-alone basis?

4            A.   I don't think it was that this

5   conclusion was derived from the work done for the

6   tax authorities.  That's more the functional

7   analysis that led us to this conclusion.

8            Q.   But the collaborative effort that

9   drew on the resources within Nortel were part of

10  the -- had approved that inclusion of that bullet

11  point on this slide?

12           A.   Yes.

13           Q.   Okay.  And I won't bother asking

14  you to identify the people on the email.  I'm sure

15  we can do that at a later point in time,

16  Mr. Albert-Lebrun.  Thank you.

17           THE CANADIAN COURT:  Now, was there

18  some other questioning that was going to take

19  place?

20           MS. KIMMEL:  Yes, there is a very short

21  line of questions that Mr. Cobb I think will be

22  asking the witness in the claims-only portion of

23  the trial.

24           THE CANADIAN COURT:  How long will you

25  be?



```
 1              MR. COBB:  Less than five minutes, Your
 2   Honour.
 3              THE CANADIAN COURT:  Why don't you come
 4   up and do it right now.
 5              MS. KIMMEL:  And I have a few maybe.
 6              THE CANADIAN COURT: Well, let's just --
 7              MS. KIMMEL:  I am defending the claims
 8   on behalf of the Monitor and Canadian Debtors.
 9              THE CANADIAN COURT:  I understand.  I
10   understand.
11
12   CROSS-EXAMINATION BY MR. COBB:
13              Q.   Good afternoon, sir, my name is
14   Alex Cobb, C-O-B-B; I act for the directors and
15   officers.
16              I understand that while you were with
17   NNSA and then when you had a role in EMEA, part of
18   your job was financial compliance?
19              A.   That is correct, yes.
20              Q.   And in that capacity one of the
21   things that you did was try and ensure that -- try
22   and prevent transactions that were not in the best
23   interests of the entities that you were responsible
24   for?
25              A.   Yes.
```



```
 1                    Q.   And you also were responsible for
 2   providing information to the directors of various
 3   EMEA boards about transactions that came before
 4   them for consideration?
 5                    A.   Yes.  I mean, not -- of course I
 6   was not -- you know, legal was really playing that
 7   role, but of course the financial information would
 8   have come from me, yes.
 9                    Q.   Sure.  So for example, with
10   respect to Project Swift you participated in a
11   series of meetings with the directors of NNUK?
12                    A.   That is correct.
13                    Q.   And my understanding is that as a
14   result of that, your participation in that process,
15   you formed the view that the directors of NNUK
16   understood Project Swift at least as well as you
17   did?
18                    A.   Oh, they certainly understood it
19   much better than I originally did.  But I certainly
20   helped them to form an opinion on Project Swift,
21   yes.
22                    Q.   Okay.  And you also, as you
23   testified earlier, participated in briefing the
24   board of NNSA with respect to the switch to the
25   RPSM model?
```



```
 1                      A.   I wouldn't put it this way.  I --
 2     as I was gaining understanding of the RPSM, I was
 3     sharing that understanding with them.  But at the
 4     time that it was implemented, which I think was
 5     your question, I didn't have an understanding and
 6     therefore I couldn't share it nor recommend them to
 7     enter into the RPSM.
 8                      Q.   Okay.  But you certainly --
 9                      A.   I did what I could.  Sorry.  I did
10     what I could to mitigate the effect of moving to
11     the RPSM, that's really what I would say my role
12     was at the specific point in time when we switched
13     in December 2001.
14                      Q.   And certainly you did participate
15     in discussions with the members of the board of
16     NNSA about the switch to RPS and part of that
17     process was to educate them, at least to the extent
18     that you understand it, about the switch?
19                      A.   Yes.  I had regular conversations
20     with them, indeed.
21                      Q.   In your capacity as someone who
22     would provide information to the EMEA boards, if
23     you thought that something that was being put
24     before the board was problematic, it was part of
25     your job to raise that with them?
```



```
 1                    A.   Yes.

 2                    Q.   And there was certainly nothing

 3    stopping you from doing that?

 4                    A.   No.

 5                    Q.   In fact, it was part of your job?

 6                    A.   It was part of my job.

 7                    Q.   So in your affidavit you make a

 8    statement to the effect that if the board of NNSA

 9    had been told that as a result of this switch to

10    RPS it was giving up certain rights contrary to its

11    interests, you doubt that the board would even have

12    considered it?

13                    A.   Yes.

14                    Q.   Do you recall that?

15                    A.   Yes.

16                    Q.   And I take it that that

17    expectation is based on your experience of someone

18    who briefed boards about these issues from time to

19    time?

20                    A.   Yeah.

21                    Q.   Okay.  And in that scenario, you

22    believe that the board would have given whatever it

23    is that you had to say appropriate consideration?

24                    A.   I wouldn't really comment on that.

25    But, yeah, I mean, it was like I was trying to help
```


Neeson&Associates    W&F

1    them.  There was no reason why they wouldn't have
2    at least listened to what I had to say.
3                    Q.    And that's consistent with your
4    experience as to the way that the boards conducted
5    themselves?
6                    A.    Well, in the end what they did was
7    their decision.  I did not necessarily agree with
8    what they wanted or they didn't necessarily take
9    decisions that I agreed with, but that was their
10    responsibility.  They could certainly listen to me
11    and anything I had to say.  Whether they were
12    acting in, you know, in accordance with what I was
13    recommending was, you know, not always the case.
14                    Q.    Absolutely.  That was their
15    decision.  When you say that your expectation is
16    that the board would not entertain a transaction
17    that was not in the best interests of NNSA, that is
18    based on your experience as to how those boards
19    operate?
20                    A.    Absolutely.  They were very
21    thorough in making sure that they were not taking
22    personal risk.  Again, the French law that's a
23    personal risk, they would never have done, taken a
24    personal risk for, you know, for any reason in
25    fact.  So they were very careful to defend their



```
 1   fiduciary duty, if I can put it this -- like this.
 2             MR. COBB:  Thank you, sir.  Those are
 3   my questions.
 4             THE CANADIAN COURT:  Anyone else?
 5             MS. KIMMEL:  I'll make you a deal.  If
 6   you promise to read my designations of testimony
 7   from Mr. Albert-Lebrun, I will not ask him any
 8   questions, and we can all go home.
 9             THE CANADIAN COURT:  Let's go home.
10             MS. KIMMEL:  Thank you.
11             THE US COURT:  Justice Newbould, you
12   mentioned to me earlier that you would like to
13   start at 9:15 tomorrow.
14             THE CANADIAN COURT:  Yes, I think I
15   need to start at 9:15.  I have something else
16   earlier in the morning across the road, so we'll
17   start at 9:15 tomorrow morning.  That's okay with
18   you, Judge Gross?
19             THE US COURT:  That's fine, certainly.
20   Mr. O'Connor?
21             MR. O'CONNOR:  I planned on producing
22   Angela Anderson as a witness tomorrow.  She has had
23   surgery and has had some complications and was
24   still waiting.  She will not be here tomorrow.  We
25   are trying to work out when we can arrange to have
```



```
 1   her here or do a video as we are doing with one of

 2   the other witnesses.

 3              THE US COURT:  Will another witness

 4   fill her place?

 5              MR. O'CONNOR:  I think for tomorrow we

 6   have Mr. Brueckheimer, Mr. Newcombe and Mr.

 7   Jeffreys.  I think that's it.

 8              THE US COURT:  Thank you.  All right,

 9   everyone, good evening to you.

10

11   -- Whereupon the court adjourned at 4:53 p.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                  REPORTERS' CERTIFICATE

 2

 3

 4            I, KIMBERLEY A. NEESON, RPR, CRR, CSR,

 5    CCP, Canadian Certified Shorthand Reporter,

 6    Realtime Systems Administrator, and I, GAIL

 7    VERBANO, RDR, CRR, CSR, US Certificate Shorthand

 8    Reporter, certify;

 9            That the foregoing proceedings were

10    taken before us at the time and place therein set

11    forth;

12            That the entire proceedings of the

13    hearing date were recorded stenographically

14    individually by each of us and were thereafter

15    transcribed;

16            That the foregoing is a true and

17    correct transcript of our shorthand notes so taken.

18

19            Dated this 21st day of May, 2014.

20

21    PER:                  PER:
```

22 *Gail Inghram Verbano*   *Kimberley Neeson*

```
23    GAIL VERBANO          KIMBERLEY NEESON,

24    WILCOX & FETZER       NEESON & ASSOCIATES

25    WILMINGTON, DE  USA  TORONTO, ON  CANADA
```










































































