



```
 1              UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3

 4   ----------------------------)

 5   In Re                       )

 6     NORTEL NETWORKS INC.,      )  Case No.

 7     et al.,                    )  09-10138 (KG)

 8       Debtors.                 )

 9   ----------------------------)

10                      - and -

11              Court File No. 09-CL-7950

12                      ONTARIO

13             SUPERIOR COURT OF JUSTICE

14                 (COMMERCIAL LIST)

15       IN THE MATTER OF THE COMPANIES' CREDITORS

16   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18   ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19        NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20       CORPORATION, NORTEL NETWORKS INTERNATIONAL

21      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                     CORPORATION

23      APPLICATION UNDERT PART IV OF THE COMPANIES'

24   CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                     AS AMENDED
```



```
 1
 2                        --------
 3
 4    ---- This is the Day 7/Volume 7 of the transcript
 5    of the proceedings in the above matter held
 6    simultaneously in:
 7    Superior Court of        United States Bankruptcy
 8    Ontario (Commercial      Court for the District of
 9    List)                    Delaware
10    Courtroom 8-1            Courtroom 3
11    330 University Avenue    824 Market Street
12    Toronto, Ontario         Wilmington, Delaware
13
14    on the 22nd day of May, 2014, commencing at 9:20
15    a.m.
16
17                        ---------
18    B E F O R E:
19    The Honorable Judge Kevin Gross (United States)
20    The Honorable Mr. Justice Frank Newbould (Canada)
21
22                        ---------
23
24
25
```


Neeson & Associates    W&P

```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22   PER: Murray McDonald, Esq.

23        Brent Beekenkamp, Esq.

24

25   FOR THE APPLICANTS
```

 

```
 1    GOWLING LAFLEUR HENDERSON LLP

 2    Suite 1600, First Canadian Place

 3    100 King Street West

 4    Toronto, ON  M5X 1G5

 5    PER: Derrick Tay, Esq.

 6         Jennifer Stam, Esq.

 7

 8    FOR THE CANADIAN DEBTORS

 9    ALLEN & OVERY LLP

10    1221 Avenue of the Americas

11    New York, NY  10020

12    PER: Ken Coleman, Esq.

13         Paul Keller, Esq.

14         Daniel Guyder, Esq.

15         Laura Hall, Esq.

16         Joseph Badtke Berkow, Esq.

17         Jonathan Cho, Esq.

18         Nicolette Ward, Esq.

19

20    FOR THE CANADIAN DEBTORS

21    BUCHANAN INGERSOLL & ROONEY

22    1105 North Market Street,

23    Suite 1900

24    Wilmington, DE  19801 1054

25    PER: Kathleen A. Murphy, Esq.
```



```
 1       Mary F. Caloway, Esq.

 2

 3   U.S. DEBTORS

 4

 5   FOR NORTEL NETWORKS INC.

 6   TORYS LLP

 7   79 Wellington Street West, Suite 3000

 8   Box 270, TD Centre

 9   Toronto, ON  M5K 1N2

10   PER: Scott Bomhof, Esq.

11       Sheila Block, Esq.

12       Andrew Gray, Esq.

13       Adam Slavens, Esq.

14

15   FOR THE U.S. DEBTORS

16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

17   1201 North Market Street, 16th Floor

18   P.O. Box 1347

19   Wilmington, DE  19899 1347

20   PER: Derek Abbott, Esq.

21       Annie Cordo, Esq.

22

23   FOR NORTEL NETWORKS INC.

24   CLEARY GOTTLIEB STEEN & HAMILTON LLP

25   One Liberty Plaza
```

 

```
 1   New York, NY  10006

 2   PER: James Bromley, Esq.

 3        Lisa Schweitzer, Esq.

 4        Howard Zelbo, Esq.

 5        Jeffrey Rosenthal, Esq.

 6        Avi Luft, Esq.

 7        Inna Rozenberg, Esq.

 8        Jacqueline Moessner, Esq.

 9        Marla Decker, Esq.

10        Matt Gurgel, Esq.

11        Darryl Stein, Esq.

12

13   EMEA DEBTORS

14

15   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

16   LIMITED

17   DAVIES WARD PHILLIPS & VINEBERG LLP

18   40th Floor

19   155 Wellington Street

20   Toronto, ON  M5V 3G7

21   PER: Robin B. Schwill, Esq.

22        Sean Campbell, Esq.

23        James Doris, Esq.

24        Louis Sarabia, Esq.

25   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
```



```
 1   LIMITED

 2   LAX O'SULLIVAN SCOTT LISUS LLP

 3   Suite 2750, 145 King Street West

 4   Toronto, ON  M5H 1J8

 5   PER: Matthew P. Gottlieb, Esq.

 6        Tracy Wynne, Esq.

 7

 8   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 9   LIMITED

10   HUGHES HUBBARD & REED

11   One Battery Park Plaza

12   New York, NY  10004 1482

13   PER: Derek Adler, Esq.

14        Neil Oxford, Esq.

15        Fara Tabatabai, Esq.

16        Charles Huberty, Esq.

17

18   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

19   LIMITED

20   YOUNG CONAWAY STARGATT & TAYLOR LLP

21   Rodney Square

22   1000 North King Street

23   Wilmington, DE  19801

24   PER: Ed Harron, Esq.

25        John Dorsey, Esq.
```

Neeson&Associates    W&F

```
 1

 2   FOR THE EMEA DEBTORS

 3   HERBERT SMITH FREEHILLS LLP

 4   Exchange House

 5   Primrose Street

 6   London, England  EC2A 2EG

 7   PER: James Norris Jones, Esq.

 8

 9   CANADIAN CREDITORS COMMITTEE

10

11   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

12   BENEFICIARIES

13   KOSKIE MINSKY

14   20 Queen Street West

15   Suite 900

16   Toronto, ON  M5H 3R3

17   PER: Mark Zigler, Esq.

18        Susan Philpott, Esq.

19        Ari Kaplan, Esq.

20        Barbara Walancik, Esq.

21

22   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

23   REPRESENTED BY THE CAW CANADA

24   CAW CANADA

25   Legal Department
```



```
 1   205 Placer Court

 2   Toronto, ON  M2H 3H9

 3   PER: Barry E. Wadsworth, Esq.

 4        Lewis Gottheil, Esq.

 5

 6   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 7   COMMITTEE

 8   SHIBLEY RIGHTON LLP

 9   250 University Avenue, Suite 700

10   Toronto, ON  M5H 3E5

11   PER: Arthur O. Jacques, Esq.

12        Thomas McRae, Esq.

13

14   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

15   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

16   FUND

17   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

18   35th Floor

19   155 Wellington Street West

20   Toronto, ON  M5V 3H1

21   PER: Kenneth T. Rosenberg, Esq.

22        Massimo (Max) Starnino, Esq.

23        Lily Harmer, Esq.

24        Karen Jones, Esq.

25        Tina Lie, Esq.
```



```
 1        Michelle Jackson, Esq.

 2        Jacqueline Cummins, Esq.

 3

 4   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 5   CONTINUING EMPLOYEES   POST CCAA AS AT JANUARY 14,

 6   2009

 7   NELLIGAN O'BRIEN PAYNE LLP

 8   50 O'Connor Street, Suite 1500

 9   Ottawa, ON  K1P 6L2

10   PER: Janice B. Payne, Esq.

11        Steven Levitt, Esq.

12        Christopher Rootham, Esq.

13        Ainslie Benedict, Esq.

14

15   FOR MORNEAU SHEPELL LIMITED

16   MCCARTHY TETRAULT LLP

17   Suite 5300, Toronto Dominion Bank Tower

18   Toronto, ON  M5K 1E6

19   PER: Barbara J. Boake, Esq.

20        James D. Gage, Esq.

21        Elder C. Marques, Esq.

22        Paul Steep, Esq.

23        Byron Shaw, Esq.

24        Sharon Kour, Esq.

25        Kelly Peters, Esq.
```



```
 1   FOR THE CANADIAN CREDITORS COMMITTEE
 2   DLA PIPER
 3   919 North Market Street, Suite 1500
 4   Wilmington, DE  19801
 5   PER: Selinda A. Melnik, Esq.
 6        Richard Hans, Esq.
 7        Timothy Hoeffner, Esq.
 8        Farah Lisa Whitley Sebti, Esq.
 9
10   INFORMAL NORTEL NOTEHOLDER GROUP
11
12   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
13   BENNETT JONES LLP
14   1 First Canadian Place
15   Suite 3400
16   Toronto, ON  M5X 1A4
17   PER: Kevin Zych, Esq.
18        S. Richard Orzy, Esq.
19        Gavin Finlayson, Esq.
20        Richard Swan, Esq.
21        Sean Zweig, Esq.
22        Jonathan Bell, Esq.
23        Amanda McLachlan, Esq.
24
25   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
```



```
 1   MILBANK, TWEED, HADLEY, MCCLOY LLP

 2   1 Chase Manhattan Plaza

 3   New York, NY  10005

 4   PER: Thomas R. Kreller, Esq.

 5        Jennifer P. Harris, Esq.

 6        Albert A. Pisa, Esq.

 7        Samir Vora, Esq.

 8        Andrew LeBlanc, Esq.

 9        Michael Hirschfeld, Esq.

10        Atara Miller, Esq.

11        Tom Matz, Esq.

12        Nick Bassett, Esq.

13        Gabrielle Ruha, Esq.

14        Rachel Pojunas, Esq.

15

16   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

17

18   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

19   CASSELS BROCK & BLACKWELL LLP

20   Suite 2100, Scotia Plaza

21   40 King Street West

22   Toronto, ON  M5H 3C2

23   PER: Shayne Kukulowicz, Esq.

24        Michael Wunder, Esq.

25        Ryan Jacobs, Esq.
```



```
1    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

2    ASHURST LLP

3    Boardwalk House

4    5 Appold Street

5    London, England  EC2A 2HA

6    PER: Angela Pearson, Esq.

7         Antonia Croke, Esq.

8

9    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10   RICHARDS LAYTON & FINGER, P.A.

11   920 North King Street

12   Wilmington, DE  19801

13   PER: Christopher Samis, Esq.

14

15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16   AKIN GUMP STRAUSS HAUER & FELD LLP

17   One Bryant Park

18   New York, NY  10036

19   PER: Fred S. Hodara, Esq.

20        David H. Botter, Esq.

21        Abid Qureshi, Esq.

22        Robert A. Johnson, Esq.

23        Brad M. Kahn, Esq.

24        Christine Doniak, Esq.

25        Joseph Sorkin, Esq.
```



```
 1        Jacqueline Yecies, Esq.

 2

 3   UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 4   UK PENSION TRUST LIMITED

 5

 6   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 7   NETWORKS UK PENSION TRUST LIMITED

 8   THORNTON GROUT FINNIGAN LLP

 9   Suite 3200, 100 Wellington Street West

10   P.O. Box 329

11   Toronto, ON  M5K 1K7

12   PER: Michael Barrack, Esq.

13        D.J. Miller, Esq.

14        Rebecca Lewis, Esq.

15        Andrea McEwan, Esq.

16        John Finnigan, Esq.

17        Michael Shakra, Esq.

18

19   FOR THE UK PENSION PROTECTION FUND AND NORTEL

20   NETWORKS UK PENSION TRUST LIMITED

21   WILLKIE FARR & GALLAGHER LLP

22   787 Seventh Avenue

23   New York, NY  10019 6099

24   PER: Brian O'Connor, Esq.

25        Heather Schneider, Esq.
```



```
 1        Sameer Advani, Esq.

 2        Andrew Hanrahan, Esq.

 3

 4    FOR THE UK PENSION PROTECTION FUND AND NORTEL

 5    NETWORKS UK PENSION TRUST LIMITED

 6    BAYARD, P.A.

 7    222 Delaware Avenue, Suite 900

 8    Wilmington, DE  19899

 9    PER:  Charlene D. Davis, Esq.

10        Justin Alberto, Esq.

11

12    THE BANK OF NEW YORK MELLON

13

14    FOR THE BANK OF NEW YORK MELLON

15    MCMILLAN LLP

16    Brookfield Place

17    181 Bay Street, Suite 4400

18    Toronto, ON  M5J 2T3

19    PER: Sheryl E. Seigel, Esq.

20

21    FOR THE BANK OF NEW YORK MELLON

22    LATHAM & WATKINS LLP

23    885 Third Avenue

24    New York, NY  10022 4834

25    PER: Michael J. Riela, Esq.
```



```
 1   WILMINGTON TRUST, NATIONAL ASSOCIATION

 2   HEENAN BLAIKIE LLP

 3   Bay Adelaide Centre

 4   333 Bay Street, Suite 2900

 5   P.O. Box 2900

 6   Toronto, ON  M5H 2T4

 7   PER: John Salmas, Esq.

 8        Kenneth Kraft, Esq.

 9        Sara Ann Van Allen, Esq.

10

11   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

12   KATTEN MUCHIN ROSENMAN LLP

13   575 Madison Avenue

14   New York, NY  10022 2585

15   PER: Craig A. Barbarosh, Esq.

16        David A. Crichlow, Esq.

17        Karen B. Dine, Esq.

18

19   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

20   BORDEN LADNER GERVAIS LLP

21   40 King Street West

22   Toronto, ON  M5H 3Y4

23   PER: Edmond F.B. Lamek, Esq.

24        James Szumski, Esq.

25
```



```
 1   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 2   PATTERSON BELKNAP WEBB & TYLER LLP

 3   1133 Avenue of the Americas

 4   New York, NY  10036

 5   PER: Daniel A. Lowenthal, Esq.

 6

 7   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

 8   CORPORATION AND NORTEL NETWORKS LIMITED

 9   OSLER HOSKIN AND HARCOURT LLP

10   100 King Street West

11   1 First Canadian Place, Suite 6100

12   P.O. Box 50

13   Toronto, ON  M5X 1B8

14   PER: Lyndon Barnes, Esq.

15        Edward Sellers, Esq.

16        Betsy Putnam, Esq.

17        Adam Hirsh, Esq.

18        Alexander Cobb, Esq.

19

20

21

22

23

24

25
```



1

2

3

4

5     REPORTED BY:   Toronto - Kimberley Neeson

6               RPR, CRR, CSR, CBC

7          Realtime Systems Administrator

8          Delaware - Gail Inghram Verbano

9                 RDR, CRR, CSR,

10         Realtime Systems Administrator

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    I N D E X

2                    EXAMINATION

3   WITNESS:                                        PAGE

4   SIMON DANIEL BRUECKHEIMER

5        Examination-in-Chief/Direct by Mr.        1563

6        Chang

7        Cross-Examination by Mr. Rosenberg        1579

8        Cross-Examination by Ms. Hall            1593

9   PETER NEWCOMBE

10       Examination-in-Chief/Direct by Mr.        1604

11       Adler

12       Cross-Examination by Mr. Ruby            1624

13       Cross-Examination by Mr. Luft            1652

14  ANDREW WILLIAM JEFFRIES

15       Examination-in-Chief/Direct by Ms.        1659

16       Schneider

17       Cross-Examination by Mr. Ruby            1673

18       Cross-Examination by Mr. Zigler          1679

19

20

21

22

23

24

25

 Neeson & Associates     W&P

```
1                    INDEX OF EXHIBITS

2

3   NUMBER/DESCRIPTION                          PAGE

4     23:  Affidavit of Simon Brueckheimer      1565

5     dated April 9, 2014

6     24:  Affidavit of Peter Newcombe dated    1605

7     April 11, 2014

8     25:  Redacted affidavit of Andrew         1660

9     Jeffries dated March 25,2014

10    26:  U.S. Patent No. 6,870,515            1669

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   -- Upon commencing at 9:20 a.m.
 2              THE CANADIAN COURT:  Good morning,
 3   counsel.
 4              THE US COURT:  Good morning.  Good
 5   morning, Justice Newbould.  I enjoy the call of the
 6   court, although I swear I hear her saying oy vey,
 7   oy vey, oy vey.
 8              THE CANADIAN COURT:  I'm not going to
 9   touch that.
10              THE US COURT:  Okay.
11              MR. MILNE-SMITH:  Good morning, Judge
12   Gross, Justice Newbould.  It's Matthew Milne-Smith
13   on behalf of the EMEA Debtors.  The next witness,
14   Simon Brueckheimer, is a joint witness on behalf of
15   the UKP and the EMEA Debtors, and my friend
16   Mr. Chang on behalf of the UKP will be leading his
17   evidence.
18              MR. CHANG:  Good morning, Justice
19   Newbould, Judge Gross.
20              THE US COURT:  Good morning, Mr. Chang.
21              MR. CHANG:  I would like to call to the
22   stand Simon Brueckheimer.
23              SIMON DANIEL BRUECKHEIMER, having been
24   first duly affirmed, was examined and testified as
25   follows:
```



```
 1   EXAMINATION IN-CHIEF/DIRECT EXAMINATION

 2   BY MR. CHANG:

 3              Q.   Good morning, Mr. Brueckheimer.

 4              A.   Good morning.

 5              Q.   Are you a member of the UK Pension

 6   Plan?

 7              A.   Yes, I am.

 8              Q.   What's your status?

 9              A.   I am technically a deferred member

10   which means simply I haven't yet drawn my pension.

11              Q.   Are you also an inventor on a

12   number of the Nortel patents that were sold as part

13   of this bankruptcy?

14              A.   Yes, I am.

15              Q.   Approximately how many patents

16   were you an inventor on at Nortel?

17              A.   I invented approximately 50

18   patents while with Nortel, and then they were filed

19   more widely with other jurisdictions.

20              Q.   Why are you here today to give

21   testimony?

22              A.   I'm here as part -- well, as a

23   representative witness for the UK Pension

24   Claimants, the EMEA Debtors, and essentially I'd

25   like to give the court some insight in terms of how
```



1    research and development was done within Nortel

2    globally as a collaborative process, but also the

3    significant contribution that inventors in the UK

4    made towards that process.

5                    Q.   And what do you hope to accomplish

6    with your testimony?

7                    A.   Well, I hope that by giving this

8    kind of insight that there will be at least a fair

9    settlement, a recognition of the invention and the

10   value in Nortel and a fair settlement for

11   pensioners.

12                   Q.   You have in front of you a copy of

13   your affidavit.  Can you confirm for me that that

14   is the affidavit that you have submitted in this

15   action?

16                   A.   I actually don't have a copy in

17   front of me.

18                   Q.   Oh, you don't?  I apologize.  I

19   thought we had put one there.  Let me hand one up.

20                   Justice Newbould, Judge Gross, do you

21   each have a copy of the affidavit with its

22   exhibits?

23                   THE US COURT:  Yes, Mr. Chang, thank

24   you.

25                   THE CANADIAN COURT:  Yes, I do.



```
 1                    THE US COURT:  I think this would be
 2   number 22, if I'm not mistaken?
 3                    THE REGISTRAR:  Exhibit 23.
 4                    THE CANADIAN COURT:  23, thank you.
 5                    THE US COURT:  23, thank you.
 6                    EXHIBIT NO. 23:  Affidavit of Simon
 7                    Brueckheimer dated April 9, 2014.
 8                    BY MR. CHANG:
 9                    Q.   Mr. Brueckheimer, do you now have
10   a copy of your affidavit in this case?
11                    A.   I do.
12                    Q.   And is this the affidavit that you
13   signed?
14                    A.   Yes, I believe it is.
15                    Q.   And it includes Exhibits A through
16   H?
17                    A.   Yes, it does.
18                    Q.   Okay.  I'd like to start with your
19   employment at Nortel.  How long did you work at
20   Nortel?
21                    A.   Just a little over 23 years.
22                    Q.   And when did you leave Nortel?
23                    A.   I left Nortel on the 17th of
24   December 2009.
25                    Q.   For the 23 years you worked at
```



```
 1    Nortel, where were you based?
 2                    A.    I was entirely based in the UK.
 3                    Q.    I know you've detailed in
 4    paragraphs 12 through 22 of your affidavit your
 5    time at Nortel so I won't -- I won't cover those
 6    points again.
 7                    Across your 23-year career, did you
 8    work with other sites within Nortel while based in
 9    the UK?
10                    A.    Yes, absolutely.
11                    Q.    What other sites did you work
12    with?
13                    A.    I worked obviously with Ottawa, I
14    worked with Research Triangle Park, Richardson in
15    Dallas, also Menlo Park in -- yes, Menlo Park on
16    the West Coast of the US, I worked with Ireland, I
17    worked a little bit with Netas in Turkey, I worked
18    with Chateaufort in France.
19                    Q.    So to give some -- to give the
20    court some perspective on how Nortel operated and
21    the integration that it had, I'd like to have you
22    elaborate on certain parts -- certain things that
23    you discuss in your affidavit.
24                    First I'd like to start with the
25    collaboration that was involved in the research
```



```
 1    that was done.  In paragraph 40 of your affidavit,
 2    you discuss a Project Rainbow.  And we'll pull
 3    paragraph 40 on page 13 up.
 4                What was Project Rainbow?
 5                A.   Project Rainbow was a project
 6    started roughly in 1994 by Colin Beaumont who I
 7    believe was a group CTO at that time.  Being called
 8    Rainbow, obviously it comprised many colours.  Each
 9    project was given a colour.
10                And the main purpose of that project
11    was to research ATM technology, which is packet
12    technology, and in principle the project that I
13    worked on in Harlow was voice on packet technology.
14                Q.   What different sites within Nortel
15    were involved in Project Rainbow?
16                A.   Well, I believe that Harlow
17    probably had two of the projects, and more
18    laterally other colours were added to the rainbow,
19    if that's physically possible.  On the West Coast
20    they had a project and also Ottawa had the bulk of
21    the projects at two sites, the Carling campus and
22    in Kanata.
23                Q.   So this was a project that labs in
24    Canada, the US and Europe had involvement in?
25                A.   That's right.
```

Neeson & Associates    W&P

1                    Q.    You mentioned that a part of

2     Project Rainbow addressed voice over packet.  Can

3     you explain to me what that is?

4                    A.    Packet technology really came from

5     the data communications field, so it was used for

6     computers to communicate.  Now the interest was to

7     use it as a means of integrating voice, data, all

8     kinds of multimedia, and, as we can see on the

9     screens here, video, et cetera, something that

10    we've become used to.

11                   And it posed a number of challenges for

12    voice which typically could be easily distorted and

13    easily garbled by packet technology.  And

14    effectively you put voice into packet but then

15    you're putting a whole lot of other services with

16    different requirements into packet and they will

17    all bump into one another as they get transmitted

18    through the network and this creates potential

19    distortion.  So we research ways of sorting that

20    out.

21                   Q.    We've heard other witnesses talk

22    about advanced technology research at Nortel.  Was

23    this an example of -- was Project Rainbow an

24    example of advanced technology research being done?

25                   A.    Yes, I believe it is part of the



```
 1   advanced technology program funded by the group

 2   CTM.

 3               Q.   Did the collaborative work that

 4   was done for Project Rainbow lead to any patents?

 5               A.   Yes, it led to quite a number of

 6   patents.  Obviously I'm more aware of the ones in

 7   Harlow, and we probably filed in a couple of years

 8   roughly five fundamental patents associated with

 9   that technology and obviously -- well, that's

10   probably my answer.

11               Q.   In paragraph 30 of your affidavit,

12   you reference a 257 patent.  Let's pull that up.

13   US Patent number 6519257, do you see that?

14               A.   Yes, I do.

15               Q.   Is this 257 patent one of the

16   patents that came out of the work on Project

17   Rainbow?

18               A.   Yes, this patent was the

19   culmination of a lot of the research that we had

20   done in Harlow on voice on packet.  As the work

21   progressed, obviously not only did we have to solve

22   the problems of voice quality, we also had to look

23   at the whole operation and build networks on a

24   national and international scale, and this

25   particular patent embodies some fundamental
```



 1   principles necessary for controlling the whole

 2   network.

 3                  Q.   Was the technology in this patent,

 4   the 257 patent, was that put into any products?

 5                  A.   Well, indeed.  Obviously Nortel at

 6   that time didn't have any products that did voice

 7   on packet, although we were trying to build a

 8   demonstrator for this technology.

 9                  And 1997 was, I think, the first bid

10   requirement from a customer in the US, AT&T, for a

11   voice on packet network, and that led to the

12   portfolio called Succession, which was essentially

13   Nortel's whole portfolio of products, multiple

14   products for voice on packet technology networking.

15                  Q.   And how long were those Nortel

16   products in use?  And on sale?

17                  A.   Well, I believe that things such

18   as the CS-2000 product, the AS-2000 product and the

19   media gateways were sold off to Genband as part of

20   the dissolution of Nortel.

21                  Q.   Was the technology in the 257

22   patent, is that still in use today?

23                  A.   I believe it would be.  I consider

24   this patent to have at least one key principle in

25   it, which was called the separation of core control



 1    from the actual bearer traffic which runs through

 2    the packet network.

 3              And the idea there was that you don't

 4    want to have a whole lot of distributed switches as

 5    in the old world.  You want to be able to just

 6    signal where you want to go and then connect the

 7    media itself.  And these principles are in use

 8    today in internet technology voice on internet,

 9    Skype, many other products use it.

10              Q.   So am I correct that the useful

11    life of the technology that you worked on

12    developing starting in 1994 and 1995 is still

13    continuing today?

14              A.   Well, absolutely.  Certainly 1995

15    I think that patent is still in force, and

16    essentially those principles are embodied in all

17    VoIP technology today.

18              Q.   At Nortel, was it typical for --

19    well, let me turn now.  The patent that we just

20    talked about, the 257 patent, was that -- is it

21    your understanding that that was included in the

22    sale to Rockstar in this bankruptcy proceeding?

23              A.   That particular patent I have

24    looked at on USPTO and I have seen an assignment of

25    it to Rockstar.



1              Q.   Let's talk about how Nortel's

2    various sites around the world collaborated to work

3    with customers.  You mentioned in your prior answer

4    work with AT&T and you also refer to that work in

5    paragraph 62(a) of your affidavit.

6              Can you describe for me what took

7    place, how that bid with AT&T took place?

8              A.   George Smith was, I believe, the

9    account director for AT&T, and he asked, as Nortel

10   had no products for this, he asked the research

11   labs, Ottawa, Research Triangle Park and Harlow, to

12   come up with some kind of solution in early '97 in

13   a slightly tongue-in-cheek competitive kind of

14   environment between the labs.  And then he decided

15   to use the Harlow solution that we had come up

16   with.  And then he appointed me design authority

17   for the bid response.

18             We made the bid response to AT&T and we

19   filed a number of patents on the design that we had

20   put together, and I personally led the bid response

21   in their labs in New Jersey.

22             And then AT&T decided to put in a

23   second bid response.  We were shortlisted, by the

24   way.  Put in a second bid response mid-1998, and

25   again I was part of the design authority, in



```
 1   particular including our research into compressed
 2   voice technologies which allow interworking with
 3   wireless networks.
 4                   Q.   So in the context of the AT&T bid,
 5   in responding to the AT&T bid, you and Harlow led
 6   labs in Canada, the US and the UK to respond?
 7                   A.   That's right.  They flew into
 8   London and we worked together.  We were assembled
 9   in Alpharetta in Atlanta, I believe, to make that,
10   and then flew to New Jersey.  So we were
11   collaborating together and this design effectively
12   became the succession portfolio for Nortel.
13                   Q.   Was it typical at Nortel to
14   assemble teams of researchers from various sites
15   around the world to respond to customer requests?
16                   A.   Yeah, absolutely it was typical.
17   I mean, obviously if it's about current product,
18   the engineers involved would come from a line of
19   business.  If it's about something which is
20   significantly new for which there are no products,
21   the researchers would probably be involved.
22                   But in my experience on many, many bid
23   responses, for example the BT bid response in 2004,
24   again which I ran, I had 85 people reporting to me
25   from many labs around the world.
```



1              Q.    Did the work on the AT&T bid

2    response lead to any patents?

3              A.    Yes, I have said that.  In 1997 we

4    filed a family of patents and then from then on, as

5    succession evolved, I was a member of the

6    succession architecture forum to look at how

7    products within that family would work together.

8    It required a governance process.  And one of the

9    key things was maintenance of voice quality, and so

10   I again filed patents on voice quality later on.

11             Q.    If you turn to paragraph 33 of

12   your affidavit on page 11, you identify a US Patent

13   6266342.  Was this one of the patents that came out

14   of the work on the AT&T bid response?

15             A.    Yes, I believe it is.

16             Q.    And can you describe for me the

17   basic technology behind -- well, actually, let's

18   take a look at Exhibit G because that's where the

19   patent is described.

20             Exhibit G, page 8 of the document which

21   is page 5 of the Rockstar winter catalogue, is this

22   a description of your 342 patent that came out of

23   the collaboration to respond to the AT&T bid?

24             A.    Yes.  I mean, obviously Rockstar

25   may not have used the exact language of the patent,



1    but certainly from the description I can see that

2    it is and the diagram I can see it is the patent.

3                    Q.   So can you describe for me what

4    problem this patent was intended to solve?

5                    A.   This particular patent was part of

6    the system design of the product, and in this

7    particular regard, one of the key things that one

8    does in the voice on packet network is interwork

9    with the old world.

10                   So you build a thing called a media

11   gateway, and this was to essentially control echo

12   cancellation, which is a problem when delay is

13   introduced into voice, and this particular patent

14   looks at a way when you have many voice circuits of

15   distributing that load and requirement across a

16   number of limited resources, processing resources.

17                   Q.   And it appears that this is one of

18   seven patents that Rockstar chose to put in its

19   catalogue at the time?

20                   A.   Yes, as I understand the context

21   of this exhibit, it's one they tried to put up for

22   sale in 2012.

23                   Q.   Now, I'd like to ask you some

24   questions about -- going back to your time at

25   Nortel towards the end.



```
 1                    In your affidavit at paragraph 41, you
 2      end your description as of January 2009.  Was there
 3      a difference in the organization of R&D in January
 4      2009?
 5                    A.    Yes.  Well, I know for sure that
 6      John Roese left the company, he was the group CTO
 7      at the time.  And what they did was they took the
 8      central researchers and they essentially aligned
 9      them and put them in the organization of the lines
10      of business.
11                    I personally was given a choice given
12      my position within the company in terms of where I
13      wanted to go and I chose to go with Enterprise at
14      the time.  So there was no central research, it
15      came under the aegis of the lines of business at
16      that point.
17                    Q.    And the work that was being done
18      within the lines of business, that was more
19      development work at the time?
20                    A.    Historically that is true.  I
21      can't say for sure how they took the researchers
22      that had been doing central research and how they
23      directed them, but historically the emphasis
24      certainly was more on the development side.
25                    Q.    In paragraph 25 of your affidavit,
```



1   you describe the Nortel fellowship program.  Now,

2   you were -- you were a Nortel fellow; is that

3   right?

4                  A.   Yes, I suppose I am a Nortel

5   fellow as it was a lifetime honour.

6                  Q.   How many Nortel fellows were

7   there?

8                  A.   Of active employees, there were

9   nine in total.

10                  Q.   What were the responsibilities

11   generally of a Nortel fellow?

12                  A.   Well, first of all, the honour,

13   accolade, title was given to people who had made a

14   sustained contribution and also had intimate

15   knowledge of not only Nortel but the industry as a

16   whole.

17                  So that kind of accolade, just like an

18   IBM fellow or a Juniper fellow, many companies have

19   fellows, is to be an industry influencer, a thought

20   leader, essentially an outward role for the company

21   as well as an inward role as a mentor for

22   intellectual property, for research, for

23   technology.

24                  And there were annual technology forums

25   where I assumed various roles such as facilitating



```
 1   workshops and a global gathering of all the R&D
 2   people within Nortel.  I would facilitate workshops
 3   to foster ideas and collaboration among the
 4   technology staff.
 5              Q.   Your external role in, you said,
 6   representing the company, but what company were you
 7   representing?
 8              A.   I was representing Nortel.  I
 9   didn't differentiate any particular geography.  I
10   mean, for example, Nortel held an Israel forum, so
11   I happen to be Jewish, but that wasn't the reason
12   that John Roese asked me to stand in for him, he
13   couldn't attend, and I would represent John Roese
14   at the Israel forum in front of 800 delegates.
15              I also attended the Mobile World
16   Congress which is a premier gathering for the
17   mobile industry, but telecoms in general, in
18   Barcelona and I gave an address there not only on
19   behalf of Nortel but also the UK Trade and
20   Investment Organization, part of the government.
21              So, you know, I took on the mantle
22   essentially of representing the company as a whole.
23              Q.   Were your inward facing
24   responsibilities also representing Nortel as a
25   whole?
```



```
 1                    A.   Yes, absolutely.  I mean,
 2      colleagues would email me from wherever
 3      jurisdiction they were in about ideas, to which I
 4      would respond, and, as I said earlier, the annual
 5      technology forum was a global gathering, and I was
 6      essentially working with all the colleagues, you
 7      know, in the 23 years that I built up relationships
 8      with.
 9                    MR. CHANG:  Thank you,
10      Mr. Brueckheimer.  Your Honours, those are my
11      questions.
12                    THE US COURT:  Thank you, Mr. Chang.
13                    THE CANADIAN COURT:  Is there any
14      cross-examination?
15                    MR. ROSENBERG:  Very briefly.  Good
16      morning, Judge Gross, Justice Newbould.
17                    THE US COURT:  Good morning.
18                    MR. ROSENBERG:  My name is Ken
19      Rosenberg and I represent the CCC, which is a group
20      of Canadian-only creditors who only have claims in
21      the Canadian Estate.
22      CROSS-EXAMINATION BY MR. ROSENBERG:
23                    Q.   Good morning, Mr. Brueckheimer.
24                    A.   Good morning.
25                    Q.   Yesterday one of your counsel in
```

Neeson & Associates    W&F

```
 1    this matter for the UKPT, Mr. Barrack, said to a
 2    witness, and the witness agreed, that the guts of
 3    Nortel was its IP.  Would you agree with that?
 4                A.    What do you mean by "guts"?
 5                Q.    The core.
 6                A.    The entrails?
 7                Q.    It's a technical term.  I'm just
 8    using Mr. Barrack's language and I thought it was
 9    good.  The core, the core asset of Nortel was its
10    IP?
11                A.    I don't think that's the entire
12    part of Nortel that was sold.  It was certainly a
13    large part of Nortel that was sold.
14                Q.    Well, you were involved obviously
15    in creating intellectual property for Nortel?
16                A.    Yes.
17                Q.    And under the CTO, the CTO is the
18    chief technology officer?  You're familiar with
19    that concept?
20                A.    I am very familiar with CTO, yes.
21                Q.    And Mr. Roese was the CTO at the
22    time in the 2006-2007 period at Nortel?
23                A.    And 2008, yes.
24                Q.    And under his direction, the R&D,
25    the research and development of Nortel, supported
```



```
 1   its global or worldwide operations, correct?
 2              A.   Absolutely, yes.
 3              Q.   And you've described in your
 4   affidavit, projects and companies you worked with
 5   and you spoke earlier about AT&T.  You're one of
 6   the few witnesses who has actually talked about
 7   customers directly, and I'd just like to go through
 8   a few of these customers with you to understand the
 9   nature of their business.
10              And this is at paragraphs 47 and 63 of
11   your affidavit.  You discuss Vodafone?
12              A.   Yes.
13              Q.   And Vodafone, for the benefit of
14   the court, could you briefly describe Vodafone and
15   its business?
16              A.   Vodafone is a mobile network
17   operator and has a global presence.
18              Q.   And it was based in the UK,
19   Vodafone?
20              A.   Well, Vodafone I believe initially
21   started in the UK and then through many
22   acquisitions created a global presence.
23              Q.   And T-Mobile?
24              A.   T-Mobile is a mobile network
25   operator, again I am familiar with it starting in
```



```
 1   the UK, I believe it's in the US as well.  I know
 2   less about T-Mobile globally though.
 3                  Q.   And is it O2 or 02?
 4                  A.   It's O2, it's part of Telefonica.
 5   It used to be BT Cellnet, BT made the erroneous
 6   decision to sell it and Telefonica bought it and
 7   they rebranded it O2.  It's a mobile network
 8   operator in the UK.  It may have presence
 9   elsewhere.
10                  Q.   And MCI Worldcom, which is a
11   company that eventually filed for insolvency
12   protection and there are cases about it, but what
13   was your understanding of Worldcom and MCI before
14   it filed for insolvency protection?
15                  A.   My familiarity with MCI Worldcom
16   or potentially just Worldcom goes back to 1996 and
17   again in the late nineties, as I understand it, it
18   was a fixed line operator.
19                  Q.   And Sprint?
20                  A.   Sprint is a combination of things.
21   It's a fixed line operator, I believe it has a
22   wireless division as well, and it -- well, it
23   certainly has a wireless division, I addressed them
24   in roughly 2001.
25                  Q.   And Southwestern Bell is the last
```



```
 1    company you refer to.
 2                    A.    Southwestern Bell I didn't
 3    directly interact with.  I believe it is a fixed
 4    line operator.
 5                    Q.    And as you have said, many of
 6    these companies were world leaders in their
 7    business with a global footprint, correct?
 8                    A.    I'm not sure about the US
 9    companies necessarily, but certainly in the case of
10    Vodafone, a global footprint.
11                    Q.    And to sum up what I think your
12    evidence was, to put it in a phrase, I understood
13    your evidence to be that in managing and deploying
14    Nortel's global R&D resources, Nortel's vision was
15    essentially that there was one Nortel and all of
16    its resources, to use the phrase, it was all for
17    one and one for all; is that fair?
18                    A.    The Three Musketeers.  My
19    experience of working with Nortel is it was Nortel.
20    As engineers, as technologists, as inventors we
21    didn't differentiate our jurisdictions in any way.
22                    Q.    Would you agree that research that
23    resulted in innovation was a global effort at
24    Nortel?
25                    A.    At times, yes.  I mean, obviously
```

Neeson & Associates   W&P

1    there was expertise concentrated potentially in

2    certain geographies, but even if there was, you

3    know, for example density of expertise in one

4    place, it would collaborate when it needed to with

5    other places.

6            But I think the general rule was

7    expertise was distributed throughout the company.

8            Q.   Thank you.  I'd like to turn to

9    your exhibits and just do a quick page flip through

10   the exhibits.

11           At Exhibit A there is a news

12   publication -- and first, congratulations on your

13   luminary career and your silver medal, and this is

14   about your silver medal.

15           I just have a technical point.  There

16   is a phrase that comes up in the evidence and it's

17   a consultant architect at Nortel, and it's referred

18   to on page 1 of this brief.

19           My only question is, what is a

20   consultant architect and were you a consultant

21   architect?

22           A.   Yes, this is 2005, I believe, and

23   at that time I was working in what we call the

24   technology field office, which was an interface

25   between the CTO technology organization and

Neeson&Associates   W&F

1    customers, CTOs and indeed other departments with

2    customers, and in that respect I was consulting

3    between the technology of Nortel and the

4    requirements of the customer, and the title I

5    adopted at that time was consultant architect.

6                 Q.    Thank you.  I'd like you to turn

7    to tab D of your evidence and a few questions about

8    the slide deck that you put into your affidavit.

9                 This slide deck is about another award

10   that you received and others at Nortel received,

11   and at the top right-hand corner there is a logo,

12   and I just want to ask you about that logo.  Do you

13   see in the top right-hand corner there is a logo on

14   the front page of the slide deck?

15                A.    That is known in Nortel or was

16   known in Nortel as the globe mark.

17                Q.    The globe mark?

18                A.    The globe mark.

19                Q.    And why is that?

20                A.    Well, if you look at the writing

21   at the bottom, this is Nortel, it replaces the O in

22   Nortel, and it was used for quite some time as

23   representing Nortel's entire business.

24                Q.    And that's consistent with your

25   view that there was just one Nortel and everybody



1    worked for it?

2                  A.   Absolutely.  I mean, every

3    corporation that I am familiar with has a global

4    brand if they are a global operator, and they don't

5    necessarily -- while they may sell under different

6    brands, if they want to put forward a global brand,

7    they will use common branding in all jurisdictions.

8                  Q.   Just a few questions about this

9    chart, some of the people in here.  At page 5, your

10   name appears and you see you're under a Mr. Wen

11   Tong, and you, of course, were located in the UK,

12   Mr. Tong was located in Canada?

13                 A.   I believe he was based in Ottawa.

14                 Q.   Did you work with him?

15                 A.   I didn't work with Wen directly.

16   The first time I met Wen was when both of us were

17   made fellows, Nortel fellows.

18                 Q.   Okay, thank you.  I'd like to turn

19   to Exhibit C and I'll finish with Exhibit C.  We've

20   seen the global mark, the globe mark, as you call

21   it, about one Nortel, correct?  You have to say yes

22   or no.  We saw that on Exhibit D?

23                 A.   We did speak about the globe mark,

24   yes.

25                 Q.   And I understand that as a fellow,



```
 1   you perceived your role to be a role model for

 2   others at Nortel; is that fair?

 3              A.   It sounds a little conceited to

 4   say I perceived it that way, but that's what the

 5   accolade was meant to be and I hope I lived up to

 6   it.

 7              Q.   So others at Nortel perceived you

 8   as a role model for the global vision of Nortel?

 9              A.   I would hope so, yes.

10              Q.   And part of that, of course, was

11   the one Nortel?

12              A.   Well, indeed.  I mean, there was

13   no differentiation between fellows in any

14   jurisdiction.

15              Q.   And briefly, if you turn to tab --

16   or, excuse me, page 7 of this exhibit --

17              THE CANADIAN COURT:  Which tab are you

18   on?

19              MR. ROSENBERG:  I'm in tab C, Your

20   Honour.

21              THE CANADIAN COURT:  C?

22              BY MR. ROSENBERG:

23              Q.   C, which is the technical

24   fellowship of Nortel program general information,

25   and at page 7, at 6(d), do you see that?
```



```
1              A.   Six?
2              Q.   Paragraph 6(d) on page 7 of
3  Exhibit C.
4              A.   I have page 7.  I can't find 6(d).
5              THE CANADIAN COURT:  It doesn't have it
6  in mine either.
7              BY MR. ROSENBERG:
8              Q.   You don't have -- do you have a
9  heading that is 610 that says "Fellows"?
10             A.   Yes.
11             Q.   That's what I'm looking at.  Okay?
12 Do you see that, Your Honour?
13             THE CANADIAN COURT:  Yes.
14             MR. ROSENBERG:  Judge Gross?
15             THE US COURT:  Yes.
16             BY MR. ROSENBERG:
17             Q.   And it says under 610, attend
18 annual technical conference and fellows
19 recognition/induction ceremony.  But then I just
20 want to highlight the next sentence.  It says:
21             "As a Nortel fellow is expected to
22 demonstrate continued technical excellence and
23 exemplary behaviour as described below."
24             Do you see these --
25             A.   Yes.
```



```
 1                  Q.   -- three points?

 2                  A.   Yes.

 3                  Q.   And you'd agree that as a role

 4    model for the one Nortel concept, this was what was

 5    expected of you as a fellow?

 6                  A.   Yes, I agree.

 7                  Q.   Okay.  And to highlight the

 8    importance of the fellowship program, and I'll be

 9    finishing on this point, I'd like to distribute an

10    organizational chart.  I'll see if I can fit

11    through here, Your Honour.  I'm one of those

12    full-figured people.

13                  THE CANADIAN COURT:  You weren't always

14    that way, Mr. Rosenberg.

15                  MR. ROSENBERG:  No.  It's meant more

16    for defensive quarterbacks and not pulling guards.

17                  BY MR. ROSENBERG:

18                  Q.   So if we can pull up -- I'm going

19    to go technical now, Your Honour and Judge Gross,

20    and have this pulled up on the screen.  This is

21    Exhibit TR44683.02.  Just wait for the technology.

22    It wasn't my fault, I think.  Ah, here we go.  Does

23    the witness have one?

24                  There were many organizational charts

25    put in, Mr. Brueckheimer, during the course of the
```

 Neeson & Associates   W&P

```
 1   discovery process.  This is one and it's from June
 2   28th, 2006 and it sets out various positions at
 3   Nortel.
 4              And I would like you to turn to tab --
 5   excuse me, page 3 of this exhibit, and I'd like you
 6   to turn to page 6 of your Exhibit C.  We're still
 7   in the fellowship program, and at particularly 6.7.
 8   Do you see that?  It starts with CEO, CTO and staff
 9   leaders?
10        A.    Yes.
11        Q.    And to emphasize the importance of
12   your fellowship award, I just want to look at who
13   at Nortel was in their own words championing and
14   determining a fellow.  In 6.7 it says:
15              "Responsible for championing the
16   program, reviewing recommendations from the
17   technical fellowship of Nortel selection committee
18   and select final Nortel fellows."
19              It says "staff leaders include."  Are
20   you with me, Mr. Brueckheimer?
21        A.    I am.
22        Q.    And it includes people on this
23   chart, and if we just look at the chart that's up
24   on the screen in front of you, the Nortel
25   cabinet -- excuse me, the Nortel organizational
```

 Neeson&Associates   W&F Wilson & Peter Ltd.

```
 1   chart, you'll see this chart at the top starts with

 2   Mr. Zafirovski.  You were aware that at the time

 3   you received the fellowship, he was the president

 4   of the company?

 5              A.   CEO of the company.

 6              Q.   CEO.  President and CEO?

 7              A.   I wasn't aware there was a dual

 8   title.

 9              Q.   And then at 6.7 it says it

10   includes -- staff leaders include the executive

11   vice-president of corporate operations.  You will

12   see in the organizational chart there is a Dennis

13   Carey?

14              A.   Yes.

15              Q.   And the chief compliance officer,

16   you'll see at the bottom of the chart, Robert

17   Bartzokas?

18              A.   Yes.

19              Q.   And chief marketing officer just

20   to the left, and it had the chief strategy officer

21   George Riedel, and the chief financial officer at

22   the top left is Mr. Currie, and the chief legal

23   officer Mr. Drinkwater.  Do you see that?

24              A.   Yes.

25              Q.   It also has global human resources
```



```
 1   which is not on this chart, but if you went to page
 2   5 of the chart, it refers to a global human
 3   resources officer.
 4            Now, with respect -- you'll see global
 5   human resources, a Martin Cousins?  Thank you.  And
 6   finally going back to page 3, in the bottom right
 7   corner it has the chief technology officer
 8   Mr. Roese.  Do you see that?
 9            A.   Yes.
10            Q.   Now, all of these people were
11   involved in the selection of you as a Nortel
12   fellow.  Are you aware of that?
13            A.   I wasn't aware that they all were
14   involved, no.
15            Q.   But you'd agree with me, and don't
16   be self-effacing, Mr. Brueckheimer, your
17   appointment as a Nortel fellow was to support the
18   entire Nortel operations, the one Nortel?
19            A.   Yes, I would agree with that.
20            MR. ROSENBERG:  Thank you very much.
21            THE CANADIAN COURT:  Thank you,
22   Mr. Rosenberg.  Any other questions of this
23   witness?
24            MS. HALL:  Yes, Your Honour.  Good
25   morning, Justice Newbould, Judge Gross.  Laura Hall
```



```
 1   of Allen & Overy for the Monitor and Canadian

 2   Debtors.

 3   CROSS-EXAMINATION BY MS. HALL:

 4              Q.   Mr. Brueckheimer, good morning.

 5              A.   Good morning.

 6              Q.   You may recall we met at your

 7   deposition last October?

 8              A.   Yes.

 9              Q.   It's fine if you don't.  I'd just

10   like to begin with a few questions about your

11   background.  You're not a lawyer, right?

12              A.   I'm not a lawyer.

13              Q.   Not an accountant?

14              A.   Not an accountant.

15              Q.   Or a tax practitioner?

16              A.   Not a tax practitioner.

17              Q.   You're not a valuation expert?

18              A.   Valuation of what?

19              Q.   What would you consider yourself

20   an expert in valuing?

21              A.   I am not a valuation expert.

22              Q.   Okay.  While you were at Nortel,

23   you had no involvement in transfer pricing; is that

24   correct?

25              THE CANADIAN COURT:  Why are we doing
```



```
 1   this?  This witness hasn't given one piece of

 2   evidence about any of that, so why are we wasting

 3   our time doing this.

 4              MS. HALL:  Well, Your Honour, he's

 5   being offered by the EMEA Debtors as well as the

 6   UKP, and the EMEA Debtors' theory is about the

 7   contribution of R&D and their entitlement to a

 8   share of the proceeds for allocation on the basis

 9   of that.

10              I would like to show that the witness

11   can't tie his contribution in any financial sense

12   to the portion of the allocation they are entitled

13   to receive.

14              BY MS. HALL:

15              Q.  And, in fact, Mr. Brueckheimer,

16   when you were at Nortel you had never heard of the

17   MRDA or the Master Research and Development

18   Agreement?

19              A.  I don't think I ever heard of it

20   in my employment with Nortel.

21              Q.  And you weren't responsible for

22   how revenue was received or recorded?

23              A.  No.

24              Q.  Mr. Brueckheimer, while you were a

25   researcher at NNUK, you received a salary from
```



```
 1    NNUK; is that correct?
 2              A.    Yes.
 3              Q.    Would you agree that some of the
 4    research you did didn't go anywhere?
 5              A.    Yes.
 6              Q.    And sometimes you can spend a lot
 7    of time and money and not result in a patentable
 8    idea?
 9              A.    Patents are not the reason for
10    doing research.  Patents are potentially the
11    outcome of doing research.  So yes, I would say
12    that some research doesn't yield any patents.
13              Q.    Or it might lead to a patent but
14    the patent ends up having a short useful life?
15              A.    I don't agree with that, no.  It
16    depends on the nature of the patent.
17              Q.    Well, but you would agree that if
18    you're unable to develop a product that uses that
19    patent, that patent wouldn't end up having a very
20    long useful life in terms of protecting Nortel's
21    products; is that correct?
22              A.    No, I don't think so.  I think if
23    you file a patent and you see it through to
24    issuance, then it has a 20-year life, and it may
25    not be that Nortel wished to make -- take advantage
```



```
 1   of what was embodied in it, but it doesn't mean to
 2   say, you know, it's got a short life.
 3             Q.   In fact, when you were at Nortel,
 4   though, you worked with in-house counsel to cull
 5   some patents; is that correct?
 6             A.   Did you say cull?
 7             Q.   Cull, yes.
 8             A.   Yes.
 9             Q.   And that was because they weren't
10   aligned to Nortel's current or future business
11   priorities?
12             A.   So Nortel decided, yes, and they
13   asked my opinion on those patents.
14             Q.   And as a result of that decision
15   to cull those patents, Nortel stopped paying
16   maintenance payments and they were no longer
17   effective patents?
18             A.   I don't know what the outcome
19   necessarily of my recommendations were, but I would
20   be asked questions on a technical context and I
21   would respond in a technical context.
22             It's much more difficult for me to say
23   if I was asked a question, is this strategic to
24   Nortel, I would have an opinion in terms of whether
25   it was a principle, a methodology, something that's
```



1    quite general, and I would make that

2    recommendation.  But I wasn't responsible for any

3    actions taken thereafter.

4              Q.   You mention in your affidavit and

5    I believe your counsel took you to paragraph 30

6    where you talk about the 257 patent, that that

7    patent was reissued?

8              A.   Yes, I believe it was reissued.

9              Q.   You understand that re-issuance

10   doesn't extend the original patent term, correct?

11             A.   I have been told that, yes, that I

12   don't think it will extend the actual lifetime of

13   the patent.

14             Q.   And another patent of yours that

15   you discussed with your counsel was the 342 patent

16   which we saw in the Rockstar document that's at

17   Exhibit G of your affidavit?

18             A.   Yes.

19             Q.   And that is a patent that Rockstar

20   was putting up for sale in 2012, right?

21             A.   Correct.

22             Q.   While you were at Nortel did you

23   ever calculate the cost of the research that led to

24   you coming up with a patentable idea?

25             A.   No.



```
 1                    Q.    And you don't know how NNUK was

 2     compensated for your contributions?

 3                    A.    No.

 4                    Q.    You don't know how much the Nortel

 5     Group made from any of your inventions?

 6                    A.    No.

 7                    Q.    And your research group never had

 8     any revenue attributed to it because no direct

 9     sales were associated with it?

10                    A.    That's right.  Those were the

11     words that I used, I believe.

12                    Q.    And you never assessed how much

13     revenue should be attributed to it?

14                    A.    No, I don't think so.  That's a

15     difficult answer to give, though.  Did I ever

16     assess how much revenue should be associated with

17     it?  No, I don't think I determined the price of

18     anything.

19                    Q.    And you actually don't know how

20     much revenue NNUK as a whole earned at any time

21     while you were there?

22                    A.    Earned as a whole?  Do you mean in

23     terms of revenues of NNUK?

24                    Q.    Right.

25                    A.    No.
```



```
 1                    Q.    While you were at Nortel you never

 2   assessed which R&D centre was better than another

 3   or was the best?

 4                    A.    No.

 5                    Q.    Just to switch to a term you used

 6   earlier in your direct exam and I believe it's also

 7   in your affidavit, you used the term foundational

 8   patent.  Do you recall that?

 9                    A.    Yes.

10                    Q.    But you never used the term

11   foundational patent while you were at Nortel,

12   correct?

13                    A.    No, I didn't say that.  I might

14   have used the term.  It's certainly a term that I

15   would have inherited, but I talk about in my

16   affidavit a foundational patent, yes.

17                    Q.    Who would you have inherited that

18   term from?

19                    A.    Probably from the IP law group.

20                    Q.    Could we just take a look at --

21   I'll strike that.

22                    And you never conducted an analysis of

23   patents by entity while you were employed by NNUK?

24                    A.    You mean by Nortel entity?

25                    Q.    Yes.
```



```
 1                    A.    No.
 2                    Q.    If we could just look at your
 3    affidavit for a moment.  In paragraph 31, and
 4    that's page 10 of the affidavit, if you could just
 5    blow up paragraph 31.  In the second line you quote
 6    Exhibit E as stating that "Harlow-based employees
 7    contributed one out of every five patents."  Do you
 8    see that?
 9                    A.    Yes, I do.
10                    Q.    And then I won't take you there
11    but on page 8 at paragraph 28, you say that Exhibit
12    E has also been marked as a different exhibit
13    number, and that's Exhibit TR21236, so I'd like to
14    bring up that version, Exhibit TR21236, please.  If
15    you could flip to the second page of that exhibit.
16    And if you could give the witness a copy.
17                    I'm sorry, on here it's actually the
18    fourth because there was a slip sheet.  If you go
19    back one, please.  Thank you.
20                    And, Mr. Brueckheimer, do you recognize
21    this as the same draft press release that you
22    attached as Exhibit E to your affidavit?
23                    A.    The second page, yes.
24                    Q.    Yes.  And then if we could flip
25    back to the cover email, that's the first page of
```



1    this document, Mr. Brueckheimer, have you seen this

2    email before?

3              A.   I don't think so, no.

4              Q.   So you mention this document in

5    your affidavit but you weren't shown this document

6    when you were preparing your affidavit?

7              A.   I don't think I've seen the email

8    that covers it, no.

9              Q.   Okay.  If you could -- if we could

10   blow up the third paragraph, please, the person who

11   is transmitting this draft press release says:

12              "You will note that it mentions that

13   Harlow inventors contribute one of every five

14   patents to the Nortel Networks portfolio.  While we

15   do not have figures specific to Harlow, this fits

16   within the range for the UK as a whole (17

17   percent).  For the purposes of this communication

18   we did not feel it was necessary to split hairs.

19   After all, this is about marketing!"

20              Do you see that?

21              A.   Yes, I do.

22              Q.   Did you know that the line from

23   the press release that you quoted in your evidence

24   to these courts was just a marketing claim that was

25   not based on an actual study of the patents in



```
 1   Nortel's portfolio?

 2               A.   No.

 3               Q.   You can take that down, thank you.

 4               I think you mentioned earlier you're

 5   aware that Nortel's residual patent portfolio was

 6   purchased by a consortium called Rockstar?

 7               A.   Yes.

 8               Q.   And do you know that the Rockstar

 9   group has actually filed lawsuits alleging

10   infringement of certain of those patents?

11               A.   No.

12               Q.   So you're not aware that Rockstar

13   is trying to make money off of those patents it

14   purchased?

15               A.   I am not involved with Rockstar, I

16   haven't watched what Rockstar do.

17               Q.   So you're not aware they've

18   brought 11 infringement actions?

19               A.   No.

20               THE CANADIAN COURT:  He just said he

21   doesn't know.

22               BY MS. HALL:

23               Q.   Would it surprise you to learn

24   that of the inventors listed in those infringement

25   actions, and there are 48 inventors on 30 patents,
```

 1  only one of those inventors is from the United

 2  Kingdom?

 3              A.   No.  Would it surprise me?  No, I

 4  have no knowledge one way or the other.  They could

 5  be focusing on a particular technology, so no.

 6              MS. HALL:  Thank you.  Nothing further.

 7              MS. BLOCK:  We have no questions, thank

 8  you.

 9              THE CANADIAN COURT:  Anybody else?  Any

10  re-examination?

11              MR. CHANG:  No, Your Honour.

12              THE CANADIAN COURT:  Thank you,

13  Mr. Brueckheimer.  It's nice to see someone who

14  knows about all these electronics we use nowadays

15  that is not a bunch of Martians in the back room,

16  but someone with a real personality.  Thank you for

17  coming.

18              THE WITNESS:  Thank you very much

19  indeed, Your Honour.

20  -- WITNESS EXCUSED --

21              MR. ADLER:  Good morning, Judge Gross

22  and Justice Newbould.  It is Derek Adler, from

23  Hughes Hubbard & Reed, for the EMEA Debtors and the

24  Joint Administrators in Delaware.

25                  Our next witness this morning is Peter



```
 1   Newcombe.  He's here and ready to go.  But given
 2   the timing, I'm thinking it may make sense to take
 3   the morning break and then go straight through and
 4   finish with him all at once.
 5                   THE CANADIAN COURT:  No.
 6                   MR. ADLER:  But we can proceed.  I'll
 7   being guided by Your Honors.  We can do it either
 8   way, but I think --
 9                   THE CANADIAN COURT:  Why don't we just
10   keep going.
11                   MR. ADLER:  Very good.
12   PETER NEWCOMBE, having first been duly affirmed,
13       was examined and testified as follows:
14   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY
15   MR. ADLER:
16                   Q.   Thank you, Mr. Newcombe.  I
17   believe you have before you a copy of your
18   affidavit, hopefully.
19                   A.   I do.
20                   Q.   And is that the affidavit you've
21   sworn in this case?
22                   A.   Yes, it is.
23                   Q.   And do the facts stated in that
24   affidavit remain true and correct today?
25                   A.   Yes, they do.
```

 Neeson&Associates    W&P

```
 1                    THE CANADIAN COURT:  Has this been

 2   marked?

 3                    MR. ADLER:  I don't think it's been

 4   marked yet.  I believe it would be 24.

 5                    THE US COURT:  That's right.

 6                    EXHIBIT NO. 24:  Affidavit of Peter

 7                    Newcombe dated April 11, 2014

 8                    MR. ADLER:  And I'll note for Your

 9   Honors that there are some minor redactions in the

10   copy that has been handed and that the witness has

11   in front of him now.  Obviously, there are complete

12   copies in the database that you can access.  The

13   redactions are fairly minor.

14                    BY MR. ADLER:

15                    Q.   Mr. Newcombe, could you please

16   summarize for the Courts briefly just your career

17   at Nortel.

18                    A.   I became part of Nortel around

19   1990, when Nortel acquired the assets of a company

20   called STC.  I moved through various functions,

21   technology functions and sales and marketing

22   functions, leading up to early '90s, where I spent

23   two years working out of the Miami office,

24   developing business in Latin America.  And then on

25   return from Miami, I had various functions, most of
```



```
 1    them market-facing, responsible for the product

 2    organization interfacing into the market.

 3              And for the final period following

 4    administration -- filing for administration of

 5    Chapter 11, I had a direct sales role for Nortel.

 6              Q.   So when did that direct sales role

 7    begin?

 8              A.   That began in January 2009, the

 9    month of filing.

10              Q.   And when did you leave Nortel?

11              A.   I left Nortel as part of the Ciena

12    acquisition of the MENS assets in March 2010.

13              Q.   And where did you go?

14              A.   I joined Ciena.

15              Q.   Now, as part of your job at

16    Nortel, were you familiar with the research and

17    development that was done in the EMEA region?

18              A.   Yes.  I was given -- I had a role

19    that was representing products into the market; and

20    I also carried out a number of R&D audits across

21    EMEA during the period around 2000-2001.

22              Q.   Now, did the research and

23    development that was done in the EMEA region

24    contribute to Nortel's business success?

25              A.   Significantly.
```



1             Q.    Could you give us some examples of
2    important contributions that came from research and
3    development that was done in EMEA.
4             A.    I'll try not to repeat Simon's
5    testimony, which I've just seen.  I guess a couple
6    of examples, certainly in the area of photonics.
7    There's is a lot of work on coherent detection
8    systems that found their way ultimately into the
9    MEN portfolio that was sold to Ciena using
10   100-gigabit systems that made a large part of the
11   value of that transaction.  MIMO technology, which
12   is a wireless antenna technology and processing of
13   wireless signals that found its way into the LTE
14   portfolio.
15             Those would be a couple of examples.
16             Q.    Now, in your mind, is there a
17   difference between research and development?
18             A.    I think there's a big gray area in
19   the middle where the two actually transition, but
20   there are activities that can be identified purely
21   as research and purely as development.
22             Typically development is when you
23   have -- we did a product introduction process
24   within Nortel.  Typically it's when you have a
25   specific funded program that has a deliverable at



1    the end of it that you intend to take to market and

2    sell.

3              Pure research, the other end of the

4    spectrum, is when you're researching just a pure

5    technology and you have an idea of where it may be

6    applied in terms of your product development, but

7    it's really pure research.  You're looking for

8    enabling technologies that you can monetize in

9    products at a later stage.

10              Q.    Do you also use the term "advanced

11    research"?

12              A.    Yes, we do.  We tended to -- there

13    was an organization.  Most of the R&D in Nortel for

14    the last ten years reported in to the lines of

15    business, but there was a group of technologists

16    that reported into the CTO.  So that was a group

17    that actually belonged to the CTO office, and that

18    group included the advanced technology group.  That

19    varied in size through the time I was at Nortel.  I

20    think at one stage I think we had about 250, 300

21    engineers in Harlow that were part of the advanced

22    technology group, as an example.

23              Q.    So did the EMEA labs do just

24    development?

25              A.    No, certainly not.  They did pure



1    research, and they did development work.   So

2    Harlow, as I said, probably had 250, 300 engineers,

3    but there was certainly pure research work going in

4    some tiny labs.   We had seven guys in Sweden

5    working on routing algorithms for IP.   So there are

6    lots of examples I can give you.

7                    Q.   And did the EMEA labs also do what

8    you've called advanced research?

9                    A.   Yes, sorry.   That was advanced

10   research that I was talking about.   Sorry.

11                   Q.   Thank you.

12                   Now, how long would it typically take

13   to bring a product to market through the R&D

14   process?

15                   A.   If we're talking about the

16   development cycle, so when we decide on a funded

17   program where a seller deliverable was at the end

18   of it, we're going to develop a wireless base

19   station or a specific deliverable that we're going

20   to go take, sell, it would probably be three to

21   five years.   You do get anomalies that are much

22   faster, and you do get some programs that will take

23   longer.   But three to five years would be a

24   reasonable timeframe for development life cycle.

25                   Q.   How about if you add the research



1    process as well?

2                   A.   If you're doing advanced

3    technology, as we were speaking about earlier,

4    typically the time would be 10 years before you'd

5    come to market.

6                   So the MIMO technology for LTE, we were

7    researching that ten years before we shipped the

8    first LTE trial.

9                   Q.   How about for UMTS technology?

10                   A.   UMTS was the same.  We were

11    probably doing foundational research that went into

12    UMTS probably eight to ten years before we started

13    shipping UMTS.

14                   Q.   Now I'd like to talk to you a

15    little bit about the customer relationships,

16    customers at Nortel.

17                   As part of your job, did you have

18    familiarity with Nortel's relations with its

19    customers in the EMEA region?

20                   A.   Yes, I did.  Although I sat on the

21    portfolio leadership teams for the carrier networks

22    and the MEN business, I was part of the European

23    sales organization, the European cabinet, the

24    leadership team for running Europe, and my prime

25    responsibility was about driving sales of our

 Neeson&Associates    W&F

1    portfolio into the European market.  So I was

2    heavily involved in various sales campaign and

3    direct customer engagement.

4                  Q.    Now, did important Nortel

5    customers originate in the EMEA region?

6                  A.    Yes.

7                  Q.    What are some examples of those?

8                  A.    If we're talking about global

9    companies that had sales beyond the borders of

10   Europe, Vodafone would be an example; T-Mobile,

11   which is part of Deutsche Telekom Group; France

12   Telecom; Cable & Wireless.  I mean, there's a

13   number.

14                  Q.    And were your sales teams involved

15   in developing those customer relationships?

16                  A.    Yes, they were responsible for

17   marketing those relationships, yes.

18                  Q.    Now, for a communications supplier

19   like Nortel, does a relationship with a customer

20   have an ongoing value to the business?

21                  A.    It has a significant value.  It's

22   quite an investment to penetrate a specific

23   account, particularly these larger customers.

24                  Q.    So how would you characterize the

25   value to a telecommunications supplier of a



1    customer relationship?

2              A.    There's probably two elements to

3    it.  One element would be, I call intangible, which

4    is relationships, trust between individuals at

5    various levels throughout the organization;

6    understanding of informal and formal

7    decision-making process, motivators within the

8    customer.  Just a knowledge of how that customer

9    works, an intimate knowledge of how that customer

10   works.

11             The more tangible or operational, what

12   I'll call operational elements, which are things

13   like being formally standardized as a supplier to

14   the customer.

15             So some of the large operating

16   companies could have very robust processes for you

17   to become an approved supplier.  They include both

18   technical and commercial elements to them.  They

19   might include IT elements, like integration with

20   their E-procurement systems, which again, sometimes

21   they are very simple.  Sometimes they can be quite

22   complex processes that take months or as long as a

23   year to get over the hurdles involved there.

24             Q.    What's an installed base?

25             A.    Installed base in the context of

 Neeson & Associates    W&P WILSON & PETZER LTD.

1    the carrier networks business is equipment that you

2    have sold to a service provider that they typically

3    would have capitalized and they're using to provide

4    services, like a wireless base station.

5                    Q.   And does having an installed base

6    have an ongoing value to a telecommunications

7    supplier?

8                    A.   It does.  I tended to have this

9    theory that I've asserted over the last ten years,

10   tested it with many companies, that the value of a

11   business is around three things:  One, the

12   intellectual property you develop and your ability

13   to defend it; secondly, your installed base, and

14   we've spoken a little bit about that already; and

15   then third is your brand, which clearly has some

16   value.  And we know that when we talk about

17   companies like Apple and other valuable brands in

18   the market -- and there's lots of theory around

19   brand valuation.  So yes, it does have value.

20                   Q.   Now, focusing on the period after

21   the companies went into insolvency, could you

22   remind us what your role was during that period.

23                   A.   When we went into insolvency, I

24   took on responsibility, a sales responsibility for

25   northern and central Europe.

 Neeson & Associates   W&P

1              So in Nortel's world, that meant UK,

2    Netherlands, Nordics and DOH, which is Germany,

3    Austria, Switzerland and a number of other smaller

4    markets.

5              Q.   And did you have a role in the

6    sales of the lines of business?

7              A.   I did.  I was part of the Project

8    Snow, which was divestiture team for the MEN

9    assets; but I also had to provide input for the

10   sales of some of the other assets as well.

11             Q.   In relation to Project Snow, the

12   sale of the MEN business, what was your role?

13             A.   Well, we had a project team that

14   was responsible for preparing the materials, part

15   of the sales process, talking to potential buyers.

16   We had internal strategy meetings on how the

17   process was going, and I was part of that, and I

18   had to provide direct input.  As well as providing

19   counsel at the senior level, I was also providing

20   direct input on the market in the EMEA.

21             Q.   Did you participate in gathering

22   the information about the MEN business that was

23   presented to potential purchasers?

24             A.   Yes, I did.

25             Q.   And did that include information



1   about MEN's customers?

2            A.   Yes, it did.

3            Q.   What type of information was

4   gathered and presented to potential purchasers?

5            A.   I guess we collected information

6   about all of the sales revenues from customers; the

7   quality of the revenue that we had from those

8   customers.  And during the whole sales process we

9   even ended up having Q and A from various buyers

10  that was probing around the level of customer

11  intimacy you had, how well-embedded you were within

12  that specific customer.

13           Q.   And remind the Courts again who

14  had purchased the MEN business, the MEN business?

15           A.   The final auction outcome was that

16  Ciena acquired the MEN assets.

17           Q.   And did the customer relationships

18  also get transferred to Ciena?

19           A.   Yes, they did.

20           Q.   At Ciena, when you went there, did

21  you have a role in the integration of the MEN

22  business with Ciena as a whole?

23           A.   Yes, I did.  I had two primary

24  responsibilities.  One was, I was responsible for

25  the integration of the European operations into



1   Ciena as a specific set of work streams and

2   programs; and I was a project lead for that or I

3   was the executive sponsor for that.

4              The second was actually a global role,

5   which was called customer experience, which was all

6   around the transition of customers on what we

7   called day one, first day that the acquisition

8   closed, for continuity of business with those

9   customers on day one.

10             Q.   So is it fair to say that Ciena

11  made efforts to retain the customers?

12             A.   They made significant efforts.  I

13  mean, I was just going to add that I shared that

14  responsibility with a gentleman by the name of Rob

15  Newman, who sat in North America.  And what we

16  prepared was both a set of handbooks for the sales

17  organization that we worked through, adoption of

18  contracts by various groups within Ciena and how

19  the contracts were migrated over to Ciena, how

20  day-one customers could continue to place orders

21  with Ciena, how we could continue to collect cash

22  and all of the things that you'd need in a normal

23  business operation.

24             Q.   And was Ciena successful in

25  retaining the customers that it took from Nortel in



```
 1    the MEN business?

 2                    A.   I can't think of us losing a

 3    customer.  I can't think of an example of a

 4    customer we lost.  It was a very successful

 5    integration, yeah.  Having been involved in some of

 6    Nortel's acquisitions and integrations, Ciena was

 7    incredibly successful in terms of the integration.

 8                    Q.   And did Ciena also obtain

 9    technology through the MEN acquisition?

10                    A.   They did.  The -- Nortel probably

11    had two major elements of technology that came

12    across as part of the acquisition.  One was an

13    ethernet portfolio.  Ciena had a much stronger

14    ethernet portfolio, so that portfolio was

15    discontinued.

16                    The other portfolio was a high-capacity

17    transport portfolio, including the 100-gig systems,

18    which were seen as probably the jewel of some of

19    the MEN assets.  And that was -- that was -- that

20    replaced Ciena's developments in that area.

21                    Q.   So from your role inside Ciena,

22    what would you say would be the balance to Ciena of

23    the value as between the customer relationships and

24    the technology that they obtained?

25                    A.   It's very hard to put a number on
```



```
 1   it.  But the best way I could, I guess, estimate

 2   would be when we went through the sale process, we

 3   had about 16 companies that expressed an interest

 4   in buying the MEN assets.  One of those

 5   companies -- we sold -- we transferred 2200 people

 6   as part of the MEN divestiture into Ciena.

 7              We had one company that was

 8   specifically after the technology element alone,

 9   and they had identified 200 people within the MEN

10   assets that were associated with the technology,

11   and the price that they put on the table was

12   roughly half the price of Ciena's winning bid.

13              So, I mean, half, if I had to put a

14   number on it.  But I'm sure there are other experts

15   out there that would have a different opinion on

16   how you value customer versus technology.

17              Q.   Now, prior to insolvency, did you

18   have any role in relation to the strategic planning

19   for Nortel's CDMA business?

20              A.   I guess I was exposed to it at a

21   number of levels.  I was exposed to it because I

22   sat on the cabinet of the carrier networks

23   business, which included all of our wireless

24   technologies.

25              I regularly attended the corporate --
```



1   over a number of years I attended the corporate

2   strategic planning, so that's at a company level.

3   I think the chart you saw with Simon around Mike

4   Zafirovski's leadership team had a regular strategy

5   review, and I was present at a number of those that

6   included the CDMA business; and I provided input to

7   it, given that we had a few CDMA customers in

8   Europe.  It wasn't a prevalent technology in

9   Europe, but it was certainly present in Africa and

10  Russia, where we had done business.

11              Q.   And what was the outlook for the

12  CDMA business in late 2008, just before the

13  insolvency?

14              A.   It was a very healthy business.  I

15  mean, it was the profit engine of Nortel as a

16  company.  It was a market that was in decline.

17  That was one of the challenges that we faced.

18              The CDMA market had come to its natural

19  end.  It had gone through a number of technology

20  sort of cycles; and the whole of the market was

21  discussing the transition to LTE 4G wireless, or

22  LTE long-term evolution, as it's known.

23              Q.   What was the outlook for the CDMA

24  technology in late 2008?

25              A.   I mean, it was a legacy



```
 1   technology.  It was still in use, but there wasn't
 2   another level of innovation in CDMA that was about
 3   to happen.
 4              Q.   Who were the biggest customers for
 5   the CDMA business?
 6              A.   Probably the largest customers
 7   were probably Verizon, Sprint; Bell I think we did
 8   business with; and there was a long list of
 9   customers after that.  Latin America.  I mentioned
10   a couple in Europe, et cetera.
11              Q.   Where were those biggest
12   customers?
13              A.   Sprint and Verizon, both in the
14   US.
15              Q.   Did you also, prior to insolvency,
16   have a role in relation to strategic planning for
17   the GSM business?
18              A.   Yes, I did, because we had a large
19   number of GSM customers in Europe.  And at various
20   stages over the last ten years, GSM was part of my
21   product responsibility in Europe.  Product from a
22   go-to-market standpoint, not from a product
23   development standpoint.
24              Q.   And again, taking you back to late
25   2008, just before the insolvency, what was the
```



```
 1   outlook for the GSM business at that time?
 2                 A.    The GSM business was probably an
 3   advance of CDMA in terms of being at its end of
 4   natural life.  Already been we had been deploying
 5   UMTS network for a number of years, so we were at
 6   the tail end of the GSM market, the very tail end
 7   of it.  And we were looking at UMTS and then the
 8   migration of UMTS into 4G/LTE.
 9                 Q.    So what was the outlook for the
10   GSM technology at that time?
11                 A.    That was old technology, legacy,
12   defunct, whatever words you want to apply to it.
13                 Q.    Did the GSM business have
14   substantial customers?
15                 A.    There was substantial installed
16   base.  Substantial customers?  We were still
17   turning over -- you know, it was in the hundreds of
18   millions, but it was -- it was -- there weren't
19   many very large customers.  And remember, France
20   Telecom was probably still a significant customer;
21   still had business in Russia with Baykal Westcom.
22   I'll probably think of others if pushed.
23                 Q.    Who were the major customers for
24   GSM at that time?
25                 A.    France Telecom; Bouygues I didn't
```



1    mention, which is in France; Baykal Westcom in

2    Russia and others.  T-Mobile.  Didn't mention

3    T-Mobile.

4              Q.   Who bought the UMTS -- I'm

5    sorry -- the CDMA and the GSM businesses from

6    Nortel?

7              A.   Ericsson bought the CDMA assets,

8    and Ericsson bought the GSM assets with the

9    involvement of another small company, Austrian

10   company, by the name of Kapsch.

11             Q.   And did Ericsson need Nortel's

12   technology for CDMA and GSM?

13             A.   Well, I think from a strategic

14   standpoint -- and, you know, this is saying it from

15   someone who is involved in the strategic planning

16   process.  I think that their interest was primarily

17   access to the North American market.  So the

18   technology was old technology.

19             The interest is, how do I get an

20   installed base in North America, and then how do I

21   migrate that installed base from CDMA to LTE?  And

22   Ericsson had always had aspirations for the North

23   American market and not really succeeded.

24             MR. ADLER:  Thank you, Mr. Newcombe.  I

25   may be back after some further questioning of



```
 1   others.
 2               THE WITNESS:  Thank you.
 3               THE US COURT:  Thank you, Mr. Adler.
 4               Any cross-examination?
 5               MR. RUBY:  Good morning, Your Honor,
 6   Judge Gross, Justice Newbould.  Peter Ruby from the
 7   Goodmans firm for the Monitor.
 8               THE US COURT:  Mr. Ruby, welcome.
 9               MR. RUBY:  Thank you.  I should say
10   before I start, I'm happy to go on now.  I notice
11   it's past 10:30, so it's really up to the Courts
12   and the reporter whether you'd like me to launch
13   into it or wait.
14               THE US COURT:  I'm fine to take a break
15   if Justice Newbould is fine with that.
16               THE CANADIAN COURT:  That's fine.
17   We'll take a break.
18               THE US COURT:  All right.  Why don't we
19   take our 20-minute break and then we'll return.
20   And you can take a break as well, Mr. Newcombe.
21   -- RECESS AT 10:36 A.M. --
22   -- UPON RESUMING AT 10:54 A.M. --
23               THE US COURT:  Mr. Ruby, we'll start as
24   soon as Justice Newbould takes the bench.
25               MR. RUBY:  Thank you, Judge Gross.
```



```
 1                    THE US COURT:  Everybody ready?
 2   All right, Mr. Ruby, you may proceed, sir.  Thank
 3   you.
 4                    MR. RUBY:  Thank you, Judge Gross.
 5   CROSS-EXAMINATION BY MR. RUBY:
 6   CROSS-EXAMINATION BY MR. RUBY:
 7                    Q.   Good morning, Mr. Newcombe.
 8                    A.   Good morning.
 9                    Q.   Sir, you ended your Nortel career
10   in the MEN business; is that right?
11                    A.   I was part of that divestiture,
12   yes.
13                    Q.   And that business carried on some
14   of the work you'd been doing with respect to
15   optical and carrier ethernet technologies?
16                    A.   "Carried on," you mean in the
17   context that once it was in Ciena?
18                    Q.   Well, I was thinking of more --
19                    A.   That was the method of its
20   operation, yes.  Yes, it was optical and ethernet,
21   yes, predominantly.
22                    Q.   And that's something you'd been
23   working on for decades; is that fair?
24                    A.   Yes, that's fair.
25                    Q.   Now, this morning my friend
```



1   Mr. Adler solicited from you your opinions on the

2   valuation of some of Nortel's businesses and

3   technologies.  Do you remember that?

4                    A.    He asked for a data point and I

5   gave him one, yes.

6                    Q.    Are you saying you did not offer

7   your opinion about the valuation of Nortel

8   businesses and technology?

9                    A.    I think my opinion was that there

10  are many ways of valuing a business, and a data

11  point was my experience from the MEN divestiture.

12                   Q.    Now, you were never responsible

13  for valuing Nortel's intellectual property in any

14  way; is that right?

15                   A.    That's correct.

16                   Q.    And I take it you have no

17  valuation credentials?

18                   A.    Only through the experiences we've

19  had in buying and selling companies.  So no, I'm

20  not a finance person, no.

21                   Q.    And you have no certification from

22  any organization as a business valuator?

23                   A.    No.

24                   Q.    Or as a technology valuator?

25                   A.    No.



```
 1                    Q.    Or as an intellectual property

 2    valuator?

 3                    A.    No.

 4                    Q.    And I take it that before

 5    expressing the valuation opinions you did this

 6    morning, you did not consult any textbook about

 7    valuation theory?

 8                    A.    No.

 9                    Q.    You did not do any study with

10    respect to valuation in the Nortel context?

11                    A.    Only through the experience, as

12    I've said before, of buying and selling.  So I've

13    been part of the acquisitions and I've been part of

14    the divestitures.  That's my only experience.

15                    Q.    You did not provide a report to

16    the Court, clearly, on your valuation opinions;

17    correct?

18                    A.    No.

19                    Q.    And as well, it's nowhere in the

20    affidavit that you provided to the Court the

21    valuation opinions you expressed this morning;

22    correct?

23                    A.    That's correct.

24                    Q.    Now, since about 1991, you have

25    not been -- or sorry.  Let me try that again.
```



```
 1                    Since about 1991, you were not in
 2    Nortel's R&D department?
 3                    A.    That's correct.
 4                    Q.    And again, since 1991 you were not
 5    doing any research and development at Nortel
 6    personally; correct?
 7                    A.    Since 1991?  That's correct; I
 8    wasn't.
 9                    Q.    And just to put a bookmark on the
10    end of your career with Nortel, that was in 2010;
11    correct?
12                    A.    March 2010; correct.
13                    Q.    Now, I take it also, just to deal
14    with some of the things you said this morning, that
15    you had no responsibility for the filing of patents
16    or the enforcement of patents by any Nortel entity;
17    correct?
18                    A.    That's correct.
19                    Q.    And your only involvement at
20    Nortel with respect to patents was that you once
21    gave out some patent awards?
22                    A.    Correct.
23                    Q.    Now, earlier this week the Courts
24    heard from a witness who called himself a tax guy.
25    Is it fair to say you're a sales guy?
```



```
 1                    A.   Some people perceive me as a sales
 2     guy.  Some people perceive me as a technology guy.
 3     I'm probably closer to sales than technology.
 4                    Q.   Fair enough.  You think of
 5     yourself as a sales guy?
 6                    A.   Not anymore.  But anyway, okay, I
 7     think of myself as a general manager.  But anyway,
 8     that's semantics.
 9                    Q.   Let me try it another way.  Since
10     2000 your only role at Nortel was either in sales
11     or managing a sales organization; is that fair?
12                    A.   Actually, no; I was seen as the
13     representative of the lines of business within
14     EMEA.
15                    Q.   And when you say "representative
16     of the lines of business," that was with respect to
17     business development and sales; correct?
18                    A.   That's correct.  Technical sales.
19                    Q.   And all of your experience at
20     Nortel was in the EMEA region, except for a
21     two-year stint with respect to Central America and
22     Latin America; is that right?
23                    A.   And about a year when I was
24     responsible for marketing across world trade, which
25     includes Latin America and Asia, as well as EMEA.
```



1                    Q.    Fair enough.  But not North
2      America?
3                    A.    No.
4                    Q.    And you never had a role with
5      global responsibility?
6                    A.    Just making sure before I say no.
7      But I can't recall one, that's correct.
8                    Q.    Now, you're an electrical
9      engineer; is that right?
10                   A.    By education, yes.  I have a
11     degree in electronics.
12                   Q.    And I take it you found that
13     helpful during your years at Nortel, to be an
14     electrical engineer by training?
15                   A.    Yes, it was useful.
16                   Q.    And it was useful because it
17     helped advance your career?
18                   A.    My first roles within -- when I
19     left university were in technical roles.  So yes.
20                   Q.    And I take it it was also helpful
21     that, as an electrical engineer, you could
22     understand better the technology you were selling?
23                   A.    I had to -- in a technical sales
24     role, you have to understand a significant depth.
25     So yes.

 Neeson&Associates    W&F

```
 1                    Q.    Now, we talked a little bit about
 2    how at Nortel you were focused on optical and
 3    carrier networks technology.
 4                    I take it you participated in the
 5    selling of Nortel hardware?
 6                    A.    Yes, I did.
 7                    Q.    And you participated in selling
 8    licenses to Nortel software?
 9                    A.    Yes, I did.
10                    Q.    And that software, can we agree,
11    usually ran on Nortel hardware?
12                    A.    Usually, yes.
13                    Q.    And you also participated in the
14    sale of related Nortel services?
15                    A.    That's correct.
16                    Q.    Now, I take it that to be able to
17    sell Nortel technology, you and your sales team
18    needed to be able to describe that technology to
19    customers; is that fair?
20                    A.    Yes.
21                    Q.    And you needed to be able to
22    describe it to potential customers in sufficient
23    detail for them to know how that technology would
24    operate?
25                    A.    Correct, yes.
```



```
 1                    Q.   And your ability and your sales

 2    organization's ability to make sales would have

 3    been considerably hampered if you were prevented

 4    from giving to potential customers such a

 5    description; is that right?

 6                    A.   That's correct.

 7                    Q.   I'd like to move to a slightly

 8    different topic.  Do you have a copy of your

 9    affidavit in front of you, sir?

10                    A.   Yes, I do.

11                    Q.   If we can pull up paragraph 27 --

12    and if you could take a look at it, sir -- of your

13    affidavit, please.  You'll see in the

14    second-to-last sentence you say:

15                    "We would occasionally take

16                    customers around our laboratories to

17                    see our engineers and our processes."

18                    Do you see that that there, sir?

19                    A.   I do.

20                    Q.   I take it that customers in the

21    field in which you worked needed to be comfortable

22    that Nortel was developing the next generation of

23    technology?

24                    A.   Yes.

25                    Q.   It was important to your sales
```



```
 1    efforts to not only have great current products but

 2    able to show future great products were coming?

 3                    A.    That's correct.

 4                    Q.    And it was also important to show

 5    customers that even beyond products, that basic

 6    research was being done in fields of interest to

 7    the customers; correct?

 8                    A.    It varied by portfolio; but in

 9    general terms, yes.

10                    Q.    Well, certainly with respect to

11    optical and carrier networks in which you worked?

12                    A.    Yes, yes.

13                    Q.    Now, if we go on, the next

14    sentence at paragraph 27 is:

15                    "It was often very helpful in

16                    cultivating customer relationships to

17                    introduce a prolific inventor, such as

18                    Simon Brueckheimer, to a potential or

19                    existing client."

20                    Do you see that there?

21                    A.    I do.

22                    Q.    Were you here for

23    Mr. Brueckheimer's testimony?

24                    A.    I was.  I'm smiling because I

25    didn't remember in my affidavit specifically
```



```
 1    mentioning Simon.  So that's why I'm smiling to
 2    myself.
 3                   Yes, I was.
 4                   Q.    I take it you know each other?
 5                   A.    Yes, we do.
 6                   Q.    You have a lot of respect for him?
 7                   A.    I do, yes.
 8                   Q.    Now, part of what Mr. Brueckheimer
 9    did was pure research; is that right?
10                   A.    Yes, it was.
11                   Q.    Now, eventually the MEN line of
12    business was sold to Ciena in March 2010?
13                   A.    That's correct.  That's when the
14    transaction closed.
15                   Q.    Can you just take a second and
16    describe to the Court maybe in a sentence or two
17    what the MEN business was.
18                   A.    Predominantly optical transmission
19    systems.  So I think I described this in my
20    affidavit.  These are systems that transport
21    information typically between points in a city,
22    around the city and between cities.
23                   Q.    Thank you.
24                   And I take it from your evidence
25    earlier today that you had a role in preparing
```



1   materials for potential buyers of the MEN line of

2   business?

3           A.   Yes, that's correct.

4           Q.   And in particular, you were

5   consulted during that sales process about the

6   potential buyer's interest in the MEN customers?

7           A.   Yes; that's correct.

8           Q.   That made sense because you were

9   the sales guy?

10          A.   Correct.

11          Q.   And can we take it that, with

12  respect to technology or research and development,

13  there were people on the Nortel team who were

14  consulted about potential buyers' interest in

15  research and development?

16          A.   That's correct.

17          Q.   And that's in the context of the

18  MEN business?

19          A.   Yes.

20          Q.   Now, we heard a little bit this

21  morning about your views about -- I don't want to

22  put words in your mouth, but my words are the

23  "life" of technology at Nortel.  Do you remember

24  that?

25          A.   I do; correct.  Yes.



```
 1                    Q.   Now, is it fair to say that as

 2   long as Nortel's technology was being sold, it was

 3   being continuously updated and enhanced?

 4                    A.   Well, or replaced.  I mean, there

 5   are instances where technology reaches the end of

 6   its useful life and you move on to something that

 7   can do the job in a better way.  So I would add

 8   "replaced" as well as "enhanced."

 9                    Q.   That's fair enough.  And an

10   example of that is CDMA, you told us, was nearing

11   the end of its life?

12                    A.   Moved to LTE, correct.

13                    Q.   Terrific.  And LTE, in your

14   example, is the replacement technology for CDMA?

15                    A.   Correct.

16                    Q.   And both the CDMA and LTE

17   technologies and related business were sold to

18   Ericsson; is that fair?

19                    A.   There was a small part of the LTE

20   core business, I think, was sold to Hitachi.  But

21   yes, the majority of it went to Ericsson; correct.

22                    Q.   Thank you.

23                    And I take it that when we're talking

24   about technology, at least with what you're talking

25   about is the technology with respect to which you
```



```
1    have substantial experience; namely, optical mainly

2    and maybe some carrier networks.  Is that fair?

3              A.   Carrier including wireless and

4    fixed, yes.

5              Q.   But that's the area in which you

6    have experience; correct?

7              A.   Wireless, fixed and optical

8    systems; correct --

9              Q.   Now, when you say "wireless" --

10             A.   Yes.

11             Q.   -- you never worked in the CDMA

12   line of business; is that right?

13             A.   I worked as part of the carrier

14   networks cabinet team, which included CDMA, UMTS,

15   GSM --

16             Q.   I see.

17             A.   -- and LTE.

18             Q.   But in terms of your sales

19   responsibilities --

20             A.   Yes.

21             Q.   -- it was with respect to optical

22   and carrier networks technologies; is that right?

23             A.   And carrier networks in Nortel's

24   definition included wireless.  Richard Lowe was the

25   general manager of that business.  It included
```

 Neeson & Associates    W&F

```
 1    wireless and fixed.
 2                 Q.    Fair enough.   Thank you for that
 3    clarification.
 4                 So in the area of the technologies with
 5    which you're familiar, sometimes a technology
 6    stretched over multiple life cycles?
 7                 A.    When you say "technology," do you
 8    mean a product or a piece of foundation technology?
 9                 Q.    Let me rephrase that.
10                 Sometimes research and development was
11    done that then stretched over multiple life cycles
12    of technology?
13                 A.    That's true, yes.
14                 Q.    And sometime the research and
15    development was used for many years?
16                 A.    Yes.
17                 Q.    Or maybe I should say the fruits
18    of the research and development were used for many
19    years.   Is that better?
20                 A.    Yes.  Yes.
21                 Q.    And sometimes on other occasions
22    the research and development never bore fruit at
23    all in terms of a product; right?
24                 A.    That's correct.
25                 Q.    And sometimes the research and
```



```
 1    development got used only for a handful of years?

 2              A.   That's correct.

 3              Q.   Sorry.  You told us that you moved

 4    to the sales organization in 1991; right?

 5              A.   No.  I said in -- I'm getting

 6    confused now.  I moved in -- January 2009 I moved

 7    into the sales organization, with a direct -- in my

 8    affidavit, I did have a year in sales in 1991, I

 9    think it was.

10              Now, let's pause for a moment here.

11    When are you talking about just post-filing, I

12    moved into the sales organization.  That was the

13    last time I moved into the sales organization.

14              Q.   No.  I'm happy to help you with

15    this.  If you go back to the beginning of your

16    career, you graduated as an electrical engineer?

17              A.   I did.  Electronics engineer, yes.

18              Q.   Electronics engineer.  Thank you.

19              Then you went and you worked for STC?

20              A.   That's correct.

21              Q.   In a, it sounded from the

22    affidavit, like a crossover engineering/sales role?

23              A.   I moved from a product role into a

24    sales role for a brief period of time, and then I

25    moved into a business development role.
```



 1                    Q.   And then since 1991 you've either
 2   been doing business development, sales or managing
 3   a sales organization?
 4                    A.   Or a technical sales, a technical
 5   sales role, yes.
 6                    Q.   Thank you.
 7                    So I take it then that since -- well,
 8   let me ask you this:  Even back in the old days,
 9   two decades ago, were you ever doing R&D?
10                    A.   Yes, small amount of R&D.  I did
11   some work on developing some software, and I had a
12   project in developing some test equipment as part
13   of verification in the R&D organization.
14                    Q.   And that was back before 1991?
15                    A.   Yes, that was way back when.
16                    Q.   Thank you.
17                    So since you moved away from R&D, will
18   you agree with me that you deferred to the
19   continuing R&D employees at Nortel about the useful
20   life of Nortel's technology?
21                    A.   Yes, with the exception that I'd
22   like to point out that I was regularly auditing the
23   lab infrastructure within Europe in terms of its
24   effectiveness.
25                    Q.   On its -- pardon me?



 1                    A.    Effectiveness.

 2                    Q.    On its effectiveness.

 3                    But in terms of its useful life, you'd

 4    agree with me that a survey of the R&D employees at

 5    any given time of the useful life, of their views

 6    of the useful life of Nortel technology, is the

 7    best indicator of what that useful life is;

 8    correct?

 9                    A.    I'm not sure I would.  And the

10    reason I say that is because if you ask someone in

11    the advanced technology organization that was

12    filing IP, they very rarely thought of it beyond

13    the technical element of it.  So to them it was a

14    piece of technology they had developed.  Engineers

15    became very -- interrelationship to a product and

16    the monetization of that product was abstract to

17    them.

18                    Q.    So the best way to do this would

19    be to survey a variety of R&D employees at Nortel?

20                    A.    Well, actually, the people that

21    were responsible for productizing the value would

22    probably be a product line manager within Nortel.

23                    Q.    Okay.  So, sir, just follow me

24    here.  I'm not asking about products.  I'm asking

25    about research and development, the life, useful

1    life of research and development.

2              The best way to determine the useful

3    life, in your view, would be to survey the people

4    doing research and development?

5              A.   I think you need a broader

6    canvass.  But it's a fair way of doing it.  Let's

7    leave it at that.

8              Q.   I'm happy to leave it at that.

9              And I take it you were never involved

10   in a study of the useful life of R&D done by EMEA

11   engineers?

12             A.   You mean intellectual property or

13   R&D development?

14             Q.   R&D.

15             A.   R&D in a sense, as part of the

16   audit that we did.  There was an element of it to

17   that audit that we did, but not in the context of

18   intellectual property, no.

19             Q.   So the audit was with respect to

20   products?

21             A.   It was.  It was looking at the

22   output of the various labs, what they produced and

23   how that translated into value for the company.

24   That was part of the audit that we did.

25             Q.   Because, of course, much R&D



```
 1   doesn't actually end up in a product or have value
 2   to the company?
 3              A.   Yes, some of it is common art --
 4   well, we won't get to the detail.  It would be a
 5   long answer.  But yes, that's correct.  Some R&D
 6   doesn't find its way into products.
 7              Q.   I'm sure there's another lawyer
 8   here.  If they want the long answer, they'll ask
 9   you.  But I'm content with the short one.
10              And I take it also that you never
11   studied useful life at R&D outside the EMEA region?
12              A.   No.  Well, actually bear in mind
13   that I was part of the cabinet team for the carrier
14   networks and MEN business.  It was a regular
15   discussion as part of that cabinet.  How effective
16   our R&D was and useful life of R&D were regular
17   discussions during those forums.
18              Q.   During R&D?  You mean products?
19   The cabinets were focused on products; right?
20              A.   No, R&D.  The R&D organizations
21   reported in to the line of business presidents.  So
22   the R&D organization didn't report into CTO.  It
23   reported into the line of business presidents, with
24   the exception of advanced technology.
25              Q.   I understand.  So what I'm asking
```



1    you, sir, though, is, did you ever do a study on

2    the useful life?

3                    A.    No.    That wasn't my role.

4                    Q.    That's fair enough.    Thank you.

5                    Moving to another subject, sir, toward

6    the end of 2007, you thought that some of your

7    customers' confidence in Nortel began to be shaken?

8                    A.    I think that's what I said in my

9    affidavit, yes.

10                   Q.    And I think you also said

11   something to the effect that you thought that at

12   least some of them were worried about Nortel's

13   finances?

14                   A.    That's correct.    It wasn't just

15   Nortel, but certainly Nortel, yes.

16                   Q.    And you and your team had to help

17   them work through those concerns?

18                   A.    Well, there were different members

19   doing it.    But I can remember presenting to

20   customers on the stability of Nortel, the structure

21   of our debt, when the debt repayment were due, cash

22   flow.    So yes, those kinds of things.

23                   Q.    The message you were trying to

24   send them is Nortel is financially solid, don't

25   worry?



```
 1                    A.   Well, yeah.  I think it's, We're
 2   solid enough that there's no need to panic.  I
 3   think that that was the way in which I'd
 4   characterize it.
 5                    Q.   You didn't try to put it a little
 6   higher than "don't panic"?
 7                    A.   No, I don't think you could -- you
 8   know, we're talking about educated customers.  And
 9   if you presented to someone within a finance
10   organization of a customer, they can look at a
11   company balance sheet and understand it, and they
12   can look at an analyst report and understand it.
13                    Q.   So let me make sure I understand
14   this right.
15                    A.   We are not trying to outsmart a
16   finance guy.
17                    Q.   I get it.  Which you're not;
18   right?
19                    A.   No.
20                    Q.   So my understanding of your
21   answer -- and just correct me if I'm wrong -- is
22   you showed them the financial data --
23                    A.   Yes.
24                    Q.   -- trusting that they would
25   realize that Nortel was sufficiently financially
```



```
1   stable?
2              A.   And I can articulate the strategy
3   of the company, yes.
4              Q.   Thank you.
5              Now, by January 2009 --
6              A.   Yes.
7              Q.   -- which you'll recognize is about
8   the time of the filings for insolvency --
9              A.   Yes.
10             Q.   -- Nortel had successfully managed
11  to hold on to many of its key customer
12  relationships; is that right?
13             A.   We had, yes.
14             Q.   And that included the customers
15  who had been, my words, skittish, back in 2007?
16             A.   I think we'd lost our single-
17  vendor position in a number of customers, but we
18  still had supply arrangements with those customers,
19  yes.
20             Q.   Sir, if you could look at
21  Exhibit C to your affidavit.
22             MR. RUBY:  And if I can ask Judge Gross
23  and Justice Newbould to turn that up.  What I'm
24  going to do is -- some of this document has been
25  redacted.  So what I'd like to do is hand around
```



1   just a selection of the pages, and this way we can

2   try and avoid any concerns.  One of them is still

3   redacted, but we'll use the redacted version.

4               THE US COURT:  All right.  Thank you,

5   Mr. Ruby.  That makes sense.

6               MR. RUBY:  Justice Newbould, do you

7   have a copy now?

8               THE CANADIAN COURT:  I do.

9               MR. RUBY:  Thank you.

10              BY MR. RUBY:

11              Q.   Now, first of all, Exhibit C is

12   something you rely on in your affidavit?

13              A.   I do refer to it, yes.

14              Q.   And just for the Courts'

15   reference, in the database this is Exhibit TR48945.

16              And I take it that this slide deck is

17   accurate.  Is that right?

18              A.   Yes.

19              Q.   And it accurately conveys the

20   state of play with the MEN business in

21   October 2009, which is the date of the slide deck?

22              A.   That's correct.

23              Q.   Now, this was a teaser

24   presentation that was provided to potential

25   customers of the MEN business; right?



```
 1                    A.    That's correct.

 2                    Q.    And it sets out the key attributes

 3     of the MEN business?

 4                    A.    Yes, it does.

 5                    Q.    Now, if we can in the excerpts

 6     turn to -- well, if we look at page 4 just for a

 7     moment, under the heading "Sales" in the middle of

 8     the page, that's you smack in the middle of the

 9     page?

10                    A.    Yes, that's me.  The intention was

11     that I would lead the sales organization as part of

12     the MEN divestiture.  I didn't lead at that time,

13     but that was the intention.  I didn't have the

14     account managers working for me.

15                    Q.    You look much better in person,

16     sir.

17                    A.    Thank you.

18                    Q.    If you turn to page 30 of the

19     slide decks or the excerpts that I've provided,

20     please, now, you see that all the names at the

21     bottom of customers have been redacted.

22                    A.    Yes.

23                    Q.    But you're familiar with who they

24     are; right?

25                    A.    I am, yes.
```



```
1                  Q.   And these are the top 20 customers
2    of the MEN business --
3                  A.   Yes.
4                  Q.   -- in October 2009?
5                  A.   Correct.
6                  Q.   And without saying in open court
7    the names of any of those customers --
8                  A.   Okay.
9                  Q.   -- so we don't bring the wrath of
10   anybody down on us, can we agree that the customers
11   you mention had concerns in 2007 are all on this
12   list of top 20 customers at page 30?
13                 A.   Customers -- yes.
14                 Q.   And I'm happy if you wanted to,
15   the names of the people you said were concerned are
16   all in your affidavit.
17                 A.   Yes.
18                 Q.   I just -- we're in the awkward
19   position of I can't tell you who any of them are.
20                 A.   Yes, that's fine.
21                 Q.   But you know?
22                 A.   Yes, I know who they are, yes.
23                 Q.   Okay.  So they're all top 20
24   customers by the time 2009 rolls around?
25                 A.   Correct.
```


Neeson & Associates    W&F

```
 1                    Q.    Now, if we turn to page 60,
 2    please, of the same slide deck, I take it from this
 3    slide that the MEN business plan was projected to
 4    continue about the same amount of R&D in 2009 and
 5    2010 as it had done in 2008.  Is that fair?
 6                    A.    That's what the slide says, yes.
 7                    Q.    But that's consistent with your
 8    recollection as well?
 9                    A.    It is, yes.  There was some
10    adjustments, but that's typical of running --
11                    Q.    And that's because, to engage in
12    the MEN business, you had to do R&D?
13                    A.    Correct.
14                    Q.    And that was expected to continue?
15                    A.    That's right, yes.
16                    Q.    Now, go backwards to Slide 54,
17    please.  This is the MEN carve-out employees by
18    country.  And this is really the last point, sir,
19    I'd like to cover with you.  I think we can learn a
20    few things from this slide.
21                    First of all, do you see where in the
22    left-hand column it lists 15 UK R&D employees for
23    MEN?
24                    A.    Correct.
25                    Q.    To run the MEN business, did you
```



```
 1   need those 15 UK employees?

 2            A.   By this stage -- I'm trying to

 3   think what that group were doing.

 4            Probably --probably yes, to be honest

 5   with you, because we had shut down most of the R&D

 6   facilities in Europe, and anything that was left at

 7   this stage was pretty critical.  So the answer is

 8   probably, yes.

 9            Q.   Okay.  And what about the three US

10   MEN employees?  Did you need them?

11            A.   I would -- I don't know.

12            Q.   Fair enough.

13            And I won't ask you to the number.  But

14   if you look, it says that there were 981 MEN R&D

15   employees in Canada in October 2009.  Did you need

16   most of those employees --

17            A.   Yes, yes.

18            Q.   -- to run the MEN business?

19            A.   Of course, yes.

20            Q.   Now, I take it that the US

21   entities -- these are the US Nortel entities?

22            A.   Okay.

23            Q.   Sorry.  Let me withdraw that and

24   try again.

25            We know that Ciena actually bought the
```



```
 1    MEN business.
 2                A.   Yes.
 3                Q.   But if it hadn't, we could agree
 4    that the US Nortel entities could not have operated
 5    the MEN business for any significant amount of time
 6    without most of the Canadian R&D employees; isn't
 7    that right?
 8                A.   If I understand your question
 9    correctly, yes.  You couldn't have carved out just
10    the US employees; that's correct.
11                Q.   Well, the US companies could not
12    have run Nortel's MEN business without the
13    Canadians, if I can put it that way.
14                A.   Yes, yes.
15                Q.   And we can agree -- let me see if
16    I can help you with this.  You see the column at
17    the bottom of the MEN R&D column is 1,001
18    employees?
19                A.   Correct.
20                Q.   And you see under "sales and
21    business development" there are 279?
22                A.   Yes.
23                Q.   Now, does it accord with your
24    recollection that in October 2009, the MEN line of
25    business had about three and a half as many times
```

Neeson&Associates   W&F

```
 1   R&D employees as sales and business development

 2   employees?

 3               A.   It sounds high; but yes, it does.

 4               Q.   Roughly right?

 5               A.   Yeah, roughly right.

 6               MR. RUBY:  Those are all my questions,

 7   sir, at the moment.  Thank you.

 8               A.   Thank you.

 9               THE US COURT:  When you're ready, you

10   may proceed.

11               MR. LUFT:  Thank you.  Good morning,

12   Judge Gross.  Good morning, Justice Newbould.  Avi

13   Luft, from Cleary Gottlieb Steen & Hamilton, on

14   behalf of the US Debtor.

15   CROSS-EXAMINATION BY MR. LUFT:

16               Q.   Good morning, Mr. Newcombe.  How

17   are you?

18               A.   Good morning.  Good, thank you.

19               Q.   Good.  I just want pick up on

20   something my colleague Mr. Ruby said right before.

21   He said you're just a sales guy.  Do you remember

22   that?

23               A.   I do.

24               Q.   Right.  Now, the way Nortel

25   generated money was selling products and services;
```



```
 1   correct?
 2             A.   Correct.
 3             Q.   And those sales were done by the
 4   sales guys?
 5             A.   That's correct.
 6             Q.   And, in fact, Nortel wasn't the
 7   only technology company in the world, was it?
 8             A.   No.
 9             Q.   They have competitors?
10             A.   That's correct.
11             Q.   And they also have R&D and
12   technology?
13             A.   That's correct.
14             Q.   And when you're faced with
15   competition, the relationship a salesperson may
16   have with a customer, in fact, often is the reason
17   you get a sale or don't get a sale; correct?
18             A.   That's correct.
19             Q.   The salespeople were significant
20   value-adds to Nortel's ability to make money;
21   correct?
22             A.   That's correct.
23             Q.   And, in fact, those customer
24   relationships and their ability to generate revenue
25   for Nortel was one of the specific selling points
```



1    that you put to potential buyers when they are

2    considering buying Nortel's lines of business;

3    correct?

4                A.   That's correct.

5                Q.   In fact, I believe in your

6    affidavit you refer to them as a key selling point;

7    is that right?

8                A.   That's correct.  Yes.

9                Q.   Right?  So when you were selling

10   to potential buyers of Nortel's line of business,

11   you weren't just offering them Nortel's technology,

12   were you?

13               A.   No.

14               Q.   You were also offering them

15   customer relationships?

16               A.   Yes.

17               Q.   Distribution channels?

18               A.   Yes.

19               Q.   Money value from the customer

20   contracts?

21               A.   Yes.

22               Q.   The value of Nortel's customer-

23   facing people?

24               A.   That's correct.

25               Q.   And that's all those sales guys



```
 1   doing that work, isn't it?
 2                A.   That's correct.
 3                Q.   Those sales guys were incredibly
 4   valuable to Nortel?
 5                A.   Yes, they were.
 6                Q.   And they're incredibly valuable to
 7   someone who is thinking about buying Nortel's
 8   businesses, weren't they?
 9                A.   That's correct, yes.
10                Q.   Now, when you were making those
11   sales pitches to people considering buying Nortel's
12   lines of business, you focused on Nortel's blue-
13   chip customers; right?
14                A.   That's correct.
15                Q.   And I know Mr. Ruby raised some of
16   the confi issues, and I'm operating under the same
17   rubric, so I'm going to try to avoid having any
18   names come out.
19                A.   Okay.
20                Q.   But you do put in testimony in
21   paragraph 51 of your affidavit about specific
22   customers who were in EMEA?
23                A.   Yes.
24                Q.   Right?  And, in fact, there was
25   similarly very valuable blue-chip customers in the
```



```
 1   US region; correct?
 2               A.   Correct.
 3               Q.   In fact, some of the largest -- we
 4   don't have to name them -- but were US customers;
 5   correct?
 6               A.   That's correct.
 7               Q.   And when companies were looking to
 8   buy Nortel's lines of business, they were also
 9   looking to buy those blue-chip customer
10   relationships; correct?
11               A.   Are we talking about in the MEN
12   context or all of the businesses?
13               The majority of the trade sales, yes.
14               Q.   Now, I want to just -- do you
15   still have the chart Mr. Ruby just put in front of
16   you about the employees by country?
17               A.   I do.
18               Q.   And this is in Exhibit C, for the
19   record, to Mr. Newcombe's affidavit.
20               And Mr. Ruby focused on the R&D
21   numbers; right?  Do you recall that?
22               A.   Yes, I do.
23               Q.   Do you know what sales business
24   development -- what that line item refers to?
25               A.   Yes, I do.
```



```
1                    Q.   And what is that?

2                    A.   These are the people within the

3     technical sales and the sales organization that

4     managed those customer relationships.

5                    Q.   The people who actually go out and

6     make money for Nortel; is that correct?

7                    A.   That's correct.

8                    Q.   Do you see there are almost three

9     times as many people in the United States as in

10    Canada?

11                   A.   Yes, I do.

12                   MR. LUFT:  I have no further questions

13    at this point.  Thank you, Mr. Newcombe.

14                   THE US COURT:  Thank you, Mr. Luft.

15                   Anyone else?  Mr. Adler?

16                   MR. ADLER:  No redirect, Your Honors.

17    I guess we can excuse the witness, then.

18                   THE US COURT:  Yes, yes, we certainly

19    can.  Thank you.  Thank you very much.

20                   THE WITNESS:  Thank you.

21                   THE US COURT:  Mr. Newcombe, you may

22    step down, sir.

23    -- WITNESS EXCUSED --

24                   THE US COURT:  Good morning.

25                   MS. SCHNEIDER:  Good morning, Judge
```

Neeson & Associates    W&F

```
 1   Gross and Justice Newbould.  My name is Heather
 2   Schneider, from Willkie Farr & Gallagher,
 3   representing the UK Pension Claimants.  And if
 4   we're ready to go, we have the next witness
 5   available here in the courtroom.
 6             THE US COURT:  I think we should
 7   continue.
 8             Justice Newbould, are you in agreement?
 9             THE CANADIAN COURT:  If that's what you
10   think, then that's what we'll do.
11             MS. SCHNEIDER:  Excellent.
12   Mr. Jeffries.
13             THE US COURT:  That's a lot of pressure
14   on me.  All right.  Thank you, Ms. Schneider.
15   ANDREW WILLIAM JEFFRIES, having first been duly
16    affirmed, was examined and testified as follows:
17             MS. SCHNEIDER:  Okay, your Honors.
18   While we get set up, we're going to hand
19   Mr. Jeffries a copy of his affidavit.  I believe
20   you have one, Judge Gross?
21             THE US COURT:  I do.
22             MS. SCHNEIDER:  And maybe we can go
23   ahead and get you one, Justice Newbould.  Do you
24   have a copy of Mr. Jeffries' affidavit?
25             THE CANADIAN COURT:  I do.
```



```
 1                    MS. SCHNEIDER:  Great.
 2                    THE CANADIAN COURT:  I've got two
 3     copies:  One said to be redacted and one not.  I
 4     don't know.
 5                    MS. SCHNEIDER:  The one that
 6     Mr. Jeffries has has been redacted, and he's aware
 7     of the confidentiality issues.  If anything comes
 8     up, we'll address them as they come.
 9                    THE US COURT:  All right,
10     Ms. Schneider.  Thank you.
11     EXAMINATION IN CHIEF/DIRECT EXAMINATION BY
12     MS. SCHNEIDER:
13            Q.   Mr. Jeffries, I just have about
14     ten minutes of questions for you so that you can
15     help explain some of the technology and acronyms
16     that are in affidavit to the Courts.
17                    But before we get into the details,
18     could you let the judges know how long you worked
19     at Nortel.
20                    THE CANADIAN COURT:  Ms.  Schneider,
21     before we get wound up here, which one are we going
22     to mark as an exhibit?
23                    MS. SCHNEIDER:  Let's mark the redacted
24     one as an exhibit, because that's the one that
25     Mr. Jeffries has.
```



```
 1                  THE REGISTRAR:  Can I clarify?  Is the
 2   redacted version the one with Tabs A, B and C?
 3                  THE CANADIAN COURT:  Yes, it seems to
 4   be.  Mine is.
 5                  THE US COURT:  I have mine redacted,
 6   yes.  We'll mark this 24.
 7                  THE REGISTRAR:  Exhibit 25.
 8                  THE US COURT:  25. Thank you.
 9                  THE CANADIAN COURT:  Thank you.
10                  EXHIBIT NO. 25:  Redacted affidavit
11                  of Andrew Jeffries dated March 25,
12                  2014.
13                  BY MS. SCHNEIDER:
14                  Q.   Now that we have that housekeeping
15   in order, Mr. Jeffries, could you tell the Courts
16   how long you worked at Nortel.
17                  A.   Okay.  I worked on the Harlow site
18   for about 30 years.
19                  Q.   Did that include Nortel and its
20   predecessor companies?
21                  A.   Yes, that's right.  So I was at
22   STC from 1979 until 1991, with a small break, and
23   then with Nortel from then on.
24                  Q.   And what is STC?
25                  A.   STC was a large UK telecom company
```

 Neeson & Associates    W&P Wilson & Peltzer Ltd.

1    at the time.

2              Q.   And what kind of work had STC been

3    doing before it was acquired by Nortel?

4              A.   It was fairly diverse.  It had a

5    submarine business.  It had a military wireless

6    business.  It had a components business, components

7    distribution business.

8    -- OFF THE RECORD DISCUSSION --

9              MS. SCHNEIDER:  Let us know if you have

10   any problems hearing.

11             BY MS. SCHNEIDER:

12             Q.   Now, Mr. Jeffries, in your

13   affidavit you discuss your work history at length,

14   and I don't want to repeat that, but I did want to

15   ask you about your work in the wireless technology

16   labs.

17             What were those labs?

18             A.   Okay.  In 1995 Al Javed in Ottawa

19   set up Nortel's wireless technology labs, and

20   included in that a couple of the groups over in

21   Harlow, technology groups.

22             Q.   Were there wireless labs located

23   in other locations around the world?

24             A.   That's right.  So we had labs in

25   Harlow and in Ottawa and in Richardson, near



1    Dallas, as well.

2              Q.   Did people in the wireless

3    technology labs work together across different

4    locations?

5              A.   Very much so.  We had a matrix

6    system of organizing ourselves.  So you would have

7    managers that would look after particular skill

8    groups.  And then you would have, say, project

9    managers that worked across those skill groups and

10   across various sites to get a job done.

11             Q.   Mr. Jeffries, were you a manager

12   in the wireless technology labs?

13             A.   Yes.  I became a department

14   manager in about 1998, and I got promoted to senior

15   manager in about 2005.

16             Q.   When you were a manager in the

17   wireless technology labs, did you manage any

18   cross-border projects?

19             A.   Yes.  There was -- a particular

20   example was a program which looked at the very

21   early development of MIMO in the late '90s and

22   early 2000s.

23             Q.   We'll unpack that a little bit.

24   But for the Courts' reference, could you turn to

25   paragraph 39 of your affidavit.  And we've brought



1    that up on the screen as well.  It's on page 13.

2              A.    Oh, paragraph 39, sorry.

3              Q.    And is the project that you're

4    discussing in paragraph 39 of your affidavit the

5    cross-border MIMO project you were just referring

6    to?

7              A.    Yes, that's right.

8              Q.    And could you explain to the

9    Courts what MIMO is.

10              A.    So MIMO -- a normal wireless

11   system up to that time would basically have a

12   single transmit antenna talking to a receiver,

13   which could have a number of receive antennas; one

14   or two was typical.

15              With MIMO what you did was you split

16   your transmitter into multiple antennas.  So now

17   you've got, as MIMO stands for, a multiple

18   input/multiple output.  You've got multiple

19   transmit antennas talking to multiple receive

20   antennas.  And what that means is that you can get

21   a much greater capacity on the link, you can get

22   much higher data rates, and you can get a much

23   greater range in the system.

24              Q.    What kind of work did your

25   cross-border team do on MIMO?



```
 1                    A.   So in the late '90s, Bell Labs
 2    discovered, if you like, the idea of MIMO.  This
 3    wasn't a Nortel discovery.
 4                    But Al Javed came along to our group,
 5    because he knew that we'd got some very good
 6    theoretical people, to try and understand what MIMO
 7    could do for Nortel's wireless.  So we started off
 8    a study to try and understand the technology; and
 9    that then led into a prototype program the
10    following year where I had a -- which I ran.  I ran
11    the program.  I had a team in Harlow where we
12    developed the MIMO algorithms.  And then I had a
13    team in Ottawa where we actually put those
14    algorithms into some existing equipment that we had
15    there so we could actually demonstrate.
16                    And from that demonstration basically
17    came the world's first over-the-air demonstration
18    of MIMO using, at the time it was a CDMA air
19    interface.
20                    Q.   You referred to that as the
21    world's first over-the-air demonstration.  Was this
22    over-the-air demonstration a wireless
23    demonstration?
24                    A.   Yes.  Yes, very much so.
25                    Q.   And prior to your demonstration,
```



1    had anyone ever done that before?

2                    A.   Not that type of demonstration

3    with CDMA, no.  People often used simulations or

4    they would use hardware to simulate the wireless

5    propagation channel.  But they hadn't done what we

6    did at all.

7                    Q.   Does MIMO relate to current

8    fourth-generation technologies like LTE?

9                    A.   Very much so.  It is fundamental,

10   to -- they're discriminatory, if you like, as to

11   what fourth-generation technologies are.  So both

12   WiMAX and LTE employ MIMO in their wireless air

13   interface.

14                   Q.   And is MIMO used in LTE today?

15                   A.   Yes.

16                   Q.   Now, another topic you discuss in

17   your affidavit is patents, and I'd like to direct

18   your attention to paragraph 22.  We'll bring the

19   bottom of the page up on the screen as well.

20                   And do you see there, Mr. Jeffries, you

21   mention that "Patent filings, and specifically

22   early patent filings, were very important to

23   Nortel."

24                   Did people in your wireless technology

25   labs file patents?



```
 1                    A.    Yes, very much so.

 2                    Q.    And did they file early patent

 3      filings, as you reference in your affidavit?

 4                    A.    Yes.  It's a key thing that we

 5      were encouraged to do.  It was a fundamental remit

 6      of the wireless technology labs to develop new

 7      technologies so you were automatically studying and

 8      patenting things at a very early stage.

 9                    Q.    Did anyone in your wireless

10      technology labs file patents that could relate to

11      LTE technology?

12                    A.    There were many at the time that

13      subsequently could have been applied to LTE.  Of

14      course, LTE didn't exist or wasn't even thought of

15      at the time.  But yes.

16                    Q.    Now, you discuss a number of

17      patents in your affidavit.  I just want to ask you

18      about one that you could explain to the Courts.

19                    So if you could turn to paragraph 42.

20                    THE CANADIAN COURT:  Can I just ask a

21      question before you go on.

22                    When you say that you were involved in

23      patent filing, what does that mean, "patent

24      filing," for you?

25                    THE WITNESS:  So from an engineer's
```



```
 1   perspective, that would involve doing the basic
 2   work, capturing that on what we called at the time
 3   a disclosure invention form.  That would go through
 4   some sort of patent review body where it would be
 5   scored, and that would incorporate people from the
 6   IP law department.  And then if that was deemed to
 7   be worthwhile pursuing, then that would be passed
 8   on to patent agents who would craft the formal
 9   patent, and that would then go through the formal
10   patent system.
11               THE US COURT:  Does that answer your
12   question, Justice Newbould?
13               THE CANADIAN COURT:  Well, the reason I
14   asked that question was because we've heard
15   evidence that it was Nortel Canada that actually
16   obtained the patents.  That's why I was asking you
17   that question.
18               BY MS. SCHNEIDER:
19               Q.   Are you familiar, Mr. Jeffries,
20   who you assigned -- taking a step back, you
21   invented some patents at Nortel; correct?
22               A.   Yes.
23               Q.   About how many patents are you
24   named an inventor on?
25               A.   About ten or so.
```



```
 1                        Q.   And do you recall who you assigned
 2      the patents to?
 3                        A.   Not explicitly.  We knew that they
 4      were assigned to Nortel not us.  That was part of
 5      our employment contracts.  But the detailed
 6      corporate structures, as an engineer, you didn't
 7      worry about.
 8                        Q.   Did you have any understanding, as
 9      an engineer, of what particular legal entity you
10      were assigning your patent to?
11                        A.   No, not really.
12                        MS. SCHNEIDER:  Do you have any other
13      questions on that, Justice Newbould?
14                        THE CANADIAN COURT:  (No response.)
15                        BY MS. SCHNEIDER:
16                        Q.   So drawing your attention back to
17      paragraph 42 in this section, you talk about a
18      number of patents that resulted from the Harlow
19      team's development of further MIMO and antenna
20      technologies.  And I want to ask you about the
21      first one that's listed there under letter A.
22                        MS. SCHNEIDER:  And this is a publicly
23      available document referenced in his affidavit, but
24      we have brought copies for the Court and Justice
25      Newbould and the witness, if you can hand him one.
```



```
 1   We have some extras for people in the courtroom as
 2   well.  And we can bring it up on the screen
 3              Mr. Jeffries, I suppose we should mark
 4   this as a trial exhibit, Your Honors, No. 26?
 5              THE US COURT:  Is it part of the data?
 6              MS. SCHNEIDER:  It's not actually
 7   marked as a trial exhibit at the moment, so it
 8   might be best to mark it as an exhibit now.
 9              THE US COURT:  Any objection from
10   anyone?
11              MS. SCHWEITZER:  No, Your Honor.
12              THE US COURT:  All right.  It will be
13   Exhibit 26.  Thank you, Ms. Schneider.
14              MS. SCHNEIDER:  Thank you.
15              EXHIBIT NO. 26:  U.S. Patent No.
16              6,870,515.
17              BY MS. SCHNEIDER:
18              Q.   Mr. Jeffries, you'll see we also
19   pulled it up on the screen.  What country was this
20   patent filed in?
21              A.   This was filed in the US.
22              Q.   And when did this particular
23   patent issue?
24              A.   It was March 2005.
25              Q.   And if you look down to the list
```



```
 1   of inventors, who was Dean Kitchener?
 2              A.   So Dean Kitchener was one of the
 3   senior staff in the wireless technology labs in
 4   Harlow.  He was an expert in antenna design and in
 5   radio propagation.
 6              Q.   What is radio propagation?
 7              A.   So that is the means by which the
 8   electrical signal, if you like, gets from the
 9   transmit antenna through to the receive antenna.
10   So the propagation medium is actually the key thing
11   that determines the whole of the wireless system
12   performance.
13              Q.   Looking at the next inventor,
14   Martin Smith.  Who was he?
15              A.   Martin Smith at the time was Dean
16   Kitchener's manager.  He was a senior adviser;
17   again, expert in antenna design and in radio
18   propagation.
19              Q.   And finally, who was Chris Ward,
20   the last named inventor there?
21              A.   Chris Ward was another senior
22   adviser within the wireless technology labs at
23   Harlow.  His particular expertise was in advanced
24   digital signal processing and, in particular, in
25   smart antennas.
```



1              Q.    And you worked with all of these

2     gentlemen in Harlow?

3              A.    Yes.

4              Q.    And I believe you co-invented some

5     patents with some of them as well; correct?

6              A.    Yes, that's right.

7              Q.    And drawing your attention a

8     little further down the page, when was this patent

9     filed?

10             A.    This was filed in October 2001.

11             Q.    And when was the work done that

12    was related to this patent?

13             A.    So typically it would have been

14    around about the year 2000 for this.

15             Q.    And you were working on MIMO as

16    well at this time; correct?

17             A.    Yes.  That was a period that I was

18    managing the joint program between -- that I've

19    already mentioned between Harlow and Ottawa.

20             Q.    Could this patent be used in an

21    LTE system?

22             A.    Yes.

23             Q.    And what kind of problem was this

24    patent meant to solve?

25             A.    One of the key problems that you



```
1   get with MIMO, and as I've said, you need more
2   transmit antennas.  And that's the problem, because
3   if you look at cell masts, nobody likes to see
4   hundreds of antennas up there.  So it gets very
5   difficult to get planning permission.  So
6   especially if you want to do smart antennas as
7   well, you need lots of antenna elements.
8              So a key observation in this patent was
9   instead of, for example, having two transmit
10  antennas that were spatially separated by some
11  degree, you could actually use polarization in the
12  medium.  So instead of what I'm showing as vertical
13  polarization, you could have two orthogonal
14  polarizations, and that would mean then that you
15  could put those into a single antenna column; and
16  you've saved a lot of space, you've saved a lot of
17  cost, and you've made the system viable to sell, if
18  you like.
19             Q.   And is that kind of technology in
20  use today?
21             A.   Yes.  And it was also effectively
22  built into the final smart antenna design that we
23  did for Nortel that, in 2009, was going to be on
24  the LTE product portfolio as the SDMA antenna.  So
25  that was just about to be trialed with Verizon at
```

 Neeson & Associates    W&F

```
 1   the time.
 2              Q.   Mr. Jeffries, as part of your
 3   review of this patent, did you look at the publicly
 4   available assignment information?
 5              A.   Yes.
 6              Q.   From the patent office Website?
 7              A.   Yes, that's right.
 8              Q.   And based on your review, did you
 9   know if this particular patent was assigned to
10   Rockstar as part of the bankruptcy procedure?
11              A.   I believe it was.
12              Q.   And then based on your view, do
13   you know who owns this patent today?
14              A.   I believe that was Apple.
15              MS. SCHNEIDER:  I have no further
16   questions, Your Honors.
17              THE US COURT:  All right.  Thank you,
18   Ms. Schneider.
19              Any cross-examination?
20              Mr. Ruby.
21   CROSS-EXAMINATION BY MR. RUBY:
22              Q.   Good morning, Mr. Jeffries.  My
23   name is Peter Ruby from the Goodmans firm on behalf
24   of the Monitor.
25              A.   Good morning.
```



```
 1                    Q.   I should be able to be very brief
 2    with you.
 3                    Is it fair to say that you've worked
 4    almost exclusively during your career with Nortel
 5    on advanced radio systems?
 6                    A.   Yes.
 7                    Q.   And were you here earlier when
 8    Mr. Newcombe testified?
 9                    A.   Yes.
10                    Q.   So you heard his testimony?
11                    A.   Yes.
12                    Q.   So we talked --
13                    A.   Some of it.
14                    Q.   Okay.  Well, did you hear the part
15    where we talked about there was a witness who
16    called himself a tax guy?
17                    A.   Right, yes.
18                    Q.   And Mr. Newcombe we called a sales
19    guy?  You heard --
20                    THE CANADIAN COURT:  I think it was you
21    who called him a tax guy, Mr. Ruby.  And I was
22    wondering whether you were a sales guy or a legal
23    guy.
24                    MR. RUBY:  Well, aren't they the same
25    thing, Justice Newbould?
```



```
 1                    BY MR. RUBY:
 2               Q.   So is it fair to call you an
 3    advanced radio systems guy?
 4               A.   Yes.
 5               Q.   And your entire career has been
 6    doing R&D or managing R&D?
 7               A.   Yes.
 8               Q.   Now, I only bring this up because
 9    you talk about valuable patents in your affidavit.
10    I take it you're not a professional valuator?
11               A.   Correct.
12               Q.   And you have no formal valuation
13    credentials?
14               A.   No.
15               Q.   No experience valuing technology
16    or patents?
17               A.   No.
18               Q.   And just to complete the picture,
19    you have no formal education in finance?
20               A.   No.
21               Q.   Or accounting?
22               A.   No.
23               MR. RUBY:   So Justice Newbould, I only
24    have one follow-on question from the question you
25    asked about the patent filings.
```



```
 1               BY MR. RUBY:
 2               Q.   Sir, if you have paragraph 22 of
 3     your affidavit in front of you -- my friend asked
 4     you about this a little bit earlier.  And you
 5     described for the Courts what you meant by patent
 6     filings.
 7               And I just want to make sure that we
 8     understand that when you use the term "patent
 9     filings" in your affidavit, it includes filing and
10     prosecuting applications for patents.
11               A.   Sorry.  Say again?
12               Q.   Okay.
13               A.   Repeat that, please.
14               Q.   Let me try this again.
15               You described, in other words, what you
16     meant by "patent filings."  I just want to make
17     sure that included in there, in the words "patent
18     filings," are filing and prosecuting applications
19     for patents.
20               A.   The manner in which I intended
21     that was when you actually had a patent granted.
22     That is what gives you the ability to trade with
23     other companies, if you like.
24               Q.   I don't mean to make this more
25     complicated.  When --
```



```
 1                    A.   I believe the answer to your

 2   question is yes.   I also explained what I intended.

 3                    Q.   I am fully capable of taking a

 4   "yes."  Thank you.

 5                    And that's on all that subject, because

 6   Justice Newbould covered it.

 7                    So if we can talk for a moment about

 8   R&D, your affidavit talks about the number of

 9   patents filed with respect to inventions made by

10   your group in the UK?

11                    A.   Yes.

12                    Q.   And I take it we can agree that

13   R&D engineers at Nortel labs in Canada also created

14   patentable inventions?

15                    A.   Yes, absolutely.

16                    Q.   And they did so with respect to

17   wireless technologies, among other things?

18                    A.   Yes.

19                    Q.   Advanced radio systems, too?

20                    A.   Yes.

21                    Q.   And you don't know how many

22   wireless patents were issued out of Ottawa?

23                    A.   No.

24                    Q.   And you don't know how many or the

25   quality of the patents issued out of Ottawa in any
```



```
 1   field of Nortel technology; correct?

 2               A.   Correct.

 3               Q.   And I take it from your answers --

 4   and correct me if I'm wrong -- that you're not

 5   trying to compare Nortel R&D engineers in the UK

 6   versus Canada, or the US for that matter?

 7               A.   No, precisely.  There was never --

 8   there was never any sort of competition, if you

 9   like, between them.  The job was, as a team, to do

10   the best we could.  And that was what was hammered

11   into us through Nortel's core values:  That you

12   work together to get the best for Nortel.

13               So if some of the work that we did

14   might have sparked an idea in Ottawa that

15   ultimately led to a patent there, fine.  That's not

16   a problem.

17               Q.   And the same the other way around:

18   If R&D was done in Ottawa or in Texas that sparked

19   an idea in the UK, that was great, too?

20               A.   Yes, that's right.  And we

21   regularly communicated with each to try to make

22   sure that sort of thing happened.

23               Q.   And my last -- I shouldn't say

24   that, but hopefully my last question, sir, is, I

25   take it that also you don't mean to compare the
```



```
 1   quality or quantity of the research and development

 2   as between the UK, Canada or the US for that

 3   matter?

 4              A.   No.

 5              MR. RUBY:  Thank you, sir.  Those are

 6   my questions.

 7              THE US COURT:  Thank you, Mr. Ruby.

 8   Anyone else?

 9              Good afternoon.

10              MR. ZIGLER:  Good afternoon, Judge

11   Gross.  And good afternoon, Justice Newbould.  Mark

12   Zigler of Koskie Minsky for the CCC.

13              THE US COURT:  Yes, sir.  Good to have

14   you here.

15   CROSS-EXAMINATION BY MR. ZIGLER:

16              Q.   Mr. Jeffries, I'm asking you to

17   turn up paragraph 16 of your affidavit for a

18   moment.  It says you're currently in receipt of a

19   pension from the Nortel UK pension plan; is that

20   correct?

21              A.   Yes, that's correct.

22              Q.   And how long have you been in

23   receipt of that pension?

24              A.   Two to three years.  I can't

25   remember it precisely, but two to three years.
```


Neeson&Associates   W&F

```
 1                    Q.   And has your pension been reduced
 2    in any way?
 3                    A.   Yes, it has.
 4                    Q.   And how?
 5                    A.   The UK pension plan is basically
 6    being paid -- or the UK pension is being paid by
 7    the Pension Protection Fund in the UK --
 8                    Q.   And my question is whether you've
 9    taken a reduction in your pension.
10                    A.   Yes, and I was explaining.
11                    Q.   Sorry.
12                    A.   And the PPF payment rules were
13    different to Nortel's payment rules.  And,
14    therefore, the pension I'm getting at the moment is
15    slightly less than I would have.
16                    Q.   You say slightly less?
17                    A.   At the moment.  But the future
18    payments will be substantially less.
19                    Q.   And the reduction is simply based
20    on the loss of indexing?
21                    A.   Exactly, yes.
22                    Q.   But the principal value of the
23    pension remains the same?
24                    A.   It remains the same, given if I
25    had to retire at the same time.
```



1               Q.   You go on to say, in paragraph 16,
2    that it was your understanding that the Nortel
3    Group as a whole was responsible for funding your
4    pension?
5               A.   That was our understanding.
6               Q.   What is the source of that
7    understanding?
8               A.   The initial -- I guess the initial
9    presentation of that would have been when we were
10   taken over by Nortel.
11              Q.   So you're saying someone in 1991
12   told you that Nortel Group as a whole outside of
13   the UK was responsible for your pension?
14              A.   There were management briefings at
15   the time to all staff.  We were told that our terms
16   and conditions were essentially unchanged.  They
17   were -- and that we would continue with our pension
18   arrangements, and that Nortel would be paying into
19   the pension.
20              Q.   Were you told which Nortel
21   entities were paying your pension?
22              A.   I can't remember exactly.  This is
23   1991.
24              MR. ZIGLER:  I understand.  Thank you,
25   sir.  I have no further questions.



```
 1                    THE US COURT:  All right, Mr. Zigler.
 2   Thank you.
 3                    MS. SCHWEITZER:  I have no questions.
 4   I think we're finished with the witness, unless
 5   there's anyone else in the room.
 6                    MS. SCHNEIDER:  I have no further
 7   direct questions, Your Honors.
 8                    THE US COURT:  Thank you,
 9   Ms. Schneider.
10                    Well, you may step down, and we thank
11   you for your testimony.
12   -- WITNESS EXCUSED --
13                    MS. SCHWEITZER:  Your Honors, I believe
14   this is the last witness for today, so we are
15   ending early.
16                    And tomorrow -- I've been trying to
17   read emails, impolitely probably, as the hearing
18   was going on, to figure out what's going on with
19   tomorrow.  There was time reserved -- I guess the
20   Canadian Debtors had asked that time be reserved in
21   case confidentiality issues needed to be brought
22   before Your Honors.
23                    THE US COURT:  Yes.
24                    MS. SCHWEITZER:  My understanding, just
25   to give you a one-minute update, is that obviously
```



1   we're all very pleased that we've had a very open

2   and public trial to now, and I think we've all

3   navigated the confidentiality issues quite

4   successfully up to now.

5            Obviously, there's constant backing and

6   forthing with buyers.  There's one buyer counsel in

7   particular I saw emails flying back and forth

8   today.  I'm not sure if they'll want to bring

9   anything forward, but there's nothing forward

10  formal to be filed.  It's just an ongoing process

11  of trying to work through practical issues.

12           So I'm not sure that that buyer wants

13  to be heard on anything tomorrow, but that

14  obviously is always ongoing in terms of just

15  navigating through confidentiality issues.

16           My understanding also, the CRA, we've

17  been talking to them.  We've isolated a set of

18  documents that they have concerns about.  So far

19  we've been trying to just handle that on a

20  practical level rather than further orders or

21  submissions.  I've seen, again, emails in the last

22  24, 48 hours of whether people prefer an order or

23  want to seek formal relief as opposed to continuing

24  to march forward on a practical basis as issues

25  arise.



```
 1                  So I don't have a final answer right
 2      now, because I know other people are emailing and
 3      talking, whether someone wants to be heard.  I
 4      don't want to, obviously, preclude any party's
 5      right to be heard.  But is it possible for us just
 6      to update your Honors' chambers later?
 7                  THE US COURT:  I think that's how we
 8      should proceed, since we don't know for certain
 9      whether we need time tomorrow or not at this point.
10                  MS. SCHWEITZER:  Would Your Honors be
11      amenable, now that Justice Newbould has heard the
12      term, to a telephonic conference if we thought that
13      that was more practical in accordance with what the
14      parties wish to heard on?
15                  THE CANADIAN COURT:  Fine by me.
16                  I have a question of Mr. Barrack,
17      really, and that is, what's the latest state of
18      play with Professor Westbrook?
19                  MS. BARRACK:  My good buddy,
20      Mr. Qureshi, and I will come forward together, arm
21      in arm.
22                  MR. QURESHI:  Not quite, but getting
23      closer.
24                  THE CANADIAN COURT:  Are you saying
25      you've settled the case?
```



```
 1                MS. BARRACK:  You know, I had some
 2    suggestions on that earlier.
 3                We are talking, and we're trying to
 4    follow the three Cs of the commercial list.  And if
 5    we can't work it out, we would like to address it
 6    first thing Tuesday morning, but we are going to
 7    try --
 8                THE CANADIAN COURT:  Tuesday morning.
 9    All right.  I was wondering, because at one point
10    you were talking about tomorrow morning.  That's
11    why I was asking you.
12                MR. QURESHI:  No.  We'll put it off
13    until Tuesday.  No need to convene just for that.
14                THE CANADIAN COURT:  Okay.  Thank you.
15                THE US COURT:  All right.  So we would
16    be able to proceed by telephone tomorrow, assuming
17    we need time.  And we'll know that by the end of
18    the day or -- yes, I think that's probably --
19                MS. SCHWEITZER:  Yes, we'll make sure
20    to tell you by the end of the day today.  And
21    obviously if a party feels it important to appear
22    personally before you, we again don't mean to
23    preclude it.  But I just wanted to know whether the
24    telephonic appearance is an option so that we can
25    offer it if it's consistent with what people want.
```

 Neeson & Associates   W&P Wilson & Peyzer Ltd.

```
 1                    THE US COURT:  Absolutely.  That would
 2      make sense.
 3                    THE CANADIAN COURT:  I assume it will
 4      be in the morning.
 5                    MS. SCHWEITZER:  Yes, preferably.  In
 6      the US it's our turn to have a long, three-day
 7      weekend.  So we would love the morning.
 8                    THE US COURT:  You're disappointing me,
 9      Ms. Sweitzer.
10                    MS. SCHWEITZER:  It's three more
11      working days until the next trial date.
12                    THE US COURT:  That's right.  Do you
13      want to start a little bit later than 9 o'clock for
14      the hearings if we have one, the teleconference?
15                    MS. SCHWEITZER:  Again, not having
16      everyone in the courtroom, can we pencil it in for
17      10 o'clock in the morning if we need to go forward?
18                    THE US COURT:  Yes.  Is that fine,
19      Justice Newbould?
20                    THE CANADIAN COURT:  That's fine.
21                    THE US COURT:  Okay, good.
22                    MS. SCHWEITZER:  Perfect.  Thank you,
23      Your Honors.
24                    THE US COURT:  All right.  I thank you
25      all.  If we don't talk before then, have a
```



1    wonderful holiday, and we will reconvene on Tuesday

2    morning.  Safe travel, everyone.  Thank you.  Good

3    day.

4    -- Whereupon court adjourned at 12:10 P.M.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    REPORTERS' CERTIFICATE

 2

 3                    I, KIMBERLEY A. NEESON, RPR, CRR, CSR,

 4     CCP, CBC, and GAIL INGHRAM VERBANO, RDR, CRR, CSR,

 5     certify;

 6                    That the foregoing proceedings were

 7     taken before us at the time and place therein set

 8     forth;

 9                    That the entire proceedings of the

10     hearing date were recorded stenographically

11     individually by each of us and were thereafter

12     transcribed;

13                     That the foregoing is a true and

14     correct transcript of our shorthand notes so taken.

15                    Dated this 22nd day of May, 2014.

16

17     PER:                        PER:

18     _Gail Inghram Verbano_      _Kimberley Neeson_

19     GAIL INGHRAM VERBANO        KIMBERLEY NEESON

20     WILCOX & FETZER             NEESON & ASSOCIATES

21     WILMINGTON, DE USA          TORONTO, ON

22

23

24

25
```











































