



```
 1              UNITED STATES BANKRUPTCY COURT

 2                FOR THE DISTRICT OF DELAWARE

 3

 4    ------------------------------)

 5    In Re                         )

 6       NORTEL NETWORKS INC.,      )   Case No.

 7       et al.,                    )   09-10138 (KG)

 8          Debtors.               )

 9    ------------------------------)

10                         - and -

11              Court File No. 09-CL-7950

12                       ONTARIO

13             SUPERIOR COURT OF JUSTICE

14                  (COMMERCIAL LIST)

15       IN THE MATTER OF THE COMPANIES' CREDITORS

16    ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17       AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18    ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19        NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20       CORPORATION, NORTEL NETWORKS INTERNATIONAL

21       CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                      CORPORATION

23       APPLICATION UNDERT PART IV OF THE COMPANIES'

24    CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                      AS AMENDED
```

Neeson&Associates   W&F

```
 1
 2                          --------
 3
 4   ---- This is the Day 8/Volume 8 of the transcript
 5   of the proceedings in the above matter held
 6   simultaneously in:
 7   Superior Court of        United States Bankruptcy
 8   Ontario (Commercial      Court for the District of
 9   List)                    Delaware
10   Courtroom 8-1            Courtroom 3
11   330 University Avenue     824 Market Street
12   Toronto, Ontario         Wilmington, Delaware
13
14   on the 27th day of May, 2014, commencing at 9:10
15   a.m.
16
17                          ---------
18   B E F O R E:
19   The Honorable Judge Kevin Gross (United States)
20   The Honorable Mr. Justice Frank Newbould (Canada)
21
22                          ---------
23
24
25
```



```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22

23   PER: Murray McDonald, Esq.

24        Brent Beekenkamp, Esq.

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   King Street West

 5   Toronto, ON  M5X 1G5

 6   PER: Derrick Tay, Esq.

 7        Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   Avenue of the Americas

12   New York, NY  10020

13   PER: Ken Coleman, Esq.

14        Paul Keller, Esq.

15        Daniel Guyder, Esq.

16        Laura Hall, Esq.

17        Joseph Badtke-Berkow, Esq.

18        Jonathan Cho, Esq.

19        Nicolette Ward, Esq.

20

21   FOR THE CANADIAN DEBTORS

22   BUCHANAN INGERSOLL & ROONEY

23   North Market Street

24   Suite 1900

25   Wilmington, DE  19801-1054
```



```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```



```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Robin B. Schwill, Esq.

16        Sean Campbell, Esq.

17        James Doris, Esq.

18        Louis Sarabia, Esq.

19

20   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

21   LIMITED

22   LAX O'SULLIVAN SCOTT LISUS LLP

23   Suite 2750, 145 King Street West

24   Toronto, ON  M5H 1J8

25   PER: Matthew P. Gottlieb, Esq.
```



```
 1          Tracy Wynne, Esq.

 2          Paul Michell, Esq.

 3

 4    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 5    LIMITED

 6    HUGHES HUBBARD & REED

 7    One Battery Park Plaza

 8    New York, NY  10004-1482

 9    PER: Derek Adler, Esq.

10          Neil Oxford, Esq.

11          Fara Tabatabai, Esq.

12          Charles Huberty, Esq.

13

14    FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

15    LIMITED

16    YOUNG CONAWAY STARGATT & TAYLOR LLP

17    Rodney Square

18    North King Street

19    Wilmington, DE  19801

20    PER: Ed Harron, Esq.

21          John Dorsey, Esq.

22

23    FOR THE EMEA DEBTORS

24    HERBERT SMITH FREEHILLS LLP

25    Exchange House
```



```
 1   Primrose Street

 2   London, England  EC2A 2EG

 3   PER: James Norris-Jones, Esq.

 4

 5   CANADIAN CREDITORS COMMITTEE

 6

 7   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

 8   BENEFICIARIES

 9   KOSKIE MINSKY

10   Queen Street West

11   Suite 900

12   Toronto, ON  M5H 3R3

13   PER: Mark Zigler, Esq.

14        Susan Philpott, Esq.

15        Ari Kaplan, Esq.

16        Barbara Walancik, Esq.

17

18   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

19   REPRESENTED BY THE CAW-CANADA

20   CAW-CANADA

21   Legal Department

22   Placer Court

23   Toronto, ON  M2H 3H9

24   PER: Barry E. Wadsworth, Esq.

25        Lewis Gottheil, Esq.
```



```
 1
 2   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
 3   COMMITTEE
 4   SHIBLEY RIGHTON LLP
 5   University Avenue, Suite 700
 6   Toronto, ON  M5H 3E5
 7   PER: Arthur O. Jacques, Esq.
 8        Thomas McRae, Esq.
 9
10   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS
11   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE
12   FUND
13   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP
14   35th Floor
15   Wellington Street West
16   Toronto, ON  M5V 3H1
17   PER: Kenneth T. Rosenberg, Esq.
18        Massimo (Max) Starnino, Esq.
19        Lily Harmer, Esq.
20        Karen Jones, Esq.
21        Tina Lie, Esq.
22        Michelle Jackson, Esq.
23
24   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN
25   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,
```



```
 1   2009

 2   NELLIGAN O'BRIEN PAYNE LLP

 3   O'Connor Street, Suite 1500

 4   Ottawa, ON  K1P 6L2

 5   PER: Janice B. Payne, Esq.

 6        Steven Levitt, Esq.

 7        Christopher Rootham, Esq.

 8        Ainslie Benedict, Esq.

 9

10   FOR MORNEAU SHEPELL LIMITED

11   MCCARTHY TETRAULT LLP

12   Suite 5300, Toronto Dominion Bank Tower

13   Toronto, ON  M5K 1E6

14   PER: Barbara J. Boake, Esq.

15        James D. Gage, Esq.

16        Elder C. Marques, Esq.

17        Paul Steep, Esq.

18        Byron Shaw, Esq.

19        Sharon Kour, Esq.

20        Kelly Peters, Esq.

21

22   FOR THE CANADIAN CREDITORS COMMITTEE

23   DLA PIPER

24   North Market Street, Suite 1500

25   Wilmington, DE  19801
```



```
 1   PER: Selinda A. Melnik, Esq.

 2        Richard Hans, Esq.

 3        Timothy Hoeffner, Esq.

 4        Jason Gerstein, Esq.

 5        Farah Lisa Whitley-Sebti, Esq.

 6

 7   INFORMAL NORTEL NOTEHOLDER GROUP

 8

 9   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

10   BENNETT JONES LLP

11   First Canadian Place

12   Suite 3400

13   Toronto, ON  M5X 1A4

14   PER: Kevin Zych, Esq.

15        S. Richard Orzy, Esq.

16        Gavin Finlayson, Esq.

17        Richard Swan, Esq.

18        Sean Zweig, Esq.

19        Jonathan Bell, Esq.

20        Amanda McLachlan, Esq.

21

22   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

23   MILBANK, TWEED, HADLEY, MCCLOY LLP

24   Chase Manhattan Plaza

25   New York, NY  10005
```



```
 1   PER: Thomas R. Kreller, Esq.

 2        Jennifer P. Harris, Esq.

 3        Albert A. Pisa, Esq.

 4        Samir Vora, Esq.

 5        Andrew LeBlanc, Esq.

 6        Michael Hirschfeld, Esq.

 7        Atara Miller, Esq.

 8        Tom Matz, Esq.

 9        Nick Bassett, Esq.

10        Gabrielle Ruha, Esq.

11        Rachel Pojunas, Esq.

12

13   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14

15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16   CASSELS BROCK & BLACKWELL LLP

17   Suite 2100, Scotia Plaza

18   King Street West

19   Toronto, ON  M5H 3C2

20   PER: Shayne Kukulowicz, Esq.

21        Michael Wunder, Esq.

22        Ryan Jacobs, Esq.

23

24   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

25   ASHURST LLP
```



```
 1   Boardwalk House

 2   Appold Street

 3   London, England  EC2A 2HA

 4   PER: Angela Pearson, Esq.

 5        Antonia Croke, Esq.

 6

 7   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 8   RICHARDS LAYTON & FINGER, P.A.

 9   North King Street

10   Wilmington, DE  19801

11   PER: Christopher Samis, Esq.

12

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   AKIN GUMP STRAUSS HAUER & FELD LLP

15   One Bryant Park

16   New York, NY  10036

17   PER: Fred S. Hodara, Esq.

18        David H. Botter, Esq.

19        Abid Qureshi, Esq.

20        Robert A. Johnson, Esq.

21        Brad M. Kahn, Esq.

22        Christine Doniak, Esq.

23        Joseph Sorkin, Esq.

24        Jacqueline Yecies, Esq.

25   UK PENSION PROTECTION FUND AND NORTEL NETWORKS
```



```
 1   UK PENSION TRUST LIMITED

 2

 3   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 4   NETWORKS UK PENSION TRUST LIMITED

 5   THORNTON GROUT FINNIGAN LLP

 6   Suite 3200, 100 Wellington Street West

 7   P.O. Box 329

 8   Toronto, ON  M5K 1K7

 9   PER: Michael Barrack, Esq.

10        D.J. Miller, Esq.

11        Rebecca Lewis, Esq.

12        Andrea McEwan, Esq.

13        John Finnigan, Esq.

14        Michael Shakra, Esq.

15

16   FOR THE UK PENSION PROTECTION FUND AND NORTEL

17   NETWORKS UK PENSION TRUST LIMITED

18   WILLKIE FARR & GALLAGHER LLP

19   Seventh Avenue

20   New York, NY  10019-6099

21   PER: Brian O'Connor, Esq.

22        Sameer Advani, Esq.

23        Andrew Hanrahan, Esq.

24

25   FOR THE UK PENSION PROTECTION FUND AND NORTEL
```

 Neeson & Associates  W&F

```
 1   NETWORKS UK PENSION TRUST LIMITED

 2   BAYARD, P.A.

 3   Delaware Avenue, Suite 900

 4   Wilmington, DE  19899

 5

 6   PER:  Charlene D. Davis, Esq.

 7         Justin Alberto, Esq.

 8

 9   THE BANK OF NEW YORK MELLON

10

11   FOR THE BANK OF NEW YORK MELLON

12   MCMILLAN LLP

13   Brookfield Place

14   Bay Street, Suite 4400

15   Toronto, ON  M5J 2T3

16   PER: Sheryl E. Seigel, Esq.

17

18   FOR THE BANK OF NEW YORK MELLON

19   LATHAM & WATKINS LLP

20   Third Avenue

21   New York, NY  10022-4834

22   PER: Michael J. Riela, Esq.

23

24   WILMINGTON TRUST, NATIONAL ASSOCIATION

25
```



```
 1   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 2   HEENAN BLAIKIE LLP

 3   Bay Adelaide Centre

 4   Bay Street, Suite 2900

 5   P.O. Box 2900

 6   Toronto, ON  M5H 2T4

 7   PER: John Salmas, Esq.

 8        Kenneth Kraft, Esq.

 9        Sara-Ann Van Allen, Esq.

10

11   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

12   KATTEN MUCHIN ROSENMAN LLP

13   Madison Avenue

14   New York, NY  10022-2585

15   PER: Craig A. Barbarosh, Esq.

16        David A. Crichlow, Esq.

17        Karen B. Dine, Esq.

18

19   LAW DEBENTURE TRUST COMPANY OF NEW YORK

20

21   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

22   BORDEN LADNER GERVAIS LLP

23   King Street West

24   Toronto, ON  M5H 3Y4

25   PER: Edmond F.B. Lamek, Esq.
```

 

```
 1        James Szumski, Esq.

 2

 3   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 4   PATTERSON BELKNAP WEBB & TYLER LLP

 5   Avenue of the Americas

 6   New York, NY  10036

 7   PER: Daniel A. Lowenthal, Esq.

 8

 9   BOARDS OF DIRECTORS OF NORTEL NETWORKS

10   CORPORATION AND NORTEL NETWORKS LIMITED

11

12   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

13   CORPORATION AND NORTEL NETWORKS LIMITED

14   OSLER HOSKIN AND HARCOURT LLP

15   King Street West

16   First Canadian Place, Suite 6100

17   P.O. Box 50

18   Toronto, ON  M5X 1B8

19   PER: Lyndon Barnes, Esq.

20        Edward Sellers, Esq.

21        Betsy Putnam, Esq.

22        Adam Hirsh, Esq.

23        Alexander Cobb, Esq.

24

25                    I N D E X
```



1

2    AYLWYN KERSEY STEPHENS

3                                              PAGE

4    Examination-in-Chief/Direct Examination

5    by Mr. Adler.......................... 1711

6    Cross-Examination by Mr. Barrack....... 1742

7    Cross-Examination by Ms. Kimmel........ 1751

8    Cross-Examination by Mr. Rosenthal..... 1804

9    Re-Examination/Redirect by Mr. Adler... 1809

10

11

12

13

14

15

16                    LIST OF EXHIBITS

17   NUMBER/DESCRIPTION                  PAGE NO.

18        27:  Affidavit of Mr. Stephens,

19        dated  April 11, 2014.          1712

20

21

22

23

24

25    --- Upon commencing at 9:10 A.M.



```
 1                    THE US COURT:  Good morning, everyone.
 2    Thank you.  Please be seated.
 3                    THE CANADIAN COURT:  Good morning.
 4    Good morning, Judge Gross.
 5                    THE US COURT:  Good morning, Justice
 6    Newbould.  I believe we are proceeding from the UK
 7    today.
 8                    MR. GOTTLIEB:  Good morning.  It is
 9    Matthew Gottlieb for the EMEA Debtors in Toronto.
10    We have Mr. Stephens as the witness, as you all
11    know, in the UK.  I have handed up hard copies of
12    the affidavit in this courtroom to be marked as the
13    next exhibit.  I hope that, Judge Gross, you have
14    the same there.
15                    THE US COURT:  Here it comes.  Thank
16    you.
17                    MR. GOTTLIEB:  Perfect.  Thank you.
18                    And Derek Adler from Hughes Hubbard is
19    in the UK with Mr. Stephens, who will lead his
20    evidence.
21                    There is only one camera in the UK, as
22    I understand it, so it will obviously be on
23    Mr. Stephens.  But you will hear Mr. Adler.  And
24    subject to any questions from the Court, I believe
25    we are ready to proceed.
```



1              THE CANADIAN COURT:  Very well.

2              MR. GOTTLIEB:  Thank you very much.

3              THE US COURT:  All right, sir.  May we

4    have Mr. Stephens sworn or affirmed.  Shall we

5    have -- can you hear me, Mr. Stephens?  Good

6    morning.  Has the witness now been sworn?

7              MR. GOTTLIEB:  I have just been told

8    that there is no sound being received in the UK.

9    Obviously, I am sorry.  I will send some emails and

10   see how this can be resolved, and I will speak to

11   the booth as well.  We thought it was all set up

12   before the judges came in, so I apologize.  Let me

13   find out.

14             THE US COURT:  Sure.

15             MR. GOTTLIEB:  Thank you.

16   -- OFF THE RECORD --

17             MR. GOTTLIEB:  Your Honor and Judge

18   Gross, I just spoke with the tech booth, and they

19   are in communication right now trying to resolve

20   this, so hopefully, it will be quick.

21             THE US COURT:  Thank you.

22             THE CANADIAN COURT:  While we are

23   waiting, can I just ask what the scheduling is

24   going to be like.  Do we have one witness today?

25             MR. GOTTLIEB:  That's right, Your



1   Honor.  We have one witness today, and then we have

2   fact witness and an expert starting next week.  I

3   believe you were provided with a copy -- I

4   apologize -- tomorrow.

5                THE CANADIAN COURT:  It is only

6   Tuesday.

7                MR. GOTTLIEB:  Yes.  I am getting

8   ahead.  So we have witnesses, fact witnesses,

9   finishing up and then the expert witnesses

10  starting --

11               THE CANADIAN COURT:  What is the

12  schedule tomorrow?

13               MR. GOTTLIEB:  The schedule for

14  tomorrow, in accordance with the one we handed up,

15  I believe it is Hall, Mr. Weisz; and the first

16  expert, Mr. Huffard, on behalf of the EMEA Debtors.

17               THE CANADIAN COURT:  How long are they

18  likely to take, do you think, tomorrow?

19               MR. GOTTLIEB:  That will take the full

20  day, tomorrow.  I would be very surprised if the

21  whole day wasn't used up with that.

22               And, Your Honor, you did get the

23  emailed copy of the proposed schedule that I

24  believe was sent out on Thursday or Friday last

25  week?  Okay.  If not, we can hand up another copy



1    before the end of the day.

2              I am told this should be working, so

3    let's give it a shot.  We have nothing on the

4    screen from the UK right now.

5              MR. ADLER:  Can you hear us?  This is

6    Derek in London.

7              MR. GOTTLIEB:  Perfect.  We can hear

8    you now.  Can you hear us?

9              MR. ADLER:  Yes.

10   -- OFF THE RECORD --

11             MR. ADLER:  Mr. Stephens is here on

12   camera.  I am on his left.  It is probably best to

13   have the camera trained on the witness

14             THE US COURT:  Yes.

15             MR. ADLER:  Very good.  So this is

16   Derek Adler for the Joint Administrators and the

17   EMEA Debtors.  Are we ready to proceed with

18   Mr. Stephens' testimony?

19             THE US COURT:  We are.  We will have

20   the witness sworn; is that correct?  He has not

21   been sworn in England?

22             MR. ADLER:  He has not been sworn in

23   England.  That will need to be done remotely.

24             THE US COURT:  Okay.  Let's do that,

25   Ms. Scaruzzi.  From my courtroom, we will either

 Neeson & Associates   W&F Wilson & Peyton Ltd.

```
 1   swear or affirm the witness.
 2    AYLWIN KERSEY STEPHENS, having first been duly
 3    affirmed, was examined and testified as follows:
 4         EXAMINATION-IN-CHIEF/DIRECT EXAMINATION
 5              BY MR. ADLER:
 6              Q.   Very well.  Again, this is Derek
 7   Adler for the EMEA Debtors.  Mr. Stephens, you have
 8   your affidavit before you?
 9              A.   I do, indeed.
10              THE CANADIAN COURT:  What is the next
11   exhibit number?
12              THE CANADIAN REGISTRAR:  Exhibit 27,
13   Your Honor.
14              THE CANADIAN COURT:  The affidavit will
15   be Exhibit 27.
16    EXHIBIT NO. 27:  Affidavit of Mr. Stephens, dated
17        April 11, 2014.
18              BY MR. ADLER:
19              Q.   Is that the affidavit that you
20   have sworn in this proceeding?
21              A.   It is.
22              Q.   And have you reviewed it again
23   recently?
24              A.   This morning.
25              Q.   And is there anything in it that
```



1    you wish to correct?

2              A.    No.

3              Q.    Mr. Stephens, would you start by

4    informing the Courts a little bit about a summary

5    of your professional qualifications.

6              A.    I am a chartered accountant.  I

7    qualified in 1969 following a four-year training

8    contract.  At that point I joined a predecessor

9    firm of what is now PwC, where I remained until

10   2003, about one year in the mid-1980's, when I

11   retired as a corporate tax partner in the London

12   office, having had that role since 1978.  On

13   retirement I took a number of part-time employment,

14   including one with Nortel.

15             Q.    And what was your role at Nortel?

16             A.    Described in Nortel terms, it was

17   special projects.  I did not have a territory or

18   entity responsibility.  I dealt with matters that

19   were referred to me from time to time by members of

20   the tax team.

21             Q.    So were you considered to be in

22   the tax department?

23             A.    Technically, yes.

24             Q.    And which entity actually employed

25   you?



 1                    A.    Nortel Networks UK.

 2                    Q.    And what is your role today?

 3                    A.    The same.

 4                    Q.    So has that remained the same

 5     throughout the time since 2003?

 6                    A.    It has, indeed.

 7                    Q.    Now, prior to when you came to

 8     Nortel, did you have any involvement in Nortel's

 9     transfer pricing situation?

10                    A.    No.

11                    Q.    When you first came to Nortel, did

12     you learn about the transfer pricing methodology

13     that was being used?

14                    A.    Initially I learned about the

15     historic transfer pricing methodology because of

16     the audit that UK Revenue were carrying out

17     covering the late 1990's.  But then following that

18     I took an interest on my own part in the model, the

19     transfer pricing model, which had been applied

20     since 2001 in succession to the previous

21     arrangements.

22                    Q.    What was being addressed in the

23     audit that you just referred to?

24                    A.    The R&D cost-sharing agreement and

25     its associated agreements.



```
 1                    Q.   So did that concern anything after
 2   the period of the cost-sharing agreement?
 3                    A.   No.
 4                    Q.   Now, what did you learn when you
 5   first came to Nortel about the methodology that was
 6   used after the cost-sharing agreement?
 7                    A.   It was a residual profit split
 8   method.
 9                    Q.   And how did that work?  Can you
10   give us a brief summary of how that worked?
11                    A.   The then six participants
12   conducted their trades independently but tended to
13   jointly support each other, supporting other
14   entities in the group; and pooled the results of
15   their trading together; allocated an element of the
16   result through their routine activities.  The
17   balance, the residual, was divided between the
18   parties on the basis of their historic contribution
19   to R&D spend.
20                    Q.   And was that methodology written
21   down anywhere?
22                    A.   It was written down in
23   PowerPoints.
24                    Q.   In PowerPoints.  But was there
25   actually a written agreement at that time?
```



```
 1                    A.    Not at that point, no.

 2                    Q.    And was it unusual in your

 3   experience not to have the transfer pricing

 4   methodology written down in an agreement?

 5                    A.    Not necessarily, no.

 6                    Q.    Did the company's auditors require

 7   there to be a written agreement?

 8                    A.    Apparently not in this case,

 9   because they signed off at least on the 2001

10   financial statements without any written agreement.

11                    Q.    Did any of the revenue authorities

12   require the company to have a written transfer

13   pricing agreement?

14                    A.    I really can't account what

15   happened subsequently.  The French revenue

16   authority would expect a written agreement.

17                    Q.    What about your knowledge of the

18   IRS, the CRA, and Her Majesty's Revenue and

19   Customs?

20                    A.    I can't speak with any great

21   authority about the North American authorities, but

22   UK Revenue would not necessarily insist on a

23   written agreement.

24                    Q.    Now, to your knowledge at that

25   time, had the transfer pricing methodology been
```



```
 1   presented to the IRS, the CRA and Her Majesty's
 2   Revenue and Customs for advance pricing agreement?
 3                A.   There had been presentations and
 4   even site visits to facilities in North America and
 5   the UK.
 6                Q.   And do you know how the
 7   methodology had been shown to those authorities?
 8                A.   You have to explain what you mean
 9   by that.
10                Q.   Had it been presented in the form
11   of a written agreement?
12                A.   No.  It had been presented, no
13   doubt, in the form of PowerPoints.
14                Q.   And was there also a study that
15   had been done by Horst Frisch?
16                A.   There was, indeed, one that was
17   done by Horst Frisch, yes.
18                Q.   And that had been presented to the
19   revenue authorities?
20                A.   Yes, with the applications.
21                Q.   Now, did there come a time when
22   the transfer pricing arrangements were actually
23   written down in an agreement?
24                A.   The first time I became aware of
25   it was, of course, the back end of 2004.
```



```
 1                      Q.   And what, to your knowledge, was
 2    the impetus for creating a written agreement?
 3                      A.   Nortel Networks SA, the French
 4    entity, had been advised it was about to undergo a
 5    tax audit.  And the advice was that before the
 6    auditors arrived, there better be a written
 7    agreement covering the transfer pricing
 8    arrangements.
 9                      Q.   Who drafted the agreement?
10                      A.   "Drafted" is a question of fact by
11    a US law firm, but they were instructed either from
12    the UK or Canada.
13                      Q.   Was anyone from EMEA involved in
14    drafting that agreement?
15                      A.   No.
16                      Q.   Was that a negotiated agreement?
17                      A.   In the sense of you implying
18    that --
19                      THE CANADIAN COURT:  A lot of this
20    evidence, I main, it is all background, but most of
21    what we heard so far is not very reliable because
22    it is hearsay.  I am just not sure why we are
23    hearing all this evidence.
24                      MR. ADLER:  Your Honor, this will be
25    very short.  I will be done with it momentarily.
```



```
 1                    BY MR. ADLER:
 2                    Q.   Did you give comments on the MRDA?
 3                    A.   I did, indeed.  They were
 4   high-level type of comments on the legal wording.
 5                    Q.   Now, based on the arrangements
 6   that you found when you came to Nortel, from a tax
 7   perspective, what was your understanding of the
 8   relation between the five RPS entities -- or I
 9   guess it was six at that time -- in relation to
10   research and development and the resulting IP?
11                    A.   I thought they had entered into a
12   form of joint venture.
13                    Q.   So why did you see it as being a
14   joint venture?
15                    A.   They were exploiting the IP
16   jointly, not in competition with each other,
17   supporting other entities in the group, and
18   agreeing to pool the profits or losses, as the case
19   may be.
20                    Q.   Now, were there other ways of
21   doing the relations between the parties?
22                    A.   If a partnership had been created,
23   that would have significant fiscal consequences for
24   all the participants.  The partnership would need
25   to be registered somewhere, so the global profits
```



1    would be potentially subject to tax revenue where

2    the partnership was resident.  For instance, the

3    UK's share of profits would be subject to taxation

4    in Canada.  And again in the UK, there are double

5    (inaudible) any Canadian tax would be credited

6    against UK tax.  Double taxation agreements don't

7    work perfectly.

8              And there might have been significant

9    consequences if the entities had contributed their

10   IP as it stood at the end of 2000, when the

11   cost-sharing arrangements ended, into a partnership

12   that might have been some form of disposal.

13             Q.   Was there any other way that you

14   might have viewed the relationship from a tax

15   perspective?

16             A.   A license arrangement, which I

17   know what the agreement says, but a license

18   agreement where one entity owned all of the IP and

19   the other parties paid a royalty for their use of

20   the IP.

21             Q.   And did this have the

22   characteristics of a licensing and royalty

23   arrangement?

24             A.   Not to my mind, because under

25   license and royalty arrangements, you wouldn't pool



```
 1  profits.
 2              Q.   And what would the tax
 3  consequences have been of treating this as a
 4  royalty, a licensing and royalty arrangement?
 5              A.   Depending on where the owner of
 6  the IP was resident, but let us assume it is
 7  Canada, in most territories where Canada has a
 8  double taxation agreement, there is a withholding
 9  tax, generally 10 percent, and that would have been
10  a suc tax
11              Q.   So of these three arrangements,
12  what was the best one for reducing the group's
13  overall tax burden?
14              A.   The joint venture.
15              Q.   Now, are you aware that the MRDA
16  has a term in it that actually says that the
17  relationship that is created by the MRDA is not a
18  joint venture?
19              A.   If it is not joint venture, I do
20  not know what it is.
21              Q.   Would you please tell the Courts
22  how R&D costs -- and I am talking about the period
23  when you were at Nortel -- how R&D costs were
24  treated on NNUK's financial statements and its tax
25  filings?
```


Neeson&Associates    W&P

       1                 A.    They were expensed as incurred in

       2    the financial statements.  And in its tax filings

       3    that was followed.  A deduction was claimed for the

       4    R&D, cost-expensed.

       5                 Q.    What do you need to show Her

       6    Majesty's Revenue and Customs in order for that

       7    deduction to be proper?

       8                 A.    That it is, quote, wholly and

       9    exclusively, unquote, incurred for the purposes of

      10    the trade of anything in the UK.

      11                 Q.    Do you believe that Her Majesty's

      12    Revenue would have extended this if the R&D had

      13    been expended to improve intellectual property that

      14    was owned by another party?

      15                 A.    I think we may have missed the

      16    deduction.  But I think they would have turned

      17    around and said that, in fact, they could impute

      18    income, which is the way our transfer pricing

      19    arrangement works, because this was work carried

      20    out for the benefit of another related party.

      21                 THE CANADIAN COURT:  Just a moment.

      22    There may be -- is there an objection here?

      23                 MS. KIMMEL:  Yes.  I am sorry to

      24    interrupt.  I would just like to register an

      25    objection to the testimony that is being elicited



```
 1   from this witness for the first time that I
 2   consider to be in the nature of opinion evidence.
 3   I don't think this is covered by his affidavit, and
 4   I think it is -- they are seeking to elicit opinion
 5   evidence from a fact witness.
 6             THE CANADIAN COURT:  Well, is there any
 7   rule that says that something has to be covered by
 8   his affidavit?
 9             MR. KIMMEL:  Yes, there is.  In our
10   trial protocol there is.  I mean, obviously, people
11   are allowing some latitude, but I think this is
12   going a bit far afield.  And it is objectionable
13   independently because of the fact that they are
14   seeking to elicit opinion and expert testimony from
15   a fact witness.
16             THE CANADIAN COURT:  What do you say is
17   opinion?  I thought he was just giving evidence as
18   to historically how they dealt with R&D.  What do
19   you say is the opinion?
20             MR. KIMMEL:  Well, I think he is
21   slipping in a few other things.
22             MR. ADLER:  Your Honor, I will move on
23   from there.  I mean, number one, though, I don't
24   think we accept that we are limited --
25             THE CANADIAN COURT:  Just a moment.  I
```

 Neeson & Associates    W&F

```
 1   don't think the objection is finished yet.
 2              MR. ADLER:  I apologize.
 3              MR. KIMMEL:  I mean, there are
 4   questions like what do you need to show in order to
 5   show a deduction is proper.  I mean, I can run
 6   through them.  There were a series of questions
 7   that are not in the nature of what they actually
 8   did but what would be appropriate as opposed to
 9   what was actually being done.
10              THE US COURT REPORTER:  Your Honor,
11   given the choppy nature of the audio, I cannot make
12   an accurate record.
13              THE CANADIAN COURT:  I can't hear that.
14              THE US COURT:  All right.  The court
15   reporter here was saying that the audio is a little
16   bit choppy, and therefore, it is difficult for her
17   to make an accurate record.  And that's the audio
18   from the United Kingdom, of course.
19              On the objection, I do think that the
20   witness has reached into areas of opinion and
21   hasn't been certified as an expert at this point.
22   But I think we can move on now for purposes of his
23   testimony.
24              MR. ADLER:  We are happy to move on,
25   Your Honor.  We weren't attempting to certify him
```

 Neeson&Associates   W&F

 1    as an expert.  Obviously, he is a tax professional

 2    and deals with these issues all the time.  A lot of

 3    what's in his affidavit actually reflects that.

 4    But I am prepared to move on to another subject.

 5                    THE US COURT:  Very well.

 6                    BY MR. ADLER:

 7                    Q.   Now, do you use the term

 8    "beneficial ownership"?

 9                    A.   I am familiar with the term.  It

10    is a term frequently used in tax.

11                    Q.   Okay.  And what does that term

12    mean?

13                    A.   What it says, or I suppose put

14    another way, an economic interest.

15                    Q.   What does "an economic interest"

16    mean?

17                    A.   Beneficial ownership (inaudible).

18                    Q.   Okay.  And now, in paragraph 13 of

19    your affidavit -- we don't need to look at it, but

20    you use the phrase -- you say the MRDA was a

21    transfer pricing document.  What did you mean by

22    that?

23                    A.   Transfer pricing document where

24    the audit was for revenue authorities.

25                    Q.   Now, after the MRDA was signed,



```
 1   were there any instances in which the MRDA was not

 2   followed, the terms of the MRDA?

 3              A.   One area I always felt, and I

 4   probably never expressed it very clearly in

 5   writing, was that there were daily breaches with

 6   some of the what I will call the IEs or the MRDA

 7   participants selling product outside of their

 8   territories of exclusivity.

 9              Q.   Which provisions of the MRDA

10   (inaudible)?

11              A.   I believe they were only, as I

12   understood it, able to sell Nortel product in their

13   territory of exclusivity, usually their territory

14   of incorporation.

15              Q.   Which entities were violating that

16   term?

17              A.   Certainly Nortel Networks Ireland,

18   which was, I believe, selling product in the UK and

19   France as well as in Holland and other territories.

20   And Nortel UK was selling outside of the UK to

21   third parties.

22              Q.   Any others?

23              A.   You have to remind me.  I am

24   sorry.  I am drawing a blank.

25              Q.   And during what period of time in
```



```
 1   your mind were those breaches going on?

 2              A.   Daily.

 3              Q.   Throughout the entire time period?

 4              A.   Throughout the entire period, yes.

 5              Q.   Did there come a time when that

 6   situation was corrected?

 7              A.   I believe it was corrected in a

 8   memorandum of understanding entered into towards

 9   the end of 2008.

10              Q.   Now, did there come a time when

11   Nortel needed to address how to account for costs a

12   Nortel entity was required to pay based on claims

13   that Nortel technology infringed on another party's

14   patents?

15              A.   There was one case involving KPN

16   in Holland.

17              Q.   Can you tell us the general

18   circumstances of that?

19              A.   KPN was a Dutch company.  It was

20   determined that Nortel was breaching patents it

21   owned.  And no doubt for convenience, KPN decided

22   to sue the Dutch subsidiary of Nortel, which was a

23   distributor and a nonexclusive distributor of that.

24              And a settlement was agreed of at or

25   about $5 million to be paid.  And the question was
```



```
 1    which entity should bear the cost.  And I expressed

 2    the view that that cost should be borne by NNL and

 3    shared as part of the profit and loss provision

 4    under the MRDA and not be borne exclusively by the

 5    Dutch distributor, because it did not own any IP.

 6                    Q.   And what was the basis for your

 7    assessing that approach?

 8                    A.   That NNL was the legal owner and

 9    thus would be the rightful person to pay, because

10    the tax authority would not (inaudible) underlying

11    economic or beneficial interest; but at the same

12    time, that cost should be borne in an RPS ratio by

13    the other participants in the MRDA.

14                    Q.   And why should they bear that

15    cost?

16                    A.   Because if they've taken the

17    benefit of the IP, they must take the cost when it

18    is breached.

19                    Q.   And was that view accepted inside

20    Nortel?

21                    A.   I believe so, yes.

22                    Q.   And is that how the costs were

23    actually handled?

24                    A.   Yes.

25                    Q.   Did anyone ever take the position
```



1    that NNL, as the holder of legal title to the IP,

2    should bear 100 percent of what the companies might

3    have to pay to resolve an infringement claim?

4              A.    No.

5              Q.    Now, how were royalties that were

6    received from third parties for the use of Nortel

7    technology dealt with during your time at Nortel?

8              A.    Not necessarily consistently.

9    There was one major settlement with a third party,

10   Foundry, which included penalty for prior breach

11   and I believe a lump sum for future rights.  That

12   procedure was, in fact, shared between the parties

13   and it went to operating profits.

14              And there was the grant of rights to

15   Microsoft to use Nortel intellectual property which

16   was for accounting purposes spread but nonetheless

17   was brought into the RPS profit pool.

18              Q.    And did there come a time when

19   royalties on a routine basis were included in the

20   profit pool?

21              A.    From 2006 onwards, when the new

22   model arrived, I think that was a result.  Possibly

23   the Microsoft procedure, but also there were a

24   number of emails floating around questioning why

25   royalties were not in the RPS pool.

 Neeson & Associates   W&F

1              And I think -- I do have to say that I

2      think absent Microsoft and Foundry, the external

3      royalties were not hugely material for them.  The

4      fact that they were missing in the earlier years

5      was not necessarily critical.

6              Q.   Now, did royalties received from

7      third parties for the use of Nortel technology fit

8      into the formula, the literal formula in Schedule A

9      of the MRDA?

10             A.   It wasn't specifically mentioned,

11     no.

12             Q.   And how were they treated after

13     2006?

14             A.   They were brought in as a separate

15     line of income in computing the profit and loss

16     pool to be shared between the participants.

17             Q.   Now, did anyone ever take the

18     position that NNL, as the holder of legal title to

19     the IP, should receive 100 percent of the royalties

20     Nortel might receive from independent companies for

21     the use of Nortel's IP?

22             A.   Not to my knowledge.

23             Q.   Now, did there come a time when

24     the UMTS business was sold to Alcatel?

25             A.   Yes.



```
 1                     Q.    What was the background of that
 2    transaction?
 3                     A.    That transaction was -- we might
 4    describe it as a global disposal of a business unit
 5    involving 18 or 20 (inaudible) companies selling
 6    the UMTS assets and undertaking (inaudible) to
 7    Alcatel.
 8                     Q.    And what approach was taken to
 9    divide the proceeds of that sale among the
10    different Nortel companies?
11                     A.    Under the contract, Alcatel had
12    the right to allocate the consideration over
13    (inaudible) asset classes.  Nortel could object,
14    although in practice it was given little time to do
15    so.  But Nortel had the right then to allocate that
16    consideration, the asset classes, between its
17    vending entities.
18                     Nortel also was bound by the contract
19    to support the Alcatel asset class allocation in
20    its tax returns.
21                     Q.    So what classes did Alcatel
22    choose?
23                     A.    Fixed assets or -- tangible
24    assets, which were fixed assets and inventories
25    which were on allocated on the basis of Nortel US
```

 Neeson&Associates    W&F WILSON & PETZER LTD.

1   GAAP, US dollar net book value, and three classes

2   of tangible technology, customer contracts and a

3   balance figure for goodwill.

4           Q.   Now, were you involved in the

5   allocation process?

6           A.   I was involved, yes.

7           Q.   And what was your role?

8           A.   We were advised that

9   representatives of the US and Canadian tax group

10  would do an initial allocation between the Nortel

11  (inaudible) vending entities, and that was in

12  early/mid-December 2006.  And we were invited to

13  comment on that, and we did.

14          Q.   Okay.  So what was the approach

15  taken for the tangible assets?

16          A.   That was US GAAP, US dollar net

17  book value; noncontroversial.

18          Q.   Okay.  What was the approach that

19  was taken to the division of the proceeds related

20  to intellectual property?

21          A.   A bit hard to explain, but it was

22  based on a revenue metric.  And you looked at the

23  third-party (covenant?) of sales in each entity,

24  and if an entity had 5 percent of the sales, it

25  would get 5 percent of the consideration.  Then you



1    looked at whether the entity was an MRDA

2    participant, and if it was, it got to keep that

3    percentage.  But if it wasn't an MRDA participant,

4    then the consideration was to be paid to Canada on

5    the basis that Canada owned the IP rights in non-IE

6    territories.

7                    Q.   Now, for clarification, I think --

8    are you describing -- are you describing the final

9    position --

10                   A.   No.  I am describing the position

11   that was taken initially.

12                   Q.   And who took that position

13   initially?

14                   A.   The North American team.

15                   Q.   So let's look at Exhibit B to your

16   affidavit, please.

17                   Now, with relation to affidavits, I

18   think I have heard that we are all dealing with

19   paper copies today because of the difficulty in

20   broadcasting them in both places, I believe.

21                   So would you please tell the Courts

22   what the document is in Exhibit B to your

23   affidavit.

24                   A.   This is a comment, amongst many

25   other things, on an internal agreement that had to



1    be written to allow the French to participate in

2    the UMTS sale because of the way they had to do it.

3                 Q.   Upon your (inaudible) to the email

4    that you wrote to Mr. Orlando on November 6, 2006,

5    on the first page of the exhibit, describe the

6    purpose of sending that email.

7                 A.   I can't comment.  I can't comment

8    on that point as to why I sent it to him, because I

9    was maybe sent a copy of the internal agreement

10   that was necessary to deal with the French

11   position.

12                Q.   In this email do you express a

13   view as to how the proceeds of the Alcatel sale

14   attributable to IP should be divided among the

15   Nortel RPS entities?

16                A.   I am pretty sure, yes.  In RPS

17   ratio.

18                Q.   Is that in the fourth paragraph

19   here, in the second to the last sentence?

20                A.   Correct.

21                Q.   Would you read that for the

22   Courts, please.

23                A.   "However, our view was that the IP

24   proceeds would be allocated to each participant in

25   accordance with the current proportionate share in

 Neeson&Associates   W&F

```
 1   the Residual."
 2              Q.   And by that, what did you mean by
 3   "proportionate share in the Residual"?
 4              A.   RPS proportion.
 5              Q.   Would you also read for the Courts
 6   the paragraph at the bottom of that page that goes
 7   over to the next page.
 8              A.   "Mark will correct me if I am
 9   wrong, but I recall that in a presentation to the
10   APA Authorities some time ago we explained how we
11   deal with IP divestment and in particular confirmed
12   that each divestment did not erode the unamortized
13   R&D pool of each participant.  The relevant IP
14   proceeds in any divestment attributable to each
15   residual participant would thus fall to be taxed in
16   its hands as a separate source of income or gains,
17   and the R&D pool continues to be amortized as if
18   nothing has happened."
19              Q.   What did you mean by "IP proceeds"
20   in that sentence?
21              A.   Technology proceeds, or proceeds
22   allocated to technology.
23              Q.   And when you said "any divestment"
24   there, what were you referring to?
25              A.   Business sale.
```



 1                    Q.    Did anyone ever disagree with the

 2    view that you expressed in that paragraph?

 3                    A.    Not that I recall.

 4                    Q.    And what was the approach that was

 5    ultimately taken for dividing the IP proceeds in

 6    the Alcatel sale?

 7                    A.    Current RPS ratio, as calculated

 8    by reference to the R&D pool.

 9                    Q.    Okay.  So is that the same as the

10    formulas used in the MRDA?

11                    A.    Precisely the same.

12                    Q.    And did anyone at that time

13    suggest that the way the IP proceeds should be

14    divided was they should be given to NNL 100 percent

15    as the legal title holder of the IP?

16                    A.    No.

17                    Q.    Now, what approach was taken in

18    relation to customer contracts in the Alcatel sale?

19                    A.    Again, they used the same metric

20    of revenues.

21                    Q.    I am sorry.  You are speaking

22    about the initial proposal?

23                    A.    The initial proposal was metric of

24    revenues allocating consideration by reference to

25    the party set forth by each individual entity.  We



```
 1   agreed with the sales metric but felt that the

 2   allocation key should be the ownership of the

 3   contracts, or the customer relationships, which was

 4   reasonably straightforward in the UMTS business or

 5   any separate customers (inaudible), and it was

 6   obvious who had the relationship with them.  And it

 7   ended up with the result that the UK and France

 8   took most of the consideration.

 9             Q.   Okay.  Now, was the approach taken

10   here ever presented to Nortel's auditors?

11             A.   It might have been presented to

12   Nortel's auditors, because they came back with a

13   question.  And their question was why the customer

14   contract moneys had not been allocated in RPS

15   ratio.

16             Q.   And what was your response to

17   that?

18             A.   The response to it fundamentally,

19   although it wasn't put this way, is that customer

20   contracts are not IP or technology, and in many

21   ways they are part of the residual profit split

22   model, which remunerates routine returns, and that

23   the RPS ratio was entirely the wrong way of

24   allocating the customer contracts.

25             Q.   Did the auditors accept that
```



1    explanation?

2              A.    I believe so, because they signed

3    off audit reports of the legal entities reflecting

4    the allocation based on ownership.

5              Q.    Did the auditors ever question the

6    allocation of IP in accordance with the RPS

7    percentages?

8              A.    Not that I am aware of, no.

9              Q.    Was the allocation of the Alcatel

10   sale also presented to the revenue authorities?

11             A.    It was certainly presented to the

12   UK Revenue authorities.  I can't speak to the

13   extent -- to how it was presented to the North

14   American authorities or other authorities.

15             Q.    And did the UK authorities ever

16   question the approach that was taken to allocating

17   the IP proceeds?

18             A.    No.

19             Q.    Shifting the subject a little bit,

20   during the time you were at Nortel, who paid the

21   EMEA entities' R&D expenses?

22             A.    The EMEA entities themselves.

23             Q.    Did anyone ever reimburse them for

24   their R&D expenses?

25             A.    No.



```
 1                    Q.   Were the EMEA entities entitled to
 2   annual transfer pricing adjustments, payments from
 3   the other parties to the MRDA?
 4                    A.   Making the round, there was only
 5   one EMEA entity that was ever entitled to receipts
 6   under the transfer pricing arrangement, and that
 7   was Nortel Networks UK.  The other two entities
 8   were payors, significant payors.
 9                    Q.   And so by "the other two
10   entities," you mean --
11                    A.   France and Ireland.
12                    Q.   And did NNUK actually ever receive
13   dollars as a result of the transfer pricing
14   adjustments?
15                    A.   Before my time, but I think -- I
16   am sorry.  This is hearsay -- 2001, 2002, yes, it
17   would have received value in one form or another.
18   The moneys would have been used to repay debt.
19                    Q.   And from 2003 on, when you were at
20   the company, how were the transfer pricing
21   adjustments settled?
22                    A.   They were settled by adding them
23   to a loan made by NNUK to Nortel Networks Ltd.
24                    Q.   Now, talk for a minute about the
25   current situation.  Have you reviewed the position
```



1    that has been taken by the Canadian Debtors in this

2    current allocation dispute?

3              A.    I have.

4              Q.    Is that consistent with how the

5    parties addressed their respective rights when

6    Nortel was a going concern?

7              A.    Not in my view, no.

8              Q.    Why not?

9              A.    I am suggesting that the other IEs

10   participating in the MRDA did not obtain any kind

11   of interest in the IP.

12             Q.    And in the entire time you were at

13   Nortel prior to this proceeding, did anyone ever

14   suggest that NNL, as the holder of legal title of

15   the intellectual property, had a greater beneficial

16   interest in the IP than any of the other RPS

17   participants?

18             A.    No, not that I recall.

19             Q.    Will the results of the allocation

20   proceeding be reported on NNUK's tax returns in the

21   UK?

22             A.    Yes.

23             Q.    Do the normal transfer pricing

24   rules apply in insolvency?

25             A.    They should do.

 Neeson & Associates    W&P WILSON & PETZOLD LTD.

1                    Q.    And is the same true for all the
2      other EMEA entities and their respective revenue
3      authorities?
4                    A.    For a large number of them, yes.
5                    Q.    If the Canadian view were
6      accepted, would that be consistent with the
7      transfer pricing model that was presented to the
8      revenue authorities in prior years?
9                    THE CANADIAN COURT:  Just a moment.
10     Excuse me.  Sir, there is an objection here.
11                   MR. KIMMEL:  Again, I have the same
12     objection, Judge Gross and Justice Newbould, that
13     this witness is being asked for his opinion --
14                   THE CANADIAN COURT:  You better speak
15     up a bit.
16                   MR. KIMMEL:  This witness is being
17     asked for his opinion about matters in connection
18     with issues in this lawsuit.  It is not the subject
19     of his affidavit, nor is it appropriate to be
20     eliciting opinion evidence from this witness at
21     this time.
22                   MR. GOTTLIEB:  If I can just deal with
23     that objection before there is any further
24     discussion on it.
25                   With respect, we have a very different



1  view.  The evidence of the witness was what

2  transpired at Nortel and what the UK taxation

3  authority was told about certain transactions,

4  including this.  So the question of the witness, as

5  I heard it, was Is this consistent; would the

6  Canadian position be consistent with what the UK

7  tax authorities were, in fact, told.  And this

8  gentleman, being involved in that, is able to give

9  an answer.  He is allowed to give an answer whether

10  or not a position taken would be consistent with

11  what he knows the UK tax authority was told.

12           So in our respectful submission, it is

13  a proper question.

14           THE CANADIAN COURT:  I think you can

15  proceed.

16           THE US COURT:  Yes.  That would have

17  been my conclusion as well, to overrule the

18  objection.

19           MR. ADLER:  All right, then.  I am not

20  sure if we got an answer to that yet.

21           THE WITNESS:  I am not sure I can

22  remember the question.

23           THE CANADIAN COURT:  The question was

24  if the Canadian position is accepted, would that be

25  consistent with what the UK tax authorities were

 Neeson & Associates   W&P

 1   told about the transfer pricing.

 2                THE WITNESS:  The answer is no.

 3                BY MR. ADLER:

 4                Q.   And do you have any concern about

 5   that in your role as the person who will presumably

 6   be preparing those returns?

 7                A.   Particularly, I would think that

 8   the UK and to the same extent for France as well,

 9   although I am not involved with the returns there.

10   Both of those companies are open for tax back to

11   2000, I believe is the position in France, and for

12   transfer pricing.

13                MR. ADLER:  Okay.  That's my

14   questioning for now, Mr. Stephens.  I may come back

15   after the other parties have.

16                We are endeavoring to adjust the camera

17   here.  We will figure out how to do that

18   momentarily to get Mr. Stephens in.  But I suggest

19   we proceed.

20   CROSS-EXAMINATION BY MR. BARRACK:

21                MR. BARRACK:  Good morning, Your

22   Honors.

23                BY MR. BARRACK:

24                Q.   Good morning, Mr. Stephens.  It is

25   Mike Barrack.  We met at the deposition.



```
 1                    A.    Good morning.  I recall.
 2                    Q.    You were closely involved on the
 3       tax side with the implementation of the MRDA, were
 4       you?
 5                    A.    Yes.
 6                    Q.    And -- go ahead.
 7                    A.    Could I clarify that?  By
 8       "implementation," I was not around when it was
 9       first introduced at the end of 2001.
10                    Q.    Right.  As opposed to the drafting
11       of it, but you actually implemented it in the UK
12       and put it into place?
13                    A.    No.  I would disagree with that.
14       It took place before I arrived.
15                    Q.    And on a year-to-year basis were
16       you responsible for filing the returns on a basis
17       consistent with the MRDA?
18                    A.    Yes.
19                    Q.    And in that capacity, you were
20       familiar with some of the technical issues involved
21       in filing those returns in the UK?
22                    A.    What technical issues?  Tax
23       technical issues?
24                    Q.    Tax technical issues.
25                    A.    Yes, yes, yes, yes.
```



```
 1                    Q.   And just to make it clear, did you
 2   file for the other EMEA entities as well or just
 3   NNUK?
 4                    A.    In a sense, I didn't file in that
 5   I did not sign the return.  But I was vaguely
 6   engaged on the Irish returns, but definitely not
 7   the French returns.  I had very little to do with
 8   the French company.
 9                    Q.   So what I would like to do is just
10   focus first on one technical issue within the UK
11   and how it intersected with the MRDA, and that is
12   accounting for the UK pension costs.  So if we will
13   back it up a little bit, I think it is not
14   controversial.  We have heard from other witnesses
15   that the MRDA on an annual basis dealt with the
16   allocation of annual profits between the five RPEs
17   or IEs, as you refer to them; correct?
18                    A.    Correct.
19                    Q.   And in that model, just to get
20   some nomenclature between us, revenues were
21   aggregated and costs were aggregated above the line
22   to come to a net profit number.  Then the LREs got
23   their routine returns, and that resulted in what
24   was known as the residual profit; correct?
25                    A.    No.  The residual profit was a
```



1   third stage down the pile, which was the routine

2   returns for the IEs had to be extracted first.

3                Q.   I want to focus then on the

4   revenue line.  Did the revenue line include the

5   revenues of all of the Nortel entities?

6                A.   Not the way it was calculated,

7   because it was calculated off the P&L accounts of

8   the participants.

9                Q.   Okay.  So it included the revenue

10  of the participants being the same as an RPE or an

11  IE?

12               A.   Yes.

13               Q.   Did it include -- sorry.  Go

14  ahead.

15               A.   It was only their revenue accounts

16  that were included, not those of the other Nortel

17  entities.

18               Q.   Okay.  So not the LREs?

19               A.   No.  The transfer pricing

20  adjustments paid by the LREs generally where

21  (inaudible) the payors were included in the results

22  of Nortel Networks Ltd.

23               Q.   So we have the five RPEs or IEs

24  being the revenue line, and then we have a series

25  of expenses being deducted to come up with the

 Neeson & Associates    W&F Wilson & Peyton Ltd.

1    residual profit.

2              Were the UK pension expenses on an

3    annual basis included in those expenses?

4              A.    Bear in mind these numbers were

5    calculated under US GAAP.

6              Q.    Understood.

7              A.    And I am not an expert in US GAAP.

8    But there is pension cost included there, and as I

9    understand it, there is some amortization of the

10   deficits on pension plans as well included in the

11   pension cost.

12             Q.    So leaving aside the niceties of

13   US GAAP as to how a UK pension expense amount would

14   be calculated, there would be embedded in the costs

15   above the line an amount in respect of the UK

16   pension costs.  Is that fair, sir?

17             A.    Yes.  There should be.

18             Q.    Okay.  And similarly, if we can

19   look at the annual debt service payments on the

20   outstanding Nortel bonds, in the MRDA calculation,

21   were they above the line and deducted before

22   residual profit was calculated, or below the line?

23             A.    No.  Interest income and interest

24   expense was not included.

25             Q.    So, sir, I believe there is



```
 1   someone there that can give you a copy of Trial
 2   Exhibit 31094, which is a presentation that bears
 3   your name of October 31, 2005.  Do you have that
 4   there?
 5                   A.   Somebody is busy scrambling to
 6   find it.
 7                   Q.   I will wait until you have it,
 8   sir.
 9                   A.   I recognize this, yes.
10                   Q.   And this bears your name.  Can you
11   identify what this document was, sir?
12                   A.   This, I believe, looking at the
13   date, was a presentation to some senior financial
14   management in the UK.
15                   Q.   Okay.  And I only want to look at
16   one page of this to talk about a couple of
17   technical issues that you referred to earlier.  And
18   I have it as, I think, the fourth-to-the-last slide
19   from the back, "Residual profit split.  Identified
20   problems in APA negotiations to date."  It is the
21   fourth or fifth from the back.
22                   Again, sir, "Residual profit split,
23   identified problems in APA negotiations to date."
24                   A.   Okay, yes.
25                   Q.   And when you are referring to APA
```



```
 1   negotiations there, APA negotiations with which

 2   entity or entities?

 3                 A.    The only parties who were in APA,

 4   that made APA applications, were the UK, Canada and

 5   the US.

 6                 Q.    Well, let's come to these issues.

 7   If you can go down to the third last bullet

 8   point -- and you made passing reference to this in

 9   your testimony already -- "Treatment of transfer

10   pricing adjustments is royalty for IP and

11   withholding consequences."  Do you see that line?

12                 A.    I do.

13                 Q.    And I think you indicated in your

14   testimony earlier today that there were three

15   economic models being considered for the transfer

16   pricing, but it was only this RPSM, or joint

17   venture, as you called it, that dealt with this

18   withholding tax issue.  Is that fair?

19                 A.    In my view, yes.

20                 Q.    Okay.  And I just want to unpack

21   technically a little bit why that is the case.

22                 As I understand it, in order to avoid

23   this withholding tax, licenses were granted to each

24   of the RPEs, and that was a necessary step in

25   avoiding the withholding tax, one of the necessary
```

Neeson&Associates   W&F

 1    steps.

 2                    A.    I am past.  I have no knowledge of

 3    those particular steps or the wording in the

 4    agreement.

 5                    Q.    Okay.  Were you aware generally

 6    that under the relevant tax legislation that was

 7    based on the OECD model, that in order to avoid

 8    this withholding tax, it was necessary to give the

 9    RPEs an ownership interest in the technology?

10                    A.    I believe that would be the case,

11    yes, because if they didn't have an ownership

12    interest, they must be paying a royalty.

13                    Q.    And that would then give rise to

14    the withholding tax?

15                    A.    Yes.

16                    Q.    And then if we could look at

17    the -- if we could go up to the fourth bullet

18    point, "Incremental reward for marketing

19    intangibles in RPS participants.  US and location

20    there of global customers.  UK and EMEA sales

21    support."

22                    What was the point you were trying to

23    make there, sir?

24                    A.    That for the US, there is actually

25    a standard, I believe, IRS argument, usually based



1    on the size of the market.  If you are successful

2    in the US market, this has to be down to the

3    superiority of the sales team; and therefore, the

4    US entity should get a premium return.

5                 And in the UK, if this had been raised,

6    in fact, by UK Revenue on the earlier transfer

7    pricing discussions, the element of support given

8    by the UK company to the other EMEA distributors in

9    making sales and installation.

10                Q.   All right.  And was this a

11   recognition of the fact that while revenue may be

12   earned in one jurisdiction, that revenue was the

13   result of costs and efforts in other jurisdictions

14   as well?

15                A.   Part and parcel of the global

16   joint venture.  Everybody trading to maximize the

17   global revenues from the exploitation of Nortel

18   technology.

19                Q.   And, in fact, in all of your

20   tax-planning activities prior to insolvency, they

21   were aimed at maximizing the joint revenue of a

22   single enterprise?

23                A.   A single global enterprise in

24   which the IEs all participated, yes.

25                MR. BARRACK:  All right.  Thank you.

Neeson & Associates   W&F

```
 1   Those are my questions.
 2   CROSS-EXAMINATION BY MS. KIMMEL:
 3              THE CANADIAN COURT:  Ms. Kimmel.
 4              MR. KIMMEL:  Thank you, Your Honor.  I
 5   guess I am the beginning of the nonfriendly
 6   crosses, so to speak.
 7              BY MS. KIMMEL:
 8              Q.   But you know me, Mr. Stephens.  I
 9   am Jessica Kimmel, and you know I am actually
10   friendly, notwithstanding.
11              A.   Nice to do battle with you again.
12              Q.   We will stay friends, I am sure.
13              I think you said this earlier this
14   morning in your testimony, Mr. Stephens, but you
15   are still under an employment contract with NNUK;
16   is that right?
17              A.   I am, indeed, yes.
18              Q.   And since the administration
19   orders that were issued in early 2009, I take it
20   you have been working with the Joint Administrators
21   as well as other continuing employees of NNUK; is
22   that right?
23              A.   Correct.
24              Q.   And the Joint Administrators being
25   the representatives of Ernst & Young UK; is that
```



```
 1   right?
 2              A.    Yes.
 3              Q.    And I think it has been your
 4   practice in the course of the entire time that you
 5   have been working with NNUK to submit monthly or
 6   periodic activity reports; is that right?
 7              A.    Not consistently, but -- they were
 8   requested at a number of points, but they got
 9   dropped for a few years.  But yes, I have done this
10   periodically.
11              Q.    And when you did do it, I take it
12   that they were intended to be an accurate
13   reflection of what you were doing in the period
14   that you were reporting on; is that right?
15              A.    Yes, although I might have to do a
16   bit, perhaps, of puffing a little bit occasionally.
17              Q.    And in addition, those reports
18   sometimes contained your views or comments on
19   particular matters that you were working on; is
20   that right?
21              A.    Yes.
22              Q.    I am going to try to avoid showing
23   you documents, although I have -- if you do want me
24   to show you a document at any point, let me know.
25   But as long as we are understanding each other,
```



```
 1   just because of the technological challenges here,

 2   I am not going to pass up documents each time I ask

 3   you a question.

 4                I think you said that in late 2004 you

 5   assumed the role as EMEA's point person in the tax

 6   department for transfer pricing; is that right?

 7                A.   That would probably be right, as

 8   my predecessor started to suffer from ill health.

 9                Q.   And your predecessor was Donna

10   Panton; is that right?

11                A.   That is correct, yes.

12                Q.   So she had been the EMEA point

13   person for transfer pricing purposes prior to the

14   end of 2004?

15                A.   In practice, yes.

16                Q.   Okay.  Now, I take it when you

17   joined Nortel Networks UK Ltd., that you had

18   experience with other multinational companies,

19   groups of companies; is that right?

20                A.   Correct, yes.

21                Q.   Experience as an auditor, I guess.

22                A.   Not an auditor.  As a tax advisor.

23                Q.   Okay.  And I assume that you

24   expected that Nortel would have a transfer pricing

25   policy?  That would be expected; right?
```



```
 1                   A.    Yes, yes.
 2                   Q.    And I take it that when you
 3     joined, the policy, as you have said, was already
 4     effectively in place.
 5                   A.    It was, indeed, yes.
 6                   Q.    Now, you mentioned in your
 7     testimony this morning that you initially looked at
 8     some of the historical transfer pricing
 9     arrangements under the cost-sharing agreements in
10     connection with some ongoing tax audits; is that
11     right?
12                   A.    That is right, yes.
13                   Q.    And those were eventually
14     resolved, I take it?
15                   A.    They were, indeed, yes.
16                   Q.    And I take it you were involved in
17     communicating with the UK tax authority in
18     connection with those audits; is that right?
19                   A.    Yes.  It was mainly done by
20     meetings, but I attended those meetings.
21                   Q.    And to the extent that you did
22     write to the UK tax authorities in connection with
23     those audits in the early days when you first
24     joined until the audits were resolved, you made
25     every effort to provide fulsome and accurate
```

 1    information to the UK tax authority; is that right?
 2              A.   I don't think I wrote a single
 3    word to the tax authorities.  As I say, it was
 4    nearly all done by -- through meetings, and I
 5    certainly was not the person who wrote any letters.
 6              Q.   Okay.  I think there is one
 7    document I am going to need to show you then, just
 8    to hopefully refresh your recollection,
 9    Mr. Stephens.  Hopefully somebody in the room there
10    has for you Trial Exhibit 33040.
11              Does this refresh your recollection,
12    Mr. Stephens, that you did at least have one
13    written communication with the UK tax authorities
14    in connection with the cost-sharing agreement tax
15    audits?
16              A.   Read the first sentence:  "I am
17    sending this on behalf of Ian Widdowson and Donna
18    Panton."  And I do not believe that I had much hand
19    in drafting any of this.  In fact, from memory,
20    most of this was written by KPMG, and I was acting
21    as the letterbox.
22              Q.   But I take it, Mr. Stephens, as a
23    professional, you wouldn't have sent a
24    communication to the tax authorities that you
25    considered to contain any inaccurate or incomplete



```
 1   statements?

 2                  A.    You may definitely take that as

 3   being the case.

 4                  Q.    Okay.  So at least in your

 5   capacity as the transmitter of these submissions,

 6   you were satisfied that they contained accurate

 7   representations at the time; is that right?

 8                  A.    Yes, yes.

 9                  Q.    Thank you.  And sometime following

10   this communication, these audits for these

11   particular historical transfer pricing arrangements

12   were settled and the tax authorities' files were

13   closed; is that right?

14                  A.    Correct, yes.

15                  Q.    And I think you said this in your

16   testimony, but I just want to have it confirmed.

17   In order to assist in this exercise, you did make

18   it your business to develop an understanding of the

19   existing or the historical transfer pricing

20   arrangements that were the subject of these audits;

21   is that right?

22                  A.    Yes, definitely.  I came to this

23   with no knowledge at all, from (inaudible) and

24   understand the background and the methodology.

25                  Q.    Very good.  And then once this was
```



```
 1   resolved, you said you turned your attention then

 2   to the residual profit-split methodology, which was

 3   already in place; is that right?

 4                A.   Yes.

 5                Q.   Now, you said that you had an

 6   opportunity to comment on what we have been

 7   calling -- I think it is a term that you coined --

 8   the MRDA; is that right?

 9                A.   Yes, yes.

10                Q.   And you said you provided some

11   high-level comments.  But I assume you provided

12   your full views at the time as to anything that you

13   were concerned about or that you disagreed with;

14   correct?

15                A.   On the basis of high-level

16   comments, not the tight legal wording of the

17   document.

18                Q.   Now, just as a starting point

19   here, in paragraph 12 of your affidavit, if you

20   have that --

21                A.   I do, indeed.

22                Q.   -- the second sentence, you say

23   that the MRDA was largely drafted and created in

24   North America.  Do you see that?

25                A.   Yes.
```

 Neeson & Associates    W&F

```
1                    Q.   But that isn't something that you
2     were involved in?  I think you have acknowledged
3     that; correct?  So you don't have --
4                    A.   I was not --
5                    Q.   Sorry.  Go ahead.
6                    A.   I was not involved at all in the
7     drafting.
8                    Q.   And, in fact, the drafting almost
9     entirely preceded your involvement with the
10    document.  You only got involved at the very end,
11    just before it was signed?
12                   A.   Yes.  But we were presented with
13    what was essentially a final document, yes.
14                   Q.   So in fairness, though,
15    Mr. Stephens, you don't actually know who was
16    involved.  Because you weren't involved, you don't
17    know who was involved in the drafting of the
18    document, do you?
19                   A.   I think I could state with some
20    certainty there was nobody on this side of the
21    Atlantic who was involved in it.
22                   Q.   Do you know who Peter Hutton is?
23                   A.   I am aware of Peter Hutton, yes.
24    He was maybe a director of tax at one point.
25                   Q.   And he was in the UK; correct?
```



```
 1                    A.   He was based in the UK, yes.
 2                    Q.   Are you familiar with someone by
 3      the name of Angela Anderson?
 4                    A.   I am -- I heard the name, but it
 5      has been mentioned to me before, but not somebody I
 6      ever came across knowing at Nortel.  I may have
 7      done so, but it must have been fleeting, to say the
 8      least.
 9                    Q.   And will you agree with me, sir,
10      that you can't say who precisely contributed to or
11      was consulted with over the course of the number of
12      years that this document was under discussion?
13                    A.   I certainly cannot, no.
14                    Q.   And outside of the people who you
15      were dealing with in the tax group, you can't say
16      one way or another what other internal groups at
17      Nortel were involved in drafting the MRDA or the
18      amendments; correct?
19                    A.   I cannot say with certainty other
20      than the tax group would have been aware if anybody
21      in the UK had been consulted.
22                    Q.   And certainly you acknowledge that
23      the EMEA tax group based out of the UK was
24      consulted and had input in connection with the MRDA
25      and the amendments that followed; correct?
```



 1                    A.   To the extent I would have been

 2   consulted, only from about November 2004; and, yes,

 3   we were consulted on some of the later amendments.

 4                    Q.   And, in fact, didn't you join a

 5   steering committee, a transfer pricing steering

 6   committee at one point that was responsible for

 7   dealing with amendments to the MRDA and dealings

 8   with the advance pricing agreements with the tax

 9   authorities?

10                    A.   This consultative committee was

11   put together to try and help devise a successor

12   model to the one that had been created in 2001, the

13   components of the residual profit split model. From

14   memory, there were two, maybe three conference

15   calls, a few emails, but ultimately, that working

16   party died.

17                    Q.   But you recall the committee was

18   set up, and you also recall that you were involved

19   in discussions and provided input and comments on

20   the various amendments to the MRDA; correct?

21                    A.   There were amendments already to

22   the components that we were discussing.  But at the

23   end of the day, all was taken away and dealt with

24   somewhere else.  We were not involved in the final

25   development of the successor model that was applied

```
 1    from 2006.  We had input into it, and a lot of our
 2    concerns were addressed in that.
 3              Q.   Okay.  That's what I was coming
 4    to.  So you acknowledge that?
 5              A.   Yes.
 6              Q.   Okay.  Thank you.
 7              Now, I would like you to take a look at
 8    the MRDA itself, which I hope somebody will be able
 9    to provide you with a copy of.  It is Trial Exhibit
10    21003.
11              MR. KIMMEL:  And, Your Honors, I am
12    happy to provide yet another copy if you would
13    like, but I imagine you --
14              THE CANADIAN COURT:  There is more than
15    enough paper in this case.
16              THE US COURT:  I have mine.  Thank you,
17    Ms. Kimmel.
18              MR. KIMMEL:  I thought you might have a
19    copy handy.
20              BY MR. KIMMEL:
21              Q.   Mr. Stephens, do you have a copy
22    of the MRDA now in front of you?
23              A.   I have a copy, yes.
24              Q.   Okay.  And you testified this
25    morning in your evidence in chief that you
```

 Neeson & Associates    W&P

```
 1   considered this document to create what you

 2   described as a form of joint venture.  Is that your

 3   evidence?

 4              A.   That is my view -- my opinion,

 5   which you may not like.  It's my opinion.

 6              Q.   Okay.  Now, could you turn to page

 7   12 of this document, Article 13, entitled

 8   "Relationship of the Participants."

 9              A.   I am familiar with what you are

10   going to say, yes.

11              Q.   I take it you know where I am

12   headed with this, Mr. Stephens.

13              A.   I know precisely where you are

14   headed, yes.

15              THE CANADIAN COURT:  He has already

16   said if it says it is not a joint venture, then his

17   answer was "then I don't know what it is."  The

18   witness has already said that.

19              MR. KIMMEL:  Yes, I heard him.

20              THE CANADIAN COURT:  All right.  Well,

21   twice doesn't make any difference.

22              BY MR. KIMMEL:

23              Q.   Mr. Stephens, what I wanted to ask

24   you was whether you ever indicated to any of the

25   tax authorities who you were dealing with your view
```



1    that, notwithstanding this provision, Article 13,

2    and the statement that it does not create a

3    partnership or joint venture, that you considered

4    that it did?

5              A.   I have not expressed any view to

6    any tax authority about the nature of the

7    arrangements, whether they are a joint venture,

8    partnership or whatever.

9              Q.   Thank you.  And you did say that

10   it was the tax authorities who were the audience

11   for this agreement.  Isn't that what your evidence

12   was earlier today?

13             A.   That is my view, yes.

14             Q.   And I take it you also acknowledge

15   that this agreement, the MRDA, indicates

16   specifically that it is granting licenses to the

17   licensed participants in respect of certain rights

18   to use the NN technology; correct?

19             A.   Yes, but I am not a lawyer, and I

20   am not necessarily sure that I would fully

21   understand the ramifications of that.  But that may

22   be necessary just to conduct business.

23             Q.   But nonetheless, you didn't

24   indicate to the tax authorities who you were

25   dealing with that there were not licenses or that



```
 1    this arrangement as reflected in this document was
 2    not accurate; correct?
 3                   A.   I have never discussed that matter
 4    with any tax authority.
 5                   Q.   And did you understand that the
 6    license arrangements under this agreement were
 7    described as being royalty-free?  Was that your
 8    understanding?
 9                   A.   That was my understanding, yes.
10                   Q.   And again, you never suggested to
11    any tax authority that that was an inaccurate
12    characterization?
13                   A.   As I said, I have not represented
14    to any tax authority any detailed term of this
15    agreement.
16                   Q.   Are you aware of anyone else on
17    behalf of Nortel ever having represented to any tax
18    authority that the arrangements that we have just
19    been discussing as described in this agreement were
20    not an accurate reflection of the relationship
21    between the parties?
22                   A.   I cannot speak for what others
23    have done.
24                   Q.   So I take it your answer is you
25    are not aware?
```



```
 1                    A.    I cannot speak, but I am not

 2    aware.

 3                    Q.    Thank you.

 4                    Now, in paragraphs 13 and 14 of your

 5    affidavit, in both of those paragraphs you speak

 6    about the fact that the MRDA, you say in 13,

 7    purported to represent an arm's-length agreement.

 8    Do you see that?

 9                    A.    Yes.

10                    Q.    And then in paragraph 14 you

11    repeat again, it "purported to be arm's length."

12    Do you see that?

13                    A.    Yes.

14                    Q.    Now, first of all, in connection

15    with the phrase "arm's length," you mean by that

16    that it was intended to be on terms that unrelated

17    parties would agree to; correct?

18                    A.    Correct, yes.

19                    Q.    And I take it you will agree with

20    me, Mr. Stephens, that you and others, including

21    the outside advisors to the Nortel entities,

22    endeavored to come up with a formulaic method to

23    arrive at an acceptable arm's-length result that

24    was embodied in this agreement and the amendments;

25    correct?
```



```
 1                    A.    Absolutely.
 2                    Q.    Okay.  And that was the result
 3    that was applied in practice by the Nortel entities
 4    under the MRDA and its amendments; correct?
 5                    A.    It was, indeed.
 6                    Q.    And the objective was to treat all
 7    of the participants fairly; is that right?
 8                    A.    Yes.
 9                    Q.    And you think that was achieved,
10    don't you?
11                    A.    I do believe that was achieved,
12    yes.
13                    Q.    And to the extent that it may have
14    resulted in an unintended benefit to one or other
15    of the participants with respect to particular
16    operations, you don't consider that to offend the
17    arm's-length principle, do you?
18                    A.    I know what you are referring to,
19    and I know I used that phrase.  That was just the
20    way the numbers fell on the facts.
21                    Q.    Okay.  So when you say you know
22    what I am referring to, I think just for the
23    benefit of the Courts, I am going to show you
24    another document, if you don't mind.  It is Trial
25    Exhibit 43387.
```



```
 1                  Sir, we are just waiting for copies to
 2     be passed out here.
 3                  Mr. Stephens, is this the email that
 4     you were thinking of when you said you knew what I
 5     was referring to?
 6                  A.   I think there probably are --
 7     there are some others making the same point as well
 8     elsewhere (inaudible).
 9                  Q.   Okay.  But the point you are
10     making in this email -- let's just orient
11     ourselves.  This is an email from you to someone
12     named Alay Patel.  Who is he?
13                  A.   He is one of the valuation people
14     working for the Joint Administrators.
15                  Q.   So he is with Ernst & Young UK?
16                  A.   He is, indeed, yes.
17                  Q.   And you have been dealing with him
18     as one of the representatives of the Joint
19     Administrators in the course of these
20     administration proceedings?
21                  A.   Correct.
22                  Q.   And this is written in August of
23     2009, and you provided him with some information.
24     And if you look towards the bottom of the page of
25     this email, the paragraph that begins, "The 'RPS
```



```
 1   Participants' tab."  Do you see that?
 2               A.   Yes.
 3               Q.   And it says,
 4   "Although I doubt neither you nor the
 5   Administrators may wish to know this but NNUK has
 6   been a serial, and unintended, beneficiary of the
 7   RPS method since it was introduced in 2001," and
 8   then you proceed to explain that.
 9               And that was your view at the time as
10   you expressed it to Mr. Patel?
11               A.   Yes.  It was just based on the
12   facts and how the numbers fell.  It is one of these
13   things that if there had been profit rather than
14   losses in those years, the UK would have been a
15   loser.  But as it happens, because there were
16   losses, it benefited to the smaller share of the
17   loss.
18               Q.   But you didn't think that that
19   offended the arm's-length principle; that was
20   just --
21               A.   Fortunes of war.
22               Q.   Good.  Thank you very much.
23               Now, in terms of the dealings with the
24   UK tax authorities, if we could just come back to
25   that in a little bit more specificity, I think you
```



```
 1   said earlier that most of them were meetings as
 2   opposed to written communications; is that right?
 3             A.   That is right, yes.
 4             Could I clarify that?  That was in
 5   relation to the transfer pricing audit covering the
 6   late 1990's.  For the APA application, there was
 7   quite a lot of written communication, but most of
 8   it came out of North America, not out of the UK.
 9             Q.   But there was some communication
10   out of the UK; correct?
11             A.   There was some communication out
12   of the UK, but the majority was from North America.
13             Q.   And you participated in most of
14   the meetings with Inland Revenue or HMRC, as they
15   are also referred to?
16             A.   There are only two that I recall.
17   There may have been a third.  There is one that I
18   attended on my own and another one where Mark Weisz
19   and John Doolittle attended as well.  There may
20   have been a third one, but I can't recall it.
21             Q.   Okay.  Now, I take it, as you said
22   to me earlier, the same would apply in connection
23   with your dealings concerning the MRDA and the
24   residual profit split, that it was important that
25   your communications with the tax authority be open
```



1    and honest and as fulsome as you could possibly
2    make them?
3                    A.    Yes.
4                    Q.    Okay.  And do you recall that
5    there came a point in time when the UK tax
6    authority decided not to take an active role in the
7    ongoing negotiations and discussions concerning
8    advance pricing arrangements?
9                    A.    Probably quite early in the
10   process they came to that conclusion, lacking
11   budget if nothing else.
12                   Q.    So early in the process it was
13   communicated to you and the others at Nortel that
14   the UK tax authority was going to go along with
15   what the other tax authorities decided rather than
16   actively participating; correct?
17                   A.    Not necessarily automatically,
18   except I think the expression was that they could
19   probably live with what the US and Canada might
20   decide so long as it wasn't too radical.
21                   Q.    And from that point onwards, I
22   take it that the involvement or communications with
23   the UK tax authority became much reduced; is that
24   fair?
25                   A.    Very much reduced, yes.  There



```
 1   were two or three conference calls, two of which I
 2   don't think (inaudible) because the North Americans
 3   held it direct, and the UK Revenue were copied with
 4   anything that was written to the North American
 5   revenue authorities.
 6             Q.   Now, you say in your affidavit
 7   that you represented to the tax authorities that
 8   each RPE, residual profit split entity, was
 9   entitled to share in the profits and losses of the
10   Nortel group; is that right?
11             THE CANADIAN COURT:  Would you just
12   point out where that is, please.
13             MR. KIMMEL:  It is paragraph 20.
14             THE CANADIAN COURT:  20.  Thank you.
15             THE WITNESS:  What I said there is -- I
16   did not say that.  I said it is implicit in
17   representation and probably it is actually explicit
18   in the paper that I wrote, which is attached here
19   somewhere as an exhibit, to UK Revenue on the UMTS
20   disposal.
21             BY MR. KIMMEL:
22             Q.   But in fairness, Mr. Stephens, I
23   read this.  And if you are saying it is implicit, I
24   would just like to have that from you.
25                  I read the last sentence of paragraph
```



1    20 of your affidavit at the top of page 6.  You

2    say, "This economic ownership was the basis on

3    which," and then you go on to say, "we could

4    represent to the tax authorities that each RPE was

5    entitled to share in the profits and losses of the

6    Nortel Group."

7                    So I took from that to mean that you

8    did, in fact, make that representation.

9                    A.   I said we "could" represent.

10                   Q.   So you are not suggesting that you

11   did?

12                   A.   I said implicitly we did make the

13   representation.  I am just not -- not saying that I

14   could point to -- certainly point to nothing in

15   writing.  With that said, I may have sat across the

16   table, but that's seven or eight years ago now, and

17   I can't remember.

18                   Q.   Just so we have it clearly, we

19   would read that paragraph of your affidavit as

20   suggesting that it was an implicit representation

21   that they were each entitled to share in the

22   profits and losses of the Nortel Group?

23                   A.   And I think, to an extent, it is

24   explicit in the paper that I sent to revenue on the

25   UMTS disposal.



1               Q.   Right.  But --

2               A.   Is the exhibit here?

3               Q.   But is it fair to say that this

4    sharing of profits and losses that you are

5    referring to, whether it be implicit or explicit in

6    your representations, that that was reflected in

7    the calculation of the arm's-length R&D allocation

8    under the MRDA?  Isn't that right?

9               A.   Yes; we shared in the operating

10   profits and losses by reference to R&D spend.

11              Q.   And that was, in fact, right in

12   the formula for calculation of the split; right?

13              A.   Yes, yes.

14              Q.   And I take it all of the tax

15   authorities were given a copy of the MRDA and the

16   amendments; is that right?

17              A.   I can't swear to that, but I

18   assume they must have been.

19              Q.   Okay.  And are you aware of any

20   other written agreement that deals with the rights

21   of the RPS participants to share in the profits and

22   losses of the Nortel Group other than the MRDA and

23   its amendments?

24              A.   I think the only other thing is

25   the memorandum of understanding that was entered



1    into at the back end of 2008.

2              Q.    Aside from that?

3              A.    Not that I am aware of, although

4    you are probably going to tell me about the Osiris

5    agreement, and I never read that.

6              Q.    So you are not aware of any other

7    such agreement; that's fair?

8              A.    Yes.

9              Q.    Now, am I right that in your

10   written communications with the UK tax authority

11   that you mentioned a few moments ago relating to, I

12   believe, one of the events that you have already

13   testified to, am I right that you told them about

14   the MRDA and that it gave the parties an economic

15   interest in the profits or losses derived from the

16   exploitation of the Nortel Group IP?  Is that the

17   way you described it?

18             A.    I am sorry.  I have just lost -- I

19   am not sure what the question is.  I am sorry, but

20   I just didn't see a question there.

21             Q.    Do you recall that the way in

22   which you described the relationship between the

23   parties and the entitlements to be that the RPS

24   participants were given an economic interest in the

25   profits or losses derived from the exploitation of



1   the Nortel Group IP?

2                A.    I can't recall what I have said

3   other than that is what I believe, and I therefore

4   think I would have said if I had made the point to

5   any revenue authority.  I am sorry, but I don't

6   recall what I said in meetings eight years ago

7   (inaudible).

8                Q.    I am going to show you something

9   that will confirm this.  But just as a starting

10  point, what I just said to you is, in fact, what

11  you believed; correct?

12               A.    Yes.

13               Q.    Okay.  Now, if we can look at

14  Exhibit I to your affidavit.  And I believe this is

15  Trial Exhibit 33213, just for the record.  These

16  are some emails in August of 2007.  And you will

17  see that the subject line on the first line is the

18  UMTS sale.  Do you see that?

19               A.    Yes, yes.

20               Q.    Now, what I am interested in is

21  actually on the second page of this document.  It

22  is your email to Nick Randall, April 23, 2007.

23               A.    Yes.

24               Q.    And Mr. Randall was with the UK

25  tax authority, was he not?



1                    A.    He was our technical -- no.    He
2    was our case manager at the time.
3                    Q.    And he was with Inland Revenue?
4                    A.    Correct.
5                    Q.    Or HMRC, as they were then known?
6                    A.    Yes.
7                    Q.    And they are still known as HMRC;
8    right?    Inland Revenue was the old name?
9                    A.    They are.    Inland Revenue is the
10   definitely the old name; and HMRC is what they are
11   colloquially known as these days.
12                   Q.    Okay.    Now, let's take a look at
13   your email to Mr. Randall, if we could.    And what I
14   am particularly interested in, if you look -- it is
15   the fourth full paragraph.    You have to skip over
16   the little box that has the electronic attachment.
17   It is the paragraph that begins "The CSA was
18   replaced with the fact."    Do you see that?
19                   A.    Yes.
20                   Q.    Just if we could look at the
21   second sentence.    You say:
22   "This gives the parties an economic interest in the
23   profits or losses derived from exploitation of the
24   Nortel Group IP by reference to their proportionate
25   historical contribution to the group R&D spend."



1   Do you see that?

2                   A.    Yes, yes.

3                   Q.    And this is what you are

4   describing to be the interests under the MRDA;

5   correct?

6                   A.    Yes.

7                   Q.    And then you go on to say, "the

8   profit derived from IP exploitation is broadly the

9   group profit after allocation of remuneration for

10  so-called routine functions performed,

11  manufacturing and product distribution."

12                  Again, you are describing the effect,

13  as you understood it, of the MRDA; correct?

14                  A.    Yes.

15                  Q.    An then you say "this agreement."

16  Again, you are referring to the MRDA; is that

17  right?

18                  A.    I would assume so, yes.

19                  Q.    "Provides that on exit, a

20  participant will be paid out for the market value

21  of the participant's economic right to participate

22  in future profits derived from IP exploitation."

23                  And that was your view at the time as

24  to what the MRDA provided for and this is what you

25  were representing to the tax authorities?



```
 1                    A.    Yes.
 2                    Q.    Now, this, I take it, is what you
 3    represented to the tax authorities as being
 4    consistent with the arm's-length principle for
 5    transfer pricing purposes; is that right?
 6                    A.    Implicitly, yes.  I doubt that I
 7    ever made that representation in those words.  By
 8    in filing tax returns based on this model, yes,
 9    that is what we were saying.
10                    Q.    And you have agreed with me
11    already, but just so we have it now that you have
12    provided your understanding, that it is the MRDA
13    that governs the participant's individual interest
14    in intellectual property and their participation in
15    profits derived from the exploitation of Nortel
16    technology or intellectual property; correct?
17                    A.    Yes.
18                    Q.    And you agree that it is a legal
19    document; right?
20                    A.    It is a legal document, yes.
21                    Q.    And as far as you know, it is the
22    only source of rights that NNUK has in connection
23    with Nortel's intellectual property; correct?
24                    A.    I am not a lawyer; therefore, I
25    can't comment on that, as to whether there is any
```

1  other formal agreement.  But I am not aware of

2  anything else.

3            Q.  So in your affidavit and -- sir, I

4  have just been reminded about the time.

5            THE CANADIAN COURT:  I was going to

6  ask, how long do you think this take?

7            MR. KIMMEL:  I probably have another

8  little over half an hour with respect to this

9  examination, so I don't think we should continue.

10           THE CANADIAN COURT:  Perhaps for the

11 reporter's sake, we will take the morning break

12 then for 20 minutes.

13           MR. KIMMEL:  Very well, Your Honor.

14           THE US COURT:  All right.  Twenty

15 minutes.

16 -- RECESS AT 10:40 a.m. --

17 -- UPON RESUMING AT 11:10 a.m. --

18           THE US COURT:  Thank you, everyone.

19 Please be seated.

20           THE CANADIAN COURT:  Ms. Kimmel.

21           MR. KIMMEL:  Thank you, Your Honor,

22 Judge Gross.

23           BY MR. KIMMEL:

24           Q.  Before the break, Mr. Stephens, we

25 had talked about the exhibit to your affidavit and

Neeson&Associates   W&F

1    how you articulated the rights under the MRDA to

2    the tax authorities.  And what I wanted to ask you,

3    sir, is whether that articulation of the rights

4    that we were looking at before the break, whether

5    that is what you mean in your affidavit when you

6    talk about owning the intellectual property or

7    having an economic ownership of intellectual

8    property.  It is the embodiment of those rights;

9    correct?

10              A.    Yes.

11              Q.    Thank you.  Now, that type of

12   ownership, I take it, is sufficient for purposes of

13   the relevant tax legislation based on the OECD

14   model; correct?

15              A.    Yes.

16              Q.    And that would apply for both

17   transfer pricing and other tax purposes; correct?

18              A.    I am not sure what you mean by

19   "other tax purposes," but the transfer pricing,

20   yes.

21              Q.    Okay, perfect.  And just so that

22   the Courts hear this directly, sir, in terms of

23   your dealings with the tax authorities, the

24   question of who had beneficial or economic

25   ownership of Nortel IP never came up, did it?



```
 1                        A.   So far as I am -- in my knowledge,
 2    I have little knowledge of the discussions that
 3    took place in North America or with the French
 4    authorities.  But the ownership issue was never
 5    directly raised by the tax authorities and did not
 6    have to be responded to.
 7                        Q.   So it never came up in your
 8    dealings with the tax authorities?  That was my
 9    question.
10                        A.   Yes.
11                        Q.   And, in fact, isn't it the case,
12    sir, that HMRC were not interested in ownership,
13    were they?
14                        A.    Initially, they were not
15    interested.  They were interested in the income and
16    cash flows.
17                        Q.   Correct.  Thank you.
18                        Now, you spoke very briefly in your
19    evidence in chief this morning about a separate
20    agreement that had to be entered into in connection
21    with the UMTS transaction concerning France, the
22    French entity.  Do you recall that?
23                        A.    Correct, yes.
24                        Q.   And that was an agreement that was
25    required in order to enable the implementation of
```



```
 1   the sale of certain assets in France to Alcatel;

 2   correct?

 3                 A.   It was, indeed, yes.  To meet the

 4   purchaser's requirements.

 5                 Q.   And specifically in that instance,

 6   the purchaser in France wanted to be able to

 7   acquire an entity, and so there had to be assets

 8   transferred to the entity in France so that the

 9   purchaser could acquire the shares of that entity;

10   correct?

11                 A.   I believe that is what was

12   intended, yes.

13                 Q.   Okay.  Now, you were looking at

14   Exhibit B to your affidavit, and if we could just

15   go back to that.  This is the email with the

16   subject line "Nortel internal IP agreement."

17   That's that internal agreement relating to the

18   French requirements for the UMTS transaction;

19   correct?

20                 A.   Yes, yes.

21                 Q.   And you were asked this morning to

22   confirm and I think you read out loud some of the

23   paragraphs of this email where you were describing

24   various understandings concerning the treatment of

25   the sale proceeds for the UMTS transaction;
```



```
 1   correct?
 2               A.   Yes.
 3               Q.   And I take it that your
 4   understandings as you reflect in this email were
 5   based on the fact that this was a sale of a
 6   business, and it was your view that the basis for
 7   allocating proceeds of sales should be the same if
 8   a purchaser is paying consideration today for
 9   technology which a participant might have received
10   over the next ten years.  That was your basis
11   for --
12               A.   Ten years I know I cited just as a
13   number, but there are parties that might enjoy in
14   the future, yes.  It is the capitalized value of
15   future income.
16               Q.   Right.  And that was the basis of
17   the comments in this email; correct?
18               A.   Yes.
19               Q.   And when you are talking about
20   "future income" in this case, you are talking about
21   those very same entitlements to participate in the
22   profits of the use of the NN technology under the
23   MRDA; correct?
24               A.   The overall, the total profits,
25   yes.
```

Neeson&Associates    W&F

    1                  Q.   Okay.   Thank you.

    2                  And you understood at the time you

    3    wrote this email, and at other times I am sure as

    4    well, that the MRDA itself did not have any

    5    provision that dealt with what happened in the

    6    event of a divestiture of assets that were the

    7    subject of the rights under the MRDA; correct?

    8                  A.   Final paragraph here deals with

    9    that point, and I have raised it many times.

    10                 THE CANADIAN COURT:   Ms. Kimmel, I am

    11   just looking at this Exhibit B.   Where is the ten

    12   years in the Exhibit B?

    13                 MR. KIMMEL:   I am sorry.   The ten years

    14   actually was a timeframe that the witness had given

    15   on his deposition testimony, which I think he

    16   recognized when I was reading it to him.

    17                 And I think his point -- I apologize,

    18   Your Honor --

    19                 THE CANADIAN COURT:   I'm trying to

    20   follow it, so -- if I don't follow it, then you are

    21   in trouble.

    22                 MR. KIMMEL:   Yes, I apologize.   So

    23   let's go back.

    24                 BY MR. KIMMEL:

    25                 Q.   When you talked about the



1    capitalization of future income over a ten-year

2    period for purposes of this illustration, you were

3    just talking about ten years as an example; right,

4    Mr. Stephens?

5              A.    Purely illustrative, yes.

6              Q.    And in fact -- I mean, we can look

7    it up.  But do you know what the period of time was

8    that the discounted cash flow analysis was for the

9    UMTS sale?

10             A.    No, I do not.

11             Q.    But whatever that period of time

12   was, the point that you made and that I just want

13   to make sure the judges understand is that what you

14   were discussing in this email and the reason why

15   you said what you said was because your view was

16   that if, at a particular point in time, an asset

17   was being capitalized that one of the participants

18   had a future entitlement to participate in the

19   proceeds of, that they should equally participate

20   at the moment in time at which that asset was

21   capitalized; correct?

22             A.    Yes; and because, in my view, they

23   had an economic interest in that asset, and

24   therefore were due a proportion of the proceeds.

25             Q.    Right.  And we can look it up, but



1    you are just not sure precisely what the discounted

2    cash flow period was that was used in the UMTS

3    transaction; right?

4                    A.    I have never seen the Alcatel

5    valuation.  I believe one was done, but I have

6    never seen it.

7                    Q.    And just to come back to sort of

8    finishing up with this, where I was headed to was

9    your confirmation that you understood at this time,

10   and as you say, you had understood at times before

11   and after this, that, in fact, there wasn't

12   anything in the MRDA that dealt with what happened

13   in the event of a sale of any asset in respect of

14   which there were rights under the MRDA; correct?

15                   A.    I regarded that as a major failing

16   of the MRDA, but there was nothing there covering

17   that.

18                   Q.    Right.  And, in fact, the way the

19   MRDA worked is that any consideration received for

20   intellectual property divestments would not be

21   brought into the RPS pool; correct?

22                   A.    That is correct, yes.

23                   Q.    And so what you were proposing is

24   that the proceeds be distributed based on the

25   allocations that you say existed under the RPS



```
 1   model and taxed in the hands of the individual
 2   participants directly; correct?
 3              A.   Insofar as the consideration was
 4   allocated to technology, yes.
 5              Q.   Now, do you know any of the
 6   details of what intellectual property or technology
 7   was the subject of the Alcatel transaction?
 8              A.   I am totally ignorant of the
 9   Nortel technology.
10              Q.   Okay.  And do you have any
11   knowledge about whether license rights were also
12   being granted to Alcatel in respect of intellectual
13   property or technology that the RPSM participants
14   were also continuing to use going forward?
15              A.   I have no specific knowledge of
16   that.
17              Q.   Now, there is another branch of
18   this email chain that I just want to show you.  It
19   is not exhibited to your affidavit, but I just
20   think it is helpful to get the full picture.  If we
21   could look at Trial Exhibit 41274.  It is part of
22   the same chain, but it is going off in another
23   direction between you and Mr. Weisz.
24              I hope you have that now, Mr. Stephens.
25   Do you have that email?
```



```
 1                    A.   I have it in front of me, yes.

 2                    Q.   Great.  And if you go to the

 3   bottom of page 2, you will first see that it is the

 4   same email chain as in the one in your Exhibit B;

 5   but then there is a response from, if we look

 6   over -- you have to look at the bottom of page 1 to

 7   see it is coming from Mr. Weisz.

 8                    A.   Yes.

 9                    Q.   It is going to various people.

10                    You will see that he says here, "As

11   part of the UMTS sale we need to transfer legal

12   ownership of the IP.  As you know, NNL is the owner

13   of the IP with the RPS entities having economic

14   rights."

15                    I take it that's consistent with your

16   understanding as well, Mr. Stephens?

17                    THE CANADIAN COURT:  Where is this?

18                    MR. KIMMEL:  Sorry.  At the top of page

19   2, the very top of page 2 of this email.

20                    THE WITNESS:  Yes.

21                    BY MR. KIMMEL:

22                    Q.   So just to repeat it again, "As

23   part of the UMTS sale, we need to transfer legal

24   ownership of the IP.  As you know, NNL is the owner

25   of the IP, with the RPS entities having economic
```



1   rights."

2              And that's consistent with what you

3   described your understanding to be as well; right,

4   Mr. Stephens?

5              A.   It is, indeed.

6              Q.   And you describe your

7   understanding of this Nortel internal IP agreement

8   at the top, this top email.  And I just want to

9   make sure this is, in fact, what you understood

10  that internal agreement to be doing.

11             But you said you think what it is doing

12  is allowing the residual participants to sell the

13  defined UMTS R&D, actual legal rights by NNL, and

14  beneficial rights by the others to Alcatel.  And

15  that's what that agreement was intended to

16  accomplish, and that's what you were talking about

17  in this email string; correct?

18             A.   That is what I have written here,

19  and it must have been my understanding at the time.

20             Q.   And you don't have any different

21  understanding today, do you?

22             A.   No.

23             Q.   Now, just to move ahead here for

24  one second.  Just give me a moment.  I am just

25  trying to skip over some documents here.



```
 1                    You will agree with me, Mr. Stephens,
 2     that you did not have occasion, while you were at
 3     Nortel prior to the bankruptcy or insolvency
 4     filings, to deal with any divestiture outside of an
 5     active business operation that was being sold;
 6     correct?
 7                    A.   Between the time I joined Nortel
 8     and bankruptcy, UMTS is the only active business
 9     sale that I was involved with.
10                    Q.   And you weren't involved in any
11     sales of passive assets or inactive business;
12     correct?
13                    A.   The only sales that I was involved
14     with I think were some of the manufacturing
15     outsourcing sales.
16                    Q.   That wouldn't involve IP?
17                    A.   Generally, it did not involve IP.
18     And --
19                    Q.   So there wasn't any occasion on
20     which you needed to address the tax authorities on
21     what would happen in the allocation of sale
22     proceeds associated with Nortel technology in the
23     case of a sale of an inactive business; correct?
24                    A.   I don't recall any inactive
25     business being sold in that period on which I had
```

 Neeson & Associates   W&P

 1    to opine.

 2                    Q.   And therefore, you aren't aware of

 3    any representations or discussions with the tax

 4    authorities about what would happen in such an

 5    event with the sale proceeds; correct?

 6                    A.   There would have been no occasion

 7    to discuss that.

 8                    Q.   And is it your view that the MRDA

 9    is not relevant at all to the value allocation and

10    divestments in a business cessation scenario?

11                    A.   The MRDA is silent on --

12                    THE CANADIAN COURT:  There is a whole

13    lot of examination here today, Ms. Kimmel, that I

14    am wondering of what I thought, just be silent;

15    because so much of it appears to me to be

16    irrelevant.  But what this witness' view on your

17    question is isn't very helpful.

18                    MR. KIMMEL:  Well, Your Honor, I think

19    my friends -- my friend in London certainly wanted

20    to have the witness express views, and he has --

21                    THE CANADIAN COURT:  -- his questions,

22    too.  But we do have rules of evidence and we do

23    have --

24                    MR. KIMMEL:  I appreciate, Your Honor,

25    the frustration, and I share it.



```
 1                    THE CANADIAN COURT:  Most of what the
 2     witness' views of what this agreement means or
 3     doesn't mean, I have expressed it before, is not
 4     very helpful.
 5                    MR. KIMMEL:  This goes directly to
 6     something in Mr. Stephens' affidavit, so let me
 7     just ask it this way.
 8                    BY MR. KIMMEL:
 9             Q.    Mr. Stephens, you had no occasion
10     to deal with the tax authorities with respect to
11     what would happen in the event of a sale of
12     technology in isolation from a business; correct?
13     You had no representations or dealings on that
14     subject?
15             A.    We generally don't discuss
16     hypotheticals with revenue authorities.
17             Q.    So when you express a view, in
18     paragraph 25 of your affidavit, about what criteria
19     might be applied by a tax authority in the event of
20     a sale of technology in isolation from a business,
21     that is a hypothetical, and you were not purporting
22     to represent or disclose any actual representations
23     or discussions that you have had on this subject;
24     correct?
25             A.    Other than it was partially
```



1    relevant in respect of the UMTS disposal, because

2    there were different tax treatments in the UK on

3    the technology, depending when it was created.

4              Q.   Well, we have your communications

5    on that.  But aside from UMTS, which we have or

6    will have dealt with by the end of this, and

7    through the documents, you have not had any

8    occasion to make any representations to tax

9    authorities or have any discussions or seek their

10   input on what criteria would apply in the event of

11   a sale of technology in isolation from a business;

12   correct?

13             A.   At the risk of repeating myself,

14   no.

15             Q.   So just to be clear, you haven't

16   had any such discussions or made representations?

17             THE WITNESS:  Look, I have answered

18   that question already.

19             THE CANADIAN COURT:  What is the

20   point --

21             MR. KIMMEL:  I just don't like the way

22   the answer "no" was left as to whether he was

23   disagreeing with me or agreeing with me.

24             THE CANADIAN COURT:  What he said was

25   at the risk of repeating himself, the answer was



```
1    no; and the reason he was repeating himself is
2    because the question has been repeated.
3                MR. KIMMEL:  Thank you, Your Honor.  I
4    will move on as long as we are clear on that.
5                BY MR. KIMMEL:
6                Q.  Now, you will agree with me,
7    Mr. Stephens, that you did not consider the
8    principles that were used in the Alcatel sale to
9    set a precedent for future divestitures, did you?
10               A.  I am aware of the matter you are
11   referring to.  It was not put to UK Revenue as a
12   precedent, but it would certainly be there as an
13   example, and I think we would have some difficulty
14   with UK Revenue if we had not followed it.  But it
15   was never formally put to them as a precedent
16               Q.  Okay.  Thank you.  And you, in
17   fact, have said in your emails, and I assume you
18   agree, that it would be open to debate whether it
19   would be a precedent or not; correct?
20               A.  Absolutely, because it was not put
21   as a precedent in the first place.
22               Q.  Thank you.  And in terms of what
23   you did do under the UMTS sale for allocation of
24   proceeds -- I think you said this in your evidence
25   in chief, but I just want to be clear about this --
```



```
1    it was done exactly on the basis of the RPS

2    percentages as they were provided for under the

3    RPSM model at the time; correct?

4                 A.   By reference to the then-known

5    percentages, yes.

6                 Q.   So you didn't, for example, use a

7    20-year look-back in calculating or giving credit

8    to R&D expenditures?

9                 A.   Ironically, in this case we did,

10   because we used the 2001 model, which had a 20-year

11   look-back in it.

12                Q.   Well, you used the 2001 model that

13   had the 30 percent amortization?

14                A.   But nevertheless, it took account

15   of expenditures back in the 1990's.

16                Q.   But that's the model that you used

17   for UMTS, the one that was provided for under the

18   RPSM exactly as it existed?

19                A.   As it existed and was in place to

20   the end of 2005 but didn't apply in 2006.

21                Q.   Right.  What you didn't do was

22   alter the operation of the model or the inputs for

23   the purposes of allocating the sale proceeds, did

24   you?

25                A.   We did not, no.
```

 Neeson&Associates    W&F

1                    Q.    Okay.

2                    A.    We still used the 2001 model.

3                    Q.    Now, you mentioned this a bit

4    earlier, but I just want to come back to it.  You

5    had suggested at various points in time that the

6    MRDA be amended to allow for a gain or a loss on a

7    sale of a business in global divestitures like UMTS

8    to be treated as if they were operating income as

9    part of the RPSM pool; correct?

10                   A.    To the extent that it involved

11   technology, yes.

12                   Q.    And you thought that -- I think

13   you said this a little bit earlier, that it was a

14   flaw in the model that it didn't expressly provide

15   for this; correct?

16                   A.    In my view, yes, it was a flaw.

17                   Q.    Now, you will agree with me that

18   no such amendment was ever implemented, despite

19   your suggestions that it be; correct?

20                   A.    No, it was never amended in that

21   regard.

22                   Q.    And we can turn it up if you'd

23   like, but I think you are familiar with the third

24   amendment to the MRDA --

25                   A.    Yes.



```
 1                    Q.   -- which, in fact, expressly
 2    provides to the contrary.  It excludes the
 3    inclusion of the business sale proceeds from the
 4    RPSM model; correct?
 5                    A.   The reason it does that -- I agree
 6    it does -- was a change in US GAAP on which this
 7    was all predicated in that, up to 2006 I think
 8    under US GAAP, gain/loss on business divestment was
 9    below the line or below the operating profit line,
10    but it then changed to put gain/loss on business
11    divestment above the operating profit line, so it
12    needed to be specifically excluded.
13                    Q.   And it needed to be specifically
14    excluded because the parties didn't want to include
15    it and it would have otherwise been included as a
16    result of the change in US GAAP; correct?
17                    A.   Because also that gain/loss on
18    sale of business divestment, as in the case of
19    UMTS, may include all sorts of other assets where
20    RPS is not the appropriate allocator.
21                    Q.   So we agree that, in fact, what
22    happened in the third addendum was the express
23    exclusion of gain and loss on sale of business from
24    the operation of the RPSM model; correct?
25                    A.   Which was consistent -- which was
```



1    consistent with the original and the second

2    addendum, yes.

3              Q.   So all of it, which is not to

4    implement the amendment that you wanted made for

5    its inclusion?

6              A.   The amendment I want made would be

7    very different to just the gain/loss on sale of

8    assets.  It would deal with technology and

9    technology only.

10             Q.   Okay.  And that never transpired;

11   right?

12             A.   As I said before, no.

13             Q.   And because the gain and loss on

14   sale proceeds are not automatically included as

15   part of the residual profit split, what you

16   suggested in the UMTS situation and what you would

17   be suggesting now is that the parties would have to

18   agree to apply those percentages to sale proceeds,

19   just like they did in UMTS; right?

20             A.   For technology, yes.

21             Q.   Now, you were asked in your

22   evidence in chief whether you had reviewed the

23   Canadian position in this case.  Do you recall that

24   Mr. Adler asked you some questions?

25             A.   Yes.



1              Q.   And you may have recalled I
2  objected at one point?  You remember that?
3              A.   I don't recall your objection,
4  but --
5              Q.   So I take it in reviewing that
6  position, you understand that the Canadian position
7  is different for purposes of sale of lines of
8  business as compared to residual patents, that they
9  treat the valuation -- that the value that is
10 ascribed to the interests in those sales results in
11 different outcomes?  You, I take it, noticed that?
12             A.   I am familiar with the outline of
13 the Canadian Estate position.
14             Q.   And so are you familiar with the
15 fact that the Canadian Estate position in respect
16 of the line of business sales does give an
17 allocation of proceeds -- an evaluation of the
18 interests to the RPSM participants in percentages
19 that are not that different than the RPSM model
20 percentages?
21             A.   That is not my understanding of
22 that position.  It is not an allocation based on
23 beneficial or economic ownership.  It is an
24 allocation based on some form of future royalty,
25 assumed future royalty right.  So I don't think

 Neeson&Associates   W&F WILSON & PETERSON LTD.

1    what you are describing is the same as what was

2    done in the UMTS transaction.

3              Q.   I wasn't suggesting that it was

4    the same.  What I was suggesting to you, sir,

5    was -- and I wanted to make sure that you

6    understood -- that there was value placed on

7    various interests in respect of the sale of

8    businesses --

9              THE CANADIAN COURT:  What does it

10   matter what this witness understands the Canadian

11   position in this case to be?  What does it matter?

12             MR. KIMMEL:  Well, I guess if that's

13   your view, Your Honor, then I can move on.

14             THE CANADIAN COURT:  Well, I am just

15   asking you a question.  I myself don't understand

16   what it matters.

17             MR. KIMMEL:  Well, I wouldn't -- sorry,

18   I wouldn't have understood what it mattered either,

19   except that the witness -- my friend Mr. Adler was

20   permitted to ask the witness --

21             THE CANADIAN COURT:  What he asked was

22   was it consistent with what they represented to the

23   tax people, and his understanding was no.  I really

24   find little help in any of this.

25             MR. KIMMEL:  Okay.  I will move on,



```
 1    Your Honor.
 2            BY MR. KIMMEL:
 3            Q.   You were asked just briefly in
 4    your evidence in chief this morning about some
 5    litigation IP patent infringement litigation
 6    involving the Dutch entity.  Do you recall that,
 7    Mr. Stephens?
 8            A.   Yes.
 9            Q.   Were you aware of the terms -- any
10    of the terms on which that litigation was settled?
11            A.   No.
12            Q.   For example -- so you don't know
13    about licensing arrangements or other aspects of
14    that settlement?
15            A.   All I was aware of, that there was
16    going to be a hit to the books of about $5 million,
17    and the background to that, I have no idea about.
18            Q.   And I take it you will agree with
19    me, sir, that that litigation was in respect of
20    alleged breaches of intellectual property rights or
21    patents in those jurisdictions that occurred during
22    the operation, ongoing business operations of the
23    Nortel entities in those jurisdictions?
24            A.   I have no knowledge whatsoever of
25    the underlying facts giving rise to the claim.
```



```
 1                    Q.    For tax purposes, I take it that
 2     it was treated as an operating expense, and that's
 3     how it was brought into the RPSM model; correct?
 4                    A.    You would have to ask the
 5     Canadian -- that went through the Canadian books.
 6     I am not familiar with the Canadian books.
 7                    Q.    So you can't really help us very
 8     much with any of the aspects of that settlement
 9     other than what you have said in your affidavit; is
10     that right?
11                    A.    That is right, yes.
12                    Q.    Just one other topic that you
13     again covered this morning.  I think it was in
14     response to some questions of Mr. Barrack.  He
15     asked you about the accounting for pension costs.
16     Do you recall that?
17                    A.    Yes.
18                    Q.    Now, was it ever suggested to you,
19     when you were dealing with the accounting for
20     pension costs in connection with NNUK, that pension
21     costs should have been included in the transfer
22     pricing model on any different basis than the basis
23     on which they were being accounted for?
24                    A.    I never discussed the accounting
25     for pension costs with anybody.
```

Neeson&Associates    W&P

```
 1                    Q.    And did anybody ever raise with
 2   you that there was some impropriety or a
 3   suggested --
 4                    THE CANADIAN COURT:   He just said he
 5   didn't discuss it with anybody.
 6                    MR. KIMMEL:   I just wanted to make
 7   sure --
 8                    THE CANADIAN COURT:   Isn't that the end
 9   of that?
10                    BY MR. KIMMEL:
11                    Q.    Are you aware of something called
12   the true cost of calculating pension benefits as a
13   methodology for determining how they are accounted
14   for?
15                    A.    No.
16                    MS. KIMMEL:   Let me just check, if I
17   could, Your Honor, with my colleagues.   I think I
18   am finished.
19                    I should say, although I think
20   everybody is aware of this, that there is a
21   separate claims portion of this witness' testimony
22   that I am not intending to get into right now.
23                    THE CANADIAN COURT:   Right.
24                    MR. KIMMEL:   And presumably, we will
25   make some arrangements for that once everybody else
```

```
 1   is finished.
 2              THE CANADIAN COURT:  Mr. Rosenthal.  He
 3   is back in Canada, Judge Gross.
 4              THE US COURT:  I see that.  Take his
 5   passport while he is up there.
 6              MR. ROSENTHAL:  I am flattered, Judge
 7   Gross.
 8              Good morning, Justice Newbould, Judge
 9   Gross.  Jeff Rosenthal of Cleary Gottlieb for the
10   US Debtors.
11   CROSS-EXAMINATION BY MR. ROSENTHAL:
12              Q.  Good morning, Mr. Stephens, or
13   good afternoon for you.
14              A.  Good morning to you.
15              Q.  I will tell you mercifully that in
16   light of what has been covered by my predecessor
17   colleagues, I expect my examination to be quite
18   short this morning.
19              A.  I am grateful for that.
20              Q.  Just one thing that I wanted to
21   follow up on, a couple of questions that Ms. Kimmel
22   had asked.  You had testified that you had only two
23   meetings with the tax authorities; correct?
24              A.  So far as I recall, only two
25   meetings, yes.
```



```
 1                    Q.   Now, Ms. Kimmel had asked you
 2   whether the HMRC was interested in ownership, and
 3   you had told her that they were not.  Do you recall
 4   that testimony?
 5                    A.   Yes.
 6                    Q.   Did they tell you that they were
 7   not interested in ownership or they just didn't ask
 8   about it?
 9                    A.   They did not ask about it.  They
10   may have assumed all sorts of things, but they did
11   not raise that specific point.
12                    Q.   Do you have any knowledge as to
13   why they did not raise it?
14                    A.   Because their interest at that
15   point was all about income and cash flows.
16                    Q.   Did they tell you anything about
17   whether they found the MRDA itself unclear or clear
18   as to ownership?
19                    A.   No, not on the ownership issue.
20   That was never -- they raised comments with us
21   verbally, but not on the ownership issue.
22                    Q.   Now, you spoke about the sale to
23   Alcatel, and I want to ask you whether you recall
24   the sale of a business called Fraud Solutions to a
25   company called Argo.  Do you recall that?
```

 Neeson&Associates   W&F

1                    A.   I advised on that when I was at
2    PwC, yes.
3                    Q.   And that took place in September
4    of 2001?
5                    A.   Correct.
6                    Q.   The CSA had been terminated by
7    that point; correct?
8                    A.   The CSA had been terminated,
9    correct, yes.
10                   Q.   And the parties, in fact, were
11   operating under the RPSM as of January 1, 2001?
12                   A.   They operated under the RPSM from
13   January 2001, but the RPSM was only created or
14   invented at the end of 2001.
15                   Q.   And when NNUK filed its tax
16   returns for 2001, it did so incorporating the RPSM;
17   correct?
18                   A.   Yes.
19                   Q.   Now, the Fraud Solutions sale had
20   a portion that was allocated to intellectual
21   property; correct?
22                   A.   There was, indeed, yes,
23   specifically to patents and patent applications.
24                   Q.   And those proceeds that were
25   allocated to intellectual property were then



```
 1    allocated among the integrated entities; correct?
 2                   A.   We allocated them on a rather
 3    ad hoc basis.  If there were 14 patents and patent
 4    applications and the consideration was $14 million,
 5    we allocated a million dollars to each of the
 6    patents or patent applications, as an example.
 7                   Q.   And the allocation that was done
 8    in connection with the intellectual property for
 9    the Fraud Solutions disposition was not done in
10    accordance with the RPSM, was it?
11                   A.   It was not, because the RPSM did
12    not exist at that point.
13                   Q.   Although the RPSM, in fact, was
14    made retroactive to that point in time; correct?
15                   A.   Yes.
16                   Q.   Just two more topics real briefly.
17    If we go back in history, one of the largest, if
18    not the largest, acquisition by Nortel in the UK
19    was a company called STC; that is right?
20                   A.   It is right, yes.
21                   Q.   And Nortel acquired STC for its
22    relationship with British Telecom rather than for
23    its technology; correct?
24                   A.   You would have to ask people who
25    were around at the time, but that is my
```

 Neeson&Associates   W&F WILSON & PETERSON LTD.

1    understanding from such people.

2            Q.   And your understanding from

3    having, in fact, studied and represented the

4    history of the STC acquisition to the tax

5    authorities was that it was done for the

6    relationship with British Telecom and not

7    technology; correct?

8            A.   There is a paper that is written

9    that suggested that the STC technology was

10   certainly not the main driver for the acquisition.

11           Q.   And, in fact, you were an author

12   of that paper?

13           A.   Correct.

14           Q.   Just one more subject.  Do you

15   recall the sale of Optical Component in 2002 to

16   Bookham PLC?

17           A.   Yes; again, before I joined

18   Nortel, but I was very heavily engaged in all of

19   the Optical Components steps, yes.

20           Q.   And my only question with regards

21   to that is, were the sale proceeds from that

22   transaction less than the book value of the

23   tangible assets sold?

24           A.   If you go back to the original

25   book value before they were hugely impaired, yes,



1   by a very wide margin.

2              MR. ROSENTHAL:  I have nothing further,

3   Your Honor.

4              THE CANADIAN COURT:  Thank you,

5   Mr. Rosenthal.

6              MR. ADLER:  If there is nothing else in

7   North America, I have some brief redirect here.

8              THE CANADIAN COURT:  Nothing here in

9   Toronto.

10             THE US COURT:  Nothing in the US.  Go

11  ahead, Mr. Adler.

12             MR. ADLER:  Okay.  Thank you.

13  RE-EXAMINATION/RE-DIRECT BY MR. ADLER:

14             BY MR. ADLER:

15             Q.  Mr. Stephens, if I could take you

16  back to Trial Exhibit 41274, Ms. Kimmel was asking

17  you questions about the email at the top of the

18  second page, when you said that as part of the UMTS

19  sale -- I am sorry.  Mark Weisz --

20             A.  Yes.

21             Q.  -- was saying we need to transfer

22  legal ownership of the IP.  And what did you

23  understand "legal ownership" to mean there?

24             A.  Legal ownership is legal title,

25  the ability to sign documents, to convey things,

 Neeson&Associates    W&F

1    but doesn't necessarily indicate economic or

2    beneficial ownership.

3              Q.   Now, moving on to another subject,

4    you referred before to whether Alcatel was a

5    precedent.  You said it was not put as a precedent

6    to the HMRC.  What does that mean?

7              A.   We didn't say to UK Revenue that,

8    "There may be other transactions like this and this

9    is how we will deal with them."

10             Q.   And is that a procedure that is

11   sometimes used?

12             A.   You might use it if you were going

13   to have a number of sales.  But in an isolated

14   transaction -- we all expected this to be

15   isolated -- no, you wouldn't need to say that this

16   was a precedent.

17             Q.   When you said that Alcatel was not

18   a precedent, was that the sense you were using it

19   in?

20             A.   If you like, I was using it in the

21   sense of not being a binding precedent, like a

22   court decision can be a binding precedent on other

23   courts.  It was a precedent but certainly we

24   weren't bound by it, nor were Revenue bound by it.

25             Q.   Now, moving on to another subject,



1   in Ms. Kimmel's questions you were discussing the

2   use in the Alcatel sale of the 2001 model and the

3   30 percent annual amortization.

4              A.   Yes.

5              Q.   Was any analysis done of the

6   useful life of the IP that was conveyed in that

7   sale?

8              A.   Not so far as I am aware.

9              Q.   Was there any discussion of doing

10  such an analysis?

11             A.   Not that I am aware of.

12             Q.   Was there any discussion about

13  modifying the useful life of the look-back period

14  at all?

15             A.   No.

16             Q.   Is that something you would have

17  considered yourself qualified to do?

18             A.   I am unqualified on the subject of

19  technology and its longevity.

20             Q.   Moving on to another subject, I

21  just want to clarify the record.  There were

22  several comments you made which might have given

23  the impression that the Alcatel sale proceeds were

24  run mechanically through the MRDA Schedule A

25  calculation.  Is that correct?



     1                    A.   The only point at which the MRDA
     2    had any influence was in the RPS ratio applied to
     3    the element of the sale proceeds which were for
     4    technology.
     5                    Q.   So, for example, there was no
     6    routine return applied?
     7                    A.   There would be no grounds for any
     8    routine return to be applied.
     9                    Q.   And the other asset classes aside
    10    from IP were treated separately; is that right?
    11                    A.   By reference to the facts of those
    12    asset classes, yes (inaudible).
    13                    MR. ADLER:  All right.  That's the
    14    extent of my redirect, Your Honors.
    15                    THE CANADIAN COURT:  Thank you.
    16                    MR. ADLER:  Then I guess if there are
    17    no more questions for other counsel in North
    18    America, I guess what we need to do is take a break
    19    and then move into a Canada-only session for claims
    20    testimony I believe is the intention.
    21                    THE CANADIAN COURT:  Are we going to do
    22    that now or is that going to be done later?  Now?
    23    Everybody is nodding yes.  Okay.
    24                    MR. GOTTLIEB:  So I think for the
    25    purpose of today, we say good-bye and thank you to



1   the US Court, if that's agreeable to everyone.

2               THE CANADIAN COURT:  That is what I was

3   wondering about.

4               MR. GOTTLIEB:  The technology of course

5   has to be running so we don't get cut off.

6               THE US COURT:  Understood.

7               THE CANADIAN COURT:  Let me understand.

8   Are you planning today to deal with the claims

9   portion or is it sometime later?

10              MR. GOTTLIEB:  It is today.  And if you

11  recall from a prior discussion we had amongst

12  counsel, Ms. Kimmel said that she expected that the

13  group would take less than an hour with this --

14              THE CANADIAN COURT:  All right.

15              MR. GOTTLIEB:  -- testimony.  So

16  subject to Your Honor, Justice Newbould's

17  directions, we are happy to do it now after a brief

18  break.

19              THE CANADIAN COURT:  That's fine.  So

20  Judge Gross, there is nothing personal here, but

21  you are not required.

22              THE US COURT:  All right.  I am

23  leaving, and I wish everyone a good afternoon, and

24  we will be back in tomorrow morning.  Thank you,

25  all.  We will stand in recess.



1    -- US court adjourned at 11:51 a.m. --

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              REPORTERS' CERTIFICATE

 2              I, KIMBERLEY A. NEESON, RPR, CRR, CSR,

 3    CCP, Canadian Certified Shorthand Reporter,

 4    Realtime Systems Administrator, and I, LORRAINE B.

 5    MARINO, RDR, CRR, certify;

 6              That the foregoing proceedings were

 7    taken before us at the time and place therein set

 8    forth;

 9              That the entire proceedings of the

10    hearing date were recorded stenographically

11    individually by each of us and were thereafter

12    transcribed;

13              That the foregoing is a true and

14    correct transcript of our shorthand notes so taken.

15              The transcript reporting the testimony

16    via videoconference from London reflects the

17    problematic audio connection, with gaps in the

18    audio transmission as well as inaudible portions,

19    and therefore may not be accurate and complete.

20              Dated this 27th day of May, 2014.

21    PER:                    PER:

22    Lorraine B. Marino      Kimberley Neeson

23    LORRAINE B. MARINO      KIMBERLEY NEESON

24    WILCOX & FETZER         NEESON & ASSOCIATES

25    WILMINGTON, DE USA      TORONTO, ON  CANADA
```







































