

141 Adelaide Street West | Suite 1108
Toronto, Ontario   M5H 3L5
1.888.525.6666   |   Fax: 416.413.0230

1                          Court File No. 09-CL-7950

2                          ONTARIO

3                SUPERIOR COURT OF JUSTICE

4                     (COMMERCIAL LIST)

5        IN THE MATTER OF THE COMPANIES' CREDITORS

6      ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

7       AND IN THE MATTER OF A PLAN OF COMPROMISE OR

8        ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

9      NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

10       CORPORATION, NORTEL NETWORKS INTERNATIONAL

11       CORPORATION AND NORTEL NETWORKS TECHNOLOGY

12                       CORPORATION

13       APPLICATION UNDER PART IV OF THE COMPANIES'

14      CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

15                       AS AMENDED

16                       --------

17

18    --- This is the Day 1/Volume 1 of the transcript of

19    proceedings in the above matter held at the

20    Superior Court of Ontario (Commercial List),

21    Courtroom 8-1, 330 University Avenue,

22    Toronto, Ontario, on the 27th day of May, 2014,

23    commencing at 12:10 p.m.

24

25                       --------



```
1    B E F O R E:

2    The Honourable Mr. Justice Frank Newbould

3

4                         ----------

5

6

7

8         REPORTED BY:  Toronto - Kimberley Neeson

9                RPR, CRR, CSR, CCP, CBC

10           Realtime Systems Administrator

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   A P P E A R A N C E S:

 2

 3                   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER:      Ben Zarnett, Esq.

11             Alan Mark, Esq.

12             Peter Ruby, Esq.

13             Jessica Kimmel, Esq.

14             Gale Rubenstein, Esq.

15             Graham Smith, Esq.

16             Jason Wadden, Esq.

17             Lauren Butti, Esq.

18

19   FOR THE APPLICANTS

20   GOWLING LAFLEUR HENDERSON LLP

21   Suite 1600, First Canadian Place

22   100 King Street West

23   Toronto, ON  M5X 1G5

24   PER:      Jennifer Stam, Esq.

25
```


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1   FOR THE CANADIAN DEBTORS
 2   ALLEN & OVERY LLP
 3   1221 Avenue of the Americas
 4   New York, NY  10020
 5   PER:        Ken Coleman, Esq.
 6               Laura Hall, Esq.
 7
 8   FOR THE CANADIAN DEBTORS
 9   NORTON ROSE FULBRIGHT LLP
10   Suite 3800, Royal Bank Plaza
11   South Tower, 200 Bay Street
12   P.O. Box 84
13   Toronto, ON  M5J 2Z4
14   PER:        Vasuda Sinha, Esq.
15
16                     EMEA DEBTORS
17
18   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
19   LIMITED
20   DAVIES WARD PHILLIPS & VINEBERG LLP
21   40th Floor
22   155 Wellington Street
23   Toronto, ON  M5V 3G7
24   PER:        Matthew Milne-Smith, Esq.
25               Robin B. Schwill, Esq.
```



```
 1              Natasha MacParland, Esq.

 2              James Doris, Esq.

 3              Luis Sarabia, Esq.

 4              George Pollack, Esq.

 5              Cara Cameron, Esq.

 6              Andrew Carlson, Esq.

 7              Maureen Littlejohn, Esq.

 8              Sean Campbell, Esq.

 9              Bryan McLeese, Esq.

10

11  FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

12  LIMITED

13  LAX O'SULLIVAN SCOTT LISUS LLP

14  Suite 2750, 145 King Street West

15  Toronto, ON  M5H 1J8

16  PER:     Matthew P. Gottlieb, Esq.

17              Tracy Wynne, Esq.

18              Paul Michell, Esq.

19              Arden Beddoes, Esq.

20              James Renihan, Esq.

21

22  FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

23  LIMITED

24  HUGHES HUBBARD & REED

25  One Battery Park Plaza
```



```
 1   New York, NY  10004-1482
 2   PER:        William Maguire, Esq.
 3               Derek Adler, Esq.
 4               Neil Oxford, Esq.
 5               Fara Tabatabai, Esq.
 6               Amina Hassan, Esq.
 7               Gabrielle Glemann, Esq.
 8               Charles Huberty, Esq.
 9               Caroline Parker-Beaudrias, Esq.
10               Miles Orton, Esq.
11               Karen Goldberg, Esq.
12               Lena Saltos, Esq.
13               Mei Li Zhen, Esq.
14               Matthew Reynolds, Esq.
15               Ken Katz, Esq.
16               Greta Fails, Esq.
17               Quan Trinh, Esq.
18
19   FOR THE EMEA DEBTORS
20   HERBERT SMITH FREEHILLS LLP
21   Exchange House
22   Primrose Street
23   London, England  EC2A 2EG
24   PER:        James Norris-Jones, Esq.
25               John Whiteoak, Esq.
```



```
 1              Gary Milner-Moore, Esq.
 2              Kevin Pullen, Esq.
 3              Catherine Emanuel, Esq.
 4              Richard Mendoza, Esq.
 5              David Russell, Esq.
 6              Andrew Cooke, Esq.
 7              Oliver Elgie, Esq.
 8              Tom Henderson, Esq.
 9              Frances Furnival, Esq.
10              Liam Spender, Esq.
11              Philip Lis, Esq.
12              Kristofer McGhee, Esq.
13              Thomas Turner, Esq.
14
15    FOR THE EMEA DEBTORS
16    DEBEVOISE & PLIMPTON LLP
17    PER:      Kevin Lloyd, Esq.
18
19      UK PENSION PROTECTION FUND AND NORTEL NETWORKS
20              UK PENSION TRUST LIMITED
21
22    FOR THE UK PENSION PROTECTION FUND AND NORTEL
23    NETWORKS UK PENSION TRUST LIMITED
24    THORNTON GROUT FINNIGAN LLP
25    Suite 3200, 100 Wellington Street West
```



```
 1    P.O. Box 329

 2    Toronto, ON  M5K 1K7

 3    PER:        John L. Finnigan, Esq.

 4                Michael Barrack, Esq.

 5                D.J. Miller, Esq.

 6                Rebecca Kennedy, Esq.

 7                Andrea McEwan, Esq.

 8                Michael Shakra, Esq.

 9

10    FOR THE UK PENSION PROTECTION FUND AND NORTEL

11    NETWORKS UK PENSION TRUST LIMITED

12    WILLKIE FARR & GALLAGHER LLP

13    787 Seventh Avenue

14    New York, NY  10019-6099

15    PER:        Brian O'Connor, Esq.

16                Sameer Advani, Esq.

17                Andrew Hanrahan, Esq.

18                Eugene Chang, Esq.

19                Heather Schneider, Esq.

20                Robert Kofsky, Esq.

21                Nicholas Chiuchiolo, Esq.

22                Elizabeth Roache, Esq.

23                Nicole Humphrey, Esq.

24                Peter Sluka, Esq.

25                Weston Eguchi, Esq.
```



```
1                  Ashley Moore, Esq.

2                  Megan Fantoni, Esq.

3

4    FOR THE UK PENSION CLAIMANTS

5    HOGAN LOVELLS INTERNATIONAL LLP

6    Atlantic House

7    Holborn Viaduct

8    London, England  EC1A 2FG

9    PER:       Angela Dimsdale Gill, Esq.

10              John Tilllman, Esq.

11              Crispin Rapinet, Esq.

12              Matthew Bullen, Esq.

13              Chris Edwards-Earl, Esq.

14

15   FOR THE UK PENSION CLAIMANTS

16   WILBERFORCE CHAMBERS

17   PER:       Michael Tennet, Esq.

18

19       BOARDS OF DIRECTORS OF NORTEL NETWORKS

20        CORPORATION AND NORTEL NETWORKS LIMITED

21

22   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

23   CORPORATION AND NORTEL NETWORKS LIMITED

24   OSLER HOSKIN AND HARCOURT LLP

25   100 King Street West
```



```
 1   1 First Canadian Place, Suite 6100

 2   P.O. Box 50

 3   Toronto, ON  M5X 1B8

 4   PER:        Lyndon Barnes, Esq.

 5               Carey O'Connor, Esq.

 6               Betsy Putnam, Esq.

 7               Adam Hirsh, Esq.

 8               Alexander Cobb, Esq.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

1             I N D E X

2

3   WITNESS:                           PAGE

4

5   AYLWIN KERSEY STEPHENS

6   Cross-Examination by Mr. Barrack..........   12

7   Cross-Examination by Ms. Kimmel...........   26

8   Further Cross-Examination by Mr. Barrack..   56

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1   -- Upon commencing at 12:05 p.m.

2               MR. GOTTLIEB:  So, Your Honour, we've

3   got the feed back now.  If you recall, the

4   affidavit that we put in on behalf of Mr. Stephens

5   did not contain claims, it was an allocation

6   affidavit, so there will be no direct.  Obviously

7   there may be some redirect.  We'll just have to

8   see.  So I believe we start with Ms. Kimmel.

9               MS. KIMMEL:  I think actually

10  Mr. Barrack is going to start.

11              MR. GOTTLIEB:  Mr. Barrack is going to

12  start?  I apologize, Mr. Barrack is going to start.

13              THE COURT:  Can you hear us, Mr.

14  Stephens?

15              THE WITNESS:  I can indeed, thank you.

16              THE COURT:  Thank you.

17              AYLWIN KERSEY STEPHENS:  PREVIOUSLY

18              AFFIRMED

19              CROSS-EXAMINATION BY MR. BARRACK:

20              Q.   Hello, Mr. Stephens, again.

21              A.   Hello.

22              Q.   I want to go to the intercompany

23  loan that was created out of the transfer pricing

24  arrangements under the MRDA.

25              A.   Um-hmm.



 1              Q.    And by the end of 2007 that was
 2     almost close to a billion dollars, correct?
 3              A.    Something in excess of 420 odd
 4     million pounds sterling, certainly, yes.  So maybe
 5     about a billion dollars at the FX rate at the time.
 6              THE COURT:  Mr. Barrack, which loan are
 7     you talking about?
 8              BY MR. BARRACK:
 9              Q.    Okay.  So this loan, Mr. Stephens,
10     arose because on an --
11              THE COURT:  Loan between whom and whom?
12              BY MR. BARRACK:
13              Q.    Between NNL and NNUK, that arose,
14     Mr. Stephens can confirm this and I don't think
15     there's any dispute in this case, that as a result
16     of the transfer pricing adjustments that were to
17     occur each year under the MRDA from 2001 through
18     2007, or 2006 because '07 wouldn't have been done,
19     there arose an intercompany loan between NNL and
20     NNUK of close to a billion dollars.
21              THE COURT:  Loaned by?
22              MR. BARRACK:  NNL to NNUK.
23              THE WITNESS:  No, the other way around.
24              THE COURT:  I thought it was the other
25     way around.



 1              MR. BARRACK:   NNUK to NNL.   Sorry, NNUK

 2    to NNL, sorry.

 3              BY MR. BARRACK:

 4         Q.   And just to break that down, Mr.

 5    Stephens, under the MRDA the contemplation was that

 6    cash would be transferred from one -- from a paying

 7    entity to a receiving entity, and rather than

 8    paying cash from Canada to the UK, an account

 9    receivable was created each year, correct?

10         A.   Once the amount outstanding had

11    got to 90 days old, then it was headed to the loan.

12         Q.   Right.  And that loan was an

13    interest-free loan?

14         A.   It was indeed.

15         Q.   And the size of the interest-free

16    loan was becoming material as it was probably the

17    biggest asset on the NNUK balance sheet?

18         A.   That is almost certainly correct.

19         Q.   Right.  And as you saw it, the

20    benefit to NNUK of the interest-free loan was

21    because if NNL went down, then NNUK wouldn't be far

22    behind because NNUK did not have a separate

23    existence?

24         A.   It didn't have a separate business

25    existence.  I got criticized for that before.  Its



```
 1   business was dependent on NNL continuing in

 2   operation.

 3              Q.    Right.  It didn't have a separate

 4   economic existence?

 5              A.    Correct.

 6              Q.    And that -- so the eventual

 7   solution to this loan issue that was proposed was

 8   known as Project Swift; is that correct?

 9              A.    That is right.

10              Q.    And in Project Swift, the

11   interest-free intercompany debt owed by NNL to NNUK

12   was to be repaid by transferring shares of various

13   European subsidiaries from -- owned directly or

14   indirectly by NNL to NNUK?

15              A.    That is probably right, yes.

16              Q.    And among those subsidiaries that

17   it was intended would be transferred was NNSA, the

18   French subsidiary that was also an IE or an RPE,

19   correct?

20              A.    It was intended that the direct

21   interest NNL held in NNSA would be transferred,

22   yes.

23              Q.    Right.  And you made that

24   qualification because there was already a nine

25   percent interest or so owned by NNUK?
```



```
 1                   A.    Proposed Swift, yes.
 2                   Q.    And the delay in the transfer was
 3    to allow an audit by the French tax authorities to
 4    be completed?
 5                   A.    The directors of NNUK were very
 6    unhappy at the idea of acquiring NNSA when there
 7    were huge uncertainties that might flow from the
 8    result of the French tax audit.
 9                   Q.    And the concept of Project Swift
10    was to allow --
11                   THE COURT:  Mr. Barrack, you said the
12    loan would be repaid.  Was it the entire loan
13    repaid from Project Swift or part of it?
14                   BY MR. BARRACK:
15                   Q.    Mr. Stephens, as I understand it,
16    once France had been transferred, that would have
17    discharged the loan in its entirety?
18                   A.    Not necessarily, no.  It would
19    depend on the value of the French business at the
20    time it was transferred.  I think --
21                   Q.    Okay.
22                   A.    -- after the first Project Swift
23    there was about 130 million pounds still
24    outstanding on the loan.
25                   Q.    Okay.  But as we'll come to hear
```



1    and learn in these proceedings, the French

2    subsidiary was never transferred?

3                A.    It never was, correct.

4                Q.    But it was -- Project Swift was

5    designed primarily to allow for a non-cash

6    resolution of the outstanding debt?

7                A.    That would be fair comment, yes.

8                Q.    Right.  And one of the -- one of

9    the motivations in the timing of this was that NNUK

10   was facing the imposition of imputed interest on

11   the intercompany loan?

12               A.    It had been facing that ever since

13   the loan was put into place at the end of 2003.

14               Q.    Right.  And --

15               A.    Because the number was now

16   becoming very substantial.

17               Q.    And material?

18               A.    Yes, in tax terms, yes.

19               Q.    And there were some restrictions

20   about NNL loaning money to NNUK at less than fair

21   market value.  Just to enter into a loan at less

22   than fair market value would have been unlawful

23   under UK law?

24               A.    Potentially unlawful.

25               Q.    Right.


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1                 A.    There was --
 2                 Q.    Go ahead, sir, I didn't mean to
 3      cut you off.
 4                 A.    Potentially unlawful because of
 5      the shape of the NNUK balance sheet unless there
 6      was good business purpose.
 7                 Q.    All right.  And prior to the Swift
 8      transaction being entered into, approximately 120
 9      million of cash was taken out of the European
10      subsidiaries that would be transferred to NNUK and
11      redeemed or dividended back up to Canada; is that
12      fair?
13                 A.    The cash of about 120 million
14      dollars was extracted from NNIF prior to its
15      purchase by NNUK, yes.
16                 Q.    All right.  And you were aware
17      that the size of the loan was becoming a concern to
18      the pension trustees?
19                 A.    I was aware of that, yes.
20      Probably not only to the pension trustees but
21      probably the directors as well.
22                 Q.    All right.  And it was not you,
23      but it was Simon Freemantle who was responsible for
24      the direct dealings with the trustees?
25                 A.    To the best of my knowledge, yes.
```



```
1                    Q.   And you -- however, you assisted
2       Mr. Freemantle in doing some of the work behind
3       Project Swift and some of the analysis?
4                    A.   Absolutely, yes.
5                    Q.   All right.  And as I understand
6       it, eventually -- sorry.  And in order to -- and
7       one of the concerns at the time was that if the
8       transaction that was proposed was not considered
9       reasonable by the pension trustees, they could have
10      sought a financial support direction from the
11      pension regulator?
12                   A.   I'm not sure what actions the
13      pension trustees could have taken but it could have
14      involved the pension regulator who has Draconian
15      powers.
16                   Q.   And you were aware that one of the
17      -- that the pension trustees -- or, sorry, one of
18      the concerns of NNUK was, and Nortel generally, was
19      that this transaction pass muster with the pension
20      trustees so that they did not invoke these
21      Draconian powers of the pension regulator?
22                   A.   And also so far as the directors
23      were concerned they were entering into a proper
24      arm's length transaction, that they were not
25      overpaying for the asset.
```


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1                Q.   All right.  And so one of the
 2    things to satisfy both of those groups as to the
 3    appropriateness of the transaction that was
 4    undertaken is that Ernst & Young UK were retained
 5    to do an analysis of the transaction that was then
 6    presented to both the directors and the pension
 7    trustees?
 8                A.   They did an open market valuation
 9    of the interest to be acquired, yes.
10                Q.   All right.  And that, sir -- I
11    wonder if someone could give you Trial Exhibit
12    TR11123 which you will recognize as the Project
13    Eagle report of Ernst & Young.
14                A.   Yes, I have some familiarity with
15    this but not a great deal.
16                Q.   Understood.  I just want to deal
17    at a very high level with this from your --
18                THE COURT:  Just a minute, Mr. Barrack.
19    You're going pretty fast here.  I want to make a
20    note.
21                MR. BARRACK:  Okay.
22                THE COURT:  Yes, go ahead.
23                BY MR. BARRACK:
24                Q.   Sir, prior to entering into
25    Project Swift, you were aware that the pension
```



```
 1    trustees had negotiated from NNL a funding

 2    guarantee of the pension debt?

 3              A.    Possibly.  I think it was a

 4    guarantee of the agreed contributions, wasn't it?

 5              Q.    Yes.  That's what I call a funding

 6    guarantee.

 7              A.    Yes, yeah.

 8              Q.    There was an agreed-upon schedule

 9    of contributions to the pension plan and that

10    obligation was guaranteed by NNL?

11              A.    Yeah, that I understand, yes.

12              Q.    Okay.  And so that when satisfying

13    the pension trustees with respect to Project Swift,

14    one of the -- and if you could go to page 35 of

15    this document.  The pages are in the bottom

16    left-hand corner.

17              A.    Yes, page 35, yes.

18              Q.    Right.  One of the risks --

19              THE COURT:  Just hang on.

20              MR. BARRACK:  Sorry.

21              BY MR. BARRACK:

22              Q.    One of the risks that was

23    contemplated in structuring Project Swift and that

24    the independent reviewer, Ernst & Young,

25    contemplated was the insolvent basis group-wide
```


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

1  insolvency, correct?

2          A.   Yes, I believe so.  As I say, I'm

3  not hugely familiar with this document.

4          Q.   Right.  And so that rather than

5  going to the -- in broad terms, I think you were

6  aware that the basic and logic -- sorry, let me

7  back up.

8          One of the things that the pension

9  trustees were negotiating for, in addition to the

10  existing guarantee, was a further guarantee from

11  NNL in the event of the insolvency and liquidation

12  of the Nortel Enterprise, correct?  As part of

13  Project Swift.

14          A.   Yes, I understand that was the

15  case, yes.

16          Q.   Right.  And there was some

17  negotiation around the amount of that guarantee and

18  I think it's undisputed that it settled at 150

19  million dollars, correct?

20          A.   That is the number with which I am

21  familiar.

22          Q.   Yes.  And as far as you were

23  aware, the basis and the logic in the calculation

24  of the 150 million dollar number meant that the

25  combination of the funding guarantee, the


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

1    insolvency guarantee given with Swift, and the

2    subsidiaries that were to be transferred was

3    reasonable value to protect against a group-wide

4    insolvency.  That was the basic logic?

5              A.   The logic can be what it may be.

6    I am not familiar with how the calculations were

7    put together or the negotiations that gave rise to

8    the 150 million dollars.  My only participation was

9    to supply numbers.

10             Q.   All right.

11             A.   I did not participate at all in

12   any of the discussions.

13             Q.   So if I were to take you in this

14   document to -- on this page, and under "Key

15   Assumptions":

16                  "For the purposes of analysing

17                  the potential impact on the scheme

18                  of a Group wide insolvency..."

19             The scheme being a term for the UK

20   Pension Plan, correct?

21             A.   Yes, I would assume so, yes.

22             Q.   "...a Group wide scenario, we

23                  have modelled a scenario based on

24                  the following key assumptions:  The

25                  NN Technology is valued at US$ 2.5



```
 1                    billion and that this is apportioned
 2                    across the group consistent with the
 3                    intellectual property profit share
 4                    agreement."
 5                    Did you have any input into that?
 6              A.    No.
 7              Q.    Okay.  And the next line:
 8                    "Management have advised that
 9                    the intellectual property profit
10                    share agreement currently apportions
11                    value..."
12                    And then gives certain percentages to
13      the various entities.
14                    Did you have any input into that?
15              A.    I may well have given those
16      numbers.
17              Q.    All right.  And in Project Swift,
18      what would come to the benefit of NNUK would be the
19      5 percent for NNUK, the 10 percent for NNSA, and
20      the 1 percent for Ireland, correct?
21              A.    Would come to the European Estate,
22      yes.
23              Q.    Right.  But those entities were to
24      be owned by NNUK, correct?
25              A.    On the assumption that the second
```


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1   part of Project Swift took place, yes, the

 2   acquisition of NNSA.

 3               THE COURT:  Sorry, I don't understand

 4   the question.  You say "those entities."  What

 5   entities would be owned?

 6               MR. BARRACK:  NNUK, you see the 5

 7   percent?

 8               THE COURT:  Yes.

 9               MR. BARRACK:  NNSA, which is France, 10

10   percent, and Ireland 1 percent.

11               THE COURT:  Yes, I see that, but then

12   you --

13               THE WITNESS:  Can I just correct --

14               THE COURT:  Just a minute.  You said,

15   Mr. Barrack, that those entities were to be owned

16   by NNUK.  That's what I didn't understand in that

17   question.

18               MR. BARRACK:  If the intercompany loan

19   had been discharged by the transfer of ownership of

20   various entities to NNUK --

21               THE COURT:  Yes.

22               MR. BARRACK:  -- then those entities,

23   sir, would have ended up being owned by NNUK.

24               THE COURT:  Which entities?

25               MR. BARRACK:  France, Ireland and
```



1  obviously NNUK owns itself.  But NNSA and Ireland.

2          THE WITNESS:  Ireland would not have

3  been owned.  Ireland was to be sold out and was

4  owned directly from Canada.  Ireland was never

5  intended to be acquired under Project Swift.

6          BY MR. BARRACK:

7          Q.   So they would have had France and

8  NNUK?

9          A.   Correct.

10          Q.   And just to clarify, that's

11  because --

12          THE COURT:  If I understand it, what

13  you're saying is under the Project Swift, had it

14  gone through, NNSA would have been owned by NNUK?

15          MR. BARRACK:  Right.  One second.

16  Thank you, sir.  Those are my questions.

17          THE COURT:  Ms. Kimmel?

18          MS. KIMMEL:  Thank you, Your Honour.

19          CROSS-EXAMINATION BY MS. KIMMEL:

20          Q.   Sticking with the Project Swift

21  questions for a few minutes, Mr. Stephens.

22          A.   Of course.

23          Q.   Mr. Barrack asked you if it was

24  considered to be a proposed solution for the

25  growing intercompany loan receivable, and you said



```
 1   yes, but there were other purposes for Project
 2   Swift as well, correct?
 3              A.    You'd have to refresh my memory.
 4   That's the only one I recall.
 5              Q.    Well, you recall that there was an
 6   objective of simplification of the ownership
 7   structure in the European entities and bringing the
 8   European subsidiaries under the umbrella of the
 9   NNUK, as one of the objectives, since that was how
10   they were operated from a headquarter perspective
11   in many respects?
12              A.    Yes, you could say it aligned the
13   legal ownership with the management chain, but the
14   motivation for Project Swift was to deal with the
15   intercompany loan.
16              Q.    And the project was implemented at
17   a time when -- had been contemplated and was
18   implemented so as to avoid any obligation on NNUK
19   to have to actually pay any imputed tax, correct?
20   They never ended up paying any of the imputed tax?
21              A.    No, there was never any actual
22   cash tax paid, but there was the erosion of a
23   significant tax asset and that tax asset was in
24   danger of running out.
25              Q.    Right.  And I think you have
```



```
 1   expressed the view before that whether there was
 2   imputed tax or -- sorry, whether there was imputed
 3   interest or actual interest, the tax position in
 4   the UK would have been the same, correct?
 5           A.    Correct.
 6           Q.    And so if, for example, interest
 7   had been paid and NNUK had been taxed on that
 8   interest, it would have actually had to pay or
 9   address that interest income in the same way that
10   it addressed the imputed interest income, correct?
11           A.    Yes.
12           Q.    Okay.
13           A.    With one possible exception, which
14   would have made it more costly.  If the actual
15   interest had been paid, there would have been a
16   Canadian withholding tax of 10 percent which
17   probably would have represented an actual cost.
18           Q.    Right.  Okay.  So just moving on
19   then, I think Mr. Barrack asked you and you
20   confirmed, that the Board of Directors had
21   considered that there was an appropriate purpose
22   for the interest-free loan that was being addressed
23   through Project Swift and that was in connection
24   with the interests of the UK company in supporting,
25   from a cash flow perspective, the Canadian company,
```



1    correct?

2                    A.    Yes.

3                    Q.    And that was a good business

4    purpose as you considered it and as the board

5    considered it at the time, correct?

6                    A.    I considered it a good business

7    purpose but this is ultimately a legal matter, but

8    in my view, yes, that was a good business purpose.

9                    Q.    Okay, thank you.  Now, in respect

10   of Project Swift, I think you described yourself as

11   an information provider.  You were the original

12   architect of the project, correct?

13                   A.    Correct.

14                   Q.    And then once it was accepted and

15   it was going to be implemented, you became a

16   facilitator and an information provider and

17   supported it as it progressed, correct?

18                   A.    Yes.

19                   Q.    And I take it you sought and

20   received or participated in the seeking and

21   receiving of advice from external advisors in

22   connection with this project?

23                   A.    Yes.

24                   Q.    And that would have included EY

25   UK?



```
 1                    A.    It definitely included EY UK, yes.
 2                    Q.    And they were the valuator of the
 3     assets that were being transferred; is that right?
 4                    A.    They were the firm who were chosen
 5     after the beauty parade, yes.
 6                    Q.    And you were absolutely convinced
 7     that they were qualified to perform that valuation,
 8     correct?
 9                    A.    Beyond that.
10                    Q.    And your assessment of that never
11     changed throughout, did it?
12                    A.    No, there was no reason to change
13     it.
14                    Q.    And I think you said this morning
15     you knew that they were doing a valuation of the
16     Swift entities on an open market basis, right?
17                    A.    That was, I believe, their
18     instruction.
19                    Q.    Right.  And you also knew that
20     they did that on the basis of a discounted cash
21     flow using multiples to arrive at a terminal value
22     for the Swift entities, correct?
23                    A.    That is the method they chose as
24     experts.
25                    Q.    Right.  And that was based on
```



1    expected revenues or profits to the Swift entities

2    under existing contracts, right?

3            A.    Based on forecasts which were

4    prepared for the purpose of this exercise, yes.

5            Q.    Okay.  And if we could look at

6    Trial Exhibit 43323, which hopefully is in the

7    room, and if you go to the second to last page of

8    this email chain --

9            A.    Um-hmm.

10            Q.    -- it's an email from you to I

11    think you see Mr. Patel, the same Mr. Patel who we

12    spoke about this morning?

13            A.    I do, yes, indeed.

14            Q.    So he was involved on behalf of

15    Ernst & Young UK in connection with the Swift

16    valuation?

17            A.    He led the EY valuation team.

18            Q.    And Amanda Tucker worked with him

19    as well; is that right?

20            A.    Correct.

21            Q.    And I think we know who Mr. Ryan

22    Smith and Simon Freemantle are, but you see below

23    that you are advising E&Y UK that you are going to

24    be presenting the revised valuation numbers to the

25    directors and --



```
 1                THE COURT:  Which page are we on?
 2                MS. KIMMEL:  Sorry, this is the second
 3   to last page.  It's Mr. --
 4                THE COURT:  I don't see any email on
 5   the second last page from Mr. Stephens.
 6                MS. KIMMEL:  There is an email that
 7   should be -- I don't know if my copy is different
 8   than yours, but there is an email dated November
 9   20th, 2007 from Mr. Stephens to Alay Patel and
10   Amanda Tucker and it says "Alay and Amanda."
11                THE COURT:  Oh, I see.  Okay.  Yes, go
12   ahead.
13                BY MS. KIMMEL:
14           Q.   And so you were advising them that
15   you were presenting a revised valuation to the
16   directors and you had asked for a written summary.
17   And we don't need to walk through this entire email
18   chain, but do you recall that there were some
19   changes that were being made at this time to the
20   valuation based on input and suggestions from PwC?
21           A.   No, I can't recall the process in
22   the valuations at all.  That may be the case and
23   PwC certainly looked at it on behalf of the pension
24   trustees, but this is a long time ago and I don't
25   remember that level of detail.
```



```
 1                    Q.    That's okay.  I can just take you
 2    -- if you go to the preceding page of this email
 3    chain --
 4                    A.    Yeah.
 5                    Q.    -- you'll see there is an email
 6    from Amanda Tucker to you, and she says:
 7                          "Following discussions with
 8                          PwC, we've made some changes to the
 9                          valuation."
10                    It's November 21, 2007.
11                    A.    Okay, yes.
12                    Q.    So, Ms. Tucker is advising you
13    that there have been discussions with PwC.  Those
14    were the advisors to the pension trustees; is that
15    right?
16                    A.    I understand so, yes.
17                    Q.    And they indicate that they're
18    going to be updating the valuation before it gets
19    given to the board; is that your understanding
20    having refreshed your recollection?
21                    A.    That's what it says here.
22                    Q.    Okay.  And do you recall, sir,
23    that you did get the updated valuation and that it
24    was, in fact, provided to the board?
25                    A.    No, I don't recall but I assume
```


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1    that must be the case.  I don't -- I don't recall
 2    this element of the transaction at all.
 3              Q.   Okay.  Now, if we could look at
 4    Trial Exhibit --
 5              THE COURT:  You realize you're spoiling
 6    all the lawyers' fun when you say that?
 7              MS. KIMMEL:  It makes things go more
 8    quickly.
 9              THE COURT:  Well, sometimes evidence is
10    helpful too.
11              BY MS. KIMMEL:
12              Q.   If we could look at Trial Exhibit
13    31164.  I appreciate, Mr. Freemantle (sic), that
14    some of these documents may be documents that you
15    haven't looked at for a long time.
16              MR. BARRACK:  Mr. Stephens.
17              BY MS. KIMMEL:
18              Q.   Sorry, Mr. Stephens.  I was
19    thinking of Mr. Freemantle because in fact what I
20    wanted to ask you about is this is an email from
21    Mr. Freemantle to you and others seeking input on a
22    couple of things, but what I'm interested in
23    particularly is there is a draft letter to the
24    pension trustee, Mr. Davies.
25              A.   Um-hmm.
```


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1                    Q.   And I'm just wondering if you
 2    recall this or recall whether you provided any
 3    comments on it before it was finalized?
 4                    THE COURT:  Can I just ask you to
 5    remind me who is Mr. Freemantle?
 6                    MS. KIMMEL:  I can tell you or would
 7    you rather Mr. Stephens tell you?
 8                    THE COURT:  It's already in the
 9    evidence.
10                    MS. KIMMEL:  He was the head of NNUK
11    treasury and global treasury I think in this
12    timeframe.
13                    THE COURT:  Thank you.
14                    THE WITNESS:  I probably would have had
15    some input into this in respect of some of the
16    historical information here.
17                    BY MS. KIMMEL:
18                    Q.   Do you recall whether you were
19    generally in concurrence with what Mr. Freemantle
20    was proposing to give the pension trustees in
21    respect of these matters?
22                    A.   Yes.
23                    Q.   Okay.  Now, in connection with the
24    final valuation that was prepared for Project Swift
25    and upon which the Board of Directors made their
```



1  decision, are you aware of any change in the

2  valuation methodology or the basis of valuation

3  between the drafts that you saw and the final

4  valuation that was provided to the board?

5          A.    Not that I recall.

6          Q.    And did you at any time ever

7  express any concern to the board of NNUK or anyone

8  within NNUK about the EY UK valuation methodology

9  and basis for valuation?

10          A.    At some point I did question the

11 valuation applied to the so-called LREs or the

12 limited risk entities as to whether they had any

13 value beyond their net asset value.

14          Q.    Okay.  And who did you raise that

15 with?

16          A.    Probably internally.  I may have

17 discussed it with EY.  I think it was discussed

18 with them rather than written about, but the

19 experts, they came to a different conclusion.

20          Q.    So you may have discussed it with

21 EY and you may have discussed it internally but

22 you're not aware ultimately of anyone ever telling

23 the NNUK Board of Directors that there was any

24 concern about the methodology or basis of valuation

25 that was being used, correct?



```
1                    A.    I'm pretty sure I would have
2     communicated that to Simon Freemantle who I think
3     at this time was a director of NNUK.
4                    Q.    And are you aware of any action
5     having been taken in connection with your
6     discussions that you had with NNUK -- sorry, EY UK
7     with respect to these concerns?
8                    A.    EY clearly dismissed my views.
9                    Q.    And the final valuation report, if
10    we could just have you take a look at it, it's
11    actually not the Project Eagle report that
12    everybody seems to like to refer to, so I'm going
13    to ask that you be given Trial Exhibit 31628.
14                   Now, just before we get into this, you
15    understood that EY UK was undertaking their
16    valuation on the basis that the limited risk
17    distributors were considered high risk, right?
18                   A.    They were ascribing such risk to
19    them as they thought appropriate, yes.
20                   Q.    And it was described as a high
21    risk?
22                   A.    That's their call.
23                   Q.    Sorry, I didn't hear what you
24    said.  That's their?
25                   A.    That's their call.
```



1            Q.   Yes, okay.  Now --

2            THE COURT:  Just a minute.  You said

3    that the limited risk distributors were considered

4    high risk; is that what you said you understood?

5            THE WITNESS:  Yes.

6            BY MS. KIMMEL:

7            Q.   And that was how E&Y was

8    proceeding with their valuation on the basis of

9    that assessment, correct?

10           A.   That was their assessment, yes,

11   and I assume they followed it in their valuation.

12           Q.   And in the context of the

13   valuation we have in front of you now, this Exhibit

14   31628, are you familiar with this?  This is the

15   actual Project Swift valuation that E&Y --

16           A.   Yes, I am, I've seen this document

17   many times, yes.

18           Q.   Okay.  And if you can put, or just

19   have in your mind anyway, the Project Eagle report

20   that you were looking at earlier with Mr. Barrack,

21   that actually wasn't the valuation that was used

22   for purposes of the transaction, was it?

23           A.   No, that -- well, in fact, if I

24   recall the Project Eagle submissions, these

25   companies were deemed worthless.



1          Q.    That was in Project Eagle?

2          A.    Yes, Project Eagle, therefore the

3    two are just totally contrary to each other.

4          Q.    And Project Eagle, the reason they

5    were assumed to be worthless, if you can just

6    recall, is that it was -- that was an assumption

7    that was made under an insolvency scenario which

8    was a different valuation that was being undertaken

9    at the time for comparative purposes, correct?

10         A.    Absolutely, yes, apples and pears,

11   as we would say in this country.

12         Q.    I like that.  Now, just one other

13   thing in relation to the valuation so I don't

14   forget to ask you this.  You mentioned in

15   Mr. Barrack's questioning that you knew there was

16   some cash that had been extracted from some of the

17   subsidiaries before the transaction went through.

18   Do you recall that testimony?

19         A.    Yes.

20         Q.    I'm sure you'll also recall that

21   when the purchase price was calculated for the

22   purposes of the valuation in the final form for

23   offsetting the loan balance, that those cash

24   extractions were netted out of the values, correct?

25         A.    Absolutely.  If the cash had not



1    been extracted, the price would have gone up dollar
2    for dollar.
3                    Q.   Okay, thank you.  Now, just on the
4    topic of NNSA, you spoke with Mr. Barrack about the
5    fact that it had been intended that it be included,
6    but I think we have it that it wasn't, right?
7                    A.   Correct.
8                    Q.   And therefore it wasn't valued for
9    the purposes of this exercise, correct?
10                   A.   It was valued in order to arrive
11   at a valuation for the minority interest held by
12   the Dutch company.
13                   Q.   Sorry, I apologize.
14                   THE COURT:  Just a moment, Ms. Kimmel.
15   When you say it wasn't valued for the purpose of
16   this exercise, what exercise are you talking about?
17                   MS. KIMMEL:  For the purposes of
18   transferring NNL's interest in NNSA to NNUK.
19                   BY MS. KIMMEL:
20                   Q.   And just to have your answer, Mr.
21   Stephens, I take it that you'll agree --
22                   THE COURT:  Just a second.
23                   THE WITNESS:  It is valued in this
24   valuation to arrive at a number for the eight or
25   nine percent interest that was owned by the Dutch



1    company that was acquired by NNUK in Project Swift.
2                    BY MS. KIMMEL:
3                    Q.    But it wasn't valued for the
4    purposes of valuing NNL's 93 percent interest?
5                    A.    That's right.  That was going to
6    be subject to a separate valuation at a later
7    point, if the transaction had ever happened.
8                    Q.    And so my point was that that
9    valuation of the 93 percent holding of NNSA that
10   NNL owned, that valuation was never undertaken
11   because events overtook everyone and that part of
12   the Project Swift never went forward, correct?
13                   A.    That is correct.
14                   Q.    And there was never an agreement
15   or contract that required NNSA to be transferred to
16   NNUK, was there?
17                   A.    Not that I am aware of, no.
18                   Q.    Now, I just want to ask you a
19   couple more brief questions about the loan.
20   Mr. Barrack talked to you about the transfer
21   pricing adjustments under the MRDA and I think he
22   asked you whether it was contemplated that those
23   would be cash payments.
24                   I'd like to have you take a look at the
25   MRDA again if you could for a moment.



```
 1                    A.    It's here somewhere.
 2                    Q.    This is --
 3                    A.    Yes, somebody has found it for me,
 4      thank you.
 5                    Q.    All right.  I'm glad for all the
 6      assistance in London.  It's Trial Exhibit 21003.
 7                    A.    Yes.
 8                    Q.    And you may know this but I just
 9      wanted you to have the agreement available if you
10      need it, that under the Article 3, which is on the
11      typewritten 5.
12                    A.    Yes, I have it.
13                    Q.    Subparagraph (d).
14                    A.    Yes.
15                    Q.    It says that:
16                          "A payment to and a payment
17                          from a participant will be reflected
18                          in the intercompany accounts to the
19                          affected participant as a payable or
20                          a receivable, whatever the case may
21                          be, and may be netted pursuant to
22                          the standard NNL practice for
23                          managing intercompany accounts."
24                          Do you see that?
25                    A.    Yes.  Yes.
```



```
 1               Q.   Was it to your experience, I know
 2   you're not a treasury person, but to your
 3   experience was it part of the standard NNL
 4   practised for managing its intercompany accounts
 5   that account balances over 90 days would be
 6   converted into loans?
 7               A.   That was certainly the practice of
 8   NNUK, a stated practice in fact that we agreed with
 9   UK Revenue for the purposes of imputing interest on
10   outstanding balances.  Now, whether that was
11   universal, I'm not sure, but certainly it was
12   NNUK's practice.
13               Q.   Well, that's all we need to know
14   about for today, so thank you.
15               THE COURT:  I don't quite understand
16   that answer really.  If something is put into an
17   account as a payable or a receivable, that's
18   something on the books of the company.  What do you
19   mean by converting it to a loan?  What does that
20   mean?
21               THE WITNESS:  If that balance was
22   outstanding, due to NNUK for more than 90 days, the
23   agreement was that it would be converted into --
24   transferred into a loan agreement, a formal loan
25   agreement, and in theory interest would be applied
```



```
 1   to that balance.
 2                  BY MS. KIMMEL:
 3                  Q.   And --
 4                  THE COURT:  Just a minute.
 5                  MS. KIMMEL:  I'm sorry, Your Honour.
 6                  THE COURT:  Well, you're all out of
 7   luck because I'm out of ink.  Does someone have a
 8   ballpoint pen there?  Thank you.
 9                  Mr. Gottlieb, you were up on your feet
10   a minute ago.
11                  MR. GOTTLIEB:  I was.  I didn't want to
12   interrupt my friend.  I told her that when she was
13   done -- I apologize, I'll come up.  I think it's
14   fair if the witness is moved to (f) and (g) of the
15   same paragraph of the agreement, otherwise we'll
16   take him to it and then Ms. Kimmel will get back up
17   because it talks about the terms of payment.
18                  I'm sorry for interrupting but I think
19   in fairness he has to see those provisions as well,
20   to be taken to those.
21                  MS. KIMMEL:  I have no problem with
22   that.
23                  BY MS. KIMMEL:
24                  Q.   Mr. Stephens, I think what
25   Mr. Gottlieb wanted you to look at -- is it (f) and
```



1   (g)?

2              MR. GOTTLIEB:  Yes, the top of the next

3   page, I believe.

4              THE WITNESS:  Yes, I'm looking at them.

5              BY MS. KIMMEL:

6              Q.   So, having looked at these, what

7   -- I wanted to just carry on with my questions, and

8   they will be incorporated into the questions, the

9   concepts of these paragraphs, don't worry, but Mr.

10  Stephens, you say that the practice of NNUK was to

11  follow the conversion of the intercompany account

12  trade receivables into formal loan agreements.

13  That's right?  That's what you said before?

14             A.   Yes, and after a 90-day period.

15             Q.   Right.  And the loans that

16  Mr. Barrack was asking you about, the ones that

17  we've talked about earlier today, the accumulation

18  of the trade receivables, those were, in fact,

19  converted into formal loan agreements, correct?

20             A.   There was a formal loan agreement,

21  a formal loan facility agreement and they were just

22  added to the loan under that facility.

23             Q.   And each year they were renewed

24  and considered by the Board of Directors of NNUK,

25  correct?



```
 1                    A.    They were renewed every 364 days,
 2     sometimes more often.
 3                    Q.    Okay.  Now, those -- and those
 4     loans, as you have testified earlier, were
 5     interest-free and -- but the interest was imputed
 6     for tax purposes, so for the purposes of what was
 7     dealt with in the tax authority -- for the tax
 8     authorities, it was treated as if there was income
 9     interest being paid, correct?
10                    A.    At a market rate, yes.
11                    Q.    And then it was offset by the
12     operating losses, the net operating losses that
13     existed in NNUK at the time, correct?
14                    A.    Most of it was offset by some
15     passive losses which the company had.  Some years
16     there were operating loss setoffs but other years
17     we had to use passive losses.  We had two pools of
18     losses in the UK.  But we had losses to cover the
19     imputed interest.
20                    Q.    Okay.  And the interest was
21     imputed at the rate that's described in paragraph
22     (g), correct?
23                    A.    No, it wasn't.  It was not.  That
24     would never have been satisfactory as an arm's
25     length rate to the UK Revenue, and we in fact
```

1    imputed interest at currency LIBOR plus one

2    percent.

3                   Q.    My apologies.  In fact you needed

4    to have an arm's length imputed interest rate and

5    so you used LIBOR plus one percent?

6                   A.    And UK Revenue agreed to that.

7                   Q.    Okay.  Thank you.  At any time

8    during the period that these loans, this revolving

9    credit facility was outstanding between 2003 and

10   2008, did NNUK make demand for repayment?

11                  A.    Not so far as I am aware.

12                  Q.    And as far as you're aware, NNUK

13   didn't need the money and that is why it did not

14   make the demand, right?

15                  A.    NNUK was never short of cash.

16                  Q.    I just want to talk to you very

17   briefly about an issue relating to NN Ireland.

18                  A.    Um-hmm.

19                  Q.    And for this I need you to take a

20   look at -- I need to get the trial exhibit number.

21   Apologies, Your Honour, I need to look up the trial

22   exhibit number.  I only have a document

23   identification number for this next exhibit.  It's

24   Trial Exhibit 50967.

25                  THE COURT:  50967?



```
 1                 MS. KIMMEL:  Yes.
 2                 BY MS. KIMMEL:
 3                 Q.   Mr. Stephens, have you had a
 4    chance to look at this email exchange between
 5    yourself and Mr. Freemantle in October of 2008?
 6                 A.   I am familiar with the background
 7    of this, yes.
 8                 Q.   Now, do you recall then that there
 9    was a dividend that was paid in June of 2008 by NN
10    Ireland to NNL that was then subsequently reversed
11    in October of 2008?
12                 A.   Yes, because there weren't enough
13    legally distributable profits when the financials
14    for 2007 were finally signed off.
15                 Q.   You say in this email to
16    Mr. Freemantle, though, in -- if you go to the
17    second page, there is an earlier email of the same
18    day.
19                 A.   Yes.
20                 Q.   You say:
21                      "The directors agreed and I
22                 assume because the draft financials
23                 show the June 2008 dividend to be
24                 covered by distributable profits and
25                 they were not aware of anything
```



1                       negative that would change that."

2                       And then you go on to say:

3                           "As I have commented

4                       previously, I think it is debatable

5                       as to whether on the facts the June

6                       2008 distribution is unlawful, but

7                       no one has any appetite to debate

8                       with KPMG."

9                       And was that your view at the time, Mr.

10   Stephens?

11              A.    Yes.

12              Q.    So eventually the dividend was

13   repaid; is that correct?

14              A.    It was reversed, yes.

15              Q.    Okay.  And it was done on the

16   basis of NN Ireland lending the money to NNL under

17   an existing loan facility in order to pay the

18   dividend back; is that right?

19              A.    That is right, yes.

20              Q.    And that was done with the benefit

21   of external legal and accounting advice on the part

22   of NN Ireland?

23              A.    We certainly took a lot of legal

24   advice on this, yes.

25              Q.    And at the time that the directors


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1    made the decision, they did it based on the
 2    management accounts.  Were those typically audited
 3    or unaudited?
 4              A.    Which decision?
 5              Q.    Sorry, the original decision to
 6    issue the dividend.
 7              A.    It was based on draft financial
 8    statements which we understood were about to be
 9    finally signed off and audited by KPMG, but for a
10    variety of reasons they didn't, and it was only
11    subsequently that these adverse transfer pricing
12    adjustments came through, so they were final
13    financial statements which the directors had
14    adopted but had not been signed off by the
15    auditors.
16              Q.    And it was only as a result of
17    the --
18              THE COURT:  Just a minute.
19              MS. KIMMEL:  I'm sorry, Your Honour.
20              THE COURT:  KPMG were the auditors for?
21              THE WITNESS:  NN Ireland.
22              THE COURT:  Thank you.
23              BY MS. KIMMEL:
24              Q.    So, Mr. Stephens, it was only as a
25    result of subsequent information that it came --
```



1    that came to light that KPMG became -- that the
2    statements were adjusted before they were finalized
3    ultimately by the auditors and that led to the
4    reversal of this dividend; is that right?
5              A.    That is right, yes.
6              Q.    And I take it the lawyers did give
7    approval for the ultimate outcome which was the
8    utilization of existing room in the loan facility
9    to repay the dividend?
10             A.    I can't say for certain that they
11   specifically approved that, but the lawyers would
12   have been made aware of everything we intended and
13   I think that they also would have been aware of the
14   loan, but I can't speak to that.
15             Q.    And this all obviously went
16   through the Board of Directors of NN Ireland before
17   it was implemented; is that right?
18             A.    Oh, they had to formally reverse
19   the dividend and enter into all sorts of bits of
20   paper to put the whole thing right, yes.  They
21   definitely discussed it.
22             MS. KIMMEL:  Your Honour, I don't have
23   very many more questions and I don't know to what
24   extent my friends have questions and whether you'd
25   like to just keep working through.



```
 1                    THE COURT:  Well, it's what, 6:00 p.m.
 2      over there in the UK?
 3                    MR. ADLER:  That's right, Your Honour.
 4                    THE COURT:  It may be getting into
 5      drinking time.  So why don't we try and finish this
 6      for the witness' sake.  I don't want him be sitting
 7      around while I have lunch.
 8                    THE WITNESS:  Thank you, Your Honour.
 9                    MS. KIMMEL:  I think it can be done, so
10      we'll just carry on, thank you.
11                    BY MS. KIMMEL:
12                    Q.   Do you recall that at some point
13      there was a discussion about how vendor financing
14      losses were being accounted for in respect of
15      transfer pricing and allocations among the various
16      entities?
17                    A.   Yes, I believe it was a query
18      raised by the US revenue authority.
19                    Q.   Right.  And you recall that there
20      was a suggestion that Nortel Networks Limited, the
21      parent company, should be bearing all of the vendor
22      financing losses that had been incurred?  Do you
23      recall that?
24                    A.   I recall -- I recall that
25      suggestion, yes.
```



Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

```
 1                    Q.   And you didn't agree with that,
 2      did you, Mr. Stephens?
 3                    A.   I do not.
 4                    Q.   Okay.  And can you just explain
 5      why you didn't agree with that or don't agree with
 6      that?
 7                    A.   I'll try and keep this simple.
 8                    Q.   Thank you.
 9                    A.   In any group of companies the
10      parent company has to control the long-term
11      investment of cash, and that's not a specific
12      Nortel issue, it applies to any -- any group.  You
13      can control working capital cash by various
14      monitors of looking at inventory levels and
15      receivable levels.
16                    But when you're looking at long-term
17      investments, in which I would include things like
18      fixed assets, I hate to say it, pension
19      contributions, actually R&D expense as well too,
20      but also in this category vendor financing, where
21      you're putting money out for quite long periods,
22      and you can't have subsidiary companies throwing
23      cash at investments of that type without
24      recognizing the constraints within the overall
25      group cash position.
```



```
 1              And at the time, the UK had
 2   considerable expertise in the vendor financing
 3   area.  It had a whole group of people, I think at
 4   that time including one of the assistant treasurers
 5   of the group, who looked at vendor financing and
 6   the covenant of the borrower, the form of
 7   agreement, but they had to go back to the parent
 8   company just to seek final authorization, as they
 9   would have to do for any major capital project.
10              So, the UK was, in this case, perfectly
11   capable of making these decisions on its own.
12         Q.    Thank you.  And therefore you
13   considered it appropriate that it continue to be
14   accounting for any losses associated with that
15   vendor financing activity that had preceded this
16   discussion, correct?
17         A.    Yes.
18         Q.    Thank you.  Now, do you recall
19   also participating in discussions about whether or
20   not the limited risk distributors should be bearing
21   their own restructuring costs?
22         A.    Yes.
23         Q.    And I take it on this topic you
24   had initially suggested that perhaps they shouldn't
25   be bearing restructuring costs incurred in the
```



1  particular entities, the limited risk distribution
2  entities; is that right?
3           A.    I suggested that when
4  restructuring costs became something of an annual
5  feature.  It's fine when you have a one-off
6  restructuring cost but Nortel seemed to have
7  restructuring costs every year and I felt in those
8  circumstances it was becoming almost like a regular
9  business expense and consideration should be given
10  as to whether it was right for the LREs given their
11  wafer-thin margin to continually be bearing
12  restructuring costs.
13           Q.    And you raised this and I take it
14  you participated in some discussions about it, and
15  ultimately it was explained to you that while they
16  were limited risk distributors, they weren't no
17  risk distributors and that it was felt that it
18  wasn't necessary to adjust for this particular
19  matter, correct?
20           A.    My colleagues in North America
21  disagreed with me and they are perfectly entitled
22  to their view.
23           Q.    And it was perfectly reasonable of
24  them to have come --
25           A.    No, these are all opinions and



1    views and I'm bound to say on this area they were
2    more expert than I.
3              Q.   Okay, thank you.  Now, I think I
4    will stop there, sir, and I will allow others who
5    may have some questions for you to carry on and
6    hopefully get you out of there before too long.
7              A.   Thank you.
8              THE COURT:  Anybody else?
9              FURTHER CROSS-EXAMINATION BY
10             MR. BARRACK:
11             Q.   Mr. Stephens, just a couple of
12   points to clarify some of the things that have been
13   raised.
14             With respect to the payments under the
15   MRDA on an annual basis, you were taken to the
16   MRDA, Article 3, R&D activity payments.
17             A.   Yes.
18             Q.   And you were referred to or not
19   referred to FNG of those -- of that agreement.
20             A.   Yes.
21             Q.   It was the intent that either the
22   amounts would be paid in 90 days or interest would
23   accrue according to the MRDA, correct, sir?
24             A.   That is correct, yes.
25             Q.   And so for your purposes in the



```
1    UK, you treated the first 90 days as a trade credit
2    and then converted to a loan after that?
3                A.    That is right, yes.
4                Q.    And that avoided some of the
5    problems with the tax authorities by that
6    characterization?
7                A.    No, even if it had been left on
8    trade account, the tax authorities would still
9    express concern that you don't leave trade
10   receivables outstanding for more than 90 days.
11               Q.    Okay.  And --
12               A.    We formalized it to put into a
13   loan agreement so it was clear what we were going
14   to impute interest on.
15               Q.    And I think you clarified, but
16   just so it's clear for His Honour, that you imputed
17   interest throughout the entire time but there was
18   no cash payment of interest, correct?
19               A.    There were no cash payment at all
20   of interest.
21               Q.    And because of the loss position
22   of the UK, there were no cash taxes payable, but
23   that was about to become a concern?
24               A.    That was becoming a concern,
25   certainly.
```



1          Q.    All right.  And just another topic
2    you referred to.  You said that NNUK was not short
3    of cash but it also had a very large pension
4    deficit outstanding, correct?
5          A.    Correct, yes.
6          Q.    And that was a concern of the
7    trustees, that there was this intercompany loan on
8    a non-cash basis in the face of a large pension
9    deficit?
10          A.    I believe that -- as I say, I did
11    not participate in the discussions with the
12    trustees but I understand that was a concern on
13    their part.
14          Q.    All right.  And then with respect
15    to these discussions about the Irish transactions,
16    I noticed that these are occurring in, and I'm not
17    sure whether this is the UK, whether this is in
18    October of '08 -- yes, October of '08 you're having
19    these conversations or these emails are exchanged?
20          A.    Yes, it would be October '08, yes.
21          Q.    Did you eventually become aware of
22    something called Project Copperhead?
23          A.    Eventually I became aware of
24    Project Copperhead in about December of 2008.
25          Q.    Are you aware of the Board of


Neeson&Associates
COURT REPORTING AND CAPTIONING INC.

1    Directors of NNUK becoming aware of Project

2    Copperhead before December of 2008?

3                A.    I was probably advised by one of

4    the directors that he was aware not long before I

5    was aware.

6                Q.    All right.  And Project Copperhead

7    was the -- turned out to be the planning for the

8    insolvency of the Nortel Enterprise, correct?

9                A.    That is correct, yes.

10               Q.    All right.  I just want to finish

11   off with the apples and pears concept that you

12   talked about and I want to go back to the Project

13   Eagle report, Exhibit 11123.

14               A.    Yes.

15               Q.    And we looked at page 35, which

16   was "Insolvent basis - 'group' wide insolvency,"

17   and I would like you to flip back to the previous

18   page, 34, which is "Ongoing solvent basis."  Do you

19   see that, sir?

20               A.    Yes, I'm there.  The numbers

21   aren't that clear.

22               Q.    All right.  And just to go

23   through, to step back for a moment, this

24   transaction was assessed on the basis of what the

25   effect would be if the Nortel Enterprise continued



1    and was evaluated separately on if the Nortel

2    Enterprise became insolvent, correct?

3                    A.    As I said, I'm not that familiar

4    with this document, but if that's what you say it

5    is, I will go with that.

6                    Q.    But the apples and pears concept

7    that you're referring to in the concept -- in the

8    context of solvency or insolvency, all of the

9    valuations -- and if we look at this first

10   paragraph, it reads:

11                        "The transactions involve the

12                        exchange of..."

13                   THE COURT:  Is this very helpful?  Mr.

14   Stephens says he's not really familiar with these

15   documents.  Isn't this argument going on now?

16                   BY MR. BARRACK:

17                   Q.    Were you aware of the difference

18   in the bases of valuation that...

19                        He did contribute to some of these

20   valuation concepts.

21                        Were you aware that the discounted cash

22   flow valuations anticipated the ongoing trading

23   operations of these companies?

24                   A.    Yes.  It was a valuation assuming

25   the group continued and forecasts were done on that



1  basis.

2           Q.   And you were aware that in the

3  event the group didn't continue that those

4  valuations may be difficult to achieve in that

5  context because of the interrelated nature of the

6  of the businesses of all of those entities,

7  correct?

8           A.   Absolutely.  That's exactly where

9  my apples and pears are, yes.  You're looking at

10 two completely different elements.

11          MR. BARRACK:  Right.  Thank you very

12 much.

13          MR. GOTTLIEB:  Your Honour, we have no

14 questions, no further questions, so assuming

15 there's nothing else, thank you for sitting late to

16 everyone, appreciate it.

17          THE COURT:  Very well.  Thank you, Mr.

18 Stephens.  You're free to go.

19          THE WITNESS:  Thank you.

20          MS. KIMMEL:  I was just going to say

21 thank you.  I was going to go into the camera to

22 say thank you again, Mr. Stephens, for

23 accommodating and staying late today.

24          THE WITNESS:  That's not a problem.

25          -- WITNESS EXCUSED



1          MR. GOTTLIEB:  So, Your Honour, we're

2    back at 9:00 tomorrow morning.

3          THE COURT:  Here's a whole bunch of

4    paper that people can have back.  All right.  So

5    we'll rise now until 9:00 a.m. tomorrow morning.

6    -- Whereupon the court adjourned at 1:15 p.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1              REPORTER'S CERTIFICATE

 2

 3              I, KIMBERLEY A. NEESON, RPR, CRR,

 4   CSR, CCP, CBC, Certified Shorthand Reporter,

 5   certify;

 6              That the foregoing proceedings were

 7   taken before me at the time and place therein set

 8   forth, at which time the witness was put under oath

 9   by me;

10              That the testimony of the witness

11   and all objections made at the time of the

12   examination were recorded stenographically by me

13   and were thereafter transcribed;

14              That the foregoing is a true and

15   correct transcript of my shorthand notes so taken.

16

17

18              Dated this 27th day of May, 2014

19
                 Kimberley Neeson
20   _____

21              NEESON & ASSOCIATES

22              COURT REPORTING AND CAPTIONING INC.

23              PER:KIM NEESON, RPR, CRR, CSR, CCP, CBC

24              CERTIFIED REAL-TIME REPORTER

25              REALTIME SYSTEMS ADMINISTRATOR
```







Neeson&Associates
COURT REPORTING AND CAPTIONING INC.











