



```
1                  UNITED STATES BANKRUPTCY COURT

2                 FOR THE DISTRICT OF DELAWARE
3

4    ------------------------------)

5    In Re                         )

6       NORTEL NETWORKS INC.,      )   Case No.

7       et al.,                    )   09-10138 (KG)

8          Debtors.               )

9    ------------------------------)

10                         - and -

11             Court File No. 09-CL-7950

12                      ONTARIO

13            SUPERIOR COURT OF JUSTICE

14               (COMMERCIAL LIST)

15      IN THE MATTER OF THE COMPANIES' CREDITORS

16   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18   ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19        NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20       CORPORATION, NORTEL NETWORKS INTERNATIONAL

21      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                    CORPORATION

23      APPLICATION UNDERT PART IV OF THE COMPANIES'

24   CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                     AS AMENDED
```



```
 1

 2                        --------

 3

 4   ---- This is the Day 9/Volume 9 of the transcript

 5   of the proceedings in the above matter held

 6   simultaneously in:

 7   Superior Court of        United States Bankruptcy

 8   Ontario (Commercial      Court for the District of

 9   List)                    Delaware

10   Courtroom 8-1            Courtroom 3

11   330 University Avenue    824 Market Street

12   Toronto, Ontario         Wilmington, Delaware

13

14   on the 28th day of May, 2014, commencing at 9:44

15   a.m.

16

17                        ---------

18   B E F O R E:

19   The Honorable Judge Kevin Gross (United States)

20   The Honorable Mr. Justice Frank Newbould (Canada)

21

22                        ---------

23

24

25
```

Neeson & Associates  W&P

```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17        Julie Rosenthal, Esq.

18

19   ERNST & YOUNG INC.

20   Ernst & Young Tower

21   222 Bay Street, P.O. Box 251

22   Toronto, ON  M5K 1J7

23

24   PER: Murray McDonald, Esq.

25        Brent Beekenkamp, Esq.
```

 

```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER: Derrick Tay, Esq.

 7        Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER: Ken Coleman, Esq.

14        Paul Keller, Esq.

15        Daniel Guyder, Esq.

16        Laura Hall, Esq.

17        Joseph Badtke-Berkow, Esq.

18        Jonathan Cho, Esq.

19        Nicolette Ward, Esq.

20

21   FOR THE CANADIAN DEBTORS

22   BUCHANAN INGERSOLL & ROONEY

23   1105 North Market Street

24   Suite 1900

25   Wilmington, DE  19801-1054
```



```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   79 Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   1201 North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```

 Neeson&Associates  W&F WILSON & PETZER LTD.

```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```



```
 1   PER: Matthew P. Gottlieb, Esq.

 2        Tracy Wynne, Esq.

 3        Paul Michell, Esq.

 4

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER: Derek Adler, Esq.

11        William Maguire, Esq.

12        Neil Oxford, Esq.

13        Fara Tabatabai, Esq.

14        Charles Huberty, Esq.

15

16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

17   LIMITED

18   YOUNG CONAWAY STARGATT & TAYLOR LLP

19   Rodney Square

20   1000 North King Street

21   Wilmington, DE  19801

22   PER: Ed Harron, Esq.

23        John Dorsey, Esq.

24

25   FOR THE EMEA DEBTORS
```



```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER: James Norris-Jones, Esq.

 6

 7   CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```



1   PER: Barry E. Wadsworth, Esq.

2        Lewis Gottheil, Esq.

3

4   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

5   COMMITTEE

6   SHIBLEY RIGHTON LLP

7   University Avenue, Suite 700

8   Toronto, ON  M5H 3E5

9   PER: Arthur O. Jacques, Esq.

10       Thomas McRae, Esq.

11

12  FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13  ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14  FUND

15  PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16  35th Floor

17  155 Wellington Street West

18  Toronto, ON  M5V 3H1

19  PER: Kenneth T. Rosenberg, Esq.

20       Massimo (Max) Starnino, Esq.

21       Lily Harmer, Esq.

22       Karen Jones, Esq.

23       Tina Lie, Esq.

24       Michelle Jackson, Esq.

25



```
1    FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

2    CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

3    2009

4    NELLIGAN O'BRIEN PAYNE LLP

5    50 O'Connor Street, Suite 1500

6    Ottawa, ON  K1P 6L2

7    PER: Janice B. Payne, Esq.

8         Steven Levitt, Esq.

9         Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```



1   919 North Market Street, Suite 1500

2   Wilmington, DE  19801

3   PER: Selinda A. Melnik, Esq.

4       Richard Hans, Esq.

5       Timothy Hoeffner, Esq.

6       Jason Gerstein, Esq.

7       Farah Lisa Whitley-Sebti, Esq.

8

9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12  BENNETT JONES LLP

13  1 First Canadian Place

14  Suite 3400

15  Toronto, ON  M5X 1A4

16  PER: Kevin Zych, Esq.

17      S. Richard Orzy, Esq.

18      Gavin Finlayson, Esq.

19      Richard Swan, Esq.

20      Sean Zweig, Esq.

21      Jonathan Bell, Esq.

22      Amanda McLachlan, Esq.

23

24  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25  MILBANK, TWEED, HADLEY, MCCLOY LLP



```
 1   1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4        Jennifer P. Harris, Esq.

 5        Albert A. Pisa, Esq.

 6        Samir Vora, Esq.

 7        Andrew LeBlanc, Esq.

 8        Michael Hirschfeld, Esq.

 9        Atara Miller, Esq.

10        Tom Matz, Esq.

11        Nick Bassett, Esq.

12        Gabrielle Ruha, Esq.

13        Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23        Michael Wunder, Esq.

24        Ryan Jacobs, Esq.

25
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
 2   ASHURST LLP
 3   Boardwalk House
 4   5 Appold Street
 5   London, England  EC2A 2HA
 6   PER: Angela Pearson, Esq.
 7       Antonia Croke, Esq.
 8
 9   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
10   RICHARDS LAYTON & FINGER, P.A.
11   920 North King Street
12   Wilmington, DE  19801
13   PER: Christopher Samis, Esq.
14
15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
16   AKIN GUMP STRAUSS HAUER & FELD LLP
17   One Bryant Park
18   New York, NY  10036
19   PER: Fred S. Hodara, Esq.
20       David H. Botter, Esq.
21       Abid Qureshi, Esq.
22       Robert A. Johnson, Esq.
23       Brad M. Kahn, Esq.
24       Christine Doniak, Esq.
25       Joseph Sorkin, Esq.
```



```
 1         Jacqueline Yecies, Esq.
 2    UK PENSION PROTECTION FUND AND NORTEL NETWORKS
 3    UK PENSION TRUST LIMITED
 4
 5    FOR THE UK PENSION PROTECTION FUND AND NORTEL
 6    NETWORKS UK PENSION TRUST LIMITED
 7    THORNTON GROUT FINNIGAN LLP
 8    Suite 3200, 100 Wellington Street West
 9    P.O. Box 329
10    Toronto, ON  M5K 1K7
11    PER: Michael Barrack, Esq.
12         D.J. Miller, Esq.
13         Rebecca Lewis, Esq.
14         Andrea McEwan, Esq.
15         John Finnigan, Esq.
16         Michael Shakra, Esq.
17         D.J. Miller, Esq.
18    FOR THE UK PENSION PROTECTION FUND AND NORTEL
19    NETWORKS UK PENSION TRUST LIMITED
20    WILLKIE FARR & GALLAGHER LLP
21    787 Seventh Avenue
22    New York, NY  10019-6099
23    PER: Brian O'Connor, Esq.
24         Sameer Advani, Esq.
25         Andrew Hanrahan, Esq.
```



```
 1   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 2   NETWORKS UK PENSION TRUST LIMITED

 3   BAYARD, P.A.

 4   222 Delaware Avenue, Suite 900

 5   Wilmington, DE  19899

 6

 7   PER: Charlene D. Davis, Esq.

 8        Justin Alberto, Esq.

 9

10   THE BANK OF NEW YORK MELLON

11

12   FOR THE BANK OF NEW YORK MELLON

13   MCMILLAN LLP

14   Brookfield Place

15   181 Bay Street, Suite 4400

16   Toronto, ON  M5J 2T3

17   PER: Sheryl E. Seigel, Esq.

18

19   FOR THE BANK OF NEW YORK MELLON

20   LATHAM & WATKINS LLP

21   885 Third Avenue

22   New York, NY  10022-4834

23   PER: Michael J. Riela, Esq.

24

25   WILMINGTON TRUST, NATIONAL ASSOCIATION
```



```
 1   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
 2   HEENAN BLAIKIE LLP
 3   Bay Adelaide Centre
 4   333 Bay Street, Suite 2900
 5   P.O. Box 2900
 6   Toronto, ON  M5H 2T4
 7   PER: John Salmas, Esq.
 8        Kenneth Kraft, Esq.
 9        Sara-Ann Van Allen, Esq.
10
11   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
12   KATTEN MUCHIN ROSENMAN LLP
13   575 Madison Avenue
14   New York, NY  10022-2585
15   PER: Craig A. Barbarosh, Esq.
16        David A. Crichlow, Esq.
17        Karen B. Dine, Esq.
18
19   LAW DEBENTURE TRUST COMPANY OF NEW YORK
20
21   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
22   BORDEN LADNER GERVAIS LLP
23   40 King Street West
24   Toronto, ON  M5H 3Y4
25   PER: Edmond F.B. Lamek, Esq.
```

 

```
 1          James Szumski, Esq.

 2

 3   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 4   PATTERSON BELKNAP WEBB & TYLER LLP

 5   1133 Avenue of the Americas

 6   New York, NY  10036

 7   PER: Daniel A. Lowenthal, Esq.

 8

 9   BOARDS OF DIRECTORS OF NORTEL NETWORKS

10   CORPORATION AND NORTEL NETWORKS LIMITED

11

12   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

13   CORPORATION AND NORTEL NETWORKS LIMITED

14   OSLER HOSKIN AND HARCOURT LLP

15   100 King Street West

16   1 First Canadian Place, Suite 6100

17   P.O. Box 50

18   Toronto, ON  M5X 1B8

19   PER: Lyndon Barnes, Esq.

20          Edward Sellers, Esq.

21          Betsy Putnam, Esq.

22          Adam Hirsh, Esq.

23          Alexander Cobb, Esq.

24

25
```

 Neeson & Associates    W&P

```
 1                    I N D E X

 2

 3                    EXAMINATION

 4   WITNESS:                              PAGE

 5   MARK DAVID WEISZ

 6      Examination-in-Chief/Direct by    1844

 7      Mr. Zelbo

 8      Cross-Examination by Mr. Oxford   1871

 9      Cross-Examination by Mr. O'Connor 1877

10      Cross-Examination by Mr. Ruby     1882

11      Recross-Examination by Mr. Oxford 1903

12      Recross-Examination by Mr. Ruby   1911

13      Re-Examination/Re-Direct by Mr. Zelbo  1914

14   GEOFFREY STUART HALL

15      Examination-in-Chief/Direct by    1917

16      Mr. Chang

17      Cross-Examination by Ms. Rosenthal 1933

18      Examination-in-Chief/Direct by    1948

19      Mr. Chang

20   PAUL HUFFARD

21      Examination-in-Chief/Direct by    1954

22      Mr. Maguire

23      Cross-Examination by MR. MARK     1996

24      Cross-Examination by Mr. Hoeffner 2068

25
```



```
 1                      INDEX OF EXHIBITS
 2    EXHIBIT/DESCRIPTION                          PAGE
 3       28     Affidavit of Mark Weisz, dated   1844
 4       April 11, 2014
 5       29     Affidavit of Geoffrey Stuart     1916
 6       Hall, dated April 10, 2014
 7       30     Expert Report of Mr.             1954
 8       Huffard,dated January 24, 2014
 9       31     Rebuttal Report of Mr. Huffard,  1954
10       dated February 28, 2014
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1

 2

 3   --- Upon commencing at 9:44 a.m.

 4              THE CANADIAN COURT:  Good morning,

 5   Judge Gross.

 6              THE US COURT:  Good morning, Justice

 7   Newbould.

 8              THE CANADIAN COURT:  Counsel.

 9              THE US COURT:  I think we are ready to

10   proceed.

11              Mr. Zelbo, good morning.  How are you,

12   sir?

13              MR. ZELBO:  Good morning, Your Honors.

14   Howard Zelbo from Cleary Gottlieb Steen & Hamilton.

15   I've been told -- and I'll be corrected if I'm

16   wrong -- that before I start the direct examination

17   of Mr. Weisz that I think Mr. Qureshi, who

18   represents, as you know, the Creditors Committee --

19              THE US COURT:  Yeah.

20              MR. ZELBO:  -- wanted to make an

21   announcement with respect to a stipulation with

22   respect to two of the expert witnesses which will

23   save some time in the trial, so we should all be

24   happy for that.  But I'll let Mr. Qureshi speak.

25              THE US COURT:  Mr. Qureshi.
```



```
 1                  MS. ROSENTHAL:  Playing the role of
 2    Mr. Qureshi --
 3                  THE US COURT:  I am sorry.  Good
 4    morning.
 5                  MR. ZELBO:  I'll take full blame for
 6    that.
 7                  MS. MILLER:  Your Honor, D. J. Miller,
 8    from Thornton Grout Finnigan, Canadian counsel to
 9    the UK Pension Claimants.
10                  Mr. Zelbo is correct.  We have, as Your
11    Honors are aware, had a dispute between the UK
12    Pension Claimants and the UCC, the US Debtors and
13    the Bondholder Group.  And we have resolved that
14    dispute, and we resolved it in the form of sort of
15    a US form of stipulation, which we've then put for
16    filing purposes in a Canadian document.
17                  And if I can just provide Your Honors
18    with just a brief -- both the context of the
19    dispute and the basis upon which that dispute has
20    been resolved.
21                  And as I'm sure you can appreciate, the
22    stipulation which sets out the terms of the
23    resolution have been negotiated, so I'm not going
24    to stray off script.  But just by way of context,
25    as Your Honors are aware, pursuant to the
```



 1   litigation protocol, all of the core parties

 2   identified the experts that they intended to rely

 3   on.  That was back in January, the beginning of

 4   January.

 5              The UK Pension Claimants identified

 6   Leif Clark as a testifying expert.  Later that

 7   month the expert reports were delivered, and an

 8   expert report was delivered by the UK Pension

 9   Claimants that was coauthored by Leif Clark and Jay

10   Westbrook.

11              That particular report did identify the

12   distinct differences between Professor Westbrook

13   and Leif Clark, one being a consultant, one being a

14   testifying expert.  But nonetheless, a dispute

15   arose with respect to the effect of that and the

16   fact that they were both listed as coauthors on

17   that report.

18              Needless to say, there has been some

19   back and forth, and I'm not going to get into that.

20   There was an impasse with respect to the request to

21   have Professor Westbrook deposed, and that impasse

22   was ultimately resolved by Professor Westbrook

23   agreeing to be deposed.  He was, in fact, deposed.

24   His deposition testimony has been designated and

25   will be used at trial.

Neeson & Associates    W&F

```
 1                    Professor Westbrook maintained on the

 2    record at his deposition and has maintained

 3    throughout that he is not a testifying expert, he

 4    was not prepared to testify at trial.  But as I

 5    say, there has been a dispute on that.  He is a

 6    coauthor on the report.  There's no dispute about

 7    that.  And pursuant to the protocols and the

 8    discussions, the US position, very clear position,

 9    is that he was required to be available to testify

10    as an expert at trial.

11                    We have attached to the stipulation,

12    which I'd like to hand up to the Court, if I can;

13    and our US colleagues at Willkie Farr in Delaware

14    have copies for Judge Gross.  There has been

15    correspondence exchanged on this matter, and that's

16    attached to the stipulation for the benefit of the

17    Courts.

18                    The essence of the resolution of this

19    issue starts on page 69 of the stipulation after

20    the lengthy recitals.  And the essence is that the

21    US interests -- that is, the US Debtors, the UCC

22    and the Bondholders -- consent to the Clark-

23    Westbrook report being admitted as expert evidence

24    at trial without prejudice to their rights to make

25    submissions as to relevance or weight and without
```


Neeson & Associates   W&F

1    prejudice to the pretrial motion that they

2    previously brought, which was dismissed without

3    prejudice to that being revived at the end of the

4    trial.  And Your Honors had ruled on that on May

5    the 8th.

6              The UK Pension Claimants, in

7    consideration for this negotiated resolution, have

8    agreed that they will not call Leif Clark to

9    testify at trial.  And that was a condition of this

10   resolution.

11             The parties have agreed that given the

12   fact that almost all of the deposition transcripts

13   were, in fact, designated or counter-designated

14   already, that for completeness, the entire

15   transcripts will be filed with the Court and

16   available for use by any party at trial.

17             The US interests, because it has been a

18   term of this resolution that Leif Clark not

19   testify, they will not, of course, be entitled to

20   use that nonattendance in any respect, and no

21   inference is to be drawn from that.

22             And the balance is basically just

23   housekeeping matters.

24             That is the essence of the resolution

25   that the parties have agreed to, and with the



```
 1   Courts' permission, we would propose to proceed in

 2   that manner.

 3               MR. QURESHI:  Sorry.  If I may briefly,

 4   Your Honors.  For the record, Abid Qureshi, Akin

 5   Gump Strauss Hauer & Feld, on behalf of the

 6   committee.

 7               Judge Gross, good morning --

 8               THE US COURT:  Good morning.

 9               MR. QURESHI:  -- Justice Newbould.

10   Just very briefly a couple of quick statements on

11   the record about the stipulation.

12               We entered into it obviously to resolve

13   what we viewed to be a significant dispute.  And

14   just one clarification, which is, although, of

15   course, we agree that we will not in any subsequent

16   briefing refer in any way to Judge Clark's absence

17   from testifying, because that is, of course, the

18   result of the stipulation, we do remain free to

19   refer in subsequent briefing, whether it's a

20   renewed motion to strike or in our post-trial

21   briefing, the refusal of Professor Westbrook to

22   come to testify.  That is something we can refer to

23   in our arguments as to either the admissibility or

24   the weight of the report.

25                   And finally, just by way of
```



 1   explanation, the reason that we thought this

 2   stipulation was appropriate was, given the clear

 3   language of the protocols that we agreed to that

 4   required the presence of a testifying expert,

 5   given, of course, the fact that Professor Westbrook

 6   signed and submitted an expert report, we did not

 7   think it would be fair to effectively allow the UK

 8   Pension parties to choose which of their two

 9   experts to put up for cross-examination; and so a

10   sensible resolution was, of course, that neither of

11   them testify.

12               So with that we, of course, would ask

13   the Courts to approve it.  And I'm happy to address

14   any questions the Courts may have.

15               THE CANADIAN COURT:  Judge Gross, in

16   Ontario, when parties provide documents for consent

17   order, they have to certify that no party is under

18   any mental disability.  I don't know whether we

19   should require in this case or not.

20               THE US COURT:  I take it that's no

21   comment on the reports.

22               THE CANADIAN COURT:  Do you want this

23   marked as an exhibit?  Does it matter?

24   Stipulations are kind of foreign to this court, so

25   how do you deal with stipulations?



    1                    THE US COURT:  Well, we usually provide
    2    a so-ordered or an order approving the
    3    stipulations.
    4                    My only concern here, of course, is
    5    that neither you nor I will have an opportunity to
    6    question the experts with any of our concerns.
    7                    I would like to give it just a little
    8    more thought, if that's all right.  And perhaps you
    9    and I can discuss this off the record before
   10    approving it.
   11                    THE CANADIAN COURT:  All right.
   12                    MR. MILLER:  Thank you, Your Honor.
   13                    THE US COURT:  Thank you.  Thank you,
   14    Ms. Miller, Mr. Qureshi.
   15                    And now I guess, Mr. Zelbo, it's back
   16    to you.
   17                    MR. ZELBO:  That stipulation was not as
   18    dense as the IFSA, but --
   19                    THE US COURT:  I'm sure it took a long
   20    time to resolve.
   21                    THE CANADIAN COURT:  There are more
   22    recitals.
   23                    THE US COURT:  Yes, there are.
   24                    MR. ZELBO:  Those were the best part.
   25                    THE US COURT:  I think before you

 Neeson&Associates    W&F

```
 1    proceed, we'll have the witness sworn.  Is that all
 2    right?  Is that what you thought, Mr. Zelbo, as
 3    well?
 4              MR. ZELBO:  That is what I was going to
 5    suggest.
 6              THE US COURT:  All right.  Thank you.
 7    MARK DAVID WEISZ, having first been duly sworn, was
 8         examined and testified as follows:
 9    EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY
10    MR. ZELBO:
11              THE US COURT:  All right.  Thank you,
12    Mr. Weisz.
13              MR. ZELBO:  Your Honors, I believe
14    Mr. Weisz just for the record submitted a witness
15    statement dated April 11th, 2014.
16              THE US COURT:  Yes, I have it here.
17              MR. ZELBO:  And I've been informed that
18    that has already been marked, or maybe we mark it
19    now.  But the next exhibit would be Trial Exhibit
20    28, if that's okay with the Courts.
21              THE US COURT:  That's correct.  Yes, it
22    is, thank you.
23              EXHIBIT NO. 28:  Affidavit of Mark
24              Weisz, dated April 11, 2014
25
```



```
 1                    BY MR. ZELBO:
 2                    Q.   Mr. Weisz, do you have a copy of
 3      your witness statement up there with you in your
 4      seat, by your seat?
 5                    A.   Yes, I do.
 6                    Q.   Great.  And is that, in fact, a
 7      copy of your witness statement in this case?
 8                    A.   Yes, it is.
 9                    Q.   Mr. Weisz, very briefly, when were
10      you first hired to work for any Nortel entity?
11                    A.   About May 1997.
12                    Q.   And just briefly walk through your
13      employment history.
14                    A.   Sure.  I was hired as director of
15      taxes for the Latin America region.  Spent three
16      years doing that and was promoted to run the
17      Americas practice, which I was relocated to
18      Richardson, Texas.
19                    After spending time doing that, I added
20      to my responsibilities and supported our global
21      treasury department for a year.  And then when
22      assignment was completed with that, I became
23      director of international tax and had
24      responsibilities for Europe, Asia and Latin
25      America.
```



1          Q.   And when did you leave Nortel?

2          A.   I left Nortel September of '97 --

3    I'm sorry of 2007.

4          Q.   There's already been -- before you

5    sat down there had already been a lot of testimony

6    about APA processes, and I don't want to bore

7    everybody with that again.  I assume you know what

8    an APA process is; right?

9          A.   I've heard of it, yes.

10         Q.   Were you involved in the APA

11   process with respect to Nortel's transfer pricing

12   arrangements?

13         A.   I was.

14         Q.   And when did you first get

15   involved, to your recollection?

16         A.   Towards the end of 2003 and into

17   2004 forward.

18         Q.   And who asked you to get involved?

19         A.   John Doolittle, vice president of

20   tax for Nortel.

21         Q.   What did Mr. Doolittle charge you

22   to do?

23         A.   To complete the APA process.

24         Q.   And are you familiar with the

25   document called the Master Research Development



1    Agreement?

2              A.   Yes, I am.

3              Q.   I want to ask you a few questions

4    about the circumstance surrounding the making of

5    the MRDA, if I may.

6              The first question is, were you

7    involved in the making of that agreement?

8              A.   Yes, I was.

9              Q.   And who were the other persons

10   involved, if any, in the making of that agreement?

11             A.    There were a number of parties

12   involved.  First, outside counsel, Giovanna

13   Sparagna; she was US counsel from Sutherland.

14   Scott Wilkie was Canadian counsel from Oslers;

15   Ernst & Young, Bob Ackerman and Dave Canale, both

16   working both in their Washington national office,

17   leading their APA practice; various Nortel folks

18   such as Karina O, John Doolittle; and then internal

19   legal folks as well.

20             Q.   And were there also outside

21   economic advisers as well?

22             A.   Yes.  Horst & Frisch were our

23   economic advisers at the time.

24             Q.   And what was the purpose -- I'm

25   going to call the Master Research & Development



```
 1    Agreement the MRDA; okay?

 2                    A.    Sure.

 3                    Q.    What was the purpose of the MRDA?

 4                    A.    The purpose of it was to

 5    contractualize the arrangements that the

 6    participants had and had been ongoing for quite

 7    some time since 2001.  Nortel had, prior to that,

 8    an R&D cost-sharing agreement which had expired;

 9    and a new arrangement had to be entered into

10    between the parties, as each of the parties

11    continued to perform R&D.

12                    Somewhere when I started to get

13    involved, no contract existed, and it was important

14    to contractualize the arrangement because other

15    jurisdictions who around the world were

16    participants but not party to the APA could be

17    subject to audit at any time.  And so it was

18    prudent to get a document to reflect the economics

19    of what has been transacting in our business for

20    quite some time.

21                    Q.    What are the economics you're

22    referring to?

23                    A.    The economics which really

24    continued from the R&D cost-sharing agreements that

25    all the participants had full economic rights and
```

```
 1    benefits to exploit Nortel technology in the
 2    country of incorporation.
 3              Q.    And what was this -- sorry.  Was
 4    this a common understanding amongst the people you
 5    referred to earlier who were assisting in the
 6    making of the MRDA?
 7              A.    Yes.  Everybody had full
 8    understanding of how the economics worked and what
 9    the agreement -- the understanding between the
10    parties was.
11              Q.    I want to, before we probe that a
12    little further, just show you a document.  If we
13    can get it up on the screen and maybe hand the
14    witness a hard copy.  It's Exhibit TR45465.  And
15    I'm going to be focusing on the top email from you
16    to Mr. Doolittle, dated April 12th, 2004.
17              Do you see this email, Mr. Weisz, that
18    you sent to Mr. Doolittle?
19              A.    I do.
20              Q.    And I believe you gave his title
21    earlier.  Could you just do it again.
22              A.    Yes; John was vice president of
23    tax at Nortel.
24              Q.    Who Karina O?
25              A.    Karina O was a director of tax in
```

Neeson & Associates    W&F

1    our Canadian company.

2              Q.   And who is Jim Gatley?

3              A.   Jim Gatley was a tax person who

4    had responsibility for transfer pricing in Canada.

5              Q.   And in the second sentence, it

6    says, "The beneficial ownership resides today with

7    the RPS companies and this is what we will

8    contractualize."

9              Do you see that?

10             A.   Yes.

11             Q.   What did you mean by "beneficial

12   ownership"?

13             A.   It was understood by all the

14   parties that the participants had full ownership

15   and rights to exploit Nortel technology in their

16   country of incorporation.  And I was expressing

17   here that that's exactly what we were going to

18   contractualize in the agreement.

19             THE CANADIAN COURT:  -- how that

20   evidence is admissible.

21             MR. ZELBO:  Excuse me?

22             THE CANADIAN COURT:  This witness

23   saying what other people understand, how is that

24   admissible?

25             MR. ZELBO:  Well, first of all, he's



 1   testifying as to his email and what he understood.

 2                  THE CANADIAN COURT:  That doesn't make

 3   it any more admissible.

 4                  MR. ZELBO:  Your Honor, I think that it

 5   is part of the factual matrix, if I may; and to

 6   look at what the commercial circumstances

 7   surrounding the making of the MRDA was, what the

 8   parties were trying to accomplish, what the parties

 9   knew and understood at the time.  And this witness

10   has firsthand knowledge of that.

11                  He both gave instructions and received

12   instructions with respect to how this document was

13   supposed to be crafted and the commercial context

14   in which it would reflect.

15                  And I'm going to apologize in advance,

16   and I'm going to defer to my Canadian counsel

17   working with us in this.  But I will cite one case

18   at least, Justice Newbould, which is Canada Trust

19   Company and Brown, which is a 2012 appellate court

20   case, which talks about how, as Your Honor well

21   knows, but for Judge Gross' benefit as well, talks

22   about how, under Ontario law, even when a contract

23   is unambiguous, that the factual matrix not only

24   should be but must be considered; and that includes

25   what the parties knew while they were negotiating

Neeson&Associates    W&F

1    or should have known.

2              And remember, this is an agreement that

3    was negotiated all the way up until -- there kept

4    being new iterations up until 2008.  It includes

5    the purpose of the agreement, the circumstances;

6    and in that case in particular, the Court also

7    noted part of the factual matrix was communications

8    with tax authorities, in that case the CRA, with

9    respect to the parties' understanding of the

10   agreement.  So I would just mention that case.

11             I think that's why this is admissible

12   testimony.

13             THE CANADIAN COURT:  It is a new one,

14   so far as I'm concerned, to call it part of the

15   factual matrix.

16             MR. ZELBO:  Your Honor, I can only

17   commend the Court to the case I cited.

18             THE CANADIAN COURT:  All right.

19             MR. ZELBO:  Thank you, Your Honor.

20             May I continue?

21             THE US COURT:  You may.

22             MR. ZELBO:  Thank you.

23             BY MR. ZELBO:

24             Q.   To your knowledge, was Ernst &

25   Young aware of the commercial purpose of the MRDA?



```
 1                    A.    Yes, they were.

 2                    Q.    And how do you know that?

 3                    A.    I had personal discussions with

 4   both Bob Ackerman and Dave Canale about the

 5   agreement itself.

 6                    Q.    Did they disagree with the

 7   concept?

 8                    A.    No, they did not.

 9                    Q.    And was Giovanna Sparagna aware?

10                    A.    Giovanna Sparagna was aware.

11   Scott Wilkie was aware.  All our internal parties

12   were aware.  This was what we represented to all

13   the tax authorities.  Anytime this issue did come

14   up, this is how we expressed our understanding of

15   what the parties were acting in accordance with and

16   what we were going to contractualize.

17                    Q.    When you say "acting in accordance

18   with," what do you mean?

19                    A.    Again, we had the R&D cost-sharing

20   agreement.  It expired.  Horst & Frisch, our

21   economist, prepared a new economic analysis which

22   ultimately became the submission for the new APA

23   process in 2002.  It was the residual profit split.

24                    And the rights that were under the

25   cost-sharing agreement continued under the residual
```



```
 1   profit-split methodology, and that is all rights
 2   and beneficial ownership resided with the
 3   participants and that they may exploit the Nortel
 4   technology in the company -- or country of
 5   incorporation.
 6             Q.   We looked a moment ago at an email
 7   from you talking about the process of starting to
 8   contractualize this arrangement.  I now just want
 9   to very quickly look at an email near the end of
10   that process, at least for the first version of the
11   MRDA.
12             Can we pull up Exhibit TR41156.01.
13             And Mr. Weisz, if you go to the bottom,
14   the email at the bottom, you say, "Enclosed is the
15   final Master R&D Agreement."
16             Do you see that?
17             A.   Yes, I do.
18             Q.   And who are you sending it to,
19   this email?
20             A.   So this email is being sent to
21   Rosanne Culina, who was, I believe, a director in
22   our Canadian tax group; Laurie Krebs, who was our
23   director for US tax; Simon Schofield, who worked
24   for me -- he was a senior manager in our UK office;
25   Ian Widdowson, another person who worked for me as
```



```
1   a senior manager in our UK office; Philip Wong, who

2   was a director of Asia tax, who worked for me as

3   well; and copying Gilles Fortier, who ran our

4   transfer pricing model, who was based in Canada.

5              Q.   And this email says, "This

6   agreement formalizes the operating arrangements

7   which have been in effect and agreed to verbally

8   since January 1, 2001, between the parties

9   concerning IP legal ownership and beneficial

10  ownership for tax purposes."

11             And what did you mean by "IP legal

12  ownership and beneficial ownership for tax

13  purposes"?

14             A.   Well, the IP legal ownership, for

15  convenience, was with NNL.  But for tax purposes

16  the beneficial ownership is what to me was

17  important, because it drove really the contractual

18  agreements that I was asking the parties to review.

19             And so in that sense the beneficial

20  ownership for tax purposes followed basically the

21  economics that we have been applying to our profit

22  split since 2001.

23             Q.   Do you have your witness statement

24  in front of you?  If you could turn to paragraph 16

25  of it.  And the first sentence says, "In all of the
```



 1    APA submissions that were provided to the tax

 2    authorities while I was involved in the APA

 3    Process, as well as meetings and informal

 4    communications with the tax authorities, it was

 5    made clear that full economic ownership (often

 6    referred to as beneficial or economic ownership) of

 7    Nortel technology in each of the exclusive

 8    territories was held by the MRDA participant for

 9    that exclusivity territory."

10            Do you see that?

11            A.    Yes, I do.

12            Q.    Can you elaborate on what you're

13    referring to there.

14            A.    Well, when the issue came up, we

15    would describe exactly as it's written here:  That

16    beneficial ownership of the technology and to

17    exploit the technologies were with the RPS

18    participants in their local countries.  And it's

19    effectively what was discussed with the authorities

20    if and when the subject came up but wasn't an issue

21    that was really in dispute.

22            Q.    So did the issue come up all the

23    time or some of the time?

24            A.    The issue did not come up all the

25    time.  It came up sometimes when, again, certain



```
 1   questions were raised.  But no, it did not come up
 2   all the time at all.
 3             Q.   And I think you already may have
 4   answered this, but I apologize.  Was this a
 5   controversial point with the IRS or CRA regarding
 6   beneficial and economic ownership in the
 7   participants for their exclusive territory?
 8             A.   No, it was not.
 9             Q.   Is there any doubt in your mind as
10   to whether the IRS or CRA understood this point?
11             A.   There's no doubt in my mind that
12   they understood this point.
13             Q.   Can we pull up Exhibit TR21041.
14   This is an email from Vince Raimondo to
15   Mr. Doolittle and yourself saying, "IP Ownership
16   Representations."
17             Do you see that?
18             A.   Yes, I do.
19             Q.   And it refers to the summary of
20   comments made to tax authorities even remotely
21   related to IP ownership in the APA submission.
22             Do you see that?
23             A.   I do.
24             Q.   Do you recall why -- well, if you
25   have a recollection, why this document was
```

 Neeson&Associates    W&F

 1   prepared?

 2              A.   I do recall.

 3              So John and I were fairly new to the

 4   process a few months into the APA process.  And

 5   obviously, a lot of statements were made to the tax

 6   authorities previous to our joining, and so we took

 7   the time to accumulate and assemble all the

 8   information that had been provided so that we had

 9   it in front of us.

10              Q.   If you could turn the page, sir,

11   the heading "Representations Made to the IRS

12   Relative to Nortel IP."  And then the first thing

13   is the APA submission.

14              Do you recognize that as what people in

15   this courtroom have been referring to as the Horst

16   Frisch submission?

17              A.   Yes, I do.

18              Q.   And do you see the reference on

19   page 10:

20                   "Under the arrangement, each

21                   cost-sharing participant (CSP) had the

22                   right to use intangible property

23                   developed pursuant to the R&D

24                   cost-sharing arrangement (i.e. the NT

25                   Technology) in its respective market.



```
1                    From an economic standpoint, each R&D
2                    cost-sharing participant could be
3                    considered to 'own' the NT technology
4                    as it related to its specific region."
5                    Do you see that?
6            A.    I do.
7            Q.    And that was related to the
8     cost-sharing participants.  Was that or was that
9     not something that was intended to be continued
10    under the MRDA and the RPSM?
11                   A.    That was intended to be carried
12    over into the RPS model.  There were discussions
13    about that.  Any alteration to this raised issues
14    of value being lost by a participant and whether a
15    buyout payment would be necessary.
16                   And so for ease, it was determined that
17    the rights that existed in the R&D cost-sharing
18    would continue to exist going forward.
19                   Q.    If you turn to page 4 of this
20    document -- so as not to confuse the folks doing
21    the graphics, I'm now referring within page 4 to
22    the reference to page 30.  Thank you.
23                   This is also from Horst Frisch.  You
24    see it says, "The old CSP's" -- that's the
25    cost-sharing participants.  Am I right about that?
```



```
 1                    A.    That's correct.
 2                    Q.    -- "possess and will continue to
 3      possess valuable intangible property."
 4                    Is that what you were just referring
 5      to, Mr. Weisz?
 6                    A.    Yes, it was.
 7                    Q.    And then I just want to look at
 8      one more.  If you turn to -- also on page 4, go
 9      halfway down, it says, "IRS Information and
10      Document Request dated April 26, 2004."
11                    Do you see that?
12                    A.    Yes, I do.
13                    Q.    And then there's a lot of quotes
14      from it.  And I want to direct your attention on
15      page 8, which is referring to page 25, I believe,
16      of that submission, so go down.  And you see it
17      says:
18                         "Generally, the underlying
19                         economic rationale for this argument is
20                         this:  The residual entities, as the
21                         owners of the intangible property, as
22                         well as the manufacturers of the
23                         tangible goods, would recognize that
24                         its distribution network is critically
25                         necessary for their long-term
```

 Neeson & Associates    W&F

```
 1              survival."
 2              Do you see that?
 3              A.   Yes, I do.
 4              Q.   Do you know what was meant by
 5    "owners of intangible property"?
 6              A.   Yes.  The participants again
 7    within Nortel were understood to own the intangible
 8    rights and had the rights to fully exploit.  That's
 9    what's being referred to here.
10              Q.   I want to take a look at a
11    document that was submitted to Her Majesty's
12    Revenue, Inland Revenue at the time, I believe; and
13    it's at Exhibit TR49869.03.
14              And just for the record, there is
15    another version of this document -- and I don't
16    have the TR number -- that is marked as a claims
17    exhibit, but I've been told that it's really not
18    legible.  So I'm using this version which was
19    marked as a -- excuse me.  There's another version
20    marked as an allocation exhibit, and this version
21    is marked as a claims exhibit.  They are the same
22    document.  I'm using this one because it's actually
23    legible, so just so you know.
24              So do you have this transfer pricing
25    report from July 2003 in front of you, sir?
```

 Neeson & Associates   W&F WILSON & PRYOR LTD.

```
1                    A.    Yes, I do.

2                    Q.    And I want you to turn, if you

3      would, to page 25.  And if you look at the first

4      paragraph and the first sentence of the second

5      paragraph it says:

6                          "Where one party uses the valuable

7                          intangibles owned and/or developed by

8                          another party, in commercial

9                          relationships, in general one party

10                         must pay either a license fee or a

11                         royalty to the other party for the use

12                         of those intangibles."

13                   Do you see that?

14                   A.    I do.

15                   Q.    Let me pause there.

16                   Did NNI engage in R&D?

17                   A.    Yes, they did.

18                   Q.    Then it goes on to say:

19                         "Alternatively, the parties can

20                         share the ownership of the intangible

21                         through the use of a CSA by which they

22                         both contribute to the development of

23                         the intangible, and as such share in

24                         its ownership."

25                   Do you see that?
```

 Neeson&Associates    W&F

```
1                    A.    I do.
2                    Q.    Now, I asked you earlier whether
3     NNI did R&D.  Did NNUK do R&D?
4                    A.    Yes, they did.
5                    Q.    And do you have a view one way or
6     the other as to whether they contributed to the
7     development of intangibles?
8                    A.    All the participants contributed
9     to the value of intangibles.
10                   Q.    Do you recall the magnitude of the
11    R&D done by NNI in terms of dollars?
12                   A.    It was significant, a significant
13    portion.  I recall that Canada spent the most
14    dollars on R&D, but the US was right behind it, and
15    then the other remaining parties really tailed off.
16                   Q.    Then it goes on to say:
17                         "The primary benefit from entering
18                         into a CSA is that all participants to
19                         such an arrangement can be considered
20                         the owner of their respective interest
21                         in the intangibles created within their
22                         jurisdiction."
23                         Do you see that?
24                   A.    I do.
25                   Q.    And I want you to turn to page 28,
```

 Neeson&Associates    W&F

```
 1   sir.  Do you see where it says, "Importantly" about
 2   halfway down?
 3            A.   Yes.
 4            Q.   "Importantly, when adopting a CSA,
 5   it is the responsibility of each participant to the
 6   R&D --
 7            MS. SCHWEIZTER:  Howard?
 8            MR. ZELBO:  Yes.
 9            THE CANADIAN COURT:  What was their
10   role?
11            UNIDENTIFIED CANADIAN SPEAKER:  Your
12   Honor, I think your microphone was turned off till
13   the latter half of your question.
14            MR. ZELBO:  I'm sorry, Your Honor.  All
15   I heard was "Howard" and then half a question.
16            THE CANADIAN COURT:  What was his role?
17            It's a KPMG document.  That's why I'm
18   asking the question.
19            MR. ZELBO:  No.  And, Your Honor, I
20   sort of guessed the question, but I apologize.
21   It's the beginning of the question I'm just not
22   hearing.  It's an audio issue.  That's all.
23            THE US COURT:  I think that Justice
24   Newbould --
25            MS. SCHWEIZTER:  Howard?
```



```
 1                    MR. ZELBO:  Yes.

 2                    THE CANADIAN COURT:  I'm asking

 3         (inaudible).

 4                    MR. ZELBO:  Your Honor, maybe -- is the

 5         question what was Mr. Weisz's role in the creation

 6         of this document?

 7                    THE US COURT:  Yes.

 8                    MR. ZELBO:  What was KPMG's role?

 9                    BY MR. ZELBO:

10            Q.    What was KPMG's role with respect

11         to transfer pricing or with respect to this

12         document?  Obviously, they prepared it.  Do you

13         know why?

14            A.    KPMG helped support the APA

15         process in the UK.

16                    THE CANADIAN COURT:  Thank you.

17                    MR. ZELBO:  I apologize for the

18         confusion there, Justice Newbould.

19                    THE CANADIAN COURT:  No, it's not your

20         fault.

21                    BY MR. ZELBO:

22            Q.    At page 28 I think is where we

23         were.

24                    "Importantly, when adopting a CSA" --

25         which is a cost-sharing agreement; am I right about
```



1    that?

2              A.    Yes.

3              Q.    -- "it's the responsibility of

4    each participant of the R&D agreement to exploit

5    that technology to its full advantage.  That is,

6    all participants to the R&D CSA are provided with

7    the same opportunities -- the opportunity to

8    exploit all Nortel technology to as great an extent

9    as possible within their respective geographic

10   area."

11             Do you see that?

12             A.    I do.

13             Q.    Now, that's referring to the CSA.

14   Was that something that Nortel wished to continue

15   under the MRDA?

16             A.    It was what we wished to continue;

17   but it was also how the business ran as well.

18             Q.    And am I right that it is

19   important for the transfer pricing agreements to

20   reflect the actual way the business is being

21   operated?

22             A.    Absolutely, yes.

23             Q.    I want to turn you to one last

24   document, and that's Exhibit TR32138.  There's

25   obviously a lot of recipients on this email.  I



```
1    will -- you can search for your name, but I believe
2    you're there.  But do you see it says, "Sent on
3    behalf of David Burn?
4                   A.    Yes.
5                   Q.    Who is David Burn?
6                   A.    Dave Burn was vice president of
7    tax, global tax for Nortel.
8                   Q.    Was he a low-level Nortel
9    employee?
10                  A.    No.  He was the vice president of
11   tax.  He was the head of tax.
12                  Q.    And he worked for NNL?
13                  A.    He worked NNL.  When I started, he
14   reported into the treasurer and then shortly
15   thereafter reported directly into the CFO.
16                  Q.    And did you at any time report to
17   Mr. Burn?
18                  A.    I reported to Dave Burn my entire
19   time.
20                  Q.    I just want to draw your attention
21   really to page 2 at the top.
22                  Thank you.  The "however."
23                  And it says there:
24                        "It is important to note that
25                        Nortel Networks Limited should make all
```



```
1                    sales for deliveries to and services

2                    provided to Canadian customers and

3                    Nortel Networks in US (US Statutory

4                    company, i.e. Nortel Networks Inc. or

5                    one of the other statutory US

6                    companies) must make all sales to US

7                    customers."

8                    Do you see that?

9              A.    I do.

10             Q.    Do you recall that being an

11   important goal of the tax department?

12             A.    Yes, I do.

13             Q.    And why?

14             A.    It was our operating model.  We

15   had set up legal entities in countries all over the

16   world.  It was very important for us to maintain

17   the integrity of not subjecting various Nortel

18   entities to audit.

19                    And so it was understood that if there

20   was going to be a customer sale, the local Nortel

21   entity would deal with the local customer point to

22   point.  This prevented issues, such as permanent

23   establishment; issues that certainly can force the

24   filing or paying of additional taxes by a foreign

25   entity into a local country.
```



```
 1                    MR. ZELBO:  Thank you, Mr. Weisz.  I
 2   have no further questions --
 3                    MS. SCHWEIZTER:  Put the document back
 4   up.
 5                    MR. ZELBO:  Sorry?
 6                    MS. SCHWEIZTER:  Howard, can you put
 7   the document back up for Justice Newbould?
 8   -- OFF THE RECORD --
 9                    MS. SCHWEITZER:  Your Honor, I have a
10   hard copy of the document also if you'd like me
11   to --
12                    MR. ZELBO:  I can hear Ms. Schweitzer
13   fine, loud and clear.
14                    THE US COURT:  I don't think she's
15   using a microphone.
16                    MR. ZELBO:  I'm reasonably certain
17   you're right.
18                    MS. SCHWEITZER:  Open your window.
19                    MR. ZELBO:  That was the inference.
20                    THE CANADIAN COURT:  When I read that
21   sentence, it doesn't read to me.  And I wonder if
22   the word "and" should be there instead of "in."
23                    "And Nortel Networks" then "in" the US
24   must make all sales to US customers.  Without that
25   I don't understand the sentence.
```



```
 1                    MR. ZELBO:  I can answer myself, but I
 2     don't think you want to hear me.
 3                    BY MR. ZELBO:
 4               Q.    So Mr. Weisz, could you explain
 5     your understanding of this.
 6               A.    Yeah.  It was very clear within
 7     the tax group and throughout Nortel that all
 8     customer sales in the US were to be made by NNI;
 9     all customer sales in Canada were to be made by
10     NNL.  Each of the participants had the same rights,
11     so in the UK, NNUK was the only legal entity
12     permitted to make sales in the UK.
13                    THE US COURT:  I think Justice Newbould
14     was concerned with the word "in."  "Nortel Networks
15     in the US."  Was "Nortel Networks" referring to the
16     generic Nortel companies?
17                    THE WITNESS:  Yes.
18                    MR. ZELBO:  I think the parenthesis
19     explains what it means by "Nortel Networks in the
20     US."
21                    THE CANADIAN COURT:  Oh, I see.
22                    MR. ZELBO:  It's going on to say the
23     statutory company.  In other words, NNI or if
24     there's any other statutory US company.
25                    THE CANADIAN COURT:  Yeah, okay.  Thank
```



1    you.

2                   MR. ZELBO:  Now I understand what the

3    issue was.  Thank you for clearing that up.

4                   I have no further questions.

5                   THE US COURT:  All right.  Thank you,

6    Mr. Zelbo.

7                   Cross-examination?

8                   MR. OXFORD:  Yes.  Good morning, Judge

9    Gross.

10                  THE US COURT:  Good morning.

11                  MR. OXFORD:  Good morning, Justice

12   Newbould.  Neil Oxford from Hughes Hubbard & Reed

13   for the EMEA Debtors.  If I just may have a moment

14   for our tech guy to get situated.

15   CROSS-EXAMINATION BY MR. OXFORD:

16                  BY MR. OXFORD:

17                  Q.   Good morning, Mr. Weisz.

18                  A.   Good morning.

19                  Q.   You're familiar, are you not, with

20   Nortel's sale of its UMTS business to Alcatel?

21                  A.   Yes.

22                  Q.   And you played a role in the

23   allocation of the proceeds from that Alcatel

24   transaction, did you not?

25                  A.   I did.



```
 1                    Q.   You were part of the discussions
 2    that happened within Nortel about how the proceeds
 3    should be allocated; correct?
 4                    A.   I was.
 5                    Q.   And one of the reasons you were
 6    having those discussions, was it not, is because
 7    the MRDA itself did not address the allocation of
 8    the proceeds of that transaction?
 9                    A.   Yes.  The MRDA just dealt with how
10    the profits would be split from our operations, not
11    sales of technology.
12                    MR. OXFORD:  I'd like to pull up, if we
13    may, Trial Exhibit 11260.  And I have hard copies
14    for Your Honor, if I may approach?
15                    THE US COURT:  Thank you, Mr. Oxford.
16                    BY MR. OXFORD:
17                    Q.   Mr. Weisz, you've seen this
18    memorandum before you, have you not?
19                    A.   Yes, I have.
20                    Q.   I see this is sent by Mr. Orlando
21    to a few people with whom the Court will be
22    familiar because they've either testified here or
23    their names have been explained.
24                    I think the only one who may not have
25    been explained to the Court is Louis Farr.  Can you
```



```
 1    tell the Court, please, who Louis Farr is.
 2                A.    Lou Farr was a US tax person who
 3    sat in Nashville.  He assisted in mergers and
 4    acquisitions and for a short period of time
 5    reported to me.
 6                Q.    Thank you.  Mr. Orlando writes:
 7                      "Enclosed is a memo that Kerry and
 8                      I drafted discussing the facts around
 9                      Nortel's position related to the UMTS
10                      sale.  Mark has reviewed it."
11                      Do you see that?
12                A.    I do.
13                Q.    And it's true, is it not,
14    Mr. Weisz, you not only reviewed the memo but you
15    approved it?
16                A.    Yes.
17                Q.    Can you turn, please, to the memo
18    itself and to Point 4 under the heading "RPS
19    Impacts."  Do you see, sir, that the second bullet
20    reads:
21                      "Thus, the allocation of the
22                      elements of the gain on sale of UMTS
23                      assets has to be considered in the
24                      context of the RPS arrangements"?
25                      Do you see that, sir?
```



```
 1                    A.   I do.

 2                    Q.   And you believed that was an

 3    accurate statement at the time you reviewed and

 4    approved this memorandum, did you not?

 5                    A.   At the time when we were an

 6    operating company, yes, I did.

 7                    Q.   And the second bullet goes on to

 8    say:  "While generally NNL" -- sorry.

 9                         "While NNL generally is the legal

10                    owner of the technology, the Master R&D

11                    Agreement determines the economic

12                    ownership of it and thus allocation of

13                    the consideration by proportionate R&D

14                    Capital Stock is appropriate."

15                         Do you see that?

16                    A.   I do.

17                    Q.   This memorandum that you had

18    reviewed and approved refers to economic ownership,

19    does it not?

20                    A.   Yes, it does.

21                    Q.   And you considered, did you not,

22    that economic ownership and beneficial ownership

23    were effectively synonymous?

24                    A.   That's correct.

25                    Q.   And it's true that the beneficial
```



1    ownership that's reflected in this memorandum is

2    the beneficial ownership of a right to receive

3    proceeds from the exploitation of Nortel IP

4    according to R&D capital stock share?

5                 A.   Yes.

6                 Q.   And that beneficial ownership,

7    sir -- I think you've testified about this -- is a

8    tax concept, is it not?

9                 A.   It's a tax concept, yes.

10                Q.   But it's just not a tax concept,

11   is it, sir?

12                A.   If it's something other than tax,

13   that I don't know.

14                Q.   It's a tax concept, is it not,

15   that's given effect to in real-world dollars and

16   cents?

17                A.   Well, yes.  I mean, you know, from

18   a tax perspective, tax followed the economics.  And

19   as an operating company, as we continued to

20   operate, this is the best -- this is what we felt

21   was the best way to distribute the funds from that

22   sale.

23                Q.   And the beneficial ownership that

24   the RPS participants had to a share in this Nortel

25   IP that was sold to Alcatel was used, in fact, as a



1    basis for the allocation of the proceeds among the

2    various selling entities at Nortel; correct?

3                    A.    In this particular transaction,

4    yes.

5                    Q.    And those proceeds were booked on

6    the individual selling entity's books and records,

7    were they not?

8                    A.    That I can't recall where they

9    were specifically booked.

10                   Q.    But to the best of your --

11                   A.    To the best of my knowledge, that

12   would be correct.

13                   Q.    And those proceeds again that were

14   allocated to the individual selling entities would

15   roll up to the individual selling entities'

16   financial statements, would they not?

17                   A.    They would.

18                   Q.    And the allocation that's

19   reflected in this memorandum that you reviewed and

20   approved was also the basis for the tax returns

21   that were filed by the individual selling entities;

22   correct?

23                   A.    That would be correct as well.

24                   Q.    And they were also the basis for

25   the taxes that were actually paid by the individual



 1   selling entities; correct?

 2              A.   That would be correct.

 3              MR. OXFORD:  Thank you, Mr. Weisz.

 4   Those are my questions.

 5              THE US COURT:  Thank you, Mr. Oxford.

 6              MR. OXFORD:  Thank you, Judge Gross.

 7   Thank you.

 8              THE US COURT:  Mr. O'Connor.

 9              MR. O'CONNOR:  Good morning, Judge

10   Gross.  Good morning, Justice Newbould.  Mr. Weisz.

11   Brian O'Connor from Willkie Farr on behalf of the

12   UK Pension Claimants.

13   CROSS-EXAMINATION BY O'CONNOR:

14              Q.   Fortunately, most of my topics

15   have been covered by Mr. Zelbo and Mr. Oxford, so I

16   will be relatively brief.  Let me start by just

17   asking you the questions.

18              It is your understanding that the MRDA

19   was not intended to address insolvency?

20              A.   It was not intended to address

21   insolvency.

22              Q.   And to your knowledge, Nortel

23   apparently didn't have any discussions about what

24   would happen in the event of insolvency?

25              A.   None that I ever was involved



```
 1   with, no.
 2                Q.    And I think you testified a few
 3   moments ago that the MRDA was intended to use the
 4   term "contractualize" the parties' operating
 5   arrangements since 2001; correct?
 6                A.    That's correct.
 7                Q.    And I want to talk just for a
 8   moment on a conceptual basis.  Would you agree with
 9   me that while Nortel was an operating entity, it
10   was the RPEs' intent to make a profit from their
11   collective business efforts?
12                A.    That's correct, yes.
13                Q.    And would you also agree with me
14   that that intent was reflected in those
15   arrangements that were contractualized in the MRDA?
16                A.    That's correct.
17                Q.    And would you also agree with me
18   that each of the RPEs made contributions to the
19   group's business to achieve that goal?
20                A.    Yes.
21                Q.    For example, each RPE performed
22   and paid for R&D?
23                A.    Yes.
24                Q.    And each RPE performed sales and
25   marketing functions?
```

Neeson&Associates    W&F

```
 1                          A.    Yes.
 2                          Q.    And each RPE performed what we
 3     referred to at Nortel as global operations, such as
 4     manufacturing support, procurement, demand
 5     planning, quality control and inventory supply
 6     maintenance?
 7                          A.    That would be correct.
 8                          Q.    And would you also agree with me
 9     that in performing those functions, the RPEs worked
10     together for the benefit of the group as a whole?
11                          A.    Yes.
12                          Q.    And finally, would you also agree
13     with me that the RPEs agreed to share in the
14     profits and losses of the group as a whole?
15                          A.    Yes.
16                          MR. O'CONNOR:  Now I have a few
17     questions, Your Honor, that relate solely to claim.
18     It's only a couple, and I think we can get it done
19     within five minutes, if that's acceptable.
20                          THE US COURT:  That's fine.  Certainly
21     you may proceed, Mr. O'Connor.
22                          MR. O'CONNOR:  Thank you.
23                          BY MR. O'CONNOR:
24                          Q.    Now, am I correct that NNUK's
25     allocation of the Alcatel sale proceeds was not
```

 Neeson & Associates    W&P

```
 1   paid in cash but was rolled into transfer pricing

 2   adjustments?

 3              A.   I don't specifically recall where

 4   it was rolled into.

 5              MR. O'CONNOR:  Can we bring up

 6   Mr. Weisz's deposition testimony at page 146.

 7              BY MR. O'CONNOR:

 8              Q.   Let me direct your attention to

 9   line 13 through 20.  I asked you -- or I am sorry.

10   Someone asked you, not necessarily me:

11                  "Do you recall a suggestion being

12                  made that the portion of the proceeds

13                  of the Alcatel sale that were due to,

14                  for example, NNUK, would not actually

15                  be paid to NNUK, but would be rolled

16                  into a transfer pricing adjustment?"

17                  And you answered:

18                  "That -- that would be, to the

19                  best of my recollection, that's how it

20                  was treated."

21                  Does that refresh your recollection?

22              A.   Yeah, that makes sense

23              Q.   And Mr. Weisz, restructuring

24   expenses were not shared under the RPSM.  They were

25   borne by the entities that incurred them locally;
```



```
 1    is that correct?
 2                    A.    Initially, that's correct.
 3                    Q.    And at least with respect to what
 4    we refer to as the limited-risk distributors, you
 5    thought that they ought to be reimbursed for at
 6    least a portion of those costs; correct?
 7                    A.    That's correct.
 8                    Q.    And that was because NNL made the
 9    decision to have the limited-risk distributors
10    increase capacity and they didn't really have the
11    ability to say no?
12                    A.    That was partially it.  I think
13    the recurring -- or those charges continued for an
14    extended period of time, and there were discussions
15    with our economists as to at what point that just
16    becomes a recurring expense.  And so that's why
17    initially they weren't reimbursed and then
18    gradually were reimbursed by the participants.
19                    Q.    So I take it that at some point
20    since they were not -- they were recurring, you
21    decided it made sense to treat them as part of the
22    operating expenses?
23                    A.    That's correct.
24                    Q.    And let's talk for just a moment
25    about pension costs.  My understanding was that
```



```
1   pension costs would be included in the RPSM if they
2   were, we've talked about, above the operating
3   profit line; is that right?
4              A.   That would be correct.
5              Q.   And transfer pricing calculations
6   with respect to all costs, including pension costs,
7   were based on US GAAP?
8              A.   That's correct.
9              MR. O'CONNOR:  I have no further
10  questions, Your Honor.  Thank you.
11             THE US COURT:  Thank you, Mr. O'Connor.
12             Anyone else interested in examining?
13             Yes, sir.  Good morning.
14  CROSS-EXAMINATION BY MR. RUBY:
15             BY MR. RUBY:
16             Q.   Mr. Weisz, my name is Peter Ruby
17  from the Goodmans firm for the Canadian Monitor.
18             If I can, I'd like to start with a very
19  brief review of the topography of your short
20  affidavit; and that's that you did 17 pages over --
21  sorry, 17 paragraphs over four pages of text;
22  right?
23             A.   That's correct.
24             Q.   And the first eight paragraphs
25  under your heading "Background" are about your
```

 Neeson&Associates    W&F WILSON & PETZOR LTD.

```
 1   career?
 2              A.   That would be correct.
 3              Q.   And then you have five
 4   paragraphs -- this is paragraphs 9 and 11 to 14 --
 5   about your understanding of the MRDA?
 6              A.   Correct.
 7              Q.   Which was your interpretation
 8   about a legal agreement; correct?
 9              A.   It was my understanding of the
10   economic transaction; that's correct.
11              Q.   So you're saying what you're
12   giving us is not your understanding of the MRDA?
13              A.   No.  It's the same.
14              Q.   Same thing?
15              A.   Yeah.
16              Q.   And this morning you also provided
17   your understanding of what some other people
18   thought about the MRDA as well; correct?
19              A.   Correct.
20              Q.   And then continuing with the
21   topography, at paragraph 10 you talk about the
22   categories of people who worked on the MRDA?
23              A.   Uh-huh.
24              Q.   And then you finish up with three
25   paragraphs about communications with the tax
```



```
 1   authorities and some internal Nortel people about

 2   economic ownership in the context of understanding

 3   the MRDA; right?

 4                 A.   Yes.

 5                 Q.   So I only want to touch on your

 6   what you call background or your career very

 7   quickly.

 8                 So just to make sure we're all on the

 9   same page, you're not a lawyer?

10                 A.   No, I'm not.

11                 Q.   You're not an economist?

12                 A.   No, I'm not.

13                 Q.   Okay.  So since you provide your

14   understanding and other people's understanding of

15   the MRDA, I'm going to ask you a few questions

16   about that.

17                 Now, I take it that you recognize that

18   the MRDA is a legal agreement between the Nortel

19   entities that signed it?

20                 A.   Yes.

21                 Q.   And the MRDA was drafted by

22   attorneys?

23                 A.   Yes, it was.

24                 Q.   And there are no portions of the

25   actual language of the MRDA that you recall as
```



```
 1   being yours; correct?

 2              A.   Well, it was drafted by the

 3   attorneys, which I reviewed.

 4              Q.   But none of the portions of the

 5   language in the MRDA are yours; right?

 6              A.   Not that I recall, no.

 7              Q.   Now, let's talk about some other

 8   people.

 9              Now, you've today told us about and

10   we've seen some documents about people who were

11   involved in the MRDA.  And there were quite a lot

12   of people who had a hand in either drafting it,

13   commenting on it or analyzing it before it was

14   finalized; right?

15              A.   We involved a lot of people to

16   make sure we got the most feedback possible; that's

17   correct.

18              Q.   And I think you've told us about

19   some of them.  But to add to the list, there was

20   Jim Gatley as well?

21              A.   He was employed by Nortel for a

22   short time; that's correct.

23              Q.   He was -- I don't want to put

24   words in your mouth, but a transfer pricing

25   specialist that also worked on the RPSM; correct?
```


Neeson & Associates    W&F

```
 1                    A.    He had transfer pricing

 2    experience; that's correct.

 3                    Q.    And Karina O also worked on the

 4    MRDA?

 5                    A.    She did.

 6                    Q.    And Rosanne Culina?

 7                    A.    She worked on some as well, yes.

 8                    Q.    And of course, Michael Orlando?

 9                    A.    Yes; Mike ran the model of the

10    transfer pricing.

11                    Q.    And there was a gentleman named

12    Gilles Fortier?

13                    A.    Yes.

14                    Q.    And I think you've told us about

15    some of the local tax people in the EMEA region.

16    So that would include Ian Widdowson?

17                    A.    Yes.

18                    Q.    And Simon Schofield, I think you

19    mentioned?

20                    A.    Yes.

21                    Q.    And, of course, Mr. Wong in Asia?

22                    A.    That's correct.

23                    Q.    And a whole bevy of in-house

24    Nortel lawyers in addition to the outside counsel

25    you mentioned before?
```



```
 1                    A.    That's correct.
 2                    Q.    Now, all of these people and all
 3    of the people that worked on the MRDA, they would
 4    have their own understandings of what the MRDA
 5    meant; right?
 6                    A.    I presume that they would.
 7                    Q.    So, sir, I'm going to try and put
 8    up a slide.  What we've tried to do is put together
 9    in one place some of the excerpts from your
10    affidavit, where something like nine or ten times
11    you mention economic ownership.  And I lost count
12    this morning how many times you mentioned it.  So
13    presumably it's a point that you think is important
14    to drive home to the Courts; right?
15                    A.    I'm not presuming that it's an
16    important point for me to drive home to anybody, to
17    be honest with you.  It's what I recall during my
18    time at work at Nortel that I was specifically
19    working on and historically have been told about.
20                    Q.    Okay.  So if you look at the
21    slide, sir, I'm not going to read it to you, but
22    we've underlined and put in bold the references to
23    variations on economic and beneficial ownership or
24    one or the other or full economic ownership,
25    et cetera.
```



```
1                    We can agree that when you use these
2    terms, "beneficial ownership" and "economic
3    ownership" have interchangeable meanings?
4                    A.    That would be correct.
5                    Q.    And you only used those terms in
6    the tax context; correct?
7                    A.    Yes, I did.
8                    Q.    And so throughout your evidence,
9    whether it's today or earlier in your affidavit, we
10   can take it that those two terms are
11   interchangeable?
12                   A.    Yes.
13                   Q.    Now, the Nortel tax department,
14   accounting group and financial people, not just
15   you, they all looked at beneficial ownership from a
16   tax perspective only; correct?
17                   A.    Yes.
18                   Q.    And earlier today you used the
19   word "exploit" when you were talking about
20   beneficial or economic ownership.  Do you remember
21   that?
22                   A.    If I used that word, yes.
23                   Q.    Well, that's -- whether you used
24   it or not, that's a word you're comfortable with in
25   terms of what people did with beneficial ownership?
```



```
 1                    A.    They exploited it; that's correct.
 2                    Q.    And it's your view that each party
 3      to the MRDA had the right to exploit Nortel IP in
 4      its own territory?
 5                    A.    It's not only my view; it's how
 6      the companies operated as well.
 7                    Q.    Your understanding of how the
 8      company operated?
 9                    A.    No.  Well, it's my understanding
10      of how the companies operated.  And given that I
11      was involved with their operations, it was my
12      understanding that that's how they operated.
13                    Q.    Okay.  So in terms of the MRDA, we
14      can agree, can't we, that whatever the Courts
15      decide the MRDA participants' beneficial or
16      economic ownership rights were, that we can find
17      those rights in the MRDA; correct?
18                    A.    I think they're explained in the
19      Horst Frisch submission and in the MRDA.  That's
20      what the attorneys were to contractualize, yes.
21                    Q.    So you use the word
22      "contractualize."  And I'm glad you did.
23                    So when you use that term, included in
24      that do you mean that whatever the beneficial and
25      economic ownership rights were of the MRDA
```



```
 1   participants, they were contractualized in the
 2   MRDA?
 3              A.   Well, it was the attorneys'
 4   responsibilities to -- well, it was my
 5   responsibility to describe the transactions
 6   economically, along with Horst Frisch, and for the
 7   attorneys to, as best they can, to contractualize
 8   that in the agreement.
 9              Q.   Let me put it another way.  So you
10   worked for NNI; right?
11              A.   No, I did not.
12              Q.   Which entity did you work for?
13              A.   I worked for CALA Inc.
14              Q.   Through your career?
15              A.   I'm not sure if it was ever
16   switched.
17              Q.   Okay.  It doesn't matter for my
18   question.
19              But using NNI as an example, the only
20   source of NNI's IP rights is in the MRDA?  We can
21   agree on that?
22              A.   Yes.
23              Q.   And there was no other legal
24   document that was a source of any form of ownership
25   related to Nortel's IP other than the MRDA;
```



1    correct?

2                    A.    That would be correct, other than

3    NNI was performing R&D.  And the idea was that for

4    administrative purposes, NNL would be legal title,

5    but the economic benefit would stay with the

6    participants in their local countries.

7                    Q.    We'll get to that in a minute, but

8    I just want to make sure I have an answer to my

9    question.

10                    No other legal document is a source of

11    any form of ownership related to Nortel's IP other

12    than the MRDA; correct?

13                    A.    Not that I'm aware of.

14                    Q.    Thank you. And we can agree

15    finally that to the extent of a licensed

16    participant's rights to exploit Nortel's IP, that's

17    also contained in the MRDA; right?

18                    So let's put aside that demonstrative.

19    That's gone.

20                    Now, I take it you appreciate that this

21    trial is about allocating the proceeds from the

22    sales of Nortel's assets?

23                    A.    Yes, I understand that.

24                    Q.    And the RPSM, in contrast, was

25    about allocating the operating profits or losses of



1    Nortel while it was operating?

2              A.   That's correct.

3              Q.   And we can agree that the RPSM

4    methodology and its economics were based on an

5    operating model?

6              A.   That's correct, they were.

7              Q.   And they did not apply to sales or

8    the proceeds of sales; correct?

9              A.   They did not.

10             Q.   We can also agree that you never

11   told anyone that the beneficial or economic

12   ownership from a tax perspective would give rise to

13   any particular rights on insolvency?

14             A.   No, I had no conversations like

15   that.

16             Q.   And similarly, you never told

17   anybody that the beneficial or economic ownership

18   from a tax perspective would give -- let me

19   withdraw that.  Let's stick with the asset sales

20   for a moment, because you've mentioned economic and

21   beneficial ownership a few times.

22             You never told anyone that someone who

23   had beneficial or economic ownership from a tax

24   perspective could sell that beneficial or economic

25   ownership to someone outside the Nortel Group;



1    correct?

2                    A.    That's correct.

3                    Q.    Did you watch or read the

4    examination of Mr. Orlando?

5                    A.    No.

6                    MR. RUBY:  Very briefly, Your Honors,

7    I'm going to do something that was done with

8    Mr. Orlando to try and deal with some of the

9    wording that's been used.

10                   BY MR. RUBY:

11                   Q.    In your affidavit you used some

12   phrases, sir, in relation to the MRDA.  One of them

13   is "full economic rights."  Do you remember that?

14                   A.    Yes.

15                   Q.    Those words "full economic rights"

16   are not in the MRDA; correct?

17                   A.    I don't believe so.

18                   Q.    What about "full economic and

19   beneficial ownership"?  That's not in in the MRDA;

20   right?

21                   A.    No, but that's how we described it

22   to contractualize it.

23                   Q.    Finally, I want to deal with

24   something you said in your affidavit, and you

25   mentioned a variation on this today.  You used the



 1   word "administrative simplicity" when describing

 2   why NNL held legal title under the MRDA; correct?

 3               A.   Yes.

 4               Q.   So first of all, if we could turn

 5   up, please, Exhibit TR11347.

 6               So you will recognize this as an email

 7   from you to Scott Wilkie and others --

 8               A.   Yes.

 9               Q.   -- in September 2004?

10               So I think, sir, you told us earlier,

11   but just to refresh all our memories, that Scott

12   Wilkie was Canadian counsel advising on the

13   drafting of the MRDA?

14               A.   I guess he was.

15               Q.   At the Oslers firm?

16               A.   From Oslers, yes.

17               Q.   So is it fair to say that this was

18   an early-ish draft of the MRDA that you were

19   sending around?

20               A.   Given the date, probably an

21   earlier draft, yes.

22               Q.   Can we go to the first page of the

23   attachment, please, and -- sorry, of the

24   attachment.

25               MR. RUBY:  Pardon me, Your Honors, for



1    a moment.  I'm just going to see if we can deal

2    with the technical issue.

3                BY MR. RUBY:

4                Q.  Sir, if you could look at the

5    first "whereas" clause, you'll see that this is at

6    the bottom of the second page of the package.  It

7    starts, "Whereas for administrative and other valid

8    business purposes, legal title," et cetera."

9                Do you see that there?

10               A.  I do.

11               Q.  So in the draft that you

12   circulated in September 2004 of the MRDA, what was

13   being proposed is that legal title be held for

14   administrative and other business purposes;

15   correct?

16               A.  That's correct.

17               Q.  And, in fact, you're aware -- I

18   don't have to show it to you -- that in the MRDA

19   that gets signed, this whole phrase about

20   "administrative and other valid business purposes,"

21   that's not there; right?

22               A.  If you say so, that's correct.

23               Q.  All right.  We can put that aside.

24   Thank you.

25               Let's talk about the IRS for the



```
 1   moment, since you spent the last few paragraphs of
 2   your affidavit dealing with it.
 3              So there is no question, sir, that
 4   after it was entered into, the MRDA was provided to
 5   the tax authorities of the US, the UK and Canada;
 6   correct?
 7              A.   That's correct.
 8              Q.   And the MRDA showed to the IRS and
 9   the other tax authorities that NNL had legal
10   ownership of the IP?
11              A.   That's correct.
12              Q.   And you did not tell the tax
13   authorities that there was any deal between the
14   participants to the MRDA other than the one
15   reflected in the MRDA; correct?
16              A.   That would be correct.
17              Q.   Now, if we could turn up your
18   affidavit, please, to paragraph 16.  And we'll put
19   it up on the screen as well.  So about halfway
20   through the paragraph you write:
21                   "The IRS specifically was
22                   interested in who had economic owner of
23                   Nortel's technology and I recall
24                   conversations with them on this issue."
25                   And you told us about that this
```



```
1    morning; right?
2                A.    That's correct.
3                Q.    Then you go on to say, again in
4    the context of the IRS:
5                      "NNL's legal title of the Nortel
6                      technology was virtually irrelevant;
7                      instead the MRDA participants' full
8                      economic ownership of Nortel's IP in
9                      their respective territory reflected
10                     the economic realities and business
11                     deal among the MRDA parties."
12               You see that, sir?
13               A.    I do.
14               Q.    So let's pull up now Trial Exhibit
15   11304.  And we'll hand around some copies as well.
16               This is an email from you to Pam
17   Peleato, copied to several other people --
18               A.    Yes.
19               Q.    -- in February 2005.
20               So the top email is what I'd like you
21   to refer to, sir.  And it starts:
22                     "The question of patents are
23                     continual" -- I assume you mean
24                     "continually raised by the IRS, but
25                     ultimately it should not have a major
```



1                    impact.  I think the tax authorities

2                    want to understand who the legal owner

3                    of the IP resides with."

4                    Do you see that?

5                    A.    I do.

6                    Q.    Those are your words?

7                    A.    Yes, they are.

8                    Q.    And when the IRS asked you who was

9     the legal owner of the IP, they were told it was

10    NNL; correct?

11                   A.    That's correct.

12                   Q.    So we can agree that NNL's legal

13    ownership of Nortel technology was certainly not

14    virtually irrelevant to the IRS?

15                   A.    Economically irrelevant, as I

16    was -- as I think I've said multiple times.  We

17    separated legal title versus economic ownership in

18    who can exploit the technology.  I really can't be

19    any clearer than that.

20                   Q.    Right.  But they continually asked

21    you about legal ownership?

22                   A.    Well, they asked a few times about

23    the legal ownership, and I responded accordingly:

24    That, again, legal title was with NNL, but

25    economically the participants continue with the



```
 1   rights that they had before and can continue to
 2   exploit all the Nortel technology in their country.
 3              Q.   And that economic rights or
 4   economic ownership, that was reflected in the
 5   licensing under the MRDA; correct?
 6              A.   I believe they were.
 7              Q.   One more point about the tax
 8   authorities.  And you can put that document aside.
 9   Thank you.
10              The RPSM reflected that R&D was the
11   most important driver of Nortel value, and that
12   fact was stressed to the tax authorities; right?
13              A.   Yes.
14              Q.   And there came a time where the
15   IRS suggested that customer relationships drove
16   value in the business and that the biggest
17   customers sat in the US; is that fair?
18              A.   Yes.
19              Q.   But consistently Nortel responded
20   that the technology was the bigger driver?
21              A.   Well, that's how we were
22   instructed to respond; that's correct.  However,
23   there were a lot of internal discussions about if
24   there was value to the customer lists.  But from a
25   strategic perspective, with our advisers, we
```



1    basically, in thinking through the process,

2    concluded that it was the technology that drew the

3    customers in.

4              Q.   I am not suggesting to you sales

5    or customers aren't important; but the company,

6    after the discussions you talked about, told the

7    IRS and the other tax authorities that the bigger

8    driver was technology?

9              A.   That's what we told the tax

10   authorities, yes.

11             Q.   Thank you.  Before -- I can't

12   remember which of my friends -- you said that

13   everybody hoped to make money.  But you're familiar

14   with what, in fact, happened for the years that you

15   were at Nortel in terms of the profitability of the

16   company?

17             A.   Yes, I'm familiar with it, yes.

18             Q.   And we can agree the RPSM was

19   designed to apply profits or losses?

20             A.   That's correct.  Each participant

21   took full risk.  And so you play with the profits

22   or the loss; that's correct.

23             Q.   And it happened that for the years

24   you were in the international tax leadership role,

25   there were a lot of losses?



```
 1                   A.   There were losses, yes.

 2                   Q.   Significant losses?

 3                   A.   Significant US GAAP losses; that's

 4      correct.

 5                   Q.   And a large portion of those

 6      losses were allocated to NNL under the MRDA?

 7                   A.   Based on the residual profit

 8      split, that's correct.

 9                   MR. RUBY:  Very briefly, sir, I'd just

10      like to turn to UMTS.  And Judge Gross, I guess

11      this qualifies as a claims bit, but it won't be

12      very long.

13                   THE US COURT:  All right.

14                   BY MR. RUBY:

15                   Q.   And it's simply this.  You talked

16      about restructuring expenses.  Do you remember

17      that?

18                   A.   Yes.

19                   Q.   So when we talk about

20      restructuring, what we're talking about is firing

21      people; right?

22                   A.   It's a combination of things, but

23      laying off people is a part of it, yes.

24                   Q.   When we're talking about the

25      costs, we're talking about the severance costs,
```

 Neeson&Associates    W&F WILSON & PETZER LTD.

```
 1    notice costs under the common law and so on?
 2                  A.    That's correct.
 3                  Q.    And during the good times at
 4    Nortel, Nortel entities ramped up the number of
 5    employees they had; correct?
 6                  A.    Yes.
 7                  Q.    And when the bad -- and they --
 8    sorry.  Let me withdraw that.
 9                  And they benefited from having more
10    employees during the good times?
11                  A.    Did we benefit from having more
12    employees?
13                  Q.    Yes.
14                  A.    I'm not sure I understand the
15    question.
16                  Q.    Let me try again.
17                  During the good times, the reason why
18    employee counts were ramped up was because that was
19    good for the company?
20                  A.    Employee numbers ramped up because
21    we were expanding our business.
22                  Q.    And then during the bad times,
23    there was a ramp-down?
24                  A.    That would be correct.
25                  Q.    And so the people who got the
```



```
 1   benefit of increased business and employees

 2   suffered the downside when it unfortunately was

 3   time to restructure them out of a job; is that

 4   fair?

 5              A.   Ultimately, that's correct.

 6              MR. RUBY:  Thank you.  Those are my

 7   questions.

 8              THE US COURT:  All right.  Thank you,

 9   Mr. Ruby.

10              Anyone else to cross-examine?

11              All right, Mr. Zelbo, did you have any

12   redirect, sir?

13              Oh, Mr. Oxford?

14              MR. OXFORD:  Your Honor, I have

15   additional questions based on what Mr. Ruby

16   elicited from the witness.  I'm in the Court's

17   hands as to whether Mr. Zelbo goes first or I go.

18              THE US COURT:  Why don't we have you go

19   first, Mr. Oxford.

20   REiCROSS-EXAMINATION BY MR. OXFORD:

21              Q.   Mr. Weisz, it's correct, is it

22   not, that the RPS methodology was introduced in

23   Nortel from 2001 onwards?

24              A.   That's my understanding, yes.

25              Q.   And the MRDA document was not
```



```
 1   fully signed up until some number of years later;

 2   correct?

 3              A.   That's correct.

 4              Q.   In fact, it wasn't really fully

 5   signed up until 2005; correct?

 6              A.   That's correct.

 7              Q.   And that's because Nortel France

 8   didn't sign the document until sometime towards the

 9   middle or end of 2005?

10              A.   That's correct.

11              Q.   So it's correct, is it not, that

12   the Nortel entities that ultimately became parties

13   to the MRDA operated without a contract for many

14   years?

15              A.   That would be correct.

16              Q.   And you understood, did you not --

17   withdrawn.

18              It's correct, Mr. Weisz, that the

19   parties to the profit-split methodology had certain

20   rights to the IP that was created as a result of

21   that; correct?

22              A.   That's correct.

23              Q.   And the MRDA was not intended to

24   change those rights that existed for many years

25   before the contract was signed; correct?
```



```
 1                    A.    That's correct as well.
 2                    Q.    Okay.  Next topic:  You told
 3    Mr. Ruby that the RPS methodology did not apply to
 4    sales or the proceeds of sales.  Do you remember
 5    giving him that answer?
 6                    A.    I do.
 7                    Q.    But it's true, is it not,
 8    Mr. Weisz, that what Nortel did -- and this was
 9    part of a process that you were involved in --
10    that's exactly what Nortel did when it allocated
11    the proceeds of the Alcatel sale?
12                    THE US COURT:  Mr. Zelbo, objection?
13                    MR. ZELBO:  Yes.  It's one thing if
14    he's sticking to claims.  But I'm not aware of
15    anything in the court procedure or the protocol
16    that allows a recross after somebody else's cross.
17    I get a redirect, but I don't think Mr. Oxford gets
18    the opportunity to do another cross because of
19    questions asked by somebody else on cross.  Nobody
20    has done that before in this case, and I don't
21    think it's permissible.
22                    THE US COURT:  Mr. Oxford?
23                    MR. OXFORD:  Your Honor, the witness --
24    I asked the witness the following question and
25    answer.  I asked him whether or not the MRDA
```



 1  applied to the proceeds of sales, to sales or the

 2  proceeds of sales, and he said no, absolutely not.

 3          Mr. Ruby asked a very similar question,

 4  to which the witness gave a very important and very

 5  different answer that contradicted the testimony he

 6  gave to me when I asked him that question a few

 7  moments ago.

 8          So I think it is important for the

 9  Court to understand exactly what the contours of

10  that testimony are, and I think, with respect, I

11  have the right to test that.

12          MR. ZELBO:  Your Honors, I'm going to

13  withdraw the question.  If Mr. Oxford wants to go

14  forward --

15          THE US COURT:  Yes.

16          MR. ZELBO:  Just in the future, I hope

17  we don't have lots of recrosses.  But I will

18  withdraw that and apologize to the attorneys.

19          THE US COURT:  It's an unusual

20  situation to have so many parties, you know, and

21  all cross-examining.  I will allow -- you've

22  withdrawn the objection, so you may proceed,

23  Mr. Oxford.

24          MR. OXFORD:  Thank you.  I appreciate

25  that, Judge Gross.  I appreciate that, Mr. Zelbo.



```
1                  BY MR. OXFORD:
2                  Q.   Let me just back up.  You told
3    Mr. Ruby that the RPS methodology didn't apply to
4    sales or the proceeds of sales; correct?
5                  A.   It did not.  The agreement was
6    based on operating profit.
7                  Q.   Right.  And what you meant by that
8    is the MRDA itself did not automatically apply the
9    RPS methodology to the sale --
10                 A.   That's absolutely correct.
11                 Q.   That's what you meant when you
12   gave my friend Mr. Ruby that answer?
13                 A.   That is absolutely correct.
14                 Q.   Because what you, in fact, did as
15   part of the process that I was asking you about a
16   few moments ago, what you and the rest of the
17   Nortel Group did was to allocate the proceeds of
18   Alcatel sales based on the RPS methodology?
19                 A.   That's right.  There was no
20   guidance in this, and so I recall that we had
21   specific discussions.  And given that we were an
22   operating company and going to continue forward, we
23   used the agreement as guidance.
24                 Q.   Right; but not just guidance.  You
25   essentially implemented the RPS methodology to
```

 Neeson & Associates    W&F

```
 1   allocate the proceeds of sales according to

 2   contribution to research and development; correct?

 3              A.   That's correct.

 4              Q.   Thank you.

 5              I'm a little reluctant to wade into

 6   drafting history, but since Mr. Ruby has opened the

 7   door, unfortunately, I'm obliged to go there as

 8   well.  Could we call up, please, Trial Exhibit

 9   50971.

10              MR. OXFORD:  And I have a copy for Your

11   Honor.

12              THE US COURT:  Thank you, Mr. Oxford.

13              BY MR. OXFORD:

14              Q.   Do you have that on the screen in

15   front of you?

16              A.   I do.

17              Q.   You see it's an email from Bob

18   Ackerman at EY.  I think you told the Court who he

19   was, but could you just refresh our recollection on

20   that.

21              A.   I'm sorry.  Your question?

22              Q.   Could you tell us again who

23   Mr. Ackerman is.

24              A.   Yes.  Bob Ackerman was a member of

25   E&Y's national tax office, and he specialized in
```



```
 1   advance pricing agreements.
 2              Q.   And he sent an email to you on
 3   September 21st, 2004; correct?
 4              A.   Yes.
 5              Q.   And that's some number of days
 6   after the exhibit that Mr. Ruby showed you.  He
 7   showed you a document from September 12th, 2004?
 8              A.   Yes.
 9              Q.   And you'll see that Mr. Ackerman
10   writes in I guess the third paragraph:
11                  "I don't see an issue by calling
12                  Nortel Canada the legal owner for IP
13                  registration and defense purposes, all
14                  other parties being economic owners.
15                  But we can soften the language as to
16                  how we achieve this result in A4."
17                  Do you see that?
18              A.   I do.
19              Q.   Can you tell me, Mr. Weisz, how
20   that relates to your understanding of the purpose
21   for which Nortel Networks Limited was to be
22   described as the legal owner of Nortel technology.
23              A.   From my perspective, and I think
24   as I've said a couple of times this morning, it was
25   always understood that legal title was going to
```

Neeson&Associates    W&F

1    reside with NNL and that the economic benefits to

2    exploit the technology was going to reside with the

3    R&D participants, and that's how we've instructed

4    counsel to draft the agreement.

5                MR. OXFORD:  I appreciate that.  Thank

6    you, Mr. Weisz.  Those are my questions at this

7    time.  Hopefully, I won't have any more.

8                THE US COURT:  Thank you, Mr. Oxford.

9                Yes, Mr. Ruby.

10               MR. RUBY:  Your Honor, we're in a bit

11   of an awkward position.  The document that has just

12   been put to the witness is something that was

13   designated last night, and my friend Mr. Oxford I'm

14   sure inadvertently didn't point out the part of the

15   email that actually is Mr. Weisz's words, which is

16   the bottom part.  So I'm happy to leave it with the

17   Court or ask one question.  I realize the procedure

18   is a little odd here.

19               THE CANADIAN COURT:  Could it be put

20   back up on the screen, please.

21               THE US COURT:  But I'll allow you to

22   question on this exhibit.

23               MR. RUBY:  Thank you, Judge Gross.

24               MR. ZELBO:  There's no objection

25   whatsoever from us.



```
 1                    THE US COURT:  All right.  I should
 2     have asked if you objected, Mr. Zelbo.
 3                    MR. ZELBO:  It doesn't matter.
 4     Mr. Ruby can ask as many questions as he wishes.
 5                    MR. RUBY:  That's very kind.  On any
 6     subject?
 7                    MR. ZELBO:  Whatever you'd like.
 8                    THE US COURT:  Mr. Zelbo doesn't get to
 9     determine that, Mr. Ruby.
10                    MR. RUBY:  I understand that.  Thank
11     you.
12     RECROSS-EXAMINATION BY MR. RUBY:
13                    BY MR. RUBY:
14                    Q.   Mr. Weisz, my only question is if
15     you look at the bottom half of what should be on
16     your screen now --
17                    THE CANADIAN COURT:  It's not.
18                    Q.   So if we can go just a little bit
19     up so we can see the header.
20                    Does everybody see it there now?
21                    So Mr. Weisz, this is your last word in
22     the chain.  This is your email; correct?
23                    A.   I'm sorry, I can't see "from" on
24     this, so . . .
25                    Q.   For whatever reason, it doesn't
```



1    actually say "from" for this email.  But you'll see

2    it says your name in the top left of what's on the

3    screen, going to Mr. Ackerman, among others?

4              A.   Okay.

5              Q.   And in the second paragraph, you

6    say [reading]:  With regards to the IP ownership,

7    per NT's legal dep, we need to have the IP owned by

8    Nortel.  "This isn't an option."

9              Those were your words?

10             A.   Those were the instructions given

11   to me by John Doolittle, that's correct.

12             Q.   And NT's legal department, that's

13   Nortel's legal department?

14             A.   That's the Canadian department's

15   legal; that's correct.

16             Q.   And it was only Nortel that was

17   going to own the IP?

18             A.   To have legal title, that's

19   correct.

20             MR. RUBY:  I will leave it there.

21   Thank you, sir.

22             THE US COURT:  All right.  Thank you.

23             Now, Justice Newbould, I'm so excited

24   to have a witness in my courtroom that I have

25   probably forgotten the break.  Shall we take a



 1   break?

 2              THE CANADIAN COURT:  You're the person

 3   calling the shots today on this.  So if you want a

 4   break, we'll take a break.

 5              THE US COURT:  Mr. Zelbo?

 6              MR. ZELBO:  It's entirely --

 7              THE US COURT:  Do you have some lengthy

 8   questioning of the witness?

 9              MR. ZELBO:  I think I have two

10   questions.

11              THE US COURT:  Then let's finish.

12              MR. ZELBO:  Whatever the Courts wish.

13              THE US COURT:  Yes, let's let Mr. Weisz

14   finish his testimony, certainly.

15              MR. ZELBO:  I can't guarantee whether

16   it will prompt more questions from Mr. Oxford and

17   Mr. Ruby.  We'll do our best.

18              THE US COURT:  By the way, are you

19   still holding Mr. Rosenthal up in Canada?

20              MR. ZELBO:  We're afraid, frankly, if

21   he leaves, he won't be let back in.

22              THE US COURT:  Okay.

23              THE CANADIAN COURT:  He's chained to

24   his chair.

25              THE US COURT:  All right.



```
 1              MR. ZELBO:  He's there for the
 2    duration.
 3    RE-EXAMINATION/RE-DIRECT BY Mr. Zelbo:
 4              BY MR. ZELBO:
 5              Q.   So again while we're on the
 6    subject of negotiating history, and Mr. Ruby
 7    pointed out to you language that had been proposed
 8    to be included in the agreement and then didn't
 9    make it, I thought I would point one similar
10    circumstance out.
11              If we could pull up Exhibit TR11349.
12    And if you have it in front of you, Mr. Weisz,
13    you'll see that this is an email from Scott Wilkie.
14    Again, he's the lawyer at Oslers in Toronto; is
15    that right?
16              A.   That's correct.
17              Q.   It's an email to you and cc'd to
18    Giovanna Sparagna, John Doolittle, and oddly
19    enough, Mr. Wilkie, who sends it.
20              Do you see that?
21              A.   I do.
22              Q.   And if you take a look, there's a
23    draft, another draft of the MRDA attached.  And
24    turn to page 7 of that draft, and you'll see
25    Article 4, which is an article where we've all seen
```



```
 1   in the final version.

 2              And you see here it provides, "Except

 3   as otherwise specifically agreed, legal title and

 4   legal ownership"?

 5              Do you see that?

 6              A.   I do.

 7              Q.   And if you look at Mr. Wilkie's

 8   comments, he says, "The reference to legal

 9   ownership is new," and then he expresses concerns

10   about that.  Do you see that?

11              A.   I do.

12              Q.   And do you recall that the term

13   "legal ownership" did not find its way into the

14   MRDA?

15              A.   That was correct.

16              MR. ZELBO:  I have no further

17   questions.

18              The only additional thing I have, Your

19   Honor, if Judge Gross wishes, I did refer to a

20   Canadian case earlier.  I do have a copy of it.  It

21   might be easier for Your Honor.  May I approach and

22   just --

23              THE US COURT:  Yes.  Thank you very

24   much, Mr. Zelbo.

25              MR. ZELBO:  I assure you this was found
```



1   by Torys.

2              THE US COURT:  Sure.

3              MR. ZELBO:  Thank you, Your Honors.

4              THE US COURT:  Thank you.

5              All right.  Mr. Weisz, it looks like no

6   one is jumping up to question you further, so you

7   may be excused, sir.  Thank you.

8   -- WITNESS EXCUSED --

9              THE US COURT:  Why don't we take now a

10  20-minute break, and we'll be back then around

11  11:30.

12  -- RECESS AT 11:11 a.m. --

13  -- UPON RESUMING AT 11:38 a.m. --

14  GEOFFREY STUART HALL, having first been duly sworn,

15       was examined and testified as follows:

16              THE CANADIAN COURT:  Mr. Chang, should

17  we mark this exhibit -- the affidavit as the next

18  exhibit?

19              MR. CHANG:  Yes, please.

20              THE REGISTRAR:  Exhibit number 29.

21              EXHIBIT NO. 29:  Affidavit of Geoffrey

22              Stuart Hall.

23              THE CANADIAN COURT:  Thank you.

24              MR. CHANG:  Justice Newbould, Judge

25  Gross, do you both have copies of Exhibit number 29



```
 1   with exhibits?

 2               THE US COURT:  Yes, thank you.

 3               THE CANADIAN COURT:   I have, yes.

 4   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION

 5   BY MR. CHANG:

 6               Q.   Mr. Hall, do you have a copy of

 7   your affidavit in this case, Exhibit 29?

 8               A.   I do.

 9               Q.   And did you sign that affidavit?

10               A.   I did.

11               Q.   And you submitted it for use in

12   this action?

13               A.   I did.

14               Q.   How long did you work for Nortel?

15               A.   23 years.

16               Q.   And where were you based during

17   those 23 years?

18               A.   All but two years I was based in

19   Maidenhead, '93 to '95 I was based in Ottawa.

20               Q.   During that entire time were you

21   an NNUK employee?

22               A.   Yes.  I was an employee of BNR

23   Limited initially, which I think was a subsidiary

24   of Northern Telecom Limited in the UK.

25               THE CANADIAN COURT:  I wonder if you
```



```
 1   could -- the acoustics in this room are not very

 2   good.  I wonder if you could just keep your voice

 3   up, please.  That's better, thanks.

 4                THE WITNESS:  I'll try.  Is that

 5   better?

 6                THE CANADIAN COURT:  Yes, it is.

 7                THE WITNESS:  Thank you.

 8                MR. CHANG:  I'll try to speak up as

 9   well.

10                THE CANADIAN COURT:  That's not a bad

11   idea.

12                MR. CHANG:  Thank you.

13                BY MR. CHANG:

14                Q.   What position did you hold when

15   you left Nortel?

16                A.   I was -- I had two titles, the

17   EMEA CTO which reported directly to the CTO, global

18   CTO, John Roese, and I was also leader of the field

19   office of the CTO.  The reason for the two titles

20   was customers didn't understand the latter one, it

21   sounded a bit agricultural.

22                Q.   Before we get into the details of

23   the work that you did at Nortel, how would you

24   characterize your role at Nortel?

25                A.   Well, I started -- I started and
```



1    was recruited as a hardware engineer so I was a

2    designer in the Carrier division, and I evolved

3    into technical management and senior technical

4    management, ultimately becoming a director of

5    development, which is a responsibility at the

6    program level and has a technical aspect to it, as

7    was the case for all technical directors in Bell

8    Northern Research.

9               And became then an executive

10   vice-president of R&D in Maidenhead, responsible

11   for R&D conducted outside of North America on the

12   Carrier division's business.

13              Q.   By the end of your tenure at

14   Nortel were you one of the most senior R&D people

15   in Europe?

16              A.   As far as I recall, at the end I

17   was the most senior purely technical person in

18   Europe.

19              Q.   And are you a member of the NNUK

20   pension plan?

21              A.   Yes.

22              Q.   Let's talk a little bit about the

23   collaborative efforts that Nortel made between its

24   various labs to do R&D at Nortel.  Nortel had a

25   number of different R&D labs around the world,



1    including in Europe, the US and Canada, right?

2                    A.    Yes, it did.

3                    Q.    And you had personal experience

4    working with those labs?

5                    A.    Most of them.

6                    Q.    Given the global distribution of

7    labs, how did people at Nortel collaborate on R&D?

8                    A.    Right from the start in 1985, and

9    it was a revelation as to how sophisticated it was

10   in those days, we take it for granted now, an

11   internet-based systems, that we can do this, but we

12   had shared computing facilities, we shared

13   libraries, obviously telephone conferences and so

14   on.

15                   But the beauty of the systems were that

16   you could log on from anywhere where you could get

17   access to those computing facilities anywhere in

18   the world that had them and you could conduct

19   business as though you were in the next room to the

20   other people that you were doing business with.

21                   And this was necessary because with a

22   very large software system, which was typical of

23   Nortel's products, you've got a large group of

24   people across different time zones contributing

25   software changes and designs and packages to those



1    products, and doing it in a structured way so that

2    you can maintain the quality of the product.  It

3    means that you have an owner who owns that part of

4    the library and you have contributors who design

5    and request changes, and the quality processes

6    manages that flow.

7                    So typical conferences would be around

8    the structure of the changes that are being

9    requested, the order in which they would be

10   delivered.  And it was very effective, and in fact

11   it was so effective that, as I recall, people who

12   worked in Ottawa, there were at that time two

13   sites, Carling and Marilyn (ph) Court, tended to

14   use that system rather than get in the same room,

15   and on occasion saw more of the people from

16   Maidenhead than they saw of their colleagues up the

17   road.

18                    Q.   Did Nortel technology sometimes

19   also cross business lines, the development of

20   Nortel technology?

21                    A.   Yes.  There was -- there was,

22   partly because of need to be -- need for speed to

23   market and partly because you don't really want to

24   reinvent the wheel or spend money unnecessarily,

25   there was a lot of reuse of platforms.  So a



1   platform for example like the DMS and the CS-2000

2   which was designed specifically for Carrier's

3   business was also used by the Enterprise business,

4   so that when we put the voice-over IP system, the

5   CS-2000, together, the SL100, which was the

6   Enterprise division's product, was able to directly

7   benefit from the design therein and build upon

8   that.

9              So yes, it happened, platform sharing

10  was relatively common between some of the business

11  divisions.

12             Q.   And I'll just note for the courts

13  that there is a more detailed description of the

14  CS-2000 starting on paragraphs 57 of his affidavit

15  but we won't spend the time here to go into all of

16  those details because they're in his affidavit.

17             You were also involved in and --

18  personally involved in how R&D was budgeted, were

19  you not?

20             A.   Yes.

21             Q.   Can you describe for me what --

22  how the R&D budgets were set at Nortel?

23             A.   So this relates to my time as a

24  development director, that would be up to 2003 in

25  various levels of seniority.



 1               So the process worked, the sales groups
 2    would request changes to the products which they
 3    believed would give an advantage in the market or
 4    close a sale or was being asked for by a
 5    particularly interesting client.
 6               That would then come to R&D for a
 7    development estimate which we would be directly
 8    involved in, how much is it going to cost to do
 9    this.
10               That then flows back to the product
11    line managers, who are part of the line of
12    business, and is put in a list of all the things
13    they might want to do, and that's prioritized.  And
14    then the call on what is actually done and the flow
15    of funding, which enables you to staff it, then
16    flows back down from the line of business to the
17    R&D implementers.
18               Q.   So the R&D budgets were set by the
19    heads of the line of business?
20               A.   Yes.
21               Q.   What, if any, direct control did
22    NNUK have over the R&D budget that would be spent
23    in the UK laboratories?
24               A.   It had no direct control; only, as
25    I said, they were -- there was a link between the



1   content of the product and the sales commitments

2   they were making.  So they could influence it but

3   they couldn't control it.

4           Q.   They could ask for a bigger budget

5   but they couldn't actually dictate it?

6           A.   No, and they had no influence on

7   where that R&D was executed either.

8           Q.   Over the course of your time at

9   Nortel you were involved in advanced technology

10  research; is that right?

11          A.   Yes.

12          Q.   For advanced technology research,

13  was there any filter for whether that research

14  would be relevant to customers?

15          A.   For the period I was involved,

16  which was mostly during the time of John Roese as

17  the CTO, he had a review process which looked for

18  relevancy and adjacency to Nortel's business.

19          So that the objective was not to stifle

20  innovation but rather to encourage it, but as

21  things progressed and you start to spend a little

22  more money on each project, you get out of a phase

23  similar to angel funding, and there you're trying

24  to spend a bit more money and make an investment,

25  so there is a decision whether to proceed with it



1    or not.

2              And part of that decision is a filter

3    process which looks for relevancy to Nortel's

4    business value, likelihood of customers wanting it,

5    but you are looking a long way forward so you're

6    looking at trends rather than, you know, these

7    customers will definitely want it.

8              Q.    Why was that relevancy filter

9    needed?

10             A.    Well, firstly, typically with

11   advanced technology if you're being novel and

12   innovative and really trying hard, you're going to

13   generate many more ideas than a), will work, and

14   b), more ideas than you can execute.

15             So there's going to be a prioritization

16   and in fact of course more ideas than you could

17   fund to develop to the next stage.  So there's got

18   to be a prioritization and say how do we take this

19   good idea, are we going to build on it, are we

20   going to execute it into products or what are we

21   going to do with it, and that has to be a

22   prioritization decision.

23             Q.    Are you aware, based on your 23

24   years at Nortel, of any patented technology that

25   was not intended at some time to be used in a



```
 1   product, service or software by a customer?
 2                   A.   I wasn't aware of any particular
 3   incidents.
 4                   Q.   Let's talk a little bit about the
 5   contribution of the UK labs to Nortel's technology.
 6   You discuss in paragraphs 45 and 46 of your
 7   affidavit the high volume of patents that were
 8   generated within the UK.
 9                   And the last sentence of paragraph 45
10   says -- we can wait for it to pull up:
11                        "My team, which included people in
12                        Maidenhead, Harlow and elsewhere, had
13                        one of the greatest patent per person
14                        ratios that I have ever experienced in
15                        my working life."
16                   Why do you believe that was true, that
17   they were so productive?
18                   A.   So there were two parts to that.
19   The first part is during the mid -- the
20   mid-nineties when John Roth was the president, I
21   believe, there was a significant push to innovate,
22   to allow the company to evolve and change in the
23   face of competition from companies like Cisco and
24   so on.  So what was referred to as the right angle
25   turn.
```

Neeson&Associates    W&P

1              Part of that was to say to R&D staff,
2    of which I was by then a director, I think, a
3    director of R&D at that time, was to say innovate
4    or you'll become obsolete.  So there was -- but at
5    the same time there's the, if you like, the stick.
6    The carrot was there are things in place to reward
7    people who generate patents, there is a push on to
8    get this done.
9              So as one of the leaders in the UK and
10   in Maidenhead, it was my responsibility to convey
11   that to the staff to get a spirit of innovation
12   going.
13             Harlow, after '91, already had a
14   significant history in generating patents and the
15   knowledge of the processes and how to do it and
16   that spirit.  Maidenhead had been more oriented
17   towards producing software and not thinking about
18   patents.
19             So the job was to create a similar
20   environment in Maidenhead where innovation is
21   rewarded.  Part of that is not punishing people for
22   failure because innovation, typically every two or
23   three goes will fail and then the fourth will go.
24             So part of it was creating that
25   atmosphere of reward where people were not just

Neeson & Associates   W&P

1   nose to the grindstone on today's problems but

2   thinking about how to innovate solutions and just

3   creating that atmosphere, that bubble of heat and

4   light and exchange of information, and part of it

5   was execution of rewards, and then obviously

6   measuring and seeing how you're doing.

7           What I -- because there was a global

8   push for that, and the rule makers were going, on

9   behalf of the UK community I was reporting back to

10  Ottawa on how we were doing and getting feedback.

11          On one particular occasion that I

12  recall, I was asked to slow down, which was very

13  irritating because I'd put a lot of my personal

14  kudos on the plant standing up in front of these

15  people and presenting to them how they should get

16  on with it.

17          The reason given was that we should

18  slow down because we were taking a disproportionate

19  amount of the budget allocated for processing

20  patents.  I took that to mean per head, although I

21  don't recall whether that was said or not, but

22  disproportionate was the word that was used.

23          After I calmed down, I took it as a

24  compliment, but at the time I was extremely

25  irritated.

 Neeson & Associates   W&F

1                    Regarding the final statement, towards

2        the end when I had a small team of gurus working

3        for me, they generated, over two years, they

4        generated one patent per employee per year, one

5        patent application.  Because of the timing, those

6        patents wouldn't have gone all the way through the

7        system before Nortel went into liquidation, but

8        they generated one per person which I don't think

9        was matched anywhere else.  I had three Nortel

10       fellows in the group, so perhaps it wasn't that

11       surprising.

12                    Q.   Now, let me make sure that we

13       understand the landscape at the time.  When you say

14       people filed patent applications, before the

15       application would get filed did -- was there some

16       kind of confirmation that there was true value in

17       filing that application?

18                    A.   Yes, there was a screening process

19       that was managed also under John Roese, at least as

20       the chair, which had participation from various

21       parties, and obviously, especially towards the end

22       of Nortel, there was a lot of pressure on making

23       sure that you were only picking things that were

24       really valuable because there wasn't huge funds to

25       develop as there had been in the good times.  So



1    there was a filter process in there to decide what

2    to spend your money on, what needed protection,

3    what would have great value.

4              I didn't personally sit on that but I

5    was aware of its actions because some got accepted,

6    some didn't.

7              Q.   So the fact that there was a high

8    rate of filing of patents coming out of the UK,

9    that was not just a reflection of the fact that

10   people were aware that they should file; it was

11   also a reflection of the quality of the innovation;

12   is that true?

13             A.   That was -- that's what I took.

14   So in the first instance -- because the reason I'm

15   drawing a distinction is the first phase was as

16   innovation coming from within development and the

17   second phase was innovation coming from research.

18             So in the first phase, it was because

19   we created an atmosphere and a demand on behalf of

20   Nortel as a customer for that innovation that

21   people actually did the work.

22             Typically in the development

23   environment, the number one thing is about

24   delivering the functionality, the product, whatever

25   has been promised to the customer, so designers



1    will tend to focus on that.  And it takes an extra

2    bit of focus to say well, if you're innovating as

3    you do this, then that should be considered for

4    filing and here's the reason why we should do it.

5              But that also gets people talking, if

6    you like, around the cooler about how to solve

7    certain problems, design meetings.  Architectural

8    meetings change because people actually thinking

9    about innovation rather than just execution of the

10   job, can we give ourselves an edge here.

11             Q.   You mentioned before in your prior

12   answer the group of gurus that you worked with

13   towards the latter part of your career, and you

14   also discuss that in paragraphs 47 and 48 of your

15   affidavit.

16             What, if any, relationship did those

17   set of gurus have?  What was their role with --

18   across business lines at Nortel?

19             A.   So they were -- they were tasked

20   through me by John Roese to ignore line of business

21   and work, and that's why we were called the field

22   office.  It meant that we were looking at the kinds

23   of criticisms and issues and problems that

24   customers were facing in delivering value to their

25   networks, to their enterprises.



 1          We were being asked to look at what
 2   problems they faced and see if we could come up
 3   with innovative ways of resolving those problems.
 4   So I'm not talking about, you know, support type
 5   technical fixes such as microphones, but I'm
 6   talking here about systemic problems, I can't do
 7   this because I can't get enough bandwidth or this
 8   is broken and there is no solution on the market
 9   today.
10          So we were looking for those and my job
11   was to engage with CTOs and deputies of CTOs around
12   the customer base to find out what was -- what the
13   pain was, and the gurus that worked for me, their
14   job was to try and figure out if they could solve
15   them, and they were successful on some occasions.
16   Sometimes you get impossible problems.
17          Q.   Thank you, Mr. Hall.  There are a
18   lot of other subjects that are addressed in your
19   affidavit, but we will leave those for now in your
20   affidavit.  I appreciate your time.  Those are my
21   questions for now.
22          MR. GOTTLIEB:  We have nothing, thank
23   you.
24          MS. ROSENTHAL:  Good morning, Your
25   Honour, good morning, Judge Gross, Mr. Hall.  My



1   name is Julie Rosenthal, I am from Goodmans and we

2   act for the Monitor and the Canadian Debtors.

3   CROSS-EXAMINATION BY MS. ROSENTHAL:

4            Q.   Mr. Hall, you began your work for

5   the Nortel Group, I believe you said, as an

6   employee of BNR Limited, correct?

7            A.   That's right.

8            Q.   And BNR was primarily a research

9   and development company?

10           A.   As I recall, and it was a while

11  ago, Bell Northern Research was a part of what was

12  called at the time a tri-corporate between Bell

13  Canada Enterprises, Northern Telecom Limited --

14  sorry, Northern Telecom, and Bell Northern

15  Research.

16           Q.   Your work at the time in 1985 was

17  primarily in research and development?

18           A.   It was.

19           Q.   And that remained true for a

20  number of years?

21           A.   For my whole career.

22           Q.   And later, as you were promoted

23  within the group, you remained involved in the R&D

24  side of the business, albeit at a managerial level,

25  fair?



```
 1                    A.    That's correct.

 2                    Q.    And in 1999 you were promoted to

 3    vice-president of R&D in Maidenhead?

 4                    A.    That's correct.

 5                    Q.    And in 2003 you were appointed as

 6    the chief technology officer for EMEA?

 7                    A.    That's correct.

 8                    Q.    And you've described that position

 9    as a customer-facing position?

10                    A.    Yes.

11                    Q.    And more specifically, in that

12    position you were responsible for managing R&D

13    relationships with Nortel's top customers

14    throughout Europe and Asia?

15                    A.    I did meet with people in Asia but

16    my responsibility was defined as EMEA.

17                    Q.    So it was primarily Europe?

18                    A.    It was primarily Europe but I did

19    meet with a number of Asian customers.

20                    Q.    And in that role, I take it that

21    you often worked in conjunction with Nortel's sales

22    teams?

23                    A.    Throughout that period no customer

24    contact would happen between a research and

25    development person without a request from a sales
```



 1    team.

 2              Q.    And depending on the

 3    circumstances, other R&D personnel might have

 4    significant contact with customers or potential

 5    customers?

 6              A.    Absolutely.

 7              Q.    And that involvement in some cases

 8    was very important in Nortel gaining new customers?

 9              A.    Yes.

10              Q.    And that involvement was also

11    important in Nortel making further sales to

12    existing customers?

13              A.    Yes, that's right.

14              Q.    And that was why, for example, as

15    part of your role as CTO you would travel to meet

16    with senior strategic management personnel at

17    Nortel's customers?

18              A.    Yes, technical, technical senior

19    people.

20              Q.    And I take it that was because

21    there was no assumption that current customers of

22    Nortel would remain as future customers unless

23    these types of efforts were made?

24              A.    I think -- I think that's

25    essentially correct.  It's part of -- there was,



1   particularly in the -- in that period where you're

2   really referring to, which is around 2003 onwards,

3   there was a concern because of the impact of the

4   dot com bubble bursting on Nortel, that Nortel had

5   lost the will to innovate.

6           So not just in Europe and Asia but also

7   my counterparts in Ottawa and the US had a job to

8   do to ensure that customers felt that Nortel still

9   had an innovation engine.

10          Q.   And that was viewed as important

11  in terms of driving current and future sales?

12          A.   Yes.

13          Q.   And part of that reason for having

14  the R&D personnel involved with the customers was

15  to ensure that Nortel developed the right products

16  to meet the customers' present and future needs?

17          A.   That was part of it, yes.

18          Q.   Now, you're aware of the fact that

19  Nortel sold product over the years to British

20  Telecom?

21          A.   Yes.

22          Q.   And I gather that Nortel first

23  began selling to BT in the 1980s?

24          A.   That's correct.

25          Q.   And I take it that Nortel



1    continued to sell product to BT in the nineties and

2    thereafter?

3              A.    That's also correct.

4              Q.    Fair to say that BT became a

5    significant customer of Nortel's in the 1990s?

6              A.    Yes.

7              Q.    Are you familiar with a product or

8    a service known as provider backbone transport?

9              A.    Yes.

10             Q.    That's known also as PBT?

11             A.    Yes, or sometimes Carrier

12   ethernet.

13             Q.    And that was technology that was

14   developed by Nortel?

15             A.    It was.

16             Q.    And I take it that PBT or Carrier

17   ethernet provides pass-through ethernet systems?

18             A.    Yes, it does.

19             Q.    And it requires less memory and

20   less processing power than similar technologies?

21             A.    Yes, it's potentially cost

22   effective.

23             Q.    You would consider it to be an

24   industry-changing technology?

25             A.    It certainly could be.



```
 1                    Q.   And the work that was done to
 2    develop that technology was carried on from around
 3    2003 forward?
 4                    A.   I think it dates back a little, a
 5    little -- no, that's about right.  Maybe a little
 6    bit earlier.
 7                    Q.   And are you familiar with BT's,
 8    that's British Telecom's, 21st century program?
 9                    A.   Oh, yes.
10                    Q.   And that was a program announced
11    by British Telecom in or around 2005 to make a very
12    large investment to move to the next generation
13    network technology?
14                    A.   Yes.
15                    Q.   And I take it that
16    telecommunications companies like Nortel had to
17    compete in order to be selected as a preferred
18    supplier to BT for that project?
19                    A.   Absolutely they did.
20                    Q.   And so, for Nortel, you've told us
21    that Nortel had been supplying products to BT since
22    the 1980s and had built up its customer
23    relationship with BT over those years, but
24    nevertheless Nortel still had to compete to be a
25    preferred supplier for this 21st century project
```



```
 1   for BT, correct?

 2               A.   That is correct.

 3               Q.   In fact, Nortel was initially

 4   excluded from the bid competition, wasn't it?

 5               A.   Nortel was deselected, I think was

 6   the phrase that was used.

 7               Q.   So first it was in, and then it

 8   was out?

 9               A.   No, no, in the first -- the

10   process was huge.  It went over many months.  I

11   think the requirements went to seven volumes, if I

12   remember rightly.  And the bid responses from all

13   of the suppliers were evaluated and Nortel was not

14   successful as -- in being selected to go to the

15   next phase.

16               Q.   I see, thank you.  But thereafter

17   Nortel was reselected, I think was your word?

18               A.   That's correct.

19               Q.   And that was on the strength of

20   its PBT technology; is that fair?

21               A.   That is fair.

22               Q.   Now, you're familiar with the fact

23   that Nortel also sold products to Vodafone?

24               A.   Yes.

25               Q.   And when Nortel was looking to
```

 Neeson&Associates   W&F

```
 1   sell its CS-2000 system to Vodafone, the R&D staff

 2   were involved in that sales process?

 3            A.   Yes.

 4            Q.   And that helped to build

 5   Vodafone's confidence in Nortel?

 6            A.   I would hope so, but I don't know

 7   so.

 8            Q.   The CS-2000 system was, I take it,

 9   a successful system?

10            A.   It was a successful system, and if

11   I remember correctly, Vodafone Spain was the first

12   people to deploy that product anywhere in the

13   world.

14            Q.   And as far as you know, Vodafone

15   was pleased with the product?

16            A.   Yes.

17            Q.   And yet despite the sale and the

18   relationship that had been created, Nortel didn't

19   take it for granted that Vodafone would buy other

20   products from Nortel; fair?

21            A.   I believe that -- I wasn't

22   involved in the sale so I'm not sure if I can give

23   you a detailed answer, but I believe that to be the

24   case.  The CS-2000 was the only switch of its type

25   at that time, so we did have a competitive
```



1    advantage.

2              Q.    Certainly for the CS-2000?

3              A.    For the CS-2000, yeah.

4              Q.    And you're familiar with Nortel's

5    Passport Packet Voice Gateway or PVG system?

6              A.    Yes.

7              Q.    And is that a different system

8    from the CS-2000?

9              A.    It's a -- the Passport is a

10   separate platform but the PVG formed part of the

11   voice-over IP solution which went under the name

12   CS-2000.

13             Q.    So could I consider them to be

14   related systems?

15             A.    They are related systems but they

16   were independent.  There were other users of

17   Passport other than the CS-2K.

18             Q.    I understand that in the early

19   2000s Nortel was looking to sell its PVG system to

20   Vodafone?

21             A.    That would be correct, as far as I

22   remember.

23             Q.    And are you aware of the fact that

24   the Nortel account team for Vodafone had to spend

25   considerable time and effort in order to make the



```
 1   sale of the PVG system to Vodafone?

 2               A.   I wasn't aware of their

 3   activities.

 4               Q.   Thank you.  Now, you've stated in

 5   paragraph 41 of your affidavit that in the

 6   mid-1990s there was, you put it, a big push from

 7   Nortel's chief technology officer in Canada to

 8   register patents, correct?

 9               A.   Yes, that's correct.

10               Q.   And you are aware that Nortel

11   considered it very important to protect its

12   patentable ideas?

13               A.   That was the message that was

14   conveyed to us, yes.

15               Q.   And that was supported by

16   corporate policy to encourage the patenting of

17   inventions?

18               A.   Yes, policy and funding.

19               Q.   And in your position as

20   vice-president of R&D at Maidenhead, you were

21   responsible for doing what you could to make sure

22   that the local employees worked to further this

23   corporate goal of obtaining patent protection for

24   patentable inventions, correct?

25               A.   That's correct, with one
```



```
 1   correction.  At the time that you specified at the
 2   start, I wasn't yet a vice-president, I was a
 3   director.
 4              Q.   I see.  But when you became the
 5   vice-president --
 6              A.   Yes, yes.
 7              Q.   -- you took responsibility for
 8   furthering that?
 9              A.   Yes, and as a director as well,
10   yes.
11              Q.   And this was all a reflection of
12   the importance that was placed on patents by
13   Nortel?
14              A.   Yes.
15              Q.   And based on your experience at
16   Nortel, I take it that you agree that for such a
17   telecommunications enterprise, patents are in fact
18   very important?
19              A.   Yes.
20              Q.   They play a very important role in
21   protecting and generating revenues?
22              A.   Yes, they do.
23              Q.   They are the primary mechanism for
24   protecting the ideas that are the product of R&D
25   activities?
```



```
 1                    A.    Yes.
 2                    Q.    And if a company can obtain key
 3    patents on a product or technology, then the
 4    company can prevent its competitors from moving
 5    into that same market niche?
 6                    A.    That's true, but there is a
 7    qualification to that in the telecoms industry, and
 8    that is if you want to create a market, there is an
 9    expectation that you will make your products
10    standards compliant.  So some patented ideas end up
11    in standards and there are rules around exclusivity
12    once you do that.
13                    But in order to have the benefit of
14    having a product which is standards compliant and
15    therefore can address a market, you have to go
16    through that reduction in the -- apparent reduction
17    in the value.
18                    Q.    You say apparent reduction?
19                    A.    Well, yes, because the volume goes
20    up if you have got a volume market.
21                    Q.    So in fact, in the situation that
22    you just described, the patent can increase in
23    value over what it would otherwise do --
24                    A.    Yes, because for some standards
25    organizations you're only allowed a nominal charge
```



```
1    because otherwise they won't accept it into

2    standard.  But if you can't say your product is

3    standards compliant, no one will buy it.

4              Q.   And those reasons that we just

5    discussed as to why patents are important, that

6    certainly would have been true for Nortel?

7              A.   Yes.

8              Q.   And you understood that a patent

9    is property owned by the person or company in whose

10   name the patent is registered?

11             A.   That's what I understood.

12             Q.   And you understood that a further

13   reason why patents are important in the

14   telecommunications industry is that the owner of

15   the patent can earn revenue from granting licenses

16   to third parties to use the patented technology?

17             A.   Yes, I understand that.

18             Q.   And this is particularly important

19   where the patent is considered to be foundational?

20             A.   I'm not sure if I knew the

21   distinction with what is foundational and other

22   forms of patents, to be honest.

23             Q.   I use the word "foundational" to

24   indicate where the technology in the area relies on

25   the particular invention that's claimed in the
```



```
 1   patent.
 2                 A.   Yes, broadly that makes sense.
 3                 Q.   And you're also aware of the fact
 4   that in the telecommunications industry, companies
 5   will exchange license rights to their respective
 6   patent portfolios?
 7                 A.   I was made aware that there was a
 8   certain amount of trading on patents going on but I
 9   was never involved in it.
10                 Q.   And that would be a second reason
11   why Nortel's patents were important, correct?  And
12   the third reason that Nortel's patents were
13   important was that they could serve as a defense,
14   correct?
15                 A.   Correct.
16                 Q.   And that meant that if Nortel were
17   accused of infringing another company's patent,
18   Nortel could attempt to counter-sue that same
19   company for infringing one of Nortel's patents?
20                 A.   That was explained to me, yes.
21                 Q.   And that would either discourage
22   the lawsuit in the first place or lead to a
23   favourable settlement?  Hopefully.
24                 A.   Hopefully.
25                 THE CANADIAN COURT:  Maybe.
```



```
 1                    BY MS. ROSENTHAL:
 2                    Q.   Now, Mr. Chang asked you a
 3     question.  He asked you whether there was any
 4     patented technology that you were aware of that was
 5     not intended to be used in any product, and you
 6     answered, not that you were aware of.  Do you
 7     recall that?
 8                    A.   Yes.
 9                    Q.   And by that I take it that you
10     meant that Nortel's ultimate goal was always to use
11     its patented inventions in products and thereby to
12     earn revenue?
13                    A.   The way I -- I never saw that as a
14     policy, firstly, but the way that the assessments
15     when we were submitting patents appeared to work
16     was that they were looking for relevancy to
17     Nortel's business, so it could either be relevancy
18     to product lines that were already being built on,
19     or it would be an adjacent area that Nortel felt it
20     could commercially exploit.
21                    I wasn't aware of patents that fell
22     outside of that, but that's what I saw.
23                    Q.   But I take it that there were
24     occasions when an invention was patented or an
25     invention -- a patent application was filed in a
```

 Neeson&Associates     W&F

```
 1   situation where a specific product had not yet been

 2   proposed for manufacture; is that fair?

 3             A.   I think -- I think that's likely

 4   to have happened but I didn't have any experience

 5   of it.

 6             MS. ROSENTHAL:  Thank you.  Those are

 7   my questions, Mr. Hall.

 8             MS. SCHWEITZER:  Your Honour, Lisa

 9   Schweitzer.  You'll be pleased to know the first

10   line of my outline today is stop.  I have no

11   questions for this witness.

12             THE CANADIAN COURT:  I'm disappointed.

13   I thought some of you intelligent lawyers out there

14   would want to take this witness on about tab A to

15   his affidavit and go through that patent and the

16   pictures.  Sadly, I am wrong.

17             MR. CHANG:  Your Honour, I would be

18   happy to go through the details but I'm afraid too

19   many people would --

20             THE CANADIAN COURT:  You can't ask

21   leading questions, at least you're not supposed to.

22             MR. CHANG:  Yes.  I have just a few

23   follow-up questions.

24   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY MR.

25   CHANG:
```



1            Q.   Mr. Hall, you answered some
2    questions from my colleague about whether there is
3    any guarantee that a customer would stay with
4    Nortel, and I want to follow up a little bit.
5                  What, if any, effect on a customer
6    relationship does the history that you've had with
7    that customer have?
8            A.   Well, that depends on what kind of
9    a history you've had.  The obvious one that any
10   consumer has is if the products are good quality
11   and they work and they do what they're supposed to
12   do, then you're starting from a good base.
13                 But right from sales through to R&D
14   there needs to be, especially in large
15   organizations like the BTs and the Verizons and the
16   Vodafones of this world, there needs to be an
17   engagement all through the organization, because
18   when it comes to things like bid assessments you
19   have to be viewed as one of the good guys at every
20   level.
21                 So there is technical engagement, there
22   is belief in the future of the company, both
23   financially and its innovations and its products.
24   Because typically when a large Carrier buys,
25   they're really expecting you to be in the network



1    for a very long time.

2              These products don't get written off

3    lightly, financially written off, I mean, lightly,

4    so they're in the network for a long time, so

5    you're building a relationship.  But it's not hard

6    to break it if you make a mess.

7              Q.   Is it fair to say that the

8    installed base of products that you have with a

9    customer also has an effect on future bids?

10             A.   It does if the installed base is

11   performing well, because it's reputation-enhancing,

12   and that's both from the basic performance of the

13   product and from your ability to deliver upgrades,

14   for example.  New software loads, new functionality

15   on an existing platform.

16             Q.   My colleague also asked you some

17   questions about ownership of patents and what

18   patents can be used for.  What training do you have

19   in the valuation and ownership of patents?

20             A.   I don't have any formal training

21   in it at all.  The responses I gave were based on

22   the information that was given to me when I asked

23   questions of the patents groups, why are we doing

24   it this way, why is it that way, and those are the

25   answers I got.

 Neeson & Associates   W&F

 1                    But no, I've not been trained in
 2     patents, patent applications or patent law or
 3     anything like that.
 4                    MR. CHANG:  Okay, thank you.  Those are
 5     my questions.
 6                    THE CANADIAN COURT:  Thank you,
 7     Mr. Chang.  I guess if that's it, thank you very
 8     much, Mr. Hall.
 9                    THE WITNESS:  Thank you.
10                    MR. CHANG:  Can I make one more
11     statement?  I wanted to let the court know that we
12     mentioned a situation with another UKPC witness,
13     Ms. Angela Anderson, before.  She had a medical
14     condition and she couldn't testify last week.
15                    We've now arranged for her to testify
16     by video tomorrow, after Mr. Malackowski, and we
17     have notified all the core parties about that, and
18     so I just wanted to make sure that the court was
19     aware as well that that is the planned schedule.
20                    THE WITNESS:  Can I leave?
21                    THE CANADIAN COURT:  Yes.  In fact, if
22     you're smart, you'll leave quickly because there
23     will be more talk, I'm sure.
24     -- WITNESS EXCUSED.
25                    THE US COURT:  All right.  Justice



```
 1    Newbould, our next witness is back in the United
 2    States.  Why don't we proceed.
 3              MR. MAGUIRE:  Thank you, Judge Gross --
 4              THE CANADIAN COURT:  Back in the USA.
 5              MR. MAGUIRE:  -- Justice Newbould.  And
 6    it is Bill Maguire once again for the EMEA Debtors.
 7              THE US COURT:  Yes.
 8              MR. MAGUIRE:  We are now, subject to
 9    Mr. Chang's explanation with respect to
10    Ms. Anderson, we are now moving to a new phase of
11    the allocation trial, which is the presentation by
12    the parties of the expert witnesses.
13              So the good news is that we're on track
14    and making progress.
15              THE US COURT:  Wonderful.
16              MR. MAGUIRE:  The bad news is that the
17    parties have reserved time with respect to the
18    presentation of expert witnesses.  You may recall
19    in the case of fact witnesses the agreement in the
20    trial protocol was that the parties would provide
21    the direct examination exclusively by affidavit,
22    with up to half an hour then for additional
23    insights.  And there's no such time limitation
24    here, although obviously we will try to proceed as
25    quickly as we possibly can.
```



```
 1                    THE US COURT:  Very well.  Thank you.
 2                    MR. MAGUIRE:  So the EMEA is calling
 3     over the today and tomorrow two expert witnesses.
 4     We're starting today with Mr. Paul Huffard, and
 5     tomorrow we will present Mr. Malackowski, who will
 6     address issues concerning intellectual property.
 7                    THE US COURT:  All right.  Very well.
 8     Shall we have the witness sworn at this point?
 9                    MR. MAGUIRE:  If it please the Court.
10                    THE US COURT:  Thank you.
11     PAUL HUFFARD, having first been duly sworn, was
12               examined and testified as follows:
13                    THE US COURT:  Thank you, Mr. Huffard.
14     It's good to see you again.
15                    THE WITNESS:  Good afternoon, your
16     Honor.
17                    MR. MAGUIRE:  And we'll try to make
18     sure we're set up on the technology side so we
19     show -- we have a deck of a PowerPoint that's been
20     provided to all parties.  And if it please the
21     Court, I am happy to provide you, Judge Gross, and
22     hopefully our colleagues in Canada are in a
23     position to provide Justice Newbould with a hard
24     copy of the deck as well.
25                    THE US COURT:  Yes, please.
```



1                    THE CANADIAN COURT:  I have it.

2                    MR. MAGUIRE:  If -- also, we have some

3    copies of the expert reports, the original and

4    rebuttal reports.  I hesitate to give the Courts

5    any additional paper, but we do have --

6                    THE US COURT:  I have one.  Thank you.

7                    MR. MAGUIRE:  You do have; okay.

8                    In terms of actually marking, I don't

9    believe the expert reports have been marked.  So if

10   we're going to mark them, then I would submit the

11   initial report of Mr. Huffard would be Exhibit 30

12   and the rebuttal report might then be marked as

13   Exhibit 31.

14                   THE US COURT:  Let's do that.

15                   EXHIBIT NO. 30:  Expert Report of Mr.

16                   Huffard, dated January 24, 2014.

17                   EXHIBIT NO. 31:  Rebuttal Report of Mr.

18                   Huffard, dated February 28, 2014.

19                   THE US COURT:  Mr. Maguire, whenever

20   you're ready, sir.

21                   Are you ready, Justice Newbould?

22                   THE CANADIAN COURT:  I am.

23                   THE US COURT:  All right.

24   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION

25   BY MR. MAGUIRE:



       1                   Q.    Good afternoon, Mr. Huffard.

       2                   A.    Good afternoon.

       3                   Q.    We have on the screen the first

       4     slide of your slide deck, which provides your

       5     relevant experience and describes you as a senior

       6     managing director of Blackstone.  Can you tell the

       7     Courts, please, what is Blackstone?

       8                   A.    Blackstone is an investment

       9     management and investment advisory business located

      10     in New York City.

      11                   Q.    And we have on the screen some of

      12     your bankruptcy advisory experience.  Can you just

      13     tell the judges generally how your experience is

      14     relevant to this procedure and to providing them

      15     with insights or help in the issues at hand.

      16                   A.    Sure.  We act as financial

      17     advisers in restructuring circumstances, sometimes

      18     working for companies, sometimes working for

      19     creditor groups; and then also working periodically

      20     for purchasers of assets that are being sold in

      21     bankruptcies.

      22                   And generally speaking, the course of

      23     our work, we spend a lot of our time focusing on

      24     valuation.  That is obviously a critical issue in

      25     most restructurings.  We also do run sale processes



1    of assets and whole companies in the context of

2    restructuring.  So for instance, the business sales

3    and the asset sales that were done here, that's a

4    role in other cases that we could have filled like

5    Lazard filled here.

6              And then lastly, we do spend a lot of

7    time looking at allocation of value among different

8    legal entities that are involved in restructurings.

9              In my personal experience, I have

10   provided expert testimony as to the allocation of

11   sale proceeds very similar to this instance in the

12   LTV Steel bankruptcy, I guess Part 2, the second

13   LTV Steel bankruptcy.  And then also just generally

14   in context of plan of reorganization negotiations,

15   when we're looking at the legal rights to

16   distributions of value among the different debtor

17   entities involved in a bankruptcy, that's an

18   allocation exercise, too.

19             Q.   I have with me a very impressive-

20   looking volume called "Contested Valuation in

21   Corporate Bankruptcy."  I understand you

22   contributed to this volume.

23             A.   Yes.  It's a bestseller, I

24   understand.

25             Q.   Turn to the next slide.



```
 1   -- OFF THE RECORD DISCUSSION --

 2            MR. MAGUIRE:  We've got a little

 3   background noise.

 4            THE US COURT:  People are trying to

 5   steal credit all over the courtroom.

 6            BY MR. MAGUIRE:

 7            Q.   Can you walk us through your

 8   assignment here and specifically the three items

 9   that you have here on Slide 3.

10            A.   Sure.  We were generally asked to

11   consider three questions in connection with our

12   engagement here:  One, what are the classes of

13   assets that were sold? what are the logical

14   groupings to think about them in in the context of

15   valuing them and ultimately allocating them?

16            And those are the two -- I guess I've

17   jumped to my two next points:  What is the value of

18   each of the assets; and then what is an appropriate

19   way to allocate them among the different selling

20   debtors, and ultimately figure out which estate

21   gets how much value.

22            Q.   What is the significance of the

23   first question here, what classes of assets?  Why

24   is it significant whether assets are broken up into

25   separate categories or classes?
```



```
 1                    A.   Well, I think there's a number of
 2   reasons why it's important to focus on the classes
 3   of assets that were involved in these sale
 4   processes.  One is different groups of assets have
 5   different legal rights that are associated with
 6   them.
 7                    So obviously, there's been a lot of
 8   discussion about the MRDA and the rights that arise
 9   under that.  There are different assets classes
10   that apply to -- different rights that apply to
11   different asset classes.  And so I think it's
12   important to take those one at a time so you get
13   the right answer.
14                    Second of all, we are now having this
15   discussion a number of years after the fact.  And
16   as we sit right now, there is limitation on the
17   information, practically speaking, that is
18   available for some of these assets, and by breaking
19   them down into smaller asset classes rather than
20   considering them as a whole, I think you get better
21   visibility on the appropriate information to
22   consider them.
23                    Q.   And if we turn to the next slide,
24   can you walk us through the valuing of asset
25   classes.
```



1                    A.    Sure.  For the purposes of the
2    expert report that I've prepared, we broadly broke
3    the assets into three classes, as you can see here:
4                    One, net tangible assets.  And so those
5    are, as an example, the cash, the accounts
6    receivable, the inventories, the PP&E.  And the net
7    part of that phrase means that it's also netted
8    down by the liabilities, which were largely current
9    liabilities or operational liabilities that were
10   assumed by the purchasers in the business sales, so
11   that's why it's called net tangible assets.  And
12   for purposes of valuing those assets in our report,
13   we used the book value as it appeared on the
14   company's books and records as of the end of 2009.
15                   For intellectual property, there's
16   actually two different valuation approaches
17   depending on which asset sales you're talking
18   about.  And as we'll talk more about in this
19   presentation, we have worked together with an IP
20   specialist firm, Ocean Tomo; and they have
21   basically provided the valuation on the
22   intellectual property.
23                   For the business sales, they've used a
24   relief-from-royalty method.  We'll talk a little
25   bit more about that in a couple minutes.



1                    And on the residual patent sale, you

2      don't actually need to do any valuation because

3      that was the only asset that was sold in that sale.

4      Basically, the selling price is the valuation.

5                    And then for the other asset classes

6      that we've considered are what we've called

7      customer-related assets.  We'll talk a little bit

8      about what the main components of that are in a

9      moment.

10                    And then also goodwill.  And goodwill

11     is generally the residual category of value.

12                    And we have valued those as a residual

13     category collectively.  And so basically for the

14     business sales, we have taken the total sales

15     proceeds, subtracted out the net tangible asset

16     value, the intellectual property value, and that

17     gives you, by calculation, the remaining customer-

18     related asset value and goodwill value.

19                    Q.   So applying those methodologies,

20     can you explain to us the results of your analysis.

21                    A.   So the pie chart on Slide 5 here

22     basically shows the result.  There's approximately

23     $7.3 billion of proceeds that are subject to the

24     ultimate allocation decision here.  We allocate

25     approximately 2 percent of that to the net tangible



1   assets.  We allocate 29 percent of that to

2   customer-related assets and goodwill.  And then

3   almost 70 percent of it, 69 percent of it, is

4   comprised of the intellectual property that was

5   sold in the residual patent sale and the business

6   sale together.

7            Q.   And if you can explain the

8   significance of that dotted line in the

9   intellectual property, the blue --

10           A.   Sure, sure.  So that is a graphic

11  presentation of the split within the overall

12  turquoise slice, which is intellectual property as

13  a whole.  That represents the split between the

14  intellectual property that was sold in the residual

15  patent sale, which comprise 59 percent, and the

16  intellectual property that was sold in the business

17  sales, which comprise 10 percent.

18           Q.   If we go to the next slide, can

19  you describe for us how you went about allocating

20  proceeds.

21           A.   Sure.  So obviously, when we talk

22  about allocation for this purpose, we're talking

23  about how do we take the value that we've just

24  derived and then allocate it into the different

25  legal entities for purposes of determining



1  ownership.

2            In net tangible assets, again, we

3  basically followed the companies' books and records

4  and allocated the value of the net tangible assets

5  to the legal entities that showed up as holding

6  those assets.

7            For intellectual property, we

8  considered two approaches; and these are really

9  legal approaches that my understanding is that the

10  judges will have to ultimately decide here, but we

11  were given them as assumptions from our legal team.

12            One is what we call the contribution

13  approach, which is based on a historical

14  measurement of the contribution to overall R&D

15  expenditures.

16            And another approach is called license

17  approach, which basically looks at, rather than

18  historical R&D spend, what is the volume of

19  business that's being transacted in each geography

20  and how much would a license be worth for the

21  licenses that were surrendered in order to

22  facilitate these sales transactions.

23            And lastly, for the residual category

24  of customer-related assets and goodwill, we

25  allocated those based on each legal entity's



1    proportion of the 2008 revenue.

2                Q.    And why did you use 2008 revenue?

3                A.    2008 revenue is the last full

4    fiscal year prior to the bankruptcy cases, and it

5    seemed like an appropriate period of time that

6    would not reflect the disruption of the company's

7    business that bankruptcy cases ultimately do cause.

8                Q.    And did that also precede the

9    actual sales of the businesses?

10               A.    It did precede the sales, and it

11   actually preceded not only the actual sales in

12   terms of when the sales were consummated but it

13   preceded the public discussion about the business

14   being sold and split up, which is probably where

15   you start to get the impact of the business sales

16   on the overall revenues.

17               Q.    If we go to the next slide, can

18   you walk us through how you addressed net tangible

19   assets.

20               A.    Sure.  So basically, this is a

21   summary chart.  These are, as I mentioned earlier,

22   the book value figures for the tangible assets and

23   the assumed liabilities broken out by the three

24   main debtor entities.  And you can see that we have

25   netted the assumed liabilities against the tangible



```
 1    assets to come up with, on the bottom line, the net

 2    tangible asset figures.

 3                    Q.    Why do you have EMEA with a

 4    negative number here?

 5                    A.    Well, mathematically, that is

 6    because the assumed liabilities were greater in

 7    order of magnitude -- in size than the tangible

 8    assets.

 9                    In actuality, the purchasers did not

10    assume every single liability on the company's

11    books.  We've made our best efforts to include the

12    relative categories that we understood the

13    purchasers were assuming, but these numbers may not

14    be exactly right in the assumed liabilities.  My

15    guess is that they've actually assumed slightly

16    less than this.  But this is mathematically the way

17    we have done it.

18                    Q.    Are you aware of any other expert

19    in the case that has given EMEA a negative net

20    tangible assets?

21                    A.    No.  It's sort of a difficult

22    question.  I'm supposed to be advocating for EMEA,

23    but other people have actually given them more

24    value here than we have given them.

25                    Q.    If we turn to intellectual
```



1    property valuation, can you describe the approach

2    there.

3                    A.    Again, all of the valuation and

4    allocation of intellectual property was performed

5    by Mr. Malackowski, who you'll hear from tomorrow,

6    and his team at Ocean Tomo.  They are specialists

7    in intellectual property; and they have employed,

8    just very briefly, a method in valuing the

9    intellectual property which is called the relief-

10   from-royalty method.

11                   My understanding and from my

12   professional experience, although I'm not an

13   intellectual property expert, is that is a commonly

14   accepted methodology in valuing intellectual

15   property.  It's a version of a net present

16   valuation calculation, which is, of course,

17   familiar to all of us in the restructuring world.

18                   Mr. Malackowski tried to come up with a

19   comprehensive value of the IP, and in that sense he

20   considered two elements of value.  One is the

21   traditional relief-from-royalty calculation, which

22   is what would a third-party purchaser have paid as

23   a royalty in the alternative to be able to sell

24   Nortel's products over time.

25                   So basically if you said, rather than



1    buying the assets, I could license them, what would

2    the reasonable license stream have looked like to

3    pay over time; and then you discount that back to

4    the present value.

5              The synergistic value is basically a

6    reflection of the fact that for the purchasers,

7    many of them do operate or sell products that are

8    potentially infringing on Nortel's IPs.  And by

9    purchasing the Nortel IP, they save themselves the

10   potential for being sued by Nortel and having to

11   pay Nortel a royalty on their potentially

12   infringing products.  So that synergistic value

13   doesn't exist in a sort of standalone world where

14   you are just running the Nortel products.  It only

15   exists in the context of an acquisition by a

16   strategic party.

17             And then as we talked about earlier, on

18   the residual patents, there's not really a

19   methodology used to value those.  That is just

20   equal to the sale price, which was approximately

21   $4.5 billion.

22             Q.   And then you told us earlier that

23   there were two approaches that you were asked to

24   consider; right?

25             A.   Yes.  And so the approaches are



```
 1   the contribution approach, which is sharing --
 2   allocating the proceeds in proportion to the
 3   selling debtor's historical R&D spend.  And then
 4   the other is the license approach, which looks at
 5   the licenses that the different parties involved in
 6   the case did have and what would be the value of
 7   giving those licenses up from a fair market value
 8   point of view.
 9            Q.   As you mentioned earlier, which
10   approach the Courts select is very much a legal
11   question.  But if we just step back and ask you
12   from a commercial experience is there a point of
13   view that you have in terms of different
14   approaches?
15            A.   Yes.  It does make sense to me,
16   from a commercial point of view -- again, it
17   ultimately is a legal question.
18            But in terms of the context of how
19   Nortel ran its business -- you even heard from a
20   number of experts this morning that I was listening
21   to -- this was a globally run, integrated company.
22   And people did view that the creation of technology
23   through spending on R&D was one of the key drivers
24   of value.  And they wanted to create a world where
25   there was cooperation among the different parts of
```



1    the company.  They worked together both on an R&D

2    and on a sales and marketing side.

3              So in that sense, contribution does

4    create more of a joint and cohesive structure for

5    the economic motivation of the different parties.

6    And I would just note, again, from everything I've

7    seen personally, it seems consistent with how they

8    talked about their business.

9              And the MRDA from 2001 to 2008

10   basically split profit-sharing on the basis of R&D.

11   I've seen documents in 2002, internal Q and A was

12   set -- was produced to facilitate the discussion

13   with the tax authorities, where they were basically

14   saying we're going to split the IP, including if we

15   had to sell it, on the basis of historical R&D

16   contribution.

17             And then obviously in 2006, you've

18   heard a lot about the UMTS sale to Alcatel, where

19   the IP, again, was split on the basis of historical

20   R&D spend.

21             Q.   Then if you can tell us the

22   results presented here on this slide.

23             A.   So when you work through all of

24   that math, basically, you actually don't get a

25   wildly dissimilar allocation, depending on whether



1    you're talking about the business sales or the

2    residual patent sales.  But basically, the US gets

3    the largest share, 43 percent of the total in both

4    cases.  Canada gets the next largest share that's

5    actually fairly close to the US share:  41 percent

6    of the business sales and 39 percent of the

7    residual patent sales.  And EMEA gets between 16

8    and 18 percent, depending on which sale you're

9    talking about.

10                   Q.   And if we go to the next category

11   of assets, customer-related assets and goodwill, if

12   you can bring us through that category as

13   addressed.

14                   A.   Sure.  Our view is that there are

15   a number of other important asset categories to

16   consider here which are key components, in our

17   view, of the sale of these sale transactions, the

18   business sale transactions, but they are difficult

19   in their individuality to value; and as such, we

20   treat them together as a residual category.

21                   So the first category is

22   customer-related assets, and that has, as we have

23   thought about it, two main components.  One is the

24   customer contracts themselves, which provide

25   contractual basis for future revenue, and then the



1    relationships with the customers, which also are
2    certainly no guarantee of future business, but they
3    are the door-opener and they are the facilitator of
4    all future business.
5              And then there's what I'll call more
6    infrastructure-oriented customer-related assets in
7    your sales force:  your distribution, your customer
8    support structures, which were globally set up.
9    And having someone who speaks the language in a
10   non-English-speaking country is an incredibly
11   important element of that infrastructure.
12             And lastly, we have goodwill.  And
13   goodwill is traditionally thought of as all of
14   those things you otherwise can't separately value.
15   And it would include things like the value of the
16   workforce, the value of the trademarks.  Remember,
17   the trademarks includes more than just the Nortel
18   brand.  It includes all of the different product
19   names that you were hearing from the prior witness
20   about.  And those are important elements of the
21   continuity of the business.
22             And then lastly, it includes business
23   synergies.  Now, I want to be clear.  We're
24   unfortunately going to use the word "synergy" in
25   two different contexts in this presentation.



1   There's the IP synergies that Mr. Malackowski will

2   talk more about.  But this business synergy is the

3   traditional synergy that you would think of when a

4   strategic party acquires a business.

5            And so an obvious example may be if I

6   have two finance staffs within a business and I

7   acquire one of the businesses, I can get rid of

8   some of the people in that finance staff, so that

9   creates value.

10            In this context, I think probably the

11   more significant synergy opportunity was actually

12   to be putting the purchasers' products through the

13   Nortel customer relationships, so selling the

14   purchasers' products through the Nortel customers.

15   And these are significant -- that is a significant

16   opportunity.  We'll talk a little bit more about

17   how some of the purchasers viewed that.

18            As it says on the bottom of this slide,

19   we allocated this residual category of value to the

20   different debtor entities on the basis of 2008

21   revenues.

22            Q.   In explaining goodwill, you do

23   include a workforce value.  Can you just very

24   briefly explain to us what's captured, what you're

25   referring to by "workforce value."



```
 1                      A.    The workforce that Nortel had was

 2      a very seasoned, expert workforce and had

 3      long-standing customer relationships.  You heard

 4      Mr. Hall just moments ago talking about the number

 5      of years he had been at Nortel, the number of times

 6      he had gone to visit customers.  And that, I think,

 7      existed throughout all of their customer-facing

 8      organization.

 9                      It also exists on the purchasing side.

10      Nortel did not manufacture many of its products;

11      they outsourced that.  And having relationships

12      with those suppliers is a key element of this.

13                      So in my view, workforce value is much

14      more than what it would cost me to go out and get a

15      search firm to hire somebody.  It was the value of

16      the embedded knowledge and expertise and

17      relationships that your in-place workforce has.

18                      Q.    Please tell us why you believe

19      that customer-related assets and goodwill are a

20      distinct or separate category of assets or class of

21      assets separate from intellectual property.

22                      A.    To me it is almost definitional

23      that the customer-related assets and goodwill are

24      separate from IP.  And I think we see that in

25      Nortel saying much the same thing in their
```

 Neeson&Associates   W&F

1   materials.

2           So when you look at the selling

3   memorandums that they gave to prospective

4   purchasers at the time the business sales were

5   done, they went into a lot of detail -- and we'll

6   show you some of this in a moment -- but they went

7   into a lot of detail as to who the customers were.

8   And it wasn't something that was just kind of lost

9   and blended into the technology.  Certainly

10  technology is a very important element in Nortel's

11  business.  But the customer relationships were

12  distinct and complementary, but important.

13          In NNL's financial records, when they

14  themselves did purchase price allocations, they

15  treated customer assets as a separate asset

16  category.  And then when they did the allocation of

17  the UMTS proceeds in the sale to Alcatel, similarly

18  you see customer assets and goodwill being distinct

19  from IP.

20          I think the buyers clearly also

21  supported that view.  When you look at their

22  allocations, purchase price allocations, there is a

23  majority of the purchase price that they allocated

24  to customer-related assets and goodwill when you

25  combine those two.



```
 1                   And similarly, the business line
 2   purchasers took nonexclusive licenses for the
 3   shared IP.  And from my perspective, having worked
 4   with purchasers of assets, if what the business --
 5   if what the business purchasers were doing was only
 6   purchasing IP, they would not have settled for
 7   nonexclusive licenses to the IP that they were
 8   using to run the business.
 9                   So again, I'm not arguing that IP is
10   not a key component here; but clearly they were
11   looking at other assets.
12                   Q.   And the buyers of the businesses
13   who treated goodwill as a separate asset, were they
14   also in the technology business similar to Nortel?
15                   A.   Yes.  So many of the purchasers
16   were other telecom equipment and providers
17   themselves.  So they had their own IP in many
18   cases.
19                   MR. MAGUIRE:  Judge Gross and Justice
20   Newbould, riveting as this is, I am aware that I
21   have pushed us past our anointed hour for lunch.
22   So if this is a good time to break, maybe we could
23   stop here.
24                   THE US COURT:  All right.  That's fine
25   with me and I hope with Justice Newbould as well.
```

Neeson & Associates     W&F

```
 1   And we'll come back at five after 2:00.

 2              MR. MAGUIRE:  Thank you.

 3   -- LUNCHEON RECESS TAKEN AT 12:50 P.M. --

 4   -- UPON RESUMING AT 2:13 P.M. --

 5              THE US COURT:  Justice Newbould.

 6              THE CANADIAN COURT:  Judge Gross.

 7              THE US COURT:  Whenever you're ready,

 8   Mr. Maguire.  Don't sell yourself short.  It's

 9   riveting testimony.

10              MR. MAGUIRE:  Thank you for that.

11   We'll try to keep it up.

12              THE US COURT:  All right.

13              BY MR. MAGUIRE:

14              Q.   Before our lunch break we had been

15   talking about this last bullet on our slide about

16   the buyers taking nonexclusive licenses to shared

17   IP.  And you had explained that if what the buyers,

18   the purchasers of the businesses were doing was

19   only buying IP, they would not have taken

20   nonexclusive licenses.

21              Mr. Huffard, if you could explain that

22   testimony and explain why that is significant to

23   your view that customer-related assets and goodwill

24   are a distinct asset class from IP.

25              A.   Sure.  For the nonexclusive
```



```
 1   licenses that were, in essence, granted by
 2   Rockstar --
 3              THE CANADIAN COURT:  Just --
 4              THE WITNESS:  I'm sorry.  Is there a
 5   question?
 6              THE US COURT:  I think Justice
 7   Newbould --
 8              THE CANADIAN COURT:  We're having
 9   trouble hearing you.
10              THE WITNESS:  Can you hear me now?
11   -- OFF THE RECORD --
12              THE US COURT:  You might want to ask
13   the question again, Mr. Maguire, just to be on the
14   safe side.
15              MR. MAGUIRE:  Let me do that.
16              BY MR. MAGUIRE:
17              Q.   And it's really asking you if you
18   can explain to the Courts why it is significant to
19   your view that customer-related assets and goodwill
20   are distinct from IP; why it is significant to that
21   view the fact that the buyers of the lines of
22   business took nonexclusive licenses.
23              A.   Sure.  So from my point of view,
24   having worked with many purchasers of distressed
25   assets and distressed businesses, it seems quite
```

Neeson&Associates   W&F

1    clear that the purchasers themselves of the

2    businesses here could not have simply been looking

3    at this as a collection of the IP and that was the

4    only thing they were focused on.

5                    And one of the points to support that

6    point of view is that, in fact, for many of the

7    most important pieces of technology and of IP, they

8    took nonexclusive licenses back from the Rockstar

9    Consortium, and those nonexclusive licenses were

10   shared with other business lines who also used that

11   technology as well as by the Rockstar Consortium

12   themselves.

13                   So as it relates to those important

14   pieces of technology, the purchasers had no real

15   protection.  These nonexclusive licenses were

16   clearly, I think, inferior to actually taking title

17   to the technology that they did directly purchase

18   or, in the alternative, if they had taken exclusive

19   licenses.

20                   But the nonexclusive licenses I

21   think -- and we'll talk about this in a little

22   bit -- were part of a conscious strategy that I

23   believe the Nortel management pursued to maximize

24   the value of the estates by separating some of

25   their more important technology and putting it into



```
 1   the Rockstar portfolio and treating these business

 2   sales really as sales of businesses.

 3                  Q.   Thank you.

 4                  Now, we have three slides now where

 5   we're going to look at the top three business

 6   sales.  But before we turn to them, let me just ask

 7   you, a ballpark, how much do the top three business

 8   sales --

 9                  MR. ROSENTHAL:  Bill, stop for a

10   second.  We've got a technical problem.  Justice

11   Newbould is trying to speak, but his microphone --

12                  THE US COURT:  Still can't hear you,

13   Justice Newbould.

14                  THE CANADIAN COURT:  Can you hear me

15   now?

16                  THE US COURT:  Yes.

17                  THE CANADIAN COURT:  Okay.  I just

18   wanted to understand an answer that Mr. Huffard

19   gave.  He said they took back nonexclusive licenses

20   from Rockstar.  Who is the "they" that took back

21   nonexclusive licenses from Rockstar?

22                  THE WITNESS:  Can you hear me now?

23                  THE CANADIAN COURT:  Yes.

24                  THE WITNESS:  This is going to get to

25   be a bad joke by the end of the hearing.
```



1                    I'm talking about the purchasers of the
2     individual business units.
3                    For any of the technology which was
4     shared, not predominantly used by a single business
5     line, the IP for that technology was put into the
6     Rockstar portfolio, and then the individual
7     purchasers who used it -- and by definition, there
8     were multiple lines of business that used the
9     shared technology -- took nonexclusive licenses
10    back in order to allow them to use the technology.
11                   THE CANADIAN COURT:  Thank you.
12                   BY MR. MAGUIRE:
13         Q.   Before we turn to the top three
14    business sales, how much of the total proceeds from
15    the business sales do the top three make up?
16         A.   Sure.  Actually, the business
17    sales, as I'm sure the Courts are aware, were very
18    concentrated in terms of where the proceeds
19    actually came from.  The top three business sales
20    constituted approximately 85 percent of the total
21    business sale proceeds.
22         Q.   And the first of the business
23    sales we want to turn to -- and I don't know if you
24    have it up on your screen.  Hopefully the Courts
25    have it up.  There we go.



 1                   This relates to the sale, the CDMA
 2    sale.
 3                   A.   Right.  So in order to kind of go
 4    through these next couple pages sufficiently -- I'm
 5    not going to literally speak to every point on it.
 6    But on each of these, the points we're trying to
 7    make are these are big businesses that constitute a
 8    predominant portion of the business sale proceeds.
 9                   They have on the right-hand side of
10    each of these companies -- on each of these pages
11    significant customers.  And anybody just looking at
12    the names will recognize that these are very large,
13    sophisticated clients.  You can't walk in off the
14    sidewalk and pitch a product to them.  They have
15    internal processes.  The relationship, the
16    credibility that Nortel had developed with each of
17    these over the years is a critical part of it.
18                   And each one of them in their public
19    commentary at or shortly after the time of the
20    business sales comment on how important the
21    customers are as they consider the totality of the
22    assets that they purchased in the business sales.
23    And we've highlighted what we felt were some of the
24    more interesting subsections of their quotes in
25    red, just for your ease.  I'm not going to read



 1    those individually.  I think you can skim those.

 2              So the biggest asset sale was for the

 3    CDMA business.  Ericsson purchased it; and the

 4    paraphrase is that this gave them important access

 5    and entree into the US market with large customers.

 6              Then if you want to go to the next

 7    page, the second largest sale was the enterprise

 8    sale.  Again, in this business line they had not

 9    just telco customers; they had large corporations

10    more generally.  And you can see, these are very

11    sophisticated accounts.  And Avaya's commentary

12    down here in red, "Enhances its customer base,

13    broadens its indirect sales channel and provides

14    greater ability to compete globally."  They were a

15    key asset.

16              Although it's not in red, I do want to

17    focus on the top quote from Avaya commentary,

18    public commentary, which is talking about their own

19    business, to be clear.  It's not talking about the

20    acquired Nortel business.  But within their own

21    business they viewed -- and again, Avaya is a telco

22    equipment provider, just like Nortel.  Within their

23    own business, they view the core of their business

24    as a large and diverse global installed customer

25    base.



1            So again, you're hearing buyers echo

2    the point that the customers really were an

3    important part of the assets that they purchased.

4            The next page, just to hit on quickly,

5    is the MEN/Optical Networks sale, almost a little

6    bit more than three-quarters of a billion dollars

7    of proceeds.

8            Here again, in significant brand-name

9    customers, and in terms of the public commentary,

10   we see them saying something even more telling,

11   which is that they're able to reengage with the MEN

12   customers and then sell Ciena products to the

13   Nortel customers.  That's what this reference to

14   early success is in respect to cross-selling.

15           And that is the kind of activity that

16   gives rise to the business synergies I was talking

17   about earlier.  That's how they're creating value,

18   not necessarily through the technologies they

19   purchased, although obviously the technology was an

20   important part of the assets that they purchased,

21   but through the customer access.

22           Q.   If you turn to the next slide, we

23   have some testimony from witnesses from the

24   Canadian parent company, Nortel Networks Limited.

25   The Courts have heard testimony from Mr. Paviter



```
 1    Binning, who is at the bottom of this page,
 2    although have not heard live testimony from the
 3    chief executive officer, Mike Zafirovksi, or the
 4    chief technology officer, John Roese.  But if you
 5    could please explain to the Courts the significance
 6    of the excerpts of testimony that are presented on
 7    this slide.
 8               A.   Sure.  Again, it's the same
 9    general observation, which is that customers are an
10    important asset of the business; it's not just a
11    technology company.
12               And this is -- in fact, everybody on
13    this page is an NNL officer making those sorts of
14    comments.  So I won't read the whole thing.
15               Mr. Zafirovski is quoted as saying,
16    "Obviously, customers are very important."
17               Interestingly, I think Mr. Roese in his
18    second answer says, "If no one knows who you are,
19    great technology goes nowhere," which is pointing
20    out what I believe is the kind of synergistic
21    relationship between technology and the
22    customer-related assets, which is they both go
23    together and create the viable enterprise.  You
24    can't have one without the other.
25               Q.   And what's the significance
```



 1    of Mr. Binning's testimony?

 2              A.    And then Mr. Binning is actually

 3    pointing to what we just talked about, which is

 4    some of the purchasers actually purchased the

 5    business intending to move their technology onto

 6    the customer platforms.  So it wasn't always just

 7    an acquisition of technology.

 8              Q.    Then if we turn to the next page,

 9    we have excerpts from the testimony of Mr. Peter

10    Newcombe, whom the Courts have heard earlier in

11    this trial.  If you can just tell us what the

12    significance of this testimony is.

13              A.    Right.  So again, I'm just going

14    to hit on some of the text that's in italics in

15    red, where Mr. Newcombe is talking about it being

16    quite an investment to penetrate a specific

17    account.

18              Again, it's consistent with my earlier

19    commentary:  You can't just walk in off the

20    sidewalk to pitch a new product to one of these

21    accounts.  It takes history.  It takes

22    relationships.  It takes global presence.  You need

23    to have support and selling and distribution

24    infrastructure around the world.

25              And then he's also talking about in his



```
 1   last answer here -- and this is specifically
 2   targeted towards the CDMA sale -- you know, that at
 3   least from his point of view, the purchaser was
 4   buying that to get access to the marketplace in
 5   North America.  And the intention was not to
 6   actually focus on the CDMA technology, which was
 7   the old generation, but rather use those customer
 8   relationships and inroads, which they had not been
 9   able to previously make themselves, to launch their
10   own technology into that customer base.
11                   Q.   So then can you sum up the results
12   of your analysis with respect to the category of
13   assets that you're calling customer-related assets
14   and goodwill.
15                   A.   Sure.  So again, the
16   customer-related assets and goodwill is the
17   residual category in our analysis.  It comes out to
18   roughly $2 billion in total.  And the allocation
19   that we do, which is again based on a revenue
20   metric in 2008, would allocate 69 percent of that
21   total to the US, 21 percent to EMEA, and 10 percent
22   to Canada.
23                   Q.   Why does EMEA get so much less
24   than the United States?
25                   A.   Well, again, it's in -- all of
```



     1    this is in proportion to the size of their markets

     2    in terms of their own revenues in the markets.

     3              Q.   And is that the same explanation

     4    for why Canada gets so much less than EMEA in this

     5    category?

     6              A.   Yes, yes.

     7              Q.   If we step back for a moment, can

     8    you explain why it is important to treat different

     9    assets differently, different classes and

    10    categories of assets differently rather than simply

    11    lumping these customer-related assets and goodwill

    12    together with IP.

    13              A.   Sure.  I think, as has obviously

    14    been the subject of extensive discussion already in

    15    this trial, as it relates to intellectual property,

    16    I think there's a specific set of contracts that

    17    govern the ownership and the legal rights that

    18    relate to that.  And those contracts, at least to

    19    my understanding, do not specifically relate to

    20    these sorts of assets.

    21              And so what might be an appropriate

    22    allocation of intellectual property, whether it's

    23    on a contribution sort of basis, as we've talked

    24    about, or a licensing theory, that's different when

    25    you start to talk about customer-related assets.



1    It's different when you start to talk about

2    elements of goodwill, such as synergy.

3              Synergy, as an example, doesn't

4    necessarily have anything to do with your

5    historical R&D spend.  It has more to do, in my

6    point of view is the scale of your business and the

7    opportunity to create value for the purchaser.

8              Q.   If we were to take an example, let

9    us say there was a valuable contract that the US

10   firm had with a customer, $100 million contract.

11   In terms of determining the ownership of that, when

12   the various estates filed bankruptcy, that contract

13   is an asset of which estate?

14             A.   Of -- I'm sorry.

15             Q.   The US contract, the contract by

16   the US company.

17             A.   I assume it would be an asset of

18   the US estate if it's a contract directly with the

19   US Debtors.

20             Q.   So in your methodology then, the

21   contracts that are owned by the US estate would be

22   attributed -- the proceeds of those would be

23   attributed to the US estate?

24             A.   Well, our methodology, again, is

25   allocating on the basis of revenue.  So to the



1    extent that that contract only generated revenue

2    within the United States, then 100 percent of it

3    would be allocated to the United States.  If it was

4    a contract that generated revenue more broadly, it

5    would be split among the different geographies that

6    generated that revenue.

7                 Q.    And if that same contract, that

8    asset, was treated as intellectual property, as,

9    say, the Canadian expert Mr. Green treats it, then

10   how would those proceeds go?

11                A.    My understanding of his

12   methodology basically has the marginal dollar of

13   intellectual property, which under your scenario

14   would include these contracts -- the marginal

15   dollar gets allocated 100 percent to Canada.  And

16   so it would all be given to Canada.

17                Q.    If we turn to the next slide with

18   respect to the asset class evaluation, can you walk

19   us through what we have here.

20                A.    Sure, this is a high-level summary

21   of how we allocate the business sale proceeds and

22   the residual patent proceeds among the different

23   asset classes.  And it largely speaks for itself.

24   It's consistent with what we've discussed earlier,

25   which is the net tangible assets are a relatively



1   small component, 4 percent of just the business

2   sales, if you look at it from that perspective.

3              Customer-related assets and goodwill

4   are the majority of the business sales, as we

5   allocate it, and IP is 25 percent.

6              Now, on the other hand, as you look at

7   the residual patent sale, that's obviously

8   100 percent IP.  Now, this is one way of looking at

9   it.

10              I think if we could move to the next

11   page, there's another way of looking at it.  And

12   this is the chart that we actually saw earlier in

13   the presentation, which I personally believe is a

14   more illustrative way to look at it, which is just

15   looking at the business sales and the residual

16   patent sales combined.

17              And in that instance the net tangible

18   assets are 2 percent, still a very small sliver.

19   The customer-related assets and goodwill is

20   29 percent, and the total IP is 69 percent.

21              The point I'm trying to make by

22   presenting these two different views of it is that

23   there are many people who say this is a technology

24   company.  How could it be when you look at the

25   business sales that technology, in fact, does not



1  represent a majority of the value and the

2  customer-related assets and IP, in fact, do

3  represent a majority of the value.  And I think

4  what really went on here historically is there's a

5  commingling of these two sale processes, and that

6  is the shared IP.  It was put into the Rockstar

7  portfolio.

8          And the effect of taking that IP out of

9  the individual business sales and putting it into

10  the Rockstar deal was to really make Rockstar the

11  IP sale, and the individual business sales were

12  sales of businesses with the necessary IP to run

13  them but not big piles of IP.  And then as a matter

14  of conscious strategy -- we'll talk about this a

15  little bit on the next page -- the company moved

16  the IP value out of the business sales into the

17  Rockstar transaction.

18          And so it's not surprising to me that

19  when you look at it on the basis of the business

20  sales alone, that you see IP is perhaps a smaller

21  percentage of the total than you would expect for a

22  technology company.

23          And if we go to the next page, we can

24  see Mr. Veschi, who was the chief IP officer,

25  commenting that as a matter of conscious strategy,



1   they put as much of the technology into the

2   residual co. IP portfolio as they could, because

3   that was their view of how to maximize the value to

4   the estates.

5              And I think that turned out to be a

6   very good decision.  And by putting the shared IP

7   into the Rockstar deal, they were able to put the

8   technology IP itself into the hands of people who

9   really valued it, not into the hands of people who

10  just wanted to run a business.  So I think it's

11  consistent with that.  And that to me gives me

12  comfort when I look at the allocation of the assets

13  that I'm not overallocating in some way value to

14  customer-related assets and goodwill.

15             Q.   Now, can you explain for us where

16  you're conclusions fall and how they compare with

17  the conclusions of other experts in this case?

18             A.   Sure.  So this is, again, a high-

19  level summary of, in the center pie, the EMEA

20  Debtors, how we would propose to split the overall

21  proceeds among the three main debtor estates, with

22  50 percent going to the US, 32 percent going to

23  Canada, and 18 percent going to EMEA.

24             The Canadian Debtors are the pie on the

25  left.  I hope I'm not mischaracterizing their



1    numbers somehow.  I'm not trying to put words in

2    their mouth.  But my understanding of their

3    proposal is that Canada would get 82 percent, the

4    US would get 14 percent, and EMEA would get

5    4 percent.  So that's quite diametrically opposed

6    to what EMEA is suggesting.

7              The US Debtors on the right-hand side

8    propose that they would get 72 percent of the

9    total, EMEA would get 17 percent, and Canada would

10   get 11 percent.

11             Now, again, all of the allocation

12   numbers that we've talked about so far have been

13   presented on the contribution approach using

14   historical R&D spends.  So I just want to be clear.

15   We'll talk in a moment how this would look on a

16   licensing approach.

17             Q.   You have some criticisms of the

18   Canadian allocation methodology; right?

19             A.   Yes, I do.

20             And in my report, especially the

21   rebuttal report, we go into detail in terms of the

22   critique.  I thought it might be helpful here to

23   summarize my points from a more commercial or top-

24   level point of view.

25             If the Canadian approach is right and



1    that the Canadian estates are able to gain the vast

2    majority of the IP value and, generally speaking,

3    the intangible asset value, I personally feel that

4    that just gives you a very irrational economic

5    result.  It wouldn't make sense if that was

6    actually the right view of the world.

7                If that was the right view of the

8    world, I can't imagine that the US and EMEA Debtors

9    would have agreed to terminate the licenses that

10   they needed to terminate to facilitate these asset

11   sales.  If they had been told in advance that that

12   was -- that's the way the world works, no one would

13   have agreed to it.  Without them terminating their

14   licenses, my belief is no purchaser would have

15   bought the assets that they bought.

16               And it also, I think, flies in the face

17   of how R&D was funded on a global, centrally

18   orchestrated, commingled basis.  It would make no

19   sense that all of these different debtor estates

20   would be spending billions of dollars of R&D money

21   developing IP, and as soon as someone in Canada

22   makes the decision to sell the business, everything

23   that's in the pipeline gets given to Canada for no

24   proceeds, no consideration.

25               None of that, to me, makes commercial



1    sense.  I'm not at all speaking about what the

2    agreements say.  But if that's what the agreement

3    says, I don't think anyone would have agreed that

4    that's what they thought it said.

5              I do think, as we talked about earlier,

6    that it's inconsistent with Nortel's own practices

7    in terms of identifying different assets in the

8    UMTS/Alcatel sale in terms of how they did their

9    internal PPAs.

10             And then also within this general

11   category of IP that the Canada experts identify are

12   clearly assets that they don't own.  Mr. Maguire

13   asked earlier questions about customer contracts.

14   That just gets lumped into their overall IP

15   package, and they don't own that hypothetical

16   contract in the US.  So they end up getting assets

17   that they don't even own.

18             Q.   Now, you mentioned the alternative

19   license approach that you have put forward in your

20   report, the EMEA experts have put forward.  If you

21   can, I guess, briefly give us some key takeaways

22   concerning that alternative approach.

23             A.   Sure.  As you talked about

24   earlier, again, it is ultimately a legal

25   determination that the judges need to make as to

 Neeson&Associates   W&F

1    what's the right approach.  But if the license

2    approach is selected, we believe that it should be

3    applied only to the intellectual property and not

4    broadly based to all of the assets, and that you

5    must include not only the value of the exclusive

6    licenses that each of the RPEs hold but also their

7    nonexclusive licenses into the rest of the world,

8    which do have value.  And you need to factor those

9    into the analysis.

10              Mr. Malackowski really does the more

11   detailed analysis, and he'll be prepared to speak

12   to it.  But I think at a very high level those are

13   two of the key elements of that approach that we

14   think need to be applied.

15              Q.   And applying that alternative

16   approach, you have the results here on our last

17   slide; right?

18              A.   That is correct.  One of the

19   things that you would notice:  That I'm in the

20   somewhat perverse position today of advocating the

21   contribution approach, which would give EMEA

22   18 percent, even though the licensing approach

23   would give us 31 percent.  So I would be happy if

24   that was the decision, but it seems to us that the

25   contribution approach is more consistent with the



1   way the company ran its business historically.

2              MR. MAGUIRE:  Thank you, Mr. Huffard.

3   Those are my questions, Your Honor.

4              THE US COURT:  Mr. Maguire, thank you,

5   sir.

6              MR. MARK:  Good afternoon.  Judge

7   Gross.  Good afternoon, Justice Newbould.

8   CROSS-EXAMINATION BY MR. MARK:

9              BY MR. MARK:

10             Q.   Mr. Huffard, my name is Alan Mark.

11  I'm from Goodmans, and I represent the Monitor and

12  the Canadian Debtors.

13             A.   Good afternoon.

14             Q.   Good afternoon.  Now, just a

15  little bit on your background, Mr. Huffard, to

16  start.

17             You are, as I understand it, and I take

18  from your description of your experience to my

19  friend, an investment banker?

20             A.   I won't take that personally; but,

21  yes.

22             Q.   Well, in a roomful of lawyers, you

23  won't find many people trying to one-up you.

24             And while you have done valuation work

25  in the course of your work, I understand,



1   Mr. Huffard, that you are not an accredited

2   valuator; is that correct?

3           A.   I have no specific accreditation

4   as a valuation expert.  I'm not actually aware of

5   anything that my competitors would have along those

6   lines.

7           Q.   In the field where you do

8   business, valuation associated with the investment

9   banking world, you and your competitors tend not to

10  be accredited valuators; is that correct?

11          A.   I believe that's correct.

12          Q.   And as I understand it, you've

13  never undertaken a course of study with a view to

14  obtaining an accreditation in valuation?

15          A.   Well, I have a master's of

16  business administration degree, which includes

17  finance classes, including valuation and other

18  related topics.  There's just no specific

19  accreditation other than an MBA that results from

20  that.

21          Q.   I understand that.  But you

22  understand, do you not, Mr. Huffard, that there are

23  a number of organizations that issue accreditations

24  for valuation, and they offer courses of study that

25  lead to those accreditations.  And I understand you



```
 1    have not taken any of those courses of study.
 2                   A.   That's probably fair to say.
 3                   Q.   All right.  And as I understand it
 4    as well, Mr. Huffard, in the course of your
 5    experience, you have never done a valuation of an
 6    IP company?
 7                   A.   What do you mean by an IP company?
 8                   Q.   You've never done a valuation of
 9    an enterprise which is predominantly an IP company.
10                   A.   Is Nortel predominantly an IP
11    company?  I'm just trying to understand the
12    distinction you're trying to make.  If a company
13    has operating business units, is that an IP company
14    or is that a real company that has an emphasis on
15    IP?
16                   Q.   Let's try and deal with the
17    predicate first.  Am I correct that you have never
18    done a valuation of an IP company?
19                   A.   I'm sorry.  I'm trying to
20    understand what you mean by an IP company.
21                   Is Nortel an IP company?
22                   Q.   Have you in the course of your
23    activities, your experience, done any valuations or
24    the allocating of assets in connection with
25    intellectual property companies?
```



```
1                    A.   We must -- I'm trying to get just
2      a better sense of what you mean by an "intellectual
3      property company."
4                    Q.   And do you recall that you were
5      deposed in this matter, Mr. Huffard?
6                    A.   Yes.
7                    Q.   And you were asked questions and
8      you gave answers?
9                    A.   I did, yes.
10                   Q.   And you were under oath that day?
11                   A.   Yes.
12                   Q.   And you understood, I take it,
13     that if you had any difficulty in understanding the
14     questions, you were free to ask the -- to pose your
15     uncertainty and ask for clarification?
16                   A.   Generally, I do, yes.
17                   Q.   Yes.  You've been deposed before.
18     It's not a new process to you.
19                   A.   That is correct.
20                   Q.   Could we bring up page 21 of the
21     transcript, please.
22                   So you have a hard copy, Mr. Huffard.
23     We also have that up on the screen in front of you.
24     Do you see that?
25                   A.   Yes.
```



```
1                    Q.   And at Line 20 on Page 21, you

2    were asked:

3                         "Question:  And have you, in the

4                    course of your activities that you have

5                    described before, done any valuations

6                    or the allocating of assets in

7                    connection with intellectual property

8                    companies?

9                         "Answer:  Not in connection with

10                   intellectual property companies."

11                   Were you asked that question; did you

12   give that answer?

13                   A.   I assume I did.

14                   Q.   And is that answer correct?

15                   A.   I'm still not, as we sit here

16   today, exactly clear what an intellectual property

17   company is.  I'm not trying to dispute the general

18   point.  I wasn't meaning to ask a very difficult

19   question.  I was just trying to get clarity on what

20   the question was.

21                   Q.   You had no difficulty answering it

22   at the time of your deposition?  You didn't require

23   clarification?

24                   A.   I don't remember actually the

25   specific question.  I'm not, again, trying to
```



```
 1   distance myself from it.  I just don't remember the

 2   facts and circumstances.

 3              Q.   Are you disputing that you were

 4   asked the question and gave the answer?

 5              A.   That's what I just said, which is,

 6   I'm not disputing it, but I don't remember it.

 7              Q.   And what difference does that

 8   make?

 9              THE US COURT:  I think we're bogged

10   down here, Mr. Mark.

11              MR. MARK:  So let's move on.

12              BY MR. MARK:

13              Q.   So Mr. Huffard, in preparing your

14   report, you took steps to familiarize yourself with

15   the relevant background information and evidence?

16              A.   I believe I did.

17              Q.   And your understanding of the

18   relevant background, I understand, is set out at

19   Part VI of your report; is that correct?

20              A.   I don't recall the actual section.

21              Q.   You have it in front of you?  If

22   you turn up page 9 --

23              A.   You're talking about the original

24   report?

25              Q.   Yes, your first report.  Page 9.
```



1    Do you see there's a heading "VI. Factual

2    Background"?

3                    A.    Yes.

4                    Q.    It says in paragraph 23:

5                          "To the extent necessary to inform

6                          my opinion regarding allocation of Sale

7                          Proceeds, my understanding of the

8                          relevant background of Nortel's

9                          operations is summarized below and

10                         based on Appendices 4, 6, 7 and 10 to

11                         19.  I have relied on these facts and

12                         the documents cited for the factual

13                         propositions set forth therein."

14                         Do you see that?

15                   A.    I do.

16                   Q.    And so the information and

17   background you relied upon in coming to your

18   opinions are based on the facts and information set

19   out in those appendices that you list there?

20                   A.    Yes, as of -- this was as of the

21   date of that report.

22                   Q.    As of the date that you formed

23   your opinions as expressed in your report, you

24   relied upon, and the information you had in your

25   possession, were the facts and information set out



1    in those appendices; correct?

2              A.   I believe that's correct.

3              Q.   And those appendices, as I

4    understand it, were not, in fact, compiled by you

5    but were provided to you by counsel; correct?

6              A.   I think it depends which appendix

7    you're talking about.  But there was a combination

8    of those two.

9              Q.   Well, I'm going to suggest to you,

10   Mr. Huffard, that each of those appendices, 4, 6,

11   7, 10 and 19, consist of information that was

12   provided to you by counsel rather than being

13   compiled as a result of your own view of the

14   record.

15             Q.   And you so told us on your

16   deposition, did you not?

17             A.   You're going to tell me that I

18   did.  I don't actually remember that fine part of

19   the discussion.

20             Q.   So in order to save time,

21   Mr. Huffard, if I was to tell you that that's what

22   you told us on your deposition, would you accept

23   that that is, in fact, correct?

24             A.   I'm willing to do that.

25             Q.   Thank you.



```
 1                    THE CANADIAN COURT:  Can you just point

 2    out, Mr. Mark, where that took place?

 3                    MR. MARK:  Yes, I'm just about to.  At

 4    page 52 of Mr. Huffard's transcript, there is a

 5    discussion going over about a page and a half where

 6    Mr. Huffard indicates the sources of the

 7    information.

 8                    BY MR. MARK:

 9             Q.   So Mr. Huffard, let's move on from

10    that and see what we can make of what your

11    understanding of Nortel was then at the time that

12    you came to the opinions expressed in your report.

13                    You understood, I take it, that within

14    Nortel, IP was considered the key driver of revenue

15    in each of Nortel's businesses?

16             A.   I certainly understood to be a key

17    driver of their revenue, yes.

18             Q.   Did you understand, Mr. Huffard,

19    that within Nortel, IP was considered the key

20    driver of revenue in each of Nortel's businesses?

21             A.   The only thing, as I sit here

22    right now, I'm just trying to think about it, as

23    you phrase that very carefully, is the word "each."

24    Certainly in aggregate it was a key driver.  There

25    are references and there are quotations that are
```



1   very similar to what you're saying, and I'm just

2   trying to remember if "each" was --

3              There were certainly -- for different

4   of their business units, technology played a

5   different role.  It was, without doubt, an

6   important part in every business.  But you're

7   trying to be very precise in your words, and I just

8   want to be careful as to how I answer.

9              Q.   Well, in fact, Mr. Huffard, it's

10  not my words; it's yours.  Could you open your

11  report, please, once again, to page 31,

12  paragraph 67.

13             A.   So I don't think it's --

14             Q.   Do you have that?

15             A.   Yes.

16             Q.   All right.  And it says, "The IP

17  is, in my opinion, clearly a distinction and

18  important aspect of each Business Sale.  Within

19  Nortel, IP was considered the driver of revenue in

20  each of the businesses."

21             Correct?

22             A.   Okay, I stand by my comment there.

23             Q.   Thank you.

24             And did you understand as well,

25  Mr. Huffard, that as a result of that view within



1   Nortel, under RPSM, all of the profits of the

2   business after routine returns were allocated were

3   to be allocated to the RPE entities based on R&D

4   capital stock?

5              A.   That is my general understanding.

6              Q.   And did you understand that, at

7   the time of the sales of the lines of business,

8   Nortel was in insolvency proceedings?

9              A.   Yes, I do.

10             Q.   And did you understand that at the

11  end of the 2008 Nortel wrote off all of its

12  acquired goodwill?

13             A.   I have general understanding of

14  that, yes.

15             Q.   And did you understand that at the

16  time of Nortel's insolvency filings, its business

17  was not generating positive cash flows?

18             A.   Yes.

19             Q.   Now, let's discuss, Mr. Huffard,

20  if we could, your mandate in this case.  And you

21  had some discussion with your counsel about that

22  this morning, and I just want to revisit that

23  briefly, if I might.

24             If you keep your report in front of

25  you, please, and you open it up to page 2.  And we



1  see there in the paragraphs under the heading "II.

2  Assignment," that's the description of your

3  mandate, Mr. Huffard.

4           And if we look at paragraph 4, it says,

5  "Based on the allocation position papers submitted

6  in this case, I understand it to be common ground

7  among the parties that the Sale Proceeds of the

8  Business Sales and Residual Patent Sale should be

9  allocated among the Selling Debtors according to

10  the value of the interests each of them transferred

11  and rights each of them relinquished in connection

12  with each sale."

13           And did you understand that to, in

14  essence, state the task that you were engaged in?

15           A.   No.  I'm confused by the question,

16  because that's not a statement of a task.  That's a

17  statement of a principle.

18           Q.   Well, and do you understand that

19  that is the applicable principle that you were

20  engaged to assist in resolving.

21           A.   Well, as I said earlier today,

22  sir, what I was asked to do had three components:

23  What asset classes should we be talking about? how

24  do you value them? and how do you allocate them?

25           I think this paragraph 4 here is sort



1   of an overlay to all of this, which is as a

2   framework for coming up with what to me would seem

3   like an equitable allocation, a fair allocation.

4   It would be allocated according to the interests

5   that each selling debtor transferred and the rights

6   that they relinquished.

7               Q.   Right.

8               A.   So it's more of a framework than a

9   directive list of tasks.

10              Q.   But you understood that to be the

11  framework that all the parties, including your

12  client, EMEA, had concurred was the framework for

13  the dispute we now have before us?

14              A.   Yeah.  And again, I don't think --

15  as I said in the first part of that sentence, I

16  understand it to be common ground.  I don't mean

17  that there was some explicit agreement or something

18  that the Courts had ordered.  But it seemed, just

19  reading people's papers and in talking with our

20  counsel, that this as a basic principle was not

21  controversial.

22              Q.   And you felt that it was

23  appropriate to record in your report what you

24  understood to be the framework for analysis to be?

25              A.   Yes.



 1                    Q.   And then moving on to paragraph 5,
 2    these are, as I understand it, Mr. Huffard, am I
 3    correct, the three questions that you were
 4    instructed by counsel to consider?
 5                    A.   That is correct.
 6                    Q.   So what you were answering is the
 7    questions you were directed to answer by counsel;
 8    correct?
 9                    A.   Yes.
10                    Q.   And then we turn over to heading
11    III on Page 3, and you give the summary of
12    conclusions.  And just stepping away from the
13    report for a moment, Mr. Huffard, am I correct that
14    the analysis that you undertook involved
15    essentially two steps?  First was identification of
16    the asset classes and ascribing a value to each of
17    those asset classes, and a value being a portion of
18    the purchase prices; correct?
19                    A.   Portion of the purchase price,
20    yes.
21                    Q.   And then the second task that your
22    mandate involved was then considering how those
23    values ought to be allocated to the selling
24    parties; correct?
25                    A.   Well, it's sort of a matter of



1    semantics, not a big deal.  But I would describe

2    that as three steps:  The classes, the value and

3    the allocation.

4                    Q.   And we can deal with the first

5    step rather easily.  You identified three asset

6    categories as you've discussed:  The tangibles, the

7    IP, and the last category, customer-related assets

8    and goodwill; correct?

9                    A.   Correct.

10                   Q.   And from there you moved to the

11   second stage of the analysis, which was the

12   ascribing of a value to each of those classes of

13   assets; correct?

14                   A.   Correct.

15                   Q.   And if you turn over to page 35 of

16   your report, this is where in your report you

17   describe what you did in connection with that task

18   and the conclusions you came to; correct?

19                   A.   That is correct.

20                   Q.   And let me clarify, in fairness,

21   particularly in relation to the business -- you did

22   a separate analysis for the business sales and for

23   the residual patent sale; correct?

24                   A.   That's correct.

25                   Q.   And then at paragraph 77 you



```
 1    describe what you did with respect to the proceeds

 2    of the sale of the business to accomplish the

 3    second stage of the analysis; correct?

 4                  A.   I believe that is correct,

 5    although I'm not sure I exactly followed your

 6    statement.

 7                  The second step is, we took the

 8    proceeds and divided that up among the asset

 9    classes.

10                  Q.   Right.  And you say, "Having

11    identified the categories of assets sold in each

12    Asset Sale, the second step is to allocate the

13    price achieved to each of the asset classes within

14    each Business Sale, and you call that the

15    Blackstone methodology; correct?

16                  A.   Yes.

17                  Q.   And then you go on to describe

18    that.  Am I correct that what you've done, if we

19    looked at the bullets first, you valued the net

20    tangible assets; correct?

21                  A.   Yes.

22                  Q.   And you did not undertake any

23    independent valuation of those assets; rather, you

24    used the book value of the tangible assets as of Q4

25    2009?
```



```
 1                      A.    That is correct.  Given the
 2    separation in time and given the complexity of
 3    actually valuing those assets relative to the small
 4    size in the overall scheme of things, we have used
 5    just the book value.
 6                      Q.    And then the second step --
 7                      A.    Let me just -- if I could add one
 8    more comment as to book value.  Many of those
 9    assets are current assets, being accounts
10    receivable or inventories or cash.  In those cases
11    the book values are typically pretty close to the
12    actual fair market value.  It's really only in the
13    category of the longer term fixed assets that
14    there's a potential for deviation.  But again, this
15    is a small number in the overall scheme of this.
16                      Q.    Right.  And then the second step,
17    you say that based on Mr. Malackowski's report, you
18    ascribed a value to the IP that was sold in each of
19    business sales; correct?
20                      A.    Correct.
21                      Q.    And as I understand it, you did
22    not undertake your own independent valuation of the
23    IP, but rather you relied upon and incorporated
24    Mr. Malackowski's conclusions?
25                      A.    That is correct.
```



```
 1                      Q.   You did no review or analysis on
 2     your own to satisfy yourself that Mr. Malackowski's
 3     valuation of IP was fair and reasonable; you simply
 4     accepted his conclusions?
 5                      A.   Well, I did read his report.  I
 6     did talk to his team about their approaches, he and
 7     his team about their approach.  And at a kind of a
 8     commercial point of view, I satisfied myself that
 9     the way they were conceptually approaching it
10     seemed reasonable.  But I did not audit his
11     individual calculations or his assumptions.
12                      Q.   So you thought he was taking an
13     appropriate overall approach, but you did nothing
14     further to satisfy yourself that how he carried out
15     that exercise and the assumptions he used were
16     appropriate; you simply relied on him?
17                      A.   I did rely on him.  I think he and
18     his firm have an excellent reputation, and I think
19     it's something I felt comfortable doing.
20                      Q.   So, for example, when it comes to
21     the royalty rates he used in the relief-from-
22     royalty approach, you did not undertake any
23     investigation of your own?
24                      A.   I did not.
25                      Q.   And then the third step of the
```



1    Blackstone methodology, as you call it, was to add

2    up A and B, the intangibles and Mr. Malackowski's

3    value for IP, and subtract them from the sale

4    proceeds?

5              A.   That is correct.

6              Q.   You undertook -- and the result of

7    that calculation is what you have called the

8    residual category of customer-related assets and

9    goodwill; correct?

10             A.   Correct.

11             Q.   And you have undertaken no

12   independent or separate valuation of that category

13   as a whole or any of its components?

14             A.   That is correct.  I personally am

15   not aware of any valuation method for those kind of

16   assets that gives you actually a reliable answer.

17   So I think I'm quite comfortable that the total

18   purchase price is whatever it was and that if you

19   subtract the other two pieces, you get a residual.

20   And that's the residual.

21             Q.   So you're indicating to us that

22   with respect to the category of assets that you

23   call customer-related assets, you've undertaken no

24   attempt to value that class of assets separately?

25             A.   The way you couch that question,



```
1    it sounds like there are things I chose to ignore.
2              I'm not aware of any methodology that
3    is commonly accepted that provides a reliable fair
4    market value of the sorts of assets that go into
5    that goodwill.  That is the reason goodwill exists,
6    is because it is difficult to discretely value it.
7              Q.   You are aware, are you not,
8    Mr. Huffard, that some of the experts in this case
9    and purchasers of these lines of business have
10   undertaken valuations of the customer assets as a
11   discrete class?
12             A.   I am generally aware of that, yes.
13             Q.   And you're aware that experts in
14   this case and the purchasers of these lines of
15   business undertook valuations of the workforce as a
16   discrete class?
17             A.   Yes, but I stand by my earlier
18   comment, which is, I don't believe that there is a
19   reliable method.  Just the simple fact that they
20   went through the process doesn't give them a
21   reliable outcome.
22             As an example, when you talk about
23   valuing customer assets, you will see that in some
24   of the purchaser IP PPAs and other places, what
25   they're doing is generally taking just the present
```



1   value of the contracts that are in place as of the

2   closing date and present-valuing that back to a

3   present value.

4            That does not capture, in my view, the

5   significant value that customer relationships, in

6   fact, represent for a company like Nortel.  That is

7   just a subcomponent.  And I chose, rather than to

8   take one of those approaches, which to me

9   significantly undervalues --

10            And similarly, on employees, there are

11  other experts who have chosen to look at the cost

12  that a company would have to invest to replace the

13  workforce.  My view is that that is a small

14  fraction of the value of the workforce.  It's

15  tangible.  It's calculable.  Both of them are

16  tangible and calculable.  But they significantly

17  underestimate the true value of those assets.

18            And that's why maybe in a way that was

19  in some sense less precise but hopefully more

20  accurate, I've included them in this residual

21  category.

22            Q.   And to be clear, Mr. Huffard,

23  because your residual category is simply a

24  residual, that if Mr. Malackowski's conclusions

25  about the value of IP change, then automatically



```
 1    the value of the residual category changes as well;
 2    correct?
 3              A.    That is correct.
 4              Q.    And just to be clear, even though
 5    you consider some of those other methods less than
 6    reliable, you undertook none of them in order to
 7    give you any stratum of information that you could
 8    use to at least do a reasonableness check on the
 9    results of the calculation?
10              A.    I do not believe that undertaking
11    those exercises would have given me a
12    reasonableness check in fact, it would have
13    produced misleading information.
14              Q.    And with workforce valuation,
15    we've certainly experts and purchasers do
16    valuations of the workforce.  And you're saying
17    those are unreliable as well?
18              A.    Yes, that is my perspective.
19    Those look really at the kind of replacement cost
20    of the workforce just in terms of search fees and
21    training and -- but I don't think that captures at
22    all the richness of and importance of the
23    workforce's knowledge and tenure.
24              Q.    And just lastly on this point
25    then, as I understand it, to be clear, Mr. Huffard,
```



1    within the category you cannot, in fact, tell us

2    what the breakdown is between value that's

3    attributable to customer-related assets or

4    workforce and value that may be attributable to the

5    other asset you identify, such as synergies?

6                    A.   Or other elements of goodwill.

7    That's correct.

8                    Q.   Right.  Okay.  So do I have it

9    correct then at the end of the day, the Blackstone

10   methodology consists of taking the numbers from the

11   books and records for the tangible assets, taking

12   Mr. Malackowski's report on IP, subtracting those

13   two numbers from the gross sale proceeds to get the

14   residual amount you call customer assets and

15   goodwill?

16                   A.   And I believe that is specifically

17   what I said in paragraph 67 of my report that you

18   just referred us to.

19                   Q.   Now, let's look at the results of

20   the evaluation exercise, Mr. Huffard.

21                   And we see that over at page 43 of your

22   report, do we, the chart at the top of page 43?

23                   A.   Yes, for the business, yes.

24                   Q.   And just before we look at the

25   particulars, so we understand the context here,



1    Mr. Huffard, it does make a difference to the

2    outcome of the allocation report that you do how

3    much value is allocated to IP and how much value is

4    allocated to the residual category; correct?

5                    A.    Yes.

6                    Q.    Because you use a different

7    allocation key for the two categories; correct?

8                    A.    I'm sorry.  Could you just repeat

9    that.

10                   Q.    It makes a difference because you

11   use different allocation keys for the two classes

12   of assets?

13                   A.    Between IP and customer-related

14   assets and goodwill?

15                   Q.    Right.

16                   A.    Yes.

17                   Q.    And for the IP category you

18   allocate according to contribution to the creation

19   of the IP; correct?

20                   A.    That is correct.

21                   Q.    And for the residual category, you

22   allocated according to revenue; correct?

23                   A.    That is correct.

24                   Q.    So that model, to the extent that

25   you move value from IP to the residual category,



1    you are moving away from the Nortel entities that

2    made heavy investments in R&D and towards entities

3    who may have made lesser investments in R&D but

4    reaped the benefit of having the revenues in their

5    jurisdiction?

6                    A.   Yeah, but again, that gets into

7    why we think it's important to separate the asset

8    classes, because of the different derivation of

9    those assets.

10                   So it makes logical sense that IP be

11   allocated by R&D.  It's not logical to me that

12   other assets, like customer-related assets, like

13   synergies that buyers may have paid, like

14   workforce, that those would be allocated on the

15   same basis.

16                   But mechanically your comment is

17   correct.

18                   Q.   We'll get to the reasons.  I will

19   have some questions for you on that.  But I just

20   want to make sure that everybody understands that

21   every dollar that gets moved from the IP category

22   to the residual category is a dollar away from the

23   Nortel entities that were the generators of the IP

24   and towards those Nortel entities where the

25   revenues ended up being booked.



```
 1                      A.    That mechanically is correct.
 2                      Q.    Okay.  And if we look at the chart
 3    at the top of page 43, which sets out the result of
 4    the Blackstone methodology, if we look down at the
 5    very bottom line, we see the totals here; correct?
 6                      A.    Yes, across all of the different
 7    sales.
 8                      Q.    So this is aggregate for all of
 9    the businesses sales.
10                      And am I correct that under the
11    category "IP" you say that the percentage of total
12    proceeds of the business sales that you ascribed to
13    IP is 22.7 percent?
14                      A.    Yes.
15                      Q.    I'm reading that correctly?
16                      A.    Yes.
17                      Q.    And that you say in Nortel that we
18    should be allocating to the category called
19    customer-related assets and goodwill 65.3 percent
20    or fully two-thirds of the value of the proceeds
21    you allocate to a category that is not IP; correct?
22                      A.    That is correct.  But this is the
23    point I was speaking to earlier, which is, in
24    essence, a good portion of the IP that one could
25    have considered to have previously existed within
```



 1   these businesses was stripped out and put into the

 2   Rockstar sale.  So you have to look at them, in my

 3   view, in order to get a meaningful balancing of IP

 4   versus customer-related assets, you have to look at

 5   them in the aggregate.

 6              Q.   Let me ask you this first,

 7   Mr. Huffard.  Where can I find that discussion in

 8   your reports?  I don't see it in your reports.  Am

 9   I correct that the first time you made that

10   argument is today to your presentation in court?

11              A.   I don't know that I have it in my

12   reports.

13              Q.   You don't.

14              A.   But it's a contextual observation

15   for this.

16              Q.   Well, let's discuss that a little

17   bit.  I want to make sure that I understand this

18   argument that you've now raised today.

19              You're saying that in the course of

20   disposition of its assets, Nortel, to use your

21   words, stripped out value from the business sales

22   and put it in the residual IP Category?

23              A.   That's the effect of what

24   happened, I believe.

25              Q.   And are you aware of the testimony



1   in this case, Mr. Huffard, that indicates that all

2   of the value associated with the use of the IP in

3   connection with the lines of business was realized

4   in the proceeds of the sales of the lines of

5   business?

6                A.   I'm not specifically aware of

7   whatever testimony --

8                Q.   And if there was that testimony --

9   for example, as Mr. Dadyburfor gave, then your

10  proposition is not correct?

11               A.   What I know is that technology was

12  not predominantly used in each of the businesses

13  was included in the Rockstar transaction.

14               Q.   Sorry.  Can you point to that

15  information anywhere in the appendices to your

16  report?

17               A.   Not off the top of my head.

18               Q.   It's not there, is it?

19               A.   I'm not saying it's not there.  I

20  just can't off the top of my head.

21               Q.   I can tell you it's not there.

22               And so I really need to understand

23  this, Mr. Huffard.  It was the evidence of several

24  witnesses that the purchasers of the lines of

25  business insisted upon and received in exchange for



```
 1    the consideration they paid all of the intellectual
 2    property rights that they required in order to
 3    carry on the purchased businesses.
 4                    A.    That's correct.  To run their
 5    businesses, but not to be an IP -- not to be an IP
 6    business but to be their business.
 7                    Q.    So they fully paid for all the IP
 8    which was integral to operating the businesses that
 9    they bought?
10                    A.    Correct.
11                    Q.    You understand that?
12                    A.    I agree.  I'm not disputing that
13    comment.
14                    Q.    But this table on Page 43 says
15    notwithstanding that those purchasers paid full
16    price for all of the IP rights to carry on those
17    businesses, you say those IP rights have a value of
18    22.7 percent of the proceeds?
19                    A.    I do.
20                    Q.    In a company which you yourself
21    describe as one where IP was the primary driver of
22    value in its operating businesses?
23                    A.    Correct.  So when you -- when you
24    look at Nortel as it filed bankruptcy, before it
25    began to split its business into the business lines
```



```
 1   and into the residual portfolio, if you go back to

 2   that -- and again, going back to the charts we

 3   showed earlier, 70 percent of the value we're

 4   allocating comes from IP.  And but for the

 5   distinction that we're making here where we're

 6   splitting these business lines and you've got the

 7   Rockstar portfolio, but for that, my observation

 8   is, in fact, my allocation of value among the

 9   assets classes is entirely consistent with that

10   categorization.  70 percent of the value is coming

11   from IP.

12              Q.   Mr. Huffard, you understand that

13   the IP and the residual IP category was IP that had

14   not been commercialized?

15              A.   But for the shared IP which was

16   put in there, which is a significant portion of it.

17              Q.   But the rights the Rockstar

18   purchasers took did not include the right to

19   exploit the shared technology in order to run the

20   businesses which had been sold to somebody else?

21              A.   I understand that.

22              Q.   Okay.  So again, I'm having

23   trouble with this, Mr. Huffard.  Do you agree or do

24   you not agree that the proceeds of the sales of

25   business did include and represent full value for
```

 Neeson & Associates   W&F

1   the IP that was associated with those operating

2   businesses?

3                  A.   I believe that when you look at

4   all of the IP together in the Rockstar sale, the

5   residual sale and the business line sales, that

6   you've captured all of the value in the Nortel IP.

7   In fact, I think they maximized the value that way.

8                  Q.   So you don't find it odd that when

9   we look at the only business that Nortel was

10  actually operating, the lines of businesses, the

11  only operating businesses and all of the operating

12  businesses, you say the IP had a value of

13  22 percent, and you ascribe two-thirds of the value

14  to this residual category of intangibles?

15                 A.   I do not find it odd.  And there

16  are definitely cases where Nortel's technology at

17  the time of the sale was the old technology.  You

18  think about the CDMA example, where Ericsson bought

19  CDMA not because the CDMA technology was great.

20  They bought it in it part because they wanted

21  access to the North American market.  So I think

22  all of those are consistent.

23                 Q.   Now, in your slide deck today,

24  Mr. Huffard, you, if I understood you correctly, at

25  page --



```
 1                    A.    That's the one document I don't

 2    have in hard copy.

 3                    There it is.

 4                    Q.    So I think we can call it up.

 5                    Page 13, so the second large bullet,

 6    you say, "Buyers of the business," and then you

 7    say, "allocated majority of purchase price to

 8    customer-related assets and goodwill."

 9                    Do you see that?

10                    A.    Yes.

11                    Q.    And I take it what you're doing

12    there is suggesting that the allocations made by

13    the purchasers are a reliable indicator of the

14    soundness of your analysis?

15                    A.    I'm not -- I'm looking at the

16    buyer PPAs as a frame of reference.  I would not

17    embrace them as it relates to the specific

18    calculations there.

19                    But what I think they are

20    interesting -- and remember, the point of this

21    page is to say that customer relationships and

22    goodwill are distinct from IP.  They're not --

23    shouldn't be subsumed into it.

24                    The point we're trying to make is that

25    when you look at what the buyers were doing, they
```



 1   were acknowledging this, too.  Whether you agree

 2   with the exact numbers they used or not, they were

 3   treating it as separate asset categories and they

 4   were putting a significant amount of value on it.

 5              Q.   Well, Mr. Huffard, nobody disputes

 6   that's there's a separate category of residual

 7   assets as opposed to IP.  I'm not up here to

 8   dispute that.

 9              A.   I'm not sure if that's the case or

10   not, but --

11              Q.   Well, it is the case.

12              A.   -- I'll take you for your word.

13              Q.   Take my word for that.

14              The issue that I'm exploring with you

15   the now is the allocation of the relative amounts

16   of value between those two classes.

17              And I need to understand whether, in

18   this bullet on Page 13, you are relying on the

19   allocations by the purchasers for anything other

20   than the proposition that you typically do have

21   these two categories of assets.

22              A.   No.  I think if you look at the

23   header of that page, customer-related assets and

24   goodwill distinct from IP, the point we're trying

25   to make here is that those are separate and large



1   asset classes; that they should not be subsumed

2   into IP.

3              Q.   Right.  Because I took it, in

4   fact, from your reports that you actually consider

5   the allocations done by purchasers, both in terms

6   of the identification of the asset classes and the

7   ascription of value, to be unreliable.

8              A.   I think they are illustrative as

9   to the asset classes.  I think they show what

10  people were sort of at least thinking.  I don't

11  rely on the actual math that's in them.

12             Q.   You don't rely on the values that

13  are ascribed to the assets?

14             A.   I don't rely on it.  Sometimes --

15  yeah, I don't rely on it.  I'm looking at more the

16  categories that exist there.

17             Q.   Because they're, in fact,

18  unreliable, in your view?

19             A.   Look, the difficulty of relying on

20  the buyer PPAs is they're done for different

21  purposes.  None of us, I believe, have any

22  diligence on what calculations went into them,

23  so --

24             Q.   Right.  So we've talked about the

25  importance of moving value from the IP category to



```
 1    the goodwill category.  Now let's look at the
 2    assets within the category of customer-related
 3    assets and goodwill.
 4              You have in your report allocated the
 5    total value in this residual category according to
 6    revenue; correct?
 7              A.   Correct.
 8              Q.   So you simply look at the revenues
 9    earned in a territory and you divide up everything
10    that's in this residual category according to those
11    revenues; correct?
12              A.   Yes.
13              Q.   So within this category we have
14    some assets, such as workforce; correct?  You've
15    agreed with me that workforce is part of the
16    goodwill?
17              A.   Correct.
18              Q.   And with workforce we can actually
19    identify where the workers are and who have paid
20    for their salaries over the years; correct?
21              A.   Correct.
22              Q.   And under the way you have
23    structured the allocation -- that is, do it by
24    revenue -- that value that may be associated with
25    the workforce may be going somewhere which is
```



1    completely unrelated to who paid for the workforce.

2              A.    The challenge I think that one

3    faces with workforce is how do you measure its

4    value and then how do you allocate it.  And I don't

5    know of a good way to measure the value of the

6    workforce.  The value is not the payroll.  Clearly

7    individuals can create a tremendous amount of value

8    well in excess of their payroll.

9              I don't know how to value employees in

10   a meaningful context for this discussion.  It's not

11   the present value of the replacement cost and the

12   retraining cost.  You can't -- these purchasers

13   took most of the employees here.  They didn't just

14   go replace them.  They could have started with a

15   brand new workforce if they wanted and paid the

16   finder's -- the search firm fees to go replace

17   them.  They didn't do that.  And they don't do

18   that -- they didn't even come close to that.  The

19   reason they didn't do that is because these workers

20   had value.  And I'm personally convinced that they

21   had a lot of value.  I just don't know how to

22   calculate it.

23             And then I don't know of a reliable

24   allocation metric.  I can't even calculate the

25   value, let alone what's the math that I apply.



```
 1    It's not in proportion to payroll.  It's not in
 2    proportion to headcount.
 3                  To me the revenue was the best metric I
 4    could think of, because it created a sense of scale
 5    in a given geography.  And employees create value
 6    based on the scale of the business.
 7                  Q.   Once again, to be clear, you've
 8    used an allocator whereby, if a large percentage of
 9    the workforce is in a place like Canada, which does
10    R&D and which does sales support and supports the
11    global organization but doesn't have a large native
12    revenue stream, you're giving the value of those
13    assets to the other entities where there is a
14    revenue stream and not to Canada?
15                  A.   I'm not giving it as a tactical
16    matter, as your suggesting.
17                  Q.   But that's the result?
18                  A.    But that is the result.
19                  MR. MARK:  Your Honor, maybe this is an
20    appropriate time for the afternoon break.
21                  THE US COURT:  Justice Newbould?  Let's
22    take our break.  Twenty minutes.
23                  THE CANADIAN COURT:  Very well.
24                  THE US COURT:  We'll be back in
25    20-minutes.
```



```
 1    -- RECESS AT 3:28 p.m. --

 2    -- UPON RESUMING AT 3:54 p.m. --

 3              THE US COURT:  All right, Justice

 4    Newbould.  You may proceed.  Mr. Mark.

 5              MR. MARK:  Thank you, Your Honor.

 6    Thank you, Your Honor.  Thank you, Justice

 7    Newbould.

 8              BY MR. MARK:

 9              Q.   Do you still have in front of,

10    Mr. Huffard, the slide deck from this morning?  So

11    if you could look up --

12              A.   I'm sorry.  No, I don't.

13              Q.   So if we could bring up on the

14    screen page 14.  And at page 14 and the couple of

15    Pages following you have the various statements,

16    Mr. Huffard, about how pleased some of the

17    purchasers of the lines of business were to acquire

18    the customer -- the installed customer base;

19    correct?

20              A.   Yes.

21              Q.   All right.  And we can all

22    understand why the purchasers may have been happy

23    to acquire the installed customer base.  But that

24    fact doesn't tell us, does it, Mr. Huffard, about

25    what or who within Nortel is responsible for
```



1    establishing that installed customer base, does it?

2              A.    It's their historical sales.

3    That's how you get a customer, is you sell to a

4    customer.

5              Q.    The fact that Ericsson may be

6    happy to pick up Nortel's customers doesn't tell

7    us, does it, whether that customer relationship is

8    primarily due to the technology of Nortel or to the

9    sales force, does it?

10             A.    I would assume it is due to a

11   combination of those two things.

12             Q.    Is it not the case, Mr. Huffard,

13   that within Nortel, whenever this question was

14   looked at, the answer was that IP was the factor

15   primarily responsible for Nortel's relationships

16   with its customers?  You're aware of that?

17             A.    I have not seen it quoted exactly

18   as you just described it.

19             Q.    All right.  In preparing your

20   report and doing your work, Mr. Huffard, did you

21   look at the Horst Frisch report?

22             A.    I'm not sure.

23             Q.    I don't see it listed in your

24   appendices.

25             A.    I'm not sure if I did.



```
 1                    Q.   Do you know what the Horst Frisch
 2    report was?
 3                    A.   I don't have a recollection of
 4    that right now.
 5                    Q.   So if I hold you that the Horst
 6    Frisch report was an economic analysis of the key
 7    drivers of value in Nortel by the world's
 8    preeminent economic consultants on that issue,
 9    would that have been a document that would have
10    been useful to you to review in the preparation of
11    your report?
12                    A.   I might have looked at it.  I'm
13    not aware of it.
14                    Q.   But you don't recall it being
15    given to you, and if I don't see it in your
16    appendices, then it wasn't; is that fair?
17                    A.   Again, if it's not there, I didn't
18    rely on it.
19                    Q.   So let's bring some of it up on
20    the screen.  It's already an exhibit in these
21    proceedings.  Can we have Exhibit TR11055, which is
22    Horst Frisch report of March 14, 2002.
23                    So if we could go first to page 4.  Do
24    you see that on the screen in front of you?
25                    A.    No.  I see the cover page on the
```



```
 1    screen.
 2                    Q.    There we go.
 3                    And just give us a moment while we hand
 4    out some copies, Mr. Huffard.  I'll be right back
 5    with you.
 6                    So if I can have you look at the second
 7    full paragraph on Page 4, Mr. Huffard, Horst Frisch
 8    says:
 9                    "Research and development is the
10                    primary contributor to the success of
11                    Nortel's operations.  Nortel's
12                    customers choose Nortel products and
13                    services because Nortel is viewed as a
14                    technology leader in its market and
15                    because Nortel is committed to using
16                    its R&D resources in providing full and
17                    proactive service and support to its
18                    customers."
19                    Do you see that?
20                    A.    I do see that text.
21                    Q.    Do you have any reason to disagree
22    with Horst Frisch's conclusions about why Nortel's
23    customers choose Nortel?
24                    A.    I have no reason to disagree or to
25    agree with it.  I don't personally know the context
```



1    of this report, asking me to look at a paragraph

2    out of a large report.  It was done in 2002, so

3    seven years before any of the business sales were

4    done.

5                    I have no -- other than reading the

6    words on the page, which I am happy to do, I don't

7    have any context for this.  I would note that

8    between 2002 and 2009 is a long time.  In the

9    interim, Nortel went bankrupt, and I don't know

10   what changed or didn't change in the marketplace.

11   So I don't know how applicable this is.

12                   Q.   Let me suggest to you that when

13   the insolvency intervenes, Mr. Huffard, the one

14   thing that usually doesn't happen is you don't get

15   a migration of hundreds of millions of dollars of

16   value away from technology to goodwill.

17                   A.   I don't necessarily agree with

18   your comment there.

19                   Q.   So is it your evidence that as

20   Nortel got closer and closer to bankruptcy, the

21   value of its goodwill grew and grew and the value

22   of its technology shrunk and shrunk?

23                   A.   No, I don't think it had nothing

24   to do with Nortel getting closer to the bankruptcy.

25   I think as Nortel revisualized its business in



```
 1    terms of selling off the different business lines,

 2    in terms of selling off the IP, that created the

 3    goodwill.

 4              And I don't believe that you can, on an

 5    apples-to-apples basis, compare the goodwill that

 6    Nortel had on its books and records prior to the

 7    Nortel filing, and that it did, as you mentioned

 8    earlier, take writedowns against.  I don't believe

 9    that you can compare that with the goodwill we're

10    now talking about in the context of the purchase

11    price paid by strategic acquirers.

12              Q.   So you're missing my point a

13    little bit here, Mr. Huffard.  I understand that

14    you say that strategic acquirers had their reasons

15    for acquiring and had their reasons for wanting to

16    pick up the customer base.  But the exercise we're

17    involved in now is trying to determine how that

18    value should be shared at Nortel.  And I'm

19    suggesting to you --

20              A.   Correct.

21              Q.   -- that the opinions of the people

22    who knew Nortel best as to which of their assets

23    were responsible for driving the success of their

24    business and their customer relationships is the

25    better indicator of how value should be allocated.
```



```
 1                    A.   You're pulling a seven-year-old --
 2    as of the time of the asset sales, a seven-year-old
 3    document out that I don't know whether they changed
 4    their opinions or they didn't change their
 5    opinions.
 6                    I'm not arguing that technology isn't a
 7    key driver.  As I said in my -- in my initial
 8    comments, 70 percent of the proceeds we're
 9    allocating to technology.  My comments that I've
10    been making recently is, that's great, but there
11    are other things, too, that played an important
12    part.
13                    Q.   So I'm focused again, Mr. Huffard,
14    I want to remind you, on the lines of business, the
15    only operating businesses and all of the operating
16    businesses that Nortel had.  I'm not at the moment
17    focused on the residual IP.  I think we can all
18    agree that that's all IP.  What I'm focused on is
19    your assignation of about 22 percent of the value
20    of the business to this company's technology.
21                    Now, turn over to page 39 of the Horst
22    Frisch report, paragraph at the bottom of the page,
23    beginning six lines down with the words "Nortel's
24    customers."
25                    "Nortel's customers return to
```



1              Nortel time after time because of the

2              company's commitment to technology

3              leadership and responsiveness to its

4              customers in producing next-generation

5              products.  Nortel is one of the few

6              companies in its market to have created

7              a position of Chief Technology Officer

8              whose role and function are on par with

9              all other chief executives in the

10             company, emphasizing the central nature

11             of technology to Nortel.  Nortel's

12             products are consistently best in

13             class, and this is due to the extensive

14             R&D it performs on a continuous basis.

15             Based on Nortel's understanding of its

16             business and the industry in which it

17             competes, Nortel has concluded that its

18             intangible values are attributable to

19             its R&D efforts."

20             Do you see that?

21        A.   I see that.

22        Q.   So would you agree with me that at

23   least the authors of the Horst Frisch report at

24   that time were of the view that all of the

25   intangibles, including all of the ones that you've



1    identified, were largely attributable to the

2    technology?

3                    A.    All I'm doing is agreeing that the

4    words on the page say what you said that they just

5    said.  I have no -- first of all, this is --

6    they're seemingly making a statement here of what

7    Nortel believes.  It doesn't say that it's what

8    they believe.  And I don't know where that's coming

9    from.

10                   So, again, I'm not --

11                   Q.    Is your dispute here, Mr. Huffard,

12   that you're not sure that Horst Frisch actually

13   believes what's in their report?  Is that what

14   we're down to?

15                   A.    I'm sure that -- why are you

16   attacking me like that?  Because I'm not saying

17   that.  I'm saying that, just based on the language

18   you've given me, the text here says, it's Nortel

19   has concluded.  It's not saying Horst Frisch is of

20   the opinion.

21                   So again, I'm not trying to make a big

22   deal of this.  I don't have any context for the

23   document you're putting in front of me.

24                   Q.    If Horst Frisch is correct, it

25   requires a reexamination of your conclusions; is



```
 1   that fair?

 2                A.   I don't believe so.

 3                Q.   So to address your concern that

 4   maybe Horst Frisch was out of date, let's look at

 5   something more recent, Mr. Huffard.  Let's look at

 6   Mr. Binning's affidavit filed in this proceeding,

 7   which is Exhibit 14, if you could call that out.

 8                Now, you read, Mr. Binning's

 9   transcript, I believe, as part of the preparation

10   for your report; did you not, Mr. Huffard?

11                A.   I read portions of it.

12                Q.   Did you read his affidavit filed

13   in this proceeding before testifying today?

14                A.   This document right here?

15                Q.   Yes.

16                A.   No, this -- I don't know that I've

17   seen this document.

18                Q.   So let's turn over to

19   paragraph 53.  So this is Mr. Binning's sworn

20   evidence on April 10, 2014.

21                And you know, Mr. Huffard, who

22   Mr. Binning is?  He was the CFO and then was the

23   chief restructuring officer.

24                A.   Yes.

25                Q.   So he understood the business, you
```



1    understand, and he was intimately involved in the

2    sales of the lines of business which are the

3    subject of your opinion?

4                    A.    Yes.

5                    Q.    And you accept that he's likely to

6    have some useful insights into the way the business

7    operated and what the objectives and desires of the

8    purchasers in the transactions were?

9                    A.    I believe that he might.

10                   Q.    All right.  So let's look at

11   paragraph 53.  Mr. Binning says:

12                        "There are many possible

13                        contributors to the value of a business

14                        in this type of a sale, but overall, in

15                        the context of Nortel's lines sales, it

16                        was my view at the time and remains my

17                        view today that in Nortel's market, as

18                        between customer relationships and

19                        technology, technology is the main

20                        driver of value for a number of

21                        reasons.  First, in deciding what

22                        technology to purchase, a telecom

23                        operator is concerned with creating a

24                        competitive advantage in the industry

25                        by having technology that is not



```
1              available to its competitors.  Second,
2              from a cost- efficiency perspective, a
3              purchaser will determine whether it can
4              purchase comparable technology from
5              another supplier at a cheaper price or
6              whether the technology can be used to
7              lower its own cost base."
8                   Now, just stopping there,
9              Mr. Huffard, did those observations
10             sound reasonable to you coming from a
11             person in Mr. Binning's position?
12             A.   They do.
13             Q.   And let's continue.
14                  "Third, the nature of the
15             technology involved in the line of
16             business sales creates an 'install
17             base' with a captive customer, which in
18             turn means that it is primarily the
19             technology which feeds the long-term
20             customer relationships."
21                  Stopping there, again, do you accept
22      that Mr. Binning knows what he's talking about and
23      has made a reasonable statement?
24             A.   Clearly, the technology does
25      create an installed base of customers.  I guess
```



1    there was at least a theoretical discussion to have

2    once you created that installed base of customers,

3    is that now actually a customer related asset or is

4    that a technology-related asset?

5              Q.    But you have -- notwithstanding

6    what Mr. Binning has said, that you have ascribed

7    22 percent to technology and 66 percent to this

8    other basket that Mr. Binning says is not the

9    primary driver; correct?

10             A.    I have.  But when you then combine

11   it with the technology that was made available to

12   these purchasers through the Rockstar transaction,

13   it is 70 percent.

14             Q.    I am talking about the line of

15   business sales, Mr. Huffard, please.

16             In the line of business sales, you

17   ascribed 22 percent of the value to IP and

18   two-thirds to the other category; is that not

19   correct?

20             A.    That is correct.

21             Q.    So let's move on to the second

22   task that you had to perform, Mr. Huffard, which

23   was, after you did the valuation -- that is, the

24   allocation of the proceeds as between the asset

25   classes -- then you had to allocate the value



```
 1   within each asset class to the selling Debtors;
 2   correct?
 3                 A.   Correct.
 4                 Q.   And the first asset class is the
 5   tangible assets; correct?
 6                 A.   That's right.
 7                 Q.   And did you once again simply take
 8   the numbers on the books and records of the Nortel
 9   entities as of Q4 2009 and use those without any
10   further analysis?
11                 A.   Yes, I did use the numbers that
12   were in the books and records, as I've said before.
13                 Q.   And then turning to the second
14   category of assets, the value that you assigned to
15   the IP, the approaches to allocation, which you
16   considered, were the ones that counsel instructed
17   you to consider; correct?
18                 A.   Yes.
19                 Q.   That is, you were instructed to
20   consider the contribution approach and the license
21   approach, and it was those instructions which
22   formed the framework for the second stage of your
23   analysis; correct?
24                 A.   Correct.  But remember, when we're
25   talking about the IP specifically, Mr. Malackowski
```



1   primarily did that analysis.

2                  Q.   I understand that.  I'm just

3   talking about the approaches which are considered

4   in your report are the approaches you were told to

5   consider by counsel.

6                  A.   Correct.

7                  Q.   And then for each of those

8   approaches, both the contribution approach and the

9   license approach, once again, your report simply

10  incorporates the conclusions of that

11  Mr. Malackowski; correct?

12                 A.   That is correct.

13                 Q.   You did none of your own

14  allocation analysis with respect to the

15  contribution approach; correct?

16                 A.   I think we've said this a couple

17  times here.  Yes, I incorporated Mr. Malackowski's

18  work.

19                 Q.   Well, we were talking before about

20  the valuation approach.  And I just want to confirm

21  that also with respect to the allocation approach,

22  you both incorporated Mr. Malackowski's findings

23  and you undertook no independent analysis of your

24  own to verify?

25                 A.   All of the IP work, whether it was



```
 1    valuation or allocation, was done by Ocean Tomo, by

 2    Mr. Malackowski.

 3                   Q.   So continuing the Blackstone

 4    methodology, when it comes to allocation of the

 5    value ascribed to tangibles and IP, your report

 6    consists of reporting to us on the work of

 7    Mr. Malackowski; correct?

 8                   A.   On the IP.

 9                   Q.   Correct.  So -- and on the

10    tangibles, reporting to us on what's in the books

11    and records of the company; correct?

12                   A.   Yes.

13                   Q.   So with respect to IP as with the

14    valuation exercise, to the extent there are flaws

15    or errors in Mr. Malackowski's analysis and

16    conclusions, your report is similarly subject to

17    such errors; correct?

18                   A.   To the extent those exist.  I'm

19    not aware of any existing right now.

20                   Q.   So let's look a little bit more

21    closely at the results of the allocation of the

22    value for IP associated with the business sales.

23    And the first approach, of course, is the

24    contribution approach; correct?

25                   A.   Correct.
```

 Neeson & Associates    W&F

1                    Q.   And you indicate in your report

2      that you consider this to be the preferable of the

3      two approaches, because it is consistent with the

4      RPSM regime that Nortel, in fact, operated under;

5      correct?

6                    A.   Among other considerations.  There

7      are other points that we've even mentioned today

8      that make that more consistent with the way Nortel

9      ran its business.

10                   Q.   Sorry, I didn't quite hear the

11     last part of your answer.

12                   A.   I'm sorry.  There are a number of

13     considerations, even including earlier today, that

14     we've listed as to why we think the contribution

15     approach makes more sense.  Consistency with the

16     RPSM as part of the MRDA is one of them, but there

17     are others.

18                   Q.   Okay.  The license approach, on

19     the other hand, actually does the exercise not of

20     examining what were the respective contributions to

21     the asset, but actually does a fair market value

22     assessment of those assets; correct?

23                   A.   Correct.  The license approach is

24     more of a geographic orientation in terms of the

25     size of the market and the value of the market that



1    you, as a geography, operate rather than what

2    you've historically contributed to R&D.

3              Q.   But my point was a little bit

4    different.  In the license approach you're actually

5    valuing the rights that were acquired by the

6    purchasers; correct?

7              A.   Correct.

8              Q.   Whereas in the contribution

9    approach you're not valuing any rights that were

10   contributed to the sale; you're doing an analysis

11   based on somebody's sense of what is an equitable

12   way to allocate the proceeds once received?

13             A.   I think that's fair.

14             Q.   And I take it you understand,

15   Mr. Huffard, that in doing the contribution

16   approach analysis, Mr. Malackowski did not, in

17   fact, use the R&D capital stock calculations which

18   were prescribed by the MRDA and the RPSM?

19             A.   Yes, I understand.  He did the

20   math differently in its detail, especially as it

21   related, among other things, to the time frame he

22   used.

23             Q.   So you understand that he ascribed

24   a different useful life to the IP?

25             A.   I do understand.



```
 1                    Q.   And again, that's an exercise that
 2   you've left to Mr. Malackowski, and you haven't
 3   done your own analysis on?
 4                    A.   I haven't done my own analysis.
 5   But from my point of view, it seems patently
 6   obvious that five years, which is the period of
 7   time prescribed in the RPS, is not the right period
 8   of time.  We've just sold the Rockstar portfolio as
 9   the single largest transaction, and most of the IP
10   in that deal originated in the '90s and early
11   2000s, so well before that five-year period.
12                    So I didn't kind of specifically
13   review; I didn't do the calculations.  But just as
14   I step back, it makes sense to me.
15                    Q.   But my point was -- and I'm sure
16   we'll cover this ground with Malackowski to be
17   clear, you did not -- other than having this
18   general sense that it seemed right, you did not
19   either do your own analysis or second -- or do a
20   check of his calculations?
21                    A.   That's correct.
22                    Q.   All right.  Now, let's look at
23   license approach.  And again, as you've told us,
24   you rely on Mr. Malackowski; correct?
25                    A.   Correct.
```



1                     Q.   And you did not do any of your own

2     analysis to check the fairness or reasonableness of

3     the royalty base that underlies his calculations?

4                     A.   That is correct.

5                     Q.   Nor did you do any analysis of the

6     fairness and reasonableness of the rebuttal reports

7     which underlie his calculations; correct?

8                     A.   That's correct.  Those are areas

9     of his expertise.

10                    Q.   Nor did you do -- despite the fact

11    that you do valuation work, you did not do a review

12    of the forecast and business plans that underlie

13    his assessment of the proper royalty base?

14                    A.   I'm generally aware of which

15    forecasts he used and how he approached the

16    construction of those forecasts.  I didn't audit

17    them, if that's your question.

18                    Q.   You didn't do the forecast

19    exercise yourself and you didn't do any checks to

20    verify his analysis?

21                    A.   No.  I'm getting repetitive here,

22    that I've relied on Mr. Malackowski for the

23    valuation and allocation of the IP.

24                    Q.   Let's turn now, Mr. Huffard, to

25    the allocation of the residual category, the



1    customer assets and goodwill.

2              Is it correct to say, Mr. Huffard, that

3    these assets, like any other assets, have their

4    value fundamentally related to their ability to

5    generate profits?

6              A.   I think that's probably generally

7    a fair statement.

8              Q.   They may be intangible and

9    difficult to sometimes identify and corral.  But as

10   assets, their value is fundamentally related to

11   their ability to generate profits; correct?

12             A.   I believe that's -- I think I just

13   answered that question.

14             Q.   And you understand that the way

15   Nortel operated under the RPSM regime, that the

16   profitability of each of the residual profit

17   entities was unrelated to the revenue derived

18   within its territory?

19             A.   I'm not sure exactly what you're

20   talking about.

21             Q.   Do you understand the way the RPSM

22   methodology worked and how the Nortel entities

23   derived their income?

24             A.   I believe I generally do.

25             Q.   So you understand that under the



1    RPSM methodology, the global revenues and costs are

2    pooled and then the profits are allocated according

3    to the R&D capital stock allocation key; correct?

4              A.   Generally.

5              Q.   So that the profit that was, in

6    fact, earned by any particular RPE was unrelated to

7    the revenue generated within its territory?

8              A.   Under -- yeah, under the -- under

9    the RPS methodology.

10             Q.   And therefore in Nortel, the

11   profits that were derived from the customer-related

12   assets and goodwill were allocated amongst the RP

13   entities not according to revenue generated but

14   according to their R&D capital stock; correct?

15             A.   That's correct.  The RPSM did not

16   use revenues as an allocation metric.  It used R&D

17   capital stock.

18             Q.   And notwithstanding that that is

19   the way Nortel carried on business, and

20   notwithstanding that that was the entitlement of

21   the RP entities, you have used revenue, which is

22   unrelated to profits, as the allocation key for

23   this category of assets; correct?

24             A.   That is correct.

25             Q.   And while you do put the customer



```
 1   assets and the IP in different categories -- and I
 2   agree that there are different categories -- at
 3   Nortel, did they not share a fundamental
 4   characteristic, Mr. Huffard, in that both of them,
 5   both the marketing and sales efforts and the IP
 6   were the product of global cooperation and
 7   integration; correct?
 8            A.   Yes, I think that's fair to state.
 9            Q.   And as I think you said, my note
10   of your evidence this morning was that sales and
11   marketing, like R&D, was done on a cooperative,
12   cohesive, global basis with everybody contributing
13   regardless of which country they were in; correct?
14            A.   Well, I'm not exactly -- I'm sure
15   those are not exactly my words.  And I'm not --
16   obviously if you were in a country and you were
17   targeting customers that were only in that country,
18   that was a sales and marketing effort that was
19   oriented within that country.  If it's a global
20   customer, I'm sure there was coordination on a
21   global basis.
22            Q.   Isn't it a little bit different
23   from even that, Mr. Huffard?  Is it not the case
24   that with respect to a customer in a particular
25   country, in the case of Nortel, the sale, the
```



```
 1    customer relationship and the support were
 2    contributed to by personnel and assets in a wide
 3    variety of countries?
 4                 A.    Yeah, I'm -- I'm sure that --
 5    definitely the customer support is done and
 6    elements -- I'm not trying to overestimate the --
 7    I'm sorry.  There are going to be instances where
 8    it's done on a local basis, but there are also
 9    going to be instances where it's done on a globally
10    coordinated basis.  And that is the cooperative
11    spirit I think they were trying to --
12                 Q.    So again, if we have a
13    circumstance where, because of decisions made and
14    cost-effectiveness and historic reasons, you have a
15    lot of sales and customer support done in a country
16    which has low domestic revenues, your allocation
17    key for the customer-related assets and goodwill
18    category is not going to compensate them for that
19    because they have low revenues?
20                 A.    Yes, I believe that's
21    mathematically the way it would work.
22                 Q.    Now, lastly, Mr. Huffard, let's
23    turn to the last component of your work, which was
24    the allocation of the residual IP.  And you and I
25    are both agreed there's only one class of assets in
```



 1    that pot.  So we don't have --

 2                    A.    We've agreed on something today.

 3                    Q.    We've agreed on something.  And

 4    again, for the exercise of allocating that value to

 5    the Nortel entities, you were, once again,

 6    instructed by counsel to consider the same two

 7    approaches, the contribution approach and the

 8    license approach; correct?

 9                    A.    That is correct.

10                    Q.    And once again, the work for both

11    of those was the work undertaken by Mr. Malackowski

12    rather than a valuation analysis undertaken by

13    yourself?

14                    A.    That is correct.

15                    Q.    And you understand that with

16    respect to Mr. Malackowski's allocation work based

17    on the license approach, that he was required to

18    make various assumptions about the nature and scope

19    of the license rights?

20                    A.    Yeah, I'm sure he had to do that.

21    Yep.

22                    Q.    And you understand, I take it, and

23    is it the case, that if Mr. Malackowski's

24    understanding of the scope of those rights are

25    incorrect, then we would not be able to rely on the



1   conclusions in your report either?

2               A.   Well, yes.  My report is

3   derivative of his as it relates to IP.  We've said

4   that 20 times today.

5               Q.   Now, in addition to your initial

6   report, Mr. Huffard, you did a rebuttal report;

7   correct?

8               A.   That's correct.

9               Q.   And I think we've marked that as

10  exhibit --

11              THE CANADIAN COURT:  31.

12              MR. MARK:  Thank you.

13              BY MR. MARK:

14              Q.   Do you have that in front of you?

15              A.   Yes.

16              Q.   Now, the hour is late so I'm just

17  going to go through this quickly, Mr. Huffard.

18              Could you turn, please, to page 6 of

19  your rebuttal report.  And in paragraph 6 we see

20  that this is introductory to your criticism.

21  Canadian Debtors and the CCC's experts; correct?

22              A.   Correct.

23              Q.   And then -- and this is under the

24  same section of your report; correct?  I'm sorry.

25  If you look back at page 5, it sets out the



```
 1   essential conclusions.

 2             A.   Yes.

 3             Q.   And at paragraph 7, the first

 4   conclusion as reported in the first sentence is as

 5   follows:

 6                 "The reports submitted by the

 7                 Canadian experts, while claiming to

 8                 apply the MRDA and an asset-based

 9                 approach, are premised on assumptions,

10                 which I do not consider are correct,

11                 about the rights that accrued to NNL as

12                 the holder of bare legal title to

13                 Nortel's IP and the nature of the

14                 licenses held by the other RPEs."

15             Do you see that first criticism?

16             A.   I do.

17             Q.   And would I be correct,

18   Mr. Huffard, that you take your conclusion that the

19   Canadian expert's view of the license rights is

20   wrong as an assumption that you obtained from

21   counsel; correct?

22             A.   That is correct.

23             Q.   And if we look over -- sorry.

24   Once again, if that assumption you got from counsel

25   is incorrect, then your conclusions in your
```

Neeson&Associates   W&F WILCOX & FETZER LTD.

```
 1   rebuttal report vis-a-vis the Canadian experts
 2   would have to be revisited?
 3                A.   I guess that would be true.
 4                Q.   And if we can turn over now to
 5   page 49 of your report, moving from the summary to
 6   the conclusion, and if we look at -- so in
 7   paragraph 82, do we have your primary conclusion
 8   with respect to the work of the Canadian experts?
 9                A.   Yes, that's true, assuming that
10   you're not including the CCC's experts in that.
11                Q.   Right.  I'm using the terms you've
12   used in the report.
13                A.   Yes.
14                Q.   And you have distinguished between
15   the Canadian expert and the CCC's experts?
16                A.   Yes.
17                Q.   All right.  So am I correct then
18   that your conclusion with respect to the work of
19   the Canadian experts can be found in the first
20   sentence of 82, which says as follows:
21                     "The reports submitted by the
22                     Canadian experts adopt numerous
23                     incorrect legal assumptions about the
24                     rights that accrued to NNL as the
25                     holder of legal title to Nortel's IP
```



```
 1                 and the nature of the licenses held by
 2                 the other RPEs, which result in a
 3                 proposed allocation that heavily favors
 4                 the Canadian Debtors."
 5                 That is your conclusion?
 6             A.   I think there are other points
 7    that I try to draw out in the -- maybe the
 8    second-to-last and last sentences of that paragraph
 9    that might be slightly different than what are
10    captured in that first sentence.  But certainly my
11    conclusions are captured in the paragraph here.
12             Q.   But again, fundamentally your key
13    observations about the work of the Canadian experts
14    is based upon the assumption you were given by
15    counsel about the scope of the license rights?
16             A.   Well, so let's just take the last
17    sentence of this paragraph, where it talks about
18    where I believe they are conflating, in the
19    categories of assets that they do, assets that they
20    don't -- putting aside the argument about the title
21    of the IP, assets that they don't own title to.
22                 So as an example, just talk about the
23    goodwill element that constitutes buyer synergies.
24    I don't think they have any particular title to
25    that that I'm aware of.  And that just gets lumped
```



```
 1   into the IP category that they kind of give

 2   themselves.

 3            So I don't think that that's the legal

 4   issue that you're referring to as to the value of

 5   the -- the license rights.  But I think that's

 6   maybe a slightly different thing.  Certainly the

 7   license rights are a big area of --

 8            Q.   That's right.  That's the big area

 9   of your rebuttal report.  And again, that's based

10   on the assumption you got from counsel?

11            A.   Right; right.

12            Q.   Now, I promise you when I say

13   "lastly" this time, Mr. Huffard, I really mean it.

14            A.   You're under oath.

15            Q.   Can you turn once again, and

16   lastly, to your slide deck from this morning, which

17   you don't have in front of you but I'm going to ask

18   for page 24 to be brought up.

19            Sorry, you've caught me in a mistake.

20   I want to -- yeah, page 24.

21            Now, I want to make sure -- and this

22   was one of the last points you made in your

23   presentation in chief this morning, Mr. Huffard.

24   And I want to make sure that I and the Courts

25   understand the point here.  It wasn't entirely
```



 1   clear to me, and maybe it's my fault.

 2                When you say the Canadian position

 3   produces irrational economic results, the first

 4   bullet you say, US and EMEA sellers would not have

 5   terminated licenses.  And are you saying there,

 6   Mr. Huffard, that if the US and EMEA sellers --

 7   sorry -- start again.

 8                If it turns out that the Canada

 9   position on allocation is correct, are you

10   identifying as a criticism of that approach the

11   fact that the US and EMEA sellers would not have

12   agreed to sell?

13                A.   I think what I'm trying to say

14   here is that, as I understand the Canadian experts'

15   approach -- let's just take the residual portfolio

16   as a relatively easy example -- they're looking at

17   the language of the MRDA, I'm sure on the advice of

18   counsel, and saying that for whatever reason,

19   because we've sold the residual patent portfolio,

20   it no longer kind of runs through the MRDA, the RPS

21   didn't apply to it, and by and large, that just

22   should get defaulted to the Canadian Debtors.

23                And the point I'm trying to make is, if

24   anyone had actually thought that was the answer in

25   the beginning of this process, the Canadian -- I



 1   can't imagine the Canada Debtors or the EMEA

 2   Debtors would have agreed to go forward on the

 3   basis of this sale process.  That to me would make

 4   no sense.

 5            Q.   Well, so are you saying that it's

 6   a component of your consideration of the valuation

 7   and allocation exercise here that the US or EMEA

 8   would have held out for holdout value if only they

 9   had known they were going to get very little?

10            A.   No.  I don't -- I don't in any way

11   think that.  And I don't think it would have been

12   holdout value.

13            For instance when you think about the

14   Rockstar sale, even -- and I will clearly wasn't

15   there in the auction.

16            Q.   No, you weren't.

17            A.   But to me -- to me that sale could

18   have been structured in the form of an asset sale

19   or in the form of a license deal where you licensed

20   all of that IP to Rockstar, gave them kind of

21   complete use of --

22            Q.   Yes, understand.

23            A.   And under that circumstance, the

24   basic argument that this IP is no longer part of

25   the RPSM will go away.  It would just be an ongoing



1    license royalty stream coming in to the estates

2    that would presumably be split according to RPS or

3    something like that.

4                    And so to think that a transaction

5    could be kind of structured easily one of two

6    different ways not being a big economic deal to the

7    purchasers, and it would give wildly different

8    outcomes to the Debtor estates, that to me is not a

9    matter of a holdup; it's just a matter of trying to

10    think through what is equitable now, what gives the

11    right results.  And that's what I'm trying to say

12    when I say gives an irrational economic result.

13                    Q.    So this is not a valuation

14    opinion; this is your assessment of what EMEA and

15    the US might have said at the time?

16                    A.    It's my commercial interpretation

17    of this transaction and of the Canadian experts'

18    approach, which basically defaults all of this

19    value to Canada.

20                    And to me, as an investment banker, as

21    a person who runs sale processes like this, trying

22    to think about -- and going back to the early part

23    of our discussion, what was my mission here, what

24    was the conceptual framework, I would summarize it

25    trying to figure out a fair and equitable



1    allocation of the proceeds among the different

2    Debtor estates.  And coming up with that sort of

3    conclusion to me personally doesn't seem like fair

4    and equitable or what I call -- it is an irrational

5    economic result.

6                    Q.   I want to be clear.  I understand

7    you have your view about the position.

8                    But if it turns out that that is the

9    correct position, you're not suggesting that the

10   allocation exercise should be influenced by the

11   fact that had they known their rights in advance,

12   they would have dug their heels in and said "no."

13                   A.   I'm suggesting that, as I

14   understand it, there is no clear, definitive

15   guidance as to how to do this allocation exercise.

16   There's a bunch of different considerations, legal

17   documents that everybody -- that the judges have to

18   take in and ultimately make a decision about.  And

19   I'm just making this observation as economic

20   context for that decision, that what's fair today

21   should have been fair back then.  And that wouldn't

22   have been fair, especially when you could have

23   structured the deal easily in a different way to

24   give a different answer.

25                   Q.   And you understand it, I take it,



1    Mr. Huffard, that the parties were in agreement

2    that at that point that everybody reserved all of

3    their rights to take any allocation position they

4    want?  Are you aware of that?

5                    A.    I'm not saying that any of this is

6    binding on the judges.  Obviously it's not.  I'm

7    just saying, from my investment banker's position,

8    what the outcome that the Canadian experts have

9    suggested does not line up with what I believe in

10   this sort of circumstance would be a fair outcome.

11   And the reason is not just some sort of overall

12   sense of equity, but rather because of all of the

13   historical contexts; but also because you could

14   have restructured this deal in a different way and

15   gotten a very different outcome analytically, I

16   believe.

17                   Q.    If you're right on that.

18                   A.    If it --

19                   Q.    Again, it depends on the

20   interpretation of the scope of the license;

21   correct?

22                   A.    There's lots of legal decisions

23   here that I'm not qualified to make.  But yes.

24                   Q.    Right.  Once again, your views are

25   premised on your assumptions about the proper



```
 1   interpretation of the legal rights of the parties?

 2              A.   Correct, in the commercial context

 3   of my experience.

 4              MR. MARK:  Thank you.  Those are my

 5   questions, Mr. Huffard.

 6              MR. HOEFFNER:  Good afternoon, Judge

 7   Gross, Justice Newbould.

 8              THE US COURT:  A late afternoon, yes.

 9              MR. HOEFFNER:  Tim Hoeffner on behalf

10   of the CCC.

11              THE US COURT:  Yes.

12   CROSS-EXAMINATION BY MR. HOEFFNER:

13              Q.   Mr. Huffard, we have not met

14   before; correct?

15              A.   I don't believe so, but --

16              Q.   There's a few topics that Mr. Mark

17   did not cover that I'd like to go over.  First of

18   all, you talk about the Alcatel transaction in your

19   report.  Do you recall that?

20              A.   Yes, I do.

21              Q.   And, in fact, you refer to the

22   Alcatel transaction as providing a, quote, useful

23   allocation methodology precedent.  Do you recall

24   that?

25              A.   I believe -- yes.
```



```
 1                    Q.   And the allocation methodology

 2    that is used in the Alcatel transaction differs in

 3    a number of ways from the allocation methodology

 4    that you use in this case; isn't that correct?

 5                    A.   That's correct.

 6                    Q.   So let's talk about a few of the

 7    differences.

 8                    First of all, Nortel separately valued

 9    goodwill and customer-related assets in the Alcatel

10    transaction; correct?

11                    A.   They separately valued, I believe,

12    goodwill -- yeah, that's correct.

13                    Q.   But your report groups

14    customer-related assets and goodwill together;

15    correct?

16                    A.   Correct.

17                    Q.   You're also aware that the Alcatel

18    model calculated goodwill based on a multifactor

19    formula; is that correct?

20                    A.   That's correct.

21                    Q.   And the three factors that were

22    used to allocate goodwill were revenues, assets and

23    people; is that correct?

24                    A.   That is my understanding.

25                    Q.   And each of those factors was
```



```
 1   given an equal one third weight in allocating

 2   goodwill; correct?

 3                A.   I believe that's right.

 4                Q.   But in your report you do not

 5   apply the three-factor formula for allocating

 6   goodwill that was utilized by Nortel in that

 7   transaction; right?

 8                A.   We do not.

 9                Q.   Instead, you allocate goodwill

10   based solely on revenues generated by the Nortel

11   entities during 2008?

12                A.   That's correct.

13                Q.   You do not allocate goodwill based

14   either on assets or people; correct?

15                A.   That is correct.

16                Q.   As you mentioned earlier today,

17   you do not attempt to directly value the

18   customer-related assets; correct?

19                A.   That's right.  And although they

20   did value them in the transaction you're talking

21   about, the UMTS sale, that that was again an

22   accounting-based valuation which was focused really

23   on the remaining contract life.  So as I talked

24   about earlier, that is sort of a subset of

25   customer value.  It's a calculation you can do, but
```



1    I don't believe that that accurately captures the

2    totality of customer value.

3              Q.   So let's just follow up on that.

4    In the Alcatel transaction, Nortel valued customer

5    relationships using what's called the multi-period

6    excess earnings method; correct?

7              A.   Yes, I believe so.

8              Q.   And the multi-period excess

9    earnings method is a commonly used accounting

10   method; right?

11             A.   Correct.

12             Q.   And the multi-period excess

13   earnings method requires performance of a

14   discounted cash flow style analysis of the returns

15   to customer relationships; right?

16             A.   Correct.

17             Q.   And the analysis also requires the

18   preparation of certain assumptions regarding the

19   expenses and investments necessary to generate

20   those customer relationships; right?

21             A.   That's my understanding.

22             Q.   So the multi-period excess

23   earnings approach also seeks to charge an

24   appropriate cost of capital to the earnings stream

25   from the customer relationship; right?



```
 1                    A.    That's correct.
 2                    Q.    But here in your report you did
 3    not apply the multi-period excess earnings method
 4    to value customer relationships; correct?
 5                    A.    Right.  As I have studied the
 6    MEEM, as it's called by its acronym, I don't
 7    actually believe that the -- it's my personal
 8    opinion that that doesn't actually value customers.
 9    It may be commonly used.  I don't agree with the
10    approach.
11                    But in any event, the kind of detailed
12    assumptions that are required for the MEEM are not
13    available as we sit here today on a legal-entity-
14    by-legal-entity basis.  There's no -- I don't
15    believe there's an ability to re-create those
16    assumptions even if one felt that that was a
17    legitimate valuation approach, which I don't
18    believe it is.
19                    Q.    But, sir, the point being that the
20    methodology that was used by Nortel in the Alcatel
21    transaction is not the same methodology that you
22    used in your work; correct?
23                    A.    That's correct.
24                    Q.    And your methodology does not
25    include calculations of the expenses and
```



```
 1   investments necessary to generate the customer
 2   relationships; correct?
 3            A.   Right.  Those are some of the
 4   assumptions that I don't believe are just literally
 5   available today, as we sit here multiple years
 6   after the fact down at the level of the legal
 7   entities, ultimately that the calculation needs to
 8   be pushed down to.
 9            Q.   And your methodology does not seek
10   to charge a cost of capital to the earnings stream
11   from the relationships at issue; correct?
12            A.   That's correct.
13            Q.   And for purposes of allocating
14   customer value in the Alcatel transaction, the sale
15   value was apportioned amongst the various sellers
16   by identifying which entity held the primary
17   customer relationship; right?
18            A.   That is correct.
19            Q.   And here in your report you did
20   not apportion sale value by identifying which
21   entity held the primary customer relationship;
22   isn't that right?
23            A.   That is correct.  As we talked
24   about earlier, my understanding of the way Nortel
25   ran its business was a much more cooperative and
```

 Neeson&Associates   W&F

1   globally interconnected way.  It seemed improper to

2   me, given that understanding, that having a

3   winner-take-all allocation of customer

4   relationships -- which is what happens when you do

5   that:  only one entity gets it.

6              And I think recognizing the

7   interspersed nature of the effort to generate sales

8   to customers, generate customer value, it seemed to

9   me that a method which spread the revenue and the

10  customer value more broadly than a winner-takes-all

11  strategy seemed more appropriate.

12             Q.   But again, the point being that,

13  again, your methodology did not follow the

14  methodology used by Nortel for the Alcatel

15  transaction; correct?

16             A.   That's correct.

17             Q.   Instead, you allocate customer

18  value based on the historical revenue that is

19  attributable to each Nortel entity?

20             A.   In 2008, yes, sir.

21             Q.   And you're also aware that the

22  methodology used by Nortel in the Alcatel

23  transaction allocated, among the active residual

24  profit entities at the time of sale in accordance

25  with their respective residual profit shares under



1    the MRDA as of December 31, 2006?

2                 A.   Yes.

3                 Q.   And your method here differs in

4    that the measurement of the share contributed by

5    the different residual profit entities is based

6    over different time periods than the five-year

7    period that is used in the MRDA calculation;

8    correct?

9                 A.   Yes, based on the fact that we've

10   now sold the businesses and the IP and at least, as

11   most clearly we can see in the Rockstar sale,

12   demonstrably five years is the wrong period.  It

13   needs to be a longer period.

14                Q.   Sir, the point being that your

15   methodology differs from the methodology used by

16   Nortel in the Alcatel transaction; correct?

17                A.   Again, I'm not trying to re-create

18   the UMTS allocation.  I'm trying to figure out

19   what's a proper allocation in the context of the

20   exercise we have here.

21                Q.   But again, the basic point is your

22   methodology differed from that used in the Alcatel

23   transaction?

24                A.   Yes, it did.

25                Q.   Let's take a look at some of the



 1   numbers that came out of the Nortel allocation of

 2   value in the transaction with Alcatel.  If we could

 3   turn to appendix 10 of your report at page 4,

 4   paragraph 7.

 5            So the total purchase price for the

 6   transaction --

 7            THE CANADIAN COURT:  I can't find it.

 8   They're not tabbed.  I'm still looking.

 9            MR. HOEFFNER:  Take your time.

10            THE CANADIAN COURT:  Okay, I've got it.

11            BY MR. HOEFFNER:

12            Q.   So the total purchase price for

13   the UMTS business was $320 million; right?

14            A.   That's my recollection, yeah.

15            Q.   And that resulted in net proceeds

16   of approximately $293 million?

17            A.   Yep.

18            Q.   And of that $293 million, based on

19   an appraisal, $162 million was allocated to

20   intellectual property; correct?

21            A.   Yes, although let me just say that

22   one of the things in the actual underlying work

23   product, there were different sub-detail line

24   items.  We have tried to group them into these

25   categories of IP, customer relationships, and

Neeson&Associates    W&F

```
 1   goodwill.  We don't actually have visibility as to

 2   "do we do it exactly right."  So this is our best

 3   estimate.

 4               Q.   And your best estimate is that 162

 5   out of the $293 million was assigned to

 6   intellectual property; correct?

 7               A.   Yes.

 8               Q.   And that's roughly 55 percent of

 9   the proceeds of the Alcatel transaction; is that

10   right?

11               A.   I don't have that number, but that

12   looks about right.

13               Q.   My math is not bad, so I think you

14   can rely on that.

15               And in the transaction, the total that

16   was assigned to customer relationships and goodwill

17   was approximately $63 million; correct?

18               A.   Yes.

19               Q.   And that's roughly 21 percent of

20   the total proceeds?

21               A.   That's correct.

22               Q.   And again, let's go back and

23   compare that to the figures that you're using in

24   your report for the business line sales.  As we've

25   talked about earlier today, you've assigned
```



1    approximately 65.3 percent of the value to

2    customer-related assets and goodwill; correct?

3                    A.    Yes.

4                    Q.    And you conclude that only

5    22.7 percent should be assigned to intellectual

6    property; is that correct?

7                    A.    I do.

8                    Q.    So that's actually the flip side,

9    the complete opposite of the precedent in the

10   Alcatel transaction; correct?

11                   A.    That is true by the numbers, but

12   you have to also look at the facts.

13                   Each of these business sales has their

14   own sets of facts and circumstances as to how

15   strong their technology was, how good their

16   customer relationships were.  And even when you

17   look at the buyer PPAs for the business lines sales

18   there is significant variation among them.  So to

19   take just one of these and say "it needs to be like

20   this," I don't think you can draw that inference.

21                   Q.    In looking at your numbers, your

22   numbers come out basically the opposite from the

23   intellectual property and customer-related assets

24   and goodwill in the Alcatel transaction; correct?

25                   A.    Yes.



```
 1                    Q.    Let's go back to the beginning.

 2   Your report states that the Alcatel transaction

 3   provides a useful allocation methodology precedent.

 4   And "precedent" is your word in your report;

 5   correct?

 6                    A.    Correct.

 7                    Q.    You understand that Nortel's

 8   allocation of value in the transaction was prepared

 9   in part for the tax authorities?

10                    A.    Yes, I think for both book and tax

11   purposes, my understanding.

12                    Q.    And do you understand that

13   Alcatel -- the Alcatel allocation was not

14   represented by Nortel to the tax authorities as

15   being precedential?

16                    A.    I don't have specific knowledge of

17   that.

18                    Q.    Are you familiar with the

19   deposition testimony of Kerry Stephens?

20                    A.    I don't have that in my mind right

21   now.

22                    Q.    It's not listed in your --

23                    A.    Just to be clear, in my comment in

24   my report that it was a useful precedent, it had to

25   do with the structure of the assets.
```



```
 1                    As I said earlier, I don't use these
 2    PPAs as being precedential as it relates to the
 3    calculation of the numbers.  Purchase price
 4    allocations are done for a variety of different
 5    reasons, and among them, tax reasons.  And those
 6    can give you different answers than if you're
 7    trying to just come up with a fair market value
 8    result.
 9                    So I'm not trying -- if you tell me
10    that Nortel didn't review that as a precedent for
11    their tax analysis, I'm fine with that.  I'm not
12    trying to argue that it does.  All we were trying
13    to say in saying that it was a precedent was that
14    they grouped the assets into different categories.
15    They recognized customer-related assets as separate
16    from IP.  They used an RPS methodology or a
17    contribution-type methodology for allocating the
18    IP.
19                    Those were the sorts of things that I
20    was trying to say were precedential.  I'm not
21    trying to argue that it's some sort of binding
22    precedent.
23                    Q.   So again, are you familiar with
24    the testimony of Mr. Kerry Stephens in his
25    deposition?
```



```
 1                     A.   I don't believe that I am.
 2                     Q.   Let me pull up pages 210 to 211 of
 3     his deposition.   If we could highlight lines 3 to 7
 4     on Page 211.
 5                     Are you familiar with Mr. Stephens'
 6     testimony concerning the Alcatel transaction that
 7     it was not a precedent -- not a precedent; Inland
 8     Revenue never agreed it was a precedent; we didn't
 9     put it to them that it was a precedent either?
10                     A.   I'm not.
11                     Q.   Now, sir, in your slides we talked
12     a bit about a slide that talked about a criticism
13     of the Canadian Debtors' opinions.   Your reports
14     also criticized that the US Debtors' methodology;
15     isn't that correct?
16                     A.   Yes.
17                     Q.   And you haven't withdrawn your
18     opinions criticizing the US Debtors' position?
19                     A.   I don't believe I have.
20                     Q.   And you agree that the US Debtors'
21     experts applied a, quote, flawed methodology to
22     allocate the sales proceeds.   And "flawed
23     methodology" is a word from your report.
24                     A.   Yes.
25                     Q.   So for the business sales, the US
```



1    experts present an allocation methodology based on

2    relative revenues for business sales?

3               A.    Correct.

4               Q.    And that's one of the items that

5    you criticize?

6               A.    Correct.

7               Q.    And the US methodology that

8    allocates business sale proceeds by the relative

9    amount of third-party revenue earned in each

10   territory does not accurately value all intangible

11   and tangible assets; correct?

12              A.    It does not reflect -- as we've

13   talked about earlier today, does not reflect the

14   different rights and obligations the different

15   assets classes have among the different

16   constituencies.  So we think it makes sense to

17   break out the asset classes.

18              Q.    Again, I'm reading from your

19   report.  And one of your criticisms in your

20   rebuttal report is the US methodology that

21   allocates business sale proceeds by the relative

22   amount of third-party revenue earned in each

23   territory does not accurately value all intangible

24   and tangible assets.  You agree that's correct?

25              A.    Correct.  So that's what I'm



1    saying.  I think you get a more accurate valuation

2    of those tangible and intangible assets by breaking

3    them out and allocating them separately.

4              Q.   It's also one of your opinions

5    that revenue-based valuation techniques are subject

6    to many distortions and poor correlations; is that

7    correct?

8              A.   Valuation techniques, yes.

9              Q.   Yes, valuation techniques.  Thank

10   you.

11             A.   As distinguished from allocation.

12             Q.   "Valuation techniques" is the word

13   in your report.

14             A.   Right.

15             Q.   Are subject to many distortions

16   and poor correlations; correct?

17             A.   Yes.

18             Q.   So in effect, the US Debtors'

19   experts asked the Courts to treat the US company as

20   if it had been a standalone business unconnected to

21   the rest of the Nortel Group that could have been

22   sold by itself; correct?  That's one of your

23   critiques?

24             A.   Correct.

25             Q.   And in addition, the US approach



1  assumes that a territorial entity was entitled to

2  keep all of the value attributable to the revenues

3  generated in its territory.  Again, that's one of

4  your critiques?

5             A.   Correct.

6             Q.   And you agree that the US approach

7  is not consistent with Nortel's historical

8  practices; is that correct?

9             A.   I believe it is not consistent,

10  based on my understanding of their historical

11  practices.

12             Q.   And the US --

13             THE CANADIAN COURT:  Mr. Hoeffner, we

14  have his report at this late stage -- we have his

15  report.  Is there any value in just putting it to

16  him and asking him if he still agrees with it?

17             MR. HOEFFNER:  Just a couple more

18  questions and I'm going to close the loop on it.

19             BY MR. HOEFFNER:

20             Q.   So turning back to your testimony

21  a moment ago, again, one of your criticisms is the

22  US Debtors' methodology reliance on third-party

23  revenue; correct?

24             A.   Correct, as -- yes.

25             Q.   But nonetheless, you testified



```
 1    earlier today that 65.3 percent of the purchase
 2    price of the business line sales should be
 3    allocated to customer-related assets or goodwill;
 4    correct?
 5              A.   Yes.
 6              Q.   And your report concluded that
 7    65.3 percent should be allocated across Nortel
 8    entities based on the revenue generated by each
 9    entity in the fiscal year; isn't that right?
10              A.   Yes.
11              Q.   One last point.  Slide 23, if we
12    could pull that up, the comparison of allocation
13    results.
14              Just to be clear, that slide does not
15    include the calculations using the positions that
16    have been articulated by the CCC; correct?
17              A.   That is the Canadian Debtors, I
18    believe -- yes, that's my understanding.  The CCC,
19    the Canada Debtors.
20              Q.   So this slide does not reflect the
21    positions advocated by the CCC; isn't that right?
22              A.   I believe that's correct.
23              Q.   And your slide does not address
24    the potential outcomes under the pro rata theory;
25    correct?
```



```
 1                      A.    No.  No it does not.
 2                      Q.    Your slides do not take into
 3    consideration the impact of a $2 billion claim by
 4    the United States into the Canadian estate, which
 5    has been referred to as a tax claim?
 6                      A.    Well, again, this is allocation of
 7    proceeds.  How the proceeds are then redistributed
 8    among the debtors based on intercompany claims or
 9    guarantee claims or other things like that is a
10    totally separate exercise.
11                      Q.    So again, your slides do not take
12    into consideration that $2 billion claim into
13    Canada by the US?
14                      A.    That's correct.  There's no
15    reallocation of value due to claims that appears
16    anywhere in my report.
17                      Q.    And your slides do not take into
18    consideration the impact of a $4 billion claim by
19    Bondholders into the Canadian estate; correct?
20                      A.    Correct.
21                      Q.    Your slide entitled -- the
22    category for US Debtors identifies a potential
23    result of 11 percent being provided to the Canada
24    estate.  Do you see that?
25                      A.    I do see that.
```



```
 1                    Q.    You have not opined on what the
 2     willingness of the Canadian estate would be to
 3     enter into all these proceedings were they to know
 4     that the result would be that they would receive
 5     11 percent; isn't that correct?
 6                    A.    I'm not opining on anybody's
 7     willingness to accept anything right now.
 8                    Q.    But you said that the US would
 9     have been outraged had they understood that the
10     result would be that set forth in the Canada
11     Debtors' proposed allocation results; correct?
12                    A.    I'm talking about specifically as
13     it relates to treatment of IP and how that works.
14                    Q.    But again, you're not providing a
15     similar opinion with respect to the willingness of
16     the Canada Debtors to accept a similar result as
17     proposed under the US theory, which would provide
18     only 11 percent to Canada.
19                    A.    So let me then -- if it's
20     all right, let me recharacterize my comments just
21     because I represent the EMEA Debtors.  I don't
22     believe that EMEA Debtors would have accepted
23     either of those if they knew the allocations --
24     EMEA would be fine with the US, I'm sure.
25                    But the point I was trying to make --
```



1   and I think it applies to the US but they can speak

2   for themselves -- is that if the EMEA Debtors had

3   understood that the Canadian view of the world was

4   correct, I think they would have wanted to do a

5   different transaction than the one that was

6   ultimately approved.

7                Let me not try to put words in the US

8   Debtors' mouth.

9                Q.   So you've made statements about

10  the views of the US Debtors.  You made statements

11  about the EMEA Debtors.  But again, you're not

12  making statements and conclusions about what the

13  Canadian Debtors' view would be of the proposed

14  allocation result with respect to its being set

15  forth by the US; correct?

16               A.   I must say I have no real sense of

17  what the Canadians are looking for.  I'm not trying

18  to put any words in their mouth.

19               MR. HOEFFNER:  Recognizing that it's

20  5:10 in the afternoon and we've all had a long day,

21  those are my questions.  Thank you very much.

22               THE WITNESS:  Thank you.

23               THE US COURT:  Thank you, Mr. Hoeffner.

24               Anyone else for cross-examination?  Are

25  we going to do our direct this evening?



```
 1                   Mr. Bromley, good to see you again.
 2                   MR. BROMLEY:  Good to see you, Your
 3      Honor.  In light of the length of the day and the
 4      amount of information that's come out, we would
 5      suggest we break for the day.  Our
 6      cross-examination, we'll work very carefully
 7      overnight to minimize it as much as possible.
 8                   THE US COURT:  Is Mr. Huffard available
 9      tomorrow?
10                   THE WITNESS:  I can be.  I wasn't
11      planning on being here.  I would prefer to do it
12      tonight if it's at all possible.
13                   THE CANADIAN COURT:  How long do you
14      plan to be in cross; do you know?
15                   THE US COURT:  It would help if you had
16      time to organize.
17                   MR. BROMLEY:  It certainly would, Your
18      Honor.
19                   THE CANADIAN COURT:  We've had a long
20      day.  I -- speaking for myself, I think we should
21      come back tomorrow.  It's a bit unfortunate that
22      we've had so many days where we weren't sitting
23      full days, and now we're going to be faced with
24      this probably more than once.  But we are where we
25      are.
```



1              Mr. Huffard, I just think we've had a
2      long day.
3              THE US COURT:  Yes.  I think it makes
4      sense as well to allow the parties to go back and
5      organize and to be able to examine I think in a
6      more expedited and sort of tailored fashion.
7              So I'm sorry, Mr. Huffard.  I know it
8      was a long day for you as well, and hopefully
9      tomorrow won't be nearly as long.  All right.
10             MR. BROMLEY:  So I just assume that
11     Mr. Huffard will start off at 9:00 tomorrow
12     morning, and we'll work on finishing as quickly as
13     possible.
14             THE CANADIAN COURT:  Sorry.  I meant to
15     say, I think 9:15.  I've got a meeting at a quarter
16     to 9:00, so if we can start at 9:15.
17             THE US COURT:  9:15 it is.  All right,
18     everyone.  You have a little beauty sleep.  And
19     with that, we'll stand in recess until
20     9:15 tomorrow morning.
21             THE CANADIAN COURT:  I'll need more
22     than 15 minutes.
23             THE US COURT:  Good night, everyone.
24     -- Whereupon court adjourned at 5:10 p.m.
25

 Neeson&Associates    W&F

```
 1
 2
 3                 REPORTERS' CERTIFICATE
 4              I, KIMBERLEY A. NEESON, RPR, CRR, CSR,
 5   CCP, CBC, Canadian Certified Shorthand Reporter,
 6   Realtime Systems Administrator, and I, GAIL INGHRAM
 7   VERBANO, RDR, CRR, CSR, US Certified Shorthand
 8   Reporter, Realtime Systems Administrator, certify;
 9              That the foregoing proceedings were
10   taken before us at the time and place therein set
11   forth;
12              That the entire proceedings of the
13   hearing date were recorded stenographically
14   individually by each of us and were thereafter
15   transcribed;
16              That the foregoing is a true and
17   correct transcript of our shorthand notes so taken.
18
19              Dated this 28th day of May, 2014.
20   PER:                     PER:
21   Lorraine Marino, Gail Verbano    Kimberley Neeson, Deana Santedicola
22   LORRAINE B. MARINO         KIMBERLEY NEESON
23   GAIL INGHRAM VERBANO       DEANA SANTEDICOLA,
24   WILCOX & FETZER            NEESON & ASSOCIATES
25   WILMINGTON, DE USA         TORONTO, ON
```









































































