



WILCOX & FETZER LTD.

FOR EXCELLENCE IN COURT REPORTING

```
 1              UNITED STATES BANKRUPTCY COURT

 2             FOR THE DISTRICT OF DELAWARE

 3

 4    ------------------------------)

 5    In Re                         )

 6      NORTEL NETWORKS INC.,       )  Case No.

 7      et al.,                     )  09-10138 (KG)

 8        Debtors.                  )

 9    ------------------------------)

10                        - and -

11             Court File No. 09-CL-7950

12                     ONTARIO

13            SUPERIOR COURT OF JUSTICE

14               (COMMERCIAL LIST)

15      IN THE MATTER OF THE COMPANIES' CREDITORS

16   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18   ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19       NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20      CORPORATION, NORTEL NETWORKS INTERNATIONAL

21      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                    CORPORATION

23     APPLICATION UNDERT PART IV OF THE COMPANIES'

24   CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                    AS AMENDED
```

Neeson&Associates    W&P

1

2

3

4      ---- This is the Day 10/Volume 10 of the transcript

5      of the proceedings in the above matter held

6      simultaneously in:

7      Superior Court of          United States Bankruptcy

8      Ontario (Commercial        Court for the District of

9      List)                      Delaware

10     Courtroom 8-1              Courtroom 3

11     330 University Avenue      824 Market Street

12     Toronto, Ontario           Wilmington, Delaware

13

14     on the 29th day of May, 2014, commencing at 9:28

15     a.m.

16

17                       ---------

18     B E F O R E:

19     The Honorable Judge Kevin Gross (United States)

20     The Honorable Mr. Justice Frank Newbould (Canada)

21

22                       ---------

23

24

25

 Neeson & Associates    W&P Wilson & Peyton Ltd.

```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17        Julie Rosenthal, Esq.

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22   PER: Murray McDonald, Esq.

23        Brent Beekenkamp, Esq.

24

25
```



```
 1   FOR THE APPLICANTS
 2   GOWLING LAFLEUR HENDERSON LLP
 3   Suite 1600, First Canadian Place
 4   100 King Street West
 5   Toronto, ON  M5X 1G5
 6   PER: Derrick Tay, Esq.
 7        Jennifer Stam, Esq.
 8
 9   FOR THE CANADIAN DEBTORS
10   ALLEN & OVERY LLP
11   1221 Avenue of the Americas
12   New York, NY  10020
13   PER: Ken Coleman, Esq.
14        Paul Keller, Esq.
15        Daniel Guyder, Esq.
16        Laura Hall, Esq.
17        Joseph Badtke-Berkow, Esq.
18        Jonathan Cho, Esq.
19        Nicolette Ward, Esq.
20
21   FOR THE CANADIAN DEBTORS
22   BUCHANAN INGERSOLL & ROONEY
23   1105 North Market Street
24   Suite 1900
25   Wilmington, DE  19801-1054
```



```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   79 Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   1201 North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```



```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```



```
 1   PER: Matthew P. Gottlieb, Esq.
 2        Tracy Wynne, Esq.
 3        Paul Michell, Esq.
 4
 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
 6   LIMITED
 7   HUGHES HUBBARD & REED
 8   One Battery Park Plaza
 9   New York, NY  10004-1482
10   PER: Derek Adler, Esq.
11        William Maguire, Esq.
12        Neil Oxford, Esq.
13        Fara Tabatabai, Esq.
14        Charles Huberty, Esq.
15
16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
17   LIMITED
18   YOUNG CONAWAY STARGATT & TAYLOR LLP
19   Rodney Square
20   1000 North King Street
21   Wilmington, DE  19801
22   PER: Ed Harron, Esq.
23        John Dorsey, Esq.
24
25   FOR THE EMEA DEBTORS
```



```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER: James Norris-Jones, Esq.

 6

 7   CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```



```
 1   PER: Barry E. Wadsworth, Esq.

 2        Lewis Gottheil, Esq.

 3

 4   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 5   COMMITTEE

 6   SHIBLEY RIGHTON LLP

 7   University Avenue, Suite 700

 8   Toronto, ON  M5H 3E5

 9   PER: Arthur O. Jacques, Esq.

10        Thomas McRae, Esq.

11

12   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14   FUND

15   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16   35th Floor

17   155 Wellington Street West

18   Toronto, ON  M5V 3H1

19   PER: Kenneth T. Rosenberg, Esq.

20        Massimo (Max) Starnino, Esq.

21        Lily Harmer, Esq.

22        Karen Jones, Esq.

23        Tina Lie, Esq.

24        Michelle Jackson, Esq.

25
```



```
 1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 3   2009

 4   NELLIGAN O'BRIEN PAYNE LLP

 5   50 O'Connor Street, Suite 1500

 6   Ottawa, ON  K1P 6L2

 7   PER: Janice B. Payne, Esq.

 8        Steven Levitt, Esq.

 9        Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```



```
 1   919 North Market Street, Suite 1500

 2   Wilmington, DE  19801

 3   PER: Selinda A. Melnik, Esq.

 4        Richard Hans, Esq.

 5        Timothy Hoeffner, Esq.

 6        Jason Gerstein, Esq.

 7        Farah Lisa Whitley-Sebti, Esq.

 8

 9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12   BENNETT JONES LLP

13   1 First Canadian Place

14   Suite 3400

15   Toronto, ON  M5X 1A4

16   PER: Kevin Zych, Esq.

17        S. Richard Orzy, Esq.

18        Gavin Finlayson, Esq.

19        Richard Swan, Esq.

20        Sean Zweig, Esq.

21        Jonathan Bell, Esq.

22        Amanda McLachlan, Esq.

23

24   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25   MILBANK, TWEED, HADLEY, MCCLOY LLP
```



```
 1   1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4       Jennifer P. Harris, Esq.

 5       Albert A. Pisa, Esq.

 6       Samir Vora, Esq.

 7       Andrew LeBlanc, Esq.

 8       Michael Hirschfeld, Esq.

 9       Atara Miller, Esq.

10       Tom Matz, Esq.

11       Nick Bassett, Esq.

12       Gabrielle Ruha, Esq.

13       Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23       Michael Wunder, Esq.

24       Ryan Jacobs, Esq.

25
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
 2   ASHURST LLP
 3   Boardwalk House
 4   5 Appold Street
 5   London, England  EC2A 2HA
 6   PER: Angela Pearson, Esq.
 7        Antonia Croke, Esq.
 8
 9   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
10   RICHARDS LAYTON & FINGER, P.A.
11   920 North King Street
12   Wilmington, DE  19801
13   PER: Christopher Samis, Esq.
14
15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
16   AKIN GUMP STRAUSS HAUER & FELD LLP
17   One Bryant Park
18   New York, NY  10036
19   PER: Fred S. Hodara, Esq.
20        David H. Botter, Esq.
21        Abid Qureshi, Esq.
22        Robert A. Johnson, Esq.
23        Brad M. Kahn, Esq.
24        Christine Doniak, Esq.
25        Joseph Sorkin, Esq.
```



```
 1         Jacqueline Yecies, Esq.

 2   UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 3   UK PENSION TRUST LIMITED

 4

 5   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 6   NETWORKS UK PENSION TRUST LIMITED

 7   THORNTON GROUT FINNIGAN LLP

 8   Suite 3200, 100 Wellington Street West

 9   P.O. Box 329

10   Toronto, ON  M5K 1K7

11   PER: Michael Barrack, Esq.

12        D.J. Miller, Esq.

13        Rebecca Lewis, Esq.

14        Andrea McEwan, Esq.

15        John Finnigan, Esq.

16        Michael Shakra, Esq.

17        D.J. Miller, Esq.

18

19   FOR THE UK PENSION PROTECTION FUND AND NORTEL

20   NETWORKS UK PENSION TRUST LIMITED

21   WILLKIE FARR & GALLAGHER LLP

22   787 Seventh Avenue

23   New York, NY  10019-6099

24   PER: Brian O'Connor, Esq.

25        Sameer Advani, Esq.
```



1          Andrew Hanrahan, Esq.

2

3    FOR THE UK PENSION PROTECTION FUND AND NORTEL

4    NETWORKS UK PENSION TRUST LIMITED

5    BAYARD, P.A.

6    222 Delaware Avenue, Suite 900

7    Wilmington, DE  19899

8    PER: Charlene D. Davis, Esq.

9          Justin Alberto, Esq.

10

11   THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER: Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER: Michael J. Riela, Esq.

25



```
 1   WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER: John Salmas, Esq.

10        Kenneth Kraft, Esq.

11        Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER: Craig A. Barbarosh, Esq.

18        David A. Crichlow, Esq.

19        Karen B. Dine, Esq.

20

21   LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```

 Neeson & Associates   W&F

```
 1   Toronto, ON  M5H 3Y4
 2   PER: Edmond F.B. Lamek, Esq.
 3        James Szumski, Esq.
 4
 5   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
 6   PATTERSON BELKNAP WEBB & TYLER LLP
 7   1133 Avenue of the Americas
 8   New York, NY  10036
 9   PER: Daniel A. Lowenthal, Esq.
10
11   BOARDS OF DIRECTORS OF NORTEL NETWORKS
12   CORPORATION AND NORTEL NETWORKS LIMITED
13
14   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
15   CORPORATION AND NORTEL NETWORKS LIMITED
16   OSLER HOSKIN AND HARCOURT LLP
17   100 King Street West
18   1 First Canadian Place, Suite 6100
19   P.O. Box 50
20   Toronto, ON  M5X 1B8
21   PER: Lyndon Barnes, Esq.
22        Edward Sellers, Esq.
23        Betsy Putnam, Esq.
24        Adam Hirsh, Esq.
25        Alexander Cobb, Esq.
```

Neeson & Associates   W&F

1                      I N D E X

2

3                      EXAMINATION

4   WITNESS:                                    PAGE

5   PAUL HUFFARD, CONTINUED

6       Cross-Examination by Mr. Bromley        2111

7       Re-Examination/Re-Direct by Mr. Maguire  2136

8       Recross-Examination by Mr. Mark          2159

9   ANGELA MARY ANDERSON

10      Examination-in-Chief/Direct by           2170

11      Ms. Schneider

12      Cross-Examination by Mr. Ruby            2188

13      Cross-Examination by Mr. Luft            2202

14  JAMES MALACKOWSKI

15      Examination-in-Chief/Direct by           2224

16      Mr. Milne-Smith

17      Cross-Examination by Mr. Chang           2345

18      Cross-Examination by Mr. Zarnett         2356

19

20

21

22

23

24

25



1                    INDEX OF EXHIBITS

2

3

4    NUMBER/DESCRIPTION                          PAGE

5       32   Affidavit of Ms. Anderson dated     2169

6       April 25, 2014

7       33   Expert Report of James E.           2224

8       Malackowski dated January 24, 2014

9       34   Rebuttal Report of  James E.        2224

10      Malackowski dated February 28, 2014

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1    --- Upon commencing at 9:28 a.m.
 2              THE US COURT:  Just a couple of brief
 3    announcements.  I have to break at 12:15 today for
 4    a judges' lunch, and I have to stop at 5:00 sharp
 5    tonight.  So with those parameters, I am ready to
 6    continue, as is Justice Newbould.
 7              Mr. Bromley, it is good to have you
 8    here.  Good morning.
 9              MR. BROMLEY:  Good morning, Judge
10    Gross.  Good to be here.  Good morning, Justice
11    Newbould.  I will try to be quick this morning with
12    Mr. Huffard so we can turn the festivities back to
13    Toronto.
14              THE US COURT:  Right.
15              MR. BROMLEY:  For the record, my name
16    is James Bromley of Cleary Gottlieb on behalf of
17    the US Debtors.  And my apologies for having to
18    bring Mr. Huffard back this morning.
19              Paul Huffard, having been previously
20    sworn, was examined and testified further as
21    follows:
22    CROSS-EXAMINATION BY MR. BROMLEY:
23              Q.   Now, Mr. Huffard, yesterday you
24    testified a fair amount about what you referred to
25    as the contribution theory.  Do you recall that
```

Neeson & Associates    W&F

1    testimony?

2                    A.    Yes, I do.

3                    Q.    And the contribution theory is one

4    theory that you and Mr. Malackowski support as

5    being appropriate for the allocation of that

6    portion of the 7.3 billion that is now in escrow

7    that you attribute to intellectual property; isn't

8    that right?

9                    A.    That is correct.

10                   Q.    And the other theory is the

11   license theory?

12                   A.    Yes, the other theory.

13                   Q.    Now, I would like to bring up a

14   couple of slides from your presentation yesterday.

15   If I could ask for slide 5, please.  Do you see

16   that, Mr. Huffard?

17                   A.    I do.

18                   Q.    Okay.  And slide 5 is captioned

19   "Asset class valuation."  And looking at that

20   slide, it starts at the top with the 7.3 billion.

21   That represents the amount in escrow; correct?

22                   A.    Yes, that's correct.

23                   Q.    And then it shows on a pie chart

24   two sections that are captioned "Residual patents

25   59 percent" and "Business sale IP 10 percent,"



```
 1    "Total IP 69 percent."  So when you were testifying
 2    yesterday and said that approximately 70 percent of
 3    the total value was attributable to IP, you were
 4    referring to this chart?
 5                 A.   I was referring to our analysis
 6    more generally, but it is displayed on this chart,
 7    and it is the -- I was rounding the 69 percent to
 8    approximately 70 percent.
 9                 Q.   Thank you.  And so this is an
10    approximation, the 69 -- the 70 was an
11    approximation of the 69 percent.
12                 And this chart represents the analysis
13    that you and Mr. Malackowski have done?
14                 A.   Yes, it does.
15                 Q.   Okay.  Now, you and
16    Mr. Malackowski used the allocation theory to
17    allocate this 69 percent among the selling debtors;
18    that's correct?
19                 A.   That is correct.
20                 Q.   Now, let's look at slide 11, and
21    there are pie charts here.  One is captioned
22    "Business sales IP," and the other "Residual
23    patents sales," each with certain percentages.  And
24    is it fair to say that these charts represent the
25    use of the contribution theory to allocate the IP
```



1    value from the business sales and the residual

2    patent sales?

3             A.   That is correct.

4             Q.   Now, when you say allocation based

5    on contribution, you are referring to the

6    allocation of the IP sale proceeds in accordance

7    with the selling debtors' relative contributions to

8    R&D; correct?

9             A.   Yes.

10            Q.   And is it fair to say that when

11   you say relative contributions to R&D, you are

12   referring to that portion of the cost of creating

13   the R&D that was borne by each of the selling

14   debtors?

15            A.   That portion -- it is the

16   proportionate share of the research and development

17   expense as they reported it.

18            Q.   So the expenses relate to the

19   creation of the R&D, and that would include

20   salaries and physical facilities, lab equipment,

21   all of that, all that expense?  Is that what would

22   be included in that?

23            A.   Those are the sorts of things that

24   might be included in there.  I am not exactly sure,

25   as you talk about physical facilities, what portion



```
 1   of the physical facility expense is included in R&D
 2   versus in some other line item.  But those are the
 3   sorts of things that are in there.
 4              Q.   And just speaking in generalities
 5   at this point?
 6              A.   Right.
 7              Q.   Not focusing on the line-item
 8   detail.  But in general terms, what we are talking
 9   about in terms of contribution is the proportionate
10   share of the expense of creating the R&D; is that
11   correct?
12              A.   Yes.
13              Q.   Okay.  So now let's focus for a
14   moment on the purchasers of the Nortel Group's
15   intellectual property.  And those purchasers
16   include the business line purchasers that you
17   discussed yesterday, Ericsson, Avaya and Ciena, as
18   well as Rockstar; correct?
19              A.   Correct.
20              Q.   And those purchasers each
21   participated in active sale processes, right,
22   overseen by this Court and the Canadian Court?
23              A.   Yes.
24              Q.   And those sales were conducted in
25   accordance with Section 363 of the US bankruptcy
```

 Neeson & Associates    W&P

```
 1   code; right?
 2              A.    That's my understanding.
 3              Q.    That's your understanding?
 4              A.    Yes.
 5              Q.    And you are familiar, are you not,
 6   with the Section 363 sale processes?
 7              A.    I am.
 8              Q.    And, in fact, as an investment
 9   banker with Blackstone, you have been involved with
10   many 363 sales, haven't you?
11              A.    I have.
12              Q.    Is it fair to say that you are an
13   expert on Section 363 sales?
14              A.    Not from a legal point of view.  I
15   don't want to, again, put myself off as a legal
16   expert.  From an investment banking point of view
17   in terms of running 363 sales processes, working
18   with sellers of assets under that sort of process
19   and working with buyers under that sort of process,
20   I believe I am an expert in that.
21              Q.    And certainly not talking about
22   from a legal perspective.  And that Blackstone as a
23   firm is certainly one of the leading advisors on
24   Section 363 sale processes?
25              A.    I believe we are.
```



```
 1                    Q.    And so you know how the 363

 2   process works?

 3                    A.    Generally, yes.

 4                    Q.    Generally, yes.  And how bids are

 5   made?

 6                    A.    Yes.

 7                    Q.    And how transactional structures

 8   are put together in the context of those sales?

 9                    A.    Yes.

10                    Q.    And you have advised both buyers

11   and sellers in how to participate in 363 sale

12   processes; right?

13                    A.    I have.

14                    Q.    Now, let's focus again on the

15   purchasers of the business lines and focusing on

16   the three examples that you gave yesterday:

17   Ericcson, Avaya and Ciena.  You are familiar with

18   those purchasers in a general way?

19                    A.    Yes, I am.

20                    Q.    And I think there were three

21   slides yesterday, one on each of the transactions.

22   And so in general terms you are aware that in each

23   of those business line sales, the purchasers

24   acquired a variety of things:  Real property,

25   customer contracts, inventory, other tangible
```



```
 1   assets, lab equipment; isn't that correct?
 2             A.   Yes.  My general understanding is
 3   that they acquired the spectrum of assets that
 4   would comprise a business, not just technology
 5   portfolios.
 6             Q.   So all of the things that would be
 7   necessary to operate that business line was
 8   included in general terms?
 9             A.   Yes.
10             Q.   And that, in addition, there were
11   employees that transferred as part of those
12   transactions; isn't that correct?
13             A.   Yes, that is my understanding.
14             Q.   As well as intellectual property?
15             A.   Yes.
16             Q.   And the intellectual property,
17   there was some intellectual property that actually
18   transferred completely and then some that was
19   licensed on a nonexclusive basis?
20             A.   Yes.
21             Q.   And you also mentioned yesterday,
22   I think, that in the business line transactions,
23   that the purchasers in certain circumstances
24   acquired liabilities, assumed certain liabilities
25   as part of the transactions?
```



```
 1                    A.   Yes.

 2                    Q.   Now, in your experience in 363

 3    sales, that kind of group of assets, acquired and

 4    liabilities assumed, that's typical of 363 sales,

 5    is it not?

 6                    A.   Yes, it is, when there's

 7    businesses, operating businesses that are being

 8    sold.

 9                    Q.   And so it doesn't surprise you

10    that these operating businesses, when transferred,

11    transferred with that group of assets and

12    liabilities, those types of assets and liabilities?

13                    A.   No.  I think that would be quite

14    typical.

15                    Q.   And with respect to the employees,

16    now, there were certain employees that were

17    transferred in the US, EMEA and Canada.  Are you

18    aware of that?

19                    A.   Yes.

20                    Q.   And is it fair to say that in your

21    experience, a purchaser would not take employees

22    from the seller unless it was in the economic

23    interest of the purchaser to do so?

24                    A.   Generally speaking, I think that's

25    a fair statement.
```



```
1                    Q.   So generally only if the employees

2    were valuable to the purchasers would the

3    purchasers agree to hire those employees?

4                    A.   Yes.

5                    Q.   And that when those employees

6    transfer from the seller to the buyer, the seller

7    is relieved of certain liabilities in respect of

8    those employees?

9                    A.   I believe that to be the case.

10                   Q.   So, for instance, the obligation

11   to pay them to come to work?

12                   A.   To pay them, yes, sure.

13                   Q.   Now, would you agree with me that

14   the purchase prices paid for the business lines

15   represent the fair market value of those business

16   lines?

17                   A.   From everything that I can see, it

18   was a complete and robust auction process that was

19   run.  I think that would define the fair market

20   value of those assets.

21                   Q.   And so those prices were set in

22   fair and open processes, as far as you know?

23                   A.   I believe they were.

24                   Q.   And you understood that there were

25   open bidding opportunities for other parties to
```



```
 1   participate?

 2              A.    That is my understanding.

 3              Q.    And, in fact, with respect to the

 4   CDMA business which was ultimately bought by

 5   Ericsson, the Enterprise business ultimately bought

 6   by Avaya, and the MEN business ultimately bought by

 7   Ciena, there were vigorous auctions for each of

 8   those business lines?

 9              A.    That is my understanding.

10              Q.    And that the final sale price was

11   substantially higher than the stalking horse price

12   for those transactions?

13              A.    I believe that to be correct.

14              Q.    And so the ability of the auction

15   process to increase the bid, that's part of the

16   beauty of the 363 process?

17              A.    Yes, as a general matter.

18              Q.    Now, would you agree with me that

19   the purchasers, when proposing to buy these

20   business lines, were proposing prices that

21   reflected what the purchasers could expect to earn

22   from acquiring those business lines?

23              A.    I don't know that I actually have

24   knowledge of how the purchasers looked at what they

25   could earn versus what they were paying.  They were
```

 Neeson&Associates   W&F WILSON & PETZER LTD.

```
 1    certainly offering to pay more than the
 2    next-highest bidder.  They may have a different
 3    view entirely of how much they could earn.
 4                Q.   I am certainly not trying to put
 5    you in the mind of the purchasers.  But generally
 6    speaking, in your experience, when someone is in a
 7    363 sale process, they are paying a price with the
 8    expectation that they are going to be able to do
 9    something with those assets that will create value
10    for them?
11                A.   That is true.
12                Q.   And is it fair to say that those
13    prices were not based on what it cost the Nortel
14    Group or any member of the Nortel Group to actually
15    create or run those businesses?
16                A.   Yes.  I don't think those are
17    related.
18                Q.   And would the same be true with
19    respect to the residual patent portfolio, that when
20    Google put its stalking horse bid in of $900
21    million, that that was based on the idea that
22    Google could do something with the patents once it
23    acquired those patents?
24                A.   Well, yes.  I think as a general
25    matter, buyers don't purchase businesses or assets
```



1    unless they think that that's going to be a good

2    thing for them.

3                    Q.   And so the Google bid and the

4    Rockstar ultimate winning bid were based more on

5    what those purchasers could expect to obtain from

6    the rights relating to the patents rather than what

7    it cost any of the Nortel entities to create those

8    assets?

9                    A.   That is correct.

10                    Q.   Now, Mr. Huffard, you are familiar

11    with the now somewhat infamous Master R&D

12    Agreement, are you not?

13                    A.   The MRDA, yes.

14                    Q.   Thank you.  I think even my

15    children are familiar with it at this point.

16                    And that there are five parties to the

17    MRDA:  NNI, NNUK, NNL, and NNSA France and NN

18    Ireland?

19                    A.   Yes.

20                    Q.   And that each is referred to as a

21    participant or an integrated entity in respect of

22    the MRDA?

23                    A.   Yes.

24                    Q.   Now, you are generally aware of

25    the term "transfer pricing"?



```
 1                  A.    Yes, I am.

 2                  Q.    But you are not a transfer pricing

 3      expert; right?

 4                  A.    I am not a transfer pricing

 5      expert.

 6                  Q.    God bless you.

 7                  And you know that the MRDA is a

 8      transfer pricing document, to a certain extent?

 9                  A.    I believe that one of the

10      components of the MRDA is to address transfer

11      pricing.

12                  Q.    Right.  And that the MRDA contains

13      a transfer pricing methodology that is referred to

14      as the residual profit-split methodology?

15                  A.    Yes.

16                  Q.    Or the RPSM?

17                  A.    Yes.

18                  Q.    Sorry?

19                  A.    Yes, I am.

20                  Q.    And you are aware, are you not,

21      that the MRDA and the RPSM contained within the

22      MRDA does not provide or direct that the proceeds

23      from the sales of the line of business be

24      distributed to the participants in any particular

25      fashion?
```

 Neeson & Associates   W&P

```
 1                      A.    That is my commercial

 2     understanding of that agreement.  I am not

 3     rendering a legal opinion on it, yes.

 4                      Q.    And so by the same token, there

 5     was nothing in the MRDA from your commercial

 6     understanding that required the proceeds of the

 7     UMTS sale to Alcatel to be allocated and

 8     distributed to the participants in any particular

 9     fashion?

10                      A.    That is my understanding.

11                      Q.    And were you aware that Nortel

12     considered several different approaches on how to

13     allocate and distribute the sale proceeds of the

14     UMTS sale?

15                      A.    I am generally aware, but I don't

16     have a detailed understanding of that.

17                      Q.    And that Nortel as a group

18     considered using revenue and income based -- as an

19     allocation approach as well as the approach

20     ultimately used?

21                      A.    I don't have a specific

22     understanding of those topics.

23                      Q.    I would like to show you a

24     document, if I could.

25                      I am not sure -- I am sorry, Your
```



 1   Honors -- which trial exhibit we are now up to.

 2   Somewhere in the 30's, I believe.

 3              THE US COURT:  Is this a brand new

 4   document?  It would be No. 32.

 5              MR. BROMLEY:  It is Exhibit TR21147.

 6              MR. ROSENTHAL:  It is actually Exhibit

 7   21147, Your Honors.

 8              MR. BROMLEY:  Thank you, Mr. Rosenthal.

 9              BY MR. BROMLEY:

10              Q.   Mr. Huffard, do you have before

11   you what has been marked as Exhibit TR21147?

12              A.   Yes, I do.

13              Q.   And it is a little over a page

14   long.  It is a document that is in the form of an

15   email from Ms. Rosanne Culina to a Mr. Peter Look,

16   dated December 15, 2006, at 8:00 a.m. on a Friday

17   morning.

18              Have you seen this document before?

19              A.   I have not.

20              Q.   And this is not something that

21   you, therefore, reviewed and relied upon in

22   preparing your expert reports?

23              THE CANADIAN COURT:  He said he hasn't

24   seen it.

25              THE WITNESS:  I don't believe I did.



```
 1                    MR. BROMLEY:  Yes, Justice Newbould.
 2   Just following up the obvious question with a more
 3   obvious question.  Sorry.
 4                    THE WITNESS:  I am good on obvious
 5   questions, by the way.
 6                    MR. BROMLEY:  It's the only ones I
 7   know.
 8                    BY MR. BROMLEY:
 9        Q.    So and just looking at No. 1,
10   Customer Contracts and Customer Relationships, you
11   see the phrase "two allocation views"?
12        A.    Yes.
13        Q.    And then under No. 2, "IPR," do
14   you understand that to mean intellectual property
15   rights?
16        A.    If you tell me that's what it
17   means.  I don't have a specific understanding of
18   it.
19        Q.    Okay.  In this context I will
20   represent to you that it does.  It does mean that,
21   and -- two allocation views.
22                    So would it surprise you, then,
23   Mr. Huffard, that there were different allocation
24   approaches that were considered in connection with
25   the UMTS sale to Alcatel?
```

 Neeson & Associates    W&P Wilcox & Fetzer Ltd.

```
 1                    A.   It would not surprise me.
 2                    Q.   Okay.  You can put that aside,
 3     sir.  Thank you.
 4                    Now, in connection with your allocation
 5     analysis and that used by Mr. Malackowski, when you
 6     calculate the contribution, you are looking to the
 7     actual dollars or pounds or euros that were
 8     actually spent on the R&D by each entity; right?
 9                    A.   Yes.  I believe that they were all
10     done on a dollars --
11                    Q.   Dollars basis?
12                    A.   Right.
13                    Q.   I think they were all measured in
14     dollars, but I think the folks in England were
15     actually paid in pounds?
16                    A.   Yes, I am sure that's correct.
17                    Q.   Now, when measuring contribution,
18     you don't, however, take into account how those
19     dollars or pounds or euros actually got into the
20     bank accounts of the entities that were making the
21     payments, do you?
22                    A.   Well, again, the actual
23     calculations here are really in Mr. Malackowski's
24     area of analysis.  I don't believe that he sort of
25     audited the cash flows that underlie the actual
```



```
 1    accounting entries on the company's books and

 2    records, but he would have to speak to that more

 3    directly.

 4                 Q.   And we will talk to

 5    Mr. Malackowski later today.  But from your

 6    understanding, this was an exercise that was

 7    focused on moneys out of accounts in each of the

 8    jurisdictions rather than moneys in?

 9                 A.   From my understanding, I don't

10    believe the exercise actually focused on, as you

11    say, moneys, which I interpret as cash.

12                 Q.   Yes.

13                 A.   I believe it did not focus on

14    cash.  I believe it focused on the accrual

15    accounting as shown in the company's books and

16    records.  There may or may not have been actual

17    cash flows that tracked the accrual accounting.

18                 Q.   Okay.  That's fair.  And I am not

19    asking --

20                 A.   I don't have specific knowledge of

21    that.

22                 Q.   And I am not asking you to be a

23    forensic accountant on this.

24                 A.   Thank you.

25                 Q.   But you are aware, under the
```



```
 1   transfer pricing regime, the RPSM, that there were

 2   transfers of cash between various entities, among

 3   the five integrated entities?

 4              A.   I am not actually specifically

 5   aware of that.  I believe that there were

 6   accounting entries that reflect the RPSM

 7   calculations.  I am not specifically aware of the

 8   cash flows that may or may not have tracked that.

 9              Q.   But you have no reason to doubt

10   that there were cash flows underlying the book

11   entries?

12              A.   I have no specific reason to doubt

13   that.  But on the other hand, my experience with

14   large corporations is that the cash flows

15   frequently actually do not track the accounting

16   entries.  But again, I don't have specific

17   knowledge of that.

18              Q.   Okay.  Do you have an

19   understanding with respect to the transfer pricing

20   methodology, the RPSM, that there were among the

21   five entities certain entities that were net payors

22   and certain that were net recipients?

23              A.   I don't have specific knowledge of

24   that.

25              Q.   And so with respect to the
```



```
 1   contribution analysis, you are not aware then of
 2   whether or not the analysis that was done by
 3   Mr. Malackowski took into account, for instance,
 4   that the US paid, between 2001 and 2009, nearly
 5   $7 billion in cash into the RPSM system.
 6               A.   Again, the contribution theory
 7   that Mr. Malackowski has followed tracks the R&D
 8   expense, the research and development expense as
 9   shown on the company's books and records.
10               What cash flows and allocations of
11   profit or loss, as you are suggesting, fall out of
12   the RPSM calculations were really not part of his
13   consideration.  That was, you know -- what he was
14   trying to follow is the front end of the RPSM,
15   which is how do you allocate profits, not what were
16   the profits that were allocated.  And so I don't
17   think -- I don't have personal knowledge of the net
18   result of the RPSM allocations of profit or loss.
19               Q.   Okay.
20               A.   Just the kind of percentages that
21   things were ultimately allocated in.  That was the
22   focus generally of Mr. Malackowski's analysis.
23               And again, just to remind the Courts,
24   he did not exactly follow the RPSM calculations as
25   it relates to some of the time periods that were
```



```
 1    used.
 2              Q.   Right.  And there was the useful
 3    life of the intellectual property, for instance, is
 4    one of the modifications?
 5              A.   Yes, that's correct.
 6              Q.   I understand that.  But just so I
 7    am clear, at least as you understand
 8    Mr. Malackowski's approach on the contribution
 9    theory, he did not take into account in terms of
10    actual cash that flowed between the entities?
11              A.   I don't believe that he did.
12              Q.   And so, for instance, did not take
13    into account that transfer pricing adjustments
14    which were due to NNUK, for instance, one of your
15    clients, were actually never paid in cash but were
16    memorialized in interest-free loans, for instance?
17              A.   Again, I think he was focusing on
18    the relative proportion of the historical R&D
19    expense, not the allocations of profit or loss that
20    resulted from those proportions.
21              Q.   Or the cash movements that
22    memorialized the profits or losses?
23              A.   Or the cash -- the cash that may
24    or may not have moved.  I just don't know what cash
25    did move.
```

 Neeson&Associates   W&F

```
 1                     Q.   Okay.  Thank you very much.  Now,
 2    I just have one small additional line of
 3    questioning, and I would like to turn to certain
 4    specific portions of your testimony from yesterday;
 5    in particular, one.
 6                     Now, Mr. Huffard, do you recall
 7    yesterday Mr. Mark asking questions to you about
 8    technology that was predominantly used in the
 9    business lines that were sold to Ericsson, Avaya
10    and Ciena?
11                     A.   Yes.
12                     Q.   And in particular, there was an
13    exchange that appears around page 187, 188 of the
14    transcript of yesterday.  And there was a question
15    that was asked in particular with Mr. Mark in
16    response to an answer that you gave, which says, "I
17    know that technology was not predominantly used --
18    that was not predominantly used in each of the
19    businesses was included in the Rockstar
20    transaction."
21                     Mr. Mark then asked you, "Can you point
22    to that information anywhere in the appendices to
23    your report?"
24                     You then said, "Not off the top of my
25    head."
```

 

```
 1              He said, "It's not there, is it?"
 2              And you said, "I'm not saying it's not
 3    there.  I just can't off the top of my head
 4    remember."
 5              And then he said, "I'll tell you it is
 6    not there."
 7              Do you recall that exchange?
 8         A.   Generally speaking, yes.
 9         Q.   Now, in preparing your rebuttal
10    report, Mr. Huffard, you reviewed, did you not, the
11    reports of the Canadian experts in these cases?
12         A.   Yes, I did.
13         Q.   And in particular, the report of a
14    Mr. Philip Green?
15         A.   Yes, I did.
16         Q.   Now, in fact, in your rebuttal
17    report on page 8 you referred to Mr. Green's report
18    as having been reviewed in preparation of the
19    rebuttal report.  Do you recall that?
20         A.   Yes.
21         Q.   Now, I would like to show you
22    Mr. Green's report, if I could.
23              Do you see that on the screen in front
24    of you, Mr. Huffard?  It says report of Philip
25    Green regarding the allocation of recoveries of
```

 Neeson&Associates   W&F WILSON & PEYTON LTD.

```
 1    Nortel entities?

 2              A.   Yes, I do.

 3              Q.   If I could ask you to turn or

 4    bring up page 37 of the report.  And there is a

 5    heading "The Residual IP Rockstar Transaction."  Do

 6    you see that?

 7              A.   Yes.

 8              Q.   And then there are three sentences

 9    that begin that first paragraph.  It says:

10                   "In connection with the business

11                   sales, Nortel only transferred to each

12                   buyer those intangible assets that were

13                   necessary for the buyer to operate the

14                   particular business it had acquired.

15                   This included any intellectual property

16                   that was used predominantly in the

17                   business in question.  In addition,

18                   with respect to intellectual property

19                   that was used by multiple businesses,

20                   the buyer of each of those businesses

21                   received a license for the intellectual

22                   property in question."

23                   Do you see that language,

24                   Mr. Huffard?

25              A.   Yes, I do.
```



```
 1                    Q.   And that's a correct statement, is

 2    it not, of the point that you made yesterday, that

 3    technology that was not predominantly used in each

 4    of the businesses was included in the Rockstar

 5    transaction?

 6                    A.   Yes, that is my understanding.  I

 7    don't believe that that's a controversial point.

 8                    MR. BROMLEY:  Thank you, Mr. Huffard.

 9                    Those are all my questions, Your Honor.

10                    THE US COURT:  All right, Mr. Bromley.

11    Thank you.

12                    Anyone else on cross-examination?  I

13    think we have had all the parties cross-examine.

14                    Mr. Maguire, are you interested in

15    redirect?

16                    MR. MAGUIRE:  If I might.  Thank you,

17    Judge Gross.  Thank you, Justice Newbould.  Again,

18    Bill Maguire for the Joint Administrators of the

19    EMEA entities.

20                    THE US COURT:  Yes.

21    RE-EXAMINATION/RE-DIRECT BY MR. MAGUIRE:

22                    Q.   It is really just two points I

23    wanted to cover, Mr. Huffard.  The first is you

24    were asked a number of questions on the subject of

25    goodwill yesterday by Mr. Mark.
```



```
 1                    A.   Yes.
 2                    Q.   And that word was used in at least
 3   two different contexts.  So I wanted to see if we
 4   could just disentangle those different contexts.
 5                    First, Mr. Mark asked you concerning
 6   the fact that in 2008 Nortel wrote off all of its
 7   goodwill.  And then a little bit later in your
 8   cross-examination you told Mr. Mark that you can't
 9   compare the goodwill that Nortel had before the
10   bankruptcy with the goodwill in the purchase price
11   that was paid by the buyers.
12                    A.   Yes.
13                    Q.   Can you please explain to us those
14   two different concepts of goodwill:  First of all,
15   the Nortel goodwill that Nortel wrote off, and then
16   secondly, the goodwill in the purchase price that
17   the buyers paid.
18                    A.   Certainly.  The goodwill that
19   Nortel wrote off was an accounting test that was
20   done at the time that they decided to make that
21   additional reserve or charge against their goodwill
22   of the value of the assets in Nortel's hands,
23   operating the business basically as Nortel had
24   operated the business.
25                    And so when they do that calculation,
```



1   again, goodwill is the residual category of value.

2   They are figuring out what they think Nortel as a

3   business is worth in their own hands and

4   subtracting out the other assets that they can

5   discretely value; or in some cases not value but

6   just they use the book value, so it is not a fair

7   market test throughout the entire balance sheet.

8   And then the remainder is the goodwill; or in the

9   case of this particular instance, they determined

10  that there really wasn't any goodwill.

11          As compared to the goodwill that I was

12  talking about in the context of the sale of the

13  businesses to the purchasers here, where in their

14  hands -- and this is reminiscent of the so-called

15  safe-hands approach that some of the experts have

16  talked about.

17          In a better home with a different

18  business strategy, with the ability to sell perhaps

19  different products through to the same customer

20  network, it is just a different value in a

21  strategic acquirer's hands.  They paid a much

22  higher price ultimately than the accountants valued

23  for purposes of writing down Nortel's goodwill.

24  And just mechanically, you end up with a different

25  number.



1              So it is not surprising in any way that

2    you would have low goodwill on Nortel's books and a

3    much higher goodwill number in the hands -- in the

4    context of a sale to a strategic purchaser.

5              Q.   The second point I wanted to turn

6    to is the Alcatel sale.  You were asked a number of

7    questions by Mr. Hoeffner yesterday on the subject

8    of different circumstances or differences between

9    what the parties did when they were allocating the

10   proceeds of the Alcatel sale and the contribution

11   approach that is applied in your report.

12             A.   Yes.

13             Q.   So I just wanted to go through a

14   couple of those.  One obviously is useful life, and

15   I think you fully explained that.

16             A second is Mr. Huffard asked you about

17   the fact that in the Alcatel sale the parties

18   allocated goodwill based on a multifactor formula:

19   Revenue, assets and people.  You recall that?

20             A.   Yes.

21             Q.   And you did not apply a

22   multifactor formula?

23             A.   I did not.

24             Q.   Nor did the expert for the

25   Monitor; isn't that right?



```
 1                    A.    That's my understanding.
 2                    Q.    And nor did the expert for the US
 3    debtor?
 4                    A.    That's my understanding.
 5                    Q.    And nor did the expert for the
 6    CCC?
 7                    A.    That's, again, my understanding.
 8                    Q.    And, of course, you did not value
 9    goodwill directly?
10                    A.    Correct.
11                    Q.    And nor did the parties in the
12    Alcatel sale actually value goodwill directly?
13                    A.    Right.  I mean, I think goodwill
14    by definition is a residual category.  It is not
15    something that I think is possible to value
16    directly.
17                    Q.    Now, there was some discussion
18    about customers and how the parties in the Alcatel
19    sale did do a direct valuation of certain customer
20    assets.
21                    A.    Yes.
22                    Q.    And that was through a thing
23    called a multi-period excess earnings method,
24    something that you gave as us an abbreviation for.
25                    A.    Right.  Called -- well, it is just
```



1    the acronym, MEEM, M-E-E-M.

2              Q.   Just two points I wanted to cover

3    on that.  First of all -- I think you made them.  I

4    just would like you to explain them a little more.

5    And that is, one, the availability of data.

6              So if you thought, if you thought that

7    the MEEM approach was the gold standard, if you

8    thought it was the appropriate standard to apply

9    here, whether in the circumstances of your report

10   you had the available data at the entity level to

11   be able to apply that approach; and then secondly,

12   what your thoughts are on whether that is, in fact,

13   an appropriate approach.  Can we take them one at a

14   time, and first just talk about the circumstances

15   in which you did your report and the availability

16   of the data.

17             A.   Right.  I am actually going to

18   answer those in the reverse order.

19             As I said yesterday, I believe that the

20   MEEM approach requires many detailed assumptions

21   that are difficult for anybody, even if you are

22   making the analysis in real time, with full access

23   to data.  It requires the people doing that

24   analysis to make many detailed assumptions that

25   are, in fact, I think very difficult to



1    substantiate on any sort of true mathematical

2    level.

3              So that's one of the reasons why I

4    personally do not believe that the MEEM is a

5    calculation that should be pursued in the context

6    of the valuation of customer-related assets for the

7    purposes of this discussion.  But that's if you are

8    doing the calculation realtime, with full access to

9    all the detailed information that management teams

10   have access to.

11             Now that we are having this discussion

12   multiple years later, that data just simply is not

13   available.  And I don't think it is possible, at

14   least based on what I understand, to re-create it.

15             Q.   And, in fact, none of the experts

16   for the US or the Monitor or the CCC applied the

17   MEEM approach?

18             A.   I don't believe that anybody has

19   applied it.  I have personally never seen the MEEM

20   used in any valuation context other than in the

21   accounting -- the production of the accounting

22   purchase price allocation schedules.  In my

23   experience, I have never seen it used in a

24   bankruptcy context or anything else.

25             Q.   And the next difference that



1    Mr. Hoeffner raised -- again, I want you to focus

2    on the different circumstances between now and the

3    Alcatel sale -- and that was with respect to the

4    subject of allocating customers, the value of

5    customers.  And you described yesterday, you

6    mentioned a winner-take-all approach that the

7    parties applied back when they were allocating the

8    proceeds of the Alcatel sale.  And if you could

9    just explain that and explain how the circumstances

10   are different in your approach.

11              A.    The allocation of customer-related

12   value under the Alcatel sale was done on the basis

13   of which of the legal entities, I believe the term

14   that was used, controlled the relationship with the

15   customer.  And so there was a detailed discussion

16   that occurred at the time among the management team

17   who controlled what relationships.

18              And I am not actually sure the exact

19   standards by which they defined controlling the

20   relationship.  But the result of that was that only

21   one legal entity, because you can only have one

22   controlling party, only one legal entity got

23   allocated 100 percent of the value of customers.

24              My analysis allocates customer value,

25   along with goodwill, on the basis of revenues.  So



```
 1   any party that was able to report revenues would
 2   get a proportionate share of the customer value.
 3              And in my understanding of the way
 4   Nortel ran its business, it seemed to me as I
 5   considered the different approaches that it was a
 6   more fair approach, given the kind of team effort
 7   that it seems like Nortel ran its business with,
 8   that it was a more fair allocation approach to end
 9   up sharing the customer value among different
10   entities rather than having, as you were just
11   saying, a winner-takes-all outcome.
12              Q.   And on that same point, do you
13   still have before you your rebuttal report?
14              A.   I think the answer is yes.  I just
15   have to find it.
16              Q.   If you could turn to page 35 of
17   your rebuttal report.
18              A.   Yes.
19              Q.   There seemed at least to me anyway
20   a suggestion in some of the questions yesterday
21   that using 2008 revenue might be disadvantageous to
22   the Canadian estate.  And so I would like you to
23   walk us through how the experts for the Monitor and
24   the CCC addressed this issue with respect to
25   customers.
```



```
 1                  So on page 35, if I understand this

 2    correctly, you have a chart that shows the

 3    approaches taken by the Monitor's expert and the

 4    expert for the CCC with respect to the allocation

 5    of asset classes.

 6                  A.   Yes.  And so -- it is actually

 7    easier to read it off the screen.  So --

 8                  Q.   Yes.  If we turn first to the

 9    Monitor's expert.

10                  A.   Yes, which is what on this table

11    appears as the Canada methodology.  And in that

12    instance, as we spoke about yesterday, IP and

13    customer relationships are treated as one single

14    category.  And those were allocated according to

15    the RPS percentages doing the five-year calculation

16    starting in the Q1, first quarter of 2010, is my

17    recollection.

18                  Q.   So there is no separate valuation

19    of customer relationships by the Monitor's expert?

20                  A.   That is my understanding.

21                  Q.   And then if we go down to the

22    expert for the CCC, that's under what you call here

23    the CCC methodology?

24                  A.   Correct.

25                  Q.   You have a line item for customer
```

Neeson & Associates    W&F

```
 1  relationships?

 2              A.   Yes.

 3              Q.   And can you tell us, how did the

 4  expert for the CCC, what methodology did that

 5  expert use?

 6              A.   They appear to have used the 2008

 7  revenues to allocate them.

 8              Q.   And how does that compare with

 9  your methodology?

10              A.   It seems to be identical.

11              Q.   Now, you were asked also about

12  some of the numbers that emerge from the Alcatel

13  sale and the comparison that you were given to the

14  different circumstances of the business sales.  But

15  as I recall, the bottom line was, Mr. Hoeffner was

16  putting to you that in the Alcatel sale, most of

17  the value was in IP.  And based on your and

18  Mr. Malackowski's analysis, in the business sales,

19  most of the value was in the customers.  I think

20  the numbers were, in the Alcatel sale, the parties

21  allocated 55 percent, he said, to IP and only 23

22  percent to customers and goodwill, and in your

23  analysis with the line of business sales, it is

24  sort of the opposite; it is about 65 percent to

25  customers and about 23 percent to IP or
```



 1    thereabouts.

 2                    A.    Right.

 3                    Q.    And I believe your response was

 4    you have to look at the facts, the different

 5    circumstances; right?

 6                    A.    Yes.

 7                    Q.    So if we look at the facts of the

 8    single largest sale, the sale to CDMA or the sale

 9    of the CDMA line to Ericsson --

10                    A.    Yes.

11                    Q.    -- can you tell us, how did the

12    technology that the Nortel parties sold to Ericsson

13    in 2009 or 2010, how did that compare with the

14    technology that Nortel sold to Alcatel back in

15    2006?

16                    A.    Well, I am not the technology

17    expert, so I don't want to say that I can give a

18    detailed description of that.  But my general

19    understanding is that the Ericsson sale of the

20    so-called CDMA business was -- in terms of the

21    technology, there was a significant portion of that

22    technology that was focused on the CDMA -- as the

23    name would suggest, the CDMA technology, which was

24    at that point a significant installed base of the

25    US cellular telephone infrastructure but was

 Neeson & Associates   W&P Wilcox & Fetzer Ltd.

1   considered a legacy technology.  It was really

2   second-generation technology.

3            There were also some technology assets

4   of what is called LTE, which was a more recent

5   generation.  So it was a combination of older

6   technology and newer technology.  A significant

7   portion of it was the older technology.

8            In terms of the newer technology, my

9   understanding is that Ericsson had significant LTE

10  assets and technology themselves.  I am sure that

11  they viewed the Nortel LTE technology as valuable.

12  I am sure it wasn't a total afterthought for them.

13  But definitely in terms of the CDMA deal, that was

14  not cutting-edge technology that they were

15  acquiring, on average.

16            Q.   And by comparison, the sale to

17  Alcatel, that was not second-generation.  That was

18  third-generation technology?

19            A.   That was third-generation

20  technology.

21            Q.   I don't know if we can pull up

22  your slides, but I would like you to take a look at

23  slide 14, which we went through yesterday.  And

24  just specifically to add to that, in the first

25  quote there is a reference to Nortel's US customer



```
 1   base.  And Ericsson makes the direct connection

 2   about how that customer base provides additional

 3   opportunities for Ericsson in CDMA and LTE.  And

 4   what is the significance of that in terms of the

 5   value of the customer base?

 6                 A.   Well, again, my general

 7   understanding from reading Ericsson's public

 8   commentary is that they entered into the CDMA

 9   purchase, viewing it as access to the American

10   market and to the American customer base.  And my

11   understanding is that they had had difficulty

12   penetrating that market.

13                 Q.   And the next quotation

14   specifically refers to contracts, the CDMA

15   contracts.

16                 A.   Yes.

17                 Q.   And to the extent that those

18   contracts were owned by the local entities, then

19   those contracts I guess are owned by the local

20   entities; right?

21                 A.   I imagine that's true.

22                 Q.   Let me also ask you to turn to

23   slide 17, specifically with the testimony at the

24   bottom from Mr. Binning.  You were asked about

25   Mr. Binning yesterday.  And the testimony
```



1    specifically that I want you to look at is where he
2    testified about how some of the buyers of the
3    businesses wanted to move the Nortel customers to
4    their products and platforms, meaning to the
5    buyers' products and platforms.
6              What is the significance of that to the
7    overall relationship in a sale between the
8    respective values of IP and customers?
9              A.   Well, I interpret Mr. Binning's
10   comments here as just being indicative of the fact
11   that in some instances buyers were not purchasing
12   the businesses for the specific Nortel technology.
13   They were looking to generate what I described as
14   yesterday the business synergy of being able to
15   sell their own products and services into the
16   Nortel customer base.
17             Q.   And given those different
18   circumstances of the lines of business sales, what
19   would be your expectation in terms of whether you
20   would see from the business sales the same
21   relationship between IP and customers and goodwill
22   as existed several years earlier in the Alcatel
23   sale?
24             A.   I think it certainly creates the
25   expectations that there may not be as much



1    allocation of value towards IP and there may be

2    more allocation of value to other elements of the

3    assets that were purchased, including certainly the

4    customers.

5                    Q.   Well, let me ask you, even taking

6    into account all of these differences between what

7    you did and what the parties did in divvying up

8    Alcatel, even taking account of all of them, if you

9    step back and I ask you to compare, which is the

10   closest, closest approach to what the parties

11   themselves did when they allocated the proceeds of

12   the Alcatel sale?

13                   Let me start with the US license

14   approach.  Which is closer to what the parties did,

15   the contribution approach or the US license

16   approach?  Which is closer to what the parties did?

17                   A.   To the Alcatel sale?

18                   Q.   To the Alcatel sale.

19                   A.   The contribution approach is more

20   consistent with the Alcatel sale than the US

21   license approach.

22                   Q.   Now let's make the same comparison

23   with the Canadian -- the Monitor's approach.  If

24   you compare the Monitor's approach with the

25   contribution approach, which is closest to what the



1    parties themselves did in the Alcatel sale?

2                    A.    In my point of view, the

3    contribution approach is more consistent in how it

4    generally allocated value.

5                    MR. MAGUIRE:  Thank you, sir.  I thank

6    the Courts.  Those are my questions.

7                    THE US COURT:  Thank you, Mr. Maguire.

8                    THE CANADIAN COURT:  Mr. Huffard, I

9    would like to ask you a question, if I could.

10                   THE WITNESS:  Certainly.

11                   THE CANADIAN COURT:  I don't know if

12   the people can bring it up, but could somebody

13   bring up slide 10 of your deck.

14                   THE WITNESS:  Yes, I see it.

15                   THE CANADIAN COURT:  All right.  In

16   there on the bottom half, looking at the second

17   bullet point on the bottom half, you say

18   "Consistent with historical practice, 2002 tax

19   authority Q and A:  Split IP proceeds based on

20   R&D."

21                   You said in evidence yesterday in

22   chief, you said, "I have seen documents in 2002.

23   Internal Q and A was . . . produced to facilitate

24   the discussion with tax authorities where they were

25   basically saying we are going to split the IP,



1    including if we had to sell it on the basis of

2    historical R&D."

3              I was trying to find the Q and A that

4    is the source for slide 10 of paragraphs 89 and 96,

5    which don't deal with that.  Are you able to point

6    to what document you are talking about where the

7    tax authorities were told that we are going to

8    split the IP, including if we had to sell it on the

9    basis of historical R&D?

10             THE WITNESS:  Can counsel help pull

11    that up on the screen?  I don't know if that is

12    permissible.

13             MR. MAGUIRE:  We will see if we can

14    find it, Judge Gross, Justice Newbould.

15             THE CANADIAN COURT:  I ask the question

16    because I don't remember having that pointed out to

17    me at all in this case up until now.

18             MR. MAGUIRE:  Yes, I am sorry.  It has

19    been a while ago.  And you may not even recall my

20    opening statement at this stage, but I think it was

21    maybe the first document was --

22             THE CANADIAN COURT:  Well, I was going

23    to ask you if this infamous MRDA was near and dear

24    to your children's heart like the IFSA to you.  I

25    do remember that part.

 Neeson&Associates   W&P

```
 1                    MR. MAGUIRE:  Yes, it is one of my
 2   favorite documents, and it is from the tripartite
 3   meeting, the kickoff meeting with the tax
 4   authorities.
 5                    THE US COURT:  Yes.  Right.
 6                    MR. MAGUIRE:  And the internal Q and A,
 7   I think it was Question 31.
 8                    MR. GOTTLIEB:  It is TR22020.
 9                    THE CANADIAN COURT:  Thank you.
10                    MR. GOTTLIEB:  And just so you have the
11   reference, it is in the opening slide deck that we
12   presented.  It is in the first few pages in there.
13                    THE CANADIAN COURT:  And I will find it
14   in there?
15                    MR. GOTTLIEB:  Yes, you will.  You will
16   find the reference and the excerpt, yes.
17                    THE CANADIAN COURT:  Does anybody have
18   any questions as a result of my question?
19                    MR. GOTTLIEB:  Just so you have it in
20   your notes, it is slide 4 of the opening.  Of our
21   opening, yes.
22                    MR. BROMLEY:  Your Honors, James
23   Bromley, Cleary Gottlieb.  Just one comment in
24   response to Mr. Maguire's comments.
25                    I don't think there is any evidence in
```



```
 1   the record that that document was actually shared
 2   with the tax authorities.  I think the document
 3   itself refers to it being a draft.  And until there
 4   is evidence adduced that it is actually provided to
 5   the tax authorities, we would object to
 6   Mr. Maguire's characterization that it was provided
 7   to the tax authorities.
 8             THE US COURT:  All right, Mr. Bromley.
 9   Thank you.
10             MR. MAGUIRE:  If I might.  I am sorry.
11   Bill Maguire again.  If I might make a
12   clarification to Mr. Bromley's clarification.
13             THE US COURT:  Yes, Mr. Maguire.
14             MR. MAGUIRE:  I think counsel is
15   absolutely correct that there is nothing in the
16   record that shows that that document was provided
17   to the authorities or, indeed, that that specific
18   answer was given or that that question was asked at
19   the tripartite meeting.  I don't believe there is
20   anything in the record that shows that that
21   actually happened.
22             I am not certain that it is correct,
23   however, to describe the document as a draft.
24   There certainly may have been iterations of it that
25   were a draft, but I believe there is testimony that
```


Neeson & Associates    W&F

```
 1   this was specifically vetted at the highest levels
 2   at Nortel and it was specifically agreed among the
 3   top Nortel executives and their outside advisors
 4   that these were the approved answers to be provided
 5   to the three governments if these questions were
 6   asked.
 7                THE CANADIAN COURT:  Mr. Maguire, the
 8   tripartite meeting was amongst whom?
 9                MR. MAGUIRE:  The meeting was between
10   Nortel on the one hand and then the three
11   governments:  The governments of Canada, the United
12   States and the United Kingdom.
13                THE CANADIAN COURT:  The tax
14   authorities?
15                MR. MAGUIRE:  The tax authorities.
16                THE CANADIAN COURT:  Fine.  Thank you
17   very much.
18                MR. MARK:  If I might, Your Honors,
19   just to join in Mr. Bromley's objection.  I
20   understand, while I am not going to give the
21   evidence, that there is some evidence in the record
22   about the preparation of that document and the
23   disposition of that very question.  It clearly
24   wasn't given to the tax authorities.  So, Justice
25   Newbould, there is a more complete record, and I
```



1    think in due course we will give you that.  But

2    just to give you that heads up.

3                    THE CANADIAN COURT:  All right.  What I

4    understand, I am being told, is that it was a Q and

5    A agreed upon to answer questions if asked by the

6    tax authorities.  At the moment there is nothing in

7    the record that the piece of paper was handed to

8    the tax authorities and nothing in the record as to

9    whether the tax authorities actually asked the

10   question.  Do I have it right?

11                   THE US COURT:  Mr. Bromley, yes.

12                   MR. BROMLEY:  I would ask the Courts to

13   take a photograph of Mr. Mark and I standing at the

14   podium together and agreeing.

15                   But what I have is the cover email that

16   is attached to the document that Mr. Maguire refers

17   to, and it says, "Potential questions at APA

18   kickoff meeting."  It is an email that is sent by

19   someone at the Deloitte & Touche national transfer

20   pricing group.  There is no indication of any

21   sign-off.  And the headline of the document says

22   "Potential questions and sample answers."

23                   So I don't see any high-level sign-off

24   on the document.  It seems at least from our view

25   to have been drafted by Deloitte & Touche.  So we



1    would just say we should keep the history of this

2    document as an open issue going forward.

3                    MR. MARK:  I think that's right.

4                    THE CANADIAN COURT:  Was that a

5    different trial number, the email, or is it part of

6    the same number?

7                    MR. MARK:  Your Honor, what I am

8    advised, that with respect to that document,

9    indeed, it was prepared by Deloitte & Touche and

10   not by Nortel personnel.  And so there is a more

11   complete record.

12                   MR. GOTTLIEB:  Your Honor, I am quite

13   troubled by this, because there is a lot of

14   testimony in the deposition that has been submitted

15   by the party about the very document.  And I could

16   go rhyme off a very different version than that.

17                   THE CANADIAN COURT:  We are in the

18   middle of a trial so --

19                   MR. GOTTLIEB:  Exactly.  That's exactly

20   my point.  So this evidence given by counsel that

21   you will have the transcript, Judge Gross will have

22   the transcript of the testimony that surrounds the

23   creation and et cetera, et cetera.  So I don't

24   think it is helpful to have counsel (inaudible)

25   about it.



 1                    THE CANADIAN COURT:  All right.  Thank

 2     you.

 3                    THE US COURT:  May I ask who was

 4     speaking for our record?

 5                    MR. GOTTLIEB:  I apologize, Judge

 6     Gross.  That was Matthew Gottlieb for the EMEA

 7     Debtors.  I apologize for that.

 8                    THE US COURT:  Thank you, Mr. Gottlieb.

 9                    Mr. Mark.

10                    MR. MARK:  Your Honor, could I, with

11     the Courts' leave, ask one question arising out of

12     the questions that both of my friends asked

13     Mr. Huffard?

14                    THE US COURT:  I'll permit that.

15                    MR. MARK:  Thank you.

16     RECROSS-EXAMINATION BY MR. MARK:

17                    Q.   Mr. Huffard, you were asked about

18     the sales process and the motivations of the

19     purchasers.  Do you recall Mr. Bromley asked you

20     about that?

21                    A.   Yes.

22                    Q.   And he asked you whether as a

23     general matter purchasers would consider how much

24     they would be able to earn from the businesses

25     purchased as an indicator of what they would be



1    prepared to pay.  Do you recall that?

2                    A.    Yes.

3                    Q.    Is it correct, Mr. Huffard, that

4    purchasers will also have strategic considerations

5    oftentimes in deciding whether to purchase a line

6    of business and how much to pay for it?

7                    A.    What do you mean by "strategic?"

8                    Q.    Well, for example, in this case

9    purchasers might want to acquire a certain

10   technology in order to get into a market that they

11   were not already in; correct?

12                   A.    Yes.  But if that kind of

13   consideration was what you were referring to as

14   strategic considerations, I think at least, as I

15   answered the question earlier, I was intending to

16   include that kind of consideration, because the

17   strategic considerations maybe over a longer term

18   ultimately translated into earnings.

19                   Q.    Right.  But it is not just a

20   question of the earnings from the immediate

21   business being purchased.  Very often the

22   purchasers will see additional value to them by

23   their getting into new markets or being able to

24   provide new technology to existing customers?

25                   A.    Yes.  I do believe that for-profit



1    corporations generally focus on earnings potential

2    when they think about this, and that earnings

3    potential can come from direct sales of the assets,

4    ability to sell new products into that market, the

5    ability to block other people from coming into that

6    market.  It is a wide variety of considerations,

7    all which fall within the rubric of what could I

8    earn from this over the long term.

9              Q.   All right.  So you have, I

10   believe, indicated in your report that you had

11   looked at some of the evidence from Mr. Binning and

12   Mr. Riedel; correct?

13             A.   Yes.

14             Q.   And you are aware they in their

15   evidence spoke to some of these strategic

16   considerations, how some of the customers were

17   interested in acquiring new technology from Nortel?

18             A.   Yes.

19             Q.   And those assessments seem

20   reasonable to you?  That is the type of strategic

21   consideration that you often see in these

22   acquisitions?

23             A.   Just so that I am clear about your

24   question, you said the customers were considering.

25   Do you mean customers or do you mean the purchasers



 1    were?

 2                  Q.    The purchasers.

 3                  A.    Okay.  Let me just -- so we have a

 4    clear record on the question, could you restate

 5    your question.

 6                  Q.    Right.  So to the extent that

 7    Mr. Binning and Mr. Riedel indicate that some of

 8    the purchasers of the lines of business were

 9    interested in acquiring the technology, for

10    example, to get into new markets, that is the type

11    of strategic consideration you are familiar with?

12                  A.    Yes.

13                  MR. MARK:  Okay.  Thank you.  Those are

14    my questions, Judge Gross.

15                  THE US COURT:  All right.  But I assume

16    your answer, Mr. Huffard, is that they want to get

17    into new markets to make money.

18                  THE WITNESS:  Yes.  It all comes down

19    to the bottom line.

20                  THE US COURT:  All right.  Let me ask a

21    question of you that -- it may be oversimplified

22    but it will help me to understand, I think, the

23    contribution theory a little better.

24                  Let's assume that research and

25    development, not costing very much money, leads to

 Neeson & Associates    W&F

1    an enormously successful line; and then let's

2    assume that there is another product that cost a

3    tremendous amount of money and results in very

4    little income.

5              THE WITNESS:  Correct.

6              THE US COURT:  Under your allocation

7    theory, would the latter receive more recognition?

8              THE WITNESS:  Yes.  And the way I would

9    describe why it makes sense that that seeming

10   paradox would play out is that Nortel wanted to

11   operate a global R&D effort where different labs

12   leveraged off of the work that others had done.

13             In fact, many of this technology is

14   multigenerational.  You are taking very old R&D and

15   then refining it further.  It may be done in

16   different labs.  Within with any given research

17   project, there are teams that may work from

18   different labs around the globe.

19             They wanted to foster a global

20   cooperative R&D effort.  And so if you set up a

21   structure where it matters the success of your

22   research, then people will become proprietary about

23   their research.  They will not be willing to take

24   projects that they themselves don't view as a good

25   project, even though someone in some other location



 1    thinks is a great project.

 2              The basic way I think of the R&D -- of

 3    the contribution approach is by spending R&D

 4    dollars, that is the way each of these countries

 5    bought the economic ownership, kind of bought the

 6    stock of Nortel.  And it is not that -- they didn't

 7    want to set up a structure -- my take is that they

 8    didn't want to set up a structure where it was

 9    competitive among the different labs, among the

10    different geographies.  They wanted people to

11    cooperate on a global basis.

12              And it makes the most sense then not to

13    make people's allocation of the profits depend on

14    the success of their individual R&D projects but

15    rather to say you are contributing to the whole in

16    proportion to your R&D spend and you own an

17    economic interest in the whole proportionate to

18    that.  That's what the contribution theory is.

19              It is not did you do a good job on R&D

20    and therefore create good products.  It is not also

21    is your market a big market.  That's more of a

22    licensing approach.  It is the view that the

23    creation of enterprise value is in proportion to

24    the amount of R&D dollars that are spent,

25    regardless of whether those were good dollars or

Neeson&Associates    W&F

```
 1    bad dollars.
 2              THE US COURT:  Does it matter at all
 3    that it wasn't, for example, NNI or NNUK that
 4    determined how much they received to develop; in
 5    other words, that they were budgeted an amount as
 6    opposed to determining for themselves what amount
 7    to spend?
 8              THE WITNESS:  Well, again, in a sense,
 9    that's why the contribution theory makes sense.
10    They didn't control their own destiny.
11              THE US COURT:  Right.
12              THE WITNESS:  So if they were going to
13    be rewarded economically, it would make sense for
14    them to control their own R&D budget.
15              THE US COURT:  Yes.
16              THE WITNESS:  Because it was centrally
17    coordinated, and coordinated -- and we have heard
18    testimony yesterday, coordinated not only within
19    the technology departments but within the sales.
20    You know, what are the customers saying, what do
21    they need, where do we need to spend money.
22    Because that was coordinated outside of the
23    individual labs, it doesn't make sense to reward
24    them based on the success or failure of their own
25    efforts, just on kind of how much did they
```

 Neeson&Associates   W&F

```
 1    contribute into the pot.
 2                 THE US COURT:  All right.  Thank you,
 3    Mr. Huffard.  Anyone follow up on that?
 4                 There was no response.
 5                 Okay.  Anything further, Justice
 6    Newbould or are we ready to excuse Mr. Huffard
 7    finally?
 8                 THE CANADIAN COURT:  I am silent.
 9                 THE US COURT:  All right, Mr. Huffard.
10    Thank you very much for being here and for
11    remaining overnight.  Thank you, sir.
12                 THE WITNESS:  Thank you, Judge Gross.
13                 -- WITNESS EXCUSED --
14                 THE CANADIAN COURT:  Mr. Milne-Smith.
15                 MR. MILNE-SMITH:  Yes.  It is Matthew
16    Milne-Smith here for the EMEA Debtors.
17                 THE US COURT:  Yes, sir.
18                 MR. MILNE-SMITH:  First, I would like
19    to bring to Your Honors attention a bit of a
20    housekeeping matter in terms of how the rest of the
21    day is going to proceed.
22                 THE US COURT:  All right.
23                 MR. MILNE-SMITH:  Mr. Malackowski is
24    our next witness.  The issue we have is that there
25    is one more fact witness being called by the UKP
```



 1   who has not yet testified, one by the name of

 2   Angela Anderson.

 3              THE US COURT:  Yes.

 4              MR. MILNE-SMITH:  Now, I understand

 5   Ms. Anderson had some medical issues that prevented

 6   her from testifying until now and that also require

 7   her to go home from London to her home in France

 8   tomorrow morning.  So she has to testify today.

 9              I don't believe she is going to be very

10   long, subject to what anybody plans for her on

11   cross-examination.  But we do need to set aside

12   probably at least an hour to make sure she gets

13   done today.

14              Now, my understanding -- and I'll look

15   back to my friends in the UKP right now -- is that

16   she is not available at this moment.  She is en

17   route to the place in London where she will be

18   examined.  But perhaps Mr. Chang can address --

19              MR. CHANG:  She is.  She has flown into

20   London.  She has landed.  But she is in London

21   traffic and trying to get where she needs to be.  I

22   don't think she will be ready --

23              MR. GOTTLIEB:  Believe it or not, I

24   think I have an update on that.  So I apologize.

25   Let me, if I might -- I apologize, Judge Gross.  It



```
 1    is Matthew Gottlieb.  We are getting some

 2    information, so let's just see if we can nail it

 3    down.

 4                THE CANADIAN COURT:  Well, let's

 5    simplify it.  Is it possible to start the next

 6    witness and then break when she is available?

 7    Because there is a five-hour difference.  We don't

 8    want to start her too late in the afternoon for

 9    her.

10                MR. GOTTLIEB:  What I am going to ask

11    is to see -- what we obviously don't want to do is

12    have Mr. Malackowski in the box for ten minutes and

13    then take him out.  That is not preferable.

14                But I think if it would be okay for us

15    to take just a couple minutes now to see if

16    Ms. Anderson is actually available in the next few

17    minutes, in which case we could start her and get

18    her in and out of the box.  If we can just have the

19    Courts' indulgence for a couple minutes to see if

20    that's possible.  As Mr. Milne-Smith just pointed

21    out, it is almost time for the morning break

22    anyway, so maybe we break a couple minutes early,

23    if that is agreeable to the Courts.

24                THE US COURT:  That makes sense, I

25    think.
```



 1              MR. GOTTLIEB:  Okay.  Thank you very

 2    much.  So we will report back once we get back from

 3    the break.

 4              THE CANADIAN COURT:  What do we take;

 5    15 minutes?

 6              THE US COURT:  Yes.

 7              MR. GOTTLIEB:  Thank you very much.

 8              THE US COURT:  Thank you.  We will take

 9    our break now.

10    -- RECESS AT 10:34 A.M. --

11    -- UPON RESUMING AT 11:00 A.M. --

12    ANGELA MARY ANDERSON, having first been duly sworn,

13         was examined and testified as follows:

14              THE US COURT:  Thank you, Ms. Scaruzzi.

15    Thank you, Ms. Anderson.

16              THE CANADIAN COURT:  All right.  We

17    will mark this then Exhibit 32.  Thank you.

18              THE US COURT:  32, yes.

19              EXHIBIT NO. 32:  Affidavit of

20              Ms. Anderson dated April 25, 2014.

21              THE US COURT:  Ms. Schneider.

22              MS. SCHNEIDER:  Thank you, Justice

23    Newbould and Judge Gross.  So just to be sure

24    everyone has a copy of Ms. Anderson's affidavit,

25    which has been marked Exhibit 32.

 Neeson&Associates    W&F

1    EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY

2    MS. SCHNEIDER:

3                Q.   And Ms. Anderson, you have a copy

4    there in London too; is that correct?

5                A.   Yes, I do.

6                Q.   And I take it you can hear me

7    okay?

8                A.   I can hear everybody fine.   Thank

9    you.

10               Q.   Great.  I am glad to hear that is

11   working.  So I just have a few minutes of questions

12   for you this morning about a few of the topics

13   discussed in your affidavit.

14               First of all, are you a practicing

15   patent attorney?

16               A.   Yes, I am.

17               Q.   And where are you registered to

18   practice as a patent attorney?

19               A.   I am registered to practice in the

20   UK, Europe and France.

21               Q.   And as a patent attorney there,

22   are you a lawyer?

23               A.   It is not a general lawyer

24   qualification.  It is a patent law qualification.

25               Q.   And are you authorized to appear



1    before the patent offices in the UK, France and

2    Europe?

3              A.    Yes, I am.

4              Q.    Prior to working at Nortel, did

5    you work as a patent attorney at any other

6    companies?

7              A.    Yes.  I worked for British

8    Aerospace, Texas Instruments and News Digital

9    Systems and a couple of private practice firms.

10              Q.    And when did you work at Nortel,

11    for what years?

12              A.    I worked at Nortel from January

13    2000 to December 2004.

14              Q.    And what location were you based

15    in?

16              A.    I was based in the Harlow office,

17    in Essex, in the United Kingdom, in England.

18              Q.    When you joined Nortel in 2000,

19    what was your position?

20              A.    I was director of patents.

21              Q.    And over time did your title or

22    position change?

23              A.    Yes.  I later became the head of

24    IP in Europe for Nortel.

25              Q.    And generally speaking, what were

 Neeson&Associates    W&F WILSON & PEYTON LTD.

1    your responsibilities as head of IP for Europe?

2              A.    On the European side of things, I

3    was responsible for the European portfolio of

4    patents and intellectual property and making sure

5    that they were treated appropriately, protected

6    where necessary, generally looked after the best

7    way possible.

8              Q.    Did you work with IP attorneys at

9    other locations in Nortel?

10              A.    Yes.  We were a single team in the

11    IP group that operated together.  We filed patents

12    in certain jurisdictions based on certain rules and

13    regulations that we had set up.  But we had

14    multinational teams for each of the business units

15    or technology areas, depending on what time of the

16    process it was there.

17              There was a change from business units

18    to technical areas.  But basically, there was a

19    cross-national team that included Americans,

20    Canadians, and people from Europe that were

21    involved in each of the different business units or

22    technical units to look after the patents for those

23    particular areas.

24              Q.    Now, I would like to ask you some

25    questions about the patent filing process.  It is



1    probably easiest to start at the beginning.

2              When an inventor at Nortel had a new

3    idea, what was the first thing they would do?

4              A.    The first thing they would do was

5    fill in an invention disclosure form that was an

6    online form that was then distributed to the

7    intellectual property patent group for assessment

8    to determine what to do with the new invention that

9    had been identified.

10             Q.    And then was that invention

11   disclosure form reviewed by a group of people?

12             A.    Yes.  There was a patent review

13   team for each of the businesses, and sometimes for

14   each of the jurisdictions, some for each of the

15   main sort of R&D sites, where a peer group of

16   people would come and listen to the inventor

17   present his invention.  The group of people that

18   assessed the invention included people from the

19   patents group, as I said big group, people from the

20   technical area.  And also people from the

21   commercial area would be included in the

22   considerations to determine what to do with the new

23   inventions

24             Q.    Now, in your affidavit -- and this

25   is paragraph 16 for reference -- you refer to



1    inventions being given what is called a TIC score.

2    Let's start at the beginning.  What does the T

3    stand for?

4                        A.    The TIC score was what we used to

5    determine whether or not we would file patent

6    applications and then what countries we would file

7    them in as well.

8                        The T relates to the technical

9    contribution of the invention.  So we would be

10   looking to see -- in evaluating the T, we would be

11   looking to see whether it was a broad invention or

12   a less important invention or maybe even just a

13   design or a simple development on top of something

14   else.

15                       And the broader the invention, the

16   higher the score it would have got.  So if it was a

17   very broad invention, it would have got a T score

18   of 3; and if it was not so good, it would have got

19   a 1 and occasionally even a zero.

20                       Q.    And what does the I stand for?

21                       A.    The I relates to the inventive

22   contribution, and that's the ability of the

23   invention to become a viable patent, effectively.

24   If it was a nice, new invention in a new technical

25   domain where there wasn't very much prior art and



```
 1   there was a good chance of it getting good broad
 2   patent application, then it would have got a higher
 3   score; and if it was a mere improvement on
 4   something that was already known or something
 5   small, a design development on a particular element
 6   of a small thing.
 7              So depending on the amount of breadth
 8   of protection we thought we would get from the
 9   invention, it would get a different score.  And
10   again, if it was a good invention, a high-ranking
11   invention, then it would get a 3.  If it was less
12   important, it would get a 2 or even a zero
13              Q.   And finally, what did the C stand
14   for?
15              A.   So the C was commercial
16   contribution.  And here we went to the business
17   units and asked them to help us to determine
18   whether the inventions were going to be in a
19   product or were likely to be in a product or were
20   already in a product perhaps.  So we would look to
21   see how valuable the invention was going to be from
22   a commercial point of view, how many products it
23   might be useful for, whether, indeed, it would be
24   used in a product or whether it was something that
25   was going to be in a future product.
```



1              And the higher the score, the more

2    likely it was that this was going to be something

3    useful in the business sense going forward.  So

4    again, a high score would have been a 3 and a low

5    score would have been a 1 or a 2 or a zero.

6              So in all, there were nine out of nine

7    potential score for every invention.  And the very,

8    very best got the best scores and the less good

9    inventions would have got low scores.

10             Q.   Did Nortel only file patent

11   applications for inventions that were in currently

12   existing products?

13             A.   No, not at all.  They would look

14   to products that were being developed or things

15   that -- the technology was looking towards moving

16   towards.  There was always inventions that related

17   to things that were in the future as well as things

18   that were in the present.

19             Q.   Could one invention be used in

20   multiple different products?

21             A.   Yes, very possibly.  If it was a

22   broad invention, it could have been used in a

23   number of different products or a number of

24   different product lines even.  It depended on how

25   broad the patent was as to whether it was relevant



 1   to a product or not.

 2              Q.   Did patent applications ever have

 3   inventors from different locations?

 4              A.   That was quite common.  As with

 5   the IP group, there were international teams

 6   working on technologies in all the technology

 7   areas, so there was quite often inventors from

 8   numerous jurisdictions.  It was quite common to

 9   have an inventor from the UK, Canada and US all on

10   the same patent application.

11              Q.   Now, taking as an example an

12   invention developed by an inventor in the UK, as a

13   matter of UK law, would all the rights related to

14   that patent application of the inventor in the UK

15   belong to the inventor's employer?

16              A.   Under the Patents Act in the

17   United Kingdom, yes, any inventions that are made

18   in the UK by an employee that is supposed to make

19   inventions would belong to the employer.  That's a

20   matter of fact and a matter of law in the United

21   Kingdom.  It is part of the Patents Act.

22              Q.   So taking, for example, someone

23   like Simon Brueckheimer -- you know him; correct?

24              A.   Yes, I do.

25              Q.   If he invented something in the



1    UK, a patent application, under the UK statute,

2    would those patent application rights belong to

3    NNUK?

4             A.   Yes, they would.

5             Q.   And I believe you said that was a

6    matter of statute in the UK?

7             A.   Yes, it is.

8             Q.   Did Nortel have a policy to assign

9    legal title in patent applications to NNL?

10            A.   Yes, they did.  Every application

11   that we filed, we prepared/executed a patent

12   assignment for the United States, a patent

13   application, which put the rights in the name of

14   NNL.

15            Q.   In your experience and in the

16   other companies you worked for, was it typical to

17   assign legal title to all patent applications to

18   one entity?

19            A.   Yes, very common.  It is much

20   more -- it is the best practice to have all the

21   patent applications in a single entity rather than

22   spotted all around various different entities,

23   because if you do need to use them in any way,

24   shape or form, you know where they are.  They are

25   all in this place and you can use them without



1    having to go and secure sublicenses and other

2    things from subsidiaries.  So it is very common to

3    file patent applications and put them in a parent

4    company.

5                    Q.   Now, when NNUK -- when legal title

6    for a patent application was transferred to NNL,

7    did NNUK receive the fair market value for that

8    application at that time?

9                    A.   I wouldn't know that for sure,

10   because I don't know what transfers were made in a

11   monetary sense.  But I never saw anything that

12   suggested there was any transfer of value as a

13   result of the assignment.

14                   Q.   And so you don't know whether at

15   any time NNUK was compensated for legal title being

16   assigned to NNL?

17                   A.   No, I am not aware of that.

18                   Q.   That's not within your area of

19   expertise or work responsibility?

20                   A.   No.  I mean, I got the patents.  I

21   didn't deal with the financial side of things.

22                   Q.   Now I'd like to ask you a little

23   bit about where patent applications were filed.

24   And for reference, I would like you to turn to

25   Exhibit A of your affidavit.

 Neeson&Associates   W&P

```
 1                    A.    Okay.
 2                    Q.    And once you turn to Exhibit A, I
 3     would like to direct your attention to the first
 4     page of the attachment, the page that says "Foreign
 5     filing practice note."
 6                    A.    Yes, I have that.
 7                    Q.    And this is a foreign filing
 8     practice note that you wrote when you were at
 9     Nortel; correct?
10                    A.    Yes, I wrote this.
11                    Q.    And what is the first guideline in
12     the foreign filing practice note?
13                    A.    "Keep filing all cases in the US."
14                    Q.    And was the US a cost-effective
15     place to file patents?
16                    A.    The US is a huge market with a
17     single filing, so you get a protection over a very
18     broad area, a very broad territory with an American
19     patent.  And relative to other patent applications,
20     it is not terribly expensive to get US patents.  It
21     is also very quick compared to some of the other
22     jurisdictions.  So generally, it is a good thing to
23     do is to get patents in the United States, because
24     they offer you a broad -- the best marketplace with
25     a single filing.  It is the biggest marketplace you
```

Neeson&Associates   W&F

1    can get with a single filing of a patent

2    application.

3              Q.   Now, guideline No. 2 refers to

4    some initials there.  But can you explain to the

5    Courts what guideline No. 2 was.

6              A.   Basically, 25 percent of the

7    cases, the best 25 percent of the cases, were filed

8    in the second year in further countries than the

9    United States; and those countries were in Europe,

10   where we designated Britain, Germany and France and

11   Canada.  So the first filing was done in the US in

12   year one.  In the second year we would have filed

13   25 percent of the cases in Europe and in Canada.

14   And that's the top 25 percent based on the TIC

15   scores.

16             Q.   And the third guideline refers to

17   some filings in Asian countries.  What percent of

18   patents did Nortel file in China, for example?

19             A.   Just 3 percent of the best cases

20   were filed in China.

21             Q.   And why did Nortel file patents in

22   China at the time you wrote this note?

23             A.   At the time I wrote this note, the

24   Chinese market was obviously beginning to be an

25   important market and looking interesting from a



1    telecom's point of view.  Huawei were starting to

2    produce products and becoming quite an interesting

3    player in the marketplace, and it was clear that

4    China was going to become more of a marketplace --

5    potential marketplace for Nortel products.

6                In addition, the patent system was

7    starting to look like a real patent system, so it

8    made sense to start using the patent system in

9    China at that time.

10               Q.   And so is it correct that Nortel

11   filed the top 3 percent of cases in China based on

12   the TIC score you mentioned earlier?

13               A.   Yes, that's right.

14               Q.   Now, why didn't Nortel just file

15   all of the patent inventions in every country that

16   you could?

17               A.   Because it would have cost very,

18   very much more than we had to spend.  We had a

19   fixed budget year on year which allowed us to file

20   a certain number of patent applications and

21   maintain a certain number of patent applications

22   and prosecute the patent applications that were in

23   process.  And if we had filed everything, we would

24   have bankrupted Nortel earlier than they did, I

25   think.



1                    Q.   And just so the Courts can

2    understand some of the fees associated with

3    patents, did most countries have yearly maintenance

4    fees for patents?

5                    A.   Once a patent is granted -- and of

6    course there's costs associated with the

7    prosecution of a patent from filing to grant.  But

8    once a patent is granted, in most countries a

9    maintenance fee is due on an annual basis, and

10   those maintenance fees get bigger and bigger as the

11   life of the patent goes on.

12                   And patents last for 20 years from the

13   date of first filing.  And by the time you get to

14   the 20th year, you are paying an awful lot of money

15   for your renewal fees, for your maintenance fees.

16   And so it is often prudent to look at what is in

17   your portfolio on a regular basis to determine what

18   you should be keeping in the portfolio and what you

19   should be perhaps losing from the portfolio to save

20   costs.

21                   Q.   Who set the budget for the patent

22   filing and maintenance at Nortel?

23                   A.   It was a corporate finance budget

24   set in the States somewhere.

25                   Q.   And so just as an example, going



1    back to Simon Brueckheimer, if he came up with an

2    invention, would it automatically be filed in the

3    UK?

4                A.    Not necessarily.  If it had a

5    sufficiently high TIC score to qualify for the top

6    25 percent, then it would have been filed in

7    Europe, which eventually would have resulted in a

8    UK patent if it granted.  If it was not in the top

9    25 percent, then it would have only been filed

10   United States.

11               Q.    Were the number of patents filed

12   in the UK determined by a combination of the

13   budget, the TIC scores and the foreign filing

14   practice policy?

15               A.    Yes, that's pretty much the

16   formula that was -- given the number of European

17   patent filings, yes.

18               Q.    Now, you mentioned that because of

19   expenses, Nortel might review its patent portfolio.

20   And starting at paragraph 24 of your affidavit for

21   reference, you talk about the process of culling

22   patents at Nortel.

23               A.    Yes.

24               Q.    Could you explain the culling

25   process to the Courts.



```
 1                     A.    As I said, maintenance fees are

 2    due on an annual basis, with the exception of the

 3    United States, where they are at 3-1/2, 7-1/2 and

 4    then 11-1/2 years.  There is only three in the

 5    States.  But every other country pretty much has a

 6    renewal every year.

 7                     So we would look at patents on a

 8    regular basis to determine whether they were still

 9    at the same TIC score effectively, to see whether

10    they were actually still being used, whether they

11    were in the products, whether they were part of a

12    licensing program, whether they were something that

13    somebody was thinking of using in a licensing

14    program, et cetera, et cetera, to see whether there

15    was still a value in keeping that right maintained.

16    And if there wasn't a value in keeping that right

17    maintained, then a decision was often made to say,

18    right, okay, this is something we are going to

19    stop.  And that could be at any point in the life

20    of the patent application.

21                     And then we would involve the business

22    units and say, Look, this is what we are planning

23    to do.  We are planning to get rid of these patents

24    because they don't seem to be relevant.  And

25    assuming they didn't have any objection, then those
```



1    patents were allowed to die by not doing the next

2    thing that was due to be done on them.

3              Q.    Did you cull patents based on the

4    country of the inventor?

5              A.    No.

6              Q.    And so if you decided to cull a

7    patent, I think you said that you basically let it

8    die.  You stopped paying the maintenance fees?

9              A.    Yes.  If it was already granted,

10   we would have stopped paying the maintenance fees.

11   If it was in prosecution, we wouldn't have done the

12   next action that was due.  For example, we wouldn't

13   have paid the -- we wouldn't have prepared a

14   response to an office action or something like

15   that.  We would have let it die by not doing

16   something.

17             Q.    So for a patent to survive long

18   term in the Nortel portfolio, is it correct that it

19   had to be filed in the first instance based on the

20   TIC score?

21             A.    Yes, obviously, yes.

22             Q.    And for it to survive as a patent

23   outside of the US, did it have to be in the top 25

24   percent based on TIC score?

25             A.    Generally, yes.

Neeson & Associates    W&F

 1                    Q.   And finally, did a patent, to

 2   survive in the Nortel portfolio, have to survive

 3   this culling process you described?

 4                    A.   Yes, absolutely.

 5                    MS. SCHNEIDER:  I have no further

 6   questions for Ms. Anderson right now.  I believe

 7   people will be asking you questions from here and

 8   some people from Delaware, and I may ask follow-up

 9   questions later.

10                    THE WITNESS:  Okay.

11                    THE CANADIAN COURT:  Is there anyone in

12   this room who wants to examine Ms. Anderson?

13                    THE US COURT:  How about in the United

14   States here?  Mr. Ruby.

15                    MR. RUBY:  Yes, thank you, Judge Gross,

16   Justice Newbould.  I am not sure where to look at

17   you, Ms. Anderson.

18                    THE CANADIAN COURT:  Can't hear you,

19   Mr. Ruby.

20                    THE WITNESS:  Can't hear you.

21                    THE CANADIAN COURT:  We cannot hear

22   you.

23                    MR. RUBY:  Can you hear me now?

24                    THE CANADIAN COURT:  Yes.

25                    MR. RUBY:  Okay.  Thank you.



```
 1                    THE CANADIAN COURT:  Can you hear
 2   Mr. Ruby, Ms. Anderson?
 3                    THE WITNESS:  Yes, I can now.  It is a
 4   bit quiet.  If he could be a bit louder, it would
 5   help.
 6                    THE CANADIAN COURT:  Well, he is not a
 7   very quiet person.
 8   CROSS-EXAMINATION BY MR. RUBY:
 9                    Q.   Good morning -- or I guess good
10   afternoon for you, Ms. Anderson.  Again, my name is
11   Peter Ruby from Goodmans for the Canadian Monitor.
12   And I only have a few questions on a few topics and
13   briefly for you.
14                    A.   Okay.
15                    Q.   First of all, if I can ask you to
16   turn up paragraph 7 of your affidavit, please.
17                    A.   Yes.
18                    Q.   And you write there:
19                         "Under Nortel's research and
20                         development cost-sharing agreement,
21                         NNUK held an exclusive license to
22                         Nortel's portfolio of patents and other
23                         IP."
24                         Now, I take it this is your
25   one-sentence summary understanding of a legal
```



1   agreement; correct?

2                    A.   I am just repeating effectively

3   what I saw in the license agreement.

4                    Q.   And we can agree, can't we, that

5   by far the best source of the meaning of the R&D

6   cost-sharing agreement is that agreement itself

7   read as a whole?

8                    A.   I would say so, yes.  Yes.

9                    Q.   Now, just one point on timing,

10  Ms. Anderson.  I take it you were not employed by

11  Nortel when any R&D cost-sharing agreement was

12  drafted or entered into.  Correct?

13                   A.   I don't know the date that this

14  was drafted, so it is difficult to comment.  But I

15  think it was before my time, yes.

16                   Q.   Well, I take it you don't remember

17  being involved in any drafting or entering into a

18  cost-sharing agreement; is that fair?

19                   A.   Well, you didn't ask me if I had

20  been involved in the drafting.  You said was I

21  aware of it, and I don't know when it was drafted.

22  That was all I said.

23                   Q.   Okay.  Thank you.  If we can turn

24  to talk about the TIC score just for a moment and

25  follow up on a few questions Ms. Schneider asked



```
 1   you.  I take it the TIC score process you described

 2   in your affidavit and for us today applied to all

 3   patent applications filed by the Nortel Group.  Is

 4   that fair?

 5                A.   Well, I think it was the

 6   guideline.  It wasn't necessarily 100 percent how

 7   it was implemented.  That was the intended

 8   guideline on how filings should be proceeded with.

 9   There were certain situations that were exceptions

10   to the rule.

11                Q.   That's helpful as a clarification.

12   Thank you.

13                The TIC score system was applied

14   generally -- I don't mean to suggest 100 percent --

15   not just in the EMEA region but across the world;

16   correct?

17                A.   The TIC system was applied to all

18   applications.  The percentages that decided filings

19   in foreign countries may have been different in

20   different business units.

21                Q.   Now --

22                A.   But the TIC score was used on

23   every application and every patent idea that came

24   into the group.

25                Q.   Now, you mentioned three aspects
```



 1   of the TIC score:  Technical, inventive and

 2   commercial contribution.  That's right?

 3               A.   Yes, yes, correct.

 4               Q.   And each of those three parts was

 5   weighted equally; right?

 6               A.   Yes, it was.

 7               Q.   So, for example, an invention high

 8   in technical and inventive contribution might pass

 9   the threshold to be patented even if its commercial

10   contribution was low; right?

11               A.   Yes, it might, yes.

12               Q.   Now, maybe we can turn now to talk

13   a little bit about filing and prosecution of

14   patents.  Now, I take it you personally filed and

15   prosecuted patents and supervised others who did

16   so?

17               A.   That's correct, yes.

18               Q.   And earlier you used the term "to

19   cull" or "culling."  Is that included in what you

20   mean by prosecution of patents?

21               A.   No, I wouldn't call that

22   prosecution of patents.  Prosecution of patents is

23   when a patent application has been filed but not

24   yet granted.  So there is the backwards and

25   forwards between the Patent Office that goes on



1    until the examiner decides that the patent is
2    either going to be granted or not, issued or not.
3              Q.    And I take it that the patent
4    filing, prosecution and culling was done under a
5    process that ultimately reported up through the
6    Nortel structure to Nortel Canada's chief legal
7    officer; is that right?
8              A.    No, it wasn't quite like that.
9    There were teams for each business unit, and it
10   would be the team that decided what to do with the
11   patent applications that were within that team,
12   within that technical area or that business area,
13   depending on when it was.  And it was that team
14   that would decide what was going to happen with
15   those patents and applications in conjunction with
16   the business unit that they were supporting.
17             Q.    Thank you.  But in terms of the
18   overall process that all these different teams
19   followed, that was ultimately a system or through
20   people that reported up to the chief legal officer
21   in Canada; is that fair?
22             A.    Well, no, I wouldn't say so.  The
23   patent group had -- the person that was running the
24   patent group was in the States.  And he gave us the
25   authority in our groups to look at the patent



1    applications within a certain business unit and

2    then agreed with the business unit which patents

3    they wanted to keep, the most important ones for

4    them.

5              Q.   So the person --

6              A.   I mean, it makes more sense to

7    talk to the business unit than to the chief legal

8    person.

9              Q.   Okay.  So the person that you are

10   talking about in the States was Mr. Art Fisher; is

11   that right?

12             A.   Yes, correct.

13             Q.   And he reported to the chief legal

14   officer at the time, Nicholas DeRoma?

15             A.   Yes, he did, yes.

16             Q.   And you also dealt with a

17   gentleman named Bill Junkin, who was in charge of

18   portfolio management for the IP group at Nortel;

19   correct?

20             A.   Yes, that's correct.

21             Q.   And Mr. Junkin was located in

22   Canada?

23             A.   Yes.  Bill was in Canada, yes.

24             Q.   Now, you also mentioned the United

25   States in connection with the budget a few minutes


Neeson & Associates   W&F

1   ago.  Is it fair to say that at the end of the day

2   it was Nortel Canada that dictated the budget for

3   the IP group?

4              A.   It was a corporate budget.  To be

5   honest, I didn't know where it came from.  I just

6   know what we had to do with it when we got it.

7              Q.   Fair enough.  You also mentioned

8   earlier that all patent applications were filed in

9   the name of NNL.  Do you remember that?

10             A.   As a general rule, yes.  As a

11  general rule, that was the case, yes.

12             Q.   And these patent applications were

13  filed with several national patent offices?

14             A.   No, not always.  Depends on what

15  the score was and what it was -- what the

16  importance was within the portfolio as to where it

17  was filed.

18             Q.   So I don't mean to dwell on this,

19  but some applications were only filed in one place,

20  some in multiple places; is that fair?

21             A.   Correct.

22             Q.   But there being --

23             A.   Yes.  Nearly all were filed in

24  America, and then 25 percent in Europe and Canada,

25  and smaller amounts in other countries.



```
 1                    Q.   And what they are being --
 2                    A.   As a general rule.
 3                    Q.   And what they are being filed with
 4      is the governmental patent offices of these various
 5      countries?
 6                    A.   Sorry.  I didn't understand your
 7      question.
 8                    Q.   And they are being filed with the
 9      various governmental patent offices in these
10      countries?
11                    A.   Yes, yes.  So yes.  The US Patent
12      Office and the European Patent Office and the
13      Canadian Patent Office, yes.
14                    Q.   And when Nortel filed in these
15      patent offices in NNL's name as the owner, they
16      were not advised that somebody else had an interest
17      within Nortel's organization in the patent;
18      correct?
19                    A.   No.  That's correct.
20                    Q.   And the patent offices were not
21      advised when a patent was registered in NNL's name
22      that it was being registered that way just for
23      administrative convenience; right?
24                    A.   Oh, I wouldn't have said it was
25      just for administrative convenience.  The patents
```



1  were all assigned to NNL as a matter of best

2  practice as much as anything.  It is very useful to

3  have everything in the same name.  It makes

4  management of the portfolio much easier.  So there

5  are some clear administrative advantages of having

6  everything in the name of NNL.

7           But there are other good reasons for it

8  being in the name of NNL, and that's if you wanted

9  to do a cross-license, you couldn't do it unless

10 you had all the patents in the same entity.

11          So it is best practices.  And I don't

12 know a company that doesn't do it, and I have

13 worked for quite a few and experienced others.

14          Q.   Thank you, Ms. Anderson.

15          One of the other reasons you mention in

16 your affidavit for filing in the name of NNL is

17 what you called historical reasons.  I take it by

18 that you meant reasons predating your employment

19 with Nortel.  Is that fair?

20          A.   Well, it has always been done like

21 that, so for me, it was historical.  So it had been

22 done like that in the past.  And if you were to

23 start to change that, you would have to reassign

24 all the patents to another entity, which would cost

25 an awful lot of money and take up an awful lot of



1    time.

2              So the historical reason is a good

3    reason as well, because it means that everything

4    stays in the same place and it saves money by not

5    having to transfer things into another place if you

6    were to choose a different entity to be the owner.

7                   Q.    Terrific.

8              If we can change topics for a moment,

9    in your affidavit you address in a couple of places

10   the quantity of patents filed by employees or with

11   inventors in NNUK and NN Ireland.  Do you remember

12   that?

13                  A.    There are some references to some

14   numbers of patents based on a list that was

15   attached to Angela de Wilton's affidavit.  That's

16   the only numbers I can talk about.

17                  Q.    So I take it you were providing a

18   data point, or were not trying to suggest a

19   comparison between the quantity or quality of

20   patents filed by NNUK, NN Ireland, Nortel in the

21   United States or Nortel in Canada.  Is that fair?

22                  A.    I don't really understand your

23   question.  Can you point me to where you are

24   talking about in my affidavit.  I am not exactly

25   sure what you are asking me.  I am sorry.

Neeson&Associates    W&F

```
 1                    Q.   So I don't mean this to be
 2    complicated.  If you look at paragraph 35 of your
 3    affidavit, for example --
 4                    A.   Yes.
 5                    Q.   -- in a brief sentence you
 6    describe -- and this is maybe the conclusion of a
 7    couple of other paragraphs.  You point out --
 8                    A.   Okay.
 9                    Q.   -- 14.14 percent of the patents on
10    a certain list had an inventor listed from the UK.
11                    All I am asking you to confirm,
12    Ms. Anderson, is that in providing these data
13    points, you are not suggesting a comparison
14    between, for example, NNUK inventors or inventions
15    and Canadian inventors or inventions?
16                    A.   All I am saying about this list is
17    that I was provided with this list, and Angela
18    de Wilton had come up with some numbers relating to
19    Canada patents.  It sort of provoked me to have a
20    little look and see what UK-related inventions
21    there might be.
22                    And this is obviously a list of patents
23    that have gone through quite a lot of processing
24    and culling and all sorts of other things.  And it
25    is a simple matter of fact that there are 998 that
```

```
 1    have UK inventors as the first named inventor.  It

 2    is merely that.  That's what I'm saying.

 3               Q.   Okay.  Thank you.  Thank you.  We

 4    have that data point.

 5               If I can ask you to turn to Exhibit H

 6    of your affidavit.  It is Trial Exhibit 31308.

 7               A.   Okay.  I have that.

 8               Q.   And this is a technology license

 9    agreement with a large UK-based customer of Nortel;

10    is that fair?

11               A.   Yes, I believe so.

12               Q.   So if I can ask you to turn first

13    to the first whereas paragraph that says:

14                    "Whereas Nortel Networks has

15                    exclusive rights to certain

16                    intellectual property relating to

17                    network management software for a local

18                    fiber network within the UK."

19                    Do you see that there?

20               A.   Yes, I do.

21               Q.   And then -- and I take it you are

22    familiar with this form of agreement that Nortel

23    used for licenses?

24               A.   Yes.

25               Q.   So if you turn over to --
```

 Neeson & Associates    W&F

```
 1              A.   Yes, I --

 2              Q.   -- Section 2.1, under the heading

 3    "Licenses," and the further subheading "Grant of

 4    Licenses," do you see where it says:

 5                   "Subject to the terms and

 6                   conditions of this Agreement, to the

 7                   extent of its legal right to do so,

 8                   which term includes Intellectual

 9                   property rights where appropriate,

10                   Nortel Networks grants to BT a

11                   personal, nontransferable,

12                   non-exclusive, non-sublicensable

13                   license in, to and under the Licensed

14                   IP," and then it continues.

15                   Do you see that?

16              A.   Yes, I do.

17              Q.   And I just wanted you to help us

18    read this, since you are familiar with it.  If you

19    go back to the definition on the first page of

20    "Licensed IP" -- and I don't mean to take you

21    through this in detail -- I think you will find

22    that you see in (g), if you read the definition

23    of --

24              THE CANADIAN COURT:  Mr. Ruby, I am

25    just wondering what the purpose of all this is.
```



1    You more than anyone are saying that we have to

2    take a look at the agreement as to what it means.

3    Is this just argument here?

4              MR. RUBY:

5              Q.    The punch-line question, Justice

6    Newbould, if I can put it this way, is I am just

7    really asking, and to help the witness with this,

8    this is a license of computer software; is that

9    correct?

10             A.    This license was for some

11   software, and, yes, there were other things as

12   well.  They are all listed in the schedules.

13             Q.    And so --

14             A.    I think there was know-how and

15   technical assistance as well, if my memory serves

16   me correctly.

17             Q.    And what it is is effectively NNUK

18   granting British Telecom a sublicense of NNUK's

19   rights in the software that is listed in the

20   agreement?

21             A.    Well, and all the intellectual

22   property that is associated with whatever we

23   transferred and whatever we did.  And I think you

24   will find it is all in the schedules at the back.

25             MR. RUBY:  Thank you, Ms. Anderson.



1    Those are my questions.

2                    THE US COURT:  Thank you, Mr. Ruby.

3                    THE CANADIAN COURT:  Thank you for your

4    very brief cross-examination.

5                    THE US COURT:  Good morning.

6                    MR. LUFT:  Good morning, Judge Gross.

7    Good morning, Justice Newbould.

8    CROSS-EXAMINATIION BY MR. LUFT:

9                    Q.   And good afternoon, Ms. Anderson.

10                   A.   Hello.

11                   Q.   First, let me thank you for

12   coming.  I understand this was not an easy trip, so

13   thank you for being here with us.  I'll try to keep

14   my comments short, but I have a few topics I wanted

15   to talk to you about.

16                   A.   Can I ask who you are, please.  I

17   am sorry.

18                   Q.   I was just about to say.  I am Avi

19   Luft.  I am from Cleary Gottlieb Steen & Hamilton,

20   and I represent the US Debtor.

21                   A.   It is nice to meet you.

22                   Q.   Nice to meet you as well.

23                   The first thing I wanted to ask you

24   about is something that my colleague Mr. Ruby just

25   talked to you about.  He said -- he raised the idea



```
1    that the government when you file a patent may not

2    know that someone else through a license has an

3    interest in a patent.  Do you remember that line of

4    questioning?

5                    A.   Yes.  Yes, I do.

6                    Q.   I believe my colleague is there,

7    and unfortunately, we don't have the ability to put

8    these documents up on a screen, but I am going to

9    ask him to hand you a document that is Exhibit

10   TR50849, and I believe we will hand up hard copies

11   to the Court in both courts.

12                   A.   I think we have a paper copy here

13   anyway.

14                   Q.   Terrific.  I'll give one second

15   for it just to get up to the bench, and then I'll

16   ask you my question about it.

17                   A.   So just to let you know, I have

18   not seen this before, but yes, I have it now.

19                   Q.   Okay.  And you mentioned being

20   familiar with the Canadian Intellectual Property

21   Office?

22                   A.   Well, I am as familiar with the

23   Canadian Intellectual Property Office as I am with

24   other intellectual property offices where I am not

25   practicing.  I know how they work because they are
```



```
 1   all very similar, but there are obviously things I
 2   don't know about the Canadian practices.
 3            Q.   Okay.  Well, let me see if you
 4   understand this, and we will see where we go.  If
 5   you turn to the second page of this document, which
 6   is a printout from their website, there is a simple
 7   question that is called "What is a patent"?
 8            THE CANADIAN COURT:  Can I just be told
 9   what the document is?  I haven't got a copy here.
10   What is it you are looking at?
11            MR. LUFT:  I am sorry, Justice
12   Newbould.  I thought that you had been handed a
13   copy already.  It is Exhibit TR50849.  And what it
14   is is a printout from the Canadian Intellectual
15   Property Office's website, where a question is
16   posed "What is a patent?" and an answer is given.
17            I don't know if you have a copy of it
18   yet.  If not, I'll just read the relevant portion.
19            THE CANADIAN COURT:  I do.
20            MR. LUFT:  Okay.
21            BY MR. LUFT:
22            Q.   Do you see it says, "What is a
23   patent?"  And the answer is --
24            A.   Yes, I do.
25            Q.   -- "You can use your patent to
```

Neeson & Associates   W&F

```
 1    make a profit by selling it, licensing it or using

 2    it as an asset to negotiate funding."  Do you see

 3    that?

 4              A.   Yes, I do, yes.

 5              Q.   Ms. Anderson, in your experience,

 6    the patent offices are well aware that people who

 7    have patents have the right to license them;

 8    correct?

 9              A.   Correct.

10              Q.   And when a patent holder enters

11    into a license, they need not inform the

12    governmental authority who issued the patent that

13    they have entered into a license; right?

14              A.   I think that depends on the

15    country.

16              Q.   In the United States you didn't

17    need to do that, did you?

18              A.   I am not a US patent attorney.  I

19    don't know, but I believe you do.  It serves you

20    better to register your licenses at the US Patent

21    Office, as it does in the UK patent offices,

22    depending on the nature of the license and what

23    rights are passed over.

24              Q.   So to the extent there was a

25    Nortel patent with a license in that sense, the
```



1  government would have been informed that there was

2  a license interest out there?

3         A.   It may or may not.

4         Q.   But if it was the policy and

5  Nortel was complying with the policy, they would

6  have told them; correct?

7         A.   There was no policy to necessarily

8  register licenses.  It would depend on the

9  situation and the circumstance and the patents

10  related and what rights you were giving to the

11  third party.

12         For example, if you are giving

13  litigation rights, then you need to register the

14  license.

15         Q.   And if you did, the government

16  would know about it; correct?

17         THE CANADIAN COURT:  I guess if you

18  did, that it would.

19         THE WITNESS:  In those situations, yes.

20         BY MR. LUFT:

21         Q.   Okay.  Now, Ms. Anderson, if we

22  could just go on.  As part of your duties, you were

23  familiar with what a patent was; correct?

24         A.   Yes.  That's my profession.

25         Q.   Terrific.



```
 1                    THE CANADIAN COURT:  We are getting
 2    somewhere now.
 3    -- OFF THE RECORD --
 4                    BY MR. LUFT:
 5                    Q.   And a patent gives someone the
 6    right to exclude others from making, using,
 7    offering for sale or selling an invention in the
 8    country in which the patent is filed?
 9                    A.   Generally, yes.
10                    Q.   And that's often referred to as
11    the right to exclude; correct?
12                    A.   I think it might be in some
13    countries, yes.
14                    Q.   And what a patent really gives you
15    is an exclusive right to use that patented
16    technology; right?
17                    A.   Within certain bounds of law, yes,
18    yes.
19                    Q.   And that exclusivity is
20    critical -- right? -- for why people want patents?
21    It means if I have a patent, I can do it and no one
22    else can; right?
23                    A.   Assuming that you are making use
24    of your patent and it has not become a license of
25    right and various other caveats that go with the
```



 1   requirements to use your patent, yes.

 2              Q.   And the way that a person who has

 3   a patent makes sure that no one else is using their

 4   patent is what is often referred to as an

 5   enforcement right; right?  The right to make sure

 6   no one else is intruding on their patent; right?

 7              A.   Assuming you find out what other

 8   people are doing, yes.

 9              Q.   And that enforcement right, the

10   right to exclude someone else from using your

11   patent, is a very important right; correct?

12              A.   A patent is an important right for

13   lots of different reasons, and one of them is that

14   you can enforce it if it is valid and enforceable,

15   yes.

16              Q.   Now, a patent granted in the

17   United States only gives rights for the United

18   States; correct?

19              A.   Correct.

20              Q.   So if I have a patent to a product

21   in the United States, it gives me no rights in

22   Canada; right?

23              A.   Unless you are importing things

24   from Canada into the States.

25              Q.   Correct.  If they come into the



1   boundaries of the United States, then my patent

2   that protects it in the United States protects it;

3   right?

4             A.   Yes, but you could make it in

5   Canada and import it into the States.

6             Q.   And if I made it in Canada and I

7   only sold it in Canada and there was no patent in

8   Canada, then, in fact, I would not have infringed a

9   United States patent; right?

10            A.   If you kept it in Canada, yes.

11            Q.   Now, a patentee has the right to

12  sell their patent to another person; right?

13            A.   Yes, yes.

14            Q.   They can license their patent to

15  another person?

16            A.   Yes.

17            Q.   They can license all of the rights

18  under a patent to another person?

19            A.   They can license what they like.

20            Q.   So it can be all the rights or

21  just a portion of the rights?

22            A.   Exactly.

23            Q.   Now, they can give that licensee

24  an exclusive license, meaning only that licensee

25  can use the patent; correct?



     1                    A.   They can give any type of license
     2    that you want.
     3                    Q.   And if a patent holder gives a
     4    licensee an exclusive license, that exclusivity
     5    applies to the patent holder as well, such that if
     6    I had a patent and I gave you an exclusive license,
     7    you are the only person who has the right to use
     8    that patent at that point.  Even though I am the
     9    holder of the patent, I may not; correct?
     10                    A.   Yes.
     11                    THE CANADIAN COURT:  Mr. Luft, is there
     12    any purpose to this Patent 101 course here?  I
     13    mean, what is the purpose of all this?
     14                    MR. LUFT:  Your Honor, I think there is
     15    a very important purpose, which is that my
     16    colleagues from Canada keep talking about their
     17    legal title and the fact that they are owners.  And
     18    I would like a very clear understanding from
     19    Ms. Anderson from what she is doing that when they
     20    gave exclusive licenses to the party, and
     21    Ms. Anderson did the work involving exclusive
     22    licenses, she understood that that exclusive
     23    license in the country granted all those rights to
     24    the other independent integrated entities and that
     25    Canada had no more rights.

 Neeson&Associates     W&F Wilcox & Fetzer Ltd.

```
 1                  THE CANADIAN COURT:  Well, isn't this
 2   an area of legal argument as to what the MRDA
 3   means?
 4                  MR. LUFT:  Your Honor, I don't believe
 5   it is.  I believe this woman worked for four years
 6   prior to the MRDA even being signed up in which she
 7   gave licenses, made representations to
 8   counterparties that they had the rights to do so.
 9   I think it is about how they actually operated
10   their business.  I don't think it has anything to
11   do with how to understand the MRDA beyond how you
12   wish to take it and Judge Gross wishes to take it.
13   But I think it is relevant.
14                  THE CANADIAN COURT:  Well, I have been
15   listening to a whole lot of hypothetical questions
16   what if, what if, what if.  And the witness is
17   properly saying if, if, if.  How is that helpful?
18                  MR. LUFT:  Your Honor, I am sorry you
19   don't find this helpful.  I will move on.  I
20   believe that these are, in fact, not hypotheticals
21   but rather just general propositions, but I am
22   happy to move on at this point.
23                  THE CANADIAN COURT:  Thank you.
24   -- OFF THE RECORD --
25                  BY MR. LUFT:
```



```
 1                  Q.   Ms. Anderson, can you hear me?

 2                  A.   Yes, I can.

 3                  Q.   Terrific.

 4                  A.   Are we still looking at this

 5      Canadian Patent Office document?

 6                  Q.   We are not.  You can put it to the

 7      side.

 8                  A.   Okay.  Thank you.

 9                  Q.   Ms. Anderson, what I did want to

10      ask you about was, in your affidavit in paragraph

11      18 you make a statement that there was no one

12      decision-maker on where a patent could be filed;

13      correct?

14                  A.   That's correct, yes.

15                  Q.   And I believe you gave some

16      testimony in response to Mr. Ruby's questions that,

17      in fact, there was a patent committee made up of

18      people from multiple of the different Nortel

19      entities who made decisions as a group as to

20      whether a patent should be filed based on TIC

21      scores?

22                  A.   Yes.

23                  Q.   So there was no executive from NNL

24      that had a separate right to sign off one way or

25      the other as to whether a patent should be filed or
```



1    not; correct?

2              A.    In the UK we had our own -- we had

3    patent committees that met to review the inventions

4    that came out of NNL.  Those scores were then

5    factored into the global database, and the filings

6    proceeded in accordance with the guidelines.

7              Q.    Great.  Thank you.  Now, you were

8    also a member of the patent portfolio group?

9              A.    I was not really in the patent

10   portfolio group, though I was involved in reviewing

11   the portfolio on a number of occasions.  I was part

12   of the patent practice group.

13             Q.    Thank you.  In fact, you were the

14   chair of the patent practice group for a time, were

15   you not?

16             A.    Yes, for most of the time I was at

17   Nortel.

18             Q.    Now, you spoke a little bit about

19   the foreign filing practice note, which is

20   Exhibit A to your affidavit.

21             A.    Yes, we have.

22             Q.    And that set a policy for where in

23   the world Nortel would choose to file its patents

24   and where it would not; correct?

25             A.    Yes, generally, yes.



 1                    Q.    And you mentioned that Nortel had
 2    to make choices about where it wanted to file its
 3    patents?
 4                    A.    That's correct.
 5                    Q.    And those choices were driven by
 6    where Nortel felt it would be most economically
 7    valuable for it to file the patents; correct?
 8                    A.    That was one of the
 9    considerations, yes.
10                    Q.    Do you have a copy?  If you could
11    just pull out the document, which is Tab A, I guess
12    Exhibit A to your affidavit.  I want to talk to you
13    about that document for a minute.
14                    A.    Yes, I have it here.
15                    Q.    All right.  And I believe you
16    testified that the policy was, to the extent
17    possible, to file all patents in the United States?
18                    A.    Yes.  That was the general
19    requirement.
20                    Q.    And that, in fact, the first
21    filing should be made in the United States, barring
22    any technical reason why it could not; correct?
23                    A.    That's correct.  That's correct.
24                    Q.    And by filing all of the patents
25    in the United States, the idea was to have Nortel's



```
 1   entire technology portfolio that it patented
 2   patented in the United States; correct?
 3              A.   The US is a big market, and it is
 4   fairly common practice to file first in the United
 5   States because of the size of the market compared
 6   to the single patent costs that you have to incur.
 7              Q.   And in your affidavit you mention
 8   that NNUK had an exclusive license to Nortel
 9   technology in the UK; right?
10              A.   That's what I understood.
11              Q.   Right?  And similarly, NNSA, the
12   French entity, would have had an exclusive license
13   to Nortel technology in France?
14              A.   I understand there was a similar
15   agreement with France, yes.
16              Q.   And you understood that NNI, the
17   US entity, also had an exclusive license to Nortel
18   technology in the United States territory; correct?
19              A.   Sorry?  NNI?  I don't know about
20   the American company.  I wasn't associated with
21   that side of things.
22              Q.   Sorry.  As part of the global
23   patent group, you had no understanding as to
24   whether the US entity had a corresponding --
25              A.   I knew where the cost-sharing
```


Neeson & Associates   W&F

```
 1   agreements were in Europe, because that's where I

 2   was working.  If there were others elsewhere, I

 3   don't know what they were about.

 4              Q.   Okay.  If we look back at Exhibit

 5   A, there is a topic that says "Reasons" under why

 6   you keep filing all cases in the US.  Do you see

 7   that?

 8              A.   Yes, I do.

 9              Q.   It says with regard to why you

10   would file all the patents in the United States:

11              "This captures more of the market

12              than any other single filing, hits the

13              home base of more competitors and

14              technology users than any other single

15              filing and gives you predictable

16              prosecution and enforceability at the

17              lowest cost per market percentage.  Our

18              US portfolio still carries the weight

19              of our licensing and defense programs."

20              Do you see that?

21              A.   I do.

22              Q.   And you wrote that?

23              A.   I did.

24              Q.   And you believed it to be accurate

25   when you wrote it?
```

 Neeson&Associates   W&F

```
 1                    A.   I believed it to be accurate when
 2   I wrote it and I believe it to be accurate now.
 3                    Q.   And, in fact, I think you mention
 4   in your declaration or affidavit that, in fact,
 5   this policy was in effect for the entire time you
 6   were at Nortel?
 7                    A.   Yes.
 8                    Q.   And I believe you described the US
 9   as a huge market earlier; correct?
10                    A.   I may have said that word.  I
11   mean, it is relatively the biggest market that I am
12   aware of.
13                    Q.   And that's what you were referring
14   to when you talked about capturing more of the
15   market than any other single filing; correct?
16                    A.   Yes.
17                    Q.   And then it says, "Hits the home
18   base of more competitors and technology users than
19   any other single filing."  Do you see that?
20                    A.   Yes, I do.
21                    Q.   And the reason you mentioned that
22   there were more of Nortel's competitors in the US
23   was because it was relevant because Nortel would
24   want to exclude those competitors from using its
25   technology?
```



```
 1                    A.   Sorry.  I didn't catch that.
 2                    Q.   Sure.  I said one of the reasons
 3    why it would be relevant to note that there were
 4    more competitors of Nortel in the US is because
 5    Nortel would want to exclude those competitors from
 6    using its technology in the US market?
 7                    A.   Well, I guess so, yes.
 8                    Q.   And if those competitors did
 9    infringe on those patents, then Nortel through NNI
10    could bring enforcement actions against them?
11                    A.   Possibly.  Possibly not.  It would
12    depend on the circumstance.
13                    THE US COURT:  Mr. Luft, I am going to
14    give you two more minutes to finish your
15    examination, because I have a meeting at 12:15 --
16                    MR. LUFT:  Fair enough, Your Honor.
17                    THE US COURT:  -- and I am not going to
18    keep Ms. Anderson over my lunchtime.  So I will
19    give you two more minutes.
20                    MR. LUFT:  I appreciate that, Your
21    Honor.
22                    BY MR. LUFT:
23                    Q.   Now, Ms. Anderson, the next topic
24    was "predictable prosecution and enforceability at
25    the lowest cost per market percentage."
```



```
 1                    A.   Yes.
 2                    Q.   And referring to enforceability,
 3        that is the topic we were talking about before;
 4        right?  Bringing legal cases to enforce your
 5        rights.
 6                    A.   Yes, yes.
 7                    Q.   And you also wrote that "Our US
 8        portfolio still carries the weight of our licensing
 9        and defense programs."
10                    Now, when you wrote "still," was that
11        meant to be an indication that prior to writing
12        this memo, the US portfolio also carried the weight
13        of the licensing and the defense programs for
14        Nortel?
15                    A.   Well, I think if you look at the
16        thing, look at the titles, it is really this policy
17        is putting into words on a piece of paper what we
18        were already doing.  And, I mean, it was just
19        really an explanation of what we were going on:
20        Keep filing, because we were already doing it; keep
21        filing, because we were already doing it; keep
22        filing, because we were already doing it.  And it
23        was just to put in place a clear guideline so that
24        everybody knew what we were expecting from the
25        different groups, just as a standard, everyday sort
```



1    of practice note that you would find in many

2    different situations in many different in-house law

3    departments and patent departments.

4              Q.   Ms. Anderson, I just want to ask

5    you a question very quickly about the next section,

6    about the policy where it talks about filing the

7    best 25 percent in England, Germany and France and

8    Canada.  Do you see that?

9              A.   Yes.

10             Q.   Now, do you see within it it

11   mentions that only Japan and China would provide

12   better market capture and that would come with

13   enforcement and cost issues; correct?

14             A.   Yes, yes.

15             Q.   So the Japanese and China market

16   would be larger.  But if we follow it down, in

17   Japan the issue would be cost, and in China there

18   was concerns about enforceability; correct?

19             A.   Yes.

20             MR. LUFT:  Ms. Anderson, those are my

21   questions.  Thank you very much.

22             THE US COURT:  Thank you, Mr. Luft.

23             THE WITNESS:  You are welcome.

24             THE US COURT:  Anyone else?

25             MS. SCHNEIDER:  I have no further



```
 1   questions.  Nobody else has any cross-examination.

 2               I just wanted to say thank you,

 3   Ms. Anderson, for making yourself available.

 4               THE WITNESS:  You are welcome.

 5               MS. SCHNEIDER:  Is there anybody else?

 6               THE US COURT:  Thank you, Ms. Anderson.

 7   Very much appreciate it.

 8               THE CANADIAN COURT:  Thank you,

 9   Ms. Anderson.

10               THE WITNESS:  You are welcome.  Have a

11   nice day.

12               THE US COURT:  And you as well.

13   -- WITNESS EXCUSED --

14               THE US COURT:  Anything we need to

15   discuss before we recess for lunch?

16               All right, everyone.  We will be back

17   at 1:30.  Thank you, all.

18   -- LUNCHEON RECESS AT 12:12: P.M.--

19   -- UPON RESUMING AT 1:33 P.M. --

20               THE US COURT:  Thank you, everyone.

21   Please be seated.

22               THE CANADIAN COURT:  Hello, Judge

23   Gross.

24               THE US COURT:  Justice Newbould, hello.

25               THE CANADIAN COURT:  I'm just looking
```



```
 1   at a pile of paper here for a moment.

 2             Is this any different from what I

 3   received from your office a day or two ago?

 4             THE US COURT:  We are not back on the

 5   transcript yet, Justice Newbould.

 6             THE CANADIAN COURT:  Oh.  Is this any

 7   different from what I received a day or two ago?

 8             MR. MILNE-SMITH:  Last night at 7:00

 9   p.m. the slide deck was circulated.  I don't

10   believe you would have received that.  You should

11   have two expert reports along with the slide

12   presentation.

13             And you should also have a slide

14   presentation that looks like this, Your Honour.

15             THE US COURT:  We'll let you know when

16   we are up and running here.

17             THE CANADIAN COURT:  All right.

18             I got this set yesterday, I think, from

19   your office.  Is it any different from what you

20   have put in front of me?  It is thicker.

21             MR. MILNE-SMITH:  The only difference I

22   can imagine is that it might include the exhibits.

23   There is some very detailed spreadsheets to

24   Mr. Malackowski's report that --

25             THE CANADIAN COURT:  Yeah, I think this
```



1   is what I got yesterday.

2               MR. MILNE-SMITH:  I don't know why it

3   would have only come yesterday.  I apologize for

4   that.

5               THE CANADIAN COURT:  All right, anyway,

6   if the reporter wants a copy, she is more than

7   welcome to have this.

8               MR. MILNE-SMITH:  You will be relieved

9   to hear, Justice Newbould, we will not be referring

10  to the exhibits today.

11              THE CANADIAN COURT:  That is a relief.

12  Go ahead.

13              THE US COURT:  We are not quite ready,

14  Justice Newbould.

15              MR. MILNE-SMITH:  Your Honour, I

16  apologize, I have some intelligence on what was

17  filed yesterday.  That was the redacted version

18  following all the back and forth on

19  confidentiality, so what came yesterday was what

20  was to satisfy the buyers.

21              THE CANADIAN COURT:  All right, anyway,

22  we'll mark the first report of Mr. Malackowski as

23  Exhibit 33.

24              THE CANADIAN REGISTRAR:  Exhibit 33,

25  Your Honour.



```
 1                    EXHIBIT NO. 33:  Expert Report of James
 2                    E. Malackowski dated January 24, 2014.
 3                    THE CANADIAN COURT:  And then the
 4     second report is Exhibit 34.
 5                    THE CANADIAN REGISTRAR:  Exhibit 34.
 6                    EXHIBIT NO. 34:  Rebuttal Report of
 7                    James E. Malackowski dated February 28,
 8                    2014.
 9                    THE CANADIAN COURT:  Go ahead,
10     Mr. Milne-Smith.
11                    THE US COURT:  I think we are still
12     waiting.
13                    THE CANADIAN COURT:  Oh, are we?
14                    THE US COURT:  Yes.
15                    All right, we are ready to proceed.
16                    JAMES MALACKOWSKI, having been duly
17     affirmed, was examined and testified as follows:
18                    MR. MILNE-SMITH:  Judge Gross, Justice
19     Newbould, Matthew Milne-Smith from Davies Ward on
20     behalf of the EMEA Debtors.
21     EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY MR.
22     MILNE-SMITH:
23                    Q.   Good afternoon, Mr. Malackowski.
24     Could you please briefly introduce yourself to the
25     Court.
```



```
 1                    A.   Yes, sir.  My name is Jim

 2   Malackowski.  I live in Chicago with my family,

 3   having graduated from the University of Notre Dame

 4   studying accounting and philosophy.  Today my

 5   primary professional activity is I'm the Chief

 6   Executive and Chairman of Ocean Tomo LLC.  Ocean

 7   Tomo is a financial advisory firm focused

 8   exclusively on matters related to intellectual

 9   property.

10                    THE CANADIAN COURT:  How did you get a

11   name "Tomo"?

12                    THE WITNESS:  Actually, Your Honour,

13   "tomo" is an Asian word reflecting intellectual,

14   and it reflects that for many years the Asian

15   market was a big part of our business.

16                    THE US COURT:  In Chicago how did they

17   get the name "Ocean"?

18                    THE WITNESS:  Lake Tomo was a

19   consideration.

20                    BY MR. MILNE-SMITH:

21                    Q.   Now, do I understand correctly

22   that you graduated from Notre Dame in 1985?

23                    A.   Yes, sir.

24                    Q.   And as you are too modest to say,

25   I will point out that you graduated summa cum
```



```
 1   laude?

 2               A.   Yes, sir.

 3               Q.   You are a Certified Public

 4   Accountant?

 5               A.   Yes.

 6               Q.   And also a Certified Licensing

 7   Professional?

 8               A.   Yes, sir.

 9               Q.   What is your role here today, as

10   you understand it?

11               A.   So I was asked today by counsel

12   for EMEA to provide my opinions on the value of the

13   intellectual property that was transferred in the

14   business sales as well as the allocation of the

15   intellectual property value both for the business

16   sale and for the residual intellectual property.

17               Q.   And how would you propose to go

18   about delivering those opinions to the Courts

19   today?

20               A.   So my proposal would be to start

21   with an overview, including the conclusions

22   reached, and then with that understanding of

23   methodology and results go through the analysis in

24   some detail.

25                    And finally, Your Honours, it is
```



1    important that we step back from that analysis and

2    test it for reasonableness, both against my own

3    study, as well as the other experts.

4                    Q.   We are just going to bring up on

5    screen here a presentation, and everyone should

6    have a hard copy of it, entitled "Summary of

7    Opinions, James E. Malackowski."  Can you identify

8    this document for the Court, please?

9                    A.   Yes, this is a demonstrative set

10   that I prepared along with others from Ocean Tomo.

11                   Q.   Mr. Malackowski, I would like to

12   just briefly discuss your relevant work experience.

13   I understand that in Appendix A to your initial

14   report you included a curriculum vitae?

15                   Yes, sir.

16                   Q.   Okay, I don't propose to walk you

17   through that.  I just want to make sure for the

18   reference of the Courts that they have that.

19                   THE US COURT:  Yes.

20                   BY MR. MILNE-SMITH:

21                   Q.   Thank you.  Just briefly, where

22   did you go after graduating Notre Dame?

23                   A.   So following graduation, I went to

24   work for a spinout of Arthur Andersen, the

25   accounting firm, that was dedicated to dispute



1   accounting and regulatory rate-making decisions.

2         Fortuitously, the day I showed up, they

3   assigned me the first patent accounting, which was

4   the firm's first.  Then they assigned me the second

5   because I did the first.  And for the next three

6   years, all I did was patent litigation accounting

7   at a time where patent value was being recognized

8   in the United States at a growing rate.

9         Q.   So you said you did that for three

10   years.  What came next?

11         A.   Well, after three years, a client

12   came and asked me to appraise a patent, not for

13   litigation but a transaction, and my firm wasn't

14   interested in that work because it wasn't covered

15   by the accounting standards at that time, nor their

16   insurance.

17         So at 25 I started what was the

18   country's first intellectual property appraisal and

19   dispute accounting firm.  We started with five

20   people and we grew over the next ten years to be

21   just under 300.  Our analysis included a lot of

22   tax-based intellectual property valuation work as

23   well as corporate strategy related to intellectual

24   property work.  So we became the big fish in the

25   very little pond.

 Neeson & Associates   W&F

```
 1                    Q.    But that was not Ocean Tomo?

 2                    A.    No, that was before Ocean Tomo.

 3                    Q.    Okay, so what came --

 4                    THE CANADIAN COURT:  Mr. Milne-Smith, I

 5     can tell you that I have looked at tab "A" and it

 6     is blank, so if somebody wants at some point to

 7     give me a copy of the curriculum vitae.

 8                    MR. MILNE-SMITH:  We'll take care of

 9     that on the break.  Thank you very much, Justice

10     Newbould.  I apologize for that.

11                    BY MR. MILNE-SMITH:

12                    Q.    So how long were you with that

13     firm?

14                    A.    So I was with that firm for

15     approximately 12 years.  We sold that business at

16     the height of the dot-com boom, and then I

17     transitioned to be a venture capital or private

18     equity investor looking at companies that had

19     strong intellectual property value.

20                    Q.    And how long were you in the

21     private equity field?

22                    A.    I did that for three years,

23     actually until the date that the non-compete

24     expired from the first sale, and then I started

25     Ocean Tomo which was a combination of the advisory
```

 Neeson&Associates    W&F

1   work I had done as well as the principal and

2   brokerage work that I had learned through the

3   private equity venture capital experience.

4                Q.   So can you briefly describe the

5   business of Ocean Tomo and your responsibilities at

6   the company?

7                A.   Yes.  As I mentioned earlier,

8   Ocean Tomo is a broad-based financial service firm

9   focussed exclusively on intellectual property.  We

10  have five groups of professionals.

11               The first is the expert witness

12  practice.  Obviously that is preparing for and

13  doing the exact type of thing we are doing today.

14               Second is strategy, working with the

15  largest companies to individual inventors to help

16  them understand how to manage their intellectual

17  property.

18               Third for us is investment banking,

19  helping to buy or sell businesses.

20               Fourth is innovation management,

21  looking at the earliest stage of technology.

22               And finally, lastly, it is transaction

23  advisory, helping companies to buy or sell their

24  IP, including the creation of a public market for

25  intellectual property.

Neeson&Associates     W&F

1                    The final part of your question, I'm

2     the Chief Executive and Chairman, and so I have

3     client responsibility as well as overall firm

4     responsibility.

5                    Q.   Okay.  How much of your time is

6     dedicated to expert testimony?

7                    A.   Sometimes too much.  I target

8     between a quarter to a third, and sometimes it is

9     50 percent or even more.  But my budgeted is about

10    a quarter of my time.

11                   Q.   Now, if we just go to the next

12    slide in your presentation, aside from your work

13    history, we see on the screen here that you have

14    prepared a summary of your relevant professional

15    experience; is that right?

16                   A.   Yes, sir.

17                   Q.   First of all, why have you broken

18    this down by licensing experience and IP valuation

19    experience?

20                   A.   In my opinion, having reviewed the

21    issues and facts of this case, there are two

22    distinct areas of expertise that I draw from.

23                   The first is my technology transfer

24    expertise, which I put in the left column under

25    "Licensing," and that is certainly related to but



1  very different from my intellectual property

2  valuation or accounting experience.  And so I put

3  the highlights of that background in the right

4  column.

5          Q.   So let's start with the licensing

6  experience or the technology transfer experience on

7  the left-hand column.  Could you please briefly

8  describe your relevant experience to the extent you

9  haven't already touched on it?

10          A.   Briefly, you mentioned I'm a

11  Certified Licensing Professional, and so that is

12  the accreditation for our industry.  Importantly, I

13  am the past President of the country's largest, as

14  well as the world's largest Technology Transfer

15  Professional Association.

16          So LES has about 10,000 members

17  worldwide in 32 national chapters.  I just finished

18  my term as president a year ago, and ten years ago

19  I was president of their largest chapter, which was

20  a combined USA/Canada chapter.

21          I teach on the subject of intellectual

22  property licensing and management at numerous

23  universities, and I am a Director on large and

24  small companies that help to manage those issues.

25          And then, finally, a little bit of a



1    unique perspective is that I have also been an

2    inventor, so I have more than 20 patents issued

3    and/or pending which gives a different perspective

4    on the licensing or transfer of technology.

5                    Q.   And in what fields were those

6    patents?

7                    A.   A variety.  My early work was in

8    the telecommunications field specifically.  That is

9    probably a third of my portfolio.

10                    And a third of my portfolio is in

11    business methods and software related to my work at

12    Ocean Tomo.

13                    And then there is a smattering of

14    miscellaneous assignments that are largely

15    client-driven.

16                    Q.   You have referred a couple of

17    times to a term "technology transfer."  Could you

18    just explain what you mean by that?

19                    A.   Yes, well, generally speaking,

20    technology transfer is the process by which an

21    owner of intellectual property allows others to

22    commercially use the property.  At a practical

23    level, it is living and breathing licence

24    agreements, understanding them, negotiating them

25    and following them.



```
 1                    Q.   Mr. Malackowski, you have been
 2    involved with the administration of the Certified
 3    Licensing Program?
 4                    A.   Yes, the CLP program was actually
 5    an initiative that we -- born at the LES
 6    organization and I served as the organization's
 7    founding Chair of its Board of Governors.
 8                    Q.   Have you actually had involvement
 9    in negotiating licence agreements, and if so, in
10    what capacity?
11                    A.   Well, of course.  My negotiating
12    experience would include principal experience,
13    meaning negotiations on behalf of my own portfolio
14    or that of my employer, as well as client advisory
15    experience, so many, many examples.
16                    Q.   And do you have any experience in
17    managing ownership of IP in the context of a global
18    multinational enterprise?
19                    A.   Yes, again, in both contexts, as
20    an advisor to clients many times, but as a
21    principal, probably most significantly is I was
22    part of the effort to consolidate Ford Motor
23    Company's IP on a global basis.  So we took all the
24    patents from Jaguar, Aston Martin and Volvo, put
25    them into a single entity to manage them, and I was
```



1    the outside Director of that entity for its first

2    five years.

3              Q.   So shifting to the right side of

4    this slide, number 2, can you please provide a

5    brief description of your IP valuation experience?

6              A.   Oh, yes, we already mentioned the

7    first two points, that I had started what we

8    believe to be the first IP appraisal firm.  I am a

9    CPI have served as an expert in Court on IP

10   valuation issues, including damages, approximately

11   40 times in open Court.  I have also served in that

12   capacity in front of the International Trade

13   Commission.  And perhaps the most interesting part

14   of that side of the chart is I have been a Resident

15   Advisor for the US Department of Commerce where

16   they would pay to send me and a delegation to

17   foreign countries to help set up intellectual

18   property accounting and other legal or procedural

19   standards.

20             Q.   In any of these expert or other

21   retainers you have described, have they involved

22   the telecommunications industry?

23             A.   Oh, significantly.

24             Q.   So looking at slide 3,

25   Mr. Malackowski, can you briefly summarize your



1    assignment here today?

2              A.   I think this slide does a pretty

3    good job.  It is fairly straightforward, three

4    questions:

5                   One, how much is the business sales

6    intellectual property worth?

7                   Two, what is the appropriate method to

8    allocate IP value?

9                   And three, how much should each of the

10   Debtors get of that IP value?

11             Q.   Now, you have prepared two reports

12   which have been marked as Exhibits 33 and 34.  Are

13   the questions that you are addressing here today on

14   this slide, are they the same as the questions you

15   addressed in your report?

16             A.   The content is the same.  The

17   slides are obviously a summary of those reports, I

18   think as noted by Your Honour a few minutes ago.

19   They are over 300 pages long, 250 footnotes, 500

20   pages of exhibits.

21             Q.   So let's start with the first

22   question then.  Is slide 5 your answer to the first

23   question?

24             A.   Yes.  So consistent with giving

25   the conclusion first and then explaining how we got



1    here, slide 5 represents the value of the

2    intellectual property in each of the eight business

3    sales transactions, with the total shown in red at

4    the bottom of 765.2 million dollars.

5            Q.   And did you value each of those

6    businesses individually or was it a global number

7    that came up with the 765?

8            A.   No, sir, it was a bottom-up

9    approach.  Each business was individually valued

10   and the total simply reflects the sum.

11           Q.   And is there a snapshot way you

12   can describe the technique you used to value the

13   IP?

14           A.   Yeah, the snapshot would be a

15   relief from royalty model which is the most common

16   method of intellectual property valuation.

17           Q.   And how does relief from royalty

18   work on the most basic level?

19           A.   On the most basic level, it looks

20   at the IP within a company and says if you didn't

21   own that intellectual property, if you didn't own

22   those patents, how much would you have to pay a

23   third party in royalties to obtain those rights.

24           Q.   Your second question refers to the

25   appropriate allocation methodology.  In your



1   opinion, what is the most appropriate allocation

2   methodology for this case?

3            A.   In my opinion, the most

4   appropriate method is what we are calling the

5   contribution method based upon the research and

6   development expenditures of each of the parties.

7            Q.   Q.Is your answer to that question

8   specific to Nortel, or would it be the same

9   regardless of the facts and circumstances of

10  Nortel?

11           A.   Well, the contribution method

12  could apply in many situations, but I chose it here

13  specifically because of the facts and circumstances

14  of Nortel.

15           Q.   And does the next slide, slide 7,

16  summarize why you concluded contribution was the

17  right approach for this case?

18           A.   It does.

19           Q.   You refer -- so there is four

20  principles, business principles that you refer to

21  here.  What are you referring to when you state the

22  "Bedrock Principle of Inventive Process"?

23           A.   So as an inventor, I'm very

24  familiar with this concept, but it is

25  straightforward.  The owner of intellectual



1  property, barring any other agreement to the

2  contrary, is its creator, that when you invent

3  something through your actions and your mind, you

4  have rights to those intellectual property assets.

5  That is where it all begins.

6          Q.   You next refer to the basic

7  accounting principles.  Which basic accounting

8  principles have you brought to bear in this case?

9          A.   In particular, I'm talking about

10 cost-matching, that there was an effort in my

11 analysis to make sure that the R&D I was

12 considering was matched in both time and geography

13 to the issues or questions I was addressing.  And

14 that basic principle of accounting is to properly

15 match expenses with activity.

16          Q.   You next refer to the importance

17 of R&D.  What was the importance of R&D in this

18 case?

19          A.   Well, I think the testimony

20 throughout this trial has made it clear that R&D

21 was critical to Nortel as an entity, critical in

22 its operations as well as critical in its

23 liquidation of its various assets.  And so time and

24 time again that importance of that R&D to the

25 business in my view drives the resolution in that



1    it is measuring that importance through

2    contribution as the right allocation method.

3                    Q.    And finally, you have referred to

4    Nortel's historical practice.  What historical

5    practices are you aware of that bear on this

6    question?

7                    A.    There are several.  I know later

8    in the presentation we'll go through them, but

9    generally speaking, it refers to how they treated

10   sales proceeds, how they allocated profits under

11   the RPSM, and how they treated licensing proceeds.

12                   Q.    So that brings us to the third

13   question, how much should each debtor get?  And

14   does slide 9 summarize your answer to that

15   question?

16                   A.    Yes.  So, Your Honours, this is

17   really the bottom line conclusion, and so if there

18   were any numbers to sort of keep in the back of

19   your mind, because we'll refer against them, it is

20   those shown on this chart, and in particular the

21   17.4 percent allocation for EMEA as compared to the

22   42.9 percent for the US and the 39.7 for Canada.

23                   What is also shown on this chart is

24   that those summary figures are really based upon

25   two components:  the business sale IP allocation



1   and the residual patent allocation that is shown on

2   the left.

3              Q.   So if you add the results of

4   business sale IP and residual patents, you get the

5   total IP proceeds?

6              A.   Yes, sir.

7              Q.   With that by way of overview, Mr.

8   Malackowski, could you please give us a road map of

9   how you plan to present your opinions?

10             A.   Yes, and as I mentioned in the

11  beginning, now that we understand where I end up,

12  let's step back and talk about the analysis that I

13  went through to get there.  And at first there are

14  two aspects:  How was the valuation done for the

15  business sales, and that is the first line; second,

16  how was the allocation done under the contribution

17  model; and then third we'll talk later about the

18  testing to confirm the work.

19             Q.   So starting with the business

20  sales IP then, the first step on that road map, can

21  you please explain your basic valuation

22  methodology?

23             A.   Yes.  Again, we were basing our

24  analysis on the relief from royalty model, but what

25  this slide shows is that there are two components



1     of the work.

2                    The first is how valuable was the

3     intellectual property to the business that was

4     actually sold as it was used in that business.

5     That is the defensive value.  In part, one of the

6     reasons those businesses were acquired is because

7     of the value of that IP.

8                    But it is important to realize that in

9     an auction market especially there was a second

10    component of IP value which is what was the value

11    of the IP being acquired to the buyer's business,

12    and we call that the synergistic value.

13                   As you note on this chart, the two

14    added together make the total, but importantly,

15    that core use within the business itself, the

16    defensive value, is the vast majority of the value,

17    over 80 percent.

18                   Q.   Mr. Malackowski, in various expert

19    reports -- sorry, I take it that you have read some

20    of the other expert reports by Mr. Green, Cox and

21    Berenblut, Britven, Kinrich and so forth?

22                   A.   Yes, although there is 80 expert

23    reports, I have read I think every one that relates

24    to this type of analysis.

25                   Q.   So in the various expert reports



1    we have heard about a number of different valuation

2    principles.  We have heard principles about highest

3    and best use; we have heard about in the hands of

4    Nortel; we have heard about safe hands assumptions.

5    What valuation principle did you apply and why?

6              A.   So, Your Honours, I used highest

7    and best use, but maybe just a comment as to why

8    that matters and what that all means.

9              Q.   Yes.

10              A.   So when you are looking at the

11   value of an intellectual property and you are

12   trying to assess how it will be used in the future,

13   do you assume that it is a company that is viable

14   and has the resources to grow and utilize it, its

15   highest and best use, or do you have to restrict

16   yourself to say, no, only the value within Nortel

17   headed towards bankruptcy, and obviously that

18   results in a lower value.

19              I think the consensus of most

20   appraisers and virtually all appraising texts would

21   be to use a highest and best use method.

22              Q.   Why was it necessary to break the

23   components down as you did between the defensive

24   and the synergistic value?

25              A.   Accuracy.  The relief from royalty



```
 1    model has different inputs, critically different

 2    inputs in the royalty rates that are utilized, not

 3    only between businesses but within a business

 4    between the defensive value and the synergistic

 5    value.

 6              Q.   So the inputs that you were using

 7    in each of them were specific to the purpose?

 8              A.   Of course.

 9              Q.   So the next slide I believe shows

10    an outline of your relief from royalty method; is

11    that correct?

12              A.   Yes, sir.

13              Q.   So could you please just walk --

14              THE CANADIAN COURT:  Just before you

15    get there, Mr. Milne-Smith, I have read your report

16    and you are saying things that I don't recall

17    seeing in the report.  For example, you just

18    referred to highest and best use.  Is there

19    somewhere in your report I can see that?

20              THE WITNESS:  Yes, Your Honour, that is

21    discussed at some length in my rebuttal report.  I

22    can try to identify a page, but it is certainly

23    within there.

24              BY MR. MILNE-SMITH:

25              Q.   We can perhaps try and find that
```



```
 1   reference on a break, Your Honour.
 2                   Oh, in fact, Your Honour, I have it
 3   here.
 4                   So if you go to page 5 of Exhibit 34,
 5   so if we could bring up the -- you'll see there is
 6   an indented paragraph.  If we could highlight that
 7   on the screen, and perhaps, Mr. Malackowski, you
 8   could just read that and explain the concept.
 9           A.   Section 2.2 of my rebuttal report
10   provides the background as to why the analysis on
11   highest and best use, and the quote that you have
12   highlighted is:
13                   "The highest and best use of a
14                   non-financial asset takes into account
15                   the use of the asset that is physically
16                   possible, legally permissible and
17                   financially feasible."
18                   And then I go on to explain how that
19   applies in the case of Nortel.
20           Q.   And there is a footnote.  Where is
21   this coming from?
22           A.   From the accounting -- from the
23   Financial Accounting Standards Board, Bulletin
24   Topic 820.
25                   THE CANADIAN COURT:   I saw that
```

 Neeson & Associates      W&P

 1   before.  I don't understand it, because something

 2   can be financially feasible and still not the

 3   highest and best use, can't it?

 4            THE WITNESS:  Sure, that is possible.

 5   And so one of the specific examples, Your Honour,

 6   in that regard I considered is whether Nortel

 7   should collapse to a pure licensing model and not

 8   sell the patents within the business.

 9            Here we know that the highest and best

10   use is appropriate because of the auction format in

11   which the businesses were sold.  So they were sold

12   in order to maximize IP and business value by

13   conducting an auction as opposed to any other

14   method of limiting its value to a Nortel

15   application.

16            MR. MILNE-SMITH:  And, Justice

17   Newbould, I didn't want to move on unless you had

18   any more --

19            THE CANADIAN COURT:  Go ahead.  Go

20   ahead.

21            BY MR. MILNE-SMITH:

22            Q.  Okay, so if we go back to slide

23   12, so using this slide as illustration, Mr.

24   Malackowski, could you please just walk through how

25   the relief from royalty method works?



```
 1                    A.   Yes, sir.  The first thing is to

 2   determine the global revenue that will be at issue.

 3   In this case, we know we have to determine both the

 4   defensive and the synergistic value.  I don't know

 5   how much detail you want, but for the defensive

 6   revenue, I began with the forecasts that were

 7   prepared by Nortel and added to them information

 8   from public market reports like IDC and Infonetics.

 9   And for the synergistic, I looked at potential

10   buyers in the marketplace.  I took the top four

11   potential buyers and examined their revenue that

12   they would apply the patents against.

13                    Q.   So that is how you derived global

14   revenue?

15                    A.   Yes.  And then once that revenue

16   was known, I then applied a royalty rate against

17   it.  The royalty rates were taken from two sources

18   as well.  For the defensive value, I looked to the

19   Lazard model and the IPCo model for Rockstar and I

20   selected a royalty rate that was specific to the

21   technologies at issue.

22                    And then for the defensive value, I

23   looked to the actual experience within the

24   marketplace, specifically Ericsson in their

25   acquisition and use of the Rockstar portfolio.
```

Neeson&Associates   W&F WILSON & PEYZER LTD.

1                    Q.    You referred in your answer to the
2    Lazard model and the IPCo model.  Could you just
3    remind the courtroom what those are referring to?
4                    A.    Yes.  So when Nortel determined to
5    sell the businesses, they prepared what are called
6    deal books, so the presentation that they will give
7    to potential buyers.  Within those presentations
8    were projections of the revenues that would be
9    generated by the business they were selling.
10                   In some cases the projections, or
11   frankly, in virtually all cases the projections
12   didn't go to the end of patent life, so I would
13   extend them using industry data.
14                   Q.    Now, you also referred to
15   companies like Infonetics and IDC.  I have seen
16   reference to those and other companies in your
17   reports as well.  At least to me those were
18   unfamiliar before this case.  Could you just
19   explain who those are and why you relied on them?
20                   A.    Yes, to an appraiser, they would
21   not be unfamiliar.  They are very well worn, highly
22   regarded market research firms that in the normal
23   course provide projected global market data by
24   technology type.  Nortel and virtually every one of
25   its competitors would consume that type of data in



1   their business planning efforts.

2            Q.   So you have described global

3   revenue and royalty rate.  That gets you I trust a

4   stream of projected revenue?

5            A.   Exactly right.

6            Q.   Okay, and then what do you do to

7   that stream of projected revenue?

8            A.   So you need to determine whether

9   or not there would be any incremental expenses to

10  be considered.  In this case, because there is no

11  outward licensing operation, its use of this

12  technology within the existing business, the only

13  expense that needs to be addressed are taxes, and

14  so I took into account specific tax rates.

15           Q.   And then what is the last step on

16  this flowchart titled "Risk"?

17           A.   The last is the discount rate.

18  Remember we are projecting sales and royalty

19  expenses over a period of time into the future.

20  Well, dollars in the future should be discounted

21  back for this purpose, and so I selected a discount

22  rate based upon the industry at issue for each of

23  the business sales.

24           Q.   And again, just to confirm what

25  you said earlier, this step was done or each of



1    these steps was done independently for each of the
2    businesses you valued or the IP you valued?
3                    A.   Yes, the inputs in each of the
4    eight transactions was specific to that technology
5    type.
6                    Q.   And so the final result, it says
7    "Net Present Value," is that the same thing as
8    those business IP values we looked at earlier?
9                    A.   Exactly right.
10                   Q.   Okay.  So following up
11   specifically on that last answer, what does this
12   show for each of the business sales listed down the
13   left?
14                   A.   This chart, 13, simply is now
15   going one more layer deep, and so it shows the
16   forecast period for each of the eight business
17   lines that I utilized.  And importantly, Your
18   Honours, it ties that forecast period to the
19   intellectual property, specifically the patents
20   that were acquired in each of those sales.  So not
21   only is the industry data specific to the
22   technology, but most importantly we are matching
23   the analysis to the patents that were transferred.
24                   Q.   And so if you can just explain the
25   legend at the bottom, just what each bar



1   demonstrates?

2                    A.   Sure.  Let's just use CDMA at the

3   top as an example.  The bar shows that the date of

4   sale for that portfolio was the end of 2009, it

5   looks like maybe November.  Of course we have the

6   exact date.  And the bar extends all the way to

7   2021, telling us that that is the average

8   expiration date of the patents that were acquired

9   in the CDMA business.  So our forecast was specific

10  to the period for which the intellectual property

11  is going to create value.

12                   Q.   So if we then jump back to slide

13  12, which one of these inputs does that forecast

14  plug into?

15                   A.   It plugs into the global revenue

16  numbers.

17                   Q.   Okay.  And just before we move on

18  to a hypothetical, if either Justice Newbould or

19  Judge Gross want to find the details of the

20  calculations you have performed for each of the

21  business IP, where could they find that?

22                   A.   They are included within the

23  exhibits to my reports.  I have tried to include

24  references on my slides to make it easier, but it

25  should be findable.



1                  Q.   Okay.  Now, Justice Newbould and
2      Judge Gross, we had prepared an example of this
3      calculation that was specific to the facts of
4      Nortel but there are confidentiality concerns about
5      the royalty rate and so forth that some of the
6      buyers were upset about.  So what we have done is
7      prepare a hypothetical that is not based on the
8      specific facts of any of the business sales but is
9      using the same methodology.
10                 So could you just quickly walk
11     through this chart to show the Courts how exactly
12     it works in practice.
13                 A.   Yes, and I will be brief because
14     in spite of the numbers it is fairly
15     straightforward, given the explanation we have just
16     had.
17                 So we project the revenue over the
18     relevant period, in our example it extends through
19     2020.  That would come from those deal books and
20     market studies.
21                 We then determine what the growth rate
22     would be from the same sources.  I next multiply
23     that revenue by a royalty rate.  Our illustration
24     shows 1 percent.  That would be a figure that is
25     taken from the Lazard IPCo analysis.

 Neeson&Associates   W&F

```
 1                 Q.    Hypothetical only.

 2                 A.    Right, this is a hypothetical

 3     number.  The real number is taken from Lazard.

 4     Multiply the two together and you get the pre-tax

 5     royalties.  Deduct taxes and then present value.

 6     In this example our relief from royalty value shows

 7     23.86 million dollars' worth of value.

 8                 THE CANADIAN COURT:  This is a

 9     discounted cash flow method you are using?

10                 THE WITNESS:  That is exactly right.

11                 THE CANADIAN COURT:  Can I just ask you

12     a couple of questions.  These growth rates, 2011 is

13     10 percent, and by 2020 it is 5.3 percent.  How do

14     you get -- there is a discount or a reduction in

15     the growth rate each year.  Is that separately

16     calculated or is that just some declining growth

17     rate?  How do you do that?

18                 THE WITNESS:  No, that is a good

19     question, Your Honour.  It is unique to each

20     technology, and the basis for my selection was both

21     a review of the deal books, because in some of the

22     books they would show a declining growth rate, but

23     also in these long-term market forecasts they

24     specifically show decrease in growth rates as

25     technology penetrates the larger markets.
```



1          And so we tried to be specific in every

2    case.

3          THE CANADIAN COURT:  Thank you.

4          BY MR. MILNE-SMITH:

5          Q.   And of course, the actual

6    calculations are in the reports and these are just

7    hypothetical.

8               And so that brings us back where we

9    started on this point at slide 15.

10         A.   Yes, this is the same chart I

11   showed you at the beginning.

12         Q.   Okay.  Now, Mr. Malackowski, as

13   I'm sure you are aware, there has been some debate

14   in this case, and I'm sure there will continue to

15   be some debate, about the proper valuation of the

16   IP and the business sales.  And just to be clear,

17   would giving a higher business IP valuation across

18   the board to the various business IP categories,

19   would that necessarily help or hurt EMEA?

20         A.   There is no consistent rule.  It

21   is case by case.  In some instances, because of the

22   calculation, a higher IP value would result in more

23   being allocated to EMEA; in other cases less.  It

24   is really in my view not the right question.  The

25   right question is what is the right rate.



 1                    Q.   Did the effect of your calculation

 2  of business IP value -- would the effect of that on

 3  EMEA Debtors play any role in your choice of the

 4  right valuation methodology or the right inputs?

 5                    A.   No, not at all.

 6                    Q.   The net proceeds from the business

 7  sales, did you understand they were a little over 3

 8  billion dollars?

 9                    A.   Yes, sir.

10                    Q.   Does it come at all as a surprise

11  to you that the total IP value is 765 million?

12                    A.   Or as Mr. Huffard indicated,

13  approximately 22 to 25 percent.

14                    Q.   That's right.

15                    A.   No, not at all.

16                    Q.   And why is that?

17                    A.   Well, several reasons, but most

18  important you have to realize that the IP that was

19  transferred in the business sales was not the full

20  body of IP that was normally used within those

21  businesses but that Mr. John Veschi who headed up

22  this process and others within Nortel went through

23  an exhaustive negotiation with the head of each of

24  the business units to pull back as much of the IP

25  as they could to include in the residual portfolio.



1                        And the only patents that were left

2     in the business sales when they were executed was

3     what was called predominant use patents, patents

4     that were predominantly and only used by that

5     business.  Patents that, for example, were shared

6     across businesses, were not transferred and

7     importantly patents that only had competitive

8     value, meaning they were not used in their business

9     but they kept others from competing, those weren't

10    transferred either.  And that explains why the

11    residual IP was frankly relatively speaking so much

12    larger.

13                   Q.   I would just like to pause here to

14    follow up on the point you made regarding John

15    Veschi.  Could we bring up page 31 of your initial

16    report?  So if we look at the bottom paragraph

17    under the list from "a" to "h," how does this

18    relate to the point you were just making?

19                   A.   I mean, I guess not surprisingly

20    it is exactly what I just said, that the business

21    sale IP only included a limited set of patents and

22    the most broadly applicable patents, i.e., those

23    that were shared across multiple businesses were

24    kept.

25                   Q.   And there is a footnote 99.  Could



```
 1   we just pull that up as well, please.  So I take it
 2   you had reviewed Mr. Veschi's -- or at least a
 3   portion of Mr. Veschi's deposition?
 4                  A.   Well, I think I have reviewed all
 5   of his deposition, and this is a passage that
 6   refers to that negotiation process, emphasizing how
 7   rigorous he was.  I mean, remember, Mr. Veschi was
 8   incented to keep as much of the IP back as
 9   possible.
10                  Q.   And why was that?
11                  A.   Because he was then going to
12   manage it for revenue.
13                  Q.   You also referred in your earlier
14   answer to patents that were not used in any one of
15   the businesses that remained in the residual
16   portfolio.  How would those patents have been of
17   any use to the existing lines of business while
18   they operated?
19                  A.   They are often critical.  As was
20   explained in the witness just shortly ago, a patent
21   is just a right to exclude, and so you certainly
22   want to be able to exclude your competitors from
23   selling exact copies of what you are doing, but you
24   also want to preclude them from selling near copies
25   or other products that they would use to compete
```



1   with you on price.  And so that residual portfolio

2   can often be larger than the portfolio you actually

3   use in your product.  And none of that was

4   transferred with the business sales and none of

5   that was licensed with the business sales.

6                 Q.   Does that portfolio have any value

7   to the existing Nortel lines of business as they

8   were operating in terms of potential lawsuits

9   against Nortel?

10                A.   That is a great question.  The

11  short answer is yes, specifically the value it

12  would provide is counter-assertion value.  So if

13  someone were to knock on Nortel's business door and

14  accuse them of infringing one of their patents,

15  Nortel would go to its portfolio, not looking for

16  patents that were on its products but looking for

17  patents that covered its competitors to strike a

18  better deal in the negotiation.

19                Q.   So you have referred to a

20  commercial value.  You have referred to this

21  counter-strike sort of value for the patents that

22  weren't necessarily used in any products.

23                     Would that value have transferred

24  over with the business sales that took place for

25  Nortel?



1                      A.   No.   To be specific, what
2      transferred over were the predominant use patents,
3      a licence to the shared patents, a non-exclusive
4      licence, but no rights to that residual
5      counter-strike portfolio.
6                      Q.   Now, isn't it true that the
7      business sales purchasers got licenses over all the
8      IP that they needed that wasn't sold to them that
9      didn't meet the predominant use standard?
10                     A.   Yes, that is what I just referred
11     to an instant ago, which is anything that they
12     needed that wasn't predominantly theirs would be
13     something that was shared and they did receive a
14     non-exclusive licence to the shared portfolio.
15                     Q.   So you mention it is a
16     non-exclusive licence.  How does the value of that
17     compare to an exclusive licence?
18                     A.   Well, at a general level a
19     non-exclusive licence is significantly less value
20     than an exclusive.  That is recognized.  But most
21     importantly you have to realize we are talking
22     about shared non-exclusive licenses, so this is
23     technology which others in the market you realize
24     is going to have access to.  You have no
25     differentiation capability.



 1                     So it has relatively little value.

 2                Q.   Now, there has been some testimony

 3  in this case about the CDMA/LTE transaction, and I

 4  think you may have heard some of the testimony this

 5  morning about it.

 6                     Do you know whether any of the LTE

 7  patents were transferred in the CDMA/LTE

 8  transaction as opposed to being non-exclusively

 9  licensed?

10                A.   So I was here for Mr. Huffard's

11  testimony this morning, and I think he did misspeak

12  on that issue.  I don't believe there were any LTE

13  patents that were transferred.  I think if you go

14  back to the underlying descriptive email

15  correspondence, you will find that that was not the

16  case.

17                Q.   So if we could pull up Trial

18  Exhibit 22020.  Justice Newbould, would you like a

19  copy -- the hard copy, or is the screen okay for

20  you?

21                THE CANADIAN COURT:  The screen is

22  fine.

23                BY MR. MILNE-SMITH:

24                Q.   I apologize, Your Honour, we are

25  just having a bit of a technical glitch.



```
 1                    No.

 2              A.   This is not the document --

 3              Q.   This is not the right document.

 4   All right, we'll come back to that.

 5              A.   It wasn't that exciting, trust me.

 6              Q.   Okay.  Can we bring the slide show

 7   back?

 8                   Oh, here is the document.  It is

 9   Trial Exhibit 49200.

10                   So just to identify what the document

11   is, this is dated October 27, 2009, and it is sent

12   to a Ms. Carroll at the US Department of State, and

13   if we could just flip to the third page of the

14   document and then highlight the penultimate

15   paragraph, so this reads:

16                        "This is not unique technology,

17                   and most of the leading telecoms

18                   manufacturers have competing products

19                   under development.  Neither the sale to

20                   Ericsson [...]"

21                   Just pausing there, do you

22   understand that the Ericsson sale was CDMA/LTE?

23              A.   Correct.

24              Q.   Okay:

25                        "[...] nor the sale to Hitachi
```



1              includes Nortel LTE patents, other than

2              a non-exclusive licence to use Nortel's

3              LTE patents, and neither sale includes

4              ITAR-controlled products or

5              technologies."

6                   So is that consistent with your

7    understanding?

8              A.   Yes, and there is further

9    confirming evidence of this.

10             Q.   Thank you.  If we could go back in

11   the slide show.

12                  THE CANADIAN COURT:  Just a second.

13   Can you go back to that document for a second?  I'm

14   trying to make a note.

15                  MR. MILNE-SMITH:  I apologize, Your

16   Honour.  Thank you.

17                  BY MR. MILNE-SMITH:

18             Q.   Let's just leave that up there for

19   a second.  And, Mr. Malackowski, how does the fact

20   that there weren't any LTE patents transferred in

21   the LTE/CDMA sale, how does that bear on this

22   debate we have been having in this case about

23   whether or not the IP valuation in the CDMA/LTE

24   sale is too low or too high?

25             A.   It bears directly, and I think



1    here Mr. Huffard had it exactly right.  It is

2    indicating that the technology sold in that estate

3    was second generation, i.e., older technology, and

4    as a result the value would be lower, all else

5    considered, and it would give further confirmation

6    to why the business sale IP was in the low 20

7    percent, whereas I'm sure we'll talk about other

8    transactions where it was 60, 65 percent.

9              Q.   So just pausing there, we are

10   about to move on to allocation.  Judge Gross,

11   Justice Newbould, if you have any questions about

12   the business IP valuation, I would like to give you

13   the opportunity to ask the witness.

14              THE CANADIAN COURT:  That is fine.

15              BY MR. MILNE-SMITH:

16              Q.   So we'll go back to the slide

17   show.

18                   All right, so if you could just

19   remind us where we are in the road map?

20              A.   So we finished half of my work.

21   We have valued the business sales IP.  We didn't

22   need to value the residual IP because we know the

23   4.5 billion transaction amount.

24              Q.   Right.

25              A.   So now the next part of my work



1    was how should we allocate both the business sales

2    IP and the residual IP.  We know it is the

3    contribution method, but how exactly was that done?

4              Q.    And what is the starting point?

5    How do you measure contribution?

6              A.    Well, the starting point is the

7    actual effort of the researchers to generate that

8    IP and that is measured by research and development

9    expense, primary research and development expense.

10             Q.    Just at a basic conceptual level,

11   why do you look at R&D spending as opposed to, for

12   example, patent output or some other available

13   metric?

14             A.    Well, I actually looked at all of

15   them.  I think the better question is why is the

16   R&D measure better.

17                   It is based upon the integrated

18   nature of the Nortel technology operation on a

19   global basis that they were collaborative efforts

20   across business units, again, well explained by Mr.

21   Huffard this morning, which in my opinion drives

22   R&D as the best allocating method.

23                   Other methods such as patent count

24   could give you somewhat consistent results, and

25   we'll talk about that.  Other methods such as



```
 1   revenues are really misleading because revenues
 2   that were earned in the US, for example, were
 3   driven by the R&D conducted in Canada and EMEA.
 4   And then ownership also has obvious challenges.
 5               Q.   Did Nortel's historic practice in
 6   terms of how it measured ownership interest, did
 7   that have any bearing on your selection of R&D
 8   spending as an allocation key?
 9               A.   Not to be difficult with the
10   answer, but I don't know that it had a bearing on
11   my selection.  It certainly confirmed my selection
12   and was part of my confirmation and testing work,
13   because as a matter of fact, no surprise to me,
14   Nortel used the exact method in practice that I
15   proposed.
16               Q.   So taking that as our starting
17   point, R&D spending, could you please explain what
18   this slide 17 that I have brought up shows?
19               A.   Yes, Your Honours, in many
20   respects this is probably the most fundamental
21   slide to my analysis.  It shows you over the
22   relevant period the primary R&D spent by each of
23   the entities, Canada, US and EMEA, on an annual
24   basis.  It totals some 35 billion dollars over this
25   period, and a lot of information can be gleaned
```



1    from the data on this chart.

2              Q.    Where did you take this data from?

3              A.    This data was an accounting

4    exercise, so I went back to the accounting records

5    for each of the entities, some of those records

6    changed over time.  And I simply compiled all of

7    the relevant data into this summary fashion.

8              Q.    And I see there is a spike in 2000

9    followed by -- a gradual growth up to 2000, and

10   then a decline thereafter.  How does that bear on

11   Nortel's business history?

12             A.    Well, perhaps not surprisingly,

13   and it is not just limited to Nortel, what you are

14   seeing there is a reflection of the dot-com bust,

15   and so many companies in the technology space

16   scaled back their research and development efforts

17   significantly after the collapse of that market.

18                   What is interesting, though, and

19   we'll come back to it later, is how did the change

20   in R&D spend impact the change in patent output,

21   one of the issues you raised a moment ago.

22             Q.    Right.  So this chart starts with

23   1991.  How did you select 1991 as the starting

24   point for your chart?

25             A.    I first looked at the patent



```
 1   portfolio, tried to understand the age of the
 2   patents that were actually transferred.  I focussed
 3   that analysis not just on every patent but on what
 4   are considered the high interest or the more
 5   valuable patents, and I included data for the
 6   earliest high interest patent that was unexpired
 7   and transferred, which was 1992, plus one year,
 8   understanding that the research would have been
 9   done largely the year before.
10             Q.   How did you select that one-year
11   period?  Was there any magic to that?
12             A.   I don't think "magic" would be a
13   word I would use, but it was based upon my review
14   of the testimony in this case, which discusses the
15   one-year period, other tax-based documents that
16   discuss a six- to twelve-month period, and
17   generally my experience combined with the available
18   data.
19             Q.   So why was your relevant data
20   period for R&D spending, why was that tied to the
21   patents in the way that you have described it?
22             A.   Well, at a fundamental level, that
23   is my assignment, what is the value of the
24   intellectual property.
25             THE CANADIAN COURT:  Can I just ask you
```



1    a question, sorry.

2                    THE WITNESS:  Yes, of course.

3                    THE CANADIAN COURT:  Just a minute ago,

4    and I was wondering about this in your report, you

5    said that for residual patents the average

6    gestation period from research to patent filing was

7    one year.

8                    Do you mean the period from the

9    completion of research to the patent filing or the

10   commencement of research to the patent filing?

11                   THE WITNESS:  Your Honour, it is

12   probably actually a little bit in between.  From a

13   practical perspective, it is the period from the

14   start of a body of work, research, to the point

15   where there is sufficient information that you can

16   file a disclosure, and so you have to have an

17   invention that has been completed and you are

18   incented to file that, generally speaking, as soon

19   as you can to get in line of anybody who might be

20   doing competitive research and you want to make

21   sure your filing is before theirs.  That is why you

22   are not waiting years before you make those

23   applications.

24                   THE CANADIAN COURT:  Thank you.

25                   BY MR. MILNE-SMITH:



1                      Q.   And perhaps at the risk of

2     conducting patent 101, and please stop me, Justice

3     Newbould, if this falls into that category, maybe

4     you could just explain how you move from filing a

5     disclosure, how that relates to a so-called

6     priority date and then when a patent actually

7     issues?

8                      A.   Sure, the priority date, which is

9     my focal point, is in fact the time that you file

10    that initial document with the patent office or

11    with the World Intellectual Property Organization

12    as a Patent Cooperation Treaty.

13                     Once you file that, you have your

14    time stamp, and then there is a procedure that

15    starts, and it varies by country or the type of

16    application you file before you will actually get a

17    patent issued, but that may take three, four, five

18    years or longer.

19                     Q.   In looking at R&D spending over

20    the years, did you amortize older spending

21    discounted or did you treat all dollars equally?

22                     A.   I ultimately treated all dollars

23    equally.  I had considered weighting dollars -- I

24    think "weighting" is a better word than

25    "discounting" or "amortizing" -- in a variety of



```
 1    ways.  And I think we'll talk about some of those

 2    later, but in my opinion it was conservative to

 3    equally weight them for purposes of assessing the

 4    EMEA allocation.

 5                Q.   And why was that?

 6                A.   Other weighting methods would

 7    increase significantly the EMEA allocation.

 8                Q.   Are you aware that Nortel

 9    conducted studies of the so-called useful life of

10    R&D in the past?

11                A.   Yes, I have seen both documents

12    and testimony describing those.

13                Q.   Okay, and did they have any

14    relevance to your exercise of determining what

15    period of time to look at and whether to weight any

16    dollars differently?

17                A.   Again, "relevance" is a very broad

18    term.  They had relevance in that they were

19    considered.  I understood that there were

20    challenges with those documents.  Many of those

21    studies were focussed on product life, not

22    intellectual property life, and there is a very big

23    difference.  Products are updated frequently.

24    Underlying IP like CDMA technology last much, much

25    longer.
```



1                    Many of those studies had variants

2    that were not reconcilable and the underlying data

3    was not available to test it.

4                    But in the end, I find those studies to

5    not be on point.  What is on point is when was the

6    R&D conducted for the intellectual property that

7    was actually purchased.

8                    Q.   Were you aware that in the Alcatel

9    transaction -- sorry, you are familiar with the

10   sale of the UMTS Access business to Alcatel?

11                   A.   Yes, sir.

12                   Q.   Were you aware that in Alcatel in

13   measuring R&D contribution and allocating IP sale

14   proceeds that they applied a 30 percent

15   amortization rate to R&D spending?

16                   A.   Yes, sir.

17                   Q.   And why not apply that here?

18                   A.   Well, it is really very much the

19   same reason I just gave you.  The other element I

20   would add is that the accelerated amortization, the

21   30 percent, is also driven in that context by

22   taxation.  That is not appropriate -- an

23   appropriate input variable for my work.

24                   Q.   Would it be an accurate measure of

25   contribution in your opinion to rule out or ignore



1   R&D spending for more than five years prior to the

2   date of sale?

3              A.   It would not only be not accurate,

4   but as we will see in the data that comes later, I

5   think it would be incredibly misleading.

6              Q.   So we have talked about the

7   beginning point of 1991 and how you moved forward

8   from there.  I notice that at the far right of

9   slide 17 there are two years, 2009 and 2010, that

10  are a lighter shade and it indicates "Removed

11  post-filing expense."  Could you please explain

12  what that means?

13             A.   Yes.  Very simply, the R&D dollars

14  that were incurred after the filing were of a

15  different character and were not as directly

16  associated with the patent output, really for

17  obvious reasons.  The company was in bankruptcy and

18  the businesses were being sold.  I think the next

19  chart provides details of the evidence that I base

20  that conclusion on.

21             Q.   Okay, so if you could just briefly

22  summarize that evidence?

23             A.   Sure.  Very briefly, there are

24  several documents of different types that explain

25  after the filing many of the lines of business were



1    either sold or under contract, so those engineers

2    were being moved.  That is also confirmed by the

3    last quote from Global IP Law Group, and then the

4    second significant reason is that the R&D staff

5    that remained was not focussed on the next

6    generation of technology.  They were in bankruptcy.

7    They were focussed on maintaining the portfolio or

8    the products, so the research efforts were more on

9    bug fixes or minor updates, not the level of

10   innovation that would result in patent portfolios

11   which is the purpose of my valuation.

12               Q.   And do so-called bug fixes drive

13   value in the patent portfolio that were ultimately

14   sold?

15               A.   Generally no, and certainly not in

16   the context of bankruptcy where there were limited

17   funds to pursue applications.

18               Q.   So you didn't consider it

19   appropriate to consider 2009 and 2010 spending.

20   Could you then summarize the period of time just so

21   the Court has it in one place, what period of time

22   you considered relevant for determining R&D

23   spending?

24               A.   For the business sales the period

25   of relevance was the date of the business sale



1    through 2008, the date of the earliest patent,

2    rather, in that business sale high interest, and

3    for the residual portfolio it was the date of the

4    earliest high interest patent and of course in both

5    cases we go one year before that.

6              Q.    Right, and the one year before,

7    that is referring to?

8              A.    The R&D -- the starting point for

9    accounting and R&D.

10             Q.    So I take it from your answer that

11   the period of time you were looking at for each one

12   of the sales is different?

13             A.    Yes.

14             Q.    Now, were you able to look at, for

15   example, Enterprise R&D spending or CDMA R&D

16   spending?  Was that data that was available to you?

17             A.    That data was not available on a

18   geographic or comprehensive basis that would allow

19   you to make that specific a determination.

20             Q.    So if we look at slide 19, does

21   this capture the period of time that you were

22   looking at?

23             A.    Yes, sir.

24             Q.    What does this slide show?

25             A.    This slide shows the invention

Neeson&Associates    W&P

1   date, that priority date for each of the Nortel

2   patents and I divided the portfolio into the three

3   categories we have talked about.  In green, Your

4   Honour, you see the priority date for each of the

5   patents that was sold in one of the eight business

6   transactions.

7                    In blue you see the priority date

8   for each of the high interest patents, the more

9   valuable patents, that were sold as part of the

10  residual portfolio.

11                   And the remaining, the gray bars,

12  represent the non-high interest residual patents.

13              Q.   And just pausing there, could you

14  explain what you mean by "high interest" versus

15  "non-high interest" residual patents?

16              A.   Yes, in very summary terms, the

17  high interest patents were the more valuable of the

18  two.  In more detailed terms the high interest

19  patents were those that were designated by Global

20  IP Law Group based upon their claim by claim review

21  as those that would have greater value.

22              Q.   Was that analysis performed for

23  the business sales as well, or was it limited to

24  the residual patents?

25              A.   Good question.  It was indirectly



```
 1    performed for the business sales because each of
 2    the business sales was limited to predominant use
 3    patents and it was determined that as a predominant
 4    use patent, it would be deemed high interest.
 5                    Q.   Now, you referred to Global IP
 6    performing this work.  Are you familiar with Global
 7    IP?
 8                    A.   I am.  They are right down the
 9    street from us in Chicago.  I have known their
10    principals for a long time, and some of my former
11    colleagues are well trained and work there.
12                    Q.   And at the risk of flattering your
13    competitors, do you have an opinion as to their
14    capabilities?
15                    A.   They are a well-regarded firm.
16                    Q.   Why does the analysis of what is a
17    high interest or not a high interest patent matter?
18    How does that play into your valuation and
19    allocation?
20                    A.   Anyone in this profession will
21    readily recognize that not all patents are created
22    equal, that as a matter of fact, it is a subset of
23    patents that have the real value, and in order to
24    understand a proper matching of value to
25    contribution, I focussed my analysis on those high
```



1    interest patents to be certain that the matching

2    wouldn't be biased or skewed by the many unvaluable

3    patents, the low interest patents.

4              Q.    And does that relate at all --

5    you'll recall a question by Judge Gross this

6    morning of Mr. Huffard.  Does the answer you just

7    gave bear at all on Judge Gross's question about

8    high value and low value patents?

9              A.    It does.  In particular we have

10   used the best available evidence directly here to

11   match the R&D spending over time to the patents

12   that were the most valuable and then, as we'll see

13   later, we were actually able to test that work by

14   looking at specific inventors and where they lived

15   and the number of patents they created.

16             Q.    So we'll come back to that in a

17   moment.  So looking at slide 19 again, what

18   conclusions, if any, do you draw about when the

19   value of the Nortel portfolio, the IP portfolio was

20   created?

21             A.    The most obvious conclusion and

22   why this chart is so powerful in my point of view

23   is it is very clear that the value that was created

24   in both the business sales as well as the high

25   interest or as well as the residual patent sale was



1    predominantly in the late '90s to the early 2000s.

2    And that in order to properly allocate the value

3    received from the sale of these assets, you have to

4    take into account the effort that was extended

5    during that period.

6                If you limited yourself to the last

7    few years, you would have an inaccurate conclusion.

8                Q.   What about the spike in 2008?

9    Doesn't that indicate that there was some really

10   valuable work taking place in 2008?

11               A.   So the spike is interesting.  It

12   is interesting also if you compare to 2007.  So

13   first there is a little blue bar in 2007 that is

14   hard to see, but that is because the last high

15   interest patent was actually filed then.  There

16   were no high interest patents filed in 2008.

17               And so why was there so much,

18   frankly speaking, unimportant activity?  When you

19   go back to the testimony in this case, what you

20   find out is that with bankruptcy pending, there was

21   a lot of catching up on routine patents to get them

22   filed.  And so a lot of things that in the normal

23   course likely would not have been filed in 2008

24   were put through the pipeline to package up for

25   sale.



 1                    Q.   So let's look at slide 20 as an
 2    example.  What are we looking at here?
 3                    A.   So, Your Honours, what slide 20 is
 4    is the Enterprise business sale example.  You
 5    remember the green bar from the chart we just saw.
 6    I have now broken that down to just those patents
 7    for Enterprise, those that were deemed to be
 8    fundamental.
 9                    And so I show them each and every
10    year with a cumulative total as reflected by the
11    green line.
12                    And so key to my analysis was if we
13    limited our contribution allocation to a five-year
14    look-back period, which is where that red line is
15    drawn, you see you would miss 85 percent of the
16    effort and that you wouldn't get a properly
17    reasoned allocation conclusion.
18                    Q.   So just so I make sure that we
19    have it, if you look in any given year, for
20    example, 1997, you have got a certain number of
21    patents.  That is the legend on the left?
22                    A.   Yes, so 1997 shows you filed about
23    80 patents that year.
24                    Q.   Right, and then the line that is
25    climbing across the chart, that links up with the

 Neeson&Associates   W&F WILSON & PETERS LTD.

1    legend on the right?

2              A.    Yes, so by 1997 you had 20 percent

3    of all the patents that were transferred already

4    filed.

5              Q.    Right, so by 2005, how many of the

6    Enterprise patents had already been created?

7              A.    As shown by the intersection of

8    the green and dotted red line, about 85 percent.

9              Q.    Okay.  So how do you derive an

10   allocation for the Enterprise IP based on the data

11   that we just looked at?

12             A.    So you start with the patent data

13   that we just looked at.  You then go to the R&D

14   that was conducted during that period, specifically

15   the R&D that was conducted and initially primarily

16   paid for by EMEA and you divide that by the total

17   R&D that occurred during that same period.

18                  So in this case, for Enterprise, we

19   know that for the period relevant to the Enterprise

20   patents, EMEA conducted 5.6 billion dollars' worth

21   of R&D, out of total Nortel R&D period of the same

22   period of 35.3 billion, showing a 15.8 percent

23   allocation specific to Enterprise.

24             Q.    Did you do the same thing for each

25   of the business lines?



1              A.    Yes, sir.

2              Q.    So slide 22, are you applying the

3    same analysis for the residual patents?

4              A.    Yes, but limited to the high

5    interest residual patents, as we talked about we

6    want to focus on where the value resides and the

7    results are frankly even more dramatic.  So here

8    you note again that the activity occurred largely

9    in the late 1990s, early into 2000, and that by the

10   end of 2005, 99 percent of the high interest

11   residual patent related R&D work was already

12   complete.

13             Q.    So what period of time did you

14   consider relevant for the residual IP portfolio?

15             A.    I considered the one year prior to

16   the first high interest and the one year prior to

17   the last high interest, which would be 1991 through

18   2006.

19             Q.    And what allocation does that

20   produce for the residual patent portfolio?

21             A.    For EMEA, as shown on slide 23, it

22   is 17.3 percent using the same methodology we

23   discussed for Enterprise.

24             Q.    Now, if you put all of the

25   different IP portfolios together, the various



1   business sale IP and then the residual IP, let's

2   start with the business sales, what does slide 24

3   show?

4              A.   Well, exactly as your question

5   suggests.  It is the consolidation of the

6   contribution approach allocation for all of the

7   business sale IP and the conclusion is 16.2 percent

8   to EMEA, 42.7 percent to the US and 41.1 percent to

9   Canada.

10             This is one of the charts we saw at

11  the very beginning.

12             Q.   Okay.  And then if we go to the

13  residual patent allocation.

14             A.   Again, a chart that repeats for us

15  of the 4.5 billion dollars, 17.6 would be allocated

16  to EMEA, 42.9 percent to the US and 39.5 percent to

17  Canada.

18             Q.   So that brings us to a total IP

19  value and the allocation of that, and I believe the

20  slide that we saw again of your overview?

21             A.   Yes, when you combine them

22  together, this gets you the 17.4 percent which I

23  referenced as the one benchmark number.

24             Q.   So Justice Newbould, Judge Gross,

25  that brings us to the end of the affirmative

 Neeson & Associates    W&F

```
 1   portion of Mr. Malackowski's evidence.
 2              You'll recall from our road map we
 3   were then going to move on to the testing section.
 4   I do note that it is about the time we take an
 5   afternoon break.  I am in the Court's hands, as
 6   always, happy to continue, happy to have any
 7   questions you may want to address and I am happy to
 8   take the break.
 9              THE CANADIAN COURT:  What time are we
10   going until?  Judge Gross, what did you say?
11              THE US COURT:  5:00 p.m.
12              THE CANADIAN COURT:  Why don't we
13   continue a bit, so we'll break it up in half for
14   the reporters.
15              MR. MILNE-SMITH:  Just let me know
16   whenever either of the Courts would like to take a
17   break or the reporter, of course.
18              BY MR. MILNE-SMITH:
19              Q.   So, Mr. Malackowski, can you
20   briefly summarize what you include in the section
21   you call "Testing"?
22              A.   So now that we have our 17.4
23   percent, we step back to make sure that it is
24   reasonable in light of the broader record of the
25   case, so I break that into three pieces.
```

 Neeson&Associates    W&P

 1                    First, a general measure of

 2     reasonableness for specific facts in the record.

 3                    Second is comparing my work to the work

 4     of and criticisms by the other experts.

 5                    And finally, I have considered an

 6     alternative approach which is a modified or a

 7     licence approach which is a modified version of

 8     what the US conducted.

 9                    Q.   Does slide 29 summarize the

10     different tests you did under the rubric of

11     reasonableness testing?

12                    A.   Yes, with respect to the record of

13     the case, there were four elements that I focussed

14     on.  One was the look-back period and the debate

15     which everyone here is familiar with between five

16     years and something longer.

17                    Second is whether or not the Global

18     IP Law Group analysis of high interest patents are

19     as good as we say they are.

20                    Third, whether or not the record of the

21     case, i.e., Nortel's actual operating experience or

22     non-operating experience was consistent with my

23     approach, and we mentioned that early.

24                    And then finally, to answer the Court's

25     question from this morning, I looked very



 1   specifically against the inventor-specific analysis

 2   to make sure we weren't giving inappropriate credit

 3   to poor inventions and ignoring strong inventions.

 4             Q.    Let's start with the look-back

 5   period.  If you could just remind the Courts why

 6   the look-back period matters?

 7             A.    If the Courts were to concur that

 8   contribution is the right method, the challenge

 9   then is which R&D expenses do you use to make the

10   calculation.  There is, suffice it to say, a debate

11   that some would suggest use only the last five

12   years.  Whereas I suggest you have to use the

13   period that is reflective of when the patents were

14   created.

15             And so one of the tests that I

16   considered is what is John Veschi doing?  What is

17   Rockstar doing today?  And, Your Honours, slide 30

18   is a chart that looks at the nearly dozen actions

19   that Rockstar has already begun against the

20   companies that you see listed there.  And so my

21   question was would Rockstar -- would be incented to

22   use the most valuable patents in those actions and

23   which patents did they pick?  Did they select

24   patents that were five years old or less, or did

25   they select, as I would think, the older patents



1    that were reflective of the greater value.

2              So this chart shows you for each

3    defendant, and we'll take the bottom one, Cisco, as

4    an example, the bar shows the starting point as the

5    first patent priority date, so in the Cisco

6    litigation the oldest patent is from 1995.  The end

7    of the bar is the last patent priority date, so in

8    the Cisco litigation the newest patent was filed in

9    1998.

10             In the circle it represents the average

11   of the portfolio that is being asserted.

12             And so you can see great consistency in

13   what Rockstar is actually doing, i.e., focusing on

14   portfolios created with research dollars in the

15   late 1990s with my conclusion of look-back period.

16             Q.   So just so I make sure I

17   understand it, each of the defendants down the left

18   and then the corresponding bars, each of those

19   represents a piece of litigation commenced by

20   Rockstar?

21             A.   Yes.

22             Q.   And based on this chart, would any

23   of the patents asserted by Rockstar fall within a

24   five-year look-back period?

25             A.   No, none.

 Neeson&Associates    W&F

```
 1                         Q.   All other things being equal, so I
 2     understand all things aren't always equal, but take
 3     a hypothetical, all other things being equal, would
 4     Rockstar have any incentive to select older or
 5     newer patents to assert for infringement?
 6                         A.   Well, that is a critical question
 7     because it explains why this analysis is
 8     meaningful.  Your Honour, what Rockstar would
 9     ideally like to do is they would like to select
10     patents that were the newest they could get so that
11     when they negotiate with these defendants, they can
12     talk about 20 years into the future, or if there
13     was actual notice, they would like to select
14     patents that were six years old, so they could go
15     back six years and recover damages and then 14
16     years in the future.
17                         The only reason they would go to
18     these older patents is because they believed they
19     were more valuable than the newer ones, confirming
20     again the period of look-back.
21                         Q.   Okay and I think it is implicit in
22     the answer that you just gave but just so it is
23     explicit, what, if any, inference do you draw from
24     the fact that Rockstar asserted older patents?
25                         A.   That the value that they purchased
```

 Neeson&Associates   W&F

1    was in that older portfolio, and that a

2    contribution method must take into account the R&D

3    at the time they created the most valuable assets,

4    not five years.

5                    Q.   So the next slide has three

6    different charts on it.  What do these show?

7                    A.   This is industry-specific

8    validation or testing of the period of patent

9    filing versus market development.  And it explains

10   why older patents are in fact the most valuable,

11   because time and time again Nortel was an early

12   innovator for markets that didn't develop until

13   much later in time.  So in the top, just to take an

14   example, we look at voice over IP, and we can see a

15   dotted line that shows that the VoIP patents for

16   this technology that were sold as part of the

17   residual portfolio have an average priority year of

18   approximately 2000, but the VoIP marketplace was

19   barely existent at that time, that the VoIP

20   marketplace only grew dramatically a decade later.

21                    And this explains why it is the

22   early patents or it confirms that the early patents

23   are the ones that are most important.  And the same

24   is true for GSM and the same is true for internet

25   search.



1                    Q.    And in fact, for GSM, what date is

2      that that you have the average priority year for

3      residual GSM patents?

4                    A.    1993 to '94.

5                    Q.    And just tying it back to your

6      earlier testimony, the priority year, does that

7      relate to filing or issuance of the patent?

8                    A.    Filing.   Issuance for this

9      portfolio would be several years later.

10                   Q.    We have been trying to avoid

11     duplicating what is in your reports in this

12     presentation.   Just so that there is no confusion,

13     are these charts in your report?

14                   A.    Explicitly, yes.

15                   Q.    So you are not looking at anything

16     different.   Mr. Malackowski, are you aware that on

17     the eve of insolvency the parties in fact amended

18     their residual profit share methodology in the MRDA

19     to provide that profit and loss sharing would be

20     done based exclusively on the last five years of

21     R&D spending?

22                   A.    I am aware of that, I believe some

23     other experts used that as a justification.

24                   Q.    Okay.   And how does this chart tie

25     in with those experts' reliance on a five-year



```
 1   look-back?

 2                   A.   Again, and I don't mean to be

 3   repetitive, but this chart, as well as the Rockstar

 4   analysis, shows that if you are matching the

 5   contribution of the various parties to the assets

 6   that were transferred, it has to extend beyond five

 7   years, because the key patents that were valued

 8   were significantly older.

 9                   Q.   Have you been following any of the

10   testimony that has been given in this case?

11                   A.   I have read all of the testimony

12   up to yesterday and parts of yesterday.

13                   Q.   Okay, and have you heard any or

14   have you read any testimony that bears on this

15   issue?

16                   A.   Yes, my review of the record is

17   confirming that the Nortel intellectual property,

18   the most valuable intellectual property was

19   developed coincident with the period I have shown,

20   i.e., well before the last five years.

21                   Q.   Okay.  So that takes us to your

22   second reasonableness testing.  How did you test

23   the reasonableness of the high interest patent

24   designation?

25                   A.   That is shown on this chart, 32.
```



1    Again, it is an important test for me because I

2    attempt to match the high value patents with the

3    contribution and value, and so I needed to be sure

4    that Global IP was accurate in their designation.

5              So, Your Honours, there are three

6    tests shown on this chart.

7              The first relates to standard essential

8    patents, so I was able to identify which of the

9    transferred patents were deemed standard essential,

10   and that means that an independent entity has

11   determined they are necessary for a given

12   telecommunication standard.

13             And what I found is of those patents

14   which were standard essential, 94.4 percent were

15   also designated by Global IP as high interest, so

16   it seems they got it right.

17             Q.   So just to be clear, the 100

18   percent, if you add up the 94.4 and the 5.6, that

19   would be all standard essential patents in the

20   Rockstar portfolio?

21             A.   That's correct.  The second

22   analysis was --

23             THE CANADIAN COURT:  I'm lost here.

24   What -- who has done what here?

25             THE WITNESS:  So, Your Honour, standard



1   essential patents are generally regarded as being

2   important, valuable, critical for an industry

3   because you have to use them to --

4                THE CANADIAN COURT:  Who has decided

5   that 94.4 percent were standard essential patents?

6                THE WITNESS:  All of the patents that

7   are shown here as a subset of standard essential

8   based upon the standards organizations.  I took

9   that list of standard setting patents and compared

10   it to whether or not they were designated as high

11   interest.  My expectation would be that Global IP

12   would find them all high interest, and they got

13   pretty close.

14                BY MR. MILNE-SMITH:

15           Q.   Just to be clear, how did you

16   determine what was a standard essential patent?

17           A.   From publicly available

18   information from the standard-setting bodies.

19           Q.   So that is an objective

20   determination?

21           A.   Yes, you can go to the bodies and

22   search on the website and search patent numbers and

23   it will show you.

24                MR. MILNE-SMITH:  So, Justice Newbould,

25   does that answer your question about the first bar?



```
 1                    THE CANADIAN COURT:  Well, yes and no.
 2                    MR. MILNE-SMITH:  Let's try again.
 3                    THE CANADIAN COURT:  What information
 4    do you look for to see whether these Nortel patents
 5    that were sold are standard essential patents?
 6                    THE WITNESS:  So, Your Honour, pick a
 7    given technology, CDMA.  You can go to industry
 8    websites where they will list all of the patents
 9    that have been submitted under that Telco standards
10    as being deemed essential under various criteria
11    that they use.  So we just put those patent numbers
12    into a database.  We map that database against our
13    database of the residual patents transferred.  We
14    see where the overlap is, so now we know which of
15    those patents in those public sites were Nortel's
16    and then I take that list and say was that
17    designated as high interest?  Because I think they
18    probably all should be high interest.
19                    And this shows that the Global IP
20    group, as it relates to this test, did a good job.
21                    BY MR. MILNE-SMITH:
22                    Q.   So perhaps let's --
23                    THE CANADIAN COURT:  If somebody wants
24    to go to Apple, you can go to these sites and see
25    what the Apple patents are and whether they are
```



```
1    standard essential, and you can do the same thing?
2              THE WITNESS:  Absolutely.
3              THE CANADIAN COURT:  Thanks.
4              BY MR. MILNE-SMITH:
5              Q.   Perhaps let's use a hypothetical
6    example.
7              THE CANADIAN COURT:  No, I understand
8    that, I understand.
9              BY MR. MILNE-SMITH:
10             Q.   Okay.  So if you could then move
11   to the second bar, and let's start with the basics
12   of what a claims chart is.  You will see it is
13   labelled "Claims Chart."  What is a claims chart?
14             A.   Very simply, it is a business
15   record where you look at the claims of a patent,
16   and usually with patent attorneys, you would read
17   the claims of the patent and compare them to a
18   product to say that this product uses the claims of
19   this patent, they are matched together.
20                  And claims charts are an essential
21   building block of patent valuation and patent
22   assertion.  It is how you demonstrate to the buyer,
23   you need to buy my patent because frankly you are
24   already using it.
25                  And so it is also a lot of work to
```



1   prepare those, so they are not prepared lightly.

2   There was a subset of those that were prepared by

3   Nortel to facilitate these transactions, and what I

4   found is that for the claims charts that were

5   prepared, 88.3 percent of those patents were

6   designated as high interest by Global IP, again

7   indicating they seemed to get it right.

8           THE CANADIAN COURT:  This was a claims

9   chart prepared by Nortel?

10          THE WITNESS:  Yes.

11          BY MR. MILNE-SMITH:

12          Q.   Now, you referred to the claims of

13  a patent.  Where do you find the claims of a

14  patent?

15          A.   So if you pick up any patent and

16  you start with sort of the bibliographic

17  information, who it is issued to, that is the first

18  section.  The second section of the specification,

19  which is the narrative description of your

20  invention, followed by the drawings that support

21  that, and at the very end, there will be the key

22  language of we claim, or similar, and the numbered

23  paragraphs that are the legal metes and bounds of

24  what you have an exclusive right to.

25          Q.   Does that all make sense to the



1    Courts?  It took me quite awhile to understand it.

2              THE CANADIAN COURT:  I took an

3    intellectual property course in law school a

4    million years ago.  I still remember what a claim

5    is.

6              BY MR. MILNE-SMITH:

7              Q.   Okay, so you are several steps

8    ahead of where I was, Justice Newbould.  So then

9    the third bar is labelled "Rockstar Asserted"; can

10   you just explain what that means?

11             A.   Yes, so now we have a buyer of the

12   patents that Global IP helped to sell, and they are

13   investing significant resources to enforce a subset

14   of those patents in litigation or licensing.

15             And what we find is of the patents

16   that Rockstar selected to enforce, 89.7 percent of

17   those are designated as high interest, again,

18   confirming the study that was done.

19             Q.   Okay, so if you could just

20   summarize your conclusions in respect of this form

21   of reasonable testing?

22             A.   Two.

23             One is the high interest designation

24   is accurate and, two, it is the basis on which a

25   contribution analysis should be premised, not by



```
1    looking at all patents.
2                THE CANADIAN COURT:  Is this a
3    convenient time, Judge Gross, for the break?
4                THE US COURT:  It is.  It is fine with
5    me.
6                THE CANADIAN COURT:  We'll take 15
7    minutes.
8                -- RECESS AT 3:04 P.M.
9                -- UPON RESUMING AT 3:28 P.M.
10               THE US COURT:  Justice Newbould, we are
11   waiting for the court reporter's equipment to get
12   working.
13               MR. MILNE-SMITH:  A recurring problem.
14               THE US COURT:  How is your shorthand,
15   Justice Newbould?
16               -- OFF THE RECORD DISCUSSION --
17               THE US COURT:  All right, I'm told we
18   are in good shape on the reporter, so we may
19   proceed.
20               MR. MILNE-SMITH:  Thank you very much,
21   Judge Gross.  Just a quick housekeeping matter.  I
22   apologize, Justice Newbould and Judge Gross as well
23   if the mistake applied to you also.  I referred to
24   Mr. Malackowski's CV being at Appendix "A."  In
25   fact, that is found at tab 3 to his initial report,
```



1   so if you want to find it, it is at tab 3, even

2   though it is Appendix "A."  And I believe at least

3   for Justice Newbould that has been marked in your

4   copy.

5          THE US COURT:  Actually, mine is at

6   Appendix "A."

7          MR. MILNE-SMITH:  The difficulties of a

8   bi-jurisdictional case.

9          THE US COURT:  There we are.

10         THE CANADIAN COURT:  I won't bother

11  asking what tab 3 was supposed to be.

12         BY MR. MILNE-SMITH:

13         Q.   Mr. Malackowski, just following up

14  on a point we were addressing before the break, and

15  it is my fault for not asking the fundamental

16  predicate question, when you are talking about

17  standards for telecom, let's take as an example

18  LTE, who determines what the standards are and how

19  are those standards put together and how do patents

20  get into them?

21         A.   Sure.  The short answer is the

22  industry.  The industry represents the consortium

23  of manufacturers who get together and then with a

24  standard-setting organization, if there is one, or

25  cooperatively if there is not, they submit



1    proposals for what should be the next generation of

2    technology.  Those are then voted on by the

3    industry to come to consensus, which is obviously

4    critical if you want your smart phone to work in

5    Chicago, in Toronto, and the UK.

6              Q.    Right.  So you looked at which of

7    the Nortel patents had been designated as standard

8    essential by these industry bodies?

9              A.    Well, I was a little more broad

10   than that.  Sometimes the industry body will

11   designate it a standard essential through a peer

12   review process.  Sometimes the manufacturers

13   themselves will submit and declare it as an

14   essential.

15             Q.    Okay.  So your next form of

16   reasonableness testing was, as I recall from the

17   overview slide, to test your conclusions against

18   comparable Nortel transactions.  I have brought up

19   slide 33.  Could you tell us how that relates to

20   testing the reasonableness of your conclusions?

21             A.    Yes, Your Honours, what I did was

22   search through the record to find what we would

23   call comparable transactions.  A comparable

24   transaction is one that would have relevance to the

25   study I'm undertaking, that would provide guidance



1    as to whether the method I used was correct, and it

2    may provide information on specific financial

3    metrics, but typically it would not, typically the

4    financial metrics would be specific to the

5    transaction and you would glean from it the

6    methodology and broader lesson.

7              So what is shown on the screen is an

8    example of that testing that I did.  This is the

9    Foundry licence where I went back to the Nortel

10   records, I discovered that they had actually

11   licensed part of their portfolio to a company

12   called Foundry, that that licence was for twelve

13   patents, seven of which ultimately were in the

14   residual portfolio.

15             Interestingly, three of the seven were

16   designated as not being used by Nortel.  Four of

17   those twelve patents were in the business sales,

18   one had expired.

19             What I learned, Your Honours, was that

20   those patents were licensed by Nortel for 35

21   million dollars, a lump sum payment representing

22   past and future use, and then importantly the way

23   that Nortel actually allocated those proceeds in

24   normal course was through a contribution

25   methodology and it was a methodology based upon R&D



1   spending.

2              So as distinguished from a licence

3   approach or a title of ownership approach, the

4   business records confirmed my conclusion of

5   contribution.

6              Q.   When you referred to the three

7   residual patents designated as not used, you said

8   that that was interestingly they were designated as

9   not used.  What is the significance of the not used

10  designation to your analysis?

11             A.   Well, there is an important

12  teaching here.  The 35 million that was allocated

13  for all of these patents went to US, Canada, and

14  EMEA.  That included compensation for the three

15  patents that were not used.  If you look to the

16  other experts, in particular, the Canadian experts

17  or the US expert interpretation of the licence

18  agreements, they would say that none of the

19  consideration for not used products, because either

20  they are outside of a product definition or for

21  legal title issues, should be distributed back to

22  in this case for example, EMEA.

23             And so we can tell from a

24  methodology standpoint that the normal course

25  operation is inconsistent with the US and the

 Neeson&Associates   W&F

 1   Canadian approach.

 2                   Q.   Are you sure for the US approach,

 3   do the US approach allocate no value to the US and

 4   EMEA in respect of not used patents?

 5                   A.   So there is a slight allocation in

 6   one of the two US experts' analysis, but it is

 7   primarily Canada who would say all of it would go

 8   to Canada.

 9                   Q.   Right, because the US are using a

10   licence-based approach; correct?

11                   A.   Right.

12                   Q.   Do you know whether the EMEA

13   Debtors were even parties to the Foundry litigation

14   and the resulting licence agreement?

15                   A.   Yes, I know they were not.

16                   Q.   And just to be clear, did the EMEA

17   Debtors and the US Debtors receive an allocation in

18   respect of the settlement with Foundry?

19                   A.   Yes, sir, they did.

20                   Q.   Okay.  When was the Foundry

21   licensing deal done?

22                   A.   October 25th, 2004, but

23   importantly contemporaneous with the MRDA.

24                   THE CANADIAN COURT:  Was that R&D spend

25   the five years looking back?



```
 1                    THE WITNESS:  Your own, great question,
 2     it is.  They used the RPSM methodology, so they
 3     used that specific analytic, and I was referring to
 4     I took some of the methodology points but then I
 5     tied the accounting to the facts of my analysis.
 6                    THE CANADIAN COURT:  What is the date
 7     of that settlement?
 8                    THE WITNESS:  October 25th, 2004.
 9                    BY MR. MILNE-SMITH:
10            Q.   Do you recall what residual profit
11     split methodology was in force in 2004 at that time
12     as opposed to later on in Nortel's history?
13            A.   Well, it would be effectively the
14     RPSM under the MRDA.
15            Q.   Right.  Do you recall when the
16     five-year look-back was introduced by Nortel?
17            A.   I believe it was coincident with a
18     period after that.  I don't recall the specific
19     date.
20            Q.   From a business perspective and
21     from your professional perspective, what would it
22     mean to you if Nortel's past practice, such as in
23     the Foundry litigation, were fundamentally
24     inconsistent with your approach?
25            A.   Well, I would look to the evidence
```



```
 1    to determine whether that inconsistency can be

 2    reconciled.  Again, for example, I determined that

 3    a five-year look-back versus a longer look-back

 4    period can be reconciled by looking at the actual

 5    portfolio that was transferred and the value of

 6    that portfolio.

 7               At a methodology level, it would

 8    require further investigation.  Fortunately, that

 9    wasn't necessary, that at a methodology level it

10    confirmed my analysis.

11               Q.   So just to be clear, was there

12    anything about this Foundry litigation and licence

13    agreement that caused you to doubt or question your

14    fundamental methodology?

15               A.   No, sir, not at all.

16               Q.   Okay.  Were there any other

17    precedents that you considered aside from Foundry?

18               A.   Yes, there were a number of other

19    business considerations over time that I found also

20    confirmed the contribution analysis.  So, Your

21    Honours, slide 34 is a summary of the investigation

22    I conducted, and each data point on this chart does

23    in fact in my opinion confirm the contribution

24    method for normal course operations, as well as for

25    example, for liquidations.
```



```
1                   Q.   So maybe you can just briefly
2    describe some of these transactions that you have
3    listed on this timeline?
4                   A.   Sure.   The first is the RPSM
5    itself.  Obviously that is allocating profits and
6    loss based upon R&D capital stock, so at a method
7    level it is the same.   We have the look-back period
8    that is a fact-specific matter.
9                   Q.   And what year was that brought in?
10                  A.   2001.   The second is the APA
11   kick-off Q&A document that was actually the
12   document that was referred to earlier today in
13   testimony, but if we look a little deeper we know
14   from, I believe, Ms. Polland's testimony that that
15   was a document that was affirmed by senior
16   management and taken into the negotiation with the
17   tax authorities.
18                   And that, again, specifically noted
19   that the allocation of a sale will be based upon
20   R&D capital stock.
21                   The third document that I looked at was
22   titled an IP migration analysis, and here, Your
23   Honours, was a situation where Nortel was
24   considering, but didn't, transferring certain IP
25   from the UK and France to NNL.   And the value of
```



1    that IP was to be allocated based upon

2    contribution.

3              A few years later, we find the Alcatel

4    transaction, and there has been plenty of testimony

5    regarding that.  Again, the sale proceeds in this

6    case from IP was allocated by contribution.

7              And then finally, interestingly, after

8    the filing itself, the 2009 financial statements

9    contained a note that, subject to Court review, the

10   IP sale proceeds would be allocated using a

11   contribution approach.

12             So consistency of method over an

13   extended period of time.

14             Q.   And if Judge Gross or Justice

15   Newbould wanted to find the documents or testimony

16   that you have referred to in this slide, where do

17   they see the references?

18             A.   At the bottom of the slide.  As I

19   mentioned, I have tried to note each of the

20   sources.

21             Q.   I take it that is true throughout

22   this presentation?

23             A.   Yes, sir.

24             Q.   So this next slide is labelled

25   "R&D v. Patent Output."  How does that bear on the



1    reasonableness of your contribution approach?

2              A.   This is the first of two tests

3    that I undertook to make sure that when money was

4    being spent on R&D, it was actually generating

5    patents of value.  And so if you look at this

6    chart, I was able to overlay the R&D that we

7    already saw versus the patent output and you can

8    see, coincidentally, that the majority of the

9    patent output is coincident with the majority of

10   the R&D spending, which is in the late 1990s, into

11   2000, well before a five-year look-back.

12             Q.   And --

13             THE CANADIAN COURT:  I'm just looking

14   at that.  Where is the patent output on this chart?

15             THE WITNESS:  It's the black line, Your

16   Honour, that is based upon the scale on the right

17   vertical.

18             THE CANADIAN COURT:  Thank you.

19             BY MR. MILNE-SMITH:

20             Q.   And just to be clear, what kind of

21   patents are included in the data represented by

22   that black line?

23             A.   As noted on the chart, and

24   consistent across my analysis, it is focussed on

25   the high interest patents, both in the residual



 1   portfolio and those that are predominant use

 2   patents within the business sales.

 3               Q.   So if I were to look at this

 4   chart, am I reading it correctly that in the year

 5   2000 Nortel filed approximately 600 high interest

 6   and business sale patents?

 7               A.   Yes, sir.

 8               THE CANADIAN COURT:   That is the filing

 9   date?

10               THE WITNESS:   The priority date, yes,

11   sir.

12               BY MR. MILNE-SMITH:

13               Q.   So if I look at this chart, and

14   just to be clear as well, on the left-hand side you

15   are giving the R&D spending.   This is similar to

16   the chart we looked at before with the three

17   coloured bars?

18               A.   Exactly the same.

19               Q.   Okay.   So looking at the spending

20   from say 2003 onwards it is evident that the R&D

21   spending doesn't change very much; correct?

22               A.   Correct, the total spend in

23   dollars is relatively constant, yet interestingly

24   the patent output in terms of high quality patents

25   is declining.



 1                    Q.   What do you find interesting about

 2     that?

 3                    A.   Twofold.  One is from a business

 4     perspective obviously after the dot-com boom, the

 5     R&D process became less efficient from a high

 6     patent output.

 7                         But importantly, again, it is simply

 8     further confirmation that looking at later periods

 9     would not capture the matching between R&D spent

10     and value created.

11                    Q.   Now, earlier in your testimony,

12     Mr. Malackowski, you referred to considering

13     different weighting options or weighting approaches

14     when you were looking at R&D spending.  And I

15     believe you indicated that the potential weighting

16     options you considered would have favoured EMEA and

17     therefore you saw your approach as more

18     conservative.  Does this chart have any

19     relationship to that weighting exercise or does it

20     shed any light on that weighting exercise you

21     described earlier?

22                    A.   Yes, specifically if you look to

23     those middle years where the patent output was the

24     highest, if you wanted to weight not by capital

25     stock of R&D but by some patent count, or even if



1    you wanted to limit your weighting simply to those

2    years alone, you would find that EMEA would have,

3    relatively speaking, a higher allocation.

4                    Q.    And your next slide is labelled

5    "Testing/Inventorship Analysis."  What is an

6    inventorship analysis?

7                    A.    So that is an analysis where I

8    looked specifically at the inventors who are listed

9    on every patent and looked up actually the home

10   address of each inventor to find out in which

11   country they lived and I did that for both all

12   patents in the residual portfolio as well as the

13   high interest and what it shows on this chart, as I

14   describe it, is EMEA effectively punched above its

15   weight, that the EMEA inventors were generating

16   more higher quality residual patents than an

17   allocation based upon R&D capital stock would

18   suggest, specifically that the 18.7 percent shown

19   on the right side of this chart is greater than the

20   17.4 percent that I rely upon.

21                   Q.    Now you'll recall from

22   Mr. Huffard's testimony this morning that Judge

23   Gross asked a question about a hypothetical where

24   one company spent a great deal of money on a patent

25   that didn't turn out to be any good, and another



1    company spent a small amount of money on a patent

2    that turned out to be extremely valuable.

3                    Does this analysis bear any -- or

4    have any relevance to the question that Judge Gross

5    asked?

6                    A.    In my opinion, yes, it directly

7    addresses that concern, because we know that we

8    have been able to confirm that if we just looked at

9    the high output patents, we would come to a

10   similar, in fact, greater allocation to EMEA.  So

11   it is in fact confirming that we aren't misjudging

12   the contributions as the question raised.

13                   Q.    So does this inventorship analysis

14   that you have explained here affect your view of

15   the proper allocation of IP proceeds among the

16   parties?

17                   A.    It is confirmatory of my opinion

18   that 17.4 percent should be allocated to EMEA.

19                   Q.    So that takes us to the next phase

20   of your analysis, the so-called Canadian and US

21   experts testing phase.  I take it you have read and

22   considered the opinions of some of the allocation

23   experts for the US and Canada?

24                   A.    Yes, sir.

25                   Q.    And what does your first slide on



1    this point here, slide 38, address?

2                    A.   What I did was look to the

3    assumptions that were within those expert reports

4    and I identified select assumptions where my review

5    of the evidence relevant to the question was

6    inconsistent.

7                    And so the first assumption that I

8    flagged was the Canadian assumption that the

9    non-Canadian RPEs had no ownership of Nortel's

10   intellectual property.

11                   Q.   And do you recall which experts

12   made that assumption?

13                   A.   Mr. Green in particular, but I

14   think it is consistent across the board.

15                   Q.   Okay.  And why did you disagree

16   with this assumption?

17                   A.   Well --

18                   MR. ZARNETT:  Your Honour, I have to

19   rise on this point.  This slide and the next four

20   or five that follow it involve this expert lapsing

21   into interpretation of the licence -- I'm not sure

22   if -- interpretation of the licence agreement,

23   opinions about ownership, other legal questions

24   which in my submission is not proper coming from

25   this expert.

 Neeson&Associates    W&F

```
 1                    THE CANADIAN COURT:  Why do you start
 2     now?  We have been hearing so many witnesses
 3     talking about these things.
 4                    MR. ZARNETT:  Well, I don't think we
 5     are only starting now.  I thought I started in the
 6     opening.
 7                    But this raises it to a new level.
 8     This is not someone who was there at the time.
 9     This is an after-the-fact valuator talking about
10     what legal conclusions should be drawn, so I just
11     don't see how it can help either Court.
12                    THE CANADIAN COURT:  Well, there has
13     been a whole lot here.  I have wondered about that,
14     but I think I'll permit this and you can
15     cross-examine.
16                    BY MR. MILNE-SMITH:
17                    Q.   Thank you, Justice Newbould.
18                    So we are at slide 39 regarding the
19     ownership assumption by the Canadian experts.  What
20     have you set out on this slide?
21                    A.   So part of my assignment was to
22     review the expert reports of Canada and the US to
23     consider whether or not their chosen or assumed
24     contribution method was in my view appropriate.
25     What is laid out on this chart is evidence that I
```



1    looked to which suggested that, no, their

2    assumption was too extreme, that there is evidence

3    in the business record that from a business

4    perspective ownership was a consideration and

5    therefore from a valuation perspective you need to

6    take into account that consideration.

7                        And here are three examples of

8    documents, and I won't read them unless you need me

9    to, but in each and every case, it explains that

10   the ownership interest from an economic point of

11   view extend beyond NNL.

12                       Q.   And I think these documents are

13   certainly familiar to the Courts, and I agree with

14   you, there is no need to read through them.

15                       What was the next assumption

16   pertaining to the Canadian Debtors' expert that you

17   have singled out?

18                       A.   The second assumption was that the

19   MRDA grants were limited to make-use licence

20   rights, which I don't believe to be true.

21                       Q.   Okay, and just going back to the

22   beginning of your testimony, Mr. Malackowski, what

23   experience do you have or what ability do you have

24   to tell the Courts what a make-use licence is?

25                       A.   It is a business point of view



1    based upon my experience in teaching on the

2    subject, negotiating licenses for my own account,

3    as well as clients, reviewing for valuation

4    purposes literally thousands of licence agreements,

5    and my industry role with the largest trade

6    associations.  So this is part of my normal day

7    activity.

8                    Q.   In that context, what is a

9    make-use licence?

10                   A.   A make-use licence is the most

11   common type of agreement where you are providing

12   your intellectual property rights to a third party

13   to allow them to make product or use your portfolio

14   for commercial purposes.

15                   Q.   Now, let's put aside the MRDA for

16   a second.  Have you reviewed any other Nortel

17   licenses in this case?

18                   A.   Several.

19                   Q.   Such as?

20                   A.   Well, for example, we talked about

21   Foundry a moment ago.  In addition to Foundry,

22   there would be the LRE licenses which are also

23   referred to as the distributor licenses, and

24   additional ones.

25                   Q.   And just -- could you remind the



1    Courts, what is an LRE?

2                A.    A limited risk entity.

3    Effectively, those distributors.

4                Q.    Okay.  So that is as distinguished

5    from the RPS entities we have been considering?

6                A.    Yes, sir.

7                Q.    So what have you set out on slide

8    41?

9                A.    So in considering a make-use

10   licence from an economic or business point of view,

11   the most important business considerations are

12   whether or not that licence is exclusive, meaning

13   if I share my rights with you, can I still use them

14   myself and can I share them with anybody else?  If

15   it is exclusively, you cannot.

16                Whether or not that licensee can

17   sublicense, so if I share my rights with you, do

18   you have the ability to go around and share them

19   with other people or do you not?

20                And third, enforcement.  If I share my

21   rights with you, do you have the right to enforce

22   that portfolio against others in the industry maybe

23   in cases where I don't want that activity.

24                And in a typical make-use licence and

25   let's look at the middle column of Foundry, you



1   don't provide exclusivity, sublicensing ability or

2   enforcement to those third parties.  You would lose

3   the economic interest of the portfolio.

4              And that is the vast majority of all

5   licence agreements.

6              Q.   So from a practical business

7   perspective, what does the Foundry licence let

8   Foundry do?

9              A.   Lets Foundry utilize the Nortel

10  portfolio to make Foundry products that would

11  otherwise be excluded under the claims.

12             Q.   Is that the same as what the RPEs

13  were allowed to do?

14             A.   No.  As shown in the first column,

15  the RPEs had significantly greater economic value

16  because they were given exclusivity for their

17  jurisdiction, they were given the right to

18  sublicense, and they were given the right to

19  enforce.

20             Q.   So how does the description that

21  -- sorry, the last column is the LRE licence.

22  Could you just describe what the LRE licence let

23  the LREs do?

24             A.   Well, remember again the LREs were

25  the distributors, so they are not conducting



1    research, and so they effectively for this purpose

2    are treated like a third party.  They are allowed

3    to manufacture product that would otherwise be

4    excluded by the claims.  They are not allowed to

5    sublicense it or to enforce it.

6                  Q.   So just to tie this together, how

7    does the information you have set out on this chart

8    tie back to the assumption you had identified

9    earlier?

10                 A.   The other experts when they assume

11   that the MRDA is a make-use licence bring with it

12   the normal course assumptions of value limits.

13   They don't exist in the MRDA the way they do in a

14   typical make-use licence, and in my opinion, that

15   explains why their analysis results in improper

16   allocation.

17                 Q.   Mr. Malackowski, before we move on

18   in the presentation, I just want to take a step

19   back.  Were you deposed in this case?

20                 A.   Of course.

21                 Q.   And were you asked questions

22   regarding your commercial opinion or your business

23   opinion regarding the MRDA licence?

24                 A.   By both the US and Canada.

25                 Q.   Do you propose to walk through



 1   your interpretation of the MRDA in your testimony

 2   today?

 3              A.   I have read the trial transcript.

 4   I don't think I intend to do that.

 5              Q.   Okay.  So Justice Newbould, Judge

 6   Gross, we are going to take our lead from the

 7   witness here.  We have included in our slide

 8   presentations at slides 42, 43, 44, 45, and 46 some

 9   slides that address the --

10              THE CANADIAN COURT:  This looks like

11   legal argument to me.

12              MR. MILNE-SMITH:  And that is why we

13   are not going through it.  The reason --

14              THE CANADIAN COURT:  Just move on then.

15              MR. MILNE-SMITH:  We included it

16   because it was subject to deposition testimony.  If

17   anyone wants to ask questions about it, it is

18   there.

19              THE CANADIAN COURT:  Well, let's move

20   on.

21              BY MR. MILNE-SMITH:

22              Q.   Okay, done.

23              Mr. Malackowski, just one more

24   question on this subject.  Why is the

25   interpretation of the MRDA relevant to your



1    opinion?

2                   A.   Under the contribution method, it

3    is not.  Under an alternative licence theory and

4    the corrections that are required there, the rights

5    under the MRDA specifically as it relates to the

6    non-exclusive territories are a critical input to

7    the valuation.

8                   Q.   Okay.  So just I want to be

9    crystal clear on this point.  What would it mean

10   for your contribution theory, so put aside the

11   alternative licence theory, for your contribution

12   theory, what would it mean or what implications

13   would it have if the Canadian experts'

14   interpretation of the MRDA or the assumptions they

15   were given about the MRDA were correct?

16                  A.   It would make no difference to the

17   contribution approach.

18                  Q.   Okay.

19                  A.   It is independent of the MRDA.

20                  Q.   Thank you.  So, Mr. Malackowski,

21   let's change our focus to the analysis advanced by

22   the US experts.  Have you identified any

23   assumptions in their analysis that gave you pause?

24                  A.   Two.  The first one is shown on

25   the screen.  In particular, the US experts



1    attributed no value to most of the European

2    patents, all of the Asia-Pacific patents, all of

3    the Middle Eastern patents and all of the Central

4    American and Latin American patents.

5                    Q.    Now I finished with this question

6    on the last set of assumptions, I'm going to lead

7    with it now.  Does this matter for your

8    contribution approach?

9                    A.    No, this is an assumption that

10   only affects the licence approach.

11                   Q.    Okay.  And we'll come back to that

12   in more detail.  For our purposes now, why does it

13   matter on a licence theory, this issue of how much

14   value to attribute to these various regions?  It

15   doesn't affect the value of the exclusive licenses,

16   does it?

17                   A.    Generally speaking, no.

18   Generally, it is focussed on the non-exclusive

19   licenses.

20                   Q.    Okay.

21                   A.    So a licence approach says let's

22   value the rights that you are giving up in order to

23   effect these transactions.  Those rights include

24   exclusive territories and non-exclusive

25   territories.  You have to account for both if you



1    are going to correctly apply this theory.

2              Q.   So let's just take a step back.

3    What were the non-exclusive licenses?

4              A.   They were licence right that is

5    the RPEs held in jurisdictions other than any RPE

6    jurisdiction, so for example, China, all of the

7    RPEs had a non-exclusive right to sell product or

8    licence a portfolio in China.

9              Q.   Okay, so for example, Germany,

10   would that be covered by an exclusive or

11   non-exclusive?

12             A.   Non-exclusive.

13             Q.   And how did you allocate the value

14   of the non-exclusive licenses?

15             A.   Consistent with traditional

16   licensing approaches, a non-exclusive licence in

17   total, meaning if you take all of the

18   non-exclusives and put them in a bundle, they

19   effectively become an exclusive licence, but you

20   have to recognize that everyone in that bundle is

21   an equal partner, they all have an ability to

22   effectuate the same transfer.

23             Q.   How many were in the bundle in the

24   case of Nortel?

25             A.   In the case of Nortel there were



```
 1   five, and three of the five were part of the EMEA
 2   group.
 3                  Q.   And I believe you said that you
 4   would value each of the five equally.  Didn't NNL
 5   have the exclusive ability to enforce for
 6   infringement?  Doesn't that make their
 7   non-exclusive licence more valuable?
 8                  A.   It is an interesting question.
 9   The short answer is no.  Long answer is it actually
10   was a burden that they would suffer, and I think it
11   is worth explaining for a moment.  And let's take
12   China as an example.
13                  Canada had the right to enforce the
14   Chinese portfolio in China, but if Canada had
15   initiated an action to do that, at any point in
16   time any of the other non-exclusive licence holders
17   could contact the defendant and offer them a
18   licence at whatever price they could negotiate and
19   effectuate a tech transfer to that market.  That
20   would leave Canada in a worse off position, because
21   it would have incurred all of the legal expense to
22   initiate and start the process and it would receive
23   none of the benefits.
24                  Q.   Now, we covered earlier in your
25   testimony the value of the IP in the business
```



1    sales; correct?

2              A.    Yes, and just a quick addendum on

3    the last point.  The only sharing would occur would

4    be as it washed through the RPSM calculations at a

5    later date.

6              Q.    Right.

7              A.    I'm sorry, could you restate the

8    last question?

9              Q.    Right, so you have talked earlier

10   in your testimony about the value of the business

11   sale IP; correct?

12             A.    Yes, sir.

13             Q.    And we know what the value of the

14   residual IP was?

15             A.    Yes, sir.

16             Q.    So how does the value of the

17   non-exclusive licenses matter?  What is the

18   relevance of it?

19             A.    It is an allocation.  For the

20   residual portfolio, we know it is worth 4.5 billion

21   dollars.  The question is how do you allocate that

22   amongst the three parties at issue.  And you need

23   to account for the fact that three-fifths of the

24   rights for the non-exclusive territories were held

25   by EMEA and, therefore, their allocation should



1    measure that unique position.

2              Q.    How does the value -- as the value

3    of the non-exclusive licence goes up, who does it

4    help or hurt?

5              A.    It would help EMEA as the value of

6    the non-exclusive licence increases.

7              Q.    And Canada?

8              A.    To a lesser extent, EMEA would get

9    three-fifths, Canada one-fifth, US one-fifth.

10             Q.    You referred to the one-fifth,

11    one-fifth, so forth, weighting or allocation within

12    the five, the bundle, as you called it, of

13    non-exclusive licenses.  Did Mr. Kinrich on behalf

14    of the US Debtors express an opinion on how to

15    value that bundle?

16             A.    He concurs.  I think that is a

17    fairly basic licensing principle.

18             Q.    Let's look at the next slide.

19    What does this set out, and how does it bear on the

20    discussion we have been having?

21             A.    This slide is a baseline showing

22    the territories that Mr. Kinrich included in his US

23    licence approach.  Those are the territories

24    highlighted in green, effectively the RPEs.

25             Q.    And you will see if you look at



1    Europe, it also looks like Germany is covered; is

2    that correct?

3                    A.    Yes.

4                    Q.    And so would Germany be covered by

5    an exclusive or non-exclusive licence?

6                    A.    That would be a non-exclusive

7    licence.

8                    Q.    And were there any other countries

9    that is Mr. Kinrich considered in valuing the

10   non-exclusive licenses for purposes of allocation

11   as you have described?

12                   A.    I believe he considered Ireland at

13   some point.  I don't recall if he included it in

14   this specific calculation.

15                   Q.    Do you recall whether Ireland was

16   an exclusive or non-exclusive jurisdiction?

17                   A.    Non-exclusive.

18                   Q.    Do you recall what the five RPEs

19   were?

20                   A.    Oh, I'm sorry, Ireland, France,

21   UK, US and Canada.

22                   Q.    So just so we are clear, was

23   Ireland an exclusive or non-exclusive?

24                   A.    Exclusive, I'm sorry.

25                   Q.    Okay.  So what are the countries



1    in yellow indicating?

2                    A.    So in addition to the Kinrich

3    analysis, I went back to the underlying patents to

4    look for those countries in which there was high

5    interest patent activity, and in my opinion, that

6    at a minimum should also be considered because

7    those were non-exclusive territories where Nortel

8    made a specific decision to file those

9    applications, and we heard from the witness just

10   before me the process they went through to

11   carefully chose -- choose those jurisdictions.

12                   Q.    You referred to high interest

13   patent activity.  What do you mean by that?

14                   A.    There is at least one high

15   interest patent in each of the countries that are

16   designated in yellow.

17                   Q.    Where would those -- so, for

18   example, if we look at China, are you talking about

19   patents that were filed in China or used in China?

20   What are you referring to?

21                   A.    Chinese patents, patents filed in

22   China.

23                   Q.    Okay.  So if a country is in

24   yellow, what does that mean in terms of patent

25   filings in that country?



```
 1                    A.   That there are high interest
 2   patent filings.
 3                    Q.   And if you look at the legend at
 4   the bottom, it indicates that yellow and green are
 5   Malackowski jurisdictions.  What makes them
 6   Malackowski jurisdictions?  What did you do with
 7   them?
 8                    A.   I included both the yellow and
 9   green jurisdictions in my base case licence
10   approach, so I considered the relief from royalty
11   that a buyer would measure in an acquisition of
12   that portfolio.
13                    Q.   What about the countries in grey?
14   The legend indicates that those are Malackowski
15   alternate jurisdictions.
16                    A.   So one of the other factors that I
17   considered is that for global portfolios of this
18   type, large numbers of patents across many
19   jurisdictions, often those are licensed on a global
20   basis.  The reason being that even if you don't
21   have a patent in a particular country, in order to
22   effectively compete, you need access to the
23   portfolio because of the integrated global nature
24   of those products.
25                         And so another analysis that I
```



1    considered was what would be a higher measure of

2    value looking at the larger portfolio.

3                    Q.    And of these two approaches, the

4    yellow and green or the grey, yellow and green, the

5    alternative, which one did you adopt and present in

6    your reports?

7                    A.    The conservative approach.

8                    Q.    Okay.  And just harkening back --

9                    THE CANADIAN COURT:  Which was that?

10                   THE WITNESS:  Yellow and green, Your

11   Honour.

12                   BY MR. MILNE-SMITH:

13                   Q.    So you didn't include the grey

14   jurisdictions?

15                   A.    Correct.

16                   Q.    So going back to the -- you'll

17   recall that earlier today we looked at the relief

18   from royalty method.  So how does your analysis of

19   what countries to use, where does that plug in?  Is

20   it a revenue, a discount rate, a royalty rate?  How

21   does it plug in?

22                   A.    It plugs in at the very beginning.

23   It helps to establish which portion of global

24   revenues are relevant in the analysis.

25                   Q.    So there are two pie charts on



1    this next slide.  Let's start with the one on the

2    left.  What does that show?

3                A.    The chart on the left shows the

4    patents and applications for Nortel in each of the

5    filing jurisdictions.  And critically, I focus on

6    the orange component of the chart, the 27 percent,

7    which shows that 27 percent of all of the patent

8    assets were filed in these other rest of world

9    jurisdiction, so it is a meaningful piece.

10               Q.    So the 27 percent, if we go back

11   to the last slide, in which coloured countries

12   would the 27 percent come from?

13               A.    It would come from the yellow and

14   the grey.

15               Q.    Okay.  So then how does that

16   relate to the chart on the right?

17               A.    Well, in addition to looking at

18   patent count, I wanted to also consider the market,

19   because it may be that patents in the rest of the

20   world were really in places that didn't matter, but

21   if you look at the telecommunication hardware

22   spending numbers for the same period, as shown on

23   the right, these also happen to be the

24   jurisdictions where there is a significant amount

25   of economic activity, relevant economic activity,



1   confirming that leaving them out, the error of

2   ignoring them is something that needs to be

3   corrected.

4           Q.   So again, if we look at that 49

5   percent, and then go back to the last slide, you

6   are telling me that half of the telecom spending

7   was in which jurisdictions, which colour?

8           A.   In the non-green jurisdictions.

9           Q.   Okay.

10          THE CANADIAN COURT:  That is telecom

11  hardware spending by who?

12          THE WITNESS:  Those are general

13  industry data from the IDC report, so it is a

14  worldwide market study that is put out by an

15  independent authority.

16          THE CANADIAN COURT:  So it is spending

17  by anybody?

18          THE WITNESS:  Yes, it is the industry,

19  Your Honour.

20          BY MR. MILNE-SMITH:

21          Q.   Now, the date there is 2011 to

22  2015.  We are of course in 2014 now.  When was that

23  -- what is your source for that?  In other words,

24  is it looking backwards?  Is it an old document

25  that you looked at to get that?



```
 1                    A.   It is reflected at the bottom of
 2    the screen, it was the 2011 projection of the
 3    industry, so where they expected the industry to
 4    grow.
 5                    Q.   How did you select Q1 of 2011?
 6                    A.   It is coincident with the residual
 7    sale.
 8                    Q.   Thank you.  So your next slide
 9    focuses on China.  Does Mr. Kinrich's, on behalf of
10    the US Debtor, does his report take into account
11    China?
12                    A.   He does, he in fact offers two
13    options, one considering China and one without.
14    And as part of my testing I looked to see the
15    significance, even within his own analysis, of
16    starting to take into account those non-exclusive
17    jurisdictions.
18                         And as shown on slide 51, China
19    alone represents 450 million dollars of value that
20    Mr. Kinrich would allocate to the US depending upon
21    how he treats China, specifically on the right side
22    of the chart by leaving China out, which I think is
23    inappropriate, he would expand the allocation to
24    the US by nearly a half a billion dollars.
25                    Q.   Why is it inappropriate to exclude
```



1   China?  Don't they have an inferior patent regime?

2            A.   There was testimony on that I

3   believe today and over the course of this trial.

4   It is in my opinion inappropriate to exclude China,

5   one, because Nortel made the decision to file high

6   interest patents in China, so they made that as a

7   business decision, a market of importance.

8                 Second, as was heard today, the IP

9   regime in China is improving and has improved over

10  the past five to ten years.

11                And three, obviously it is a large

12  significant market.

13            Q.   Do you have any experience

14  yourself with IP licensing in China?

15            A.   Yes, sir, Ocean Tomo has a joint

16  venture relationship with the UPEX, United Property

17  Exchange in Shenzhen and they are our partner for

18  addressing the work we do in China.

19            Q.   So summarizing these points, what

20  does slide 52 show us?

21            A.   Slide 52 on the right shows my

22  analysis from my conservative case to my case

23  including all geographies and as I would expect,

24  the 4.5 billion actual transaction falls squarely

25  within the middle of my work.



1                        The chart on the right is showing

2    the effect of the Kinrich analysis when taking into

3    account the proper discount rates by ignoring

4    portions of the world geography, by ignoring those

5    yellow and grey countries, and what it shows is he

6    is understating or would be understating the value

7    of the residual portfolio.

8                        Q.    Now, I thought that the value of

9    the residual IP was known, that the actual sale

10   price line showed.  How did you use a value of 3.6

11   billion in your licence approach?

12                        A.    It is a value used for allocation,

13   so the important thing is the relative contribution

14   of each of the territories, and you take that

15   allocation and then apply it against the 4.5

16   billion.

17                        Q.    So what was the next US assumption

18   that you -- US expert assumption that you looked

19   at?

20                        A.    The second assumption, the one

21   that has also been talked about at some length, is

22   whether or not the R&D spending that is considered

23   for the contribution model should include transfer

24   pricing adjustments, and in the US expert position,

25   they seek to correct my work by adjusting the R&D



1    spend for transfer pricing.  And in my opinion,

2    that correction is not only not necessary, but

3    would be misleading.

4                    Q.    And why is that?

5                    A.    As shown on this chart, my

6    objective is to get as close to the actual

7    inventive process as possible.  On the left side of

8    the chart, ideally what I would like to have would

9    be the lab notebooks of every inventor to determine

10   how much was spent on every R&D project, to know

11   whether it resulted in a high value patent or not.

12                   Those records are not available.

13                   THE CANADIAN COURT:  Just a second.

14   I'm not getting any --

15                   MR. MILNE-SMITH:  Is it the feed, Your

16   Honour?  Okay.

17                   THE CANADIAN COURT:  I'm not getting

18   it, and I am not getting any from the US.

19                   Thank you.

20                   BY MR. MILNE-SMITH:

21                   Q.    Are you back up, Your Honour?

22                   THE CANADIAN COURT:  Just a second.

23                   MR. MILNE-SMITH:  I apologize.

24                   THE CANADIAN COURT:  Okay.

25                   BY MR. MILNE-SMITH:



1                  Q.    All set?

2                        Actually, this pause reminds me, I

3     have been jumping back and forth a little bit and I

4     want to make sure it is clear for everyone in the

5     courtroom.  The first US assumption that we were

6     talking about, did this relate to your licence or

7     your contribution theory?

8                  A.    Licence theory.

9                  Q.    Okay, and now we are moving to the

10    second assumption, does that relate to your licence

11    or contribution theory?

12                 A.    The contribution theory.

13                 Q.    Okay, so we have moved to

14    contribution now.  So, sorry, I interrupted you,

15    you were in the middle of explaining about lab

16    notes and project accounting.

17                 A.    Well, as the Court's earlier

18    question today would imply, in an ideal world you

19    would be able to go back to the lab notebooks and

20    identify for every piece of research how much money

21    was spent on that particular piece of research, by

22    whom and what patents resulted from that.

23                       Those records are simply not

24    available.  And the evidence in the case confirms

25    that it is not possible to do that analysis.



1                    As a result, in my opinion, the best

2    available evidence in order to compare and properly

3    match the contribution to the output of

4    intellectual property is the R&D spend, the actual

5    dollars that were spent by each of the RPEs, each

6    of EMEA, Canada and the US for research and

7    development.

8                    Q.   Why is R&D spend the best proxy?

9                    A.   It is reflective of the types of

10   activities that we know lead directly to the

11   inventive process.  It is the engineering time and

12   the related expenses that result in the innovation.

13                   Q.   And just to tie it back to one of

14   your very first slides this morning, you referred

15   to the inventive process.  What does the inventive

16   process have to do with ownership and allocation?

17                   A.   Well, again, it is an inert right,

18   that the inventor, barring any other assignment

19   away, is the one that owns the benefit of the

20   invention.

21                   Q.   So we have talked about lab notes,

22   R&D spend, the last column is adjusted R&D spend.

23   What do you mean by that?

24                   A.   So after the spending was

25   recorded, as part of the MRDA or other agreements,



1    there were allocations within Nortel to move money

2    through various jurisdictions under the MRDA on a

3    profit basis.  So they would allocate based upon

4    profitability.

5                    And the US experts would suggest

6    that, well, since we had to allocate expenses back

7    to EMEA, for example, or to Canada, why don't we

8    count that as R&D dollars, and why isn't that a

9    better measure of contribution?  And the answer is

10   twofold.

11                   One is it is not a measure of R&D

12   dollars.  It is a measure of profitability.  So you

13   are teaching away from the inventive process, you

14   are moving away.

15                   Second, it is an allocation that is

16   done for other purposes, specifically tax

17   efficiency, not for recording the matching between

18   the inventive nature of contribution and results.

19                   Q.   Are you aware of whether the

20   transfer pricing adjustments that you have been

21   referring to were actually settled or paid in cash?

22                   A.   In certain instances, as reflected

23   on slide 54, I understand from my review of the

24   record that those adjustments were never actually

25   made, they were accounting records or loans that



1    were established, but another reason I reject the

2    adjustment to the R&D spend is that EMEA for

3    example, never actually got the money.

4                Q.   Mr. Malackowski, have we now

5    completed your assessment of the Canadian and US

6    experts' analyses?

7                A.   Yes, sir.

8                Q.   Okay, subject to any questions

9    from either of our benches, could you let me know

10   what is the next step in your analysis, and I am

11   happy to say the final step?

12               A.   Thankfully, it is the final step.

13   The final step was to consider a licence approach

14   in the event that the Courts determine that that is

15   the proper methodology, and so in a few slides I

16   show a licence approach which I believe to be more

17   accurate than that presented by the US.

18               Q.   Can you briefly explain your work

19   under this alternative?

20               A.   Yes.  Briefly, it follows the same

21   general approach that we talked about for the

22   residual business sales, as shown on slide 56, it

23   is to determine the relevant revenue by geography,

24   to apply a royalty rate, to deduct the relevant

25   expenses and then to discount to get to the net



1    present value.

2              If you go to the next slide, like

3    the residual business sales, the forecast was done

4    specific to each area of technology and the period

5    that was covered in the forecast was based upon the

6    life of the given patents.

7              Q.   So for the licence approach, we

8    looked earlier at your business IP valuation.  Did

9    that relate to your contribution or your licence

10   approach?

11             A.   So earlier when we did the

12   business valuation, it was ordered -- it was used

13   for the contribution approach.

14             Q.   Right.

15             A.   In order to determine the amount

16   of IP value that you would allocate using the

17   contribution method.

18             Q.   So now we are talking about the

19   residual patents and this valuation you have just

20   described is only relevant to your alternative

21   licence approach?

22             A.   Correct.

23             Q.   Okay.  So what are -- on slide 57,

24   down the left-hand side, there is a heading

25   "Franchise" and then it lists eight categories,



1    what are those?

2              A.   Those are the categories of

3    technologies that were sold as part of the residual

4    portfolio.

5              Q.   And where did you get those

6    categories?

7              A.   Through the IPCo model, the

8    Rockstar transactional documents.

9              Q.   And who prepared the IPCo model?

10             A.   It was prepared by Nortel with its

11   advisors.

12             Q.   And this looks very much like an

13   earlier slide we looked at in the context of the

14   business IP.  Is it showing basically the same

15   thing?

16             A.   The same method, specific to

17   technology, specific to the period of the patents

18   that were transferred.

19             Q.   And what conclusions did you reach

20   in respect of the alternative licence model?

21             A.   As shown on slide 58, for the

22   business sale IP, so going back to our original

23   value numbers and reallocating them, the EMEA

24   numbers jump significantly.  They have jumped to

25   43.4 percent.

 Neeson&Associates   W&F

```
 1                    Q.   Why are the EMEA numbers so high?
 2                    A.   It all is driven by those
 3      non-exclusive territories, the value associated
 4      with those non-exclusive markets and the fact that
 5      EMEA has three seats at the table of five.
 6                    Q.   All right.  So and slide 59?
 7                    A.   Slide 59 is the similar analysis
 8      for the residual patents.  Here again you can see
 9      that the allocation to EMEA increases significantly
10      to 33.6 percent, for the same reason.
11                    Q.   And why is it so different?  In
12      this one, you have EMEA at 33, the US at 55 and the
13      last one we had them roughly equal.  Why the
14      difference?
15                    A.   It points to the fact that the
16      allocation is done on a technology and patent life
17      specific basis.  The royalty rates are specific.
18      The discount rates are specific.  All of it is
19      driven by the best factual record available.
20                    Q.   So can you just explain what slide
21      60 is and how it bears on this analysis?
22                    A.   Again, as we spoke of a moment
23      ago, slide 60 talks about the RPEs and in this case
24      makes specific reference to those who had
25      non-exclusive licence rights that could be shared,
```



 1   and there are the five entities, three of them are

 2   EMEA entities.

 3              Q.   So why did you include this

 4   alternative licence model in your testing section?

 5   You recall from that road map this fell under

 6   testing.  How is this relevant to testing?

 7              A.   Two respects.  One is it is

 8   testing against the US calculations, so part of my

 9   assignment was to review their work and point out

10   what I thought were errors or inconsistencies.

11                   And then second, it is a testing

12   against the contribution method to show that it is

13   in fact a conservative approach.

14                   I didn't come advocating for a number

15   for EMEA.  I came bringing my opinion of what was

16   the right analysis.

17              Q.   And on this slide, the licensing

18   number here, is that the -- how does the licensing

19   number here of 35 percent of EMEA, how does that

20   relate to these two slides here at 58 and 59?

21              A.   When you combine them together,

22   you get the weighted average of 35 percent.

23              Q.   Okay, and the bar in the middle

24   under "Inventorship High Interest Patents," have we

25   seen that before?



```
 1                        A.    Of course.

 2                        Q.    So at the risk of stating the

 3     obvious, which of the three methods you have set

 4     out here does the worst for EMEA?

 5                        A.    Well, from a bottom line

 6     perspective, the contribution approach is the most

 7     conservative.

 8                        Q.    Now, what is set out on this

 9     slide, 62?

10                        A.    It is my final slide, and so it is

11     simply aggregating the analysis that I prepared

12     with that of Mr. Huffard and comparing it to the US

13     and Canadian expert conclusions, which I believe

14     shows the position of EMEA's allocation under the

15     contribution method as being a mid position.

16                        Q.    So just to be clear, when you say

17     total assets on the right-hand side, are you

18     referring to just IP?

19                        A.    Yes, the business sale IP, plus

20     the residual patents, this analysis is taken

21     forward to Mr. Huffard's work.

22                        Q.    Mr. Malackowski, thank you very

23     much, those are my questions.

24                        A.    Thank you.

25                        THE CANADIAN COURT:  Is there any
```



1   cross-examination?

2   CROSS-EXAMINATION BY MR. CHANG:

3            Q.   Justice Newbould, Judge Gross, Mr.

4   Malackowski, my name is Eugene Chang, I am from

5   Willkie Farr & Gallagher, and I represent the UK

6   Pension Claimants.

7            A.   Yes, we met at my deposition.

8            Q.   Yes, thank you, and thank you for

9   remembering me.  I would like to draw some

10  similarities and contrasts between your primary

11  theory, which is the contribution theory, and our

12  pro rata theory and how they apply to the realities

13  of Nortel.

14            Now, I think you said during your

15  direct that you were aware that Nortel was a

16  globally operated business?

17            A.   Yes, sir.

18            Q.   It had research labs around the

19  world that collaborated together?

20            A.   Yes, sir.

21            Q.   And those research labs around the

22  world, they also -- they collaborated on the

23  technology that led to the residual patent

24  portfolio; right?

25            A.   Their collaboration in research



1    led to the residual portfolio as well as the

2    business sale portfolio.

3                 Q.    As well as the business sales,

4    thank you.  And so there were researchers in, for

5    example, the UK labs that would work with others in

6    Canada and the US on those technologies; is that

7    right?

8                 A.    Of course.

9                 Q.    And the technology development at

10   Nortel also crossed business lines, so technology

11   that was developed in one business line would also

12   be used in other business lines, right?

13                A.    That is true as well.

14                Q.    So this was -- Nortel, you would

15   agree, was operated as one globally integrated

16   company for purposes of R&D and for purposes of

17   creating the assets that were sold in this

18   bankruptcy, right?

19                A.    Generally, I believe that is fair.

20   There was a head -- Chief Technology Officer that

21   coordinated the activities of Nortel on a global

22   basis.

23                Q.    Now, in your direct I believe you

24   also said that ideally, on a contribution analysis,

25   you would want to do a detailed analysis of the



1   contributions of each RPE's labs, look at lab

2   notebooks, documents, to find exactly who

3   contributed to what, right?

4                A.   Yes, sir.

5                Q.   But because of the way Nortel was

6   operated, here it just wasn't possible to

7   disentangle all of that research that led to the

8   assets that were being sold, right?

9                A.   It depends on the level of

10  disentangled.  Clearly at the lab book level, it

11  was not.  But in my opinion, use of the R&D capital

12  stock unadjusted gives you a business proxy that is

13  a reasonable measure.

14               Q.   That is a proxy, that is not

15  actually figuring out what the actual contribution

16  was from each lab, right?

17               A.   Well, it is an approximation.  It

18  is obviously tested by the inventor analysis, but

19  it is not, as I admit on direct, an inventor

20  notebook specific approach.

21               Q.   And you use that proxy because

22  here, because of how Nortel was operated, you can't

23  disentangle all of the contributions of the various

24  labs?

25               A.   It was the best available



 1   information, yes, sir.

 2              Q.   Now, part of the assumption that

 3   you make there in using R&D spend is that the R&D

 4   output per dollars is the same all the way across

 5   the organization, right?

 6              A.   Well, we know that is not true.

 7   If you look at the charts I showed you, I talked

 8   about the fact that at later years the output

 9   dropped in terms of patent output, and you can see

10   the mix change between the various entities.  So

11   there was some consideration of that issue.

12              Q.   Let me ask the question slightly

13   differently, because I think there was a

14   miscommunication.  Your analysis starts from the

15   premise that you can correlate R&D spend with the

16   amount of actual invention and contribution to the

17   patent portfolio, right?

18              A.   A premise which I test, yes, sir.

19   Yes.

20              Q.   And it assumes then also that you

21   would get the same productivity out of the dollars

22   spent in a UK lab as you would in a US lab, right?

23              A.   Well, it makes that assumption

24   after having tested that theory by looking at the

25   inventor approach and the general trend of R&D by



    1   entity.

    2              Q.   Okay.  But that is an assumption

    3   that you rely on?

    4              A.   It is a conclusion that I have

    5   reached as a reasonable measure.

    6              Q.   Okay.  Now, let's take a look at

    7   table 25 of your report.  It is on page 53.  And

    8   this is the table titled "Summary Of Contribution

    9   Allocation Approach of the Residual Patent Sale

   10   Proceeds."

   11              A.   I'm sorry, are you in the original

   12   report or the rebuttal?

   13              Q.   Sorry, the original report.  This

   14   is Exhibit 33, I believe.

   15              A.   Yes, sir.

   16              Q.   Now, this is a more detailed

   17   breakdown of the numbers that we saw in your slide

   18   presentation, right?

   19              A.   Yes, sir.

   20              Q.   And here the first set of columns

   21   that are titled "R&D Allocation 1991-2006," that is

   22   the time period that you think is the most

   23   appropriate to look at; right?

   24              A.   For the residual portfolio because

   25   of the priority dates, yes, sir.



1          Q.   Yes, okay.  And here if we look at

2    the percentage that you would allocate to NNUK,

3    here you find that it is 8.73 percent, right?

4          A.   Yes, sir.

5          Q.   And in your report, you also look

6    at various other time periods and you get other

7    numbers associated with them, right?

8          A.   Yes, sir.

9          Q.   And if we look, for example, at

10   the last column, the R&D allocation from 2001 to

11   2008, for NNUK the percentage drops all the way to

12   5.5 percent, right?

13         A.   Correct.

14         Q.   Okay.  Now, you said you reviewed

15   the trial testimony from people who have come

16   before, right?

17         A.   Up through yesterday.

18         Q.   Okay.  Actually, let me start from

19   your own analysis.  In your -- in opening -- in

20   your direct you had a slide 36 in which you

21   depicted the numbers from your inventorship

22   analysis, right?

23         A.   Yes, sir.

24         Q.   Now, as part of that inventorship

25   analysis, you also were able to identify the



1    contribution through this analysis of NNUK, right?

2              A.    You and I spoke about that at my

3    deposition.

4              Q.    And I believe at your deposition

5    you said that you recalled it being about 12

6    percent under your analysis?

7              A.    11.9 to 12.2.

8              Q.    Okay, thank you.  Your memory is

9    astonishing.  And as we discussed at your

10   deposition, that is higher than any of the numbers

11   that we just saw in your table that are based on

12   the R&D allocation, right?

13             A.    As we discussed.

14             Q.    Okay.  Now, you have also looked

15   at Dr. Bazelon's inventorship analysis, right?

16             A.    Yes, sir.

17             Q.    So if we pull up from Bazelon

18   report, the rebuttal, page 49, he has some tables

19   that also show his inventorship analysis?

20             A.    With very similar conclusions,

21   that is true.

22             Q.    And do you recall that his

23   conclusions were that for the entire residual

24   patent portfolio, the contribution from UK

25   inventors was 15 percent?



```
 1                    A.   It was 14 to 15.  I don't remember
 2      the exact amount.
 3                    Q.   Okay.  So if we look at table 3,
 4      on page 49 of his rebuttal report.
 5                    A.   There you go, 14 to 15.
 6                    Q.   We have 15 percent?
 7                    A.   Yeah.
 8                    Q.   And if we look at table -- let's
 9      see.  If we look at table 2, we then have the high
10      value patents on the page before, that is page 48
11      of his report, the same rebuttal report.  On the
12      bottom, table 2, the revised table, that's right,
13      thank you.
14                    Here if you look across for the UK,
15      total granted high value patents is 14 percent
16      under Mr. Bazelon's -- Dr. Bazelon's analysis,
17      right?
18                    A.   Yes, sir.
19                    Q.   Those numbers are again higher
20      than the R&D percentage, the R&D spend that
21      occurred during this time, right?
22                    A.   Limited to the UK for residual
23      patents, correct.
24                    Q.   And here, this is the -- these are
25      the same high value patents that you analyzed,
```



```
 1   aren't they?

 2              A.   Yes, sir.

 3              Q.   And are you -- you reviewed the

 4   trial testimony that has gone to date, right?

 5              A.   Not including yesterday.

 6              Q.   Not including yesterday.  Do you

 7   recall that Ms. Angela De Wilton also performed an

 8   analysis of the patents that were filed by

 9   inventors in the Nortel patent portfolio?  It

10   wasn't specific to the residual patent portfolio,

11   but in the Nortel patent portfolio for a certain

12   time period?

13              A.   Yes, sir.

14              Q.   And do you recall that her

15   testimony at trial was that her best estimate was

16   about 15 to 20 percent were filed from the UK?

17              A.   I do recall something similar to

18   that, yes.

19              Q.   Okay, and did you also review

20   Simon Brueckheimer's testimony?

21              A.   I did.

22              Q.   And his testimony was that it was

23   about one in every five patents that he believed

24   came out of the UK, do you recall that?

25              A.   I don't specifically recall that,
```



1    but I can accept that, sure.

2              Q.   Okay, so the range of

3    contribution, actual contribution from the UK, it

4    appears to be in the trial record anywhere from 12

5    percent by you all the way up to 20 percent by some

6    other fact witnesses, right?

7              A.   Based upon the patent inventorship

8    analysis, yes.

9              Q.   And your R&D spend analysis has

10   the range being from 5.5 percent to 8.7 percent for

11   the UK, right?

12             A.   Approximately, yes.

13             Q.   So it does appear that the UK was

14   punching fairly above its weight, doesn't it?

15             A.   Even within my own analysis, I

16   would agree that the UK output on an inventorship

17   analysis is greater than the R&D cost allocation.

18             Q.   Okay.  Now, you are aware, are you

19   not, that NNUK had no direct control over its R&D

20   budget?

21             A.   Well, we talked about that a

22   moment ago, that it was a global enterprise that

23   was directed by the CTO.

24             Q.   So NNUK had no direct control over

25   the R&D percentage that you would apply to allocate



1    funds to NNUK, right?

2              A.   So direct control is a term that I

3    am not certain is well defined.  But I do recognize

4    it was a global entity, that it was based upon CTO

5    strategy, and the UK was responsive to that

6    strategy.

7              Q.   And so you would also agree with

8    me that at least for NNUK, the R&D spend does not

9    seem to correlate with the exact R&D allocation --

10   sorry, the R&D contribution that was coming from

11   the UK?

12             A.   Well, no, I think it is much more

13   complicated than that, when you want to go to the

14   bottom line conclusion.  I do agree that the UK had

15   a higher number of high interest patents on a

16   percentage basis than the economic R&D allocation

17   would suggest.  But because it was an integrated

18   entity, they were also working on patents that were

19   filed in the US, as were all the other entities

20   working on patents in all the other jurisdictions,

21   which is why I believe that the R&D approach is the

22   correct approach in spite of the variances that we

23   are discussing.

24             Q.   Your inventorship analysis and

25   Dr. Bazelon's inventorship analysis and all of



1   these numbers, they look at the named -- where the

2   named inventors were no matter where the patent was

3   filed, right?

4               A.   Correct.

5               Q.   And so that analysis --

6               A.   Where they lived.

7               Q.   So that analysis applies to the

8   entire residual patent portfolio no matter where

9   the patent was filed, right?

10              A.   Absolutely right.

11              Q.   Okay.  Those are my questions.

12  Thank you.

13              A.   Thank you.

14              THE CANADIAN COURT:  Mr. Zarnett?

15  CROSS-EXAMINATION BY MR. ZARNETT:

16              Q.   Good afternoon, Judge Gross,

17  Justice Newbould.  Ben Zarnett for the Canadian

18  Monitor and Canadian Debtors.

19              Mr. Malackowski, we met at your

20  deposition, but you may not recall because I was

21  dressed differently.

22              A.   I recall.

23              Q.   Sir, as you have described in your

24  evidence today, you were asked to consider two

25  approaches to allocation, contribution and licence;

 Neeson&Associates   W&F

```
 1   correct?
 2               A.   I was asked to consider those.  I
 3   considered all the approaches that I think are
 4   advanced, ultimately concluding on the contribution
 5   approach.
 6               Q.   And exactly, of the two that you
 7   were asked to consider, the contribution approach
 8   you believe is the most appropriate approach; is
 9   that right?
10               A.   Yes, sir.
11               Q.   And the licence-based approach,
12   even as you have done it, is not your preferred
13   method of allocation; is that correct?
14               A.   Correct.  It is presented as an
15   alternative.
16               Q.   Thank you.  Now, to precisely
17   understand what the contribution approach is, could
18   I ask you to take a look at page 39 of your initial
19   report.  If we could pull that up on the screen.
20               A.   I have it in front of me, if you
21   want to just ask the question.
22               Q.   All right, well, let's -- maybe it
23   will come up as we are speaking, but if everyone
24   has it, I'm looking, Mr. Malackowski, at the first
25   paragraph under the heading "Appropriate Method For
```



```
 1     Measuring Contribution"?
 2                A.    Yes, sir.
 3                Q.    And the first sentence reads:
 4                      "The Joint Administrators take the
 5                      position that the RPEs are entitled to
 6                      share in the proceeds from the sale of
 7                      Nortel IP according to the relative
 8                      contribution each of them made to the
 9                      creation of that IP."
10                A.    That is correct.
11                Q.    So if we leave out the part that
12     says "the Joint Administrators take the position,"
13     is sharing in the proceeds from the sales of Nortel
14     IP according to the relative contribution each of
15     them made to the creation of that IP, is that the
16     contribution method?
17                A.    Generally speaking, yes, sir.
18                Q.    Sure.  And when in this sentence
19     it describes that the Joint Administrators or EMEA
20     take the position that the RPEs are entitled to
21     share, that part of the proposition, that the RPEs
22     are entitled to share, your assignment, sir, was to
23     calculate the shares; correct?
24                A.    My assignment was to calculate the
25     shares.  The --
```



1                    Q.    To measure the effect of the
2      position we see here?
3                    A.    Well, that is certainly part of my
4      assignment, yes, sir.
5                    Q.    Sure, and your role was not to
6      express an opinion on whether the view of
7      entitlement was a correct one; is that right?
8                    A.    Well, my role was not to make the
9      decision which I understand to be for the Courts,
10     but in my report I express the opinion that from an
11     economic business licensing perspective, I find the
12     contribution approach to be most appropriate.
13                   Q.    Sure.  But your focus is on how to
14     measure the relative contributions; is that right?
15     You have expertise in that?
16                   A.    I believe I do.  That is certainly
17     a significant portion of my work, but as we showed
18     in my direct testimony, part of my conclusion and
19     work was to show how the contribution method is
20     consistent with Nortel's actual experience across a
21     variety of transactional structures.
22                   Q.    Sure, and all right, so we'll come
23     to that.  Now, sir, there are certain challenges in
24     meeting the test of measuring relative
25     contribution; fair?



```
 1                  A.    I think that is generally fair.
 2    There are challenges with any of the accounting
 3    over a period like this.
 4                  Q.    Right, and one of the challenges
 5    is that the ideal way to do it, which would involve
 6    looking at the contribution of each RPE lab,
 7    interviewing R&D staff, reviewing all the
 8    documentation, that wasn't possible?
 9                  A.    I think I have made that clear in
10    my analysis, I agree with that.
11                  Q.    But that would have been the most
12    accurate process if it had been possible?
13                  A.    Even if it was possible, I don't
14    know how practical it would have been because we
15    are talking about a substantial period of time and
16    thousands of engineers.  But it was not possible.
17                  Q.    Sure, and I take it one reason
18    that it wasn't possible is that Nortel simply
19    didn't record things that way for the entire time
20    period you were looking at?
21                  A.    Well, I don't know if the record
22    is clear as to what they did or didn't do because
23    those records are not available.  But clearly as
24    part of the inventive process there would be lab
25    notebooks kept for every invention.
```



1              Q.   But from the stand -- Nortel did

2    keep records of its R&D spending by year; correct?

3              A.   And in more detail than that.

4              Q.   Sure, and you relied on those?

5              A.   Yes, sir.

6              Q.   But one thing it did not do for

7    its own purposes or for any other, I suppose, was

8    actually tie each dollar spent to the creation of a

9    particular identifiable piece of IP?

10             A.   Not in the records that remain,

11   correct.

12             Q.   And from the time period you did

13   see records, that just wasn't there, they just

14   didn't keep it, record it, publish it, or anything

15   like that?

16             A.   I agree.

17             Q.   All right.  So I take it as well

18   that when you reviewed the entire R&D spending by

19   Nortel, you noted that it exceeded the ultimate

20   value of the IP?

21             A.   Well, as I noted, I think you

22   referenced the 35 billion dollars as compared to

23   the 4.5 billion in residual and the approximately

24   800 million in the business sales.

25             Q.   So I take it that meant that for



1    certain there was R&D spending that didn't end up

2    representing value at the end of the day for

3    Nortel?

4              A.   Well, I suspect that that is true,

5    they were not perfect, but it is not a one to one

6    correlation in that there would be R&D spending

7    that generated negative learning or know-how or

8    other elements of IP that simply were not

9    categorized as a patent.

10             Q.   But at the end of the day if you

11   spend substantially more on R&D than you realize

12   either by a sale to a purchaser or by operating

13   yourself, there are R&D dollars spent not reflected

14   in ultimate value; correct?

15             A.   Broadly speaking, if it is not

16   covered in the sale or earnings, then you would not

17   capture it.

18             Q.   All right.  And it wouldn't be

19   possible to precisely determine which of the

20   dollars spent from what location and at what time

21   resulted in ultimate value and which ones, although

22   well intentioned, didn't end up in ultimate value;

23   correct?

24             A.   Precisely is not possible, though

25   you can test to see if there were changes or biases



1   over time that you needed to account for.  Some of

2   those we talked about in my testimony and I have

3   confirmed that I believe the average R&D records

4   are sufficient for that purpose.

5                    Q.   Now, sir, one of the

6   determinations you made about the residual patent

7   portfolio was in fact that most of the value in it

8   was represented by a -- by less than half of the

9   patents; correct?  I think it is 37 percent?

10                   A.   Yeah, I think that is generally

11  fair.

12                   Q.   Which I assume makes it even more

13  difficult to precisely find the dollars and the

14  source and the timing of the dollars identified to

15  those particular patents; is that right?

16                   A.   Well, actually, it would be just

17  the opposite.  The more you can narrow down the

18  value to a limited set of inventions, the easier it

19  should be to track the R&D.  That said, it still

20  was not practical from a business perspective in

21  this case.

22                   Q.   Do you agree, sir, between 1991

23  and the time of the sales that generated the

24  proceeds that we are concerned with, the market for

25  technology was continually changing?



```
 1                    A.   At a very broad level, sure.  It
 2    is changing every day and continues to change.
 3                    Q.   And in the period, in fact, 2009
 4    to 2011, when the sales took place, the market was
 5    characterized by rapidly changing technology and
 6    innovation; do you agree with that?
 7                    A.   I think that is fair within Telco,
 8    sure.
 9                    Q.   There was a constant demand for
10    newer and faster products and services?
11                    A.   That is true as well.  Now you are
12    starting to move away from core R&D to
13    product-based maintenance, but everybody always
14    wants better, faster, cheaper.
15                    Q.   And that demand requires people to
16    focus on R&D, if they are in that industry;
17    correct?
18                    A.   In part, it would cause them to
19    focus on other aspects of the business,
20    maintenance, products, acquisitions, these are very
21    general questions, so at a general level, sure.
22                    Q.   Sure, and staying at a general
23    level, when technology changes, I take it that
24    there is a risk that existing technology becomes
25    obsolete?
```

 Neeson & Associates   W&P

```
 1                   A.   At a general level, sure.
 2                   Q.   Sure.  And money that was spent on
 3      that now obsolete technology no longer has value
 4      and new money has to be spent; correct?
 5                   A.   Again, at a very general level, as
 6      technology changes, the value of older technology
 7      could diminish.
 8                   Q.   All right.  And were all of those
 9      things we have discussed among the reasons that you
10      had to look at a proxy to measure relative
11      contribution?
12                   A.   I don't believe the general trends
13      you mentioned were the motivation for the proxy.
14      The motivation for the proxy was the lack of the
15      specific R&D logs and then the ability to confirm
16      that R&D measure as an appropriate benchmark
17      through the testing that was done.
18                   Q.   All right.  But nonetheless, you
19      determined that the only way the relative
20      contribution could be measured was by a proxy;
21      correct?
22                   A.   Well, a proxy that was tested and
23      the same proxy that was used in normal course, yes.
24                   Q.   And in fact, Nortel itself had
25      looked for a proxy to find relative contribution
```



1    themselves; correct?

2              A.   Well, they used the same measure

3    that I used, which was R&D capital stock.

4              Q.   All right.  Now, when in your

5    evidence, and if we could turn up your slide 34 for

6    a moment, you identified some behaviours, not your

7    word, my word, at Nortel historically that you

8    indicated were supportive of the approach you took;

9    correct?

10             A.   I identified examples where a

11   contribution approach was followed, yes, sir.

12             Q.   Okay.  Now, Nortel followed a

13   contribution approach with a proxy, presumably

14   because it didn't have the accurate data that you

15   also didn't have; correct?

16             A.   Well, no.  I think that's

17   different.  I think that Nortel utilized R&D

18   capital stock because for its business judgment

19   that was a reasonable and certain way to allocate

20   or conduct these decisions.  If Nortel had wanted

21   or thought there was a need for greater precision,

22   they would have contemporaneously generated it if

23   it was cost-effective.

24             Q.   All right, they didn't, and the

25   way they did it was a reasonable business judgment?



```
 1                    A.   Right, which is why I take comfort
 2    in adopting the same approach.
 3                    Q.   So one of the transactions you
 4    point to on slide 34 is the Alcatel transaction,
 5    UMTS that we have heard a lot about in this case?
 6                    A.   Yes, sir.
 7                    Q.   I take it you have read a lot
 8    about in this case?
 9                    A.   Yes, sir.
10                    Q.   Okay.  Can you -- and I think the
11    evidence is clear that when a contribution approach
12    was used for part of those proceeds, the IP-related
13    proceeds, the look-back period was not the one that
14    you are suggesting in your evidence today; correct?
15                    A.   Of course, I said on my direct
16    explicitly that.
17                    Q.   Sure, yeah, no, I wasn't -- now,
18    do you know, sir, what the priority dates of the
19    patents were that were transferred in the Alcatel
20    transaction?
21                    A.   Well, I do, because I have seen
22    them.  I don't believe I have them with me from
23    memory, but yes, we have looked at the Alcatel
24    information.
25                    Q.   All right.  Were the priority
```



1    dates of those patents more than five years prior

2    to the Alcatel transaction?

3                   A.   That is my recollection.

4                   Q.   Sure.

5                   A.   But again, I don't have the dates

6    with me.

7                   Q.   And Nortel would have known the

8    priority dates when they decided to apply the

9    contribution method, as you call it, to a portion

10   of those proceeds?

11                  A.   They certainly would have known,

12   though that wouldn't necessarily dictate their

13   look-back period, which was driven by other

14   considerations, such as taxation, as I described in

15   my direct.

16                  Q.   Your view is that it was dictated

17   by taxation?

18                  A.   No, other considerations,

19   generally taxation being an illustration.

20                  Q.   I'm sorry, are you expressing the

21   view that Nortel took taxation into account?

22                  A.   No, sir.  I'm saying that the fact

23   that the priority date for the Alcatel transaction

24   exceeded 5 years, yet they used a shorter look-back

25   period than the priority date, doesn't lend one to



1    the conclusion that therefore you should look to

2    priority date.  It lends one to the conclusion that

3    there were other business reasons for the period

4    used.  I gave you an example.

5              Q.   But you don't know what those

6    business reasons were; you weren't with the parties

7    at the time, correct?

8              A.   I certainly was not with the

9    parties at the time, that is obvious.

10             Q.   So one thing we do know, sir, is

11   that they didn't use a look-back period of more

12   than what the MRDA RPSM method mandated; correct?

13             A.   Correct.

14             Q.   All right.  Now, your slide 34

15   also, along the top row, the far left, refers to

16   the RPSM method itself as supportive of your view;

17   correct?

18             A.   Yes, sir.

19             Q.   All right.  And I just want to

20   understand the ways in which it is the same.  I

21   take it it looks at exactly the same categories of

22   expense and calls them R&D expense as you do?

23             A.   Yes, as I described in my direct,

24   the ways I looked to it is for general methodology

25   and then for the specific data inputs, I try to



1   find the best available data for the purposes of my

2   calculation so the data varies.

3                Q.   Just staying with what the R&D

4   expense was, Nortel summed those up in the same

5   categories as you are; is that right?

6                A.   I believe that's correct, yes,

7   sir.

8                Q.   And it identified the same

9   spenders of R&D as you did?  It lumped them by RPE

10  participant; correct?

11               A.   I believe that is correct.

12               Q.   Sure.  And --

13               THE CANADIAN COURT:  Mr. Zarnett, we

14  are going to break at 5:00, so whenever it is a

15  convenient time for you.

16               BY MR. ZARNETT:

17               Q.   Sure, let me just if I can finish

18  this off, Mr. Malackowski.  The idea in the RPSM

19  was to come up with a cap -- an R&D capital stock;

20  is that right?

21               A.   Yes, sir.

22               Q.   All right, and the difference

23  between your methodology and the RPSM methodology

24  is about either an amortization rate, which

25  originally the RPSM was 30 percent, or a look-back

 Neeson & Associates    W&F

1   period that ultimately became a 5-year look-back;

2   correct?

3                A.   That is a difference, yes, sir.

4                Q.   Is there any other difference

5   between the RPSM method as Nortel used it,

6   calculated it, et cetera, and your methodology?

7                A.   Not as it relates to the method

8   point reflected on this chart.

9                Q.   All right.

10               Thank you, Your Honour, I think I'll

11  forego this one minute and use it wisely at 9:00

12  a.m.?

13               THE CANADIAN COURT:  If you like, we

14  can start at one minute to 9:00.

15               MR. ZARNETT:  Okay, you are on.  Thank

16  you.

17               THE US COURT:  Justice Newbould, we'll

18  start at 9:00 a.m.; is that correct?

19               THE CANADIAN COURT:  Yes.

20               I was suggesting he could start at one

21  minute to 9:00 if he wanted because he is giving up

22  a minute now, but we'll see.

23               THE US COURT:  That will be fine.

24               THE CANADIAN COURT:  Can I just give

25  this back?  It turns out I did have a copy of that,



1    so you can give that back to the EMEA folks.

2              THE CANADIAN REGISTRAR:  Yes, Your

3    Honour.

4              THE CANADIAN COURT:  So we'll break now

5    and come back at 9 o'clock tomorrow morning.

6              THE US COURT:  We'll stand in recess,

7    good evening, everyone.  --- Whereupon Court

8    adjourned on May 29th, 2014, at 5:00 p.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                  REPORTERS' CERTIFICATE
 2               I, DEANA SANTEDICOLA, RPR, CRR, CSR,
 3      and I, GAIL INGHRAM VERBANO, RDR, CRR, CSR, US
 4      Certified Shorthand Reporter, Realtime Systems
 5      Administrator, certify;
 6               That the foregoing proceedings were
 7      taken before us at the time and place therein set
 8      forth;
 9               That the entire proceedings of the
10      hearing date were recorded stenographically
11      individually by each of us and were thereafter
12      transcribed;
13               That the foregoing is a true and
14      correct transcript of our shorthand notes so taken.
15               Dated this 29th day of May, 2014.
16
17      PER:                    PER:
18      Gail Inghram Verbano     Deana Santedicola
19      GAIL INGHRAM VERBANO     DEANA SANTEDICOLA
20      WILCOX & FETZER          NEESON & ASSOCIATES
21      WILMINGTON, DE USA       TORONTO, ON
22
23
24
25
```

















































































