



```
 1              UNITED STATES BANKRUPTCY COURT

 2              FOR THE DISTRICT OF DELAWARE

 3    ----------------------------)

 4    In Re                       )

 5       NORTEL NETWORKS INC.,    ) Chapter 11

 6       et al,                   ) Case No.

 7            Debtors.            ) 09-10138(KG)

 8    ----------------------------)

 9                       - and -

10              Court File No. 09-CL-7950

11                    ONTARIO

12           SUPERIOR COURT OF JUSTICE

13             (COMMERCIAL LIST)

14      IN THE MATTER OF THE COMPANIES' CREDITORS

15    ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16     AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17      ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18    NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19      CORPORATION, NORTEL NETWORKS INTERNATIONAL

20      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                   CORPORATION

22      APPLICATION UNDER PART IV OF THE COMPANIES'

23    CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                   AS AMENDED

25                   --------
```



```
 1
 2                        --------
 3
 4  --- This is the Day 11/Volume 11 of the transcript
 5  of proceedings in the above matter held
 6  simultaneously in:
 7  Superior Court of        United States Bankruptcy
 8  Ontario (Commercial      Court for the District of
 9  List)                    Delaware
10  Courtroom 8-1            Courtroom 3
11  330 University Avenue     824 Market Street
12  Toronto, Ontario         Wilmington, Delaware
13
14  on the 30th day of May, 2014, commencing at 9:03
15  a.m.
16
17                        --------
18  B E F O R E:
19  The Honourable Judge Kevin Gross (United States)
20  The Honourable Mr. Justice Frank Newbould (Canada)
21
22                        ----------
23
24
25
```



```
 1                    CANADIAN DEBTORS

 2

 3   FOR THE MONITOR, ERNST & YOUNG INC.

 4   GOODMANS LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 3400

 7   Toronto, ON  M5H 2S7

 8   PER:       Jay Carfagnini, Esq.

 9              Joseph Pasquariello, Esq.

10              Ben Zarnett, Esq.

11              Alan Mark, Esq.

12              Peter Ruby, Esq.

13              Jessica Kimmel, Esq.

14              Chris Armstrong, Esq.

15              Julie Rosenthal, Esq.

16

17   ERNST & YOUNG INC.

18   Ernst & Young Tower

19   222 Bay Street, P.O. Box 251

20   Toronto, ON  M5K 1J7

21   PER:       Murray McDonald, Esq.

22              Brent Beekenkamp, Esq.

23

24   FOR THE APPLICANTS

25   GOWLING LAFLEUR HENDERSON LLP
```

 

```
 1   Suite 1600, First Canadian Place

 2   100 King Street West

 3   Toronto, ON  M5X 1G5

 4   PER:       Derrick Tay, Esq.

 5              Jennifer Stam, Esq.

 6

 7   FOR THE CANADIAN DEBTORS

 8   ALLEN & OVERY LLP

 9   1221 Avenue of the Americas

10   New York, NY  10020

11   PER:       Jacob Pultman, Esq.

12              Ken Coleman, Esq.

13              Paul Keller, Esq.

14              Daniel Guyder, Esq.

15              Laura Hall, Esq.

16              Joseph Badtke-Berkow, Esq.

17              Jonathan Cho, Esq.

18              Nicolette Ward, Esq.

19

20   FOR THE CANADIAN DEBTORS

21   BUCHANAN INGERSOLL & ROONEY

22   1105 North Market Street

23   Suite 1900

24   Wilmington, DE  19801-1054

25   PER:       Kathleen A. Murphy, Esq.
```



```
 1                    Mary F. Caloway, Esq.

 2

 3                       U.S. DEBTORS

 4

 5   FOR NORTEL NETWORKS INC.

 6   TORYS LLP

 7   79 Wellington Street West, Suite 3000

 8   Box 270, TD Centre

 9   Toronto, ON  M5K 1N2

10   PER:       Sheila Block, Esq.

11              Andrew Gray, Esq.

12

13   FOR THE U.S. DEBTORS

14   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

15   1201 North Market Street, 16th Floor

16   P.O. Box 1347

17   Wilmington, DE  19899-1347

18   PER:       Derek Abbott, Esq.

19              Annie Cordo, Esq.

20

21   FOR NORTEL NETWORKS INC.

22   CLEARY GOTTLIEB STEEN & HAMILTON LLP

23   One Liberty Plaza

24   New York, NY  10006

25   PER:       James Bromley, Esq.
```

 

```
 1              Lisa Schweitzer, Esq.

 2              Howard Zelbo, Esq.

 3              Jeffrey Rosenthal, Esq.

 4              Avi Luft, Esq.

 5

 6                   EMEA DEBTORS

 7

 8  FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 9  LIMITED

10  DAVIES WARD PHILLIPS & VINEBERG LLP

11  40th Floor

12  155 Wellington Street

13  Toronto, ON  M5V 3G7

14  PER:     Matthew Milne-Smith, Esq.

15              Robin B. Schwill, Esq.

16              Sean Campbell, Esq.

17              James Doris, Esq.

18              Louis Sarabia, Esq.

19

20  FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

21  LIMITED

22  LAX O'SULLIVAN SCOTT LISUS LLP

23  Suite 2750, 145 King Street West

24  Toronto, ON  M5H 1J8

25  PER:     Matthew P. Gottlieb, Esq.
```



```
 1              Tracy Wynne, Esq.

 2              Paul Michell, Esq.

 3   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 4   LIMITED

 5   HUGHES HUBBARD & REED

 6   One Battery Park Plaza

 7   New York, NY  10004-1482

 8   PER:       Derek Adler, Esq.

 9              Neil Oxford, Esq.

10              Fara Tabatabai, Esq.

11              Charles Huberty, Esq.

12

13   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

14   LIMITED

15   YOUNG CONAWAY STARGATT & TAYLOR LLP

16   Rodney Square

17   1000 North King Street

18   Wilmington, DE  19801

19   PER:       Ed Harron, Esq.

20              John Dorsey, Esq.

21

22   FOR THE EMEA DEBTORS

23   HERBERT SMITH FREEHILLS LLP

24   Exchange House

25   Primrose Street
```



```
 1   London, England  EC2A 2EG

 2   PER:       James Norris-Jones, Esq.

 3              CANADIAN CREDITORS COMMITTEE

 4

 5   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

 6   BENEFICIARIES

 7   KOSKIE MINSKY

 8   20 Queen Street West

 9   Suite 900

10   Toronto, ON  M5H 3R3

11   PER:       Mark Zigler, Esq.

12              Susan Philpott, Esq.

13              Ari Kaplan, Esq.

14              Barbara Walancik, Esq.

15

16   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

17   REPRESENTED BY THE CAW-CANADA

18   CAW-CANADA

19   Legal Department

20   205 Placer Court

21   Toronto, ON  M2H 3H9

22   PER:       Barry E. Wadsworth, Esq.

23              Lewis Gottheil, Esq.

24

25   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
```



```
1   COMMITTEE

2   SHIBLEY RIGHTON LLP

3   250 University Avenue, Suite 700

4   Toronto, ON  M5H 3E5

5   PER:        Arthur O. Jacques, Esq.

6               Thomas McRae, Esq.

7

8   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

9   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

10  FUND

11  PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

12  35th Floor

13  155 Wellington Street West

14  Toronto, ON  M5V 3H1

15  PER:        Kenneth T. Rosenberg, Esq.

16              Massimo (Max) Starnino, Esq.

17              Lily Harmer, Esq.

18              Karen Jones, Esq.

19              Tina Lie, Esq.

20              Michelle Jackson, Esq.

21

22  FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

23  CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

24  2009

25  NELLIGAN O'BRIEN PAYNE LLP
```



```
 1   50 O'Connor Street, Suite 1500

 2   Ottawa, ON  K1P 6L2

 3   PER:        Janice B. Payne, Esq.

 4               Steven Levitt, Esq.

 5               Christopher Rootham, Esq.

 6               Ainslie Benedict, Esq.

 7

 8   FOR MORNEAU SHEPELL LIMITED

 9   MCCARTHY TETRAULT LLP

10   Suite 5300, Toronto Dominion Bank Tower

11   Toronto, ON  M5K 1E6

12   PER:        Barbara J. Boake, Esq.

13               James D. Gage, Esq.

14               Elder C. Marques, Esq.

15               Paul Steep, Esq.

16               Byron Shaw, Esq.

17               Sharon Kour, Esq.

18               Kelly Peters, Esq.

19

20   FOR THE CANADIAN CREDITORS COMMITTEE

21   DLA PIPER

22   919 North Market Street, Suite 1500

23   Wilmington, DE  19801

24   PER:        Selinda A. Melnik, Esq.

25               Richard Hans, Esq.
```



```
 1                Timothy Hoeffner, Esq.
 2                Farah Lisa Whitley-Sebti, Esq.
 3            INFORMAL NORTEL NOTEHOLDER GROUP
 4
 5   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
 6   BENNETT JONES LLP
 7   1 First Canadian Place
 8   Suite 3400
 9   Toronto, ON  M5X 1A4
10   PER:       Kevin Zych, Esq.
11              S. Richard Orzy, Esq.
12              Gavin Finlayson, Esq.
13              Richard Swan, Esq.
14              Sean Zweig, Esq.
15              Jonathan Bell, Esq.
16              Amanda McLachlan, Esq.
17
18   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP
19   MILBANK, TWEED, HADLEY, MCCLOY LLP
20   1 Chase Manhattan Plaza
21   New York, NY  10005
22   PER:       Thomas R. Kreller, Esq.
23              Jennifer P. Harris, Esq.
24              Albert A. Pisa, Esq.
25              Samir Vora, Esq.
```



```
 1                   Andrew LeBlanc, Esq.

 2                   Michael Hirschfeld, Esq.

 3                   Atara Miller, Esq.

 4                   Tom Matz, Esq.

 5                   Nick Bassett, Esq.

 6                   Gabrielle Ruha, Esq.

 7                   Rachel Pojunas, Esq.

 8

 9      THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10

11   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12   CASSELS BROCK & BLACKWELL LLP

13   Suite 2100, Scotia Plaza

14   40 King Street West

15   Toronto, ON  M5H 3C2

16   PER:      Shayne Kukulowicz, Esq.

17                   Michael Wunder, Esq.

18                   Ryan Jacobs, Esq.

19

20   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

21   ASHURST LLP

22   Boardwalk House

23   5 Appold Street

24   London, England  EC2A 2HA

25   PER:      Angela Pearson, Esq.
```



```
 1                   Antonia Croke, Esq.

 2

 3    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 4    RICHARDS LAYTON & FINGER, P.A.

 5    920 North King Street

 6    Wilmington, DE  19801

 7    PER:       Christopher Samis, Esq.

 8

 9    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10    AKIN GUMP STRAUSS HAUER & FELD LLP

11    One Bryant Park

12    New York, NY  10036

13    PER:       Fred S. Hodara, Esq.

14               David H. Botter, Esq.

15               Abid Qureshi, Esq.

16               Robert A. Johnson, Esq.

17               Brad M. Kahn, Esq.

18               Christine Doniak, Esq.

19               Joseph Sorkin, Esq.

20               Jacqueline Yecies, Esq.

21

22       UK PENSION PROTECTION FUND AND NORTEL NETWORKS

23                 UK PENSION TRUST LIMITED

24

25    FOR THE UK PENSION PROTECTION FUND AND NORTEL
```



```
 1   NETWORKS UK PENSION TRUST LIMITED

 2   THORNTON GROUT FINNIGAN LLP

 3   Suite 3200, 100 Wellington Street West

 4   P.O. Box 329

 5   Toronto, ON  M5K 1K7

 6   PER:      Michael Barrack, Esq.

 7             D.J. Miller, Esq.

 8             Rebecca Lewis, Esq.

 9             Andrea McEwan, Esq.

10             John Finnigan, Esq.

11             Michael Shakra, Esq.

12

13   FOR THE UK PENSION PROTECTION FUND AND NORTEL

14   NETWORKS UK PENSION TRUST LIMITED

15   WILLKIE FARR & GALLAGHER LLP

16   787 Seventh Avenue

17   New York, NY  10019-6099

18   PER:      Brian O'Connor, Esq.

19             Sameer Advani, Esq.

20             Andrew Hanrahan, Esq.

21

22   FOR THE UK PENSION PROTECTION FUND AND NORTEL

23   NETWORKS UK PENSION TRUST LIMITED

24   BAYARD, P.A.

25   222 Delaware Avenue, Suite 900
```



```
 1   Wilmington, DE  19899

 2

 3   PER:        Charlene D. Davis, Esq.

 4               Justin Alberto, Esq.

 5

 6               THE BANK OF NEW YORK MELLON

 7

 8   FOR THE BANK OF NEW YORK MELLON

 9   MCMILLAN LLP

10   Brookfield Place

11   181 Bay Street, Suite 4400

12   Toronto, ON  M5J 2T3

13   PER:        Sheryl E. Seigel, Esq.

14

15   FOR THE BANK OF NEW YORK MELLON

16   LATHAM & WATKINS LLP

17   885 Third Avenue

18   New York, NY  10022-4834

19   PER:        Michael J. Riela, Esq.

20

21          WILMINGTON TRUST, NATIONAL ASSOCIATION

22

23   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

24   HEENAN BLAIKIE LLP

25   Bay Adelaide Centre
```



```
 1   333 Bay Street, Suite 2900
 2   P.O. Box 2900
 3   Toronto, ON  M5H 2T4
 4   PER:       John Salmas, Esq.
 5              Kenneth Kraft, Esq.
 6              Sara-Ann Van Allen, Esq.
 7
 8   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
 9   KATTEN MUCHIN ROSENMAN LLP
10   575 Madison Avenue
11   New York, NY  10022-2585
12   PER:       Craig A. Barbarosh, Esq.
13              David A. Crichlow, Esq.
14              Karen B. Dine, Esq.
15
16        LAW DEBENTURE TRUST COMPANY OF NEW YORK
17
18   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
19   BORDEN LADNER GERVAIS LLP
20   40 King Street West
21   Toronto, ON  M5H 3Y4
22   PER:       Edmond F.B. Lamek, Esq.
23              James Szumski, Esq.
24
25   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
```



```
 1   PATTERSON BELKNAP WEBB & TYLER LLP

 2   1133 Avenue of the Americas

 3   New York, NY  10036

 4   PER:        Daniel A. Lowenthal, Esq.

 5

 6        BOARDS OF DIRECTORS OF NORTEL NETWORKS

 7        CORPORATION AND NORTEL NETWORKS LIMITED

 8

 9   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

10   CORPORATION AND NORTEL NETWORKS LIMITED

11   OSLER HOSKIN AND HARCOURT LLP

12   100 King Street West

13   1 First Canadian Place, Suite 6100

14   P.O. Box 50

15   Toronto, ON  M5X 1B8

16   PER:       Lyndon Barnes, Esq.

17              Edward Sellers, Esq.

18              Betsy Putnam, Esq.

19              Adam Hirsh, Esq.

20              Alexander Cobb, Esq.

21                      --------

22

23

24

25        REPORTED BY:  Toronto - Deana Santedicola
```



```
 1                          RPR, CRR, CSR

 2                    Delaware - Gail Verbano

 3                       RMR, CRR, CSR

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 Neeson&Associates    W&F

```
 1                    I N D E X

 2

 3                                             PAGE

 4   Housekeeping matters.....................  2394

 5

 6   Submissions re demonstrative exhibits

 7   for testimony of Dr. Bazelon.............  2401

 8   Ruling...................................  2547

 9

10   JAMES E. MALACKOWSKI

11   Cross-Examination by Mr. Zarnett

12   (Cont'd).................................  2431

13   Cross-Examination by Mr. Steep...........  2482

14   Cross-Examination by Ms. Schweitzer......  2517

15   Further Cross-Examination by Mr. Chang...  2612

16   Re-Examination/Redirect Examination by

17   Mr. Milne-Smith..........................  2614

18

19   DR. RICHARD L.V. COOPER

20   Examination In-Chief/Direct Examination

21   by Mr. Adler.............................  2623

22

23

24

25
```



1                    INDEX OF EXHIBITS

2

3    NUMBER/DESCRIPTION                        PAGE NO.

4    35    Expert report of Richard Cooper,

5          dated January 24, 2014            2624

6

7    36    Rebuttal report of Dr. Cooper,

8          dated February 28, 2014           2624

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   -- Upon commencing at 9:03 a.m.

 2

 3              THE CANADIAN REGISTRAR:  Mr.

 4   Malackowski, you are reminded that you are still

 5   under oath, sir.

 6              THE CANADIAN COURT:  Good morning.

 7              THE US COURT:  Good morning, Justice

 8   Newbould.

 9              THE CANADIAN COURT:  Before counsel get

10   going here, there has been an issue raised by the

11   Court staff, and I have noticed it too, materials

12   being filed with the Court and on the front of it,

13   it says "highly confidential", or a whole bunch of

14   language saying that and they have been opening it

15   and there is a lot of redacted stuff.

16              And so they haven't put it on the

17   record yet, that is, they haven't allowed it to be

18   seen by people who want to see it.

19              I am assuming that anything that has

20   been filed with the Court from the commencement of

21   trial is public and not to be kept from the public.

22   And I am assuming that all the stuff on the front

23   of these reports and other things that say it is

24   highly confidential is incorrect.

25              And if I'm right, then I think what has
```



1    to happen is that the parties who have been filing

2    have to come back and put some kind of a sticker on

3    top of that "highly confidential" language, and if

4    it says "redacted", that is fine.

5              Now, is my understanding wrong?

6              MS. SCHWEITZER:  Your Honour, Lisa

7    Schweitzer.  Without knowing the exact document you

8    are looking at, I think that there would be two

9    places where there would be obvious mention of

10   "highly confidential".

11             The first is the expert reports and

12   deposition transcripts under the protective order

13   all got marked as highly confidential on the idea

14   that redactions --

15             THE CANADIAN COURT:  Just a minute.  We

16   are in a trial now.  That protective order doesn't

17   cover trial.  We had that discussion more than

18   once.

19             MS. SCHWEITZER:  Exactly, and so that

20   when they were prepared, the designation was put on

21   top of them just so that at that point the

22   materials would be identified as something that was

23   subject to a protective order.

24             You are absolutely right, Your Honour,

25   which is that that protective order is now



```
1    surpassed for things that --
2              THE CANADIAN COURT:  If counsel has an
3    issue with the stuff that is being filed --
4              MS. SCHWEITZER:  So what we have done
5    in the filings, I believe, generally, is that the
6    redactions -- anything is public unless it has a
7    redaction and the redaction would be clear on its
8    face.
9              If it would be more clear to the Court
10   staff going forward, I'm sure people can in
11   addition redact that "highly confidential" label.
12   But it wasn't added for the filing.  My
13   understanding is it would be in most of the
14   materials --
15             THE CANADIAN COURT:  Well, I'm assuming
16   it was there before and people just haven't taken
17   the time to remove it.
18             MS. SCHWEITZER:  Yeah, I think it is
19   probably just a practice point that in sometimes
20   filings --
21             THE CANADIAN COURT:  All right, so I
22   think what should happen, because the Court staff
23   has been concerned and doesn't want to leave things
24   to the public that shouldn't be, so that what I am
25   assuming is that everything that has been filed
```



```
1    since the trial started, the Court office is

2    available to the public, and I think that the

3    parties who have filed it should quickly bring in

4    tape or something, and it can say "redacted", but

5    cover up that confidential stuff so nobody is

6    mistaken.

7              Is that satisfactory?

8              MS. SCHWEITZER:  That is fine.  Or Your

9    Honour, another alternative sometimes in the US is

10   sometimes people will put "redacted version".

11             THE CANADIAN COURT:  That is fine, but

12   cover up all the confidential language on the

13   start, and I think, having talked to Judge Gross,

14   that there is the same issue down in the US.

15             MS. SCHWEITZER:  That is fine, Your

16   Honour.

17             THE CANADIAN COURT:  Am I right, Judge

18   Gross?

19             THE US COURT:  Yes.

20             THE CANADIAN COURT:  Okay.

21             THE US COURT:  We are in agreement.

22             And before we begin, I would like to

23   thank our court reporters yesterday, Ms. Marino and

24   Ms. Verbano, because they had some technical

25   difficulties and they were very persistent and I
```



1    think we are cleared up today.

2                    THE CANADIAN COURT:   Thank you.

3                    Ms. Miller.

4                    MS. MILLER:   Your Honour, Judge Gross,

5    good morning, there are, I understand, three

6    housekeeping matters if we could address prior to

7    this witness continuing.

8                    The first I'll be dealing with; the

9    second Mr. Barrack and Mr. Qureshi will be

10   addressing; and the third Ms. Stam will be

11   addressing.

12                   The first relates to the negotiated

13   form of stipulation that was presented to the

14   Courts on the Clark Westbrook report, and we

15   understand that the two judges wanted to discuss

16   that at a break and we just wanted to confirm if

17   the Courts were content to proceed on the basis of

18   the stipulation as presented or if there were any

19   further directions or input required.

20                   THE CANADIAN COURT:  Speaking for

21   myself, I am quite prepared to proceed that way.

22                   THE US COURT:  And likewise, yes, I

23   have had an opportunity to read it and I am content

24   with it.

25                   MS. MILLER:  Thank you, Your Honour.

 

```
 1                    I'm going to turn it over then to
 2      Mr. Qureshi and Mr. Barrack for the second
 3      housekeeping matter.
 4                    I stand corrected, Ms. Stam will deal
 5      with the third housekeeping matter before the
 6      second.
 7                    THE CANADIAN COURT:  Ms. Stam.
 8                    MS. STAM:  Good morning, Justice
 9      Newbould, good morning, Judge Gross.
10                    I am here to address the
11      confidentiality issues and the matter relating to
12      the CRA that we spoke about at the teleconference
13      last Friday.
14                    THE CANADIAN COURT:  Right.
15                    MS. STAM:  I believe that yesterday,
16      Judge Gross, you were provided with a proposed
17      order and, Justice Newbould, I know you were also
18      provided with a proposed order that we have reached
19      agreement on with the CRA, which is largely and
20      aligned with what we discussed at the
21      teleconference last Friday and involves the sealing
22      of four documents or multiple copies of what is
23      essentially four documents.
24                    I do have them here in a sealed
25      envelope, if Your Honour would like to review them.
```



```
 1                   It also involves the redaction of

 2   similar types of information and other documents,

 3   which is similar to the relief that we have agreed

 4   on for the purchasers and the licensees and such,

 5   but does not involve additional sealing of

 6   documents.

 7                   THE CANADIAN COURT:  Have you

 8   circulated that order to all counsel?

 9                   MS. STAM:  I have.

10                   THE CANADIAN COURT:  All right, are

11   there any hiccups?

12                   MS. STAM:  No, Your Honour, the only

13   changes were we caught a couple of typos.

14   Everybody likes typos.  So we have sorted that out.

15   The orders in the US and Canada are the same.

16                   THE CANADIAN COURT:  All right.  If you

17   could leave me with a copy of the order, I'll read

18   it at the break or at lunchtime, and then you want

19   us to sign the order?

20                   MS. STAM:  Yes, please.

21                   THE CANADIAN COURT:  And you will need

22   Judge Gross to sign as well?

23                   MS. STAM:  Yes, please.

24                   THE US COURT:  Yes.

25                   THE CANADIAN COURT:  All right, so if
```



```
 1   you could leave me with a copy and Judge Gross a
 2   copy, then I'll take a look at it later today.
 3               MS. STAM:  Sure.  I did also bring a
 4   copy of the original motion record.  Would you like
 5   me to leave that also?
 6               THE CANADIAN COURT:  All right, that is
 7   fine.
 8               MS. STAM:  You can hand it back to me
 9   afterwards.
10               THE CANADIAN COURT:  I will.
11               I don't think I need to take a look at
12   the documents, Ms. Stam.
13               Next?
14               MS. STAM:  I understand the next matter
15   is going to be handled by Mr. Bromley in
16   Wilmington.
17               THE US COURT:  Good morning,
18   Mr. Bromley.
19               MR. BROMLEY:  Good morning, Judge
20   Gross, good morning, Justice Newbould.  I'm just
21   going to introduce the issue, and Mr. Qureshi who
22   is in Toronto will address it as well, and I think
23   then Mr. Barrack may have some comments.
24               This has to do with the demonstrative
25   exhibits that were distributed two nights ago in
```

 Neeson & Associates   W&P

```
 1    connection with the testimony of Coleman Bazelon.
 2              Now, as we have been shifting the
 3    timelines for the testimony of the various
 4    witnesses, I think originally there was some hope
 5    that Mr. Bazelon would testify yesterday.  I think
 6    now, according to the schedule that has been recut
 7    amongst the parties, I think he is scheduled for
 8    Monday.
 9              And the issue that we have is that the
10    demonstratives that were provided to us are
11    calculations, formulas with respect to certain
12    things that apparently Mr. Bazelon is going to
13    testify about at trial and relating to mechanics
14    underlying his argument.
15              Now, Mr. Bazelon's report, initial
16    report, was filed in January, I think January 24th,
17    and his deposition took place after that and there
18    was none of this information in either the initial
19    report or the rebuttal report.  And Mr. Qureshi
20    will be addressing that, but we have concerns about
21    getting information in the demonstratives prior to
22    the testimony of an expert that seemed to indicate
23    that the testimony will include opinion testimony
24    that was not included in the original report or
25    able to be vetted in deposition.
```



```
 1                  So with that, I will turn it over to
 2      Mr. Qureshi.
 3                  THE US COURT:  Thank you, Mr. Bromley,
 4      I certainly understand the point.
 5                  THE CANADIAN COURT:  Mr. Qureshi, good
 6      morning.
 7                  MR. QURESHI:  Thank you.  Good morning,
 8      Judge Gross.  Good morning, Justice Newbould.  Abid
 9      Qureshi, Akin Gump, on behalf of the Committee, if
10      I may, and I'll try to be quick.
11                  The demonstrative exhibits that were
12      disclosed last night, and there were five of them
13      and I'll refer the Court to a couple of them in a
14      moment, as Mr. Bromley indicated they set forth the
15      mechanics for how the pro rata approach could
16      apparently be implemented, complete with
17      mathematical formulae.
18                  As Mr. Bromley said, the problem we
19      have is it is certainly a basic rule in the United
20      States, codified in the Federal Rule of Civil
21      Procedure 26, and my understanding is that there is
22      a substantively equivalent Ontario rule, that all
23      expert opinions need to be disclosed in the report.
24                  If I could turn up, please, from
25      Mr. Bazelon's opening report just a couple of
```



```
 1   passages so that Your Honours can see what the

 2   issues are.

 3              He states -- can we get those report

 4   excerpts up, please?

 5              And you will see, I hope momentarily on

 6   the screen -- there it is -- these are two passages

 7   both from Mr. Bazelon's opening report, and what he

 8   says is:

 9                   "I understand that there are

10                   different legal mechanisms for

11                   carrying out such an approach",

12                   being the pro rata approach, "in

13                   practice.  Because this report is

14                   focussed on the economic rationale

15                   underlying any allocation of the

16                   lockbox funds, I do not address

17                   those mechanisms in any detail."

18              Later on in the report he goes on to

19   say that he has not been asked to opine upon the

20   specific legal mechanics for carrying out the

21   allocation and offers no opinion on those at this

22   time.

23              Now, at his deposition --

24              THE CANADIAN COURT:  Just before you go

25   any further, I want to ask you a question.
```



```
 1                MR. QURESHI:  Sure, of course.
 2                THE CANADIAN COURT:  First of all, I
 3     haven't seen what you are talking about that he
 4     wants to use, but does the document that you have
 5     now been given deal with legal mechanisms?
 6                MR. QURESHI:  So let's turn up, if we
 7     could, slide 4.
 8                THE CANADIAN COURT:  I'm asking you a
 9     question.
10                MR. QURESHI:  Yes, and I am going --
11                THE CANADIAN COURT:  Well, I would like
12     an answer.
13                MR. QURESHI:  The answer to the
14     question, Your Honour --
15                THE CANADIAN COURT:  Does it deal with
16     legal mechanisms?
17                MR. QURESHI:  I believe that it does,
18     and if I may explain why, Your Honour, in his
19     deposition he was asked repeatedly if guarantee
20     claims should be allowed, how does that get
21     implemented?  And the answer he gave, again and
22     again, is that is a legal question to me and it is
23     up to the Courts.  I don't have an opinion on it.
24                And then he was asked, and we can -- if
25     we can just quickly bring up this portion of his
```

 Neeson & Associates   W&P

1    deposition.  It is at page 78, going over to 79 --

2                THE CANADIAN COURT:  What was the last

3    document that was --

4                MR. QURESHI:  The last document, let's

5    go back to that.  This is one of the pages from the

6    demonstrative exhibits, if we can go back to that

7    slide, please, this is one of the pages from the

8    demonstrative exhibits that we received the night

9    before last.

10                And so this formula, as I understand

11   it, is now something that Mr. Bazelon is going to

12   testify to in terms of how his pro rata approach

13   can be implemented.

14                So the point, Your Honour, is that in

15   his

16   report --

17                THE CANADIAN COURT:  What is legal

18   about this?

19                MR. QURESHI:  Well, I'm not sure what

20   is legal about this.  The point is it is a new

21   opinion.  In his report, he says I have no opinion

22   on the legal mechanics of how to implement this.

23   In his deposition he is asked, How do you implement

24   this?  If you allow the guarantee claims, if you

25   allow intercompany claims, how is it implemented?



1    And he says, it is a legal issue; I don't have an

2    opinion on how to do it --

3                    THE CANADIAN COURT:  You already said

4    that.  You don't have to repeat it.

5                    MR. QURESHI:  So now we have for the

6    first time a mathematical formula.  We have had no

7    disclosure of this formula.  We have had no ability

8    to ask him about it in his deposition.  It is

9    clearly --

10                   THE CANADIAN COURT:  Could you

11   cross-examine him here on it?

12                   MR. QURESHI:  Of course we could

13   cross-examine him here on it, but that is

14   respectfully, Your Honours, I think completely

15   inconsistent with the purpose of the federal rules

16   in the US and what I understand to be similar rules

17   here, which is that we are entitled to advance

18   this --

19                   THE CANADIAN COURT:  Well, I'm not

20   quite sure you are quite accurate about that, but

21   in any event, go on.

22                   MR. QURESHI:  Well, Your Honours, this

23   is not a situation where this is some sort of minor

24   extension, if you will, of a principle that is

25   articulated in his report.  These formulas are



```
1    nowhere in his report.
2              Sure, I can on the stand on
3    cross-examination, in what would be a much
4    lengthier cross than otherwise, start asking him
5    deposition-type questions about what did these
6    formulae mean, where did they come from, how were
7    they applied.
8              But respectfully, we shouldn't be
9    dealing with expert opinions for the first time
10   from the witness stand.  And the rules are clear,
11   this is required to be in his report.
12             Now, Judge Gross, if I could refer Your
13   Honour to a Third Circuit case on the point, and I
14   believe that we have a copy in the courtroom in
15   Delaware ready to hand up and, Your Honour, it will
16   undoubtedly be a familiar concept to you.  This was
17   a Third Circuit decision reviewing a Trial Court
18   that refused to allow for the first time on direct
19   opinion testimony from an expert that was not
20   disclosed in the report.
21             And, Your Honour, what the Trial Court
22   did in that case is the Trial Court said, no, you
23   cannot offer opinions for the first time from the
24   stand, and excluded the additional opinions that
25   the expert was attempting to elicit for the first
```



```
 1   time.
 2                And the Third Circuit, citing Rule 26,
 3   said that that's not appropriate, Rule 26 clearly
 4   says all opinions must be disclosed in the report.
 5                And so we do think it is prejudicial to
 6   see these mathematical formulas.  Certainly,
 7   Justice Newbould, it doesn't look like legal
 8   mechanics, but the point is if he now has something
 9   beyond legal mechanics, it should have been in his
10   report.  He said he had no opinion about it.
11                THE CANADIAN COURT:  Well, is there not
12   an issue of nuance here?
13                MR. QURESHI:  I'm sorry?
14                THE CANADIAN COURT:  Is there not a
15   nuance here to what you are talking about?  If it
16   is a separate opinion, that is one thing.  If it is
17   dealing with his opinion in some, and I'll just use
18   unlegal language, some little add-on, is that
19   different?
20                MR. QURESHI:  I would agree, Your
21   Honour, that there is certainly a zone of
22   reasonableness, if you will.  If the testimony is a
23   reasonable extension of something that is in his
24   report, I wouldn't be standing here.  The
25   difficulty that I have with this is he says nothing
```

```
 1   at all in his report.  He goes a little further in
 2   his deposition, and in his deposition he says,
 3   well, if a guarantee claim is allowed or if an
 4   intercompany claim is allowed, there can be a
 5   double-dip effectively, you can participate in this
 6   pro rata scheme twice.  But that is as far as he
 7   goes.
 8              The difficulty I have with this is now
 9   we are confronted with a mathematical formula.  I
10   have no idea what it means.  Of course I can
11   cross-examine him on it for the first time once I
12   hear presumably on direct for the first time what
13   this mathematical formula means.  But you know, the
14   rules are quite clear, and I think what is --
15              THE CANADIAN COURT:  Okay.
16              THE US COURT:  I assume, Mr. Qureshi,
17   that part of your concern is that you don't have an
18   opportunity to pass this by your experts?
19              MR. QURESHI:  That is absolutely right.
20   It is twofold, Judge Gross.
21              One, I didn't have the opportunity to
22   examine Mr. Bazelon on the point, and secondly, I
23   have not had the opportunity to have our experts
24   consider this and, if appropriate, to offer
25   rebuttal expert testimony.  Once we understand what
```



```
 1   this formula means and how it is applied and where
 2   it came from, it might well be the case that our
 3   experts have an opinion on it and we would want the
 4   opportunity to have our experts offer rebuttal
 5   opinions, if necessary.
 6              We just don't think we should be
 7   required in the middle of trial to start going down
 8   that road.
 9              And unless Your Honours have any
10   questions, or Justice Newbould, I have our Canadian
11   counsel here if Your Honour wants to get into
12   further details on Ontario law on the point, but
13   otherwise I'll turn it over to Mr. Barrack.
14              THE CANADIAN COURT:  All right.
15              MR. BARRACK:  Good morning, Your
16   Honours.
17              THE US COURT:  Good morning.
18              MR. BARRACK:  Maybe we can start with
19   the law in Ontario, and I am sure you are aware,
20   Justice Newbould, of the Marchand case, and I
21   believe there is one to be handed up in Delaware as
22   well, a Court of Appeal decision, the touchstone
23   for this type of thing, and if you look at page 14
24   it says:
25                     "In our view, these cases
```



1                    indicate that the 'substance'

2                    requirement of Rule 53.03(1) must be

3                    determined in light of the purpose

4                    of the rule [...]"

5                    THE CANADIAN COURT:  Just wait a

6     minute, Mr. Barrack.  Do you have it, Judge Gross?

7                    THE US COURT:  I do now, yes, thank

8     you, Justice Newbould.

9                    MR. BARRACK:  In paragraph 38, Judge

10    Gross:

11                       "In our view, these cases

12                    indicate that the substance

13                    requirement of Rule 53.03(1) must be

14                    determined in light of the purpose

15                    of the rule, which is to facilitate

16                    orderly trial preparation by

17                    providing opposing parties with

18                    adequate notice of opinion evidence

19                    to be adduced at trial.

20                    Accordingly, an expert report cannot

21                    merely state a conclusion.  The

22                    report must set out the expert's

23                    opinion, and the basis for that

24                    opinion.  Further, while testifying,

25                    an expert may explain and amplify



 1                    what is in his or her report but
 2                    only on matters that are 'latent in'
 3                    or 'touched on' by the report."
 4            So if we could look at what happened
 5    here, the purpose of this rule is to give adequate
 6    pretrial notice.  In Canada, we do not depose
 7    experts, so this is a rule that allows experts to
 8    go farther.
 9            This matter was dealt with on
10    deposition, and I would like to hand up two things.
11    I would like to hand up a copy of the slides and
12    some passages from the deposition.
13            And I believe those are going to be in
14    Delaware as well.
15            So if we can look at --
16            THE CANADIAN COURT:  Just before you do
17    that, is this the entirety of what has been
18    produced?
19            MR. BARRACK:  Yes.
20            THE CANADIAN COURT:  The --
21            MR. BARRACK:  Sorry, the demonstrative
22    in question?
23            THE CANADIAN COURT:  The demonstrative,
24    yes.
25            MR. BARRACK:  Yeah, that is the



```
 1    entirety of the demonstrative that was sent out.
 2                THE CANADIAN COURT:  Five pages?
 3                MR. BARRACK:  Five pages.
 4                THE CANADIAN COURT:  All right.
 5                MR. BARRACK:  And what these do is --
 6    very simply what these do is answer the question
 7    that you raised in opening, Justice Newbould, is
 8    how you deal with guarantees and how you deal with
 9    intercompany claims in a pro rata approach.
10                And they simply start by defining the
11    worldwide assets and the worldwide debts.
12                Slide one is pure pro rata, assets over
13    debts.
14                Slide two indicates how guarantees, if
15    you were to allow in effect a double-dip on the
16    guarantees, how you would calculate the pro rata
17    formula, which is worldwide assets over worldwide
18    debts plus the guarantee amount.
19                The third slide deals with the 2
20    billion intercompany claim, how you would deal with
21    that, which is you can either do it by simply
22    adding the 2 billion to the denominator or you can
23    do it by recognizing that the 2 billion is received
24    by the particular estate and adding it and the
25    percentage received from the Canadian Estate to the
```


Neeson&Associates   W&F

```
 1   numerator and the 2 billion to the denominator.
 2               And the final slide --
 3               THE CANADIAN COURT:  Like, for example,
 4   10 cents or something on the dollar?
 5               MR. BARRACK:  Right, if you got 10
 6   cents on the dollar, then you add it back in
 7   because you recognize that that is how you wash it
 8   through.
 9               And then the final slide just gives the
10   qualifications that no debt can recover more than a
11   hundred percent.  If you recover more than the
12   applicable pro rata percentage, then that debtor or
13   estate is removed.  The funds are distributed to
14   the lockbox to bring the participating entities to
15   a position to be able to satisfy the claims, and no
16   funds are moved from any entity.
17               So against that background, these
18   matters do not speak to a legal mechanism, and they
19   do not also do something else that Dr. Bazelon was
20   asked about.  They don't calculate the number, the
21   71 percent, as Mr. Britven did.
22               So if I could go then -- and, Judge
23   Gross, I don't know if you have been handed
24   portions of the deposition testimony?
25               THE US COURT:  Yes.
```



```
 1                    MR. BARRACK:  Okay, if I could take
 2      you --
 3                    THE US COURT:  But you know what I
 4      don't have is Mr. Bazelon's report in front of me.
 5      And what I want to know is does his report contain
 6      these mathematical -- this mathematical exercise?
 7                    MR. BARRACK:  It does not contain this
 8      mathematical exercise, but he was questioned about
 9      it on deposition.  And my submission is that it is
10      latent in his report, and that is why I would like
11      to take you to demonstrate that those asking the
12      questions of him clearly saw that it was latent in
13      his report, asked questions and stopped, could have
14      followed up and asked how do you do this.
15                    He said you could do this --
16                    THE CANADIAN COURT:  Whereabouts do you
17      want us to look at?
18                    MR. BARRACK:  Okay, so start at page
19      22, question 5:
20                       "Question:  Are intercompany
21                    claims part of your pro rata model?
22                       Answer:  They can be, but they
23                    don't need to be.
24                       Question:  Well, you're offering
25                    an economic opinion.  Should they
```



 1  be?

 2     Answer:  It is up to the court to

 3  decide what the claims in the case

 4  are.  If asked, I would suggest that

 5  they not include the intercompany

 6  claims, but they can.

 7     Question:  Wouldn't it defeat the

 8  purpose of a pro rata allocation

 9  among creditors if you included

10  intercompany claims?

11     Answer:  Well, I think it's up to

12  the court to decide who the

13  creditors are.

14     Question:  That's not the

15  question I asked you, sir.  Assume

16  we know who the creditors are.  You

17  posed an economic model.  In that

18  economic pro rata model, do

19  intercompany claims fall away?

20     Answer:  It would depend on how

21  they were treated by the court, but

22  at a high level you would expect

23  them to wash out of the

24  calculations.  It's possible that

25  they might not."



```
 1                  That is exactly the slide that is if
 2       they wash out or don't wash out.
 3                  Jumping down to line 11:
 4                      "Question:  What about claims
 5                  of creditors that are made in more
 6                  than one jurisdiction, that is, the
 7                  same claim made in more than one
 8                  jurisdiction; are you familiar with
 9                  those in the Nortel case?
10                      Answer:  I understand that there
11                  are some.  I'm aware of at least
12                  two.
13                      Question:  Which two are you
14                  aware of?
15                      Answer:  Well, it's actually more
16                  than two, a set of claims from --
17                  potential claims from bondholders
18                  against the US and Canadian estates
19                  and a claim from the UK into Canada
20                  related to the pension."
21                  And then over at line 6:
22                      "Question:  Again, using your
23                  'One Nortel' model, do these
24                  multiple claims come out or can a
25                  creditor claim more than one?
```


Neeson & Associates    W&P
WILSON & PETERSON LTD.

1                    Answer:  So the pro rata

2                allocation model that I discuss is

3                based on the claims of the estates.

4                It's a legal question for the courts

5                to decide what the claims on the

6                estates are and whether or not the

7                guarantees lead to any duplication

8                of claims.  It can be addressed both

9                ways."

10                It could have been very easy to ask

11    how.

12                Then go over to page 78, which is three

13    or four pages over, to the very bottom of page 78,

14    line 25:

15                "Question:  Am I also right,

16                sir, that you are not offering an

17                opinion in this case as to whether

18                bondholders, for example, ought to

19                be able to recover in more than one

20                jurisdiction?

21                Answer:  My analysis sets up a

22                framework that recognizes the courts

23                will decide what those guarantees

24                mean and my approach can

25                accommodate -- easily accommodate

 Neeson & Associates    W&P

1           any resolution by the court on that

2           issue."

3           And then over to the next page in this

4    precis, page 88:

5              "Question:  Well, in order for

6              a court to implement your pro rata

7              allocation methodology, what must

8              the court do with intercompany

9              claims?

10             Answer:  It doesn't have to do

11             anything with them.

12             Question:  So is it your

13             testimony, sir, that a pro rata

14             allocation methodology that you

15             advocate could be implemented by the

16             courts in this case while respecting

17             and giving effect to claims between

18             and among different Nortel estates?

19             Answer:  It could be.  It's up to

20             the court to decide what the claims

21             on which estates are valid and then

22             a pro rata allocation method can be

23             implemented on top of that.

24             Question:  In your opinion, sir,

25             is it possible for a pro rata

 Neeson&Associates    W&F

1    allocation methodology that you

2    advocate in this case to be

3    implemented by the courts while

4    allowing certain creditors to file

5    claims in more than one

6    jurisdiction?

7        Answer:  Yes.  It's up to the

8    courts to decide what the meaning of

9    the guarantees, et cetera, are and

10   how they present themselves as

11   claims to the different estates, but

12   with those claims, they can be

13   allocated on a pro rata basis.

14       Question:  So it's your testimony

15   then, sir, that the -- that if the

16   court were to determine that

17   Nortel's bondholders could assert --

18   I should say Nortel's bondholders on

19   those issuances with a guarantee, is

20   it your testimony that if the court

21   should -- the courts decide that

22   those bondholders could assert the

23   full amount of their claims in both

24   the Canadian estate and in the US

25   estate that the courts could,



```
 1              nonetheless, implement your pro rata
 2              allocation methodology?
 3                   Answer:  Oh, absolutely yes.
 4                   Question:  I take it the answer
 5              would be the same with respect to
 6              the guarantee that was issued by NNL
 7              to the UK pension trustee?
 8                   Answer:  That's correct."
 9              And then finally, if you go to the
10    second-last page, page 109, Dr. Bazelon at line 11
11    was asked:
12                   "Question:  Well in -- if the
13              courts were to implement your
14              allocation model and I understand
15              you're not opining on how that could
16              be done, but if the courts were to
17              implement --"
18              And this is critical, he answered:
19                   "Answer:  I have to -- I
20              haven't said I am not opining on how
21              it could be done.  I'm saying, I
22              haven't given an allocation number
23              that is the end result of it because
24              it can't be given yet."
25              So back to the test in Canada, the test
```



1    in Canada is Dr. Bazelon talking about something

2    that was a matter that was latent in or touched

3    upon by the report.  The ability to accommodate

4    both guarantees and intercompany claims was dealt

5    with and implicit in his report.  It was more than

6    implicit in his report because he was asked

7    specific questions.  The horse came to the pond

8    several times and could have stuck its nose in and

9    drank but decided not to.

10                   In addition to that, we put these

11    slides out five -- we could have simply had him

12    give this testimony without reference to a

13    demonstrative.  The demonstrative is out.  It has

14    been out for what will be five days, including a

15    weekend, before testimony has been given.

16                   This issue was raised by the Court in

17    opening and it does not involve complicated issues,

18    as you can see from the slides.  They are simple

19    division formulas.  He has been fully deposed on

20    the issue.  There was no element of surprise.

21                   And under Ontario law, this is right up

22    the middle of the strike zone of what he should be

23    allowed to testify to.

24                   Subject to any questions you might

25    have, those are my submissions.



```
 1                   THE US COURT:  I'll give you my
 2   thoughts first.
 3                   THE CANADIAN COURT:  Well, what I was
 4   going to suggest, and there may be other people,
 5   but what I was going to suggest was I want to
 6   consider it a bit before I give my thoughts.
 7                   THE US COURT:  Yes, and I do too, and
 8   what I was going to suggest is the word "implicit"
 9   has been used, but an opinion is something that is
10   expressed and I would like to know and be shown in
11   the report and the rebuttal report specifically
12   where this information is provided, because he may
13   have been cross-examined, but he was cross-examined
14   on his report and the cross-examine was necessarily
15   limited to the report.
16                   So I want to know more about the
17   report.
18                   MR. O'CONNOR:  Judge Gross, Justice
19   Newbould, if I could be heard just briefly on the
20   standard in the US on the issue.
21                   THE US COURT:  Yes, sir.
22                   MR. O'CONNOR:  And I start -- we have
23   handed up our cases, and I start with the Third
24   Circuit's opinion in D. Marines vs. KLM Royal Dutch
25   Airlines.
```



```
 1                    THE CANADIAN COURT:  I don't have a

 2      copy of that here.

 3                    MR. O'CONNOR:  I apologize, Justice

 4      Newbould, I'm afraid we may not have copies for you

 5      right at the moment.  We will get you copies, just

 6      as quickly as we can.

 7                    THE CANADIAN COURT:  Okay, that is

 8      fine, thank you.

 9                    MR. O'CONNOR:  And I site that case

10      just for the proposition that the exclusion of

11      evidence is of course a drastic remedy, and I

12      direct the Court's attention to the District of

13      Delaware Judge Stark's decision in the nCube

14      Corporation case, which was a case in which one of

15      the parties was trying to exclude expert testimony

16      on the basis that it was not included in the

17      expert's report.

18                    The first thing I would like to point

19      out in that case, and that is on page 8 of the

20      report, is what the Court says is that it will

21      listen to these objections, take them under

22      advisement, but it will hear the objectionable

23      testimony and resolve the objections on post-trial

24      briefing.  That's the first point.

25                    The second point is the Court goes on
```

Neeson & Associates    W&P

```
1    to state what the standard is under Rule 26(a), and
2    of course Rule 26(a) of the Federal Rules requires
3    a complete statement of all opinions the witness
4    will express and the basis and reasons for them.
5                     But the Court goes on to say the
6    following:
7                         "When determining whether an
8                         expert's testimony is beyond the
9                         scope of the expert's written
10                        report, courts do not require
11                        'verbatim consistency with the
12                        report, but...allow testimony which
13                        is consistent with the report and is
14                        a reasonable synthesis and/or
15                        elaboration of the opinions
16                        contained in the expert's report.'"
17                    The Court goes on to say that:
18                        "A key consideration when
19                        determining whether testimony is
20                        beyond the scope of an expert report
21                        is whether the objecting party had
22                        notice of the subject matter of the
23                        testimony based on the contents of
24                        the report and elaborations made
25                        during any deposition testimony."
```



 1                  And, Your Honour, we would submit, as

 2     Mr. Barrack has argued in Canada, that during the

 3     course of the deposition, Mr. Bazelon was asked

 4     about whether he had a legal opinion on which was

 5     the correct way the Courts should address these

 6     issues, and he said he wasn't offering a legal

 7     opinion, but he did make clear that this could be

 8     done, the pro rata approach, and accommodate the

 9     guarantees or the bonds.

10                  As Mr. Barrack indicated, Mr. Qureshi

11     didn't go further to ask, well, how would that be

12     done.

13                  And what we have done in the

14     demonstrative is simply a very simple mathematical;

15     you take the numerator and the denominator, and

16     depending on whether you include the guarantees of

17     the bonds, you have a different fraction.  That is

18     really all that demonstrative does.

19                  So in our, to use the Canadian

20     expression, respectful submission, we think this is

21     nothing more than an elaboration of the opinions

22     expressed in Mr. Bazelon's report.

23                  THE US COURT:  Is he going to offer a

24     number based upon this mathematical formula?

25                  MR. O'CONNOR:  No, he is not, because



```
 1   you can't do that without knowing the total claims
 2   base.  So this is simply designed to assist the
 3   Courts to understand if it picked from column A, B
 4   or C, how, once you know all the claims numbers,
 5   you would actually do the arithmetic calculation.
 6   That is all it does.
 7                  Thank you, Your Honour.
 8                  THE US COURT:  I do agree with Justice
 9   Newbould that we ought to take it under
10   consideration, but I do understand that the parties
11   would need a ruling by --
12                  THE CANADIAN COURT:  Today.
13                  THE US COURT:  -- certainly today in
14   order to prepare if we were intending to proceed.
15                  THE CANADIAN COURT:  Right.
16                  THE US COURT:  Yes, Mr. Bromley.
17                  MR. BROMLEY:  Your Honours, if I may
18   just rise, I do think it is important to recognize
19   that there are rules of evidence in both
20   jurisdictions and that we have to be mindful of
21   dealing with both of them.
22                  And I think that the decision that
23   Mr. Barrack handed down referring to latent in, I'm
24   not sure I understand what "latent in" means for US
25   purposes.
```



 1                    What I do understand is that Rule 26 --
 2                    THE CANADIAN COURT:  It is whatever the
 3    Supreme Court of Canada says it means.  Every time
 4    you ask them, you might get a consistent opinion.
 5                    MR. BROMLEY:  Well, the next time I run
 6    into them, I may ask the question.
 7                    But for purposes of Rule 26, I think
 8    the rule itself says it must contain, the report
 9    must contain the information, and I think
10    Mr. Barrack's comments really disclose the issue
11    that we are facing here.
12                    In opening, Your Honour Justice
13    Newbould asked what happens to the 2 billion dollar
14    claim.  And this is exactly what these exhibits,
15    demonstrative exhibits are intended to respond to,
16    that question.
17                    We did not have these in front of us
18    during the deposition of Mr. Bazelon, and if we had
19    them, the questioning would have been different.
20                    And to say that we were able to tip our
21    toe in the water or drink from -- I forget the
22    analogy that Mr. Barrack said is, but whatever, if
23    we had had this, we would have known there was
24    water there to drink, let's put it that way.
25                    But I think there is a solution, Your

1    Honours, and which is I understand that Mr. Bazelon

2    was present in Court yesterday and ready to

3    testify, and what we can do is have a two-hour

4    deposition of Mr. Bazelon on these five slides.  We

5    can have it today.  We can have it over the

6    weekend, prior to his testimony, and then if there

7    are any issues that have been raised, they would

8    have been cured by the opportunity to ask those

9    questions.

10              I understand from my colleague,

11    Mr. Rosenthal, that the protocol accommodates this

12    type of thing, and while we certainly don't want to

13    have to do it, the idea that we have an expert who

14    is going to testify and, as Mr. Barrack said,

15    either with or without the demonstratives is going

16    to say these things, we should have the opportunity

17    to cross-examine that witness prior to him getting

18    on the stand.

19              So that's it, and I am certainly not

20    asking for a ruling right now, but put that out as

21    a suggestion as a potential accommodation.

22              THE US COURT:  That is a helpful

23    suggestion, Mr. Bromley, thank you.

24              MR. BROMLEY:  Thank you.

25              MR. BARRACK:  I'm just going to hand --



```
 1   sorry, I'm just going to hand up the American cases
 2   to you, so that you have them.
 3                 THE CANADIAN COURT:  Thanks, yes.
 4                 MR. BARRACK:  And just one quick bullet
 5   point to Judge Gross's question.  The reason this
 6   came up on deposition is because this issue arose
 7   out of other expert rebuttal reports that were
 8   delivered, Mr. Kilimnik and McConnell.
 9                 THE CANADIAN COURT:  Okay, well, we'll
10   give you a ruling before we leave today.
11                 Mr. Zarnett, are you ready to go?
12                 MR. ZARNETT:  Yes, thank you, Your
13   Honour.
14                 THE CANADIAN COURT:  Mr. Malackowski,
15   I'm sure you found all that very scintillating.
16     THE WITNESS:  Thank you, Your Honour, very much.
17
18                     JAMES MALACKOWSKI,
19    having been previously duly sworn, was resumed and
20                   testified as follows:
21
22   CROSS-EXAMINATION BY MR. ZARNETT (CONT'D):
23                 Q.   Good morning.
24                 A.   Good morning, sir.
25                 Q.   Mr. Malackowski, when we broke
```

1    yesterday, we were discussing your slide 34.

2              A.    Yes, sir.

3              Q.    Specifically you are noting that

4    the RPSM methodology that was used by the Nortel

5    entities from 2001 was one of the factors that you

6    considered in testing your use of the contribution

7    approach?

8              A.    Yes, sir.

9              Q.    And you'll agree with me that the

10   RPSM methodology that was used by Nortel applied to

11   operating profits and losses?

12             A.    Yes, sir.

13             Q.    And required them to be shared

14   according to capital stock calculated for the

15   particular year that the sharing was going to be

16   implemented; is that right?

17             A.    Generally speaking, it was the R&D

18   capital stock pursuant to the formula.

19             Q.    Right, and as we discussed

20   yesterday, that formula was at first a 30 percent

21   amortization and then later a five-year look-back,

22   correct?

23             A.    Exactly right.

24             Q.    Now, when that was implemented in

25   2001, Nortel would have been aware that there were



```
1   patents with priority dates earlier than either the
2   amortization period or a five-year look-back period
3   would cover; correct?
4               A.   Of course.
5               Q.   So if we look at slide 19, for
6   example, where you have plotted out the priority
7   dates for various patents, business sale patents,
8   high interest residuals, non-high interest
9   residuals, many of them fall before the period that
10  Nortel would take into account for its RPSM;
11  correct?
12              A.   Correct.
13              Q.   And the related spending on them
14  for their creation would also fall outside that
15  period; correct?
16              A.   Correct.  I think it is a
17  non-controversial point, it is pretty clear.
18              Q.   Sure, sure.  I'll let you know
19  when we are getting to controversy, okay?
20              Now, sir, I guess it is also
21  non-controversial that as each year goes by, more
22  and more of this historical spending falls off the
23  map, so to speak, for the Nortel's RPSM
24  calculation?
25              A.   Well, there is a living period,
```

Neeson&Associates    W&F

1    both for the calculation to capital stock, which is

2    rolling five years, for example, or slightly

3    different with the 30 percent, and there is a

4    rolling patent life as well, as new patentes are

5    filed and older patents expire or are abandoned, so

6    there are these two windows that move along.

7               Q.   Sure, but the kind of spending and

8    the amounts that you have kept alive in your

9    calculation for your contribution method from 1991

10   forward, they would fall off in Nortel's

11   calculation?

12              A.   And in my calculation, as well,

13   over a longer period of time.  Had the sale been

14   delayed, I would have eliminated the early years.

15   Both move in time.

16              Q.   But talking about what you did,

17   though, you have included spending for patents that

18   Nortel consciously would have known they weren't

19   including for their RPSM?

20              A.   Again, just to be very clear, my

21   look-back period extends beyond the five-year

22   look-back period or the 30 percent amortization for

23   the reasons I describe.  Nortel would be aware of

24   those assets, yes.

25              Q.   If you look back to slide 34, sir.



```
 1                    A.    Yes, sir.

 2                    Q.    Another item that you refer to as

 3    supportive of your contribution approach was the

 4    APA kick-off Q&A?

 5                    A.    Yes, sir.

 6                    Q.    Which is document TR22020, and I

 7    wonder if we could call that up.  Sir, you were

 8    present in Court yesterday to hear a lot of

 9    discussion among counsel as to what the exact

10    status or fate of this document was; do you recall

11    that?

12                    A.    I was.

13                    Q.    And was that more interesting or

14    less interesting than the discussion you heard this

15    morning?

16                    A.    It was more interesting because I

17    had also read about it in the depositions.

18                    Q.    All right, good, well, let's not

19    comment what side of the fence that issue will be

20    decided on, but let's just deal with this document

21    on its terms, if we could, okay.

22                    If you look at page 39 of this

23    document.

24                    A.    Yes, sir.

25                    Q.    This is the portion that you are
```



1    referring to on slide 34; is that right?

2              A.    Exactly right.

3              Q.    All right.  And the suggestion

4    here was that proceeds from the sale of IP would be

5    allocated on the basis of the share of total R&D

6    capital stock in the year of sale; correct?

7              A.    Well, specifically that you would

8    look to the year of sale and the capital stock

9    balance, which would be the look-back period that

10   was used for operating purposes.

11             Q.    All right, and if you look back,

12   for lack of a better term, to page 10 of this

13   document, sir, question number 8, we see a

14   description of the 30 percent declining balance

15   amortization for the capital stock?

16             A.    Yes, sir.

17             Q.    Do you see that?  And four reasons

18   given for it?

19             A.    Yes, sir.

20             Q.    All right.  And so the author of

21   this document would have considered how the capital

22   stock would be calculated for the purpose of an

23   allocation of IP sale proceeds; correct?

24             A.    Well, at a general level, of

25   course, there is a focus of products here, but yes,

 Neeson&Associates    W&F WILCOX & FETZER LTD.

```
 1    I understand that.
 2                Q.   Different than the way you have
 3    done it; correct?
 4                A.   Different because the question at
 5    issue has different facts, yes, sir.
 6                Q.   Now, one of the items you referred
 7    to on slide 34 is the IP migration analysis?
 8                A.   Yes, sir.
 9                Q.   And you refer to Nortel
10    considering transferring certain IP; do you see
11    that?
12                A.   I do.  I mentioned in my direct
13    that transaction was not in fact completed is my
14    understanding.
15                Q.   But as you understood the document
16    you reviewed in connection with it, once again, the
17    look-back period for any calculation would have
18    been the way Nortel did it for operating profits,
19    not the way you have done it; correct?
20                A.   Yes, sir.
21                Q.   Now, on slide 33 you refer to the
22    Foundry licence patents?
23                A.   Yes, sir.
24                Q.   And you gave some evidence to
25    Mr. Milne-Smith about this?
```



1                A.    Correct.

2                Q.    Now, the income from that licence

3     was treated as operating income; is that your

4     understanding?

5                A.    The income from the licence was

6     divided into two components.  Part of it was for

7     past damages, part of it was a future royalty.

8     They both went through the RPS formula.  I don't

9     recall that both components were characterized as

10    operating income from an accounting perspective

11    because the revenue for the future I believe

12    occurred over time.

13               Q.    For the purpose of the RPSM

14    calculation, it was treated identically to

15    operating income; correct?

16               A.    As I indicated, yes, sir.

17               Q.    Now, using Nortel's look-back

18    period, not your look-back period; correct?

19               A.    Again, and as we spoke about

20    yesterday, because of the different motivations for

21    the operating look-back period such as taxation.

22               Q.    Now, sir, if you look at the

23    patents that you have listed on the left-hand side

24    of slide 33, do you know what the priority dates of

25    those patents were?

```
 1                    A.   I know the patents specifically,

 2   because they are attachment 1 to the licence.  I

 3   don't have the applications or the patents

 4   themselves to tell you the patent priority from

 5   memory.  Some of them have 4 million serial

 6   numbers, so they go back quite far, some of them

 7   have 6 million serial numbers, so they would be

 8   quite current.

 9                    Q.   Some of them, at least, and the

10   spending on them would fall outside the look-back

11   period, the RPSM/Nortel look-back period?

12                    A.   No, I believe that is correct,

13   absolutely.

14                    Q.   And Nortel would have known that

15   when they decided how to treat this?

16                    A.   Yes, sir.

17                    Q.   Thank you.  Now, sir, on slide 34,

18   you refer to Mr. Doolittle's testimony?

19                    A.   Yes, sir.

20                    Q.   Do you agree with me that his

21   evidence was about proceeds being allocated for the

22   purpose of NNL's financial statements?

23                    A.   Explicitly.

24                    Q.   And that the allocation, according

25   to his evidence, would be according to R&D
```



```
 1   contributions under the MRDA?
 2              A.   Yes, sir.
 3              Q.   And that would be using Nortel's
 4   RPSM look-back period, not yours; correct?
 5              A.   Of course.
 6              Q.   And I think you mentioned briefly
 7   in your evidence that there was a caveat to the
 8   financial statements?
 9              A.   I believe, from memory, that there
10   was recognition that ultimately the Courts would
11   determine the proper allocation.
12              Q.   I wonder if we could call up
13   TR21541.  And if we could go to page 74 of that
14   document.
15              THE CANADIAN COURT:  Is there a year to
16   that document, Mr. Zarnett?
17              MR. ZARNETT:  This is the 10K filed
18   in --
19              THE CANADIAN COURT:  I saw that, but
20   what is the year?
21              MR. ZARNETT:  It is filed in 2010, Your
22   Honour, for the -- it says for the fiscal year
23   ended December 31, 2010.
24              THE CANADIAN COURT:  Thank you.
25              BY MR. ZARNETT:
```



```
1                    Q.   And we are on page 74, sir, and we

2      have got that up on the screen, and if we could

3      just look at the second-last paragraph on the page,

4      and I am just looking at the last sentence, sir:

5                         "The NNL classification and

6                         related amounts shown in these

7                         financial statements are not

8                         determinative of, and have not been

9                         accepted by any debtor estate, any

10                        party in interest in the Creditor

11                        Protection Proceedings or any court

12                        overseeing such proceedings, for

13                        purposes of deciding the final

14                        allocation of the divestiture

15                        proceeds."

16                   Do you see that?

17                   A.   I do.  I believe that is why we

18     are here.

19                   Q.   All right, a pretty substantial

20     caveat; do you agree?

21                   A.   As noted in my direct, yes, they

22     recognized that the Court will be making these

23     allocations.  They have made an accounting

24     allocation using the contribution methodology as

25     their initial allocation.
```



```
1                    Q.   You said in your evidence

2    yesterday that the contribution theory is

3    independent of the MRDA?

4                    A.   Yes, in that the principle

5    methodology would still apply regardless of whether

6    or not someone interpreted the MRDA ala the US

7    experts versus ala the Canadian experts.

8                    Q.   And, sir, I take it that being

9    independent of the MRDA, the fact that the EMEA

10   Debtors agreed to the RPSM methodology does not

11   affect your conclusions?

12                   A.   Well, I think it is again

13   confirming of a general method.  I'm simply

14   applying better facts to that method, meaning we

15   are valuing particular assets and we are looking to

16   a look-back period in time that is relevant to

17   those assets as opposed to a generic look-back

18   period that is motivated for many other reasons,

19   such as taxation.

20                   Q.   And, sir, I take it that your

21   approach of being independent of the MRDA also

22   means that you approach the matter without

23   considering what the MRDA said would be

24   compensation for R&D expenditures; is that correct?

25                   A.   No, I think you are taking the
```



 1   term "independent" too far.  I believe the question

 2   on my direct and my response related to if the

 3   assumptions of the other experts were found true

 4   with respect to, for example, the licence

 5   provisions, would that affect my contribution

 6   analysis?  No.  Would it affect my licence

 7   approach?  Perhaps.

 8              Q.    Now, dealing with your

 9   contribution analysis and so that we understand, is

10   your contribution analysis affected if you assume

11   that the MRDA provides that a share of operating

12   profits or losses is the compensation for R&D

13   investment?

14              A.    I don't believe so.  I don't

15   believe it would change the right method for

16   allocating sale proceeds, which I understand to be

17   outside the scope of the MRDA.

18              Q.    All right.  Could I ask you, sir,

19   to look at slide 20.

20              A.    Yes, sir.

21              Q.    It lists the invention dates of

22   the patents that went in the Enterprise sale.  They

23   were the predominantly used patents in the

24   Enterprise sale; is that what you have here?

25              A.    Yes, sir.



```
 1                    Q.   And it plots them back to their
 2    priority dates and when the priority date for each
 3    patent was; is that right?
 4                    A.   Yes, sir.
 5                    Q.   All right.  And you have something
 6    denominated on this as the Canadian look-back
 7    period with a line between 2005 and 2006?
 8                    A.   Yes, sir.
 9                    Q.   And by the "Canadian look-back
10    period", do you mean the look-back period in the
11    MRDA, the RPSM?
12                    A.   As advanced by the Canadian
13    experts, yes, sir.
14                    Q.   Okay, but it is the RPSM method in
15    the MRDA?
16                    A.   Fair clarification.
17                    Q.   Okay, well, we don't take calling
18    it Canadian as criticism.
19                    THE CANADIAN COURT:  So this isn't a
20    critical part?
21                    BY MR. ZARNETT:
22                    Q.   Now, more than 80 percent of the
23    patents had priority dates before is it -- I guess
24    before 2006 is your point, and of the line that is
25    ascending the page?
```



```
 1                    A.    That is exactly the point, yes,
 2    sir.
 3                    Q.    And even if we go back to before
 4    2005, it would be just slightly under 80 percent;
 5    correct?
 6                    A.    Yes, sir.
 7                    Q.    All right.  And as long as the
 8    MRDA was in effect and operating as you understand
 9    it, profits and losses from Enterprise would be
10    shared according to R&D capital stock calculated on
11    the RPSM look-back period; correct?
12                    A.    Operating profits and losses from
13    Enterprise would be that way.  A sale proceed would
14    be outside the scope of the MRDA.
15                    Q.    Well, just stay with my question
16    for a moment.  That is how operating profits would
17    have been shared with many of these patents that we
18    see on your line not being considered; correct?
19                    A.    Again, a non-controversial point,
20    that's right.
21                    Q.    Thanks.  Now, if Enterprise had
22    continued to operate rather than having been sold
23    and operated through the forecast period that you
24    have used in your analysis on slide 13, which I
25    think was up until 2020?
```



```
 1                    A.    Yes, sir.
 2                    Q.    Then operating profits in that
 3    period, if the MRDA had stayed in force, would also
 4    have been shared according to the RPSM method;
 5    correct?
 6                    A.    Barring any revision to that
 7    method in the future, sure.
 8                    Q.    All right.  So if you assumed that
 9    in that forecast period the Nortel entities group
10    operating profit was an amount that present values
11    to 244 million dollars, which is the amount you
12    attributed to the IP, if they had earned that as
13    operating profits over the term to 2020, that would
14    have been shared according to the RPSM method;
15    correct?
16                    A.    Well, by definition, if it was
17    operating profit and the MRDA was not revised, it
18    would have flowed through the RPSM calculation.
19                    Q.    So if they had earned what you
20    forecast for the purpose of valuation, but if they
21    had actually stayed in business and earned it, the
22    money would have been allocated differently than
23    you allocated for the sale; correct?
24                    A.    Well, we don't really know exactly
25    how it would have been allocated other than general
```



1    formula because we don't know what the R&D capital

2    stock would be over the future period, but I don't

3    dispute that had things stayed the same, they would

4    have stayed the same, that the RPSM would have been

5    used.

6              Q.    Right, and, sir, that is not

7    notwithstanding the priority dates we see for the

8    majority of the patents?

9              A.    Again, non-controversial point,

10   you are right.

11             Q.    And even if Enterprise had not

12   come up with a new patent and if the R&D spending

13   ratios had remained exactly as they were to 2010,

14   the sharing would have been according to a

15   five-year look-back, what you called the Canadian

16   look-back, not the way you have described it;

17   correct?

18             A.    True, but by your question, then

19   it clearly would not have been based upon the

20   innovation that was captured in the sale because

21   there would be no patents at that point.

22             Q.    I'm asking you to assume for the

23   purpose of my question that they operated with the

24   same patents.

25             A.    No, you said they would create no



1    new patents.

2              Q.    That's correct.

3              A.    So by the time you got to the

4    future applying a five-year look-back there would

5    be no patents at all, so further disconnecting that

6    type of analysis from an accountant who is asked

7    what is the contribution of these patents that were

8    sold in a transaction.

9              Q.    The buyer of these patents, the

10   buyer of these patents would want to use them in

11   the future; correct?

12             A.    Generally speaking, buyers of

13   patents want to use them in the future.

14             Q.    And you looked at a period out to

15   2020 to get a handle on that value; correct?

16             A.    Yes, sir.

17             Q.    So what I am asking you is if

18   Nortel hadn't sold but done what the purchaser

19   intended to do, use this group of patents and this

20   business out to the future to 2020, the split of

21   profit that would have come out of that would have

22   been calculated differently than what you are doing

23   in your contribution analysis; correct?

24             A.    So I don't mean to be difficult or

25   pick hairs, but you just interjected now what the



1   purchaser would have done.  I have no idea what

2   would happen if a path was followed ala the

3   purchaser.  Your question first presumed that it

4   was a path that was followed by Nortel with

5   consistent operations, and in that case, barring

6   any change to the MRDA, the RPSM would have been

7   applied.  We can't anticipate what change in

8   direction may have occurred with a purchaser.

9            Q.   And one change we know that would

10  have happened if Nortel had continued to operate

11  rather than selling, one change from your

12  methodology is the calculation of the R&D capital

13  stock would have been different because a different

14  look-back period would have been used than you had

15  used, right?

16           THE CANADIAN COURT:  Well, I suppose

17  you don't know that and you don't know what would

18  happen with the tax authorities.  The witness has

19  said several times if it hadn't changed.

20           BY MR. ZARNETT:

21           Q.   Yes.  I'm not asking him to --

22           A.   I struggle with your question only

23  because you are asking me to assume a Nortel that

24  lasts decades into the future when we know it was

25  insolvent and filed for bankruptcy.  So I don't

 Neeson&Associates   W&F

```
1    think it is a simple explanation to just say, hey,
2    everything is going to be hunky-dory and stay the
3    same for the next 25 years.  They probably wouldn't
4    have sold had they believed that would have
5    happened.
6              Q.   I'll avoid asking you to define
7    "hunky-dory", and move on to slide 30, sir.
8              A.   I'm sorry, slide?
9              Q.   30.
10             A.   Yes, sir.
11             Q.   Here you track when the Rockstar
12   asserted patents had priority years.  In other
13   words, Rockstar has asserted claims in relation to
14   patents it acquired and you have tracked the
15   priority year of those patents; correct?
16             A.   That is exactly right.
17             Q.   All right.  And if Nortel had kept
18   those patents and asserted those claims, I take it
19   on the assumptions you make that, like the Foundry
20   licence, anything they got from asserting those
21   claims would have been shared under the RPSM
22   formula?
23             A.   Well, that is really a speculation
24   that I don't know that I can address, in part
25   because I don't believe it is reasonable to assume
```

 Neeson&Associates   W&F

```
 1    that Nortel would have asserted the same claims.
 2    These include competitors in the industry that have
 3    their own portfolio and the decision for a Nortel
 4    to sue, for example, a charter or a customer or a
 5    Samsung is very different than a Rockstar decision.
 6              So I can't make that connection to say
 7    things would have been the same.
 8              Q.   I wasn't asking you so much as to
 9    who they would sue or how much they would get, as
10    if they decided to assert claims under these
11    patents in any circumstance, the proceeds of doing
12    that would have been shared under the RPSM formula;
13    correct?
14              A.   My expectation is that any
15    litigation of Nortel in normal course would have
16    been treated very much like the Foundry settlement,
17    and therefore, yes, a contribution method that was
18    driven by R&D capital stock with a look-back period
19    of five years or a 30 percent amortization.
20              Q.   All right, now, and that is
21    notwithstanding the priority dates of the patents?
22              A.   Again, non-controversial point,
23    the same point.
24              Q.   Good.  Now, do you agree, sir,
25    that not all R&D activity is associated with the
```



```
 1    filing of patents?

 2              A.   Of course.

 3              Q.   And a significant portion of

 4    Nortel's R&D was focussed on product development?

 5              A.   We can talk about what

 6    "significant" means, but I understand clearly that

 7    a portion was focussed on product development,

 8    shorter term decisions for product maintenance.

 9              Q.   And that kind of R&D spending has

10    a shorter life, economic life, than the life of a

11    patent; is that right?

12              A.   I agree with that.

13              Q.   All right.  So R&D capital stock

14    includes spending of that type, on products with a

15    short life, as well as spending on patents; is that

16    right?

17              A.   Yes, as well as negative learning,

18    trade secret development, a number of other things.

19              Q.   Sure.  So when you look at your

20    slide 17, for example, where you have traced

21    historic R&D spending, you have included all R&D

22    spending without obviously separating it among

23    spending on a patent and spending on a product,

24    right?

25              A.   Well, I begin with all R&D
```

 Neeson&Associates   W&F

1    spending.  I take into account that patent

2    distinction.  You recall there are later charts

3    where we plot the patent activity against the

4    spending to confirm that we don't have any mix

5    problems over time that you may be concerned over.

6                Q.    Your methodology does not include

7    any amortization of R&D spending that may have

8    taken place in 1991 and 1992 on products; correct?

9                A.    Could you -- that is an

10   interesting question.  Can you re-read or could we

11   re-state that?

12               Q.    You told Mr. Milne-Smith about

13   four times that he had asked a good question, and I

14   was waiting until I could get some comment from

15   you.

16               And the ones that Mr. Milne-Smith had

17   asked you that you said were good, were those the

18   ones you weren't expecting?

19               Now, sir, if you look at 1991.

20               A.    Yes, sir.

21               Q.    You ended up treating every dollar

22   spent in 1991 the same; correct?

23               A.    Of course.

24               Q.    And the same as every dollar spent

25   in 2006?



```
 1                    A.   "The same" has a very broad
 2   connotation.  Yes, they are both inputs to my
 3   model.  I tested whether or not I should weight
 4   them differently, we talked about on direct, and
 5   ultimately concluded it would be conservative to
 6   EMEA by treating them the same.
 7                    Q.   Does "conservative to EMEA" mean
 8   conservative to all parties?
 9                    A.   No, it means that the EMEA
10   percentage is reduced in the ultimate allocation.
11                    Q.   But your methodology does not
12   include any depreciation or amortization of
13   spending that we know took place on products, for
14   example, in 1991; correct?
15                    A.   Well, it does include any spending
16   that took place on products in that year.
17                    Q.   But it doesn't depreciate it?
18                    A.   No, because it presumes that the
19   mix between spending on product development,
20   maintenance, trade secrets and patents is the same
21   over time and we tested that assumption, we found
22   it to be reasonable and conservative, and
23   therefore, there was no need to try to separate,
24   plus frankly the records aren't available to do
25   that separation anyways so it is the best evidence.
```



```
 1                    Q.   Sir, could I ask you to take a
 2    look at TR22078, please.
 3                    A.   I don't believe I have that
 4    document.
 5                    Q.   You will.
 6                    Sir, this is a joint request for
 7    something called an APA.  Are you familiar with
 8    that?
 9                    A.   I'm familiar with the concept of
10    Advance Pricing Agreement, as well as I believe
11    this document or several documents very similar.
12                    Q.   All right, and, sir --
13                    THE CANADIAN COURT:  That is October
14    '08?  Is that October '08?
15                    THE WITNESS:  Yes, Your Honour, October
16    31st.
17                    BY MR. ZARNETT:
18                    Q.   And I take it since you have been
19    following the evidence you know this was something
20    that was given to the tax authorities; correct?
21                    A.   Absolutely, it is a document
22    developed in participation with the tax
23    authorities.
24                    Q.   Sure.  And if you look at page 49
25    of this document, page 49 of 55?
```



    1                    A.   What Bates number are you looking
    2    at?  That is page 643?
    3                    Q.   Yes, you'll see page 643 and you
    4    will also see it up on the screen, Mr. Malackowski,
    5    if that is -- you will see at the bottom of the
    6    page Nortel, the authors of this document engaged
    7    in a discussion about the useful life of
    8    technology?  Do you see that?
    9                    A.   I do.
   10                    Q.   And if you look over to page --
   11    sorry, still on page 49 at the bottom, they say:
   12                    "The economic life of
   13                    technology is difficult to measure
   14                    [...]"
   15                    Do you see that?
   16                    A.   I do.
   17                    Q.   Do you agree with that?
   18                    A.   As a general principle, sure.
   19                    Q.   And if you look at page 50, Nortel
   20    identifies that, in the first full paragraph on
   21    that page, an "evolution in the commercial and
   22    economic life span of technologies from longer to
   23    shorter cycles"; do you see that?
   24                    A.   I do.
   25                    Q.   All right, and do you see that in



```
1    the third -- in the second complete paragraph an

2    estimate of a shelf life of about five years for

3    investment in R&D?  Do you see that?

4              A.   I do.

5              Q.   All right.  And you will see the

6    conclusion just above the heading of "Example of

7    RPSM", so it is the paragraph beginning:

8                   "Recognizing the difficulties

9                   inherent [...]"

10            Do you see that?

11             A.   I do.

12             Q.   [...] the useful life of Nortel

13   intangibles is estimated to be approximately five

14   years [...]"

15            Do you see that?

16             A.   I do.

17             Q.   And that approach, sir, you

18   understand that that was being put forward by

19   Nortel to the tax authorities.  Do you say that

20   that was done for tax considerations?

21             A.   In part it certainly was.  That

22   was the whole driver of the APA.  In part it is

23   important to understand the distinction between

24   technology and R&D that is used here versus patent

25   life, but ultimately the most important thing is
```



1    look at the assets that were sold and what was

2    their life.  Those are the assets I'm valuing, and

3    we know from slide 31 and technology and the patent

4    analysis that the life of the assets I'm studying

5    exceeds the five-year look-back period.

6              Q.    Now, sir, did you understand

7    Nortel to be, and I just want your understanding on

8    this, to be estimating the useful life of R&D for

9    the purpose only of operating profits?

10             A.    As distinct from taxation issues?

11   I don't understand the question.

12             Q.    As distinct from what they would

13   do with sale proceeds.

14             A.    Well, in the examples we have, we

15   know they used the same look-back period for sales

16   proceeds tied to similar analysis.

17             Q.    All right, so if you tie that 2002

18   document together with the 2008 document, you would

19   say that the useful life calculation was being put

20   forward for use in a sale?

21             A.    At a general level, yes, we know

22   that when they sold the technology ala the Alcatel

23   transaction, they used a five-year or 30 percent

24   amortization period, but we know that like this

25   document, the Alcatel and other transactions were



```
 1   in part motivated by tax considerations.
 2              Q.   So, sir, at the end of the day, is
 3   it fair to say that there is no example of Nortel
 4   ever speaking of the allocation of proceeds,
 5   agreeing to an allocation of proceeds or applying
 6   an allocation of proceeds with a look-back approach
 7   such as you are using?
 8              A.   Within the Nortel documents I have
 9   seen, I think they have utilized the RPSM while
10   that was in place for their look-back analysis.
11              Q.   And not yours?
12              A.   Of course.
13              Q.   All right.  Now, in your report,
14   sir -- your reports -- you don't show us what the
15   contribution allocation would be using Nortel's
16   RPSM method as opposed to yours; correct?
17              A.   Correct.  We spoke about that in
18   my deposition.
19              Q.   But you are here now, so let's --
20              A.   And I have not done that analysis
21   for the reasons described in my direct testimony,
22   that the patents are essentially extinct, the high
23   interest patents within that five-year look-back
24   period.
25              Q.   So, sir, if we look at page --
```



```
1                    A.    What are we looking at?
2                    Q.    Sorry, page 53 of your initial
3     report, which is Exhibit 33.
4                    A.    Yes, sir.
5                    Q.    Table 24 deals with the business
6     line IP sale proceeds?
7                    A.    It does.
8                    Q.    Now, you propose two different
9     periods of time, neither of which are the RPSM
10    look-back period; correct?
11                   A.    Correct, both are driven by the
12    asset life that was sold.
13                   Q.    Now, we do see that in table 25
14    you have got four periods of time; correct?
15                   A.    Yes, sir.
16                   Q.    All right, and, again, none of
17    them are the look-back period under the RPSM;
18    correct?
19                   A.    Of course.
20                   Q.    All right, but we do see I guess
21    in table 25 that the more recent spending and the
22    less old spending that is included, the higher
23    NNL's portion becomes; correct?
24                   A.    In table 25, if you focus on
25    calculations that go through 2008 as opposed to
```



1    2006, NNL's percentage does increase, yes.

2                    Q.    And that is because in later years

3    NNL was spending disproportionately more on R&D

4    than the other participants; correct?

5                    A.    Or said another way, as I did in

6    direct, those middle years where the highest value

7    patents were generated were disproportionately

8    funded by EMEA.

9                    Q.    Now, sir, are you familiar with

10   what the R&D capital stocks would be under the

11   five-year look-back, 2005 to 2009?

12                   A.    Well, conceptually, yes.  I don't

13   have a schedule of that, though.

14                   Q.    All right, if I -- all right,

15   well, why don't we call up TR45645.  All right, and

16   if you see that, sir, up on the screen, you'll see

17   "Allocated Residual Profit [Percentage]"?

18                   A.    And I'm sorry, can you tell me

19   what this document is, where it is from?

20                   Q.    This is the Q1 2010 transfer

21   pricing adjustment sheet for Nortel.

22                   A.    Produced by Nortel?

23                   Q.    Yeah, and if you would like --

24                   THE CANADIAN COURT:  Just a second,

25   Mr. Zarnett, I think I'll take a copy of that



```
 1   exhibit.
 2                 MR. ZARNETT:  Okay.
 3                 THE CANADIAN COURT:  Thank you.
 4                 BY MR. ZARNETT:
 5                 Q.   So, Mr. Malackowski, do you see
 6   the allocated residual profit percentages there for
 7   NNL of 49.8 percent?
 8                 A.   Yes, sir.
 9                 Q.   And NNI of 38.5 percent?
10                 A.   Yes, sir.
11                 Q.   And the EMEA entities at I believe
12   to 11.7 percent?
13                 THE CANADIAN COURT:  That is not what I
14   have got in front of me.
15                 MR. ZARNETT:  I'm sorry, we may be on
16   different lines, Your Honour.
17                 THE CANADIAN COURT:  Yes, what I have
18   been handed is something that shows NNL 51.6
19   percent.
20                 MR. ZARNETT:  That is at the bottom,
21   but I'm looking at a line called "Allocated
22   Residual Profit Percentage".
23                 THE CANADIAN COURT:  Okay, I see.
24                 BY MR. ZARNETT:
25                 Q.   Thank you, Your Honour.  So do you
```

Neeson&Associates    W&F

```
 1   see those numbers, Mr. Malackowski?
 2               A.   Yes, sir.
 3               Q.   All right, and if you, just
 4   remembering those numbers --
 5               THE CANADIAN COURT:  Could I just ask
 6   you a question, Mr. Zarnett?  You may have already
 7   answered this, and the witness asked what it was.
 8   Is this based upon a notional sale in the first
 9   quarter of 2010 with a five-year look-back; is that
10   what this is based on?
11               MR. ZARNETT:  This is the RPSM
12   calculation five-year look-back, yes.
13               THE CANADIAN COURT:  Looking at
14   something in the first quarter of 2010 and assumed
15   a sale at that time; is that right?
16               MR. ZARNETT:  It is not assuming a sale
17   but it is --
18               THE CANADIAN COURT:  Okay, I
19   understand.
20               MR. ZARNETT:  It is just the
21   calculation.
22               THE CANADIAN COURT:  Okay, thank you.
23               BY MR. ZARNETT:
24               Q.   So --
25               A.   And I'm sorry, just to be clear,
```



```
 1   it is a calculation for the residual Nortel
 2   entities after the sale of the business?
 3                   Q.   It is the RPSM calculation of what
 4   the capital stock percentages would be at this
 5   point in time.
 6                   A.   Okay, I don't know that I have
 7   seen this before, but okay.
 8                   Q.   Okay, well, then let me show you
 9   one that you do cite in your report and that is
10   TR43476.
11                   A.   Thank you.
12                   Q.   So, Mr. Malackowski, do you recall
13   this one?  This one you do cite, so I take it you
14   have seen this one?
15                   A.   Well, that means I would have seen
16   it, but there are many, many, many spreadsheets of
17   this type, so I certainly can't --
18                   Q.   All right, I just -- if you look
19   at the same line on this called "Allocated Residual
20   Profit Percentage"?
21                   A.   Yes, sir.
22                   Q.   You will see that for the year
23   previous 47.4 percent for NNL, 38.8 percent for
24   NNI; do you see that?
25                   A.   I do.
```

Neeson & Associates    W&F

```
 1                   Q.   And some numbers that add to 13.7
 2    percent for EMEA?
 3                   A.   I do.  I would only note that this
 4    includes certain hedges, and I don't know what the
 5    financial hedging would be and how it affects these
 6    numbers, but you are reading the numbers correctly.
 7                   Q.   All right, well, I don't know that
 8    I need you to speculate on that.  But if we look at
 9    slide -- your slide 26, if we go back to that
10    then --
11                   THE CANADIAN COURT:  This last one we
12    looked at, that is as of April of '09?
13                   MR. ZARNETT:  That's right.
14                   THE CANADIAN COURT:  Thank you.
15                   BY MR. ZARNETT:
16                   Q.   And just so that we understand how
17    this would work, Mr. Malackowski, if we used the
18    numbers we saw on that Q1 2010 document as the
19    capital stock rather than the way you have
20    calculated it, what you show there on slide 26 as
21    the Canada share of 39.7 percent would be 49.8
22    percent, right?
23                   A.   The numbers are different in the
24    amounts that you suggest.  I don't think it is fair
25    to say that it is a directly substitutable or a
```

 Neeson & Associates  W&F WILSON & PETZER LTD.

 1   direct comparison.  One is three months worth of

 2   data, one is with financial hedging.  My analysis

 3   is very specific to the sale, but yes, if you ask

 4   me if two numbers are different and they are, I'll

 5   admit for you they are.

 6            Q.   Okay, that wasn't -- my question

 7   wasn't just limited to that.  If you assume the

 8   calculation was done the Nortel way, using the RPSM

 9   calculation with Nortel's look-back period and not

10   yours, and if you assume the result of that is 49.8

11   percent, then that would compare to your 39

12   percent, right?

13            A.   That is the same question.  If you

14   make that assumption, there would be that

15   comparison.  I don't think it is a fair assumption

16   to assume that the documents you put in front of me

17   are the right look-back period even under the RPSM.

18            Q.   And you haven't -- you didn't

19   calculate that, as I understand it, how the RPSM

20   calculation would work under the contribution

21   approach?

22            A.   I don't believe it is relevant

23   under the contribution approach.

24            Q.   All right, so just following,

25   though, how the numbers would change, sir, on slide



1   26, if we used the Q1 2010 figures, the US figure

2   would be 38.5 percent, not 42.9, is that where the

3   substitution would be made?

4           A.   Generally speaking, again, if you

5   assume this is a document that has meaning, those

6   are the two US columns, yes.

7           Q.   Sure, and EMEA would reduce to

8   11.7 percent from 17.4 percent; correct?

9           A.   I'll trust your math, yes.

10          THE CANADIAN COURT:  Mr. Zarnett, can I

11  just ask you a question?  You are asserting that

12  this has a five-year look-back period, both these

13  documents.  I think the witness says he doesn't

14  know, but you are saying as a fact, you are

15  pointing to the witness --

16          MR. ZARNETT:  Yes, this is the document

17  that is used by one of the experts you will hear

18  testify.

19          THE CANADIAN COURT:  All right.

20          MR. ZARNETT:  To calculate the

21  look-back period in that time.

22          THE CANADIAN COURT:  Thank you.

23          THE WITNESS:  Your Honour, I have no

24  dispute with the five-year -- that is what these

25  documents do use.  My dispute is what revenue they



```
 1   are against, a quarter revenue or --
 2              THE CANADIAN COURT:  I fully
 3   understand.
 4              THE WITNESS:  Yes.
 5              THE CANADIAN COURT:  Whenever is a
 6   convenient time, Mr. Zarnett.
 7              MR. ZARNETT:  This is a convenient
 8   time, Your Honour.
 9              THE CANADIAN COURT:  So we'll take 20
10   minutes.
11              THE US COURT:  20 minutes.  Thank you.
12   -- RECESS AT 10:30 A.M.
13   -- UPON RESUMING AT 10:54 A.M.
14              THE CANADIAN COURT:  Mr. Zarnett.
15              BY MR. ZARNETT:
16          Q.   Thank you, Your Honour.
17              Mr. Malackowski, just back briefly to
18   this question of how you would calculate a
19   five-year look-back, could I ask you to take a look
20   at your initial report and it may be easier if this
21   comes up on the screen, because it is Exhibit,
22   believe it or not, B.1.7.1.  And, Mr. Malackowski,
23   you may be able to locate that in hard copy, but I
24   think everyone else will find it easier on the
25   screen.
```



1                    A.   Let's start with the screen and
2    see if that works.
3                    Q.   Okay, sure.
4                    So as I understand it, sir, on this
5    exhibit you have totalled Nortel's R&D spending in
6    each of the years here identified; is that right?
7                    A.   Yes, sir.
8                    Q.   And then in each year you have
9    provided a percentage of what the total is for each
10   of the participants; correct?
11                   A.   On the bottom half of the chart,
12   yes, sir.
13                   Q.   Sure, so if we could just
14   highlight that, the bottom half of the chart,
15   please.  And, sir, if we wanted to determine the
16   five-year --
17                   THE CANADIAN COURT:  Just before you go
18   on, you are saying this is an exhibit, an
19   attachment to his report?
20                   MR. ZARNETT:  Yes, and, Your Honour,
21   here, as a visual clue --
22                   THE CANADIAN COURT:  I understand that,
23   but there are tabs?
24                   MR. ZARNETT:  Yes, there are tabs, so
25   it is at -- there is a tab that begins the



```
 1   exhibits.
 2              THE CANADIAN COURT:  Yes, and I don't
 3   see any B's, I see a whole lot of R's.
 4              MR. ZARNETT:  There should be a B
 5   before the R.
 6              THE CANADIAN COURT:  I don't see that.
 7              MR. ZARNETT:  We'll have to get you a
 8   -- we'll work with Mr. Milne-Smith to get you the
 9   same format.
10              THE CANADIAN COURT:  All exhibits are
11   at tab 25 and they all start with an "R".
12              MR. ZARNETT:  I wonder, Your Honour, if
13   -- what comes before tab R in your book?  Because
14   they seem to be formatted differently.
15              THE CANADIAN COURT:  No, no, the
16   exhibits are all under tab 25.
17              MR. ZARNETT:  Oh, I see, all right.
18              THE CANADIAN COURT:  And the index page
19   under tab 25 lists a whole bunch of exhibits
20   starting with "R".
21              MR. MILNE-SMITH:  Your Honour, I
22   believe that Exhibit "B" should be under tab 24.
23              THE CANADIAN COURT:  Ah, okay, thank
24   you.
25              MR. MILNE-SMITH:  I apologize.
```

Neeson & Associates    W&P

 1                    THE CANADIAN COURT:  You don't have to
 2     apologize.  It's me.
 3                    MR. ZARNETT:  So Your Honour has to go
 4     over to Exhibit B.1.7.1.  And it should be headed
 5     up "Total Nortel R&D Spending".
 6                    THE CANADIAN COURT:  I have it.
 7                    BY MR. ZARNETT:
 8             Q.   All right.  And Judge Gross, is
 9     this road map helping at all?
10                    THE US COURT:  Well, I have exhibit --
11     I do have Exhibit "B", but I don't see this
12     document within Exhibit "B".  But I'm sitting close
13     enough that I think I can make it out.
14                    BY MR. ZARNETT:
15             Q.   All right, well, we'll make it a
16     little larger on the screen.
17                    So, Mr. Malackowski, you have here
18     totalled Nortel spending for the years 1989 to
19     2011; correct?
20             A.   Yes, sir.
21             Q.   And if we look specifically at the
22     years 2009 back to 2005, we have the percentage
23     spending in each year; correct?
24             A.   Yes, sir.
25             Q.   And above that we had the total



```
 1   spending for each year; correct?
 2                 A.    Yes, sir.
 3                 Q.    And from that data, could we
 4   calculate the five-year look-back percentage?
 5                 A.    I believe so, yes, sir.
 6                 Q.    All right, and I am told that when
 7   one does that, you get the numbers that I gave you
 8   from the previous exhibit; do you accept that?
 9                 A.    I accept that that's what you were
10   told.
11                 Q.    Okay.
12                 A.    I don't recall what those numbers
13   were.
14                 Q.    All right, but it is simply a
15   mathematical calculation to average these five
16   years to get the five-year look-back; correct?
17                 A.    Yes, I believe that is correct.
18                 Q.    All right, so we could all do that
19   and double-check.
20                 THE CANADIAN COURT:  He might want to
21   depose you for a couple of hours to see whether or
22   not your math is right.
23                 MR. ZARNETT:  I have time this weekend,
24   Your Honour.
25                 BY MR. ZARNETT:
```



1                Q.   All right, sir, let me turn you to

2    a slightly different topic, Mr. Malackowski, in

3    your rebuttal report and yesterday you referred to

4    something called an inventorship analysis?

5                A.   Yes, before we leave that last

6    subject, just so there is no confusion, if you look

7    to slide 17 of the exhibits that I sent you or that

8    we used yesterday, and there is no trick to this,

9    but on the bottom of slide 17 is a footnote.  The

10   footnote cites to the page where these numbers were

11   obtained, and if you go to the "R" exhibits, "R"

12   means revised.  If you go to exhibit R.2.2, that is

13   a slightly revised version of what exactly you were

14   looking at, so if someone wants to pull up the

15   data, I just want to make sure you pull up the

16   right data.

17               Q.   Thank you, but the methodology

18   would be the same?  We would look at those five

19   years and average the percentages you have arrived

20   at and we would get the five-year capital stock

21   percentages for each entity for that five-year

22   look-back period ?

23               A.   Yes, I just want to make sure you

24   have the right numbers.

25               Q.   Thank you.  Now, yesterday you



1    were talking about an inventorship analysis;

2    correct?

3              A.   Yes, sir.

4              Q.   And do you agree that is a useful

5    metric for testing the reasonableness of a proposed

6    allocation?

7              A.   Generally, yes.  That is how I

8    have used it.

9              Q.   All right, and one way you used it

10   was to compare the US Debtors' residual patent

11   allocation proposal to the inventorship of high

12   interest patents; correct?

13             A.   Within my reports, that is one of

14   the comparisons I made.

15             Q.   Sure, sure, and if you look at

16   your rebuttal report, page 41, table 13.

17             A.   Yes, sir.

18             Q.   You note that there that the US

19   expert, Mr. Kinrich, proposes a 9.7 percent

20   allocation to Canada out of the residual patent

21   portfolio sale; correct?

22             A.   Driven by his licensing model,

23   yes, sir.

24             Q.   And you compare that to the two

25   numbers we see below that, the 46.3 percent high

 Neeson&Associates  W&F WILSON & PETZER LTD.

1    interest patent inventorship in Canada, and also to

2    the total patent inventorship in Canada; correct?

3              A.   I do.

4              Q.   All right, and you draw the

5    conclusion that Mr. Kinrich's result may be

6    unreasonable; correct?

7              A.   Well, I'm drawing the point that

8    there are inventive activities outside of the US

9    that, for example, are represented in US revenues,

10   and so one of the concerns I have with the licence

11   approach and why the contribution approach is I

12   believe the accurate one relate to that

13   discontinuity.

14             Q.   And because the number you arrive

15   at for Canada under your licence approach is not

16   dissimilar to this, it is also fair to say that

17   your inventorship analysis leads to the similar

18   conclusion as you drew in respect of Mr. Kinrich;

19   correct?

20             A.   No, that is fair.  The licence

21   approach, even as corrected, still has the issue of

22   focussing on revenues rather than when -- where the

23   inventions were created.

24             Q.   All right, and if we look at this

25   inventorship number for Canada of 46.3 percent of



1   high interest patents and we compare it to your

2   contribution approach allocation to Canada, which I

3   think is around 39 and a half percent; is that

4   right?

5               A.   It is 39.7 percent or 39 and a

6   half percent for the residual portfolio.

7               Q.   Sure, we see it on table 13 here;

8   correct, right at the top?  We see a disconnect

9   there, don't we, that Canada's high interest

10  inventorship is higher than you are allocating

11  under the contribution approach?

12              A.   Well obviously the disconnect in

13  terms of order of magnitude is much less.  The

14  numbers are not identical, but this is a test which

15  ultimately was reflected in my final exhibits

16  showing that there is certainly some confirming use

17  of the inventor approach with the contribution

18  analysis.

19              Q.   But the inventorship approach here

20  would suggest, to use your words, that Canada was

21  punching above its weight, just as EMEA was;

22  correct?

23              A.   Yes, sir.

24              Q.   And that I guess the only entity

25  that was punching below their weight, to continue



```
 1   the analogy, was the US on this approach; correct?
 2              A.   Under this approach, yes, sir.
 3              Q.   Sure.  Could I ask you, sir,
 4   whether you have looked at the rebuttal report of
 5   Dr. Bazelon, who we --
 6              A.   I believe so, yes, sir.
 7              Q.   All right.  I wonder if I could
 8   ask you to look at an analysis that Dr. Bazelon
 9   did, it is table 15 of his report, his rebuttal
10   report.
11              THE CANADIAN COURT:  That is his
12   rebuttal report?
13              BY MR. ZARNETT:
14              Q.   It is his rebuttal report, Your
15   Honour, and we will get that up on the screen.
16              A.   Are you referring to his
17   inventorship analysis?
18              Q.   No, I'm not actually.  This is a
19   different analysis.  And just take a look at this
20   table, Mr. Malackowski, just for a second, and then
21   I think we should go back to the previous page just
22   to give you the context of what Dr. Bazelon says he
23   did to develop this table, and I just want to get
24   your comment on it.
25              So if you look at beginning on page 46,
```



1    the second full paragraph, it begins, "For a point

2    of comparison [...]", he says that he "[...]

3    examined the patents included in the Rockstar

4    transaction."

5                    And he says:

6                        "The transfer price that the

7                        Rockstar Consortium paid for the

8                        Nortel patents that it acquired can

9                        be deconstructed from a cash flow

10                       model developed by Nortel when it

11                       was considering entering into the

12                       patent licensing business."

13                   Now, just stopping there, you also

14   examined the patents in the Rockstar transaction?

15                   A.   Yes, sir.

16                   Q.   And you also looked at or did you

17   look at the IPCo cash flow model?

18                   A.   I did, as described under my

19   licence approach, I used that data as well as

20   market data.

21                   Q.   Okay, and if you look at the next

22   paragraph, the one that begins "The IPCo model

23   provides [...]", he says that it:

24                       "[...] provides a breakdown of

25                       royalty revenues for eight market



```
 1                    groupings of patents."

 2                    And he goes on to say he was able to

 3    trace over 3,000 of the patents into those patents

 4    groupings; do you see that?

 5                    A.   Yes, those would be the same

 6    Enterprise groups that I focussed on.

 7                    Q.   Okay, and then he says, and this

 8    is the last sentence of that second-last paragraph,

 9    he says:

10                        "From this, I was able, on a

11                        preliminary basis, to estimate the

12                        value that the patents originating

13                        in each RPE contributed to the value

14                        ultimately realized by Nortel in the

15                        Rockstar transaction."

16                    Do you see that?

17                    A.   I see the sentence you read, yes,

18    sir.

19                    Q.   All right, and just so that we are

20    talking on common terms, what Dr. Bazelon says he

21    is doing is actually trying to find the value of

22    particular patents and attribute it to patents

23    invented in each location; is that what you

24    understand he was doing?

25                    A.   Well, I don't know that I would
```



```
 1   phrase it that way.  What I understand him to be
 2   doing is to deconstruct the 4.5 billion dollar
 3   purchase price by referring back to the IPCo
 4   projections by Enterprise.  Those projections are
 5   for limited periods of time, so I think there is
 6   some concerns I would have with any conclusions
 7   from this approach.  But he is basically just doing
 8   a discounted cash flow that was shown within those
 9   sale documents.
10              Q.   All right, and then if you -- in
11   the last paragraph he says that he compares the
12   result of that analysis to R&D spending by estate;
13   do you see that?
14              A.   That is a correct reading.
15              Q.   Okay, so let's now take a look at
16   table 15 and just go over to the next page.
17              So if we just look at the line EMEA
18   there for a moment, he concludes that the value of
19   patents originating in the EMEA area is 17 percent
20   of the residual IP portfolio, on the terms he has
21   described; correct?
22              A.   Yes, sir.
23              Q.   And 52 percent for Canada; do you
24   see that?
25              A.   I do.
```



1                Q.   All right, and then 32 percent for

2    patents originating from the US?

3                A.   Exactly.

4                Q.   All right, now, have you examined

5    that study at all that Dr. Bazelon has done?

6                A.   I have reviewed it, yes.

7                Q.   Okay, and is it, as you call it, a

8    reasonableness test check for your conclusions?

9                A.   I don't use it for a

10   reasonableness check for my conclusions for the

11   limitation I provided, which is in particular it

12   doesn't reflect the full life of the patents that

13   were transferred.

14               Q.   And subject to that limitation, it

15   would suggest that the allocation to Canada of 39

16   percent is too low; correct?

17               A.   Well, again, you are pointing out

18   that there are differences in the numbers, but the

19   limitation is a large one.  I don't draw comfort

20   from this chart.  I understand what it is.  I think

21   the analysis, if you want to do a licence approach,

22   is better reflected in what I have done; for

23   example, I don't think he takes into account any of

24   the non-exclusive licence territories.

25               Q.   All right, so this is not an



1   approach that you have considered, I take it, in

2   the end?

3               A.   It is not an approach I would

4   adopt as a reasonableness test of the conclusions

5   and the data I have seen.

6               Q.   Mr. Malackowski, those are my

7   questions.  Just hold on there.  There will be

8   people coming up with more.

9               A.   Thank you.

10              THE CANADIAN COURT:  Mr. Steep.

11  CROSS-EXAMINATION BY MR. STEEP:

12              Q.   Justice Newbould, Justice Gross,

13  Mr. Malackowski, I'll Paul Steep of McCarthy

14  Tetrault and I act for the CCC.  You will recall

15  that we met at your deposition earlier this year.

16  Good morning.

17              A.   I do.  Nice to see you again.

18              Q.   Nice to see you again.

19              Mr. Malackowski, I want to start by

20  just putting the context of your report into the

21  context of Mr. Huffard's report.  You obviously

22  heard Mr. Huffard's evidence?

23              A.   Yes, sir.

24              Q.   And you are familiar with his

25  slide deck that preceded his evidence?



```
 1                    A.    I am.
 2                    Q.    And I expect that you had an
 3       opportunity to review that before it was given in
 4       evidence?
 5                    A.    That is true.
 6                    Q.    All right.  And I just want to
 7       walk through the steps that he outlined on slide
 8       number 4, which is fairly simple.  I'll walk you
 9       through it.  If you need to see the slide -- well,
10       there it is.  He has a methodology of three asset
11       classes:  Net tangible assets, intellectual
12       property and then customer-related assets and
13       goodwill?
14                    A.    Correct.
15                    Q.    Right.  And you understand that
16       the net tangible assets were calculated according
17       to what were the book values recorded in the books
18       and records of Nortel; correct?
19                    A.    Assets less liabilities he
20       aggregated that data and presented it.
21                    Q.    And then you understand that for
22       the second category, the intellectual property, he
23       relies upon your work to give him the value that he
24       plugs into that category?
25                    A.    Yes, that was my assignment.
```

 Neeson & Associates   W&F WILSON & PETERS LTD.

1              Q.   All right, and then you understand
2    that for him to come up with the last category,
3    customer-related assets and goodwill, he takes the
4    sum of the first two asset classes and subtracts
5    them from the purchase price?
6              A.   Arithmetically that is part of the
7    process.  Obviously he then goes on to allocate
8    them based on the metrics he deems most
9    appropriate.
10             Q.   Right, but I just want to focus on
11   what gets in what class so that we understand the
12   mechanics of this.
13             And I have correctly described the
14   mechanic?
15             A.   At a very summary level, I don't
16   disagree with anything you have said.
17             Q.   All right.  And so if the
18   intellectual property number on the business sale
19   goes up, the customer-related assets and goodwill
20   category will go down; that is directionally what
21   will happen?
22             A.   Assuming the net tangible assets
23   stay fixed, it is simple math because you have a
24   defined total.
25             Q.   Right.  And as we have just seen,



1   you allocated on your contribution methodology

2   let's call it 40 percent, 39.7 percent of the

3   intellectual property to Canada; correct?

4                A.   Including both the business sale

5   and the residual IP, 39.7.

6                Q.   Right.  And you know that the last

7   class, the customer-related assets and goodwill,

8   the allocation metric there was on the basis of

9   revenue; correct?

10               A.   I believe 2008.

11               Q.   Right.  And it is axiomatic, the

12  revenue that was earned in Canada, the smaller

13  market, was much less than 40 percent of the total;

14  correct?

15               A.   I believe factually that is true.

16               Q.   Right.  And so to the extent that

17  assets are allocated to intellectual property,

18  because you allocate on the basis of the 40 percent

19  contribution, that will largely benefit Canada, as

20  opposed to putting them in the last class,

21  customer-related assets and goodwill, which will be

22  measured on revenue?

23               A.   So that is a good question.  I had

24  specifically considered that issue.

25               Q.   So I should stop now, because I



```
 1   have one and Mr. Zarnett has none?
 2             THE CANADIAN COURT:  If anyone else
 3   wants to pop up and take a shot.
 4             THE WITNESS:  I have looked at it for
 5   each of the business sales and for the Enterprise,
 6   and it is not consistent across all platforms,
 7   meaning in some cases you are right, in some cases
 8   it is the opposite, but overall generally as you
 9   add value to IP in Mr. Huffard's analysis, all else
10   being equal, tangible assets being fixed, you will
11   reduce customer --
12             BY MR. STEEP:
13        Q.  And that is exactly why I said
14   directionally, but overall that is the tendency of
15   this model, right?
16        A.  Fair enough.  Fair enough.
17        Q.  Now, let's look then at how you
18   determined value, and I just want to do this in a
19   very summary fashion.  You had two components of
20   value in the IP connected to the sales of the
21   business, defensive value and synergistic value;
22   correct?
23        A.  Yes, sir.
24        Q.  All right.  And both of those
25   involve projecting revenues over a forecasted
```



```
 1   period; correct?
 2              A.   Yes, under a relief from royalty
 3   model.
 4              Q.   All right.  And I am correct that
 5   the defensive value is a measure of the revenue
 6   that would be generated by the IP in the actual
 7   Nortel business that was transferred?
 8              A.   Correct.
 9              Q.   All right, whereas the synergistic
10   value is the value that might be incremental to a
11   purchaser's use of that IP?
12              A.   Within their existing business,
13   yes, sir.
14              Q.   All right.  Now, if we turn up
15   slide 15 from your opening deck, we get the totals
16   of those?
17              A.   Yes, sir.
18              Q.   765 million.  Now, for the
19   defensive value, I understand that you used
20   forecasts that came from the Nortel deal books that
21   were prepared by Lazard; is that correct?
22              A.   In part, augmented by industry
23   research when necessary.
24              Q.   And the augmentation took place
25   because you got to the end of whatever period
```

 Neeson & Associates    W&F  WILSON & PETZER LTD.

1    Lazard had projected, had to tack on to it for your

2    useful life analysis, and so you took that from

3    other sources?

4              A.    Yes, that is fair.

5              Q.    Now, for the synergistic value,

6    you considered hypothetical purchaser based on four

7    market participants, competitors, and as I

8    understand it, usually or always including the

9    purchasers who actually bought the businesses; is

10   that right?

11             A.    That is fair.

12             Q.    All right.  Now, as that

13   categorization indicates, you knew who the actual

14   purchasers were?

15             A.    Yes, sir.

16             Q.    But you didn't rely just on the

17   actual purchasers.  You added in other market

18   competitors; correct?

19             A.    Understanding that it was an

20   auction process and so I wanted to include the

21   benefit of that auction.

22             Q.    All right.  But is it fair to say,

23   Mr. Malackowski, that the actual purchaser of the

24   IP will, just as your hypothetical purchaser, enjoy

25   one assumes some synergistic value?



```
 1                    A.   Yes, sir.
 2                    Q.   All right.  And is it fair to say
 3   that the actual purchaser will also enjoy that
 4   defensive value, the use of that IP in what was now
 5   formally the Nortel business?
 6                    A.   Of course.
 7                    Q.   And so that value should be
 8   reflected in whatever value the purchaser gets out
 9   of that transferred Nortel business; it should have
10   both defensive and synergistic components?
11                    A.   I'm not certain I understand the
12   question, but generally, yes, the transactions
13   should reflect that value.
14                    Q.   All right.  Now, I want to take
15   you back to Mr. Huffard's opening slides.  I'm
16   sorry that we have to go back and forth.  But you
17   would have heard him refer to slide 14 yesterday,
18   and we can just call that up.  And in particular,
19   if you were listening to his evidence, you heard
20   him refer to this excerpt from the Ericsson 2009
21   annual report, TR43865; correct?
22                    A.   Yes, sir.
23                    Q.   All right, and you heard him refer
24   to this quote in connection with giving evidence
25   about the importance of the customer relations;
```



```
 1   correct?

 2              A.    Exactly.

 3              Q.    All right.  And I assume you also

 4   had access to this document?

 5              A.    Yes.

 6              Q.    And as part of your review of the

 7   record, you took a look at that document?

 8              A.    There I don't recall if I actually

 9   looked at this document, but I'm sure I had access

10   to it.

11              Q.    Okay.  Now, I would like to bring

12   that up.  You were aware that Ericsson reported on

13   the transaction in its 2009 annual report, the same

14   one that is quoted here?

15              A.    Yes, I believe I referred to that

16   within my own report.

17              Q.    Right.  And if I can just call up,

18   and I want to make sure that, Judge Gross, you have

19   this as well, it will be TR40195.  We are handing

20   them up here.  I'll just wait to make sure that you

21   have one as well.

22              THE US COURT:  Thank you, Mr. Steep.

23              BY MR. STEEP:

24              Q.    And if you would turn up, first of

25   all, page 38, and I am referring to the 38, Judge
```



```
 1   Gross, of the actual SEC filing.  You can see the
 2   numbers in the middle of the page at the bottom?
 3              THE US COURT:  Yes.
 4              BY MR. STEEP:
 5              Q.   And I just want to look at the
 6   second-last paragraph there, because it will orient
 7   us to the quote that was referred to by Mr.
 8   Huffard.  And you will see it right there:
 9                   "Now also Nortel's US customer
10                   base is added, providing additional
11                   opportunities in CDMA and LTE."
12              That is the quote from page 14 of the
13   Huffard slide deck; correct?
14              A.   I believe so.
15              Q.   Right.  Now if you turn ahead to
16   pages 119 and 120, you will see the purchase price
17   allocation that Ericsson reported on in the same
18   annual report.  So if you go to the top of page
19   120, you will see a heading "Nortel Business".
20              THE CANADIAN COURT:  Sorry, it has to
21   be brought up, please.
22              BY MR. STEEP:
23              Q.   If you just give me a minute, Mr.
24   Malackowski, until we get the screen up.  I know
25   you have got the page.  Thank you.
```



1                And if you could just enlarge the
2    table.  Thank you.
3                Now, you understand that when
4    businesses are acquired in public companies, they
5    do a purchase price allocation and they typically
6    report that; correct?
7                A.   For meaningful transactions,
8    significant transactions, yes, sir.
9                Q.   All right, so this would have been
10   a meaningful transaction for Ericsson in 2009?
11               A.   That's correct.
12               Q.   All right.  And I am sure you
13   don't carry around in your head the 2009 conversion
14   rate for Swedish Kronor, so I'm going to suggest to
15   you that it is about 6.8 to the US dollar.  It
16   should be marked there.  And for purposes of our
17   examination, perhaps you'll be kind enough to
18   accept that from me.
19               A.   Yes, sir.
20               Q.   If you do, you must remember that
21   the CDMA transaction was about 1.1 US?
22               A.   Well, I think if you look to the
23   previous page, 119, it specifically says that.
24               Q.   Right.
25               A.   1.18 billion.



```
 1                    Q.   Right, and you recall that that
 2   was the magnitude of the CDMA transaction?
 3                    A.   Yes, sir.
 4                    Q.   All right.  And so you see if you
 5   use that conversion rate against the total purchase
 6   price of 8 billion 345 million, that would come out
 7   to about 1.18 billion US?
 8                    A.   Again, it is stated right in the
 9   document.
10                    Q.   All right.  Now, you will see what
11   they did -- and did you look at this document at
12   the time you prepared your report?
13                    A.   I believe so.  I'm familiar with
14   this.
15                    Q.   All right.  And I am correct that
16   you don't actually refer to this document in the
17   text of your initial report?
18                    A.   I don't believe so.  There was
19   some understanding at the time the purchase price
20   allocations were agreed by the parties not to be
21   relied upon, so I did not.
22                    Q.   All right, but you looked at it?
23                    A.   It is a public filing document, so
24   I have seen it.
25                    Q.   All right.  Now, you know that
```



1    what Ericsson did here was value the intellectual

2    property rights at 4 billion 979 thousand Kronor,

3    over half the purchase price; correct?

4              A.   Yes, sir.

5              Q.   And if we look at customer

6    relationships immediately below that, they report

7    those at about 811,000 Kronor; correct?

8              A.   Yes, sir.

9              Q.   That is about one-tenth the

10   purchase price?

11             A.   Fair enough.

12             Q.   And you would agree with me on

13   that ratio that they value IP rights as having five

14   times -- over five times the value of the customer

15   relationships?

16             A.   Well, specifically they had an

17   appraisal done that resulted in these conclusions.

18             Q.   All right, and they reported

19   publicly that the intellectual property rights were

20   five times the value of the customer relations?

21             A.   Based upon that appraisal.

22             Q.   Now, if we did the conversion on

23   that 4 billion and 979,000 Kronor, that would be

24   about 732 million dollars; fair enough?

25             A.   I accept that.



1          Q.   And if we -- that would be
2    intellectual property rights for just one
3    transaction --
4          THE CANADIAN COURT:  I don't understand
5    the question, Mr. Steep.  If you do a conversion on
6    that 4 billion, what 4 billion?
7          MR. STEEP:  Intellectual property
8    rights under the fair value column are valued at 4
9    billion 979 thousand -- or million Kronor.  If you
10   convert that to US dollars --
11         THE CANADIAN COURT:  Oh, I see, okay.
12         BY MR. STEEP:
13         Q.   I'm sorry, I wasn't con clear, Mr.
14   Malackowski has confirmed that would be about 732
15   million dollars?
16         A.   I can accept that.
17         Q.   All right.  And that is 732
18   million dollars for intellectual property rights on
19   one transaction, the CDMA transaction; correct?
20         A.   As appraised by the buyer
21   post-transaction.
22         Q.   Okay the buyer who is enjoying the
23   intellectual property rights in the Nortel business
24   and enjoying the synergistic value; correct?
25         A.   Yes, sir.  Now, just to add a



1    little footnote to that, we know that with respect

2    to Ericsson, they were also considering an

3    out-licensing business which makes them somewhat

4    unique, so there is a component of value that

5    Ericsson has contemplated going to licence this to

6    the industry.

7              Q.    And if you compare that value of

8    732 to your slide at tab -- or slide 15 where you

9    have 765 million for all of the IP rights in all of

10   the business sales, in one transaction the

11   intellectual property rights would capture almost

12   all of the value that you attributed to all of the

13   IP rights?

14             A.    No, I don't think that is a good

15   question.  That is not an accurate interpretation

16   or conversion of my chart to this data.  My chart

17   represents what was the value captured by Nortel in

18   an auction environment.  Could there have been --

19   and you pointed out the one instance where there

20   was a meaningful difference, where there was a

21   buyer who would have perhaps paid more if the

22   auction had been more aggressive.  I think Ericsson

23   would say they got a good deal on the auction.

24             My goal was to determine what was the

25   fair market price with at least four market



```
 1   competing participants.  And that is why my

 2   analysis I think is appropriate and reconciled to

 3   what is shown on the screen.  Add to that the

 4   out-licensing, add to that that the PPA's were not

 5   considered to be relevant evidence, I'm comfortable

 6   with my result.

 7              Q.   All right, but in fact when you

 8   say reconciled, your report doesn't reconcile it to

 9   any of the PPA's, does it?

10              A.   Well, it does not, because I

11   understand the PPA's were not to be used by the

12   experts and I have only seen the ones that are

13   available publicly.  I have never even been given

14   the others.

15              Q.   And I take it if you thought you

16   weren't to refer to them, and you didn't look at

17   them, that you didn't provide a reconciliation to

18   them?

19              A.   Well, it is part of my

20   investigation to be certain that I am comfortable

21   with my result.  There is probably hundreds of

22   things that I have considered to make sure that my

23   analysis is accurate.

24              THE CANADIAN COURT:  Mr. Steep, can I

25   just ask a question here?
```

 Neeson & Associates   W&F

```
 1              MR. STEEP:  Yes.

 2              THE CANADIAN COURT:  You said you

 3    understood the PPA's were not to be used by the

 4    experts.  Was there some agreement on that?

 5              THE WITNESS:  That is my understanding

 6    that there was an agreement amongst the parties at

 7    the time that the reports were prepared that none

 8    of the experts were to use them.

 9              THE CANADIAN COURT:  All right, thank

10    you.

11              MR. MILNE-SMITH:  I apologize for the

12    intrusion.  There was, and I believe this was part

13    of the pre-trial motions that eventually fell away

14    in terms of projections to evidence, so there were

15    a series of side agreements and side letters about

16    not relying on prior PPA's among the Debtors.  It

17    is unclear whether that applied to Mr. Steep's

18    client.  We eventually decided thanks to guidance

19    from Your Honour earlier in the trial not to

20    proceed with those limitations.

21              BY MR. STEEP:

22         Q.   All right, but you had a chance at

23    the time you prepared your report to look to these

24    documents?  You were aware of them?

25              A.   Which documents?
```



```
 1                    Q.   The PPAs that were publicly

 2   available?

 3                    A.   Oh, that were publicly available?

 4   Yes, but I didn't have the chance to see all of

 5   them.

 6                    Q.   All right.  Now, I want to then

 7   turn to your rebuttal report.

 8                    A.   Yes, sir.

 9                    Q.   And your rebuttal report was

10   prepared after you had had an opportunity, of

11   course, to read those reports which you thought

12   were relevant to your IP analysis; correct?

13                    A.   Yes, sir.

14                    Q.   Now, in the course of doing your

15   rebuttal report, you made a statement --

16                    A.   Could you tell me which page?

17                    Q.   I can.  If you would turn up page

18   19 of your rebuttal report.  Have you got that,

19   Judge Gross?

20                    THE US COURT:  Yes, I do.

21                    BY MR. STEEP:

22                    Q.   And if you go to the last

23   paragraph then of page 19 you made a statement

24   that:

25                         "[...] while the traditional
```



```
 1              operating Business Lines had lower

 2              potential value in the hands of

 3              Nortel, the potential value of the

 4              licensing business would have been

 5              greater in the hands of Nortel, had

 6              it continued to operate, than the

 7              Residual Patents would be in the

 8              hands of a third-party

 9              non-practising entity like

10              Rockstar."

11              Correct?

12              A.   And then I give three reasons on

13     the next page.

14              Q.   Right.  And what you did was then

15     consider what would be the value in the hands of

16     Nortel in a circumstance where they had held on to

17     all of the patents, including the patents that went

18     with the lines of businesses, as well as all of the

19     Rockstar patents; correct?

20              A.   I did consider that, but only in

21     response to my criticism of Mr. Green's

22     calculations.

23              Q.   All right.  And in doing that, you

24     ran some forecasted numbers; correct?

25              A.   Correct, I adjusted Mr. Green's
```



```
 1    work because he assumed there would be no licensing
 2    business within Nortel in normal course, and I
 3    showed the impact of that assumption.
 4                Q.   All right.  So what you considered
 5    here was a Nortel that had all of its IP rights
 6    unencumbered by any licenses and it held them to
 7    run a licensing business; correct?
 8                A.   Generally speaking, yes, that is
 9    fair.
10                Q.   All right.  And then if we turn to
11    page 20 to the second paragraph, the last line, you
12    summarized -- sorry, it should be the first
13    paragraph then, the first full paragraph, and in
14    the last line you state your conclusion:
15                     "The total value of the IP in a
16                     licensing business in the hands of
17                     Nortel could have been worth as much
18                     as $10,367 million according to the
19                     calculations set out in Exhibit 1".
20                     Correct?
21                A.   Yes, Exhibit 1 is the criticism of
22    Mr. Green.
23                Q.   And if you go to Exhibit 1, you
24    will find a table that sets out this number;
25    correct?
```

 Neeson&Associates   W&F

 1                    THE CANADIAN COURT:  Where is Exhibit
 2    1?
 3                    MR. STEEP:  Exhibit 1 in the rebuttal
 4    report, sadly at least the pages in mine, Your
 5    Honour, Judge Gross, are not paginated, but it is
 6    up on the screen.  You will see what the chart
 7    looks like.
 8                    MR. GOTTLIEB:  Your Honour, tab 30, you
 9    can find it there.
10                    BY MR. STEEP:
11             Q.   And it is actually Exhibit 1.2
12    within Exhibit 1.  And as you did in your primary
13    report, you broke it out into value that is
14    attributable to the business sale IP and value that
15    is attributable to the IP; correct?
16             A.   Yes, sir.
17             Q.   And in this calculation, the value
18    attributable to the business sale IP is 3.7 billion
19    dollars?
20             A.   Well, again, this is modifying
21    Mr. Green's calculation, but that is the result of
22    that modification.  It is showing the significance
23    of his error of assuming Nortel would simply have
24    discarded the residual portfolio had it not sold
25    it.



1                    Q.   If we just go back to the language
2    you used in your report:
3                         "The total value of IP in a
4                         licensing business in the hands of
5                         Nortel could have been worth as much
6                         as [10.4 billion dollars]".
7                         That is what you say, correct?
8                    A.   Yes, noting to this chart.
9                    Q.   And that 10.4 billion dollars
10   includes business sale IP, which on this exhibit
11   you value at 3.7 billion dollars?
12                   A.   Based upon Mr. Green's foundation,
13   yes, sir.
14                   Q.   Now, in your testimony yesterday,
15   you also referred to Mr. Veschi in the context of
16   his handling of the IP that went with the sales of
17   the business; do you recall that?
18                   A.   I do.  That was part of my testing
19   of the look-back period based upon the actual
20   Rockstar litigation.
21                   Q.   All right.  And you referred to
22   your understanding that Mr. Veschi had made his
23   best efforts, and I am paraphrasing you, to keep
24   back IP in the residual IP; correct?
25                   A.   Correct.

```
 1                    Q.   All right.  And I take it that
 2    that understanding of what Mr. Veschi did came from
 3    reviewing his transcript?
 4                    A.   Yes, sir.
 5                    Q.   All right.  Mr. Veschi was only
 6    deposed once; correct?
 7                    A.   I can't recall with precision.  If
 8    it was more than once, I read them both.
 9                    Q.   All right.
10                    THE CANADIAN COURT:  And if it was
11    three times, you read them three times.
12                    THE WITNESS:  I have read all of
13    Mr. Veschi's testimony.
14                    BY MR. STEEP:
15                    Q.   I gotta get you to speak to my
16    experts.
17                    Now, just to orient ourselves to your
18    comments yesterday, you were talking about how
19    Mr. Veschi and his colleagues at Nortel arrived at
20    the predominant use standard and how they applied
21    it to the lines of business and what impact it had
22    on the residual IP; correct?
23                    A.   Yes, sir.
24                    Q.   All right.  Now, let's just bring
25    up his transcript, if we can, and I am going to
```



```
 1   refer to pages 122, 123, 124, over to 126, just to
 2   give you the full context of what he says about
 3   predominant use.
 4                   A.   Can I have a copy of his
 5   transcript?
 6                   Q.   You will.  And we will call it up
 7   on the screen.  And Judge Gross, we have to make
 8   sure that you get a copy as well?
 9                   THE US COURT:  I have one.  Thank you,
10   Mr. Steep, I have it.
11                   BY MR. STEEP:
12                   Q.   So I think, to use your phrase, it
13   is non-controversial among the parties that the
14   standard they applied to allocating or segregating
15   patents to IP business was the predominant use
16   standard?
17                   A.   Agreed.
18                   Q.   All right.  And you agree that
19   Mr. Veschi, if we look at page 122, in answer to a
20   question about what predominant use means at line
21   11, he says:
22                   "I'm the one that came up with
23                   it, and I've been asked multiple
24                   times to define it and I have
25                   avoided having to define it
```



```
 1                    throughout the entire process
 2                    because I thought it was best for it
 3                    to not be defined."
 4                    Fair enough?
 5             A.   Yes, specifically because he
 6   wanted to negotiate as much of the IP into the
 7   residual and didn't want to give them a definition
 8   to hide behind.
 9             Q.   All right, well, I want to just
10   walk you through what he says here to just test
11   that proposition.
12                  So if you go over the page to 123, he
13   says at line 7:
14                    "So I basically took control
15                    and said the way this needs to be
16                    done is we need to create a process,
17                    have all the businesses involved at
18                    the same time, because even though
19                    we might be selling them in a
20                    series, their interests in this
21                    discussion are equal.  Have all the
22                    businesses represented, get them all
23                    the entire portfolio of patents to
24                    look at and give them an opportunity
25                    to come back saying which ones they
```

 Neeson & Associates    W&F

```
1                    think should go to them if they're
2                    sold, and then we'll -- [...] 'we'
3                    in this case would end up being
4                    Gillian", referring to Gillian
5                    McColgan there, "[...] will manage a
6                    process to determine where there was
7                    -- where there was an agreement."
8                    You will agree with me what he is
9          talking about there is a consensual process
10         involving all of the businesses; fair enough?
11                   A.   Well, sure, I mean, in particular
12         it is a negotiation between his team and the
13         business unit leaders informed by the whole
14         process, to keep as many of the patents in the
15         residual portfolio as possible.
16                   Q.   All right.  Now, he didn't use
17         those words, but I understand what you take from
18         it.  Now if you go to line 20, he says:
19                   "To do that we had to establish
20                    a standard and there were debates at
21                    the time as to what the standard
22                    should be.
23                    In every sale, according to Chris
24                    Cianciolo, so if you talk to him, he
25                    would verify this, Chris told me in
```



```
 1                every sale we had ever done before
 2                the standard that was used was
 3                exclusive [...]"
 4           And you understand exclusive to be a
 5      higher standard than predominant use?
 6                A.   Yes, I think that is fair.
 7                Q.   All right.  So up until that
 8      point, the standard that Nortel had applied was an
 9      exclusive standard in every sale?  You understood
10      that?
11                A.   Well, I understand that's
12      Mr. Veschi's testimony here.
13                Q.   You haven't got any contrary
14      information?
15                A.   I mean, I can't elaborate on
16      Mr. Veschi's testimony.  I know he was with Nortel
17      for a recent period of time, that he is expressing
18      his understanding.  I can't affirm that that's
19      absolutely correct in every instance, I haven't
20      studied it.
21                Q.   I know, but you relied --
22                THE CANADIAN COURT:  If you are going
23      to be fair to the witness, you have to keep on
24      going.
25                MR. STEEP:  I'm going to keep on --
```



```
 1                    THE CANADIAN COURT:  Well get to it,
 2   page 125, line 16.
 3                    BY MR. STEEP:
 4              Q.   If I can just go to 124 first,
 5   before I take him there, and I have got that, so at
 6   21, line 21 on 124 he says:
 7                        "We tried to get exclusive as a
 8                        standard which would have probably
 9                        meant maybe 20 per cent of the
10                        portfolio would have been sold with
11                        the businesses but there was --
12                        because that's what we've always
13                        used before according to Chris, but
14                        there was push-back on that.
15                    So I had to come up with
16                        something that would be more liberal
17                        than exclusive but not so -- not at
18                        the other end of the spectrum where
19                        the patents were largely just given
20                        away."
21                    So you'll agree with me that, again,
22   what he is talking about is a more liberal standard
23   for patents going with the business than what they
24   had used in the past.
25                    THE CANADIAN COURT:  Well, again I
```



```
 1    suggest you to move on to page 125 before you start
 2    putting all this to him.
 3              BY MR. STEEP:
 4              Q.   All right, and I am on page 125,
 5    and all I want to get you to is that there
 6    was -- you can read the rest of 125.  I'll read it
 7    for you:
 8                   "Because my view was, and I
 9                   think it's the accurate view, you're
10                   not going to get an additional dime
11                   for the patents you throw in, so why
12                   would you throw them in.
13                   And the counter view was well, it
14                   's going to make it harder to sell
15                   the businesses so why would you keep
16                   them back.  If our goal is to sell
17                   the businesses, let's just sell the
18                   businesses and move on.
19                   So I came up with 'predominant'.
20                   [...] and that's what we need to
21                   use.  And it was defined as --
22                   loosely defined as if the patent is
23                   used in a business almost
24                   exclusively, or largely, it's
25                   largely there or they're the
```

Neeson&Associates   W&F

```
1                    sponsor, and it's, you know -- so if
2                    you looked at the overall Nortel
3                    use, business A is using this patent
4                    everywhere and maybe business B and
5                    C are just tangentially using it a
6                    little bit, maybe we would say that
7                    is predominant.
8                       We didn't define it, and the way
9                    I set it up was Gillian would
10                   arbitrate and manage the process,
11                   and if the techies couldn't agree,
12                   the first level of appeal would be
13                   to me, and if after they appealed to
14                   me there was still disagreement, the
15                   next level of appeal would be to
16                   Gordon Davies.  I had already set
17                   this up with Gordon."
18                      Now, Your Honour, I just want to put to
19      the witness, to the extent you relied upon
20      Mr. Veschi's evidence about what were the meaning
21      and impact of predominant use, you would rely as
22      well on these statements of Mr. Veschi; correct?
23                      A.   I would rely on the total of
24      Mr. Veschi's transcript, so there are the words
25      here where he is loosely defining "predominant" as
```



```
 1    almost exclusive and then later in his transcript
 2    he goes on to say my goal was to get as many of the
 3    patents as possible into the residual, starting at
 4    page 128 you see some of that discussion.
 5                 Q.   Right, and you understood that the
 6    M&A people handling the business sales had the
 7    opposite goal, to put as much into the businesses
 8    as they could?
 9                 A.   At some level, yes, and that is
10    why there was the tension in the negotiation.
11                 Q.   So there was a tension between the
12    two, and in fact, you know that there was agreement
13    in every case in that there were appeals to
14    Mr. Veschi?
15                 A.   I think that is fair.
16                 Q.   All right.  Now, I want to turn
17    just briefly to your less preferable methodology,
18    the licensing methodology, and I hope we can do
19    this quickly.
20                 For your licensing approach, you also
21    had to consider the value of the IP that went with
22    the businesses; correct?
23                 A.   Yes, sir.
24                 Q.   All right, and it is the same
25    forecasted model; correct?
```

 Neeson & Associates    W&F WILCOX & FETZER LTD.

1                    A.    That doesn't change.  It is just

2     the allocation that changes.

3                    Q.    Just the allocation, because under

4     contribution, you of course use your contribution

5     key or metric to allocate it, but under the

6     licensing approach, you are going to allocate those

7     streams of revenues back to various geographies;

8     correct?

9                    A.    Correct.

10                   Q.    And the RPEs in those geographies

11    are going to get the benefit of those streams of

12    revenues after you have done your net present value

13    calculation; correct?

14                   A.    Generally, yes.

15                   Q.    All right.  Now, in the

16    contribution approach for the residual IP

17    valuation, you did not have to do a specific

18    valuation because the price of the IP could be

19    allocated out using your contribution metric?

20                   A.    The price was known from the

21    transaction, the 4.5 billion.

22                   Q.    All right.  Now, in the licensing

23    approach, though, the purchase price gave you no

24    insight into how value was derived for the

25    purchasers; correct?



```
 1                    A.   I'm not sure I understand your
 2   question.  In the licensing model --
 3                    Q.   The purchase price --
 4                    A.   Of the residual portfolio or the
 5   business sales?
 6                    Q.   In the residual portfolio.
 7                    A.   Okay.
 8                    Q.   Perhaps it is easier if we just --
 9   I was trying to do it too quickly to get through
10   this.  Can we call up page 31 of the original
11   initial report of Mr. Malackowski.  And if you have
12   page 31.
13                    A.   I do.
14                    Q.   And Judge Gross, have you got
15   that?
16                    THE US COURT:  Yes.
17                    BY MR. STEEP:
18                    Q.   Right under "valuation of residual
19   patents" in the first paragraph, second -- or
20   sorry, third sentence:
21                         "However, the purchase price
22                         gives no insight into how that value
23                         was derived, and therefore how it
24                         should be allocated among the RPEs."
25                         Correct?
```



```
 1                    A.   Yes, sir.
 2                    Q.   All right, and you have to come up
 3   with an allocation which will allow you to push out
 4   the value of the residual IP into the geographies
 5   of the RPEs; correct?
 6                    A.   To allocate it by geography, yes,
 7   sir.
 8                    Q.   Right, and so what you do is a
 9   global forecast of earnings that might be generated
10   by way of licensing; correct?
11                    A.   And then parse it to various
12   geographies.
13                    Q.   Right, just as you described to us
14   yesterday, and then just like you did with the
15   business sale IP forecasted earnings, you give
16   credit to the residual IP earnings to the RPE in
17   that geography?
18                    A.   For their exclusive licenses, also
19   taking into account the non-exclusive licenses.
20                    Q.   All right.  Now, the net result is
21   to, under the licensing model, award the present
22   value of those forecasted earnings, for example, to
23   NNI, NNUK, NN Ireland; correct?
24                    A.   Well, not exactly.  You take those
25   forecasted values and then use them as the
```



1    allocation factor against the 4.5 billion.  You

2    don't directly award the NPV.  So if it is a little

3    higher or lower than the 4.5, it is okay.

4                    Q.    All right, fair enough.  Now, to

5    the extent that the RPS, residual profit share

6    methodology applied to earnings, you did not factor

7    that into your analysis when you allocated those

8    revenues out to the various RPEs?

9                    A.    I didn't re-allocate them under

10   the RPS, correct.

11                   Q.    All right.  And you have been

12   through this with Mr. Zarnett, so I don't want to

13   repeat, but if that licensing type business had

14   been carried on in a circumstance where the RPSM

15   applied, those regional participating entities

16   would not have captured all of the revenue; they

17   would only have captured their residual profit

18   share; correct?

19                   A.    In normal course, those amounts I

20   believe would have gone through the RPSM formula,

21   barring any change to that formula.

22                   Q.    And you did not do a calculation

23   to show us what that might look like under your

24   licensing model?

25                   A.    No, that was not my assignment.

 Neeson&Associates   W&F

```
 1                    Q.   All right, those are my questions.
 2    Thank you, Judge Gross, thank you Justice Newbould,
 3    thank you Mr. Malackowski.
 4                    A.   Thank you.
 5                    THE US COURT:  Thank you.
 6                    THE CANADIAN COURT:  Ms. Schweitzer.
 7    CROSS-EXAMINATION BY MS. SCHWEITZER:
 8                    Q.   I get three more minutes to say
 9    good morning, Mr. Malackowski.  Lisa Schweitzer
10    from Cleary, for the US Debtors.
11                    A.   Are you telling me your cross is
12    only three minutes?
13                    Q.   I'll say good afternoon in three
14    minutes, and then we'll start again, how is that?
15                    It will be more than three minutes,
16    less than three hours, how is that for an
17    estimation?
18                    I think a lot of questions have been
19    covered and a lot of subjects have been covered
20    after the last two days and I'm going to try and
21    keep to not repeating myself.  It might require a
22    little more skipping.  I didn't intend to start
23    with a transfer pricing exercise, but just since
24    that was the most recent topic discussed this
25    morning with the Canadian Debtors, I would like to
```

 Neeson & Associates   W&F WILSON & PETZOR LTD.

 1    turn to that just to get that out of the way.

 2                    A.    Sure.

 3                    Q.    I think to turn to your slide 34,

 4    if we could put that on the screen, and I'll go

 5    through the slide a bit, but there was a discussion

 6    this morning that started on the slide about using

 7    Nortel's transfer pricing methods and Nortel's RPSM

 8    methods and all that, so I'm just going to start

 9    more generally with that discussion.

10                    I believe Mr. Zarnett had asked you

11    this morning if you had looked at the numbers using

12    Nortel's RPSM method or if you had done a

13    quote/unquote the Nortel way; do you remember those

14    discussions?

15                    A.    There was discussions as to

16    whether or not I had done an allocation effectively

17    using a five-year look-back period.  I had

18    indicated that I had not because my examination of

19    the intellectual property transfer done told me it

20    would not be a meaningful analysis.

21                    Q.    So just to look at this slide on

22    the use of the contribution approach where you give

23    these different prior data points and one of them

24    is the RPSM, you are not actually -- you are

25    showing that that's a method that takes into



1    account R&D spend, but you are not using it as an

2    exact example of what should be done in this case;

3    that's right?

4              A.    Specifically, I looked to each

5    item on this chart as a comparable transaction,

6    meaning the methodology employed is consistent with

7    my contribution method.  That said, in each and

8    every case, as far as the actual calculation

9    arithmetic, I have used what I believe to be more

10   applicable evidence as to the look-back period, the

11   forecasting and the other information specific to

12   the sale transactions and the residual portfolio.

13             Q.    Okay, and I want to go through a

14   little more specifically when you say these prior

15   methods are consistent with your approach, that I

16   what I hear you saying is in spirit they are

17   consistent but they do different math or apply it

18   in different manners?

19             A.    Well at the most fundamental level

20   they apply a contribution method as opposed to a

21   licence method as opposed to a legal title method

22   so that is the threshold question.

23             Q.    And that is a contribution method

24   broadly defined, not through a specific formula

25   that you are pulling out from these slides and



1    putting into your case?

2              A.   Yes, ma'am.

3              Q.   Okay, and so just to start with

4    the two slides you had been shown by Mr. Zarnett,

5    and I realize we are on the edge of your expertise

6    here or even maybe your knowledge, the first one

7    you had seen was a transfer pricing work sheet

8    which was TR45645, it says "xls", I don't know if

9    that helps us pull it up.  We'll see if that magic

10   works.  Do you have a hard copy in front of you or

11   not?  This is the transfer pricing work sheet.

12             A.   I just have the one page.  I don't

13   have the whole document.

14             Q.   This is -- that is all I have

15   also, it is not my document.  So Mr. Zarnett had

16   shown you this document which appears to, as it is

17   labelled, although I'm certainly not authenticating

18   it, it says "Nortel 1Q 2010 transfer pricing

19   adjustments", and had asked you -- is it Q1 summary

20   on the bottom?

21             A.   What you have on the screen is

22   interesting because it is the cover sheet which

23   shows there are all kinds of assumptions that are

24   being made, so I would just hesitate to use this

25   for anything without understanding those



1    assumptions.

2             Q.   Okay.  Fair enough.  We are trying

3    to -- I apologize, because this isn't my document,

4    but we'll freeze on this page, because it makes the

5    same point.  But Mr. Zarnett this morning had asked

6    you questions about a line item on the page he

7    referred to which has allocated residual profit

8    percentages, which I think people have referred to

9    as RPS percentages, and he was reading them off, 49

10   percent or 38 percent or 2.5 percent, and we are

11   working to get it on the screen.  I apologize.  It

12   is not our document, again.

13            But do you recall that discussion about

14   the percentages, the ultimate RPS percentages and

15   whether you had applied those percentages?

16            A.   Yes.

17            Q.   Okay.  And are you familiar with

18   the final Canadian funding agreement that was

19   entered into at Nortel.

20            A.   At some level, I have seen a

21   significant amount of testimony regarding that

22   document.

23            Q.   And you see, whether on the screen

24   or the document that you were handed out, there is

25   a header in yellow that says that this model or



```
 1   document, whatever it is, it says "For Discussion
 2   Purposes Only", because "NNI is covered by Final
 3   Canadian Funding Agreement"; do you see that?
 4            A.   I do.
 5            Q.   And is it your understanding that
 6   under the Final Canadian Funding Agreement NNI had
 7   settled out its obligation to make these periodic
 8   transfer payments?
 9            A.   Now you are going beyond the scope
10   of my analysis.  That may be true.  I would have to
11   refresh my recollection with it.
12            Q.   Okay, so this is a little beyond
13   the area of your knowledge and that is fine, I
14   assume we will have many transfer pricing witnesses
15   and experts who can discuss this.  I just didn't
16   know if you had focussed on that detail.
17                 You were also shown a prior -- a second
18   document, and maybe we won't pull it on the screen
19   just because of the difficulty of that.  But for
20   everyone's reference, it was the other work sheet
21   which was TR43476 xls, do you have a hard copy in
22   front of you, Mr. Malackowski?
23            A.   Yes, ma'am.
24            Q.   And again, without the -- we'll
25   try to get that on the screen, the summary.  But
```



1    again, that same document has allocated residual

2    profit percentages and it lists across them 47

3    percent, 38 percent, 33.1 percent for each of the

4    parties --

5                    A.   No, I'm sorry, you misspoke, and

6    the reporter misheard.

7                    It is 47.4, 38.8, 3.1 are the three

8    numbers you read.

9                    Q.   I apologize, I'm reading too

10   quickly.  Can we get that on the screen?  It is

11   TR43476.  Oh, can I ask the Canadian Debtors to

12   pull it up?  Is that impossible?  I don't know if

13   everyone -- does everyone have a copy in front of

14   them?  Perfect.  Judge Gross do you have a copy in

15   front of you as well?

16                    THE US COURT:  No, I don't.

17                    THE CANADIAN COURT:  These two pages?

18                    MS. SCHWEITZER:  This is something the

19   Canadian Debtors had put up before.  Can you put it

20   on the screen?

21                    THE US COURT:  I'm getting it right

22   now.  Thank you.

23                    BY MS. SCHWEITZER:

24                    Q.   Okay.  Look at that, magically it

25   is on the screen.  It is a good day.



1              That is the most technologically
2    impressive thing I'll do all day, because I didn't
3    do any of it.  And on this you were also asked
4    questions about this spreadsheet, Mr. Malackowski,
5    is that right?
6                   A.   Yes, ma'am.
7                   Q.   And just to walk you through this,
8    there was repeated reference to Nortel's RPSM
9    method or Nortel's way of allocating different
10   profits this morning, and the reference was always
11   made to this line item that says "allocated
12   residual profit percentages", with the numbers that
13   we read off before; do you see that?
14                  A.   I see the line.  I do understand
15   there were references to this line as being
16   Nortel's methods from my examination.  I indicated
17   that this chart has issues such as whether or not
18   hedging was applied.  But yes, I understand the
19   allocated residual profit percent is the
20   calculation they have mentioned.
21                  Q.   Right, and in fact, this chart
22   could have other issues because the header of the
23   chart is "Nortel March Outlook as of 4/21/2009",
24   which again that period is covered by the IFSA,
25   isn't it?



```
 1                     A.    Well, it has that issue, and now

 2    having gotten a glimpse of the cover sheet where I

 3    see there is all kind of assumption variables put

 4    in, I can't suggest anyone rely on this unless

 5    there is a lot more understanding.

 6                     Q.    And I am certainly not offering it

 7    that I am trying to authenticate it or rely on it,

 8    but I do want to focus on it just in terms of some

 9    of the other categories of deductions.

10                     You are familiar with the MRDA enough

11    to understand that there is a Schedule "A" that

12    sets forth a residual profit split methodology; is

13    that right.

14                     A.    Yes, ma'am.

15                     Q.    And the residual profit split

16    methodology does not simply say here are R&D costs,

17    here are RPEs, let's apply a percentage; is that

18    right?

19                     A.    Correct, it is a more involved

20    calculation.

21                     Q.    Right, and some of those, without

22    looking at the numbers because you and I sitting

23    here today don't know if these numbers are correct,

24    what would happen is that the different steps of

25    the calculation would be first that distributor
```



```
 1    routine returns are calculated for distributors,

 2    which are the limited risk entities as they are

 3    referred to?

 4               A.    That's right, somewhere between

 5    zero and four percent.

 6               Q.    And then the residual profit

 7    entities, RPEs, are given other routine returns?

 8               A.    Yes, sir -- ma'am, sorry.

 9               Q.    I'll be either, it doesn't really

10    matter.  Return on GOP I believe is Global

11    Operations, S and M is sales and marketing, and G&A

12    is --

13               A.    General administrative.

14               Q.    There you go, you are better than

15    me, because you are the accountant -- return on

16    sales and those are different types of routine

17    returns that would be paid to the RPE entities

18    before any percentages are applied; is that right?

19               A.    Yes, ma'am.

20               Q.    And you would have to have

21    sufficient profits among the entities to even get

22    to the point of applying the RPS percentages to any

23    residual profits that have gone that far down the

24    waterfall, isn't that right?

25               A.    Well, that is my understanding,
```



 1   but now we are starting to move outside the scope

 2   of my analysis.

 3                Q.   Okay, but you do have a general

 4   understanding that when people talk about putting

 5   operating income or licensing income through the

 6   RPS methodology, that they are talking about

 7   putting it through this type of waterfall, not

 8   merely taking percentages and multiplying a licence

 9   revenue times a percentage; is that right?

10                A.   Exactly right.

11                Q.   And in the same way, that would be

12   a reason that you wouldn't use the RPSM percentages

13   as a straight methodology for allocating sale

14   proceeds; is that right?

15                A.   One of many, that is why I use

16   what is referred to as the R&D capital stock or the

17   R&D that is relevant.

18                Q.   And even the R&D capital stock, if

19   you are referring to it, as people use that in

20   Schedule "A", that is talking about a specific

21   five-year window for a specific time period; is

22   that right?

23                A.   I think we are all clear that I

24   don't take the five-year window.

25                Q.   Right, so you are using it in



1    spirit, but you are not actually saying to use the

2    MRDA RPSM?

3                   A.   I'm using it as a comparable

4    transaction that teaches a methodology applying the

5    specific facts of the assets that were sold.

6                   Q.   Right, okay, and then turning back

7    to the slide 34 from your demonstrative, I would

8    like to look at some of the other examples that you

9    are using for your contribution, historic examples.

10                  Can we put that up, demonstrative 34?

11                  As we said, the APA kick-off Q&A's is

12   not actually a comparable transaction; that is just

13   certain documents you had seen reflecting questions

14   and answers about what Nortel or someone who wrote

15   the document believed would be the way you would

16   allocate certain sale proceeds; is that right?

17                  A.   Well, that was a long lead-up.

18   Suffice it to say it is a document that is the

19   approved answers by management for representation

20   to the tax authorities on how a sale would be

21   treated.

22                  Q.   Right, well, I'm sure people will

23   stand up in the room and have a long debate on

24   whether it was approved by management, but maybe to

25   shorten the question, this isn't referring to an



1   actual precedential transaction is it?

2           THE CANADIAN COURT:  It is not

3   presidential.

4           BY MS. SCHWEITZER:

5           Q.   It is not referring to a

6   presidential transaction either, is it?

7           A.   It is not, and my reference was to

8   Ms. Polland's deposition on the approval.

9           Q.   And then on the IP migration and

10  analysis, that also was a hypothetical modelling,

11  but there was no actual transaction undertaken that

12  you are citing to; is there?

13          A.   There is not.  The way this chart

14  is aligned is what happened on top were the actual

15  transactions, and the bottoms were the -- things on

16  the bottom were either contemplated or in process,

17  and so the chart is laid out that way specifically.

18          Q.   That is helpful to understand.

19  And just in terms of the other non-transactional

20  precedent that you point to is the Nortel 2009

21  financial statements.  Previously, you were shown

22  not only the financial statements that have those

23  allocations in them, but a footnote, and I think

24  you were shown the 2010 version of the note to the

25  financial statements, saying that the final



1   allocations are subject to Court approval; do you

2   recall that?

3                    A.   I do, yes.

4                    Q.   And the same note was actually in

5   Nortel's 2009 financial statements, is that right?

6                    A.   I believe it was always there.

7                    Q.   Okay, and they don't only say that

8   it is a place holder, that the note further says

9   that the actual results and allocations could be

10  materially different from the ones included in the

11  financial statements; is that right?

12                   A.   That is my recollection.

13                   Q.   Okay, and just for the Court's

14  record and reference, that the 2009 financial

15  statements that would have that note is TR21541,

16  but in the interests of speeding through, I will

17  not pull that up, since there is no dispute.

18                   Turning to the top of the two

19  precedential documents you were citing to, the

20  other one which is the transaction you were citing

21  to, is the Alcatel UMTS transaction; is that right.

22                   A.   Yes, with the caveat that this is

23  following the Foundry, from the page before, so I

24  didn't reapply Foundry, but Foundry is also on the

25  top.



```
 1                    Q.   Fair enough, because we will go
 2      back to Foundry as well, so I do appreciate that.
 3      In the Alcatel transaction, you are aware that
 4      internally Nortel had considered different options
 5      for allocating the intellectual property in that
 6      sale.  Are you aware of that?
 7                    A.   Yes, I think there are memorandums
 8      that specifically lay out multiple options on a
 9      couple of key variables.
10                    Q.   Okay, and if we can actually pull
11      up that memorandum that you are citing or referring
12      to, it is TR21147.  I believe this was referred to
13      in Mr. Huffard's declaration, if anyone wants a
14      copy.  We have copies and the Court also.
15                    If you scroll down to there is a number
16      two, IPR two allocation views on the second part of
17      the first page.
18                    A.   Yes, this is exactly what I was
19      referring to.
20                    Q.   Right, and actually there is an
21      "A" and a "B", and the "B" says -- refers to use of
22      this RPS process.  If you look at "A", it says in
23      the first sentence:
24                         "Since the value of IPR is
25                         based on the revenue that it
```



```
 1                  produces, allocate on that basis."

 2                  Right?

 3                  And then if you look at the

 4      recommendation at the bottom of that page, it says:

 5                      "The better answer is A."

 6                  And if you look at the little "ii", it

 7      says:

 8                      "RPS determines economic

 9                      relationships between the parties re

10                      operating income only."

11                  Do you see that?

12                  A.   Yes, ma'am.

13                  Q.   It does not impact divestiture

14                  gain/loss."

15                  So the memo, which is on the screen

16      which was sent by Ms. Culina of the Canadian Tax

17      Department to Mr. Look, also of the Canadian Tax

18      Department, actually initially offered two

19      allocations and was recommending the allocation

20      based on revenue rather than -- and local rights

21      rather than RPS was the better answer; is that

22      right?

23                  A.   Well, that is what the document

24      says, but ultimately that is not what the decision

25      was.
```



1              Q.   You are right, it is to talk

2    about, well, the other testimony is in the record

3    regarding what the ultimate decision was, but

4    certainly Nortel didn't see it as a fait accompli

5    as the only way proceeds could be allocated in

6    Alcatel; is that right?

7              A.   That is right.  All of these

8    decisions are considered for a variety of business

9    reasons, including tax.

10             Q.   Right, and after the Alcatel

11   transaction, the Nortel parties had amended the

12   MRDA and particularly Schedule A to excludes line

13   of business sales from the RPSM formula; is that

14   right?

15             A.   I know that that amendment was

16   made and it exists.  I would be speculating as to

17   the timing relative to the Alcatel transaction.  I

18   just don't recall.

19             Q.   Okay.  Well, again, I know we are

20   a little far afield on transfer pricing, but the

21   evidence is in the record and other people can

22   bring it out in the future.

23             Turning to -- I think also before we

24   leave Alcatel, you are citing it as a principle for

25   an allocation method.  When you were trying to



```
1    value the IP, you also considered different methods
2    for valuing the IP; is that right?  You went
3    through an income approach, a cost approach, a
4    marketing approach?  You considered different
5    alternatives?
6              A.    Well, at the highest level, those
7    are the three basic methods, and you always start
8    by considering all three, though I think quickly it
9    was determined to use an income approach, a relief
10   from royalty.
11             Q.    Right, and a market approach is to
12   look at other comparable transactions to consider
13   how valuation was done there to hold those against
14   this transaction; is that right?
15             A.    Well, more specifically a market
16   approach is to compare the value of a given asset
17   in the market to the asset you are appraising.
18             Q.    Right, and when you looked at
19   potentially comparable transactions to consider
20   whether you could use a market approach to value
21   Nortel's IP, you in your report discuss how you had
22   considered the Alcatel sale as a potential market
23   approach comparable transaction, didn't you?
24             A.    I believe it was considered and
25   rejected for certain reasons in my report.
```



 1                    Q.    And in fact, the reasons that you
 2    offer that it was rejected was that you said you
 3    didn't consider it to be a helpful precedent
 4    transaction and it is on page 23 of your report.
 5    If we were to pull it up, TR40543, PDF page 24.
 6                    You said you didn't consider it to be a
 7    helpful precedent transaction for valuing IP, that
 8    Nortel sold post-petition because the size and the
 9    scope of the portfolio is different and the sale
10    took place outside the context of a bankruptcy.  So
11    that you didn't actually apply this approach and
12    you rejected it as a basis for valuation
13    calculation; is that right?
14                    A.    Yes, generally, there is other
15    discussion along those lines, but that is a fair
16    summary.
17                    Q.    Okay.  Now, you had mentioned the
18    Foundry transaction, so I would like to turn back
19    to the Foundry transaction or your prior slide on
20    that.
21                    And the Foundry transaction, again, you
22    made the point that this is a precedential
23    transaction because in the case of Foundry the
24    licensing revenue received was allocated using RPS
25    percentages; is that right?



```
 1                    A.    Perhaps you can point me to my use

 2   of the word "precedential"; I think I just referred

 3   to it as a comparable transaction under the method

 4   that I described.

 5                    Q.    Okay, fair enough.  I'll take

 6   comparable.  But you thought that the interesting

 7   approach was the contribution approach based on R&D

 8   spend; is that right?

 9                    A.    The fact that that was the method

10   that was used as opposed to a licence approach or a

11   legal title approach I found to be confirming of my

12   analysis.

13                    Q.    Okay, I would like to pull up

14   TR21167.  We again have copies for the courtroom,

15   but we'll put it on the screen.  And Exhibit 21167,

16   have you seen this document before?  I can hand you

17   a hard copy, I apologize.

18                    A.    I actually have it with me.

19                    Q.    There you go.  So you have seen it

20   before.  This is emails between Ms. O, who is a

21   member of Nortel's tax department, Mr. Lou Farr,

22   who is again -- works for Nortel's tax department,

23   and other members of Nortel's tax department.  Is

24   that right?  It is a series of emails between them?

25                    A.    It is.
```



```
 1                    Q.   And if we turn to the second page,
 2     where it says "Tax Analysis", this is discussing
 3     the Foundry settlement and how it is being
 4     allocated and if you look at the number 2, "Income
 5     Tax" --
 6                    A.   Yes, ma'am.
 7                    Q.   Do you see that paragraph?
 8                    A.   I do.
 9                    Q.   It says:
10                         "Foundry made a payment to NNL
11                         for the right to use the IP
12                         worldwide."
13                    Do you see that?
14                    A.   I do.
15                    Q.   And the next sentence says:
16                         "The fact that Nortel intended
17                         to transfer worldwide rights means
18                         that all of the other RPS
19                         participants were involved in the
20                         transaction."
21                    Is that consistent with your
22     understanding that under the MRDA, in light of the
23     licenses given to the RPS participants or the RPE
24     parties, that they would need to be involved in a
25     licensing transaction of worldwide licence rights?
```



```
 1                    A.    Yes, ma'am.
 2                    Q.    Then to look at next sentence, it
 3   says:
 4                         "To complete the transfer,
 5                    economically, each participant
 6                    should be paid its allocable share
 7                    of the royalties as payment for the
 8                    right to use the IP in its
 9                    location."
10                    Do you see that?
11                    A.    I do.
12                    Q.    And then if you look down further,
13   it says:
14                         "Because of the law suits and
15                    their effect on the relationship
16                    between Foundry and Nortel, it was
17                    not possible to obtain forecast re
18                    Foundry's anticipated
19                    country-by-country use of the IP."
20                    Do you see that?
21                    A.    I do.
22                    Q.    And the relevance of that
23   forecasted use would be that is where the revenue
24   -- or that is where the sales that you would be
25   charging royalties on would be located; is that
```



1   right?

2              A.   Generally, yes.

3              Q.   And the reason you would want that

4   is to understand which royalties are attributable

5   to which patents, for example, is it a US sale that

6   would be subject to a US patent or a Canadian sale

7   that would be subject to a Canadian patent; is that

8   right?

9              A.   At one level, yes, but of course

10  it ignores the fact that for a US patent that may

11  have actually been developed by Canada or EMEA, so

12  it is a different analysis than I have conducted

13  for those reasons, but you are reading the document

14  very well.

15             Q.   Okay.  But it is also this is

16  consistent with a licence the way you would

17  allocate under a licence in that if you go sue

18  someone and they pay you royalties, those royalties

19  are attributable to specific patents in specific

20  jurisdictions; is that right?

21             A.   The big difference being this is

22  not taking into account the non-exclusive

23  territories, and as shown in my work when you

24  properly account for the licence rights, exclusive

25  and non-exclusive, the weighting changes



```
 1    dramatically.  And so yes, if you did that, then
 2    you could use my alternative licence approach.
 3                    Q.   Right, and what I am trying to
 4    focus on is that you are suggesting that you can
 5    look at Foundry as a comparable prior transaction
 6    because in that case Nortel used the RPS
 7    percentages or used a contribution-based allocation
 8    approach?  That is what you are holding it out for,
 9    isn't that right?
10                    A.   Although they considered the
11    license and contribution approach, as did I,
12    ultimately the work was done based upon the
13    contribution method, as was mine.
14                    Q.   Right.  And they didn't decide the
15    contribution method was better.  They said it is
16    not possible to obtain the forecast to do the
17    licensing approach, and therefore, we are going to
18    use the contribution approach; do you disagree with
19    that reading of this memo?
20                    A.   Well, that is what this memo
21    suggests.  There are other limitations related to
22    the non-exclusive licenses.  In the end what I took
23    from this is after the debate was done and the dust
24    settled, they used the contribution method.
25                    Q.   I understand that you are saying
```


Neeson & Associates   W&F

1    that was their final decision and that decision

2    wasn't made based on having two methods that they

3    could choose from with full information.  It was

4    because they did not have the information to apply

5    the licence approach; isn't that right?

6                    A.    In part, that is true.  In part,

7    remember, this is a tax memo from the tax

8    department.  It is inherent to have a lot of

9    tax-driven considerations in this discussion as

10   well.

11                   Q.    I will agree, they discussed other

12   things in this memo.

13                   Now, to turn back to your report, there

14   has been a lot of discussion about the contribution

15   approach and in your direct presentation yesterday,

16   you spent a lot of time walking the Court and the

17   parties through the way you approached the

18   contribution approach to allocation of the various

19   proceeds.

20                   A.    Yes, ma'am.

21                   Q.    You also acknowledged that you did

22   offer a second analysis, which was the licence

23   approach to allocation?

24                   A.    Of course.

25                   Q.    And that while you prefer the



1    contribution approach, under the circumstances you

2    actually had concluded that either the licence

3    approach or the contribution approach was a

4    reasonable basis to allocate value under the

5    circumstances; isn't that right?

6              A.   Well, from an economic

7    perspective, I believe the contribution approach to

8    be accurate, but if the Courts determined that the

9    licence approach is required under agreements, then

10    I show the corrected figures.

11             Q.   Okay.  And the parties have walked

12    you through yesterday, and I don't to re-walk you

13    through it at any length all the different reasons

14    and considerations that went into all the

15    iterations of the contribution approach.  But I

16    think you had agreed yesterday that you had

17    considered different forms of the contribution

18    approach by, for example, looking at Nortel's lab

19    books and going back through a forensic analysis,

20    that you ruled out that approach because it would

21    be difficult to separate out the contributions of

22    the various RPEs in light of the coordinated and

23    integrated R&D practices; is that right?

24             A.   As well as the limited data at

25    this point.



 1                     Q.   Not just limited data.  But you
 2     also looked at this coordinated and integrated
 3     approach to R&D and decided that this type of
 4     forensic diligence would -- that the fact the R&D
 5     was coordinated and integrated would make that
 6     exercise even more difficult and impractical to do,
 7     isn't that right?
 8                     A.   It would make it more difficult, I
 9     agree.
10                     Q.   And in looking at considering the
11     use of some sort of inventorship approach, you
12     again said that it would be misleading to look at
13     inventor counts or inventorship to measure each
14     affiliate's contribution, again in light of this
15     coordinated and integrated activity; isn't that
16     right?
17                     A.   I don't recall saying it would be
18     misleading.  I don't believe it is preferred.
19     Obviously, my report will speak for itself in that
20     regard.  And I explain the limitations of the
21     inventor approach.
22                     Q.   Well, I don't need to pull it up,
23     but I believe, just to quote your report at
24     paragraph 39, you actually said:
25                          "Due to the commingled and



1                    co-operative nature of the R&D
2                    conducted by Nortel", as described
3                    in more detail in your appendices,
4                    "using inventorship as the metric
5                    for measuring contribution to
6                    development of the patented
7                    technologies would be misleading."
8                    A.   And that was an excellent
9     question.
10                    Q.   And you haven't changed your view
11    that it would actually be misleading?
12                    A.   No, I stand by my report.
13                    THE CANADIAN COURT:  Ms. Schweitzer,
14    can I ask you, are we to finish before lunch or are
15    we going to be taking lunch?  You said it was three
16    minutes to three hours and I just --
17                    MS. SCHWEITZER:  What time would you
18    like to take lunch, Your Honour?
19                    THE CANADIAN COURT:  Well, if it is not
20    going to be long, we could just continue, but if it
21    is going to be a while, just tell us what is a good
22    point for you.
23                    MS. SCHWEITZER:  I don't think I could
24    guarantee being finished in 15 minutes, but what I
25    can do is pause at the end of this section and then

Neeson&Associates    W&F

1    we can take a break.  I don't expect it will be

2    much longer than that, but I hate to overpromise.

3                   THE CANADIAN COURT:  I don't know if

4    there are other people or not?

5                   MS. SCHWEITZER:  I think it would only

6    be redirect, I believe, after that.

7                   MR. MILNE-SMITH:  I will have a brief

8    re-examination, but it will be brief.

9                   MS. SCHWEITZER:  If you would like, I

10   could just finish this line of questioning.

11                  MR. CHANG:  I may also have a couple of

12   questions, very short, just follow-up.

13                  MS. SCHWEITZER:  Okay.  Okay.

14                  THE CANADIAN COURT:  Well, it sounds

15   like we might be done by 1 o'clock, if we just keep

16   going; is that fair?

17                  THE US COURT:  Which makes sense.

18                  MS. SCHWEITZER:  That could be

19   achievable.  I will -- I think I should be able to,

20   yes.

21                  THE CANADIAN COURT:  I'm just assuming

22   that everybody in the room, it is a Friday

23   afternoon, would rather finish it rather than take

24   an hour for lunch and come back for half an hour?

25                  MS. SCHWEITZER:  I completely agree



```
 1   that I am happy to keep going.  Oh, everyone is
 2   telling me that there is another witness, we are
 3   not finished.
 4              THE CANADIAN COURT:  Oh, is there?
 5              MS. SCHWEITZER:  Yes.
 6              THE CANADIAN COURT:  Oh, all right.
 7   Who is that?
 8              MS. SCHWEITZER:  Who is our other
 9   witness today?  Mr. Cooper in Delaware.
10              THE CANADIAN COURT:  Well, then why
11   don't we, whenever it is convenient then, we'll
12   take the lunch break.
13              MS. SCHWEITZER:  Do you know what --
14              THE CANADIAN COURT:  Is this a
15   convenient spot?
16              MS. SCHWEITZER:  It is now, because I
17   would have to take my time to figure out where I
18   was, which is perfectly fine.  I will use this time
19   to shorten my questioning even further.
20              THE CANADIAN COURT:  Is lunchtime
21   enough for you to figure it out?
22              MS. SCHWEITZER:  It is Friday, Your
23   Honour, so there are no promises.
24              THE CANADIAN COURT:  So why don't we
25   come back at quarter to two?
```



```
 1                    THE US COURT:  Very well.  Quarter to
 2    two, everyone.  Thank you.
 3    -- RECESS AT 12:30 P.M.
 4    -- UPON RESUMING AT 1:48 P.M.
 5                    THE CANADIAN COURT:  Were you making a
 6    joke at my expense?
 7                    MS. SCHWEITZER:  I think it was
 8    knocking on heaven's door, if I got it right.
 9                    THE US COURT:  That's right.  When I
10    hear the knock on the door, I think of the old Bob
11    Dylan song.
12                    THE CANADIAN COURT:  Just before you
13    get started up, Ms. Stam, I have got your order.  I
14    have signed your supplementary order.
15                    THE US COURT:  I have done likewise.
16                    THE CANADIAN COURT:  And you can have
17    it, plus your motion record back.
18                    MS. STAM:  Thank you very much, Your
19    Honour.
20                    THE CANADIAN COURT:  And, Debbie, here
21    is a copy for the court, that is to be filed.
22                    THE US COURT:  All right, Justice
23    Newbould.
24                    And we also have, as a preliminary
25    matter, the issue of the demonstrative for
```



```
 1   Mr. Bazelon's expert testimony on Monday, and I
 2   think Justice Newbould and I have consulted and we
 3   think that Mr. Bromley's suggestion makes sense to
 4   us and the demonstrative may be used subject to
 5   Mr. Bazelon being available for a two-hour
 6   deposition over the weekend or at such time as the
 7   parties agree, and I don't know if the mechanics of
 8   that or the logistics of that deposition have been
 9   discussed, where and when.
10            MR. BARRACK:  We are so shocked and
11   surprised, Judge Gross, that if you would excuse
12   Mr. Bazelon and some of us, we are going to leave
13   and do that right now.  There is others in the
14   courtroom, and we will -- we have arranged for a
15   court reporter, and we'll have it done and we'll be
16   ready to go on Monday.
17            THE US COURT:  Thank you, Mr. Barrack.
18            MR. BARRACK:  Thank you for the rule.
19            THE US COURT:  Thank you.
20            BY MS. SCHWEITZER:
21            Q.   Mr. Malackowski, I promised you I
22   would have a chance to say good afternoon to you.
23   Good afternoon again.  For the record, Lisa
24   Schweitzer.
25            A.   Good afternoon.
```



```
 1                    Q.   I think we left off starting to
 2    talk about your inventorship analysis and to pull
 3    up your demonstrative, slide 36, just to have
 4    something to look at.
 5                    A.   Yes, ma'am.
 6                    Q.   You have that in front of you?
 7                    A.   I do.
 8                    Q.   Now, you are not offering this
 9    inventorship analysis as an allocation method or
10    allocation percentages; that's right?
11                    A.   Correct, it is a test of my
12    contribution.
13                    THE US COURT:  We are not hearing the
14    witness.
15                    THE WITNESS:  Hello, testing?  Is it
16    any better?  Now it is coming on.
17                    THE US COURT:  Better, thank you, yes
18    Mr. Malackowski, thank you.
19                    THE WITNESS:  Apologies.
20                    BY MS. SCHWEITZER:
21                    Q.   Just to repeat the question for
22    the US Court's benefit, I had asked you to confirm
23    that you are not using the inventorship analysis as
24    an allocation method, that's right?
25                    A.   Correct, it is a testing of my
```



```
 1   contribution approach.
 2              Q.   Okay.  And I think Mr. Zarnett had
 3   shown you table 13 of your rebuttal report earlier
 4   this morning, if we could pull that up.  And on
 5   that we are actually going to talk about punching
 6   for a couple of minutes, which is something I spend
 7   my whole weekend telling my children not to discuss
 8   or do.
 9              But yesterday and today we had all this
10   testimony about punching above your weight in
11   various different ways and Mr. Zarnett in fact was
12   asking you questions about table 13, and
13   referencing prior testimony about punching -- which
14   entities are punching above their weight.
15   Mr. Zarnett, I believe, was looking at the --
16              THE CANADIAN COURT:  Do you tell them
17   not to punch or just tell them not to punch above
18   their weight?
19              MS. SCHWEITZER:  Very good.  Well, you
20   know, at home we don't punch, but...
21              BY MS. SCHWEITZER:
22              Q.   On table 13, I believe
23   Mr. Zarnett's questions about punching above their
24   weight or who did good inventorship were focussed
25   on looking at allocation results as compared to
```



1    inventorship.  I actually believe the prior

2    testimony, if we could turn back to page 36, was

3    more this freeze was intended to reference the idea

4    that of how inventee people were, for lack of a

5    better word, how good their inventions were, and

6    you had offered this as a demonstrative again, as

7    not a method, but just a finger in the air on

8    looking at where the inventors were for the patents

9    on the left side for the total portfolio, and on

10   the right side for the high interest patents; is

11   that correct?

12              A.   Yes, ma'am.

13              Q.   Okay, and yesterday Mr. Chang had

14   asked you where we had referenced to who was the

15   most -- who was punching above their weight or most

16   productive, he had noted that EMEA in fact

17   produced -- or had inventors on 17 percent of the

18   patents, but 18 percent of the high interest

19   patents, that's right?

20              A.   Well, more specifically, Mr. Chang

21   was focussed on the patents of the UK, so that was

22   the focus of his analysis.

23              Q.   Fair enough.  And then in fact,

24   well, while we would rather not talking about

25   punching at all, and the idea of using it as a



1   metaphor for who was producing a high percentage of

2   their patents to be high interest patents, if you

3   look at the US, the US has inventors listed on 27

4   percent of the portfolio, and in fact, 33 percent

5   of the high interest patents; that's correct?

6              A.   Yes, ma'am.

7              Q.   We can stop talking about

8   punching, isn't that awesome?

9              Now, as we said, this inventorship

10  analysis was just meant as a test.  It is not an

11  actual allocation methodology.  And when you

12  prepared this, if there were multiple inventors, my

13  understanding, is just to give you a hypothetical

14  number, if there were -- if there is one inventor,

15  you count it as one; is that right?

16             A.   Yes, ma'am.

17             Q.   And then if there are three

18  inventors on a patent, you counted each one of them

19  as one-third?

20             A.   Yes, ma'am.

21             Q.   That's right, and five would be

22  one fifth.  And in doing that, you didn't adjust

23  their fractional share based on someone being a

24  better inventor or primary inventor or good

25  inventor or anything like that, that's right?

 Neeson&Associates   W&F

1                    A.    Correct.

2                    Q.    So in the same way you also didn't

3    give more points for a patent that you thought were

4    more valuable?  Everyone got one point every time

5    they were listed as an inventor or their

6    proportional share of one point every time they are

7    listed as an inventor; that's right?

8                    A.    That is true, though the

9    comparison between total patents and high interest

10   patents gives you some insight on that analysis.

11                   Q.    Right, but to take an example, if

12   you had one individual that was a sole inventor on

13   three foundational high interest US patents that

14   inventor would get three points, that's right?

15                   A.    Yes, ma'am.

16                   Q.    And if that inventor also had one

17   technological invention that was filed in a

18   non-high interest, non-foundational patent -- to

19   pick three jurisdictions, Sweden, Finland, and

20   Denmark, that person --

21                   THE COURT REPORTER:  I'm sorry, Ms.

22   Schweitzer, you're going to have to slow down.  I'm

23   really sorry.

24                   MS. SCHWEITZER:  Sure.  I apologize.

25                   THE COURT REPORTER:  Can you start that

```
1    question again, please?

2              MS. SCHWEITZER:  Of course.

3              BY MS. SCHWEITZER:

4              Q.   So the second inventor that we are

5    going to take, instead of inventing three

6    foundational patents that are high interest

7    patents, we have the example of a second inventor,

8    and for that second inventor, he has one invention,

9    is filed then in three patents of patent filing in

10   let's say Finland, Sweden, Denmark, he also gets

11   three points; that's right?

12             A.   Arithmetically, that is true.

13   Obviously, there are a lot of issues as to why they

14   were filed and high interest versus not, but the

15   math is correct.

16             Q.   But it is just simply one point

17   for each invention?

18             A.   Yes, that is the way the

19   allocation is done.

20             Q.   Okay.  And again, you were asked

21   before of your views on how the inventorship

22   analysis guided you in looking at the US licence

23   approach.  When you did the inventorship analysis,

24   did you also form a view about the Canadian

25   approach to allocation?
```



1                    A.    Well, again, I compared the
2        allocation to the inventorship in the chart you
3        showed me a moment ago, and I noted differences or
4        discrepancies.
5                    Q.    And when the Canadian approach
6        recommends that a hundred percent of the residual
7        patent portfolio be allocated to the Canadian
8        Debtors, did you have a reaction as to whether that
9        was reasonable in light of this analysis that you
10       are using as a comparable?
11                   A.    Well, I don't think a hundred
12       percent to one part is reasonable in any analyses,
13       and certainly this would confirm that.
14                   Q.    And to go back to your proxies,
15       you first for measuring contribution, you first
16       rejected the lab book forensic analysis because of
17       inaccessibility of records, and because it was
18       inappropriate in light of the contributions and
19       co-operative nature of the R&D?
20                   A.    It was not possible.
21                   Q.    And also because you found it to
22       be unreasonable in light of the fact that it was
23       coordinated integrated R&D at Nortel, isn't that
24       right?
25                   A.    Yeah, I don't recall if I used the



1    word "unreasonable".  Perhaps I did.  More

2    importantly, it was simply not feasible.

3              Q.   But that wasn't the only reason

4    you selected it.  You said if you started going in,

5    you couldn't really do that type of forensic

6    analysis?

7              A.   Well, there would be challenges

8    but we don't know what the data would show because

9    we weren't able to go in and review it.

10             Q.   Okay, fair enough.  Your report

11   says what it says, we'll go back and look.  And

12   then on the inventor ship analysis, again you found

13   that would have been an unreasonable measure in

14   light of this co-operative and integrated nature of

15   the R&D, that's right?

16             A.   Yes, that is the quote that you

17   showed us before lunch.

18             Q.   Right, so then you ultimately

19   moved on to select the R&D spending as a proxy for

20   contribution?

21             A.   That is where I ended up, that is

22   true.

23             Q.   And that again was supposed to be

24   a proxy for the research efforts contributed by

25   each of the RPE affiliates, that's right?



```
 1                    A.   Well, it is the best available
 2    economic evidence, yes.
 3                    Q.   Right.  And again, you are
 4    considering all of the R&D spending that
 5    contributed towards the creation of the IP in your
 6    contribution analysis, right?
 7                    A.   Based upon the life of the
 8    intellectual property, yes.
 9                    Q.   And you are actually using the R&D
10    numbers from the transfer pricing spreadsheets,
11    that's right?
12                    A.   Prior to the adjustments, yes,
13    ma'am.
14                    Q.   What adjustments are you
15    referencing?
16                    A.   Any transfer pricing profit
17    adjustments.
18                    Q.   Okay, yes, so you are looking at
19    the R&D spend numbers under the cost sharing or you
20    are looking at the accrual amounts, not the payment
21    amounts?
22                    A.   Yes, ma'am.
23                    Q.   That is your point, right?  And
24    those R&D spend numbers aren't just the cost for
25    patents; that includes all sorts of R&D spend
```



```
 1   numbers within that, right?
 2              A.   Of course.  It is primarily the
 3   cost of the engineers' salaries.
 4              Q.   Right, and people who worked on
 5   product development and all sorts of other R&D,
 6   that's right?
 7              A.   It includes all of the R&D costs.
 8   Largely personnel but also miscellaneous expenses.
 9              Q.   Right.  And to turn again to the
10   question or the spirit of a question asked
11   yesterday or maybe it was the day before by now, of
12   Judge Gross of Mr. Huffard.  He had asked that if
13   one RPE were to spend a lot of money coming up with
14   a few amount of patents and another RPE entity or
15   inventors within there could invent patents more
16   quickly or cheaply, those would be given
17   equal -- the contribution analysis would reflect
18   the cost, not how efficient they were in the patent
19   creation?
20              A.   Correct.  Which is why we do the
21   inventor test.
22              Q.   But again, the R&D number isn't
23   clean because it includes not just the cost of
24   generating the patents but it includes all sorts of
25   other R&D costs?
```



```
 1                      A.   I don't know if I would describe
 2     it therefore as not clean, but as I think is
 3     non-controversial, within the R&D cost item is
 4     engineers and other expenses.
 5                      Q.   And again, even though you are
 6     applying it on a line of business basis you are
 7     using those same percentages s for each line of
 8     business and for the patent portfolio.  You
 9     couldn't and didn't do any sort of contribution
10     analysis for subsets of the patents conveyed in the
11     different sales, that's right?
12                      A.   Yes, and no.  The data set is the
13     same.  The distinction where there is a difference
14     is the period that is reviewed.  The period is
15     specific to the portfolio that was transferred.
16                      Q.   But it is all the costs for those
17     periods.  You don't tie it to the specific patents
18     that were conveyed?
19                      A.   Yes, ma'am, that is not possible.
20                      Q.   Let's turn to your demonstrative
21     slide 54.
22                      A.   I have it.
23                      Q.   And this is where you go through
24     the different rules or different possible ways of
25     measuring R&D contribution.  We have already talked
```



1    about the lab notes idea.  We have talked about the

2    R&D spend, which is your proposal for contribution

3    analysis.  And now there is a big red "X" over

4    adjusted R&D spend, and I assume that is referring

5    to adjustments that expert Lorraine Ryan had

6    recommended in terms of -- that you should account

7    for R&D spend, who paid for the R&D, rather than

8    just who incurred the employee costs and other R&D

9    costs; is that right?

10                   A.   Yes, ma'am.

11                   Q.   And you put an "X" because you

12   think that is not appropriate to make those

13   adjustments, that's right?

14                   A.   Correct.

15                   Q.   And the first criticism is that

16   your method -- that this type of adjustment is not

17   consistent with a measure of contribution to R&D

18   that was actually used by Nortel, and we have

19   covered this morning about the evidence you look at

20   in terms of what the use of Nortel was?

21                   A.   Exactly, like Foundry, UMTS, et

22   cetera.

23                   Q.   And we have already talked about

24   those.  And then the second criticism or your

25   second point is that it doesn't make sense to under



1    the RPS system to make any adjustments to account

2    for who paid for the R&D spend since the

3    adjustments reflect the shared profits and not a

4    contribution to cost, right?

5              A.   In my view, that is a critical

6    point, because the adjustments are not just limited

7    to R&D but to general reimbursement of cost.

8              Q.   It is a general reimbursement of

9    costs, meaning some of the other costs we talked

10   about but also an allocation that is driven by

11   these R&D spend amounts, the RPS percentages that

12   Mr. Zarnett was talking to you at length about;

13   that's right?

14             A.   Yes, in consideration of the other

15   costs as you pointed out today.

16             Q.   Right, and then if we could look

17   at slide 77 of the US Debtors' opening statement,

18   and this is a demonstrative that was shown to the

19   Court in the US Debtors' opening.  Just as -- this

20   is being shown to you, rather than your report

21   because you have many exhibits, I know where this

22   one is, it should be the same number.  But this is

23   just an excerpt from the declaration of Mr. Michael

24   Orlando who as you may know is a member of NNI's

25   tax group or was at the time.  Are you familiar



```
 1   with his affidavit?

 2               A.   Not in top of mind recollection.

 3   This is not my data, correct?  This is someone

 4   else's data?

 5               Q.   This is a table contained in the

 6   declaration of Mr. Orlando, and these are the R&D

 7   expenditure figures which should be or I'll

 8   represent to you are intended to be the same as the

 9   RPSM costs that you list in your report, not the

10   amounts that people paid in, but the additional R&D

11   numbers that you were using to do your percentage

12   allocations.  I recognize it is a shorter period.

13   You go back further in time.  But here are the

14   amounts that each R&D cost per RPE entity per year

15   on the table.  Okay?

16               A.   I don't know how helpful I can be

17   in this.  I don't recall this particular document,

18   but I can accept it for your question.

19               Q.   Right, and if I tell you that this

20   was a summary of what is contained in Nortel's

21   transfer pricing work sheets for those periods on

22   R&D costs, you'll accept that?

23               A.   For the purpose of your question,

24   sure.

25               Q.   And so these were the numbers or
```



```
 1    would have been the numbers that you were using or
 2    to look into for the R&D costs, you were looking at
 3    what people put and accrued on their books, not
 4    what they paid in or out of the RPSM; is that
 5    right?
 6              A.   That is right.  I can't tell you
 7    if these are those numbers because I don't know
 8    these numbers.
 9              Q.   So let's just assume that
10    Mr. Orlando's evidence -- the declaration is in
11    evidence, and it can be verified by the Courts
12    later.  But I'll represent to you that these are
13    from the transfer pricing work sheets.
14              If we turn the page to the next
15    demonstrative, this is again from Mr. Orlando's
16    declaration and it is just again a summary of the
17    amounts that were paid in or owed by each RPE under
18    the MRDA on a year-to-year basis; will you accept
19    that representation?
20              A.   I accept that is what you are
21    representing it to be.  I have no further helpful
22    information.
23              Q.   Okay.  And the point of me showing
24    you this is that these are the numbers that you say
25    when you refer to adjusted R&D spend, you are
```



1    saying these are the types of spending numbers or

2    payment numbers which should not be taken into

3    account in your contribution analysis?

4                    A.   Conceptually true, yes.

5                    Q.   Right.  And so, if you will just

6    accept for my representation that these are the

7    actual numbers if you go back to the prior page,

8    NNL, for example, in 2001 accrued 1 billion 400

9    million and change in R&D costs, right?  And then

10   if you turn to the next page, again, accepting my

11   representation, NNL received or was entitled to

12   receive 589 million dollars for that year in R&D

13   costs, right?

14                   A.   Okay, I can --

15                   Q.   Under the transfer pricing system.

16   Turning back again to the second -- so the earlier

17   slide, NNI on the other hand incurred 1.3 billion

18   dollars in R&D costs for the year 2001, okay?

19                   A.   That is a read of this document,

20   sure.

21                   Q.   And turn to the next page, NNI

22   also in addition to that 1.3 billion dollars paid

23   in 1.9 billion dollars into the RPSM calculations

24   and into the MRDA formulas for 2001; do you see

25   that?



```
 1                    A.    Again, that is what this document
 2     purports to represent.
 3                    Q.    So then NNI in its own -- NNI
 4     certainly as an estate would say, I paid directly
 5     over a billion dollars for 2001, for my own R&D
 6     costs, and then again under the MRDA I paid an
 7     additional 1.9 billion dollars into the transfer
 8     pricing system, again, under the same R&D
 9     arrangements and licence arrangements; do you see
10     that?
11                    A.    I see the numbers.  I think they
12     are disjointed from the actual innovation process,
13     but yes, that is -- there were post-innovation
14     adjustments.
15                    Q.    And your point is this is all
16     irrelevant to contributions and theories and
17     contributions and cost -- these cost metrics for
18     R&D?
19                    A.    It is irrelevant for the
20     allocation of the sale proceeds for the reason that
21     I provided, one of which it is not limited to R&D
22     re-allocation; two is these monies weren't always
23     paid; and three, it is moving you away from the
24     inventive process.  I'm trying to understand which
25     RPEs were responsible for creation of the patents
```



1    that created value.  Re-allocating costs later

2    doesn't tell you that.

3              Q.   So I think there are two points in

4    your answer that I want to cover in turn.

5              The first point you made is that I

6    don't know if people actually got the money.  If

7    NNI paid that money into the system for 2001, NNL

8    would have received that money because the money

9    was paid into NNL.  But you didn't look either way

10   whether NNL actually received that money or not; is

11   that right?

12             A.   So you are asking me about a

13   specific year between two specific parties.  I

14   don't know or recall.  I can tell you that the

15   evidence I have reviewed suggests that the funds in

16   many instances were not actually transferred or

17   there was simply loan balances accrued, so there

18   was not a completion of the adjustments that were

19   intended.

20             Q.   Right, and in some instances money

21   was actually paid, right?

22             A.   I suppose that is true.

23             Q.   And in some instances money might

24   have been set off from other obligations between

25   the parties, isn't that right?



```
 1                    A.    Perhaps.

 2                    Q.    And in some instances maybe loans

 3    were provided?

 4                    A.    We know there were instances of

 5    loans.

 6                    Q.    And in some instances maybe assets

 7    were transferred in consideration of these

 8    obligations, isn't that right?

 9                    A.    I'm speculating.  I don't know.

10    Perhaps.

11                    Q.    And you don't know because you

12    didn't undertake the analysis or any adjustment to

13    account for that in your contribution analysis;

14    that's right?

15                    A.    Because I don't believe you should

16    make such adjustments, and we know in certain

17    circumstances the payments weren't made.  So I

18    don't have a full accounting of all the payments

19    that weren't made because it is really not

20    relevant.

21                    Q.    In your opinion?

22                    A.    In my opinion.

23                    Q.    And you also, because you didn't

24    look at it, you didn't look at whether, let's just

25    pick Canada, for example, you didn't look at if NNL
```



```
 1    would have been able to undertake all of that R&D
 2    and fund all that R&D, which if we go back to the
 3    prior slide, the prior slide indicates that NNL
 4    incurred 7 and a half billion dollars of R&D costs
 5    from 2001 and 2008, and you didn't analyze or
 6    conclude whether NNL would have in fact been able
 7    to fund that R&D, hire those employees, do all the
 8    other R&D work without receiving transfer pricing
 9    payments, right?
10               A.   Correct, I did not undertake that
11    study.
12               Q.   Now, another aspect of the MRDA is
13    that in addition to making all these payments or
14    receiving money or whichever way the money is going
15    to flow, under the MRDA, as you note in your
16    report, the participants all get rights to use the
17    IP in their own jurisdictions, that's right?
18               A.   Exclusive within their
19    jurisdiction, non-exclusive rights elsewhere.
20               Q.   In your contribution approach,
21    that doesn't take into account at all those legal
22    ownership rights, does it?
23               A.   Not in the sense that it is
24    pursuant to a licence under the MRDA.  The
25    contribution approach measures where the
```



```
 1    innovations were created by R&D dollars.
 2              Q.   Right, and as of the dates of the
 3    sales, each of the sellers had its open legal
 4    rights and entitlements to use IP and to convey IP
 5    in its own jurisdictions, that's right?
 6              A.   Prior to the release of that for
 7    the sale, yes, ma'am.
 8              Q.   And the contribution approach
 9    doesn't allocate at all based on those ownership
10    rights; that's right?
11              A.   No, that is the licence approach.
12              Q.   Right, in fact, you do offer a
13    different analysis that is a licence approach, and
14    that is based on people's legal rights; that's
15    right?
16              A.   Well, that is based upon their
17    licence rights, which is a business and legal
18    perspective, but yes.
19              Q.   Right, and the contribution
20    approach doesn't allocate on that basis?
21              A.   I think that is very clear.
22              Q.   Okay.  Now, I believe in your
23    deposition, when you were asked for support or
24    precedent in using your contribution approach for
25    allocation, you had suggested that it was analogous
```



1    to the cost methodology used in various valuations;

2    is that right?

3                    A.    Yes, ma'am.

4                    Q.    And in fact, in coming up with

5    your valuation for IP, as we discussed before, you

6    considered three different types of methods, an

7    income approach, a cost approach and a market

8    approach, isn't that right?

9                    A.    Yes, ma'am, yes.

10                   Q.    And when you were looking at

11   valuation, you specifically considered and rejected

12   R&D spend as an appropriate valuation method and

13   use of a cost approach you rejected for valuation

14   purposes, isn't that right?

15                   A.    Well, to be specific I rejected

16   the cost approach generally, yes, ma'am.

17                   Q.    Including a cost approach based on

18   R&D spend, that's right?

19                   A.    Well, R&D would be a cost to be

20   considered like all costs.

21                   Q.    Right, and the reason you rejected

22   it is that you said that Nortel's R&D spending

23   grossly exceeded the economic benefits associated

24   with IP in the hands of Nortel and the value to

25   purchasers, that's right?



1                    A.    We know that to be true because
2      they spent 35 billion dollars which was less than
3      they received.
4                    Q.    So while you are not using a cost
5      approach for valuation, you are using a cost
6      approach for allocation?
7                    A.    Yes, ma'am.
8                    Q.    And one of the ways that you find
9      as a reasonable thing to do is as founded in a cost
10     approach that is used in other cases for valuation,
11     that's right?
12                   A.    You know, at some distant list,
13     I'm sure it is on the list.  The reason I found it
14     reasonable was it reflects the R&D activity that
15     led to patenting.  We know that that is the
16     methodology used within the Nortel business.  We
17     were able to test it with the inventor approach,
18     and yes, it is also consistent with a cost
19     analysis.
20                   Q.    And it is divorced from people's
21     legal ownership rights as of the dates of the sale,
22     right?
23                   A.    It is divorced from the licence
24     rights which is used in the licence approach.
25                   Q.    I want to focus on your valuation



1    and allocation of the patent portfolio, and when I

2    reference patent portfolio, because different

3    people use it in different ways, can we agree that

4    I'm talking about the patent portfolio that was

5    ultimately sold to Rockstar?

6              A.   We --

7              Q.   So I'm not meaning all of Nortel's

8    patents from the beginning of time, so we can use

9    less words and save the fingers of the reporter and

10   we'll just call it the patent portfolio, is that

11   okay?

12             THE CANADIAN COURT:  How about the

13   residual patents.

14             BY MS. SCHWEITZER:

15             Q.   Fair enough, the residual patents.

16   And for that you agree that the sale price of 4 and

17   a half billion dollars is the fair market value of

18   that patent portfolio, right?

19             A.   Yes, ma'am, as of the date of the

20   sale.

21             Q.   And so you didn't do an

22   independent valuation of the patent portfolio.  You

23   started with a valuation of 4.5 billion dollars?

24             A.   My objective was to allocate the

25   actual price of 4.5 billion.



```
 1                    Q.   Okay.  And again, just as a matter
 2    of housekeeping, just so that we don't have long
 3    answers when we can have short answers, there was a
 4    small number of patents that were held in the name
 5    of sellers other than the RPE participants?
 6                    A.   Yes, ma'am.
 7                    Q.   And so for those handful of
 8    patents you valued those, you took them off the
 9    top, and then what you were allocating was the rest
10    of the patent portfolio, that's right?
11                    A.   Yes, ma'am, I believe those other
12    patents were about 43 million dollars, a relatively
13    small amount.
14                    Q.   So again, for your testimony, so
15    you don't feel the need to clarify each time, if I
16    refer to the 4 and a half billion dollar sale price
17    for your valuations we understand it is always
18    subject to that off the top adjustment so you don't
19    have to keep throwing in that clarification; is
20    that fair?
21                    A.   Yes, ma'am, and helpful.
22                    Q.   Okay.  And then when you -- you
23    had two steps of your opinion.  You first have your
24    valuation step, and then you have your allocation
25    of that value for each sale among the sellers.  In
```



```
 1   the patent portfolios we discussed, your valuation
 2   is just the 4 and a half billion dollar sale price,
 3   and when you use your contribution approach, you
 4   just take those contribution percentages and
 5   multiply those across the 4 and a half billion
 6   dollar sale price; is that right?
 7                  A.   Based upon the life of the patents
 8   that were transferred, yes, ma'am.
 9                  Q.   Yes, as you testified earlier, it
10   might be a different window for each -- that the
11   different sales, but again it is just math?
12                  A.   Generally, yes.
13                  Q.   That's right, okay.  And then as
14   you have referenced, you did this alternative
15   licence-based allocation for the patent portfolio,
16   that's right?
17                  A.   Yes, ma'am.
18                  Q.   And if we can put up your
19   demonstrative slide 56, this demonstrative was your
20   summary of the approach you took to -- I don't want
21   to say value the patents, but to come up with your
22   basis for allocation of the value among the
23   different sellers; is that right?
24                  A.   For the residual patents, yes,
25   ma'am.
```



1                    Q.   And this is more generally
2     referred to as a discounted cash flow or an income
3     approach?
4                    A.   More specifically a relief from
5     royalty model, yes, ma'am.
6                    Q.   But that is parallel, it is the
7     same idea of a discounted cash flow, where there is
8     a projection of discount back and then you are
9     allocating on that basis; that's right?
10                   A.   Yes, ma'am.
11                   Q.   Okay.  And to walk through this,
12    under your licence-based allocation approach, the
13    first thing you did was you determine the global
14    revenues for all the geographies you found to be
15    included in your model, that you forecasted market
16    revenues for each of those regions, that's right?
17                   A.   Yes, ma'am.
18                   Q.   And then you applied a royalty
19    rate to those revenues on the theory that it is
20    licenses, so you are going to earn money by
21    charging royalties?
22                   A.   Yes, ma'am.
23                   Q.   And for those royalties, you used
24    the ones in the IPCo model, that's right?
25                   A.   Yes, ma'am.



```
 1                    Q.   You took out operating expenses to
 2   move from a revenue to a cash flow or profit type
 3   analysis, that's right?
 4                    A.   Yes, ma'am.
 5                    Q.   And then what you call licensing
 6   income, really that step is applying a discount
 7   rate to bring back that stream of income to the
 8   present value; is that right?
 9                    A.   Yes, ma'am.
10                    Q.   And the discount rate you applied
11   there is 30 percent across the board?
12                    A.   Yes, ma'am.
13                    Q.   That's right?  And then once you
14   got the net present value, the way you did your
15   work, you had net present value by geography such
16   that you could assign or allocate to each RPE
17   entity the net present value of their royalty
18   income for their exclusive geographies, that's
19   right?
20                    A.   Yes, ma'am.
21                    Q.   And for the non-exclusive
22   geographies or what we refer to as the rest of the
23   world, you split one fifth for each of the RPE
24   entities, that's right?
25                    A.   There were four -- I'm sorry, five
```



1   holders of those rights, each had equal value, yes,

2   ma'am.

3           Q.   Right, and when you ran this

4   approach, you got a total net present value of 3.57

5   billion dollars, is that right?

6           A.   In part.  There were two analyses.

7   I think it was 3.5 to 5.2.  It is reflected on the

8   chart 52.

9           Q.   Okay.  You are saying your

10  demonstrative slide 52?

11          A.   Yes, ma'am.

12          Q.   And what you did was then you

13  didn't allocate the 3.6 or 5.3.  You just used this

14  as pro rata shares effectively in the ultimate sale

15  price of 4 and a half billion dollars, that's

16  right?

17          A.   Yes, ma'am.

18          Q.   And turning back to slide 56,

19  Mr. Kinrich in following his licence approach also

20  takes a similar approach and does a

21  similar -- whether you call it relief from royalty

22  or discounted cash flow analysis; is that right?

23          A.   At a very general level it is

24  similar.

25          Q.   Okay, I'm actually going to walk



```
 1   through step by step why it is the same.  But they
 2   are both -- they both follow this type of
 3   step-by-step approach, and we'll walk through it.
 4   On the global revenue, royalty rates and operating
 5   expenses, Mr. Kinrich takes the IPCo model, that's
 6   right?  And it is the IPCo model which gives him
 7   revenues by geography, a royalty rate and operating
 8   expenses that he can use; is that right?
 9              A.   For the limited geographies.  He
10   doesn't consider global geographies, in some cases
11   he doesn't consider all of the geographies within
12   the IPCo model.  For example, China.
13              Q.   Meaning, China.  Okay, well, we
14   are going to talk about China, but you will accept
15   that for this revenue by geography, royalty rate
16   and operating expenses, Mr. Kinrich is using the
17   IPCo model recognizing there is a toggle for China,
18   is that right?
19              A.   Fair enough, yes.
20              Q.   Okay.  And Mr. Kinrich, instead of
21   using his own discount rate, puts the net present
22   value of that model at 4 and a half billion
23   dollars; that's right?
24              A.   And in my view, that is his fatal
25   error, that he is backing into a discount rate
```



1    which turns out to be extraordinarily low, which

2    makes it clear that the revenue base that Rockstar

3    purchased on was greater than what was within the

4    model.

5            Q.    Okay, well, we are going to talk

6    about discount rates later.  I'm just trying to

7    start with what he did and to understand what is

8    the same and different about what you and

9    Mr. Kinrich did.  He, instead of putting in a

10   discount rate puts the 4 and a half billion dollars

11   as the net present value and then a discount rate

12   is derived from -- because he has all the variables

13   except for that discount rate; is that right?

14           A.    Generally.

15           Q.    Okay, and Mr. Kinrich, as you

16   said, also could have put a discount rate in, like

17   you did, and then come up with his net present

18   value based on the discount rate he uses; right?

19           A.    He could have done that as well,

20   yes.

21           Q.    Okay.  And like you, Mr. Kinrich

22   when he runs his model comes up with revenues by

23   geography, numbers for revenue by geography, and

24   like you he gives RPEs the revenues associated with

25   their own geographies and one fifth of what we



```
 1   would call the rest of world revenue, that's right?
 2              A.   At some level conceptually true,
 3   but he doesn't take into account really the rest of
 4   the world because he doesn't do the revenue
 5   projections to have that data.
 6              Q.   Well, to the extent he includes
 7   the revenues for the rest of the world, he follows
 8   the one fifth --
 9              A.   No, he and I agree it is equal
10   fifths, yes.
11              Q.   Right.  So you are following
12   generally a similar methodology, and you have told
13   me a couple of times the things you disagree with
14   are what his discount rates suggests and how the
15   rest of the world is included or not included in
16   his model, that's right?
17              A.   Yes, ma'am.
18              Q.   Okay.  Now, as you have referred
19   to, Mr. Kinrich including or excluding certain
20   jurisdictions, Mr. Kinrich started as his model,
21   the IPCo model that was developed not by
22   Mr. Kinrich but by Nortel, Lazard and Global IP; is
23   that right?
24              A.   That was his starting point, that
25   is true.
```



```
 1                   Q.   Okay.  And you already described
 2   Global IP yesterday as a highly regarded firm who
 3   does intellectual property work; is that right?
 4                   A.   I think those were my words.
 5                   Q.   And I assume you would also call
 6   Lazard a highly regarded investment banking firm?
 7                   A.   I believe that is true.
 8                   Q.   And that model wasn't prepared by
 9   those folks individually.  They worked with people
10   at Nortel in the IP group at Nortel; is that right?
11                   A.   Yes, ma'am.
12                   Q.   And those people included names we
13   have heard today and across the trial:  Mr. Veschi?
14                   A.   It did.
15                   Q.   And Ms. McColgan?
16                   A.   It did.
17                   Q.   And other people within Nortel?
18                   A.   Yes, ma'am.
19                   Q.   And Mr. Veschi is now the CEO at
20   Rockstar who acquired the patent portfolio; is that
21   right?
22                   A.   It is.
23                   Q.   And Ms. McColgan also works at
24   Rockstar?
25                   A.   She is the CTO.
```



```
 1                    Q.   And since you have read all of the

 2     trial transcripts, you would also be familiar with

 3     Mr. Ray and Ms. Hamilton's testimony that an entire

 4     steering committee was formed with representatives

 5     of the Debtors in this IPCo monetization process;

 6     is that right?

 7                    A.   Yes, ma'am.

 8                    Q.   And there were representatives

 9     from all the debtor estates in that steering

10     committee?

11                    A.   My memory is a little foggy on

12     that, but I can accept that, yes.

13                    Q.   Monitor, Joint Administrator --

14     Joint Administrator and US Debtors representatives

15     certainly?

16                    A.   Certainly.

17                    Q.   Senior people from each estate?

18                    A.   That I remember.

19                    Q.   And outside advisors were also

20     involved in the process?

21                    A.   Yes, ma'am.

22                    Q.   And this IPCo business model that

23     was developed by this large group of people also

24     went through several iterations, that's right?

25                    A.   And there remained several models
```



1    based upon assumptions, yes.

2              Q.    And all these representatives in

3    the steering committee were given a broad

4    opportunity to comment on the model and participate

5    in its development, weren't they?

6              A.    That I really am not familiar

7    with.  I presume so.

8              Q.    And I believe you might have said

9    it already, but certainly in your report, that as

10   part of this monetization process Global IP had

11   reviewed claims charts prepared by Nortel?

12             A.    Yes, I did indicate that.

13             Q.    And those claim charts reflected

14   an analysis of potential claims or ways that the

15   patents could be asserted that were in the

16   portfolio, that's right?

17             A.    Correct.

18             Q.    And Global IP also assigned star

19   ratings to the patents which now are referred to by

20   the parties as these high interest patents or

21   higher interest patents; is that right?

22             A.    Yes, ma'am, a one star rating or a

23   two star rating.

24             Q.    And you discussed earlier in your

25   testimony how you independently validated the star



1    ratings and found them to be good, that they were
2    well prepared, isn't that right?
3                    A.    Yes, ma'am.
4                    Q.    In fact, even in your own licence
5    approach, as we discussed, you use elements of the
6    IPCo business model including the franchises?
7                    A.    Yes, ma'am.
8                    Q.    And you used the royalty rates?
9                    A.    Yes, I select a rate out of the
10   options, but I used those royalty rates.  Yes,
11   ma'am.
12                   Q.    The patents you included in your
13   own allocation model included these high interest
14   patents that Global IP had selected as the most
15   valuable patents; that's right?
16                   A.    I focussed on those, yes, ma'am.
17                   Q.    In fact, you determined that that
18   likely was where most of the value of the patent
19   portfolio resided, was in those high interest
20   patents, that's right?
21                   A.    Yes, ma'am, as tested and shown in
22   my exhibits.
23                   Q.    I would like to now talk to you
24   about what you have been dying to talk about which
25   is the rest of the world and how that works in the



1    model.

2                    A.    I am just dying to be done.

3                    Q.    The quicker we get to it, the

4    quicker we are done.

5                    When you built your licence approach

6    and you included revenue by geography, the way you

7    determined which geographies to include was any

8    geography where there was one high interest patent

9    was the criteria for that geography to be included?

10                   A.    The RPEs plus any geography with

11   one high interest patent.

12                   Q.    Right, so for example, if

13   Australia has one patent, Australia gets included

14   in the model?

15                   A.    If they have a high interest

16   patent, yes, ma'am.

17                   Q.    Yes, thank you for that

18   clarification, one high interest patent, and if UK

19   has 50 high interest patents, they get included as

20   well, the criteria is one patent gets you in?

21                   A.    Or to be an RPE.

22                   Q.    Yes, any RPE plus one geography

23   where there is at least one high interest patent?

24                   A.    Yes, ma'am.

25                   Q.    And once you got in by having a

 Neeson & Associates   W&F

1   high interest patent you are able to capture the

2   revenue for that market because you applied a

3   consistent royalty rate to the revenue for each

4   geography; is that right?

5              A.   I think so, but generally

6   speaking, once it was a territory that had high

7   interest patents we included under the rest of

8   world licence a relief from royalty against that

9   market.

10             Q.   Okay.  And at Nortel you are

11  familiar with the testimony earlier in the trial

12  that the company's practice was to file routinely

13  to file patents in the United States, that's right?

14             A.   And selectively around the world

15  based upon their scoring system and certain

16  thresholds of filing, yes.

17             Q.   Yes, and because it was

18  selectively around the world, a fewer number of

19  patents are filed in geographies outside the United

20  States, that's right?

21             A.   Right, they were constrained to a

22  certain percentage and then limited to certain

23  quantity -- quality.

24             Q.   And if we pull up TR44363 at page

25  6, are you familiar with the fact that a teaser had



 1    been used and prepared and used by Lazard and

 2    Global IP in connection with the patent portfolio

 3    sale?

 4              A.   Yes, ma'am.

 5              Q.   And unless you would like to see

 6    the entire teaser, I just am focussed on page 6,

 7    there are confidential issues so it is redacted in

 8    different ways.

 9              But I just wanted to show that this is

10    the map included in the teaser which, according to

11    the way this is described, is that the approximate

12    number of issued patents in these key countries and

13    it lists out by geography how many patents are in

14    these various regions, that's right?

15              A.   Yes, ma'am.

16              Q.   And this document was prepared by

17    Global IP and Lazard as indicated on the bottom of

18    the document, they have their little logos on it?

19              A.   Yes, ma'am.

20              Q.   And this, the auction process for

21    these patents -- well, the pre-auction process in

22    which this teaser was used would have been late

23    2010 and early 2011; that's right?

24              A.   Generally speaking I think that is

25    fair.



```
 1                    Q.   Okay, and that was around the same
 2   time that the IPCo model was being developed,
 3   that's right?
 4                    A.   Or reflecting the results of the
 5   IPCo model, yes, generally concurrent.
 6                    Q.   Now, let's turn to your slide 50
 7   of your demonstrative.
 8                    A.   Yes, ma'am.
 9                    Q.   This is where you make your own
10   pie chart of the patent counts for the Nortel
11   filing jurisdictions?
12                    A.   Yes, ma'am.
13                    Q.   And you indicate on the footer,
14   the source of this is an exhibit contained at least
15   on the left side, is an exhibit contained in
16   Mr. Kinrich's expert report, is that right?
17                    A.   Yes, Exhibit 21.
18                    Q.   Let's pull up Exhibit 21 to his
19   report.  It is TR11432, PDF page 120.  This is the
20   exhibit that you used to generate your patent
21   counts; is that right?
22                    A.   Yes, ma'am.
23                    Q.   And in your pie chart, you used
24   the column which is "total" which includes all
25   patents and applications, that's right?
```



```
 1                    A.    Yes, ma'am.
 2                    Q.    Okay, let's go back to your page
 3    50 of your demonstrative.  And this reflects, as we
 4    said, the patent counts which were patents and
 5    applications.  If you were to remove the
 6    applications and just look at the patents, if we
 7    just talk about the non-orange area, right, so we
 8    are talking only patents and we are taking out the
 9    20 percent, the orange part of the pie chart, is
10    that right?  That is what I am asking you, then I'm
11    going to give you a number.  You understand what I
12    am talking about?
13                    A.    I think so.
14                    Q.    So it is every colour except for
15    orange, and we only include patents, that piece of
16    the pie would be 92 percent of the pie, meaning 92
17    percent of the patents as opposed to patents and
18    applications were filed either in the US, France,
19    UK, Canada and Germany; is that consistent with
20    your understanding?
21                    A.    So I haven't done that calculation
22    specifically, but I believe the 92 percent is a
23    figure from Mr. Kinrich's report that I cite in my
24    report in this comparison.
25                    Q.    And you have no reason to doubt
```



1    its accuracy, that's right?

2                    A.    I don't.

3                    Q.    And then by definition this rest

4    of the world number, the orange part of the graph,

5    would go down to 8 percent just mathematically

6    speaking if you are only looking at patents and not

7    applications, that's right?

8                    A.    Yes, ma'am.

9                    Q.    And a patent is only enforceable

10   once it is actually a granted patent.  It is not

11   enforceable while it is an application, is that

12   right?

13                   A.    Of course.

14                   Q.    And that is consistent with

15   numbers in your report also that we know by the end

16   of 2009 only 2 percent of Nortel's patents were

17   filed in Asia; that's right?

18                   A.    You know, frankly, I'm at a loss

19   for that reference.  I can accept that or you can

20   show that.  I don't know that from memory.

21                   Q.    It is page 19 of your report, if

22   you want to look it up.  It is TR40543, page 20.

23                   A.    Yes, I see it.

24                   Q.    Okay.  So only 2 percent of the

25   patents are in Asia, and 12 percent in Europe,

 Neeson&Associates    W&F

```
 1    that's right, or less than -- it is 12 percent for
 2    this entire area, so it is less than 12 percent in
 3    Europe, that's right?
 4              A.    As of the end of 2009.
 5              Q.    Okay.
 6              A.    Yes.
 7              Q.    Now, let's go back to your
 8    demonstrative slide 47.  This is your red flag
 9    assumption number 1, which is a look at
10    Mr. Kinrich's report.  And what you note about
11    Mr. Kinrich's report is that zero value is
12    attributed by Mr. Kinrich and, therefore, by the
13    Global IP -- I'm sorry, by the IPCo business model
14    to most European patents, all Asian-Pacific
15    patents, all Middle-Eastern patents and all CALA or
16    Central American/Latin American patents; is that
17    right?
18              A.    Based on these geographies, yes,
19    ma'am.
20              Q.    And then if you turn to your slide
21    49 you show where his geographies are, and you
22    highlight in yellow additional geographies that you
23    included, right?
24              A.    Yes, ma'am.
25              Q.    And I believe you said you looked
```



```
 1   at but didn't include the grey geographies because
 2   you wanted to take a more conservative approach; is
 3   that right?
 4              A.   Well, I did a second analysis that
 5   includes the grey geographies so I did both.
 6              Q.   But what you used for purposes of
 7   your opinion were the yellow geographies; is that
 8   right?
 9              A.   Yellow and green.
10              Q.   So that we don't keep flipping
11   back and forth between these different exhibits, we
12   have taken your slide 49 and superimposed some of
13   the patent counts for the high interest patents
14   located in those yellow and grey geographies just
15   to get a flavour for the geographies you are
16   talking about.  If we look at Brazil, which is one
17   of the yellow geographies, there was only one
18   patent that was actually granted in Brazil; is that
19   right?  And again, we are using the numbers from
20   Mr. Kinrich's Exhibit 21.
21              A.   Well, I'm looking at Mr. Kinrich's
22   Exhibit 21 and it shows 130 total assets, one
23   patent and 129 applications.
24              Q.   Right, and for purposes of your
25   report you included patents, not applications,
```



1    right?

2              A.    Well, for the purposes of my

3    report, I'm valuing the intellectual property, I'm

4    using as the trigger mechanism the filing of one

5    high interest patent, but you asked a good

6    question, because this points out that with high

7    interest patents, even if it is only one, there is

8    substantial other assets that are transferred and

9    Mr. Kinrich gives no recognition to the 129

10    applications.

11              Q.    I'm just trying to state with the

12    facts.  What you had said is when you did your

13    allocation, you looked at geographies and you

14    included places with high interest patents, that's

15    right?

16              A.    That was the trigger mechanism,

17    yes.

18              Q.    So what I want to do is look at

19    the patent counts for each geography, because under

20    your model for example, if there were no patents

21    but there were applications, even under your model

22    you excluded that geography, isn't that right?

23              A.    That is true, though if you look

24    at the data, there is only a very few instances

25    where that occurred, and they only had one



1    application.  So it is not looking at the data in a

2    vacuum.  It is understanding the landscape and

3    making a judgment as to what is appropriate.  I

4    think I have done that.  I don't believe

5    Mr. Kinrich has.

6              Q.   Okay, and I want to go through

7    these geographies because in the same way you went

8    through the exercise, this data available was

9    available to Nortel, Global IP and Lazard when they

10   built their own model and so I want to see the

11   number of patent counts in each of these

12   geographies.

13             A.   The list at Exhibit 21, you can

14   look at all of them.

15             Q.   Right and for the ease of the

16   Court and everyone else that doesn't have those

17   documents in front of them, we can put them on the

18   map as well.  India, which is another jurisdiction,

19   has nine filed patents, is that right?

20             A.   And 173 applications, yes.

21             Q.   And these are total patent counts,

22   they are not high interest patents, is that right?

23             A.   I'm looking at Mr. Kinrich's

24   analysis and he does not distinguish between high

25   interest and total, so I from memory don't know if



1    they are all high interest or not.

2              Q.   You can look at the grand total at

3    the bottom and that might help you.

4              A.   I don't see how it would.  We are

5    looking at different things.

6              Q.   Well, there are 7,000 patents

7    transferred, weren't there 7,000 patents and patent

8    applications transferred in the sale?

9              A.   Yeah, but we don't know if they

10   are -- we know they are not all high interest, so I

11   thought that was the question.

12             Q.   My question to you was Exhibit 21

13   includes all the patents, not merely the high

14   interest patents?

15             A.   That is true.

16             Q.   And so the numbers I'm putting on

17   the screen are all the patents, not filtered for

18   the ones that are high interest patents?

19             A.   Right.  Coincidentally, they may

20   all be high interest, we don't know.

21             Q.   Or they could be lower counts when

22   you only filter for high interest patents, isn't

23   that right?

24             A.   Yes, ma'am.

25             Q.   So we looked at Brazil and we



1    looked at India, and then if we look at Australia,

2    Australia has 15 patents, that's right?

3              A.   Yes, ma'am, only one application.

4              Q.   And Russia has zero patents?  You

5    had mentioned the Middle East -- well, let's look

6    at Africa, because it is nice and big.  Africa has

7    no patents, that's right?

8              A.   Russia has 46 applications.

9    Africa?  I don't see Africa on Exhibit 21.

10             Q.   It is a geography test, but I'll

11   tell you I didn't see any African countries on the

12   exhibit.  There are no granted patents in the

13   Middle East as well, is that right?

14             A.   No, there are some applications,

15   but I don't see any granted patents.

16             Q.   Yes, there is one application in

17   Israel and one in Saudi Arabia, and no patents,

18   that's right?

19             A.   I think that is correct.

20             Q.   And in the entire CALA region,

21   there is one patent in Brazil and then there is 31

22   Mexican patents, is that right?

23             A.   Well, Brazil we talked about, one

24   patent, 129 applications.  Mexico has 31 patents,

25   yes, ma'am.

 Neeson & Associates   W&F

```
 1                    Q.   So in all of CALA, which you said
 2     was left out of Mr. Kinrich's analysis, not even
 3     filtering for high interest patents, he left out 32
 4     granted patents, that's correct?
 5                    A.   By count, it is correct, but
 6     please remember that these are 32 patents that are
 7     deemed to be the highest value because they went
 8     through the screening process to get those foreign
 9     filings.  So in my opinion, you have to take them
10     into account.
11                    Q.   Okay.  And again, your criticism,
12     to go back to your deck, was that he had left Out
13     Middle Eastern patents as well, and as we looked at
14     the chart, there are no Middle Eastern patents,
15     that's right?
16                    A.   There are applications as we
17     discussed.
18                    Q.   Two, right?
19                    A.   Okay, well, he left them out.
20                    Q.   And they are not granted so you
21     can't sue upon them, that's right?
22                    A.   That is true.  Of course that is
23     my alternative analysis, which is not the basis of
24     my calculations, but you are right.
25                    Q.   And then if we put up the European
```



1    numbers on the slide, if you look on the left side

2    we have again imposed the European numbers, 14

3    patents in Sweden, 6 patents in Finland, one in

4    Portugal, five in Spain, four in Italy, well, two

5    and four in Belgium, Luxemburg, Liechtenstein,

6    that's right, those were the patents excluded by

7    Mr. Kinrich or in truth by the IPCo business model?

8              A.   I mean, I can look up each of

9    these against the table if that is what you are

10   asking me to do.  I presume you have got this

11   right, so those would be the patent counts, not

12   including the applications.

13             Q.   And so in Europe, the total

14   percent of the patents, and granted patents that

15   were not covered by the IPCo model is 4 percent of

16   the total European patents by the math on the top,

17   that's right?

18             A.   If that math is correct, not

19   including the applications.

20             Q.   Turning back to slide 50 from your

21   demonstratives, we just went through a breakdown of

22   some of those patent counts on the left side.  On

23   the right side you show the telecom hardware

24   spending and show that big hardware spending of 49

25   percent in the rest of the world, do you see that?



 1                    A.    Yes, ma'am, I do.

 2                    Q.    And in putting these pie charts

 3     together, you didn't match up the geographies in

 4     which that spending occurred compared to those

 5     geographies we just looked at that might have one

 6     patent, zero patents, nine patents?

 7                    A.    No, for this illustration, it was

 8     merely to show that the regions that Mr. Kinrich

 9     did not consider include valuable regions

10     economically.

11                    Q.    To understand how you took account

12     of these patents and geographies in your model, I

13     would like to look at the PC franchise, which is

14     the fifth franchise that you break down on -- well,

15     first we'll pull up the summary of your own

16     valuation analysis which is Exhibit R.3.1.  Can we

17     move to the prior page?

18                    R.3.1 -- I'm sorry, go down.  I

19     apologize, some of these have multiple pages.  And

20     I am looking for the one that has the total of 3.57

21     on the lower right corner.  The next page.

22                    And this summarizes valuation analysis

23     you did in order to generate your allocation of the

24     patent portfolio; is that right?

25                    A.    It is one of the analyses, yes,



1    ma'am.

2                 Q.    As we note in the bottom, and just

3    so everyone understands what we are flipping

4    through is that 3.57 is the total value that you

5    got when you ran your numbers on the way shown on

6    the screen; that's right?  As opposed to the 4.5

7    billion dollar sale price?

8                 A.    Yes, that was the number shown on

9    the lower --

10                Q.    I think I have done that, sorry.

11   Sorry about that.

12                And so to walk through this, this is as

13   we discussed before, you took the franchises, which

14   are the same franchises as in the IPCo business

15   model.

16                A.    Yes, ma'am.

17                Q.    And then where a country had one

18   high interest patent, you went to that geography

19   and forecasted or looked at reference numbers to

20   generate revenues for that franchise and for that

21   geography, that's right?

22                A.    Yes, ma'am.

23                Q.    And then you applied a royalty

24   rate to come up with the forecast of royalties for

25   that geography for that franchise, that's right?



```
 1                    A.   Yes, ma'am.
 2                    Q.   And so for a given franchise, for
 3    example, smartphones or wireless infrastructure,
 4    you applied a consistent royalty rate across the
 5    franchise, across geographies; that's right?
 6                    A.   Yes, ma'am.
 7                    Q.   And that is what the IPCo model
 8    does as well, that's right?
 9                    A.   It does.
10                    Q.   And the IPCo model also uses the
11    franchises on the left side, that's right?
12                    A.   Yes, ma'am.
13                    Q.   Okay.  And so let's just pick one
14    of the franchises just because it is hard to talk
15    about them all at the same time, but just to see
16    how your analysis worked.  We'll take the PC
17    franchise right in the middle, and if you go all
18    the way to the right, you have a total value of 315
19    million -- that is millions, right?
20                    A.   It is.
21                    Q.   And your breakdown by geography,
22    you have a number for the US, Canada, and then a
23    total for North America?
24                    A.   Yes, ma'am.
25                    Q.   You have UK, Ireland, France, a
```

Neeson & Associates    W&F

```
 1   total for EMEA, which includes rest of world
 2   geographies potentially as well within EMEA?
 3              A.   Correct.
 4              Q.   Like it could include Germany or
 5   another place you included, right?
 6              A.   Right, which is why 31 plus 25 is
 7   less than 88, yes.
 8              Q.   Yes, it took me about a half hour
 9   to figure that out, so I thought I would save some
10   other people some time.  APAC is a region, so it
11   could include one or more countries within that
12   region, and CALA as well is all the CALA countries?
13              A.   Yes, ma'am.
14              Q.   Now, to look behind this, for the
15   PC for the APAC region, you attribute or generate
16   55 million dollars worth of royalty revenues,
17   right?
18              A.   Yes, ma'am.
19              Q.   And if you look at the bottom, you
20   refer to Exhibit R.12.  You refer to R.8.1.  I
21   would like to turn you to R.12.1, because that is
22   where you are getting your market percentages from,
23   and that is TR40872 at page 466.  Page 466.
24              It is on the screen, if it is easier
25   for you to see.  It is page 3 of 4 within that
```



```
 1   exhibit.
 2              A.   I see it.
 3              Q.   So what you did to generate a
 4   country's forecasted royalty revenue is you looked
 5   at external data for a regional forecast and then
 6   you looked at that individual country's share of
 7   that regional market; is that right?
 8              A.   From the IDC data, yes, ma'am.
 9              Q.   Right, and so the one that is on
10   the screen is the APAC region personal computer
11   market which again ties back to your personal
12   computer franchise value, right?  And in here, CN
13   is China, so China has no forecasted revenues for
14   the PC market, that's right?
15              A.   For this time period for this
16   franchise, yes, ma'am.
17              Q.   Right, so you wouldn't have
18   included in your model any allocation of value to
19   China for the --
20              A.   For the franchise, correct.
21              Q.   And Japan has 18 percent?
22              A.   Yes, ma'am.
23              Q.   Korea has 4.2 percent?
24              A.   These all vary over time, but yes,
25   ma'am.
```



```
1                    THE CANADIAN COURT:  I'm just

2      wondering, Ms. Schweitzer, where are we going with

3      all this?

4                    MS. SCHWEITZER:

5                    Q.   If we could go back to the other

6      slide we were just looking at, we can show how this

7      ties back to the differences between Mr.

8      Malackowski's model and IPCo model.  And that is

9      R.3.1.

10                    THE CANADIAN COURT:  It just strikes me

11     that there are differences in models, there are

12     differences in the models.  All you are asking this

13     witness to do is confirm what he's done.

14                    MS. SCHWEITZER:  Well, the importance,

15     Your Honour, is that one of his criticisms of

16     Mr. Kinrich, which is in fact a criticism of

17     Nortel's IPCo model, is that it left out important

18     jurisdictions and Mr. Malackowski is trying to

19     ascribe significant value to those jurisdictions.

20                    What we have shown first is that many

21     of those jurisdictions he is highlighting in fact

22     didn't have any granted patents in it.  When I go

23     back to the slide, you'll see that he is ascribing

24     in this case for the PC 55 million dollars worth of

25     value and --
```



```
 1                    THE CANADIAN COURT:  Is this all

 2    argument?

 3                    MS. SCHWEITZER:  It is not argument.

 4    It goes to how his model works.  And the 55 million

 5    dollars worth of value, and I'll ask Mr.

 6    Malackowski if he disagrees, is generated by

 7    Japanese and Korean revenues at the time that there

 8    was only one high value patent in Korea and three

 9    in Japan, as compared to when you look at the US

10    which he is only giving three times as much

11    value --

12                    THE CANADIAN COURT:  Well, that is why

13    it strikes me as all argument.  I'm speaking for

14    myself, it just strikes me that this is all

15    argument, could all be argued with all the

16    materials here.

17                    MS. SCHWEITZER:  That is fine.

18                    THE CANADIAN COURT:  I haven't heard

19    the witness cry uncle yet.

20                    MS. SCHWEITZER:  That is fair.  It took

21    us a significant amount of time to understand the

22    model, so I wanted to make sure everyone understood

23    how it worked.

24                    BY MS. SCHWEITZER:

25                    Q.   I was at the end of this point.
```

 Neeson&Associates    W&F

1    But I think that Mr. Malackowski, you'll agree that

2    for this PC model, that the US which had 56 high

3    interest patents and APAC which is generated off of

4    one Japan and one Korea patent, you applied an

5    equal royalty rate straight across the model, is

6    that right?

7                    A.    Arithmetically that is true, but

8    the question I believe to believe misleading

9    because in Japan we know there were 65 high

10   interest patents in total and 199 applications, so

11   we would have to go back and determine how many

12   applications there are, and we have to remember

13   that they filed every patent in the US and it had

14   to go through an elevated screening to get to

15   Japan.  So in my opinion, it is appropriate that

16   once they triggered a high interest patent in the

17   geography for technology, you have to give it

18   consideration, and Mr. Kinrich and I disagree with

19   that, that is very obvious.

20                   Q.    And what you are saying is a

21   criticism of Mr. Kinrich, and in fact a criticism

22   of the IPCo business model, is in some cases they

23   left off these jurisdictions because possibly they

24   only had one patent in them for the entire

25   franchise for the entire geography and you decided



```
 1    that that one patent should be given equal market
 2    revenue and equal royalty rate in your model?
 3              A.   I'm not criticizing the IPCo
 4    model.  It was prepared for a different purpose,
 5    and I think it obviously did a great job for that
 6    purpose.  I'm criticizing Mr. Kinrich's analysis
 7    with the benefit of the record of this case, whose
 8    assignment it was to allocate these proceeds
 9    fairly.  He simply ignored large chunks of the
10    world with large value and meaningful patent
11    portfolios.
12              Q.   Based on his use of a model
13    prepared by Nortel's professionals, that's right?
14              A.   Well, you know, it is interesting
15    you say that, because yes, it is.  He start and
16    stopped with the model.  He didn't apply the full
17    record of this case, that is my criticism.
18              Q.   And turning to your criticism of
19    the Chinese patents, you also had mentioned
20    previously that Mr. Kinrich doesn't include China
21    in his model; is that right?
22              A.   Well, he looks at it with and
23    without China, ultimately I believe his opinion is
24    based without, and you can see it is a half a
25    billion dollars or 444 million dollars in
```



```
 1    allocation to the US because of that assumption.
 2                  Q.   I'm not going to argue with you
 3    about Mr. Kinrich's valuation of China, because
 4    he'll be on the stand and people can argue with
 5    that.  But the reason China was treated differently
 6    than other geographies is because the IPCo model
 7    had a toggle built in, is that right?
 8                  A.   The IPCo model had a lot of
 9    toggles, and different royalty rates.  In this
10    case, China geography.  In my assignment, though,
11    was to come up with the right model as was
12    Mr. Kinrich, you can't leave China out.
13                  Q.   And the only geography which IPCo
14    model had a toggle for was China, is that right?
15                  A.   That's correct on geography.
16                  Q.   Now, the last thing you had noted
17    about Mr. Kinrich's model as opposed to your model
18    is that the discount rate that was derived from
19    Mr. Kinrich's model was lower than the one that you
20    used in your model; is that right?
21                  A.   Well, it is arithmetically lower,
22    but importantly he just backed into it by plugging
23    in the 4.5 billion and my criticism was the low
24    discount rate that was generated should have been a
25    red flag to him, that he is obviously not including
```



```
 1   all the revenues that Rockstar --
 2              Q.   If you had used Mr. Kinrich's
 3   model or your model and plugged in a different
 4   discount rate, it doesn't actually affect the
 5   allocation percentages, does it, because it is all
 6   done pro rata to the sale price; is that right?
 7              A.   No, I don't know that that's true.
 8   I believe that since you are discounting future
 9   cash flows, depending upon the weighting of those
10   cash flows it could with make a difference.
11              Q.   Well, in your model you applied a
12   straight discount rate across the model, is that
13   right?
14              A.   I did based upon research in the
15   intellectual property field as to the riskiness of
16   a licensing business which was 30 percent.
17              Q.   And if I had substituted in a 12
18   percent discount rate in your model, I wouldn't
19   have gotten a different allocation, would I have?
20              A.   No, because I used a consistent
21   discount rate.
22              Q.   And you acknowledge in your report
23   that while you conclude that the discount rate
24   suggested to you regions were left out, then
25   another reason could be a difference in buyer
```



1    perception as to the riskiness of the IPCo

2    business, isn't that right?

3                A.    Well, theoretically that may be

4    true but practically it can't be, because if that

5    was true, then the expectation of Rockstar would be

6    that the value of this portfolio is less than what

7    they paid for it.  Obviously that isn't the case.

8                Q.    Well, in the case -- if they had

9    been using Mr. Kinrich's model, they could have

10    said we just discount the risk or we projected a

11    working cost of capital at this 12 to 15 percent

12    rate, that is possible, right?

13                A.    I don't know what rate they used.

14    Certainly a different rate is likely.

15                Q.    And you are aware of analyses

16    prepared by Lazard for Nortel that reported that

17    the median cost of equity for publicly traded IP of

18    licensing companies was 15 percent, aren't you?

19                A.    I don't recall that specifically,

20    though Nortel -- I mean, Rockstar is obviously not

21    a publicly traded licensing company, so I would

22    have to look at the analysis to see what they did.

23                Q.    We can put it on the screen, it is

24    TR50777.

25                A.    And this is just a note that says



 1    working --

 2                    Q.    I'm sorry, we are going to keep

 3    going.  And if you look in the middle of the page,

 4    and where they are talking about a cost of capital

 5    analysis right in the second bullet point the:

 6                        "Median cost of equity for

 7                        publicly traded IP licensing

 8                        companies is 15 percent".

 9                        The next line:

10                        "The implied cost of equity for

11                        business is 15 to 17 percent".

12                        And those are close to the numbers

13    derived in Mr. Kinrich's model, aren't they?

14                    A.    But these businesses are very

15    different than Rockstar's portfolio.  These are

16    businesses like InnerDigital and Tesera that are

17    doing research in conducting an actively licensing

18    program for years.  It is not someone who is going

19    to go out and start a litigation-based licensing

20    program.  That has a much higher risk.  But the

21    chart speaks for itself.

22                    Q.    In your opinion.

23                        Okay, I have no further questions.

24                    A.    Thank you, ma'am.

25                        THE WITNESS:  Haven't I seen you

 Neeson&Associates    W&F WILSON & PETZOLD LTD.

```
 1   before?

 2   FURTHER CROSS-EXAMINATION BY MR. CHANG:

 3            Q.   You have.  Mr. Malackowski, I know

 4   it has been a really long day.  I think I really

 5   only just have a couple of quick questions to

 6   clarify.

 7            There is a lot of discussion today

 8   about the R&D costs that form the basis for your

 9   allocation and your contribution allocation method.

10            A.   Yes, sir.

11            Q.   I want to put a point of

12   clarification on there.  You had said that it

13   encompasses all the R&D costs that were allocated

14   by Nortel within the transfer pricing system, is

15   that right?

16            A.   Yes, sir.

17            Q.   Now part of the compensation to

18   employees that are actually creating the technology

19   and the patent portfolio, part of those was the

20   pension that they would get, right?

21            A.   Yeah, I suppose that is fair.

22            Q.   And you are aware that pensions

23   include deferred pension costs?

24            A.   Yes, of course.

25            Q.   Those deferred pension costs were
```



```
 1   not actually reflected in the R&D allocation?
 2                    A.   They would not be.  They were
 3   deferred so they would occur in future periods.
 4                    Q.   And those were costs that are in
 5   fact directly associated with the creation of that
 6   IP that was sold here?
 7                    A.   Directly created -- well,
 8   associated with those inventors or engineers, I
 9   think that is fair.
10                    Q.   Okay, thank you.
11                    MS. SCHWEITZER:  Your Honour, I promise
12   I don't have any further questions, but I have been
13   corrected that I should be handing up copies of the
14   demonstratives for the record.  I think we have
15   been marking them as trial exhibits; is that right?
16   I am being told we are not.  If not, I'm happy to
17   hand it up either way to anyone in the courtroom.
18                    THE CANADIAN COURT:  What is it you
19   have got there?
20                    MS. SCHWEITZER:  This is the
21   demonstrative I have used in my
22   cross-examination, just showing the patent --
23                    THE CANADIAN COURT:  We haven't marked
24   any of these demonstratives as exhibits, so I'm
25   wondering --
```



```
 1              MS. SCHWEITZER:  Oh, we haven't?  Then
 2    I'm being corrected as uncorrected.  I'll withdraw
 3    this.  I just wanted to make sure I know who wanted
 4    it.
 5              MR. ROSENTHAL:  I think the judges have
 6    them all though, right?
 7              MS. SCHWEITZER:  These were -- this is
 8    the new one, so I'm happy to --
 9              MR. ROSENTHAL:  But the judges have the
10    booklets.
11              MS. SCHWEITZER:  Yeah, we can hand it
12    up later.  That is not a problem.
13    RE-EXAMINATION/REDIRECT EXAMINATION BY MR.
14    MILNE-SMITH:
15              Q.  Mr. Malackowski, Judge Gross,
16    Justice Newbould, I'm acutely aware of the hour and
17    the time that has already been spent.  I have three
18    points which I hope to make extremely quickly.
19              Let's start with your rebuttal report,
20    Mr. Malackowski, this is a point that Mr. Steep
21    took you to earlier today.  Page 19.
22              A.  Yes, sir.
23              Q.  And it was talking about the 10.4
24    billion dollar figure, so if we start on page 19 of
25    your rebuttal report, now, just to resituate you in
```



```
 1   Mr. Steep's examination, you were taken to the
 2   paragraph at the bottom of the page, you recall
 3   that?  And then if we go over to page 20, you were
 4   taken to the middle paragraph and specifically the
 5   last sentence saying:
 6                    "The total value of the IP in a
 7                    licensing business in the hands of
 8                    Nortel could have been worth as much
 9                    as [10.4 billion] [...]"
10                    Do you recall that discussion?
11                    A.   At some length, yes, that is
12   related to Mr. Green.
13                    Q.   Yes, and if we go back to page 19,
14   I would just like to take you to a paragraph that
15   Mr. Steep didn't take you to.  It is the
16   penultimate paragraph on the page.  It says:
17                    "Setting aside these issues,
18                    the most important problems with
19                    Green's methodology, as mentioned
20                    above, is that it omits Nortel's
21                    licensing business and treats NNL's
22                    interest as a residual.  To
23                    demonstrate these problems, I have
24                    used Green's methodology to allocate
25                    the value of the IP sold in each of
```



```
 1                    the businesses sold by Nortel,

 2                    including its licensing business.  I

 3                    do not do so as a means of offering

 4                    a viable allocation approach.

 5                    Instead, I do so to demonstrate the

 6                    inherent problems with a

 7                    residual-based approach that does

 8                    not attribute any value to Nortel's

 9                    pre-existing licensing business."

10              So just to be clear, whose methodology

11    produced the 10.4 billion dollar figure?

12                    A.   It was Mr. Green's methodology,

13    illustrating his errors.

14                    Q.   The second point, Mr. Steep took

15    you to Trial Exhibit 40195, that was the Ericsson

16    20-F filing?

17                    A.   Yes, sir.

18                    Q.   I think a hard copy was passed up,

19    which you have or you can look on screen.  If we

20    could go to page 120 this was the page that

21    Mr. Steep took you to?

22                    A.   It was.

23                    Q.   And he drew your attention to two

24    different line items.  One was the intellectual

25    property rights; the other was the customer
```



```
 1   relationships?

 2              A.   Yes, sir.

 3              Q.   And he drew your attention to the

 4   ratio between those two figures; do you recall that

 5   discussion?

 6              A.   I do.

 7              Q.   Now, Mr. Malackowski, how did Mr.

 8   Huffard value customers and goodwill?

 9              A.   As shown in his exhibits, it was

10   based upon the total value received considering the

11   tangible assets and the intellectual property, so

12   it was a residual of those analyses.

13              Q.   Did he treat customers and

14   goodwill separately or together?

15              A.   He treated them together is my

16   recollection.

17              Q.   If you take customers and goodwill

18   as set out in the Ericsson 20-F together, if we

19   could just highlight those two, and Mr. Steep

20   talked about IP being five times customers, if you

21   look at customers and goodwill together, what is

22   the ratio?

23              A.   They are much closer to equal.  It

24   would be approximately 3.8 to 4.9.

25              Q.   Okay.  And the third point, Mr.
```



```
 1    Malackowski, thank you, we are done with that

 2    document, Mr. Steep took you through a portion of

 3    Mr. Veschi's deposition.

 4              A.   Yes, sir.

 5              Q.   And he helpfully took you through

 6    page 126.  I would just like to finish up the

 7    section that you had cited in your report.  You'll

 8    recall in your direct testimony I took you to

 9    footnote 99 on page 31 of your original report and

10    you cited right through to page 128, so I would

11    like to take you to pages 127 and 128 of the Veschi

12    deposition.

13              So I apologize for the global

14    highlighting there.  I'm looking at the bottom of

15    page 127 starting "And I think our view [...]".

16              A.   Yes, sir.

17              Q.   So he says:

18                   "And I think our view, and this

19                   is part of the whole battle we had,

20                   was well" -- and I'll apologize for

21                   Mr. Veschi's language -- "tough

22                   shit, you know, this stuff is worth

23                   way too much, you know, you can't

24                   just make your life easier at the

25                   expense of the creditors, that's
```



```
 1              not -- you know, I wasn't hired for

 2              that and I'm not going to sit here

 3              on my watch and let that happen

 4              because it would be a sin if that

 5              happened.

 6                 So you know, we fought the good

 7              fight there I think to get -- I

 8              think predominant was the best I

 9              could do for you guys, really, and I

10              could have probably insisted on

11              exclusive and got fired and I

12              figured that wouldn't help you, so

13              what's the next best thing I could

14              do and I think that is predominant.

15                 Question:  So part of the intent

16              behind the predominant standard was

17              to retain as much value within the

18              Residual Co. IP portfolio?

19                 Answer:  Yes, to -- to see as

20              little of it squandered by [...]"

21              THE CANADIAN COURT:  Is there a

22    question here, what is this?

23              BY MR. MILNE-SMITH:

24              Q.   Was that part of what you relied

25    on, Mr. Malackowski?
```

Neeson & Associates   W&F

```
 1                 THE CANADIAN COURT:  He said he relied
 2    upon the entire deposition of Mr. Veschi, is what
 3    he said.
 4                 MR. MILNE-SMITH:  Those are my
 5    questions.
 6                 THE CANADIAN COURT:  Thank you, Mr.
 7    Malackowski.  Shall we take a 15-minute break
 8    before we come back before the next witness, does
 9    that make sense to you, Judge Gross?
10                 THE US COURT:  It does.
11                 MR. ADLER:  Judge Gross, I'm sorry, and
12    Your Honour.
13                 THE CANADIAN COURT:  Mr. Adler, yes.
14                 MR. ADLER:  For the Joint
15    Administrators and EMEA Debtors.
16                 This day hasn't quite played out as we
17    expected here.  We have Dr. Cooper here ready to
18    go.  But I'm concerned, we would be starting a new
19    subject here.  He is the first of two transfer
20    pricing witnesses that will be going now.
21    Dr. Cooper and then Dr. Felgran on Monday.
22                 There is no chance we would finish
23    Dr. Cooper today.  We have quite a substantive
24    direct for him.  And with apologies, it seems to
25    us, and we are in your hands, but it seems to us
```



1   that it may be wiser for all to start first thing

2   Monday morning.

3                THE CANADIAN COURT:  Well, I'll tell

4   you the concern that I have, and that is that the

5   way this is going, we are going to run into trouble

6   with time, because there are a lot of -- there is a

7   lot of down time when there was some fact

8   witnesses.  Now this is taking longer than anybody

9   expected and I am concerned we are going to run

10  into problems.  Would it not make sense to take his

11  evidence in-chief this afternoon?  That is my own

12  view.

13               MR. ADLER:  We are in your hands about

14  that.  It seems to us that there is still ample

15  time in the schedule the way things have been

16  playing out, but we'll go with what Your Honours

17  think is best.

18               THE CANADIAN COURT:  I don't know what

19  Judge Gross' view is.

20               THE US COURT:  Mr. Bromley, I'll hear

21  from you first.

22               MR. BROMLEY:  Your Honour, as the US

23  Debtors are the last set of experts that are going

24  to go, we too are concerned about being squeezed at

25  the end, so it is 3 o'clock, we would recommend at



1    least from our perspective to start Mr. Cooper

2    today.

3              THE US COURT:  I think we should.

4              MR. ADLER:  That is fine, Your Honour,

5    then after the break he'll be ready to go.

6              THE US COURT:  Very well, and if need

7    be, I think we'll be prepared to extend the time a

8    little bit.

9              MR. ADLER:  Thank you, we appreciate

10   that.

11             THE US COURT:  So that at least perhaps

12   we can complete his direct.

13             MR. ADLER:  Great, thank you.

14             THE US COURT:  All right, we'll be back

15   in 15 minutes.

16   -- RECESS AT 3:12 P.M.

17   -- UPON RESUMING AT 3:23 P.M.

18             THE CANADIAN COURT:  Yes.

19             THE US COURT:  All right.  Mr. Adler,

20   you may proceed, sir.

21             MR. ADLER:  Good afternoon, Justice

22   Newbould and Judge Gross.  It's Derek Adler, from

23   Hughes Hubbard & Reed, for the Joint Administrators

24   and the EMEA Debtors.

25             The next witness is Dr. Richard Cooper.



1    And hopefully, the expert reports and his materials

2    can be handed up in the two courtrooms.

3                   THE US COURT:  Thank you.  We'll have

4    the witness sworn now.

5

6                   RICHARD V. L. COOPER, having first

7       been duly sworn, was examined and testified as

8                         follows:

9

10                  THE US COURT:  Thank you, Dr. Cooper.

11   Welcome to you.

12                  THE WITNESS:  Thank you very much.

13   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION

14   BY MR. ADLER:

15                  Q.   Dr. Cooper, do you have copies of

16   your opening allocation report and also your

17   rebuttal report in front of you?

18                  A.   Yes, I do.

19                  Q.   Have you reviewed those recently?

20                  A.   Yes, I have.

21                  Q.   And do they remain a true and

22   correct statement of your opinions that you're

23   submitting to the courts in this case today?

24                  A.   Yes, they do.

25                  THE CANADIAN COURT:  Should we mark

```
 1   those as exhibits?

 2              THE US COURT:  Yes.  That's consistent

 3   with our practice.  I think it's 33 and 34.

 4              THE CANADIAN COURT:  No; 35 and 36.

 5              EXHIBIT NO. 35:  Expert report of

 6              Richard Cooper, dated January 24, 2014.

 7              EXHIBIT NO. 36:  Rebuttal report of Dr.

 8              Cooper, dated February 28, 2014.

 9              BY MR. ADLER:

10              Q.   Now, Dr. Cooper, have you prepared

11   some slides today to assist you with your

12   presentation?

13              A.   Yes, I have.

14              Q.   Those are on the screen now.

15   Let's start.  Would you please describe generally

16   your qualifications for the two courts.

17              A.   Give you a little bit of my

18   background.  I am a -- I have a Ph.D. in economics

19   from the University of Chicago, where I was very

20   fortunate to have studied under Professor Milton

21   Friedman, who I think is one of the five greatest

22   economists of all time.  I not only had classes

23   from him but he was also on my dissertation

24   committee.  So it was very special to watch him

25   over time and see him there.
```



```
 1                      After finishing my degree, I went to a
 2    place called The Rand Corporation, which is
 3    sometimes called the granddaddy of the think tanks.
 4    And I spent the first eight years of my
 5    professional career there.  While there, I was
 6    fortunate to have the opportunity -- I was asked to
 7    testimony as an expert witness before the United
 8    States Congress on three occasions:  To the House
 9    Armed Services Committee, the Senate Armed Services
10    Committee, and the House Budget Committee.  So
11    those were in the 1970s.
12                      About that time I went to Coopers &
13    Lybrand, one of the then Big Eight accounting
14    firms, where I developed and led their
15    international trade economics practice, and spent
16    almost ten years at Coopers & Lybrand.  While
17    there, I met a partner who was an international tax
18    partner, and I got my first exposure to transfer
19    pricing.
20                      Shortly thereafter, and right around
21    1990, his name was Ernie, Ernie Aud, moved to E&Y
22    to start the transfer pricing practice there and
23    asked me to join him.  So the two of us developed
24    the transfer pricing practice at Ernst & Young.
25                      When we got there, Ernst & Young was
```

 Neeson & Associates   W&P

```
 1   probably the last of the big accounting firms to
 2   get into transfer pricing.  And by 1998, 1999,
 3   somewhere in there, we had this large transfer
 4   pricing practice with, oh, roughly a thousand
 5   people in more than 40 countries.  So we were there
 6   at the time that the business sort of exploded.
 7                So I have -- as a result of this, I
 8   have got more than 25 years in transfer pricing.  I
 9   have worked on a variety of projects, probably --
10   certainly numbering in the hundreds, probably more
11   than 500.
12                I think relevant, particularly relevant
13   to the Court here, I have significant experience in
14   Advance Pricing Agreements, or APAs, as they're
15   called.  In fact, I was the lead person on the
16   second APA ever done, which was also the first APA
17   done in Canada.  It was for a Canadian parent
18   company with significant operations in the United
19   States.  And so we really were -- felt like
20   pioneers in that early stage, which over time has
21   become a very valuable way for companies to work
22   with tax authorities to resolve difficult and
23   contentious issues, and some which we face here.
24                Q.   Do you also actually do work for
25   revenue authorities?
```



1              A.   I actually do, yes.  I've done

2    work both for the IRS, for some state revenue

3    agencies, and also for a foreign government revenue

4    agency.

5              Q.   And in the course of your

6    experience as a transfer pricing professional, have

7    you handled issues relating to IP valuation?

8              A.   I've had significant experience

9    dealing with IP valuation, particularly with cost-

10   sharing buy-ins or buyouts has probably been the

11   most predominant case, but also significantly with

12   licensing agreements and also with the residual

13   profit split.

14             Q.   Do you also have experience as

15   part of your transfer pricing career with IP

16   licensing agreements?

17             A.   Significantly.  While at Ernst &

18   Young I helped develop a database which was the

19   first of its kind that had license agreements that

20   numbered over 5,000 license agreements that we

21   could search for comparable prices to find out what

22   license arrangements were.  It was very helpful in

23   doing IP work.

24             Q.   Thank you, Dr. Cooper.  Could you

25   next tell the Courts what your assignment is here,



1    what you have been asked to do.

2              THE CANADIAN COURT:  Dr. Cooper, I just

3    want to ask you a question.  Does Dr. Dolores

4    Wright sill work at Charles Rivers Associates?

5              THE WITNESS:  No.  Dolores has moved

6    to -- years ago she moved to a place called

7    Analysis Group.  She worked out of -- and I'm not

8    sure if she still does -- out of Denver.  And so I

9    know some people who work with her.  That's where

10   she went to.

11             THE CANADIAN COURT:  I had the occasion

12   to cross-examine her about a dozen years ago.

13             THE WITNESS:  Some of us have been in

14   this business for a long time.

15             THE US COURT:  And she left immediately

16   thereafter.

17             THE WITNESS:  Well, actually, Dolores

18   also worked with Ernie, who was my colleague at --

19   there is a long story, Your Honor, about which we

20   don't need to bore the Court with right now.  But

21   there are stories to be told.

22             BY MR. ADLER:

23        Q.   So, Dr. Cooper, could you tell the

24   Courts what your assignment is here, what you've

25   been asked to do.



 1                    A.   I've been asked, first of all, to

 2    provide an opinion regarding the EMEA and Canadian

 3    Debtors' positions with regard to their consistency

 4    with established transfer pricing principles and

 5    the arm's-length standard, number one; number two,

 6    Nortel's representations to tax authorities that it

 7    dealt with; and number three, the actual substance

 8    of Nortel's business arrangements and practices as

 9    they proceeded.

10                    That was my initial assignment.  Once

11    we all submitted, I was then asked to review and

12    respond to expert reports provided by both the

13    Canadian and US Debtors.

14                    Q.   Now, let's start by explaining, if

15    you would, just giving the Courts an overview of

16    what the science of transfer pricing addresses,

17    what it does.

18                    A.   It's interesting to watch you call

19    it a science, because there's also -- there's a

20    combination of art and science.

21                    Let me begin by giving a little bit of

22    foundation in terms of -- I'm going to go back to

23    when I was in Professor Friedman's classroom.  And

24    there would be usually be some bone-head student,

25    which I was certainly on at least one occasion, but



 1   others, too, who would ask a seemingly silly
 2   question.  And rather than ridicule that person,
 3   because actually Professor Friedman was probably
 4   the best teacher I ever had in the classroom as
 5   well as being brilliant, which is an extraordinary
 6   combination.
 7              He would say, "Let's go back to some
 8   first principles, some basic principles."  And then
 9   he would step by step walk the student through so
10   the student actually got the right answer on his or
11   her own.
12              I think transfer pricing is much the
13   same way.  It is built really on some very basic
14   economic principles.  It really is about how do you
15   allocate income amongst -- in a multinational
16   enterprise amongst the different entities that
17   participate in the affairs of the business.  But
18   you use basic economic principles to do so.
19              Now, I think for the layperson, I think
20   it's most common to think, when you hear -- when
21   you think of transfer pricing, gee, we're going to
22   price the -- what is the value of this bottle of
23   water, and if I sell it to another entity, what
24   should I mark it up by.
25              Transfer pricing really embodies a lot



1   more than that.  There are really four categories

2   of sets of transactions that are covered by it.

3   Number one clearly is physical or tangible

4   property.  Second are financial transactions; loans

5   and advances, things of that sort.  Third are

6   services.  And fourth, of particular importance

7   here, is intangible property.

8   And in the transfer pricing world we typically

9   think of intangible property as a broad category,

10  whereas, you know, when we're -- here I think we're

11  dealing with some very specific intellectual

12  property, or IP we often call it.

13  So the issue here is how do we then allocate the

14  income that comes from those business transactions

15  to the multiple entities that an enterprise has.

16  So that really is at a very, very high level what

17  transfer pricing is about.

18              Q.   And you used the term

19  "multinational enterprise."  What does that mean?

20              A.   For a variety of reasons, both

21  legal and tax, companies don't operate as one thing

22  around the world, as everybody knows.  So when you

23  operate in multiple jurisdictions, you typically

24  set up some sort of an enterprise in that

25  jurisdiction.  You know, a corporate form is very



```
1    common, but it can be -- other branches can also be
2    possible, too, in certain circumstances.  Leave it
3    to the tax experts to design those.
4              But what happens is we have multiple
5    entities operating around the world.  And so the
6    key that the transfer pricing official faces, the
7    key that the tax authority faces, and the key that
8    the company faces is really two things:  How to
9    prevent tax avoidance, because other things equal,
10   companies would like to reduce their taxes; but at
11   the same time, how to reduce double taxation,
12   because tax authorities would like to tax as much
13   income as they can.  So it's really a balancing act
14   how they handle those two aspects.
15             And I think what has happened
16   especially in the last 30 to 40 years is simply
17   remarkable in the sense that trillions and
18   trillions of dollars of commerce go on all the time
19   now, and that's because companies and tax
20   authorities feel relatively free to transact
21   without worrying about retribution really.  There's
22   a set of rules, guideposts, stop signs and
23   crosswalks, and red lights and green lights that
24   enable business to go by.  And really a lot of this
25   is because of the transfer pricing framework that
```



1    was set up that allows companies to operate this

2    way.

3                Q.   So Dr. Cooper, you've anticipated

4    some of this, but why is it necessary -- why has it

5    been necessary to develop a specialized body of law

6    pertaining to transfer pricing?

7                A.   Well, as I said, companies would

8    like to reduce taxes, to minimize their taxes, and

9    taxpayers -- and tax authorities would like to

10   collect more taxes.  So the real issue is to test

11   how -- we need to move the slide to the next slide.

12   Let's not leave this one.

13               I think that the bottom quote on there

14   I think says it very well, and that is "to ensure

15   that taxpayers clearly reflect income attributable

16   to control transactions and to prevent the

17   avoidance of taxes with respect to such

18   transactions."

19               Now, this is in the US set of

20   regulations.  There are similar kinds of guidelines

21   in the OECD and in other tax authorities around the

22   world, but I just picked this one out because I

23   thought it was was maybe the clearest of all.

24               Q.   Do you use the term "controlled

25   entities" in the transfer pricing area?



```
 1                    A.   Yes.   The controlled entities

 2    refers to all of those entities that sit under the

 3    parent, whether -- it could be a manufacturing

 4    entity.  It could be sales.  It could be a

 5    combination of those things.  But it's the one that

 6    the overall -- that are under the parent, so they

 7    are controlled by the parent.

 8                    Q.   And why is it necessary to treat

 9    them differently than any other taxpayers?

10                    A.   Because -- go back to what I said,

11    and that is that other things equal, companies

12    would like to transact business in ways that would

13    minimize their taxes.  And uncontrolled entities

14    will bargain; they will reach an agreement on their

15    own, and that will be a market price.  There is no

16    such market internally.  And so that's why

17    controlled entities are different.

18                    Q.   So what standards have been

19    developed to address these issues in relation to

20    controlled entities?

21                    A.   Well, as I mentioned earlier, body

22    of law -- a body of law has been brought together

23    in the transfer pricing framework, and the OECD has

24    issued guidelines which really provide guidance to

25    tax authorities in terms of how they should set up
```

 Neeson&Associates    W&F

```
 1   their arrangements that are in a consistent way to

 2   minimize conflict so that -- and so we have, in

 3   terms of our own situation right here, we have the

 4   OECD guidelines, we have Canadian rules, we have US

 5   rules, UK rules, Irish rules and French rules,

 6   would be the predominant ones we're concerned about

 7   in this case.  All have guidelines that, generally

 8   speaking, fall within the framework set forth by

 9   the OECD.

10              THE CANADIAN COURT:  Can I ask you a

11   question there?  Is that what you're referring to

12   by, quote, body of law?

13              THE WITNESS:  Yes.

14              THE CANADIAN COURT:  Thank you.

15              THE WITNESS:  I'm sorry if I wasn't

16   clear on that, Justice Newbould.

17              THE US COURT:  In other words, there's

18   not a uniform law.

19              THE WITNESS:  There's not a uniform

20   law, because they are -- go back to what I said

21   earlier.  That's what I think is sort of remarkable

22   about this, how the countries really did come

23   together.  Rules at one point were really quite

24   different.  And how we brought them together into

25   really what is I think of as a much more cohesive
```



1    and consistent set of guidelines that go across

2    boundaries.

3              And when you realize the tax regimes in

4    many of the countries are very different.  We have

5    a worldwide tax, whereas other countries will adopt

6    a territorial tax system, and how do you make all

7    those things fit together.

8              But that's what I was referring to by

9    the body of law.

10             BY MR. ADLER:

11             Q.   So does that body of law include

12   an accepted test for determining how to allocate

13   income among entities within a multinational

14   enterprise?

15             A.   Yes.  The broad principle is the

16   arm's-length standard.  How would two entities, two

17   individuals, two entities conduct business if they

18   were operating at arm's length.  Now, that's a nice

19   concept in itself, but how you translate that into

20   something actionable?

21             The touchstone really for that, what

22   I've called it here is comparability, and that is,

23   we compare internal transactions that we don't

24   really have benchmarks for with ones that do have

25   benchmarks in the outside world.



```
 1                    So just the way -- for example, it's
 2   not unlike what, let's say, a tax appraiser will do
 3   for real estate.  They'll look at what houses are
 4   priced comparably in your neighborhood and then
 5   issue a tax.  We use the same set of principles in
 6   finding comparables in transfer pricing.
 7                    Q.    So what is the result of looking
 8   at the comparables?  At the end of it, what do you
 9   wind up with?
10                    A.    What you end up with is an arm's-
11   length price.  And typically because prices are not
12   exact, we typically end up with a range as opposed
13   to a point estimate.  And it's very important to --
14   that as long as you are in that range, that's the
15   important thing.
16                    Q.    Now, how does a multinational
17   enterprise go about choosing a transfer pricing
18   method or methodology?
19                    A.    It depends.  This is a facts-and-
20   circumstances business.  Every situation, every
21   entity can be different.  And so the first thing we
22   look at is what the facts and circumstances are.
23                    Within that framework, there are
24   several recognized methods in each of those four
25   categories of transactions I mentioned:  Tangible
```



1    property, financial services, and intangibles.

2    There are a set of methods that you can choose

3    from.  And in every case there is always another

4    method if your facts and circumstances don't fit

5    any of those.  The real challenge then is to find

6    the method that is, in the words of the OECD, the

7    most appropriate method for the facts and

8    circumstances at hand.

9              Now, how do you get there is, one of

10   the first things we do in any transfer pricing

11   analysis is to do what's called a functional

12   analysis, which is really finding out who does

13   what, what assets are employed and what risks are

14   involved.  Those are really the three principal

15   things that we're looking at when you're doing a

16   functional analysis; trying to understand where the

17   risks are, where the functions are and where the

18   assets are; the things that deserve returns.

19             Q.   Now, are there special issues that

20   arise in relation to multinational enterprises in

21   relation to IP, intellectual property rights?

22             A.   IP is probably the toughest

23   category to work with -- not probably.  It is, as a

24   general matter, because it's fuzzy.  I mean, it's

25   not precise.  We can look at this bottle of water.



 1    We can walk out of the store.  We have a good idea
 2    of what it sold for.  It's easier to get those.
 3              IP is, you know, how to measure it.
 4    I've watched some of the proceedings over the last
 5    couple of days, and we see people talking about how
 6    do we measure the value.  Lots of different
 7    concepts are raised.
 8              So transfer pricing really has
 9    developed a way of looking at them, I mean, not
10    necessarily precise, but it is a special problem.
11    And it typically involves more -- we'll get -- I'll
12    get into them, but more unique ways of looking at
13    it.  And then to do that, you need to think about
14    the -- there are three ways that transfer pricing
15    looks at how IP is conducted or should be.
16              First is the traditional licensing
17    model.  I own IP and I will license it to you and
18    to a country and somebody in the country; that they
19    may have exclusive rights for that country.  They
20    could have rights for working in an industry.  They
21    could have a variety of ways that would be defined
22    in the terms of the contract.  And that license
23    would typically carry a royalty.  Sometimes that
24    royalty is lump sum.  That's -- but more often it
25    has some percentage attached to it, what are based

Neeson&Associates    W&F

1   really on the sales activity of the selling entity.

2   That's the license, the license -- what we call the

3   license model.

4           Second model which probably developed

5   next is cost-sharing.  And what cost-sharing does

6   is let's say there are just two entities involved

7   in the sharing of IP.  We will share in the cost of

8   creating that IP.  And what very often happens

9   there, you have -- if -- suppose the company

10  started in Canada and decided it wanted then to

11  have some European operations.  It wanted then to

12  establish a -- that accentuated it, didn't it?

13          THE US COURT:  I thought the sun came

14  out.

15          THE WITNESS:  We just had a big clap of

16  thunder here, Justice Newbould.

17          THE CANADIAN COURT:  So I hear.

18          -- OFF THE RECORD DISCUSSION --

19          THE WITNESS:  So in the cost-sharing

20  model, if you're setting up one in let's say

21  Ireland that way, they would want to buy into your

22  model.  They have to get the rights to your model.

23  They typically would pay a buy-in fee, but after

24  that they would share in the cost of -- suppose a

25  billion dollars' worth of R&D is done.  They would



1    share in those costs proportionate to the benefit

2    they received.  So that is the cost-sharing model.

3              Profit split is the model that probably

4    came into the transfer pricing literature latest or

5    methods latest.  And there are really sort of two

6    methods there.  One is the comparable profit split,

7    which in all my years I've only seen applied once.

8    It takes unusual circumstances to.

9              The other is the residual profit split

10   method which, as I think we've heard here is what

11   Nortel ultimately went to and I'll talk about in a

12   few moments in a little bit more detail.  But what

13   residual profit does is to -- or profit split does

14   is to share the profits from the R&D you've done.

15   The R&D sets the amount of profits you're going to

16   get.

17             So to some extent, and a considerable

18   extent, profit split and cost-sharing are mirror

19   images of one another.  In cost-sharing, the amount

20   you pay depends on the benefit that you get from.

21   In a profit split, the amount you put in determines

22   what you get.  So they really are sort of flip

23   images of one another.

24             BY MR. ADLER:

25             Q.   So in a case like Nortel, where



```
 1   you have multiple entities within the enterprise

 2   that are collaborating to create IP in different

 3   locations, what approaches does that lead you to?

 4                  A.    In Nortel's case, I mean, Nortel

 5   actually did.  What they did is they used -- and I

 6   think it's probably been well-established here.

 7   They did a cost-sharing during the '90s, and

 8   beginning in 2001 they employed the residual profit

 9   split method.  And as a general matter, those are

10   the ones that are most appropriate.

11                  And I've done licensing for other

12   clients, licensing models that would handle a

13   situation like this, but it's not very common.

14   Profit split and cost-sharing are the two most

15   common.  And I think for Nortel's circumstances in

16   the 2000s, I think the profit split, in fact, made

17   the most sense.

18                  Q.    Now, in a situation like that,

19   where you have multiple entities creating

20   intangibles together, is there a way to look at

21   comparable data?

22                  A.    I'm not sure which --

23                  Q.    Is comparable data available?

24                  A.    Typically not.  I mean, actually

25   that's where the comparable profit split method
```



```
 1   comes from and that occasionally -- that says is
 2   there another comparable out there you can base
 3   your split on.  That happans on rare occasions.  As
 4   I say, I've seen it once.  But in general, you need
 5   to go to another sort of what I would call an
 6   income-based approach afterwards, which in this
 7   case it was the residual profit split method.
 8             So what you try to do, though, in the
 9   residual profit-split method is you start off by
10   looking at what functions can you benchmark, are
11   readily benchmarkable.
12             In fact, can we go to the --
13             Q.   Yes, can we put on the next slide
14   there?
15             A.   Yes.  So what we do in the
16   residual profit-split method is break things down,
17   break all of the activities down into two
18   categories.  Unfortunately, in the very beginning
19   we called them routine functions, and that name has
20   stuck ever since.  And sales is usually classified
21   as one of those routine functions.
22             Now, I can't manage any company
23   succeeding without having sales.  It's going to
24   die.  But yet we call it a routine function.  But
25   what it really means is that these are functions
```



1    that are more readily benchmarked by data available

2    in the outside world.

3              Take the sales and distribution

4    function, for example.  There are a number of

5    independent distributors, surprising numbers

6    actually of even publicly traded independent

7    distributors that will operate, let's say, in the

8    telecom industry, or they may operate in the food

9    industry or they supply grocery stores, things like

10   that.

11             We can find the returns from the way

12   those companies operate so we can begin to

13   benchmark those sets of functions inside the

14   residual profit model.  So we call these routine

15   functions, and that really means function that can

16   be more readily benchmarked by publicly available

17   data.

18             Q.   And how do you determine how to

19   reward those functions, the entities that perform

20   so-called routine functions?

21             A.   It depends.  You go -- as I say,

22   generally speaking, you go to publicly available

23   data that you can look -- you would look first

24   inside.  Suppose that you -- all transfer pricing

25   regulations like we call comparable uncontrolled



```
 1   transactions, if you can find it.  Those are not
 2   always available.  In fact, that would be -- so
 3   suppose we sold internally, we sold -- let's say in
 4   the State of Texas we used an uncontrolled
 5   distributor to sell our stuff.  In every other
 6   state we might be able to use that as a benchmark.
 7   Those kinds of situations are rare.
 8               So what we instead do is turn to data
 9   to find, in this case the sales and distribution
10   function, what returns they get.  And that
11   establishes the return that we would like to give
12   to the -- that we need to give to our own internal
13   sales function across the entities.
14               Q.   So again, these are functions
15   where you can establish a comparable rate of
16   return?
17               A.   A comparable rate of return.
18               Q.   And then after you've identified
19   these routine functions and determined how much
20   value they should get from the enterprise, what do
21   you do next?
22               A.   Then what that does, you collect
23   all the returns from that, subtract that from the
24   enterprise's overall profitability, and what's left
25   is the residual; hence the name residual profit
```



1    split.

2                    Q.   Once you've identified the

3    residue, the residual profit, what do you do with

4    that?

5                    A.   Then that's where the split part

6    of the residual profit-split method comes in.  So

7    the issue is what basis are we going to share those

8    profits, are we going to split the profit.

9                    So the key there is to identify what we

10   think the drivers of these intangible profits are,

11   because what we're saying is the residual profits

12   are coming from this hard-to-measure intangible.

13                   And so we look, and an example might

14   be, let's say, a consumer products company that

15   sells lotions and consumer products.  They

16   typically spend very heavily on advertising.  They

17   develop brand awareness, so you know the names.

18   You know either the brand names or the company

19   names.  And sometimes it's both.  You know, Proctor

20   & Gamble will promote its own name, just to pick a

21   name out at random, and also promote their own

22   products' names.  So in that case you might think

23   the driver of profitability or a big contributor is

24   the marketing spend.

25                   In the case of an intellectual property



```
 1   company, based company, which is what Nortel --
 2   which we think Nortel was, then R&D may be the
 3   basis.  In fact, they chose R&D as the basis for
 4   trying to identify as the contributor to that
 5   intangible profits.
 6            Then the key is to find out how to
 7   share the profits relative -- through what we call
 8   an allocation key.  And I've seen the term
 9   "allocation key" used several times in these
10   proceedings already.  Nortel used R&D spend among
11   the five RPEs, the residual profit entities, the
12   relative R&D, to determine the allocation key.
13            Q.   You used the term "entrepreneur" a
14   lot in your report.  Could you tell us what that
15   means in the context of a residual profit-split
16   method?
17            A.   The residual profit-split method
18   really envisions those creators, the people that
19   are sharing in profit, as being the entrepreneurs,
20   the ones that are taking risk in order to get
21   future gain.  That is what the core of the model is
22   about.  We reimburse the functions for -- the
23   routine functions that are more easily measured,
24   and then the residual profits go to the
25   entrepreneurs.
```



```
 1                    Q.   Is this analogous to any

 2   particular type of open market relationship?

 3                    A.   I mean, in some cases it's not

 4   unlike what a law firm or an accounting firm does,

 5   having lived there.  You have qualified staff who

 6   you couldn't get along without.  They're very

 7   important.  And we all went through that stage;

 8   when we were younger, we were there.  And so we got

 9   compensated fairly for that.  And then the partners

10   in the firm share.  If it's a good year, you do

11   well.  If it's a bad year, you don't do so well.  I

12   mean, and so it's very analogous to that situation.

13                    Q.   So it's similar to a partnership?

14                    A.   I think it really is very similar

15   to really a joint venture is probably what it's

16   most analogous to.  It may not be literally a joint

17   venture or legally a joint venture, but it really

18   operates and behaves like a joint venture.

19                    Q.   Now, I think you've read

20   Dr. Eden's report in this proceeding where she says

21   that the residual profit-split method is the,

22   quote, "method of last resort."

23                    Is that a correct characterization?

24                    A.   I think that is not a fair

25   characterization.  I think -- and she actually
```

1   cites some language that appeared in an IRS -- not

2   the regulations per se but in the preamble to the

3   IRS regulations that were published in 1994, which

4   is the first time the residual profit-split really

5   entered into it.

6              The preamble really sort of hints at it

7   as a method of last resort.  And there is, I think,

8   some truth to that when it's applied retroactively.

9   But when it's designed from the get-go, I think

10   that it is certainly not true.  And, in fact, I

11   think in situations like Nortel, rather than being

12   the method of last resort, I think it's actually

13   the method of first resort.  It's the one that

14   makes most sense as a method.

15              Now, the key in any method comes in how

16   you implement it and the particulars there.  But as

17   a method, it gives you the most flexibility to get

18   done what you think needs to be done to reward the

19   proper -- entities properly all the way.

20        Q.   So would you say it's often used?

21        A.   Yes.  It's not used lots.  The

22   most common method really is still licensing.  But

23   when you have a complicated situation like Nortel,

24   it is -- I've seen it -- dozens of times now.  But

25   it's -- you need to have a large enterprise to



1    really make it work.

2              Q.   And is it acceptable to the

3    revenue authorities?

4              A.   Yes, it is acceptable.  It is

5    acceptable in the OECD regulations, accepted, as I

6    say, in the IRS.  In fact, actually it was the IRS

7    and to some extent the CRA which I think really

8    pushed Nortel toward the RPSM at the end of the

9    cost-sharing period.

10             Cost-sharing was becoming very

11   difficult for Nortel to implement.  Cost-sharing is

12   administratively more complex.  Every time --

13   Nortel was very acquisitive in the late '90s.  And

14   every time you make an acquisition, if the IP is in

15   the wrong place, you have to make buy-in payments

16   or buyout payments.  It just gets to be complicated

17   to administer that way.

18             So as I say, I think it was really the

19   IRS that played a significant role in trying to

20   push Nortel toward their RPSM, which really came

21   out in the first APA application that Nortel set

22   forth.

23             Q.   Now, let's talk next about how the

24   residual profit-split methodology actually worked

25   at Nortel.  Could you first just provide the Courts



1    with an overview of how the particular residual

2    profit-split methodology at Nortel worked?

3                    A.   I think we've touched on this, but

4    to get a little bit more detail, in Nortel they

5    determined -- let's go back to the routine

6    functions.

7                    In the residual profit-split method,

8    the first thing we do is we look for the routine

9    functions.  We do what's called a functional

10   analysis.  And indeed, Nortel had one done by Horst

11   Frisch in 2002, and I think it was updated in 2003.

12   And then I think Ernst & Young did one in, I think,

13   roughly '06.

14                   So a functional analysis tell us what

15   are the routine functions.  And indeed, they

16   actually moved somewhat, changed a bit, going from

17   the earlier functional analysis to the one later

18   on.  I mean, they evolved as they understood the

19   business better.

20                   But the routine functions, generally

21   speaking, were the manufacturing function when

22   Nortel had manufacturing.  It would have been

23   operations once Nortel got out of the physical

24   manufacturing; distribution, sales and marketing;

25   operations, as I say, and then corporate services

 Neeson&Associates   W&F

1    would be the main categories that would have

2    received a routine return.

3              Those returns would have been

4    benchmarked against the data that were available

5    and used.  And indeed, there were -- as I say, we

6    had Horst Frisch that worked for Nortel during the

7    2002-'3 period.  They employed KPMG for a year or

8    two in the middle to benchmark some and, then

9    Ernst & Young toward the latter half of the 2000s.

10             Q.   So what did they determine that

11   the value driver was?

12             A.   They determined that the value

13   driver, as I sort of hinted at earlier, was really

14   R&D.  It really was -- that was -- it really was IP

15   was the driver, and R&D was the driver for IP.  And

16   so that became the basis to -- that was the

17   entrepreneurial function, as we sometimes called

18   it.  And I think I used that word a lot in my

19   allocation report, because I think it really is.

20   It tries to drive the flavor also of what's going

21   on.  It really was Nortel -- for better or worse,

22   it was what Nortel was about.

23             Q.   And so then what was the

24   allocation key that they developed to divide up the

25   residual profit based on R&D?



1                    A.    Nortel used two different

2    allocation keys in what I will call the first RPSM

3    period, and that's the one that's really sort of

4    covered under the model set forth by Horst Frisch.

5                    They used a method called R&D capital

6    stock, which basically was depreciating prior R&D,

7    amortizing it by 30 percent per year backwards.

8    And so that the capital stock today is the sum of

9    the historic R&D each year depreciated by

10   30 percent, so 30 percent per year.  And that

11   measure created the capital stock.

12                   And then for each -- and we had five --

13   in Nortel's case, we had the five RPEs.  We had the

14   NNL obviously, NNI, UK, NNSA, France, of course,

15   and then NN Ireland.  So capital stock was created

16   for each of those five, totaled, and then the

17   profits were shared.  The profit split was each

18   entity's share of that profit split.  That's in the

19   first period.

20                   The second period was the -- from 2006

21   to early onward, which they evolved to a simple

22   five-year look-back.  Just simply sum backwards the

23   most recent five years was the relative measure.

24   Sum backward for each of the five entities and then

25   again allocate it on that basis.



1                    And I'll come back later.  I think

2     that -- I think that method was flawed from the

3     get-go.  And there are a number of reasons why.  I

4     think that -- and I'll come back to that in a

5     moment.

6                    Q.   So in each case is it right that

7     the amount of spending on R&D was part of the

8     allocation key?

9                    A.   In each case the amount of

10    spending on R&D was the driver to the allocation

11    key.  Just a matter of how you calculated the

12    allocation key based on the R&D you had.

13                   Q.   And did they make any distinction

14    between the value of R&D spending in one place or

15    another place?

16                   A.   Very importantly, no.  Every

17    dollar was treated as the same.  And that is an

18    important concept underlying -- generally speaking,

19    it implies -- it underlies every RPSM I've ever

20    seen where every dollar is created equal, unless

21    you had some clever category to deal with that on a

22    different basis.

23                   Take a quick aside, I sort of liken

24    this to something that's kind of common with the

25    lottery these days.  It's not uncommon to see



1    groups of workers form a pool, get together, and

2    then everybody puts in $20, whatever it is.

3    Somebody then acts as sort of captain of the team,

4    goes off to buy lottery tickets and sees what

5    happens.

6              And there's actually an interesting

7    case, and we all may recall it.  But I remember

8    thinking about it when we were talking about this.

9    Gee, this example kind of fits here.  It was

10   several years back that the guy who went off and

11   actually won $38 million prize.  And he claimed,

12   no, this was from a ticket that he had bought for

13   his own purposes.  And, of course, that case

14   actually went to trial, and it was decided in favor

15   of the group as opposed to the individual.

16             So -- but in that case every dollar

17   going in is treated equally.  It doesn't have a

18   different color or different shape.  It's the same

19   dollar that's going in, because we don't know

20   beforehand which R&D is going to be successful and

21   which is not.  After the fact it becomes clear, but

22   beforehand we don't know which R&D is going to

23   become -- and so all the partners go into it with

24   this equal sharing concept in mind.  So it really

25   is based on that kind of level of equality.

 Neeson&Associates    W&F

```
 1                THE CANADIAN COURT:  That case is a
 2   good example of the saying that the pigs got fat;
 3   the hogs got slaughtered.
 4                THE WITNESS:  Isn't that the truth?
 5                BY MR. ADLER:
 6           Q.   So in your view, Dr. Cooper, is it
 7   appropriate to treat costs that way under these
 8   circumstances, to treat every dollar spent on R&D
 9   as being equal?
10           A.   If you don't have prior knowledge
11   about which is going to be successful, then it
12   clearly is appropriate.
13                If for some reason you knew when you
14   were going -- when you were undertaking this that
15   every dollar was not equal, then, in fact, you
16   could proceed on that some projects were not as
17   good from the beginning.  You knew it at the time,
18   what we'd say ex ante, beforehand; then you could
19   conceive of that.
20                As I say, every time I've seen an RPSM
21   implemented, it really has been on the basis that
22   every dollar is created equal walking in the door.
23           Q.   Now, having done that overview,
24   let's talk about the particular functions that were
25   identified for the particular Nortel entities.
```



1                      And could you provide an overview of

2      that; first of all, which entities were identified

3      as the entrepreneurial entities, in your word.

4                      A.    Okay.    And I think I've gotten

5      ahead of my presentation in parts.    We touched on

6      some of these things.    Let me do them again real

7      quickly.

8                      The RPS entities or they're called RPE

9      entities -- I mean there are a variety of forms --

10     are the five.    There were six.    Australia was in at

11     one time.    But I still think of it largely in terms

12     of the five entities there that are listed that

13     I've shown here; that is, which would be Canada,

14     US, UK, France and Ireland.

15                     They did routine activities, too.

16     Their routine activities in the first period were

17     manufacturing; in the second period --

18     manufacturing and distribution and corporate

19     services.    In the second period, it was mostly

20     corporate services, distribution and operations,

21     overseeing the contract manufacturers.    And they

22     got rewarded with routine returns for those

23     functions.    And then they also got rewarded with

24     the profit and losses -- it turns out more the

25     latter -- for the risks that they took from the R&D



```
 1    investment they undertook.
 2               Q.   So is it right then that for these
 3    entities, the RPS entities, even if they never get
 4    anything from the residual profit and losses,
 5    they've already received compensation through the
 6    system for the routine functions?
 7               A.   Oh, yes.  They have already
 8    received compensation for the routine functions.
 9    That's very definitely the case.
10               Q.   And that includes distribution and
11    manufacturing, things like that?
12               A.   Yes, that's right.  In the first
13    RPSM period, the RPS entities here, the RPEs, did
14    not get a sales return, but instead they got a
15    fairly generous return-on-assets function, which
16    really returned them for all the manufacturing and
17    other kind of assets.  So it really sort of covered
18    the range of things.
19               In the second period, where assets were
20    not so important, they instead got a return for
21    distribution.  But yes, they got routine returns
22    and were compensated for those functions that they
23    did.
24               Q.   And what about the other entities
25    in the group?
```



 1                    A.   Then the other entities would be
 2     the limited-risk entities.  These basically almost
 3     entirely were distributors.  So, for example, there
 4     was one in Hungary.  There was one in Germany.
 5     There was one in -- so forth; particularly around
 6     Europe, where it didn't make sense to really set up
 7     sizable ones, but they -- where you still wanted to
 8     have sales operation in those -- and sales and
 9     distribution operation, and those were the LREs.
10     And they received a return for their distribution
11     function.
12                    Q.   Now, focusing on NNL in
13     particular, what were the functions that were
14     identified in the functional analysis for NNL in
15     relation to IP?
16                    A.   Basically, NNL did everything, or
17     the other stuff that the other RPEs did.  In
18     addition, NNL had legal title to the -- which is
19     common.  I'll come back that to in a moment.  And
20     NNL did -- it did all the administrative functions
21     around IP:  Keeping patents current, keeping them
22     registered, going through the filing process.
23                    And actually Nortel was actually -- NNL
24     was actually compensated for that.  That would have
25     been one of the routine functions that was treated



1    under the RPSM model in terms of their legal staff.

2    Doing the IP maintenance and so forth was all

3    covered through the routine returns.

4              With regard to R&D costs, they were

5    compensated with regard to their R&D costs the way

6    the other four RPEs were compensated; that is, with

7    their share of residual profits.

8    -- OFF THE RECORD --

9              BY MR. ADLER:

10             Q.   Now, you referred before a little

11   bit to the periods of time that were considered

12   relevant to the allocation key, the periods of time

13   for allocation for R&D spending.  What's useful

14   life in the transfer pricing context?

15             A.   Useful life refers to how long the

16   IP is good, how long is it commercially valuable

17   for.  That is really what it measures.

18             Q.   And so how does that interact with

19   the allocation key in a residual profit-split

20   method?

21             A.   In a residual profit-split method,

22   ideally you want the allocation key to be designed

23   to capture the driver of profits.  And if IP is

24   driving profits, you want it to capture that price,

25   that value.



1                    If IP is going to be good for 15 years

2     or 18 years, you want that value captured in the

3     allocation key.

4                    Q.    So how does that relate to whether

5     a particular R&D spending should be counted in

6     relation to the allocation key?

7                    A.    I mean, what you really need to do

8     is it needs to be counted in there.  That's the

9     important step, that it needs to be part of that

10    allocation key; the R&D spend that covered the

11    period that created the commercially valuable IP.

12                   Q.    And by "commercially valuable,"

13    you mean what?

14                   A.    That we could get economic benefit

15    from that IP.

16                   Q.    Now, are different approaches

17    taken depending on what context you're reporting

18    the income in?

19                   A.    Yes.  It turns out to do a

20    valuation of the sort that's been done here -- when

21    I take a look at the list of experts who have done,

22    some very qualify people, the amount of time and

23    effort they spent doing it and the expense they

24    went through, a company can't afford to do that

25    every year.  It would break the piggy bank, and



```
 1   even a profitable company would quickly become
 2   unprofitable.
 3            So what companies do is they develop
 4   rules of thumb for filing their annual tax returns.
 5   The method that Nortel operated in the first RPSM
 6   period, where they chose the 30 percent per year
 7   amortization rate, I think was a reasonable
 8   approach.  I thought at the time, even before I
 9   looked at what Nortel did, that it probably was on
10   the high side.  I think something less than
11   30 percent probably would have been right.  I think
12   the IP would have lasted longer than that.
13            If you look at a 30 percent per year,
14   if you go out about six years, seven years, you're
15   not giving any weight to it at all.  But
16   nevertheless, it was an approach I think tax
17   authorities would by and large buy for a company's
18   annual tax filings.
19            On the other hand, I think the
20   five-year look-back, as I say, when I saw it the
21   first time, even without understanding, it just
22   struck my as inappropriate.  I've never done that
23   before.  I don't know if I have ever seen it or
24   not, but I've never done that before.  Because what
25   you're staying is a dollar of IT spent five years
```



1    ago had 100 percent value, and a dollar spent the

2    year before that had no value.  And that just

3    doesn't make common sense.  So as I say, I had my

4    difficulties with that.

5                But I think the important point here is

6    that for annual tax filings -- and even that may

7    have been okay for annual tax filings, because

8    companies trying to see what really works best.

9    But when it comes to a major taxable event -- and

10   I've done a variety of these.  One was a major

11   buyout when a company went into a cost-sharing

12   arrangement, and so we had to do a buy-in to get

13   into the cost-sharing.  That was a huge event.  The

14   value was going to be somewhere between

15   $200 million and a billion dollars, so that's a big

16   number.  When you get numbers that size, tax

17   authorities pay attention to them.

18                So when you get to a major taxable

19   event and the sale of the residual profit -- I mean

20   the sale of -- the IP sale clearly falls in that

21   category -- we're going to do what I do:  A much

22   more in-depth, or what I call a deep dive into

23   looking really what are the particulars.  It's not

24   going to settle for, gee, what worked on an annual

25   basis.  Now I want to look at what created real



1   value there and who is responsible, because our

2   issue here is how to allocate that among the five

3   participants.

4              Q.   Now, for annual tax filing

5   purposes, is it acceptable to use an estimate of

6   the useful life?

7              A.   Yeah, because when you are doing

8   that, you don't have -- you don't have -- you don't

9   want to take the time, spend the money and

10  everything else to do the deep dive I talked about,

11  so you're using an estimate.

12             Q.   But does there still have to be

13  support for that estimate?

14             A.   Oh, yes there does.  And the level

15  of support that Nortel did was fine.  They had --

16  they interviewed the other staff, which is very

17  common to go back and interview the IP managers in

18  terms of the things they do.  IP managers, they may

19  have a short-term focus, but they are closer to the

20  situation.  So I think what Nortel did during that

21  period was reasonable in terms of annual filings

22  but as I say, not what you would do for deep dive.

23             Q.   And is what you just said true for

24  the five-year period, which you just criticized as

25  well?



1                    A.   As I say, I probably wouldn't have

2    liked the five-year period at the time if I saw it.

3    When I saw it, I probably would have reacted to it

4    if I were looking on the other side, if I were a

5    tax authority.  But I wouldn't make an enormous

6    issue about that on the annual filings.

7                    It clearly was inappropriate, we know,

8    from -- in terms of actual results that resulted

9    when you came to the major IP sale.

10                   Q.   Now, you referred to major taxable

11   events.  Will the revenue authorities accept

12   estimates if actuals are available, if actual

13   information is available in relation to a major

14   taxable event?

15                   A.   No.  They want to look at the real

16   numbers.

17                   Q.   And would the transactions that

18   have led to the dispute that we're here on, would

19   they be considered major taxable events?

20                   A.   Certainly.

21                   Q.   Now, let's move on to talk about

22   another concept that seems to come up in transfer

23   pricing, which is beneficial ownership.

24                   A.   Yes.

25                   Q.   Does that term have meaning in the



1    transfer pricing context?

2              A.   It has very substantial meaning in

3    the transfer pricing context.

4              Q.   What's that meaning?

5              A.   The meaning is that -- and it

6    applies here and applies in almost any situation

7    where you have either cost-sharing or residual

8    profit split or any kind of profit split, and that

9    is that it is usually administratively convenient

10   to have one entity hold legal title to the IP, for

11   management purposes, ease of administering, variety

12   of reasons like that.

13             But the other entity has economic

14   interest in it.  It is done -- it has paid for its

15   share of creating the IP, and it has what is

16   termed -- even though it may not be legal title, it

17   has beneficial ownership or economic ownership in

18   that portion for which it's created.  If it paid

19   for half of the IP -- or R&D that created the IP,

20   they would be entitled in this case to half of the

21   beneficial ownership and half of the IP.

22             Q.   So what are the benefits that a

23   beneficial owner is entitled to?

24             A.   Basically all of the benefits, all

25   of the economic benefits that come from ownership



1    of any sort.

2                    Q.   And in an RPS, a residual-profit-

3    split-method company, who are the beneficial owners

4    of the intangibles that are being created?

5                    A.   The beneficial owners of the

6    intangibles are those that paid for the development

7    of the IP that -- development of the -- paid for

8    the R&D and led to the IP.

9                    Q.   And what are they entitled to?

10                   A.   They're entitled to their fair

11   share.  And their fair share would be determined by

12   what they put into it, their proportion that they

13   put into the IP.

14                   Q.   Now, you mentioned that legal

15   title might be held by one of the entities, while

16   others are the beneficial owner.  Does legal title

17   by itself have any value in a functional analysis

18   for a residual-profit-split-method company?

19                   A.   In itself it has no value at all.

20   There's been a lot of discussion about this over

21   the years, and the discussion has been pretty

22   consistent.  If somebody holds legal title, they

23   will look first to see -- I mean, you think of that

24   as the owner.  But the next thing you do is you

25   look what's behind that and what really created



 1   that and where really is the value of that, and it
 2   happens -- it really comes to the economic
 3   ownership.
 4               And I put -- I apologize for the long
 5   quote I put in here, but it's from the draft --
 6   OECD draft guidelines.  The draft guidelines were
 7   issued -- were prepared in 2013.  We're actually
 8   expecting them to be final this September.  But
 9   they really reflect what appeared -- it's just a
10   crisper way of saying what more or less appears in
11   both the '95 and 2010 guidelines.
12               And I highlighted one sentence in there
13   which sort of gets to this point, which is, that
14   "legal ownership of intangibles, by itself, does
15   not confer any right ultimately that may initially
16   accrue to the legal owner."
17               Basically we are saying legal title by
18   itself doesn't matter.  What matters is who has
19   really economic ownership of the property that's
20   been created.
21               Q.   And you noted that that's part of
22   an OECD discussion draft.  Does that same principle
23   apply today even without that discussion?
24               A.   Yes.  As I say, you will find --
25   in earlier drafts you will find less crisp language

 Neeson&Associates   W&F

```
 1   that essentially says the same thing.

 2              Q.   Let's talk about the significance

 3   of legal title in the what you found at Nortel.

 4              Can you tell us about how legal title

 5   played out in the context of Nortel from the

 6   functional analysis and the other materials that

 7   you looked at?

 8              A.   In Nortel legal title was held by

 9   NNL.  And as I say, I think that was perfectly

10   common and typical for a large multinational.

11              It was the administrator of the IP for

12   the -- as I had mentioned earlier, for the entire

13   group.  But that is not an entrepreneurial

14   function.  That is an administrative function, for

15   which it deserves an administrative or routine

16   return.  And it was compensated for that, as I say,

17   through the RPSM.  The legal expenses for that were

18   put into the RPSM model.  It was shared amongst all

19   the entities in proportion to their RPS shares.

20              And under the residual profit-split

21   method, RPSM -- I think I alternate between saying

22   it two ways -- or the MRDA, which -- another phrase

23   we've heard a lot -- NNL received no allocation, no

24   additional allocation of profits based on that

25   legal title.
```



```
 1                      Q.   And was it entitled to receive any
 2    additional allocation of profits?
 3                      A.   No.
 4                      Q.   Why is that?
 5                      A.   Because -- because the additional
 6    profits really came from the creation of IP, which
 7    was the creation of the R&D that was behind that,
 8    and that had nothing to do with legal title.
 9                      Q.   And now, you mentioned that NNL,
10    the Canadian company, had been compensated for its
11    IP administration functions.  Did you do anything
12    as part of your work to verify that?
13                      A.   Well, I mean, we did the best we
14    could in the sense that there's a very complicated
15    RPSM model.  And I'm very fortunate to have a very
16    talented staff, one of whom is sitting in this
17    room, who really helped with all of that.  We spent
18    enormous amounts of hours going through the model.
19                      I mean, I am very impressed with what
20    Nortel did.  They really did -- they tried to do a
21    terrific job.  You can watch how the model evolved.
22    In the first couple of years, it was a lot cruder.
23    They really refined how they did it.
24                      And we looked seriously into it.  I'm
25    going to say that I am 99 percent confident that
```



```
 1   they were, in fact, reimbursed from the way we
 2   looked at the way they've categorized things; the
 3   legal costs we think that went into the pool, that
 4   went into the RPSM sharing.  So as I say, I state
 5   it with reasonable confidence but not 100 percent
 6   confidence.
 7              Q.   Now, in your opinion, Dr. Cooper,
 8   first of all, was the residual profit-split model
 9   the most appropriate transfer pricing method for
10   Nortel from 2001 onward?
11              A.   Yes, I do.  I believe it clearly
12   was the most appropriate transfer pricing method
13   for them to handle the variety of issues they had.
14              Q.   In general terms, what's the basis
15   for that opinion?  Just summarize the basis for
16   that opinion.
17              A.   I mean, it really comes down to --
18   Nortel was a complicated company in some ways.  It
19   operated in multiple jurisdictions.  It did IP in
20   multiple jurisdictions.  We've heard before that it
21   was an that they did that in an integrated way.
22   Sometimes projects would start in one R&D center
23   and move to another R&D center.  A variety of
24   things made it very hard to tag it particularly.
25              And the other options for Nortel would
```



1   have been a lot more expensive.  As I think I

2   mentioned, I did one project for a major client,

3   though this is probably ten years ago, where they

4   went from a cost-sharing model to a license model,

5   but they had huge, huge buy-in payments.  For them

6   it was worthwhile doing.  Nortel couldn't have

7   pulled that off.  In order to do that, they would

8   have to -- NNL would have had to pay for all of it.

9   They had no way to do.  So RPSM was really the only

10  practical alternative, I believe, for Nortel.

11             Q.    Now, is the use of research and

12  development costs or relative research and

13  development spending to measure the value of the

14  various parties' contributions to the creation of

15  IP, is that an accepted valuation method in the

16  transfer pricing world?

17             A.    Yes, it is.  I mean, it's probably

18  the most -- for doing this, it's probably the most

19  common method.  And as I said earlier, unless you

20  had some particularly good alternatives, some

21  particularly good insight into what was going on

22  and what was creating your IP, unless you did --

23  and as I say, in all the years I've done this, I've

24  always seen R&D spending used as some measure of

25  it, some -- depreciation or amortization rate may



1    be -- may change.  But as a general matter, some

2    version of what they did is what I've always seen.

3                    Q.    Now, under a residual profit-split

4    method, are the annual balancing payments between

5    the parties, are those considered to be

6    reimbursement for research and development costs?

7                    A.    No, not at all.  All it is is a

8    sharing of profit and loss.  If there was a profit,

9    it wouldn't be -- I mean, it's also not a -- it's a

10   return to R&D that was done, but it's certainly not

11   a reimbursement.

12                   Q.    And now, you've seen the MRDA.

13   You've referred to the MRDA, an acronym everyone in

14   it this room knows very well by now.

15                   A.    Yes.

16                   Q.    From a transfer pricing

17   perspective, is that a licensing agreement?

18                   A.    I do not see it as a licensing

19   agreement at all.

20                   Every RPSM will have a licensing

21   feature.  It gives -- what it does is it legally

22   gives the rights to a company to use that IP in its

23   territory.  If even gives them the right to enforce

24   the IP, which actually was used by Nortel when it

25   came to the Foundry case, where actually NNI was



1   given -- because of that provision, they were given

2   the right to go after, and one might say

3   obligation, but I'm not a lawyer, so I can't say

4   that, but nevertheless.  So -- that's right.

5              Q.   Now, while we're on the subject of

6   written agreements, do the revenue authorities

7   honor written agreements between controlled

8   entities in the transfer pricing area?

9              A.   "Honor" is a peculiar word to use

10  here, except if I say "Your Honor."  Then that's

11  not a peculiar word, or it is "Your Honors,"

12  plural.

13             No, but "honor" is peculiar word.  What

14  revenue authorities will do, they will look at an

15  agreement, but what they care about most is what a

16  company really does and do their actions comport

17  with the written agreement.

18             I mean, so when your doing a functional

19  analysis, you will always look to the -- you always

20  look as one of the first things, look at the

21  written agreements.

22             But it's interesting.  When go back to

23  when we were really initially developing the

24  transfer pricing practice, I will bet you that

25  three out of four of my clients did not have a

 Neeson & Associates   W&P WILSON & PETZER LTD.

1    written agreement at all.  Very often some of them

2    went so far as to actually have a memo that

3    specified what the terms were but certainly no

4    written agreement.  And lots of them didn't even

5    have that.

6                Now, what's happened over time is that

7    people have become aware to try to codify, so they

8    really understand, number one, and they can

9    represent to a tax authority.  And the tax

10   authority will always look at the written

11   agreement.  I think that's an important piece to

12   look at.  But they look at whether actual actions

13   comport with the agreement.  And actual actions

14   always win.

15               Q.   Thank you.  Now let's move on to

16   the specific matters you were asked to opine on.

17               The first was whether the EMEA Debtors'

18   allocation position is consistent with transfer

19   pricing principles.  Would you please summarize for

20   the Courts the opinions you've come to on that

21   point.

22               A.   I believe that the EMEA Debtors'

23   allocation position was, in fact, consistent with

24   the transfer pricing principles.  Under the

25   arm's-length standard, as I say, which is really



1   the guiding light to transfer pricing, beneficial

2   owners are entitled to the proceeds from all forms

3   of, as I say, exploitation of jointly developed,

4   jointly created intangibles, including proceeds

5   from sales of intangibles.

6              And companies, we don't -- companies

7   don't distinguish between capital gains and --

8   there's no different tax rate between those and

9   ordinary income.  Capital gains may not appear as

10  an above-the-line item, but it is nevertheless

11  still income.  And the arm's-length principle calls

12  for all income to be treated at arm's length, not

13  just operating income.

14             Second thing is that the same

15  allocation key I believe should be used for

16  allocating profits -- that was used for allocating

17  profits should be used for allocating sale

18  proceeds.  I say same allocation key adjusted for

19  what I would call the ex-post deep dive.

20             Q.   And does that relate to the useful

21  life point?

22             A.   That relates to the useful life

23  point.  And when Nortel -- as I said earlier, when

24  Nortel was doing its annual filings, it didn't know

25  what the useful life was.  I mean, if it sat and

 Neeson & Associates   W&F

1   did a detailed study, it might have done more.  But

2   for, as I say, annual filings, it was fine.  But

3   for when you're doing something of this magnitude,

4   you would do the deep dive that's been done here.

5               And I would say that the allocation of

6   Nortel asset proceeds is a cross-border transaction

7   that really does fall under the general framework

8   of transfer pricing.  I mean, it's huge amounts of

9   dollars across entities in three great nations.

10              Q.   So when the various revenue

11  authorities look at the allocation proceeds from

12  this case, what principles will they be applying?

13              A.   I think they'll apply the

14  arm's-length principle.  I don't think they have

15  any choice but to apply the arm's-length principle.

16  That's what they all signed up for and they all

17  believe in.

18              Q.   Now, moving on to the next thing

19  you were asked to opine on, the consistency of the

20  EMEA Debtors' allocation position with the

21  representations that Nortel previously made to the

22  various revenue authorities.

23              Go ahead.

24              MR. PULTMAN:  If I may interject, Your

25  Honor.



```
 1                    THE US COURT:  Yes, sir.
 2                    MR. PULTMAN:  Jacob Pultman of
 3      Allen & Overy on behalf the Canadian Debtors and
 4      Monitor.
 5                    THE US COURT:  Yes.
 6                    MR. PULTMAN:  We've not stood before to
 7      make objection with respect to Dr. Cooper's
 8      testimony, and we have no objection generally with
 9      respect to his transfer pricing testimony, which
10      led through slide No. 17.
11                    THE US COURT:  All right.
12                    MR. PULTMAN:  But the next two slides,
13      slide 18 and slide 19, are not transfer pricing.
14      They are asking essentially this witness,
15      Dr. Cooper, to take the role not simply of an
16      expert but in part to take the role of a fact
17      witness, and more importantly, to take the role
18      that Your Honor and Justice Newbould have in this
19      case.  And that is, they're asking Dr. Cooper
20      whether the actions, various factual actions that
21      took place, first what the factual circumstances
22      were; second and most importantly, whether those
23      actions are consistent with various principles.
24                    And in particular, if you look at slide
25      19, they ask for the consistency of the EMEA
```



1    Debtors' allocation position with how Nortel

2    actually did business.  That is the role of the

3    Court.  And this expert in transfer pricing is no

4    more qualified to do that than anyone else.  It's

5    Your Honor's job and it's Justice Newbould's job to

6    take the facts and circumstances as described by

7    this witness.

8              This witness has said with respect to

9    generally that these were complex issues, as they

10   were at Nortel.  He described this as a fact-and-

11   circumstances matter generally.  And with respect

12   to IP, he says this is fuzzy territory; this is

13   complex.

14             It is all of those things, and it is

15   not the this expert's job to come to this Court and

16   opine as to the conclusions, the ultimate

17   conclusion of the case, as to whether the facts

18   that took place, the representations that were or

19   were not made as facts will develop, whether those

20   are consistent.  That, Your Honor, is the Court's

21   rule.

22             Therefore, we object to slide 18 and 19

23   and to the portions of Dr. Cooper's allocation

24   reports that speak to these issues, Section 4.2,

25   4.3 of the allocation expert report.



 1                  MR. ADLER:  May I be heard?
 2                  THE US COURT:  Of course, Mr. Adler,
 3     you certainly may.
 4                  MR. ADLER:  Well, first of all, let me
 5     make it absolutely clear that we are only using
 6     Dr. Cooper as an expert in transfer pricing
 7     matters, which happen to pervade every aspect of
 8     this case.  And there's transfer pricing
 9     terminology throughout the MRDA.  There is transfer
10     pricing terminology, specialized terms throughout
11     the representations they've made to the revenue
12     authorities.
13                  And, in fact, the actions that they
14     took throughout the functioning of Nortel conform
15     not only to the legal theory that we base our case
16     on, which is the simple fact that when you
17     contribute to the creation of IP, you gain a
18     beneficial ownership interest by operation of law,
19     which was never abrogated or changed here.  But
20     they also conform with a transfer pricing
21     methodology that was selected to conform to those
22     principles.
23                  Now, in relation to slide 18, we have a
24     series of specific representations that were made
25     to the revenue authorities that use certain



1    terminology that has meaning in the transfer

2    pricing context.  It has meaning that the revenue

3    authorities would understand as indicating certain

4    things about the way the proceeds from the current

5    transactions would be treated.  It also has meaning

6    in how the companies understood their own

7    relationship, because the MRDA says that they are

8    adopting the residual profit-split methodology.

9    And, in fact, the original Schedule A to the MRDA

10   says it's just a summary of what happens under the

11   RPS methodology here.

12              So we think it's extremely important

13   for the Courts to understand exactly what the

14   revenue authorities would understand by the

15   representations that were made in slide 18.

16              THE US COURT:  Well, transfer pricing

17   and the APA are integrally related, as I understand

18   it.

19              MR. ADLER:  That absolutely right, yes.

20              THE US COURT:  I mean, the whole

21   purpose for transfer pricing is to enable, here

22   Nortel, to enter into an APA with the taxing

23   authority.  Is that not correct?

24              THE CANADIAN COURT:  May I ask

25   Mr. Pultman a question?

 Neeson&Associates    W&F

1                    THE US COURT:  Yes.

2                    THE CANADIAN COURT:  Would it not be

3    consistent with the rulings made on the pretrial

4    motions that were filed to have this go in subject

5    to argument at the end?

6                    MR. PULTMAN:  And, your Honor, we

7    certainly understand that.  We are rising only to

8    sensitize the Court to the issue again.  We've sat

9    back and not done it until now.

10                   But with respect to these specific

11   slides, they're going for the ultimate conclusion.

12   And I hear Mr. Adler's argument, but it is exactly

13   that:  Argument for the Court to conclude on, not

14   for the witness.

15                   THE CANADIAN COURT:  I heard you say

16   that.  I heard you say all that.  And whether

17   you're right or wrong on that, I don't know.  But

18   would it not be consistent to deal with it at the

19   end of the case?

20                   MR. PULTMAN:  It certainly would be

21   consistent with Your Honors' ruling in advance of

22   trial.

23                   THE US COURT:  All right.  So we'll

24   hold to that ruling.  Is that right, Justice

25   Newbould?

 Neeson & Associates    W&F

```
 1                    THE CANADIAN COURT:  I vote that way.
 2                    THE US COURT:  All right.  Thank
 3   goodness.
 4                    MR. ADLER:  He just came up here to
 5   steal my notes; that all.
 6                    THE US COURT:  Thank you, Mr. Pultman.
 7                    MR. PULTMAN:  Thank you, Your Honor.
 8                    THE US COURT:  We understand your
 9   argument.
10                    MR. ADLER:  Thank you, Your Honors.
11                    BY MR. ADLER:
12                    Q.   Dr. Cooper, then could we then go
13   to the next slide and could you summarize for the
14   Courts whether the EMEA Debtors' allocation
15   position is consistent with the representations
16   Nortel had previously made to the tax authorities
17   that you've seen?
18                    A.   Ask that again, please.  I was
19   still mulling over counsel's earlier comments.
20                    Q.   In your opinion, is the EMEA
21   Debtors's allocation position consistent with
22   representations Nortel made to the revenue
23   authorities that you've seen?
24                    A.   Yes, it is.  And I pulled out a
25   couple things here.  And I don't need to read these
```



1    long paragraphs.  But by and large, they say that

2    the participants perform -- and I've highlighted a

3    couple things -- "similar functions and assume

4    similar risks.  These entities are entitled to

5    participate in the ongoing benefits."

6                    And the theme is over and over again.

7    And that was from the 2004 functional analysis.

8                    The 2008 functional analysis said,

9    "Each IE maintains internal ownership in the IP."

10                   There is a -- among the documents I

11   looked at was preparation for the initial APA

12   meeting that was back in 2002, when one of the

13   talking points was when asked what's going to

14   happen if we sell any of the IP, the response was

15   that we would split is it in proportion to the RPS

16   model.

17                   And that was one -- we don't know

18   whether that point was actually ever made

19   physically in the meeting, but we do know that it

20   was one of the talking points that Nortel proposed

21   to make to the tax authorities if asked.

22   So I'd say that by and large -- I mean by and

23   large.  I'd say yes, entirely the position of the

24   EMEA Debtors is consistent with what Nortel

25   actually told the tax authorities it was doing



1    or -- and intended to do.

2                    Q.    And so, for example, looking at

3    one of the highlighted phrases in the quotes you've

4    selected it says, "Each the APA participants

5    performs similar functions and assumes similar

6    risks."

7                    Does that tell the taxing authorities

8    something about how these entities will share the

9    benefits of their endeavor?

10                   A.    Since returns are supposed to be

11   commensurate with the activities that are

12   undertaken and the risks that are undertaken, yes,

13   it says that they would therefore be entitled to

14   similar returns.

15                   Q.    And they also refer here to

16   ongoing entrepreneurial and risk-taking functions

17   in relation to also the same entities.

18                   A.    It says the same thing again.  And

19   that's -- they are reinforcing the point that the

20   entity -- that all of the RPEs are participating

21   in -- are doing the same set of functions that

22   generate the same return.

23                   Q.    And what follows with that with

24   respect to their right to enjoy the benefits of the

25   activity?



     1                    A.   What would fall is they would have
     2    the right to enjoy the similar benefit, be they
     3    come from ongoing income or from asset sales.
     4                    Q.   And the quote that you've pulled
     5    from the 2008 functional analysis uses the phrase
     6    "economic ownership."  "Each IE" -- integrated
     7    entity -- "maintains an economic ownership in the
     8    IP."
     9                    What would that communicate to the
    10    revenue authorities?
    11                    A.   Once again, it says -- it's
    12    reinforcing the same point:  That each RPE deserves
    13    its fair share of whatever comes out of the IP.  It
    14    doesn't distinguish, doesn't say not -- except for
    15    or something like that.  It says it belongs -- it
    16    enjoys full economic ownership according to its
    17    share.  That's what it implies.
    18                    Q.   And would that be limited with
    19    respect to what forms of exploitation of the IP it
    20    applies to?
    21                    A.   No.
    22                    Q.   Moving on to the next thing you
    23    were asked to opine on, is the EMEA Debtors'
    24    allocation position consistent with what you've
    25    observed about how Nortel actually did business?



```
 1                    A.   Yes, it is.   Nortel split profits

 2    according to -- operating profits and losses

 3    according to the method prescribed in the RPSM and

 4    the MRDA -- I've not told not to say "murda," but

 5    it's only got two syllables, so it's easier to say

 6    than MRDA.

 7                    Nortel split the proceeds from the

 8    sale -- there's one sale, and which we've heard

 9    talked about again.   In the UMTS sale to they

10    shared the profits resulting from that -- proceeds

11    from that, I should say, in accordance with the RPS

12    percentages.   And as you may recall from earlier

13    testimony, there was a bunch of memos going back

14    and forth on the inside about that, and that was

15    what they ultimately settled on what was the

16    appropriate way to share those profits.

17    They also shared those profits and the royalty

18    income that came from the Foundry settlement.   Once

19    again, the same thing:   There was internal

20    discussion, but that's how they -- in terms of

21    their actually position, what they actually did in

22    sharing that.   They're in 2010.

23                    Pre -- just pre-sale, there was

24    internal memos floating in Nortel which have been

25    circulated, which showed that they intended that
```



1    the sale proceeds ought to be split, once again, in

2    proportion to the RPS percentages.

3                Now, again the three I put on here are

4    actual action that they did.  The others were

5    simply memos that may have said -- indicated some

6    intentions, but these are actual actions that

7    comport with what they did.

8                Q.   And were those actions also

9    required by their adherence to the residual

10   profit-split methodology?

11               A.   Responsible, yes.  Those actions

12   were required in response to their adherence to the

13   residual profit-split methodology as would be

14   interpreted by tax authorities around the world.

15               Q.   Now, finally, last side.  The

16   other thing you've been asked to opine on is your

17   review of the positions taken in the other transfer

18   pricing expert reports.  And I draw your attention

19   particularly to the position that taken by Canada

20   and Dr. Reichert here.

21               Is that position consistent with the

22   arm's-length principle?

23               A.   I think it's not in any way

24   consistent with the arm's-length principle.  I

25   mean, envision -- an example I used in my



```
 1   deposition was suppose that I asked Mr. Keefe, who
 2   was my deposer on that, if suppose he and I had
 3   gone into a partnership, we bought a piece of
 4   property, let's say a house, for a million dollars;
 5   because it happened to be located in the US, I took
 6   title in my name, but we each contributed half.
 7              And I said that suppose that we'd fully
 8   intended to rent it out, earn annual income.
 9   Suppose somebody came along, though, and I asked
10   him if -- two years later and gives me an offer I
11   can't say no to.  I mean, he offers me $3 million
12   for this house we paid a million dollars for.  But
13   because title is in my name, I walk away with
14   $3 million.  And I think that's an inappropriate.
15   So I think that likens the position.
16              And what is really implicit in
17   Dr. Reichert's analysis is that at any point in
18   time, at any point in time, NNL can sell property.
19   And according to the strict interpretation that he
20   imposes on the MRDA, there's no compensation to the
21   other RPEs.  I don't think a tax authority --
22   there's a tax authority involved in this that would
23   ever have accepted that, because I think that's --
24   I believe that's highly inappropriate.
25              Q.   So then would an agreement in
```



```
 1    which one party contributed to R&D costs,

 2    contributed to the creation of IP without any right

 3    to the proceeds of the sale of the IP and without

 4    any right to control when the proceeds -- when the

 5    IP is sold, would that meet the arm's-length

 6    principle, in your opinion?

 7              A.   No, no.  I mean, he actually has a

 8    phrase in there which says it would not be

 9    economically irrational for an entity to go into

10    that business.  And I can't imagine under any

11    circumstances that it would be remotely

12    economically rational to do it, because when you

13    are totally at the whim -- it's one thing to have

14    the business risk that we all -- that any company

15    faces.  The business world brings risks.  It's a

16    whole 'nother thing to add on top of that that the

17    partner can turn around on you on a moment's

18    notice.

19              Q.   And so does the arm's-length

20    principle allow you -- in a situation where you've

21    got a multiple entities collaborating in the

22    creation of IP performing the same functions, does

23    the arm's-length principle allow you to give

24    disproportionate return to one of those entities?

25              A.   No, it doesn't.  That is not
```



 1   part -- that is not part of the arm's-length

 2   return.  Arm's-length return is what would parties

 3   reasonably have agreed to if operating at arm's

 4   length.

 5              Q.   So are you saying then that Canada

 6   is like the guy with the lottery ticket here?

 7              A.   Canada is like the guy with the

 8   lottery ticket here.

 9              MR. ADLER:  That's my direct

10   examination, Your Honors.  Thank you.

11              THE CANADIAN COURT:  You may not be the

12   only party.

13              THE US COURT:  All right.  Thank you,

14   Mr. Adler.  Let me check on our court reporter for

15   a moment.

16              Justice Newbould, do I assume we're

17   going to end for the day or should we proceed with

18   some cross-examination?

19              -- OFF THE RECORD DISCUSSION --

20              THE CANADIAN COURT:  I'm in your hands.

21              THE US COURT:  I think it probably

22   makes sense for us -- I'm sure your cross will be

23   somewhat lengthy, Mr. Pultman?

24              MR. PULTMAN:  Actually, Your Honor, it

25   will be Mr. Smith who will do the cross, and I'm



1   advised that it will be lengthy.

2               THE US COURT:  All right.  Then we

3   should finish for the day; and particularly to

4   allow our court reporter to have some rest, I

5   think.

6               THE WITNESS:  Especially after how fast

7   I talk.  I apologize.

8               THE US COURT:  Mr. Adler, yes, sir.

9               MR. ADLER:  I'm just rising to say

10  thank you for your attention.

11              THE US COURT:  Thank you.  Thank you.

12  And the timing was good.  And we will resume again

13  on Monday morning.  And everyone have a good, safe

14  weekend and --

15              THE CANADIAN COURT:  Can I just ask,

16  what's the state of play on Monday?  What's the

17  next witness after this witness?

18              MR. ADLER:  It's Dr. Cooper.  After

19  that is the transfer pricing witness from the UK

20  pension interest, Dr. Felgran.  And then we should

21  get to Mr. Bazelon at the end of the day.

22              THE CANADIAN COURT:  Thank you.

23              THE US COURT:  All right.  Thank you

24  all.

25  -- OFF THE RECORD --

 

1                    THE US COURT:  Safe travels to you and

2    to everyone, and we'll stand in recess.

3

4    -- Whereupon court adjourned at 5:00 p.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    REPORTERS' CERTIFICATE

2

3                    I, DEANA SANTEDICOLA, RPR, CRR, CSR,

4      and I, GAIL VERBANO, RMR, CRR, CSR, US Certificate

5      Shorthand Reporter, certify;

6                    That the foregoing proceedings were

7      taken before us at the time and place therein set

8      forth;

9                    That the entire proceedings of the

10     hearing date were recorded stenographically

11     individually by each of us and were thereafter

12     transcribed;

13                   That the foregoing is a true and

14     correct transcript of our shorthand notes so taken.

15

16                   Dated this 30th day of May, 2014.

17     PER:                PER:

18     *Gail Inghram Verbano*   *Deana Santedicola*

19     GAIL VERBANO        DEANA SANTEDICOLA

20     WILCOX & FETZER     NEESON & ASSOCIATES

21     WILMINGTON, DE  USA  TORONTO, ON  CANADA

22

23

24

25