



```
 1                UNITED STATES BANKRUPTCY COURT

 2
                  FOR THE DISTRICT OF DELAWARE
 3

 4  ------------------------------)

 5  In Re                         )

 6    NORTEL NETWORKS INC.,       )  Case No.

 7    et al.,                     )  09-10138 (KG)

 8      Debtors.                  )

 9  ------------------------------)

10                        - and -

11            Court File No. 09-CL-7950

12                      ONTARIO

13            SUPERIOR COURT OF JUSTICE

14                (COMMERCIAL LIST)

15      IN THE MATTER OF THE COMPANIES' CREDITORS

16  ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18  ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19      NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20      CORPORATION, NORTEL NETWORKS INTERNATIONAL

21      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                    CORPORATION

23      APPLICATION UNDERT PART IV OF THE COMPANIES'

24  CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                    AS AMENDED
```



```
 1

 2

 3

 4    ---- This is the Day 12/Volume 12 of the transcript

 5    of the proceedings in the above matter held

 6    simultaneously in:

 7    Superior Court of        United States Bankruptcy

 8    Ontario (Commercial      Court for the District of

 9    List)                    Delaware

10    Courtroom 8-1            Courtroom 3

11    330 University Avenue    824 Market Street

12    Toronto, Ontario         Wilmington, Delaware

13

14    on the 2nd day of June, 2014, commencing at 9:06

15    a.m.

16

17                     ---------

18    B E F O R E:

19    The Honorable Judge Kevin Gross (United States)

20    The Honorable Mr. Justice Frank Newbould (Canada)

21

22                     ---------

23

24

25
```



```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17        Julie Rosenthal, Esq.

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22   PER: Murray McDonald, Esq.

23        Brent Beekenkamp, Esq.

24

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER: Derrick Tay, Esq.

 7       Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER: Ken Coleman, Esq.

14       Paul Keller, Esq.

15       Daniel Guyder, Esq.

16       Laura Hall, Esq.

17       Joseph Badtke-Berkow, Esq.

18       Jonathan Cho, Esq.

19       Nicolette Ward, Esq.

20

21   FOR THE CANADIAN DEBTORS

22   BUCHANAN INGERSOLL & ROONEY

23   1105 North Market Street

24   Suite 1900

25   Wilmington, DE  19801-1054
```



```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   79 Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   1201 North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```



```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```

 Neeson & Associates    W&F

```
 1   PER: Matthew P. Gottlieb, Esq.

 2        Tracy Wynne, Esq.

 3        Paul Michell, Esq.

 4

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER: Derek Adler, Esq.

11        William Maguire, Esq.

12        Neil Oxford, Esq.

13        Fara Tabatabai, Esq.

14        Charles Huberty, Esq.

15

16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

17   LIMITED

18   YOUNG CONAWAY STARGATT & TAYLOR LLP

19   Rodney Square

20   1000 North King Street

21   Wilmington, DE  19801

22   PER: Ed Harron, Esq.

23        John Dorsey, Esq.

24

25   FOR THE EMEA DEBTORS
```



```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER: James Norris-Jones, Esq.

 6

 7   CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```



1   PER: Barry E. Wadsworth, Esq.

2       Lewis Gottheil, Esq.

3

4   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

5   COMMITTEE

6   SHIBLEY RIGHTON LLP

7   University Avenue, Suite 700

8   Toronto, ON  M5H 3E5

9   PER: Arthur O. Jacques, Esq.

10      Thomas McRae, Esq.

11

12  FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13  ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14  FUND

15  PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16  35th Floor

17  155 Wellington Street West

18  Toronto, ON  M5V 3H1

19  PER: Kenneth T. Rosenberg, Esq.

20      Massimo (Max) Starnino, Esq.

21      Lily Harmer, Esq.

22      Karen Jones, Esq.

23      Tina Lie, Esq.

24      Michelle Jackson, Esq.

25

 Neeson & Associates   W&F

```
 1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 3   2009

 4   NELLIGAN O'BRIEN PAYNE LLP

 5   50 O'Connor Street, Suite 1500

 6   Ottawa, ON  K1P 6L2

 7   PER: Janice B. Payne, Esq.

 8        Steven Levitt, Esq.

 9        Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```



```
 1   919 North Market Street, Suite 1500

 2   Wilmington, DE  19801

 3   PER: Selinda A. Melnik, Esq.

 4        Richard Hans, Esq.

 5        Timothy Hoeffner, Esq.

 6        Jason Gerstein, Esq.

 7        Farah Lisa Whitley-Sebti, Esq.

 8

 9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12   BENNETT JONES LLP

13   1 First Canadian Place

14   Suite 3400

15   Toronto, ON  M5X 1A4

16   PER: Kevin Zych, Esq.

17        S. Richard Orzy, Esq.

18        Gavin Finlayson, Esq.

19        Richard Swan, Esq.

20        Sean Zweig, Esq.

21        Jonathan Bell, Esq.

22        Amanda McLachlan, Esq.

23

24   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25   MILBANK, TWEED, HADLEY, MCCLOY LLP
```



```
 1   1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4       Jennifer P. Harris, Esq.

 5       Albert A. Pisa, Esq.

 6       Samir Vora, Esq.

 7       Andrew LeBlanc, Esq.

 8       Michael Hirschfeld, Esq.

 9       Atara Miller, Esq.

10       Tom Matz, Esq.

11       Nick Bassett, Esq.

12       Gabrielle Ruha, Esq.

13       Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23       Michael Wunder, Esq.

24       Ryan Jacobs, Esq.

25
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2   ASHURST LLP

 3   Boardwalk House

 4   5 Appold Street

 5   London, England  EC2A 2HA

 6   PER: Angela Pearson, Esq.

 7       Antonia Croke, Esq.

 8

 9   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10   RICHARDS LAYTON & FINGER, P.A.

11   920 North King Street

12   Wilmington, DE  19801

13   PER: Christopher Samis, Esq.

14

15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16   AKIN GUMP STRAUSS HAUER & FELD LLP

17   One Bryant Park

18   New York, NY  10036

19   PER: Fred S. Hodara, Esq.

20       David H. Botter, Esq.

21       Abid Qureshi, Esq.

22       Robert A. Johnson, Esq.

23       Brad M. Kahn, Esq.

24       Christine Doniak, Esq.

25       Joseph Sorkin, Esq.
```

Neeson&Associates   W&F

```
 1        Jacqueline Yecies, Esq.
 2   UK PENSION PROTECTION FUND AND NORTEL NETWORKS
 3   UK PENSION TRUST LIMITED
 4
 5   FOR THE UK PENSION PROTECTION FUND AND NORTEL
 6   NETWORKS UK PENSION TRUST LIMITED
 7   THORNTON GROUT FINNIGAN LLP
 8   Suite 3200, 100 Wellington Street West
 9   P.O. Box 329
10   Toronto, ON  M5K 1K7
11   PER: Michael Barrack, Esq.
12        D.J. Miller, Esq.
13        Rebecca Lewis, Esq.
14        Andrea McEwan, Esq.
15        John Finnigan, Esq.
16        Michael Shakra, Esq.
17        D.J. Miller, Esq.
18
19   FOR THE UK PENSION PROTECTION FUND AND NORTEL
20   NETWORKS UK PENSION TRUST LIMITED
21   WILLKIE FARR & GALLAGHER LLP
22   787 Seventh Avenue
23   New York, NY  10019-6099
24   PER: Brian O'Connor, Esq.
25        Sameer Advani, Esq.
```



```
 1        Andrew Hanrahan, Esq.

 2

 3   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 4   NETWORKS UK PENSION TRUST LIMITED

 5   BAYARD, P.A.

 6   222 Delaware Avenue, Suite 900

 7   Wilmington, DE  19899

 8   PER: Charlene D. Davis, Esq.

 9        Justin Alberto, Esq.

10

11   THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER: Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER: Michael J. Riela, Esq.

25
```



```
 1   WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER: John Salmas, Esq.

10       Kenneth Kraft, Esq.

11       Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER: Craig A. Barbarosh, Esq.

18       David A. Crichlow, Esq.

19       Karen B. Dine, Esq.

20

21   LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```


Neeson & Associates   W&F

```
 1   Toronto, ON  M5H 3Y4
 2   PER: Edmond F.B. Lamek, Esq.
 3        James Szumski, Esq.
 4
 5   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
 6   PATTERSON BELKNAP WEBB & TYLER LLP
 7   1133 Avenue of the Americas
 8   New York, NY  10036
 9   PER: Daniel A. Lowenthal, Esq.
10
11   BOARDS OF DIRECTORS OF NORTEL NETWORKS
12   CORPORATION AND NORTEL NETWORKS LIMITED
13
14   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
15   CORPORATION AND NORTEL NETWORKS LIMITED
16   OSLER HOSKIN AND HARCOURT LLP
17   100 King Street West
18   1 First Canadian Place, Suite 6100
19   P.O. Box 50
20   Toronto, ON  M5X 1B8
21   PER: Lyndon Barnes, Esq.
22        Edward Sellers, Esq.
23        Betsy Putnam, Esq.
24        Adam Hirsh, Esq.
25        Alexander Cobb, Esq.
```



```
 1                    I N D E X

 2

 3   EXAMINATION OF:                           PAGE

 4   RICHARD V. L. COOPER (Continued)

 5      Cross-Examination by Mr. O'Connor      2716

 6      Cross-Examination by Mr. Smith         2720

 7      Cross-Examination by Mr. Luft          2805

 8      Re-Examination/Re-Direct by Mr. Adler  2822

 9   STEVEN FELGRAN

10      Examination-in-Chief/Direct by         2838

11      Mr. O'Connor

12      Cross-Examination by Mr. Adler         2862

13      Cross-Examination by Mr. Mark          2870

14      Cross-Examination by Mr. Luft          2886

15      Re-Examination/Re-Direct by            2892

16      Mr. O'Connor

17   COLEMAN BAZELON

18      Examination-in-Chief/Direct by         2895

19      Mr. Barrack

20      Cross-Examination by Mr. Gottlieb      2976

21      Cross-Examination by Mr. Zarnett       2983

22      Cross-Examination by Mr. Zigler        2991

23

24

25
```



1                    INDEX OF EXHIBITS

2

3    NUMBER/DESCRIPTION                        PAGE

4       37   Expert report of Steven Felgran    2838

5       dated January 24, 2014

6       38   Rebuttal report of Steven Felgran  2838

7       dated February 28, 2014

8       39   Report of Dr. Bazelon              2895

9       40   Rebuttal report of Dr. Bazelon     2895

10      41   Demonstrative entitled "Pro Rata   2939

11      Mechanics"

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1   --- Upon commencing at 9:06 a.m.
 2              THE US COURT:  Good morning, everyone.
 3   Please be seated.
 4              THE CANADIAN COURT:  Good morning,
 5   Judge Gross.
 6              THE US COURT:  Good morning, Justice
 7   Newbould.  Good morning to you.  Mr. Adler, yes,
 8   sir.
 9              MR. ADLER:  Good morning, Judge Gross,
10   Justice Newbould.  Unless there is any other
11   business, I think we are just continuing with
12   Dr. Cooper's testimony this morning.
13              THE US COURT:  That's correct.
14              THE CANADIAN COURT:  I have a question.
15   Excuse me.  Just before we begin, I have a
16   question.  On the list of witnesses today I
17   understand is Mr. Felgran.
18              MR. ADLER:  That's correct.
19              THE CANADIAN COURT:  I am wondering why
20   he is -- looking at his report, he deals with
21   claims against the Canadian Estate.  He is not an
22   allocation witness, so I am wondering why we are
23   dealing with him.
24              MR. O'CONNOR:  Your Honor, it is Brian
25   O'Connor of Willkie Farr on behalf of the UK
```


Neeson & Associates    W&F

```
 1   Pension Claimants.  You are correct that
 2   Mr. Felgran's first report is directed to claims.
 3   But his rebuttal report is directed to rebutting
 4   some of the interpretations of the MRDA given by
 5   the other experts for allocation purposes.  And my
 6   examination will be brief.  It will not entail
 7   claims.  It will only deal with the allocation
 8   issues.
 9                  THE CANADIAN COURT:  Okay.  Thank you.
10                  THE US COURT:  Thank you, Mr. O'Connor.
11                  Dr. Cooper, good morning.
12                  THE WITNESS:  On my way to a good
13   morning.
14                  THE US COURT:  Yes, welcome back.
15                  THE WITNESS:  Thank you very much.
16
17   RICHARD V. L. COOPER, having been previously sworn,
18       was examined and testified further as follows:
19
20                  MR. ADLER:  Dr. Cooper, you remember
21   that you are under oath here?
22                  THE WITNESS:  Yes.
23                  MR. ADLER:  I think we have some
24   questions from the UK pension claimants, and then I
25   think it goes to the Canadian Debtors after that.
```



```
 1                    THE US COURT:  Thank you.
 2                    Mr. O'Connor, good morning.
 3     CROSS-EXAMINATION BY MR. O'CONNOR:
 4                    Q.    Again, Brian O'Connor from Willkie
 5     Farr on behalf of the UK Pension Claimants.
 6                    Good morning, Dr. Cooper.
 7                    A.    Good morning.
 8                    Q.    On Friday you testified that each
 9     jurisdiction has its own transfer pricing
10     regulations.  Do you recall that?
11                    A.    Generally, yes.
12                    Q.    And is it fair to say that the
13     arm's-length principle is a fundamental principle
14     with respect to the transfer pricing regulations in
15     each of the jurisdictions relevant here?
16                    A.    Each of the jurisdictions relevant
17     here, yes.
18                    Q.    And are you aware of any --
19                    THE CANADIAN COURT:  Mr. O'Connor, just
20     before you go on, we are having trouble hearing
21     Dr. Cooper.
22                    THE WITNESS:  Excuse me.  I am sorry.
23                    THE US COURT:  Is that better?
24                    THE CANADIAN COURT:  That's better.
25     Yes, thank you.
```



```
 1                    BY MR. O'CONNOR:
 2            Q.   Are you aware of any distinctions
 3    in the manner in which the arm's-length principle
 4    is applied in the jurisdictions relevant here?
 5            A.   I am not sure I understand your
 6    question.
 7            Q.   You said a moment ago that the
 8    arm's-length principal applies in each of the
 9    jurisdictions relevant here; correct?
10            A.   Yes.
11            Q.   Now, are you aware of any
12    distinctions in the way that the arm's-length
13    principle is applied in those jurisdictions?
14            A.   As I say, I don't know what that
15    means.
16            Q.   Would it be fair to say that the
17    arm's-length principle is applied similarly in each
18    of the jurisdictions relevant here?
19            A.   Yes.
20            Q.   Now, would you agree with me that
21    the purpose of the MRDA was to allow the
22    participants to share in the profit or loss from an
23    ongoing common endeavor?
24            A.   Yes.
25            Q.   And would you agree with me that
```



```
 1   the profit or loss was determined after the
 2   participants' current operating costs were
 3   considered?
 4              A.   Could you please repeat that for
 5   me.
 6              Q.   Yes.  Would you agree with me that
 7   the profit or loss was determined after the
 8   participants' current operating costs were
 9   considered?
10              A.   In some instances, I don't believe
11   that's correct.
12              Q.   But generally, would you say that
13   that's after the general operating costs were
14   considered?
15              A.   Yes.
16              Q.   And would you agree with me that
17   the Nortel debtors' common endeavor, which I will
18   call the One Nortel business model, was akin to a
19   joint venture among related parties?
20              A.   Yes.
21              Q.   And would you also agree with me
22   that the MRDA was intended to codify this common
23   endeavor?
24              A.   In the end, I don't think we know
25   what the intentions were, because it was prepared
```



```
 1    by parties that we have not had -- I have not had a

 2    chance to talk to.

 3              Q.   Would you agree with me that the

 4    common endeavor was codified years after it had

 5    begun?

 6              A.   Yes.

 7              Q.   And would you agree with me that

 8    the product of this common endeavor was the IP

 9    created by the Nortel Group?

10              A.   Say that again, please.

11              Q.   Yes.  Would you agree with me that

12    the product, the end product of this common

13    endeavor was the IP created by the Nortel Group?

14              A.   Yes.

15              Q.   Would you also agree with me that

16    under the MRDA, the participants enjoyed economic

17    ownership of the group's IP?

18              A.   Yes.

19              Q.   And under the MRDA, am I correct

20    that participants were not permitted to retain for

21    themselves the revenues they generated by

22    exploiting Nortel's IP in their exclusive

23    territory; that instead, that revenue was shared

24    according to the RPSM irrespective of where the

25    revenue came from?
```



```
 1                    A.   Yes.

 2                    MR. O'CONNOR:  Those are my questions,

 3     Your Honor.  Thank you, Dr. Cooper.

 4                    THE US COURT:  Thank you, Mr. O'Connor.

 5                    Good morning.

 6                    MR. SMITH:  Good morning, Judge Gross,

 7     Justice Newbould.  Graham Smith from the Goodmans

 8     firm for the Canadian Monitor and the Canadian

 9     Debtors.

10     CROSS-EXAMINATION BY MR. SMITH:

11                    BY MR. SMITH:

12                    Q.   Good morning, Dr. Cooper.

13                    A.   Good morning, Mr. Smith.

14                    Q.   Well, unfortunately, it seems we

15     have something in common to commiserate on with the

16     Blackhawks now being out and my beloved Canadiens

17     now out.

18                    A.   We do.

19                    Q.   We do.  I wanted to start,

20     Dr. Cooper, by making sure if I understood

21     something correctly that I believe you were

22     suggesting on Friday in your direct testimony.  And

23     in part, I believe it is reflected in your slide

24     deck.  If we could call up Dr. Cooper's slide deck,

25     page 10.
```



1                    And you will see at the bottom the last
2      two bullets, where you state:
3                         "The entities that engage in
4                         profit-driving activities are
5                         considered the entrepreneurs sharing
6                         upside and downside."
7                    And then the smaller bullet:
8                         "Relationship is analogous to a
9                         joint venture among independent
10                        entities; terms comparable to what
11                        joint venture partners would agree."
12                   And that's similar to what you just
13     told my colleague Mr. O'Connor; correct?
14                   A.    I didn't hear a question.
15                   Q.    That's the same point that you
16     just made to my colleague Mr. O'Connor; is that
17     correct?
18                   A.    Yes.
19                   Q.    And you said, sir, in your
20     testimony on Friday that, in fact, you think it is
21     very similar to a joint venture in that it may not
22     be literally a joint venture or legally a joint
23     venture, but it really operates and behaves like a
24     joint venture; correct?
25                   A.    I recall saying something to that

 Neeson & Associates    W&F

```
 1   effect.
 2              Q.   So I want to understand, sir, and
 3   be very clear on this, are you telling us that what
 4   transfer pricing tells us -- and I appreciate you
 5   can't speak from the legal effect of anything.  But
 6   just from the transfer pricing world's perspective,
 7   are you telling us that the very fact that parties
 8   may adopt a residual profit split entails that they
 9   all have, in effect, full-blown ownership of the
10   entire business and of any assets created from that
11   business?
12              A.   I would have to look at each
13   individual situation.  As I think I said also on
14   Friday, transfer pricing depends on the facts and
15   circumstances, so I do not feel prepared to address
16   whether or not that would happen in each and every
17   RPSM situation.
18              Q.   All right.  So to be clear then,
19   you are not suggesting to the Courts here that in
20   and of itself the adoption of a residual profit
21   split means that the parties end up with a
22   co-ownership of the ultimate assets produced;
23   correct?
24              A.   I am not sure on the answer to
25   that question.  As I say, I would need to look at
```


Neeson & Associates    W&P

```
 1  the facts and circumstances of the situations

 2  affected.

 3              Q.   Well, let's explore that a little

 4  deeper.  If that proposition were true, that that's

 5  what transfer pricing tells us -- just because you

 6  go into residual profit split, you end up in

 7  something analogous to a co-ownership situation --

 8  if that were true, then you wouldn't need to take

 9  as the first step in the profit split the

10  determination of what profits to be split,

11  correct? -- because you just by definition are

12  splitting everything; correct?

13              A.   No, you would not split

14  everything.  That's not the rule under the RPSM.

15              Q.   Right.  In fact, the very first

16  task under the RPS method is to determine exactly

17  which total profits are to be shared; correct?

18              A.   That's correct.

19              Q.   And, in fact, that's right in the

20  OECD 2010 guidelines, isn't it?

21              A.   I would have to take a look to see

22  exactly what you are quoting.

23              Q.   All right.  Well, maybe we can go

24  to that.  If we pull up the OECD guidelines, it is

25  Exhibit TR11391, and page 93.
```



 1                    Do you need some water?

 2                    A.   Yes.   Thank you very much.

 3                    Q.   Sir, if you go to page 93 of the

 4      OECD guidelines --

 5                    A.   Yes.

 6                    Q.   -- you will see at the top the

 7      heading "Transactional Profit-Split Method."

 8                    A.   Yes.

 9                    Q.   And that's the heading that covers

10      the RPS method; correct?

11                    A.   Yes.

12                    Q.   And you will see in the very first

13      section there, 2.108, that it states:

14                         "The transactional profit-split

15                         method seeks to eliminate the effect on

16                         profits of special conditions made or

17                         imposed in a controlled transaction or

18                         in controlled transactions that are

19                         appropriate to aggregate under the

20                         principles of paragraphs 3.9 to 3.12 by

21                         determining the division of profits

22                         that independent enterprises would have

23                         expected to realize from engaging in

24                         the transaction or transactions.

25                         "The transactional profit-split



```
 1              method first identifies the profits
 2              to be split for the associated
 3              enterprises from the controlled
 4              transactions in which the associated
 5              enterprises are engaged (the combined
 6              profits."
 7         And that is, in fact, the guiding rule,
 8    isn't it, sir?
 9         A.   Yes.
10         Q.   And here, sir, in the situation of
11    Nortel, the RPSM that was designed by Horst Frisch
12    and that was submitted to the tax authorities was,
13    in fact, a split of profits from product sales;
14    correct?  Have you looked at that?
15         A.   It is a split of operational
16    profit.
17         Q.   And it was never, sir, from the
18    get-go a split of profit from the sale of
19    businesses or sale of underlying assets; correct?
20         A.   It was a split of operational
21    profit.  It was defined that way.
22         Q.   So you would agree with me, sir,
23    that it never, from the get-go, included a split of
24    profits from sales of businesses or sales of
25    underlying assets; correct?
```



```
1                    A.   It excluded -- it did not
2    specifically exclude the sale of businesses until
3    the third addendum.
4                    Q.   Yes, but from the get-go it was
5    never -- those were never included either; correct?
6                    A.   Those were not included in the
7    MRDA.
8                    Q.   Right.  Well, and we know from
9    what you've said that it is the MRDA that codifies
10   the RPSM; correct?
11                   A.   I do not think that encompasses
12   all of the RPSM.
13                   Q.   Well, if you take aside the MRDA
14   then, there is nothing that you found in the
15   hundreds of documents you have reviewed that would
16   suggest that profits from anything other than
17   operations were included in the defined profit to
18   be split; correct?
19                   A.   In the defined profit to be split
20   as defined in the MRDA; you are correct.
21                   Q.   Or in the RPSM from the get-go;
22   correct?
23                   A.   As defined in the MRDA.
24                   Q.   Yes.  And are you suggesting that
25   it was any different in practice or in conduct from
```



```
 1   the beginning of the RPSM?

 2             A.   Yes, I am.

 3             Q.   And where do we see that, sir?

 4             A.   We see that in two specific

 5   transactions.

 6             Q.   But you, sir, have said -- I take

 7   it you are referring to the UMTS and the Foundry?

 8             A.   Yes.

 9             Q.   But you have said in your report,

10   sir, that those are outside of the RPSM; correct?

11             A.   Outside of the MRDA.

12             Q.   And in each of those cases, sir,

13   in respect of -- or at least in the UMTS

14   transaction, the IP that was sold was IP that was

15   in use; correct?

16             A.   Not -- in use?  I don't know -- I

17   do not know the specific facts around the UMTS

18   sale.

19             Q.   And if we look at the parties'

20   memorandum of understanding of December '08 -- you

21   have seen that; correct?

22             A.   I would have to see it again to

23   refresh -- I am sure I have seen it.

24             Q.   It is Exhibit TR11393.  And, sir,

25   you are big on looking at what the parties'
```



```
 1   business arrangements were; correct?  That's one of
 2   the three tasks that you undertook?
 3              A.   Yes, yes.
 4              Q.   And this memorandum of
 5   understanding is, in fact, the parties' own
 6   statement as to their understanding of their
 7   arrangements; correct?
 8              A.   This is a written agreement that
 9   says "memorandum of understanding."
10              Q.   Yes.  And the first paragraph
11   recites, sir, that it is providing a record of
12   certain operating arrangements and understandings
13   of the NNL and the licensed participants; correct?
14              A.   I see that it says that.
15              Q.   And if you look, sir, on the
16   second page, Item No. 4, the parties themselves are
17   stating that:
18                   "The RPSM under the 2004 agreement
19                   is intended to determine the allocation
20                   of residual profits derived from the
21                   distribution and sale of products
22                   developed from the NN technology and as
23                   a result of R&D activity carried out by
24                   each of the participants," et cetera;
25                   correct?
```



```
1                    A.   I see that it says that.

2                    Q.   And you have no evidence to

3    suggest that the parties' own statement of their

4    understanding was incorrect; is that fair?

5                    A.   I have no evidence?  No, I think

6    that's incorrect.

7                    Q.   You think the parties' own

8    statement of their understanding is incorrect?

9                    A.   I think this is a written

10   agreement, and that's what this written agreement

11   says.

12                   Q.   But my question to you, sir -- and

13   I am not sure I understand your answer now.  My

14   question was whether you have seen anything in all

15   your review of the documents to suggest that this

16   statement of the intention of the parties in

17   respect of what is being split is not accurate.

18                   A.   I think what I have said is

19   something different.  I think what I have said is

20   that what I have seen in the actual behavior and

21   conduct and the compensation that one would expect

22   in return, this would not reflect exactly what I

23   think is the ultimate disposition.

24                   Q.   And again, you are talking about

25   the UMTS and the Foundry matters; correct?
```

 Neeson & Associates    W&F

```
 1                    A.   And general economic principles
 2                    Q.   General contract principles?
 3                    A.   And general economic principles.
 4                    Q.   Well, whatever the parties did
 5      with the UMTS and the Foundry proceeds, we know
 6      that, as you referenced, they explicitly agreed in
 7      the amendment to the MRDA that sale of business was
 8      not within the operating profits to be split;
 9      correct?
10                    A.   Yes, they explicitly say that in
11      the addendum that was adopted two weeks before
12      insolvency.
13                    Q.   And it was retroactive; correct,
14      sir?
15                    A.   Yes, it was made retroactive.
16                    Q.   And, sir, so if we go back then to
17      the first principal that the OECD stated under the
18      profit split discussion that we talked about, that
19      the very first task of the parties in adopting
20      residual profit split is to come to a definition of
21      what is being split, we have a very clear
22      definition of what is being split by the parties
23      here, don't we?
24                    A.   We have a clear definition of what
25      is being split under operating profit, how
```



 1   operating profits are to be split.  We have that

 2   definition.

 3              Q.   So the MOU, sir, as you pointed

 4   out is toward the end of the piece; correct?  If we

 5   go back -- let's go all the way back to the start

 6   of the piece.  Let's go back to 2002.  And perhaps

 7   we could call up Exhibit TR22122.

 8              And this, sir, is a set of covering

 9   letters to tax authorities from Nortel requesting

10   the advance pricing agreement.

11              Have you seen these cover letters

12   before, sir?

13              A.   A long time ago.

14              Q.   And so we have just seen what the

15   parties said at the end of the piece in the MOU.

16   If we go back to the beginning of the piece here,

17   if we stay on the first page, this is the cover

18   letter to Inland Revenue or Her Majesty's Customs

19   and Revenue in the UK; correct?

20              A.   Yes.

21              Q.   And if we go to the second

22   paragraph --

23              THE CANADIAN COURT:  What is the date

24   on that?

25              MR. SMITH:  March 27, 2002, Your Honor.



```
 1              BY MR. SMITH:
 2              Q.   And, sir, right in the second
 3     paragraph we see that Nortel states that:
 4                   "The APA requested concerns the
 5                   transfer pricing methodology to be used
 6                   in the global sharing of profits and
 7                   losses attributable to the manufacture,
 8                   sale and distribution of tangible
 9                   inventory property that is or has been
10                   produced utilizing technology developed
11                   by Nortel Networks affiliates."
12              And you will see, sir, if you go five
13     pages in, the March 14, 2002 letter to the IRS;
14     correct?
15              A.   Yes.
16              Q.   And in the first paragraph
17     there -- this is from NNI -- it says:
18                   NNI "(collectively, with its
19                   affiliated subsidiaries) . . .  and the
20                   other applicants specified in this
21                   letter respectfully request that the
22                   Internal Revenue Service enter into an
23                   advance pricing agreement concerning
24                   the transfer pricing methodology to be
25                   used in the global sharing of profits
```



```
 1                    and losses attributable to the

 2                    manufacture, sale and distribution of

 3                    tangible inventory property that is or

 4                    has been produced utilizing technology

 5                    developed by Nortel Networks

 6                    affiliates."

 7                    And then, sir, if you go to what I

 8     believe is the 12th page in, you should see a March

 9     14, 2002 cover letter to the Canadian tax

10     authority.  Do you see that?  Mr. Gauvreau.  Have

11     you got that?

12                    A.   Yes.

13                    Q.   And the first paragraph there

14     reiterates the same thing; correct?

15                    A.   Yes.

16                    Q.   So no question, sir, in terms of

17     representations to tax authorities -- and that's

18     another thing you focus on in your work; correct?

19                    A.   Yes.

20                    Q.   No question in respect of

21     representations to tax authorities right from the

22     beginning what the transfer pricing methodology was

23     being used to share; correct?

24                    A.   I see what these letters say.

25                    Q.   Well, do you agree with me, sir,
```



```
1    there is no ambiguity there?

2              A.   I am aware also that there was

3    preparation for the -- that Nortel had put together

4    sort of a talking-point document in preparation for

5    its meetings.  And one of the questions there,

6    which I also cited in my report, was the question

7    of what would happen if we had a sale.  And the

8    answer there says -- so once again, in transfer

9    pricing, I try to look at all the facts and

10   circumstances:  Actual behavior and written

11   agreements.  They collectively determine what is

12   the arm's-length answer.

13             Q.   One of the three specific points

14   that you make in your report, sir, is that the

15   Court should look at the representations to the tax

16   authorities to determine if the allocation

17   positions of EMEA and Canada are consistent with

18   the representations to the tax authorities;

19   correct?

20             A.   Yes.

21             Q.   The document you are talking

22   about, sir, is not a representation to the tax

23   authorities; correct?

24             A.   The documentation I am talking

25   about was preparation and to make -- in case the
```



```
 1   question from the tax authorities arose.
 2              Q.   And you have no idea, sir, what
 3   the discussion internally in Nortel was around that
 4   document, do you?
 5              A.   That is correct.
 6              Q.   And you have no idea, sir, when
 7   that document refers to "economic ownership" in the
 8   very answer you are talking about, the very
 9   proposed answer that you are talking about, that
10   they didn't fully understand that meant an economic
11   ownership in the sense of the license, in the case
12   of the licensees; correct?
13              A.   I am not sure I understand your
14   question.
15              Q.   You have no idea, sir, if the
16   person who drafted that potential question and
17   answer was, in fact, talking about a licensee's
18   economic ownership in a license; correct?
19              A.   I would have to go back and look
20   at that quote.  You know, I have it somewhere in
21   here.
22              Q.   But that was not a representation
23   to the tax authorities; correct?  We are agreed on
24   that?
25              A.   We do not know whether it was a
```



1    representation to tax authorities or not.  What I

2    do know, it was a document that we looked at.  It

3    was presumably accurate in that it described what

4    Nortel planned to say in case the question was

5    asked.  Whether that question was ever asked in

6    private meetings, we do not know.

7                    Q.    And what we do know is exactly

8    what they said in these letters; correct?

9                    A.    I understand, but I do not believe

10   that represents the entirety of the facts and

11   circumstances.

12                   Q.    You haven't seen a single

13   representation to the tax authorities, sir, that

14   qualifies the statement we see in these letters in

15   any respect; is that correct?

16                   A.    Repeat that, please.

17                   Q.    You haven't seen any evidence,

18   sir, that qualifies the statement that we focused

19   on in each of these three cover letters; correct?

20                   A.    That states what -- that states

21   what it states.

22                   Q.    And when you referred in your

23   slide deck, sir, to a joint venture -- and I think

24   you might have mentioned the word "partnership" in

25   your direct testimony as well; correct?

 Neeson & Associates    W&P

```
 1                    A.   I would have to see what I said

 2   about partnership, because, I mean, "partnership"

 3   is a difficult word to use in this situation.  I

 4   think I said analogous to a joint venture, but --

 5                    Q.   Right.  But you are obviously

 6   aware, sir, that here the parties themselves

 7   expressly agreed that they are not joint venturers

 8   and they are not partners; correct?

 9                    A.   I said that they -- I think what I

10   also said, I recognize that they were not legally a

11   joint venture or partnership.

12                    Q.   Well, sir, do you understand that

13   the parties agreed that they were not joint

14   venturers or partners for any purpose?  Do you

15   recall that in the MRDA or do we need to call it

16   up?

17                    A.   I believe that's what it says in

18   the MRDA, but I also said I believe that they

19   behaved as a joint venture.

20                    Q.   And are you aware, sir, of any

21   evidence in all your forensic work here that

22   suggests when the parties said "for any purpose,"

23   that's not what they meant?

24                    THE CANADIAN COURT:  Where are we going

25   with this?  Aren't you just arguing about the
```

 Neeson&Associates   W&F Wilson & Peyton Ltd.

```
 1    meaning of a document?  I think you should move on.
 2                 BY MR. SMITH:
 3                 Q.   And you are aware, sir, that if we
 4    go back to the end of the piece, back to the MOU
 5    where they describe their arrangements, they
 6    confirm again that they are not in a relationship,
 7    a partnership or joint venture; correct?
 8                 A.   I have not gone back -- do you
 9    want me to go back and read that again?
10                 Q.   Sure.
11                 A.   Where is it at the end?  Oh,
12    that's the letters.
13                 Q.   It is 11393, if you have it.
14                 A.   I have the document in front of
15    me.  Which page is it?
16                 Q.   Page 3, Item 9, where it states,
17    "The relationship of the participants to each other
18    is as stated in Article 13 of the agreement."
19                 A.   Which is --
20                 Q.   Do you want the MRDA, sir?
21                 A.   No.
22                 Q.   So we agree that they reiterate
23    that that's not their relationship; correct?
24                 A.   I can't remember.  Is Article 13
25    the one that states that in the MRDA?
```



1              Q.    Yes.

2              A.    Then I would agree that's what it

3    says.

4              Q.    And I also want to understand,

5    sir, are you suggesting to the Courts here that all

6    the participants in the RPS had the same risk and

7    reward profile and that's why they should all share

8    in whatever ultimate return or exploitation there

9    is on the IP?

10             A.    I think I said essentially that in

11   my direct testimony, something to that effect.

12             Q.    Yes.  But what you didn't mention,

13   sir, is that in your work for the claims side of

14   this trial -- and all that work was also only from

15   a transfer pricing perspective; correct?

16             A.    That's correct.

17             Q.    What you didn't mention, sir, in

18   that work, that you were of the strong opinion that

19   NNL, in fact, should bear the full risk of some of

20   the biggest costs of all, being the restructuring

21   costs and the vendor financing losses.  You didn't

22   mention that; is that right, sir?

23             A.    That is correct.  I said that was

24   one interpretation on restructuring.  I said there

25   were two reasonable interpretations, and I favor



```
1    that interpretation.  But I said you could also
2    make a very strong case that those should be shared
3    equally.
4              Q.   And in fact, sir, you said you
5    were of the strong opinion that NNL should bear
6    that full risk for the entire group; correct?
7              A.   That's correct.
8              Q.   And if we add up just in order of
9    magnitude those restructuring costs and vendor
10   financing losses over the RPS period, that's some
11   $19 billion, isn't it, sir?
12             A.   I will take your word that that is
13   the number, but I would think it is something of
14   that magnitude.
15             Q.   And your counsel, sir, made a
16   point yesterday that you use the word
17   "entrepreneur" quite a bit through your allocation
18   reports; correct?
19             A.   That is correct.
20             Q.   In fact, you went to the trouble
21   of defining the RPS participants as capital E
22   Entrepreneurs; correct?
23             A.   That is correct.
24             Q.   And you did nothing of the sort in
25   the claims side of your work; is that right?
```



```
 1                    A.    Yes.
 2                    Q.    And that's because for the claims
 3     side of the work, you couldn't portray them as
 4     entrepreneurs all bearing the same risk and reward;
 5     correct?
 6                    A.    I disagree with that totally.
 7                    Q.    Why didn't you call them
 8     entrepreneurs in that work then?
 9                    A.    There was no reason to.  I am
10     writing two reports.  The same people are going to
11     be reading both reports.  So it is not like it was
12     a secret.
13                    Q.    So the risk/reward profile that
14     you advocate for purposes of claims to these Courts
15     is that NNL should bear entirely the biggest costs
16     of all of the group; correct?
17                    A.    Maybe we should go back to what
18     you asked me earlier regarding entire, you know,
19     risks and rewards.  What we said pretty clearly
20     from the beginning is, first of all, at stage 1 of
21     the RPSM we have defined certain functions with
22     regard -- that deserve their own specific return
23     that we, as I said, sometimes call them routine
24     returns, even though we may not be routine and
25     ordinary.  But nevertheless, we have routine
```

Neeson & Associates    W&F

```
 1   returns.  That was sort of step 1.  So they all,

 2   including the entrepreneurs, get that return.

 3               What I also said is that -- and I have

 4   said it before, I believe I said it in my

 5   deposition when it was addressed to me -- is that

 6   the RPEs or the RPS participants were entrepreneurs

 7   with respect to the R&D, the IP activity that they

 8   jointly engaged in.  That's what I said and that's

 9   what this is.

10               Q.   Well, in fact, sir -- I am sorry.

11               A.   That's what I said.

12               Q.   In fact, sir, they are

13   entrepreneurs only in the sense of sharing in the

14   risk and reward of operating profit; correct?

15   That's their deal.

16               A.   That is the written agreement that

17   is stated in the MRDA.

18               Q.   And, sir, let's turn --

19               A.   Let's go back further.  And if you

20   define, you know, "according to operating profit,"

21   you would have put the restructuring costs in it

22   from the very beginning.  But that was excluded.

23               Q.   Exactly, sir, because they defined

24   "operating profit" because the OECD precisely

25   requires the parties to do that; right?
```



```
 1                      A.    The operating profit -- at the
 2   time Nortel reported that those were operating
 3   expenses, the restructuring costs were operating --
 4   they reported on their financial statements to the
 5   US, to Canada.  That's how they reported their --
 6                      Q.    But not for purposes of the profit
 7   split?
 8                      A.    That is a provision that was added
 9   in, as I say, literally days before insolvency.
10                      Q.    But it was retroactive, sir, and,
11   in fact, reflected their conduct; correct?
12                      A.    It reflected the way they
13   allocated profits in the RPSM model in the '01
14   period.  But that is not -- under the '01 period,
15   '01 to '05 period, they were operating under a
16   method where it was not specifically excluded.  It
17   was done retroactively; yet the model doesn't do it
18   that way.
19                      Q.    And from '06 onwards, that was
20   clearly their definition of operating profit; it
21   did not include restructuring costs?
22                      A.    No.  From January of '09 onward it
23   was.  That's how it was defined in January -- I
24   believe it was January of '09 is when I believe the
25   agreement excluding restructuring costs was added.
```



1              Q.   The agreement will speak for

2    itself.  But if it is retroactive, it is

3    retroactive and we can figure that out for

4    ourselves; correct?

5              A.   Yes, you can.

6              Q.   Let's move on, sir, to something

7    you touched on only briefly in your direct.  And as

8    my colleague John Keefe, if you might recall, said

9    to you on deposition, this may be something we are

10   actually in violent agreement on.  But I wanted to

11   turn then to your views on the US interests'

12   allocation position; all right?

13             A.   Yes.

14             Q.   And you are aware, of course, that

15   the US interests rely on the allocation reports of

16   Dr. Lorraine Eden; correct?

17             A.   Correct.

18             Q.   And she is an academic; right?

19             A.   I believe she is employed at the

20   Texas A&M University.

21             Q.   Yes.  And you have reviewed her

22   two reports with some care, I take it?

23             A.   Yes.

24             Q.   And obviously, you have reviewed

25   the US allocation position; correct?



```
 1                      A.    Yes.
 2                      Q.    So perhaps you can help the Courts
 3     with a few things in that regard.  And first of
 4     all, I appreciate that the R&D contribution theory
 5     that you propose and the Canadian Debtors'
 6     allocation theory may not be in sync, but I think
 7     we can agree that one of the key flaws in the US
 8     interests' position is this:  It fails to recognize
 9     that a licensee's rights under the Nortel licenses
10     cannot be divorced from the terms of the RPSM;
11     correct?  That's a flaw in the US position;
12     correct?
13                      A.    Repeat that question again.
14                      Q.    Yes.  The US position fails to
15     recognize that a licensee's rights under the Nortel
16     licenses cannot be divorced from the terms of the
17     RPSM?
18                      A.    I believe that's correct.
19                      Q.    And that's a specific flaw that
20     you see in the US approach and in Dr. Eden's
21     approach; correct?
22                      A.    Yes.
23                      Q.    And, indeed, sir, I think as you
24     would put it, the US interests' position fails to
25     recognize that the license rights are subordinate
```



```
 1   to the division of operating profits or losses

 2   under the Nortel RPSM; correct?

 3              A.   Correct.

 4              Q.   And as a result, sir, in your

 5   view, what the US interests' position does is give

 6   the US interests a windfall that their arrangements

 7   simply did not provide for; correct?

 8              A.   I have not looked at the US

 9   position in detail.  I would have to go back and

10   look at the calculations and things like that.  My

11   guess is the numbers would not be -- you know,

12   "windfall" sort of implies a huge number.  I don't

13   know what the number is.  I mean, there may be some

14   difference in what the final position would be, but

15   I did not study the quantitative impact of their

16   position or its position.  I am not sure whether

17   the correct word is "their" or "its."

18              Q.   Perhaps, sir, we could just look

19   for a moment at your rebuttal report, and

20   particularly page 23.  Do you have that, sir?

21              A.   Yes.

22              Q.   And you will see the paragraph

23   beginning "Allowing the US Debtors"?

24              A.   Those are my words, yes.

25              Q.   "To keep the full value of
```

 Neeson & Associates    W&P

```
 1                    NNI's exclusive license, as Dr. Eden
 2                    suggests, would give the US Debtors a
 3                    windfall that they were not entitled to
 4                    under the group's pre-insolvency
 5                    arrangements?"
 6              A.    That's what I say.
 7              Q.    Right.
 8              A.    But I did not quantify it.
 9              Q.    Right.  And you are aware, sir,
10    that the US interests' license approach, because it
11    doesn't recognize the constraints of the RPSM,
12    gives Canada only about a 12 percent interest in
13    the lines of business sales and under 10 percent
14    interest in the residual IP sale.  Are you aware of
15    that?
16              A.    No, I am not aware of that.
17    Repeat that, please, Mr. Smith.
18              Q.    Well, let me ask you this.  The
19    R&D contribution approach that you support would
20    give, for example, Canada an allocation of the sale
21    proceeds in line with the R&D spend under the RPSM;
22    correct?
23              A.    That's correct.
24              Q.    Right.  And I appreciate that you
25    and Mr. Malackowski have a position that you can
```



```
 1   change the look-back period to some extent, but it
 2   basically reflects the R&D spend with whatever you
 3   say is the appropriate look-back period; correct?
 4              A.   Yes.
 5              Q.   And if the US position with the
 6   flaw that you have pointed out in it gave Canada
 7   about a 10 percent or 12 percent respectively share
 8   of the IP sales, that would be grossly under
 9   proposition --
10              A.   When you remind me of the numbers,
11   I think "windfall" was a correct word.
12              THE CANADIAN COURT:  Mr. Smith, just if
13   I could stop you, I have lost the feed here.
14   -- OFF THE RECORD --
15              THE US COURT:  Thank you, Mr. Smith.
16   You certainly may proceed.
17              MR. SMITH:  Thank you, Judge Gross.
18   Thank you, Justice Newbould.
19              BY MR. SMITH:
20              Q.   And, sir, we know the approach you
21   have taken in your reports to looking at the
22   Canadian allocation position and the EMEA
23   allocation position is to look at their consistency
24   or inconsistency with transfer pricing principles,
25   representations to tax authorities and the parties'
```



```
 1   business arrangements; correct?

 2               A.   Yes.

 3               Q.   And if you were to do that

 4   analysis with respect to the US interests'

 5   position, clearly you would come to the conclusion

 6   that it is not consistent with any of those three

 7   things; correct?

 8               A.   I can't remember actually doing --

 9   specifically applying those three principles, but I

10   believe that would be the answer.

11               Q.   All right.  Thank you.

12               And your recognition, sir, that you

13   can't take a license approach without -- or you

14   can't take a license approach and divorce the

15   license rights from the constraints of the RPSM,

16   that would apply just as much to any expert's work

17   here; correct?  Be it Mr. Malackowski's or

18   Mr. Huffard's, for example?

19               A.   Please repeat that again.

20               Q.   Yes.  The flaw you pointed out in

21   the US allocation position and Dr. Eden's position

22   was that it does not recognize that the RPSM --

23   sorry, let me reverse that -- it does not recognize

24   that the license rights are subordinate to or

25   constrained by the RPSM; correct?
```



```
 1                    A.   I am not sure I said that.  I

 2   mean, I am not sure I understand the logic that you

 3   are driving to there or that you are using, where

 4   you are going with that.

 5                    Q.   I am just going back, sir, to the

 6   proposition we discussed first off when we talked

 7   about the US position; that you said that its flaw

 8   is that it fails to recognize that the license

 9   rights were subordinate to the division of

10   operating profits and losses under the RPSM; right?

11                    A.   I agree with that.

12                    Q.   And all I am asking you here --

13   and perhaps it wasn't very clear, and I apologize.

14   But all I am asking you here is, that proposition

15   also has to apply to any of the experts' approaches

16   that turn on a license approach; correct?

17                    A.   I agree.

18                    Q.   And I just wanted to come back

19   just for a moment -- I will come back to Dr. Eden

20   in a moment.  But just while we are talking about

21   the license rights, did I understand you, sir, to

22   suggest in your evidence in direct that, from a

23   transfer pricing perspective, the MRDA is not a

24   licensing agreement at all?

25                    A.   I don't think that's what I said.
```



1    I am not sure -- it clearly has licenses, a license

2    arrangement in it.  So I don't think that's what I

3    said.  Can you be more specific as to what you are

4    asking?

5                Q.   Well, I will turn you, sir, to the

6    transcript of your evidence on Friday, if we can

7    call up the trial transcript, page 2673.

8                A.   You said 2673?

9                Q.   Yes.

10               A.   What I have is 2449.

11               Q.   So do I.

12               A.   Oh, there you go.

13               Q.   I think if you go to line 12, sir,

14    it says the question by Mr. Adler was:

15                    "And now, you've seen the MRDA.

16                    You've referred to the MRDA, an acronym

17                    everyone in this room knows very well

18                    by now.

19                    "Answer:  Yes.

20                    "Question:  From a transfer

21                    pricing perspective, is that a

22                    licensing agreement?

23                    "Answer:  I do not see it as a

24                    licensing agreement at all."

25               A.   I agree.  I agree with that



1  statement.  And I think it is consistent with what

2  I just said, is that it has licensing features to

3  it but is not what I understand is a normal

4  licensing agreement.

5           Q.   Well, sir, you are quite familiar

6  with licensing agreements; correct?

7           A.   I have seen many of them.

8           Q.   And in the world of licensing, it

9  is hardly surprising that the licensor is normally

10  the owner of all the rights in connection with the

11  IP, subject to whatever interest it grants away;

12  correct?

13           A.   That is correct.

14           Q.   And a licensor may license all or

15  part of its rights to one or more licensees.

16  That's pretty trite, isn't it, sir?

17           A.   Correct.

18           Q.   And whatever is not granted with

19  the licensee remains vested with the licensor;

20  correct?

21           A.   Correct.

22           Q.   And in the arm's-length world, a

23  license agreement is careful to specify the scope

24  of the license rights that are being granted away

25  to the licensees; correct?



```
 1                    A.   Explain that.  You used the word
 2    "careful."  I am not sure what you mean.
 3                    Q.   Okay.  Take out the word
 4    "careful."
 5                    In the normal paradigm in the
 6    arm's-length world, a license agreement includes a
 7    specification as to the scope of the license rights
 8    being granted away; correct?
 9                    A.   That's correct.
10                    Q.   And you didn't offer any analysis
11    in your reports here, sir, to say that the MRDA
12    does anything different; correct?
13                    A.   I am not sure what you are asking
14    me there.
15                    Q.   You have never said -- up until
16    Friday, sir, in this case, you have never said that
17    the MRDA is not a licensing agreement, have you?
18                    A.   That I don't know.  I am sure
19    that -- in terms of a written document, probably
20    not.  I don't know the answer to that, actually.
21                    Q.   You don't know if you have said
22    that before?
23                    A.   If I -- as I said -- I am not sure
24    I understand your question now.
25                    Q.   At any point in the evidence in
```



1   this case, sir, in your reports, did you ever

2   suggest to the Courts that the MRDA is not a

3   licensing agreement until we heard it on Friday?

4                A.    I think you are taking what I said

5   on Friday totally out of context.

6                Q.    Well, let's get the context then.

7                A.    The context is that it is -- I

8   find it to be not a normal license agreement the

9   way that a license agreement is normally employed

10  in the outside world.  And then I went on to say

11  that I had never -- I don't recall ever seeing a

12  license agreement where the licensee was required

13  to plunk in billions of dollars beforehand for an

14  uncertain future that could be yanked away on a

15  moment's notice.

16               I said that is not a normal license

17  agreement.  And when I said that -- when I was

18  answering that question, it was in that regard to

19  that very specific point.

20               Q.    Right.  Because you say, in a

21  normal license agreement, if the underlying

22  property, the underlying IP, for example, is yanked

23  away, the licensees would have to get some

24  compensation; correct?

25               A.    That's correct.



```
1                    Q.   Right.  And they would have to be

2    compensated for the value of their license

3    interests; correct?

4                    A.   That is correct.

5                    Q.   And you don't suggest, sir, that

6    the Canadian allocation position is saying anything

7    different, do you?

8                    A.   Yes, I do.

9                    Q.   Do you suggest that Dr. Reichert

10   is saying anything different?

11                   A.   Yes, I do.

12                   Q.   Do you not appreciate, sir, that

13   the Canadian position is exactly that the license

14   rights need to be compensated, sir?

15                   A.   What I said is -- what I have said

16   is that does not reflect the economic circumstances

17   of the arrangement.  The economic circumstances of

18   the arrangement are that you would be entitled to

19   the full economic return to their economic rights.

20                   Q.   Yes.  And in this case, that's

21   their license rights; correct?

22                   A.   Not necessarily at all.

23                   Q.   What other rights are you looking

24   to, sir?

25                   A.   I am looking to the underlying
```



```
 1   economic proposition that is at stake here.  It is
 2   sharing of the huge amounts of money or the
 3   results -- whatever returns come from the huge
 4   amounts of investment under the principles of the
 5   RPSM.  That's what I am saying.
 6               I am saying I think the license
 7   rights -- I believe the agreement embodies more
 8   than the very specific license rights embedded in
 9   the MRDA.  All they talk about is the split from
10   operating profit.
11               Q.   So in your construct here, from a
12   transfer pricing world, you are adding rights
13   beyond what are in the MRDA; correct?
14               A.   Yes.  I believe the MRDA -- yes, I
15   am adding rights.  I am adding, yes, ownership
16   rights.  Yes, I am.  I am saying that they deserve
17   a greater economic ownership than the MRDA conveys
18   as it was utilized.
19               Q.   I appreciate your clarification,
20   sir.  Now, just back to Dr. Eden and her work, sir.
21               You appreciate that she is not a
22   transfer pricing practitioner like you are;
23   correct?
24               A.   I don't know her professional
25   career.
```



```
 1                    Q.   And, sir, and with all respect to
 2  her academic credentials, you would agree that, to
 3  your knowledge, she is not a globally recognized
 4  authority on transfer pricing; correct?
 5                    A.   I don't know the answer to that.
 6  I don't know.  What I think I said is I don't know,
 7  or I may have even gone so far as to say that.  I
 8  don't know her.
 9                    Q.   Well, just stay with my question,
10  sir.  To your knowledge, Dr. Eden is not a globally
11  recognized authority on transfer pricing issues?
12                    A.   My knowledge --
13                    THE CANADIAN COURT:  What does that
14  mean?  I don't understand what that means.
15                    MR. SMITH:  The only reference, Your
16  Honor -- and this is part of the problem of the
17  order of witnesses, I suppose.  But Dr. Eden
18  promotes herself as a globally recognized authority
19  on transfer pricing.  And I think we will hear from
20  the other transfer pricing witnesses that they
21  certainly don't.
22                    BY MR. SMITH:
23                    Q.   And you have been in this business
24  how long, sir?
25                    A.   More than 25 years.
```



```
 1                    Q.   And you have had, I think you said
 2    on Friday, hundreds of transfer pricing
 3    assignments; correct?
 4                    A.   That's correct.
 5                    Q.   Globally?
 6                    A.   Yes.
 7                    Q.   And you have never seen Dr. Eden
 8    involved in any of those for any party, be it a tax
 9    authority or a taxpayer; correct?
10                    Q.   And you are aware, sir, that
11    Dr. Eden -- one of the foundational points in
12    Dr. Eden's work here is her statement that the RPSM
13    is a method of last resort; correct?
14                    A.   Yes.
15                    Q.   And she says that it is the
16    transfer pricing method least favored by tax
17    authorities; correct?
18                    A.   I believe she says that.
19                    Q.   And you are aware, sir, that she
20    says that the profit-split method is considered to
21    be particularly unreliable; correct?
22                    A.   I would have to see the exact
23    quotes, but I certainly remember words to that
24    effect.
25                    Q.   All right.  And in the same vein,
```



1    she says that tax authorities view the RPSM as

2    typically the least reliable transfer pricing

3    method for determining an arm's-length price;

4    correct?

5                 A.    Once again, I don't recall the

6    specifics, but I remember words to that effect.

7                 Q.    So starting with that last

8    principle of Dr. Eden's, that tax authorities view

9    the RPSM as typically the least reliable method and

10   that it is considered to be particularly

11   unreliable, you would agree, sir, that perhaps with

12   the exception of Brazil, the tax authorities that

13   you deal with, like the US, Canada and Europe, do

14   not typically view the RPSM as the least reliable

15   transfer pricing method; correct?

16                A.    That is correct.

17                Q.    And, sir, you would agree with me

18   that referring to the profit-split method as being

19   considered to be particularly unreliable, in fact,

20   reflects a serious misunderstanding of either the

21   method itself or its purpose; correct?

22                A.    I would agree with that.

23                Q.    I told you we might be in violent

24   agreement, sir.

25                      And you certainly would not --

 Neeson&Associates    W&F

```
 1                    A.    You are right.

 2                    Q.    And you certainly would not say

 3      yourself that it is a particularly unreliable

 4      method, obviously; correct?

 5                    A.    That is correct.

 6                    Q.    In fact, it is actually one of the

 7      most reliable methods out there; right?

 8                    A.    Yes.  I think yesterday I said

 9      rather than be the method of last resort, I think

10      it very often is the method of first resort.

11                    Q.    And if we go back to her first

12      proposition, that it is a method of last resort and

13      least favored by tax authorities, it has actually

14      over the past -- I don't know -- decade or two, I

15      think, become one of the preferred methods; right?

16                    A.    What I said on Friday, I think, is

17      probably a bit more accurate.

18                    I think that when the method was first

19      put in, it was perhaps put in reluctantly.  I mean,

20      I was talking with -- I knew many of the people

21      that were involved in the writing of the

22      regulations and so forth.  But I think it has

23      clearly evolved into what I would say the 2000s,

24      where -- were -- I think -- so it wouldn't be the

25      past decade or two.  I would say probably the past
```



 1   decade.

 2            Q.   Right.

 3            A.   But I think you are correct in

 4   substance.

 5            Q.   Thank you.  And we know in this

 6   case, sir, that all of you and Dr. Felgran and

 7   Dr. Reichert -- and you are all experienced

 8   transfer pricing practitioners; right?

 9            A.   That's correct.

10            Q.   We know that you all agree that

11   the RPSM was not just appropriate but was the best

12   method for Nortel's circumstances; correct?

13            A.   I certainly believe that, given

14   what we know.

15            Q.   And the IRS and the Canada revenue

16   agency obviously thought that; right?

17            A.   Yes.

18            Q.   And when we say "best method,"

19   sir, that's a term of art in the transfer pricing

20   world, isn't it?

21            A.   Yes, it is.

22            Q.   It is the method that most

23   approximates what arm's-length parties would do;

24   right?

25            A.   Correct.  It is a little more



```
 1    subtle than that.  It doesn't say to what the best

 2    method to what arm's-length parties would do.  But

 3    the result, meaning the financial result, the split

 4    of income that would be achieved, is really what it

 5    says in that regard when they are referring to

 6    "best method."  But I think in principle, you are

 7    correct.

 8              Q.   Okay.  Thank you.  And one more

 9    thing -- and this could be important for a later

10    discussion.  But you would say that the very reason

11    that the RPS was right for Nortel's case is because

12    it reflected the economic substance of the

13    relationships of the Nortel parties; correct?

14              A.   Yes.

15              Q.   And I think in the transfer

16    pricing world, we sometimes say "economic

17    substance" and sometimes say "commercial

18    substance," but it is basically the same concept;

19    correct?

20              A.   You tend not to say "commercial

21    substance" as a word -- as a collection of words

22    together very often, but yes.

23              Q.   And I just want to see if you can

24    help with one other aspect of Dr. Eden's building

25    blocks in her work.  And that's, sir, I take it you
```



```
 1    are aware that her initial report characterizes the

 2    Nortel RPSM as being intentionally skewed in favor

 3    of NNL for tax avoidance reasons; correct?

 4              A.    I recall that.

 5              Q.    And that's certainly not a

 6    conclusion you drew in any of your work; correct?

 7              A.    That is correct.

 8              Q.    And, indeed, sir, although you

 9    mentioned in your slides on Friday that

10    multinational enterprises are motivated to

11    attribute income to lowest tax jurisdictions, that

12    was really simply to explain as to why transfer

13    pricing regulation exists at all; right?

14              A.    That's correct.  As I say, that

15    was half the reason.  The other reason is avoiding

16    double taxation.

17              Q.    Sure.  And, in fact, sir, you are

18    quite aware that multinational enterprises, when

19    they do related-party transactions, are not

20    necessarily motivated by tax avoidance; correct?

21              A.    It is funny.  When -- I have

22    always used two different sets of words.  And when

23    I saw her presentation, in the practice of

24    international tax and transfer pricing, I tend to

25    think of tax planning as a way to, you know,
```



```
 1   appropriately -- I always use "appropriately," you
 2   know, applying your taxes around the world.  Paying
 3   your taxes around the world actually would be a
 4   better word.  Whereas tax avoidance I always took
 5   to be sort of the evil twin of that, and that being
 6   where one was really trying to -- where one was
 7   trying to avoid taxes.  And there is some subtle
 8   words there.
 9              But in general, I do not see -- tax
10   planning is common in the profession that
11   corporations utilize in constructing their affairs,
12   but in a sensible way.  And as I think I also said,
13   there are varying degrees of that.  Some people
14   make that a high priority -- some corporations make
15   that a high priority; some corporations do not.
16              Q.   So they are not necessarily
17   motivated by whatever you want to call it, tax
18   minimization or takes avoidance; correct?
19              A.   It is one of the factors in
20   decisions they make.
21              Q.   But in the sense that Dr. Eden
22   uses the phrase "tax avoidance," when she said that
23   the Nortel RPS was intentionally skewed in favor of
24   NNL for tax avoidance reasons, you, in fact, would
25   agree, sir, that MNEs do not necessarily do their
```



 1   related-party transactions being motivated by tax
 2   avoidance; right?
 3            MR. LUFT:  Your Honor, I am just going
 4   to object.  This question is in the sense that
 5   Dr. Eden uses the word.  I mean, he has already
 6   given his opinion on what he understood.  But to
 7   say how Dr. Eden is using it I think is more
 8   appropriately put to Dr. Eden.
 9            THE US COURT:  I think that's correct
10   also.
11            THE WITNESS:  I agree with that, too.
12            MR. SMITH:  Okay.  Thank you, Judge
13   Gross.
14            BY MR. SMITH:
15            Q.   And in this case, of course, we
16   know that the choice of the RPS for Nortel and its
17   design were expressly recommended by Horst Frisch;
18   correct?
19            A.   Yes.
20            Q.   And its mandate --
21            A.   Excuse me.  I don't know the
22   answer to that; that is, it was in their report.  I
23   don't know that that was their recommendation.
24            Q.   Well, did you read their report,
25   sir?



1                    A.    Yes, I have.

2                    Q.    And Horst Frisch's mandate was to

3    recommend the "best method" in the circumstances of

4    Nortel; right?

5                    A.    I have not seen their engagement

6    letter.  But I would assume that probably is

7    correct, but I don't know for sure.

8                    Q.    Well, let's put some certainty

9    around that.  Perhaps we could call up the Horst

10   Frisch report.  It is Exhibit TR11055B.

11                   And, sir, where I wanted to take you

12   there it is page No. 1 at the bottom.  I believe it

13   is the sixth page in.  Do you have that?  It is

14   headed at the top "Introduction."

15                   A.    Correct.  Correct.

16                   Q.    And we see there, sir, that they

17   state:

18                   "We have been asked to assist in

19                   the analysis of Nortel Networks'

20                   intercompany transfer pricing

21                   practices, to review the transfer

22                   pricing methodologies of Nortel's prior

23                   Advance Pricing Agreements, and to

24                   recommend the best methodology for a

25                   new, comprehensive and more



```
 1                 administrable APA."
 2                 So that's their statement, that it is
 3      to recommend the best methodology; correct?
 4                 A.    That is correct.
 5                 Q.    Does that refresh your memory a
 6      bit then?
 7                 A.    Yes.   That's consistent with what
 8      I thought.
 9                 Q.    And that's precisely what is
10      required by all of transfer pricing guidance or
11      law, as you referred to it on Friday; right?   To
12      pick the best method?
13                 A.    Yes.
14                 Q.    And the IRS regulations, or
15      Regulation 482, I believe it is -- I guess that's a
16      Treasury regulation, I apologize -- it is very
17      explicit about that; right?
18                 A.    That is correct.
19                 Q.    And it means, sir, the method
20      that, in the given facts and circumstances,
21      provides the most reliable measure of an
22      arm's-length result; correct?
23                 A.    Yes.
24                 Q.    And obviously, sir, it certainly
25      doesn't mean the method that avoids the most amount
```

Neeson & Associates    W&P

```
 1   of tax for the taxpayer; right?
 2                A.   That is correct.
 3                Q.   And it obviously does not mean the
 4   method that intentionally skews income to a low-tax
 5   jurisdiction; correct?
 6                A.   That is correct.
 7                Q.   And we know, sir, that Horst
 8   Frisch is a long highly regarded professional
 9   transfer pricing firm; correct?
10                A.   Yes.
11                Q.   And it was a responsible choice by
12   Nortel to engage to take on this mandate; correct?
13                A.   Yes.
14                Q.   And they are highly ethical?
15                A.   To the best of my knowledge.
16                Q.   And just lastly with respect to
17   Dr. Eden's work here, sir, you are aware that she
18   states in her evidence to the Court that the APA
19   settlement that we have heard about between the
20   Canada Revenue Agency and the IRS, which resulted
21   in a $400-million-a-year adjustment for five years,
22   you are aware that she says that shows the RPSM was
23   so flawed that it is another reason why RPSM
24   percentages are not an appropriate benchmark for
25   allocation?  You are aware she said that; correct?
```



 1                     A.   Once again, I don't have the exact
 2    words, but I recall her saying something very
 3    similar to that.
 4                     Q.   Sure.   Thank you.   And, in fact,
 5    sir, she is quite wrong in that reasoning, in your
 6    view; isn't that right?
 7                     A.   I believe she is wrong in that it
 8    is -- the method is so flawed, yes.
 9                     Q.   And in fact, sir, the IRS and the
10    CRA didn't disclose any breakdown of the basis for
11    the figure they hashed out; isn't that right?
12                     A.   That is correct.
13                     Q.   And nobody knows the basis for
14    that; correct?
15                     A.   Only the people that were in that
16    room, and I don't think any of those are around
17    here.
18                     Q.   And again, you and I may have a
19    debate about the EMEA position versus the Canadian
20    position.   But I think one thing we can agree on is
21    that the existence of the APA settlement between
22    the tax authorities does not mean for a moment that
23    the allocation key used for residual profits, being
24    the R&D spend allocation key, was unreasonable or
25    flawed; correct?

Neeson&Associates    W&F

1                    A.    With the exception that, as you

2     know, I believe that the look-back ought to be

3     adjusted.  And I think there are specific elements

4     in the RPSM which probably should be corrected.

5     But as a general principle, I would agree with you.

6                    Q.    Right.  And I certainly wasn't

7     suggesting that you are not qualifying the

8     look-back period for the purposes of your work.

9     But what I am focused on is that there is nothing

10    to be drawn from the APA settlement to indicate

11    that the allocation key was unreasonable or flawed;

12    right?

13                   A.    I agree with that 100 percent.

14                   Q.    Thank you, sir.  And, sir, just to

15    turn to some of your opinions in this case -- and

16    it may be important at the end of the day for the

17    Courts to determine if your opinion is helpful to

18    their legal task or not to know exactly what

19    context and what perspective you are bringing to

20    the table here.  So I want to ask you a few

21    questions around that.

22                   A.    Okay.

23                   Q.    Firstly, sir, I take it there is

24    no issue that all of your evidence is from your

25    perspective as a transfer pricing practitioner and

Neeson&Associates    W&F

```
 1   only from that perspective; correct?
 2                A.   As an economist and transfer
 3   pricing practitioner.
 4                Q.   Right.  And as you would put it,
 5   every page of your report is from that perspective;
 6   right?
 7                A.   I don't think that's a trick
 8   question, is it?
 9                Q.   I am sorry?
10                A.   I don't think that's a trick
11   question, is it?
12                Q.   No, no, no.
13                A.   Then the answer is yes.
14                Q.   I will tell you when it is a trick
15   question.
16                A.   Okay.  Thank you.
17                Q.   Remember, I am not Mr. Keefe.  I
18   may live to regret that.
19                Secondly, sir, just staying within the
20   perspective that you are bringing with your
21   opinions, obviously, it is correct to say that you
22   don't have any expertise with respect to the
23   allocation of assets in a bankruptcy; correct?
24                A.   That is correct.
25                Q.   And that's not what transfer
```



1    pricing does; right?

2              A.   I am not sure.  As I said

3    earlier -- as I think I said in my direct

4    yesterday, I believe that transfer pricing

5    principles should apply irrespective of whether it

6    is in insolvency or not, bankruptcy.  Because there

7    is still the division of income and assets that

8    come with it; and when they cross borders, when

9    those things cross borders, I don't know what else

10   you really could use other than transfer pricing.

11             Q.   But we don't find that anywhere in

12   transfer pricing guidance.  Like, for example, in

13   the OECD or in the Reg 482 in the US, we don't see

14   anything in there about applying transfer pricing

15   principles to allocation within a bankruptcy;

16   correct?

17             A.   There is nothing that specifically

18   references; that would be correct.  But it does

19   say -- but at least the US regulations are fairly

20   specific that it talks about the allocation of all

21   income.  It doesn't qualify it.

22             Q.   Right.  But you have never seen

23   anyone in transfer pricing apply transfer pricing

24   principles to the allocation exercise in a

25   bankruptcy; correct?



```
 1                    A.    That is correct.  I think the
 2   Nortel case is novel in many ways.
 3                    Q.    And obviously, that's certainly
 4   not an exercise that you have ever undertaken;
 5   correct?
 6                    A.    That is correct.
 7                    Q.    And, sir, just to elaborate, when
 8   you confirm that all of your opinions here are from
 9   the transfer pricing perspective -- I guess you
10   said the economist/transfer pricing perspective, to
11   be fair; right?
12                    A.    Yes.
13                    Q.    When you confirm that, what that,
14   in fact, means to you is that you are looking at
15   all this in the context of how the tax authorities
16   might view the proceeds of the sales; right?
17                    A.    When I say that, that is largely
18   correct.  I also said something in direct which
19   said that transfer pricing is unique in that it has
20   gotten the tax authorities around the world to rely
21   on a common set of principles for the allocation of
22   income and assets and the like.  And there is not
23   really many other -- is "fora" the appropriate
24   word?  "Forums," plural -- to do that.  So I think
25   that the principles, I said, do apply.
```

 Neeson & Associates    W&F

```
 1                    Q.   Well, in fact, sir, you are not
 2     actually opining to the effect that transfer
 3     pricing principles should apply.  You are saying
 4     that if the Court decides they should apply, here
 5     is what they are; right?
 6                    A.   I think that is correct.
 7                    Q.   Right.  And just to go back, sir,
 8     so we are very clear, when you bring us a
 9     perspective of your opinions as a transfer pricing
10     practitioner, it is all in the context of how tax
11     authorities might view the proceeds of the sales;
12     yes?
13                    A.   With regard to allocation?  With
14     regard to the allocation question?
15                    Q.   Yes.
16                    A.   I think that's appropriate.  But
17     my point really goes more broadly than that.
18     Because the tax authorities have spent a lot of
19     time thinking about these issues, I think that
20     perspective offers something of value to the Court.
21                    Q.   Right.  But the upshot of that is
22     that what you are saying effectively to these
23     Courts is that if they were to apply transfer
24     pricing principles to allocation, really they are
25     engaged in the process of figuring out what tax
```



```
 1   authorities might -- what view the tax authorities

 2   might take of the proceeds; correct?

 3                 A.   I think it is a different

 4   perspective.  I am saying something very different,

 5   I believe.  I am saying that there are people

 6   around the world, there are governments and

 7   institutions who have spent a great deal of time

 8   dealing with these issues; and I think what they

 9   have decided offers valuable insight to this Court.

10                 This Court will make the decision,

11   whatever it feels is most appropriate.  And -- but

12   I believe that the transfer pricing guidance offers

13   useful insights to the Court to consider.  However,

14   I suspect there are specific taxable events out of

15   this, since I think all of the estates continue to

16   file returns.  But I am not an expert in that in

17   the case of insolvency.

18                 Q.   And, in fact, sir, your belief is

19   that what tax authorities might do is relevant

20   because if the IP had been sold outside of

21   insolvency or pre-insolvency, then all the tax

22   authorities would have been involved.  That's the

23   basis for your belief that transfer pricing is

24   relevant; correct?

25                 A.   Yes, they would have been involved
```



```
 1   had the sale occurred before insolvency.
 2              Q.   Right.  So just sticking with
 3   that, sir, with that being your perspective, if we
 4   go down that road for a moment -- I know there's
 5   lots of roads to go down here, and some of them
 6   might even be the yellow brick road.  But let's
 7   just go down that road for a moment.
 8              What the tax authorities would do if
 9   the sales had occurred in a noninsolvency
10   environment is simply the five relevant tax
11   authorities here would sit down and hash it out;
12   correct?  That's the bottom line, isn't it, sir?
13              A.   Well, I have been involved in a --
14   I believe it was the first multilateral APA, which
15   was multiple institutions.  Would those five tax
16   authorities actually get together?  I don't know
17   how they would resolve it, but it would be resolved
18   somehow, you know, among the tax authorities.
19              Q.   Well, exactly, sir.  You would
20   say, who knows what is going to happen when the
21   five authorities sit down and try to hash it out;
22   correct?
23              A.   That is correct.
24              Q.   So if the Courts were to adopt
25   this route, sir, and go down this road, it is a
```

Neeson&Associates    W&F WILSON & PETZOLD LTD.

```
 1   pretty speculative endeavor, isn't it?
 2              A.   I disagree.  I think it is a very
 3   strong set of principles that the tax authorities
 4   would rely on.
 5              Q.   But you agree, sir --
 6              A.   Behind closed doors, we do not
 7   know what they would do.
 8              Q.   It would be just like the APA
 9   settlement in this case, sir:  It is a black box;
10   right?
11              A.   It could well be a black box.  But
12   once again, there are a set of principles that the
13   tax authorities would have at their disposal and I
14   believe would form a strong basis for the guidance
15   that would come out of it.
16              Q.   But it would be a pretty
17   spectacular task for the Courts here, sir, to sit
18   down and speculate what five tax authorities might
19   hash out in terms of the proceeds of sale, wouldn't
20   it?
21              A.   I disagree with that 100 percent.
22   I think the principles offer firm guidance.  What
23   exactly they would do, we don't know.  But the
24   Court can take a look at what the principles are to
25   see how that affects its judgment.
```



```
 1                      Q.   Well, sir, I suggest to you that

 2   if we go down your road, sir, the end of that road

 3   of the five tax authorities hashing it out is who

 4   knows what is going to happen there; correct?

 5                      THE CANADIAN COURT:  Hasn't he said

 6   that to you about five times in the last five

 7   minutes?

 8                      MR. SMITH:  Well, thank you, Your

 9   Honor.  But with respect, I wasn't sure from his

10   last answer if he was pulling back from that or

11   not.  But if that's clear, it is clear.

12                      THE WITNESS:  I am not sure of your

13   question.  We have gone around this so many times,

14   I am not sure what you are asking.

15                      MR. SMITH:  Thank you, Justice

16   Newbould.

17                      BY MR. SMITH:

18                      Q.   So, sir, we have now explored some

19   of the parameters of your opinion evidence.  Let's

20   turn to your particular mandate here.  And if we go

21   to your initial allocation report -- my apologies,

22   sir.  I have created a large pile here.

23                      Your mandate, sir, or your assignment,

24   I guess, as you call it, was set out on page 3 of

25   your report under Section 2.2; correct?
```



```
 1                    A.   I believe that's correct.  I don't
 2    have it in front of me.
 3                    Q.   Oh, you don't have it in front of
 4    you?  Do you have your report?
 5                    A.   No, I don't have my report in
 6    front of me.  I can see it on the screen.
 7                    Q.   Okay.  Well, why don't we work
 8    with that until Mr. Adler gets you your copy back.
 9                    Under 2.2 you tell us that you have
10    been asked to opine on certain issues in respect to
11    allocation; correct?
12                    A.   That is correct.
13                    Q.   And in particular, to provide
14    your:
15                    "opinion on the consistency of the
16                    allocation positions of the EMEA
17                    Debtors and Canadian Debtors with (a)
18                    established transfer pricing and
19                    arm's-length principles (b) prior
20                    representations . . . to various tax
21                    authorities . . . and (c) the business
22                    arrangements" -- there is a hard copy
23                    for you, sir -- "among the Nortel
24                    entities from 2001 forward"; correct?
25                    A.   Yes.
```



```
 1                    Q.   And just to be clear, looking at
 2   Item (a), sir, consistency with arm's-length and
 3   transfer pricing principles, that is something you
 4   certainly have never undertaken as a transfer
 5   pricing practitioner, determining the consistency
 6   of an allocation position with those; right?
 7                    A.   Of an allocation position?
 8                    Q.   Yes.
 9                    A.   I am not sure what -- of an
10   allocation position in a bankruptcy proceeding.  I
11   would say that that is correct.  I think I said
12   that many times.
13                    Q.   And that is certainly not
14   something that is part of transfer pricing
15   training; is that right?
16                    A.   What is not something that is part
17   of transfer pricing training?
18                    Q.   Determining the consistency of an
19   allocation position with transfer pricing
20   principles.
21                    A.   I disagree with that.  I said -- I
22   disagree with that.
23                    Q.   Well, certainly -- have you ever
24   been trained in that, sir?
25                    A.   Trained?  I have been trained in
```



```
 1    transfer pricing principles, and I believe there
 2    have been multiple times where I have used it in an
 3    allocation.
 4              Q.   Do you refer to a single one of
 5    those in your report, sir?
 6              A.   No, I don't.
 7              Q.   And none of those have been in the
 8    context of a bankruptcy, as you have said?
 9              A.   I have said that many times.  None
10    of that has been in the context of a bankruptcy.
11              Q.   So let's assume that the Courts
12    were to go down this road (a) here to look at the
13    consistency of the allocation positions with
14    transfer pricing and arm's-length principles.
15    Let's just assume that for the moment and look at a
16    couple of principles to see if you agree that they
17    are transfer pricing principles.
18              Firstly, sir, your perspective is that
19    the agreement of the parties is irrelevant to the
20    tax authorities from a transfer pricing
21    perspective; correct?
22              A.   I don't think I used the word
23    "irrelevant."  I think what I said is that -- and I
24    think I cited yesterday in my -- not yesterday --
25    Friday in my testimony that it is a point -- I mean
```

 Neeson&Associates    W&F

```
 1   that the legal agreement per se doesn't mean much

 2   relative to -- but that's one of the first things

 3   that authorities look at.  It provides a frame.

 4   And they look then at actual behavior.  And results

 5   are guided by actual behavior.

 6              Q.   All right, sir.  I am going to ask

 7   you to -- I am going to take you to your deposition

 8   at page 137.  Just while that is being handed

 9   around, sir, you recall your deposition on March 28

10   of this year; correct?

11              A.   In the broad sense, very well.  In

12   the specifics, no, not the details.

13              Q.   If you turn, sir, to page 137.

14              A.   I am on the screen with it.

15              Q.   Okay.  And I am sorry.  It is a

16   bit of an exchange, but I want you to have the

17   context.  137, line 4, the question is:

18              "Okay.  Are you suggesting that

19              the MRDA and all the various agreements

20              that were entered into among the Nortel

21              parties were designed to mislead the

22              tax authorities by not reflecting the

23              true agreement among those parties?"

24              Your answer:  "I never -- I

25              never -- I never said that they were
```



```
 1                 designed to mislead the tax

 2                 authorities.

 3                     "Question:  Right.  But are you

 4                 suggesting that any of the agreement

 5                 amongst the Nortel parties reflected

 6                 agreements that did not actually

 7                 reflect the true agreement among them?"

 8                 There is an objection.  And then you

 9      say:

10                     "What I am saying is the true

11                 agreement among them is irrelevant from

12                 the point of view of the tax authority.

13                 So this is what somebody set forth as

14                 an agreement on paper."

15                 And then the question by Mr. Keefe is,

16      he says "Right."  And you say:

17                     "And period.  I mean, that is --

18                 and the -- and the -- there are

19                 signatories to it.  All related parties

20                 signed it, so therefore, it sets forth,

21                 I presume, what the parties agreed to.

22                 That's not -- that's -- from transfer

23                 pricing, that is not the relevant

24                 question."

25                 Were you asked those questions and you
```



1    gave those answers, sir?

2              A.    Yes.

3              Q.    So, sir, the perspective you do

4    bring is, in fact, that the agreement of the

5    parties is not relevant to the tax authorities;

6    correct?

7              A.    I think the way you are casting

8    that is inappropriate, is wrong.  I think that the

9    fact that the parties entered into an RPSM is

10   appropriate, and the tax authorities would --

11   actually, the tax authorities would take a look to

12   see whether or not that was an appropriate method

13   to use, a best method to use.  But in fact, I think

14   they would come to it.

15             Would they sit and necessarily adopt

16   every provision in the thing?  No, they wouldn't,

17   because, once again, trying to prevent tax

18   avoidance and double taxation.  That's what the

19   idea is behind transfer pricing.

20             And they would look at the agreements

21   to see, you know, whether or not they complied with

22   that.  Actually, they would look at behavior, is

23   what they would do.  You know, the agreements would

24   be more incidental.  But they would certainly look

25   at the agreements as a starting point, a starting



```
 1  point, you know, amongst other facts and
 2  circumstances.
 3            Q.   All right.  So today you are not
 4  saying the agreements are relevant, but you are
 5  saying it is a starting point; correct?  That's
 6  what we just heard.
 7            A.   I am not saying that -- you say I
 8  am not saying they are relevant?
 9            MR. GOTTLIEB:  Justice Newbould, Judge
10  Gross, I think we need -- if there is going to be
11  this attempt at impeachment, you have to go back
12  and look at the answer that the witness gave on the
13  stand today, that Mr. Cooper gave on the stand
14  today, because it is completely consistent with the
15  transcript and completely consistent with this line
16  going down.  And I apologize.  I didn't rise the
17  first time, but if we are going to keep going down
18  this road, it really is not a proper attempt at
19  impeachment.
20            THE CANADIAN COURT:  When I am looking
21  at the transcript, there are some things that
22  haven't been put to the witness which are
23  consistent with what he said.  I agree with that,
24  Mr. Gottlieb.
25            MR. GOTTLIEB:  Thank you, Your Honor.
```



```
 1                    THE CANADIAN COURT:  At what point,
 2    Mr. Smith, is it appropriate to take the morning
 3    break?
 4                    MR. SMITH:  I am certainly happy to do
 5    it now, if it suits Your Honors.
 6                    THE CANADIAN COURT:  I am thinking
 7    about the reporters.
 8                    THE US COURT:  Yes, absolutely.  All
 9    right.  Why don't we take our 20-minute break now.
10    Thank you.
11    -- RECESS AT 10:35 A.M. --
12    -- UPON RESUMING AT 11:05 A.M. --
13                    THE US COURT:  Thank you, everyone.
14    Please be seated.  Dr. Cooper.
15                    Justice Newbould.  We can't hear you.
16    There is silence at your end.  No, we can't hear
17    you still.
18    -- OFF THE RECORD --
19                    THE US COURT:  You may proceed,
20    Mr. Smith.  Thank you.
21                    MR. SMITH:  Thanks, Judge Gross.
22                    BY MR. SMITH:
23                    Q.   Sir, I just wanted to turn for a
24    bit on the discussion you raised briefly in your
25    direct testimony about the OECD guidance on
```



```
 1    intangibles, which we see in their 2013 issue;

 2    correct?

 3                    A.    Correct.

 4                    Q.    And that is at Exhibit TR21600.

 5    And it is being handed up to you, sir, but maybe

 6    just by background, you can tell us if my

 7    understanding is correct.  This is essentially the

 8    work by the OECD to substantially expand on its

 9    discussion of intangibles as it appeared in its

10    2010 guidance.  Have I got that right?

11                    A.    Yes.

12                    Q.    And you referred, sir, to one

13    sentence out of paragraph 73 of this document in

14    your slide deck.  Do you recall that?

15                    A.    Yes.

16                    Q.    All right.  So if we could turn to

17    that.  It is page 21, I believe, paragraph 73.

18                    A.    Yes.

19                    Q.    And as I recall, what you wanted

20    to highlight to the Courts was that the OECD says:

21                    "The question of legal ownership

22                    is separate from the question of

23                    remuneration under the arm's-length

24                    principle."

25                    I don't think you cited that sentence,
```

 Neeson & Associates    W&F

1   but it precedes the sentence you did highlight;

2   correct?

3              A.   Yes, yes.

4              Q.   And the sentence you highlighted

5   says:

6                   "It is important to note that, for

7                   transfer pricing purposes, legal

8                   ownership of intangibles, by itself,

9                   does not confer any right ultimately to

10                  retain any return from exploiting the

11                  intangible that may initially accrue to

12                  the legal owner as a result of its

13                  legal or contractual right to exploit

14                  the intangible."

15                  And, sir, you didn't take us to the

16  paragraph above, but would you agree that it is

17  important to understand this statement in 73 that

18  when the OECD is talking about ownership, we need

19  to know ownership of what; correct?  It is very

20  important.

21             A.   Correct.  That is correct.

22             Q.   And in 72, we see the statement

23  that:

24                  "In identifying the legal owner of

25                  intangibles, an intangible and any



```
1               license relating to that intangible are
2               considered to be different intangibles
3               for transfer pricing purposes, each
4               having a different legal owner."
5               Correct?
6          A.   Yes, yes.
7          Q.   And that's a sound transfer
8    pricing principle; correct?
9          A.   Yes.
10         Q.   So if we go back to 73, the
11   statement that you highlighted that begins "It is
12   important to note that," that applies equally to
13   the owner of a license right; correct?  Ownership
14   of the license right itself does not confer any
15   right to retain any return from exploiting.  It
16   would equally apply to that, too, wouldn't it?
17         A.   I am not sure where you are going
18   with this line of questioning.
19         Q.   Well, all I am saying is that the
20   sentence you noted in 73 for the Courts on Friday
21   applies just as equally to the owner of a license
22   right; correct?
23         A.   I would think that the question
24   that I cited on Friday I think applies to really
25   any agreement, which is what I said before; that
```

 Neeson & Associates    W&F WILSON & PEYTON LTD.

1    transfer pricing looks beyond what is written on a

2    piece of paper to see what is actually done.

3              Q.   So when the OECD defines "owner of

4    intangibles" and says in 72 that an owner of the

5    intangible itself and an owner of the license

6    relating to the intangible are different owners,

7    that informs the statement in 73, doesn't it?  You

8    can't read one without the other?

9              A.   I think you can't -- I think you

10   have to read the entire guidelines all together.

11             Q.   And, sir, I would suggest to you

12   that what the discussion around Section 73 tells us

13   from a transfer pricing perspective is that it is

14   all about adequate compensation for contribution;

15   that, for example, an economic owner of a license

16   right has to be adequately compensated.  Correct?

17             A.   I agree with that.

18             Q.   And nowhere does it say that

19   compensation has to include a residual interest or

20   a true ownership type of interest in the ultimate

21   IP; correct?

22             A.   That's correct.

23             Q.   And, sir, if we go to the MRDA --

24   do you have that in front of you already?

25             A.   No, I don't.



 1                    Q.   Do we have copies?  It is Exhibit
 2      21003, sir.
 3                    A.   Which one do you want here?  Where
 4      are we going?
 5                    Q.   Right.  If you go to page 5, sir,
 6      if you are looking at the page numbers on the
 7      bottom.
 8                    A.   In the opening one?
 9                    Q.   Yes.  It is under Article 3, "R&D
10      activity payments."
11                    A.   Yes.
12                    Q.   And we see there, sir, that the
13      parties are explicit that:
14                         "For and as a consequence of the
15                         performance of R&D Activity, each
16                         Participant shall be entitled to
17                         receive a payment in an amount equal to
18                         the allocation determined under the
19                         RPSM . . . as the measure of the
20                         benefit to which it is entitled
21                         commensurate with its performance of,
22                         and contribution to, R&D activity."
23                         Correct?
24                    A.   Go back to that one again.  I was
25      looking at a different one.  Which --



1                  Q.   I am sorry.  Are you in Article 3?

2                  A.   I am in Article 3.

3                  Q.   It is (a).

4                  A.   (a), okay.  Yes.

5                  Q.   And so the parties, sir, have

6    there specified what each party is to get in return

7    for its performance of R&D activity; correct?

8                  A.   That's what that says.

9                  Q.   And that's exactly in keeping with

10   the OECD guidance that the parties have to be

11   compensated for their contribution; correct?

12                 A.   They have to be compensated

13   appropriately.  We don't know whether that -- I

14   would not -- you cannot say from this whether or

15   not that would be adequate compensation.

16                 Q.   Well, in fact, sir, in the

17   arm's-length world, we know that entities certainly

18   agree to conduct R&D activity for compensation that

19   does not include ownership of the resulting IP;

20   correct?

21                 A.   In the arm's-length world perform

22   R&D?  The only time -- if you are talking about a

23   contract R&D arrangement, they perform it -- it is

24   a service.

25                 Q.   Sure.



1                    A.    And so therefore, you get a

2     markup.  You do not get a right in it, but you are

3     compensated for your activity.

4                    Q.    Right.  You could be compensated

5     by a fee arrangement; right?

6                    A.    That's correct.

7                    Q.    And there is a spectrum, a range

8     of compensation for R&D activity in the

9     arm's-length world, isn't there?

10                   A.    That's correct.

11                   Q.    And it goes right from a simple

12    fee compensation right up to some kind of sharing

13    or co-ownership of the resulting IP; right?

14                   A.    It could go up there.

15                   Q.    Right.

16                   A.    To that end of the spectrum.

17                   Q.    And it could go anywhere in

18    between; correct?

19                   A.    Theoretically, it could go

20    anywhere in between.

21                   Q.    Right.  Well, in the arm's-length

22    world, for example, we know that entities agree to

23    perform R&D activity you said for a fee, but also

24    they might agree to do it for a share of the

25    profits that result; correct?



```
 1                    A.    That is correct.

 2                    Q.    Now you can put that aside for a

 3     moment, sir.  If you can just return to your

 4     allocation report, a question where you discuss at

 5     page 7.

 6                    A.    My opening report?

 7                    Q.    Yes, please.

 8                    A.    Yes.

 9                    Q.    Thank you.  And you say, sir, in

10     the bottom paragraph -- and this is a statement of

11     your conclusion.  You say that:

12                    "When the assets responsible for

13                    driving the residual profits are sold,

14                    according to transfer pricing and

15                    arm's-length principles, the sales

16                    proceeds should presumptively be

17                    allocated on the same basis that annual

18                    trading profits and losses from those

19                    assets were to have been allocated."

20                    Do you see that?

21                    A.    Yes, I do.

22                    Q.    Well, sir, I suggest to you then

23     that it is very important, if that's your

24     conclusion, to be clear on what the allocation

25     entitlement was with respect to those annual
```



1    trading profits and losses; right?  You would turn

2    to the parties' agreement; correct?

3                 A.   You would look at the parties'

4    agreement to understand what the terms were, yes.

5                 Q.   And you go on to say at the bottom

6    paragraph, sir, that:

7                      "The RPSM applies to both current

8                 and future profits generated on the IP,

9                 and a sale of the underlying IP is

10                nothing more than the monetization of

11                those future profits.  Since the RPSM

12                anticipates that the future profits

13                from the specified assets would be

14                allocated the same way as current

15                profits, then the same reasoning (and

16                resultant allocation) should

17                presumptively apply to the sales

18                proceeds as well."

19                Well, again, sir, if we are talking

20    about the monetization of those future profits, it

21    is important to be very precise about what the

22    entitlement to those profits was; correct?  What

23    the boundaries were around that entitlement,

24    because, that is all you're monetizing; right?

25                 A.   I am not sure what you are asking.



 1                   Q.   When you say, sir, that the sale

 2   of underlying IP is nothing more than the

 3   monetization of those future profits, you have to

 4   look very carefully as to what it is monetizing,

 5   what profits; correct?

 6                   A.   Okay.  Let me take that -- let me

 7   accept that for the moment until I see where you

 8   are going with it.

 9                   Q.   Well, if the entitlement under the

10   RPSM is to a share of operating profits, under this

11   theory you have got to be careful that what you are

12   talking about in terms of proceeds is monetization

13   of the operating profits; right?

14                   A.   I think you are interpreting this

15   too literally.  What I am really saying here is

16   that you would be entitled to the fair return to

17   your investment that you put into it.  And I say

18   presumptively you would do it on the same basis

19   that you allocated -- that the RPSM percentages

20   allowed otherwise, unless there was some good basis

21   to the contrary.

22                   Q.   So now you are saying that you are

23   entitled to a fair return as opposed to an

24   entitlement to the monetization of the future

25   profits?



 1                   A.   I would stand by what I said here.

 2    I was trying to add color to that.  But I stand by

 3    the statement that was written here.

 4                   Q.   If we look, sir, at the other

 5    question -- or sorry, the second question you posed

 6    to yourself about whether the allocation positions

 7    of EMEA and Canada are consistent with what was

 8    represented to the tax authorities, there is

 9    certainly no question in your mind that the MRDA

10    was given to the tax authorities; correct?

11                   A.   Well after the fact.  I mean, the

12    tax authorities were in discussion with this, we

13    know, from early -- somewhere in early 2002, and

14    the MRDA was not given to them until -- certainly

15    until late '04.

16                   Q.   Sure.

17                   A.   But, yes, it was --

18                   Q.   And one thing we know, sir, and if

19    you want, we can go there.  But one thing we know

20    that the MRDA provides is that if a party left the

21    RPS system, it had to be compensated for the fair

22    market value of its license; correct?

23                   A.   Yes.

24                   Q.   And I know -- and I am not

25    suggesting to you that that provision applies



```
 1   exactly to the allocation process here.  I am not
 2   taking you there.  But just the very existence of
 3   that, sir, would clearly suggest to the tax
 4   authorities that the licensees did not have a true
 5   ownership interest in the IP; correct?  Otherwise,
 6   they would have had to have been compensated for
 7   that; right?
 8              A.   I believe that clause is in there
 9   for a different reason, but that's -- you know,
10   I --
11              Q.   All right.  But you are all about
12   here, sir, representations to tax authorities;
13   right?
14              A.   Yes, yes.
15              Q.   And any intelligent tax authority
16   is going to look at that and infer that there is no
17   ownership right by a licensee in the IP itself;
18   correct?
19              A.   I disagree with that.
20              Q.   Well, then there would be a
21   serious undercompensation if a party left the RPS
22   system; correct?
23              A.   I disagree with that.
24              Q.   Well, all they are entitled to is
25   the fair market value of their license interest;
```



```
 1   right?
 2               A.   That's what that clause says.
 3               Q.   Right.  And that's different from
 4   the fair market value of the IP itself; correct?
 5               A.   It could be.  It likely would be
 6   different.  That's what that clause says.
 7               Q.   And I know, sir, in terms of tax
 8   representations, I already took you to the cover
 9   letters in 2002.  I would just like to take you
10   quickly to Trial Exhibit 43733.
11               MR. SMITH:  Do we have copies for the
12   witness, a hard copy?
13               I think we are using a different -- it
14   is the same document with a different exhibit
15   number, sir.  I am sorry, Your Honor.  It is 21031.
16               BY MR. SMITH:
17               Q.   It is a letter of April 26, 2004,
18   to the Internal Revenue Service, particularly
19   Thomas Ralph.  Now, he is the leader of the APA
20   program at that time; correct?
21               A.   I do not believe that is right.  I
22   believe he was a team leader inside, but I can't
23   remember what Tom was doing quite at that point.
24               Q.   All right.  Fair enough.
25               And if you could, sir, turn to page 4
```

Neeson&Associates   W&F

1    of that letter.  And you understand, sir, that this

2    is a response to particular questions from the tax

3    authorities; right?  This is part of the APA

4    process?

5              A.   Yes.  Yes, it is.

6              Q.   And at the bottom of page 4, sir,

7    we see the question or the request:

8                   "Please describe the legal and tax

9                   consequences of terminating the cost

10                  sharing arrangement.  For example,

11                  please provide the amount of any

12                  buy-out payments paid or if none were

13                  paid please explain why not."

14                  And the answer from Nortel, sir, is:

15                  "As you are aware, Nortel applied

16                  a research and development cost sharing

17                  arrangement . . . for the allocation of

18                  R&D expenses among various Nortel

19                  entities.  The R&D CSA was established

20                  prior to the R&D Advanced Pricing

21                  Agreement . . . between Northern

22                  Telecom Inc. (the predecessor

23                  corporation to Nortel Networks Inc.)

24                  and the IRS, but was then incorporated

25                  by reference into the APA.  The APA was



1    effective for the fiscal 1992 to 1999

2    years (inclusive), and Nortel applied

3    the R&D CSA in practice until December

4    31, 2000."

5    And then the next paragraph says that:

6         "Thereafter, as requested by the

7    IRS and CCRA, Nortel prepared a new APA

8    request employing the residual

9    profit-split methodology . . . as its

10   primary transfer pricing method.

11   Accordingly, Nortel applied the RPSM

12   after the R&D CSA was terminated.

13        "Under the R&D CSA, each

14   participant obtained certain rights

15   with respect to its share of the

16   intangibles developed under the CSA.

17   Specifically, a CSA participant

18   obtained a royalty-free license to use

19   the technology developed under the CSA.

20   With the CSA termination, such former

21   participants are deemed to have

22   acquired a fully paid-up license

23   permitting the former participant to

24   continue to exercise the rights it

25   obtained under the CSA.  As such, no



 1              buy-out payment is necessary because

 2              each former CSA participant continues

 3              to own the rights it acquired during

 4              the CSA upon CSA termination.

 5                   "In addition, under the RPSM, each

 6              former CSA participant receives

 7              compensation for such rights through

 8              the application of the capitalized R&D

 9              factor to attribute residual intangible

10              profits to the former CSA

11              participants."

12              Did you consider that representation,

13    sir, in your work here?

14              A.   With regard to the CSA?  Yes, I --

15              Q.   This entire representation.

16              A.   Yes, this was something I saw.

17              Q.   And unless I am missing it, sir,

18    there is nothing that suggests in here that each

19    participant obtained residual ownership right in

20    the IP; correct?

21              A.   A cost-sharing agreement is

22    fundamentally different than a residual profit

23    split, and this is talking about the cost-sharing

24    arrangement.  And in that case you have -- the

25    cost-sharing arrangement is defined exclusively to



1   your having the rights to exploit the intangible in

2   your territory and you pay costs, then, according

3   to what benefits you get.

4              Q.   Right.  You have your license

5   rights under the CSA arrangement; correct?

6              A.   Yes.

7              Q.   Right.  And this is saying exactly

8   that's what is being continued under the RPSM;

9   correct?

10             A.   Well, I mean, if that's the way

11  you want to interpret it, you can interpret it.

12  What are you saying that --

13             Q.   Are you aware of any

14  representation to the tax authority that would

15  qualify this representation?

16             A.   What representation are you

17  referring to here?

18             Q.   The whole answer under Item 5.

19             A.   The answer under Item 5, as I see

20  it, addresses two things:  You know, what was the

21  arrangement under the CSA and what do they get when

22  they transition into the RPSM after that.

23             Q.   Right.  And, sir --

24             A.   Go ahead.  Never mind.

25             Q.   I was just going to ask you, sir,


Neeson & Associates    W&P

 1   just turning quickly to Part C of your task here,

 2   to look at the consistency of allocation positions

 3   with business arrangements of the parties, I am

 4   going to ask you to take a look, sir, at Exhibit

 5   31622, which we will provide to you in a moment.

 6              We have already looked at the MOU that

 7   the parties signed in December of '08; correct?

 8              A.   Yes.

 9              Q.   And if you take a look at this

10   document, sir, which is report of Alan Bloom and

11   others, January 14, 2009, was this a document that

12   was brought to your attention to do your analysis

13   of consistency with business arrangements?

14              A.   I believe so.

15              Q.   And, sir, you will see at page 6,

16   in Item 3.3, the statement:

17              "Secondly, all intellectual

18              property rights belong to NNL, the

19              Canadian company, irrespective of which

20              Group company originally carried out

21              the research and development activity

22              that generated the IP.  A pool of

23              operating profits generated by the

24              Group, after allowing for a level of

25              operating profit for each company, is



```
 1                    divided amongst the Nortel Group

 2                    companies that contribute to research

 3                    and development costs.  These companies

 4                    are known as Residual Profit Sharing

 5                    Companies. . . . There are three RPS

 6                    companies in the region being NNUK, NN

 7                    France and NN Ireland."

 8                    You made no reference to this document

 9      in your report, did you, sir?

10                    A.   No.

11                    MR. SMITH:  Judge Gross, thank you very

12      much.  Thank you, Justice Newbould.  Dr. Cooper,

13      thank you.

14                    THE US COURT:  Thank you, Mr. Smith.

15                    Yes, Mr. Luft.

16      -- OFF THE RECORD --

17                    THE US COURT:  Mr. Luft, whenever you

18      are ready, sir.

19                    MR. LUFT:  Thank you, Your Honor.  Good

20      morning, Judge Gross.  Good morning, Justice

21      Newbould.  My name is Avi Luft from Cleary Gottlieb

22      Steen & Hamilton, and I represent the US debtor.

23      CROSS-EXAMINATION BY MR. LUFT:

24                    Q.   Good morning, Dr. Cooper.  How are

25      you?
```



```
1                    A.    Good morning.

2                    Q.    I have a few questions I want to

3      ask you.  I hope to get a better understanding of

4      some of your opinions; okay?

5                    A.    Yes.

6                    Q.    Now, I want to go back to some of

7      your testimony that you gave on Friday, which was

8      in your direct testimony, to start; okay?

9                    A.    Okay.

10                   Q.    Now, you spoke about two different

11     types of transfer pricing models being used at

12     Nortel; right?

13                   A.    Yes.

14                   Q.    And those were the CSA, which was

15     in effect for R&D through the year 2000 and the

16     RPSM, which was in effect from 2001 going forward.

17                   A.    Correct.

18                   Q.    And I believe the way you

19     described those two methods was that they were flip

20     images of one another.

21                   A.    I think I said "mirror," but I may

22     have said "flip" also, since I see them both ways.

23                   Q.    I think you did both, but --

24                   A.    Probably.

25                   Q.    -- you meant them to be the same;
```



 1    correct?

 2                    A.    Yes.

 3                    Q.    And the reason you described them

 4    as flip images are, if I am understanding it

 5    correctly, is that under the CSA, proportionate

 6    profits dictate proportionate R&D expenditure,

 7    whereas under the RPS, an entity's proportionate

 8    R&D expenditure dictates its profits?

 9                    A.    Exactly right.

10                    Q.    Is that fair?

11                    A.    Exactly right.

12                    Q.    So in practical terms, if under a

13    CSA I receive 70 percent of the benefit from the

14    R&D, then I am responsible for 70 percent of the

15    cost?

16                    A.    That's correct.

17                    Q.    Whereas under the RPS, if I spend

18    70 percent of the cost of R&D, then I will expect

19    70 percent of the profits.

20                    A.    Residual profit, yes.

21                    Q.    Residual profit.  Thank you,

22    Doctor.  That is correct.

23                    Now, under both the cost-sharing

24    agreement and the RPSM method, however, you will

25    agree that one entity can hold legal title while



```
 1   another entity can have beneficial or economic

 2   ownership?

 3               A.   Not only is that correct; that's

 4   common.

 5               Q.   And Dr. Cooper, in your report you

 6   refer to beneficial ownership and economic

 7   ownership synonymously.

 8               A.   Synonymously, yes.

 9               Q.   So if I use one or the other, we

10   will understand that you mean both?

11               A.   Exactly.

12               Q.   Okay.  Terrific.

13               Now, as Mr. Smith brought up earlier

14   today, the United States Debtor has a different

15   view on allocation from the EMEA Debtor and has a

16   different view on economic ownership than the EMEA

17   Debtor; right?

18               A.   Correct.

19               Q.   And I am not here to argue with

20   you which one is right or wrong.  But it is -- your

21   opinions reflect the view of the EMEA Debtor, and

22   those are the ones I am going to be asking you

23   about.

24               A.   Fair enough.

25               Q.   Okay.  Now, I believe you told us
```



1   on Friday that, in your view, beneficial ownership

2   was over the portion of the IP that an entity paid

3   for.  So if it paid for half of the R&D, then it

4   had beneficial ownership of half the R&D.

5              A.   Correct.

6              Q.   And under the CSA, whatever R&D a

7   participant paid --

8              A.   I would have said actually half

9   the benefits that arise from, you know, from the

10  R&D.

11             Q.   Okay.  Thank you for that

12  clarification.

13             And under the CSA, whatever R&D a

14  participant pays for constitutes its economic

15  ownership?

16             A.   I would agree.

17             Q.   And that could be money that an

18  entity expends on R&D it conducts in its own

19  territory; right?

20             A.   Yes.

21             Q.   And it could include R&D that an

22  entity pays for to an independent contractor to do

23  R&D for it?

24             A.   I would think so.

25             Q.   And it could include R&D that a



 1    counterparty to a CSA performs but for which the

 2    first entity received the benefit and thus makes a

 3    transfer pricing adjustment?

 4                 A.    Correct.

 5                 Q.    So basically, whoever pays for the

 6    R&D, regardless of whether they do it or not, would

 7    have the economic ownership for the resulting IP

 8    proportionate to the amount it paid?

 9                 A.    That's correct.

10                 Q.    Now, if we could shift for a

11    second over to the RPSM, for each of the integrated

12    entities, economic or beneficial ownership in your

13    view is based on how much they spent on R&D created

14    in their territory?

15                 A.    I don't think it would actually

16    have to be in their territory.  I mean, I can

17    imagine a circumstance where they might have -- I

18    don't think they did, but they could have engaged

19    another unrelated party, for example, that they

20    paid for that was in physically another territory.

21    I don't think that was common, but I think that

22    would be possible.

23                 Q.    So the key, again, would be what

24    they paid for?

25                 A.    What they paid for.



```
 1                    Q.   And I believe it is the view that

 2     you expressed in your reports that transfer pricing

 3     principles call for the allocation of the proceeds

 4     from the sales of the line of business and the

 5     Rockstar transaction relating to R&D according to

 6     that economic ownership that we have just

 7     discussed.

 8                    A.   Yes.

 9                    Q.   So effectively, if you paid for

10     the R&D, that's your economic ownership, and that's

11     what you should be allocated?

12                    A.   Recognizing that one has to deal

13     with that over -- the over-time issue.  I mean, if

14     the R&D percentages stayed constant over time,

15     never changed, then that would be accurate.

16     Otherwise, you have to take into account the time

17     dimension.

18                    Q.   And I want to talk to you for a

19     second about that, Dr. Cooper.  In fact, I think

20     that's why you reference Dr. Malackowski in your

21     report -- or Mr. Malackowski in your report.

22                    A.   That's correct.

23                    Q.   And it was Mr. Malackowski's

24     opinion that, in fact -- he talks about useful life

25     and that it is an important consideration, in your
```



```
 1    view, when considering how much each person paid,

 2    because if you don't account for the full useful

 3    life of the R&D, then you may end up shortchanging

 4    some of the participants who paid for some of the

 5    older R&D.

 6             A.    That's correct.

 7             Q.    And I believe Mr. Malackowski's

 8    opinion, which you have put in your report, is, in

 9    fact, much of the R&D that was sold in the Rockstar

10    and the line of business, in fact, was older than

11    something that would have been created during the

12    five-year look-back.

13             A.    That's my understanding.

14             Q.    And you thought that is an

15    important fact for your view of the transfer

16    pricing analysis?

17             A.    That's correct.

18             Q.    And I think you talked to us on

19    Friday about deep dives that occur by the tax

20    authorities when there are major taxable events.

21             A.    Yes.

22             Q.    And I think, if I understood your

23    testimony, you were saying that the sales of the

24    lines of business and of the Rockstar portfolio

25    were the types of significant events that would
```



1    require tax authorities to do a deep dive and to

2    really look at what the real economic ownership is.

3               A.   That's correct.

4               Q.   And in your view, that economic

5    ownership would be based on the parties' spend on

6    R&D over the extended period of time reflected in

7    Dr. Malackowski's report -- Mr. Malackowski's

8    report?

9               A.   Correct.  Something I remember, as

10   I said in there, I certainly looked at his report.

11   I mean, I got an understanding, broad

12   understanding.  I cannot vouch to particular,

13   specific conclusions he raised, because I am not

14   privy to all of his calculations and so forth.  But

15   as a general matter, the answer to the question is

16   yes.

17               Q.   Dr. Cooper, consistent with that,

18   do you have a copy of your opening report in front

19   of you?

20               A.   Yes.

21               Q.   I am just going to ask you to turn

22   to page --

23               A.   Just a second.  I have to be sure

24   I have the right one.  Yes.

25               Q.   Take your time.  Whenever you are



1   ready.

2                    A.    Page what?

3                    Q.    31, carrying over to 32.

4                    A.    Yes.

5                    Q.    And I am just looking at the last

6   sentence on the bottom of the page that carries

7   over.  You wrote:

8                          "In that sale, as illustrated in

9                          the Malackowski report, a significant

10                         portion of the more valuable (high

11                         interest) patents sold in 2011 were

12                         actually filed before 2006."

13                   A.    Correct.

14                   Q.    Correct?  And you have a citation

15  to Mr. Malackowski's report, Section 11.13, Figure

16  1 for that proposition?

17                   A.    Correct.

18                   Q.    Can I ask that we just bring up

19  that figure from Mr. Malackowski's report so that

20  we can look at it together.

21                   A.    I think we need to go back.  We

22  are not there yet.

23                   Q.    I think it is on page 41 of

24  Mr. Malackowski's opening report, if that helps.

25                   A.    Yes, that one.



```
 1                 Q.   Figure 1.  Dr. Cooper, does that
 2   look like the chart you were referring to?
 3                 A.   Yes.  Yes, that's the chart I was
 4   referring to.  I believe it is the chart I was
 5   referring to.
 6                 Q.   And I will represent to you that I
 7   believe it -- it certainly is what I intend for you
 8   to be looking at.
 9                 And before we look specifically at the
10   chart, I wonder if you recalled that
11   Mr. Malackowski in his opening report also noted
12   that when considering the appropriate time line for
13   looking at IP, that the creation of Nortel's IP
14   should be measured based on R&D spending the year
15   before the filing, effectively, because there was a
16   one-year lag between the amount of money you spent
17   on R&D and then the patent actually being filed.
18   Do you recall that?
19                 A.   I don't recall that specific.  I
20   think I remember him talking about that principle,
21   but I did not focus on that.
22                 Q.   Okay.  And if we look at the chart
23   that you cite to --
24                 A.   Yes.
25                 Q.   -- which is titled "Priority Year
```



1    Distribution for Residual Patents and High-Interest

2    Residual Patents;" right?

3                    A.    Yes.

4                    Q.    And the high-interest are the ones

5    that you referred to as "most valuable"?

6                    A.    Yes.

7                    Q.    By the way, did you hear or read

8    any of Mr. Malackowski's testimony?

9                    A.    I saw a little bit of his -- I saw

10   a little bit of his rebuttal.  I am trying to

11   remember if I saw any of his presentation

12   pertaining to high-interest.  I remember him

13   talking a little bit about it, but I did not see a

14   lot of it.

15                   Q.    And specifically, what we see is a

16   chart going from 1987 through 2011, where the bar

17   in yellow represents the high-interest patents;

18   right?

19                   A.    Correct.

20                   Q.    And the reason I asked is if we

21   can pull up what was slide 22 of Mr. Malackowski's

22   deck, which I think will graphically help us

23   understand what we just looked at.  And I will

24   represent to you, Dr. Cooper, that the data

25   contained in this slide from Mr. Malackowski is the



```
 1  same data reflected in his Table 1 that you cited

 2  to.

 3              A.   Okay.

 4              Q.   Okay?  And again, this is the

 5  high-interest patents that we are only looking at.

 6  And if we look at the dotted line --

 7              THE CANADIAN COURT:  What page of his

 8  report is that in?

 9              MR. LUFT:  This is page 22 of his

10  demonstrative deck, Your Honor.

11              THE CANADIAN COURT:  Oh.

12              THE WITNESS:  It is not in his report.

13  It is what he used.

14              MR. LUFT:  I will represent that we

15  checked that the data is the same as Table 1.  But

16  I think this is just graphically a little easier to

17  follow.

18              THE CANADIAN COURT:  All right.

19              BY MR. LUFT:

20              Q.   Dr. Cooper, have you had a chance

21  to look at the slide?

22              A.   Yes.

23              Q.   And I think if we look at the

24  dotted line, it makes the same point that you were

25  making in the line we read from your report:  That
```



1   the expense for almost all the high-interest

2   patents occurred prior to 2006.  Do you see that?

3                  A.   Yes.

4                  Q.   And using the one-year time lag,

5   that would mean that that's all R&D expense that

6   occurred from 2005 going back.

7                  A.   Correct, if you used -- under that

8   assumption, yes.

9                  Q.   Right.  And you thought that was

10  an important point.  And the reason you put that in

11  your report is to reflect this idea that you do not

12  want to shortchange the parties that paid for R&D

13  expense in a prior time period?

14                 A.   Yes.

15                 Q.   And that the parties' proportion

16  of R&D expense changed over time, so it is

17  important to look at what they actually paid during

18  each time period?

19                 A.   That's correct.

20                 Q.   Now, if we were to look at 2001 on

21  this chart, correct -- that would be -- these are

22  all the patents filed in 2001.

23                 A.   Yes.

24                 Q.   Which, if we take the one-year lag

25  presumption, means that this is all R&D expense



```
 1    incurred from 2000 going back; right?

 2                    A.    Correct.

 3                    Q.    And 2000 going back would all be

 4    R&D expense incurred under the CSA; correct?

 5                    A.    Yes.

 6                    Q.    I want to ask you about something

 7    else you talked about on Friday.  I believe you

 8    testified that the key in any method comes from how

 9    you implement it.  Do you recall that?

10                    A.    Yes.  Something to that effect,

11    yes.

12                    Q.    And you would agree with me that

13    Nortel's implementation of its RPSM was flawed?

14                    A.    Yes.

15                    Q.    Dr. Cooper, I just want to follow

16    up now on a couple things that came up today.  Do

17    you still have Exhibit TR22122?  These are the

18    letters from Nortel Networks to the tax authorities

19    that Mr. Smith --

20                    A.    Are you talking about the last one

21    I looked at?

22                    Q.    I don't believe so.  I believe it

23    was a little bit earlier.  It was the March 27,

24    2002, letter on top to the UK authority.  Do you

25    see that?
```



```
 1                    A.   March 22 is on top?

 2                    Q.   It is a March 27th letter.

 3                    A.   Oh, March 27.  So you said 22122?

 4                    Q.   Correct.

 5                    A.   Okay, yes.

 6                    Q.   I just specifically wanted to ask

 7     you, if you turn a couple pages in, Mr. Smith

 8     directed you to a letter to the IRS.

 9                    A.   Yes.

10                    Q.   And he said that it was a letter

11     from NNI.  Do you recall that?

12                    A.   Yes.

13                    Q.   Now, in fact, if we look at the

14     letter, it is from Nortel Networks Ltd., the

15     Canadian entity.

16                    A.   Actually, you are correct.

17                    THE CANADIAN COURT:  Which letter are

18     you talking about?  Were there not three of them in

19     there?

20                    MR. LUFT:  There are, Your Honor.  I

21     was referring to the one that is stapled in the

22     middle to the IRS.  But I think as Dr. Cooper will

23     confirm for me --

24                    THE WITNESS:  Yes.

25                    MR. LUFT:  -- in fact, all three
```



```
 1    letters are from Kriss Bush of NNL to the different

 2    taxing authorities, not, in fact, from NNUK or NNI.

 3                  THE WITNESS:  That is correct.

 4                  BY MR. LUFT:

 5                  Q.   And Dr. Cooper, I wanted to talk

 6    to you about one more topic.  Mr. Smith raised the

 7    topic of windfalls with you this morning.

 8                  A.   Yes, yes.

 9                  Q.   And specifically, he asked you

10    about potential windfalls to the United States.  Do

11    you recall that?

12                  A.   Yes.

13                  Q.   He did not ask you about any

14    potential windfall to Canada, did he?

15                  A.   No.

16                  Q.   And if the Canadian Debtors'

17    allocation position was accepted, in your view that

18    would result in, I believe you referred to as a

19    huge windfall, because such an allocation would

20    benefit the Canadian Debtors far beyond what they

21    contributed to the creation of IP; correct?

22                  A.   Correct.

23                  Q.   And there would also be a huge

24    windfall that would be far beyond what the Canadian

25    Debtors would have reasonably expected to receive
```



1    based on the integrated entities pre-insolvency's

2    economic arrangements; right?

3                    A.    Correct.

4                    Q.    And the result of the Canadian

5    Debtors' position would be a transfer of wealth

6    from NNI and EMEA to the Canadian Debtor without

7    any payment by the Canadian Debtor; correct?

8                    A.    Correct.

9                    MR. LUFT:  Dr. Cooper, thank you for

10   your time.  Those are my questions as of now.

11                   THE US COURT:  Thank you, Mr. Luft.

12                   MR. LUFT:  Thank you, Your Honors.

13                   THE US COURT:  Mr. Adler.

14                   MR. ADLER:  Something has been spilled

15   on the podium here, and I do have papers I need --

16   we need to take just a minute to wipe this off.

17                   THE WITNESS:  Yes.  Yes, let's take a

18   couple minutes here.  Take your time.

19   -- OFF THE RECORD --

20                   MR. ADLER:  Thank you, Your Honors.

21   RE-EXAMINATION/RE-DIRECT BY MR. ADLER:

22                   Q.    And, Dr. Cooper, I just have a few

23   questions.  First of all, let's start with the

24   document that Mr. Luft was just having you look at.

25   It is 22122.



```
 1                    A.    Yes.

 2                    Q.    Now, this morning Mr. Smith put to

 3       you the idea that the RPSM that was designed by

 4       Horst Frisch and that was submitted to the tax

 5       authorities was, in fact, a split of profits from

 6       product sales, and he asked you to agree to that.

 7       And then he took you with several statements.  We

 8       will start with the first one on the front page of

 9       this document 22122, which says, in the second

10       paragraph:

11                          "The transfer pricing methodology

12                          to be used in the global sharing of

13                          profits and losses attributable to the

14                          manufacture, sale and distribution of

15                          tangible inventory property" --

16                    A.    Excuse me, Mr. Adler.  We are

17       looking at which one now?

18                    Q.    It is the first page of 22122.

19                    A.    Right.

20                    Q.    And it is the second paragraph

21       there.  And it is the sentence that says, in

22       essence -- it ends with that they are sharing

23       profits and losses attributable, dot, dot, dot, to

24       products that had been produced "utilizing

25       technology developed by Nortel Networks
```



1    affiliates." So it is focused on products, I

2    believe.

3              And then Mr. Smith asked you whether

4    you had seen any statement which qualifies that

5    statement regarding profits.  And I would like to

6    direct your attention now to the next page of the

7    same exhibit, in the third paragraph on the page,

8    the middle sentence, which says:

9                   "Nortel is proposing to use a

10                  global residual profit-split

11                  methodology, the RPS methodology . . .

12                  to cover the tangible property and the

13                  global sharing of profits and losses

14                  attributable to the rights associated

15                  with Nortel Networks Technology for the

16                  term of this APA."

17             Is that a qualification on the notion

18   that the parties were only sharing profits that

19   arose from selling products that used Nortel

20   technology?

21             A.   I am not sure which one we are

22   asking there.

23             Q.   It is highlighted on the screen as

24   well.  It is the sentence that -- it says, they are

25   sharing "profits and losses attributable to the



1    rights associated with Nortel Networks technology."

2    And I would note that that is not limited to

3    products.

4              A.   Yes, I would agree with that.

5              Q.   Now let's talk for a minute about

6    the residual profit-split method in general.  We

7    discussed on Friday, you testified Friday, that the

8    key in a residual profit split is identifying what

9    the profit driver of the company is.

10             A.   That's correct.

11             Q.   Now, once you do that, do the

12   companies that participate only share the profits

13   that are attributable to the profit driver?

14             A.   No.

15             Q.   What do they share?

16             A.   Well, there is the entire pool, a

17   big proposition of which can be the routine return.

18   And then they get -- they share profits

19   attributable to the -- the residual is shared

20   according to the allocation key.

21             Q.   So it is not limited to any

22   particular activity.  It is actually the profits of

23   the entire business, isn't it?

24             A.   The profits of the entire

25   business; that's correct.



1                    Q.   Now, Mr. Luft was asking you some

2     questions about the look-back period and the

3     different periods that were used for various

4     purposes.  I just want to clarify that for a

5     moment.

6                    Were you as part of your work asked to

7     review the work Nortel performed to support its

8     look-back period, the five-year look-back period in

9     particular?

10                   A.   Was I specifically asked to

11    look -- I mean, I am not -- I mean, I was asked to

12    look at whether the implementation of Nortel's

13    RPSM, that the economic circumstances, what the

14    consequences were.  And I think that's a derivative

15    to look at, but not to -- I did not look

16    specifically at the look-back period.  It was not

17    a --

18                   Q.   Okay.

19                   A.   I am sorry if I am being a little

20    fuzzy on that.

21                   Q.   No, that's okay.

22                   So did you offer an opinion or were you

23    asked to offer an opinion on whether the five-year

24    look-back was reasonable for use in the annual tax

25    filings?



```
1                    A.   I believe indirectly, not
2    specifically.  But I believe indirectly what I was
3    asked to look at.
4                    I believe indirectly that I was asked
5    to look at the five-year look-back and the
6    reasonableness of it.
7                    Q.   I want to clarify a couple of
8    points in relation to the relationship between the
9    RPS methodology and the MRDA, the written document.
10   First of all, what is the relationship between
11   those two things, the RPSM and the MRDA?
12                   A.   The MRDA is a written document
13   that tries to memorialize what is going on inside
14   the -- with the RPS.  The regulations both -- for
15   example, the Section 42 regulations in the United
16   States as well as the OECD guidelines, present a
17   methodology for what broadly an RPS is.  And
18   then -- and the MRDA, I believe, is a
19   memorialization of what was set out only with
20   regard to the operating profit, not beyond that.
21   The MRDA did not go beyond the operating profit in
22   its specifics.
23                   Its whereas clause, though, talks
24   that -- says -- and it is the second or third or
25   fourth one, somewhere on that first page, says that
```

 Neeson & Associates   W&F

```
 1   the participating entities, the RPEs, will be
 2   entitled to all the upside and all of the downside
 3   risk.  So that suggests to me that they were
 4   contemplating that it belonged, that it went beyond
 5   operating profit, but the MRDA itself specifically
 6   only addresses the operating profit.
 7                Q.   So this morning I think there was
 8   a question about whether you were adding rights to
 9   the MRDA.  Could you explain what you might have
10   meant about that.
11                A.   Oh, I am not sure -- I mean, I
12   don't believe that I am adding any rights to the --
13   the MRDA is what it is.  I can't add or subtract
14   from it.  All I can do is comment on it.  So I
15   found that line of questioning kind of confusing.
16                Q.   Are you trying to vary the terms
17   of the MRDA?
18                A.   I can't do anything with the MRDA.
19   The MRDA is as it was written back then, and so I
20   can't --
21                In terms of my analysis, can I consider
22   what other alternatives there might be?  The answer
23   is yes.
24                Q.   Now, we have talked a lot about
25   beneficial ownership, and you have stated your
```



1    opinion about the beneficial ownership that arises

2    for the RPEs entities here.

3                    A.    Yes.

4                    Q.    In your view, what is the source

5    of that beneficial ownership interest?  Does it

6    come from the terms of the MRDA?

7                    A.    It comes from the concept

8    underlying the RPS.  The MRDA simply tries to

9    memorialize that, but it does not come from the

10    MRDA itself.

11                    Q.    And you have testified that the

12    beneficial ownership that is gained is based on the

13    percentage of R&D spending that each of the entity

14    does, obviously, for certain periods and so on.  Is

15    that based on the actual R&D costs that are borne

16    by each entity?

17                    A.    Yes.  And is that ownership

18    interest affected under the RPS methodology by the

19    annual payments, the true-up payments that are done

20    at the end of the year?

21                    A.    No.  I mean, what they spend on

22    R&D is what they spend on R&D.

23                    Q.    Now, we discussed briefly what the

24    OECD says about beneficial ownership created in

25    this type of structure.  Could you just summarize



```
 1   what the OECD tells us as to who should receive the
 2   economic benefits of intangibles in an RPS-type
 3   methodology.
 4                   A.   The benefits ought to go to the
 5   creators of that RPS, which in this case were the
 6   five RPEs.  So the creators, and they created in
 7   the form -- and the amount they spend on R&D is our
 8   measure of the creation and who gets the beneficial
 9   ownership as a result.
10                   Q.   Now, Mr. Smith took you this
11   morning to Article 3 of the MRDA, which discusses
12   the profit split and the fact that it is part of
13   the compensation that they are going to get for
14   performing R&D, and basically, it says that for
15   performing R&D, they are going to get a share of
16   operating profits.  And Mr. Smith suggested to you
17   that that was the entirety of what the RPS entities
18   are entitled to as a result of performing R&D
19   activity.
20                   Would the taxing, the revenue
21   authorities accept that only operating profit is
22   what the RPS entities are entitled to as a result
23   of performing R&D activity?
24                   A.   No, they would not.  No, I believe
25   they would not.
```



```
 1                  Q.   What else would they expect?

 2                  A.   They would expect their share

 3      of -- suppose this were an operating entity, and

 4      the $4-1/2 billion sale hit the books.  Then I

 5      would expect the IRS, HMRC, the Irish and the

 6      French authorities to all demand their fair share

 7      of that payment.

 8                  Q.   And that touches on another point

 9      that Mr. Smith made, which was, if the idea that if

10      there had been a sale like this with the $4-1/2

11      billion, the five tax authorities would sit down

12      and hash it out.  Do you recall that line of

13      questioning?

14                  A.   Yes, he did.  And I -- go ahead.

15                  Q.   And Mr. Smith suggested to you

16      that there was no way to know what would come out

17      of that process.

18                  Based on your experiences in dealing

19      with the IRS and the other taxing authorities and,

20      in fact, acting as an examiner for the IRS, do you

21      think that one of the things that might have come

22      out of that process was that Canada would get 82

23      percent of the proceeds?

24                  A.   I think there is somewhere between

25      zero and zero percent chance of that happening.
```



1                    Q.    And what principles do you think

2     they would apply in that situation?

3                    A.    I believe that they would apply,

4     you know -- I believe they would, number one, apply

5     core transfer pricing principles.  And then I think

6     in terms of specifics, they would look at what the

7     facts and circumstances were and conclude that the

8     R&D spend was, in fact, the determinant of, you

9     know, was the right allocation key -- or was the

10    right foundation to the allocation key.

11                   To the extent there was any hashing

12    out, I think it would be over the look-back period.

13    But I think they would all, when they saw the

14    evidence, would all agree it was greater than five

15    years.  Would they go back?  I think you can see

16    negotiating on the margins, but I think that the

17    general principle would be very similar to what --

18                   Q.    And what type of evidence would

19    they look at in relation to the look-back period?

20                   A.    Well, they would look at the

21    actual patents.  I think they would take a look

22    very much at the table that Mr. Luft put on the

23    board for me here from Mr. Malackowski's report.

24    They would look at that kind of information.  They

25    might seek other information.  They might want to,



1    you know, talk to the R&D people.

2              I don't know who else they would do.

3    But in general, having sat in APA meetings,

4    numerous ones, you know, not closed-door ones, you

5    know, the tax authorities ask intelligent

6    questions.

7              Q.   And if the actual life, the actual

8    creation dates of the IP that had been sold were

9    available, would they look at that?

10             A.   Without a doubt.

11             Q.   Now, Mr. Smith asked you some

12   questions about the payment of fees for R&D

13   activities, suggested to you that it wouldn't be

14   unusual for a company to perform R&D in an

15   arrangement with other companies on a fee-paid

16   basis.

17             A.   That's correct.

18             Q.   In a contract R&D situation like

19   that, would it be common for the person performing

20   the services to receive nothing for having

21   performed those services?

22             A.   No.

23             Q.   Would it be common for them to

24   bear the risk of receiving nothing for having

25   performed those services?



```
 1                  A.   No.
 2                  Q.   Would an arrangement like that
 3     meet the arm's-length standard?
 4                  A.   No.
 5                  Q.   Mr. Smith also took you to a
 6     provision about exiting from the MRDA, a provision
 7     that in a certain period said that upon exit you
 8     would receive -- an RPS entity would receive the
 9     value of their licensing rights.
10                  A.   Yes.
11                  Q.   Now, if that value didn't
12     correspond to the percentage of the beneficial
13     ownership based on contribution, do you believe
14     that the taxing authorities would have accepted
15     that result?
16                  A.   I believe the tax authority would
17     have taken a very serious look at it.  Suppose one
18     of the entities left.  Suppose it was UK.  Suppose
19     it was US.  I mean, I think the IRS would take a
20     very serious look at what that was worth.
21                  Q.   And what principles do you think
22     they would have applied?
23                  A.   Arm's-length principles.
24                  Q.   And would that also look at the
25     beneficial ownership that it accrued based on
```



 1   contribution?

 2                   A.   Without a doubt.

 3                   MR. ADLER:  That's my redirect.

 4                   THE US COURT:  Thank you, Mr. Adler.

 5                   THE CANADIAN COURT:  Dr. Cooper, I have

 6   got a question for you.

 7                   THE WITNESS:  Yes, Justice Newbould.

 8                   THE CANADIAN COURT:  This morning you

 9   were asked about the provision that if a

10   participant left Nortel, they would be entitled to

11   fair market value of the exclusive license.  And

12   you said, when you were asked about that, you

13   believe that that provision for a retirement

14   allowance was there for another reason.  Do you

15   remember saying that?

16                   THE WITNESS:  Yes.

17                   THE CANADIAN COURT:  What is that other

18   reason you are talking about?

19                   THE WITNESS:  All I can do, Justice

20   Newbould, is go back to my prior experience.  I am

21   certainly not a lawyer, but I have seen these

22   situations before.

23                   And if a multinational thinks they may

24   close down, you know, a facility in someplace, they

25   want to have a provision for exiting the country;

```
 1   not a wholesale bankruptcy, as we have here.  But
 2   that's what that -- I think that provision is
 3   normally in for that reason.
 4              And then what is demanded out of it is
 5   as Mr. Adler just asked me about, would be fair
 6   compensation for what their rights were, which I
 7   think would include their economic ownership.
 8              I do know that I recently had -- we
 9   recently -- it was a while back now -- several
10   APAs.  And the European authorities -- that's what
11   they focused the APA on was, what was the size of
12   that buyout for them leaving the -- in this case it
13   was a cost-sharing arrangement as opposed to an
14   RPSM.  But what was the compensation about, and
15   that's what that clause was all about.  And they
16   were very bold in terms of what they wanted.
17              And it ended up being a negotiation
18   among the IRS and with several European tax
19   authorities.  But I think that's why that clause is
20   in there
21              THE CANADIAN COURT:  All right.  Thank
22   you.
23              Does anybody have any questions arising
24   out of my questions?
25              THE US COURT:  No one is rising.  So
```



1    Dr. Cooper, thank you, sir.

2              THE WITNESS:  Thank you for the

3    pleasure of being here.  Thank you very much.

4              THE US COURT:  And your testimony.

5    Thank you.  And you may be excused.

6              THE WITNESS:  Thank you.

7

8    -- WITNESS EXCUSED --

9    -- DISCUSSION OFF THE RECORD --

10             THE US COURT:  Mr. O'Connor, yes, sir.

11             MR. O'CONNOR:  Yes, Brian O'Connor from

12   Willkie Farr.  The next witness is the UKPC's

13   witness, Dr. Felgran, and I do believe that the

14   direct will be short enough that we can get him

15   completed before our lunch break.

16             THE US COURT:  All right.  Should we

17   proceed?  I think so.

18             THE CANADIAN COURT:  Yes.

19             THE US COURT:  Thank you, Mr. O'Connor.

20             THE CANADIAN COURT:  Somebody gave me a

21   transcript of Dr. Cooper's deposition.  I am going

22   to hand it back to whoever gave it to me.

23             THE US COURT:  You will come forward,

24   Mr. Felgran, and if you would remain standing while

25   you are sworn.  Steven Felgran, S-T-E-V-E-N



```
 1   F-E-L-G-R-A-N.

 2

 3   STEVEN FELGRAN, having first been duly sworn, was

 4          examined and testified as follows:

 5

 6              THE US COURT:  You may proceed,

 7   Mr. O'Connor.

 8              MR. O'CONNOR:  Your Honors, we have two

 9   reports from Dr. Felgran.  The first is his opening

10   report dated January 24, which I believe the next

11   exhibit is 37, if I am correct.

12              THE US COURT:  Yes.

13              MR. O'CONNOR:  And the second report is

14   his rebuttal report dated February 28, which we

15   will mark as Exhibit 38.

16              EXHIBIT NO. 37:  Expert report of

17              Steven Felgran dated January 24, 2014.

18              EXHIBIT NO. 38:  Rebuttal report of

19              Steven Felgran dated February 28, 2014.

20              THE US COURT:  All right, sir.  Thank

21   you.

22   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY MR.

23   O'CONNOR:

24              BY MR. O'CONNOR:

25              Q.   Good morning, Dr. Felgran.  Would
```

 Neeson & Associates   W&F

1   you please tell the Courts briefly about your

2   educational background.

3              A.   Certainly.  I have a BA from the

4   University of Pennsylvania, and I have an MA and a

5   Ph.D. in economics from Yale University.

6              Q.   And can you also briefly describe

7   your employment history since you began your

8   professional career.

9              A.   Yes, I can.  I started off after

10  graduate school with a company called Arthur D.

11  Little, which was a management consulting firm.  I

12  did all kinds of applied microeconomics, including

13  transfer pricing.

14             After a couple of years at Arthur D.

15  Little, I went to the Federal Reserve Bank of

16  Boston.  I was a research economist.  I was there

17  for about six years, not doing transfer pricing.

18  And then I went from there to Northeastern

19  University, where I taught managerial economics,

20  which is a sequence in business school.

21             And then I joined KPMG in 1993.  And I

22  was with KPMG for a long time.  I just left this

23  past September.  I was there for 20 years.

24             Q.   And can you describe for the

25  Courts what your focus was in your career at KPMG.



```
 1                      A.   Sure.  At KPMG I was a transfer
 2   pricing specialty economist.  I did nothing but
 3   transfer pricing.  And within transfer pricing I
 4   worked on the various facets of transfer pricing,
 5   which includes doing transfer pricing documentation
 6   studies, doing transfer pricing planning studies,
 7   working on advance pricing agreements, which are
 8   APAs -- same thing -- and working a lot on tax
 9   controversy, which means doing presentations before
10   IRS exams panels, IRS appeals panels and competent
11   authority.
12                      I also worked, I should say, on all
13   four aspects of transfer pricing, being tangible
14   goods transactions, intangibles, services and
15   loans.
16                      Q.   Are you currently employed?
17                      A.   I am.  I am with a company called
18   AlixPartners, which I just joined this past April.
19                      Q.   And what is AlixPartners?
20                      A.   AlixPartners is a global advisory
21   firm.  They specialize in bankruptcy and business
22   restructurings and turnaround and enterprise
23   improvement and also in financial advisory
24   services.  And I am in that last group, FAS.
25                      Q.   And do you have a specific focus
```

 Neeson & Associates    W&P WILSON & PETERSON LTD.

1      at AlixPartners?

2                    A.   I do.  Not surprisingly, it is,

3      once again, transfer pricing.  And I with another

4      person co-lead the North American transfer pricing

5      practice for AlixPartners.

6                    Q.   And have you had occasion during

7      the course of your career to provide expert

8      testimony in connection with transfer pricing

9      issues?

10                   A.   I have.  I have provided expert

11     testimony numerous times in front of IRS appeals

12     panels, in front of US and foreign competent

13     authorities, and in other venues within the tax

14     regulatory framework.

15                   Q.   And in the course of your career

16     have you had the occasion to write on the subject

17     of transfer pricing?

18                   A.   Yes.  I have written numerous

19     articles on transfer pricing, including some

20     articles on the treatment of restructuring

21     expenses.  But I have a whole long list of articles

22     attached to the end of my first report which covers

23     the past ten years.  And obviously, I have written

24     articles prior to the past ten years.

25                   Q.   Okay.  And you were retained by



1    the UK Pension Claimants in this case to provide

2    expert opinion testimony?

3                A.   That's correct.

4                Q.   Can you tell the Courts generally

5    what you were asked to do.

6                A.   Sure.   In general, I was asked to

7    take a look at Nortel's transfer pricing policy

8    over 2001 through 2008 and also the implementation

9    of that policy over those years.

10               Q.   And did you undertake that review?

11               A.   I did.

12               Q.   And you prepared two expert

13   reports that we marked as Exhibits 37 and 38?

14               A.   That's right.

15               Q.   I would like to focus now on the

16   first report, the one we have marked as Exhibit 37.

17   What issues do you address in that report?

18               A.   Well, I address a lot of issues in

19   that report, but the very first thing I do is I

20   talk about transfer pricing in general and what

21   methods are available as a general matter.

22               Q.   And let's stop for a moment.   The

23   Courts heard from Dr. Cooper, who described

24   transfer pricing in some detail.   Were you present

25   to hear Dr. Cooper's testimony?

 Neeson&Associates   W&F

```
 1                      A.    Yes, I was.
 2                      Q.    And keeping in mind that the
 3    Courts have heard about transfer pricing from
 4    Dr. Cooper, can you briefly describe the major
 5    issues that transfer pricing agreements address
 6    from your point of view.
 7                      A.    Sure.  And I will try not to be
 8    too repetitive of what Dr. Cooper said.
 9                      In my mind -- and I will try to do this
10    in a way that I think is helpful to the Court.  In
11    my mind, transfer pricing can be looked at as both
12    a top-down and a bottoms-up exercise.  And I think
13    from the top down what we are talking about is we
14    have a global pool of profits, and that global pool
15    of profits needs to be allocated amongst the
16    various entities that make up the multinational
17    enterprise.  And the issue is how to do that, and
18    when things are bad, what entity is doing what.
19    And that's a matter of what functions are being
20    performed and what risks are being borne.
21                      So the basic concept is that a
22    low-function, low-risk entity gets a relatively low
23    amount of profit.  A high-function, high-risk
24    entity gets a higher expected profit.  And there is
25    obviously variations in between those.
```



 1                    At the other end, bottoms up is the

 2    actual transfer pricing.  The actual transfer

 3    pricing has to be consistent with the arm's-length

 4    standard, and the US has its own regulations.  The

 5    OECD has produced guidelines.  Different countries

 6    have their own sets of regulations that are largely

 7    based on the OECD guidelines, Canada being a prime

 8    example, the UK another example.

 9                    But everybody wants to have transfer

10    prices that are consistent with the arm's-length

11    standard.  Why is that?  It is basically for tax

12    purposes.  It is not necessarily for business

13    purposes.  This is a tax compliance exercise.

14    Multinationals need to have transfer prices that

15    are consistent with arm's-length to be in

16    compliance with the tax rules and regulations

17    around the world.

18                    And those two meet.  The top-down and

19    the bottom-up approach meet.  If you do set

20    arm's-length equivalent prices, you will, in fact,

21    get to the right outcome as far as what those

22    entities as a whole should be making.

23                    Q.   And what did you do next in your

24    first report, Dr. Felgran?

25                    A.   So after looking at transfer



 1   pricing in general, I then went to the specifics of

 2   the residual profit-split method and explained what

 3   that is.

 4            Q.   And by the way, is there more than

 5   one transfer pricing methodology that a

 6   multinational can adopt?

 7            A.   Yes.  I mean, there are numerous

 8   specified methods in the regulations.  Just to

 9   rattle them off without explaining them really

10   quickly, under the OECD, the traditional

11   transactions methods include three:  Comparable

12   uncontrolled price, which is CUP; resale price

13   method, and then cost-plus-markup method.

14            And then under another category, which

15   is called transactional profitability methods, we

16   have a series of profit-split methods, the most

17   prevalent of which is the one we see here, which is

18   the residual profit-split method, the RPSM.

19            Q.   And again, keeping in mind that

20   the Courts have heard from Dr. Cooper, can you

21   briefly describe how the RPSM methodology works.

22            A.   I can.  By the way, I forgot to

23   list one method.  I am sorry.  There is also

24   another one called the transactional net margin

25   method, TNMM.  So we have the TNMM and we have the



1   profit split under the category of transactional

2   profit-split methods.

3              I am sorry.  The question was?

4              Q.   The question was can you briefly

5   describe how an RPSM system works.

6              A.   Yes, yes, I can.  So let's focus

7   on what those words mean, profit-split method.  We

8   are splitting the residual profit.  In essence,

9   what this boils down to -- again, top-down

10  approach -- the multinational enterprise has a

11  certain amount of total profits in the system.  So

12  under an RPSM, the first thing that happens is they

13  figure out what routine functions are being

14  performed, and they compensate those routine

15  functions with a routine profit.

16             And Dr. Cooper talked about this a

17  little bit.  Routine profit simply means a normal

18  profit, not an excess or residual profit but a

19  normal rate of return.  So the routine functions

20  get a normal rate of return.  And those were --

21  routine functions are things like distribution,

22  some head office functions, contract manufacturing,

23  things like that.

24             Once you have compensated those

25  low-risk functions with a routine return, what is

Neeson & Associates   W&P

1    left is called the residual profit, and that

2    residual profit needs to be allocated among the

3    entities that are contributing to earning that

4    residual profit.  In this case, of course, we call

5    those the RPEs.

6                 So we need to have an allocation metric

7    we can use to allocate the residual profits across

8    the board to the RPEs.  That's a matter then of

9    asking the company what is driving value, you know,

10   what really in your company is the most important

11   thing to create a profit uplift, if that's

12   possible.  In some cases, obviously you have a

13   loss.

14                So in the case of Nortel, it was

15   determined for good reason that it is a technology

16   company and what is really important is R&D stock

17   or R&D spend.  So the allocation metric is based on

18   R&D stock or R&D spend.  So the residual profit is

19   then divided up amongst those entities that are

20   contributing to earning that residual profit in

21   accordance with their relative R&D contributions.

22                That in a nutshell is the RPSM.

23                Q.   And when is an RPSM appropriate

24   for adoption as a transfer pricing mechanism?

25                A.   An RPSM is appropriate for



1    adoption when you have valuable intangibles at more

2    than one location.  In other words, if you have two

3    or more entities in two different tax jurisdictions

4    and these entities are both contributing to your

5    technology base, meaning they are both spending

6    R&D, then it is appropriate.

7              So in other words, if you have two or

8    more intangibles and those are valuable

9    intangibles, you basically have to use an RPSM.

10             Q.   Now, keeping in mind Justice

11   Newbould's question to me this morning as to

12   whether your opinions relate to allocational

13   claims, is there anything else that you addressed

14   in your first report?

15             A.   Yes.  So in my first report, I

16   also went to some specific issues.  To mention two

17   of those, they were the treatment of pension costs

18   and the treatment of restructuring expenses.

19             Q.   Was there anything else besides

20   those two?

21             A.   Yes.  I did address a third issue,

22   which is the concept of transfer pricing

23   adjustments, which leads to the discussion of what

24   turned out to be an interest-free loan.

25             So just to back up on that, because



1   that's a little bit complicated, under the residual

2   profit-split method you start with what the company

3   is actually making before any adjustments.  Then

4   you have the actual model, here the Horst Frisch

5   model, later the E&Y model, and that model gives

6   you a target level of profit.  And it is extremely

7   unlikely that what the company is making is in

8   accordance with what the target profit should be,

9   so there needs to be an adjustment.  That is called

10  a transfer pricing adjustment.

11          So if a company in Jurisdiction A

12  actually made 90 but the target profit is 100, it

13  is paid 10 and vice-versa.  So you have this series

14  of transfer pricing adjustments.  The whole thing

15  nets to zero, but some countries have to pay in and

16  some countries get paid by whoever the bank is.  In

17  this case the bank was NNL.

18          This leads to another point, a related

19  point, which is that NNL owed NNUK a lot of money

20  in the form of transfer pricing adjustments.

21  Starting in 2003, that money ceased to be paid.

22  Instead there was a loan that was issued by the UK

23  to NNL that was required by Canada.  Canada said to

24  NNUK, "You have to pay.  You have to issue this

25  loan to us in lieu of our paying you."



1              And I think the frosting on the cake

2    here is that no interest was paid on that loan,

3    unfortunately, which is, of course, a violation of

4    the arm's-length principle.  Interest has to be

5    paid, and the interest has to be arm's-length

6    interest.

7              Q.   Now, Dr. Felgran, those issues --

8    the restructuring cost issue, the pension cost and

9    the settlement of transfer pricing adjustments --

10   do they relate in any way to the issue before the

11   Court at this hearing on allocation or do they

12   relate to claims?

13             A.   They really relate to claims.

14             Q.   Okay.  So let's then turn to your

15   rebuttal report, which we marked as Exhibit 38.

16   Does that report address claims issues or

17   allocation issues?

18             A.   The rebuttal report really

19   addresses claims and allocation issues.

20             Q.   Now, I want to focus only on the

21   allocation issues, not on the claims issues.  What

22   are the allocation issues that that report

23   addresses?

24             A.   Okay.  So the allocation issues, I

25   would say there are two categories.  Category 1 in



1    the allocation is, is the RPSM an appropriate

2    method for the 2001 to 2008 period; and then going

3    beyond, is this still an appropriate method for the

4    allocation of the post-bankruptcy sales proceeds.

5              And then I think the second big issue

6    is this tension between the idea of legal title and

7    economic ownership.  And for that category,

8    obviously, Tim Reichert for the Canadian Debtors

9    had a very strong argument about -- what he thinks

10   is strong from his point of view -- what he thinks

11   about legal title being dominant.  And I discuss

12   his point of view at some length.

13             Q.   So let's take the first issue.

14   Have you formed an opinion on the propriety of the

15   RPS system employed by Nortel?

16             A.   Yes.  So for the years that I

17   looked at, 2001 and 2008, I have no doubt that the

18   RPSM was an entirely appropriate method for the

19   issue at hand, you know, for transfer pricing

20   purposes.

21             Q.   And why is that?

22             A.   For the reasons we discussed.  I

23   mean, it is a technology company.  You need a way

24   to allocate profits between entities.  We had R&D

25   that was entangled between different jurisdictions.



1    It is hard to say who did what exactly.

2                    So we need a metric.  We need a way to

3    divide the residual profit.  And there really is no

4    other system that measures -- that allocates

5    profits in an arm's-length way other than the RPSM.

6    So it was an entirely appropriate method and a

7    method that the tax authorities would be happy

8    with.

9                    In fact, the tax authorities, as we

10   know, recommended that the cost-sharing arrangement

11   be replaced with the RPSM back in the early 2000s.

12                   Q.   And do you have an opinion on

13   whether the MRDA and the RPSM is an appropriate

14   allocation methodology for allocating the sales of

15   the Nortel Group's assets?

16                   A.   Yes.  I think it is not an

17   appropriate methodology for allocating the

18   post-bankruptcy sales proceeds, and I think that

19   for several reasons.

20                   Q.   Why don't you elaborate for the

21   Court on what those reasons are.

22                   A.   Yes.  So one reason is that

23   transfer pricing assumes a going concern.  And this

24   is very important.  You know, all transfer pricing

25   reports assume a going concern.  There is nothing



1    in transfer pricing at all that addresses

2    insolvency or bankruptcy or anything like that.

3    And I have to say that in my 20 years at KPMG, I

4    never encountered a case in which bankruptcy came

5    up.

6              So transfer pricing is about the

7    year-in/year-out operating income and is that

8    operating income the correct operating income for

9    tax purposes or did an entity overpay somebody else

10   or was that entity undercompensated by somebody

11   else.  You know, these are the key issues.  And it

12   really is about the ongoing business and the

13   ongoing making of operating profit.  So going

14   concern is a key fact in transfer pricing.

15             Q.   By the way, can I ask you to be a

16   bit more specific.  In the course of your 20 years,

17   have you ever seen a transfer pricing agreement of

18   whatever methodology that had provisions addressing

19   what would happen in the event of an insolvency?

20             A.   No, I never saw such a thing.

21             Q.   Do you find it odd that a transfer

22   pricing methodology would not apply to the sale of

23   the proceeds of a multinationals enterprise upon a

24   happening of insolvency?

25             A.   I don't find it odd at all.  I



1    mean, it is not meant for bankruptcy purposes.  I

2    am sure there are other methods for bankruptcy

3    purposes that I am not familiar with that would

4    work very well here.  But the RPSM specifically,

5    again, is designed for an ongoing business, for a

6    going concern.

7                    So if I have a plumber in my house and

8    there is suddenly a leak in the roof, I don't tell

9    the plumber to go fix the leak in the roof.  So by

10   the same token, the RPSM is only meant for certain

11   purposes, and it is not meant for bankruptcy.

12                   Q.   Now, you reviewed Dr. Cooper's

13   reports and you heard his testimony on Friday.

14   What do you understand Dr. Cooper to be opining as

15   to the allocation methodology to be applied here?

16                   A.   I think what Dr. Cooper is saying

17   is that the entities, the RPEs, made contributions

18   via their R&D spend or R&D stock to the technology

19   platform, to the technology base, and we should

20   take those into account in doing the bankruptcy

21   sales proceed allocation.  I think that's his view.

22                   I think he goes on to say there are

23   some issues with the useful life, and the five-year

24   look-back in particular may not be the best way of

25   doing that.  But I think in general, he is saying



1  that R&D contribution methodology is a sound

2  methodology for the allocation.

3          Q.   Do you understand Dr. Cooper to be

4  opining that the MRDA as it is written applies

5  here?

6          A.   I don't think he is saying that.

7  I think he is talking about the RPS method, the

8  residual profit-split method in particular and not

9  the MRDA.  And we can talk about how those are

10 different.  But I think he is harkening back to the

11 economics, not to the legal contract but to the

12 economics, and I think he is saying this could work

13 if we make some fixes to the system.

14         Q.   You mentioned a moment ago that

15 the MRDA is not necessarily the same as the RPS.

16 What did you mean by that?

17         A.   Yes, so the -- okay.  When I was

18 at KPMG, we always worked, obviously, on economic

19 documents, not legal documents.  But quite often

20 people would give us, the economists, a legal

21 document and say, you know, "Do us a favor and read

22 this legal document and tell us if it is consistent

23 with the meaning of the economics document."

24         So the economics document is the

25 touchstone; in transfer pricing, this is.  It is



1    the touchstone.  It is the key document that one

2    turns to.  And in this case it is the Horst Frisch

3    document primarily, followed by the EY documents.

4    And these are the core documents.

5              If somebody had come to me with the

6    MRDA and said, "Does the MRDA reflect accurately

7    the Horst Frisch economics model," I would have to

8    say, "Well, there is some ambiguity in the MRDA.

9    It isn't crystal clear."  I mean, what is clear is

10   the Schedule A in the MRDA.

11             Schedule A, I think, does a reasonably

12   good job, though it is quite short, but it is a

13   reasonably good attempt to explain just the

14   technical pieces as we went through them before of

15   the residual profit-split method.  But the rest of

16   it I find, honestly -- as an economist, not as an

17   attorney -- I found it confusing and contradictory.

18   Not that I can necessarily point to specific

19   pieces; but just reading the whole thing several

20   times, as I did, I didn't find it very informative.

21             So I think if the purpose of the legal

22   contract is to simply take an economic document and

23   turn it into something that can be used

24   constructively by the different members of an MNE,

25   I think it falls down.



 1                    Q.   Now, Dr. Cooper makes a statement
 2   in his report that the lockbox proceeds are the
 3   equivalent of the present value of the future
 4   operating profits of the business.  Do you agree
 5   with that?
 6                    A.   I don't entirely agree with that.
 7   And let me give an example of why I don't agree
 8   with that.
 9                    Let's say somebody has a house and he
10   wants to sell that house, and the house is worth a
11   million dollars, and he gets a million dollars for
12   the house.  Does he have a million dollars?  Not
13   really.  It depends on his mortgage liability.  If
14   his mortgage liability at that moment is $500,000,
15   he, in fact, has $500,000:  What he sold versus the
16   liability.
17                    So the sale of assets by itself is not
18   indicative of anything.  You have to look at the
19   sale of assets and the liabilities that go along
20   with that.
21                    You know, in the Rockstar transaction,
22   there was an asset sale with no liabilities
23   attached.  When they sold some of the LOBs, there
24   were some liabilities attached, but what was
25   missing was all the deferred liabilities, which is



```
 1   not counted at all.  And in particular, the

 2   deferred pension liabilities were not counted.  So

 3   I think those have to be taken into account if one

 4   really wants to say something about, you know, what

 5   the value of this transaction is.

 6              Q.   Let's turn to the second issue you

 7   mentioned, and that was whether Dr. Reichert's

 8   interpretation of the MRDA is economically

 9   rational.  What do you understand Dr. Reichert to

10   be opining?

11              A.   If I understand Dr. Reichert

12   correctly, I believe he is saying that there are

13   two periods, basically.  There is the entire period

14   pre-bankruptcy and then there is bankruptcy.  And

15   the second you get to the day of bankruptcy,

16   economic ownership fades away and legal title

17   becomes all that is important.  I mean, in a

18   nutshell, I think that's what he is saying.

19              Q.   And have you formed an opinion on

20   whether you agree with that?

21              A.   I strongly disagree with that.

22              Q.   And why is that?

23              A.   For a whole host of reasons.  But

24   let me just quickly define economic ownership,

25   because that might be a good place to start.
```



1              So what is economic ownership?

2    Economic ownership gets an entity the right to a

3    fair share of the profits that stem from the

4    assets, from the valuable assets, to which that

5    entity has made a contribution.  So that's true of

6    the RPEs.  The RPEs have a right to a profit, to an

7    income stream based on the assets, meaning the IP,

8    to which they have made a valuable contribution,

9    which they have because they have spent R&D all

10   these years.  R&D spending has gone into making

11   that technology base more and more valuable.  So,

12   therefore, since they are spending this money, they

13   in turn get back profits that are commensurate with

14   their R&D stock or R&D spend.  That's the way this

15   thing works.

16              And there is nothing in economic

17   ownership that limits it.  There is nothing in

18   economic ownership that says this ends when product

19   sales ends.  That is not part of economic

20   ownership.  You make an investment in something and

21   you are entitled to the proceeds, whether those

22   proceeds come from product sales, patent sales,

23   anything.  There is just no limitation in the world

24   of economic ownership.

25              So his interpretation of I guess it is



1    the MRDA, based on some particular sentences in the

2    MRDA, that somehow or other economic ownership just

3    fades away at the stroke of midnight on the day of

4    bankruptcy or before the day of bankruptcy is just

5    not a part of transfer pricing.  That is the

6    antithesis of transfer pricing.

7             Q.   In your opinion, would two

8    unrelated parties striking an arm's-length deal

9    agree to the MRDA as interpreted by Dr. Reichert?

10            A.   I can't see any scenario in which

11   two parties would agree to this as interpreted by

12   Dr. Reichert.  I mean, the only way that two

13   entities would agree to somebody giving up their

14   rights is if they in turn get paid for giving up

15   their rights.

16            So you would say, well, if I am going

17   to lose my rights if there is a certain terminating

18   event, then you, the other party, have to pay me my

19   fair market value of what it is I am giving up.  So

20   the entity, being rational, would demand that.

21   And, by the way, the tax authority would, of

22   course, demand that.  There is no question about

23   it.

24            Q.   And is it your understanding that

25   the other RPEs other than NNL had the ability to



1    dictate when the business would be shut down or

2    when assets would be sold?

3            A.   They had no ability to dictate

4    when assets would be sold, no.

5            Q.   And is that another reason why you

6    would think that arm's-length parties would not

7    agree to a deal that would have given the other

8    RPEs nothing in the event of a sale or shutting

9    down the business which was dictated to by NNL?

10           A.   Yes, yes, I agree with that.

11           MR. O'CONNOR:  Those are my questions,

12   Your Honor.

13           THE US COURT:  All right.  Thank you,

14   Mr. O'Connor.

15           It is 12:30.  Cross-examination will be

16   about how long?  Who -- Mr. Mark, will you be

17   lengthy with the witness?

18           MR. MARK:  Not hours, but I would

19   expect I would go past 1:00 p.m., so it may be best

20   to take a lunch break now.

21           THE US COURT:  Yes, all right.  So

22   should we take our hour and 15 minutes, Justice

23   Newbould, and be back here a little after quarter

24   to 2:00?

25           MR. ADLER:  We will have a short



1   examination as well to start with.

2            THE US COURT:  Sure, Mr. Adler.  I

3   certainly wasn't eliminating that.

4            All right, folks.  Have a good lunch,

5   and we will be back quarter to 2:00.

6   -- LUNCHEON RECESS TAKEN AT 12:35 P.M. --

7   -- UPON RESUMING AT 1:58 P.M.

8            THE US COURT:  Thank you, everyone.

9   Please be seated.

10           Justice Newbould.

11           THE CANADIAN COURT:  Judge Gross.

12           THE US COURT:  All right.  Mr. Adler is

13   raring to go here, Justice Newbould.

14           MR. ADLER:  Thank you, Judge Gross,

15   Justice Newbould.  Good afternoon.  It is Derek

16   Adler for the Joint Administrators and the EMEA

17   Debtors.

18   CROSS-EXAMINATION BY MR. ADLER:

19           Q.   Dr. Felgran, just a few follow-up

20   questions.  You discussed the mechanics of the RPS

21   methodology this morning.  In relation to the RPS

22   methodology, the way it was applied at Nortel, who

23   paid the R&D costs?

24           A.   The individual entities paid the

25   R&D costs.



```
 1                    Q.   And you are referring to the five
 2   RPS --
 3                    A.   I am sorry.  To be clear, the five
 4   RPEs paid their R&D costs.
 5                    Q.   And the annual transfer pricing
 6   adjustments that came out every year, did those
 7   represent a reimbursement of R&D costs that were
 8   incurred by the other entities?
 9                    A.   I wouldn't phrase it that way.  I
10   mean, the transfer pricing adjustments were the way
11   to get the income to the target level.  So it
12   wasn't just about R&D.  R&D was the driver, but R&D
13   created the target, and the transfer pricing
14   adjustments brought us from the income
15   pre-adjustment to the correct post-judgment level
16   per the target methodology.
17                    Q.   So it was a sharing of the profits
18   that resulted from the group's activities; is that
19   right?
20                    A.   Exactly, yes, exactly.
21                    Q.   Now, it is said that lot of the
22   transfer pricing methodology, that transfer pricing
23   leads to a range of appropriate prices for
24   something.
25                    A.   Yes.
```



```
1                    Q.    Is that a correct statement?

2                    A.    That it leads to range of

3    appropriate --

4                    Q.    Range of prices.

5                    A.    Oh, a range.  I see.  Yes,

6    transfer pricing is about a range, and that's true

7    in both the US regs and the OECD regulations.

8                    Q.    Now, does that apply specifically

9    with respect to the number that you get at the end

10   of a residual profit-split methodology, the

11   allocation that comes out of a residual

12   profit-split method?

13                   A.    No.  It is a little bit

14   complicated, because remember that the RPSM has two

15   pieces to it.  It has the routine payment, and then

16   it has the splitting of the residual.  The routine

17   payment is based on external comparables.  It is

18   based on the benchmarking exercise that Dr. Cooper

19   described earlier today or Friday.  In that piece

20   of it there is a range.

21                   As far as splitting up the residual

22   profit that's left, that's actually point-specific.

23   You know, that's based on the specific methodology.

24   So if a particular entity, let's say the US, had a

25   certain amount of R&D spending, that R&D is divided
```



 1    by the total R&D, and that is a precise number.

 2    And that's applied to precisely the residual profit

 3    total to get their share of the residual profit.

 4    So that second piece of it is not a range but a

 5    precise number.

 6              Q.    Okay.  So once you establish the

 7    formula and take out the routine part of it, it

 8    leads to a mathematically specific result, doesn't

 9    it?

10              A.    Correct, correct.

11              Q.    Now, I think you agreed this

12    morning that the residual profit-split methodology

13    is a recognized transfer pricing method; is that

14    right?

15              A.    Absolutely right.

16              Q.    And you also said that it was the

17    right method, in your view, for Nortel from 2001

18    onward; is that right?

19              A.    I do agree with that, yes.

20              Q.    And in Nortel's residual

21    profit-split method, it's contribution, it's

22    contributions to R&D that lead to beneficial or

23    economic ownership in the profits that come from

24    the exploitation of the IP; is that right?

25              A.    Yes, that's right.



1                    Q.    And would you agree that NNL, the

2      Canadian entity, performed no function in relation

3      to IP that entitled it to any greater portion of

4      economic ownership than any of the other RPS

5      entities?

6                    A.    I agree with that.  I mean, the

7      methodology treated Canada the same way as the four

8      remaining RPEs.  There is nothing different about

9      Canada.

10                   Q.    And now, when an entity has

11     economic ownership, that entitles it to the profits

12     from all forms of exploitation of the IP; isn't

13     that correct?

14                   A.    Correct.

15                   Q.    And that includes sales of the IP?

16                   A.    Correct.

17                   Q.    And you have also testified that

18     beneficial ownership doesn't stop on the eve of

19     bankruptcy; is that right?

20                   A.    Absolutely correct.

21                   Q.    Okay.  Now, are you aware that in

22     due course the revenue authorities will examine the

23     filings by the various entities here in which they

24     disclose the results of this proceeding that we are

25     involved in?



 1                      A.    One could expect that.  Of course,
 2     we never know exactly what the revenue authorities
 3     are going to do, but it is reasonable to assume
 4     that they would investigate this and make sure that
 5     it has been done in accordance with arm's-length
 6     standards.
 7                      Q.    So you would agree that the
 8     principles that apply in that context are the same
 9     principles that applied before bankruptcy?
10                      A.    Yes, I do.
11                      Q.    Now let's talk briefly about the
12     concept of economic life of IP.
13                      A.    Okay.
14                      Q.    Can you explain what that means.
15     Let's just start by defining it, please.
16                      A.    Sure.  Economic life of IP simply
17     means for how many years do we think that a
18     particular formulation of something, a particular
19     invention or way of looking at things -- or it
20     could be a brand name, for example, anything that's
21     IP, that is a valuable intangible -- for how many
22     years that thing lives on until it ultimately has
23     no more value.
24                      Q.    And having value in this context
25     means that somebody is willing to buy it; is that



1    right?

2              A.   Yes.  Somebody is willing to buy

3    it or somebody is willing to use that to establish

4    the baseline for the next generation of whatever it

5    may be.

6              Q.   And for this purpose is there a

7    distinction between products that incorporate IP

8    and the IP itself with respect to economic life?

9              A.   No, I wouldn't say so, no.

10             Q.   Well, certain, products have their

11   own life cycle.

12             A.   Right.

13             Q.   And a technology might go on

14   beyond a particular product; isn't that right?

15             A.   Yes, that is absolutely correct,

16   yes.

17             Q.   So the economic life of

18   intellectual property is not tied to the product,

19   is it?

20             A.   Right.  It is not tied to it.

21             Q.   Now, so would I be right in taking

22   that if there is someone out there who actually

23   wants to buy a patent, who is willing to pay good

24   money for a patent, that that patent is ipso facto

25   still within its economic life?



```
 1                    A.    Yes.
 2                    Q.    And you heard Dr. Cooper's
 3     testimony with respect to how useful life would be
 4     addressed in relation to a major taxable event?
 5                    Yes.
 6                    Q.    Do you agree that the taxing
 7     authorities would expect a company to present
 8     detailed support for the actual useful life of the
 9     IP that was sold in a major event?
10                    A.    Yes; and I have seen evidence of
11     to what extent the tax authorities do go to get
12     evidence about that.  Yes, absolutely.
13                    Q.    And so in that context, they are
14     going to require actual data, not just some
15     estimate?
16                    A.    Yes.
17                    Q.    And so in this case that means,
18     for example, for the Rockstar sale, that the taxing
19     authorities would look at when the technology that
20     was sold in the Rockstar sale was actually created?
21                    A.    Correct.
22                    MR. ADLER:  That's my questioning.
23     Thank you, Dr. Felgran.
24                    THE US COURT:  Thank you, Mr. Adler.
25                    Mr. Mark.
```



```
 1                 MR. MARK:  Yes, good afternoon, Your

 2   Honor.  Good afternoon, Justice Newbould.

 3   CROSS-EXAMINATION BY MR. MARK:

 4            Q.   Dr. Felgran, my name is Alan Mark.

 5   I represent the Canadian Monitor and the Canadian

 6   Debtors.  A few questions for you this afternoon.

 7                 As I understand your resume,

 8   Dr. Felgran, you are here to give us a perspective

 9   on certain issues in your capacity as a transfer

10   pricing professional; correct?

11            A.   Yes.

12            Q.   You are not a valuator?

13            A.   No.

14            Q.   And you are not an expert,

15   certainly, in allocation of proceeds in bankruptcy?

16            A.   No, I am not.

17            Q.   And, indeed, as I understand your

18   report, you take pains to make the point that you

19   are not here to provide an opinion on the proper

20   allocation methodology; correct?

21            A.   In terms of the post-bankruptcy

22   sales?

23            Q.   Yes.

24            A.   Yes, that's correct.

25            Q.   And I think that the only opinion
```



```
 1   you express on the question of the appropriate

 2   post-bankruptcy proceeds allocation issue is your

 3   view that the RPS methodology ought not to be the

 4   allocation methodology; correct?

 5              A.   Correct.

 6              Q.   And other than that, you are from

 7   Switzerland on the question?

 8              A.   Fair enough.

 9              THE CANADIAN COURT:  Not a bad place to

10   be from.

11              THE WITNESS:  Not at all.

12              MR. MARK:  Absolutely not.

13              BY MR. MARK:

14              Q.   And, indeed, in your initial

15   report in these proceedings, you didn't address the

16   allocation issues at all; fair?

17              A.   Yes, fair.

18              Q.   And your rebuttal report, as I

19   read it, arose because you were asked to address

20   some specific transfer pricing concepts addressed

21   by Dr. Reichert, Dr. Cooper and Professor Eden;

22   correct?

23              A.   Yes, that's correct.

24              Q.   And as I understand your testimony

25   from this morning as well, the transfer pricing
```


Neeson&Associates   W&F
Wilson & Peyser Ltd.

1   world doesn't deal with bankruptcy issues.  In

2   fact, it is not a concept that comes up in transfer

3   pricing; correct?

4              A.   Correct.

5              Q.   And if I understand transfer

6   pricing correctly, the touchstone, I gather, is the

7   reliability of the results in terms of whether the

8   transfer pricing regime in question reliably

9   reflects the arm's-length concept; is that correct?

10             A.   That is correct.  Reliability of

11  the results is one of the most important concepts.

12             Q.   And within transfer pricing

13  economics, it is that concept rather than a concept

14  of economic rationality which is at the core?

15             A.   Correct.

16             Q.   And, indeed, in transfer pricing

17  economics, transfer pricing economists don't even

18  speak in terms of economic rationality; correct?

19             A.   Correct.

20             Q.   And lastly, if I understand your

21  report and your evidence correctly, in transfer

22  pricing, for your purposes, the focus is on

23  economic ownership rather than legal ownership;

24  correct?

25             A.   Yes.



```
1                        Q.   And at the risk of repeating what
2    you have said a couple of times, it is clear that
3    you agree that the MRDA and the RPSM don't deal
4    with the proceeds of disposition of the businesses
5    in this case?
6                        A.   Correct.
7                        Q.   And I gather from your testimony
8    this morning you also are of the view that the
9    proceeds of disposition in this case don't simply
10   represent the capitalization of future profits
11   either?
12                       A.   That is also correct.
13                       Q.   Now, turning to the transfer
14   pricing concept in just a bit more detail, is it
15   correct to say, Dr. Felgran, that broadly speaking,
16   the objectives of transfer pricing are, one, to
17   ensure that taxing authorities each get their fair
18   share of revenue, and two, to ensure that the
19   taxable entity doesn't suffer double taxation?
20                       A.   Yes, that's correct.
21                       Q.   And while it may have its origins
22   in dealing with those tax issues, is it also
23   correct to say that the selected methodology must
24   reflect the economics, and the tax results are the
25   tax results as they may fall?
```

 Neeson&Associates    W&F WILCOX & FETZER LTD.

```
 1                    A.   Yes, correct.
 2                    Q.   So it doesn't have, and I gather
 3     you would not accept a mandate which had as its
 4     objective the minimization of tax as opposed to
 5     determining simply the right model for the
 6     enterprise and the tax consequence.
 7                    A.   I would not accept such a mandate;
 8     correct.
 9                    Q.   And in your assessment that the
10     RPS methodology was most appropriate for Nortel,
11     was that because you agree that R&D at Nortel was
12     the key driver of residual profit in the businesses
13     of Nortel?
14                    A.   Not exactly.  I believe the RPS
15     method is the best method in any case when you have
16     valuable intangibles at two or more entities in
17     different tax jurisdictions.  In this case it
18     turned out that R&D was the appropriate allocation
19     mechanism.
20                    Q.   You have reviewed the Horst Frisch
21     study, I take it?
22                    A.   Yes, yes, I have.
23                    Q.   And you are aware of their view
24     and the view of the folks at Nortel that R&D was,
25     in fact, the key driver of profits at Nortel?
```



```
 1                    A.    Yes.
 2                    Q.    And you agree with that, I take
 3      it, based on everything you have seen?
 4                    A.    Based on everything I have seen,
 5      yes.
 6                    Q.    Now, let's turn to a slightly
 7      different aspect.
 8                    As I understand it as well,
 9      Dr. Felgran, one of the things you do as a transfer
10      pricing professional is you look to see if the
11      company's legal agreements are consistent with the
12      economic substance of the business; is that
13      correct?
14                    A.    Well, that's not something that I
15      always do.  I mean, that is an occasional task that
16      I was asked to do in my time at KPMG.  It probably
17      came up less than half of the time.
18                    I mean, what I have always been asked
19      to do is do an economic study.
20                    Q.    Right.
21                    A.    Sometimes a company, or if KPMG
22      were the company's tax advisor, one of those people
23      would ask me to review the legal contracts to make
24      sure that the legal contracts were, in fact, in
25      sync with the economics report or analysis that we
```



1   had done.  So that's how I got involved with legal

2   contracts.

3            But sometimes I was never asked to

4   review the legal contracts, and sometimes there

5   were no legal contracts.  I mean, having legal

6   contracts in the US is a best practice, but it is

7   not a necessity unless the tax authority requests

8   that those contracts be written.

9            Q.   Would it be fair to say that if

10  you were undertaking a transfer pricing engagement

11  and you examined the core document that reflects

12  those transfer pricing arrangements and you thought

13  that the legal rights stated in there were not

14  compatible with the economic rights, you would

15  raise it with the client?

16           A.   Yes.  And that's one of the things

17  I, in fact, was asked to do when I was asked to

18  review the legal contracts:  Make sure that the

19  rights and obligations in that contract were

20  reflective of what has been laid out in the

21  economics document.

22           Q.   Right.  And as a transfer pricing

23  professional, if the legal agreement reflecting the

24  transfer pricing arrangements amongst the parties

25  followed the economic analysis, you would expect

 Neeson & Associates   W&P

```
 1    that any transfer pricing professional involved in

 2    that engagement would ensure that the legal rights

 3    did, in fact, fairly reflect the economic

 4    arrangements?

 5                  A.   I am sorry.  I have a little

 6    trouble interpreting that question.  Can you repeat

 7    it.

 8                  Q.   All right.  When you have a

 9    situation where you first do the economic study and

10    then the preparation of a contract to set out the

11    legal rights of the parties pursuant to the

12    transfer pricing arrangement, and assuming there

13    are transfer pricing professionals involved in the

14    engagement, you would expect that the contract --

15    the legal rights would reflect the economic rights?

16                  A.   Yes, I agree.

17                  Q.   And we know in this case, of

18    course, that the MRDA did follow the Horst Frisch

19    study?

20                  A.   That's something I think I would

21    not agree to.  I think it attempted to follow it.

22                  Q.   I mean temporally, in terms of

23    time.

24                  A.   Oh, in terms of time, yes.

25                  Q.   Yes.
```



```
 1                    A.   Yes, the MRDA was 2004, and that
 2    was after Horst Frisch, yes.
 3                    Q.   And you understood that the MRDA
 4    memorializes Nortel's transfer pricing method?
 5                    A.   Well, again, I think it is an
 6    attempt to memorialize that method.
 7                    Q.   So you don't accept that the
 8    Nortel RPEs entered into the Master R&D Agreement
 9    to, amongst other things, memorialize the transfer
10    pricing method?
11                    A.   I think -- well, I wasn't there.
12    I believe that the RPEs entered into the MRDA
13    thinking that they were memorializing the transfer
14    pricing method.  I am offering an opinion that --
15    and I said this earlier -- I am not sure the MRDA
16    is exactly reflective 100 percent of the transfer
17    pricing agreement as outlined by Horst Frisch.
18                    Q.   So let's break that down a bit.
19    First step:  There is no question that what the
20    folks who prepared the MRDA were trying to do was
21    to memorialize the transfer pricing arrangements?
22                    A.   I would hope that's the case, yes.
23                    Q.   And from what you have seen, that
24    appears to be the case?
25                    A.   Yes.
```



```
 1                    Q.   Okay.  And as you indicated now
 2      and as you indicated in your evidence this morning,
 3      you have some question about whether that contract
 4      I think, to use your words, contains some
 5      ambiguity?
 6                    A.   Yes, it does.
 7                    Q.   But again, you are not here to
 8      offer an opinion on its interpretation.  That's not
 9      your purview?
10                    A.   No.  It is not my forte, and I am
11      not an attorney.
12                    Q.   And you mentioned in your evidence
13      this morning in response to some questions from
14      Mr. O'Connor your view of some of the contents of
15      Dr. Reichert's report; correct?
16                    A.   Correct.
17                    Q.   And Dr. Reichert is a fellow
18      transfer pricing professional?
19                    A.   Yes.
20                    Q.   And I don't want to get into a
21      debate with you about whether you are properly
22      interpreting his reports.  But I gather the point
23      you are making, as I understand your evidence, is
24      that whatever the RPS entity's interest in the IP
25      is, it shouldn't terminate on bankruptcy?
```

 Neeson & Associates    W&P

```
 1                      A.    Yes.
 2                      Q.    And what you want to see is that
 3   fair value for that interest, whatever that
 4   interest may be, should be reflected in the
 5   allocation?
 6                      A.    Yes.
 7                      Q.    And you haven't seen, as I
 8   understand it, the reports of the valuation and
 9   allocation experts on behalf of the Canadian
10   Estate?
11                      A.    Correct.  I have not seen that.
12                      Q.    So your observation about what
13   Dr. Reichert said was really limited to what he
14   said, your view of what he said in his reports?
15                      A.    In his two reports, his direct and
16   rebuttal.
17                      Q.    Right.  And if, in fact, the
18   valuation and allocation experts who have provided
19   evidence for the Canadian Debtors in this
20   proceeding recognized the proper interest of the
21   RPS entities and ascribed appropriate fair value to
22   that interest, then your concerns are addressed?
23                      A.    It is hard for me to answer that,
24   not having seen their reports.  I mean, what you
25   say sounds reasonable, but there could be other
```

1    concerns I am not aware of right now.

2              Q.   But with respect to that

3    concern --

4              A.   Yes.

5              Q.   -- if they identify the

6    appropriate interest on the proper interpretation

7    of the agreement, they ascribe fair value to it,

8    then your concern that you expressed is dealt with?

9              A.   Yes, yes.

10             Q.   Thank you.  Now, you have had some

11   discussion earlier in your evidence today about

12   what happens with the taxing authorities.  And in

13   your report you deal with an issue which is

14   relevant to claims, which is the $2 billion

15   adjustment; correct?

16             A.   You are referring to the APA now?

17             Q.   Sorry?

18             A.   You are referring to the APA

19   adjustment?

20             Q.   The APA.

21             A.   Yes, I do discuss that.

22             Q.   And I don't want to get into the

23   details of the issues relevant to the APA which

24   concern claims, but I do want to just discuss with

25   you the process a little bit.  And I think in your



```
 1   report you make the point, if I understand you
 2   correctly, that whatever APA settlement is
 3   negotiated between the taxing authorities, it
 4   cannot be presumed to reflect what they would
 5   consider to be an arm's-length result.
 6                A.    That is correct.  We have no
 7   information -- and I think Dr. Cooper said the same
 8   thing earlier.  We just have no information and
 9   never will as to how they came up with that
10   2 billion number.  It may not even be connected to
11   transfer pricing.
12                Q.    Right.  And you make the point in
13   your report -- and I don't know that we have to
14   turn it up -- that, in fact, when these
15   negotiations are opened up, the taxation
16   authorities are often pursuing their own objective
17   to maximize taxable revenue in their jurisdictions;
18   correct?
19                A.    That is correct.
20                Q.    And so there is no assurance, in
21   your experience, when the taxing authorities come
22   to a settlement on a certain tax year or a certain
23   taxable event, that one can say that the results
24   that they settle upon reflect an arm's-length
25   result?
```



1              A.   That is correct.

2              Q.   And each taxing authority can be

3    expected in those negotiations to advance a view of

4    the proper interpretation of the transfer pricing

5    arrangements which will maximize the taxable income

6    in their territory?

7              A.   That is correct.

8              Q.   And even if the Courts were to

9    rule on the scope of the interests that the RPS

10   entities had in the IP, even then the tax

11   authorities might stray from that view and come up

12   with a result that doesn't reflect that?

13             A.   So this is a little bit off of the

14   APA topic now, but I mean, it is possible that the

15   tax authorities could take issue with the RPS

16   method in general.

17             Q.   Or they could abide by it?

18             A.   Correct.

19             Q.   If the Courts in this case,

20   Dr. Felgran, were to come to the conclusion that

21   the method for determining the R&D capital stock

22   under the RPSM arrangements did not reflect an

23   arm's-length arrangement and were to adjust it to

24   reflect what they considered to be an arm's-length

25   arrangement, would one then have to potentially go



1    back and adjust the allocations of profits and

2    losses that occurred over the years under the prior

3    R&D capital stock calculation?

4              A.   Yes.  So the R&D capital stock

5    issue comes up in 2001 to 2005 with a 30 percent

6    amortization rate.  If the tax authorities were to

7    take issue with that and say it should be higher or

8    lower, yes, and --

9              Q.   And even aside from the tax

10   authorities, in the company's own transfer pricing

11   adjustments, if, for example, there was to be a

12   determination that NNUK's R&D capital stock ought

13   to have been higher, then you would have to go back

14   and recalculate and allocate to it a higher

15   proportion of what were predominantly losses over

16   the last several years of the life of the

17   agreement; correct?

18             A.   Yes, in theory, that is absolutely

19   correct.

20             Q.   Now, Mr. Adler -- if you will just

21   give me a moment, if I can read my own note of what

22   he asked you, I will have a question for you.

23             Mr. Adler asked you whether, in your

24   view, Canada had any different interest in the IP

25   than the other RPS entities.  Do you recall that



```
 1    question?
 2              A.    I do.
 3              Q.    And I believe you indicated to him
 4    that in your view it did not?
 5              A.    That's right.
 6              Q.    Now, Dr. Felgran, just let me
 7    explore that with you for a minute.  There is no
 8    question, is there, that Canada was the only RPS
 9    entity with title to the IP?
10              A.    That's right.
11              Q.    So there may be a debate in this
12    case about what that title was worth.  But to be
13    fair, Canada did have an interest in the IP that
14    was different than the interest of the other RPS
15    entities?
16              A.    Well, as far as economic
17    ownership, it is exactly the same.  Again, it is
18    based on their R&D stock or their R&D spend divided
19    by the total.  That's their economic claim.  They
20    did have legal title.
21              Q.    Right.
22              A.    Under the transfer pricing rules,
23    legal title has no value, and no income is to be
24    attributed to the entity that has legal title.
25                    The only difference with Canada is that
```



1    Canada was performing legal services.  Legal

2    services is one of those routine functions that get

3    a routine payment.  So that's the only one place in

4    which there is a difference between Canada and the

5    other RPEs.

6            Q.   No.  And I understand your point

7    from the transfer pricing perspective on the

8    economic interest issue.  But I just wanted to be

9    sure you are not advancing an argument that,

10   properly interpreted, the MRDA does not, in fact,

11   place legal title with NNL.

12           A.   There is no question MRDA does

13   place legal title with NNL.

14           MR. MARK:  Thank you, Dr. Felgran.

15   Those are my questions.

16           THE US COURT:  Mr. Luft.

17           MR. LUFT:  Thank you, Your Honor.  Good

18   afternoon, Your Honor.  Good afternoon, Justice

19   Newbould.

20   CROSS-EXAMINATION BY MR. LUFT:

21           Q.   Good afternoon, Dr. Felgran.  My

22   name is Avi Luft.  I am from Cleary Gottlieb Steen

23   & Hamilton, and I represent the US Debtor.

24           I want to ask you a few questions on

25   some of the areas that you touched on in direct.



```
 1    The first one relates to the RPSM method.  And I
 2    believe earlier today you listed a number of
 3    methods that all are qualified transfer pricing
 4    methods; correct?
 5              A.   Yes, correct.
 6              Q.   And you start from the most basic
 7    proposition.  The ideal in transfer pricing is to;
 8    determine what two uncontrolled parties would
 9    arrive at in the market; is that right?
10              A.   Yes.
11              Q.   And so when you are doing transfer
12    pricing, ideally, although you can't always find
13    it, you look to see if there are comparable
14    uncontrolled transactions from the marketplace and
15    use those to determine what a proper transfer
16    pricing payment would be; is that right?
17              A.   Yes.  That's the ideal, yes.
18              Q.   But as I mentioned, you can't
19    always find that; is that right?
20              A.   Unfortunately, right.
21              Q.   And a company like Nortel, where
22    you had valuable nonroutine intangibles at two or
23    more locations, you can't find a comparable very
24    easily in the market; right?
25              A.    You can't find a comparable at all
```



```
 1    in the market.
 2                 Q.    Right.  And that means you're not
 3    going to be able to use a comparable uncontrolled
 4    price method, a CUP?
 5                 A.    Correct.
 6                 Q.    And you are not going to be able
 7    to use a resale price method?
 8                 A.    Correct.
 9                 Q.    And you are not going to be able
10    to use a cost plus method?
11                 A.    Correct.
12                 Q.    So once you get rid of all those,
13    what you are basically stuck with is you can use a
14    CSA or you can use a profit-split method; right?
15                 A.    Yes.  I mean, I would add to that
16    you can have royalty payments.  You can have just a
17    crisscross of royalty payments.  So there are
18    actually three options:  Royalty payments,
19    cost-sharing agreement, and then the residual
20    profit split method.
21                 Q.    And here we know, after Nortel
22    transferred from the CSA to the RPSM, that the tax
23    authorities told them they no longer wanted them to
24    use a CSA
25                 A.    That's my understanding, yes.
```



1                    Q.   And if Nortel wanted to avoid the

2       issue of royalty payments, that would have left

3       them with a profit-split method?

4                    A.   Yes.

5                    Q.   Right.  So whether you call it the

6       best method or the only method, if they didn't want

7       to pay royalties, it was the method they had to

8       use.

9                    A.   It was also the best method.

10                    Q.   And the residual profit-split

11       method is also the furthest from market pricing; is

12       that right?

13                    A.   That is right.

14                    Q.   Now, there has also been some

15       testimony today about motivations regarding

16       minimization of taxes.  Now, amongst the integrated

17       entities, because of Canada's generous research tax

18       credits, Canada had effectively the lowest tax

19       rate; correct?

20                    A.   It had the lowest tax rate for the

21       Nortel entities; that's correct.

22                    Q.   And I believe you refer in your

23       report to the fact that they were effectively a tax

24       haven for Nortel.

25                    A.   Yes.  I mean, that's kind of a



```
 1    funny term to use for Canada, but they were a tax
 2    haven for Nortel --
 3               THE CANADIAN COURT:  I'll say.
 4               THE WITNESS:  They were a tax haven for
 5    Nortel because of the fact that there were R&D tax
 6    credits available in Canada for use by Nortel.
 7               BY MR. MARK:
 8               Q.   And one of the motivations for
 9    Nortel in implementing the RPS method was a desire
10    to minimize Nortel's overall tax burden and
11    maximize shareholder return; is that right?
12               A.   That's my understanding from
13    reading the deposition testimony and other
14    documents, yes.
15               Q.   I also want to ask you about how a
16    company determines ---or excuse me, let me strike
17    that -- how a transfer pricing professional goes
18    about determining how a company does business for
19    setting up a proper transfer pricing system.  Okay?
20    Specifically, there is something referred to as a
21    functional analysis.
22               A.   Yes.
23               Q.   And you are familiar with a
24    functional analysis?
25               A.   I have done many of them, yes.
```



```
 1                    Q.   And one of the first things you do
 2   in a functional analysis is you conduct functional
 3   risk interviews?
 4                    A.   Correct.
 5                    Q.   And that's important because it
 6   means you have to speak to all the key people in
 7   the company who can tell you about how that company
 8   actually does business; right?
 9                    A.   Correct.
10                    Q.   It is not enough to just read an
11   agreement where the company puts forth what they
12   say they do business.  You actually have to speak
13   to the people and really figure out how the company
14   actually runs.
15                    A.   Yes, that's right.
16                    Q.   And finally, I just wanted to
17   touch on a topic relating to what are referred to
18   as integrated entities and limited risk entities.
19                    A.   Okay.
20                    Q.   And I believe in your report you
21   reference that there are differences between the
22   two of them; correct?
23                    A.   Yes.  Let me just ask you, when
24   you say "integrated entities," those are the same
25   as the RPEs; correct?
```



```
 1                    Q.    Correct.

 2                    A.    All right.

 3                    Q.    So just so we are clear, that's

 4     NNI?

 5                    A.    Yes.

 6                    Q.    NNL?

 7                    A.    The five RPEs.

 8                    Q.    And the three -- okay.  Right?

 9                    A.    Okay.

10                    Q.    And an IE like NNI, the US entity,

11     and an LRE like, let's say, NN Poland, would have

12     very different functions, assets and risks;

13     correct?

14                    A.    Yes, that's correct.

15                    MR. LUFT:  I have no further questions

16     at this time.  Thank you, Dr. Felgran.

17                    THE US COURT:  Mr. Luft.

18                    Mr. O'Connor.

19     RE-EXAMINATION/RE-DIRECT BY MR. O'CONNOR:

20                    Q.    I just have one brief question.

21     Dr. Felgran, my colleague Mr. Mark had asked you a

22     couple of questions about your view of

23     Dr. Reichert's opinion, and I think he asked you a

24     question that said, in essence, as long as the RPEs

25     were being compensated for whatever interest they
```



1   had, that was all that the transfer pricing

2   required.  Do you remember that?

3                 A.    Vaguely, yes.

4                 Q.    And is it your understanding that

5   under Dr. Reichert's construction of the MRDA, that

6   none of the RPEs other than NNL would receive any

7   compensation for the transfer of the residual

8   patent portfolio?

9                 A.    Yes, that is exactly my

10  understanding, yes.

11                Q.    And from an economist's and a

12  transfer pricing practitioner's view, is that

13  rational to you?

14                A.    From a transfer pricing

15  economist's point of view, if you do anything for

16  any other company, you must be compensated.  So it

17  would be irrational to give up any rights that

18  produced any sort of income stream whatsoever for

19  no payment.  That would be irrational and it would

20  be a violation of the code.

21                MR. O'CONNOR:  Thank you, Doctor.  No

22  further questions.

23                THE US COURT:  Mr. O'Connor.

24                Justice Newbould, anything from you?

25                THE CANADIAN COURT:  No.  I am



```
1    assuming, Dr. Felgran, you will be coming back

2    during the claims process.

3              THE US COURT:  Here comes Mr. O'Connor

4    to answer.

5              THE CANADIAN COURT:  Am I right?

6              THE US COURT:  Mr. O'Connor.

7              MR. O'CONNOR:  Yes, both Dr. Felgran

8    and I will be coming back for the claims process.

9              THE US COURT:  Thank you.

10             THE CANADIAN COURT:  No comment.

11             THE US COURT:  Thank you, sir.  You may

12   step down.

13   -- WITNESS EXCUSED --

14             MR. BARRACK:  Good afternoon, Your

15   Honours.  Michael Barrack.  The next witness is Dr.

16   Bazelon.  Perhaps we could mark Dr. Bazelon's two

17   reports as the next exhibits.  I'm not sure what

18   the numbers are, Your Honour.

19             THE REGISTRAR:  I don't have copies of

20   those, Mr. Barrack.

21             MR. BARRACK:  You don't have those?

22             THE CANADIAN COURT:  I've got two here.

23   Mr. Barrack?

24             MR. BARRACK:  Yes.

25             THE CANADIAN COURT:  I have them.
```



```
 1                    THE REGISTRAR:  I don't have ones to
 2    mark.
 3                    THE CANADIAN COURT:  I'm sorry.
 4
 5    COLEMAN BAZELON, having first been duly affirmed,
 6          was examined and testified as follows:
 7                    COLEMAN BAZELON, having been first duly
 8    affirmed, was examined and testified as follows:
 9
10                    THE CANADIAN COURT:  So the report will
11    be Exhibit 39 and the rebuttal report, Exhibit 40;
12    is that right?
13                    THE REGISTRAR:  Exhibit 39 and 40, Your
14    Honour.
15                    EXHIBIT NO. 39:  Report of Dr. Bazelon.
16    EXHIBIT NO. 39:  Report of Dr. Bazelon.
17                    EXHIBIT NO. 40:  Rebuttal report of Dr.
18                    Bazelon.
19    EXAMINATION-IN-CHIEF/DIRECT EXAMINATION
20    BY MR. BARRACK:
21                    Q.   Dr. Bazelon, I understand you have
22    a BA from Wesleyan University from the college of
23    social studies which included economics?
24                    A.   Yes, that's correct.
25                    Q.   And then a diploma in economics
```



1    from the London School of Economics?

2              A.    Yes.

3              Q.    And that was a one-year program?

4              A.    That was a one-year program that

5    was equivalent to the first year of the masters

6    program.

7              Q.    And then you spent a year at the

8    Board of Governors of the Federal Reserve?

9              A.    That's correct, in Washington,

10   D.C. at the Board of Governors.

11             Q.    And then you headed off to the

12   University of California at Berkeley?

13             A.    Yes, and I received a masters and

14   a Ph.D. in economics there.

15             Q.    And in March of 1995 you joined

16   the Congressional Budget Office?

17             A.    That's correct.

18             Q.    As an analyst?

19             A.    I was started as an analyst and

20   finished as a principal analyst.

21             Q.    What were you analyzing?

22             A.    Initially radio spectrum license

23   auction receipts for the US federal government.

24   That grew into analysis of wireless policy and on

25   to telecommunications, as well as analyses related



```
 1    to auctions.

 2              Q.    And I understand in 2001 you

 3    joined the Analysis Group as a vice-president?

 4              A.    That's correct.

 5              Q.    And some of our other experts work

 6    at the Analysis Group?

 7              A.    They do indeed.

 8              Q.    And you were a consulting

 9    economist from 2001 to 2007?

10              A.    Yes.

11              Q.    And I understand you were

12    supporting the -- you began by supporting the

13    outside work of an outside academic, Tom Hazlett?

14              A.    That's correct.

15              Q.    What type of work did that

16    involve?

17              A.    Professor Hazlett was a

18    telecommunications -- or is a telecommunications

19    economist and most of the work I did with him was

20    supporting his practice in the telecommunications

21    area.

22              Q.    Did you do other work that would

23    be relevant to this case while you were initially

24    at Analysis Group?

25              A.    Yes, in addition to supporting
```



1    Professor Hazlett I also worked with other Analysis

2    Group partners in the IP practice doing valuations

3    on intellectual property.

4              Q.    All right.  And did that involve

5    patent valuations and damages?

6              A.    It involved patent valuations both

7    in private valuations for companies and in damages

8    situations.

9              Q.    Did that work involve the

10   telecommunications field?

11             A.    Some of those patents did, yes.

12             Q.    And by the time you left, did you

13   have your own substantial practice in that area?

14             A.    Yes, when I left Analysis Group I

15   was no longer supporting Professor Hazlett and I

16   had my own sustained practice that focused on the

17   telecommunications and media area.

18             Q.    And you joined Brattle in 2007?

19             A.    That's correct.

20             Q.    And what does Brattle do?

21             A.    It's an economic consulting firm.

22             Q.    And have you been focused on a

23   particular industry?

24             A.    I have continued focusing my

25   practice on the telecommunications and media



```
 1   industries.
 2              Q.   And what does your practice at
 3   Brattle involve?
 4              A.   I consider it has three buckets of
 5   work.  One of them is policy and academic level
 6   analysis; another is strategy advice to private
 7   clients; and the third is litigation support.
 8              Q.   Okay.  So let's break that down.
 9   Can you give us some examples of the academic type
10   work you do for regulators and policy-makers?
11              A.   Sure.  A relevant recent example
12   would be a report I recently co-authored and
13   released on the Canadian wireless market.  We
14   analyzed the competitive nature of the wireless
15   market in Canada and the impacts of a fourth
16   competitor entering the market.
17              Another -- that was -- there the client
18   was the Canadian Competition Bureau, part of the
19   Canadian government, and the report was filed in a
20   CRTC proceeding.
21              Q.   If I can stop you there, I
22   understand that's not listed in your resume because
23   it was released on May 12, 2014?
24              A.   That's correct.  It was released
25   after I filed my reports.
```

 Neeson&Associates   W&F

1                    Q.   All right.  And, sorry, you were

2    going to give me another example of your policy

3    work?

4                    A.   Sure.  Another example would be a

5    study that I released for the National Academy of

6    Sciences in the US on the economics of digitization

7    and copyright industries.

8                    Q.   Does your academic work involve

9    valuation in the telecommunications field?

10                   A.   It often does.  It's broadly

11   policy related, but often involves valuation of

12   telecommunications assets and, as an example, last

13   year I released a peer-reviewed article titled

14   Spectrum Value.

15                   Q.   So if we could turn to the second

16   branch of your work, your strategy advice to

17   clients, what role do you play in the valuation of

18   complicated telecommunication assets?

19                   A.   In my strategy advice, I advise

20   clients who are interested in investing in

21   telecommunications firms or assets and will value

22   the underlying assets for them.  I also provide

23   advice to bidders in spectrum auctions.

24                   Q.   So typically who are your clients?

25                   A.   Investors such as hedge funds and



1    the like.

2              Q.   All right.  What type of analysis

3    do you do for them?

4              A.   I would value the assets of a

5    telecommunications company, so often they are

6    interested in investing or perhaps buying -- it's

7    not uncommon that they'll want to buy the debt of a

8    company and understand what the underlying assets

9    supporting that debt are worth and I'll do a

10   valuation analysis.

11             If it's a spectrum asset, I'll value

12   the license and the ability to sell it.  Or in

13   other cases I might analyze technology trends

14   within the sector.

15             Q.   All right.  And regarding the

16   spectrum auctions that you've talked about, who are

17   your clients there?

18             A.   I've worked for -- typically

19   worked for bidders.  I've worked for bidders in

20   auctions in the US, in Canada and in India.

21             Q.   And what services do you provide

22   them?

23             A.   I provide a lot of services to

24   them including preparing for the auction which can

25   be assessing what they're trying to get out of it,



```
 1    valuing the assets that are coming through the
 2    auction, help them understand the value of those
 3    assets.  I will help them set up their war room and
 4    help them through the bidding process in analyzing
 5    results of the auction rounds and preparing their
 6    next round bids.
 7              Q.   And what part of your training and
 8    experience allows you to perform valuations for
 9    your clients?
10              A.   Well, my Ph.D. in economics has
11    given me the toolkit necessary and my almost 20
12    years of work first for the Congressional Budget
13    Office and then as a consulting economist has
14    taught me how to use those tools in valuation
15    settings.
16              Q.   Have your clients made investments
17    based on your valuations?
18              A.   Yes, they have.
19              Q.   Do you have any idea of the size
20    of investments that have been made based on your
21    valuations?
22              A.   They don't always tell me what
23    they pay for them but many of my clients have gone
24    on with their investments, but in the narrow range
25    of the spectrum auctions, the bidders I've worked
```



 1    for have purchased over $5 billion worth of cell

 2    phone licenses.

 3              Q.   Let's go to litigation expert

 4    testimony.  I understand that the kinds of cases

 5    you have been involved in are listed at pages A7 to

 6    A10 and I don't intend to go through them

 7    individually.  Are there additions to that list?

 8              A.   There are and, by the way, I don't

 9    have a copy of the two reports.

10              Q.   Oh, sorry.

11              A.   In case you were wanting to ask me

12    about them.

13              Q.   We were going to make you do this

14    blind.

15              A.   I've been through orals for a

16    Ph.D.  It can't be worse.

17              The litigation -- excuse me, the

18    designations as an expert are listed in my CV.

19    There's one addition since I filed this report.  I

20    was recently retained in an international trade

21    commission matter on behalf of a group of

22    telecommunications equipment providers in a patent

23    dispute.

24              Q.   Do more than that case involve the

25    telecommunications industry where you've --



```
 1                     A.   Yes, most of my designations have
 2     been broadly in the telecommunications and media
 3     industries.
 4                     Q.   And did those cases involve
 5     patents?
 6                     A.   Some of them did, yes.
 7                     Q.   And did they involve valuation
 8     issues?
 9                     A.   Many of them involved valuation
10     issues.
11                     Q.   And did those involve the
12     application of general economic principles to the
13     dispute?
14                     A.   I would say that all of them
15     involved using my skills as an economist.
16                     MR. BARRACK:  Your Honour, I'm not sure
17     that the practice in this trial has been to ask for
18     experts to be qualified but I would ask --
19                     THE CANADIAN COURT:   So why start now?
20     I have assumed that there's been some kind of an
21     agreement that all of these people are qualified
22     because no one has yet asked to tender anybody.
23                     MR. BARRACK:  Okay.
24                     BY MR. BARRACK:
25                     Q.   So if we could turn to your
```



```
1    reports.  In Appendix B to your initial report you

2    set out the materials which you have reviewed?

3              A.   That's correct.

4              Q.   And I'll just lead you through it.

5    With respect to this particular case, you have

6    reviewed the pleadings, as I understand it, the

7    Nortel financial statements, some of the documents

8    produced including an analysis of the patents.

9              So stopping there, what was the

10   analysis of the patents that you reviewed?

11             A.   That would include spreadsheets

12   and databases produced in the case of the patents

13   owned by Nortel as well as incorporating

14   information from I believe it's the Global IP Law

15   Group's analysis of Nortel's patents.

16             Q.   Right.  And do you know why that

17   Global IP analysis was prepared?

18             A.   My understanding is it was

19   prepared for Nortel when they were considering

20   setting up what is referred to as the IPCo which is

21   an intellectual property licensing company that

22   they were considering keeping in-house.

23             Q.   All right.  And I also understand

24   you've read some of the fact depositions?

25             A.   Yes, I have.
```



 1                Q.   Some of the expert reports?

 2                A.   That would be correct.

 3                Q.   Some of the expert depositions?

 4                A.   Yes.

 5                Q.   And some of the trial transcripts?

 6                A.   Correct.

 7                Q.   And in your report you've listed

 8     the academic literature that you have reviewed and

 9     some websites.  Can you tell us about the websites

10     that you went to to assist with your analysis?

11                A.   Certainly.  These would be public

12     websites related to patent offices that I went to

13     to find information about the patents at issue in

14     this case.

15                Q.   And were you assisted by a team at

16     Brattle?

17                A.   Yes, I was.

18                Q.   And what did they do for you, very

19     briefly?

20                A.   They implemented the analyses and

21     research that I directed.

22                Q.   All right.  What question were you

23     retained to answer?

24                A.   From an economic perspective what

25     was the best way to allocate the lockbox funds



1    among the selling debtors.

2              Q.   And when you say the lockbox

3    funds, what do you mean?

4              A.   My understanding is the lockbox

5    funds are the receipts from the disposition of

6    Nortel's assets.

7              Q.   Right.  And that includes both the

8    line of business assets and the Rockstar sale?

9              A.   Yes, also known as the residual IP

10   portfolio.

11             Q.   All right.  Were you asked or

12   instructed to support any particular method of

13   allocation?

14             A.   No, I was not.  I was given a free

15   hand.

16             Q.   And who do you understand that the

17   funds in the lockbox are to be distributed to?

18             A.   My understanding is that under the

19   IFSA that funds in the lockbox are distributed to

20   the selling debtors.

21             Q.   What did you conclude was the most

22   appropriate method for allocating the lockbox

23   funds?

24             A.   After conducting my analysis, I

25   concluded that the pro rata allocation method was



1    the most appropriate.

2              Q.   You say after conducting.  Did you

3    start there?

4              A.   No, I didn't.

5              Q.   What other allocation methods did

6    you consider?

7              A.   Well, I considered the three

8    allocation methods being put forward by the three

9    estates in this case.  That would include the

10   licensing approach based on territorial licensing

11   rights that the US Estate has put forward; I

12   considered the Canadian IP ownership approach; and

13   I considered the contribution approach put forward

14   by the EMEA Estate.

15              I also gave some consideration to what

16   the MRDA would look like if it was, in fact,

17   applied to allocating proceeds from asset sales.

18              Q.   All right.  So, I'd like to have

19   you comment on how a couple of your areas of

20   expertise informed your opinion with respect to the

21   appropriate allocation methodology.

22              How did your expertise in economics of

23   markets and how firms operate in them inform that

24   process?

25              A.   To fully understand Nortel's



1    business and its corporate form or the structure of

2    its business, it's very helpful to understand how

3    it operated in the global telecommunications

4    market.

5              So my understanding of firms and

6    markets and my understanding of the

7    telecommunications industry in particular informed

8    my opinions about Nortel's form.

9              Q.   And how did your understanding of

10   the technology that was being created at Nortel

11   inform your opinion?

12             A.   Similarly, the technology was

13   largely to be used in the telecommunications

14   sector, so understanding how the technology feeds

15   through into value creation was helpful in

16   understanding the technology.

17             Q.   And how did your understanding of

18   patents and patent protection inform your analysis?

19             A.   Patents are the way the

20   intellectual property was protected, so

21   understanding how patents create -- lead to the

22   creation of value and value to their owners was

23   very important to understanding and sorting through

24   and analyzing Nortel's form and the other theories

25   put forward.

 Neeson & Associates   W&F

1                    Q.   At page 6 of your report you

2    address the generic topic, the economics of

3    allocation.  Are issues of allocation common in

4    economics?

5                    A.   Yes, they come up in many

6    different -- in many different situations.  Any

7    time there is a common pool of value that needs to

8    be allocated to common owners, or if there are

9    common costs that need to be allocated, economics

10   is quite familiar with addressing those issues.

11                   Q.   Right.  In coming to your

12   conclusion that pro rata was the most appropriate

13   allocation methodology, were you required to draw

14   on your valuation expertise?

15                   A.   Not directly.  The pro rata

16   allocation approach avoids having to make a

17   valuation analysis.

18                   Q.   In providing your analysis of the

19   other expert opinions or other approaches, were you

20   required to draw on your valuation expertise?

21                   A.   Yes, I was.  All of the other

22   allocation approaches at some level are based on

23   valuation of assets.

24                   Q.   All right.  Can we turn to page 1

25   of your first report, and in your executive summary



1    you provide three broad observations about the

2    economics of Nortel which support your conclusion.

3    Can you just describe these -- we're going to go

4    into them more deeply but just locate us on what

5    these three broad observations are?

6                 A.   Of course.   The three observations

7    are all related to the interconnectedness of Nortel

8    and how its operations and assets were intertwined.

9                 The first observation related to the

10   organizational form of Nortel.   The second

11   observation related to the interconnectedness and

12   intertwined nature of the technology at Nortel.

13   And the third observation related to the

14   interconnectedness of the geographies of Nortel.

15                Q.   So with respect to the

16   organization, what, again very briefly, were the

17   salient aspects of the Nortel organization which

18   caused you to support the pro rata method of

19   allocation?

20                A.   That it was a highly integrated

21   company often referred to as the one Nortel.   Given

22   that highly integrated nature, the pro rata

23   allocation seemed the most appropriate way to deal

24   with allocating these funds.

25                Q.   What did you observe to be the



1  role of individual legal entities within Nortel

2  prior to insolvency?

3          A.  The evidence that I saw suggested

4  the management decisions and the operations of

5  Nortel did not take into consideration any of the

6  legal distinctions, that they weren't part of the

7  operational decisions of Nortel as a production --

8  productive entity.

9          Q.  Is that the same thing as -- or

10  how is that different than respecting the fact that

11  there were legal entities?

12          A.  It's separate from that.  There

13  were legal entities but they didn't --

14  consideration of those legal entities didn't

15  influence the decision-making process of Nortel's

16  management.

17          Q.  In your view were any of the

18  economic incentives of Nortel aligned along the

19  lines of the legal entities?

20          A.  Not as far as I could tell.

21          Q.  Okay.  With respect to the

22  technology, what were the salient aspects of the

23  Nortel technology which caused you to support the

24  pro rata method of allocation?

25          A.  That the technology was very



1    intertwined, that the production of the research

2    and development flowed across the lines of business

3    or the technology groups at Nortel, and that it

4    would be very difficult to parse apart the source

5    of the value by line of business or technology.

6                    Q.    We'll come to your analysis of

7    that.  With respect to the geography of Nortel,

8    what were the salient aspects of Nortel's

9    geographic organization which caused you to support

10   the pro rata method of allocation?

11                   A.    Particularly when it came to the

12   R&D functions at Nortel, that they were not divided

13   along geographic lines, that the different labs in

14   the different countries worked together and there

15   was lots of cross-geographic collaboration and that

16   it would be very difficult indeed to draw a fence

17   around each of the geographies and try to allocate

18   value along those lines.

19                   Q.    Picking up a couple of points from

20   pages 8 to 10 where you deal with Nortel's matrix

21   organization under that heading, I'm not going to

22   get you to repeat what you've told us.

23                   But was Nortel's structure different

24   than other technology companies you have

25   encountered?



 1                     A.    It was a matrix organization.   It
 2    was different than most other technology companies
 3    in that the breadth of its product portfolio, its
 4    lines of business was wider than I think many of
 5    the other companies, and also its research and
 6    development was more global.
 7                     It's not that other firms don't have
 8    global research facilities, but they tend to have
 9    them much more concentrated in one country.   An
10    example would be RIM in Canada did most of its
11    research in Canada.
12                     Q.    All right.   This may come here or
13    it may come under the technology, but how does the
14    fact that individual patents could be identified as
15    appropriate to sell with lines of business affect
16    your conclusion?
17                     A.    It doesn't affect my conclusion.
18    The integrated nature of the Nortel technology was
19    in its production and the inputs into creating it,
20    not in that it could in some cases be associated
21    with just one line of business.
22                     Q.    All right.   And were the patents
23    sold with the line of business broken up
24    geographically when sold?
25                     A.    No, they weren't.   The patent went



```
 1    with the line of business with no consideration or

 2    accounting for the geographic creation of those

 3    patents.

 4                    Q.   Okay.  So if we could turn briefly

 5    then to your first report, pages 11 to 15 under the

 6    heading, "The Interconnectedness of Nortel

 7    Patents," this is where you explain how you came to

 8    your second of your three observations about the

 9    technology.

10                    What did you look at to analyze this

11    issue?

12                    A.   I looked at the data and documents

13    and testimony provided in this proceeding and where

14    people explained how the intellectual property was

15    created.  And then I also did an analysis of the

16    Rockstar portfolio of patents.

17                    Q.   When you looked at the Rockstar

18    portfolio of patents, what did you focus on in

19    those patents?

20                    A.   It was a citation-based analysis.

21    Patents cite technically to prior art that the

22    patent examiner has looked at in establishing that

23    the patent is itself an innovation worthy of being

24    patented, and it's quite common in analyzing

25    portfolios of patents to look at citations from one
```



1    patent to another.

2              Q.   And did you focus on a subset of

3    the citations in these individual patents?

4              A.   Yes, I did.  I looked at the

5    citations that were - sorry - I looked at the

6    citations that were from Nortel patents to other

7    Nortel patents, so trying to focus my attention on

8    how different lines of research at Nortel

9    interacted with each other.

10             Q.   Is there a name for that type of

11   analysis?

12             A.   It's a forward citation analysis.

13             Q.   And is a forward citation analysis

14   a common method of analyzing the interrelationship

15   between patents?

16             A.   Yes, it is.  The patents cite to

17   the prior art so they build on prior research, so

18   the patent citations can tell you which other

19   patents any given patent builds on.  They're also

20   commonly used in patent valuation studies.

21             Q.   And what generally did the Nortel

22   citations reveal to you about the

23   interconnectedness of Nortel's patents?

24             A.   Generally that they were quite

25   interconnected and that the patents and different



1    lines of business cited to each other quite a bit.

2                    Q.   Okay.  If we could turn to page 14

3    of your initial report and look at figure 5, we

4    have that up on the screen, is this an accepted

5    method of depicting interrelationships between

6    patents?

7                    A.   Yes, it is.  As I said, analyzing

8    forward citations is common and laying out network

9    graphs is a common technique for showing

10   interconnectedness in networks.  It's been applied

11   in patent analysis and elsewhere.

12                   Q.   In what context would this come

13   up?

14                   A.   In valuing -- in understanding the

15   production of the Nortel patents wherein a set of

16   patents, looking at connections between different

17   nodes in the network is a common way of looking at

18   the display in the interconnectedness in evaluating

19   it.

20                   Q.   And have you used this in other

21   contexts?

22                   A.   I have.

23                   Q.   Just to break this down, what do

24   the words in the circles represent?

25                   A.   These are the technology groupings



1   that the analysis is based on.

2            Q.   Okay.  And what was the source of

3   these technology groupings or franchises as you

4   call them in the report?

5            A.   The analysis of which technology

6   buckets a particular patent belonged in was done by

7   the Global IP Law Group as part of the analysis

8   that we talked about earlier that they did for

9   Nortel.

10           Q.   And you just took that from their

11  report?

12           A.   I did.  I think I grouped a couple

13  of them -- a couple of the buckets together, but

14  that's explained in my appendix.

15           Q.   Okay.  And what does the size of

16  the circle represent?

17           A.   The size of the circle represents

18  the number of patents that are in that technology

19  grouping.  To make this graph readable, I had to

20  scale the number of patents and in this case I

21  scaled them by their square root.

22           Q.   And what do the lines represent?

23           A.   The lines represent the forward

24  citations between patents in the different

25  technology groupings.  They -- it might be a little



1    hard to see on this graph but they do have arrows

2    pointing so that forward -- citations in both

3    directions are represented.

4                    Q.    Okay.  And what does the thickness

5    of the lines represent?

6                    A.    Again, it's the number of

7    citations connecting the nodes on the network

8    graph, and again, for purposes of readability I

9    scaled them, in this case, to the square root of

10   their number of connections.

11                   Q.    So when you add all that up and

12   you stand back and you look at this diagram, in

13   plain words what does it tell you?

14                   A.    It tells me that Nortel's

15   different lines of technology, that the

16   intellectual production process behind them are

17   very interconnected.

18                   Q.    Right.  And how did that

19   interconnectedness inform your view that the pro

20   rata methodology is the appropriate methodology?

21                   A.    Well, it shows it to be very

22   difficult to disentangle the production of the

23   intellectual property or the patents at Nortel.

24   Even if you had clear ideas of what the different

25   nodes were worth, what went into the production of



 1    those nodes crosses each other's technology

 2    boundaries.

 3              Q.   And if we can go to your first

 4    report at pages 15 to 23, you perform an analysis

 5    under the heading "The Geographic Entanglement of

 6    Nortel's IP Creation Process."

 7              A.   That's correct.

 8              Q.   In those pages you describe

 9    another analysis of the citations contained in

10    Nortel's patents.  What aspects of the citations

11    did you look at to perform this analysis?

12              A.   Well, I added to the previous

13    citation analysis by looking at inventor analysis,

14    looking at where the inventors that are listed on

15    the patents, which countries they were in.

16              Q.   And how did you determine the

17    location of the inventors?

18              A.   The inventors and their location

19    are clearly listed on the front of each patent.

20              Q.   All right.  And did you look at

21    forward citations as well?

22              A.   Yes, this builds on the analysis

23    we described before of forward citations as well.

24              Q.   So if we go over to page 22, if

25    I've done it right, and we look at figure 7 on page



1    22, maybe you can break this down for us.

2              Down the left-hand side of the page we

3    have the rows identified?

4              A.   That's correct and each row

5    represents the geographic location of the patents,

6    when parsed by inventor.

7              Q.   All right.  And if we look at the

8    columns 1 through 10, what are they?

9              A.   Those are the same technology

10   groupings that we saw in the previous network graph

11   and they're listed in the notes at the bottom.

12             Q.   And those are the ones that you

13   took from the IPCo analysis?

14             A.   That's correct.

15             Q.   And what do the lines represent?

16             A.   These are the same forward

17   citation lines but now separated by geography as

18   well as lines of business.

19             Q.   All right.  And the thickness of

20   the lines?

21             A.   Again, they're related to the

22   number of citations although in this case it's --

23   it's a proportionate measure that's different than

24   the square root.

25             Q.   I'll leave that to others.  Is

 Neeson&Associates   W&F

1    this a common form of presentation?

2              A.    I think this is less common in

3    part because, as I said earlier, Nortel was

4    somewhat unique in that most companies don't have

5    this level of spread of its intellectual property

6    production across both lines of businesses and

7    geographies.  Most countries -- excuse me, most

8    companies would be more concentrated in both the

9    columns and in the rows.

10              Q.    So you would -- just to translate

11   that, if this was a typical technology company,

12   what would you expect to see down the rows?  Would

13   you expect to see the same number of rows?

14              A.    So, companies do have research

15   facilities across the world but they would be much

16   more concentrated so there would be far fewer

17   connections between the different geographies, and

18   whichever geography was the one that had most of

19   the production, say in the example of RIM, if it

20   was Canada on the top line, you would expect to see

21   a very thick interconnection within that geography

22   across the lines of businesses.

23              Q.    Okay.  What does this depiction

24   tell you about the interrelationship between

25   Nortel's patents?



```
 1                     A.    That they are quite interconnected
 2    both as we saw before across the lines of business,
 3    but also across geographies, and that it would be
 4    very difficult to disentangle all of this analysis
 5    to bring value back to specific geographies.
 6                     Q.    So let's just put that in human
 7    terms.  If we took the example of an individual
 8    patent inventor, and I think you read the testimony
 9    of Simon Brueckheimer?
10                     A.    That's correct.
11                     Q.    Just tell us how that would relate
12    to his work?
13                     A.    If I remember correctly, he
14    mentioned working in the UK on the carrier voice,
15    some carrier voice patents.  Those patents would be
16    represented in the circle that's three rows down
17    and three columns in, so UK and under column 3 for
18    carrier voice would be where the patents that he
19    talked about would be located.
20                     What this is showing is that the
21    patents that are in that circle that
22    Mr. Brueckheimer worked on would be very
23    interconnected both across other technologies, the
24    research on carrier voice would support
25    intellectual property production in other
```



1    technology areas, so that would be the horizontal

2    lines connecting the dots for the United Kingdom;

3    that he was collaborating with researchers in other

4    labs in other countries on carrier voice technology

5    which would be represented by the vertical line

6    under 3, and that the diagonal lines show that

7    those interconnections went across technologies as

8    well as across geographies simultaneously.

9              Q.   And what does this depiction tell

10   you about the ability economically to allocate to

11   specific countries their contribution to the value

12   of any individual patent?

13             A.   Well, I think it shows how

14   difficult it would be to disentangle the value, the

15   production process of Nortel's intellectual

16   property and sort of put a fence around any one

17   geographic area.

18             Q.   Okay.  So stepping from geographic

19   regions to individual debtor companies, in Canada

20   for instance there's been testimony that many of

21   the researchers worked for a particular selling

22   debtor, NN Technology.  Are you able to identify

23   which selling debtor conducted the Canadian

24   research?

25             A.   I haven't done that analysis.  I



1    don't know if there is evidence to allow you to

2    disentangle the debtors.  This analysis is based on

3    a country where the inventor is, taken from the

4    patents.

5                    Q.   And is that analysis -- are you

6    able to do that analysis by looking at the face of

7    the patent?

8                    A.   Yes, the inventors' names and

9    their locations are on the patents, with no

10   reference to what company they were employed by.

11                   Q.   So on the face of the patent, are

12   you able to attribute them to individual debtor

13   countries?

14                   A.   No, not within a geography.

15                   Q.   All right.  And similarly, the

16   IFSA identifies 15 US debtor corporations.  Are you

17   able to identify which selling debtor the research

18   is attributable to in the US?

19                   A.   No, again this is US geographic

20   based analysis and I am not able to distinguish

21   between the selling debtors.

22                   Q.   So if a patent had a single

23   vertical line through the many countries, would

24   that allow you to identify the relative

25   contributions of those countries?



```
 1                    A.    No, what that would tell me is
 2   that the technology involved in that patent did not
 3   rely very much on other technologies developed at
 4   Nortel, but it did rely on analysis across many
 5   labs in different countries and it wouldn't give
 6   you a way to parse those -- that value creation.
 7                    Q.    Okay.  If we can turn to another
 8   topic then, at pages 18 to 20 of your first report
 9   you do an analysis of cross-geography originations.
10   Now, again, you looked at the patents?
11                    A.    Yes.  This is the inventor
12   analysis looked at on its own.
13                    Q.    And what aspects of the patents
14   did you look at for this analysis?
15                    A.    For this analysis, I didn't -- I
16   did not -- I put aside the citation analysis and
17   just looked at the location of the inventors as
18   described on the patents.
19                    Q.    Okay.  And were you able to assign
20   countries to inventors?
21                    A.    Yes, I was.  The patents list
22   their home country.
23                    Q.    And what did you do for patents
24   with inventors in more than one country?
25                    A.    I would proportionately share the
```



 1   patent among those inventors.

 2            Q.   All right.  And I understand you

 3   analyzed three different sets of patents?

 4            A.   That's correct.

 5            Q.   Can you describe them?

 6            A.   The first set was a collection of

 7   top 100 patents that Nortel put together

 8   periodically and I think there was three samples of

 9   the top 100 which led to the 213 patents analyzed

10   in table 1.

11            Q.   Sorry, just to stop there, that

12   was something that Nortel did internally?

13            A.   I believe that's correct, yes.

14            Q.   Okay.

15            A.   And just to point out that it's

16   less than 300 because some of the patents that were

17   top patents survived from one list to another.

18            Q.   Okay.  What was the next group of

19   patents that you looked at?

20            A.   This would be the Rockstar patents

21   that were considered high value.  These are the

22   patents that had a one or two star rating from the

23   Global IP Law Group analysis.  And I think

24   Mr. Malackowski focused quite a bit on the high

25   value subset.



1                    Q.   Right.  And then the third subset

2    that you looked at?

3                    A.   Would be all of the patents

4    included in the Rockstar portfolio.

5                    Q.   Okay.  And if we look either to --

6    I understand if we go to table 3 on page 19, and I

7    understand that this was corrected in your rebuttal

8    report and appears at page 49 of your rebuttal

9    report as well?

10                   A.   I believe that's correct.

11                   Q.   I believe we have the corrected

12   one up on the screen.  In these data, what subset

13   are you analyzing?

14                   A.   This is the entire Rockstar patent

15   portfolio set.

16                   Q.   And what do these data

17   demonstrate?

18                   A.   They show, based on the inventor

19   analysis, the contribution of inventorship to the

20   portfolio of Rockstar patents, parsed across

21   geographies.

22                   Q.   So this is inventorship by

23   country?

24                   A.   Yes.

25                   Q.   And from this analysis, what was



1    your conclusion about the value of R&D spending as

2    a metric to measure contribution to the value of

3    the patents?

4                    A.   That it's an unreliable metric.  I

5    take the example of the UK which contributed by

6    inventorship analysis about 15 percent of the

7    inventors of the Rockstar patents, but by an R&D

8    spending metric contributed quite a bit less, less

9    than a third of that.

10                   Q.   Right.

11                   THE CANADIAN COURT:  Mr. Barrack, I've

12   been looking at page 39 of the rebuttal report, I

13   don't see anything about this.

14                   MR. BARRACK:   Sorry, 49 of the second

15   report.  It's a correction at the back of the

16   second report.

17                   THE CANADIAN COURT:   Sorry, I thought

18   you said 39.

19                   THE WITNESS:  The correction is to a

20   couple of the numbers of the patents, but it

21   doesn't change any of the percentages in the far

22   left column, which is the part of the analysis that

23   I'm focused on in responding to that question.

24                   BY MR. BARRACK:

25                   Q.   So if we just break that down a



1    little bit, if we go across the UK line, we see

2    percentage of total granted as 15 percent?

3                 A.    That's correct.

4                 Q.    And that represents what?

5                 A.    Fifteen percent of the -- one way

6    to think of it is 15 percent of the inventors that

7    contributed to the -- 15 percent of the

8    inventorship of the patents in the Rockstar

9    portfolio were from inventors in the United

10   Kingdom.

11                Q.    All right.  And again, that

12   compared to the MRDA spend percentage for NNUK?

13                A.    More than three times what that

14   R&D spending was.  Another way of saying it is that

15   the UK fought well above its weight in producing

16   intellectual property.

17                Q.    How does this analysis, and you

18   have your other charts as well, compare with the

19   similar analysis of Mr. Malackowski?

20                A.    Well, Mr. Malackowski did his

21   analysis at the estate level, so it's roughly

22   comparable, but we break out -- I break out the

23   three EMEA RPEs separately, whereas he treats them

24   as one single entity.

25                As you can see here, that whereas the



1    UK was a particularly productive contributor to the

2    patent production, that some of the other EMEA

3    entities were less productive, and when you average

4    them together some of the pluses and minuses cancel

5    each other out, and the total at the EMEA Estate

6    level, it's not as disparate as indicated by

7    looking at the individual countries.

8                    Q.    So what is the impact of this

9    inventor analysis of cross-country originations on

10   your support for pro rata?

11                   A.    Well, it reinforces my support for

12   pro rata because it shows the difficulty of using,

13   or the inappropriateness of using R&D spending as a

14   metric for distributing the funds in a contribution

15   approach.

16                   Q.    So as an economist, are you able

17   to disentangle the contribution to the creation of

18   patents on a geographic basis with confidence?

19                   A.    No, not with confidence.

20                   Q.    All right.  I'm going to turn to

21   another topic.  I wonder if that's an appropriate

22   place for the afternoon break, Your Honour?  Do you

23   want me to go to 3:30, keep going?

24                   THE CANADIAN COURT:  Are you fine with

25   that, Judge Gross?



1                 THE US COURT:  Ready.

2                 THE CANADIAN COURT:  Just before we do

3    that, on page 6 of the report you refer to the

4    economist John Nash and the game theory.  Is that

5    the "Beautiful Mind" John Nash?

6                 THE WITNESS:  That's one and the same.

7    His theories weren't nearly as crazy as he was.

8                 THE CANADIAN COURT:  Fifteen minutes.

9    -- RECESS AT 3:17 P.M. --

10   -- UPON RESUMING AT 3:40 P.M.--

11                THE US COURT:  Ready?

12                THE CANADIAN COURT:   Judge Gross, yes.

13   Mr. Barrack?

14                BY MR. BARRACK:

15                Q.   In your second report beginning at

16   page 4, you comment on the economics of the MRDA,

17   and at pages 4 to 7 you review the evidence which

18   has been confirmed in testimony about some of the

19   concepts under the MRDA.

20                Prior to insolvency, what did you

21   observe as the economic purpose of the MRDA?

22                A.   To divide operating profits among

23   the residual profit entities.

24                Q.   And is it part of your evidence to

25   offer any comment on the appropriateness of the



1    MRDA as a transfer pricing mechanism?

2              A.   No, I'm not here as a transfer

3    pricing expert today.

4              Q.   And in your rebuttal report at

5    pages 7 to 9, you have a heading "The MRDA Does Not

6    Provide an Economically Rational Allocation of the

7    Lockbox Funds."  I would like to get some

8    nomenclature down so that when you're describing

9    this we know what you're talking about.

10              There appears to be agreement amongst

11    all parties that under the MRDA, five-year

12    spending, R&D spending was treated as a capital

13    item and amortized as 30 percent.  Can we refer to

14    that capital amount as the R&D capital stock?

15              A.   Yes, we can.  I think that's two

16    different concepts.  At one point it was a

17    five-year capital stock, the other time it was a

18    capital stock that was amortized at 30 percent, but

19    in both cases it ends up with an R&D capital stock.

20              Q.   Fair enough.  It is also accepted

21    that under the MRDA, the proposal to the competent

22    authorities was to divide the annual residual

23    profits and losses among the RPEs based upon their

24    relative proportion of the R&D capital stock; is

25    that fair?



1                     A.    That's my understanding, yes.

2                     Q.    And can we refer to that annual

3    percentage used for residual income splitting as

4    the annual profit/loss percentage?

5                     A.    The annual profit/loss percentage,

6    yes.

7                     Q.    Okay.  In your opinion, would it

8    be appropriate to allocate the proceeds of the line

9    of business sales and the Rockstar sale on the

10   basis of the annual profit/loss percentages used in

11   the MRDA?

12                    A.    No, it would not.  The MRDA, as

13   just mentioned, was designed to allocate profits

14   and losses, and assets are not profits and losses.

15                    Q.    Do the annual profit and loss

16   percentages allocate all of the value associated

17   with all of Nortel's patents?

18                    A.    No, they were designed to allocate

19   the operating profits and losses so they only

20   include a subset of the entitlements that come from

21   a portfolio of patents like Nortel's.

22                    Q.    Under the MRDA how were on-going

23   pension costs dealt with in calculating the annual

24   profit and loss percentages?

25                    A.    Like other operating expenses, the



1    pension costs were subtracted from revenues in the

2    calculation of the residual profit or loss that was

3    to be distributed under the MRDA.

4              Q.   Okay.   Now, while I appreciate

5    it's not your testimony that this is appropriate,

6    if for some reason the courts were to look to the

7    MRDA as the operative analogy for allocating

8    proceeds of asset sales in liquidation, what would

9    be the economically appropriate treatment of the

10   pension costs?

11             A.   They would be subtracted off the

12   revenues from the asset sales to calculate the

13   profit --

14             THE CANADIAN COURT:  Can I ask you

15   which pension costs you're talking about?  Are you

16   talking about future pension costs?

17             THE WITNESS:  I'm here referring to the

18   pension liabilities, the future pension costs, yes,

19   that would be, had Nortel continued to operate as

20   an on-going entity, under the MRDA as those pension

21   costs were paid off, they would be paid off out of

22   operating -- as an operating expense reducing the

23   operating profits that were divided up under the

24   MRDA.

25             Similarly, to analogize that to the



1   sale of assets, you would account for your deferred

2   operating expenses including the Nortel pension

3   costs.

4                    BY MR. BARRACK:

5                    Q.   All right.  So to break that down

6   a little bit, on an annual basis in calculating the

7   annual profit/loss percentage, what's your broad

8   understanding of what was included for pension

9   costs?

10                   A.   Some share but not a full

11  accounting of the costs of those pensions would

12  flow through the income, annual income statement

13  into calculating the profit or loss for a given

14  year to be distributed.

15                   Q.   Okay.  So then can you explain, go

16  through how that analogy would be carried forward

17  to a sale on a liquidation?  What's the equivalent

18  measure of pension costs that you would take into

19  account?

20                   A.   So now that we've moved from

21  income statements to balance sheets, the revenue

22  from the asset sales would be first you would

23  deduct any of the unpaid operating liabilities such

24  as the unpaid portion of the pension costs before

25  calculating the profit or loss under the MRDA that



1    gets distributed.

2              Q.    Right.    And because we're trying

3    to attribute all of the present value which

4    represents future value, in your view would it be

5    economically appropriate to take in all future

6    operating liabilities such as pension costs as

7    well?

8              A.    Yes.

9              Q.    All right.    Does your pro rata --

10   if the MRDA was used as an analogy, and this is not

11   your model, but if the MRDA was applied on that

12   basis, would it end up resulting in a priority for

13   operating losses?

14              A.    Yes, they would get paid prior --

15   in full prior to the calculation of the operating

16   profit or loss, the residual profit or loss that

17   would then get divided under the MRDA.

18              Q.    Does your pro rata approach give

19   priority to pension or operating costs?

20              A.    No, it treats all the unsecured

21   claims equally.

22              Q.    All right.    Why do you find the

23   pro rata method to be more economically appropriate

24   than an allocation method based on the MRDA?

25              A.    The MRDA was designed to allocate



1    the profits which were derived from a subset of the

2    rights or entitlements of Nortel's intellectual

3    property, so it's not -- it wasn't designed to be a

4    bargain for dividing up the sales proceeds.

5                   Nortel was run as the one Nortel

6    integrated entity, and as one international

7    company, it typically paid its debts first before

8    its -- before returning money to others.  And as

9    such, I would think it's much more in line with how

10   Nortel was operated to distribute the lockbox funds

11   on a pro rata basis based on claims.

12                  Q.   So you made reference a couple of

13   times to a subset of economic rights being dealt

14   with in the MRDA.  Can you just expand that concept

15   for their honours so they understand what you're

16   talking about?

17                  A.   Sure.  The MRDA divided operating

18   profits so the rights that were used and were

19   compensated for under the MRDA were the subset of

20   patent rights that were exploited in the on-going

21   Nortel operations.

22                  That leaves out, I think, two

23   categories of patent entitlements that really

24   didn't contribute directly to the operating

25   profits.  One was patents for products that were



1   not being produced by Nortel at that time; and then

2   the other was the asset value of those patents or

3   the value in selling them.

4              Q.   Now, turning to another topic.  On

5   your deposition you were asked whether the pro rata

6   approach can accommodate both the guarantee in the

7   intercompany claims, and the court asked us in

8   opening whether the pro rata approach could

9   accommodate the 2 billion intercompany claim of the

10  US into Canada.

11             And I understand you have prepared a

12  demonstrative, we showed it to the court before, to

13  deal with these issues?

14             A.   Yes, I have.

15             Q.   I wonder if we can have copies of

16  those.  Do you have it in front of you?

17             A.   I don't, sorry.

18             MR. BARRACK:  And I wonder, Your

19  Honour, if this should be marked as the next

20  exhibit?

21             THE CANADIAN COURT:  Any objection to

22  it being marked?  The next exhibit.

23             THE REGISTRAR:  Exhibit 41.

24  EXHIBIT NO. 41:  Demonstrative entitled Pro Rata

25  Mechanics.



1            THE CANADIAN COURT:  Just before you go

2    on, Mr. Barrack, can I make a note here?  Go ahead.

3     Wait a minute, Mr. Barrack.

4            BY MR. BARRACK:

5            Q.   Okay.  So can we go to page 2 of

6    this demonstrative, the pure pro rata percentage.

7    In simple terms, what is this ratio?

8            A.   This is the ratio of the worldwide

9    assets of Nortel that are available for pro rata

10   distribution divided by the worldwide debts of

11   Nortel that are to be paid out of the pro rata

12   distribution model.

13           Q.   And is this the simplest form of

14   pro rata?

15           A.   Yes, it is.

16           Q.   All right.  And is it possible to

17   adjust this ratio to accommodate various legal

18   decisions which the court might make?

19           A.   Yes.  The principle of a pro rata,

20   calculating a pro rata percentage based on the

21   assets over the claims can hold under any number of

22   assumptions or legal determinations by the court.

23           Q.   All right.  And while I anticipate

24   you're going to get many different scenarios on

25   cross-examination, once the court was to decide a



1   number of these issues, and some of them we'll come

2   to, a representative sample, would it be possible

3   to adjust the pro rata percentages to take these

4   into account?

5                    A.   Yes, it is based on the idea that

6   the assets available for distribution are in the

7   numerator and that the claims, here represented

8   simply by the debts of the worldwide Nortel entity,

9   are in the numerator.  Both of those can be

10  adjusted based on legal rulings.  But the basic

11  formula of assets available over the claims would

12  remain.

13                   Q.   All right.  Can we flip back to

14  slide 1 where you've got the definitions just to

15  break them down a little bit.  WWA, worldwide

16  assets in all estates available to unsecured claims

17  which will be subject to pro rata distribution.

18  Does the -- do those assets include the cash that

19  is currently in each of the bankruptcy estates?

20                   A.   Yes, it does.

21                   Q.   Do those assets include the

22  proceeds of sale or lockbox funds?

23                   A.   Yes, it would be the sum of the

24  estates' assets and the lockbox funds.

25                   Q.   And when you say "available to



1  unsecured claims," what happens to priority or

2  secured claims?

3          A.   Well, priority or secured claims

4  would be taken out of this equation, so that they

5  would get both -- the claims would be removed as

6  they are paid, as are the assets that were used to

7  pay them.

8          Q.   And when you say "subject to pro

9  rata distribution," what assets are not available

10  for the pro rata distribution?

11          A.   Well, in addition to the priority

12  or secured claims, if an estate or a debtor has

13  sufficient assets to pay off its claims at a rate

14  higher than the global pro rata amount, then they

15  would -- because we don't take money out of any

16  estates, their claims and their assets would be

17  removed from the equation as well.

18          Q.   All right.  And --

19          A.   It's an important point to

20  remember that when we are talking about the ratio

21  for the pro rata distribution, that it's just the

22  claims that are available to be distributed are to

23  be addressed under the pro rata approach.

24          Q.   All right.  And what happens to

25  claims that have already been settled and satisfied



1    by payments to individual creditors?

2              A.   It's up to the courts to decide

3    how to handle those.  If those are treated as

4    priority -- viewed as priority claims, then they

5    would come out of this allocation approach.  If

6    not, it's up to the courts to decide whether or not

7    to include them in the set of funds available for

8    worldwide distribution or not.

9              Q.   Okay.  And before we go to the two

10   examples of adjusting the simple formula, can we go

11   to slide 5 under "Pro Rata Mechanics."  It's page

12   5.  You make a number of qualifying points there.

13   The first is that:

14                   "No debt (including guaranteed

15                   debt) can recover more than 100

16                   percent."

17              Before you explain that, let's get some

18   nomenclature again.  When you refer to a debt, what

19   does that refer to?

20              A.   That's the underlying debt that's

21   on one or more of the -- that's claimed against one

22   or more of the Nortel Debtors.

23              Q.   So in a simple example where bonds

24   had claims of $4 billion, say, and that $4 billion

25   was guaranteed, was issued by Canada, NNL or NNC or



1    guaranteed by NNI, what would the amount of the

2    debt be?

3                   A.   The underlying debt would be the

4    $4 billion debt.

5                   Q.   Right.  And when you refer to a

6    claim, what does that refer to?

7                   A.   That's how that debt is

8    represented as a claim, represented in the Nortel

9    Estates or Debtors.

10                  THE CANADIAN COURT:  Does that include

11   interest on it?

12                  THE WITNESS:  That's for the court to

13   decide whether or not -- what the underlying debt

14   is.  I think in all of these cases the court or

15   courts of jurisdiction decide both what the

16   underlying debt is but also how to represent that

17   debt as claim -- as a claim or multiple claims in

18   the Estates or the Debtors.  But once those

19   decisions are made, the formula is fairly simple

20   and straightforward to calculate the pro rata

21   amount.

22                  BY MR. BARRACK:

23                  Q.   And are you offering any opinion

24   as to whether post judgment interest on any debt or

25   any component of any debtor claim should be



```
 1    recognized?

 2              A.   I'm not part of the claims part of

 3    this trial.

 4              Q.   All right.  And so, who will

 5    determine the amount of the debts and the amount of

 6    the claims?

 7              A.   It would be the courts with the

 8    proper -- court or courts with the proper

 9    jurisdiction.

10              Q.   And would you -- and do you

11    suggest any legal restrictions on the recovery of

12    creditors or their claims in these -- in these

13    examples?

14              A.   Well, I note that it would be

15    inappropriate to distribute more than a hundred

16    percent of a debt.  Whether or not there are other

17    restrictions on how much any debtor or claimant can

18    recover would again be a matter for the courts, but

19    similar to the hundred percent restriction or

20    stipulation I note here, it would be very easy to

21    implement any other restrictions on the recoveries

22    of any parties.

23              Q.   Okay.  And while it's probably

24    obvious, how could there be a recovery of more than

25    100 percent hypothetically?
```



```
 1                      A.   Well, in the example you gave of
 2   bonds of 4 billion that could be claimed in two
 3   jurisdictions, if the courts chose to represent
 4   those as full claims in both jurisdictions, that
 5   would be -- those $4 billion in bonds would
 6   represent $8 billion in claims, and so long as the
 7   global pro rata recovery rate was above 50 percent,
 8   they would -- they would implicitly recover more
 9   than a hundred percent of the underlying debt, in
10   which case, recognizing that, you would take that
11   debt and the payments for that debt out of the pro
12   rata calculation system.
13                      Q.   All right.  Your next point is:
14                      "Any entity which is able to
15                      effect a recovery on claims in excess
16                      of the applicable pro rata percentage
17                      is removed from the pro rata formula
18                      and becomes a non-participating
19                      entity."
20                      What assets and debts are used
21   initially to do this assessment?
22                      A.   So initially we, as in we used the
23   global assets and claims to figure out the global
24   pro rata recovery rate.  We then examined each of
25   the debtors to see whether or not they already have
```



```
 1   sufficient assets to pay the claims against them in

 2   excess of that percentage.  If that condition is

 3   met, then both that set of claims for that debtor

 4   and the assets of that debtor are then removed from

 5   the calculation of the global pro rata rate and it

 6   is re-calculated.

 7              Q.   And as the pure or simple analysis

 8   is adjusted as we go through the examples or as

 9   legal conclusions are layered on, is this analysis

10   repeated?

11              A.   It is an iterative process but I

12   would not expect it to be very many steps.

13              Q.   Right.  Your next point is:

14              "Funds are distributed from the

15              lockbox to bring participating entities

16              to a position to be able to satisfy

17              claims against them at the pro rata

18              percentage."

19              Do your other slides demonstrate how to

20   calculate those pro rata percentages in some

21   scenarios?

22              A.   Yes, it calculates the percentages

23   and then to complete the step you would in essence

24   top off the funds in each of the debtors, so that

25   they would then be able to have -- they would then
```


Neeson&Associates   W&F

 1   have funds sufficient to pay their claims at the

 2   pro rata amount.

 3            Q.   And then your final point is:

 4                 "No funds are moved from any

 5                 entity (unless there is a surplus, in

 6                 which case the surplus flows to

 7                 equity-holders)."

 8            How do you define a surplus for this

 9   purpose?

10            A.   That would be, in essence, if the

11   debtor went solvent, in that it was able -- had

12   sufficient assets to pay all of its claims at 100

13   percent and still had money left over, that money

14   would be returned to the owner of that debt.

15            Q.   And if there is a surplus and

16   moved to the equity holder, and assume that the

17   equity holder is another Nortel entity, does the

18   amount received become subject to the pro rata

19   calculations?

20            A.   Ultimately it's up to the courts

21   to decide how to treat it, but the logic of the pro

22   rata allocation method would be that you would

23   treat any surplus like that as cash in the

24   receiving estate.

25            Q.   Is it possible to do interim



1    distributions?

2                  A.    Yes, the formulas I lay out could

3    easily do interim distributions of parts of the

4    lockbox funds.

5                  Q.    And how would you expect the

6    interim distributions to relate to the total amount

7    in the lockbox?

8                  A.    The interim distributions, the

9    exact amounts would depend on how they were

10   distributed.  The uncertainty about the claims was

11   distributed among the estates, but I think one

12   thing that's clear from the formula is that the

13   amount that needs to be held back under this pro

14   rata approach would almost certainly be less and

15   quite a bit less than the sum of the uncertain

16   claims.  So you wouldn't have provision for claims

17   dollar for dollar, it would be something a bit less

18   than that.

19                  Q.    All right.  And how would the

20   amount which would be held back from an interim

21   distribution in a pro rata approach compare to the

22   amount to be held back under any of the other

23   allocation methods?

24                  A.    So, under the other allocation

25   methods, I think you have to provision in each,



1   after you distribute the lockbox funds, distribute

2   -- provision in each estate for any uncertainty of

3   claims.  I would expect that amount to total more

4   than the amount held back under the pro rata

5   distribution amount.

6              Q.   And do these formulas work if

7   they're applied to individual debtors as well as

8   estates?

9              A.   Yes, they do.

10             THE CANADIAN COURT:  Could I just ask a

11  question here.  I don't understand your last bullet

12  point:

13                 "No funds are moved from any

14                 entity (unless there is a surplus, in

15                 which case it flows to equity.)"

16             Let's assume under your pure pro rata

17  that people are entitled to 20 percent of their

18  claim and let's assume that in one jurisdiction

19  there isn't sufficient cash to pay them 20 percent

20  of their claim.  Where does the cash come from?

21  Does it get moved from another entity?

22             THE WITNESS:  No, it's coming from the

23  lockbox.  So to be under the pro rata distribution,

24  to be eligible for the pro rata distribution, all

25  of the receiver -- all of the estates or underlying



```
 1   debtors would be receiving funds, top-up funds from
 2   the lockbox.
 3              THE CANADIAN COURT:  No, but I thought
 4   you said it's lockbox plus whatever cash is
 5   available.
 6              THE WITNESS:  I'm sorry.  The lockbox
 7   funds are distributed so that when combined with
 8   the cash in the debtor, the debtor is able to make
 9   the pro rata allocation amount.
10              THE CANADIAN COURT:  What if there
11   isn't sufficient cash so that -- does it mean that
12   creditors from one country will get a different
13   amount than creditors in another, depending on the
14   amount of cash in that country?
15              THE WITNESS:  It should not matter
16   based on cash, unless one country has enough cash
17   that absent any distribution in the lockbox funds
18   they are already able to pay their creditors at a
19   level higher than the pro rata amount, in which
20   case the -- you wouldn't distribute any funds to
21   that -- from the lockbox to that creditor or
22   debtor, and they would pay at the higher rate, and
23   then the global -- their cash and their claims are
24   removed from the equation and you re-calculate the
25   new pro rata amount which is going to be a lower
```



1    recovery percentage because you have allowed some

2    portion of Nortel to recover at a higher rate.

3              BY MR. BARRACK:

4              Q.   Is the result of these

5    constraints, is there ever a scenario where cash is

6    taken out of, other than if an estate becomes

7    insolvent or a debtor becomes -- sorry, becomes

8    solvent or an estate becomes solvent, is there ever

9    a case other than that situation where the funds

10   are taken out of an insolvent debtor or an

11   insolvent estate under this pro rata method?

12             A.   No, the idea is not -- this is not

13   a consolidation of all of the cash into one fund

14   and redistribution.  This is a method for figuring

15   out the distribution of lockbox funds to individual

16   creditors or estates or debtors.

17             Q.   All right.  If we can go to page

18   3, "Guarantees," and can you explain to us briefly

19   what this ratio demonstrates?

20             A.   Yes.  So in the straightforward,

21   simple pro rata, WWD, which are the debts of

22   Nortel, were used to represent the claims on

23   Nortel.  In the case of a guarantee where one debt

24   may be able to claim in multiple jurisdictions

25   depending on how the courts want to implement that



1    guarantee, it may lead to claims in excess of

2    debts.  And those are represented by the guarantee

3    amount which makes the denominator larger and the

4    global pro rata recovery percentage lower than it

5    would be without the guarantees.

6              Q.   And is there an assumption in this

7    formula as to -- in the term "Guarantee Amount" as

8    to what the court would have ordered with respect

9    to the guarantee claim?

10              A.   There is no assumption in this

11    formula.  It's up to the court to decide how to

12    bring effect to that guarantee and translate it

13    into claims.

14              Q.   So what would be the difference

15    between the pure pro rata treatment of guarantees

16    and this formula's treatment of guarantees?

17              A.   So in the pure pro rata we would

18    view it from a global perspective and that the

19    guarantee would not lead to duplicative claims

20    against the global assets of Nortel.

21              Under this version, it illustrates how

22    the court could allow, bring effect to the

23    guarantee by allowing claims in excess of the

24    underlying debt.

25              THE CANADIAN COURT:  Are you talking



```
 1   about the 2 billion?
 2              MR. BARRACK:  No, in this case we're
 3   talking -- technically this could apply --
 4              THE CANADIAN COURT:  What guarantee is
 5   there apart from --
 6              THE WITNESS:  It's the 4 billion.
 7              MR. BARRACK:  The bonds and the pension
 8   guarantees.
 9              THE CANADIAN COURT:  Right, I
10   understand.
11              THE WITNESS:  2 billion is coming.
12              THE CANADIAN COURT:  No, I know.  Okay.
13              BY MR. BARRACK:
14              Q.   Do you offer an opinion as to
15   which of the treatments of the guarantee claims is
16   most economically appropriate?
17              A.   Well, the logic behind the pro
18   rata approach is that it is most in line with how
19   Nortel actually operated as a single integrated
20   entity, and as such, I would -- I would think that
21   the guarantees don't increase the claims on the
22   global integrated entity and would drop out.
23              Q.   All right.  Is that a legal
24   opinion?
25              A.   Absolutely not.
```



```
 1                    THE CANADIAN COURT:  So what does that
 2   mean, which formula are you saying?
 3                    THE WITNESS:  If you asked me my
 4   preference on formulas, it would be the one on page
 5   2.
 6                    THE CANADIAN COURT:  Pure?
 7                    THE WITNESS:  Yes.
 8                    BY MR. BARRACK:
 9                    Q.   So if we go over to page 4 then,
10   the pro rata mechanics on the $2 billion
11   intercompany claim, we're going to use this example
12   using the $2 billion intercompany claim.  Would
13   these mechanics in these two formulae apply to any
14   intercompany claims?
15                    A.   Yes, they would.
16                    Q.   All right.  So what are the two
17   methods, describe for us in words before we get
18   into the numbers, what are the two methods of
19   dealing with intercompany claims?
20                    A.   Well, this illustrates two ways
21   that the courts could view this.  In both cases the
22   common element is that the $2 billion intercompany
23   claim is treated as a claim and therefore is added,
24   the $2 billion in claims resulting from it is added
25   to the denominator of both equations.  Of course it
```

 Neeson&Associates    W&F

1   doesn't raise the total amount of debt that

2   underlies the total claims on Nortel.

3             The top equation ends with just

4   recognizing that it's a debt.  It has increased the

5   total claims and the percentage that we use for the

6   pro rata allocation is now a smaller number than it

7   would be in a pure case.

8             Q.   All right.  So let's break each

9   one of those down.  And again, before we go to the

10  numbers, in the bottom box what is the -- what is

11  the effect of an intercompany claim or intercompany

12  claims on the ultimate calculation of the

13  distribution to creditors?

14            A.   Well, as noted here, if you

15  recognize that the intercompany claim is not only a

16  claim but also an asset of one of the Nortel

17  entities, and include the value that they're going

18  to receive, that they're going to recover on that

19  claim, which is represented by the 2 billion times

20  the D, the recovery percentage, if you recognize

21  that, it turns out in the math that the claim, the

22  intercompany claim doesn't end up changing the

23  ultimate --

24            THE CANADIAN COURT:  I didn't

25  understand that when I read that.  I don't



```
 1   understand how A can equal D unless the numerator
 2   here times D percentage is times a hundred percent.
 3   Because if it's less than a hundred percent, I
 4   don't understand then how the result can be the
 5   same as A.
 6              THE WITNESS:  So maybe an example would
 7   help.  If the recovery amount D was, let's say, 50
 8   percent, to keep the math easy, then this would
 9   suggest that you would have worldwide assets of
10   whatever plus 1 billion.
11              THE CANADIAN COURT:  Right.
12              THE WITNESS:  And your worldwide debts
13   plus 2 billion, and this isn't strictly
14   algebraically true, one over two is a half or 50
15   percent, and it turns out that when you solve for
16   the D percentage that makes this equality true, it
17   turns out to be the same percentage as you would
18   have if you did not include the 2 billion times D
19   percent in the numerator or the 2 billion in the
20   denominator.  With a piece of paper I could show
21   you.
22              MR. BARRACK:  We could show you that on
23   a flip chart, Your Honour, to work through the
24   math.
25              THE WITNESS:  I don't know how helpful
```

Neeson & Associates    W&F

 1   that would be.

 2            THE CANADIAN COURT:  I don't know how

 3   you can do that when you don't know what A

 4   percentage represents.

 5            BY MR. BARRACK:

 6        Q.   Mathematically is this correct?

 7        A.   Yes.

 8        Q.   That A is always going to equal D?

 9        A.   So long as we are limiting it to

10   the entities that are participating in the pro rata

11   distribution.

12        Q.   So let's just do a short high

13   school algebra walk so it will be on the record and

14   people can check it later.  So how do you solve for

15   D, what's the first thing you do, the first step?

16        A.   The first step is you multiply

17   both sides of the equation by WWD plus 2 billion.

18        Q.   Right.  And then what does that

19   give you?

20        A.   That gives you WWA plus 2 billion

21   times the D percentage you're solving for, equals

22   WWD times the D percentage plus WWD -- excuse me,

23   plus 2 billion times D percentage.  You now have 2

24   billion times D percentage on both sides of the

25   equal signs and they can cancel out, and then when



1    you divide back through by WWD, you end up with D

2    percent equals WWA over WWD which is the same

3    formula as in the pure approach.

4                    Q.    Okay.

5                    A.    The record to be checked later.

6                    Q.    Okay, subject to errata and that

7    high school algebra.  Let's go to the concept here

8    in the second box.  What economically is the

9    concept that's being taken into account?  And maybe

10   an example would help.

11                   A.    It's recognizing that the debtors

12   and the estates are conduits between the assets of

13   the one integrated Nortel that represents how

14   Nortel actually operated on the one hand, and the

15   debtors outside of Nortel, and it just shows that

16   taking money from one estate to another, so long as

17   both estates are still going to receive funds from

18   the lockbox, has no ultimate effect on the

19   distribution percentage because each dollar that's

20   added to the cash amount in one estate is offset by

21   a dollar less from the lockbox fund, and each

22   dollar that's subtracted from one of the estate's

23   cash balances is made up by an extra dollar from

24   the lockbox funds.

25                   Q.    Right.  So as between these two --



1    as between these two boxes or these two formula, is

2    there an economic rationale for proceeding one way

3    as opposed to the other?

4              A.    I illustrate this to show the

5    flexibility in how the court can implement these.

6    But the bottom box is the one that I think is more

7    economically consistent with how Nortel was run as

8    a single entity.

9              Q.    Right.  Which of these two boxes

10   is more likely to engage the qualifications on page

11   5?

12             A.    Well, the top box suggests that

13   the company receiving the intercompany claim is

14   going to have more assets or some additional

15   benefit from this, so it's more likely that they

16   will end up outside of the pro rata allocation

17   approach.

18             Q.    Right.  Can these formulae be

19   applied to past recognized and paid unsecured

20   intercompany claims?

21             A.    They can be.  It's up to the

22   courts as to whether to treat any past claims, both

23   the assets associated with them and the claims that

24   are associated with the payment, inside or outside

25   of this pro rata mechanics.



1                    Q.   Okay.  And if the court decides to
2    go with the option of taking into account the
3    intercompany claims is not washing out under the
4    second box, if an estate or debtor reaches the pro
5    rata percentage through the payment of an
6    intercompany account, how is that intercompany
7    account treated once the debtor or estate becomes
8    solvent?
9                    A.   So there's two steps to this.  One
10   is they receive enough so that they have assets
11   above the global pro rata recovery rate, in which
12   case they would receive those assets on the
13   intercompany claim and then their assets and claims
14   would be removed from the pro rata allocation.
15                   If the amount of money through the
16   intercompany claim actually would be enough to take
17   the debtor or estates solvent, then their claims
18   would be paid first, it would be equivalent --
19   functionally equivalent to them becoming priority
20   claims and then any excess money over that would be
21   returned to the equity holders of that estate.
22                   Q.   All right.
23                   A.   Of that debtor.
24                   Q.   Turning to another topic and away
25   from the slides now.  In your second report you



1    make specific comments on the allocation approach

2    as advocated by the other experts, and in your

3    rebuttal report at page 3 you address the Canadian

4    legal title approach.

5              What is your conclusion as to whether

6    the Canadian legal title approach is economically

7    rational from the perspective of the other RPE

8    entities?

9              A.   So I don't find it to be

10   economically rational.  The Canadian legal title

11   approach vests with the Canadian entities all the

12   residual value associated with the intellectual

13   property developed by Nortel and contributed by the

14   other -- the other entities.

15             As discussed earlier, the compensation

16   that these other entities received through the MRDA

17   over time was only for a subset of those rights,

18   and therefore we would be in a position where the

19   entities would be contributing something of value

20   to the Canadians without compensation.

21             Q.   And just in these series of

22   questions, how do you define economically rational?

23             A.   So, the study of economics, the

24   study of most of economics assumes that individuals

25   act in their own self-interest and that's



1    essentially how we define rationality, as not

2    engaging in things that make us worse off.

3                Q.   All right.  And at what point in

4    time are you assessing the economic rationality of

5    these various approaches at a point in time in

6    relation to the insolvency of Nortel?

7                A.   Whether it was prior to the

8    insolvency?

9                Q.   Right.

10               A.   So the legal title and revenue

11   approach are based on interpretations of the MRDA,

12   so you have to look at the rationality at the time

13   that the parties would have entered into the

14   agreement.

15               Q.   Okay.

16               A.   It's obviously irrational ex post.

17               Q.   Right.  What do you assume was the

18   compensation or what did you take from the Canadian

19   legal title approach to be the compensation for the

20   patents created by the RPEs?

21               A.   The ability to share in the

22   profits or losses, operating profits or losses of

23   Nortel as an on-going entity.  It was to divide up

24   the annual profits and it was a formula that was

25   used that was not a final say forever as to how



1    Nortel's profits would be divided up.

2                   Q.   Would it be economically rational

3    for the other RPEs to accept the payments under the

4    MRDA annual profit and loss percentages as full

5    compensation for their efforts in creating patents?

6                   A.   No, I don't believe it would

7    because their full efforts in creating patents led

8    to a fuller set of entitlements from those patents.

9    The compensation they received was only, as we

10   discussed earlier, was only for a subset of those

11   entitlements.

12                  Q.   Okay.  At page 21 of your second

13   report, second paragraph, you state:

14                       "The Monitor and the Canadian

15                       Debtors' legal title approach

16                       artificially separates the patent

17                       rights in Nortel's products from other

18                       rights."

19                       You then conclude on page 22, toward

20   the end of the paragraph under the chart:

21                       "Rather, the MRDA also provided an

22                       option value to the extent the residual

23                       IP became embodied in future products

24                       and this option value was surrendered

25                       with the termination of their license



 1                     rights.  The US and EMEA Debtors should

 2                     therefore be compensated for this

 3                     surrendered option value associated

 4                     with their license rights."

 5                     Will you explain to the courts what

 6        this option value represents?

 7                     A.   My understanding of the Canadian

 8        position is that the other RPEs were entitled to a

 9        shared compensation associated with the products

10        that Nortel was actually producing.  Had Nortel in

11        the future added to that portfolio of products that

12        it was producing, they would have had a claim on

13        the rights, on the value created from those

14        additional products.

15                     So the auction value here would be

16        payment, the value that they -- that was associated

17        with their ability to share on future profits on

18        products that were not currently in the Nortel

19        portfolio.

20                     Q.   Okay.  I'd like to switch then to

21        Dr. Reichert's testimony in support of the Canadian

22        legal title approach.

23                     Dr. Reichert puts forward a theory that

24        an investor will invest if the expected NPV of an

25        investment is greater than zero.



1                    Is that a rational economic theory?

2                    A.   It's not necessarily irrational

3    but it's certainly an incomplete view of

4    investment.  Investors want to maximize the NPV of

5    their investments, not simply meet the threshold of

6    not losing money on an investment.

7                    Q.   Would it be economically rational

8    for the non-Canadian RPEs to contribute to the

9    creation of IP and agree they would have no

10   entitlement to the proceeds of that sale on a sale

11   on insolvency?

12                   A.   Not unless they were compensated

13   for giving up those fuller set of rights in some

14   other way.

15                   Q.   So if we go back to page 3 of your

16   rebuttal report, the third bullet comments on the

17   US revenue approach.  In your opinion, were each of

18   the RPEs, including NNI, the US RPE, entitled to

19   treat the revenue stream and profits generated

20   within its geographic region as its own?

21                   A.   No, my understanding is what they

22   were entitled to was a share of the global profits

23   or losses.

24                   Q.   What in your view is the

25   relationship between the revenues earned in a

Neeson&Associates    W&F WILSON & PETERS LTD.

1    geographic region and the costs incurred to earn

2    those revenues?

3                    A.    Well, the costs that support the

4    revenue that's collected in any given geographic

5    area come from the worldwide Nortel, whether it's

6    the integrated organizational structure of the

7    corporation or whether it relates to the production

8    of the intellectual property that goes -- that

9    underlies the value that Nortel brings to market.

10   That production was done worldwide through all the

11   different geographies.

12                   Q.    In your opinion, does the --

13   sorry.  Is the revenue approach advocated by the US

14   interests economically rational from the

15   perspective of the other RPEs?

16                   A.    It doesn't appear to be.  In

17   particular, if you look at the Canadian view or

18   position for the revenue approach, it suggests that

19   while they contributed not quite half but a large

20   percentage of the contribution to the intellectual

21   property of Nortel, that they would be trading that

22   in exchange for a share of revenues that are

23   proportional to their much smaller --

24   proportionally much smaller market, and that does

25   not seem like a fair economic trade or rational



 1    bargain.

 2              Q.   If we can go back to your rebuttal

 3    report, page 3, to the second last bullet point

 4    where you comment on the R&D contribution approach

 5    supported by EMEA, which you explain more fully at

 6    pages 45 and 46 of your report, in your opinion is

 7    the R&D contribution approach economically rational

 8    from the perspective of the estates?

 9              A.   The approach is economically

10    rational.

11              Q.   In your opinion, is R&D spending

12    an appropriate measure of contribution for estates?

13              A.   No, the analysis that I looked at

14    before, that we went through before, shows that R&D

15    spending is a very imperfect measure of your

16    contribution to the intellectual -- intellectual

17    property development and therefore would be an

18    inappropriate -- unadjusted would be an

19    inappropriate metric to use in allocating

20    contribution.  And I've seen nothing -- I've seen

21    nothing that gives me any confidence you would be

22    able to adjust it in a meaningful way.

23              Q.   In your opinion, is R&D spending

24    an appropriate measure of the contribution for

25    individual selling debtors?



     1                     A.    No, and as we get down to the

     2     country and debtor level, we would expect the

     3     difference between contribution and R&D spending

     4     value to be even more varied than it is at the more

     5     aggregated levels.

     6                     Q.    And did your analysis demonstrate

     7     that in the case of NNUK?

     8                     A.    Yes, the NNUK as part of EMEA was

     9     the example that NNUK, as I say here, fought above

    10     its weight and contributed at least by an inventor

    11     analysis significantly more than its value or in

    12     patents than it did based on its R&D spending

    13     contribution.

    14                     Q.    Is any confidence you have in the

    15     contribution methodology increased or decreased as

    16     you aggregate the individual corporations within

    17     each estate?

    18                     A.    It's not.  It demonstrates that as

    19     you aggregate up, the pluses and minuses wash out.

    20     So in Mr. Malackowski's confirming analysis, when

    21     he did an inventor analysis at the estate level,

    22     concluded that the EMEA contribution was not out of

    23     line with its -- its R&D contribution was not out

    24     of line with the value it created, but the analysis

    25     that I show when you break that down by the



```
 1   components of EMEA, that that story does not hold
 2   true -- does not hold, and to then use the
 3   contribution approach to allocate to estates would
 4   be inconsistent with the underlying economics, the
 5   contribution of the RPEs.
 6              Q.   Is the pro rata approach
 7   economically rational?
 8              A.   I believe it is, yes.
 9              Q.   Is it economically consistent with
10   the way Nortel ran its business?
11              A.   Yes, it is.
12              Q.   Is it economically consistent with
13   the way Nortel liquidated its assets?
14              A.   Yes, it is, as far as I understand
15   it.
16              Q.   Now, I just want to turn to a
17   final, very, very briefly, at a very high level, to
18   one more topic, and that is while you don't accept
19   the other allocation approaches, you do point out
20   flaws in the way those approaches are implemented.
21   And is this the area where you actually applied
22   your valuation, in part your valuation expertise?
23              A.   Yes, and in evaluating what the
24   other experts presented required understanding
25   valuation techniques.
```



1              Q.   Have you listed all of your

2    criticisms?

3              A.   No, I haven't.  I just listed some

4    of the bigger ones that if the court adopts the

5    approach, they should certainly take into account.

6              Q.   So we just want to do this at a

7    very high level.  At pages 26 to 30, you set out

8    some -- these are all in your second report.  You

9    set out criticisms of the Green report of the

10   Monitor and the Canadian Debtor.  At a very high

11   level, what is the nature of your criticisms?

12             A.   Of Mr. Green, I have two.  One is

13   that he aggregates the lines of business -- his

14   projections related to the lines of business in a

15   way that masks the fact that two of the lines of

16   businesses actually have a negative NPV in his

17   equations, which is equivalent in the way it's

18   implemented to Nortel actually paying somebody to

19   take the line of business off their hands.

20             And since we know they were sold for

21   positive money, I thought that was an inappropriate

22   -- inappropriate to do, and that should be

23   corrected.

24             And he also, I believe, starts with a

25   base here that is much lower, 2009 which is sort of



1    lower than historical average and I believe that
2    distorts his analysis as well.
3                Q.   At pages 30 to 33 you set out
4    criticisms of Mr. Britven's report followed by the
5    CCC.   Again, at a very high level, what are the
6    nature of your criticisms?
7                A.   Two there.   The first one holds
8    that he also includes negative NPV businesses in
9    his analysis although they oddly are different
10   lines of business than Mr. Green included, and
11   Mr. Britven also uses a fairly high discount rate
12   without justifying it.
13               Q.   All right.   At pages 35 to 44 you
14   set out criticisms of the application of the US
15   revenue approach.   At a high level, what are your
16   criticisms?
17               A.   I have three of Mr. Kinrich's
18   analysis for the US, implementing the US revenue
19   approach.   The first is that he creates the rest of
20   the world inconsistently between the line of
21   business sales and the Rockstar residual patent
22   sales.
23               I think Mr. Malackowski said he ignored
24   it for the line of business sales, which is
25   mathematically equivalent to allocating it based on



1    the value related to the line of business.

2              The second --

3              Q.   Mr. Malackowski?

4              A.   Pardon me?

5              Q.   Is it Mr. Malackowski in this case

6    you said?

7              A.   His -- Mr. Malackowski's criticism

8    of Mr. Kinrich --

9              Q.   Okay.

10             A.   -- was that he ignored the rest of

11   the world and I was just trying to point out that

12   it's equivalent to just allocating it in the same

13   proportion as the existing line of business.

14             Q.   And your second criticism?

15             A.   Second criticism is the

16   inappropriate use of 2009 as a base year for

17   projections, which again favours the US over the

18   other debtors.

19             And the third approach has to do with

20   his inappropriate discounting of the intellectual

21   property in the Chinese market.

22             Q.   And is this -- how important is

23   the correction to the treatment of the Chinese

24   market?  And maybe we could look at table 13, page

25   43 of your rebuttal report.



```
 1                      A.   It's fairly substantive.  In the

 2   example there, his inappropriate exclusion of much

 3   of the Chinese value ends up in a formulation for

 4   the -- for the residual IP portfolio, an allocation

 5   of 16 percent to the EMEA Debtors, whereas a more

 6   appropriate inclusion of the Chinese market leads

 7   to over 21 percent.  So that's a five percentage

 8   point difference in allocation which is --

 9                      Q.   So you are looking at the EMEA

10   Debtors, the middle column, the bottom two numbers?

11                      A.   Yes, under the percentage heading.

12                      Q.   And those are the proceeds from

13   the Rockstar sales?

14                      A.   Yes, they are.

15                      Q.   Okay.  Finally with respect to the

16   contribution approach, do you make suggestions for

17   specific adjustments?

18                      A.   I don't make specific suggestions

19   for adjusting the contribution approach.

20                      Q.   Is there a reason you don't make

21   specific adjustments to the contribution approach?

22                      A.   As I think I mentioned, the

23   adjustments -- I would not have any confidence in

24   the adjustments that you would have to make to

25   translate R&D spending into an appropriate R&D
```



1  contribution metric.

2          MR. BARRACK:  All right.  Thank you.

3  Those are my questions, Mr. Bazelon.  Others will

4  have questions.

5          THE CANADIAN COURT:  Mr. Gottlieb?

6          MR. GOTTLIEB:  Justice Newbould, Judge

7  Gross, I'm looking at the time and we're off until

8  Thursday.  I've talked to other counsel and we're

9  not going to be finished with Dr. Bazelon today.

10  Obviously if we start, he'll be unavailable to

11  anyone until then.

12          THE CANADIAN COURT:  Are you going to

13  finish with all the other witnesses this week you

14  were supposed to?

15          MR. GOTTLIEB:  The anticipation based

16  on -- I'm getting head shakes, I'm getting some

17  yeses, I'm getting some no's, I'm not really sure

18  what the answer to that is.  I would have thought

19  so based on what we understand to be the case.  It

20  really depends on how long the examination of

21  Mr. Green goes.

22          THE CANADIAN COURT:  I had not realized

23  the examinations in-chief were going to be this

24  long, but in the end, it's going to be eating into

25  argument time.

 Neeson & Associates   W&P

```
 1                   MR. GOTTLIEB:  We've looked at, as you

 2     know -- again, I'm in the court's hands.  We've

 3     looked at the time that we had allocated for the

 4     trial and we moved much more quickly at the front

 5     than we thought, and we've moved things around,

 6     obviously.  I'm in the court's hands as to how to

 7     deal with it.

 8                   THE CANADIAN COURT:  I think we had

 9     better keep on going for a while.

10                   MR. GOTTLIEB:  Okay.

11     CROSS-EXAMINATION BY MR. GOTTLIEB:

12                   Q.   Hi, Dr. Bazelon.  I am Matthew

13     Gottlieb for the EMEA Debtors.  I don't think we've

14     met before.  Nice to see you.

15                   I want to talk about the eight business

16     sales, if we can.  You're familiar with those,

17     obviously?

18                   A.   Yes.

19                   Q.   Those sales involve the transfer

20     of lines of business of Nortel to the various

21     purchasers; correct?

22                   A.   That's correct.

23                   Q.   And you're aware in the business

24     sales, those eight sales, a variety of assets were

25     transferred to the purchasers; correct?
```



```
 1                    A.    That's correct.
 2                    Q.    And there are all different types
 3    of assets?  Tangible assets and intangible assets;
 4    correct?
 5                    A.    Yes.
 6                    Q.    So for the tangible assets, for
 7    example, you're aware there were fixed assets?
 8                    A.    I believe that's correct, yes.
 9                    Q.    And employees and customer
10    contracts were transferred; correct?
11                    A.    Yes.
12                    Q.    And we know obviously that there
13    were intangible assets, and those assets included
14    intellectual property; correct?
15                    A.    Yes.
16                    Q.    And you're aware, Dr. Bazelon,
17    that those assets that were sold in the lines of
18    business were owned by various Nortel entities;
19    correct?  Not just one entity owned any one line of
20    business assets; correct?
21                    A.    That's my understanding, that the
22    assets that were sold with the line of business
23    came from various Nortel entities.
24                    Q.    And those entities were located
25    around the world; correct?
```



```
 1                    A.    I believe so, yes.
 2                    Q.    And those included many of the
 3      Nortel entities in what I'm calling the EMEA
 4      region.  You're familiar with that region
 5      undoubtedly?
 6                    A.    Yes.
 7                    Q.    And you're aware that those
 8      entities were sellers of the assets as well;
 9      correct?
10                    A.    Yes.
11                    Q.    Okay.  And, for example, there
12      were several entities in the EMEA region that sold
13      assets as part of the line of business sales that
14      were not RPEs?
15                    A.    I understand that to be true, yes.
16                    Q.    Okay.  Did you review any sale
17      agreements with respect to the eight lines of
18      business sales?
19                    A.    I don't remember the detail in
20      which those were reviewed, but I believe I had
21      access to them.  We could check in my report under
22      the documents that I considered.
23                    Q.    Okay.  And you're aware, sir, that
24      the money that was obtained on the lines of
25      business sales -- I apologize.  The money that came
```



```
 1   as a result of those line of business sales went
 2   into the lockbox; correct?
 3              A.   That's my understanding, yes, that
 4   partly funded the lockbox.
 5              Q.   And each of the sellers who sold
 6   assets were signatories to the IFSA; you're
 7   familiar with that?
 8              A.   I've seen the IFSA and reviewed
 9   it, yes.
10              Q.   Okay.  And all of those selling
11   parties, therefore, were part of the IFSA, were
12   part of that agreement and the cash that went into
13   the lockbox was as a result of those line of
14   business sales; correct?
15              A.   Those are two points but I believe
16   they're correct.
17              Q.   Thank you.  And I want to move
18   then briefly just to give an example, and the
19   example doesn't matter, but a Nortel Spanish
20   company, a Nortel company in Spain, for example, it
21   was a seller of assets in the line of business
22   sales; correct?
23              A.   I believe the Spanish entity was.
24   It's listed at the back of the IFSA and we could
25   check.
```



```
 1                   Q.   Perfect.  Perfect.  Okay.  Now, I
 2   want to move to the pro rata theory for just a
 3   moment as I understand it.  So at the end of the
 4   pro rata theory you come up with the pro rata
 5   percentage; that's correct?
 6                   A.   Yes, it is.
 7                   Q.   And let's say that that pro rata
 8   percentage is 70 percent.  With me so far?
 9                   A.   Okay.
10                   Q.   Okay?  And as I understand the pro
11   rata theory as you have explained it, if Spain has
12   cash on hand after the line of business sales that
13   will allow it to pay its creditors at 70 percent of
14   their claims, or 71 percent of their claims, are
15   you with me?
16                   A.   Yes.
17                   Q.   Then Spain will get zero from the
18   lockbox; correct?
19                   A.   It's true that there would be no
20   distribution to the lockbox, but Spain, in that
21   example, the Spanish debtor estate --
22                   Q.   Sure.
23                   A.   -- if that's how I should refer to
24   it, are also relieved of any other claims in the
25   global Nortel entity as well.
```

 Neeson&Associates   W&F

1               Q.   Well, we're talking about claims
2    that are against the Spanish entity, so you have to
3    stick with me on this, okay?
4               So the claims against the Spanish
5    entity that are made, do you understand that?
6               A.   Yes.
7               Q.   There's enough cash on hand at the
8    Spanish Nortel entity to pay those claims, the
9    actual claims against the Spanish entity, at 71
10   percent of the value of those claims.  That's the
11   cash already on hand.  Are you with me?
12              A.   Yes.
13              Q.   Okay.  On that scenario, the
14   Spanish Nortel company gets zero dollars from the
15   lockbox; correct?
16              A.   Yes.  I'm sorry, I thought I
17   agreed with your point earlier before expanding on
18   it as to the full --
19              Q.   You talked about being relieved
20   but we're talking about dealing with all the claims
21   against the actual claims that have been registered
22   against the Spanish entity.
23              A.   Yes.
24              Q.   And there's enough cash on hand to
25   pay 71 cents on those, and therefore Spain gets



 1   zero dollars from the lockbox?

 2                 A.   They are removed from the pro rata

 3   allocation formula because they are already paying

 4   it above the global pro rata amount.  They are

 5   still free to pay that greater amount, so no money

 6   is taken -- necessarily taken from them.

 7                 Q.   Okay.  But let's just deal with my

 8   point because we've gone around it a little and I

 9   think I understand the theory properly, but if

10   Spain has enough cash to pay 71 cents, it gets zero

11   distribution from the lockbox?

12                 THE CANADIAN COURT:  He said that three

13   times.

14                 MR. GOTTLIEB:  And I've gotten a few

15   different answers on that.

16                 THE CANADIAN COURT:  Well, it would be

17   good not to ask it twice.

18                 MR. GOTTLIEB:   Well, I got an answer

19   about liabilities and all that, so I just want a

20   clean answer on this point.

21                 BY MR. GOTTLIEB:

22                 Q.   Do I have that correctly?

23                 A.   Absolutely.  You are correct when

24   you're talking about the lockbox.

25                 Q.   So that means that notwithstanding



1    the entity, the Nortel Spanish entity, sold assets;

2    correct?

3              A.   Contributed assets to the line of

4    business sales that are in the lockbox.

5              Q.   And therefore monies are sitting

6    in the lockbox as a result of those sales; correct?

7              A.   Yes.

8              Q.   And the assets that were sold by

9    Spain, the Spanish entity gets zero dollars on the

10   pro rata theory in that scenario; correct?

11             A.   If I understand how you've

12   characterized that, yes, they would receive no

13   monies back, still receive no monies back from the

14   lockbox fund.

15             MR. GOTTLIEB:  If I could check for a

16   moment, please.  Thank you, Dr. Bazelon.  Thank

17   you, Your Honour, thank you, Judge Gross.

18             THE CANADIAN COURT:  Mr. Zarnett?

19             MR. ZARNETT:  Thank you, Your Honour.

20   CROSS-EXAMINATION BY MR. ZARNETT:

21             Q.   Good afternoon, Dr. Bazelon.  My

22   name is Ben Zarnett for the Canadian Monitor and

23   the Canadian Debtors.  I just have a few questions

24   for you.

25             A.   Good afternoon.



1           Q.   Sir, I'm interested in your view

2   of the relationship between the total in the

3   lockbox and the total attributable to intellectual

4   property.

5           So I can take it in your view the

6   assets sold in Nortel's bankruptcy were mostly IP;

7   is that correct?

8           A.   That's correct.  I believe I

9   stated that in my --

10          Q.   Sure.  And the fixed and tangible

11  assets that were part of the business sales were a

12  small amount of the total proportion; correct?

13          A.   That's correct.  Varying amounts

14  depending on the -- who was doing the estimating,

15  but yes, a relatively small amount of the total.

16          Q.   So is it fair to say, sir, that in

17  the line of business sales, in your view, anything

18  that wasn't a tangible fixed -- a fixed asset or

19  otherwise a tangible asset was IP or IP related?

20          A.   I have not and it's not necessary

21  for the pro rata approach to take a position on

22  exactly -- I think you're going to the issue of

23  goodwill, exactly how to divide the non-tangible

24  assets of the business line sales.

25          Q.   Sir, in your reply report, and in



1    the interests of time maybe we'll go directly

2    there, in your rebuttal report, page 20 -- I'm

3    sorry, not page 20.  Page 10 to 11 and footnote 20.

4                 You refer to some values for the IP at

5    the bottom of page 10, you refer to it as ranging

6    from a minimum of 4.5 billion to close to 7

7    billion.  And you then go to footnote 20 where you

8    refer to some numbers, and 2.5 billion from the

9    business sales, and you say the latter is the rough

10   average of values assigned to IP related asset

11   categories including goodwill and customer

12   relationships.  Do you see that?

13                A.   Yes.

14                Q.   So is it fair to say that in your

15   view, goodwill and customer relationships are

16   entangled with the IP?

17                A.   Yes, yes.

18                Q.   Take their value from the IP?

19                A.   They are part of the one Nortel

20   production and, yes, take their value from the IP,

21   at least in large part.

22                Q.   And, sir, I take it you're saying

23   the allocation methodology that applies to IP

24   should apply to those assets as well?

25                A.   Well, my approach that I am



```
1    putting forward doesn't require that

2    disentanglement, so I think the question is best

3    asked of an expert who needs to disentangle those

4    assets.

5                Q.   I've got you here now.  So I took

6    it from your evidence that one of your

7    justifications for the pro rata theory was the

8    nature of the IP and the impossibility of

9    disentangling who was entitled to what from it?

10               A.   Yes, that's absolutely right.

11               Q.   Sure.  But the theory that you're

12   advancing applies to everything in the lockbox;

13   correct?

14               A.   That's correct.

15               Q.   All right.  So I take it that your

16   preferred theory would be not to distinguish

17   goodwill and customer relationships from IP?

18               A.   That's correct.  That's not the

19   only thing that's not distinguishing.

20               Q.   Now, sir, let me turn to a

21   slightly different topic with you.  Could I ask you

22   in your rebuttal report, please, to look at table

23   15 which is found on page 47.

24               And, sir, do I have it right from your

25   report that what you did was look at various
```



```
 1    patents that were sold to Rockstar in order to

 2    derive this table?  I'm not saying that's the only

 3    thing you did, but that's one of the things you

 4    did?

 5              A.   Yes.

 6              Q.   And you identified the location of

 7    the inventor?

 8              A.   Yes.

 9              Q.   And you determined from some of

10    the work you had done the percentage spending in

11    Canada, the United States and EMEA, and indeed in

12    various parts of EMEA, and noted the percentage R&D

13    spend; correct?

14              A.   Yes.  Although those aren't -- I

15    don't think it's fair to characterize those as my

16    calculations.  I believe they come out of the MRDA

17    percentages that we were referring to earlier.

18              Q.   All right.  And one thing, though,

19    that you did derive is the right-hand part of this

20    table, the value of the patents; correct?

21              A.   That's correct.  As explained in

22    the text prior to the table.

23              Q.   And this table allows you to

24    compare, I take it, the number of patents invented

25    by each of the regions you have identified, the
```



1    percentage of R&D spending and the value; correct?

2              A.    Yes, but as described in the value

3    analysis, it's a very imperfect and preliminary

4    measure so I don't want to put forth that I think

5    this is the final value allocation but it is a

6    rough guide to the value for sure.

7              Q.    And you use it for some, for lack

8    of a better word, directional guidance.  Is that

9    fair in respect of NNUK?  When you compare the

10    numbers, you say it allows you to draw a view about

11    just using NNUK's R&D spend; correct?

12              A.    That's correct.  NNUK is the

13    example.

14              Q.    And if you did the same analysis

15    for Canada directionally we'd see the same thing,

16    wouldn't we?  Just using R&D spend would be less

17    than the value you have derived on this preliminary

18    basis for the patents they invented?

19              A.    That's correct.

20              Q.    Thank you.  Now, you mentioned in

21    your evidence, and you discuss in your rebuttal

22    report that when the Rockstar patents were sold,

23    the US and EMEA Debtors surrendered what you call

24    an option, and I think the way you described it was

25    although there may not have been products at the



1    time, there was a potential for future products

2    that may have come under the license; correct?

3                    A.    That's correct.  Under the

4    Canadian view, where they're entitled to

5    compensation for the use rights, I recognize, point

6    out that there is an option value associated with

7    those rights.

8                    Q.    And you have not done any

9    calculation of that option value; is that correct?

10                   A.    That's correct.

11                   Q.    All right.  And calculating that

12   option value would involve calculating essentially

13   the value of those license rights; correct?  One

14   would look into the future and try to determine

15   what financial benefit could be achieved by

16   exploiting those rights; correct?

17                   A.    Yes, it's true that that's what it

18   would do.  It's not -- I think you characterize it

19   as the value of those license rights.  I don't know

20   that it would necessarily capture the full value of

21   those license rights because it would be limited to

22   the ways in which Nortel might exploit the license

23   value.

24                   Q.    However one was looking at it, in

25   order to value a license one would look at the



1    value that could be derived from exploiting it in
2    accordance with its terms; is that fair?
3                A.    That would be fair.
4                Q.    All right.  And an allocation
5    method that looks at that and attempts to
6    compensate someone for giving that up, if they did,
7    would not be economically irrational, would it?
8                A.    I'm not sure -- could you just ask
9    that question again?
10               Q.    Sure.  An allocation method that
11   attempted to identify the value of a license and
12   what could be earned from exploiting it in
13   accordance with its terms, as compensation for
14   someone who gave such a right up, that would not be
15   economically irrational, would it?
16               A.    No, no, it wouldn't assuming --
17   yes, no, that would not be as stated.
18               MR. ZARNETT:  Thank you, sir.  Those
19   are my questions.
20               THE CANADIAN COURT:  Mr. Zigler?
21               MR. ZIGLER:  Thank you, Your Honour.
22   Good afternoon, Your Honour, good afternoon,
23   Justice Newbould.
24               THE US COURT:  Good afternoon.
25



1    CROSS-EXAMINATION BY MR. ZIGLER:

2              Q.   Good afternoon, Dr. Bazelon.  My

3    name is Mark Zigler.  You may recall we met at your

4    deposition.  I am counsel for the Canadian

5    Creditors Committee.

6              As I understand it, Dr. Bazelon, you

7    were saying that claims should be the basis for the

8    allocation key for the lockbox assets; is that a

9    fair assessment?

10             A.   Yes.

11             Q.   And those are claims of creditors

12   largely; is that correct?

13             A.   Yes.

14             Q.   Okay.  So in coming to give your

15   evidence here, since the time of the preparation of

16   your two reports and your deposition, have you had

17   the opportunity to look at some of the evidence

18   with respect to claims that has been tendered in

19   this case to date?

20             A.   I have not done an analysis of

21   claims but I have looked at some of the claims

22   numbers that have been presented by other experts

23   in this case, in particular I believe Mr. Britven.

24             Q.   What about the evidence of the

25   fact witnesses, have you followed any of that?



```
 1                    A.   I have read most of the trial
 2   transcript but I have not -- I have not sat down
 3   with pen and paper to take those into account.
 4                    Q.   I understand.  But you've heard
 5   the evidence of Mr. Sproule and Mr. Ray and
 6   Mr. Currie?
 7                    A.   They sound familiar, yes.
 8                    Q.   And since the time of your
 9   deposition and your earlier reports, have you also
10   had a look at the own estate assets to any degree?
11                    A.   The own estate assets?
12                    Q.   The assets that remain within the
13   Canadian Estates, the US Estates and the collective
14   EMEA Estate?
15                    A.   Yes, again I haven't done any
16   detailed analysis of them.
17                    Q.   But you're more familiar than you
18   were at the time of your deposition?
19                    A.   I believe at the time of my
20   deposition I may have seen Mr. Britven's report and
21   that would still include it.  I'm just not sure if
22   I would characterize it as more familiar now than
23   then.
24                    Q.   Okay.  Well, let me assist you to
25   some degree with some of these claims because I
```



```
 1    will be asking you some questions about how they

 2    work within your allocation key.

 3              And the first actually is the claim of

 4    the parties that have retained you in this

 5    proceeding, that is, the UK Pension Fund.  Are you

 6    familiar with their claims?

 7              A.   I believe I am.  Certainly at a

 8    high level.

 9              Q.   And you're familiar with the bond

10    claims?

11              A.   Yes.

12              Q.   And you're familiar with the

13    claims of the Canadian Creditors?

14              A.   Yes.

15              Q.   And you're familiar with the 2

16    billion US intercompany claim into Canada?

17              A.   Yes.

18              Q.   And generally -- and I'm going to

19    ask that the evidence of Mr. Sproule be put up on

20    the screen and put forward to you.  This is an

21    excerpt from the evidence of Mr. Sproule.

22              And, Your Honour, you should have

23    copies and Judge Gross should be provided with

24    copies.  I'm going to ask that page 855 be put up

25    on the screen.
```



```
 1                   So you see at page 855, question 10,
 2      Mr. Sproule indicated, when asked about the claims
 3      in Canada, there is 1 billion for non-pension
 4      Canadian employee related claims, 2 billion for
 5      their pension shortfall, the 2 billion intercompany
 6      from NNI, and claims from the UK Pension Trust of
 7      some 7 to 800 million dollars, as well as the
 8      unsecured bonds that were cross-guaranteed between
 9      Canada and the United States and about $4.1
10      billion, and when asked to give a thumbnail
11      arithmetic, Mr. Sproule said about $10 billion.
12                   Do you recall hearing those numbers
13      before?
14                   A.   They look familiar, yes.
15                   Q.   And you would agree with me that
16      the claims of the NNI certainly are claims, any
17      recovery on those claims, because we're talking
18      about creditor recoveries in your pro rata scheme,
19      goes right back to the US Estate?
20                   Whatever the recovery is in Canada goes
21      right back to the US Estate?
22                   A.   I'm not following.  I'm sorry, I'm
23      just not following.
24                   Q.   Because whatever recovery there is
25      in Canada, let's say there is a 50 percent recovery
```



1    in Canada, then on that $2 billion claim, using the

2    $10 billion example, 50 percent of that goes right

3    back to the US Estate, does it not?

4                    A.    Yes, if that's exhibited in the

5    pro rata model.

6                    Q.    And indeed, I'm going to show you

7    another document.  And this has been filed, Your

8    Honour, in the US court but not in Canada, it's the

9    form 2019 that the noteholders committee has to

10   file of the make-up of the committee, the address

11   of the claimants and the amount of their claims.

12                   It is not marked as an exhibit in this

13   proceeding.

14                   THE CANADIAN COURT:  What's your point?

15   What are you going to put to the witness?  Where

16   are you going with this?

17                   MR. ZIGLER:  I am going to put to the

18   witness simply the location of the noteholder

19   committee claimants who represent most of the

20   notes.

21                   BY MR. ZIGLER:

22                   Q.    If you could have a look at the

23   document, Mr. Bazelon.  Have you seen this document

24   before?

25                   A.    It does not look familiar, no.



```
 1                    Q.   Please have a look at it before

 2    you answer that question.  There is a schedule,

 3    Exhibit A, with the list of Noteholder Claimants on

 4    the noteholders committee, their address and the

 5    nature and the amount of their economic interest.

 6    It was filed March 11th, 2014.

 7                    Now, have you seen that document

 8    before, or that list?

 9                    A.   I don't recall seeing a list of

10    the names, addresses and amounts of the individual

11    noteholder claimants.

12                    Q.   But it is a document filed in the

13    US bankruptcy?

14                    A.   It appears to be, yes.

15                    Q.   And you're familiar with the

16    noteholders committee concept?

17                    A.   Yes.

18                    Q.   And looking at the list of the

19    noteholders, would you agree with me they're all

20    located in the United States?

21                    A.   They appear to be.  Most of them

22    in New York.

23                    Q.   Yes.  And in fact, as they are

24    cross-claimed in both Canada and the United States,

25    again using my example, any funds that would come
```



1    to -- that they recover would be in both the

2    Canadian estate, but they are creditors of the US

3    Estate as well?

4                    A.    I believe, yes.

5                    Q.    Right.  And of course the people

6    you represent, not you represent but who retained

7    you, have some at least 7 to 800 million in claims

8    and they have another trial after this one about

9    additional claims; are you familiar with that?

10                   A.    I'm familiar that there is a -- a

11   portion of their claim into Canada has a guarantee.

12                   Q.    So using Mr. Sproule's numbers,

13   would you agree with me that whatever funds come to

14   the Canadian Estate in this allocation, the lion's

15   share of them get allocated right back to creditors

16   of other estates or directly to other estates?

17                   A.    Yes, a number of the -- using the

18   $10 billion number, a large share of it is to

19   creditors or claimants that are elsewhere.

20                   Q.    That are not Canadian creditors?

21                   A.    Not in Canada, that's correct.

22                   Q.    So the fact that on step one of

23   any allocation process, using the ownership

24   approach, money comes to Canada does not mean that

25   it stays in Canada; is that not correct?



```
 1                     A.   Not if the claims are held by
 2   people outside of Canada.
 3                     Q.   And I want you for a minute to
 4   pull up the evidence of Mr. Ray, and we'll put that
 5   to you.  I'm only referring you to one small part
 6   of it, and that is page 1455.  If we can have that
 7   put up on the screen.
 8                     And if you look at the question that
 9   was put to Mr. Ray, at line 5:
10                     "Question:  Am I correct that you
11                     knew at the time of the Rockstar
12                     transaction that the US had a $2
13                     billion claim into Canada?"
14                     "Answer:  Yes.
15                     "Question:  You knew when the
16                     Rockstar transaction closed that the
17                     Bondholders had a 4 billion claim into
18                     Canada?
19                     "Answer:  Yes.
20                     "Question:  And if the proceeds of
21                     the Rockstar transaction are allocated
22                     to either the US or to Canada, the US
23                     Estate and the bondholders will still
24                     recover significant proceeds?"
25                     And the answer is "Yes."
```



```
1                    Indeed, Mr. Ray goes on to say on the
2     next page that there is about a billion dollars of
3     other claims, at page 1456, line 10, there is a
4     billion dollars of general unsecured claims in the
5     US Estate.  Do you see that?
6                    A.   I do.
7                    Q.   So that on that $2 billion
8     inter-estate claim, in terms of how that would
9     ultimately get allocated when sent back to the US
10    Estate, would you agree with me that, based on
11    Mr. Ray's number, 80 percent of that would go to
12    the noteholders, if they're 4 billion out of the 5
13    billion or so that he talks about?
14                   A.   I'm just missing the 5 billion,
15    but --
16                   Q.   Well, he's identified the $4
17    billion in cross-guaranteed bonds and the $1
18    billion of additional claims.
19                   A.   Yes.
20                   Q.   That adds up to five.
21                   A.   Yes, $5 billion of potential total
22    claims.
23                   Q.   Right.  So 80 percent of that is a
24    noteholder claim?
25                   A.   Oh, yes, yes, I'm sorry.
```



1              Q.   So 80 percent of any recovery on

2    the $2 billion intercompany also goes to the

3    noteholders; is that not correct?

4              A.   If the US guarantee is recognized

5    as part of a US claim under the pro rata

6    distribution method, that's true.

7              Q.   Well, we'll get to the pro rata

8    method later.  I'm just looking at the math of how

9    money would flow.

10             I take it your proposal was still that

11   the money would flow to the US Estate, but you

12   would adjust elsewhere; is that not it?

13             A.   I believe that's fair.

14             Q.   I don't use algebraic formulas but

15   basically if you pay them something through the 2

16   billion intercompany, you just pay them less on the

17   rest of the lockbox distribution so that they end

18   up with the same percentage?

19             A.   Yes, as long as they stay in the

20   pro rata distribution.

21             Q.   Right.  But that's mathematically

22   doable as long as you're working backwards from the

23   ultimate pro rata percentage; correct?

24             A.   Yes.

25             Q.   But using this scenario, the



1    noteholder creditors, even using the Canadian

2    ownership approach, would recover very

3    significantly through the combination of the

4    Canadian and the US Estate?

5                    A.    I suppose that's true, yes.

6                    Q.    So much so that we might be beyond

7    the hundred cents that you propose in pro rata; is

8    that not correct?

9                    A.    I haven't done the math so I don't

10   know that but -- I'm sorry, I just haven't done the

11   math.

12                   Q.    You indicated in your evidence

13   when Mr. Barrack was asking you questions that it

14   would be inappropriate for anyone to get more than

15   a hundred percent?

16                   A.    I believe that's correct, a

17   hundred percent of their debt, yes.

18                   Q.    And in terms of a global

19   insolvency where some people are getting a lot less

20   than a hundred percent, what is the rationale for

21   it being inappropriate for anyone to get more than

22   a hundred percent?

23                   A.    That's correct.

24                   Q.    You agree there is no rationale?

25                   A.    That's correct.



```
 1                    Q.   And it is just a question of
 2   arbitraging the money among the estates; is that
 3   not correct?
 4                    A.   Which it --
 5                    Q.   The allocation of the lockbox
 6   among the estates?
 7                    A.   Yes, to effect the outcome that
 8   you're looking for, yes.
 9                    Q.   Now, you indicated at page 3 of
10   your rebuttal report when talking about -- and I'd
11   like you to turn up both page 2 and 3 of your
12   rebuttal report, in talking about the legal title
13   approach, that it results in a very extreme
14   allocation of lockbox funds in favour of the
15   Canadian Estate.  Do you see that?
16                    A.   Yes.
17                    Q.   But in fact, is it very extreme if
18   most of the money flows right out of the Canadian
19   Estate and you look at the full allocation process
20   to creditors?
21                    A.   That would depend on how it all
22   flows out and I haven't done those calculations.
23                    Q.   Based on the calculation we just
24   did a few minutes ago, isn't that the result, most
25   of it comes out of Canada and it's not so extreme?
```



```
 1    Would you agree with me?
 2                A.   If it flows the way you
 3    represented, then the ultimate claimants' payments
 4    aren't as lopsided but the allocation still goes to
 5    the Canadian Estate in a lopsided way.
 6                Q.   And then leaves the Canadian
 7    Estate as part of the distribution to creditors
 8    that you say is the appropriate target for a pro
 9    rata distribution; is that correct?
10                A.   Yes.
11                Q.   All right.  So in effect, the
12    legal title approach creates a form of pro rata
13    distribution, does it not?
14                A.   I would have to think a lot longer
15    and harder about the math and the numbers before
16    I'd agree that it --
17                Q.   I won't put up the reference to
18    your deposition on that unless you want me to help
19    you recall it.  That's what you thought.
20                A.   It gets closer to it for sure.
21                Q.   Okay.  Of course because there
22    would be other distributions to the other estates
23    from the other parts of the lockbox?
24                A.   Yes.
25                Q.   Now, I want you to compare what
```



```
 1   you said about the extreme allocation approach to

 2   Canada.  If you go back to your chart on page 2,

 3   your extreme allocation comment is based on the 79

 4   percent or so that Mr. Britven has; is that --

 5             A.   Yes, or the 83.

 6             Q.   Or 83 percent of Green, that

 7   basically around 80 percent of the lockbox funds

 8   would go to Canada under this extreme allocation

 9   approach, which may not mean that the money stays

10   in Canada.  Correct?

11             A.   That's correct.

12             Q.   Now, look at Mr. Kinrich's number,

13   73 percent.  Would you say that is an extreme

14   allocation number?

15             A.   That's very high.

16             Q.   Well, it's not far off from

17   Mr. Britven's 79 percent, is it?  It's about 90

18   percent of it?

19             A.   Yes.

20             Q.   It's extreme, isn't it?

21             A.   Yes, it's high.

22             Q.   And the one difference being that

23   if it goes to the US Debtors, where do the funds

24   end up?

25             A.   With US claimants.
```



```
 1                    Q.    The US creditors?

 2                    A.    Creditors.

 3                    Q.    So when you say the estates are

 4     essentially conduits here for creditors, what do

 5     you mean in terms of the ultimate distribution to

 6     creditors when you're using these two scenarios?

 7                    A.    I'm sorry, I don't know if I

 8     follow what your question is by what do I mean by

 9     that?

10                    Q.    You say the estates are conduits?

11                    A.    Yes.

12                    Q.    And they are conduits to get money

13     to creditors?

14                    A.    Yes.

15                    Q.    Now, if you use an extreme

16     allocation approach to an estate where the money

17     actually stays in that estate, doesn't that overpay

18     the creditors of one estate at the expense of all

19     the others?

20                    A.    Likely, and I'm not putting

21     forward the revenue approach as the appropriate

22     approach.

23                    Q.    No, I understand.  That's why I'm

24     asking you the question.

25                          Just one small question about
```



1   Mr. Britven's discount rate.  You were critical of

2   Mr. Britven using a 22 percent rate when you

3   thought a 15 percent rate was appropriate.  That

4   was just a small question on his methodology.

5                    A.   Yes.

6                    Q.   Do you recall that?

7                    A.   I do recall that.

8                    Q.   In fact, the 22 percent was the

9   number that Nortel used; is that not correct?

10                   A.   That's correct.

11                   MR. ZIGLER:  Thank you.  I have no

12  further questions.

13                   THE CANADIAN COURT:  Mr. Qureshi?

14                   MR. QURESHI:  Good afternoon, Your

15  Honour.  For the record, Abid Qureshi from Akin

16  Gump on behalf of the committee.  I'm not sure what

17  Your Honours' pleasure is.  I will tell you that I

18  anticipate my cross-examination to be around about

19  an hour and a half, so obviously I don't think I'll

20  get done today.  I'm happy to start if the courts

21  would prefer.  I'm sure I can shorten things up

22  if we --

23                   THE CANADIAN COURT:  To answer your

24  question, it certainly isn't my pleasure.

25                   MR. QURESHI:  Fair enough.



```
 1                    THE CANADIAN COURT:  If this case is
 2    going to get done in time and unless you want us to
 3    miss the benefit of argument, I don't see how this
 4    case is going to get done on the days allotted and
 5    I just think people have got to shorten
 6    cross-examinations and get to the meat of it and
 7    not -- I don't see all this.
 8                    MR. QURESHI:  I couldn't agree more
 9    with that, Your Honour.
10                    THE CANADIAN COURT:  I wonder whether
11    you really need an hour and a half.
12                    MR. QURESHI:  Well, Your Honour, I do
13    think that the cross-examination that I have
14    planned for him goes to the core of the pro rata
15    theory.  I'm not going to waste time on other
16    aspects of it.  I'm happy to start.
17                    And just with respect to timing, Your
18    Honour, we do gain a little time because neither
19    Clark nor Westbrook will testify.  And the other
20    point, as I understand it at least, on timing is
21    that the parties at least have contemplated and I
22    believe this is reflected in the trial protocol,
23    that in the days allotted we actually don't get to
24    argument, that we have post-trial briefing and then
25    argument at some future occasion yet to be
```



```
 1   scheduled.
 2              THE CANADIAN COURT:  That's certainly
 3   not my understanding.
 4              MR. QURESHI:  Well, in any event...
 5              THE CANADIAN COURT:  When do you say we
 6   get to the argument?
 7              MR. QURESHI:  Again, Your Honours, my
 8   understanding is that what the parties had
 9   contemplated in laying out this schedule is that at
10   the conclusion of expert testimony, which would
11   take us through the days that we presently have
12   allotted, that subsequent to that point there would
13   be post-trial briefing and then after post-trial
14   briefing a time would be scheduled for closing
15   arguments.
16              THE CANADIAN COURT:  Well, that's a new
17   one on me, let's put it that way.  I don't know
18   when you expect that to happen.  I thought we had
19   so many days for the trial and then we have so many
20   days for the claims trial, period.
21              In any event, if you're going to be an
22   hour and a half, I guess we're going to have to
23   stop now but it's rather disconcerting.  And don't
24   assume you're going to get any more days after the
25   27th of June, period.
```

 Neeson&Associates    W&F

1              MR. QURESHI:  Understood, Your Honour.

2    I don't think anybody is assuming we're going to

3    get any additional days.

4              THE CANADIAN COURT:  Oh, but you are.

5    You're telling me that we're going to come back

6    sometime later for argument.

7              MR. QURESHI:  That's right.  With

8    respect to argument, Your Honour, that's correct, I

9    think all of the parties are under the impression

10   that when we laid out this schedule, what was

11   contemplated, at least among the parties, and I

12   thought made clear to the courts, is that through

13   June 27th were the days that we would spend on fact

14   and expert witnesses; that the courts would then

15   have the benefit of post-trial briefing from all of

16   the parties before we returned for closing

17   arguments at some point certainly subsequent to the

18   claims trial, but at some point to be scheduled by

19   the courts.

20             THE CANADIAN COURT:  There's no point

21   debating that tonight, but certainly it's not

22   something that I understood.

23             MR. QURESHI:  Fair enough.  And we may

24   have to address that again.  But certainly I will

25   spend the intervening time to shorten the

 Neeson & Associates    W&F

1    cross-examination, Your Honour.

2              THE CANADIAN COURT:  All right.  Then

3    we'll stop now until Thursday morning, nine

4    o'clock.

5              THE US COURT:  Standard recess,

6    counsel.  Back Thursday morning and we'll continue

7    with this cross-examination.

8    -- Whereupon the court adjourned at 5:15 p.m.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    REPORTERS' CERTIFICATE
 2                    I, KIMBERLEY A. NEESON, RPR, CRR, CSR,
 3    CCP, Canadian Certified Shorthand Reporter,
 4    Realtime Systems Administrator, and I, GAIL INGHRAM
 5    VERBANO, RDR, CRR, CSR, Realtime Systems
 6    Administrator, US Certificate Shorthand Reporter,
 7    certify;
 8                    That the foregoing proceedings were
 9    taken before us at the time and place therein set
10    forth;
11                    That the entire proceedings of the
12    hearing date were recorded stenographically
13    individually by each of us and were thereafter
14    transcribed;
15                    That the foregoing is a true and
16    correct transcript of our shorthand notes so taken.
17
18    Dated this 2nd day of June, 2014.
19
20    PER:                          PER:
21    Gail Inghram Verbano          Kimberley Neeson
22    GAIL INGHRAM VERBANO          KIMBERLEY NEESON
23    WILCOX & FETZER               NEESON & ASSOCIATES
24    WILMINGTON, DE  USA           TORONTO, ON  CANADA
25
```





















































































