



```
 1              UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3    ----------------------------)

 4    In Re                       )

 5       NORTEL NETWORKS INC.,    ) Chapter 11

 6       et al,                   ) Case No.

 7             Debtors.           ) 09-10138(KG)

 8    ----------------------------)

 9                         - and -

10                 Court File No. 09-CL-7950

11                       ONTARIO

12             SUPERIOR COURT OF JUSTICE

13                  (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15    ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16     AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17      ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18    NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19     CORPORATION, NORTEL NETWORKS INTERNATIONAL

20     CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                      CORPORATION

22      APPLICATION UNDER PART IV OF THE COMPANIES'

23    CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                      AS AMENDED

25                      --------
```



```
 1

 2                              --------

 3

 4   --- This is the Day 13/Volume 13 of the transcript

 5   of proceedings in the above matter held

 6   simultaneously in:

 7   Superior Court of        United States Bankruptcy

 8   Ontario (Commercial      Court for the District of

 9   List)                    Delaware

10   Courtroom 8-1            Courtroom 3

11   330 University Avenue    824 Market Street

12   Toronto, Ontario         Wilmington, Delaware

13

14   on the 5th day of June, 2014, commencing at 9:15

15   a.m.

16

17                              --------

18   B E F O R E:

19   The Honourable Judge Kevin Gross (United States)

20   The Honourable Mr. Justice Frank Newbould (Canada)

21

22                             ----------

23

24

25
```



```
 1    REPORTED BY:  Toronto - Kimberley Neeson
 2              RPR, CRR, CSR, CCP, CBC
 3         Realtime Systems Administrator
 4          Delaware - Gail Verbano
 5                  RMR, CRR, CSR
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1   A P P E A R A N C E S:

 2

 3                    CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER:      Jay Carfagnini, Esq.

11             Joseph Pasquariello, Esq.

12             Ben Zarnett, Esq.

13             Alan Mark, Esq.

14             Peter Ruby, Esq.

15             Jessica Kimmel, Esq.

16             Julie Rosenthal, Esq.

17             Chris Armstrong, Esq.

18

19   ERNST & YOUNG INC.

20   Ernst & Young Tower

21   222 Bay Street, P.O. Box 251

22   Toronto, ON  M5K 1J7

23   PER:      Murray McDonald, Esq.

24             Brent Beekenkamp, Esq.

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER:      Derrick Tay, Esq.

 7             Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER:      Jacob Pultman, Esq.

14             Ken Coleman, Esq.

15             Paul Keller, Esq.

16             Daniel Guyder, Esq.

17             Laura Hall, Esq.

18             Joseph Badtke-Berkow, Esq.

19             Jonathan Cho, Esq.

20             Nicolette Ward, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   BUCHANAN INGERSOLL & ROONEY

24   1105 North Market Street

25   Suite 1900
```



```
 1   Wilmington, DE  19801-1054

 2   PER:       Kathleen A. Murphy, Esq.

 3              Mary F. Caloway, Esq.

 4

 5                    U.S. DEBTORS

 6

 7   FOR NORTEL NETWORKS INC.

 8   TORYS LLP

 9   79 Wellington Street West, Suite 3000

10   Box 270, TD Centre

11   Toronto, ON  M5K 1N2

12   PER:       Sheila Block, Esq.

13              Andrew Gray, Esq.

14

15   FOR THE U.S. DEBTORS

16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

17   1201 North Market Street, 16th Floor

18   P.O. Box 1347

19   Wilmington, DE  19899-1347

20   PER:       Derek Abbott, Esq.

21              Annie Cordo, Esq.

22

23   FOR NORTEL NETWORKS INC.

24   CLEARY GOTTLIEB STEEN & HAMILTON LLP

25   One Liberty Plaza
```



```
 1   New York, NY  10006

 2   PER:       James Bromley, Esq.

 3              Lisa Schweitzer, Esq.

 4              Howard Zelbo, Esq.

 5              Jeffrey Rosenthal, Esq.

 6              Avi Luft, Esq.

 7

 8                    EMEA DEBTORS

 9

10   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

11   LIMITED

12   DAVIES WARD PHILLIPS & VINEBERG LLP

13   40th Floor

14   155 Wellington Street

15   Toronto, ON  M5V 3G7

16   PER:       Matthew Milne-Smith, Esq.

17              Robin B. Schwill, Esq.

18              Sean Campbell, Esq.

19              James Doris, Esq.

20              Louis Sarabia, Esq.

21

22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

23   LIMITED

24   LAX O'SULLIVAN SCOTT LISUS LLP

25   Suite 2750, 145 King Street West
```



```
 1   Toronto, ON  M5H 1J8

 2   PER:        Matthew P. Gottlieb, Esq.

 3               Tracy Wynne, Esq.

 4               Paul Michell, Esq.

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER:        Derek Adler, Esq.

11               Neil Oxford, Esq.

12               Fara Tabatabai, Esq.

13               Charles Huberty, Esq.

14

15   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

16   LIMITED

17   YOUNG CONAWAY STARGATT & TAYLOR LLP

18   Rodney Square

19   1000 North King Street

20   Wilmington, DE  19801

21   PER:        Ed Harron, Esq.

22               John Dorsey, Esq.

23

24   FOR THE EMEA DEBTORS

25   HERBERT SMITH FREEHILLS LLP
```



```
 1   Exchange House

 2   Primrose Street

 3   London, England  EC2A 2EG

 4   PER:       James Norris-Jones, Esq.

 5              CANADIAN CREDITORS COMMITTEE

 6

 7   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

 8   BENEFICIARIES

 9   KOSKIE MINSKY

10   20 Queen Street West

11   Suite 900

12   Toronto, ON  M5H 3R3

13   PER:       Mark Zigler, Esq.

14              Susan Philpott, Esq.

15              Ari Kaplan, Esq.

16              Barbara Walancik, Esq.

17

18   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

19   REPRESENTED BY THE CAW-CANADA

20   CAW-CANADA

21   Legal Department

22   205 Placer Court

23   Toronto, ON  M2H 3H9

24   PER:       Barry E. Wadsworth, Esq.

25              Lewis Gottheil, Esq.
```



```
 1
 2   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
 3   COMMITTEE
 4   SHIBLEY RIGHTON LLP
 5   250 University Avenue, Suite 700
 6   Toronto, ON  M5H 3E5
 7   PER:        Arthur O. Jacques, Esq.
 8               Thomas McRae, Esq.
 9
10   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS
11   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE
12   FUND
13   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP
14   35th Floor
15   155 Wellington Street West
16   Toronto, ON  M5V 3H1
17   PER:        Kenneth T. Rosenberg, Esq.
18               Massimo (Max) Starnino, Esq.
19               Lily Harmer, Esq.
20               Karen Jones, Esq.
21               Tina Lie, Esq.
22               Michelle Jackson, Esq.
23
24   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN
25   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,
```

Neeson&Associates   W&F

```
 1   2009

 2   NELLIGAN O'BRIEN PAYNE LLP

 3   50 O'Connor Street, Suite 1500

 4   Ottawa, ON  K1P 6L2

 5   PER:        Janice B. Payne, Esq.

 6               Steven Levitt, Esq.

 7               Christopher Rootham, Esq.

 8               Ainslie Benedict, Esq.

 9

10   FOR MORNEAU SHEPELL LIMITED

11   MCCARTHY TETRAULT LLP

12   Suite 5300, Toronto Dominion Bank Tower

13   Toronto, ON  M5K 1E6

14   PER:        Barbara J. Boake, Esq.

15               James D. Gage, Esq.

16               Elder C. Marques, Esq.

17               Paul Steep, Esq.

18               Byron Shaw, Esq.

19               Sharon Kour, Esq.

20               Kelly Peters, Esq.

21

22   FOR THE CANADIAN CREDITORS COMMITTEE

23   DLA PIPER

24   919 North Market Street, Suite 1500

25   Wilmington, DE  19801
```

 Neeson & Associates    W&F

```
 1   PER:        Selinda A. Melnik, Esq.

 2               Richard Hans, Esq.

 3               Timothy Hoeffner, Esq.

 4               Farah Lisa Whitley-Sebti, Esq.

 5             INFORMAL NORTEL NOTEHOLDER GROUP

 6

 7   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 8   BENNETT JONES LLP

 9   1 First Canadian Place

10   Suite 3400

11   Toronto, ON  M5X 1A4

12   PER:        Kevin Zych, Esq.

13               S. Richard Orzy, Esq.

14               Gavin Finlayson, Esq.

15               Richard Swan, Esq.

16               Sean Zweig, Esq.

17               Jonathan Bell, Esq.

18               Amanda McLachlan, Esq.

19

20   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

21   MILBANK, TWEED, HADLEY, MCCLOY LLP

22   1 Chase Manhattan Plaza

23   New York, NY  10005

24   PER:        Thomas R. Kreller, Esq.

25               Jennifer P. Harris, Esq.
```



```
 1              Albert A. Pisa, Esq.

 2              Samir Vora, Esq.

 3              Andrew LeBlanc, Esq.

 4              Michael Hirschfeld, Esq.

 5              Atara Miller, Esq.

 6              Tom Matz, Esq.

 7              Nick Bassett, Esq.

 8              Gabrielle Ruha, Esq.

 9              Rachel Pojunas, Esq.

10

11    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12

13  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14  CASSELS BROCK & BLACKWELL LLP

15  Suite 2100, Scotia Plaza

16  40 King Street West

17  Toronto, ON  M5H 3C2

18  PER:     Shayne Kukulowicz, Esq.

19              Michael Wunder, Esq.

20              Ryan Jacobs, Esq.

21

22  FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

23  ASHURST LLP

24  Boardwalk House

25  5 Appold Street
```



```
 1   London, England  EC2A 2HA

 2   PER:       Angela Pearson, Esq.

 3              Antonia Croke, Esq.

 4

 5   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 6   RICHARDS LAYTON & FINGER, P.A.

 7   920 North King Street

 8   Wilmington, DE  19801

 9   PER:       Christopher Samis, Esq.

10

11   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12   AKIN GUMP STRAUSS HAUER & FELD LLP

13   One Bryant Park

14   New York, NY  10036

15   PER:       Fred S. Hodara, Esq.

16              David H. Botter, Esq.

17              Abid Qureshi, Esq.

18              Robert A. Johnson, Esq.

19              Brad M. Kahn, Esq.

20              Christine Doniak, Esq.

21              Joseph Sorkin, Esq.

22              Jacqueline Yecies, Esq.

23

24      UK PENSION PROTECTION FUND AND NORTEL NETWORKS

25               UK PENSION TRUST LIMITED
```



```
 1

 2   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 3   NETWORKS UK PENSION TRUST LIMITED

 4   THORNTON GROUT FINNIGAN LLP

 5   Suite 3200, 100 Wellington Street West

 6   P.O. Box 329

 7   Toronto, ON  M5K 1K7

 8   PER:       Michael Barrack, Esq.

 9              D.J. Miller, Esq.

10              Rebecca Lewis, Esq.

11              Andrea McEwan, Esq.

12              John Finnigan, Esq.

13              Michael Shakra, Esq.

14

15   FOR THE UK PENSION PROTECTION FUND AND NORTEL

16   NETWORKS UK PENSION TRUST LIMITED

17   WILLKIE FARR & GALLAGHER LLP

18   787 Seventh Avenue

19   New York, NY  10019-6099

20   PER:       Brian O'Connor, Esq.

21              Sameer Advani, Esq.

22              Andrew Hanrahan, Esq.

23

24   FOR THE UK PENSION PROTECTION FUND AND NORTEL

25   NETWORKS UK PENSION TRUST LIMITED
```



```
 1   BAYARD, P.A.

 2   222 Delaware Avenue, Suite 900

 3   Wilmington, DE  19899

 4

 5   PER:        Charlene D. Davis, Esq.

 6               Justin Alberto, Esq.

 7

 8               THE BANK OF NEW YORK MELLON

 9

10   FOR THE BANK OF NEW YORK MELLON

11   MCMILLAN LLP

12   Brookfield Place

13   181 Bay Street, Suite 4400

14   Toronto, ON  M5J 2T3

15   PER:        Sheryl E. Seigel, Esq.

16

17   FOR THE BANK OF NEW YORK MELLON

18   LATHAM & WATKINS LLP

19   885 Third Avenue

20   New York, NY  10022-4834

21   PER:        Michael J. Riela, Esq.

22

23           WILMINGTON TRUST, NATIONAL ASSOCIATION

24

25   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
```



```
 1   HEENAN BLAIKIE LLP

 2   Bay Adelaide Centre

 3   333 Bay Street, Suite 2900

 4   P.O. Box 2900

 5   Toronto, ON  M5H 2T4

 6   PER:       John Salmas, Esq.

 7              Kenneth Kraft, Esq.

 8              Sara-Ann Van Allen, Esq.

 9

10   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

11   KATTEN MUCHIN ROSENMAN LLP

12   575 Madison Avenue

13   New York, NY  10022-2585

14   PER:       Craig A. Barbarosh, Esq.

15              David A. Crichlow, Esq.

16              Karen B. Dine, Esq.

17

18       LAW DEBENTURE TRUST COMPANY OF NEW YORK

19

20   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

21   BORDEN LADNER GERVAIS LLP

22   40 King Street West

23   Toronto, ON  M5H 3Y4

24   PER:       Edmond F.B. Lamek, Esq.

25              James Szumski, Esq.
```



```
 1

 2   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 3   PATTERSON BELKNAP WEBB & TYLER LLP

 4   1133 Avenue of the Americas

 5   New York, NY  10036

 6   PER:        Daniel A. Lowenthal, Esq.

 7

 8        BOARDS OF DIRECTORS OF NORTEL NETWORKS

 9        CORPORATION AND NORTEL NETWORKS LIMITED

10

11   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

12   CORPORATION AND NORTEL NETWORKS LIMITED

13   OSLER HOSKIN AND HARCOURT LLP

14   100 King Street West

15   1 First Canadian Place, Suite 6100

16   P.O. Box 50

17   Toronto, ON  M5X 1B8

18   PER:        Lyndon Barnes, Esq.

19               Edward Sellers, Esq.

20               Betsy Putnam, Esq.

21               Adam Hirsh, Esq.

22               Alexander Cobb, Esq.

23

24

25
```



```
 1                    I N D E X

 2

 3    WITNESS:   DR. BAZELON (CONTINUED)

 4                                         PAGE

 5    CROSS-EXAMINATION BY MR. QURESHI..... 3034

 6    CROSS-EXAMINATION BY MR. LEBLANC..... 3079

 7    CROSS-EXAMINATION BY MR. ZIGLER...... 3084

 8    RE-DIRECT/RE-EXAMINATION BY

 9     MR. BARRACK........................ 3085

10

11

12    WITNESS:  JAMES PHILIP GREEN

13    EXAMINATION IN-CHIEF/DIRECT EXAMINATION

14     BY MR. RUBY........................ 3095

15    CROSS-EXAMINATION BY MR. ZELBO....... 3168

16    CROSS-EXAMINATION BY MR. MAGUIRE..... 3250

17

18

19

20

21

22

23

24

25
```



```
 1                    INDEX OF EXHIBITS

 2

 3   NUMBER/DESCRIPTION                    PAGE/LINE NO.

 4   42  Report of J. Philip Green, reissue

 5       date February 28, 2014........... 3095/11

 6

 7   43  Rebuttal report of J. Philip

 8       Green, dated February 28, 2014... 3095/13

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   -- Upon commencing at 9:15 a.m.

 2

 3            THE REGISTRAR:  Dr. Bazelon, you are

 4   reminded you are still under oath, sir.

 5

 6    COLEMAN BAZELON, having been previously duly

 7     affirmed, was resumed and testified further as

 8                      follows:

 9

10            THE US COURT:  Good morning, Justice

11   Newbould.

12            THE CANADIAN COURT:  Judge Gross.

13            MR. ZIGLER:  Your Honour, a small

14   housekeeping matter from Friday.  Good morning,

15   Judge Gross, good morning, Justice Newbould.  Just

16   a small housekeeping matter from Mr. Bazelon's

17   cross-examination.

18            I had put to him on Friday the rule

19   20.19 form that was filed in the US Bankruptcy

20   Court and I was wrong in saying it didn't have an

21   exhibit number.  It actually does have a TR number

22   so I will give you that number and that way we

23   don't have to mark it as an exhibit, and it was

24   Exhibit TR49184.  So the 20.19 form filed in the US

25   Bankruptcy Court is TR49184.
```



```
 1                    THE CANADIAN COURT:  Just tell me,
 2   what's a form 20.19?
 3                    MR. ZIGLER:  That is the filing of the
 4   noteholders committee as to who they are, their
 5   addresses and the amount that they hold.
 6                    THE CANADIAN COURT:  Okay.
 7                    MR. ZIGLER:  Thank you.
 8                    THE CANADIAN COURT:  And that's where
 9   you got the figure from you were putting to the
10   witness?
11                    MR. ZIGLER:  That's where we got the
12   location of the noteholders.
13                    THE CANADIAN COURT:  Oh, the location.
14                    MR. ZIGLER:  We didn't add up all the
15   figures on the form.
16                    THE CANADIAN COURT:  But presumably
17   they're in there.  Okay, thank you.
18                    Yes, Mr. Qureshi?
19                    MR. QURESHI:  Good morning, Your
20   Honours, Abid Qureshi, Akin Gump on behalf of the
21   committee.  Good morning, Judge Gross.
22                    THE US COURT:  Good morning,
23   Mr. Qureshi.
24                    MR. QURESHI:  Your Honours can see I
25   got a really short haircut in the hopes that it's
```



```
 1   going to make me go faster this morning.  I think
 2   it's going to work.
 3                THE CANADIAN COURT:  Just before you
 4   start...
 5   -- OFF THE RECORD
 6                THE CANADIAN COURT:  Okay.
 7                MR. QURESHI:  May I proceed, Your
 8   Honours?
 9                THE CANADIAN COURT:  Yes.
10                MR. QURESHI:  In order to move things
11   along this morning, you both should have before you
12   a folder that has excerpts from three documents
13   that I may refer to during the cross-examination.
14   Judge Gross, I hope that was handed up to Your
15   Honour as well?
16                THE US COURT:  It's on the way.
17                MR. QURESHI:  Wonderful.  It's been
18   handed out in the courtrooms and the witness should
19   have a copy as well.
20                THE US COURT:  I've got it.
21                MR. QURESHI:  Thank you.
22
23   CROSS-EXAMINATION BY MR. QURESHI:
24                Q.   Dr. Bazelon, good morning.
25                A.   Good morning.
```



```
 1                    Q.   Let's start by getting right into

 2    the demonstratives that you produced in connection

 3    with your direct examination.  If I could please

 4    have the first slide from that presentation brought

 5    up.

 6                    Now, Dr. Bazelon, am I correct that if

 7    the courts adopt your pro rata distribution

 8    methodology, at the conclusion of this trial the

 9    courts cannot in fact issue any final ruling on

10    allocation, and that's because they cannot at this

11    time determine what's in WWA and WWD from the first

12    slide, worldwide assets and worldwide debt?

13                    A.   That's correct.  The assets might

14    be determinable but I'm not sure, but you're quite

15    correct that the worldwide debts won't be known

16    until the claims process is settled.

17                    Q.   Okay.

18                    A.   So that the final distribution to

19    claimants couldn't happen until then.

20                    Q.   And when you came up with the

21    various formula that are contained in this set of

22    demonstrative exhibits, you had in mind that there

23    would be distributions to the three, I think you

24    referred to them as high level estates, right, the

25    US, Canada and EMEA?
```



```
 1                    A.    It's much easier to talk about it
 2     at that level but of course the formulas work at
 3     the selling debtor level.
 4                    Q.    I understand that the formulas
 5     work, that that's your testimony.  My question,
 6     sir, is when you came up with the formula, what you
 7     had in mind was distributions just to those three
 8     high level debtors, correct?
 9                    A.    That was the example I used so I
10     guess it was in my mind but I'm not sure I meant to
11     limit it in that way.
12                    Q.    But you understand today that
13     there are some 23 debtor entities that under the
14     IFSA are selling debtors and are therefore entitled
15     to a distribution out of the lockbox?
16                    A.    Yes, I haven't counted them but I
17     understand there is quite a number listed.
18                    Q.    So let's focus first on the
19     worldwide asset part of this -- of this formula.
20                    Now, worldwide assets, I think you
21     testified earlier that already includes cash on
22     hand in each estate, correct?
23                    A.    That's correct.
24                    Q.    And it would include whatever
25     other assets exist in each estate today, correct?
```

 Neeson & Associates   W&F

```
 1                    A.    That are available for paying

 2    debtors, yes.

 3                    Q.    Right.  And so, the first thing

 4    that Judge Gross and Justice Newbould would need to

 5    do in order to apply your approach is to determine

 6    for each of the 23 estates how much cash and assets

 7    are held in each one, right?

 8                    A.    That would be correct.

 9                    Q.    And you are aware, sir, that there

10    are assets of various Nortel entities that have yet

11    to be liquidated?

12                    A.    I wasn't aware that there was

13    significant assets waiting to be --

14                    Q.    Okay.  Well, if there are, in your

15    model what happens?  Do we wait for those assets to

16    get liquidated or do Judge Gross and Justice

17    Newbould estimate the value of those assets for

18    purposes of calculating WWA?

19                    A.    As you said a moment ago, the

20    claims have to be determined before the final

21    allocation to the claimants.  I would be surprised

22    if the assets weren't sold off before the claim --

23    if they weren't sold off before the claimants were

24    known, but if they weren't, they would have to

25    either make an estimate of that or wait.
```



```
 1                    Q.   Okay.  So either Justice Newbould
 2    and Judge Gross agree on an estimated value or
 3    those assets are already sold, correct?
 4                    A.   That would be correct.
 5                    Q.   Okay.  And of course, you're not
 6    aware of how long it might take to liquidate any
 7    assets that remain in any of the estates today,
 8    right?
 9                    A.   No.
10                    Q.   Now, the WWA calculation on your
11    first slide, that's also computed after priority in
12    administrative claims in each of the 23 estates
13    have been satisfied, correct?
14                    A.   That's correct.
15                    Q.   So what happens is administrative
16    and priority claims in each estate are paid out of
17    cash in those estates, and then the judges would do
18    the math of calculating what exists in each of the
19    23 estates.  Do I have that right?
20                    A.   I believe that's correct.  I think
21    of it as priority claims and administrative claims.
22    I think they can treat as priority if they like.
23                    Q.   Okay.  And of course you have no
24    idea how long it's going to take before
25    administrative claims and priority claims in each
```



```
 1   of these 23 estates are determined, right?
 2              A.   I have not looked at that, no.
 3              Q.   Now let's talk about settlements
 4   and how settlements get treated as part of
 5   worldwide assets.  I want to use as an example the
 6   settlement that was reached, and I believe you are
 7   aware of it, between the US Estate on the one hand,
 8   EMEA and the UK Pension parties on the other.
 9              Now, you are aware that the US settled
10   various intercompany claims from EMEA by a cash
11   settlement of $75 million?
12              A.   I am aware, yes.
13              Q.   And you understand that 37 and a
14   half million dollars of that payment was given to
15   the EMEA Estate, to the debtor entities?
16              A.   Yes.
17              Q.   And that the other 37 and a half
18   million in cash out of the US Estate was paid to
19   the UK Pension parties, correct?
20              A.   Yes.
21              Q.   Now, in your formula you agree
22   with me that the 37 and a half million that was
23   paid to the EMEA Estate, that gets treated as part
24   of the worldwide asset allocation, it is now cash
25   in the EMEA Estate and gets treated as part of the
```



```
 1    WWA, right?

 2              A.    That would be the most natural way

 3    and most consistent with the approach of the pro

 4    rata, yes.

 5              Q.    So the effect of that is then that

 6    the 37 and a half million that was paid to EMEA to

 7    settle those claims effectively becomes available

 8    for distribution to all creditors, right?

 9              A.    If that's how the judges choose to

10    treat it, absolutely.

11              Q.    And under your approach, what

12    effectively that does is it unwinds any effect of

13    the settlement as it relates to creditors of the

14    EMEA Estate, right?

15              A.    In an arithmetic sense, that's

16    true.  There's also the associated liabilities that

17    are gone and I don't know -- I don't know what --

18              Q.    But it has no effect, sir, because

19    the creditors of EMEA gain no incremental benefit

20    from that settlement, right?

21              A.    In that -- in that application,

22    that's correct.

23              Q.    Okay.  Now, let's look at what

24    happens under the logic of your approach to the

25    other 37 and a half million that was paid to the UK
```



1    Pension parties.

2                 Now, your position, sir, is that

3    because the UK Pension parties are not an estate,

4    the 37 and a half million that went from the US to

5    the UK Pension parties has already left the system,

6    so to speak, and is therefore not part of the

7    worldwide asset calculation, WWA, on your first

8    page here; isn't that right?

9                 A.    Not necessarily.  I think first

10   that it leaves the system because they're not a

11   selling debtor, not because they're not an estate.

12   It's true that it's out of the system but it's up

13   to the judges as to whether or not to include that

14   in their calculations of the worldwide assets.

15                Q.    So the choice available to the

16   courts then would be one of two things, right?  The

17   UK Pension could keep its 37 and a half million

18   dollars that it was already paid and then continue

19   to participate in any pro rata distribution, right?

20   That's one alternative?

21                A.    Correct.

22                Q.    And the other alternative is that

23   the courts could somehow take back that 37 and a

24   half million dollars that was paid to the UK

25   Pension parties so that they gain no advantage from



```
 1   that settlement as against any other creditors; do
 2   I have that right?
 3              A.   It is correct that they would end
 4   up not getting an advantage.  I don't believe it
 5   would be in the taking back of any cash.
 6              Q.   Well, it would -- it would then be
 7   effected by some other mechanic like giving them
 8   less, but effectively what you would do is take
 9   away the economic benefit of that settlement,
10   right?
11              A.   That would be correct.
12              Q.   Okay.  And in the first scenario
13   where the UK Pension parties, because they're not
14   an estate, they get to keep the 37 and a half
15   million dollars, if that's the option that the
16   courts should choose, and continue to participate
17   in the pro rata recovery, then they obviously would
18   not recover ultimately at the pro rata amount,
19   right, because they're getting the additional 37
20   and a half million?
21              A.   They would end up with a very
22   marginally higher percentage of recovery, yes.
23              Q.   Now, it's your position, sir, is
24   it not, that in the pure pro rata approach you
25   don't want to create incentives to settle for
```



1    individual creditors; isn't that right?

2                    A.    I haven't thought through all of

3    the incentive issues.  I don't -- I think the pure

4    pro rata approach is the most appropriate one for

5    the court to adopt because it's closest to how

6    Nortel operated prior to the insolvency.

7                    Q.    Well, do you recall telling me at

8    your deposition, and we can pull out the

9    transcript, that you don't think it's a good idea

10   to start creating incentives for cash settlements

11   along the line of the settlement achieved with the

12   UK Pension parties?

13                   A.    Yes, I do.

14                   Q.    And the reason you don't want to

15   create any incentives for settlements like that is

16   that the effect of cash settlements is that the

17   overall assets available for part of the pro rata

18   calculation are diminished, right?  Because cash

19   leaves the system to pay individual creditors?

20                   A.    So during --

21                   Q.    Is that correct?

22                   A.    It depends on how -- it's not

23   necessarily correct.  It depends on how the courts

24   treat things.  The discussion we had about

25   incentives I said was an issue I hadn't thought



```
1    through and you wouldn't want to create incentives
2    that create bad behaviour but I hadn't thought
3    through exactly how that would all flow through.
4    Your question assumes both -- assumes a very
5    specific ruling on behalf of the courts about how
6    they treat it leaving the system, and I didn't --
7                 Q.    Well, are you aware, sir, that
8    other cash settlements have been agreed to, other
9    than the example I gave you of the UK Pension
10   parties?
11                A.    I believe there have been some.
12                Q.    Right.  So as I understand your
13   testimony, cash has already been paid to those
14   creditors that have settled and so they can either
15   be left out, so that cash has left the system,
16   those creditors are not part of the pro rata
17   distribution, right?  And the other alternative is
18   the courts could somehow economically get that
19   money back, right?  Those are the two alternatives?
20                A.    They can economically do that if
21   the selling parties are still part of the system.
22                Q.    Right, okay.  Now, let's turn to
23   WWD in your first page, the worldwide unsecured
24   debts, and see if we can understand how that part
25   of it works.
```

 Neeson&Associates    W&F

 1                    So as I understand it, Justice Newbould
 2    and Judge Gross would need to look at final allowed
 3    claims in each of the 23 estates that are eligible
 4    for distribution from the lockbox in order to
 5    compute what WWD is, correct?
 6              A.    It would be in order to compute
 7    the pro rata percentage, that's absolutely correct.
 8              Q.    And with respect to the Canadian
 9    Estate, you have no idea how long it's going to
10    take for all claims in Canada to be finally
11    determined and no longer subject to appeal, right?
12              A.    I have not looked at that issue.
13              Q.    And the same would be true of the
14    US Estate and of all the estates in EMEA, correct?
15              A.    That's correct.
16              Q.    Now, I want to turn just
17    specifically to EMEA for a moment.  Now, you should
18    have in your folder, and Your Honours should also
19    have, Exhibit number TR50310.  This is an Ernst &
20    Young, the Joint Administrators in Europe, their
21    report to creditors.  It's dated February 6th of
22    2014.
23                    Dr. Bazelon, do you have that document
24    before you?
25              A.    I see it here.



1               Q.   Perfect.  I'm going to refer to

2    page 9 of the document.  It will also be on the

3    screen if that is easier for you to see.  And

4    you'll see on the top of page 9 it says:

5                    "The Joint Administrators

6                    continue to invite submissions of

7                    claim forms as part of the informal

8                    claims process which commenced in

9                    July of 2010."

10                   Do you see that?

11              A.   I do.

12              Q.   Were you aware, sir, that for the

13   21 EMEA estates, the claims process is still in its

14   informal stage?

15              A.   I did not -- I did not know that.

16   I don't know what the meaning of the informal stage

17   versus another stage.

18              Q.   Okay.  Then in the next paragraph

19   you will see that it says:

20                   "At this time, given the extant

21                   issues in respect of TPR," the

22                   pension regulator, "and PPA,"

23                   purchase price allocation, "it is

24                   not possible to make a distribution

25                   to the creditors of the company or



```
 1                    to say when a formal creditor claims

 2                    process can be commenced."

 3                    And so, you understand in light of

 4       that, sir, that even after the conclusion of this

 5       trial, the UK Pension parties, for example,

 6       continue to be free to assert additional claims in

 7       any of the 21 EMEA estates, correct?

 8                A.   I hadn't thought about them in

 9       particular, but this says that claims can still be

10       submitted, yes.

11                Q.   Right.  And you understand that

12       Justice Newbould has no jurisdiction over the

13       claims process in EMEA, correct?

14                A.   That's my understanding at least.

15                Q.   And the same for Judge Gross,

16       right?

17                A.   Yes.

18                Q.   Okay.  And you also don't have any

19       ability to estimate how long it's going to take for

20       that process to come to conclusion, right?

21                A.   I haven't looked at that, no.

22                Q.   Now, let's turn for a moment to

23       your rebuttal report, and in particular to appendix

24       R-2.  And you should have a copy of that appendix

25       before you as well.  And it's also on the screen.
```



```
 1                    Do you have that, Dr. Bazelon?
 2             A.    I do.
 3             Q.    And if you look -- so what you've
 4    done in this appendix is you have summarized the
 5    parties' positions as per their original allocation
 6    statements in terms of what the issue is that the
 7    courts have to determine, right?
 8             A.    That's correct.
 9             Q.    And what we've done up on the
10    screen is highlight the position of the three
11    estates, the Canadian Debtors, the US Debtors and
12    the EMEA Debtors.
13                    Now, Dr. Bazelon, you agree with me
14    that each of the three estates in substance takes a
15    similar position as to the question that the courts
16    must answer at the conclusion of this trial, right?
17                    All of them suggest, again in
18    substance, that what the courts must do is value
19    that which each estate surrendered in connection
20    with the sale process?
21             A.    I think it's fair to say that each
22    -- that's closer to the Canadian and US positions,
23    and that it's the value of what -- it's their
24    entitlement from what they surrendered.
25             Q.    So each of them formulated a
```



```
 1    little differently but in substance they all get to

 2    that same point, right?

 3              A.   At a high level it's about what

 4    each estate is entitled to.

 5              Q.   So if the courts conclude that at

 6    the conclusion of this trial what they need to do

 7    is answer that question, put a value on that which

 8    each estate gave up as part of the sale process,

 9    your pro rata distribution model does not provide

10    the court with any assistance in answering that

11    question, right?

12              A.   I don't believe that's correct,

13    no.

14              Q.   I'm sorry?

15              A.   I don't agree.

16              Q.   You don't agree.  Okay, let's look

17    at what you said in your deposition then.  Can we

18    please have copies of the deposition handed around.

19    And if I could refer you, Dr. Bazelon, to page 119,

20    lines 6 to 17, and Jaime, if we can please play

21    clip 5.

22              (The following excerpt was played by

23    video.)

24              "I just want to make sure the

25              record is clear because that was a
```



```
1                somewhat confusing answer for me.
2                So you agree with me that if -- the
3                question the court must answer is as
4                stated in your appendix R2 here, the
5                quote I just read from the US
6                Debtors' position, that the
7                application of your pro rata
8                methodology would not enable the
9                court to answer that question?
10                   Answer:  Yes, it's not designed
11                to answer that question."
12                THE CANADIAN COURT:  I can tell you
13   it's not on page 119 that I've got.
14                MR. QURESHI:  I'm sorry?
15                THE CANADIAN COURT:  Page 119 doesn't
16   contain what --
17                MR. QURESHI:  I'm sorry.
18                THE CANADIAN COURT:  Oh, I see, it's
19   the middle of a question.  I beg your pardon, okay.
20                MR. QURESHI:  119, line 6, Your Honour.
21                THE CANADIAN COURT:  Yes, I see.
22                BY MR. QURESHI:
23                Q.   So, Dr. Bazelon, I gather, sir,
24   that it's also the case that that question, of
25   course, was in connection with the question as
```



1    framed by the US Debtors.  If the question that the

2    courts must answer is framed as framed by the

3    Canadian Debtors, your approach is not designed to

4    answer that question either, right?

5                    A.   It's not designed if -- I think

6    the context of this discussion that you played a

7    clip from is that whether it was designed to value

8    a set of narrow -- of defined rights as the basis

9    for the allocation, and what I say here and I've

10   said before is that it takes a different approach

11   to allocating the funds and deciding how much each

12   of the selling debtors or estates are entitled to.

13                   Q.   Right.  It takes a different

14   approach and it's not designed to answer the

15   question as posed by any of the three estates,

16   right?

17                   A.   Well, it's certainly not in the

18   first two as written, but you re-characterized it

19   when you asked me the question here at a higher

20   level about how to divide up the value in the

21   lockbox, and I think it does help the court to

22   answer that question.

23                   Q.   Well, nowhere in your report is

24   there any proposed valuation of what any estate

25   gave up in connection with the sale process, right?



```
 1                        A.    Not an independent one.  I do
 2    comment on the ones performed by the other experts.
 3                        Q.    Right, but you don't provide a
 4    valuation?
 5                        A.    That's correct.
 6                        Q.    Now let's turn briefly away from
 7    your slides and I want to just turn for a moment to
 8    the report of Mr. Britven.
 9                        Now, you understand Mr. Britven is an
10    expert that later today or tomorrow will testify on
11    behalf of the triple Cs, right?
12                        A.    That's my understanding, yes.
13                        Q.    And you understand that
14    Mr. Britven, like you, among other things,
15    advocates a pro rata methodology, correct?
16                        A.    That's correct.
17                        Q.    So let's take a look at his
18    rebuttal report.  And Your Honours should have in
19    the folder before you the one page from the
20    rebuttal report that I intend to refer to, and
21    that's page 5.  If we can please put that on the
22    screen.
23                        And you'll see that this table 1 from
24    Mr. Britven's rebuttal report is labelled
25    "Percentage Recovery by Each Key Creditor Group
```



1    Resulting From Each Allocation Report."

2              And we've highlighted, Dr. Bazelon, the

3    column that says UK Pension, below that it has your

4    name, and attributes to you a 71.2 percent recovery

5    to each of -- each of those entities.  Do you see

6    that?

7              A.   I do.

8              Q.   Now, you agree with me that that

9    is not, in fact, your opinion, correct?

10             A.   That's not necessarily my opinion.

11             Q.   And you never told Mr. Britven

12   that it was your opinion that there should be a

13   71.2 percent recovery, right?

14             A.   That's correct.

15             Q.   And you don't state in your report

16   that that's your opinion, right?

17             A.   That's correct, I don't.

18             Q.   And you didn't testify in your

19   deposition that that was your opinion, right?

20             THE CANADIAN COURT:  Why are we doing

21   this?  Is this cross-examination of the next

22   witness?

23             MR. QURESHI:  It is relevant for the

24   next witness, absolutely, Your Honour.  I'm done

25   with it.

 Neeson & Associates    W&F

```
 1              BY MR. QURESHI:
 2              Q.   We can turn back to the
 3    demonstrative slides and if we could please move to
 4    the second of those slides.  This deals with your
 5    pure pro rata approach.  Do I have that right, sir?
 6              A.   That's correct.
 7              Q.   And again, in the formula for your
 8    pure pro rata approach we disregard all guarantee
 9    claims, we disregard all intercompany claims and
10    it's simply assets over debt, right?
11              A.   That's the simplest, most
12    straightforward formulation.
13              Q.   Right.  And so you're aware, sir,
14    are you not, that in the line of business sales
15    that there is a separate lockbox containing the
16    proceeds of each sale?  Are you aware of that?
17              A.   I am not aware of the exact
18    structure of the lockbox.
19              Q.   Okay.  Well, I'll represent to you
20    that that's the structure.  There's evidence in the
21    record on that.
22              Now, if a debtor entity sold assets in
23    just one line of business sale, that debtor would
24    nonetheless, in your approach, be entitled to an
25    allocation from the lockboxes of all of the sales,
```

 1    right?
 2                  A.    That would be correct.
 3                  Q.    Now, I want to take a closer look,
 4    if I could, at the claims asserted by the UK
 5    Pension parties.  Now, you understand that there
 6    was an underfunding of the UK Pension, right?
 7                  A.    Correct.
 8                  Q.    In an amount of approximately 2.1
 9    billion pounds?
10                  A.    Okay.
11                  Q.    All right?  And you're aware that
12    the UK Pension parties can assert the full amount
13    of that claim against NNUK, NNUK being the primary
14    obligor, right?
15                  A.    That's my understanding, yes.
16                  Q.    And you're also aware that in
17    respect of that same underfunding amount the UK
18    Pension parties have asserted a guarantee claim
19    against NNL, right?
20                  A.    That's my understanding, yes.
21                  Q.    And you're also aware, sir, that
22    the pension regulator in the UK has the authority
23    to issue what are called contribution notices to
24    each of the EMEA entities in respect of that same
25    underfunding amount.  Are you aware of that?



```
 1                       A.    I am at a high level aware but I
 2    don't know the details of the UK Pension
 3    guarantees.
 4                       Q.    And are you aware that those
 5    contribution notices that the pension regulator can
 6    issue to 19 estates in EMEA can be asserted in the
 7    full amount of the underfunding?
 8                       A.    I believe I was aware that that's
 9    possible.
10                       Q.    So, obviously Justice Newbould/
11    Judge Gross have no jurisdiction over where the UK
12    Pension parties within EMEA can file claims, right?
13                       A.    I would think that would be
14    correct.
15                       Q.    So in the application of your pure
16    pro rata approach, if the UK Pension parties end up
17    with an allowed claim in each of 19 EMEA estates
18    and in the Canadian Estate on account of their
19    guarantee claim, then they would be entitled to
20    participate in the pro rata distribution 20 times,
21    right?
22                       A.    That's a very big "if" but yes, it
23    would, I think, end up being 60 billion in claims.
24                       Q.    Well, regardless of the claim
25    amount, sir, they would get to participate 20 times
```


Neeson&Associates    W&F

```
 1   in the pro rata distribution at whatever percentage
 2   it ends up being, right, in that scenario?
 3              A.   That scenario which assumes that
 4   the courts have accepted those claims in the full
 5   amount 20 times.
 6              Q.   Right.  Okay.  And even if the
 7   claims were accepted in a lesser amount, it makes
 8   no difference?  They still get to participate 20
 9   times in the pro rata distribution, right?
10              A.   If that's how the claims are
11   accepted.
12              Q.   Let's move on to slide 3 in your
13   demonstratives and talk about guarantees.  Now,
14   there are at least three guarantee claims that you
15   know about, right?  There's the guarantee we just
16   spoke about in connection with the pension, right,
17   NNL's, the guarantee claim asserted by -- against
18   NNL by the pension parties?
19              A.   That's correct.
20              Q.   Right?  And you're aware of the
21   bondholder guarantee claim against NNI?
22              A.   Yes.
23              Q.   Right?  And you're also aware that
24   Export Development Canada has a guarantee claim
25   against the US Estate?
```



```
 1                    A.   I may have heard about that one
 2   but I'm not -- I haven't focused on that one.
 3                    Q.   Okay.  Regardless, sir, with
 4   respect to any guarantee claim that is allowed by
 5   the courts, under your model the courts can decide
 6   whether to give it economic effect or not, right?
 7                    A.   That's correct.
 8                    Q.   Okay.  And the formula that's on
 9   page 3, that's the formula that, if the courts
10   select, they do give economic effect to it, right?
11                    A.   Yes, it shows the amount in the
12   denominator where the extra claim associated with
13   the guarantee amount comes into the worldwide
14   claims.
15                    Q.   Right.  But in the pure pro rata
16   approach, the one you prefer, there's no economic
17   effect of guarantees whatsoever, right?
18                    A.   That's correct.
19                    Q.   So let's look a little bit closer
20   at which estate ends up paying --
21                    A.   I should say there is no effect in
22   the formula.
23                    Q.   So if the courts were to adopt
24   this formula on page 3, again this being the one
25   that gives some economic effect to guarantees, now
```



1    one of your rules that you have further back on

2    slide 5 is that no creditor can recover more than a

3    hundred percent, right?

4            A.    Correct.

5            Q.    Okay.  And so, in a scenario with

6    a guarantee holder where they get to participate

7    once in the pro rata distribution in the guarantor

8    estate and once in the pro rata distribution in the

9    primary obligor's estate, right, they get to

10   participate twice.  I have that right, don't I?

11           A.    Yes.

12           Q.    In a scenario where as a result of

13   participating two times that creditor would end up

14   with more than 100 percent of whatever the courts

15   allow the claim at, that can't happen under your

16   model, they're capped at a hundred, right?

17           A.    I think it would be rational to

18   cap them at a hundred, and in my model they then

19   get removed from -- their claims and the assets

20   used to pay them get removed from the ones

21   available for the pro rata --

22           Q.    So you effectively treat it like a

23   priority claim.  They get paid out in cash and then

24   the guarantee claim drops out of WWA, or I should

25   say the cash to pay them drops out of WWA, the

 Neeson & Associates    W&F

```
 1   guarantee claim drops out of WWD, right?

 2                A.    That's correct.

 3                Q.    And do you know in that scenario,

 4   sir, where they would recover more than a hundred

 5   percent under your model, do they get paid out as a

 6   priority claim by the guarantor estate or by the

 7   primary obligor estate?

 8                A.    There is a great deal of latitude

 9   for the courts as to how they want to effectuate

10   that payment.

11                Q.    So you don't have an opinion on

12   it.  It's up to the courts.  They can figure out

13   whether that priority claim sits in the case of the

14   Bondholders at NNI, or whether that priority claim

15   should be paid out of the Canadian Estate, right?

16                A.    That's correct.

17                Q.    Okay.  Now let's move on to slide

18   4, intercompany claims.  Now, again, you, as I

19   understand it, sir, are providing the courts here a

20   choice of which formula to adopt, and am I right

21   that the bottom formula here, the effect of that is

22   to eliminate any economic effect of intercompany

23   claims?

24                A.    Yes, that's the implication of the

25   bottom formula.  You characterize this as a choice.
```



```
 1   It's an illustration of two ways.  There is far
 2   more and I don't --
 3              Q.   Fair enough.
 4              A.   I have not given -- laid out all
 5   the choices before the court.
 6              Q.   Far more than what you present
 7   here and far more of course than what's in your
 8   report, right?
 9              A.   There's many ways they can decide
10   the legal decisions in this case.
11              Q.   But the formula that you have put
12   on this one, the lower formula on slide 4, that --
13   because here you use the example of the $2 billion
14   US claim, it's included in the numerator, it's
15   included in the denominator, so the effect is it
16   washes out, correct?
17              A.   That's correct.
18              Q.   And because it washes out, it has
19   no effect on US creditor recoveries.  US creditors
20   don't gain any benefit in the application of that
21   formula, correct?
22              A.   Their ultimate recoveries from the
23   intercompany claim wouldn't be changed.
24              Q.   Well, they would get no
25   incremental recovery as a result of the
```



```
1    intercompany claim, right?
2              A.    That's correct.  They would --
3    they would receive at the global pro rata rate.
4              Q.    Now, the first formula on this
5    page, that's the one that if the courts should
6    decide to adopt it would give some economic effect
7    to intercompany claims, correct?
8              A.    That's correct.
9              Q.    And so what happens here is, again
10   using the example that you've used of the $2
11   billion US intercompany claim against Canada, that
12   US creditors in the application of that formula
13   would ultimately recover higher than the pro rata
14   amount, right?  Because the 2 billion would then
15   get distributed to US creditors in addition to the
16   pro rata recovery that they get?
17             A.    Yes, that's correct.
18             Q.    So the effect on the US Estate of
19   adopting formula 1 is to effectively take the US
20   out of the pro rata formula because they're going
21   to recover something other than the pro rata
22   amount, right?
23             A.    It doesn't take them out of the
24   formula because once you include the payment from
25   the recovery on the intercompany loan that it takes
```



1   them out; it takes them out because with a $2

2   billion claim they likely go solvent.

3            Q.   Okay.  But either way they're out?

4            A.   And if they go solvent then you

5   remove them from the formula.

6            Q.   And so once the US is taken out of

7   the formula then Justice Newbould and Judge Gross

8   need to, again, total up all assets and all debt

9   and all of the estates that remain in order to come

10  up with a new pro rata percentage amount, right?

11           A.   Well, yes, but recognize they've

12  already done it and really they're just removing a

13  couple of numbers from the previous formula.

14           Q.   Right.

15           THE CANADIAN COURT:  Can I ask a

16  question, Mr. Qureshi.  I haven't understood this

17  piece of paper at page 4.  Every time I look at it,

18  it tells me something different.

19           Sir, is this page 4 intended to be

20  something on top of the pro rata distribution?  Is

21  it something on top of page 1, so that I think you

22  just said above the pro rata distribution they also

23  get paid on this intercompany claim basis at the

24  top of page 4.

25           THE WITNESS:  Thank you for asking,



```
 1   Your Honour.  All of these formulas are about how
 2   to calculate the target pro rata distribution rate
 3   that is then used to look at each of the selling
 4   debtors to decide how much of the lockbox funds
 5   need to be transferred to them so that they can
 6   effectuate that rate.
 7                This -- this page is just an
 8   alternative formulation --
 9                THE CANADIAN COURT:  I'm trying to
10   understand what the top of it is, where it fits in.
11                THE WITNESS:  So the top one would,
12   like the formula on page 2, would have the same
13   worldwide assets, but it would recognize that
14   claims were $2 billion higher so there would be a
15   lower target rate to pay out.
16                THE CANADIAN COURT:  To whom?
17                THE WITNESS:  A lower target rate to
18   compare to each of the selling debtors to decide
19   whether or not or how much money from the lockbox
20   they should receive so that they are enabled to pay
21   their claims at that target rate.
22                THE CANADIAN COURT:  So you're saying
23   this would apply to the US Estate?
24                THE WITNESS:  This would -- the C
25   that's calculated there would apply to all of the
```



```
1    estates globally.  This would be the new recovery
2    rate on claims that we are targeting and that the
3    lockbox funds would be distributed so that each of
4    the debtors could pay their claims at that recovery
5    rate.
6              THE CANADIAN COURT:  Well, if it
7    applies to all of the estates, how does anybody get
8    an extra?  You said they would get an extra.  I
9    don't understand this.
10             THE WITNESS:  So in this formulation,
11   what's implicit in it is that the claim -- the $2
12   billion intercompany claim that the US would
13   recover on from Canada, the assets from it in the
14   top version don't show up as part of the worldwide
15   assets for -- available for distribution, or for
16   the calculation of the pro rata rate.
17             So whatever the recovery on that $2
18   billion would be, which in this formulation would
19   be C percent of 2 billion, so if C was 50 percent
20   there would be a billion dollars, would be an extra
21   billion dollars in the US estate to be distributed
22   to US claimants above and beyond the C or 50
23   percent pro rata recovery that would be effected
24   through a combination of their cash and
25   distributions from the lockbox funds.
```



```
 1                BY MR. QURESHI:
 2                Q.   Now, Dr. Bazelon, it's the case,
 3     sir, is it not, that in that example that you just
 4     gave to Justice Newbould where the US in this
 5     example would ultimately, their creditors would
 6     ultimately recover more than the C percentage,
 7     right?
 8                A.   Yes, absolutely.
 9                Q.   Okay.  And the rest of the world,
10     if this is the only intercompany claim, recovers at
11     the C percentage?
12                A.   That's correct.
13                Q.   Okay.  And so, because US
14     creditors would now recover above that target
15     amount, you would have to take them out of the pro
16     rata calculation?
17                A.   You would not take them out just
18     because they're recovering above the amount,
19     because the extra amount above the pro rata that --
20     when you characterize it as them recovering above
21     the pro rata amount, that happens with the
22     distribution of funds that are not part of this
23     system.
24                So within the pro rata distribution
25     system they're not recovering above, but it is true
```



```
1    they ultimately recover above.
2                What takes them out as a practical
3    matter is that they would go solvent and then you
4    would treat them -- treat now just not the
5    bondholder claims, if there was a guarantee in the
6    US, I understand we're not illustrating it here,
7    but not only the bondholder claims but also the US
8    claims can all be treated, as you characterized
9    earlier, as a priority claim.
10               Q.   So isn't it the case, sir, that
11   they actually come out, whether or not they're
12   solvent, they come out if the creditors are going
13   to recover above the pro rata amount?
14               A.   It's not the case that they
15   necessarily come out.  If the intercompany claim
16   was a much smaller amount that wasn't enough to
17   make them go solvent, then they would recover at
18   the pro rata rate plus whatever the distribution
19   from that extra amount that's outside of this
20   system would be.
21               Q.   Take a look, if you could, please,
22   at your deposition and I'm going to turn this time
23   to the second day of your deposition, so we don't
24   have a video unfortunately, page 266, line 15
25   through page 267, line 1.
```



 1                      Sir, do you have that before you?

 2                      A.   266?

 3                      Q.   266, line 15.  And the question

 4      was:

 5                           "Now, the second example, I'm

 6                      not sure I understood it, you said

 7                      run the table with an intercompany

 8                      claim.  What do you mean by that?"

 9                      Do you see that question in the

10      transcript?

11                      A.   Yes.

12                      Q.   And the answer you gave me is:

13                           "If an estate had an

14                      intercompany claim, and that's the

15                      only adjustment, that's the only

16                      deviation from the pure pro rata

17                      mechanics, and the payment of that

18                      intercompany claim, it's treated as

19                      a claim to the estate and that puts

20                      them in a position of being solvent

21                      or even just being over the pro rata

22                      allocation, now they have assets

23                      above the target amount and they

24                      would have to be taken out."

25                      Was that your testimony at your



```
 1   deposition, sir?

 2              A.   Yes.

 3              Q.   Now, when -- let's talk about

 4   other intercompany claims that exist.  So you're

 5   aware, sir, that Justice Newbould may be spending

 6   the better part of his July presiding over a trial

 7   concerning a number of intercompany claims, among

 8   other things, that have been asserted by EMEA

 9   against the Canadian Estate?  You're aware of that,

10   right?

11              A.   I understand that.

12              THE CANADIAN COURT:  That's what I was

13   thinking before, Mr. Qureshi, your

14   cross-examination on incentivizing settlements

15   seems to me to be somewhat academic, from what I

16   can see.

17              MR. QURESHI:  No comment, Your Honour.

18              BY MR. QURESHI:

19              Q.   Now, if Justice Newbould should

20   allow an intercompany claim by the EMEA estates

21   against Canada after the trial later this summer,

22   the creditors of those EMEA entities would

23   ultimately recover at greater than the pro rata

24   percentage, right?  Just as the US creditors would

25   in the example on slide 4?
```



```
 1                    A.   Only if they, the judges, chose to
 2   use that first.
 3                    Q.   Right.
 4                    A.   Keeping those recoveries outside
 5   of the system.
 6                    Q.   Okay.  Are you also aware that
 7   Canada has asserted a claim against the EMEA
 8   estates?  It's referred to as the snap back claim.
 9   Are you aware of that?
10                    A.   I have heard of it, yes.
11                    Q.   So same thing, if that claim is
12   ultimately allowed such that Canada now has an
13   intercompany claim allowed against NNUK, same
14   thing, right?  It gets treated exactly the same
15   way, the NNUK creditors would now recover at higher
16   than the pro rata amount, correct?
17                    A.   The ultimate recovery of the
18   creditors, not the recovery within the system.
19                    Q.   I'm talking about the ultimate
20   recovery because they get the pro rata amount and
21   then they get the benefit of the intercompany claim
22   being redistributed in just that estate.  Okay?
23                    So in that example where three
24   intercompany claims end up being allowed, right,
25   what happens is US creditors don't recover
```



```
 1   ultimately at the pro rata amount; Canadian
 2   creditors don't ultimately recover at the pro rata
 3   amount; and in my example NNUK creditors don't
 4   ultimately recover at the pro rata amount, correct?
 5              A.   I think that would be the correct
 6   implication of your example.
 7              Q.   Okay.  And so, then the only
 8   estates in that example that would recover at the
 9   pro rata amount would be the remaining EMEA estates
10   that don't have any intercompany claims asserted
11   against them or allowed to their benefit, right?
12              A.   Or any other values outside of the
13   system.
14              Q.   And in that same example, the
15   recovery, the differing percentage recovery that
16   each of the creditors in the US, Canada and NNUK
17   would get, that recovery has no relationship
18   whatsoever to the value of the assets that each of
19   those estates gave up in connection with the sale
20   process, right?
21              A.   It's not -- I can't answer that
22   question directly because it's not based on the
23   value of those assets.
24              Q.   Right.  Okay.  Now --
25              A.   Whatever they may be.
```



```
 1                    Q.   So in the top formula on page 4,
 2     any intercompany claim that's treated as part of
 3     that formula, again where it is given some economic
 4     effect, the assets of all of the estates worldwide
 5     are used to satisfy that intercompany claim, right?
 6                    A.   In a sense they are used in
 7     calculating the amount, but of course the payments
 8     only are going to come from one creditor to the
 9     other.
10                    Q.   Right.
11                    A.   Or one estate to the other.
12                    Q.   Let's use the example of the $2
13     billion US claim.  If that claim is treated under
14     this first formula, worldwide assets are used to
15     satisfy that claim, right?
16                    A.   That's correct.
17                    Q.   So EMEA, for example, its assets
18     would then be used to satisfy an intercompany claim
19     that was asserted by the US Estate and allowed
20     against the Canadian Estate, right?
21                    A.   That's correct.  This is the
22     one-Nortel view of the company.
23                    Q.   Right.
24                    A.   And it's the worldwide assets that
25     are used to settle the claim, which I think
```



1    illustrates why the intercompany claims don't fit

2    well within the pro rata approach.

3              Q.    Exactly.  And your preferred

4    method therefore, sir, is to disregard all

5    intercompany claims, including the $2 billion claim

6    that's already been allowed by the courts, right?

7              A.    I think the intercompany claims

8    are inconsistent with the view of a single company

9    operated together over the years.  You can

10    effectuate them if for reasons outside of the view

11    of one Nortel there are legal reasons that the

12    courts find they want to give some meaning to them,

13    the formulas can handle them, but it's certainly an

14    addition to the simple view of one Nortel.

15              Q.    Right.  And so in your view, Dr.

16    Bazelon, it would be appropriate to set aside all

17    intercompany claims, right?

18              A.    That would be -- if asked, that's

19    my preferred -- I think that's the approach that's

20    more consistent with the one Nortel.

21              Q.    Okay.  Now let's turn to slide 5.

22    And here are -- these are the rules that you make

23    your formula subject to, right?

24              A.    Yes.

25              Q.    Now, on Monday Mr. Gottlieb used



```
 1   the example of Nortel -- your first bullet here is
 2   no debt can recover more than a hundred percent.
 3   So he used the example of Spain, if it has enough
 4   cash on hand to pay its creditors at the pro rata
 5   amount, Spain drops out, right?
 6              A.   That would be correct.
 7              Q.   And I just --
 8              A.   If it was calculated at the
 9   selling debtor level as opposed to an estate.
10              Q.   Right.  I just want to make sure I
11   understand that it's an iterative process, right?
12   So if Spain drops out, you then recalculate WWA by
13   adding up the assets of all 23 estates and then you
14   go around again and you see if at the new now-lower
15   pro rata amount there is any estate that has enough
16   cash on hand to satisfy claims at that amount, and
17   then that estate would drop out, and it's
18   iterative, right?
19              A.   It's iterative.  You describe it
20   as if you would test one estate at a time and
21   recalculate, when obviously you would do it in
22   groups of estates that might not meet the claim.  I
23   don't think as a practical matter that's going to
24   be a big issue.
25              Q.   So let's look at your third bullet
```



```
 1   point on page 5, and -- and your fourth together,
 2   and the last bullet you say:
 3                    "No funds are moved from any
 4             entity (unless there is a surplus,
 5             in which case the surplus flows to
 6             equity-holders)."
 7             And so, we've -- your testimony, sir,
 8   is that no cash actually needs to get moved from
 9   one estate to the other in order to effectuate
10   these mechanics, correct?
11             A.   That's correct.
12             Q.   But as you explained to
13   Mr. Gottlieb on Monday, the more cash or assets
14   already in an estate, the less that estate gets out
15   of the lockbox, right?
16             A.   That's correct.
17             Q.   Okay.
18             A.   Assuming they are getting a
19   distribution from the lockbox.
20             Q.   Right.  And so mathematically,
21   giving an estate that has more cash less out of the
22   lockbox is no different than moving cash from one
23   estate to another?
24             A.   So, you end up at the same end
25   point but you do not -- you respect any legal
```



```
1    constraints about moving cash.
2              Q.   Now, I want to turn to one final
3    area, Dr. Bazelon, and that's the role of creditor
4    expectations in your model.
5              Now, sir, you believe that the
6    expectations of creditors can be a useful piece of
7    information in selecting an allocation model,
8    right?
9              A.   Yes, I think I testified that it's
10   one of the things the courts may want to look at.
11             Q.   Right.  And you're an economist.
12   In your field you agree that there's a lot of
13   literature about the importance of enforcing
14   contract rights because contracts, of course,
15   generate economic activity, right?  And that's
16   generally a good thing?
17             A.   A little deeper than that, but
18   yes.
19             Q.   And you're an economic policy
20   analyst, and you agree that as a matter of economic
21   policy, it would be bad policy to ignore legitimate
22   creditor expectations, right?
23             A.   With emphasis on legitimate.
24             Q.   Okay.  And so, put differently,
25   you agree that it's good policy, good economic
```



1    policy to enforce contracts that represent

2    legitimate creditor expectations?  Right?

3                    A.   Is that different than what you

4    just asked me?

5                    Q.   So you testified on direct that

6    one of the merits of the pro rata approach in your

7    opinion is that it's economically rational.  Do you

8    recall that?

9                    A.   Yes.

10                   Q.   Okay.  And you also believe, sir,

11   that seeking and granting a guarantee is

12   economically rational conduct, right?

13                   A.   It certainly can be.  As an

14   abstract point it's hard to say more than that.

15                   Q.   Well, you believe that it was

16   economically rational for the UK Pension Trustee to

17   seek a guarantee from NNL, right?

18                   A.   I believe it was.

19                   Q.   And you believe that it was

20   economically rational for NNL to give that

21   guarantee to the UK Pension Trustee, right?

22                   A.   I think so.

23                   Q.   And you believe it was

24   economically rational for NNL to issue bonds with a

25   guarantee from NNI, right?



```
 1                    A.    Yes.
 2                    Q.    Okay.  And nonetheless, it's your
 3   opinion that all guarantees in the application of
 4   the pure pro rata formula should be set aside?
 5                    A.    You're making a leap that the
 6   guarantees --
 7                    Q.    Well --
 8                    A.    No, you're making a leap that the
 9   guarantees that were negotiated for are the ones
10   that are being set aside here and I have seen no
11   evidence of that.
12                    Q.    Well, your opinion, as I
13   understand it, sir, is that in the application of
14   the pure pro rata model all guarantee claims and
15   all intercompany claims should be set aside, right?
16                    A.    That's -- yes, in the application
17   of the pro rata.
18                    MR. QURESHI:  Your Honour, may I have a
19   moment?  Thank you.  That's all I have, thank you.
20                    THE CANADIAN COURT:  Thank you,
21   Mr. Qureshi.
22                    MR. LEBLANC:  Good morning, Justice
23   Newbould, good morning, Judge Gross.  Andrew
24   LeBlanc of Milbank, Tweed, Hadley and McCloy on
25   behalf of the Ad Hoc Bondholder group.  Your
```



```
1    Honour, I just have a couple of topics I wanted to
2    go over with Dr. Bazelon, if it please the court.
3    May I proceed?
4              THE CANADIAN COURT:  Yes.
5
6    CROSS-EXAMINATION BY MR. LEBLANC:
7              Q.   I just want to cover just a few
8    topics.  We met at your deposition last week,
9    right, Dr. Bazelon?
10             A.   Yes, we did.
11             Q.   The first topic I want to cover is
12   something you spoke about last week in your direct
13   examination about the inventorship concept.  Do you
14   recall that testimony?
15             A.   Yes.
16             Q.   And you used the inventorship to
17   consider whether the UK Estate, in your words,
18   fought above its weight.  Do you recall that
19   testimony?
20             A.   Yes, I do.
21             Q.   But you don't actually support
22   using the concept of inventorship as an allocation
23   model here, correct?
24             A.   That's correct.
25             Q.   And you don't because in part you
```

Neeson&Associates   W&F

```
 1    really can't tell where a patent was created just

 2    by looking at the location of the inventor; isn't

 3    that right?

 4                 A.    That's correct.  There's much more

 5    than just the inventor's location that fed into the

 6    production of that knowledge, yes.

 7                 Q.    And there's testimony that you've

 8    reviewed that even calls into question whether you

 9    can even tell the location of the inventor; isn't

10    that right?

11                 A.    That sounds familiar, yes.

12                 Q.    In fact, you read testimony from

13    John Veschi as part of your work in this case,

14    right?

15                 A.    Yes.

16                 Q.    And you're aware that Mr. Veschi

17    testified that where the inventors were located

18    or -- let me withdraw that.

19                 Mr. Veschi testified that it's his

20    understanding that the inventor address on the

21    patents sometimes might not even be where they were

22    located?

23                 A.    Yes.

24                 Q.    And they may have, for example,

25    been an ex-pat from Ottawa to Europe and it would
```



```
 1    show up as an Ottawa patent when in fact they

 2    produced it in Europe, right?

 3                A.    That may have been his example,

 4    yes.

 5                Q.    So that's another fallacy of the

 6    inventorship model that renders it unreliable as an

 7    allocation process, correct?

 8                A.    That would be fair.

 9                Q.    All right.  Next topic.

10    Mr. Zigler last week had asked you some questions,

11    there was even some mention of it today, of the US

12    20.19 statement.  Do you recall that?

13                A.    Yes.

14                Q.    And that was shown to you to show

15    the residency of certain of the Bondholders, right?

16                A.    Correct.

17                Q.    You would agree with me that the

18    residency of creditors bears no relationship to

19    what they should recover in a case?  Do you agree

20    with that?

21                A.    I hadn't really thought about it

22    in that dimension so it's not obvious to me why

23    that's important.

24                Q.    Okay.  But as an economist, it

25    doesn't matter where someone lives in determining
```



```
 1   what they're entitled to, does it?
 2                  A.   It depends on the nature of that
 3   entitlement so I couldn't answer that question as
 4   broadly as you asked it.
 5                  Q.   You didn't conduct any study, for
 6   example, of how many Nortel retirees are golfing in
 7   Florida for the winter, right?
 8                  A.   Absolutely not.
 9                  Q.   That just has no relevance to this
10   case at all, does it?
11                  A.   That part doesn't, absolutely not.
12                  Q.   And the EDC, the Export
13   Development Canada that was mentioned a few minutes
14   ago in questions from Mr. Qureshi, if they have a
15   claim against the United States Estate because of a
16   guarantee, the fact that they're an Ottawa entity,
17   that doesn't make any difference in what they're
18   entitled to recover, does it?
19                  A.   Not -- no, their residence in
20   Ottawa, I don't think -- I haven't looked at that
21   example but I don't think that would have any
22   impact on their recovery entitlement.
23                  Q.   And it's just not an analysis you
24   conducted at all to look at the residency of
25   creditors in this case, have you?
```



```
 1                    A.    That's correct.
 2                    Q.    Last topic.  You were shown some
 3     testimony by Mr. Sproule from this trial by
 4     Mr. Zigler.  Do you recall that?
 5                    A.    Yes.
 6                    Q.    Have you read the trial testimony
 7     of Mr. Sproule in full?
 8                    A.    I believe I have but it was a
 9     couple of weeks ago, I think.
10                    Q.    Just for the sake of expediency,
11     let me just reference a line of testimony and see
12     if you recall it.  Mr. Sproule had testified that
13     he is receiving 70 percent of his pension today.
14     Do you recall reading that?
15                    A.    Something less than the full
16     amount, yes.
17                    Q.    Okay.  But 70 percent, does that
18     number sound about right?
19                    A.    Sounds familiar, yes.
20                    Q.    And there was testimony from other
21     UK witnesses in response to questions from
22     Mr. Zigler that indicated that they were getting
23     the full principal amount but not subject to
24     indexing of their pensions.  Did you recall reading
25     that?
```



```
 1                    A.   Yeah, that it starts at the full
 2    amount for some of them.
 3                    Q.   In your pro rata allocation,
 4    however, you don't consider at all what pensioners
 5    for example are recovering from any other sources
 6    as part of your analysis, do you?
 7                    A.   That's correct, the pensioners
 8    themselves aren't the claimants, it's their pension
 9    funds.
10                    MR. LEBLANC:  No further questions,
11    Your Honour.  Thank you, Dr. Bazelon.
12                    THE CANADIAN COURT:  Anyone else?
13                    MR. ZIGLER:  Good morning, Your Honour,
14    Judge Gross.  I think, given the way the
15    re-examinations go, unless someone else has a first
16    cross-examination, I have one question of Dr.
17    Bazelon.
18                    THE CANADIAN COURT:  All right.
19
20    FURTHER CROSS-EXAMINATION BY MR. ZIGLER:
21                    Q.   Dr. Bazelon, Mr. Qureshi put to
22    you the questions or positions for the court of the
23    Canadian and US Debtors and the EMEA Debtors.  I
24    don't know if you have that before you?
25                    A.   That's correct.
```



1                    Q.   Just using the US Debtors example,
2   whether each selling debtor is required a fair
3   market value of the assets and rights it sold or
4   relinquished in connection with the sale of
5   Nortel's businesses and patent portfolio, is it
6   implicit in your one-Nortel approach that it is not
7   possible to unscramble that egg to determine what
8   they all gave up, given how they ran their business
9   and held their assets?
10                   MS. BLOCK:  Leading.
11                   MR. ZIGLER:  It's a cross-examination.
12                   THE CANADIAN COURT:  It's leading but
13  I've heard more leading evidence in this case with
14  no objection, so nobody has failed to engage in
15  that process.
16                   THE WITNESS:  That would be fair.
17                   MR. ZIGLER:  Thank you.
18
19  RE-EXAMINATION/RE-DIRECT BY MR. BARRACK:
20                   Q.   Dr. Bazelon, you were asked some
21  questions by Mr. Zigler about the effect of assets
22  and claims being aggregated in Canada; do you
23  recall those?
24                   A.   Yes.
25                   Q.   In your pure pro rata example at

1    slide 2, if you'd pull that up, is there any need

2    for the courts to determine guarantee claims,

3    intercompany claims or FSD claims?

4               A.    No.

5               Q.    If all of the assets and debts or

6    claims were aggregated in one estate, would that be

7    the equivalent of pure pro rata?

8               A.    Assuming that the estate

9    distributed it on a pro rata basis, yes.  So in

10   Mr. Zigler's example, if Canada had all of the

11   claims and all of the assets, it would effect a pro

12   rata.

13              Q.    So if we move one step away from

14   that, to the extent that there are assets and

15   claims outside of a single estate, is there any

16   certainty that those assets and claims would

17   approximate a pro rata recovery?

18              A.    No, only by happenstance.

19              Q.    And to the extent there were other

20   inter-estate claims or intercompany claims outside

21   of that single estate, would there be any certainty

22   that they would result in an approximate pro rata

23   recovery?

24              A.    No, I don't believe so.

25              Q.    Let's turn to Mr. Qureshi and the



```
 1   whole matter of interim distributions.  Under any
 2   method other than pro rata, will ultimate creditors
 3   have to wait until assets are sold, claims are
 4   settled and priority claims are settled before they
 5   get their money?
 6              A.   I would think so, yes.
 7              Q.   Is there any difference under the
 8   pro rata approach and the other methods regarding
 9   the need to hold funds in estates until final
10   distribution?
11              A.   In principle, given the
12   uncertainty over claims, there would have to be
13   some holdback under any method if you were going to
14   do an interim distribution.
15              I think one of the advantages of the
16   pro rata approach is that the way the percentages
17   are calculated, that the amount that has to be held
18   back under the pro rata would probably be less than
19   the equivalent amount that would have to be held
20   back under any of the other approaches.
21              Q.   Will you explain to us how it is
22   that you come to that conclusion that there would
23   be less held back under the pro rata approach?
24              A.   So, if you start as a baseline
25   that any uncertainty around claims is the amount
```



1   that you would have to hold back, so let's just, to

2   make the math easy, say in each of the three major

3   estates there was $1 billion worth of uncertain

4   claims, if you distributed -- under any of the

5   other approaches a total of $3 billion, the funds

6   would have to be held back from ultimate claimants

7   to provision for the possibility of that.

8                   Under the pro rata, because it's a

9   proportionate share of the total assets, it turns

10  out that the total sum that needs to be held back

11  would be something quite a bit less than 3 billion.

12                  Q.   All right.  And in broad terms,

13  how would you calculate the amount that had to be

14  held back?

15                  A.   You would -- you would actually do

16  it in reverse by calculating the interim

17  distribution amount by taking the -- in the

18  calculation of the WWA percent over WWD, and when

19  you apply it to each of the different estates or

20  selling debtors, you would use in WWD the worst

21  case or largest amount of claims available for that

22  -- for that -- may I start that answer over again?

23                  Q.   Sure.

24                  A.   Thank you.  I want to get this

25  clear.



```
 1                    You would use in the calculation of the
 2      formula the worst case for a single debtor and the
 3      best case for the other debtors in calculating the
 4      percent, and if you do that, the amount, the sum of
 5      the amount that's held back, or the sum of the
 6      amount that's distributed would imply an amount
 7      that's not distributed or held back that is less
 8      than the sum of the uncertainty over the claims.
 9              Q.   All right.  I'd like to -- if --
10      another topic.  If settlements were approved by the
11      court as priority claims, would they come out of
12      the unsecured pool?
13              A.   Yes, they would be outside of the
14      distribution of the set of assets or claims that
15      are in the pro rata formula.
16              Q.   And turning to another topic,
17      Mr. Qureshi asked you a number of questions about
18      what Judge Gross or Justice Newbould would have to
19      do in terms of doing the calculations.
20                   Is it possible for the courts to
21      provide instructions to the administrators on how
22      to distribute so that any interim calculations that
23      had to be done could be done by them without
24      returning to court or simply returning to court for
25      approval?
```



```
 1                    A.    I believe that would be possible.

 2   You set up the formulas and have somebody else

 3   actually do the arithmetic.

 4                    Q.    Now, if we do stick with slide 2,

 5   WWA over WWD, Mr. Qureshi asked you how many times

 6   the UKPC could claim on this slide.  Does this

 7   slide contemplate claims or debts?

 8                    A.    This slide contemplates the

 9   underlying debts so the number of duplicate claims

10   on the same debt are not part of it.

11                    Q.    Right.  And if you can go to page

12   4 in the 2 billion in company claims, these two

13   formulas, just to clarify, are these alternatives

14   or are they on top of each other?

15                    A.    They're alternative ways of

16   implementing the intercompany claim in the

17   calculation of the pro rata percentage.

18                    Q.    All right.  And can they be used

19   to any intercompany or inter-estate claim by

20   substituting the amount for 2 billion?

21                    A.    Yes.  I use the example of a 2

22   billion intercompany claim but it would work for

23   any levels or --

24                    Q.    Just to simplify this, in the top

25   slide, if there is an intercompany claim and --
```



```
1    there's an intercompany claim, does it -- I want

2    you to very simply explain how it affects the

3    creditor in the either company or estate that is

4    the beneficiary of that claim.

5              A.   So, under this formulation, the

6    creditors -- enough funds would be distributed from

7    the lockbox so that with the original cash in the

8    receiving estate, that that estate would be able to

9    pay its creditors at the global pro rata, the new

10   global pro rata percentage of C percent.

11             Because the recovery on the

12   intercompany claim is outside of the distribution

13   system, that's additional cash that then, after

14   those payments, or after that distribution, is then

15   available to also be distributed to those same

16   claimants.

17             Q.   Right.  And ultimately if we

18   focused on one claim, if you go -- if you were to

19   give effect to all of the intercompany claims,

20   you'd have to do that same process for all of the

21   intercompany or inter-estate claims?

22             A.   That would be correct.

23             Q.   Right.  And so the bottom is an

24   alternative?

25             A.   Yes.
```



```
 1                    Q.    And with respect to, in very
 2   simple terms, under that alternative what happens
 3   to intercompany or inter-estate claims?
 4                    A.    Well, the bottom alternative
 5   recognizes that the recovery on an intercompany
 6   claim is itself an asset in the recovery estate or
 7   selling debtor and treats it as cash in that
 8   selling estate or debtor, and so that's why it's
 9   also now -- the recovery percentage is added to
10   worldwide assets, and as the equation at the bottom
11   indicates, this equation mathematically just
12   reduces to the pure pro rata.
13                    Q.    Right.  And so that if
14   economically you were to go with this, would the
15   court -- would an alternative be for the court to
16   simply ignore and not have to adjudicate, or the
17   courts have to adjudicate those myriad of
18   intercompany and inter-estate claims?
19                    A.    Yes, that would --
20                    Q.    One final area.  You were asked by
21   Mr. Qureshi about the relationship between the pro
22   rata formula, the pure pro rata formula and
23   guarantees.
24                    In your opinion, does a pro rata, a
25   pure pro rata, back to slide 2, does a pure pro
```



1   rata provide the beneficiaries of guarantees with

2   what they bargained for economically?

3              A.   That's ultimately for the court to

4   decide, but it appears that it does to the extent

5   that Nortel is one integrated company which is the

6   underlying basis for the pro rata approach.

7              MR. BARRACK:  Thank you.  Those are my

8   questions.

9              THE CANADIAN COURT:  Thank you,

10  Mr. Barrack.  Mr. Qureshi, I'm going to give you

11  back your transcript.

12             MR. QURESHI:  Thank you.  Your Honour,

13  may I follow up very briefly on one new area that

14  Mr. Barrack raised?  It will be three questions.

15             THE CANADIAN COURT:  He raised a new

16  area?

17             MR. QURESHI:  Interim distributions,

18  yes.

19             MR. BARRACK:  I think Mr. Qureshi

20  questioned about interim distributions quite

21  extensively.

22             MR. QURESHI:  I'm happy not to do it,

23  Your Honour.

24             THE CANADIAN COURT:  I'm happy you not

25  do it as well, I think.

 Neeson & Associates   W&P

```
 1              MR. QURESHI:  In that case...

 2              THE CANADIAN COURT:  All right.  Thank

 3   you, Dr. Bazelon.

 4              THE WITNESS:  Thank you.

 5   -- WITNESS EXCUSED

 6              THE CANADIAN COURT:  What's next?

 7              THE US COURT:  Mr. Ruby.

 8              MR. RUBY:  Yes, thank you, Judge Gross.

 9   So the next witness would be the first expert

10   witness for the Monitor.  We're happy to start now,

11   take the morning break, whatever the Court pleases.

12              THE US COURT:  We started a little bit

13   late.

14              MR. RUBY:  I'm happy to bring up the

15   witness.  Whatever the Courts want.

16              THE CANADIAN COURT:  Why don't we go to

17   11 o'clock.  That will be sort of halfway through

18   the morning.

19              MR. RUBY:  Thank you.

20               JAMES PHILIP GREEN, having first been

21   duly sworn, was examined and testified as follows:

22              THE US COURT:  You may proceed.

23              MR. RUBY:  Thank you.  J. Peter Ruby

24   from Goodmans for the Monitor and the Canadian

25   Debtors.
```

Neeson&Associates    W&F

```
 1   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION

 2   BY MR. RUBY:

 3           Q.   Mr. Green, do you have copies of

 4   your initial and rebuttal reports with you?

 5           A.   I do.

 6           MR. RUBY:  Judge Gross and Justice

 7   Newbould, if we could mark these as the next

 8   exhibits, please.

 9           THE CANADIAN REGISTRAR:  Exhibits 42

10   and 43, Your Honor.

11           EXHIBIT NO. 42:  Report of J. Philip

12           Green, reissue date February 28, 2014.

13           EXHIBIT NO. 43:  Rebuttal report of

14           J. Philip Green, dated February 28,

15           2014.

16           THE CANADIAN COURT:  Thank you.

17           BY MR. RUBY:

18           Q.   Now, Mr. Green, did you also

19   prepare some slides to assist the Courts today with

20   their understanding of your testimony?

21           A.   Yes, I did.

22           MR. RUBY:  So, Judge Gross and Justice

23   Newbould, we'll put them on the screen, but,

24   hopefully, you also have hard copies of the slides.

25           THE US COURT:  Yes, thank you.
```



```
 1                 BY MR. RUBY:
 2                 Q.   So, Mr. Green, if we can start,
 3      quite briefly, with your credentials and
 4      experience.
 5                 Is a copy of your full CV attached to
 6      your report?
 7                 A.   Yes, it is.  It's included as
 8      Exhibit C to the initial report.
 9                 Q.   And I don't propose to take you
10      through all of your experience and credentials.
11      Even what's on the screen, I don't propose to take
12      you through it all, but maybe we can hit some
13      particular points.
14                 First of all, what year did you
15      graduate from college?
16                 A.   I graduated from Rutgers
17      University in 1984.  So I just passed my 30th
18      college reunion.
19                 Q.   And what valuation credentials
20      have you earned?
21                 A.   I have earned two valuation
22      credentials.  They're both listed on this slide
23      that's up.  The first one is, I'm accredited in
24      business valuation by the American Institute of
25      Certified Public Accountants, the AICPA.  I'm also
```

 Neeson&Associates    W&F

```
 1    an accredited senior appraiser by the American
 2    Society of Appraisers in business valuation, which
 3    also focuses on intangibles.
 4                Q.   So can we just very briefly
 5    describe the ABV accreditation and its relevance to
 6    your work in this case.
 7                A.   Sure.  The ABV accreditation is
 8    something that's really only available to certified
 9    public accountants.  And what it does is it
10    requires a number of courses that the AICPA makes
11    you take, and then it also is an eight-hour test in
12    order to be able to become certified by the
13    American Institute of Certified Public Accountants.
14                Q.   Similarly, can you briefly
15    describe the ASA accreditation and its relevance to
16    your work.
17                A.   Sure.  The ASA accreditation is
18    provided by the American Society of Appraisers,
19    which is a large, essentially standards-making body
20    for the appraisal profession in the US.  And it
21    covers real estate appraisers, machinery appraisers
22    and that sort of -- those sorts of people.  And it
23    has its own set of rules with respect to standards
24    and things that one needs to follow.
25                     To become an accredited senior
```



```
 1   appraiser, however, requires that you demonstrate
 2   10,000 hours of appraisal experience plus submit to
 3   them two reports that actually have to get peer-
 4   reviewed.  10,000 hours in a professional's life is
 5   about five years, so they're pretty serious about
 6   who they're accrediting and how long it takes.
 7              Q.   Have you previously offered
 8   valuation evidence in court proceedings?
 9              A.   Yes, I have.  I've testified on
10   valuation issues in a variety of different places
11   and topics.
12              Q.   And roughly what portion of your
13   time is spent on work related to litigation?
14              A.   It varies from year to year.
15   Sometimes it's as much as -- it's as little as
16   50 percent, sometimes 60 percent, but somewhere in
17   that neighborhood.
18              Q.   And can you briefly describe,
19   please, your relevant nonlitigation experience.
20              A.   Sure.  The nonlitigation
21   experience includes doing valuations for
22   transactions.  So I'll value patent portfolios both
23   to determine their fair market value or assist in a
24   transaction or also help companies who are trying
25   to develop products and figure out what they should
```



1    be paying for patents if it's coming the other way.

2            I also have assisted people with

3    fairness opinions, whether or not they're actually

4    being properly compensated for the use of an

5    intellectual property.

6            And I've also just helped people just

7    valuing them for purposes of donating them when

8    that used to be popular, and those kinds of things.

9            Q.   Mr. Green, let's turn to this

10   matter now.

11           Can you briefly describe for us what

12   your assignment was in this case.

13           A.   Well, my assignment was to, using

14   my background, training and experience, which

15   really is focusing on valuation, to help the Courts

16   with evaluating the allocation question as I

17   understood it.  And we've put the allocation

18   question up here on the board.

19           Q.   And so the question that's up on

20   the screen now, is that the one you answered in

21   your reports?

22           A.   Yes, this is the one that I

23   answered.  And, really, what I was trying to figure

24   out was what portion of the proceeds that was

25   realized in each sale was due to the transfer or

Neeson&Associates    W&F

```
1    surrender by the Debtors in this matter of property
2    interests and assets that were the subject of the
3    transaction.  And so to me, this was a valuation
4    question.  So I brought to answering this question
5    some valuation principles in my training.
6              Q.   And you were in the courtroom a
7    few minutes ago when Mr. Qureshi brought out to the
8    Courts the similarities between this question and
9    the ones put forward by the US and EMEA Debtors?
10             A.   Yes, I was.
11             Q.   Now, what expertise did you bring
12   to answering this question?
13             A.   Well, it's a valuation question.
14   It also has some accounting issues in it because
15   there's a lot of accounting documents and records
16   that I had to go through.  So I brought my
17   expertise in these areas to bear on answering the
18   question.
19             Q.   So let's turn to the approach you
20   took to answer the question.
21             In general terms, can you describe for
22   us the approach you took.
23             A.   Sure.  It really follows what
24   would normally be done in a valuation.  So the
25   first thing I did was I had to get an understanding
```



```
 1    of what it was that I was valuing, the types of

 2    assets.  So we'll talk in a few minutes about them.

 3              But, really, what I was looking at was

 4    there were tangibles and intangible assets.  And

 5    the intangible assets are really -- and what

 6    they're all about is really described in the MRDA.

 7    It delineates the property interests that each of

 8    the US, Canadian, and EMEA Debtors had with respect

 9    to the intellectual property here.

10              I then valued each of the debtor's

11    property interests just based on what would be the

12    appropriate methodology for each different type of

13    asset.

14              And, in general, when you're doing any

15    type of valuation, what you're really trying to do

16    is reduce the values to cash flow.  We're trying to

17    figure out how much cash is actually going to be

18    attributable or derived by ownership of an asset.

19              So maybe you sell it, maybe you use it,

20    maybe you license it, but there's a variety of

21    different things.  But it all comes down to

22    figuring out the amount of cash that would result

23    from the use or sale of an asset.

24              Q.   Now, you mentioned the MRDA a

25    moment ago.  Are you providing an opinion on the
```



1    meaning of that agreement?

2                A.    No, I'm not interpreting the MRDA

3    from a legal point of view.  I certainly, to do my

4    work, just like a real estate appraiser might have

5    to figure out the metes and bounds of a survey,

6    I've had to analyze the MRDA to evaluate what the

7    metes and bounds were of the licenses and the

8    intellectual property rights that are at issue in

9    this matter.

10               Q.    Now, if we can just look at the

11   first bullet on the screen, can a valuator do any

12   appropriate valuation without first identifying the

13   property interests to value?

14               A.    I don't think so.  The purpose of

15   valuation is to figure out the value of an asset,

16   be it real estate, intellectual property, a car,

17   whatever it might be.  And one has to first figure

18   out what that asset is.  So one needs to define it;

19   one needs to see what cash flow can actually come

20   from its use.

21               Q.    So, Mr. Green, if we can talk

22   first about your valuation methodology that you

23   applied to the business sales.  For the business --

24   and we can move on to the next slide.

25               For the business sales, what were the



 1    categories of assets or rights transferred to the
 2    buyers?
 3                    A.    Well, when I look through the
 4    record, both the asset sale agreements and the
 5    financial records that were from inside of Nortel
 6    related to the businesses that were sold, there
 7    were really three types of assets.
 8                    There were tangible assets that were
 9    transferred or sold, which included inventory,
10    fixed assets, those kinds of things.  There were
11    intangible assets:  An in-place workforce,
12    intellectual property; there were customer
13    relationships and contracts and agreements; and
14    then for the Enterprise business, it also sold some
15    wholly owned subsidiaries, some businesses that it
16    owned.
17                    So those were the types of assets that
18    were transferred.
19                    Q.    And what were the categories of
20    assets or rights surrendered in the business sales?
21                    A.    When I look through the documents,
22    the only types of assets that were surrendered were
23    the licenses to the intellectual property under the
24    MRDA that the US and EMEA Debtors had that were
25    surrendered actually.



1                    Q.    So, Mr. Green, just to help us on

2    the previous slide you used the word "transferred";

3    on this one you used "surrendered."

4                    Can you just explain why you used these

5    two different words in conjunction with the

6    different assets and rights.

7                    A.    Well, because what I was looking

8    at was to try to answer the allocation question,

9    which talks about transferred or surrendered

10   assets.  So what I've done is I have broken them

11   down into, essentially, what happened to each one

12   of them in order to be able to answer the question.

13                   Clearly, the US and EMEA Debtors had

14   rights under the intellectual property but that was

15   owned -- that was owned by Nortel.  However, they

16   only had license rights to that.  So they

17   surrendered those rights.  They couldn't be sold,

18   or they were not sold, in the actual business

19   sales.

20                   Q.    So if we delve a little bit more

21   into these assets that you've told us that need to

22   be identified, are the asset categories summarized

23   on the next slide?

24                   A.    Yes, they are.

25                   Q.    And how do you value the tangible



1    assets?

2              A.   Well, I value the tangible assets

3    based on their book value.  And their book value

4    was shown to me in the carve-out financial

5    statements that were prepared in connection with

6    the actual sales of the businesses, as well as in

7    what were called gain-and-loss statements, which

8    were actually prepared after the businesses were

9    sold.

10             Q.   Now, Mr. Green, are you familiar

11   with Mr. Huffard's report?

12             A.   I am.

13             Q.   And how did he value the tangible

14   assets?

15             A.   He did essentially the same thing.

16   He went and looked at the book values of those

17   tangible assets.  But in his analysis, he deducted

18   liabilities that would be associated with the

19   tangible assets.

20             Q.   And why did you not apply

21   liabilities to the tangible assets?

22             A.   Well, the tangible assets -- the

23   liabilities that were deducted by Mr. Huffard

24   primarily relate to something called deferred

25   revenue.  These deferred revenue assets are --



```
 1   deferred revenue liabilities are essentially
 2   amounts that would be due that are related to
 3   projects that have already been billed and perhaps
 4   paid for.  And so they don't really offset the
 5   physical assets, the intangible -- the accounts
 6   receivable, the other things that were sold.  So I
 7   didn't offset them by the liabilities.
 8                 Q.   And what is the relative effect of
 9   that on the three estates?
10                 A.   The relative effect of that is to
11   essentially increase the asset values, the tangible
12   assets values, that get attributed to each of the
13   three assets.
14                 Q.   And was the relative effect
15   different on any one or more of the estates?
16                 A.   Yes.  To the extent you had
17   greater deferred revenue liabilities, you got a
18   bigger benefit.  The US principally benefits from
19   excluding the liabilities, however.
20                 Q.   So both of us just mentioned the
21   US Debtors a moment ago.  Just so we have some
22   terminology right, can we agree that the purpose of
23   your evidence today, when both of us refer to the
24   US and EMEA Debtors, it's really shorthand today
25   for the licensed participants under the MRDA;
```



```
 1   namely, NNI, NNUK, NNSA, and NN Ireland?
 2              A.   Yes.
 3              Q.   This way we don't trip over the
 4   parties that didn't have license rights, or at
 5   least not exclusive license rights.
 6              A.   Right.
 7              Q.   All right?
 8              A.   Yes.  Yes.
 9              Q.   Now, how did you value the
10   in-place workforce?
11              A.   Well, an in-place workforce
12   consists of people that were actually operating a
13   business or part of a business.  And when they were
14   transferred, essentially that was an asset that was
15   provided to the buyers.  And because they were all
16   together, the buyers essentially saved the cost of
17   having to replace those people, to go out and
18   recruit them and train them and so forth.  So
19   there's some salary savings and there's some cost
20   savings in terms of having to pay for recruitment
21   fees and so forth.
22              And so these are -- the value of the
23   in-place workforce is measured on a replacement
24   cost, essentially saying, well, how much have we
25   saved from not having to pay all these fees and
```

 Neeson&Associates    W&F

1   have all this inefficiency with salaries.

2           Q.   If we move to the next asset on

3   your list, can you just remind us what the wholly

4   owned subsidiaries are you're talking about.

5           A.   Sure.  These are wholly owned

6   subsidiaries that we just saw two slides ago that

7   were sold in the Enterprise business sale.  And I

8   valued these based on some contemporaneous fair

9   market valuations that were done at the time the

10  businesses were sold.

11          Q.   So now, if we can move down the

12  slide to everybody's favorite topic, IP rights and

13  licenses.

14          First of all, what categories of IP

15  rights did you value?

16          A.   I valued essentially two types of

17  IP rights.  They are a license right that was held

18  by the US and EMEA Debtors and an ownership right

19  that was held by the Canada Debtor, NNL.

20          Q.   And, generally, how did you

21  evaluate each of these?

22          A.   What I did is I valued the license

23  rights that were held by the US and EMEA debts

24  individually.  I could figure out what the values

25  were of those rights by using a discounted cash



 1    flow analysis.

 2              And then, because I knew the value of

 3    what their rights were, I could then deduct from

 4    the total value of the IP the value of those

 5    rights, and that would be the remaining value that

 6    would go to the owner, the Canadian Debtor.

 7              Q.   And how did you determine that

 8    there were two categories of Nortel IP to value?

 9              A.   That was from my review of the

10    MRDA and its provisions.

11              Q.   Now, drilling down a little bit

12    into how you valued the IP license and the IP

13    ownership, can you just explain a little bit more

14    how you did that.

15              A.   Sure.  The IP license rights or

16    any license right or pretty much any contract is

17    generally valued by taking a look at what its terms

18    would be and then evaluating how much cash results

19    from execution of that contract, how much cash flow

20    would be resulting from continuing the use of a

21    license or something of that nature.

22              We're just assuming, for valuation

23    purposes that the agreement continued in place

24    or -- and we can then count the cash flow that

25    would come out of it.

 Neeson & Associates    W&F

1                    With respect to ownership and what
2    they -- what the Canadian Debtors would receive,
3    what I know ultimately from figuring out the total
4    values of the tangible assets, the in-place
5    workforce, and the wholly owned subsidiaries, is a
6    total value, the remaining value of the proceeds,
7    would be related to intellectual property.  And so
8    once I know the values of the US licenses and the
9    EMEA license, I can then figure out the difference
10   being attributable to the Canadian ownership of the
11   intellectual property.
12                    Q.   So leaving aside the math for the
13   moment and just to dwell on this point for a
14   second, in your approach to IP valuation, why does
15   Canada gets what it gets?
16                    A.    It really gets what it gets
17   because it owns it, based on my understanding of
18   the MRDA.
19                    Q.   Now, this slide concludes with
20   customer relationships and you valuing the customer
21   relationships with the IP licenses.
22                    Why did you value the customer
23   relationships this way?
24                    A.    Well, to value the licenses, I had
25   to do -- I did a discounted cash flow analysis,



1    which starts off with revenue that results from the

2    sale of products that would be using the

3    intellectual property that was licensed.

4              To sell the products, you have customer

5    relationships; you have contracts; you have

6    agreements; you have sales that are going to be

7    going on.  And those are the revenues that are

8    essentially coming from the contracts or from the

9    customer relationships, if you will.  But you can't

10   sell the customer relationships independently of

11   having the use of the intellectual property.

12             So it's a single line of revenue that

13   is associated with both the valuation of the IP

14   licenses and the customer relationships.  They get

15   valued together.

16             Q.   Generally, Mr. Green, is there an

17   element of customer relationships that is not

18   related to intellectual property?

19             A.   Well, sure.  Those of us who are

20   old enough, you know, had a Rolodex sitting on our

21   desks at one point.  We may not have a contract

22   with everybody in our Rolodex, but we certainly

23   have relationships with our customers.  And that

24   would be essentially something that would be part

25   of goodwill.



1                    Q.   So since you just mentioned

2    goodwill, can you just give us a sentence or two

3    explaining what goodwill is.

4                    A.   Sure.  Goodwill, from a valuation

5    and an accounting perspective, is the difference

6    between the purchase price that was paid for a

7    business and the identifiable tangible and

8    intangible assets.  So if someone were to have

9    bought a business for $100 and you had $40 of

10   tangible assets and $20 of intangibles you'd have

11   $60 of identified assets; the remaining $40, from

12   an accounting and valuation point of view, would be

13   attributed to goodwill.

14                   Q.   Thank you.

15                   Now, in this case, did you consider

16   whether there was a goodwill asset that was

17   transferred or surrendered by the Debtors?

18                   A.   Yes, I did.  I spent a number

19   of -- a lot of time trying to figure this out

20   because, as a practical matter, goodwill isn't

21   booked on an operating business.  Nortel doesn't

22   recognize its own goodwill.  It's only the goodwill

23   that it recognizes from its purchases that it puts

24   on its books and records.

25                   So there's a lot of accounting

Neeson&Associates    W&F

1    literature that talks about how one looks for

2    impairment of goodwill.  And so I wandered through

3    that literature.

4              And I also considered that I had

5    actually valued a piece of goodwill by doing a

6    separate valuation of the in-place workforce.

7    Normally, in purchase price allocations under US

8    GAAP or the GAAP that we follow now, in-place

9    workforce is valued as part of goodwill.  I've

10   pulled that out.

11             So what I was really looking for was

12   any evidence of goodwill that is essentially

13   attributable to the business.  And what I looked

14   for were the things that are normally considered by

15   accountants and auditors to evaluate whether or not

16   goodwill is impaired.

17             So I noticed, first off, that all of

18   Nortel's goodwill was written off in 2008.  This

19   was a multiple-billion-dollar write-off that was

20   attributed to all four the business segments that

21   Nortel operated.  And what that tells us is that

22   the value of the goodwill that was inside of the

23   business was less than the presumed operating

24   profits or cash flows that were going to come from

25   those businesses in the future.



```
 1                   I also was looking to see how Nortel
 2    was doing with its customers.  Was it retaining
 3    customers? Losing customers?  There is some
 4    evidence in the record that shows that Nortel was
 5    losing customers.  Typically if you're -- if you
 6    have goodwill, you'd expect that there would be
 7    customer relationships that would be being
 8    maintained.  Nortel was obviously losing money at
 9    the time.  It had no excess earnings.
10                   And so the indicia of goodwill that one
11    would normally see -- that it was earning excess
12    profits, customers were happy, it was keeping all
13    of its actually booked goodwill -- wasn't there.
14    So I concluded that there really was no goodwill in
15    Nortel at the time of my valuation.
16                   Q.   So having looked at the assets and
17    rights that needed to be valued, maybe we could
18    continue to the second favorite topic for lawyers,
19    which is numbers and calculations.
20                   THE CANADIAN COURT:  Is this a
21    convenient time, Mr. Ruby?
22                   MR. RUBY:  Absolutely.
23                   THE US COURT:  All right.  How long,
24    Justice Newbould?  15 minutes or 20?
25                   THE CANADIAN COURT:  You call it.
```



```
1                    THE US COURT:  15 minutes.  Take a

2      15-minute break.

3                    MR. RUBY:  Thank you.

4      -- RECESS AT 11:02 A.M. --

5      -- UPON RESUMING AT 11:26 A.M. --

6                    THE US COURT:  Thank you, all.  Please

7      be seated.

8                    Mr. Ruby, you may proceed, sir.

9                    MR. RUBY:  Thank you, Judge Gross.

10                   BY MR. RUBY:

11                   Q.   We were about to talk about

12     numbers.

13                   On this slide, are you using

14     hypothetical numbers or real data and calculations?

15                   A.   These are real data and

16     calculations.

17                   Q.   How did you apply to the business

18     sales the valuation methodology you took us through

19     just before the break?

20                   A.   Well, what you can see from this

21     chart is I started off with the total value from

22     the proceeds of the business sales, which is the

23     $2.88 billion, and then I valued, based on the book

24     values, the tangible assets that we see for all of

25     the debtors.  You can see that there's 121 million
```



1   for the Canadian Debtors and 317 million for the US

2   Debtors and so forth.

3                I also valued the in-place workforce

4   separately and attributed value to the wholly owned

5   subsidiaries that were also sold by the US Debtors.

6                And so if you take a look, what I've

7   done here is simply subtracted from the total

8   proceeds the values of the things that I separately

9   valued that were not IP-related.  And that leaves

10  us with a title IP value of $1,982,225,000, which

11  is what you can see in the middle column there, in

12  the middle part, the subtotal.

13               From that, I valued the US and EMEA

14  Debtors' license rights, including their customer

15  relationships, and those totaled 438 million and

16  164 million.

17               So that left me with the remainder,

18  being the value of the IP that was owned by the

19  Canadian Debtors of about 1.38 billion.  It's just

20  a simple subtraction, Your Honors.

21               Q.   Mr. Green, we'll come back in a

22  few minutes to exactly how you valued the IP

23  license components you've got on the screen.  But

24  before we do that, in looking at this slide, why is

25  it that while the purchasers of these businesses



```
 1    paid about $2 billion for the IP rights, you assess
 2    the US and EMEA license values at much smaller
 3    numbers?
 4              A.    Because the purchasers actually
 5    bought ownership rights.  They bought the patents;
 6    they bought the technology and the rights to it.
 7              The US and EMEA Debtors only had
 8    license rights, which are a subset of ownership
 9    rights.  Also the purchase price that was paid by
10    the purchasers of these businesses included their
11    view of what the usage -- of what the value was
12    that they would get from the use of the IP.  And
13    that's different from the way that I have valued
14    these numbers or valued these licenses.
15              Q.    So I think the next slide is a
16    different presentation of a similar set of numbers.
17    Can you just explain to us what this slide shows
18    us.
19              A.    Sure.  What this does is breaks
20    out the subtraction that we just saw, that long
21    column of numbers, into the relevant Debtors.  So
22    what we can see going across the top of this slide
23    is that we have the Canadian and the US and EMEA
24    Debtors.  And then you can see the values of the
25    tangibles, the in-place workforce, the wholly owned
```


Neeson&Associates    W&F WILSON & PETZER LTD.

```
 1   subsidiary, and the customer rights that have been
 2   allocated to each of the Debtors.
 3            And you can see at the bottom of it
 4   that there's 1.58 billion that's attributed to the
 5   Canadian Debtors, a billion dollars that's
 6   attributed to the US Debtor, and about 300 million
 7   that's been attributed to the EMEA Debtor.
 8            Q.   So a moment ago I said we are
 9   going to come back to how exactly you valued the
10   license lights.  So let's do that now.
11            How did you determine, as your -- I
12   think you told us in your methodology, was your
13   first step of determining what I think you called
14   the metes and bounds of the US and EMEA Debtors'
15   license rights?
16            A.   Well, the first thing I did was
17   I -- as I would in any valuation, is I went to the
18   relevant document, which as I understand it is the
19   MRDA, which provides a description of the license
20   rights that the US and EMEA Debtors held.  That
21   license was granted by Canada.  It was the owner,
22   and it granted license rights to the US and EMEA
23   Debtors.
24            Q.   And were there terms of the
25   license that you understood as being significant to
```



 1   your valuation?

 2              A.   Yes, there are a number of terms

 3   that are significant to the valuation, and I

 4   basically listed them out on this chart.  This was

 5   just -- and we'll go through them term by term.

 6              Q.   So why don't you take us through

 7   them and explain why, for each one, they're

 8   significant.

 9              A.   Sure.  First off, the license

10   rights that the US and EMEA Debtors had were to an

11   exclusive and perpetual license.  These are

12   exclusive rights; they're perpetual.  But they're

13   limited in the sense that they are only for

14   particular designated territories, actually where

15   those businesses operate.  And they're further

16   limited to products that are defined -- which is a

17   defined term in the MRDA, although they do include

18   some sublicensing rights and some rights to sue.

19              As I understand it, the licenses had

20   very limited transferability terms.  And ultimately

21   the operating profits and losses that are going to

22   be earned from products and services that were sold

23   or derived from the use of the license had to be

24   shared using the RPS split methodology that's

25   described also in the MRDA.

 Neeson & Associates   W&F

```
 1                  So each one of these terms was

 2   significant to the valuation because it has an

 3   impact on the cash flows that would be available to

 4   each of the US and EMEA Debtors from their use of

 5   the license rights, from use of the IP that was

 6   licensed under this -- under the MRDA.

 7                  Q.   So, again, just so we're all on

 8   the same page when you look at these license terms,

 9   are you playing judge and offering a legal opinion

10   looking at it from a valuation perspective or

11   something else?

12                  A.   I'm looking at it solely from a

13   valuation perspective.  I knew I had an agreement.

14   I needed to know which parts of the agreement would

15   affect the cash flows that would be available to

16   the owners or to the particular right-holder.  And

17   so I just went through this to be able to evaluate

18   what the -- how the cash flows would be affected by

19   each of the individual terms.

20                  Q.   So, Mr. Green, in the blue box in

21   the middle of the screen, you mention sublicensing

22   and rights to sue.  How did those terms factor into

23   your valuation methodology?

24                  A.   Well, I considered that those

25   rights existed, but -- and essentially included
```



```
 1    them in the overall revenues that were projected.
 2              So to the extent that there was
 3    sublicensing that had actually occurred or that
 4    there actually had been litigation that had
 5    resulted in some kind of awards, I included them in
 6    the ultimate valuation using the revenues.
 7              Q.   So, again, so we're all on the
 8    same page, Mr. Green, on this slide, did you mean
 9    to set out all the language from the agreement with
10    respect to the terms you've identified?
11              A.   No.  There is -- as we all know,
12    the MRDA is a complicated document.  It has many
13    terms.  This was just to give me an idea or
14    essentially the roadmap of the important terms that
15    would affect the cash flows that would be available
16    to the US and EMEA debtors under their licenses.
17              Q.   So on this slide you've only
18    summarized some of the terms of the MRDA.  In doing
19    your valuation, did you apply the MRDA as a whole
20    or did you cherry-pick to apply certain terms and
21    not others?
22              A.   No.  I considered the entirety of
23    the document.  But these are the specific license
24    terms that I'm aware that were related to my
25    analysis that was -- that were important.
```



```
 1                    Q.   So with those metes and bounds
 2   detailed --
 3                    THE CANADIAN COURT:  Mr. Ruby --
 4                    MR. RUBY:  Yes.
 5                    THE CANADIAN COURT:  Mr. Ruby, I wonder
 6   if I could just ask a question.  The box says
 7   "limited transferability."  And I'm wondering, sir,
 8   if you can point out which portions of the MRDA
 9   you're relying upon for that box.
10                    THE WITNESS:  Sure.  I don't have a
11   copy of the document in front of me.
12                    MR. RUBY:  Justice Newbould, if you
13   give us a moment, we'll get the witness a copy of
14   the MRDA.
15                    THE CANADIAN COURT:  Thank you.
16                    MR. RUBY:  Justice Newbould, I'm happy
17   for the witness to look for it or I can suggest, if
18   you'd like, a place where he might want to start.
19   But that's up to you, sir.
20                    THE CANADIAN COURT:  One of the reasons
21   I asked the question, Mr. Ruby, is in his report,
22   page 15, he said that the MRDA prohibited the
23   transfer to third parties, and this says "limited
24   transferability."  And I'd like to understand what
25   it is he's talking about, which provisions.
```



```
 1                  MR. RUBY:  I must be missing it, Your
 2     Honor.  I apologize.
 3                  BY MR. RUBY:
 4            Q.   Maybe I can ask the question this
 5     way, Mr. Green.
 6                  Why in your report, as Justice Newbould
 7     just mentioned, you referred to, to paraphrase,
 8     non-transferability and your slide refers to
 9     limited transferability?
10            A.   Because I understand that at least
11     the transferability that's being described here
12     relates to -- can be actually -- can actually occur
13     with the consent of the parties.  But that's -- and
14     I understood that there had never been consent of
15     the parties when I wrote my report.  So I assumed
16     that there had been no transfer, that there was no
17     transferability.
18                  MR. RUBY:  So perhaps the way we should
19     proceed is, on the assumption that Mr. Green won't
20     be finished in the box by lunchtime, maybe he can
21     take a minute during lunch to see if he can find
22     the exact language in the MRDA for you, Justice
23     Newbould.
24                  THE CANADIAN COURT:  Thank you.
25                  BY MR. RUBY:
```



 1                    Q.   So now that we've talked about how
 2      you valued the license rights in general, can we
 3      take a moment, sir, to talk about how the licenses
 4      to the IP were implemented in practice at Nortel?
 5                    A.   Sure.  Just to discuss this a
 6      little bit, we had these particular -- the various
 7      debtors had particular rights to Nortel's
 8      intellectual property.
 9                    And as a practical matter, the way
10      those businesses operated -- and we'll use the CDMA
11      business as an example -- is that the CDMA business
12      was operating worldwide.  So the US Debtor, the
13      EMEA Debtor, and the Canadian Debtor all operated a
14      CDMA business.  And those entities all had rights
15      to sell Nortel products.
16                    And in selling those Nortel products,
17      some of those products would be covered by
18      intellectual property that was specific to the CDMA
19      business, and then there was other shared IP that
20      was also used in the CDMA business.
21                    So what would happen is that, to be
22      able to sell the products, those products would
23      have specific IP and they would also have some
24      shared IP that would be used among all the other
25      businesses.



```
1                    And so as the businesses operated,
2      whether it was CDMA, the Enterprise business, or
3      even the MEN business, what you come to find is
4      that there is some very specific IP that they used,
5      and then there's some shared IP that they actually
6      were -- that was actually used among all of them or
7      could be used among all of them.
8                    At the end, there was also a lot of IP
9      that Nortel had that was not used by any of these
10     businesses.  So although EMEA and US and Canada
11     were selling Nortel products and using specific IP
12     and sharing some, there was a whole lot of IP that
13     ultimately was sold as the residual that wasn't
14     actually used by the businesses.
15                   Q.   Now, with that background, can you
16     please explain to the Courts how you valued the US
17     and EMEA Debtors' licenses.
18                   A.   Sure.  Well, as I mentioned
19     earlier, the license value that I've derived is
20     based on the present value of the benefit, which is
21     the cash flow, that would result from the licensed
22     participant actually using the license.  So
23     essentially what we're looking at is the amount of
24     cash flow that would result from the continued
25     operation of the CDMA business and what would
```



```
 1   actually be ultimately the end result, the
 2   operating profits, as adjusted by the residual
 3   profit-split methodology.
 4             So essentially what I've done here is
 5   I've determined the value of that license right to
 6   the CDMA business or the license rights that were
 7   had to the specific IP and the shared IP by
 8   measuring the cash flows.
 9             And basically, the way I look at it,
10   although it's called a value-in-use measurement --
11   it's a standard that is described in my reports --
12   it's really essentially fair market value, because
13   there are various terms of the licenses that are
14   basically limiting what can be done with them.  So
15   it's the fair market value standard is really being
16   applied.
17             Q.   Now, can you just explain for a
18   moment what you mean by the value-in-use standard.
19             A.   Sure.  In my report, there is a
20   discussion about a standard called "value-in-use."
21   And value-in-use essentially reflects the cash
22   flows that would be earned from the continued use
23   or operation of a particular business or a
24   particular asset by the owner as opposed to some
25   other third-party entity.  It's also sometimes
```



1    described as an investment value, which would be

2    the value to some -- to a specific entity of making

3    an investment.

4                    Q.   Now, you've said, Mr. Green, that

5    you measured the cash flows to derive the values of

6    the EMEA and US IP licenses.  Can you please

7    describe in detail exactly how you did that,

8    perhaps using the MEN business as an example.

9                    A.   Sure.  It's actually the subject

10   of my next slide.

11                   Now, the analysis that I did -- and

12   this is just sort a summary high-level spreadsheet

13   of it, if you will -- comes from a variety of

14   different documents that I considered.

15                   On the far left of this you can see

16   that there's actual information.  And so that's

17   actually coming from the carve-out financial

18   statements that were prepared by Nortel and its

19   auditors and its accountants.

20                   On the left-hand side of this is a

21   projection for the MEN business, which includes

22   information that came from Nortel and its

23   projections as well as information that came from

24   analyst reports and other information about the

25   future or the expected future for businesses such



1    as Nortel's MEN business.

2            The projections -- and it's worthwhile

3    noting, there were at least two types of

4    projections available for the MEN business.  There

5    was one that was called a safe-hands projection,

6    which is essentially the projection that would

7    result from somebody, a third party, operating the

8    MEN business.  And then there was a

9    continued-use-by-Nortel projection, which is

10   essentially the projection as if Nortel were to

11   continue to operate the MEN business and it were

12   not to be sold.

13           In doing this analysis and in doing

14   virtually all of my analyses, I've relied on the

15   continued-use-by-Nortel projections.  I haven't

16   used the safe-hands projections.

17           What you can see from looking at these

18   projections is that if -- or this spreadsheet, in

19   looking at the left-hand side, you can see that,

20   first off, the MEN business, historically, was not

21   earning substantial operating profits; in fact, it

22   was suffering losses in through 2009.  You can also

23   see that it was suffering a revenue decline from

24   2007 through 2009.

25           However, in the projections that I've



 1    done for the MEN business, based on the

 2    expectations of both the company and the way that

 3    the analyst community was looking at this type of a

 4    business, I've assumed that its operating revenues

 5    would increase over time.

 6              And so the projections that came from

 7    Nortel are really reflected in the 2010, 2011, and

 8    2012 columns.  And you can see that there's an

 9    assumption here that revenue will increase by

10    4 percent in 2010, 6 percent in 2011, and then

11    2 percent in 2012.

12              You can see that thereafter, in this

13    revenue projection, I've just used the same amount,

14    the same amount of revenue growth of 2 percent

15    that's consistent with the amount that was in the

16    Nortel projections.

17              Based on my analysis of the other

18    analyst reports and taking a look at what the

19    expectation were for this business, that 2 percent

20    growth was consistent with what the expectations

21    were for this type of business out into the future.

22    So I continued to use that.

23              You can then see that there are various

24    deductions to come to gross profit.  And I've also

25    included expenses, the selling and administrative



1    expenses, as well as the research and development

2    expenses that would be incurred in the continued

3    operation of the business.

4              These kinds of costs are going to be

5    incurred if the company is continuing to plan to

6    sell MEN equipment, MEN services, and so forth.

7              So what you can see is that by -- down

8    at the bottom is that I've calculated ultimately

9    the operating earnings by deducting from these

10   projected revenues the cost of the sales, which

11   gives us gross profit, and the selling and R&D

12   expenses.

13             And so this is essentially a forecast

14   for what would happen if this business continued to

15   operate.

16             Just one other point that needs to be

17   made about this forecast is that when you're

18   looking at the revenue line, what that revenue line

19   includes -- and this is what the point of the slide

20   that I just showed you before -- is that those

21   revenues are being derived from the use of the

22   shared IP, as well as the use of the MEN-specific

23   IP in this business.  So this top-line revenue

24   reflects that usage.

25             It also -- because the products that



1   are being sold are using this intellectual

2   property, it also reflects the values of the

3   customer relationships because customers are buying

4   products that are covered by the intellectual

5   property and you wouldn't have customers unless you

6   could sell them these types of products that are of

7   this sophisticated nature that are covered by the

8   patents.

9            So this one revenue line is essentially

10  the basis for -- or why I put together the values

11  of the customer relationships in the IP.

12            Q.   Just to follow up on two points,

13  Mr. Green:  Why did you use the retained-by-Nortel

14  projections as opposed to the safe-hands

15  projections that you described a minute ago?

16            A.   Well, I'm trying to evaluate the

17  license rights that were surrendered by the US and

18  EMEA Debtors.  The value of those license rights is

19  necessarily constrained, if you will, to what the

20  US and EMEA Debtors could have done with these

21  operating businesses.

22            If I were to use the safe-hands

23  projections, that would essentially impart to the

24  US and EMEA Debtors value that they couldn't

25  actually reach, because that includes the synergies



1    and other things that would come from a third

2    party.

3            So this is essentially a reflection of

4    what would have happened if the US and EMEA Debtors

5    had continued to be able to be operating the MEN

6    business along with the Canadian Debtor.

7            Q.   A final point on this slide,

8    Mr. Green.  If you see down on the left-hand side

9    towards the bottom, there is an entry for goodwill

10   impairment.  Can you explain that?

11           A.   Yes.  A couple of slides back we

12   talked about goodwill and how I search for indicia

13   of goodwill in the business as a separable or

14   surrendered asset or a transferred asset.  And what

15   this is is -- one of the things I noted was that

16   there had been a big goodwill write-off.  This a

17   1,036,000,000 of the write-off that was attributed

18   to the MEN business.

19           Q.   So in a more cursory way, can we

20   look, just for a moment, at the CDMA business,

21   which is the next slide?

22           A.   Sure.  This is the projection for

23   the CDMA business that I relied on.  This is a

24   little different than the MEN business in that what

25   you can see is that the revenues are going in a



```
 1   different direction than the MEN business.

 2                    What is similar about this is that I'm

 3   relying on the "Nortel retains the business and

 4   operates it" projections.  I've relied on the same

 5   types of documentation to do the forecasting.

 6                    And what you can see is that the CDMA

 7   business, when you look down at the bottom, is

 8   actually -- has operating earnings in the period

 9   from 2007 to 2009.  It also, throughout the period

10   that I forecast, even though they are declining, it

11   continues to have operating profits.

12                    Q.   So what period did the projections

13   cover with respect to the CDMA business?

14                    A.   The projections that I had

15   available to me projected 2010 through 2012,

16   similar to what I had for the MEN business.  And

17   you can see that subsequent to 2012, there's a

18   decline in revenue between 2011 and 2012 of

19   24 percent.  I've applied a 23 percent decline in

20   revenue.

21                    This makes sense, Your Honors, because

22   the CDMA business essentially -- you've heard of

23   the 4G or the LTE technology.  CDMA, in the history

24   of phone technology, is the 2G.  So this

25   essentially is the decline or the end -- the
```



```
 1   wind-down of the use of this technology, and that's
 2   what these cash flows reflect, or these revenues
 3   reflect.
 4              Q.    And again, during this period,
 5   what's happening with the R&D expense?
 6              A.    I continue to have R&D expense in
 7   CDMA business.  This is to continue to make and
 8   sell the products as necessary.  But as you can
 9   see, it declines dramatically.
10              Q.    Now, did you consider the LTE
11   technology that was also sold to Ericsson in this
12   business transaction?
13              A.    I did.
14              Q.    And how did you deal with that LTE
15   technology?
16              A.    There are two things.  One thing
17   is by 2009, the largest customer for Nortel's CDMA
18   technology was Verizon, and Verizon had determined
19   that, all things considered, it wasn't going to be
20   buying from Nortel LTE technology.
21              And so I've excluded, in the go-forward
22   projections, any LTE-related revenue because at
23   least, if we're thinking about the continued
24   operation of the CDMA business inside of Nortel,
25   there was no evidence that I had of cash flows that
```



 1    would be related to that.

 2              I've also pulled out from the R&D

 3    expenses the future costs that would be associated

 4    with continued LTE development.  In the numbers for

 5    2007 through 2009, there is a significant amount of

 6    LTE R&D in it.  It's almost 150 to $200 million

 7    each year.  You can see that that's not present in

 8    the projected years.

 9              Q.   And with respect to how you

10    handled the LTE technology, what is the relative

11    effect on the estates?

12              A.   Well, by excluding the LTE

13    technology, it actually increases the license

14    values of the US and EMEA's licenses.

15              Because there was so much money being

16    spent on R&D and there was no revenue associated

17    with it, it was actually dragging down the cash

18    flows and the operating profits.

19              Q.   So let's discuss now the last of

20    the three large business sales, the Enterprise

21    sale.  And again, which projections did you use for

22    valuing the licenses in the Enterprise sale?

23              A.   The Enterprise sale has a set of

24    projections that were derived or prepared by

25    Nortel.  They wouldn't necessarily fall into either



1   category of safe-hands or run-by-Nortel.  But these

2   are the projections that were prepared by Nortel,

3   or I base my analysis on the projections prepared

4   by Nortel.

5            Q.   And what is the effect of the

6   choice of projections you made with respect to the

7   Enterprise sale on the three estates?

8            A.   Well, the effect of this is to

9   actually increase the value of the license rights

10  that were held by the US and EMEA Debtors.  As you

11  can see looking at this Enterprise business, it has

12  suffered extensive losses in the 2009-to-2010 --

13  excuse me 2007-to-2010 period.

14            What I have done in these

15  projections -- and this is done based on looking at

16  the company, analyzing a lot of Nortel records --

17  I've made it so that it's basically fundamentally

18  operating at a small profit as opposed to

19  significant losses in the projections.

20            Q.   Now, are you aware whether Nortel

21  looked at liquidating what you've told us was a

22  money-losing business?

23            A.   Yes, it did.

24            Q.   And how did you factor that into

25  your analysis, if at all?



1                    A.   Well, what I understand is that

2    Nortel ultimately decided to retain the Enterprise

3    business, and that's what the going-forward plan

4    was had Nortel continued to operate.  So what I've

5    done, essentially, is considered that if Nortel

6    were going to continue to operate the Enterprise

7    business inside of it, it would have endeavored to

8    earn profits from it as opposed to suffer the

9    losses that we see here.

10                   Q.   Mr. Green, what was your next step

11   after projecting the operating profits from all the

12   businesses that were sold?

13                   A.   Well, it actually appears on the

14   next slide.  The fact is that, in addition to the

15   three projections we've just seen, there are

16   several others for the other businesses that were

17   transferred by Nortel or sold by Nortel.  And I did

18   the same types of analyses for those businesses.

19                   And what happens is I wound up

20   aggregating all of the operating profits.  So this

21   chart shows you the total -- on the top line the

22   total value of all of the operating profits that

23   would be earned from all of those businesses that

24   were sold in 2010 through 2018.

25                   So 113 million would have been earned



1   from those businesses in their operating profits in

2   2010 and so forth.  You can see it increases.

3              But to develop the value of the license

4   rights that were surrendered by the US and EMEA

5   Debtors, there was one further step.  Because I've

6   assumed that the MRDA is in place, or the MRDA is

7   in place, the residual profit-split methodology

8   would have to be applied in order to be able to

9   figure out what the amount of cash is that would be

10  actually allocable to each of those Debtors.

11             And so what you can see here is the --

12  on the bottom -- and I haven't included all the

13  computations here in detail.  But what you can see

14  on the bottom of this chart is the value of the

15  operating profits that would be attributable to the

16  US Debtor and the EMEA Debtor based on all of the

17  forecasts that I did in connection with those

18  businesses.

19             Q.   And why did you apply the RPSM

20  calculation to the aggregated profits and not the

21  specific profits of each business line?

22             A.   Because, actually, that's how

23  Nortel did it when it was operating.  This is

24  consistent with Nortel's process and as defined in

25  the MRDA.



```
 1                    Q.   Now, to apply the RPSM, you

 2      applied some kind of percentage; is that right?

 3                    A.   Yes.

 4                    Q.   So can you explain what that

 5      percentage was and where it came from.

 6                    A.   Sure.  The RPS percentages that

 7      I'm talking about are often referred to as the

 8      capital stock percentage.  And so what those are is

 9      an aggregation of the -- or an analysis of the

10      cumulative five years' R&D spend that had been done

11      by the Debtors in -- at Nortel.  So there are a set

12      of numbers and there's a formula that actually

13      derives those capital stock percentages, and that's

14      what I'm referring to.

15                    Q.   So you described the capital stock

16      as relating to a five-year period.  Can you just

17      tell the Courts which five-year period you used.

18                    A.   Yes, that's good.  I used the

19      five-year period from 2005 to 2009.  Effectively,

20      it's the first quarter of 2010 RPS splits that I

21      relied on.

22                    Q.   And why did you choose that

23      five-year period?

24                    A.   Well, that five-year period was

25      the most recent, and the forecasts, if you think
```

 Neeson & Associates   W&F WILSON & PETERSON LTD.

1    about it, are out into the future.  So I thought

2    that was the most appropriate, given that I was

3    forecasting -- it's the latest information.

4              It also is consistent with the date of

5    the valuations that I've done.  I've essentially

6    valued the license rights as of December 31st,

7    2009.  This is the consistent with that time

8    period.

9              Q.   And why did you choose a valuation

10   date of the end of 2009?

11             A.   Well, by the end of 2009, most of

12   the business agreements had been signed.  Two of

13   the business sales had actually closed, two of the

14   major ones.  So this is right in the right time

15   frame.  Most of the other transactions closed

16   between January and April of 2010.

17             Q.   So you've now explained how you

18   valued the IP licenses.  Perhaps we can now turn to

19   what happened to the IP as the businesses were

20   sold.

21             A.   Sure.  I've actually illustrated

22   this on the next slide.

23             So what happened is as each of the

24   businesses were sold -- and we can start off with

25   CDMA as an example.  As it closed, as its sale



1    closed, the specific IP that was used in its

2    business was actually transferred to the buyer by

3    NNL.  What also happened is a license was given to

4    use the shared IP to the buyer.

5              So essentially the buyer paid for the

6    specific IP as well as the shared -- the license to

7    the shared IP.  And, obviously, nothing happens

8    with respect to the IP that wasn't used.  It wasn't

9    transferred at all.

10             And this same unwinding occurs with

11   each and every sale.  So as the MEN business gets

12   sold, as the CVAS business gets sold and so forth,

13   what's happening is the specific IP that's used in

14   those businesses is transferred to the buyers,

15   license rights are given to the buyers for the

16   shared IP, and ultimately what's left is the IP

17   that's not used by any of the operating entities or

18   by any of the Debtors.

19             Q.   Thank you.

20             Before we turn to the next subject,

21   perhaps we should just compare your ultimate

22   business sale allocation to what some of the other

23   experts for other parties have had to say.  So if

24   you can turn to the next slide, sir.

25             First of all, have you reviewed other



1    expert reports about allocation?

2              A.   Yes, I have.

3              Q.   And which ones have you analyzed

4    for the purpose of comparing what you've done to

5    what they've done?

6              A.   I've analyzed Mr. Kinrich's

7    report, and I've also analyzed the Huffard and

8    Malackowski analysis.

9              Q.   And does this slide show the

10   differences in the business sale allocations as

11   between you, Mr. Kinrich, and the combined

12   Mr. Huffard and Mr. Malackowski?

13             A.   Yes, it does.

14             Q.   And can you just explain to the

15   Courts briefly, please, the sources of those

16   differences as between the different experts and,

17   if you prefer, using the next slide.

18             A.   Well, there are a number of

19   methodological differences between what I did and

20   what was done by Mr. Kinrich and Messrs. Huffard

21   and Malackowski in coming up with the values that

22   would be associated with the assets that were sold

23   in the business sales.

24             Mr. Kinrich, as you can see from this

25   chart, doesn't really analyze the values of any of



1   the assets individually.  Essentially what
2   Mr. Kinrich does is he says, well, a business sold
3   for $100, let's just say.  The US, for example,
4   might have had 80 percent of those revenues.  So
5   80 percent of the sales proceeds, the $100, would
6   be allocated to the US.
7           It's indifferent in terms of what the
8   specific assets were that were transferred or --
9   and it doesn't analyze, from my point of view,
10  the -- or answer what the allocation question is,
11  because we're trying to figure out what was the
12  value of what was transferred or surrendered.
13          The Huffard and Malackowski approach is
14  somewhat similar to what I did in the sense that it
15  endeavors to go through and identify by specific
16  types of assets their values, except that -- and we
17  have, as we talked about earlier, some similarities
18  in the way we analyze the net book value of the
19  tangible assets; but they didn't value, for
20  example, the in-place workforce and give any credit
21  to the value of the subsidiaries.
22          And ultimately what Mr. Malackowski did
23  for us is he valued the intellectual property by
24  essentially using a relief-from-royalty
25  methodology.  He essentially tried to figure out



1    what the sales would be that were associated with

2    the continued use of the technology or the use of

3    the technology, and then he figured out some

4    royalty rates.

5              And what you can find is -- and then he

6    allocated those values based on the contribution of

7    those assets.  Essentially what he's saying is that

8    he can figure out the total dollar value of R&D

9    that had been spent by the US, EMEA, and Canadian

10   Debtors out over a 20-year period.  He takes the

11   value of the IP that he has derived from his

12   relief-from-royalty and allocates it based on those

13   contribution numbers.

14             That's very different from what I've

15   done, obviously, because he's not really valuing a

16   license right.  He's just saying everyone is

17   entitled to their piece of the overall value of the

18   IP that he derived and then allocates it using

19   contribution.

20             And then you can see that there was

21   some discussion about customer relationships and

22   goodwill that's all combined in the Huffard and

23   Malackowski analysis because they couldn't actually

24   reconcile the values to the total proceeds.  And so

25   they have combined them into, essentially, a big



```
 1    lump and allocated them depending on what they are,

 2    either on a residual basis or on historical

 3    revenue.

 4              Q.   Now, just to follow up on a couple

 5    of things.  Under IP rights you've got allocation,

 6    15-plus years R&D under the Malackowski and Huffard

 7    column.  Can you just explain that to the Court for

 8    a moment.

 9              A.   Yes.  This is Mr. Malackowski's

10    contribution-approach analysis.  So what he's said

11    is that the way to allocate the values of the

12    intellectual properties that were transferred in

13    the business sale is to basically figure out how

14    much R&D was spent by each of the Debtors, and

15    then -- in total, for over a 20-year period of

16    time, and then allocate based on the total value of

17    that R&D spend relatively.

18              So if the US spent $100, EMEA spent

19    $200, and Canada spent $200, it would be allocated

20    10 percent to the US, 20 percent to -- excuse me --

21    20 percent to the US, 40 percent to EMEA, and the

22    other 50 percent, or whatever the numbers would be,

23    to Canada.

24              Q.   And just a moment on Mr. Kinrich.

25    You explained how your view is he didn't value any
```



1   of the assets that are on the left-hand side of the

2   screen, but you mentioned revenue.  Is the use of

3   revenue to do allocation, revenue alone,

4   appropriate, in your view?

5               A.   In my view, it's not.  It doesn't

6   tell you anything about, really, the value of the

7   assets that were transferred or surrendered.  It

8   assumes that there is some kind of correlation

9   between revenue and value.  And as I understand it,

10  that's not really what we're trying to analyze

11  here.

12              In any event, he didn't establish that

13  correlation in his reports, from what I could tell.

14              Q.   So leaving for the moment the

15  allocation approaches of the other experts and

16  returns to yours, with respect to the business

17  sales, did you prepare any alternative valuation to

18  the one you started today explaining to the Court?

19              A.   Yes, I did.

20              Q.   And can you explain that

21  alternative analysis for the business sales.

22              A.   Sure.  What I did was, knowing

23  that there was $2.8 billion of total proceeds and

24  knowing that the values of the intangible assets

25  were 534 million and that the wholly owned



1    subsidiaries were 110 million, I could derive a

2    total value for the intangible assets of

3    $2.2 billion, essentially.

4            And then what I did as an alternative

5    was I allocated that $2.2 billion using the R&D

6    capital stock splits for the 2005-to-2009 time

7    period.  And essentially what this assumes is that

8    that $2.2 billion is fundamentally the cash flow

9    that would result from the use of the intangibles.

10           Essentially it's saying, well, look,

11   even though the Nortel Debtors couldn't actually

12   have achieved the $2.2 billion based on the

13   projections, the buyers had done -- suggest that

14   they could actually do this.  And so we just

15   allocate those values based on the RPS splits.

16           Q.   Just for the Courts' own notes, do

17   you know offhand where in your reports they can

18   find this alternative analysis?

19           A.   This analysis appears on page 62

20   of my initial report.

21           Q.   Now, I think in your original

22   report you called this a maximum allocation.  Why

23   was that?

24           A.   Because what this does is this

25   assumes that the US and EMEA and Canadian Debtors,



```
 1   as a practical matter, are going to actually
 2   operate these businesses in the same manner that
 3   the buyers actually assume that they could.  So
 4   we're assuming some synergies, we're assuming the
 5   financing of the buyers is the basis for those
 6   $2.2 billion of cash flows.
 7              So there's nothing else also, if you
 8   think about it, to allocate here.  We figured out
 9   what the tangible values are.  We figured out what
10   the values of the wholly owned subsidiaries were.
11   Those aren't really subject to much dispute.  So
12   all we've got left to allocate are the intangibles.
13   It's simply being done on the capital stock splits.
14              Q.   And earlier in your testimony,
15   Mr. Green, you talked about your choosing
16   safe-hands versus retained-in-Nortel projections
17   and so on.  What is the relationship between your
18   choice of projections and this alternative
19   calculation?
20              A.   Essentially if you think about it,
21   this 2.2 billion is a reflection of the safe-hands
22   projections.  So it's essentially giving value to
23   the US and EMEA Debtors that is based on an
24   operation that Nortel was unable to actually
25   accomplish.
```



```
 1                       Q.   So just to summarize, can you just
 2   quickly let the Courts know what the outcome is
 3   from this alternative analysis.
 4                       A.   Well, the outcome is that there's
 5   an -- would be a total allocation to the Canadian
 6   Debtor of about 1.2 billion, there would be an
 7   allocation to the US Debtor of 1.3 billion, and the
 8   EMEA Debtor would get about 355 million.
 9                       Q.   And the percentages are shown on
10   the slide for those numbers right below them?
11                       A.   Yes, they are.
12                       Q.   Now, how is the approach you've
13   just talked about and that's on the screen
14   different from the Malackowski-Huffard contribution
15   approach?
16                       A.   The significant difference is that
17   the Malackowski-Huffard approach uses contribution
18   to R&D out over a 20-year period, whereas in this
19   approach I'm relying on what the MRDA splits were
20   that the company was actually using at the time.
21                       So it's consistent with what the
22   documents are, as I understand them.
23                       Q.   Now, we spent a lot of time on the
24   business sales.  We can, I think, do the residual
25   IP analysis a little more quickly.
```



```
 1                    So if we turn to the residual IP sale,
 2      and sticking with the methodology you talked about
 3      at the beginning of your testimony about first
 4      identifying the assets, can you please explain what
 5      made up the IP in the residual IP.
 6                    A.    Sure.   If we were to go back to
 7      the analysis that I showed you earlier of how the
 8      companies actually operated with respect to the
 9      shared IP and the product-specific IP and then the
10      non-used IP, what you can see is that after the
11      business sales there was shared IP that was still
12      available or still held by the company, because it
13      had been licensed to the buyers; there was also
14      intellectual property that wasn't used in any of
15      the businesses.   And this essentially becomes the
16      assets that were sold or the IP that was sold in
17      the Rockstar sale.   Okay?
18                    And so it consisted of two things,
19      obviously:   The shared IP that was used in multiple
20      businesses.   The shared IP was actually sold to
21      Rockstar, but there were nonexclusive licenses that
22      were given to the buyers.   So when the Rockstar
23      Consortium got these assets, they knew that they
24      had licenses to a certain portion of the portfolio.
25                    With respect to the IP that wasn't
```



1   used, that simply wasn't used in Nortel's

2   businesses, and it was simply sold to Rockstar.

3   And this is what this thing is composed of.

4           Q.   From a valuation perspective, what

5   are the implications of the grouping of these two

6   cylinders you've shown on the screen?

7           A.   Well, from a valuation

8   perspective, at least in the way that I have valued

9   the Nortel IP, what this suggests to me is that

10  since there's already been payments for the shared

11  IP in connection with the business sales, we need

12  to be basically -- and so we've already wiped that

13  out, in a sense.  We need to then look at the IP

14  that was not used and evaluate whether or not there

15  were rights that were associated -- or license

16  rights that were associated with that part of the

17  Rockstar sale or if there were any other

18  intangibles or tangible assets that went along with

19  that sale.

20          Q.   So to return to the language of

21  the valuation question, or I should say the

22  allocation question, how did you go about valuing

23  the interests transferred or surrendered with

24  respect to the residual IP sale?

25          A.   I did the same thing as I did with



1    respect to the business sales.

2              If we turn to the next slide, you can

3    see that I went through the same exercise, if you

4    will, of trying to identify tangible assets,

5    intangible assets that were actually transferred in

6    the Rockstar sale that could be separated.

7              There were no tangible assets, to my

8    knowledge, that were transferred in the Rockstar

9    sale.  There's only a small value of the in-place

10   workforce that were transferred.  There was some

11   20-odd employees that were actually transferred.

12   And that left me with an IP value of $4.4 billion.

13             I then went to evaluate whether or not

14   there were license rights to the remaining IP.  In

15   other words, whether or not there were license

16   rights in the IP that wasn't used in the

17   businesses.  My understanding of the licenses, as

18   we discussed earlier, is that they related to

19   products.

20             And so I didn't allocate any value to

21   the license rights.  And as the owner, the Canadian

22   Debtor would get the remaining 4.4 billion.

23             Q.   So looking at that blue empty box

24   right above the 4.4 billion, which no doubt

25   everybody has noticed --

 Neeson&Associates   W&P

```
 1                  THE CANADIAN COURT:  It should be red.
 2                  MR. RUBY:  Well, I suppose it depends
 3      on your point of view.
 4                  MR. ZELBO:  Or green.
 5                  MR. RUBY:  Or black.  There could be
 6      all kinds of reasons.
 7                  BY MR. RUBY:
 8                  Q.   But what did you do, Mr. Green, if
 9      anything, to look for indications of value related
10      to the licenses in the residual IP?
11                  A.   I did a number of things.  I went
12      to try and see, first off, if there were actually
13      business plans or documents which would be
14      suggestive of any use of the residual IP by the US
15      or EMEA Debtors.  Was there a business that was
16      being planned?  Was there a product?  Is there some
17      connection to the IP that wasn't being used that
18      would enable me to derive cash flows that could
19      then be the basis for a valuation of a license
20      right?
21                  Q.   So let's run through some of those
22      indications you just said you looked for.  Did you
23      find any products being made related to the
24      residual IP?
25                  A.   I didn't.  Not that I was aware
```



1    of, no.

2              Q.    And are you aware of any current

3    or past cash flows related to the licenses in the

4    residual IP?

5              A.    I wasn't.  There is a small number

6    of -- or there was some licenses that had actually

7    been granted by Nortel to its intellectual

8    property, to its patents.  But the amount of the

9    royalties that were being derived were immaterial,

10   really.  They were less than $30 million a year or

11   about $30 million.

12             Q.    Now, are you aware of any cash

13   flow projections related to a Nortel business that

14   you were reasonably confident would result in cash

15   flows related to the licenses in the residual IP?

16             A.    The only cash flow projections

17   that I'm aware of are ones that are actually used

18   by Mr. Kinrich which relate to something called

19   IPCo, which was the company that had been discussed

20   inside of Nortel to actually monetize the

21   portfolio.  Essentially what they were planning on

22   doing was licensing and potentially suing others to

23   obtain licenses to the intellectual property.

24             Q.    And I take it from your answer

25   that you looked also at the IPCo models.



```
 1                    A.   Yes, I did.
 2                    Q.   And was that part of your looking
 3      for indications of value in the IP licenses?
 4                    A.   Yes, it was.  And we'll talk about
 5      this in a few minutes.  But the IPCo models, there
 6      were many models.  They make a whole variety of
 7      assumptions.
 8                    Ultimately, IPCo was never actually
 9      done.  The company never went forward for a variety
10      of different reasons, which I understand relate to
11      financing and also to the sort of speculative
12      nature of what this business was going to be.
13                    A licensing business is very hard to
14      manage and to, essentially, operate with any
15      certainty because so much it has to do with
16      litigation and getting other people to take
17      licenses, so --
18                    Q.   So, Mr. Green, what did you
19      conclude with the appropriateness of using the IPCo
20      models in a valuation of the licenses in the
21      residual IP?
22                    A.   Well, IPCo never operated, unlike
23      the CDMA business or the Enterprise business.  And
24      so, really, IPCo was really a very speculative
25      basis on which to actually try and derive cash
```



```
 1    flows.  There simply wasn't a reliable basis to do
 2    it.
 3              Q.   Jumping to the end of the story a
 4    little bit, was the $4.5 billion that Rockstar paid
 5    for the residual IP an indication that the licenses
 6    in the residual IP had value?
 7              A.   No, not from what I could tell.
 8    What the 4.5 billion represents is whatever
 9    ownership was going to actually be taken by the
10    Rockstar Consortium.  It represents their value.
11    It doesn't represent a license value that would
12    have been under the MRDA and attributable to the US
13    and the EMEA Debtors.
14              Q.   So a few moments ago we put up a
15    slide that summarized the business sale
16    allocations.  If we can switch to the next one.  Is
17    this, again, a summary comparing your allocation
18    with respect to the residual IP sale to that of
19    Mr. Kinrich and Mr. Huffard and Mr. Malackowski?
20              A.   Yes, it is.
21              Q.   Can you briefly explain this chart
22    to the Courts.
23              A.   Yes, I can.  What this chart
24    demonstrates is that there are substantially
25    different allocation results among the -- between
```



```
 1    my report, the Kinrich, and the Huffard and

 2    Malackowski reports.

 3              And you can see that the US Debtor in

 4    the Kinrich report gets about $3.3 billion of the

 5    Rockstar sale; the Huffard and Malackowski reports

 6    give about a billion seven to Canada and about

 7    2 billion to the US of the Rockstar sale; and both

 8    Kinrich and the Huffard and Malackowski reports

 9    give about 700 million to EMEA.

10              So you can see there's wide variety in

11    comparison to the way that I have done this, where

12    I have allocated essentially the entire value to

13    the Canadian Debtor.

14              Q.   Now, a few minutes ago, Mr. Green,

15    you talked to us about your alternative valuation

16    for the business sales.  Do you also have an

17    alternative valuation for the residual IP sale?

18              A.   Yes, I do.

19              Q.   And for the benefit of the Courts,

20    where would they find reference to that in your

21    reports?

22              A.   This would be in Appendix P, which

23    is part of my supplemental report.

24              Q.   So I see we've got on the screen a

25    bit of a summary of that alternative residual IP
```



```
 1   approach.  Can you just take the Courts through
 2   what this approach entails.
 3              A.   Sure.  As I mentioned earlier, the
 4   projections for the IPCo were fairly broad in terms
 5   of what the expectations were for the business, and
 6   they were very different.
 7              And essentially what happened is the
 8   company, using the information from Global IP and
 9   some of its own internal forecasting, came up with
10   projections for an operating IPCo, which included
11   the revenues as well as the expenses of doing so.
12   And then Lazard came through and actually created
13   those -- turned those cash flows essentially into
14   valuations.
15              And what you're seeing here is a slice
16   of a valuation that was actually done by Lazard,
17   where they took the cash flows that had been
18   projected by Nortel and Global IP as a business for
19   IPCo and turned them into, well, what is this
20   business really going to be worth to us?
21              And what you can see is there is a
22   broad range of values.  There's $2.7 billion worth
23   of value in the upper right-hand corner and there's
24   $5.61 million -- or $561 million -- excuse me -- of
25   value in the lower left-hand corner.
```



```
 1                    And the differences in those values --
 2      and that's a five-times difference -- are related
 3      to the adjustments that appear on the column that's
 4      in the row that's above the numbers, the
 5      probability adjustment for revenue, and the
 6      discount rate.
 7                    Now, the probability adjustment for
 8      revenue effectively reflects what the certainty is
 9      of whether or not IPCo is going to be able to win
10      at litigation, whether it's going to be able to
11      actually license the technologies, the outcomes
12      that it's going to get from actually its operation.
13                    And it's suggesting that there is a
14      possibility of every litigation working out their
15      way, every case actually -- every license that they
16      try and negotiate actually going their way.  But
17      then there's also a probability that maybe that
18      only happens 60 percent of the time.  So it's a
19      broad range of outcome with respect to probability
20      for this actually occurring.
21                    And then the cash flows are discounted
22      using a discount rate of between 25 and 45 percent,
23      which is also a very broad range.  Usually a
24      start-up business is going to be valued with
25      something on the order of a 45 percent discount
```



1    rate.

2                    And as you get something that is more

3    and more certain, say, for example, a company

4    that's selling products at a third round of venture

5    capital financing perhaps, that would be maybe

6    around 35 percent for a discount rate.  And then

7    you might have a 25 percent discount rate

8    applicable to a relatively small business that is

9    actually operating.

10                   But the whole point is that the

11   discount rate is effectively calculating or

12   considering the risk that any of this is actually

13   going to occur.

14                   And so these adjustments are

15   effectively what Lazard did in order to be able to

16   present to Nortel and its management the range of

17   possibilities for value that would come back to the

18   company from the actual operation of IPCo.

19                   This is also one of the reasons why I

20   sort of thought that -- why I thought that IPCo was

21   not really a reliable basis for determining the

22   value of license rights in this case.

23                   Q.   Did any of the other experts

24   consider the IPCo-type model?

25                   A.   Well, yes.  Mr. Kinrich, actually,



```
 1    is using the IPCo model in his analysis for the
 2    allocation of the residual IP sale.  And what he's
 3    done, essentially, is he's applied a 12 percent
 4    discount rate to these numbers, to a very late-
 5    stage projection, assumed the 100 percent certainty
 6    that all of this would actually play out, in order
 7    to be able to arrive at a $4.5 billion value for
 8    the residual IP, which is consistent with what the
 9    sale was.  And from that, he's essentially
10    allocated based on where the cash flows result from
11    the licensing.
12                    Q.   Does assuming 100 percent chance
13    of success in litigation put all these people out
14    of work?  We don't need lawyers anymore.
15                    A.   I don't want to speculate on that,
16    but it might, sure.
17                    Q.   Did Mr. Huffard or Mr. Malackowski
18    do anything similar to what you've just described
19    with respect to the IPCo model?
20                    A.   Well, they have a license
21    approach, which is really not the one that I
22    believe Mr. Malackowski testified as his favored
23    approach.  What they used, really, is a
24    contribution approach, where they took the
25    $4.5 billion that was essentially coming from the
```



1    residual sale and allocated based on the relative

2    R&D contribution.

3              So not really.  They considered it in

4    their license approach, but not in the approach

5    that I think was more favored in this courtroom.

6              Q.   Just to deal with one more point

7    related to these slides.  The discounts rates on

8    the least, 25, 35 and 45 on this slide, where did

9    they come from?  Or maybe I should ask, who came up

10   with those?

11             A.   These actually came from Lazard.

12   They were part of Lazard's analysis.

13             Q.   And in Mr. Kinrich's analysis, can

14   you remind us what the discount rate he used was?

15             A.   It's effectively 12 percent.

16             Q.   Do you have a view about whether

17   12 percent is an appropriate or not discount rate

18   for this kind of analysis?

19             A.   Well, a 12 percent discount rate

20   would really apply to an operating business which

21   has a long history and some certainty to it.  Most

22   smaller business or businesses that are start-ups

23   typically have much higher discount rates.

24             Mr. Malackowski, in his license

25   analysis, uses -- and even in his analysis of the



1    relief-from-royalty uses a 30 percent discount

2    rate, which is consistent with something I did.

3                    Q.    Now, if we turn to the next slide,

4    please, this also concerns your alternative

5    residual IP approach?

6                    A.    Yes.   And this is really an

7    analysis that is based on certain assumptions,

8    which I really listed in the lower right-hand

9    corner here.   It assumes, obviously, that Nortel

10   could actually have successfully operated an IPCo,

11   that what didn't happen actually did happen, and

12   that the MRDA actually allows the US and EMEA to

13   participate in the operating profits -- it's not

14   clear whether or not those are part of the

15   rights -- and that the results of the operations

16   would be shared based on the RPSM.

17                    So it's assuming that an operating

18   business existed, that there were rights under

19   these patents which were not actually being used by

20   any product, and that they would fall under the RPS

21   splits.

22                    And so to apply how you would use this

23   analysis or this allocation, you remember on the

24   previous slide, the middle number, the

25   1,093,000,000 was highlighted, it's an example of



 1    how this might be done.  But the 1,093,000,000 is

 2    the dead middle of what Lazard had calculated here.

 3             And what one could do is say, well, the

 4    value of IPCo is the present value of all of the

 5    cash flows that would result from licensing.

 6             So that 1,093,000,000 essentially is

 7    cash flow, the present value of the cash flows.

 8    And one could then say, well, look, the value of

 9    the license rights that might be related to IPCo

10    from -- of the US and EMEA Debtors, one could apply

11    the RPS splits, which I've done here:  38 percent

12    for the US Debtor, 11 percent for the EMEA Debtor.

13    You can see it results in 420 million as the value

14    of the license rights that the US Debtors would

15    get; 127 million would be the value of the license

16    rights to the EMEA Debtors; and the residual would

17    still wind up going to the owner, Canada.  And that

18    would be 3.9 million in this alternative analysis.

19             Q.   So, Mr. Green, just to give the

20    Courts a fully rounded picture, if we can take you

21    back to the previous slide.

22             If you used the number in the top

23    right-hand corner, roughly 2.7 billion instead of

24    the 1 billion you used in your example on the next

25    slide, roughly, what effect would that have on your



1   alternative calculation?

2           A.   What would that would do is

3   essentially -- the 2.7 billion, just to make math

4   easy, is roughly three times the 1,093,000,000.  So

5   the value of the US Debtors' license rights would

6   increase by three times -- I believe that would

7   result in about 1.2 billion -- and the value of the

8   EMEA Debtors' license rights would increase by

9   three times to about 350, 380 million.

10          Q.   So to just step back from this

11  alternative model for a moment, why did you not use

12  the alternative model that's on the screen and

13  instead use the primary approach you described

14  earlier?

15          A.   Well, this approach, as you can

16  see, relies upon certain assumptions with respect

17  to the actual operation of IPCo and what would have

18  happened with it.  It also assumes that there would

19  be some rights by the US and EMEA Debtors to use --

20  to these cash flows that are coming from -- that

21  aren't coming from products.  So it assumes

22  somewhat of a change in the MRDA.

23          But also, again, this is very

24  speculative.  You could see that the value of IPCo

25  ranges, even on the charts that I just showed you,



    1    from 500 million to 2.7 billion.  That's a

    2    significant range.

    3              And so it just seemed to me to be very

    4    speculative, as I mentioned, and actually never

    5    happened under these Nortel's actually operation.

    6              Q.    Can we go two slides forward,

    7    please.

    8              So just to try and bring this all

    9    together, can you just take us through this slide,

   10    which goes back to your primary valuation?

   11              A.    Sure.  What this slide does is it

   12    summarizes the allocation based on -- among the US

   13    and EMEA Debtors of the proceeds from the business

   14    sales and the residual IP sale.

   15              And what you can see is that, using the

   16    analysis where you actually value the tangibles and

   17    the tangible assets, the workforce and so forth, as

   18    well as providing value to the license rights that

   19    the US and EMEA Debtors had, the Canadian Debtor

   20    would wind up with $6 billion, primarily because,

   21    at least in my analysis, there is no value to the

   22    license rights related to the residual IP sale

   23    because there's no products that are being made;

   24    the US Debtor would get about a billion dollars;

   25    and the EMEA Debtor would get about $300 million of



```
1    the total proceeds from both sales.

2              MR. RUBY:  Thank you, Mr. Green,

3    Justice Newbould, and Judge Gross.

4              THE US COURT:  Mr. Zelbo.

5              MR. ZELBO:  I'm happy to proceed, happy

6    to have lunch, whatever the Courts prefer.

7              THE US COURT:  Why don't we take a

8    lunch recess now, and we'll be back at --

9              THE CANADIAN COURT:  I agree.

10             THE US COURT:  -- quarter to 2:00.  All

11   right.  Thank you.

12             MR. ZELBO:  Thank you, Your Honor.

13   -- LUNCHEON RECESS TAKEN AT 12:38 P.M.

14   -- UPON RESUMING AT 1:52 P.M.

15             THE US COURT:  Thank you, all.  Please

16   be seated.

17             Justice Newbould, good afternoon.

18             THE CANADIAN COURT:  Judge Gross, good

19   afternoon.

20             THE WITNESS:  Before we get started, I

21   wanted to take care of the homework assignment that

22   I had from this morning from Justice Newbould, if

23   you don't mind --

24             THE US COURT:  Oh, yes.

25             THE WITNESS:  -- if you don't mind.
```



```
 1                    THE US COURT:  No.
 2                    THE WITNESS:  Justice Newbould,
 3     actually, as with so many things in life, the
 4     answer was right in front of us.
 5                    If you were to turn to page 12 of the
 6     MRDA --
 7                    THE CANADIAN COURT:  Yes, I have it.
 8     14(a).
 9                    THE WITNESS:  Yes, under 14(a), it says
10     that the agreement cannot be assigned by any
11     participant without the written consent --
12                    THE CANADIAN COURT:  Well, I assumed
13     that's it was, but I wanted to -- okay, thank you
14     very much.
15     Okay.  Thank you, Mr. Green.
16                    THE WITNESS:  You are very welcome.
17                    THE US COURT:  All right.  Are we ready
18     to proceed?
19                    Mr. Zelbo, good afternoon.
20                    MR. ZELBO:  Good afternoon,
21     Judge Gross.  Good afternoon, Justice Newbould.  If
22     it pleases the Courts, I will commence the
23     cross-examination of Mr. Green.
24     CROSS-EXAMINATION BY MR. ZELBO:
25                    Q.   Good afternoon,
```



1    Mr. Green.

2              A.   Good afternoon. Mr. Zelbo.

3              Q.   The first step in your allocation

4    analysis is to identify the property interests of

5    each party; right?

6              A.   That's correct.

7              Q.   Okay.  And you say in your slide

8    No. 4 the MRDA delineated the IP property

9    interests.

10             A.   That's right.

11             Q.   And that's a big issue here;

12   right?  You know that?

13             A.   Yes.

14             Q.   Okay.  And you testified on

15   direct, I believe, that you determined in your own

16   mind the metes and bounds, I think are the words

17   you've used, of the IP property interests in the

18   MRDA; right?

19             A.   From the -- for the purpose of

20   doing the valuation, yes.

21             Q.   Sure.  I just want to clear up

22   some confusion in my mind at least -- it may not be

23   in yours -- just confusion in my mind as to what,

24   whether you're interpreting, you're given

25   assumptions, you're making assumptions, you're



1    following instructions of counsel, because it's

2    important for me to understand where you're coming

3    from on your valuation analysis.  Okay?  So we're

4    just going to walk through this briefly, I hope.

5              Now, in your initial report submitted

6    in this case, you on several occasions -- and we

7    can turn to it -- refer to, quote, "assumptions"

8    that you were asked to make about the scope of the

9    license.

10             Do you remember that?

11             A.   Yes.

12             Q.   And maybe we can just turn to one

13   so we have it.  On Page 6 of your opening report --

14   let me get that out myself.  It's the first bullet

15   point there amongst the three bullets.

16             Can you make it bigger for me?  Thanks.

17   Just the first bullet really.

18             So in the sentence before that we just

19   lost because of the blowing-up, like I asked it

20   says:

21                  "In this case, I concluded that

22                  these licenses had no material

23                  value.  I have reached this

24                  conclusion in light of" -- and then

25                  let's go to the first bullet, please



```
1                    -- "the assumptions that I have been

2                    asked to make about the scope of the

3                    licenses."

4                    Do you see that?

5              A.   Yes, I do.

6              Q.   So when I read that, I thought you

7    had been given assumptions from counsel.  And you

8    say this several other times in your report.  You

9    recall that; right?

10             A.   There are other points where the

11   word "assumption" appears, yes.

12             Q.   Well, not just the word

13   "assumption."  Let's go to page 16 of your report,

14   please, near the bottom of page 16, the "however."

15                  "However, because the IP in

16                  question either was not used in any

17                  operating business or its value had

18                  already been realized in the

19                  business sales" -- we need to go to

20                  the next page -- "and given the

21                  meaning of the terms of the licenses

22                  which I have been asked to assume."

23                  Do you see that that?

24             A.   Yes.

25             Q.   Now, at your deposition you may
```



1    recall there was a lot of questioning by three

2    different sets of counsel.  I didn't have the

3    pleasure, but others did -- trying to find out who

4    gave you assumptions with respect to interpreting

5    the MRDA, knowing that you're not a lawyer, and

6    we're trying to figure out where these assumptions

7    come from.

8             And do you recall being asked --

9    specifically saying, "No one has given me a

10   specific set of assumptions regarding the scope of

11   the licenses" and basically saying the passages we

12   just read were inartfully written.  Do you remember

13   that?

14            A.   I do remember that.

15            Q.   And you were quite insistent at

16   your deposition, were you not, that nobody gave you

17   a set of assumptions.  Instead, Mr. Green, you said

18   that you read the MRDA on your own, and then you

19   also said, however, that if you had questions, you

20   would ask counsel for the Monitor.

21            Do you remember that?

22            A.   Yes, I do.

23            Q.   And you said that you relied on

24   the answers you were given from the Monitor to the

25   questions you had about interpreting the MRDA;



```
 1   right?

 2                  A.   Yes.

 3                  Q.   Do you remember that at that

 4   moment when you said that, my colleague Mr. Luft,

 5   sitting to my right, asked you:

 6                       "Okay.  You're telling me you

 7                       read the MRDA.  Your report was

 8                       inartfully drafted about

 9                       assumptions.  Okay.  But you're

10                       saying if you had questions about

11                       interpreting the MRDA, you asked

12                       counsel and you relied on it.  Tell

13                       me what counsel told you if you

14                       relied on it.  I need to know the

15                       basis of your opinion."

16                  Do you remember him asking you to tell

17   you about that?

18                  A.   Yes, I do.

19                  Q.   And counsel for the Monitor

20   refused to let you testify to that.  They

21   instructed you not to respond.  Do you remember

22   that?

23                  A.   Yes, I do.

24                  Q.   And they instructed you not to

25   respond because they said, Well, these aren't
```



```
 1   assumptions you were given.  These are just things
 2   we talked to you about that you relied on.  And so
 3   under the stipulation, according to their reading
 4   in this case, we're not entitled to know what you
 5   relied on from counsel.
 6                 You remember that colloquy?
 7                 A.   I do.
 8                 Q.   So at the end of your deposition
 9   we're in a situation where you have said, "My
10   report was inartful, but I read the MRDA.  If I had
11   questions, I asked counsel.  I relied on the
12   answers, but I can't tell you what they told me."
13                 Now, are you aware that after your
14   deposition, the Monitor filed a brief in this case
15   moving to strike the testimony of certain other
16   witnesses in this case.
17                 For the Courts, it's the motion to
18   strike Bereskin and Stratton reports.
19                 And the Monitor's brief on
20   paragraph 17 -- we don't have to pull it.  It's
21   fine.  You can if you want.
22                      "To conduct his valuation
23                      analysis, Mr. Green relied on
24                      assumptions that the movants
25                      provided and that reflected the
```



```
 1              movants' allocation position.  At no

 2              point" -- to paragraph 17 -- "did

 3              Mr. Green provide a legal analysis

 4              of the MRDA or a view as to custom

 5              and practice with respect to the

 6              MRDA."

 7              So now we're hearing in this chronology

 8   as we march through that you did rely on

 9   assumptions that the movant provided and that

10   reflected the movant's allocation position.  Were?

11   You aware that the Monitor said that in a brief.

12              A.   No, I wasn't.  I don't think it's

13   inconsistent with what I told you at my deposition,

14   however.

15              Q.   Then on opening statement -- and

16   this is the last one, because I just want to get to

17   the bottom of this -- at opening statement counsel

18   for the Monitor said -- and this is at trial

19   transcript page 459, line 13:

20              "He," meaning you, "then looks

21              at the licenses that were

22              surrendered, and given the terms of

23              the licenses which he's asked to

24              assume, it's not the valuator's job

25              to do that, it's ours, if the
```



```
 1                    licenses are interpreted in the

 2                    manner that the Canadians contend

 3                    for, what he has to be looked at --

 4                    what the value were the -- was being

 5                    given up when the licenses were

 6                    surrendered."

 7                    Do you see that?

 8                    A.   Yes.

 9                    Q.   The Monitor's counsel is telling

10      the Courts that it wasn't your job to interpret the

11      MRDA; right?  He's -- the question you were asked

12      is, "Mr. Green, if the license is interpreted in

13      the way we contend" -- presumably he told you,

14      Monitor's counsel told you what they contended --

15      "then what's the value?"  That's what was being

16      said at opening statements.

17                    So Mr. Green, I don't know how much I

18      carried away, except that I just need to know the

19      actual state of affairs so I can do the cross here.

20                    So just tell me which is it.  Is it the

21      Monitor's counsel, as they said in closing, told

22      you what the Canadians contend and you were asked

23      to assume it, or is it that you interpret it on

24      your own, or thirdly, you relied on counsel but you

25      won't tell us what they said?  I just want to know
```



 1   which it is.

 2                   A.   What I did and what I explained at

 3   my deposition is that I was provided with the

 4   documents:  The MRDA, people's -- various entities'

 5   positions, all kind of documents.  As a valuator,

 6   someone who values license rights and contracts on

 7   a regular basis, what I did is I read the license

 8   and understood its terms from the point of view of

 9   somebody who is a valuator.

10                   I'm not a lawyer.  I'm not certainly

11   interpreting the metes and bounds of the contract,

12   these agreements, the way that the judges certainly

13   will do, and it is certainly their purview to do

14   that.

15                   But what I did is I reviewed those

16   documents.  To the extent that there was issues

17   about what they meant or their interpretation, I

18   would have asked counsel for the Monitor.

19                   I think with regard to assumptions,

20   there are assumptions listed in Exhibit A to my

21   report.  Among those major assumptions are things

22   like the MRDA is still in place and we still have

23   to contend with its terms.  So I think that when

24   we're looking about the assumptions that I have

25   been asked to make, those relate to things that



 1   are, for example, in Exhibit A to my report.

 2              I've read the documents and evaluated

 3   them as someone who is going to value a license

 4   right, consistent with my experience in doing so.

 5   I'm certainly not interpreting the legal terms of

 6   it other than to be able to evaluate their effects

 7   on the cash flow and the values of the licenses.

 8              Q.   I don't need to go on with this,

 9   Mr. Green.  Just to be the clear, the only

10   assumption in Exhibit A of your six major

11   assumptions related to the MRDA is that it's still

12   in effect.  And your report is replete with

13   references to assumptions that you were asked to

14   make regarding the scope of the licenses.  But I

15   think I hear what you're saying.

16              So just one last question.

17              A.   Mr. Zelbo, just to answer that

18   point, the scope of the license that I was

19   understanding here was that the scope -- that the

20   license was still in place and that I needed to

21   value things within the scope of that license.  I'm

22   not sure that there's been any inconsistency here.

23              Q.   So in your report when you said

24   you were asked to assume about the scope of the

25   license, you just meant the MRDA was still in



1   effect?  That's your testimony?

2              A.   Right, because the plain reading

3   of the MRDA from a valuation perspective told me

4   what the terms were that were important.

5              Q.   Now, Monitor's counsel at opening

6   said the job they asked you to do is if the

7   licenses are interpreted in the manner that

8   Canadian counsel contend, what's the value.

9              So I take it when you were reading the

10  MRDA, you were not unaware of the manner the

11  Canadians contend the MRDA should be interpreted?

12  You knew about that?

13             A.   Well, certainly I had read the

14  allocation positions of all of the Debtors in this

15  case, sure.

16             Q.   Fair market value of what was sold

17  in the Rockstar sale was $4.5 billion; right?

18             A.   I think we can all agree on that,

19  yes.

20             Q.   Have you analyzed what portion of

21  that $4.5 billion proceeds was due to the transfer

22  of the full economic rights to exploit the NN

23  technology in the United States?

24             A.   I don't mean to be difficult.  I

25  don't really understand your question.



1               Q.   I can ask it again.

2               A.   I really truly don't understand

3     it.

4               Q.   Sure.  $4.5 billion is the fair

5     market value; right?

6               A.   Sure.

7               Q.   You didn't -- more simply, you

8     didn't determine what portion of that $4.5 billion

9     was due to the transfer of the full economic rights

10    to exploit the NN technology in the United States?

11              A.   To my knowledge, for purposes of

12    doing my valuation, there were no rights applicable

13    to the United States with respect to the NN

14    technology in that $4.5 billion that was received

15    as the proceeds from the sale, the way that I

16    understand the arrangements among the parties.

17              Q.   So when Rockstar paid $4.5 billion

18    for this patent portfolio, they didn't acquire full

19    economic rights to exploit the NN technology in the

20    United States?  Because if that's true, we better

21    call up their lawyers, because they've brought a

22    really big lawsuit in the United States.

23              A.   So your question is can the

24    Rockstar Consortium actually exploit the patents

25    and what it acquired in the US?  Can they license



```
 1   it --
 2                 Q.   No, sir.
 3                 A.    -- and sue on it?  Is that your
 4   question?
 5                 Q.   No, sir, it's not, because I know
 6   you're not a lawyer, and I don't want to ask you
 7   questions about legal standing.
 8                 What I'm trying to ask you -- I'm
 9   trying to respond to what you just said.  And I
10   will -- are you telling --
11                 Yes or no:  When Rockstar got the
12   patent portfolio, did it receive full economic
13   rights to the NN technology with respect to the
14   United States market?  Can you answer that?
15                 A.   My understanding is that the
16   Rockstar Consortium bought the portfolio and the
17   rights of ownership.  If that is somehow construed
18   in your economic benefit question, then yes, that's
19   what my understanding is.
20                 Q.   Okay.  So all I'm asking you is,
21   did you separately value what portion of the
22   4.5 billion from the Rockstar sale was due to the
23   transfer -- okay -- to Rockstar of all the rights
24   with respect to the NN technology in the United
25   States?  Can we just agree you didn't do it that
```



```
1    way?

2                   A.   I was going to say that what I did

3    is I valued -- I looked at the license rights, the

4    value of the license rights, and what was actually

5    owned by the US and EMEA and Canada, and concluded

6    that all of the license rights, all the ownership

7    rights were buried in -- were held by Canada,

8    because there were no rights that were held by the

9    US and EMEA through a license.

10                  Q.   Well --

11                  A.   So I didn't do it that way, no.

12                  Q.   Okay.  You do understand my

13   question was putting aside who owns the full

14   economic rights, who owned before the Rockstar sale

15   the full economic rights to the patent portfolio in

16   the United States.  My question was, did you figure

17   out what portion of the 4.5 billion was due to the

18   transfer rights, and you haven't.  I think I've

19   gotten your answer; right?  You haven't.

20                  THE CANADIAN COURT:  He just said he

21   hadn't.

22                  MR. ZELBO:  Okay, that's fine.  Thank

23   you.

24                  BY MR. ZELBO:

25                  Q.   Now, as part of your analysis of
```



```
1    your allocation with respect to Rockstar -- we're
2    going to stick to that for a moment, all right? --
3    you conclude that NNI and the EMEA Debtors'
4    licenses did not include rights to patents not used
5    in any of their operating businesses under the
6    MRDA; right?
7              A.   I think it's a bit broader than
8    used in the business.  But as the term is applied
9    in the MRDA, that's correct.
10             Q.   I can pull up your reports.  It's
11   a quote from your reports.  Do you agree with me?
12             A.   Yes, I do.
13             Q.   Now, if you're wrong about that --
14   right? -- if you're wrong about that and NNI and
15   the EMEA Debtors did have rights -- right? -- did
16   have rights with respect to patents not used in the
17   businesses, your analysis would be wrong?  At least
18   your first analysis would be wrong; right?
19             A.   Right.  I think we would be at
20   Exhibit P.
21             Q.   You think we'd be at Exhibit P.
22   We'll talk about Exhibit P later.  But your
23   principal analysis, the one in your initial report
24   would be wrong; right?
25             A.   Well, it would be inconsistent
```



1   with that interpretation of rights.  I haven't

2   valued some subset of rights under the licenses in

3   my initial report because my understanding is the

4   licenses don't apply to -- there are no products as

5   defined in the MRDA.

6           Q.   But then if that's wrong, you said

7   something about we'd be in Appendix P?  Is that

8   what you're saying?

9           A.   Yeah, then the alternative would

10  be to look at the analysis that was done in

11  Appendix P.

12          Q.   We'll talk about that later.

13          Appendix P wasn't in your initial

14  report; right?

15          A.   No, it wasn't.

16          Q.   It was in your rebuttal report;

17  right?

18          A.   That's correct.

19          Q.   And the only time it's mentioned

20  in your rebuttal report is in a footnote; right?

21  Footnote 30, and then in the appendix; right?

22          A.   Right.

23          Q.   Can you pull up the MRDA, please.

24  Let's -- I just want to take -- just pull up

25  Section 4(e) for a minute.



```
 1                    Now, you see 4(e) -- I know you're

 2      familiar with this term -- "Licensed Participants,"

 3      and you recognize that to be NNI and the EMEA

 4      Debtors at issue here; right?

 5                    A.   Yes.

 6                    Q.   I can wait for you.  I'm sorry.  I

 7      see you're still turning pages.  Take your time.

 8                    A.   All right.  I'm with you.

 9                    Q.   So I was just asking, "Licensed

10      Participants," that's NNI and the EMEA Debtors;

11      right?

12                    A.   Yes.

13                    Q.   -- "have the right to assert

14                         actions and recover damages or other

15                         remedies in their respective

16                         territories from infringement or

17                         misappropriation of NN technology by

18                         others."

19                         Right?

20                    A.   Yes.

21                    Q.   So to put that in plain English,

22      NNI has the right to bring actions against

23      infringers of NN technology in the United States;

24      right?

25                    A.   That's my understanding, yes.
```



1         Q.   Only in a courtroom would my last
2    sentence have been plain English.
3              Now, you're familiar with the term NN
4    technology; right?
5              THE CANADIAN COURT:  I'd like to see
6    you outside the courtroom then.
7              MR. ZELBO:  You don't want to do that.
8              BY MR. ZELBO:
9         Q.   Are you familiar with the term "NN
10   technology," sir?
11             A.   I am.  As it's defined in the
12   MRDA, yes.
13             Q.   Right.  And you understood, for
14   purposes of your analysis, that all the patents
15   sold to Rockstar are included within the meaning of
16   "NN technology"; right?
17             A.   As I understand it, yes.
18             Q.   Okay.  So if one reads Article
19   4(e), NNI has the right to bring actions against
20   infringers of all the patents in the Rockstar --
21   that were sold in Rockstar in the United States,
22   and NNUK has a similar right in England and so
23   forth; right?  That's one of the rights?
24             A.   That is described in the MRDA,
25   yes.  I agree with you.



1                    Q.   So if the Courts find that NNI
2    continued to have enforcement rights under Article
3    4(e) with respect to all patents sold in the
4    Rockstar sale, whether they were used before or
5    ever in a line of business or not, the Courts
6    conclude NNI has that right, your analysis would
7    not take that into account and would ascribe no
8    value to that right; correct?
9                    A.   No, I disagree with you.  The --
10   to the extent that NNI or any of the Debtors had
11   actually ever instituted a litigation, actually
12   received revenues or some recoveries, those would
13   have been included essentially in the revenues or
14   the cash flows that I calculated in doing the
15   license valuations.  So to the extent that those
16   rights had ever actually been used or could
17   possibly have been used in the future, they would
18   have been included in the projections.
19                    So I disagree with you.  They've been
20   properly valued in my analysis.
21                    Q.   Let me ask it a different way,
22   Mr. Green; okay?  Before the Rockstar sale but
23   after the sales of all the lines of business --
24   okay? -- Company X starts using -- just cheats,
25   starts using a Nortel patent in the United States,



1    starts making products with Nortel patents; okay?

2    And Nortel is not using that patent.  It's just

3    sitting there.  They're not making a product with

4    it.  In fact, they've sold off their lines of

5    businesses.

6            You agree with me NNI could bring an

7    action against that party; right?

8            A.   I don't know.  The point that

9    you're talking about I think calls for a legal

10   conclusion.

11           As I understand it, the parties have

12   terminated their license rights.  It would sort of

13   depend on what the patents were.  If you're just

14   talking about what was in Rockstar, there's -- as

15   we talked about earlier, there were some patents

16   that were related to the -- that were common, that

17   were part of the business.

18           I mean, I think that's a very

19   complicated question.  It's sort of beyond the

20   scope of what my analysis is and would be up to the

21   purview of the judges to evaluate.

22           Q.   Let's talk about the patents not

23   used in any business sale.  There was no license

24   termination prior to the Rockstar sale; right?

25           A.    In other words, the gray slice of



1    the diagram that I showed earlier?

2             Q.   I don't know what diagram you

3    showed earlier, but maybe you can answer my

4    question.  My question simply is with respect to

5    patents not used in a business -- okay? -- there

6    was no license termination prior to the Rockstar

7    deal; right?

8             A.   So the slice that was not used.

9             Q.   Sure.  What's the answer?

10            A.   Okay.  It is truly -- I think this

11   might be a standing question.

12            Q.   No, no, no.

13            A.   This is a question that I

14   certainly -- it's not in my purview really to

15   answer.

16            Q.   Let me --

17            A.   I don't know if NNI could have

18   actually brought the suit.  It sort of depends on

19   the circumstances of the case.  It depends on the

20   circumstances of the licensing.  It's not clear to

21   me where those rights stand or if they're

22   independent of NNL.

23            Q.   You're getting ahead of me or

24   behind me.  I'm not sure.  But the exact question

25   I'm asking -- right? -- very simple question.  I



```
 1    think we can agree on it.  I'm honestly trying to
 2    be straightforward with you, Mr. Green.  I just
 3    want the record to be clear.
 4              With respect to patents not used in
 5    lines of business, we can all agree there was no
 6    license termination prior to the Rockstar sale;
 7    right?
 8              A.   I think that's true.
 9              Q.   And the question that you're
10    unable to answer because it's a legal question --
11    and I actually agree with you on that -- the
12    question that you're unable to answer, just to be
13    clear, is if somebody came along and started
14    infringing on that patent before the Rockstar sale,
15    the question I had asked you is could NNI bring a
16    lawsuit, recover damages, get a royalty rate, get
17    an injunction, and you said you couldn't answer
18    that because that's a legal question.  And I agree
19    with you on that.  That's common ground, I think.
20    That's not a question that you could answer; right?
21              A.   I don't think it's a question that
22    I should be answering in light of the circumstances
23    we find ourselves in.
24              Q.   Now, you understand that the MRDA
25    also had a sublicensing right for the licensed
```



```
 1   participants?

 2              A.   Yes, I do understand that.

 3              Q.   And, in fact, I believe you

 4   testified that you understood one of the purposes

 5   of the sublicensing right was to enable NNI or the

 6   other licensed participants, in case they brought

 7   an action for infringement as part of a judgment in

 8   that case, for example, or otherwise resolved that

 9   case, to extend a sublicense to the infringer;

10   right?

11              A.   That was something we discussed at

12   my deposition, yes.

13              Q.   So at least as you understand the

14   sublicense right, at a minimum, if NNI has an

15   enforcement right, it has a sublicense right

16   consistent with that enforcement right,

17   effectively; right?

18              A.   Again, you might be asking for a

19   legal conclusion.

20              Q.   But that was your understanding?

21              A.   But that was my understanding.  I

22   mean, I looked at the sublicense right as an

23   ability, as it says in the MRDA, to make and have

24   made and use -- have products made for the company

25   is really what it was effective for.  But it could
```



```
 1    have these other implications, so I agree with you.
 2                 Q.    In your view, it could have two
 3    different things.  You could do a sublicense to a
 4    contract manufacturer, and it could be coextensive
 5    with the enforcement right?
 6                 A.    It could be.  Again, the second
 7    part of your question I think calls for a legal
 8    conclusion.
 9                 Q.    I understand.  But that's what you
10    told us at your deposition you understood; right?
11                 A.    Sure.
12                 Q.    Okay.  I just want you to assume
13    with me, because the Courts are going to decide
14    what the MRDA means, not me, not you -- but let's
15    assume the Courts conclude -- okay? -- that NNI had
16    an unlimited sublicense right; okay?  That at any
17    time prior to the closing of the Rockstar sale, NNI
18    could sublicense any or all of NN technology to a
19    third party and give them the full rights to
20    exploit NN technology in the United States.  I just
21    want you to assume that.  Okay?
22                 A.    Okay.
23                 Q.    If the Courts find that, your
24    analysis would not take that into account?  You
25    would ascribe no value to that in your analysis;
```



```
 1   right?
 2             A.    No.  I think that that would be
 3   limited by the analysis in Appendix P.
 4             Q.    Okay.  Then we'd be in Appendix P?
 5             A.    Correct.
 6             Q.    Okay.  We will get there, I
 7   promise.  Even though you only did it in a
 8   footnote, we're going to get there anyway.
 9             Even under your reading and the
10   Monitor's reading of the license rights, NNI had
11   the exclusive right to make and sell products in
12   the United States -- right? -- using NN technology?
13             A.    Using NN technology, yes, I think
14   that's fair.  Under the MRDA, yes.
15             Q.    Yeah.  That's not a right that NNL
16   had.  They gave it to NNI.
17             A.    Again, I think that's correct for
18   purposes of my analysis.  That's right.
19             Q.    Now, you'll agree with me that a
20   party can't transfer a right it doesn't have;
21   right?  That's common ground, isn't it?
22             A.    I'm assuming that's true.  I'm not
23   a lawyer.  I believe that's my understanding,
24   however.
25             Q.    Why don't you -- that's fine.
```



1    I'll let you have that one.  And we'll just assume

2    it's true, that you can't transfer a right you

3    don't have.  Okay?

4                    A.   Sure.

5                    Q.   If that's true, if that's a fair

6    legal proposition, then NNL had absolutely no right

7    or ability to give any third party the right to

8    make or sell products in the United States; isn't

9    that right?

10                   A.   NNL, as I understand it, was the

11   owner of the technology.  It had licensed rights to

12   make and sell products using that technology to NNI

13   in the United States, which was the NNI territory.

14                   Q.   Sure.

15                   A.   So I agree with you that at least

16   I think on that analysis, that NNI -- NNL, rather,

17   couldn't make and sell products in the US.  It had

18   licensed away that right.

19                   Q.   Well, we already had that done.  I

20   was actually going to the next leg of this, which

21   is, not only can NNL not make and sell products in

22   the United States -- we all agree on that -- but

23   NNL couldn't give any third party the right to make

24   or sell products in the United States as long as

25   NNI's exclusive license was in existence?



```
 1                      A.   It may call for a legal
 2   conclusion.  As a basic understanding, I think
 3   that's probably true, too, sure.
 4                      Q.   Now, we've talked about the
 5   patents a bit that weren't -- we've talked about
 6   the patents that weren't -- that you claimed
 7   weren't being used in any line of business; right?
 8                      I want to talk about now this category
 9   of patents sold in Rockstar that were used in
10   multiple line of businesses, but because they
11   weren't predominantly used in one, the patents
12   ended up staying with Nortel.  Okay?  You know what
13   I'm talking about?
14                      A.   Yes, I do.
15                      Q.   Now, on those, you understand that
16   NNI and the EMEA Debtors had licenses, exclusive
17   licenses with respect to those patents; right?  The
18   patents that remained with Nortel, they had
19   exclusive licenses?
20                      A.   They had exclusive licenses to
21   those patents prior to the business sales, I think,
22   yes.
23                      Q.   How about after the business
24   sales?
25                      Just -- do you understand my question
```



```
 1   or should I back up?  Whatever you prefer.
 2              A.   I'm not --
 3              Q.   That's fine.  I'll back up.  I'll
 4   back up.
 5              A.   There's context here in terms of
 6   timing I think that's important.
 7              Q.   That's fine.  I agree.  It's very
 8   important.  We should be precise.  Okay.
 9              There are patents that are just sold in
10   the line of business sales.  We know that.  They're
11   gone.  They're not in the portfolio.  We can forget
12   about them; okay?
13              A.   That's correct.
14              Q.   Then there are patents that were
15   shared but not predominantly used in any one
16   business, so the purchasers got licenses with
17   respect to those patents, but the patent itself
18   stayed at Nortel; right?
19              A.   Right.
20              Q.   Okay.  The US and EMEA Debtors
21   didn't terminate their licenses with respect to
22   those patents.  They still had the licenses; is
23   that right?  Is that --
24              A.   I don't know that to be true.  As
25   I understand it, there were license termination
```

 Neeson & Associates     W&F WILSON & PETZER, LTD.

1    agreements with respect to each of the business

2    sales.  I'm not sure whether they extended all the

3    way to the ones that had already been licensed that

4    were part of the common technology.  There had been

5    a surrendering of licenses in the business sales.

6              Q.  So is your opinion based on the

7    assumption that with respect to the patents that

8    were shared and not predominantly used in a line of

9    business and that therefore stayed with Nortel, is

10   your opinion based on the assumption that as to all

11   of those patents, NNI and the EMEA Debtors

12   terminated their licenses already?

13             A.  No.  My opinion is based on the

14   understanding that when the business sales

15   occurred, there were a transfer of patents that

16   were actually predominantly used in the business;

17   that certain common patents that were used in

18   multiple lines of business were retained by Nortel;

19   and that in valuing the license rights, I have

20   valued both the patents and the technology that was

21   transferred as well as that residual license right.

22             Q.  Fair enough.  I just want you to

23   assume, because -- just assume, since you said it

24   didn't matter anyway for your opinion, just assume

25   that NNI and the EMEA Debtors didn't terminate



```
 1   their licenses with respect to retained patents;
 2   okay?
 3              A.   Okay.
 4              Q.   All right.  You're aware that most
 5   of the licenses on these shared patents granted to
 6   the purchasers were nonexclusive licenses.  You
 7   know that; right?
 8              A.   Yes, I do.
 9              Q.   And so there was still an ability
10   to give a license to that patent to other parties?
11              A.   By whom?  By the people who
12   purchased the technology --
13              Q.   No.
14              A.   -- or by --
15              Q.   If somebody has a nonexclusive
16   license, the owner of the patent, if you will, can
17   give a nonexclusive license to someone else; right?
18              A.   Well, sure, yes.
19              Q.   Sure.  And if NNI continues to
20   have a sublicense right because it didn't terminate
21   its licenses, and the license is interpreted the
22   way we view it, NNI still had a right to sublicense
23   the licenses with respect to those patents; right?
24              A.   It might have in your
25   interpretation.  I don't -- the business sales were
```



1    actually complicated transactions.  There's a lot

2    of documents that surround the interpretation of

3    those agreements.  And at least as a practical

4    matter, so if NNI had a right to license technology

5    that had already been licensed to six or seven

6    other parties, it didn't seem like it was a very

7    valuable right, because the people that were using

8    it were already using it.

9                 Q.   Well, then the patent itself

10   wouldn't be very valuable to Canada either, would

11   it?

12                A.   Well, what's already happened is

13   that the value of the shared technology rights has

14   already been in some respects dispersed among the

15   buyers.

16                Q.   Sure.  So the value of the patent

17   has been diminished because there's multiple

18   nonexclusive licenses; right?  Every time you give

19   a nonexclusive license, the value of your patent

20   diminishes a little bit; right?

21                A.   As the owner, maybe.  It depends

22   on what you get back as the owner.

23                Q.   Or if you get royalties.

24                But my point was simply that NNI could

25   still sublicense its rights out.  It could still



```
 1    enforce if somebody was infringing; right?  Nothing
 2    was stopping it.
 3               A.   Again, I'm -- this is -- there was
 4    a lot of complicated corporate documents that are
 5    associated with the business sales.  I know there's
 6    a license and termination.
 7               To the extent, as you're saying, they
 8    didn't actually terminate their rights in the
 9    shared technology, I guess in theory they could
10    have licensed it out; sure.
11               Q.   Mr. Green, on the Rockstar sale, I
12    think we all know you gave the entirety of the
13    4.5 billion proceeds to Canada; right?
14               A.   They're allocated the entirety of
15    that proceeds; that's correct.
16               Q.   And we heard testimony from
17    Ms. Hamilton.  Do you know who Sharon Hamilton is?
18               A.   I believe so, yes.
19               Q.   We heard testimony from
20    Ms. Hamilton that the allocation on the Rockstar
21    sale to NNI wasn't zero.  Just to be clear, the
22    only allocation NNI gets on the Rockstar
23    transaction in your formulation isn't related to
24    the patents.  It's a couple hundred thousand
25    dollars related to the in-place workforce, the fact
```



1   that John Veschi is now the head of Rockstar, used

2   to be at NNI; right?

3            A.   That's right.

4            Q.   And the EMEA Debtors still get

5   zero -- right? -- because they had no in-place

6   workforce; right?

7            A.   That's correct.

8            Q.   Now, with respect to the

9   4.5 billion that you allocate to Canada, based on

10  your assumptions relating to the scope of the

11  license, you don't then run that number through the

12  RPSM in the MRDA; right?

13           A.   No, I don't.

14           Q.   And that's because you don't think

15  it's appropriate to run the proceeds from the

16  Rockstar sale that you're allocating to NNL through

17  the RPSM; right?

18           A.   That's right.

19           Q.   Because running it through the

20  RPSM, in your view, wouldn't fairly value NNL's

21  rights?

22           A.   No, because it's not consistent

23  with the valuation of the license rights and the

24  circumstances of the parties.  NNL owns the

25  technology.  It owns the asset.  It sold it.  And

 Neeson&Associates    W&F

1    therefore -- and there were no license rights that

2    needed to be deducted from it.  So therefore, as

3    the owner, NNL gets the entire value.

4                    Q.    But NNL is receiving 4.5 billion,

5    and you think it's appropriate not to run it

6    through the RPSM; right?

7                    A.    Correct.  They owned it.  They

8    owned the technology.  There was no operating

9    businesses around it.  So the owner gets the value.

10                   Q.    When you say they're the owner,

11   just to be clear, you're referring to the fact that

12   they have legal title?

13                   A.    That's correct.

14                   Q.    You don't think that Rockstar paid

15   $4.5 billion for the right to exploit NN technology

16   in Canada, do you?

17                   A.    I'm not sure we all know what

18   caused Rockstar to pay $4.5 billion.  They could

19   potentially exploit the technology in Canada if

20   they owned it.  So how they allocated it among the

21   various jurisdictions, I don't know.

22                   Q.    I thought the question was what

23   portion of the proceeds realized in each sale

24   transaction was due to the transfer or surrender,

25   as the case may be, of property interests and the



1   assets that were the subject of the transaction;

2   right?

3              A.   Your question was, unless I

4   misunderstood it -- or are you on to a new

5   question?  I thought you were asking me whether or

6   not Rockstar could exploit the technology in

7   Canada.  And I think the answer is as an owner, it

8   could.

9              Q.   I'm asking you a different

10  question.

11             A.   Okay.

12             Q.   Did Rockstar, do you believe, paid

13  $4.5 billion for the right to make and sell

14  products in Canada and to enforce the patents in

15  Canada?  Do you believe that?

16             A.   I don't know what Rockstar was

17  thinking about when it paid the 4.5 billion and how

18  it allocated it among geographies.  I don't think

19  any of us do.  What we do you know is they paid

20  $4.5 billion for the bundle of rights that they got

21  and that were owned by NNL.

22             Q.   Do you think it plausible that

23  Rockstar would pay $4.5 billion for the right

24  solely to exploit it in the -- exploit the

25  technology in the Canadian market?



```
 1                      A.   I don't know how Rockstar did it.
 2   Facially, I would agree with you, it seemed that
 3   Canada would be a relatively small market for all
 4   of those IP rights, but who knows.
 5                      Q.   You know that NNI's licenses and
 6   the EMEA licenses were not terminated until the
 7   closing of the Rockstar sale; right?
 8                      A.   That's my understanding with
 9   respect to the remaining residual portfolio.
10                      Q.   So when you say, well, NNL is the
11   owner, meaning legal title, and there's no license
12   rights that need to be deducted, that's again
13   because you're assuming the license rights have
14   absolutely no value?
15                      A.   Because there are no products
16   being made in the territory by either the US or
17   EMEA Debtors using the technology.
18                      Q.   There's no products being made by
19   Canada using the technology either, is there?
20                      A.   That's true.  But Canada is the
21   owner and the licensor to the US and EMEA Debtors.
22                      Q.   And you know that termination of
23   the US and EMEA licenses was a condition to the
24   closing of the Rockstar sale; right?
25                      A.   That's my understanding, yes.
```



1                    Q.    Are you aware of any evidence in
2    the record that Rockstar was willing to close that
3    sale without the termination of the EMEA and NNI
4    licenses?
5                    A.    I don't know if there are things
6    in counsel's --
7                    Q.    I'm just asking if you're aware.
8                    A.    I haven't seen any documents that
9    suggest otherwise, to my knowledge.
10                    Q.    Are you aware of any evidence in
11    the record that Google was going to sign the
12    stalking horse agreement unless the EMEA and NNI
13    licenses were terminated?
14                    A.    I don't know -- I haven't seen
15    anything that says that there was a condition for
16    that.  I'll take your word for it, sure.
17                    Q.    And you know, don't you, that the
18    Rockstar sale was a consensual sale; right?  EMEA,
19    the US Debtors, NNL, all with their free will and
20    volition, agreed to do it; right?
21                    A.    That's correct.
22                    Q.    And you know that the parties
23    agreed that an entity terminating a license would
24    be treated like a seller.  You knew that; right?
25                    A.    I'm not sure exactly what that



1   means in the context of this analysis.  I was asked

2   to figure out what the values were of the assets

3   that were transferred or surrendered, what the US

4   and EMEA Debtors did in the Rockstar transaction is

5   they gave up their license rights to what was in

6   the Rockstar portfolio, to my knowledge.

7                Q.   Sure.  I'm just asking you whether

8   you understand that in the IFSA, which at your

9   deposition you told us you read many, many times,

10  that in the IFSA it specifically provides that

11  where any debtor enters into an appropriate license

12  termination, the debtor shall be deemed to be a

13  selling debtor and the proceeds of such sale shall

14  be deemed to be sale proceeds.  You know that;

15  right?

16               A.   Well, it's what it says in the

17  IFSA.  What "selling debtor" means in the context

18  of these -- the context of those documents and how

19  it needs to be interpreted with respect to the

20  allocation question that I'm solving could be very

21  different.

22               Q.   You said before the lunch break I

23  think in response to questions from Justice

24  Newbould -- actually, it's not; in response to a

25  question from Mr. Ruby, who is rephrasing the



```
 1   question from Justice Newbould.  But you say:
 2                  "Because I understand that at
 3              least the transferability that's
 4              being described here relates to --
 5              can be actually -- can actually
 6              occur with the consent of the
 7              parties but that's -- and they
 8              understand -- I understood that
 9              there had never been consent of the
10              parties when I wrote my report, so I
11              assumed that there had been no
12              transfer, that there was no
13              transferability."
14          Do you recall saying that prior to the
15   lunch break?
16              A.   Yes.
17              Q.   So when you wrote your report, you
18   understood that there hadn't been consent of the
19   parties?  Is that your testimony?
20              A.   Well, I was unaware at the time
21   that I wrote my report of any instance where the
22   MRDA rights had been transferred in a way to a
23   third party.  I'm aware of terminations of MRDA
24   rights, and I discussed this general concept that
25   there is a consent necessity in my report on page
```



1   26, when I discuss the MRDA and the terms that were

2   significant to my analysis.

3             Q.   Why don't we take this one bit at

4   a time.  Let's talk about the business sales.

5   We've been talking about the Rockstar sale.  Let's

6   talk about the business sales.

7             The business sales were all consensual;

8   right?

9             A.   To my knowledge, yes.

10            Q.   And NNL, NNI, and the EMEA Debtors

11  all voluntarily participated in the sales; right?

12            A.   To my knowledge, yes.

13            Q.   NNL consented to NNI's and the

14  EMEA Debtors' participation -- right? -- in the

15  sales?

16            A.   I think everyone consented to

17  being in the sale.  I'm not sure what the -- this

18  is a legal interpretation of how the sale documents

19  went, but --

20            Q.   Now, you say in your report the

21  reason you use this value-in-use analysis for the

22  business sales -- right? -- is because the licenses

23  by their terms were not transferable; right?

24  That's what you say in your report?

25            A.   That's right.



```
 1                    Q.   But, in fact, they were
 2    transferable with consent; right?
 3                    A.   That's correct.
 4                    Q.   That's what 14(a) says?
 5                    A.   That's what 14(a) says.  However,
 6    I hadn't seen any evidence that it actually ever
 7    happened.
 8                    Q.   What's the "it" in that answer?
 9                    A.   What?
10                    Q.   What do you mean that "it"
11    hadn't --
12                    A.   That any transfer had ever
13    occurred or that there had ever been any consent
14    with respect to the license rights under the MRDA.
15                    Q.   Okay.  Why don't we take this one
16    step at a time then, sir.
17                    You understand in the context of these
18    consensual sales that NNI and the EMEA Debtors
19    terminated their licenses; right?
20                    A.   They terminated their license
21    rights under the MRDA.  They didn't terminate their
22    participation in the MRDA, to my knowledge.
23                    Q.   Okay.  And you understand, because
24    we went through it, that the parties agreed that a
25    license termination would be treated as a sale, and
```

 Neeson&Associates   W&F WILSON & PETYER LTD.

```
 1   they'd be treated as a seller; right?  We just went
 2   through that.
 3                 A.   Again, I think I said that there
 4   was a lot of complicated corporate documents with
 5   respect to seller.  I know that there were sellers.
 6   For the purposes of doing my analysis, however, I
 7   have evaluated license rights in accordance with
 8   the licenses that are given by the MRDA.  I'm not
 9   aware of any circumstance where being a seller
10   changed their term of the MRDA or removed the
11   license.
12                 Q.   Can we turn up the IFSA.  Somebody
13   give me a trial number.  Oh, you are good.
14   Exhibit TR21638.
15                 We know, as we talked about in your
16   deposition, you said you read this many times.
17   Take a look at 11(d).  By the way, 11 is called
18   "Relinquishment of Intellectual Property Licenses."
19   Right?  11(d), please.  Thank you.
20                      "Where any Debtor enters into
21                      any appropriate license termination
22                      in accordance with the provisions of
23                      this Section 11, such Debtor shall
24                      be deemed to be a Selling Debtor,
25                      and the proceeds of such asset sale
```



```
1                      shall be deemed to be sale

2                      proceeds."

3                           Do you see that?

4                 A.    I do.  It also says that:

5                           "...for the purposes of

6                      Sections 12(b) and 12(d), and

7                      Sections 12(b) and 12(d) shall apply

8                      accordingly."

9                           This is consistent with the point that

10     I was making earlier, Mr. Zelbo, that there's a lot

11     of complicated corporate documents around these

12     sales and the selling debtors and their

13     relationship to the MRDA.

14                          So I think that what I've done is, like

15     I said, I valued rights.  I'm not providing an

16     opinion as to what a selling debtor means in the

17     context of these sales and how it would affect or

18     whether or not it changes the underlying terms of

19     the MRDA.  That would be something for the purview

20     of the judges.

21                     Q.   Mr. Green, on the line of business

22     sales -- okay?  We're going to go into this in more

23     depth later, but I just want to lay a predicate

24     now.  The valuation of IP, which is the largest

25     component of your allocation -- okay? -- what you
```



1    do for NNI and the EMEA Debtors is you look to what

2    they could have earned had there been no sale and

3    they continued operating the businesses; right?

4              A.    That's the way that the license

5    rights are valued, yes.

6              Q.    And you don't do that for NNL.

7    That's not the way you value NNL's IP rights?

8              A.    That's correct, because NNL is the

9    owner.

10             Q.    Well, let's be clear.  In your

11   report you were very clear that the reason you used

12   this value-in-use was because the licenses by their

13   terms were not transferable.

14             Let's go to your report at page 4,

15   please.  The next-to-last paragraph, third line ,

16   you see the "because"?

17             A.    On what page are you?

18             Q.    Sure.  I'm on Page 4.

19             A.    You're on Page 4.

20             Q.    Yes.  I apologize.  I couldn't

21   find it right away.

22             A.    Okay.

23             Q.    Okay?  Are you with me?

24             A.    Yes.

25             Q.    "Because the licenses by their



```
 1                    terms were not transferable, the

 2                    appropriate method to value the

 3                    licenses is to consider what income the

 4                    relevant US and EMEA Debtors could have

 5                    generated through their respective

 6                    exploitation of the license rights if

 7                    Nortel continued to operate the

 8                    businesses with the MRDA continuing in

 9                    effect."

10                    Do you see that?

11            A.    I do.

12            Q.    So the reason that you use this

13   particular method that looks at what NNI and EMEA

14   Debtors could have earned had Nortel stayed in

15   business is because you say the licenses by their

16   terms were not transferable.  That's why you do it.

17            A.    That's one of the reasons; that's

18   correct, yes.

19            Q.    But, in-fact, as we've seen under

20   Article 14(a) -- why don't we turn to MRDA 14(a),

21   please.  I think that's best.

22            This says:

23                    "The agreement shall not be

24                    assigned by any participant except

25                    with the written consent of each of
```



```
 1                    the other participants."
 2            A.    Right.
 3            Q.    Do you see that?
 4            A.    Yes.
 5            Q.    I'm not going to get into a legal
 6    debate over whether that applies at all to anything
 7    here.  Just let's be clear:  That's the provision
 8    you were relying on to say they're not
 9    transferable; right?  That was what you relied on?
10            A.    It's this provision, with the
11    proviso that there's a written consent requirement
12    suggesting that the participants can't assign their
13    rights under the MRDA, yes.
14            Q.    Sure.  And that's the provision
15    you relied on to say on Page 4 that because the
16    licenses by their terms were not transferable, the
17    appropriate method is this value-in-use method?
18            A.    Right.
19            Q.    Okay.  And you understood that
20    Article 14(a) applies to all participants; right?
21            A.    It says, "by any participant,"
22    yes.
23            Q.    And NNL was a participant, was it
24    not?
25            A.    NNL was a participant in the MRDA
```



```
 1   and the grantor of the licenses to the US and EMEA

 2   Debtors, yes.

 3              Q.   So that they were a participant;

 4   right?

 5              A.   Yes.

 6              Q.   And you understood under the

 7   nonassignment provision, Article 14(a), NNL could

 8   not assign its rights under the agreement without

 9   the consent of each of the other participants.

10   That's how you read 14(a); right?

11              A.   That's right.

12              Q.   So as you read 14(a), it applied

13   to NNL and it applied to NNI and it applied to

14   NNUK, NNSA and NN Ireland -- right? -- equally?

15              A.   To the extent that they were all

16   participants, I assumed -- again, I'm not providing

17   a legal interpretation.  I'm just saying I assumed

18   that this provision applied to all the

19   participants.

20              Q.   And I think we've already talked

21   about this, but you also understood that it

22   permitted assignments with the consent of all

23   parties?

24              A.   With the consent of all parties;

25   correct.
```



1           Q.   I know I've read you the IFSA
2    before.  I don't want to get you caught up in legal
3    stuff; okay?  So I'm just going to tell you --
4    all right? -- and I want you to assume for me,
5    under the IFSA -- okay? -- all parties consented to
6    the sales.  All parties agreed that a license
7    termination would be treated as a sale; okay?
8           A.   Right.  But again, the terms under
9    the IFSA with respect to seller and what that
10   impact is on the MRDA, which I understand also from
11   the IFSA is still in place, I don't know how that,
12   from a legal point of view, changes everybody's
13   positions with respect to this term or the other
14   terms of the MRDA.  It's not something I've
15   analyzed.  I think it's something for the Courts to
16   evaluate.
17          Q.   Okay.  Let me make it simple for
18   you, Mr. Green; okay?
19          If all the parties consented to the
20   sales -- okay? -- 14(a) doesn't apply; right?  It
21   says the agreement can't be assigned except with a
22   written consent.  If everybody consented, there's
23   no problem; right?
24          A.   I believe that this 14(a)
25   provision relates to assigning the rights under the



1    MRDA by any of the participants.  How that

2    necessarily plays into the business sales in the

3    IFSA is something I think somebody needs to

4    interpret from the point of view of how the -- of

5    the interrelationships among the documents.  I

6    don't think that's for my purview.

7              Q.   Mr. Green, we need to be clear

8    here.  Your entire -- your value-in-use analysis,

9    as we just saw, which produces dramatically

10   different results for NNI and EMEA than for NNL

11   because you value them in dramatically different

12   ways under the business sales -- for NNI and EMEA,

13   you look to what could you have earned had the

14   business continued to operate, and then just by

15   subtraction, as you said in your direct, the rest

16   goes to NNL; okay?

17             So this is important.  I need to

18   understand why you're treating them differently.

19   And what you told us in the report was you treat

20   them differently -- okay? -- because the licenses

21   by their terms were not transferable.  And you told

22   me you found that in 14(a).

23             So my question to you is, since 14(a),

24   which applies to all parties here, says that if all

25   parties consent, you can assign whatever you want,



1    14(a) has no bearing on this case.

2                    A.   No.  Actually, 14(a) does have

3    bearing on this case, because like a restricted

4    stock that is -- or closely held, where it has

5    restrictions on it, the value of that stock is

6    constrained because you can't market it.

7                    The same thing happens with the rights

8    under the MRDA.  They are not readily sellable, to

9    my knowledge.  As I understand it, it wasn't as if

10   NNI could turn and find another company to stand in

11   its shoes and take over its rights without the

12   other parties consenting.  That's how I understood

13   it for the purposes of doing my valuation.

14                   So that limited transferability means

15   that one needs to look at -- and the absence of

16   consent, as far as I could tell, means that one

17   needs to look at the cash flows that are being

18   derived from the use of the license by NNI and EMEA

19   or by the US and EMEA.  And then one needs to

20   basically understand that NNL is in a different

21   position in this agreement because it's the

22   licensor of the technology and essentially we're

23   told it has legal title.  So that means that it

24   gets the residual, the difference between the

25   values of the IP and the license rights that were



```
 1   surrendered.
 2              Q.   This is what you just said:
 3                   "So that limited
 4                   transferability means that one needs
 5                   to look at -- and in the absence of
 6                   consent, as far as I can tell, means
 7                   that one needs to look at the cash
 8                   flows that are being derived from
 9                   the use of the license by NNI and
10                   EMEA."
11              In the absence of consent as far as you
12   can tell.
13              I'm not going fight with you on the
14   facts and I'm not going to fight with you on the
15   law, Mr. Green.
16              I want you to assume that there was
17   consent.  I want you to assume that all of these
18   parties came before Judge Gross and Justice
19   Morawetz on the business line sales and said we all
20   consent to do this and we think it's in the best
21   interests of creditors; okay?  I want you to assume
22   there was consent.
23              A.   Okay.
24              Q.   So when you say in the absence of
25   consent, I think this value-in-use analysis is the
```



1  way to go, if there's consent, you don't use this

2  value-in-use analysis and you don't treat NNI and

3  EMEA any differently than you treat NNL; right?

4         A.   Well, no.  If there were

5  consent -- if this is the key term that is going to

6  be changing -- it's a different understanding --

7  the most that would ever be allocable would be the

8  maximum allocation that's on page 62 of my report.

9  That would be the other end of the spectrum, which

10 then allocates based on the MRDA splits.

11        Q.   All right.  So if there was

12 consent, we're in what you call your maximum

13 allocation of business sale proceeds on page 62;

14 right?

15        A.   That's right.

16        Q.   We're going to get to that, too.

17             Can you pull up slide 9 of your

18 deposition.  I just want to go through your

19 methodology briefly, although with what you just

20 said, I'm not sure this is -- I just want to walk

21 through how we get to these numbers so everybody

22 understands it.

23             So we know the total business sale

24 proceeds is 2.9 billion; right?

25        A.   Yes.



```
 1                    Q.    That is the fair market value of
 2    all the business lines; right?
 3                    A.    It's the fair market value of the
 4    business lines and of the -- that was paid by the
 5    purchasers, yes.
 6                    Q.    Fair market value is what a
 7    willing buyer would pay a willing seller in an
 8    arm's-length situation; right?
 9                    A.    Right.
10                    Q.    That's basic.  Even I as a lawyer
11    know that valuation concept.
12                    And then you value the tangible assets.
13    We don't have to spend time on that.  You told us
14    you just looked at book value; right?
15                    A.    Correct.
16                    Q.    And then the in-place workforce,
17    you're looking at replacement value; right?
18                    A.    Yes.
19                    Q.    And to be clear, the Canadian
20    Debtors, it's $78 million; right?
21                    A.    That's right.
22                    Q.    And that includes all those
23    terrific R&D people we've heard so much about
24    working for NNL; right?
25                    A.    That's right.
```

 Neeson & Associates   W&P

```
 1                    Q.   And then the US Debtors, it's
 2   134 million; is that right?
 3                    A.   Right.  It reflects the bigger
 4   workforce, sure.
 5                    Q.   Yeah.  And then the 110 million
 6   for the US subsidiaries; right?
 7                    A.   That's right.
 8                    Q.   Okay.  So then we go to total IP
 9   value including customer relationships.  That's
10   really the big nut here.
11                    It's 1.9, almost 2 billion; right?
12                    A.   That's right.
13                    Q.   So that would be -- if I'm
14   understanding this right, that, in your view, is
15   the fair market value of the total IP at Nortel
16   with respect to these business lines; right?
17                    A.   That's right.
18                    Q.   Okay.  So what you need to do is
19   now figure out how to allocate that fair market
20   value --
21                    A.   That's right.
22                    Q.   -- right?
23                    What was due to what the US had to
24   offer, what was due to what NNL had to offer, what
25   was due to what NNUK had to offer?
```



```
 1                     A.   Right.  Well, NNL was the owner.

 2    We knew that this was going to wind up being the

 3    net result after we valued the individual license

 4    rights.

 5                     Q.   And as owner, you mean legal title

 6    holder?

 7                     A.   Correct.

 8                     Q.   And do you think $438 million is

 9    what Rockstar paid for the rights to get full

10    exploitation rights to the technology in the United

11    States?

12                     A.   I don't think Rockstar is involved

13    in this analysis.  I think Rockstar is related to

14    the --

15                     Q.   I'm sorry.  I misspoke.  Mr. Luft

16    tried to tell me that.

17                     Do you think $438 million is the total

18    of what the purchasers of the business lines paid

19    to be able to operate the businesses in the United

20    States with the NN technology?  You haven't

21    measured that; right?

22                     A.   I think we can agree that the

23    purchasers paid 2.88 billion to operate the

24    businesses worldwide, whatever they were getting.

25    What the US Debtors surrendered was a license to
```



```
 1    rights that were worth $438 million.
 2              Q.   Well, let's look at how you get at
 3    that.  And I just want to --
 4              Now, I know that -- you understand that
 5    roughly 65 to 70 percent of the revenue from the
 6    business lines year in and year out was generated
 7    in the US market; right?
 8              A.   That's my understanding.
 9              Q.   Okay.  And you value the US IP
10    license and customer relationships roughly
11    22 percent of the total of the IP and customer
12    relationships, if my math is right?
13              A.   That's right.  Approximately.
14    I'll take your word for the 22 percent.
15              Q.   Trust me, I had somebody else do
16    that calculation.
17              Mr. Green, the way you did the US
18    Debtors and EMEA Debtors' IP license right and
19    customer relationships is as follows.  We are going
20    to take it just a step at a time here.
21              First, you treated them together;
22    right?  You treated them in one bucket, the IP.
23    Not the debtors.  The IP and the customer
24    relationships; right?
25              A.   That's correct.  They're part of
```



1    the same revenue stream.  We saw that earlier this
2    morning.
3                  Q.   And then what you did is you got
4    projections.  And we're going to talk about those
5    projections later.  I know you spent a long time on
6    that on direct.  We'll talk about that later.
7                  But you got projections; right?  And
8    you did a DCF.  We all know when a DCF is.  And
9    then you ran it through the RPSM.
10                 A.   That's not right.
11                 Q.   Okay.
12                 A.   What I did is a calculated the
13   operating profits from each of the businesses out
14   into the future.  I then aggregated all those
15   operating profits.  I then, using the operating
16   profits and the residual profit-split methodology
17   that the company used, figured out what cash flow
18   or what profits would be allocable to each of the
19   US and EMEA Debtors.  I then DCF'd those cash flows
20   that are post-RPS splits.
21                 Q.   Fair enough.  Thank you for the
22   correction.
23                 And you say that that is what NNI and
24   the EMEA Debtors could have earned had they stayed
25   operating the businesses as Nortel?  That's what



 1   you're looking at; right?  That's what you decided

 2   to look at?

 3          A.   Right.  It's essentially saying

 4   that the entire remaining value of the operation of

 5   the business out into the future is the IP value,

 6   and it's 438 million for the US Debtors.

 7          Q.   Now, for NNL you don't do the same

 8   analysis; right?  You don't look at the projected

 9   operating income that NNL could have earned had the

10   business lines continued to operate?

11          A.   Right.  It doesn't have the

12   license.

13          Q.   Let me finish.  You don't run it

14   through the RPSM.  You don't do the discount.  You

15   just don't do that analysis at all for Canada;

16   right?

17          A.   Correct.  It doesn't have the

18   license.  It's the owner.  It's the title holder to

19   the IP.  It's not necessary.

20          Q.   It's okay with me, Mr. Green, if

21   you keep saying that.  It really is.  I don't mind

22   it.  But I don't want you to be under a

23   misimpression.  I'm just trying to figure out what

24   you did, and you keep telling me why you did it,

25   and that's fine if you want to, but it's not



1    entirely necessary; okay?  But I don't want to stop

2    you if that's what you want to do.

3              And the way you get at this number, you

4    don't independently -- well, the way you get at

5    this number, it's just by subtraction, as you said;

6    right?  You take all the amounts you've already

7    calculated; right?  And we know the total price is

8    2.9 billion.  You just subtract and say the rest is

9    Canada; right?

10             A.   I think that's putting -- that's

11   understating what happened here.  I mean, what

12   happened here is --

13             Q.   But that's what you did.  You said

14   yourself you did it by subtraction.

15             A.   Well, I identified the assets, the

16   values of all of the other assets -- the tangibles,

17   the in-place workforce, the subsidiaries,

18   everything else that was either transferred or

19   surrendered in the business sales -- came to a net

20   value of what the IP was, figured out the value of

21   the IP rights that were held by the US and EMEA

22   Debtors.  The rest of it goes to Canada as the

23   owner.  It's just simple math in terms of

24   subtraction, but there's a lot of work behind each

25   one of these line items.



```
 1                 Q.   I'm sure there's a lot of work.
 2    You had to determine book value for the tangible
 3    assets, replacement value for the in-place
 4    workforce, and you did the DCF RPSM.  I get that;
 5    okay?
 6                 So -- but all I'm trying to say is it
 7    wasn't a lot of work to get the Canadian number
 8    because that was just taking all of the numbers --
 9    right? -- the 121, the 317, 94, 78, 134, 41, the
10    110, the 438, the 164 -- add it all up, subtract
11    from 2882, and you get 1379; right?  That's it.
12                 A.   That's the simplicity of this
13    chart.  That's the simple mechanics of the chart.
14    The fact is that all the things that happened here
15    were complicated.
16                 Q.   Mr. Green, I don't know how
17    complicated it is to come up with a book value for
18    tangible assets.  I'm not an economist.  But my
19    point simply is, it may have been or it may not
20    have been complicated to get all those numbers.
21    But on the Canadian number, all you did was
22    subtraction.  That's what you did.
23                 A.   Because the Canadian number is
24    derived from every other number that I had
25    calculated.
```



```
 1                    Q.   You understand that Mr. Kinrich

 2     did your same analysis, even though he disagrees

 3     with it.  He did your analysis.  He took your

 4     projections, he took your numbers, and he did the

 5     same analysis for Canada.  In other words, what you

 6     did for the US Debtors and the EMEA Debtors he did

 7     for Canada.  He looked and said, "Okay, what would

 8     Canada have gotten had we not sold, had we used a

 9     value-in-use, and we took the DCF and ran it

10     through the RPSM?  What would the Canada number

11     be?"  You do know he did that; right?

12                    A.   I do.

13                    Q.   And he came up with a number, and

14     the number was 397 million.  You know that; right?

15                    A.   That would be the number if one

16     assumed that you were going to treat NNL as if it

17     were a licensee and not a licensor.

18                    Q.   And at least as of your

19     deposition, even though you were aware of that

20     number, you hadn't checked it because you didn't

21     think you needed to.  It was irrelevant to you;

22     right?

23                    A.   Right.  It's not part of my

24     analysis.  It's not necessary.

25                    Q.   Do you have any reason sitting
```



```
1    here today to doubt that that's the number?  If you
2    apply the same value-in-use analysis to the US
3    Debtors and the EMEA Debtors for NNL, you're going
4    to come up with 379 million?
5                 A.   Again, if you assume that NNL is a
6    licensee and not a licensor, we went back -- I've
7    gone back since the deposition and checked the
8    math, and that's fairly close.
9                 Q.   Okay.  So by my math, because the
10   numbers are actually slightly different than I
11   recall, but by my math, there is $982 million left
12   over, in effect; right?  Because -- you understand
13   that; right?  You know what I'm talking about?
14                A.   Well, what you're trying to say is
15   that if we were to put in a line for the IP license
16   as if NNL had an IP license and not a -- and was
17   not a licensor, if we put that in there in another
18   line and deducted 397 million, I think you'd get to
19   the 900 million that your discussing; right?
20                Q.   Okay.  Yes, 980 was my number.
21                So effectively -- incidentally, in
22   doing your analysis, you're assuming -- I don't
23   know what you're assuming.  Are you assuming that
24   NNL could transfer its IP rights without consent?
25                A.   I'm not assuming that NNL -- I
```



1    haven't really thought that through, but I'm not

2    assuming that NNL could transfer its IP rights.  It

3    is an owner.  It would have to live within the

4    boundaries of the MRDA.

5                    Q.    And we've talked about before that

6    14(a), at least in your analysis, applies equally

7    to all participants?

8                    A.    Right.  I haven't thought that

9    through, though.

10                    Q.    So there's $982 million excess.

11    Is it fair to say that that is a calculation

12    effectively of what you believe under your

13    projections -- right? -- what would be the amount

14    the purchasers paid -- right? -- above the tangible

15    assets, in-place workplace and the amount that

16    Nortel could have earned had it remained in

17    business?  Is that fair?

18                    A.    That is the amount that they paid

19    over and above what Nortel could have done if it

20    continued to operate these businesses.  I think we

21    agree with that, yes.

22                    Q.    And I know there's a debate

23    between you and Mr. Kinrich as to whether that

24    excess actually exists, depending on what

25    projections you look at, but let's just stick with



1    there's a $982 million excess that the purchasers

2    paid above what Nortel could have earned had it

3    remained in business.

4              You allocate that $982 million to NNL?

5              A.   That's right.

6              Q.   Now, you don't know why the

7    purchasers paid $982 million more than the value of

8    Nortel had it stayed as an operating business;

9    right?

10             A.   No, it's not really relevant.  The

11   point here is what could Nortel have done if it

12   stayed in business.  What they did is a function of

13   their economics and what the buyers could actually

14   do with these businesses.  It's not something that

15   was actually transferred or sold by the EMEA and US

16   Debtors in connection with their license rights.

17             Q.   So even though you don't know what

18   it's for, you allocate it to Canada's IP and

19   customer relationships; right?

20             A.   Yes, because Canada is the owner

21   of the IP.

22             Q.   Now, let's talk -- I know you

23   spent a lot of time on your opening, but let's just

24   talk briefly about the projections; okay?  And I'm

25   not going to spend that long on this.



```
 1                    Is it fair to say, given the way this
 2      analysis is set up, that the lower the projected
 3      cash flow for what Nortel could have earned had it
 4      continued to operate its business, the higher the
 5      allocation will be to NNL in your model?
 6                    A.    In other words, the values of the
 7      license rights would be less, and therefore, NNL
 8      would receive a bigger piece of the license rights?
 9      Yes, I think that's the way that the math would
10      work.  That's correct.
11                    Q.    Sure, because the larger the
12      excess, since you allocate it all to Canada, the
13      more allocation to Canada; right?
14                    A.    I think that's correct.  But if --
15      the lower the projections are.  That's correct.
16                    Q.    But if you had applied the same
17      method for all three debtors, those lower
18      projections would apply to all three debtors.  The
19      issue that we have a debate on is that you apply a
20      different method for NNL than you do for NNI and
21      EMEA based on this non-transferability argument.
22      That's what it comes down to; right?
23                    A.    It's not just not the
24      non-transferability argument.  It's the fact that
25      I'm valuing in use and I'm valuing the rights that
```



1    were -- or the opportunities and the economics that

2    were available to the US and EMEA Debtors, assuming

3    they could operate the businesses, not as if a

4    third party operated the businesses.

5                    Q.    Sure.  But NNL, had it stayed in

6    Nortel operating its business, wouldn't have

7    realized this $982 million excess either; right?

8                    A.    I think that the excess that we're

9    talking about here is just a function of ownership

10   of the license rights --

11                   Q.    Legal title; right?

12                   A.    Legal title to the IP.

13                   Q.    You understand that NNL -- you

14   understand that a patent owner could retain legal

15   title and give all its rights, all the commercial

16   rights away to other parties through an exclusive

17   license or otherwise; right?  You understand that?

18                   A.    As somebody who does -- values

19   licenses on a regular basis, yes.  I'm not

20   providing a legal opinion on that concept.  But

21   yes, I understand that they can do that.

22                   Q.    I want to take out Canada and rest

23   of world for a minute because it just complicates

24   the hypothetical.  But let's say that Nortel was

25   just operating in the United States; okay?  And so



```
 1   NNL has legal title to the patent, and NNL gives an
 2   exclusive license to NNI to exploit in every way
 3   possible NN technology in the United States.  All
 4   NNL has is legal title.  Okay?
 5              A.   Okay.
 6              Q.   That legal title wouldn't be worth
 7   very much, would it?
 8              A.   If there's an MRDA, sure.  I mean,
 9   you wind up having to take the results of the
10   exploitation of the patents, as you just say, in
11   the United States and then share the proceeds from
12   operating the business in accordance with the RPS
13   splits.
14              Q.   So in that instance, the value
15   would simply be that NNL is a party to the MRDA and
16   it gets its residual profit split; right?  That's
17   what you're saying?
18              A.   Right.  Well, that's how the
19   parties operated here.  It's part of the documents.
20              MR. ZELBO:  Your Honor, this has been
21   going on a while, and I want to try to shorten it.
22   And if Your Honors want a break, we can do that.
23   If not, I'm happy to continue, whatever you wish.
24              THE US COURT:  I'm happy to take a
25   break.  I didn't want to interrupt you, frankly.
```



```
1                MR. ZELBO:  Thank you.

2                THE US COURT:  So since you've made the

3    suggestion, I'll take you up on it.  We'll take a

4    20-minute break.  Thank you.

5    -- RECESS AT 3:14 P.M. --

6    -- UPON RESUMING AT 3:40 P.M. --

7                THE US COURT:  All right.  Mr. Zelbo.

8                MR. ZELBO:  Apologies, Your Honor.

9                THE US COURT:  It's a big record.

10               MR. ZELBO:  Even in these paperless

11   days, it seems that the paper overwhelms.

12               THE US COURT:  Can't get away from it.

13               BY MR. ZELBO:

14               Q.   Mr. Green, you mentioned earlier

15   about an alternative max allocation writes to the

16   business lines sales.  You remember that?

17               A.   Yes, I do.

18               Q.   You mentioned that both when

19   Mr. Ruby was questioning you and in response to one

20   of my questions.

21               Now, if you turn to slide 21 of the

22   slide deck that was used during your direct

23   examination, it says in the asterisk at the bottom,

24   "assumes amounts realized in sales over tangible

25   assets and subsidiaries is what Nortel would have
```



```
 1    earned by operating."  And then you say, "divided

 2    following RPSM."

 3                 Do you see that?

 4                 A.   I do.

 5                 Q.   You're not using the RPSM, are

 6    you?  Let me ask it a different way, Mr. Green.

 7    Let's go to your report.

 8                 If you turn to page 62 -- keep going

 9    up, please.  I want to look at the bullet points.

10    This is a chart depicting your maximum allocation

11    of business sale proceeds; is that right?

12                 A.   Yes, it is.

13                 Q.   Okay.  And it says, "This

14    alternative allocation of intangible assets assumes

15    that," and then there are two assumptions.  Do you

16    see that?

17                 A.   Yes.

18                 Q.   I want to focus on the second

19    assumption.  The second assumption says,

20    "Normal/routine returns are in approximately the

21    same relative proportion as RPS percentages."

22                 Do you see that?

23                 A.   Yes.

24                 Q.   Before I ask you about that

25    assumption that underlies your allocation here, I
```



 1   think that the Courts are well familiar with this,

 2   so we could probably do it quickly.  And I know you

 3   know this, too.  But under the RPSM there is a

 4   methodology for running the residual profit-split

 5   method; right?

 6             A.   That's right.

 7             Q.   And in very broad strokes, that

 8   methodology has two components to it.  One is,

 9   first you measure routine returns and you provide

10   routine returns to all the participants?

11             A.   Yes.

12             Q.   And then if there's operating

13   profit left over or operating losses, you allocate

14   those according to the RPS capital stock

15   percentages; right?

16             A.   That's right.

17             Q.   So you got two things.  You got

18   routine returns, RPS percentages.

19             Now, you say this is based on the

20   assumption that the routine returns are in

21   approximately the same relative proportion as the

22   RPS percentages; right?

23             A.   Yes.

24             Q.   So in effect, what your allocation

25   here is just using the RPS percentages; right?



```
 1                      A.    That's right.  It's a simple way
 2   of allocating the intangible asset values that come
 3   about from the business sales after you take out
 4   the -- take the total proceeds, deduct the tangible
 5   values; you come up with intangibles, an intangible
 6   value.   The assumption is that intangible value,
 7   that 2.2 billion that is sitting in the "Total"
 8   column on the chart that we're looking at now, is
 9   essentially the present value of the cash flows
10   that would come from the use of the technology
11   actually by a third party, and then it's just
12   allocated based on the percentages.
13                      Q.    It may be a simple way, but it's
14   an incorrect way.  And the reason it's incorrect,
15   because if your assumption is wrong that the
16   routine returns are the same percentage as the RPS
17   percentages, then the fundamental underlying
18   construct of your entire analysis here would be
19   incorrect; right?
20                      A.    No.  I mean, this is a very
21   simplified way of doing this.  In order to be able
22   to actually do the -- apply the RPS percentages and
23   do the routine returns, one would really have to
24   have the projections that the buyers used in order
25   to be able to figure out their cash flows.
```



 1            So what I've really done here is made a
 2   couple of simplifying assumptions in order to be
 3   able to provide the Court with an alternative to
 4   just simply allocating based on the license rights.
 5   Here's another way of looking at the cash flows.
 6   One could allocate it based on the way the parties
 7   had actually operated.
 8            Q.   Why don't we look at your
 9   deposition, page 220, line 15.  Give me a minute.
10   Let me get to it myself.
11            You do recall you were deposed in this
12   case, Mr. Green, on March 31st, 2014?
13            A.   I do.
14            Q.   And you were asked questions then,
15   and you were under oath, just like you are today?
16            A.   Yes.
17            Q.   And the answers you gave then were
18   truthful; right?
19            A.   Yes.
20            Q.   If you look at page 220, line 15:
21            "And if the routine returns" --
22            And again, this is questioning from my
23   colleague Mr. Luft relating to this alternative
24   maximum.
25                 "If the routine returns were

 

1          not approximately in the same
2          relative proportion to the RPS
3          percentages, then your calculation
4          would be incorrect; right?"
5          And here's the answer you gave:
6              "Well, it's not that my
7          calculation would not correct.  It's
8          just that the fundamental underlying
9          construct of this analysis would
10         probably -- wouldn't be really
11         correct."
12             Do you see that?
13         A.   Yes.  And then if you go through
14   the rest of the answer, I think it's fairly
15   consistent with what I just said.  It's a
16   simplifying analysis -- simplifying set of
17   assumptions in order to be able to provide an
18   alternative analysis.
19         Q.   Well, I'll go on.  We'll read it.
20   But first of all, that was a truthful answer you
21   gave at your deposition; right?
22         A.   Yes.
23         Q.   The point here is that if you're
24   going to do the allocation of the proceeds from
25   business sales just on RPS percentages without



1    actually running it through the MRDA, one has to

2    make certain assumptions, and that's one of them?

3                    A.    That's correct.

4                    Q.    So in other words, once you were

5    asked, look, just run it through the RPS

6    percentages and see what comes up, you said, "Wait

7    a minute.  That's not how the RPSM works.  You have

8    to do routine returns."  And so you said, "Well,

9    I'll just assume they're in the same relative

10   percentage, and then it will work."

11                   A.    Well, not really.  I mean, the

12   fact is that this is a part of the overall

13   computation.  But as I said, to be able to actually

14   apply the residual profit-split methodology, one

15   would need the buyers' projections in order to be

16   able to figure out their cash flows they got to the

17   2.2 billion to start with.  So I've had to make

18   some simplifying assumptions in the alternative.

19   It provides us with another basis for evaluating

20   how to allocate the proceeds among the Canadian, US

21   and EMEA Debtors.

22                   Q.    Mr. Kinrich has listed in his

23   report -- and we can turn it up, Table 6 on page 29

24   of his report.

25                   MR. ZELBO:  And I apologize, Your



1    Honors.  This report has not yet been submitted

2    into evidence.  I could do it now.  I know Your

3    Honors have it.  I think it's probably not

4    necessary.  If anyone disagrees, we can.   I'm just

5    showing him this one table, which is Table 6 on

6    Page 29 of his rebuttal report.  I apologize.  I

7    led you astray over there.

8              Page 29; right?  Table 6.

9              BY MR. ZELBO:

10             Q.   So here Mr. Kinrich chooses Q1

11   2001 and does the routine return share and the

12   residual profit share.  And you can see for the US

13   the routine returns share is 56.1 and the residual

14   profit share is 38.5.  Do you see that?

15             A.   Yes, I do.

16             Q.   And for Canada the routine return

17   is 25.2 and the residual profit split share is

18   49.9.  Do you see that?

19             A.   Yes.

20             Q.   So it doesn't appear to be the

21   case that under the MRDA and RPSM the routine

22   returns were in the same percentage as the residual

23   profits; right?

24             A.   Correct.  But again, to be able to

25   apply the routine returns, one would need some data



1   that isn't available to us, so I used --

2            THE CANADIAN COURT:  Mr. Zelbo, can I

3   ask a question?

4            MR. ZELBO:  Of course.  I don't know if

5   it's of me or the witness, but either one is fine.

6            THE CANADIAN COURT:  Yes.  These

7   percentages are different.  Do we know in relative

8   terms the dollar value of the routine returns

9   versus the dollar value of the residual profit

10   splits?  Are we talking about a lot of money here

11   or a little bit of money?

12            MR. ZELBO:  I think it makes a huge

13   difference, Your Honor.  I mean, frankly, while

14   Nortel was operating, it's different -- it's

15   different with the sales because they're cashing

16   in; right?

17            THE CANADIAN COURT:  I understand that.

18            MR. ZELBO:  But while they were

19   operating, everything was eaten up by the routine

20   returns.

21            Maybe I can help you.  Your Honor, if I

22   can have one moment, I think I could probably help.

23            I think, Your Honor -- and Mr. Kinrich

24   will explain this, but I don't want get ahead of my

25   skis here.  But in Table 7 Mr. Kinrich does have



1    numbers where he then does the RPS percentage.  And
2    the impact of looking at the routine returns
3    changes it from 44.8 percent to 52.7 percent for
4    the US.  Canada goes from 43 to 35.5.  And you can
5    also see the dollar amounts there.
6                    That's if you run it through the RPSM.
7                    BY MR. ZELBO:
8                    Q.   And no adjustment is made in your
9    alternative allocation, Mr. Green, with respect to
10   useful life of the patents?  In other words, you
11   use the useful life formulation in Schedule A,
12   where in the MRDA you don't make any adjustments if
13   the useful life assumptions are wrong in the MRDA;
14   right?
15                   A.   No, I'm using the assumptions in
16   the MRDA of five years; that's correct.
17                   Q.   And you understand that the MRDA
18   specifically provides that in the sale of a line of
19   business, those revenues are not run through the
20   MRDA RPSM formula.  You know that; right?
21                   A.   Again, I understand that that is a
22   part of how one would consider allocating or how
23   the MRDA works.  I've, for purposes of evaluating
24   in my principal analysis the values of the license
25   rights, run them through the MRDA.  I haven't run



1    the entirety of the transaction through the MRDA,

2    and that's consistent with what I understand would

3    happen if the parties continued to operate the

4    businesses.

5                   Q.   But they didn't continue to

6    operate the business.  They sold it; right?

7                   A.   Right.  But we had to evaluate --

8                   Q.   And the MRDA says you don't do the

9    RPSM percentages.  You don't run it through the

10   RPSM for gain or loss on a sale of business; right?

11                  A.   I haven't calculated gain or loss.

12   I have, in connection with doing the -- answering

13   the allocation question, I've tried to analyze the

14   values of the assets that were transferred or

15   surrendered in connection with the sales.  I'm not

16   calculating gain or loss here.

17                  Q.   Let's talk about Appendix P.

18   Appendix P is, I guess, an alternative to NNI

19   getting nothing for all those -- for the

20   4.5 billion Rockstar proceeds; right?  And what you

21   do there is you take -- it's just like the lines of

22   businesses, isn't it, Mr. Green?  What you're doing

23   is you are looking at NNI and EMEA as if the

24   company had not been sold and they had operated

25   IPCo or something like IPCo; is that right?

 Neeson & Associates   W&P WILSON & PETZER LTD.

```
 1                    A.    Fundamentally, what I'm doing is
 2    I'm assuming that there are cash flows that could
 3    be measured from the running of a business called
 4    IPCo, yes.
 5                    Q.    Sure.  But just like in the
 6    business lines -- I just want to be clear for the
 7    Courts -- when you're valuing under Appendix P NNI
 8    and the EMEA Debtors' allocation, the question
 9    you're asking is what does NNI and the EMEA
10    Debtors, based on some projections, what could they
11    earn had they not sold the patents but ran IPCo;
12    right?  That's what you've done?
13                    A.    Assuming IPCo was a business that
14    was run by Nortel, what would they have received;
15    that's correct.
16                    Q.    But that's not what you're doing
17    for NNL.  Just in the lines of business for NNL,
18    you run NNI and EMEA as if it hadn't been sold, and
19    then for NNL they just get the rest?
20                    A.    That's right.
21                    Q.    Right.  So if Rockstar paid
22    $4.1 billion, for example, more than you calculate
23    could have been earned by Nortel from this
24    licensing business, that 4.1 billion, that goes to
25    Canada; right?
```



 1                    A.    That's how the calculation is

 2   done, because the US and EMEA Debtors have no

 3   license rights in the residual IP because there's

 4   no products.

 5                    Q.    Wait a minute.  Wait a minute.

 6   Wait a minute.  Wait a minute.  I thought -- I'm

 7   pretty sure you said this in your rebuttal report.

 8   We can pull it up -- that Appendix P was based on

 9   the assumption that NNI and the EMEA Debtors did

10   have enforcement and sublicensing rights.  In fact,

11   I think there's a specific sentence that says:

12                         "If, contrary to the Monitor's

13                         contention, NNI and the EMEA Debtors

14                         do have enforcement and sublicensing

15                         and other rights with respect to the

16                         patents in the patent portfolio sold

17                         to Rockstar, then I go to

18                         Appendix P."

19                    So let's just be clear here.  Your

20   Appendix P assumes that they have rights.  I know

21   you don't -- think they don't exist, but let's

22   assume they do; right?

23                    A.    Well, then I must have misheard

24   your question as only referring to Appendix P.  If

25   we're referring to the Appendix P analysis, then



1    yes, I agree with you.

2                   Q.   Okay.  And based on the

3    projections you use, this excess amount -- and

4    again, we all know this because I went over this in

5    the business lines sales.  By excess amount I mean

6    the price that you believe Rockstar paid above what

7    Nortel could have earned had it stayed in.  That

8    excess amount ranges up to 4.1 billion; right?

9    Because your low end of your projections are

10   458 million; right?

11                  A.   The low end of which projections

12   are you refering to?  In the Appendix P analysis

13   that I described for the Court, I showed that the

14   value of -- the present value of the cash flows

15   that could result from use of IPCo was somewhere

16   between 561 million and 2.7 billion.

17                  Q.   I'm reading from your Appendix P.

18   We can call it up, but I don't think it's necessary

19   because I'm almost done.

20                  "The resulting valuations range

21                  from 458 million to 2.7 billion,

22                  depending on the discount rate,

23                  probability adjustments for

24                  enforcement success, and whether

25                  China is included."



1                    If you wish to see it, it's in your

2    rebuttal report, Appendix P, page 1 at the bottom.

3                    A.   Right.  And I've only presented on

4    the slide that's on No. 25 an amount that includes

5    the China enforcement.  So these are higher

6    numbers.  There's a lower range if one excludes

7    enforcement in China, enforcement activities in

8    China.  So that's where the 413 comes from.  I

9    didn't use that here.

10                   Q.   And under your analysis under

11   Appendix P, all amounts above that 458 million or

12   500 million or 600 million, whatever it is -- it's

13   going to be a lot of money -- that all goes to

14   Canada.  That's your Appendix P analysis; right?

15                   A.   Essentially, yes.

16                   MR. ZELBO:  Thank you.  I have no

17   further questions.

18                   THE US COURT:  Thank you, Mr. Zelbo.

19                   Mr. Maguire, good afternoon.

20                   MR. MAGUIRE:  Good afternoon, Judge

21   Gross.  Good afternoon, Justice Newbould.  Again,

22   for the record, Bill Maguire, from Hughes Hubbard &

23   Reed for the EMEA Debtors.

24

25                   CROSS-EXAMINATION BY MR. MAGUIRE:



```
 1                      Q.   Good afternoon, Mr. Green.

 2                      A.   Good afternoon.  How are you?

 3                      Q.   Good.  Thank you.

 4                      Just to follow up on a couple of the

 5      matters that my colleague, Mr. Zelbo, covered.

 6                      First, with respect to the sale of the

 7      residual patent portfolio to Rockstar, it's fair to

 8      say that the Monitor did not ask you to consider if

 9      the Canadian estate could have consummated, could

10      have done that sale to Rockstar without the

11      participation of the EMEA and the US Debtors; isn't

12      that right?

13                      A.   Well, I think I actually testified

14      about this at my deposition, that the deal, I

15      think, could have been consummated.  There were

16      demands for some kind of licenses.

17                      My understanding -- and I think I

18      testified about this at my deposition -- is that to

19      the extent that there needed -- as a practical

20      matter, there could have been a resolution to this.

21      And there could have been some kind of hold-backs

22      or reserves taken and the transaction proceeded

23      subject to the reserves, if need be.  We talked

24      about this.

25                      Q.   Exactly.  And you're just
```



1    conflating a few points that we need to break up

2    and take one at a time.  So let's just walk through

3    those.

4              The first thing is the Monitor did not

5    ask you to consider and your reports do not detail

6    any analysis by you as to whether the Monitor for

7    the Canadian estates could have consummated the

8    Rockstar sale without the participation of the EMEA

9    and the US Debtors; right?

10             A.    Correct.  I haven't done those

11   computations.

12             Q.    But without considering that, you

13   still felt very comfortable at your deposition

14   saying that it wouldn't change your analysis

15   whatsoever if the EMEA and the US Debtors did not

16   participate.  If the Canadian estates had not been

17   able to do the Rockstar sale, that would not change

18   your analysis whatsoever; right?

19             A.    That's right.

20             Q.    In your view, even if the Canadian

21   estates couldn't have gotten a single dollar out of

22   Rockstar, as far as you're concerned, your opinion

23   is that the entire $4.5 billion should be allocated

24   to the Canadian estates; correct?

25             A.    I don't understand your question.



1    The way I've done my analysis is I have allocated

2    the net value of the proceeds of 4.5 billion to the

3    Canadian estate because it's the owner of the --

4    that has title to the IP that was sold.

5                    Q.    And it's your view that even --

6    it's your view that even if the US Debtors and the

7    EMEA Debtors had not participated, it would not in

8    any way have changed the purchase price that

9    Rockstar paid for the residual patent portfolio?

10                   A.    Not that I'm aware of or could

11   think of, no, not materially.  I think there could

12   have, as I said, been some kind of reserve set up

13   for any contingencies related to what might be

14   continuing rights.  But I'm not aware of anything

15   that would cause that value to be different.

16                   Q.    So your view, quite simply, is

17   that there really was no need for the US Debtor or

18   the EMEA Debtors to participate in the Rockstar

19   sales?

20                   A.    That's correct, because by this

21   point, at least based on my analysis for the

22   purposes of doing the valuations here, there were

23   no license rights that continued to be enforced

24   that could be valued if there was no value in those

25   licenses to the US and EMEA Debtors.



1              Q.   And since the rights had no value,
2    therefore, it was quite unnecessary for the US or
3    the EMEA to participate in the sale to Rockstar?
4              A.   Well, it would have -- to the
5    extent that they had some kind of cause of action,
6    it would have been limited to whatever harm they
7    suffered.
8              They had no license rights or there was
9    nothing to value, so -- of value there, so I didn't
10   see how it was going to materially affect the
11   overall price for the Rockstar transaction.
12             Q.   No need for participation by the
13   US Debtor, no need for a US sale hearing, no need
14   for a US sale order.  And Canada, as far as you're
15   concerned, could proceed and collect the entire
16   $4.5 billion; right?
17             A.   No.  I wouldn't say that.  There's
18   a lot of procedural things that you just
19   identified.  From the point of view of
20   understanding the value that was paid and the value
21   that was attributed to the Canada Debtor, those are
22   things that I've tried -- that obviously I have
23   given some consideration to in the context of my
24   deposition.
25             But I'm not aware of anything that



```
 1   would have caused a reduction in the value that was

 2   paid by the Rockstar consortium, because there

 3   were -- and even if there would have been such a

 4   thing, there would have been an ability to have

 5   reserves or set up some kind of contingency.

 6               But even so, there was a contract among

 7   the parties.  The license rights had no value, so

 8   there shouldn't have been an effect on the overall

 9   price that would have been paid.

10               Q.   So your overall view really was

11   that the participation of the US and the EMEA

12   Debtors was really simply a "belt and

13   suspendering," in your words; right?

14               A.   That's pretty much it, yes.

15               Q.   Now, you understand that when the

16   US and the EMEA parties came to these courts and

17   went through the procedural parts that you

18   mentioned, they had to make a decision as to

19   whether to support the sale to Rockstar or to

20   oppose it.  Did you understand that?

21               A.   I'm aware of that, yes.

22               Q.   And at the time, you understand

23   that the US and the EMEA parties believed that

24   there was an alternative to Rockstar; and that was,

25   by obtaining revenues from the proceeds of the
```



```
 1    residual patent portfolio either through IPCo or
 2    through some other sale; right?
 3                A.   I'm aware of IPCo.  I'm not aware
 4    of an alternative sale other than the Rockstar
 5    sale.  I suppose there could have been other
 6    bidders out there, but we focus on Rockstar.
 7                Q.   But you certainly understand that
 8    the US Debtors, Mr. Ray for example, believed that
 9    IPCo was an alternative which would return value to
10    the US estate, for example?
11                A.   I believe that that was a
12    consideration, yes.  That was discussed.
13                Q.   And you would accept that for a
14    party appearing before a court, which is faced with
15    two options, Option 1 being to go forward with an
16    option like IPCo and obtain a stream of revenue --
17    that's one option; right?
18                A.   Correct.
19                Q.   And the other option is to support
20    a sale to Rockstar which is nothing other than belt
21    and suspendering and which would return that party
22    zero; you understand that it would be irrational
23    for a person in that position to support a sale to
24    Rockstar that would return that estate zero when
25    they believed they had another better alternative?
```



```
 1                      A.   I disagree with you.  I think
 2  that, at least in this case, what we've found is
 3  that the parties actually decided not to have an
 4  IPCo; that there was essentially zero value in that
 5  alternative or value that was so unknown and
 6  unpredictable that it wasn't something that they
 7  could actually use as a reliable basis for making a
 8  decision.
 9                      So I don't think that there was ever a
10  possibility that they were going to wind up having
11  revenues or cash flows that could be attributed to
12  them through the RPS system from the continued
13  operation of an IPCo.  The best deal they could get
14  was the one that they got, which was selling it to
15  Rockstar.
16                      Q.   You're not denying as a general
17  matter that when a person believes that they have,
18  as between two options, one option that would
19  return them zero and another option that will
20  return them something more than zero, that it would
21  be, all other things being the same, irrational for
22  them to choose zero?
23                      A.   I think from an economic point of
24  view, that may be generally true.  I think for the
25  circumstance of this matter, that's not really
```

 Neeson & Associates   W&P WILSON & PETERSON LTD.

1    true, because what you're assuming is "going to

2    return something" was so speculative that such a

3    wide range of values, even in the documents we've

4    seen today, that it winds up being so uncertain

5    that it's effectively a zero.

6                    Q.    And the uncertain effect of

7    billions or hundreds of millions of dollars, in

8    your mind, is effectively the same as absolute

9    certain with no question about it, no

10   qualification, absolute zero?

11                   A.    Again, the parties made a decision

12   to not go forward with running an IPCo.  There were

13   a number of things that went into that decision,

14   including the speculative and uncertain nature of

15   the cash flows, the timing of those cash flows, and

16   a variety of different things that suggested to, at

17   least Nortel and its managers, that it wasn't

18   something that was worth it to do.

19                   So, in my mind, that's a zero.

20                   Q.    Now, I'm not going to ask you to

21   play judge.  But I do want you to step back and

22   tell us a little bit about your understanding as to

23   what exactly it is that Nortel Networks Limited did

24   to earn $4-1/2 billion from the Rockstar sale.

25                   And to start with, is it fair to say



1    that your understanding really emanates from your

2    view that Nortel Networks Limited is entitled to

3    the entire $4-1/2 billion, because it is the owner,

4    sole owner of 100 percent of the patents?

5              A.   I think we discussed this at my

6    deposition; but, yes.  I mean, as I understand it,

7    there's agreements among the parties; there are --

8    which ultimately provide with NNL being the

9    titleholder to the IP; and, accordingly, the -- to

10   the extent there aren't any license rights that the

11   US and EMEA Debtors had, then the value of the

12   proceeds from the sale of the residual IP would go

13   to the owner, which is NNL.

14             Q.   And the basic deal, your

15   understanding of the basic deal is that Nortel

16   Networks Limited was given ownership of the patents

17   in exchange for providing debt and equity financing

18   services through EMEA and the United States; right?

19             A.   We talked about this at my

20   deposition.  I mean, that is one of the things that

21   I discussed as being something that a parent would

22   do.  And NNL is -- I think we went through the org

23   chart.  NNL is fairly high up in the organizational

24   chart of the structure of Nortel, yes.

25             Q.   Specifically, the exchange -- your



1    understanding here was the exchange was Nortel

2    Networks Limited got the patents in return for the

3    services it provided, which was debt financing,

4    equity financing and central accounting; right?

5                    A.    That was one of the reasons -- you

6    asked me:  What did NNL do at my deposition?  And

7    these are the things that I discussed as being

8    things that NNL and NNC above it did with respect

9    to their obligations as parents.  We can see that

10   there's a variety of things that NNL is supposed to

11   do in connection with the activities under this

12   agreement too.

13                    So yes.

14                    Q.    This is what you described as

15   Nortel Networks Limited doing in exchange for the

16   patents; right?

17                    A.    Well, in -- in exchange for -- or

18   it wasn't in exchange.  It is as part of how the

19   parties agreed to set up their business under the

20   MRDA, which is described in the document.

21                    Q.    Well, today you're telling me it

22   wasn't in exchange.  So maybe we should just go to

23   your deposition transcript.

24                    Q.    If we could pull up page 74 of

25   that transcript.  And if I could ask you, please,



 1   to turn to line 20:

 2              "Question:  What did Nortel

 3          Limited do to earn a 100 percent

 4          share of the $4-1/2 billion Rockstar

 5          proceeds?

 6          Answer:  Again, Nortel Limited

 7          was part of the overall consolidated

 8          parent entity that -- of Nortel, and

 9          this was the entity that was

10          essentially given the ownership of

11          the patents.  And in exchange there,

12          for the services provided by the

13          parent, including debt and equity

14          financing and all kinds of things

15          that occurred at the parent level,

16          the subsidiary or other entities,

17          such as the EMEA and the US Debtors,

18          obtained benefits from the parent."

19          And you go on to say:

20          "And so part of this overall

21          analysis or this overall operation

22          of the company results in NNL

23          holding the patents, the other

24          parties getting licenses, the EMEA

25          and US Debtors getting licensed for



1              the use of the technology, and the

2              parties all having a methodology for

3              compensating each other for the use

4              of the technology."

5                   And then the next question is:

6                   "Are there any services that

7              Nortel Limited provided in return

8              for this $4.5 billion other than the

9              debt and equity financing services

10             that you just referred to?

11                  Answer:  Again, Nortel Limited --

12             Nortel, NNL -- was part of the

13             overall consolidated parent entity,

14             so there were other aspects of the

15             overall consolidated parent entity

16             that were being run."

17                  And if we skip a little bit further

18        ahead a page or two, to the top of page 78, there

19        you are asked a question:

20                  "Well, you described the debt

21             financing, and you described equity

22             financing.  My question is, is there

23             anything else?

24                  Answer:  There is overall

25             operation of the company on a

 Neeson&Associates   W&F

```
1                 corporate, consolidated basis that

2                 was going on inside of Canada.

3                 There were central accounting.

4                 There were all kinds of things that

5                 were being -- that were occurring

6                 inside of the Canadian entity."

7                 So, sir, you were asked those

8       questions, and you gave those answers?

9                 A.    That's correct.

10                Q.    And it is true, is it not, sir,

11      that there is no mention --

12                THE US COURT:  Mr. Ruby?

13                MR. RUBY:  I just wanted to point out,

14      Your Honors, that, in my view, this doesn't

15      contradict the witness' testimony today.

16                MR. MAGUIRE:  Respectfully, the witness

17      specifically denied the word "exchange."  That

18      specifically was his answer.

19                THE US COURT:  I don't want to take

20      time to go back and read the transcript.  But I

21      must confess I did hear it differently, Mr. Ruby,

22      and I think that the cross-examination impeachment

23      is appropriate.

24                You may proceed, Mr. Maguire.

25                BY MR. MAGUIRE:
```



```
 1                    Q.   Mr. Green, is it fair to say that
 2      the -- there is no mention in the infamous Master
 3      Research and Development Agreement of debt
 4      financing or equity financing or access to capital
 5      markets or central accounting?
 6                    A.   Well, I wouldn't necessarily say
 7      that.  NNL has a variety of different activities
 8      that it must perform.  We also, if you look at the
 9      history of this, know that NNL started off having
10      technology that was ultimately licensed.  And to
11      the US and EMEA Debtors, this is how the history of
12      this runs.
13                    And so what we have here is that in
14      exchange for licensing or signing the technology to
15      NNL, providing it with legal title, NNL provides to
16      the US and EMEA Debtors certain things that it's
17      obligated to do under here, under the MRDA, as well
18      as they obtained licenses to use the patented
19      technology; and they all agreed to share in the
20      profits that are earned from the exploitation of
21      that technology.
22                    There are other things that are going
23      on.
24                    Yes, sir?  Justice Newbould, did --
25                    THE US COURT:  I don't think Justice
```

Neeson & Associates     W&F

```
 1    Newbould said anything.
 2              THE WITNESS:  Sorry.
 3              THE CANADIAN COURT:  I'm sitting here
 4    mute.
 5              THE WITNESS:  There are other things
 6    that are going on, obviously, at the company at the
 7    NNL level and at the NNC level which include
 8    providing financing, making it so that these
 9    companies can actually have working capital and
10    actually doing the accounting and the other things
11    that are part of the operations of the business.
12    That's what I was trying to explain.
13              BY MR. MAGUIRE:
14              Q.   Lots of things going on
15    everywhere.  My question was very much focused on
16    that document that you're familiar with, the Master
17    Research and Development Agreement.  There isn't an
18    Article 15(b) on debt financing; right?
19              A.   No, there's not.
20              Q.   And there's no Article 21(a) on
21    equity financing anywhere in that agreement?
22              A.   No.  There is an obligation and a
23    definition in this agreement as to how the parties
24    would operate, and there is a statement that NNL
25    is -- has legal title to the IP that is developed
```



1    inside of Nortel.

2              There is no need for it, if you will,

3    to, other than to continue to provide its

4    obligations under this agreement, to obtain the

5    $4-1/2 billion.  They are the owner.  There are no

6    other rights that the US and EMEA Debtors have.

7              Q.   And when Nortel went into the

8    public markets and issued stock, the cash that it

9    received all went to Nortel Networks Corporation;

10   right?

11             A.   It started off at Nortel Networks

12   Corporation and would have been used to fund the

13   operations of the business.

14             Q.   And Nortel Networks Corporation is

15   not a party to the Master Research and Development

16   Agreement; isn't that right?

17             A.   I think that's fair.  It's the

18   parent company.

19             Q.   And you've told us about all the

20   different things that were going on in Nortel.  But

21   if we just focus on the core functions that are the

22   subject of the Master Research and Development

23   Agreement and the core functions of running the

24   business, isn't it fair to say that as between

25   Nortel Networks Limited the EMEA Debtors and the US



1   Debtors, basically all of these companies were

2   fulfilling substantially the same core business

3   functions?

4            A.   At some level, it's true.  Again,

5   there's a parent company that is doing the

6   consolidated financials and those kinds of things,

7   so sure.

8            Q.   In fact, as you're aware, Nortel

9   Networks Limited specifically represented to three

10  governments that during the period of the residual

11  profit split, at least as of 2004, they made the

12  representation that the participants in the Master

13  Research and Development Agreement were fulfilling

14  the same functions; right?

15           A.   I believe that there are documents

16  that evidence that; yes.

17           Q.   Now, sir, you have discussed with

18  Mr. Zelbo the various assumptions that you'd made.

19  And you'd talked some about value-in-use and

20  certain other parts of your analysis.

21           In the course of your review of the

22  record in this case, is it fair to say you cannot

23  give us the name of anyone at Nortel Networks

24  Limited who ever said to anyone that in a sale of

25  intellectual property, Nortel Networks Limited will



1  get to keep and not share certain of the sale

2  proceeds?

3          A.   I think we discussed this at my

4  deposition, that I didn't have a name.  I didn't

5  know what everyone might have said throughout the

6  vastness of this record.

7          Q.   And it's fair to say that from

8  your review of this vast record, you cannot, again,

9  give us the name of anyone at Nortel Networks

10  Limited or at the US or at EMEA, anyone at all who

11  ever said that in a sale of intellectual property,

12  any proceeds for any party would be limited to

13  value-in-use and that Nortel Networks Limited would

14  get to keep and not share everything above

15  value-in-use?

16          A.   Again, I think we discussed this

17  at my deposition.  What people said either at

18  Nortel, in and out of hallways, at the water cooler

19  isn't what's relevant.  What really does matter is

20  what the terms are of the MRDA and what the parties

21  were actually abiding with.

22          And I've used those for my valuation of

23  the license rights.

24          Q.   But you are aware of certain

25  statements that were made by Nortel Networks



 1   Limited -- not around the water cooler, but to tax

 2   authorities of different governments, to the

 3   opposite effect, that all of the proceeds of a sale

 4   of IP would be shared.  You are aware of that;

 5   right?

 6              A.   I'm aware of that.  I'm not sure

 7   that that undoes what is a signed agreement among

 8   the parties and has been essentially reinforced

 9   through other agreements that have occurred

10   subsequent to the bankruptcy.

11              Q.   And, again, I'm not going to ask

12   you to play judge and rule on that right now.  But

13   you are aware of those documents and those

14   statements made by Nortel Networks Limited?

15              A.   I am.

16              Q.   You're aware, for example, of the

17   Q-and-A document from the kickoff meeting in 2002;

18   right?

19              A.   I'm aware of the document, yes.

20              Q.   And you're aware of the process

21   that Nortel went through in preparing that document

22   and getting ready for that meeting?

23              A.   I'm aware of the process and the

24   document, yes.

25              Q.   Have you seen the agenda items for



1    the pre-meetings and the preparation meetings among

2    members of Nortel management and their outside

3    advisers in which they walked through agendas in

4    terms of making sure that they were prepared and

5    ready for that meeting?

6              A.   For this meeting in 2002, that

7    you're describing, I may have seen those.  I don't

8    recall specifically.

9              Q.   Have you seen the reports from

10   their outside consultants from Deloitte & Touche,

11   identifying the issues that they expected would

12   come out at the meetings before the governments?

13             A.   Yes, I've seen them.

14             Q.   Okay.  You've seen the ones from

15   Deloitte & Touche?

16             A.   I believe so, yes.

17             Q.   And you've seen the responses from

18   KPMG?

19             A.   I believe so, yes.

20             Q.   And both of those refer to this

21   question about ownership of IP that the tax

22   authorities could ask the question:  How does

23   Nortel propose to account for any future sale of

24   intellectual property developed prior to or during

25   the term of the APA?



```
 1                    And of the answer:  Proceeds from the
 2    sale of IP will be allocated to the residual
 3    profit-split participants on the basis of their
 4    economic ownership of the IP -- that is, on the
 5    basis of their share of total R&D capital stock in
 6    the year of sale.  You're aware of that?
 7                    A.   Yes, and I think that's consistent
 8    with what I've done.  I've evaluated and provided
 9    value to the US and EMEA Debtors for their license
10    rights in proportion to or using the residual
11    profit-split methodology as it evolved and that to
12    the extent that there were no other rights that
13    were available under the -- to those Debtors in the
14    residual patent sale, they were -- there was no
15    reason to allocate to them under the RPS
16    methodology.
17                    Q.   You didn't happen to notice any
18    reference to legal title or to the methods that you
19    used in any of those preparation materials for that
20    meeting with the governments?  No reference to
21    legal title in the Q-and-A document that was
22    prepared; right?
23                    A.   I don't have those documents in
24    front of me, and there were a quantity of them.  So
25    on this -- we've heard today the record here is
```

1   vast.

2             I don't -- I couldn't tell you

3   specifically.  I'm assuming you're representing to

4   me that it doesn't exist.  Again, it -- the

5   analysis that I've done is not -- winds up giving

6   legal title to -- or the Rockstar proceeds to the

7   Canadian Debtor, because it owned the -- it had

8   legal title to the patented technology, but also

9   because it doesn't -- there were no other rights

10  that were available to value for the US and EMEA

11  Debtors.  I endeavored to identify value based on

12  the residual profit-split methodology and provide

13  value for their licenses.

14            Q.   You have an Appendix L in your

15  main report, which deals with other Nortel

16  transactions.  Do you recall that?

17            A.   Yes, I do.

18            Q.   And in that you look at some prior

19  history of Nortel, looking for guidance; right?

20            A.   I looked at other analyses that

21  had been done, yes.

22            Q.   You say they should be carefully

23  investigated to provide guidance; right?

24            A.   To the extent they can provide

25  guidance, yes.



1            Q.   And you refer to four instances.

2   The first one we can deal with very quickly because

3   it's Nortel Networks Japan.  And if I understand

4   you correctly, Japan dropped out of the parties'

5   research and development arrangements before the

6   parties even adopted their residual profit-split

7   arrangement; right?

8            A.   That's correct.

9            Q.   So we can go to the second

10  instance you provide here in Appendix L, and that

11  is something called IP migration analysis?

12           A.   Yes.

13           Q.   And the IP migration analysis you

14  described as something that happened in 2003?

15           A.   Yes.

16           Q.   Nortel was considering

17  transferring certain IP that was owned directly by

18  the UK firm and the French firm and transferring

19  that to the Canadian parent, Nortel Networks

20  Limited?

21           A.   Yes.

22           Q.   So they did a valuation?

23           A.   They did an analysis to value it

24  based on the market capitalization of Nortel;

25  that's correct.



    1                    Q.    You say a valuation was prepared
    2   by Nortel.  So Nortel did a valuation; right?
    3                    A.    Right; based on its market
    4   capitalization.
    5                    Q.    And within that, the -- what they
    6   did was, in their analysis, the intellectual
    7   property was -- that was based, as you say, in the
    8   market cap; and after they subtracted the tangible
    9   assets and liabilities, they assigned 50 percent,
   10   one half, of the remaining value to IP; right?
   11                    A.    Yes.
   12                    Q.    And the intellectual property
   13   value they allocated to the UK and to the French
   14   subsidiary based on the then-current allocation
   15   percentages in the MRDA allocation formula; right?
   16                    A.    That's right.
   17                    Q.    So, again, this allocation here
   18   was done using the residual profit share
   19   percentages; right?
   20                    A.    It was applied to the residual
   21   intangibles; that's correct.
   22                    Q.    Right.  It was not done based on
   23   who had legal title?
   24                    A.    Well, it was done essentially to
   25   divide up among these entities the value that was



1    implied to the -- implied by the rest of the

2    analysis for the intellectual property.

3              And this analysis, as I understand it,

4    really went nowhere.  It also involves a lot of

5    different things that aren't available to us here.

6              Q.    Your third example is Alcatel;

7    right?

8              A.    Yes.

9              Q.    And the Courts have heard a great

10   deal about Alcatel, so we can move fairly quickly

11   through this.  But if you turn to page 3 of your

12   Appendix L, you have five bullets providing some

13   guidance here on the question of Alcatel; right?

14             A.    Yes.

15             Q.    The third bullet says that the

16   value of the customer relationships is allocated

17   based on revenue to the Nortel entities that

18   controlled the customer relationship; right?

19             A.    That's how the calculation was

20   done, yes.

21             Q.    And your fourth bullet notes that

22   the value of the developed technology and knowhow

23   as well as in-process R&D were allocated based on

24   the RPS percentages; right?

25             A.    That's right.

 Neeson&Associates    W&F

1          Q.   So that's what the parties did in

2     Alcatel; right?

3          A.   Right.  But Alcatel was done --

4     this analysis was fundamentally done to figure out

5     how to determine a gain/loss from the sale of this

6     business.  It relied on information that came from

7     Alcatel, the purchaser, not from -- which is not

8     available to us here, their valuations, their

9     detail.  And so I didn't use this as a basis for

10    doing the analysis here.  It's a different process.

11    It wasn't involving the same question.

12         Q.   Well, what you say in your report

13    is that the allocation is something that you

14    disagree with because it ignores what you describe

15    as the economic realities of the MRDA license

16    rights and corresponding transfer pricing

17    methodology in place at the time.

18              That's what you say in your report;

19    right?

20         A.   Yes.

21         Q.   You describe their approach.  You

22    call it a simplified approach, and you say that the

23    approach that the parties followed when they were

24    allocating the proceeds of Alcatel ignores the

25    limits and restrictions, maybe what you described



1    this morning as the metes and bounds of the

2    licenses; is that right?

3              A.   That's right.

4              Q.   You say:  In particular, the

5    simplified approach -- and you're referring to what

6    you parties actually did there; right?

7              A.   Yes.

8              Q.   You say it ignores the fact that

9    the value of the license rights to the EMEA and US

10   Debtors is constrained by the expected profits they

11   would earn from exploiting the IP in their specific

12   territories and fields of use.  And those are the

13   constraints which you say the parties ignored when

14   they were doing Alcatel, which are fundamental to

15   the valuation analysis that you have performed;

16   right?  You have relied heavily on those

17   constraints; right?

18             A.   Well, I have used the value --

19   I've used projections that were identifying the

20   future profits that would be earned as if Nortel

21   were to continue.  In the Alcatel analysis, what's

22   being done is -- it's an analysis that's based on

23   what Alcatel actually -- how they allocated the

24   business, and it's based on what they paid.  It's

25   based on their economics, not based on the



```
 1    economics of Nortel and what it gave up.
 2              Q.   And, again, have you looked
 3    through the Alcatel materials, the reports that
 4    were done internally, the memoranda that were
 5    provided to the auditors, to see if the people at
 6    Nortel at the time, what they said to the auditors
 7    on the subject of legal title and who owned the IP?
 8              A.   I've looked at the documents.  I
 9    don't recall the discussion about legal title.
10              Q.   All right.  Your last item here
11    for guidance concerns Project Equinox.  And that, I
12    believe, involves a valuation but says nothing
13    about allocation; right?
14              A.   That's correct.
15              Q.   So we can skip that.
16              You were asked a number of questions on
17    the subject of litigation and licensing,
18    specifically about the MRDA Article 4(e) or
19    Section 4(e).  And I think you were good enough to
20    convert that into plain English, basically along
21    the lines that the US could go and sue competitors
22    in the United States; right?
23              A.   I think we discussed that as me
24    trying to understand Mr. Zelbo's question, what he
25    was trying to get at, yes.
```



```
 1                    Q.   And can I take that as applying
 2    also to the EMEA Debtors?
 3                    THE CANADIAN COURT:  Mr. Zelbo's street
 4    talk.
 5                    MR. MAGUIRE:  I'm not going to match
 6    Mr. Zelbo's street talk.
 7                    BY MR. MAGUIRE:
 8                    Q.   But can I check the box and
 9    confirm that your understanding, similarly, would
10    be that the EMEA entities would, by virtue of 4(e),
11    have the ability to sue competitors in the EMEA
12    territories where they were infringing Nortel
13    patents?
14                    A.   That discussion that we had, when
15    I said that, I think was in reference to what the
16    Rockstar Consortium could do with respect to its
17    ownership rights that it had obtained from -- when
18    it purchased the residual IP.  I'm not sure that we
19    were discussing this as just giving everybody the
20    right to go and sue -- "this" being Article 4(e) of
21    the MRDA.
22                    Q.   Maybe I didn't quite follow you.
23    Let me step back, then, and see if we can just
24    clear this up.
25                    Where EMEA is doing business and
```



```
 1   EMEA -- and a competitor comes in and steals some
 2   Nortel patents, is it your view under Article --
 3   Section 4(e), does that give the EMEA entities the
 4   right to sue in their territories competitors for
 5   infringement of Nortel patents?
 6              A.   Again, I think this calls for
 7   somewhat of a legal conclusion regarding standing
 8   and how this might actually work inside of the
 9   company.
10              In my analysis, to the extent that
11   actually happened, I've included it in the cash
12   flows.
13              Q.   You're aware that the Monitor has
14   some other experts, Mr. Cox, Mr. Berenblut and
15   Mr. Reichert; right?
16              A.   Yes.
17              Q.   And you're aware that Mr. Cox and
18   Mr. Berenblut have done an analysis of what you
19   did?
20              A.   I'm aware that they prepared
21   analyses similar to mine except they didn't
22   actually do the valuation part of it.  They had the
23   theory, yes.
24              Q.   Okay.  So I asked Mr. Cox if it
25   was his understanding that the EMEA could go and
```



1    sue competitors when they infringed Nortel patents.

2    And I understood from him that that was the case,

3    and I understood the same from Mr. Berenblut.

4                    Have you read the reports of

5    Mr. Reichert?

6              A.   Yes, I have.

7              Q.   Why don't we take a look at

8    Mr. Reichert's rebuttal report at page 137 and see

9    if you're on the same page as Mr. Reichert.  This

10   was another of the Monitor's experts.

11                   And if we go to the top of page 137, he

12   refers there in the second full paragraph --

13   actually, maybe we start at the very top of the

14   page.  He refers to the Foundry litigation, which

15   encompassed a $35 million settlement for patent

16   infringement alleged to have incurred by Foundry

17   Networks Inc., an unrelated third party.

18                   And you're aware who Foundry is; right?

19             A.   Yes, I am.

20             Q.   Foundry was a maker of switches?

21             A.   Yes.

22             Q.   It was public company?

23             A.   Yes, it was.

24             Q.   Competing with Nortel?

25             A.   To some degree, yes.

 Neeson & Associates    W&F

```
 1                    Q.   Nortel sued Foundry for

 2   infringement?

 3                    A.   Yes.

 4                    Q.   They did that in court in the

 5   United States?

 6                    A.   To my knowledge, yes.

 7                    Q.   And the Nortel parties were Nortel

 8   Networks Limited and the US company, Nortel

 9   Networks Inc.  They were the plaintiffs; right?

10                    A.   To my knowledge, that's correct.

11                    Q.   Now, if we go to the next

12   paragraph, Dr. Reichert says:

13                         "As with the Alcatel

14                         transaction, I believe it was

15                         appropriate for the proceeds of the

16                         Foundry settlement to have been

17                         allocated among the licensees,

18                         although this does not provide any

19                         meaningful conclusion with respect

20                         to the allocation of the residual

21                         IP."

22                            He goes on to say:

23                         "Upon a closer examination of the

24                         conditions of the Foundry

25                         settlement" --
```



```
 1                    And when he's talking about the Foundry
 2    settlement, you're aware that Foundry settled with
 3    Nortel?
 4                    A.   Yes, I am aware of that.
 5                    Q.   And it paid Nortel some
 6    $35 million; right?
 7                    A.   Yes.
 8                    Q.   -- "it is clear that it
 9                    represents payment for the use of
10                    certain of the Nortel technology in the
11                    production and sale of similar
12                    telecommunications equipment as that
13                    produced and sold by the licensees
14                    under the MRDA."
15                    So Foundry was making competing
16    equipment; right?
17                    A.   Correct.
18                    Q.   And he finds it entirely
19    appropriate that Nortel would have sued Foundry and
20    have shared the proceeds; right?
21                    A.   I think that's consistent with my
22    view, too.  That to the extent there were
23    litigation --
24                    THE CANADIAN COURT:  Mr. Green, it's
25    better if you just answer the question.  He didn't
```



1    ask you about what you've done or why you've done

2    it.  You're doing a lot of arguing here that is not

3    responsive to the question.  Lots of lawyers, many

4    of them here that can argue the case.

5              THE WITNESS:  I must have misunderstood

6    his question, then, Your Honor.  I apologize.

7              BY MR. MAGUIRE:

8              Q.   Bottom line:  You agree with

9    Dr. Reichert here that it was entirely appropriate

10   for Nortel Networks Inc., the US company, to sue

11   Foundry for infringing Nortel patents by making

12   competing products; right?

13             A.   This is what Dr. Reichert says as

14   being appropriate.  I would assume that Nortel

15   would have -- would sue for patent infringement if

16   it found it necessary to do so.  I know that NNL

17   and NNI were the plaintiffs.

18             Q.   And that's entirely consistent

19   with your understanding of that section we looked

20   at, that 4(e), that Nortel Networks Inc. Had the

21   power to go into court and sue a competitor who was

22   infringing a Nortel patent; right?

23             A.   Yes; in this instance, standing

24   had been determined.  Yes.

25             Q.   Just to confirm that, why don't we



```
 1    take a look at the complaint in the Foundry case.
 2    It's Trial Exhibit 22084.  If we can pull that up,
 3    you'll see that this a Complaint from the United
 4    States District Court in the District of
 5    Massachusetts, all the way back in 2001.  And the
 6    plaintiffs are Nortel Networks Inc. And Nortel
 7    Networks Limited; right?
 8                    A.   Yes.
 9                    Q.   And the Complaint starts by
10    saying:
11                    "Plaintiffs, Nortel Networks
12                    Inc. (NNI) and Nortel Networks
13                    Limited (NNL) collectively Nortel."
14                    And if we go over to the second page,
15    we'll see there's a count one.  And in paragraphs 8
16    and 9, it says, first, that NNL is the owner of the
17    patent.  Do you see that?
18                    A.   Yes.
19                    Q.   And it says that NNI is the
20    exclusive licensee of the patent; right?
21                    A.   Yes.
22                    Q.   And it says the same for all the
23    other patents; right?
24                    A.   I can't see it, but I assume so,
25    yes.
```



1             Q.    And you're also familiar, are you

2    not, with the Kyocera litigation; right?

3             A.    I am.

4             Q.    Why don't we take a look at the

5    Kyocera complaint.  That's Trial Transcript 49900.

6             And here we have a complaint from a

7    Federal Court in Dallas, Texas, from 2002.  And

8    you'll see here we have, again, Nortel Networks

9    Limited and Nortel Networks Inc. Suing Kyocera

10   Wireless Corporation; right?

11            A.    Yes.

12            Q.    And if we go over to the third

13   page, at the top of the page we have a

14   paragraph 10.  That paragraph says that NNL is the

15   owner by assignment of all right, title and

16   interest to the patents; right?

17            A.    Yes.

18            Q.    And it says:

19            "NNI is the exclusive licensee

20            of the patents and has been provided

21            the right to sue by virtue of the

22            exclusive license agreement."

23            Right?

24            A.    Yes.

25            Q.    So that's fully consistent with



1    your understanding.  What Nortel Networks Limited

2    was saying here to a federal court in 2002 was that

3    this participant, Nortel Networks Inc., had been

4    provided the right to sue by virtue of its

5    exclusive license agreement; right?

6                    A.    That's what it says in the

7    Complaint, yes.

8                    Q.    Now, if the US and the EMEA

9    entities had the right to sue to exclude others

10   from using Nortel patents, that would affect your

11   opinion, would it not, that Nortel Networks

12   Limited, should get the entire $4-1/2 billion from

13   Rockstar?

14                   A.    No, it wouldn't.  I think what I

15   have done is I've tried to evaluate whether or not

16   there is some rights or there was some lawsuit or

17   there was something that would give me some

18   guidance as to a cash flow that would be

19   attributable to the licenses that the US and EMEA

20   Debtors held.  And I was unable to identify those.

21                   And so I think it's -- still at the end

22   we have, as confirmed by even these complaints, NNL

23   being the owner of the IP that was at issue even in

24   these cases and would get the residual.

25                   Q.    Well, in fact, the basis for your



```
1    opinion is that the rights that the United States
2    and the EMEA entities have, have no value.  They're
3    worthless; right?
4                    A.   I was -- they don't have any value
5    because they can't find any cash flows that would
6    be associated with those rights.
7                    Q.   So it's zero?
8                    A.   It's a zero; that's correct.
9                    Q.   Big zero?
10                   A.   That's right.
11                   Q.   But if they have the right to sue
12   people in court and get money and give licenses,
13   that's not zero?
14                   A.   That would wind up being, I think,
15   IPCo, the concept of IPCo; and to the extent we
16   want to consider IPCo, then I have evaluated that
17   in terms of Appendix P.
18                   Q.   That could also be Rockstar;
19   right?  Rockstar has the right to sue and get
20   money; right?
21                   A.   As an owner, it does, yes.
22                   Q.   And Rockstar has sued; right?
23                   A.   To my knowledge, it has, yes.
24                   Q.   Who has Rockstar sued?
25                   A.   A variety of different companies.
```


Neeson & Associates

W&F
WILSON & PETZER LTD.

```
 1                   Q.    Any names?

 2                   A.    I couldn't tell you off the top of

 3      my head.  I've seen it in the news.

 4                   Q.    And some of the patents that

 5      Rockstar is suing over are the same patents that

 6      were the subject of the Foundry litigation; isn't

 7      that right?

 8                   A.    If you -- I don't know personally.

 9      I'm assuming that if you're saying that, you're

10      probably right.

11                   Q.    And if the US company was entitled

12      to the proceeds of the Foundry litigation, then you

13      would expect the US company to be entitled to a

14      similar share of the Rockstar -- the same patents

15      that are the subject of Rockstar's litigation;

16      right?

17                   A.    I don't think that the logic

18      follows, at least from the point of view of valuing

19      the license rights.  Right now we have Rockstar who

20      has gone and sued -- and who is a totally different

21      owner of the patents -- for whoever it might be

22      suing under those patents.  And so they now have

23      the opportunity to obtain the recoveries.

24                   Q.    You're certainly not denying that

25      Nortel Networks Limited said to multiple courts
```



1    that the license participants -- you're --

2    specifically Nortel Networks Inc. Had the right to

3    sue to exclude other people from using Nortel

4    patents; right?

5                    A.    That's my understanding as one of

6    the attributes of ownership, yes.

7                    Q.    That Attribute of ownership was

8    owned specifically by Nortel Networks Inc.; right?

9                    A.    Nortel Networks Inc. Had an

10   exclusive license to the patents that it used in

11   its products, in its products.  And so it also had

12   a license, to my knowledge, to use technology that

13   was associated that.

14                   Q.    And EMEA's right was no less than

15   the right of Nortel Networks Inc.  It also had the

16   exclusive right, and it also had the right to sue?

17                   A.    It had the right to sue; that's

18   correct.

19                   Q.    Now, turning to another subject,

20   with respect to the business sales that you

21   testified about today, you have no separate value

22   that you've assigned to customer relations --

23   relationships and goodwill; is that right?

24                   A.    That's right.

25                   Q.    In fact, it's your view that there



```
 1   was no goodwill in Nortel; right?
 2              A.   At the time of the business sales,
 3   no.
 4              Q.   And you've explained to us that
 5   goodwill is really a residual category of value.
 6   You take the purchase price; you subtract any
 7   identifiable tangible and intangible assets, and
 8   then the math falls out, the residual, which is
 9   goodwill?
10              A.   That's right.
11              Q.   And goodwill includes such things
12   as the value of supply agreements; right?
13              A.   To the extent that they can't be
14   separable, yes, or have any separable value, yeah.
15              Q.   Things like a workforce?
16              A.   To the extent that you're not
17   going to separately value it, like I did, yes.
18              Q.   And in a business combination
19   under generally accepted accounting principles,
20   you're not really allowed to recognize the value of
21   a workforce as an intangible value apart from
22   goodwill; right?
23              A.   That's what accounting principles
24   provide, yes.
25              Q.   Now, here it's your view that
```



1    there was no goodwill; but you, nonetheless, did

2    recognize there obviously was a value in the Nortel

3    workforce?

4                    A.    That's right.

5                    Q.    So at least with respect to that,

6    you did recognize some value for goodwill at

7    Nortel?

8                    A.    That's right.  Or what would

9    normally be included in goodwill.

10                   Q.    Yeah.  Now, with respect to any

11   supplier contracts, you did not do an analysis of

12   the value to any of the buyers or to anybody of any

13   of the supplier contracts that any of the selling

14   entities had; is that right?

15                   A.    That's correct.  Those would be

16   assets that were transferred to the buyers, yes.

17                   Q.    So your analysis simply proceeds

18   with a zero for goodwill; and with respect to

19   customers, that's all lumped in with intellectual

20   property?

21                   A.    That's right.

22                   Q.    Now, you know Mr. Britven and his

23   report; right?

24                   A.    I'm aware of it, yes.

25                   Q.    And Mr. Britven is an expert who



```
 1    is retained by the CCC; right?

 2                 A.    Yes.

 3                 Q.    And the CCC, you're aware, is very

 4    closely assigned in interest with the Monitor?

 5                 A.    Yes.  I'm aware of.

 6                 Q.    In fact, Mr. Britven in his

 7    reports basically adopts all the same assumptions

 8    about the constraints and the rights and

 9    obligations of the parties that you do?

10                 A.    Fundamentally, I think that's

11    correct.

12                 Q.    But your colleague, Mr. Britven,

13    does depart from you, does he not, on this subject

14    of customer relationships and goodwill; isn't that

15    right?

16                 A.    Yes, he does.

17                 Q.    If we look at his report -- his

18    opening report at page 34, he says that in the

19    aggregate -- this is in a footnote, actually --

20    Footnote 81, it looks like.  He says:

21                       "In the aggregate, allocating

22                       the purchaser goodwill associated

23                       with each business sale to the

24                       owners of the underlying assets

25                       associated with each business sale
```



```
 1                    is reasonable and is consistent with
 2                    the ownership approach."
 3              Right?
 4              A.    That's what he says, yes.
 5              Q.    And you did not take issue with
 6    Mr. Britven in your rebuttal report?
 7              A.    I didn't rebut Mr. Britven's
 8    analysis.  I just think it's incorrect, given what
 9    one would need to do to properly evaluate that.
10    And if one is also considering that the goodwill
11    that we're talking about here is resulting from
12    what a purchaser got from its own -- its own
13    economics of how it would exploit Nortel's
14    technology and its operations.
15              Q.    Your colleague, Mr. Britven, did
16    give you a call-out in his rebuttal report; right?
17              A.    I think he did.
18              Q.    Why don't we take a look at --
19    let's see.  It's page 33 of his rebuttal report
20    down at Section 9.1 and 9.2.  9.1 says:
21                    "The Green primary report
22                    adopts essentially identical
23                    assumptions as to the terms of the
24                    MRDA to which we adopted."
25              That's fair; right?
```



```
1                    A.    Yes.
2                    Q.    And then he goes on in 9.2 to say:
3                          "In our view, Green's treatment
4                          of certain asset categories, such as
5                          customer relationships, may
6                          understate the value of the assets
7                          surrendered by the licensed
8                          participants in the business sales."
9                    Right?
10                   A.    That's what he says, yes.
11                   Q.    Okay.  And if we talk about the
12   business sales, specifically on the subject of
13   customers, did you see the testimony of Blackstone,
14   Mr. Huffard?  Did you see any of his slides?
15                   A.    Yes, I saw Mr. Huffard's stuff,
16   yes.
17                   Q.    Let me just show you a slide 16
18   that Mr. Huffard testified about.  And this was the
19   subject of customer-related assets.  And
20   specifically invite your attention to the quotation
21   from Ciena, which was the purchaser of the MEN
22   business, where they referred to cross-selling.
23   And this is where MEN is describing its purchase of
24   the business.  Do you understand that?
25                   A.    Yes, I see that.
```



```
 1                    Q.   And you're familiar with the
 2   concept of cross-selling?
 3                    A.   Generally, as it would be applied
 4   to this type of company, yes.
 5                    Q.   Cross-selling, when applied to
 6   this kind of a company basically means that Ciena
 7   was looking to cross-selling, where they would sell
 8   their platforms, their IP to the Nortel legacy
 9   customers; right?
10                    A.   Correct; or perhaps the other way
11   around:  That Nortel personnel would be selling
12   into the customers that were being serviced.
13                    Q.   Now, where a buyer buys a business
14   for the purpose of cross-selling its technology to
15   the customers of that business, you understand that
16   can happen; right?
17                    A.   That is something that a company
18   can do, sure.
19                    Q.   Right.  And there's certainly an
20   indication that that's exactly what Ciena was doing
21   here; right?
22                    A.   Something that they were doing?
23   There's no -- to my understanding, the -- what you
24   just said, however, has to do with an intent that
25   that is the principal reason for buying the
```



```
1    business.  There was technology that was actually

2    driving these sales in the MEN business, as I

3    understand it.

4              Q.   You recognize that there's a value

5    to having customers to whom you can sell your IP?

6              A.   Correct.

7              Q.   And when you're selling your IP,

8    the value to the buyer of the business is not in

9    the seller's IP; rather, the value to the buyer is

10   in the seller's customers; right?  That's the

11   cross-selling target audience?

12             A.   I'm not sure I'm understanding

13   your question.  What's happening here is, from what

14   I can tell, is that Ciena is able to sell -- and it

15   doesn't say which -- particularly what's going on

16   here.  But they're able to cross-sell into

17   customers.  It's part of the relationship.  That

18   doesn't sell -- doesn't necessarily say whose

19   technology is going where.

20             And in the analysis that I've done,

21   again, I've considered the fact that you're selling

22   Nortel intellectual property to customers, to

23   Nortel customers.  It's been valued properly.

24             Q.   So let's take a look at the other

25   side, selling Ciena technology to Nortel customers.
```



1    Take a look at that for a moment.

2              A.   Sure.

3              Q.   I'm Ciena.  I want your

4    customers -- you're Nortel -- so I can sell my

5    Ciena technology to your customers.

6              A.   Right.

7              Q.   There's a value to me in getting

8    your customers; right?

9              A.   There could be, sure.

10             Q.   I'm prepared to pay you to get

11   those customers; right?

12             A.   Right.  And those would be

13   safe-hands projections -- the safe-hands analysis.

14   That would be the value that the buyer would have

15   placed on why they bought the asset -- sure.

16             Q.   And that can be a lot of value;

17   right?

18             A.   It depends on the transaction --

19   the circumstances of the buyer.  I wouldn't

20   necessarily categorically say it's a lot or a

21   little.

22             Q.   Let me show you slide 17 from

23   Mr. Huffard's slides.  And these basically are some

24   excerpts from testimony by executives of Nortel

25   Networks Limited -- specifically, the Chief



1    Executive Officer, former Chief Technology Officer

2    and Chief Financial Officer, Mr. Binning.  You're

3    familiar with each of these witnesses; right?

4              A.   Yes, I am.

5              Q.   And you see, specifically,

6    Mr. Binning testifies about his awareness that some

7    of the buyers wanted to move the Nortel customers

8    to their products and platforms; right?

9              A.   Yes.

10             Q.   Now, if we can pull up for a

11   moment your slide at 21.  You testified about this

12   on direct.  And you also testified concerning

13   routine returns on cross-examination.  There's a

14   reference here at the bottom of the page in that

15   blue box to R&D capital stock; right?

16             A.   Yes.

17             Q.   And when you were describing this

18   slide -- or when you were going through the subject

19   of routine returns, I don't believe you were able

20   to exactly quantify how much it was.  But you

21   understood that was a longstanding and important

22   part of Nortel's business, is that there were

23   routine returns that were paid to entities around

24   the world for performing vital but routine tasks;

25   right?



1                 A.   Routine returns were part of the

2    residual profit-split methodology, and it was a way

3    of being able to compensate each of the

4    participants for their actual usage of or the

5    actual operations of the business, yes.

6                 Q.   And the way you operate your

7    alternative allocation, if I understand it right,

8    is you simply take the proceeds here and you split

9    them out based on the capital stock percentage of

10   each of the residual profit-split participants?

11                A.   That's correct.

12                Q.   And that would leave nothing for

13   any of the other sellers who were not residual

14   profit-split participants; right?

15                A.   I think we talked about this

16   earlier, that I have assumed for purpose of my

17   analysis that everyone is -- that what I'm talking

18   about with these entities are the participants in

19   the MRDA, but -- and whoever may be associated with

20   them.  I'm not sure to whom you're referring.

21                Q.   Well, for example, we have in the

22   EMEA Debtors, there are three participants in the

23   MRDA; right?  There's Ireland, UK and France;

24   right?

25                A.   Correct.



```
 1                    Q.   But the rest of Europe is not a
 2      part of the MRDA.  They're not participants; right?
 3                    A.   That's correct.
 4                    Q.   So under your alternative
 5      allocation, Spain would get zero.  Poland, Germany,
 6      Portugal, Hungary, Switzerland, all those other
 7      countries would get zero; right?
 8                    A.   I haven't diced it that finely or
 9      analyzed it that finely.  I have allocated to the
10      EMEA participant its portion of the proceeds of the
11      intangible asset that were a part of my alternative
12      allocation.
13                    Q.   But those countries, those
14      companies in those countries that had distribution
15      outlets, had distribution centers, that had
16      customers and workforce -- you have not refined
17      your analysis to deal with them when you did your
18      alternative allocation here?
19                    A.   Well, the costs of those
20      companies, those kinds of things are actually
21      included in the residual profit-split methodology.
22      So I would have done it that way.  With respect in
23      my original analysis, in the intangibles, I've
24      simply assumed that the regular returns would equal
25      the residual profit split, the R&D capital stock
```



     1    percentages, and so there would be some return to

     2    them.

     3                Q.    And you discussed that assumption

     4    with Mr. Zelbo?

     5                A.    Right.

     6                Q.    I'm not going to go over that.

     7                Now, when you speak of the R&D capital

     8    stock, I believe you've noted that when Nortel did

     9    its R&D capital stock, that was a computation it

    10    did from time to time; right?

    11                A.    That's right.

    12                Q.    One feature of it was what they

    13    called a one-year lag; right?

    14                A.    That's correct.

    15                Q.    So if you went in to

    16    Mr. Doolittle's office in 2009 and said,

    17    "Mr. Doolittle, I would like the R&D capital

    18    stock," he would give you the R&D capital stock

    19    with a one-year lag; right?

    20                A.    That's right.

    21                Q.    So if you went in in 2009, he

    22    would not give you 2005 through 2009.  He would

    23    give you 2004 through 2008; right?

    24                A.    Yes, he would.

    25                Q.    Okay.  And it is a fact, is it



```
 1   not -- in fact, I think you told us earlier that

 2   the business sales were all auctioned off, at least

 3   all major ones, were auctioned and signed up and

 4   some even closed before year-end 2009?

 5               A.    That's right.

 6               Q.    Another feature of the R&D capital

 7   stock is the five-year look-back; right?

 8               A.    Essentially, yes.

 9               Q.    And I believe in your report you

10   note that the five-year look-back -- let me see if

11   I can find the reference.  This would be in your

12   rebuttal report at page 23.  You have a section

13   called the -- Ignores the Limited Technology

14   Lifespan.  Do you see that?

15               A.    Yes.

16               Q.    And you refer to the five-year

17   look-back in that section; right?

18               A.    Yes.

19               Q.    Specifically, you say the lifespan

20   for products was generally expected to be less than

21   five years; right?

22               A.    That's right.

23               Q.    But you are aware, are you not,

24   sir, that Nortel itself represented to governments

25   that the lifespan for patents was much longer than
```



1   the lifespan for products?

2                   A.   It may have done so.  But the fact

3   is that the life span of a patent is statutory.

4   The lifespan of a product into which it goes into

5   is shorter.  When you're dealing with cash flows

6   and business projections, you're measuring what

7   comes out of a product sale, not what comes out of

8   a patent.  So . . .

9                   Q.   You're not denying that the

10  lifespan of patents is very different from the

11  lifespan of products?

12                  A.   I agree with you.  I think that

13  I've measured the revenues that come from products;

14  yes.

15                  Q.   Now, if I could ask you to turn to

16  page 12 of your initial report.  If we go to the

17  very bottom of the page, that last paragraph -- are

18  you with me?

19                  A.   Yes.

20                  Q.   You say that although the named

21  sellers in the residual IP sale included Canadian

22  Debtors, US Debtors and EMEA Debtors, virtually all

23  of the at least 6,000 patents and patent

24  applications transferred were owned by one Canadian

25  Debtor -- i.e., NNL.



```
 1                    And that's a fundamental part of your

 2   analysis; right?

 3                    A.   Yes, it is.

 4                    Q.   You have a footnote there, 35;

 5   right?

 6                    A.   Yes.

 7                    Q.   If we can pull up 35, you say

 8   there that you understand that there was a small

 9   number of patents registered in the names of other

10   companies, right, companies other than NNL?

11                    A.   Yes.

12                    Q.   And you describe that's a small

13   number which is immaterial to your analysis; right?

14                    A.   That's correct.

15                    Q.   Then you go on to say, "The MRDA

16   provides licenses."  Do you see that?

17                    A.   I do.

18                    Q.   Then you say:

19                    "As will be discussed further

20                    in this report, the US and the EMEA

21                    Debtors have been compensated for

22                    these patents at their net book

23                    value."

24                    Right?

25                    A.   Yes.
```



```
 1                  Q.   And it's correct, is it not, that
 2   Nortel did not actually carry intellectual property
 3   on its balance sheet?
 4                  A.   I'm not sure what you mean by
 5   "didn't carry intellectual property on its balance
 6   sheet."  It did.  It had the intellectual property
 7   that it had acquired and had it on its balance
 8   sheet.
 9                  Q.   Why don't we take a look with
10   respect to the internally generated R&D that Nortel
11   operated at your rebuttal report -- sorry, your
12   initial report.  Looks like Appendix H.
13                  Net book value of intangible assets
14   transferred.  If we go to the first page there, if
15   we go to your Footnote 2, if we go to the last
16   sentence, under US GAAP:
17                       "Internally developed
18                       intellectual property and other
19                       intangible assets are generally not
20                       recorded on the balance sheet."
21                  Do you see that?
22                  A.   Correct.  But you asked your
23   question, and it was they had no -- they had no
24   intellectual property on their balance sheets.
25   They did.  They had things that they had acquired.
```

Neeson&Associates   W&F

1    They wouldn't in any circumstance have what they

2    had actually internally developed, because that

3    would have been an expense in accordance with GAAP.

4                    You said there wasn't any.  And, in

5    fact, there is.

6                    Q.    So the patents, the research and

7    development, all the billions of dollars that

8    Nortel did itself, all of that was not on the

9    balance sheet; right?

10                    A.    It wouldn't have been recorded on

11    the balance sheet for the most part.  What would

12    have been recorded on the balance sheet were the

13    things that it acquired, yes.

14                    Q.    So the 35 billion wasn't on the

15    balance sheet?

16                    A.    The 35 billion was actually

17    sitting in the retained earnings as net losses;

18    yes.

19                    Q.    So it wasn't on the balance sheet

20    as an asset?

21                    A.    It certainly wasn't on an asset.

22    It flowed through the financial statements, as it

23    would in accordance with the accounting principles.

24                    Q.    So the book value of Nortel's

25    investment in R&D was zero; right?



```
 1                    A.   The book value -- there would be
 2    no book value.
 3                    Q.   Precisely.
 4                    A.    It would have been expensed as the
 5    company went along and did the R&D.
 6                    Q.    There would be no book value.  But
 7    what you award to the EMEA entities, to those
 8    companies that own legal title and beneficial
 9    ownership of patents, is book value, which happens
10    to be zero; right?
11                    A.   No.  I award them book value of
12    the tangible assets that were on the books that
13    were sold.
14                    Q.   So let's just break this down a
15    little bit, and I'll ask you to go to
16    Mr. Malackowski's report at page 45.
17                    A.   Yes.
18                    THE US COURT:  Mr. Maguire, let me get
19    of sense of how much more time you're going to take
20    this evening and whether there are other parties
21    who would be cross-examining.
22                    MR. MAGUIRE:  If I could have just one
23    moment, Your Honor.
24                    THE US COURT:  And I'm not looking to
25    rush you.  I just want to get a sense of whether we
```

 Neeson&Associates   W&F WILSON & PEYZER LTD.

```
1   should be looking to maybe end for the day and
2   continue tomorrow or if we should push along.
3              MR. MAGUIRE:  Sure.  If I could just
4   have one second.
5              THE US COURT:  Sure.
6              -- PAUSE --
7              MR. MAGUIRE:  I think I could probably
8   be done in about five minutes, Your Honor.
9              THE US COURT:  Are there others who
10  will be cross-examining the witness Mr. Green?
11             MR. FINNIGAN:  Yes, Your Honor.  John
12  Finnigan.  I'll have 20 minutes to half an hour,
13  and then we'll have reexamination.
14             THE US COURT:  Mr. Ruby?
15             MR. RUBY:  So far I have about one
16  minute of re-exam.
17             THE US COURT:  All right.  Should we
18  push along here a little bit?
19             THE CANADIAN COURT:  When I hear
20  counsel say he'll be five minutes, I'd like to hold
21  him to it and give him the five right now so
22  that -- otherwise, overnight it might become 15
23  minutes.
24             Mr. Maguire, it's nothing personal.
25  I'm used to the beast.  I was one for a long time
```



```
1    myself.
2              MR. MAGUIRE:  I don't take it
3    personally, Justice Newbould.
4              THE US COURT:  Please proceed.
5              MR. MAGUIRE:  Thank you, Your Honor.
6              BY MR. MAGUIRE:
7         Q.   So what Mr. Malackowski is
8    describing here in this part of his report is
9    certain companies that were not part of the
10   research and development arrangement; right?
11             A.   Yes.
12             Q.   And there are a bunch of those
13   companies, American companies and also European
14   companies; right?
15             A.   Right.  They were the
16   nonintegrated entities; correct.
17             Q.   And they had done their research,
18   and they had owned patents.  But they never
19   assigned them to NNL.  And they didn't get any
20   licenses back, and they weren't part of the whole
21   MRDA; right?
22             A.   My understanding is that, to the
23   extent research and development was being done, it
24   was being done by the participants in the MRDA.  To
25   the extent that there was any other R&D that was
```



```
 1    outside of that, it was small and wouldn't have

 2    been material.

 3                 Q.   All right.  So why don't we take a

 4    look at the next page.  And this is Table 84 in

 5    Mr. Malackowski's report, which is the non-NNL,

 6    high-interest residual patents by franchise.

 7                 Do you see that?

 8                 A.   Yes.

 9                 Q.   And he's got a list of companies

10    there that own various patents.  It's more than

11    40 patents altogether.  Do you see that?

12                 A.   I see that, yes.

13                 Q.   And includes -- some of these are

14    American companies.  But it also includes the

15    German Nortel and NN France, which is a subsidiary

16    in France; right?

17                 A.   Yes.

18                 Q.   Okay.  And the French subsidiary

19    alone has some 16 high-interest patents; right?

20                 A.   It looks that way, yes.

21                 Q.   And these are all companies, you

22    understand, who never assigned legal title to

23    Nortel Networks Limited?

24                 A.   Again, I don't know what the

25    origin was of these patents.  There were patents
```



1    that, as I described in my report, were outside of

2    the MRDA.  To the extent they had not been

3    developed by Nortel, perhaps they had been acquired

4    or something of that nature.

5              So I don't know about the origin of

6    these patents.  But they -- to my knowledge, there

7    were -- as I said in the footnote in my report, a

8    minimal number of patents that were of minimal

9    value, to my knowledge, that were outside the MRDA,

10   yes.

11             Q.   So Mr. Malackowski values these

12   patents at some -- over $40 million.  And with

13   respect to those patents, your position is that

14   where Nortel Networks Limited owns the patents and

15   has legal title, it is entitled to all of the

16   proceeds of ownership; right?

17             A.   Correct.

18             Q.   And when these non-Nortel Networks

19   Limited entities in the United States and in Europe

20   own legal title and everything else, they get book

21   value, which in this case happens to be zero;

22   right?

23             A.   Well, to the extent that there was

24   book value on these things, they would have been on

25   the books of the companies that owned them; and I



```
 1    would have considered that in the analysis.

 2                   Q.   And to the extent that there was

 3    no book value, then they got zero?

 4                   A.   Right.  But, again, what's at

 5    issue here is, what is the origin of these -- to

 6    the extent that these were actually purchased

 7    patents, the MRDA wouldn't apply.  The purchase

 8    price would actually appear on the books and

 9    records of Nortel or the Nortel entity.  And to the

10    extent that they had been amortized to the point

11    that they had no book value, I wouldn't have

12    included it.  It wouldn't have had any book value

13    on Nortel's books either.

14                   Q.   And to the extent that an

15    internally generated patent created at Nortel

16    Networks Limited is sold to Rockstar, your view is

17    it gets the entire proceeds.  And to the extent it

18    was created at the same time and the same

19    circumstances in Europe at one of these companies

20    or in the US at one of these companies, then the

21    company gets book value, which in this case happens

22    to be zero; right?

23                   A.   Again, this has to do with where

24    the patent was actually -- how the patent actually

25    got there.  To my knowledge, the MRDA required
```



```
1    that -- and I considered this in my valuation, that
2    technology that was developed by the Nortel
3    entities actually be assigned to NNL or that NNL
4    took ownership.
5                    But these patents -- and we would need
6    to look at them separately -- could have been
7    simply acquired from third parties by NN France or
8    CoreTek; and, therefore, they would be outside of
9    the MRDA.  They would have been assets on the
10   balance sheets of these businesses when the
11   business sale transactions happened.
12                   To the extent that there was any
13   remaining value in these patents on the books, they
14   would have been included in my analysis.  I suspect
15   that there was no value because these things had
16   been written off, because they would have been
17   amortized.
18                   Q.   I keep hearing you say "could have
19   been."  Are you representing that you've done any
20   analysis about any of these internally generated
21   patents at any of these companies?
22                   A.   I'm saying that there's an
23   assumption here that these were internally
24   generated.  My understanding is that there were
25   patents -- and I've said this in my analysis --
```



1    that were acquired in connection with businesses.

2    And I've said, at least to my knowledge, that those

3    patents were of minimal value on the books and

4    records of Nortel.

5              Q.   So you treated them as if they'd

6    been acquired, although you don't know if that's

7    true; right?  Right?

8              A.   I haven't separately valued these

9    rights.  That's the question.

10             Q.   You treated them as if they'd been

11   acquired even though you didn't know that that was

12   true; right?

13             A.   No.  I didn't -- and we still

14   haven't -- even Mr. Malackowski hasn't gone through

15   and identified for us the origin of these patents.

16   He's just observing these companies had these

17   patents.  And he's describing some value to them,

18   which, to my knowledge, would be minimal if it were

19   sitting on the books of Nortel.

20             Q.   And having assumed that they were

21   acquired and that they were put on the books,

22   unlike all of the other IP that was not put on the

23   books, you then assumed that they had been written

24   off as having no further value; right?

25             A.   They had -- not material value;



1   that's correct.

2            Q.   And you further assumed that that

3   was an accurate reflection of their actual value

4   and that they had actually no value, even though

5   they are high-interest patents; right?

6            A.   They were high-interest patents as

7   described by Global IP.  Mr. Malackowski has

8   assumed that there are specific license revenues

9   that could actually result from these patents in

10  his relief-from-royalty analysis.  He hasn't

11  actually identified which patents they are.  I

12  don't think that the analysis is very substantive.

13           Q.   You haven't done any digging to

14  work any of that out, have you?

15           A.   No, because they were sitting on

16  the books at whatever value they were put on.

17           Q.   And the book value happened to be

18  zero?

19           A.   Or of minimal value; that's

20  correct.

21           MR. MAGUIRE:  Thank you.  No further

22  questions.

23           THE US COURT:  All right, Mr. Maguire.

24  Thank you, sir.

25           Do you want to finish with Mr. Green



1    this evening, Justice Newbould?  I hear --

2                    THE CANADIAN COURT:  If you'd like to,

3    I'll leave and you can finish him up.

4                    THE US COURT:  I don't think that would

5    work.  All right.  Well, then, it sounds like we're

6    standing in recess for the evening.  So I wish you

7    all a good evening, and we'll resume tomorrow.

8                    9 o'clock, Justice Newbould?

9                    THE CANADIAN COURT:  That's fine.

10                   THE US COURT:  9:00 a.m.  And we'll be

11   back, and you'll be back on the stand, Mr. Green.

12                   Thank you all.  Good evening to you.

13   -- whereupon court adjourned at 5:13 p.m.

14

15

16

17

18

19

20

21

22

23

24

25



1                    REPORTERS' CERTIFICATE

2

3                    I, KIMBERLEY A. NEESON, RPR, CRR, CSR,

4     CCP, Canadian Certified Shorthand Reporter,

5     Realtime Systems Administrator, and I, GAIL

6     VERBANO, RDR, CRR, CSR, US Certificate Shorthand

7     Reporter, certify;

8                    That the foregoing proceedings were

9     taken before us at the time and place therein set

10    forth;

11                   That the entire proceedings of the

12    hearing date were recorded stenographically

13    individually by each of us and were thereafter

14    transcribed;

15                   That the foregoing is a true and

16    correct transcript of our shorthand notes so taken.

17

18                   Dated this 5th day of June, 2014.

19    PER:                   PER:

20    *Gail Inghram Verbano*   *Kimberley Neeson*

21    GAIL VERBANO           KIMBERLEY NEESON

22    WILCOX & FETZER        NEESON & ASSOCIATES

23    WILMINGTON, DE  USA  TORONTO, ON  CANADA

24

25







































































