



```
 1                UNITED STATES BANKRUPTCY COURT

 2              FOR THE DISTRICT OF DELAWARE

 3

 4    -----------------------------)

 5    In Re                        )

 6       NORTEL NETWORKS INC.,     )  Case No.

 7       et al.,                   )  09-10138 (KG)

 8         Debtors.                )

 9    -----------------------------)

10                         - and -

11              Court File No. 09-CL-7950

12                       ONTARIO

13             SUPERIOR COURT OF JUSTICE

14                  (COMMERCIAL LIST)

15      IN THE MATTER OF THE COMPANIES' CREDITORS

16   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17     AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18   ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19        NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20       CORPORATION, NORTEL NETWORKS INTERNATIONAL

21      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                     CORPORATION

23      APPLICATION UNDERT PART IV OF THE COMPANIES'

24   CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                     AS AMENDED
```



```
 1

 2

 3

 4    ---- This is the Day 14/Volume 14 of the transcript

 5    of the proceedings in the above matter held

 6    simultaneously in:

 7    Superior Court of        United States Bankruptcy

 8    Ontario (Commercial      Court for the District of

 9    List)                    Delaware

10    Courtroom 8-1            Courtroom 3

11    330 University Avenue     824 Market Street

12    Toronto, Ontario         Wilmington, Delaware

13

14    on the 6th day of June, 2014, commencing at 9:06

15    a.m.

16

17                   ---------

18    B E F O R E:

19    The Honorable Judge Kevin Gross (United States)

20    The Honorable Mr. Justice Frank Newbould (Canada)

21

22                   ---------

23

24

25
```



```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17        Julie Rosenthal, Esq.

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22   PER: Murray McDonald, Esq.

23        Brent Beekenkamp, Esq.

24

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER: Derrick Tay, Esq.

 7        Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER: Ken Coleman, Esq.

14        Paul Keller, Esq.

15        Daniel Guyder, Esq.

16        Laura Hall, Esq.

17        Joseph Badtke-Berkow, Esq.

18        Jonathan Cho, Esq.

19        Nicolette Ward, Esq.

20

21   FOR THE CANADIAN DEBTORS

22   BUCHANAN INGERSOLL & ROONEY

23   1105 North Market Street

24   Suite 1900

25   Wilmington, DE  19801-1054
```



```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   79 Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   1201 North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```



```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```



```
 1   PER: Matthew P. Gottlieb, Esq.

 2        Tracy Wynne, Esq.

 3        Paul Michell, Esq.

 4

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER: Derek Adler, Esq.

11        William Maguire, Esq.

12        Neil Oxford, Esq.

13        Fara Tabatabai, Esq.

14        Charles Huberty, Esq.

15

16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

17   LIMITED

18   YOUNG CONAWAY STARGATT & TAYLOR LLP

19   Rodney Square

20   1000 North King Street

21   Wilmington, DE  19801

22   PER: Ed Harron, Esq.

23        John Dorsey, Esq.

24

25   FOR THE EMEA DEBTORS
```



```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER: James Norris-Jones, Esq.

 6

 7   CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```



1    PER: Barry E. Wadsworth, Esq.

2        Lewis Gottheil, Esq.

3

4    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

5    COMMITTEE

6    SHIBLEY RIGHTON LLP

7    University Avenue, Suite 700

8    Toronto, ON  M5H 3E5

9    PER: Arthur O. Jacques, Esq.

10        Thomas McRae, Esq.

11

12   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14   FUND

15   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16   35th Floor

17   155 Wellington Street West

18   Toronto, ON  M5V 3H1

19   PER: Kenneth T. Rosenberg, Esq.

20        Massimo (Max) Starnino, Esq.

21        Lily Harmer, Esq.

22        Karen Jones, Esq.

23        Tina Lie, Esq.

24        Michelle Jackson, Esq.

25



```
 1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 3   2009

 4   NELLIGAN O'BRIEN PAYNE LLP

 5   50 O'Connor Street, Suite 1500

 6   Ottawa, ON  K1P 6L2

 7   PER: Janice B. Payne, Esq.

 8        Steven Levitt, Esq.

 9        Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```

 

1   919 North Market Street, Suite 1500

2   Wilmington, DE  19801

3   PER: Selinda A. Melnik, Esq.

4       Richard Hans, Esq.

5       Timothy Hoeffner, Esq.

6       Jason Gerstein, Esq.

7       Farah Lisa Whitley-Sebti, Esq.

8

9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12  BENNETT JONES LLP

13  1 First Canadian Place

14  Suite 3400

15  Toronto, ON  M5X 1A4

16  PER: Kevin Zych, Esq.

17      S. Richard Orzy, Esq.

18      Gavin Finlayson, Esq.

19      Richard Swan, Esq.

20      Sean Zweig, Esq.

21      Jonathan Bell, Esq.

22      Amanda McLachlan, Esq.

23

24  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25  MILBANK, TWEED, HADLEY, MCCLOY LLP

 Neeson & Associates  W&F WILSON & PETZER LTD.

```
 1   1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4        Jennifer P. Harris, Esq.

 5        Albert A. Pisa, Esq.

 6        Samir Vora, Esq.

 7        Andrew LeBlanc, Esq.

 8        Michael Hirschfeld, Esq.

 9        Atara Miller, Esq.

10        Tom Matz, Esq.

11        Nick Bassett, Esq.

12        Gabrielle Ruha, Esq.

13        Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23        Michael Wunder, Esq.

24        Ryan Jacobs, Esq.

25
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2   ASHURST LLP

 3   Boardwalk House

 4   5 Appold Street

 5   London, England  EC2A 2HA

 6   PER: Angela Pearson, Esq.

 7       Antonia Croke, Esq.

 8

 9   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10   RICHARDS LAYTON & FINGER, P.A.

11   920 North King Street

12   Wilmington, DE  19801

13   PER: Christopher Samis, Esq.

14

15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16   AKIN GUMP STRAUSS HAUER & FELD LLP

17   One Bryant Park

18   New York, NY  10036

19   PER: Fred S. Hodara, Esq.

20       David H. Botter, Esq.

21       Abid Qureshi, Esq.

22       Robert A. Johnson, Esq.

23       Brad M. Kahn, Esq.

24       Christine Doniak, Esq.

25       Joseph Sorkin, Esq.
```

 Neeson & Associates   W&P

```
 1        Jacqueline Yecies, Esq.

 2   UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 3   UK PENSION TRUST LIMITED

 4

 5   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 6   NETWORKS UK PENSION TRUST LIMITED

 7   THORNTON GROUT FINNIGAN LLP

 8   Suite 3200, 100 Wellington Street West

 9   P.O. Box 329

10   Toronto, ON  M5K 1K7

11   PER: Michael Barrack, Esq.

12        D.J. Miller, Esq.

13        Rebecca Lewis, Esq.

14        Andrea McEwan, Esq.

15        John Finnigan, Esq.

16        Michael Shakra, Esq.

17        D.J. Miller, Esq.

18

19   FOR THE UK PENSION PROTECTION FUND AND NORTEL

20   NETWORKS UK PENSION TRUST LIMITED

21   WILLKIE FARR & GALLAGHER LLP

22   787 Seventh Avenue

23   New York, NY  10019-6099

24   PER: Brian O'Connor, Esq.

25        Sameer Advani, Esq.
```



```
 1        Andrew Hanrahan, Esq.

 2

 3   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 4   NETWORKS UK PENSION TRUST LIMITED

 5   BAYARD, P.A.

 6   222 Delaware Avenue, Suite 900

 7   Wilmington, DE  19899

 8   PER: Charlene D. Davis, Esq.

 9        Justin Alberto, Esq.

10

11   THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER: Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER: Michael J. Riela, Esq.

25
```



```
 1   WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER: John Salmas, Esq.

10        Kenneth Kraft, Esq.

11        Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER: Craig A. Barbarosh, Esq.

18        David A. Crichlow, Esq.

19        Karen B. Dine, Esq.

20

21   LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```



```
 1    Toronto, ON  M5H 3Y4
 2    PER: Edmond F.B. Lamek, Esq.
 3         James Szumski, Esq.
 4
 5    FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
 6    PATTERSON BELKNAP WEBB & TYLER LLP
 7    1133 Avenue of the Americas
 8    New York, NY  10036
 9    PER: Daniel A. Lowenthal, Esq.
10
11    BOARDS OF DIRECTORS OF NORTEL NETWORKS
12    CORPORATION AND NORTEL NETWORKS LIMITED
13
14    FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
15    CORPORATION AND NORTEL NETWORKS LIMITED
16    OSLER HOSKIN AND HARCOURT LLP
17    100 King Street West
18    1 First Canadian Place, Suite 6100
19    P.O. Box 50
20    Toronto, ON  M5X 1B8
21    PER: Lyndon Barnes, Esq.
22         Edward Sellers, Esq.
23         Betsy Putnam, Esq.
24         Adam Hirsh, Esq.
25         Alexander Cobb, Esq.
```



1                    I N D E X

2                   EXAMINATION

3    WITNESS:                                    PAGE

4    J. PHILIP GREEN, Resumed

5       Cross-Examination by Mr. Finnigan        3337

6    THOMAS BRITVEN

7       Examination-in-Chief/Direct by           3366

8       Mr. Steep

9       Cross-Examination by Mr. Rosenthal       3415

10      Cross-Examination by Mr. Milne-Smith     3495

11      Cross-Examination by Mr. Chang           3553

12

13                   INDEX OF EXHIBITS

14   NUMBER/DESCRIPTION                          PAGE

15      44    Excerpt from "Valuing Intangible   3355

16      Assets, by Reilly and Schweihs

17      45    Expert report of Thomas Britven    3366

18      dated January 24, 2014

19      46    Rebuttal report of Thomas Britven  3366

20      dated February 28, 2014

21

22

23

24

25



```
 1                    --- Upon commencing at 9:06 a.m.
 2               THE US COURT:  Good morning, everyone.
 3    Please be seated.
 4               Mr. Green, you are back.
 5               THE WITNESS:  Yes.
 6    -- OFF THE RECORD --
 7               THE US COURT:  Good morning, Justice
 8    Newbould.  We are ready to proceed.
 9               MR. FINNIGAN:  Good morning.  John
10    Finnigan of Thornton Grout Finnigan for the UKPC.
11    Judge Gross, it is a pleasure to be here before you
12    for the first time.
13               THE US COURT:  Thank you.
14    Mr. Finnigan.
15               MR. FINNIGAN:  Good morning, Justice
16    Newbould.
17               THE CANADIAN COURT:  Good morning.
18
19     J. PHILIP GREEN, having first been previously
20       sworn, was resumed and testified further as
21                    follows:
22
23    CROSS-EXAMINATION BY MR. FINNIGAN:
24               Q.   Good morning, Mr. Green.
25               A.   Good morning, Mr. Finnigan.
```



```
 1                    Q.   We are going to explore four areas
 2    I hope quite briefly this morning, and the first
 3    one is an area I hope we are in agreement on, since
 4    I have taken most of this directly from your
 5    report.
 6                    So you describe in your reports that
 7    Nortel was a global business which operated using a
 8    matrix structure; correct?
 9                    A.   That's correct.
10                    Q.   And information was shared and
11    common tasks were performed across geographic
12    boundaries and legal entities; correct?
13                    A.   That is also correct.
14                    Q.   And legal entities were not
15    standalone?  Their operations were necessarily
16    interrelated?
17                    A.   I think that would be fair.
18                    Q.   And one of the common tasks
19    performed across this global enterprise was
20    research and development; correct?
21                    A.   Yes.
22                    Q.   And research and development was a
23    key driver of Nortel's business?
24                    A.   I believe that's true, yes.
25                    Q.   And it was performed by the five
```



 1   RPEs that we have been discussing over the last

 2   day, and that's the US, Canada, the UK, France and

 3   Ireland; correct?

 4              A.   Correct.  For purposes of my

 5   analysis, I have called UK, France and Ireland

 6   "EMEA."

 7              Q.   Fair enough.  And the research

 8   done in the labs was done cooperatively, and they

 9   worked together to develop IP; is that your

10   understanding?

11              A.   Generally, yes.

12              Q.   Intellectual property --

13              THE US COURT:  Yes.  I am sorry,

14   Mr. Zelbo.

15              MR. ZELBO:  Your Honor, I object to

16   this line because it is just having an expert

17   witness confirming not things that are within the

18   province of an expert but simply alleged facts.

19   These are obviously assumed facts that the witness

20   assumed in his report, and he is just reading those

21   facts back as if they were evidence.  But this is

22   just an expert here.

23              MR. FINNIGAN:  Your Honor, I am

24   examining the witness.  This is prefatory.  It is

25   important to the UKP to have this evidence.  And



```
 1   this man has testified in his report about it, and

 2   I think this is entirely proper cross-examination.

 3               THE US COURT:  Well, I will allow the

 4   questioning.  It is sort of laying a foundation

 5   for, I think, questions that you will be raising.

 6               MR. FINNIGAN:  It is.

 7               THE US COURT:  And so I will overrule

 8   that objection.

 9               MR. FINNIGAN:  Thank you.

10               BY MR. FINNIGAN:

11               Q.   And as a result of this

12   cooperative R&D effort, there was a large portfolio

13   of patents and other IP developed at Nortel;

14   correct?

15               A.   I think that's also true.

16               Q.   8800 patents as of January 2009?

17               A.   That order of nature, yes.

18               Q.   And under the MRDA, you have

19   testified that the global revenues were pooled;

20   correct?  Consolidated for purposes of the MRDA

21   calculations?

22               A.   The participants, yes.

23               Q.   Yes.  And then certain expenses

24   were deducted?

25               A.   Correct.
```

 Neeson & Associates    W&F

1                    Q.    To arrive at operating profit?

2                    A.    That's right.

3                    Q.    And pension costs were one of the

4    costs that were deducted?

5                    A.    To my knowledge, yes.

6                    Q.    And the net profit was then

7    allocated according to the R&D capital stock's

8    percentages?

9                    A.    That's correct.

10                   Q.    And participants did not keep for

11   themselves the revenue they generated by exploiting

12   Nortel's IP?

13                   A.    No.  They kept their share of the

14   residual profit split.

15                   Q.    Moving on to the second area,

16   which are your assumptions and understandings

17   embedded in your report, your first primary

18   understanding is that Nortel owned the intellectual

19   property, owned the NN technology; correct?

20                   A.    Correct.  The MRDA says it is a

21   title-holder.

22                   Q.    Right.  And the second major

23   assumption is the scope of the license granted to

24   the licensed participants was limited to technology

25   that was used in the operating business; that is to



1   say, selling products that generated operating

2   profits.  Correct?

3                    A.   I think that's a little too

4   narrow.  I understand that the MRDA relates to

5   products.  There is also -- the definition of

6   "products" is rather broad.  It is not just ones

7   that are being sold but also ones that are being

8   considered and so forth.

9                    Q.   Right.  But I understood your

10  report to say that in your view, the licenses are

11  limited to Products, capital P, that are actually

12  used to generate revenues; is that right?

13                   A.   Used to or could be used to.

14  "Products" is a -- capital P "Products" is defined

15  in the agreement.

16                   Q.   Let's just turn that up for a

17  moment.  The MRDA, I don't know if you still have

18  it with you.  Exhibit TR21003 is the exhibit

19  number.  Exhibit 21003, I should say.

20                   A.   I have it.

21                   Q.   And the "Products" definition is

22  found at page 4, top of the page, subparagraph (g).

23                   A.   Yes.

24                   Q.   Perhaps we can expand that on

25  the -- there we go.



```
 1              So "Products shall mean products" --
 2   stopping there.
 3              That is not particularly helpful to
 4   define the term by the very word.
 5              But it includes small P "products,
 6   software, and services designed, developed,
 7   manufactured or marketed, or proposed to be
 8   designed."
 9              So let's take an example.  Let's say
10   we've got -- did you see Simon Brueckheimer's
11   testimony?
12              A.   I don't recall seeing it, no.
13              Q.   And so he was a research scientist
14   in the UK, and he was described, he was a prolific
15   inventor.
16              So in your understanding of the
17   products definition, and as you applied it in your
18   analysis, so if Mr. Brueckheimer was there and he
19   developed software that was proposed to be used,
20   that fits the product definition; correct?
21              A.   I think it does, yes.
22              Q.   And so if he develops that
23   software, indeed, he goes as far as to get a patent
24   for it -- all right? -- does NNUK have a license
25   for that patent?
```



```
 1                    A.    In the way that I would have

 2      analyzed it, I would have thought that -- I mean,

 3      this is, I think, a legal conclusion.  But I would

 4      have thought that they would have had a license to

 5      the patent, sure, to use it.

 6                    Q.    Right.  To use it.  And let's

 7      assume the patent is not actually used in the

 8      business.  It is a patent that is for an idea,

 9      let's say, for the future.  It is a great idea but

10      it can't be marketed yet.  So if it is not actually

11      being used, is it subject to the license, in your

12      understanding?

13                    A.    Well, it is included in the

14      overall terms of the license, but there is no

15      revenue or product that is actually generating cash

16      flow.

17                    Q.    Right.

18                    A.    So the value of the license to

19      that particular patent, since it is unused, is

20      zero --

21                    Q.    All right.

22                    A.    -- which is what I considered.

23                    Q.    So in the way you understand the

24      MRDA, Simon Brueckheimer invents the idea.  He gets

25      a patent.  It is sitting on the shelf of NNUK not
```



 1  being used, but NNUK has a license for that

 2  product; is that right?

 3          A.  Well, the patent is sitting on

 4  NNL's shelf, as I understand it, and it has been

 5  licensed to NNUK to the extent it uses it.  That's

 6  my understanding.

 7          Q.  So the license would cover it to

 8  the extent it used it?

 9          A.  Correct.

10          Q.  So, for example, if

11  Mr. Brueckheimer wanted to go back to that patent

12  and he has got a new idea, he wants to change it,

13  he wants to expand it or improve it, he is

14  perfectly entitled to do that, isn't he?

15          A.  Well, I imagine so, sure.

16          Q.  Right.  Even though it is not

17  being actually used in the business?

18          A.  Well, sure.  But it would seem to

19  me that the goal of research and development inside

20  of a company like Nortel is to make products that

21  result in cash flow.  It is not just a purely

22  academic exercise.

23          Q.  But you understand that some

24  research and development will pay dividends or

25  generate income and some won't.  And some won't



```
 1   right away, but it may in the future?

 2              A.    Correct.

 3              Q.    All right.  So let's change our

 4   hypothetical a little bit.  And the patent that

 5   Brueckheimer has created and had registered is used

 6   for a few years to generate income and then is not

 7   used.  It stops being used.  But it was ultimately

 8   sold to Rockstar, that patent.

 9              A.    Okay.

10              Q.    So does, in your view of it, NNUK

11   have a license in the patent that was used and then

12   not used?

13              A.    I think it has a license to the

14   patent as long as it was held by NNL.

15              Q.    So NNUK, in my hypothetical to

16   you, has a license in the product that was used and

17   then not used and then sold to Rockstar?

18              A.    It has a license to use the

19   technology that is incorporated in that patent --

20   in that product.  Excuse me.  Yes.

21              Q.    And in this example, let's assume

22   that this patent, this idea, was entirely funded by

23   work in the UK, by research and development work in

24   the UK.  So it was an entirely UK invention and

25   paid for.  Is it the conclusion of your analysis
```



1    that when that patent comes to be sold to Rockstar,

2    NNUK gets nothing?

3              A.   Well, yes, to the extent that

4    there is no cash flow that is actually resulting

5    from the use of the patent by Nortel at the time,

6    NN -- there is no product that is being made.

7    There is no cash flow that is being sold or that is

8    being derived from the use of the technology, so

9    what is left is -- there is no value in the UK's

10   license to use that technology, so it is a zero.

11             Q.   So NNUK pays the money to create

12   the asset, the patent.  It is sold.  Value is

13   realized.  NNUK gets nothing?

14             A.   Well, that's the purpose of, as I

15   understand it, of the MRDA situation; that there

16   are -- there is technology that is being used

17   globally that is developed by the various entities

18   and it is shared.  To the extent it is developed in

19   the UK and used elsewhere or, you know, developed

20   elsewhere and used by the UK, the idea was to share

21   in the profits.  And to the extent there is no

22   product being made, there is no profits being made.

23             Q.   No.  But the asset has value

24   because it has been sold to Rockstar and they have

25   paid money for it.



    1                    A.   That asset may or may not have any

    2    value to Rockstar if there is no profit, if there

    3    is no product around it.

    4                    Q.   But Rockstar paid $4.5 billion for

    5    a portfolio of patents.  And I am saying to you --

    6    my question is NNUK has paid for certain patents

    7    all by itself, funded it completely.  And you say

    8    that when that $4.5 billion is realized from

    9    Rockstar, NNUK gets nothing out of that.

   10                    A.   Because NNUK doesn't own the

   11    patent that it developed.  That title has been --

   12    is held by NNL.  NNUK has a license.  There is no

   13    value in its license right to the extent there is

   14    no cash flow from the sale of the product.

   15                    Q.   All right.  Let's talk about your

   16    analysis of ownership under the MRDA for a moment.

   17    And this -- your understanding comes from your

   18    reading of the MRDA.  And you have said repeatedly

   19    that NNL owns the technology, the NN technology,

   20    because it has legal title.  Legal title is

   21    recorded in the MRDA in favor of NNL; correct?

   22                    A.   That's my understanding, yes.

   23                    Q.   And that appears two places in the

   24    MRDA:  Once in the preamble it is recorded that

   25    legal title is held in the name of NNL; and then in



```
 1    the operative part of the document it says, "Legal
 2    title shall be vested in NNL."  Do you recall that?
 3                   A.   Yes.
 4                   Q.   And there is no mention in your
 5    report, is there, of the provisions in the MRDA
 6    that record that the licensed participants hold and
 7    enjoy equitable and beneficial ownership of certain
 8    exclusive rights?  There is no mention of that in
 9    your report, is there?
10                   A.   Right.  I didn't understand that
11    to be a term of the license.  I understood it to be
12    part of a whereas clause.  We talked about this at
13    my deposition.
14                   Q.   And there is no reference in your
15    report to the fact that the licensed participants
16    bear full entrepreneurial risk and benefits of the
17    Nortel Networks business?
18                   A.   Again, I believe that was part of
19    a whereas clause and wasn't a part of the term of
20    the license.
21                   Q.   You didn't think that those
22    clauses merited mentioning in your analysis of the
23    ownership of the intellectual property, did you?
24                   A.   No, because I thought those terms
25    at most reflected a relationship to the exclusive
```



```
 1   license provisions.
 2                Q.   Let's turn up, if we could, page
 3   15 of the MRDA, which is described as Schedule A,
 4   "Calculation of Arm's Length Allocation to Each
 5   Participant."  If I can direct your attention, the
 6   fourth paragraph down begins "Accordingly."  Do you
 7   have that?
 8                A.   Yes.
 9                Q.   I think it is also on your screen.
10   It says:
11                     "Accordingly, the compensation
12                     provided to participants under the RPSM
13                     reflects the fact that the participants
14                     bear the full entrepreneurial risk of
15                     the Nortel business, such as the risks
16                     attendant with the substantial and
17                     continuous development and ownership of
18                     the NN technology."
19                     Is there any analysis, sir, in your
20   report of the ownership reflected here that the
21   participants enjoyed?
22                A.   Yes.  NNL was a participant, and
23   so I evaluated their ownership in my analysis,
24   sure.
25                Q.   But you made no account for the
```



1    ownership that the other participants had as

2    reflected in the words I just read?

3                    A.    Yes, I did.  I understood that the

4    other participants owned licenses, exclusive

5    license rights, and I have valued those exclusive

6    license rights.

7                    Q.    Well, this is talking about

8    ownership of the NN technology, is it not?

9                    A.    Well, there is a whole long

10   sentence here that discusses a variety of different

11   things.  It talks about participants and ownership

12   and so -- and a variety of different points.  It

13   doesn't say that the participants own the

14   technology directly.

15                   As I understand it, NNL as title-holder

16   owns the technology, owns the patents, and

17   everybody else has a license with it that they own,

18   which is how I did my valuation.

19                   Q.    So to the extent that this

20   paragraph reflects any ownership interest of the

21   participants in the Nortel technology, you assumed

22   that that meant that they owned licenses, that the

23   other LPs owned licenses?

24                   A.    That's correct.

25                   Q.    No ownership interest in the way



```
 1    you looked at it in the underlying NN technology?
 2                    A.    Correct; no direct ownership
 3    interest.
 4                    Q.    And if these Courts conclude that
 5    the ownership rights are broader than you have
 6    understood, then your analysis will undervalue the
 7    allocations to be made to the other licensed
 8    participants; is that correct?
 9                    A.    To the extent that there is a
10    difference in the terms, sure.  I think you would
11    wind up in the page 62 analysis and Appendix P.
12                    Q.    All right.  Now, you make
13    reference to a certain authority at page 42 of your
14    opening report, if we can just call that up,
15    please.  Page 42 -- let me know when you are there.
16    Do you have that, sir?
17                    A.    I do.
18                    Q.    So if I can direct your attention
19    to paragraph 4, the second to the last paragraph on
20    the page.  Yes, that's the right one, thank you.
21                    And I want to direct your attention,
22    please, to the last two sentences.  And this is in
23    your description of the accounting and valuation
24    guidance for intangible assets.  And you say there
25    that:
```



```
 1                    "From an accounting and finance
 2                    perspective, intangible assets that can
 3                    be valued can typically be identified
 4                    and associated with a specific bundle
 5                    of legal property rights that prevent
 6                    others from using the intangible asset
 7                    without penalty."
 8                    And then you cite to your Footnote
 9                    180 is -- I believe it is a text by
10                    Reilly and Schweihs?
11          A.   I think it is Schweihs.
12          Q.   Schweihs, S-C-H-W-E-I-H-S,
13   "Valuing Intangible Assets"; correct?
14          A.   Yes.
15          Q.   And is that an authoritative
16   source for the content in that book?
17          A.   It is -- for the content or is the
18   book an authoritative source?
19          Q.   Is the book considered an
20   authoritative source in your area of expertise?
21          A.   It is, I think, yes.
22          Q.   And do you have regard to it other
23   than this case?  Do you use it in your work on an
24   ongoing basis?
25          A.   Yes, I do.
```



```
 1                    Q.   And so it is a widely respected
 2     publication?
 3                    A.   I believe it is, yes.
 4                    Q.   So you have cited to a couple of
 5     passages from the book.  I want to show you now
 6     another passage from the book which deals with
 7     transfer pricing.  And we are going to circulate
 8     these copies of the passage I want to direct your
 9     attention to.
10                    MR. FINNIGAN:  And, Your Honors, this
11     is a passage from the book "Valuing Intangible
12     Assets" by Reilly and Schweihs.  It has not been
13     marked as an exhibit yet in these proceedings, so I
14     would ask that it be marked as an exhibit now.
15                    THE US COURT:  Any objection?
16                    All right, hearing none --
17                    THE CANADIAN COURT:  Is there a copy
18     here for me?
19                    MR. FINNIGAN:  There is not.  I
20     apologize.  We will have it on the screen for you,
21     and we will a make arrangements to have a copy sent
22     to you, Justice Newbould.
23                    Ah, we were more organized than I
24     thought.
25                    THE US COURT:  There should be one up
```

Neeson&Associates    W&F

```
 1   there for you, Justice Newbould.

 2              THE CANADIAN COURT:  Two chapters.

 3   Okay.

 4              MR. FINNIGAN:  I am just going to rely

 5   on one chapter.  We should have the chapter

 6   containing pages in -- it will be in the 400's.

 7   -- OFF THE RECORD --

 8              THE US COURT:  Justice Newbould, I am

 9   prepared to admit this into evidence.

10              THE CANADIAN COURT:  Very well.

11              MR. FINNIGAN:  This will be exhibit --

12   are we up to 43?  44.

13              THE CANADIAN REGISTRAR:  44.

14              THE US COURT:  44?

15              EXHIBIT NO. 44:  Excerpt from "Valuing

16              Intangible Assets," by Reilly and

17              Schweihs.

18              THE US COURT:  All right.  You may

19   proceed, Mr. Finnigan.  Thank you.

20              BY MR. FINNIGAN:

21              Q.   All right.  So for your benefit,

22   what I have done is I have extracted out the index

23   to the book and then the section that deals with

24   transfer pricing.  So if you turn over in the table

25   of contents, which is about four or five pages in,
```



```
 1   it is xii at the bottom.  If you could please
 2   advance to xii at the bottom.
 3                   A.   Sure.
 4                   Q.   And Part VI in the Roman numerals
 5   in the index.
 6                   A.   Yes.
 7                   Q.   And you will see that that records
 8   that Part VI is "Special Topics, Intercompany
 9   Transfer Pricing and Royalty Rate Analysis."  Do
10   you see that?
11                   A.   I do.  I am looking at the hard
12   copy, but if it's on the screen -- there you go.
13                   Q.   Yes, there we go.  So that's just
14   to orient you.  And then if we can move forward to
15   page 449, please.  And you will see that's the
16   beginning of Chapter 25, which is on intercompany
17   transfer pricing and royalty rate analysis.  Are
18   you with me?
19                   A.   I am.
20                   Q.   And within this section I want to
21   direct your attention, please, to page 464, and the
22   heading on it is "Profit-Split Methods."  Are you
23   with me now?
24                   A.   I am.
25                   Q.   So it is recorded here by the
```



1    authors that:

2              "At least three profit-split

3              methods may be used to estimate the

4              appropriate transfer price or royalty

5              rate for intangible assets and

6              intellectual properties:  The residual

7              allocation rule, the capital employed

8              allocation rule, and the comparable

9              profit-split rule.  A profit-split

10             method may be applied if the following

11             conditions are met."

12          First bullet:  "Each controlled

13             taxpayer owns a valuable, nonroutine

14             intangible asset that it either

15             acquired from uncontrolled taxpayers or

16             developed itself."

17          Second bullet:  "Such intangible

18             assets contribute significantly to the

19             . . . combined profit."

20          Third bullet:  "There are

21             significant transactions between the

22             controlled taxpayers and the activities

23             of each party contributes significantly

24             to the combined profit or loss."

25              And fourth:  "The controlled



```
 1                taxpayer elects to apply the
 2                profit-split method that complies with
 3                the procedural requirements contained
 4                in the regulations."
 5           So to your understanding, have the
 6    authors accurately described the conditions that
 7    need to be present to use a profit-split method?
 8           A.   This is not really my area of
 9    expertise.  It sounds right, but there are people
10    involved in this case who are truly transfer
11    pricing experts and could tell you whether or not
12    these are the four or five bullet points that are
13    truly important in evaluating a transfer pricing
14    methodology.
15           Q.   You have no reason to doubt that
16    the authors of the book that you cited got it right
17    when they recorded what needs to be present to use
18    a profit-split method?
19           A.   I have no doubt.  But again, this
20    is an area, a complex area of tax law that, while I
21    am generally familiar with, this is not my area of
22    expertise.
23           Q.   All right.  Let's just read on.
24                "The profit-split methods rely
25                either wholly or in part on internal
```



 1                    data rather than data derived from
 2                    unrelated-party transactions.
 3                    Consequently, it is generally accepted
 4                    that methods that rely upon comparable
 5                    transactions generally provide a more
 6                    reliable and accurate measure of the
 7                    arm's-length royalty rate.  This is one
 8                    reason that the regulations allow
 9                    taxpayers to apply a profit-split
10                    methodology:  If and only if, each
11                    controlled party owns valuable
12                    nonroutine internally developed
13                    intangible assets."
14                    No reason to doubt the accuracy of
15        that, is there?
16                    A.   Again, I think this is a
17        development or an analysis that was done for
18        specific purpose in this book.  I don't know if
19        this is part of the necessary rules in how transfer
20        pricing is being done.  Again, this is -- there is
21        a lot of people who are truly transfer pricing
22        experts in this case who could tell you more about
23        this than I can.
24                    Q.   Well, just read down.  "The
25        Residual Allocation Rule" is the next heading.



1    Read down to the second paragraph, where it begins

2    "In the second step."

3                    "In the second step, since a

4                    profit-split method can only be used in

5                    cases where each taxpayer owns

6                    valuable, nonroutine intangible assets,

7                    there will be residual profits left to

8                    be allocated after assigning each

9                    related party a return to its routine

10                   economic activity."

11                   Again, you have no reason to doubt that

12   the authors have accurately reflected what is

13   required in order to use a profit-split method?

14                   A.   Sure.  But I think that that's

15   exactly what happened in this case; that there were

16   profit splits that were allocated after assigning

17   not routine returns.  I mean, it seems fair to me

18   that that's what happened here.

19                   Q.   Was it your understanding that the

20   profit-split method could only be used where each

21   participant owned the intangible property?

22                   A.   Well, I think it depends on what

23   intangibles are being described.  As I understand

24   it, the process that Nortel actually used,

25   regardless of what it says in this book, had been



1    approved by taxing authorities and the method that

2    they were using had been approved.  I am not sure

3    that this particular sequence of words necessarily

4    has to apply or was necessarily forced to apply in

5    the circumstance with Nortel.

6                    Q.    And you are aware from your review

7    of the record that Nortel represented to the tax

8    authorities that the RPE entities owned the

9    intangible assets, owned the intellectual property?

10                   A.    I think it is fair to say that

11   NNL, which was one of the RPE entities, owned the

12   intellectual property, yes.

13                   Q.    And you heard evidence that Nortel

14   intended to comply with the rules and regulations

15   surrounding the use of the profit-split method?

16                   A.    I believe that's true, yes.

17                   Q.    All right.  And just to put a

18   point on it, in your analysis, the only participant

19   in the Nortel profit-split method that owned any

20   interest in the intangibles was NNL?

21                   A.    Based on the licenses in the MRDA,

22   yes.

23                   Q.    Finally, Mr. Green, I want to

24   direct your attention to your rebuttal report at

25   page 14.  Are you with me?



```
 1                    A.    Yes.

 2                    Q.    And this last paragraph -- it is

 3   page 6, bottom of paragraph 14.  And in this

 4   section of your report you are criticizing the

 5   revenue approach of Mr. Kinrich; correct?

 6                    A.    Correct.

 7                    Q.    And the heading is "Revenue-Based

 8   Analysis Leads to Nonsensical Results."  And you

 9   say:

10                    "The revenue-based analysis in the

11                    Kinrich report leads to nonsensical

12                    results.  For example, implicit in the

13                    revenue-based allocation is that the

14                    LTE business is essentially worthless

15                    because it had almost no 2009 revenue

16                    (i.e. zero historical revenue equals

17                    zero value).  However, it is clear that

18                    Nortel had invested hundreds of

19                    millions of dollars in R&D to develop

20                    LTE as the next-generation technology.

21                    The fact that the methodology in the

22                    Kinrich report allocates little value

23                    to the LTE business and the LTE IP

24                    already developed by Nortel is an

25                    indication of the flaws in the
```



```
 1                    methodology."

 2              Do you stand by that statement today?

 3              A.   I do.

 4              Q.   And the result is nonsensical

 5    because it makes no allocation to the LTE business;

 6    correct?

 7              A.   Right.

 8              Q.   And you agree that in the patents

 9    that were sold to Rockstar, NNI, NNUK, will have

10    contributed to the creation of those patents?

11              A.   Again, they will have contributed

12    to the creation.  We agree with that, and that

13    there was -- but NNL owned them and that there was

14    no --

15              Q.   Sorry.  And substantial sums and

16    effort went into creating those patents; correct?

17              A.   Right.  And they had been

18    compensated under the RPS profit splits, sure.

19              Q.   And when that was sold to

20    Rockstar, your allocation method ascribes

21    absolutely no value for NNI or NNUK for those

22    patents, does it?

23              A.   It ascribes no value to their

24    license rights.

25              Q.   And so just like Mr. Kinrich's
```



```
 1   analysis, your analysis is, therefore, flawed?
 2               A.   No, not at all.
 3               MR. FINNIGAN:  Those are all my
 4   questions.  Thank you.
 5               THE US COURT:  All right.  Thank you,
 6   Mr. Finnigan.
 7               Any other cross before we hear from
 8   Mr. Ruby?
 9               MR. RUBY:  If there is no one who has
10   another question for Mr. Green, I have none either.
11               THE US COURT:  All right.  Thank you,
12   Mr. Ruby.
13               Mr. Green, you are welcome to step
14   down, sir.  Thank you.
15               THE WITNESS:  Thank you, Your Honor.
16   Thank you, Justice Newbould.
17   -- WITNESS EXCUSED --
18               MR. STEEP:  Good morning, Judge Gross.
19   Paul Steep of McCarthy Tetrault.  My first time in
20   front of you.  It is a pleasure to be here.
21               THE US COURT:  Yes.  I have seen you on
22   the tube.
23               MR. STEEP:  Thank you.  Good morning,
24   Justice Newbould.
25               I am calling to the witness stand
```



```
 1   Thomas Britven.  And, Judge Gross, if you would
 2   just bear us with for two minutes.
 3              THE US COURT:  Yes.
 4              MR. STEEP:  My friends at the Monitor
 5   have graciously allowed us to sit up front while I
 6   am examining.  And I am just going to set up.
 7              THE US COURT:  Thank you for that
 8   accommodation, folks.
 9              MR. STEEP:  Your Honor, you should have
10   copies of the two Duff & Phelps reports.  Justice
11   Newbould, those should be handed up to you as well.
12              THE CANADIAN COURT:  I have already got
13   them.  I don't need another copy.
14              MR. STEEP:  All right.
15              THE US COURT:  All right.  If we will
16   have Mr. Britven sworn, please.
17
18   THOMAS BRITVEN, having first been duly sworn, was
19          examined and testified as follows:
20              THE US COURT:  Let's just wait a minute
21   or so, Mr. Steep, for everyone to sort of get
22   settled, and then we can begin.
23              All right.  I think we are ready now.
24   Whenever you are ready, Mr. Steep.
25              MR. STEEP:  Thank you, Judge Gross.
```

1    Your Honor, we should mark the two reports as the

2    next exhibit.  I think that's 45 for the initial

3    report and 46 for the rebuttal report.

4                    THE US COURT:  Yes.

5                    THE CANADIAN REGISTRAR:  Exhibits 45

6    and 46.

7                    EXHIBIT NO. 45:  Expert report of

8                    Thomas Britven dated January 24, 2014.

9                    EXHIBIT NO. 46:  Rebuttal report of

10                   Thomas Britven dated February 28, 2014.

11   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION

12   BY MR. STEEP:

13                   BY MR. STEEP:

14                   Q.   Mr. Britven, I understand you have

15   prepared some demonstrative slides to assist us in

16   going through your evidence this morning.  Is that

17   correct?

18                   A.   That's correct.

19                   MR. STEEP:  And, Your Honor, you should

20   have a hard copy of that, if that is of assistance.

21   We will put them up on the screen.  And the same

22   with you, Justice Newbould.  You should have a hard

23   copy.

24                   THE CANADIAN COURT:  I do.

25



```
 1                    BY MR. STEEP:
 2             Q.    Good morning, Mr. Britven.
 3             A.    Good morning.
 4             Q.    Mr. Britven, I understand that you
 5      graduated with a degree in accounting in 1981 and
 6      that you subsequently qualified as a CPA; is that
 7      correct?
 8             A.    That's correct.
 9             Q.    I understand you are also a
10      chartered global management accountant; is that
11      correct?
12             A.    That's correct.
13             Q.    I understand that you are a
14      certified fraud examiner?
15             A.    Yes, sir.
16             Q.    And I understand that you are a
17      certified valuation analyst and that you are
18      accredited in business valuation; is that correct?
19             A.    Those are both correct.
20             Q.    I understand that you are a
21      certified licensing professional; is that correct?
22             A.    I am.
23             Q.    I understand that at the present
24      time you hold an office with the Executive
25      Licensing Society.
```



```
 1                      A.    That's correct.  I am the

 2    president of the LES Foundation.

 3                      Q.    I understand as well that you have

 4    been an examiner for the federal Bankruptcy Court?

 5                      A.    Yes, I have.

 6                      Q.    Let's just briefly go through your

 7    work history.  I understand that you have been

 8    doing work in the area of intellectual property for

 9    approximately 25 years?

10                      A.    That is correct.  And as shown in

11    the slide, a portion of my career has been with the

12    firms published on the screen.

13                      Q.    I understand until recently that

14    you were the practice leader in the intellectual

15    property practice for Duff & Phelps; that is

16    correct?

17                      A.    That is correct.

18                      Q.    I understand that recently you

19    have elected to become an independent contractor

20    and are on your own at the present time; is that

21    correct?

22                      A.    I made that decision as of last

23    month.  That's correct.

24                      Q.    All right.  And I understand that

25    you are still retained by Duff & Phelps to complete
```



```
1    this assignment; is that correct?

2              A.    That is also correct.

3              Q.    All right.  Now, you have set out

4    for us at the next slide your questions that you

5    were asked to consider.  Would you briefly describe

6    the questions for us, Mr. Britven.

7              A.    Sure.  And these are laid out on

8    page 3 of my report.  But briefly, I was asked to

9    determine the allocation amount based upon the

10   ownership approach.  I was also asked to determine

11   the resulting percentage recovery by key creditor

12   groups based upon that allocation.  And then in

13   Question No. 3 I was asked to determine the

14   allocation amount based upon a pro rata approach.

15   And then four, I was asked to put those percentage

16   comparisons in a common table.

17             And if I could just clarify a couple

18   things, when I say "ownership approach," I am

19   talking about that which was sold or relinquished

20   in connection with the sales, and that's what I am

21   valuing based upon ownership.

22             And then when I use the term "pro rata

23   approach," I am talking about an allocation

24   approach such that there could be a common dividend

25   paid if so desired to the various estates.
```



1                  Q.   All right.  Now, in the next slide

2      you set out your scope of work.  I just want to

3      leave that as a reference point and move directly

4      to a summary of how you answered the various

5      questions.

6                  So let's first turn to the ownership

7      approach and the allocation based upon ownership.

8      What were the results of that, Mr. Britven?

9                  A.   So the results of that are shown

10     on the slide.  And we are going to step through

11     just the executive summary of the slide deck

12     initially.  Then we will go into more detail.

13                 This particular slide shows the answer

14     to Question 1, and that's my opinion as to the

15     allocation of the $7.3 billion.  Then you will see

16     that the slide shows 7 percent would go to EMEA,

17     79 percent to Canada, and 14 percent to the US.

18                 Q.   And do you have regard to the MRDA

19     when you apply the ownership approach?

20                 A.   Yes.  This analysis is based upon

21     an interpretation of the MRDA that I received from

22     counsel, and those underlying assumptions are

23     foundational to this analysis.

24                 Q.   All right.  And when we look at

25     the chart that you have set out on this particular



 1    slide, when the allocation is made according to

 2    your ownership approach, is that the complete

 3    picture?

 4                A.    I don't think that's a complete

 5    picture.  This, of course, is the amount relative

 6    to the allocation question.  But there is treasury

 7    cash to be considered.  There is inter-estate

 8    claims.  There are guarantees.  There are estimated

 9    claims.  And when I take those estimates into

10    account, we can then get to the percent recoveries

11    that I estimated in answer to Question 2.

12                Q.    All right.  So if we could turn up

13    then the summary of your response to Question 2,

14    can you walk through this slide for us,

15    Mr. Britven.

16                A.    Certainly.  So I have identified

17    the key creditor groups on the left, and then the

18    answer to Question 2 is on the far right, the

19    estimated recovery percentage.  And this chart is

20    based upon our waterfall model.  And at the end of

21    the day, we can see that the waterfall model would

22    provide the guaranteed Bondholders with 100 cents

23    on the dollar.  It would provide the US creditors

24    with 95 cents on the dollar, et cetera.

25                Q.    Now, you have used a phrase there



 1     "waterfall model."  What do you mean by that?

 2                   A.    The waterfall model is the model

 3     that we use to put the cash at the top, to take

 4     into account those inter-estate claims, those

 5     guarantees, to estimate the claims from the various

 6     third-party creditors.  And then since water moves

 7     from one estate to the next, if you will, kind of

 8     cascades down, we are trying to identify where it

 9     ends up as a preliminary matter.

10                   Q.    All right.  Let's now turn to the

11     summary of the third question concerning the

12     pro rata approach to allocation.  Tell us what

13     methodology did you use to obtain a pro rata

14     allocation.

15                   A.    We used the pro rata approach.  It

16     is an allocation approach such that a common

17     dividend could be paid.  And we calculated that

18     potential common dividend to be 71 cents on the

19     dollar, and it is based upon a two-step process.

20                   One is the claims relative to the

21     available assets.  That's Step 1.  And then Step 2

22     is we have another model that allows us to

23     determine which estates would need to be allocated,

24     which portions of the $7.3 billion to achieve that

25     projected payout, if you will.  And that's what



 1   this chart is showing.

 2            The pro rata allocation amounts are at

 3   the very bottom of the schedule, and those are in

 4   the amount of $5 million -- $5 billion to Canada,

 5   $182 million to the US, and $2 billion to EMEA.

 6            Q.   Mr. Britven, just before we move

 7   from this summary, what would happen if you changed

 8   the claim amounts in the methodology that you used

 9   for your pro rata allocation?

10            A.   The percentages would change, but

11   the underlying methodology would not.  It is a

12   flexible model, and it can accommodate additional

13   inputs.  And, of course, that would change the

14   71 percent.

15            Q.   Let's turn then to your answer to

16   the fourth question concerning the recoveries under

17   the pro rata approach to the key creditor groups

18   based on the claims known at this time.

19            And you have got a comparison chart for

20   us there.  Can you briefly explain how this chart

21   compares the results

22            A.   Absolutely.  So this is a

23   comparison based upon the waterfall model for

24   Columns 1 to 6.  And then the pro rata approach is

25   referenced -- I am sorry -- Column 6 and 7.

 Neeson & Associates    W&P

1               And what I did was I took my results
2      and listed them in Columns 1 and 7.  And then I
3      took the allocation positions of the other parties
4      and the expert opinions, and I ran them through the
5      waterfall model to see what that would suggest in
6      terms of a payment, in terms of cents on the
7      dollar, using a common set of data.  And so this
8      will give us a compare-and-contrast chart that is
9      on an apples-to-apples basis.
10               Q.   Now, I don't want to go through
11      every line item here, but what are the key
12      takeaways from this particular comparison chart?
13               A.   Well, setting aside the two
14      columns for pro rata on the far right, it is pretty
15      obvious that the guaranteed Bondholders and the US
16      creditors basically receive 100 cents on the
17      dollar, regardless of the allocation methodology.
18               And then below that we see that the
19      Canadian creditors have different results based
20      upon the different allocation keys, a big variance
21      between 11 percent and 61 or 59 percent.
22               Accordingly, we see some variations
23      relative to the EMEA creditors but not as extensive
24      as we see with regards to the Canadian creditors.
25               Q.   And finally, before we leave this



1   chart, Mr. Britven, you have got a line item right

2   at the bottom, "Undistributed cash in NNI."  Can

3   you explain the significance of that line item.

4              A.   Yes.  So under my ownership

5   approach in Column 1, I don't have any excess cash.

6   I pay the US creditors 95 cents on the dollar.  But

7   with regards to the other experts, the model

8   suggests that there will be additional funds left

9   in the United States in the amounts shown on the

10  schedule.

11             And I am not in a position to determine

12  what should happen with those funds.  Perhaps they

13  would be allocated back to the Bondholders in the

14  form of interest.  Perhaps it would be paid to

15  Canada in the form of a dividend.  I don't know.

16  Those decisions would need to be made.  But I

17  quantify the dollar value.

18             Q.   Let's turn now to the more

19  detailed analysis of your ownership approach.

20             First, as a professional valuator, is

21  ownership a principle that you commonly apply?

22             A.   Ownership is foundational to our

23  work.  It is typically one of the first questions

24  we ask:  Who owns the underlying asset?  We need to

25  know what is owned to begin the valuation process.



1    That's pretty fundamental.  It underpins what we do

2    on a daily basis.

3                    Q.    Then I want to take you through

4    the next two slides with the quotes so that we get

5    to slide No. 12, looking at the value in Nortel's

6    hands versus safe hands.

7                    Before I take you to the detail of

8    this, briefly explain what comparison you are

9    making between the phrase "Nortel's hands" and

10    "safe hands."

11                    A.    Certainly.  In order to frame this

12    issue, as a technology company, it is imperative

13    that Nortel be able to provide assurance to its

14    customers that it will not only be able to operate

15    but to thrive and to generate profits to provide

16    the R&D support those customers require.  And what

17    Nortel could do versus what an Ericsson or Avaya

18    can do are dramatically different.

19                    In safe hands we have a stronger

20    balance sheet, more resources, more stability.

21    That's a very different circumstance than the

22    situation Nortel found itself in at the end of

23    2008.  It is losing customers, declining revenues.

24    It is laying people off.  They don't have the

25    resources to do future R&D that they did in the



1    past.  And clearly, these lines of businesses would

2    not be able to do as well in Nortel's hands as

3    compared to in safe hands.

4              And it also confirms the decision to

5    sell the reporting units.  These reporting units

6    were naturally more valuable in safe hands because

7    of the assurances they could provide to those

8    customers.

9              Q.   Let's turn our attention now to

10   the two columns represented on the slide.  On the

11   left-hand slide with the representation of 988

12   million Nortel valuation, where does that come

13   from?

14             A.   So at the end of 2008 Nortel

15   valued its operations.  They updated their

16   forecasts.  They talk about this in their financial

17   statements.  And as a result of those updated

18   forecasts, they placed a value on their business of

19   $988 million.

20             Q.   Was that connected in any way to

21   the write-off of the goodwill at the end of 2008?

22             A.   Yes.  The reason they were

23   updating their forecasts and performing this

24   valuation was part of the impairment testing.

25   Because the Nortel operation had declined, it



 1    triggered another impairment test, and they are

 2    testing goodwill.  And the purpose of the

 3    impairment test is to determine whether or not

 4    there should be another goodwill adjustment.

 5              There had just been a goodwill

 6    adjustment in the third quarter.  They are looking

 7    at the goodwill again in the fourth quarter.  There

 8    had been some triggering events, so they are

 9    updating their forecasts, revaluing the business,

10    and now they are going to make a decision as to

11    what they should do about the goodwill in Step 2 of

12    what is called the AIT analysis.

13              Q.   Now let's just briefly look at it

14    right-hand side, the 2.8.  That represents the sale

15    proceeds from the sales of the lines of business?

16              A.   Exactly.

17              Q.   So if we advance to the next slide

18    then and look at the ownership approach as it is

19    applied to the line of business valuation you did,

20    can you walk us through the steps and the results

21    of that line of business valuation.

22              A.   Yes.  I am performing the

23    ownership approach.  I am trying to get to the

24    answer for Question 1:  What was owned and/or sold

25    or relinquished, if you will.  And I am going



 1    through a three-step process.

 2              So the first thing I did was I

 3    identified the assets that had been sold or

 4    relinquished.  And then I went on to identify the

 5    owners of those assets, then determined the value.

 6    And then, of course, there would be an allocation

 7    of that value.  So that's the high level.

 8              More specifically in terms of Step 1,

 9    we identified the assets that were owned and/or

10    relinquished in these categories.  They would be

11    tangible assets.  And tangible assets, I think we

12    heard already that includes things like accounts

13    receivable or furniture and desks, but it would

14    also include accounts payable, for example.

15              Then we have a category of customer

16    relationships.  We also have a category of

17    intellectual property, which, of course, would

18    include the patents.  And then purchaser goodwill.

19    So those are our assets.

20              And then we move to Step 2, where we

21    identify the owners of those assets.  And the way

22    we did that is we looked to the balance sheet for

23    the intangible assets, the book values.  We can see

24    who owned them based on the recordings.

25              We looked to the income statement to



 1    identify the owners of the customer relationships.

 2    We looked to the MRDA to tell us who owned the

 3    surrendered license agreements and who owned the

 4    patents.  And then we will talk a little bit more

 5    about how to allocate that purchaser goodwill.

 6              But moving to Step 3, we see the values

 7    of those assets and the owners, and we can take

 8    those values which came from the purchasers.  The

 9    purchasers performed purchase price allocations,

10    and they tell us what these values are generally.

11    And we used those values, except in the case of the

12    surrendered licenses under the IP, where we,

13    Duff & Phelps, needed to value that license.

14              And then we used those values from the

15    purchase price allocations and allocated those

16    values to the US, EMEA and Canada.  And I think I

17    have already mentioned how I allocated the tangible

18    assets.

19              With regards to the income statement

20    and those customer relationships, ideally what we

21    would have done there relative to the $682 million

22    value, we would have gone through all the sales

23    contracts and said who signed what.  And then we

24    would have looked at some projections relative to

25    those customers.  That's a pretty big task.  And in



1    lieu of that, we used revenues to allocate the

2    customer relations, because we thought it was

3    appropriate in that specific circumstance.

4              We are going to talk more about the IP

5    value in detail.

6              And then in terms of the purchaser

7    goodwill, I think it is important to note that this

8    is the purchaser goodwill.  This is not something

9    that Nortel owned.  Nortel wrote off their

10   goodwill.  So this is goodwill that the purchasers

11   recognized.  And we allocated that based upon the

12   value of the other intangible assets that were

13   owned by the various estates.

14             Q.   Now, you have referred to purchase

15   price allocations in taking us through your

16   valuation methodology under ownership.  Let's turn

17   then to the next slide.  Briefly explain what a

18   purchase price allocation is.

19             A.   So in the case of Ericsson, for

20   example, they will pay a set dollar value for the

21   acquisition, and then they need to decide how to

22   post that on their balance sheet.  And so they

23   usually hire outside experts or they can do this

24   internally.  And they follow the accounting

25   standards to value those assets at fair value so



1   they can be properly presented on the balance

2   sheet.  And that's the PPA process.  That's under

3   FAS 141.  And there are rigorous standards around

4   this process.

5              Once it is done either by an outside

6   party or by internal personnel, it is subject to

7   audit.  Management would sign off on that in

8   connection with the audited financial statements,

9   for example.  It is independent.

10             We found tremendous comfort in the

11  PPAs.  They are outside of any of the parties in

12  this litigation, and the folks who did those PPAs

13  had access to information that no one in this room

14  has access to.  They had access to management,

15  specific industry information, business plans.

16  They knew how the assets were going to be deployed.

17  And we only have a portion of that in this record.

18  And therefore, I determined that the PPA was the

19  best available information available to us in terms

20  of assessing value.

21             And there are more issues or things we

22  can talk about relative to the PPA.  It is just a

23  question of how deep you want to go.

24             Q.  I just want to ask you one more

25  question with respect to the PPAs.  Is there any



1   bias built into the PPA process because, for

2   example, a purchaser may want to achieve a certain

3   tax effect?

4               A.    There is a natural tension in a

5   PPA.  Management generally wants high profits and

6   low taxes.  Well, you can't have both.

7               And then the accounting literature

8   constrains what they are going to be able to do.

9   This desire for high profits and low taxes, this

10  stuff pretty much offsets one another, in my view,

11  especially in connection with the constraints

12  around the process in connection with the

13  accounting standards.

14              Q.    I want to turn you next then to a

15  particular purchase price allocation as an example.

16  Which purchase price allocation is this?

17              A.    This is the Ericsson purchase

18  price allocation.  They acquired what has been

19  referred to as the CDMA business.

20              Q.    And where did you find this,

21  Mr. Britven?

22              A.    This is part of Ericsson's

23  financial statements and part of the annual audit.

24  This is also part of the SEC filing.

25              Q.    All right.  Now, briefly walk us



1   through how they allocated the purchase price from

2   the CDMA/LTE business.

3              A.    Surely.  So Ericsson and its

4   professionals would look at that purchase price and

5   determine the fair value.  They are valuing these

6   assets in particular -- the IP rights, for

7   example -- in the hands of a notional buyer.  It is

8   not specific to Ericsson.  It is not specific to

9   Nortel.  It is a notional buyer under the

10  accounting literature.  And they are categorizing

11  those assets that they acquired and valuing them

12  accordingly.

13             And when we take the Swedish krona and

14  convert it to US dollars in the lower right, we can

15  see that they value the IP at $728 million.  They

16  valued the customer relationships at $119 million

17  and the goodwill at $432 million.  And here again,

18  the goodwill is just what is left over.  So what

19  they can identify, they identify, and then the

20  goodwill is the excess.

21             And it is out of sequence, but the

22  assets, the tangible assets in this case were

23  negative, which is not uncommon.  It just means

24  they had some accounts payable or something that

25  offset those underlying tangible assets.



1                    Q.    Now, I don't want to take you
2    through all the PPAs, but what other PPAs did you
3    have access to for your valuation?
4                    A.    We had three PPAs, and they made
5    up 90 percent of the $2.8 billion.
6                    Q.    And in respect of the last
7    10 percent where you didn't have PPAs, how did you
8    allocate across the asset classes that you
9    identified?
10                   A.    We just ratioed and extrapolated
11   for the remaining 10 percent.
12                   Q.    Now, with that background, let's
13   turn to the value you attached to the surrendered
14   licenses in the hands of the licensed participants.
15   Let's start with the top line.
16                         You have a business value in Nortel's
17   hands of $988 million.  Where does that figure come
18   from?
19                   A.    That comes from the Nortel updated
20   forecasts, where they valued their business at the
21   end of 2008.  And that's part of the AIT testing,
22   the annual impairment test.
23                   Q.    The annual impairment test that
24   resulted in the goodwill write-off?
25                   A.    That's correct.

 Neeson & Associates    W&P

1              Q.   Okay.  Now, you then have what you

2    have described as a US and EMEA RPSM share and a

3    figure of 50.2 percent.  Where does that come from?

4              A.   That's the EMEA and US RPSM share

5    as of 2009.  So we have the value of the Nortel

6    operating units, and we are saying how much of that

7    value based on profitability would end up in the

8    hands of US and EMEA, in essence, and then so that

9    imputes a value of $496 million.  And then if I

10   could just jump ahead, next we say, well, of that

11   half a billion dollars, how much of that is IP.

12             And to determine the 57 percent, we

13   turned to those PPAs again and could determine the

14   percentage of intellectual property to other

15   operating assets to determine the value of the

16   surrendered license here in the hands of the US and

17   EMEA.

18             Q.   Am I correct that that

19   57.3 percent which you apply against the $496

20   million comes from taking a percentage off the PPAs

21   you analyzed?

22             A.   Correct.  And just to be sure and

23   to be clear, we didn't consider the goodwill in the

24   PPAs for purposes of calculating the 57 percent

25   because Nortel didn't have any goodwill.  So we



```
 1   ratioed on the other asset categories.
 2              Q.   All right.  Let's take a little
 3   closer look at your $988 million valuation from the
 4   forecasts.  Did you check that against the
 5   financial statements of Nortel?
 6              A.   Yes, we did.  We did.  And the
 7   $988 million value is consistent with what we see
 8   in their audited financial statements, and more
 9   specifically the footnotes to those financial
10   statements.
11              Q.   And in particular, tell us what
12   the footnote describes.
13              A.   Well, the footnote describes how
14   they updated their forecasts, how Nortel management
15   updated their forecasts in the fourth quarter.  And
16   we can find that updated forecast in the Nortel
17   documents.
18              And then the footnote in the financial
19   statement goes on to describe how they used those
20   forecasts in connection with the annual impairment
21   test and how it resulted in a reduction in goodwill
22   of $1.2 billion.  And we can track that through.
23   And so we can look at those footnotes, look at the
24   underlying projections.  And those pieces fit
25   together.
```



```
 1                    Now, the 988 will not appear on a
 2   financial statement because it is the result of
 3   Step 1 of a two-step process.  So Step 1 is what is
 4   the value.  And if the value is less than what is
 5   on the books, do Step 2, and Step 2 relates to the
 6   actual write-off.
 7                    Q.   Let's then turn --
 8                    THE CANADIAN COURT:  Can I ask a
 9   question, Mr. Steep?
10                    MR. STEEP:  Yes, you can.
11                    THE CANADIAN COURT:  In getting to this
12   value of 988, I understand where you say it came
13   from.  Were you able to see what kind of discount
14   percentages for future income streams were being
15   used?
16                    THE WITNESS:  Yes.
17                    THE CANADIAN COURT:  How much
18   information did you have?  Your report says you
19   could only see certain documents.
20                    THE WITNESS:  Right.  So we have a
21   binder about this thick (indicating) on this issue.
22   There are three forecasts that we can see.  We can
23   see the forecast values by year.  We can see the
24   discount rate.  We can see the discounting.  We can
25   see the testing around this issue as well as a
```



1    related issue.

2              So this is the 142 impairment test.

3    There is also forecasts that are very similar

4    relative to the 144 analysis, and they are

5    contained in a binder about this thick

6    (indicating).

7              THE CANADIAN COURT:  Okay.  Thank you.

8              BY MR. STEEP:

9              Q.   I want to turn your attention now

10   to our next slide and ask you whether you

11   considered the value of the surrendered licenses,

12   assuming that those licenses had been transferred

13   to a third party.  We know they were surrendered.

14   But did you consider what value they might have had

15   had they not been surrendered and transferred to a

16   third party?

17              A.   Yes, we did.  And just for some

18   additional context there, so we valued the

19   surrendered licenses in Nortel's hands; all right?

20   It is my understanding the MRDA and the licenses

21   are not transferable, so what is the value in

22   Nortel's hands.  And then we said, well, let's go

23   ahead and assume that this can be transferred.

24   Let's lift that restriction on transferability and

25   allow another party to step into the shoes of the



 1   licensed participant and what does that suggest in
 2   terms of value.
 3             And when we do that look, we see that
 4   the party that would step into the licensed
 5   participant's shoes would be subject to the same
 6   constraints of the licensed participant.  There
 7   would be limitations around the field of use and
 8   around sublicensing.  There would be an obligation
 9   to share profits.  There would be an obligation to
10   transfer ownership of the patents to NNL.  And then
11   it would not be transferable again.
12             And so from a third-party businessman's
13   perspective, it is just not practical to assume
14   that this would be attractive to a third party.  A
15   businessman is not going to want to step into those
16   shoes.
17             Q.   All right.  And so what did that
18   tell you about value?
19             A.   Well, that tells me that the value
20   of these surrendered licenses to a third party are
21   de minimus and the highest value is in the hands of
22   Nortel, which is kind of counterintuitive, but in
23   this case, the highest value is in the hands of
24   Nortel, and that's the highest and best use.  And
25   that actually becomes fair market value by



1    definition, the highest and best use.

2                    Q.    The highest and best use for the

3    licenses?

4                    A.    Correct.

5                    Q.    Now, let's then turn to your

6    reasonability check.  Did you do a reasonability

7    check against your valuation of the lines of

8    business?

9                    A.    Yes.  So at the end of the lines

10   of businesses we performed the allocation, and that

11   is shown under the D & P, Duff & Phelps, analysis

12   using the PPAs.  We allocated 1.4 billion of the

13   2.8 billion to US and EMEA.

14                   Then we stepped back and we said, well,

15   that's based upon Nortel's forecasts of what they

16   thought they could do.  We said we have these other

17   forecasts, the forecasts that Nortel gave to the

18   safe hands purchasers.  We said, well, let's

19   assume -- even though we don't think it is

20   possible, let's assume Nortel could achieve those

21   results, the results they said were possible for a

22   buyer, and we will use that analysis in connection

23   with the RPSM sharing.  That suggests that the

24   value that would be allocated would be about a

25   billion dollars.  So I am higher than the billion



```
 1   dollars under the alternative look.
 2              Q.    And the forecasts you are
 3   referring to in that answer are the forecasts that
 4   went into the deal books for the prospective
 5   purchasers; is that correct?
 6              A.    That's correct.
 7              Q.    And so those would be
 8   distinguished from the forecasts that were done in
 9   connection with the AIT testing at the end of 2008?
10              A.    That's also correct.
11              Q.    Let's then look at a comparison on
12   how the line of business sales were allocated to
13   the US and EMEA across all of the expert reports.
14   Can you walk us through that, please.
15              A.    Right.  So now we are looking at
16   the amount allocated to the US and EMEA under the
17   various experts' opinions.  And so under my column
18   I am allocating about half of the 2.8 to US and
19   EMEA.  Mr. Green is similar.
20              And then with regards to the three bars
21   on the right, the remaining experts all allocate
22   significantly higher amounts to the US and EMEA.
23              And this is just a starting point,
24   because this is at the allocation stage.  Once the
25   inter-estate claims are taken into account, those
```



```
 1    three bars on the right will continue to grow and
 2    take up more of the remaining space in the little
 3    dotted area.
 4              Q.   So then let's go to your
 5    concluding side on the ownership allocation result
 6    for the lines of business.  This slide, I take it,
 7    sets out all of your findings on the value of the
 8    various asset classes owned by Canada, the US or
 9    EMEA; is that correct?
10              A.   That's correct.  This is the
11    summary, and you can see the allocation amounts at
12    the bottom.  And we also have the detail here by
13    asset class.
14              Q.   All right.  And so just looking at
15    the totals, 1.4 billion to Canada, 979 million,
16    almost a billion, to the US, and 432 million to
17    EMEA?
18              A.   That's correct, for the lines of
19    businesses.
20              Q.   Okay.  Now, let's turn our
21    attention then to the residual IP or what is
22    sometimes referred to as the Rockstar transaction.
23    Can you explain to us your approach to valuing the
24    IP connected with the Rockstar transaction.
25              A.   Surely.  So we are still under the
```



1    ownership approach, and I am looking at the lines

2    of businesses, and I know that that which was

3    necessary or required to run those businesses has

4    already been sold.  That's what the $2.8 billion

5    represents.  They purchased everything they needed.

6    And so now under Rockstar, I am looking at what is

7    left over, or the residual; all right?

8              And what this chart shows, basically

9    three columns.  On the left we have those patents

10   that were actually sold in the lines of business.

11   And then in the middle, where we see the patents

12   subject to license, those are referred to as the

13   common patents.  And then to the right is the

14   Rockstar sale, where we have patents that are not

15   used.

16              And going back to that center column,

17   we see that those common patents, to the extent

18   they were part of the business lines, have been

19   compensated for and are included in the IP value --

20   that's the $1.1 billion value -- as part of the

21   $2.8 billion.  So of the 2.8, 1.1 billion was

22   related to IP.  And that's over on our left-hand

23   side.

24              Over on the right-hand side, we have

25   the not-used patents, whatever is left over from

Neeson&Associates   W&F

1    those common patents, making up the 4.5 Rockstar

2    proceeds.

3                    Q.    Just to be clear, where was the

4    surrendered licenses' value captured in your

5    analysis?

6                    A.    We specifically valued the

7    surrendered licenses as part of the business sales.

8    That's my $285 million value.

9                    Q.    And what implication does that

10   have for the valuation attached to the Rockstar

11   transaction?

12                   A.    There is no more value relative to

13   those exclusive license agreements, those

14   surrendered license agreements.  They don't touch

15   Rockstar.

16                   Q.    So then let's turn to the

17   ownership allocation result with lines of business

18   and the Rockstar transaction added in.

19                   A.    Yes.  So under the ownership

20   approach, we are now adding the Rockstar

21   transaction allocations to the business sales

22   allocations we spoke of earlier.  And that will

23   allow us to achieve the total allocation under the

24   ownership approach of the $7.3 billion.  And this

25   is where we started.



1                   Of the $7.3 billion, 5.8 billion to
2      Canada, 1 billion to the US, and about a half a
3      billion to EMEA.
4                   Q.   Now, I am going to take you later
5      in your examination to the recoveries that flow
6      through your waterfall model.  I take it this is
7      well before you've applied the waterfall model to
8      the allocations you give.
9                   A.   Right.  We will come back to the
10     waterfall model, where we take into account
11     treasury cash, inter-estate claims, guarantees,
12     estimated claims.
13                  Q.   All right.  So let's turn our
14     attention to the alternative methodology that you
15     described in your report, which is the pro rata
16     allocation.  We have gone over this just a little
17     bit in your summary, so just remind us briefly what
18     your approach is.
19                  A.   So the pro rata allocation method
20     is an allocation such that a common dividend could
21     be paid, if so desired.  And we calculate that
22     under a two-step process.
23                  Quickly, we determined the available
24     assets, divided by the claims, to get the
25     percentage, and then we have a model that



1    determines how much we would need to allocate to

2    each estate to achieve that percentage.  And when I

3    say "estate," I really mean the debtor groups.

4              I should clarify and make sure that I

5    am being clear.  This model doesn't dictate what

6    the individual estates do.  It only allocates to

7    the estate groups the value equivalent to that, and

8    then the individual bankruptcy estates can do what

9    they usually do.  But on a weighted average basis,

10   that would be the amount that the overall group

11   receives, yes.

12             Q.   Now, under this slide, which you

13   have described as the pro rata methodology, tell us

14   what factors you took account of.

15             A.   Well, in order to perform the

16   analysis, we took into account the $7.3 billion and

17   we also took into account the treasury cash and

18   estimated claims.  We also made certain assumptions

19   for the purposes of our illustration.

20             Q.   All right.  And where did you get

21   those assumptions?

22             A.   They were from counsel.  And

23   obviously, if the underlying assumptions or

24   instructions change, we could make those

25   adjustments in the model.

 Neeson & Associates    W&P

1          Q.   And I am going to take you through

2     some of those assumptions as we go through this

3     examination.

4               So now let's go to the computation you

5     did to achieve a pro rata allocation.

6          A.   So this is an illustration of a

7     calculation.  And where we start is we started with

8     the A, which would be the total assets available

9     for distribution.

10              MR. STEEP:  And let's just make sure

11    that that's identified for both judges.

12              Justice Newbould, Judge Gross, you will

13    see a circled lower case A off to the right.  So

14    you are starting at the top of the chart, where it

15    says "assets," and you have totals out to the

16    right-hand side.

17              BY MR. STEEP:

18         Q.   So tell both justices what you

19    have included in the assets to get to the total at

20    A.

21         A.   So we included the sales proceeds,

22    the $7.3 billion lockbox proceeds, and we also

23    included the treasury cash after payment of some

24    priority claims that had been estimated.  And so

25    that gives us the total pool of cash of $8.8



```
 1   billion.
 2              We then used an estimated set of
 3   claims, and that's shown --
 4              Q.   And let's just make sure we
 5   identify where we are.  We are now on the left-hand
 6   side under the claims heading, going down the
 7   chart; correct?
 8              A.   That's correct.  And that will
 9   take us to letter B.  So letter B would represent
10   the estimated claims for the purposes of this
11   illustration.
12              Q.   And just to be clear, you have got
13   categories of unsecured claims:  Canada, US, EMEA,
14   claims subject to guarantees or second claims.
15   Where did you get that data?
16              A.   Two sources.  They started out as
17   instructions from counsel.  And then as we have
18   been following along and working in this case, we
19   see that there is support for almost all those
20   numbers.  And we can share some of that support
21   later, if you would like.
22              Q.   All right.  And so the total
23   claims that you put into your model are?
24              A.   We used $12 billion for the
25   purposes of the illustration.  And so if we take A
```



1    divided by B, that will give us the pro rata

2    percentage of 71 percent, or 71 cents on the

3    dollar.  And that's what you see in the third

4    column over, or C.

5              We then mathematically calculate how

6    much money would need to be in Canada, for example,

7    to achieve a 71 percent payout.  And that's our

8    letter D.  So if Canada has $3.5 billion in claims

9    and we want to pay them out at 71 cents on the

10   dollar, we need to get $2,496,000,000 into Canada

11   at D.  And D is the same answer that we see at E.

12   We just took the D number, the 2,496,000,000 and we

13   say, okay, that's Canada, so we put it in the

14   Canadian column.

15             Q.   You are now in the box on the

16   right-hand side of the chart.

17             A.   Right, labeled E.  So the moneys

18   to pay 71 cents on the Canadian claims would be

19   allocated to Canada in the amount of $2,496,000,000

20   at this stage; all right?

21             We then work through this chart doing

22   the same thing for the US, where we see that the US

23   would need $926 million to pay 71 percent of their

24   $1.3 billion in claims.

25             Similarly, we do that for EMEA and for



```
 1   the UK Pension Trust and for the guaranteed

 2   Bondholders.  And if you look at that shaded area,

 3   it is the same line as letter B.  You will see a

 4   total to the far right of $8.8 billion.  Oops.

 5                  Q.   There we are.

 6                  A.   So it is on the far right, about

 7   three-quarters of the way down, $8.8 billion.

 8                  Well, that's all the money.  That's the

 9   entire amount.  We have allocated the entire amount

10   at this level.  And then we said, well, let's wait.

11   We need to do something about the treasury cash, so

12   we reflect the treasury cash in the next row at F

13   to calculate the allocation of the lockbox proceeds

14   of $7.3 billion.

15                  And if we were to allocate the amounts

16   of 5 billion, 182 million and 2 billion to these

17   debtor groups -- okay? -- based upon this set of

18   assumptions, assuming nothing else changes, which

19   probably isn't what is going to happen in the real

20   world, assuming nothing else changes, that would

21   result in a 71-cents-on-the-dollar payout across

22   the board.

23                  Q.   Now, I want to take you briefly

24   through the claims you used and the support you had

25   for those particular claims.  Let's first go to the
```



1   guaranteed Bondholder claim of 4,092,000,000.

2   Where does that come from?

3            A.   So this is our calculation.  We

4   took the face amounts of the bonds across the top.

5   That's all publicly available.  We then calculated

6   prefiling interest commensurate with the terms to

7   determine the $4,092,000,000 amount for those

8   guaranteed Bondholders as of filing.

9            Q.   Let's turn our --

10           A.   That is further supported by the

11  source documents in the notes.

12           Q.   And I should note that on each of

13  the slides you have got sources indicated at the

14  very bottom right-hand corner; is that correct?

15           A.   That's correct.

16           Q.   All right.  Let's turn our

17  attention then to the US creditors' claims, which

18  you estimated at $1.3 billion.

19           A.   Correct.  So we were provided the

20  instruction to use $1.3 billion initially.  And

21  then during the course of the trial I noted that

22  Mr. Ray testified that the US claims for the

23  unsecureds were over a billion dollars.  So this

24  gives me additional comfort that the 1.3 is a

25  pretty good estimate.  I am not saying that's the



1   final number, but it is a reasonable estimate.

2              Q.   Let's turn then to the Canadian

3   creditor claims.

4              A.   This is additional support beyond

5   the instruction we received.  There is a reference

6   to the Canadian bonds in that particular document.

7   We see we have -- there was testimony from

8   Mr. Sproule regarding the $2 billion pension

9   shortfall.  He also testified to the benefits at

10  trial.

11             We were unable to identify further any

12  support for the 200 million in Canada and Singapore

13  claims that we are relying on instruction.

14             Q.   China and Singapore?

15             A.   I am sorry.  China and Singapore.

16  That would give us about 3.3 or 3.4; again, close

17  to the estimate we received from counsel earlier.

18             Q.   And finally, let's look at the UK

19  Pension Trust claim, and then I will ask you about

20  the EMEA creditor claim.  But dealing first with UK

21  Pension Trust.

22             A.   Here is a source document from

23  Ernst & Young in London.  They are part of the

24  administration process in the UK.  And in that

25  document we see a reference to the $2.1 billion UK

 Neeson&Associates    W&F WILSON & PETZOR LTD.

1    pension claim, and that equates to about 3 billion
2    US.  And so here is additional support for the UK
3    Pension Trust estimate that we used.
4                    Q.   And beyond the instruction that
5    counsel gave you for the EMEA claims, did you find
6    support in the record?
7                    A.   Yes.  Oh, I am sorry.  With
8    regards to the EMEA?  No.  There is 500 million.
9    We couldn't find additional support for that
10   number.
11                   Q.   Okay.  So if we then go to the end
12   of the pro rata allocation, this slide summarizes
13   the result on the basis of the claim estimates that
14   you used for your computation.
15                   A.   Based upon those claim estimates
16   and also based upon the underlying assumptions in
17   the model.  All those things can be accommodated in
18   terms of changes in the model; but based upon that
19   set, these are the percentages.  And at the bottom,
20   we see the pro rata allocation of the $7.3 billion.
21                   Q.   Now, I then want to turn your
22   attention, now that we have gone through pro rata,
23   to the second and fourth questions, which concerned
24   recoveries under the ownership approach and
25   recoveries under pro rata.



```
 1              Let's first look at the ownership

 2   allocation result.  And tell us what you did to

 3   ultimately get to the recoveries.

 4              A.   Certainly.  So we are going back

 5   to Question No. 1 under the ownership --

 6              THE CANADIAN COURT:  Mr. Steep, just

 7   before you continue, how long do you plan to be in

 8   chief?

 9              MR. STEEP:  I plan to be about another

10   10, maybe 15 minutes at the most.

11              THE US COURT:  Would you like to take a

12   break now, Justice Newbould, or --

13              THE CANADIAN COURT:  No.  I am just

14   sort of wondering what the appropriate time is.

15   That's all.

16              MR. STEEP:  I am happy to break now,

17   because I am going on to a new topic.  These are

18   two new questions.  But I won't be much longer.  It

19   will be 10 or 15 minutes, I think, to get through

20   the remaining slides.

21              THE US COURT:  All right.  So why don't

22   we take our 20-minute break now.  Is that fine with

23   you, Justice Newbould?

24              MR. STEEP:  Thank you, Judge Gross.

25   -- RECESS AT 10:31 A.M. --
```



```
1   -- UPON RESUMING AT 10:56 A.M. --

2              THE US COURT:  Please be seated

3   everyone.  Thank you.  You may proceed.

4              MR. STEEP:  Good morning.  Thank you,

5   Judge Gross.

6              BY MR. STEEP:

7              Q.   Justice Newbould asked you a

8   question about the discount rate contained in the

9   forecasts that you looked at for the 988 million

10  valuation done at the end of 2008.  And on the

11  break I asked you to check that set of discount

12  rates.  What were the results of that check,

13  Mr. Britven?

14             A.   The discount rates used as part of

15  the 988 ranged from 19 to 22 percent.

16             Q.   All right.  Let's go back to the

17  slide that we were at.  We were now going to focus

18  our attention on Questions 2 and 4, looking at the

19  recoveries that flow out of ownership and the

20  recoveries that flow out of pro rata.

21             First, ownership.  So tell us what we

22  have represented here on this slide.

23             A.   So in the context of ownership,

24  the bar on the left represents the allocation.

25  This again is the answer to our Question No. 1;
```



1   okay?  That would total $7.3 billion.

2              And then if you move to the bar on the

3   right, we add in the $1.58 billion worth of

4   treasury cash to get the total allocated sales

5   proceeds plus treasury cash of $8.8 billion.

6              Q.   So now let's go to the next slide

7   and look at where the cash ends up, assuming the

8   claims analysis that you did.

9              A.   So based upon our waterfall

10  analysis, we see on the left-hand side this is the

11  composition of the $8.8 billion.  And then we ask

12  the question where does that cash end up after the

13  inter-estate claims and the guarantees and the

14  money cascades down, if you will.  We see where the

15  money lands in the blue bar.

16             And the important point here is that of

17  the $6.1 billion that starts in Canada, that ends

18  up in other categories.  So the Canadian creditors

19  would receive 2 billion.  Part of the 6 billion to

20  Canada would go to the UK Pension Trust.  Part

21  would go to the guaranteed Bondholders that I have

22  broken out separately here.  And part would go to

23  the US unsecureds.

24             So this is --

25             THE CANADIAN COURT:  Mr. Britven, can I



```
1    just ask you a question?  Are you assuming these
2    claims at 100 cents on the dollar?
3                THE WITNESS:  We have used those claim
4    estimates, yes, sir, at 100 cents on the dollar.
5                THE CANADIAN COURT:  Thank you.
6                THE WITNESS:  So this is the dollar
7    value.  And then to answer Question No. 4, I need
8    to convert that -- Question Nos. 2 and 4, I need to
9    convert that to a percentage recovery.  So this is
10   the absolute dollar value that would go to those
11   entities, those key creditor groups, and then the
12   next slide will tell us the percent recovery.
13               BY MR. STEEP:
14               Q.   So let's look at that, then, an
15   illustrative percentage recovery comparison.
16               A.   So when we take those absolute
17   dollar values and divide by the claims before
18   adjustment, we calculate, for example, in my Column
19   No. 1 -- that's my ownership approach -- those
20   percentages in terms of pennies on the dollar.
21   Guaranteed Bondholders, 100 cents; US creditors,
22   95; Canadian creditors, 59 cents, et cetera.
23               On the far right-hand of this chart is
24   pro rata, and that's a different model.
25               And then we look to the other experts
```



1    and their allocation opinions.  And we take their

2    allocation opinion relative to the 7.3, use the

3    same assumptions relative to inter-estate claims

4    and guarantees and estimated claims through the

5    same waterfall model, and that would give these

6    implied percent recoveries.  So now there is an

7    apples-to-apples comparison for the various

8    experts.

9              And then we talked about this a little

10   earlier.  We do have some residual money in NNI

11   that would require some direction from the Court as

12   to how it should be handled.

13             Q.   That's the undistributed cash, in

14   the bottom line?

15             A.   That's correct.

16             Q.   Now, I want to walk you through

17   these comparisons a little more slowly than we did

18   the first time we looked at this chart.

19             Looking at Mr. Green's approach, the

20   Canadian debtors and the Monitor, what are the

21   significant differences, if any, between his

22   approach and your approach?

23             A.   Well, in looking at the percentage

24   recoveries, these are the closest, so they are very

25   similar, although they are a little different.



 1    Mr. Green and I have a similar interpretation of
 2    the MRDA.  We do use different methodologies.  He
 3    uses a run-off methodology.  And yet even using a
 4    different methodology, he gets to a comparable
 5    result.
 6              Q.   Let's turn then to Mr. Kinrich's
 7    approach on behalf of the US Estate.
 8              A.   So there are similarities with
 9    regards to the results at the guaranteed Bondholder
10    and US creditor lines.  Obviously, a big difference
11    relative to the Canadian creditors in terms of a
12    side-by-side comparison.
13              Mr. Kinrich does an allocation based
14    upon revenue.  In my view, he doesn't actually
15    perform a valuation; he just allocates based upon
16    revenue.  Revenue is not a proxy for relative
17    profits, especially in the context of the
18    profit-sharing agreement between these parties.
19              A couple more observations relative to
20    Mr. Kinrich's work.  He says that the US
21    contributed 40 percent of the R&D and yet wants
22    70 percent of the proceeds from the sales.  Also,
23    during the time period leading up to filing, the US
24    was absorbing 40 percent of the losses, yet now
25    with regards to the proceeds, he is requesting a



1    70 percent on the gain or the positive side.

2    40 percent when they are losing money, 70 percent

3    when there is money that has been made.

4              Q.    Let's turn to Mr. Malackowski's

5    and Mr. Huffard's approach.  The first is the

6    license.  The second is the contribution.  Let's

7    look first at the license approach of

8    Mr. Malackowski.

9              A.    Here again, very similar results

10   for the guaranteed Bondholders and US creditors;

11   very different results on a side-by-side comparison

12   relative to the Canadian creditors.

13             With regards to the licensing approach,

14   it is inconsistent with the values we saw in the

15   PPAs.  The PPAs valued the IP at over $1.1 billion,

16   and Mr. Malackowski comes up with a value of about

17   750 million.  There is a difference there.

18             The license approach is dependent upon

19   revenues, and I would have the same comments on

20   revenues as I have on Mr. Kinrich's work.

21             Q.    And then finally, let's look at

22   the comparison to Mr. Malackowski's contribution

23   approach.

24             A.    Kind of a similar comparison on

25   the left-hand side.  The big difference is with



1    regards to the Canadian creditors on a dollar

2    value.

3             Mr. Malackowski will acknowledge that

4    R&D spend does not reflect actual contribution.  He

5    would have preferred to have performed an actual

6    contribution analysis relative to access to

7    inventor logs and technology and things of that

8    nature.  So it is a second choice, if you will, to

9    look to the R&D spend.

10            In performing that analysis,

11   Mr. Malackowski doesn't take into account

12   acquisitions.  He is looking at R&D from the

13   licensed participants in Canada; yet Nortel

14   acquired $30 billion of enterprises, many of which

15   had patents, and that's not part of his analysis.

16            Q.   Why is it important to take

17   account of acquisitions in a contribution

18   look-back?

19            A.   Well, there is no internal R&D

20   relative to that acquired patent, yet it is a

21   patent that exists and is part of the patents in

22   this matter that are in dispute.

23            Q.   And who paid for those

24   acquisitions?

25            A.   Those acquisitions generally were



 1   a result of stock transactions or debt financing,

 2   and that would, of course, have been orchestrated

 3   by Canada.

 4              A couple more comments with regard to

 5   Mr. Malackowski on the contribution approach.  He

 6   disregards the MRDA.  And from an ownership

 7   perspective, it says whatever it says about

 8   ownership.  He doesn't tie his analysis to that.

 9              Additionally, he disregards the

10   five-year calculation in the MRDA.  And the result

11   of that, here again, is when Nortel is losing

12   money, EMEA will be absorbing, say, 10 percent of

13   the losses, but now that there is a gain on the

14   sale of these businesses, Mr. Malackowski is, in

15   essence, asking for a larger percentage.  A small

16   percentage during the loss; a bigger percentage in

17   connection with the gain.

18              Q.   And I said "finally."  I shouldn't

19   have, because I also want you to contrast your

20   approach to Dr. Bazelon's approach.

21              A.   So Mr. Bazelon doesn't have any

22   numbers for us to compare.  At a high level, I

23   think there are similarities in terms of the

24   pro rata approach, but his is a more specific and

25   detailed theory.  This allocation approach that I



1    have employed stops at the debtor group level, and

2    I believe his approach goes beyond that, and that's

3    the big difference.

4            Our model, of course, can accommodate

5    changes that we would expect to receive from the

6    Court, and we can make those adjustments as

7    necessary.

8            MR. STEEP:  Judge Gross, Justice

9    Newbould, those complete my questions.

10            THE US COURT:  Thank you.

11    Mr. Rosenthal.  Oh, I am sorry.

12            MR. ROSENTHAL:  Does the Monitor have

13    questions?

14            MR. ZARNETT:  We have no questions.

15            THE US COURT:  Mr. Zarnett, yes, sir.

16    We will put you on the record here in the United

17    States.

18            MR. ZARNETT:  Yes.  I just wanted to

19    add that it has been a pleasure to be here the last

20    two days, and we have no questions to add to that

21    pleasure at this particular moment.

22            THE US COURT:  All right.  Thank you.

23    Thank you.

24            MR. ROSENTHAL:  Good morning, Your

25    Honor.

 Neeson&Associates    W&F

1                    THE US COURT:  Mr. Rosenthal.  You are

2    here.

3                    MR. ROSENTHAL:  I am pleased to be

4    back, although looking forward to my return to

5    Toronto, if I am allowed back in there as well.

6                    THE US COURT:  Yes.

7                    MR. ROSENTHAL:  Good morning.  Justice

8    Newbould.

9    CROSS-EXAMINATION BY MR. ROSENTHAL:

10                   Q.   Good morning, Mr. Britven.

11                   A.   Good morning.

12                   Q.   Mr. Britven, I want to start by

13   talking a little bit about your slides that you

14   gave out this morning.

15                   A.   Yes, sir.

16                   Q.   Did you personally work on those

17   slides?

18                   A.   I did.

19                   Q.   Were you very careful to ensure

20   that they are accurate?

21                   A.   Well, I did my best.

22                   Q.   And did you prepare them

23   specifically for presentation to the Court?

24                   A.   Yes.

25                   Q.   Let's start by talking about slide



1   22.  In this slide you present the amounts for the

2   US and EMEA, and you had to allocate the IP value

3   between the US and EMEA; correct?

4             A.   Yes, sir.

5             Q.   And to get to this number that you

6   allocated for IP value between US and EMEA, the way

7   this chart allocates that IP value is based on

8   revenues; correct?

9             A.   It should be based upon the -- let

10  me back up.  You are asking about IP?

11            Q.   Yes.  The IP line, where you have

12  the US $228 million and EMEA $57 million --

13            A.   Yes.

14            Q.   -- you do that split between the

15  US and EMEA based upon their relative revenues;

16  correct?

17            A.   We did that in the original

18  report.  There is a revision to do that based upon

19  the RPSM.

20            Q.   I am talking about this chart here

21  that you have presented this morning at slide 22.

22  This allocates it by revenues; correct?

23            A.   I am going to need to check the

24  numbers.  Perhaps we used the older version and not

25  the revised version.



1              Q.   Feel free to take a look.  Why
2    don't we look at Exhibit -- Schedule 2.5 to your
3    original report.
4              2.1.  I am sorry.  It is on page 00058
5    of his original report.  It is Schedule 2.1.  And
6    if we look where we see 228 and 57, the split of
7    the IP between US and EMEA, that's allocated on
8    this chart, slide 22, also based on relative
9    revenues; right?
10             A.   Yes.  We originally broke that
11   between the US and EMEA based upon revenues.  We
12   had used the RPSM percentage earlier in the
13   calculation.  And then in connection with my
14   deposition, we issued a revised slide describing
15   how that should have been allocated based upon the
16   RPSM, but the dollar values were not significant
17   enough to make a numerical change to the report.
18             Q.   Let me ask you this question.  On
19   slide 22 are these numbers accurate?
20             A.   The numbers are accurate.  The
21   method employed should be the RPSM.  The numbers
22   are close enough not to necessitate a reissuance of
23   the entire report, as these small changes would
24   flow through the entire report.
25             Q.   I am not asking about the



```
 1    magnitude of the changes.  But you do agree that

 2    these numbers, the 228 million for the US for IP

 3    and the 57 million for EMEA for the IP, are

 4    accurate calculations, according to you?

 5              A.   They are mathematically accurate.

 6    We did change the method to achieve those results.

 7    There is a revised Schedule 2.5 that was provided

 8    in my deposition.  And the $228 million value would

 9    convert to 219 million, and the $57 million would

10    convert to a $66 million value.

11              As we discussed before, I didn't roll

12    that all the way through the report, given the

13    small size of the numbers.

14              Q.   I am not understanding it when you

15    use the phrase "it would convert into."  Are you

16    saying that instead of 228, your calculation is

17    that it is 219 or that it is 228, as you have in

18    chart 22?

19              A.   The more accurate calculation, the

20    precise calculation, would be 219, but we left the

21    228 in the calculus.

22              Q.   So you consciously, when you

23    prepared 22, put a number for the US and a number

24    for EMEA that is different from what you

25    calculated?
```



```
 1                    A.   We used the original number

 2   because it hadn't changed enough to warrant a

 3   change in the report.  So this is a difference

 4   between 228 and 219.

 5                    Q.   And, in fact, the change you just

 6   told me about also flows through and effects a

 7   change to your goodwill calculations as well;

 8   correct?

 9                    A.   In a minuscule manner.  We are

10   talking about $9 million.

11                    Q.   So the magnitude of your

12   correction is what guided you to decide whether to

13   use accurate numbers or numbers that you didn't

14   believe accurate?

15                    A.   It depends on how you want to

16   define "accurate."  From an accounting perspective,

17   if there is a minor change, obviously, we sometimes

18   pass on those minor changes, and this is one of

19   those circumstances.  We have rounding errors the

20   size of this adjustment in this case.

21                    Q.   And I am going to move on from

22   this.  But just so I understand, if we look at

23   slide 6, for example, the total for the US, that's

24   not your total calculation as you have corrected

25   it?
```



1                    A.   Right.  I didn't flow through the
2   $9 million adjustment as it would relate to the US,
3   $9 million on 1 billion.
4                    Q.   So your initial report was dated
5   January 24, 2014; right?
6                    A.   That's correct.
7                    Q.   You had worked on your allocation
8   approach and the value of the surrendered licenses
9   well before you submitted your first report on
10  January 24; correct?
11                   A.   Well, we obviously worked on it
12  before January 24, yes.
13                   Q.   Let's talk about slide 16 now.
14                   A.   Yes, sir.
15                   Q.   This is your computation of the
16  value of surrendered licenses for purposes of the
17  lines of business sales; correct?
18                   A.   That's correct.
19                   Q.   This computation is a material
20  component of your calculation of the value
21  transferred or relinquished in the lines of
22  business sale; correct?
23                   A.   Correct.  We are valuing the
24  licenses that were surrendered.
25                   Q.   And the fair market value, just so



1   we understand that, of the lines of business is

2   what the buyers paid for them; correct?

3            A.   The fair market value is what the

4   buyers paid, yes.  Those numbers are close enough.

5   Price and fair market value are really different

6   concepts, but let's assume that they are the same

7   for this case.

8            Q.   So the starting point for this

9   calculation on slide 16 is that the business value

10  of all the lines of business in Nortel's hands is

11  $988 million; right?

12           A.   That's correct; the value in the

13  hands of Nortel.  And I should note those are the

14  discounted cash flows that we spoke of earlier.

15           Q.   And when Mr. Steep was asking you

16  questions and you turned to this slide or one of

17  the other slides and you first mentioned the $988

18  million, you have a quote -- and apologies if I

19  wrote it down wrong, but you said, "Nortel talks

20  about this in their financial statements."

21           We wouldn't find the $988 million in

22  any financial statement; correct?

23           A.   As I noted in my direct testimony,

24  the 988 does not appear in the financial

25  statements.  But in the footnotes they talk about



1   the annual impairment test and the "updated in the

2   forecasts," and that's what I was referring to.

3            Q.   And we are going to come to that

4   in a moment.  But you derived the $988 million

5   starting point for your calculations from a

6   document that you call the 2008 fourth-quarter AIT?

7            A.   That's correct.

8            Q.   And that's the only document that

9   you cite in your report as the source for the $988

10  million starting point; correct?

11           A.   That's also correct.

12           Q.   And had you found the $988 million

13  in Nortel's audited financials or annual reports,

14  it would be fair to say that you would have cited

15  that; correct?

16           A.   Well, as I explained in my direct

17  testimony, I wouldn't expect to find the actual

18  $988 million value in the annual report by

19  definition.

20           The annual impairment test is a

21  two-step test, and the 988 comes about as a result

22  of the completion of the first step.  The results

23  from the second step, where appropriate, would

24  appear in the audited financial statements.

25           Q.   Is it fair to say that the



```
 1    reliability of your calculation of the value of the
 2    surrendered licenses for the US and EMEA Debtors is
 3    dependent upon the accuracy of this $988 million
 4    starting point that you derive from a document that
 5    you call the 2008 fourth-quarter AIT?
 6                   A.   I think that's fair.  I think the
 7    988 represents the best evidence we have available
 8    to us as to the value of these business lines in
 9    Nortel's hands at the end of 2008.
10                   Q.   We are going to look at the
11    evidence itself in a moment.  I just wanted to know
12    if you would agree that the reliability of your
13    calculation is dependent upon this number.
14                   A.   I agree.
15                   Q.   And it is fair to say that in
16    turn, because of the way your calculations flow,
17    the reliability of the value that you attribute to
18    the US and EMEA Debtors from the lines of business
19    sales depends on the reliability of your
20    calculation of the value of the surrendered
21    licenses; correct?
22                   A.   I am not sure if I followed all
23    that.  But the $285 million value is important in
24    terms of calculating the value of the IP as it
25    relates to the US and EMEA as well as Canada.
```

Neeson & Associates    W&F

1                   Q.   And, for example, if you used a

2   bigger starting point for the value of Nortel's

3   businesses, let's say $6 billion instead of $988

4   million, then the value that you would ultimately

5   calculate for the surrendered licenses for the US

6   and EMEA would also be billions of dollars in your

7   calculation; correct?

8                   A.   But I wouldn't use the $6 billion.

9   That was a value referenced in connection with the

10   third-quarter results.  And there was discussion in

11   the literature as to why the value declined, which

12   triggered a new impairment test.  So that I am

13   thinking specifically of a memo from Nortel to its

14   auditors that said that there has been an

15   announcement of a cut in the workforce.  There has

16   been an article in The Wall Street Journal talking

17   about how Nortel is likely to file for bankruptcy.

18   The customers are leaving, and the customers are

19   expressing concerns, which required those forecasts

20   to be adjusted.

21                   So obviously, I would expect a

22   $9 billion value from the prior quarter to be

23   overstated in the fourth quarter, given the

24   triggering events that occurred and that are

25   documented in part of what I would call this



1   correspondence between Nortel and its auditors.

2           Q.   Mr. Britven, do you need me to

3   repeat my question?

4           A.   I wouldn't use the 6 billion

5   because I know it is in the wrong time period.  If

6   your question is if the 988 was larger, it would

7   have an impact on the analysis.

8           Q.   In the second bullet of Section

9   6.39 of your initial report you say, "The Q3 2008

10  impairment test was conducted with the assistance

11  of . . . PwC" --

12          A.   Please wait for me to catch up to

13  you.  I want to be able to read this along with

14  you, if I may.

15          Q.   Sure.  Let's get that up.  Do you

16  have that now?

17          A.   Yes.  And I appreciate your

18  patience.

19          Q.   Sure.  You say -- and we have got

20  to go up a couple of bullets.  It says:

21              "The Q3 2008 impairment test was

22              conducted with the assistance of . . .

23              PwC.  The principles underpinning both

24              the Q3 and Q4 impairment tests would

25              have been very similar."  Is that



```
 1                    right?
 2              A.    That is correct.
 3              Q.    And you cite Footnote 67 to the Q3
 4    triggering-event memo; right?
 5              A.    That's also correct.
 6              Q.    I would like to pull up on the
 7    screen so that we can all see what a triggering
 8    event memo looks like.  And you have got it cited
 9    by Bates number, but it is Exhibit TR21643.  This
10    is the triggering event memo you are talking about
11    for Q3.
12              A.    That's the one for Q3, yes, sir.
13              Q.    And this memo is written to
14    Nortel's global technical accounting files;
15    correct?
16              A.    Correct.
17              Q.    It is sent to KPMG personnel?
18              A.    Yes, sir.
19              Q.    It is sent to Paul Karr, who was
20    then Nortel's vice president and controller at NNL;
21    correct?
22              A.    I believe that to be correct.
23              Q.    PwC assisted with this test;
24    correct?
25              A.    Yes.
```



 1                    Q.   And it would have been given
 2   serious consideration by Nortel's Board of
 3   Directors; correct?
 4                    A.   I believe that's correct.
 5                    Q.   Nortel's auditors would have taken
 6   this into account; true?
 7                    A.   And I believe they did.
 8                    Q.   And, indeed, the AIT was subject
 9   to audit, wasn't it?
10                    A.   Yes.
11                    Q.   So let's look at the last page of
12   this memo, which is page 15.  There is a press
13   release afterwards.  Go to page 15 of the memo.
14                    And there is a reference to a goodwill
15   impairment of $1.142 billion; right?
16                    A.   Right.  That would be the
17   write-off in connection with Q3.  My testimony was
18   referencing a write-off in Q4.
19                    Q.   We are going to get to Q4.  Don't
20   worry.  We will get there.
21                    A.   I just want to provide you some
22   context.
23                    Q.   The Q3 write-off here, according
24   to this AIT from Q3, the memo we are looking at, is
25   $1.142 billion; correct?



 1                       A.   That's right.  That's the amount
 2    of the goodwill impairment in Q3 2008.
 3                       Q.   So let's look at page 6 of this Q3
 4    memo that we are looking at that was considered by
 5    the board and subject to audit.  And this has a
 6    book value of Nortel's business units as more than
 7    $5 billion; correct?
 8                       A.   That's what this memo is showing,
 9    yes, sir.
10                       Q.   The chart at the very top.
11                       And on the same page it indicates that
12    the fair value of Nortel's business units is nearly
13    $7 billion; isn't that right?
14                       A.   Yes.  That was the $6 billion I
15    thought you were referring to earlier.
16                       Q.   It is pretty clear that you didn't
17    rely on the Q3 figures as the starting point for
18    your calculations; correct?
19                       A.   I used the Q4 numbers, the more
20    recent numbers.
21                       Q.   We are going to get to the Q4 in a
22    moment.
23                       Now let's turn back to Table 6 on page
24    32 of your report.  And it is also actually slide
25    16; right?  Slide 16 depicts Table 6?

 Neeson&Associates   W&F

```
1                    A.   If you could just flip back one
2    more time.  Yes, sir.
3                    Q.   Now, if we started with a business
4    value of $6.933 billion and carried through your
5    exact calculations, that would yield a value of the
6    surrendered licenses to the US and EMEA of about
7    $3-1/2 billion; correct?
8                    A.   You say 3-1/2 billion?
9                    Q.   Roughly.  If you took 50 percent
10   of about $7-1/2 billion and then 57 percent of
11   that -- strike that.  Actually, I am doing two
12   steps at once.  I am sorry.  If you took the --
13                   THE CANADIAN COURT:  How many people
14   came up with that figure?
15                   MR. ROSENTHAL:  No, no.  Your Honor, I
16   jumped ahead of myself.  My apologies.
17                   BY MR. ROSENTHAL:
18                   Q.   If you took the $6.933 billion as
19   the starting point, the US and EMEA RPSM share
20   would be almost $3-1/2 billion; correct?
21                   A.   That's correct.
22                   Q.   And then if we took the percentage
23   of business value that you say is represented by IP
24   of 57.3 percent, we would get right about
25   $2 billion for the value of the surrendered
```

 Neeson & Associates   W&F WILCOX & FETZER LTD.

```
 1   licenses to the EMEA and US Debtor groups in the

 2   line of businesses; correct?

 3              A.   That's about right.

 4              Q.   And that's using your methodology

 5   with the RPSM share and the IP percentages;

 6   correct?

 7              A.   Right.  But we are using the wrong

 8   data point.

 9              Q.   Let's look at slide 17.  And you

10   say the $988 million valuation is consistent with

11   the 2008 financial statements.

12              A.   Yes, sir.

13              Q.   And you cite Exhibit TR40269,

14   which is the 10-K; right?

15              A.   Yes, sir.

16              Q.   And you cite pages 141 and 142.

17              A.   I don't specifically remember.

18              Q.   Right, on slide 17.

19              A.   I don't have it up.

20              Q.   Oh, I am sorry.  So let's pull up

21   Exhibit TR40269 and turn to 141.

22              And if we look at this document, there

23   is a reference at the very bottom to the reduction

24   in goodwill write-down of $1.142 billion in the

25   last line, just as we saw in that memo; correct?
```



 1                    A.    That is correct.  And that relates
 2   to the MEN and ES reporting units.
 3                    Q.    And that's the same number that we
 4   just saw in Exhibit TR21643; right?
 5                    A.    The 1142; that's correct.
 6                    Q.    So now let's take a look at page
 7   142 of the 10-K.  And if we look near the bottom of
 8   that first paragraph, there is a reference to a
 9   goodwill impairment charge of $1.237 billion;
10   correct?
11                    A.    That's also correct.  That's the
12   fourth-quarter write-off.
13                    Q.    Now, Mr. Britven, can we find any
14   reference to this $1.237 billion goodwill
15   impairment charge anywhere in the document that you
16   claim to be the fourth-quarter goodwill impairment
17   test?
18                    A.    When you reference the document I
19   claim, which document are you referring to?  Are
20   you talking about the whole stack?  Are you talking
21   about a specific documents?
22                    Q.    The document that you relied upon
23   to derive this $988 million figure that you have
24   testified is only found in that one document.
25                    If we look at that document, would I be



1   able to find anywhere in that document the

2   reference to that goodwill write-off, like we were

3   able to correlate for the third-quarter?

4              A.   It would not be part of the

5   discounted cash flows by definition because of the

6   way the AIT is performed.  Step 1 would result in

7   the 988, but Step 2 would be a different exercise

8   that would result in the 1.2 billion.  We find

9   references to the 1,237,000,000 in my binder, but

10  we wouldn't expect you to find it in the forecasts

11  that you are referencing.

12             Q.   Let's take a look at the document

13  that you decided to use instead of the memo that we

14  just showed for the third quarter.

15             A.   We have a fourth-quarter memo

16  also, very similar to the third-quarter memo.

17             Q.   Can you show me where in your

18  report you refer to that?  You have your report up

19  there; right?

20             A.   I have my report.  It is a

21  voluminous report.  It was part of the documents

22  that we had.  I don't know if it is specifically

23  referenced in the body of my report individually

24  other than in the overall documents.

25             Q.   Well, I want to know whatever you



```
 1   relied upon when you came up with these

 2   calculations.  And you can take time if you need

 3   to, but if you could tell me where in your report

 4   you talk about relying on a fourth-quarter memo, I

 5   would like to see it.

 6             A.   We have the fourth-quarter memo.

 7   We could probably find it over the lunch hour, if

 8   you would like.  We have a large team on this

 9   project.  And that would have been something that

10   was available to us.  I have it.  We can probably

11   find it so you can see it.

12             But the fourth-quarter memo talks about

13   this write-off.  It talks about these triggering

14   events that are referenced in my testimony.

15             Every document we have that supports a

16   point is not specifically referenced in the report.

17             Q.   Isn't it true, Mr. Britven, that

18   you told me under oath that every document you

19   relied upon, every one you cited with specificity

20   in your report?  You told me that; right?

21             A.   I did say that in my deposition.

22   But where there is redundancy, we don't reference

23   all the redundancy.

24             Q.   So based on your recollection, is

25   there anything in the report that mentions a
```

 Neeson & Associates   W&P

1    fourth-quarter memo that you relied upon?

2                    A.    I would have to go back and look.

3                    Q.    Do you recall that?

4                    A.    Not sitting here right now.

5                    Q.    Well, why don't you take the lunch

6    break, and over the lunch break, if you can find

7    the citation to it, just let me know.

8                    A.    Why don't I just find the

9    document.

10                   Q.    I would like to know first if it

11   is in the report.  But let's talk more

12   fundamentally; okay?

13                   This memo you are referring to, the

14   fourth-quarter memo, would I find the $988 million

15   number in that?

16                   A.    No.  You would find other

17   information that is consistent with the 988.

18                   Q.    So I want to, again --

19                   A.    We don't expect to find the 988

20   relative to Step 1, because the literature talks

21   about the write-off of the goodwill.  The 988 is an

22   interim step, and we have the document that

23   purports to be that.

24                   Q.    The third-quarter memo that we

25   looked at -- why don't we pull back up that chart



1    in the third-quarter memo.

2              The third-quarter memo not only has the

3    goodwill write-off amount we saw but it also has a

4    chart of what the fair value of Nortel's assets

5    are; correct?

6              A.   The one you just showed me?  Yes,

7    sir, I agree.

8              Q.   And yes.  So this fourth-quarter

9    memo that you just mentioned, you said that the 988

10   wouldn't be in there.  There is no chart that would

11   list the fair value of Nortel's assets as 988 in

12   the fourth-quarter memo?

13             A.   I don't have the document

14   memorized, sir.  There is lots of documents.  Why

15   don't I just get the memo over the noon hour, and I

16   will take a look at it.

17             Q.   So let's talk about the document

18   that you actually rely on, Exhibit 21645.  It is

19   the document in your report.  This is it; correct?

20             A.   Yes, we did.

21             Q.   Can you tell me which group's

22   files it came from?

23             A.   Which group's file?  You mean

24   which group within Nortel?

25             Q.   Yes.



```
 1                    A.   This was a Nortel -- I am sorry.
 2    Are you finished?
 3                    Q.   I didn't say anything.
 4                    A.   Oh, I am sorry.
 5                    This is a Nortel document.  After my
 6    deposition we went and found the reference to a
 7    Nortel employee who started this file, and we can
 8    see updates to this file.  It says it is a
 9    Nortel -- we believe it is a Nortel document, which
10    makes sense.  It is from their accounting
11    department.
12                    Q.   So at your deposition you had no
13    idea where it came from, but you did inquiries
14    after your deposition?
15                    A.   I didn't know specifically at my
16    deposition.  It is hard to remember all these
17    things.  We went and looked at the metadata after
18    my deposition.  We can see that this was an Excel
19    file that was created by a Nortel employee, and
20    there is lots of hidden things in the electronic
21    version.  It is a working document.  We relied on
22    it.
23                    I don't ordinarily seek out the actual
24    author, but since you made a point of it in my
25    deposition, we went back and looked.
```



 1                    Q.    Now, when you decided to rely on
 2    this spreadsheet, you were of the view that Nortel
 3    management had prepared it; correct?
 4                    A.    That's correct.  It is a Nortel
 5    document.  We would expect there to be staff people
 6    involved, and then management would be involved as
 7    well.
 8                    Q.    But you had no basis for that
 9    view; correct?
10                    A.    It is not a specific view.  It is
11    what they do in accounting departments.
12                    Q.    You had no basis for that view?
13                    A.    I think I have a basis for that
14    view based upon my experience.
15                    I think I would also add that in the
16    course of an annual impairment test, management
17    would be involved.  It would go and get quite a bit
18    of scrutiny relative to the Board of Directors as
19    well as the auditors.  So of course, there would be
20    management involved in an annual impairment test.
21    We see that with regards to Q3 memo.
22                    Q.    Why don't we pull up -- and I am
23    just trying to pick which of the five places in
24    your deposition I want to pull up.  Let's pull up
25    219, starting at line 7.  Do you recall at your



 1   deposition I asked you:

 2              "Sitting here today, just looking

 3         at the document and based on your

 4         recollection, you have no idea how you

 5         reached the conclusion that management

 6         saw this; correct?"

 7         And after Mr. Steep commented, you

 8   said, "I don't have the recall you're asking me

 9   for."

10         A.   You were asking me for --

11         THE CANADIAN COURT:  Wait, wait.  There

12   has been no question of you yet.

13         THE WITNESS:  I am sorry.  I apologize,

14   Your Honor.

15         BY MR. ROSENTHAL:

16         Q.   Did you give that answer in

17   response to that question?

18         A.   Yes, I did.

19         Q.   Okay.  I will move on.

20         When you decided to rely on this

21   spreadsheet, you were also of the view that KPMG

22   had audited it; correct?

23         A.   The specific spreadsheet?

24         Q.   Yes.

25         A.   You would have to show me my

 Neeson&Associates   W&F WILSON & PETZER LTD.

```
 1    deposition.  I don't remember that.
 2              Q.   You don't remember that?  I will
 3    show it to you.  Let's take a look at page 217,
 4    line 3 to 4.  And we are talking about this
 5    document.  And you said at line 3, "I was of the
 6    view that Nortel management actually performed the
 7    AIT."
 8              "Why?"
 9              And you said, "And then it was audited
10    by KPMG.
11              A.   That's the way the AIT works.  It
12    is performed by management.  Management is
13    responsible for the financial statements.  And then
14    it is audited.
15              Q.   That was the testimony you gave at
16    your deposition; correct?
17              A.   That is correct.
18              Q.   And once again, you had no basis
19    for that view; correct?
20              A.   Of course, I do.  That's the way
21    the AIT works.  Management performs the financial
22    statements.  They are subject to audit.  This is
23    from the accounting department.
24              Q.   Let's turn --
25              THE CANADIAN COURT:  Mr. Rosenthal,
```



 1   Mr. Rosenthal, I just want to understand what you

 2   are doing here.  I read that very brief question

 3   and answer you just put on the screen.  Is there

 4   anything in the transcript that indicates that that

 5   relates to this document we are looking at?

 6                MR. ROSENTHAL:  Yes, Your Honor.  If we

 7   pull up page 216, lines 13 to 14, he is referring

 8   to the fourth-quarter AIT, or the document that he

 9   calls a fourth-quarter AIT.  We dispute that.

10                I mean, Your Honor, that's actually the

11   reason for this line of questions.  He has got a

12   document --

13                THE CANADIAN COURT:  I understand that.

14   But I am just trying to understand whether the

15   document you flashed up there is what is being

16   talked about.

17                MR. ROSENTHAL:  Yes, Your Honor.  In

18   page 216, lines 13 to 14, he is talking about this

19   document.

20                BY MR. ROSENTHAL:

21        Q.   You understood, Mr. Britven, we

22   were talking about this document when you were

23   talking about management performing the AIT?

24        A.   You are being very specific and

25   you are going back to parts of my deposition



```
 1   without context.  I have to see exactly what you

 2   are talking about here, sir.

 3                  For example, this answer here says "We

 4   were of the view that it was part of the AIT."

 5                  THE CANADIAN COURT:  Mr. Rosenthal, if

 6   you are trying to convince the judges of something,

 7   it might be helpful to see it rather than just

 8   having two lines flashed up on the screen for a

 9   minute.  I can't --

10                  MR. ROSENTHAL:  Sure.

11                  THE CANADIAN COURT:  I am not able to

12   put any context to this.

13                  MR. ROSENTHAL:  Your Honor, that's a

14   fair point, Your Honor.  Why don't we turn to page

15   215.

16                  THE CANADIAN COURT:  Do we have a copy?

17   Is there a paper copy for me?

18                  MR. ROSENTHAL:  Your Honor, the problem

19   is this is such a lengthy spreadsheet that I don't

20   know how helpful paper copies would be.  Does

21   anybody have a copy in the Toronto court?  I am not

22   sure.

23                  THE CANADIAN COURT:  I am talking about

24   the transcript.

25                  MR. ROSENTHAL:  Oh, I certainly would
```

 Neeson&Associates   W&F

```
 1   hope --
 2               THE US COURT:  Of the deposition?
 3               MR. ROSENTHAL:  Yes.
 4               THE US COURT:  Yes.
 5               MR. ROSENTHAL:  One of my colleagues up
 6   in Toronto hopefully has it to hand up.
 7               THE US COURT:  Thank you, Ms. Cordo.
 8               BY MR. ROSENTHAL:
 9               Q.   So just to be clear, Mr. Britven,
10   let's start at page 215 so we can all see what
11   document we are talking about, and actually 214.
12   On line 16 I asked you are, "Do you recognize
13   Exhibit 21645?"
14               So just so we are all on the same page,
15   that's the same document that we are talking --
16               THE CANADIAN COURT:  Let's just keep
17   going on.  Just keep reading on.
18               BY MR. ROSENTHAL:
19               Q.   Okay.  And then on page 215 at the
20   top --
21               THE CANADIAN COURT:  No.  Page 214,
22   line 19.
23               BY MR. ROSENTHAL:
24               Q.   Yes.
25                    "If I represented to you that this
```

Neeson&Associates    W&F

```
 1              is the document cited in your report as

 2              the fourth quarter 2008 AIT, would that

 3              look familiar to you as that?

 4                   "Answer:  Portions of this do look

 5              familiar to me.  I can't say that the

 6              entire document looks familiar .~.~.~

 7              but certainly portions."

 8              So then what we did, Mr. Britven, I

 9    showed you the Bates number.  And I said,

10                   "My understanding, just to put on

11              the record, I believe that this is the

12              electronic printout of NNC-NNL

13              11665042."  And I mentioned that it is

14              referenced in Footnote 45 of your

15              initial report.

16              And if we pull up -- Footnote 65.  I am

17    sorry.  I misspoke.  If we pull up Footnote 65 of

18    your initial report -- that's on page 30 -- and

19    that's the document that I referred to in the

20    deposition.  And that footnote is a footnote to

21    paragraph 6.38 of your report, where you refer to

22    it as Nortel's AIT and year-and December 31, 2008

23    financial statement process.

24                   MR. STEEP:  Now, I have to rise at this

25    point now that my friend has done this, because he
```



1   knows that on May 6 I wrote him a letter

2   specifically pointing out that this document and

3   this series of questions that he represented to the

4   witness and put before the witness was not the

5   complete document.

6              It is a voluminous electronic document,

7   and the print version that he put before the

8   witness, I am sure inadvertently, did not include

9   all of the information.  And I have the letter

10  here, and I am happy to put it before the Court.

11  But it is a critical point, because whatever was

12  referred to on the deposition was incomplete.  It

13  was not the document referenced in the report.

14             MR. ROSENTHAL:  Just to clarify that

15  situation --

16             MR. STEEP:  Just I will file the letter

17  first.  Okay?

18             MR. ROSENTHAL:  Yes.  Your Honors,

19  Mr. Steep sent the letter on May 6, 2014.  And, of

20  course, we diligently followed up and had a

21  conversation with his associate and said what is

22  the problem here with our printout.  And we were

23  told, well, there are some hidden fields that don't

24  print when you print the printout of the Excel

25  spreadsheet.



 1                We asked if there is anything material

 2    with respect to the examination of the witness or

 3    the information he relied upon that was not in the

 4    printout of the spreadsheet, and we were told no,

 5    so just so the record is complete.

 6                MR. STEEP:  Well, there is no record of

 7    that.  That's the first I am hearing of this.

 8                THE US COURT:  Do you dispute it?

 9                MR. STEEP:  I have no information on it

10    one way or the other.  The associate is not

11    identified.  The person who asked the questions, it

12    wasn't Mr. Rosenthal.  I am sure he would have told

13    me.

14                MR. ROSENTHAL:  I think the easiest

15    thing, however, Your Honor, is at the deposition we

16    have a hard copy of what he was given.

17                THE US COURT:  Yes.

18                MR. ROSENTHAL:  And that deposition was

19    about two and a half months ago now.  Obviously, if

20    there is anything that the witness pointed to that

21    Mr. Steep thinks is inaccurate from the hard copy,

22    because there is hidden fields, hundreds of pages

23    and all that, and there's particular numbers that

24    the witness says he relied upon.

25                Obviously, if there was anything



1    missing or incomplete, Mr. Steep, because he wrote

2    the letter, surely knows and would bring it out if

3    it was material or relevant.  And he is welcome to

4    do that on reexamination as well.

5              I mean, when you print out a document

6    with numerous hidden fields, you have limitations.

7    We are talking, though, about specific numbers that

8    this witness has said he relied upon that were in

9    both the electronic and the print version.

10              THE US COURT:  All right.  I think you

11   may proceed with your examination on this line,

12   Mr. Rosenthal.

13              BY MR. ROSENTHAL:

14              Q.   So let's go back, now that we have

15   established on pages 214 and 215 that we are

16   talking about the document that you have

17   characterized in your report as the 2008

18   fourth-quarter AIT.  I just want to ask you --

19              A.   I am still confused.  And I

20   apologize; all right?  I have a document in front

21   of me.  It doesn't have a Bates number on it.  As I

22   understand the Bates stamping here, they stamp the

23   first page.  I just need to know where you think

24   this document ends.

25              Q.   I don't know what document -- is



```
 1   it a document I have handed to you?
 2              A.   It is sitting up here.  I didn't
 3   bring it up.  This was --
 4              Q.   My understanding is the document
 5   that has been handed to you is a full printout of
 6   the spreadsheet that was produced by the Monitor
 7   and debtors in this case.
 8              A.   So you are saying this is 042?
 9              Q.   042.
10              A.   Those are the last three digits of
11   the Bates.
12              Q.   Yes.
13              A.   This is the entire document.
14              Q.   As has been produced to us.
15              So you are not aware of a single
16   witness out of the hundred or so in this case who
17   has been deposed who testified about this document
18   that you used as your starting point; correct?
19              A.   No.  That's correct.
20              Q.   And you don't recall it appearing,
21   the 988 figure, on any document besides this one
22   spreadsheet; correct?
23              THE CANADIAN COURT:  Which one
24   spreadsheet are you referring to?
25              MR. ROSENTHAL:  The Exhibit TR21645,
```



 1   Your Honor.
 2              BY MR. ROSENTHAL:
 3              Q.   Have you been able to find the 988
 4   that you use as your starting point in any document
 5   among the millions of documents produced in this
 6   case other than this one?
 7              A.   Well, I am confused.  So the
 8   document I have in my hands is what you are saying
 9   is 0042.  And I will agree with that.  This is a
10   paper printout.  It is hard to read this because it
11   is not the electronic file where I can scan back
12   and forth.  All right?
13              If you are calling this "the
14   document" -- okay -- I don't know of another source
15   for the 988.  When I say "this," I mean this -- I
16   don't know -- 100-plus-page document.
17              Q.   So I want to take a closer look
18   then at this document that you relied upon as your
19   sole source.  Your intent in using the $988 million
20   starting point was to do a discounted cash flow
21   summary as of December 31, 2008; correct?
22              A.   The discounted cash flow -- we
23   were looking for the value in Nortel's hands, and
24   so we looked to how they performed the analysis.
25   And they performed a discounted cash flow as of



1    December 2008 based upon their updated forecasts.

2              Q.    And you believed that the right

3    methodology was to have a DCF for value as of

4    December 31, 2008; correct?

5              A.    I don't have a specific view if

6    the right methodology is limited to that, but

7    that's what they did.

8              Q.    Why don't we turn to your

9    deposition again, page 223, line 18.  I asked you,

10   "Your intent for the DCF value summary by using the

11   988 was to do it as of December 31, 2008, correct?

12              "Answer:  That's correct."

13              Did you give that answer to that

14   question?

15              A.    Yes, I did.  I think that's

16   consistent with my testimony here.

17              Q.    Now, one of Nortel's largest

18   business units was Carrier Networks; correct?

19              A.    That's correct.

20              Q.    And this document that you relied

21   upon had a DCF value for Carrier Networks of

22   $502 million that was then built into the 988;

23   correct?

24              A.    One of the DCFs for Carrier

25   Networks shows a value of 502.  There is another



1    cash flow for Carrier Networks that shows a value

2    of 274.  I used the 502 in my analysis, sir.

3                Q.   And if we turn to page 52 of this

4    spreadsheet, we can see the DCF value of 502 for

5    Carrier Networks; correct?  Let's pull it up.

6                A.   If I could ask a clarifying

7    question.

8                Q.   Sure.

9                A.   This was handed up to me.  Did you

10   want me to refer to this?

11               Q.   If it is easier to read, sure.

12               A.   I suspect it will be.

13               Q.   So if we look at this page here,

14   this has the DCF analysis that reaches the 502 for

15   Carrier Networks; correct?

16               A.   That's correct.  So those

17   forecasts, those updated forecasts, are then DCF'd.

18   This particular one used a discount rate of

19   19 percent, and that's part of this overall

20   document.

21               Q.   All I asked, this is the source

22   for the 502 that rolled up into your 988; correct?

23               A.   That's correct.

24               Q.   And we have redacted certain years

25   at the request of the buyers?



 1                    THE US COURT:  Yes.

 2                    BY MR. ROSENTHAL:

 3             Q.   But isn't it true that when you

 4    were able to look at the unredacted version, that

 5    this DCF actually was not calculated as of December

 6    31, 2008, but was a DCF for December 31, 2011;

 7    correct?

 8             A.   That's correct.

 9             Q.   And when you used this number for

10    a DCF of December 2008, you didn't know why whoever

11    drafted this document had done a December 2011 DCF;

12    correct?

13             A.   You are asking me about the Nortel

14    person.  And I agree; I don't know why they did it

15    that way.  I was, however, reluctant to change the

16    work that Nortel had performed.

17             Q.   Not only were you -- well, let me

18    ask you this.  When you decided to use the $988

19    million from this spreadsheet here as

20    representative of the discounted cash flow value as

21    of December 31, 2008, were you even aware that the

22    DCF for Carrier Networks was calculated as of 2011?

23             A.   I don't remember if I was aware at

24    the time of my deposition.  There was a lot of

25    documents.  I think my staff did point this out at



```
 1   some point, but I think I subsequently forgot, and
 2   now I have been refreshed.
 3               So we as a team were aware of this when
 4   we used the 988.
 5               Q.   If you took the projections that
 6   were given for the years from 2009 to 2011 --
 7               A.   The projections that were given --
 8               Q.   Let me strike that.  If you look
 9   at the data in this document -- and remember, we
10   went over this at your deposition.
11               A.   "This document," are you talking
12   about this one or this one (indicating)?
13               Q.   The exhibit that you cite and you
14   call the 2008 fourth-quarter AIT.  When I am
15   talking about "this document" now, that's all I am
16   talking about; okay?  In the document that you have
17   called a 2008 fourth-quarter AIT.
18               If you were to actually perform a
19   December 31, 2008 discounted cash flow on just the
20   Carrier Networks, you get close to 988 for that
21   unit alone; correct?
22               A.   I am not following you.  Are you
23   saying that if you add in the missing data for
24   those three years, you get to 988?
25               Q.   You get close to it, don't you?
```



```
 1                    A.   I don't remember the number being
 2   that large.
 3                    Q.   Well, what if I told you that it
 4   comes out to precisely $890 million.  Does that
 5   ring a bell?
 6                    A.   On a discounted cash flow basis?
 7                    Q.   Yes.
 8                    A.   That number does not ring a bell.
 9   We would consider that number.  We would also
10   consider the alternative cash flow that showed a
11   value of 274.
12                    Q.   Let's talk about Nortel Government
13   Services, also known as NGS.  And that's another
14   line of business for Nortel; correct?
15                    A.   That's correct.
16                    Q.   And you are aware today that this
17   document that you call a fourth-quarter AIT assigns
18   zero value to NGS; correct?
19                    A.   I agree.
20                    Q.   And you don't recall being aware
21   of that fact when you actually prepared your report
22   and relied on this document, though; correct?
23                    A.   I don't specifically remember.  I
24   do remember an answer in my deposition noting that
25   the value of NGS was zero.
```



```
 1                   Q.   And, in fact, when you -- well,
 2    let me take a step back.  Are you aware that NGS
 3    was owned entirely by NNI?
 4                   A.   Yes.
 5                   Q.   And were you aware of that when
 6    you decided to give no value to NGS in your
 7    line-of-business-sale analysis?
 8                   A.   Yes.  And the way we performed the
 9    calculus in terms of allocating assets, the NGS
10    assets are moved into NNI's number.  The NGS
11    customer relationships are moved into NNI's number,
12    along with any license rights or patents -- I am
13    sorry -- any patents they would own, but I don't
14    think they did.  So the way we performed the
15    analysis, we captured that value and put it into
16    NNI, or the United States.
17                   Q.   Well, that's interesting, because
18    on slide 12 that you gave out this morning, you
19    talk about a starting point of $988 million, and
20    you specifically note now, unlike in your report,
21    that this excludes NGS; correct?
22                   A.   That's also correct.  I was
23    talking about how I allocated the purchase price of
24    $2.8 billion and how, by way that we performed that
25    analysis, NNI received credit for the NGS business.
```

 Neeson & Associates   W&P

```
 1                    Q.   You are familiar with the report

 2    of Philip Green; correct?

 3                    A.   Yes.

 4                    Q.   You reviewed his numbers and

 5    methodology?

 6                    A.   I did.

 7                    Q.   You are aware that he assigns a

 8    value of $105 million to NGS and allocates it

 9    entirely to NNI?

10                    A.   Yes, I am aware of that.

11                    Q.   Let's pull back up your slide 16

12    again.  To determine the value of the surrendered

13    licenses under your ownership approach, you applied

14    the RPSM percentages for the US and EMEA based on a

15    calculation of the average R&D spending for 2005 to

16    2009; correct?

17                    A.   That is correct.

18                    Q.   Now, if we pull up Schedule 8 of

19    your first report, based on R&D spending for 2005

20    to 2009, you calculated the RPSM percentages for

21    NNL at 49.8 percent, NNI 38.5 percent, and EMEA to

22    be 11.6 percent; correct?

23                    A.   I don't know.  I don't have that

24    in front of me, sir.  We are going to need to slow

25    down.
```



```
 1                   Q.   I am sorry.  I didn't realize it
 2   wasn't up.
 3                   There, it is up on the screen now.
 4                   A.   So you are asking me if those are
 5   the R&D percentages that --
 6                   Q.   That you used.
 7                   These are the percentages you used;
 8   correct?
 9                   A.   Yes, sir.
10                   Q.   And if we pull up paragraph 3.36
11   of your initial report, you state that as of fiscal
12   2009 these percentages are the approximate relative
13   R&D expense shares that would have been used in the
14   application of the RPSM; correct?
15                   A.   We do say that.  That may not be
16   entirely accurate because it is a one-year lag.  I
17   would, however, want to use the most current
18   information in performing the calculus relative to
19   the 988.
20                   Q.   Well, but this morning in your
21   testimony didn't you repeat what you said there,
22   and you said the 50.2 percent RPSM share is as of
23   2009?  Don't you recall saying that to Mr. Steep?
24                   A.   It is as of --
25                   Q.   In fact --
```

Neeson&Associates   W&F

```
 1                    A.   It includes 2009.  That's an

 2   accurate statement, sir.

 3                    You are referring to the specific way

 4   in which they have a one-year lag.  I didn't want

 5   the one-year lag in my analysis.  I want the most

 6   recent RPSM because my projections are looking

 7   forward.  If I had 2010, I would have used it.  I

 8   want the most recent for my analysis because I am

 9   looking forward.

10                    Q.   Now, is it correct that what you

11   did with your formula here is you used a business

12   value --

13                    A.   I am sorry.  The formula here.

14   You need to point me out -- point what you are

15   referring to.

16                    Q.   Good point.  Slide 16.

17                    A.   Thank you, sir.

18                    Q.   You used a business value as of

19   2008.

20                    A.   12/31/2008.  Yes, we agree.

21                    Q.   And an RPSM percentage as of 2010;

22   correct?

23                    A.   I used 2009 data along with the

24   prior years to calculate my RPSM percentage,

25   knowing that the 988 is based upon projections into
```

 Neeson&Associates    W&F

1    the future.  I want to know what the RPSM is going

2    to look like out there, and I would, of course, use

3    the most recent that I have available to me.

4              Q.   Just so our terminology is clear,

5    because you have said as of 2009, 2009 data.  There

6    is something that Nortel used called the 2009 RPSM

7    or the 2010 RPSM or the 2008 RPSM; correct?

8              A.   That's correct.

9              Q.   Just so there is no confusion, for

10   clarity, when you say -- when you use this 50.2

11   percent number, you are using the 2010 RPSM;

12   correct?

13             A.   Based upon how they defined that,

14   that's correct.

15             Q.   I am not asking you why.

16             A.   I am agreeing with you, sir, if

17   you let me finish.

18             Q.   2010.  Thank you.

19             Just so I understand it, you are

20   applying the 2010 RPSM to 2008 financial data;

21   correct?

22             A.   The 2008 is a present value based

23   upon future years.  It would be appropriate.

24             Q.   Now, by 2010 most of these lines

25   of businesses were sold; right?



```
 1                    A.   But we only have the data through

 2   2009.

 3                    Q.   Are you aware as to whether many

 4   of these lines of businesses that you applied the

 5   2010 RPSM to were sold in 2009?

 6                    A.   That's a different analysis.  This

 7   988 --

 8                    Q.   Are you aware?

 9                    A.   -- is based upon in the hands of

10   Nortel and they would continue to operate some of

11   these businesses for some period of time.

12                    Q.   You are familiar with various ways

13   to value IP; right?

14                    A.   Yes, sir.

15                    Q.   You did not conduct a valuation of

16   Nortel's IP as a whole, did you?

17                    A.   We conducted the valuation as I

18   have described.  We used the PPAs.  We used the

19   Rockstar value.  We valued the individual

20   surrendered license rights.  We did those things.

21                    Q.   Let me ask you my question again.

22                    A.   Yes, sir.

23                    Q.   Did you or did you not conduct a

24   valuation of Nortel's IP as a whole?

25                    A.   I think it depends on what you
```



 1   mean by that.  I valued the IP in the lines of

 2   business, and I valued the IP in the Rockstar

 3   transaction.  I am not sure specifically what you

 4   are asking me.

 5               Q.   Well, let me ask you to pull up

 6   your deposition --

 7               A.   Yes, sir.

 8               Q.   -- page 35, because I don't think

 9   you had any problem answering the question then.  I

10   asked you at the top of page 35, line 2:

11                    "You did not conduct a valuation

12                    of the IP as a whole, putting aside the

13                    surrendered licenses?

14                    "Answer:  That's correct.  We're

15                    using the IP values from the PPAs."

16                    Did you give that answer to that

17   question?

18               A.   I did.

19               Q.   Was it truthful?

20               A.   The PPAs are the IP values we

21   used.

22               Q.   The IP values in the PPAs were not

23   done by you, were they?

24               A.   I agree with that.

25               Q.   So when I asked did you, Thomas



1    Britven, conduct any valuation of the IP as a

2    whole, the answer is no; right?

3              A.   We did not perform the PPAs.  We

4    used those PPA values in our valuation work.

5              Q.   Let's take a look at slide 14,

6    which is your discussion of the PPAs.

7              A.   Yes, sir.

8              THE CANADIAN COURT:  Mr. Rosenthal, I

9    can tell you that, listening to this, I don't know

10   what you meant by the question, so I don't know how

11   it is very helpful.  I don't know what you meant by

12   the question "as a whole."

13             MR. ROSENTHAL:  It was in the

14   aggregate, Your Honor.

15             THE CANADIAN COURT:  I don't understand

16   that either, but anyway.

17             BY MR. ROSENTHAL:

18             Q.   Mr. Britven, in your calculation

19   of what value from these sales you would allocate

20   to the US Debtors and what value you would allocate

21   to the EMEA Debtors, you performed the calculation

22   on slide 16; correct?

23             A.   Slide 15?

24             Q.   16.

25             A.   16.  If we could pull that up,



```
 1   please.
 2               Yes, sir, I did.  And this is a value
 3   of the surrendered licenses.
 4               Q.   Did you ever -- let me just pull
 5   up another slide, slide 13.
 6               You see there is a line for
 7   intellectual property value, and it is
 8   $1.143 million?
 9               A.   Yes, sir.
10               Q.   Is that your calculation?
11               A.   That comes from the PPAs.  So just
12   so we are clear, 90 percent of the PPA values come
13   from the PPAs, and then we extrapolated to get the
14   last 10 percent.
15               Q.   Now, you have a statement that the
16   surrendered licenses are $285 million; correct?
17               A.   That's correct.
18               Q.   And then you have that Canada's
19   patents are worth $858 million; correct?
20               A.   That's the value of the patents.
21   Some of the patents are owned outside of Canada,
22   but they are small.
23               Q.   Did you value that?
24               A.   We allocated a portion of the 858
25   to US and EMEA patents.
```



```
 1                    Q.    That's not my question.  Did you

 2    calculate that value?  When you say that Canada has

 3    $858 million worth of patents in the lines of

 4    businesses, did you calculate that?

 5                    A.    You are asking me if I calculated

 6    the 858?  The answer is yes.

 7                    Q.    And you calculated that by simply

 8    taking the $1.143 billion and just subtracting what

 9    you would give to the US and EMEA; correct?

10                    A.    That's correct.

11                    Q.    Now, going back to the PPAs, let's

12    talk about what this slide doesn't state.  You

13    don't know how the buyers did these PPAs, do you?

14                    A.    I don't know how the buyers what?

15    I am sorry.

16                    Q.    Performed their PPAs.

17                    A.    Specifically?

18                    Q.    Correct.

19                    A.    No.  I know the standards that

20    would apply to their PPAs.  We are the largest

21    valuation -- Duff & Phelps is the largest valuation

22    firm in the world.  We do a lot of PPA work.  So

23    there are standards around and accounting criteria

24    around the PPA.  So we have a general sense.  But

25    we don't know specifically how each of these buyers
```

 Neeson & Associates    W&F

```
 1   performed the PPAs in detail.

 2              Q.   You never audited them?

 3              A.   No.  We don't have the detail.  We

 4   did not audit them.

 5              Q.   You used these numbers with

 6   precision, as if they are exact numbers for

 7   purposes of your calculation.

 8              You would agree with me that there is a

 9   range within which reasonable valuators can differ

10   when preparing a PPA; correct?

11              A.   Within the context of the

12   standards.  I think the standards constrained that

13   range.  But I am not of the view that every

14   valuator comes up with the exact same value for

15   every asset.

16              Q.   And you made no effort to

17   ascertain where within the range, if at all, these

18   PPAs fell; correct?

19              A.   No.  I am comfortable -- I am

20   sorry.  I am comfortable --

21              Q.   The answer is no.  We can move on.

22              A.   Please reask your question.  I

23   want to make sure I answer your question.  I have

24   got to hear it to answer it.

25              Q.   You made no effort to ascertain
```



```
 1    where within the range these PPAs were; correct?

 2                   A.   Correct.  We used those numbers.

 3    We believe the range is fairly narrow, given the

 4    rigors of the standards

 5                   Q.   And you are aware from your

 6    deposition and the colloquy you had with counsel

 7    for EMEA that there is a dispute as to whether

 8    these PPAs that you relied upon are admissible in

 9    this litigation; correct?

10                   A.   I understand there is an issue

11    around the PPAs.  As a valuator, that's something

12    you all need to deal with.

13                   Q.   Are you aware of whether the

14    Canadian Monitor and Debtors themselves have agreed

15    that they can't be relied upon?

16                   A.   I don't have a clear recollection

17    as to the actual agreement, nor do I ever remember

18    seeing the actual agreement.

19                   Q.   Nobody told you, when you decided

20    to rely on the PPAs, what the agreement was?

21                   A.   Well, telling me something and

22    allowing me to read it in a document and

23    remembering what it says specifically are two

24    different things.  I am aware that there is an

25    issue around the use of the PPAs.  Whatever that
```

 Neeson & Associates   W&P

1    is, we used the PPAs as the best evidence.

2              Q.   Let me just ask you this.  Isn't

3    it true that you performed no asset-based

4    allocation independent of the PPAs?

5              A.   The PPA performs the asset-based

6    allocation, and we used what is in the PPAs.

7              Q.   Now, you are aware that you are

8    not the only expert witness who has purported to

9    perform an allocation calculation on behalf of the

10   Canadian Debtors and their creditors; correct?

11             A.   Can I hear that again, please.

12             Q.   You are aware that you are not the

13   only expert to perform an allocation calculation on

14   behalf of the Canadian Debtors and their creditors?

15             A.   That part I don't understand.

16             Q.   Well, you were retained by

17   creditors of the Canadian Debtors; correct?

18             A.   Correct.

19             Q.   And you are aware that the

20   Canadian Estate and the creditors collectively --

21   there is another expert also retained by that

22   group.  It is called the Canadian allocation

23   group -- aren't you?

24             A.   I am not sure.  Maybe it goes by a

25   different name.  Is there an expert that I



```
 1   should -- that you should identify for me?

 2              Q.   Philip Green.

 3              A.   Mr. Phil Green.  All right.  Yes,

 4   I am familiar with Mr. Green's work.

 5              Q.   And you have reviewed his report

 6   and his calculations; correct?

 7              A.   Yes.

 8              Q.   Let's take a look at your slide

 9   36.  And you state that you have a similar

10   interpretation of the MRDA.  Do you see that

11   bullet?

12              A.   Yes, sir.

13              Q.   And what you are actually saying

14   is that the Canadian interests gave you the same

15   assumptions; right?

16              A.   I don't know that they are the

17   same, but they are similar.

18              Q.   And you say that you have

19   different methodology, yet comparable results.  So

20   I would like to probe those two statements that are

21   in that sentence.

22              First, if we look at your methodology

23   for the Rockstar sale, Mr. Green and you both

24   attribute either all or virtually all of the value

25   to the Rockstar sale all to NNL based upon the same
```



```
 1   assumption that the licensed participants had no
 2   rights in the patent portfolio; correct?
 3               A.   We are common there.  I am of the
 4   view that some of those patents -- that's correct.
 5   I am of the view that some of the patents are not
 6   owned by NNL, and that's a difference.  I think he
 7   allocates 100 percent.
 8               Q.   But while you trumpet the fact
 9   that you are coming out to similar results, it
10   would be pretty surprising if you both concluded
11   that the US -- or you both were told to assume that
12   the US Debtors and the EMEA Debtors had no rights
13   and yet came up with materially different
14   calculations; correct?
15               A.   I would agree the assumptions here
16   influence the outcomes.  Yes, I agree.
17               Q.   And next, your chart here, if we
18   look at the Britven and the Green charts of
19   recoveries, that includes treasury cash flow of the
20   estates; correct?
21               A.   That's correct.
22               Q.   And that is the same between you
23   and Mr. Green, because the approximately $1.5
24   billion in treasury cash in the estates isn't even
25   being allocated in this proceeding; correct?
```



```
 1                   A.    Well, Mr. --
 2                   Q.    You would expect $1-1/2 billion of
 3     your calculations to be identical because it is not
 4     even subject to allocation; correct?
 5                   A.    Mr. Green doesn't use the
 6     $1.5 billion in his analysis.  I took his
 7     allocation and then ran it through the waterfall
 8     model, which would take into account the
 9     $1.5 billion; the inter-estate claims, the
10     guarantees, the estimated claims.  So there is a
11     common data set there.
12                   All I got from Mr. Green was his
13     allocation, the same as my allocation, if you will,
14     at question 1.
15                   Q.    So in valuing the lines of
16     business, while you say that you and Mr. Green use
17     a different methodology, you both use a methodology
18     that is based upon, one, what you believe Nortel
19     would have earned absent the sale; correct?
20                   A.    Yes, as a general notion.  He does
21     a run-off, and I use in the hands of Nortel.  His
22     run-off is different, though, than in the hands of
23     Nortel.  His is a much-reduced Nortel.
24                   Q.    But it is both, at its root, based
25     upon what Nortel would have earned absent the sale;
```

 Neeson & Associates    W&F

```
 1   correct?

 2                  A.   With regards to the value of the

 3   surrendered license; that's correct.

 4                  Q.   You both run it through RPSM

 5   percentages; correct?

 6                  A.   That's correct.

 7                  Q.   You both only do the RPSM

 8   percentages for the EMEA and the US Debtors and

 9   then give the Canadian Debtors the residual;

10   correct?

11                  A.   Based on ownership; that's

12   correct.

13                  Q.   So now that we have looked at the

14   methodology and its similarities, let's talk about

15   differences and their magnitude.  Isn't it true

16   that in your own expert opinion, Mr. Green

17   understated the value of the assets surrendered by

18   the US and EMEA Debtors?  Yes or no.

19                  A.   I believe he is probably a little

20   light, especially in the area of customer

21   relationships.

22                  Q.   A little light.  In fact, if we

23   want to look at the order of magnitude of

24   Mr. Green's understatement to the EMEA and the US

25   and overstatement to Canada, you would agree with
```



1    me that Mr. Green allocates $1.4 billion in IP and

2    customer relationships for the line of business

3    sales to Canada; correct?

4                    A.    I don't have the numbers

5    memorized.  That sounds about right, but there is a

6    lot of numbers in this case, sir.  Do you have a

7    document I can look at?

8                    Q.    Sure.  Why don't we pull up the

9    Green report, Exhibit D.2.

10                   THE CANADIAN COURT:  I am just

11   wondering where we are going with all this.  The

12   reports are here.  You are just going through the

13   differences.

14                   MR. ROSENTHAL:  Well, Your Honor, the

15   witness said -- you know, he is trumpeting how

16   comparable the results are between him and

17   Mr. Green and just called the differences a little

18   light.  I am going to show you and the witness that

19   they are actually off by about 50 percent.

20                   THE CANADIAN COURT:  Well, you used the

21   word "trumpeting."  I don't know what the "there"

22   is.  Isn't this all argument?

23                   MR. ROSENTHAL:  Not when he has an

24   expert opinion that he has just stated, talking

25   about how comparable they are.



```
 1                    BY MR. ROSENTHAL:
 2               Q.   In this exhibit, if we look at the
 3    IP and customer relationships, Mr. Green attributes
 4    $1.414 billion to Canada; correct?
 5               A.   That's correct.
 6               Q.   And isn't it true that that's
 7    about 50 percent more than you did?
 8               A.   Well, this is for the intellectual
 9    property rights and customer relationships.
10               Q.   Correct.
11               A.   Do you have my number for me or do
12    I have to look that up?
13               Q.   Sure, we can pull up yours.  It is
14    Schedule 2.1, which is page 58 of your first
15    report.  Do you see the numbers there for IP and
16    customer relationships?
17               A.   858 plus the 93, 950 million or
18    so --
19               Q.   He is about 50 percent higher than
20    you; correct?  Yes or no.
21               A.   If I could just finish, I would
22    really appreciate it.
23                    950 million compared to his 1.4.  The
24    big difference there is I allocate a lot of the
25    customer relationship value to US and EMEA.
```

 Neeson & Associates   W&P

```
 1                    Q.   You disagree with the manner in

 2   which Mr. Green treats customer relationships;

 3   correct?

 4                    A.   It is not my preferred way of

 5   doing it; that's correct.

 6                    Q.   And if they are material and can

 7   be valued, IP, goodwill and customer relationships

 8   should be valued separately, which Mr. Green did

 9   not do; correct?

10                    A.   I think that's also correct.

11                    Q.   And Mr. Green also assumes that

12   there is no goodwill value in the business line

13   sales, and therefore attributes to value to the US

14   or EMEA for goodwill, whereas you find that there

15   is $853 million in goodwill in the business line

16   sales, half of which are allocated to the US and

17   EMEA; correct?

18                    A.   That's a really long question.  I

19   think the answer, that's incorrect.

20                    Q.   I will break it up.  You are aware

21   that Mr. Green assumes that there is no goodwill

22   value in the line of business sales; correct?

23                    A.   It depends on how you look at it.

24   It is not uncommon, and I think you heard Mr. Green

25   testify, that in-place workforce is oftentimes
```



1   considered part of goodwill.  So is it goodwill or

2   is it in-place workforce?  I think you could call

3   it either one.

4            And if it is goodwill, then he did, in

5   fact, allocate some goodwill to EMEA and to the US.

6   If it is not, then I think the rest of your

7   question is likely to be correct.

8            Q.   Let's talk about the MRDA for a

9   second.

10           A.   Yes, sir.

11           Q.   We can agree that it is an

12  operating agreement?

13           A.   I think that's correct.

14           Q.   We can agree that the MRDA is not

15  designed to deal with sale proceeds; correct?

16           A.   That's my understanding, yes.  It

17  specifically excludes gains or losses on sales.

18           Q.   Mr. Britven, if the parties had no

19  agreement to apply an RPSM to a sale, one of the

20  ways that you yourself might have done your

21  calculations would be revenues; correct?

22           A.   So if we could just back up there

23  for a little bit, I think the agreement does

24  reference ownership, and that's what I used in this

25  case.



```
 1                    If I were to not have the guidance

 2   under the MRDA and were to consider different ways

 3   to allocate, I would consider revenue; I would

 4   consider contribution; I might consider units or

 5   headcount.  There could be all kinds of things I

 6   would consider.  But I used the ownership method,

 7   and I thought there was a basis for that,

 8   especially in light of all the valuation literature

 9   that applies here.

10                    Q.   And when you talk about the

11   ownership method, you are talking about the

12   assumptions you were given about legal title with

13   respect to the IP?

14                    A.   That's correct.  That's almost all

15   instruction from counsel.  However, I did test

16   those assumptions based upon my experience with

17   thousands of license agreements and my extensive

18   experience in the IP space.

19                    Q.   Now, one other approach that has

20   been proposed in this case and that you looked at

21   in your report is an inventor-based allocation.  Do

22   you recall looking at that in connection with your

23   report?

24                    A.   Yes, sir.

25                    Q.   You would agree that even if we
```



 1   know RPSM percentages, it is not possible to

 2   measure actual contribution based upon inventor

 3   work, given the size of the portfolio, the

 4   limitations on time and the availability of

 5   information; right?

 6            A.   Especially after the fact.  Yes, I

 7   think it would be very difficult, if not

 8   impossible, in this circumstance to do a valuation

 9   of the output, if you will, in the circumstance of

10   this litigation.

11            Q.   And you undertook to see if an

12   inventor-based proxy could assist in the analysis;

13   correct?

14            A.   We did perform an inventor-based

15   analysis in critiquing, I believe,

16   Mr. Malackowski's work.

17            Q.   And you didn't believe -- after

18   you tried to do it, you didn't believe that it was

19   determinative; correct?

20            A.   It wasn't determinative, and I

21   thought it was as reliable as Mr. Malackowski's,

22   which I believe are insufficient relative to the

23   ownership approach we did apply, or even pro rata.

24            Q.   And an analysis of the patents

25   based on the location of the inventors doesn't



```
 1    reveal the contributions of each inventor relative

 2    to others; correct?

 3              A.    That's correct.

 4              Q.    It doesn't reveal the amount and

 5    the source of the funding for each invention, does

 6    it?

 7              A.    That's also correct.

 8              Q.    Nor does it reveal the ultimate

 9    value of each invention claimed in a patent;

10    correct?

11              A.    We agree.

12              Q.    And you did a chart that is

13    Table 4 of your rebuttal report at page 29.  And

14    this chart at Table 4 you would agree has no

15    indication of the relative worth of these patents;

16    correct?

17              A.    I am not sure I understand your

18    question.

19              Q.    Well, this chart is a pure

20    numerical analysis.  You didn't undertake any

21    qualitative accounting of the value of the

22    particular patents attributed with the percentages;

23    correct?

24              A.    That's correct.

25              Q.    And, in fact, this chart itself,
```



1  you would agree, while you used it to try to see if

2  this approach could work, you ultimately agree that

3  it suffers from all of the same shortcomings that

4  you identified a few moments ago; correct?

5              A.   I am not quite sure what you are

6  referring to.  The shortcomings I just identified a

7  few moments ago?

8              Q.   Yes.  The shortcomings of this

9  chart doesn't tell you the contributions of a

10  particular inventor relative to others, if they

11  collaborated; it doesn't tell you the value of

12  particular patents.  It doesn't tell you the amount

13  and source of funding for the inventions.  All of

14  those shortcomings would also apply to this chart;

15  correct?

16              A.   That's correct.  And I used this

17  again in critiquing and assessing Mr. Malackowski's

18  R&D spend analysis.

19              Q.   And at the end of the day, when

20  you look at both your chart and Mr. Malackowski's

21  inventor-based approach, you conclude that they are

22  both inferior; correct?

23              A.   I think they are.  I think this is

24  at least as informative as Mr. Malackowski's R&D

25  approach.  But I do believe the ownership is a more



```
 1   appropriate approach

 2              Q.   And as between your chart and

 3   Mr. Malackowski's regarding inventor-based

 4   analysis, you can't endorse one over the other;

 5   correct?

 6              A.   I thought they were equally

 7   informative.

 8              MR. ROSENTHAL:  Your Honor, I am at a

 9   good point if you want to take a lunch break now

10   or --

11              THE US COURT:  How much longer do you

12   think you might have, Mr. Rosenthal?

13              MR. ROSENTHAL:  I am more than halfway

14   through, but I can't say how much more yet.

15              THE US COURT:  And is there anyone else

16   who will be examining the witness at this point?

17              MR. CHANG:  I will be, Judge Gross

18              MR. MILNE-SMITH:  I will also, Judge

19   Gross.

20              THE US COURT:  Well, it sounds like we

21   have a ways to go.

22              THE CANADIAN COURT:  It sure does.

23              THE US COURT:  Why don't we take a

24   lunch break now.  And maybe Mr. Rosenthal will be

25   able to reduce his examination, and the others as
```



```
 1   well.  All right.  We will be back here at quarter
 2   to 2:00.
 3   -- LUNCHEON RECESS TAKEN AT 12:30 P.M. --
 4   -- RESUMED AT 1:56 P.M. --
 5             THE US COURT:  You may be seated,
 6   everyone.  Thank you.  Mr. Rosenthal, Mr. Britven.
 7             THE WITNESS:  Good afternoon.
 8             THE US COURT:  Good afternoon, Justice
 9   Newbould.
10             THE CANADIAN COURT:  Judge Gross.
11             THE US COURT:  Mr. Rosenthal is ready.
12             MR. ROSENTHAL:  Thank you, Your Honor.
13             Your Honors will be pleased to hear I
14   took the lunch break and looked through my
15   remaining outline.  And I would say that, for most
16   of it, I think Justice Newbould is right, that I
17   can probably just do it through argument later.  So
18   that I will not take up the Courts' and the
19   witness' time with some of those subjects.
20             And I think, frankly, for the remaining
21   ones, I think just in order to make our arguments
22   later, I just want to be able to establish certain
23   things as to whether they are assumptions or not.
24             THE US COURT:  All right.
25             MR. ROSENTHAL:  I am just going to
```



1   probably just pose a very brief series of

2   questions, and I will try to be brief.  And if the

3   witness can respond in kind, we could perhaps get

4   through this within 15 minutes or so.

5            THE US COURT:  All right,

6   Mr. Rosenthal.  Good luck.

7            BY MR. ROSENTHAL:

8            Q.   Mr. Britven, we are going to be

9   talking mostly about your slide 35 now, which is

10  your illustrative percentage recovery comparison.

11  And as I just told the Courts, I really just want

12  to get an idea of some of the portions that I

13  believe are assumptions that went into this and see

14  if you can perhaps just confirm for me or not.

15           A.   Yes, sir.

16           Q.   Now, when you first prepared your

17  schedule that went into this of claims for each of

18  the estates, you did that based on counsel

19  instructions; correct?

20           A.   That's correct.

21           Q.   And, in fact, in your report --

22  and it is on page 18 -- after saying that they are

23  for illustrative purposes only, you wrote that:

24                "The inclusion of these amounts

25                should not be taken as an



```
 1                  acknowledgment by the CCC as to their
 2                  validity, or enforceability or quantum.
 3                  We include them only for illustrative
 4                  purposes."
 5                  Now, is that something that the CCC
 6      requested that you put in there?
 7                  A.   Yes.
 8                  Q.   Going back to slide 35, you have
 9      percentage amounts for the Canadian creditors.  Do
10      you see, reading across, it is the fourth row down?
11                  A.   Yes, sir.
12                  Q.   And slide 30 has the breakdown of
13      the Canadian creditor claims that add up, you say,
14      to 3.3 to $3.4 billion; that is right?
15                  A.   That's correct.
16                  Q.   But, in fact, when you did your
17      calculation for the Canadian creditor line for the
18      percentages on slide 35, is it fair that you
19      also -- fair to say that you also assumed that
20      there would be an $880 million UK pension claim
21      diluting the Canadian creditors?
22                  A.   There is an $880 million
23      guarantee.  A portion of that is paid as part of
24      this analysis.  So it is part of that waterfall.
25      It is one of the elements.
```



```
 1                    Q.   And when you say a portion is
 2   paid, you are assuming that the Canadian creditor
 3   pool is diluted by another $880 million that gets
 4   you to these percentages; correct?
 5                    A.   I would have to look at the exact
 6   calculus.  I don't know if it is the full 880 or
 7   some portion of that.  I just need to look.
 8                    Q.   Why don't we look at page 18 of
 9   your report.  Am I reading this right, that when
10   you took the claims that you listed, for example,
11   on slide 30, you also included for your percentages
12   this 880 UK Pension Trust guarantee claim against
13   the Canadian Estate?
14                    A.   We did.  That's the max.  It is
15   880 as a max.
16                    Q.   And that was also instruction you
17   were given by the UCC?
18                    A.   That's correct.
19                    Q.   I said UCC.  I meant CCC.
20                    A.   That's what I thought.
21                    Q.   And when the CCC asked you to make
22   this assumption, they told you that they did not
23   agree with the validity of that assumption;
24   correct?
25                    A.   Well, they asked us to make the
```



1    assumption, and they were also concerned about some

2    kind of acknowledgment, so they asked for the

3    language that you see in the report or something

4    similar to that.

5              Q.   Do you know if the CCC agrees that

6    there should be any UKP claim into Canada?

7              A.   I am not sure on their current

8    position.

9              Q.   And is it fair to assume that

10   adding the $880 million UKP claim has the effect of

11   lowering on percentage basis the Canadian creditor

12   recoveries?

13             A.   Could you just give me a moment,

14   please?

15             Q.   Sure.

16             A.   Yes, it does.

17             Q.   Now, on the US side, just to give

18   one example, because I don't want to belabor the

19   point so I am just trying to pick an example here

20   and there, you did not include in your implied

21   recovery calculations the fact that former Nortel

22   Canadian employees are trying to pursue claims

23   against the US Debtors; correct?

24             A.   If that's not included in the

25   unsecured creditor claims against the US, you are



 1    correct.

 2              Q.   If there were significant Canadian

 3    employee claims that were asserted against the US

 4    Debtors, is it fair to say that the percentage

 5    recovery of US creditors would go down?

 6              A.   Assuming all else being equal,

 7    these are estimates.  The claim amounts can vary as

 8    well as the underlying assumptions.

 9              Q.   The $1.3 billion figure here that

10    you cite for the US, your estimate of the US

11    Debtors, the claims against the US Debtors, values

12    any possible priority tax claim against the US

13    Debtors at zero; right?

14              A.   I would have to hear more about

15    that.  We do take some priority claims into account

16    in calculating the treasury cash, and I would want

17    to make sure we are not talking about the same

18    thing and you are talking about some other priority

19    claim.

20              Q.   Well, let's take a look at page 18

21    of your report.

22              A.   Yes, sir.

23              Q.   And it is Footnote 44.  Does the

24    last sentence refresh your recollection that any

25    potential priority tax claim against the US Debtors



1   has been valued at zero for purposes of all of your

2   percentage recoveries?

3              A.   I am sorry.  I didn't hear the tax

4   claim part of your question.  You are correct.

5              Q.   You mentioned China and Singapore

6   claims of $203 million as part of your testimony.

7   Do you know -- were you given any support for that

8   assumption at all?

9              A.   I don't believe we could find

10  additional support for that, so we would have taken

11  the instruction.  We looked for additional support

12  without success.

13             Q.   Now, if we look back up to slide

14  35, now, you have at the bottom of slide 35 in the

15  Kinrich column $1.38 billion in undistributed cash

16  in NNI; correct?

17             A.   That's correct.

18             Q.   And you said it is not your job to

19  try to figure out what happens as a matter of

20  bankruptcy law to undistributed cash, so you just

21  made sure just to note it but not do anything with

22  it.  Fair to say?

23             A.   I just stopped there.

24             Q.   So it is your understanding, given

25  your experience, that what happens with



1    undistributed cash as kind of a priority matter is

2    something for the US bankruptcy Court to figure

3    out?

4                    A.    Yes.  I am not the -- I am not in

5    a position to make those decisions.  I would look

6    for instructions from the Courts and make the

7    adjustments as necessary.

8                    Q.    Now, if we wanted to help Judge

9    Gross figure that out at a later date when he

10   doesn't have you on the witness stand anymore to

11   help and he determined that undistributed cash,

12   after all creditors are paid, goes to equity and he

13   wanted to figure out, well, what is the percentage

14   impact on the Canadian creditor recovery, you have

15   given him the data on slide 30 as to what the

16   denominator of Canadian creditor claims are in your

17   estimates; correct?

18                   A.    Well, that's the denominator as

19   currently estimated.  I would imagine there will be

20   other issues that the Court addresses, such as the

21   possibility of post-filing interest.  And the net

22   of all those things would have to be reflected,

23   obviously, here in the schedule.

24                   Q.    And I am not suggesting anything

25   as to what the ultimate outcome is, but I am saying



```
 1    whatever the number -- strike that.
 2              Whatever the amount ultimately is of
 3    remaining cash in NNI after all creditor claims are
 4    paid, if Judge Gross wanted to take your report to
 5    figure out what is the impact of that, he can take
 6    that amount and divide it by your estimate of
 7    Canadian creditor claims to get a sense of what is
 8    the percentage recovery impact, whatever that may
 9    be; correct?
10              A.   I would suspect that there will be
11    other things that change.  So I am hesitant to say
12    that that in isolation is a reliable look, because
13    I suspect there will be other movements in the
14    numbers.  There will be decisions that are made,
15    and the net result of all those are what is going
16    to be important, in my view.
17              Q.   So without regard to what the
18    numbers actually are, you could take whatever is
19    remaining in the US Estate and whatever the
20    ultimate total of Canadian claims are and divide
21    the numerator by the denominator to get a sense of
22    what the percentage impact is, but we don't know
23    what those numbers are; fair to say?
24              A.   I haven't calculated those
25    numbers, and I suspect there will be other
```



```
 1   modifications as well.
 2              Q.   Now, is it fair to say that the
 3   waterfall that you have with respect to Columns 1
 4   through 5 -- and we are on slide 35 -- the
 5   waterfall that you have for Columns 1 through 5 is
 6   actually not the same waterfall that you have for
 7   Column 7?
 8              A.   Column 7 is not -- doesn't run
 9   under the waterfall.  It is a different model.
10              Q.   So different methodologies;
11   correct?
12              A.   It is a different methodology and
13   a different model.
14              Q.   For example, you and Mr. Green
15   allocate roughly $6 billion to the Canadian Estate;
16   correct?
17              A.   Under the ownership approach?
18              Q.   Yes.
19              A.   Under the waterfall model, that's
20   about right.
21              Q.   And that yields, in your view,
22   about a 60 percent recovery, based on all the
23   assumptions that you take into account for Canadian
24   creditors; correct?
25              A.   Right.  So there is a set of
```



```
 1   assumptions there that drive that percentage

 2   calculation.

 3               Q.   And then the pro rata approach

 4   actually would distribute about a billion dollars

 5   less out of the lockbox to the Canadian Estate;

 6   correct?

 7               A.   That sounds about right, because

 8   the assumptions are not identical.

 9               Q.   And because the methodology is

10   different, that billion dollars less yields a

11   recovery to creditors, based on all your

12   assumptions, of 10 percent more; fair to say?

13               A.   Correct.

14               Q.   With regard to your pro rata

15   waterfall --

16               A.   So let's be clear on the terms.

17   If you say "waterfall," I am going to instantly go

18   to question No. 2 and my ownership approach.  And

19   when you say "pro rata," let's just stick with the

20   pro rata model.

21               Q.   I will use different terms.  Can I

22   say "pro rata methodology"?

23               A.   That's fine.

24               Q.   With regard to your pro rata

25   methodology, you have assumed that the Bondholders
```



1  would not collect any claim in the United States;

2  correct?

3           A.   Yes.  The way we perform the

4  calculation, we have the bonds being paid out of

5  the Canadian Estate.  We do have a trigger in the

6  model that allows that to be split or converted to

7  the US.  But the run that you saw, the illustration

8  that you saw on the screen assumed all the bonds be

9  paid out of the Canadian Estate.

10          Q.   If the Bondholders, in fact,

11  whether it is because of US law or for any other

12  reason, were to be paid out of the US Estate, we

13  would need to drastically adjust the amount of

14  money that you would allocate to the US relative to

15  Canada.  Fair to say?

16          A.   Correct.  Adjustments would be

17  necessary, and the model can accommodate that.

18          Q.   And, in fact, the adjustments

19  could be billions of dollars different from what

20  you have in your model; correct?

21          A.   If you are going to change the

22  underlying assumption to have the bondholders paid

23  out of the United States, it would require

24  a billion-plus-dollar adjustment.

25          Q.   Just one more line of questions



1    really now.

2              In your experience you have offered

3    expert opinions regarding the fair market value of

4    assets or businesses a number of times; correct?

5              A.   Yes.

6              Q.   And you consider yourself to have

7    expertise in that area?

8              A.   Yes.

9              Q.   And having such expertise, you

10   would agree with me, wouldn't you, that the

11   pro rata calculations that you have done do not

12   purport to allocate based on the fair market value

13   of what the respective estates transferred or

14   relinquished in the asset sales; correct?

15             A.   That's correct.  That's what we

16   did in the ownership model.

17             Q.   And, in fact, of all the times

18   that you have been engaged as an expert, not once

19   before have you provided testimony with respect to

20   the performance of a pro rata allocation analysis;

21   correct?

22             A.   That's correct.

23             Q.   You have no opinion one way or the

24   other on whether a pro rata approach is appropriate

25   in this case?



 1                    A.   No.  I consider that to be a legal
 2   question, and I have no view.
 3                    Q.   You don't even have an opinion as
 4   to whether it is fair in this case, do you?
 5                    A.   I don't really perceive my job as
 6   to determine what is fair.  I think that's the job
 7   of the Courts and the Honors.
 8                    Q.   And you do understand, given your
 9   expertise, what the phrase "to value assets
10   transferred or relinquished" are; right?
11                    A.   Yes, sir.
12                    Q.   And you sought to calculate that
13   using certain assumptions in your response to
14   Question 1; right?
15                    A.   That's correct.
16                    Q.   And your pro rata approach would
17   allocate to the US less than 20 percent of what you
18   yourself have calculated to be the value of the
19   assets they have transferred or relinquished;
20   correct?
21                    A.   If that's the way math works, I
22   will agree with you.  I would have to look at the
23   schedule.
24                    Q.   Based on your familiarity, those
25   numbers sound about right?  I mean, I could show



1    you the numbers if you want.

2              A.   I am naturally skeptical.  I am a

3    CPA.  I would like to see the numbers.  If you tell

4    me that's what they are, I will accept that.

5              Q.   Okay.  Well, I will represent that

6    it is less than 20 percent.

7              A.   Thank you.

8              Q.   And with respect to the pro rata

9    approach, would you agree that it is fair to say

10   that you were simply giving an opinion as to the

11   mathematical accuracy of your calculations?

12             A.   I think that's certainly part of

13   it.  It is mathematically accurate.  There is also

14   a model that had to be developed to allocate the

15   amounts into the various debtor groups to make the

16   calculations work.  So it is more than simple math.

17             MR. ROSENTHAL:  I have no further

18   questions.  Thank you.

19             THE WITNESS:  Thank you very much.

20             THE US COURT:  Mr. Rosenthal, thank

21   you.

22             MR. MILNE-SMITH:  Good afternoon,

23   Mr. Britven.

24             THE US COURT:  Yes, please.

25             MR. MILNE-SMITH:  Judge Gross, it is



1   nice to finally meet you in person.

2             THE US COURT:  Good to have you here.

3             MR. MILNE-SMITH:  Matthew Milne-Smith

4   on behalf of the EMEA Debtors.

5   CROSS-EXAMINATION BY MR. MILNE-SMITH:

6             Q.   Mr. Britven, can we start by

7   bringing up slide 35 from your demonstrative

8   exhibit.

9             Is it fair to say that this slide

10  summarizes how many cents on the dollar each

11  creditor group would get under the various experts'

12  approaches?

13            A.   It is, based upon those underlying

14  assumptions and parameters.  But there would need

15  to be a determination by the Courts relative to the

16  undistributed cash in NNI.

17            Q.   That's a very fair point.  And

18  just to be clear on that point, all of the

19  percentages that you have listed here for all of

20  the different experts are premised on the numbers

21  that you use for the claims amounts?

22            A.   That's correct.  I thought that

23  was appropriate to have a common set of data for

24  comparison purposes.  The data can change but,

25  well, let's change it for everyone.  Let's have an



1    apples-to-apples comparison.

2              Q.   And I am not suggesting it is

3    inappropriate.  I just want to make sure we are on

4    the same page.

5              Now, you explained in your direct some

6    of the support you found for the numbers that you

7    use.  Do you recall that?

8              A.   Yes.

9              Q.   I take it it is almost a truism to

10   say that you can't comment and haven't commented on

11   any claims that you weren't told about.

12             A.   That's correct.

13             Q.   And the actual quantum of claims,

14   of course, will have to be determined in each

15   jurisdiction?

16             A.   I think that's also correct,

17   unless there is some agreed-upon procedure

18   otherwise.

19             Q.   Right.  And if the quantum of

20   claims is different than what you have chosen for

21   illustrative purposes, then the recovery

22   percentages will also change across the board?

23             A.   That's correct.  They are

24   estimates.

25             Q.   So, for example, you have provided



1    a $500 million figure for EMEA unsecured creditors;

2    correct?  The nonpension UK claims?

3                 A.   Yes, sir.

4                 Q.   So if there are priority claims in

5    the EMEA estate, the recovery percentage for

6    unsecureds would go down?

7                 A.   So we are talking about priority

8    claims that we haven't already taken into account.

9                 Q.   Correct.

10                A.   Okay.  If there are priority

11   claims within EMEA that I haven't reflected and

12   EMEA was to be allocated 71 cents, yes, some would

13   receive the priority claim amount, and others would

14   receive a smaller amount.

15                Q.   Right.  And the recovery

16   percentages may also vary across the EMEA entities.

17   Do you accept that?

18                A.   Yes.  It is not the intent of the

19   pro rata approach to mandate a percentage for each

20   individual claim within each individual estate.

21   This is simply an allocation at the debtor group

22   level, and they, within that group, will do

23   whatever they normally do in the course of their

24   bankruptcy proceedings.

25                Q.   Right.  So taking the 27 percent



1    that you have provided for EMEA creditors under

2    your CCC ownership approach, then if there are

3    entities that could pay more than the projected

4    27 percent out of their treasury cash, for example,

5    that necessarily means that others would be getting

6    less than 27 percent?

7                    A.   Mathematically, that's correct.

8                    Q.   You are aware that there has been

9    no claims bar date in the EMEA proceedings to date?

10                   A.   I wasn't aware of that.

11                   Q.   Are you aware that there are

12   financial support directive claims by the UK

13   Pension Authority against almost 20 different EMEA

14   entities?

15                   A.   I heard testimony to that effect,

16   yes.

17                   Q.   Right.  And that the amount for

18   that is undetermined, and, in fact, whether it is

19   going to be allowed or not is undetermined, but it

20   could be in the billions?

21                   A.   That was the $60 billion number I

22   heard earlier?

23                   Q.   I am not sure if it is 60 billion,

24   but it is in the billions.

25                   A.   Yes, it could be large.



```
 1                      Q.   And to the extent that such FSD
 2    claims are allowed, that would reduce EMEA's
 3    percentage recovery?
 4                      A.   Well, clearly, if we put another
 5    $60 billion of claims in the calculus, things would
 6    change.
 7                      Q.   Or even 1 billion?
 8                      A.   Things would change based upon
 9    changing the underlying claim amounts; that's
10    correct.  These are estimates.
11                      Q.   So we have been talking about
12    changes just to EMEA.  Are you also aware that
13    there are -- or I take it you are aware that there
14    are various Canadian debtor claims against the EMEA
15    estates?
16                      A.   Is this the snapback claim or
17    something different?
18                      Q.   That's one of them.  So you are
19    aware of the snapback claim.  That relates to the
20    $2 billion tax settlement?
21                      A.   Yes.
22                      Q.   And you are aware there are also
23    certain trading claims by the Canadian Estate
24    against EMEA?
25                      A.   Only generally.
```

Neeson & Associates     W&F

1              Q.   And to your knowledge, the

2    Canadian Debtors continue to pursue those claims?

3              A.   I really don't have a very good

4    recollection of what those things are, especially

5    in the current state.

6              Q.   And because I think you gave

7    testimony in your direct that you didn't know where

8    that $500 million EMEA figure came from; is that

9    right?

10             A.   That's correct.  I cannot find

11   additional support for that number.

12             Q.   Right.  So for all you know, the

13   snapback claims and the trading claims could be

14   additional hundreds of millions of dollars against

15   the EMEA estate?

16             A.   I don't know the actual amount.

17   We used the estimates, the best estimates we had

18   available to us.

19             Q.   And if any of these claims against

20   EMEA entities by the Canadian Estate were allowed,

21   it would increase the Canadian recovery and

22   decrease the EMEA recovery?

23             A.   Well, it is an interactive model,

24   so if there is money left over in the 500 million,

25   it may not have any impact whatsoever.  So it all



1    depends.

2              But if you are going to increase the

3    claims generally, then the percentage will

4    generally go down.

5              Q.   And Canada's would go up, because

6    we are talking about Canadian --

7              A.   I am sorry.  You are talking about

8    ownership.

9              Q.   I am talking about Canadian claims

10   against EMEA.

11             A.   May I hear it again?  I was

12   confused.  I apologize.

13             Q.   Sure.  So we have been talking

14   about Canadian claims against EMEA.  We have got

15   the snapback claims.  We have got the trading

16   claims.  To the extent those claims were allowed,

17   it would increase the Canadian recovery percentage

18   and decrease the EMEA recovery percentage?

19             A.   I think that's correct

20   conceptually.

21             Q.   And you spoke with Mr. Rosenthal

22   about the undistributed cash point, about money

23   potentially flowing from the US up to Canada.  Do

24   you recall that testimony?

25             A.   Yes.



1          Q.   And if NNSA, the French entity, or

2    NN Ireland were solvent and had excess cash, are

3    you aware that their equity was held by Canada and

4    money could flow up to Canada from those as well?

5          A.   I am not aware of the status of

6    those bankruptcies and whether or not those

7    entities are solvent.

8          Q.   Okay.  But if that were the case,

9    then money -- again, percentages would go up in

10   Canada and down in EMEA?

11         A.   The more money you put into Canada

12   without changing their claims, the higher the

13   percentage.

14         Q.   So it is fair to say on this point

15   that from your slide 35, we can tell directionally

16   which allocation approaches are better or worse for

17   each estate?

18         A.   May I have slide 35 up, please?

19         Q.   Sure.

20         A.   Yes.  And that's the purpose of

21   this:  To get a sense for how these compare on a

22   common set of data.  We can change the underlying

23   data, and then there can be another comparison

24   performed.

25         Q.   So we get a directional sense, but



1    we won't know about actual recovery percentages

2    until the claims procedures are run in each estate?

3              A.    That's correct, or the estimates

4    become more and more refined.  It is a continuous

5    process.

6              Q.    Okay.  So we have been talking

7    about your ownership approach.  I want to talk

8    briefly about pro rata.

9              You have made, do I understand

10   correctly, various assumptions about so-called

11   treasury cash held in each estate?

12             A.    We have made treasury cash

13   assumptions at the aggregate level.  Obviously,

14   that treasury cash is held in various estates.

15             Q.    Okay.  You have anticipated my

16   next question.  So obviously, you haven't broken

17   that down by entity within any of the three

18   estates?

19             A.    We know the treasury cash by

20   debtor group, and we actually take that into

21   account under the pro rata approach.

22             Q.    Right.  But, for example, you have

23   indicated 438 million in treasury cash for EMEA.

24   Could you please bring up slide 27.

25             So you will see the treasury cash



1    indicated on the bottom right-hand corner for EMEA

2    of 438 million right next to the letter F.

3                  A.   That's correct.   That was our

4    estimate of treasury cash as of June 30, 2014.

5                  Q.   But you haven't broken down that

6    treasury cash down among the roughly 20 EMEA

7    entities?

8                  A.   No.   And here again, the analysis

9    stops at the debtor group level.   It doesn't go

10   into those individual estates.

11                 Q.   And so what your model assumes, as

12   I understand it, is that the 438 million is

13   available to be distributed wherever it needs to

14   make sure everyone gets the same percentage; in

15   this example, 71.2 percent?

16                 A.   I don't think I make that specific

17   assumption.   We just take into account and

18   acknowledge that EMEA as a group has $438 million

19   of treasury cash, and we use that in this calculus.

20   I haven't gone beyond that debtor group level.

21                 Q.   Let me give you a hypothetical

22   then.   One of the EMEA entities has enough treasury

23   cash to exceed the 71.2 percent recovery or

24   whatever the pro rata percentage turns out to be.

25   Are we clear on that?



 1                    A.   We are.  But I can tell you now I
 2     didn't perform the analysis at that level.
 3                    Q.   Oh, I understand.  I understand.
 4     I just want to follow through the consequences.
 5                    So if we have an EMEA entity with
 6     treasury cash that exceeds the pro rata recovery
 7     amount, there are two possibilities.  One is that
 8     they have to turn over that treasury cash.  The
 9     other is that someone gets less than the pro rata
10     amount.
11                    A.   Or it could be both.  And who they
12     turn it over to could conceptually be other EMEA
13     estates.
14                    Q.   Right.  And you have no knowledge,
15     I take it, and express no opinion as to whether
16     that is legally permissible to pool treasury cash
17     within EMEA?
18                    A.   No, I don't have a legal basis.  I
19     don't have a legal background for that.
20                    Q.   I would like you to assume as
21     another hypothetical that an EMEA entity
22     contributed assets toward the asset sales, the
23     proceeds of which are in the lockbox.  So I am
24     talking about the 7.3 billion.
25                    A.   Yes, sir.



```
 1                    Q.   Assume that the pro rata recovery
 2   percentage is the roughly 70 percent you have
 3   offered for illustrative purposes.
 4                    A.   Yes.
 5                    Q.   And finally, assume that the same
 6   EMEA entity again has enough treasury cash to pay
 7   its creditors 70 percent or more without any funds
 8   from the lockbox.
 9                    A.   Yes.
10                    Q.   So I take it then, under your
11   pro rata model, such a legal entity would receive
12   no compensation for the assets or rights it sold or
13   transferred to the lockbox?
14                    A.   That would have to be worked out
15   among the estates, and they could handle it any way
16   that would be appropriate.  I have not performed
17   the analysis at that level.  I stopped at the
18   debtor group level.
19                    Q.   Mr. Britven, you relied on the
20   buyer PPAs because, in your opinion, they have
21   superior information to what we could reconstruct
22   today, several years later.  I think you gave
23   evidence to that effect this morning.  Do you
24   recall?
25                    A.   Yes, I do believe that to be true.
```

 Neeson & Associates   W&F

```
 1                    Q.   So speaking in general, a seller's
 2   purchase price allocation at or around the time of
 3   sale is relevant for similar reasons?
 4                    A.   Yes, I agree with that.
 5                    Q.   And you will recall that at the
 6   time of your deposition you weren't aware that
 7   Nortel had prepared its own PPA following the
 8   business sales in 2009 and '10?
 9                    A.   I am still not aware of a seller
10   PPA.
11                    Q.   Okay.  But you would obviously be
12   interested in the value Nortel assigned to the IP
13   and how they allocated that value among the RPEs --
14                    A.   I would -- I am sorry.  Are you
15   finished?
16                    Q.   No, go ahead.
17                    A.   I would be interested in seeing
18   other PPAs to the extent they exist.  This PPA
19   relative to the debtor I have not seen nor can we
20   find.
21                    Q.   Would you bring up, please, Trial
22   Exhibit 11264.
23                    So you will see, Mr. Britven, this is
24   an email dated September 28, 2010, from Michael
25   Orlando, who is listed as the director of transfer
```



1    pricing for Nortel.

2              A.   Yes, sir.

3              Q.   And you will see that it is sent

4    to a David Chapman and a number of different

5    individuals.  Just so you understand where this is

6    coming from, if you flip over the page, you will

7    see there is references to NNA in the email from

8    Trevor Beeches to David Chapman and various other

9    people.

10             A.   I am sorry.  Could you repeat that

11   last part?  I didn't quite follow what you were

12   saying.

13             Q.   I am just -- let's make this easy.

14   I am going to represent to you that these are

15   people from NN Australia who are receiving this

16   information from Michael Orlando.

17             A.   I will accept that.

18             Q.   Okay.  And if we go back to page 1

19   of this document, you will see there is a reference

20   to various attached PPA estimates?

21             A.   Hang on here.  Where do you see

22   the PPA?

23             Q.   Do you see what is highlighted on

24   the screen?  It says "Alteon (Radware) PPA

25   estimate" and so on, four different documents?



```
 1                      A.   Right.  These are -- I understand,
 2    yes.
 3                      Q.   So then let's look at the
 4    attachments which are included in this document.
 5    If we could go to page -- we have hard copies we
 6    can distribute.  Unfortunately -- I will apologize
 7    to the people with the hard copies -- the documents
 8    are not page-numbered.  But we will bring it up on
 9    screen so everyone can see where we are.
10                      So let's skip over Alteon and Packet
11    Core, since those are relatively small
12    transactions.  And if we could go to page 24 of the
13    document.  And you will see at the top, if we could
14    just sort of highlight the header up there, you
15    will see it says, "CDMA/LTE sale, high-level
16    estimate for financial reporting purposes only -
17    includes both 2009 and 2010 activity.  Actual
18    proceeds allocation is subject to negotiation
19    amongst estates."
20                      A.   Right.  And I am of the view that
21    these are final --
22                      THE CANADIAN COURT:  Just wait.  There
23    is no question yet.  Just wait for the question.
24                      THE WITNESS:  I am sorry.  I apologize,
25    Your Honor.
```



```
 1                    THE CANADIAN COURT:  There is too much

 2    argument going on.  Just wait for the question.

 3                    BY MR. MILNE-SMITH:

 4                    Q.   If we can then pull out on the

 5    document, and I will take you into where I am

 6    actually going to ask the question.

 7                    If you look on the left-hand side,

 8    there is a heading for -- you will see "intangible

 9    assets," and then one of those intangible assets at

10    the bottom of the page is intellectual

11    property/other residual.  You will see the

12    allocation key indicated is "allocate to RPS

13    entities based on R&D capital stock."  Do you see

14    that, sir?

15                    A.   I do.

16                    Q.   I just want to make sure we are

17    all on the same page.  Now, if we can just move

18    along so we can see the actual allocation.  You

19    will see the figures for NNL, NNI, NNUK and so

20    forth, 472 million and all the way down to

21    12 million for NN Ireland?

22                    A.   Could you help me with the context

23    here?  Is this the CDMA portion?

24                    Q.   This is the CDMA/LTE, the Nortel

25    draft PPA, and how they proposed to allocate the IP
```



1   sales, the IP proceeds from CDMA/LTE.

2                    A.   Thank you.

3                    Q.   Now, I am next going to take you

4   down to the bottom left-hand corner of the

5   document.  And you will see there is RPS entity R&D

6   capital stock percentages.  And you will recall you

7   had a discussion with Mr. Rosenthal this morning

8   about what was the 2010 RPS and what was the 2009?

9                    A.   Yes.

10                   Q.   And you will see that the 2010

11  percentage is the 49.8 percent to Canada that you

12  have used in your calculations?

13                   A.   Yes.

14                   Q.   And you will see the 2009

15  calculations show 47.4 percent to Canada, 38.8 to

16  the US; and if you add them up, it is 13.7 percent

17  for EMEA?

18                   A.   I am not quite sure what you meant

19  by "if you add them up."

20                   Q.   If you add up 3.1, 9.4 and 1.2,

21  that adds to 13.7?

22                   A.   Oh, the remaining portions, yes.

23                   Q.   And I am going to put it to you,

24  Mr. Britven, that what Nortel used in this PPA, if

25  we go back to the numbers that I showed you for NNL



1    and so forth, 472 million and then across the page,

2    those are, in fact, the 2009 percentages, because

3    472 million out of 996 million in total IP proceeds

4    for CDMA is 47.4 percent and not the 49.8 percent

5    that you used.

6                    A.    I agree that's what this document

7    shows.

8                    Q.    So the numbers that you used are

9    not the numbers that Nortel used?

10                   A.    That's correct.  These numbers are

11   different.

12                   Q.    And you will recall, Mr. Britven,

13   that you criticized Mr. Kinrich for --

14                   THE CANADIAN COURT:  Mr. Milne-Smith,

15   can I just ask you a question.  You have said that

16   this is a PPA, or is it a draft PPA?  What is it?

17                   MR. MILNE-SMITH:  It is -- I can't put

18   it any higher than it is a draft PPA.  And that's

19   why I took the witness, Justice Newbould, at the

20   beginning to the proviso that actual proceeds

21   allocation is subject to negotiation among estates.

22   That, of course, is why we are here.

23                   THE CANADIAN COURT:  I am asking you

24   the question because you then said, "So you didn't

25   use the numbers Nortel used."  And I haven't heard



```
 1    that this document was used.
 2                    MR. MILNE-SMITH:  Okay.  Let's go back
 3    then to the covering email.  If you could go to
 4    page 2 of the document.  So at the top of the page
 5    being written to Mike Orlando and Sadiq.  And it
 6    says:
 7                        "Are we able to use your internal
 8                        Nortel view on the Radware and Avaya
 9                        allocation model so we can provide a
10                        'management' estimation on sale
11                        proceeds?"
12                    And then we get Mr. Orlando's response
13    on the first page attaching these documents.  So
14    that's where I take that from, Justice Newbould.
15                    THE CANADIAN COURT:  Let's see the
16    first page again.
17                    MR. MILNE-SMITH:  Mr. Orlando says, "I
18    am fine with this approach since it is consistent
19    with the global transfer pricing model," of course,
20    being the RPSM.  "As you know, it may not
21    represent the final allocation of proceeds to
22    Australia."  And he talks about being conservative
23    for purposes of the Australian tax authorities.
24                    THE CANADIAN COURT:  Thank you.
25
```



```
 1                BY MR. MILNE-SMITH:

 2                Q.   So going back to the question I

 3     had asked you, Mr. Britven, you recall that you

 4     criticized Mr. Kinrich -- one of bases on which you

 5     criticized Mr. Kinrich is that while the US only

 6     conducted 40 percent of the R&D, they received

 7     70 percent of the proceeds?

 8                A.   Under Mr. Kinrich's approach;

 9     that's correct.

10                Q.   Okay.  I take it then you would

11     also agree with me that under the model that Nortel

12     used, EMEA did 13.7 percent of the R&D, but you

13     only allocate them 7 percent?

14                A.   I don't know that Nortel used

15     this.  These are management estimates.  That

16     doesn't mean they were subject to the traditional

17     PPA process nor reviewed by external auditors, nor

18     made part of the audited financial statements.

19     There is a lot of stuff that comes out of the tax

20     department that says a lot of different things.

21     These are not nearly as reliable as the PPAs that I

22     had from Ericsson, Avaya and Ciena that had all the

23     other things in there.

24                Q.   And you say that NNL did

25     50 percent of the R&D, roughly, but received
```




1  80 percent of the allocation.  And that's not

2  grounds for criticism.

3              A.   Pardon me?

4              Q.   You criticized --

5              A.   May I see the attachment again,

6  please?  Could we keep that up?  And please ask

7  your question again.  I appreciate your patience

8  with me.

9              Q.   No problem.

10             So again, you criticized Mr. Kinrich

11  because there was the 40 percent R&D but 70 percent

12  allocation; correct?

13             A.   Correct.

14             Q.   And under your approach, NNL did

15  50 percent R&D but gets 80 percent allocation?

16             A.   That's an apples-and-oranges

17  comparison.

18             Q.   Okay.  You have reviewed the

19  reports filed in this case by James Malackowski?

20             A.   Yes, sir.

21             Q.   And you attended his deposition

22  and his trial testimony?

23             A.   Yes, sir.

24             Q.   You understand what I mean by his

25  contribution theory?



```
 1                      A.    I do.
 2                      Q.    At its most basic level, IP sale
 3   proceeds should be allocated in proportion to a
 4   measure of historic R&D spending?
 5                      A.    That's the premise.
 6                      Q.    And the Nortel PPAs we just looked
 7   at also allocated in proportion to a measure of
 8   historic R&D spending?
 9                      A.    I am assuming that they allocated
10   based upon the five-year look-back if, in fact,
11   these PPAs were used.
12                      Q.    And, sorry.  I should have made it
13   clear.  We could walk through all of them, but I
14   think it would be tedious to do so.  I will
15   represent to the Courts that all of the PPAs used
16   those same percentages.  I apologize for not making
17   that clear earlier.
18                      Now, you, of course, have taken a
19   different approach to valuing the IP.  You looked
20   at the total Nortel business value from the Q4 2008
21   annual impairment test spreadsheet?
22                      A.    Well, we looked at that and we
23   also looked at the PPAs.  So are you focused on the
24   surrendered licenses or the overall value?
25                      Q.    For the surrendered licenses you
```



1    start with the $988 million figure.

2                    A.    That's correct.

3                    Q.    And that appeared in that

4    spreadsheet that we looked at; right?

5                    A.    That's also correct.

6                    Q.    And that was the only place that

7    it appeared?

8                    A.    Yes.

9                    Q.    Now, that $988 million figure,

10   that would represent the value not only of the

11   Nortel businesses but also the residual IP;

12   correct?

13                   A.    That's the value of the reporting

14   units in the normal course of business.  It doesn't

15   have an IPCo line in those valuations in the hands

16   of Nortel.

17                   Q.    I understand there is no --

18                   A.    It is just the reporting units.

19                   Q.    Right.  But the reporting units

20   would have been using the residual IP?

21                   A.    No.  The reporting units use the

22   licensed IP.  They don't use the residual IP by

23   definition.

24                   Q.    Well, okay, there is two points

25   there.  The first, you will recall, of course, that



1    a portion of the residual IP was, in fact, used in

2    the businesses.  That was the shared IP.  Remember

3    your slide?

4                A.   Correct.  And those commensurate

5    rights are included and compensated for in the

6    $2.8 billion line of business sales.

7                Q.   I understand.  I am not arguing

8    that with you.  I just want to make clear what the

9    988 represents.  So it includes the residual IP at

10   least insofar as it was being used in the

11   businesses?

12               A.   It includes a portion of the

13   common patents subject to those licenses.

14               Q.   And with respect to the nonused

15   patents, are you familiar with the concept of the

16   defensive value of IP?

17               A.   I am.  I think the term has been

18   used differently in this case, but I think I

19   understand what you are talking about.

20               Q.   Just so you are clear, what I am

21   talking about is IP that, while it is not used in

22   any Nortel product, it is used to essentially deter

23   infringement lawsuits from competitors.

24               A.   Yes.

25               Q.   And to the extent it does deter



1    such lawsuits, it provides value to the businesses

2    as they operate?

3                    A.    I agree it provides value.  It is

4    my understanding that that hedge of protection, if

5    you will, was provided by NNL as the owner of those

6    patents.  But those patents and their respective

7    claims, that technology is not specifically used in

8    Nortel products.

9                    Q.    And again, Mr. Britven, you keep

10   on thinking I am trying to argue with you about who

11   owns the residual IP.  I am not.  All I am trying

12   to make clear is this $988 million value includes

13   the value of the residual IP.

14                   A.    The $988 million value includes

15   the license portion of the common patents.

16                   Q.    And their defensive value?

17                   A.    Defensive value.  Which patents

18   are you referring to, the not-used patents?

19                   Q.    Yes.

20                   A.    No, that's not true.  That

21   protection is provided, and that value does show up

22   in the 988, but it is not owned by the licensed

23   participants nor is it licensed.

24                   Q.    Again, not talking about

25   ownership, not talking about license --



```
 1                    A.   I apologize.

 2                    Q.   I just want to make sure we have

 3      it.  You said the value shows up in the

 4      988 million.  That's all I am getting at.

 5                    A.   That's correct.

 6                    Q.   Okay.  So going back to your 988,

 7      you then determined what portion of that was

 8      attributable to IP based on an average of the buyer

 9      PPAs, and it came out to 57 percent.

10                    A.   Yes, sir.

11                    Q.   So your opinion is that the fair

12      value of Nortel's IP at the time was 570 million.

13      57 percent of 1 billion?

14                    A.   I don't have an opinion per se on

15      that.  I am using the 988 as shown on slide 16.

16                    Q.   Right.  And you said 57 percent of

17      that is IP?

18                    A.   50 percent of the PPAs is IP;

19      that's correct.

20                    Q.   57 percent.

21                    A.   Yes.

22                    Q.   So 570 million is IP.  That's the

23      fair value of the IP?

24                    A.   I didn't value the IP -- I didn't

25      perform the calculation you are talking about.  I
```

Neeson&Associates   W&F

```
 1    valued the surrendered license.
 2              Q.   Okay.  And when you worked in the
 3    RPS percentages, that produced a total value of
 4    285 million for EMEA and the US Debtors combined?
 5              A.   That's correct.
 6              Q.   And you used the 2010 RPS
 7    percentages for EMEA and the US?
 8              A.   As Nortel uses the term.  I call
 9    that the 2009, because the last year is 2009, but
10    obviously, they call it 2010 because of the lag.
11              Q.   Right.  And you took into account
12    the 2009 R&D spending, even though most of the
13    sales occurred in 2009?
14              A.   I didn't quite follow that.  I
15    took into account the R&D spending?
16              Q.   In 2009, because you said you
17    wanted to use the most current numbers.  So you
18    used the 2009 R&D spending; correct?
19              A.   Yes, sir.
20              Q.   Even though most of the business
21    sale value occurred in 2009?
22              A.   What do you mean by "value"?  The
23    value is a function of the present value of the
24    discounted cash flows.  It goes out for a number of
25    years.
```



 1                    Q.    The business sales that
 2     contributed the most of value to the 3 billion
 3     occurred in 2009.
 4                    A.    That's a different analysis.  This
 5     analysis focuses on in the hands of Nortel, and you
 6     are talking about safe hands.
 7                    Q.    Under the buyer PPAs that you
 8     used, the total value of IP was roughly
 9     1.1 billion; correct?
10                    A.    That's correct.
11                    Q.    So the $285 million figure we get
12     for EMEA and the US is roughly 25 percent of the
13     value of IP; correct?
14                    A.    That's correct.
15                    Q.    And 75 percent to Canada?
16                    A.    That's also correct, based upon
17     ownership.
18                    Q.    And that doesn't match up to any
19     calculation of historic R&D spend that Nortel or
20     anyone else has ever used?
21                    A.    That's correct.  It is unrelated
22     to the R&D spend.
23                    Q.    Mr. Britven, you set out in
24     Section 4.2 of your initial report a number of
25     assumptions on which you relied in reaching your



```
 1   opinions.  That's fair?

 2                A.   Yes.

 3                Q.   And a number of those assumptions

 4   related to the proper interpretation of the MRDA.

 5   Do you recall that?

 6                A.   That's correct.

 7                Q.   And I am not going to go through

 8   those again.  Mr. Rosenthal has done that.

 9                You recall your direct testimony that

10   Mr. Malackowski "ignored" the MRDA?

11                A.   I believe he did.

12                Q.   You would agree with me that, in

13   fact, what he did is he simply applies different

14   assumptions or interpretations than you do?

15                A.   No.  I think he ignored the MRDA.

16   The MRDA notes ownership.  Where is that in

17   Mr. Malackowski's analysis?  I cannot find that.

18                Q.   You said that Mr. Malackowski

19   ignored the purchase of Bay Networks?

20                A.   I don't remember specifically

21   saying that, sir.

22                Q.   I am sorry.  No.  I think I am

23   interpolating.  I do apologize.  You said he

24   ignored various purchased assets, and you referred

25   to a $30 billion figure?
```



```
 1                    A.    I did.
 2                    Q.    And are you familiar with Bay
 3      Networks as being the most significant of those
 4      purchases?
 5                    A.    That's correct.
 6                    Q.    And you criticize Mr. Malackowski
 7      for not accounting to the contribution that the
 8      Canadian Estate made towards the purchase of Bay
 9      Networks and other companies like it?
10                    A.    I am not noting Bay Networks
11      specifically.  Just generally, in a general notion,
12      he doesn't take into account the impact of any of
13      the acquisitions.
14                    Q.    And were you aware, sir, that Bay
15      Networks was purchased with NNC stock?
16                    A.    I at one time knew -- I am under
17      oath.  I am not quite sure the structure of the
18      transaction.
19                    Q.    It wasn't paid for with NNL cash?
20                    A.    Oh, these were generally stock
21      transactions, yes.
22                    Q.    Right.  And the NNC stock, of
23      course, derived its value from all of the
24      subsidiaries owned by NNC?
25                    A.    I think that's fair.
```



```
 1                    Q.   And that includes NNI and the EMEA
 2   Debtors.
 3                    A.   Yes, all of the entities would
 4   have contributed to the overall well-being of
 5   Nortel.
 6                    Q.   Right.  And it is in fact the
 7   shareholders of Nortel that are in one way making
 8   the contribution, because they are getting diluted;
 9   correct?
10                    A.   I don't know if they are getting
11   diluted, because they are getting assets as well.
12                    Q.   Okay.  Fair enough.  Let's talk
13   about ownership generally.
14                    One way that you can benefit from
15   ownership of a revenue-generating asset is by
16   ongoing profit; right?
17                    A.   Yes, sir.
18                    Q.   And another way is capital
19   appreciation?
20                    A.   Yes, sir.
21                    Q.   And so if you own a house, you can
22   profit by renting it out?
23                    A.   That's one way.
24                    Q.   You could also profit by selling
25   it?
```



```
 1                    A.    Assuming it has gone up in value,
 2      yes.
 3                    Q.    And to the best of your knowledge,
 4      IP is no different?
 5                    A.    IP is different than a house.   I
 6      have been in the business for 25 years.
 7                    Q.    Okay.  In terms of the two ways
 8      that you can profit from ownership, IP is the same
 9      as a house:  Capital appreciation, ongoing profit?
10                    A.    I could employ an IP in my
11      business that generates profits.  I could license
12      it.  It may appreciate.  I think there is more than
13      the two ways.
14                    Q.    Okay.  But fair enough.  But there
15      are at least those two ways that we share in common
16      with a house?
17                    A.    Generating revenues and capital
18      appreciation?
19                    Q.    Correct.
20                    A.    Yes, sir.
21                    Q.    So in terms of ongoing profit in
22      the Nortel context, they used the RPSM methodology?
23                    A.    That's correct.
24                    Q.    And they allocated profit in
25      proportion to R&D activity?
```



```
 1                    A.   That's also correct, under the

 2   MRDA.

 3                    Q.   And we said before that the

 4   percentages by which you allocated between Canada

 5   and the other of the licensed participants doesn't

 6   have anything to do with R&D contribution.  It is

 7   75 percent/25 percent.  Do you recall?

 8                    A.   I don't recall the 75/25.

 9                    Q.   You recall we talked about how,

10   out of the $1.1 billion value of IP, you allocated

11   285 million to the US and EMEA?

12                    A.   Yes, sir.

13                    Q.   And 75 percent to Canada as the

14   residual?

15                    A.   So I used the RPSM percentage

16   relative to EMEA and the US, and the residual went

17   to Canada.

18                    Q.   Right.  You didn't use the RPS

19   percentages for Canada?

20                    A.   That's correct.

21                    Q.   And you agreed with me that the

22   25 percent/75 percent didn't match up to any

23   historic measure of R&D spending?

24                    A.   That's also correct.

25                    Q.   So in other words, you would
```



1   allocate this capital appreciation component, the

2   benefit of sale, differently from how Nortel

3   allocated ongoing profit?

4             A.   I would.  And I note the terms of

5   the MRDA say exclude gains or losses.

6             Q.   And we will obviously have our

7   judges decide on that.

8             So you also considered, am I correct,

9   in forming your opinion, the sale of the UMTS

10  access business to Alcatel?

11            A.   Can I hear the first part of the

12  question again, please?

13            Q.   In forming your opinion in this

14  matter, you considered the sale of the UMTS

15  business to Alcatel?

16            A.   I am familiar with this

17  transaction.  I did consider it.

18            Q.   And in that case, much as with the

19  post-insolvency sales, the buyer did a PPA

20  allocating sale proceeds into four categories?

21            A.   You're seeing a formal PPA.  I am

22  generally familiar with how they broke up the sales

23  price for recording purposes.

24            Q.   Right.  Tangibles, customers, IP,

25  and then a residual goodwill category.  That's what



1    you talked about this morning.

2                    A.   I didn't talk about UMTS this

3    morning.

4                    Q.   No.  I understand.  I mean the

5    four categories.

6                    A.   Those are the categories I spoke

7    of this morning.  I think they pretty much line up

8    with UMTS.

9                    Q.   Yes, you are correct.

10                   And then you are also aware that Nortel

11   then allocated those four categories among the

12   various selling entities from Nortel?

13                   A.   That's correct.

14                   Q.   So let's start with the areas on

15   which I think we have agreement.

16                   In Alcatel the buyer allocated the sale

17   proceeds among tangible assets, IP, customers and

18   goodwill?

19                   A.   Those four categories; I agree.

20                   Q.   And you have done the same in this

21   case?

22                   A.   Yes.

23                   Q.   Mr. Green did not?

24                   A.   That's correct.

25                   Q.   And you are aware that Nortel



```
 1    allocated the IP sale proceeds in UMTS based on a

 2    measure of historical R&D spending?

 3                  A.   Yes.  They used the RPSM

 4    percentage based upon my recollection.

 5                  Q.   Right.  Mr. Malackowski proposes

 6    to allocate sale proceeds based on a measure of

 7    historical R&D spending?

 8                  A.   He does.  He does a different

 9    calculation, but he does.

10                  Q.   And you do not?

11                  A.   That's correct.

12                  Q.   And finally, you are aware --

13    sorry.  I don't mean to tease people.  I mean

14    "finally" along this line of questioning.

15                  Finally, you are aware of certain

16    patent litigation by Nortel?

17                  A.   Yes.

18                  Q.   For example, Nortel brought an

19    action for infringement in the US against a company

20    called Foundry?

21                  A.   Yes.

22                  Q.   And I should clarify.  When I say

23    "Nortel" in this case, I mean NNL and NNI.  You are

24    aware of that?

25                  A.   Yes.
```



```
 1                    Q.   And this was something that you
 2     took into account in your analysis, whether or not
 3     you referred to it in your report?
 4                    A.   I considered it, yes.
 5                    Q.   Let's take a step back from
 6     Foundry.  On your approach, on your ownership
 7     approach --
 8                    A.   Yes, sir.
 9                    Q.   -- if a third party in the US
10     infringed on patents that were not used in any
11     Nortel product, that would be outside the scope of
12     NNI's license?
13                    A.   I think I would have to hear more
14     with regards to your hypothetical.
15                    Q.   On your theory, on your reading of
16     the MRDA, if we are talking about patents not used
17     in the Rockstar portfolio, that would be outside
18     the scope of NNI's license; correct?
19                    A.   So we are talking about patents
20     that are not used, and the question is whether or
21     not that is outside the scope of NNI's license?
22                    Q.   Correct.
23                    A.   Based upon my understanding of the
24     MRDA and the license agreement, yes, I would agree
25     with that.
```



 1                    Q.   And NNI would have no interest in
 2    those patents?
 3                    A.   As I understand it, the rights to
 4    use those patents had not been licensed to NNI,
 5    because the rights are related to the use in making
 6    products by or for license -- or by or for
 7    participants.
 8                    Q.   And so having no interest in those
 9    patents, NNI shouldn't receive anything in respect
10    of their infringement?
11                    A.   I don't have a view on that one
12    way or the other.  Nortel could decide how they
13    wanted to allocate or divide up that money any way
14    they wanted.
15                    Q.   But they certainly wouldn't be
16    entitled to it as a result of any license or
17    ownership interest they held because you deny any
18    such license or ownership interest?
19                    A.   I don't know the facts and
20    circumstances around the level of effort or what it
21    took for the Foundry litigation and the efforts by
22    NNI in connection with that litigation.  I don't
23    know enough about it to tell you how it should have
24    been done.
25                    In terms of what they did do, it is



```
 1    inconsistent with my reading of the MRDA, my
 2    understanding.
 3              Q.   Right.  And you are sort of
 4    anticipating where I am going.  But just to make
 5    sure everybody in the courtroom is on the same
 6    page, you are, of course, aware that Nortel did, in
 7    fact, allocate the proceeds from the Foundry
 8    settlement not just to NNL, not just to NNI, but,
 9    in fact, to all the RPS entities?
10              A.   That's my recollection, yes, sir.
11              Q.   Even though, on your
12    understanding, the licensed participants had no
13    interest in those patents to the extent they were
14    not-used residual patents?
15              A.   Correct.
16              Q.   And so while it is inconsistent
17    with what you propose, as you just said, it is
18    consistent with what Mr. Malackowski proposes?
19              A.   At some level, there is a big
20    difference in my mind in terms of doing a five-year
21    look-back versus a 15 or 20-year look-back.
22              Q.   Now, I want to just touch briefly
23    on the $988 million and how you value the
24    surrendered licenses.  And I promise not to redo
25    anything that Mr. Rosenthal did.  At times I will
```



1    just have to remind you so we have the context

2    properly.

3              So we walked through your method

4    earlier.  I take it you selected your method

5    because you thought it was the right principled

6    approach?

7              A.   I think that's fair, especially in

8    context of the ownership approach that we were

9    taking and our background as valuators.

10             Q.   This obviously isn't something

11   that you somehow reverse-engineered by starting

12   with your conclusion?

13             A.   No, sir.

14             Q.   Now, obviously, the $988 is the

15   starting point; is that fair to say?

16             A.   Well, really we started earlier

17   than that, so it all depends on where you want to

18   kind of step into the process.  We are looking at

19   the overall values associated with the lines of

20   business.  Then we are looking at the value of the

21   IP in those PPAs, and then we are looking at the

22   license agreement that was surrendered and asking

23   the question what is the value of this in the hands

24   of Nortel and how do we determine that value.

25             Q.   Okay.  So let's put aside



```
 1   terminology.  I don't want to get hung up on what
 2   is the starting point or not.  I take it we are on
 3   the same page that if you change that $988 million
 4   number, you are going to change the outcome?
 5                A.   Mathematically, that's correct.  I
 6   don't think we could just blindly change that
 7   number.
 8                Q.   No.  You would have to have a
 9   basis for the number you selected; correct?
10                A.   We would have to have that -- we
11   would want to think about that number in the
12   overall context of what we know.
13                Q.   Right.  Now, I just want to make
14   sure we are clear on something.  Obviously, as
15   those changes cascade through your methodology, the
16   impact on changing the $988 million figure is going
17   to be asymmetric as between Canada and the US on
18   the one hand -- sorry.  Between EMEA and the US on
19   the one hand and Canada on the other.
20                A.   I am not sure of your point.
21                Q.   So for the US and EMEA, the way
22   your model works is they get 28.5 percent of your
23   988 million or whatever the starting point might
24   be.  28.5 percent.  It is arithmetic.
25                A.   So you multiply the 50.2 times the
```

 Neeson & Associates   W&P

```
 1   57.3, and that's the 28.5 percent.

 2              Q.   Yes.  So there is an arithmetic

 3   relationship there?

 4              A.   Mathematically, I will agree with

 5   you.

 6              Q.   Whatever the business valuation

 7   might be, the US and EMEA are going to get

 8   28.5 percent?

 9              A.   Mathematically, that's correct.  I

10   am a little bit hesitant to agree to whatever the

11   number.  Obviously, the number has to make sense in

12   the context of what we know about Nortel at the end

13   of 2008.

14              Q.   Right.  And what Canada gets isn't

15   a percentage of the starting point.  They get

16   whatever the difference between 1.14 billion and

17   whatever US and EMEA get.  So Canada isn't an

18   arithmetic portion of it.  They get a residual.

19              A.   Canada gets the residual as the

20   owner, yes, sir.

21              Q.   So if the AIT value had been such

22   that US and EMEA get 1.143 billion or more, then

23   Canada would get nothing?

24              A.   Is that how it works

25   mathematically?
```



1              Q.   Well, you said that the
2    difference -- what Canada gets is the difference
3    between 1.143 billion and what US and EMEA get?
4              A.   I am sorry.  I am not quite
5    following what you are saying.
6              Q.   Okay.  US and EMEA get
7    28.5 percent of the starting point; right?
8              A.   Of the starting point we didn't
9    agree on, but yes.
10             Q.   Consider that my shorthand for the
11   988 million, which you don't have to accept.  Fair
12   enough?
13             A.   Thank you.
14             Q.   So US and EMEA get 28.5 percent.
15   Canada gets 1.143 billion minus whatever US and
16   EMEA get?
17             A.   Correct.  I thought you were
18   talking about a different mathematical equation.  I
19   apologize.
20             Q.   No problem.  So if US and EMEA get
21   1.143 billion, Canada could get nothing?
22             A.   That's correct, mathematically.
23             Q.   And putting aside specific
24   numbers, is it fair to say as a general matter that
25   the lower the starting point -- again, my



 1   definition of starting point -- the better Canada
 2   does and the worse US and EMEA do?
 3               A.   Mathematically, I think you are
 4   correct.
 5               Q.   Okay.  Now, Mr. Rosenthal walked
 6   you through an example of how, if you had a
 7   $7 billion starting point, then it would produce a
 8   $2 billion value for the US and EMEA.  Do you
 9   recall that?
10               A.   Yes.  I disagree with the
11   $7 billion starting point in your scenario, because
12   that approximates the value in the third quarter
13   versus the fourth quarter.
14               Q.   I understand.  I am not arguing
15   that with you.  But you would agree with me that
16   under that kind of model, if, contrary to your
17   belief, that $7 billion were correct, then on your
18   model, Canada would get nothing, because the
19   2 billion would exceed the 1.143?
20               A.   Mathematically, you are correct.
21   But when you get to unreasonable results, we
22   obviously have to step back and say, What is
23   transpiring here?
24               Q.   I very much agree.
25               Mr. Britven, you are familiar with the



```
 1   circumstances of the Nortel business sales?

 2              A.   Generally speaking, yes.

 3              Q.   Generally speaking.  So it is fair

 4   to say that they were orderly transactions between

 5   market participants?

 6              A.   Yes, I will agree with that.

 7              Q.   You would agree that for

 8   allocation purposes, assets should be valued based

 9   on fair market value?

10              A.   As a general notion, yes.

11              Q.   And on this assignment, you relied

12   specifically on Nortel's annual impairment test

13   prepared in the fourth quarter of 2008?

14              A.   Correct.  And the reason we did

15   that is we wanted to know the value in Nortel's

16   hands, which can be different than fair market

17   value.

18              Q.   Can we please bring up your

19   initial report, page 30.  And if we highlight the

20   second bullet point there under 6.39.  So I just

21   want to read this to you.

22                   "The Business value determined in

23                   the AIT process was the aggregate of

24                   the values of the business reporting

25                   units and is a fair value defined in a
```



```
 1                 very similar way to fair value used in
 2                 the PPA context.  This 'fair value' is
 3                 a market-based measurement, not an
 4                 entity-specific measurement .~.~.~. It
 5                 is based on the assumptions that market
 6                 participants would use in pricing the
 7                 asset."
 8                 So I take it from this the AIT was a
 9     measure of fair value?
10                 A.   So in the AIT, they are trying to
11     get to fair value.  And the way that that works is
12     they look at the value in the hands of the owner,
13     and then they assume that that reflects fair value
14     in the hands of a -- notional hands, notional
15     purchaser's hands, to perform the analysis.  So
16     they really are Nortel's estimates, but you are to
17     assume that that's the fair value when you perform
18     the AIT analysis.
19                 Q.   Right.  So it is a fair value?
20                 A.   It is an assumed fair value.  In
21     reality, they are Nortel's estimates, which are
22     assumed to be fair value so they can perform the
23     test.
24                 Q.   And we have seen a few different
25     phrases:  Fair value, fair market value.  I take it
```



1    you would agree with me that fair value is

2    substantively identical for our purposes to fair

3    market value?

4                    A.    I agree.

5                    Q.    Okay.  Fair market value takes

6    into account what a notional buyer would pay?

7                    A.    That's correct.

8                    Q.    A notional value is independent of

9    whose hands it is in?

10                   A.    That's also correct.

11                   Q.    And under AIT literature, a

12   notional buyer is what Nortel was trying to

13   estimate for the AIT?

14                   A.    For the purpose of the AIT.  My

15   analysis has a different purpose.

16                   THE CANADIAN COURT:  No, no.

17   Mr. Britven, just deal with the question.

18                   THE WITNESS:  I apologize, Your Honor.

19                   BY MR. MILNE-SMITH:

20                   Q.    Under AIT literature, a notional

21   buyer is what Nortel was trying to estimate in

22   performing the AIT?

23                   A.    That's technically correct.

24                   Q.    In other words, it is what someone

25   would pay for the asset?



```
 1                    A.   Under the customary AIT rules,
 2   where you customarily would use your own internal
 3   projections as a proxy for notional value.
 4                    Q.   So if we then go to the next
 5   bullet on page 30.  And you are quoting here from,
 6   I believe, the FASB rules.  It says,
 7                    "Fair value is the price that
 8                    would be received to sell an asset or
 9                    paid to transfer a liability in an
10                    orderly transaction between market
11                    participants at the measurement date."
12                    You agree with that, obviously?
13                    A.   Yes, I do.
14                    Q.   And, of course, we know what the
15   price that was received to sell the Nortel business
16   in an orderly transaction between market
17   participants is, don't we?
18                    A.   We do.  That's the 2.8 billion.
19                    Q.   Right.  And you would agree that
20   an actual sale price is an accurate measure of fair
21   value?
22                    A.   I agree.
23                    Q.   Mr. Britven, you spoke this
24   morning or this afternoon with Mr. Rosenthal about
25   the Q4 2008, and specifically the triggering
```



```
 1   memorandum?

 2            A.   Yes, sir.

 3            Q.   I would like to bring that up.  It

 4   is Trial Exhibit No. 50987.  So if we will just

 5   highlight the sort of header portion so we can all

 6   see what this is about.

 7            This is a memo dated February 26, 2009.

 8            A.   Yes, sir.

 9            Q.   And it was sent to various people

10   be at Nortel and KPMG.

11            A.   I agree.

12            Q.   And this is the document you were

13   talking about when you were telling Mr. Rosenthal

14   about the Q4 triggering memo; correct?

15            A.   Correct.  This is the one I had in

16   mind.

17            Q.   Okay, good.  Now, I think you told

18   Mr. Rosenthal, but I want to be sure, the

19   $988 million figure doesn't appear in this memo;

20   correct?

21            A.   I think I told him I wasn't

22   certain.

23            Q.   All right.  You are not aware of

24   it appearing in this memo.  I can't see it

25   anywhere.
```



```
 1                    A.    I will accept that.
 2                    Q.    And you will also agree with me
 3    that the 1.234 billion number from the financial
 4    statements -- you recall that number?
 5                    A.    Yes.
 6                    Q.    The goodwill write-down?
 7                    A.    Yes.
 8                    Q.    That also doesn't appear in this
 9    memo; correct?
10                    A.    I don't specifically remember the
11    details.  I remember the $1.2 billion write-off.
12    There is a memo regarding that somewhere.  I will
13    note that this is the 144 memo.  The annual
14    impairment test that resulted in the goodwill
15    write-off is the 142 memo.
16                    Q.    So if we go to page 2 of this
17    document, you will see there is a heading "M & A
18    Input Regarding ES and MEN Business Unit
19    Valuations"?
20                    A.    Yes, sir.
21                    Q.    I take it you will agree with me
22    that "ES" is referring to Enterprise Services?
23                    A.    Yes.
24                    Q.    Give or take a few assets there,
25    that is what was sold to Avaya for roughly
```



```
 1    $900 million?
 2              A.   That's approximately correct.  I
 3    would agree.
 4              Q.   And MEN is the business that was
 5    sold to Ciena for 765 million?
 6              A.   Yes.
 7              Q.   So I just want to take a look at
 8    what this triggering memo says about those two
 9    businesses.  So if you start on the second
10    sentence, it says,
11                   "Per discussion with Atulan
12                   Navaratnam, M & A director, Nortel had
13                   been engaged with several potential
14                   buyers for the potential sale of MEN
15                   business.  Bids received in December
16                   2008 ranged from 500 million to
17                   1 billion.  Per discussion with Khush
18                   Dadyburfor, VP M & A, 700 million would
19                   have been considered a reasonable price
20                   for MEN pre-bankruptcy, and the
21                   post-bankruptcy sale price would be
22                   approximately 500 million."
23              And then you will see, skipping down to
24    the next sentence, it talks about 100 million out
25    of the 500 million estimated fair value for the MEN
```



 1   business, and it attributes 100 million of that to
 2   the global services.
 3                 So you see that reference to
 4   500 million fair value for the MEN business?
 5                 A.   Which includes $100 million of the
 6   GS business, yes, sir.
 7                 Q.   Right.  And that's in the Q4
 8   triggering memo that you relied on?
 9                 A.   That's correct.
10                 Q.   And would you also agree with
11   me -- we can pull it up if you want to.  But in
12   that $988 million chart, the chart you relied on
13   that found 988 million?
14                 A.   Yes.
15                 Q.   The MEN business was valued at
16   minus $184 million?
17                 A.   We should look at that because I
18   believe the $400 million is included in the
19   calculus to get to the negative 184.
20                 Q.   Okay.  That's Exhibit 45521.  So
21   you will see Metro Ethernet Networks, minus 184.
22   That is what being in read means.
23                 We have got it up on the screen for
24   you, sir.
25                 A.   If I could just have a moment,



1  please.

2              Q.   Of course.

3              A.   I agree that's the net result.

4  But that's the net of negative cash flows and the

5  estimated selling price.

6              I am sorry.  I would have to look at

7  the detail as to what is exactly in the 184, sir.

8  I agree with you in aggregate, but there is detail

9  behind that.

10             Q.   With respect, Mr. Britven, let's

11 just see if we can make this a bit simpler.  We

12 spoke at some length about how the AIT is supposed

13 to measure fair value.  You recall that discussion?

14             A.   That's the purpose of the AIT,

15 yes, sir.

16             Q.   And in this Q4 triggering memo

17 that you rely on, here is Nortel saying that the

18 fair value for the MEN business is 500 million.

19             A.   That's not true.  That's only part

20 of the story.  It is worth 500 million, part of

21 which is the global services.

22             Q.   Okay.

23             A.   But there are expected negative

24 cash flows associated with this business that takes

25 it down to the negative 184.  If you give me a



1  moment, I can probably get to that number for you.

2  But the 184 is a netting of the estimated selling

3  price against the negative cash flows.

4            Q.   Okay.  But take your time, because

5  to me it says 500 million fair value.  If you want

6  to explain how it gets to minus 184 from

7  500 million, then I am all ears.

8  -- Pause --

9            A.   So there is an analysis associated

10  with this transaction as estimated, and it shows

11  that they estimate the selling price of MEN to be

12  $400 million.  And there is actually -- so that's

13  the $400 million terminal value.  But in order to

14  get to the terminal value, they expect that they

15  are going to experience negative cash flows of

16  $306 million.

17            Furthermore, the $400 million selling

18  price occurs at a later point in time, and it must

19  be discounted back to present value.

20            Q.   Okay.

21            A.   So it is the netting of those

22  numbers that results in the negative 184.  It is

23  shown on the forecasts.  It is summarized in the

24  discounted cash flow, which is consistent with the

25  memo you are seeing.



1          Q.   And so that's a sheet that you are

2    taking out of this binder like this (indicating)

3    you talked about that has this calculation you are

4    referring to?

5          A.   That's correct.

6          Q.   But what it actually says in the

7    memo is fair value, 500 million.  You would agree

8    with that?

9          A.   That's the estimated selling price

10   after the business continues to experience losses.

11   So it would be appropriate to offset those two.

12         Q.   Mr. Britven, I am not asking you

13   what you think should be done.  I am asking you if

14   you agree with me that this memo -- I want to see

15   if there is anywhere in this memo that you rely on

16   that says anything other than 500 estimated fair

17   value for MEN.

18         A.   This memo does say 500.  I can

19   also see what they did relative to the projected

20   losses and the netting.

21         Q.   And, of course, you are aware

22   that --

23         THE CANADIAN COURT:  Mr. Milne-Smith,

24   can I ask the witness a question?

25              Sir, you have been looking at a



1    document there.  Is that a trial exhibit you are

2    looking at, where you talked about the --

3              MR. MILNE-SMITH:  Justice Newbould, I

4    can help you with that.  The trial exhibit I

5    believe -- there is two versions of it.  One is a

6    pdf.  The other is the native Excel spreadsheet.

7    So the pdf is Exhibit 21645, and the native Excel

8    spreadsheet is Exhibit 45521.

9              THE CANADIAN COURT:  And it is the

10   second, Mr. Britven, that you were looking at?

11             THE WITNESS:  I am sorry, Your Honor.

12   I wasn't following the Bates numbers.  I have what

13   was handed up to me when I took the witness stand.

14   It is an excerpt of the larger stack.  There is

15   actually the larger stack, which we don't have;

16   then the stack I had shown the Court earlier, and

17   then there is a smaller subset.  And I was looking

18   at the smaller subset relative to the 400 million

19   and the negative 184.

20             THE CANADIAN COURT:  All right.  And is

21   that, Mr. Milne-Smith, part of Exhibit 45521?

22             MR. MILNE-SMITH:  I believe so, Your

23   Honor.  Yes.

24             MR. STEEP:  Your Honor, we can agree

25   that it is part of the same document.  If you look



 1   at the right-hand side of the document in the

 2   native format, you will see the values that

 3   Mr. Britven has been referring to.

 4                   BY MR. MILNE-SMITH:

 5                   Q.   And, Mr. Britven, just so we are

 6   clear on the facts, because you were referring to

 7   discounting and future losses and present-valuing

 8   and so forth, you would agree with me, of course,

 9   that the MEN business sold in 2009?

10                   A.   That sounds about right.

11                   Q.   Okay.  And just finishing up then,

12   Enterprise, the next paragraph on this page that we

13   have been looking at talks about Enterprise.  It

14   says "GTA" -- I will just pause there.

15                   I understand that is Global Technical

16   Accounting, so it is basically the finance branch.

17                        "GTA understands that Nortel had

18                        received bids of 1 to 1.2 billion in Q4

19                        2008," in the case of the Enterprise

20                        services business.  "The sales value

21                        for the ES business at Q4 2008,

22                        adjusted for probable erosion from

23                        bankruptcy announcements, was estimated

24                        by senior NNC management to be

25                        400 million. . . with 100 million



```
 1                    estimated fair value for ES businesses
 2                    attributed to global services."  Do you
 3                    see that?
 4          A.   Yes, sir.
 5          Q.   And that's the business that
 6  ultimately sold to Avaya for 900 million?
 7                    A.   Generally speaking, that's about
 8  right.
 9                    Q.   And that's the business that, for
10  purposes of your AIT analysis and the surrendered
11  licenses, you valued at 45 million?
12                    A.   That's correct.  The underlying
13  documents show ongoing losses associated with that
14  business and then the ultimate sale, and they net
15  the amounts on a present value basis.
16                    MR. MILNE-SMITH:  Thank you.  Those are
17  my questions.
18                    THE US COURT:  Thank you,
19  Mr. Milne-Smith.
20                    Mr. Chang, good afternoon.
21                    MR. CHANG:  Judge Gross, Justice
22  Newbould, I note that it is 3:20.  I am happy to
23  proceed.  I think I have about 20 minutes to a half
24  an hour worth of questions.  I stand at the Courts'
25  convenience.
```

 Neeson&Associates   W&F

```
 1                    THE US COURT:  Could you use a break,

 2   Justice Newbould?

 3                    THE CANADIAN COURT:  I will leave it up

 4   to you.

 5                    THE US COURT:  All right.  Let's take a

 6   20-minute break, and then we will finish up.

 7   -- RECESS AT 3:19 P.M. --

 8   -- UPON RESUMING AT 3:43 P.M. --

 9                    THE US COURT:  Thank you, everyone.

10   Please be seated.

11                    Justice Newbould.

12                    THE CANADIAN COURT:  Judge Gross.

13                    THE US COURT:  Mr. Chang, are you

14   ready, sir?

15                    MR. CHANG:  Thank you.

16   CROSS-EXAMINATION BY MR. CHANG:

17                    Q.   Mr. Britven, just to remind you,

18   my name is Eugene Chang of Willkie Farr & Gallagher

19   on behalf of the UK pension claimants.  I would

20   like to start with clarifying some issues about the

21   UK pension claims that have come up over the course

22   of today.

23                    If we could start with slide 34 of your

24   slide deck.

25                    A.   Yes, sir.
```



1                  Q.   Now, I believe Justice Newbould
2     had a question while you were on this slide on
3     direct about whether these claims are paid 100
4     cents on the dollar.  Now, the illustration on this
5     slide, this has to do with your ownership theory;
6     correct?
7                  A.   That's correct.
8                  Q.   And here the UK pension claim is
9     not for the full amount of the deficit, is it?
10                 A.   We are using the $3 billion value
11    for the claim, and that's the number I used, if I
12    am remembering correctly.  I don't know if that's
13    the full value or not, but we allowed the full
14    value of that amount to run through the model.
15                 Q.   Do you recall in your report -- I
16    know it has been a long day -- that you were asked
17    to assume for the purpose of your ownership theory
18    that the UK pension claim was for the guarantee
19    amount, the 880 million?
20                 A.   It has been a long day.  If I
21    could just check my report here, please.
22                 Q.   Sure.  And I can point you to page
23    19 of your opening report.  Romanette ii.
24    Romanette ii says,
25                      "UK Pension Trust claims against



1                    the Canadian Debtors and the US Debtors

2                    with the exception of the 880 million

3                    UK Pension Trust guarantee claims, as

4                    noted above, which claims have not been

5                    admitted by the CCC."

6          And this is underneath the section that

7    addresses for purposes of the computation under

8    Question 2 what you were not to include; is that

9    right?

10          I put a few negatives in there.  I can

11   ask it in a positive way, if that helps.

12          A.   Yes.  So if you go to slide 30, I

13   have the UK Pension Trust in at 3 billion.

14          Q.   I can help you -- sure.

15          A.   So I also allow for an

16   $880 million guarantee amount as part of the model.

17   Does that help what we are talking about here?

18   Because I am still a little confused.

19          Q.   Not quite.  What I am asking is --

20   and let me split it up.  For purposes of your

21   pro rata -- sorry.  For purposes of the ownership

22   analysis, were you asked to assume that the UK

23   pension claim was simply the guarantee claim for

24   880 million and not the full claim of 3 billion?

25          A.   So we put the 3 billion in the



1   model, and we also put the $880 million guarantee

2   in the model under the ownership approach.  We put

3   them both in.

4                  Q.   So for slide 34, is it your

5   understanding that when you say the UK Pension

6   Claimants would be entitled to receive 1.3 billion,

7   that that includes 100 cents on the dollar for the

8   UK pension claim, the full claim?

9                  A.   I don't know what you mean by "the

10  full claim."  So when the model runs, we pay part

11  of the $3 billion, and then there is part of the

12  guarantee that is paid from Canada.  And those

13  amounts together make up the 1.3 billion, as shown

14  on slide 34 under UK Pension Trust.

15                 So the UK pension trust will always

16  receive a higher percentage than the EMEA claimants

17  because of the guarantee.

18                 Q.   Okay.  Let me ask it a different

19  way.  In your opening report you set out the

20  assumptions that you relied on for the various

21  questions you were answering; right?

22                 A.   That's correct.

23                 Q.   And part of those assumptions, on

24  pages 18 and 19 you set out a section which

25  described the claims you were not going to include



1    for purposes of answering Question 2; correct?

2              A.   Let's go back to that and make

3    sure I am reading it correctly.  I am pretty

4    confident in terms of what is in the model.  Let's

5    make sure that what we said is consistent with

6    that.  What's the page again, please?

7              Q.   It is pages 18 to 19.  Are you

8    with me?

9              A.   I am.  So I found the $3 billion

10   amount.  It is in paragraph H.  There is the

11   $3 billion value that we have included.  And you

12   were pointing me to another portion here?

13             Q.   If you look down at the bottom of

14   page 18, right before the romanette, the language

15   here says, "For purposes of our computations under

16   Question 2, we are not to include," and then there

17   are four romanettes.  Do you see that?

18             A.   Right.  And under romanette ii it

19   says,

20             "UK Pension Trust claims against

21             the Canadian Debtors and the US

22             Debtors, with the exception of the

23             $880 million UK Pension Trust guarantee

24             claims, as noted above."

25             So we have allowed the $880 million



 1   guarantee to be part of the model, and we have

 2   allowed the $3 billion of the UK Pension Trust

 3   claims to be part of the model.  So both of those

 4   are part of the ownership analysis that I

 5   performed.

 6            THE CANADIAN COURT:  Mr. Chang, I

 7   realize that the report includes some of this

 8   information.  I am not sure why it was even in

 9   there.  But we can't be making any decision about

10   this until we know what the claims are.  Isn't this

11   all academic, what you are talking about?

12            MR. CHANG:  It is, Your Honor.  And my

13   only point in doing this was that we have a full

14   understanding of if you were to look in detail and

15   rely at all on his numbers, what those numbers

16   actually include.

17            THE CANADIAN COURT:  But what those

18   numbers -- this is academic.  You say so.  Why are

19   we taking a lot of time on this?  Who knows what

20   the strength of those claim are.

21            MR. CHANG:  Your Honor, I will move on.

22   Thank you.

23            BY MR. CHANG:

24            Q.   Now, there was also some

25   discussion before about claims that had been made



1    through the various entities in EMEA.  Do you

2    recall that?

3                    A.   Are you talking about the

4    individual estates within EMEA?

5                    Q.   Yes; that there may be as many as

6    20-plus claims that the UK pension fund might be

7    able to make throughout EMEA.  Do you recall that

8    generally?

9                    A.   Oh, the $60 billion conversation.

10                   Q.   Yes.

11                   A.   Yes.

12                   Q.   You are not aware if the UK

13   pension fund could actually make claims that

14   totaled up 60 billion and that those claims would

15   ever actually be allowed in that form?

16                   A.   I am not aware, no, sir.

17                   Q.   And so you are not an expert on

18   European FSD law, are you?

19                   A.   No.

20                   Q.   And so I am going to put the

21   claims part of that aside.  Let's see how that

22   works through your pro rata model.  If you turn to

23   page 27 of your slides.

24                   First, to set it up and make sure we

25   understand page 27, the little A, the small little



1    red A, which is next to the $8.8 billion, those are

2    the worldwide assets that are available; is that

3    right?

4            A.    That's correct.  And we made some

5    deductions to arrive at the 1.5 billion in treasury

6    cash, as I noted earlier.

7            Q.    And the little B, that is the

8    total worldwide debts that are to be addressed in

9    the pro rata model; right?

10           A.    Well, those are the claims that

11   have been estimated and that we have used.  We also

12   include an inter-estate claim between the US and

13   Canada, the $880 million UK Pension Trust guarantee

14   as part of the overall analysis.  So you don't see

15   that, but it is part of the model.

16           Oh, I am sorry.  You are on pro rata.

17           Q.    Yes, pro rata.

18           A.    It is late.  You are correct.  We

19   are starting with 8.8 billion, and we have

20   12 billion in claims for the pro rata.  You are

21   absolutely correct, and I apologize.

22           Q.    And for purposes of the pro rata

23   model, you were asked to assume that the

24   intercompany claims and the guarantees, those did

25   not apply in the pro rata model; right?

 Neeson&Associates  W&F

```
 1                    A.   That's correct.  It is not part of
 2   this illustration.  The model can accommodate that,
 3   but that's not part of this illustration.
 4                    Q.   So here, this computation shown on
 5   this page, this is essentially a computation -- let
 6   me back up a step.  Did you see the testimony of
 7   Dr. Bazelon?
 8                    A.   Yes.
 9                    Q.   Dr. Bazelon has a formula of
10   worldwide assets divided by worldwide debts.  This
11   is essentially the calculation of that formula, is
12   it not?
13                    A.   I think that's correct.
14                    Q.   So coming back to the various
15   claims that could be made through various estates,
16   to the extent they can be, would you agree with me
17   then that the UK pension debt is a single debt that
18   would only be counted once for purposes of
19   pro rata?
20                    A.   That sounds like a legal issue to
21   me.  We ran the model as I previously described.
22   We made the allocation at the debtor estate group
23   level.  And I haven't gone into the nuances in
24   terms of the sub-estate analysis.
25                    Q.   The Courts could ensure with a
```



1    pro rata model fairly simply that a debt like the

2    UK pension debt could not recover double or more?

3                    A.    That's my understanding, yes.

4                    Q.    And that's actually one of the

5    benefits of the simplicity of the pro rata model,

6    is it not?

7                    A.    I think that could be said, yes.

8                    Q.    Now, for the pro rata model,

9    that's your alternate model; is that right?

10                   A.    That's correct.

11                   Q.    And you find that model to be more

12   reliable than, for example, the revenue model that

13   Mr. Kinrich sets forth?

14                   A.    I don't think I have used the term

15   "reliable."  Perhaps you can correct me on that.

16   I --

17                   Q.    I believe -- sorry.

18                   A.    Go ahead.

19                   Q.    I believe you used the word

20   "reliable" this morning in your direct.

21                   A.    If I did, I stand by it.  I looked

22   to the ownership approach initially, and then if

23   none of the other approaches are accepted by the

24   Courts, I think pro rata is the alternative.

25                   Q.    And would you also consider the



```
 1   pro rata model to be more reliable than the R&D

 2   contribution approach espoused by Mr. Malackowski?

 3             A.   You would have to refresh my

 4   recollection on the use of the word "reliability"

 5   and the context.

 6             Q.   Well, the record shows what it

 7   shows, so I will leave that alone.

 8             Moving to how you allocate the money

 9   within your ownership approach within the estates,

10   is it true that for purposes of your model and for

11   purposes of the waterfall, that the money that

12   would get allocated to the Canadian -- to NNL would

13   be distributed pro rata among the Canadian Debtors?

14             A.   Yes, that's how the waterfall

15   model works.  It would also be distributed across

16   the guarantees that were part of that calculus, if

17   you will.

18             Q.   So that's your understanding of

19   the most reasonable way to distribute the funds

20   among the Canadian entities; right?

21             A.    That's how we performed the model.

22   We would accept direction, of course, from the

23   Courts as to any modifications that would be

24   appropriate.  We would accept those rulings and

25   make corresponding input adjustments.
```



```
 1                    Q.   And that pro rata distribution
 2    within the Canadian Estate, that would apply to the
 3    parties that, in fact, sponsored you to be here
 4    today; right?
 5                    A.   It would apply to the Canadian
 6    creditors, yes.
 7                    Q.   And it would also apply, in your
 8    view, to any moneys received by the US Estate;
 9    correct?
10                    A.   That's correct.
11                    Q.   That the 15 NNI plus 14 other US
12    entities, once the money was given to the US
13    Estate, it should be distributed pro rata among
14    those entities; correct?
15                    A.   That's the way the waterfall
16    works, yes, sir.
17                    Q.   And that's also true for EMEA;
18    right?
19                    A.   Correct.  There are many pro ratas
20    baked inside of the ownership model.
21                    Q.   Now, let's talk a little bit more
22    about --
23                    A.   And I should clarify.  What I mean
24    by that is all I am doing is I am taking the
25    proceeds available in that specific group as
```

 Neeson & Associates   W&F

1    compared to the claims in that group.  So everyone

2    who has a claim in Canada would receive on a

3    proportional basis a distribution, if you will, to

4    calculate the estimated pennies on a dollar.  But

5    it is not a pro rata.  It is just the way the math

6    works.

7              Q.   That is looking at all the assets

8    that are available to that group and dividing it by

9    all the debts in that group; right?

10             A.   That's correct.

11             Q.   So that is a pro rata distribution

12   within that estate; right?

13             A.   You could say that.  I am trying

14   to draw a distinction so there is not so much

15   confusion about the pro rata being part of the

16   ownership.

17             The ownership is one look, and then the

18   pro rata allocation method is another.  We just use

19   the traditional allocation of funds within estates

20   in performing the ownership approach:  Pennies on

21   the dollar, dollars divided by allowed claims.

22             Q.   Let's take a closer look at the

23   ownership approach.  I believe you testified

24   earlier that, like Mr. Green, you rely on a certain

25   interpretation of the MRDA?



```
 1                    A.   Yes, sir.
 2                    Q.   And you set out that
 3    interpretation of the MRDA, the one you relied on,
 4    in your slides -- I believe it was slide 18 -- is
 5    that right?
 6                    A.   That would be part of it.  There
 7    was a broader interpretation in the report itself.
 8                    Q.   And you were asked to assume the
 9    MRDA meant this by your counsel?
10                    A.   That's correct; under Ontario law.
11                    Q.   So if the Courts were to decide
12    that the MRDA meant something different, obviously,
13    your opinions would not apply anymore; right?
14                    A.   Well, it all depends on what the
15    difference is and how it relates to the way I
16    performed the analysis.
17                    Q.   Your ownership theory rests on the
18    fact that NNL and NNL alone holds legal title to
19    the patents; right?
20                    A.   With very few exceptions.
21                    Q.   With a few exceptions?
22                    A.   And you are talking about
23    Rockstar.
24                    Q.   And you used that to allocate an
25    amount to the Canadian Debtor group; right?
```



```
 1                      A.   We determined the value associated

 2    with ownership, and that goes to the owner, who by

 3    and large, is NNL, with few exceptions.

 4                      Q.   And NNL is not the only member of

 5    the Canadian Debtor group, are they?

 6                      A.   That's correct.

 7                      Q.   So the other Canadian companies

 8    within the Canadian Debtor group, they would not be

 9    entitled to the proceeds of the Rockstar sale under

10    your ownership analysis, would they?

11                      A.   Well, I haven't done the analysis

12    at that level.  We just simply allocate to the

13    debtor groups and stop.

14                      Q.   And you allocate that money, the

15    entire Rockstar proceeds, with the exception of the

16    few that aren't owned by NNL, to the legal title

17    holder, which is NNL itself; right?

18                      A.   But we put it in the debtor group

19    in terms of the allocation.  It goes to Canada,

20    which has more than one legal entity.

21                      Q.   One of the other legal entities in

22    the Canadian Debtor group is Nortel Network Global

23    Corporation; correct?

24                      A.   I believe that's correct.

25                      Q.   Nortel Network Global Corporation
```



```
 1    is not an owner of the patent portfolio that was
 2    sold to Rockstar, is it?
 3              A.   That's my understanding.  I agree.
 4              Q.   So Nortel Networks Global
 5    Corporation under the ownership theory is not
 6    entitled to the $4.5 billion, is it?
 7              A.   I think that's a legal question.
 8    I stop at the estate debtor group level.  And then
 9    my analysis is in the hands of the law at that
10    point.
11              Q.   But your analysis is that it is
12    NNL, not any of the other Canadian Debtor
13    corporations, that is entitled to the $4.5 billion;
14    correct?
15              A.   That's correct.  NNL would own the
16    patents, and they would have the ownership rights.
17              Q.   And in your analysis, the only way
18    the other members of the Canadian Debtor group gain
19    access to that $4.58 billion is through a pro rata
20    distribution in that group; correct?
21              A.   We didn't really perform the
22    analysis at that level.  We looked at the NNLs
23    within that group.  We then allocate the dollars to
24    that group, and then we stop.  We don't do it by
25    specific legal entity within Canada or EMEA or the
```



1   US.  I stopped at the group level.

2                    Q.   If NNL were not part of that

3   group, the other debtor entities in that group --

4   Nortel Networks Corporation, Nortel Networks Global

5   Corporation, Nortel Networks International

6   Corporation, and Nortel Networks Technology

7   Corporation -- none of those would be entitled to

8   the $4.5 billion under the ownership theory; right?

9                    A.   If they are not grouped with NNL,

10  they wouldn't be in the same group where the

11  dollars are assigned.

12                   Q.   Now, let me turn to another one of

13  your slides.

14                   A.   Yes, sir.

15                   Q.   If you could turn to slide 23.

16                   A.   Slide 23.  Yes, sir.

17                   Q.   This slide describes the fact that

18  the patent portfolio that was sold to Rockstar has

19  two parts to it; right?  It has the shared patents

20  and the not-used patents?

21                   A.   That's correct.

22                   Q.   And you are aware, are you not,

23  that Nortel itself at the time that these sales

24  were happening, the business sales were happening,

25  went through and classified its patents on a



1    spreadsheet as shared or not used?

2              A.   Yes, I am familiar with that.

3              Q.   And you rely on Nortel's

4    classification; right?

5              A.   Yes.  We looked at their work.

6              Q.   And your opinion here is that --

7    and specifically for the not-used patents, because

8    they were not used and classified as not used --

9    they were not exclusively licensed to each of the

10   other RPEs, NNI, NNUK, et cetera; right?

11             A.   I think our view is they weren't

12   licensed at all to those licensed participants

13   because they weren't used, as defined in the MRDA.

14             Q.   And therefore, all of the value

15   should go to NNL, in your view; right?

16             A.   Yes, based on their ownership.

17             Q.   I would like to pull up -- have

18   you seen a complaint against a company called

19   Kyocera?

20             A.   I believe I have.

21             Q.   It has been shown in prior

22   testimony.  Let's pull it up now.  It is Exhibit

23   TR49900.

24             If you turn to page 2 of this

25   complaint, there are patents listed as part of the



1    cause of action in paragraph 6 and 7 of this

2    complaint.  The first patent is US Patent No.

3    5,896,411.  Do you see that?

4              A.   Yes, sir.

5              Q.   And the other patent that was

6    asserted by Nortel against Kyocera was US Patent

7    No. 6,088,578.

8              A.   Yes, sir.

9              Q.   And if you turn to paragraph 11 on

10   the next page, do you see that Nortel, NNI and NNL

11   represented to the Court in that case that NNI is

12   the exclusive licensee of both the '411 and the

13   '578 patents by virtue of its exclusive license

14   agreements?

15             A.   I see that language.

16             Q.   Are you aware that the '411 patent

17   and the '578 patent were part of the Rockstar sale?

18             A.   I am not sure at this point.  If

19   you make that representation, I will accept that.

20             Q.   I will represent that to you, but

21   I can also show it to you on an exhibit, if you

22   prefer.

23             A.   No, that's fine.

24             Q.   Are you aware that Nortel itself

25   classified both of those patents as not used?

Neeson&Associates   W&F

```
 1                      A.   I don't specifically remember, but
 2    if you make that representation to me, I will
 3    accept it.
 4                      Q.   And so for both of those patents
 5    which were included in the sale to Rockstar, you
 6    would not -- in your opinion, neither of those
 7    patents were actually licensed to NNI; correct?
 8                      A.   Generally speaking, that's
 9    correct.
10                      Q.   Now, I would like to go back to
11    the UK in particular.
12                      A.   Yes, sir.
13                      THE CANADIAN COURT:  Mr. Chang, what is
14    the date of that complaint?
15                      MR. CHANG:  The date of the complaint
16    was March 15, 2002, and it is at the top of the
17    document.
18                      THE CANADIAN COURT:  And when did
19    Nortel classify them as not being used?
20                      MR. CHANG:  At the time of the business
21    sales in 2009-2010.  Here, maybe this will help.
22                      If we pull up Exhibit 22107, and here
23    for visibility I am using the copy that was marked
24    at the deposition and not the trial exhibit,
25    because the trial exhibit was shrunk so that it
```



1    becomes even smaller and it is harder to read.  It

2    is exactly the same document.

3                   BY MR. CHANG:

4                   Q.   Mr. Britven, you reviewed the

5    deposition transcript of John Veschi, the CTO of

6    Nortel?

7                   A.   Yes, sir.

8                   Q.   And you also reviewed the

9    deposition transcript of Ms. Gillian McColgan, who

10   worked with John Veschi at Nortel?

11                  A.   Yes, sir.

12                  Q.   Do you recall that the database

13   that is attached to this set of emails in Exhibit

14   22107 was discussed at those depositions?

15                  A.   I don't know if it was this

16   specific list.  But there was a list of patents

17   discussed in those depositions, and it goes to this

18   point about what was used and not used in common.

19                  Q.   And if you look at the front page

20   of this, Ms. McColgan's email to John Veschi in the

21   middle of the page, do you see that in the third

22   paragraph Ms. McColgan is saying that she gave to

23   others within Nortel, Carol Mcgran, info on the

24   not-used, shared, et cetera, classifications?

25                  A.   So you are referring to the



 1    paragraphs that reads, "Also gave her the info on

 2    the not-used, shared, et cetera"?

 3                    Q.    That's right.

 4                    A.    Yes, sir.

 5                    Q.    And the first paragraph says,

 6                          "This is the list of all the

 7                          retained patents in ResidualCo with the

 8                          time line info requested by Carol

 9                          Mcgran."

10                    Do you see that?

11                    A.    Yes.

12                    Q.    So is it your understanding that

13    the Excel spreadsheet that is attached to here

14    lists out the patents that were sold as part of the

15    Rockstar sale?

16                    A.    I am not sure one way or the

17    other.  If you want to represent that to me, I will

18    accept it.

19                    Q.    Okay.  Did you understand that

20    ResidualCo was the IPCo that was being at that

21    point -- sorry.  Let me start over.

22                    Do you understand that ResidualCo

23    included the IP that was going to be used in IPCo

24    but then was being placed on sale?

25                    A.    That would make sense, but I don't



1    have specific knowledge.

2                 Q.   And since we are already on this

3    document, I will turn to page 63 of the pdf to show

4    the Kyocera -- one of the Kyocera patents.

5    Unfortunately, the hard copy, just so you know, it

6    doesn't have page numbers on it, so I will show it

7    on screen.

8                 In the middle -- we will blow up a

9    section -- there is a description on the left-most

10   column saying "RR2195."  And then to the right of

11   it it has Patent No. 5,896,411.  Do you see that?

12                A.   Yes, sir.

13                Q.   That is one of the Kyocera

14   patents?  Is that one of the patents in the Kyocera

15   complaint; yes?

16                A.   Yes, sir.

17                Q.   And over all the way on the right,

18   it is labeled "not used," is it not?

19                A.   That's correct.

20                Q.   The other Kyocera patent is also

21   in here, but I won't bore the Court by taking you

22   to that as well.

23                Looking at the UK, you are not aware,

24   are you, of any evaluation of the fair market value

25   of the patents that were transferred from the UK to



1   NNL, are you?  Evaluation by Nortel.

2              A.   No, I am not.

3              Q.   And so you are also not aware of

4   Nortel ever determining that it transferred -- NNL

5   transferred fair market value to NNUK for the

6   patents it was receiving legal title to, are you?

7              A.   I am sorry.  Ask that again.

8              Q.   You are not aware of NNL

9   transferring fair market value to NNUK for the

10  patents it was receiving from NNUK, it was

11  receiving legal title to from NNUK?

12             A.   I thought that was part and parcel

13  of the MRDA and the associated license agreement.

14             Q.   But you are not aware of Nortel

15  ever determining what the fair market value would

16  be and transferring that value from NNL to NNUK?

17             A.   Specifically valuing the patents

18  received and then specifically compensating the UK

19  in some fashion?  No, I am not aware of that

20  transaction.

21             Q.   So if we look at a patent by Simon

22  Brueckheimer that has come up prior in this

23  trial -- did you review the testimony by Simon

24  Brueckheimer in this trial?

25             A.   Only briefly.



```
1                    Q.   Do you recall that he mentioned a
2     patent, US Patent No. 6,519,257, that he considered
3     a foundational patent on VoIP technology, voice
4     over IP?
5                    A.   Yes, I remember that.
6                    Q.   And do you recall that he
7     testified that this came out of Project Rainbow
8     within Nortel?
9                    A.   I don't remember the project name.
10                   Q.   Do you recall that he said that
11    this was a patent that was incorporated into Nortel
12    products, including the succession line of
13    products?
14                   A.   I don't specifically recall, but
15    that would be logical.
16                   Q.   And do you know that -- and I will
17    represent to you that if we look at Exhibit 2 --
18                   THE CANADIAN COURT:  Where are we going
19    with this, Mr. Chang?  What is the point of all
20    this?
21                   MR. CHANG:  The point is, and let me
22    cut to the chase and ask the witness.
23                   THE CANADIAN COURT:  I would just like
24    to understand the point, because it sounds to me
25    like argument.
```



1              MR. CHANG:  My point is that he would

2    ascribe zero value to NNUK for that patent or any

3    like it that were funded by NNUK, that were

4    generated by NNUK inventors and that were labeled

5    "not used."

6              BY MR. CHANG:

7         Q.   So let me ask, Mr. Britven, now

8    that I have let the horse out of the barn, you,

9    under your ownership theory, would give NNUK zero

10   value for a patent invented by Simon Brueckheimer

11   that was part of the Rockstar portfolio and was

12   labeled "not used"; correct?

13             A.   I would give -- the ownership

14   model would not assign any value as a result of

15   ownership to the UK, because that patent is owned

16   by NNL.  There would have been compensation in a

17   macro sense along the way under the RPSM

18   profit-sharing as part of the overall agreement.

19             So the NNL would provide the patent and

20   title to -- I am sorry.  UK would provide the title

21   to NNL.  There would be an exclusive license.  I

22   valued those license rights that EMEA had, just

23   like I valued the license rights that the US had.

24   So I valued the license rights and I valued the

25   ownership rights.



```
 1                    Q.   So you would value -- you would

 2    give NNUK zero, no money out of the Rockstar sale,

 3    the 4.5 billion, that included the sale of a patent

 4    that was used in a Nortel product, as testified by

 5    Simon Brueckheimer, that was invented by a UK

 6    inventor, and that was considered a foundational

 7    patent still used today?  You would give NNUK zero

 8    money from the Rockstar sale; correct?

 9                    A.   Correct.  NNUK is no longer the

10    owner of that patent, nor is the inventor.  NNL

11    owns that patent, and under the ownership theory,

12    they would receive the value associated with

13    ownership.

14                    MR. CHANG:  No further questions.

15                    THE US COURT:  Thank you, Mr. Chang.

16                    Mr. Steep?

17                    MR. STEEP:  I have no reexamination.

18    Thank you, Judge Gross.  Thank you, Justice

19    Newbould.

20                    THE CANADIAN COURT:  Mr. Britven, I

21    have a question.  It arose from this morning, and I

22    am just a little unclear about a couple things.

23                    THE WITNESS:  Yes, Your Honor.

24                    THE CANADIAN COURT:  You were being

25    asked by Mr. Rosenthal about this $988 million
```



1    figure, and you were shown a slide with respect to

2    the Carrier Network discounted cash flow, which you

3    say shows 502 million.

4              THE WITNESS:  Yes, Your Honor.

5              THE CANADIAN COURT:  And I don't have

6    that up, but I had it up.  It has all gone blank on

7    me.  I am wondering if somebody could put up that

8    slide.  It is from Exhibit 21645, and it is well

9    into that slide.  I pulled it up before, the one

10   that shows the 502 million.

11             MR. ROSENTHAL:  We will get somebody to

12   put that on the screen, Your Honor.

13             THE CANADIAN COURT:  Thank you.

14             MR. ROSENTHAL:  We just have to switch

15   computer technicians here, but they are doing it in

16   a second, Your Honor.

17             THE CANADIAN COURT:  Right.  Okay.

18   Could you show the top left corner of that, please?

19   Just reduce it so we can see the top left corner.

20             No, can't see it yet.

21             All right, this is a third-quarter 2008

22   updated analysis.  I have got a couple of

23   questions.

24             One is, I thought you were doing a

25   fourth-quarter analysis, Mr. Britven.  But the



1   question I am asking is this:  It was put to you

2   that this 502 figure was calculated as of 2011, and

3   you said you recalled one of your staff telling you

4   that sometime later.

5              I am just wondering, I am trying to

6   understand why, if it is shown here on a

7   third-quarter 2008 analysis, why it is said to be

8   2011.  And secondly, in light of the fact that the

9   asset was sold, the Carrier sale was in 2008 or

10  early 2009, what purpose would Nortel be -- what

11  purpose would Nortel have in 2011 to be calculating

12  the value of it again?

13             THE WITNESS:  May I start with the big

14  picture, Your Honor?

15             THE CANADIAN COURT:  Sure.

16             THE WITNESS:  So as I understand the

17  surrendered license agreements, they were not

18  transferable.  So the value of those license

19  agreements are going to be in Nortel's hands.

20             When we looked at transferring those

21  license agreements, even though they weren't

22  transferable, if we took those license agreements

23  and looked at them in a third party's hands, our

24  conclusion was they would have de minimus value.

25  So the surrendered license has de minimus value in



1    the hands of a third party.

2              The highest value is in Nortel's hands.

3    In order to determine the value in Nortel's hands,

4    we looked to Nortel's internal forecasts.  And

5    those internal forecasts were updated the fourth

6    quarter of 2008.  That's what the notes in the

7    financial statements say.  And the summary page of

8    this sheet -- I don't have a Bates number for you,

9    and I apologize --

10              THE CANADIAN COURT:  Don't worry about

11   it.

12              THE WITNESS:  -- is referenced

13   fourth-quarter 2008 analysis.

14              THE CANADIAN COURT:  That shows the

15   988?

16              THE WITNESS:  Yes, sir, Your Honor.

17              THE CANADIAN COURT:  Yes.

18              THE WITNESS:  Okay?  So when we look at

19   this file, what it looks like they do is it is a

20   rolling analysis.  So they took the third-quarter

21   analysis and they rolled it forward.  And that's

22   why we see these hidden rows and these comments and

23   things that are overwritten.  They are work papers,

24   so it takes a little bit of skill and hunting and

25   pecking, if you will, to find the right answers so



```
 1   that it all ties up to this summary sheet.
 2              THE CANADIAN COURT:  All right.  Well,
 3   what I am asking is why is it said that it was an
 4   analysis as of 2011 and why would Nortel in 2011 be
 5   doing that sort of thing for Carrier?
 6              THE WITNESS:  I am sorry.  So Nortel
 7   was updating what they could do with these
 8   businesses in their own hands, and that would
 9   generate the highest value, from my perspective, as
10   to the surrendered license.
11              So we look to the forecasts that the
12   operating units used.  And the forecasts for
13   Carrier Networks projects sales into the future as
14   if they are going to keep that business for some
15   period of time.  Then the discounting discounts
16   those cash flows back to determine the value as of
17   a date in time.
18              THE CANADIAN COURT:  All right.  So let
19   me just ask you that, because maybe I
20   misunderstood.  I took this to be it was really
21   done later in 2011.  You are saying it wasn't done
22   in 2011.  It is a calculation as of 2011 done in
23   fourth quarter of 2008.  Is that right?
24              THE WITNESS:  That's correct, Your
25   Honor, as part of that annual impairment test.
```



1                THE CANADIAN COURT:  Okay, fine.  I do

2     understand that.  Thank you.

3                THE WITNESS:  Thank you.

4                THE CANADIAN COURT:  Does anybody have

5     any questions arising out of my questions?

6                THE US COURT:  None here.

7                THE CANADIAN COURT:  Thank you,

8     Mr. Britven.

9                THE WITNESS:  Thank you, Your Honors.

10               THE US COURT:  Mr. Britven, thank you,

11    sir.

12               THE WITNESS:  Thank you very much.

13               THE US COURT:  Safe travels.  Travel

14    safely, and you may step down when you are ready.

15    -- WITNESS EXCUSED --

16               THE US COURT:  Anything further this

17    afternoon, counsel?

18               MR. ROSENTHAL:  Nothing further, Your

19    Honor.

20               THE US COURT:  Well, we are headed for

21    a one-week break, I know.  And I hope you will

22    reintroduce yourselves to your families and get

23    some rest.  And we will resume again a week from

24    Monday.  All right.  Thank you, everyone.  Good

25    evening to you.



```
 1    -- RECESS AT 4:26 p.m --

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                   REPORTERS' CERTIFICATE

 2

 3               I, DEANA SANTEDICOLA, RPR, CRR, CSR,

 4    and I, LORRAINE B. MARINO, RDR, CRR, CSR, US

 5    Certified Shorthand Reporter, certify;

 6               That the foregoing proceedings were

 7    taken before us at the time and place therein set

 8    forth;

 9               That the entire proceedings of the

10    hearing date were recorded stenographically

11    individually by each of us and were thereafter

12    transcribed;

13               That the foregoing is a true and

14    correct transcript of our shorthand notes so taken.

15

16               Dated this 6th day of June, 2014.

17    PER:                    PER:

18    Lorraine B. Marino      Deana Santedicola

19    LORRAINE B. MARINO      DEANA SANTEDICOLA,

20    WILCOX & FETZER         NEESON & ASSOCIATES

21    WILMINGTON, DE USA      TORONTO, ON

22

23

24

25
```

































































