



```
 1              UNITED STATES BANKRUPTCY COURT

 2              FOR THE DISTRICT OF DELAWARE

 3    ----------------------------)

 4    In Re                       )

 5       NORTEL NETWORKS INC.,    ) Chapter 11

 6       et al,                   ) Case No.

 7             Debtors.           ) 09-10138(KG)

 8    ----------------------------)

 9                        - and -

10                  Court File No. 09-CL-7950

11                       ONTARIO

12             SUPERIOR COURT OF JUSTICE

13                 (COMMERCIAL LIST)

14      IN THE MATTER OF THE COMPANIES' CREDITORS

15   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16    AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17     ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18   NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19    CORPORATION, NORTEL NETWORKS INTERNATIONAL

20    CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                     CORPORATION

22     APPLICATION UNDER PART IV OF THE COMPANIES'

23   CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                     AS AMENDED

25                     --------
```



```
 1
 2                        --------
 3
 4   --- This is the Day 16/Volume 16 of the transcript
 5   of proceedings in the above matter held
 6   simultaneously in:
 7   Superior Court of       United States Bankruptcy
 8   Ontario (CommercIal     Court for the District of
 9   List)                   Delaware
10   Courtroom 8-1           Courtroom 3
11   330 University Avenue   824 Market Street
12   Toronto, Ontario        Wilmington, Delaware
13
14   on the 17th day of June, 2014, commencing at 9:05
15   a.m.
16                        --------
17   B E F O R E:
18   The Honourable Judge Kevin Gross (United States)
19   The Honourable Mr. Justice Frank Newbould (Canada)
20                        ----------
21       REPORTED BY:  Toronto - Kimberley Neeson
22                RPR, CRR, CSR, CCP, CBC
23            Realtime Systems Administrator
24              Delaware - Lorraine B. Marino
25                      RDR, CRR, CSR
```



```
 1   A P P E A R A N C E S:

 2   CANADIAN DEBTORS

 3

 4   FOR THE MONITOR, ERNST & YOUNG INC.

 5   GOODMANS LLP

 6   Bay Adelaide Centre

 7   333 Bay Street, Suite 3400

 8   Toronto, ON  M5H 2S7

 9   PER:      Jay Carfagnini, Esq.

10             Joseph Pasquariello, Esq.

11             Ben Zarnett, Esq.

12             Alan Mark, Esq.

13             Peter Ruby, Esq.

14             Jessica Kimmel, Esq.

15             Chris Armstrong, Esq.

16             Julie Rosenthal, Esq.

17             Graham Smith, Esq.

18             Lauren Butti, Esq.

19             Jessie Mighton, Esq.

20

21   ERNST & YOUNG INC.

22   Ernst & Young Tower

23   222 Bay Street, P.O. Box 251

24   Toronto, ON  M5K 1J7

25   PER:      Murray McDonald, Esq.
```



```
 1              Brent Beekenkamp, Esq.

 2

 3   FOR THE APPLICANTS

 4   GOWLING LAFLEUR HENDERSON LLP

 5   Suite 1600, First Canadian Place

 6   100 King Street West

 7   Toronto, ON  M5X 1G5

 8   PER:      Derrick Tay, Esq.

 9             Jennifer Stam, Esq.

10

11   FOR THE CANADIAN DEBTORS

12   ALLEN & OVERY LLP

13   1221 Avenue of the Americas

14   New York, NY  10020

15   PER:      Jacob Pultman, Esq.

16             Ken Coleman, Esq.

17             Paul Keller, Esq.

18             Daniel Guyder, Esq.

19             Laura Hall, Esq.

20             Joseph Badtke-Berkow, Esq.

21             Jonathan Cho, Esq.

22             Nicolette Ward, Esq.

23

24   FOR THE CANADIAN DEBTORS

25   BUCHANAN INGERSOLL & ROONEY
```

 Neeson&Associates   W&F

```
 1   1105 North Market Street

 2   Suite 1900

 3   Wilmington, DE  19801-1054

 4   PER:       Kathleen A. Murphy, Esq.

 5              Mary F. Caloway, Esq.

 6

 7                    U.S. DEBTORS

 8

 9   FOR NORTEL NETWORKS INC.

10   TORYS LLP

11   79 Wellington Street West, Suite 3000

12   Box 270, TD Centre

13   Toronto, ON  M5K 1N2

14   PER:       Sheila Block, Esq.

15              Andrew Gray, Esq.

16

17   FOR THE U.S. DEBTORS

18   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

19   1201 North Market Street, 16th Floor

20   P.O. Box 1347

21   Wilmington, DE  19899-1347

22   PER:       Derek Abbott, Esq.

23              Annie Cordo, Esq.

24

25   FOR NORTEL NETWORKS INC.
```

 

```
 1   CLEARY GOTTLIEB STEEN & HAMILTON LLP
 2   One Liberty Plaza
 3   New York, NY  10006
 4   PER:       James Bromley, Esq.
 5              Lisa Schweitzer, Esq.
 6              Howard Zelbo, Esq.
 7              Jeffrey Rosenthal, Esq.
 8              Avi Luft, Esq.
 9
10                   EMEA DEBTORS
11
12   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
13   LIMITED
14   DAVIES WARD PHILLIPS & VINEBERG LLP
15   40th Floor
16   155 Wellington Street
17   Toronto, ON  M5V 3G7
18   PER:       Matthew Milne-Smith, Esq.
19              Robin B. Schwill, Esq.
20              Sean Campbell, Esq.
21              James Doris, Esq.
22              Louis Sarabia, Esq.
23
24   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
25   LIMITED
```



```
 1   LAX O'SULLIVAN SCOTT LISUS LLP

 2   Suite 2750, 145 King Street West

 3   Toronto, ON  M5H 1J8

 4   PER:       Matthew P. Gottlieb, Esq.

 5              Tracy Wynne, Esq.

 6              Paul Michell, Esq.

 7   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 8   LIMITED

 9   HUGHES HUBBARD & REED

10   One Battery Park Plaza

11   New York, NY  10004-1482

12   PER:       Derek Adler, Esq.

13              Neil Oxford, Esq.

14              Fara Tabatabai, Esq.

15              Charles Huberty, Esq.

16

17   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

18   LIMITED

19   YOUNG CONAWAY STARGATT & TAYLOR LLP

20   Rodney Square

21   1000 North King Street

22   Wilmington, DE  19801

23   PER:       Ed Harron, Esq.

24              John Dorsey, Esq.

25
```

 Neeson & Associates    W&F

```
 1   FOR THE EMEA DEBTORS

 2   HERBERT SMITH FREEHILLS LLP

 3   Exchange House

 4   Primrose Street

 5   London, England  EC2A 2EG

 6   PER:       James Norris-Jones, Esq.

 7              CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER:       Mark Zigler, Esq.

16              Susan Philpott, Esq.

17              Ari Kaplan, Esq.

18              Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```

 

```
1    PER:        Barry E. Wadsworth, Esq.

2                Lewis Gottheil, Esq.

3

4    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

5    COMMITTEE

6    SHIBLEY RIGHTON LLP

7    250 University Avenue, Suite 700

8    Toronto, ON  M5H 3E5

9    PER:        Arthur O. Jacques, Esq.

10                Thomas McRae, Esq.

11

12    FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13    ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14    FUND

15    PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16    35th Floor

17    155 Wellington Street West

18    Toronto, ON  M5V 3H1

19    PER:        Kenneth T. Rosenberg, Esq.

20                Massimo (Max) Starnino, Esq.

21                Lily Harmer, Esq.

22                Karen Jones, Esq.

23                Tina Lie, Esq.

24                Michelle Jackson, Esq.

25
```



```
1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

3   2009

4   NELLIGAN O'BRIEN PAYNE LLP

5   50 O'Connor Street, Suite 1500

6   Ottawa, ON  K1P 6L2

7   PER:       Janice B. Payne, Esq.

8              Steven Levitt, Esq.

9              Christopher Rootham, Esq.

10             Ainslie Benedict, Esq.

11

12  FOR MORNEAU SHEPELL LIMITED

13  MCCARTHY TETRAULT LLP

14  Suite 5300, Toronto Dominion Bank Tower

15  Toronto, ON  M5K 1E6

16  PER:       Barbara J. Boake, Esq.

17             James D. Gage, Esq.

18             Elder C. Marques, Esq.

19             Paul Steep, Esq.

20             Byron Shaw, Esq.

21             Sharon Kour, Esq.

22             Kelly Peters, Esq.

23

24  FOR THE CANADIAN CREDITORS COMMITTEE

25  DLA PIPER
```



```
 1   919 North Market Street, Suite 1500

 2   Wilmington, DE  19801

 3   PER:       Selinda A. Melnik, Esq.

 4              Richard Hans, Esq.

 5              Timothy Hoeffner, Esq.

 6              Farah Lisa Whitley-Sebti, Esq.

 7           INFORMAL NORTEL NOTEHOLDER GROUP

 8

 9   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

10   BENNETT JONES LLP

11   1 First Canadian Place

12   Suite 3400

13   Toronto, ON  M5X 1A4

14   PER:       Kevin Zych, Esq.

15              S. Richard Orzy, Esq.

16              Gavin Finlayson, Esq.

17              Richard Swan, Esq.

18              Sean Zweig, Esq.

19              Jonathan Bell, Esq.

20              Amanda McLachlan, Esq.

21

22   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

23   MILBANK, TWEED, HADLEY, MCCLOY LLP

24   1 Chase Manhattan Plaza

25   New York, NY  10005
```



```
 1   PER:        Thomas R. Kreller, Esq.

 2               Jennifer P. Harris, Esq.

 3               Albert A. Pisa, Esq.

 4               Samir Vora, Esq.

 5               Andrew LeBlanc, Esq.

 6               Michael Hirschfeld, Esq.

 7               Atara Miller, Esq.

 8               Tom Matz, Esq.

 9               Nick Bassett, Esq.

10               Gabrielle Ruha, Esq.

11               Rachel Pojunas, Esq.

12

13      THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14

15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16   CASSELS BROCK & BLACKWELL LLP

17   Suite 2100, Scotia Plaza

18   40 King Street West

19   Toronto, ON  M5H 3C2

20   PER:        Shayne Kukulowicz, Esq.

21               Michael Wunder, Esq.

22               Ryan Jacobs, Esq.

23

24   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

25   ASHURST LLP
```



```
 1   Boardwalk House

 2   5 Appold Street

 3   London, England  EC2A 2HA

 4   PER:       Angela Pearson, Esq.

 5              Antonia Croke, Esq.

 6

 7   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 8   RICHARDS LAYTON & FINGER, P.A.

 9   920 North King Street

10   Wilmington, DE  19801

11   PER:       Christopher Samis, Esq.

12

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   AKIN GUMP STRAUSS HAUER & FELD LLP

15   One Bryant Park

16   New York, NY  10036

17   PER:       Fred S. Hodara, Esq.

18              David H. Botter, Esq.

19              Abid Qureshi, Esq.

20              Robert A. Johnson, Esq.

21              Brad M. Kahn, Esq.

22              Christine Doniak, Esq.

23              Joseph Sorkin, Esq.

24              Jacqueline Yecies, Esq.

25
```



```
 1        UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 2                    UK PENSION TRUST LIMITED

 3

 4    FOR THE UK PENSION PROTECTION FUND AND NORTEL

 5    NETWORKS UK PENSION TRUST LIMITED

 6    THORNTON GROUT FINNIGAN LLP

 7    Suite 3200, 100 Wellington Street West

 8    P.O. Box 329

 9    Toronto, ON  M5K 1K7

10    PER:      Michael Barrack, Esq.

11              D.J. Miller, Esq.

12              Rebecca Lewis, Esq.

13              Andrea McEwan, Esq.

14              John Finnigan, Esq.

15              Michael Shakra, Esq.

16

17    FOR THE UK PENSION PROTECTION FUND AND NORTEL

18    NETWORKS UK PENSION TRUST LIMITED

19    WILLKIE FARR & GALLAGHER LLP

20    787 Seventh Avenue

21    New York, NY  10019-6099

22    PER:      Brian O'Connor, Esq.

23              Sameer Advani, Esq.

24              Andrew Hanrahan, Esq.

25
```



```
 1   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 2   NETWORKS UK PENSION TRUST LIMITED

 3   BAYARD, P.A.

 4   222 Delaware Avenue, Suite 900

 5   Wilmington, DE  19899

 6

 7   PER:        Charlene D. Davis, Esq.

 8               Justin Alberto, Esq.

 9

10               THE BANK OF NEW YORK MELLON

11

12   FOR THE BANK OF NEW YORK MELLON

13   MCMILLAN LLP

14   Brookfield Place

15   181 Bay Street, Suite 4400

16   Toronto, ON  M5J 2T3

17   PER:        Sheryl E. Seigel, Esq.

18

19   FOR THE BANK OF NEW YORK MELLON

20   LATHAM & WATKINS LLP

21   885 Third Avenue

22   New York, NY  10022-4834

23   PER:        Michael J. Riela, Esq.

24

25
```



```
 1            WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER:      John Salmas, Esq.

10             Kenneth Kraft, Esq.

11             Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER:      Craig A. Barbarosh, Esq.

18             David A. Crichlow, Esq.

19             Karen B. Dine, Esq.

20

21       LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```



```
 1   Toronto, ON  M5H 3Y4
 2   PER:        Edmond F.B. Lamek, Esq.
 3               James Szumski, Esq.
 4
 5   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
 6   PATTERSON BELKNAP WEBB & TYLER LLP
 7   1133 Avenue of the Americas
 8   New York, NY  10036
 9   PER:        Daniel A. Lowenthal, Esq.
10
11        BOARDS OF DIRECTORS OF NORTEL NETWORKS
12        CORPORATION AND NORTEL NETWORKS LIMITED
13
14   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
15   CORPORATION AND NORTEL NETWORKS LIMITED
16   OSLER HOSKIN AND HARCOURT LLP
17   100 King Street West
18   1 First Canadian Place, Suite 6100
19   P.O. Box 50
20   Toronto, ON  M5X 1B8
21   PER:        Lyndon Barnes, Esq.
22               Edward Sellers, Esq.
23               Betsy Putnam, Esq.
24               Adam Hirsh, Esq.
25               Alexander Cobb, Esq.
```



1

2                        I N D E X

3

4  DR. TIMOTHY REICHERT

5                                              PAGE

6  Examination-in-Chief/Direct Examination

7  by Mr. Smith...............................3818

8  Cross-Examination by Mr. Zelbo.............3891

9  Cross-Examination by Mr. Adler.............3960

10  Cross-Examination by Mr. Barrack...........4022

11  Re-Examination/Re-Direct by Mr. Smith.......4058

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    INDEX OF EXHIBITS

 2

 3   NUMBER/DESCRIPTION                    PAGE NO.

 4

 5     49: Report by Dr. Timothy Reichert      3819

 6     50: Reply Report by Dr. Timothy         3819

 7     Reichert

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1   -- Upon commencing at 9:05 a.m.

2            THE US COURT:  Good morning, everyone.

3   Please be seated.  New faces every day.  New/old

4   faces.

5            THE CANADIAN COURT:  Good morning.

6            MR. SMITH:  Good morning.  Good

7   morning, Justice Newbould, Judge Gross.  Graham

8   Smith for the Canadian Monitor.

9            THE US COURT:  Good morning, Mr. Smith.

10            MR. SMITH:  Good morning.  We have as

11   our next witness Dr. Timothy Reichert.  If the

12   witness could be sworn, please.

13            THE US COURT:  We need a moment down

14   here for the court reporter.

15            THE CANADIAN COURT:  Does it appear to

16   be working, Judge Gross?

17            THE US COURT:  We're good now, Justice

18   Newbould.

19

20            TIMOTHY ALLEN REICHERT,

21         HAVING BEEN FIRST DULY SWORN,

22      WAS EXAMINED AND TESTIFIED AS FOLLOWS:

23

24   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION BY

25   MR. SMITH:



1            Q.   Good morning, Dr. Reichert.

2            A.   Good morning.

3            Q.   Sir, you've prepared two reports

4    for the courts in this matter.  The first one is

5    dated January 24, 2014.

6            THE CANADIAN COURT:  We'll mark that

7    one Exhibit 49.

8            EXHIBIT NO. 49:  Report by Dr. Timothy

9            Reichert.

10           THE CANADIAN COURT:  And the reply

11   report Exhibit 50.

12           EXHIBIT NO. 50:  Reply Report by Dr.

13           Timothy Reichert.

14           BY MR. SMITH:

15           Q.   Sir, can you confirm that you

16   adopt these two reports as testimony in this case?

17           A.   Yes.

18           Q.   Dr. Reichert, what was the primary

19   reason for undertaking the analysis that you did in

20   those reports?

21           A.   I was asked to evaluate the Nortel

22   RPS, residual profit split arrangement that was in

23   place between the parties or among the parties,

24   rather, with respect to its design, selection as a

25   methodology, and quantification.

Neeson&Associates    W&F

```
 1                    I was also asked to examine and

 2    evaluate the opinions of the other transfer pricing

 3    experts in this case.

 4                    Q.   Thank you.  Now, here today, of

 5    course, we're in the allocation part of this case

 6    and what's your understanding of what you may be

 7    able to assist the courts with in the allocation

 8    aspect of this case?

 9                    A.   Well, what I hope to do today is

10    bring the court and these proceedings back to some

11    first principles in transfer pricing; specifically,

12    the definition of the arm's length principle, its

13    extent and limits, the approach taken by guidance

14    and regulations with respect to the arm's length

15    principle to the question of whether or not to

16    respect the legal arrangements of the parties; and

17    to offer my opinion that there is nothing in the

18    arrangements, the substance, nor is there anything

19    in the guidance or regulations surrounding the

20    arm's length principle to imply that from a

21    transfer pricing perspective we should disregard

22    the arrangements.

23                    Q.   And just for clarity, when you

24    speak of guidance and regulations, what are you

25    talking about there?
```



```
 1                    A.    I'm talking about the OECD
 2    transfer pricing guidelines; I include in those the
 3    draft discussion document from 2013 on intangibles.
 4    I'm talking about regulations such as the 482,
 5    section 482 regulations in the United States and
 6    similar regulations outside the United States.
 7                    Q.    Thank you.  And Dr. Reichert,
 8    you've prepared a slide deck or a demonstrative for
 9    purposes of your testimony today, correct?
10                    A.    I have.
11                    Q.    All right.  Perhaps if we could
12    provide a copy to the court.  Do you have a copy of
13    it, Dr. Reichert?
14                    A.    I do.
15                    Q.    And Judge Gross, there should be
16    one on its way to you.
17                    THE US COURT:  Thank you, Mr. Smith, I
18    have mine.
19                    MR. SMITH:  Awesome, thank you.
20                    BY MR. SMITH:
21                    Q.    Dr. Reichert, just turning for the
22    moment to your qualifications and experience, which
23    I believe you've highlighted on slide number 1, if
24    we look at the numbers in the bottom right-hand
25    corner of the demonstrative, could you just quite
```

 Neeson&Associates    W&F

```
 1   briefly take us through your formal education and
 2   the degrees conferred on you?
 3                A.   Sure.  So I have a Ph.D. in
 4   economics from George Mason University; I have
 5   fields of concentration in law and economics and in
 6   public choice theory.  I have a master's degree in
 7   international political economics from the Catholic
 8   University of America and a bachelor's degree in
 9   political philosophy from Franciscan University.
10                Q.   Thank you.  And sir, I understand
11   that you've been a transfer pricing practitioner or
12   transfer pricing economist since 1995; am I correct
13   in that?
14                A.   That's correct.
15                Q.   Can you just explain, are those
16   the same things, a practitioner and an economist in
17   a transfer pricing world?
18                A.   An economist is one practitioner
19   of one type, if you will, or category of
20   practitioner.  In transfer pricing we see lawyers
21   practice in the field, we see accountants
22   occasionally who practice and as well economists.
23   I think the majority of the practitioners in the
24   space are economists.
25                Q.   Thank you.  And if you could, sir,
```

Neeson & Associates    W&F

```
 1   turning to the right side of slide number 1 in your
 2   demonstrative --
 3            A.   Sure.
 4            Q.   -- could you just briefly take us
 5   through the positions you've outlined there and the
 6   firms that you have set out there?
 7            A.   Sure.  So I started my career in,
 8   I believe it was 1994, '93 or four, for the
 9   Borzilleri Group in Washington, D.C., I was an
10   economist for the firm.  We did work in the
11   antitrust space, commercial damages, other forms of
12   damages, economic policy, et cetera.
13            I then moved on in I believe May of '95
14   to Economic Consulting Services, which is a firm in
15   Washington, D.C. that at the time specialized in
16   transfer pricing controversy.  I was a senior
17   economist there.
18            I left economic consulting services to
19   join Ernst & Young.  I was a partner in the
20   transfer pricing practice.  I led the transfer
21   pricing practice for one of their 13 geographies in
22   North America.
23            I left Ernst & Young, was at a firm
24   called Analysis Group for a short period of time.
25   I was a vice-president there.
```



```
 1                    I was then at Duff & Phelps, where I
 2     was a managing director.  I led the global transfer
 3     pricing practice at Duff & Phelps, and three years
 4     ago I founded Economics Partners.
 5                    Q.   Now, can you tell us a little more
 6     about Economics Partners that you founded, and I
 7     see you've set out certain highlights on page 2 of
 8     the slide deck?
 9                    A.   Sure.  So the firm was established
10     in August of 2011.  We specialize in applied
11     economics, focusing on transfer pricing and complex
12     tax valuation.  We have offices in Denver,
13     Washington, D.C., and Tel Aviv, 24 professional
14     economists.  We represent clients before tax
15     authorities around the world.  I list some
16     countries here; that's not an exhaustive list.
17                    Typically we are, of course,
18     representing those clients in controversy matters.
19     We have roughly 120 clients in total, many of whom
20     are -- in fact, the vast majority of whom -- are
21     Fortune 100 clients and companies.
22                    Q.   And just turning to number 3 in
23     the slide deck, sir, I think you have elaborated a
24     little bit on your professional experience.  Maybe
25     you could just briefly take the courts through that
```



```
 1   and explain some of your references that you've

 2   already made to controversies and the other

 3   references you made here to APA negotiations and so

 4   forth.

 5                 A.    Okay.  So first with respect to

 6   transfer pricing controversy, what is that?  As I

 7   think I may have mentioned, we at Economics

 8   Partners do an extensive amount of transfer pricing

 9   controversy work, as we call it.  And I think

10   that's a term of art in the space.

11                 That pertains to or refers to work

12   typically on behalf of a taxpayer or a tax

13   authority.  So the counterparty is typically one or

14   the other either in an APA setting, at exam, at

15   appeals or pursuant to litigation.

16                 I have over the course of my career led

17   over 400 transfer pricing engagements.  As I said a

18   moment ago, I have been retained by both tax

19   authorities and taxpayers.  That's sort of an

20   important thing, I think, for our firm.  The IRS is

21   an important client, for example, for us.

22                 That allows us to hold a space in the

23   market that I think demonstrates that we are a firm

24   that plays it down the middle.  We are respected by

25   both tax authorities and taxpayers.
```



1              I've had appearances as an expert in

2    IRS appeals proceedings -- this is my first

3    appearance in a court of law -- led over 50

4    valuation engagements in the course of my career.

5              As I said, we do an extensive amount of

6    controversy, we also negotiate on advanced pricing

7    arrangements.  We're negotiating -- I'm negotiating

8    what is currently the largest unilateral APA in the

9    US APA system, and one of the largest and certainly

10   the most complex tri-lateral APA in the system.

11             I have done extensive work in the

12   telecommunications sector, as well as the high

13   technology sector.  That work often involves

14   selecting, designing transfer pricing arrangements

15   including those that rest on the residual profit

16   split methodology.  Most of those, in fact, are

17   intangible asset licensing arrangements.

18             Q.   Thank you.  Dr. Reichert, turning

19   to slide number 4 in your demonstrative, you've set

20   out four bullet points under the heading "Key

21   Principles."

22             Before taking us through them, could

23   you just elaborate for us, what do you mean by "Key

24   Principles" in this context and why you've set

25   these out?



```
 1                        A.    Okay.  Well, when I refer to key
 2     principles, I mean just that, key principles.
 3     Principles that in transfer pricing, as a result of
 4     promulgations by the OECD or tax authorities
 5     through their regulations, are considered to be
 6     what one might call bedrock principles or concepts.
 7                        This slide really begins the meat of my
 8     presentation.  The purpose of this slide is to give
 9     you and the courts an upfront sense for where this
10     presentation is going to go.
11                        Q.    Thank you.  So we will revert to
12     each of these, what you've called key principles,
13     in turn.  But just in an overview fashion, if I
14     took you to the first one, where you state:
15                             "The arm's length principle is
16                             focused on allocation of income for
17                             tax purposes.  The arm's length
18                             principle does not directly address
19                             the allocation question before the
20                             Courts."
21                        What's your main idea in putting that
22     forth?
23                        A.    The point there is that I view the
24     arm's length principle as self-limited to tax and
25     in fact to transfer pricing.  The OECD guidelines
```

 Neeson & Associates   W&P

```
 1   are extremely clear about that in their discussions

 2   surrounding the arm's length principle.

 3             When I say "does not directly address

 4   the allocation question before the court", I

 5   recognize that some of the considerations that we

 6   look to in transfer pricing may be useful to the

 7   courts here, in an allocation setting.

 8             In particular, some of the things said

 9   about the arm's length principle with respect to

10   substance and form, and some of the considerations

11   that we look to with respect to substance and form

12   may be of use to the court here.

13             Just to be clear about what I mean when

14   I say "substance and form," I am referring to

15   again, when I say form, the arrangements, the

16   structure that the parties to a controlled

17   transaction have put in place.

18             Q.   All right.  And in the second of

19   the key principles, on slide 4, you state:

20                 "In the tax context,

21                 'ownership' reflects entitlement to

22                 a defined income stream.  It does

23                 not imply any particular legal

24                 relationship:  For example, a joint

25                 venture that requires full
```



1                    equity-type ownership."

2                    Again, just in an overview fashion, can

3      you tell us what the gist of your idea there is?

4                    A.    Sure, sure.    Economic ownership, I

5      define economic ownership - and I think this is

6      consistent with the OECD guidelines - as the right

7      to benefit from some or all of an income stream as

8      a result of a defined undertaking or activity.

9                    The idea behind economic ownership is

10     that just as we see in open markets, we see

11     property rights and contracts carving up a

12     resource, so too and in fact, all the more inside

13     of a multinational, we see exactly the same thing.

14                   And that's really what economic

15     ownership is all about is the carving up of a

16     resource inside of a multinational enterprise.

17                   And I say all the more inside of a

18     multinational enterprise precisely because, as I

19     discuss at some length in my reports -- I think I

20     may be the only of the transfer pricing economists

21     to point this out -- firms exist in contexts in

22     which there are high transactions costs in the open

23     market, and there are lower transactions costs for

24     the same kind of economic activity or a similar

25     kind of economic activity inside the firm.



```
 1                Because of those lower transactions
 2    costs, we can see and we tend to see arrangements
 3    inside the multinational that we may not observe
 4    outside the multinational.
 5                And, in fact, economic ownership is
 6    central to many of those arrangements because we
 7    are carving up resources in ways we may not observe
 8    in the open market.
 9                Q.   Thank you.  And turning to the
10    third bullet, sir, where you state:
11                     "Licensing is a legal
12                     arrangement or transaction type well
13                     accepted by tax authorities.  RPSM
14                     [residual profit split method] is a
15                     transfer pricing methodology
16                     designed to compensate parties to
17                     various business arrangements, in
18                     particular a licensing arrangement."
19                Again, at a higher level, what's your
20    main idea there?
21                A.   Okay.  So licensing is one
22    particular form of economic ownership.  It's a way,
23    both outside and inside firms, that resources can
24    be carved up or allocated as between or among
25    parties, controlled or unrelated parties.
```

Neeson & Associates    W&P

```
 1                    There's a dichotomy, I think, that's
 2    been put forward in this case, and it's a false
 3    dichotomy between licensing and the residual profit
 4    split method.  Licensing is a transaction pattern.
 5    A residual profit split method is a methodology
 6    that, in fact, is designed in large part, perhaps
 7    not exclusively but certainly in large part, to
 8    price licensing arrangements.
 9                    In fact, there is an interesting
10    anecdote about the residual profit split method in
11    the 482 regs.  The only example in the dash 6
12    section of the 482 regs of the application of the
13    residual profit split method is called the Newlon
14    Example, written by a man named Scott Newlon, who
15    wrote himself into the regs, apparently into
16    immortality in these proceedings as well.
17                    But that example is an example of a
18    licensing arrangement priced by the RPSM.  In fact,
19    that's been my experience over the course of my
20    career:  the residual profit split method -- most
21    of the time it's applied, it's applied to price
22    licensing arrangements.
23                    Q.   And finally, sir, again on the
24    fourth page of your slide deck, you state:
25                         "The legal arrangements among
```



```
1                   parties govern their intercompany
2                   transfer pricing, save for two
3                   exceptional circumstances which do
4                   not apply in this case.  Nortel's
5                   licensing arrangements reflect the
6                   economic substance of the
7                   relationship and fully accord with
8                   transfer pricing principles and the
9                   arm's length standard."
10               I think you hinted at this when you
11    were discussing your understanding of your purpose
12    here in the allocation case, and perhaps you could
13    just again, at an overview level, elaborate on that
14    principle.
15               A.   Sure, I would be happy to.  There
16    are really, I think, two points made here.  Number
17    one, I believe the bedrock principle, maybe the
18    only thing that is, in fact, presumptive in
19    transfer pricing -- we've heard a lot about things
20    that are presumptive, presumptive allocation, for
21    example.
22               In my view, perhaps the only
23    presumption in transfer pricing is a presumption in
24    favour of form for reasons that we will discuss as
25    we go through this presentation.
```

 Neeson&Associates   W&F

 1                    I also note here that, in my opinion,

 2     Nortel's licensing arrangements, the substance of

 3     those arrangements are entirely consistent with

 4     form.

 5                    And the threshold that we have to cross

 6     in transfer pricing per the regulations and

 7     guidance in order to disregard the form and

 8     structure of the arrangements that the parties have

 9     entered into is a very high one, a two-pronged test

10     which we'll talk about.  And I don't believe we get

11     over those thresholds.

12                    Q.   Thank you, Dr. Reichert.  So,

13     coming back to the first of your key principles

14     then about the arm's length principle and that it's

15     focused on allocation of income for tax purposes,

16     is this what you have elaborated on in number 5 of

17     your demonstrative under the heading "Transfer

18     Pricing Context:  The Extent and Limits of the

19     Arm's Length Principle"?

20                    A.   Yes, this is a slide obviously

21     talking about the extent and limits of the arm's

22     length standard.  And as I say here, the arm's

23     length principle is limited to tax applications on

24     its own terms.  The transfer pricing regulations

25     and guidelines do not purport to dictate legal or



```
 1   property interests either in insolvency or in a
 2   going concern context, or for that matter
 3   entitlement to proceeds from sale of assets, either
 4   again in an insolvency context or going concern
 5   context.
 6               I have some bullets here.  I'm happy to
 7   walk through them.  These are quotations from the
 8   OECD guidelines.  I think they're important.
 9               Q.   All right.  Go ahead.
10               A.   Okay.  The first and second are
11   quite similar.  The first says the arm's length
12   principle, this is from the glossary of the OECD
13   guidelines:
14                    "The arm's length principle:
15                    The international standard that OECD
16                    member countries have agreed should
17                    be used for determining transfer
18                    prices for tax purposes."
19                    Similarly, the second quotation here:
20                    "This Chapter provides [this is
21                    Chapter 1] provides a background
22                    discussion of the arm's length
23                    principle, which is the
24                    international transfer pricing
25                    standard that OECD member countries
```

 Neeson & Associates    W&F

1          tries have agreed should be used for

2          tax purposes [again, I highlight

3          that] by MNE groups and tax

4          administrations."

5          This next quote I think is a very

6    important one.  This comes from a section of the

7    OECD guidelines, it's discussing and in fact

8    referring back to a section in chapter 1 that talks

9    about the recognition of actual transactions

10   undertaken.

11          The quote says:

12          "Paragraphs 1.64-1.69,

13          'Recognition of actual transactions

14          undertaken'" --

15          -- so, again, those are the paragraphs

16   that tell us when we do or do not respect or

17   recognize the arrangements of the parties --

18          " -- do not provide any

19          guidance as to a country's ability

20          to characterise transactions

21          differently under other aspects of

22          its domestic law."

23          This is important because what these --

24   what the guidelines are talking about in these

25   paragraphs is a case in which we may decide that



```
 1   we're crossing those thresholds and we're
 2   disregarding the form or the actual arrangements of
 3   the parties.
 4             The guidelines say that disregard, if
 5   we decide to do that, for transfer pricing purposes
 6   doesn't have any real bearing on other aspects of
 7   the country's domestic laws.  It is not intended
 8   to.
 9             Q.   And your final bullet?
10             A.   Okay.  The final bullet simply
11   says:
12                  "MNEs [multinational
13                  enterprises] are free to organize
14                  their business operations as they
15                  see fit.  Tax administrations do not
16                  have the right to dictate to an MNE
17                  how to design its structure."
18             It's fairly obvious.  How does this
19   relate to the limitations on the arm's length
20   principle?
21             There is also a presumption, I think,
22   for freedom in the arm's length standard and the
23   guidance surrounding it, and that, of course, is a
24   limitation on the extent of the arm's length
25   principle and its application.
```



 1                    I think this is particularly relevant

 2    because I think that in this case, we do tend to

 3    see, particularly some of the other transfer

 4    pricing experts, taking certain positions that in

 5    my view do, in fact, dictate and don't perhaps

 6    respect the freedom of multinationals to enter into

 7    arrangements that we may not see in the open

 8    market.

 9                    Q.    Leaving the extent and limits of

10    the arms length principle for the moment, and going

11    back to the second and third of your key

12    principles, where you referenced economic ownership

13    in the transfer pricing context, and licensing and

14    the relationship of licensing to transfer pricing,

15    if we look at the headings in your slides 6 through

16    9, we see you've headed them "Understanding

17    Economic Ownership," that's 6, and at 7,

18    "Understanding Intangibles."  And then at 8,

19    "Understanding Economic Ownership of Intangibles."

20    And then at 9, "Evidence of Licensees' Limited

21    Economic Ownership."

22                    And just briefly by way of overview,

23    could you say why you focused on these concepts

24    here?

25                    A.    So these slides obviously flow



```
 1   together, and what I'm doing here is first, I want

 2   to explain what, again, we mean by economic

 3   ownership and I want to talk about intangibles.  I

 4   want to talk about intangibles as a resource inside

 5   the multinational enterprise.  From there, move to

 6   economic ownership of intangibles as a broad and

 7   very wide resource, widely applied resource, and in

 8   particular licensing as a form of economic

 9   ownership.

10             And then apply some of that to what we

11   see or compare some of that to what we see in the

12   Nortel RPS.

13             Q.   Thank you.

14             A.   So, beginning I guess, with this

15   first slide.

16             Q.   Slide 6?

17             A.   Um-hmm.

18             Q.   Yes.  Why don't you take us

19   through that.  The first couple of lines speak

20   about the terms used.  Could you tell us what

21   you're referencing there and whether those mean the

22   same notion or different notions in the transfer

23   pricing world?

24             A.   Okay.

25                  "So transfer pricing employs a
```



```
 1                    specific concept of ownership.
 2                    Commonly used terms include:
 3                    'Ownership,' 'economic ownership,'
 4                    'beneficial ownership.'"
 5              I think in transfer pricing practice,
 6    and I've spoken about this before, those words are
 7    used roughly synonymously.  I recognize that they
 8    may have or carry different meanings outside of a
 9    transfer pricing context, but within a transfer
10    pricing context they mean roughly the same thing.
11                    Q.    And then you go on to say:
12                    "Economic ownership is not a
13                    reference to ownership in a legal
14                    sense."
15              What's your point there?
16                    A.    It's the point I made earlier,
17    that economic ownership refers to a party's right
18    to benefit from an income stream attributable to a
19    defined undertaking or activity.
20              That undertaking could, for example, be
21    taking on a role inside an organization, including
22    the role of a licensor or a licensee.  And I think
23    as well, what I mean here is that economic
24    ownership, as I have stated a number of times this
25    morning, is about carving up a resource.
```


Neeson & Associates    W&P

```
 1                    Q.   And finally on slide 6, sir, and I
 2     think you've hinted at this earlier, but you state:
 3                         "Assertions by other transfer
 4                         pricing experts that R&D activity
 5                         results in co-ownership of the asset
 6                         are incorrect, and not supported by
 7                         any authority."
 8                    Can you speak to your point there from
 9     a transfer pricing perspective?
10                    A.   Yeah, so the point here is that
11     the assertions that R&D activity necessarily
12     results in co-ownership are clearly unfounded.  We
13     know, for example, that contract R&D arrangements
14     exist.  Those don't result in co-ownership.
15                    We also know -- and I'll talk about
16     this later in this presentation -- that there are
17     arrangements in the open market in which R&D or
18     some other intangible related activity or
19     investment may be performed by one party and the
20     benefit may enure to another.
21                    That happens in the open market and
22     again all the more inside of a multinational
23     enterprise because of the latitude inside a
24     multinational enterprise to structure a host of
25     different arrangements.
```



```
 1                    Q.   Thank you.  Now, sir, you
 2      referenced the concept of intangibles earlier in
 3      discussing your key principles, and I believe you
 4      mentioned that it's a broad concept or a broad
 5      idea.
 6                    If we turn to slide 7, is this where
 7      you expand on that in the context of transfer
 8      pricing?
 9                    A.   Yeah.  Yeah, this is -- that's
10      right, this is the slide.  Two points here, I
11      think.  Intangibles, the term intangibles is a
12      broad designation under the OECD guidelines and for
13      that matter, elsewhere, the US section 482
14      regulations.
15                    And it includes intangible property as
16      well as other things.  So intangibles, when we talk
17      about intangibles, we are not limiting the scope of
18      consideration to just property, first of all,
19      legally protected intangible property.  We may be
20      looking at a host of things.  Go to the 482
21      definition of intangibles, for example, an
22      extremely broad definition.
23                    So we include things like
24      customer-based assets, customer lists, customer
25      relationships, customer awareness.  We include
```

 Neeson & Associates    W&F

1    things like software code, software architecture,

2    designs, operating procedures, systems, protocols.

3    Organizational capital is sometimes viewed as an

4    intangible asset.

5              So there's a rubric, this designation

6    of intangible is a very broad thing.  By definition

7    it's a broad, broad resource category.

8              Intangible property is also a broad

9    category.  Even when we see this term "intangible

10    property," that too is a very broad category in a

11    transfer pricing context.  It may be a more limited

12    category in an IP space -- I'm not an expert in

13    that space; I don't know.

14              But I can tell you that when we're

15    working in a transfer pricing context and we talk

16    about intangible property, it includes a lot of

17    things.  I list some of them here:  rights to use

18    industrial assets, patents, trademarks, trade

19    names, designs, models, literary and artistic

20    property rights, intellectual property, know-how,

21    trade secrets and so forth.

22              Q.   Thank you.  Dr. Reichert, if you

23    could turn to slide 8 in your demonstrative and

24    that's the one, of course, you headed

25    "Understanding Economic Ownership of Intangibles."



```
 1                    Is this putting together the two ideas
 2      of economic ownership and intangibles in the
 3      transfer pricing context?
 4                    A.    It is, and it's focusing on a
 5      specific form of economic ownership that I believe
 6      to be particularly relevant to this proceeding, and
 7      that is licensing.
 8                    Q.    Okay.
 9                    A.    Licensing of intangibles.
10                    Q.    And you begin by saying:
11                         "A license right is a
12                    recognized and permissible form of
13                    'ownership' in transfer pricing."
14                    Then you have several OECD references.
15      Perhaps you could just briefly take us through
16      those.
17                    The first one is:
18                         "Limited rights in intangibles
19                    are commonly transferred by means of
20                    a license or other similar
21                    contractual arrangement, whether
22                    written, oral or implied...Such
23                    limited rights and intangibles are
24                    themselves intangibles."
25                    Why have you brought that to the
```

 Neeson & Associates    W&F

```
 1    court's attention?

 2                    A.    Well, because -- in part because

 3    of what we say in the sentence preceding.  What I'm

 4    saying in the opening sentence of this slide is

 5    that a licensed right is a recognized and

 6    permissible form of ownership in transfer pricing.

 7    And I think that that concept has, to some degree,

 8    been lost by perhaps some of the other experts in

 9    the case.

10                    Then I go on to talk about limited

11    rights, highlighting:

12                        "Limited rights in intangibles

13                        are commonly transferred by means of

14                        a license or other similar

15                        contractual arrangement, whether

16                        written, oral or implied...Such

17                        limited rights in intangibles are

18                        themselves intangibles."

19                    That's from the OECD, the 2013 draft

20    document at paragraph 59.  I think the key thing I

21    am emphasizing here is the limitation on the rights

22    that one typically accords to a licensee in a

23    licensing arrangement.  There is a very good

24    economic reason for this.

25                    When you think about what's happening
```



1    in a licensing arrangement, a licensor is according

2    or granting some use, some specified and defined

3    use to intangibles to a licensee.

4              Those intangibles in that specified use

5    may and typically do confer a form of monopoly

6    power, as we would call it in economics, upon the

7    licensee, okay?

8              They confer -- and I don't mean that in

9    a pejorative sense at all -- they confer, strictly

10   speaking, a downward sloping demand curve, the

11   expectation that the licensee may earn economic

12   rents, okay?  Economic profit.

13             Well, the essence of monopoly power is

14   limitation on competition, limitation or absence,

15   in fact, of competition.  And a licensor has to be

16   very, very careful in the licensing arrangement not

17   to create competition for himself and not to create

18   competition among the licensees in that

19   arrangement.

20             So when you read a licensing

21   arrangement, when I read a licensing arrangement as

22   an economist it's a fascinating exercise for me

23   because that's what I'm looking at.  I'm looking at

24   licensor attempting to circumscribe the domain, the

25   powers of that licensee, such that the licensee

 Neeson&Associates    W&F

```
 1   still gets something of value to it but does not

 2   diminish the value for the system, i.e. the other

 3   licensees, or for the licensor.

 4              Q.   And Dr. Reichert, your second

 5   bullet there is another reference to the OECD and a

 6   later paragraph.  Is that around the same idea of

 7   the limitation on --

 8              A.   It is.

 9              Q.   -- intangibles recognized by the

10   OECD?

11              A.   Yes, it is.  It goes to that point

12   and another.  It says:

13              "Generally [so generally, it

14              means what it says], the registered

15              legal owner of such intangibles has

16              the exclusive legal and commercial

17              right [legal and commercial right]

18              to use the intangible, as well as

19              the right to prevent others from

20              using or otherwise infringing the

21              intangible.  These rights may be

22              granted for a specific geographic

23              area and/or for a specific period of

24              time."

25              Q.   And then the third bullet on slide
```



 1    8, Dr. Reichert, is a paragraph again from the OECD

 2    that states:

 3                    "In identifying the legal owner

 4                    of intangibles, an intangible and

 5                    any license relating to that

 6                    intangible are considered to be

 7                    different intangibles for transfer

 8                    pricing purposes, each having a

 9                    different legal owner."

10                    Can you just explain why you think that

11    has any import for the courts?

12                    A.   Sure.  This is really, I think,

13    just the OECD recognizing what we're talking about

14    here, that a license arrangement is carving up the

15    resource and there's been an indication or an

16    assertion by some other experts in this case that

17    that doesn't make any sense, and, you know, here we

18    have the OECD making exactly this point,

19    recognizing exactly this point.

20                    Q.   And could you just take us to your

21    final bullet point on slide 8 and explain why you

22    think that has some import in this case?

23                    A.   Sure.  Okay.  So this responds to

24    one of the characteristics of the MRDA in the

25    Nortel RPS that I think the EMEA and US Debtors



 1    find most troubling.  And that is the fact that R&D

 2    activity residual rights pertaining perhaps to that

 3    activity enure to the benefit of NNL.

 4            And the paragraph I think speaks to

 5    itself.  I'll just read it, however:

 6                    "In transactions between

 7                    independent enterprises [so in the

 8                    open market] arrangements are

 9                    observed where the transferor or

10                    licensor retains the full right to

11                    any enhancements of the licensed

12                    intangible that may be developed

13                    during the term of the license."

14            So this is the OECD recognizing

15    precisely, I think, the thing that is troubling to

16    some of the other debtor groups here.

17            I'll note that I see this all the time.

18    I do quite a bit of work in the fast food industry,

19    for example.  And I think very apt -- maybe not a

20    very apt -- an analogy to what we see in this

21    licensing arrangement, the Nortel RPS, is a

22    franchise arrangement.  I think it's certainly a

23    better open market analogy than, for example, the

24    analogy given of a housing partnership that we've

25    seen put forward in this case.



1              But in franchising arrangements you see

2    the franchisees, including the master franchisees,

3    with obligations to invest significantly in

4    marketing and advertising, all of which enhances

5    the trademark and brand of the franchisor.

6              You also see effort made by the

7    franchisees to develop things, for example, like

8    menu items.  Many of the menu items you see when

9    you walk into a McDonald's in the United States

10   were developed outside of the United States.

11             These things enure to the franchisor.

12   The franchisor has the right to take those

13   intangibles and use them in licensing to other

14   franchisees elsewhere, and has the right to use

15   them in his or her own restaurants as well.

16             Q.   And sir, following your excerpts

17   from the OECD on this slide 8, which is still on

18   slide 8?

19             A.   Yes.

20             Q.   At the bottom you state:

21                  "By contrast, Dr. Cooper

22                  incorrectly assumes that spending

23                  investment dollars in R&D means full

24                  ownership, when in fact investment

25                  was treated by the MRDA and the CSAs



1              that preceded it, as a substitute

2              for royalty."

3              I think you've hinted at this idea but

4    not necessarily this concept of a substitute for

5    royalty.  Could you perhaps expand on your

6    statement there for the courts?

7              A.   Sure.  I view the R&D, as my

8    reading of the MRDA as an economist and my

9    understanding of the arrangement is that the R&D

10   effort and investment, the cost incurred by the

11   licensees around R&D, pertaining to R&D, is

12   considerations.  Consideration for the make/sell

13   right, and it's consideration for a limited

14   interest in residual profit.

15             It's in essence then a substitute for a

16   traditional royalty that you might see in a

17   licensing arrangement.

18             Q.   Sir, turning to slide 9 of the

19   demonstrative, we saw the heading of this earlier,

20   "Evidence of Licensees' Limited Economic

21   Ownership," and I believe you indicated that this

22   was more of you turning toward the actual Nortel

23   arrangements in place.

24             And you've got three points there.  The

25   first is:

Neeson&Associates    W&F

```
 1                    "The transition from CSA -- "
 2               I take it that's cost sharing
 3      arrangement, correct?
 4               A.   Yes.
 5               Q.   " -- to MRDA required no buy-in or
 6                    buy-out and parties continued to hold
 7                    the same license rights
 8                    post-transition."
 9               Can you break that proposition down for
10      us and tell us what -- why you think that is of
11      potential import to the courts here?
12               A.   Okay.  When I looked to what the
13      parties were actually doing, and I asked the
14      question:  Okay, do we see evidence in the Nortel
15      RPS for what I've been talking about more generally
16      in the preceding slides?  I think the most
17      dispositive evidence that I've come across is what
18      happens when the parties transition from the CSA to
19      the MRDA.
20               Now, remember that the nature of the
21      rights that the parties held in the MRDA and the
22      CSA are the same.  The same rights under the MRDA
23      as under the CSA, okay?  Nortel RPS rights same as
24      the CSA rights.
25               But what happened when these parties
```

 Neeson&Associates   W&F

```
 1    transitioned from the CSA to the MRDA is some of

 2    them saw their interest in those rights, their

 3    share of the thing that the participants were

 4    jointly owning, whatever that was, they saw their

 5    share decrease.

 6               In NNI's case, for example, the

 7    transition from the CSA to the MRDA diminished

 8    NNI's ownership share over its rights to whatever

 9    it was they were sharing by about 25 percentage

10    points.  That's a quarter of the pie was taken away

11    from NNI.

12               So, what happened when that occurred?

13    No one, NNI, its advisors and the IRS, no one

14    raised their hand and said wait a minute, we've

15    just lost 25 percent of our residual interests.

16    They didn't say wait a minute, we've lost 25

17    percent of the going concern or goodwill value

18    associated with our R&D investments.

19               Here's what I mean by that, by the way.

20    When you talk about goodwill -- when I talk about

21    goodwill -- I mean it in exactly in the sense that

22    Miller and Modigliani, the Nobel Laureates, talked

23    about it.  It's the value of future investment

24    opportunities.

25               NNI had the right, perhaps, or may have
```



1    thought that it had the right, to continue to

2    invest in that 25 percent of the R&D investment

3    opportunities in the future.  That would be 25

4    percent of the goodwill.  That's a residual

5    interest.

6              But NNI did not raise its hand and say

7    I need to be compensated for the goodwill and I

8    need to be compensated for the residual interest.

9              What it was compensated for --

10             Q.   Is that what you're talking about

11   in terms of a buy-in and buy-out?

12             A.   Yes, I'm going to get to that in

13   just a moment.  What it was compensated for was the

14   value of its R&D activity payments, its license

15   rights.  And in fact the IRS specifically asked

16   about this in the back and forth pertaining to the

17   APA.

18             The IRS asked a question, okay, so what

19   about a buy-in and buy-out?  This was a question

20   from Tom Ralph to Dave Canale.  And the response

21   from the US advisor of NNI to the IRS was, no

22   buy-out is necessary; the rights have remained the

23   same, they are license rights and those license

24   rights are valued specifically as R&D activity

25   payments that waste away over about a five-year



```
 1   time horizon.
 2              Now, to put that in context, I just
 3   want to put this in context, two things.  One, I've
 4   worked for Tom Ralph, I know Tom Ralph very well.
 5   He's obviously at the IRS, and he's a very sharp
 6   lawyer.  He fully understands, he is in fact
 7   pursuing a number of cases where buy-ins and
 8   buy-outs which should include residual rights
 9   didn't, okay?  So he's fully aware of this issue.
10              Let me also put some other context
11   around this.  If you look at the market enterprise
12   value of Nortel at about this time, it's somewhere
13   in the neighbourhood of $53 billion.
14              Now, out of that, perhaps half, roughly
15   half of the operating profit stream in very, very
16   rough justice, perhaps half then of the enterprise
17   value is routine returns, okay?  So take that off
18   the table.
19              That leaves you with about $25 billion
20   of value pertaining to technology, i.e. pertaining
21   to residual profit.  If NNI felt that it lost
22   residual rights, it would have raised its hand and
23   said I just lost 25 percent of 25 billion, six to
24   $7 billion.  There would be about a six to $7
25   billion issue on the table.  But that's not what
```



1   happened.  It was paid for a very limited value

2   associated with the license rights that eroded away

3   after the transition.

4            Q.  You referenced the role of Tom

5   Ralph and the IRS with respect to that issue, and I

6   see in your slide deck you referenced the April

7   2004 response to the IRS.  Perhaps we could just

8   call that up, it's Exhibit TR21031.

9            A.  Okay.

10           Q.  I'm waiting for Judge Gross.

11   There, he's got it.

12           THE US COURT:  Yes.

13           BY MR. SMITH:

14           Q.  Good.  Dr. Reichert, I believe

15   your reference there is to the bottom of page 4,

16   where there is a bolded question that says:

17               "Please describe the legal and

18               tax consequences of terminating the

19               cost sharing arrangement.  For

20               example, please provide the amount

21               of any" --

22           THE CANADIAN COURT:  Just a minute,

23   Mr. Smith.  Can I see page 4?

24           MR. SMITH:  Thank you.  Sorry, Your

25   Honour.  So right at bottom.



```
 1                    BY MR. SMITH:
 2                    Q.   It says:
 3                         "For example, please provide
 4                    the amount of any payments [sorry,
 5                    any buy-out payments] paid or if
 6                    none were paid, please explain why
 7                    not."
 8                    So what do you understand this document
 9    to be?  It's headed "Response to IRA Information
10    and Document Request."  Is that a term of art in
11    the transfer pricing world?
12                    A.   Yes, in an APA setting, the IRS
13    issues IDRs.  These are questions, request for
14    information and data from the taxpayer.
15                    Q.   If you could, just take us through
16    the answer provided under item 5 there and explain
17    if that coheres with what you were explaining
18    before.
19                    A.   Okay.  Would you like me to read
20    the whole thing or summarize it?
21                    Q.   I think the first two paragraphs
22    are introductory.
23                    A.   Okay.  So the third paragraph
24    says:
25                         "Under the R&D CSA, each
```



1   participant obtained certain rights

2   with respect to its share of the

3   intangibles developed under the CSA.

4   Specifically, a CSA participant

5   obtained a royalty-free license to

6   use the technology developed under

7   the CSA.  With the CSA termination,

8   such former participants are deemed

9   to have acquired a fully paid up

10  license permitting the former

11  participant to continue to exercise

12  the rights it obtained under the

13  CSA.  As such, no buy-out payment is

14  necessary because each former CSA

15  participant continues to own the

16  rights it acquired during the CSA

17  upon CSA termination.

18       In addition, under the RPSM, each

19  former CSA participant receives

20  compensation for such rights through

21  the application of the capitalized

22  R&D factor to attribute residual

23  intangible profits to the former CSA

24  participants."

25  That's a little technical but what that



```
 1   last paragraph means is the capitalized R&D stock
 2   was essentially a right to one vintage's return
 3   stream, one vintage of R&D's return stream over
 4   about five years, at which time it was essentially
 5   gone.
 6              Now, recognize at this time the parties
 7   were using a 30 percent decay rate, so I'm using
 8   five years as rough justice.  But this clearly
 9   indicates that we're talking about license rights
10   that the parties had.
11              Q.   Thank you.  Just returning to your
12   slide 9, sir, items 2 and 3 where you have stated:
13              "Responsibility for making and
14              receiving buy-in/buy-out payments
15              rests with NNL, and compensation
16              only for license rights when a
17              licensee leaves the MRDA."
18              Why have you referenced these factors
19   under your discussion of evidence of their limited
20   economic -- licensees' limited economic ownership?
21              A.   Well, this is entirely consistent
22   with a licensor retaining certain residual
23   interests.  Under the MRDA, NNL had responsibility,
24   as I say here, for making and receiving
25   buy-in/buy-out payments.
```



1            Let's talk about buy-in payments first.

2    There is a concept of a special balancing payment

3    in the MRDA.  That is a payment to be made to NNL

4    by a new participant.

5            So let's say that, I don't know,

6    Mongolia decides that it's performed R&D for a few

7    years, it wants to be a participant in the Nortel

8    RPS.  So it raises its hand and says, "I'd like

9    in."  And to do so, it makes a payment to NNL, not

10   to the other participants.

11           Now, you would think that if this thing

12   was, in fact, a joint venture, the payment would

13   have been made to all of the participants, but it

14   wasn't.  The payment was specified to go to NNL.

15           Correspondingly, responsibility for

16   buy-outs rested with NNL.  And that is consistent

17   with the retention of the rights that a licensor

18   would retain.  A licensor would want to buy out the

19   licensee so that those rights again rested with the

20   licensor, so that he or she could license them out

21   again.

22           So that's why I think that's of

23   particular note.

24           Q.   And your observation at the bottom

25   of the slide, you say this tells us the:



```
 1                        "RPEs did not economically own
 2                    anything beyond a license interest
 3                    [and] predictions regarding tax
 4                    authorities' views of economic
 5                    ownership from the proceeds from
 6                    dispositions are incorrect."
 7               I think you have discussed the first
 8    conclusion sufficiently.  Maybe you could just
 9    expand on the second?
10               A.   Sure.  Let me just note, by the
11    way, item 3, "Compensation Only For License
12    Rights."
13               Q.   Sure.
14               A.   I'm pointing out there that the
15    compensation is for license rights.  So the
16    compensation we're talking about in these
17    buy-in/buy-out provisions is compensation for
18    license rights.
19               So what does this tell us?  Again it
20    tells us that the RPEs through their course of
21    conduct did not economically own anything beyond a
22    license interest.  Again what I'm doing here on
23    this slide is I'm saying well, what's the evidence,
24    right?  I'm talking in general terms about economic
25    ownership, economic ownership of intangibles,
```



1    licensing as a form of economic ownership.  Well,

2    do we see that here?

3              And indeed we do.  I noted it several

4    times in my report.  The other experts have not

5    spoken to this for whatever reason.

6              But we have, in my opinion again,

7    evidence from the course of conduct, particularly

8    that transition, that the interest was a limited

9    interest and in addition, we have evidence

10   regarding tax authority behaviour.  We have a lot

11   of predictions in this case made about how tax

12   authorities would behave.  Gee, what would tax

13   authorities do if they saw NNL, for example,

14   retaining residual rights as the Canadian Debtors

15   contend that it should?

16             Well, we have an example of that and we

17   have an example of the IRS deeming the licensees to

18   hold limited rights.  And that much is clear,

19   again, from the course of conduct.  So it

20   falsifies, in my opinion, these predictions.

21             Q.   Dr. Reichert, could we turn,

22   please, to slide 10 of your demonstrative, which

23   you've headed "Economic Ownership Did Not Lapse."

24   And I notice in the first paragraph there you

25   state:

 Neeson&Associates    W&F

 1                    "It has been suggested that I

 2               posit a 'hypothetical and

 3               non-commercial scenario in which the

 4               RPEs' economic ownership under the

 5               MRDA lapses and legal title alone

 6               becomes the determining factor.'"

 7               And you've referenced that's a

 8     statement from Dr. Felgran's Rebuttal Report.

 9               A.   Yes.

10               Q.   Why do you feel it's important to

11     address that here?

12               A.   Well, first of all, I make no such

13     statement and don't put forward such a scenario.  I

14     talk at length about the importance of economic

15     ownership.  I think I've stated on the record that

16     the extent of the licensees' rights, whatever the

17     courts decide those were, those rights should, to

18     the extent that they have implications for the

19     asset sales, and the asset sales -- meaning the

20     line of business sales, the residual IP sales --

21     involved those licensees' rights.  Of course the

22     licensees should be compensated.

23               I've talked about, for example, the

24     line of business buyers stepping into the shoes of

25     the licensees' interests, the interests that were



```
 1    surrendered by the licensees.

 2              Now, I say here that the income stream

 3    that the licensees are entitled to, i.e. the RPSM

 4    payments cease, and the income stream ceases

 5    because the businesses have been sold, of course.

 6    But the rights to share, not because the rights to

 7    share in that income stream lapse.

 8              Nor do I say the licenses terminate.

 9    As I say here, the court will decide the extent to

10    which the licenses entitle the licensees to a share

11    in the IP sold in the line of business sales and

12    the Rockstar sale.

13              Q.   Sir, when we were going through

14    your four key principles that you outlined here

15    earlier, you spoke to some extent about legal

16    arrangements.  And we see at slide 11, 12, 13 that

17    you specifically reference the legal arrangements

18    and the presumption in favour of legal arrangements

19    and so forth.

20              So perhaps, just fairly briefly by way

21    of overview on slide 11, you could take us through

22    your proposition there, and why you have excerpted

23    what you have from OECD, and I take it the last one

24    is what you referenced as the reg. 482 provisions,

25    right?
```



```
 1                    A.    That's right.   Okay.   So as I
 2      mentioned earlier, in my view if there is a
 3      presumption in transfer pricing guidance and
 4      regulations, it's a presumption in favour of the
 5      legal arrangements actually structured by the
 6      parties.
 7                    I have some quotes here that I think
 8      are important for the court.   I start with a quote
 9      from paragraph 1.64 of the 2010 OECD guidelines.
10      It says:
11                         "A tax administration's
12                         examination of a controlled
13                         transaction ordinarily should be
14                         based on the transaction actually
15                         undertaken by the associated
16                         enterprises as it has been
17                         structured by them...in other than
18                         exceptional cases, the tax
19                         administration should not disregard
20                         the actual transactions or
21                         substitute other transactions for
22                         them."
23                    That's very, very strong language and I
24      think it means what it says.   In fact, the OECD
25      goes on in the next quote to expand on what is
```



1    meant by "exceptional."

2              So they say in chapter 9, when

3    referring back to these paragraphs that talk about

4    respect for the parties' arrangements, they say:

5                    "Paragraphs 1.64-1.69

6                    explicitly limit the non-recognition

7                    of the actual transaction or

8                    arrangements to exceptional cases...

9                    the word 'exceptional' in this

10                   context is similar in meaning to

11                   'rare' or 'unusual.'"

12             So to the degree that the OECD felt the

13   need to explain further what's meant by "unusual",

14   it does so here.

15             I also include a quote from section

16   482.  This is actually cited, I believe, in the

17   Veritas case, which is an interesting case, I think

18   for us here.  Because in the Veritas case, the IRS

19   was contending something very similar, I think, to

20   the EMEA and US Debtors' contentions here.

21             The IRS was contending that what the

22   parties had structured as the sale of a defined

23   asset, in fact, a wasting asset that looked a lot

24   from an economic perspective like what we have

25   here, was in fact akin to a business and the



1    transfer of that asset was akin to the sale of a

2    business.

3                The Tax Court said no, no, no, no.  The

4    structure is that of a license arrangement,

5    five-year life on the license -- or rather

6    four-year life on the license interest involved,

7    and it cited this, and in fact I'll note that the

8    US Tax Court cites this language numerous times.

9    So if you'd like I can read it.  It says:

10                    "The Commissioner will evaluate

11                    the results of a transaction as

12                    actually structured by the taxpayer

13                    unless its structure lacks economic

14                    substance."

15                Just one more comment if I may on this.

16    I have worked for the IRS as an expert in a case

17    that involved substance and form, and I can tell

18    you that there is a tremendous amount of

19    trepidation on the part of the IRS when it feels

20    the need to invoke its authority to disregard a

21    taxpayer's form in favour of substance.

22                And in that case the issue went all the

23    way up to really the very top levels of the IRS and

24    the IRS decided to walk away.

25                Q.   Dr. Reichert, on slide 12 you



```
 1   continue on your point about the presumption in
 2   favour of legal arrangements.  But you say here:
 3                  "Whether the structure of the
 4                  transaction is one you would see in
 5                  the open market, is the wrong
 6                  question."
 7                  And why do you raise that point there?
 8                  A.   Well, so the point here, I'm
 9   really making two points on this slide.  The point
10   here is that this presumption in favour of form --
11   now, I want to be clear, it's a presumption in
12   favour of form.  There is a test, we'll get to it
13   in a moment, for disregarding the transactions.
14                  But this presumption extends to
15   transaction structures we don't see in the open
16   market, and that's another thing you see a lot of
17   in this case.  You see a lot of the opposing
18   transfer pricing experts making statements like oh,
19   I've never seen this before, it doesn't make any
20   sense because I've never seen it before.
21                  But as I noted, and as I discuss at
22   some length in my reports, we shouldn't expect to
23   see some of the things we see inside of a
24   multinational in the open market, and the
25   presumption of favour and form extends to those
```



```
 1   precisely because we shouldn't expect to see a

 2   perfect coherence between market transaction

 3   patterns and transaction patterns inside the firm.

 4           If you'd like, I can read some of the

 5   quotes we have here, one of which I think I may

 6   have already read:

 7               "MNEs are free to organise

 8               their business operations as they

 9               see fit.  Tax administrations do not

10               have the right to dictate to an MNE

11               how to design its structure."

12           And the point I was making a moment

13   ago:

14               "Associated enterprises are

15               able to make a much greater variety

16               of contracts and arrangements than

17               can independent enterprises because

18               the normal conflict of interest

19               which would exist between

20               independent parties is often

21               absent."

22           In other words, transaction costs,

23   frictions are much lower inside the multinational.

24           I said this slide is making two points.

25   The second point is despite all of that, in my view
```



1   what we see in the Nortel RPS, at least with

2   respect to this retention of residual rights and

3   benefits by NNL, is not at all inconsistent with

4   what we see in the open market.

5                   So despite the fact that it's important

6   or given that it is still important to point out

7   the presumption for form extends to transaction

8   patterns we don't see in the open market, it may be

9   the case that the transaction pattern we see here

10  is entirely consistent with at least the component

11  of it that seems to cause the most concern for the

12  EMEA and US Debtors.  It is consistent with what we

13  see in other market arrangements.

14                  Q.   Thank you.  You referenced the

15  threshold in transfer pricing for disregarding the

16  actual arrangements a couple of times.  I take it

17  your slides 13, 14, 15 and 16 speak to that point;

18  is that right?

19                  A.   They do.

20                  Q.   All right.  Perhaps if you could

21  start with your slide 13, where you state in the

22  body of that slide that:

23                      "OECD establishes a high

24                      threshold for diverging from an

25                      MNE's actual legal arrangements."



1                    And you state that there's a

2    two-pronged test.  Could you just as an overview

3    take us through that test?

4                    A.    It's a two-pronged test.  It's an

5    "or" test; it's not an "and" test.  The second

6    prong is actually an "and" test.  Either of these

7    two prongs or these two thresholds, if you cross

8    that threshold, form can be disregarded, okay?

9                    Again, the second test is itself an

10   "and" test.  Both conditions as I read the

11   guidelines must be met, okay?

12                   So the first is straightforward.  It's

13   substance and form coherence, and then the second

14   is that the transaction must be commercially

15   irrational and practically impedes the tax

16   authority's ability to determine an arm's length

17   price.

18                   So in another part of the guidelines

19   what they say is "commercially irrational such

20   that" -- I believe it's in an example --

21   "commercially irrational such that the arrangement

22   practically impedes the tax authorities' ability to

23   determine an arm's length price."

24                   We know that couldn't have been the

25   case right?  The RPS was suggested to, quite



 1    strongly, the participants by the tax authorities.

 2    The tax authorities asked for the Nortel RPS.

 3              So it seems clear, I think, that the

 4    inquiries should end there as to commercial

 5    irrationality.

 6              Q.    Turning, sir, to your slide 14, I

 7    take it this is where you have at least outlined an

 8    application of the economic substance test or

 9    threshold to the Nortel arrangements.  Is that

10    correct, my understanding?

11              A.    That's correct.

12              Q.    Maybe just take us through that.

13              A.    So when the guidelines talk about

14    economic substance, they talk about these four

15    things in particular.  They talk about functions,

16    risks and assets.  I summarize that with

17    characteristics, so talking about the

18    characteristics in this case of NNL.

19              There is a question that's been on the

20    table as to whether NNL was in fact a bona fide

21    licensor.  What did it do to be the licensor?

22              First let me say it would be very odd,

23    I think, to take the position that NNL didn't have

24    the marks and characteristics, it didn't bear the

25    marks of a licensor if you're asserting that NNL



 1   was a joint venture participant in a joint venture,

 2   particularly knowing that it's the parent entity.

 3          Because if NNL bears the marks and

 4   characteristics of a full joint venture

 5   participant, essentially a full business, it ought

 6   to also, it seems to me, bear the marks of a

 7   licensor.

 8          But NNL did do a number of things to --

 9   that are consistent with the role of a licensor.

10   It was, as I said, it was the parent.  That doesn't

11   necessarily mean that NNL was the licensor and

12   owned the residual rights, but in point of fact

13   that is -- that is commonly how it works with a

14   multinational.

15          Normally if there hasn't been some kind

16   of IP migration, that's a buy-in or buy-out by

17   another party in the multinational, another

18   controlled affiliate of residual interests, they

19   remain in the parent.  It's usually the parent that

20   has and controls those.

21          NNL certainly incurred more R&D in some

22   years than all the other participants combined, had

23   more R&D personnel than anyone else in the system.

24   As Dr. Cooper has pointed out at some length in his

25   claims report, it directed and controlled R&D, the



1    restructuring of R&D, made key strategic decisions

2    about R&D.

3                   NNL entered into arrangements with the

4    contract manufacturer.  That's very common, by the

5    way, and the distributors, by the way, but that's

6    very common for a licensor to do.  It retained the

7    trademark and associated goodwill, yet again

8    something you commonly see in a technology

9    licensor.

10                  So I think there's very little question

11   that the marks of a licensor enured in NNL.

12                  So moving on then to the next two

13   facets of this economic substance test.  Commercial

14   and economic context, and object and economic

15   effect, okay.  These two things go together.  The

16   commercial and economic context you find yourself

17   in should influence the object or the motivation

18   and economic effect of the arrangement you put in

19   place.

20                  So what was that commercial and

21   economic context?  Well, we had a rapidly

22   depreciating R&D asset, didn't we?  All the

23   parties, I think, agree to that.  That asset was

24   also quite volatile.  We know that.  And so, what

25   did that mean?  It meant that the licensees were



1    entering into a license arrangement that was

2    predicated on, their make/sell rights were

3    predicated on a rapidly depreciating asset that was

4    somewhat volatile.

5              So what did the Nortel RPS do in that

6    context?  It said, you know what, we're going to

7    recognize the risk inherent in your make/sell

8    product, make/sell grant, and we're going to give

9    you a hundred percent of the residual profit.

10   We're going to allow you to take on this make/sell

11   grant essentially at cost, at the cost of the R&D,

12   and thereby give you the full incentive to invest

13   in R&D and get out there and make and sell

14   products.

15             That's my reading of what's going on in

16   the license arrangement, in the substance of that

17   arrangement.

18             And then I've already talked about

19   course of conduct.  I think that the course of

20   conduct is entirely consistent with the substance

21   of the arrangement.

22             For all these reasons I think form and

23   substance very much cohere.  The Nortel RPS to me

24   makes sense as a licensing arrangement.

25             Q.   Thank you.  I understand, Your

 Neeson & Associates    W&F

```
 1   Honours, that there is a technical issue with the
 2   slide deck perhaps not showing up on the screens.
 3   Can we continue just with the hard copies?
 4                  THE US COURT:  Sure.
 5                  MR. SMITH:  Thanks.
 6                  THE WITNESS:  I'm comfortable with the
 7   hard copy.
 8                  BY MR. SMITH:
 9                  Q.   Dr. Reichert, at page 15 of your
10   slide demonstrative, you turn to the commercial
11   rationality threshold, the second threshold that
12   you spoke about.
13                  You referenced already that in your
14   view, the second part of that threshold is not met
15   in terms of impedance of the tax authorities.
16                  Perhaps you could just briefly take us
17   through the first part of that test.
18                  A.   Okay.  So, the OECD guidelines say
19   the following.  They say:
20                       "Where reliable data show that
21                       comparable uncontrolled transactions
22                       exist, it cannot be argued that such
23                       transactions between associated
24                       enterprises would lack commercial
25                       rationality.  The existence of
```



```
 1                comparables data evidencing arm's
 2                length pricing for an associated
 3                enterprise arrangement demonstrates
 4                that it is commercially rational for
 5                independent enterprises in
 6                comparable circumstances."
 7                    The OECD then goes on to say:
 8                    "In transactions between
 9                independent enterprises [we have
10                quoted this earlier], arrangements
11                are observed where the transferor or
12                licensor retains the full right to
13                any enhancements of the licensed
14                intangible that may be developed
15                during the term of the license."
16                    What I am saying is here the OECD
17       recognizes we see these arrangements in the open
18       market that have the feature that is troublesome to
19       the EMEA and US Debtors.  And the OECD says when we
20       can see the same behaviour in the open market, that
21       behaviour is not commercially irrational in a
22       controlled context, okay?
23                    Now, I will note that this says
24       comparable, uncontrolled transactions.  I'm not
25       asserting that we've found or I found comparable,
```



```
 1   uncontrolled transactions that are perfect

 2   comparables here, but I do believe that we see in

 3   the open market the kind of behaviour that is

 4   viewed to be irrational.  And the OECD recognizes

 5   that when you see it in the open market it can't be

 6   deemed to be irrational in a controlled

 7   transaction.  That's the first point I'm making on

 8   this slide.

 9              Would you like me to continue?

10              Q.   Sure.  Continue a discussion of

11   the rationality threshold.

12              A.   So the point I make next is that

13   Nortel's RPS --

14              THE CANADIAN COURT:  Just before you do

15   that, can I ask you a question about the second

16   bullet point?

17              THE WITNESS:  Yes, sir.

18              THE CANADIAN COURT:  This is a quote

19   from the OECD.  Does that say -- is that purporting

20   to say that whoever drafted the OECD has, in fact,

21   observed transfer licensor retaining full right to

22   any enhancements, or is it setting out what the

23   test might be?

24              THE WITNESS:  I believe that it's --

25   that's a very good question.  This is the OECD
```

 Neeson&Associates   W&F WILSON & PETZER LTD.

1    stating that these transactions are observed.

2              THE CANADIAN COURT:  That they have

3    observed them?

4              THE WITNESS:  I believe so, yes.

5              THE CANADIAN COURT:  Thank you.

6              THE WITNESS:  Does that answer your

7    question, Your Honour?

8              THE CANADIAN COURT:  It does.

9              BY MR. SMITH:

10             Q.   All right.  So you go on in your

11   slide 15, you've already mentioned the impedance

12   point before, and then you reference here that the

13   licensees were not only NPV, which I take is it net

14   present value greater than zero, they received all

15   of the operating profit in the system.  I think you

16   referenced this idea in a slightly earlier,

17   different context earlier?

18             A.   So again, the test is an "and"

19   test.  Commercial irrationality such that and

20   impedes the tax administration's ability to

21   determine an arm's length price, and as I say here,

22   the RPSM was proposed by the tax authorities,

23   designed in large part by them and with them.

24             And this is why I talk about APA's in

25   my report, my first report.  Because in an APA

1   setting, as the OECD guidelines say, there is a

2   free flow of information.   There is a tremendous

3   transparency in an APA context.

4            So I think it's very, very hard to

5   conclude that the Nortel RPS somehow impeded the

6   tax authority's ability to examine and evaluate the

7   structure, and in my view, that should end the

8   inquiry with regard to commercial rationality.

9            Q.   All right.

10           A.   I also say at the bottom of this

11   slide, I make another point, and that is that I

12   talk a lot about the arrangement being net present

13   value greater than or equal to zero in my report,

14   in my analysis.   And what I say is look, these guys

15   were investing in R&D, the company was making

16   decisions to invest in R&D.

17           And it doesn't make sense to assume

18   that the company was investing in that R&D when

19   they entered into this arrangement in 2001 in the

20   hopes of selling it in some monetization

21   transaction like the Apple/Rockstar transaction.

22           Thus they must have felt that R&D was

23   NPV positive, that it was a worthwhile investment

24   to have made.   And I've sort of been criticized by

25   some of the other experts as not kind of telling



1    the whole story, that I'm not also pointing out

2    that well, really, economic rationality requires

3    that you're choosing the best arrangement available

4    among all the alternatives available to you.

5              And, of course, that's true and that's

6    why I say virtually in the same breath in the very

7    next paragraph in my report that oh, by the way,

8    the Nortel RPS participants received 100 percent of

9    the residual profit in the system.

10             So if there is a bargaining range

11   between NPV zero and a hundred percent of the

12   residual profit, the RPS participants got a hundred

13   percent of the residual profit.

14             So it seems to me that on that basis as

15   well, we're fully consistent with commercial

16   rationality.

17             Q.   Thank you.  And slide 16 of your

18   demonstrative, I take it, is simply your

19   conclusions that you've already told us about here

20   on the two possible exceptions to the presumption

21   in favour of legal arrangements, correct?

22             A.   That's right.  This is just

23   stating the conclusion.

24             Q.   And sir, there's three slides left

25   or four, I guess.  Slides 17 and 18 are also, also



```
 1    reference the legal arrangements in your heading.

 2    Perhaps you could just take us through those and

 3    why you're making these points to the court today.

 4                      A.    Okay.  So look, there's a very

 5    good reason why this presumption in favour of form

 6    exists in transfer pricing.  And it's discussed by

 7    the OECD guidelines.  If we depart from this most

 8    fundamental piece of evidence as to what these

 9    parties were doing, i.e. the legal structure of the

10    contract, we end up in what I refer to in my report

11    as the wild west colloquially.  But the way the

12    OECD guidelines state that is, they say:

13                      "Restructuring of legitimate

14                      business transactions would be a

15                      wholly arbitrary exercise, the

16                      inequity of which could be

17                      compounded by double taxation

18                      created where the other tax

19                      administration does not share the

20                      same views as to how the transaction

21                      should be structured."

22                      And in a lot of respects, that's

23    exactly where the other transfer pricing experts in

24    this case have landed, wildly competing visions as

25    to what this thing is.
```



 1                 They're inserting, in my opinion, their

 2    own interpretations of the arrangement when, in

 3    fact, the OECD warns us that it's a very dangerous

 4    thing to disregard form, precisely because you end

 5    up in this world where everyone is positing their

 6    own vision of what this arrangement was.  It's very

 7    easy to use economic theory to do lots and lots of

 8    things and make lots and lots of arguments, and I

 9    think the OECD guidelines in particular make

10    reference to the importance of sticking with what

11    it is these parties were doing so that we can guide

12    an economic analysis.

13                 The role of the economist, if we do not

14    cross these two thresholds, is to price the

15    transaction that the parties have actually

16    structured.

17                 Q.   And sir, you reference on this

18    slide Dr. Cooper's housing example, which you

19    alluded to briefly before, and I think, if I recall

20    correctly, you also had a lottery ticket example if

21    you recall that.

22                 What's your view of how positing those,

23    I'm not sure what you'd call them, alternative

24    structures, how that fits into your statements here

25    about the risk of ignoring the actual arrangements?



 1                     Okay.  Well, I think it's an example of

 2     exactly what we're talking about.  Those are both

 3     examples consistent with the idea that I believe

 4     Dr. Cooper has put forward that what we have here

 5     is a joint venture or a partnership, despite the

 6     fact that the arrangement explicitly says this is

 7     not a joint venture, this is not a partnership, nor

 8     is it, by the way, a principal/agent relationship

 9     so it's going to be something in the middle.  It is

10     what it says, it's a license arrangement.

11                     I close this slide with just one

12     statement here:

13                         "To say that a party's

14                         resources have been used to develop

15                         or acquire an asset says nothing

16                         about the nature of that party's

17                         interest. [Again], it's the legal

18                         structure of the relationship

19                         (lender, tenant, partner, et cetera)

20                         that determines the legal interests

21                         of the parties and their rights on

22                         the disposition of the asset."

23             Q.    And flipping over to 18 of your

24     demonstrative, sir, here you reference in your

25     heading "The Risk of Legal Arrangements:



 1   Inconsistency," and you have two columns, "Claims"

 2   and "Allocation."  What are you telling us there?

 3              A.   Well, so I think because of the

 4   way this proceeding is bifurcated in a way that we

 5   normally wouldn't see as transfer pricing

 6   economists, for example, in the US Tax Court,

 7   bifurcated as between claims and allocation, I

 8   think there's a particular risk of inconsistency as

 9   between the characterizations of the relationship

10   taken in the claims portion versus the allocation

11   portion, and something, if I can presume to do so,

12   I'd like to alert the courts to.

13              We see, for example, in Dr. Cooper's

14   analysis for claims purposes he says that NNL

15   controlled the licensees.  He said that NNL

16   directed key functions, the restructuring, for

17   example.  It directed key decisions as to when

18   vendor financing, financing of large transactions

19   should take place.

20              He goes so far as to say that NNL

21   should pay the licensees' restructuring costs.  The

22   OECD talks about "own" operational costs that if

23   you're in any respect an entrepreneur, even if

24   you're a fully fledged but routine entity, you have

25   your own operational costs.  When we benchmark an



1   entity with something in the open market those

2   things we her benchmarking it with, those firms or

3   licensees or licensors that we're benchmarking

4   with, they have their own operational risks.

5              Dr. Cooper, when he refers to the

6   licensees and the claims analysis, he refers to

7   them as "participants."

8              By contrast, when we look to the

9   allocation discussion, NNL and the licensees have

10  equal rights and equal functions and we have a

11  joint venture in place.  The licensees are instead

12  referred to as "entrepreneurs," and no mention is

13  made of control and direction by NNL.  We're all in

14  this thing together for purposes of allocation, but

15  not for claims.

16             I think that is happening precisely

17  because we're departing from the form of the

18  relationship.

19             Q.   Thank you.  Finally, sir, on 19

20  and 20 of your demonstrative you reference this

21  concept that we heard about in testimony at this

22  trial from Dr. Cooper of a "deep dive" by tax

23  authorities.

24             Can you just take us through your

25  points here and what your thoughts are on Dr.



 1   Cooper's notion of a "deep dive" as he testified
 2   to?
 3                A.   So Dr. Cooper has said that the
 4   five-year life would be tossed out by tax
 5   authorities.  Let me say that the five-year useful
 6   life period used in the Nortel RPS was robust.  I
 7   considered all of the R&D investment and all of the
 8   R&D capital in my analysis, and I examined the
 9   economic useful life of that R&D capital from five
10   or -- I think six or seven different directions all
11   converging on the same answer.
12                Dr. Cooper disagrees.  He says that the
13   line of business sales and the residual IP sale
14   would trigger a deep dive.  He doesn't specify an
15   economic life.  I believe he adopts
16   Mr. Malackowski's analysis, but he says that tax
17   authorities will do a deep dive.
18                Now, deep dive, I realize in fairness
19   to Dr. Cooper, he's using that in a colloquial or
20   informal sense.  It is not a term, or concept,
21   however, that arises formally in transfer pricing
22   and in fact there is a notion that is fairly close
23   to this deep dive notion that is available to us as
24   a formal notion in transfer pricing, and this is
25   the commensurate with income standard.

 Neeson & Associates   W&F WILSON & PEYZER LTD.

```
 1                    So what is the commensurate with income
 2    standard?  The IRS -- it has been recently been
 3    clarified.  The IRS was for a time asserting that
 4    the commensurate with income standard, the
 5    commensurate with income language in the regs, gave
 6    it the authority to first of all replace the arm's
 7    length standard.  They said that the commensurate
 8    with income standard replaced the arm's length
 9    standard in certain contexts.
10                    THE REPORTER:  Sorry, could you slow
11    down a little bit please.
12                    THE WITNESS:  Excuse me, I'm sorry.
13    They said that in certain contexts, in particular
14    intangible asset transfers -- okay.  Sorry about
15    that.
16                    So the IRS contention was that we've
17    replaced the arm's length standard in those
18    contexts.  And in fact what the commensurate with
19    income power allows us to do is import these ex
20    post considerations, import ex post considerations
21    into a bargain that was struck years in the past,
22    ex ante.
23                    Even if those ex post considerations
24    could not reasonably have been known or knowable to
25    the parties to that arrangement, okay?  That's a
```


Neeson & Associates    W&F

 1    very, very big claim and taxpayers were extremely

 2    worried about it.

 3             So the issue was litigated in the

 4    Xilinx case and the decision by the Tax Court has

 5    resulted in clarification by the IRS, and the

 6    clarification basically says:

 7                  "In determining the price for a

 8                  controlled intangible transfer under

 9                  the commensurate with income

10                  standard, a key consideration is the

11                  profit potential of the intangible

12                  which uncontrolled taxpayers would

13                  have reasonably anticipated...as of

14                  the time of the transfer."

15             Commensurate with income, the IRS has

16    no authority to apply ex post considerations when

17    analysing intangible transactions after the fact.

18             I can tell you that I have dealt with

19    this issue outside of the United States as well in

20    a matter before the Israeli tax administration,

21    Israeli tax authority.  They would take exactly the

22    same position, and as I understand it have had

23    economists in APA proceedings, CRA, Canadian

24    economists, say Canada does not have any

25    commensurate with income or ex post repricing



1    authority.

2              The question, of course, is at arm's

3    length what happens, when parties enter into a

4    deal, they strike that deal given the best

5    information available to them at that time.

6              Q.   And on your final slide 20, sir,

7    you make a couple of observations under the same

8    topic and you state that:

9                   "In considering the appropriate

10                  useful life for the purposes of the

11                  RPSM I was required to consider, and

12                  did consider, all R&D investment."

13                  What point are you making there?

14             A.   I'm making the same point I made

15   on the earlier slide, that I'm looking at all of

16   the R&D capital.  Why?

17             Because all of the R&D capital stock is

18   giving rise to the residual profit, right?  You

19   want the capital stock to correspond both in terms

20   of its nature -- so the things that give rise to

21   the residual profit should be in the capital stock

22   -- which is more than just IP.  And with respect to

23   matching in time, which means the useful life of

24   the R&D investments should correspond to the time

25   horizon over which that R&D gives rise to residual



```
 1   profits.

 2               That's what I'm talking about here and

 3   that's what I did.

 4               Q.   Could you just take us through

 5   your second point on slide 20?

 6               A.   So I'm simply pointing out that if

 7   one were to consider the respective R&D

 8   contributions to IP, so when one looks at, for

 9   example, Mr. Malackowski's analysis, he's really

10   looking to IP, the patents.

11               And so if the question on the table is

12   what are the various R&D contributions to IP

13   actually sold in a transaction, it would be

14   necessary to exclude from that calculation any R&D

15   investment that doesn't, in fact, contribute to

16   that IP.  That's all I'm saying.

17               MR. SMITH:  Dr. Reichert, thank you.

18   Justice Newbould, Judge Gross, thank you very much.

19               THE CANADIAN COURT:  Why don't we take

20   the morning break.  We'll take 20 minutes.

21    -- RECESS AT 10:37 --

22    -- UPON RESUMING AT 11:07 --

23               THE US COURT:  Thank you, everyone.

24   Please be seated.

25               MR. ZELBO:  Good morning, Justice
```



1    Newbould, and good morning, Judge Gross.

2              THE US COURT:  Good morning, Mr. Zelbo.

3

4    CROSS-EXAMINATION BY MR. ZELBO:

5              Q.   And good morning, Dr. Reichert.

6              A.   Good to see you again, Mr. Zelbo.

7              Q.   Can you hear me okay?  I've been

8    accused of not speaking up at times.

9              THE US COURT:  Yes.

10             MR. ZELBO:  Thank you, Judge Gross.

11             BY MR. ZELBO:

12             Q.   It's nice to see you again, we met

13   at your deposition.

14             A.   It's good to see you as well.

15             Q.   As you know, I am from Cleary

16   Gottlieb representing the US Debtors.

17             Dr. Reichert, I believe you testified

18   on direct, and I think you probably say it in your

19   slides, that the legal arrangements between the

20   parties should be respected; is that correct?

21             A.   Yes, it is.

22             Q.   So the first question would be to

23   know what the legal arrangements between the

24   parties are.

25             A.   That's right.



```
 1                    Q.   And you're not here to provide a
 2    legal analysis of the parties' rights under the
 3    MRDA, of course?
 4                    A.   No.
 5                    Q.   That's for the courts, right?
 6                    A.   That's correct.
 7                    Q.   And to be clear, Dr. Reichert, in
 8    your report you were not asked to make any
 9    assumptions about the scope of the licenses in the
10    MRDA, were you?
11                    A.   I was not.
12                    Q.   Okay.  I want to show you
13    paragraph 13 from the Monitor's April 11th, 2014
14    motion to strike certain expert reports.  Can we
15    get that up on the screen?  And do we have a copy
16    for the witness?
17                    We may not need a copy.  Dr. Reichert,
18    are you comfortable just looking at it here?  This
19    won't be long.
20                    A.   Sure.
21                    Q.   If you want it we can get it.
22    It's just one sentence though.  I just want to look
23    at the last sentence of this paragraph.  It says --
24    last two sentences, sorry, I didn't mean to lead
25    you astray there:
```

 Neeson & Associates   W&F

```
 1                    "To conduct his economic

 2              analysis, Dr. Reichert relied on

 3              assumptions that the movants

 4              provided and that reflected the

 5              movants' allocation position."

 6              Do you see that?

 7         A.   I do.

 8         Q.   Is that accurate?  Is that an

 9    accurate representation to the courts?

10         A.   It's really not, no.

11         Q.   Because, in fact, you don't list

12    any assumptions provided to you in your reports,

13    right?

14         A.   I don't know if I list assumptions

15    in the report anywhere.  There are a lot of pages

16    here.  If you could help me to understand what --

17    perhaps what section you're referring to?

18         Q.   It's okay.

19         A.   You mean assumptions with respect,

20    Mr. Zelbo, to --

21         Q.   Sorry, Doctor, it's okay.  You

22    told me the Monitor's counsel didn't give you

23    assumptions.  We can leave it at that.

24         A.   Okay.

25         Q.   Now, your understanding of the
```



1  scope of the license grant is based on your having

2  read the MRDA, right?

3          A.   It's based upon my having read the

4  MRDA, examined it in light of the facts surrounding

5  it.  As I mentioned during my deposition, it's also

6  based upon a review of third party arrangements

7  that may be similar to it in some respects.  It's

8  based upon those kinds of considerations.

9          Q.   Well, we'll get to third party

10 arrangements, but I thought you had told me in your

11 deposition, and we can go there if you want, Dr.

12 Reichert, that the only thing your understanding of

13 the scope of the licenses was based on was your

14 reading of the MRDA.  I'm happy to show you the

15 testimony if you dispute it?

16         A.   I'm pretty sure what I told you in

17 my testimony was that I did read the MRDA.  And I

18 also mentioned during the course of that discussion

19 that I did several other things.  For example, I

20 mentioned that I looked to third party agreements.

21         Q.   Why don't we put up the deposition

22 page 39, line 23 to 41, line 13.  Can you give me a

23 second to pull up the dep?

24         THE CANADIAN COURT:  Mr. Zelbo, do you

25 have a copy of that deposition for me?



```
 1                    MR. ZELBO:  Can somebody hand the judge
 2     a copy of the deposition transcript, please?  Your
 3     Honour, should I wait or go on?
 4                    THE CANADIAN COURT:  You may need three
 5     people to carry it up here by the looks of it.
 6                    MR. ZELBO:  Sorry, I couldn't hear, I
 7     apologize.
 8                    THE CANADIAN COURT:  You may need three
 9     people to carry it from the looks of it.
10                    MR. ZELBO:  It wasn't that thick.  What
11     is that?
12                    THE CANADIAN COURT:  I have no idea,
13     but four-in-one would be lovely.
14                    MR. ZELBO:  You unfortunately don't get
15     the handy mini script that I have, but we can
16     obviously make one of those for Your Honour.
17                    THE CANADIAN COURT:  What page are you
18     on?
19                    MR. ZELBO:  I'm on page 39, starting on
20     line 23.  And actually you could start at line 20
21     where I quote something from his report.  And then
22     it goes on and just quotes his report on his
23     interpretation of the scope of the license, I'm not
24     going to read that.
25                    BY MR. ZELBO:
```



```
 1                    Q.   Then on line 13 I continue.  Do
 2   you see it, Dr. Reichert?
 3                    A.   Um-hmm.
 4                    Q.   "What is your understanding based
 5                    on?"
 6                    I'm asking what your understanding of
 7   the scope of the license is, as you say in your
 8   report on page 37.
 9                    And you say:
10                         "Well, having read the MRDA.
11                    Question:  Anything else.
12                    Answer:  Nope.  Perhaps some
13                    other things, but my primary
14                    understanding is certainly the
15                    reading of the MRDA.
16                    Question:  When you say 'perhaps
17                    some other things,' can you think of
18                    what they might be?
19                    Answer:  Yeah.  I -- you're
20                    essentially asking me to sort of
21                    recall the thought process and the
22                    reflection that I went through --
23                    Question:  That's correct.
24                    Answer:  -- in reading the MRDA,
25                    and perhaps I -- I worked through
```



```
 1            some other considerations.  But the
 2            fundamental and primary basis for
 3            what I say here is my reading of the
 4            MRDA.
 5               Question:  So sitting here today,
 6            when I ask what your understanding
 7            is based on, the only thing you can
 8            identify is your -- that you read
 9            the MRDA, right?
10               Answer:  Okay.
11               Question:  Was that a yes?
12               Answer:  Perhaps, yeah, I think
13            so."
14            A.   Okay.
15            Q.   That was truthful at the time,
16      right?
17            A.   It was, and you'll note from --
18            THE CANADIAN COURT:  Just wait a
19      minute.
20            MR. SMITH:  Your Honour, with respect,
21      I'm not sure there is a contradiction.  The
22      question asked at trial was, or the allegation was
23      that he said at deposition the only thing he relied
24      on, and that wasn't the question that my friend
25      just referred to.
```

 Neeson & Associates   W&F

1                    It says "sitting here today, can I ask

2       what your understanding is based on, and the only

3       thing you can identify is", and earlier he clearly

4       identified his thought process.

5                    MR. ZELBO:  May I continue, Justice

6       Newbould and Judge Gross?

7                    THE CANADIAN COURT:  Go ahead.  Go

8       ahead.

9                    THE US COURT:  Yes.

10                   BY MR. ZELBO:

11              Q.   Dr. Reichert --

12              A.   Mr. Zelbo.

13              Q.   -- in either of your reports, you

14      do not analyse the licensed participants'

15      sublicensing rights under the MRDA.  In fact, you

16      don't discuss the sublicensing rights; is that

17      correct?

18              A.   There are two parts to that

19      question.  The first is --

20              Q.   Well, how about I'll change the

21      question so it's only one part, how is that?

22                   THE CANADIAN COURT:  Just, you let him

23      answer.

24                   MR. ZELBO:  Sorry, Your Honour.  I was

25      trying to clarify.  It's fine.  I apologize.



```
 1                  THE CANADIAN COURT:  He's in the middle
 2   of his answer.  Go ahead.
 3                  THE WITNESS:  The first part was a
 4   statement that I did not analyse the sublicense
 5   rights and we went through that at some length
 6   during my deposition.  I noted to you that I felt
 7   my reading of the MRDA gave effect to the terms of
 8   the entire arrangement as a whole, holistically,
 9   and in that respect I did, indeed, analyse the
10   sublicense rights.
11                  BY MR. ZELBO:
12             Q.   Well, I actually asked if you
13   analysed it in your reports, but to make it
14   simpler, you don't discuss the sublicense rights in
15   your reports?
16             A.   And as I said during my
17   deposition, I do not discuss the sublicense rights
18   specifically, no.
19             Q.   And you don't discuss the licensed
20   participants' enforcement rights anywhere in either
21   of your two reports; is that correct?
22             A.   That's correct.
23             Q.   Can we turn to slide 6?  Do you
24   have your slides still in front of you?
25             A.   I believe so.
```



```
 1                   Q.   Let's turn to slide 4 first.   In
 2    slide 4, you say:
 3                        "In the tax context,
 4                        'ownership' reflects entitlement to
 5                        a defined income stream."
 6                   Do you see that?
 7                   A.   I do.
 8                   Q.   Then if we go to slide 6, just to
 9    put this in context, you then say in the first
10    bullet, excuse me, first bullet:
11                        "Transfer pricing employs a
12                        specific concept of ownership.
13                        Commonly used terms include:
14                        'Ownership,' 'economic ownership'
15                        and 'beneficial ownership.'"
16                   Do you see that?
17                   A.   Yes.
18                   Q.   And I think you said on your
19    direct that economic ownership and beneficial
20    ownership are essentially the same things,
21    essentially synonyms?
22                   A.   I said they're nearly synonyms and
23    I recognized that in other contexts they may not be
24    used as synonyms.
25                   Q.   Now, in your report, you note that
```



```
 1   the MRDA states that the intention that the

 2   licensees continue to hold and enjoy the rights

 3   they had under the Nortel CSA.  Do you recall

 4   saying that in your initial report?

 5                  A.   I believe I do.  I recognize your

 6   representing that I do.  I'll trust that --

 7                  Q.   I'm sorry.  Were you not finished?

 8   I apologize.

 9                  A.   I've finished.

10                  Q.   And when you say that the MRDA

11   states the intention that the licensees continue to

12   hold and enjoy the rights they had under the Nortel

13   CSA, I take it you're referring to the whereas

14   clause in the MRDA, and we can pull that up if

15   you'd like just to confirm that's what we're

16   talking about.  It's Exhibit TR21003.  It's the

17   second last clause.

18                  Do you see that?

19                  A.   I do.  Let me find it in the hard

20   copy if I may.

21                  Q.   Take your time.

22                  A.   Okay.

23                  Q.   Was that the second whereas

24   clause, the clause you were referring to in your

25   report when you say that the MRDA states that the
```

 Neeson & Associates    W&P Wilcox & Fetzer Ltd.

```
 1   parties intended to continue the rights, license

 2   rights under the CSA in the MRDA?

 3              A.   It's certainly this, yes.  There

 4   may have been other considerations as well.

 5              Q.   Now, you see -- keep that MRDA up

 6   just for a second, please, I'm sorry -- you see it

 7   refers to "enjoyed equitable and beneficial

 8   ownership of certain exclusive rights."  Do you see

 9   that in the whereas clause?

10              A.   Yes, I do.

11              Q.   Okay.  Is it your view that the

12   words "beneficial ownership" in the MRDA is

13   ambiguous?

14              A.   No, I don't think so.

15              Q.   So the courts can read that for

16   themselves as to what it means, right?

17              A.   Of course.

18              Q.   And you're not interpreting the

19   case law that exists in both Canada and the United

20   States with respect to what beneficial ownership

21   means for tax purposes?

22              THE CANADIAN COURT:  Didn't he say he

23   isn't doing a legal analysis of the agreement?

24              MR. ZELBO:  That's fine, Your Honour.

25   I just wanted to make sure he wasn't interpreting.
```



```
 1                    THE CANADIAN COURT:  If he's not doing
 2     a legal analysis, I guess he's not looking at the
 3     case law.
 4                    MR. ZELBO:  You know what?  That's
 5     totally fair.
 6                    BY MR. ZELBO:
 7              Q.   I would like to look at -- I want
 8     to ask you a question.  You talk about economic
 9     ownership in your report as a bundle of sticks,
10     right, and you can parcel out the different sticks,
11     right?
12              A.   I do.  I actually talk about
13     property.
14              Q.   Property?
15              A.   As a bundle of sticks.
16              Q.   Sure.
17              A.   Okay.
18              Q.   Is it your testimony that if a
19     party gets, you know, even a splinter's worth from
20     one of those sticks, that that constitutes, that
21     rises to the level of something that somebody would
22     describe as beneficial ownership?
23              A.   It may be beneficial ownership or
24     economic ownership of the splinter, I suppose.  I'm
25     not sure of the import of your question, so it
```

 Neeson & Associates   W&F

1    seems to me if -- you've stated the answer in the

2    question itself.  If you have a splinter, you have

3    a splinter.

4              Q.   I think you've answered it for me,

5    thank you.  You cite in your report an information

6    circular issued by the CRA.  I believe it's

7    Informational Circular 87-2.

8              A.   Okay.

9              Q.   Okay?  And you understand that

10   Informational Circular 87-2R, I believe is what

11   it's called --

12             THE CANADIAN COURT:  Can you just tell

13   me where in the report that is, Mr. Zelbo.

14             MR. ZELBO:  Where it's cited in his

15   report, Your Honour?  I can also hand out the

16   circular but it is cited in Appendix C on page 16.

17   I'm not sure if you have all the appendices.

18   They're quite --

19             THE CANADIAN COURT:  I do.

20             THE WITNESS:  Excuse me, Mr. Zelbo, is

21   this in my primary report?  I take it it is.

22             MR. ZELBO:  Can I have Appendix C,

23   please?  I believe it's in your primary report,

24   sir.

25             THE WITNESS:  Yeah, I think it is.



```
 1                    MR. ZELBO:  Can you hand the witness a
 2    copy?  The court has it, I think.
 3                    BY MR. ZELBO:
 4                    Q.   Would you turn to page C-16,
 5    please.  Sure.  Could you hand out a copy to my
 6    friends to the right?
 7                    A.   Okay.
 8                    Q.   I still have to get used to
 9    calling my adversaries "my friends" instead of my
10    colleagues.  Do you see that, you cite
11    Informational Circular 87-2R?
12                    THE CANADIAN COURT:  There's also a
13    rule that when you refer to "my learned friend" as
14    opposed to "my friend", it's supposed to be if it's
15    Queen's Counsel.  You're learning.
16                    MR. ZELBO:  I'm going to learn all this
17    by the end of trial, Your Honour.  By the end of
18    trial I'm going to be saying process instead of
19    process.  That's when we'll know.
20                    BY MR. ZELBO:
21                    Q.   If you look at Informational
22    Circular, you say:
23                    "Informational Circular 87-2R
24                    sets out the CRA's interpretation
25                    and administrative positions
```



```
 1                    regarding section 247 of the Act."
 2              A.   Yes.
 3              Q.   And just for the Court's benefit,
 4    the Act you're referring to there is the --
 5              THE CANADIAN COURT:  I think I know.
 6              BY MR. ZELBO:
 7              Q.   The Income Tax Act, the ITA?
 8              A.   Sure.
 9              Q.   Now, I don't know if you've yet
10    been provided a copy of the Informational Circular,
11    but I'd like for that to happen, please, and in
12    particular I want to draw your attention to Part 4
13    about qualifying cost contribution arrangements.
14              A.   Okay.
15              Q.   Tell me when you're there.  It's
16    on page 13, Dr. Reichert.  Can we pull that up?
17    I'm sorry, the TR number is Exhibit TR50295, page
18    13, and we're going to be looking at paragraph 121.
19              I'm going to read that out loud, Dr.
20    Reichert, if it's okay with you:
21                   "Each participant's expected
22                   benefit from a QCCA -- "
23              Let's pause there.  A qualifying cost
24    contribution agreement -- a CSA, a cost sharing
25    agreement, would be a qualifying cost contribution
```



```
 1   agreement, right?

 2                A.   It can be.  The term "qualified"

 3   means specific things.  So there are lots of

 4   arrangements that are referred to as CSA's that are

 5   not QCSAs or QCCAs.

 6                In fact, I think the parties referred

 7   to three cost sharing arrangements in this case,

 8   one of which, for example, had to do with routine

 9   returns, if I'm not mistaken.  Another may have

10   been administrative activities.

11                I don't think those would be qualified

12   cost contribution arrangements and I have not

13   analyzed whether the CSA in this case would be a

14   QCCA.

15                Q.   The R&D CSA, while you haven't

16   analyzed it, but let's just look.  We can go to

17   paragraph 120 then perhaps to start:

18                     " -- QCCA is an arrangement

19                     whereby two or more parties share

20                     the costs and risks of producing,

21                     developing, or acquiring any

22                     property, or acquiring or performing

23                     any services, in proportion to the

24                     benefits which each participant is

25                     reasonably expected to derive from
```



```
 1                    the property or services as a result

 2                    of the arrangement."

 3                    That describes, does it not, the R&D

 4    CSA?

 5                    A.    I think that's an apt description

 6    of the R&D CSA.

 7                    Q.    Thank you.

 8                    A.    It's not inconsistent with it,

 9    I'll say that.

10                    Q.    Let's go to paragraph 121 again:

11                    "Each participant's expected

12                    benefit from a QCCA, for the

13                    purposes of apportioning the costs,

14                    consists of the benefits that the

15                    participant will derive from

16                    exploiting the results of the QCCA,

17                    and not from the actual activities

18                    of the QCCA."

19                    It's the next sentence I want to focus

20    on:

21                    "If the QCA develops property

22                    such as an intangible, each

23                    participant in a QCCA is not

24                    required to be a legal owner of the

25                    property, but each participant must
```



```
 1                    enjoy substantially similar rights,

 2                    benefits, and privileges as a legal

 3                    (effective or beneficial

 4                    ownership)."

 5                    Do you see that?

 6              A.    I do.

 7              Q.    And you don't cite that provision

 8     anywhere in your report; is that correct?

 9              A.    Not to my knowledge, no.

10              Q.    Dr. Reichert, and again, you've

11     testified that the MRDA continued the scope of the

12     license under the CSA, right?

13              A.    That's my understanding, yes.

14              Q.    Okay, great.  Now Dr. Reichert,

15     you understand that a patent holder can transfer

16     all rights in the patents through a license, right?

17     That can happen?

18              A.    I take it that it can.  I know

19     you're representing to me that it can.  I would

20     assume that that's a sale as opposed to a license,

21     but I'm not a lawyer so I'm not in a position to

22     say it is or is not a license or a sale.

23              Q.    Okay.  Can we pull -- can you hand

24     me and the witness Exhibit TR21600.

25                    THE CANADIAN COURT:  Mr. Zelbo, this
```



```
 1   circular is dated September 27, 1999.  I am

 2   assuming that it was still in force at the relevant

 3   dates?

 4            MR. ZELBO:  It is my understanding that

 5   that is still in force.

 6            THE CANADIAN COURT:  Okay, thank you.

 7            BY MR. ZELBO:

 8            Q.  Dr. Reichert, maybe you have

 9   insights.  You cited in your report.  I assume you

10   thought it was still in force?

11            A.  I believe it was in force.

12            Q.  Doctor, I want to show you the

13   OECD discussion draft in 2013 that you cite quite

14   often in your slides.

15            A.  Thank you.

16            Q.  And just a moment ago when I asked

17   you a patent holder can transfer all rights through

18   a license, you said you're not a lawyer and I

19   appreciate that, and you said that sounds more like

20   a sale.

21            Let's just take a look at paragraph 106

22   because you do cite these guidelines heavily in

23   your slides.

24            A.  I do.

25            Q.  And less heavily in your report
```



1    but they're in your slides.  And Justice Newbould,

2    these are OECD, it's a discussion draft on transfer

3    pricing aspects of intangibles.

4                    THE CANADIAN COURT:  Which slide is it

5    on?

6                    MR. ZELBO:  Which slide in his thing?

7    That's going to take me a minute, Your Honour, but

8    I can find it.

9                    THE CANADIAN COURT:  I've got it, slide

10   8.

11                   MR. ZELBO:  It's slide 8 when he's

12   talking about economic ownership of intangibles.

13                   THE CANADIAN COURT:  Thank you.

14                   BY MR. ZELBO:

15                   Q.   And if we look at paragraph 106,

16   it says:

17                       "Rights in intangibles

18                       themselves may be transferred in

19                       controlled transactions.  Such

20                       transactions may involve a transfer

21                       of all rights in the intangibles in

22                       question (e.g. a sale of the

23                       intangible or a perpetual, exclusive

24                       license of the intangible) or only

25                       limited rights (e.g. a license or

 Neeson&Associates    W&F

1                     similar transfer of limited

2                     rights..."

3                     And then it continues.  Feel free to

4      read the whole thing but I won't.

5                     A.    Yes.

6                     Q.    So you understand that a patent

7      holder can transfer intangibles and can transfer

8      all rights in the intangibles and it can do it

9      through a sale of the intangible, or it can do it

10     through a perpetual, exclusive license of the

11     intangible, right?

12                    A.    I understand that you're applying

13     the logic here to a patent.  My answer before was

14     in reference to a patent.  I don't know if you can

15     or cannot license all rights to a patent, and that

16     would still be a license or a sale, but yes, I

17     understand where you're going with this.

18                    Q.    This refers to intangibles.

19                    A.    Sure.

20                    Q.    And you do know that intangibles,

21     as used in these guidelines, refer to patents,

22     amongst other intangibles, right?

23                    A.    The category does include patents,

24     yes, it does.

25                    Q.    Could you turn to paragraph 73,



```
 1    please.
 2                    A.    The same document?
 3                    Q.    Yes, sir.  I just want to read,
 4    look at the first two sentences:
 5                         "The question of legal
 6                    ownership is separate from the
 7                    question of remuneration under the
 8                    arm's length principle.  It is
 9                    important to note that, for transfer
10                    pricing purposes, legal ownership of
11                    intangibles, by itself, does not
12                    confer any right ultimately to
13                    retain any return from exploiting
14                    the intangible that may initially
15                    accrue to the legal owner as a
16                    result of its legal or contractual
17                    right to exploit the intangible."
18                    Do you see that?
19                    A.    I do.
20                    Q.    And that's a correct statement of
21    transfer pricing principles?
22                    A.    It is, absolutely.
23                    Q.    Now, give me one second, Dr.
24    Reichert.
25                    THE CANADIAN COURT:  Can I see that
```



1   slide again for a minute, please?

2               BY MR. ZELBO:

3               Q.   If we can turn to --

4               THE CANADIAN COURT:  Mr. Zelbo, could I

5   see that slide again for a moment?

6               MR. ZELBO:  Of course.

7               THE CANADIAN COURT:  I was making a

8   note and it went black.

9               MR. ZELBO:  Can we put that slide back

10  up?  Justice Newbould, may I go forward or should I

11  wait?

12              THE CANADIAN COURT:  Go ahead.

13              MR. ZELBO:  Excuse me.

14              THE CANADIAN COURT:  Go ahead.

15              BY MR. ZELBO:

16              Q.   Let's turn now to a section of

17  these OECD guidelines you do cite, and on slide 12,

18  we don't need to turn to it unless you want.

19  Actually, let's turn to it, slide 12 from your

20  slides.

21              I'm sorry, I apologize, slide 15.  I

22  can't read my own handwriting.  In the second

23  bullet, do you see that?

24              A.   I do.

25              Q.   "In transactions between



```
1                   independent enterprises, arrangements
2                   are observed where the
3                   transferor/licensor retains the full
4                   right to any enhancements of the
5                   licensed intangible that may be
6                   developed during the term of the
7                   license."
8              Do you see that?
9              A.   I do.
10             Q.   And that's from paragraph 108 of
11   the guidelines we're looking at right now or we
12   were looking at?
13             A.   Yes.
14             Q.   Let's turn to paragraph 108
15   because I also want the courts to see the sentence
16   that follows the sentence you quote.  So if we go
17   down to the third sentence, we see the one you
18   quote:
19                   "In transactions between
20                   independent enterprises,
21                   arrangements are observed where the
22                   transferor/licensor retains the full
23                   rights to any enhancements of the
24                   licensed intangible that may be
25                   developed during the term of the
```



```
1                    license."

2                    Right?

3                    A.   Yes.

4                    Q.   Let's look at the next sentence:

5                         "Transactions between

6                    independent enterprises are also

7                    observed where the

8                    transferee/licensee retains the

9                    right to any enhancements it may

10                   develop, either for the term of its

11                   license or in perpetuity."

12                   Do you see that?

13                   A.   Absolutely.

14                   Q.   Both those statements are correct?

15                   A.   They are, yes.

16                   Q.   At the end of the day, Dr.

17   Reichert, what it all turns on is where we started,

18   right?  It all turns on what the MRDA provides and

19   the scope of the legal arrangement, right?

20                   A.   It does.  It turns on the nature

21   of the asset, the thing that the parties shared in

22   the MRDA, and the nature of the thing that the

23   licensor retained.

24                   Q.   And to know that we should look at

25   the terms of the MRDA, right?
```



```
 1                    A.   I think that's fair.  Let me
 2   qualify a bit the answer I gave a moment ago.  It
 3   also, of course, turns on the threshold tests that
 4   I mentioned, but as I noted I don't think they
 5   apply in this case.
 6                    Q.   The threshold test, meaning it
 7   needs to be economically rational and cohere with
 8   economic substance?
 9                    A.   That's right.
10                    Q.   Sure.  But after those thresholds,
11   we should be looking at the parties' legal
12   arrangements?
13                    A.   And pricing them out, that's
14   correct.
15                    Q.   And the parties' construction of
16   their legal arrangements as they see fit?
17                    A.   That's exactly right.
18                    Q.   And that's what the OECD
19   guidelines there are indicating?
20                    A.   That's correct, yes.
21                    Q.   And you can observe all sorts of
22   different types of behaviour in open market
23   transactions?
24                    A.   And in transactions within the
25   multinational.  That's correct, yes.
```



```
 1                    Q.   Now, can I have that, Jeff,
 2   please?  You likened the Nortel arrangement to a
 3   franchise arrangement.  I think you likened it to a
 4   McDonald's, and I apologize, I don't have copies of
 5   this, I'm just going to ask the witness questions.
 6   I hadn't anticipated a McDonald's analogy so I
 7   don't have this handy.
 8                    Are you familiar with a regulation
 9   under the, Her Majesty's revenue regulations
10   relating to transfer pricing called -- believe me,
11   it wouldn't surprise me if you haven't heard of it
12   -- INTM-467210?
13                    A.   I would love to say that I've
14   heard of that.  I honestly have not.
15                    Q.   Dr. Reichert, I would have been
16   super impressed.  But I will tell you somebody who
17   knows a lot about transfer pricing sent me this
18   during the break, and I just want to quote to you
19   and see if you agree with this.  It says:
20                         "Always consider the
21                         differences between a franchising
22                         arrangement and a licensing
23                         arrangement.  A license agreement is
24                         not a franchise agreement.  Each
25                         will offer different rights and a
```



1                    different type of trading

2                    relationship."

3                Do you agree with that statement?

4                A.   Well, I'm not sure I entirely

5    agree with it.  I can tell you that my clients in

6    the fast food space speak of licensing and

7    franchising synonymously with some frequency.

8                So I recognize, I think, the point that

9    you're making, which is that franchising and

10   licensing are not identical categories.  I think

11   there's a strong overlap between the two,

12   certainly.

13               Q.   Dr. Reichert, in a McDonald's

14   franchise, do the franchisees spend billions of

15   dollars on R&D developing new technology?

16               A.   I'm not sure if it's billions, but

17   they do spend substantial sums developing

18   technologies.  If you include under the rubric of

19   technologies things like menu items, cooking

20   techniques and so forth, the franchisees do in fact

21   develop those things.

22               I don't know the dollar figure

23   involved, but they do.  They certainly spend

24   billions of dollars on marketing and advertising

25   and brand development.



```
 1                    Q.   And you know NNI had a very large
 2   sales force out there working and developing
 3   customer relationships, right?
 4                    A.   I do.  Compensated through the
 5   routine returns to distribution, I believe.
 6                    Q.   And I think you testified earlier,
 7   can we bring up Orlando declaration page 14, figure
 8   1?  I think you were testifying earlier about that
 9   NNL did more research and development than
10   everybody combined.
11                    A.   I said in certain years.
12                    Q.   Sure.  Well, why don't we just
13   look at what the facts are, just so everybody
14   understands.  Can we turn that up, please?  Or not.
15   Thank you.
16                    So, these are figures, and you have
17   some of these figures in your report, I think, but
18   these are figures of the annual R&D expenditures
19   for NNL, NNI and the other licensed participants.
20   Do you see that?
21                    A.   I do.
22                    Q.   So if you look at this over the
23   2001-2008 period, in other words, before the
24   bankruptcy filing, right, the MRDA years.
25                    A.   Sure.
```



```
1                    Q.    NNL spent 7.3 billion, and NNI
2      spent 6.4 billion.
3                    A.    Yeah, that's right.
4                    Q.    So they both spent a lot of money.
5                    A.    They did.  They did.
6                    Q.    And I will represent to you,
7      because I won't make you do the math here, that if
8      you add up NNI and the other licensed participants,
9      it adds up to 9 billion 134 million.
10                   A.    We walked through this during my
11     deposition.  And that's true in total.  But the
12     comment I made --
13                   THE CANADIAN COURT:  He hasn't even
14     asked you a question yet.
15                   THE WITNESS:  I apologize.
16                   BY MR. ZELBO:
17                   Q.    But I'm glad you remember that.
18     So just to be clear, during the years 2001 to 2008,
19     the MRDA years before bankruptcy, in fact the
20     licensed participants in total spent more than NNL
21     on R&D.
22                   THE CANADIAN COURT:  Your question is?
23                   THE WITNESS:  Is that a question?
24                   BY MR. ZELBO:
25                   Q.    Yes.  Right?
```



```
 1                    A.   It is correct, the statement you
 2    referenced at the outset.
 3                    THE CANADIAN COURT:  How long did it
 4    take to come up with that question?
 5                    MR. ZELBO:  I take full credit, Justice
 6    Newbould, for every question that flops and no
 7    credit for the ones that succeed.
 8                    THE WITNESS:  The point that you
 9    referenced at the outset of your remarks was a
10    comment that I made during my primary testimony,
11    which was that in some years, NNL spent more than
12    anyone else in the system and you, in fact, see
13    that on this chart.  And rather, all the other
14    participants combined.  You see that on the chart
15    as well.
16                    BY MR. ZELBO:
17                    Q.   Okay.  Can we turn to slide 9.
18    This is headed "Evidence of Licensees' Limited
19    Economic Ownership."   Do you see that?
20                    A.   Yes, I do.
21                    Q.   And you cite three items of
22    evidence, right?
23                    A.   Yes.
24                    Q.   Okay.  Just you don't cite the
25    terms of Article 5, right?
```



```
 1                    A.    Not on this slide.
 2                    Q.    You don't cite the terms of
 3    Article 4, the enforcement right?
 4                    A.    That's correct, I do not.
 5                    Q.    You don't cite statements made by
 6    Nortel, representations made to tax authorities
 7    regarding ownership of IP, right?
 8                    A.    I do not.
 9                    Q.    You don't cite anything relating
10    to the parties' course of conduct relating to how
11    they treated the parties' sublicensing rights, do
12    you?
13                    A.    I think that item 1 is, in fact,
14    course of conduct related to how they treated the
15    parties' sublicensing rights, because the course of
16    conduct I'm referencing here involved compensation
17    for what the parties believed their rights were in
18    their totality.
19                    Q.    We're going to get to that, and
20    that's a fine clarification, Dr. Reichert.  But you
21    don't cite anything about the course of conduct of
22    the parties with respect to actual sublicensing
23    agreements to third parties, and who was
24    sublicensing and in what territory during the
25    course of the MRDA or even the CSA years, right?
```



```
 1                      A.    On this slide I do not, that's
 2      correct.
 3                      Q.    And you don't cite anything, any
 4      evidence of what Nortel told tax authorities about
 5      the scope of sublicensing rights and who
 6      sublicensed in what territories?
 7                      A.    Not on this slide, that's correct.
 8                      Q.    One more question.  I don't want
 9      to try anyone's patience.  You don't cite anything
10      in here about the parties' course of conduct
11      relating to NNI's enforcement rights, correct?
12                      A.    That's correct.
13                      Q.    Okay.  Now, the first thing -- the
14      first evidence you do cite here, and you say this
15      is part of the course of conduct, but you would
16      agree with me if you're going to look at the course
17      of conduct, one needs to look at the full panoply
18      of the parties' behaviour and their whole course of
19      conduct, not just one isolated item, right?
20                      A.    Yes.  And -- okay, yes.
21                      Q.    Now, you refer to the transition
22      from the CSA to the MRDA required no buy-in or
23      buy-out.  The parties continued to hold the same
24      license rights post-transition.  Right?
25                      A.    That's my understanding, yes.
```



```
 1                    Q.   Could we put back up Exhibit
 2      TR21002, and turn to page 10 of the PDF.  May I
 3      have it, please.
 4                    A.   Is this the MRDA?
 5                    Q.   It's actually the CSA first.
 6      Article 10.  You see in the second paragraph it
 7      says:
 8                    "Subject to the provisions of
 9                    the second paragraph of Article 11,
10                    upon the expiry or termination of
11                    this cost sharing agreement,
12                    participant shall be deemed to have
13                    acquired a fully paid up license
14                    permitting participant to continue
15                    to exercise the rights granted to it
16                    herein, and, in particular, the
17                    rights granted to it in Article 5."
18                    Do you see that?
19                    A.   I do.
20                    Q.   And in fact, if we can call up
21      Exhibit TR21031, which is the document you showed
22      before from Mr. David Canale from Ernst & Young to
23      the IRS and go to page 5, as you yourself pointed
24      out, and just to back up top, this is a question
25      from the IRS, just go up a little bit to the
```



```
1    question on 5, there you go.

2              It says:

3                   "Describe the legal and tax

4              consequences of terminating the

5              CSA."

6              See that?

7              It says, for example:

8                   "Please provide the amount of

9              any buy-out payments paid, or if

10             none were paid, please explain why

11             not."

12             Do you see that?

13             A.   I do.

14             Q.   And Mr. Canale from Ernst & Young

15   says, specifically tells the IRS that:

16                  "A CSA participant obtained a

17             royalty-free license to use the

18             technology developed under the CSA

19             and with the termination, such

20             former participants are deemed to

21             have acquired a fully paid up

22             license permitting the former

23             participant to continue to exercise

24             the rights it obtained under the

25             CSA."
```



 1                    Do you see that?

 2              A.    I do.

 3              Q.    Okay.  So to be clear, when the

 4   CSA ends, the scope of the license, it's fully paid

 5   up and the scope of the license continues?

 6              A.    That's my understanding, yes.

 7              Q.    Okay.  What changes, right, is the

 8   way in which the parties to Nortel's transfer

 9   pricing arrangements are going to share, if you

10   will, operating profit?

11              A.    Well, that's true but --

12              Q.    I'm sorry, go ahead.

13              A.    That change entails or implies a

14   diminution in the shares for NNI and NNUK that's

15   extremely substantial, yes.

16              So as I said, the nature of the rights

17   appears to be the same; the piece of the pie held

18   changes dramatically as a result of the

19   restructuring.

20              Q.    The piece of the pie in which the

21   parties were going to divide up operating profits

22   changed?

23              A.    Well, the pie being the interest

24   that the parties were jointly owning or sharing.

25   Whatever that was.



```
 1                    Q.   Changed for NNL too, right?

 2                    A.   It did.

 3                    Q.   It changed for all the

 4      participants in the same way?

 5                    A.   Not in the same way.  There was a

 6      redistribution of value -- to the extent that the

 7      value is defined as a joint venture, there was a

 8      redistribution of residual rights from NNI and NNUK

 9      to NNL.

10                    If we believe this was a joint venture,

11      if that's the thing that this pie represented, NNL

12      lost about a quarter -- rather NNI lost about a

13      quarter of it and NNUK, I'm forgetting the numbers,

14      lost somewhere in the neighbourhood of five

15      percentage points of it, the pie.

16                    Q.   In fact, by the time the MRDA was

17      signed and indeed by the time this letter was sent

18      from Mr. Canale, Nortel had been experiencing

19      several years of loss environment, right?

20                    A.   There had been losses, yes.

21      That's correct.

22                    Q.   And so, in fact, they weren't

23      sharing residual profits at this point, they were

24      sharing residual losses?

25                    A.   Well, depends.
```



```
 1                    Q.    Until it turned a profit.

 2                    A.    It depends.  I mean the question

 3      is ex ante.  The question is what was the

 4      expectation and not really as of 2004 because my

 5      understanding is the question isn't when did the

 6      parties formally strike or write the MRDA, but

 7      rather what does the MRDA represent.  It's

 8      effective as of 2001.  So it's codifying the

 9      arrangements of the parties.

10                    To me the question is what is it that

11      they felt that they had as of the beginning of

12      1/1/2001 under the CSA?  And what did they

13      therefore feel they were losing as of 1/1/2001 when

14      they moved in under the MRDA?

15                    Q.    And what they had when the CSA

16      terminated was a fully paid up license and an

17      agreement on how to share operating profits, right?

18                    A.    Precisely my point.

19                    Q.    Great.  We are in agreement then?

20                    A.    We are in agreement -- okay.

21                    Q.    Sorry.  Now, Dr. Reichert, one of

22      the things you say in your report, and we can turn

23      to it if you'd like but it's pretty

24      non-controversial, I think --

25                    A.    What page?
```

 Neeson & Associates    W&P

 1                    Q.    Sure.   The report at 38, second
 2      paragraph?
 3                    A.    First report?
 4                    Q.    Yes?
 5                    THE CANADIAN COURT:   Which page?
 6                    MR. ZELBO:   Page 38.
 7                    THE WITNESS:   Okay.
 8                    BY MR. ZELBO:
 9                    Q.    What you're doing here is
10      analysing, you see it in the second paragraph, I
11      guess:
12                         "An important question from a
13                         transfer pricing perspective is
14                         whether there is anything that is
15                         inherently inconsistent with
16                         economic rationality in a licensing
17                         arrangement that provides for the
18                         licensees to make investments in
19                         exchange for the benefit of a share
20                         of residual profit attributable to
21                         R&D, proportionate to their R&D
22                         investment, without further
23                         consideration."
24                    Do you see that?
25                    A.    I do.



1                    Q.   You conclude in your report that

2    your reading of the MRDA, right, is not inherently

3    inconsistent with economic rationality?

4                    A.   Yes, that's right.

5                    Q.   Okay.   Just so I'm clear, you're

6    taking your reading and then applying this test of

7    inherently inconsistent with economic rationality.

8    That's what's happening?   That's what you're doing

9    in your report on this section, right?

10                   A.   Yes.

11                   Q.   In your reports, there is no

12   analysis of whether a different reading of the MRDA

13   would or would not be inherently inconsistent with

14   economic rationality, right?

15                   A.   There's not, although I think it's

16   implied by the way I discuss the transition from

17   the CSA to the MRDA that, in fact, if there were a

18   joint venture interest, I think that would be

19   irrational, commercially irrational for NNL without

20   a buy-in.

21                   There would have to be some sort of

22   buy-in for these parties to move from what I read

23   this license arrangement to be, which is a limited,

24   makes product, make/sell license to a joint

25   venture.   Without that it would be commercially



```
 1    irrational for NNL.
 2              Q.   I just want to be clear.  What you
 3    just said, you're assuming on my -- on your
 4    reading, right, I think what you just said, correct
 5    me if I'm wrong, I think what you just said is
 6    under your reading the CSA was a limited make/sell,
 7    and if they moved in the MRDA to a different
 8    direction, that would be a problem.  There would be
 9    a buy-in, is that what you're saying?
10              A.   I'm not sure I understand your
11    paraphrase, I'm sorry.
12              Q.   Sure.  I'm simply trying to get at
13    a very straightforward issue.  If we can't get
14    there it's fine, Dr. Reichert.  I'm just trying to
15    understand.  You're saying your reading is not
16    inherently inconsistent with economic rationality
17    for transfer pricing purposes?
18              A.   My reading of the MRDA.
19              Q.   Correct.
20              A.   The Nortel RPS?
21              Q.   Correct.
22              A.   I think that's correct.
23              Q.   And in your report I'm saying you
24    are not analysing whether another reading of the
25    MRDA would or would not be economically rational.
```

 Neeson&Associates   W&F

1    All you're doing is saying here's my reading, and

2    that's not inherently inconsistent with economic

3    rationality?

4                    A.    I think that's a fair statement

5    insofar as we recognize that I don't directly

6    analyse other readings.  I think it's clear

7    implicit in what I say that if we had moved to a

8    joint venture somewhere, that would be irrational

9    for NNL without a buy-in.  That's implied by my

10   reading of the MRDA.

11                   Q.    If the rights under the CSA, just

12   assume with me for a minute and then we're going to

13   move on, if the rights under the CSA to the

14   licensed participants were such that they got

15   substantially the same benefits as a legal owner,

16   to use that phrase from the information circular,

17   okay?

18                   A.    Okay.

19                   Q.    Just assume with me that those are

20   the rights in the CSA and those rights were

21   continued in the MRDA, so there's no -- then there

22   would be no change in the rights?

23                   A.    There would be no change in the

24   rights.  That doesn't mean there would be no change

25   in their interests, as I said, but not in the



```
 1   rights.

 2                 Q.   Sure.

 3                 A.   Okay.

 4                 Q.   But you haven't analysed whether

 5   that construct is or is not economically rational.

 6   That's not in your report?

 7                 A.   It's not discussed in my report in

 8   a direct way.

 9                 Q.   Now, if we can stick with page 38

10   in this inherently inconsistent with economic

11   rationality test, in the very next paragraph you

12   say:

13                      "A fundamental economic

14                      principle is that, for an investment

15                      to be economically rational, it is

16                      both necessary and sufficient for

17                      the investment to be expected to

18                      return (a) its nominal dollar

19                      cost --"

20                 A.   Yes.

21                 Q.   -- (i.e. the return of the

22                      invested amount), and (b) profits over

23                      and above the nominal cost, equal to

24                      the investments's cost of capital or

25                      required rate of return (i.e., the
```



```
1                    return on the investment)."
2            Right?  And you say:
3                    "Investments that meet these
4            criteria are said to be net present
5            value zero because the cost of the
6            investment is equal to the present
7            value of the gross profits earned
8            from that investment."
9            Right?
10           A.   Yes.
11           Q.   Let's just stick with this formula
12   for a minute.  You did not calculate what the
13   licensed participants expected their nominal dollar
14   costs would be when they entered into the MRDA
15   arrangement, correct?
16           A.   That's correct.  We discussed this
17   at my deposition.  I didn't have to.  I will note
18   that we went through this at some length during my
19   deposition, and I since spent some time with that
20   calculation so I'm happy to discuss that if you'd
21   like.
22           Q.   Dr. Reichert, your counsel can
23   bring out -- had the ability to bring out anything
24   in direct and I'm sure he's very competent, a
25   terrific lawyer, he'll bring it out in redirect.
```



```
 1                    I just want to know if you did the
 2   calculations.  I know you know it and I know I know
 3   it because I was at the deposition.  The courts
 4   need to know it.
 5                    A.   Okay.
 6                    Q.   Okay?
 7                    A.   Yes.
 8                    Q.   So I'm just going to stipulate
 9   that every time you tell me you haven't done these
10   calculations you're going to tell me you didn't
11   need to, but that's not my question, okay?
12                    A.   Okay, thank you.
13                    Q.   You didn't calculate their cost of
14   capital?
15                    A.   Correct.
16                    Q.   You didn't calculate the licensed
17   participants required rate of return?
18                    A.   That's correct.
19                    Q.   So, you didn't do any of the
20   calculations for the licensed participants set
21   forth in this formula, right?
22                    A.   I'm not sure that's a fair
23   statement.  We observed the investment being made,
24   right?  That means that the company felt that these
25   were economically rational R&D investments.  We
```



1    observed the investment being made, these are

2    professionals who know a lot more about the R&D

3    investment than I do.

4             So in that sense, sure, I did the

5    calculation because the company must have done the

6    calculation.  That's the only point I'm making.

7             Q.    So your point is because the

8    company kept investing in R&D, they must have been

9    rational economic actors and therefore they must

10   have thought they were going to make money from the

11   R&D.  That's your --

12            A.    That's right.

13            Q.    That's your analysis?

14            A.    Yes.

15            Q.    You understand that the arm's

16   length standard aims to mimic behaviour of hard

17   bargaining market actors acting with interest

18   adverse to one another, right?

19            A.    Yes, I do.

20            Q.    And is it your view that NNI, were

21   it an uncontrolled party, in other words not

22   affiliated with NNL, engaged in hard bargaining

23   with interests adverse to NNL, would have agreed

24   that if it would spend billions of dollars on R&D

25   investment, and if NNL later sold the intellectual



```
 1   property for billions of dollars, that NNL could

 2   keep it all?

 3               A.   If you're asking me whether I

 4   think that's a rational arrangement, I think as of

 5   1/1/2001, sure.  Again, that's what happens in

 6   license arrangements with some frequency.  The

 7   licensor has the right to sell the underlying asset

 8   and terminate the license.

 9               So --

10               Q.   But that happens in license

11   agreements --

12               THE CANADIAN COURT:  Just wait a

13   minute.  Wait, wait, wait.  Go ahead, finish your

14   answer.

15               MR. ZELBO:  I'm sorry.

16               THE WITNESS:  I think that's a

17   sufficient answer but thank you, Your Honour.

18               BY MR. ZELBO:

19               Q.   I was moving away from

20   rationality.  I understand you're not intrinsically

21   inconsistent with economic rationality tests.  I'm

22   talking about just something else.

23               A.   Sure.  Just common sense is sort

24   of what you're talking about.

25               Q.   No, although I hope I am.  But
```

 Neeson & Associates   W&F Wilson & Peyton Ltd.

1    that wasn't where I was going.

2              A.   Okay.

3              Q.   I'll ask the question again.  Is

4    it your view --

5              A.   I'll try to help.

6              Q.   -- that NNI, were it an

7    uncontrolled party engaged in hard bargaining with

8    interests adverse to NNL, would it have agreed that

9    if NNL later sold the IP for billions of dollars,

10   that NNL could keep it all?

11             A.   Yes, so that's the import of my

12   analysis, sure, and look, it sounds on its face

13   like a very reasonable question to ask, but you

14   have to keep in mind that as of 1/1/2001, no one

15   had any real conception of an IPCo or a transaction

16   involving the Rockstar consortium.

17             So it's kind of a hypothetical that

18   doesn't mean a lot in the context of the deal that

19   was struck in 2001, and yes, I think that it's

20   reasonable for these participants to have entered

21   into the deal they entered into.  They got, again,

22   a hundred percent of the return, the residual

23   profit stream associated with the R&D investments.

24   That's -- that's no small thing.

25             Q.   Well, they didn't get a hundred



```
 1   percent.  They got their --
 2                  A.   They did.
 3                  Q.   They got their -- so Canada didn't
 4   get any returns?
 5                  A.   I'm talking about the
 6   participants --
 7                  Q.   Oh, all the participants?
 8                  A.   All of the participants.
 9                  Q.   You're including Canada.  I get
10   it.  If NNL and NNI are sitting across a bargaining
11   table, and they're unrelated parties, and you're
12   representing NNI --
13                  A.   Okay.
14                  Q.   Okay?  It honestly wouldn't occur
15   to you to say, listen, NNL, I hear you, maybe we're
16   not going to sell the IP, I get it, but you know
17   what?  All the same, I'd like to protect myself
18   because we're bargaining with each other.  You want
19   me to spend billions on R&D, you're going to spend
20   billions on R&D.  We're going to create valuable
21   patents we hope, and yeah, we're going to sell
22   them, we're going to sell products and make lots of
23   money.  But you know what?  Just in case, I'm not
24   going to let you sell these patents and get all the
25   increase in value of the patents.  We should be
```



 1   sharing those, too.

 2              My question is you're representing NNI,

 3   wouldn't you raise that at the bargaining table?

 4   Or would you just say, all right NNL, it's never

 5   going to happen so I won't protect myself.

 6              A.   So, I would say two things in

 7   response to that.  I mean, your question is

 8   directly analogous to the advice Dave Canale gave

 9   to Tom Ralph, the advice that Dave Canale gave on

10   behalf of NNI to Tom Ralph in the document we

11   talked about earlier.

12              Tom Ralph was satisfied.  Tom Ralph was

13   satisfied that what NNI had was a return stream in

14   the form of residual profit of a finite duration.

15   No residual interests.  Otherwise, Tom Ralph would

16   have raised his hand and said wait a minute, any

17   residual rights to patents, any goodwill and going

18   concern, that's a really important thing, the

19   investment opportunity for that extra 25 percentage

20   points of R&D, did that not have value?  Of course

21   it had value.

22              But NNI wasn't paid for it when it lost

23   it so I think -- I think that in light of that,

24   yes, I think it would be perfectly reasonable for

25   me to have said what you're positing would be



1    difficult to say to NNI, and I would also say to

2    NNI, look, guys, you got a hundred percent of the

3    residual profit out of this deal.  You could be

4    paying a royalty.  Think about if -- if the

5    alternative case in which NNL was investing in all

6    the R&D.  You would have to pay a royalty to NNL in

7    order to get your make/sell rights, okay?

8              We know what happens when you pay a

9    royalty.  It has to be higher than the R&D that

10   you're relieved of.  So the licensees in this case,

11   NNI, were getting the make/sell right at cost as

12   opposed to something north of or above cost.

13             I think my advice to NNI would have

14   looked something like that.

15             Q.   Dr. Reichert, you mentioned

16   royalties.  You understand the license is

17   royalty-free, right?

18             A.   So it's royalty-free because R&D,

19   as I read it, is the consideration for the

20   make/sell licence.  So it is royalty free, yes.

21   There is no term that says pay the licensor five

22   percent of sales or six percent of sales.

23             Q.   Your paradigm, Dr. Reichert, is

24   essentially this, right?  NNL is saying to NNI,

25   look, you've got two choices, guys.  You can --



```
 1                    A.   I apologize for interrupting.

 2   Will you do that again, who is saying what to whom?

 3                    Q.   Sure.  Your paradigm is this:  NNL

 4   is saying to NNI --

 5                    A.   Okay.

 6                    Q.   -- I will give you a license for

 7   this technology I have, and you can pay me a

 8   royalty or you can take a make/sell right.  That's

 9   your paradigm.

10                    A.   I wouldn't say it that way.  I

11   wouldn't say that -- that, hey NNI, you can pay me

12   a royalty or take a make/sell right.  If a royalty

13   was paid they would take a make/sell right.  If R&D

14   was incurred as consideration they would have taken

15   a make/sell right.  That's -- that's what I'm

16   saying.

17                    Q.   Okay.  So then -- so then the

18   choice that NNL is giving NNI --

19                    THE CANADIAN COURT:  So I'm the first

20   one to admit I don't know what a make/sell right

21   is.  What are you talking about?

22                    MR. ZELBO:  I'll ask the witness unless

23   you want me to tell you, but I doubt that.

24                    THE CANADIAN COURT:  Well, it's your

25   question.
```

Neeson & Associates  W&F

```
 1                    MR. ZELBO:  Okay.  Your Honour --
 2                    THE CANADIAN COURT:  The judges here
 3    have got to understand this --
 4                    MR. ZELBO:  That's fine.
 5                    THE CANADIAN COURT:  -- and I, for one,
 6    don't.
 7                    MR. ZELBO:  The witness claims that all
 8    NNI has is a make/sell right and nothing more,
 9    which means the right to use the intellectual
10    property --
11                    THE CANADIAN COURT:  Oh, make it and
12    sell it.
13                    MR. ZELBO:  To make products or to sell
14    products and nothing else.
15                    THE CANADIAN COURT:  All right.
16                    MR. ZELBO:  That's a make/sell right.
17    There's also something called the have/made right.
18    Which means you can have somebody else make the
19    product for you and there's sublicensing and
20    exclusion rights, a whole panoply of rights.
21    That's what we're talking about, Your Honour.
22                    THE CANADIAN COURT:  Thank you.
23                    MR. ZELBO:  And I apologize for not
24    giving the defined terms earlier.
25                    BY MR. ZELBO:
```



```
 1                    Q.   Let's look at it a different way
 2   because I think I understand what you just said,
 3   Dr. Reichert.   NNL is saying I have technology,
 4   I'll share it with you, you either have to pay a
 5   royalty to me or you can do R&D going forward.
 6   That's the paradigm you're positing; is that right?
 7                    A.   That's essentially correct, yes.
 8   If I can clarify something that you -- you
 9   mentioned to Justice Newbould a moment ago, my
10   conception of the make/sell right or understanding
11   of it, rather, encompasses what you described as
12   the have/made right.  As I see the -- the grant in
13   Article 5, it includes the right to make or have
14   made for one the products by or for the
15   participants.  I believe, if by have/made, you mean
16   have contract manufacturers make the product for
17   you, I would include that.
18                    Q.   So let's go back to your paradigm.
19                    A.   Okay.
20                    Q.   Because I think -- I think you may
21   be walking into the middle of the movie, instead of
22   starting at the beginning.
23                    A.   Okay.
24                    Q.   So let's start at the beginning of
25   the negotiations.
```

Neeson & Associates    W&F

```
 1                  THE CANADIAN COURT:  Are you sure it's
 2  not the replay?
 3                  MR. ZELBO:  Excuse me?
 4                  THE CANADIAN COURT:  Are you sure it's
 5  not the replay?
 6                  MR. ZELBO:  Your Honour, that thought
 7  had occurred to me as well, which is why I am
 8  wrapping it up.
 9                  MR. SMITH:  As long as there's no
10  sequel here.
11                  MR. ZELBO:  It's like Friday the 13th.
12                  THE WITNESS:  Groundhog Day is what it
13  is.
14                  MR. MARK:  That was last week.
15                  BY MR. ZELBO:
16                  Q.   Take a look at the MRDA, Article
17  4.
18                  A.   Let me find it, Mr. Zelbo.  Give
19  me just a moment.
20                  Q.   Sure, Article 4(a).  It says:
21                       "Except as otherwise
22                       specifically agreed, legal title to
23                       any and all Nortel Networks
24                       technology, whether now in existence
25                       or acquired or developed pursuant to
```



```
 1                    the terms of this Agreement, shall

 2                    be vested in [NNI].  In

 3                    consideration therefore, NNL agrees

 4                    to enter into an exclusive license

 5                    with each of the Licensed

 6                    Participants as set forth in Article

 7                    5."

 8                    Do you see that?

 9                    A.   I do.

10                    Q.   Now, I know you're not a lawyer --

11   I have been told I misread that, it says, "shall be

12   vested in NNL."  I apologize if I did misread that.

13                    I know you're not a lawyer, so if you

14   are unable to answer this just tell me.  But in

15   plain English, Dr. Reichert, this is saying in

16   consideration for agreeing to vest legal title in

17   NNI, NNI is giving the license --

18                    A.   Is that a question?

19                    Q.   Do you see that?  Yes, it is.  Do

20   you agree with that?

21                    A.   I see it.  You had two questions.

22   I see it.  I don't agree with what I think you're

23   describing this as.  So, you see these terms a lot

24   in licensing arrangements.  This is a vesting term

25   to the licensor.
```



```
 1                 My understanding of why we see these in
 2     license agreements, again not being a lawyer, is
 3     that they exist precisely because the licensor
 4     needs to ensure, as I was saying in my testimony
 5     earlier, that he's not creating competition for
 6     himself.  This is a way to ensure that everything
 7     is vesting back to the licensor.  That's this
 8     mechanism, as I understand it.
 9                 Q.   Yes, I was focusing on the second
10     sentence, though.  In consideration, us lawyers
11     know what consideration means, it's an exchange, in
12     consideration therefore, meaning in consideration
13     for agreeing to grant title, NNL grants to NNI and
14     the other licensed participants a license.  That's
15     the bargain.
16                 A.   Okay.  So what you're doing there
17     is you're assuming that the intangibles, whatever
18     they are, are in the licensees first and that those
19     are being transferred to NNL in return in
20     consideration for something else.
21                 And if that were true, I think the
22     ultimate import of that is that this thing is a JV.
23     If that were true, why go to the trouble of calling
24     this a license?  Why go to the trouble of -- of
25     treating this explicitly in Article 13 not as a JV
```



```
 1   or a partnership?  Why make it clear in the
 2   wherefore clause -- wherefore section or the
 3   whereas clauses, rather, that all right, title and
 4   interest is in NNL in the first instance it would
 5   seem to me, so moreover, why would you not
 6   recognize these residual rights in the licensees in
 7   the CSA to MRDA transition.
 8             So I'm not a lawyer, as you said.  I
 9   don't -- I'm not trying to pretend to be a lawyer.
10   But I do have to read the agreement in order to
11   understand or attempt to understand what's going on
12   so that I can price it out, and that's my
13   understanding.  The court may decide otherwise, and
14   I fully recognize that.
15             Q.  Sure.  Dr. Reichert -- give me one
16   second, please, I'm sorry.  We'll come back to
17   this.
18             But Dr. Reichert, you understand that
19   NNI and NNUK, they're spending billions on R&D.
20             A.  Yes.
21             Q.  Right?  Certainly they're
22   developing something with that R&D, right?
23             A.  Well, as an existential matter,
24   yes, something results from that R&D.
25             Q.  Okay.  All right.
```



```
 1                      A.   But your question is they are
 2   developing, which carries some sort of ownership
 3   import, I think, which is not my view of the -- of
 4   the expenditure of R&D.
 5                      Q.   Dr. Reichert, I just want to read
 6   for you and the courts' benefits, if I could, an
 7   excerpt from a deposition testimony of Sheldon
 8   Burshtein which is NNL's expert on, I guess --
 9                      A.   Matters of --
10                      Q.   -- licensing and he was discussing
11   the MRDA and these provisions.
12                      A.   Okay.
13                      Q.   If we could just put that up on
14   the screen.
15                      THE CANADIAN COURT:  Isn't he
16   purporting to give evidence about the Canadian law?
17                      MR. ZELBO:  Actually, I believe
18   Mr. Burshtein was there to interpret both Canadian
19   law -- he was there interpreting Canadian law, but
20   he was also interpreting the agreement, if you
21   will.  We'll have arguments over whether he was
22   applying Canadian law at some point.  But I just
23   want to show the witness an excerpt from that.
24   It's the only draft I've got, on page 85 of the
25   transcript, line 7.  And it's been pointed out to
```



1   me that I have a rough draft.  I apologize, that's

2   all I have, because it hasn't been finalized.

3                   BY MR. ZELBO:

4                   Q.   There is a question to

5   Mr. Burshtein:

6                   "You will agree with me, sir,

7                   that it's an ongoing process, this

8                   exchange of IP [which is

9                   intellectual property] gets created

10                  in the LP [that's a licensed

11                  participant] is owned by the

12                  licensed participant, legal title

13                  goes up to NNL and in consideration

14                  therefore, the exclusive

15                  royalty-free perpetual license is

16                  given to the LPs." [As read].

17                  You see that?  And then Mr. Poltman

18  objects to the form but says the witness can answer

19  and the witness answers and says "agreed."   Then

20  there is another question from my colleague,

21  Ms. Block, who asks:

22                  "And that's an ongoing process

23                  because it doesn't just deal with

24                  the IP that each LP came into the

25                  arrangement with.  It also applies



```
1                      as more IP is created by LPs."
2                And the answer is:
3                      "Agreed."
4                And the question:
5                      "That exchange is set out in
6                Article 4(a)?
7                      Answer:  Agreed.
8                      Question:  And in return the LP,
9                in the future, gets the royalty-free
10               license for all of the additional
11               IP?
12                     Answer:  Agreed."
13               Do you see that?
14               A.   I do.
15               Q.   So Dr. Reichert, I know you're not
16   a lawyer --
17               THE CANADIAN COURT:  I mean, I don't
18   understand it either frankly, because it seems to
19   be conflating a couple of issues.  Isn't R&D dealt
20   with in section 3(a)?
21               MR. ZELBO:  In part, Your Honour, but
22   the point here --
23               THE CANADIAN COURT:  Not in part.  It's
24   right in 3(a).
25               MR. ZELBO:  Excuse me?
```



```
 1                THE CANADIAN COURT:  It's not in part;
 2   3(a) deals with that directly.
 3                MR. ZELBO:  Your Honour, Article 3(a),
 4   is that what you referred to?
 5                THE CANADIAN COURT:  Yes.
 6                MR. ZELBO:  Okay.  Deals with each
 7   participant, so that's NNL and NNI, and --
 8                THE CANADIAN COURT:  What I'm saying
 9   is, Article 3(a) deals with the consideration for
10   the R&D.
11                MR. ZELBO:  Correct.  But, Your Honour,
12   we'll argue this later, but there are two things
13   that are happening and I don't want to -- one is
14   that in -- everybody does R&D, NNI and NNUK and the
15   other licensed participants do it, too, just like
16   NNL.
17                THE CANADIAN COURT:  Um-hmm.
18                MR. ZELBO:  They're developing things,
19   NNL is developing things.  NNI says I'm doing
20   billions of R&D, I could keep all that myself, but
21   I'm not going to.  I'm going to give you title to
22   it, NNL, but in exchange I get a license.  That's
23   one thing that's happening.
24                The second thing that's happening is as
25   a consequence, that's the legal rights, I'm going
```



```
 1   to give you legal title, I'm going to get a
 2   license.
 3                  THE CANADIAN COURT:  I agree with you
 4   that it's all legal argument as to what the
 5   agreement means.  I don't read 4(a) as saying that.
 6                  MR. ZELBO:  Excuse me?
 7                  THE CANADIAN COURT:  At the moment I
 8   don't read 4(a) as saying that.  But it's all legal
 9   argument for later on.  You might convince me
10   otherwise.
11                  MR. ZELBO:  All right.  We'll argue it.
12   I was only pointing out NNL's own expert's
13   interpretation of it, that's all.  But Your Honour,
14   just to finish this out, 3(a) is for each
15   participant talking about we're now going to share
16   operating profit according to the RPSM.  That was
17   my only point.
18                  THE WITNESS:  Could --
19                  MR. ZELBO:  Your Honour, obviously
20   we'll brief the other issue and hopefully convince
21   you otherwise at the appropriate time, but I won't
22   do that through this witness, you'll be pleased to
23   know.
24                  THE WITNESS:  So is there a question
25   pending for me?
```

 

```
 1              MR. ZELBO:  There is not.  There was
 2   about -- there was almost going to be.
 3              THE WITNESS:  Thank you, Your Honour.
 4              BY MR. ZELBO:
 5              Q.   Now, I need your slides.  Can
 6   somebody give me a copy of the slides?  If you turn
 7   to slide 12, Dr. Reichert.  All right.
 8              Q.   You say:
 9                   "The retention of residual
10                   benefits by the legal owner of the
11                   IP is entirely consistent with open
12                   market conduct."
13              Do you see that?
14              A.   I do.
15              Q.   Then you say:
16                   "(i.e. R&D joint development
17                   arrangements and the comparable
18                   arrangements in my Rebuttal Report
19                   at pages 69 and Appendix B)."
20              Now, we can turn to it if the courts
21   wish, but I think I can cut through this fairly
22   quickly.  And of course if you want to see your
23   report, tell me.
24              But, actually, let's pull it up.  Let's
25   get your rebuttal report at 65, okay?  Which is the
```



```
 1   section that this is all in.
 2                THE CANADIAN COURT:  65 or 69?
 3                MR. ZELBO:  Well, 65 is the heading to
 4   the section in which page 69 appears.  There is a
 5   long analysis.
 6                THE CANADIAN COURT:  Thank you.
 7                MR. ZELBO:  I'm just trying to get to
 8   the point of what he was analysing here when he
 9   looked at the joint development agreements.
10                BY MR. ZELBO:
11                Q.   You see the title to 65 is the:
12                     "Systematic and Holistic
13                     Approach to Application of Transfer
14                     Pricing Regulation and Guidance to
15                     Restructuring Costs, Vendor
16                     Financing, and Estimated Future
17                     Non-GAAP Pension Costs."
18                A.   Yeah.
19                Q.   Do you see that?
20                A.   I do.
21                Q.   And then you cite Exhibit B which
22   contains more detail on your analysis of the
23   comparable agreements you looked through with
24   respect to these three issues, right?
25   Restructuring costs, vendor financing and pension
```



```
 1   costs, right?
 2                A.    That's correct, yes.
 3                Q.    So just for point of clarity, when
 4   you cite and you say the agreements at Appendix B
 5   of your report, the only analysis of those other
 6   joint development agreements that's in your reports
 7   relates to looking at comparable agreements or
 8   agreements you thought were comparable with respect
 9   to these issues:  restructuring costs, vendor
10   financing and non-GAAP pension costs, right?  You
11   have a very long analysis of that, right?
12                A.    That's correct.  I think it's
13   important for the court to understand, or the
14   courts, rather, to understand that first of all I
15   didn't need to do this analysis because you don't
16   get to this analysis here, the analysis I show on
17   page 65, unless you are essentially disregarding
18   the former structure of the arrangements, which
19   we're not doing.  I'm not doing.
20                So the question is not relevant.
21   That's why I -- I didn't go to the agreements that
22   you're referring to for purposes of that exercise.
23   Right?
24                Q.    I understand that.  I just wanted
25   to make sure that nobody was confused when on slide
```



```
 1   12, and you cite to these joint development

 2   agreements and your Appendix B that in your

 3   reports, you had looked at those for any other

 4   purpose other than on the three items we just

 5   talked about.  You just told me you didn't need to,

 6   I get that.  But I just wanted to make sure nobody

 7   was confused that you did that.

 8                A.    That's correct.  The point I'm

 9   making on this slide is that many of the agreements

10   that I looked at for an entirely different purpose,

11   wholly separate purpose, in fact provide the kind

12   of term that I'm referring to here, the very kind

13   of term that seems to be so troublesome.

14                Q.    And none of those agreements,

15   though, that analysis isn't in your reports,

16   though?

17                A.    Again, I said that's correct.

18                MR. ZELBO:  Your Honours, I don't know

19   if this is a good time for lunch but if it is, I

20   might, in fact I certainly will be able to shorten

21   this.

22                THE CANADIAN COURT:  The old promise.

23   That's fine.

24                MR. ZELBO:  I will keep this promise.

25                THE CANADIAN COURT:  All right.  So
```

Neeson&Associates   W&F

1    we'll come back at quarter to two.  Is that fine,

2    Judge Gross?

3              THE US COURT:  That is fine, thank you.

4    I will be here.

5              -- LUNCHEON RECESS TAKEN AT 12:28 P.M.

6              -- UPON RESUMING AT 2:00 P.M.

7              THE US COURT:  Thanks, everyone.

8    Please be seated.  All right.  Good afternoon,

9    Justice Newbould.  Mr. Zelbo?

10             MR. ZELBO:  Good afternoon.

11             THE US COURT:  Good afternoon.

12             MR. ZELBO:  True to my word, I have

13   shortened the cross to the point where I have no

14   further questions but one point of clarification

15   which is that, with apologies to the courts, when I

16   was citing the transcript of the deposition of

17   Sheldon Burshtein, I had not realized that

18   yesterday afternoon the final transcript did come

19   in.  There's no change between the draft that I was

20   citing to and the final, other than the pagination

21   changes.

22             So instead of page 85 line 7, to 86

23   line 4, I am told I was instead reading from page

24   96 line 14, to page 97 line 11.

25             And with that, I have no further



1    questions.

2            THE CANADIAN COURT:  I don't think that

3    change is going to be definitive for this case.

4            MR. ZELBO:  I sort of suspected that.

5            THE CANADIAN COURT:  Thank you,

6    Mr. Zelbo.

7            MR. ZELBO:  But nonetheless wanted the

8    record to be clear.

9            THE CANADIAN COURT:  Thank you,

10   Mr. Zelbo.

11           MR. ADLER:  Good afternoon, Justice

12   Newbould.  It's Derek Adler for the Joint

13   Administrators and the EMEA Debtors.  I've been

14   before you by video before.  It's a pleasure to be

15   here in person and good afternoon, Judge Gross, as

16   well.

17           THE US COURT:  Good afternoon,

18   Mr. Adler.

19

20   CROSS-EXAMINATION BY MR. ADLER:

21           Q.   Now Dr. Reichert, let's start with

22   a few questions just about the basics of the arm's

23   length standard.

24           You've written that that's an objective

25   test; is that right?




```
 1                    A.    I think it is, yes.
 2                    Q.    And the purpose of it is to
 3    allocate global income among the entities in a
 4    multinational enterprise; is that right?
 5                    A.    The purpose is to allocate taxable
 6    income.
 7                    Q.    And the test doesn't look at any
 8    one entity in the enterprise, it actually looks
 9    holistically at how income is allocated across the
10    enterprise; isn't that right?
11                    A.    Well, the arm's length standard or
12    arm's length principle isn't a test, per se.  The
13    principle would be applied to the parties to a
14    given transaction.  If those parties included all
15    the parties in the enterprise and the entities in
16    the enterprise, the answer to your question would
17    be yes.
18                    Q.    And the arm's length standard is
19    followed by all the major commercial nations; isn't
20    that right?
21                    A.    Brazil perhaps being the big
22    exception, but yes.
23                    Q.    You've described it as a
24    convention among governments; is that an accurate
25    description?
```



```
 1                   A.   I think it is, yes.
 2                   Q.   And the principles for applying
 3    the arm's length standard are relatively uniform
 4    from country to country; isn't that right?
 5                   A.   I think that's accurate, yes.
 6                   Q.   And you don't know of any
 7    differences among the major countries that are
 8    relevant to what we've been talking about here in
 9    this case, do you?
10                   A.   The differences in practice
11    pertain primarily to the kinds of things we're
12    talking about today, whether, for example, goodwill
13    is compensable, but that really derives from tax
14    laws as opposed to the arm's length standard
15    itself.  So you do see differences in application
16    depending upon whether there are other constraints
17    in the tax law on the arm's length standard, but by
18    and large the application is uniform.
19                   Q.   And certainly none of the expert
20    reports in this case have drawn attention to any
21    distinctions between the laws in the different
22    countries that are relevant to the opinions of the
23    experts here?
24                   A.   Not that I can recall.
25                   Q.   Now, in terms of the reasons for
```



```
1   developing the arm's length standard, do you use
2   the term "controlled entities" in the transfer
3   pricing area?
4              A.   Yes.
5              Q.   And that means that those
6   entities -- that refers to entities within a
7   corporate group; is that right?
8              A.   It can refer to entities that are
9   commonly controlled but not part of the same
10  corporate group, so the concept of control can
11  apply outside of a multinational as across entities
12  in different firms.  That can happen.
13             In fact, there is some case law
14  covering that question, but by and large the answer
15  to your question is yes.
16             Q.   And the fundamental principle
17  there is these are entities that don't act
18  independently; isn't that right?
19             A.   Yes.
20             Q.   They're not freely entering the
21  transactions with the other companies in the group;
22  isn't that right?
23             A.   Well, I'm not sure I would say
24  they're not freely entering into the transactions.
25  They are commonly controlled I think is the proper
```



1    way to state what you're getting at.

2              Q.   But by definition, the

3    transactions that are entered into between

4    controlled parties are not at arm's length, right?

5    They're entered into within the controlled group.

6              A.   Okay, yes.  By definition, the

7    entities are commonly controlled.  That's why we're

8    applying the arm's length standard, so yes.  But I

9    think the OECD guidelines recognize there can be

10   hard bargaining inside the multinational

11   enterprise.

12             Q.   But the reason you need the arm's

13   length standard is actually because entities under

14   common control don't actually negotiate like

15   independent commercial parties.  They don't agree

16   on market terms?

17             A.   For the most part that's accurate.

18   That's been my experience, yes.

19             Q.   And so the purpose of the arm's

20   length standard is to mimic the arrangements that

21   independent and you've said hard bargaining, that's

22   in your report, hard bargaining parties would reach

23   if they were --

24             A.   That's correct, yes.

25             Q.   -- if they were independent.



 1                   Now, the core principle underlining the

 2    -- underlying the arm's length standard is that

 3    you're rewarding the relative contributions to

 4    creating the value of the enterprise; is that

 5    right?  Strike that.  It wasn't a good question.

 6                   A.    Okay.

 7                   Q.    The core principle is to give

 8    appropriate rewards to the value that's contributed

 9    by each of the entities in the enterprise; is that

10    right?

11                   A.    That's a -- that's a hard one to

12    answer, Mr. Adler, because I'm not sure what you

13    mean by appropriate returns or appropriate rewards.

14    I think the motivation is to provide arm's length

15    rewards to value created.

16                   Q.    So it's to reward value creation

17    in a way that's comparable to what free market

18    entities would get in comparable transactions?

19                   A.    It's to reward value creation in a

20    manner consistent with comparable transactions to

21    the degree that those exist.  Remember that in many

22    cases, we don't see transactions in the open market

23    that follow the same pattern as what we see inside

24    of a multinational.

25                   Q.    And in the residual profit split



1   methodology, the entities that contribute to the

2   main profit driver of the firm are the ones that

3   share in the residual profits; is that right?

4           A.   That's correct.  To the main

5   profit driver of the firm, that's distinct from the

6   enterprise value perhaps, but yes, the statement

7   you just made is accurate.

8           Q.   And you wrote in your report that

9   that methodology was particularly appropriate for

10  highly integrated technology-centric companies in

11  which the technology investments are the primary

12  reason for economic profits and/or losses, and are

13  made by multiple controlled parties.

14          A.   Sure, yes.

15          Q.   Now, you've testified that in your

16  opinion, the residual profit split was the right

17  transfer pricing methodology for Nortel from 2001

18  onwards; is that correct?

19          A.   Correct.

20          Q.   And under the RPS methodology, the

21  parties that contribute to the driver of the

22  firm -- the profit driver of the firm, the

23  so-called non-routine activities, are the ones that

24  are entitled to share in the residual profits; is

25  that right?



```
 1                        A.    The residual operating profit in
 2    the system, yes.
 3                        Q.    And at Nortel, it was determined
 4    that research and development, the creation of IP,
 5    was the profit driver; is that right?
 6                        A.    Well, I think research and
 7    development was the primary profit driver.  Whether
 8    that means the creation of IP or not is not
 9    entirely clear.  IP was certainly created, but
10    those two things are not identical.
11                        Q.    Fair enough.  With respect to R&D
12    investment, you referred to it as the crucial and
13    non-routine contributor to the enterprise value?
14                        A.    Yeah, I say the enterprise was
15    existentially dependent upon it is how I say it.
16                        Q.    So R&D was the non-routine
17    function that entitled the parties to share the
18    residual profit?
19                        A.    No, I would not agree with that
20    statement.
21                        Q.    But R&D activity was
22    considered -- it was considered entrepreneurial in
23    nature in this context, wasn't it?
24                        A.    The role of the licensees was
25    considered to be entrepreneurial.  A licensee,
```



```
 1   paying a royalty to a licensor, is also an
 2   entrepreneur.  So the fact that the cost incurred
 3   by these licensees was incurred in the form of R&D
 4   is an incident of the transaction.  That's how I
 5   would -- it was as I've said, consideration.
 6                 Q.   And when you talk about a
 7   licensee, you're actually talking about the parties
 8   that are referred to as the participants in the
 9   MRDA, isn't it?
10                 A.   I'm talking about, yes, all of
11   them.  Of course the primary issue being with
12   respect to the licensees in this case, but yes.
13                 Q.   Well, when you get to talk about
14   sharing of profits, they're referred to as
15   participants; isn't that right?  In the MRDA and in
16   other contexts here?
17                 A.   Sure.
18                 Q.   Because they were participants in
19   a joint activity here, weren't they?
20                 A.   They were, yes.
21                 Q.   And the entities which you have
22   referred to yourself as entrepreneurial,
23   that -- the RPS entities were the ones who took on
24   the risk and reward of -- of the function of the
25   enterprise, weren't they?
```



```
 1                    A.   Yeah, the question is
 2   entrepreneurial with respect to what, right?
 3   Entrepreneurial, what is it that they jointly own?
 4   So, they could jointly own make/sell rights or they
 5   could, under the conception, for example, of the
 6   EMEA Debtors jointly own the entire enterprise.
 7                    So I would assert that the agreement is
 8   clear and we don't cross the hurdles or thresholds
 9   that I spoke about earlier, so the thing they
10   jointly share is the thing the agreement says they
11   share, which is make/sell rights.
12                    Q.   And what they were investing in
13   was the IP; isn't that right?
14                    A.   They were investing in something
15   referred to as NN Technology which is broader,
16   again, than IP.  Yes, I think in general the answer
17   to your question is yes.
18                    Q.   And you refer to them as R&D
19   investors in your report several times?
20                    A.   I think I do, yes.
21                    Q.   And when you looked for comparable
22   agreements to compare to this, what you looked at
23   were joint development contracts; isn't that right?
24                    A.   Well, I looked to joint
25   development contracts for purposes of determining
```



1   for claims, for the transfer pricing issues in this

2   case, whether at arm's length we would expect to

3   see restructuring borne by one party to an

4   arrangement, or alternatively vendor financing and

5   things of this nature would be borne by one party

6   as opposed to a group of parties.

7              Q.   And joint development contracts

8   were the ones that you considered to be comparable

9   to the arrangement here; isn't that right?

10             A.   No, I did not say they were

11  comparable.

12             Q.   Actually, I think you did.  It was

13  in your slide which referred to Appendix B before,

14  which is a list of joint development contracts;

15  isn't that correct?

16             A.   Let me see the slide.  Which slide

17  are you referring to?

18             Q.   I'll tell you what, I'll move on

19  from there.  In Nortel's RPS methodology, the

20  fact -- the principle that R&D was the

21  entrepreneurial activity was reflected in the

22  choice of contributions to R&D as the allocation

23  key; isn't that correct?

24             A.   I'm sorry, will you repeat that?

25  I was trying to follow and I was unable to.



```
 1                    Q.   I apologize.  In Nortel's version
 2    of the RPS methodology --
 3                    A.   Okay.
 4                    Q.   -- the fact that R&D was the
 5    profit driver was reflected in the choice of
 6    contributions to R&D as the allocation key; isn't
 7    that correct?
 8                    THE CANADIAN COURT:  I don't understand
 9    the question.
10                    MR. ADLER:  Okay, I'm sorry, Your
11    Honour.
12                    BY MR. ADLER:
13                    Q.   Now, at Nortel the residual
14    profits were divided on the basis of relative R&D
15    spending; is that correct?
16                    A.   Relative R&D stocks, capitalized
17    R&D.  Capital stocks.
18                    Q.   Which was based on R&D spending;
19    isn't that correct?
20                    A.   That's true, yes.
21                    Q.   And that reflected the fact that
22    it was R&D spending that was considered to be the
23    contribution to the value of the enterprise; isn't
24    that correct?
25                    A.   The R&D spending, yes, was viewed
```



```
1    by the company as the primary asset in the
2    business.   The technology, NN Technology, was the
3    primary asset in the business.
4              Q.    And so, when we speak of an
5    allocation key in transfer pricing terms, that's
6    the formula that's used for dividing up the
7    residual profit; is that right?
8              A.    Yes.
9              Q.    And in your view, at Nortel, it
10   was appropriate to use contributions, relative
11   contributions to research and development as the
12   key to allocating residual profits; is that right?
13             A.    It was appropriate to use R&D
14   capital stocks to allocate residual profit.
15             Q.    Which were based on R&D spending?
16             A.    They are based on R&D spending,
17   yes.
18             Q.    And is it appropriate in your view
19   to use costs, R&D costs, as a measure of the
20   relative value of the contributions to creation of
21   IP?
22             A.    I think in this instance it was.
23             Q.    And that's an accepted --
24             A.    Sorry, did you say to the creation
25   of IP?  Or residual profit?  I'm sorry, Mr. Adler.
```



```
 1                    Q.   I said to the creation of IP.
 2                    A.   Okay.  I think it's appropriate to
 3    use capitalized R&D stocks to allocate residual
 4    profit, to be clear.
 5                    Q.   And again, that's based on
 6    relative R&D costs?
 7                    A.   It is based on relative R&D costs.
 8                    Q.   And that's an accepted approach to
 9    valuing contributions to the creation of an
10    intangible?
11                    A.   It's an accepted approach to
12    splitting residual profit, particularly in the
13    context of the RPSM.
14                    Q.   And splitting the profit is based
15    on the relative values that are being contributed
16    to the profit driver; isn't that right?
17                    A.   Splitting the residual profit is
18    predicated upon the relative R&D cost shares.
19                    Q.   And the effect of this at Nortel
20    was that every dollar of R&D spending was
21    considered to have equal value; isn't that right?
22                    A.   Equal value in terms of the
23    generation and sharing of residual profit which was
24    accorded to the make/sell -- product make/sell
25    rights under the MRDA.
```



1                    Q.   And you believed that that was the
2    most reasonable manner in which to place relative
3    values on Nortel's R&D investments; isn't that
4    right?
5                    A.   To place relative values on the
6    R&D investments' effect on economic profit or
7    residual profit, yes.
8                    Q.   And treating each dollar as having
9    the same value was appropriate due to the
10   integrated nature of Nortel's business; isn't that
11   right?
12                   A.   Again, for purposes of splitting
13   residual profit, the answer to that is yes.
14                   Q.   Well, but it's actually a way of
15   placing value on the R&D investment, isn't it?
16                   A.   It's a way of placing a value on
17   the R&D investments, in their use, making and
18   selling products.  That's what the Nortel RPS did.
19                   Q.   Now, you've defined economic
20   ownership to mean a party's rights to benefit from
21   an income stream; is that correct?
22                   A.   Some or all of an income stream I
23   think is how I stated in my report.  As a result of
24   a defined undertaking or activity.  I believe that
25   was my definition.



1                    Q.   And in that sense it was the RPS

2     entities here who were the beneficial owners for

3     transfer pricing purposes; is that correct?

4                    A.   They were the beneficial owners

5     again of the residual profit.

6                    Q.   Now, you referred before --

7     Mr. Zelbo referred to your metaphor that ownership

8     or ownership rights are a bundle of sticks, rights

9     that can be divided in different ways.  And you

10    would agree that under transfer pricing principles,

11    the question of legal ownership is separate from

12    the question of entitlement to profits; isn't that

13    right?

14                   A.   It is, yes, technically separate.

15    I don't want to give the courts the impression that

16    it is in some way irrelevant.

17                   Q.   And you'd agree that legal title

18    doesn't presumptively give the legal title holder a

19    right to receive the proceeds from exploitation of

20    an intangible asset; isn't that right?

21                   A.   Legal title is an important

22    consideration and as I've stated in my earlier

23    testimony, there is a presumption in favour of form

24    in the transfer pricing regulations.

25                   Q.   Now let's look at your deposition

 Neeson & Associates    W&P WILSON & PETZER LTD.

```
1    transcript, if we could, at pages 182 to 183.  And
2    there, if you look at the question on the bottom of
3    page 182, I asked you:
4                    "But you would agree with me
5                 that what -- what this section
6                 cumulatively says is that legal
7                 title doesn't presumptively give the
8                 legal title holder a right to
9                 receive the proceeds from
10                exploitation of an intangible
11                asset?"
12              And you said:
13                  "It does not.  I would agree
14                with that statement."
15              A.   Yes.
16              Q.   Is that your testimony here today
17    as well?
18              A.   And as I say in the very next
19    sentence:
20                  "The OECD guidelines are very
21                clear about the form of an
22                arrangement being departed from in
23                exceptional circumstances."
24              So I do agree with what I said earlier.
25                THE CANADIAN COURT:  I don't see any
```



 1   difference here in the transcript at the deposition

 2   from the evidence here, Mr. Adler.

 3               BY MR. ADLER:

 4               Q.   So what you're saying then is that

 5   it depends on the overall facts and circumstances;

 6   is that correct?

 7               A.   Sure it does, yes.

 8               Q.   It depends on looking at the

 9   functions that are played by each party in the

10   enterprise?

11               A.    Insofar as those functions include

12   status, a role as a licensor, or a licensee, or

13   some other role in the enterprise, yes, I think

14   that's accurate.

15               Q.   But for transfer pricing purposes,

16   the first step, isn't it, is to determine what

17   function each entity performs in the enterprise,

18   isn't it?  You do a functional analysis?

19               A.   No, that's not accurate.  The

20   first step is to examine the legal arrangements.

21   The OECD guidelines say that they form the starting

22   point for our analysis.

23               Now, that may happen as part of a

24   functional analysis, but -- and a functional

25   analysis in fairness is one of the first steps.



1    For certain, it's a very important one.

2              Q.   And but you have to do that in

3    order to determine whether the arm's length

4    standard is met, don't you?

5              A.   One has to perform a functional

6    analysis in order to determine?

7              Q.   Yes.

8              A.   One has to perform -- there's no

9    test that says if you have not performed a

10   functional analysis, you cannot conclude that the

11   arm's length standard has been adhered to.

12             Q.   But the arm's length standard

13   requires that each entity in the enterprise receive

14   appropriate economic rewards for the contributions

15   it makes; isn't that right?

16             A.    Appropriate economic rewards for

17   what it is and what it does.

18             Q.   And that's the functions it

19   performs, the ways it contributes to the value of

20   the enterprise; isn't that right?

21             A.    It's not merely the functions that

22   it performs.  It includes the things that it owns,

23   so the reason that the -- the guidelines and

24   country regs refer to functions, risks and assets

25   is because, of course, economic ownership of assets



```
 1   matters to this process that you're asking about,

 2   this functional analysis process.

 3               Q.   So what it means really is what it

 4   gives to the enterprise, what it provides to the

 5   enterprise which could be an asset of some form,

 6   the use of an asset?

 7               A.   I'm not sure what you mean by what

 8   it gives or provides.  I mean, the statement sounds

 9   like you're describing an exchange.  I don't think

10   you mean it that way, so if you could clarify the

11   question, I'm trying to be helpful.

12               Q.   Well now, did you do a functional

13   analysis as part of your work here?

14               A.   I think it's fair to say that I

15   satisfied myself that the -- I was familiar enough

16   with the functions, the risks and assets of the

17   entities.  Of course we're all looking at this

18   after the fact, so I would say that with respect to

19   the process one would typically go through to

20   perform a functional analysis, I don't think any of

21   the transfer pricing economists have been able to

22   do that.

23               But I don't think any of the transfer

24   pricing economists would contend that they're not

25   familiar with the functions, risks and assets that
```



```
 1   are involved in this transaction.
 2              Q.   As part of your work, you reviewed
 3   the functional analyses that had been done for
 4   Nortel when it was in operation, didn't you?
 5              A.   I did.
 6              Q.   And you relied on those in
 7   reaching your conclusions, didn't you?
 8              A.   Those documents, excuse me, those
 9   functional analyses were certainly considered, yes.
10              Q.   Now, at your deposition you agreed
11   with me that if you have an entity that held legal
12   title to intangible assets for purely
13   administrative purposes, under transfer pricing
14   principles, that entity would not be entitled to
15   the residual profits generated by those
16   intangibles.  Is that a correct statement of your
17   opinion?
18              A.   Yes, we talked about that during
19   my deposition, that's correct.
20              Q.   And you characterized that that
21   would be a routine function as an administrator in
22   the context that I just posited?
23              A.   Yes.
24              Q.   You said it would only justify,
25   you said, when an administrator earns probably
```



```
 1   something quite nominal.
 2               A.   I know you're representing that I
 3   said that.  I suspect that's how I said it, yeah.
 4   I agree with the statement.
 5               Q.   Now, let's talk a little bit about
 6   the legal arrangements here.  We understand already
 7   that you don't view it as your job to interpret the
 8   MRDA and give a legal opinion on that.  So I won't
 9   -- I won't ask you that question again.
10               Now, your testimony about there being a
11   presumption in favour of the legal arrangements, to
12   refer to your slide, that's only an issue if
13   someone is trying to change the terms of the
14   parties' agreement; isn't that right?
15               A.   It's only an issue -- well, no.
16   The presumption in favour of form exists whether
17   one is attempting to change or restructure or
18   disregard the transactions or not.  Of course the
19   presumption, if you will, matters or kicks in as a
20   threshold when there is an attempt to disregard
21   form.
22               Q.   Okay.  And if there's no attempt
23   to disregard, then there's not an issue with that
24   then, is there?
25               A.   Well, no, the presumption stands,
```



1    right?  The presumption hasn't been questioned.
2              Q.   In any agreement, though, you
3    always do have to meet the arm's length standard in
4    order for the authorities to find it dispositive.
5    Meaning the arm's length standard is always a part
6    of the inquiry, isn't it?
7              A.   Well, it is the inquiry, right?
8    So yes, I mean that's the inquiry.  I'm not sure
9    it's part of the inquiry.
10             Q.   Let's look at page 19 of your
11   rebuttal report where you say:
12                  "The legal form of an
13                  arrangement," this is in the second
14                  paragraph from the bottom -- "The
15                  legal form of an arrangement and the
16                  economic substance must conform and
17                  the economic substance must not give
18                  rise to an arrangement that is
19                  economically irrational."
20             And I think economically irrational
21   there is your shorthand for the arm's length
22   standard, for meeting the arm's length standard; is
23   that right?
24             A.   No, this is my shorthand for the
25   commercial rationality test that we will talked



 1   about earlier, right?  These are threshold tests

 2   for whether we disregard form or not.

 3              Q.   Okay.  That threshold has to be

 4   crossed in any case, the economic rationality test,

 5   doesn't it?

 6              A.   Actually no.  The test is not this

 7   must be rational.  The test is, one must

 8   demonstrate that this is commercially irrational.

 9              Q.   All right.  But then let's look at

10   page 65 of the same report, where you have a

11   flowchart that you have prepared.

12              A.   Okay.

13              Q.   Again it's in the rebuttal report.

14   And this is a flowchart that we understand you have

15   prepared based on the OECD transfer pricing

16   guidelines and principles that are of general

17   application in the transfer pricing area.

18              A.   No, I wouldn't say that.  These

19   are the principles -- they are of general

20   application, but this flowchart pertains to the

21   specific issues that I was examining in the -- for

22   purposes of claims in this matter.

23              This doesn't purport to summarize --

24              Q.   Is that a different test than what

25   would apply for determining how to allocate



1    profits?

2               A.   Oh, this is a subset of the --

3    what the OECD guidelines say, or my summary of what

4    the OECD guidelines say about the particular issues

5    I was looking at here, namely restructuring costs,

6    vendor finance, vendor financing costs or losses,

7    and the sharing of excess non-GAAP pension costs.

8               Q.   Let's look at the flowchart here,

9    the logical framework of transfer pricing

10   guidelines?

11              THE CANADIAN COURT:  It looks a bit

12   like Snakes and Ladders to me.

13              MR. ADLER:  Well, it functions that

14   way.

15              BY MR. ADLER:

16              Q.   So the first item you've got is

17   that does a legal agreement contain a covering

18   term?  And if the answer is yes, you go down to the

19   right side there where you consider whether the

20   form is consistent with the substance and

21   economically rational, and only after you get past

22   that step, if that's a yes, is the legal agreement

23   considered to be dispositive with respect to the

24   item in question.

25              Is that the test?

 Neeson & Associates    W&P WILCOX & FETZER LTD.

```
 1                      A.    That is the test that I applied.
 2     It's the test I believe applies to these questions
 3     that I mentioned earlier, restructuring costs,
 4     vendor financing losses, excess non-GAAP pension.
 5                      Q.    And this is based on the OECD
 6     guidelines that are of general application; isn't
 7     that right?  The ones you cite here in the margins
 8     are applications -- are general applications; isn't
 9     that right?
10                      A.    Well, the guidelines, of course,
11     are of general application, but I am examining the
12     guidelines in light of the questions at hand.
13     These are specific questions at hand.
14                      I think that this is the logical
15     framework one would apply per the guidelines for
16     the questions to which I have applied this set of
17     tests.
18                      Q.    Now, looking at what happens in
19     the middle box that we just pointed to, where it
20     says it's no or unclear, if the form of the
21     arrangement is not consistent with the substance,
22     or if there is no legal agreement, this is going up
23     to the top of the branch above -- above there, then
24     the next thing you look at is what do third parties
25     do?  Is that a correct statement of the decision
```



```
 1   tree, the flow here?
 2              A.   That's correct, yes.
 3              Q.   Now, in fact in the case of
 4   Nortel, we do have instances where the revenue
 5   authorities disregarded the legal agreements
 6   between the parties, don't we?
 7              A.   I'm not sure what you're referring
 8   to.
 9              Q.   Are you aware that from about 2002
10   or 2003 onward, when there was an annual transfer
11   pricing adjustment in favour of the UK entity, the
12   funds didn't actually change hands but were
13   recorded as an interest-free loan that was
14   documented with an interest-free loan agreement?
15              A.   I am aware of that, yes.
16              Q.   And are you aware that Her
17   Majesty's Revenue and Customs in England imputed
18   the interest -- disregarded that legal agreement
19   and imputed the interest and taxed NNUK on the
20   basis of imputed interest as if they had paid
21   interest to their parent company?
22              A.   I was not aware of that.  That is
23   not disregard for the arrangements.  That's
24   disregard for a particular facet of the
25   arrangement.  But I was not aware of that.
```



```
 1                    Q.   But in that case there was, I'll
 2    represent to you, there was a written loan
 3    agreement that said it was an interest-free loan,
 4    that was disregarded by Her Majesty's Revenue and
 5    Customs?
 6                    A.   Yes, yes, yes.  Okay.  I do know
 7    what you're referring to.  And sure, I mean it's an
 8    interest-free loan, right?  So those don't happen
 9    at arm's length.  I, in fact, point that out in my
10    rebuttal report.  So form and substance don't
11    cohere in the case of that particular arrangement.
12                    Q.   And Her Majesty's Revenue
13    apparently had no particular problem disregarding
14    that written agreement in this case?
15                    THE CANADIAN COURT:  Well, are we
16    dealing now with the claims issue?
17                    MR. ADLER:  No, Your Honour.  It's an
18    example.  He said that it's an exceptional thing to
19    disregard the form of a written agreement, and
20    I'm --
21                    THE CANADIAN COURT:  But whether or not
22    it's an exceptional thing, it strikes me you're
23    getting into the claims issue.
24                    MR. ADLER:  I'll move on.
25                    BY MR. ADLER:
```



```
 1                    Q.   Now, would you agree with me, Dr.
 2   Reichert, that at the time they implemented the RPS
 3   methodology, the parties didn't contemplate the
 4   sale of the businesses or the sale of the residual
 5   IP?
 6                    A.   I believe that that's highly
 7   likely.  I believe it's very likely that the answer
 8   to that is yes.
 9                    Q.   And, in fact, at your deposition
10   in response to questioning from Mr. --
11                    THE CANADIAN COURT:  I don't think this
12   is proper cross-examination, at least in this
13   country, to start talking about someone's
14   deposition.  You can ask a question and if he gives
15   you a different answer, you can then cross-examine
16   him on the deposition.
17                    MR. ADLER:  Fair enough.
18                    BY MR. ADLER:
19                    Q.   Would you say that the Rockstar
20   proceeds were a windfall?
21                    A.   I have referred to them as a
22   windfall gain, yes.
23                    Q.   Now, the proceeds from sales of
24   intangible assets, those are subject to taxation;
25   isn't that right?
```



```
 1                      A.   It depends upon the circumstances.
 2    They may be.
 3                      Q.   But presumptively, you have to
 4    report them and they're subject to being evaluated
 5    by the taxing authorities; isn't that right?
 6                      A.   Generally that's true, correct.
 7    Yes.
 8                      Q.   And it's important for transfer
 9    pricing purposes to make sure that the proceeds
10    from the sale of an intangible asset are attributed
11    to the correct entities within a multinational
12    enterprise?
13                      A.   True as a general matter, yes.
14                      Q.   And the allocation of the proceeds
15    here will eventually be reported to the various
16    revenue authorities and will be subject to
17    taxation; isn't that right?
18                      A.   That may be the case.
19                      Q.   Now I'll move to the subject of
20    economic life or useful life.  As part of your
21    work, you reviewed Nortel's amortization schedules;
22    isn't that correct?
23                      A.   Well, it depends upon what
24    amortization schedules you are referring to.  If
25    you're referring to the amortization schedule
```



```
 1   associated with the R&D capital, yes.  Are you
 2   referring to that or are you referring to -- okay.
 3              Q.   That's what I'm referring to.  I'm
 4   sorry, you're right to clarify that.  I'm referring
 5   to those amortization schedules.
 6              A.   Okay.
 7              Q.   And you concluded that the
 8   amortization schedules were reasonable, that 30
 9   percent annual depreciation and the five-year
10   look-back respectively; is that right?
11              A.   Well, that's correct.  I don't
12   think -- I don't use the word "look-back," I don't
13   use that term because it's not clear what that is.
14   I'm referring to an economic useful life.  I don't
15   think look-back is the same concept, at least
16   insofar as I understand how that concept has been
17   used in this case.
18              Q.   Fair enough.  Now, when you did
19   that review, you didn't examine the particular
20   technologies or the patents in order to determine
21   the useful life of it, did you?
22              A.   I did not perform an analysis of
23   the individual patents or the specific patents, or,
24   for that matter, specific know-how items.  I did
25   examine some, I looked to make sure that I had a
```



```
 1    clear understanding of what the technology is.
 2               Q.   But you didn't form your own
 3    conclusions about the life of that technology, did
 4    you?
 5               A.   I think I did form my own
 6    conclusion.  It was predicated on six or seven
 7    separate approaches or methods of evaluating the 30
 8    percent rate of decay that Nortel used.  I
 9    certainly formed my own opinion, though.
10               Q.   And one of the things that you did
11    was to look at economic literature; is that right?
12               A.   I did.
13               Q.   None of that literature was about
14    Nortel technology in particular, was it?
15               A.   Well, some of that literature
16    looks at the industry in which Nortel resided, so
17    in that sense I would say that the literature was,
18    in fact, on point.
19               Q.   But none of it actually examined
20    the useful life of Nortel's own technology, did it?
21               A.   It did not.
22               Q.   Thank you.
23               A.   That is correct.
24               Q.   And you also reviewed the work
25    that Nortel itself had done and presented to the
```



 1   tax authorities; isn't that right?

 2                  A.    That's correct.

 3                  Q.    Now, you'll recall that for the

 4   2001 to 2005 period, Nortel reflected the useful

 5   life of its IP by amortizing R&D spending 30

 6   percent per year; do you recall that?

 7                  A.    Okay.  Again, the useful life was

 8   not confined to IP, it was to the R&D capital.

 9                  Q.    But that is based on the useful

10   life of the IP, isn't it?  Isn't that how you

11   evaluate the appropriateness of that figure?

12                  A.    No, the question is, is the --

13   what is the time horizon over which the technology

14   generates residual profit?  That's the question.

15                  Q.    Okay.  Fine.  And in support of

16   that 30 percent rate, Nortel had relied on

17   interviews of its R&D personnel; is that correct?

18                  A.    It did, yes.

19                  Q.    And you refer -- you reviewed the

20   survey information, both the survey questionnaire

21   and the results of that survey as part of your

22   work; isn't that correct?

23                  A.    I did.

24                  Q.    And you understood that that

25   survey had been performed in order to support



```
1    Nortel's advanced pricing arrangement application
2    to the tax authorities; isn't that right?
3                   A.   Yes.
4                   Q.   And it's important to provide
5    complete and honest information to the revenue
6    authorities, isn't it?
7                   A.   I think that's an important thing,
8    yes.
9                   Q.   You have to provide accurate
10   information?
11                  A.   I think that's a correct
12   statement, yes.
13                  Q.   Let's look at Trial Exhibit 21011.
14   Hopefully that can be handed up to the judges as
15   well, given out.
16                  THE US COURT:  Please.  Thank you.
17                  BY MR. ADLER:
18                  Q.   Now, I believe this was listed as
19   among the materials you reviewed as part of your
20   work.  Do you recognize this?
21                  A.   I believe I do, yeah.
22                  Q.   Okay.
23                  A.   I think so, yeah.
24                  Q.   So, you understand this is
25   actually the survey that was used as part of
```



1   Nortel's work; isn't that right?

2            A.   I'm sorry, were you -- I was

3   looking at the document.  I apologize, Mr. Adler,

4   will you repeat that?

5            Q.   This is actually -- you understand

6   that this is actually the survey that was used by

7   Nortel internally to the interview process?

8            A.   Yeah, I believe that's right.

9            Q.   Now, I note that it says in the

10  second paragraph of the lower email, this is an

11  email in which Mr. Horn is circulating the

12  questionnaire, he says:

13              "...it is not necessary to

14              spend time investigating or

15              researching the topic."

16           Do you see that?

17           A.   I do.

18           Q.   And in your view, that was an

19  appropriate interview technique?

20           A.   Well, I think that I would say -

21  excuse me -- I would say this -- give me just a

22  moment.

23           So, he's asking the R&D personnel of

24  the company how much R&D is still in service as of

25  2001, given that that R&D was performed at an



```
 1   earlier date.  That's a reasonable question to ask

 2   if the inquiry is what is the economic useful life

 3   of the R&D capital.

 4            And he says there is no right answer,

 5   there is no correct or necessarily correct answer,

 6   and that's true.  That's why we use a survey, so

 7   we're using the collective intelligence of the

 8   research staff.

 9            Q.   And he's also saying it's not

10   necessary to spend time investigating or

11   researching the topic?

12            A.   Presumably because the R&D

13   personnel had a reasonably good understanding of

14   this already.  They knew their business.  So in

15   other words, he's trying to tell the R&D personnel

16   don't turn this into a research project, that would

17   be too costly for the company, and use your

18   judgment and intuition.

19            Q.   So do you call it impressionistic?

20            A.   It may be impressionistic.  I

21   think it's -- look, you're asking the people who

22   know, because they performed the R&D, they

23   understand the life cycle of the technology, they

24   are intimately familiar with the R&D road map of

25   the company, and so I would say it's probably more
```



```
 1   than impressionistic.
 2            Q.    Now, focusing on the next page on
 3   the answers that this particular person provided,
 4   question 6 relating to the 1991 R&D program, and we
 5   have to go back and look at what the questioning
 6   was, but it's on the prior page.  What percentage
 7   of the expenditure is still --
 8                 THE CANADIAN COURT:  What --
 9                 MR. ADLER:  I apologize.
10                 THE CANADIAN COURT:  Can you show me
11   what the same question is?
12                 BY MR. ADLER:
13            Q.    Yes, could we -- the question is
14   considering -- there we go.  By the way, you used
15   the term "still in service" before but the question
16   was "still useful and valuable."   Is that the same
17   thing?
18            A.    They're probably synonymous or
19   close.  They may or may not be technically the same
20   thing.  It depends, of course, on the reader,
21   right?
22            Q.    Now, this particular person said
23   that 70 percent of the 10-year-old expenditure was
24   still useful and valuable.
25            A.    Um-hmm.
```



1                    Q.   Is that particular answer
2      consistent with a 30 percent annual rate?
3                    A.   Of course not.  I mean, look,
4      Mr. Adler.  What I did is -- and I believe I am the
5      only expert to have done this in this case -- I
6      looked at the economic useful life of the R&D, NN
7      Technology, the capital stock from probably six or
8      seven different angles.  I used evidence from a
9      number of different directions, including, as you
10     have noted, the academic literature, including
11     surveys that Nortel had conducted, representations
12     to tax authorities, and I brought to bear my
13     experience in this industry.  As I note in my
14     report, I have valued technology very, very similar
15     to Nortel's on two occasions.
16                    I have also brought to bear my
17     experience in an IRS appeals context on exactly
18     this question.
19                    And I can tell you that in my
20     experience, when the issue is economic useful life
21     of technology and this kind of technology, matters
22     settle right at around five percent, rather
23     five-year economic life.
24                    So I -- I grant that this particular
25     respondee to -- to the survey gave an answer that



1 implies a long life, but keep in mind that we have

2 this survey, I believe there was another survey as

3 well, there is a collective set of decisions being

4 made with the R&D personnel, and again that's one

5 piece of evidence that I brought to bear on the

6 question of is the economic useful life consistent

7 with the 30-percent depreciation rate and/or

8 five-year assumption used by Nortel.

9   Q.   Now, you just suggested that you

10 are the only expert to delve into this area.  You

11 are aware that Mr. Malackowski has done a

12 patent-specific, a technology-specific analysis of

13 useful life as well, aren't you?

14   A.   I'm not sure that he has.  He's

15 looked at patents and he uses a concept called

16 look-back period.  Look-back period is not the same

17 thing as economic useful life.  He's taking

18 patents, he's taking just the high interest

19 patents, and he's using a concept that is foreign

20 to me.  I don't know what a look-back is.  It's not

21 an economic useful life of technology.

22   Moreover, if you assume that he's even

23 close to correct, take the 20 years, add it all up,

24 which he does, you get a capital stock, which means

25 he can't be talking about economic life.  You get a



```
 1   capital stock that is so large it's not possible

 2   for Nortel to have produced an adequate return to

 3   it.

 4              Q.   Coming back to this interview

 5   process, though --

 6              THE CANADIAN COURT:  Mr. Adler, can I

 7   ask you a question about this interview process?

 8              MR. ADLER:  Yes.

 9              THE CANADIAN COURT:  I think earlier in

10   that document it said it was going to be circulated

11   to a number of people and put together?

12              MR. ADLER:  Yes.

13              THE CANADIAN COURT:  All right.  So

14   you've just picked up one.  Is there any

15   information as to what the total result was?

16              MR. ADLER:  That's my next document,

17   Your Honour.

18              THE CANADIAN COURT:  Thank you.

19              BY MR. ADLER:

20              Q.   Can we pull up Trial Exhibit

21   21013, please.

22              THE CANADIAN COURT:  I don't want it.

23              BY MR. ADLER:

24              Q.   Now again, Dr. Reichert, do you

25   recall reviewing this document as part of your
```



```
 1   work?
 2              A.   Give me a moment.  I want to see
 3   -- I want to see if this is, in fact, the document
 4   that I looked at.
 5              Q.   I'll tell you that it is listed in
 6   your appendix on exhibits, although I think we've
 7   printed a slightly more legible copy than the one
 8   you had looked at but...
 9              A.   So in my report at page 77 --
10              THE CANADIAN COURT:  Just a minute.
11              THE WITNESS:  Oh, sorry.
12              THE CANADIAN COURT:  Is there a
13   question here yet?
14              BY MR. ADLER:
15              Q.   No.
16              A.   I thought your question was
17   whether I had reviewed this document.
18              Q.   Well, I guess that's a fair point.
19   I did ask whether you have seen this -- whether you
20   recall reviewing this document as part of your
21   work.
22              A.   I may or may not have reviewed
23   this document.  I'm looking at my report to see
24   what I, in fact, relied on.  So what I say is:
25                   "Nortel stated that it
```



1           conducted interviews with its R&D

2           personnel at facilities around the

3           world.  According to Nortel, these

4           interviews indicated 22.5 percent of

5           R&D expenditures undertaken in '96

6           were still in service five years

7           later.  This amount equates to an

8           average amortization rate of 28.2

9           percent, which is consistent with

10          the 30 percent amortization rate

11          used by Nortel.  This, in turn, is

12          equivalent to an economic life of

13          roughly 5.5 years, given straight

14          line depreciation."

15          I think this is a different interview,

16  if I'm not mistaken, this is the Ron Horn interview

17  or survey which I believe was disavowed by the

18  company in some way, if I'm not mistaken.  I don't

19  remember the facts surrounding it, but...

20          Q.   This is the Ron Horn survey, and

21  it is --

22          A.   Okay.

23          Q.   -- also listed in the documents

24  that you reviewed as part of your work.

25          A.   Okay.

 Neeson & Associates    W&F WILSON & PETZOLD LTD.

```
 1                     Q.   And, I mean, this shows that the

 2     results of the survey we've just been looking at,

 3     first of all out of 224 questionnaires distributed,

 4     only 102 responses were received?

 5                     A.   Yes.

 6                     Q.   A 45 percent rate.  Is that a

 7     robust interview process to you?

 8                     A.   I don't know.  I'm not an expert

 9     in survey techniques.  I can't tell you that -- I

10     can't tell you the answer to that.  Although I

11     should say I don't know the answer to that.

12                     Q.   And the results of this survey

13     were -- showed that 18 percent of the R&D spending

14     was still in service, as you put it, at 10 years

15     later; is that right?

16                     A.    I recognize you're representing

17     that to me.  I will take your word for it.

18                     THE CANADIAN COURT:  Well, I thought

19     the question about your previous document was

20     useful and valuable.  I don't remember seeing in

21     service.

22                     MR. ADLER:  He had used the term in

23     service and said it was the same thing, and I was

24     just using it as shorthand, Your Honour.

25                     THE WITNESS:  I didn't say it was the
```

 Neeson&Associates     W&F

 1    same thing.

 2              BY MR. ADLER:

 3              Q.   Now, when we talk about the

 4    commercial life, that means that you're able

 5    to -- the commercial life of an intangible, that

 6    means you're able to derive income from it; isn't

 7    that right?

 8              A.   So the economic useful life is the

 9    time period over which one is able to generate

10    residual profit.  By the way, to the question of

11    whether useful and economic useful life are the

12    same thing, so the survey Ron Horn did here where

13    he asks, is the expenditure still useful and

14    valuable?

15              Technology can still be useful

16    certainly without generating residual profit.  It

17    can even be valuable without generating residual

18    profit which is precisely why most of the time we

19    are using a relatively short economic life in the

20    context of an RPSM, because the residual profit,

21    the economic rents of the firm are typically

22    competed away easily within five years.  That's why

23    you have to continue to do R&D at the rate that

24    Nortel did.

25              Q.   Now, just stepping back for a



```
 1   moment to the prior subject, with respect to the
 2   use of interview, the interview process to gather
 3   information about useful life, in your writings
 4   you've actually cautioned that interview-based fact
 5   finding methods can be used for improper purposes;
 6   isn't that right?
 7            A.   Yeah, that's correct.  That's why
 8   I developed something called the Profit Vintages
 9   Method, which following our discussion in the
10   deposition a month or two ago, I have actually
11   applied in this case and arrived at an economic
12   life entirely consistent with what my report
13   states.
14            Q.   Now, in terms of the definition of
15   useful or commercial life, though, and we can take
16   down that exhibit there, you would agree with me
17   that it means fundamentally that someone out there
18   in the market is willing to pay for the technology;
19   isn't that right?
20            A.   What it means fundamentally is
21   that the technology stock is generating residual
22   profit.  That's the question in this case.  It may
23   be that the best proxy for that or a good proxy for
24   that is whether the technology is still of
25   commercial value, but the question would be
```



1    commercial value in what context?  In the same

2    context that we're talking about here?  In the

3    Nortel RPS or not?

4              So in other words, if the question is,

5    does, for example, the -- the residual IP sale

6    indicate to us a long economic useful life, it

7    decidedly does not, because what is it telling us?

8    It's telling us the value of the residual patent

9    rights.  That's a very different thing from the

10   economic useful life for purposes of making and

11   selling products and generating residual profit.

12             Because again, the residual profit,

13   particularly in an industry like this, is competed

14   away rapidly.  They're two different questions.

15             Q.   Now, you've actually written an

16   article about this, "The Meaning of Economic Life"?

17             A.   That's the article I referred to a

18   moment ago, the Profit Vintages Method, yes.

19             Q.   And could we pull up Trial Exhibit

20   40710 and go to page 6 to 7.

21             A.   Thank you.

22             Q.   Now you refer to, this is an

23   article, I take it, about the subject we're talking

24   about, how to define and measure the economic life

25   of intangibles, and you refer to the concept of



1    commercial transferability?

2                    A.    Yes.

3                    Q.    Here, which I take it means

4    whether somebody's willing to buy the intangible;

5    is that right?

6                    A.    Well, yes, the intangible in

7    question, so that came out of some work that we did

8    with the licensing department of a very large, high

9    technology company, and we were examining the

10   estimates of the company as to the time frame over

11   which they could sell the technology or license the

12   technology, and the royalty rate that they would be

13   able to generate, and/or the profit that they would

14   be able to extract from a licensee in the same use

15   of that technology that was in question for the

16   purposes of the transfer pricing exercise we were

17   doing.

18                    So in other words, in this case the

19   analog would be what is the commercial

20   transferability of the technology making and

21   selling products?

22                    Q.    All right.  Let's look at the

23   article and what you wrote here.  And what's on the

24   screen there:

25                    "Finally, we come to



```
 1                    'commercial transferability.'  In a
 2                    sense, commercial transferability is
 3                    the most objective of the three
 4                    definitions of economic life.  The
 5                    test here is a standard market test
 6                    - are the intangible assets
 7                    saleable?  Would a buyer be willing
 8                    to pay for the intangibles?  The
 9                    primary advantage of this approach
10                    is that it sidesteps the question of
11                    whether or not current or previously
12                    'functioning' generations of the
13                    intangibles matter.  The question
14                    asked is, simply, 'for how long
15                    would a third party be willing to
16                    pay for your current portfolio -
17                    however you define it - of
18                    intangible assets?'"
19                    And then, actually, if we could move
20       down to the next paragraph from there, starting
21       out, "thus, in principle."
22                    "Thus in principle," commercial
23                    transferability is the most
24                    objective -- I'm sorry.
25                        "...commercial transferability
```

 Neeson & Associates    W&F

1                or willingness to pay definition is

2                objective.  However, in practice, it

3                is typically the case that the fact-

4                finding necessary to implement this

5                definition is very difficult to

6                perform."

7           So what I'm understanding from this is

8    that if you can sell an intangible, it must be

9    within its useful life; isn't that right?

10          A.   Well, the useful life of the

11   intangible in question, this goes back to the whole

12   concept of economic ownership that we talked about

13   earlier, right?  So where you want to go with this

14   is you want to say well, the Rockstar transaction

15   tells us that the economic life was very long.

16          Well, it does tell us that the patents

17   had a long economic life, so the value of those

18   patents in the activity of being a patent troll,

19   the legal ownership of those patents, which I would

20   view as a residual interest in this case, sure,

21   that's got a very long life.

22          But the life in question for purposes

23   of the residual profit split method is the time

24   horizon over which all of the R&D, not just the

25   patents, gives rise to residual profit, the thing



1   being split.  Two different questions, again.

2              Q.   The point here that you're making

3   in your article as I understand it is that if you

4   can sell an intangible, it is by definition still

5   within its economic life if you can gain money from

6   it.  Now, you're taking that in a different

7   direction and trying to say who has the rights to

8   that money, but you will agree with me that if you

9   can sell an intangible, it remains within its

10  commercial life, by your definition of commercial

11  life here.

12             A.   The intangible in question, sure,

13  if you can sell it, it remains within its economic

14  useful life.

15             Q.   That's my only question.

16             A.   Okay.

17             Q.   The only problem with the

18  commercial transferability test is that when you

19  have a going concern, you're not in a

20  position -- you're not going to sell the IP so you

21  don't necessarily know if it's saleable or not?

22             A.   That's not true necessarily.

23  Again, that discussion came out of work that we've

24  done, we've actually done this with more than one

25  licensing department, working with the licensing



1   personnel to estimate the royalties and the profit

2   that they could extract from licensees over some

3   period of time.

4            So they explicitly model this, they

5   actually approach it the way an acquisition deal

6   team would approach it.  The particular licensing

7   department I'm referring to is a very sophisticated

8   licensing department.

9            So the commercial transferability in

10  that case was decidedly a product make/sell

11  commercial transferability concept.

12           Q.   But it's typically something that

13  you can't do, make a commercial transferability

14  analysis for a going concern; isn't that right?

15           A.   Again, okay, fair.  Typically you

16  cannot, but it's not that you cannot do it.

17           Q.   But when you actually sell the IP,

18  it is ipso facto within its useful life; isn't that

19  right?

20           A.   Again, the IP, right, the

21  property, the residual interests are ipso facto

22  within their economic useful life.  That's a fair

23  statement.

24           Q.   And that's true of the Rockstar

25  transaction as well, isn't it?



```
 1                    A.   That's a fair statement, yes.

 2                    THE US COURT:  Dr. Reichert, may I ask

 3     when you wrote this article?

 4                    THE WITNESS:  Judge Gross, that is a

 5     very good question.  I'm not sure the date is on

 6     here.  Let me just see.

 7                    THE US COURT:  I didn't find one.

 8                    THE WITNESS:  I'm going to have to

 9     apologize to you and tell you I don't know, but my

10     suspicion is it would have been around five years

11     ago.

12                    THE CANADIAN COURT:  It says draft at

13     the bottom, actually.

14                    THE WITNESS:  It does.  These have

15     remained in draft.  These are, in my view, my own

16     working papers but they were requested by the other

17     debtor groups.

18                    THE US COURT:  Thank you.

19                    THE WITNESS:  You're welcome.

20                    BY MR. ADLER:

21                    Q.   And the article does reflect your

22     views; is that right?

23                    A.   Indeed, the Profit Vintages

24     Methodology, which is what I'm for the very first

25     time deriving here, actually part of it, is in my
```



1    opinion in certain contexts a reliable way to

2    estimate economic life.  The basic idea there is

3    you sink a dollar of R&D and it generates gross

4    residual profit for a certain number of years,

5    let's call that four.

6              Well, if it generates residual profit

7    for four years, you must have four vintages in

8    service.  That means there must be four gross

9    residual profit layers in the gross residual profit

10   of the company, which means that you can take a

11   forecast and decompose it.  You can determine from

12   the forecast how many residual profit layers,

13   rather how many vintages, are in service and that

14   is exactly the same thing as economic useful life

15   if you have a first in/first out inventory of

16   technology which you do in a steady state.

17             So it's a methodology for using a

18   company's forecast to infer the economic life of

19   that company's technology.  I have applied it to

20   Nortel's forecasts, I did not include it in the

21   report because, to be frank, forecasts are all over

22   the place.  But the median forecast, if I'm

23   remembering correctly, produces an economic life in

24   the neighbourhood of four years.

25             Q.   Now, we referred before -- I



1    referred before and then didn't complete the

2    process of pointing out the slide where you

3    referred to comparable arrangements in Appendix B,

4    the Joint Development Reports, and my colleague has

5    pointed out that that was slide 12 of your slides,

6    where you referred to Appendix B.

7              And again, Appendix B is joint

8    development agreements, so I ask the question

9    again.  You felt that joint development agreements

10   were comparable transactions for present purposes;

11   is that right?

12             A.   So, I think I'm very careful in my

13   report not to refer to these as comparable,

14   uncontrolled transactions.  I do not refer to them

15   as such and I have not represented them to be.  I'm

16   saying comparable arrangements, that's -- I'm using

17   the term more loosely than the term in the

18   regulations which is comparable, uncontrolled

19   transaction.

20             I don't think that these rise to the

21   level of a comparable, uncontrolled transaction.  I

22   don't say I am applying a cut method.

23             I think they provide us with

24   information.  I think they provide us with

25   information as to how open market actors behave.

 Neeson&Associates   W&F

 1                    Q.    Now, your understanding of the
 2    agreement between the parties here is that the four
 3    residual profit split entities other than NNL had
 4    no right to the proceeds of any sale of the jointly
 5    developed IP that they were creating; is that
 6    correct?
 7                    A.    No, I don't think I've -- I've
 8    said that.  I think that, look, first of all my
 9    position is that whatever rights they had, they
10    should be compensated for surrendering them.
11                    So if the court decides that those
12    rights were quite fulsome, then they should be
13    compensated for surrendering them.  If instead the
14    court decides that those rights were narrow, then
15    they should be compensated for surrendering those
16    narrow rights.
17                    But I believe when I've discussed the
18    sale transactions, the point I have made is that it
19    makes sense for the licensees who have product
20    make/sell rights to be compensated for surrendering
21    those product make/sell rights and therefore they
22    should participate in some fashion, whatever that
23    is, in the line of business sales.  They should
24    participate in those line of business transactions.
25                    Q.    Let's pull up your opening report



1    and go to page 37.  The paragraph that starts out

2    "these license grants," third from the bottom.

3    Where you say the second sentence there:

4                    "Their 'economic ownership' did

5                    not encompass any rights to sell

6                    technology assets or entitlement to

7                    share in the proceeds of a sale of

8                    those assets."

9                    Is that your understanding of the

10   arrangements, the legal arrangements between the

11   parties here?

12                   A.   I'm sorry, let me -- let me just

13   find the statement you're referring to.

14                   Q.   I apologize, it's in the third

15   paragraph from the bottom, the second sentence on

16   page 37.

17                   A.   Okay.

18                   Q.   Is that your understanding of the

19   agreement between the parties here, what you have

20   been referring to as the legal arrangements?

21                   A.   Yes.  So I say they don't have an

22   entitlement to share in the proceeds of the

23   transaction.  You think that they are surrendering

24   a license right.  They don't have a property

25   interest I think is what I'm trying to say here, in



1   the line of business transactions, for example.

2                    Q.   But Nortel Networks Canada has the

3   right to sell the jointly created IP at any time;

4   isn't that right?

5                    A.   I don't recall the provisions of

6   the MRDA and I think the provisions surrounding

7   that question are complex, but yes, I think that as

8   a licensor in general, that seemed to be a power

9   accorded to the licensor, the owner of the residual

10  IP.

11                   Q.   So your understanding of the legal

12  arrangements here is that the RPS entities agreed

13  that they would each incur billions of dollars in

14  R&D spending to create a portfolio of IP that NNL

15  could sell at any time and not share the proceeds

16  with the other four participants?

17                   THE CANADIAN COURT:   What kind of a

18  sale are you talking about, Mr. Adler?  Are you

19  talking about a sale that carries along the

20  licenses or are you talking about a sale that

21  doesn't?

22                   MR. ADLER:  Well, either way, Your

23  Honour.  I mean there's a sale of the IP itself

24  because there was no constraint on them to sell it.

25                   BY MR. ADLER:



 1                    Q.    Is that your understanding of
 2   their commercial arrangement?
 3                    A.    Will you repeat the question for
 4   me, Mr. Adler?  Thanks.
 5                    Q.    Your understanding of the legal
 6   arrangements here is that the RPS entities agree
 7   that they would each incur billions of dollars in
 8   R&D spending to create a portfolio of IP that NNL
 9   could sell at any time and not share the proceeds
10   with the other four participants.
11                    A.    Look, I don't think that's an
12   accurate representation of my understanding.  First
13   of all, you refer to the parties jointly creating
14   the IP.  As I've said, I think that the R&D is
15   consideration for the R&D activity clearance.  And
16   thereby consideration for the product make/sell
17   grant.
18                    And in a context like that, in fact,
19   it's within the purview of the licensor to sell the
20   assets that he or she owns.
21                    Is it rational?  Yes, it is.  It
22   happens in the open market with frequency.  Think
23   about entering into this arrangement in 1/1 of
24   2001.  Remember, these entities anticipated, and in
25   fact they got R&D activity payments for eight



```
 1   years, and there was no reason for them to

 2   anticipate going into the arrangement that -- that

 3   the entity would become, Nortel would become

 4   insolvent or that, you know, the events that

 5   transpired would have transpired.  It was a

 6   perfectly rational arrangement for them to have

 7   entered into.

 8               Q.   You are aware that during the RPS

 9   period between 2001 to 2008 the EMEA entities spent

10   a total of 2.6 billion on R&D?

11               A.   I understand you're representing

12   that to me.  I will take your word that that's

13   accurate.

14               Q.   And are you aware that what they

15   got for that was a share of 1.6 billion of losses

16   in return for that investment?

17               A.   Ex post, that may very well have

18   been the case.

19               Q.   And you are aware that the US, the

20   NNI invested $6.4 billion or more than that in R&D

21   over that same period?

22               A.   Again, I understand you're

23   representing that to me.

24               Q.   And what they got for that is a

25   share of losses of $5.7 billion?
```



```
 1                    A.    Again, ex post they received
 2    losses, that's right.
 3                    Q.    And your testimony is that under
 4    the legal arrangements between the parties, NNL
 5    here is entitled to keep the whole $4.5 billion
 6    from the Rockstar sale?
 7                    A.    That is my understanding of this
 8    arrangement, and that is, again, consistent with
 9    open market behaviour.  There are agreements in the
10    appendices of my reports that involve same terms,
11    and it's consistent, again, with a licensing
12    arrangement, yes.
13                    Q.    And so your understanding is that
14    that was part of the contractual arrangements of
15    the parties going back to 2001; isn't that right?
16    That NNL had a right to sell the IP and keep the
17    proceeds?
18                    A.    Yes, at least 2001 to the degree
19    that the interests from the CSA period were past
20    forward into the MRDA.  In other words, remember
21    that these parties were part of an arrangement in
22    which interests were licensed to these participants
23    going all the way back to, perhaps, 1978, and, you
24    know, when you look at NNI or NNUK, as far as I can
25    tell they were born as licensees.  So I would say
```



1   quite possibly, well before 2001 in answer to your

2   question.

3            Q.   Are you aware that --

4            THE CANADIAN COURT:  How long do you

5   plan to be, because we'll have to be taking an

6   afternoon break at some point.

7            MR. ADLER:  I think I can finish in

8   five or ten minutes or so.  I am coming to the end,

9   Your Honour.

10           THE CANADIAN COURT:  All right.

11  Because five minutes --

12           MR. ADLER:  I apologize.

13           THE CANADIAN COURT:  -- otherwise we'll

14  take a break.

15           MR. ADLER:  Why don't we take a break

16  now.

17           MR. ZELBO:  Your Honour, I apologize

18  for this but you asked the date of the article.

19  It's in Dr. Reichert's CV.  Just so everybody

20  knows, it's January 2011.

21           THE CANADIAN COURT:  2011?

22           MR. ZELBO:  That's what it says.

23           THE CANADIAN COURT:  I just didn't

24  quite hear it, that's all.

25           MR. ZELBO:  No, no, no.  I think you



```
 1   thought maybe I misread it.  No, but it's 2011.

 2                THE WITNESS:  Three years.

 3                MR. ZELBO:  Just from your CV.

 4                THE WITNESS:  Thanks.

 5                THE US COURT:  Thank you.

 6                THE CANADIAN COURT:  Thank you.  Thank

 7   you.  We'll take fifteen minutes.

 8                -- RECESS AT 3:15 P.M. --

 9                -- UPON RESUMING AT 3:35 P.M. --

10                THE CANADIAN COURT:  Mr. Adler?

11                MR. ADLER:  Your Honours, this has been

12   a very useful break.  I have decided that I've

13   concluded my questioning.

14                THE CANADIAN COURT:  I'm having great

15   success with my breaks today.

16                MR. SMITH:  The bad news is Mr. Barrack

17   expanded his.

18                MR. ADLER:  Dr. Reichert, thank you,

19   and thank you --

20                THE CANADIAN COURT:  We have ways to

21   deal with Mr. Barrack.

22                MR. ADLER:  Thank you, Your Honours.

23   Thank you, Dr. Reichert.

24                THE CANADIAN COURT:  Mr. Barrack?

25                MR. BARRACK:  Judge Newbould, Judge
```



```
 1   Gross.

 2

 3   CROSS-EXAMINATION BY MR. BARRACK:

 4            Q.   Mr. Reichert -- Dr. Reichert, we

 5   know each other from before.

 6            A.   We do.  It's good to see you

 7   again, Mr. Barrack.

 8            Q.   Good to see you.  So here's what I

 9   did in the break.

10            THE CANADIAN COURT:  You know, there

11   was a former Chief Justice of Ontario who said a

12   long time ago that a lawsuit is not a tea party.

13            MR. BARRACK:  Right.

14            THE CANADIAN COURT:  The last couple

15   days I wondered whether Justice McRuer was right or

16   wrong.  Everybody has been so polite with each

17   other.

18            MR. BARRACK:  Times have changed.

19            BY MR. BARRACK:

20            Q.   So here's what I did on the break.

21   I've got an hour's worth of stuff.  So I took it

22   and I put it into bullet points.  You know what I

23   can do, we can go deep on any of these points or we

24   can go to the bullet points.  So let's try, I've

25   got them on my computer, the bullet points.
```

 Neeson & Associates    W&P

 1                    Canada was a low rate tax jurisdiction

 2     because of R&D credits?

 3              A.   For Nortel, Canada was a low rate,

 4     low tax rate jurisdiction, as you put it, the point

 5     being I think for you that the Nortel RPS was

 6     intended as a tax minimization scheme.

 7              Q.   Next point:  Transfer pricing

 8     involves legal --

 9              A.   Are we able to go deep or --

10              Q.   Yeah -- no, we'll just stay

11     shallow.

12              A.   Okay.

13              Q.   Transfer pricing involves legal

14     tax minimization?

15              A.   I don't think that's true at all.

16              Q.   You don't think that's true?

17              A.   No, I don't think legal --

18              Q.   You don't think your clients hire

19     you to minimize their taxes?

20              A.   In fact, most of the time my

21     clients hire me to ensure that their structures are

22     defensible, because that's what our firm does.

23              Q.   And you don't get hired, amongst

24     the alternatives, to find the one that will result

25     in the least tax for your clients?



```
 1                      A.   That does happen occasionally,

 2    sure.  But that's not the -- most of what we do is

 3    tax controversy, not transfer pricing design.

 4                      Q.   No, but that's a different thing.

 5                      A.   It's rare for us.

 6                      Q.   When they're in the soup they need

 7    you, but to keep them out of the soup, you're paid

 8    by these Fortune 100 companies to come up with the

 9    transfer pricing scheme that will result in the

10    lowest tax.  Fair?

11                      A.   I don't think that's accurate, no.

12                      Q.   Is it the highest tax?

13                      A.   No, that's not accurate either.

14                      Q.   Is it the right amount of tax?

15                      A.   I think that's a fair statement,

16    sure.

17                      Q.   Right.  And if there's two

18    alternatives it will be the lowest, correct?

19                      A.   Two equal alternatives, then yes,

20    the lowest for sure.

21                      Q.   The lowest.  And Nortel attempted

22    to put profits in Canada to legally minimize tax?

23                      A.   Well, there is a view that Nortel

24    was intending to divert income to Canada.  There is

25    no doubt that the Nortel RPS was better as a tax
```



1    matter for Nortel than the CSA, but the Nortel RPS

2    was a more natural structure than the CSA, because

3    we went from a structure in which, for example, the

4    UK and similarly the US were taking credit for R&D

5    that they themselves did not perform and it wasn't

6    clear that they controlled it, to a structure in

7    which an entity's native R&D, R&D that their own

8    employees were performing, was the R&D for which

9    they got credit.  That's a much more natural

10   structure and entirely consistent with the whole

11   thrust of the OECD these days.

12              Q.   I get the natural business.  But

13   Nortel attempted to put profits in Canada to

14   legally minimize its tax.  There has been lots of

15   evidence on that point.

16              A.   Well, you have to -- I mean, look,

17   the IRS and CRA suggested the Nortel RPS, so --

18              Q.   We're going to come to what they

19   did.

20              A.   I'm sorry?

21              Q.   We're going to come to what they

22   did.  But the motivation of the Nortel tax transfer

23   pricing people was to attempt to put profits in

24   Canada to legally minimize the tax.

25              If Nortel executives have said that in



1    testimony --

2                    A.    They said that was their

3    motivation?

4                    Q.    They said one of the benefits of

5    it was?

6                    A.    I agree it's one of the benefits.

7    I can't speak to the motivation.

8                    Q.    Right.  But it is one of the

9    benefits?

10                   A.    It is certainly one of the

11   benefits, yes.

12                   Q.    The MRDA was not accepted by any

13   tax authority?

14                   A.    I'm not sure that that's accurate.

15                   Q.    Can you tell me one that did?

16                   A.    Well, was there not -- first of

17   all, was the Nortel RPS not suggested by the IRS

18   and CRA, so I would assert that the MRDA, which

19   codified the Nortel RPS, was accepted by the IRS

20   and CRA.

21                   Q.    The result -- sorry.

22                   A.    Please go ahead.

23                   Q.    The result for the years 2001 to

24   2005 were not accepted by CRA or the IRS, correct?

25                   A.    That's correct.  And that's why I



1    distinguish in my report between selection of a

2    method, design of a method which is economic

3    ownership and quantification of the method.  And I

4    opined that Nortel's quantification was not arm's

5    length.

6                    Q.    Right.

7                    A.    That there needed to be at arm's

8    length a readjustment of over a billion dollars to

9    the US.

10                   Q.    So a basic -- the basic

11   proposition of moving income into Canada for tax

12   minimization for the years 2001 to 2005 was not

13   accepted by the IRS and the CRA in the method

14   proposed by Nortel under the MRDA, correct?

15                   A.    I think the accurate statement is

16   that the Nortel RPS was somehow requantified.

17   There was an agreement that to my knowledge no one

18   in these proceedings has a sense for what lurks

19   underneath it, but there was an agreement between

20   IRS and CRA which reallocated $2 billion of taxable

21   income at the end of 2005.

22                   Q.    Did you read the trial transcript

23   of Mr. Orlando?

24                   A.    That's a good question.  I think I

25   have read -- actually, I'm not sure I have.  I



```
 1    don't believe I have.

 2              Q.   And what he agreed with what you

 3    just said that the IRS and the CRA did not accept

 4    for 2001 to 2005 the MRDA methodology, but they

 5    wouldn't tell Nortel why not.  You're aware of

 6    that?

 7              A.   Yeah, that's -- I think that's

 8    what I was saying a moment ago or at least what I

 9    was trying to say.

10              Q.   It is.  So from their perspective

11    there was a flaw in this methodology for those

12    years of $2 billion, correct?

13              A.    It doesn't follow that there was a

14    flaw in the methodology or the MRDA.  It follows

15    that there was perhaps a flaw in the

16    quantification, but again, we don't know.

17              Q.   We don't know.  Okay.  Let's move

18    on.  The MRDA did not purport to deal with the

19    allocation of the proceeds of sale of assets in an

20    insolvency liquidation?

21              A.   Are you asking me to comment on

22    that?

23              Q.   That's a question.

24              A.   Okay.  I think that whether the

25    MRDA dealt with insolvency directly or indirectly
```



```
 1   is an important question.  As a license agreement,

 2   that fact and other terms in the arrangement have

 3   implications for insolvency.

 4              Q.   They have implications.  The MRDA

 5   did not specifically address the bankruptcy of all

 6   of the parties, correct?

 7              A.   It did not specifically address

 8   the bankruptcy of all of the parties.

 9              Q.   And it specifically excluded the

10   proceeds of sale of assets, correct?

11              A.   Well, it depends upon what assets

12   you're talking about.  And in fact, the exclusion

13   in Schedule A --

14              Q.   Right.

15              A.   -- is completely consistent with,

16   in fact I think it's motivated by the fact that

17   what the parties were carving up through the Nortel

18   RPS arithmetic was residual profit.  Because the

19   gain or loss on a sale of a business could include

20   a lot of things, typically would include things

21   like routine returns.  So of course you would

22   exclude gain or loss from a sale of a business.

23              Q.   Very important point.  Very

24   important point.  What the MRDA was doing had a

25   limited function, correct?
```



```
 1                    A.   Yes, exactly.  The thing being
 2   shared was the right to make and sell products and
 3   the asset was the right to make and sell products
 4   and the residual profit that was being split was
 5   associated with it.  That's a limited intent, yes.
 6                    Q.   You know that the thing is the
 7   subject of debate in this trial, correct?
 8                    A.   I do indeed, yes.
 9                    Q.   You're not really telling, and I
10   think you've said in your testimony, the court can
11   decide what the thing is one way or the other,
12   correct?
13                    A.   No doubt about it.  That's
14   absolutely right.
15                    Q.   So leave what the thing is apart
16   and let's deal with what was divided.  The only
17   thing that was divided was residual profit as
18   defined in Schedule A of the MRDA, correct?
19                    A.   I think that's correct, yes.
20                    Q.   Okay.  As an economist, not a
21   transfer pricing person, the principles applicable
22   to the allocation of proceeds of sale on an
23   insolvency liquidation may be different than the
24   principles which guide allocation of residual
25   profits in a transfer pricing regime?
```



1                    A.    Absolutely true.

2                    Q.    The NPV model, the NPV equals zero

3    model, explains the minimum an investor will accept

4    on an investment?

5                    A.    That's exactly right, and that's

6    how I describe it.

7                    Q.    Right.  In calculating NPV equals

8    zero, an investor will take into account all of the

9    returns that the investor is to receive over the

10   life of the investment, all of the payments or all

11   of the returns, correct?

12                   A.    Not necessarily.  The investor

13   will take into account the returns that are

14   available to him or her.

15                   Q.    Fair enough.  All of the payments

16   or returns available to him or her, correct?

17                   A.    That's correct.  Realistically

18   available, yes.

19                   Q.    And in doing an NPV equals zero

20   assessment, investors will consider terminal value?

21                   A.    If there is a terminal value.  So

22   the question is the economic useful life of the

23   investment.  So as a general matter, what you've

24   just said is not true.  A terminal value will be

25   included to the extent that the cash flow stream



```
 1    extends into perpetuity or it otherwise extends
 2    beyond the explicit forecast period.  That's all
 3    terminal value is doing.
 4              Q.   Let me adjust the question.
 5              A.   Okay.
 6              Q.   I think we can get there.
 7              A.   Okay.
 8              Q.   If there is a terminal value, the
 9    NPV equals zero equation will consider, necessarily
10    consider the terminal value?
11              A.   I think even that is not
12    necessarily accurate.  If there is a terminal
13    value, the question is what does it pertain to?
14    Does it, in fact, is it claimed by the investor
15    examining the investment in question?
16              Q.   Fair enough.  If the investor is
17    entitled to a terminal value, and a terminal value
18    exists, a rational investor in doing the NPV equals
19    zero equation will consider both the periodic
20    income and the terminal value, correct?
21              A.   That's a correct statement.
22              Q.   Okay.  And the terminal value
23    generally arises from one of two sources in
24    valuation.  There may be exotics, but I am going to
25    give you an example.
```



1                    So just stay with the bullet point.

2    The bullet point is that it can arise either from a

3    capitalized value of future earnings to which the

4    investor is entitled outside of the NPV

5    amortization period being considered, correct?

6                    A.    Will you repeat that?  That was a

7    long proposition.  I want to make sure I follow it.

8                    Q.    Commonly -- where I'm going with

9    this is commonly there are two ways to think about

10   terminal value.  One is you might have an asset and

11   I'll give you an example.  Let's say there's a

12   piece of property and a piece of property is on the

13   outskirts of an expanding city.  And an investor

14   decides it wants to buy that piece of property

15   because it thinks in ten year's time the city will

16   have expanded out there and it will be the perfect

17   site to sell to a developer for an office building

18   but it's not ready yet.

19                    So it thinks that in those ten years

20   what it will do is it will operate a country store

21   on that site.  So, and it's thinking about whether

22   it's going to make that investment.  So to make

23   that investment, what it will do is it will take

24   the net present value of the profit or cash or

25   whatever periodic income measure you want to take



1    from the country store, and at end of the ten

2    years, it will take the net proceeds of sale of the

3    property to a developer, it will take both of those

4    streams of income in calculating -- in determining

5    whether the investment is NPV equals zero, correct?

6                    A.    In your hypothetical, the investor

7    is contemplating full ownership, and so the answer

8    is absolutely yes.

9                    Q.    Right.

10                   A.    Yes.

11                   Q.    You, in all your valuation work,

12   have seen that very commonly, and I'm sure Their

13   Honours have seen this very commonly in cases

14   before them, that sometimes what happens in a

15   discounted cash flow or NPV equals zero analysis is

16   that -- is that the profits are calculated for a

17   finite period of time, say 10 years, for instance

18   in a gas plant, you might have a -- you might have

19   full ownership of a gas plant that produces

20   electricity, and you might have a take-or-pay

21   contract for 20 years.

22                   And so what you do is you calculate the

23   known profit under that take-or-pay contract for

24   the 20 years or a contract for differences for 20

25   years and then at the end of the 20 years you'll



1    put in a capitalized amount that represents the

2    expected income into perpetuity without the

3    contract in place.  That's a common methodology,

4    correct?

5                    A.    Whether it's common or not is hard

6    to say.  What you just described is a reasonable

7    methodology if one, in fact, owns the gas plant,

8    sure.

9                    Q.    It's an economically rational way

10   to proceed, correct?

11                   A.    Well, it depends on what you're

12   doing, right?

13                   Q.    If you're valuing, if you're doing

14   the NPV equals zero assessment as to whether to

15   invest or not, an investor, who was deciding

16   whether to invest in a gas plant that had a 20-year

17   contract and then was uncontracted, that would be

18   an economically rational way to do the math,

19   correct?

20                   A.    Okay, well, you'll forgive me for

21   this, I think.  You might be confusing some

22   concepts.  So you wouldn't be as an investor

23   applying the NPV greater than or equal to zero

24   criteria into that.  You would be taking the

25   present value of the cash flow stream in your



1   hypothetical, figuring out what that's worth and

2   then the net present value of what it's worth and

3   the present value that you got, in other words what

4   you would pay if you paid the present value, would

5   be zero.

6              Q.   Okay.  Let's break it down because

7   these aren't difficult concepts.  We're together on

8   this but just so it's clear on the record.

9              A.   Okay.

10             Q.   The gas plant example, what you

11  want to determine is whether the present value of

12  the future returns at discount -- at an appropriate

13  discount rate reflecting risk is equal to or

14  greater than zero, correct?

15             A.   By definition, if the cash flows

16  are positive and the discount rate isn't infinite,

17  which I think both of those are true of your

18  hypothetical --

19             Q.   Right.

20             A.   -- the present value is positive.

21  There is no net in --

22             Q.   Okay, the net present value.  So

23  the netting involves?

24             A.   Okay.  So the net present value

25  criterion is different from present value.



```
 1                   Q.    Okay.  Explain how it's different.
 2                   A.    So the net present value of an
 3      investment is the net of the investment itself.
 4                   Q.    Right?
 5                   A.    And the present value of the cash
 6      flow stream that that investment throws off.  In
 7      your hypothetical you're just looking at the cash
 8      flow stream.
 9                   Q.    Right.  And you have to subtract
10      from that the amount you invest?
11                   A.    Correct.
12                   Q.    Okay.  So let's deal with the
13      present value calculation on the gas plant example.
14                   A.    Okay.
15                   Q.    You would have the periodic income
16      for the 20 years under the contract, you would find
17      a net present value for that, correct?
18                   A.    A present value.
19                   Q.    A present value, sorry, for that?
20                   A.    Yes.
21                   Q.    Correct?  And you would probably
22      apply one discount rate for that.  Then you would
23      look at the income into perpetuity, you would
24      calculate the present value for that probably using
25      a different discount rate, correct?
```



1          A.   That's not necessarily the case.

2     It depends upon the systematic risk of the later

3     cash flow stream.

4          Q.   Could or could not be?

5          A.   Yes, that's right.

6          Q.   Okay.  You then take those two

7     present values, you subtract your investment and if

8     it's equal to or greater than zero, then you

9     invest.  It's economically rational to invest?

10         A.   Okay, yes.  I'll just take your

11    hypothetical and say yes to it.  There is a

12    technicality there involving the cost of investment

13    is that, you know, at the time is it a present

14    value, because the net present value is the net of

15    the present values of those two things but I think

16    we're talking about the same thing.

17         Q.   Right.  We could complicate it by

18    having the investment being made over time.  But if

19    we assume it's an up front investment we would just

20    compare the two --

21         A.   Fair enough.  I don't mean to

22    complicate it.

23         Q.   No, but I understand what you're

24    saying.  If it's over time you've got a net present

25    value of the investment as well, correct?



```
1                 A.    Correct.

2                 Q.    Okay.  So --

3                 A.    Present value.

4                 Q.    Sorry, you have to present value

5      the investment as well.

6                 A.    Yes.

7                 Q.    If we look at Nortel, and we

8      assume there was no transfer pricing agreement in

9      effect, so we go back to the beginning of time

10     before transfer pricing agreements, okay?

11                A.    All right.

12                Q.    Okay?  And you have the five RPE

13     entities, okay?  You know what they are?  They're

14     the United States, Canada, France, Ireland and the

15     UK.  Okay?

16                A.    Okay.

17                Q.    Let's assume that they're all

18     producing patents, they all have research and

19     development and that R&D produces patents.

20                A.    Okay.

21                Q.    Fair enough?

22                A.    Sure.

23                Q.    If they were going to -- if they

24     are going to enter into an exchange with the other

25     RPEs for various rights within those patents --
```



```
 1                    A.    Okay.

 2                    Q.    -- they would apply the NPV equals

 3     zero analysis, correct?

 4                    A.    It depends upon the arrangement.

 5     I think what you're positing is sort of, a you

 6     know, a confederation, right?  You've got these

 7     fully fledged entities, they all own their own

 8     technology and they're deciding to enter into a

 9     specific transfer pricing arrangement.

10                    Q.    No, not transfer pricing, just

11     pricing.

12                    A.    But just a pricing arrangement?

13                    Q.    Just a pricing arrangement.

14                    A.    Let me ask you, what kind of

15     pricing arrangement are you referring to?

16                    Q.    An arm's length type.  They're

17     trying -- they're trying as between themselves to

18     have a pricing arrangement that's economically

19     rational from the perspective of each of the RPEs

20     if it was a stand-alone entity.

21                    A.    Okay.

22                    Q.    Okay?

23                    A.    All right.

24                    Q.    Now, if that were to occur, each

25     of them, if they were going to -- we're now going
```



1   from determining whether they're going to invest --

2   well, let's go to the intermediate step.

3                If each one of them on your assumption

4   would make a decision whether to invest in R&D on

5   an NPV equals zero analysis, correct?

6                A.   They would be making that decision

7   irrespective of whether they were entering into

8   this arrangement or not, because in your

9   hypothetical they're investing in R&D.

10                Q.   Fair enough.

11                A.   Okay.

12                Q.   And in your hypothetical, you take

13   the enterprise as a whole as making that decision,

14   Nortel as a whole invests in R&D because its NPV

15   equals zero, correct?

16                A.    In the same way that the entities

17   share in the residual profit from the make/sell

18   rights overall, yes.

19                Q.   We're not in the MRDA right now.

20   We're outside.

21                A.   Understood.  Okay.  All right,

22   fair enough.

23                Q.   So we're outside, they're each

24   investing in R&D, and they each own that R&D that

25   they invest.



```
 1                    A.    All right.
 2                    Q.    They each do it on an NPV equals
 3    zero basis, correct?
 4                    A.    They evaluate their R&D
 5    investments presumably on an NPV basis, yes, using
 6    the NPV criterion.
 7                    Q.    Right.  And they do it on the
 8    basis of taking into account both periodic income
 9    and terminal value, correct, if there is any?
10                    A.    When you say they do it you mean
11    they evaluate these R&D investments --
12                    Q.    Yes.
13                    A.    -- on the basis of periodic income
14    and terminal value if there is any?
15                    Q.    Yes.
16                    A.    Presumably, yes.
17                    Q.    All right.  Now, when they -- when
18    they go and bargain with each other to exchange
19    those rights, they would not, if they were
20    economically rational, look to trade periodic
21    income in terminal value for just periodic income,
22    correct?
23                    A.    Sure.  In your hypothetical, you
24    have fully fledged separate and independent parties
25    that in contrast to what I had said earlier these
```

Neeson & Associates    W&F

```
 1    licensees were born as licensees, in your
 2    hypothetical they're born as a confederation.
 3               Q.   Right.
 4               A.   Okay.  Sure.
 5               Q.   So that under -- and when you go
 6    and assess the -- when you go and assess the MRDA,
 7    your basic thesis is that there is a sufficient
 8    return to each of the RPEs for all of their R&D
 9    investment by participating in the periodic income
10    only, correct?
11               A.   I'm saying that as of 2001 --
12               Q.   Right?
13               A.   -- you look at the forecasts in
14    place.
15               Q.   Right.
16               A.   This thing was NPV positive for
17    the licensees and in fact, they got all of the
18    residual profit, the internal rate of return on
19    that was quite possibly as high as 30 percent based
20    upon my calculations, so --
21               Q.   So now you're the -- sorry.
22               A.   Go ahead.
23               Q.   Let's break that down.
24               A.   Okay.
25               Q.   Okay.  Your NPV positive or NPV
```



1    equals zero or greater is for Nortel as a whole,

2    correct?

3              A.   Yes.

4              Q.   Right.  You didn't do -- you can't

5    assume from that analysis, because Nortel central

6    controlled where the R&D went, where if any one of

7    the RPEs is going to be positive or negative,

8    correct?  NPV equals zero or none, correct?

9              A.   Well, by virtue of the fact that

10   the Nortel RPS shared all of the value of the

11   make/sell rights --

12             Q.   Right.

13             A.   -- there were no distinctions as

14   between the participants in terms of their net

15   present value.

16             Q.   There was a distinction in terms

17   of their spend though, right?

18             A.   Yes.

19             Q.   And their spend was controlled by

20   Canada, right?

21             A.   So there was a distinction in

22   terms of their spend and that same distinction

23   would determine their share of the thing that they

24   were sharing.

25             Q.   Right.  And the only thing they



```
 1   shared -- sorry.

 2              A.   I apologize, go ahead.

 3              Q.   The only thing they shared was the

 4   periodic income, correct?

 5              A.   Yes, yes, in my opinion, that's

 6   absolutely right.  That's what the models show,

 7   that's what the conversion from the CSA to MRDA

 8   shows.  I believe that's what the agreement shows.

 9              Q.   Right.  And if terminal value

10   arose from the sale of assets, it was not governed

11   by the MRDA, correct?

12              A.   I wouldn't say that.  If terminal

13   value arose, you're talking about residual rights,

14   goodwill and going concern, that's what terminal

15   value is.

16              Q.   Let's be more precise.

17              A.   Okay.

18              Q.   Because we talked about various

19   types of terminal value.

20              A.   Okay.

21              Q.   Right?  If there were patents that

22   were not used in income producing activities, all

23   right?

24              A.   Okay.  Unused -- unused patents.

25              Q.   Right.  And those unused patents
```



```
 1   were sold, and that is a form from each -- each

 2   RPEs's perspective, if we look at their NPV equals

 3   zero analysis, go back to their stand-alone

 4   analysis, they would consider as part of their

 5   terminal value if there was any unused patents that

 6   could be sold for a value, correct?

 7             A.   Within the Nortel RPS?

 8             Q.   No, stand-alone without the RPS?

 9             A.   Okay, to go back --

10             Q.   Completely unrestricted?

11             A.   -- to your confederation -- to the

12   confederation.

13             A.   Yes, they would.

14             Q.   They would.  And so -- and so that

15   in the MRDA, so we know that stand-alone there

16   could be terminal value, that terminal value could

17   arise from the sale of unused patents, and that we

18   know stand-alone they would take that into account

19   in their NPV equals zero calculation, correct?

20             A.   Again, if you assume that all of

21   these parties came to the table as fully fledged

22   entities in an operating in a federation of some

23   kind, then I think the answer to that is correct.

24             Q.   Right.  And you'll accept that the

25   MRDA, on its terms, exempts proceeds of that type
```



 1   of sale from its allocation methodology, correct?

 2              A.    It does, not for the reasons that

 3   I think you're implying.  Fair enough.

 4              Q.    Forget about for the reasons.  It

 5   does.

 6              A.    It excludes gain or loss on the

 7   sale of assets precisely because it's trying to

 8   identify the residual profit pool resulting from

 9   the R&D capital stock and the make/sell rights that

10   the parties are sharing.

11              Q.    Exactly.  And really what it comes

12   down to in your model, why you say periodic income

13   is enough for the RPEs, is really a function of two

14   things.  One, that you say that ex ante, nobody

15   contemplated this sale, correct?

16              A.    I think the biggest reason --

17   well, so, I have cited that as a reason, but --

18              Q.    Let's stay with that reason for a

19   moment.

20              A.    -- there are reasons for sure I

21   wouldn't.

22              Q.    But one of the reasons is ex ante,

23   nobody contemplated a sale?

24              A.    I think it's fair to say that ex

25   ante there was little or no expectation of some



```
 1    sort of residual IP sale.  It seems obvious to me.

 2                 Q.   And when you combine that with the

 3    fact that the MRDA excluded sales, what we're

 4    dealing with that event is an unallocated risk

 5    under the MRDA, correct?

 6                 A.   No, I don't see why that's an

 7    unallocated risk.

 8                 Q.   How is it allocated in the MRDA?

 9                 A.   Well, if you're a licensee you

10    enter into the deal knowing you don't have full

11    ownership rights.  You don't have residual IP

12    rights.  In which case it's not an unallocated

13    risk, you go in with your eyes wide open.

14                 Q.   Okay.  Here's the -- and that

15    brings us to the critical assumption in your model.

16    If you owned those rights in advance before you go

17    into the -- before you go into the RPS model,

18    that's a different assumption that isn't based on

19    your analysis, correct?

20                 A.   Yes, that's true.  If the -- if

21    the participants were, in fact, parties to a joint

22    venture, that's a different thing from what I have

23    come to understand the Nortel RPS was.

24                 Q.   Right.  And if the parties were,

25    in fact, operating as a joint venture as Kerry
```



1    Stephens said when he testified, "if it's not a
2    joint venture, I don't know what it is," if the
3    parties were operating as a joint venture, then the
4    RPEs would be economically irrational to enter into
5    the bargain you have posited, correct?
6                  A.    Well, yes.    I mean if the parties
7    were fully fledged and owned all the residual
8    interests going into the deal, by definition it's
9    economically irrational for them to give those away
10   to NNL without a substantial buy-in.
11                 So if you assume the answer is that
12   this thing is a joint venture, then by definition
13   it's a joint venture.
14                 Q.    And if you assume that the RPEs
15   didn't have any rights other than rights to
16   periodic income, it becomes tautologic as well,
17   correct?
18                 A.    That's true, but I didn't assume
19   it.    I am taking the arrangement, again, as I
20   discussed at some length during my direct testimony
21   today, the role of the economist is to take the
22   arrangement as structured by the parties, the US
23   tax courts in particular have verified this
24   numerous times, examine the substance and form and
25   commercial rationality of that arrangement, and if

 Neeson & Associates    W&P

1   you don't fail those tests, you accept the form for

2   the reasons I described in my testimony.

3                  Q.   Understood.

4                  A.   So I am not assuming, it's not

5   tautological in my analysis.  I am satisfied that

6   we haven't tripped those thresholds.

7                  Q.   Understand.  But you've also

8   accepted that that threshold determination is for

9   the courts, correct?

10                 A.   I think that the determinations in

11  general in this case are for the courts, sure.

12                 Q.   But sticking with your evidence,

13  if the court makes the determination that rather

14  than having the RPEs having the rather limited

15  rights that you refer to, and they have more

16  fulsome rights, than the model you've posited I

17  think you've told me, the RPEs would be

18  economically irrational to enter into that bargain,

19  correct?

20                 A.   It depends on how much more

21  fulsome but in your hypothetical, it's a joint

22  venture going in, walking in the door, they have

23  all the residual interests.  Of course it would be

24  irrational for them to give those residual

25  interests away without payment.  Of course.

Neeson & Associates   W&F

```
 1                    Q.   Just a couple of clean-up points.
 2    Transfer pricing has an embedded going concern
 3    assumption?
 4                    A.   Yeah, I think we talked about this
 5    during my deposition.  I --
 6                    Q.   Just to cut you off --
 7                    A.   Okay, I'm sorry, go ahead.
 8                    Q.   You're not as familiar with this
 9    as people in the court room.  The problem is the
10    judges haven't seen the deposition.
11                    A.   Fair enough.
12                    Q.   They may not have seen the
13    deposition.
14                    A.   Okay.
15                    Q.   So we're just picking off some
16    points.  We may have talked about these before.
17                    A.   Sorry about that.  Go ahead.
18                    Q.   Transfer pricing has an embedded
19    going concern assumption?
20                    A.   Yeah, I think I've seen -- I
21    believe it was Dr. Feldman who may have asserted
22    that.  I don't know that that's an accurate
23    statement.
24                    Q.   You don't?  Okay.  I didn't think
25    I was going to have to do this, but let me find
```

 Neeson & Associates   W&P Wilson & Peyzer Ltd.

```
 1   where you said that.
 2                A.   You'll take me to my deposition, I
 3   take it?
 4                Q.   Yeah.  Page 261 line 23, to page
 5   262 line 5.
 6                A.   Can I see the surrounding
 7   discussion?
 8                Q.   Yeah, yeah.  We're going to put it
 9   up on the screen.  Do you have it there?  Do you
10   have your deposition there?
11                A.   I don't think I have my full
12   deposition.
13                Q.   We'll give you one.
14                A.   Thank you.  What page are we on,
15   261?
16                Q.   I've got to go back and check my
17   notes.  We are on 261, line 23.
18                THE CANADIAN COURT:  I don't see a
19   whole lot of difference, but anyway...
20                MR. BARRACK:  When I say to him one of
21   the -- one of the fundamental assumptions in the
22   MRDA --
23                THE CANADIAN COURT:  Where are you
24   reading from?
25                MR. BARRACK:  Sorry, 261.
```



```
 1                    THE CANADIAN COURT:  Yes.

 2                    MR. BARRACK:  Line 23.

 3                    THE CANADIAN COURT:  Um-hmm.

 4                    BY MR. BARRACK:

 5                    Q.   "One of the fundamental

 6                    assumptions in that MRDA model, as

 7                    with most or all transfer pricing

 8                    models, is the going concern

 9                    assumption?

10                        Answer:  That's not entirely clear.

11                        Question:  You would expect that

12                    that's true, right?

13                        Answer:  I suspect that is true."

14                    THE CANADIAN COURT:  Next question and

15      answer.

16                    THE WITNESS:  I'm responding -- sorry,

17      Your Honour.

18                    BY MR. BARRACK:

19                    Q.   But it's not necessarily the case,

20      right?

21                    THE CANADIAN COURT:  How is that

22      different from what the witness said?  Mr. Barrack?

23                    MR. BARRACK:  Let me explore the

24      concept with him.

25                    BY MR. BARRACK:
```



```
 1                    Q.   Go ahead.
 2                    A.   So your question to me is one of
 3      the fundamental assumptions in the MRDA model, and
 4      then the clause, "as with most or all transfer
 5      pricing models, is the going concern assumption."
 6      I'm responding to your question regarding the MRDA
 7      and I'm saying I suspect they walked into this
 8      thing thinking it was a going concern.  That's the
 9      point I was making earlier.
10                    Q.   Okay.  Sorry.  Just to clarify,
11      there may be other models that don't have a going
12      concern assumption.  You believe there is a going
13      concern assumption embedded in the MRDA model?
14                    A.   No, I don't say that I believe
15      that there's a going concern assumption embedded in
16      the MRDA model precisely because, as I've pointed
17      out, what these parties get under the MRDA is the
18      profit stream associated with their R&D.  They've
19      got five vintages of R&D around in any given year.
20                    Q.   Right.
21                    A.   And each one is paying off.
22      They've got a five-year-old vintage all the way to
23      a one-year-old vintage.  The five-year-old vintage
24      is paying off its last year, and the one-year-old
25      vintage is paying off its first year, but that's
```



```
1   what they have.  So I wouldn't -- I wouldn't say

2   that the MRDA contained, in and of itself, a going

3   concern assumption.  I would say entering the MRDA,

4   it would have been economically rational for the

5   parties, it would have made sense, let me say it

6   that way.

7              Q.   Okay.

8              A.   It would have made sense for the

9   parties to assume a going concern.

10             Q.   There's nothing in the MRDA that's

11  inconsistent with a going concern assumption,

12  correct?

13             A.   I think that's -- ah, it depends

14  upon what you mean by inconsistent.  So the MRDA

15  does not contain a going concern assumption.  So in

16  that sense it's not consistent with a going concern

17  assumption.

18             But, there's nothing inherently

19  inconsistent.  You could walk into the MRDA

20  believing this was going to persist through time

21  for a hundred years.

22             Q.   So back to my question.  There's

23  nothing in the MRDA that's inconsistent with a

24  going concern assumption, correct?

25             A.   Again, if the premise of the MRDA
```



```
 1    is that the parties owned make/sell rights and

 2    those make/sell rights are a wasting asset I think

 3    you could say that's inconsistent with a going

 4    concern assumption.  So it depends upon how you're

 5    thinking about consistency, I suppose, but the MRDA

 6    certainly didn't require in any way a going concern

 7    assumption.

 8              Q.   There is nothing inconsistent with

 9    investing in a wasting asset and a going concern

10    assumption if you --

11              A.   That's true.

12              Q.   Right?

13              A.   That's a true statement.

14              Q.   Right.  So that if you are going

15    to perpetually invest in wasting assets, you have a

16    going concern assumption, correct?

17              A.   That's a true statement.

18              Q.   Right.  And to be inconsistent

19    with a going concern assumption, there would have

20    to be -- one of the ways would have to be to

21    allocate the risk of it not being a going concern,

22    correct?

23              A.   No, that doesn't mean you're

24    inconsistent with a going concern assumption.  It

25    just means as you've said you're allocating the
```

 Neeson & Associates    W&F

```
 1    risk that it's not a going concern.
 2               Q.   Fair enough.  And maybe that is
 3    the key point.  What this MRDA did was it did not
 4    allocate the risk of this not being a going
 5    concern.
 6               A.   I think it explicitly did allocate
 7    the risk.  I think by virtue of the fact that these
 8    parties had a defined income stream attributable to
 9    each vintage of their R&D, it's absolutely
10    allocating the risk.  That's all they had and so as
11    a licensing arrangement, if the thing falls apart,
12    rights, residual interests revert back as in any
13    license arrangement to the licensor.
14               Q.   There is no explicit term, and
15    this we can go back to your deposition, there is no
16    explicit term in the MRDA that deals with Nortel
17    not being a going concern, correct?
18               A.   I think that's a correct
19    statement, yes.
20               Q.   Right.  And your assumption of how
21    things would fall out on an insolvency is entirely
22    dependent and its economic rationality on your
23    assumption about the license rights, correct?
24               A.   I would not call it an assumption.
25               Q.   Fair enough.
```



```
1                    A.   But it's entirely dependent upon

2   that --

3                    Q.   Your position?

4                    A.   -- opinion, yes.

5                    Q.   Thank you, those are my questions.

6   Thank you.

7                    A.   You're welcome.

8                    THE CANADIAN COURT:  Mr. Barrack.

9   Anyone else who wishes to cross-examine?

10  Mr. Smith, redirect?

11                   MR. SMITH:  Thank you, Justice

12  Newbould, Judge Gross.

13

14  RE-EXAMINATION/RE-DIRECT EXAMINATION BY MR. SMITH:

15                   Q.   Dr. Reichert, just on the

16  hypothetical that Mr. Barrack put to you a few

17  minutes ago, is the notion that any one of the

18  licensees in the Nortel arrangement that they had a

19  body of stand-alone IP that they could dispose of

20  independently for value, is that notion consistent

21  with any of the facts or the economic substance of

22  the Nortel business arrangement as you have

23  examined it?

24                   A.   In my opinion, no.

25                   Q.   The question from Mr. Adler about
```

```
 1    his proposition that if NNL held title for
 2    administrative purposes only, then in that case it
 3    would, I think your evidence was it would not or
 4    probably not have an entitlement to residual value
 5    of the IP itself, right?
 6              A.    Yes.
 7              Q.    Is there anything in your economic
 8    analysis, and I'm not asking you to interpret the
 9    MRDA as such, but is there anything in your
10    economic analysis of the business arrangements and
11    their economic substance in the Nortel entities to
12    suggest that that's an accurate characterization or
13    not?
14              A.    In my opinion it's absolutely an
15    incorrect characterization, and I discussed that at
16    some length in my direct testimony.  NNL was a bona
17    fide licensor.
18              Q.    There was a question from
19    Mr. Adler regarding the internal -- sorry, Inland
20    Revenue in the UK and its treatment of the
21    non-interest bearing aspect of loans from the UK to
22    NNL.  Do you recall that?
23              A.    I do.
24              Q.    Okay.
25              A.    Yeah.
```



```
 1                    Q.   Do you know if what the Inland
 2   Revenue did there in imputing interest was, in
 3   fact, an exercise of the transfer pricing threshold
 4   test that you have discussed, or whether it was an
 5   application of a more general interest imputation
 6   rule?
 7                    A.   That's a good question.  I suspect
 8   that it was the latter rather than the former
 9   because they did treat it as a loan, right, which
10   would presumably mean that they respected the form
11   of that arrangement and then priced it out by
12   imputing interest.
13                    Q.   Thank you.  Just two more points,
14   Dr. Reichert.  Referring to Mr. Zelbo's
15   cross-examination of you and perhaps if we could
16   pull up the deposition of Dr. Reichert, page 30.
17                    You recall that Mr. Zelbo questioned
18   you about your understanding or where you got your
19   understanding of the scope of the license rights.
20   Do you recall that?
21                    A.   Yes.
22                    Q.   And he took you -- you answered
23   that you thought in your deposition you had
24   referred to the fact that you'd also considered, I
25   think you used the word third party arrangements or
```



```
 1   third party licenses?

 2                 A.   Yes.

 3                 Q.   And Mr. Zelbo took you to one part

 4   of your deposition.  Do you recall that?

 5                 A.   I do.

 6                 Q.   If you look at page 30, sir, from

 7   line 8 through 21, where the question was:

 8                      "Are you offering an opinion on

 9                 how the court should read the

10                 license grant under the MRDA?"

11                 You answered:

12                      "No.  To be clear, I'm offering

13                 an opinion regarding the

14                 implications -- the economic

15                 implications of the license as I

16                 read the license, and I read that

17                 license as an economist.

18                 Question:  Are you offering an

19                 opinion based on custom and practice

20                 with respect to parties who engaged

21                 in licensing on how to read the

22                 licenses?

23                 Answer:  My opinion is based in

24                 part on my experience of reading

25                 uncontrolled, meaning third party
```



1              licenses, and studying the behaviour

2              of licensors and licensees, I might

3              add."

4         Is that the reference you were

5    recalling in your evidence, sir?

6         A.   Yes, it was.  It is.

7         Q.   Finally, sir, if we could go to

8    the CRA circular that Mr. Zelbo took you to, it's

9    Exhibit TR50295.  Do you still have it there?

10        A.   I think I do somewhere.  Let me --

11   I think -- is this it?  Yes.  This is 87-2R?

12        Q.   It is.

13        A.   Okay.

14        Q.   Thank you.  Mr. Zelbo took you to

15   one paragraph under the heading "Qualifying Cost

16   Contribution Arrangements."  Correct?

17        A.   Yes.

18        Q.   I think we understand from your

19   evidence that that's also referred to as Cost

20   Sharing Arrangements; is that right?

21        A.   Yes.

22        Q.   And sir, if you look at the first

23   page of that circular?

24        A.   Page 1 of the circular?

25        Q.   Yes.  I think it's actually --



```
 1    yes, the first page.  Items 3 and 4.  Do you have

 2    some familiarity with this circular before today,

 3    sir?

 4                  A.   Yes.

 5                  Q.   Okay.  And you see the reference

 6    there to, it's setting out the department's views

 7    on transfer pricing and with respect to the

 8    application of the 1995 OECD guidelines, correct?

 9                  A.   Yes.

10                  Q.   And then it goes on in 4 to say:

11                       "The OECD guidelines should be

12                       consulted for a more detailed

13                       discussion of the principles

14                       contained in Parts 2 to 6 of this

15                       circular."

16                  A.   Yes.

17                  Q.   And it refers to 1995 OECD

18    guidelines.  I think you have referred extensively

19    to 2010 guidelines, correct?

20                  A.   That's correct.

21                  Q.   And also to 2013?

22                  A.   That's correct.

23                  Q.   And is there anything in the OECD

24    guidelines, sir, that tells us that under transfer

25    pricing guidance, that under a cost sharing
```



 1   arrangement, the parties must have identical legal

 2   ownership, that each participant must have

 3   identical legal ownership?

 4              A.    Not in the intangible resource

 5   overall.  In fact, I was going to make that point

 6   that I think, in fact, paragraph 120 makes exactly

 7   the point.  I was simply trying to answer

 8   Mr. Zelbo's precise question.

 9              But what a qualified cost contribution

10   arrangement or a CSA can do and often does is allow

11   controlled parties to share in the development and

12   ownership of a defined asset.  It does not imply

13   unfettered rights to the entire enterprise.

14              Q.    All right.  And sir, if you could

15   turn to page 13 of that circular.

16              A.    Okay.

17              Q.    Item 123, you'll see a reference

18   there that:

19              "For a QCCA to satisfy the

20              arm's length principle, each

21              participant's contribution must be

22              consistent with that which an arm's

23              length party would have agreed to

24              contribute, under comparable

25              circumstances, given the benefit it



1          would have reasonably expected to

2          derive from the arrangement."

3          A.   Yes, I see it.

4          Q.   Okay.  And under 124, we have the

5     statement that:

6               "Under the arm's length

7               principle, the value of each

8               participant's contribution to a QCCA

9               should be consistent with the value

10              that arm's length parties would have

11              assigned to that contribution in

12              comparable circumstances.  The

13              application of the arm's length

14              principle would take into account,

15              among other things, the contractual

16              terms and economic circumstances

17              particular to the QCCA."

18         Are those two statements sound transfer

19    pricing principles at the time they were made in

20    1999 and are they sound transfer pricing principles

21    today?

22         A.   Yes, they are.

23         Q.   And the threshold test that you

24    discussed for the tax authority to disregard the

25    actual structure, the actual arrangements of the



1    parties, do they apply equally to cost sharing

2    arrangements?

3                    A.   Yes, they do.

4                    Q.   And I think, sir, we don't have to

5    turn it up unless you need it, but in the 2004

6    answer to the IRS that we turned to in your

7    examination in-chief, in the passage we talked

8    about there was a reference to the CSA that

9    preceded the RPSM being approved by the tax

10   authorities, correct?

11                   A.   Yes, there is.

12                   Q.   Thank you, sir.

13                   MR. SMITH:  Thank you, Your Honour,

14   thank you, Judge Gross.

15                   THE WITNESS:  Thank you.

16                   THE CANADIAN COURT:  Thank you, Dr.

17   Reichert.

18                   THE WITNESS:  You're welcome.

19                   THE US COURT:  Thank you.

20                   THE WITNESS:  You're welcome, Judge

21   Gross and Justice Newbould.

22                   THE CANADIAN COURT:  All right.  So I

23   guess we'll stop for the day and we'll start at

24   nine o'clock tomorrow morning.

25   -- Whereupon court adjourned at 4:25 p.m.



```
 1                    REPORTER'S CERTIFICATE
 2                    I, KIMBERLEY A. NEESON, RPR, CRR,
 3     CSR, CCP, CBC, Canadian Certified Shorthand
 4     Reporter, Realtime Systems Administrator, and I,
 5     LORRAINE B. MARINO, RDR, CRR, CSR, US Certified
 6     Shorthand Reporter, certify;
 7                    That the foregoing proceedings were
 8     taken before us at the time and place therein set
 9     forth;
10                    That the entire proceedings of the
11     hearing date were recorded stenographically
12     individually by each of us and were thereafter
13     transcribed;
14                    That the foregoing is a true and
15     correct transcript of our shorthand notes so taken.
16
17              Dated this 17th day of June, 2014.
18     PER:                      PER:
19     Lorraine B. Marino        Kimberley Neeson
20     LORRAINE B. MARINO        KIMBERLEY NEESON
21     WILCOX & FETZER           NEESON & ASSOCIATES
22     WILMINGTON, DE USA        TORONTO, ON  CANADA
23
24
25
```









































































