



```
 1              UNITED STATES BANKRUPTCY COURT

 2              FOR THE DISTRICT OF DELAWARE

 3

 4   ------------------------------)

 5   In Re                         )

 6     NORTEL NETWORKS INC.,       )   Case No.

 7     et al.,                     )   09-10138 (KG)

 8       Debtors.                  )

 9   ------------------------------)

10                        - and -

11              Court File No. 09-CL-7950

12                       ONTARIO

13              SUPERIOR COURT OF JUSTICE

14                  (COMMERCIAL LIST)

15     IN THE MATTER OF THE COMPANIES' CREDITORS

16   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17     AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18   ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19       NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20     CORPORATION, NORTEL NETWORKS INTERNATIONAL

21     CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                     CORPORATION

23     APPLICATION UNDERT PART IV OF THE COMPANIES'

24   CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                     AS AMENDED
```



```
 1

 2

 3

 4    ---- This is the Day 17/Volume 17 of the transcript

 5    of the proceedings in the above matter held

 6    simultaneously in:

 7    Superior Court of          United States Bankruptcy

 8    Ontario (Commercial        Court for the District of

 9    List)                      Delaware

10    Courtroom 8-1              Courtroom 3

11    330 University Avenue      824 Market Street

12    Toronto, Ontario           Wilmington, Delaware

13

14              on the 18th day of June, 2014,

15    commencing at 9:10 a.m.

16

17                      ---------

18    B E F O R E:

19    The Honorable Judge Kevin Gross (United States)

20    The Honorable Mr. Justice Frank Newbould (Canada)

21

22                      ---------

23

24

25
```



```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17        Julie Rosenthal, Esq.

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22

23   PER: Murray McDonald, Esq.

24        Brent Beekenkamp, Esq.

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER: Derrick Tay, Esq.

 7        Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER: Ken Coleman, Esq.

14        Paul Keller, Esq.

15        Daniel Guyder, Esq.

16        Laura Hall, Esq.

17        Joseph Badtke-Berkow, Esq.

18        Jonathan Cho, Esq.

19        Nicolette Ward, Esq.

20

21   FOR THE CANADIAN DEBTORS

22   BUCHANAN INGERSOLL & ROONEY

23   1105 North Market Street

24   Suite 1900

25   Wilmington, DE  19801-1054
```



```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   79 Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   1201 North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```



```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```



```
 1   PER: Matthew P. Gottlieb, Esq.

 2        Tracy Wynne, Esq.

 3        Paul Michell, Esq.

 4

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER: Derek Adler, Esq.

11        William Maguire, Esq.

12        Neil Oxford, Esq.

13        Fara Tabatabai, Esq.

14        Charles Huberty, Esq.

15

16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

17   LIMITED

18   YOUNG CONAWAY STARGATT & TAYLOR LLP

19   Rodney Square

20   1000 North King Street

21   Wilmington, DE  19801

22   PER: Ed Harron, Esq.

23        John Dorsey, Esq.

24

25   FOR THE EMEA DEBTORS
```



```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER: James Norris-Jones, Esq.

 6

 7   CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```



```
 1   PER: Barry E. Wadsworth, Esq.

 2        Lewis Gottheil, Esq.

 3

 4   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 5   COMMITTEE

 6   SHIBLEY RIGHTON LLP

 7   University Avenue, Suite 700

 8   Toronto, ON  M5H 3E5

 9   PER: Arthur O. Jacques, Esq.

10        Thomas McRae, Esq.

11

12   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14   FUND

15   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16   35th Floor

17   155 Wellington Street West

18   Toronto, ON  M5V 3H1

19   PER: Kenneth T. Rosenberg, Esq.

20        Massimo (Max) Starnino, Esq.

21        Lily Harmer, Esq.

22        Karen Jones, Esq.

23        Tina Lie, Esq.

24        Michelle Jackson, Esq.

25
```



```
 1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 3   2009

 4   NELLIGAN O'BRIEN PAYNE LLP

 5   50 O'Connor Street, Suite 1500

 6   Ottawa, ON  K1P 6L2

 7   PER: Janice B. Payne, Esq.

 8        Steven Levitt, Esq.

 9        Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```



1   919 North Market Street, Suite 1500

2   Wilmington, DE  19801

3   PER: Selinda A. Melnik, Esq.

4        Richard Hans, Esq.

5        Timothy Hoeffner, Esq.

6        Jason Gerstein, Esq.

7        Farah Lisa Whitley-Sebti, Esq.

8

9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12  BENNETT JONES LLP

13  1 First Canadian Place

14  Suite 3400

15  Toronto, ON  M5X 1A4

16  PER: Kevin Zych, Esq.

17       S. Richard Orzy, Esq.

18       Gavin Finlayson, Esq.

19       Richard Swan, Esq.

20       Sean Zweig, Esq.

21       Jonathan Bell, Esq.

22       Amanda McLachlan, Esq.

23

24  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25  MILBANK, TWEED, HADLEY, MCCLOY LLP



```
 1   1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4        Jennifer P. Harris, Esq.

 5        Albert A. Pisa, Esq.

 6        Samir Vora, Esq.

 7        Andrew LeBlanc, Esq.

 8        Michael Hirschfeld, Esq.

 9        Atara Miller, Esq.

10        Tom Matz, Esq.

11        Nick Bassett, Esq.

12        Gabrielle Ruha, Esq.

13        Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23        Michael Wunder, Esq.

24        Ryan Jacobs, Esq.

25
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 2   ASHURST LLP

 3   Boardwalk House

 4   5 Appold Street

 5   London, England  EC2A 2HA

 6   PER: Angela Pearson, Esq.

 7        Antonia Croke, Esq.

 8

 9   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

10   RICHARDS LAYTON & FINGER, P.A.

11   920 North King Street

12   Wilmington, DE  19801

13   PER: Christopher Samis, Esq.

14

15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16   AKIN GUMP STRAUSS HAUER & FELD LLP

17   One Bryant Park

18   New York, NY  10036

19   PER: Fred S. Hodara, Esq.

20        David H. Botter, Esq.

21        Abid Qureshi, Esq.

22        Robert A. Johnson, Esq.

23        Brad M. Kahn, Esq.

24        Christine Doniak, Esq.

25        Joseph Sorkin, Esq.
```



```
 1        Jacqueline Yecies, Esq.
 2   UK PENSION PROTECTION FUND AND NORTEL NETWORKS
 3   UK PENSION TRUST LIMITED
 4
 5   FOR THE UK PENSION PROTECTION FUND AND NORTEL
 6   NETWORKS UK PENSION TRUST LIMITED
 7   THORNTON GROUT FINNIGAN LLP
 8   Suite 3200, 100 Wellington Street West
 9   P.O. Box 329
10   Toronto, ON  M5K 1K7
11   PER: Michael Barrack, Esq.
12        D.J. Miller, Esq.
13        Rebecca Lewis, Esq.
14        Andrea McEwan, Esq.
15        John Finnigan, Esq.
16        Michael Shakra, Esq.
17        D.J. Miller, Esq.
18
19   FOR THE UK PENSION PROTECTION FUND AND NORTEL
20   NETWORKS UK PENSION TRUST LIMITED
21   WILLKIE FARR & GALLAGHER LLP
22   787 Seventh Avenue
23   New York, NY  10019-6099
24   PER: Brian O'Connor, Esq.
25        Sameer Advani, Esq.
```



```
 1        Andrew Hanrahan, Esq.

 2

 3   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 4   NETWORKS UK PENSION TRUST LIMITED

 5   BAYARD, P.A.

 6   222 Delaware Avenue, Suite 900

 7   Wilmington, DE  19899

 8   PER: Charlene D. Davis, Esq.

 9        Justin Alberto, Esq.

10

11   THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER: Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER: Michael J. Riela, Esq.

25
```



```
 1   WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER: John Salmas, Esq.

10       Kenneth Kraft, Esq.

11       Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER: Craig A. Barbarosh, Esq.

18       David A. Crichlow, Esq.

19       Karen B. Dine, Esq.

20

21   LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```



```
 1   Toronto, ON  M5H 3Y4
 2   PER: Edmond F.B. Lamek, Esq.
 3        James Szumski, Esq.
 4
 5   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
 6   PATTERSON BELKNAP WEBB & TYLER LLP
 7   1133 Avenue of the Americas
 8   New York, NY  10036
 9   PER: Daniel A. Lowenthal, Esq.
10
11   BOARDS OF DIRECTORS OF NORTEL NETWORKS
12   CORPORATION AND NORTEL NETWORKS LIMITED
13
14   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
15   CORPORATION AND NORTEL NETWORKS LIMITED
16   OSLER HOSKIN AND HARCOURT LLP
17   100 King Street West
18   1 First Canadian Place, Suite 6100
19   P.O. Box 50
20   Toronto, ON  M5X 1B8
21   PER: Lyndon Barnes, Esq.
22        Edward Sellers, Esq.
23        Betsy Putnam, Esq.
24        Adam Hirsh, Esq.
25        Alexander Cobb, Esq.
```



```
 1                    I N D E X

 2                    EXAMINATION

 3  WITNESS:                                PAGE

 4  JEFFREY KINRICH

 5     Examination-in-Chief/Direct by Mr. Luft   4093

 6     Cross-Examination by Mr. Oxford          4207

 7     Cross-Examination by Mr. Chang           4258

 8     Cross-Examination by Mr. Zarnett         4290

 9     Cross-Examination by Mr. Steep           4344

10     Re-Examination/Re-Direct by Mr. Luft     4362

11

12                    INDEX OF EXHIBITS

13  NUMBER/DESCRIPTION                         PAGE

14     51:   Expert report of Jeffrey Kinrich  4093

15     dated January 24, 2014

16     52:   Rebuttal expert report of Jeffrey 4093

17     Kinrich dated February 28, 2014

18     53:   Excerpt from "Valuing Small       4324

19     Businesses and Professional Practices,"

20     2009

21

22

23

24

25
```



1    ---- Upon commencing at commencing at 9:10 a.m.

2            THE US COURT:  Good morning, everyone.

3    Thank you.  Please be seated.

4            Good morning.

5            MR. LUFT:  Good morning, Judge Gross.

6            THE CANADIAN COURT:  Good morning,

7    Judge Gross.

8            THE US COURT:  Good morning, Justice

9    Newbould.

10           THE CANADIAN COURT:  Before we start, I

11   want to raise an issue about the question of

12   interest on the bonds.  And it was suggested I

13   guess on Monday morning by counsel for the Monitor

14   that that bond issue, the interest on the bond

15   issue, should be decided.

16           We don't know quite enough about the

17   issue.  The issue, whether it is to be decided or

18   not I suppose in part will depend upon the

19   discretion we have under the principle of Ashmore

20   and the Corporation of Lloyd's to decide it now or

21   not.

22           So, Mr. Ruby, what we would like is a

23   short memorandum -- and I mean short -- from the

24   Monitor by tomorrow morning as to what it is

25   exactly the Monitor wants decided by us with



 1  respect to the bond rate of interest, presumably

 2  here in Canada and in Delaware, and then what it is

 3  you want decided, without any argument, and why it

 4  would be helpful to have it decided now.

 5          And then anybody on the responding side

 6  who takes issue with us deciding it now can give us

 7  a brief memorandum of the same kind, without

 8  argument on the issue at all, by the following

 9  morning.

10          We will then consider the two or

11  however many memoranda there are and decide whether

12  or not to schedule it.  And if we do schedule it,

13  it would likely be scheduled sometime next week on

14  one of the days that as of now is not being

15  scheduled because of the shortage of witnesses or

16  the lack of witnesses that were anticipated.

17          So Judge Gross and I discussed this,

18  and we both agree that should be done.  All right?

19          MR. RUBY:  We will take care of it,

20  Your Honor.

21          THE CANADIAN COURT:  Thank you.  The

22  only other issue I want to raise is -- it is not an

23  issue really.  I am looking at the schedule, and I

24  see that next Monday there is a vacancy.  And I

25  assume is that because the last witness is not

 Neeson & Associates    W&P Wilson & Peterson Ltd.

```
 1   available on the Monday?
 2              MR. ROSENTHAL:  Jeff Rosenthal, Your
 3   Honor.
 4              THE CANADIAN COURT:  Yes.
 5              MR. ROSENTHAL:  My understanding is
 6   that --
 7              THE CANADIAN COURT:  I remembered that.
 8   You don't need to tell me.  You can probably also
 9   rattle off your law firm too.
10              MR. ROSENTHAL:  When the Courts gave us
11   the schedule I think back in March or so, I believe
12   that it was given by us as a day off from the
13   Courts.
14              THE CANADIAN COURT:  Oh.
15              MR. ROSENTHAL:  I suspect that if both
16   Courts are available, we can see -- it is not
17   because of our witness unavailability, although we
18   have now told her there is no court Monday.
19              THE CANADIAN COURT:  I understand.
20              MR. ROSENTHAL:  But we can certainly
21   find out if the judges would like to sit on Monday.
22              THE US COURT:  On the assumption that
23   we weren't sitting on Monday, I scheduled a number
24   of things.  So it would be a little bit difficult
25   for me on Monday at this point.
```



```
 1                    THE CANADIAN COURT:  All right.  So we
 2   will do it Tuesday then.
 3                    THE US COURT:  Tuesday, yes.
 4                    MR. ROSENTHAL:  Sure.
 5                    MR. CRICHLOW:  Your Honor, good
 6   morning.  Good morning, Justice Newbould.  It is
 7   David Crichlow on behalf of Wilmington Trust, the
 8   indenture trustee.
 9                    I just wanted to raise one issue before
10   we move on to trial, since we are addressing the
11   interest rate issue on the bonds.  And I wanted to
12   remind Justice Newbould, because he may not be
13   aware of this, but that issue was raised in an
14   objection brought by Wilmington Trust in the US
15   Bankruptcy Court.
16                    THE CANADIAN COURT:  I am aware of
17   that.
18                    MR. CRICHLOW:  Okay.  So there is an
19   objection pending, and I just want to make sure
20   that in deciding how we are going to move forward,
21   we deal with the fact that Wilmington Trust has an
22   objection and has argued this position and we maybe
23   address whether that objection is going to stand
24   and whether any further briefing needs to be made
25   by Wilmington or how we will proceed.
```

 Neeson & Associates    W&F

```
 1                    So I just wanted to put that on the
 2    record.  Thank you.
 3                    THE CANADIAN COURT:  Thank you.
 4                    THE US COURT:  Thank you, Mr. Crichlow.
 5                    Mr. Luft, good morning.
 6                    MR. LUFT:  Good morning, Judge Gross.
 7    Good morning, Justice Newbould.  The US Debtor
 8    would like to begin its expert portion of the case
 9    today by calling Jeffrey Kinrich to the stand.
10                    THE US COURT:  Very well.  Thank you.
11                    Mr. Kinrich.  Good morning,
12    Mr. Kinrich.  If you will just go over to the
13    witness stand and remain standing while we have you
14    either sworn or affirmed, sir.
15                    THE CANADIAN COURT:  Just before we
16    begin, I know I have got reports somewhere.
17    Apparently they are not here.  I thought they were.
18    And apparently they are not in my office.  Are
19    there extra copies that I could be provided with?
20    -- OFF THE RECORD --
21                    THE CANADIAN COURT:  Let me just stand
22    down for a minute, because I think I have got them
23    bound with all the exhibits.  Let's just stand down
24    for two minutes, and I will take over.
25                    THE US COURT:  That's fine, Justice
```



1    Newbould.  We should wait.

2    -- Pause --

3              THE CANADIAN COURT:  So we will get it

4    in a minute, but we can proceed without my copies

5    at the moment.

6              THE US COURT:  Hopefully, they have a

7    copy of what they have prepared for the direct

8    examination for you, the slides.

9              THE CANADIAN COURT:  Okay.  Thank you.

10             THE US COURT:  Sure.  All right.  We

11   are ready to have Mr. Kinrich sworn.

12

13   JEFFREY KINRICH, having first been duly sworn, was

14             examined and testified as follows:

15

16             THE US COURT:  Good morning,

17   Mr. Kinrich.

18             THE WITNESS:  Good morning.

19             THE US COURT:  Mr. Luft, when you are

20   ready to proceed.

21             MR. LUFT:  Thank you, Your Honor.  As

22   an initial matter, I believe we have handed up to

23   both Courts both unredacted for your purposes and

24   redacted copies of Mr. Kinrich's report; my

25   understanding is very lightly redacted.  And it



```
 1   should not become an issue with regard to the

 2   direct examination, but for filing purposes, they

 3   are.  I guess we just need to mark them as the next

 4   two exhibits.  Do we know the number?

 5              THE US COURT:  50 and 51, is that --

 6              THE CANADIAN REGISTRAR:  51 and 52,

 7   Your Honor.

 8              THE CANADIAN COURT:  Sorry.

 9              THE CANADIAN REGISTRAR:  51 and 52.

10              THE CANADIAN COURT:  51 and 52.

11              MR. LUFT:  51 and 52.

12              EXHIBIT NO. 51:  Expert report of

13              Jeffrey Kinrich dated January 24, 2014.

14              EXHIBIT NO. 52:  Rebuttal expert report

15              of Jeffrey Kinrich dated February 28,

16              2014.

17

18   EXAMINATION-IN-CHIEF/DIRECT EXAMINATION

19   BY MR. LUFT:

20              Q.  Good morning, Mr. Kinrich.  How

21   are you?

22              A.  Good morning, Mr. Luft.  Fine,

23   thanks.

24              Q.  Good.  Mr. Kinrich, in what way

25   are you here to provide assistance to the Courts
```



1    here today?

2                    A.    I am here to provide assistance on

3    the issue of valuation:  The amount, the portion of

4    the proceeds from the sales of the lines of

5    business and the patent portfolio, the $7.3 billion

6    of sales attributable to each of the debtor groups.

7                    Q.    Now, Mr. Kinrich, who retained

8    you?

9                    A.    The US Debtor.

10                   Q.    And, Mr. Kinrich, is your

11   compensation in this matter in any way tied to the

12   opinions you are giving or the outcome of this

13   litigation?

14                   A.    It is not.

15                   Q.    Now, Mr. Kinrich, you have in

16   front of you what has been marked as Exhibits 51

17   and 52, which are your two expert reports in this

18   matter.  Are there any changes which you would like

19   to make to those reports?

20                   A.    No, there are not.

21                   Q.    You also have a set of slides.

22   Did you prepare those slides?

23                   A.    Yes, yes, I did.

24                   Q.    And for what purpose were they

25   prepared?



```
 1                    A.   To assist me and hopefully to
 2   assist the Courts in understanding my testimony.
 3                    Q.   Mr. Kinrich, I would like to begin
 4   by discussing your qualifications and experience.
 5   I believe we are having a technical issue, so we
 6   will pause for a moment.
 7   -- Pause --
 8                    MR. LUFT:  Your Honors, I apologize.
 9   It seems there is an issue with the computer.  We
10   can either take a brief break, or I am happy to
11   proceed.
12                    THE CANADIAN COURT:  I am happy to
13   proceed with the paper.
14                    MR. LUFT:  That's okay with us as well,
15   Your Honors.
16                    THE US COURT:  Yes.  But the court
17   reporter is fine, Ms. Marino?
18                    THE COURT REPORTER:  So far, Your
19   Honor.
20                    MR. LUFT:  Should it become an issue,
21   let us know, and we will go forward.
22                    THE US COURT:  Of course.  I have a
23   great view of Justice Newbould.
24                    MR. LUFT:  And that's all that matters;
25   right?
```



```
 1                    THE US COURT:  That's all I need.
 2    That's all I need.
 3                    BY MR. LUFT:
 4             Q.   Mr. Kinrich, you have a copy of
 5    your slides?
 6             A.   I do, right in front of me.
 7             Q.   Until the issue is taken care of,
 8    I will just ask you to turn the slides when I ask,
 9    and everyone will have them in front of them.
10    Everyone in the court has a copy?  Okay.  Then
11    let's proceed this way.
12                  Mr. Kinrich, your first slide is titled
13    "Qualifications and Experience."  If I wanted to
14    find a full copy of your curriculum vitae, where
15    could I find one?
16             A.   It is Appendix A of my expert
17    report.
18             Q.   Mr. Kinrich, can you start by
19    telling the Court a little bit about your
20    educational background.
21             A.   Yes.  I have a bachelor's degree
22    in mathematics from Pomona College.  Pomona is a
23    liberal arts college, one of the Claremont colleges
24    in southern California.  I am from southern
25    California.  I live in Los Angeles.
```

 Neeson&Associates    W&F

```
 1                    I have a master's degree in statistics
 2    from Stanford University, and I have an MBA in two
 3    fields:  In finance and in quantitative methods,
 4    from the University of Maryland.
 5                    Q.   Now, Mr. Kinrich, the next point
 6    on your slide is credentials.  Could you tell the
 7    Courts about what type of credentials you hold.
 8                    A.   Yes.  I am a certified public
 9    accountant in both California and in Illinois.  I
10    also hold an accreditation in business valuation.
11    That is an accreditation issued by the American
12    Institute of Certified Public Accountants to those
13    who have met the requirements and have the required
14    experience in the field of business valuation.
15                    Q.   And, Mr. Kinrich, at this point
16    could you tell the Courts a little bit about your
17    work experience.
18                    A.   Yes.  After graduating from
19    business school -- I worked in the Washington, D.C.
20    area before business school.  But after graduating
21    from business school, I returned to Los Angeles and
22    joined what was at the time Pricewaterhouse and is
23    now PricewaterhouseCoopers.  I joined in the
24    consulting practice in 1981.  I worked there for
25    over 20 years in what was called financial advisory
```



```
 1   services.  That is the part of the practice that
 2   was focused on things like valuation, litigation,
 3   economic analysis, damage calculations, things of
 4   that sort.  And that was my practice for that
 5   20-year period.
 6            I then left Pricewaterhouse, which at
 7   the time was PricewaterhouseCoopers.  The merger
 8   had occurred.  I left and joined my current firm,
 9   Analysis Group.
10            Analysis Group is a firm of about 600
11   people across the United States, with ten offices,
12   focusing on financial, accounting and strategy
13   consulting.  Essentially my personal practice did
14   not change.  I still continued with economic
15   damages in litigation, with valuation and with
16   similar kinds of things.  I merely did it in a firm
17   that didn't have conflicts every 30 seconds, which
18   was part of the motivation to change firms.
19            Q.   Mr. Kinrich, have you focused your
20   practice on certain fields?
21            A.   Yes.  My practice has been focused
22   on intellectual property, intellectual property
23   damages and valuation.  I also have done a lot of
24   work in high-tech companies.  Some of that is
25   intellectual property work and some of it is just
```



```
 1   commercial or contract disputes or valuation of

 2   businesses.

 3            That high-tech, you know, that would

 4   include communications technologies.  It would

 5   include other kind of high-tech businesses,

 6   semiconductors.  And I also do a fair amount of

 7   work, since I am from Los Angeles, in the

 8   entertainment business.

 9            Q.   Not surprising.

10            THE US COURT:  Mr. Luft, I note we are

11   up and running on the technology.

12            MR. LUFT:  Oh, good.

13            THE US COURT:  Oh, I am sorry.

14            MR. LUFT:  We will do a hybrid for now.

15            BY MR. LUFT:

16            Q.   Mr. Kinrich, I now want to talk

17   about the last bullet point on the slide you

18   prepared, your business and professional

19   affiliations.  Can you speak to those with regard

20   to how they are relevant in this matter.

21            A.   Yes.  I am on the steering

22   committee of the California Institute of CPAs'

23   litigation and valuation sections.  I have been a

24   member of that steering committee for over 20

25   years.  That is the part of the Cal Society of CPAs
```



 1    that assists practitioners in learning about and

 2    improving their skills in fields of valuation,

 3    economic damages, litigation process, things of

 4    that sort.

 5              In addition, I served a term, a

 6    three-year term on the American Institute of

 7    Certified Public Accountants forensic and

 8    litigation services committee.  That's a committee

 9    of nine people at any one time.  To be chosen, you

10    have to be nominated by your state, and I was the

11    California state nominee.

12              While I was there, I spent a

13    significant portion of my time on two matters.  One

14    was assisting with the editing of the intellectual

15    property practice aid, and one was being the

16    litigation section's -- litigation services

17    committee's interface in the development of what

18    was called the Statement on Standards for Valuation

19    Services, sometimes called SSVS-1, No. 1.  It is

20    the standard that all CPAs must follow in

21    conducting valuation services.  And I was the

22    assigned liaison to the valuation -- the people

23    developing it.  And for those two services, when I

24    finished my term, I was awarded Volunteer of the

25    Year award for spending a lot of hours.

 Neeson & Associates    W&F WILSON & PETZER LTD.

 1                      Q.   Mr. Kinrich, at this point I would
 2    like to turn to your assignment in this matter.
 3    And could you describe for the Courts what your
 4    assignment was.
 5                      A.   Yes.  I have been asked by the US
 6    Debtors to determine the value relinquished by each
 7    of the Nortel entities essentially to the debtor
 8    entities for each of what I would call or what is
 9    called the post-petition sales, meaning the eight
10    line of business sales that totaled about
11    $2.8 billion, and the patent portfolio sale of
12    $4-1/2 billion, roughly.
13                      Q.   Mr. Kinrich, what did you
14    understand that assignment to entail?
15                      A.   That I was to determine what
16    portion of the proceeds was due to the assets and
17    rights relinquished by each of the debtor groups as
18    part of the transaction.  The assignment was to
19    take the total and figure out how much was due to
20    each of the individual debtor groups and how much
21    should be apportioned to them.
22                      Q.   Now, Mr. Kinrich, in approaching
23    that assignment, were there certain initial steps
24    or considerations you took?
25                      A.   Yes.



```
 1                    Q.    Can you describe them for the
 2     Court.
 3                    A.    Sure.  The first thing in my
 4     process was to understand and focus on the
 5     transactions that actually happened.  By that I
 6     mean there were eight sales of lines of business
 7     and there was a sale of the patent portfolio.  The
 8     value that we are talking about comes from those
 9     sales that totaled $7.3 billion.  The value is not
10     from operating the business.  The value is from
11     selling the business -- the businesses.  Excuse me.
12     So because of that my focus was on the sales
13     themselves and where the value came from, what the
14     buyers were buying, what rights and assets the
15     sellers were selling in conjunction with those
16     sales.
17                    The sales were joint, consensual sales.
18     They were jointly done by all of the debtor groups.
19     They were consensual in that each of the debtor
20     groups consented to participate in the sale.  And
21     they were sales as opposed to business operations
22     from ongoing businesses.  All three of those
23     elements -- joint, consensual, and sales -- were
24     relevant to me as I proceeded with my analysis.
25                    I think I already mentioned I then
```

 Neeson & Associates    W&F

1   recognized that my assignment was to determine what

2   portion of those sales were due to the surrender of

3   assets, so that became my focus.  And because they

4   were joint, consensual sales, I treated each of the

5   integrated entities as essentially parallel.  That

6   doesn't mean they had equal value, but they all

7   entered into the transactions jointly and

8   consensually and so should be valued using parallel

9   methodologies.  There shouldn't be some set of

10  entities valued with one approach and another set

11  of entities valued in some other fashion that

12  doesn't reconcile.

13            Q.   Now, Mr. Kinrich, in taking on

14  this assignment did you form any final opinions?

15            A.   I did.

16            Q.   And are those accurately set forth

17  in the slide before us?

18            A.   Yes.  The slide -- this is Table 1

19  from my expert report, and this does set forth my

20  ultimate conclusions of value attributable to each

21  of the debtor groups.

22            Q.   Mr. Kinrich, I would like to now

23  take us, for lack of a better term, back to the

24  beginning so we can see how you got to those

25  conclusions.



```
 1                  Can you discuss the initial steps you
 2   took when approaching the issue of how to value
 3   this portfolio.
 4                  A.   Yes.  I will start with what I
 5   think I have already mentioned, which is I knew the
 6   fair market value of the assets sold.  I knew how
 7   much the lines of business sold for.  And I did
 8   each of the eight lines of business separately.  I
 9   didn't lump them all together.  I may talk about
10   them in aggregate, but I did them individually.
11                  I knew they sold for a total of about
12   $2.8 billion, and I knew that the patent portfolio
13   sold for $4-1/2 billion.  I knew those were the
14   fair market values of the assets sold.  Already
15   that makes it different than a somewhat more
16   traditional valuation assignment.  Because I know
17   the total fair market value, I don't have to figure
18   it out, and that influences my analysis.
19                  Once I identified that, which was
20   fairly straightforward because the numbers were
21   right there, I then looked to see what information,
22   what data is available to me to enable me -- to
23   give me the ammunition, if you will, to figure out
24   what I needed in order to do the apportionment, in
25   order to figure out how much was due to each of the
```

Neeson & Associates    W&P WILSON & PETZER LTD.

1    individual debtor groups.  So I collected

2    information about Nortel, about the individual

3    sales, about the markets Nortel operated in, other

4    related information.

5                    I also had to identify the rights and

6    assets that were being sold.  Each of these on the

7    line of business side is an operating business.  On

8    the patent portfolio side, there is a collection of

9    patents.  I had to identify what was there, and I

10   had to identify what rights were associated with

11   those assets and how those rights broke down among

12   the debtor groups.

13                   Once I had all that, I then had to

14   figure out what to do with it.  I had to figure out

15   what methodology I would use to assess the fair

16   market value, the contribution of each of the

17   debtor groups, given the facts, the circumstances

18   and the assignment that I had.

19                   Q.   Now, Mr. Kinrich, were you asked

20   to make any assumptions as to what rights each of

21   the IEs held with regard to the Nortel technology?

22                   A.   Yes, I was.

23                   Q.   Could you describe those for the

24   Court.

25                   A.   Yes.  I was asked to assume that



1    each of the debtor groups in their exclusive

2    territories had exclusive rights to all what is

3    called NN technology.  So, for example, the United

4    States had exclusive rights to NN technology in the

5    United States, Canada had exclusive rights to NN

6    technology in Canada, and similarly for the other

7    three debtor groups in EMEA, or the three

8    integrated entities.  I am sorry.

9           That these exclusive rights included

10   the rights to exploit the technology, to sublicense

11   the technology and to enforce the technology.  By

12   "enforce," I mean -- excuse me.  By "exploit,"

13   rather, I mean that they could use it to make

14   products.  They could sell products that embodied

15   the technology.  They could have others make

16   products.  By "sublicense" I mean that they had the

17   right to license others to make products.  And by

18   "enforce" I mean they have the right to pursue

19   infringers, to litigate as needed, to either

20   exclude infringers exercising their rights under a

21   patent, or to license infringers through settlement

22   of litigation or otherwise.

23           I also was asked to assume that each

24   integrated entity's rights were exclusive; that is,

25   no one else had those rights.  There are such



1    things as nonexclusive rights.  I was asked to

2    assume these are exclusive; that they are

3    perpetual, that the rights exist forever, subject,

4    of course, to the expiration of the patent, but the

5    rights themselves don't expire -- the patent

6    might -- and that they are royalty-free, meaning

7    that no additional compensation or payment is

8    required to continue to possess those rights.

9              That's for the exclusive territories.

10             Q.   Mr. Kinrich, can I ask you a

11   question before you go on?

12             A.   Yes.

13             Q.   Were you asked to assume that

14   there was any scope-of-use restriction on the

15   rights that each of the integrated entities held to

16   the whole Nortel technology portfolio?

17             A.   No.  I was asked to assume that

18   there were no scope-of-use restrictions, that the

19   rights to the patent portfolio were exclusive and

20   all-encompassing, if you will, within the

21   integrated entity territories.

22             Q.   Now, Mr. Kinrich, can you tell the

23   Courts what you were asked to assume with regard to

24   the nonexclusive territories.

25             A.   Yes.  In the nonexclusive



 1    territories, I was asked to assume that each of the

 2    IEs, each of the integrated entities, had

 3    essentially shared rights.  Each had nonexclusive

 4    rights jointly in those territories.

 5              So, for example, somewhere in, say,

 6    South America, just to pick a nonexclusive

 7    territory, each of the five integrated entities had

 8    a nonexclusive right to exploit a patent that might

 9    happen to exist in South America, but no one of

10    them had exclusive rights.  So essentially they

11    each had them and shared them jointly.

12              Q.   Now, Mr. Kinrich, once you had

13    followed your initial steps and been given your

14    assumptions, what valuation methodologies did you

15    consider when deciding on what would be the most

16    appropriate methodology to use for this assignment?

17              A.   I considered, as I always do in a

18    valuation assignment, all of the standard valuation

19    methodologies.  There are three overriding

20    groupings of valuation methodologies that all

21    business appraisals might consider.  They are the

22    income approach, the market approach, and the

23    asset-based approach.

24              Generally speaking, the income approach

25    is a way to use some measure of economic benefit,

 Neeson & Associates    W&P

1   whether it is revenues, profits, contribution

2   margin, something, some measure of activity,

3   economic activity of the targeted company to

4   measure value.

5            The market approach takes a different

6   view.  The market approach says if I know the value

7   somewhere else in the market, say from a public

8   company or something like that, I can use that by

9   analogy.  I can draw an economic analogy to figure

10  out what is applicable to the subject company, to

11  the company I am trying to value or the business

12  activity I am trying to value.

13           And finally, the asset approach is one

14  where, rather than looking at the business as a

15  whole, one could look at the components of the

16  business, break down the business into

17  individualized assets and value the individualized

18  assets separately and then add up the total.

19           So those are the three general

20  approaches that are used in business valuation, and

21  I considered all of them.

22           Q.   Now, Mr. Kinrich, why as a

23  valuator do you select one method over another?

24           A.   Because based on the data and

25  information available in any given factual



```
 1   circumstance, any given case, and based on the

 2   question being asked, the thing I am trying to

 3   answer, some methods prove more useful, more

 4   appropriate, more natural, and provide answers that

 5   make more sense than others do.

 6              Q.   Now, Mr. Kinrich, what

 7   methodology, in your view, was the most appropriate

 8   methodology to use to value these assets?

 9              A.   Though the conclusion is similar

10   for all, my thinking was different for the two sets

11   of assets.

12              For the lines of business, the lines of

13   business are operating businesses, operating as

14   going concerns.  And so an income approach made

15   most sense, because an income approach focuses on

16   businesses that are operating as a going concern.

17              For the patent portfolio I used also an

18   income approach, because intellectual property,

19   patent rights, are best valued using an operating

20   approach.

21              I also used the market approach for a

22   piece of my analysis, just a component, and we will

23   discuss that.

24              And I considered but did not use the

25   asset-based approach, because for operating
```



1   businesses, breaking down the assets fails to
2   capture the synergies that a business gets from the
3   fact that all the various assets -- the tangible
4   assets, the intangible assets like patents or
5   workforce in place or customer relationships or
6   goodwill -- all of the things operate together to
7   generate the value of the business.  If you break
8   it down, you fail to capture those synergies, or at
9   least you don't do a good job of capturing the
10  synergies.  So it is better to look at it as an
11  operating whole, and that is what I chose to do.
12             Q.   Now, Mr. Kinrich, I see you have
13  selected certain passages of learned treatises that
14  you thought were appropriate to share with the
15  Court.  Can you explain to the Court how they
16  relate to what you were just talking about.
17             A.   Yes.  These are -- this and a
18  couple of others about to come are simply examples
19  of what some of the treatises in the field say on
20  that subject.  For example, this is from Smith and
21  Parr, "Valuation of Intellectual Property and
22  Intangible Assets."  They say that the income
23  approach is best suited for things like licenses,
24  patents, and business enterprises -- too fast;
25  thank you -- and that the income approach indicates



1    fair market value directly through a direct

2    analysis.  So that's just supportive of what I

3    already said:  That the income approach is

4    appropriate for these kind of assets.

5              Here is another treatise from Shannon

6    Pratt, "Valuing a Business," where Mr. Pratt

7    indicates that going-concern value, meaning

8    operating businesses, tend to be based largely on

9    income and cash flow analyses.  Again, just pretty

10   standard valuation principles.

11             And also from "Valuing a Business,"

12   from Mr. Pratt's book, focusing on the intangibles,

13   the patent side of the assignment, that intangibles

14   lend themselves well to the application of the

15   income approach, and in particular,

16   technology-related intangibles such as patents are

17   valued appropriately using an income approach.

18             All of this is just supportive of what

19   I said before:  That an income approach is an

20   appropriate way to pursue this valuation.

21             Q.   Now, Mr. Kinrich, did you have an

22   opportunity to observe Mr. Green's testimony in

23   this matter?

24             A.   I did.

25             Q.   If you will recall, he placed up a



```
 1   slide that referenced your valuation with regard to

 2   individual assets and placed an "N/A" or a "not

 3   applicable" with regard to whether you individually

 4   valued the assets.  Do you recall that?

 5              A.   I do recall that slide.

 6              Q.   And, Mr. Kinrich, why, when using

 7   an income approach, would it be not applicable to

 8   have a valuation for the individual assets?

 9              A.   Because the income approach

10   captures the value of all of the individual assets

11   operating together.  You do not separately value

12   them.  They are included in the value of the

13   business as a whole.

14              If you try to cull them out separately,

15   that would be inappropriate, because you are

16   capturing the entire set of assets, including the

17   synergies that the assets gain by functioning

18   together.

19              So the income approach does not focus,

20   and properly does not focus, on adding up the value

21   of the individualized assets.  That would be the

22   asset-based approach that I referred to earlier.

23   And as I described, that is not as appropriate a

24   methodology, for the reasons I described a few

25   moments ago.
```



```
 1                    Q.   Mr. Kinrich, if someone was to
 2     look at Mr. Green's chart and assume the "N/A" was
 3     meant to indicate that you did not consider and
 4     identify each of the assets of Nortel, would that
 5     be accurate?
 6                    A.   No, it would not.  I specifically
 7     recognized that any operating business is made up
 8     of individual assets.  But because they operate
 9     together and the issue is what is the value of the
10     business as a whole, I am capturing that value in
11     its entirety and I am not looking at the individual
12     assets individually.
13                    Q.   Now, Mr. Kinrich, I would like to
14     turn for a moment to something you talked about at
15     the very beginning, which was your experience with
16     regard to valuing patents.
17                    A.   Yes.
18                    Q.   I was wondering whether you would
19     explain for the Court for the moment where the
20     economic value of a patent comes from.
21                    A.   Value from a patent comes from the
22     ability of the patent -- of the person who has the
23     rights to the patent to exploit, license and
24     enforce the patent.  Those are the things I
25     mentioned earlier.
```



1              You get value by exploiting it, by

2     putting it in your products or selling products

3     that embody the invention.  You can get value by

4     licensing it to others and thereby collecting

5     royalties or some other payment stream.

6              You can get value by enforcing it in

7     one of two ways:  Either enforcing it and

8     collecting royalties or damages in a lawsuit or by

9     enforcing it and keeping others out so that your

10    own product, the one that makes use of the patent,

11    has less competition in the marketplace and thereby

12    gains a premium of value in some fashion.

13             If you have exclusive rights to the

14    intellectual property, this enhances the value.  If

15    you don't have exclusive rights to a technology,

16    then someone else may also be able to utilize it.

17    But if you have exclusive rights, others cannot

18    utilize it, and that has more value.

19             Q.   Mr. Kinrich, let me ask you a

20    question with regard to the license right.  Can you

21    explain the relationship between a license right

22    and the ability to capture the economic value from

23    a patent.

24             A.   Yes.  If you have the right to

25    license, you can capture 100 percent of the

 Neeson & Associates   W&F

1    economic value of the patent.  You can do that --

2    if it is exclusive, that is.  You can do that by

3    essentially saying to your potential licensee "I

4    will license you this exclusively."  Essentially,

5    that licensee then has the full rights to exploit

6    the patent and can capture all of the economic

7    benefits associated with it.

8              So the ability to license exclusively

9    essentially captures all of the economic value of

10   the patent itself.

11             Q.   Mr. Kinrich, when you say "all,"

12   would that include defensive value?

13             A.   It would.  Defensive value,

14   actually, there are several definitions of

15   "defensive value."  They are not necessarily --

16   people aren't always talking about the same thing.

17             But if by "defensive value" one means

18   the ability to use your patent essentially as a

19   small threat against someone else, you essentially

20   say, "Don't sue me because I have got patents and I

21   will sue you back," that value, if you have

22   exclusive license, is one that you can use even as

23   a licensee.  You don't have -- you can capture all

24   of that there.

25             Essentially that argues for a



```
 1   cross-license.  You don't sue me; I won't sue you.
 2   We are all going to go our merry way.  Essentially,
 3   you are agreeing implicitly with the person who is
 4   threatening you that we are each going to
 5   cross-license to the other even if you don't write
 6   it down that way.
 7               So defensive value clearly is included
 8   in that.
 9               Q.   Mr. Kinrich, what about the other
10   definition of "defensive value," where I am
11   infringing on your patent and I am worried that if
12   I don't take a license, you will sue me.  Would
13   that be captured?
14               A.   It is.  Again, if you have the
15   exclusive rights, you can sue someone.
16               Q.   Now, Mr. Kinrich, I want to ask
17   you about your last bullet point.  Does the
18   economic value of a patent always reside with the
19   title holder to that patent?
20               A.   It does not.
21               Q.   Can you explain that.
22               A.   Yes.  It is almost what I just
23   said about the licensee situation.  If I have --
24   let's say there is a patent holder, and the patent
25   holder through an agreement gives me exclusive
```



 1   rights to a particular territory, say the United

 2   States.  I now have all of the rights in the United

 3   States to extract value from the patent.

 4             The patent holder has given up those

 5   rights and has no economic value anymore in the

 6   United States.  So they are still the legal title

 7   holder and perhaps they retain rights somewhere

 8   else; for example, Canada.  But in the United

 9   States, there is no economic value to holding legal

10   title.  Rights -- or value is associated with

11   economic rights, not with legal title.

12             Q.   Now, Mr. Kinrich, I want to go

13   back to the assumptions you were given.  And as I

14   believe you are aware, there are different views in

15   this case as to what those rights are.

16             And you were asked to make a certain

17   set of assumptions.  I am not going to ask you

18   specifically about whether those assumptions are

19   right or wrong.  What I do want to ask you about is

20   the economic significance of the rights addressed

21   in the assumptions; specifically, the ability to

22   exploit, license and enforce under a perpetual

23   royalty-free license.

24             What is the economic significance of

25   having those rights, if those are what was held by



```
 1   someone?

 2              A.   If those rights exist, the ones I

 3   was asked to assume, then the holder of those

 4   rights has full economic beneficial ownership of

 5   the intellectual property in the territory where

 6   those rights exist.  There is no one -- nothing

 7   else left to go to someone else within that

 8   territory.

 9              Q.   Now, how about the nonexclusive

10   rights of the rest of the world?  What is the

11   economic significance of holding that right?

12              A.   Nonexclusive rights do not convey

13   full rights.  The other holders of nonexclusive

14   rights share in those rights.

15              So, for example, in this case there are

16   five integrated entities.  Each of the five has

17   parallel nonexclusive rights.  And so for purposes

18   of my analysis, I gave each of them one-fifth of

19   the total value of that nonexclusive right.

20              In aggregate it is an exclusive right.

21   So the exclusive right exists at Nortel.  But

22   individually, each has one-fifth of the value.  And

23   when I did my calculations and my valuation, I

24   included one-fifth of the right with each of the

25   integrated entities.  Three of those five
```



1  integrated entities are in EMEA, so EMEA ends up

2  with 60 percent of the total value of the

3  nonexclusive rights.

4           Q.   Now, Mr. Kinrich, you have been

5  talking to us about the economics of a patent.  Do

6  those economics change at all when we start

7  discussing a patent portfolio?

8           A.   They do somewhat.  A portfolio

9  allows the portfolio owner or the portfolio right

10 holder to benefit from synergies, benefit from the

11 fact that patents can function together.

12           And so a portfolio of patents can be

13 worth more than individual patents because they

14 essentially cover the waterfront better.  There is

15 more value.  You are covering a larger portion of

16 the technology space, and so you can extract more

17 value from a portfolio than simply adding together

18 individual patents, or at least it is often the

19 case you can.

20           Q.   So, Mr. Kinrich, at this point

21 let's discuss the Nortel patent portfolio.  Can you

22 describe the Nortel patent portfolio and its makeup

23 to the Court.

24           A.   Yes.  The Nortel patent portfolio,

25 as shown on the screen, consisted of at the time of



1    the Rockstar sale about 4,350 issued patents, over

2    4,000 issued patents.  Of those, over 65 percent of

3    them, approximately two-thirds of them, were United

4    States patents.  The other integrated entities had

5    much smaller shares.  Ireland only had two patents.

6    But the others are as shown on the chart for

7    Canada, the UK and France.  And then in the rest of

8    the world, another 30 or 40 countries, about

9    14 percent of the patents existed.

10              This counts each patent.  That is, one

11    patent in the United States counts as one and one

12    patent in Saudi Arabia counts as one.  So this is

13    the total distribution of what the patent counts

14    look like.

15              Q.   Now, Mr. Kinrich, you also refer

16    to a concept called "technologies" in your report.

17    Can you describe for the Court what that means and

18    what the break-up of the Nortel technologies was.

19              A.   Yes.  Technologies is a better way

20    to look at patents rather than simply counts,

21    because a technology is the same patented concept

22    measured across territories.  So, for example, if

23    you have a particular patented idea in the United

24    States and the same patented idea in France and the

25    same patented idea in Germany, that's three



 1    patents, but it is one technology.  You have it in

 2    three territories.

 3              So what I am looking at is what is the

 4    scope of where a particular invention, inventive

 5    idea, was protected.  The Nortel documents

 6    categorize their patents into what I call

 7    technologies; not their word, mine.  But they are

 8    essentially patent families; same patent across

 9    territories.

10              There were 7,000 patents and

11    applications, because when I do this, I can count

12    applications as well, patents that have been

13    applied for but not yet granted.  Not all will be

14    granted but some probably will.  There were

15    approximately 7,000 patents and applications in the

16    Nortel portfolio.  They represent about 3,700

17    technologies.

18              Of those, 73 percent, almost

19    three-quarters, are only protected in the United

20    States.  There is no parallel or sister patent in

21    any other country.  Another 24 percent, for a total

22    of 97 percent, are protected in the United States,

23    but 24 percent are also protected in at least one

24    other country.

25              So that tells me that the US has



1    essentially full patent protection for the Nortel

2    technologies and most other territories have at

3    most about a quarter in aggregate, not even

4    individually, of the total protection.  So the US

5    has a large, overwhelmingly large portion here.

6              Q.   Now, Mr. Kinrich, are all patents

7    of equal value?

8              A.   They are not.  Some patents are

9    worth more than others.

10             Q.   Did you do anything to look at the

11   break-up of the value of different patents in the

12   Nortel portfolio?

13             A.   I did.  In conjunction with the

14   Rockstar sale or before it became the Rockstar

15   sale, when Nortel was evaluating how to proceed

16   with monetizing its patent portfolio, it conducted

17   a study in conjunction with a firm called Global IP

18   to categorize and rate the patents in the patent

19   portfolio.  What Global IP did was to rate patents

20   as highest-interest patents, high-interest patents

21   and not-high or highest-interest patents.  Three

22   buckets, three categories.

23             What I looked at was the high and

24   highest-interest patent groupings as determined by

25   Nortel and Global IP.  There are 1,456 technologies



1    that fell into that category.  Of those,

2    77 percent, over three-quarters, are only in the

3    United States.  So they are high-interest, but the

4    only place that Nortel had patent protection was

5    the United States.  99-1/2 percent had protection

6    in the United States in total, and about 22 percent

7    of those were shared with at least one other

8    territory.

9            So again, even more so than what we saw

10   in the prior slide, the high and highest-interest

11   ones are more weighted to the United States.

12           Q.   Mr. Kinrich, another concept you

13   discuss in your reports is market size.  Can you

14   please explain the relevance of that concept to the

15   Court here.

16           A.   Yes.  I have just finished talking

17   about patents.  The market size is an additional

18   factor that is influential in patent value.  Assume

19   for a minute that we have a patent that exists in

20   the United States and, say, France; the same

21   patent, same technology, same inventive idea.  It

22   is worth more in the United States than it is in

23   France because the market for whatever is going to

24   be made with that technology is larger in the

25   United States because the United States is just a



1    larger economic market for these technologies.  So

2    even if the patent counts were the same, even if

3    every patent existed in every country, there would

4    be more value in the United States, because the

5    size of the market is larger.

6              As you can see on the slide, adding up

7    the various markets for the Nortel technologies

8    shows that the United States is not only larger

9    than any of the other individual integrated

10   entities but is larger by far than the sum of the

11   other integrated entities, which tells me that a

12   very large portion of the total value of the

13   portfolio resides in the United States.

14             Q.   Mr. Kinrich, having examined the

15   portfolio as set forth in summary in the four

16   slides we just looked at, what conclusions did you

17   draw with regard to the economic significance of

18   that data?

19             A.   That the patent, the locations of

20   the patents, the protection of the technologies and

21   the market size all suggest that a very large

22   portion of the total value from the Nortel

23   portfolio comes from protection in the United

24   States.

25             Q.   Now, Mr. Kinrich, once you had



1    examined the patent portfolio, could you please
2    describe for the Court what income approach you
3    selected as the right method to determine what
4    portion of the proceeds were due to each of the
5    debtors' contributions to the Rockstar sale, which
6    netted $4.5 billion.
7              A.    Yes.  As you just mentioned, I
8    know the portfolio.  I know the fair market value
9    of the portfolio was $4.5 billion.  I also know
10   from the assumptions you gave me and from the
11   discussion I just had about patent rights what the
12   rights and assets relinquished were.  I know that
13   each integrated entity had its rights in its
14   territory.  I know the rights were shared across
15   the nonexclusive territories.
16             I took that and said the best way to do
17   this valuation is to find out what a projection
18   would be of the income that would be attributable
19   to exploiting the patent portfolio.  That would be
20   a discounted cash flow methodology.
21             And I was able to identify in the
22   Nortel documents a projection that Nortel made in
23   conjunction with its ordinary course of business
24   attempts to develop a licensing strategy, and that
25   was called the IPCo model.  And so I started with



1    the IPCo model as a basis, or I started

2    investigating whether the IPCo model was a

3    reasonable basis on which to base my valuation.

4              Q.   Now, Mr. Kinrich, to do a

5    discounted cash flow analysis, what two inputs do

6    you need?

7              A.   A DCF requires two.  It requires

8    knowledge about the cash flows over time and

9    requires a discount rate to take those cash flows

10   over time and convert them to present value.  Those

11   are the two foundational bits of information that

12   are required in conducting a DCF.

13             Q.   Now, Mr. Kinrich, you mentioned

14   the IPCo model.  Could you explain to the Courts

15   what the IPCo model was, based on your analysis.

16             A.   Yes.  Let me divide that into two

17   pieces, because first I want to talk about the IPCo

18   business.

19             The IPCo business was a business

20   investigation, a business line that Nortel was

21   considering both before and after its bankruptcy

22   filing, where it was anticipating extracting

23   economic value from a licensing strategy to exploit

24   its own patent portfolio.

25             It developed a business plan



1    essentially, developed forecasts.  It developed

2    projections as to what would be obtainable in

3    revenues and what the cost of doing so would be,

4    and that was the business itself.

5              The IPCo model was the implementation

6    of that, where they actually quantified those

7    things.  They figured out what royalty rates can be

8    obtained, what are the target markets, what are the

9    target vendors, the target franchises, the costs.

10   That was what Nortel developed as the IPCo model.

11             Q.   Now, Mr. Kinrich, how did that

12   model work?

13             A.   It worked by identifying -- by

14   dividing up the portfolio into what they termed

15   franchises:  A wireless franchise, a PC franchise,

16   an internet advertising franchise, things of that

17   sort.  And it then identified vendors within those

18   franchises, you know, which companies sold

19   products.

20             It also identified the size of the

21   markets by territory.  It focused on -- it broke

22   things up into North American territory, which it

23   defined as the US and Canada; an EMEA territory,

24   which it defined as the UK, France and Germany.

25   And it included China with an option:  Include



1    China or don't include China.  So those were the

2    territories that IPCo focused on.

3              Then it looked at the cost structures

4    related to developing those territories and

5    generating those revenues and computed a result.

6              Q.   Now, Mr. Kinrich, once you

7    identified the IPCo model as a possible source of

8    data, what did you do to determine that that would

9    be a reliable source of data?

10             A.   Well, I evaluated the model in

11   several ways.   First I evaluated the conditions

12   surrounding its formation and development.  Then I

13   looked at the physical structure of the model, and

14   then I vetted some of the numerical inputs, some of

15   the actual values that it used in its calculations

16             Q.   Mr. Kinrich, can we start with the

17   first one:  Your analysis of the factual

18   circumstance and what conclusions and significance

19   you drew from it.

20             A.   Yes.  The IPCo model was developed

21   under the general direction of John Veschi.

22   Mr. Veschi was hired by Nortel before the

23   bankruptcy to lead this licensing strategy.  He was

24   an experienced licensing professional who had

25   expertise and experience in this field.  He was



1    advised by Lazard, a major investment bank,

2    well-known major investment bank.  He was also

3    advised by Global IP, which is a well-known and

4    well-reputed intellectual property consulting firm.

5              After the bankruptcy proceeded, a

6    steering committee was created.  It may have

7    actually been created before.  But a steering

8    committee was created that consisted of

9    representatives of each of the debtor entities and

10   also many of the creditor groups.  So all

11   constituencies, if you will, were represented in

12   the oversight.

13             The efforts of Lazard and of Global IP

14   were significant and serious.  They worked for many

15   months on this.  They went out and with Global IP's

16   help they developed over 10,000 claim charts.  A

17   claim chart is a document that lays out patent

18   claims and reads them against products to identify

19   potential infringers.

20             They identified the markets, broke up

21   the technologies, the patents into markets.  They

22   identified the size of the markets.  They

23   identified vendors in the markets and figured out

24   what fraction of the total markets they were

25   targeting.  Generally speaking, they targeted



```
 1   between 80 and 95 percent of the total market

 2   within any territory.

 3             They figured out where the patent

 4   coverage was, recognizing -- remember a moment ago

 5   I talked about the patents were in the United

 6   States to a large extent but also some other

 7   locations.  And they took that into account,

 8   because if you don't have patent coverage, you are

 9   not going to extract any value from those

10   nonexistent patents.  And if you only have a couple

11   patents, you are probably not going to extract much

12   value.  And so you focus on where the -- the old

13   Willie Sutton line, you know:  You go where the

14   money is.

15             So they took that into account and

16   focused on the geographies where the patents

17   existed and where the markets existed.  Those two

18   both have to exist.

19             Q.   Mr. Kinrich, I want to ask you

20   about the next step of your vetting process, which

21   was, you mentioned you looked at the structure of

22   the model.  Could you describe for the Court what

23   you did and what significance you drew from it.

24             A.   Yes.  The model itself, as I think

25   I said, targeted franchises.  And within
```



1   franchises, it had geographies.  And within those,

2   it had target vendors.

3              So it would take a company, Company

4   X -- I won't use specific names.  But it would take

5   Company X and say that company operates in this

6   territory.  We think we can pursue that company,

7   and it made judgments as to when that litigation

8   would take place, and they were different by

9   company.

10              They made judgments as to what level of

11   effort essentially they would put forth.  They had

12   two strategies by company:  What they called

13   litigation light and litigation heavy.  Litigation

14   light was less expensive but yielded lower ultimate

15   royalty rates.  Litigation heavy was more expensive

16   but yielded higher ultimate royalty rates.

17              They made those judgments on a

18   vendor-by-vendor basis and chose times -- you know,

19   chose schedule over time that took into account a

20   litigation strategy.

21              And then they also forecast their own

22   operating expenses; you know, they are going to

23   have employees, they are going to have fringe

24   benefits and Social Security taxes and everything

25   else.  And so they did all that, and that was all



1    built into the model.  They also took taxes into

2    account.

3              Q.    Mr. Kinrich, I believe you said

4    the final part of your vetting related to assessing

5    the reasonableness of the inputs in the IPCo model.

6    Again, could you please describe what you found to

7    the Court and the significance of it.

8              A.    Yes.  The model, as I said, looked

9    at markets.  It assigned a royalty rate per

10   franchise, depending on whether you had a

11   litigation-light or litigation-heavy strategy.  I

12   looked at those.  I didn't just look at the fact

13   they did them, but I looked at the numbers.

14             I have seen thousands of royalty rates

15   in my career.  I was able to look at them not to

16   determine that they hit it exactly right -- there

17   is no way that anyone could ever do that -- but to

18   say the numbers they used for the various

19   franchises made sense to me, consistent with what I

20   already knew.

21             I looked at the markets.  I looked at

22   the sources.  They used reputable data sources that

23   are available commercially.  Many of those sources

24   are the very sources I use when I do other

25   analyses.  I pulled sources, different ones than



1    they did, to see if, for example, their estimates

2    of size of the telecommunications market in a given

3    territory were reasonable, and they were.

4              I also looked at their analysis of

5    target vendors to see that those vendors

6    essentially represented a large fraction, usually

7    80 to 95 percent, of the participants in a given

8    territory in a given market.  And all of that I

9    validated, found that their process not only said

10   that they identified those things but did identify

11   those things.

12             Q.   Now, Mr. Kinrich, you mentioned

13   that there was a territorial split in the IPCo

14   model.  Did you look at the reasonableness of the

15   territorial split that the IPCo model created?

16             A.   I did.

17             Q.   Can you tell the Court about what

18   you looked at.

19             A.   Yes.  I think I mentioned that the

20   IPCo model captured -- forecast the capture of

21   revenues from North America, specifically to

22   include US and Canada, and from EMEA, specifically

23   to include the UK, France and Germany, and that the

24   IPCo model actually had an alternative to include

25   China or not include China.  And there was



1    discussion in the development of the IPCo model

2    about that.

3                Q.    Mr. Kinrich, let me ask you, was

4    there any of these other territories in which you

5    had the option of including or excluding a

6    territory other than China?

7                A.    No.  China was the only one that

8    had an option built into the model itself.  You

9    basically said China in or China out in one of the

10   inputs to the spreadsheet.

11               Q.    Now, what did you find with regard

12   to the coverage of the IPCo model across Nortel's

13   portfolio?

14               A.    That the IPCo model captured

15   territories representing 95 percent of Nortel's

16   patents.  And that makes sense to me.  You are

17   never going to expect 100 percent coverage because

18   you have a few I will call them random patents, for

19   lack of a better term, in various territories.  You

20   want to focus where you get the highest value.

21               And there was information that Lazard

22   and the steering committee communicated back and

23   forth indicating that Lazard and the developers

24   considered other territories and felt that this

25   list was the one that they were comfortable with,



1    where they could extract value and that it made

2    sense, that this was the list of territories where

3    value extraction was appropriate.

4              Q.    Now, Mr. Kinrich, as an

5    experienced valuator, what significance do you

6    place on the fact that Nortel and Lazard came to --

7    reached a conclusion through their analysis that

8    these 95 percent were the places where patents

9    could profitably be sought through a licensing

10   model?

11             A.    That made sense to me.  And I came

12   to the conclusion that the IPCo model, for all the

13   various reasons I have just described, is a

14   reasonable basis on which to rely for purposes of

15   evaluating or valuing how the value in the

16   $4.5 billion patent portfolio sale should be

17   attributed to the various debtor entities.

18             Q.    Now, Mr. Kinrich, you have had an

19   opportunity to read Mr. Malackowski's reports and

20   to read his testimony in this case?

21             A.    I have.

22             Q.    Now, Mr. Malackowski in his

23   analysis attributes 22 percent of the entire

24   portfolio value to that 5 percent of patents.  Did

25   you consider that?  And what was your conclusion?



```
 1                    A.   Well, I saw he said that, and my
 2    conclusion was that makes no sense for two reasons.
 3                    First, Lazard explicitly considered
 4    that, considered expanding beyond the countries
 5    that are targeted already and concluded that was
 6    not appropriate.  They were confident or
 7    comfortable, rather, with their conclusion.
 8                    But beyond that, 22 percent of the
 9    value shouldn't come from the last 5 percent of the
10    patents.  You should get less than 5 percent of the
11    value from those because those are the countries
12    that have fewer patents on average.  You are going
13    to get most of the value from the large markets
14    where you have great patent protection.
15                    And so if you look at percentages, you
16    should get more than 95 percent of the value from
17    the first 95 percent of the patents and far less
18    than 5 percent of the value from the last 5 percent
19    of the patents.  It makes no sense to have
20    22 percent of the cash flows from that last
21    5 percent.  Especially included in his analysis is
22    that he is going to start getting revenues from
23    China immediately, and that, given the
24    circumstances there, also didn't make any sense.
25                    Q.   Now, Mr. Kinrich, having now
```



 1    tested and vetted the IPCo model, did you reach any

 2    conclusions as to its reliability for use?

 3                 A.    Yes.   I concluded that it was a

 4    reliable -- reasonable basis on which to rely for

 5    purposes of determining the relative contribution

 6    and the value due to each of the territories, each

 7    of the debtor groups, in connection with the patent

 8    portfolio sale.

 9                 Q.    Now, Mr. Kinrich, now that you

10    believed you had a reliable model and set of data

11    to use, how did you go about using that model to

12    generate the cash flows you needed to run the DCF?

13                 A.    Well, I did two things.   First, I

14    ran the model.   What I mean by that is I figured

15    out how much the projected cash flows are across

16    the territories for the model with China and for

17    the model without China, because it provides me

18    with that option, and I had to consider both.

19                 I also had to divide those cash flows

20    up among the debtor entities.   So remember, the

21    model only gave me North America.   It didn't give

22    me the US and Canada separately.   So I had to do an

23    analysis to divide up North America between the US

24    and Canada.

25                 I did that on the basis of



1   telecommunications expenditures in those two

2   territories.  Not only did that make sense just in

3   the abstract but that was consistent with how the

4   IPCo model itself actually operated when it figured

5   out things within, say, Europe.  It took European

6   telecommunications expenditures and looked to see

7   what share was in Germany, UK and France.

8            And then I had to do the same thing for

9   EMEA, where, again, it had one aggregate number,

10  and I had to do the same kind of division for the

11  IEs there.  And then I had to include China or not

12  include China for the two options that were

13  provided to me.

14           When I get the cash flows, I then have

15  to figure out a discount rate, because those cash

16  flows exist over time.  I am going to compare

17  present values.  And so I have to figure out how to

18  convert those cash flows over time to present value

19  for purposes of comparison.

20           Q.   Now, Mr. Kinrich, as you just

21  mentioned, you did have to compute a discount rate.

22  As you mentioned, there are two factors, cash flow

23  and discount rate, that go into a DCF.

24           Can you explain to the Court how you

25  determined the discount rate.



```
 1                    A.   Yes.  In a sort of forward-looking
 2    discount rate, forward-looking in the sense that
 3    you are doing the calculation from scratch, you
 4    know two things:  You know the cash flows, you
 5    figure out the discount rate, and you present-value
 6    those to get a present value.
 7                    Here I get to do sort of the opposite.
 8    I know the present value.  I have a transaction
 9    that sold for $4.5 billion.  I don't have to figure
10    that out.  That's about one of the few givens in
11    this case.
12                    So I have the present value, and I have
13    the cash flows from running the model with China or
14    without China.  But I have them.  So I can derive
15    the discount rate just applying the standard
16    discounted cash flow formula, which is on the
17    board, and I will not burden people with explaining
18    great level of detail.  But I can figure out from
19    the financial mathematics what discount rate
20    equates the aggregate cash flows with the known
21    actual fair market value of the portfolio.
22                    When I do that, I find that if I do not
23    include China and thereby have a lower series of
24    cash flows, because the China cash flows are not
25    there, the implied discount rate, the derived
```

 Neeson & Associates    W&F

1   discount rate, is 12.2 percent.  If I do include

2   China, because I have a larger series of cash

3   flows, the derived discount rate is 15.7 percent.

4               Q.   Now, Mr. Kinrich, I want to ask

5   you a question --

6               THE CANADIAN COURT:  Mr. Kinrich, can I

7   just ask you a question?  Can I just ask you a

8   question, please?

9               THE WITNESS:  Certainly.

10              THE CANADIAN COURT:  Did you have any

11  information of the anticipated cash flows that

12  Rockstar had?  Did you have any information about

13  the Rockstar anticipated cash flows?

14              THE WITNESS:  I did not have any

15  information from Rockstar.  We do know the Rockstar

16  participants would be getting a license, and

17  therefore, to the extent that some of the IPCo

18  projections include the Rockstar participants, we

19  could anticipate that they would essentially avoid

20  having to pay those royalties by virtue of being a

21  participant.  But we do not have any information

22  from Rockstar about their expectations separately.

23              The only thing we know with hindsight

24  is that all of the litigation that they have

25  pursued to date has been litigation against --

 Neeson&Associates    W&F
WILSON & PETERSON LTD.

```
 1   enforcing US patents.  They have not anticipated or
 2   not indicated that they are pursuing revenues
 3   outside the United States to date.  That doesn't
 4   mean they haven't signed license agreements that
 5   aren't in litigation.  We don't know that.
 6               THE CANADIAN COURT:  I was asking you
 7   that question because, as you point out, a discount
 8   rate in part reflects the risk associated with the
 9   cash flows; correct?
10               THE WITNESS:  Yes.
11               THE CANADIAN COURT:  All right.  Thank
12   you.
13               BY MR. LUFT:
14               Q.   Mr. Kinrich, I would like to ask
15   you a follow-up question regarding the discount
16   rate.  Now, you described this methodology you
17   used.  Is this a methodology that is observable in
18   the markets?
19               A.   Yes.  This is a very common
20   methodology applied anytime the markets know the
21   two things I know here:  Anytime the markets know
22   what the market price of an asset is and what the
23   expected cash flows of the asset are.  So, for
24   example, a common place this is done every day is
25   the bond market, where a bond is known to pay, say,
```



```
 1    $100 a year for X years, and at the end of that
 2    time the principal is returned.  Those are
 3    identified cash flows.  You know what the price of
 4    the bond is.  You used to be able to look it up in
 5    the newspaper.  Now you look it up on the computer.
 6              And the computation of the yield, which
 7    is a discount rate, is doing exactly what I have
 8    done here.  It is simply solving for the discount
 9    rate that equates the known price with the
10    projected cash flows.
11              Q.   Now, Mr. Kinrich, having derived
12    the discount rate through using the
13    methodologically appropriate method, what did you
14    do to assess the reliability of your result?
15              A.   Well, I wanted to make sure that
16    this made some sense, so I considered several other
17    things.
18              The royalty stream for IPCo would be
19    obtained, generally speaking, from communications
20    equipment companies.  Now, there are exceptions,
21    but that was a reasonable place to look.  And I
22    found that the median weighted average cost of
23    capital for that industry at around the time of
24    these transactions ranged from 11.3 to
25    16.5 percent, essentially almost the same range as
```

 Neeson & Associates    W&F WILSON & PETERSON, LTD.

1   the range of discount rates that I derived on the

2   with-and-without-China section.

3           I also found in Lazard's materials, the

4   materials Lazard used in connection with preparing

5   its analysis of IPCo, that Lazard had gone out to

6   look for information about publicly traded IP

7   licensing companies, sometimes called nonpracticing

8   entities and sometimes called other things.  There

9   are several publicly traded entities that are just

10  licensing companies.  They do not sell product,

11  manufacture product, and their cost of equity,

12  Lazard noted, is around 15 percent.

13          I then went on to note that cost of

14  equity is higher than weighted average cost of

15  capital, because the weighted average cost of

16  capital always includes a debt component that is

17  cheaper than equity.  So if the cost of equity is

18  about 15 percent, the discount rate that would

19  apply to that would be something less than

20  15 percent, and that gave me some comfort.

21          And then I considered the actual

22  transaction that occurred, the Rockstar

23  transaction.  The participants in the Rockstar

24  portfolio are indicated here in the bottom of the

25  slide:  Apple, BlackBerry, et cetera.  And I



1    observed the weighted average cost of capital for
2    those consortium members.
3                I also thought about the actual auction
4    process itself.  In an auction, when there are
5    multiple bidders and the bidders are active and
6    have financial wherewithal and other qualities that
7    make this a competitive bid -- by the way, this was
8    a very competitive bid -- auction theory, economic
9    theory, says that the bidders compete with each
10   other and bid up to approximately their cost of
11   capital.  They are going to pursue this, and
12   essentially the beneficiary of all that is the
13   seller.
14               The seller might not be able to realize
15   this.  And, in fact, I don't believe Nortel could
16   have realized this on its own in an operating
17   sense.  But by selling the asset, two bidders, two
18   primary bidders, the Google consortium and the
19   Rockstar Consortium, are bidding against each
20   other.  And in bidding against each other, they are
21   essentially saying in their own heads, if
22   corporations have heads, how much is this costing
23   us.  They have a cost of capital, and they
24   typically will not spend more than their cost of
25   capital, except maybe in irrational exuberance.



1              But when the result comes out at

2      approximately their cost of capital, that gives me

3      some comfort that for them this deal makes sense.

4      It is probably higher and thereby a lower cost of

5      capital than Nortel could have realized, but it

6      makes sense, because Nortel gets the benefit of the

7      competitive bidding situation and thereby extracts

8      the value that the bidders, you know, in a

9      different, in a less competitive situation, would

10     hope to retain themselves by paying less.

11             So this all gave me comfort.  I start

12     with the fact that the mathematics tells me that

13     has to be the right answer.  But I still want to

14     make sure that it makes sense, and this gave me

15     comfort that it did.

16             Q.   Now, Mr. Kinrich, it has been

17     noted in this case that Lazard, while doing its

18     analysis of the IPCo business and the IPCo model,

19     had illustrative discount rates in the 25 to

20     45 percent range.  In assessing your calculations,

21     did you take into consideration what Lazard was

22     looking at and its thoughts as part of the model?

23             A.   Yes, I did.  I saw those

24     calculations.  I saw the Lazard illustrative

25     discount rates, and I also then realized that I and



1  all of us in the courtroom had the benefit of

2  hindsight.

3              At the time Lazard did that, they were

4  looking at what would be appropriate for Nortel to

5  operate this business, and they did not know what

6  the portfolio would sell for.  We have the benefit

7  of hindsight.  We know that it sold for

8  $4.5 billion.  We have to take that into account in

9  arriving at a measure of the contribution

10  attributable to each of the entities.

11             They all -- the patents and the patent

12  rights are the only thing that were sold in that

13  patent portfolio.  So in aggregate, they have to be

14  worth $4.5 billion.  Nortel -- excuse me.  I said

15  that wrong.  Lazard did not have the benefit of

16  knowing the $4.5 billion when it used its

17  illustrative rates.

18             Also, nowhere in the Lazard analysis

19  that I found at least do they conclude as to a

20  discount rate.  They use it for illustrative

21  purposes and do not say they know what their

22  opinion would be.

23             But more importantly, we have the

24  benefit of knowing the transaction.  That is of

25  great influence to me.



```
 1                    Q.   Now, Mr. Kinrich, as a valuator,
 2    if you know the ultimate price that is paid, is it
 3    ever appropriate to disregard that information and
 4    instead try to put yourself back in the shoes of
 5    where someone was at the time when determining the
 6    discount rate?
 7                    A.   Not in this circumstance.  We are
 8    to figure out the value attributed for a
 9    transaction that actually was, $4.5 billion.  You
10    have to start with the actual transaction that
11    occurred.
12                    Q.   And also, Mr. Kinrich, when trying
13    to figure out the appropriate discount rate for a
14    patent portfolio, would it matter if you were
15    running the business versus trying to determine the
16    discount rate if you decided to sell the business?
17                    A.   It probably does matter.  That is,
18    Nortel -- these discount rates that are on the
19    board, Nortel would not experience those discount
20    rates.  Actually -- excuse me.  WACCs.  I said that
21    wrong.
22                    Nortel was a business that was a
23    riskier business.  It was a troubled business.  It
24    was losing money, didn't have the same access to
25    capital that these participants did.  So if Nortel
```



1    were trying to run the business, it would not be

2    surprising that the Nortel valuation would take

3    those same cash flows, assign a higher discount

4    rate to them, and thus a lower value.

5              But the transaction that happened is

6    the sale.  Essentially, this is reason -- this is

7    no different than any other run versus sell

8    decision.  If it is worth more to you to run a

9    business than to sell it, you run it.  If it is

10   worth more to you to sell a business than run it,

11   you sell it.  Essentially, this is consistent with

12   a conclusion that selling the portfolio was worth

13   more to Nortel than attempting to run the

14   portfolio.

15              Q.   Now, Mr. Kinrich, you can go back

16   to our friend Mr. Malackowski for a moment.  He has

17   criticized your choice of discount rate and instead

18   chose to use a 30 percent discount rate and then a

19   gross-up methodology.  Did you consider

20   Mr. Malackowski's criticism of you and have you

21   given it any thought?

22              A.   I did.  I don't think it is right,

23   but I did a calculation on the assumption it is to

24   see what his result would mean -- what his

25   methodology, rather, would mean for my result.



1                    Q.    Could you explain for the Court
2    what you found.
3                    A.    Yes.  Let me first explain what
4    Mr. Malackowski did.
5                    What Mr. Malackowski did was project a
6    series of cash flows, starting with some of the
7    royalty rates in the IPCo model, though he applied
8    it to a broader geography.  He went to those
9    countries represented in the 5 percent and assigned
10   a lot of value to those.  I don't think that's
11   right, but that's not relevant to what we are
12   talking about here.
13                   He took a series of cash flows,
14   discounted them at 30 percent.  That was his
15   judgment as to what an appropriate discount rate
16   was.  He got an answer.  His answer, using his
17   methodology and his cash flows, was over a billion
18   dollars short of what the actual transaction was.
19   He fell at around $3.5 billion, and that included
20   all those extra cash flows he associated with those
21   other countries.
22                   He recognized, properly in my mind,
23   that he has to equal $4.5 billion.  So what he did
24   after discounting it 30 percent was he grossed up
25   the answer to equal 4.5, proportionately.  Just



 1   everything grew proportionately.

 2            So I said I will accept his 30 percent

 3   for purposes of argument and follow his methodology

 4   and see whether the apportionment that I get is

 5   materially different than the conclusion I drew.

 6   So that is shown on this slide.

 7            On the left-hand side -- first of all,

 8   because he included China and because I had to pick

 9   one as an example, I picked the one with China.

10   The one without China, the answer -- the same

11   principle applies.

12            So on the left side here I have my

13   conclusion on the portion of my analysis where I

14   included China.  And you see at the bottom left

15   $4.45 billion.  That's the available proceeds.  You

16   see in the percentage column the percentage that I

17   associate with each of the debtor groups on this

18   model, this portion of the calculation, the

19   China-in portion.  And you see that, for example,

20   Canada gets 11.1 percent, EMEA 22 percent, and the

21   US Debtors 66.9 percent.  Those were my results

22   from China.

23            On the right-hand side, I applied

24   Mr. Malackowski's approach.  I said, all right, I

25   will accept your 30 percent discount rate and



1    gross-up method.  Applying that 30 percent discount

2    rate gives me the column there in the middle.  And

3    then I use a gross-up, just as he does, to

4    recognize that the total transaction really was

5    $4.5 billion, and I get the percentages on the far

6    right.

7              Well, you know what?  They are

8    essentially identical.  So if he is right -- I

9    don't think he is, but if he is right, it doesn't

10   change the ultimate apportionment to the lines of

11   business.  And the result of using his 30 percent

12   discount rate does not change the apportionment of

13   proceeds to the debtor groups.

14             Q.   Now, Mr. Kinrich --

15             THE CANADIAN COURT:  Mr. Luft, can you

16   tell me when is an appropriate time for the morning

17   break.

18             MR. LUFT:  Now would be fine.  Now is a

19   perfectly fine time, Your Honor.  If you want to

20   hear a little more, we can go a little bit.

21   Whatever is best for you.

22             THE US COURT:  Are you ready, Justice

23   Newbould?

24             THE CANADIAN COURT:  Take 20 minutes?

25             THE US COURT:  Yes.



```
 1                    THE US COURT:  Take 20 minutes.  Thank
 2   you.
 3   -- RECESS AT 10:34 a.m. --
 4   -- UPON RESUMING AT 10:56 a.m. --
 5                    THE US COURT:  Thank you, everyone.
 6   Please be seated.
 7                    THE CANADIAN COURT:  Imagine, the judge
 8   opened the door all by himself.
 9                    THE US COURT:  I have been jealous, to
10   tell you the truth.  All right.  Mr. Luft, are you
11   ready to proceed?
12                    MR. LUFT:  I am, Your Honors.
13                    THE US COURT:  All right.  Mr. Kinrich.
14                    BY MR. LUFT:
15        Q.   Mr. Kinrich, we had just spoken
16   about your computation of the cash flows and the
17   discount rate necessary for a discounted cash flow.
18   Once you had those two inputs, could you please --
19                    THE CANADIAN COURT:  Just a moment.
20   Just a moment.  I don't have any -- I don't have a
21   screen.  All I can see is Judge Gross.
22                    THE US COURT:  That's too bad.  All
23   right.  It is a tough enough job, isn't it, Justice
24   Newbould?
25                    THE CANADIAN COURT:  Not a pretty
```



1   picture, no.

2              MR. LUFT:  Are Your Honors ready?

3              THE US COURT:  Yes.

4              THE CANADIAN COURT:  No, no, I don't

5   have any --

6              THE US COURT:  You don't yet?

7              THE CANADIAN COURT:  No.

8              THE US COURT:  Sorry.

9   -- OFF THE RECORD --

10             THE US COURT:  Ready?

11             THE CANADIAN COURT:  Yes.

12             THE US COURT:  Very well.  Okay.  We

13  may proceed.

14             MR. LUFT:  Terrific.

15             BY MR. LUFT:

16             Q.   Mr. Kinrich, we had just talked

17  about your discounted cash flow analysis and your

18  cash flows and what you did to determine the

19  reliability of those inputs.

20             Having both of them and having assessed

21  their reliability, could you please explain for the

22  Courts how you used them in your discounted cash

23  flow model to arrive at your valuation.

24             A.   Yes.  You will recall where we

25  left off, I think, was I derived the discount rate



1    implied by the cash flows and the known fair market

2    value.  I then took that discount rate and applied

3    it to the cash flows on a territory-by-territory

4    basis.

5              So I had the cash flows for Canada,

6    which I developed, as I discussed earlier, by

7    subdividing the North American ones according to

8    the telecommunications expenditures.  I had the

9    same thing for the United States.  I had the same

10   thing for the two exclusive EMEA territories.  I

11   had Germany, which is, while it is in Europe, is

12   not an exclusive territory, so I shared that one

13   jointly across the five integrated entities.

14             And then I had to decide what to do

15   with China.  Or actually, at that point I didn't

16   decide.  I merely ran it with China and I ran it

17   without China.

18             Q.   Mr. Kinrich, let me ask you

19   quickly:  Why did you run it with and without

20   China?

21             A.   Because the IPCo model itself

22   provides the toggle to include China or not include

23   China.  It is the only toggle in the model that

24   affects geographies.  It is the only decision in

25   the model.  And I recognized that they had provided



1    for that capability, so I used the model as

2    provided to find out what the results were in each

3    case.

4                    Q.   Mr. Kinrich, in the slide in front

5    of us do we see the results of that DCF analyses

6    that you mentioned?

7                    A.   Yes.  On the top line here you see

8    the result of running the IPCo model without China,

9    and you see the percentages that result

10   attributable to each of the debtor groups, dollars

11   and percentages.

12                   On the second line, the bottom line,

13   you see the same thing on the IPCo model with

14   China.  And again, you see the percentages that

15   result attributable to each of the debtor groups.

16                   Q.   Now, Mr. Kinrich, did you run any

17   sensitivities on these numbers to determine the

18   reliability of your results?

19                   A.   I did.  I considered the

20   possibility that the cash flows I have projected,

21   the actuals might be different.

22                   So what I did was I first considered

23   the possibility that the royalty rates, and thereby

24   the revenues, associated with IPCo should be higher

25   or lower.  So I ran a sensitivity analysis to see



1    if I increase the royalty rates, for example, what

2    would happen to the resulting amount attributed to

3    each of the debtor groups.  I also considered the

4    possibility that the litigation strategies and

5    thereby the cost structure might be different.

6              As you may recall, litigation light

7    costs less than litigation heavy but results in

8    lower revenues.  So I ran -- instead of the mixed

9    case that the developers of IPCo assumed or

10   developed, where they sometimes did one, sometimes

11   did another based on the strategies that they

12   conceived of, I said what if it is all litigation

13   light or what if it is all litigation heavy, just

14   to see what the range of possibilities was.  And I

15   ran those as sensitivities.

16             I also considered the possibility that

17   the revenue stream will continue longer.  The model

18   runs through 2020.  That is, the one developed by

19   Lazard and John Veschi's group runs through the

20   year 2020.  They never explicitly say why they

21   choose 2020, or if they do, I didn't note it.  But

22   that is roughly the time that the average patent

23   expires in the portfolio, so that number, you know,

24   makes some sense.

25             But the patents aren't all expired by



1    2020.  So I projected what if they continue to get

2    revenues for a longer period of time, just, again,

3    to see what that would do to the resulting

4    apportionment to the debtor groups.

5              Q.   And, Mr. Kinrich, what was the

6    result of those sensitivities that you ran?

7              A.    In all three cases the results are

8    robust with respect to those changes.  That is,

9    making those changes does not have a material

10   impact on the percentages attributable to each of

11   the debtor groups.  So I felt confident that even

12   if the inputs are off, you would get the same

13   apportionment to -- the same amount attributable to

14   each of the debtor groups in any case.

15             THE CANADIAN COURT:  Can I just ask a

16   question, Mr. Kinrich?  Where in your report do I

17   find that?

18             THE WITNESS:  Hold on.  Let me locate

19   it.  I think it is in a footnote.  And give me a

20   moment to locate it.

21             THE US COURT:  Perhaps around page 48?

22             THE WITNESS:  I have gone too far, so

23   let me look there.

24             THE US COURT:  There you talk about

25   royalty rates, in Footnote 139.



1          THE WITNESS:  Yes.  That is part of it.
2    That is the place where I talk -- in Footnote 139
3    at page 48 is where I talk about the royalty rate
4    sensitivity.  I also talk about the other
5    sensitivities in a different location, and I have
6    not yet found that.
7          BY MR. LUFT:
8          Q.   Mr. Kinrich, if you looked at
9    Footnote 171, would that refresh your recollection?
10         A.   Yes.  At the portion of Footnote
11   171 that is on page 59, after the formula I talk
12   about how some of the revenues and costs project
13   beyond the period 2020.  In the very last sentence
14   I note that the valuations implied by the IPCo
15   model are not sensitive to the inclusion of the
16   later revenues.  So that's another location where I
17   mention it, or I mention that component, rather.
18         THE CANADIAN COURT:  I asked that
19   because you said that you projected if they got
20   revenues beyond, and you did some analysis.  I just
21   didn't see that kind of an analysis in your report.
22   That's why I was asking.
23         THE WITNESS:  Yes.  The numerical
24   results are not shown, but the last sentence of
25   Footnote 171 explains that that is -- the results



 1    are not sensitive.

 2                    THE CANADIAN COURT:  Yes.  Thank you.

 3                    BY MR. LUFT:

 4                    Q.   Now, Mr. Kinrich, if we look at

 5    the two ranges you developed using the DCF analyses

 6    you ran with China revenue in and with China

 7    revenue out, can you please describe what you did

 8    once you had these ranges to determine what the

 9    appropriate valuation of the proceeds that were due

10    to each of the debtor entity's contributions

11    attributable to the Rockstar sale was.

12                    A.   Yes, I could.  At this point in my

13    analysis I have the results that are shown on the

14    screen.  I also have the results of the patent and

15    market analysis that I started my presentation

16    with, the ones that talk about number of

17    technologies by territory and market sizes and

18    things like that.

19                    The ones on -- the analysis on the

20    screen sets out a range, or rather defines a range.

21    I have to decide where in that range to reach an

22    ultimate conclusion.  The market information -- I

23    am sorry.  Let me back up.  I have one more

24    important point.

25                    The royalty rates included in IPCo are



1    uniform across the targeted territories.  The

2    royalty rates are not higher where there is more

3    patent coverage.  But the way one extracts a

4    uniform royalty rate is by essentially leveraging

5    the territories where you have higher patent

6    coverage across these territories.

7              So the market and patent information

8    that I described perhaps an hour ago has an

9    influence on me that says more of the value comes

10   from the place where there is patent coverage and

11   from the larger markets -- that is, the United

12   States -- than simply is reflected in IPCo.  So

13   that influenced me as a qualitative factor, not as

14   a quantitative factor.

15             I also then had to deal with the China

16   issue.  Because IPCo provides for China in and

17   China out, I started essentially with the middle,

18   giving equal weight.  And then I did an economic

19   literature search on patent value, patent rights,

20   patent enforcement in China.

21             I also consulted with Mr. Raymond

22   Zenkich, who will be a witness here, I believe,

23   later -- I don't know when, but soon -- who

24   provided me with information about the market's

25   perception of what the market would pay for patents



1    in China.  That's part of his professional

2    expertise.  And he said the market would pay little

3    to nothing for them.

4              I combined all of that.  So I started,

5    as I say, roughly in the middle of the China

6    in/China out calculation.  I moved that downward

7    somewhat because of the results of my economic

8    review of the Chinese patent regime and value.  And

9    I was influenced by, as I said, the market

10   conditions and the patent counts and all that to

11   move it more towards the US in some qualitative

12   fashion.

13             Ultimately what I did is end up at a

14   result that is between the two lines that are on

15   the screen but closer to the without-China line,

16   not because it is without China but because of the

17   influence of the market factors.

18             And the results I concluded are the

19   ones shown at the very bottom of the screen here

20   now, which results in about 9.7 percent of the

21   patent value associated with Canada, about

22   16 percent associated with EMEA, and about

23   74.3 percent associated with the United States

24   Debtors.

25             Q.   Now, Mr. Kinrich, as we mentioned



```
 1   earlier, these results are somewhat dependent on
 2   the assumptions you were asked to make with regard
 3   to each of the entity's rights with regard to the
 4   Nortel technologies; correct?
 5              A.   That is correct.
 6              Q.   Now, and you understand Mr. Green
 7   was asked to make different assumptions,
 8   specifically that the US and EMEA simply had a
 9   make-use right for product, and through that,
10   looking at the same portfolio, attributed no money
11   to the US and EMEA?
12              A.   That's correct.
13              Q.   Now, let me ask you, did you look
14   at Mr. Green's methodology and draw any
15   conclusions?
16              A.   I did.
17              Q.   Can you explain to the Court what
18   you found --
19              A.   Sure.
20              Q.   -- with regard to the methodology.
21              A.   Yes.  What Mr. Green's methodology
22   was for purposes of associating US and EMEA rights
23   with the patent portfolio was to essentially be
24   informed that the US and EMEA had no rights to the
25   patent portfolio, so they had zero value.  There
```

 Neeson & Associates    W&F WILSON & PEYTSON LTD.

1    was no economic analysis in connection with that.

2    It was simply a conclusion from what he believes he

3    was informed.

4                    Q.    Now, Mr. Kinrich, do you believe

5    that result of zero value for the US and EMEA, even

6    assuming the assumptions Mr. Green was given, is

7    accurate?

8                    A.    No.    Even under his assumptions

9    that doesn't follow.    The economics don't follow.

10                   Q.    Can you explain to the Court why

11   that is.

12                   A.    Yes.    Mr. Green asserts that --

13   Mr. Green, rather, agrees that the US and EMEA had

14   rights to the patents that they were using in

15   products in their territories in connection with

16   the lines of business, what he calls make-use

17   rights.    He agrees that the US and EMEA are

18   entitled to compensation for those rights.    But his

19   assertion is that the compensation for those rights

20   was entirely conveyed through the sale of the lines

21   of business and there is nothing left for the

22   patent portfolio.    That doesn't make sense to me.

23                   The rights that the US and EMEA held in

24   connection with what he says are make-use rights,

25   not the assumption I was given, are exclusive



1    rights.  And what was conveyed to the line of

2    business purchasers were nonexclusive rights and

3    were limited nonexclusive rights.

4                    The rights subject to those

5    encumbrances to the line of business purchasers,

6    the US and EMEA still retained those exclusive

7    rights.  They were conveyed through the sale of the

8    patent portfolio.  Those rights are worth

9    something.  They were not conveyed in their

10   entirety.  Only nonexclusive rights, to a limited

11   set of them, were conveyed in the line of business

12   sales.  And so what is left has to be in the patent

13   portfolio valuation.

14                    Q.   Now, Mr. Kinrich, if, as you say,

15   the US and EMEA were not compensated, using the

16   assumption that Mr. Green was given, what results

17   did you find when you actually ran an economic

18   analysis?

19                    A.   I did a calculation that depends

20   in part on what it means to have those rights.  As

21   I understand Mr. Green to be saying -- no, let me

22   back up.

23                    The rights that were retained, the

24   exclusive rights that were retained by US and EMEA

25   in connection with the line of business sales were



1    the rights to the patents that were used in

2    multiple lines of business.

3              Patents that were only used in one line

4    of business were typically sold to the buyer.  But

5    patents that were used in multiple lines of

6    business, the buyer got a nonexclusive limited

7    license, but Nortel retained those rights.  Those

8    rights, as I said, were ultimately sold as part of

9    the patent portfolio.

10             Mr. Berenblut and Dr. Cox estimate that

11   about one-third of the patents in the patent

12   portfolio are those kinds of patents, patents that

13   were used in multiple lines of business.

14             So if one starts with that one-third

15   and say that one-third of the value of the patent

16   portfolio, because it is one-third of the patents,

17   is associated with those patents, you get a very

18   different result than what Mr. Green has come up

19   with.  That calculation is shown on the screen, on

20   the left side of the screen -- left side of the

21   table.

22             If you simply associate one-third of

23   the patent portfolio with the rights I just

24   described, the US Debtors get over $1 billion of

25   value, not zero, and the EMEA Debtors get almost a



```
 1   quarter of a billion dollars of value, not zero.
 2                 Now, I understand that even under
 3   Mr. Green's definition there is another possible
 4   outcome.  That is, if the US and EMEA have
 5   exclusive rights to all patents in the portfolio,
 6   because the portfolio definition would include, for
 7   example, the ability to do services -- I believe
 8   the NN technology and products is defined to
 9   include services, and IPCo is a service.  IPCo was
10   being planned.  It was certainly contemplated.
11   IPCo covered all of the patents.  There are other
12   possibilities.  They could decide to make some new
13   product and therefore use the other patents.
14                 Whatever way you get there, if all of
15   the patents are covered, then you get the
16   right-hand side of this exhibit.  You get the one
17   that is essentially my result; that 100 percent of
18   the patents in the patent portfolio, even under
19   Mr. Green's definition, are covered by the US and
20   EMEA's rights, and therefore, they should be
21   apportioned or allocated the amounts that I show on
22   the right-hand side of the page.
23                 And if the Court finds something in
24   between, I just put a number in between in the
25   middle of the page to enable the Court to see what
```

Neeson&Associates   W&F

```
 1    the impact would be on some result that is in

 2    between.  I don't have a particular argument for or

 3    against 60 percent.  I just picked a number between

 4    33 percent and 100 percent for illustrative

 5    purposes.

 6                Q.   Now, Mr. Kinrich, I would like to

 7    now turn to another one of Mr. Green's analyses.

 8    Are you familiar with his alternative valuation of

 9    the patent portfolio, so the one not where he gave

10    the US and EMEA zero but the one he has referred to

11    as Appendix P?

12                A.   I am familiar with his Appendix P

13    analysis.

14                Q.   Have you had a chance to review it

15    and draw any conclusions with regard to it?

16                A.   Yes.

17                Q.   Can you explain what you found to

18    the Court.

19                A.   Yes.  In Appendix P what Mr. Green

20    does is he recognizes that there is $4.5 billion of

21    proceeds from the joint, consensual sale.  He does

22    a calculation based on what you can call value in

23    use, what he calls value in use.  Essentially he

24    says how much would Nortel realize from operating

25    IPCo.  And he takes the IPCo projections and
```



1    considers various alternatives.

2              When he does that, he comes up with a

3    total value of between $400 million and

4    $2.7 billion for IPCo.  He says that value would

5    have to be shared through the RPSM percentages.

6              And he computes those, but he only

7    computes them for the US and EMEA.  He computes

8    that the US and EMEA, if they got that 400 million

9    to $2.7 billion and had to share their proceeds

10   through the RPSM calculation, would be entitled to

11   a certain amount of money.  He gives -- as shown on

12   the screen, 38.5 percent of that value goes to the

13   US, 11.7 percent to EMEA.

14             He then takes the Canadian portion,

15   almost 50 percent, and adds to it all of the

16   remaining value that was obtained in the sale but

17   is not what he said they would have obtained from

18   operating IPCo.  So he gives the remaining 1.8 to

19   $4.1 billion to Canada.  And his explanation in his

20   deposition was there must be some other basis for

21   that value.

22             That doesn't make any sense from an

23   economic perspective.  You can capture all of the

24   value of a patent portfolio through licensing.  A

25   simplistic example might be if, instead of selling



1    to Rockstar, on Day One Rockstar picked up the

2    phone and said, "We will pay you $4.5 billion.  We

3    want an exclusive license to all of your

4    technology."  That transaction is equivalent to

5    what happened.

6              So all of the value can be obtained

7    through an IPCo-like structure.  There is no such

8    thing as "some other value."  The value comes from

9    the patent rights.  There are no other rights being

10   conveyed.  So it has to total 4.5 billion.  There

11   is not this plug that he then first plugs and then

12   associates with Canada.

13             There is no basis to distinguish

14   Canada's rights from the other integrated entities'

15   rights.  These are all, as I have said, joint,

16   consensual sales.  They all entered into this

17   transaction together.  Each had rights.  And

18   therefore, the value they obtained was from all of

19   them consenting to the sale.

20             The lack of transferability isn't

21   relevant, because without transferability --

22   without transferring, they couldn't have gotten

23   4.5 billion.  They only got it by agreeing jointly

24   to enter into the transaction.  The value should be

25   shared accordingly.



```
 1                  And then finally, for the RPSM

 2    percentages, the transaction is a sale.  The MRDA

 3    says that sales proceeds are not subject to the

 4    RPSM percentages.  So this isn't the same as

 5    operating the business.  They would not have

 6    operated the business.  They didn't get the

 7    proceeds from operating the business.  And you

 8    don't divide up those proceeds as if you were

 9    operating the business when, in fact, you sold the

10    business.

11                  Q.   Mr. Kinrich, I want to talk to you

12    about one other concept that has come up with this

13    litigation, and that's the idea of a contribution

14    approach that has been espoused by the EMEA

15    entities.

16                  As a matter of economic valuation, do

17    you have any views on a contribution approach?

18                  A.   Contribution approach is not a way

19    to determine fair market value.  Costs incurred are

20    not equal to fair market value, so you can't

21    measure them through what is being termed a

22    contribution approach.

23                  Q.   Mr. Kinrich, I now want to turn to

24    the valuation you did of the line of business

25    sales.  Now, what type of transaction were the
```



1    eight line of business sales?

2              A.    They, again, were joint,

3    consensual sales.  They were sold individually, and

4    they were sales of operating businesses, businesses

5    operating as a going concern.

6              Q.    And with regard to these sales,

7    Mr. Kinrich, what were you asked to value?

8              A.    I was asked to value the portion

9    due to the contributions, the relinquishment of

10   assets and rights associated with each of the

11   debtor groups in conjunction with each of these

12   line of business sales.

13             Q.    Mr. Kinrich, to do that, how did

14   you select the proper valuation methodology for

15   your analysis of the line of business sales?

16             A.    Well, I considered the various

17   methodologies that I described previously, the

18   three basic valuation methodologies.  I considered

19   the pros and cons given the information available,

20   given the fact that these were operating

21   businesses.

22             As I think I concluded earlier, or

23   indicated earlier, I used an income approach for

24   the valuation.  I was able to use a market approach

25   in part, and I will describe how.  And I did not



1    use the asset-based approach because these are

2    operating businesses.  These are going concerns,

3    and so the value is best captured through an income

4    approach.

5              Q.   Now, Mr. Kinrich, you created a

6    slide about why the income method is most reliable

7    in a line of business sale context.  Can you

8    briefly go through it with the Court.

9              A.   Yes.  The income method captures

10   all of the value.  It is the combination of the

11   tangible assets -- the computers and desks and

12   pencils and whatever else -- and the intangibles --

13   the patent rights, the workforce, the customer

14   relationships, goodwill -- all operating together,

15   all operating synergistically to create a company

16   value.

17             So you capture the full value of all of

18   the tangible and intangible assets by using the

19   income approach.  And the literature supports this.

20   I think these are repeats of what we have mentioned

21   previously about from treatises.  And as I said,

22   given the kind of information available, the

23   asset-based and market-based approaches do not

24   produce as reliable a result.

25             Q.   Now, Mr. Kinrich, is there a



1    single type of income approach?

2            A.    There is not.  There are many

3    things one could do in the income approach.  For

4    example, you could use a discounted cash flow and

5    project future income and discount it to present

6    value, or you can use variations on a multiple

7    approach.  You can capitalize current income.  You

8    can do a multiple of current gross margin.  You can

9    do a multiple of current revenues.  And each of

10    them is appropriate in certain circumstances.  In

11    many cases they will give either the same or

12    similar answers.  But the choice of which to use is

13    dependent on the facts and circumstances and what

14    makes sense for the problem at hand.

15            Q.    Given the issue in front of you,

16    Mr. Kinrich, and the information you had available,

17    what did you believe to be the most appropriate

18    income method to use for your analysis?

19            A.    After looking at the circumstances

20    and the factors and the information, I believe that

21    a gross revenue multiple would best measure the

22    relative value contributed and relinquished by each

23    of the debtor entities in conjunction with the

24    sales.

25            Q.    Mr. Kinrich, can you explain to



```
 1   the Court why you believe that to be the case.
 2               A.   Yes.   From another one of Shannon
 3   Pratt's books on valuation he indicated gross
 4   revenue multiples are useful for companies with
 5   losses or erratic earnings.
 6               Nortel was a company in bankruptcy.   It
 7   was a company that experienced overall losses, and
 8   so profit margins are not a good forecast of what
 9   the future will hold, especially when a buyer is
10   buying a business and presumably will transform it
11   to be part of their business.
12               Professor Damodaran writes in a
13   different treatise that revenue multiples are
14   available even for the most troubled firms, and
15   they are not as volatile as earnings multiples and
16   thus less likely to be affected by year-to-year
17   swings.
18               That, again, is especially relevant to
19   troubled businesses because the profit margin of a
20   troubled business is often negative, but the value
21   still exists in the fact that there are business
22   relationships and future sales that a buyer can
23   obtain.
24               Q.   Now, Mr. Kinrich, you mentioned
25   the importance of the facts and circumstances and
```



1    the information available.  What about the

2    information available in this instance made it

3    particularly reliable to use a revenue multiple

4    method?

5              A.   Well, first the fact that -- you

6    start with that I did have information relative to

7    revenues and that Nortel was a money-losing

8    business.  Nortel, as a money-losing business,

9    meant that capitalizing earnings was not likely to

10   provide valuable insights into the relative

11   contribution of value.

12             And I also didn't have available

13   forecasts that would divide the income streams by

14   territory.  Remember, the task at hand is to figure

15   out how much is contributed by each of the debtor

16   entities.  It isn't enough to know what Nortel

17   forecast in the aggregate.  One has to think about

18   how does that divide up among territories, because

19   the relative contribution of the territories is

20   what I am trying to analyze.

21             I did have some forecast information

22   but not enough to rely on to make that a primary

23   method.  I did, however, use that as part of my

24   confirmatory analysis.

25             Q.   Mr. Kinrich, as I understand it, a



1    revenue-multiple method relies on being able to

2    find a proper comparable set.  What was the

3    comparable set here and how closely aligned was it

4    to the factors at hand?

5              A.   You are correct.  A revenue

6    multiple, in traditional valuation, looks to other

7    companies for comparability.

8              Here we have the luxury of looking

9    essentially to Nortel itself for comparability.

10   The actual line of business that was sold is our

11   basis for comparison.  So I don't have the -- I

12   don't face the challenges that occur often when

13   using a revenue multiple, where I have to evaluate

14   how comparable that other company is to the subject

15   company.  Here that comparable company is the

16   subject company.  I know what the company sold for,

17   and so I have a much stronger revenue multiple than

18   I might -- without further analysis than I might

19   have in doing it in some other circumstance.

20             Q.   Now, Mr. Kinrich, I think we would

21   all agree that a company does not just care about

22   revenue.  It also cares about its costs and

23   ultimately, through that, its profits.

24             Does a revenue-multiple analysis take

25   into consideration the costs?



1              A.    Absolutely.

2              Q.    Can you explain how.

3              A.    Yes.  A revenue multiple,

4    remember, it is based on either comparables, in the

5    normal case, or the exact company here.

6                   When someone pays, say, a billion

7    dollars for a company, they are buying essentially

8    a profit stream or a hoped-for profit stream, an

9    expected profit stream.  You can see how much that

10   is relative to revenues.  But when the company,

11   when it is being purchased, the buyer, of course,

12   contemplates there will be expenses.  They are not

13   going to take every dollar of revenue and that is

14   not equal to a dollar of profit.  There will be

15   expenses related.

16                  So looking at the revenue multiple

17   already contemplates that the business that is

18   being purchased will incur expenses and will not

19   translate all of that revenue to profits.  That

20   would not be normal or expected.

21             Q.    Now, Mr. Kinrich, let me ask you,

22   in this case, just for example, Canada's relative

23   R&D spend costs were greater than its proportion of

24   revenue.

25             A.    Yes.



 1                      Q.   Do they get penalized for that
 2     under a revenue-multiple analysis?
 3                      A.   No, they don't.  And that's
 4     another advantage of using the revenue multiple:
 5     That if I had actually used the actual profit
 6     margins for Canada, the United States and the EMEA
 7     entities, I would have found that 100 percent of
 8     the value is associated with the United States.  It
 9     was the only profitable entity.  That isn't fair,
10     because the Canadian R&D effort as well as the US
11     R&D effort contributes to the aggregate performance
12     of Nortel.
13                      By using a revenue multiple, I
14     essentially charge each of the entities a share,
15     its proportional share of the R&D efforts and the
16     overheads and the corporate management, thereby not
17     penalizing an entity that provided that as a
18     service or something like that to other parts of
19     the organization, and not unfairly benefiting an
20     organization, a part of the organization that
21     doesn't spend that money.  A revenue multiple
22     essentially charges everyone their share of these
23     kind of expenses.
24                      Q.   Now, Mr. Kinrich, you chose to use
25     a discounted cash flow analysis for the patent



1    portfolio.  Did you consider using that same type

2    of analysis with regard to the line of business?

3              A.   I did.  I did not end up doing

4    that, though I did other analyses that are

5    equivalent to discounted cash flow as part of my

6    validation and confirmation process.

7              As I described a moment ago, I think, I

8    didn't have forecasts that enabled me to break out

9    revenues by line of business by the territories.

10   That would be required if I was going to do a

11   discounted cash flow.  But I did have some

12   information that addressed that point.  And part of

13   what I did was take that into account to see if the

14   revenue multiple, based on current results,

15   then-current results, was consistent with what the

16   parties would reasonably expect going forward.

17             If future expectations were in

18   proportion to current, then I was okay.  Then

19   essentially I was doing roughly the equivalent of a

20   discounted cash flow because the projections going

21   forward would be in the same relationship as the

22   then-current information.  I checked to confirm

23   that that was, in fact, true.

24             Q.   Now, Mr. Kinrich, once you had

25   determined that a revenue-multiple analysis was the



 1   most appropriate method, can you explain to the
 2   Court how you performed that analysis.
 3              A.   Yes.  I had two methodologies --
 4   not methodologies.  Two alternative calculations.
 5              On the one hand, I looked at treating
 6   all revenues equivalently.  What I mean by that is
 7   a buyer who is buying a line of business may not
 8   care if that dollar of revenue occurs in the United
 9   States or in Germany.  A dollar of revenue will be
10   expected to generate essentially the same
11   contribution to profit.  And so my first approach
12   recognizes that from the buyer's perspective.
13              My second approach, on the right-hand
14   side of this exhibit, recognizes that from Nortel's
15   perspective, the integrated entities were
16   entrepreneurial, risk-taking entities, and the
17   distribution entities were not.  They were
18   essentially distribution entities.
19              So that my second approach allowed for
20   the possibility that the distribution entities are
21   worth less per dollar of revenue than the
22   integrated entities because the integrated entities
23   provide additional value.  And so I allowed for it
24   to occur either way.  I investigated to see if, in
25   fact, this had an influence.

Neeson & Associates    W&P
WILSON & PETZER LTD.

1              Q.   And under your methodology with

2    those two pieces of information, what would you do?

3              A.   I considered both of those

4    perspectives -- a buyer's perspective, a dollar is

5    a dollar, and the seller's possible perspective,

6    integrated entities might be worth more -- as both

7    valid.  And so I averaged the results.  It ended up

8    the numbers were not all that different anyway, but

9    I averaged those two results to get to my ultimate

10   conclusion.

11             THE US COURT:  Is this where you

12   mentioned you used the market approach?

13             THE WITNESS:  It is exactly where I

14   mentioned that, and I will show that in perhaps the

15   next slide.

16             BY MR. LUFT:

17             Q.   Mr. Kinrich, before we get to the

18   second calculation, which does involve the market

19   approach, as Judge Gross noted, could you just

20   explain for the Court the calculation analysis you

21   did when you were considering all revenues as

22   equivalent.

23             A.   Yes.  What I did was start with

24   the fact that I know the purchase price, I know the

25   sales proceeds for each line of business.  So I did



1    this line of business by line of business, eight

2    individual calculations -- actually, six, and we

3    will talk about the other two in a minute.

4              I also know from what are called

5    carve-out financial statements how much revenue

6    existed in each of the territories and in aggregate

7    for each of the lines of business.  A carve-out

8    financial statement was a financial statement

9    prepared by PricewaterhouseCoopers in conjunction

10   with Nortel that was done to facilitate and provide

11   information related to the actual sales

12   transactions.

13             So I had revenues and I had the sales

14   price.  That let me compute a revenue multiple.

15   And I used revenues from 2009, the year either

16   where the sale occurred at the very end of the year

17   in some cases -- there were sales in November and

18   December of that year -- or in early 2010.  So the

19   revenue base I used was the most recent year of

20   revenues.

21             Q.   Now, Mr. Kinrich, why were 2009

22   revenues the most appropriate revenues to use for

23   your multiple?

24             A.   Because, in a sense, that's what

25   the buyers were buying.  That was the state of



1    Nortel at the time the transactions occurred.  The

2    customers that were continuing to buy from Nortel

3    at that point were the customer relationships that

4    were in existence at the time of the sale, and it

5    was the most current.  It was the most current

6    representation of what was going on.

7            Having said that, I considered

8    alternatives to see whether an alternative would

9    have an influence.

10            Q.   Mr. Kinrich, can you talk to the

11    Court about that alternative sensitivity analysis

12    you looked at.

13            A.   Yes.  As I said, I ended up

14    focusing on 2009 and concluding that that was the

15    most appropriate.  But I considered the fact that

16    there is more history than just 2009, so what would

17    happen if I looked on a debtor-group-by-debtor-

18    group basis for the last three years and averaged

19    them.  That's all the information there is by

20    debtor group.  The carve-out financials only went

21    back three years.

22            And I did that, and that is shown

23    actually on the right-hand side of the slide that

24    is on the screen.  And I found that, generally

25    speaking, the results were close between the 2009



1    results, that I think are most appropriate because

2    they are current and what people were actually

3    buying, and the average of 2007 to '9, which

4    includes a longer time period.

5              Q.   Now, Mr. Kinrich, a buyer looking

6    to buy a company is not only interested in what has

7    happened in the past but also what will happen in

8    the future; correct?

9              A.   Yes.

10             Q.   What did you do to determine that

11   the revenue you were looking at as the basis of

12   your multiple in 2009 was a proper projection of

13   what a buyer could expect in the future?

14             A.   As you know, what a buyer wants is

15   future revenues, future income, not simply the

16   past.  So the question is whether the 2009

17   information is a reasonable proxy for what was

18   expected in the future.  If it is, it can be used.

19   If it isn't, I will have to make some adjustments.

20             So what I did was look at three sets of

21   projections.  First I looked at the Nortel

22   projections that existed to the extent I could.

23   And I mentioned that they had projections.  They

24   didn't always provide me territorial projections,

25   so they didn't provide me all the information I



1    needed, but I used what was available.

2              I also looked at more generalized

3    market projections:  What was the gross domestic

4    product expected in those countries, how was that

5    expected to grow.  If the economy was growing

6    faster, maybe the business would be expected to

7    grow faster.  So I considered that.

8              And I also considered projections of

9    telecommunications equipment expenditures.  The

10   more communications equipment that is expected to

11   be spent, not for Nortel but in general, the more

12   likely Nortel's business would grow in those

13   territories.

14             I also in doing that had to take into

15   account the size of the markets.  If a very tiny

16   market is growing quickly, that doesn't have a big

17   impact on the overall answer even five years down

18   the road.  So I had to combine both expected growth

19   rates and size of markets to see what the result

20   would be.

21             Q.   Mr. Kinrich, if we can go back,

22   could you describe what you found when you looked

23   at the Nortel projected growth rates.

24             A.   Yes.  On the screen is an exhibit

25   from my report where I aggregated and compiled the



```
 1   available Nortel forecasts.  And without boring

 2   people even more than they already are, the

 3   results --

 4                 THE CANADIAN COURT:  Is this screen 31?

 5                 THE WITNESS:  It is, Your Honor.

 6                 THE CANADIAN COURT:  I just say because

 7   it is not up here.  So I just want to know what you

 8   are talking about.

 9                 THE WITNESS:  It is Exhibit 16 from my

10   report, and it is screen 31.

11                 THE CANADIAN COURT:  Thank you.

12                 THE WITNESS:  These are forecasts that

13   Nortel prepared.  And when you look at the results,

14   you find that, while there are some areas that

15   might grow higher and some areas that might grow

16   lower, in aggregate the results are consistent with

17   the starting point of 2009.  And so this gave me

18   comfort that the 2009 basis was consistent with

19   what you would expect in the future.

20                 BY MR. LUFT:

21                 Q.   Mr. Kinrich, if we look at your

22   next slide regarding the Gross Domestic Product

23   forecast, could you again explain to the Court what

24   you found.

25                 A.   Yes.  This is slide 32 and it is
```

 Neeson & Associates    W&F

1   Exhibit 19 from my report.

2            And here I projected each of the

3   territories to grow at the projected Gross Domestic

4   Product rates that were available that I learned

5   from my research.  And I found again that the

6   projections showed very stable growth into the

7   future.  And so there was no reason to think there

8   would be differential results that the US or Canada

9   or EMEA would change its relative market share in

10  any dramatic fashion.

11           Q.   And finally, Mr. Kinrich, you

12  mentioned also looking at telecommunication

13  infrastructure expenditures.  Could you please, if

14  we look at slide 33, explain to the Court what you

15  found.

16           A.   Yes.  Essentially I found the same

17  thing.  When you look at telecommunications

18  expenditures, telecommunications equipment

19  expenditures, you find that the growth rates across

20  the territories combined with the market sizes of

21  those territories says that the net result does not

22  lead to a conclusion that the different territories

23  will have materially different future revenues.

24  And therefore, I felt confident that using 2009 as

25  a base was consistent with what a discounted cash



1    flow would show and was a reasonable basis for

2    making a valuation assessment.

3                    Q.    Mr. Kinrich, at this point I would

4    like to turn to the second of your calculations,

5    the one that related to entities that were

6    nonintegrated entities as well as integrated

7    entities.  And you explained why you thought it was

8    important to do it.  Can you now explain for the

9    Court what steps you took in your analysis to treat

10   the integrated and the nonintegrated entities

11   differently.

12                   A.    Yes.  Here is Exhibit 13 from my

13   report.  What I did -- remember, I said I

14   considered whether the distribution entities should

15   be treated differently than the integrated

16   entities.  I was able to find market information

17   for entities that distributed equipment similar to

18   Nortel.  I went out and looked, and what I found

19   was two sets of them.

20                   On Exhibit 13 on the left side I get a

21   series of comparable companies that Nortel itself

22   used in its APA documents, advance pricing

23   agreement documents, where it established a series

24   of comparable companies that it viewed as

25   comparable to what its distributors did.



```
 1                    On the right side was a separate list
 2      that I developed independently, using my own
 3      research.  I found that using the Nortel
 4      comparables, if you see at the top of the page,
 5      that the average comparables sold in the market --
 6      this is a market-based -- this is where I applied
 7      the market approach -- the average comparables sold
 8      in the market for 15 percent of revenues,
 9      15 percent of one year's revenues.  Using my own
10      comparable set, I found 18 percent of revenues,
11      which I considered to be quite similar.
12                    Because Nortel used its own set and its
13      own documents in the ordinary course of business, I
14      relied on the Nortel set, and I used the 15-percent
15      factor as the basis for me to, if you will,
16      separate out the distribution value from the
17      integrated-entity value before I did my
18      calculations.
19                    Q.   Now, Mr. Kinrich, once you had
20      done that analysis, can you please explain for the
21      Court what you did to do your calculation for the
22      second prong of your revenue-multiple analysis.
23                    A.   Yes.  This is Exhibit 10 from my
24      report.  The blue, or rather the blue, red and
25      green diagram at the left is meant to illustrate
```



1    the concept.  The integrated entities are most of

2    the total value.  At the top you have three

3    rectangles representing nonintegrated entities.

4    Those are the distribution entities.

5                    For each of the nonintegrated entities

6    I did the calculation that is on the right.  I took

7    the revenues from those entities, multiplied by

8    this -- I am sorry -- by the market-based revenue

9    multiple -- that's the 15 percent I described a

10    moment ago -- to get a value relinquished by each

11    of those distribution entities, the nonintegrated

12    entities.

13                    What was left I then divided up

14    proportionately by their revenues, and then I add

15    the things together.  So I took the two blue

16    rectangles and called that the US Debtors' share,

17    including both integrated and nonintegrated

18    entities within that debtor group.  The same thing

19    for the red rectangles for Canada, and the same

20    thing for the green rectangles for EMEA.

21                    That gave me another estimate of the

22    total value contributed by each of the debtor

23    groups in conjunction with each line of business

24    sale.  And I did this for each line of business.

25                    THE CANADIAN COURT:  Can I just ask you



1    a question, Mr. Kinrich.  Again, in the bottom one

2    you have got share of IE revenue times remaining

3    value.  What was the remaining value?  What is the

4    concept there?

5                  THE WITNESS:  The concept there is for

6    each line of business there was a sales price.

7    Let's say a business sold for $1 billion, as the

8    largest one roughly did.

9                  Let's say the top line, the portion

10   attributable to the distribution entities, sold for

11   100 million.  I would have 900 million left.

12                 THE CANADIAN COURT:  All right.  Thank

13   you.  It is the total less the product of the top

14   line?

15                 THE WITNESS:  Correct.  Exactly.

16                 THE CANADIAN COURT:  Thank you.  Thank

17   you.

18                 BY MR. LUFT:

19                 Q.   Mr. Kinrich, having done now these

20   two calculations and having the two inputs into

21   your revenue multiple methodology, can you describe

22   for the Court what results you reached.

23                 A.   Yes.  Remember, I took these two

24   sets of results and I averaged them.  The results

25   are as shown on the screen.  It is Table 5 from my



1    report.  And the result is the Canadian Debtors are

2    entitled to 11.9 percent of the total value

3    relinquished in the line of business sales.

4    Remember, I did it individually for each of the

5    eight separately.  The EMEA Debtors, for

6    18 percent, are entitled to 18 percent; and the US

7    Debtors are entitled to 70 percent.

8            Q.    Now, Mr. Kinrich, in addition to

9    doing the revenue-multiple analysis, which you

10   believe to be the most appropriate analysis to use,

11   did you do any other valuation analyses to check

12   and confirm your results?

13           A.    Yes, I did.

14           Q.    Can you describe your results.

15           A.    I considered -- I considered the

16   possibility of using various profit margins and

17   profit contributions as opposed to simply revenues.

18   As I described earlier, revenues were preferable

19   because of Nortel's lack of profits and its

20   then-current troubled history.  But nonetheless,

21   profits are profits, and I wanted to see what the

22   results would be.

23           If I used actual net profits, I

24   couldn't even do the calculation.  Only the US had

25   a positive profit, and that would result in



1    100 percent of the value to the US, so I didn't

2    even bother with that calculation.

3              But I did look at gross margins, being

4    revenue less cost of goods sold.  And I looked at

5    contribution margin, being revenue less cost of

6    goods sold less selling, general and administrative

7    expenses.  The results are as shown on the screen.

8    They are roughly similar, though clearly not

9    identical, to the results I got from the revenue

10   multiples.

11             For the reasons I described, I consider

12   the revenue multiples to be a better measure of

13   relative value contributed, but these helped

14   confirm that the revenue multiples were not

15   inconsistent with what I would get from various

16   profit calculations.

17             Q.   And given these two additional

18   full analyses that you ran, what conclusion did you

19   draw with regard to the reliability of your

20   conclusion with regard to your line of business

21   valuation?

22             A.   It is that my conclusion made

23   sense, it was reliable, it was consistent with

24   expected profitability, it was consistent with

25   expected future growth, and thus consistent with



```
 1    what you would get if you had the information
 2    required to run a discounted cash flow analysis.
 3    And so I felt confident that the results fairly
 4    reflect the value relinquished by the debtor
 5    groups.
 6                  Q.   Mr. Kinrich, I now want to turn
 7    again back to our friend Mr. Green and ask if you
 8    had an opportunity to review his analysis of the
 9    line of business.
10                  A.   I did.
11                  Q.   And what is your view on the
12    analysis Mr. Green did on the valuation with regard
13    to the line of business?
14                  A.   I think it suffers from flaws and
15    is not appropriate.
16                  Q.   Can you explain for the Court what
17    you have prepared and detail what those are.
18                  A.   Yes.  What Mr. Green did, just to
19    start with what he actually did, was he took --
20    this is on the left side of the chart.
21                  He took the total proceeds of
22    $2.8 billion.  He identified about 111 million of
23    wholly owned businesses that he dealt with
24    separately.  That's fine.
25                  He valued the in-place workforce,
```



1   focusing only on the R&D personnel at $255 million.

2   And he identified from book values about

3   $534 million of tangible assets.  That left him

4   just under $2 billion of value that he associated

5   with intellectual property and customer

6   relationships.

7                He then allocated that using a

8   methodology that starts with his value-in-use

9   calculation.  He does that by figuring out what the

10  value in use, as he defines it -- his own

11  projections, not Nortel's projections -- what they

12  would be for the US and for EMEA but not for

13  Canada.  He figures out the grand total and

14  apportions that, again, through the RPSM

15  percentages; gives the US $468 million, gives EMEA

16  about $100 million; takes the entire balance and

17  gives it to Canada.

18                Again, I believe there are problems

19  here.  First is his inconsistent methodology.  He

20  doesn't value Canada the way he values the US and

21  EMEA.  If he had, he would find that he doesn't get

22  $2.8 billion or rather doesn't get almost

23  $2 billion of IP rights and customer relationships.

24  He would only give Canada, under his own

25  methodology, $387 million.  That's shown on the



1    right-hand side of this chart.

2                He then has a billion dollars of

3    excess, the difference between what he calls value

4    in use and what the actual sales proceeds are, and

5    he says that all goes to Canada.

6                His basis appears to be that the US and

7    EMEA's value was not transferable and that,

8    therefore, Canada gets it all.  But once again,

9    these were joint, consensual sales.  They each had

10   to enter into these transactions.  Canada could not

11   have obtained that value without the US and EMEA

12   participating.

13               The transaction that happened is a

14   sale.  The transaction that happened is not

15   continuing operation of the business.  So that

16   methodology doesn't make sense to me from an

17   economic standpoint.

18               He further, once again, as I described

19   in connection with the patent portfolio, he runs

20   the results through the RPSM, but again, the MRDA

21   says sales proceeds do not get distributed

22   according to the RPSM percentages.  So once again,

23   it is inappropriate to do what he has done.

24               And in addition, there are some other

25   inconsistencies on actually how he implemented it



```
 1   that cause additional problems.
 2              Q.   Mr. Kinrich, before I --
 3              THE CANADIAN COURT:  Mr. Kinrich,
 4   sorry, can I just ask another question?
 5              THE WITNESS:  Yes, sir.
 6              THE CANADIAN COURT:  The 387 you have
 7   there, is that derived from the RPSM method?
 8              THE WITNESS:  Yes.
 9              THE CANADIAN COURT:  Thank you.
10              THE WITNESS:  If you use Mr. Green's
11   method --
12              THE CANADIAN COURT:  Yes, I understand.
13              THE WITNESS:  Exactly.
14              BY MR. LUFT:
15              Q.   Now, Mr. Kinrich, before we get to
16   the other implementation errors you were about to
17   talk about, let me ask you, what is the economic
18   impact of using a value in use and the RPSM method
19   with regard to the proportional distribution
20   Mr. Green is doing here?
21              A.   I am sorry.  What was the first
22   part of the question?
23              Q.   Sure.  Let me take it back.  My
24   question is what is the economic impact of choosing
25   to value the US and the EMEA entities using a
```

 Neeson&Associates   W&F

1  value-in-use method and by running it through the

2  RPSM.

3          A.   The economic impact for both of

4  those separately is to shift value to Canada.

5          Q.   Now I want to talk about these

6  implementation errors that you identified.

7          Mr. Kinrich, you mentioned that

8  Mr. Green used his own projections.  First of all,

9  can you explain what you mean by what his

10  projections were, and then can you explain what

11  your thoughts were with regard to how he

12  implemented them.

13          A.   Yes.  Mr. Green identified in the

14  record projections that Nortel made in connection

15  with its businesses.  He did not accept those

16  projections.

17          He did what he described as creating

18  retained-by-Nortel projections.  He did that by

19  adjusting downward some of the Nortel projections

20  based on his own judgment and, in many cases, at

21  least for the biggest ones, creating a business

22  that essentially has no profits.

23          Had he used the Nortel projections, the

24  ones that Nortel actually had for those businesses,

25  which he says are in conjunction with what he calls



```
1   safe hands -- in other words, as a sale -- the
2   value that would have been obtained almost exactly
3   matches the actual value that these sold for.  They
4   are both rounding $2.8 billion.
5             So the Nortel projections were pretty
6   good.  He did not use them to value the
7   transactions.  He used, as I said, these lower
8   projections on this theory that that is all that
9   the US and EMEA could have obtained, but he doesn't
10  associate that same rule with Canada.
11            If US and EMEA don't consent to the
12  sale, Canada is not going to get the sales proceeds
13  either.  So that did not seem appropriate to me.
14            Q.   Mr. Kinrich, let me ask you a
15  couple follow-ups.  Mr. Green in his report also
16  identifies that he found other projections which he
17  didn't adjust but were not specifically labeled as
18  retained by Nortel and were lower.  Would they
19  suffer from the same flaws?
20            A.   At times he used earlier Nortel
21  projections.  He did not use the most recent Nortel
22  projections.  The most recent Nortel projections
23  before the sale, the ones that they had updated and
24  for whatever had happened in the intervening time,
25  are the ones that result in the value that is
```



1   almost exactly equal to the actual sales proceeds.

2            So use of an earlier one is

3   inconsistent with using the best information that

4   was available at the time.

5            Q.   One other question on the

6   projections, Mr. Kinrich.  Are the projections that

7   Mr. Green used to compute the US and EMEA's value

8   in use close in results to the ones you noted he

9   could have used, which were the latest that

10  resulted in an amount very close to the

11  $2.8 billion received in the sale?

12           A.   No.  The ones he used would result

13  in a value more than a billion dollars short of the

14  actual transaction values.

15           Q.   Now, Mr. Kinrich, you mentioned

16  that there were other implementation issues.  Could

17  you describe for the Court another one.

18           A.   Yes.  Another one has to do with

19  terminal value.

20           Q.   And could you describe for the

21  Court what is the issue with Mr. Green's analysis

22  regarding terminal value.

23           A.    In Mr. Green's projections for

24  these lines of business and what he calls value in

25  use, he projects them to extend for a period of

 Neeson & Associates   W&F

1    time, I believe eight or nine years, and in each

2    year he shows in his projections, because Nortel

3    shows in its projections, an expenditure for R&D

4    expenses.  He includes R&D expenditure up to the

5    very end.  In fact, in the last year there is a

6    total of almost $900 million of R&D expenses in the

7    projections.

8                I think everyone would agree that to

9    the extent that is going to generate value, some of

10   that value belongs to the US and EMEA and should be

11   captured at the end of the projection period in

12   some kind of a terminal value.

13               He doesn't do that.  He terminates the

14   calculation at that point with no terminal value.

15   And by his methodology, when he associates value

16   only with the US and EMEA and then subtracts that

17   from the grand total, he gives all of that terminal

18   value to Canada.  He does not do an analysis that

19   allows US and EMEA to capture the value that he

20   recognizes fairly belongs to them.

21               Q.   And Mr. Kinrich, let me ask you,

22   it notes here that there is also issues with

23   goodwill.  First of all, how does one appropriately

24   compute goodwill?

25               A.   Goodwill can only be computed by



 1    measuring the value of each individual asset, each

 2    component of the value of a business, and comparing

 3    the sum of those individual components to the

 4    actual transaction price.

 5              So goodwill is defined as a remainder.

 6    You have a sales price or a transaction price.  You

 7    have the value of tangible assets, of intellectual

 8    property, of workforce, whatever there might be,

 9    customer relationships; and goodwill is the

10    difference, by definition.

11              Q.   Now, Mr. Kinrich, Mr. Green

12    assumed that there was no goodwill.  Can you tell

13    me, based on your experience and practice, whether,

14    first, that is appropriate, and second, based on

15    the charts put up for the Court, what the impact of

16    doing so is.

17              A.   Yes.  You can't assume a lack of

18    goodwill.  Goodwill is the result of a series of

19    valuation steps.  If you assume a lack of goodwill,

20    then what you are doing is giving all that value --

21    you are putting it somewhere else.  And let me show

22    you on the chart.

23              What Mr. Green does at the top of this

24    chart, he takes the total sales proceeds, subtracts

25    what he says is the value attributable to US and



1   EMEA -- there are all the flaws I just described; I

2   won't repeat myself -- and he says all of that is

3   Canada.

4            But because he has failed to identify,

5   for example, goodwill -- "terminal value" fits

6   equally well in here -- his actual calculation

7   doesn't derive a result for Canada.  It derives a

8   result for Canada plus this other thing he hasn't

9   measured, whether it is the value of goodwill, some

10  of which belongs to the US and EMEA, or the value

11  of the terminal value, some of which belongs to the

12  US and EMEA.

13           There is no way arithmetically,

14  mathematically, to figure out what the value of

15  Canada is, because he doesn't measure that X, that

16  X factor.

17           Q.   Now, Mr. Kinrich, did you have an

18  opportunity to review Mr. Britven's report?

19           A.   I did.

20           Q.   And in Mr. Britven's report, he

21  notes that the buyers, in their purchase price

22  allocations, allocated $850 million from the line

23  of business sales to goodwill.  If you were to

24  assume that the buyers were accurate about that,

25  what impact would that have on Mr. Green's



```
 1    valuation of Canada?
 2              A.    A huge portion of Mr. Green's
 3    valuation of Canada would instead be goodwill,
 4    which would have to be associated in some portion
 5    to both the US and EMEA and not to Canada.
 6              Q.    Now, Mr. Kinrich, I want to ask
 7    you about one last portion of Mr. Green's analysis,
 8    and this is what he referred to as his alternative
 9    max allocation, and he said that's what you would
10    look to if he is wrong that, in fact, the US and
11    EMEA should not be limited to rights as though they
12    could not transfer.
13              Can you -- have you, first, had an
14    opportunity to examine Mr. Green's alternative max
15    allocation?
16              A.    Yes, I have.
17              Q.    And can you tell the Courts what
18    opinions you draw with regard to it.
19              A.    He states in his alternative max
20    calculation, one of his assumptions was that what
21    are called normal or routine returns are in
22    approximately the same relative proportion as the
23    RPS percentages.
24              Well, they are not.  I ran the
25    calculation.  Table 6 of my report shows that the
```



1   routine returns give the Canadian Debtors far less

2   and give the EMEA and US Debtors far more than the

3   percentages associated with the residual profit

4   split.  If you make only that change and still keep

5   his use of the RPSM, still run all the profits from

6   the calculation through the RPS percentages but

7   only make that change, you get the results shown at

8   the bottom of the page, my Table 7.

9            So even with just that simple

10  correction, the numbers move quite substantially.

11            Q.   Mr. Kinrich, having performed all

12  the analyses you performed and having vetted each

13  of them and found them to be reliable, can you

14  please describe for the Court what your ultimate

15  conclusions in this matter are.

16            A.   Yes.  Ultimately, my conclusions

17  are Table 1 from my report, which provides, as

18  shown on the screen -- I won't burden everyone with

19  reading it -- the percentages and dollars

20  attributable to each of the debtors for the line of

21  business, percentages and dollars for each debtor

22  group for the patent portfolio.  And ultimately

23  about 10.6 percent of the total proceeds of

24  $7.3 billion goes to the Canadian Debtors, about

25  16.8 percent goes to EMEA Debtors, and about



1    72.6 percent goes to the US Debtors.

2              MR. LUFT:  Thank you, Mr. Kinrich.  I

3    have no further questions at this time.

4              THE US COURT:  All right.  Thank you,

5    Mr. Luft.

6              Mr. Oxford, good afternoon.

7              MR. OXFORD:  Good afternoon, Judge

8    Gross.  Good afternoon, Justice Newbould.  For the

9    record, Neil Oxford of Hughes Hubbard & Reed for

10   the EMEA Debtors.

11   CROSS-EXAMINATION BY MR. OXFORD:

12             Q.   Good afternoon, Mr. Kinrich.

13             A.   Good afternoon.

14             Q.   I want to start -- actually, I

15   want to do this in reverse order from my friend

16   Mr. Luft, and I want to start with the business

17   line sales.

18             Now, it is correct that you used

19   relative 2009 revenues to allocate the proceeds of

20   those sales?

21             A.   Ultimately, after the various

22   investigations I described, that is one of the

23   steps, yes.

24             Q.   And you preferred the 2009

25   figures, did you not, sir, because you considered

 Neeson&Associates   W&F WILSON & PETERSON LTD.

1    the 2007 and 2008 figures to be somewhat anomalous?

2              A.    That is part of it, although as I

3    showed you, I did look at the average of 2007 to '9

4    to confirm that they were consistent.

5              Q.    Sure.  But just focusing on my

6    question, if you wouldn't mind, just for a moment,

7    I would like to focus on 2007 and 2008 versus 2009.

8    Are you with me?

9              A.    I am.

10             Q.    Thanks.  We can agree, can we not,

11   that Nortel's situation was significantly different

12   in many ways in those two years, 2007-2008 and

13   2009?

14             A.    Yes.  The economy was also

15   different.  There were differences in that period.

16             Q.    Right.  But again, just focusing

17   on my question, sir, we can agree, can we not, that

18   Nortel's circumstances were significantly different

19   between 2007 and 2008 on the one hand and 2009 on

20   the other?

21             A.    I think that's probably true.  I

22   am not sure what you mean when you say

23   "significantly different," so I can't 100 percent

24   agree.  But every year is different than any other

25   year, yes.



1                    Q.    Sure.  But 2009 was a particularly

2        different year for Nortel.  We can agree on that?

3                    A.    They had filed bankruptcy early in

4        the year.

5                    Q.    Right.  So in 2007 and 2008 the

6        main Nortel entities were not operating under the

7        supervision of this court, the Superior Court in

8        Toronto, the courts in England and elsewhere;

9        that's correct?

10                   A.    That is.

11                   Q.    But by 2009, that's exactly what

12       happened?

13                   A.    Yes.

14                   Q.    In fact, not just 2009.  By the

15       middle of January 2009?

16                   A.    Yes.

17                   Q.    So that's one difference between

18       those two sets of data.

19                   A second difference, I think we can

20       agree, can we not, sir, that in 2007 and 2008

21       Nortel wasn't trying to sell all of its business

22       lines?

23                   A.    It was not.

24                   Q.    It was not.  But that's exactly

25       what it was trying to do in 2009; correct?



```
 1                    A.   Yes.
 2                    Q.   And so that's two so far.  We are
 3       making progress.
 4                         Number three, I think we can agree that
 5       in 2007 and 2008 Nortel had not concluded any
 6       definitive agreements to sell any of its business
 7       lines?
 8                    A.   I think we can agree to that, yes.
 9                    Q.   And we can agree that by February
10       2009 that's exactly what it started doing; correct?
11                    A.   That process began, yes.
12                    Q.   And could we just pull up
13       demonstrative No. 7.  This is a slide that my
14       friends representing the Canadian Monitor used in
15       their examination of Mr. Ray.  Bear with me, if you
16       wouldn't mind.
17                         Okay.  Do you have it on your screen,
18       sir?
19                    A.   I do.
20                    THE CANADIAN COURT:  There it is.
21       Okay.
22                    BY MR. OXFORD:
23                    Q.   So we can see from this slide that
24       by February 2009 the deal had been signed on the
25       Layer 4-7 sale?  Can you see that, sir?
```



1                   A.    I see that.

2                   Q.    And by July the CDMA sale had been

3         signed?

4                   A.    Yes.  These are -- I think I am

5         understanding you to say these are signing dates,

6         not consummation dates.

7                   Q.    Yes.  We will get to the

8         consummation dates in a moment.

9                   A.    Fine.

10                  Q.    We can agree that in September the

11        Enterprise sale was signed?

12                  A.    Yes.  Well, I am accepting all

13        these dates.  I have no reason to disagree.  I just

14        don't have them memorized, but I certainly accept

15        them.

16                  Q.    Okay.  And by October the Next Gen

17        sale had been signed?

18                  A.    Yes.

19                  Q.    And in November the MEN sale and

20        the GSM sale had been signed; correct?

21                  A.    Yes.

22                  Q.    So accepting these data as

23        correct, we can agree that by the end of 2009

24        Nortel had concluded agreements to sell seven of

25        its eight business lines, can we not?



```
 1                    A.   Yes.
 2                    Q.   The fourth difference I think we
 3  can agree on is that in 2007 and 2008 Nortel hadn't
 4  actually closed on the sale of any of its business
 5  lines; correct?
 6                    A.   I think we can agree to that, yes.
 7                    Q.   So can we pull up Mr. Kinrich's
 8  slide 25, which is going to save us a little time.
 9                    And you will see this is your slide,
10  sir, that Mr. Luft took you through.  You will see
11  that the Layer 4-7 sale closed in March of '09?
12                    A.   Yes.
13                    Q.   CDMA sale closed in November of
14  '09?
15                    A.   Yes.
16                    Q.   And Next Gen and Enterprise closed
17  in December of 2009?
18                    A.   Correct.
19                    Q.   Okay.  So for four of the eight
20  business sales, these were sold midway through
21  2009, obviously at the various dates reflected on
22  this slide?
23                    MR. LUFT:  Objection, Your Honor.  That
24  just completely misstates what it says.  Obviously
25  December is not midway through --
```



1                    THE US COURT:  I am sorry.  I missed
2   that, Mr. Luft.  Obviously December is not what?
3                    MR. LUFT:  Is not midway through the
4   year 2009.
5                    THE US COURT:  Mr. Oxford?
6                    MR. OXFORD:  I can withdraw that.
7                    BY MR. OXFORD:
8            Q.    We can agree, can we not,
9   Mr. Kinrich, that during the course of 2009 at the
10  various dates reflected on your slide 25, Nortel
11  had concluded and closed the sale for four of its
12  eight business sales?
13           A.    The closings occurred on the dates
14  indicated in my slide, yes.
15           Q.    And that hadn't occurred in '07
16  and '08; correct?
17           A.    It had not.
18           Q.    The fifth and last difference I
19  want to take you to is that for '07 and '08 we
20  actually have full annual financial data for the
21  business lines as they are operated by Nortel;
22  correct?
23           A.    We do, as we do for '09, with the
24  exception of a few weeks at the end for a couple of
25  the transactions.



    1                    Q.    Right.  Well, let me just break
    2    this down, sir.
    3                    Is it your testimony that we have full
    4    financial data for the Layer 4-7 sale for 2009 as
    5    it was operated by Nortel?
    6                    A.    No, but that is one of the ones
    7    that we don't have full financial information for
    8    for any period.
    9                    The two little ones -- and I skipped
   10    that earlier in my testimony by mistake.  But the
   11    two smaller transactions, that one and Next Gen,
   12    did not have carve-out financial statements and so
   13    did not have financial information essentially for
   14    any of the periods.  Because they are only
   15    1 percent of the total proceeds, they were
   16    allocated by me, and I think by each of the other
   17    experts in this case, in proportion to the other
   18    99 percent, and nobody paid any, you know,
   19    additional -- provided any additional analysis or
   20    effort on those.
   21                    So the first one did not have full
   22    information either.
   23                    Q.    I see.  So just so I have your
   24    testimony, Mr. Kinrich, we don't actually have
   25    financial data for 2009 for two of those eight



1  sales, albeit they are on the smaller side;

2  correct?

3              A.   The two smallest ones we don't.

4  And they were treated by me and, as I said, by I

5  think the others all in a similar fashion.

6              Q.   And for the other two sales that

7  closed in 2009, we don't have full 2009 financial

8  data as those businesses were operated by Nortel;

9  correct?

10             A.   You have all -- you have through

11  the closing date.  So you have proportional

12  information through, except for six weeks for CDMA

13  and except for two or three weeks -- well, two

14  weeks for Enterprise.

15             Q.   And so you grossed that data up?

16  Is that what you did?

17             A.   No.  Remember, what is relevant --

18  first of all, I looked to see what would happen if

19  you did.  But remember, what is relevant is the

20  relative contribution by each of the territories.

21  So the fact that I don't have a full year doesn't

22  change the percentages.  If you did 50 percent for

23  the first 48 weeks of the year, I have treated it

24  as 50 percent for the whole year.

25             Q.   So can we keep that slide up.  So



1   for those two sales, CDMA and Enterprise, you

2   didn't actually use full-year financial data;

3   correct?

4                   A.   I used what was available through

5   the closing date because that was what the

6   audited -- the carve-out financials projected or

7   presented.  I am sorry.  And --

8                   Q.   And those are -- just so we have a

9   clear record again, it will be a little easier if

10  you can focus on my question.  Those don't

11  represent full-year financial data; correct?

12                  A.   They represent data only through

13  the closing date, which is most but not all of the

14  full year.

15                  Q.   So we can agree, sir, that in

16  those five respects we have just gone through, 2009

17  was an anomalous year for Nortel compared with 2007

18  and 2008; correct?

19                  A.   I think -- I don't know that I can

20  characterize as an "anomalous."  I can characterize

21  as each of those events that as a factual matter

22  occurred as you describe.

23                  Q.   But it is your testimony, sir,

24  that it is 2007 and 2008 that are an anomalous, not

25  2009?



```
 1                    A.    From an economic perspective, they

 2    were.  They did not have the relative sales

 3    relationship that was similar to a long-term

 4    history.  But again, I also considered what if they

 5    count, and I did that analysis as well.

 6                    Q.    It is your testimony, sir, as I

 7    understand it, that the filing for creditor

 8    protection may have affected the overall revenues

 9    of the group but it didn't affect -- it didn't have

10    a substantial effect on the relative levels of

11    revenue across the entities.  That's your opinion,

12    sir?

13                    A.    Yes.

14                    Q.    Can we pull up Mr. Kinrich's

15    report at 54, please.  It is page 26.

16                    And do you see there, sir, you describe

17    the relative shares of total revenues for the

18    Canadian debtors, the EMEA Debtors and the US

19    debtors?

20                    A.    I do.

21                    Q.    And you do that for 2007, 2008 and

22    2009; correct?

23                    A.    I do.

24                    Q.    Can you tell me, please, what is

25    the effect on the EMEA Debtors' business sale
```



```
 1   allocation if you use 2009 figures as opposed to

 2   2008?

 3              A.   The share to EMEA would be

 4   modestly lower.  Let me look at the arithmetic

 5   here.  It would be lower.

 6              Q.   Okay.  You want me to help you

 7   with the arithmetic, sir?

 8              A.   I don't know what your question

 9   is.

10              Q.   My question is what is the

11   difference in the EMEA Debtors' sale of the

12   allocation if you use 2008 figures versus 2009.

13              A.   You would use 4 percent -- if I am

14   reading these properly, revenue share for EMEA is

15   roughly 4 percent higher in 2008 than in 2009.

16              Q.   Right.  So in the context of the

17   business sales, that represents a little somewhere

18   north of about $100 million; correct?

19              A.   I will accept that.  I haven't

20   done the calculation, but I will accept that.

21              Q.   And it is your testimony to these

22   Courts that the $100 million that you move to the

23   United States, to the US Debtors, by using 2009

24   figures is, quote/unquote, not substantial?

25              A.    No.  My testimony is not about
```

 Neeson & Associates   W&F

```
 1   moving revenues.  It is about what revenues are
 2   most representative of what is expected going
 3   forward.  I think, as I described in my testimony,
 4   that the projections are consistent with the 2009
 5   results, and the 2009 results are more -- are what
 6   the buyers were buying.  What happened in 2008 was
 7   no longer the state of the world by the time the
 8   buyers bought the businesses.
 9              Q.   Sure.  And we will get to
10   projections, Mr. Kinrich.  Don't worry about that.
11              My question is as follows:  You have
12   testified in your reports that the effect of the
13   creditor protection filings did not have a
14   substantial effect on the relative levels of
15   revenue across entities; correct?
16              A.   Yes.
17              Q.   We can agree, can we not, that by
18   using 2009 versus 2008, the effect on the EMEA
19   Debtors is that the EMEA Debtors' allocation is
20   reduced by about $100 million, or 4 percent, on the
21   business sales?
22              A.   Had I used 2008, which I don't
23   think is appropriate for the various reasons I have
24   testified, the numerical difference would be what
25   you describe.
```

 Neeson&Associates   W&F

1          Q.    Can we pull up Exhibit 6 to

2    Mr. Kinrich's report, please.

3              Mr. Kinrich, you mentioned in response

4    to Mr. Luft's questions that you had done various

5    other financial analyses to test the robustness of

6    your conclusions; correct?

7          A.    Yes.

8          Q.    And one of the things you looked

9    at was the historical revenue shares by integrated

10   entity?

11         A.    Yes.

12         Q.    And that's what is reflected on

13   your Exhibit 6 to your report; correct?

14         A.    It is.

15         Q.    The red numbers at the top, those

16   represent Canada; correct?

17         A.    Correct.

18         Q.    And the blue is the United States,

19   is it not?

20         A.    Correct.

21         Q.    And sandwiched in between is the

22   EMEA entities in green; correct?

23         A.    Correct.

24         Q.    Do you notice any trends,

25   Mr. Kinrich, in the EMEA share?

 Neeson & Associates    W&F

 1                    A.    EMEA grows and then at the end

 2   shrinks.

 3                    Q.    Right.  And it grows from 2001

 4   through 2008; correct?

 5                    A.    Yes.

 6                    Q.    In fact, it goes up from

 7   12.8 percent in 2001 to 22.7 percent in 2008?

 8                    A.    It does.

 9                    Q.    And that's an increase of

10   approximately 10 percent?

11                    A.    Yes.

12                    Q.    It increases every single year

13   until 2009, does it not?

14                    A.    Yes, it does.

15                    Q.    There is no decrease until 2009

16   happens?

17                    A.    There is not.

18                    Q.    There is no decrease in the EMEA

19   Debtors' share until Nortel files for bankruptcy;

20   correct?

21                    A.    Correct.

22                    Q.    And yet it is your testimony to

23   these Courts that 2007 and 2008 revenue figures are

24   anomalous and 2009 is not?

25                    A.    Yes.



```
 1                    Q.   I just want to look at one more
 2   robustness check that you did.  Mr. Luft took you
 3   through this.  Can we pull up slide 33.
 4                    So this is Exhibit 20 to your report,
 5   is it not, sir?
 6                    A.   It is.
 7                    Q.   And this shows forecasted revenue
 8   growth based on forecasted telecommunications
 9   market growth; correct?
10                    A.   Yes.
11                    Q.   And what you essentially did is
12   you started with the 2009 figures and you applied
13   market data to forecast the growth to the relative
14   shares of revenue amongst, again, the Canadian, the
15   EMEA and the US Debtors; correct?
16                    A.   I did.
17                    Q.   And as we saw in Exhibit 6 a few
18   minutes ago, we saw that the EMEA Debtors' shares
19   grew steadily from 2001 through 2008; correct?
20                    A.   Yes.
21                    Q.   And they dipped only in 2009?
22                    A.   Correct.
23                    Q.   And what we see in your figures in
24   Exhibit 20 is that, again, the EMEA Debtors' share
25   grows steadily from 2009 through 2013?
```

 Neeson&Associates   W&F WILSON & PETERSON LTD.

```
 1                    A.   That's true here.  You have to
 2   read this in conjunction with Exhibit 16, which
 3   shows quite the opposite.
 4                    Q.   But Exhibit 20, sir, is your
 5   valuation based on projected future market growth,
 6   taking Nortel's data and applying
 7   telecommunications market rate growth projections;
 8   correct?
 9                    A.   It is, but it is not taking
10   Nortel's projections of what they anticipated to
11   happen in EMEA.  That's Exhibit 16.  And EMEA is
12   shrinking relatively in Nortel's internal
13   projections.  I took both of those in account:  The
14   market is growing, but EMEA, as projected by
15   Nortel, is shrinking.
16                    Q.   Sure.  But I am asking you, sir,
17   about your projections.
18                    A.   Mine are both.  I did both sets.
19                    Q.   You did both sets.  I am asking
20   you about the projections in Exhibit 20.
21                    Would you agree, sir, then, taking
22   Exhibit 6 and Exhibit 20 together, EMEA's revenue,
23   EMEA's relative share of revenue grows steadily
24   between 2001 and 2013 and dips only in 2009?
25                    A.   Only if you ignore other relevant
```



1   data.  But I agree that ignoring other exhibits,

2   that's what you would get.

3            MR. OXFORD:  Judge Gross, Justice

4   Newbould --

5            THE US COURT:  Yes.

6            MR. OXFORD:  -- this is now a good time

7   to break for me for lunch.  I am happy to continue

8   to a new section.  I am in the Courts' hands.

9            THE US COURT:  There you are, Justice

10  Newbould.  You shrunk on the screen.

11           How much longer do you think you have,

12  Mr. Oxford?

13           MR. OXFORD:  I could take the lunch

14  break and see if I could cut it a little bit.  I

15  certainly won't be finishing much before 1:00.

16           THE US COURT:  I don't know that I have

17  the same touch as Justice Newbould, but why don't

18  we recess now until, what would it be?  Quarter to

19  2:00.

20           MR. OXFORD:  Very good.

21           THE US COURT:  All right.  1:45.

22           MR. OXFORD:  Thank you, Your Honors.

23  -- LUNCHEON RECESS TAKEN AT 12:23 P.M. --

24  -- UPON RESUMING AT 1:51 P.M.

25           THE US COURT:  Thank you, all.  You may



```
 1   be seated.

 2   -- Pause --

 3                THE US COURT:  Justice Newbould.

 4                THE CANADIAN COURT:  Judge Gross.

 5                THE US COURT:  Mr. Oxford, before you

 6   continue, I want to know how much time you shaved

 7   off your examination, because I don't want Justice

 8   Newbould to think he has the magic touch only.

 9                MR. OXFORD:  Yes.  I am pleased to

10   report, Your Honor, that you both have magic

11   touches.

12                THE US COURT:  Oh, good.

13                MR. OXFORD:  I would say around

14   50 percent.  We do have one important topic, which

15   is that of the nonexclusive licenses.  But I have

16   managed to cut out anything other than that.

17                THE US COURT:  I was really kidding, to

18   tell you the truth.

19                MR. OXFORD:   Okay.  Then I can put

20   them back in?

21                Good afternoon, Mr. Kinrich.

22                THE US COURT:  Are we ready?  Do you

23   have what you need up at your end, Justice

24   Newbould, technologically?

25                THE CANADIAN COURT:  Technologically, I
```



1   am up to date.

2                   THE US COURT:  My screen is just

3   showing you, but we can proceed.  And I certainly

4   have the handout.

5                   MR. OXFORD:   If at any time you need

6   hard copies of anything, Your Honor, we have them

7   here.

8                   THE US COURT:  Thank you.

9                   BY MR. OXFORD:

10                  Q.   Mr. Kinrich, good afternoon.

11                  A.   Good afternoon.

12                  Q.   I want to address the topic of

13   IPCo, which you testified about on direct at some

14   length.

15                  In essence, you rely on the IPCo

16   revenue models to allocate the proceeds of the

17   residual patent portfolio; correct?

18                  A.   Yes.

19                  Q.   And you vetted the IPCo model;

20   correct?

21                  A.   Yes.

22                  Q.   You declared it robust and

23   reliable?

24                  A.   For purposes of the allocation,

25   yes.



```
 1                    Q.    And this is based on your review
 2    of the Global IP presentations?
 3                    A.    Among other things.
 4                    Q.    And the deposition of the Nortel
 5    executives?
 6                    A.    Yes.
 7                    Q.    And reviewing the IPCo model
 8    itself?
 9                    A.    Correct.
10                    Q.    Anything else?
11                    A.    Some of my own professional
12    judgments are certainly involved in there as well.
13                    Q.    Did you do any other analysis of
14    the IPCo model that you haven't just told me about?
15                    A.    Well, I did -- I didn't just tell
16    you about it.  But in my direct testimony I talked
17    about vetting some of the data inputs from external
18    sources, not just relying on what they did.  So
19    that was another part of the process.
20                    Q.    Okay.  I appreciate that answer.
21                    You also relied on the interest levels
22    as determined by Nortel and Global IP, did you not?
23                    A.    Yes, the high and highest-interest
24    levels as -- but not in connection with IPCo.  I
25    did in general as part of the understanding of the
```



1   patent portfolio.

2              Q.   Right.   Some of your testing was

3   based on an analysis of the high-interest

4   designation of these patents; correct?

5              A.   Yes.   Again, not in connection

6   with IPCo but in connection with the overall

7   judgments in the patent portfolio; that's correct.

8              Q.   And that is something that you and

9   Mr. Zenich agreed on?

10             A.   I don't know that I discussed that

11  particular topic with him.   He may very well agree

12  with me.

13             Q.   Okay.   Well, let me try it this

14  way.   I don't mean to cut you off.   But in essence,

15  Global IP looked at the patent portfolio and

16  determined which of those patents were of highest

17  interest; correct?

18             A.   That is something they did, yes.

19             Q.   And that is something that

20  Mr. Zenich looked at; correct?

21             A.   Yes, he did.   At least I

22  understand he did.

23             Q.   Yes.   And you relied on

24  Mr. Zenich's analysis and testing of that data;

25  correct?



```
 1                    A.   I did for the technical elements

 2   in connection with the judgments that the overall

 3   distribution of high and highest-interest patents

 4   assessed by Global IP was consistent with

 5   Mr. Zenkich's judgment.  But again, that didn't

 6   come into play directly with IPCo, but it did come

 7   into play with the other part of my analysis.

 8                    Q.   Right.  And that other part of

 9   your analysis is testing the reliability of your

10   conclusions; correct?

11                    A.   Or perhaps -- I would say it is

12   another element of my conclusions rather than

13   simply testing.

14                    Q.   So leaving China to one side for

15   one moment, you assigned value to the revenue from

16   the patents filed in each of the five principal

17   jurisdictions:  The United States, Canada, the

18   United Kingdom, France and Germany; correct?

19                    A.   Well, the IPCo model did, and I

20   used that, those results, yes.

21                    Q.   So that's what you did; correct?

22                    A.   Yes.

23                    Q.   And within each business line or

24   franchise, sir, you applied a royalty rate;

25   correct?
```



     1                    A.    Again, IPCo applied a royalty
     2   rate.  I used the royalty rates that they use, and
     3   those differ depending on whether there is a
     4   litigation-light or litigation-heavy strategy.  So
     5   the same franchise could have a different royalty
     6   rate for different vendors depending on the
     7   strategy that they elected to pursue.
     8                    Q.    But one variable that is not in
     9   your analysis, or IPCo's, is whether the royalty
    10   rate changes depending on which country or
    11   jurisdiction you are in; correct?
    12                    A.    That's correct.  The IPCo model
    13   has a uniform royalty rate, which was one of the
    14   things I took into account when I reached my
    15   ultimate conclusion, recognizing that a lot of the
    16   leverage in the model comes from the place where
    17   there is a lot of patent coverage, which is the
    18   United States.
    19                    Q.    Right.  Sure.  And we will get to
    20   that in a moment.  Don't worry about that.
    21                    So each of these five countries that
    22   you have assigned value to, the US, Canada,
    23   et cetera, they all have enforcement regimes that
    24   vary in their quality or robustness; correct?
    25                    A.    Yes, although generally speaking,

Neeson & Associates    W&F

```
 1   they would all have essentially equivalent

 2   robustness as far as my economic judgments would be

 3   concerned.  That is, the US, Canada and the three

 4   EMEA entities I would not differentiate in the

 5   relative strength of their enforcement regime.

 6              Q.   I see.  And those five

 7   jurisdictions, Mr. Kinrich, they also had quite

 8   wide disparity in the number of patents that were

 9   filed there; correct?

10              A.   The Nortel patents?  Yes.

11              Q.   Yes.  So for example -- and we

12   don't need to pull it up, but I think it was your

13   slide 18 shows the US has eight times as many

14   patents as France; correct?

15              A.   I will accept that number.  It is

16   certainly on that order, yes.

17              Q.   And again, you didn't apply any

18   different royalty rate depending on the number of

19   patents?

20              A.   No.  I don't think that's quite

21   accurate.  I would say the IPCo model didn't.  I in

22   my ultimate conclusions about value took into

23   account that there is more value associated with

24   the larger patent portfolios in reaching an

25   ultimate judgment as to what that value -- what the
```



1    ultimate result should be.  But the IPCo model as

2    developed by Nortel did not differentiate; did a

3    uniform worldwide rate for the targeted

4    territories.

5              Q.   And the IPCo model did a uniform

6    royalty rate regardless of the number of patents

7    filed in those jurisdictions; correct?

8              A.   Well, by definition, uniform is

9    uniform.

10             Q.   Right.

11             A.   But -- yes.

12             Q.   Okay.  Moving to China, sir, you

13   testified a little bit this morning to Mr. Luft

14   that you evaluated essentially whether China --

15   whether it would be appropriate and reliable to

16   include in your analysis projected revenues from

17   China; correct?

18             A.   I did.  I considered the two

19   alternatives that IPCo had and weighed them and did

20   include revenues from China in my ultimate

21   conclusion.

22             Q.   And you considered a number of

23   factors which you told the Courts about this

24   morning, did you not?

25             A.   I did.



```
 1                    Q.   One of those factors is the number
 2   of patents that are registered in China?
 3                    A.   That is a factor.
 4                    Q.   Right.  And China had 96 patents,
 5   according to your report, that were registered
 6   there; correct?
 7                    A.   I think that's probably about
 8   right, and I accept the number.
 9                    Q.   I am happy to take you to your
10   report if you have any concerns about that number.
11                    A.   I have no concerns about a
12   misrepresentation of anything like that.
13                    Q.   And about 50 percent of those
14   registered patents were high value, according to
15   the Global IP analysis; correct?
16                    A.   I don't remember specifically, but
17   that doesn't surprise me.  And I'd certainly accept
18   it as a representation.
19                    Q.   It sounds about right to you?
20                    A.   I have no reason to dispute it,
21   and I could look it up, but I don't think there is
22   a reason to.
23                    Q.   Okay.  I appreciate that.
24                    Another of the factors that you
25   considered was what you described as lax
```



1   enforcement in China concerning their intellectual

2   property.

3              A.   That was one of the factors I did

4   mention.

5              Q.   And you looked at a number of

6   third-party studies, did you not?

7              A.   Yes.

8              Q.   And we don't need to go to your

9   report.  But is it fair to say that China is

10  towards the bottom of those league tables that are

11  cited in your reports?

12             A.   It is.

13             Q.   And one of the other factors you

14  considered, Mr. Kinrich, was the extent to which a

15  uniform royalty rate could be obtained worldwide,

16  did you not?

17             A.   Yes.

18             Q.   And what that means is that a

19  company that has a deep and broad patent portfolio

20  in the US, such as Nortel, can leverage that

21  portfolio to extract the same royalty rate

22  worldwide; correct?

23             A.   They can try to.  But as I think I

24  described, one of my judgments was if that happens,

25  it is, just as you said, leveraging the US patent



```
 1   portfolio.  Therefore, the value is really coming

 2   from the US even if the royalty revenue is coming

 3   from one of the other territories.

 4             Q.   Right.  But again, just focusing

 5   on my question, sir, we can agree that a company

 6   like Nortel that has a deep and broad US patent

 7   portfolio can leverage that portfolio to extract

 8   the same royalty rate worldwide?  Yes or no.

 9             A.   It is not answerable yes or no.

10   It is -- in territories where there is patent

11   enforcement, that is possible.  That value should

12   be attributed to the US, not to that territory.

13   And in countries where there is quite limited

14   patent coverage, then you probably would not be

15   able to do that.

16             Q.   So just so I have your testimony,

17   sir, you are not able to answer the question is it

18   correct that a company with deep and broad US

19   patent portfolio can leverage that portfolio to

20   extract the same royalty rate worldwide, even in

21   jurisdictions where patent protection is less

22   robust than the US?

23             A.   That is --

24             MR. LUFT:  Objection, Your Honor.  He

25   did just answer that question.  If Mr. Oxford would
```



```
 1   like to put the end of his question "yes" or "no"
 2   on, I am happy to let him do that.  But he is not
 3   being fair.
 4               THE US COURT:  Mr. Oxford?
 5               MR. OXFORD:  "Yes or no" was at the
 6   start of my question.  I am happy to top and tail
 7   it.
 8               THE US COURT:  Yes or no?  Yes.
 9               THE WITNESS:  Now I don't know what the
10   question is.
11               THE US COURT:  All right.  Try it one
12   more time.
13               BY MR. OXFORD:
14               Q.   Once more with feeling,
15   Mr. Kinrich.
16               Can you answer the question yes or no:
17   Is it true that a company with deep and broad US
18   patent portfolios can leverage that portfolio to
19   extract the same royalty rate worldwide even in
20   jurisdictions where patent protection is less
21   robust than the US?
22               A.   No, I cannot answer that yes or
23   no, because there are circumstances where that
24   could be true, and there are other circumstances
25   where that would be either not true or much less
```



```
 1   true.
 2              Q.   You were deposed in this case,
 3   sir?
 4              A.   Yes.
 5              Q.   And you were asked some questions,
 6   and you gave answers; correct?
 7              A.   Yes.
 8              Q.   And those answers were truthful?
 9              A.   They were intended to be truthful.
10   There are a couple of cases where I made
11   misstatements and used the wrong word that is still
12   in the record.  But they properly record what I
13   said at the time.
14              Q.   Can we pull up Mr. Kinrich's
15   deposition, please.  Can we turn to page 231,
16   please.
17              MR. OXFORD:  May I have one moment,
18   Your Honor?
19              THE US COURT:  Certainly, Mr. Oxford.
20              MR. OXFORD:  Thank you, Your Honor.  I
21   appreciate that.
22              BY MR. OXFORD:
23              Q.   Mr. Kinrich, do you see at page
24   231 there is sentence that begins "I also took into
25   account"?  Do you see that, sir?  You testified:
```



```
 1                      "I also took into account the

 2                 discussions about the various patents,

 3                 the patent characteristics and included

 4                 in that perhaps most importantly is

 5                 that to the extent that a uniform

 6                 royalty rate could be obtained

 7                 worldwide as projected in IPCo."

 8                      Do you see that, sir?

 9            A.   I do.

10            Q.   Was that true testimony at the

11   time, sir?

12            A.   It is not a full phrase.  Go to

13   the very next sentence and you will see it is just

14   what I said here today.

15            Q.   Right.  I am happy to do that,

16   sir.  You go on to say:

17                      "It is reasonable, not absolutely

18                 required but it is reasonable that for

19                 a given licensee, say Ericsson, but

20                 nothing to do with Ericsson in

21                 particular, that Ericsson would pay a

22                 uniform royalty rate for the relevant

23                 products, essentially across the world,

24                 certainly across the territories, but

25                 essentially across the world, that is a
```



 1                      reasonable but not necessary result."

 2                      A.   Correct.  I think that's accurate

 3      then and accurate -- consistent with what I just

 4      said a moment ago.  It is not an absolute yes or

 5      no.

 6                      Q.   Okay.  I appreciate that, sir.

 7                      This ability to potentially extract a

 8      worldwide royalty rate leveraging the US patent

 9      portfolio was one of the most important factors in

10      your analysis of projected Chinese revenues, was it

11      not?

12                      A.   No, at least not as I understand

13      your question today.  The judgment about China had

14      to do with enforcement regimes and ability to

15      extract royalties through enforcement or other

16      things in China.  The assumption was if you are

17      extracting royalties, they will be at the uniform

18      worldwide rate.  So that was already included in

19      the China analysis.

20                      Q.   Let's move off China and let's

21      move on to what I will call the rest of the world

22      and I think you call the 5 percent or the last

23      5 percent.

24                      A.   "Rest of world" is fine.  I use

25      that phrase as well.



1            Q.   So you described the 5 percent of

2   patents that are not captured in your analysis as

3   "the last 5 percent"?

4            A.   Well, I generally describe it as

5   "rest of world."  It was the 5 percent, in contrast

6   to the 95 percent that was in my table.  But I

7   don't mean it sequentially in any fashion.  It just

8   is that group.

9            Q.   You don't mean to suggest that

10  those last 5 percent are any less in quality than

11  the first 95 percent?

12           A.   Not on an individualized basis,

13  although we can investigate that should that prove

14  relevant.

15           Q.   And you are aware, sir, are you

16  not, that Nortel filed only its most important and

17  valuable patents abroad?

18           A.   I have heard that testimony.  But

19  that be doesn't seem to be true factually, in that

20  a higher percentage of the high and

21  highest-interest patents are US-only than the

22  average patent.  So it does not appear that that

23  is, in fact, a true statement.

24           Q.   But that was certainly the

25  intention of the Nortel executives whose testimony



1    that you reviewed; correct?

2              A.   I noted that testimony.  And then

3    I noted the evaluation that Nortel did of its own

4    portfolio and found that it didn't prove to be

5    true, or at least not very true.

6              Q.   You also told us on direct, sir,

7    that Lazard had considered for inclusion in their

8    IPCo model jurisdictions other than the six that

9    you have testified about.

10             A.   Yes, they did.

11             Q.   Which jurisdictions were you

12   describing?

13             A.   Just generally.  The two different

14   things I am thinking of:  One, there was some

15   discussion within Lazard and the steering committee

16   of Japan and Korea; and further, there was a more

17   generalized discussion as to whether other

18   territories should be added, without reference to

19   specific ones.  And Lazard came back and said, no,

20   we think we have covered the ones -- I am

21   paraphrasing -- but we have covered the ones that

22   are financially viable and worthy of consideration.

23             Q.   I see.  And can you tell me,

24   please, sir, what analysis did you do to test the

25   reliability of Lazard's conclusions as to the



1   exclusion -- let's just take your two examples --

2   Japan and Korea.

3                   A.   I relied on the fact that Lazard

4   and Nortel were profit-maximizing entities.  They

5   were doing their analysis in the ordinary course of

6   business with a desire to maximize value and their

7   own comments about whether it was, in fact, worth

8   the effort, worth the effort to attempt to extract

9   value from there and other territories.  And their

10  own judgments I found, to use a double negative,

11  not to be unreasonable.  I did not affirmatively

12  investigate them so much as look to see what they

13  said and realized that those are the kinds of

14  judgments that can be made reasonably in the

15  ordinary course of business.

16                  Q.   But you didn't do any analysis

17  yourself to test those conclusions from Lazard that

18  Korea and Japan be excluded from their model?

19                  A.   Not for those two countries in

20  specific.  I did in general across the other

21  territories, but I did not specifically look at

22  those two as separate issues.

23                  Q.   Can we pull up Trial Exhibit 51009

24  and turn to page 19.  It is on the screen in front

25  of you, sir.  You are welcome to a hard copy if you



```
 1   would like it.
 2               A.   I would like a hard copy, I think,
 3   because it is a long document.  Thank you.
 4               Q.   Sir, do you have that in front of
 5   you, Trial Exhibit 51009?
 6               A.   I do, although the page -- I mean,
 7   it must be on something other than the first page.
 8               Q.   Yes.  I am on page 19.
 9               This is one of the third-party analyses
10   of patent regime quality that you cited in your
11   report, is it not?
12               A.   Yes, it is.
13               Q.   And this is the Global IP index by
14   Taylor and Wessing; correct?
15               A.   Yes.
16               Q.   Could we blow up the Table 9A,
17   please.  And you will see there that Germany, which
18   you gave full value to, is ranked as No. 1?
19               A.   Yes, I do.
20               Q.   The UK, I am pleased to note, is
21   No. 2.  You see the USA there is No. 4.  Canada is
22   6, and France is ranked 10th.  Do you see that?
23               A.   I do.
24               Q.   And I think you told me a few
25   moments ago that you considered all of these
```



 1   rankings to be essentially equivalent.  Is that

 2   fair?

 3              A.   Not simply from this document, but

 4   looking across all of the various sources, I did

 5   not consider individualized rankings.  I looked at

 6   the aggregate of them and essentially considered

 7   all of those groupings, especially taking into

 8   account that IPCo did not have a toggle for any of

 9   those other countries.

10              Q.   Sure.

11              A.   That that was a reasonable thing

12   to look at and did not differentiate that there

13   would be a 2 percent higher probability in one

14   country or a 1 percent lower in another country.

15   That wasn't needed.

16              Q.   But this chart that is on the

17   screen is not inconsistent with your conclusions,

18   is it?

19              A.   It is not.

20              Q.   In fact, you relied upon this

21   chart, amongst others?

22              A.   As one of many inputs, but yes, I

23   did.

24              Q.   Do you see there, sir, that Japan

25   is ranked No. 11?

 Neeson & Associates   W&P

```
 1                         A.    I do.

 2                         Q.    And you see also that South Korea

 3    is ranked No. 13?

 4                         A.    I do see that.

 5                         Q.    And unfortunately, China doesn't

 6    fare quite so well.  It is down towards the bottom

 7    at No. 22.

 8                         A.    I do see that.

 9                         Q.    And that is consistent with your

10    research, is it not?

11                         A.    It is.

12                         Q.    That's all I have for that

13    document at the moment.

14                         We prepared a couple of demonstratives

15    which make some minor changes to a couple of your

16    slides, Mr. Kinrich.  We have hard copies.  If we

17    can have them handed 'round in both courts, that

18    would be appreciated.

19                         MR. LUFT:  Did we get these last night?

20                         MR. OXFORD:  No.  These are

21    Mr. Kinrich's, which we have just added a couple of

22    pieces of data from his own reports.

23                         BY MR. OXFORD:

24                         Q.    Do you have those slides, sir?

25                         A.    I do not.  I see it on the screen.
```



```
 1    I do not have a copy.
 2                Q.   Would you like a hard copy as
 3    well, sir?
 4                A.   If it is only one page, I can do
 5    it on the screen.
 6                Q.   It is a couple.
 7                A.   If you have one, I would be happy
 8    to take one.
 9                Q.   Let me see if I can scare up one
10    more.
11                So, sir, this is your slide 18 that we
12    added the patent counts from one of your
13    appendices.  We also added data from Japan and
14    South Korea.  We also, just for fun, added some
15    flags so we can see who is where.
16                A.   It is much prettier than the one I
17    did; I will grant you that.
18                Q.   Actually, the gentlemen to my left
19    take all the credit for that.  I take zero credit.
20                So you see there, sir, that France at
21    had 357 patents?
22                A.   Yes, I see that.
23                Q.   And there were 96 patents in
24    China?
25                A.   Correct.
```



```
 1                    Q.   65 in Japan?

 2                    A.   I accept that.  I have no reason

 3     to disagree.

 4                    Q.   And 43 in Korea?

 5                    A.   Fine.

 6                    Q.   So let's take Japan first.  We can

 7     agree, sir, can we not, that Japan represents a

 8     very significant technology market?

 9                    A.   Yes.

10                    Q.   And we can also agree, sir, can we

11     not, that in 2009 its telecom market was

12     approximately the size of China's?

13                    A.   I don't have that fact in order to

14     agree with you.  I don't have a basis to disagree

15     with you.  I just don't -- those aren't the kind of

16     numbers I have in my head.

17                    Q.   I appreciate that.

18                    And in 2009, sir, the GDP of Japan was

19     roughly the size of China's?

20                    A.   Same statement:  If you are

21     representing it to me, I am not going to tell you

22     you are wrong.  I cannot testify to that.

23                    Q.   But you have no reason to

24     disagree?

25                    A.   I do not know, so I have no basis
```

 Neeson & Associates    W&F

1    to have an opinion one way or the other.

2                Q.    We can also agree, based on the

3    data that is in your report, sir, that Japan has a

4    high-quality patent enforcement regime?

5                A.    I think that is probably

6    reasonable.  I know there were concerns in Nortel

7    about the cost of that process in Japan; that even

8    though it is high quality, they believe it is

9    particularly high cost.  But I do not have an

10   opinion on quality beyond the documents that we

11   have shown, and so I don't disagree with you.

12               Q.    In the chart we just looked at,

13   France was 10; correct?

14               A.    I will accept your word.  I think

15   that's what you told me.

16               Q.    It was ranked tenth.  And Japan

17   was just next; it was No. 11.  Do you remember

18   that?

19               A.    I do.

20               Q.    And the IPCo model that you adopt,

21   sir, that gives 100 percent credit for revenue

22   attributable to the French patents, does it not?

23               A.    The portion of the analysis that

24   relies just on IPCo and does not yet take into

25   account the patent portfolio characteristics that I



1    ultimately used to get my conclusion, that portion

2    of it does what you said.  My ultimate conclusion

3    is not limited to that.

4              Q.   Okay.  Well, let me try this one

5    more time, sir.

6              Can we agree that the IPCo model that

7    you adopt and apply gives 100 percent value to the

8    revenue attributable to the French patents?

9              A.   It does in the way I just

10   described:  Not in terms of the value contributed

11   but in terms of the revenue from France, yes.

12             Q.   And in the same model from IPCo

13   that you adopt and apply, the patents that are in

14   Japan, which is the next-ranked jurisdiction in

15   quality, are given zero value; correct?

16             A.   That's correct.  That is what the

17   Nortel and Lazard developers judged was

18   appropriate.

19             Q.   And you, sir, didn't question it,

20   did you?

21             A.   Well, I questioned it in the sense

22   of I investigated whether they made those

23   statements.  I investigated whether it was just an

24   oversight or whether it was something they did

25   intentionally.  And it was quite clear it was an



```
 1    intentional judgment on their parts.
 2              Q.   Okay.  So let's look at South
 3    Korea.  You can agree with me similarly with Japan
 4    that South Korea also represents a very significant
 5    technology market?
 6              A.   Yes.
 7              Q.   And again, that it, too, has a
 8    high-quality patent enforcement regime?
 9              A.   Yes, generally.
10              Q.   And when you take Japan and Korea
11    together, their telecom spending in 2009 certainly
12    exceeded China's?
13              A.   I can't agree with you.  I am
14    certainly not disagreeing with you.
15              Q.   Okay.  And South Korea, we saw on
16    our little league table, was ranked No. 13?
17              A.   I think that's what you showed me
18    a minute ago.
19              Q.   So just a couple of spots after
20    France; right?
21              A.   I think that's correct.
22              Q.   And your model assigns absolutely
23    no revenue to all of the patents in South Korea;
24    correct?
25              A.   Well, it isn't my model.  It is
```



1    the model that Nortel developed.  But that model

2    does not associate revenues with South Korea;

3    that's correct.

4                Q.   It may not have been your model

5    initially, sir, but it is a model that you adopted

6    and applied; is that not true?

7                A.   It is.  But as I have described,

8    my ultimate conclusion starts with that and then

9    makes adjustments, taking into account relative

10   patent weights and relative patent counts and

11   market sizes to get to an ultimate conclusion.

12               Q.   Okay.  Let's look at high-interest

13   patents, sir.  Can we have the second of our

14   demonstrative slides, please.

15               What we did here, sir, was similar to

16   the previous slide.  We took as a base your slide

17   18, and we added not just all patents but the

18   high-interest patents.  Do you see that, sir?

19               A.   I do.

20               Q.   And what that reflects, does it

21   not, sir, is that of the 96 patents in China, which

22   you had listed in Exhibit 21 to your report, 46

23   were rated as high-interest; correct?

24               A.   Yes.

25               Q.   And you give value in your report



 1   to the revenue stream from those patents; correct?

 2              A.   The Chinese patents?  Yes.

 3              Q.   Yes.  And you discount that by I

 4   think 75 percent to 25 percent; is that fair?

 5              A.   No, that wouldn't be fair.  I told

 6   you the ultimate conclusion was influenced not only

 7   by China but by the dominance of the US market and

 8   the ability to leverage US patents.  So the

 9   conclusion about China is far more than 25 percent

10   in order to get down to an average that is around

11   that point.

12              So the Chinese conclusion is much

13   closer to a 50/50 weight, although I didn't

14   actually have a quantification of it

15              Q.   I see.  And because some of that

16   Chinese revenue is earned by leveraging the US

17   portfolio, you essentially assigned it back to the

18   US?

19              A.   No.  It isn't related to China per

20   se.  It is a general -- there are really two

21   independent statements.

22              There is a range for China in the IPCo

23   model, with and without China.  And then there is a

24   separate analysis that I did before I ever started

25   talking about IPCo -- I mean at least today,



```
 1   discussed well before I ever mentioned the IPCo
 2   model -- that talked about the number of high and
 3   highest-interest patents in the United States, the
 4   US market size, all that.  And that was an
 5   additional factor that influenced the overall
 6   conclusion.
 7              Q.   Just turning back to the slide,
 8   sir, you will see that of the 65 patents in Japan,
 9   47 were rated by Global IP as high-interest.  Do
10   you see that, sir?
11              A.   I see that.
12              Q.   And at the risk of getting myself
13   into trouble with the same question as before, the
14   IPCo model that you adopted gave zero value to
15   those patents; correct?
16              A.   It gave zero value to an income
17   stream from Japan, yes.
18              Q.   And that is despite the fact that
19   Japan's IP enforcement regime is ranked
20   significantly higher than China's?
21              A.   They both are true statements.  I
22   am not sure whether it is "despite the fact," but I
23   don't disagree with your overall conclusion.
24              Q.   And also despite the fact that
25   China had fewer high-interest patents than Japan?
```



1                      A.    Yes, by one, according to your

2    numbers, yes.

3                      Q.    Okay.  That's all for that slide,

4    thanks.

5                      We can agree, sir, Mr. Kinrich, that

6    the low ranking of an IP enforcement regime is not

7    an absolute bar to extracting value from patents

8    filed in countries outside the US?

9                      A.    I didn't hear the end of your

10   question.  Can you repeat it.

11                     Q.    Can we agree, sir, that the fact

12   that a patent enforcement regime is not highly

13   ranked is not an absolute bar to extracting revenue

14   from patents filed in those countries?

15                     A.    I agree, it is not an absolute

16   bar.

17                     Q.    It is not impossible to obtain

18   royalties from technology with patents filed in,

19   for example, Japan and South Korea?

20                     A.    I would agree; that is not

21   impossible.

22                     Q.    And that's because royalties are

23   typically paid on a region or worldwide basis; is

24   that not true?

25                     A.    No, that wouldn't be why.  It



 1    would be because you can enforce them directly.

 2              In a review of international license

 3    arrangements, I discovered over 90 or something

 4    between 90 and 95 percent of -- no, closer to

 5    90 percent of patent arrangements are territorial

 6    and do not apply to worldwide sales.

 7              So generally speaking, the rule is

 8    contrary to what you are suggesting.  There are

 9    cases where the rule is what you suggest.

10              Q.   Did you review any of Nortel's

11    licensing agreements, sir?

12              A.   Not for that conclusion.  I don't

13    remember whether I reviewed them for something else

14    or not.

15              Q.   So you didn't look at the Foundry

16    license agreement, sir?

17              A.   The Foundry -- I did look at the

18    Foundry matter, so the answer is yes.  I do not

19    remember the details of it, but I did look at it.

20              Q.   So you can't tell the Court one

21    way or another whether, when Nortel settled with

22    Foundry, it granted a worldwide license to Foundry?

23              A.   I think they did.  I don't have

24    enough of a clear recollection to be certain.

25              Q.   Sir, you are familiar with the



     1   company Qualcomm, are you not?

     2                A.   I am.

     3                Q.   And you are familiar, sir, are you

     4   not, that Qualcomm was actually one of the models

     5   that Nortel and Global IP used to create the IPCo

     6   model; correct?

     7                A.   They are one of the other patent

     8   and licensing entities that was considered,

     9   certainly, by the Nortel effort.

    10                Q.   And are you aware -- you testified

    11   this morning about Mr. Malackowski, but I want to

    12   take you to a different portion of his testimony.

    13                Mr. Malackowski testified that Qualcomm

    14   generated a significant portion of its revenue by

    15   licensing patents in China.  Were you aware that he

    16   had testified like that?

    17                A.   I was.

    18                Q.   And you have no reason to disagree

    19   with Mr. Malackowski's analysis, do you?

    20                A.   Not with his statement.  Qualcomm

    21   has a massive Chinese patent portfolio, not just 40

    22   or 60 patents but thousands.  And much of that

    23   revenue is on manufacturing in China that is

    24   exported to the West, and that is how Qualcomm is

    25   able to succeed in doing that.



1                  Q.   And Qualcomm, does it not, sir,

2     licenses its patents at standard worldwide rates,

3     does it not?

4                  A.   I think that is true.  I can't say

5     that anyone knows whether that is absolutely

6     uniform, but certainly that is often true.

7                  Q.   That's all I have for this topic.

8                  Mr. Luft asked you a question about the

9     contribution approach this morning.  Do you

10    remember that?

11                 A.   I do.

12                 Q.   And you testified contribution

13    approach is not a way to determine fair market

14    value.  Costs incurred are not equal to fair market

15    value, so you can't measure them through what is

16    being termed a contribution approach.  Do you

17    remember giving that testimony?

18                 A.   Essentially, yes.

19                 Q.   Are you aware, sir, that the EMEA

20    Debtors do not attempt to determine fair market

21    value by measuring costs?

22                 A.   I think that's probably true,

23    although I think the assignment is for fair market

24    value.  That's why I drew the distinction.

25                 MR. OXFORD:  I just have a couple of



1   questions on Alcatel.

2             I am kidding.  Actually, I have no

3   further questions.

4             THE US COURT:  Oh, Mr. Oxford.  Thank

5   you.

6             MR. OXFORD:  Thank you, Mr. Kinrich.

7   Thank you, Judge Gross.  Thank you, Justice

8   Newbould.

9             THE WITNESS:  Thank you.

10            THE US COURT:  Mr. Chang, good

11   afternoon.

12            MR. CHANG:  Good afternoon, Judge

13   Gross.  Justice Newbould.

14   CROSS-EXAMINATION BY MR. CHANG:

15            Q.   Mr. Kinrich.

16            A.   Hello, sir.

17            Q.   Just to remind you, my name is

18   Eugene Chang.  I am with Willkie Farr & Gallagher,

19   representing the UK pension claimants.  I have two

20   broad topics to talk to you about today.  First I

21   want to start with asking you about your general

22   methodology a little bit, explore that.

23            So your general methodology is the

24   income approach; right?  You testified to that on

25   direct.



```
 1                    A.   Are you speaking for line of
 2    business or are you speaking for patent portfolio
 3    or --
 4                    Q.   I am talking for both, actually.
 5                    A.   Generally, that applies to both
 6    but in different ways.  So depending on where we
 7    go, the answer may be different.
 8                    Q.   Okay.  So let's focus more
 9    specifically on the patent portfolio.
10                    A.   Okay.
11                    Q.   For the patent portfolio, your
12    general approach is the income approach, although
13    you go more specifically to a revenue model; right?
14                    A.   No, that's not true.
15                    Q.   Did I misunderstand your direct
16    testimony?
17                    A.   You just said patent portfolio,
18    and that would apply to the line of business, not
19    to the patent portfolio.
20                    Q.   Okay.  Let me back up a step then.
21                    Is your general approach to the patent
22    portfolio an income approach?
23                    A.   Yes.
24                    Q.   Okay.
25                    A.   Discounted cash flow.
```



```
 1                    Q.    Thank you.  It is a cash flow
 2    approach; right?
 3                    A.    Yes, that is.
 4                    Q.    And as part of that cash flow
 5    approach, in general, you would take into account
 6    both the money coming in as well as the costs
 7    associated with generating that cash flow; right?
 8                    A.    Correct.
 9                    Q.    And so those costs that you would
10    take into account are costs that are associated
11    with the thing that you are using to generate the
12    revenue; right?
13                    A.    In this case, they are the costs
14    of enforcement of patents and running an
15    organization that is enforcing those patents.
16                    Q.    Okay.  Your model does not
17    include -- for the patents does not include all of
18    the costs related to the creation of that patent
19    portfolio, does it?
20                    A.    No.  Those are sunk costs and
21    would not be -- they are costs incurred in the
22    past.  Those costs were incurred in order to create
23    the asset value that was sold for $4-1/2 billion.
24    They are not costs of running that portfolio going
25    forward.  They would be considered in the financial
```

 Neeson & Associates    W&F WILSON & PETZER LTD.

1   term sunk costs and not be part of a cash flow

2   model.

3               Q.   So, for example, you didn't

4   include the labor costs that were associated with

5   doing the R&D that actually created the patent

6   portfolio that was sold?

7               A.   No.   That cost should -- is

8   properly not included because it is not a cost

9   incurred from that point forward that you are

10  valuing.

11              Q.   Okay.   And it also doesn't include

12  the pension costs for the people, the researchers,

13  the inventors that helped create that patent

14  portfolio; right?

15              A.   That's correct.

16              Q.   But those are costs that were

17  necessary in order to actually create the portfolio

18  that was sold for 4-1/2 billion, weren't they?

19              A.   They are costs that were incurred.

20  We can debate on an individual basis which were

21  necessary and which were not.   But 20/20 hindsight

22  is wonderful.   I am sure that some of those people

23  spent time on false leads.   None of that is

24  relevant.   In aggregate, that was the cost required

25  to create individualized patents.



1                    Q.    Now, you are aware that as a

2    matter of Nortel policy almost all of the patents

3    were filed in the US; right?

4                    A.    Correct.

5                    Q.    No matter where they were

6    invented, whether they were invented in the UK,

7    whether they were invented in Canada, almost all of

8    the patents were filed in the US; right?

9                    A.    That is true.

10                   Q.    And, in fact, if we turn to slide

11   14 of your direct, we see that if we add 73 percent

12   and 24 percent we have 97 percent of the patent

13   portfolio was actually filed in the US; right?

14                   A.    Correct.

15                   Q.    Now, you are also aware that it

16   was Nortel policy to file about 25 percent of the

17   most valuable patents elsewhere, including the UK

18   and Canada; right?

19                   A.    Yes.  It ends up that it is closer

20   to an average for all patents, not for the most

21   valuable patents.  But that's -- the two are kind

22   of close to each other.

23                   Q.    And your slide 14 here shows that

24   it is less than 25 percent.  For the residual

25   patent portfolio it was about 24 percent of the

Neeson&Associates    W&F

```
 1   total patents there; right?

 2                A.   Yes.

 3                Q.   So you do understand that the

 4   patent filing policy was there for the benefit of

 5   Nortel as a whole?

 6                A.   I think that's a reasonable

 7   conclusion.  I don't know what the purpose was in

 8   the sense that no one -- I have not read an

 9   articulation of it.

10                Q.   And in part do you understand that

11   it was because Nortel was operated as one globally

12   integrated entity?

13                A.   I understand that that is how

14   Nortel was operated.

15                Q.   And you don't dispute that that

16   was actually how Nortel operated; right?

17                A.   That is my understanding.

18                Q.   Well, let's consider how this

19   policy interacts with your model.  So let's assume

20   that there is a patent that was invented by UK

21   inventors, including, for example, Simon

22   Brueckheimer.  Have you heard his name before?

23                A.   I have.

24                Q.   Did you read his testimony from

25   earlier in this trial?
```



```
 1                  A.    I did not read his testimony.
 2                  Q.    Okay.  But you know of him as a
 3      prolific UK inventor, don't you?
 4                  A.    I have heard his name, yes.
 5                  Q.    Okay.  So Simon Brueckheimer
 6      invents a new technology.  That patent is filed
 7      only in the US.  It exists in the residual patent
 8      portfolio, just a US patent, no UK patent.  Your
 9      model would give NNUK zero value for that Simon
10      Brueckheimer invention; correct?
11                  A.    No, that isn't correct, because
12      the basis -- there are two different issues.  There
13      is a part where that has some relevance and part
14      where it doesn't.
15                  The IPCo model, as the prior questioner
16      elicited, does not differentiate across the EMEA
17      and US territories on royalty rates.  So to the
18      extent that that patent is a US patent and is
19      important and is part of why Nortel could get a
20      certain royalty rate, the UK and France will
21      benefit from that even though it isn't filed in the
22      UK and France.
23                  Part of the influence on my ultimate
24      conclusion within the range defined by IPCo gives
25      more value to the places -- to the US patent
```



1    portfolio because of the dominance of both the

2    market size, which, of course, wouldn't be affected

3    by what you are talking about, and the number of

4    patents.  So there is that influence.

5              But there is still value, significant

6    value, to the UK and France from the invention you

7    are hypothesizing from the fact that it is included

8    in the IPCo model royalty calculations.

9              Q.    So maybe you misunderstood my

10   question, and maybe I misspoke.  I am talking about

11   value that you attribute directly from that patent.

12   Now, part of your model is the fact that if only a

13   US patent exists, the US has exclusive control over

14   that; correct?

15             A.    Well, maybe you misunderstood my

16   answer, because I thought I answered your question,

17   and I still think I answered it properly.

18             There is value, in my conclusion, to

19   the UK from the very patent you are talking about.

20   There is one piece of the analysis that is focused

21   on where the patent is filed, and that's the piece

22   I think you are identifying in your question.  But

23   the IPCo piece does not associate the income

24   specifically with the fact that there is a patent

25   only in the United States.



```
 1                    So value accrues to the UK from that
 2    patent in aggregate.
 3                    Q.   It is a very small amount of value
 4    compared to the value you would give to the US for
 5    that US patent; right?
 6                    A.   No, it is not a very small amount.
 7    It is the overwhelming majority of the total value.
 8    I only shift the conclusion slightly from the fact
 9    that most of the value is in the US.
10                    If I valued it purely on US markets and
11    US patents, the amount attributable to the US would
12    be much higher than the conclusion I have reached.
13                    Q.   So let me make sure I understand
14    where you are going.  You valued -- the IPCo model
15    values across technologies; right?  They call
16    them --
17                    A.   Do you mean franchises?
18                    Q.   Franchises.  The IPCo model sets
19    royalty rates across franchises; right?
20                    A.   Yes.  Actually, I would say
21    royalty rates, plural, even within a franchise,
22    because there is some -- a franchise does not have
23    only one royalty rate.  But it does do that
24    process.
25                    Q.   And what you are saying is that
```



1    for a particular franchise, there are US patents

2    and other patents; correct?

3            A.   That is a true statement, but the

4    royalty rates do not vary on that basis.

5            Q.   And the royalty rate is uniform

6    across the world; right?

7            A.   Across the identified territories.

8            Q.   Across the identified territories.

9    And that's why, in your view, the UK is not getting

10   zero value for that patent, that it has some effect

11   on this uniform royalty rate?

12           A.   It isn't the rate per se.  It is

13   the fact that the UK market and the size of the UK

14   market is getting the full benefit from that rate,

15   whatever that rate is.  It isn't that that rate is

16   a little higher or a little lower based on that one

17   patent, though in aggregate clearly the patents

18   influence the choice of rate.  But the UK market is

19   getting value as if it were patented in the UK.

20           Q.   It is true, though, that you place

21   a lot of weight on where a patent issues, not where

22   it was invented; right?

23           A.   I place some weight on that.  Most

24   of the weight, because of the way the IPCo model

25   functions, is not on that factor.  Most of the



1   value, at least within the identified territories,

2   the ones that IPCo focuses on, including the UK,

3   that the location of where it is patented is a

4   relatively small factor, not a major factor.

5            Q.   The location of where a patent was

6   invented is irrelevant to you; correct?

7            A.   Yes.  The fact of the invention

8   location does not come into play; only the other

9   factors we have discussed.

10           Q.   And Nortel's policy of filing

11  every patent in the US has the effect of expanding

12  the money that you would attribute to the US;

13  correct?

14           A.   In a modest way, the answer is

15  yes.  It is a relatively small adjustment, probably

16  only a few percentage points of the grand total,

17  based on that.

18           Q.   Under your model, the US was

19  getting the benefit of all the research that was

20  done in the various labs around the world by

21  Nortel; right?

22           A.   All of the integrated entities are

23  getting the benefit of all that.

24           Q.   And in particular the US, because

25  that is where all of the patents were getting



```
 1  filed; right?
 2              A.   No.  I have said this -- I am
 3  sorry.  Maybe I am being unclear.
 4              The IPCo model, because of its uniform
 5  royalty rates across the territories, at least
 6  within the identified targeted territories,
 7  provides equal value to each territory and does not
 8  weight the US any more just because it has more
 9  patents.
10              Q.   Under your model, despite the fact
11  that --
12              Under your model, it is irrelevant to
13  you where a patent was invented and where the
14  costs, the research and development costs were
15  incurred, took place, were incurred as well; right?
16              THE CANADIAN COURT:  Mr. Chang,
17  shouldn't you move on?  You have been covering this
18  for quite some time, and we are just hearing these
19  things over and over.  I think you should move on.
20              MR. CHANG:  I will.  I will, Your
21  Honor.  Thank you.
22              BY MR. CHANG:
23              Q.   Now I would like to shift to my
24  second topic, which is China.  Now, in response to
25  my friend Mr. Oxford's questions, I believe you
```



 1   said that a part of your basis for discounting the

 2   value that China was given in the IPCo model was

 3   because of the enforcement regime in China; right?

 4           A.   Yes.  I don't think I would phrase

 5   it as discounting, because I had two choices.  I

 6   have a China-on and China-off switch, so I have to

 7   make a judgment what to do about that fact.  But I

 8   did certainly take into account the enforcement

 9   mechanisms and the judgment of market participants

10   on whether they give weight to China patents in

11   connection with patent portfolio transactions.

12           Q.   You don't know exactly why that

13   toggle exists in the IPCo model, do you?

14           A.   I am always unclear how to answer

15   a question about "exactly," because you can always

16   be more exact.  I generally know what Lazard was

17   doing with it.  I do not know exactly what Lazard

18   was doing with it.

19           Q.   There is no testimony in the

20   record that the toggle was there because there was

21   concern specifically about enforcement of Chinese

22   patents, is there?

23           A.   I don't know the record in full,

24   so I can't tell you what testimony there is.  I

25   only know what Lazard said about it in the



 1   documents I reviewed.

 2            MR. CHANG:  Okay.  Let's take a look at

 3   the documents themselves then.  If we turn to Trial

 4   Exhibit 50643.

 5            And due to confidentiality concerns, we

 6   are just providing an excerpt, Your Honors.  You

 7   can pull up the full document if you would like.

 8   We are going to provide a hard copy to the witness

 9   as well.

10            Justice Newbould, do you have your

11   copy?

12            THE CANADIAN COURT:  Well, you go

13   ahead.

14            MR. CHANG:  Okay.

15            MR. LUFT:  This is an excerpt of a

16   document.

17            MR. CHANG:  That's correct.  I provided

18   an excerpt because there were confidentiality

19   concerns about the full document.  I have the full

20   document as well.  But I know that --

21            MR. LUFT:  Is the whole rest of it

22   confidential?

23            MR. CHANG:  No, but there is not an

24   agreed copy of exactly what should be redacted from

25   the rest of it.  I have a full copy that you can



1    see if you would like.

2                   THE US COURT:  Mr. Luft.

3                   MR. LUFT:  Your Honor, I am willing to

4    go ahead, but --

5                   THE US COURT:  Well, let's see how we

6    do.  And perhaps the witness could at least have

7    the full copy in front of him.

8                   MR. LUFT:  I think that would be

9    appropriate, Your Honor.

10                  THE US COURT:  Yes.

11                  THE WITNESS:  Thank you.

12                  BY MR. CHANG:

13                  Q.   So, Mr. Kinrich, you are familiar

14   with IPCo model 2.2, dated May 5, 2010; right?

15                  A.   I am.

16                  Q.   In fact, that's one of the

17   documents that you relied on?

18                  A.   It is.  This predated the IPCo

19   model that I used, but this is one of the steps

20   along the way, yes.

21                  Q.   I would like to turn to page 9 of

22   the slide deck, which is labeled "Update on China."

23   Do you see that?

24                  A.   I do.

25                  Q.   Do you see that in this model



1    Nortel added China to the royalty base for the

2    years 2015 to 2020 in three specific markets:

3    Wireless handsets, wireless infrastructure, and

4    PCs; is that right?

5              A.    Yes, it is.

6              Q.    And that accords with your

7    understanding of what happened with the IPCo model?

8              A.    Yes, it does.

9              Q.    And do you see also that Nortel

10   recognized that China had a strong emphasis on

11   wireless?

12             A.    Yes.  I interpret that to mean

13   that Nortel applications in China had a strong

14   emphasis on wireless, but yes, that's right.

15             Q.    And do you also understand that

16   Nortel believed that the revenues from China and

17   the value in China would start as of 2015 and

18   through 2020?

19             A.    Yes.

20             Q.    And Nortel already discounted the

21   Chinese revenue projections by two-thirds for that

22   time period?

23             A.    I guess just the use of the

24   English phrase "by two-thirds."  They discounted by

25   one-third to equal two-thirds of the total, if



1    that's what you intend to say.

2              Q.   Fair enough.  That is what I

3    intended to say, and I accept the correction.

4              So now let's take a look at what

5    happened later when the toggle was added.  If we

6    could turn to Trial Exhibit 48697.01.  This will be

7    the IPCo model 4.0.

8              A.   I know there is no question

9    pending, but the toggle was added way before this.

10   So when you said when "the toggle was added," this

11   is not it.

12             Q.   Sure.  We will take a look and we

13   can talk about that.

14             MR. CHANG:  This, again, I am providing

15   an excerpt because there are confidentiality

16   concerns.  We have full copies for you if you like.

17   But I am only going to be looking at one specific

18   spot of it.

19             MR. LUFT:  Can the witness have a copy?

20             THE US COURT:  Yes, Mr. Luft.

21             MR. LUFT:  Can the witness have a

22   complete copy?

23             THE US COURT:  Yes, the witness should

24   have a complete copy as well.

25             MR. LUFT:  And can we have a complete



```
 1   copy?

 2                THE US COURT:  Yes.

 3                THE WITNESS:  I was given two complete

 4   copies, so I am willing to share one.

 5                THE US COURT:  Yes, you may.

 6                BY MR. CHANG:

 7                Q.   Okay.  So, Mr. Kinrich, you are

 8   familiar with IPCo model 4.0?

 9                A.   I am.

10                Q.   And if we turn to page 3 of the

11   slide deck --

12                A.   Yes.

13                Q.   -- do you understand that at a

14   certain point in time there was an effort to sell

15   the wireless patents from the residual patent

16   portfolio separately?

17                A.   Yes, I do understand that.

18                Q.   And you also understand that the

19   majority of the patents that were filed in China

20   were wireless patents?

21                A.   I think that is correct, yes.

22                Q.   And as we saw in version 2.2,

23   there were three specific franchises that were

24   added to the model:  Wireless handsets, wireless

25   infrastructure -- both wireless -- and PC; right?
```



```
 1                    A.    Right.
 2                    Q.    Now here on slide 3, under "PC,"
 3    do you see that there is a second bullet point:
 4    "China removed from the addressable market as the
 5    remaining patent coverage is not extensive"?
 6                    A.    I do see that.
 7                    Q.    So that would be consistent -- I
 8    understand we don't have conclusive evidence on
 9    this one way or the other.  That would be
10    consistent with Nortel using the China toggle
11    because they were trying to sell the wireless
12    portfolio and remove China from the IPCo model;
13    right?
14                    A.    If you ignore other information
15    about what happened in 3.1 and 3.0, you are
16    correct.  However, 3.1 and 3.0 did not have any
17    removal of wireless, and the toggle was there
18    explicitly to include or exclude China so that the
19    Nortel professionals could judge the relative
20    importance of China, having nothing to do with this
21    analysis you are describing here.
22                    Q.    But you have no direct evidence as
23    to what Nortel was using the toggle for, do you?
24                    A.    No, but I have direct evidence
25    that it is not for what you are suggesting here
```



1    related to wireless 4.0, because it existed when

2    they did not contemplate this yet.  So it is

3    unrelated.

4                 Q.    Do you have direct evidence that

5    the wireless patent transaction was not yet

6    contemplated by Nortel when the toggle was added?

7                 A.    I do not know the timing.  I do

8    know that nothing in the documents at the time it

9    was added has any hint about that as a potential

10   transaction, and there was lots of other

11   information in the documents suggesting questions

12   about the viability of China which don't mention

13   the wireless proposed transaction.

14                Q.    Now let's talk about your

15   evaluation of the Chinese enforcement regime.

16   First let's talk about your relevant expertise.

17                You are not an expert in Chinese patent

18   law; right?

19                A.    I am not.

20                Q.    You are not an expert in

21   telecommunications technology either, are you?

22                A.    As a technologist, no, I am not a

23   technologist.

24                Q.    You are not -- you did not

25   actually look at and evaluate any of the particular



1    Chinese patents in the residual patent portfolio,

2    did you?

3              A.   I did not.

4              Q.   You are not aware of what each

5    Chinese patent in the residual patent portfolio

6    covers, are you?

7              A.   That is correct.

8              Q.   You are not qualified, in fact, to

9    evaluate whether any particular Chinese patent is

10   invalid or infringed, are you?

11             A.   You are correct.

12             Q.   And you did not make an evaluation

13   of whether any particular Chinese patent would be

14   enforced or not by a Chinese court, did you?

15             A.   That's correct.

16             Q.   Do you know exactly what forms of

17   damages would be available for infringement of

18   these particular Chinese patents in the Nortel

19   residual patent portfolio?

20             A.   I do not.

21             Q.   Now, because you had a concern

22   about your expertise in the enforcement of Chinese

23   patents, you asked counsel for someone else to help

24   address those shortcomings; is that fair?

25             A.   No, that is quite unfair.

 Neeson & Associates   W&F

    1                    Q.    Okay.

    2                    A.    It is not a question of expertise

    3    in the enforcement of Chinese patents.  It is a

    4    different subject whatsoever.

    5                    Q.    Is it true that you had a request

    6    that there were certain areas that you did not feel

    7    you had the expertise, and if there was some other

    8    way to address those, Mr. Zenkich became the

    9    solution to those?

   10                    A.    Yes.  The particular area was what

   11    the market at the time perceived as the value of

   12    Chinese patents in transactions where patent

   13    portfolios were transferred.

   14                    In other words, I can do economics, but

   15    I didn't have experience in actual transactions

   16    dealing with buyers and sellers, and Mr. Zenkich

   17    did.  So that was the particular area that I asked

   18    for assistance, and Mr. Zenkich ended up being the

   19    answer.  I did not know him before that.

   20                    Q.    So you did not rely on anyone

   21    specifically with an experience, an expertise, in

   22    enforcing Chinese patents, did you?

   23                    A.    No.  Enforcement per se as a

   24    technical legal matter is not relevant to the

   25    answer.  What is relevant is value that is conveyed



```
1    either through purchase and sale or through

2    economics of what business actors, for lack of a

3    better term, would expect to be able to extract.

4    It is not about the court system and it is not

5    about actual enforcement.  It is about value.

6               Q.   So let's take a look at your

7    report, paragraph 104, your opening report, Exhibit

8    51.  And it is on page 50.

9               A.   Hold on.  Let me get there.

10              Q.   Sure.

11              A.   Yes.

12              Q.   Are you there?

13              A.   I am on page 50.  Where are you

14   reading?

15              Q.   Now, I am going to point you to

16   five lines down, there is a sentence that starts,

17   "The reliability."  Do you see that?

18              A.   Yes.

19              Q.   "The reliability of projected

20                   Chinese royalty revenues depends in

21                   large part on the strength of IP rights

22                   in China.  To this end, I conducted my

23                   own qualitative assessment of the

24                   enforceability of patents in China."

25                   Were those your words?
```

Neeson&Associates    W&F

```
 1                    A.    Yes.

 2                    Q.    Staying on that page -- on the

 3   next page, you have a Table 8 that identifies four

 4   of the sources that you relied on; right?

 5                    A.    It does.

 6                    Q.    And these are, I think you called

 7   them economic literature in your direct.

 8                    A.    I don't remember exactly what I

 9   said about them.

10                    Q.    Let me withdraw that.

11                    These are four publications that you

12   found to rely on for this part of your opinion;

13   correct?

14                    A.    In part.  I mean, this isn't all I

15   relied on for this part of my opinion, but you are

16   correct that these are four that I did find.

17                    Q.    The first one, the Intellectual

18   Property Rights Index, 2011, you don't know exactly

19   how that is calculated, do you?

20                    A.    Well, there is that word "exactly"

21   again.  I know generally how it is calculated.

22   There is information communicated in the document.

23   But beyond what it says in the document, I can't go

24   beyond that.

25                    Q.    In fact, the methodology that they
```



1    used to calculate this you believe is propriety to

2    them.  So you don't know what the methodology was,

3    do you?

4                    A.   The exact methodology, as I just

5    described.  I can't go beyond what they described

6    publicly.

7                    Q.   You don't know whether or not

8    people in the field of IP consider this index

9    reliable or not, do you?

10                   A.   I didn't at the time of my

11   deposition.  Since then I have looked and found it

12   is cited frequently in research articles.  So I now

13   have more of an understanding about the fact that

14   people do rely on it than I did at that time.

15                   Q.   Do you recall who created and

16   compiled this index?

17                   A.   There was an individual -- I think

18   his name might be Kyle Jackson.

19                   Q.   He was a graduate student in

20   economics; correct?

21                   A.   He was, although he had dozens of

22   contributing authors and sources.  He was the

23   facilitator, the compiler, the whatever.

24                   Q.   Do you consider -- at the time

25   that you relied on this, you didn't know whether or



 1   not people in the IP field had actually relied on

 2   this, did you?

 3            A.   I couldn't speak to citations or

 4   anything of that at that time.  I have gone to look

 5   since.  But you are right; at that time I did not

 6   go to and do that investigation.

 7            Q.   And that's true for all four of

 8   these indices; isn't it?

 9            A.   At that time, yes.

10            Q.   And it is also true for all four

11   of these indices that you don't know the exact

12   methodology by which they were calculated?

13            A.   Once again, it is the word

14   "exact."  I know the methodologies.  I know what

15   they did.  I don't know exactly what they did down

16   into individual calculations and which piece of

17   paper it was from.

18            Q.   You don't know exactly what data

19   they relied on, do you?

20            A.   I know what they described.  I

21   can't -- again, I can't do any better than that.

22            Q.   And unlike the economics textbooks

23   that you identified in your direct, these aren't

24   learned treatises, are they?

25            A.    They are not treatises in that



1    sense.  They are information.  They are not

2    prescriptions as to how something should be done.

3    They are information about facts or judgments that

4    are made by others in the marketplace.

5              Q.   When you did your research to find

6    out what had been used after the deposition, did

7    you see anyone who relied on these in the same way

8    that you have relied on them here:  To do a

9    valuation or allocation?

10             A.   I didn't find any other cases

11   where a valuation or allocation was done.  So since

12   I have a set of zero, I have no one who relied on

13   it in that set.  There is nothing that meets the

14   premise for me to evaluate.

15             Q.   You also relied on Mr. Zenkich's

16   opinion; is that right?

17             A.   I did, at least in part.

18             Q.   You don't have any opinion --

19   well, sorry.  We will meet Mr. Zenkich later,

20   perhaps tomorrow.

21             Mr. Zenkich limited his opinion

22   specifically to 2009 to 2010, didn't he?

23             A.   I don't know if that was a

24   chronological limitation of his opinion.  I know he

25   has told me that there was no particular sea change



1   in the time period.  I can't -- you will have to

2   ask him.  I can't tell you.

3            Q.   Okay.  Now, are you aware that,

4   going back to the patent filing policies, that at

5   certain times Nortel only filed the top 3 percent

6   of patents in China?

7            A.   I am aware of that.

8            Q.   Okay.  And did you read

9   Ms. Anderson's testimony at trial on that subject?

10           A.   I read some testimony, and I

11  became aware of that fact.  If that means it had to

12  have been Ms. Anderson's, then that's who I read.

13  I do not remember the name.

14           Q.   Are you also aware that Nortel's

15  patent portfolio was periodically culled so that --

16  in that Nortel would go back and periodically

17  review the value of its issued patents to decide

18  which would be maintained and which would be

19  abandoned?

20           A.   Yes.  I knew that they abandoned

21  patents that they did not consider to be

22  particularly valuable.

23           Q.   And these Chinese patents in the

24  Nortel patent portfolio would have been within the

25  select few that were deemed valuable enough to file



1   in China in the first place; right?

2                    A.   Yes, although, as I have

3   discussed, that did not really increase in any

4   dramatic fashion the percentage of high and

5   highest-interest patents that were filed.  We saw

6   one of the charts, not just speaking for China but

7   across the board, that the number of high and

8   highest-interest patents in the United States is

9   actually higher than the percentage of all patents,

10  which means that they didn't quite do what they

11  were setting out to do.

12                   Q.   You are also -- it is also true

13  that these Chinese patents in the residual patent

14  portfolio would have survived Nortel's culling and

15  valuation attempts and valuation along the way;

16  right?

17                   A.   I don't know that, because I don't

18  know the timing.  In other words, they could all

19  have issued after the last culling.  I am not

20  saying that happened.  I just cannot answer your

21  question.

22                   THE US COURT:  And I am not sure this

23  is the right witness to be asking these questions,

24  since we are going to have Mr. Zenkich.

25                   MR. CHANG:  Sure.



```
 1                    THE US COURT:  Would this not be more
 2    appropriate --
 3                    MR. CHANG:  Let me wrap it up with a
 4    question.
 5                    BY MR. CHANG:
 6             Q.    You didn't actually evaluate
 7    within the context of what Nortel was doing and how
 8    Nortel evaluated the value of these patents.  Your
 9    opinion as to these patents was based on
10    generalities of whether Chinese patents in general
11    in this time period were enforceable or not; right?
12             A.    I think that's, to coin a phrase,
13    general.  That's too general.
14                    My opinion was based on a number of
15    investigations, some of which you have laid out on
16    the screen in terms of those patent indices, some
17    of which relates to U.S. Government and US trade
18    representative commentary that is in the literature
19    about enforceability and about ability to extract
20    value, some of which is based on Mr. Zenkich's
21    opinions about markets, some of which is based on
22    my own experience in the past about -- some of
23    which is based on the fact that, generally
24    speaking, especially at this time period, the
25    Western companies had great difficulties in
```



1    extracting licenses and royalties from Chinese

2    companies for domestic use, not for use when it was

3    exported to the United States.  That they can take

4    care of.  And all of that together helped influence

5    where I came out ultimately on the Chinese value

6    issue.

7                I gave China considerable value, but I

8    did not give it full, hundred percent value, for

9    all the reasons I have described.

10               Q.   You did not base your opinion on

11   what Nortel actually did with these Chinese patents

12   and what these Chinese patents actually covered and

13   were; right?

14               A.   I did equally to the way I did

15   every other patent and what it actually did.  In

16   other words, it was all taken into account by the

17   Global IP and the Lazard and the Nortel individuals

18   in their judgments.  And so I did not go -- I did

19   not individually look at claims charts.  I did not

20   individually evaluate patents in China or anywhere

21   else.  That's a technical area.  I am an economist

22   and an accountant.

23               Q.   You are aware that multinational

24   companies during this time period continued to file

25   patents in China?



```
 1                    A.    Yes.

 2                    Q.    And the numbers of patent filings

 3    in China continued to increase from 2007 all the

 4    way till today?

 5                    A.    I would expect that to be true.

 6                    Q.    In significant numbers; correct?

 7                    A.    I expect that they are still

 8    increasing, yes.

 9                    Q.    So it is true that, in general,

10    foreign companies do find value in obtaining patent

11    rights in China; right?

12                    A.    I think a better way to think

13    about it is option value.  Filing for patents in

14    China is not that expensive.  Enforcing patents in

15    China is a question.  So having some gives you that

16    option, but it doesn't mean that there is current

17    value.

18                    Q.    Are you an expert in how much it

19    costs to file and prosecute a patent in China?

20                    A.    No, merely that I understand from

21    literature that the filing costs are less than they

22    are in some of the other territories that Nortel

23    was concerned about and so filed less.

24                    MR. CHANG:  Those are my questions.

25    Thank you.
```



```
 1                    THE US COURT:  All right, Mr. Chang.
 2                    Mr. Zarnett, you are up.
 3                    MR. ZARNETT:  Thank you, Your Honor.
 4                    THE CANADIAN COURT:  I am wondering --
 5      I expect you will be a while, Mr. Zarnett?
 6                    MR. ZARNETT:  Yes.
 7                    THE CANADIAN COURT:  I am just
 8      wondering if this is an appropriate time for the
 9      afternoon break for the reporters' sake.
10                    THE US COURT:  I could use a break.
11                    MR. ZARNETT:  Thank you.
12                    THE CANADIAN COURT:  Me, too.
13                    THE US COURT:  All right.  We will
14      stand in recess for 20 minutes.
15      -- RECESS AT 3:06 p.m. --
16      -- UPON RESUMING AT 3:38 p.m. --
17                    THE US COURT:  Please be seated,
18      everyone.  Thank you.
19                    Justice Newbould, Mr. Zarnett is ready
20      to go.  Mr. Zarnett, when you are ready, you may
21      proceed, sir.
22                    MR. ZARNETT:  Thank you very much.
23      CROSS-EXAMINATION BY MR. ZARNETT:
24                    Q.   Mr. Kinrich, I would just like to
25      put in context some of the assumptions that are the
```



```
 1   foundation for the allocation that you propose be

 2   made.  One of the assumptions that you made was

 3   that the EMEA Debtors and the US Debtors license

 4   rights were contained in the MRDA; is that right?

 5              A.   The assumption that I was asked to

 6   make was what I was given by the US Debtor.  I

 7   believe the source of the US Debtors' assumption is

 8   the MRDA, but I did not take it directly from the

 9   MRDA.  I took it from the assumption I was given.

10              Q.   And one of the assumptions that

11   you made that you told Mr. Luft about this morning

12   was an assumption about the scope of the license

13   rights; correct?  That the license rights were not

14   limited by any scope restriction; that is correct?

15              A.   That is right.

16              Q.   And are you familiar with the term

17   "field of use"?

18              A.   I am.

19              Q.   And is your assumption the

20   equivalent of assuming that the field of use was

21   unlimited?

22              A.   I think so.  I think that's a fair

23   probably equivalent statement.  I didn't think

24   about it that way, but that's probably equivalent.

25              Q.   And you told us about the right to
```



1   exploit, the right to sublicense, the right to

2   defend from infringement that you assumed were part

3   of the package of economic rights that the US and

4   EMEA Debtors had; correct?

5            A.   Yes.

6            Q.   And I take it that integral to

7   that assumption is that all economic value of

8   Nortel's intellectual property in the exclusive

9   territories was held by the integrated entity, the

10  IE, in that territory; is that correct?

11           A.   I think that's the conclusion one

12  draws from the assumptions I was asked to make.  I

13  wasn't asked to assume that, but that is the

14  conclusion I get from the assumptions I was asked

15  to make.

16           Q.   And, sir, the scope of a license

17  is an important consideration in determining its

18  value; is that correct?

19           A.   Yes.

20           Q.   And you say in your initial

21  report, paragraph 68 -- and that's on page 30.  And

22  I am right at the bottom of the page, the second

23  sentence that begins "To the extent."

24           A.   I see that.

25           Q.   And you say:



 1                    "To the extent a patent owner

 2                    grants a party an exclusive license to

 3                    all the rights granted under the

 4                    patent, the licensee effectively holds

 5                    all the economic rights to the patent

 6                    that had previously belonged to the

 7                    patent owner for the term of the

 8                    license."

 9                    And that's consistent with what you

10     just told me; correct?

11                    A.    It is.

12                    Q.    And if you look, sir, at the

13     footnote, Footnote 83 that you have used as your

14     source for that statement, it says:

15                    "Exclusivity in licensing is the

16                    legal basis for beneficial ownership of

17                    a right by the licensee since it

18                    transfers to the licensee some of the

19                    patentee's monopoly rights [.~.~.]  In

20                    the case of an exclusive license, the

21                    licensee becomes the only person

22                    entitled to make use of the patent in

23                    the fields specified in the license."

24                    Do you see that?

25                    A.    I do.

Neeson&Associates    W&F

```
1                    Q.   All right.  And your assumption
2      was that the rights that went to the licensees were
3      all of the patentee's monopoly rights in the
4      exclusive territory; correct?
5                    A.   Yes.
6                    Q.   And that the field of use or the
7      fields specified in the license were everything the
8      patentee could have done; correct?
9                    A.   That's the assumption I was asked
10     to make, yes.
11                   Q.   Sure.  And, sir, there would be
12     implications for the economic value of the licenses
13     to the extent that only some of the monopoly rights
14     and not all of them were transferred; correct?
15                   A.   I think it is better to say there
16     could be.  Whether there would be or not depends on
17     the extent of that difference.
18                   Q.   And to the extent that the field
19     of use was limited, there could be implications for
20     the value of the license; correct?
21                   A.   Yes.
22                   Q.   And similarly, there could be
23     implications for the value that the patent holder
24     had; correct?
25                   A.   Correct.
```



 1                    Q.   And anyone who valued the license
 2    holder's rights, if it was only a license of some
 3    of the monopoly rights or if the field of use was
 4    restricted in any way, would have to take those
 5    matters into account?
 6                    A.   Yes.
 7                    Q.   And the implication could be that
 8    there was a residual value remaining with the
 9    patent owner?
10                    A.   Yes, that could happen.
11                    Q.   And one would have to use a
12    different methodology than the methodology you have
13    used, which treats NNL, NNI and the EMEA Debtors as
14    having exactly the same rights if your assumption
15    had been different here about the scope of the
16    license; correct?
17                    A.   The analysis has to parallel the
18    value, where the economic value lies.
19                    Q.   Sure.  And if you don't assume
20    they all have equal rights, you would have to
21    revise the analysis to take that into account?
22                    A.   You would have to adjust as
23    necessary.
24                    Q.   All right.  Now, sir, in your
25    report you refer several times to the licenses

 Neeson & Associates   W&F

1    being royalty-free?

2              A.   I do.

3              Q.   And, in fact, in the slides that

4    you presented this morning, slide 7, the words

5    "royalty-free," the hyphenated word or the words

6    "royalty-free" appear there as well; correct?

7              A.   They do.

8              Q.   And I take it, in part due to

9    their repetition, that that is an important feature

10   of the economic rights of the licensee; that is

11   correct?

12             A.   Depending on what the alternative

13   is, it might not be.  But it certainly is something

14   that I relied upon.

15             Q.   If there were an obligation to pay

16   a royalty, would that have an implication for the

17   value of the license holder's rights?

18             A.   It could, depending on the facts

19   and circumstances.

20             Q.   And if there is an obligation to

21   pay a royalty, would that have an implication to

22   the patent holder's value?

23             A.   Again, it could, depending on

24   facts and circumstances.

25             Q.   Now, sir, in your description of



1   the MRDA that appears in the report, you do not

2   refer to any obligations that any party under the

3   MRDA had to perform research and development?

4               A.   I presume you are correct.  I do

5   not remember referring to it, and I will not

6   disagree with you.

7               Q.   Certainly in slide 7, when you are

8   talking about the key factors of economic value,

9   you don't refer to an obligation to perform

10  research and development as a factor; correct?

11              A.   That's correct.

12              Q.   And you also do not refer to any

13  obligations that may exist under the MRDA to either

14  make or entitlements to receive what are called

15  RPSM payments; is that correct?

16              A.   That's correct.  These are --

17  because of the sale transaction nature of these;

18  that's correct.

19              Q.   And, sir, an obligation to perform

20  research and development involves an economic cost;

21  is that right?

22              A.   Yes.

23              Q.   Being relieved of an obligation to

24  perform research and development relieves someone

25  of a cost and, therefore, is an economic benefit?



```
 1                     A.   Not -- that doesn't follow,

 2    because there is benefit to be obtained from the

 3    R&D as well.  So the present value of the

 4    obligation may actually be positive and not doing

 5    it may actually cost you money.

 6                     Q.   Being relieved of an obligation to

 7    perform research and development on behalf of

 8    someone else may be a benefit?

 9                     A.   It may be.  But if that other

10    person is also performing R&D, for your benefit,

11    the net value still may be positive.

12                     Q.   If the amount of research and

13    development being performed by one party is more

14    than the other, being relieved of that obligation

15    may be a benefit?

16                     A.   There certainly could be

17    circumstances where that is true.

18                     Q.   And, sir, it is correct that in

19    your analysis and your allocations you don't

20    consider any of that; correct?

21                     A.   That's correct, because these are

22    sales, and it is post-bankruptcy, and Nortel or the

23    Nortel lines of business and patent portfolio are

24    being liquidated.  So I did not understand that

25    those continuing obligations existed at that point.
```



1                Q.   Well, sir, for the purpose of your

2    analysis, you assumed that the rights granted by

3    the MRDA subsisted right up to the sale; correct?

4                A.   In terms of the intellectual

5    property rights, yes.

6                Q.   And to the extent that you took a

7    peak into the future to look, for example, at

8    revenue projections into 2010, 2011, et cetera --

9    slide 31, for example.

10               A.   Yes.

11               Q.   And you were looking at these to

12   see where the revenue benefits would fall in the

13   period after 2009; correct?

14               A.   For the lines of business, not

15   for -- yes.

16               Q.   Sure.  For the lines of business.

17               A.   Yes.

18               Q.   You were assuming that the same

19   economic rights to benefits from each jurisdiction

20   would subsist; correct?

21               A.   Can you ask that again?  I didn't

22   quite understand it.

23               Q.   Sure.  When you looked at what

24   would happen in 2010 or 2011 under a forecast --

25               A.   Yes.



1          Q.   -- and used that to verify whose
2    economic benefits might be relinquished by giving
3    up revenue in those periods, you were assuming that
4    the license rights would continue into that period
5    absent the sale; correct?
6          A.   Given that this is the lines of
7    business rather than the patent portfolio, it is
8    really that the business operations would continue
9    into those periods rather than --
10         Q.   Sure.  But the economic
11   entitlements to the IP used in that business would
12   remain the same in the forecast period; correct?
13         A.   If the forecast had occurred --
14   that is, yes, Nortel is projecting benefits, and
15   those benefits are based on the presumption that
16   they will be in that business into the future.
17         Q.   And when you looked at IPCo
18   projections, which also went into the future, and
19   looked at them for the purpose of determining the
20   geographies in which cash flows would be achieved,
21   you again were assuming that the same set of
22   economic rights would subsist in terms of the IP;
23   correct?
24         A.   The projections for IPCo are by
25   territory, as we have discussed.  And I am



1   projecting that the benefits of IPCo flowed from

2   those territories.  IPCo does not conduct R&D, and

3   so no further value or cost of R&D is to be

4   included.  I am not sure whether that is what you

5   are suggesting.

6            Q.   I am not talking about that, sir.

7   I am talking about the set of economic rights that

8   you assumed existed in 2009.

9            All of the economic value to the IP you

10  assumed would continue during the forecast period

11  of IPCo for the purpose of determining what

12  geography and what entity you would allocate future

13  cash flow to; correct?

14           A.   Not quite.  Remember, we have a

15  sale.  So my question is what portion of the sale

16  is attributed to each of the geographies, and I am

17  not --

18           Q.   I understand --

19           A.   Excuse me.  I am not forecasting

20  that Nortel would actually conduct that revenue or

21  conduct that business, because it was more

22  cost-effective for them to sell the portfolio than

23  for them to undertake the licensing business.

24           Q.   To the extent, sir, that you made

25  use of a forecast for the purpose of determining



1   valuation or relative values, surely you were

2   assuming the same set of rights as between the

3   parties would subsist in the forecast period?

4              A.   In the sense that the rights I am

5   assuming are the ones that were laid out on my

6   assumptions page; that's correct.

7              Q.   And I take it that even though you

8   look at the future and in these forecast periods

9   and assume the same set of license rights would

10  continue, you give no effect to any sharing

11  obligations that might arise under other provisions

12  of the MRDA; correct?

13             A.   That's correct.  I understand that

14  the sharing provisions do not apply to sales

15  proceeds.

16             Q.   Leaving aside the question of sale

17  proceeds and looking at revenues and cash flow and

18  operating income that would be generated in the

19  future, you do not take into account any RPSM

20  sharing obligation that would apply to them;

21  correct?

22             A.   I do not anticipate those revenues

23  and cash flows into the future.  I anticipate sales

24  proceeds.  The basis for apportionment is relative

25  expected -- relative projected, rather, values from



1    IPCo or from the lines of business.  But the

2    transaction is not one in which we anticipate that

3    Nortel would continue to operate.  It is one in

4    which the sale was made, and that is the context in

5    which my appraisal was done.

6              Q.   Let's take your paradigm.  The

7    basis for apportioning is the value of the

8    projected IPCo cash flow; correct?

9              A.   Yes.

10             Q.   And in calculating the value of

11   the projected IP cash flow, you do not take into

12   account any RPSM sharing obligations that may have

13   applied; correct?

14             A.   I do not take into account RPS

15   sharing obligations; I agree.  I don't understand

16   them to apply, but I agree I didn't do them.

17             Q.   And, sir, you are not expressing

18   an opinion on whether they apply or not in the

19   future, do you?  Are you?

20             A.   No.  It is related to the fact

21   that they are sales proceeds, not about the future.

22             Q.   All right.  But, sir, could we

23   take a look, please, at paragraph 27 of your reply

24   report.

25             A.   Yes, I have that.



```
 1                    Q.   And, sir, in paragraph 27 you
 2      begin by saying "Alternatively," and you say:
 3                    -- "if one understands the license
 4                    to grant the right to license and
 5                    enforce against third parties for their
 6                    own products and services to NNI as do
 7                    the US Debtors" --
 8                    And if I could just stop there,
 9                    that's the assumption that your
10                    analysis is based on; correct?
11                    A.   Correct.  My primary analysis.
12                    Q.   So what follows is what should
13      occur under your assumption.  You say:
14                    -- "revenue earned from that
15                    activity while Nortel was a going
16                    concern would have been run through the
17                    MRDA and just as with the income
18                    generated from NNI's other business
19                    activities in the US, the income
20                    received by Canada through the transfer
21                    pricing payments would not be subject
22                    to US taxes."
23                    Do you see that?
24                    A.   I do.
25                    Q.   All right.  So, sir, do I have it
```



1    from you and do I understand this correctly that if

2    a business in the nature of IPCo had operated prior

3    to bankruptcy, it would have been your

4    understanding that operating profits would have

5    been subject to RPSM sharing?

6            A.    I think in principle, before

7    bankruptcy, if this had been a business run in the

8    2000s, say, just to pick a period, some method

9    would have been appropriate.  It is not clear it is

10   the RPSM shares because it would be different sets

11   of functions, assets and risks.

12           I am not a transfer pricing expert.  I

13   am not going to purport to tell you what actually

14   would have happened in that circumstance.

15           Q.    Well, in your report you say

16   "revenue."  And I take it by "revenue" you meant

17   operating profits.

18           A.    Yes, I think that's a fair

19   assumption.

20           Q.    If you have revenue, you are going

21   to have either operating profits or operating

22   losses; correct?

23           A.    Correct.

24           Q.    So but you say "revenue earned

25   from that activity while Nortel was a going



1    concern," which I take it you mean prior to

2    bankruptcy, "would have been run through the MRDA."

3              So I take it when you wrote your

4    rebuttal report you were satisfied that it was

5    reasonable to make that statement?

6              A.   Yes.

7              Q.   All right.  And, sir, you say that

8    that would result in income received by Canada

9    through transfer pricing payments; correct?

10             A.   Yes.

11             Q.   And what your analysis of the

12   period post-2008, when you look into the future, is

13   to see revenue and cash flow projections that would

14   not run through the MRDA?

15             A.   That -- I guess that's a matter of

16   definition.  My understanding is they are still

17   subject to the MRDA.  The MRDA specifically says

18   don't apply the RPSM percentages.  But they are

19   still in the MRDA, I think, is one way to interpret

20   that.

21             Q.   I am not talking about the sale

22   proceeds.  I am talking about the revenue

23   projections that you use, the actual 2009 revenue

24   and the future revenue you use in your line of

25   business approach to determine value.  You treat



1    those differently than paragraph 27 of your

2    rebuttal report treated pre-bankruptcy revenues and

3    operating profits; correct?

4            A.   No, same -- it is not correct.

5            Q.   And, sir, similarly with IPCo,

6    future cash flows that you look at for the purpose

7    of determining value you treat differently than

8    cash flows and operating profits that might have

9    been earned by the Nortel Group if they had done

10   this prior to bankruptcy; correct?

11           A.   No, that is not correct.

12           Q.   Now, sir, you said in your

13   evidence this morning that using a revenue model

14   for the lines of business captures the synergies of

15   all the assets operating together?

16           A.    I think I said an income approach.

17   I don't think I said revenue, but --

18           Q.    All right.  When you applied a

19   revenue model to the line of business sales, did

20   the synergy, the aspect of capturing the synergies

21   drop out or --

22           A.    No, I wouldn't say revenue model.

23   I say revenue multiple.  But it is all part of the

24   income approach.  And the income approach does

25   capture the value of all of the assets that



1   function together in an operating business as a

2   going concern.

3                 Q.   All right.   The precise

4   terminology wasn't my point there.

5                 The methodology you used for the line

6   of business sales that involved allocating the

7   proceeds according to shares of 2009 revenue, was

8   that intended to capture the synergies of all the

9   parties' assets operating together?

10                A.   For the lines of business, yes.

11  Each line of business operates as a going concern.

12                Q.   And, sir, do you agree that

13  research and development was the single most

14  important factor driving Nortel's ability to

15  generate revenues?

16                A.   Possibly in the past.   In fact,

17  perhaps even probably in the past.   At the time of

18  the acquisitions, I don't think that necessarily

19  follows.

20                Q.   During 2009 was research and

21  development the single most important factor

22  driving Nortel's ability to generate revenues?

23                A.   Past research and development I

24  think would be true.   Going forward, the buyers can

25  decide how they want to handle research and



1    development or whether they would do their own --

2    whether they were already doing their own research

3    and development or not.  So it is not the same on a

4    going-forward basis.

5                    Q.    In 2009 was research and

6    development the single most important factor that

7    drove Nortel's ability to generate its 2009

8    revenues?

9                    A.    The past research and development

10   probably was.

11                   Q.    Sure.  And do you agree that each

12   integrated entity performed research and

13   development for the benefit of Nortel as a group?

14                   A.    That's my understanding, yes.

15                   Q.    And if I could ask you to look at

16   your report, please.  This is your initial report,

17   page 17, Table 2.

18                   A.    Yes, I have that.

19                   Q.    And if we look at the top sale

20   there, the first one you list, CDMA and LTE, you

21   describe the proceeds of sale as 1.05 billion;

22   correct?

23                   A.    Yes.

24                   Q.    And then the 2009 revenue

25   attributable to the sellers in that transaction,



1    $1.4 billion; correct?

2              A.    Correct.

3              Q.    And you derived those numbers from

4    carve-out statements; is that correct?

5              A.    Correct.

6              Q.    And if we could look at Exhibit 9

7    to your initial report --

8              A.    Yes.

9              Q.    -- you allocate on Exhibit 9 for

10   CDMA and LTE -- this is the far left-hand sale

11   among the sales you show there -- you allocate

12   90.8 percent of those sale proceeds to the US

13   Debtors; correct?

14             A.    Yes.

15             Q.    Or $955 million; correct?

16             A.    Correct.

17             Q.    And 60 million, six zero million,

18   or 5.7 percent, to the Canadian Debtors; correct?

19             A.    Correct.

20             Q.    And that is based directly on the

21   proportions of 2009 revenue that each achieved?

22             A.    It is.

23             Q.    And I didn't mean to leave out

24   EMEA at 3.5 percent.

25             A.    And they appreciate it.



```
 1                    Q.   I am not sure they do appreciate
 2    it, Mr. Kinrich.
 3                    If we go to Exhibit 7 of your report,
 4    your initial report, you have in the top box, as I
 5    understand it, excerpted from the carve-out
 6    statement for this line of business the revenue and
 7    costs and earnings figures; correct?
 8                    A.   Yes.
 9                    Q.   Divided by certain regions;
10    correct?
11                    A.   Yes.
12                    Q.   And if we look at the revenue
13    line, which is the second from the top there, the
14    one you circled in your report, North America
15    achieved $1.3 billion of revenue?
16                    A.   Correct.
17                    Q.   And with smaller amounts in other
18    regions, there was a total of about 1.5 billion
19    shown on the carve-out statement; correct?
20                    A.   Right.
21                    Q.   And if you go down several lines
22    to a line called "R&D," North America incurred
23    $299 million of R&D in 2009?
24                    A.   Yes.
25                    Q.   And the grand total across all the
```



```
 1   regions was $337 million of R&D; correct?
 2              A.   Correct.
 3              Q.   All right.  So a purchaser
 4   acquiring that line of business would see that in
 5   2009 $337 million in R&D had to be spent to
 6   generate the 1.4 to $1.5 billion of revenue;
 7   correct?
 8              A.   No, that's not generally how R&D
 9   works.  R&D is expended -- or put another way, the
10   revenues would have been generated from prior R&D.
11   The current R&D rarely has much influence on
12   revenues, especially the "R" part of R&D.
13              Q.   Sir, the principle of matching,
14   you are familiar with that; correct?
15              A.   I am.
16              Q.   And under it, on financial
17   statements, expenses used to -- incurred to create
18   revenues are shown on the same financial -- in the
19   same financial period as those revenues; correct?
20              A.   Not when it comes to R&D.  They
21   are expensed, generally speaking, under generally
22   accepted accounting principles, and not capitalized
23   except under very specific circumstances.
24              Q.   I thought, sir, that's what I
25   said.  Under the principle of matching, you would
```



1    expense the R&D in the period in which the revenues

2    were earned.

3                A.    No.    I am disagreeing

4    specifically.    That is an error.    In generally

5    accepted accounting principles, you expense it in

6    the period in which it is expended.    The revenues

7    that come from that R&D may not occur for many

8    years.

9                Q.    In this particular year there

10   is -- the revenues that were earned were the

11   product of R&D, either in the past or in this year;

12   correct?

13               A.    Generally, yes.    R&D, customer

14   relationships, the workforce, all of the various

15   tangible and intangible assets.

16               Q.    And a purchaser would relate the

17   amount of R&D that was spent historically and in

18   this year to the revenue-generating capacity of

19   what it was buying; correct?

20               A.    Not necessarily, not for these

21   kind of activities where the purchasers had

22   substantial R&D of their own.

23               Many of the purchasing entities said

24   explicitly, as part of their disclosures, that they

25   were really buying, for example, the customer

 Neeson&Associates    W&F

1    relationships rather than research capacity.  So it

2    would vary by specific opportunity, specific

3    activity.

4              Q.   Well, then let's look at Nortel

5    itself, sir.  Nortel itself chose to spend this

6    much R&D in 2009, the same year as these revenues

7    were generated; correct?

8              A.   It did.

9              Q.   And if you look at the bottom box

10   on Exhibit 7, you have there broken out from

11   another sheet of the carve-out statement for North

12   America; correct?

13             A.   I do.

14             Q.   And if we look at the revenue line

15   that you have circled, North America accounted for

16   $1.3 billion of revenue, 78 million of which was in

17   Canada and 1.2 billion of which was in the US;

18   correct?

19             A.   There is actually more in the US,

20   because there is a small amount in the next column

21   from a different entity code.  But you are

22   generally correct.

23             Q.   Now, if you look down -- you

24   didn't label the entries that follow.  But if you

25   look down from the revenue line about five lines,



1    you will see a number of $299 million.  Do you see

2    that?

3              A.   I do.

4              Q.   And that was North America's

5    spending on revenue, and that ties to something we

6    see in the upper box; correct?

7              A.   It does.

8              THE CANADIAN COURT:  You said spending

9    on revenue.  Did you mean spending on R&D?

10             MR. ZARNETT:  That's correct.  Thank

11   you, Justice Newbould.

12             BY MR. ZARNETT:

13             Q.   Yes, that's the R&D equivalent;

14   correct?

15             A.   Yes.

16             Q.   And if you look across the boxes

17   labeled "Canada" and the "US," sir, one thing you

18   will see is that they don't add up --

19             A.   Correct.

20             Q.   -- to 299 million.

21             A.   Yes.

22             Q.   And do you recall that's because

23   you did not include another Canadian entity that

24   spent approximately $140 million on R&D in that

25   year?



```
 1                      A.   I don't recall it, but I do know
 2   that that is the case, yes.
 3                      Q.   So the total -- and that other
 4   Canadian entity was one of the Canadian Debtors,
 5   Nortel Networks Technology Corporation.  Do you
 6   recall that?
 7                      A.   I think that's right.
 8                      Q.   And the total spending in Canada
 9   for R&D in 2009 was $180 million?
10                      A.   I think that's approximately
11   correct.
12                      Q.   Sure.  And that's more than twice
13   Canada's total revenue in 2009?
14                      A.   It is.
15                      Q.   And if you look at -- and it is
16   about three times what you have allocated to Canada
17   out of the proceeds of this sale; correct?
18                      A.   I will accept that as probably
19   correct.
20                      Q.   And the US spent 35.3 percent of
21   the total R&D in that year?
22                      A.   Again, I will accept your numbers.
23                      Q.   $120 million.
24                      A.   Yes.
25                      Q.   And it generated 90 percent of the
```



```
 1   revenues?

 2              A.   It did.

 3              Q.   And doesn't it follow that the US

 4   revenue was due in part to disproportionate R&D

 5   spending in Canada?

 6              A.   It doesn't follow for the reasons

 7   we discussed earlier, that the R&D is not related

 8   to current revenue.  But certainly overall, there

 9   was more R&D as a proportion of sales over history

10   in Canada than there was elsewhere.

11              Q.   All right.  And if you look at

12   this year, the spending that Canada was incurring

13   on R&D had no relationship to the revenue that it

14   was incurring; correct?

15              A.   Correct.

16              Q.   It could only be spending that

17   money for the benefit of someone else's revenue;

18   correct?

19              A.   Well, for the benefit of Nortel as

20   a whole.

21              Q.   Right.  And the revenue -- Nortel

22   as a whole from a revenue standpoint, the biggest

23   beneficiary of that was the US?

24              A.   Yes.

25              Q.   And your allocation, though,
```



```
 1   simply takes into account the revenue?
 2              A.   I wouldn't include the word
 3   "simply."  But my allocation takes into account the
 4   revenue as what the buyer is buying or the value of
 5   the transaction going forward, since the R&D is
 6   already a sunk cost, what the geographic source of
 7   that value is.
 8              Q.   The revenue is all historic, too,
 9   sir.
10              A.   Yes.  But the projections, the
11   expectation of what the relative contribution of
12   customers and therefore revenues and profits is --
13   you will remember I did an analysis showing that
14   the historical revenues are proportional to and
15   consistent with the expectations of the future.
16              Q.   But, sir, if we look -- that is
17   your slide 31?
18              A.   That I can't tell you.  But I can
19   in a minute.
20              That is one piece.  There are others.
21   Slide 31 is one element of that.
22              Q.   And if history is a guide, for
23   Nortel to generate revenue, it had to spend money
24   on R&D; correct?
25              A.   Yes.
```



1                       Q.   And to the extent Nortel was

2       forecasting revenues in the future, the assumption

3       was it was also going to spend R&D dollars in the

4       future; correct?

5                       A.   The forecasts contemplate that if

6       Nortel continues to operate, it would expend R&D

7       money in the future.

8                       Q.   And the revenues you see for the

9       US in the future would be due to disproportionate

10      R&D spending in the future by Canada; correct?

11                      A.   On the books, yes, but in my

12      valuation methodology, no.  That's one of the

13      advantages of using a revenue-based multiple, is

14      that it charges to the United States its

15      proportional share of that R&D and it doesn't

16      charge it to Canada and thereby burden Canada with

17      more R&D than it is getting the benefit from.

18                      Q.   Well, it advantages the United

19      States by benefiting it with the revenue that it

20      earns through R&D spending by other Nortel

21      entities, doesn't it?

22                      A.   Not with the allocation

23      methodology.  That is, the revenue-based

24      methodology charges the proportional share of that

25      to the United States.



1          Q.   All right, sir.  But let's take a

2    look back at Exhibit 9 to your initial report.

3    When we look at the value that you attributed or

4    the allocation that you have given to the United

5    States of 90.8 percent, it is a direct function of

6    the revenue; correct?

7          A.   Yes.  After doing all the analyses

8    that reach -- that concluded that was appropriate,

9    that is what I did.

10         Q.   And if Canada did 100 percent of

11   the research and development and the US generated

12   100 percent of the revenues, following your

13   methodology, 100 percent of the sale proceeds would

14   be allocated to the United States?

15         A.   As would 100 percent of the

16   expense of generating the R&D.  So the two would

17   match.  It wouldn't -- even if Canada did

18   historically expend for R&D, my methodology does

19   not charge Canada with that amount -- it charges --

20   it essentially charges the United States with that

21   because they got the benefit from it

22         Q.   I am sorry.  So if Canada did

23   100 percent of the research and development, spent

24   its dollars, used its personnel to spend -- to do

25   all of the research and development, and the



```
 1    business was then sold and the proceeds were

 2    allocated solely by revenue and the United States

 3    had 100 percent of 2009 revenue, on your

 4    methodology, 100 percent of those sale proceeds

 5    would be allocated to the US and zero to Canada;

 6    correct?

 7                    A.    That is correct.

 8                    Q.    And that, in your evidence, is

 9    charging the United States with the cost of the

10    R&D?

11                    A.    All of the revenues would be, as

12    under your hypothetical, from the US.  Therefore,

13    the source of the income required to expend the R&D

14    would also be from US, and I would charge all of

15    that expenditure to the US.  I would not charge it

16    to Canada through the methodology.  So that the US

17    is bearing the cost of that R&D development.

18                    Q.    How, in attributing 100 percent of

19    sale proceeds to the US, are you charging them with

20    anything?

21                    A.    Because all of the revenue

22    multiples contemplate that the costs required to

23    generate that revenue are incurred in proportion to

24    those revenues.  So if you tell me the assumption

25    is 100 percent of the revenues are in the US, I am
```



```
 1    going to respond that 100 percent of the costs are
 2    also then charged to the US.
 3              Q.   So Canada, by spending R&D in this
 4    example, spending all of the R&D, would receive
 5    zero; and you say that that recognizes the
 6    synergies of all of the companies' assets together?
 7              A.   The synergies come from a
 8    combination of the various assets:  R&D, tangible
 9    assets, et cetera.
10              So again, all I can say is that the
11    methodology recognizes that whoever obtains
12    revenues has to pay their fair share of the full
13    operating expenses, including any R&D.
14              Q.   Sir, could we take a look at slide
15    27 of your slide deck.
16              A.   Yes.
17              Q.   This is one of the sources you
18    used to explain or defend the use of a revenue
19    multiple.
20              A.   Yes.
21              Q.   The revenue multiple that you used
22    in this case was the percentage of revenue to sale
23    proceeds; correct?
24              A.   It is revenue -- yes, yes, that's
25    correct.
```



```
 1                    Q.   Taking 100 percent of the revenue
 2   of the sellers as one factor and the sale proceeds
 3   as the next factor and deriving a multiple.
 4                    A.   Correct.  Sales multiple, revenue
 5   multiple.
 6                    Q.   You didn't use multiples for this
 7   part of the analysis from any other business?
 8                    A.   No.  I used the one that was being
 9   sold.  In some sense, its best comparable is
10   itself.
11                    Q.   And, sir, each component part of
12   Nortel was not structured the same way for cost
13   purposes; is that correct?
14                    A.   That is my understanding.
15                    Q.   All right.  And do you agree, sir,
16   that the source you have cited at slide 27 is
17   authoritative?
18                    A.   Generally, yes.
19                    Q.   And it is headed up "Valuing Small
20   Businesses and Professional Practices."  Is that
21   still applicable to what Nortel had become by 2009?
22                    A.   It is.  It isn't because Nortel is
23   small by any means.  It is because the principles
24   apply.  The quotation came from that particular
25   book.  Shannon Pratt has written essentially the
```



```
 1   same book many times, and this is the one that
 2   happened to focus on small businesses.  It doesn't
 3   mean this only applies to small businesses.
 4                  Q.   Okay, good.  Thank you.
 5                  Sir, let's take a look at the context
 6   in which this quote appears.  If we could call up
 7   that book.  That is the title page there you see on
 8   the screen?
 9                  A.   I do.
10                  Q.   Okay.  Then we will hand out an
11   excerpt from it.
12                  THE CANADIAN COURT:  Is this an
13   exhibit, trial exhibit already?  Is there a number
14   to it?
15                  MR. ZARNETT:  No.  I think we are going
16   to have to do that right now, Your Honor.
17                  THE CANADIAN COURT:  What is the next
18   exhibit number?
19                  THE CANADIAN REGISTRAR:  53.
20                  THE CANADIAN COURT:  53 would be the
21   exhibit number.
22                  MR. ZARNETT:  Thank you.  Thank you.
23                  EXHIBIT NO. 53:  "Valuing Small
24                  Businesses and Professional Practices,"
25                  2009.
```



```
 1                    BY MR. ZARNETT:
 2              Q.   If we could take a look, sir, at
 3    page 341 of this excerpt --
 4              A.   I see that.
 5              Q.   -- the heading for companies with
 6    losses or erratic earnings, that's the portion from
 7    which you derived the quote that you have
 8    reproduced at slide 27?
 9              A.   It is.
10              Q.   All right.  If we look at what
11    comes before that, sir, there is a heading back on
12    page 340 called "When Gross Multiples May Be
13    Useful."
14              A.   Yes.
15              Q.   And you didn't reproduce this on
16    your slide; correct?
17              A.   I did not.
18              Q.   And it says:
19                   "As a broad generalization, gross
20                   revenue pricing multiples may be useful
21                   with regard to the following
22                   objectives:  1, to approximate a range
23                   of possible values with a minimum of
24                   time and effort."
25                   Now, sir, you weren't asked to spend a
```



1    minimum of time or effort on your analysis, were

2    you?

3                    A.    I was not.

4                    Q.    All right.  And that might not be

5    consistent with Nortel litigation, in any event.

6                    THE CANADIAN COURT:  Certainly that's

7    the thought that crossed my mind.  If he had been,

8    he would have been the only person.

9                    BY MR. ZARNETT:

10                   Q.    And the second says:

11                        "To conclude an estimate of value

12                        when other data are unavailable or

13                        inadequate."  Do you see that?

14                   A.    I do.

15                   Q.    And then the third item says, "As

16   one indicator of value - or a range of values -

17   used in conjunction with other, more rigorous,

18   valuation methods."  Do you see that?

19                   A.    I do.

20                   Q.    And, sir, if you look over to page

21   341 to a section below the one you excerpted your

22   quote from, it says:

23                        "For highly homogeneous industries

24                        and professions," it says, "the more

25                        similar many businesses or practices



```
 1               within an identifiable industry are,

 2               the more valid the indication of value

 3               provided by the gross revenue .~.~.~

 4               multiple method.  If an industry or

 5               profession tends to have a fairly

 6               standard cost structure, a given level

 7               of revenue should be expected to

 8               produce a predictable amount of

 9               economic income."  Do you see that?

10          A.   I do.

11          Q.   And, sir, just from looking at the

12   cost structure relating to research and development

13   that we saw with respect to CDMA, no one could

14   conclude that the cost structure of Nortel Canada

15   was similar to the cost structure of Nortel US;

16   correct?

17          A.   No.  And that would not be a

18   conclusion I would try to draw.  But I would still

19   apply this, because that isn't the way I read this

20   to apply.

21          Q.   Now, sir, when you looked at

22   contribution and gross margin, as you described in

23   your evidence this morning and you describe in your

24   report, you looked at those as a check or another

25   analysis; correct?
```



```
 1                    A.   I did.

 2                    Q.   As you defined -- and I am not

 3     saying there is anything wrong with your

 4     definition.  But as you define "gross margin" and

 5     "contribution margin," they deal with costs before

 6     research and development; correct?

 7                    A.   They do.

 8                    Q.   So looking at those wouldn't deal

 9     with where research and development was being

10     expended and the impact of that; correct?

11                    A.   That's correct.  That's why I deal

12     with it otherwise.

13                    Q.   Now, let's talk about some more

14     rigorous valuation methods.

15                    Do you agree, sir, that financial

16     economists agree that a discounted cash flow

17     analysis is the preferred technique for asset

18     valuation?

19                    A.   For income-producing assets,

20     generally, yes.

21                    Q.   Sure.  And do you agree with the

22     statement that value today always equals future

23     cash flows discounted at the opportunity cost of

24     capital?

25                    A.   Again, for income-producing
```



1   assets, I think that would be generally

2   appropriate.

3                Q.   And, sir, I think as you described

4   to Mr. Luft this morning, a DCF analysis requires

5   two elements:  Projected future cash flows, meaning

6   revenue less costs; and the discount rate to be

7   applied to obtain them.  Correct?

8                A.   Yes.

9                Q.   And in your allocations for the

10  line of business sales, you did not perform a

11  discounted cash flow analysis; correct?

12               A.   I did not, but as I described this

13  morning, what I did is the economic equivalent of

14  that.  But I did not perform a DCF.

15               Q.   And, sir, you understood that the

16  value of a license is driven by the profits a

17  licensee could obtain by using the patented

18  technology?  And by "using," let's include

19  licensing, sublicensing, et cetera.

20               A.   Yes.

21               Q.   And obviously, depending on the

22  scope of the license; correct?

23               A.   That's correct.

24               Q.   And you understood the US Debtors

25  and EMEA Debtors surrendered their licenses as part



```
 1   of the business sales; correct?

 2                 A.    I did.

 3                 Q.    And you did not forecast the

 4   profits the US Debtors and EMEA Debtors could have

 5   obtained by using the NN technology?

 6                 A.    In that -- I remember that answer

 7   in my deposition.  I think in that context, "using"

 8   did not include the licensing piece, what you just

 9   included in a prior answer.

10                 So I think it is a question of

11   definition of "using."  I think I was talking about

12   "using" in the sense of putting it in a product, in

13   that particular category.

14                 Q.    For the line of business work you

15   did, the allocations you did for the lines of

16   business, you didn't forecast the profits the US

17   Debtors and EMEA Debtors could have obtained by

18   using the NN technology for products; correct?

19                 A.    I looked at those forecasts.  I

20   did not do those forecasts, for the reasons I

21   discussed this morning.

22                 Q.    And for the line of business

23   sales, you did not do a forecast of the profits

24   that they could have made even by licensing?  You

25   didn't do that for the line of business allocation,
```



```
 1   did you?
 2                A.    That's correct.
 3                Q.    Sir, can we turn to the residual
 4   patent portfolio.
 5                A.    Certainly.
 6                Q.    You point out in your report --
 7   and I will turn it up for you but you may recall
 8   it -- that the Rockstar transaction consisted of
 9   4,353 patents but also 2,786 patent applications.
10                A.    Yes.
11                Q.    The precise numbers don't
12   matter --
13                A.    Right.
14                Q.    -- but there were a substantial
15   number of patent applications; correct?
16                A.    Yes.
17                Q.    Now, do patent applications have
18   economic value?
19                A.    They probably do, although not
20   every one will.
21                Q.    And was the Rockstar purchase
22   price more because applications were included than
23   it would have been otherwise?
24                A.    We, of course, don't know with
25   certainty.  But I think that it is reasonable to
```



1    believe that some of the value that Rockstar

2    obtained was the applications.

3              Q.   And, sir, in your report you do

4    some analysis of the applications, for example, for

5    the purpose of determining the remaining life of

6    the patent portfolio.  You considered both the

7    remaining life on existing patents and also when

8    the applications were filed; is that right?

9              A.   Yes, that is.

10             Q.   And you sort of averaged the

11   results you get to develop some remaining-life

12   figures; is that fair?

13             A.   Yes.

14             Q.   And you also take a look at the

15   grant rate of applications?  I think you used a

16   number of 75 percent of applications that actually

17   granted?

18             A.   Actually, you are close.  I think

19   I concluded less than 75 were granted, but for

20   purposes of my analysis, I used 75.

21             Q.   All right.  And, sir, are you able

22   to say or to estimate how much of the Rockstar

23   purchase price was due to applications?

24             A.   I am not.

25             Q.   You didn't attempt in any part of



```
 1   your analysis to separate the value of applications

 2   from the value of patents; is that correct?

 3                A.   I did not.  That's correct.

 4                Q.   And, sir, a party wanting to

 5   acquire a patent application, would they pay

 6   anything for it if it didn't come with the right to

 7   prosecute that patent application into a patent?

 8                A.   If I understand your question --

 9   and there may be something to it I am missing

10   because it either sounds obvious -- the answer is

11   "no" or I am missing something.

12                Q.   Okay.  Well, let's start with the

13   assumption that there is something to my question.

14   Give me that.

15                A.   I wasn't criticizing the question.

16   I was criticizing my understanding of it.

17                Q.   No, no.  So let's take a step

18   back.  I take it the value that a patent

19   application has is directly related to its ability

20   to become a patent.

21                A.   Yes.

22                Q.   So if you take that away, if it is

23   a patent application that is doomed to failure or

24   withdrawn or canceled or rejected, then the value

25   in it disappears; correct?
```



```
 1                   A.   I think that's probably.

 2                   Q.   So the party with the sole right

 3   to prosecute an application would have to transfer

 4   that to someone who is interested in a patent

 5   application; correct?

 6                   A.   Presumably.

 7                   Q.   And again, when you allocate

 8   9.3 percent up to 11.1 percent, depending on

 9   whether China is included, of the Rockstar

10   allocation to the Canadian Debtors, that

11   allocation, the one on slide 22, that doesn't

12   address this issue at all, does it?

13                   A.   It addresses it in the sense that

14   the value for those is already included.  It

15   doesn't separately cull them out.  But the value of

16   those applications is contemplated in the IPCo

17   analysis.

18                   Q.   But your assumption is everybody

19   had the same rights to turn applications into

20   patents; correct?

21                   A.   I didn't understand that question.

22                   Q.   Sorry.  You are assuming, as you

23   allocate the value of patent applications that,

24   embedded in the Rockstar price, that the IEs had

25   identical rights concerning patent applications;
```



```
 1  fair?
 2              A.   "Identical" to as if they were
 3  patents?  I am not sure -- the question isn't --
 4              Q.   The same right to turn it into a
 5  patent application.
 6              A.   The same right as --
 7              Q.   Sorry.  To turn it into a patent.
 8              A.   As whom?  As anyone else would
 9  have?
10              Q.   As between themselves.
11              A.   Within a -- I don't think I have
12  an assumption about it, though I would clearly
13  expect that the probability of turning an
14  application into a patent is not dependent on which
15  of the parties is trying to exercise that right.
16              Q.   Sorry.  Not my question.
17              In allocating the value from the
18  Rockstar transaction, you haven't attributed any
19  particular value to someone who might have had the
20  sole right to prosecute patent applications?
21              A.   I have not in the sense that my
22  understanding is if it matures into a patent, the
23  value associated with that, given the assumptions I
24  have been asked to make, resides in the integrated
25  entity for whom that is the exclusive territory or
```



```
 1    is shared if it is in the nonexclusive territories.

 2                 Q.    But you haven't attributed any

 3    value to the right of a party who could prosecute

 4    the patent application to say I won't transfer that

 5    right?  You didn't attribute anything to that?

 6                 A.    Not separately, but it is included

 7    in the royalty streams that are part of IPCo.

 8                 Q.    But not treated any differently as

 9    among the integrated entities?

10                 A.    I don't think I understand that.

11                 Q.    All right.  Let's move to a

12    different topic.

13                 Can we look at slide 23, please.

14                 A.    Yes.

15                 Q.    This slide is headed up "Using

16    Canada's Interpretation of the License Rights."

17                 A.    Yes.

18                 Q.    I thank you for that.

19                 Sir, so we understand what is at play

20    here, tell me if we have this on a common basis.

21    Mr. Green assumed that the license rights of the US

22    and EMEA Debtors had a restriction on its scope;

23    correct?

24                 A.    He did.

25                 Q.    And you note that patents, shared
```



1    patents, patents that were used in multiple lines

2    of business, were subject to nonexclusive licenses

3    to the buyers of that business; correct?

4                   A.    Yes.

5                   Q.    And they had certain field-of-use

6    definitions and other provisions; correct?

7                   A.    Yes.

8                   Q.    And your proposition is that there

9    remained value in the US and EMEA Debtors' licenses

10   in connection with those patents over and above any

11   value that was given away to the purchasers by

12   those nonexclusive licenses; is that right?

13                  A.    Correct.  They had exclusive

14   licenses even under Canadian definition of "limited

15   field of use."

16                  Q.    And to use a business term, there

17   is a delta between the values of each?

18                  A.    Yes.

19                  Q.    Now, you don't do any cash flow or

20   DCF analysis of either the value of the US and EMEA

21   Debtors' interest in that patent less the value of

22   the nonexclusive licenses; correct?

23                  A.    That's correct.

24                  Q.    And in the analysis you do in the

25   left-hand column of this, where you take one-third



```
 1    of the patent portfolio, that proceeds on the basis

 2    that each patent in the Rockstar portfolio, whether

 3    not in use or in use, has equal value; correct?

 4              A.    It essentially does, yes.

 5              Q.    And do you agree that's a naive

 6    approach to valuing a portfolio?

 7              A.    In fact, I think I said it

 8    explicitly.

 9              Q.    And you said it in your report;

10    correct?

11              A.    That's what I mean, yes.

12              Q.    And, in fact, your evidence in

13    your report and even in other parts of your

14    evidence this morning is that the value of a patent

15    portfolio is skewed; correct?

16              A.    Yes.

17              Q.    And you treated, for example,

18    highest-interest patents as more valuable than high

19    and more valuable than neither highest nor high;

20    correct?

21              A.    I did.

22              Q.    And you don't do any of that kind

23    of analysis here, do you; how many of these patents

24    were highest interest or anything of the sort?

25              A.    I do it qualitatively.  I think I
```



```
 1   have a long footnote discussing this very point in
 2   which I point out -- first of all, I did not do it
 3   patent by patent because I don't think there is an
 4   identified list that would enable anyone to
 5   accomplish that.
 6            Second, I describe in the footnote how
 7   patents in use are more likely to be -- to have
 8   value, because, after all, someone is using them.
 9   And if one competitor, the Nortel -- the former
10   Nortel entity, is finding it useful, there is more
11   reason to believe someone else would, as opposed to
12   a patent that is not in use in any of the Nortel
13   lines.
14            So I mention that, but I also mention
15   the offsetting factor that the Nortel component
16   presents an encumbrance.  And so this is by way of
17   an example using the Canadian interpretation to
18   show that there is value in the portfolio.
19            Q.   But, sir, you are not putting this
20   forward as a valuation of that delta, are you?
21            A.   I am putting it forward -- well,
22   first of all, on the right-hand column I am,
23   because I think we can clearly talk about
24   100 percent as not needing a further subdivision.
25            On the left-hand column, I think it is
```



```
 1   an indication of value.  There are areas to
 2   criticize it.  I criticize it myself in my own
 3   report.  But I think, given that the Canadian
 4   interpretation was that the US and EMEA have zero,
 5   this is a demonstration, and it was intended as a
 6   demonstration, that it is a substantial amount of
 7   money and is not zero.
 8               Q.   Sir, you used, as you discussed
 9   with Mr. Oxford and in your evidence in direct, the
10   IPCo model; correct?
11               A.   I did.
12               Q.   One of the reasons you used it was
13   the sophistication of the people who were involved
14   in preparing it?
15               A.   Yes.
16               Q.   And you, sir, know that they
17   proposed various discount rates; correct?
18               A.   I would say they used various
19   discount rates illustratively.  They said
20   "illustrative," and nowhere in the documents that I
21   could find is there any analysis of a discount
22   rate.  Having said that, they did use them, yes.
23               Q.   All right.  And they never used an
24   illustrative discount rate as low as 12 percent,
25   did they?
```



 1                    A.    They did not.

 2                    Q.    And I think you fairly described

 3     in your direct that what Lazard would have been

 4     looking at was a type of discount rate that was

 5     appropriate to use if you were trying to value how

 6     Nortel could operate this business and what it

 7     might achieve from it; correct?

 8                    A.    I don't know that's the case, but

 9     I think that's a reasonable view.

10                    Q.    All right.  And you don't

11     criticize that selection of discount rates on that

12     paradigm, do you?

13                    A.    Well, I do only with hindsight.

14     That is, it may very well be that given what is now

15     known about the transaction value, that the range

16     of discount rates that Lazard considered would

17     still be inappropriate, even for Nortel to operate

18     it.

19                    We have the benefit of hindsight of

20     knowing that the portfolio sold for $4.5 billion.

21     That would have an influence on anyone assessing a

22     discount rate, even one that was to be applied to

23     operations rather than sale.

24                    Q.    But you are not suggesting, sir,

25     are you, that the appropriate rate to value, prior



1   to the sale and prior to the sale price being

2   known, Nortel's opportunity to participate in an

3   IPCo was 12 percent?

4               A.   I am not suggesting that that

5   would have been known by Lazard or anyone before

6   the transaction itself occurred.

7               Q.   Now, if we take a look at your

8   slide 21, sir, this is where you apply

9   Mr. Malackowski's discount rate of 30 percent?

10              A.   Yes.

11              Q.   That falls somewhere in the range

12  of rates that Lazard had used; correct?

13              A.   It does.

14              Q.   And the number we see at the

15  bottom, the present value using the 30 percent

16  discount rate of $2.1 billion, that fairly

17  represents what Nortel could have achieved if it

18  operated this business; correct?

19              A.   No, I don't think that's quite

20  fair.  It represents what a present value would be

21  at 30 percent, but that doesn't mean that that is

22  what they could have achieved.

23              More -- facts happen.  Over time they

24  would come to learn that this portfolio was more

25  valuable.  They learned it as part of the



1    transaction that actually occurred.  If that had

2    not occurred, they would learn it in some other

3    way, that there is more value to this portfolio

4    than what was contemplated at the time of the

5    original transaction -- original calculation.

6              Q.   Sir, you don't know whether

7    Rockstar's performance with this portfolio is going

8    to justify a $4.5 billion price or not; correct?

9              A.   If what you are asking is if we go

10   forward 20 years and look back to see what they got

11   out of it, no, I do not know what will happen 20

12   years from now.

13             Q.   All right.  And there have been no

14   reported victories in lawsuits, no reported

15   licensing income or anything like that, is there?

16             A.   There is some reported

17   information, relatively minor.  And, of course,

18   there never will be any reports about their own

19   internal licensing, meaning each of the Rockstar

20   Consortium members gets a license.

21             Q.   All right.

22             A.   And that will not be reported on

23   any financial information.

24             Q.   So, sir, dealing with the best

25   information we have about Nortel's opportunity, if



```
 1   we use a discount rate in the range that Lazard was

 2   looking at and we apply it to a cash flow

 3   projection that you found reliable, IPCo, we end up

 4   with this present value of $2.15 billion.  That's

 5   what you are saying here?

 6              A.   Using a 30 percent discount rate

 7   on the IPCo projection results in that.  And until

 8   you know that the portfolio sold for $4.5 billion,

 9   you then don't know whether further adjustments are

10   made.

11              Q.   And, sir, to be fair, you don't

12   know why Rockstar paid what they paid, do you?

13              A.   I am not in their head.

14              MR. ZARNETT:  Thank you, sir.  Those

15   are my questions.

16              THE WITNESS:  Thank you.

17              MR. STEEP:  Good afternoon, Judge

18   Gross.  Paul Steep for the CCC.

19              THE US COURT:  Yes, sir.

20              MR. STEEP:  Good afternoon, Justice

21   Newbould.

22   CROSS-EXAMINATION BY MR. STEEP:

23              Q.   Mr. Kinrich, I have got the

24   coveted 5:45 slot --

25              A.   4:45.
```



```
 1                    Q.   4:45 -- and so will be brief.
 2                    A.   Thank you.
 3                    Q.   All right.  I want to pick up
 4    where Mr. Zarnett left off with the Rockstar
 5    transaction.  And obviously, you are familiar with
 6    the Lazard/IP Global modeling that was done?
 7                    A.   Yes.
 8                    Q.   And I believe it is true that you
 9    also noticed that each of the debtors had
10    substantial input into that model?
11                    A.   Yes.
12                    Q.   And you mean by that that
13    executives from each of the business lines inputted
14    their knowledge about the technology into the IPCo
15    model?
16                    A.   I actually don't know that it was
17    their knowledge of technology.  It could have been
18    management; it could have been business planning,
19    it could have been several things.  They were part
20    of the steering committee.
21                    Q.   Could we agree that whatever
22    expertise they brought, business, management or
23    technology, your belief was that it informed the
24    IPCo model?
25                    A.   It had the opportunity to inform
```



1    it.

2                Q.   All right.  And as you have

3    discussed with my friends today, you did come

4    across the Lazard discount rates that they used

5    when they looked at the cash flows generated off

6    that model?

7                A.   Yes, I did.

8                Q.   And I just want to expand on the

9    one that you looked at.  So if we could have

10   Exhibit TR43715 brought up.

11               And I think that you will recognize

12   this as model 3.0, one of the valuation models that

13   was prepared by Lazard.

14               A.   Yes.  It has vanished from the

15   screen -- oh, there it is.

16               Q.   There it is.  And you have a hard

17   copy?

18               THE CANADIAN COURT:  I don't have

19   either, Mr. Steep.

20               MR. STEEP:  You should have one.

21               THE CANADIAN COURT:  I have now gotten

22   the screen but I don't have the hard copy.  Thank

23   you.

24               BY MR. STEEP:

25               Q.   If everybody has the hard copy and



1    it is up on the screen, on the left-hand side we

2    see the various franchises which inform the model;

3    correct?

4              A.   Yes.

5              Q.   And then we see the present value

6    of the cash flows, the terminal values, and then a

7    "total" column in each of the three discount rates

8    that are used; correct?

9              A.   We do.

10             Q.   And Lazard came up with present

11   values that ranged, if you used a 25 percent

12   discount rate, from 2.6 billion to 816 million --

13   or sorry -- 868 million if you used the high

14   discount rate of 45 percent; correct?

15             A.   Yes.

16             Q.   And again, this was based on an IP

17   model assuming that Nortel went into the IPCo

18   company business; is that correct?

19             A.   Yes, that is correct.

20             Q.   So that the business in the hands

21   of Nortel might have been as low as $868 million on

22   the Lazard modeling?

23             A.   That's one of the alternatives

24   Lazard presents here.  This is not -- this is model

25   3.0.  Later models existed.  But yes, at this



```
 1   point, that's correct.
 2              Q.   Now, just as a fact, when you
 3   looked at the model, in your first report you don't
 4   refer to these discount rates of Lazard anywhere,
 5   do you?
 6              A.   I will accept your statement.  I
 7   don't remember one way or the other.
 8              Q.   You refer to the cash flows, but
 9   you don't refer to the discount rates; correct?
10              A.   I accept that.
11              Q.   Now, I want to return to a
12   question Justice Newbould asked you this morning,
13   and that was, you don't have access to the actual
14   cash flows that were used by the consortium that
15   purchased the Rockstar portfolio.
16              A.   You are right.  I do not have
17   access to -- we don't even know if they had them.
18   But I don't have access.
19              Q.   Exactly.  You have no information
20   from the consortium about how they worked up the
21   valuation which supported their purchase price of
22   4.5 billion?
23              A.   I do not have any information from
24   within Rockstar internally.
25              Q.   All right.  Now, if you go to
```



```
1    Exhibit 28 of your initial report, you prepared
2    some charts which showed us how you inferred the
3    discount rate using the $4.5 billion purchase
4    price; correct?
5              A.   I wouldn't describe these exhibits
6    as doing that.  I certainly did that, but I don't
7    think that that's the purpose of these exhibits.
8              Q.   All right.  Well, let's just walk
9    through the information that is in these exhibits.
10   And we have up in front, and you should have it on
11   your screen, Justice Newbould, Exhibit 28A.
12             THE CANADIAN COURT:  I have it.  I have
13   gotten it in the report, too.
14             BY MR. STEEP:
15             Q.   All right.  So if we look at the
16   right-hand column, Mr. Kinrich, you will see
17   present value 2010 to 2020, and you have a "1"
18   there that takes us down to a footnote:
19                 "Represents the present value
20                 using the implied discount rate
21                 (12.2 percent) if the net present value
22                 of the cash flow (revenue . . . )
23                 projected by the IPCo model without
24                 China is equal to 4.5 billion."
25                 Correct?
```



```
 1                    A.   Yes.
 2                    Q.   All right.  Now, I just want to
 3     get the elements of this.  For a present valuation
 4     like this, a DCF, you need a cash flow and you need
 5     a discount rate; correct?
 6                    A.   Correct.
 7                    Q.   All right.  Now, in this
 8     circumstance, as you pointed out in chief, you had
 9     a cash flow which you took from the IPCo model;
10     correct?
11                    A.   Yes.
12                    Q.   And you had a purchase price, but
13     you lacked a discount rate; correct?
14                    A.   Correct.  So that's how I derived
15     it.
16                    Q.   So if we go down to the bottom
17     right-hand corner, you plug in 4.5 billion, which
18     is the purchase price; correct?
19                    A.   Yes.  "Plug in" I am not sure is
20     the right phrase.  But that present value is the --
21     the discount rate is created or is derived to solve
22     so that the total is that $4.5 billion.
23                    Q.   And in the facts that are before
24     us, it is always going to be 4.5 billion in that
25     bottom right-hand corner, isn't it?
```



 1                        A.    Correct.   That's the purchase --
 2    that's the actual transaction price.
 3                        Q.    And then what you do is across the
 4    top, from 2010 to 2020, you put in the cash flows
 5    that Lazard and Nortel management did for the IPCo
 6    model without the China revenue being included;
 7    correct?
 8                        A.    Correct.   This page is without
 9    China.
10                        Q.    And if you put in those cash flows
11    and use 4.5 billion as the net present value of
12    those cash flows, it automatically gives you
13    12.2 percent; correct?
14                        A.    That's what you are solving for,
15    and that is the result of that analysis.
16                        Q.    All right.   Now, in 28B, you went
17    through the same exercise, only including China;
18    correct?
19                        A.    Correct.
20                        Q.    Now, just before we leave 28A, I
21    think we are in agreement that what IPCo modeled
22    for were the jurisdictions of Canada, the US, UK,
23    France and Germany?
24                        A.    And then China when it is in.
25                        Q.    But in 28A we just see those five



 1    jurisdictions; correct?

 2                  A.    Correct.  Yes.

 3                  Q.    And I think it is common ground

 4    that you regarded those jurisdictions, as did

 5    Lazard and management, as stable IP-regime

 6    jurisdictions where there would be good enforcement

 7    rights?

 8                  A.    Yes.

 9                  Q.    And you will agree with me that a

10    discount rate is to reflect the risk of earning the

11    cash flows which are in the DCF model?

12                  A.    I would agree with that when you

13    are estimating a discount rate not knowing the

14    total value.  When you know the total value, it is

15    no longer merely that.  It is the only possible

16    answer at that point.

17                  Q.    But even if it is the only

18    possible answer, you would expect it to reflect the

19    risk of earning those cash flows.  That's what a

20    discount rate is in the DCF.

21                  A.    Yes.

22                  Q.    All right.  So for 28A to have any

23    meaning at all, it must be that that 12.2 percent,

24    if you have a net present value of 4.5 million --

25                  A.    Billion.



 1                   Q.   -- billion, reflects the risk of

 2      earning those cash flows between 2010 and 2020?

 3                   A.   I think I would rather say that it

 4      reflects the value associated with that in

 5      connection with the auction process.  That is, it

 6      is possible in the auction process that someone

 7      paid more or less than what they felt was the risk

 8      but felt that that was either what they had to do

 9      to do the bidding or that was what they were

10      willing to do to get the asset.

11                   Q.   Well, let's just go to first

12      principles.  You don't know if anyone in the

13      auction process was basing their auction price on

14      these particular cash flows.  You just don't have

15      that particular information?

16                   A.   You are right.  I don't.  They did

17      have the model as part of what was communicated to

18      them, but the royalty rates were not part of that,

19      what they were given.  So they did have the same

20      structure available, each of the bidders did.

21                   Q.   Whatever they had -- they probably

22      had lots of things.  You expect they probably had

23      their own investment bankers advising them;

24      correct?

25                   A.   I would expect that.



1                    Q.    And you would expect those

2    investment bankers to make up models for their

3    clients; correct?

4                    A.    That's a reasonable expectation.

5                    Q.    And they may even have had

6    valuators like you preparing models; correct?

7                    A.    They didn't call me, but I can't

8    speak for anyone else.

9                    Q.    But bottom line, you don't know

10   and we don't know what cash flows were used by any

11   of the auction participants that ultimately yielded

12   4.5 billion?

13                   A.    That's correct.

14                   Q.    So back to my question.  When you

15   put in the IPCo cash flow line here in 28A and you

16   used the net present value of 4.5 billion, which is

17   the final price paid by the consortium, the

18   discount rate that comes out reflects the risk of

19   earning those revenues between 2010 and 2020?

20                   A.    The same answer as before:  It

21   reflects what is required to be for purposes of an

22   allocation.  It probably should reflect that.

23   Whether it really does given the economics of it --

24                   Q.    "Should" will do.

25                   A.    All right.



```
 1                    Q.   It is a reasonable expectation for

 2     people like you and I that it should reflect the

 3     risk of those cash flows?

 4                    A.   Yes, recognizing that people could

 5     pay more than they anticipated and thereby drive

 6     the discount rate down or something else could be

 7     happening.

 8                    Q.   All right.  You then, in 28B,

 9     looked at the imputed discount rate if you added in

10     the cash flows from China after year 6; correct?

11                    A.   Yes.  That is the year that the

12     model starts China.

13                    Q.   All right.  And so we have the

14     same jurisdictions as before.  We have Canada, the

15     US, the UK, France and Germany; correct?

16                    A.   Yes.

17                    Q.   And what you do is you add

18     incremental revenue, I think just over 2 billion,

19     maybe as high as 3 billion, from year 6 on;

20     correct?

21                    A.   I will accept your numbers, and

22     you certainly do it from year 6 on.

23                    Q.   And again, you use the purchase

24     price of 4.5 billion as the net present value;

25     correct?
```



```
 1                    A.    Yes, the actual transaction price;
 2    correct.
 3                    Q.    And in this exhibit that yields an
 4    implied discount rate of 15.7; correct?
 5                    A.    Correct.
 6                    Q.    That 15.7 discount rate, if we use
 7    the same words as before, we would expect or it
 8    should reflect the risk of earning those revenues;
 9    correct?
10                    A.    Yes.
11                    Q.    All right.  Some of those
12    revenues, most of those revenues come from the same
13    jurisdictions as we looked at in 28A; correct?
14                    A.    They do.
15                    Q.    And in 28A, the discount rate
16    applied to those was 12.2 percent; correct?
17                    A.    Correct.
18                    Q.    Now, there has been a lot of talk
19    this afternoon, which I will try to summarize, that
20    there may not be as much value in the Chinese
21    patents because of the risk that you won't be able
22    to enforce them as effectively; correct?
23                    A.    Yes.
24                    Q.    And is it fair to say that those
25    Chinese revenues should attract a higher discount
```



1   rate because of that risk?

2              A.   I think that's a reasonable

3   conclusion.

4              Q.   Now, in this chart you have

5   applied -- or you haven't applied, but the imputed

6   rate of 15.7 is applied back over all of the cash

7   flows, even those earned in Canada, the US, the UK,

8   France and Germany; correct?

9              A.   Rather than say "even those," it

10  is applied across the entire spectrum, yes.

11             Q.   Right.  Now, those cash flows

12  haven't suddenly become more risky than they were

13  when we looked at them in 28A, have they?

14             A.   No.

15             Q.   Right.  It is the same regimes;

16  correct?

17             A.   It is.

18             Q.   So one way of valuing or

19  approaching this from first principles might have

20  done is say, those cash flows attract from the UK,

21  US, all the non-China jurisdictions, a discount

22  rate of 12-1/2 percent or 12.2 percent; and the

23  China revenues attract a higher discount rate,

24  because those are subjected to a higher risk that

25  will be earned than are the others



```
 1                    A.    Perhaps.  That actually will not

 2   work.  No, that is a flawed analysis, because we

 3   know the total has to be 4-1/2 billion.  If you do

 4   what you are suggesting, you will end up with more

 5   than 4-1/2 billion.

 6                    Q.    Exactly my point.  Exactly my

 7   point.

 8                    The way you have done this, it is just

 9   circular.  Because you want to end up with

10   4.5 billion, you impute a 15.7 percent discount

11   rate against all of the cash flows, even though the

12   risk for most of the cash flows hadn't changed

13   appreciably.  It is the same jurisdictions.

14                    A.    Yes.  None of that is an

15   indictment of this.  This is an attempt to figure

16   out what is implied by the results.  It is not

17   saying the first one has a lower risk than the

18   second.  It is saying the parties who are buying

19   this are somewhere in this range, and we don't know

20   where.  We are not suggesting that --

21                    Q.    You go ahead.

22                    A.    We are not suggesting that the

23   value of the portfolio is different than $4-1/2

24   billion.

25                    Q.    That's only true if you assume
```



1    that they used a cash flow like the one that you

2    put in Exhibit 28A or 29A.

3                    A.   I think that's not quite accurate,

4    and here is why.  Remember the task at hand.  The

5    task at hand is to figure out which territories and

6    what value from those territories is -- sorry.  It

7    is getting late.  I started my sentence backwards.

8    Let me start that sentence over.

9                    It is to figure out what was

10   attributable to the assets and value relinquished

11   from each of the territories.  I do not know

12   exactly what that is, but I know the total is

13   $4-1/2 billion.

14                   I also have a reasonable allocation

15   basis.  It doesn't mean that that's exactly what

16   Rockstar did.  They may have their own.  We all

17   concede, I don't know what Rockstar did.  But I do

18   have a reasonable basis that was developed in the

19   ordinary course of business that gives me a

20   distribution of those proceeds.

21                   The reason I need a present value is

22   that I have those expended over time.  I have to

23   put them on an apples-to-apples comparison basis,

24   and I do that to try to say what relative

25   proportion is attributable to each of the various



1   entities.  That's what is going on here.

2                  The fact that I don't know what

3   Rockstar did exactly does not change the fact that

4   I need an apportionment basis, and that basis is

5   reasonably derived from the relative contributions

6   of IPCo.

7                  Q.   Let me put this proposition to

8   you.  It is not that you don't know exactly.  You

9   don't know the cash flows at all.

10                 A.   Conceded.

11                 Q.   Right.  And you don't know the

12  discount rates either.  All you know is the price

13  that was paid.

14                 A.   I know the price that was paid,

15  and then I used the IPCo model as a basis for that

16  apportionment.

17                 Q.   Right.  All the time having to

18  concede that you don't know if that cash flow has

19  anything to do with how the business was valued by

20  the purchaser.

21                 A.   Recognizing that's true, but also

22  recognizing it does have a lot to do with how

23  Nortel perceived the value of the business, and

24  that is the best source for where the relative

25  contribution of value lies.



```
 1                    Q.   Now, one final question.  At the
 2    end of the day, you apportioned across the lines of
 3    business and across Rockstar about 10 to 11 percent
 4    of the lockbox to Canada; correct?  We can call up
 5    your last slide and you will see it.
 6                    A.   That's my Table 1.
 7                    Q.   Yes.
 8                    A.   Yes.  10 to 12, depending on which
 9    of the entities.  And it averages 10.6 percent.
10                    Q.   Right.  And that's roughly
11    770 million that would go into Canada on the
12    allocation?
13                    A.   Yes.
14                    Q.   And you are aware that there is a
15    $2 billion approved claim from the US Debtors into
16    Canada?
17                    A.   I have heard that.  I have not
18    done anything other than hear that, but --
19                    Q.   You have heard that.  And you are
20    aware that the Bondholders have a claim into Canada
21    of $4 billion?
22                    A.   I think I have heard that as
23    well.
24                    Q.   Right.  In your report you have
25    not done any analysis about what the net impact
```

 Neeson&Associates    W&F WILSON & PETERSON LTD.

1   would be after those claims are taken into account

2   on the 770 that is allocated to Canada?

3              A.   I have done no analysis of any

4   sort on any claims.

5              MR. STEEP:  All right.  Thank you.

6   Those are my questions.

7              THE US COURT:  Thank you, Mr. Steep.

8              Yes, Mr. Luft.

9              MR. LUFT:  I have a very brief

10  redirect.  I believe no one else has questions?

11             MR. OXFORD:  No questions from EMEA,

12  Your Honor.

13  RE-EXAMINATION/RE-DIRECT BY MR.LUFT:

14             Q.   Good afternoon, Mr. Kinrich.  I

15  know it has been a long day, so I will try to be

16  very brief.

17             A.   Thank you.  I appreciate it.

18             MR. LUFT:  And for the record, it is

19  Avi Luft from Cleary Gottlieb.

20             THE US COURT:  Of course, Mr. Luft.

21             BY MR. LUFT:

22             Q.   Mr. Kinrich, I want to take this

23  in reverse order, so I will first start with the

24  questions from the Canadian parties.

25             Now, you were asked a series of



1    questions by Mr. Zarnett about sharing obligations.

2    Do you recall those?

3                A.    Yes.

4                Q.    Does Mr. Green apply any RPSM

5    sharing obligations when giving zero dollars to the

6    US and EMEA in his patent portfolio analysis?

7                A.    He does not.

8                Q.    And does Mr. Green apply any RPSM

9    sharing obligations to Canada when he does his

10   value-in-use line of business analysis?

11               A.    He does not.  He takes all the

12   excess and gives it to Canada.

13               Q.    Now, another thing that came up

14   with Mr. Zarnett was questions about R&D expense.

15   Now, what is the difference for the buyers who paid

16   $7.3 billion for these assets between prior expense

17   on R&D, which I believe you referred to as sunk

18   costs, and the projections of future costs when

19   deciding how much they will pay for the line of

20   business and the patent portfolio?

21               A.    They are getting the benefit of

22   the past expenditures as realized in products and

23   technology and intellectual property without having

24   to incur any additional costs related to that.  On

25   a going-forward basis, if they choose to do



 1   additional R&D, they will have to pay for it

 2   themselves.

 3               Q.   And in your line of business

 4   model, who are those costs attributed to for future

 5   expense?

 6               A.   The future expense will be

 7   incurred by the buyer.

 8               Q.   Now, Mr. Kinrich, I next want to

 9   take you to the questions that were directed to you

10   from the UKP, and specifically, I want to ask you

11   about the model 2.2, which was shown to you by

12   Mr. Chang.

13               A.   Yes.

14               Q.   And notably, if you could look at

15   page 9, which is the page that he directed you to.

16               A.   Sorry.  Let me look through this

17   pile of stuff.

18               Q.   Well, actually, let me withdraw

19   that question, Mr. Kinrich.  You can just pull it

20   out in front of you.  Do you have a copy of the

21   excerpt that we were given or just the full copy?

22   Do you still have your excerpt?

23               A.   I must have it somewhere up here.

24               I think this is it.  Yes, I just had it

25   folded upside down.  Yes, I do have it.



1                      Q.   Mr. Kinrich, can you tell me if
2    page 13 is included in that excerpt?
3                      A.   It is not included in this
4    excerpt.
5                      Q.   Now, Mr. Chang in talking about
6    this model indicated to you that consideration of
7    including and excluding China had not yet been
8    included and directed you to page 9.  Do you recall
9    that?
10                     A.   I do.
11                     Q.   All right.  I know we are
12   concerned about sensitivity with regard to
13   redactions, so I will ask you not to say any
14   numbers.  But if you could turn to page 13 --
15                     A.   I have that.
16                     Q.   -- of the full version, I will ask
17   you to turn to that page.  If you were to look at
18   the top right-hand corner discussing revenue --
19                     A.   Yes.
20                     Q.   -- is there evidence on that page
21   that makes clear explicitly that they were already
22   considering both including and excluding China?
23                     A.   There is.  Back in version 2.0, in
24   fact, that was true, according to what this page
25   shows.



 1                    Q.   In fact, specific numbers
 2     referencing excluding China; correct?
 3                    A.   Yes, there are numbers that say
 4     "excluding China" right on the page.
 5                    Q.   And numbers which would include
 6     China, from which they are pulled out of.
 7                    A.   Correct.
 8                    Q.   Okay.  You can put that aside.
 9                    Finally, I want to ask you a couple
10     questions with regard to the questions from my
11     friends in EMEA.  Do you still have the maps they
12     made you?
13                    A.   Yes.
14                    Q.   And I believe they showed you the
15     first one, which was total patents by jurisdiction,
16     and the second one was total high-interest patents
17     by jurisdiction.
18                    A.   Yes, they did.
19                    Q.   Now, if we look at the numbers
20     from Japan and Korea in both of those, would you
21     agree with me that those numbers are substantially
22     smaller than any of the countries in the IPCo model
23     in which it was presumed that the value would be
24     constant -- i.e., not China -- for where there was
25     an on/off?



```
 1                    A.   Yes.   They are all much smaller
 2   than the other entities in the IPCo model.
 3                    Q.   And finally, Mr. Kinrich, I want
 4   to ask you, you were asked some questions about the
 5   economic decisions with regard to IPCo and the
 6   decision not to seek value from that 5 percent.
 7   Now, and specifically, you were asked about the
 8   ability to extract value from a patent; is it
 9   possible to get some money from it.
10                    In your experience as a valuator, does
11   a business only care about whether there is some
12   value that could possibly be extracted or do they
13   also consider the cost of extracting that value and
14   alternative uses of their money when making the
15   decision whether or not to pursue a line of
16   business in an area?
17                    A.   They always consider the costs of
18   developing the revenues as well as the revenues
19   itself, and they also consider what their
20   alternative uses of funds are.
21                    MR. LUFT:  Mr. Kinrich, I have no
22   further questions.  Thank you.
23                    THE CANADIAN COURT:  Mr. Kinrich, I
24   have gotten a couple of questions, if I could,
25   please.
```



```
 1                   THE WITNESS:  Yes, sir.
 2                   THE CANADIAN COURT:  And it has to do
 3   with the discount rate that has been discussed.
 4                   When doing a DCF valuation, you take
 5   your revenue stream or cash flow stream, revenue
 6   minus costs, and you apply a discount rate to it;
 7   correct?
 8                   THE WITNESS:  Yes.
 9                   THE CANADIAN COURT:  And that discount
10   rate includes at least in part the risk associated
11   with that cash flow forecast?
12                   THE WITNESS:  Yes.
13                   THE CANADIAN COURT:  So the higher the
14   cash flow forecast, presumably that increases the
15   risk?
16                   THE WITNESS:  Yes, although to do it
17   properly, your cash flows are supposed to be
18   expected cash flows.
19                   In other words, it is improper to say I
20   have a very, very optimistic plan for my business;
21   therefore, I will discount it with a high discount
22   rate, though that is what is often done in venture
23   capital, and that is why venture capital rates are
24   often much higher than one would normally expect,
25   because they are discounting not expected cash
```



1    flows but discounting hoped-for cash flows.

2              THE CANADIAN COURT:  All right.  So if

3    it is not the expected or the anticipated income

4    from the cash flow, what is the risk that is

5    measured in arriving at a discount rate?

6              THE WITNESS:  Technically --

7              THE CANADIAN COURT:  Is it the nature

8    of the business? the number of competitors?  What

9    is it?

10             THE WITNESS:  Technically, it is the

11   volatility expected around that expected value.

12   Technically, in finance theory -- and I am not sure

13   anyone wants to hear this -- risk is equivalent to

14   volatility or variance of the expected returns.

15             THE CANADIAN COURT:  Right.  Okay.

16   Now, in your report at paragraph 118 you say that

17   you infer the discount rate to apply to the

18   expected cash flows provided by the IPCo model.

19   You do that by using the IPCo model's cash flows

20   and the value of the portfolio revealed by the

21   proceeds of $4.5 billion.

22             As I understand it, the discount rate

23   that is used in doing a DCF is a rate applied to

24   the cash flow forecast --

25             THE WITNESS:  Yes.



1                    THE CANADIAN COURT:  -- that is being

2    used by the valuer.

3                    THE WITNESS:  Yes.

4                    THE CANADIAN COURT:  So in the Lazard

5    IPCo model, they anticipated, with that cash flow

6    forecast, discounts of 25 to 45 percent.

7                    THE WITNESS:  They used them

8    illustratively.  There is nothing in their document

9    suggesting they built up or did an analysis of that

10   rate, but that is what they used.

11                   THE CANADIAN COURT:  All right.  But

12   that's what they used.  All right.

13                   And if you say you conclude that the

14   discount rate should be 11 percent -- we will call

15   it that for the moment -- based upon the actual

16   sale price, tell me if I am wrong, but wouldn't

17   that require an assumed cash flow of something

18   different from the IPCo cash flow forecast?

19                    THE WITNESS:  No.

20                    THE CANADIAN COURT:  Because it is a

21   much lower -- it reflects a much lower risk to the

22   cash flow.

23                    THE WITNESS:  The 12 to 16 percent

24   number that I derive is based on the IPCo cash

25   flows.  So it exactly requires that.



1                     Were the cash flows higher, then the

2     discount rate would be higher.  But using the --

3     because we know two things -- we know the actual

4     sales proceeds and we know at least an allocation

5     or apportionment basis, as reflected in the IPCo

6     model -- the mathematics compels us to use the

7     derived discount rate as the one that equates those

8     two streams.

9                     THE CANADIAN COURT:  If Rockstar

10    anticipated riskier cash flows than those cash

11    flows in the IPCo model, then the discount rate

12    would be different, would it not?

13                    THE WITNESS:  If Rockstar anticipated

14    riskier cash flows, they would also have to

15    anticipate higher cash flows, because the two have

16    to work together to get a value of $4.5 billion.

17                    THE CANADIAN COURT:  Unless the

18    purchase price was based on something else; as you

19    just pointed out, the auctions worked in a

20    different way.

21                    THE WITNESS:  Well, the value of a

22    patent portfolio has to come from the patents.

23    People could overestimate that value, but the only

24    rights that they are obtaining are the patent

25    rights.  And so that is sort of foundational to the



1  analysis that there is no other value other than

2  patent rights being communicated here

3                 THE CANADIAN COURT:  All right.  Fine.

4  Thank you.  Does anybody have any questions arising

5  out of my questions?

6                 Okay.  Thank you, Mr. Kinrich.

7                 THE WITNESS:  Thank you.

8                 THE US COURT:  All right.  Mr. Kinrich,

9  you may step down, sir.  Thank you.

10                 THE WITNESS:  Thank you.

11                 THE US COURT:  And I know it was a long

12  day.  It was just one day, believe it or not.

13                 THE WITNESS:  Can you prove that?

14  -- WITNESS EXCUSED --

15                 THE US COURT:  Justice Newbould, I

16  think you were going to mention starting time

17  tomorrow.

18                 THE CANADIAN COURT:  Yes.  I need to

19  start at 9:30 tomorrow morning, if that's all right

20  with everybody.

21                 THE US COURT:  All right.  Thank you,

22  everyone.  Good evening.  See you at 9:30 tomorrow

23  morning.

24  -- Whereupon court adjourned on June 18th, 2014, at

25  5:21 p.m.

 

```
 1                REPORTERS' CERTIFICATE

 2

 3                I,  LORRAINE B. MARINO, RDR, CRR, CSR,

 4     US Certified Shorthand Reporter, and I, DEANA

 5     SANTEDICOLA, RPR, CRR, CSR, certify;

 6                That the foregoing proceedings were

 7     taken before us at the time and place therein set

 8     forth;

 9                That the entire proceedings of the

10     hearing date were recorded stenographically

11     individually by each of us and were thereafter

12     transcribed;

13                That the foregoing is a true and

14     correct transcript of our shorthand notes so taken.

15

16                Dated this 18th day of June, 2014.

17     PER:                    PER:

18     Lorraine B. Marino      Deana Santedicola

19     LORRAINE B. MARINO      DEANA SANTEDICOLA

20     WILCOX & FETZER         NEESON & ASSOCIATES

21     WILMINGTON, DE USA      TORONTO, ON

22

23

24

25
```















































































