



```
 1              UNITED STATES BANKRUPTCY COURT

 2            FOR THE DISTRICT OF DELAWARE

 3

 4   -----------------------------)

 5   In Re                        )

 6     NORTEL NETWORKS INC.,      )  Case No.

 7     et al.,                    )  09-10138 (KG)

 8       Debtors.                 )

 9   -----------------------------)

10                     - and -

11            Court File No. 09-CL-7950

12                    ONTARIO

13          SUPERIOR COURT OF JUSTICE

14               (COMMERCIAL LIST)

15      IN THE MATTER OF THE COMPANIES' CREDITORS

16   ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18   ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19       NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20      CORPORATION, NORTEL NETWORKS INTERNATIONAL

21     CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                   CORPORATION

23     APPLICATION UNDERT PART IV OF THE COMPANIES'

24   CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                   AS AMENDED
```



```
 1

 2

 3

 4    ---- This is the Day 18/Volume 18 of the transcript

 5    of the proceedings in the above matter held

 6    simultaneously in:

 7    Superior Court of        United States Bankruptcy

 8    Ontario (Commercial      Court for the District of

 9    List)                    Delaware

10    Courtroom 8-1            Courtroom 3

11    330 University Avenue    824 Market Street

12    Toronto, Ontario         Wilmington, Delaware

13

14              on the 19th day of June, 2014,

15    commencing at 9:39 a.m.

16

17                       ---------

18    B E F O R E:

19    The Honorable Judge Kevin Gross (United States)

20    The Honorable Mr. Justice Frank Newbould (Canada)

21

22                       ---------

23

24

25
```



```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17        Julie Rosenthal, Esq.

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22

23   PER: Murray McDonald, Esq.

24        Brent Beekenkamp, Esq.

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER: Derrick Tay, Esq.

 7        Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER: Ken Coleman, Esq.

14        Paul Keller, Esq.

15        Daniel Guyder, Esq.

16        Laura Hall, Esq.

17        Joseph Badtke-Berkow, Esq.

18        Jonathan Cho, Esq.

19        Nicolette Ward, Esq.

20

21   FOR THE CANADIAN DEBTORS

22   BUCHANAN INGERSOLL & ROONEY

23   1105 North Market Street

24   Suite 1900

25   Wilmington, DE  19801-1054
```

 Neeson&Associates   W&F

```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   79 Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   1201 North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```



```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```



```
 1   PER: Matthew P. Gottlieb, Esq.
 2        Tracy Wynne, Esq.
 3        Paul Michell, Esq.
 4
 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
 6   LIMITED
 7   HUGHES HUBBARD & REED
 8   One Battery Park Plaza
 9   New York, NY  10004-1482
10   PER: Derek Adler, Esq.
11        William Maguire, Esq.
12        Neil Oxford, Esq.
13        Fara Tabatabai, Esq.
14        Charles Huberty, Esq.
15
16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
17   LIMITED
18   YOUNG CONAWAY STARGATT & TAYLOR LLP
19   Rodney Square
20   1000 North King Street
21   Wilmington, DE  19801
22   PER: Ed Harron, Esq.
23        John Dorsey, Esq.
24
25   FOR THE EMEA DEBTORS
```



```
1    HERBERT SMITH FREEHILLS LLP

2    Exchange House

3    Primrose Street

4    London, England  EC2A 2EG

5    PER: James Norris-Jones, Esq.

6

7    CANADIAN CREDITORS COMMITTEE

8

9    FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```



```
 1   PER: Barry E. Wadsworth, Esq.

 2        Lewis Gottheil, Esq.

 3

 4   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 5   COMMITTEE

 6   SHIBLEY RIGHTON LLP

 7   University Avenue, Suite 700

 8   Toronto, ON  M5H 3E5

 9   PER: Arthur O. Jacques, Esq.

10        Thomas McRae, Esq.

11

12   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14   FUND

15   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16   35th Floor

17   155 Wellington Street West

18   Toronto, ON  M5V 3H1

19   PER: Kenneth T. Rosenberg, Esq.

20        Massimo (Max) Starnino, Esq.

21        Lily Harmer, Esq.

22        Karen Jones, Esq.

23        Tina Lie, Esq.

24        Michelle Jackson, Esq.

25
```



```
 1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 3   2009

 4   NELLIGAN O'BRIEN PAYNE LLP

 5   50 O'Connor Street, Suite 1500

 6   Ottawa, ON  K1P 6L2

 7   PER: Janice B. Payne, Esq.

 8        Steven Levitt, Esq.

 9        Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```

 

1   919 North Market Street, Suite 1500

2   Wilmington, DE  19801

3   PER: Selinda A. Melnik, Esq.

4       Richard Hans, Esq.

5       Timothy Hoeffner, Esq.

6       Jason Gerstein, Esq.

7       Farah Lisa Whitley-Sebti, Esq.

8

9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12  BENNETT JONES LLP

13  1 First Canadian Place

14  Suite 3400

15  Toronto, ON  M5X 1A4

16  PER: Kevin Zych, Esq.

17       S. Richard Orzy, Esq.

18       Gavin Finlayson, Esq.

19       Richard Swan, Esq.

20       Sean Zweig, Esq.

21       Jonathan Bell, Esq.

22       Amanda McLachlan, Esq.

23

24  FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25  MILBANK, TWEED, HADLEY, MCCLOY LLP



```
 1   1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4       Jennifer P. Harris, Esq.

 5       Albert A. Pisa, Esq.

 6       Samir Vora, Esq.

 7       Andrew LeBlanc, Esq.

 8       Michael Hirschfeld, Esq.

 9       Atara Miller, Esq.

10       Tom Matz, Esq.

11       Nick Bassett, Esq.

12       Gabrielle Ruha, Esq.

13       Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23       Michael Wunder, Esq.

24       Ryan Jacobs, Esq.

25
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
 2   ASHURST LLP
 3   Boardwalk House
 4   5 Appold Street
 5   London, England  EC2A 2HA
 6   PER: Angela Pearson, Esq.
 7        Antonia Croke, Esq.
 8
 9   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
10   RICHARDS LAYTON & FINGER, P.A.
11   920 North King Street
12   Wilmington, DE  19801
13   PER: Christopher Samis, Esq.
14
15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
16   AKIN GUMP STRAUSS HAUER & FELD LLP
17   One Bryant Park
18   New York, NY  10036
19   PER: Fred S. Hodara, Esq.
20        David H. Botter, Esq.
21        Abid Qureshi, Esq.
22        Robert A. Johnson, Esq.
23        Brad M. Kahn, Esq.
24        Christine Doniak, Esq.
25        Joseph Sorkin, Esq.
```



```
 1        Jacqueline Yecies, Esq.

 2  UK PENSION PROTECTION FUND AND NORTEL NETWORKS

 3  UK PENSION TRUST LIMITED

 4

 5  FOR THE UK PENSION PROTECTION FUND AND NORTEL

 6  NETWORKS UK PENSION TRUST LIMITED

 7  THORNTON GROUT FINNIGAN LLP

 8  Suite 3200, 100 Wellington Street West

 9  P.O. Box 329

10  Toronto, ON  M5K 1K7

11  PER: Michael Barrack, Esq.

12       D.J. Miller, Esq.

13       Rebecca Lewis, Esq.

14       Andrea McEwan, Esq.

15       John Finnigan, Esq.

16       Michael Shakra, Esq.

17       D.J. Miller, Esq.

18

19  FOR THE UK PENSION PROTECTION FUND AND NORTEL

20  NETWORKS UK PENSION TRUST LIMITED

21  WILLKIE FARR & GALLAGHER LLP

22  787 Seventh Avenue

23  New York, NY  10019-6099

24  PER: Brian O'Connor, Esq.

25       Sameer Advani, Esq.
```



```
 1        Andrew Hanrahan, Esq.

 2

 3   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 4   NETWORKS UK PENSION TRUST LIMITED

 5   BAYARD, P.A.

 6   222 Delaware Avenue, Suite 900

 7   Wilmington, DE  19899

 8   PER: Charlene D. Davis, Esq.

 9        Justin Alberto, Esq.

10

11   THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER: Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER: Michael J. Riela, Esq.

25
```

 Neeson & Associates    W&F WILSON & FETZER LTD.

```
 1   WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER: John Salmas, Esq.

10        Kenneth Kraft, Esq.

11        Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER: Craig A. Barbarosh, Esq.

18        David A. Crichlow, Esq.

19        Karen B. Dine, Esq.

20

21   LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```



```
 1   Toronto, ON  M5H 3Y4

 2   PER: Edmond F.B. Lamek, Esq.

 3       James Szumski, Esq.

 4

 5   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 6   PATTERSON BELKNAP WEBB & TYLER LLP

 7   1133 Avenue of the Americas

 8   New York, NY  10036

 9   PER: Daniel A. Lowenthal, Esq.

10

11   BOARDS OF DIRECTORS OF NORTEL NETWORKS

12   CORPORATION AND NORTEL NETWORKS LIMITED

13

14   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

15   CORPORATION AND NORTEL NETWORKS LIMITED

16   OSLER HOSKIN AND HARCOURT LLP

17   100 King Street West

18   1 First Canadian Place, Suite 6100

19   P.O. Box 50

20   Toronto, ON  M5X 1B8

21   PER: Lyndon Barnes, Esq.

22       Edward Sellers, Esq.

23       Betsy Putnam, Esq.

24       Adam Hirsh, Esq.

25       Alexander Cobb, Esq.
```



1                    I N D E X

2                   EXAMINATION

3   WITNESS:                                    PAGE

4   RAYMOND ZENKICH

5     Examination-in-Chief/Direct by           4398

6         Ms. Schweitzer

7     Cross-Examination by Mr. Oxford           4412

8     Cross-Examination by Mr. Chang            4425

9     Cross-Examination by Mr. Pultman          4442

10    Re-Examination/Re-Direct by               4476

11        Ms. Schweitzer

12  LAUREEN RYAN

13    Examination-in-Chief/Direct by            4480

14        Mr. Qureshi

15    Cross-Examination by Mr. Maguire          4516

16    Cross-Examination by Mr. Finnigan         4576

17    Cross-Examination by Mr. Steep            4589

18    Re-Examination/Re-Direct by Mr. Qureshi  4611

19                  INDEX OF EXHIBITS

20  NUMBER/DESCRIPTION                          PAGE

21     54   Expert report of Raymond Zenkich    4398

22     55   Expert report of Laureen Ryan       4479

23          dated February 28, 2014,revised

24          April 14, 2014

25



```
 1   --- Upon commencing at 9:39 a.m.
 2                THE US COURT:  Good morning, everyone.
 3   Please be seated.
 4                Good morning, Ms. Schweitzer.
 5                MS. SCHWEITZER:  Good morning, Your
 6   Honor.
 7                THE CANADIAN COURT:  Good morning.
 8   Good morning, Judge Gross.
 9                THE US COURT:  Good morning.  Our
10   witness here is ready to be sworn.
11                THE CANADIAN COURT:  We have got a man
12   on his feet here.
13                MR. CARFAGNINI:  Justice Newbould and
14   Judge Gross, Jay Carfagnini for the Canadian
15   Monitor.
16                THE US COURT:  Good morning.
17                MR. CARFAGNINI:  Good morning, Your
18   Honors.  In accordance with the Courts' direction,
19   the Monitor was to provide the Courts with a brief
20   memorandum on the interest issue and our view as to
21   why it should be heard.  I have that brief memo
22   here to hand up, and my colleagues in Delaware are
23   going to do the same to Judge Gross.
24                THE US COURT:  Mr. Pultman, thank you.
25   Good morning.
```



```
 1                    MR. CARFAGNINI:  Just for the Courts'
 2    information, there are several parties who are in
 3    support of the Monitor's position here, including
 4    the CCC, the UK Pension Trust and EMEA, and I don't
 5    know whether they wanted to speak to this or you
 6    wanted to hear them on it.
 7                    THE CANADIAN COURT:  I don't want to
 8    hear anything at the moment.  I want to consider
 9    your request, and then I want to consider the
10    response by tomorrow morning, and then we will
11    decide whether to schedule it or not.
12                    MR. CARFAGNINI:  I understand that,
13    yes.
14                    THE CANADIAN COURT:  All right.
15                    MR. CARFAGNINI:  Thank you, Your Honor.
16                    THE US COURT:  Thank you.
17                    MR. ZIGLER:  Your Honor, if I may.
18    Good morning, Judge Gross and Your Honor.  Mark
19    Zigler for the CCC.  We are a bit unclear about the
20    direction yesterday in terms of those who support
21    this.  For example, there may be a bit of a
22    condition that we have on it.
23                    Should we be submitting something
24    tomorrow as well in support, or is it your
25    intention to hear people tomorrow?
```



```
 1                    THE CANADIAN COURT:  My own view is
 2    that all I want to hear is from somebody.  If
 3    anybody thinks we shouldn't schedule it, I want to
 4    hear from them, about the same amount of material.
 5                    And I think that is the same with Judge
 6    Gross, is it not, Judge Gross?
 7                    THE US COURT:  That's correct.
 8                    MR. ZIGLER:  So our only position is
 9    that if you schedule it, the whole matter -- this
10    allocation dispute, what is set out in this
11    memorandum and the claims pieces -- all be heard
12    together and that there be one decision from each
13    Court so that we don't play this Ping-Pong game of
14    possible bifurcated litigation.  That is our main
15    concern.  And, of course, without conceding that
16    there is an issue of interest in the United States.
17                    Thank you.
18                    MR. BARRACK:  Sorry.  Just one
19    sentence.  We support -- UKPC supports this, but we
20    do make the note that it is not necessarily
21    inevitable that this issue will come up under some
22    of the allocation methodologies, particularly
23    pro rata.
24                    THE CANADIAN COURT:  Thank you.
25                    MR. LEBLANC:  Good morning, Justice
```



1    Newbould, and good morning, Judge Gross.  Andrew

2    Leblanc of Milbank, Tweed on behalf of the

3    Bondholders.  The only request -- we will file a

4    response tomorrow.  We just received this as I

5    walked into Court.

6              The only request we would make, Your

7    Honor, is that this pleading be filed publicly, at

8    least in Delaware, where that process is typical.

9    There has been some discussion of this yesterday on

10   the record.  There has been a lot of questions

11   asked of us because of that discussion, and there

12   are other parts of this that are not public that I

13   won't talk about.  But I think it would be useful

14   that this document be filed publicly, and we would

15   file -- we would anticipate filing our responsive

16   pleading tomorrow publicly as well.

17             THE US COURT:  I think that's

18   appropriate.

19             THE CANADIAN COURT:  Well, you say

20   there are some things in here that are not on the

21   record?

22             MR. LEBLANC:  No.  I wasn't referring

23   to here.  There have been discussions that were not

24   on the record.

25             THE CANADIAN COURT:  Yes.



```
 1                    MR. LEBLANC:  And I don't want to refer
 2    to those, but I want to limit what is not on the
 3    record to only what should not be on the record.
 4    And we think this submission should be available on
 5    the public record so that our clients and others
 6    can be aware of the submission.  And I think we
 7    would file ours publicly as well.
 8                    THE CANADIAN COURT:  Okay.  Any
 9    opposition to that?
10                    All right.  Then it can be filed in the
11    public record.
12                    THE US COURT:  Very well.
13                    MR. LEBLANC:  Thank you, Your Honor.
14    -- OFF THE RECORD --
15                    THE CANADIAN COURT:  Could you provide
16    a copy to the Registrar.
17                    THE US COURT:  And I assume the
18    Monitor's counsel will do the filing on the record.
19                    MR. PULTMAN:  We will file that this
20    morning on the record, Your Honor.
21                    THE US COURT:  Thank you.  Thank you,
22    Mr. Pultman.
23                    THE CANADIAN COURT:  So it has to be
24    filed.  Not as an exhibit; just to be filed.
25                    MS. SCHWEITZER:  Are we ready to begin
```



```
 1   in Delaware?
 2              THE US COURT:  I think we are ready to
 3   proceed.
 4              THE CANADIAN COURT:  Mr. Zarnett, you
 5   get around.
 6              MS. SCHWEITZER:  Justice Newbould, are
 7   you ready to proceed in Delaware?
 8              THE US COURT:  Very well.  Okay.  We
 9   will have our witness sworn.  Thank you.
10
11   RAYMOND ZENKICH, having first been duly sworn, was
12              examined and testified as follows:
13
14              MS. SCHWEITZER:  Your Honors, for the
15   record, it is Lisa Schweitzer from Cleary Gottlieb
16   for the US Debtors.  The witness is Mr. Raymond
17   Zenkich, and I believe his expert report will be
18   marked as Exhibit 54, Trial Exhibit 54.
19              And, Judge Gross, I am told that you
20   have a copy of the report and the demonstratives in
21   front of you.
22              THE US COURT:  I do.  Thank you.
23              MS. SCHWEITZER:  Mr. Justice Newbould,
24   do you have a copy of the report as well or do you
25   need one handed up?
```



```
 1                    THE CANADIAN COURT:  I do have one.
 2    Thank you, Ms. Schweitzer.
 3                    MS. SCHWEITZER:  Thank you.
 4                    EXHIBIT NO. 54:  Expert report of
 5                    Raymond Zenkich, dated January 24,
 6                    2014.
 7    EXAMINATION-IN-CHIEF/DIRECT EXAMINATION
 8    BY MS. SCHWEITZER:
 9                    Q.   Good morning, Mr. Zenkich.
10                    A.   Good morning.
11                    Q.   You submitted an expert report in
12    this case dated January 24, 2014; is that right?
13                    A.   Yes, I did.
14                    Q.   And have you had a chance to
15    review that report before coming to court today?
16                    A.   Yes.
17                    Q.   Do you wish to make any changes to
18    your report?
19                    A.   No, I do not.
20                    Q.   Can you briefly describe for the
21    Court your professional background, with a focus on
22    your experience that is relevant to the work that
23    you have been asked to do today.
24                    A.   Yes.  I am a cofounding partner
25    for the intellectual property boutique Red Chalk
```

 Neeson & Associates    W&F Wilson & Peterson LTD.

1    Group.  We founded Red Chalk Group eight years ago.

2    We provide a set of very specialized services to

3    large Fortune 100 or 200-size companies, large

4    international global companies.  Most have a

5    telecommunications or high-tech focus.

6              My firm focuses on three primary

7    services:  Consulting services; brokerage services,

8    which would be most relevant, I think, for today's

9    discussion; and then lastly, litigation support.

10             If I can come back to brokerage

11   services for a moment and why I think it is

12   relevant for our discussion today, my experience

13   has been leading transactions that include both

14   buying and selling large patent portfolios in the

15   telecommunications space in the relevant timeframe

16   for our discussion today.

17             In doing that, we use -- in that type

18   of work as well as for other types of engagements

19   we use internal patent experts, technical experts,

20   as well as experts with the requisite experience to

21   help us support our conclusions.

22             In addition to having founded Red Chalk

23   Group eight years ago, I am also an adjunct

24   professor at the Chicago-Kent School of Law.  I

25   help teach a course around global IP management,



1    and the portions of that course that I focus on all

2    relate to patent valuation.

3                  Lastly, I am a member of the Licensing

4    Executive Society, which is an organization focused

5    on intellectual property issues such as licensing

6    and global patent issues.

7                  Q.   What experience do you have with

8    patent portfolios similar in size and scope to

9    Nortel's portfolio?

10                 A.   So my experience has been leading

11   engagements for large patent portfolios in the

12   telecommunications space.  By "large" I am

13   referring to patent portfolios with several

14   thousand patents and applications that have global

15   coverage worldwide.

16                 And leading those teams, it is often

17   our role to help understand the relative strength

18   of assets in the portfolio as well as provide

19   advice around valuations.  And our clients come to

20   us because we are objective and are viewed as a

21   trusted advisor to advise around the issues of

22   valuation and sort of what to do with their patent

23   portfolios.

24                 Q.   Turning to your opinions that you

25   provided in your report, you were asked to provide



 1    three opinions with respect to the work done by

 2    Global IP related to Nortel's patent portfolio.

 3    Can you briefly describe those opinions for the

 4    Court.

 5              A.    Yes.   The first issue related to

 6    the assigned end markets.  And we were asked to

 7    look at the assigned end markets provided by

 8    Global IP Law Group and have an opinion on were the

 9    assigned end markets -- and by "assigned end

10    markets" I mean, for example, wireless, voice or

11    internet -- were those assigned end markets

12    reasonable.

13              To do that I led my team of patent

14    experts and technical experts -- experts who have

15    advanced degrees in the field, oftentimes worked in

16    R&D functions, and had decades of experience in the

17    relevant areas -- and asked them to look at the

18    assigned end market and ask themselves would

19    someone with the requisite experience in this

20    timeframe in this field have agreed with the

21    assigned end market provided by Global IP Law

22    Group.

23              Having led my team and QA'd the work,

24    tested the work, reviewed the conclusions, I

25    determined that the areas of interest identified by



1    Global IP Law Group were reasonable.

2              Q.    And your second conclusion

3    regarding Nortel's patent portfolio?

4              A.    The second conclusion was around

5    levels of interest.  And here we were asked to look

6    at the levels of interest provided by Global IP Law

7    Group and answer the question were those

8    reasonable.

9              To do that we used our team of patent

10   experts and technical experts, experts who we have

11   used on many projects in the past, are very

12   confident in their capabilities, to look at the

13   levels of interest and answer the question are

14   they -- would someone of the requisite experience

15   at this timeframe have viewed them as being

16   reasonable.

17             Our conclusion was that the levels of

18   interest identified by Global IP Law Group were

19   reasonable.

20             Q.    And again, briefly, could you just

21   summarize your third conclusion.

22             A.    Yes.  The third conclusion relates

23   to 31 patent families that had no US counterparts.

24   And the question we were asked to look at was do

25   any of these families have members that were of



1    greater interest than the high-value patents

2    identified by Global IP Law Group; in other words,

3    did they have some higher extraordinary value.

4    Again, using our team of patent experts and

5    technical experts, we looked at that.

6              And one additional element we added was

7    we had to engage technical experts who were

8    bilingual.  So we sought out experts who were

9    fluent in the relevant languages who were also

10   technical experts.  This allowed us to not have to

11   rely on translations, which, in my opinion,

12   oftentimes are not the best basis to reach this

13   kind of conclusion.

14             After engaging my team, leading the

15   effort, testing the output and seeing the

16   conclusions, I concluded that none of the patents

17   had value, any extraordinary value beyond the

18   high-interest patents that Global IP Law Group had

19   identified.

20             Q.   Mr. Zenkich, turning to your

21   opinion regarding the value of Chinese patents, you

22   were also asked to provide an opinion regarding the

23   value of Chinese patents in the open market in the

24   2009-2010 timeframe.  Can you please tell the

25   Courts the opinion you reached with respect to the



```
 1    Chinese patents.
 2                  A.    Yes.  In 2009 to 2010 the market
 3    would have generally ascribed little to no value to
 4    Chinese patents on the open market.
 5                  Q.    What do you base your opinion on?
 6                  A.    My opinion is based on my
 7    experience as a patent broker.
 8                  Having founded Red Chalk Group eight
 9    years ago and to today, I am very involved in
10    patent brokerage; that is, both buying patent
11    portfolios, selling patent portfolios, and helping
12    our clients around a wide set of issues around
13    those topics; for example, valuations and
14    evaluations of the portfolios.
15                  During this timeframe I had led and was
16    involved with large portfolios of
17    telecommunications patents that were being sold in
18    the market.  During that time there was never any
19    interest expressed in the Chinese components of
20    those portfolios.  In other words, we had
21    portfolios of telecommunications patents that were
22    sizable, large transactions, that included assets
23    worldwide.  At no time were the Chinese assets a
24    focus.
25                  Similarly, we have been involved in
```



1   helping clients purchase patent portfolios or

2   patents.  This is oftentimes done for M&A activity

3   or covering future product needs.  In that work,

4   again, we were never asked to identify Chinese

5   assets for purchase.  And again, these are

6   telecommunications-related patents, companies who

7   operated worldwide or globally.  We were not asked

8   to purchase or single out, identify Chinese

9   patents.

10              In addition, I am just simply not aware

11  of patent portfolios coming on the market at this

12  timeframe at all.  So in other words, there were no

13  Chinese patent portfolios being sold around

14  telecommunications patents, and nor were we being

15  asked to bring to market portfolios of that type.

16              So there was, in general, no activity

17  or interest around Chinese assets or patents at

18  this timeframe.

19              Q.   Did anything else -- were there

20  any other considerations that helped you form your

21  opinion?

22              A.   Yes, there were.  As I said,

23  reflecting on this timeframe, 2009-2010, I am very

24  active in sort of the patent community.  Many of

25  our clients are large global companies.  And during



```
 1   this timeframe there were discussions about China.
 2   You know, people were asking questions around --
 3   there were questions around should we be purchasing
 4   Chinese assets, what is going on in China.
 5   Obviously, people know the market in China.
 6             And, you know, my recollection at that
 7   time was there was always a sense of there are
 8   problems, there are issues.  For example, you know,
 9   is it really valuable for me? should I spend money
10   on Chinese patents?  That was, again, sort of the
11   overall sense I had had in talking to my peers in
12   the brokerage community, peers at clients, you
13   know, heads of IP, heads of legal, people handling
14   transactions.  It was a very consistent theme.
15             And in preparing the report, I did try
16   to seek out some better understanding as to why
17   that was the case.  At the time I wasn't reflecting
18   on maybe all of the reasons for it.  But in going
19   back, I was trying to see what was going on.
20             And in particular, there was an article
21   from the US PTO, the United States Patent Office.
22   This came out in 2012, I believe.  And I believe I
23   submitted that with my report.  And if I can just
24   turn to one section of the report which I think
25   really summarizes it quite well, and it is
```



```
 1   consistent with my experience --
 2              MS. SCHWEITZER:  Mr. Zenkich, if you
 3   can pause.  For the Honors' consideration, it is
 4   Exhibit TR50067.  And I can hand up the hard copy.
 5              THE US COURT:  Please.
 6              THE CANADIAN COURT:  Is it referred
 7   to -- it is referred to, is it not?
 8              MS. SCHWEITZER:  The report is referred
 9   to in a footnote, yes.
10              THE CANADIAN COURT:  Right.  Just point
11   that out for us, if you could, please.
12              MS. SCHWEITZER:  Of course, Your Honor.
13              THE US COURT:  Footnote 6, page 9, I
14   believe.
15              MS. SCHWEITZER:  Yes, thank you, Your
16   Honor.  You are quicker than I am.
17              THE US COURT:  Thank you,
18   Ms. Schweitzer.
19              BY MS. SCHWEITZER:
20       Q.   I am sorry for the interruption,
21   Mr. Zenkich.  If you could continue.
22       A.   Yes.  Thank you.
23              On page 7 there is a section entitled
24   "Effectiveness and Enforcement of Remedies."  And I
25   will just read the first sentence and also, I
```



```
1   think, provide some perspective on how the report
2   was prepared.
3             This is the United States Patent Office
4   trying to understand what some of the challenges
5   were in China at this time.  And they sought out
6   comments from participants to get a better
7   perspective.  I think this was a proactive effort
8   on the US PTO's part to improve the patent process
9   in China.  In the very first sentence:
10                 "Commenters raised a number of
11                 concerns with the ability of successful
12                 litigants to obtain and enforce
13                 effective remedies."
14             I am not a patent attorney.  I am not
15   an attorney.  Red Chalk Group doesn't practice law.
16   So I would rely on the experts better than I to
17   really understand the full meaning of "remedies."
18   But later on, the last sentence, I think,
19   summarizes their position:
20                 "Commenters generally raised
21                 concerns with three aspects of China's
22                 system for remedies:  insufficient
23                 monetary damages; overly burdensome
24                 requirements to obtain injunctions; and
25                 difficulty of enforcing awards."
```

Neeson & Associates    W&F

```
 1                    If I reflect on these comments, in my
 2       experience at the time, there were really two
 3       things that were sort of consistent with my
 4       recollection.
 5                    First, damages were low.  These weren't
 6       seen as places where you could recoup a lot of
 7       damages.  I believe the US PTO report cites a cap
 8       of, I believe, $125,000, which, in my experience,
 9       is quite low, at least compared to the US.
10                    Next, injunctive relief is difficult or
11       rare, hard to enforce.  Again, I am not an
12       attorney, but that's consistent with people
13       describing just general difficulties.  And again,
14       that is echoed here in the US PTO report.
15                    So additional information was the US
16       PTO report, which confirmed my experience of the
17       time, 2009-2010, as well as my just general
18       experience in both having participated in
19       conversations with my peers.  I have spoken at
20       conferences around intellectual property, talked
21       about valuation of patents, and also participated
22       in articles that talked about this topic.
23                    Q.   Mr. Zenkich, to go back to page 4
24       of your demonstratives, you also mentioned that
25       there was an absence of nonpracticing entities in
```

```
 1    China.  Can you describe what a nonpracticing

 2    entity is and how that related to your opinion.

 3                    A.   Yes.  Nonpracticing entities, also

 4    referred to as patent trolls, are entities set up,

 5    quite simply, to make money from patents.

 6                    And during this timeframe what was

 7    obvious to me, and sort of in hindsight I think

 8    confirms my point of view, is that there were no

 9    nonpracticing entities that I knew of that were

10    operating in China.

11                    And when I am focusing on nonpracticing

12    entities, I am really talking about ones who, if

13    not nuisance-oriented litigation, in other words,

14    people with patents they think are valuable trying

15    to get license revenue or trying to extract damages

16    from people.

17                    And what that told me was, as in

18    contrast to the US, was there at least weren't

19    people with that mindset actively seeking out or

20    pursuing that business in China.

21                    So that would be the last element, the

22    fact that there were no nonpracticing entities

23    operating in China, sort of the professional,

24    non-nuisance type of practicing entities.

25                    Q.   For the opinion that you are
```



```
 1   offering with respect to the value of Chinese
 2   patents, is that based on your consideration of
 3   Nortel's specific patent portfolio or your
 4   experience in the market at the time?
 5             A.   No.  It is based exclusively on my
 6   experience as a patent broker and being involved in
 7   these issues for a long time.
 8             It is based exclusively on my
 9   experience in being a patent broker and working on
10   these topics around intellectual property for a
11   long time.  We did not look at the Nortel patent
12   portfolio for Chinese patents.
13             Q.   And I know you have already
14   confirmed that you are not a lawyer, so you have
15   saved someone a question in the courtroom.
16             You are also not purporting to offer an
17   expert opinion on the Chinese patent legal system,
18   are you?
19             A.   No, I am not.
20             MS. SCHWEITZER:  I have no further
21   questions.
22             THE US COURT:  All right.  Thank you,
23   Ms. Schweitzer.
24             Mr. Oxford, good morning.
25             MR. OXFORD:  Good morning, Judge Gross.
```



1    Good morning, Justice Newbould.  For the record,

2    Neil Oxford of Hughes Hubbard & Reed for the EMEA

3    Debtors.

4    CROSS-EXAMINATION BY MR. OXFORD:

5                    Q.   Good morning again, Mr. Zenkich.

6    How are you?

7                    A.   Good morning.  Thank you.

8                    Q.   Can we pull up paragraph 22 of

9    Mr. Zenkich's report, please.  Thank you.

10                   Do you have the place, sir?

11                   A.   Yes, I am getting it.  One moment,

12   please.  Yes, I have it.

13                   Q.   It is also on the screen in front

14   of you, if that is easier as well.

15                   So, Mr. Zenkich, this is your report.

16   And the first thing you say in your report about

17   your assessment of Chinese patents is:

18                        "When assessing a patent portfolio

19                   with patents or applications filed in

20                   China (including particularly in the

21                   2009-2010 timeframe) I typically

22                   ascribe little to no value to the

23                   Chinese assets because" -- two reasons.

24                   You go on to say the first reason is

25   "the difficulty of successfully enforcing patent



```
 1    rights in China compared with other jurisdictions."
 2    Do you see that?
 3                    A.   Yes, I do.
 4                    Q.   And that's your opinion, sir?
 5                    A.   Yes, it is.
 6                    Q.   You told the Court in direct about
 7    a US PTO report that you had read.
 8                    A.   That's correct.
 9                    Q.   It is true, though, sir, you don't
10    have any personal experience of enforcing patents
11    in China?
12                    A.   No, I am not -- as I mentioned, I
13    am not an attorney.  I am not a patent attorney in
14    the US or in China.  However, my work does touch on
15    a lot of these issues.  I have clients who are
16    considering enforcement in countries.  And we do
17    support a set of clients in ways that touch on
18    enforcement.
19                    Q.   Okay.  Well, let me try this
20    again.  Is it true, Mr. Zenkich, that you don't
21    have any personal experience in enforcing patents
22    in China; yes or no?
23                    A.   I have not personally pursued
24    enforcement in China of patents.
25                    Q.   So the answer is:  Yes,
```

 Neeson & Associates    W&P

```
 1    Mr. Oxford, I have no personal experience in
 2    enforcing patents in China?
 3                    A.    Yes, that's correct.
 4                    Q.    Okay.  Thank you.
 5                    It is true you have never helped a
 6    client file an enforcement action in China;
 7    correct?
 8                    A.    It is difficult for me to answer.
 9    The work we do -- for example, we might be asked to
10    prepare what is called a technical claim chart for
11    a patent, and that can be used to describe products
12    that potentially could be infringing a patent.
13    That work can result in -- can be used in many ways
14    by our clients.
15                    So I just want to answer your question
16    to acknowledge that, yes, while I have not filed an
17    enforcement action, the work we do oftentimes or
18    can have that type of component to it.  But I would
19    agree with you that I have not personally filed an
20    enforcement action.
21                    Q.    Fair to say, Mr. Zenkich, that the
22    work you have done could have been used in an
23    enforcement action in China, it could not; you,
24    sitting here today, simply have no idea?
25                    A.    No.  I do have an idea.  As I
```



```
 1    said, we do work that is oftentimes used as an

 2    input into enforcement-type activity.  For example,

 3    we might look at a US family member.  That family

 4    member may have counterparts in China, for example,

 5    or other jurisdictions.

 6                I can't sit here today and, for all the

 7    work I have done, hundreds of these types of

 8    activities, I can't articulate which may have been

 9    used for enforcement or not, nor can I, because the

10    work is actually confidential, so I can't talk

11    about that.

12                Q.   Okay.  That's fine.  I will take

13    that.

14                Is it true -- last question on this

15    topic, sir -- that you, Mr. Zenkich, haven't

16    personally been involved in filing an enforcement

17    action anywhere in the world, not just China?

18                A.   I would just echo what I said

19    earlier.  I personally have not, nor has my

20    company.  But because of the work we do, it can be

21    used in many ways.  And one of those ways could, in

22    fact, be to support enforcement action.

23                Q.   Can we pull up paragraph 22 again

24    of Mr. Zenkich's report, please.

25                The second reason you give in your
```



1    report, sir, is because of "the greater risk of

2    Chinese patents being found invalid compared with

3    other jurisdictions."  Do you see that, sir?

4              A.   Yes, I do.

5              Q.   And I take it, in light of your

6    response to Ms. Schweitzer's question this morning

7    about this still being your opinion and you don't

8    have any changes, that is still your opinion today?

9              A.   Yes, it is.

10             Q.   Even though you didn't mention it

11   in your direct examination?

12             A.    I don't believe I mentioned it;

13   that's correct.

14             Q.   So specifically, sir, it is your

15   belief that the significant increase in

16   patent-granting activity over the last ten years

17   has increased the risk that patents may be

18   challenged as invalid, even if granted?

19             A.   May I ask where you are getting

20   the first portion of your statement from?

21             Statement 2 here talks about the

22   greater risk being found invalid compared to other

23   jurisdictions.

24             Q.   Sure.  Can we turn to paragraph

25   30, which is on page 9 of Mr. Zenkich's report.



```
 1                    A.    Thank you.
 2                    Q.    This is the bottom, the sentence
 3      beginning "As a matter," and it turns over the page
 4      to page 10.
 5                          "As a matter of practice, my
 6                    belief" -- my belief -- "is that the
 7                    significant interest in patent granting
 8                    activity in China over the last ten
 9                    years has increased the risk that
10                    patents may be challenged as invalid
11                    even if granted."
12                    Do you see that, sir?
13                    A.    Yes, I do.  Thank you.
14                    Q.    And that refreshes your
15      recollection that that is your opinion?
16                    A.    It sure is.
17                    Q.    It is true, sir, that you, in
18      order to reach this conclusion you have put in this
19      report submitted to both these Courts, you didn't
20      actually analyze any data, did you?
21                    A.    Well, certainly in preparing my
22      report I relied on research.  And again, this
23      research was to confirm what I had experienced
24      during this time.  There were certain reports that
25      I relied on and looked to that certainly talked
```

 Neeson&Associates     W&F WILSON & PEYZER LTD.

```
 1   about the rates of application activity in China

 2   across the different patent types.  And there

 3   certainly has been an increase.

 4            And it was also, I believe, cited in an

 5   article from Chris Bailey, and it is consistent in

 6   general with my recollection of the time, that

 7   while there was a significant increase in

 8   activity -- and I can perhaps touch on some of the

 9   reasons for that -- that the quality was not

10   corresponding.

11            In other words, there was a significant

12   increase in activity.  In some cases, just -- my

13   knowledge is that there is a notion of a utility

14   patent in China.  And a utility patent, in my

15   understanding, does not have the same type of

16   prosecution process as in the US.  That type of

17   patent, there is no tests of novelty, utility or

18   obviousness.

19            So what that meant for me was there was

20   a significant increase in patent activity during

21   this time.  And if that's the case, if there was

22   enforcement action, it led me to believe there may

23   be -- that challenges to those three issues could,

24   in fact, occur.  And in general, my opinion was

25   that that did have an impact on the valuation of
```



1    patents, because if they are of lower quality, at

2    the end of the day, it is really patents that are

3    being infringed, that are valid and infringed that

4    drive quality.

5              So this comment gets to the first,

6    those patents being valid or not.

7              Q.   Let me try again, sir.  And I am

8    going to ask you to focus very closely on my

9    question and see if you can answer my question.

10             Did you perform, sir, any analysis of

11   data in order to reach the conclusion that a

12   significant increase in patent-granting activity in

13   China over the last ten years has increased the

14   risk that patents may be challenged as invalid,

15   even if granted?

16             A.   By "analysis of data," I have

17   certainly reviewed and looked at the work done in

18   the reports I referenced.  But I will acknowledge

19   that I did not independently conduct surveys or

20   seek out patent data, draw my own conclusions

21   around some of this type of activity.

22             So does that answer your question?

23             Q.   Not particularly well, but let me

24   try it this way.

25             It is true, sir, at your deposition you



```
 1    were unable to identify a single instance where a

 2    Chinese patent was found invalid and its US or

 3    European counterpart was not?

 4                A.    Can you repeat the first portion

 5    of your sentence, please, or your question, please.

 6                Q.    Sure.  Is it true, sir, at your

 7    deposition you were unable to identify a single

 8    instance, not one, where a Chinese patent was found

 9    invalid when its US or European counterpart was

10    not?  That is true, is it not, sir?

11                A.    If that was my deposition

12    testimony, I wouldn't disagree with that.

13                Q.    And it is true, sir, you don't

14    know how frequently wireless handset patents are

15    found to be invalid in China?

16                A.    Yes.  I do not know even how that

17    would be calculated, let alone what the number

18    would be.

19                Q.    And you don't know how frequently

20    wireless infrastructure patents are found invalid

21    in China?

22                A.    Again, I wouldn't know how that is

23    calculated or what the number would be.

24                Q.    And that's true for any type of

25    patent that is relevant to the Nortel litigation in
```



1    China, isn't it?

2                  A.    In general, that is true.  I would

3    not know how to calculate that nor what the number

4    would be.

5                  Q.    Last topic, sir.  You told the

6    Court when you were talking about your experience

7    that you were a member of the Licensing Executive

8    Society?

9                  A.    Yes, that's true.

10                 Q.    You have only been involved, have

11   you not, sir, in negotiating a handful of global

12   licenses for intellectual property?

13                 A.    If I recall our exchange at the

14   deposition, I was reflecting on my role in working

15   with large companies around patent sales, both

16   buying and selling.  As I mentioned at the time,

17   those discussions can migrate between an outright

18   sale, can touch on licensing or the perhaps greater

19   attractiveness of licensing.

20                 In terms of the number of transactions,

21   I would agree it was not significant.  It was

22   probably less than ten.

23                 Q.    And you don't recall your

24   involvement in any of those licensing deals with

25   any specificity?



```
 1                    A.   I do with specificity.  However,
 2      that work is confidential.
 3                    Q.   But the one thing you certainly
 4      recall with specificity is that you did not take
 5      the lead in any of those negotiations of those
 6      licensing deals; correct?
 7                    A.   That's true.  However, I would add
 8      a slight nuance to that.  For example, if I am the
 9      person negotiating on behalf of my client, I am the
10      person talking about price, talking about terms,
11      talking about issues.  To the extent that touches
12      on the licensing topic, I was involved.
13                    However, I am not an attorney.  Clearly
14      when the time comes to put pencil to paper, really
15      explore the issues, that's when I am not taking the
16      lead anymore.  I am relying on or my clients are
17      relying on counsel.
18                    Q.   And it is true also, sir, that in
19      those handful of global licensing deals that you
20      were involved in, you don't recall how the royalty
21      rates or fees were structured; correct?
22                    A.   No, that's not correct.  I mean, I
23      don't want to overstate my knowledge or
24      involvement.  But certainly, you know, discussions
25      do come up around what are the royalty rates for
```



```
 1   certain things and is there coverage.
 2              MR. OXFORD:  Mr. Zenkich, can I just
 3   ask you to hold on.
 4              THE US COURT:  I think we have been
 5   disconnected from Canada.  Have you been hearing
 6   all of this, Justice Newbould?
 7              THE CANADIAN COURT:  We are back.
 8              BY MR. OXFORD:
 9         Q.   Okay.  Mr. Zenkich, I wouldn't
10   take it personally.  It may be more to do with me
11   rather than you.
12              Sir, would you like to continue with
13   your answer?  It may be helpful to have the court
14   reporter to read back the last --
15              THE US COURT:  I think that's a good
16   idea.
17              MR. OXFORD:  Thank you.
18              (The court reporter read back as
19              follows:
20                 "Question:  And it is true also,
21              sir, that in those handful of global
22              licensing deals that you were involved
23              in, you don't recall how the royalty
24              rates or fees were structured; correct?
25                 "Answer:  No, that's not correct.
```

```
 1                    I mean, I don't want to overstate my
 2                    knowledge or involvement.  But
 3                    certainly, you know, discussions do
 4                    come up around what are the royalty
 5                    rates for certain things and is there
 6                    coverage.")
 7                    BY MR. OXFORD:
 8                    Q.   Have you finished with that
 9      answer, sir?
10                    A.   Yes, I have.
11                    Q.   Do you remember me asking you at
12      your deposition, sir, whether you recalled any of
13      the specifics of the royalty rates or fees and how
14      they were structured in the deals that you were
15      involved in?
16                    A.   I recall our exchange.  I don't
17      recall the specific points you are referring to.
18                    Q.   And do you recall giving me the
19      answer when I asked you for the details of the
20      royalty rates or the fees, you said, "Sitting here
21      today it is impossible for me to do that."  Do you
22      remember that, sir?
23                    A.   Right.  In reflecting on our
24      exchange at the time -- I have had probably
25      hundreds of client discussions on these type of
```



 1   topics.  And at the time, yes, it wasn't fresh in

 2   my mind.

 3              But certainly since we spoke I

 4   reflected on our conversation and did realize that,

 5   in fact, I was involved in discussions and

 6   certainly talked about things like royalty rates

 7   and jurisdictional coverage.

 8              Q.   And again, the number of deals

 9   that you were involved in where you had such

10   discussions is fewer than ten, sir; correct?

11              A.   That's correct.

12              MR. OXFORD:  Thank you, Mr. Zenkich.

13   Those are all the questions that I have for you at

14   this time.

15              Thank you, Judge Gross.  Thank you,

16   Justice Newbould.

17              THE US COURT:  Thank you, Mr. Oxford.

18              MR. CHANG:  Good morning, Judge Gross.

19   Good morning, Justice Newbould.

20              THE US COURT:  Mr. Chang, good morning.

21   CROSS-EXAMINATION BY MR. CHANG:

22              Q.   Good morning, Mr. Zenkich.

23              A.   Good morning.

24              Q.   I have a few questions to follow

25   up on what my friend Mr. Oxford was asking you

 Neeson&Associates    W&P

1    about.

2                    The first is, just to confirm, you are

3    not here to testify and to be an expert on the

4    enforcement of patents in China, are you?

5                    A.    That's correct.    I am bringing

6    today my experience as a patent broker on large

7    transactions at this time.

8                    Q.    Okay.  And so for paragraph 22 of

9    your report that Mr. Oxford took you to, when you

10   say that you based your opinion on the difficulty

11   of successfully enforcing patent rights in China

12   compared to other jurisdictions, you meant from a

13   market perspective; is that right?

14                   A.    No.  I think the process I had

15   gone through in preparing my report was, I think,

16   first and foremost to reflect on my experience at

17   the time, so understanding my role as a patent

18   broker, buying and selling large patent portfolios,

19   evaluating large portfolios; and then also

20   recognizing that at this time I was having

21   conversations with people, you know:  What is going

22   on in China?  What are some of those issues?

23                   It was then -- and when asked to

24   prepare the report, I reflected on my experience,

25   and then I did think about what some of the



1    underlying reasons could have been.  And certainly

2    one of them is this issue of enforcement, also

3    identified, I believe, by the US PTO report that

4    seemed to confirm that to me.

5                    Q.   All right.  But you are not here

6    to testify today about the difficulties in

7    following the practices and procedures for

8    enforcing a patent in China; is that right?

9                    A.   No, I am not.

10                   Q.   And you are also not here to

11   testify, as I believe you told Mr. Oxford, about

12   the actual chances of successfully enforcing a

13   patent in China?

14                   A.   Well, I would certainly say that I

15   am not an attorney, so I can't provide legal

16   advice.

17                   However, in talking about the chances,

18   I think that that does allow me an opportunity to

19   integrate my experience at the time as well as the

20   research I conducted, especially the US PTO report,

21   to reach that conclusion.

22                   Q.   Okay.  Now, you do have experience

23   generally valuing patents, don't you?

24                   A.   Yes, I do.

25                   Q.   And you would agree with me that

 Neeson&Associates    W&F

```
 1   the value of a patent is typically determined on a
 2   case-by-case basis?
 3             A.   There are certainly -- yes, I
 4   would agree with you on a case-by-case basis.
 5   That's how we would value a patent, yes.
 6             Q.   So when you typically assess the
 7   value of patents, Chinese or otherwise, you would
 8   look at the scope and content of that particular
 9   patent; correct?
10             A.   That is one element we would look
11   at, yes, the scope and content of the patent;
12   correct.
13             Q.   And typically, you would also have
14   technical experts help you with that analysis;
15   right?
16             A.   That is an additional thing we
17   would do, yes.
18             Q.   And here you did not actually look
19   at any of the Chinese patents in the Nortel patent
20   portfolio, did you?
21             A.   That is correct.  And I would add
22   that what I was asked to provide was an opinion on
23   the value -- in my opinion, what the market would
24   have ascribed value to Chinese patents at this
25   time.  And my opinion was little to no value.
```



```
 1                   Q.   You had a team of technical
 2    experts looking at the patents in Nortel's residual
 3    patent portfolio, did you not?
 4                   A.   Yes, we did.  But I would just
 5    clarify that it was to address three questions:
 6    One, around the reasonableness of the area of
 7    interest, the market area of interest; second,
 8    level of interest; and then lastly, the 31 family
 9    members that didn't have US counterparts.
10                   And on the first one -- I apologize --
11    assigned end market was the first area.
12                   Q.   So in the context of the analysis
13    that is on page 3 of your slides, you did have a
14    team of technical experts look at the residual
15    patent portfolio, including the Chinese patents;
16    right?
17                   A.   Your question is regarding page 3?
18                   Q.   Yes, page 3.  This is the Opinions
19    Regarding Nortel's Patent Portfolio, where you were
20    assessing the reasonableness of Global IP's
21    assessment?
22                   A.   Yes, that's true.  So for the 31
23    families, they did, in fact, break out into 39
24    patents and one application.  And if my memory is
25    correct, there were a small number of patents in
```



```
 1   that set that were Chinese.
 2             I would add, however, that our analysis
 3   of those Chinese patents was in the context of were
 4   any of them of greater value than the
 5   highest-interest patents identified by Global IP
 6   Law Group.  It was not an exercise to value any of
 7   those members in the 31 families.
 8             Q.   So you didn't value -- do a
 9   typical valuation analysis of the Chinese patents
10   in the residual patent portfolio because you
11   weren't asked to do that; is that right?
12             A.   That's correct.  Beyond the small
13   handful that were in my Step 3; that's correct.
14             Q.   Now, your opinion that Chinese
15   patents in this timeframe have little to no value,
16   that's not specifically limited to Nortel's Chinese
17   patents -- right? -- the patents in the portfolio,
18   is it?
19             A.   No, it is not.  It was my general
20   experience at the time.
21             Q.   And in fact, it is not limited to
22   telecommunications patents even; right?
23             A.   I would stress that my experience
24   here is around telecommunications and high-tech.
25   It is certainly not pharmaceutical-related.  But on
```



```
 1   a case-by-case basis we could talk about that.
 2              Q.   So let me understand your opinion
 3   then.  So your opinion is telecommunications
 4   patents in this timeframe, based on your brokerage
 5   experience, are of little to no value?  Is that --
 6   am I getting that right?
 7              A.   Yes.  But I do want to stress, I
 8   said telecommunications and high-tech, and that can
 9   include a wide set of technologies.
10              But my general point is high-tech and
11   telecommunications, those are the areas where I
12   personally was involved in both the purchase and
13   sale of patent portfolios and valuations of them.
14              Q.   Now, for the purpose of rendering
15   and creating your opinion, you relied on your own
16   personal work experience; right?
17              A.   That's correct, as well as that of
18   my firm.
19              Q.   You did not canvass other brokers?
20              A.   No, not for my report, no.
21              Q.   And you didn't canvass high-tech
22   companies like IBM, did you?
23              A.   So just to be clear, in
24   preparation of the report, no, I did not do any
25   kind of canvassing or surveying.  But certainly at
```



```
 1   the time, being in the market, I am talking to
 2   companies like IBM or other large companies, peers
 3   at companies, and we are having general discussions
 4   about patents and the patent market that certainly
 5   cover that timeframe and beyond.
 6                Q.   So you also did not look at any
 7   Nortel documents to do your analysis, did you?
 8                A.   I am confused by the "also"
 9   portion of your question.
10                Q.   Well, we have been talking about
11   the things that you didn't do, including that you
12   didn't look at the specific patents in the patent
13   portfolio.  You also didn't look at any Nortel
14   documents about how the patents in the residual
15   patent portfolio were created?
16                A.   Thank you for clarifying.  No, we
17   did not look at any of the history of what Nortel
18   was doing or reasons thereof.
19                Q.   So your analysis didn't take into
20   account any of Nortel's policies for selecting
21   which patents to file in which jurisdiction, did
22   they?
23                A.   No, it did not.
24                Q.   And so it didn't take into account
25   the fact that Nortel was very selective in filing
```



 1    only the top 3 percent most valuable patents in

 2    China, did it?

 3              A.   I am not aware of any of the

 4    reasons for their approach, let alone the one you

 5    just mentioned.

 6              Q.   Okay.  And your analysis also then

 7    did not take into account the review and culling

 8    process that Nortel had in place to cull down its

 9    existing patent portfolio; right?

10              A.   No, it did not.

11              Q.   So your analysis did not take into

12    account the value that Nortel itself saw in the

13    Chinese patents in its patent portfolio; right?

14              A.   Our work didn't touch on Nortel's

15    valuation of its portfolio.  We were focusing on

16    the three questions identified plus a question

17    around my opinion on the value of what the market

18    would bring to Chinese patents at the time, what

19    the market value of the Chinese patents were at the

20    time.

21              Q.   Now, looking at paragraph 32 of

22    your report, this is where you discuss the fact

23    that you are not aware of any nonpracticing

24    entities in China?

25              A.   That's correct.  That's correct.



```
 1                    Q.   And if we look at the top of page

 2    11, part of your basis for that is you believe the

 3    cost of enforcing patents in China in the 2009 to

 4    2010 timeframe was prohibitively high; is that

 5    right?

 6                    A.   Yes.  It is important to note that

 7    this is in the context of nonpracticing entities.

 8    And I would just highlight that from my

 9    perspective, that means companies set up to pursue

10    non-nuisance-oriented-type licensing or damages

11    awards.

12                    So -- and I think the reason why that

13    was prohibitively high is because as an NPE, you

14    are making a cost-benefit analysis.  You are saying

15    I am going to spend X to make Y.  And at times, you

16    know, if your costs, even if they might be low, the

17    rewards may not be high enough or may be too costly

18    to receive those awards ultimately.  So that's why

19    I believe in this portion you have highlighted

20    here.

21                    But yes, the NPEs felt in this

22    timeframe the costs were prohibitively high.

23                    Q.   I am not sure that was the

24    question I asked, but I will move on.

25                    Is it fair to say that your knowledge
```



1    of the cost of taking a case in China from filing

2    through appeal, that knowledge is pretty limited?

3                A.    It is pretty limited.  It is not

4    zero, but it is pretty limited; I would agree.

5                Q.    And I believe at your deposition

6    you said that you believed it was roughly around

7    156,000, based on the article you read; is that

8    right?

9                A.    Can you just clarify what you are

10   referring to for the 156,000?

11               Q.    156,000 for litigation costs

12   associated with enforcing a Chinese patent.

13               A.    I don't recall that portion in the

14   deposition.  I certainly recall having reviewed

15   sort of literature that the costs -- I am sorry --

16   the damages, sort of average damages and caps to

17   damages.  At the moment I can't recall my knowledge

18   of what the cost to litigate or the cost to enforce

19   or what the settlement outcomes were.  I don't

20   recall.

21               Q.    So just to be -- let me ask it a

22   different way.  You are aware that the average cost

23   for patent litigation in the US from filing through

24   trial is $5 million or more; is that right?

25               A.    My understanding, I believe the



```
 1    AIPLA puts out an annual report.  I believe
 2    PricewaterhouseCoopers does as well.  I think there
 3    is, in fact, a range of an average.  And my
 4    knowledge is that that range goes from 2-1/2 to
 5    $3 million up to 5 million and, as you said, even
 6    beyond.
 7              However, I would just add that you
 8    should include the fact that many are settled.  And
 9    so that does, I think, play an important -- or sets
10    a context to consider when looking at the costs.
11              Q.   As far as you are aware, the costs
12    of enforcing a patent in China doesn't approach
13    anywhere near $2 million, does it?
14              A.   I certainly don't have personal
15    knowledge, and I can't recall at the moment what
16    the research on the costs to litigate in China are.
17    I simply don't know.
18              Q.   You mentioned in your direct
19    testimony that there was a cap on the recovery
20    that -- your understanding is that there is a cap
21    on the recovery that you can get in China for
22    enforcing a patent; is that right?
23              A.   Yes, that's correct.  And it comes
24    from at least one source, which I believe is the US
25    PTO article.  And I think it may also be mentioned
```



1    in another article.  But I believe the damages was

2    around $125,000, and it was a cap.  And I believe

3    the cap was on lost profit, if I am not mistaken.

4                Q.   Okay.  So I am going to bring up

5    on the screen a trial exhibit, Exhibit TR50994.

6    And I can have copies distributed.  It is a

7    one-page article, so we can probably also view it

8    on the screen.

9                MS. SCHWEITZER:  If you could give the

10   witness a copy, that would be helpful.

11               MR. CHANG:  Yes, I will.

12               THE WITNESS:  Thank you.

13               BY MR. CHANG:

14               Q.   Sir, for context, this is an

15   article from "China Daily," and the title is "Zonda

16   Loses Case to German Company."

17               Do you see that in this case in

18   paragraph No. 2 the Chinese company was ordered to

19   pay the German company $3 million US?

20               A.   Yes, I do.

21               Q.   So it is not your testimony that

22   patent damages in China are actually limited to

23   less than $125,000 US; right?

24               A.   Well, certainly the article you

25   are showing me has an amount of $3 million.  My



1    testimony was around a cap.  And I believe that cap
2    was attached to lost profits.
3              So I don't know what the components of
4    this $3 million are, but certainly I agree that
5    this is an example.  Obviously, the difficulty is
6    in trying to generalize beyond this example.
7              Q.   Do you, in fact, know whether that
8    cap is simply a presumptive cap and that can be
9    overcome by showing additional evidence or whether
10   it is actually a statutory cap that limits all lost
11   profits claims?
12             A.   So I am not an attorney in China.
13   As I recall the various articles, they mention the
14   term "cap."  Obviously, there may be ways to appeal
15   or go beyond that.
16             But I would just reference the article
17   of the US PTO, and I believe Chris Bailey mentioned
18   a notion of a cap.  And I would refer to,
19   obviously, the laws in China to explain what that
20   cap may or may not be.
21             Q.   So you don't actually know what
22   the requirements and the details and the effect of
23   that cap actually is, do you?
24             A.   Well, the effect of the cap, I
25   think, is captured in the US PTO report.  And I

 Neeson&Associates    W&F

1   believe, as I mentioned earlier, that cap does have

2   an influence on the perception of what remedies are

3   available in China.

4               Q.   You are aware that patent damages

5   awards in China have exceeded -- have been in the

6   millions of dollars; right?  This isn't the only

7   example where that is true, is it?

8               A.   I wouldn't be surprised if there

9   were other examples.  There may be other examples.

10  I am certainly trying to make a general observation

11  of the market at a point in time.

12              Q.   And you are also aware that

13  multinational companies have consistently been

14  filing greater and greater numbers of patents in

15  China; correct?

16              A.   I am aware of that fact.  I am

17  also aware of the fact that there are many reasons

18  behind that increase.

19              Q.   You mentioned that there is a

20  difference between utility -- you mentioned that,

21  in response to some questions by Mr. Oxford,

22  utility patents in China.  Do you recall that?

23              A.   Yes, I do.

24              Q.   You understand that there are more

25  than one type of patent in China; right?

 Neeson&Associates   W&F

1                    A.    Yes.  And again, I am not a

2    Chinese patent attorney, but my knowledge is that

3    there are design patents equivalent to design

4    patents in the US, utility patents and inventive

5    patents.

6                    Q.    And invention patents are actually

7    examined before they are issued in China?

8                    A.    My understanding is that an

9    inventive patent has a closest analogy to a US

10   utility patent, and that, I believe, is the case.

11   In fact, there is some examination process looking

12   at things like novelty, but again, I am not an

13   expert on that.

14                   Q.    And the type of patent you were

15   referring to when you were saying that these were

16   being invalidated in greater numbers, that was a

17   utility patent, which is, in fact, not examined by

18   the Chinese Patent Office before it is issued;

19   right?

20                   A.    I don't believe my answer was

21   limited to utility patents.  I was clarifying that

22   there certainly is a growth, and that growth

23   certainly incorporates utility and inventive.

24                   I do believe that a large component of

25   that growth was, in fact, the utility patents,



1    given their lower examination process, less

2    examination.

3                Q.   And you aren't here today as an

4    expert in how to invalidate a Chinese invention

5    patent, are you?

6                A.   I am certainly not an expert on

7    Chinese patent law or how to invalidate Chinese

8    patents.  However, to the extent that my extensive

9    experience in the US and my knowledge on the

10   validation of US patents, to the extent that is an

11   analogy to China, I would say it would apply.

12   However, I would acknowledge that I am not an

13   expert on how to invalidate Chinese patents.

14               Q.   And you did not evaluate for the

15   Chinese patents in Nortel's patent portfolio

16   whether they were all invention patents and whether

17   those invention patents were, in fact, valid and

18   enforceable, did you?

19               A.   No.  We did no analysis of that

20   type of the Nortel patents.

21               MR. CHANG:  Okay.  Thank you.  No

22   further questions.

23               THE US COURT:  Thank you, Mr. Chang.

24               MR. PULTMAN:  Good morning, Your Honor.

25   Good morning, Justice Newbould.



```
 1    CROSS-EXAMINATION BY MR. PULTMAN:

 2                Q.   Mr. Zenkich, my name is Jacob

 3    Pultman.  I am here for the Canadian Monitor.  I

 4    have a series of questions for you.

 5                A.   Good morning.

 6                Q.   You started by telling us you had

 7    four opinions that you were offering today; is that

 8    correct?

 9                A.   That's correct.

10                Q.   And three of the opinions were

11    captured on slide No. 3.  If I can pull up slide

12    No. 3 of your presentation.  Those are the three

13    opinions that you have offered to start?

14                A.   Yes.  And they are also all

15    reflected in my report; that's correct.

16                Q.   And it is, in fact, word for word

17    of Section 3(b), (c) and (d) of your report, isn't

18    it?

19                A.   I am going to accept that as the

20    case.  But yes, it is meant to do that.

21                Q.   And in your report you state that

22    the opinions you give on these subjects are based

23    on your experience in intellectual property

24    consulting, intellectual property brokerage, and

25    your review of the documents that you identify in
```



```
 1    Appendix B.  And that's in paragraph 4 of your
 2    report.  I can call that up if that will assist
 3    you.
 4                 A.   I believe that's accurate.
 5                 Q.   And also in your report you
 6    distinguish between two kinds of ways that someone
 7    can assess the value of an intellectual property
 8    portfolio.  You talk about an automated approach
 9    and a manual approach.  Do you recall that?
10                 A.   Yes, I do.
11                 Q.   And in paragraph 11 of your report
12    you talk about how the automated approach looks at
13    bibliographic information and various, I will call
14    it objective facts and information.  Do you recall
15    that?
16                 A.   If I may just look at the
17    paragraph briefly.
18                 Q.   Absolutely.  And we will pull up
19    paragraph 11 of your report.
20                 A.   Yes, I see it.  Thank you.
21                 Q.   And that talks about the automated
22    approach using bibliographic information from the
23    patents, such as forward citations and the like.
24                 A.   That's correct.
25                 Q.   But you also referred to a second
```



```
 1   approach -- isn't that right? -- in paragraph 12?
 2              A.   Yes, the "eyes on patent"
 3   approach.
 4              Q.   And you call that both the manual
 5   or the "eyes on patent" approach?
 6              A.   Yes, that's correct.
 7              Q.   And you prefer that approach;
 8   isn't that right?
 9              A.   Yes.  And I would just add that my
10   preference is based on having had extensive
11   experience with both.
12              Q.   And you believe that an eyes-on
13   approach is the most effective and thorough way of
14   identifying patents with the greatest external
15   value.  That's what you said in your report?
16              A.   Yes, that is certainly true.  And
17   based on my experience and others in the industry,
18   I think most would agree that having an expert
19   knowledgeable in the field look at the patent, look
20   at the claims, reflect on that impact in the
21   market, that that is, in fact, the most effective
22   and thorough way.
23              Q.   And for purposes of the first
24   three opinions that you gave here today, the ones
25   that we just pulled up on the chart, the ones
```



1    contained in 3(b), 3(c) and 3(d) of your report,

2    you used the manual eyes-on-patents approach; is

3    that right?

4              A.   Yes.  And I would simply add, in

5    the context of what we were asked to answer;

6    correct.

7              Q.   Okay.  Always in the context of

8    the question that was posed to you; isn't that

9    right?

10              A.   Yes.

11              Q.   Whatever the request was from

12    counsel for the US?

13              A.   That's correct.

14              Q.   So in doing that, you took the

15    eyes-on-patent approach, and Red Chalk, your

16    company, did an eyes on the patents in the

17    portfolio; is that right?

18              A.   That's correct.

19              Q.   Now, when we say Red Chalk did it,

20    we don't mean you personally; isn't that right?

21              A.   No, not at all.

22              Q.   And when you say "not at all," it

23    means you didn't do any of that?

24              A.   No.  I would like to answer the

25    question.



```
 1                    By doing the eyes-on-patent approach, I

 2     have a team, a team of patent experts and technical

 3     experts.  I myself have done this work for many

 4     years.  I know how to do it.  I myself read patents

 5     and read claims and draw opinions on them, not

 6     legal opinions, but I draw opinions on them as a

 7     technical expert.

 8                    So to answer your question, I had my

 9     team of patent experts, some of which are patent

10     agents, and technical experts look at the patents

11     under my direction.  And in some cases I also

12     looked at some of the patents just to, as good

13     practice, QA the work:  Understand the work,

14     understand what was going on so I can draw a

15     conclusion.

16                    Q.   But it is fair to say that the

17     thousands of patents that were reviewed here were

18     done by 13 specialists that you brought into Red

19     Chalk; isn't that right?

20                    A.   No, it is not.  As I said, my

21     team, including myself and internal Red Chalk Group

22     experts as well as the 13 experts you mentioned --

23     experts who, I might add, are people we often work

24     with very regularly, people who have advanced

25     degrees in R&D functions, decades of experience,
```



```
 1   people who are familiar with patents, people whose
 2   opinions I trust -- assisted.
 3            And at the end of the day, it was me
 4   reviewing the results, talking to the experts,
 5   talking to my team, drawing the ultimate
 6   conclusion.
 7            Q.   And if I can pull up paragraph 36
 8   of your report.  We will take a look to answer the
 9   first of the questions we looked at today who
10   actually did the work.
11            And this is with respect to the
12   question of the reasonableness of the assigned end
13   markets.  Do you see that?
14            A.   Yes, I do.
15            Q.   And for purposes of the
16   reasonableness of the assigned end markets, in
17   paragraph 36 in your report you say, "To do this I
18   relied on technical experts as I would for any
19   evaluation of patents and applications."  And then
20   you go on to describe the valuable role that they
21   play; isn't that right?
22            A.   That's correct.
23            Q.   And that was correct at the time
24   you signed it and it is correct today?
25            A.   And I would simply clarify that's
```



 1   a supporting role; correct.

 2                  Q.   And these specialists -- you

 3   describe them as having decades of technical

 4   experience in wired, wireless telecommunications,

 5   internet technologies and the like -- they also did

 6   the work to answer the second of your questions;

 7   isn't that right?

 8                  A.   That's correct.

 9                  Q.   And they did the work to answer

10   the third question as well; isn't that right?

11                  A.   Just to reiterate my earlier

12   comment, they play a supporting role under my

13   direction.  So it is technical experts, patent

14   experts and myself.

15                  Q.   Now, none of the 13 technical

16   experts are actually employees of Red Chalk, are

17   they?

18                  A.   Give me one moment to reflect on

19   that.  They are certainly all engaged on a variable

20   basis.  So if by not being an employee that answers

21   your question, that's how I would answer it.

22                  Q.   So it is fair to say that not a

23   one of the 13 is a regular, full-time employee of

24   Red Chalk?

25                  A.   Give me a moment to reflect on all



```
 1    of them, please.

 2                 Q.   Sure.

 3                 A.   None of them is currently a Red

 4    Chalk Group employee; that's correct.

 5                 Q.   And we don't have within your

 6    report the credentials for any of the 13, do we?

 7                 A.   I don't recall.  And I believe in

 8    the paragraph you have mentioned I certainly allude

 9    to a lot of their qualifications.  And I would

10    simply add that these are people we work with quite

11    regularly, so I am very confident of their

12    capabilities and skill sets.

13                 Q.   I am sure you are confident.  My

14    question is not whether you allude to them, but do

15    you provide us with their credentials.  So let me

16    ask you specifically, is their education anywhere

17    in your report?

18                 A.   I am going to refer to the

19    relevant section of my report, if you don't mind.

20                 Q.   Take your time.

21                 A.   This does not -- I am referring to

22    paragraph 36, the second half, as well as 38.

23                 I would acknowledge that I am not

24    giving a specific person's name, but I will say I

25    am looking at paragraph 36, starting with "Many of
```


Neeson&Associates    W&P

1    the experts."  And you may have read this, but I

2    will just repeat it, if you don't mind.

3                    Q.   Oh, I have read it, yes.  But

4    right go ahead.

5                    A.   I will repeat it:

6                         "Many of the experts we engage on

7                         projects have advanced degrees in their

8                         technical fields and have practiced

9                         their expertise in the relevant

10                        industry, quite often in R&D functions.

11                        Some also hold patents in their fields

12                        of expertise.  The technical experts we

13                        engage are also very familiar with

14                        patents, patent language conventions,

15                        and the overall evolution of the

16                        technology and its patent landscape."

17                        For these reasons, in paragraph 37, I

18    reiterate that it is consistent with our consulting

19    work.

20                        So I would acknowledge in paragraph 36

21    I am not giving a name and sort of a degree, but I

22    think I tried to paraphrase or summarize experience

23    in paragraph 36.

24                    Q.   Is it fair to say I don't have the

25    names of any of these 13 people in your report?

```
 1                    A.   Yes, it is.
 2                    Q.   Is it fair to say I don't have the
 3   degrees that they hold, what schools they went to,
 4   what technical background they have, what
 5   publications they have made, what professional
 6   associations they have?  I don't have any of that
 7   in your report, do I?
 8                    A.   I would agree with that.  I would
 9   reiterate that I am very comfortable with their
10   backgrounds and have been throughout my years in
11   doing this kind of work.
12                    Q.   To your knowledge, have any of
13   those 13 technical specialists been deposed in this
14   case?
15                    A.   To my knowledge, no.  I do recall,
16   obviously, in the early stages of our work making
17   sure there were no issues with the work they have
18   done.  But that's the extent of my knowledge.
19                    Q.   But my question was a simple one
20   relating to depositions.  Have any of them been
21   deposed in this case?
22                    A.   I don't believe so, no.
23                    Q.   Have any of them testified at
24   trial in this case?
25                    A.   I don't believe so, no.
```

Neeson & Associates   W&F

```
 1                    Q.   To your knowledge, has any one of
 2      them provided a certification to the Court of their
 3      understanding of their duties?
 4                    A.   Into this case?
 5                    Q.   Yes.
 6                    A.   I don't believe so.  I am just
 7      hesitating because I know they had signed certain
 8      agreements, and I just don't -- I am not an
 9      attorney, so I don't recall exactly what they were.
10      But I believe it was something for the Court, if I
11      am not mistaken.
12                    Q.   Well, let me show you your
13      certification in this case, which is in your expert
14      report, and I can pull that up on the screen.
15                    And that's the Acknowledgment of
16      Expert's Duty that you see before you on the screen
17      that is on page 18 to 19.  Do you see that?
18                    A.   I see that on the screen, yes.
19                    Q.   And you filled out an
20      Acknowledgment of Expert's Duty in this case;
21      right?
22                    A.   Yes, I did.
23                    Q.   Do you know, sitting here today,
24      whether any of the 13 technical specialists you
25      have talked about have signed a similar form?
```



```
 1                    A.   I don't recall, but I do recall --
 2                    THE CANADIAN COURT:  These forms are
 3     signed under our rules for an expert report, for an
 4     expert to sign when an expert report has been
 5     provided.  You know that such 13 persons haven't
 6     filed expert reports.
 7                    MR. PULTMAN:  I certainly do.
 8                    THE CANADIAN COURT:  You know there
 9     would be no such -- I don't know why we are taking
10     time on this.
11                    MR. PULTMAN:  I appreciate, Your Honor.
12     There was a motion that was made with respect to
13     this witness' testimony and the basis of it.  I am
14     happy, Your Honor, to cut to the chase with it.
15                    The reason why I am testing the
16     underlying basis and foundation of this expert's
17     report is because this expert is giving a report
18     based on other people who are not here.  And on
19     that basis I am entitled to test --
20                    THE CANADIAN COURT:  Well, don't we
21     know they are not here?
22                    MR. PULTMAN:  We certainly do.
23                    THE CANADIAN COURT:  Don't we know they
24     haven't filed an expert report?  Don't we know they
25     haven't been deposed?
```



1              MR. PULTMAN:  I believe I know it.  I

2    haven't heard the witness yet be very sure about

3    it.  I believe as long as the Court knows it, I am

4    happy to move on.

5              MS. SCHWEITZER:  Your Honors, I don't

6    want to belabor this.  I think there have been very

7    loose statements for the record today.

8              Mr. Pultman hasn't made a motion.  The

9    motion that was made was with respect to Chinese

10   opinions, not the three opinions that he is

11   cross-examining on.  And as Justice Newbould has

12   said, no other witness has been cross-examined with

13   respect to which consultants they relied on and

14   expert resumes of their consulting team.

15             So I am happy to allow Mr. Pultman to

16   continue if the Courts think it is wise, but I

17   think this has gone way beyond the purpose or scope

18   of his report or proper examination of this type of

19   witness.

20             MR. PULTMAN:  I am happy to move to the

21   question of Mr. Zenkich's own expertise, to the

22   extent that he has some.

23             THE US COURT:  Why don't we do that.

24             BY MR. PULTMAN:

25             Q.   Okay.  Now, you have told us you

 Neeson&Associates    W&F

```
1   are not a lawyer.  You have told us you are not a
2   patent lawyer.  Is it fair to say you are not a
3   patent agent also?
4                   A.    That's very clear.  I am not a
5   patent agent.
6                   Q.    And even though you have a
7   master's degree in engineering, you are not
8   licensed anywhere as an engineer, are you?
9                   A.    I am not familiar with the
10  licensing sort of process around engineers.  I
11  certainly have an engineering background, and I use
12  that in my sort of work at Red Chalk Group.
13                  I would acknowledge that, you know,
14  while I was a software engineer, a database
15  engineer, I don't know what the licensing process
16  may or may not have been.  That's the only reason I
17  want to clarify my answer to your question.
18                  Q.    Do you live in the State of
19  Illinois?
20                  A.    That's correct.
21                  Q.    Has the State of Illinois licensed
22  you as an engineer?
23                  A.    To my knowledge, no.
24                  Q.    Are you licensed as a valuator by
25  the State of Illinois?
```

 Neeson & Associates   W&F

```
1              A.   To my knowledge, no.

2              Q.   Are you licensed in any other

3   state in the United States as a valuator?

4              A.   To my knowledge, no.

5              Q.   Have you ever testified previously

6   as an expert witness in any court?

7              A.   No, I have not.

8              Q.   Not in the United States and not

9   in Canada?

10             A.   No, I have not.

11             Q.   Let me ask you about -- you are

12  not an accountant either, by the way?

13             A.   If you are asking if I am a

14  certified public accountant, no, I am not.  But I

15  do have some knowledge of accounting.

16             Q.   My question wasn't whether you

17  have knowledge of accounting.  It was a direct

18  question.  Are you an accountant, sir?

19             A.   Could you help me understand what

20  you mean by "accountant," please?

21             Q.   Do you have any degrees in

22  accounting?

23             A.   I do not have any degrees in

24  accounting.

25             Q.   Have you been licensed to practice
```



```
 1    in the field of accounting?

 2              A.    No, I have not.

 3              Q.    Now, I would like to turn you to

 4    the question of China, because you have given a

 5    good amount of testimony today on China.  And in

 6    particular, you have told us that with respect to

 7    enforcement of patents, you don't have personal

 8    experience, but you spoke with respect to the

 9    availability of injunctions in China with respect

10    to patents.  Do you recall that?

11              A.    Yes, I do.

12              Q.    And in particular, you are of the

13    view that injunctions are rarely granted in China

14    for patent cases.

15              A.    Yes.  And I would simply add that

16    my view is informed by research -- for example, the

17    US PTO report -- and my experience in talking to

18    professionals who are attorneys and have much more

19    sort of knowledge and experience than I do.

20              Q.    Well, let's turn to that.  You

21    gave us in your expert report a list of the

22    materials that you relied on at Appendix B, I

23    believe.  Do you recall that?

24              A.    Yes.  I will just turn to that

25    appendix, if you don't mind.
```



 1                    Q.   Please.  We will pull it up for

 2   you.  And if we can pull up the public documents.

 3                    And you see there are a list of public

 4   documents that you rely on?

 5                    A.   Yes, I see the list.

 6                    Q.   Okay.  And in particular there is

 7   a document that I am going to show you which you

 8   did cite to in your report, and that is the second

 9   document on the list.  It is the EU-China IPR.

10                    A.   Yes.

11                    Q.   That's Exhibit TR50244.

12                    Now, if I can turn you first to page --

13   we are going to pass out copies to everyone in the

14   courtroom.

15                    A.   Thank you.  Thank you.

16                    Q.   And then we will turn you to page

17   5 of the document.

18                    Mr. Zenkich, do you have the document

19   in hand?

20                    A.   Yes, I have it.  Thank you.

21                    Q.   And on the fifth page, under the

22   overview at the very bottom there, there is a

23   paragraph that I am going to blow up and then read

24   to you where it says, "From an international

25   perspective."  And it indicates:

 Neeson & Associates    W&F

```
 1                    "From an international

 2                    perspective, many basic concepts of

 3                    Chinese patent law are similar to the

 4                    German or European patent system.

 5                    However, many important legal questions

 6                    are still not codified in the patent

 7                    law, resulting in some legal

 8                    uncertainties."

 9                    Do you see that?

10          A.   I do.  Could you help me, where on

11   page 5 that is?

12          Q.   That is at the very bottom of the

13   left-hand column under the Words "Overview."  It is

14   actually -- my apologies.  Page 5 is of the pdf

15   version of this.  So it will say page 2, I believe.

16          A.   Thank you.  I am going to look for

17   it.

18          Q.   No.  I am sorry.  Page 3.

19          A.   Page 3?

20          Q.   Yes.

21          A.   I see it now.  If you don't mind,

22   I want to look at the context it was given in.

23          Q.   Please.

24          A.   Thank you.  (Pause)

25          Yes, thank you.
```



```
 1                   Q.   Now, this part of the document
 2   where it indicates that Chinese patent law, basic
 3   concepts are similar to German or European patent
 4   systems, you are familiar with that, aren't you?
 5                   A.   That portion of your question I
 6   just want to be clear on.  Certainly I can read
 7   what this here says.  I am not familiar with German
 8   or European patent systems.  I am not a patent
 9   attorney or an agent in either country.
10                   Q.   Well, don't you cite to this
11   document as a document you relied on in preparing
12   your report?
13                   A.   Yes, I certainly cite to it as a
14   document in my report.  I am not purporting to be a
15   German or a European patent expert.
16                   Q.   Sure.  But my only question was:
17   Did you, in fact, cite to this specific provision
18   within your report, to your recollection, sitting
19   here today?
20                   A.   I know there were two ways we
21   referenced this document, and I would just refer to
22   my report to get the accurate description thereof.
23   Sitting here right now, not taking the time to look
24   through my report in more detail in the footnotes,
25   I couldn't answer your question.
```



```
 1                    Q.   Well, let me ask you about two
 2      things that you did not reference in your report.
 3      One is the following paragraph, also on that same
 4      page; in particular, the final sentence there,
 5      which indicates that:
 6                         "The major cities, in particular
 7                         Beijing, Shanghai and Guangzhou, can be
 8                         considered as a reliable forum for
 9                         patent infringement actions."  Do you
10                         see that?
11                    A.   Yes, I do.
12                    Q.   And did you ever have any
13      conversations with the authors of this report from
14      Bird & Bird about that statement?
15                    A.   No, I did not.
16                    Q.   Did you have any conversations
17      with them about the provision that is on the
18      page 11 of this document with respect to interim
19      relief?
20                    THE CANADIAN COURT:  Can you bring that
21      last paragraph up again.
22                    MR. PULTMAN:  Apologies, Your Honor.
23                    THE CANADIAN COURT:  I was making a
24      note from that last paragraph.
25                    MR. PULTMAN:  We will bring that back
```

Neeson&Associates    W&F    WILSON & PETERS LTD.

```
 1    up first.
 2                THE CANADIAN COURT:  Thank you.
 3                BY MR. PULTMAN:
 4                Q.   And we are going to turn to
 5    page 11 of the report, of the document, under the
 6    section "Interim Relief" in the right-hand column.
 7    And we will blow that up so you can see it as well.
 8                A.   Thank you.
 9                Q.   And it indicates:
10                     "As mentioned above the plaintiff
11                     can request the People's Court to stop
12                     infringing acts immediately, preventing
13                     losses before and during the lawsuit.
14                     This is called a 'preliminary
15                     injunction.'  Preliminary injunctions
16                     will usually be granted by the court
17                     providing the plaintiff can furnish
18                     evidence strongly supporting his claim
19                     that:  (1) his lawful rights are being
20                     infringed or the infringement is
21                     imminent," and then a parenthetical.
22                     And then "(2) the infringement will
23                     result in irreparable damage to the
24                     patent or rights holder."
25                     Do you see that?
```



 1                     A.   Yes, I do see that.  And I would
 2     add that obviously this is a view of the legal
 3     system in China.  My report, in relying on this and
 4     other documents, was to provide an opinion on the
 5     value of Chinese patents at this time.
 6                     I would simply acknowledge that even
 7     the US PTO used the word "problems" in describing
 8     the patent system in China.
 9                     Q.   Yes.  And my question to you was
10     whether you saw the provision within the article
11     that you relied on that indicated that interim
12     relief -- specifically, preliminary injunctions --
13     with respect to infringement are available and they
14     will usually be granted by the court with this
15     showing.
16                     A.   Yes.  So I read this article in
17     its entirety.  And after reading this article and
18     the others and relying on my experience, my overall
19     view is the opinion I expressed before.
20                     Q.   And in expressing that overall
21     view, you didn't point the Courts to this provision
22     with respect to preliminary injunctions, did you?
23                     A.   Well, I certainly provided the
24     whole article.  That's important, to provide the
25     whole article.  And I used this information to

 Neeson & Associates   W&P

```
 1    inform my opinion.
 2              Q.   Are you familiar with the
 3    standards for obtaining preliminary injunctions in
 4    the United States?
 5              A.   No, I am not.
 6              Q.   So you are not familiar with the
 7    likelihood of success on the merits and irreparable
 8    injury?
 9              A.   I am not an attorney.  I have
10    heard these terms.  I have vaguely seen and heard
11    them.  But no, I am not an expert.
12              Q.   And you are not familiar with the
13    posting of a bond, a requirement within the Third
14    Circuit, for example?
15              A.   I do have some limited knowledge
16    of bond requirements.
17              Q.   And do you know in what ways the
18    posting of a bond for obtaining an injunction is
19    different in China than it is in the United States?
20              A.   No, not at all.
21              MR. PULTMAN:  If Your Honors would care
22    to take the morning break -- I have probably about
23    ten more minutes of questioning.  I can go through
24    it now or take the morning break.  I am at your
25    disposal.
```



```
 1                    THE CANADIAN COURT:  I will leave it up
 2   to Judge Gross.  I am quite happy to.
 3                    THE US COURT:  Let's take a 15-minute
 4   break at this time, and we will come back and
 5   complete the testimony.
 6                    MR. PULTMAN:  Thank you, Your Honor.
 7                    THE US COURT:  Thank you, all.
 8   -- RECESS AT 10:57 a.m. --
 9   -- UPON RESUMING AT 11:22 a.m. --
10                    THE US COURT:  Please be seated,
11   everyone.
12                    Mr. Pultman, when you are ready, sir.
13                    MR. PULTMAN:  Thank you, Your Honor.
14                    BY MR. PULTMAN:
15                    Q.  Mr. Zenkich, the offices of Red --
16                    THE CANADIAN COURT:  Just before you
17   start --
18                    MR. PULTMAN:  Apologies.
19                    THE CANADIAN COURT:  -- it is all a
20   blank, a black blank.
21                    MR. PULTMAN:  I hope you are not
22   talking about me.
23
24                    THE CANADIAN COURT:  Perfect.  Thank
25   you.
```



```
 1                    BY MR. PULTMAN:

 2                    Q.   Mr. Zenkich, Red Chalk has offices

 3      in Chicago, Illinois?

 4                    A.   That's correct.

 5                    Q.   And are there other offices that

 6      Red Chalk has?

 7                    A.   No.  I would describe it as we

 8      have a representative office in Tokyo, in Germany.

 9      In the past we had Regus base there, but by no

10      means are they offices.  They are really just

11      representative offices for us.

12                    Q.   And you have described those as

13      virtual offices?

14                    A.   Yes.  Phone numbers, basically.

15                    Q.   Is there any Red Chalk office in

16      China?

17                    A.   No, there is not.

18                    Q.   Has there ever been a Red Chalk

19      office in China?

20                    A.   No.

21                    Q.   Have you ever lived in China?

22                    A.   No.

23                    Q.   Worked in China?

24                    A.   No.

25                    Q.   You don't speak Mandarin?
```



```
 1                    A.    No, I do not.

 2                    Q.    You don't speak Cantonese?

 3                    A.    No, I do not.

 4                    Q.    Publications.  I am going to ask

 5    you briefly about those.  You have on your list of

 6    publications two publications that you have

 7    contributed to.  Do you recall that?

 8                    A.    Yes, I do.

 9                    Q.    Okay.  One is an article entitled

10    "Unraveling the Mystery of IT Costs" from 2005. Do

11    you recall that publication?

12                    A.    Yes, I do.

13                    Q.    And that is something that you

14    cowrote with others at McKinsey?

15                    A.    That's correct.

16                    Q.    And it was originally an internal

17    McKinsey article?

18                    A.    I am not sure how to describe it

19    as internal or not.  Basically, McKinsey produces

20    material that is shared with clients in various

21    forms.  I believe it was published in the "McKinsey

22    Quarterly," in the "McKinsey on IT" and then

23    republished elsewhere.  But I can't really be exact

24    on where it may have been published or not.

25                    Q.    But the subject matter you know.
```



1    That is about IT cost savings?

2                    A.    Yes, that's true.

3                    Q.    And it has nothing to do with

4    intellectual property?

5                    A.    That's correct.

6                    Q.    And nothing to do with China?

7                    A.    Well, I am sure IT cost issues

8    would translate to China, but the article was not

9    written with China in mind.

10                    Q.    And the other publication that you

11    have listed is an article entitled "China's

12    Emerging Patent Trading Market" in July and August

13    of 2011. I can pull that up.  It is Exhibit

14    TR50068.  And it should be on the screen in front

15    of you, and we will hand out copies as well.

16                    A.    Thank you.

17                    Q.    And this is an article by a

18    Mr. Chris Bailey; is that right?

19                    A.    That's correct.

20                    Q.    And you contributed to this

21    article but you didn't write the article?

22                    A.    That's correct.

23                    Q.    And you were interviewed a couple

24    of times by Mr. Bailey in connection with it?

25                    A.    That's correct.



```
 1                    Q.   And in fact, you are quoted within
 2      the article?
 3                    A.   That's -- I am not sure if it is a
 4      quote or paraphrasing.  But I know he mentions my
 5      name in the article.
 6                    Q.   But you are not the only patent
 7      broker that is mentioned in the article, are you?
 8                    A.   If I can just review it.  I
 9      believe that's correct, but I think I know what you
10      are referring to.
11                    Q.   Sure.  I can give you three names
12      and you can tell me if there are, in fact, others.
13                    A.   Yes, please.
14                    Q.   Is there a Jon Rortveit of Tynax
15      quoted in the article?
16                    A.   I know Tynax was reported.  I
17      don't know Jon.  But I am seeing the section right
18      now and I see the name, yes.
19                    Q.   And a Mike McLean of UBM
20      Techinsights?
21                    A.   Yes.
22                    Q.   And a Patrick Snow of Iceberg
23      Transactions and China's Technology Exchange; is
24      that right?
25                    A.   Yes, I see the names, yes.
```



```
 1                    Q.   And Mr. Bailey's view was, and he
 2     says it at the front:
 3                         "Although the Chinese patent
 4                    transactions market is currently small
 5                    and relatively unsophisticated, over
 6                    the coming years that is likely to
 7                    change."  Do you see that?
 8                    A.   Yes, I do.
 9                    Q.   Now, in addition to contributing
10     to this article, you rely on it.  It is one of the
11     materials that you rely on in Appendix B; is that
12     right?
13                    A.   Yes, it is.
14                    Q.   Is it fair to say that -- and I am
15     going to blow up a portion that is on page 81 of
16     the article.  It is on the fourth page of the
17     article, the bottom right-hand corner, with respect
18     to CTEX.
19                    A.   Yes.
20                    Q.   And it indicates that:
21                         "CTEX held China's first patent
22                    auction in 2010, which saw 28 lots sold
23                    and generated RMB 3 million," about
24                    450,000 US.  "It is preparing for a
25                    second later in 2011."
```



1                   Do you see that?

2                   A.    Yes, I do.

3                   Q.    And, in fact, do you know whether

4      there was another patent auction thereafter in

5      2011?

6                   A.    My recollection on both the

7      auction in 2010 was there was some concern that the

8      number may not be correct.  And in 2011 I am not

9      aware if they made a second auction then or not.

10                  Q.    So you don't know?

11                  A.    Regarding 2011, I do not know.

12                  Q.    Let me ask you about on the next

13     page.  There are references to "other players

14     making inroads into the market."  And the market

15     they are referring to, Mr. Bailey is referring to,

16     is China, isn't it?

17                  A.    I would have to read the whole

18     section, but I have no reason to disagree with

19     that.

20                  Q.    And I am happy for you to do it.

21     But he refers to:

22                        "At UBM Techinsights, which

23                        already has a significant local

24                        presence in China, McLean told me that

25                        his company had assisted Chinese



1                    acquirers with due diligence on
2                    potential transactions."  Do you see
3                    that?
4          A.   Yes, I do.
5          Q.   Did you ever talk to Mr. McLean
6   about what work he did with Chinese acquirers?
7          A.   I mean, I have talked with Mike
8   McLean throughout the years.  Our paths do cross
9   throughout the year.
10              I do have some knowledge of what
11  companies like UBM Techinsights do.  I just don't
12  recall if our conversations ever went to what role
13  he may or may not play regarding supporting
14  acquisitions.
15         Q.   And the next sentence indicates
16  that:
17                  "Jon Rortveit claims Tynax has
18                  already completed some 'significant
19                  deals' in China, and is already in the
20                  process of setting up a dedicated
21                  Chinese exchange, in partnership with a
22                  Hong Kong and US based company . . .
23                  with the support of local provincial
24                  governments, associations and the
25                  Chinese Academy of Sciences that will



```
 1                    play an active role in training Chinese
 2                    buyers and facilitating transactions by
 3                    being much closer to the buyer."  Do
 4                    you see that?
 5                    A.   Yes, I do.  And I would just also
 6      clarify that this is in late 2011 when he is making
 7      that statement.  So yes, I see it.
 8                    Q.   And is it fair to say that
 9      Mr. Rorveit is of the view that when the market
10      develops, it is going to move quickly, very
11      quickly, which is what he indicates later in this?
12                    A.   That is what he says.
13                    Q.   Now, I am going to turn your
14      attention to Mr. Kinrich.  Are you familiar with
15      Mr. Kinrich?
16                    A.   Yes, I am.
17                    Q.   Are you familiar with his
18      testimony yesterday in court?
19                    A.   I did see portions of it.  So yes,
20      I am, roughly.
21                    Q.   You understand that Mr. Kinrich is
22      a valuation expert that the US is putting forward?
23                    A.   I don't know Mr. Kinrich's
24      background or professional accreditations.  I know
25      the role he played, sort of, yesterday.
```

 Neeson&Associates    W&F

```
 1                    Q.   And do you know that Mr. Kinrich
 2   is relying on your opinions with respect to the
 3   value of Chinese patents?
 4                    A.   I know that I provided a report
 5   and that Mr. Kinrich, in addition to my report and
 6   several other inputs, reached a conclusion.
 7                    Q.   Do you know that Mr. Kinrich
 8   testified yesterday about the importance of
 9   Nortel's perceived value of its own business?  Were
10   you here for that testimony?  It was at about 5:00
11   in the afternoon.
12                    A.   I don't recall that portion of the
13   testimony.
14                    Q.   I am going to put it up on the
15   screen then for you.  And we will hand out to the
16   Court a copy of the testimony.  And it is on, for
17   the record page, 4360, line 17 to 25 of the
18   official transcript.
19                    A.   Could you repeat where I should
20   look in here, if you don't mind?  Where would I
21   look again?
22                    Q.   It is page 4360, or you can look
23   at the screen, if that's easier.  It is blown up
24   for you.
25                    A.   I have both.  Thank you.
```



```
1                        Q.   And these were questions and

2        answers put to Mr. Kinrich yesterday in which he

3        was asked:

4                        "All the time having to concede

5                        that you don't know if that cash flow

6                        has anything to do with how the

7                        business was valued by the purchaser."

8                        And Mr. Kinrich answered:

9                        "Recognizing that's true, but also

10                       recognizing it does have a lot to do

11                       with how Nortel perceived the value of

12                       the business, and that is the best

13                       source for where the relative

14                       contribution of value lies."

15                       Do you see that?

16              A.   Yes, I see that.

17              Q.   Did you do anything to determine

18       what Nortel viewed as the value of the Chinese

19       patents?

20              A.   I was not involved at all around

21       the valuation topic.

22              Q.   And did you review at all the IPCo

23       model with respect to the value of Chinese patents?

24              A.   In preparing my report, I did not

25       rely on the IPCo model.
```



1          Q.   Did you review the IPCo model?

2          A.   In preparing my report, I did not.

3    I did, I believe, at some point cursorily review it

4    prior to that.

5          MR. PULTMAN:  Thank you very much.  I

6    have no further questions for you.

7          THE US COURT:  Anyone else on

8    cross-examination?  All right.  Ms. Schweitzer.

9          MS. SCHWEITZER:  I have a very limited

10   redirect.

11   RE-EXAMINATION/RE-DIRECT BY MS. SCHWEITZER:

12         Q.   I will not start by asking if you

13   have ever eaten Chinese food.  But have you ever

14   worked with Chinese companies on patent brokerage

15   matters in the time periods that you are opining

16   on?

17         A.   Yes, I have.

18         Q.   And how did those Chinese

19   companies' views compare to other companies in the

20   2009-2010 timeframe?

21         A.   As I indicated in my report and as

22   well as in the Bailey article, in general, there

23   were, I will say, two things I observed.  One,

24   regarding valuations of technology, Chinese

25   companies simply were not recognizing the value of



 1   telecommunications patents.  In some cases they
 2   were off by factors of 10 or 20.  They were too
 3   low.
 4           Second, in dealing with those companies
 5   primarily looking to purchase assets, the focus was
 6   never Chinese assets.  In other words, those
 7   companies were not looking to purchase Chinese
 8   assets.
 9           Q.   And Mr. Pultman had asked you
10   whether you saw the provision in one article saying
11   that preliminary injunctions are a form of a remedy
12   available in China.  Do you recall that question?
13           A.   Vaguely, yes, I do.
14           Q.   And if I could have on the screen
15   the PTO report, Exhibit TR50067, and turn you to
16   page 8.
17           In forming your opinion, in doing
18   research for your opinion, did you also see and
19   consider the PTO report and the views of the
20   commentators from 2010 contained therein regarding
21   the various difficulties in obtaining injunctions
22   in China that was occurring at that time?
23           A.   Yes.  I mean, I read this article
24   in its entirety and relied on it.  And I believe in
25   response to one of my questions from Mr. Pultman I



```
 1   referred to the US PTO reaching similar

 2   conclusions.

 3              Q.   And how did these various articles

 4   and commentator views relate to your view that you

 5   were asked to opine on regarding the market value

 6   and how the market was valuing patents in the

 7   2009-2010 time period?

 8              A.   Yes.  Again, relying on my

 9   perspective as a patent broker, these were entirely

10   consistent with what I was seeing, what I was

11   hearing, and more importantly, what the market was

12   saying, what transactions were transacting for.

13              MS. SCHWEITZER:  I have no further

14   questions.

15              THE US COURT:  Thank you,

16   Ms. Schweitzer.

17              Justice Newbould, any questions?

18              THE CANADIAN COURT:  No, I do not,

19   Judge Gross.

20              THE US COURT:  All right.  Thank you,

21   Mr. Zenkich.  You may step down.  You are excused.

22              THE WITNESS:  Thank you.

23   -- WITNESS EXCUSED --

24              MR. QURESHI:  Justice Newbould, Judge

25   Gross, good morning.  For the record, Abid Qureshi,
```

 Neeson&Associates    W&F

1    Akin Gump, on behalf of the Official Committee.

2              The US interests' next witness will be

3    here in Toronto, and that is Laureen Ryan.  So if

4    the Courts are ready to proceed, we'll call her up.

5              THE US COURT:  I'm ready.

6              THE CANADIAN COURT:  Yes, go ahead.

7              MR. QURESHI:  Thank you.

8              And, Your Honours, while she takes the

9    stand, we'll be handing out both her report and the

10   demonstrative exhibit, and I believe that we are up

11   to Exhibit number 55 for Ms. Ryan's report.

12             THE US COURT:  Yes.

13             THE CANADIAN COURT:  All right, Exhibit

14   55.

15             Mr. Qureshi, is this the report revised

16   April 14, 2014?

17             MR. QURESHI:  That's correct, Your

18   Honour.

19             THE CANADIAN COURT:  Thank you.

20             THE CANADIAN REGISTRAR:  Exhibit No.

21   55.

22             EXHIBIT NO. 55:  Expert Report of

23             Laureen Ryan dated February 28, 2014,

24             revised April 14, 2014.

25



```
 1                    LAUREEN RYAN,
 2   LAUREEN RYAN, having first been duly sworn, was
 3          examined and testified as follows:
 4
 5               THE CANADIAN COURT:  You are not the US
 6   President, so you don't have to put your hand up.
 7               THE WITNESS:   I don't?  Thank you.
 8               MR. QURESHI:  Judge Gross, do you have
 9   the materials before you?
10               THE US COURT:  Yes, Mr. Qureshi, thank
11   you.
12   EXAMINATION IN-CHIEF/DIRECT EXAMINATION
13   BY MR. QURESHI:
14               Q.   Thank you very much.
15               And, Your Honours, just by way of
16   introduction, Ms. Ryan submitted one report.  It
17   was a rebuttal report in which she offers opinions
18   both with respect to the contribution approach by
19   Huffard and Malackowski and also with respect to
20   the pro rata theory pursued by the UKP and the
21   CCCs.
22               In order to keep things moving this
23   morning, we don't intend to elicit any direct
24   testimony with respect to her opinions on the pro
25   rata theory.
```



1                 Those are in the report.  And we are
2    content to rely upon the report.
3                 So with that introduction, Ms. Ryan,
4    good morning.
5                 A.   Good morning.
6                 Q.   Let's start, if we could, please,
7    with your experience.  We'll bring up slide 2 from
8    the demonstratives, and of course, your CV sets
9    forth fully your experience in your report.
10                What I would like you to do, rather
11   than take us through everything, is just talk about
12   your experience specifically as it is relevant to
13   the opinions that you gave in this case, please.
14                A.   Sure.  So it is mostly focused on
15   the first bullet in this particular slide.  I have
16   over 25 years of experience as a certified public
17   accountant, a forensic accountant and investigator,
18   and a professional with valuation and bankruptcy
19   experience, and including dispute matters that
20   involve allocation of proceeds issues.
21                Other relevant experience is I have
22   been a responsible officer and a fiduciary within
23   the Bankruptcy Court, and I have various valuation
24   credentials and my education background is in
25   accounting and economics.



1          Q.   Okay.  Are you a transfer pricing

2     expert?

3          A.   No, I am not.

4          Q.   Is transfer pricing expertise

5     necessary for the opinions that you offer

6     concerning the contribution approach?

7          A.   No, it is not necessary for my --

8     for the exercise that I did.

9          Q.   Now, you are, of course, aware

10    that Mr. Malackowski is an intellectual property

11    expert; right?

12         A.   Yes.

13         Q.   And are you?

14         A.   So, again, for the work, although

15    I have done many engagements that involve

16    intellectual property matters, that experience was

17    not relevant or not needed to do the exercise that

18    is contained in my report.

19         Q.   Can you please explain why it is

20    your view that IP expertise was not necessary to do

21    what you have done here?

22         A.   So we'll get into this in a little

23    more detail later, but if you look at the exercise

24    that I did, it is -- I dealt with accounting

25    information, financial information, and how to use



1    that information to parse out the proceeds with

2    respect to the intellectual property bucket, I'll

3    call it.

4              So to step back one moment, Mr.

5    Malackowski and Mr. Huffard divided the pie into

6    three buckets, and my criticisms only relate to the

7    intellectual property bucket.  I did not change the

8    overall value assigned to the bucket.  I just

9    changed and modified the allocation of that bucket.

10             Q.   Okay, and as you said, we'll come

11   back to some more details in a moment.  You are

12   proposing in your report certain adjustments to the

13   contribution approach, but are you offering any

14   opinions at all as to whether the contribution

15   approach is the right approach for purposes of

16   allocation?

17             A.   No, so my report and my opinion is

18   limited to looking at the contribution approach in

19   the first instance, and in that regard I'm assuming

20   that the Courts adopt that approach.

21             And so assuming that the Courts adopt

22   that approach, then I'm looking at the

23   modifications that should be made to the

24   intellectual property bucket within the exercise

25   that Mr. Malackowski did.



1            Q.   Okay.  I want to just clarify some

2    terminology that we are going to be getting into.

3    So you talk about in your report a couple of terms

4    that I think are important for the Courts to

5    understand.

6            One is "direct R&D spend" and the other

7    is "total R&D funding."  Can you please explain to

8    the Courts the difference between those two terms?

9            A.   Yes.  So direct R&D spend reflects

10   the money paid -- or actually not paid, but the

11   money incurred within a geography.  The amount

12   funded, the total R&D funded, represents the amount

13   that was funded or obligated to pay related to R&D

14   expense.

15           So think of it in terms of you, you are

16   entity A, I am entity B.  Entity A expects to incur

17   a million dollars next year in research and

18   development.  And I, entity B, commit to fund that.

19   And so my funding of that R&D enables you to do

20   that in the future.

21           Q.   Okay.  And what do you understand

22   Huffard and Malackowski to have done in their

23   contribution approach?

24           A.   So they limited their analysis or

25   they gathered the data related to R&D expense only



 1   to that incurred in country.  They did not consider

 2   who funded it.

 3              Q.   Okay, and do you have an opinion,

 4   Ms. Ryan, as to whether looking at just direct R&D

 5   spend is appropriate?

 6              A.   Yes, so my opinion is they should

 7   have looked at total R&D, or research and

 8   development funded for each of the entities.

 9              Q.   Okay, before we get into the

10   details of the adjustments that you made to reflect

11   that, please explain to the Courts why it is that

12   you concluded that making that type of an

13   adjustment was appropriate?

14              A.   So it starts off by looking at the

15   assigned task that I was given to do, so I looked

16   at Mr. Malackowski's report.  And in his report, he

17   lays out his premise for the contribution approach.

18              Q.   Okay, let's just pull that up, if

19   we could.  If we can please have brought out from

20   the Malackowski report page 40.  It is just one

21   slide that will be -- one page that we'll be

22   looking at.  If anybody would like a full copy, we

23   have them to hand out.

24              We are looking at the section of his

25   report entitled "Appropriate Method for Measuring



1    Contribution," and I believe, Ms. Ryan, this is

2    what you are referring to, so please proceed.

3                    A.    It is, and I might point out this

4    is the section where he explains -- you'll note it

5    says "Contribution Approach to Allocation," and

6    then he justifies why it is an appropriate method

7    for measuring contribution.

8                    And preceding this particular paragraph

9    he discusses some other ways of getting at this

10   conversation or getting at this approach, and said

11   how those are difficult to do and they are

12   misleading, so he arrives here.

13                   And he says this is a measurement based

14   on spending of R&D, and the most important thing is

15   he says:

16                       "In a large organization, where

17                       R&D funding supports a large number of

18                       R&D personnel and results in a large

19                       number of patents over time, this

20                       funding can be valid and indeed the

21                       most accurate proxy measurement for

22                       determining the contribution of each

23                       research group to the development of

24                       IP."

25                   And then he goes on to say:

Neeson&Associates    W&F

```
 1                    "Indeed, it is a common practice
 2                to regard each dollar spent on R&D as
 3                fungible for the purposes of measuring
 4                relative contribution to R&D in a group
 5                [...]"
 6           Q.   Okay, so where Mr. Malackowski
 7      here refers to funding, is it your understanding
 8      that that's what he actually did in his report?
 9           A.   No, ultimately he did spending,
10      and in fairness, he did, when you get into the body
11      of his report, use the word "spending" and
12      "funding" fairly interchangeably effectively, when
13      you get into it.  But that is not what this premise
14      is.
15                And it is not, when you think about the
16      relative contribution of funding R&D, it is based
17      on the amount that was supporting the R&D from an
18      obligation perspective.
19           Q.   Okay.  Now I would like to move
20      briefly to some other testimony that the Courts
21      have heard.  Are you familiar with the trial
22      testimony of Dr. Cooper?
23           A.   Yes, I am.
24           Q.   And you understand Dr. Cooper to
25      be a transfer pricing expert testifying on behalf
```



```
 1   of the EMEA Debtors; correct?

 2                 A.    Yes.

 3                 Q.    I would like to pull up on the

 4   screen, if we could, please, an excerpt from

 5   Dr. Cooper's trial testimony, and this appears at

 6   page 2809, line 13, through 2810, line 9, and

 7   again, if anybody would like copies, we can

 8   certainly hand it out.  You'll see on the screen,

 9   Ms. Ryan, that in this --

10                 THE CANADIAN COURT:  Do you have the

11   date of that?

12                 MR. QURESHI:  It is on the top, yes,

13   June 2nd, Your Honour.

14                 BY MR. QURESHI:

15                 Q.    It seems a long time ago.

16                 Ms. Ryan --

17                 THE CANADIAN COURT:  It is seeming

18   longer by the day.

19                 BY MR. QURESHI:

20                 Q.    Indeed.  Ms. Ryan, you will see

21   that in this section of -- this was the

22   cross-examination of Dr. Cooper by Mr. Luft on

23   behalf of the US Debtors, and you will see in this

24   section the discussion concerns the CSA period, the

25   Cost Sharing Agreement period.
```



 1                    Can you please explain to the Court

 2    what the relevance is of this testimony to your

 3    conclusions?

 4                    A.    Sure.  So the analysis that I did

 5    was divided in period one and period two, two

 6    different periods, and they aligned with the CSA

 7    period and the MRDA period.

 8                    So this first testimony that you

 9    pointed out to related to the CSA period is

10    relevant because it is directly aligned with the

11    approach that I took.

12                    It says, the questioner asked:

13                    "Question:  And under the CSA,

14                    whatever R&D a participant pays for

15                    constitutes its economic ownership?"

16                    And Mr. Cooper says:

17                    "Answer:  I would agree."

18                    And then he goes on to say:

19                    "Question:  And that could be

20                    money that an entity expends on R&D it

21                    conducts in its own territory; right?

22                    "Answer:  Yes.

23                    "Question:  And it could include

24                    R&D that an entity pays for to an

25                    independent contractor to do R&D for



```
 1              it?
 2                   "Answer:  I would think so.
 3                   "Question:  And it could include
 4              R&D that a counterparty to the CSA
 5              performs but for which the first entity
 6              received the benefit and thus makes a
 7              transfer pricing adjustment?
 8                   "Answer:  Correct.
 9                   "Question:  So basically, whoever
10              pays for the R&D, regardless of whether
11              they do it or not, would have the
12              economic ownership for the resulting IP
13              proportionate to the amount it paid?
14              Answer:  That's correct."
15         Q.   Okay, and what is the significance
16    of this statement for the CSA period as it relates
17    to your report?
18         A.   So basically, this is supporting
19    the approach of using funding.  Whoever paid for
20    it, whoever funded the R&D should be aligned with
21    the economic benefit, who made the contribution.
22         Q.   Thank you.  Let's move forward a
23    little bit in the transcript to see what Dr. Cooper
24    says with respect to --
25              THE CANADIAN COURT:  I would just ask
```



1   you, Ms. Ryan, and is that what you are saying in

2   your report at paragraph 11?

3             THE WITNESS:  Are you on page 11?

4   Because I don't have paragraph numbers.

5             THE CANADIAN COURT:  The paragraph

6   starts "During period one [...]"

7             THE WITNESS:  If I might ask you, you

8   said paragraph 11?

9             THE CANADIAN COURT:  Page 11.

10            THE WITNESS:  Oh, page 11, I'm sorry.

11            MR. QURESHI:  Page 11, the paragraph

12  beginning "during period one [...]" about halfway

13  down the page.

14            THE WITNESS:  That is exactly what I am

15  saying, Your Honour.

16            THE CANADIAN COURT:  Your point to be,

17  you say both those things should be included if you

18  are going to use that system?

19            THE WITNESS:  Both those things should

20  be considered.

21            THE CANADIAN COURT:  Right.

22            THE WITNESS:  The total R&D doesn't

23  change.  It is just a matter of who gets the

24  benefit of the allocation.

25            THE CANADIAN COURT:  Thank you.



```
 1              BY MR. QURESHI:
 2              Q.   Let's go back briefly to
 3    Dr. Cooper's testimony and look at what he said
 4    with respect to what you call in your report period
 5    two, that is, the MRDA period.
 6              If we can bring up this excerpt,
 7    please, it follows in the transcript, it is at page
 8    2810, lines 10 through 25.
 9              Ms. Ryan, let me -- I don't think we
10    need to read it.  Let me just ask you, do you
11    understand what Dr. Cooper testified to with
12    respect to the CSA period to be any different with
13    respect to the MRDA period, or your period two?
14              A.   No.  What the testimony here says,
15    and you said you don't need me to read it, but it
16    basically is the same pattern of -- it is who
17    funded it.
18              Q.   Okay.  Thank you.  Now, let's turn
19    to the conclusions that you actually reached.  If
20    we can bring up page 3 from the demonstratives,
21    please.
22              First of all, Ms. Ryan, does this set
23    forth the conclusions that you reached in your
24    report?
25              A.   Yes, it does.
```



1             Q.    Let's start with having you

2    explain to the Courts, if you could, please,

3    briefly how it is that you understand Huffard and

4    Malackowski came to their conclusions, which we

5    have set forth on the left column here?

6             A.    Sure.   So you might remember from

7    Mr. Huffard's testimony that his approach with

8    respect to the contribution approach was to first

9    allocate the total amount of $7.3 billion into

10   three buckets.  He put a section into net tangible

11   assets, he put another amount into customer assets

12   and goodwill, and then he put another amount into

13   intellectual property.

14             I did not change those buckets.  The

15   next thing he did was he allocated the first two

16   buckets, the net tangible assets and the

17   customer-related assets and goodwill, and then

18   finally he allocated the intellectual property

19   bucket.

20             And in doing the intellectual property

21   bucket, he relied on Mr. Malackowski.  Mr.

22   Malackowski took the R&D expense-related numbers.

23   He added those up.  He then parsed those out by

24   transaction.  Each transaction, he used a different

25   relative period related to the patents, related to



 1   the business lines, and then he used a separate

 2   period for the residual patents.

 3                After running that through the model,

 4   these are the numbers that resulted.

 5                Q.   Okay, so the three buckets that

 6   you reference, can you just tell us which of those

 7   buckets you did or did not make any modifications

 8   to in your report?

 9                A.   Sure.  So you will see on this

10   chart I just summarized it by non-IP assets and IP

11   assets, so the non-IP assets were the tangible

12   assets and the customer-related assets or goodwill.

13   I did not touch those, I did not change those, so

14   you will see across the first row not only are the

15   totals the same, but the allocation is the same.

16                With respect to the IP assets, which is

17   the next row down, those are the numbers that were

18   changed or modified.

19                Q.   Okay.  And where did you get the

20   data necessary to make the adjustments that you did

21   make to the IP assets?

22                A.   So the data was included in what

23   is simply referred to as transfer pricing work

24   sheets, financial information.  It is data that is

25   included.  It is the same body of knowledge, same



1   body of data that Mr. Malackowski and Mr. Huffard

2   relied upon.  I just looked at the information that

3   they used and used the same information.

4             Q.   Ms. Ryan, did you rely on any

5   information or any data to reach your conclusions

6   other than what Huffard and Malackowski relied

7   upon?

8             A.   I did not have to look outside the

9   things that were referenced in their report.

10             Q.   Okay, walk us through, please, the

11   ultimate conclusions that you reached that we have

12   set forth on slide 3.

13             A.   So my conclusions are in the

14   right-hand set of figures, where it says "Revised

15   Huffard Report," and that is where I adjusted both

16   period one and period two, that is, the CSA and

17   MRDA periods were both adjusted to include the

18   total funding.

19             You will notice that the total amounts,

20   again, in the total column are all the same, the

21   allocation between the categories or the buckets of

22   non-IP versus IP.

23             But my conclusion is, after making the

24   adjustments to reflect total funded allocation in

25   the IP asset row, that the total allocation for



1    Canada should be 20.2 percent, for the US it should

2    be 66.7 percent, and for EMEA it should be 13.1

3    percent.

4              Q.   Ms. Ryan, are you familiar with

5    Mr. Malackowski's trial testimony?

6              A.   Yes.

7              Q.   Okay, I would like to pull up, if

8    we could, please, what was slide 54 in Mr.

9    Malackowski's demonstrative exhibits.  Do you

10   recall specifically, Ms. Ryan, the testimony that

11   Mr. Malackowski offered with respect to this slide?

12             A.   Yes.

13             Q.   So I would like to direct your

14   attention to the far right of the page and you will

15   see there that he has a column "Adjusted R&D Spend"

16   with a big red "X" over it, and of course you'll

17   recall that he offered testimony suggesting that

18   your adjustments are inappropriate.

19             I would like to explore your response

20   to those criticisms.  If we could start, please,

21   with the first point here.  Mr. Malackowski writes

22   in his slide:

23                  "Not consistent with the measure

24                  of contribution to R&D used by Nortel."

25                  Ms. Ryan, what is your response to that



 1   criticism?

 2                    A.   So I have two points.  One is that

 3   the testimony that he gave to explain this point

 4   was not clear.  He didn't really say why it was

 5   inconsistent.

 6                    Secondly, it is consistent.  The

 7   information that I used and Mr. Malackowski used is

 8   directly from the information that Nortel prepared

 9   contemporaneously at the time they did their Cost

10   Sharing Agreements and their transfer pricing

11   agreements and their calculations.

12                    So it is consistent with the

13   information used by Nortel and the information --

14   and the data used by Nortel to record things in

15   their books and records.

16                    Q.   Okay, thank you.  Now let's move

17   to the second point on this slide.  Mr. Malackowski

18   here writes:

19                         "Makes no sense under profit split

20                         system, since the adjustments reflect a

21                         share of profits, not a contribution to

22                         cost."

23                    And first, Ms. Ryan, let me ask you,

24   does this criticism have any application to what

25   you refer to in your report as period one, the Cost



```
 1    Sharing Agreement period?

 2              A.   No, not at all.  This comment can

 3    only be focused on period two.

 4              Q.   So as it relates to period two,

 5    the MRDA period, what is your response to this

 6    criticism?

 7              A.   So again, I don't agree with his

 8    comment here.  To derive the share of profits, one

 9    needs to recognize expenses to derive the profits.

10    So all I am doing is disaggregating the pie a

11    little bit to get to the core of making it on a

12    comparable basis as it was for period one.

13              Q.   Okay.  Finally, on this slide, Mr.

14    Malackowski writes:

15                   "Adjustments not paid could not be

16                   used to fund R&D."

17              And first, let me ask you, Ms. Ryan, do

18    you understand what that is a reference to?

19              A.   So my general understanding is

20    that there is some claims that EMEA or the UK

21    parties have against Canada with respect to not --

22    payments that were expected under the transfer

23    pricing system that they say they didn't receive

24    from Canada.

25              Q.   Okay, so if you assume that there
```

 Neeson & Associates    W&F

1   were transfer pricing payments that should have

2   been made from Canada to EMEA and that were never

3   paid, does that at all impact the adjustments that

4   you make to the contribution approach?

5                 A.   No, this is not a cash, you know,

6   tracing system exercise.  This is based on accrual

7   accounting.  It is based on a recognition of the

8   obligations of the parties to fund, to record an

9   obligation in the books and records of the company.

10                 And just like the UK has a claim

11   against Canada, they have a claim against Canada

12   because they have an asset that is a receivable

13   from them at the time.  So there is -- you know, it

14   is reflected in the books and records.

15                 Q.   Okay, so now let's turn to the

16   mechanics of the adjustments that you actually did

17   make, and I want to start with what you called

18   period one, the Cost Sharing Agreement years.

19                 And if we could turn, please, to slide

20   4 in the presentation and you will see the heading

21   here is "Period One (CSA) Sample Calculation 1996."

22   Can you please explain to the Courts what this page

23   is?

24                 A.   Sure.  So this is again from

25   period 1, the Cost Sharing Agreement.  This is an



1   excerpt from the actual source information that was

2   used by Mr. Malackowski and relied upon by Mr.

3   Huffard.  I went back to the same source

4   information.  And it reflects the calculations

5   under the research and development Cost Sharing

6   Agreement.

7             So if we could focus on the column for

8   1996, that might be the easiest.  And if you look

9   at row 197 for NTI or NNI, as it is named, you will

10  see that the initial amount of R&D expense recorded

11  was 583.9 million.  That is the number, by the way,

12  that Mr. Malackowski used.

13            Then what happened is through this Cost

14  Sharing Agreement they made an adjustment.  So if

15  we go to the bottom part of the chart, we'll see

16  the "Increase/Decrease in R&D Allocation," the

17  reference that is in row 483, and then let's go

18  back down to the NNI row, which is 486, and if you

19  go over to the 1996 column, you will see 605.8

20  million.

21            That represents the amount that NNI was

22  obligated to fund for other of the entities' R&D

23  through the Cost Sharing Agreement.

24            As a result, the total R&D funded is

25  reflected on row 468 for NNI, and if you go over

 Neeson & Associates   W&F

1   again to the column of 1996 you will see the total

2   is 1189.7 and that reflects the total funded by NNI

3   for 1996.

4              I might point out that if you look in

5   row 208 for the total of 1996, you will see that

6   the total R&D is 1.719.5 -- or I should say 1

7   billion 719.5 million.

8              You will see that same number at row

9   479, again in column 1996, so the total R&D did not

10  change.  All it is doing is reflecting how the

11  parties viewed their obligations with respect to

12  research and development.

13             Q.   Now, this, we just walked through

14  a sample year of 1996.  Was the analysis you

15  conducted substantially the same for every year

16  under the Cost Sharing Agreement?

17             A.   Yes, it was.

18             Q.   And this spreadsheet that we are

19  looking at, what is the source of this document?

20             A.   This is a Nortel-prepared cost

21  sharing work sheet, data that was used to do their

22  allocations at the time.  This is the same source

23  that Mr. Malackowski relied upon.

24             Q.   Okay.  Thank you.

25             Now, I would like to turn to slide 5,



1   if we could.  And this slide contains data pulled

2   from Exhibit D in your report, and again, this

3   focuses on 1996, just for illustrative purposes.

4   Can you please explain what you have set forth on

5   this slide.

6               A.   Sure.  So if we could -- again,

7   this is one year's worth of calculations.  If you

8   might recall that the US that we used in the

9   previous slide for the direct R&D was 583.9.

10              And then I had pointed out that the

11  transfer pricing adjustment related to research and

12  development was the 605.8, which is the amount that

13  they funded for others.  And that was the total --

14  that was used to derive the total R&D funded of

15  1189.7 for the US for 1996.

16              Q.   Now under the Canadian column, if

17  we can just move there for a moment, you have

18  bracketed $580.8 million.  Can you please explain

19  that number?

20              A.   So again, under the Cost Sharing

21  Agreement and how these allocations were made,

22  Canada, although they in geography had 912.8, they

23  received the funding for that primarily from the

24  US.  They received funding of $580.8 million from

25  others to be able to fund R&D.

 Neeson & Associates    W&F

 1                    So what that means is, to derive the

 2    total R&D funded for Canada, you have to add those

 3    two numbers, and that results in 331.9.

 4                    Q.   Okay, and the bracketed 33.8

 5    million for EMEA, is it the same explanation for

 6    that number?

 7                    A.   It is.

 8                    Q.   Okay.  Let's turn now, if we

 9    could, to slide 7 -- I'm sorry, slide 6.  And slide

10    6 contains a summary for the entire Cost Sharing

11    Agreement years.  Can you please explain this

12    slide, please?

13                    A.   So this is, again, the Cost

14    Sharing Agreement years is from 1989 to 2000.  This

15    reflects the total allocation between the three

16    debtor groups.

17                    And as you will see, that the total

18    just for this period, just adding those numbers up,

19    not putting them through the whole Huffard model,

20    the total of R&D funded by Canada is 21 percent;

21    the total funded by the US is 73 percent; and the

22    total funded by EMEA is 6 percent.

23                    THE CANADIAN COURT:   This is after

24    your adjustments?

25                    THE WITNESS:  This is after my



1    adjustments.  And those are percentages of the

2    total $19 billion of R&D spent during that relative

3    period.

4              BY MR. QURESHI:

5              Q.   And Ms. Ryan, in order to derive

6    those percentages, the 21 for Canada, the 73 for

7    the US and the 6 for EMEA, did you need to make any

8    modifications to the data that you found in

9    Nortel's transfer pricing work sheets?

10             A.   No, I used information that was

11   generated by Nortel.

12             Q.   Okay, thank you.

13             Now, let's move on to your period 2,

14   which is the MRDA period.  And we have a sample

15   calculation again set forth on the next slide,

16   which is slide 7.

17             Can we start by explaining, clearly you

18   have done something different for period two and

19   we'll get to that.  But why did you have to

20   approach period two differently?

21             A.   So in period one there were

22   primarily three Cost Sharing Agreements, one

23   related to research and development, one related to

24   overhead or headquarters and one related to

25   property.



1             When we moved, or when the company

2    moved from the Cost Sharing Agreement or period one

3    to an MRDA agreement, they collapsed all those and

4    they moved -- and they allocated it differently.

5             So -- and when they moved to the MRDA

6    period, it certainly is articulated that R&D is a

7    driver of that process.  And so it required me to

8    disaggregate the transfer pricing adjustment to

9    come up with a reasonable approach to say how much

10   of that adjustment was related to research and

11   development.

12             Q.   Okay, so let's look at 2002 as a

13   sample calculation for the MRDA period, and you

14   have set forth the calculation.  Starting with the

15   box on the left, just walk us through the steps

16   that you took to get to that R&D.

17             A.   So the box to the left shows kind

18   of the first step.  If you will see the first

19   number of 482 was the transfer pricing adjustment

20   for Canada that year.  So the idea is to how much

21   of that related to R&D.

22             What I observed is that the primary

23   drivers, not surprisingly given the Cost Sharing

24   Agreements that got collapsed into the MRDA, the

25   primary --

 Neeson&Associates    W&F

          1                    THE CANADIAN COURT:  Just before you do
          2    that.
          3                    THE WITNESS:  Yes, sure.
          4                    THE CANADIAN COURT:  The 482, you
          5    referred to Exhibit D-2, which would be your
          6    report.  Is it in this slide deck or do I go to D-2
          7    to see that?
          8                    THE WITNESS:  The 482 is in D-2, I can
          9    point that out to you if you would like.
         10                    THE CANADIAN COURT:  No, no, is it in
         11    the slide deck here?
         12                    THE WITNESS:  No, the first time you
         13    see it is here.  This is just showing you one
         14    example for one year, for one entity.
         15                    THE CANADIAN COURT:  Yes, okay.  I just
         16    want to take a look.
         17                    THE WITNESS:  If you would like, I can
         18    point you to where it is in the exhibit.  If you
         19    look in Exhibit D-2, page 7 of 10.
         20                    THE CANADIAN COURT:  Yes.
         21                    THE WITNESS:  Okay.  And if you look
         22    into the second column, which is NNI Canada.
         23                    THE CANADIAN COURT:  NNL --
         24                    THE WITNESS:  I'm sorry, NNL Canada,
         25    thank you, you will see it says "Required



```
 1    Increase/Decrease TPA of 482," and there is
 2    brackets around it.  It first starts out with
 3    "Direct R&D Spend in 2002."  It is the bottom box
 4    on that page.
 5                THE CANADIAN COURT:  I see it, thank
 6    you.
 7                THE WITNESS:  Do you see it?
 8                THE CANADIAN COURT:  Yes, I do.
 9                THE WITNESS:  Great.
10                THE CANADIAN COURT:  Thank you.
11                THE WITNESS:  Thank you.
12                BY MR. QURESHI:
13           Q.   And that 482 number, Ms. Ryan, is
14    that what NNL received in transfer pricing payments
15    in that year?
16           A.   Yes.
17           Q.   So please continue then explaining
18    the further adjustments that you had to make.
19           A.   Yes, so it is really taking the
20    482 and trying to break it down.  What does it
21    relate to?
22                And so within the transfer pricing work
23    sheets, there was a figure for selling SGA, selling
24    general administrative expenses.  There was also
25    the direct R&D spend number, and those are the two
```



1   primary drivers to get to the profit numbers that

2   are then used to compare and derive the transfer

3   pricing adjustment.

4                    Q.   Let me just ask you briefly on the

5   SG&A number.  Did the transfer pricing work sheets

6   actually contain a line item for SG&A or is that a

7   number that you had to derive?

8                    A.   No, that is a data point that is

9   right -- extracted from those work sheets.

10                   Q.   Okay.

11                   A.   So what I did is I said, okay,

12  let's derive the proportionate share.  So the SG&A

13  was 383 in this example calculation, the direct R&D

14  spend was $880 million, for a combined $1.2 or $1.3

15  billion.  The R&D as a percentage of the combined

16  number is 70 percent.  So now I have done with step

17  one.

18                   Q.   Now, let's go to box two on the

19  right side of the page and explain what you do with

20  that 70 percent in the second box?

21                   A.   So now I take that 70 percent, and

22  if you go up to the top right-hand corner, I

23  multiply it against the total transfer price

24  adjustment of the 482 to derive the portion of the

25  transfer pricing adjustment that was used for



1    research and development, and that is 336.  And

2    that is a negative number.

3                    Q.   And the third box on that page?

4                    A.   And then I add that 336 to the

5    direct amount spent or recorded as spent in

6    geography in Canada to derive the total amount

7    funded by Canada, so it is 336 combined with 880 to

8    derive the 544.

9                    Q.   And again, Ms. Ryan, this is a

10   sample year, 2002.  Did you do substantially the

11   same calculation for each year under the MRDA

12   period?

13                   A.   Yes, I did.

14                   Q.   Let's then turn if we could,

15   please, to slide 8, where we have a summary for

16   your entire period two.  Ms. Ryan, what conclusions

17   did you reach for period two?

18                   A.   So this reflects adding up the R&D

19   numbers for period two, and as a result you can see

20   here that if you just add up the numbers, Canada

21   funded 27 percent during that whole period, the US

22   funded 58 percent during that period and EMEA

23   funded 15 percent of the total R&D.

24                   Q.   Let's turn to slide 9 then, if we

25   could, where we have set forth the conclusion for



1    both periods.  You walked us through what you did

2    for period one and what you did for period two.

3    What did you have to do to then get to the final

4    adjustments that you are proposing?

5                   A.   So after I added up the revised

6    research and development information, in simple

7    terms I had to run it through Mr. Huffard's report,

8    and again if you remember -- and I should say Mr.

9    Malackowski/Mr. Huffard.

10                  Q.   You said Mr. Huffard's report, did

11   you mean his model?

12                  A.   I'm sorry, his model, because he

13   broke down the research and development costs or

14   summarized them by transaction using different

15   periods.

16                  So after running it through that model,

17   in the two-step process, because I first summarized

18   period one, and then I summarized period two, and

19   then ran them through the model.

20                  And the result here is the chart all

21   the way to the right in the blue which shows Canada

22   at 20.2 percent, which we talked about earlier, the

23   US at 66.7 percent and EMEA at 13.1 percent.

24                  Q.   Okay, and Ms. Ryan, with respect

25   to the 13.1 percent for EMEA, did you have the data



```
 1   necessary to divide that up on an individual debtor

 2   entity basis within EMEA?

 3              A.   Yes, I did.

 4              Q.   Let's just flip quickly to slide

 5   10, if we could, please.  Is that, Ms. Ryan, what

 6   you have set forth on slide 10?

 7              A.   Yes, it is.

 8              Q.   And again, to do the individual

 9   debtor entity breakdown, what was the source of the

10   information?

11              A.   So it was the adjusted research

12   and development numbers from my report, and then

13   putting it through the model that Mr. Huffard

14   constructed.

15              Q.   Okay.  Let's go back to slide 9

16   for a moment, and there is just one final area I

17   would like to explore and then we will be done.

18   And that is the middle column that you have on this

19   page where you say that is only the CSA period.

20              I would like to pull up from Mr.

21   Malackowski's testimony, again from his

22   demonstratives, slide 22, if we can please have

23   that on the screen.  Thank you.

24              And you will see in this slide Mr.

25   Malackowski is looking at the invention date of
```



1     what were categorized as the high interest patents

2     from the residual patent portfolio sale.  Is this

3     slide, the information set forth on this slide, Ms.

4     Ryan, relevant to that middle column that we just

5     looked at, the CSA-only period?

6               A.    It is in that it is interesting

7     that the total of the high interest patent count

8     during the period one, which is the CSA period, is

9     quite high.

10              Q.    And where does period one end for

11    purposes of looking at these patents?

12              A.    So while period one ends in 2000,

13    Mr. Malackowski testified, and it is in his report

14    too, that the spending in a particular period, the

15    high interest patent is solidified the year after.

16    So for purposes of this chart, the number of high

17    interest patents that relate to period one, one

18    needs to look through 2001 to get the total.

19              And if you kind of follow that up, it

20    looks approximately around 80 percent-plus of the

21    total high interest patents that were developed

22    during period one.

23              Q.    Okay, now let's go back to slide

24    number 9, your conclusion slide, and focus, if we

25    could, please, on that middle column, where you



1    have said:

2                     "Revised Huffard report only CSA

3              period adjusted."

4              What did you do to come up with those

5    numbers, please?

6              A.   So what this column is, and you

7    can see it is kind of in between the two, because

8    what it does is just adjusts the figures during

9    period one to reflect total funded.  In this

10   column, for period two, the numbers are unadjusted,

11   and so it just says I'm going to focus on period

12   one where the numbers were straight and clean under

13   the Cost Sharing Agreements directly related to

14   research and development, but in period two, where

15   the numbers had to be derived, they weren't

16   changed.

17             Q.   So Ms. Ryan, should the Courts

18   decide to accept adjustments only for the CSA

19   period and not for period two, the MRDA period --

20   would that be what is reflected in that middle

21   column?

22             A.   That's right.  Then the numbers

23   would be 25 percent for Canada, 60.9 percent for

24   the US and 14 percent for EMEA.

25             Q.   Ms. Ryan, thank you, Your Honours,



1    those are my questions.

2                    THE CANADIAN COURT:  Can I just ask you

3    a question on that page 9.

4                    THE WITNESS:  Sure, yes.

5                    THE CANADIAN COURT:  The middle one,

6    revised Huffard report only for the CSA period, I

7    took a quick look back to tab 6 and it is quite --

8    the figures are quite different.  Is there a reason

9    why those figures are different?

10                   MR. QURESHI:  Slide 6 of the

11   demonstratives.

12                   THE WITNESS:  Oh, yes, yes, there is a

13   reason.  The numbers on slide 6 reflect, first of

14   all, it only reflects IP and the numbers in the

15   other chart reflect IP and non-IP.

16                   Secondly, the numbers on 6 just adds up

17   the R&D expense for the entire period, so it is not

18   run through Mr. Huffard's model, which takes that

19   information and then says for business transaction

20   one we are only going to look at the R&D expense

21   for these five years, for business transaction two

22   we are only going to look at the R&D expense for

23   these six years depending on the patents.

24                   So you have to run it through the whole

25   model to get to the final result.



1              So this is an interim step, but it does

2     give you a snapshot of the total R&D for that

3     period.

4              THE CANADIAN COURT:  Okay, I see.

5              BY MR. QURESHI:

6         Q.   Just one follow-up question on

7     that, if I may, Your Honour.  So slide 6, those

8     percentages, is it the case, Ms. Ryan, that those

9     percentages are just a percentage of the dollars

10    that were spent on R&D?

11             A.   Yes, so this is the dollars that

12    were spent during that period, and you know, if you

13    go back to that slide that we talked about a minute

14    ago which is -- well, you put it up on here --

15    related to the high interest patent chart, where

16    you showed about 80 percent were developed during

17    period one, you will notice on slide 6 that the US

18    paid for 73 percent of the research and development

19    during that relative period.

20             Q.   Okay.  Thank you.

21             MR. MAGUIRE:  Good afternoon, Justice

22    Newbould.

23             THE CANADIAN COURT:  Good afternoon.

24             MR. MAGUIRE:  Good afternoon, Judge

25    Gross.



 1                    THE US COURT:  Mr. Maguire, good to see

 2   you.

 3   CROSS-EXAMINATION BY MR. MAGUIRE:

 4          Q.   For the record, Bill Maguire from

 5   Hughes Hubbard for the EMEA Debtors.

 6               Good afternoon, Ms. Ryan.

 7          A.   Good afternoon.

 8          Q.   You were just describing some of

 9   the differences in your slides between numbers that

10   were IP only and some numbers that included all of

11   the buckets, and I would like to invite you, if you

12   would, to turn to page 3 of your report, where you

13   have a table, and we'll try to put that up on the

14   screen.

15               Are you with me?

16          A.   Yes.

17          Q.   And am I right that this table is

18   a comparison between what Mr. Huffard and Mr.

19   Malackowski's approach is, and what you describe

20   your approach is as the total R&D approach?

21          A.   Yes.

22          Q.   And what you do here is you take

23   the total IP from --

24          A.   Yeah, and just to be clear,

25   remember, these relate to only the IP portion.  It



1    is not adding in the non-IP portion, just to -- as

2    it says at the top of the chart.

3              Q.    And that is exactly my point.  We

4    don't have the tangible assets.  We don't have the

5    customer assets, the customer relationships, the

6    non-IP portion of the sales?

7              A.    Not in this particular chart, but

8    if you go to the next page in the report, it does

9    have the total.

10              Q.    That is why I wanted to focus on

11    this chart, because it is IP only; right?

12              A.    Yes.

13              Q.    And all of the adjustments that

14    you have made are IP only?

15              A.    That's correct.

16              Q.    You don't change any of the

17    customer relationships numbers, you don't modify

18    any of the tangible assets numbers?

19              A.    I do not.

20              Q.    Okay.  So if we look at this

21    chart, what we have here under Huffard's report,

22    you set forth how Mr. Malackowski and Mr. Huffard

23    set forth their allocation of IP.  And when we say

24    IP, we mean both from the Rockstar sale and also

25    from the business sales?



```
 1                    A.    That's correct.
 2                    Q.    And that total was a $5.2 billion
 3      number?
 4                    A.    That's correct.
 5                    Q.    Okay.  And then beside that you
 6      have your revised numbers, the numbers from Mr.
 7      Malackowski and Mr. Huffard as changed by your
 8      calculations and analysis?
 9                    A.    That is what is in this chart.
10                    Q.    And so beside each of the dollar
11      numbers you also have the respective percentages of
12      the allocations; right?
13                    A.    Yes.
14                    Q.    So for example, if we look at
15      Canada, Canada here under the Huffard/Malackowski
16      approach was allocated 39.6, about 40 percent;
17      right?
18                    A.    Yes.
19                    Q.    And under your modified approach,
20      you allocate Canada just over 23 percent?
21                    A.    Yes.
22                    Q.    I'm reading that correctly?
23                    A.    Yes.
24                    Q.    So you are reducing Canada's take
25      in this table by -- the effect of your adjustments
```



1    is to cut Canada by something over 16 percent?

2              A.   The result of that is, whatever

3    the 23.4 percent.

4              Q.   Nearly in half.

5              A.   I guess it is sort of a little bit

6    over half.

7              Q.   And then the effect of your

8    modifications with respect to the US is to increase

9    the US share from 42.9, say 43 percent, to a little

10   over 66 percent?

11             A.   That is correct.

12             Q.   That is an increase of more than

13   23 percent?

14             A.   I'll take your math.

15             Q.   An increase of more than half?

16             A.   I'll take your math.

17             Q.   And then with respect to EMEA, the

18   impact of your changes is to change EMEA from 17.4

19   percent down to 10.4 percent, a decrease of exactly

20   7 percent?

21             A.   That's correct.

22             Q.   Something a bit less than half;

23   right?

24             A.   That's correct.

25             Q.   Okay.  Now, if we turn -- you were



1    going to point us I think to the next page, and

2    that is page 4 and you have a table at the top

3    there.

4                    And that table -- I think you were

5    going to tell us that includes the effect of your

6    adjustments when put into the model with all of the

7    numbers, including the non-IP buckets; is that

8    right?

9                    A.   Yes, that's correct.

10                   Q.   And that is where we see that at

11   the bottom of that table the respective numbers

12   that you provided on your slides earlier, showing

13   Canada 20.2 percent, US 66.7 percent and EMEA 13.1

14   percent?

15                   A.   Correct.

16                   Q.   Okay.  Now, you were examined

17   before me by my colleague Mr. Qureshi, and you

18   understand that he represents the Unsecured

19   Creditors Committee?

20                   A.   I do.

21                   Q.   And you understand that the

22   interests of the Unsecured Creditors Committee are

23   very closely aligned with the interests of the US

24   Debtor?

25                   A.   Yes.



```
 1                      Q.   You are aware that the US Debtor

 2   has presented another expert witness at this

 3   proceeding, just yesterday, in fact, a Mr. Kinrich?

 4                      A.   Yes.

 5                      Q.   And you are familiar with his

 6   work?

 7                      A.   Generally.

 8                      Q.   And his opinions and conclusions?

 9                      A.   Generally.

10                      Q.   And you understand that Mr.

11   Kinrich followed a very different approach.  He

12   didn't apply the contribution approach?

13                      A.   Yes, I understand that.

14                      Q.   And you understand that the

15   conclusion of Mr. Kinrich, following his approach,

16   with respect to EMEA is that the EMEA entities'

17   allocation should be 16.8 percent; are you aware of

18   that number?

19                      A.   I don't have his figures

20   memorized, but I'll take you for your word.

21                      Q.   And the US Debtors' position in

22   this proceeding is that that is the right number

23   for EMEA, 16.8 percent?

24                      A.   I understand that.

25                      Q.   Now, if the US Debtor were right,
```



```
 1  and this is a purely hypothetical question, but if
 2  -- if --
 3              A.   My antenna should be up?
 4              THE CANADIAN COURT:  What he wants to
 5  say is "on the outside chance..."
 6              BY MR. MAGUIRE:
 7              Q.   Let's all tread very carefully
 8  here.
 9              If the US Debtor were right, then 16.8
10  percent would be the right number for EMEA and that
11  would mean that your number would be a wrong
12  number?
13              A.   Is that a question?
14              Q.   Well, I guess it is simple math,
15  but we'll put it as a question.  You would agree if
16  the US Debtors' position in this case is correct,
17  then the result of your analysis with respect to
18  EMEA is incorrect?
19              A.   So I guess you could look at it
20  that way.  I think it is more so, as I said
21  earlier, my -- I'm not endorsing the approach.  I'm
22  just recalculating the approach.
23              So this is really based upon the
24  judges.  This is their purview, as what they decide
25  and what approach they decide, and so these are the
```



```
 1    numbers that are available to them to make the

 2    decision, depending on which approach they prefer.

 3              Q.   You are certainly not offering any

 4    opinion in this case as to whether the contribution

 5    approach is the best approach or whether it is not

 6    the best approach; right?  You have made that

 7    clear?

 8              A.   Yes, I'm not actually opining

 9    whether or not any of the experts' approaches are

10    appropriate.  That is not -- that wasn't part of my

11    scope.

12              Q.   But if we look at where you land,

13    applying your modified approach, it is -- the math

14    is clear that you land with respect to EMEA nearly

15    4 percentage points below where Mr. Kinrich lands

16    when he applies his approach, and more than 5

17    percentage points below where Mr. Malackowski

18    concludes applying his approach?

19              A.   That is how the math works, yes.

20              Q.   That is the spectrum we are

21    talking about, the impact of your changes with

22    respect to EMEA?

23              A.   So again, I didn't do my -- if you

24    are -- if the math works out near Mr. Kinrich's

25    report or someone else's report, I mean, there is
```



1    all kinds of comparisons one can do, but the

2    numbers are the numbers.

3              Q.   And in arriving at those numbers,

4    you made certain assumptions; right?

5              A.   Yes.

6              Q.   Now, one of the assumptions you

7    told us about was that the profit sharing transfer

8    -- was with respect to the profit sharing transfer

9    pricing adjustments, and how you found a way to

10   derive how much of those related to research and

11   development?

12             A.   So yes, I took an approach to

13   derive the research and development portion of the

14   adjustment.

15             Q.   And I think you put up a slide,

16   and let me see, there might be a couple of slides,

17   slide 7.  And in that you explained how you got the

18   70 percent?

19             A.   I did.

20             Q.   The 70 percent number you needed

21   to calculate in order to figure out how much of the

22   transfer pricing adjustment related to R&D?

23             A.   That's correct.

24             Q.   Because that wasn't in Nortel's

25   books.  Nortel didn't do this calculation for you?

 Neeson&Associates    W&F

```
 1                 A.    That's correct.

 2                 Q.    Nortel never did the calculation

 3     that you did in your report; right?

 4                 A.    That's correct.

 5                 Q.    So you had to derive that somehow?

 6                 A.    That's correct.

 7                 Q.    And your 70 percent, the way you

 8     got that was to take the direct R&D spend, which

 9     was the actual dollars that Canada actually spent

10     in 2002 on R&D; right?  That was the numerator?

11                 A.    That was part of the equation.

12                 Q.    Right.  And to complete the

13     equation, you had a denominator and the denominator

14     was the combination of the SG&A and the direct R&D

15     spend, those two numbers there which add up to

16     1263?

17                 A.    That's correct.

18                 Q.    And when you say SG&A, that is an

19     acronym for sales, general and administrative?

20                 A.    Yeah, that or selling general

21     administrative.

22                 Q.    And that is not R&D?

23                 A.    No, that is not R&D.

24                 Q.    So your denominator included R&D

25     and sales, general and administrative?
```



```
1                    A.    That's correct.

2                    Q.    And it didn't include any other

3    categories of costs that Nortel Networks Limited

4    expensed in 2002?

5                    A.    That's correct.

6                    Q.    You assumed that it was

7    appropriate for the denominator to include R&D and

8    SG&A, and not any other categories of costs that

9    Canada actually spent in 2002?

10                   A.    That's correct.

11                   Q.    Now, if we were to take an example

12   from across the pond, if we were to take Nortel

13   Networks UK, let us say in 2001, you would

14   acknowledge that in that year Nortel Networks UK

15   spent a great deal of money on things other than

16   R&D and SG&A?

17                   A.    Yes.

18                   Q.    In fact, your work sheets tell us

19   that the company spent more than 2 -- I think it is

20   more than $2.2 billion on cost of revenues.  That

21   is different from SG&A; right?

22                   A.    It is.

23                   Q.    And it is different from R&D?

24                   A.    That's correct.

25                   Q.    And the company also spent, again
```



```
 1   from your work sheets, more than $460 million on

 2   restructuring costs, that is redundancy payments,

 3   other costs of restructuring?

 4              A.   I'll take your word for it.

 5              Q.   Well, I'm asking you.

 6              A.   No, you are asking me the figure,

 7   so I'm assuming the figure is right, but there were

 8   restructuring costs within the transfer pricing

 9   work sheets.

10              Q.   And restructuring costs are not

11   SG&A?

12              A.   No, they are not.

13              Q.   And they are certainly not R&D?

14              A.   No, they are not.

15              Q.   But you did not include any of the

16   cost of revenues in your denominator?

17              A.   No, because the number that was

18   used to derive the required increase/decrease to

19   TPA excluded restructuring costs, for example.

20              Q.   But the actual costs that the

21   company spent in 2001 included costs of revenues?

22   It needed --

23              THE CANADIAN COURT:  Mr. Maguire, can

24   you just tell me for me what on the income

25   statement or balance sheet "Cost of Revenues"
```



1  means?  Costs -- you used the expression "cost of

2  revenues."

3              MR. MAGUIRE:  Yes.

4              THE CANADIAN COURT:  What is the notion

5  there?

6              MR. MAGUIRE:  Let me explore that with

7  the witness, if that is okay, Justice.

8              THE CANADIAN COURT:  All right.

9              MR. MAGUIRE:  You are familiar with the

10  term cost of revenues?

11             A.   Yeah, usually it is cost of sales,

12  but --

13             Q.   Does it include manufacturing?

14             A.   If that is the case, it may.

15             Q.   Does it include inventory?

16             A.   It may include the inventory to

17  the extent it is related to the sales figure.

18             Q.   Does it include distribution?

19             A.   It may.

20             Q.   Any other categories of costs that

21  are included in -- let's say, the $2.2 billion cost

22  of revenues that NNUK had in 2001?

23             A.   So again, I would just say cost of

24  sales, but cost of sales generally are those

25  variable costs that relate to the sales that were



```
 1   made that particular year.
 2                  Q.    And we have talked about a number
 3   of line items, I guess, on the expense side of the
 4   income statement, cost of revenues, manufacturing,
 5   distribution, SG&A, R&D, and there are other
 6   corporate purposes that a company has and that NNUK
 7   had throughout its life that the company had to
 8   spend money on; right?
 9                  We haven't covered all of the line
10   items on the income statement?
11                  A.    No, but in general, you have.  I
12   mean, you have revenue, you have cost of sales, and
13   then you have things that are below your gross
14   profit margin, such as selling, and general
15   administrative, and research and development, and
16   restructuring, so I think you covered the major
17   ones.
18                  Q.    And the dollars, the Nortel
19   parties generally spent a great deal, a great deal
20   of money, a great deal of their cash on things
21   other than R&D and other than SG&A; isn't that fair
22   to say?
23                  A.    Sure.
24                  Q.    Many billions of dollars on
25   manufacturing and distribution and on
```



```
 1   restructuring, to take just three examples?
 2              A.   They did.
 3              Q.   And there was no restriction that
 4   you are aware of on how Nortel companies could
 5   spend the cash that they received in a transfer
 6   pricing adjustment?
 7              A.   Cash is fungible.
 8              Q.   This is not a case where the
 9   transfer pricing adjustments were paid into some
10   special account or kept in some segregated lockbox
11   for any particular purpose?
12              A.   That's correct.
13              Q.   A Nortel company that received 100
14   million dollars in cash under a transfer pricing
15   adjustment was free to spend that entire 100
16   million dollars on R&D?
17              A.   I'm sorry, say that again, please?
18              Q.   A Nortel company that received a
19   transfer pricing adjustment, and I am just making
20   up a number, 100 million dollars, just for the sake
21   of the question --
22              A.   Mm-hmm.
23              Q.   -- it was free to spend that
24   entire amount on research and development?
25              A.   Yes.
```



1                 Q.   It was also free to spend some or

2    all of it on manufacturing?

3                 A.   Yes, but in -- in practical terms

4    the money isn't traced through that way, but yes,

5    in theory.

6                 Q.   The same for distribution,

7    restructuring or any other corporate purpose?

8                 A.   Yes.

9                 Q.   You would agree that a dollar in,

10   a dollar out could be used for any purpose anywhere

11   for anything?

12                A.   Yes, cash is fungible.

13                Q.   And so we are not in a position to

14   say that no one at Nortel used any transfer pricing

15   adjustments -- that no one at Nortel -- let me take

16   that back.

17                You can't say that nobody at Nortel

18   ever used transfer pricing adjustment cash to pay

19   corporate purposes like cost of revenues,

20   restructuring or any other corporate purpose?  You

21   simply can't exclude those?

22                A.   So the thing that you are mixing

23   up a little bit here is this exercise was not to

24   trace a dollar of cash to how it was actually used.

25   It is to reflect the funding obligations of the



1    parties.

2                    And so that is actually what is done.

3    This is the obligation to fund R&D.

4                    When money goes into a bank account,

5    every company, or most companies don't segregate it

6    between okay, I'm going to have an R&D expense

7    account, I'm going to have a cost of sales account.

8    It goes into one cash amount.  But there are

9    obligations that are recorded, and those

10   obligations related to the transfer pricing

11   adjustments relative to R&D were recorded as

12   obligations between and among the entities and it

13   did affect the R&D expense.  And so that -- that is

14   the exercise here.

15                    Q.   Yeah, no, I understand exactly

16   what you are saying.  What I am trying to focus on,

17   though, is how the funding, what the cash, the

18   transfer pricing adjustments actually funded and

19   whether we can say that they did not actually fund,

20   that none of the cash that was ever received by

21   Nortel Networks Limited was ever used for any

22   particular corporate purpose.  We cannot say, for

23   example, that if Nortel Networks Limited Canada got

24   100 million dollar transfer pricing adjustment

25   payment from the United States, that it did not use



1    any of that money for restructuring.  So you are

2    not in a position to be able to say that?

3              A.    That's correct.

4              Q.    Now, if we were to include other

5    costs in the denominator, if we were to go beyond

6    R&D and SG&A and include other costs, other

7    expenses, then the denominator would become bigger?

8              A.    Well, mechanically, yes, but it

9    would be inappropriate.  It wouldn't be relative to

10   this exercise.  It is not -- this exercise is to

11   derive the amount that was funded, the obligation

12   between and among the parties to fund R&D.  This is

13   the amount that was recorded in the books and the

14   records as how much R&D expense was incurred and

15   funded and obligated to pay for.

16             This is not a cash flow exercise.  This

17   is an accrual exercise.  This is an accounting

18   exercise.  And so you could say that about any

19   company about anything about how to trace money and

20   you don't know where -- what dollar is spent on

21   what.

22             Q.    Yeah, you wanted, I think you told

23   us, to figure out how much of the transfer pricing

24   adjustment related to R&D; right?

25             A.    I did say that.



```
 1                    Q.   Okay.  And in doing that, you
 2   included SG&A?
 3                    A.   I did.
 4                    Q.   And you did not include the other
 5   costs?
 6                    A.   That's correct.
 7                    Q.   And if someone were to disagree
 8   with that judgment and decide that a dollar is
 9   indistinguishable, whether it be spent on SG&A or
10   whether it be spent on restructuring, a dollar is a
11   dollar, and decide that we should not limit the
12   denominator to R&D and SG&A, and that other
13   corporate costs, all other corporate costs are
14   worthy of equal consideration and inclusion in the
15   denominator, that would make your denominator
16   bigger?
17                    A.   Well, mechanically it would make
18   it bigger, but it wouldn't be an appropriate
19   analysis.
20                    Q.   I understand that is not what you
21   did.  But a larger denominator would impact your
22   analysis?
23                    A.   Again, mechanically it would
24   impact the analysis, but it wouldn't be an
25   appropriate analysis.
```



```
 1                    Q.   And the way that it would impact
 2    the analysis is that by making a larger
 3    denominator, that would then reduce the percentage
 4    of the transfer pricing adjustment that is related
 5    to R&D as opposed to SG&A and other corporate
 6    expenses?
 7                    A.   So you can't -- remember, this is
 8    the total R&D number is the same, so it might
 9    reduce it for some and increase it for others.  You
10    can't say it would reduce it or increase it.  It
11    will change the numbers is all I can say.
12                    Q.   So --
13                    A.   By putting different numbers in
14    the information, the numbers would change.
15                    Q.   If we were to take Nortel Networks
16    UK for 2001, if we were to add nearly 3 billion
17    dollars combining restructuring costs and costs of
18    revenues, that would significantly impact your
19    calculation?
20                    A.   Well, again, you are -- when you
21    say significantly impact, it may or may not,
22    because it matters, if you are throwing more
23    numbers into an equation, you have to do that for
24    every entity and everything that is done and how
25    that all relates in the relative percentages
```



```
 1   between and among the entities, and it would be
 2   inappropriate to put restructuring in any event
 3   because restructuring is not used.  It is taken out
 4   of the figures before they do the calculation for
 5   transfer pricing.  So it is not even included in
 6   that number.
 7                Q.   The cost of revenues is a shared
 8   expense that is absolutely included, isn't that
 9   right?
10                A.   When you say it is absolutely in
11   there, it is --
12                Q.   The profits of the companies start
13   with revenues and cost of revenues before you make
14   any adjustments, isn't that right?
15                A.   So when you say the income
16   statement has revenues, costs and then below the
17   line costs.
18                Q.   And you have not run any numbers
19   or provided us with any analysis of what the impact
20   would be if the Courts were to consider other
21   expenses besides simply R&D and SG&A?
22                A.   I have not done any other
23   calculations than I have presented today for that
24   purpose.
25                Q.   Now, we have been talking a little
```



1    bit, by way of example, of NNUK in 2001.  If we

2    were to take a slightly broader horizon and talk

3    about the years 2001 to 2005, now, during those

4    years the US company, Nortel Networks Inc., paid

5    the Canadian company, Nortel Networks Limited,

6    about 5 billion dollars in transfer pricing

7    adjustments; right?

8              A.   I don't have the numbers

9    memorized, but if you would like to point me to a

10   chart you are looking at, I'm happy to look at it.

11             Q.   Sure, we can maybe put up from the

12   US Debtor Mr. Bromley's slide.  It is from the

13   opening statement of the US Debtor, slide 198.

14   We'll put that up for you.

15             By the way, you visited this trial

16   before today?

17             A.   When you say did I sit in this

18   room?  I did.

19             Q.   You did, were you present in

20   either courtroom for opening statements?

21             A.   No.

22             Q.   Have you seen the opening

23   statements of Mr. Bromley?

24             A.   I have seen this chart.

25             Q.   Okay.  Now, so you will see here



1    this shows the transfer pricing adjustments by year

2    through 2001 through 2005?

3                    A.    Yes.

4                    Q.    And it is about 5 billion dollars?

5                    A.    That's correct.

6                    Q.    And actually, most of it, it looks

7    like about 2.6, 2.7 billion, is in the first two

8    years, it looks like 2001 and 2002?

9                    A.    That's correct.

10                   Q.    Now, if we go to the next slide,

11   slide 199, you will see where Mr. Bromley showed us

12   that 40 percent of that 5 billion dollars was

13   reversed by the transfer -- by the tax authorities

14   in a settlement; do you see that?

15                   A.    I do see that.

16                   Q.    And Mr. Bromley told us, and this

17   is from page 308 and 309 of the trial transcript,

18   that the Internal Revenue Service and the Canadian

19   revenue authority considered that 2 billion

20   dollars, that 40 percent, had been overpaid and

21   should be considered to be a dividend that had been

22   paid by NNI, the subsidiary, to NNL, the parent, a

23   deemed dividend.  Do you see that?

24                   A.    I don't see it, but I hear you.

25                   Q.    Yes.  The 2 billion dollar figure



```
1    that we are talking about, in applying your
2    approach, you did not reverse any of the 5 billion
3    dollars, did you?
4                A.    You mean the 2 billion?
5                Q.    Any of the 2 billion?
6                A.    Oh, any of the 5 billion -- you
7    mean the 2 of the 5.  No, I did not, nor did Mr.
8    Malackowski.
9                Q.    You did not treat the 2 billion
10   dollar overpaid to NNL as a deemed dividend?
11               A.    No, I did not.
12               Q.    You counted the entire 5 billion
13   dollars as transfer pricing adjustments?
14               A.    I did.
15               Q.    And you would agree with me that a
16   2 billion dollar dividend is different from a 2
17   billion dollar transfer pricing adjustment?
18               A.    The names are different, yes.
19               Q.    And a dividend is not research and
20   development?
21               A.    No.
22               Q.    And a dividend is not SG&A?
23               A.    No.
24               MR. MAGUIRE:  Justice Newbould, Judge
25   Gross, seeing the appointed hour and being about to
```



 1   move on to another topic, I'm in your -- at your

 2   disposal.

 3              THE CANADIAN COURT:  You are at our

 4   disposal?

 5              MR. MAGUIRE:  I'm happy to proceed.

 6              THE CANADIAN COURT:  Do you want to buy

 7   us lunch?

 8              MR. MAGUIRE:  I didn't go that far.

 9              THE CANADIAN COURT:  If this is a

10   convenient time, Mr. Maguire.  How about you, Judge

11   Gross?

12              THE US COURT:  This is fine.

13              THE CANADIAN COURT:  So why don't we

14   come back, how is 2 o'clock.

15     -- RECESS AT 12:47 P.M.

16     -- UPON RESUMING AT 2:00 P.M.

17              THE US COURT:  Good afternoon,

18   everyone.  Please be seated.

19              Good afternoon.  Let me raise a

20   preliminary issue, if I may, because I don't know

21   why we didn't have Monday scheduled, and I have

22   managed to clear some matters.  If the parties are

23   available to proceed on Monday, I think we have

24   fallen perhaps a little bit behind, but I don't

25   want to mess up your schedules either.  So does



1    Monday work for people if we want to go forward on

2    Monday?  Ms. Schweitzer.

3              MS. SCHWEITZER:  Jeff Rosenthal, who is

4    our official scheduler, is in Canada.

5              THE US COURT:  He is still there.

6              MR. ROSENTHAL:  Hello, Judge Gross.

7              THE US COURT:  Mr. Rosenthal.

8              MR. ROSENTHAL:  We will check with the

9    witness that we had planned for Tuesday, and, you

10   know, see if she is available on Monday, and

11   certainly if the Courts are available and would

12   like, and she can do that, we would be more than

13   happy to accommodate.

14             THE US COURT:  Or if any of the

15   witnesses that are now scheduled for today and

16   tomorrow need to, you know, go over, perhaps that

17   would work too.

18             MR. ROSENTHAL:  That is actually a good

19   point, we will ask, Your Honour.  Because we do

20   have one issue that we were going to see how long

21   Ms. Ryan's examination was going to be, but the two

22   subsequent witnesses that we have this week are

23   both being cross-examined by Mr. Barrack who has a

24   conflict tomorrow and we had previously agreed that

25   we would not call them if they could not be



1    completed today.

2                    But we could find out to the extent

3    that they would be available Monday to at least

4    clear that up.

5                    THE CANADIAN COURT:  I'm not quite sure

6    what that -- I was wondering how long we are going

7    to be sitting tomorrow as well.

8                    MR. ROSENTHAL:  My expectation in light

9    of the conflict that we have agreed to accommodate

10   is that the only witness tomorrow would be Ms.

11   Tucker.  I don't know how long the

12   cross-examinations will be.  I would expect the

13   direct examination to probably be about an hour, if

14   the parties want to give their cross estimates,

15   presumably we can be done by lunch, if they are not

16   very long.

17                   THE CANADIAN COURT:  Well, the US folks

18   might be able to be out of here Friday afternoon.

19                   MR. ROSENTHAL:  That is definitely a

20   possibility, Your Honour.

21                   THE US COURT:  How about the other

22   witnesses, Mr. Rosenthal?  Mr. McConnell, for

23   example, is he still --

24                   MR. ROSENTHAL:  So Mr. McConnell is

25   here, was prepared to testify today, but I suspect



```
 1   that given the hour right now he wouldn't be
 2   completable today, and Mr. Barrack has a conflict
 3   tomorrow and asked us can we please not do him if
 4   he would spill over to tomorrow.  Same thing with
 5   Mr. Kilimnik, my understanding is that Mr. Barrack
 6   is planning to do both witnesses, so we had agreed
 7   to that accommodation.
 8              But with Monday being available,
 9   perhaps we can --
10              THE CANADIAN COURT:  Yeah, I'm with
11   Judge Gross, I think we should be sitting on
12   Monday.
13              MR. ROSENTHAL:  Well, we are happy
14   to -- we'll talk to all three of those witnesses
15   and see what can be done.
16              THE US COURT:  Thank you.
17              THE CANADIAN COURT:  When Judge Gross
18   asked about Monday and if anybody had a problem, it
19   reminded me when I was a student and I worked in a
20   factory one summer, we were card-carrying members
21   of a union and we went to a union meeting and the
22   way they held the vote, they were trying to get a
23   strike, anybody opposed, stand up.
24              And only one poor fellow stood up, and
25   he didn't stand up for long.
```



```
 1                    MR. ROSENTHAL:  The one other thing I
 2   would note, Judge Gross, by the way, is after Ms.
 3   Eden and the two that will presumably spill over,
 4   that is our last witnesses, just I wanted to make
 5   sure the Courts were aware that that's all we had
 6   for remaining witnesses.
 7                    THE CANADIAN COURT:  Well, we have got
 8   Robert Kilimnik.
 9                    MR. ROSENTHAL:  Yes, who I understand
10   should be a short witness.
11                    THE CANADIAN COURT:  John McConnell.
12                    MR. ROSENTHAL:   And then Ms. Lorraine
13   Eden or Dr. Eden.
14                    THE CANADIAN COURT:  And Catherine
15   Tucker.
16                    MR. ROSENTHAL:  Catherine Tucker will
17   be tomorrow --
18                    THE CANADIAN COURT:  Tomorrow, okay.
19                    MR. ROSENTHAL:  -- or Dr. Tucker also,
20   and then we would have Eden and McConnell and
21   Kilimnik.
22                    THE CANADIAN COURT:  Okay, thanks very
23   much.
24                    THE US COURT:  All right.
25                    THE CANADIAN COURT:  Mr. Maguire.
```



```
 1                    BY MR. MAGUIRE:
 2              Q.   Thank you, Justice Newbould, Judge
 3    Gross.
 4              Good afternoon.
 5              A.   Good afternoon.
 6              Q.   Your slides confirm that over the
 7    decades of the 1990s and 2000s Nortel spent over 35
 8    billion dollars on research and development; you
 9    are familiar with that number, 35 billion?
10              A.   That sounds about right.
11              Q.   And is it fair to say that over
12    those two decades, Nortel turned to a lot of
13    sources to fund that cash need?
14              A.   When you say fund that cash, you
15    are saying Nortel certainly received as an entity
16    for all its operations, received funding between
17    and among its entities as well as through the
18    bonds.
19              Q.   Certainly, and you haven't run
20    down all the sources of Nortel's -- of the 35
21    billion that Nortel spent on research and
22    development in the 1990s and 2000s?
23              A.   As I said earlier, I didn't trace
24    cash.
25              Q.   Do you know whether over those two
```



```
 1    decades any of the US or the Canadian or the EMEA
 2    parties obtained any cash from their distribution
 3    subsidiaries?
 4              A.   Can you say that again, please?
 5              Q.   Yeah, do you know whether any of
 6    the parties, US, Canadian, EMEA, got any cash from
 7    their distribution subsidiaries, any time over
 8    those two decades?
 9              A.   So as I said earlier, I didn't do
10    a cash-tracing exercise.
11              Q.   Do you know whether any of the US
12    or Canadian or EMEA parties used any cash from
13    their distribution subsidiaries to fund any of
14    their research and development?
15              A.   I did not do a cash-tracing
16    exercise.  What I did see is that there were
17    movements related to the obligations to fund
18    research and development between and among those
19    entities.
20              Q.   You are aware that the parties had
21    distribution subsidiaries that made 1 percent,
22    sometimes as much as 4 percent of gross sales?
23              A.   I'm aware there were distribution
24    entities.
25              Q.   And are you aware that a
```



1  percentage of gross sales, Nortel had very

2  substantial gross sales, if you take the whole

3  decade of the '90s and the decade of the 2000s;

4  right?

5           A.   Yes, it was a very large

6  corporation.

7           Q.   Would it be fair to say that over

8  those two decades, Nortel's creditors funded at

9  least some of that 35 billion dollars?

10           A.   Again, I didn't do a cash-tracing

11  exercise, and when you say creditors funded, that

12  is -- I'm not sure I understand what you are trying

13  to achieve.

14           Q.   The 35 billion dollars had to come

15  from somewhere.  Nortel had to get the cash from

16  someone.  Would you agree that it is fair to say

17  over those two decades the creditors provided some

18  of the cash, some of that 35 billion dollars?

19           A.   And so did the customers.

20           Q.   And the shareholders?

21           A.   Cash came from many -- well, not

22  many, but cash came from a number of sources over

23  time.

24           Q.   How about governments?  Are you

25  aware that governments provided subsidies for



1    research and development?

2              A.   Well, they may have.

3              Q.   So that 35 billion came from a

4    number of sources and you haven't traced down

5    specifically all the sources; right?

6              A.   Again, I said I didn't do a

7    cash-tracing exercise.

8              Q.   But none of the people we have

9    been talking about, that we have mentioned anyway,

10   actually performed any of Nortel's research and

11   development; right?

12             A.   When you said any of the people,

13   who are you referring to?

14             Q.   Well, the governments for example,

15   when a government gave a subsidy to Nortel to

16   perform research and development, it gave cash; it

17   didn't actually perform the research?

18             A.   That's correct, I would think so,

19   I think that is just factually correct.

20             Q.   And to the extent that customers

21   or creditors or shareholders provided any cash that

22   Nortel used to fund research and development, the

23   customers, the creditors, the shareholders, the

24   banks, none of them actually stepped into a lab and

25   invented anything?



```
 1                    A.   No, but I don't think they funded
 2    research and development.
 3                    Q.   Well, on a broader point, do you
 4    accept that there is a fundamental difference
 5    between funding something and actually performing
 6    something?
 7                    A.   I do.
 8                    Q.   It is very important that we all
 9    pay our kids' tuition, right, but actually paying
10    tuition is not the same as qualifying as a teacher
11    and stepping into a classroom and actually
12    teaching?
13                    A.   That's correct.
14                    Q.   And paying a medical bill is not
15    the same as stepping into an operating room and
16    performing surgery?
17                    A.   That's correct.  Okay.
18                    THE CANADIAN COURT:  This must be a
19    trick question.
20                    THE WITNESS:  I know, I'm trying to see
21    where this is going.
22                    BY MR. MAGUIRE:
23                    Q.   And all this by way of
24    illustrating that when you fund -- medicine is an
25    obvious example, that is not the same as performing
```



1    a medical examination, performing a diagnosis or

2    performing a course of treatment?

3                    A.    That is true.

4                    Q.    In each case, we are talking about

5    the distinction between funding something, paying

6    for something, and actually performing it; right?

7                    A.    In those examples, I think that is

8    what you are trying to compare.

9                    Q.    And you recognize that is a

10   fundamental distinction?

11                   A.    I recognize it is a distinction.

12                   Q.    And in any given year, Nortel

13   measured research and development activity by the

14   amount of money that a participant party spent in

15   its country performing research and development;

16   isn't that right?

17                   A.    That's correct.

18                   Q.    To take an example, we spoke

19   earlier about Nortel Networks UK, the UK company,

20   in 2001.  It spent 352 million dollars in what you

21   call direct R&D spend; right?

22                   A.    I'll just take it without looking

23   at my chart.  If you would like me to look at the

24   chart, I'm happy to do so, but I'm happy to say

25   that is fine.



```
 1                    Q.   Okay, and by direct R&D spend,
 2     what we mean is that that's the amount of money
 3     that Nortel Networks UK actually spent on labs and
 4     salaries and the costs of actually performing
 5     research and development in the United Kingdom;
 6     right?
 7                    A.   That's correct.
 8                    Q.   And that is all in Nortel's books
 9     and records; right?
10                    A.   That's correct.
11                    Q.   And that is how Nortel measured
12     Nortel Networks UK's research and development
13     contribution for 2001?
14                    A.   I wouldn't necessarily agree with
15     that statement.
16                    Q.   Well, you adjusted Nortel's
17     numbers to apply your revised approach; right?
18                    A.   So I came up with adjustments.
19                    Q.   And you used -- you came up with
20     what you called the TP used for R&D?
21                    A.   For the second -- for period two,
22     that's correct.
23                    Q.   Right.  And that is the number
24     that you derived using the nominator and
25     denominator that we discussed earlier?
```



```
 1                    A.   Yes.
 2                    Q.   Okay.  Now, for Nortel Networks UK
 3    in 2001, the number that you derived for TP used
 4    for R&D is 360 million dollars?
 5                    A.   Do you want me to verify that, or
 6    are you asking me --
 7                    Q.   If you have any doubt about that
 8    I'm happy to --
 9                    A.   I'm happy to take your
10    representations, it is probably about that amount.
11                    Q.   And it is a bracketed number, so
12    that means it is a negative number?
13                    A.   Actually, just let me look where
14    you are looking.  I think that might be better can
15    you point me to --
16                    Q.   Yes, I don't think it is in your
17    actual schedule.  I think we will have to go to
18    your back up spreadsheet, okay?
19                    A.   Okay, sure.
20                    Q.   So if we look at your -- we can
21    pull it up, it is Exhibit TR50996, it's tab D-2
22    details.
23                    A.   Okay.
24                    Q.   And you will see here Exhibit D-2
25    to your report, revised Huffard report, you call
```

 Neeson&Associates   W&F

1   this "Detail Total R&D Contribution by Debtor Group

2   1989 To 2008"?

3            THE CANADIAN COURT:  Is this an exhibit

4   to the report?

5            MR. MAGUIRE:  This is not an exhibit to

6   the report, as I understand it, Justice Newbould.

7   This is a backup material that Ms. Ryan provided.

8            THE CANADIAN COURT:  Oh, I see, you

9   have got that in the deposition.

10           MR. MAGUIRE:  Yeah.

11           BY MR. MAGUIRE:

12           Q.   If we look at this document, we

13   will see that you have in column "B" the different

14   years for the different entities; right?

15           A.   Yes, that's correct.

16           Q.   And then across the top we have

17   the different entities, and I think if we scroll

18   across to "M," we will see Nortel Networks UK, and

19   we might be able to focus just on that column and

20   bring that over to the left, if we can make that a

21   little easier for everyone to read.

22           And then if we go down to 2001, now

23   here you see the numbers from your spreadsheet for

24   Nortel Networks UK for 2001; right?

25           A.   Yes.

 Neeson & Associates   W&P

```
 1                    Q.    And at the top you have -- it
 2     looks like row 54, you have the direct R&D spend?
 3                    A.    That's correct.
 4                    Q.    And that is 352 million and
 5     change?
 6                    A.    That's correct.
 7                    Q.    And then if we go down to line 68
 8     on the spreadsheet, we'll see TP used for R&D; do
 9     you see that?
10                    A.    I do.
11                    Q.    And that is 360 million dollars?
12                    A.    Yes.
13                    Q.    And that is a negative number?
14                    A.    It is.
15                    Q.    And that means we should reduce
16     NNUK's R&D number by the TP used for R&D; right?
17                    A.    Yes.
18                    Q.    And when we put the 352 million
19     that Nortel Networks UK actually spent performing
20     R&D in 2001 together with your negative number 360
21     million, we end up with minus 8 million dollars as
22     how you count the contribution of Nortel Networks
23     UK for 2001?
24                    A.    Probably that is right.  It is
25     added up top.
```

 Neeson&Associates   W&F

 1                    Q.   So all of the work that Simon
 2   Brueckheimer and more than a thousand other
 3   researchers did in 2001 showing up for work every
 4   day in Maiden Gate and Harlow and everyone else in
 5   the United Kingdom, all of that at the end of the
 6   day you say counts when you consider the other
 7   adjustments you make as a negative 8 million
 8   dollars?
 9                    A.   For that particular entity, that
10   entity was then combined with the others and that
11   results in the numbers in my report.
12                    Q.   It is an interesting question that
13   a person's research and development can be a
14   negative number, and I realize math is just math,
15   but the idea of negative research and development
16   almost suggests like you uninvented something?
17                    THE CANADIAN COURT:  Mr. Maguire, can I
18   see that footnote 9.
19                    MR. MAGUIRE:  Certainly, Your Honour.
20   That I think is a reference to -- yes, "Calculated
21   On An Entity Basis (R&D Percentage of Combined
22   TPA)."
23                    BY MR. MAGUIRE:
24                    Q.   And that is a reference to I guess
25   the 70 percent example that you gave us earlier

Neeson&Associates   W&F

1    where you described the nominator and the

2    denominator?

3              A.   Yes, so calculated by -- on an

4    entity-level basis, and then it was grouped by the

5    debtor groups and the summarization of the debtor

6    groups is what is included in my report.

7              THE CANADIAN COURT:  All right.

8              THE WITNESS:   In the summarization

9    tables in the report, in D-2 in the report.

10             BY MR. MAGUIRE:

11             Q.   In any event, the bottom line is

12   for NNUK for 2001, when you do your analysis, you

13   end up with a minus 8 million for all the good work

14   that Mr. Brueckheimer and everybody else across the

15   pond did?

16             A.   That is the figure that is here.

17             Q.   And that is counting all of the

18   inventions and the patents and all the other work

19   that they actually performed that year in the

20   United Kingdom?

21             A.   That's correct.

22             Q.   And that is based on your TP used

23   for R&D number that you derived using that

24   nominator and denominator?

25             A.   That's correct.



1                    Q.   Which computes, you compute that

2      derived number was a negative 360 million for this

3      particular year?

4                    A.   The transfer pricing adjustment is

5      a negative 360 million.

6                    Q.   Do you know whether Nortel

7      Networks UK actually got any of that funding?

8                    A.   I know that it was recorded as an

9      obligation to be paid.

10                   Q.   Do you know whether Nortel

11     Networks UK actually got any of that money?

12                   A.   Again, you are back to the

13     questioning about did I trace cash.  I didn't trace

14     cash.

15                   Q.   So you don't know whether Nortel

16     Networks UK got any of that money?

17                   A.   I don't know if they actually paid

18     their obligation.  It was a recorded obligation in

19     the books and records of the company.

20                   Q.   Do you know whether Nortel

21     Networks Inc., the US company, ever paid any cash

22     to -- any transfer pricing adjustment to any EMEA

23     entity, including Nortel Networks UK?

24                   A.   So my general understanding is

25     that the way the funds moved was to -- for example,



1    in US, the US entity would pay it over to Canada

2    and then Canada would then distribute it back out.

3                    Q.   So to the best of your

4    understanding, if the 360 million is a number that

5    you credit to Nortel Networks Inc., Nortel Networks

6    Inc. never actually paid any of that cash to Nortel

7    Networks UK?

8                    A.   Are you telling me that is a fact

9    or you are asking me?  I'm -- I'm not sure I

10   understand your question.

11                   Q.   I'm asking you your understanding.

12   If I understood your answer, you believe that

13   Nortel Networks Inc., the US firm, paid transfer

14   pricing adjustments not to EMEA but to Canada?

15                   A.   That is my general understanding,

16   yes.

17                   Q.   So if the 360 million came from

18   the US, the US never paid that money to EMEA?  Your

19   understanding is they paid that money to Canada?

20                   A.   The funding obligations were

21   recorded between and among the entities.  How the

22   funds flowed between and among the entities, yes,

23   whether or not Canada passed along back,

24   consolidated the cash and passed along back to the

25   UK, I don't know.

 Neeson & Associates    W&P

1          Q.   And you have no idea if NNUK ever
2    got any of that money?
3          A.   My understanding is that they have
4    a claim, so they -- it sounds like they have a
5    claim for the net amount that they were owed, at
6    least some portion of what they were owed.
7          Q.   But in any event, it doesn't make
8    any difference to your analysis whether EMEA ever
9    got a single dollar of that actual cash?
10         A.   No, it doesn't.
11         Q.   So even if EMEA never got a single
12   dollar of the 360 million that reduces its
13   contribution from 352 million to a negative 8
14   million, that does not in any way impact your
15   analysis?
16         A.   That's correct.
17         Q.   Now, you would agree that when we
18   talk about funding, that means to pay for
19   something?
20         A.   So in terms of this exercise, the
21   funding means an obligation to pay something.
22         Q.   Simon Brueckheimer's salary was
23   paid in cash; right?
24         A.   I don't know how Mr. Brueckheimer
25   was paid.



1               Q.   Well, nor do I, but I guess it

2    would be fair for us to assume that the good folks

3    at Nortel Networks UK, when they got their salary

4    every two weeks or whenever they were paid, that

5    they were paid in cash?

6               A.   I'll take your assumption.

7               Q.   And you would agree that it would

8    not be possible for Nortel Networks UK to have paid

9    anyone any cash that it never got?

10              A.   It needs cash to pay cash.

11              Q.   Now, you told us earlier how Mr.

12   Malackowski took a different approach from the

13   approach that you took?

14              A.   He did a different -- he employed

15   a different way of getting to the numbers under the

16   contribution approach.

17              Q.   We could maybe put up that slide

18   that Mr. Qureshi showed you earlier from Mr.

19   Malackowski's presentation.  I don't remember the

20   exact reference, but hopefully we have it.

21              While we are waiting for that, you

22   saw -- you have read Mr. Malackowski's trial

23   testimony?

24              A.   I'm familiar with it.

25              Q.   Yes.  This is the slide that



 1    Mr. Qureshi showed you on direct examination?

 2                    A.    He did.

 3                    Q.    Yes.  And you recall that Mr.

 4    Malackowski was focussed on the lab notes and the

 5    project accounting.  Do you recall that he

 6    testified that that would be his starting place, if

 7    he had the right information, to go directly to the

 8    labs, directly to the inventors, directly to the

 9    people who actually came up with the inventions

10    that drove Nortel's business; do you recall that?

11                    A.    Well, I do recall him talking

12    about that topic.  In his report, and it's the

13    couple of paragraphs that I referred to earlier

14    right before the paragraph in the contribution

15    approach section where he talks about where he

16    ultimately concluded how to do this analysis.  He

17    talks about the desire to look at lab notes and

18    those weren't available.

19                    But as you read on to his -- in those

20    two paragraphs, he talks about, and I am happy to

21    show you, but he talks about the fact that Nortel's

22    R&D activities were done on a global and integrated

23    and collaborative basis, and to go to the other

24    approaches that he first explored would be

25    misleading.



```
 1                       Q.   And where he landed was on what
 2   you call direct R&D spend, that is what he actually
 3   used; right?
 4                       A.   That is what he used.
 5                       Q.   And that is what he calls here R&D
 6   spend; right?  That is the one with the little
 7   green circle and the little checkmark arrow on his
 8   slide?
 9                       A.   That's correct.
10                       Q.   And he explained in his trial
11   testimony that that was the best proxy to reflect
12   the actual research and development activities that
13   were conducted by the parties in their countries;
14   right?
15                       A.   I would have to look back at his
16   report and see if he said exactly what you just
17   said.
18                       Q.   That is effectively what his slide
19   says, if we look at the first bullet under R&D
20   spend, right, that it "reflects the actual R&D
21   activities conducted by the RPE"; right?
22                       A.   Yes, you are correct, it does say
23   that.
24                       Q.   And if we back up, he also pointed
25   out that that was consistent with the measure of
```



1    contribution to research and development used by

2    Nortel; right?

3              A.   That is what it says there.

4              Q.   Okay.  You are familiar with the

5    Alcatel transaction?

6              A.   Generally.

7              Q.   Now, Nortel did not make any

8    adjustments to its research and development numbers

9    based on transfer pricing adjustments when it was

10   allocating the proceeds of the Alcatel sale; right?

11             A.   It did not adjust its transfer

12   pricing, that's correct.

13             Q.   In your report you note that Mr.

14   Huffard and Mr. Malackowski backed out the research

15   and development numbers from the numbers, the data

16   that they used, the research that Nortel had

17   conducted relating to its UMTS business; right?

18             A.   Yes, that's correct.

19             Q.   That is not an adjustment that you

20   made; right?

21             A.   That's correct.

22             Q.   The numbers you used include the

23   money that Nortel spent on research and development

24   for the UMTS business?

25             A.   It includes all of the research



1    and development funded during the relative periods.

2              Q.   And that includes the R&D that

3    Alcatel -- that Nortel did for the UMTS business?

4              A.   That's correct.

5              Q.   And that business you know was

6    sold to Alcatel in 2006?

7              A.   That's correct.

8              Q.   And none of the buyers in any of

9    the business sales who bought a business in 2009 or

10   2010 paid anything for the research and development

11   work that was sold to Alcatel back in 2006?

12             A.   Can you please repeat that

13   question?

14             Q.   Yes.  The buyers who came along in

15   the business sales, they came along in 2009 and

16   2010.  What they bought, the pool of intellectual

17   property they bought, that didn't include anything

18   that had been sold to Alcatel three or four years

19   earlier?

20             A.   That's correct.

21             Q.   And the Rockstar purchase, there

22   weren't any patents in the Rockstar sale.  All of

23   the ones that were sold to Alcatel, they weren't

24   included in the portfolio that was sold to

25   Rockstar?



```
 1                    A.   I'll take your word for it.  I
 2   just don't know if there was some residual rights.
 3   I don't know that.  But I'll take your word for it.
 4                    Q.   And that is why Mr. Malackowski
 5   and Mr. Huffard backed out the R&D that was
 6   attributable to the UMTS sale from their numbers;
 7   is that fair?
 8                    A.   Are you asking me a question or
 9   are you making a representation?
10                    Q.   I'm asking.  That is the obvious
11   reason?
12                    A.   I know they -- I know they
13   deducted it.
14                    Q.   Okay.  And that is not a deduction
15   that you made?
16                    A.   I did not make that deduction.
17                    Q.   You are familiar with the Foundry
18   settlement?
19                    A.   Generally.
20                    Q.   You are aware that Nortel did not
21   make any transfer pricing adjustments to its R&D
22   numbers when it was allocating the proceeds of the
23   Foundry settlement?
24                    A.   Yes.
25                    Q.   Nobody at Nortel used any
```



1   nominator or denominator like we have discussed

2   today?

3           A.    No.

4           Q.    You are aware that Nortel

5   undertook profit sharing from 2001 through 2008?

6           A.    I'm aware that there was a

7   different approach to transfer pricing that

8   involved an RPSM method.

9           Q.    And in accomplishing that method

10  Nortel did not make any adjustments to its R&D

11  numbers based on transfer pricing adjustments?

12          A.    During period two, the entries

13  would not have gone directly against R&D expense.

14  It would have been to another account to reduce the

15  profit.

16          Q.    The only entries that would have

17  gone into that process were the ones that you

18  called direct R&D spend?

19          A.    That's correct.

20          Q.    And that is the dollars that each

21  company spent in performing research and

22  development in its own country?

23          A.    That's correct.

24          Q.    Now, you saw that, when you were

25  working with Mr. Huffard's and Mr. Malackowski's

Neeson & Associates    W&F

1    work, you saw that they referred to a contract, the

2    Master Research and Development Agreement that we

3    refer to as the MRDA?

4              A.    Yes.

5              Q.    And when you saw that reference,

6    you looked at the MRDA?

7              A.    Yes, I'm assuming you are asking

8    me a question.  I'm sorry if I'm not --

9              Q.    That was a question.  If my voice

10   didn't tail up at the end, I meant that as a

11   question.

12             A.    Yes.

13             Q.    But you did look at the contract.

14             A.    I did.

15             Q.    When you looked at it, did you

16   observe that the contract itself does not use the

17   term "to fund" or "funding."  That it does use the

18   term "perform" or "performance"?

19             A.    I don't recall specifically.  I

20   would have to look at it to see it again.

21             Q.    Okay, we can try to maybe pull up

22   the -- the contract at the second page.  I can get

23   you a hard copy as well, if you would like, but

24   we'll pull it up here.

25             A.    I would appreciate that, thank



1    you.

2                   Q.   So we have the first page of the

3    document in front of us.  Maybe we can turn to the

4    second page and go to the fourth recital.  You will

5    see that it provides the words:

6                   "Whereas each Participant has

7                   performed, in the past, and intends to

8                   continue to perform R&D Activity with

9                   respect to the Nortel Products."

10                  You see the use of the term "perform"

11   there?

12                  A.   If you don't mind, could you give

13   me one minute just to refresh my memory of this

14   before I jump to the clause that you are looking

15   at, please.

16                  Q.   Absolutely.  Take as much time as

17   you need.  Just tell me when you are ready to

18   proceed.

19                  A.   (Witness reviews document.)

20                  Can you go back to your original

21   question, please?  I don't remember.

22                  Q.   Yes.  We have it blown up on the

23   screen, but it is about this recital and I am just

24   asking you to observe here that the parties used

25   the term "performed," and how they have performed



1    in the past and how they each intend to continue to

2    perform research and development?

3              A.   It does say that.

4              Q.   Okay, and if you skip down two

5    more recitals, there is one that starts:

6                   "Whereas each Participant believes

7                   that it is appropriate [...]"

8              And you will see it specifically

9    mentions in the second line "its contribution to

10   R&D activity," do you see that?

11             A.   I do.

12             Q.   And the next line again refers to

13   "contribution to that R&D activity."

14             A.   I see that.

15             Q.   And R&D activity is a term that

16   shows up in the definitions, if we go to page

17   numbered 4 of the document, two more pages, there

18   is a definition (h), do you see that, R&D activity?

19             A.   I do.

20             Q.   And you see if we -- on the second

21   line you will see again there is a reference to

22   "performed," and the focus here again is on

23   research and development that was performed by or

24   for any participant, do you see that?

25             A.   I do.



```
 1                     Q.   And then if we skip down to the
 2    bottom of the page, Article 2(a), that contains the
 3    commitment that:
 4                     "Each Participant hereby agrees to
 5                     use its best efforts to perform R&D
 6                     Activity [...]"
 7                     Right?
 8                     A.   I see that.
 9                     Q.   And then if we go across to the
10    next page, 5, up near the top, we'll see Article 3,
11    R&D activity payments and section (a) refers to the
12    "performance of R&D Activity," right?
13                     A.   I see that.
14                     Q.   And the second -- or the last two
15    lines I guess of that section again refer to:
16                     "The benefit to which it is
17                     entitled commensurate with its
18                     performance of, and contribution to,
19                     R&D Activity"; right?
20                     A.   I see that.
21                     Q.   And then if we go a few pages more
22    to page 10, there is a section (c) at the top and
23    this is section -- Article 11 (c) and little "i"
24    describes a defaulting event and little "i," the
25    very first defaulting event is where an eligible
```



    1    participant fails to perform any R&D activity for

    2    two years; do you see that?

    3                    A.    I do.

    4                    Q.    Okay.  And then last but not

    5    least, there is a Schedule A that follows the body

    6    of the agreement, it is on page 15 of the contract,

    7    and it is in the paragraph that starts towards the

    8    bottom of the page "On the other hand [...]," and

    9    that refers to "[...] Nortel entities not subject

   10    to the agreement"; do you see that?

   11                    A.    Yes, I see that.

   12                    Q.    They are described as the least

   13    complex entities and the parties note in their

   14    agreement that they, meaning the distribution

   15    entities, do not perform research and development;

   16    right?

   17                    A.    Correct.

   18                    Q.    So do you recall making the

   19    observation when you looked at the Master Research

   20    and Development Agreement, the emphasis on

   21    performing research and development?

   22                    A.    I read those clauses.

   23                    Q.    Okay.  Now, the parties to the

   24    contract are set forth at the very beginning of the

   25    agreement, and you read the entire agreement when



```
 1   you got it?
 2            A.   I did.
 3            Q.   Okay.  If we go to your last
 4   slide, I think you described this as an entity
 5   level allocation for EMEA; is that right?
 6            A.   Yes.
 7            Q.   And if I understand the way this
 8   works, you have a list of all of the entities, the
 9   EMEA entities on the left, and then you have the
10   value and the percentage allocation that they get
11   under the Huffard and Malackowski approach, and you
12   got that from Mr. Huffard and Mr. Malackowski's
13   reports; is that right?
14            A.   Yes, exactly.
15            Q.   And then the revised Huffard
16   report are your adjustments, right, for, first of
17   all, the Cost Sharing Agreement period and then in
18   blue for the revised -- the numbers for both
19   periods?
20            A.   That's correct.
21            Q.   Okay.  And if we just take a
22   couple of examples, if we go down it looks like
23   five lines down, you have Nortel Networks SA, that
24   is the French subsidiary; right?
25            A.   Yes.
```



```
 1                     Q.   And then underneath it you have
 2   Nortel France SAS, that is another French
 3   subsidiary?
 4                     A.   Yes, and I see it says Nortel
 5   France, but I'm assuming that Nortel Networks SA is
 6   in France as well.  I don't know that for a fact.
 7                     Q.   I'll represent to you that Nortel
 8   Networks SA is the French subsidiary.
 9                     A.   Thank you.
10                     Q.   And then underneath the two French
11   companies we have Nortel GmbH, a German subsidiary?
12                     A.   I see that.
13                     Q.   And then if I understand how this
14   works, if we look at Nortel France SAS and Nortel
15   GmbH and we go across, we see the amounts that Mr.
16   Huffard allocates and then under your revised
17   approach, you cut the Nortel France SAS from 22
18   down to 15 and a half; right?
19                     A.   That is the result of the
20   adjustments.
21                     Q.   Yeah, and then down again to 13.9?
22                     A.   In the last set of adjustments,
23   the last set of columns.
24                     Q.   Okay.  And then there are similar
25   adjustments for the German company?
```

Neeson & Associates    W&F

```
 1                    A.    Correct, meaning it is going --
 2    reduced.
 3                    Q.    And that is based on the
 4    adjustments to the transfer pricing adjustments
 5    based on your analysis?
 6                    A.    That's correct.
 7                    Q.    Now, neither of those companies
 8    were parties to the Master Research and Development
 9    Agreement; right?
10                    A.    They may not have been.
11                    Q.    So they never got any transfer
12    pricing adjustments?
13                    A.    So to the extent that there were
14    adjustments made to this entity, it would be how
15    they were reflected in the transfer pricing
16    worksheets, so there must have been -- some of the
17    entities did -- although it did say in this
18    agreement that certain entities would only perform
19    the research and development, in fact what did
20    happen is even some of the distributors or the
21    limited risk entities also performed some R&D from
22    time to time and fell into the calculations that
23    was performed by Nortel.
24                    Q.    They did not have any agreement,
25    however, to share any research or certainly didn't
```



1    have an agreement under the Master Research and

2    Development Agreement to get any transfer pricing

3    adjustments, to share any research, to assign any

4    title to any patents or any of the other provisions

5    of the Master Research and Development Agreement,

6    because they weren't parties to it; right?

7                A.    That is probably right.  Some of

8    the adjustment that related to Nortel GmbH, if I

9    recall, have to do with a settlement related to the

10   ARE entities and so there might be something in

11   there in the model that relates to that, and that

12   was also reflected in Mr. Huffard's report.

13               Q.    And when you say ARE entities, you

14   are referring to at-risk entities; right?

15               A.    Yes.

16               Q.    And they also had no research and

17   development deal.  They were not party to the MRDA;

18   right?

19               A.    No, but I'm just saying in the

20   calculations to derive the allocation of proceeds,

21   there was some adjustments made by Mr. Huffard

22   which I carried through and were talked about

23   related to those entities.

24               Q.    But you made additional

25   adjustments to what Mr. Huffard did, and your



1    additional adjustments are supposed to be based on

2    transfer pricing adjustments; right?

3                A.   They were.  I can't explain this

4    without seeing all the detail.

5                Q.   Very good.  Those are my

6    questions.  Thank you, Ms. Ryan.

7                A.   Thank you.

8                THE CANADIAN COURT:  Anyone else?

9    Mr. Finnigan.

10               MR. FINNIGAN:  Yes, good afternoon,

11   Justice Newbould.  Good afternoon, Judge Gross.

12               THE US COURT:  Good afternoon.

13   CROSS-EXAMINATION BY MR. FINNIGAN:

14               Q.   Ms. Ryan, my name is John Finnigan

15   of Thornton Grout Finnigan, and I represent the UK

16   Pension Claimants.

17               A.   Pleasure to meet you.

18               Q.   Pleasure to meet you, too.  The

19   very thorough Mr. Maguire has stolen most of my

20   thunder, so I am reduced to one topic and it won't

21   take long.

22               He has taken you to the MRDA that you

23   have read in preparation of your report, and I want

24   to ask you, under the MRDA, did you understand that

25   the participants agreed to divide residual profits



1    based on the individual participants' contribution

2    to research and development activity?

3                    A.    That sounds like the language that

4    is in this agreement.

5                    Q.    And you understood that the

6    allocation key for that was research and

7    development capital stock?

8                    A.    So my general understanding of

9    that there was two different calculations during

10    the MRDA period, but that is one of them for sure.

11                    Q.    And that the R&D capital stock was

12    the measure of historical R&D expenditures by the

13    various participants?

14                    A.    Yes.

15                    Q.    And in the formula that

16    Mr. Maguire took you to in Schedule A, each

17    participant's contribution to research and

18    development was taken into account in determining

19    how much of the residual profits they would receive

20    each year, or losses?

21                    A.    That's correct.

22                    Q.    So the transfer pricing

23    adjustments that were the product of the

24    application of the formula had already taken

25    account of each party's contribution to the



1   research and development?

2              A.   So the transfer pricing adjustment

3   was a result of doing that analysis related to

4   research and development.

5              Q.   Right, and embedded in that

6   formula was the contribution made by each of the

7   participants measured by the R&D capital stock?

8              A.   So I'm not -- so whether or not

9   the formula in and of itself measures a

10  contribution, I'm not opining on that one way or

11  the other.  A formula was done.  The formula was

12  partially based on R&D capital stock calculations

13  in the period -- in fact, in the period, transition

14  period from the CSA period or the period one to

15  period two, those R&D expense items were based upon

16  the CSA-adjusted numbers, that is, the numbers that

17  I used to do those calculations.

18              But how they measured it and derived it

19  at the end of the day they made a transfer pricing

20  adjustment and that transfer pricing adjustment was

21  partially related to research and development and

22  that obligation occurred related to research and

23  development.

24              Q.   Right, and I am just focussing on

25  the MRDA for now.  And I don't want to take you



```
 1   back to the agreement unless we need to go there,

 2   but just will you agree with me that the amount

 3   that each party was allocated each year was based

 4   on how much they had contributed to the research

 5   and development in that year?

 6                A.   So the formula I think is a little

 7   more complicated than that.  The formula -- and

 8   again, I'm not here to opine on the transfer

 9   pricing agreements, so I don't want to get too deep

10   into this.  But the calculations looked back at

11   historical research and development in the

12   particular period and those numbers were based upon

13   the CSA numbers in the early years and there is a

14   lot of other things that went into the formula, if

15   you -- you can --

16                Q.   I think we are talking about the

17   same thing.  The R&D capital stock was the measure

18   and the allocation key for the contribution made by

19   the individual participants, will you agree with

20   that?

21                A.   Again, I'm not here to interpret

22   the agreement.  I'm here to analyze the numbers, so

23   I'll leave that to you all to do.

24                Q.   All right.  Now, did you

25   understand that the individual participants were
```



```
 1   not entitled to keep the profits that were

 2   generated in their own geography under the formula

 3   in the MRDA?

 4                A.   I'm sorry, did you say the

 5   entities were not entitled to keep the profits?

 6                Q.   That was generated in their own

 7   geography.

 8                A.   Are you saying they were or they

 9   were not?

10                Q.   They were not.  The US was not

11   entitled to keep all the profits that were

12   generated by the activities of NNI?

13                A.   So the general -- again, I don't

14   want to appear like I'm interpreting an agreement,

15   because I'm totally not.  The idea of the transfer

16   pricing is to put the profits in the jurisdiction

17   that they should be taxed.

18                Q.   Well, did you not understand that

19   the idea is that the profits were pooled and then

20   divvied out based on the contributions made by the

21   individual participants?

22                A.   Again, I don't want to interpret

23   what this agreement or pooling -- I don't see

24                Any -- I don't know if I recall any

25   language saying things were pooled, but certainly
```



```
 1   there
 2              Were -- there was analyses done to move
 3   the recognition of profit and losses into the
 4   proper jurisdiction for tax purposes.
 5              Q.   I'm not trying to get your
 6   interpretation.  I'm not trying to have you
 7   interpret the agreement for us.  We have others
 8   here to do that.  I'm getting at your understanding
 9   of the agreement.  Now, was it your understanding
10   that the profits were calculated and then divided
11   among the participants based on their contributions
12   to R&D activity?
13              A.   So my general understanding is
14   that, and it is really laid out in the beginning
15   sections of this agreement and in some respects it
16   is similar to what the Cost Sharing Agreement was,
17   is that it was to recognize that there is a global
18   contribution to the R&D efforts.
19              Q.   Yes.
20              A.   And this was a way to divide it
21   up.
22              Q.   Right.  And it is going to be
23   divided up by calculating the gross profits, the
24   profits of the entire enterprise, the one Nortel,
25   and then dividing those profits or losses among the
```



1   various participants based on their contribution

2   measured by R&D capital stock?

3              A.   So I think the key here is

4   whatever measurement tool they used, they used it.

5   And they came up with an adjustment and that

6   adjustment was an obligation that needed to be

7   funded and recorded in the books and the records by

8   the entity that was a giver and the taker on the

9   other side of the entry.

10             So however they addressed it, it came

11  up with an adjustment and that adjustment was

12  driven by the objective of sharing in the costs

13  related to R&D.

14             Q.   So did you conceive this as a

15  cost-sharing agreement or a profit-sharing

16  agreement.

17             A.   So I didn't put this particular

18  Master Research and Development Agreement into any

19  term.  It is what it is.

20             Q.   I'm getting at your understanding.

21  Did you think of it as a cost-sharing agreement or

22  as a profit-sharing agreement?

23             A.   I didn't think of it in either of

24  those terms.  I'm just explaining how the

25  adjustment is driven and what it represents.



```
 1                    Q.   All right.  Let me come at it this
 2    way.  Was it your understanding that if the US
 3    generated 70 percent of the profit, we'll say, in a
 4    given year, but that its R&D capital stock was only
 5    50 percent of the total R&D capital stock, was it
 6    your understanding in my example that the US could
 7    keep 70 percent of the profits or 50 percent of the
 8    profits?
 9                    A.   Again, now you are putting into
10    the formula -- you know, the formula is a little
11    more complicated than that and --
12                    Q.   No, just focus on my example, on
13    my hypothetical.  The US generates 70 percent of
14    the profits, but has only contributed 50 percent of
15    the R&D.  Are you with me on that?
16                    A.   I hear your hypothetical.
17                    Q.   And is it your understanding and
18    the operation of the MRDA that the US could keep 70
19    percent of the profits or 50 percent of the profits
20    or some other number?
21                    A.   So I think your hypothetical is
22    oversimplifying things a little bit, because the
23    mechanics of the MRDA has got a couple of steps in
24    the process to calculate the adjustment.
25                    Q.   Right, but can you work with me
```



1    hypothetical?

2              A.    But you are asking me to give you

3    an answer that doesn't have any relationship to

4    what I did.

5              Q.    Well, no, I'm asking how you

6    understood that the MRDA worked, because I'm afraid

7    that we have a misunderstanding, at least between

8    us, as to how the basic mechanism in the MRDA

9    operated.

10             So my example, 70 percent of the

11   profits in the US but only 50 percent of the

12   capital stock in the US.  They have only

13   contributed 50 percent to the IP or the research

14   and development.  Was it your understanding that

15   they could keep the 70 percent number, a 50 percent

16   number or some other number?

17             A.    I think there is -- there is a

18   couple of steps in the calculation in the MRDA.

19   There is a routine profits number that gets

20   calculated first and then there is --

21             Q.    Okay.

22             A.    -- other figures in there.  So --

23   but the R&D capital stock is one of the components,

24   one of the parameters that is used to derive the

25   number.



```
 1                    Q.   So after we are down to the
 2    number, the residual profit that is going to be
 3    split up among the participants in the agreement in
 4    my example, let's assume the residual number has
 5    been taken care of, or the -- the routine return
 6    has been taken care of and we are just dealing with
 7    the residual, all right, so it is just this now, we
 8    are going to divide up the residual and the US has
 9    generated 70 percent of that residual profit
10    through its activities but it only has 50 percent
11    of the capital stock.  Are you able to answer my
12    question now?
13                    A.   So if you want to just -- let's
14    ignore the agreement for the moment, and you are
15    saying let's assume for the moment that your
16    formula is how it has been agreed to be shared.
17                    Q.   Yes.
18                    A.   Then your formula would generate a
19    different type of an adjustment.  It would generate
20    an adjustment, and that adjustment would result in
21    a payment obligation that would be recorded in the
22    books and records of the company to pay -- the US
23    entity would have to pay another entity, your
24    second entity, I think you said Canada or the UK.
25                    Q.   I didn't say, but let's assume
```

1    it's -- it's is the UK and Canada.  But let's make

2    it even simpler.  Let's assume that the other 20

3    percent in the 70 percent has been generated on

4    account of contributions made by the UK.  Is it

5    your understanding in my example that the US would

6    have to send that 20 percent, the balance of the

7    profit, to the UK as a transfer pricing adjustment?

8                    A.    Yes.

9                    Q.    All right.  So you understand that

10   the US could not keep all the profit it earned if

11   it only contributed a portion of the R&D to the

12   generation of that profit?

13                   A.    Under your hypothetical.

14                   Q.    Right, and the reason it had to do

15   that is because other entities contributed to the

16   creation of the products that were sold in the

17   American market; is that fair?

18                   A.    Other entities had R&D activities.

19                   Q.    Right.  And they are contributing

20   products that may be sold in the US to generate

21   revenue and profit?

22                   A.    Now you are entering a few more

23   factors in there.  You said and they are

24   contributing to things sold in the US market.  I

25   don't think that is conclusive.  It is not -- now



1   you are saying about things sold.  That is

2   different than --

3              Q.   Well, we are moving on.  I'm

4   trying to explore your understanding, Ms. Ryan.  So

5   we all know that the participants jointly

6   participated in creating intellectual property;

7   correct?

8              A.   I think that is a fair assumption.

9              Q.   Right, and the parties measured

10  their contributions through something known as R&D

11  capital stock; correct?

12             A.   So again, in period two --

13             Q.   Yes.

14             A.   -- R&D capital stock was one of

15  the parameters in the formula.

16             Q.   Right.  And so, if in my example

17  the US had generated 70 percent of all the profit

18  globally but it only contributed 50 percent of the

19  IP, it is going to have to share that excess 70

20  minus 50, which is 20, it is going to have to share

21  that to the other participants to recognize their

22  contribution to the IP?

23             A.   I think in general, your concept

24  of the obligation to send funds or to fund the R&D,

25  the contribution made by others is correct.



```
 1                  Q.   Right, so you acknowledge that the

 2    US has to share that profit that is earned in its

 3    jurisdiction with others who contributed to the

 4    creation of the IP?  We are on the same page?

 5                  A.   That's correct, just like I said

 6    in my direct testimony, and I think Mr. Cooper said

 7    as well that the funding is to pay for the R&D that

 8    was incurred within geography as well as the R&D

 9    incurred by other geographies.

10                  Q.   Right.  Now and in your

11    adjustments what you are doing is you are giving

12    credit back to the US for amounts it has had to pay

13    to others to recognize their contributions to the

14    creation of the IP and the profit?  You want to

15    give credit back to the US for money it is obliged

16    by the formula to give to others; is that correct?

17                  A.   So yes, I am giving recognition to

18    the amount funded by the US in some cases, every

19    year it is a little different, but in some cases,

20    to the extent that the US funded R&D activity in

21    another country as well as its own, yes, that is

22    how -- that is the formula -- I mean, that is the

23    application of this approach.

24                  Q.   And this funding that you are

25    talking about is the amount that the US is obliged
```

 1   by the formula in the agreement to send to the

 2   others to recognize their contribution, isn't that

 3   correct?

 4              A.   They are obligated to send and

 5   fund it.  This next step of the process of

 6   recognize contribution, I think that is for the

 7   judges to decide.

 8              MR. FINNIGAN:  Thank you, those are all

 9   my questions.

10              THE CANADIAN COURT:  Mr. Steep.

11              MR. STEEP:  Thank you, Your Honour.

12   Judge Gross, good afternoon.

13              THE US COURT:  Mr. Steep.

14   CROSS-EXAMINATION BY MR. STEEP:

15              Q.   Paul Steep for the Canadian

16   Creditors Committee.  Good afternoon.

17              A.   Good afternoon.

18              Q.   I just want to put a tiny bit more

19   context around your understanding of how these

20   payments occurred, and I will keep it brief.

21              You obviously looked at the MRDA;

22   correct?

23              A.   Yes.

24              Q.   All right.  And you looked at the

25   MRDA to at least get a basic understanding of the

 Neeson&Associates    W&P WILSON & PETERS LTD.

```
 1   mechanism for payments being made or received;
 2   correct?
 3              A.   Yes.
 4              Q.   All right.  Now, I want to take
 5   you to one paragraph that Mr. Maguire didn't put up
 6   before you, and that is at Article 2(c), and Your
 7   Honours, I think you have it, but I would like to
 8   call it up.
 9              And you'll recall, because Mr. Maguire
10   took you to this, that this comes under Article 2,
11   which is the performance of R&D activity.  Now, Ms.
12   Ryan, do you have 2(c) in front of you?
13              A.   I do.
14              Q.   All right, so you will see that:
15              "All costs incurred directly or
16              indirectly by each Participant for R&D
17              Activity shall be borne exclusively by
18              it."
19              So each of the participants is solely
20   responsible; fair enough?
21              A.   It says what it says, yes.
22              Q.   And you agree with me then?
23              A.   I agree that it says that.
24              Q.   Right, but I need to know your
25   understanding as an expert who adjusted these
```



```
1    payments.  You understood that the obligation was
2    for these entities to bear the direct and indirect
3    costs related to their R&D activity?
4              A.   I see that.
5              Q.   And that was your understanding?
6              A.   Yes.
7              Q.   Okay:
8                   "Any reimbursements for costs
9                   including any other compensation shall
10                  be provided to such Participant for its
11                  R&D Activity solely as provided in
12                  Article 3 below."
13                  Correct?
14             A.   Yes.
15             Q.   And so your understanding would
16   have been to the extent that any participant got
17   any compensation, it was solely throughout the
18   mechanisms set out in Article 3?
19             A.   For period two, yes.
20             Q.   Yes, for period two under the
21   MRDA.  So in your testimony, you have from time to
22   time talked about a funding obligation.  Am I
23   correct that what you are talking about is the
24   obligation to make payments under the provisions of
25   the MRDA, at least for period two?
```



```
 1                    A.    Yes.

 2                    Q.    All right.  So these are

 3   contractual commitments; fair enough?

 4                    A.    Yes.

 5                    Q.    All right.  Now, I want to take

 6   you to another document that you may not have seen,

 7   and Your Honours, I want to turn up Exhibit

 8   TR11366.  To give you some context, Ms. Ryan, I'm

 9   going to pull this up.

10                    And Your Honours, we have paper copies.

11   I notice you sometimes don't want paper copies when

12   it is available on screen.  Ms. Ryan, if you would

13   like a paper copy, we can hand it up to you.

14                    A.    I would, please.

15                    Q.    Okay.

16                    A.    Thank you.

17                    Q.    This comes from a filing made by

18   the US Debtors at the time the Interim Funding and

19   Support Agreement was approved, and I'm sure you

20   are generally aware of the Interim Funding and

21   Support Agreement, the IFSA?

22                    A.    I'm generally aware.

23                    Q.    All right.  So I want you to look

24   at paragraph 14 of that filing:

25                          "Within the Nortel Group, NNL is
```

 Neeson&Associates    W&F

1                    the owner of the vast majority of
2                    Nortel's intellectual property assets
3                    and, in accordance with the Master R&D
4                    Agreement, NNL licenses its
5                    intellectual property to the Main
6                    Nortel Companies on a royalty-free
7                    basis.  The Nortel Transfer Pricing
8                    Regime, in normal times, is the means
9                    by which NNL is compensated for the
10                   development and use of its intellectual
11                   property by affiliates."
12            Now, were you aware of that statement
13    when you prepared your report?
14            A.    Yes.
15            Q.    Now, I want you to assume that
16    that statement is accurate, that the compensation
17    paid under the funding obligation that we looked at
18    in the MRDA was for the development and use of
19    NNL's intellectual property; correct?  You will
20    make that assumption?
21            A.    I'm -- okay, I'll assume that.
22            Q.    All right.  Now, when you made
23    your transfer pricing adjustments to Mr.
24    Malackowski's report, you were not asked and did
25    not do any corresponding calculation between



1          2008 -- sorry, 2001 and 2008 to

2     calculate whatever benefit the participants might

3     have received for that compensation that was paid?

4               A.   As I said earlier, my scope of my

5     engagement was to look at Mr. Malackowski's work

6     under the contribution approach only, so I did not

7     have a separate independent scope, if that is what

8     you are suggesting.

9               Q.   So the answer would be that I am

10    correct, you didn't prepare any analysis of

11    benefits that might have been received by a

12    participant like NNI for the compensation that was

13    paid to NNL?

14              A.   I don't have an opinion on that.

15              Q.   And you didn't prepare any

16    analysis?

17              A.   No, I did not.

18              Q.   All right.  So if they received a

19    benefit for the use of the intellectual property

20    during the period 2001 to 2008 and it has a

21    monetary value, we can't look to your report to

22    find out what that monetary value is and set it off

23    against the compensation that they paid?

24              A.   That sounds like a different

25    analysis to me.  I didn't do what I think I



 1    understand you are saying.

 2              Q.   Now, in your report at page 8, and

 3    perhaps we should call this up so the justices can

 4    see this.  You have got a copy of your report

 5    there?

 6              A.   I do.

 7              Q.   You make the statement at the very

 8    bottom of page 8, looking at the last paragraph in

 9    the text before the footnotes:

10                   "[...] the US was the only entity

11                   that reported a cumulative operating

12                   profit for the period 2001 to 2008."

13                   Correct?

14              A.   Yes.

15              Q.   All right.  And then you set out

16    in the chart that follows at the top of page 9 what

17    you say that operating profit is; correct?

18              A.   Yes.

19              Q.   All right.  Now, I want to walk

20    through just the mechanics of how you did that,

21    using the year 2001.  So first of all, if we just

22    look at 2001 at the top of page 9, you say that the

23    cumulative loss for that year over all Nortel

24    entities was 3.9 billion; correct?

25              A.   So this, just to be clear, the



1   statement "cumulative operating profit" relates to

2   the cumulative amount for all this period added

3   together.  You just pointed me to 2001.  That is

4   not cumulative.  That is just for that year.

5               Q.   I meant if I looked at all of the

6   entities that incurred a loss that year and

7   totalled them, the total would be 3.9 billion?

8               A.   Yes, yes.

9               Q.   That is all I meant, all right.

10  Now, I have to go to your worksheets and I want to

11  pull up the one that that comes from, which I

12  believe is Exhibit TR4912.  And Your Honours, I'm

13  not going to give you paper copies of these because

14  these are the very broad Excel spreadsheets.  And

15  the typing is a little small, so certainly I find

16  it hard to read.  We'll try to expand it.

17              But if I looked between your chart and

18  this chart --

19              THE CANADIAN COURT:  And this is a

20  worksheet of the witness; is that what you are

21  saying?

22              BY MR. STEEP:

23              Q.   Yes, it is -- well, it is the

24  worksheet that you used as the source document for

25  the table at page 9 setting out operating loss and



1   profit; is that correct, Ms. Ryan?

2            A.   I'm looking to see if this is the

3   right source.

4            Q.   Well, if you go -- if you go down

5   to the line that says "accounting" in quotation

6   marks "operating profit," do you see that line?

7            A.   I do.

8            Q.   And if you go across to the NNI

9   column, you'll see 305.8; correct?

10            A.   I do, yes.

11            Q.   All right, and this is one of

12   these strange work papers where if it is stated in

13   the positive like that, it is in fact a loss;

14   correct?

15            A.   That's correct.

16            Q.   All right.  So that normally we

17   would expect, at least lawyers would expect to see

18   brackets around that as an operating loss of

19   approximately 306 million; correct?

20            A.   Yes.

21            Q.   All right.  And then I'm not going

22   to call it up, but just to remind you, if we went

23   back to your table, that is the 306 that you

24   reported under the US --

25                 THE CANADIAN COURT:  Where is the



1    table?

2              MR. STEEP:  The table is at the top of

3    page 9, Your Honour, in her report.

4              BY MR. STEEP:

5              Q.   So you will see under "US," I said

6    309, I misspoke, it is 306 million.

7              A.   Yes, that is correct, I'm sorry, I

8    got lured into that for a minute.

9              Q.   All right.  Now, I want to go

10   to --

11             THE CANADIAN COURT:  Well, just a

12   minute.  Where is that on page 9?

13             MR. STEEP:  Page 9, Your Honour, at the

14   very top, she has got a --

15             THE CANADIAN COURT:   Oh, I see.

16             MR. STEEP:  For 2001, which is the year

17   we are in.

18             THE CANADIAN COURT:  Yes.

19             BY MR. STEEP:

20             Q.   I'm just going to do this one time

21   to show how the documents tie together.

22             All right, now, what I would next like

23   to do is take you to the 10-K for 2001.  This is

24   their public filing with the Securities and

25   Exchange Commission.  I'm sure you'll --

 Neeson&Associates   W&F

```
 1                    THE CANADIAN COURT:  Just before you
 2   do, this worksheet that you have got up here was
 3   for what year?
 4                    MR. STEEP:  2001, Your Honour.
 5                    THE CANADIAN COURT:  Okay.
 6                    BY MR. STEEP:
 7                    Q.   So I would like to take you to the
 8   10-K, and that is Exhibit TR40264.  And Nortel
 9   reported on a consolidated basis all of its
10   entities being consolidated up for SEC reporting
11   purposes; correct?
12                    A.   It did.  And if you are going to
13   ask me to look at something, I would appreciate a
14   hard copy, because that is a little difficult to
15   read.
16                    Q.   Okay, we'll give you a 10-K.
17                    A.   Thank you.
18                    Q.   Now, I hope you have got the 10-K
19   with the Bates numbers at the bottom, because
20   otherwise I won't be able to give you a page
21   number.
22                    A.   I do.
23                    Q.   Okay, so please go to CCC 0097248.
24    And I am going to take you to the operating
25   profits/loss line.
```



 1                    THE CANADIAN COURT:  I can't read the
 2      years at the top.
 3                    MR. STEEP:  I'm going to -- they are
 4      2001 at the extreme right.
 5                    THE CANADIAN COURT:   And that is what
 6      you are using.
 7                    BY MR. STEEP:
 8                    Q.   And that is what I am going to
 9      use.  Now, do you have that reference?
10                    A.   I do.
11                    Q.   So if we go to operating earnings
12      for that year on a consolidated basis, they
13      reported a loss of 25 billion dollars; is that
14      correct?
15                    A.   That's correct.
16                    Q.   All right.  Now, I then want to
17      take you to how they accounted for that loss across
18      the various entities, okay?
19                    A.   Okay.
20                    Q.   And we have to go into your
21      worksheets again.  And this will be Exhibit
22      TR49192, and I believe I'm correct in identifying
23      this as Exhibit "D" from your report.  And I want
24      to take you to -- and I wonder if we could expand
25      this, please -- the operating earnings line.



     1            We have got to get up the next page,

     2    Your Honour.  This one is not the correct page.

     3    I'm going to come back to this page.  It is the

     4    next page.  I just want to tie it into the 25

     5    billion so you can see we are on the same

     6    worksheet.

     7            Right, so if you would just please

     8    expand -- can you not expand the operating earnings

     9    line right across so that we can see the 25

    10    billion?  Right there.

    11            Right, and there you see it under the

    12    "Total" column 25 billion, and again, because this

    13    comes from the worksheet, that is actually a loss,

    14    though it is reported in a positive number.

    15            A.    That's correct.  That is what that

    16    says.

    17            Q.    All right.  So then please go back

    18    to the sheet we did have up which breaks this out

    19    across Nortel entities.  And so if we look at the

    20    operating earnings line broken down by individual

    21    corporate entities, we'll see that the loss that

    22    was reported for public purposes in the SEC filing

    23    in NNI was in fact 7 billion dollars; correct?

    24            THE CANADIAN COURT:  Sorry, where are

    25    you looking?



```
 1                 MR. STEEP:  I'm under the NNI column.
 2                 THE CANADIAN COURT:  Yes.
 3                 MR. STEEP:  This is the makeup of the
 4      25 billion.
 5                 THE CANADIAN COURT:  Could we have it
 6      blown up a bit, please?
 7                 MR. STEEP:  You'll see 6.906 --
 8                 THE CANADIAN COURT:  Could we get it
 9      blown up a bit, please.
10                 BY MR. STEEP:
11                 Q.   There under NNI for operating
12      earnings, and again, Your Honour, that is a
13      negative number.
14                 So the way Nortel actually reported its
15      earnings, when you go behind the consolidated
16      number, they said that in 2001 NNI lost 6.9 billion
17      dollars; correct?
18                 A.   Yes.
19                 Q.   And NNL, which also had a loss,
20      was recorded as having a loss of only 2.2 billion;
21      correct?
22                 A.   Yes.
23                 Q.   And that is because at least some
24      of the compensation paid to NNL was reported in
25      their income; correct?
```



```
 1                      A.   I'm not sure I -- say that again.
 2  I'm not sure I understand that question.
 3                      Q.   Any compensation that was paid in
 4  respect of R&D performance, what you said earlier
 5  to my friend Mr. Finnigan, that the money was paid
 6  up to NNL, was reported in NNL as their operating
 7  income; correct?
 8                      A.   Say that one more time, please?
 9                      Q.   Any compensation payments required
10  to be made by the participants, and I think these
11  were your words, were paid up to NNL; correct?
12                      A.   That is generally my
13  understanding.
14                      Q.   Right.  And they were reported as
15  income in NNL; in other words, that is its
16  compensation, its earnings; correct?
17                      A.   Oh, not entirely.  So I would
18  think if the accounting works to reflect the
19  obligations between and among the parties, it would
20  record it in the -- in other words, the
21  intercompany accounts would reflect what was owed
22  or what was paid by entity.  How the money flowed
23  to follow that might be a different path.
24                      Q.   I don't want to do a tracing
25  exercise and I can tell you don't want to either,
```



1   at least on a cash basis.  For accounting purposes,

2   those compensation payments, if they were made,

3   were reported as income in NNL and therefore

4   attracted the R&D tax credits, for example, if they

5   were available in Canada?

6                A.   I don't think you are right.

7                Q.   All right.

8                THE CANADIAN COURT:  Mr. Steep, there

9   is a reference here to intercompany revenue for NNL

10  of 4-point-some-odd billion.

11               MR. STEEP:  Yes.

12               THE CANADIAN COURT:  Do we know what

13  that is from?  Is there somewhere telling us that?

14               MR. STEEP:  Well, I was try --

15               THE CANADIAN COURT:  Is your point --

16  is your point that that includes whatever the US

17  paid that year under the MRDA?

18               MR. STEEP:  I can't say US.  That

19  includes whatever compensation was paid up from any

20  entity.

21               BY MR. STEEP:

22               Q.   Is that not your understanding?

23               A.   No, that is not my understanding.

24  I would think that intercompany revenue is exactly

25  that.  It is revenue between and among the entities



 1   and has nothing to do with transfer pricing.

 2               Q.   All right.

 3               A.   But we don't have backup sheets

 4   behind that, but that is typically what it would

 5   mean.

 6               Q.   All right, you didn't do any

 7   analysis of the payments flowing up?

 8               A.   As you said, I didn't do a tracing

 9   exercise.

10               Q.   Okay.  So let me move on then.

11               In your table where you report the

12   profit between 2001 and 2008, it comes in each

13   instance from the worksheets that I have taken you

14   to; correct?

15               A.   It does.

16               Q.   And you will agree with me that if

17   I looked at how Nortel actually reported profit or

18   loss, that NNI was not reported as a profitable

19   entity in those worksheets; at the earnings line

20   that I took you for 2001, it would be reporting a

21   loss?

22               A.   So I don't know which report you

23   are talking about.  But the information, this

24   operating profit or loss, these figures were from

25   those worksheets.  There were certainly things



1    below the line that could impact the ultimate net

2    income or loss, such as restructuring costs.

3                    Q.    Right.

4                    A.    Restructuring costs would not be

5    considered an operating expense.

6                    Q.    All right.  I don't want to get

7    into an accounting dispute with you.  I just want

8    to get your evidence that if I looked at how they

9    publicly reported their consolidated loss and then

10   looked at the background, as we just did for 2001,

11   on that analysis they recorded NNI as incurring

12   losses; correct?

13                   A.    So again, you showed me a figure,

14   and that figure was -- reflected a negative number,

15   but you know, there were reconciling factors

16   between the 10-K and what was used and reported in

17   the worksheets.

18                   Q.    All right.

19                   A.    So and that is very typical.

20                   Q.    And just before I leave this, my

21   friend Mr. Maguire asked you some questions which

22   led you to say that money was coming to Canada to

23   take advantage of the tax situation, I think in

24   respect of his observation that the government was

25   funding tax; do you recall that -- or funding



```
 1   research and development?

 2              A.   That was a kind of a complicated

 3   statement.  It sounded like you were talking about

 4   a few different things, so I did hear him say

 5   something about a subsidy for research and

 6   development.

 7              Q.   All right.  And you are aware that

 8   NNL took advantage of research and development tax

 9   credits in Canada when NNL reported its income;

10   correct?

11              A.   Generally.  I don't have a lot of

12   detail about that.

13              Q.   Right, and you didn't back out

14   whatever benefit the Nortel participants derived

15   from taking advantage of those tax credits when you

16   made the transfer pricing adjustments back?

17              A.   No, I did not.

18              Q.   Let me just ask you a very few

19   questions that do relate to pro rata.  I noticed

20   from reviewing your CV that you have been qualified

21   as a certified fraud professional, correct,

22   forensic examiner?

23              A.   A Certified Fraud Examiner.

24              Q.   Right, and I also noticed that you

25   have experience as a Trustee, as a liquidating
```



```
 1    Trustee; correct?
 2                   A.    Yes.
 3                   Q.    All right.  And it is replete in
 4    your CV that you have been involved in a number of
 5    complex financial matters involving accounting, and
 6    I imagine other financial issues; is that correct?
 7                   A.    Yes.
 8                   Q.    All right.  Now, in your
 9    experience in all of these fields, you have had to
10    unwind complicated financial transactions; correct?
11                   A.    In some, yes.
12                   Q.    Right, even in circumstances where
13    parties are trying to hide what they have done from
14    the Courts or from other participants; correct?
15                   A.    Yes.
16                   Q.    All right.  And you observed that
17    Mr. Britven made his observations in a circumstance
18    where the claims process was not complete; do you
19    recall that?
20                   A.    When he developed the model
21    that --
22                   Q.    Yes.
23                   A.    Well, the claims process is not
24    complete, that is just a fact.
25                   Q.    Right, it is just a fact, so there
```



```
 1    is no possible way to use final numbers at the
 2    point that he was delivering his report in January
 3    of 2014, is there?
 4              A.   That's correct.
 5              Q.   All right.  Now, you are familiar
 6    with the fact that in a bankruptcy, claims are,
 7    first of all, going to be recognized and then at
 8    some stage evaluated and approved, allowed or
 9    disallowed; correct?
10              A.   Generally that is true.
11              Q.   All right, that process hasn't
12    finally -- finally taken place in the US or in
13    Canada or in the UK; correct?
14              A.   That is my understanding.
15              Q.   All right.  Have you been involved
16    in circumstances, Ms. Ryan, where claims have been
17    at the point where they are almost completed and
18    the Bankruptcy Court on the strength of someone
19    with your credentials, for example, authorizes an
20    interim distribution to claimants with a hold-back
21    in case those claim amounts are ultimately changed?
22              A.   Yes.
23              Q.   All right.  Are you familiar with
24    the fact that in this very bankruptcy in this
25    Court, the health and welfare trusts claimants have
```

 Neeson & Associates    W&P

```
 1   received a distribution with a hold-back?

 2              A.   That might be the case, yes.

 3              Q.   It wouldn't surprise you?

 4              A.   In a limited circumstance, that

 5   would not surprise me.

 6              Q.   All right.  Now, if you assume

 7   that the Courts are cooperating, as they apparently

 8   are in this trial, we all show up at the same time

 9   in two different places and we all agree to examine

10   the witness on an appointed day, there is no reason

11   why someone with your qualifications or like

12   qualifications couldn't examine all of the claims

13   and identify the probable claims for the Court;

14   correct?

15              A.   Certainly one could take a view of

16   a guesstimate of claims known and claims unknown at

17   any point in time.

18              Q.   Right, and you could keep updating

19   that as you got more information, couldn't you?

20              A.   Sure.

21              Q.   Right.  And there is no reason why

22   those claims, under the supervision of the Court,

23   couldn't be shared among all the participants who

24   are --

25              THE CANADIAN COURT:  This is just
```



1  argument, Mr. Steep.

2         MR. STEEP:  All right, I'm just going

3  to wrap it up then.

4         You know, Your Honour, I'm as efficient

5  as anyone asking questions.  I can't have used up

6  two hours in my total questioning over all the

7  witnesses.

8         BY MR. STEEP:

9         Q.   There is no reason why someone

10 couldn't develop those claims lists, sit down and

11 work out where there appear to be common claims

12 made in each estate and identify those?

13        A.   One could do estimates of claims

14 at any point in time.

15        MR. STEEP:  Thank you.

16        THE CANADIAN COURT:  Any other

17 cross-examination?

18        Any re-examination, Mr. Qureshi?

19 RE-EXAMINATION/REDIRECT EXAMINATION BY MR. QURESHI:

20        Q.   Very brief, Your Honour.

21        Ms. Ryan, I just want to take you back

22 to just a couple of questions that Mr. Maguire

23 asked you, and if I could start, please, by pulling

24 up the worksheet that Mr. Maguire had on the

25 screen, if we can please have that brought up, and



```
 1    I just want to draw your attention to some numbers
 2    that Mr. Maguire put to you.
 3              There we go.  This is the page.  And in
 4    particular, you will see if you look at the screen,
 5    Ms. Ryan, I have highlighted the two numbers that
 6    Mr. Maguire took you to, and you will recall that
 7    he showed that when you take the positive number
 8    and the negative number, you end up with a negative
 9    8 million dollars for the contribution for NNUK for
10    that particular year, and I believe this is 2001.
11              Can you please explain why that is a
12    negative number that results?
13              A.   So there is a couple of things
14    going on.
15              First, you have to appreciate that the
16    required increase/decrease, meaning the actual
17    transfer price adjustment, which is in row 58, is
18    902 million dollars.  So that means that they
19    needed to receive funding effectively from the
20    other entities of that amount.
21              Q.   Okay, thank you.
22              Now, just one other issue that again
23    Mr. Maguire touched upon.  If I could please have
24    up page 7 from our demonstratives, from Ms. Ryan's
25    demonstratives, and you will recall, Ms. Ryan, that
```



1    Mr. Maguire spent some time taking you through the

2    various calculations that you performed here in

3    this sample year 2002, and really for any year

4    under the MRDA or year period two; do you recall

5    that.

6              A.   I do.

7              Q.   Now, I would like you -- and he

8    also asked you a question about the 2 billion

9    dollar IRS settlement; do you recall that?

10             A.   Yes.

11             Q.   Okay, so let's go to slide 9, if

12   we could, and we talked about this on direct, on

13   slide 9 you have got the CSA-only period in the

14   middle and then both periods to the right.  Did any

15   of Mr. Maguire's questions with respect to your

16   calculations under the MRDA, did any of those

17   questions relate to the middle column here, the CSA

18   period?

19             A.   No.

20             Q.   Did any of Mr. Maguire's questions

21   at all relate to the CSA period?

22             A.   No, not at all.

23             Q.   Ms. Ryan, if you assume that there

24   was not a single penny of transfer pricing payments

25   from 2001 through 2008, so your period two, does



1    slide 9 show what the result would be of your

2    adjustments to the contribution approach?

3              A.   Yes, it would be the middle

4    column, which is the only CSA period adjusted.

5              MR. QURESHI:  Okay, thank you, that is

6    all I have.

7              THE CANADIAN COURT:  Ms. Ryan, I hate

8    to do this, but I just have one question for you.

9    Could you turn to your slide 8, please.

10             THE WITNESS:  Yes.

11             THE CANADIAN COURT:  Your first column

12   is direct R&D; your second column is TP-R&D, which

13   I take to be third party R&D?

14             THE WITNESS:  Not third party --

15             THE CANADIAN COURT:  Or transfer

16   payment R&D?

17             THE WITNESS:  It is the amount of

18   funding related to that R&D that was paid for by

19   others.

20             THE CANADIAN COURT:  It is money coming

21   from others which you call R&D; right?

22             THE WITNESS:  Yes, because it is

23   related.

24             THE CANADIAN COURT:  All right.  I just

25   want to ask you a question, and I am not asking you



1    to interpret the MRDA.  Is there any particular

2    provision you think in your mind of that agreement

3    that has led you to call that money R&D?

4                    THE WITNESS:  So again, and I don't

5    want to be -- appear to, as you say, interpret the

6    MRDA.

7                    THE CANADIAN COURT:  No, I'm just

8    asking -- I would just like to know your thinking

9    process.

10                   THE WITNESS:  But there is a number of

11   clauses that talked to the emphasis of R&D -- it

12   talks about in the agreement, and I'll paraphrase,

13   it talks about the -- first of all, it talks about

14   in the reason the agreement in and of itself is

15   R&D.  Two, it talks about the obligation to make

16   these payments on a regular basis, and the

17   information and the adjustment is derived from R&D.

18                   So if you look at the word R&D and

19   obligations to pay and obligations to fund and

20   share in the costs and support the overall

21   collaborative effort and given the way Mr.

22   Malackowski set up his premise, it all seems to

23   hold together very nicely.

24                   THE CANADIAN COURT:  The only reason I

25   asked you that was it was being put to you by more



```
 1   than one person that you were asked, is this a

 2   cost-sharing agreement or a profit-sharing

 3   agreement.

 4             THE WITNESS:  Yes.

 5             THE CANADIAN COURT:  And that is what

 6   has given rise to my question.

 7             THE WITNESS:  Okay, I understand.

 8             THE CANADIAN COURT:  Thank you.

 9             Does anyone have any questions arising

10   out of my question?  Okay, fine, thank you very

11   much, Ms. Ryan.

12             THE WITNESS:  Thank you very much.

13             THE US COURT:  Thank you, Ms. Ryan.

14   -- WITNESS EXCUSED

15             MR. ROSENTHAL:  Your Honours, I have

16   good news to report.  We have heard back from

17   witnesses during the last hour and a half, and the

18   two witnesses who --

19             THE CANADIAN COURT:  Do you mean to say

20   somebody has been looking at their BlackBerry in

21   here?

22             MR. ROSENTHAL:  Just because of the

23   request by the Courts.

24             THE CANADIAN COURT:   Yeah; right.

25             MR. ROSENTHAL:  But in any event, Your
```

Neeson & Associates    W&F

1    Honours the two witnesses we have agreed we would

2    not call tomorrow because of Mr. Barrack's conflict

3    are both available on Monday, so we are happy to

4    call Mr. McConnell on Monday, followed by

5    Mr. Kilimnik, and then Dr. Eden will be our last

6    witness and finish up on Tuesday, and I would also

7    endeavour to say that, given that our last break we

8    managed to eliminate five witnesses between the

9    parties collectively, we'll be happy to talk to

10   other parties to even see if we might be able to

11   reduce that number over this weekend.

12          And the only other witness we would

13   have is Dr. Tucker tomorrow.

14          THE CANADIAN COURT:  All right, so we

15   are done for today; is that what you are saying?

16          MR. ROSENTHAL:  We have no more

17   witnesses today.  We will call Dr. Tucker tomorrow,

18   because I understand Mr. Barrack is not responsible

19   for her, and then we will do Professor McConnell

20   and Mr. Kilimnik on Monday, and wrap up our case

21   with Dr. Eden on Tuesday.

22          THE CANADIAN COURT:  So we are probably

23   going to be done by sometime by lunch tomorrow.

24          MR. ROSENTHAL:  I don't know what the

25   cross estimates are, but I can give you about a

 Neeson&Associates   W&P

1    one-hour give or take estimate for the direct.

2              THE CANADIAN COURT:  Judge Gross, do

3    you mind leaving early today at quarter to 4:00?

4              THE US COURT:  It really runs counter

5    to my work ethic, but I am willing.

6              MR. ROSENTHAL:  Thank you, Your Honour.

7              THE US COURT:  Thank you,

8    Mr. Rosenthal, thank you everyone.  I'll say good

9    evening and be back tomorrow morning.

10             THE CANADIAN COURT:  9 o'clock.

11   -- Whereupon Court adjourned on June 19th, 2014 at

12   3:44 p.m.

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    REPORTERS' CERTIFICATE

 2

 3              I, DEANA SANTEDICOLA, RPR, CRR, CSR,

 4    and I, LORRAINE B. MARINO, RDR, CRR, CSR, US

 5    Certified Shorthand Reporter, Realtime Systems

 6    Administrator,

 7                That the foregoing proceedings were

 8    taken before us at the time and place therein set

 9    forth;

10                That the entire proceedings of the

11    hearing date were recorded stenographically

12    individually by each of us and were thereafter

13    transcribed;

14                That the foregoing is a true and

15    correct transcript of our shorthand notes so taken.

16

17    Dated this 19th day of June, 2014.

18    PER:                      PER:

19    Lorraine B. Marino        Deana Santedicola

20    LORRAINE B. MARINO        DEANA SANTEDICOLA

21    WILCOX & FETZER           NEESON & ASSOCIATES

22    WILMINGTON, DE  USA       TORONTO, ON  CANADA

23

24

25
```



































































