



WILCOX & FETZER LTD.

FOR EXCELLENCE IN COURT REPORTING

```
 1              UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3      ----------------------------)

 4      In Re                       )

 5         NORTEL NETWORKS INC.,   ) Chapter 11

 6         et al,                    ) Case No.

 7              Debtors.          ) 09-10138(KG)

 8      ----------------------------)

 9                           - and -

10                    Court File No. 09-CL-7950

11                        ONTARIO

12            SUPERIOR COURT OF JUSTICE

13               (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15     ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17       ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18     NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19      CORPORATION, NORTEL NETWORKS INTERNATIONAL

20      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                       CORPORATION

22       APPLICATION UNDER PART IV OF THE COMPANIES'

23     CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                       AS AMENDED

25                       --------
```

 Neeson&Associates   W&F

```
 1

 2                          --------

 3

 4  --- This is the Day 19/Volume 19 of the transcript

 5  of proceedings in the above matter held

 6  simultaneously in:

 7  Superior Court of        United States Bankruptcy

 8  Ontario (Commerical      Court for the District of

 9  List)                    Delaware

10  Courtroom 8-1            Courtroom 3

11  330 University Avenue    824 Market Street

12  Toronto, Ontario         Wilmington, Delaware

13

14  on the 20th day of June, 2014, commencing at 9:10

15  a.m.

16                          --------

17  B E F O R E:

18  The Honourable Judge Kevin Gross (United States)

19  The Honourable Mr. Justice Frank Newbould (Canada)

20                        ----------

21      REPORTED BY:  Toronto - Kimberley Neeson

22              RPR, CRR, CSR, CCP, CBC

23          Realtime Systems Administrator

24            Delaware - Lorraine B. Marino

25                    RDR, CRR, CSR
```



```
 1   A P P E A R A N C E S:

 2

 3                   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER:       Jay Carfagnini, Esq.

11              Joseph Pasquariello, Esq.

12              Ben Zarnett, Esq.

13              Alan Mark, Esq.

14              Peter Ruby, Esq.

15              Jessica Kimmel, Esq.

16              Chris Armstrong, Esq.

17              Julie Rosenthal, Esq.

18

19   ERNST & YOUNG INC.

20   Ernst & Young Tower

21   222 Bay Street, P.O. Box 251

22   Toronto, ON  M5K 1J7

23   PER:       Murray McDonald, Esq.

24              Brent Beekenkamp, Esq.

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER:      Derrick Tay, Esq.

 7             Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER:      Jacob Pultman, Esq.

14             Ken Coleman, Esq.

15             Paul Keller, Esq.

16             Daniel Guyder, Esq.

17             Laura Hall, Esq.

18             Joseph Badtke-Berkow, Esq.

19             Jonathan Cho, Esq.

20             Nicolette Ward, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   BUCHANAN INGERSOLL & ROONEY

24   1105 North Market Street

25   Suite 1900
```



```
 1   Wilmington, DE  19801-1054
 2   PER:        Kathleen A. Murphy, Esq.
 3               Mary F. Caloway, Esq.
 4
 5                    U.S. DEBTORS
 6
 7   FOR NORTEL NETWORKS INC.
 8   TORYS LLP
 9   79 Wellington Street West, Suite 3000
10   Box 270, TD Centre
11   Toronto, ON  M5K 1N2
12   PER:        Sheila Block, Esq.
13               Andrew Gray, Esq.
14
15   FOR THE U.S. DEBTORS
16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
17   1201 North Market Street, 16th Floor
18   P.O. Box 1347
19   Wilmington, DE  19899-1347
20   PER:        Derek Abbott, Esq.
21               Annie Cordo, Esq.
22
23   FOR NORTEL NETWORKS INC.
24   CLEARY GOTTLIEB STEEN & HAMILTON LLP
25   One Liberty Plaza
```



```
 1   New York, NY  10006

 2   PER:        James Bromley, Esq.

 3               Lisa Schweitzer, Esq.

 4               Howard Zelbo, Esq.

 5               Jeffrey Rosenthal, Esq.

 6               Avi Luft, Esq.

 7

 8                      EMEA DEBTORS

 9

10   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

11   LIMITED

12   DAVIES WARD PHILLIPS & VINEBERG LLP

13   40th Floor

14   155 Wellington Street

15   Toronto, ON  M5V 3G7

16   PER:        Matthew Milne-Smith, Esq.

17               Robin B. Schwill, Esq.

18               Sean Campbell, Esq.

19               James Doris, Esq.

20               Louis Sarabia, Esq.

21

22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

23   LIMITED

24   LAX O'SULLIVAN SCOTT LISUS LLP

25   Suite 2750, 145 King Street West
```



```
 1   Toronto, ON  M5H 1J8

 2   PER:        Matthew P. Gottlieb, Esq.

 3               Tracy Wynne, Esq.

 4               Paul Michell, Esq.

 5

 6   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 7   LIMITED

 8   HUGHES HUBBARD & REED

 9   One Battery Park Plaza

10   New York, NY  10004-1482

11   PER:        Derek Adler, Esq.

12               Neil Oxford, Esq.

13               Fara Tabatabai, Esq.

14               Charles Huberty, Esq.

15

16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

17   LIMITED

18   YOUNG CONAWAY STARGATT & TAYLOR LLP

19   Rodney Square

20   1000 North King Street

21   Wilmington, DE  19801

22   PER:        Ed Harron, Esq.

23               John Dorsey, Esq.

24

25   FOR THE EMEA DEBTORS
```



```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER:       James Norris-Jones, Esq.

 6

 7              CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER:       Mark Zigler, Esq.

16              Susan Philpott, Esq.

17              Ari Kaplan, Esq.

18              Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```

 Neeson&Associates    W&F

```
1    PER:        Barry E. Wadsworth, Esq.

2                Lewis Gottheil, Esq.

3

4    FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

5    COMMITTEE

6    SHIBLEY RIGHTON LLP

7    250 University Avenue, Suite 700

8    Toronto, ON  M5H 3E5

9    PER:        Arthur O. Jacques, Esq.

10               Thomas McRae, Esq.

11

12   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14   FUND

15   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16   35th Floor

17   155 Wellington Street West

18   Toronto, ON  M5V 3H1

19   PER:        Kenneth T. Rosenberg, Esq.

20               Massimo (Max) Starnino, Esq.

21               Lily Harmer, Esq.

22               Karen Jones, Esq.

23               Tina Lie, Esq.

24               Michelle Jackson, Esq.

25
```

Neeson&Associates   W&F

```
 1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

 2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

 3   2009

 4   NELLIGAN O'BRIEN PAYNE LLP

 5   50 O'Connor Street, Suite 1500

 6   Ottawa, ON  K1P 6L2

 7   PER:       Janice B. Payne, Esq.

 8              Steven Levitt, Esq.

 9              Christopher Rootham, Esq.

10              Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER:       Barbara J. Boake, Esq.

17              James D. Gage, Esq.

18              Elder C. Marques, Esq.

19              Paul Steep, Esq.

20              Byron Shaw, Esq.

21              Sharon Kour, Esq.

22              Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER
```



```
 1   919 North Market Street, Suite 1500

 2   Wilmington, DE  19801

 3   PER:       Selinda A. Melnik, Esq.

 4              Richard Hans, Esq.

 5              Timothy Hoeffner, Esq.

 6              Farah Lisa Whitley-Sebti, Esq.

 7

 8            INFORMAL NORTEL NOTEHOLDER GROUP

 9

10   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

11   BENNETT JONES LLP

12   1 First Canadian Place

13   Suite 3400

14   Toronto, ON  M5X 1A4

15   PER:       Kevin Zych, Esq.

16              S. Richard Orzy, Esq.

17              Gavin Finlayson, Esq.

18              Richard Swan, Esq.

19              Sean Zweig, Esq.

20              Jonathan Bell, Esq.

21              Amanda McLachlan, Esq.

22

23   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

24   MILBANK, TWEED, HADLEY, MCCLOY LLP

25   1 Chase Manhattan Plaza
```



```
 1    New York, NY  10005
 2    PER:       Thomas R. Kreller, Esq.
 3               Jennifer P. Harris, Esq.
 4               Albert A. Pisa, Esq.
 5               Samir Vora, Esq.
 6               Andrew LeBlanc, Esq.
 7               Michael Hirschfeld, Esq.
 8               Atara Miller, Esq.
 9               Tom Matz, Esq.
10               Nick Bassett, Esq.
11               Gabrielle Ruha, Esq.
12               Rachel Pojunas, Esq.
13
14      THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
15
16    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
17    CASSELS BROCK & BLACKWELL LLP
18    Suite 2100, Scotia Plaza
19    40 King Street West
20    Toronto, ON  M5H 3C2
21    PER:       Shayne Kukulowicz, Esq.
22               Michael Wunder, Esq.
23               Ryan Jacobs, Esq.
24
25    FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
```



```
 1   ASHURST LLP

 2   Boardwalk House

 3   5 Appold Street

 4   London, England  EC2A 2HA

 5   PER:        Angela Pearson, Esq.

 6               Antonia Croke, Esq.

 7

 8   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

 9   RICHARDS LAYTON & FINGER, P.A.

10   920 North King Street

11   Wilmington, DE  19801

12   PER:        Christopher Samis, Esq.

13

14   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

15   AKIN GUMP STRAUSS HAUER & FELD LLP

16   One Bryant Park

17   New York, NY  10036

18   PER:        Fred S. Hodara, Esq.

19               David H. Botter, Esq.

20               Abid Qureshi, Esq.

21               Robert A. Johnson, Esq.

22               Brad M. Kahn, Esq.

23               Christine Doniak, Esq.

24               Joseph Sorkin, Esq.

25               Jacqueline Yecies, Esq.
```



```
 1
 2      UK PENSION PROTECTION FUND AND NORTEL NETWORKS
 3                 UK PENSION TRUST LIMITED
 4
 5   FOR THE UK PENSION PROTECTION FUND AND NORTEL
 6   NETWORKS UK PENSION TRUST LIMITED
 7   THORNTON GROUT FINNIGAN LLP
 8   Suite 3200, 100 Wellington Street West
 9   P.O. Box 329
10   Toronto, ON  M5K 1K7
11   PER:      Michael Barrack, Esq.
12             D.J. Miller, Esq.
13             Rebecca Lewis, Esq.
14             Andrea McEwan, Esq.
15             John Finnigan, Esq.
16             Michael Shakra, Esq.
17
18   FOR THE UK PENSION PROTECTION FUND AND NORTEL
19   NETWORKS UK PENSION TRUST LIMITED
20   WILLKIE FARR & GALLAGHER LLP
21   787 Seventh Avenue
22   New York, NY  10019-6099
23   PER:      Brian O'Connor, Esq.
24             Sameer Advani, Esq.
25             Andrew Hanrahan, Esq.
```



```
 1

 2   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 3   NETWORKS UK PENSION TRUST LIMITED

 4   BAYARD, P.A.

 5   222 Delaware Avenue, Suite 900

 6   Wilmington, DE  19899

 7

 8   PER:        Charlene D. Davis, Esq.

 9               Justin Alberto, Esq.

10

11               THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER:        Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER:        Michael J. Riela, Esq.

25
```



```
 1            WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER:      John Salmas, Esq.

10             Kenneth Kraft, Esq.

11             Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER:      Craig A. Barbarosh, Esq.

18             David A. Crichlow, Esq.

19             Karen B. Dine, Esq.

20

21        LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```



```
 1   Toronto, ON  M5H 3Y4
 2   PER:        Edmond F.B. Lamek, Esq.
 3               James Szumski, Esq.
 4
 5   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
 6   PATTERSON BELKNAP WEBB & TYLER LLP
 7   1133 Avenue of the Americas
 8   New York, NY  10036
 9   PER:        Daniel A. Lowenthal, Esq.
10
11        BOARDS OF DIRECTORS OF NORTEL NETWORKS
12        CORPORATION AND NORTEL NETWORKS LIMITED
13
14   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
15   CORPORATION AND NORTEL NETWORKS LIMITED
16   OSLER HOSKIN AND HARCOURT LLP
17   100 King Street West
18   1 First Canadian Place, Suite 6100
19   P.O. Box 50
20   Toronto, ON  M5X 1B8
21   PER:        Lyndon Barnes, Esq.
22               Edward Sellers, Esq.
23               Betsy Putnam, Esq.
24               Adam Hirsh, Esq.
25               Alexander Cobb, Esq.
```



```
1                    I N D E X

2

3   WITNESS:                                PAGE

4

5   CATHERINE ELIZABETH TUCKER

6   Examination In-Chief/Direct Examination

7     by Mr. Bromley......................... 4642

8   Cross-Examination by Mr. Milne-Smith...... 4693

9   Cross-Examination by Mr. Advani........... 4698

10  Cross-Examination by Mr. Rosenberg........ 4706

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



1                    INDEX OF EXHIBITS

2

3    NUMBER/DESCRIPTION                        PAGE NO.

4

5       56:  Report of Catherine Elizabeth      4641

6       Tucker.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1    -- Upon commencing at 9:10 a.m.
 2                THE CANADIAN COURT:  Mr. Abbott.
 3                MR. ABBOTT:  Good morning, Judge Gross,
 4    Justice Newbould.  Your Honour, we submitted
 5    electronically a memo in response to the memo that
 6    the courts received yesterday.  I have a hard copy
 7    for Your Honour.
 8                THE US COURT:  I printed one out, thank
 9    you, and I've been reading it.
10                MR. ABBOTT:  Your Honour, you will see
11    that today, despite going very high-tech for most
12    of this trial, we have decided to go old-school
13    again today.  We have a couple of demonstrative
14    exhibits.  I'm not sure where Your Honour would
15    like to have them.  Obviously the principal --
16                THE US COURT:  The witness is in
17    Toronto?
18                MR. ABBOTT:  Correct.  These are really
19    auxiliary here.  I don't want to, you know, cause
20    problems with parties' ability to see the courts
21    and the courts' ability to see the parties, so we
22    stuck them there for now.  If you would like us to
23    move them around or put them someplace else, we're
24    happy to do that.
25                THE US COURT:  Well, since there is no
```



```
1   witness, would they be better -- do you need them
2   both together?  Could one be on one side and one on
3   the other?
4              MR. ABBOTT:  That's fine, Your Honour.
5   Maybe we can put one over towards the door and one
6   near the witness stand.
7              THE US COURT:  That's what I was
8   thinking.
9              MR. ABBOTT:  Okay, we will do that,
10  Your Honour.
11             THE US COURT:  Thank you, Mr. Abbott.
12  Mr. Zelbo?  They don't want you to hurt yourself,
13  Mr. Zelbo.  Do you have blackboards up there,
14  Justice Newbould?
15             THE CANADIAN COURT:  I don't see any.
16  Oh, I see, there they are over there.  We'll
17  manage.
18             MR. ABBOTT:  Thank you, I think that's
19  all we have for this courtroom for now.
20             THE US COURT:  Very well.
21             THE CANADIAN COURT:  Mr. Bromley?
22             THE US COURT:  Mr. Bromley, good
23  morning.
24             MR. BROMLEY:  Good morning, Judge
25  Gross, good morning, Justice Newbould.  And Justice
```



```
 1   Newbould, we have here hard copies in the court as
 2   well and have handed up to the registrar the
 3   submissions that we made this morning.
 4              THE CANADIAN COURT:  Yes, I've read
 5   them.
 6              MR. BROMLEY:  So we have one witness
 7   today, Your Honour, for the trial, that is
 8   Catherine Tucker here in Toronto, and if the courts
 9   are ready, I'll proceed.
10              THE CANADIAN COURT:  Yes.
11              THE US COURT:  We're ready.
12
13              CATHERINE ELIZABETH TUCKER,
14           HAVING BEEN FIRST DULY SWORN,
15        WAS EXAMINED AND TESTIFIED AS FOLLOWS:
16
17              THE CANADIAN COURT:  We'll mark her
18   report as the next exhibit, Mr. Bromley.  What
19   number would that be?
20              THE REGISTRAR:  Exhibit number 56, Your
21   Honour.
22              THE CANADIAN COURT:  56?  Thank you.
23              EXHIBIT NO. 56:  Report of Catherine
24              Elizabeth Tucker.
25              MR. BROMLEY:  Your Honours, if I can
```

```
 1   just take care of one piece of housekeeping before
 2   we start with the questioning.  We may have to ask
 3   the court's indulgence to take a break during the
 4   course of the testimony.  Ms. Tucker has an infant,
 5   Charlotte, who was born less than 24 hours after
 6   the conclusion of her deposition.
 7               THE CANADIAN COURT:  I'm sure they were
 8   completely unrelated.
 9               MR. BROMLEY:  Well, Mr. Ruby and Mr.
10   Rosenberg were the last -- I'm not commenting on
11   the subjective, I'm simply observing the objective,
12   which is they were the last questioners.
13               THE CANADIAN COURT:  Ms. Tucker,
14   whenever you want a break, just let us know.
15               THE WITNESS:  That's really kind of
16   you, thank you.
17               MR. BROMLEY:  Thank you very much, Your
18   Honours.  If we can pull up the first slide, thank
19   you.
20
21   EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY
22   MR. BROMLEY:
23               Q.   Good morning, Professor Tucker.
24               A.   Good morning.
25               Q.   Could you just introduce yourself
```



1    to the courts and tell us what your current

2    occupation is?

3                    A.   Of course.  Should we go to the

4    first slide -- second slide.  So, I'm Catherine

5    Tucker, I'm currently the Mark Hyman Junior Career

6    Development Professor and Associate Professor at

7    the MIT Sloan School.

8                    Q.   Now, Ms. Tucker, I take it from

9    your accent that you're not originally from Boston?

10                   A.   No.  No, I get that a lot.  Accent

11   explanation.  I grew up in Oxford, England.  I was

12   lucky enough to go to school there where I studied

13   politics, philosophy and economics.  Then I ran

14   away to Stanford University where I did a Ph.D. in

15   economics.  But your accent tends to stick, so that

16   explains it.

17                   Q.   Now, Professor Tucker, what did

18   you study at Stanford?

19                   A.   So my dissertation was focused on

20   what makes a new communication technology spread

21   and be successful.

22                   Q.   And what do you mean by a new

23   communications technology?

24                   A.   So my dissertation was focused on

25   studying the spread of adding basically video to a



1    voice-over IP system.  I would say now though what

2    we might find as a new communications technology is

3    actually a lot broader.  We could think of

4    something like Facebook, we could think of email.

5    Basically it just got broader since my

6    dissertation.

7                    Q.   Now, looking at your biography, I

8    see that you have a number of references to digital

9    data.  Can you tell us what that is?

10                   A.   Of course.  And I think this

11   reflects changes that we have seen in the economics

12   of information and communication technology since

13   my dissertation, in that when I started off, it

14   used to be that we had a phone and it used to be we

15   had a computer and they were separate devices which

16   were used for different purposes.

17                   But now there has been something we

18   call technology conversions which means that the

19   phone in my pocket can practically act as a

20   computer.  And what this does mean?  Well, it means

21   that digital data has become increasingly important

22   for trying to understand the economics of these

23   kinds of technologies.  And so a lot of my research

24   has recently focused on search and issues of data

25   privacy to deal with all this amount of data we now



```
 1   deal with.
 2              Q.    Professor Tucker, when did you
 3   join MIT Sloan?
 4              A.    I joined in 2005.
 5              Q.    And just so we are clear, MIT
 6   Sloan is the business school at the Massachusetts
 7   Institute of Technology?
 8              A.    That's right, yes.
 9              Q.    And can you tell us, Professor
10   Tucker, how your experience relates to the
11   economics of innovation?
12              A.    Yes.  This has been a more recent
13   line of research for me and I think it reflects
14   some of the conversions we have seen in this area
15   of IT.  In increasingly -- of increasing
16   importance, this high-tech space has been the
17   emerging of what we call patent assertion entities.
18   And these are entities, you might think of
19   something like Rockstar, which -- whose primary
20   business model is to go out there and assert
21   patents while not actually making things, and what
22   I have done is I have actually studied, well, how
23   do patent assertion entities such as Rockstar, how
24   does their existence and emergence affect optimal
25   R&D strategy for high-tech companies.
```



```
 1                    Q.   So, Professor Tucker, this is
 2    primarily a discussion of your academic work.  Has
 3    this had any practical application?
 4                    A.   Well, I have been lucky enough to
 5    be asked to present the work on digital data at the
 6    White House in front of the Federal Communications
 7    Commission, in front of the OECD.  I have been
 8    asked to testify in front of the US Congress about
 9    it.
10                    When it comes to the work on patent
11    assertion entities, I have been asked to present at
12    the US Senate and also at the European Commission.
13                    Q.   Let's turn to this case, and if I
14    could ask you, Professor Tucker, what is your
15    assignment in this case?
16                    A.   Of course.  Maybe we can go to the
17    next slide, 4.  What I was asked to do was to use
18    my knowledge of the economics of high-tech firms
19    and inherent incentives and also my knowledge of
20    the economics of intellectual property to try and
21    evaluate Mr. Green's characterization of the
22    license rights under his reading of the MRDA.
23                    And I think it is nicely summarized by
24    these two quotes I have up on the slide.  And what
25    Mr. Green's characterization is, is that he assumes
```

 Neeson&Associates    W&F Wilson & Petzer Ltd.

1    that the license rights are limited to the existing

2    product lines at Nortel at the time the businesses

3    were sold, as if they had been continued to be

4    operated by Nortel, and he goes from this to then

5    conclude that the entirety of the Rockstar sale or

6    the residual patent portfolio sale should belong to

7    the Canadian Debtors or NNL.

8                    Q.    So, have you reviewed Professor

9    Green's reports?

10                   A.    Yes, I have, yes.

11                   Q.    And you have an understanding of

12   the analysis that Mr. Green went through?

13                   A.    Yes, yes.

14                   Q.    Can you explain to us how

15   Mr. Green is able to move from NNL being the

16   leading title holder to the Nortel Group IP, to it

17   being entitled to all of the proceeds from the

18   residual patent sale?

19                   A.    I think the linchpin of his

20   analysis, I think it's somewhat summarized in this

21   extract I have from his report, is the assumptions

22   he makes about the bounds of the license rights, in

23   that he assumes that the -- that by virtue of these

24   limited license rights, as he reads them, that NNI

25   is not entitled to the upside in either the line of



```
 1   business -- line of business sales, nor any of the

 2   upside of its R&D when it came to the residual

 3   patent portfolio.

 4             Q.   So Professor Tucker, you're not a

 5   lawyer, are you?

 6             A.   No, I'm an economist.

 7             Q.   And you're not offering a legal

 8   interpretation here of the MRDA, are you?

 9             A.   No, no, I'm not.

10             Q.   And you're not proposing an

11   allocation method for the sale proceeds?

12             A.   No, I'm not proposing any such

13   method.

14             Q.   So let's move to your analysis,

15   Professor Tucker.  What is your perspective on

16   Mr. Green's report?

17             A.   Well, I think the major foundation

18   of Mr. Green's analysis lies in the fact that legal

19   title was vested in NNL and I think that drives a

20   lot of his conclusions.

21             Q.   So, what is the foundation of

22   Mr. Green's interpretation of the MRDA?

23             A.   So, it comes to this, and you can

24   actually see in this slide, I've got this little

25   block which says "Legal title vesting," and as I'll
```



```
 1   go on to explain, this basically drives everything
 2   with which we -- which is going to characterize how
 3   Mr. Green views the MRDA and therefore what it
 4   implies of allocation.
 5               THE CANADIAN COURT:  Just before you go
 6   any further, I take it, Mr. Bromley, you don't have
 7   a hard copy of this slide deck?
 8               MR. BROMLEY:  I do.
 9               THE CANADIAN COURT:  Oh, here it is.
10   Ah, okay.  Thank you very much.
11               MR. BROMLEY:  I've had so many hard
12   copies of this slide deck, Your Honour, if you'd
13   like some to take home with you to read on the
14   subway...
15               THE CANADIAN COURT:  This is not close
16   to my heart, like other documents, and the lawyers
17   I'm looking at.
18               MR. BROMLEY:  After five and a half
19   years, Your Honour, I think it's more of a
20   pacemaker for me.
21               BY MR. BROMLEY:
22               Q.   Ms. Tucker, so you've divided up
23   on this slide between NNL and NNI?
24               A.   Oh yes.  Maybe I should just set
25   up a little bit more about what this slide is.  Now
```



1    you've got the slide, now you can actually see the

2    slide, let me explain what the rationale is behind

3    it.

4                    So the first thing I should say is

5    you're going to see lots of slides like this so I

6    should just explain why I've set it up in this way.

7    We have one row which is NNL and one row which is

8    NNI.

9                    Why am I focusing on NNL and NNI?

10   Well, in some sense the heart of this case is

11   trying to understand the incentives that lay behind

12   these two corporate entities, and so it makes sense

13   to be focusing on understanding their economic

14   relationship rather than other things such as lines

15   of business or other things that may have been

16   happening at Nortel.  It's also what Mr. Green was

17   focusing on too.

18                   The other thing I should say is all

19   through the presentation I'm going to have NNI in a

20   box there, but the economics is not just confined

21   to North America.  You could also think of this,

22   this would apply to Nortel Ireland or Nortel

23   France.  I'm just going to use NNI as a shorthand

24   for that.

25                        Q.   So, Ms. Tucker, can you walk us



```
 1   through each of the columns?
 2              A.   Of course.  So let's start off
 3   with the R&D column.  And under Mr. Green's reading
 4   of the MRDA, NNL enjoys the full upside of the R&D
 5   because it has legal title vested in it.  When it
 6   comes to IP, that stands for intellectual property,
 7   because legal title is vested in NNL, they have
 8   ownership over the IP.
 9              And taking these two facts together,
10   when it comes to the sale of the residual patent
11   portfolio, he takes legal title vesting to mean
12   that NNL should enjoy virtually a hundred percent
13   of the proceeds.
14              Q.   So, what does this mean for NNI
15   under Mr. Green's reading of the MRDA?
16              A.   So, what it means is that for NNI,
17   when it comes to the some billion dollars they
18   spent over the last decade, their upside is going
19   to be limited to the current business lines that
20   Nortel -- that Nortel had at the time of the sale.
21              When it comes to the intellectual
22   property, I think it's actually Mr. Reichert who
23   characterized it this way but I thought it was
24   quite a nice summary, which is that basically you
25   should view their licenses as being limited
```



1    make/sell licenses.

2              And taking these two facts together, it
3    means that when it comes to the residual patent
4    portfolio, Mr. Green reads the MRDA as implying
5    that NNI should have zero percent or virtually zero
6    percent of the proceeds.

7              Q.    Professor Tucker, do you know why
8    it was that Mr. Green describes legal title being
9    vested in NNL?

10             A.    I believe the origins of that come
11   from the MRDA, this is a procedure that is written
12   in the MRDA.

13             Q.    And is it your understanding that
14   -- about how this legal title vesting actually took
15   place?

16             A.    Well, so I'm not a legal expert.
17   I believe there have been other witnesses such as
18   Ms. Angela Anderson, Ms. Angela DeWilton,
19   Mr. Burshtein's deposition, which described this
20   process but it seemed to be some kind of exchange
21   that in return for vesting legal title that the
22   integrated entities were given licenses towards
23   Nortel technology.

24             Q.    So, Ms. Tucker, from an economics
25   perspective is Mr. Green's ownership theory



```
 1   consistent with what you would expect from an arm's
 2   length agreement between unrelated parties?
 3               A.   No.
 4               Q.   And can you explain why?
 5               A.   Well, actually I prepared the next
 6   slide.
 7               MR. ROSENBERG:  Your Honour, if I may,
 8   this is rank speculation.  It's not even hearsay.
 9   I don't know on what basis this can possibly be
10   admissible as to what this witness' interpretation
11   is of a document she had no place or part of in
12   making.
13               THE CANADIAN COURT:  I don't understand
14   what you're saying, Mr. Rosenberg.  What is rank
15   speculation?
16               MR. ROSENBERG:  Well, the witness is
17   being asked on how these rights came into the MRDA.
18               THE CANADIAN COURT:  No, the question
19   that I heard is from an economic perspective is
20   Mr. Green's ownership theory consistent with what
21   you would expect from an arm's length agreement
22   from unrelated parties.  That's the question.
23               MR. ROSENBERG:  I understand, Your
24   Honour.  The foundation to answering that question
25   would require -- it's double hearsay.  Mr. Green is
```



```
 1   interpreting a document, she's interpreting what
 2   Mr. Green said, but it is all going to the question
 3   as to what is in the agreement and how it relates
 4   to other agreements which aren't before the court.
 5               THE CANADIAN COURT:  I'm going to
 6   permit it.  If the witness' understanding of
 7   Mr. Green's ownership theory is wrong, then the
 8   evidence is only -- only goes so far, but I'm going
 9   to permit it.
10               MR. ROSENBERG:  Thank you.
11               BY MR. BROMLEY:
12         Q.   I think the question was can you
13   explain why.
14         A.   Oh, okay.  So let me tell you, you
15   know, be very clear, I'm an economist so what I'm
16   going to be focusing on is thinking about the
17   missing economics when it comes to, from an
18   economics perspective, Mr. Green's analysis and I
19   prepared this slide to try and walk us through
20   these missing economics.
21         Q.   So can you walk us through the
22   slide, Professor Tucker.
23         A.   Oh yeah, of course.  Let's start
24   off with the first column, which is again R&D, and
25   when -- from an economics perspective when you're
```



```
 1   considering two arm's length parties, what's always
 2   going to be important is the question of
 3   incentives.  In a high-tech firm whose lifeblood is
 4   R&D, such as Nortel, what's going to be
 5   particularly important are the incentives towards
 6   R&D, and in particular the idea that the incentives
 7   should be directed towards forward-looking
 8   innovation.
 9              Now, in economics, the best way we have
10   incentivizing this is to give entrepreneurial
11   ownership of the risks and benefits associated with
12   the R&D investments.
13              Q.   And so, how does -- let's move
14   over to the next column relating to intellectual
15   property.
16              A.   We're still there, I've got one
17   more -- two more columns to go.
18              Q.   Okay.
19              A.   So the second column, when it
20   comes to thinking about ownership, economics again
21   takes a different perspective, in that what matters
22   is something we call the right to exclude, and if
23   you have the right to exclude other parties from an
24   asset, that means that you can enjoy all the
25   benefits that derive or the stream of value that
```



 1   derives from a particular asset.

 2            And so what's going to be crucial from

 3   an economics perspective when you're looking at the

 4   MRDA is thinking well, who has exclusive rights to

 5   various territories within that document.  And what

 6   we see is that NNI had exclusive rights to the US

 7   territory.

 8            And these are actually backed up with

 9   enforcement rights, which is going to be important

10   because you can actually make sure that you can

11   enforce your right to exclude.

12            Another way of telling things from an

13   economist's perspective is that NNI had the right

14   to sublicense.  And why is that important?  Well,

15   the corollary of the ability to exclude is the

16   ability to include.  In intellectual property that

17   tends to be done by sublicensing.

18            So in essence, from an economics

19   perspective, when it came to the US, NNI was the

20   economic owner of the IP rights.

21            Q.   And what does this mean with

22   respect to the sale of the residual patent

23   portfolio?

24            A.   So, both these two columns, I

25   think from an economics perspective what they bring



1    into question, the first two columns bring into

2    question Mr. Green's reading when it comes to the

3    residual patent portfolio.

4              There's just one other extra thing

5    which I think Mr. Green didn't consider in his

6    analysis, which was the fact that when it came to

7    the sale of the portfolio to first of all Google in

8    its stalking horse bid, or -- and Rockstar

9    subsequently in the final sale, both buyers utterly

10   demanded that the various IEs' license rights were

11   dropped.

12             And this makes perfect sense, right,

13   because if I'm going to buy the patent portfolio,

14   the last thing I want is an entity such as NNI

15   still having an ability to sublicense and basically

16   occlude all the value that I could have got from

17   the patent portfolio.

18             And so therefore I would tend to say

19   that NNI dropping its rights should be foremost as

20   to the key to value maximization or the actual

21   ultimate 4.5 billion dollar sale price when it came

22   to the patent portfolio.

23             Q.   Professor Tucker, in doing your

24   analysis, were you given any instructions by

25   counsel?



```
 1                    A.    Yes, I was.

 2                    Q.    And what were they?

 3                    A.    Well, I was told that the MRDA was

 4     the key document in the case.  I was given the

 5     MRDA, I was pointed to the first -- certain

 6     relevant sections, the enforcement rights section

 7     and the section which described the fact that there

 8     were exclusive royalty-free perpetual rights, and I

 9     was told to think about those from an economics

10     perspective.

11                    The other assumption I made, and I

12     don't know how you quite characterize this, but I

13     am leaning on Lorraine Eden's report and her

14     definition of what an arm's length agreement is.

15                    Q.    And that's Professor Eden who is a

16     transfer pricing expert?

17                    A.    Yes, that's right.

18                    Q.    So in this context what do you

19     assume about the parties' various rights to the

20     Nortel technology?

21                    A.    So as I understand it, that's why

22     we're here, we're trying to understand what these

23     rights are, and what my report is trying to do is

24     understand from an economics perspective what would

25     be a consistent interpretation of those rights,
```



```
 1    which I would expect from my perspective of being a
 2    high-tech economist.
 3                    Q.   So let's go into a bit more
 4    detail, Professor Tucker.   Why are the economics of
 5    organizational incentives important to high-tech
 6    firms like Nortel?
 7                    A.   Well, I think they're going to be
 8    important to any multinational company, especially
 9    one that has arm's length arrangements, as we'll
10    discuss later.   But they're going to be
11    particularly important in a high-tech setting
12    because of the need to make sure that appropriate
13    R&D is being conducted.
14                    Q.   And so what are the incentives
15    that are relevant to Mr. Green's interpretation of
16    the MRDA?
17                    A.   So what's going to be important is
18    thinking about well, were the integrated entities,
19    such as NNI, were there appropriate incentives to
20    make investments in what I would characterize as
21    the right kind of R&D.
22                    Q.   So, when you talk about
23    appropriate incentives or the right kind of R&D,
24    what do you mean?
25                    A.   What I mean by the right kind of
```

 Neeson&Associates    W&F

```
 1   R&D is I mean -- so what is distinct about
 2   high-tech?  Well, high-tech is characterized by
 3   very short, brutal product cycles.  And what does
 4   this mean?  It means you have to focus on always
 5   thinking about the next product cycle and being
 6   forward-looking and thinking about the next
 7   generation to come.
 8              I mean, when we teach this at business
 9   school, we use a slightly cheesy line, which is
10   that it's very easy in this space to go from being
11   a hero to being a zero in a very short space of
12   time just because there is so much disruption and
13   the technology cycles are so short.
14              Q.   Can you describe the economic
15   theory behind that?
16              A.   Yes.  Well, you can see we've
17   actually got to the slide where I'm going to do
18   this, and the basic economic theory is based upon
19   something we call the S-curve of innovation.
20              Let me just describe what a single
21   S-curve is doing.  It's basically describing the
22   rate at which a technology is adopted or penetrates
23   the marketplace, and it starts off very slowly, as
24   basically just a few tech geeks are adopting it,
25   and then suddenly you have an inflection point at
```



1   which point the technology goes mass market and we

2   see a huge burst of adoption.  Then eventually it

3   tails off, at which point we can just think of a

4   few technophobes adopting it at that point and

5   eventually it will go into decline.  So that's what

6   a single S-curve describes.

7               But what's key in a high-technology

8   space is that each S-curve is very close together

9   and that therefore any technology company has to be

10  constantly thinking about what's going to be the

11  next S-curve and how can I get to that.

12              Q.   Are S-curves typical in the field

13  of economics?

14              A.   Yes.  I mean, they're certainly

15  typical, they're one of the mainstays of our

16  teaching when we talk about the economics of

17  technology to our students.

18              I'd also say -- I should actually

19  probably just clarify, an S-curve describes an

20  empirical regularity and as such it is found in the

21  field of sociology, it was discovered there since

22  the 1950s, it's talked about in the field of

23  technology, folks like Clay Christensen also talk

24  about it.

25              So really an S-curve is describing an



1    empirical regularity.  I think the distinction in

2    economics is we really focus on appropriate

3    incentives given this empirical regularity which is

4    described by an S-curve.

5                    Q.   So how would economic theory

6    describe a firm that focused on improving an

7    existing technology as opposed, say, to one that

8    focused on creating new technologies?

9                    A.   We would say such a firm would be

10   focusing on a concept we call static efficiency

11   which mean that firm is just trying to extract

12   profits from a single S-curve of innovation.

13                   Q.   In what kind of context do you

14   think a focus on static efficiency would make

15   sense?

16                   A.   Well, to take an example from my

17   report, if we are to think about a dog bowl

18   manufacturer that made, for example -- found a way

19   of making a dog bowl not slip around, then it would

20   make sense for that dog bowl manufacturer to focus

21   on just one S-curve of innovation.

22                   Why?  Well, we're not really expecting

23   much innovation or disruption in the dog bowl

24   market.  All right.  For decades to come, dogs will

25   still eat out of dog bowls, we are not expecting



1  disruption, therefore a focus on a single S-curve

2  of making sure that dog bowl is cost effectively

3  produced would make a lot of sense.

4           Q.   So, now let's look at Nortel in

5  contrast.  How would a high-tech firm like Nortel

6  operate?

7           A.   Well, in distinction, in contrast

8  to the dog bowl manufacturer, Nortel would really

9  want to be focusing its R&D constantly on the next

10 curve.  And why is that?  Well, it knows that the

11 technology cycle for any one S-curve is going to be

12 short, there's going to be disruption, and

13 therefore it would be basically a recipe for

14 disaster if they weren't focused on the next

15 S-curve.

16          Q.   And what's that approach refer to?

17          A.   So that approach is called in

18 economics, we call it maximizing dynamic efficiency

19 in contrast to static efficiency, and the idea is

20 you would simply maximize profits over time

21 recognizing that there will be successive S-curves.

22          Q.   And are you aware of any real-life

23 examples of high-tech companies that didn't make

24 that leap to the next S-curve?

25          A.   Well, if we take an entirely



```
 1    different technology space, one thing we often
 2    teach about, especially at MIT given it's close to
 3    our reach in Massachusetts, is the camera industry,
 4    and we saw Polaroid being disrupted by the change
 5    to different kinds of film first of all, and then
 6    we see Kodak, guess what, went into another S-curve
 7    which is to do with 36 millimetre film, and then we
 8    even see -- and then being disrupted by digital
 9    photography, and then we even see currently, I'd
10    argue, digital camera manufacturers being disrupted
11    by the fact that cellphones are now becoming
12    cameras.
13              So we can see in that industry this
14    constant pattern of disruption.
15              THE REPORTER:  You're going to have to
16    slow down, please.
17              THE WITNESS:  I'm sorry, I got excited,
18    I'm very sorry.  Where do you want me to go back
19    to?  Let me go through technology cycles in digital
20    cameras again.
21              So what we can think of is Kodak
22    failing to recognize the next S-curve, which was
23    going to be digital photography.  Then we can think
24    ironically almost of the digital cameras that
25    replaced Kodak failing to recognize that the next
```



1    curve, S-curve of innovation would actually be the

2    camera becoming part of a cellphone.

3                  BY MR. BROMLEY:

4                  Q.   So, Professor Tucker, how might a

5    multinational enterprise incentivize its

6    subsidiaries to conduct R&D?

7                  A.   So, what we tend to -- when we

8    think about this, one of the best ways one can

9    potentially do this is to ensure that any such

10   subsidiary that's engaging in R&D expects to share

11   in the profits of any of the S-curves to come.

12                 Q.   And so, what would it mean if the

13   high-tech multinational enterprise did not allow a

14   material subsidiary that was conducting R&D to

15   share in the upside of the R&D investments?

16                 A.   Well, I think it would be

17   disastrous.  Why?  Well, ultimately that subsidiary

18   would simply have incentives to make incremental

19   improvements to the current S-curve.  I mean, think

20   about some tweaks to a dog bowl.  They won't be

21   incentivized to do the right kind of

22   forward-looking innovation which is the lifeblood

23   of any high-tech firm.

24                 Q.   Professor Tucker, how does this

25   discussion relate to Mr. Green's analysis?



```
 1                      A.   Well, it's important for

 2   Mr. Green's analysis because effectively Mr. Green

 3   limits the upside of the R&D investments of the

 4   integrated entities to simply one single S-curve,

 5   which, as we discussed, goes against what one would

 6   expect for the economics of high-tech organizations

 7   and necessary incentives.

 8                      Q.   And so, why is that?  Why is it

 9   that you see Mr. Tucker not giving credit for

10   future S-curve and innovation?

11                      A.   Mr. Green?

12                      Q.   Mr. Green, yes.  Did I say

13   Ms. Green?

14                      A.   I think you referred to my father,

15   Mr. Tucker.

16                      Q.   Oh, Mr. Tucker.

17                      A.   Wonderful.  Okay, let me actually

18   give you an example which I prepared which I think

19   is probably better than me just talking

20   non-specifically.

21                      So we have here various successions of

22   S-curves.  I focused here on cellular.  Why

23   cellular?  Well, first of all, I think as to

24   technology it's easier to understand than some of

25   the things that Nortel worked on and also obviously
```

 Neeson&Associates   W&F

```
 1   the CDMA sale was a big sale for Nortel.

 2                Now, the first generation of

 3   technology, you should think of that as being

 4   simply a phone which makes phone calls.  That's

 5   what the phones can do there.

 6                The second generation of technology,

 7   think of that as phones that allow you to make text

 8   messages as well as making calls.

 9                3G, this is when we start to put the

10   internet in cellphones and we can start to use the

11   internet to search, search the internet on our

12   phone.

13                And 4G is where our phone is eventually

14   becoming a streaming device which is capable of

15   replacing a computer.

16                Q.   Now, looking at this slide that we

17   have --

18                THE CANADIAN COURT:  What will 5G be?

19                THE WITNESS:  This is very exciting to

20   MIT engineers.  We reckon it's going to hit around

21   2020 and there is a lot of arguments about what

22   it's going to be, but -- can I go on?

23                THE CANADIAN COURT:  Don't take my

24   question seriously.

25                THE WITNESS:  Okay.
```



```
 1                    MR. BROMLEY:  Is that advice to the

 2    lawyers as well, Your Honour?

 3                    BY MR. BROMLEY:

 4             Q.    Looking at this slide, can you

 5    tell the courts why the line for 4G is a dotted

 6    line?

 7             A.    Oh, yes.  So all the dotted line

 8    here is representing is the fact that these curves

 9    are happening after the line of business sales in

10    2009.

11             Q.    Professor Tucker, you also state

12    in your report that Mr. Green's analysis doesn't

13    give NNI upside from R&D and 4G technology.  Why is

14    that?

15             A.    Well, he actually hasn't said so

16    in his definition -- in his deposition, excuse me.

17    He was explicitly asked whether he gave any value

18    to LT technology.  LT is a different way of

19    describing 4G.  And so, as you can see, I've sort

20    of put a big cross over 4G when it came to the

21    credit given to the IEs for their various

22    technology investments.

23             Q.    Let's look at 3G.  That technology

24    had been launched by the time of the line of

25    business sales, hadn't it?
```



```
 1                    A.   Yes, it had but it had been sold
 2    in 2006 to Alcatel, so it's irrelevant for
 3    Mr. Green's analysis.
 4                    Q.   Professor Tucker, can you help us
 5    visualize what these missing S-curves imply for
 6    Mr. Green's allocation?
 7                    A.   Yes.  I mean, what you can see
 8    from the previous slide is simply that when it
 9    comes to doing his value in use calculations, he
10    was really focusing on 2G technology, which is a
11    technology which was peaking or had this mass
12    market spurt in around 1999, and as such it was
13    somewhat of a dying technology at the time of the
14    sales.
15                    And I think you can see that if we look
16    at this slide, which I have entitled Mr. Green's
17    value of intangibles.  Now, the Y axis is millions
18    of US dollars, and the first line represents the
19    various value he allocated to intangibles, and then
20    the next two lines, two bars, are describing the
21    value he allocates to the US and then the smaller
22    one is to Europe on the far right-hand side.
23                    Q.   So focusing on the first column,
24    the one on the left, I see that there's 2 billion
25    at the bottom in green.  But wasn't the total of
```



1    the line of business sales 2.8 billion?

2              A.    Yes, that's right, but remember

3    we're actually focusing on intangibles here, and I

4    think the missing .8 million is what he calls

5    intangibles or I think of as equipment or physical

6    stuff.

7              Q.    And for Mr. Green's purposes

8    intangibles are effectively predominantly the

9    intellectual property?

10             A.    That's how I view it, yes.

11             Q.    Now, is it correct, according to

12   this slide, that Mr. Green does not attribute any

13   of the $4.5 billion value generated by the patent

14   sale to either NNI or the EMEA IEs?

15             A.    That's correct, and actually later

16   in the presentation I'm going to show a slide which

17   shows exactly him doing that or not allocating any

18   value.

19             Q.    And focusing now on the second and

20   third columns, what did these represent in detail?

21             A.    So, if we just take NNI or the

22   value of US major business line intangibles, we can

23   see here there is a split between what he calls

24   existing technology and what he calls future

25   technology, the future technology being a lot



1    smaller, and it comes to, you know, comes to around

2    450 million.

3                    Q.    And Mr. Green gives less value to

4    this slice of future technology because it's more

5    risky; is that right?

6                    A.    So that's right.  What he says in

7    his report is he says that he considers any third

8    -- each wave of technology he allows it to have 4.5

9    years and then he says he considers a third wave of

10   technology to simply be too speculative to even put

11   into the calculation.

12                   Q.    Now, Professor Tucker, let's focus

13   on patents for a few minutes.  So, the -- actually,

14   before I go there, isn't -- so when Mr. Green is

15   saying that future technology is inherently risky,

16   is he also saying that forecasts for untested

17   products would be speculative?  Is that part of the

18   exercise?

19                   A.    Well, I mean, the way I read it is

20   he gets something right which is that he's right in

21   saying that any one embodiment of a technology in a

22   product in a high-tech space is going to be risky

23   and speculative.

24                   But I think what he -- he misses in his

25   analysis that that is not true for the IP which is



```
 1   related to the underlying R&D conducted towards
 2   that technology.
 3             And in fact, that kind of IP, because
 4   it can be a building block, I would actually argue
 5   can have a far longer lifespan than any one
 6   embodiment in a particular physical product of a
 7   technology.
 8             Q.   So let's talk about patents for a
 9   bit.  Isn't a patent a blueprint for a particular
10   product?
11             A.   So sometimes it can be.  And I
12   actually have an example here, we actually have it
13   marked out on the easel as well, if you want to see
14   it.
15             Q.   This is -- just for the court and
16   the record, it's Exhibit TR51015.
17             A.   So in this example you can
18   actually see a dog bowl patent and what you can see
19   it consists of is four different pictures of a dog
20   bowl from a variety of angles.  And it consists of
21   just four lines of text where they describe the
22   fact that this is a non-slip dog bowl.
23             MR. BROMLEY:  So Judge Gross and
24   Justice Newbould --
25             THE CANADIAN COURT:  If that's for me,
```

 Neeson & Associates    W&F

1    I don't need it.  Don't I have the picture here?

2    How old is this patent?

3                THE WITNESS:  So, it was filed, as you

4    see, around 2008, this patent.  It was granted.

5                MR. BROMLEY:  It was on the cutting

6    edge of dog bowl design, Your Honour.

7                BY MR. BROMLEY:

8                Q.   Now, have we handed up a copy of

9    the physical patent to the courts?  If we could ask

10   that the patent also be handed up to Judge Gross in

11   Delaware.

12               So, Professor Tucker, have you seen

13   this patent before?

14               A.   Yes, I have.  Yes.

15               Q.   What is it?

16               A.   This is a dog bowl patent.  I

17   found it, I went to Google patent search, I did a

18   Google search for non-skid dog bowl patent and this

19   is what came out.

20               Q.   And I see that the patent has four

21   pages.  Is that the entirety of the patent?

22               A.   That's all there is.  That's why

23   we have this demonstrative here to describe each of

24   the four pages.

25               Q.   Okay.  And are you sure there's



```
 1   nothing more to that patent?
 2               A.   So, I was intrigued by this
 3   patent, as you can see, so what I actually did is I
 4   went out and I bought the dog bowl which relates to
 5   this patent.  I don't know if we have it in the
 6   courtroom.
 7               Q.   I think you do.
 8               A.   I think we do.  Wonderful.
 9               MR. BROMLEY:  If Your Honour would like
10   to see the dog bowl?
11               THE CANADIAN COURT:  It's not lunch
12   time yet.
13               MR. BROMLEY:  We did make it available
14   for inspection at Torys last night and I will note
15   no one took us up on it.
16               THE WITNESS:  Anyway, the main thing to
17   take from this dog bowl is it's very clearly
18   described in the patent, right?  It's a blueprint
19   for how you would make this particular kind of
20   non-slip dog bowl.
21               BY MR. BROMLEY:
22               Q.   And looking at the dog bowl
23   itself, is there actually a reference to this
24   patent on the dog bowl?
25               A.   There is.  Our Pets Company, who
```



 1   are the people that filed the patent, are very

 2   excited about their intellectual property and have

 3   a little label at the bottom which cites precisely

 4   this patent.

 5           MR. BROMLEY:  Justice Newbould, Judge

 6   Gross, we would like to move to a second patent,

 7   and it is marked as Exhibit TR50532.

 8           BY MR. BROMLEY:

 9           Q.   And we have a copy of it, a hard

10   copy of it?

11           A.   A hard copy of it here.  I also

12   pinned it out on the board because it's really

13   quite a dense patent.

14           Q.   Professor Tucker, have you seen

15   this patent before?

16           A.   Yes, this patent is what I cite --

17           THE US COURT:  If you will just stop

18   for a moment for the court reporter.

19           MR. BROMLEY:  I would note that the dog

20   bowl is intended for clumsy pets with long ears.

21   Judge Gross, is the court reporter ready yet?

22           THE US COURT:  Not quite.

23           MR. BROMLEY:  Okay.

24           THE US COURT:  We're ready,

25   Mr. Bromley.



```
 1                 MR. BROMLEY:  Thank you very much.
 2                 BY MR. BROMLEY:
 3                 Q.   So, Professor Tucker, I believe we
 4     were in the first stages of describing this patent.
 5                 A.   Yes.  So this -- this is, you
 6     know, what I characterize as a high-tech patent.
 7     It's one that I cite in my report.  There are
 8     several things to know about it.  First of all,
 9     it's very long relative to the dog bowl patent.  In
10     fact, it's so dense and difficult to understand you
11     can see we couldn't work out whether we had it the
12     right way around when we put it up on the easel.
13                 So we've got, I think, over 37
14     diagrams, many of the pages are dense text, and
15     it's describing this concept of a virtual private
16     network and how one might control it.
17                 And what's key for me when it comes to
18     this patent and this building block nature of
19     high-tech patents that I was describing is that it
20     doesn't describe any one form of technology and it
21     certainly doesn't show cellphone.
22                 However, this patent was actually used
23     by Rockstar in a recent spate of litigation as part
24     of the Rockstar patent portfolio sale, and it was
25     actually used by Rockstar in a recent lawsuit
```



```
 1    against various handset manufacturers who made
 2    android phones such as Huawei.  I have horrible
 3    pronunciation, it's a Chinese company and it's
 4    spelled --
 5                 Q.    H-U-A-W-E-I.
 6                 A.    -- H-U-A-W-E-I.
 7                 Q.    And so how do high-tech patents
 8    like this feed into products?
 9                 A.    So that's a good question because,
10    as we can see here, it's not quite clear what
11    product this is going to relate to.  And I think
12    it's actually best described if we go to the next
13    slide, which is going to be -- this is a
14    screen-shot which I took from the Project Iceberg
15    executive summary, and Project Iceberg was
16    basically when they started to go and pitch the
17    patent portfolio to various sellers.
18                 Now, one thing I want to apologize for
19    is originally this slide had lots of patent numbers
20    on it but I believe we had to redact it in court.
21                 However, what you should take from this
22    is that basically either a cellphone such as this,
23    which is basically a 2G phone, had many different
24    kinds of patents much like this inside it but not
25    in any visible way.  Why?  Because they're really
```

Neeson&Associates   W&F

1   describing a technology concept.

2                Q.   So this patent that we have on the

3   chart, do you know when this was actually filed?

4                A.   So it was filed, I believe, in

5   1999.

6                Q.   And that's currently subject to

7   litigation by Rockstar, you said?

8                A.   That's right, yes.

9                Q.   Professor Tucker, what does the

10  nature of high-tech patents mean for their value

11  over time?

12               A.   So, basically high-tech patents

13  have -- from this building block nature, basically

14  we tend to view them as having a far longer

15  lifespan than any one single embodiment in a

16  product, and in particular the building block

17  nature is important because it means that though

18  any one technology cycle can be brutal, fast and

19  disruptive, intellectual property can actually stem

20  into many different generations of technology as a

21  building block and potentially have a far longer

22  lifespan.

23               Q.   Now, we've put a chart up on the

24  screen, I believe this was a slide that

25  Mr. Malackowski used in his direct testimony.



```
 1                    Have you taken a look at
 2    Mr. Malackowski's work?
 3              A.   Yes.  So, actually I pulled up
 4    this slide simply because I thought it really did
 5    quite a nice job of illustrating this point about
 6    the longevity of high-tech patents due to their
 7    building block nature.
 8                    And what you can see, and
 9    Mr. Malackowski went through it in his
10    presentation, is it's simply a histogram that shows
11    many of the high-interest patents that Rockstar
12    paid $4.5 billion for, are actually older patents,
13    and I think that's explained by their building
14    block nature.
15              Q.   And did you do any independent
16    work to verify Mr. Malackowski's conclusions?
17              A.   So, I did, and I think it's in
18    figures 3 and 5 of my report.  What I did was -- in
19    economics the way we measure whether or not a
20    patent is valuable is by measuring how many forward
21    citations it has, and basically the analysis in
22    figures 3 and 5 in my report give the same
23    conclusion as Mr. Malackowski's slide, which is
24    that it was the older patents which are more
25    valuable.
```



```
 1                    Q.    And a forward citation is what?
 2                    A.    A forward citation is whether
 3    another company, another tech company is basically
 4    building on your technology and is therefore citing
 5    your patent in their patent.
 6                    Q.    And so the more forward citations,
 7    the more --
 8                    A.    The more fundamental or more of a
 9    building block that patent is, the more other
10    technology is stemming from it.
11                    Q.    So, how does this illustration of
12    useful life of the Nortel patents relate to your
13    view of Mr. Green's analysis?
14                    A.    Well, I think it's important
15    because Mr. Green focuses on the fact that product
16    lifecycles are short in his analysis.  He ignores
17    the fact that the underlying R&D and the associated
18    patent portfolio actually has a far greater
19    potential lifespan.
20                    Q.    And what is the impact on NNI and
21    EMEA of Mr. Green's failure to take into account
22    the full useful life?
23                    A.    So, I think if I was to look at a
24    very high level about how it was that NNL gets some
25    kind of windfall from these proceedings, well then,
```

 Neeson & Associates    W&F

```
 1   it seems to come from the fact that he doesn't
 2   recognize the building block nature of patents and
 3   the fact that these high-tech patents actually have
 4   implications for future products to come which he
 5   is ignoring in his analysis.
 6              Q.   So let's turn, if we could,
 7   Professor Tucker, to your analysis of the economics
 8   of intellectual property rights.
 9              A.   Of course.
10              Q.   And what do economics tell us
11   about intellectual property ownership?
12              A.   Okay.  So in general the key
13   concept we teach in economics when it comes to
14   thinking about ownership of property rights is what
15   we call the right to exclude.
16              Q.   And what do you mean by the right
17   to exclude?
18              A.   So the right to exclude means --
19   basically is saying if I can exclude others from a
20   stream of benefits or monies or revenues that is
21   derived from a certain asset, deny the effective
22   economic owner of all the value associated with
23   that asset.
24              Q.   How does sublicensing fit into
25   that?
```

 Neeson&Associates    W&F

```
 1                      A.   So, sublicensing fits in because
 2   if you think about the right to exclude, if you
 3   have the right to exclude by -- by association, you
 4   also have the right to include, and therefore the
 5   way we have sort of used sublicensing in
 6   intellectual property is a reflection of that right
 7   to include which comes from the right to exclude,
 8   which is, you know, important for thinking about
 9   intellectual property.
10                      Q.   And can you give us an example of
11   the power of the right to exclude?
12                      A.   So, in my report I have a very
13   simple example of a gold mine, a mineral rights
14   example.  So let's imagine we have a gold mine out
15   in British Columbia, and we have two parties, one
16   party has legal title to the mine, another party is
17   the exclusive license holder of rights to dig for
18   gold in that mine, well then, because that
19   exclusive license holder, that party owns all the
20   gold that you can dig up from the mine, they are
21   the full economic owner of that gold.
22                      And what's important is that they can
23   actually prevent that legal title holder to that
24   stretch of land from enjoying any of the gold that
25   might reside in their land.
```



1                    Q.   So bringing this back to

2   Mr. Green's analysis, in your review of the MRDA,

3   did you notice anything that echoed the economic

4   emphasis on the power of the right to exclude?

5                    A.   So, I think what's really striking

6   when reading the MRDA as an economist is the

7   distinction which is made between integrated

8   entities which conduct R&D and those that don't.

9   And in particular, that as soon as -- when you have

10  the integrated entities that conduct R&D, those are

11  the ones which are given exclusive license rights.

12                   And that makes sense from an economics

13  perspective.  Why?  Well, in economics we think of

14  basically economic ownership as being the right to

15  exclude and we see it being given to these

16  integrated entities which are conducting R&D.

17                   Q.   So what is the link between the

18  differences in the rights between, say, the

19  integrated entities that conduct R&D, the

20  subsidiaries that don't conduct R&D, and your

21  discussion of incentives in R&D?

22                   A.   So, I think the way I would

23  describe these two columns in terms of how they fit

24  together is in the first column I was discussing,

25  well, you would expect in this kind of R&D,



```
 1   high-tech R&D setting for there to be huge
 2   incentives towards forward-looking R&D, and then
 3   when we actually look at how the MRDA is
 4   constructed, we see from an economics perspective
 5   what is a huge incentive in the form of these
 6   exclusive license rights.
 7              So in some sense they coalesce and make
 8   sense or are consistent from an economics
 9   perspective.
10              Q.  So let's move from the gold mine
11   to --
12              THE US COURT:  We need to pause for a
13   moment.  Excuse me.
14              All right.  We're back and running.
15              MR. BROMLEY:  Great.  I think from a
16   scheduling perspective we only have a couple more
17   slides left and it might make sense to then take a
18   break after the direct.
19              THE CANADIAN COURT:  That's fine.
20              THE US COURT:  That would be fine.
21              BY MR. BROMLEY:
22              Q.  Professor Tucker, the gold mine
23   example that we were just talking about seems
24   relatively simple.  How does IP rights play out at
25   Nortel?
```



```
1                    A.   So, I actually think it's best
2     summarized if we actually use this slide, which is
3     from Nortel itself, and this is from a
4     presentation, this was given back in 2004, five
5     years before the bankruptcy, and it was given by
6     the IP group, and what it does is it summarizes how
7     Nortel itself viewed the value deriving to its IP.
8                    Q.   And at a high level, what does
9     this slide tell you?
10                    A.   So, what it tells me is that even
11    five years before the bankruptcy, Nortel itself
12    realized there were many ways of potentially
13    monetizing its patents.
14                    Q.   So there are four corners on this
15    slide.  The first one up on the left is defense and
16    protection.  What does that mean?
17                    A.   So, if we go to the little spoke
18    at nine o'clock, it's sort of a mid yellow/orange
19    colour, that, you'll see it says protect product
20    technologies, and this is, I think, what we think
21    of as traditional use of patents, it would be what
22    the dog bowl manufacturer was doing with their
23    patent, and what it does is it basically stops you
24    making -- stops you -- it stopped -- it allows you
25    to stop any potential competitor from directly
```



1    imitating your product.

2              I think what's interesting for me as a

3    high-tech economist though is the fact that there

4    are two other spokes under defense and protection,

5    and what these are referring to is the fact that in

6    the high-tech industry, one of the best weapons you

7    have in your arsenal is potentially having a large

8    patent portfolio.

9              And why is this?  Well, what happens if

10   another high-tech firm sues you, then having this

11   broad and wide-ranging patent portfolio allows you

12   to counter-sue and therefore potentially diffuse

13   that IP risk.

14             And we actually saw Nortel doing that

15   in the case of Vonage.  Vonage sued them, Nortel

16   counter-sued and as a result both parties settled.

17             And so even, you know, the most

18   traditional use of a patent, I think in high-tech

19   industries the use of patents is slightly more

20   complicated due to this building blocks and

21   wide-ranging nature of high-tech patents.

22        Q.   Moving down to the bottom left

23   there is the word "leadership."  What is meant by

24   that?

25        A.   So, leadership, maybe it's best if



1    I take leadership and other business value together

2    because they're two sides of the same coin.  And

3    leadership, what they're talking about is basically

4    the benefits you get if you're Nortel of being able

5    to influence the course and the direction of that

6    next S-curve into technology.

7                    I mean, it talks about other business

8    value, they're thinking about how to monetize that

9    leadership or that control over the next S-curve,

10   for example making money through complementary

11   products and so on.

12                   Q.   And then we have licensing income

13   and value.

14                   A.   Yes.  So an obvious other source

15   of value from a high-tech patent is the fact that

16   you can sublicense it and reap money that way.  I

17   think it's fair to say that in Nortel's history

18   they weren't a particularly aggressive licensing

19   authority.  There were signs that that was going to

20   change with the hiring of John Veschi towards the

21   end of Nortel's life.

22                   Q.   And so what does this graphic tell

23   you about Mr. Green's interpretation of the rights

24   under the MRDA?

25                   A.   So, it seems to me that in



1    Mr. Green's analysis he's focusing on this one

2    spoke at 9 a.m.  That is the traditional view of a

3    patent, which is for defense and protection, but

4    he's not thinking about all the other potential

5    sources of value that an IP rights holder can

6    potentially derive from those rights to a patent.

7                 Q.   You said earlier the final missing

8    -- piece of the missing economics was Mr. Green's

9    analysis did not reflect the value of the

10   termination of the exclusive license.  What do you

11   mean by that?

12                A.   Yes, so this goes back to the RPP

13   sale, and the fact that when it came to the sale of

14   the residual patent portfolio, first of all Google

15   in its stalking horse bid demanded termination of

16   all the license rights held by the IEs, and then at

17   the actual time of the sale to Rockstar, again

18   termination was demanded as part of the sale.

19                Q.   And so from the perspective of

20   high-tech economics, why do you think that Google

21   and Rockstar wanted that termination?

22                A.   Well, I think it comes back in

23   some ways to the complexity of how a high-tech

24   patent portfolio is used in these high-tech

25   industries.  You know, partly these defensive



1   purposes, partly these strategic purposes.  And if

2   you had out there, especially in the US which is

3   probably the most important forum when it comes to

4   thinking about intellectual property protection, an

5   outside party that had exclusive rights to

6   sublicense the patent portfolio in that territory,

7   well then it would really occlude the potential

8   value for these defense and more complex purposes

9   that you might think the patent portfolio could be

10  used for.

11              And so therefore I think when it comes

12  to the sale price of the residual patent portfolio

13  that the termination was key.

14              Q.   So are you aware of any real-life

15  examples where you had high-tech rights that were

16  being -- intellectual property rights that were

17  being transferred but were otherwise encumbered by

18  licenses, for instance?

19              A.   Yes.  So one thing which intrigued

20  me recently was -- and let me be clear there is a

21  lot of context here, but if you look at the recent

22  attempt by Kodak to sell some of these patents

23  which have now become valuable potentially in

24  phones, they were really very unsuccessful.  The

25  sale really wasn't able to reap any money from it



1    and there were many reasons for this.

2              One of the reasons that was cited was

3    basically that Kodak had been very active in its

4    licensing and had given a lot of licenses which

5    basically encumbered the value of the patent

6    portfolio and made it less attractive in the eyes

7    of potential buyers.

8              Q.   So turning back to Mr. Green, how

9    do you know that Mr. Green did not allocate any of

10   the proceeds from the sale of the residual patent

11   portfolio to NNI and the EMEA integrated entities?

12             A.   I think he makes it very clear.  I

13   have actually got a slide from his presentation

14   now.  So this is actually an extract from

15   Mr. Green's presentation he gave to this court.

16             And what you'll see is the two

17   cylinders, and the first rainbow coloured cylinder,

18   what that's representing is the fact that he noted

19   that there were some non-exclusive licenses given

20   to the patent portfolio as part of the lines of

21   business sales.

22             And what he did was he considered that

23   that was sufficient compensation for the integrated

24   entities for their rights towards the residual

25   patent portfolio and as a result he allocated the

 Neeson & Associates    W&F

1    entire value of the Rockstar sale to NNL as legal
2    title holder.
3                    Q.    And in your view from an economics
4    perspective is it sufficient to compensate NNI
5    solely for its intellectual property rights in the
6    lines of business sale?
7                    A.    No, I think that's what my entire
8    report is about, really, and there were at least
9    four reasons why I think it's not sufficient.
10                    The first is, it doesn't make any sense
11    from the perspective of what kind of incentives we
12    would expect to see in an arm's length relationship
13    between two corporate entities in a high-tech space
14    given the need to give incentives for
15    forward-looking innovation.
16                    Secondly, it ignores the building block
17    nature of patents and in some sense I think it's
18    artificial given their building block nature to say
19    some patents relate directly to products and some
20    don't.  And that's just not the way that high-tech
21    patents work.
22                    Third, it ignores, which I went through
23    when I discussed Nortel's own IP Law Group slide,
24    all the different sources of value potentially that
25    an IP rights holder could have had, like outside



1    existing business lines.

2             And I think finally it ignores, as we

3    just talked about, the fact that the buyers

4    demanded these rights be terminated when the

5    residual patent portfolio was sold and I believe

6    that was key for the $4.5 billion that it actually

7    ended up selling for.

8             Q.   So, Professor Tucker, in your view

9    is Mr. Green's interpretation consistent with what

10   you would expect an arm's length relationship to

11   require?

12            A.   No.  No, it's not.  What we would

13   expect in economics from an arm's length

14   relationship in this kind of industry is there

15   needs to be sufficient incentives for an entity

16   such as NNI to spend $7 billion it ended up doing

17   on R&D and, in my view, Mr. Green's analysis

18   doesn't give us any of these -- doesn't have a

19   meaningful economic rationale for why we wouldn't

20   see any kind of these incentives present.

21            MR. BROMLEY:  Your Honour, that

22   concludes our direct examination.  I think it might

23   make sense to take the morning break at this point.

24            THE CANADIAN COURT:  That's fine.

25            MR. BROMLEY:  If that's fine with Your



```
 1   Honours.
 2                 THE US COURT:  It's fine here.
 3                 THE CANADIAN COURT:  Fine, thank you
 4   very much.  We'll take 20 minutes.
 5   -- RECESS AT 10:20 --
 6   -- UPON RESUMING AT 10:47 --
 7                 THE CANADIAN COURT:  Just before we
 8   start, Mr. Ruby, on this issue we've now had an
 9   exchange of memoranda.  We'd like a brief response
10   from you or anybody else on Monday morning.
11                 MR. RUBY:  Yes, Your Honour, we'll
12   provide it.
13                 THE CANADIAN COURT:  Thank you.
14   Mr. Milne-Smith?
15                 MR. MILNE-SMITH:  Good morning, Justice
16   Newbould, Judge Gross.  I am Matthew Milne-Smith on
17   behalf of the EMEA Debtors.
18
19   CROSS-EXAMINATION BY MR. MILNE-SMITH:
20            Q.   Dr. Tucker, good to see you again.
21            A.   Lovely to see you too.
22            Q.   So I just have two brief areas I
23   would like to touch on.  You recall this morning
24   Mr. Bromley was asking you about the example of a
25   cellphone, we had a slide of a cellphone and you
```



```
 1    spoke about the distinction between the product and
 2    the patents underlying it.
 3              In your report, perhaps we could just
 4    pull up your report at paragraphs 88 and 89, and
 5    that's on page 36.
 6              So you'll see in paragraph 89 you refer
 7    to source material that is cited in the Berenblut
 8    and Cox report?
 9              A.   Yes.
10              Q.   And talk about how from those
11    source materials they conclude the lifespan of the
12    underlying patents is less than 4.5 years.  Do you
13    recall that part of your testimony?
14              A.   Yes, I do.
15              Q.   Of your report, I should say, I
16    suppose.  The source material that you're referring
17    to that was relied on by Berenblut and Cox, in
18    terms of the testimony you gave this morning did
19    you understand that source material to be referring
20    to what we would characterize as the phone or what
21    we'd characterize as the patents underlying it?
22              A.   So, the source material, I think I
23    was referring to the phone.  The fact it's a 4.5
24    year technology cycle just tells me that.
25              Q.   And in your opinion which lifespan
```



1    is more relevant, or which is relevant for

2    determining how long intellectual property can have

3    commercial value?

4              A.   Well, when I -- I'll tell you what

5    I tend to tell my students when we discuss things

6    like this.  I mean, for me when it comes to

7    thinking about the useful life of a patent I tend

8    to think of it actually living out the entire legal

9    life of a patent.  I certainly wouldn't think that

10   4.5 years of a single product technology cycle is

11   particularly relevant for thinking of the value of

12   a patent.

13             Q.   You referred in your testimony

14   this morning --

15             A.   Could I just add a little?  I'm so

16   sorry.

17             Q.   Please do.

18             A.   I want to be clear that when I say

19   a patent now I'm talking about a high-tech patent

20   and that's because of this unique property of them

21   being building blocks, and of course you could have

22   a low-tech patent such as a dog bowl where maybe if

23   it was a short-lived disruptive industry dog bowl,

24   4.5 years might be relevant.

25             Q.    You referred in your testimony



1    this morning to Mr. Reichert or Dr. Reichert.  Did
2    you review his testimony in this case?
3                    A.   So I was teaching but I reviewed a
4    little bit of it, yes.
5                    Q.   Okay.  You discussed in your
6    testimony the difference between high-technology
7    companies on the one hand and the sort of static
8    technology companies like dog bowl manufacturers on
9    the other.
10                   In a static technology company, you
11   have said that it might make sense to give
12   incentives just to tweak contemporaneous products;
13   is that right?
14                   A.   That's right, because they can
15   expect to enjoy the value of those tweaks for many
16   years to come because they're not expecting
17   disruption.
18                   Q.   Now, when you were viewing or when
19   you saw Mr. Reichert's testimony, did you happen to
20   come across his analogy between Nortel and a fast
21   food franchisee?
22                   A.   Are you talking about McDonald's?
23                   Q.   I don't think he specified
24   McDonald's.
25                   A.   Okay, sorry, it came to me as



```
 1   McDonald's just because we teach a case about
 2   franchisees and McDonald's.  Sorry if he didn't say
 3   McDonald's.
 4              Q.   I may be wrong but you recall that
 5   testimony?
 6              A.   I remember the fast food analogy,
 7   yeah.
 8              Q.   So in your opinion, would the fast
 9   food industry be more like a high technology
10   company or more like a dog bowl manufacturer?
11              A.   It would be more low -- it would
12   certainly be more what I would call low-tech.  I
13   mean, when we teach about in this case McDonald's
14   and we try to think about the incentives that lie
15   between the franchisor and the franchisee, our main
16   focus is on the idea of cleanliness.
17              That is when you're trying to think
18   what does McDonald's want to incentivize, it wants
19   to make sure that each of its subsidiaries is
20   actually clean.  And why is that?  Well, if you
21   think about it, if you go to one McDonald's and
22   it's dirty, it would really hurt the McDonald's
23   brand.  So it would make sense for incentives.  But
24   it is a very different set of incentives from the
25   ones we would expect in the high-tech industry
```



```
 1   which is more than just keeping your bathrooms

 2   sanitary.

 3               MR. MILNE-SMITH:  Thank you very much.

 4   Those are my only questions.

 5               MR. ADVANI:  Good morning, Justice

 6   Newbould, good morning, Judge Gross.  Sameer Advani

 7   from Willkie Farr & Gallagher for the UK Pension

 8   Claimants.

 9

10   CROSS-EXAMINATION BY MR. ADVANI:

11               Q.   Good morning, Professor Tucker.

12               A.   Good morning.

13               Q.   I have very few questions for you

14   and I think what I would like to do is maybe just

15   build on and explore some of the opinions expressed

16   in your report and what you said earlier today

17   about the economic incentives for innovation in

18   high-tech organizations.

19               A.   Yes.

20               Q.   As you told us earlier on, one of

21   the things you were asked to do by the US Debtors

22   was to review and comment on the opinions of

23   Mr. Green?

24               A.   That's right.  That was my

25   assignment.
```

 Neeson & Associates   W&P Wilson & Peters Ltd.

```
 1                    Q.   And in particular, you looked at
 2    one of the assumptions Mr. Green made about the --
 3    that the rights that were granted to the integrated
 4    entities, or the IEs, was limited to the present
 5    value of income that they could generate from the
 6    sale of products used around the time the lines of
 7    businesses were sold?
 8                    A.   That's right, yes.  I think that
 9    was characterized, as I think of it, I might have
10    had a quote like that even on my first -- second
11    slide in my presentation.
12                    Q.   I think that's right.  And those
13    kind of products, just for ease of reference, I
14    think you refer to them in your report as
15    contemporaneous products?
16                    A.   I do.  And that was sort of an
17    attempt to have a succinct shorthand.
18                    Q.   Sure.
19                    A.   He's got a long description of
20    what they are in this report but --
21                    Q.   Right, and I think I'll use that
22    shorthand just so we're talking about the same
23    thing.
24                    A.   Great.
25                    Q.   And with respect to that
```

Neeson & Associates    W&P

1    assumption, am I correct that your opinion is that

2    the way he focuses on limiting the rights of the

3    IEs to current revenues from the sale of

4    contemporaneous products is inconsistent with the

5    economic incentives for innovation that you'd see

6    in high-tech companies like Nortel?

7              A.   So, it's not consistent, no, and

8    that's the entire first part of my report.

9              Q.   Right.  And is it fair to say then

10   that if those rights were as Dr. Green -- or

11   Mr. Green, sorry, suggests that limited they would

12   have the effect of disincentivizing innovation?

13             A.   Well, the only innovation you

14   would expect is not something which I would think

15   of as innovation and it would be basically tweaks

16   to the dog bowl.  They would be trying to improve

17   production lines around the existing or current

18   generation of technology.

19             Q.   Right.  Okay.  And so, it's your

20   view that in considering these incentives for

21   innovation and innovation in the way you just

22   described it, one needs to almost look beyond the

23   current revenues generated by products that are in

24   the market and instead focus on whether the

25   licensee has the ability to participate in the



1   future profits from future innovation?

2             A.   That would be what we would advise

3   the ideal incentive mechanism would look like in

4   economics, yes.

5             Q.   I would like to spend just a

6   couple of minutes talking a little bit about NNUK

7   which is the UK Nortel company.  Actually, before I

8   do that, let me step back for a second.

9             I think in your report, and I think it

10  might have even come up earlier this morning, you

11  draw a distinction between high tech and low tech,

12  correct.

13            A.   That's right, yes.

14            Q.   One of the features of high-tech

15  patents or high technology that you talk about is

16  that it's a building block upon which future

17  innovation can be developed?

18            A.   Yes, and that's exactly what I'm

19  trying to illustrate with this particular exhibit,

20  it's not -- this is a concept which can find its

21  way into many different embodiments in different

22  products.

23            Q.   And I think in your deposition you

24  might have described these kinds of patents as

25  intermingled; is that right?



 1                      A.    Intermingled?  Yes.  I mean, that
 2    was Mr. Ruby -- I'll just put a context to that,
 3    which is Mr. Ruby and I were discussing gold mines
 4    and we were discussing about how easy it was to
 5    separate out gold and silver, and I was saying in
 6    the high-tech space it's just very hard to separate
 7    out the intermingling of patents in a residual
 8    patent portfolio in the way Mr. Green does, because
 9    part of the point of them is they're intermingled,
10    they're building blocks which are foundations for
11    next S-curves to come.
12                      Q.    And part of that is evidence, I
13    think again you might have mentioned it earlier
14    today in response to questions by Mr. Bromley, you
15    see these high forward citation counts, it's
16    reflective of that level of interconnectivity?
17                      A.    Yes.  So I would say it's not just
18    within the firm that you get these forward
19    citations, they also come from many of Nortel's
20    competitors in the high-tech space.  It's basically
21    the -- you remember how I talked about this idea of
22    convergence.  Basically that's what we're seeing
23    with these high-tech patents, the fact that they
24    are being cited by many different firms for many
25    different purposes.



1                    Q.    Understood.  And another sort of
2    feature that you talk about in your report with
3    respect to high-tech patents generally but with
4    Nortel specifically is I think you identified a
5    number of instances where high-tech patents have
6    been the result of I think what you call
7    cross-geography collaboration between people
8    working at various different Nortel locations?
9                    A.    Yes, I do.
10                   Q.    So, coming back then -- oh,
11   actually before we get to NNUK, among the examples
12   you've given of high-tech patents includes things
13   like voice-over internet protocol or VoIP?
14                   A.    That's right, yes.
15                   Q.    You also talked about it earlier
16   today, LTE technology which relates to wireless
17   devices?
18                   A.    That's right, yes.
19                   Q.    So have you had a chance to review
20   any of the affidavits or trial testimony before
21   today about the nature of R&D that was performed at
22   NNUK?
23                   A.    So, there is a gentleman named, is
24   it Mr. Simon Brueckheimer?
25                   Q.    Brueckheimer.



```
 1                    A.   He is repeatedly mentioned so I
 2     got the impression that Mr. Simon Brueckheimer is a
 3     wizard when it comes to technology.
 4                    Q.   I'm sure he will be glad to hear
 5     that.
 6                    A.   Yes.
 7                    Q.   Part of the testimony that has
 8     come out is it relates to the nature of the work
 9     that was done at NNUK among other things on
10     technology such as VoIP and LTE wireless
11     technologies?
12                    A.   Yes.
13                    Q.   And you'd agree with me those are
14     the kinds of R&D that a company would want to
15     incentivize?
16                    A.   Exactly, yes.
17                    Q.   Would you also agree with me then
18     that it would be --
19                    THE CANADIAN COURT:  It's probably
20     easier to let you go on, but under the guise of
21     cross-examination, you are in interest with the
22     evidence in-chief and this is completely leading.
23     If there is anything important, it's of little
24     value.
25                    MR. ADVANI:  Your Honour, I want to tie
```



 1    it back --
 2                    THE CANADIAN COURT:  I know what you
 3    want to do but there is a way lawyers are supposed
 4    to act.
 5                    MR. ADVANI:  If I could just finish off
 6    with one question on this point, Your Honour.
 7                    BY MR. ADVANI:
 8                    Q.   Professor Tucker, would you agree
 9    that it would be inconsistent with the economic
10    incentives you have described in your report for an
11    entity like NNUK to do this kind of research in
12    exchange for only the right to sell --
13                    THE CANADIAN COURT:  That's so leading.
14    That's just way too leading for someone asking a
15    witness in interest.
16                    MR. ADVANI:  Understood, Your Honour.
17                    BY MR. ADVANI:
18                    Q.   Let me wrap it up with just one
19    question, and I think you might have said this in
20    your direct.  I think you talked about the fact --
21                    THE CANADIAN COURT:  If it was said in
22    direct, you don't need to do it again.
23                    MR. ADVANI:  There's one clarification,
24    if I may, Your Honour, just a last question.
25                    BY MR. ADVANI:



```
 1                    Q.   You mentioned that the incentives
 2   relate to other integrated entities and I think you
 3   mentioned Ireland and France.  I take it you didn't
 4   intentionally mean to leave out the UK?
 5                    A.   I am sorry for leaving out my
 6   homeland.  That was utterly unintentional.
 7   Basically economics work even in England.
 8                    MR. ADVANI:  That's good to know and
 9   that's all I had to ask.  Thank you, Your Honours,
10   and thank you, Professor Tucker.
11                    THE CANADIAN COURT:  Mr. Rosenberg?
12                    MR. ROSENBERG:  Thank you.  Good
13   morning.  Good morning, Judge Gross.
14                    THE US COURT:  Good morning.
15                    MR. ROSENBERG:  Good morning, Justice
16   Newbould.  I am Ken Rosenberg, for the record, for
17   the CCC.
18
19   CROSS-EXAMINATION BY MR. ROSENBERG:
20                    Q.   And good morning, Professor
21   Tucker.
22                    A.   Good morning.  It's lovely to see
23   you again.
24                    Q.   Good to see you again.
25                    THE CANADIAN COURT:  It's not for your
```



```
 1   benefit, Ms. Tucker.

 2                THE WITNESS:  I'm thinner this time;

 3   what can I say.

 4                BY MR. ROSENBERG:

 5                Q.   You look good.  I hope the baby is

 6   well.

 7                I'm going to start with just a few

 8   matters related to Mr. Green and I don't believe

 9   these are contentious.

10                Mr. Green is a business valuator;

11   that's your recollection?

12                A.   Yes.

13                Q.   And he's a certified public

14   accountant.  You're not a CPA, correct?

15                A.   Not at all, no.

16                Q.   And Mr. Green is also a certified

17   management accountant.  I take it from your CV

18   you're not a CMA?

19                A.   No, no, I'm not, no.

20                Q.   He is also accredited in business

21   valuation and has the acronym ABV designation.

22   You're not an accredited business valuator,

23   correct?

24                A.   No, I have no such accreditation,

25   no.
```

Neeson & Associates   W&F

```
 1                      Q.   And finally he is an accredited
 2     senior appraiser by the American Society of
 3     Appraisers.  You're not an ASA, correct?
 4                      A.   No, I'm not, no.
 5                      Q.   Thank you.  Do you recall being
 6     asked questions -- I'm not going to take you to
 7     this, but you recall being asked questions at your
 8     deposition about the relationship between your
 9     critique and -- your critique of Mr. Green and the
10     facts in this case, and you said your report is a
11     critique of Mr. Green's use of phrases in the MRDA
12     or interpretation of the MRDA.  Do you recall that
13     evidence?
14                      A.   Yes.  I mean, given I think I made
15     it clear in my direct my assignment was to
16     basically assess his interpretation of the license
17     rights from an economics perspective, I hope I made
18     that clear in my deposition as well.
19                      Q.   Right.  But the nub of what you
20     said you were doing in your critique was looking at
21     how Mr. Green interpreted phrases in the MRDA,
22     correct?
23                      A.   That's right.  And thinking about
24     whether or not that's consistent with the
25     economics.
```



```
 1                    Q.   And to be clear, you didn't do
 2   your own valuation in your critique; you just
 3   analyzed Mr. Green's valuation?
 4                    A.   I didn't analyze Mr. Green's
 5   valuation per se.  I considered whether his reading
 6   of the MRDA was consistent from an economics
 7   perspective.
 8                    Q.   Right.  I'd like to turn up your
 9   report and put it on the screen and start with
10   paragraphs 1 to 3.
11                    A.   Paragraph 1?
12                    Q.   Let's start with paragraph 1.  And
13   in paragraph 1 of your report - I just have to get
14   my own copy here - you set out three things you
15   were tasked to do, correct?
16                    A.   Yes, that's right.
17                    Q.   Let's look at the first one.
18                    "First, I have been asked by
19                    counsel for NNI together with its
20                    affiliated US Debtors (the US
21                    Debtors) to analyze incentives,
22                    corporate structures, and research
23                    frameworks that high-technology
24                    organizations use to foster
25                    forward-looking innovations."
```

Neeson&Associates    W&F

```
 1                    Do you see that?

 2               A.    Yes.

 3               Q.    And did you do that in your

 4    report?

 5               A.    Yes, I did, though I do want to

 6    just highlight that I think this paragraph should

 7    be taken in conjunction with points A to C in my

 8    report which, as I say, I do this in order to

 9    evaluate Mr. Green.  It's not a general objective.

10               Q.    You go on to say that:

11                     "Counsel has also asked me to

12                     examine and apply my knowledge of

13                     these organizational frameworks in

14                     high-technology markets, in order to

15                     evaluate how Nortel's organizational

16                     structure and incentives aligned

17                     with a culture of innovation and

18                     long-run objectives to stay ahead of

19                     competitors."

20               Do you see that?

21               A.    Yes, I do.

22               Q.    And:

23                     "Second, I have also been asked

24                     to describe the nature of

25                     high-technology patents and to
```



1                    discuss how they generate value for

2                    the overall strategy of a

3                    high-technology organization."

4            I'll stop there.  Did you do that?

5            A.   Yes, I did.  Yes.

6            Q.   And you also, from the previous

7    sentence, evaluated how Nortel's organizational

8    structures and incentives aligned with the culture

9    of innovation, et cetera?

10           A.   Yes, I did, though I do just want

11   to emphasize I say that I do this in order to

12   evaluate various assumptions made in the Green

13   report.

14           Q.   But you say, so we're not parsing

15   here, you undertook to evaluate how Nortel's

16   organizational structures and incentives aligned

17   with the issues that follow?

18           A.   Yes, but I think if we went to the

19   second paragraph in my report, it makes the context

20   of this clear.

21           Q.   Finally, the third task is you

22   have been "asked to explain the economics of value

23   capture as it relates to the ownership and

24   licensing rights of patents."

25                Do you see that?



```
 1                    A.    Yes, I do, yes.
 2                    Q.    And you did that as well in your
 3      report; that's your evidence?
 4                    A.    Yes, I did.  Again, with the
 5      context given by paragraph 2 and points A through
 6      C.
 7                    Q.    I'd like to go to paragraph 8 and
 8      then I'll go to paragraph 28.  Paragraph 8 of your
 9      report, and in particular the second sentence that
10      starts with the word "This."
11                    A.    "The"?
12                    Q.    No, the second sentence that
13      starts with "This."
14                    A.    Oh, the second sentence.  Okay.
15                    Q.    It says:
16                    "This means that it is crucial
17                    for any high-technology organization
18                    to provide incentives to its
19                    employees and subsidiaries to make
20                    sure that the kind of innovations
21                    they pursue are forward-looking and
22                    not just focused on incremental
23                    improvements to contemporaneous
24                    products."
25                    Those are your words?
```



```
 1                    A.    Yes.

 2                    Q.    And that's what you say you did?

 3                    A.    So, let's be clear.  I'm saying

 4    what it's crucial for a high-tech organization to

 5    do in general.  I'm obviously in my report going to

 6    be focusing on Mr. Green and the MRDA document that

 7    he's focusing on in allocating the property rights

 8    of the various parties in this organization.

 9                    Q.    And so it's clear, what you looked

10    at was the MRDA and the incentives within the MRDA?

11                    A.    Yes, that's correct, yes.

12                    Q.    Right.  And your sentence is here

13    you said that it's crucial to provide incentives to

14    employees and subsidiaries to make the right

15    decisions?

16                    A.    Yes, that's definitely correct.

17                    Q.    Let's go to paragraph 28 of your

18    report, and this is your chart regarding S-curves

19    that's found in your report, correct?

20                    A.    That's right, yes.

21                    Q.    And this chart is in reference to

22    the S-curve charts that are in your demonstrative

23    that you provided to the court this morning,

24    correct?

25                    A.    Yes.
```



```
1                    Q.   And it's clear that none of the -
2    not none, I don't want to exaggerate - but most of
3    the S-curve charts that are in your demonstrative
4    are not found in your report?
5                    A.   No, that's right.  I tried to
6    bring the S-curve to life.
7                    Q.   This is the only S-curve chart
8    that's actually in your report?
9                    A.   Yes, that's right.
10                   Q.   And with respect to this S-curve
11   chart, when you use the word current technology,
12   you could also use the word existing technology,
13   correct?
14                   A.   I imagine you could, yes.
15                   Q.   And emerging technology means
16   future technology or a synonym for emerging would
17   be future technology?
18                   A.   That is certainly possible.
19   Future can be used in many different ways.
20                   Q.   I'd like to go to paragraph 34.
21   In 34 you talk about maximizing incentives for
22   dynamic efficiency.  Correct?
23                   A.   That's right.
24                   Q.   And this morning in your
25   examination in-chief you talked about dynamic
```



```
 1   efficiency?

 2              A.   I did, yes.

 3              Q.   And to make this hopefully quick,

 4   in your view Nortel was a company who sought to be

 5   a company achieving dynamic efficiency?

 6              A.   That's right, yes.

 7              Q.   Not static efficiencies?

 8              A.   Exactly, yes.

 9              Q.   I'd like to go to paragraph 36.

10   In paragraph 36, the last sentence -- actually,

11   let's start at the top and we'll end up at the last

12   sentence and then I'll have some questions about

13   the last sentence.  You say:

14              "However, in a high-technology

15              industry, this backward-looking

16              focus, which simply gives incentives

17              to tweak contemporaneous products,

18              would not make sense."

19         Maybe we had better explain a little

20   bit of this.  Backward focusing, by that you mean

21   just somebody with current technology?

22              A.   Yes, that's correct.

23              Q.   The left-handed S-curve?

24              A.   That's right.  The current

25   generation of technology, resting on one's laurels.
```

 Neeson&Associates   W&F

```
 1                    Q.   And with respect to

 2    contemporaneous products, you are referring again

 3    to existing or current products?

 4                    A.   I'm referring to Mr. Green's value

 5    in use methodology, yes.

 6                    Q.   And from an economist's

 7    perspective, contemporaneous products would be

 8    equivalent to your current technology or emerging

 9    technology, correct?

10                    A.   That's right.  They would

11    represent a single S-curve.

12                    Q.   Then you go on to say:

13                         "It would seem a sure-fire

14                         recipe for ensuring that a research

15                         and development arm of that

16                         organization only ever focused on

17                         the existing S-curve for a

18                         technology, rather than giving it

19                         the incentives that a third party

20                         would demand to make the research

21                         and development investments which

22                         would be needed to help the entire

23                         organization move to the next

24                         S-curve."

25                         Do you see that?
```



```
 1                    A.    Yes.
 2                    Q.    And just so we understand as we
 3     move through this cross-examination, when you're
 4     referring to a third -- arm's length third party,
 5     are you referring to the relationship between NNI
 6     and NNL?
 7                    A.    That's exactly -- I mean, that
 8     seems to be the most relevant third party
 9     relationship.
10                    Q.    So a key assumption in your
11     analysis is that NNL and NNI are arm's length third
12     parties?
13                    A.    That's right.  And as I said, I
14     take the definition of what arm's length is from
15     the MRDA.
16                    Q.    So this distinction -- and then
17     you go on to the last sentence:
18                          "This distinction is important
19                          for understanding how an
20                          organization such as Nortel might
21                          want to set up incentives around its
22                          research and development process and
23                          its associated patent portfolio if
24                          it wants to maintain a leadership
25                          position."
```



1                 Do you see that?

2                 A.   Yes, I do.

3                 Q.   And the crux of this, the nub of

4    this analysis is to look at incentives, correct?

5                 A.   Is the?

6                 Q.   To look at incentives?

7                 A.   Yes, as they relate to Mr. Green's

8    report, yes.

9                 Q.   And as these incentives relate to

10   the relationship between all five IEs:  Canada,

11   France, Ireland, the US and the UK, correct?

12                A.   That's right, and especially the

13   UK.

14                Q.   And you treat each of them as

15   arm's length third parties?

16                A.   That's right, because, as I say,

17   we're looking at the MRDA which is a transfer

18   pricing document, as Lorraine Eden sets it out, the

19   third party standard seems to be important.

20                Q.   And there is another framing

21   concept.  When you talk about incentives in your

22   analysis, you're only looking in and to the MRDA,

23   correct?

24                A.   Yes, that's right, because

25   Mr. Green is using MRDA to -- as the basis of his



1    allocation decisions, and as I think Lorraine Eden

2    describes in her report, we're now facing a

3    situation where we're using a transfer pricing

4    document to allocate value across NNI, NNL, NNUK,

5    and so that seems to be the relevant line of

6    incentives to be looking at for my report, yes.

7              Q.    Then going back to paragraph 8, so

8    with the context that we have just gone through, if

9    we can pull up paragraph 8, you start, and I'll

10   read from the beginning:

11                   "The economics of innovation

12                   and technology emphasize that for a

13                   high-technology organization to

14                   survive, it has to jump from one

15                   short technology cycle to another."

16                   And just stopping there, from your

17   slide deck this morning and from paragraph 28,

18   you're talking about moving from the left-hand

19   S-curve to the right-hand S-curve?

20             A.    That's right.

21             Q.    And then as we saw from an

22   iterative slide, that will continue through the

23   next generations of technology?

24             A.    That's right, yes.

25             Q.    And it's your understanding that's



1    what Nortel was attempting to do while it was in

2    operation?

3                 A.   Well, certainly, you know, if you

4    read the 10Ks it certainly said it was doing that

5    and the MRDA expressed similar intentions.

6                 Q.   So now to go back to the second

7    sentence and review it in the context of what we've

8    just seen, this means that it's crucial for any

9    high-technology organization to provide incentives

10   to its employees and subsidiaries; do you see that?

11                A.   Yes.

12                Q.   And when you were analyzing

13   Nortel's organizational structure, your evidence is

14   clear from the depositions that you did not look at

15   the lines of business at Nortel, correct?

16                A.   No, I did not, no.

17                Q.   And you'd agree with me that as an

18   economist doing an economic analysis, what you're

19   attempting to do is search for the right signals or

20   incentives to be sent to the right person or

21   organization in order to achieve the optimal

22   efficiencies?

23                A.   So it's certainly, if Nortel was

24   an operational concern and they brought me in to

25   advise them, that's exactly what I would be telling



```
 1    them, yes.

 2               Q.   And the more focused and correct

 3    and targeted the incentive, the better the expected

 4    result?

 5               A.   I don't know if we'd call it -- I

 6    don't know if I quite accept that, but I think if

 7    we say the better the incentive.

 8               Q.   The better the incentive.

 9               A.   Yes.

10               Q.   Correct, thank you for that.  So I

11    would like to go back to paragraph 1 of your

12    report, and you were asked to examine Nortel's

13    organizational structure, correct?

14               A.   That's correct.

15               Q.   And once you did that, coupled

16    with other factors, you were going to evaluate how

17    Nortel's organizational structures and incentives

18    aligned with this culture of innovation and

19    long-run objectives to stay ahead of the

20    competitors, correct?

21               A.   Yes.  Again I think it might be

22    useful if we could just bring up paragraph 2 to

23    explain why I was asked to do this.

24               Q.   Well, I'm not interested at the

25    moment why you were asked to do it.  I just wanted
```



1   to know if you did do it.  But if it helps -- if it

2   helps explain that you did do it, we can pull up

3   paragraph 2.

4                  A.   So, paragraph 2 says I've been

5   asked to describe these economic frameworks in

6   order to discuss the validity of the Green report's

7   assumption that NNI's parent, NNL, intends to limit

8   the benefit NNI obtained from its research and

9   development solely to benefit generated from

10  patents in use by products produced by Nortel's

11  line of businesses at the time those businesses

12  were sold.

13                 So I think it's important from the

14  get-go to just be clear that I wasn't employed, I

15  mean NNI didn't go and employ an MIT professor to

16  look at the organizational incentives in Nortel as

17  an existing concern.  That would have been a huge,

18  huge, monumental, hours and hours and hours long

19  task.  Instead I was asked to set out this

20  framework in order to analyze Mr. Green's reports

21  and how he interpreted the relationship between NNI

22  and NNL, which seems to be the relevant parties

23  because those are the parties which we're currently

24  fighting over who gets the money.

25                 Q.   I would like to go to Appendix C



1    of your report, Professor Tucker.

2              A.    Appendix C?

3              Q.    Appendix C.  And those are the

4    documents that you relied upon in the analysis that

5    you undertook, and these are the -- this lists all

6    of the documents and information that you reviewed

7    in preparing your analysis that's found in your

8    report, correct?

9              A.    That's right, yes.

10              Q.    And let's just look and see what

11    you looked at.  In terms of the deposition

12    transcripts, the only ones you looked at are listed

13    here, correct?

14              A.    Certainly as of the time of my

15    report those are the ones I looked at, yes.

16              Q.    Are there any others?

17              A.    Well, since then I've had the

18    delight of reading other expert witnesses'

19    depositions.

20              Q.    I see.  So when we review your

21    report and what you have written here and provided

22    to the court, what's clear is this is what went

23    into the writing of your report?

24              A.    That's right, yes.

25              Q.    And these are the only transcripts

Neeson&Associates    W&P

```
 1   that you reviewed?
 2              A.   That's correct, yes.
 3              Q.   For example, you didn't review
 4   Mr. Currie's?
 5              THE CANADIAN COURT:  No, no.  When she
 6   says these are the only ones, you don't have to
 7   list the other ones.
 8              MR. ROSENBERG:  Thank you, Your Honour.
 9              THE CANADIAN COURT:  There's no jury
10   here.
11              BY MR. ROSENBERG:
12              Q.   And then the exhibits are listed
13   here?
14              A.   Yes, that's right.
15              Q.   And going to the patents on page
16   3, you looked at five patents, correct?
17              A.   That's right.
18              Q.   And none of these patents relate
19   to the line of business sales, they all relate to
20   the Rockstar sale, correct?
21              A.   Yes, that's right.
22              Q.   And in terms of the expert reports
23   you have under other case documents, the only other
24   expert reports you looked at are on page 3 under
25   other case documents, correct?
```



```
 1                    A.   I think -- I think the

 2      highlighting of the other case documents, yes,

 3      those look like the reports that I looked at, yes.

 4                    Q.   And you didn't look at any other

 5      expert reports in preparing your analysis?

 6                    A.   I certainly didn't rely on them,

 7      no.

 8                    Q.   Thank you.  I'd like to turn up a

 9      document that was shown to you on your deposition.

10      It's a Nortel policy about research and

11      development.

12                    THE CANADIAN COURT:  Is there an

13      exhibit number to that, Mr. Rosenberg?

14                    MR. ROSENBERG:  It's Exhibit TR31300.

15      Hopefully, Judge Gross, you're getting that

16      document in the US.

17                    THE US COURT:  Yes.

18                    BY MR. ROSENBERG:

19                    Q.   And you recall being asked

20      questions about this document?

21                    A.   You won't believe this, but I

22      really remember every minute of our deposition,

23      yes.

24                    Q.   I apologize.

25                    A.   No, no, no, no.  Look, I mean, I
```



1    always blame EMEA.  They went after you.

2                    Q.   We blame EMEA too.  That's

3    interesting.  I think we have some common ground.

4                    THE CANADIAN COURT:  I hesitate to say

5    you were kicking and screaming at the time, but I

6    am sure I am half right.

7                    BY MR. ROSENBERG:

8                    Q.   And this is a document called

9    "Research and Development Program."  Do you see

10   that?

11                   A.   Yes, I do, yes.

12                   Q.   And it's dated January 26th, 19 --

13   excuse me, September -- let me start from the

14   beginning.

15                   The date issued is September 27th,

16   2006.  Do you see that?

17                   A.   That's right.

18                   Q.   And looking in the box in the fine

19   print, under September 27, 2009 it says, if you can

20   enlarge that:

21                        "This corporate procedure shall

22                        be followed by Nortel Networks

23                        Corporation (NNC) and its

24                        subsidiaries and other controlled

25                        business globally, whether



```
 1                      incorporated or unincorporated
 2                      (collectively 'Nortel')."
 3                      Do you see that?
 4                      A.    Yes.
 5                      Q.    And you understand, I take it,
 6      that NNL is a subsidiary of NNC?
 7                      A.    Yes.
 8                      Q.    And that NNI is a subsidiary of
 9      NNL?
10                      A.    Yes, we talked about this, yes.
11                      Q.    Okay.  But to be clear, for the
12      purpose of your report you never treated NNI as a
13      subsidiary of NNL; you treated them, your words
14      were, on equal footing?
15                      A.    That's right, because I was
16      considering it from the theoretical transfer
17      pricing perspective where this is the result of
18      hard bargaining between two unrelated parties.  I
19      think we can all say that transfer pricing in some
20      ways doesn't describe necessarily reality and
21      that's where in some ways what I was doing was a
22      theoretical exercise saying what should the
23      incentives have been.
24                      Q.    And with respect to this document,
25      if we can just turn the page, the problem is I
```



```
 1   remember it too and I'm using my memory and I
 2   should pull up the document --
 3             A.   You're going to show me a business
 4   case?
 5             Q.   Yes.  How about I'll sit there --
 6   sit here.  You obviously do remember.
 7             In this document, if we go to
 8   subsection 4 of the document --
 9             THE CANADIAN COURT:  That's why she's a
10   professor at MIT, Mr. Rosenberg.
11             MR. ROSENBERG:  That's why I'm from
12   Winnipeg and played football.
13             BY MR. ROSENBERG:
14             Q.   So paragraph 4 says:
15                 "Each business unit president
16                 is responsible for establishing
17                 and..."
18             Can we just pull up 4, please.
19             It says:
20                 "...establishing and publishing
21                 R&D business unit guidelines..."
22             Do you see that?
23             A.   Yes.
24             Q.   It goes on to talk about, in (c),
25   "managing the R&D program"?
```



```
 1                    A.   Yes.
 2                    Q.   And in fact this sets out -- to
 3      save time, it sets out a series of things that
 4      business unit presidents must do?
 5                    A.   Yes.
 6                    Q.   Okay.  And if we go to part 5 of
 7      this, or section 5, R&D Program Approvals, and just
 8      pull that up, it says under 5.1(a):
 9                         "R&D program is classified as
10                         either internally or externally
11                         funded."
12                    And then it says:
13                         "With internally funded R&D
14                         programs, all internally funded R&D
15                         programs must be supported by a
16                         business case."
17                    Do you see that?
18                    A.   Yes.
19                    Q.   And to be clear, you gave a number
20      of responses to this, but, to summarize, first you
21      never looked at this document.  It's not in your
22      Appendix C, correct?
23                    A.   That's right, I never saw it
24      before my deposition.
25                    Q.   And from your perspective,
```



1    everything that's in this document you referred to

2    as just merely operational details?

3                   A.   Yes, that's right, because I was

4    never asked to analyze incentives in Nortel as an

5    operating concern.  I was asked to consider this

6    theoretical exercise which was embedded in the MRDA

7    and the transfer pricing perspective in it.

8                   Q.   So from your perspective, how

9    Nortel actually operated was an operational detail

10   and not relevant to your analysis?

11                  A.   So, let me be clear.  I am a

12   high-tech economist.  I find it fascinating how

13   Nortel actually operated.  I think it will make an

14   interesting case study for times to come.

15   Unfortunately for me and my interests in this

16   exercise, what I was asked to do was to look at the

17   MRDA, think about Mr. Green's perspective of the

18   MRDA, and the reason I was limited to looking at

19   NNI and NNL and NNUK was because these are the

20   relevant parties under the MRDA, and therefore

21   these are the incentives we're trying to understand

22   here when we're thinking how to allocate the

23   various monies which we're trying to allocate.

24                  I think this is fascinating.  It seems

25   consistent with what I'd expect in a high-tech



1    organization.  Unfortunately it just wasn't

2    relevant to what I was doing.

3                Q.   And you didn't look at it; that's

4    the punch line?

5                A.   No, I didn't look at it.  If

6    someone wants to pay me to go through this, I'd

7    love to, but it just wasn't what I was asked to do.

8                Q.   And going to another issue, you'd

9    never asked the question whether NNI had the

10   ability to direct research and development among

11   its employees or subsidiaries, did you?

12               A.   No, I didn't, because, as I

13   understood it, transfer pricing is such a

14   theoretical exercise where you have these arm's

15   length parties which are operating very much in

16   sync.  No, I never focused on that because in some

17   ways I'm trying to understand the theoretical

18   relationship which was meant to underlie the MRDA

19   and the transfer pricing.

20               Q.   And you also didn't look at the

21   functions of the office of the chief technology

22   officer at Nortel and what that person did?

23               A.   No, no, I think I made -- there

24   were some nice quotes from him that I used in my

25   report but I didn't do more than that.

Neeson&Associates   W&F

1           Q.   So you were unaware that budgets

2    for R&D were allocated by lines of business, not

3    legal entity?

4           A.   So, it certainly wouldn't surprise

5    me to hear that that's what happened in Nortel's

6    organization.  I think we talked about it in the

7    deposition, yes.  That's great.

8           Q.   I'm not here to surprise you with

9    it.  I'm saying when you did your report you were

10   unaware of the proposition that budgets for R&D

11   were allocated by line of business and not legal

12   entity?

13          A.   No, as I said, it just wasn't

14   relevant to what I was asked to do.

15          Q.   And you were also unaware that the

16   product line, not the regions, determined what

17   products should be developed when and on what

18   schedule?

19          A.   No, as I say, it just wasn't

20   relevant to what I was asked to do.

21          Q.   And you also weren't aware that

22   research and development output was tracked in a

23   product line context, not in relation to

24   contributions made by each region?

25          A.   No.  As I say, it just wasn't



```
 1   relevant to trying to think about the economic
 2   incentives underlying the MRDA.
 3                 Q.   You were also unaware -- excuse
 4   me, strike that.
 5                 You weren't familiar with Nortel's
 6   matrix organizational structure?  You simply knew
 7   that it had a matrix structure?
 8                 A.   That's right.  And I think in my
 9   deposition I made various ineffectual gestures to
10   explain what that is.  Now I have a video to make
11   those gestures again, yes.  That's right.  That's
12   what, as I said in my deposition, that's what we
13   consider is an area in the business school which we
14   call organizational behaviour.
15                 Q.   I'd like to go back to your report
16   now.  If you can pull up the report of Catherine
17   Tucker, page 1.
18                 Actually, let's go to paragraph 8,
19   please.  Paragraph 8 of your report.  In paragraph
20   8, in the second sentence, you say:
21                     "This means that it is crucial
22                     for any high technology organization
23                     to provide incentives to," and I'm
24                     going to stop here, "its employees
25                     and subsidiaries."
```



```
 1                    Do you see that?
 2                    A.    Yes.
 3                    Q.    But you didn't include lines of
 4      business of Nortel in that analysis that you
 5      undertook?
 6                    A.    No, because, as I said, I was
 7      looking at the MRDA and how Mr. Green interpreted
 8      it and it really does seem that the corporate
 9      entities are what are relevant to this court
10      because they are trying to allocate monies between
11      them, not the lines of businesses now after the
12      Nortel bankruptcy.
13                    Q.    And going back to paragraph 1,
14      pulling up and highlighting the sentence "Counsel
15      has also asked me," keep going, organizational
16      markets "in order to evaluate Nortel's
17      organizational structure and incentives."
18                    I would just like to focus on their
19      organizational structure and incentives.  It is
20      possible, isn't it, Professor Tucker, that there
21      could be incentives within Nortel regarding R&D,
22      and in particular forward-looking R&D, that would
23      exist or could exist outside of the MRDA?
24                    A.    Yes, and indeed I had hoped there
25      would be.  I really would hope there would be.
```



1              Q.   But you didn't look at any of
2    those when critiquing Professor Green's report?
3              A.   No, when I was looking at Mr. --
4    so I got distracted by the Professor Green.
5              Q.   Did I say Professor Green?  I did
6    that on the deposition.  Mr. Green.
7              A.   You went from Dr. Green to
8    Professor, so I got slightly distracted.  I'm so
9    sorry.
10             Now, okay, I think -- I think -- I
11   think this is perhaps what's slightly confusing
12   here, is that ultimately from my perspective I
13   assume and would hope that there were many
14   different layers of incentives in Nortel, both for
15   employees, for lines of business, all focused on
16   forward-looking innovation.
17             Now, the fact that those incentives
18   exist and existed as Nortel as an on-going concern
19   is wonderful and what I would expect, but they
20   don't act as a substitute for the incentives I
21   would expect to see in the MRDA which describes the
22   relationships between allegedly arm's length
23   corporate entities and, as I said, go on to say in
24   paragraph 2, these are the incentives or the
25   relationships between corporate entities that I'm



 1  asked to analyze, not the other incentives.

 2             I think the key thing to take away from

 3  this is just simply that there were many incentives

 4  and they're very complex incentives in one of these

 5  organizations but they act as complementary forces,

 6  one is not really a substitute for the other.

 7             Q.   Well, let's just break this down.

 8  You're not a transfer pricing expert, are you?

 9             A.   No, I'm not.

10             Q.   Have you ever given an opinion on

11  transfer pricing?

12             A.   No, I'm not.  No, I haven't.

13             Q.   And you've never testified about

14  transfer pricing?

15             A.   No, I haven't.

16             Q.   And I take it you've never

17  prepared a transfer pricing document that had legal

18  implications?

19             A.   No, absolutely not.

20             Q.   And you've never drafted one?

21             A.   No, I haven't.

22             Q.   Have you ever given an opinion --

23             THE CANADIAN COURT:  There's no jury

24  here, Mr. Rosenberg.

25             THE WITNESS:  I can share the one



```
 1   opinion I've ever given about transfer pricing,

 2   which is where -- I actually teach pricing at MIT

 3   when it comes to high-tech, and the only opinion

 4   I've ever given is when one of my students put up

 5   their hands and asked me about transfer pricing, I

 6   said that had to do with tax minimization

 7   strategies, I don't teach that, my opinion is I

 8   don't teach that.

 9                   BY MR. ROSENBERG:

10                   Q.   So to get back to the core

11   question, when you talk about incentives in your

12   opinion, you're only referring to incentives that

13   you would have found within the MRDA and none of

14   the other layers that you referred to in your

15   explanation?

16                   A.   Yes, that's exactly what I was

17   asked to do and I think what's relevant for the

18   court.

19                   Q.   I'd like to turn to just a slight

20   -- a different topic.  You know what a DCF or

21   discounted cash flow analysis is?

22                   A.   Yes, I do, yes.

23                   Q.   And it's clear that you never

24   performed one on the same issues that Mr. Green

25   performed in his report?
```



```
 1                    A.   No, and I think I even said in my
 2     deposition I wouldn't employ me to perform it
 3     either.
 4                    Q.   And you're also familiar with the
 5     fact that a discount rate does look at the risks or
 6     speculative nature of a future cash flow forecast
 7     or activity?
 8                    A.   That's one of the things it
 9     proxies for, yes.
10                    Q.   And with respect to your S-curve
11     at paragraph 28 - maybe we can pull up paragraph 28
12     of Professor Tucker's report - and if we can just
13     highlight -- yes, the S-curve itself, you have a
14     current technology line that we talked about, we
15     could also call that existing technology, correct?
16                    A.   Yes.
17                    Q.   And if you were to do a DCF
18     analysis of the expected forecast operational
19     profits from that S-curve, you could apply a DCF
20     analysis and come up with a discount rate, correct?
21                    A.   We're talking about a single
22     S-curve?
23                    Q.   Yes, a single S-curve.
24                    A.   I think you could.
25                    Q.   And you're aware --
```



```
 1                      A.   You would need a lot of
 2   information to do it, but yes, I'm sure you could.
 3                      Q.   And the same answer would be true
 4   with respect to the emerging technology or future
 5   technology S-curve, correct?
 6                      A.   Yes.  So that would be a lot more
 7   complex.
 8                      Q.   Right, but that's what business
 9   valuators do, correct?
10                      A.   Yes, though -- yes, they do, I
11   believe, although I'm sure -- though I'm not part
12   of the discipline.  If someone was to ask me about
13   it, I would say it's going to be a lot more
14   difficult when you do it for emerging technologies.
15                      Q.   And what's clear is you don't do
16   that, you don't calculate discount rates?
17                      A.   I actually don't do any
18   Excel-based analysis in my report at all.
19                      Q.   And you'd agree with the
20   proposition that the discount rate of a current
21   technology S-curve versus an emerging technology
22   S-curve would likely be different?
23                      A.   Yes.  In predictable ways, but
24   yes.
25                      Q.   And the emerging technology
```



```
 1   discount rate is likely to be higher than the
 2   current technology discount rate?
 3              A.   Yes, it would embody two -- I
 4   think it embodies two different factors of risk
 5   that you would have to incorporate.  The first is
 6   whether or not you have picked the right S-curve,
 7   and the second is when that inflection point is
 8   going to hit.
 9              Q.   Okay.  And you will recall from
10   Mr. Green's report in Appendix K that he did a
11   discount rate for emerging -- for current
12   technology and emerging technology?
13              A.   So, this is where you and I had a
14   little disagreement in our deposition in that
15   basically what Mr. Green calls a future technology
16   is not what I would describe a future technology,
17   and it's certainly not what would be represented by
18   the emerging technology in this S-curve.  It simply
19   tweaks the dog bowl.
20              Q.   My only question was, you recall
21   that Mr. Green did a discount rate for current
22   technology of Nortel and emerging technology?
23              A.   Yes, I recall that.
24              Q.   And you recall that his discount
25   rate for current or emerging technology was 12
```



1    percent -- excuse me, strike that.

2                His discount rate for current or

3    existing technology was 12 percent?

4                A.    That's right, yes.

5                Q.    And emerging or future technology

6    was 30 percent?

7                A.    That's right, yes.

8                Q.    Going back to your comment about

9    layers of incentive within Nortel, just to break

10   that down, it could be in Nortel, you didn't study

11   it, but there could have been and you would expect

12   to find, as an economist, incentives within Nortel

13   outside of the MRDA?

14               A.    That's right.  Certainly as an

15   operational concern, yes.

16               Q.    Those could have been found within

17   the policy that we looked at, Exhibit 31300?

18               A.    You mean the process whereby

19   people proposed new products?

20               Q.    Yes.

21               A.    Yes.

22               Q.    And they could have been found

23   within how the lines of business actually operated

24   and incented their employees?

25               A.    Yes, there could have been -- I



```
 1   would have hoped there were many incentives there,
 2   yes.
 3              Q.   And they could have been found
 4   within the overarching organization that was Nortel
 5   and how they operated within a matrix structure?
 6              A.   Yes, within a matrix structure.
 7   As my colleagues in organizational behaviour
 8   discuss, incentives can be particularly complex,
 9   yes.
10              Q.   And I'd like to -- no, that's it.
11   I have no other questions.  Thank you.
12              THE CANADIAN COURT:  Thank you, Mr.
13   Rosenberg.
14              THE WITNESS:  Thank you.
15              THE CANADIAN COURT:  Anyone else?  Any
16   redirect, Mr. Bromley?
17              MR. BROMLEY:  Your Honour, the US
18   Debtors have no redirect.  I would like to say
19   that --
20              THE CANADIAN COURT:  No redirect?
21              MR. BROMLEY:  No redirect.  If you'd
22   like some, we could work on it.
23              THE CANADIAN COURT:  No.  I was looking
24   for the opportunity to ask you if your case was
25   going to the dogs.
```



```
1                    MR. BROMLEY:  I do have a purebred
2    Canadian dog actually too.  But they are resident
3    in the US.
4                    THE CANADIAN COURT:  Is it a Newfie?
5                    MR. BROMLEY:  No, that is -- we have no
6    redirect, Your Honour.  I don't know if you have
7    any questions for the witness.
8                    THE US COURT:  No.
9                    THE CANADIAN COURT:  Thank you very
10   much, Professor Tucker.
11                   THE WITNESS:  Thank you.
12                   MR. BROMLEY:  And, Your Honour, I would
13   just like to mention this will be my last witness
14   in front of you, so I would like to thank you for
15   the privilege of being here.
16                   THE CANADIAN COURT:  Thank you, I've
17   enjoyed having you.
18                   MR. RUBY:  Your Honours, if I may just
19   bring up, now that we're complete with the witness
20   -- thank you, Ms. Tucker --
21                   THE CANADIAN COURT:  You're quite free
22   to go and grab that baby.
23                   MR. RUBY:  Yes.
24                   THE US COURT:  You're free to run.
25   -- WITNESS EXCUSED --
```



```
 1                  MR. RUBY:  Yes, if I could just bring
 2   up three scheduling matters, since we have the
 3   time.
 4                  THE CANADIAN COURT:  Yes.
 5                  MR. RUBY:  And, Judge Gross, I
 6   apologize in advance, two of them concern the
 7   claims trial so I'll try and deal with them
 8   quickly.
 9                  The first one that concerns everybody
10   is timing of oral and written closings.  As you
11   know, the parties have a protocol.  Justice
12   Newbould, you mentioned timing the other day.  We
13   are of course --
14                  THE CANADIAN COURT:  I was clearly
15   wrong in what my belief was.
16                  MR. RUBY:  Well, I would never say that
17   but maybe -- but since you said it --
18                  THE CANADIAN COURT:  Not to my face.
19                  MR. RUBY:  Certainly not today.  So,
20   we're obviously in the courts' hands with that.
21   The protocol we do have, depending on when you
22   measure the end of the trial from, whether it's
23   from next week or from the end of the claims phase,
24   takes us sometime into August or September for oral
25   closings.
```



```
 1                    The parties have talked about it.  We
 2     don't have any firm views.  End of September seems
 3     to be a time that we could probably dovetail
 4     everything.  I understand that the courts have
 5     obviously summer vacation plan schedules that need
 6     to be taken into account.  I'm not suggesting that
 7     we work out today --
 8                    THE CANADIAN COURT:  We can deal with
 9     it.
10                    MR. RUBY:  But if we could ask for some
11     guidance before the end of the hearing on Tuesday,
12     that would be very helpful.
13                    THE CANADIAN COURT:  All right.
14                    MR. RUBY:  As I say, if we can point to
15     the end of September, that -- I'm not speaking for
16     any of the other parties but it's just adding up
17     the weeks that are in the protocol from the end of
18     the claims trial.
19                    THE US COURT:  Mr. Ruby, I assume
20     you're also asking about your submissions; is that
21     correct?  Your written submissions?
22                    MR. RUBY:  Yes.  We've thought, and it
23     isn't any more sophisticated than we thought if the
24     courts give us guidance when the oral closing, and
25     we seem to have different terminologies between the
```

 Neeson&Associates    W&F

```
 1   two jurisdictions, but oral closing we can then

 2   work backwards the written briefing schedule.

 3              THE CANADIAN COURT:  All right.

 4   Obviously we want the written briefs in sufficient

 5   time to read them before the oral argument.  It

 6   will certainly shorten the oral argument too.

 7              MR. RUBY:  Absolutely.  So the current

 8   protocol talks about four weeks from the end of the

 9   trial.  When we were defining the trial, it was a

10   more certain one trial, and then a few more weeks

11   for a reply briefing period, and then --

12              THE CANADIAN COURT:  Judge Gross and I

13   will take a look at our schedules and get back to

14   you.

15              MR. RUBY:  Thank you.  The second

16   issue, Justice Newbould, is just for you, it's

17   merely that we have to do some kind of

18   confidentiality hearing the same way we did for the

19   allocation trial.  Again, in my submission it's

20   nothing more than an opportunity to tell any

21   interested parties that there's a date certain

22   where they can come and make objections if they had

23   any.

24              Obviously everything worked out quite

25   well the last time, but the claims trial portion
```



1   hasn't had an opportunity.  If the court would like

2   to do it next Friday, obviously that time isn't

3   going to be used for this trial.

4             THE CANADIAN COURT:  Well, it seems to

5   me what you should do is give parties a chance to

6   provide you with notice if they've got any

7   concerns.  If they do, then we'll work out when

8   that's going to be dealt with either by telephone

9   conference or coming into court.  I don't think we

10  need to set up a court day next Friday.  If you

11  want to tell people if they have any concerns about

12  confidentiality issues in the claims process, they

13  provide them to you by next Friday, that's fine.

14  And then if you want me to make an order, I so

15  order.

16             And then once you've found out if there

17  are any issues, then we can deal with them after

18  that.  How is that?

19             MR. RUBY:  We can certainly do that.

20  The only thing I have to say that worked very well

21  is by having at least I think we had a telephone

22  appointment scheduled, that brought focus.

23             THE CANADIAN COURT:  That's fine.  Ten

24  o'clock Friday morning, that's fine.

25             MR. RUBY:  Thank you very much, Your



```
 1    Honour.  The only other issue, and again it's
 2    scheduling, deals with the folks who deal or are
 3    going to deal with the claims part of the trial
 4    think it would be useful to have some kind of
 5    chambers appointment with you at your convenience
 6    to help organize that part of the trial.
 7              THE CANADIAN COURT:  Let's do that
 8    sometime next week.  We'll know what the timing is.
 9    We can do it before or after court or whatever.  Is
10    that okay?  Just leave it loose for the moment.
11              MR. RUBY:  Absolutely.  Thank you, Your
12    Honours.  Those are the only housekeeping matters I
13    had.
14              THE CANADIAN COURT:  Is that it for
15    today?  Do you mind going early Friday, Judge
16    Gross?
17              THE US COURT:  Not at all.
18              THE CANADIAN COURT:  All right, thank
19    you very much, ladies and gentlemen.  So then we'll
20    be back on -- just remind me, what have we got
21    left?  Who do we have left and when do we hear
22    them?
23              MR. ROSENTHAL:  We have two witnesses
24    scheduled for Monday, Professor McConnell and
25    Mr. Kilimnik.
```



```
 1                  THE CANADIAN COURT:  Mr.?
 2                  MR. ROSENTHAL:  Kilimnik,
 3     K-I-L-I-M-N-I-K.
 4                  THE CANADIAN COURT:  So they're for
 5     Monday.  Where will they be?
 6                  MR. ROSENTHAL:  They will both be here
 7     in Toronto.  And then Dr. Eden is the last witness
 8     in Delaware on Tuesday.
 9                  THE CANADIAN COURT:  Okay.
10                  MR. ROSENTHAL:  Thank you, Your Honour.
11     -- Whereupon court adjourned at 11:48 a.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1                  REPORTERS' CERTIFICATE

 2

 3              I, KIMBERLEY A. NEESON, RPR, CRR, CSR,

 4    CCP, Canadian Certified Shorthand Reporter,

 5    Realtime Systems Administrator, and I, LORRAINE B.

 6    MARINO, RDR, CRR, CSR, US Certified Shorthand

 7    Reporter, Realtime Systems Administrator, certify;

 8              That the foregoing proceedings were

 9    taken before us at the time and place therein set

10    forth;

11              That the entire proceedings of the

12    hearing date were recorded stenographically

13    individually by each of us and were thereafter

14    transcribed;

15              That the foregoing is a true and

16    correct transcript of our shorthand notes so taken.

17

18              Dated this 20th day of June, 2014.

19

20    PER:                  PER:

21    Lorraine B. Marino    Kimberley Neeson

22    LORRAINE MARINO       KIMBERLEY NEESON

23    WILCOX & FETZER       NEESON & ASSOCIATES

24    WILMINGTON, DE  USA   TORONTO, ON  CANADA

25
```









































