



```
 1              UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3    ----------------------------)

 4    In Re                       )

 5       NORTEL NETWORKS INC.,    ) Chapter 11

 6       et al,                   ) Case No.

 7            Debtors.            ) 09-10138(KG)

 8    ----------------------------)

 9                          - and -

10                    Court File No. 09-CL-7950

11                        ONTARIO

12               SUPERIOR COURT OF JUSTICE

13                   (COMMERCIAL LIST)

14       IN THE MATTER OF THE COMPANIES' CREDITORS

15     ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

16      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

17        ARRANGEMENT OF NORTEL NETWORKS CORPORATION,

18     NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

19       CORPORATION, NORTEL NETWORKS INTERNATIONAL

20       CORPORATION AND NORTEL NETWORKS TECHNOLOGY

21                       CORPORATION

22      APPLICATION UNDER PART IV OF THE COMPANIES'

23    CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

24                       AS AMENDED

25                       --------
```


Neeson & Associates   W&P

```
 1
 2                           --------
 3
 4   --- This is the Day 20/Volume 20 of the transcript
 5   of proceedings in the above matter held
 6   simultaneously in:
 7   Superior Court of        United States Bankruptcy
 8   Ontario (Commercial      Court for the District of
 9   List)                    Delaware
10   Courtroom 8-1            Courtroom 3
11   330 University Avenue    824 Market Street
12   Toronto, Ontario         Wilmington, Delaware
13
14   on the 23rd day of June, 2014, commencing at 9:10
15   a.m.
16
17                           --------
18   B E F O R E:
19   The Honourable Judge Kevin Gross (United States)
20   The Honourable Mr. Justice Frank Newbould (Canada)
21
22                           ----------
23
24
25
```



```
 1    REPORTED BY:  Toronto - Deana Santedicola

 2                  RPR, CRR, CSR

 3          Delaware - Lorraine Marino

 4                  RDR, CRR, CSR

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1   A P P E A R A N C E S:

 2

 3                    CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER:      Jay Carfagnini, Esq.

11             Joseph Pasquariello, Esq.

12             Ben Zarnett, Esq.

13             Alan Mark, Esq.

14             Peter Ruby, Esq.

15             Jessica Kimmel, Esq.

16             Julie Rosenthal, Esq.

17             Chris Armstrong, Esq.

18

19   ERNST & YOUNG INC.

20   Ernst & Young Tower

21   222 Bay Street, P.O. Box 251

22   Toronto, ON  M5K 1J7

23   PER:      Murray McDonald, Esq.

24             Brent Beekenkamp, Esq.

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER:       Derrick Tay, Esq.

 7              Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER:       Jacob Pultman, Esq.

14              Ken Coleman, Esq.

15              Paul Keller, Esq.

16              Daniel Guyder, Esq.

17              Laura Hall, Esq.

18              Joseph Badtke-Berkow, Esq.

19              Jonathan Cho, Esq.

20              Nicolette Ward, Esq.

21

22   FOR THE CANADIAN DEBTORS

23   BUCHANAN INGERSOLL & ROONEY

24   1105 North Market Street

25   Suite 1900
```



```
 1   Wilmington, DE  19801-1054

 2   PER:       Kathleen A. Murphy, Esq.

 3              Mary F. Caloway, Esq.

 4

 5                  U.S. DEBTORS

 6

 7   FOR NORTEL NETWORKS INC.

 8   TORYS LLP

 9   79 Wellington Street West, Suite 3000

10   Box 270, TD Centre

11   Toronto, ON  M5K 1N2

12   PER:       Sheila Block, Esq.

13              Andrew Gray, Esq.

14

15   FOR THE U.S. DEBTORS

16   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

17   1201 North Market Street, 16th Floor

18   P.O. Box 1347

19   Wilmington, DE  19899-1347

20   PER:       Derek Abbott, Esq.

21              Annie Cordo, Esq.

22

23   FOR NORTEL NETWORKS INC.

24   CLEARY GOTTLIEB STEEN & HAMILTON LLP

25   One Liberty Plaza
```



```
 1   New York, NY  10006
 2   PER:       James Bromley, Esq.
 3              Lisa Schweitzer, Esq.
 4              Howard Zelbo, Esq.
 5              Jeffrey Rosenthal, Esq.
 6              Avi Luft, Esq.
 7
 8                    EMEA DEBTORS
 9
10   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
11   LIMITED
12   DAVIES WARD PHILLIPS & VINEBERG LLP
13   40th Floor
14   155 Wellington Street
15   Toronto, ON  M5V 3G7
16   PER:       Matthew Milne-Smith, Esq.
17              Robin B. Schwill, Esq.
18              Sean Campbell, Esq.
19              James Doris, Esq.
20              Louis Sarabia, Esq.
21
22   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK
23   LIMITED
24   LAX O'SULLIVAN SCOTT LISUS LLP
25   Suite 2750, 145 King Street West
```



```
 1   Toronto, ON  M5H 1J8

 2   PER:        Matthew P. Gottlieb, Esq.

 3               Tracy Wynne, Esq.

 4               Paul Michell, Esq.

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER:        Derek Adler, Esq.

11               Neil Oxford, Esq.

12               Fara Tabatabai, Esq.

13               Charles Huberty, Esq.

14

15   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

16   LIMITED

17   YOUNG CONAWAY STARGATT & TAYLOR LLP

18   Rodney Square

19   1000 North King Street

20   Wilmington, DE  19801

21   PER:        Ed Harron, Esq.

22               John Dorsey, Esq.

23

24   FOR THE EMEA DEBTORS

25   HERBERT SMITH FREEHILLS LLP
```



```
 1   Exchange House

 2   Primrose Street

 3   London, England  EC2A 2EG

 4   PER:       James Norris-Jones, Esq.

 5              CANADIAN CREDITORS COMMITTEE

 6

 7   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

 8   BENEFICIARIES

 9   KOSKIE MINSKY

10   20 Queen Street West

11   Suite 900

12   Toronto, ON  M5H 3R3

13   PER:       Mark Zigler, Esq.

14              Susan Philpott, Esq.

15              Ari Kaplan, Esq.

16              Barbara Walancik, Esq.

17

18   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

19   REPRESENTED BY THE CAW-CANADA

20   CAW-CANADA

21   Legal Department

22   205 Placer Court

23   Toronto, ON  M2H 3H9

24   PER:       Barry E. Wadsworth, Esq.

25              Lewis Gottheil, Esq.
```



```
 1
 2   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES
 3   COMMITTEE
 4   SHIBLEY RIGHTON LLP
 5   250 University Avenue, Suite 700
 6   Toronto, ON  M5H 3E5
 7   PER:      Arthur O. Jacques, Esq.
 8             Thomas McRae, Esq.
 9
10   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS
11   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE
12   FUND
13   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP
14   35th Floor
15   155 Wellington Street West
16   Toronto, ON  M5V 3H1
17   PER:      Kenneth T. Rosenberg, Esq.
18             Massimo (Max) Starnino, Esq.
19             Lily Harmer, Esq.
20             Karen Jones, Esq.
21             Tina Lie, Esq.
22             Michelle Jackson, Esq.
23
24   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN
25   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,
```



```
 1   2009

 2   NELLIGAN O'BRIEN PAYNE LLP

 3   50 O'Connor Street, Suite 1500

 4   Ottawa, ON  K1P 6L2

 5   PER:       Janice B. Payne, Esq.

 6              Steven Levitt, Esq.

 7              Christopher Rootham, Esq.

 8              Ainslie Benedict, Esq.

 9

10   FOR MORNEAU SHEPELL LIMITED

11   MCCARTHY TETRAULT LLP

12   Suite 5300, Toronto Dominion Bank Tower

13   Toronto, ON  M5K 1E6

14   PER:       Barbara J. Boake, Esq.

15              James D. Gage, Esq.

16              Elder C. Marques, Esq.

17              Paul Steep, Esq.

18              Byron Shaw, Esq.

19              Sharon Kour, Esq.

20              Kelly Peters, Esq.

21

22   FOR THE CANADIAN CREDITORS COMMITTEE

23   DLA PIPER

24   919 North Market Street, Suite 1500

25   Wilmington, DE  19801
```



```
 1   PER:        Selinda A. Melnik, Esq.

 2               Richard Hans, Esq.

 3               Timothy Hoeffner, Esq.

 4               Farah Lisa Whitley-Sebti, Esq.

 5            INFORMAL NORTEL NOTEHOLDER GROUP

 6

 7   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

 8   BENNETT JONES LLP

 9   1 First Canadian Place

10   Suite 3400

11   Toronto, ON  M5X 1A4

12   PER:        Kevin Zych, Esq.

13               S. Richard Orzy, Esq.

14               Gavin Finlayson, Esq.

15               Richard Swan, Esq.

16               Sean Zweig, Esq.

17               Jonathan Bell, Esq.

18               Amanda McLachlan, Esq.

19

20   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

21   MILBANK, TWEED, HADLEY, MCCLOY LLP

22   1 Chase Manhattan Plaza

23   New York, NY  10005

24   PER:        Thomas R. Kreller, Esq.

25               Jennifer P. Harris, Esq.
```



```
1              Albert A. Pisa, Esq.

2              Samir Vora, Esq.

3              Andrew LeBlanc, Esq.

4              Michael Hirschfeld, Esq.

5              Atara Miller, Esq.

6              Tom Matz, Esq.

7              Nick Bassett, Esq.

8              Gabrielle Ruha, Esq.

9              Rachel Pojunas, Esq.

10

11     THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

12

13   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

14   CASSELS BROCK & BLACKWELL LLP

15   Suite 2100, Scotia Plaza

16   40 King Street West

17   Toronto, ON  M5H 3C2

18   PER:     Shayne Kukulowicz, Esq.

19              Michael Wunder, Esq.

20              Ryan Jacobs, Esq.

21

22   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

23   ASHURST LLP

24   Boardwalk House

25   5 Appold Street
```



```
 1   London, England  EC2A 2HA
 2   PER:       Angela Pearson, Esq.
 3              Antonia Croke, Esq.
 4
 5   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
 6   RICHARDS LAYTON & FINGER, P.A.
 7   920 North King Street
 8   Wilmington, DE  19801
 9   PER:       Christopher Samis, Esq.
10
11   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
12   AKIN GUMP STRAUSS HAUER & FELD LLP
13   One Bryant Park
14   New York, NY  10036
15   PER:       Fred S. Hodara, Esq.
16              David H. Botter, Esq.
17              Abid Qureshi, Esq.
18              Robert A. Johnson, Esq.
19              Brad M. Kahn, Esq.
20              Christine Doniak, Esq.
21              Joseph Sorkin, Esq.
22              Jacqueline Yecies, Esq.
23
24      UK PENSION PROTECTION FUND AND NORTEL NETWORKS
25                 UK PENSION TRUST LIMITED
```



1

2    FOR THE UK PENSION PROTECTION FUND AND NORTEL

3    NETWORKS UK PENSION TRUST LIMITED

4    THORNTON GROUT FINNIGAN LLP

5    Suite 3200, 100 Wellington Street West

6    P.O. Box 329

7    Toronto, ON  M5K 1K7

8    PER:        Michael Barrack, Esq.

9                D.J. Miller, Esq.

10               Rebecca Lewis, Esq.

11               Andrea McEwan, Esq.

12               John Finnigan, Esq.

13               Michael Shakra, Esq.

14

15   FOR THE UK PENSION PROTECTION FUND AND NORTEL

16   NETWORKS UK PENSION TRUST LIMITED

17   WILLKIE FARR & GALLAGHER LLP

18   787 Seventh Avenue

19   New York, NY  10019-6099

20   PER:        Brian O'Connor, Esq.

21               Sameer Advani, Esq.

22               Andrew Hanrahan, Esq.

23

24   FOR THE UK PENSION PROTECTION FUND AND NORTEL

25   NETWORKS UK PENSION TRUST LIMITED



```
 1   BAYARD, P.A.

 2   222 Delaware Avenue, Suite 900

 3   Wilmington, DE  19899

 4

 5   PER:       Charlene D. Davis, Esq.

 6              Justin Alberto, Esq.

 7

 8              THE BANK OF NEW YORK MELLON

 9

10   FOR THE BANK OF NEW YORK MELLON

11   MCMILLAN LLP

12   Brookfield Place

13   181 Bay Street, Suite 4400

14   Toronto, ON  M5J 2T3

15   PER:       Sheryl E. Seigel, Esq.

16

17   FOR THE BANK OF NEW YORK MELLON

18   LATHAM & WATKINS LLP

19   885 Third Avenue

20   New York, NY  10022-4834

21   PER:       Michael J. Riela, Esq.

22

23        WILMINGTON TRUST, NATIONAL ASSOCIATION

24

25   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION
```

Neeson&Associates   W&F

```
 1   HEENAN BLAIKIE LLP

 2   Bay Adelaide Centre

 3   333 Bay Street, Suite 2900

 4   P.O. Box 2900

 5   Toronto, ON  M5H 2T4

 6   PER:        John Salmas, Esq.

 7               Kenneth Kraft, Esq.

 8               Sara-Ann Van Allen, Esq.

 9

10   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

11   KATTEN MUCHIN ROSENMAN LLP

12   575 Madison Avenue

13   New York, NY  10022-2585

14   PER:        Craig A. Barbarosh, Esq.

15               David A. Crichlow, Esq.

16               Karen B. Dine, Esq.

17

18       LAW DEBENTURE TRUST COMPANY OF NEW YORK

19

20   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

21   BORDEN LADNER GERVAIS LLP

22   40 King Street West

23   Toronto, ON  M5H 3Y4

24   PER:        Edmond F.B. Lamek, Esq.

25               James Szumski, Esq.
```



```
 1

 2   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

 3   PATTERSON BELKNAP WEBB & TYLER LLP

 4   1133 Avenue of the Americas

 5   New York, NY  10036

 6   PER:       Daniel A. Lowenthal, Esq.

 7

 8        BOARDS OF DIRECTORS OF NORTEL NETWORKS

 9        CORPORATION AND NORTEL NETWORKS LIMITED

10

11   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS

12   CORPORATION AND NORTEL NETWORKS LIMITED

13   OSLER HOSKIN AND HARCOURT LLP

14   100 King Street West

15   1 First Canadian Place, Suite 6100

16   P.O. Box 50

17   Toronto, ON  M5X 1B8

18   PER:       Lyndon Barnes, Esq.

19              Edward Sellers, Esq.

20              Betsy Putnam, Esq.

21              Adam Hirsh, Esq.

22              Alexander Cobb, Esq.

23

24

25
```



1                        I N D E X

2

3    WITNESS:  JOHN J. MCCONNELL

4                                            PAGE

5    EXAMINATION IN-CHIEF/DIRECT EXAMINATION

6     BY MR. QURESHI...................... 4781

7    CROSS-EXAMINATION BY MR. BARRACK...... 4802

8    CROSS-EXAMINATION BY MR. HANS......... 4874

9    RE-DIRECT/RE-EXAMINATION BY

10    MR. QURESHI......................... 4919

11

12   SUBMISSIONS RE POST-PETITION

13    INTEREST ISSUES..................... 4923

14

15

16

17

18

19

20

21

22

23

24

25



1                    INDEX OF EXHIBITS

2

3   NUMBER/DESCRIPTION                      PAGE/LINE NO.

4   57  Expert Report of Professor John

5       F. McConnell dated February 28,

6       2014...........................4780/21

7

8   58  Demonstrative - Nortel Bond

9       Spreads to US Government Yield

10      Curve (Basis Point)..............4845/16

11

12  59  Demonstrative - Pricing and

13      Identified Ad Hoc Bondholder Group

14      Holdings, dated January 13,

15      2009-March 11, 2014..............4910/18

16

17  60  Demonstrative - Identified Ad

18      Hoc Bondholder Group Holding dated

19      January 13, 2009-March 11, 2014..4915/11

20

21  61  Demonstrative - Illustrative Bond

22      Trading Volumes, January 13,

23      2009-June 19, 2014...............4915/15

24

25



```
 1   -- Upon commencing at 9:10 a.m.

 2

 3              THE US COURT:  Good morning, everyone.

 4   Please be seated.  Good to see you all.

 5              THE CANADIAN COURT:  Good morning.

 6   Good morning, Judge Gross.

 7              THE US COURT:  Good morning, Justice

 8   Newbould.  All right, we are ready to proceed.

 9              Mr. Leblanc, good morning.

10              MR. LEBLANC:  Good morning, Your

11   Honour.  Good morning, Judge Gross; good morning,

12   Justice Newbould --

13              THE CANADIAN COURT:  We can't hear

14   counsel in the US.

15              MR. LEBLANC:  Can you hear me now, Your

16   Honour?

17              THE CANADIAN COURT:  Yes, I can, thank

18   you.

19              MR. LEBLANC:  Good morning, Justice

20   Newbould.  Your Honour, I rise to just advise the

21   Court of one scheduling change, which I hope meets

22   with the Court's approval.  The US interests have

23   concluded not to call Robert Kilimnik, who was

24   originally proposed as an expert.

25              In many respects, it was our conclusion
```


Neeson & Associates    W&P

1   that he was duplicative of the testimony that you

2   are about to hear from Mr. McConnell, who will be

3   called as a witness in Canada.

4           We advised the parties of that

5   yesterday, so you'll hear just the one witness

6   today, Mr. McConnell, and then we'll proceed

7   tomorrow with Professor Eden as the final witness

8   for the proceedings.

9           So the testimony today will just be the

10  one single witness.

11          THE US COURT:  All right, thank you.

12          MR. LEBLANC:  If the Courts have any

13  questions, I'm happy to respond to them, but

14  Mr. Kilimnik otherwise will be withdrawn in full,

15  Your Honour.

16          THE CANADIAN COURT:  Speaking for

17  myself, I'm more than happy to have one less

18  witness.

19          MR. LEBLANC:  We are happy to oblige

20  Your Honour.  Thank you, Your Honour.

21          THE CANADIAN COURT:  Mr. Barrack.

22          MR. BARRACK:  Your Honour, we learned

23  of this at 6 o'clock last night.

24          Mr. Leblanc is clearly in Delaware, not

25  here.  We prepared to cross-examine Dr. McConnell,

 Neeson&Associates    W&F

```
 1   Professor McConnell on the basis of Mr. Kilimnik's
 2   evidence, which is contradictory.  We only note
 3   that for the record.  There is not much we can do
 4   about it.  The evidence is --
 5                  THE CANADIAN COURT:  You have the
 6   report.
 7                  MR. BARRACK:  But the report is not in
 8   evidence and neither is the deposition.
 9                  So I don't know whether we can
10   cross-examine on it or not.  It is pretty sharp
11   practice to pull at 6 o'clock the night before.
12                  THE CANADIAN COURT:  Let's not talk
13   about sharp practice.  Whether it is or it isn't,
14   that's not the point.
15                  What is the situation with these expert
16   reports that are not -- the only one we have had is
17   Professor Westbrook's and there is an order made
18   with respect to him, but with respect to the other
19   expert reports then, do I understand they are not
20   evidence in the case unless the expert is called?
21                  MR. BARRACK:  Yes, that is what I
22   understand.  Mr. Leblanc may want to address that.
23                  MR. LEBLANC:  Your Honour --
24                  MR. BARRACK:  That's not right?
25                  MR. LEBLANC:  That's not right.
```

 Neeson & Associates     W&P

```
 1                    THE CANADIAN COURT:  Just a moment, we

 2    have two people here shaking their heads

 3    horizontally, which means they don't agree.

 4                    MR. BARRACK:  I'll let Mr. Leblanc

 5    state what he believes the position is.

 6                    THE CANADIAN COURT:  Okay.

 7                    MR. LEBLANC:  Your Honour, the

 8    protocol -- actually, the litigation protocol that

 9    was agreed by the parties actually deals with this

10    question, and to the extent that an expert is

11    withdrawn after the deposition -- that was

12    contemplated in the protocol -- then any of the

13    other core parties can choose to rely upon or

14    submit his report and any portions of the

15    depositions that they choose to use.

16                    That is their option.  It is not our

17    option.  So we have withdrawn the report, and if

18    Mr. Barrack wants to put the report in, he can

19    certainly do so.  If he wants to use the

20    deposition, he can do that as well.  That is the

21    rights that the parties have under the agreed

22    protocol.

23                    THE CANADIAN COURT:  Well, that is a

24    little bit different from cross-examining on a

25    report, but --
```



```
 1                    MR. LEBLANC:  That is why it is their
 2      choice, Your Honour, as to what they want.  If they
 3      don't want the report to come in, then they are
 4      free not to do that.
 5                    MR. BARRACK:  You can see the Hobson's
 6      choice.  If you make it part of your case --
 7                    THE CANADIAN COURT:  I think I
 8      understand.
 9                    MR. BARRACK:  You got it.
10                    THE CANADIAN COURT:  Was Mr. Hobson the
11      rock-and-hard-place man?
12                    MR. ROSENTHAL:  Good morning, Your
13      Honour.  I just want to clarify one thing with
14      respect to what Mr. Barrack said because you had
15      noticed some shaking heads.
16                    There were five experts who the parties
17      all consensually had agreed previously would not
18      testify and their reports would come in and
19      depositions would come in.
20                    I don't know if Mr. Barrack had them in
21      mind, but certainly the breadth of his statement
22      should not be meant to cover Mr. McGarty,
23      Mr. Bereskin, Mr. Burshtein, Mr. Stratton and --
24                    THE CANADIAN COURT:  You are saying
25      that their depositions are agreed to be part of the
```

 

 1    record?

 2                    MR. ROSENTHAL:  There were a number of

 3    witnesses who are not testifying and their reports

 4    are coming in and their depositions are coming in.

 5                    THE CANADIAN COURT:  That is by

 6    agreement?

 7                    MR. ROSENTHAL:  By agreement of the

 8    parties.  With Mr. Kilimnik there was no agreement

 9    of the parties, so therefore we the US interests

10    don't have a right to put it in.  But as

11    Mr. Leblanc noted, any other party is free to do

12    so.

13                    THE CANADIAN COURT:  Mr. Barrack?

14                    MR. BARRACK:  I accept Mr. Rosenthal's

15    position.  If there is agreement, then there is no

16    deposition.  The problem here is they are calling

17    on other people to put the report in.  We don't get

18    the chance to cross-examine.

19                    THE CANADIAN COURT:  Was there a

20    deposition of --

21                    MR. BARRACK:  Yes, there was.

22                    THE US COURT:  Is there a request,

23    Mr. Barrack -- I'm back to Mr. Barrack, forgive me.

24    Is there a request here of the Court?

25                    MR. BARRACK:  The real request, Judge

Neeson & Associates   W&F

1    Gross, is to be able to cross-examine Professor

2    McConnell on that report and on that deposition,

3    without having to adopt the evidence as part of our

4    case.

5              MR. LEBLANC:  Your Honour, this is

6    Andrew Leblanc.  Mr. Qureshi is presenting Mr.

7    McConnell, but from the perspective of the US

8    interests, we are trying to do this in a manner of

9    efficiency.

10             This is becoming less efficient.  We

11   don't have any problem.  We don't think there is

12   inconsistency.  They can address whatever they want

13   with Mr. McConnell without putting in the report as

14   evidence itself.  We don't have any problem with

15   that, Your Honour.

16             THE CANADIAN COURT:  Do I understand

17   what you are saying is that they can cross-examine

18   using Mr. Kilimnik's report without making it an

19   exhibit as part of their case?  Is that what you

20   are saying?

21             MR. LEBLANC:  I don't have any problem

22   with that, Your Honour, if that is what they choose

23   to do, if they want to use it that way, to resolve

24   this, just to do it efficiently is all I'm trying

25   to do.  We wanted to avoid the duplication of



```
 1   having two witnesses testify to the same topic, and
 2   we are fine if they want to do that.  It doesn't --
 3   we don't have an issue with that.
 4               THE CANADIAN COURT:  That is very
 5   helpful.  Mr. Zigler?
 6               MR. ZIGLER:  Good morning, Your Honour;
 7   good morning, Judge Gross.  It is Mark Zigler.
 8               THE US COURT:  Good morning.
 9               MR. ZIGLER:  Just with respect to this
10   witness, there is two points.
11               I think we want a clear understanding
12   certainly from the CCC's point of view that his
13   evidence cannot be relied on by the Bondholders.
14   He is the only witness that the Bondholder
15   committee put forward.
16               THE CANADIAN COURT:  Didn't you just
17   hear what Mr. Leblanc said?
18               MR. ZIGLER:  Well, Mr. Leblanc relied
19   on it in his opening argument, and we just want it
20   clear that it is expunged from the record.
21               I understand that.  As long as we have
22   that agreement, because I didn't quite understand
23   that coming from what Mr. Barrack just raised.
24               The other point -- and we'll deal with
25   it at the end of the trial -- Mr. Hoeffner came up
```



```
 1   from New York to cross-examine this witness.  A lot
 2   of costs thrown away.
 3              The costs of this trial are a big
 4   problem to start with, and we'll deal with it at
 5   the end of the trial.  We think it is really an
 6   inappropriate thing to do at the eleventh hour.
 7              THE CANADIAN COURT:  Well, Judge Gross,
 8   what I am going to propose, based on what
 9   Mr. Leblanc said, is to make an order that
10   Mr. Barrack may cross-examine the witness by using
11   the Kilimnik report without the Kilimnik report
12   being introduced as evidence on its own.  I take it
13   that is what Mr. Leblanc was proffering.
14              THE US COURT:  Yes, that is what I
15   understood, and that is certainly acceptable as
16   well.
17              THE CANADIAN COURT:  Okay, so I'll make
18   that order, Mr. Barrack.
19              MR. BARRACK:  Thank you.
20              THE CANADIAN COURT:  Mr. Zarnett?
21              MR. ZARNETT:  Good morning, Judge
22   Gross, Justice Newbould.
23              I have the reply memoranda that you had
24   asked for.  I think you may have got them all
25   electronically.
```



```
 1                    THE CANADIAN COURT:  I have got them
 2    all electronically.  I have read them all.  And
 3    after this witness, Judge Gross and I will have a
 4    discussion and we'll let you know what our decision
 5    is.
 6                    MR. ZARNETT:  Thank you very much.
 7                    MR. QURESHI:  Good morning, Your
 8    Honours.  Abid Qureshi from Akin Gump on behalf of
 9    the committee.
10                    If we are done with the preliminaries,
11    I believe we are set for Professor McConnell.
12                    THE US COURT:  All right.
13                    MR. QURESHI:  And while Professor
14    McConnell takes the stand, we have offered up his
15    report as well as some demonstratives.  I believe
16    his report becomes Exhibit 57.
17                    THE CANADIAN REGISTRAR:  Exhibit number
18    57, Your Honour.
19                    THE CANADIAN COURT:  His report, very
20    well.
21                    EXHIBIT NO. 57:  Expert Report of
22                    Professor John F. McConnell dated
23                    February 28, 2014.
24                    MR. QURESHI:  Judge Gross, do you have
25    both the report and the demonstratives before you?
```



```
 1                    THE US COURT:  I do, yes, Mr. Qureshi,
 2    thank you.
 3                    MR. QURESHI:  Thank you.
 4
 5                    JOHN JOSEPH MCCONNELL,
 6     having been duly sworn, was examined and testified
 7                         as follows:
 8
 9    EXAMINATION IN-CHIEF/DIRECT EXAMINATION BY
10    MR. QURESHI:
11                    Q.   Professor McConnell, good morning,
12    sir.
13                    A.   Good morning.
14                    Q.   You should have on the witness
15    stand both your expert report and a set of the
16    demonstrative exhibits.
17                    If we can please pull up the first
18    slide in our demonstratives which set forth your
19    qualifications.  Professor, where do you teach and
20    what do you teach?
21                    A.   I have been a Professor of Finance
22    for about 40 years.  I am currently a Professor of
23    Finance at Purdue University.  In my capacity as a
24    Professor of Finance, I teach, lecture, write
25    about, think about, read about topics that I expect
```



```
 1   to be testifying about at this trial.

 2              Q.   Professor, your CV, which is

 3   contained in your report, sets forth in full your

 4   qualifications.  We are not going to take you

 5   through all that.  That would take much too long.

 6              I want to focus, as you alluded to,

 7   just on your experience as it relates to the

 8   testimony you are offering here.  Let's start, if

 9   we could, please, with the academic side of your

10   experience.

11              A.   I probably jumped the gun on that,

12   but I have been a teacher of finance for 40 years,

13   approximately 40 years.  I teach topics related to

14   finance.  I teach about topics with respect to

15   bonds, bond trading, bond pricing, lecture, write,

16   consult, and have spent a lifetime thinking about

17   topics with regard to capital markets.

18              Q.   Professor, tell us, please, a

19   little bit about your experience on the consulting

20   side as it relates to bond pricing and bond

21   markets?

22              A.   Among other things, I have been

23   retained by investment banks and other

24   institutions, financial institutions, to develop

25   models for pricing, valuating and hedging corporate
```

 Neeson&Associates    W&F

```
 1   bonds.
 2              Q.   Professor, what is it that you
 3   were asked to do --
 4              THE CANADIAN COURT:  Can I just ask you
 5   a question.  Where is Denison University?
 6              THE WITNESS:  Granville, Ohio, and we
 7   had a great time.
 8              THE CANADIAN COURT:  We were all
 9   undergraduates once.
10              BY MR. QURESHI:
11              Q.   Let's turn to the next slide in
12   the presentation, and Professor McConnell, if you
13   can please explain to the Courts what it is that
14   you were asked to do in this case?
15              A.   I was asked to review, evaluate
16   and comment upon reports submitted in this matter,
17   review, comment and evaluate from an economic
18   perspective a report submitted in this matter by
19   Messrs. Clark and Westbrook.
20              Q.   Now, you recall, of course,
21   Professor McConnell, that Judge Clark and Professor
22   Westbrook submitted a report advocating a pro rata
23   recovery to all creditors.
24              I want to bring up, if I could, just
25   one paragraph from that report.  It is paragraph
```



1    49, and in paragraph 49, which you can see on the
2    screen before you, Professor, Clark and Westbrook
3    write:
4                      "It appears more likely that
5                the expectations of Nortel creditors
6                were based upon the credit of the
7                corporate group rather than any
8                component of that group."
9                Professor, did you reach a conclusion
10    with respect to this particular statement in the
11    Clark and Westbrook report?
12                A.    I have.
13                Q.    Let's go back to the sum of your
14    conclusions, please, and if you can tell the Court
15    what conclusion it is that you reached?
16                A.    In my opinion, the economic data
17    contradict, strongly contradict Mr. Clark's and
18    Mr. Westbrook's assertion that Nortel creditors
19    would base their expectations of recovery in the
20    event of default on the payment capacities of the
21    global group as opposed to the entities that
22    comprise the group.
23                Q.    Professor, you mentioned Nortel
24    creditors.  Which creditors in particular do you
25    address in your opinion?



```
 1                         A.   The Nortel Bondholders or
 2    Bondholders of Nortel bonds.
 3                         THE CANADIAN COURT:  Could I ask you a
 4    question on that.  Are you -- I have read your
 5    report.  I take it you are considering the original
 6    Bondholders who bought the bonds from Nortel as
 7    opposed to later hedge funds who bought them up in
 8    a distressed market?
 9                         THE WITNESS:  I believe that the
10    comments and observations that I am about to --
11    expect to testify on would apply to all creditors
12    -- or all Bondholders and potential Bondholders.
13                         THE CANADIAN COURT:  Thank you.
14                         BY MR. QURESHI:
15                         Q.   You mentioned, Professor, that you
16    based your opinions on the economic evidence.  What
17    economic evidence in particular did you review to
18    reach the conclusions that you have?
19                         A.   The prices of the Nortel bonds.
20                         Q.   Okay, and please explain what bond
21    pricing tells you about the expectations of
22    bondholders?
23                         A.   A general proposition in financial
24    economics or finance is that the price of any
25    security, including bonds today, embeds within it
```



1    the expectations of the security holders of the

2    payments that they will receive in the future.  And

3    therefore, bond prices embed within them the

4    expectations of the Bondholders' payoffs in the

5    future, or recoveries, in this instance, in the

6    future.

7                    Q.    Professor, let's take a closer

8    look at the bond pricing information that you did

9    look at, and if we can please go to the next slide

10   in the presentation, and you have set forth on this

11   page pricing information with respect to six Nortel

12   bonds.

13                   Why don't we start by having you

14   explain how it is that you selected these six

15   issuances to analyze.

16                   A.    I was interested in bonds that

17   were issued by NNL or NNC and that either were or

18   were not guaranteed by NNI and --

19                   Q.    Now -- I'm sorry, please continue.

20                   A.    And in this case, there are six

21   bonds that fit that category.

22                   Q.    Now, Professor, on this chart you

23   have set forth a number of characteristics of these

24   six bonds.  Can you please start by explaining why

25   you selected these particular characteristics to



1  set forth on this chart?

2              A.   These characteristics are

3  important for investors when thinking about buying

4  a bond.  They are influential in determining the

5  price of the bond, and that is why it shows these

6  particular characteristics.

7              Q.   Okay, let's walk through, if we

8  could, each of those characteristics and explain to

9  the Courts the relevance of that characteristic.  I

10 guess we can start with the red column, "Guarantor

11 2".

12             A.   Well, that is the question I

13 looked at, is whether the guarantee by NNI mattered

14 for pricing.

15             Q.   Okay, and --

16             A.   The other characteristics, I know,

17 matter for pricing.  That is the coupon rate of

18 interest, and here we have three types -- or two

19 types of bonds.  We have fixed rate bonds, floating

20 rate bonds.

21             The first one is floating rate bonds

22 and the others are fixed rate bonds, with coupons

23 that range from 1.75 percent to 10.75 percent.  So

24 there is quite a range of differences in coupon

25 interest rates.



1          The issue date doesn't need any

2    comment, I believe.  Those are the dates on which

3    they were issued.

4          The maturity date ranges from 2011 to

5    2023, so there is quite a difference in maturity

6    dates.  Maturity date is the date on which the

7    final payment of principal is scheduled to be paid

8    on the bonds, assuming there is no early

9    retirement.

10          The last row, which is the early

11   retirement options, indicates that the bonds differ

12   with respect to this feature.  So for example, bond

13   number two is a convertible and callable bond, so

14   it could be extinguished either by conversion or by

15   being called.

16          Bond number three, early retirement

17   option is that it is callable.

18          Four, again, is convertible and

19   callable.

20          Five is callable.

21          Number one, the floating rate bond, has

22   no early retirement option, and number six, the

23   6.875 percent bond, also has no early retirement

24   option.

25          THE CANADIAN COURT:  Convertible into



1    what?

2              THE WITNESS:  Common stock of the

3    issuer.

4              BY MR. QURESHI:

5              Q.   All right, Professor, let's now

6    turn to the pricing data that you have looked at

7    for these six bonds, and we can find that on the

8    next page in the demonstratives.  That is on slide

9    5.

10             And, Professor, just from a high level,

11   please explain what it is that you have set forth

12   on this chart.

13             A.   I'm not sure what you mean by

14   "high level", but I'll try to explain what I have

15   on this chart.

16             These are bond prices, bond prices of

17   the six bonds that I just described.  The bond

18   prices commence with January 14th, 2009, the

19   petition date, and continue forward up through

20   January 14th of 2014, almost contemporaneous.

21             On the -- that is on the vertical --

22   horizontal axis.

23             On the vertical axis are bond prices

24   expressed as a percentage of par value, so 20

25   represents $200 per $1,000 of face value.



 1                    At the bottom I have coloured bars, and

 2      those coloured bars designate each of the six bonds

 3      -- or one of the six bonds each.  So bond number

 4      one is a floating rate bond in light blue.  Bond

 5      number 6 is the 6.875 percent bond in red.  That is

 6      the one not guaranteed by NNI.

 7                    So this exhibit plots the prices that

 8      investors were paying to buy the bonds through

 9      time.

10                    Q.    Professor, what is the source of

11      the data that you used to compile this chart?

12                    A.    The source of the data is

13      Bloomberg, which is a data provider, providing

14      service.

15                    Q.    Okay, now, Professor, relevant to

16      the question that Justice Newbould asked earlier,

17      this chart begins, as you explained, on the

18      petition date, January 14th of 2009.  Why did you

19      start it on that date as opposed to some

20      pre-petition period?

21                    A.    As I mentioned, I described three

22      factors that influence pricing or influence really

23      the cash flows that investors can expect to receive

24      in the future:  coupon interest rate differentials,

25      maturity date differentials, prepayment or early



```
 1   exercise differentials.
 2              As of the petition date, all of those
 3   factors disappear as influencing the bond price.
 4   They disappear because on that date the maturity is
 5   instantaneous, that is, all of the bonds become due
 6   and payable on the petition date.
 7              The differential in coupon interest
 8   rate disappears because as of that date the
 9   Bondholders no longer are expecting regular
10   periodic current interest payments.
11              The early extinguishment provision
12   disappears because they are all due and can be
13   extinguished or disappear on that date.
14              So each of those characteristics no
15   longer has an influence on price as of that point
16   in time.  So as of that point in time, I have bonds
17   that are being priced on the basis of their
18   expected recovery only.  They are all on the same
19   footing in that respect.
20              Q.   And so, Professor, for this period
21   of time, the petition date forward, what
22   conclusions did you draw based on the pricing
23   information that you analyzed?
24              A.   The conclusion that I drew is that
25   Messrs. Clark and Westbrook's assertion that all
```



1    Bondholders would expect to receive payments from

2    the global group or recoveries in the event of

3    default from the global group, as opposed to

4    individual entities in that group, is contradicted,

5    strongly contradicted by these data.

6              Q.    Now, Professor, if Clark and

7    Westbrook were correct that Nortel Bondholders'

8    expectations were based on the credit of the Nortel

9    Group as a whole as opposed to any individual

10   entities within that group, what would you expect

11   this chart to look like?

12             A.    My understanding is that they were

13   espousing a pro rata distribution.  In the event of

14   a pro rata distribution, each of the Bondholders

15   would have expected the same percentage recovery

16   rate.  If so, the bonds would all be trading at the

17   same price.

18             What I observe in this exhibit and in

19   the bond pricing data, that five of the bonds trade

20   as if they are expecting the same pro rata

21   distribution, and those are the bonds not

22   guaranteed by NNI -- or excuse me, that were

23   guaranteed by NNI.

24             That tells me that those Bondholders

25   were expecting a pro rata distribution.  The bond



 1   not guaranteed by NNI trades at a substantially

 2   lower price.  That tells me that Bondholders were

 3   not expecting to receive a pro rata distribution

 4   from a single pool of assets.

 5              In my opinion, these data contradict

 6   Judge Clark and Professor Westbrook's assertion.

 7              Q.   Now, Professor, let's focus for a

 8   minute in the middle of this slide you see the date

 9   that we have marked in a box for the order

10   approving the residual patent portfolio sale, and

11   obviously we can all observe a substantial spike in

12   the prices on that date.

13              But I would like to focus you to the

14   top of the chart, where the five bonds that have a

15   guarantee from NNI, from that date forward you see

16   there is an increased spread as between those

17   prices.  Do you have any opinions concerning that?

18              A.   I do.  They relate to -- my

19   opinions on that topic relate to the spike in

20   prices to which you refer.  On that day or in that

21   interval was the sale of the residual patent

22   portfolio, which indicated to Bondholders -- it

23   apparently indicated to Bondholders, the data

24   seemed to say indicated to Bondholders that their

25   recovery capacities had improved dramatically.

 Neeson & Associates     W&F

 1                What happened after the spike is that

 2    there is a spread now of the prices of the bonds

 3    that are guaranteed.

 4                You asked me, I believe, what could

 5    explain in my opinion that spread in prices.  I

 6    would point to the bottom of the chart where I have

 7    the coupon rates.

 8                Bond three and bond five have coupon

 9    payment rates, interest coupon payment rates of 10

10    percent or a little over 10 percent.  Those are the

11    top two lines in that box.  Bonds number two and

12    number four have much lower promised interest

13    rates, 2 percent or so.  Those are the bottom two

14    bonds in that box.  That indicates to me that

15    Bondholders were expecting to receive interest that

16    differentiated between the 10 percent and the 2

17    percent bonds.

18                The blue line in the middle is the

19    floating rate bond, and my interpretation of the

20    data is that bond -- or investors in general,

21    capital market participants who could buy and sell

22    these instruments expected the recovery of interest

23    for that bond to lie somewhere in between the 10

24    percent and the 2 percent coupon bonds.

25                That is my interpretation of the spike



1   in prices and the price dispersion that follows

2   thereafter.

3                Q.   And what did you conclude with

4   respect to bond six during this period?

5                A.   Bond six continues to trade, that

6   is, the non-guaranteed bond continues to trade

7   substantially below the prices of the other five

8   bonds.

9                Q.   Okay, now, I just want to go back

10  a little bit to your testimony about the -- prior

11  to the patent sale when those guaranteed bonds were

12  moving together, and you testified, sir, that that

13  indicated to you that those Bondholders expected a

14  pro rata recovery.

15               And just so we are clear on

16  interpretation, did you mean pro rata with respect

17  to each other as opposed to pro rata with respect

18  to all creditors?

19               A.   Yes, I'm sorry, whatever pool of

20  assets was available to them, they were expecting

21  the same payoff, percentage payoff.

22               Q.   Okay.  Now, Professor, you have

23  obviously explained why you looked at the petition

24  date forward.  You didn't do a chart like this for

25  the pre-petition period.  Why not?



```
 1                    A.    Because the data do not lend
 2     themselves to the type of analysis that allows me
 3     to determine the effect of the guarantee on the
 4     price of the bonds.
 5                    In particular, the bonds have different
 6     maturity dates.  They have different exercise
 7     options, and they have different coupon rates.  I
 8     could not draw the inferences, could not draw
 9     inferences with those data with respect to the
10     effect of the guarantee on the bond prices.
11                    Q.    Now, Professor, you may recall
12     being shown at your deposition pricing and yield
13     and spread information for the pre-petition period,
14     and I would like to pull up a sample of that on the
15     screen.  And for the record, this comes from Trial
16     Exhibit 12044B.
17                    This, Your Honours, is the pricing
18     information that was attached to a stipulation that
19     the parties reached with respect to the Clark and
20     Westbrook report.  If we can please have that page
21     enlarged.
22                    And the first thing I would like to
23     note, Professor, is that this table --
24                    A.    This is not in my booklet.
25                    Q.    It is not.  We can get you a hard
```



```
 1   copy.
 2                   A.   I'm sorry for interrupting.  I can
 3   move closer to the screen.
 4                   Q.   Can you see it on the screen?
 5                   A.   Sure.
 6                   Q.   And you will see that there are
 7   seven bonds set forth on this page, and in your
 8   bond pricing chart you had six.  Can we start by
 9   explaining that, if you could?
10                   A.   Yes.  Bond number seven at the
11   bottom was not issued by NNI -- excuse me, NNL.  It
12   was not issued by NNL or NNC, so it did not fit the
13   criteria.
14                   Q.   You can see, if we go to the top
15   of this chart, it presents information for two
16   dates, January 31 of 2008 and March 31 of 2008.  So
17   both pre-petition periods.
18                   For our purposes, let's focus on the
19   January 31st period, and let's look at the column
20   labelled "Trading Price".
21                   And, Professor McConnell, what I would
22   like to ask you here is does that information, the
23   trading prices of the same six bonds that you
24   looked at post-petition, does that information for
25   this pre-petition period allow you to draw any
```


Neeson & Associates   W&F

```
 1   inferences regarding Bondholder expectations of
 2   relative recovery rates across Nortel bonds in the
 3   event of a default?
 4                   A.    It does not.
 5                   Q.    And why not?
 6                   A.    Because, as I have mentioned,
 7   these bonds are not comparable.  They have
 8   different maturity dates, different coupon rates of
 9   interest and different early exercise options.
10                   So for example, if I look at bond six
11   at the bottom, it has a price of 73.  If I look at
12   bond three near the top, it has a price over 100.
13                   Were I to ignore the fact that they
14   have different coupon rates, different maturity
15   dates, different early exercise options, looking at
16   those prices, one might be led to conclude on that
17   evidence alone that the guarantee has substantial
18   value.  But the bonds are so different that that
19   would not be a reasonable interpretation of the
20   data.
21                   So I can't look at those data
22   pre-petition with the disparate characteristics of
23   the bonds and draw inferences with respect to
24   creditor expectations as reflected in the bond
25   pricing data.
```



 1                    Q.   And, Professor, let's move one to

 2    the right and take a look at the yield column for

 3    the same six bonds.  Again, does that information

 4    allow you to draw inferences concerning expectation

 5    of recovery rates upon default?

 6                    A.   It does not.

 7                    Q.   And why not?

 8                    A.   And for the same reasons that I

 9    mentioned with respect to price.

10                    Q.   Okay.  Let's move over one last

11    column, and this column is labelled "Approximate

12    Spread to US Government Yield Curve".  Let's start,

13    if we could, please, by explaining what a spread to

14    a government yield curve is.

15                    A.   A spread to a government yield

16    curve is the difference between the yields of two

17    bonds.  In this instance, it is the Nortel bonds

18    versus US Treasury bonds.

19                    So the yield, which is in this instance

20    calculated as an internal rate of return on the

21    Treasury bonds compared with the internal rate of

22    return on -- what is called the internal rate of

23    return on the Nortel bonds, that spread or that

24    difference is referred to in this instance as the

25    spread to a US Treasury bond.



```
 1                    Q.   Okay, and, Professor, we can see
 2    for these data that the bond at the bottom, your
 3    bond six, has a spread of 617 basis points.
 4                    A.   Did you say my bond?
 5                    Q.   Well, this is -- from your chart,
 6    bond six.  Be glad that you are not a holder.
 7                    A.   I'm sorry?
 8                    Q.   And at the top of the page, the
 9    guarantee bonds show spreads in the 700 range.
10    Does looking at those spreads for the pre-petition
11    period, sir, allow you to draw any inferences
12    concerning expectation of recovery rates on
13    default?
14                    A.   It does not.
15                    Q.   And again, why?
16                    A.   For the same reasons, that the
17    bonds being compared do not have the same maturity,
18    the same coupons, the same pre-payment options, and
19    coupons, pre-payment options and remaining term to
20    maturity.
21                    I'll note one other factor, that
22    certain of these bonds actually are not -- that I
23    have replicated in these analyses are not actually
24    yields to maturity.  They are yields to what is
25    called worst or first, which again has the effect
```

Neeson & Associates    W&F

 1    of not making them comparable.

 2                  Q.   Okay, Professor, just one last

 3    area that I would like to explore away from the

 4    pricing information.  If we can go to the last

 5    slide in the demonstratives, please.  That is slide

 6    six.  We'll have that brought up.

 7                  And you'll see on slide six we have set

 8    forth some language from a Nortel bond prospectus

 9    concerning the same bonds that you have analyzed.

10    And first, let me ask you, Professor, what is the

11    purpose of a prospectus in a bond issuance?

12                  A.   Prospectuses are issued in

13    conjunction with or prior to the sale of a bond.  A

14    prospectus advises and informs buyers and potential

15    investors, market participants, of the

16    characteristics of the bonds, and so it provides

17    information to investors and potential investors.

18                  Q.   Okay, and Professor, we have set

19    forth on this page language from the prospectuses.

20    It is substantially similar.  I'll focus you on the

21    top for bonds two and four where the prospectus

22    says in part:

23                       "The issuers' subsidiaries are

24                       separate and distinct legal entities

25                       and any subsidiary that is not a



```
1                    guarantor has no obligation [...]"

2                    And then it goes on from there.

3                    And, sir, you recall that Clark and

4     Westbrook reached the conclusion that creditors

5     expected -- expectations were based on the credit

6     of the group as a whole and not of the individual

7     entities.

8                    Sir, is the language in these

9     prospectuses consistent, in your opinion, with the

10    conclusion that Clark and Westbrook reached?

11                   A.   Well, reading this as an

12    economist -- I'm not a lawyer.  Reading this -- as

13    I don't pretend to offer a legal opinion.  But

14    reading it as an economist, this language would be,

15    as I interpret it, totally inconsistent with Mr. --

16    Judge Clark and Professor Westbrook's assertion.

17                   Q.   Okay, thank you, Professor, those

18    are my questions.

19                   THE CANADIAN COURT:  Thank you.

20    Mr. Barrack.

21    CROSS-EXAMINATION BY MR. BARRACK:

22                   Q.   Good morning, Judges.

23                   Professor, we met before.

24                   A.   We have.

25                   Q.   You are not a lawyer?
```



```
 1                    A.    I am not a lawyer.
 2                    Q.    You are a finance professor with a
 3      specialization in capital markets?
 4                    A.    That's fair.
 5                    Q.    And you are offering an opinion on
 6      the effect of certain choices the Court might make
 7      on capital markets?
 8                    A.    Say that again, please?
 9                    Q.    You are offering an opinion on the
10      effect of certain choices the Court might make on
11      capital markets?
12                    A.    I think you are referring to my
13      report?
14                    Q.    Yes.
15                    A.    In my report I talked about the
16      possible implications for a pro rata distribution
17      on capital markets.
18                    Q.    Right.
19                    A.    Yes.
20                    Q.    When I asked you previously, you
21      told me, you agreed you were offering an opinion on
22      the effect of certain choices the Court might make
23      on capital markets; correct?
24                    A.    I believe -- I don't recall
25      specifically, but that sounds reasonable.
```

Neeson & Associates   W&P

```
 1                  Q.   You are not telling the Court

 2   which choice it should make about the treatment of

 3   guarantees?

 4                  A.   I am not.

 5                  Q.   You are not telling the Court

 6   whether these choices are positive, negative or

 7   neutral?  You are only describing some effects;

 8   correct?

 9                  A.   What I believe I said is that

10   there could be positive effects for some

11   Bondholders and negative effects -- or creditors

12   and negative effects for others.

13                  Q.   Well, I'm going to ask you one

14   more and then we can go to your deposition.  You

15   are simply trying to identify possible effects on

16   the market so that the Court can take those into

17   account and be conscious about them; correct?

18                  A.   I believe that is a fair

19   characterization, yes.

20                  Q.   You did not try to quantify the

21   capital market effects described in your report?

22                  A.   That is absolutely correct.

23                  Q.   You did not meet with or speak

24   with any Bondholders in the preparation of your

25   report?
```



```
 1                    A.    That is also correct.
 2                    Q.    You only met with lawyers and
 3    individuals working with Navigant to help you
 4    prepare the report?
 5                    A.    That is fair.
 6                    Q.    You reviewed parts of the bond
 7    indentures and some summarizations created for you?
 8                    A.    That is also correct.
 9                    Q.    And you reviewed some rating
10    agency reports and had some summaries prepared for
11    you, but those reports were not prepared in
12    writing?
13                    A.    That's correct.
14                    Q.    And you only reviewed a segment of
15    the rating reports, not all of them; correct?
16                    A.    I did not review all of the rating
17    reports; that's correct.
18                    Q.    And you only looked at some bond
19    prices after insolvency and reviewed those;
20    correct?
21                    A.    I believe I reviewed all bond
22    prices.
23                    Q.    Well, we are going to come to the
24    2026s.  You left the 2026s off your charts;
25    correct?
```



```
 1                    A.   Yes, I did.
 2                    Q.   Okay, and we'll come back to that.
 3   Now, in your opinion, if the Court is concerned
 4   about the impact of their decision on capital
 5   markets, do you agree that the Courts may want to
 6   assess the impact of the ability of issuers to
 7   issue bonds?
 8                    A.   May I have the question again,
 9   please?
10                    Q.   If the Court is standing back and
11   trying to assess your evidence and the evidence
12   that we were going to hear from Mr. Kilimnik, that
13   one of the things the Courts will want to have an
14   eye to is what the effect of their decision will be
15   on the ability of issuers to issue bonds?
16                    A.   I don't know that I rendered that
17   opinion in my report.  I may have answered a
18   question with respect to that in my deposition, but
19   I don't recall doing so.
20                    Q.   Okay.  Do you have any opinion on
21   whether any treatment of the guarantees by the
22   Courts by effecting pro rata would have any effect
23   on the ability of issuers to issue bonds?
24                    A.   I haven't thought about it.  I
25   don't believe I commented upon that in my report.
```



```
 1    I don't believe I commented on that at my

 2    deposition.  So the answer is no.

 3              Q.   So the effects you are referring

 4    to are simply wealth transfer effects between

 5    classes of bonds; is that correct?

 6              A.   With respect to the capital market

 7    effect?

 8              Q.   Yes.

 9              A.   Yes, that is correct.

10              Q.   That is the limited nature of your

11    opinion?

12              A.   That is what I wrote and at my

13    deposition that is what I testified to.

14              Q.   All right, so that, for instance,

15    if the Bondholders in their opening submission

16    said:

17                   "The case law in both

18                   jurisdictions we believe is clear

19                   that the relevant expectations are

20                   the expectations that are put in

21                   place at the time on a pre-petition

22                   basis, not a post-petition basis."

23                   [As read.]

24                   For you, that doesn't have any bearing

25    because in your view the expectations of
```



1    Bondholders are the same both pre-petition and

2    post-petition?

3              A.    Could I have it again, please?

4              Q.    Is it your evidence that the

5    expectations of Bondholders pre-petition and

6    post-petition are the same?

7              A.    Just to be clear, when you are

8    referring to "expectations", you are referring to

9    expectations with respect to the guarantee?  Or are

10   you referring to the expectations with respect to

11   future cash flows?

12             Q.    Expectations with respect to the

13   form and timing of recoveries.

14             A.    Here is what -- here would be my

15   opinion, and I think this is an answer to your

16   question.  Okay?  I think you are asking me would

17   investors pre-petition have had expectations

18   embedded within them or embedded within their

19   expectations a differential treatment depending

20   upon the entity that issued and guaranteed the

21   bond?  Is that what you are asking me?

22             Q.    No.

23             A.    No?  Okay.

24             Q.    What I am asking you is -- well,

25   let me frame it another way.  In forming your



```
 1   opinion, you were not aware of any trading

 2   activities that may be different pre- and

 3   post-insolvency for bonds?

 4                A.   Are you referring to volume of

 5   trading?  When you say "trading activities", I'm --

 6                Q.   In forming your opinion, you were

 7   not aware of any trading activities that may be

 8   different pre- and post-insolvency; correct?

 9                A.   Here is my understanding of

10   trading activities.  I'm trying to figure out what

11   the term means, but orders are placed; the orders

12   are executed.  Ownership of the securities are

13   transferred.  Brokers and dealers are involved with

14   the trading activities.  Is that to what you are

15   referring?

16                Q.   I asked you that question on

17   deposition.  Let's call it up.  Page 160, line 14.

18   I can give you a copy of your deposition too:

19                     "Question:  Are you aware of

20                any -- in which trading activities

21                of bonds might be different

22                pre-insolvency and post-insolvency?

23                     Answer:  By trading activities do

24                you include prices?

25                     Question:  Yes.
```



1                    Answer:  Prices could be affected

2              by insolvency.

3                    Question:  Right.  Any other

4              trading activities that you are

5              aware of that may be different

6              pre-insolvency or post-insolvency?

7                    Answer:  If you're referring to

8              facts or considerations that

9              creditors or bond - investors would

10             take into account, I don't believe

11             so, except to the extent that some

12             regularity authorities, I suppose, I

13             believe prohibit some types of

14             investors from buying bonds that are

15             in the state of insolvency.  I don't

16             know of any technical

17             characteristics of the trading

18             activity that would make that

19             distinction.  It's not to say there

20             aren't any, I just don't know of any

21             as I sit here."

22             Do you recall those questions and

23       answers?

24                    A.   I do not.  But my answer would be

25       the same now that I think you have clarified to me



1    what you are asking.

2              Q.    All right.  Are you aware that

3    prior to an insolvency it is common for bonds to be

4    priced on a yield-to-maturity basis?

5              A.    I'm aware that all else equal in

6    comparing bonds, yield-to-maturity is a meaningful

7    statistic and can be used to price bonds.

8              Q.    And is, in fact, used to price

9    bonds by people who trade them in the marketplace?

10             A.    All else equal, yes.

11             Q.    All right.  Which means purchasers

12   take all of the payments that would be expected to

13   be made if the bond is held to maturity and they

14   calculate a percentage yield or a return on the

15   bond based upon the price paid for the bond?

16             A.    To maturity.

17             Q.    To maturity.

18             A.    Yes.

19             Q.    Right, and that is --

20             A.    That is an internal rate of

21   return.

22             Q.    Right, and that is what -- that is

23   the analysis that bond traders commonly use in

24   pricing bonds; are you aware of that?

25             A.    I would say that at issuance, all



```
1   else equal, all else equal, the answer is yes.
2                  Q.   Did you read the testimony of
3   Mr. Binning?
4                  A.   I read parts of Mr. Binning's
5   testimony.
6                  Q.   Did you read my cross-examination
7   of Mr. Binning?
8                  A.   I don't know who the questioner
9   was.
10                 Q.   Did you hear Mr. Binning state
11  that, prior to insolvency, purchasers take all of
12  the payments that would be expected to be made if
13  the bond is held to maturity and they calculate a
14  percentage yield of return on the bond based upon
15  the price for the bond?
16                 A.   I did not hear that but I did read
17  it.
18                 Q.   You read it.  And you agree with
19  his testimony that that is how bonds trade?
20                 A.   No, I agree with his testimony
21  that that's how a yield-to-maturity is calculated.
22                 Q.   Well, he went beyond that.  He
23  went beyond that to say -- and let's call up
24  Mr. Binning's testimony at page 1089, line 8.  Can
25  we just go up to line 8, please.  Line 8.  Thanks.
```

Neeson & Associates   W&F

1           So Mr. Binning testified as follows:
2               "Question:  And one of the
3           fundamental premises of the bond
4           market is that a company can only
5           sell bonds into the public market if
6           the price of the bond provides a
7           yield to purchasers which is
8           acceptable?
9               Answer:  That's right.
10              Question:  And bond traders
11          typically assess bonds on the basis
12          of yield to maturity?
13              Answer:  That's right.
14              Question:  And that means they
15          take all the payments what would be
16          expected to be made if the bond is
17          held to maturity, and they calculate
18          a percentage yield or return on the
19          bond based upon the price paid on
20          the bond?
21              Answer:  That is correct."
22          So did you read those questions and
23      answers?
24          A.   I did.
25          Q.   And you see what Mr. Binning is

 Neeson & Associates   W&F WILCOX & FETZER LTD.

```
 1   saying, not hypothetically or theoretically, but
 2   what bond purchasers -- how bond purchasers in the
 3   market make their purchasing decision.  Do you have
 4   any basis to disagree with Mr. Binning?
 5                 A.   Well, I want to make sure that you
 6   and I are reading the same thing.  And this has to
 7   do with new issue bonds.  The company is selling
 8   bonds into the public market, and that means the
 9   bonds are going to be priced at par.
10                 Q.   Right.
11                 A.   And those, a yield-to-maturity can
12   be calculated, I don't dispute that, on such a
13   bond.  And bonds selling at par can be compared
14   with other bonds selling at par that are newly
15   issued.
16                 And on that basis, with all else equal,
17   with all else equal, bond traders could use that as
18   information in making their trades.
19                 Q.   All right.  And did you read
20   Mr. Binning's testimony as well that as of
21   September 2008, do you recall September 30, 2008,
22   he made a presentation to the Board of Directors of
23   Nortel?  Did you read that?
24                 A.   No, I did not.
25                 Q.   And were you aware that he said
```



1    that the bonds are now trading on a dollar basis

2    rather than a yield basis?

3                    A.    I'm not.

4                    Q.    Okay.  And were you aware that he

5    testified that bond traders are asking, Are these

6    bonds I could invest in and make a return or value

7    creation?

8                    And that in that period, the trading --

9    the analysis of whether to purchase a bond or not

10   had changed, in his opinion?

11                   A.    I'm not aware of that.

12                   MR. QURESHI:  I'm sorry to rise, Your

13   Honour.  I would just ask if the witness is going

14   to be asked to agree or disagree with Mr. Binning's

15   testimony, I think it would be helpful if the

16   witness and all of us actually had the transcripts

17   that --

18                   THE CANADIAN COURT:  Mr. Qureshi, all

19   he has been asked is if he is aware of it, and he

20   is saying he is not aware of a lot of these things.

21                   BY MR. BARRACK:

22                   Q.    Right.  And are you aware of the

23   fact that when a bond value decreases relative to

24   par, the bonds begin to be traded by distressed

25   investors?  Are you aware of that fact?



1                    A.   Well, first of all, I don't know

2    what is meant by "distressed investor".  I believe

3    that investors have different risk preferences, and

4    different investors, who are all participants in

5    the capital market, will consider buying any

6    investment opportunity that meets their

7    requirements.

8                    Q.   You are a person who purports to

9    be experienced in the capital markets?

10                   A.   That --

11                   Q.   Yes?

12                   A.   Yes, I am.

13                   Q.   And in that experience, have you

14   observed that when corporations enter the vicinity

15   of insolvency or become insolvent, that corporate

16   bonds are generally passed from one type of

17   investor to another type of investor, as you say,

18   based upon their risk preferences?

19                   A.   I don't know if that is a general

20   statement or a specific statement.  There are

21   different types of investors with different risk

22   preferences, with different risk tolerance,

23   different capital requirements.  Different types of

24   investors specialize in buying different types of

25   bonds.



```
 1                    I cannot make a general conclusion that
 2    one investor's risk preferences would necessarily
 3    differ from another.
 4                    Q.    Okay.  Have you observed that
 5    there are a category of investors more likely than
 6    not or more commonly, in the marketplace when bonds
 7    are issued, they are purchased by institutional
 8    investors with long-dated obligations and they
 9    match those long-dated obligations against the
10    dating payments of the bonds?
11                    A.    Some investors fall into that
12    category.
13                    Q.    Right.  And are you aware of the
14    fact that in the Canadian bond market,
15    particularly, those group of investors, like life
16    insurance companies, pension funds, and I am sure
17    it is the same in the States, are common bond
18    purchasers when there is no issue of insolvency?
19    Are you aware of that?
20                    A.    I'm aware that there are -- I want
21    to be careful.  I don't know all of the
22    institutional details of Canadian bond markets.
23                    Q.    Right.
24                    A.    So I guess if you are asking me do
25    I know about Canadian bond markets and investors in
```



 1    Canadian bond markets to the extent that they

 2    differ from the US, I have no opinion.

 3                  Q.    Okay, restrict your answer to the

 4    US then.

 5                  A.    Okay, what was the question, sir?

 6                  Q.    The question is that commonly

 7    corporate bonds that are not -- they are issued by

 8    corporations that are not in the vicinity of

 9    insolvency are often bought by institutional

10    investors with long-dated obligations to match the

11    payments of the bonds against those obligations?

12                  A.    There are some investors who fall

13    into that category, absolutely.

14                  Q.    And are you aware that when bonds

15    enter the area of insolvency, it is a not uncommon

16    market phenomenon for those investors to sell their

17    bonds to a group of funds who specialize in trading

18    of bonds in corporations that are in the vicinity

19    of insolvency or in insolvency?

20                  A.    Again, there are groups of

21    investors that specialize in particular categories

22    of investments.

23                  Q.    All right.

24                  A.    If that is what you are asking me.

25                  Q.    Now, let's call up Mr. Binning's



```
1    testimony at page 1098, line 22:

2                    "Question:  You then make the

3                 observation that bonds are now

4                 trading on a dollar basis rather

5                 than a yield basis implying that

6                 bondholders are now focussed on

7                 recovery values."

8                 And the open quote:

9                    "'Bondholder queries to the

10                   company are consistent with

11                    the above.'

12                 Correct?

13                   Answer:  That's right."

14                 THE CANADIAN COURT:  Mr. Barrack, could

15    you have the two pages brought up?

16                 MR. BARRACK:  Can we do that?

17                 BY MR. BARRACK:

18                 Q.   All right, and then open quote:

19                    "'Bondholder queries to the

20                   company are consistent with

21                    the above.'

22                 Correct?

23                   Answer:  That's right.

24                   Question:  So what you are

25                 observing and telling the board
```



```
 1   there is that the bond trades aren't

 2   doing the yield-to-maturity

 3   analysis.  While you're not thinking

 4   about insolvency, the bond market is

 5   starting to think about trading

 6   these bonds on the basis of what I

 7   might recover in an insolvency

 8   situation?

 9       Answer:  Either recover or what

10   could I make?  Potentially if the

11   bonds went from par, from 50 percent

12   or whatever the number is, back

13   towards a hundred, so there's two

14   things that would go through the

15   minds of a bond trader at that point

16   in time.  They would do their own

17   analysis, and they would sort of

18   say, are these bonds I could invest

19   in and make a return?  Or could it

20   go the other way at that point in

21   time.  So these are the sort of

22   considerations at that point.

23       Question:  Right.  This is the

24   switch in the bond trading market at

25   this time, instead of yield to
```



```
 1                    maturity --
 2                         Answer:  It's a value.
 3                         Question:  It's a value market?
 4                         Answer:  That's right.
 5                         Question:  It becomes an
 6                    arbitrage market at that point.
 7                         Answer:  That's right.  What they
 8                    do is they're taking a view in terms
 9                    of how they think those bonds are
10                    going to trade, and the value
11                    creation for them is on price
12                    potentially.
13                         Question:  Right.  Classic
14                    arbitrage market?
15                         Answer:  That's right."
16               Now, those were the observations of the
17     Nortel bond market on September 30th by
18     Mr. Binning, who was the CFO of the corporation.
19     Do you have any basis to disagree with any of the
20     statements Mr. Binning made?
21               A.   Okay, what is your question, sir?
22               Q.   He is describing a change in the
23     marketplace as Bondholders perceived a threat to
24     Nortel from insolvency, and he is describing a
25     change in the marketplace in two respects:  one,
```

 Neeson&Associates    W&F

```
 1   the analysis that was undertaken by bond traders in
 2   their purchases of bonds; and two, the identity of
 3   the players in the market.
 4               Do you agree with his statements?
 5               A.   I will have to read it again.
 6   Could I have where it starts?
 7               Q.   You have a hard copy of it as
 8   well.
 9               A.   Okay, is this dated May 5th -- or
10   Day Five?  Day Five?
11               Q.   I believe that is -- yes, that is
12   the case.
13               A.   And what page should I look at?
14               Q.   We were just reading from line --
15   sorry, page 1099 -- sorry, we started at 1098, line
16   22, and we read through to 1099, line 5.
17               A.   1098, line?
18               Q.   22.
19               A.   22.
20               Q.   22.
21               A.   May I write on this?
22               Q.   Yes, you may.
23               A.   Okay, thanks.
24               (Witness reviews document.)
25               I think your question of me had two
```



1  parts to it, and one is, as I understood your

2  question -- and I may have misunderstood the

3  question -- is Mr. Binning testifying that there

4  was a different type of bond investor?

5           I don't see that in his testimony.

6           The second question I think you are

7  asking me is, is it the case that investors were

8  concerned with the level of recovery at the

9  petition date or near the petition date, and I

10 agree with that.  That is what I testified to.

11          Q.   Okay, let's go to page 11 -- I'll

12 take the second point.  Let's go back to the first

13 point, because he came back to it in his testimony.

14          Let's go to page 1100, line 12 to line

15 20.

16          A.   Here it is, okay.

17          Q.   And:

18               "Question:  So that's why you

19               make the final note that RBC view

20               approximately 50 percent of the debt

21               has transferred into the hands of

22               distrusted investors?"

23               I'm not going to say "sic".

24          THE CANADIAN COURT:  Surely a Freudian

25 slip, surely.



```
 1                    BY MR. BARRACK:
 2             Q.   Surely.
 3             A.   Well, they may be distrusted.
 4             Q.   Well, that is for the Court.
 5                  "Answer:  That is what you
 6             normally find in a situation whereby
 7             if the bond value decreases relative
 8             to par, the bonds begin to change
 9             hands relatively quickly because
10             these people do this for a living."
11             And I think what he is describing
12  there -- first of all, do you agree with the
13  statements he made?
14             A.   That there would be lots of volume
15  when distress -- or when a company files for
16  insolvency or bankruptcy?
17             Q.   Yes, take that point.
18             A.   There is and was volume, heavy
19  volume on those dates --
20             Q.   So the purchaser --
21             A.   That implies that the bonds were
22  changing hands, I think that is what he is
23  testifying to.
24             Q.   And is your experience as a
25  finance professor the same as Mr. Binning's as an
```



1    experienced CFO that the purchasers at that time
2    tend to be distressed investors, people who trade
3    those types of bonds for a living?
4              A.   Well, there are different
5    categories of investors, which I have testified to.
6    There are regulated institutional investors that
7    cannot invest in bonds that are in default.
8              If, to the extent that those investors
9    held the bonds prior to insolvency, they would be
10   mandated essentially to sell their positions.
11   Other investors buy them.  Those investors are
12   risking their capital, as any other investor would
13   be.
14             Do those investors sometimes specialize
15   in distressed bonds?  Yes, there are such
16   investors.
17             Q.   All right.  So let's change topics
18   here.  You did not study the Nortel bond prices
19   prior to the announcement of insolvency?
20             A.   That is correct.
21             Q.   Despite that fact, you would
22   expect that the presence or absence of the
23   guarantees would affect prices in that period?
24             A.   Based upon the post-petition
25   pricing, yes, I would.



```
 1                    Q.   Right.  And you did not study

 2    pre-insolvency bond prices because it was your

 3    opinion that there were differences in the

 4    characteristics of the bonds, and I think you said

 5    coupon, maturities and one other?

 6                    A.   The option to retire prematurely.

 7                    Q.   Okay, so fair enough.  And if

 8    there was a method of eliminating the differences

 9    in maturity dates, coupon and early payment, that

10    could be a relevant comparison for the

11    pre-insolvency period?

12                    A.   Yes, as I understand your

13    question.

14                    Q.   Right.  Now, you are at Princeton?

15    Which university are you at?

16                    A.   Man, you are --

17                    THE CANADIAN COURT:  Boy, that is a

18    slap in the face to people from out west.

19                    THE WITNESS:  Wow, man --

20                    BY MR. BARRACK:

21                    Q.   Sorry, which university are you

22    at?

23                    A.   Purdue.

24                    Q.   Purdue, the boilermaker.

25                    A.   Your son graduated from
```



1    Northwestern.  We are in the same athletic

2    conference.  I mean, come on.

3                Q.   And I have got to get it on the

4    record, at the top of his class.  And he is -- I'll

5    bet if I asked --

6                A.   I congratulate him.

7                Q.   Thank you.  Thank you.

8                And I'll bet if I asked him --

9                THE CANADIAN COURT:  Kids often do

10   better than their parents.

11               BY MR. BARRACK:

12               Q.   Yeah, thank God.

13               A.   I'm reminded of that daily, Your

14   Honour.

15               Q.   We won't go to my other son, the

16   golfer.

17               I'll bet at Purdue in your university

18   you could come up with a way to compare those

19   prices of the bonds pre-insolvency to determine

20   whether there was any effect to the guarantees or

21   not?  Just impossible?

22               A.   I can't envision it.

23               Q.   You can't think of it.  Okay.

24               You are familiar with the concept that

25   when prices are quoted for bonds, they are quoted



1    as spreads over government securities of a similar

2    term?

3                A.   I am familiar with the notion of

4    spreads, which I have testified to.  And I am

5    familiar with the way in which those are

6    calculated.  And I know that all else equal, which

7    is an important caveat, spreads to treasury can be

8    compared.

9                Q.   Okay.

10               A.   But the important caveat, all else

11   equal.

12               Q.   But you are familiar with the

13   concept that when prices are quoted for bonds, they

14   are quoted as spreads over government securities of

15   a similar term?

16               A.   I am not familiar with that.

17               Q.   Okay.  And are you aware that that

18   allows for the isolation of risks associated with

19   particular bonds separate and apart from the

20   risk-free rate of return that the government bond

21   is a proxy for?

22               A.   All else equal, all else equal, I

23   would agree with that statement.

24               Q.   Okay, let's look at your

25   deposition, page 122, line 23.  At the bottom of



```
 1   the page, you see that:
 2                  "Question:  Now I want you to
 3              assume with me -- as we had this
 4              conversation earlier, I want you to
 5              assume with me that when prices are
 6              quoted for bonds, they are quoted as
 7              spreads over Government of Canada
 8              securities of a similar term?
 9              Answer:  Okay.
10              Question:  I want you to assume
11              with me that that allows for the
12              isolation of the risks associated
13              with the particular bonds separate
14              and apart from the risk-free rate of
15              return that the government bond is a
16              proxy for.
17              Answer:  Can I have that again,
18              please?
19              Question:  You understand the
20              concept.  It's a basic finance
21              concept.  Often bonds are compared
22              to what is a proxy for the risk-free
23              rate of return?
24              Answer:  Yes, that's a fair
25              characterization.
```



```
 1                    Question:  And the proxy that is
 2                    generally used for the risk-free
 3                    rate of return is -- in Canada and
 4                    the United States is the federal
 5                    government bond?
 6                    Answer:  I believe that's true in
 7                    Canada.  It's certainly true in the
 8                    US."
 9              Do you remember those questions and
10    answers?
11              A.   I don't, but I read it and it
12    sounds reasonable.
13              Q.   So when I asked you whether the
14    concept of quoting spreads over Government of
15    Canada securities of a similar term allowed for the
16    isolation of the risks associated with the
17    particular bonds, separate and apart from the
18    risk-free rate of return for the government that
19    the government bond is a proxy for, you agreed with
20    me that that was a basic finance concept and often
21    bonds are compared to what is a proxy for the
22    risk-free rate of return?  Is that your testimony
23    today?
24              A.   What I have -- and it is my
25    testimony today and my testimony at that time,
```



```
 1   comparing with similar terms, similar terms, which

 2   is all else equal, then that is a fair

 3   characterization.

 4             Q.   Can we call up Mr. Binning's

 5   testimony at page 1089, line 22.  We looked at this

 6   before, but you recall Mr. Binning stating at the

 7   bottom of the page:

 8                  "Question:  And in that trade

 9                  -- in that business, what they

10                  typically [...]" --

11                  A.   Hold on, hold on, where am I?

12   What line?

13                  Q.   Line 22:

14                  "Question:  And in that trade

15                  -- in that business, what they

16                  typically do is compare that yield

17                  to government security to a similar

18                  term?

19                     Answer:  That's right.

20                     Question:  And that is known in

21                  the industry as the spread?

22                     Answer:  It is.

23                     Question:  Right.  And that

24                  spread is the spread between the

25                  yield on the bond at a specific
```

Neeson&Associates    W&F

```
1                    price and the yield on similar
2                    government securities?
3                         Answer:  That's correct.
4                         Question:  And that is seen as a
5                    reflection of the risk associated
6                    with the particular bond, correct?
7                         Answer:  It's the
8                    credit-worthiness of the company."
9                    So stopping there, are you aware that
10   in the bond market, bond traders trade on the basis
11   of spreads to government securities?
12                    A.   And I believe he was asked "of
13   similar terms", and I agree with that.
14                    Q.   Okay, but --
15                    A.   All else equal.
16                    Q.   All else equal, but if the term is
17   the same, so the ten-year --
18                    A.   Well, I would --
19                    Q.   He said term.
20                    A.   Well, I would believe a fair
21   reading of his testimony had embedded in it -- this
22   is my reading of it -- a presumption that the terms
23   were similar.
24                    Q.   So let's look at Mr. Kilimnik's
25   testimony.  If we can go to Mr. Kilimnik's
```

 Neeson & Associates    W&F

1    testimony at page 18, line 12.

2                THE CANADIAN COURT:  This is his

3    deposition?

4                MR. BARRACK:  This is his deposition,

5    yes, Your Honour.

6                BY MR. BARRACK:

7                Q.   So we are at page 18, line 12:

8                     "Question:  Okay.  Let's --

9                     when bonds are priced, generally,

10                    amongst bond traders, they talk

11                    about spreads over government bonds,

12                    correct?

13                        Answer:  [...]" --

14                THE CANADIAN COURT:  No, you have been

15    reading half this stuff without questions and

16    without answers.  The transcript is going to be

17    meaningless.  You are going so fast, and you skip

18    "Question" and you skip "Answer".

19                BY MR. BARRACK:

20                Q.   I'll slow down:

21                     "Question:  Okay.  Let's --

22                     when bonds are priced, generally,

23                     amongst bond traders, they talk

24                     about spreads over government bonds,

25                     correct?



1        Answer:  Correct.

2        Question:  And spreads over

3    government bonds of a similar term?

4        Answer:  Yes.

5        Question:  And that allows -- the

6    reason they do that is that allows

7    for the isolation of the risks

8    associated with the bonds?

9        Answer:  That's correct.

10        Question:  And the lower the

11    spread, the less risky the bond?

12    The higher the bond, the more risky,

13    correct?

14        Answer:  Yes.

15        Question:  And that's why, if we

16    go to -- stay with page two, and we

17    look at your point one, that's why

18    you say the spread will reflect the

19    risk associated with a particular

20    issuance.

21        Answer:  Correct.

22        Question:  Now, if guarantees

23    reduce the risk of the bond, then we

24    would expect that they would reduce

25    the spread at the time of issue



1              relative to bonds without a

2              guarantee?

3                   Answer:  If we are the same

4              corporation or the same borrowing

5              entity, yes.

6                   Question:  Now, you expand your

7              description of the rule of credit

8              spreads at page four, point two.

9                   And that paragraph describes your

10             view of how spreads operate,

11             correct, and are related to credit

12             risk?

13                  Answer:  Yes, my understanding of

14             how the market prices risk."

15             So do you agree with Mr. Kilimnik's

16     statements?

17             A.   Well, I'll make sure we are

18     reading the same thing.  If I read his testimony,

19     he is talking about at issue.

20             Q.   Yeah.

21             A.   And again, in my reading, he is

22     talking about at issue with bonds with the same --

23     well, let's narrow it to term to maturity, okay.

24             We have a corporation -- we have two

25     corporations, two corporations that are issuing



1    bonds at par.

2                    Q.    Right.

3                    A.    At issuance, they have the same

4    ten-year maturity.   If one of those bonds or one of

5    those bonds has an 8 percent coupon, and therefore

6    an 8 percent term yield to maturity, and the other

7    at issue the same day has an 8 and a quarter

8    percent coupon, everything else the same, term to

9    maturity, issued at par on the same day, the one

10   with the higher coupon which would give a higher

11   yield to maturity and a higher yield to the same

12   treasury bond -- compared to the same Treasury

13   bond -- then yes, that higher coupon, which is

14   reflected in a higher yield and a higher spread to

15   Treasury, embeds higher credit risk.

16                   Q.    Right.

17                   A.    I don't dispute that, and that is

18   what I see that he is saying.

19                   Q.    Right, but are you going to agree

20   with me that -- or you just don't know one way or

21   the other -- whether in the bond markets, when bond

22   prices are quoted, they are quoted as spreads?

23                   A.    I would not characterize the

24   spreads that are quoted as prices.

25                   Q.    Are you aware -- well, let's break



1    it down.  Are you aware that spreads are probably

2    quoted?

3              A.   I know that spreads are quoted.

4              Q.   Right, and you know that those

5    spreads, as Mr. Binning has talked about and as

6    Mr. Kilimnik talked about, are used by bond traders

7    in making their bond trading decisions?

8              A.   When I read both of their

9    testimonies, they are not giving a blanket

10   endorsement to that proposition.

11             Q.   It is a question of fact.  As a

12   fact, whether it is right, wrong or indifferent on

13   the fine math, do bond traders look to spread

14   information in making their decisions about trading

15   bonds?

16             A.   All else equal, yes.

17             Q.   Now, you look at pricing

18   information.  You don't look at spreads; correct?

19             A.   That's correct.

20             Q.   You look at absolute prices of

21   bonds?

22             A.   Well, relative prices, yes.

23             Q.   Relative prices.  Well, you look

24   at absolute prices and then compare them, right?

25             A.   Well, the prices are quoted as a



1    percentage of par.

2              Q.    Right.

3              A.    It is not quite an absolute price,

4    but if you would like, we can agree that a

5    proportional price is an absolute price.

6              Q.    Right, it is a form of pricing of

7    a particular bond as opposed to comparing one bond

8    with a government security or comparing a bond with

9    anything else?

10             A.    I'm sorry?

11             Q.    It is -- what you take is the

12   price of individual bonds, what you are saying is

13   it is a measure of price based on a thousand --

14             A.    Yes, yes --

15             Q.    -- per thousand?

16             A.    Correct.

17             Q.    As opposed of taking the price of

18   that bond per thousand and comparing it to either

19   government securities or any other bonds; correct?

20             A.    I compare them with the other

21   Nortel bonds.

22             Q.    Your starting point for each bond

23   is to look at the price of that bond, and then you

24   compare the various Nortel bonds to draw your

25   conclusions?



```
 1                    A.    Yes, that's correct.
 2                    Q.    In your report, you only referred
 3     to some of the Nortel bonds?
 4                    A.    I missed -- or in my report, I do
 5     not talk about the NNCC bond, I think that is to
 6     what you are referring.
 7                    Q.    And those are commonly referred to
 8     -- they matured in 2026; correct?
 9                    A.    That is my recollection.
10                    Q.    And had you put those bonds on
11     your chart, they would have performed like the
12     guaranteed bonds; correct?
13                    A.    That is approximately correct,
14     yes.
15                    Q.    But you didn't put --
16                    A.    Well, let me note.  I know that
17     only because I received an exhibit, I think it was
18     last night, showing that.  But I do know it as of
19     today.
20                    Q.    And did you read Mr. Binning's
21     testimony when he said that the 2026 bonds, along
22     with the -- that the '23s that you looked at were
23     non-guaranteed?
24                    A.    I didn't see that in his
25     testimony.
```



1          Q.   Okay, let's call that up.

2          A.   Or I may have seen it.  I don't

3    recall seeing it.

4          Q.   Look at Mr. Binning, page 1097,

5    lines 14 to 17.  We were reviewing his chart, and I

6    asked him:

7               "Question:  The next two, the

8               23s and the 26s, in effectively,

9               were the non-guaranteed bonds; is

10              that right?

11              Answer:  That's correct."

12         Did you read that testimony?

13         A.   I have now, yes.

14         Q.   And do you understand that the

15   reason they were non-guaranteed bonds is that they

16   were issued by a shell corporation and guaranteed

17   by NNL, the Canadian company?

18         A.   I was not aware that they were

19   issued -- I mean, I did not know what NNCC was.  My

20   understanding now is that it is a financing entity.

21   I did not know it was guaranteed by NNL.  I thought

22   it had a support agreement from NNI.

23         Q.   Now, so you are aware that the

24   UKPC and the US interests, certain of the US

25   interests have come to an agreement with respect to



1    the presentation of data relating to yields and

2    spreads of certain Nortel bonds during the

3    pre-filing period?

4                    A.    I am.

5                    Q.    Right.  And the data underlying

6    the figures agreed to in the stipulation comes from

7    Advantage Data and S&P Capital IQ?  Were you aware

8    of that?

9                    A.    I'm sorry, I was --

10                   Q.    Sorry.

11                   A.    -- drifting, I apologize.

12                   Q.    The data underlying the figures --

13                   A.    Not that this isn't interesting.

14                   Q.    Oh, it is fascinating.  The data

15   underlying the figures agreed to in the stipulation

16   comes from Advantage Data, S&P Capital IQ; were you

17   aware of that?

18                   A.    I accept your representations.

19                   Q.    Right.  And do you accept that

20   those are reputable sources of spread data?

21                   A.    They are reputable vendors of data

22   of all sorts, including spread data.

23                   Q.    Okay.  And I would like to go to

24   the stipulation then.  You had it up on your

25   screen, so you are familiar with the way it is laid



1   out, that it has the various categories of bonds

2   and various pricing information?

3              A.   It has the -- my recollection it

4   has the seven -- it has seven bonds listed and

5   certain data with respect to those bonds.

6              Q.   So if we can look at the chart

7   with this stipulation.

8              THE CANADIAN COURT:  Was this made an

9   exhibit?

10             MR. BARRACK:  Yes, it has previously

11  been made an Exhibit.  It is Exhibit TR12044B.

12             BY MR. BARRACK:

13             Q.   So you can see that there are

14  various dates at the top, January 31 versus March

15  31, 2008?

16             A.   Yes, I see that.

17             Q.   And down the left-hand column, we

18  have -- the various bonds are listed, and we

19  commonly refer to them, have been referring to them

20  by their maturity dates.  So we have the '11s, '13s

21  and '16s, which are the guaranteed bonds; you

22  understand that?

23             A.   Yes, I do.

24             Q.   The two convertibles, because

25  there is option pricing has to be built into them,



```
 1   there is no spread pricing information for those,

 2   so we can ignore those for this analysis.  And the

 3   last two, the '23 and the '26s, you saw Mr. Binning

 4   identified those as the non-guaranteed bonds;

 5   correct?

 6              A.   I believe that is what he

 7   testified to.

 8              Q.   All right, so --

 9              A.   Based upon my reading a moment

10   ago.

11              Q.   Right.  And when we go through --

12   and what we have done as well, is we have prepared

13   a demonstrative of the prices of the bonds.

14              THE CANADIAN COURT:  Mr. Barrack, for

15   the sake of the reporters, when would be a good

16   time for a break?

17              MR. BARRACK:  This would be fine.

18              THE CANADIAN COURT:  All right, perhaps

19   we'll take 20 minutes.

20   -- RECESS AT 10:35 A.M.

21   -- UPON RESUMING AT 11:03 A.M.

22              THE CANADIAN COURT:  Mr. Barrack.

23              BY MR. BARRACK:

24              Q.   We have handed up in Toronto a

25   copy of a demonstrative, and Judge Gross, you
```



```
 1   should have one handed to you as well.
 2              THE US COURT:  Very well.  It is on its
 3   way, by reliable messenger.
 4              THE CANADIAN COURT:  Is this agreed,
 5   Mr. Barrack?
 6              MR. BARRACK:  Pardon?
 7              THE CANADIAN COURT:  Is this agreed or
 8   is there --
 9              MR. BARRACK:  This is a demonstrative
10   we prepared.  The demonstratives are handed out the
11   night before.  This is simply a pictorial
12   representation of what is in the stipulation.
13              THE CANADIAN COURT:  Oh, okay.  So we
14   needn't make it an exhibit or should we make it an
15   exhibit?
16              MR. BARRACK:  Well, you know, we were
17   talking about that.  I'm happy to make it an
18   exhibit, but we haven't made any of the
19   demonstratives exhibits, which is kind of a
20   late-blooming thought.
21              THE CANADIAN COURT:  Sometimes they
22   have a habit of going astray unless you make an
23   exhibit out of them.
24              MR. BARRACK:  Yeah, I'm happy to make
25   it an exhibit.
```



```
 1                    THE CANADIAN COURT:  Anybody objecting
 2   to making this an exhibit?
 3                    MR. QURESHI:  No objection, Your
 4   Honour, but then I think it would make sense to go
 5   back and for identification purposes give an
 6   exhibit number to all of the demonstratives that
 7   have been used with all of the experts.
 8                    THE CANADIAN COURT:  That is fine by
 9   me.  If you want to figure it all out and tell us
10   tomorrow, and if anybody has an objection, let us
11   know.
12                    So this will be exhibit then?
13                    THE CANADIAN REGISTRAR:  Exhibit 58,
14   Your Honour.
15                    THE CANADIAN COURT:  Thank you.
16                    EXHIBIT NO. 58:  Demonstrative - Nortel
17                    Bond Spreads to US Government Yield
18                    Curve (Basis Point).
19                    BY MR. BARRACK:
20                    Q.  So what we have done here,
21   Professor McConnell, if you look at this exhibit,
22   is we have simply taken the information, some of
23   the information that is in the stipulation which is
24   Exhibit TR12044B and represented it in a pictorial
25   fashion.
```

 Neeson & Associates   W&P

```
 1                    So if you go to the bottom of the
 2    chart, you can see we have given colours to each of
 3    the series of bonds that were issued, other than
 4    the convertible bonds, for the reasons we talked
 5    about.
 6                    So you have got the 2011s, the 2013s
 7    and the 2016s being green, purple and orange.
 8    Those are the guaranteed bonds; correct?
 9                    A.   I was looking at the chart.   The
10    top three, as you say, the top three are --
11                    Q.   Are the --
12                    A.   Did you ask me the guaranteed
13    bonds?
14                    Q.   Yes.
15                    A.   Yes.
16                    Q.   And you see that under the
17    "Issuer/Guarantor"?
18                    A.   Yes.
19                    Q.   And as we discussed, the bottom
20    two, the 2023s and the 2026s, were identified by
21    Mr. Binning as, in effect, the non-guaranteed
22    bonds; correct?
23                    A.   I believe that is what Mr. Binning
24    said.
25                    Q.   Right, and the reason Mr. Binning
```



```
 1   said -- there is no debate with respect to the

 2   2023s, and with respect to the 2026s it is because

 3   there is no NNI guarantee; correct?

 4                A.   My understanding, or at least I

 5   thought this was my understanding, that NNI had a

 6   support agreement with respect to the 7.875 percent

 7   bond.

 8                Q.   Right.  You did not list a support

 9   agreement in any of the documents you reviewed;

10   correct?

11                A.   That's correct.

12                Q.   You did not review a support

13   agreement; correct?

14                A.   I have not reviewed a support --

15   well, I may have been shown a support agreement,

16   but it would have been in the recent past.

17                Q.   All right.  But when you wrote

18   your report, you had no idea about whether there

19   was or there wasn't a support agreement?

20                A.   That's correct.

21                Q.   And we'll let the record stand

22   where it is on the support agreement.  We have

23   Mr. Binning's testimony.

24                And just to again focus you on some of

25   the relevant dates, the 2011, the '13s and the
```



```
 1    2016s were issued on June 29th, 2006.

 2                 And so if you go over to the first date

 3    that we are going to look at, that is the date of

 4    issuance of the 2011s, 2013s, and 2016s, there was

 5    a second issuance of the '16s, a $650 million

 6    add-on, if you go to the end of the chart, that is

 7    May 28, 2008.  And we have other dates that we have

 8    looked at the prices of the bonds.

 9                 The convertible bonds, which we are not

10    looking at their price, were issued on March 22,

11    2007, and we have a month before and a month after,

12    and we have January 31, 2008 --

13                 A.   These were the convertible bonds

14    issued on --

15                 Q.   In March of 2007, but we don't

16    have the converts on here.

17                 A.   Okay, but the convertibles are on

18    not here, okay.

19                 Q.   Right, so we do the convert issue

20    date before and after, and then we do the -- in

21    2000 -- when the 2007 10-K came out was in February

22    or between January 31, 2008 and March 31, 2008.

23                 And that was the first time that there

24    was segmented financial information for Nortel --

25    or a level of segmented financial information that
```



1   did not exist before.  That is just to alert you

2   and the Court as to what those dates are.  Assume

3   all those dates are the relevant dates.

4            So if we look then at those various

5   dates, on June, if we go to the bottom, and it is

6   June 29, 2006, what we see is that the 2011s, the

7   2013s and the 2016s were issued, and the 2013 and

8   the 2016 had a higher spread than the 2023s and the

9   2026s; correct?

10           A.   These numbers at the bottom are

11  higher than the two numbers -- excuse me, the

12  numbers at the top are higher than the two numbers

13  at the bottom, yes, that is correct.

14           Q.   Right, and what you told us was

15  the relevant date, in your assessment, was the date

16  of issue; correct?

17           A.   For bonds issued at par, correct.

18           Q.   All right.  And this information,

19  if we accept the proposition, and I realize you

20  have the ceteris paribus assumption throughout, of

21  all things being equal, but if we put that aside

22  for a moment and accept that bond traders -- I want

23  you to assume that bond traders trade on the basis

24  of spreads, these data would indicate that the

25  market was not showing a price effect for the



1    guarantees; correct?

2                  A.    You are asking me to assume what

3    again?

4                  Q.    That bond traders traded on the

5    basis of spread on the date of issue.

6                  A.    Okay.

7                  Q.    Consistent with Mr. --

8                  A.    But we are talking about the date

9    of issue of the 10 and eighths and 10.75s.  These

10   are not the date of issues of the other two.

11                 Q.    No.

12                 A.    So those are not -- we are not

13   comparing those.

14                 Q.    But we are comparing them -- on

15   the date of issue of those bonds, of the 11s, 13s

16   and 16s, because we are never going to get them all

17   issued on the same day; correct?

18                 A.    Oh, exactly.  Correct, I totally

19   agree with that.

20                 Q.    And it is your evidence, this --

21   if you accept spreads as being an indicator of

22   risk, as Mr. Kilimnik did, and you would expect

23   that if there was value in the marketplace to a

24   guarantee, that it would be reflected in the

25   spreads, these data, with those assumptions, these



```
 1   data would demonstrate that the market was not

 2   giving any price effect to the guarantees; correct?

 3              A.   No, I disagree with that.

 4              Q.   Can you tell one way or the other?

 5              A.   No, I cannot, just looking at

 6   these data.

 7              Q.   But I want you to look at me and

 8   listen very carefully to the assumptions.

 9              A.   Okay.

10              Q.   There are two assumptions.  One is

11   that the market trades bonds on the basis of

12   spreads, got it?  Assumption number one.

13   Assumption number two, that if guarantees are

14   valued in the marketplace, it will be reflected in

15   the spreads.  Those are the two assumptions.

16              If we were to make those two

17   assumptions, then these data would show that the

18   market gave no effect to the guarantee; correct?

19              A.   I disagree.

20              Q.   Pardon?

21              A.   I disagree.

22              Q.   Okay, tell me why.

23              A.   What you have said, as I

24   understand it, is the market trades on the basis of

25   spreads.
```



```
 1                    Q.    Right.

 2                    A.    I am asked to assume that.

 3                    Q.    Yes.

 4                    A.    They may be trading on the basis

 5     of spreads, but these data do not have any bearing

 6     and cannot tell us anything about whether and to

 7     how much the market is attributing the guarantee to

 8     the bond price.

 9                    Q.    All right.

10                    A.    For all the reasons that I have

11     talked about.

12                    Q.    Okay.  Let's go to Mr. Kilimnik's

13     evidence.

14                    A.    Mr. Kilimnik, did you say?

15                    Q.    Kilimnik, yes.  Let's go to page

16     19 of his evidence.

17                    THE CANADIAN COURT:  Just before you

18     do, Mr. Barrack, I just want to understand your

19     answer.  You said you can't tell one way or the

20     other for reasons you have given, and those reasons

21     were?

22                    THE WITNESS:  That the bonds have

23     different coupons.

24                    THE CANADIAN COURT:  Coupon, maturity?

25                    THE WITNESS:  Maturity and the option
```


Neeson & Associates    W&F

1    exercise, callability.  And in this instance there

2    is a further factor.

3              The bond spreads are calculated for the

4    guaranteed bonds relative to worst.  The yield is

5    calculated not to maturity, but the yield is

6    calculated to what is called the worst, and that is

7    then compared with a Treasury bond with the yield

8    calculated to maturity.

9              Those are not comparable calculations.

10   So in this instance, for these calculations, there

11   are four features --

12             THE CANADIAN COURT:  What do you mean

13   calculated to worst?

14             THE WITNESS:  There is a procedure in

15   which a characterization is made of when the worst

16   time period would be for the bonds to be called or

17   for the exercise of that option, that call option.

18   It embeds uncertainty into it.

19             And so what they have done here is a

20   sort of ad hoc procedure to take a term, a yield to

21   this so-called worst and compare that with a yield

22   to maturity on a treasury bond.

23             Those are simply not comparable.

24             BY MR. BARRACK:

25             Q.   In the option that you referred to



```
 1   in that analysis, is that an option to pre-pay?
 2                 A.    Yes.
 3                 Q.    And bond traders would be aware of
 4   that?
 5                 A.    I would believe so.
 6                 Q.    All right.  And okay, so let's go
 7   to what Mr. Kilimnik had to say about this.
 8                 A.    Kilimnik.
 9                 Q.    And let's go, sorry, just a minute
10   here, to I believe it is page 19, line 9.
11                 And you understand, sir, that he was a
12   gentleman who had traded bonds and supervised bond
13   trading activities for insurance companies?
14                 A.    That is my understanding, yes.
15                 Q.    So:
16                 "Question:  Now, if guarantees
17                 reduce the risk of the bond, then we
18                 would expect that they would reduce
19                 the spread at the time of issue
20                 relative to bonds without a
21                 guarantee?
22                    Answer:  If we are the same
23                 corporation or the same borrowing
24                 entity, yes."
25                 Do you see that?
```



```
 1                    A.    I do.

 2                    Q.    Right.  Do you agree with him?

 3                    A.    At the time of issue we are

 4     comparing two bonds that are going to be issued on

 5     that date.

 6                    Q.    Right.

 7                    A.    I agree with that.

 8                    Q.    Well, I don't see him saying two

 9     bonds have to be issued on that day.

10                    A.    I said the spread at the time of

11     issue.

12                    Q.    The spread at the time of issue,

13     so if you issue one bond, you have another bond

14     outstanding, you can have a spread against that

15     bond, sir.  He did not say two bonds have to be

16     issued on the same day.

17                    A.    That is my interpretation of what

18     he said.

19                    Q.    All right.  And we could go

20     through each one of these, and you would give me

21     the same answer, that there is no reliability to

22     this information?

23                    A.    I'm not saying there is no

24     reliability.

25                    Q.    Right.
```



```
 1                    A.   I never said there is no
 2   reliability.  What I have said and tried to say is
 3   that the comparison, as I understand you are
 4   attempting to draw, the inference you are
 5   attempting to draw cannot be drawn from these data.
 6                    Q.   So let's go beyond the inference
 7   that I am trying to draw from these data to the
 8   actual underlying fact and let's go -- let's have
 9   your evidence clear before we go to Mr. Binning's
10   evidence.
11                    Is it your evidence, do you have any
12   evidence to offer to the Court as to whether or not
13   the guarantees were reflected in the price of the
14   bonds prior to insolvency?
15                    A.   Yes, I believe I do.
16                    Q.   Okay, and that is based on the
17   post-insolvency data?
18                    A.   It is.
19                    Q.   Right, and you extrapolate from
20   the post-insolvency data to assume that it must
21   have been the same prior to insolvency; correct?
22                    A.   No, I would say that based upon my
23   40 years of experience of reading, writing,
24   exploring, consulting on bond pricing and other
25   matters relative to bond pricing and financial
```



1    markets, that the evidence is pretty clear that

2    investors throughout time take into account the

3    likely outcomes that will occur through the life of

4    the instrument in question.

5              The likelihood or the difference in

6    payoff becomes manifest in the data, clearly

7    manifest in the data post-insolvency.  And based

8    upon my experience in writings and readings that it

9    is my opinion and expectation that investors would

10   have taken that into account prior to insolvency.

11             Q.   You, sir, have absolutely no data

12   to demonstrate either in this case or another case

13   that guarantees are reflected in pricing pre the

14   contemplation or vicinity of insolvency data?

15             A.   Other than what I have testified

16   to, no.

17             Q.   And you have done no analysis to

18   determine whether guarantees get blended in with

19   other considerations or whether they specifically

20   affect prices?

21             A.   I do have information that they

22   explicitly affect prices.

23             Q.   Not pre-insolvency?

24             A.   If you are asking me did I look at

25   the prices pre-insolvency, I have testified no.



 1                    Q.   And you don't have quantitative
 2    data from any other source for any other
 3    corporation that guarantees affect pricing
 4    pre-insolvency?
 5                    A.   I do not.
 6                    Q.   Okay.  So let's look at
 7    Mr. Binning's testimony.  Let's go to page 1106,
 8    line 5.
 9                    A.   Do I have a hard copy of that
10    also?
11                    Q.   Yes, you do.
12                    A.   That is Mr. Binning?
13                    Q.   Yes, it will say "Day -- " on the
14    front of it, it says -- do you have it?
15                    A.   "Day Five", yes, I do, and it is
16    page?
17                    Q.   1106.  And we are going to go to
18    line 5.  And what I was doing is I was taking him
19    through the stipulation, just to locate what we
20    were talking about at the time of the stipulation
21    on the pricing data.  And I said:
22                    "Question:  Right.  So if we
23                    simply note we have the -- and if
24                    these numbers are correct, the
25                    guaranteed bonds the 11s, 13s and



1    16s are trading wider spread showing

2    more risk than the guaranteed bonds,

3    correct?  Based on these numbers?

4       Answer:  Based on these numbers.

5    The only other thing that I would

6    say, and I understand the sort of

7    inference that you are drawing, I've

8    been involved in the bond market for

9    many, many years in my various roles

10   as CFO --

11      Question:  Right.

12      Answer:  And what people look

13   for, what bondholders look for is

14   there may or may not have been a

15   guarantee in place and they may have

16   taken that into account.  But,

17   certainly, in terms of the sort of

18   analysis that I have seen over the

19   years at this point in time, you

20   know, people sort of make a

21   distinguishing between bonds that

22   had a guarantee and they didn't,

23   they would be just looking at the

24   overall quality of the company.  And

25   that's generally, you know,



1   certainly what happens in my

2   experience.

3       Question:  Right.  So the

4   guarantee is kind of neither here

5   nor there?

6       Answer:  I don't think it is.

7       Question:  Yeah.  When you say

8   you don't think it is, you are

9   agreeing with me the guarantee is

10  neither here nor there?

11      Answer:  In terms of there may be

12  a guarantee in place, but in terms

13  of, you know, certainly when one

14  looks at a company they look at the

15  quality of the company and the

16  credit ratings and various other

17  things.  They may take into account

18  that there's a guarantee, but

19  certainly, at the end of the day, I

20  don't know the sort of point that

21  you are sort of making in terms of

22  does the guarantee have any meaning.

23  Clearly for those bondholders that

24  invested it was there, but these

25  numbers show what you are saying."



```
 1                    Do you see those questions and answers?
 2              A.   I do.
 3              Q.   And as a matter of fact,
 4    Mr. Binning in his long experience as a CFO in the
 5    bond market said that his experience was that prior
 6    to the insolvency, what Bondholders looked to is,
 7    as he said, the corporation rather than the
 8    presence of the guarantee.  Do you have anything to
 9    contradict Mr. Binning's testimony?
10              A.   First, I don't contradict
11    Mr. Binning's testimony.  I do not contradict
12    Mr. Binning's testimony.  I am trying to understand
13    what he is saying, however.
14              Q.   He is saying what the spread data
15    tells him is that the bond investors prior to
16    insolvency did not price the bonds on a
17    differential basis according to the presence or
18    absence of the guarantee.
19              A.   I am not sure I see that here.  It
20    says -- this is quite ambiguous to me:
21                   "They may take into account
22                   that there's a guarantee, but
23                   certainly, at the end of the day, I
24                   don't know the sort of point that
25                   you are sort of making in terms of
```



```
 1                   does the guarantee have any meaning.
 2                   Clearly for those bondholders that
 3                   invested it was there, but these
 4                   numbers show what you are saying."
 5                   Now, I don't know what the heck you are
 6         saying.
 7                   Q.   Well, I'm going to make it clear.
 8                   A.   And I read -- I'm not being
 9         humorous here.   I'm not being humorous here.
10                   Q.   No, I understand you are not being
11         humorous.   I understand exactly what you are doing.
12                   But I suggest to you that on a fair
13         reading, while it may not be precise, what
14         Mr. Binning was saying when he looked at that data,
15         that those data didn't surprise him because they
16         reflected his experience in the bond market, which
17         is prior to insolvency bondholders do not price in
18         the guarantees.
19                   A.   I think that is a tortured reading
20         of --
21                   Q.   Well, we'll leave it to the
22         judges.   Let's turn to another topic.
23                   A.   Another, I'm sorry, what?
24                   Q.   Another topic.
25                   A.   Topic.
```



```
 1                    Q.    Now, as I understand it, your

 2    report was filed in response to the report

 3    submitted by Judge Leif Clark and Professor Jay

 4    Westbrook?

 5                    A.    Yes, sir.

 6                    Q.    And at paragraphs 26 to 32 of your

 7    report you criticize the Clark and Westbrook report

 8    and its reliance on the theory of modified

 9    universalism?

10                    A.    I'm going to take your word for

11    it, and while I'm accepting your word for it, I am

12    going to look for my report.

13                    Q.    Specifically, at paragraph 32 of

14    your report, you note that:

15                          "'Modified universalism' is at

16                          odds with how credit markets

17                          function."

18                    A.    I'm sorry, that sounds correct,

19    but I'm not sure that I have my report in front of

20    me.

21                    Q.    Paragraph 32 of your report?

22                    A.    I may have it, I just can't seem

23    to find it.

24                    Q.    It is there somewhere.

25                    A.    I have my deposition.  I have Day
```



1    Five.  I have my demonstratives, Mr. Kilimnik's

2    report, and -- oh, yes, I do have mine, thank you.

3    Paragraph 32?

4                    Q.   Yes, page 7.

5                    A.   Yes.

6                    Q.   All right.  You see the first

7    sentence?

8                    A.   Yes.

9                    Q.   "Two types of economic data

10                        demonstrate that 'modified

11                        universalism' is at odds with how

12                        credit markets function."

13                   A.   Yes, I do.

14                   Q.   And your definition of modified

15   universalism is that the proceeds of liquidation of

16   Nortel would be distributed on a pro rata basis

17   with reference to a single debt amount for each

18   creditor, regardless of the presence of a

19   guarantee?

20                   A.   That is my understanding, yes,

21   sir.

22                   Q.   And you, in your report, as you

23   told me earlier, draw cause and effect

24   relationships between modified universalism and

25   capital market impacts?

Neeson&Associates    W&F

```
 1                   A.    Yes.
 2                   Q.    You did not study any of the
 3    positive effects of modified universalism?
 4                   A.    I did not study modified
 5    universalism except to the extent that I report --
 6    comment upon in my report, and as I think indicate,
 7    the wealth transfers could be positive for some
 8    investors and negative for others.
 9                   Q.    Right.  And you didn't go beyond
10    that and determine whether there were any broader
11    positive effects of modified universalism on the
12    functioning of capital markets?
13                   A.    That is correct.
14                   Q.    Right.  And while we'll debate the
15    difference between substantive consolidation and
16    modified universalism, you understand the concept
17    of substantive consolidation?
18                   A.    I have, as I testified at my
19    deposition, I have a layman's understanding.
20                   Q.    That is because you don't have a
21    deep -- an area of your expertise has not been deep
22    in the insolvency area?  You have touched it, but
23    it hasn't been a major focus of your study?
24                   A.    No, I would say I haven't been
25    focused on substantive consolidation.
```



 1                    Q.   Do you know what the concept is?

 2                    A.   As I testified at my deposition,

 3      and I will testify today, I have a layman's

 4      understanding.

 5                    Q.   Okay.  And in your opinion, the

 6      same market impacts would occur if there was

 7      substantive consolidation as pro rata; you equate

 8      the two?

 9                    A.   Are you referring to this specific

10      case or is this a general --

11                    Q.   Generally.

12                    A.   I'm not sure I know enough about

13      substantive consolidation to offer an opinion.

14                    Q.   All right.  If in the United

15      States estate, which has NNI and a number of

16      subsidiary corporations, or in the Canadian estate,

17      where there is NNL and a number of subsidiary

18      corporations, with the bonds either being issued

19      solely by NNI -- sorry, by NNL and guaranteed by

20      NNI, being the two covenantors with respect to the

21      bonds, if they were -- if either of those

22      corporations was to substantively consolidate with

23      its subsidiary, then the market impacts would be

24      the same as allowing a single claim for the

25      guaranteed bonds; correct?



     1                    A.   I'm going to have to have the
     2   question again.
     3                    Q.   If there was substantive
     4   consolidation in the US of NNI and its
     5   subsidiaries, okay, so let's break it down, NNI and
     6   NNL are the covenantors on the bonds; correct?
     7                    A.   Yes, as I understand the term
     8   covenantors, yes.
     9                    Q.   And they have a number -- each
    10   have a number of subsidiaries underneath them;
    11   correct?
    12                    A.   That is my understanding, yes.
    13                    Q.   Right.  And the creditors of those
    14   corporations, if the -- and let me give you an
    15   example.  In Canada, 3500 researchers worked for a
    16   company called NN Technology, all right, which is
    17   not a covenantor on the bond.  Those researchers
    18   would have an outstanding claim for their pension
    19   liability and perhaps disability liabilities.
    20                    And if there was to be substantive
    21   consolidation of NNL and a subsidiary such as NN
    22   Technology such that the creditors of NN Technology
    23   became creditors of NNL, the market impacts would
    24   be the same as allowing a single claim for the
    25   guaranteed bonds?



```
 1                    A.   I apologize, I cannot -- I'm not
 2    able to -- I don't understand your question.
 3                    Q.   Let's look at your deposition,
 4    page 163, line 9.
 5                    A.   I wish I were able to follow it.
 6                    Q.   I understand.  Let's look at your
 7    deposition.
 8                    A.   Page what, sir?
 9                    Q.   163, line 9.
10                    A.   Okay.
11                    Q.
12                    "Question:  I'm going to bring
13                    it right down to cases.  There is a
14                    company called Nortel Networks
15                    Technology Corporation, and it
16                    employed a substantial number of the
17                    researchers in Canada, and it
18                    accumulated in respect of, I want
19                    you to assume -- it assumed -- it
20                    accumulated in respect of those
21                    researchers a substantial unfunded
22                    pension debt.  I want you to assume
23                    that the Bondholders had -- that
24                    there were no bonds issued by that
25                    corporation, and that the employee
```

 Neeson & Associates   W&F

1   creditors of that corporation would

2   otherwise have no call on Nortel

3   Networks Limited, who issued the

4   bonds.  Okay?  Would it -- would

5   your observations be the same if

6   within Canada the courts affected a

7   pro rata distribution of the

8   Canadian entities including the

9   Canadian entity and treated creditor

10  claims of multiple Canadian entities

11  on a pro rata basis?

12      Answer:  Just to make sure that

13  all of this in the proper context,

14  that there was no expectation prior

15  to the court's decision that that

16  would occur, so that it came as a

17  surprise.  In that case then there

18  would be wealth transfers.

19      Question:  Right.  And similarly,

20  if that same situation happened

21  within the American estate, there

22  would -- and it came as a surprise,

23  that -- there would be wealth

24  transfers?

25      Answer:  That is my opinion,



1           yes."

2           A.   Yes, I agree with that.

3           Q.   Okay.  Since writing of your

4    report, have you become aware of a recent case from

5    the United States Court of Appeals in the Third

6    Circuit which discussed modified universalism, the

7    In Re:  ABC Learning Centres Limited case?

8           A.   I believe that I was shown by you,

9    information with respect to that at my deposition.

10          Q.   All right.  And I can give you a

11   copy of that.

12          A.   Thank you.

13          Q.   And at page 3 of that decision, if

14   we can go to page 3 of that decision.

15          A.   Yes, sir.

16          Q.   I want to start to read where --

17          THE CANADIAN COURT:  Is this the same

18   judge as Watergate?

19          MR. BARRACK:  I'm not sure.

20          THE US COURT:  No.

21          BY MR. BARRACK:

22          Q.   It reads:

23               "Congress enacted Chapter 15 to

24               provide effective mechanisms for

25               dealing with cases of cross-border

Neeson & Associates    W&F

```
1                    insolvency with the following
2                    objectives:
3                        1)   Co-operation between courts
4                    of the United States and the courts
5                    and other competent authorities of
6                    foreign countries involved in
7                    cross-border insolvency cases;
8                        2)   Greater legal certainty for
9                    trade and investment;
10                       3)   Fair and efficient
11                   administration of cross-border
12                   insolvencies that protects the
13                   interests of all creditors, and
14                   other interested estates, including
15                   the debtor;
16                       4)   Protection and maximization
17                   of value of the debtor's assets,
18                   and;
19                       5)   Facilitation of the rescue of
20                   financially troubled businesses,
21                   thereby protecting investment and
22                   preserving employment."
23                   And then moving further down that
24       page --
25                   THE CANADIAN COURT:  Where are you
```



1   going with this, Mr. Barrack?

2            MR. BARRACK:  I don't need to take him

3   through all of this.

4            BY MR. BARRACK:

5            Q.   When you drafted your report -- I

6   can come back to it in argument.

7            When you drafted your report

8   criticizing modern (sic) universalism, were you

9   aware that cross-border insolvency regimes in the

10  US and Canada were based on those same principles?

11           A.   I don't believe that I criticized

12  modified universalism.  I commented on, okay, the

13  effects that it could possibly have.

14           Now, what is your question, sir?

15           Q.   That is fair.  So you are offering

16  not a criticism of it, but as you said earlier,

17  just a neutral observation about what some of the

18  market effects of it may be?

19           A.   That is what I testified to, yes.

20           Q.   All right.  And as an academic, if

21  the Court were to assess it as a policy, it would

22  want to examine both the positive and negative

23  effects, if there were any, of implementing that as

24  a policy?

25           A.   First of all, I'm not going to



```
 1    tell the Court what to do, but as a person who

 2    relies upon the Court system, I would hope so.

 3              Q.   Okay.

 4              THE CANADIAN COURT:  Mr. Barrack, isn't

 5    there an issue whether modified universalism is a

 6    procedural issue or whether it is a substantive

 7    issue?

 8              MR. BARRACK:  There may be.

 9              THE CANADIAN COURT:  The report of

10    Mr. Westbrook has taken procedural and turned it

11    into substantive, is that an issue?

12              MR. BARRACK:  It may be, and for

13    another day, I take your comment.

14              BY MR. BARRACK:

15              Q.   Just a couple of points about the

16    Nortel bonds, and I am just changing subjects now.

17              You agree that none of the bonds

18    feature any of the collateral pledge and are

19    entirely unsecured?

20              A.   That is my opinion, understanding,

21    and I believe factually correct.

22              Q.   And there are no contractual

23    subordination provisions?

24              A.   That is correct.

25              Q.   And finally, you offer no opinion
```



```
 1   as to whether the realization costs in an

 2   insolvency such as Nortel have any impact on the

 3   capital markets?

 4             A.   You are asking me do I have an

 5   opinion on that?

 6             Q.   Yes.

 7             A.   No, I do not.

 8             Q.   Okay.  Thank you, those are my

 9   questions.

10             MR. HANS:  Good morning, Justice

11   Newbould, Judge Gross.  Richard Hans from DLA

12   Piper.  After 20-plus days of trial, I'm finally

13   getting a chance to get up here.

14             THE CANADIAN COURT:  Welcome.

15   CROSS-EXAMINATION BY MR. HANS:

16             Q.   Professor, we -- thank you.  We

17   are stars on the same day, I guess, here.

18             We met at your --

19             A.   We are.

20             Q.   That's right.  We met at your --

21             THE CANADIAN COURT:  "Welcome" means

22   bring it on.

23             BY MR. HANS:

24             Q.   All right.  Then here we go, Your

25   Honour.
```



```
 1                    A.    You are welcome to at any time.
 2                    Q.    That's right, and hopefully we can
 3    get through this pretty quickly here.
 4                    Professor, just to be clear, you were
 5    retained by the UCC in this case, isn't that
 6    correct?
 7                    A.    That is correct.
 8                    Q.    Right, and are you aware that two
 9    of the three UCC members are indentured Trustees
10    for the guaranteed bonds?
11                    A.    I'm not.
12                    Q.    All right.  I just want to be
13    clear, too.  You offered your report as a rebuttal
14    report in response to the Clark and Westbrook
15    report and not to any other expert report in this
16    case; isn't that correct?
17                    A.    That is my belief and
18    understanding, yes.
19                    Q.    All right.  You understand, of
20    course, that the current creditors of this case, to
21    the extent that they include the Bondholders,
22    include only the current Bondholders in this
23    case -- or current Bondholders of Nortel; correct?
24                    A.    That is my understanding, yes.
25                    Q.    And the creditors do not include
```



1    Bondholders who may have once held but no longer

2    hold bonds in Nortel; correct?

3                    A.    Bondholders who bought the bonds

4    and sold them, as I understand it, no longer expect

5    to receive recovery when the case is decided.

6                    Q.    Okay.  And with respect to the

7    current Ad Hoc Bondholder Group, you are not aware

8    of when any of the current Bondholders, the members

9    of that group, purchased their bonds, are you?

10                   A.    I have made no investigation of

11   that question.

12                   Q.    All right.  And if I told you that

13   all but perhaps one or two of the current

14   Bondholder Group purchased after Nortel filed in

15   bankruptcy, you wouldn't know that one way or the

16   other?

17                   A.    Say that again, I'm sorry?

18                   Q.    If I told you that all but perhaps

19   one or two of the current Ad Hoc Bondholder Group

20   purchased after Nortel filed in bankruptcy, you

21   wouldn't know one way or the other if that was

22   correct; correct?

23                   A.    That is correct.

24                   Q.    So you wouldn't know at what price

25   they purchased either; correct?



```
 1                    A.    That's correct.
 2                    Q.    And you wouldn't know whether they
 3    continued to buy and sell bonds, continuing to
 4    trade in the markets, would you?
 5                    A.    I haven't -- that the bonds
 6    continued to trade or those particular investors?
 7                    Q.    Or whether those investors
 8    continued to trade?
 9                    A.    No, I do not.
10                    Q.    All right.  And to be clear, and I
11    believe I asked you this at your deposition, you
12    have not read the investment guidelines of any of
13    the current Bondholders, have you?
14                    A.    I have not.
15                    Q.    And do you have any understanding
16    as to whether any Bondholders have testified or are
17    testifying at this trial?
18                    A.    I have no knowledge.
19                    Q.    All right.  And to be clear, you
20    have never spoken to anyone or any entity who
21    purchased bonds in the after market of any of the
22    Nortel bonds; correct?
23                    A.    If they did, they didn't identify
24    themselves as such.
25                    Q.    All right.  And you have not
```



```
1    conducted any other analysis one way or the other
2    as to the decisions to purchase bonds in the after
3    market; correct?  Other than looking at the pricing
4    that you have noted in your report?
5              A.   Could I have the question again,
6    please?
7              Q.   Let me restate it.  Let me put it
8    this way.  So you have no way of knowing precisely
9    what factors went into the purchase and/or sale of
10   any of the Nortel bonds by any of the current
11   Bondholders in the after market, do you?
12             A.   I do not.
13             Q.   Okay.
14             THE CANADIAN COURT:  Could I just ask a
15   question?  Sorry.
16             You gave an answer a minute ago saying
17   you don't know whether the investors in these bonds
18   have continued to trade.  What is shown on slide 5
19   of your slide deck, are those trading prices or are
20   those --
21             THE WITNESS:  I'm sorry, those are
22   trading prices, that is a fair point, Your Honour.
23   That there was trading, but I don't know who was
24   trading.
25             THE CANADIAN COURT:  Okay, that is why
```

 Neeson & Associates    W&P

```
 1    I was asking, because it surprised me.
 2                THE WITNESS:  Thank you very much.  All
 3    right.  I guess as a consequence, you are right, it
 4    must have continued to buy and sell.
 5                THE CANADIAN COURT:  Either that or
 6    putting in a bid and offer for those --
 7                THE WITNESS:  No, those are trading
 8    prices, thank you.
 9                BY MR. HANS:
10                Q.   Now, notwithstanding the fact that
11    you haven't had these discussions or additional
12    analysis regarding the trading of these bonds, you
13    have offered an opinion as to what you believe to
14    be the expectations of the Nortel Bondholders,
15    isn't that correct?
16                A.   That is correct.
17                Q.   And those expectations are,
18    Professor, in your expert opinion, I guess,
19    informed by the universal available information at
20    the time of purchase, isn't that correct?
21                A.   That would be my expectations,
22    yes, as a market-wide phenomenon.
23                Q.   And certainly as long as credit
24    rating agencies were issuing credit ratings on
25    bonds, the investors would be sensitive to those
```



1    credit ratings when evaluating the acquisition of

2    corporate debt?

3            A.   I believe that is a fair

4    representation, that they would take that into

5    account.

6            Q.   All right.  And so someone who

7    purchased bonds let's say in the 2006 offering,

8    that purchaser may be looking at a different set of

9    information and perhaps even a different set of

10   documents than someone who bought in the after

11   market let's say in 2007, wouldn't that be fair?

12           A.   I would think so.

13           Q.   Times change, information changes

14   regarding the company, they would want to know that

15   and consider that, wouldn't they?

16           A.   I would think so, yes, that would

17   be my expectation.

18           Q.   All right.  And I think you have

19   spoken to it in your report, but the purchasers of

20   bonds would review such documents as the bond

21   prospectus; correct?

22           A.   As a market-wide phenomenon, yes.

23           Q.   And any offering memorandum;

24   correct?

25           A.   As a market-wide phenomenon, in my



1    opinion, yes.

2                   Q.    Yes.    And one of the reasons a

3    Bondholder would want to do that would be because

4    they would want to know what the terms and

5    conditions were associated with the bonds; correct?

6                   A.    Again, as a market -- I'm not

7    saying that every single Bondholder or investor

8    studies those in details, but I believe as a

9    market-wide phenomenon, that information would be

10   taken into account.

11                  Q.    The average Bondholder would

12   ordinarily look at that kind of information?

13                  A.    I don't know what average means,

14   but Bondholders in my opinion, as a group and

15   collectively and reflected in prices, would take

16   that into account.

17                  Q.    Okay, and they would want to know,

18   for example, as we have already discussed here

19   today, whether there were any guarantees associated

20   with the bonds; correct?

21                  A.    That is my opinion, that's

22   correct.

23                  Q.    And what the terms of those

24   guarantees might be; correct?

25                  A.    I believe that is correct.



```
 1                    Q.   All right.  And does the guarantee
 2     place any limitation on the rights of the issuer to
 3     engage in any form of business; correct?
 4                    A.   To the extent that the covenants
 5     of the bond either limit or do not limit the types
 6     of activities in which the issuer can participate,
 7     I would expect that that would be factored into the
 8     pricing of the bond by investors at the time of
 9     issuance, and I believe that is your question.
10                    Q.   All right.  Investors would want
11     to know, too, if there were any carve-outs
12     associated with the guarantee as well; correct?
13                    A.   To the -- yes, I believe that is a
14     fair representation.
15                    Q.   All right.  Would it be fair to
16     say that the reason an investor would want to spend
17     some time going over these terms and conditions and
18     associated risks is because in Nortel in 2006, 2007
19     and 2008 was not offering investment grade
20     security?
21                    A.   I believe that would be true
22     regardless of whether it was an investment grade
23     security.
24                    Q.   But particularly if there was not
25     an investment grade security; correct?
```



```
1                  A.   I don't think there would be any
2    difference.
3                  Q.   Well, certainly --
4                  A.   Between investment grade and
5    non-investment grade.
6                  Q.   Okay.  But here we have
7    non-investment grade security, so you would agree
8    that they would want to know what the risks and
9    uncertainties were associated with the purchase of
10   claims -- to mean the purchase of bonds
11   particularly where it was not investment grade
12   security; correct?
13                 A.   I believe it would be true
14   investment grade or non-investment grade.
15                 Q.   All right.  And the risks and
16   uncertainties with respect to any of these bonds
17   would inform their expectations, would they not?
18                 A.   When you are saying these bonds,
19   you are talking about the Nortel bonds.
20                 Q.   The risks and uncertainties with
21   any of the Nortel bonds that you looked at here,
22   those risks and uncertainties would inform the
23   expectations of the Bondholders purchasing those
24   bonds; correct?
25                 A.   In my opinion, yes.
```



1                      Q.   Yeah, and because it was not an

2    investment grade security an investor would want --

3                      THE CANADIAN COURT:  You've been saying

4    that, Mr. Hans.  And I don't know whether that is

5    true or not.  Is there any evidence in 2006 they

6    weren't investment grade?  I don't know.

7                      MR. HANS:  Actually, Your Honour, there

8    has been, and actually, I'm going to show the

9    offering memorandum now as well that is going to

10   speak to the fact that it was not an investment

11   grade security.

12                     THE CANADIAN COURT:  Okay.

13                     MR. HANS:  But there has been some

14   testimony before now, I believe, Your Honour, that

15   these were not investment grade at that time.  But

16   let's go forward.

17                     BY MR. HANS:

18                     Q.   Let's look at the offering

19   memorandum dated June 29, 2006.  It is Trial

20   Exhibit 40117.  And I would like to direct your

21   attention to page 18.

22                     THE CANADIAN COURT:  What is the date

23   of that?

24                     MR. HANS:  It is June 29, 2006.

25                     THE CANADIAN COURT:  Thank you.



```
 1              BY MR. HANS:
 2              Q.   And we have highlighted a section
 3    there at the bottom "Risk Factors".  Do you recall
 4    reading this when you reviewed the offering
 5    memorandum, Professor?
 6              A.   I don't know -- recall whether I
 7    reviewed this specific component.  You may have
 8    shown this to me at my deposition, but I'm reading
 9    it now.
10              Q.   All right, fair enough.  And this
11    is kind of an entree into several other risk
12    factors that we are going to take a look at, but I
13    just want to read it here:
14                   "Investing in the Notes
15                   involves substantial risks.  You
16                   should carefully consider all the
17                   information in this offering
18                   memorandum prior to investing in the
19                   Notes.  In particular, we urge you
20                   to consider carefully the factors
21                   set forth under 'Risk Factors'
22                   beginning on page 25 of this
23                   offering memorandum and in the 'Risk
24                   Factors' sections of the 2005 Annual
25                   Report and the 2006 First Quarter
```



1                    Report beginning on page 19 of Annex

2                    C and 86 of Annex B respectively."

3                    Do you see that?

4                    A.    I do.

5                    Q.    So let's go to the risk factors,

6    and in particular I would like to direct your

7    attention to pages 29 -- excuse me, my apologies.

8    Let me just go to page 25 first.

9                    A.    All right.

10                   Q.    It is the one they refer to.  Do

11   you have any recollection as to whether or not you

12   reviewed these risk factors beginning on page 25

13   when preparing your report?

14                   A.    Again, I don't recall what

15   specific -- at this point what specific passages --

16                   Q.    All right.

17                   A.    -- I did or did not read with

18   respect to the offering memorandum.

19                   Q.    Let's go to pages 29 and 30 in

20   particular.  And, Professor, look to the paragraph

21   that begins:

22                    "The covenants in this

23                    indenture will contain significant

24                    exceptions and 'carve-outs' which

25                    may provide less protection to



```
 1                    holders of Notes than indentures
 2                    governing securities of comparably
 3                    rated companies, and many of these
 4                    covenants will cease to be in effect
 5                    should the ratings on the Notes
 6                    increase to investment grade."
 7                    Do you see that?
 8                    A.   Yes, I do.
 9                    Q.   All right.  Does that refresh your
10     recollection?  I think that you had some concerns
11     as to whether or not there was -- this was
12     investment grade or not.
13                    A.   I did not express such concerns if
14     it is investment grade or not.
15                    Q.   All right, then let's go down a
16     little further.  There is another risk factor that
17     begins:
18                    "The covenants in the indenture
19                    governing the Notes and Guarantees
20                    contained [...]"
21                    A.   I'm with you, thank you.
22                    Q.   Okay, yes:
23                    "The covenants in the indenture
24                    governing the Notes and Guarantees
25                    contain significant exceptions and
```



1    'carve-outs' in order to provide

2    significant operating flexibility

3    for NNC and its subsidiaries.  These

4    exceptions may provide less

5    protection to holders of Notes than

6    indentures governing securities of

7    non-investment grade rated

8    companies.  In particular, you

9    should be aware that the indenture

10   governing the Notes and the

11   Guarantees will:"

12   And it goes down below and says:

13       "Not restrict the ability of

14   NNC or its subsidiaries to lend cash

15   to or make investments in

16   non-guarantor subsidiaries, joint

17   ventures, customers or other third

18   parties other than in connection

19   with a transfer of all or

20   substantially all of the assets of

21   NNC, the Company or NNI".

22   Do you see that?

23   A.   I'm reading it.

24   Q.   All right.

25   A.   And I believe I understand it, or



1  as an economist.  I'm not here to offer a legal

2  opinion.

3                Q.   I understand.  As you sit here,

4  though, the ability of a subsidiary to lend cash or

5  any restriction on a subsidiary's ability to lend

6  cash would be an important protection to a

7  Bondholder, would it not?

8                A.   I'm not sure that it would be, if

9  I understand your question.

10                Q.   Well, actually, let's go to your

11  report then.  In fact, I think you spoke to this in

12  paragraphs 21 and 22 on page 5 of your report.  Go

13  to those.  And there you lay out various ways the

14  borrower can reduce risk to a specific debt by

15  incorporating protective covenants in the loan

16  agreement; do you see that?

17                A.   Yes.

18                Q.   All right.  And in there you lay

19  out a number of things here that could act as

20  protections to the Bondholders; correct?

21                A.   Yes.

22                Q.   All right.  And I do note that you

23  actually later on note here in your report that in

24  fact none of these are available or were made

25  available to the Bondholders of the Nortel bonds?



1                    A.    What I say there is that it does

2     not have any collateral pledge and is entirely

3     unsecured.  Is that -- I'm sorry.  What I say in my

4     report is I have been advised by counsel that

5     Nortel's long-term debt does not feature any

6     collateral pledge and is entirely unsecured.

7                    Okay.  Sorry.  Thank you.

8                    Q.    So, Professor, are you aware of

9     whether or not these bonds contain any of the

10    protections that you have laid out here?

11                   A.    I do not know.

12                   Q.    You do not know.  Let's go back to

13    those risks again, please, on page 29.

14                   So we'll go to that bullet point, the

15    fact that the indenture governing -- sorry, did you

16    get it?  Okay, I'm sorry.

17                   The indenture governing the notes and

18    guarantees will not restrict the ability of NNC or

19    its subsidiaries to lend cash.  Is that, in your

20    view, something that would be of particular concern

21    or risk to the Bondholders?

22                   A.    It could be, but when cash is

23    lent, in return a note is received, so the assets

24    of the company haven't shrunk in any way.  So you

25    know, it would depend, I guess, on the quality of



1   the note that is received in exchange.  I just

2   don't know.

3             Q.   All right, and you haven't

4   conducted any additional analysis with respect to

5   whether or not that was or was not of particular

6   concern to the Bondholders here?

7             A.   That's correct.

8             Q.   And so if there was no

9   restrictions on the borrower's ability to make

10  dividend payments to shareholders, would that have

11  been of concern to Bondholders in this particular

12  case?

13            A.   I believe so.

14            Q.   And if there was no pledge of

15  specific assets as collateral, I think as you have

16  already noted, that would be of concern to a

17  Bondholder, wouldn't that be correct?

18            A.   It would make a difference in the

19  Bondholder's expectations, yes.

20            Q.   All right, and the lack of or the

21  presence of any of these protections would

22  certainly inform the expectations of any

23  Bondholder, wouldn't that be correct?

24            A.   When you say any of these such as

25  joint ventures, customers or third parties --



```
 1                     Q.    Yes.

 2                     A.    I believe that is fair.

 3                     Q.    Now we already made reference to

 4    it, but I would like just to speak to the credit

 5    agencies here very quickly.  I think at paragraph

 6    44 of your report, you note that investors are

 7    sensitive to credit ratings when evaluating

 8    corporate debt?

 9                     A.    Yes, I recall that.

10                     Q.    And so investors would look not

11    only to the rating itself, but also to the analysis

12    by those key credit rating agencies; correct?

13                     A.    I'm sorry, what was the question,

14    sir?

15                     Q.    I'm sorry, so the investors would

16    not only look to see what the rating was, whether

17    it is an "A" or "B" or "C", or whatever it may be,

18    but they would also look to the analysis provided

19    by those credit rating agencies; correct?

20                     A.    That would be some piece of

21    information --

22                     Q.    All right.

23                     A.    -- that would factor into the

24    prices that are observed.

25                     Q.    All right.  And the principal
```



```
 1   rating agencies would be Standard and Poor's;

 2   correct?

 3              A.   That would be my belief, that is

 4   my opinion, yes.

 5              Q.   Moody's?  Moody's?

 6              A.   I'm sorry I thought you --

 7              Q.   I'm sorry, I'm just -- Moody's?

 8              A.   Moody's, Standard and Poor's, yes.

 9              Q.   Yes, okay.  Fitch and DBRS as

10   well?

11              A.   I'm familiar with Fitch.  I

12   apologize, I'm not familiar with DBRS, except to

13   the extent of -- DBRS except with respect to this

14   litigation.

15              Q.   All right.  In fact, those credit

16   rating agencies would look to the terms of the debt

17   contract itself; correct?

18              THE CANADIAN COURT:  Would or should?

19   I mean, surely every investor, some may look at the

20   reasoning, some may not.  How can any witness know

21   what every bond buyer looks at or takes into

22   account?

23              MR. HANS:  Well, actually, Your

24   Honour --

25              THE CANADIAN COURT:  Or what every
```



```
 1   investment house or rating agency looks at?
 2               BY MR. HANS:
 3               Q.   Fair enough, Your Honour.
 4               So let's go to paragraph 44 of
 5   Professor McConnell's report.  And you speak there,
 6   Professor, it is on page 11 of your report, that:
 7                     "[...] investors are sensitive
 8                     to credit ratings when evaluating
 9                     corporate debt.  Some factors that
10                     rating agencies take into account
11                     when awarding ratings include the
12                     terms of the debt contract, the
13                     seniority of the debt relative to
14                     other claims, and credit
15                     enhancements that improve the credit
16                     risk profile of the debt."
17               Do you see that?
18               A.   Yes, I do.
19               Q.   And you still abide by that;
20   correct?
21               A.   I agree with that, yes.
22               Q.   All right.  Now, Professor, I'm
23   just going to note the only credit report that was
24   in your report was a Standard and Poor's report
25   from November of 2008; correct?
```



```
 1                    A.    Yes, that's correct.
 2                    Q.    All right.  I would like to show
 3      you a report by Moody's May 21, 2008, and it is
 4      Exhibit TR12040.  Now, you have read -- you have
 5      seen Moody's reports before; correct?
 6                    A.    Yes, I have.
 7                    Q.    I just want --
 8                    A.    This report before or in general?
 9                    Q.    In general.
10                    A.    Actually, both.
11                    Q.    Well --
12                    A.    The answer is both.
13                    Q.    Okay, both.  My first question was
14      going to be in general, but the second with respect
15      to this.  In fact, I believe it was shown to you at
16      your deposition.  But I would just like to go
17      halfway down that first page and just look at the
18      actual ratings assigned by Moody's to each of the
19      bonds at that point in time.  You see that?  And I
20      believe except with respect to the preferred stock
21      of the company, all of the debt was rated at B3; do
22      you see that?
23                    A.    Yes, I do.
24                    Q.    Okay.  And are you aware of what a
25      B3 rating means under Moody's parlance?
```



```
 1                    A.   It has been awhile since I have

 2   reviewed those.  At one -- at various points I have

 3   read the specific wording, but I haven't memorized

 4   it or I cannot recite it to you as I sit here.

 5                    Q.   I understand.  If I told you that

 6   under Moody's a "B" rating mean that is the credit

 7   is speculative, would you -- would that refresh

 8   your recollection one way or the other?

 9                    A.   It doesn't, but any

10   investment -- I'm not sure quite what speculative

11   means, but if it means that there is risk

12   associated with it, I would say that any investment

13   security has risk associated with it.

14                    Q.   I understand.  But Moody's also

15   deems a "B" rating to mean that it is subject to a

16   high credit risk.  Would that refresh your

17   recollection in any way, shape or form?

18                    A.   It does not, but I accept your

19   representation that that's what Moody's says.

20                    Q.   All right.  If you'll accept that

21   that's fine, we don't have to go to show you that.

22                    Let's go to the next Moody's report

23   dated December 15th.  It is Trial Exhibit TR12042.

24                    All right, Professor, so this one is

25   dated December 15th, and now Moody's here -- and
```



```
 1   this is subsequent to the November 21st S&P report

 2   that you reviewed in your report.  I will just note

 3   that here, as you can see, there has been a

 4   downgrade and Moody's --

 5              A.   I'm sorry, this is December 15th,

 6   yes, that is subsequent.

 7              Q.   And Moody's has now downgraded

 8   Nortel's debt to CAA2 and assigned it a negative

 9   outlook; do you see that?

10              A.   I do.

11              Q.   And if I told you that under

12   Moody's rating symbols and definitions, a credit

13   rating of CAA means that the credit is judged to be

14   speculative, of poor standing and subject to very

15   high credit risk, would that refresh your

16   recollection or would you accept that

17   representation?

18              A.   I will accept your representation.

19   No, it does not refresh my recollection.

20              Q.   All right.  Okay, and actually,

21   the very next day Moody's issued a more descriptive

22   report in which they discuss their downgrade.  Now,

23   Professor, you may recall we showed you this at

24   your deposition.  Do you recall?

25              A.   I know you showed me various
```



```
 1   Moody's reports.  I'll accept your representation
 2   that you showed this one to me.
 3              Q.   All right.  Well, I would like to
 4   go to page 3 of this report, and in fact, there is
 5   a section entitled "Structural Considerations"?
 6              THE CANADIAN COURT:  This is Exhibit
 7   12045?
 8              BY MR. HANS:
 9              Q.   Yes, Your Honour, my apologies, I
10   should have noted, 12045.
11              Do you see that, Professor?
12              A.   I do.  What -- see what?
13              Q.   I just wanted to make sure you
14   were looking at the right sections.
15              A.   I'm sorry for talking over you,
16   yes, I see "Structural Considerations".
17              Q.   I would like to direct your
18   attention particularly to the second paragraph and
19   let me just read that and we'll highlight that here
20   for everyone:
21                   "In general, a system of
22                   cross-guarantees causes all debt to
23                   be interpreted as pari passu.
24                   Technically however, there are two
25                   note issues that are not pari passu.
```



1              However, since the financial

2              consequences of this situation are

3              not determinable and are, in any

4              case, thought to be minimal, Moody's

5              rates all of the Nortel Group of

6              companies' debts as if they were

7              pari passu."

8              And then as a parenthetical:

9                  "(The 7.875% $150 million notes

10             due 2026 were issued by Nortel

11             Networks Capital Corporation are

12             guaranteed by Nortel Networks

13             Limited.  The 6.875% $200 million

14             notes due 2023 were issued by Nortel

15             Networks Limited and do not benefit

16             from any guarantees.)"

17             Do you see that?  Those are the two

18    issues that Moody's is noting are not technically

19    pari passu; do you see that?

20             A.   I do.

21             Q.   And as we discussed at our

22    deposition, you are familiar with the term "pari

23    passu"; are you not, Professor?

24             A.   To the extent that I discussed it

25    at my deposition, and to the extent that you accept



 1   that as a reasonable understanding, yes.

 2            THE CANADIAN COURT:  Even if he had

 3   been at Princeton only, after 40 years I think he

 4   would know what pari passu meant.

 5            BY MR. HANS:

 6            Q.   Well, we have to ask those

 7   questions, Your Honour.

 8            THE CANADIAN COURT:  Give the judges a

 9   little bit of credit.

10            THE WITNESS:  But he is not giving me

11   that credit.  That is the point.

12            BY MR. HANS:

13            Q.   I'm just testing your expert

14   opinion, Professor.

15            Pari passu, Professor, I believe as you

16   noted in your deposition, means in essence that

17   everyone or everything is treated the same;

18   correct?

19            A.   That was my understanding and it

20   still is.

21            Q.   Right.  It would be fair to say

22   that following the Moody's downgrade on November

23   15th and the issuing of this report on -- excuse

24   me, on December 15 and issuing this report on

25   December 16th, the expectations of Bondholders at



1    that time would have changed, isn't that fair?

2              A.    Say that again, I'm sorry.

3              Q.    In light of the downgrade on

4    December 15th, 2008, and then the subsequent

5    issuing of the report on December 16th by Moody's,

6    would it be fair to say that this downgrade

7    affected the expectations of the Bondholders?

8              A.    The empirical evidence on that is

9    that in many instances, and I think the general

10   sense is that downgrades and rating changes have

11   some but relatively modest impact on prices, and if

12   that is true, then investors had by and large

13   priced this possibility or expectation of a

14   downgrade into the price.  That would be my

15   expectation based upon the research that has been

16   done on this question and the readings and thinking

17   about it that I have experienced.

18             Q.    But you haven't done any specific

19   analysis with respect to the downgrade in this

20   particular instance, have you?

21             A.    No, I have not.

22             Q.    All right.  Certainly you'll agree

23   with me, Professor, that a little less than one

24   month later when Nortel filed in bankruptcy, the

25   expectations of the Bondholders changed at that



```
 1    moment in time, wouldn't that be fair to say?
 2              A.    Probably so, but I don't know to
 3    how great an extent, given all the warnings that I
 4    have seen, such as this one and others, I'm not
 5    sure to how great of an extent that came as a
 6    surprise to investors.
 7              Q.    Well, it came as some
 8    surprise -- well, perhaps not a surprise, but it
 9    certainly did affect the pricing of the Nortel
10    bonds, did it not?
11              A.    I would believe so.  I have not
12    specifically investigated that question.
13              Q.    Well, actually, let's take a look
14    at Exhibit 3 again of your report on page 16.  And
15    on the left side of your chart there, Professor, is
16    dated January 14th, 2009; correct?
17              A.    Yes.
18              Q.    And that is the date of the filing
19    in bankruptcy; correct?
20              A.    Yes.
21              Q.    In the immediate aftermath, the
22    prices of those bonds fell, isn't that fair?
23              A.    Well, what you asked me, as I
24    understand your question, was on the petition date,
25    would that information have affected prices on that
```



1    date.  I think that was your question.  And I have

2    not explored that question.  All I have

3    done -- what I have done is showed what the prices

4    are on that date.

5              Now, subsequent to that date,

6    apparently new information, further information

7    came into the market about the likely recoveries

8    that is embedded in the price, and that is what I

9    have testified to.

10             Q.   All right.  Let's pull up a chart

11   that was in the CCC's pretrial brief at page 111.

12   Now, Professor -- that's all right, Atara.  I was

13   wondering --

14             MS. MILLER:  You knew I was coming up.

15             MR. HANS:  I knew you were coming.

16             MS. MILLER:  Your Honours, good

17   morning -- good afternoon.  For the record, Atara

18   Miller from Milbank, Tweed, Hadley & McCloy on

19   behalf of the Bondholders.

20             We object to this demonstrative and

21   generally to the line of questioning to the extent

22   that the holdings of the members of the Bondholder

23   Group and when they acquired their holdings is not

24   relevant to the allocation concern before the

25   Court.



1                THE CANADIAN COURT:  Well, that may

2    remain to be seen.  I think he can proceed, and

3    whether you are right or wrong, I guess that awaits

4    argument.

5                Mr. Hans:  All right.  Thank you, Your

6    Honour.  We obviously do think it is relevant given

7    the expectation --

8                THE CANADIAN COURT:  Well, I assume so

9    or you wouldn't be doing it.

10               BY MR. HANS:

11               Q.   And I will just note that the

12   information reflected in the chart comes from the

13   Rule 2019 statements filed by the Bondholder Group

14   and the representative party discovery provided in

15   this litigation.

16               So just I will point out a couple of

17   things here just looking at this chart, Professor,

18   and I take it that you have not looked at or

19   considered any of this information prior to today;

20   is that fair?

21               A.   Prior to last night when I

22   received this.  Yeah.  I believe it was last night.

23               Q.   All right.  And I note here as

24   well that there were -- these are I guess the

25   principal members of the Ad Hoc Bondholder Group

 Neeson&Associates    W&F

1    here.  Let's look at CarVal Investors LLC in

2    particular, I think it is the fifth one down, all

3    right.  And it would appear here that at least as

4    of January 13th, 2009, they had 173 million dollars

5    worth of bond -- or in a bond position here in

6    Nortel; do you see that?

7                  A.   I do.

8                  Q.   Okay.  And in fact, that is the

9    highest holdings that they have throughout the

10   period, the relevant period here --

11                 A.   On these dates.  I don't know what

12   happened --

13                 Q.   On these dates --

14                 A.   I have no idea what happened

15   between these dates.

16                 Q.   All right, and you don't know

17   whether they are buying or selling at any other

18   points in between here; is that correct?

19                 A.   I know they are.

20                 Q.   Yes.

21                 A.   Because their positions are

22   increasing and decreasing.

23                 Q.   It would be fair to say that the

24   considerations for firms that are actively trading

25   in the distressed debt market, I'm not labelling



```
 1   anyone a distressed debt investor at this moment,
 2   but anyone trading in the distressed debt market
 3   here post bankruptcy may be -- may be looking at
 4   these bonds with different considerations than
 5   those who purchased at the time of the offering?
 6              A.   The word "considerations" embeds a
 7   lot of territory.  For example, a regulated
 8   investor who is not permitted to invest in below
 9   investment grade bonds would certainly have that as
10   a consideration.  If so, that consideration would
11   differ presumably from these investors who are
12   buying during that time period.
13              So there are a lot of -- the term
14   "consideration" is so broad as to -- I can't
15   dispute that the considerations would be different.
16              Q.   All right.  But would it be fair
17   to say that the investors in the post-petition
18   market will be reacting to certain events occurring
19   during that market?
20              A.   Well, I talked about that in my
21   direct testimony.
22              Q.   And --
23              A.   I emphasized that the bond prices
24   changed when new information came into the market.
25   I would expect that market participants, as
```



1    reflected in those prices, were responding to that

2    information.  So yes.

3                    Q.   And some Bondholders are

4    responding differently than other Bondholders;

5    fair?

6                    A.   There is buying and selling, and

7    my expectation would be that that reflects the

8    way -- the risk tolerances, the portfolio

9    structure, the diversification considerations

10   that -- and other factors that factor into a

11   portfolio manager's decision to buy and sell

12   securities.

13                   Q.   But with respect to these

14   particular Bondholders here, you have not looked at

15   those particular risk factors that they consider or

16   those particular structures or investment

17   strategies that they follow; correct?

18                   A.   That is absolutely correct.

19                   Q.   All right.  And you did not

20   undertake, say, for example, with Monarch

21   Alternative Capital down towards the bottom there,

22   you did not undertake any effort to understand

23   Monarch's expectations in particular with respect

24   to purchasing bonds during this time frame?

25                   A.   I have not interviewed with anyone



 1    at Monarch.  I have not reviewed their investment

 2    guidelines or investment policies.  I have not read

 3    anything about Monarch Alternative Capital, so the

 4    answer to your question is no, I have not.

 5              Q.   I will note there is the date here

 6    18 July, 2011.  Monarch has a position of 206

 7    million; do you see that?

 8              A.   I do.

 9              Q.   And then we'll go across, and at

10    least as of March 11, 2014, it had reduced its

11    holdings to 112 million; do you see that?

12              A.   I do.

13              Q.   Do you have any understanding as

14    to why Monarch would have in fact reduced its

15    holdings after July of 2011?

16              A.   I do not.  And again, I don't know

17    that they reduced them.  They may have increased

18    them at various times and then reduced.  All I see

19    is -- I think these are end of month dates or -- I

20    don't know how these particular dates were chosen.

21              Q.   Well, these are I believe

22    associated with the 2019 --

23              THE CANADIAN COURT:  Hasn't the

24    Professor made it clear he hasn't looked at any of

25    these companies for any of their investment



1   decisions, guidelines or anything else?  Why do you

2   go through them all?  You may get a different

3   answer than you are looking for.

4           MR. HANS:  I'm ready -- he has made it

5   quite clear that he doesn't know that, so we'll

6   move on.

7           BY MR. HANS:

8           Q.   All right, we are going to take a

9   look at a pricing chart where we have actually

10  included some information, and this is essentially

11  the pricing chart that you have -- you had used in

12  your report, Professor, as Exhibit 3, and we have

13  just added in here certain additional information,

14  including certain dates and the like.

15          I will note that in your pricing chart

16  you include only the two reference points besides

17  the petition date, and one is the last line of

18  business sale and the other is what you described

19  as the RPP sale, which is the Rockstar sale as we

20  have described it in this case.

21          A.   Yes, sir.

22          Q.   Okay.

23          A.   Well, I think that is correct.

24  I'm not sure that I had in my demonstrative the

25  first date to which you refer.



```
 1                    Q.   And actually, since we are now I
 2   guess, Your Honour, creating exhibits here --
 3                    A.   I do not have that first date to
 4   which you refer in my exhibit that I presented
 5   today.
 6                    Q.   In the exhibit you presented
 7   today, but you do have in your report --
 8                    A.   Yes, that's correct.
 9                    Q.   Okay.
10                    A.   The yes, that's correct, I'm
11   sorry.
12                    Q.   And I guess we need to label this
13   as an exhibit here, Your Honour.  I don't know what
14   the next one is?
15                    THE CANADIAN REGISTRAR:  Exhibit 59.
16   May I have a copy to mark, please.
17                    EXHIBIT NO. 59:  Demonstrative -
18                    Pricing and Identified Ad Hoc
19                    Bondholder Group Holdings, dated
20                    January 13, 2009-March 11, 2014.
21                    BY MR. HANS:
22                    Q.   Since in your report you only
23   noted the last line of business sale dated
24   September 30, 2010, I just wanted to make sure, I
25   think you noted a few minutes ago, Professor, that
```



```
 1   as new information came into the marketplace, the

 2   trading and the pricing reflected that new

 3   information post-petition; correct?

 4              A.   Yeah, well, pre- and post-petition

 5   would be my expectation.

 6              Q.   Yes.  All right.  And clearly the

 7   sales of the lines of business affected the pricing

 8   of the bonds and the expectations of the

 9   Bondholders, isn't that fair?

10              A.   To the extent it is new

11   information, it certainly would change their

12   expectations, yes.

13              Q.   All right, and we have on this

14   chart, and it largely just simply reflects the

15   information that we had in the exhibit we showed

16   you, the demonstrative we showed you a few minutes

17   ago with the different Bondholder positions, but we

18   have the rising dotted lines and with a dot showing

19   at those various points in time what those total

20   bond holdings were of the Ad Hoc Bondholder Group.

21   Do you see those rising dashed or dotted lines,

22   Professor?

23              A.   I do.

24              Q.   And it is clear that they are

25   increasing their positions as they proceed;
```



1   correct?

2              A.   Through time their positions are

3   increasing, in the aggregate, yes.

4              Q.   Yes, in the aggregate.

5              A.   I mean, again, there was a

6   decrease and then an increase, but from start to

7   finish, there is an increase.

8              Q.   All right.  Your Honour, I will

9   just note that there appears to be at least -- at

10  least we have marked here in the report January

11  2013 where mediation failed at that point in time.

12             Were you aware of the attempted

13  mediations in this case?

14             A.   I knew there were attempted

15  mediations, yes.

16             Q.   And the success or failure of

17  those mediations would certainly be information

18  that would be important to the Bondholders;

19  correct?

20             A.   I would say the outcome of the

21  mediations would be consequential to Bondholders,

22  yes.

23             Q.   Fair enough.  All right, we are

24  going to look at one final chart, just for

25  illustrative trading volumes here.

 Neeson & Associates    W&P

1                    A.    Thank you.

2                    Q.    I apologize, I realize that the

3    first demonstrative I used we did not assign an

4    exhibit number to that, and I guess so the next one

5    would be 60 for that; would that be correct?

6                    THE CANADIAN REGISTRAR:   Exhibit 60

7    will be the demonstrative entitled "Identified Ad

8    Hoc Bondholder Holdings January 13 to March 11,

9    2014".

10                   And 60 will be Illustrative Bond

11   Trading Volumes, February 13th to --

12                   THE CANADIAN COURT:   Exhibit 61, isn't

13   it?

14                   THE CANADIAN REGISTRAR:   Exhibit 61

15   is --

16                   THE CANADIAN COURT:   No.

17                   THE CANADIAN REGISTRAR:   Then Exhibit

18   60 will be the Illustrative Bond Trading Volumes.

19                   THE CANADIAN COURT:   No.

20                   THE CANADIAN REGISTRAR:   Sorry?

21                   THE CANADIAN COURT:   No.  You missed

22   one there, Debbie.

23                   THE CANADIAN REGISTRAR:   We had

24   previously marked one as Exhibit 58.

25                   THE CANADIAN COURT:   59, I thought.



```
 1                    THE CANADIAN REGISTRAR:  Oh, I beg your
 2   pardon.  So I have got two that are the same,
 3   sorry.
 4                    So Exhibits 58 was Nortel Bond Spreads
 5   US Government Yield Curve.
 6                    Exhibit 59 Pricing and Identified Ad
 7   Hoc Bondholder Group holdings.
 8                    And then Exhibit 60 will be the
 9   Illustrated Bond Trading Volumes January 13, 2009
10   to June 19th, 2014.
11                    THE CANADIAN COURT:  We are up to 61,
12   though.
13                    THE CANADIAN REGISTRAR:  Exhibit 60,
14   Your Honour.
15                    THE CANADIAN COURT:  No, no, no,
16   Debbie.  Here.  Just take a look at this.  Here is
17   58 here.
18                    -- OFF THE RECORD DISCUSSION --
19                    THE CANADIAN REGISTRAR:  Sorry,
20   everybody, for the confusion.  Do you want me to
21   repeat what everything is?
22                    THE COURT REPORTER:  Yes.
23                    THE CANADIAN REGISTRAR:  I'll start at
24   Exhibit 58.  That is the Nortel Bond Spreads to the
25   US Government Yield Curve Basis Points.
```



1                    Exhibit 59, Pricing Identified Ad Hoc

2     Bondholder Group Holdings January 13 to March 11,

3     2014.

4                    Exhibit 61, Illustrated Bond Trading

5     Volumes January 13, '09 to June 19, 2014.

6                    Identified Ad Hoc Bondholder Group

7     holdings January 13, '09 to March 11, '14.

8                    THE CANADIAN COURT:  60.

9                    THE CANADIAN REGISTRAR:  Exhibit 60.

10                   EXHIBIT NO. 60:  Demonstrative -

11                   Identified Ad Hoc Bondholder Group

12                   Holding dated January 13, 2009-March

13                   11, 2014.

14                   EXHIBIT NO. 61:  Demonstrative -

15                   Illustrative Bond Trading Volumes,

16                   January 13, 2009-June 19, 2014.

17                   BY MR. HANS:

18                   Q.   Professor, I just note on this

19    chart there is certain obviously key dates here

20    where there is increased trading volume.  Did you

21    consider or analyze in any way, shape or form the

22    actual trading volume in the bonds post-petition?

23                   A.   No, I did not.

24                   Q.   Okay.  We'll just note for the

25    record that the spike on the left side dated 13



1    January '09 is in the immediate aftermath of the

2    filing of bankruptcy or in or about the time of the

3    filing of bankruptcy; correct?

4              A.    That is my understanding, yes.

5              Q.    And do you have any understanding

6    why there may be a spike on or about 13 April,

7    2009?

8              A.    I do not.

9              Q.    All right, if I noted that that

10   was in fact at or about the time where the first

11   bids were due on the first business sale, would

12   that surprise you in any way?

13             THE CANADIAN COURT:  The Professor just

14   said that, in answer to your question, did he

15   consider or analyze in any way, shape or form the

16   trading volumes, and he said he didn't.  Is that

17   the end of this?

18             BY MR. HANS:

19             Q.   It is, in fact, if he has not

20   analyzed those in any way, shape or form.

21             I'm sorry, just two last questions

22   going back to Exhibit 59, which is the Pricing and

23   Identified Ad Hoc Bondholder Group --

24             A.    Yes, I have that.

25             Q.    Yes, and to be clear, your Exhibit

Neeson & Associates   W&P

1    3, and I believe Mr. Barrack asked this, but I just

2    want to be clear, your Exhibit 3 in your report did

3    not include the 2026 bonds in the pricing data;

4    correct?

5                    A.    That is correct.

6                    Q.    All right.  And one last question

7    here.  I note that a number of these bonds have for

8    quite some time traded over par.  Do you see that?

9                    A.    I do.

10                   Q.    All right, but you have done no

11   particular analysis as to why any specific investor

12   would buy over par bonds in a bankrupt company,

13   have you?

14                   A.    Well, I commented on it earlier.

15   I gave my opinion in that regard.

16                   Q.    But other than looking at the

17   pricing data, you have done no other analysis,

18   isn't that correct?

19                   A.    The prices are investors'

20   expectations of recoveries in the future.  What

21   these tell me is that these investors are expecting

22   to receive par or hope to receive or are expecting

23   to receive par plus a cumulative -- some cumulative

24   interest.

25                   MR. HANS:  I have no further questions



```
 1   at this time, Your Honour.

 2               THE CANADIAN COURT:  Thank you,

 3   Mr. Hans.

 4               Anyone else?

 5               MR. QURESHI:  I don't think there is

 6   any further cross, if I may, Your Honour --

 7               THE CANADIAN COURT:  Any

 8   re-examination?

 9               MR. QURESHI:  Yes, I have one just very

10   narrow area, if I may.  And I am going to hand out

11   a document.  This is the Support Agreement.  This

12   relates to the 2026 bonds that the professor was

13   asked about by Mr. Barrack, and for the record, it

14   is Exhibit 43730.

15               MR. BARRACK:  Your Honour, I object.

16   This document --

17               THE CANADIAN COURT:  Wait, wait, wait,

18   wait.  Can I just take a look at what is being

19   proposed here?

20               MR. BARRACK:  I see it has been marked

21   as a Trial Exhibit.  I don't know that any witness

22   has spoken to it or been available to speak to it.

23               MR. QURESHI:  Well, Your Honour --

24               THE CANADIAN COURT:  Just wait,

25   Mr. Qureshi.
```



```
 1                    Mr. Barrack, you discussed it and you
 2     said, well, we'll leave the record as it stands is
 3     I think what you said.  The witness apparently
 4     hadn't looked at it or dealt with it, but what is
 5     your objection?
 6                    MR. BARRACK:  My objection is that it
 7     is an odd way to put in an agreement of which there
 8     had been no prior testimony about it.
 9                    THE CANADIAN COURT:  Well, did you not
10     open the issue on your cross?
11                    MR. BARRACK:  He referred to in his --
12                    THE CANADIAN COURT:  "He" being --
13                    MR. BARRACK:  Professor McConnell
14     referred to --
15                    THE WITNESS:  The guy from Princeton.
16                    MR. BARRACK:  Sorry, he did refer to
17     the support agreement during his testimony that he
18     believed that there was a support agreement that he
19     had not seen, and so now --
20                    THE CANADIAN COURT:  I'm going to
21     permit it.  You opened the door.
22                    MR. BARRACK:  Okay.
23     RE-EXAMINATION IN-CHIEF/RE-DIRECT EXAMINATION BY
24     MR. QURESHI:
25                    Q.   Thank you, Your Honour, I think I
```



 1   just have one question on this document.

 2              And Professor, just to give you some

 3   context, this relates to the 2026 bonds, and I

 4   believe you testified that that is the bond

 5   issuance that you did not analyze in your report.

 6              I would like to direct you to the last

 7   page of this agreement, and this is -- this was the

 8   prospectus for the 2026 bonds which you can see on

 9   the front, the second page.

10              But if you go to the very end, there is

11   something called a Support Agreement, and it is

12   about a page and a half.  I'm going to alert you to

13   just a couple of provisions and then I'm going to

14   ask you a question about it.

15              First it says that this is an agreement

16   between Northern Telecom Inc., that being the

17   predecessor to NNI, and Northern Telecom Capital

18   Corporation, that being the predecessor to NNCC.

19   Do you see that, sir?

20              A.   I do.

21              Q.   I'm going to just identify a

22   couple of provisions for you.  First it says:

23                   "Whereas, the Company," being

24                   NNCC "is a wholly-owned subsidiary

25                   of NTI and has no independent



```
 1              operations other than as acting as a

 2              finance company for its

 3              affiliates [...]"

 4              And the next provision says:

 5                   "Whereas, NTI and the Company

 6              desire to provide certain assurances

 7              with respect to performance of the

 8              Company's obligations in connection

 9              with the Company's offer of debt

10              securities consisting of debentures,

11              notes, bonds and/or other evidences

12              of indebtedness [...]"

13              And it goes on from there.

14              Now, if we can go down to the operative

15    provisions and you will see they are -- they are

16    all titled.  There is one that says "Not a

17    Guarantee" and then the one above that says

18    "Maintenance of Net Worth" and that one reads:

19                   "At all times prior to the

20              termination of this Agreement, NTI

21              shall cause the Company to have and

22              to maintain a net worth of at least

23              $1.00.  For purposes hereof, 'net

24              worth' shall mean a sum equal to the

25              Company's tangible net worth, as
```



```
 1              determined in accordance with
 2              generally accepted accounting
 3              principles".
 4              Professor, here is my question.  What
 5   is your understanding of the economic effect of
 6   this support agreement as it relates to the NNCC
 7   bonds?
 8              A.  As an economist reading this, and
 9   I am not giving a legal opinion, but it would seem
10   to have essentially the same effect as a guarantee,
11   although I'll note it says this is not a guarantee.
12              Q.  Thank you, Professor, those are my
13   questions.
14              THE CANADIAN COURT:  Thank you,
15   Professor McConnell.
16   -- WITNESS EXCUSED
17              MR. QURESHI:  So, Your Honours, I
18   believe that that is it for today.  We obviously
19   have dropped Professor Kilimnik, so the remaining
20   witness is Professor Eden, and she will be
21   testifying tomorrow in Delaware.
22              So I believe that means we are done for
23   the day.
24              MS. SCHWEITZER:  Your Honour --
25              THE US COURT:  Ms. Schweitzer, yes.
```



 1                  MS. SCHWEITZER:  Lisa Schweitzer from

 2    Cleary, for the US Debtors.  I am in Delaware this

 3    morning.

 4                  I had just wanted to rise because I

 5    know that there were further submissions made on

 6    the post-petition interest issues this morning, and

 7    the US Debtors and some other parties who had

 8    reviewed the last round of submissions were

 9    troubled by certain of the statements made therein

10    and wanted an opportunity, to the extent that the

11    Courts were willing to entertain these submissions

12    or consider setting any sort of schedule or

13    allowing this proceeding in any manner, to have an

14    opportunity to briefly speak to the Court and

15    address some of the new issues and the concerns we

16    have that are raised by it.

17                  I don't know -- I'm happy to do that

18    now or to have time tomorrow.

19                  THE US COURT:  Now?  Let's do it now.

20                  MS. SCHWEITZER:  Sure.

21                  THE US COURT:  That is fine, Ms.

22    Schweitzer.  Thank you.

23                  I don't have the submissions in front

24    of me.  I don't know whether that would be a good

25    thing to do or --



 1                MS. SCHWEITZER:  I don't know if the --
 2    I didn't make them --
 3                THE US COURT:  I have them in my
 4    chambers, so I can get them quickly enough.
 5                MS. SCHWEITZER:  That is fine.  These
 6    aren't my submissions, so I don't have them to --
 7                THE US COURT:  Okay.  Do people have
 8    extra copies?
 9                Thank you.
10                Thank you.
11                MS. SCHWEITZER:  So for Your Honours'
12    benefits, the submissions that I understand were
13    made this morning were a further supplemental
14    submission by the Monitor first and the Canadian
15    Debtors, and second by the CCC, and third by the UK
16    pension parties.
17                And some of the themes you have already
18    seen on the idea that this post-petition interest
19    issue is being characterized as something that, if
20    decided, will be helpful to settlement.
21                What we are concerned about is that
22    this post-petition interest issue is being held out
23    as the issue that is creating a logjam or somehow
24    driving either settlement or non-settlement on the
25    other hand, and also that it is being characterized



```
1   as the only or a large issue remaining, that
2   somehow resolving it, advancing it quickly will
3   clear the logjam.
4             Second of all, there are various
5   procedural and due process issues that are being
6   glossed over or swept under the rug in terms of
7   just saying, hey, the Courts -- I think one person
8   had submitted that the Courts are here and the
9   technology is set up; we should just have a joint
10  hearing either because we are technologically able
11  to or because, in the interests of comity and
12  cooperation, this should all be heard together.
13            However, the submissions do recognize
14  that there are different issues before the two
15  Courts.  There are ripeness issues, and there are
16  questions even of the procedural correctness of
17  teeing it up at this time or as a joint hearing.
18            I mean, first, the first thing that is
19  most troubling to the US Debtors is that we are
20  being put in an untenable position where we have
21  been subject to years' worth of mediations and most
22  recently further settlement discussions, and there
23  is this allegation in the public that this
24  post-petition interest issue is driving or
25  preventing settlement of the case.  And the US
```



1    Debtors and the US interests just think that is
2    patently false.  It is not the issue.  It is not
3    even the largest issue.
4              You have seen from our submissions and
5    you have heard from our testimony and our
6    questioning we don't believe creditor recoveries
7    are the method by which allocation should be made
8    in this case.  That is separate issues that will be
9    decided by Your Honours later on, but you have
10   heard the reasons why and you have seen some of the
11   deficiencies of that methodology being pointed out.
12             We all have our own fiduciary
13   obligations to our own creditors.  We all have to
14   consider, as we do in every case, the legal issues
15   at stake and the risks attendant to litigation, but
16   this idea of manufacturing or engineering to a
17   perfect creditor recovery result is, first of all,
18   fallacious and impossible, but to the extent it is
19   being driven by the idea that you can do it just by
20   knowing whether post-petition interest will be paid
21   or what rate it will be paid compounds that error.
22             To point out some of the other issues
23   that would be more threshold issues, for example,
24   just the fact of the pro rata theory being
25   advanced.  If you have seen -- not to accept any of



1   the expert evidence, but if you have seen the

2   charts that the CCC and the UKP offer, these charts

3   suggesting the pro rata theory would move creditor

4   recovery substantially, you know our briefing and

5   I'm not going to argue at length, but that is the

6   type of threshold issue that we think has no

7   foundation under the law as a remedy and could

8   drive settlement by taking that out as well if not

9   better than post-petition interests.

10              The same idea with the idea of

11   uncertainty of claims or uncertainty of creditor

12   recoveries.  If you look at the other creditor

13   recoveries that aren't resolved at this point, you

14   have, based on the Monitor's most recent March

15   report, in NNC 7.7 billion of 9.7 billion dollars

16   of filed claims are unresolved under their report.

17              The same thing for NNL, 8.9 billion of

18   13.5 billion dollars in filed claims unresolved.

19   My understanding is that doesn't even necessarily

20   include all of the employee claims because of the

21   differences in the claims system.

22              Additionally, all the people who are

23   advocating for post-petition interests have their

24   own claims to resolve.  The CCC members still have

25   pension claims.  There have been partial



1    distributions on those, and how those would

2    reconcile with the plan, unresolved.

3              The EMEA Debtors, again, have billions

4    of dollars of claims against the Canadian Debtors,

5    subject to a trial that is about to happen,

6    unresolved.

7              We in the US have resolved them,

8    unresolved against Canada.  The UK pension claims

9    you have heard as well somewhere between zero and 3

10   billion dollars against the Canadian creditors.  I

11   think the expert questioning said that it could go

12   up to 60 billion dollars against the European

13   debtors collectively.

14             So to suggest that 1.6 billion dollars

15   of potential post-petition interest is somehow

16   going to determine whether the parties can settle

17   or not or is some gateway to determining creditor

18   recoveries, if that even were the right metric, is

19   just sheer smoke and mirrors.  It is just not

20   reflective of what is in the record.

21             There is obviously prematurity issues.

22   Judge Gross, Your Honour, you had had these issues

23   before you.  There was an objection filed by

24   Wilmington Trust --

25             THE US COURT:  Yes.



1            MS. SCHWEITZER:  -- last November.

2   You'll remember Wilmington Trust is a creditor of

3   the Canadian Debtors, not even a creditor of the US

4   Debtors -- or not even a creditor of a creditor of

5   the US Debtors.

6            But at the time you considered whether

7   that objection should proceed, just five, six

8   months ago, and you had determined that these would

9   be an advisory issue to take this out of line, and

10  you specifically called out the idea that after

11  months and years of mediation, that one issue

12  shouldn't be cherry-picked along the way.

13           Again, we have in the joint hearing

14  you'll notice in the submissions, in the same way,

15  the joint hearing issue is raised in this idea that

16  we should all just decide these issues together,

17  without discussing in any specificity what these

18  issues are or how they would be decided together or

19  which judges would be deciding which of these

20  issues.  For example --

21           MR. BARRACK:  Your Honour --

22           THE CANADIAN COURT:  No, just wait,

23  Mr. Barrack.

24           MS. SCHWEITZER:  For example, my

25  understanding is in Canada the post-petition

1    interest becomes part of the claim, along with the

2    marker date for measuring the claim, FX currency

3    adjustments and other issues.  In the US, it is a

4    post-solvency plan-related issue.

5              So if this was heard jointly, is

6    someone proposing that Justice Newbould will be

7    determining how or ruling on or entering separate

8    orders on how the US plan would be administered or

9    the entitlement to claim solvency-related interest

10   claims in the US?

11             And in the same way, are they asking

12   Your Honour, Judge Gross, to rule on the date on

13   which the Canadian claims are allowed?

14             And if these are decided jointly,

15   people are suggesting somehow rolling this into an

16   allocation litigation will make this an easier

17   task, but in fact, number one, it was specifically

18   excluded from the allocation litigation under the

19   allocation protocol.  It specifically says claims

20   other than EMEA and UK pension claims are out, will

21   not be considered.  People are -- understanding

22   that is on our dockets, people have been given

23   notice of that.

24             Second of all, this just compounds

25   another layer of appellate issues in this case



1    regarding the ripeness regarding those decisions

2    and, again, cherry-picking.  It is not going to

3    speed things up.  The only thing we know is that

4    someone will be unhappy, someone will appeal.

5                THE CANADIAN COURT:  Is there some

6    reason why you don't want the Bondholder -- you are

7    for the unsecured creditors -- sorry, you are for

8    the Debtor Estate, as I understand it.

9                MS. SCHWEITZER:  Yes, that's right.

10               THE CANADIAN COURT:  Is there some

11   reason why you don't want that issue decided?

12               MS. SCHWEITZER:  Well, I think the

13   question, Your Honour, is whether and when that

14   issue needs to be decided.  We the US Debtors

15   believe that we are -- we stand by our allocation

16   positions.  We stand by the fact that we are

17   entitled to --

18               THE CANADIAN COURT:  But why do you say

19   this will be an allocation issue?

20               MS. SCHWEITZER:  Well, the --

21               THE CANADIAN COURT:  This is an issue

22   that has been raised, and why do you say it is an

23   allocation issue?

24               MS. SCHWEITZER:  The reason is that my

25   understanding in Canada is the Bondholder



1    post-petition interest becomes part of your claim

2    against the debtor regardless of how much money the

3    debtor has and regardless of the prorated creditor

4    recoveries within the estate.

5              In the US, Bondholders do not get

6    post-petition interest until all creditors have

7    been paid in full.  You have to reach the point of

8    solvency.  Prior to allocation --

9              THE CANADIAN COURT:  Well, isn't your

10   case that they will reach solvency?  Isn't that

11   your case?

12             MS. SCHWEITZER:  Our case is, yes, that

13   is what we are advocating for, and notably every

14   single person advocating for the determination of

15   post-petition interest is arguing the opposite,

16   that the unsecured -- that the CCCs and the UKP are

17   arguing a pro rata theory --

18             THE CANADIAN COURT:  I understand that.

19             MS. SCHWEITZER:  -- that they propose

20   would only pay people 70 cents on the dollar and

21   that would wipe out Bondholder guarantees.  So the

22   same people who are saying this needs to be decided

23   now --

24             THE CANADIAN COURT:  No, I understand

25   that.



 1                    MS. SCHWEITZER:  Right, and it is also,

 2     quite frankly, the other thing we see all the time

 3     being played in the press is the idea that lawyers

 4     are running up fees, and quite frankly, this is one

 5     more expensive litigation that we need to determine

 6     how to do in an efficient manner and in a manner

 7     when it is appropriate when the issues can be

 8     narrowed and --

 9                    THE CANADIAN COURT:  Well, whenever it

10     is raised, is it not going to be expensive?

11                    MS. SCHWEITZER:  Well, it depends.  I

12     mean, I think the issue is that once we can get

13     past and reduce these other more material and

14     threshold issues on the claims side, such as what

15     are the other billions of dollars of claims against

16     the Canadian Estates, where and how much are the UK

17     pension parties going to recover, if these are the

18     things that are driving their willingness to

19     settle, these are the issues they should also be

20     resolving.

21                    We'll see how much money comes into the

22     US Estates.  We'll see how that runs through a plan

23     in the United States and if people will understand

24     and be able to decide what money are we actually

25     fighting over.  Maybe it is none; maybe it is so



1   much you could pay all of the post-petition

2   interest in full and return money to Canada.  No

3   one knows because we are not there yet.  And what

4   we are doing is manufacturing the end point in

5   order to drive an earlier settlement.  You are not

6   supposed to -- we are supposed to take these in

7   order.  We are not supposed to build up litigation

8   issues and create more fees and more litigations

9   and more trials in the guise of being more

10   efficient.

11              And as I said, this is not one simple

12   hearing on one simple matter.  There is, as you

13   have heard, several series of bonds.  They have

14   different matrices in terms of where they get paid

15   from, which Debtors have guarantees.  Even in the

16   US, we have some bonds issued at NNCC, a special

17   purpose vehicle that is a credit financing vehicle,

18   and then you have guarantees up in Canada.  Other

19   times NNI is a guarantor.  How the money flows

20   through these different Debtors all relates to

21   whether you are even going to reach the issue and

22   what your claims would be to post-petition interest

23   once you get down there.

24              So I understand the desire to knock off

25   issues that will get us closer to settlement, but



1   what I am saying is this is not a simple issue.  It

2   is not a ripe issue.  It is not even one issue --

3                THE CANADIAN COURT:  Wait just a

4   second.  Let me ask you -- you don't need to keep

5   repeating yourself, Ms. Schweitzer, but is this not

6   a legal issue, a straight legal issue, what

7   interest Bondholders are entitled to get?  Is it

8   not just a straight legal issue?

9                MS. SCHWEITZER:  It is not a straight

10  legal issue for several reasons.

11               First of all, and I hate to be the

12  Monday morning Canadian lawyer, but my

13  understanding is that the legal issue in Canada to

14  whether and how much is tied to other issues,

15  including when -- the date of when your claim is

16  marked, because interest would only accrue after

17  your date is marked.

18               In the US the presumption is you mark

19  all claims as of the petition date.  In Canada my

20  understanding is that is not necessarily the case,

21  and if it were the case, that you either pick the

22  petition date or another date, because the bonds

23  are denominated in US dollars, that that adds

24  another wrinkle because they get converted to

25  Canadian dollars as of that marking date.  And the



 1    Canadian dollar rate has fluctuated over time.

 2                So it is not a single legal issue that
 3    tells you how much that person is owed, because you
 4    have multiple factors feeding into that.

 5                On the US side, you have to look again
 6    that you have your contract rate.  Who would be
 7    entitled to post-petition interest?  It might not
 8    be only the bonds once you hit solvency, not that
 9    we are going to get there.

10                But also if the bonds are recovering
11    from two different estates, two different sets of
12    estates, from Canada on their principal claim and
13    from the US only after everyone has gotten paid in
14    full, how do those two claims work together?  When
15    are you paid in full?  How do you put the
16    recoveries to the point of solvency?

17                So you can peel off any issue and call
18    it a legal issue, but it is quite actually -- it is
19    impossible to litigate without the circumstances
20    around it.  To even understand the materiality of
21    the issue, who are the parties that are averse, who
22    are the parties being affected.

23                And on that note, in the US not all
24    parties have even really been given notice of this
25    issue being teed up.  Are there other creditors of



1    the US that might be creditors of NNI or creditors

2    of another debtor that have interests in this being

3    resolved or may not know that they have interests

4    in this being resolved because they don't know if

5    it is going to affect their bottom line or someone

6    else's bottom line.

7                    Again, in the US, there are many

8    intercompany claims and other issues that need to

9    get settled out, and people might have stronger

10   views when they understand the facts in total that

11   they may not appreciate if you just pick one issue

12   out, call it a straightforward legal issue and

13   litigate it against everything else.

14                   So in short, that you look at this and

15   you say there are complex procedural issues.  We

16   have got notice issues.  People are suggesting

17   let's do this quickly.  This has been sitting

18   around for a long time.  It is on the Monitor's

19   estimate a 1.6 billion dollar issue, so it

20   shouldn't be taken lightly or rushed.

21                   And in terms of staging, if the goal

22   which is being advanced is, number one, it is part

23   of the allocation, that is wrong.  It has been

24   expressly carved out --

25                   THE CANADIAN COURT:  Well, you have



1   already said this.

2            MS. SCHWEITZER:  Right.  And number

3   two, that if it is being argued that it is going to

4   simplify or advance the negotiations or the

5   resolution of this process, it is just not true.

6   It is not what we are seeing, and the issues are

7   just going to become more complicated and more

8   costly.  So there is no reason this issue arises to

9   the top compared to the many other issues that are

10  set to be resolved in the coming weeks through the

11  other trials.

12            THE US COURT:  Thank you, Ms.

13  Schweitzer.

14            Mr. Hodara.

15            MR. HODARA:  Good afternoon, Judge

16  Gross, Justice Newbould.  I have sat here very

17  quietly for the 20 days of trial.  Justice

18  Newbould, I don't think that we have had the

19  pleasure of talking directly.  Judge Gross knows me

20  well from this case, the five years of it, and from

21  other situations.

22            I have just one point to add --

23            THE CANADIAN COURT:  May I just ask you

24  who you represent?

25            MR. HODARA:  Sorry, counsel for the



1    Official Committee of Unsecured Creditors here in

2    the United States.

3                 THE CANADIAN COURT:  Thank you.

4                 MR. HODARA:  So I have just one

5    additional point to make to the points that Ms.

6    Schweitzer just addressed, and that has to do with

7    the practicality of getting back to the settlement

8    table.

9                 Mr. Carfagnini, lead counsel for the

10   Monitor, has said very clearly that he believes the

11   post-petition interest issue needs to be resolved

12   in order for there to be further meaningful

13   settlement discussions.

14                THE US COURT:  Yes.

15                MR. HODARA:  I think that is exactly

16   backwards.  I think that if Your Honours take this

17   issue now and hear it, then by the Monitor's

18   counsel's own words, they are going to wait for

19   that decision before they are willing to come back

20   and have meaningful discussions.

21                At the same time, if Your Honours then

22   reach a decision, one side or the other or both are

23   going to take that on appeal.  Given what the

24   Monitor's counsel has said, when will there be

25   meaningful discussions, what we have said -- and

 Neeson&Associates   W&F

```
 1   when I say "we", I speak for all of the US
 2   interests and I think many other parties in this
 3   case outside of the United States -- we are ready
 4   to come back to the table immediately, as soon as
 5   these last day and a half of witnesses are done.
 6   We very much hope that there is somebody else there
 7   to meet with us when we come to the table.
 8                  Thank you.
 9                  THE US COURT:  Thank you, Mr. Hodara.
10                  Mr. Leblanc, yes, sir.
11                  MR. LEBLANC:  Yes, Your Honour, and I
12   will be very brief.
13                  I just wanted to make one point to
14   address something.  Ms. Schweitzer talked about the
15   legal issue as it relates in Canada.  Obviously the
16   question that is going to be before Your Honour and
17   was before Your Honour in November that you said
18   couldn't be decided until other questions were
19   known, it even turns on the question of what is the
20   relevant legal standard, and that depends on what a
21   plan says and how creditors react to that plan,
22   because obviously to the extent that we are in a
23   cram-down situation, different provisions of 1129
24   will apply than will provisions that would apply if
25   we are in a consensual plan scenario.
```

 Neeson & Associates    W&F

```
 1                    So the question of whether this can
 2   just be decided in the abstract based upon
 3   hypotheticals, we don't think it is an issue that
 4   can be addressed that way.  And that is the
 5   hesitation.  We don't -- to address, Justice
 6   Newbould, your concern or your comment, it is not
 7   an issue we are trying not to resolve.  It is an
 8   issue that is not resolvable based upon the
 9   unknowns that have to come in the future, and those
10   really relate, as I understand it, in both
11   jurisdictions to what plans parties propose, that
12   creditors then vote on and how those things are
13   resolved.
14                    So I echo the comments and I adopt --
15                    THE CANADIAN COURT:  Well, do we know
16   that there will be plans?
17                    MR. LEBLANC:  Well, that is another
18   good point.
19                    THE CANADIAN COURT:  Is that an
20   assumption on your part?
21                    MR. LEBLANC:  Well, certainly we would
22   hope that there would be plans that would then be
23   voted on by creditors before there would be
24   conversions in either jurisdictions to liquidation,
25   Chapter 7 liquidations or to a bankruptcy in
```

Neeson & Associates    W&F

```
 1   Canada.
 2              And obviously even that question, what
 3   the effect of a conversion in Canada might have on
 4   the accrual of interest, because obviously that
 5   will affect -- potentially affect what the petition
 6   date is.
 7              These are all questions that just deny
 8   the concept that you can address this in the
 9   abstract, render a decision that then everyone
10   could say, okay, now that I know the answer to that
11   question, I'm prepared to settle.  This is not in
12   our view, Your Honour, an issue the resolution of
13   which will bring people closer together.  It is
14   simply an issue the resolution of which will bring
15   people further apart.
16              So we would encourage and, as we have
17   suggested, we think that the idea that has been
18   presented here, it really doesn't make sense.  If
19   the goal is to try to bring resolution to this,
20   people are prepared to do so and have those
21   discussions.  We have been trying to do so.  But
22   this isn't the way to do it.
23              Thank you, Your Honour.
24              THE US COURT:  If this isn't the way to
25   do it, I would like to know the way to do it.
```



```
 1                    Anyway, yes, Mr. O'Connor.
 2                    MR. O'CONNOR:  Good afternoon, Judge
 3    Gross; good afternoon, Justice Newbould.
 4                    Just a couple of points.
 5                    It is hard for me to believe that
 6    trying to find a way to resolve an issue which has
 7    this magnitude of the post-petition interest
 8    wouldn't be of assistance both to the Courts and to
 9    the parties.
10                    It is very good for everyone to say
11    we'll go back to the table and start negotiating
12    again, but unfortunately, there hasn't been very
13    much success in having done that in the past.
14                    THE US COURT:  But you are arguing that
15    there is insolvency here?
16                    MR. O'CONNOR:  That is true -- well,
17    let me go back, Your Honour.
18                    THE US COURT:  I'm sorry, solvency on
19    the part of the US Debtors.
20                    MR. O'CONNOR:  Right, and the point I
21    would want to make is the following.  I don't think
22    there is a situation where you are being asked to
23    give an advisory opinion.  This is not like it was
24    even back in November of 2013.
25                    The Courts have now heard virtually the
```



```
 1   entire trial record, all of the evidence, except
 2   for one witness tomorrow.  And I think for purposes
 3   of rendering your decision, we hope that you will
 4   be considering all of the allocation methodologies
 5   that have been proposed, including the pro rata
 6   approach that we have advocated.
 7                And in doing that, it would be, it
 8   seems to me, important for the Courts to know what
 9   the effect of the recoveries would then be to
10   creditors all over the world.
11                So one of the issues is you should know
12   what those claims are.  Now, it is true that we
13   can't tell you that all the various claims can be
14   resolved at once.  There are claims that have
15   factual matters as to whether there is liability or
16   not and what the amount of the damages are.
17                But this is a legal issue.  This is a
18   legal issue as to if it turns out, based upon the
19   allocation metric that the Courts apply, that the
20   NNI is solvent, what would the Bondholders and
21   other unsecured creditors be entitled to?  Would it
22   be interest at the Federal Judgment rate, which
23   would be maybe 90 million dollars, or would it be
24   interest at the contract rate, which would be well
25   in excess of 1.6 billion?
```



1                    That is a very significant issue.  We

2    said that back in November.  We were the only

3    parties who stood up at the time that Wilmington

4    Trust made their objection and said we thought that

5    was a gating issue and we thought it should be

6    addressed.

7                    Now, in terms of due process, we have

8    been through a heck of a lot over the last year.

9    Lawyers have been working very hard.  We have

10   accomplished quite a bit, not as much as we would

11   like, but quite a bit, and I am relatively

12   comfortable in saying that the parties here on a

13   reasonable briefing schedule certainly address this

14   legal issue.

15                   And as to whether the Courts have to

16   decide it, I'm not suggesting you necessarily have

17   to decide it in advance of allocation, but I think

18   you should be considering it at the same time as

19   allocation.  And obviously, to the extent that any

20   time during oral argument you have questions, you

21   could give the parties guidance on where you are, I

22   think that would be helpful in itself to the

23   parties trying to address this issue.

24                   Thank you.

25                   THE CANADIAN COURT:  Mr. Zigler.



     1                    MR. COLEMAN:  Your Honour, if I might?
     2                    THE US COURT:  Yes, certainly.
     3                    MR. COLEMAN:  Ken Coleman of Allen &
     4     Overy on behalf of the Monitor.
     5                    Very, very briefly -- I think some of
     6     what I was going to say has already been said --
     7     the Monitor has been and remains willing to talk
     8     about a resolution and negotiate with the parties
     9     here to reach a resolution.  That hasn't changed.
    10                    I think people need to be realistic
    11     about where we have been on the subject of
    12     consensual resolution, the mediations that have
    13     taken place, the extensive efforts that have been
    14     made over the years to get us there.
    15                    And the position we took in the reply
    16     memorandum that was filed this morning that
    17     something needs to change, something -- some fact
    18     needs to change, some circumstance needs to change
    19     to advance that proposition.
    20                    What the Monitor filed at the request
    21     of the Courts during this process of discussing
    22     Bondholder interest was a formulation of the issue
    23     broken down to two basic simple questions, and we
    24     thought that this effort of resolution could be
    25     advanced if the Courts would take on those two



1    questions, not to try to solve everything.

2              The proposition wasn't quite that

3    heroic.  We didn't think that the Courts should

4    undertake to resolve everything.  We weren't

5    looking for a perfect result.  We weren't

6    suggesting that answering those questions would be

7    determinative.  But we were suggesting that taking

8    on those topics would be enormously helpful and may

9    well provide a mechanism to help the parties get

10   through what we now find ourselves in.

11             That was the reason for the suggestion,

12   and that is what we think the Courts -- that is why

13   we think the Courts should consider that.

14             Thank you.

15             THE US COURT:  Thank you, Mr. Coleman.

16             THE CANADIAN COURT:  Mr. Zigler.

17             MR. ZIGLER:  Yes, good afternoon, Your

18   Honour; good afternoon, Judge Gross.

19             THE US COURT:  Mr. Zigler.

20             MR. ZIGLER:  Yes.  First let me start

21   with one small point.

22             THE CANADIAN COURT:  Let's not spread

23   this out too long.  Just deal with the points

24   quickly.

25             MR. ZIGLER:  We are five years into



1    this.  We know who the three major creditor groups

2    are, because you have just heard it throughout this

3    trial, two large pension employee interests --

4              THE CANADIAN COURT:  What is your

5    point?

6              MR. ZIGLER:  My point is that at this

7    stage Ms. Schweitzer is totally incorrect about

8    saying we will spend more money by not dealing with

9    this issue.

10             The credibility of this process after

11   five years is such that the less time it takes, the

12   more you can deal with even one more big issue

13   before we are done, the less time we'll be going

14   back and forth with trials and appeals of all those

15   issues.

16             And before we become the "Bleak House"

17   of the insolvency bar, we should try and treat this

18   in as big a package as possible so that the parties

19   at least have an outcome from both Courts where

20   they know where they stand.

21             There is no point saying let's go back

22   and negotiate tomorrow.  We just did that a few

23   weeks ago.  We have done that through three

24   mediations.  A decision of the Courts is required,

25   and the broader that decision is on issues that

 Neeson & Associates    W&F

1    separate really the three major creditor groups and

2    the three major constituencies here, the quicker we

3    get that, the better.

4              If you save things in reserve for the

5    next kick at the can down the road a year from now

6    and the other the appeals two or three years from

7    now, you'll be spending a heck of a lot more money

8    and disappointing all creditor groups.

9              That is all I have to say.

10             THE CANADIAN COURT:  Thank you.

11             Mr. Barrack, you were ready before.  Is

12   there anything you want to say?

13             MR. BARRACK:  No, I think Mr. O'Connor

14   addressed our concerns.

15             THE CANADIAN COURT:  All right.

16             Well, I think Judge Gross and I will

17   have to consider this and --

18             MS. DINE:  Your Honour, if I may?

19             THE US COURT:  Yes, Ms. Dine, yes.

20             MS. DINE:  Your Honour, Justice

21   Newbould, Karen Dine.  I'm from Katten Muchin

22   Rosenman on behalf of Wilmington Trust.

23             I just rise briefly to support the

24   arguments that have been made by the Monitor, the

25   UKPC and the Canadian Creditors Committee that this

 Neeson&Associates    W&F

1    should move forward and would just briefly point

2    out that the circumstances really have changed

3    since Wilmington Trust first raised this issue and

4    made this motion.

5              And now we are past the -- almost past

6    the trial itself.  The allocation positions

7    themselves are clear, and it is no longer just an

8    issue standing alone.  It is an issue being raised

9    and added to the whole mix of issues, which is --

10   and is a material issue that I think is critical to

11   the parties in helping them to move forward both

12   with settlement and ultimately with the allocation.

13             While there are no plans on file yet, I

14   think we all know there is no operating business.

15   The businesses have been sold.  It is not like this

16   is just a case that simply is in its infancy, and

17   that the legal issues that are presented are fairly

18   discrete and do not really need additional factual

19   development and it is something the Courts can look

20   to and give the parties guidance on now.

21             THE US COURT:  Thank you.

22             MS. DINE:  Thank you, Your Honours.

23             THE US COURT:  Thank you, Ms. Dine.

24             THE CANADIAN COURT:  All right, so I

25   guess we'll adjourn.

 Neeson&Associates   W&P

```
 1                    THE US COURT:  We'll take it up with

 2   you in the morning.  All right, we'll tell you

 3   where we are in the morning.

 4                    Anything further for this afternoon?

 5                    MS. SCHWEITZER:  No, Your Honour.

 6                    THE US COURT:  Thank you, we'll stand

 7   in recess.

 8                    Justice Newbould, is that correct?

 9                    THE CANADIAN COURT:  Yes, what, until 9

10   o'clock in the morning?

11                    THE US COURT:  9:00 a.m., yes.

12

13

14   -- Whereupon Court was adjourned at 1:05 p.m.

15

16

17

18

19

20

21

22

23

24

25
```



1                    REPORTERS' CERTIFICATE

2

3                    I, DEANA SANTEDICOLA, RPR, CRR,

4     CSR, and I, LORRAINE MARINO, RDR, CRR, CSR, US

5     Certified Shorthand Reporter, certify;

6                    That the foregoing proceedings were

7     taken before us at the time and place therein set

8     forth;

9                    That the entire proceedings of the

10    hearing date were recorded stenographically

11    individually by each of us and were thereafter

12    transcribed;

13                    That the foregoing is a true and

14    correct transcript of our shorthand notes so taken.

15

16                    Dated this 23rd day of June, 2014.

17    PER:                          PER:

18    *Lorraine B. Marino*            *Deana Santedicola*

19    LORRAINE MARINO                DEANA SANTEDICOLA

20    WILCOX & FETZER                NEESON & ASSOCIATES

21    WILMINGTON, DE USA             TORONTO, ON  CANADA

22

23

24

25

























































