



```
 1                UNITED STATES BANKRUPTCY COURT

 2
               FOR THE DISTRICT OF DELAWARE
 3

 4     ------------------------------)

 5     In Re                         )

 6        NORTEL NETWORKS INC.,       )   Case No.

 7        et al.,                     )   09-10138 (KG)

 8          Debtors.                  )

 9     ------------------------------)

10                        - and -

11              Court File No. 09-CL-7950

12                       ONTARIO

13            SUPERIOR COURT OF JUSTICE

14                 (COMMERCIAL LIST)

15      IN THE MATTER OF THE COMPANIES' CREDITORS

16    ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

17      AND IN THE MATTER OF A PLAN OF COMPROMISE OR

18    ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL

19       NETWORKS LIMITED, NORTEL NETWORKS GLOBAL

20       CORPORATION, NORTEL NETWORKS INTERNATIONAL

21      CORPORATION AND NORTEL NETWORKS TECHNOLOGY

22                      CORPORATION

23      APPLICATION UNDERT PART IV OF THE COMPANIES'

24    CREWDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36,

25                      AS AMENDED
```

 Neeson & Associates   W&F WILCOX & FETZER LTD.

```
 1

 2

 3

 4    ---- This is the Day 21/Volume 21 of the transcript

 5    of the proceedings in the above matter held

 6    simultaneously in:

 7    Superior Court of          United States Bankruptcy

 8    Ontario (Commercial        Court for the District of

 9    List)                      Delaware

10    Courtroom 8-1              Courtroom 3

11    330 University Avenue      824 Market Street

12    Toronto, Ontario           Wilmington, Delaware

13

14                  on the 24th day of June, 2014,

15    commencing at 9:25 a.m.

16

17                          ---------

18    B E F O R E:

19    The Honorable Judge Kevin Gross (United States)

20    The Honorable Mr. Justice Frank Newbould (Canada)

21

22                          ---------

23

24

25
```



```
 1   A P P E A R A N C E S:

 2

 3   CANADIAN DEBTORS

 4

 5   FOR THE MONITOR, ERNST & YOUNG INC.

 6   GOODMANS LLP

 7   Bay Adelaide Centre

 8   333 Bay Street, Suite 3400

 9   Toronto, ON  M5H 2S7

10   PER: Jay Carfagnini, Esq.

11        Joseph Pasquariello, Esq.

12        Ben Zarnett, Esq.

13        Alan Mark, Esq.

14        Peter Ruby, Esq.

15        Jessica Kimmel, Esq.

16        Chris Armstrong, Esq.

17        Julie Rosenthal, Esq.

18   ERNST & YOUNG INC.

19   Ernst & Young Tower

20   222 Bay Street, P.O. Box 251

21   Toronto, ON  M5K 1J7

22

23   PER: Murray McDonald, Esq.

24        Brent Beekenkamp, Esq.

25
```



```
 1   FOR THE APPLICANTS

 2   GOWLING LAFLEUR HENDERSON LLP

 3   Suite 1600, First Canadian Place

 4   100 King Street West

 5   Toronto, ON  M5X 1G5

 6   PER: Derrick Tay, Esq.

 7       Jennifer Stam, Esq.

 8

 9   FOR THE CANADIAN DEBTORS

10   ALLEN & OVERY LLP

11   1221 Avenue of the Americas

12   New York, NY  10020

13   PER: Ken Coleman, Esq.

14       Paul Keller, Esq.

15       Daniel Guyder, Esq.

16       Laura Hall, Esq.

17       Joseph Badtke-Berkow, Esq.

18       Jonathan Cho, Esq.

19       Nicolette Ward, Esq.

20

21   FOR THE CANADIAN DEBTORS

22   BUCHANAN INGERSOLL & ROONEY

23   1105 North Market Street

24   Suite 1900

25   Wilmington, DE  19801-1054
```



```
 1   PER: Kathleen A. Murphy, Esq.

 2        Mary F. Caloway, Esq.

 3

 4   U.S. DEBTORS

 5

 6   FOR NORTEL NETWORKS INC.

 7   TORYS LLP

 8   79 Wellington Street West, Suite 3000

 9   Box 270, TD Centre

10   Toronto, ON  M5K 1N2

11   PER: Sheila Block, Esq.

12        Andrew Gray, Esq.

13

14   FOR THE U.S. DEBTORS

15   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

16   1201 North Market Street, 16th Floor

17   P.O. Box 1347

18   Wilmington, DE  19899-1347

19   PER: Derek Abbott, Esq.

20        Annie Cordo, Esq.

21

22   FOR NORTEL NETWORKS INC.

23   CLEARY GOTTLIEB STEEN & HAMILTON LLP

24   One Liberty Plaza

25   New York, NY  10006
```

Neeson&Associates    W&F

```
 1   PER: James Bromley, Esq.

 2        Lisa Schweitzer, Esq.

 3        Howard Zelbo, Esq.

 4        Jeffrey Rosenthal, Esq.

 5        Avi Luft, Esq.

 6

 7   EMEA DEBTORS

 8

 9   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

10   LIMITED

11   DAVIES WARD PHILLIPS & VINEBERG LLP

12   40th Floor

13   135 Wellington Street

14   Toronto, ON  M5V 3G7

15   PER: Matthew Milne-Smith, Esq.

16        Robin B. Schwill, Esq.

17        Sean Campbell, Esq.

18        James Doris, Esq.

19        Louis Sarabia, Esq.

20

21   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

22   LIMITED

23   LAX O'SULLIVAN SCOTT LISUS LLP

24   Suite 2750, 145 King Street West

25   Toronto, ON  M5H 1J8
```



```
 1   PER: Matthew P. Gottlieb, Esq.

 2        Tracy Wynne, Esq.

 3        Paul Michell, Esq.

 4

 5   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

 6   LIMITED

 7   HUGHES HUBBARD & REED

 8   One Battery Park Plaza

 9   New York, NY  10004-1482

10   PER: Derek Adler, Esq.

11        William Maguire, Esq.

12        Neil Oxford, Esq.

13        Fara Tabatabai, Esq.

14        Charles Huberty, Esq.

15

16   FOR THE JOINT ADMINISTRATORS OF NORTEL NETWORKS UK

17   LIMITED

18   YOUNG CONAWAY STARGATT & TAYLOR LLP

19   Rodney Square

20   1000 North King Street

21   Wilmington, DE  19801

22   PER: Ed Harron, Esq.

23        John Dorsey, Esq.

24

25   FOR THE EMEA DEBTORS
```



```
 1   HERBERT SMITH FREEHILLS LLP

 2   Exchange House

 3   Primrose Street

 4   London, England  EC2A 2EG

 5   PER: James Norris-Jones, Esq.

 6

 7   CANADIAN CREDITORS COMMITTEE

 8

 9   FOR THE FORMER EMPLOYEES OF NORTEL AND LTD

10   BENEFICIARIES

11   KOSKIE MINSKY

12   20 Queen Street West

13   Suite 900

14   Toronto, ON  M5H 3R3

15   PER: Mark Zigler, Esq.

16        Susan Philpott, Esq.

17        Ari Kaplan, Esq.

18        Barbara Walancik, Esq.

19

20   FOR ALL ACTIVE AND RETIRED NORTEL EMPLOYEES

21   REPRESENTED BY THE CAW-CANADA

22   CAW-CANADA

23   Legal Department

24   205 Placer Court

25   Toronto, ON  M2H 3H9
```



```
 1   PER: Barry E. Wadsworth, Esq.

 2        Lewis Gottheil, Esq.

 3

 4   FOR THE RECENTLY SEVERED CANADIAN NORTEL EMPLOYEES

 5   COMMITTEE

 6   SHIBLEY RIGHTON LLP

 7   University Avenue, Suite 700

 8   Toronto, ON  M5H 3E5

 9   PER: Arthur O. Jacques, Esq.

10        Thomas McRae, Esq.

11

12   FOR THE SUPERINTENDENT OF FINANCIAL SERVICES AS

13   ADMINISTRATOR OF THE PENSION BENEFITS GUARANTEE

14   FUND

15   PALIARE ROLAND ROSENBERG ROTHSTEIN LLP

16   35th Floor

17   155 Wellington Street West

18   Toronto, ON  M5V 3H1

19   PER: Kenneth T. Rosenberg, Esq.

20        Massimo (Max) Starnino, Esq.

21        Lily Harmer, Esq.

22        Karen Jones, Esq.

23        Tina Lie, Esq.

24        Michelle Jackson, Esq.

25
```



1   FOR THE STEERING COMMITTEE OF NORTEL CANADIAN

2   CONTINUING EMPLOYEES - POST CCAA AS AT JANUARY 14,

3   2009

4   NELLIGAN O'BRIEN PAYNE LLP

5   50 O'Connor Street, Suite 1500

6   Ottawa, ON  K1P 6L2

7   PER: Janice B. Payne, Esq.

8        Steven Levitt, Esq.

9        Christopher Rootham, Esq.

10        Ainslie Benedict, Esq.

11

12   FOR MORNEAU SHEPELL LIMITED

13   MCCARTHY TETRAULT LLP

14   Suite 5300, Toronto Dominion Bank Tower

15   Toronto, ON  M5K 1E6

16   PER: Barbara J. Boake, Esq.

17        James D. Gage, Esq.

18        Elder C. Marques, Esq.

19        Paul Steep, Esq.

20        Byron Shaw, Esq.

21        Sharon Kour, Esq.

22        Kelly Peters, Esq.

23

24   FOR THE CANADIAN CREDITORS COMMITTEE

25   DLA PIPER

 Neeson & Associates   W&P Wilson & Peyton Ltd.

1   919 North Market Street, Suite 1500

2   Wilmington, DE  19801

3   PER: Selinda A. Melnik, Esq.

4       Richard Hans, Esq.

5       Timothy Hoeffner, Esq.

6       Jason Gerstein, Esq.

7       Farah Lisa Whitley-Sebti, Esq.

8

9   INFORMAL NORTEL NOTEHOLDER GROUP

10

11   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

12   BENNETT JONES LLP

13   1 First Canadian Place

14   Suite 3400

15   Toronto, ON  M5X 1A4

16   PER: Kevin Zych, Esq.

17       S. Richard Orzy, Esq.

18       Gavin Finlayson, Esq.

19       Richard Swan, Esq.

20       Sean Zweig, Esq.

21       Jonathan Bell, Esq.

22       Amanda McLachlan, Esq.

23

24   FOR THE INFORMAL NORTEL NOTEHOLDER GROUP

25   MILBANK, TWEED, HADLEY, MCCLOY LLP



```
 1   1 Chase Manhattan Plaza

 2   New York, NY  10005

 3   PER: Thomas R. Kreller, Esq.

 4        Jennifer P. Harris, Esq.

 5        Albert A. Pisa, Esq.

 6        Samir Vora, Esq.

 7        Andrew LeBlanc, Esq.

 8        Michael Hirschfeld, Esq.

 9        Atara Miller, Esq.

10        Tom Matz, Esq.

11        Nick Bassett, Esq.

12        Gabrielle Ruha, Esq.

13        Rachel Pojunas, Esq.

14

15   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16

17   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

18   CASSELS BROCK & BLACKWELL LLP

19   Suite 2100, Scotia Plaza

20   40 King Street West

21   Toronto, ON  M5H 3C2

22   PER: Shayne Kukulowicz, Esq.

23        Michael Wunder, Esq.

24        Ryan Jacobs, Esq.

25
```



```
 1   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
 2   ASHURST LLP
 3   Boardwalk House
 4   5 Appold Street
 5   London, England  EC2A 2HA
 6   PER: Angela Pearson, Esq.
 7        Antonia Croke, Esq.
 8
 9   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
10   RICHARDS LAYTON & FINGER, P.A.
11   920 North King Street
12   Wilmington, DE  19801
13   PER: Christopher Samis, Esq.
14
15   FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
16   AKIN GUMP STRAUSS HAUER & FELD LLP
17   One Bryant Park
18   New York, NY  10036
19   PER: Fred S. Hodara, Esq.
20        David H. Botter, Esq.
21        Abid Qureshi, Esq.
22        Robert A. Johnson, Esq.
23        Brad M. Kahn, Esq.
24        Christine Doniak, Esq.
25        Joseph Sorkin, Esq.
```



```
 1        Jacqueline Yecies, Esq.
 2   UK PENSION PROTECTION FUND AND NORTEL NETWORKS
 3   UK PENSION TRUST LIMITED
 4
 5   FOR THE UK PENSION PROTECTION FUND AND NORTEL
 6   NETWORKS UK PENSION TRUST LIMITED
 7   THORNTON GROUT FINNIGAN LLP
 8   Suite 3200, 100 Wellington Street West
 9   P.O. Box 329
10   Toronto, ON  M5K 1K7
11   PER: Michael Barrack, Esq.
12        D.J. Miller, Esq.
13        Rebecca Lewis, Esq.
14        Andrea McEwan, Esq.
15        John Finnigan, Esq.
16        Michael Shakra, Esq.
17        D.J. Miller, Esq.
18
19   FOR THE UK PENSION PROTECTION FUND AND NORTEL
20   NETWORKS UK PENSION TRUST LIMITED
21   WILLKIE FARR & GALLAGHER LLP
22   787 Seventh Avenue
23   New York, NY  10019-6099
24   PER: Brian O'Connor, Esq.
25        Sameer Advani, Esq.
```



```
 1        Andrew Hanrahan, Esq.

 2

 3   FOR THE UK PENSION PROTECTION FUND AND NORTEL

 4   NETWORKS UK PENSION TRUST LIMITED

 5   BAYARD, P.A.

 6   222 Delaware Avenue, Suite 900

 7   Wilmington, DE  19899

 8   PER: Charlene D. Davis, Esq.

 9        Justin Alberto, Esq.

10

11   THE BANK OF NEW YORK MELLON

12

13   FOR THE BANK OF NEW YORK MELLON

14   MCMILLAN LLP

15   Brookfield Place

16   181 Bay Street, Suite 4400

17   Toronto, ON  M5J 2T3

18   PER: Sheryl E. Seigel, Esq.

19

20   FOR THE BANK OF NEW YORK MELLON

21   LATHAM & WATKINS LLP

22   885 Third Avenue

23   New York, NY  10022-4834

24   PER: Michael J. Riela, Esq.

25
```

 Neeson & Associates    W&F

```
 1   WILMINGTON TRUST, NATIONAL ASSOCIATION

 2

 3   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

 4   HEENAN BLAIKIE LLP

 5   Bay Adelaide Centre

 6   333 Bay Street, Suite 2900

 7   P.O. Box 2900

 8   Toronto, ON  M5H 2T4

 9   PER: John Salmas, Esq.

10       Kenneth Kraft, Esq.

11       Sara-Ann Van Allen, Esq.

12

13   FOR WILMINGTON TRUST, NATIONAL ASSOCIATION

14   KATTEN MUCHIN ROSENMAN LLP

15   575 Madison Avenue

16   New York, NY  10022-2585

17   PER: Craig A. Barbarosh, Esq.

18       David A. Crichlow, Esq.

19       Karen B. Dine, Esq.

20

21   LAW DEBENTURE TRUST COMPANY OF NEW YORK

22

23   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK

24   BORDEN LADNER GERVAIS LLP

25   40 King Street West
```



```
 1   Toronto, ON  M5H 3Y4
 2   PER: Edmond F.B. Lamek, Esq.
 3       James Szumski, Esq.
 4
 5   FOR LAW DEBENTURE TRUST COMPANY OF NEW YORK
 6   PATTERSON BELKNAP WEBB & TYLER LLP
 7   1133 Avenue of the Americas
 8   New York, NY  10036
 9   PER: Daniel A. Lowenthal, Esq.
10
11   BOARDS OF DIRECTORS OF NORTEL NETWORKS
12   CORPORATION AND NORTEL NETWORKS LIMITED
13
14   FOR THE BOARDS OF DIRECTORS OF NORTEL NETWORKS
15   CORPORATION AND NORTEL NETWORKS LIMITED
16   OSLER HOSKIN AND HARCOURT LLP
17   100 King Street West
18   1 First Canadian Place, Suite 6100
19   P.O. Box 50
20   Toronto, ON  M5X 1B8
21   PER: Lyndon Barnes, Esq.
22       Edward Sellers, Esq.
23       Betsy Putnam, Esq.
24       Adam Hirsh, Esq.
25       Alexander Cobb, Esq.
```



1                    I N D E X

2

3       LORRAINE EDEN

4                                               PAGE

5       Examination-in-Chief/Direct Examination

6       by Ms. Block.......................... 4972

7       Cross-Examination by Mr. Adler......... 5020

8       Cross-Examination by Mr. O'Connor...... 5044

9       Cross-Examination by Mr. Smith......... 5049

10      Cross-Examination by Mr. Zigler........ 5080

11

12                  LIST OF EXHIBITS

13

14   NUMBER/DESCRIPTION                      PAGE NO.

15

16       62:  Initial expert report of Lorraine

17      Eden, dated January 24, 2014.          4972

18       63:  Rebuttal report of Lorraine Eden,

19      dated February 28, 2014.               4972

20

21

22

23

24

25

 Neeson&Associates    W&P

1    ---- Upon commencing at commencing at 9:25 a.m.

2              THE US COURT:  Good morning, everyone.

3    Please be seated.  Thank you.

4              Ms. Block, it is a pleasure to have you

5    in court with me.

6              MS. BLOCK:  It is a pleasure to be

7    here, sir.

8              THE CANADIAN COURT:  Judge Gross, good

9    morning.

10             THE US COURT:  Good morning, Justice

11   Newbould.  Don't be jealous.  Ms. Block is here

12   with me today.

13             MS. BLOCK:  It won't restrain him;

14   don't worry.

15             THE US COURT:  He didn't sound too

16   jealous.

17             THE CANADIAN COURT:  I am sure, as

18   usual, she has a nice smile on her face.

19             THE US COURT:  She does.  Are we ready

20   to proceed?

21             Our witness is here.  Ms. -- is it

22   Eden?

23             DR. EDEN:  Yes, it is.

24             THE US COURT:  And we will have you

25   sworn, Ms. Eden, or affirmed, whichever you prefer.



```
 1                    LORRAINE EDEN, having been first duly

 2                         sworn, was examined and testified

 3                         as follows:

 4                    THE US COURT:  Thank you, Ms. Eden.

 5                    Ms. Block, whenever you are ready to

 6       proceed.

 7                    MS. BLOCK:  Good morning, Your Honor.

 8       Sheila Block for the US Estate.  We would like to

 9       call our last witness, Dr. Eden.

10       EXAMINATION-IN-CHIEF/DIRECT EXAMINATION

11       BY MS. BLOCK:

12                    Q.   And, Dr. Eden, you have filed two

13       reports in this proceeding?

14                    A.   I have.

15                    MS. BLOCK:  Can they be made Exhibits

16       62 and 63?

17                    THE US COURT:  Yes.

18                         EXHIBIT 62:  Initial expert report

19                         of Dr. Eden, dated January 24,

20                         2014.

21                         EXHIBIT 63:  Rebuttal report of

22                         Dr. Eden, dated February 28, 2014.

23                    BY MS. BLOCK:

24                    Q.   And do you have any changes to

25       those reports as filed?
```



```
 1                   A.   I do not.
 2                   Q.   And have you prepared slides to
 3      assist with your testimony?
 4                   A.   I have.
 5                   Q.   Let me start then with your
 6      qualifications.
 7                   THE CANADIAN COURT:  Do we have the
 8      slides, Debbie?.  Thanks, Mr. Gray.
 9                   BY MS. BLOCK:
10                   Q.   If we can start with your
11      qualifications on slide 2.  Before we get to your
12      Ph.D. from Dalhousie, prior to that what degrees
13      did you hold?
14                   A.   I have a bachelor's with honors in
15      economics from Mount Allison University in
16      Sackville, New Brunswick.  I have a master's degree
17      in economics from McGill University in Montreal.
18                   Q.   And from your Ph.D. work, was your
19      thesis at all relevant to the topic of transfer
20      pricing that you are here to testify about?
21                   A.   Yes, it was.  My specialty was
22      public finance.  And I wrote my dissertation under
23      Carl Shoup, one of the foremost public finance
24      economists in the world at the time.  And my
25      dissertation was on the microeconomics of transfer
```



```
 1   pricing.
 2                Q.   You are now a professor at
 3   Texas A&M Business School.  What do you teach
 4   there?
 5                A.   Yes.  I teach at Texas A&M in the
 6   Mays Business School.  I teach courses in
 7   international business, on multinational
 8   enterprises, and I teach a graduate seminar on
 9   transfer pricing.
10                Q.   And how long have you been at
11   Texas A&M?
12                A.   Since 1995.
13                Q.   And are any of your graduate
14   students working in the transfer pricing field?
15                A.   Yes.  I have placed well in excess
16   of 60, 70 -- I have kind of lost count -- students
17   in full-time careers in transfer pricing.
18                Q.   Let me turn to your recognitions
19   for your academic work.  First, you were a
20   Fulbright scholar.  Where did you do your work for
21   your Fulbright?
22                A.   I did my Fulbright at Harvard
23   University in the Kennedy School.
24                Q.   You are also a fellow of the
25   Academy of International Business.  What is that
```



1   academy?

2                A.    The Academy of International

3   Business is the association for professors of

4   international business worldwide.  It has more than

5   3,000 members.  There are about 60 fellows.

6                Q.    How do you get to be a fellow?

7                A.    You have to be nominated.  It is

8   based on your research area, your contributions to

9   the field of international business.

10               Q.    You have also received the

11  President's Award from that academy for

12  contribution.  What does that relate to?

13               A.    Yes.  This is an award for people

14  who have made lifetime achievements in the field of

15  international business.

16               Q.    Let me turn to your transfer

17  pricing work with governments and international

18  organizations.  First, with the Canadian

19  government, what work have you done on transfer

20  pricing with the CRA?

21               A.    With the CRA, I have been involved

22  with them almost since the formation of the

23  international tax directorate in 1988.  I was asked

24  to develop and teach an in-house course on transfer

25  pricing that was offered more than a dozen times



1  across Canada to small groups or large groups

2  internal within CRA.

3            I was also asked to provide advice to

4  CRA in the development of some of the documents,

5  transfer pricing documents, such as the transfer

6  pricing circular 87-2R and the Advance Pricing

7  Agreement, the APA, the information circular 94-4.

8            Q.   And during what years did you

9  offer these training courses for CRA personnel?

10           A.   When I was first asked to do this,

11  it was because CRA only had one economist in the US

12  who had -- excuse me.  In Canada who had some

13  expertise in transfer pricing.  And I was asked to

14  develop a course on transfer pricing to, in effect,

15  build up the expertise in the international tax

16  directorate.

17           I taught courses, more than a dozen of

18  these, between 1990-2003.  By 2003 there was a

19  large number of economists at CRA, and they had

20  developed their own in-house courses at that time.

21           Q.   And you have also testified before

22  the House of Commons Foreign Affairs Committee.  Is

23  that on multinationals?

24           A.   Yes.  I was fortunate to be asked

25  to speak before the House of Commons in conjunction



 1   with the Department of Foreign Affairs on the

 2   strategies and structures of multinational

 3   enterprises, focusing on Canadian multinationals

 4   within North America and US and Mexican

 5   multinationals within Canada.

 6            Q.   You also indicate you have done

 7   work for the U.S. Government, particularly the US

 8   Bureau of Labor Statistics.  What was that work?

 9            A.   The Bureau of Labor Statistics is

10   responsible for creating all the price indexes in

11   the US, ones we would be familiar like the Consumer

12   Price Index, for example.

13            There is a group in there that is

14   responsible for the export and import price

15   indexes.  They were not taking account of

16   related-party trade and basically had excluded

17   related-party transactions from the calculation of

18   the index.  They brought me in to develop a

19   protocol by which the US could start collecting

20   data on intra-firm transactions.

21            I traveled with the field economists,

22   too, when they were interviewing firms to collect

23   this data.  And this then -- the field economists

24   were brought together in Washington, D.C., and I

25   trained them.

 Neeson&Associates    W&F

```
 1                    Q.   And you also indicate on this
 2   slide that you have done work with the World Bank,
 3   the IMF and the UN Conference on Trade and
 4   Development.  Just briefly, what type of work has
 5   that been?
 6                    A.   Yes.  This work has been primarily
 7   on the side of regulation of multinationals,
 8   focusing on this both for -- on transfer pricing
 9   for UNCTAD.  It is the UN Commission -- it is
10   basically a multinationals in developing
11   countries -- for the World Bank and the
12   International Monetary Fund.  This resulted in a
13   chapter on export and import price indexes, taking
14   into account transfer pricing.
15                    Q.   And for the OECD you are the tax
16   and transfer expert on a project on global
17   governance of the internet, reporting to the UN?
18                    A.   Yes.  This is a new project that
19   has been started looking at global governance, the
20   internet.  And there is a small group of research
21   advisors on that.  I am the one who is responsible
22   for international tax and transfer pricing for
23   this.  We are expected to make a report on two
24   years.
25                    My particular interest is in cloud
```



1    computing and the transfer pricing implications of

2    cloud computing.

3              Q.    We can see from Exhibit 62, your

4    first report at Appendix D, that we don't have to

5    turn up, you have given us a 64-page CV, which

6    shows extensive scholarship.  And your slide

7    indicates you have more than 150 publications on

8    transfer pricing and multinationals.

9              A.    Yes.  That has been my field of

10   expertise since my Ph.D.

11             Q.    And this must be the first time I

12   have ever cited Google Scholar.  You were cited

13   over 5,000 times for your publications on Google

14   Scholar?

15             A.    Yes --

16             THE CANADIAN COURT:  Dr. Eden, I was

17   interested.  What is a Google Scholar?

18             THE WITNESS:  It is nice to speak to

19   you, Justice Newbould.

20             This is a new index that Google has

21   created that is basically collecting citations,

22   scholarly and professional citations to books,

23   chapters, presentations that a scholar has made.

24   So if you would go to Google and put in Lorraine

25   Eden Google Scholar, up will come this page that



```
 1   does basically a daily count, as far as I can tell,
 2   of the number of times that a particular individual
 3   has been -- their work has been cited.  So it is
 4   not the straight Google site but specifically to
 5   research.
 6               THE CANADIAN COURT:  So Judge Gross
 7   might be a Google scholar if his works, his
 8   opinions, are cited or I guess clicked on many
 9   times.
10               THE WITNESS:  It is not just straight
11   clicking on them.  It is actually citations in
12   other people's work.
13               THE CANADIAN COURT:  I see.
14               BY MS. BLOCK:
15         Q.   Now, you have written a number of
16   books, as we can see from your extensive CV.  Have
17   you written a text on transfer pricing and taxing
18   of multinationals?
19         A.   Yes, I have.  It is called "Taxing
20   Multinationals."
21         Q.   And is this used in the transfer
22   pricing field?
23         A.   Yes.  I think it is widely used
24   both in terms of people doing courses on this and
25   in the professional field.
```



1                    Q.    And do you know Dr. Reichert, who

2    has testified here?

3                    A.    Yes, I do.

4                    Q.    And has he acknowledged your

5    expertise in transfer pricing in some way?

6                    A.    At one point in time he tried to

7    or he asked about hiring me, actually, in the

8    same -- I have a capacity with the Analysis Group

9    as an affiliated expert with the Analysis Group,

10   and Dr. Reichert made me the same offer.

11                   Q.    Have you ever testified at trial

12   before?

13                   A.    I have not.

14                   Q.    Let's turn to slide 3, and can you

15   tell us what question you are here to address?

16                   A.    The question I am here to address

17   and was addressed in my reports is whether Nortel's

18   residual profit-split method, the RPSM, is an

19   appropriate basis for valuing the assets that were

20   relinquished or sold in the Nortel bankruptcy by

21   the various debtors.

22                   Q.    And were you given an assumption?

23                   A.    Yes.  I was asked to assume that

24   the goal of allocation in this case is to value the

25   assets sold and relinquished by the debtors.



1                        Q.    Based on that assumption, did you

2    reach an opinion as to whether the RPSM used in the

3    MRDA is an appropriate basis for determining the

4    value of assets sold or relinquished in the sales?

5                        A.    I did.

6                        Q.    And what opinion was that?

7                        A.    That it was not appropriate to use

8    Nortel's RPSM as a basis for allocation.

9                        Q.    Why not?

10                       A.    Well, a variety of reasons; in

11   particular, four.  I think there are four main

12   reasons why it is not appropriate.

13                       Q.    And have you listed those on slide

14   4?

15                       A.    I have.

16                       Q.    The first reason is transfer

17   pricing is for ongoing businesses.  Let's move to

18   that first reason on slide 5.  And why do you say

19   it is for ongoing businesses?

20                       A.    Well, the transfer pricing rules

21   were set up specifically for purposes of reporting

22   taxable income on an annual basis by related or

23   controlled parties.  The assumption behind these is

24   these were firms that were ongoing, that were

25   making profits.  They were declaring profits in



1    different jurisdictions.  And we needed to

2    calculate the taxes of those affiliates.

3                    Q.   And the first cite that you

4    provide is to 87-2R, and it says controlled

5    transactions are defined as transactions between

6    parties not dealing at arm's length.

7                    When the Nortel entities who are here

8    in this courtroom opposing each other were actually

9    operating as part of the Nortel multinational

10   enterprise, were they related parties for transfer

11   pricing purposes?

12                   A.   They were clearly related parties

13   or controlled parties under the meaning in the US,

14   Canadian, OECD, under the regulations, yes.

15                   Q.   Now, as Dr. Tucker told us on

16   Friday, she relied on your definition of

17   related-party transactions.  Please give that to

18   the Courts.

19                   A.   Related-party transactions are

20   transactions between parties that are commonly

21   controlled.

22                   Q.   You say as well that, according to

23   Nortel personnel, the RPSM was not designed to

24   apply to insolvency.  Where did you get that

25   information from?

 Neeson&Associates    W&F

```
 1                   A.   Well, there are a variety of
 2   testimony that suggests that when asked, the Nortel
 3   tax department said, "When we contemplated this, we
 4   did not contemplate bankruptcy.  And this would be
 5   typical for multinationals."  Transfer pricing
 6   policies are not designed to contemplate
 7   bankruptcy.
 8                   Q.   In your more than 700-page
 9   textbook on transfer pricing, do you refer to
10   bankruptcy or insolvency?
11                   A.   It is not mentioned in the book.
12                   Q.   Now, on slide 5 you also cite to
13   two references to the MRDA.
14                   THE CANADIAN COURT:  Maybe it will be
15   the next time.
16                   THE WITNESS:  It will be the next time,
17   yes, thank you.
18                   THE CANADIAN COURT:  After this case.
19                   THE WITNESS:  I am working on the
20   second edition.
21                   BY MS. BLOCK:
22                   Q.   You also cite on slide 5 two
23   references to the MRDA consistent with this last
24   point.  And the first one is from Schedule A.  I am
25   hoping we can bring up Exhibit 21003 at page 48 and
```



 1    just look at these two references.

 2              This is the second amendment to

 3    Schedule A in the third addendum to the Master R&D

 4    Agreement.  And if we can turn to the next page,

 5    page 48 of the pdf, can you tell us what your

 6    reference is?

 7              A.   Yes.  What I am focusing on is the

 8    (ii) here, which basically says in calculating the

 9    RPSM, one starts with the definition of profits,

10    and then one takes out of that extraordinary items,

11    such as the gain or loss on the sale of a business.

12    So they are not included in the calculation.

13              Q.   And your second reference from the

14    MRDA was to Article 11 that provides that a

15    participant terminated from the MRDA must receive

16    fair market value.  Can we turn up page 4 of the

17    MRDA and look at the definition of retirement

18    allocation, which is what you get under Clause 11.

19    And this tells us what that is.  What are the key

20    points here?

21              A.   Yes.  I am not a lawyer commenting

22    on this, but this particular clause says that if a

23    party defaults or goes into bankruptcy, becomes

24    insolvent, it does not go to Schedule A.  It gets

25    the fair market value of its license.

Neeson&Associates    W&P

```
 1                    Q.   Let's turn to slide 6 and look at
 2     your second reason that RPSM is not appropriate.
 3     And you say that tax minimization is a motive for
 4     transfer pricing.  As background, are there
 5     different ways to do transfer pricing?
 6                    A.   Yes.  There are a variety of
 7     methods for -- under the various tax regulations on
 8     calculating transfer prices for purposes of meeting
 9     the arm's-length standard.
10                    Q.   And you say that transfer pricing
11     is an inexact science.  What do you mean by that?
12                    A.   Well, the idea behind the
13     arm's-length standard is to find the right price;
14     in other words, the price that two unrelated,
15     uncontrolled parties would set under the same facts
16     and circumstances at the same point in time doing
17     the same thing.
18                    In other words, what would be the
19     market price that two unrelated parties would do in
20     this hypothetical.  So it suggests there is a
21     single price.  I have always thought of this as
22     kind of the Holy Grail.  It is impossible to find a
23     single price.  Transfer pricing is an inexact
24     science.  There is a lot of fuzziness involved in
25     trying to achieve this goal of finding the, quote
```



```
 1    unquote, right price.
 2                Q.    And would there be a range of
 3    prices that could be within the continuum of
 4    appropriate transfer pricing?
 5                A.    Yes.  And starting in 1994 the IRS
 6    regulations actually built this in by creating
 7    something called the arm's-length range, saying
 8    that any price within the range was an acceptable
 9    price.
10                Q.    In the second bullet on slide 6
11    you say that tax avoidance is a key motive in
12    transfer pricing policies, and you cite your report
13    at paragraph 22.  First of all, is the type of tax
14    avoidance, minimization planning that you
15    discussed, is that legitimate?
16                A.    Yes.  Tax planning is simply the
17    taking into account taxes by the firm in
18    determining its policies and structures.  And tax
19    avoidance is legal tax planning.  It is within the
20    boundaries of the law.  As long as the parties do
21    this in good faith and they abide by the transfer
22    pricing regulations, they are allowed to minimize
23    the taxes that they pay.
24                Q.    And what is the goal of doing
25    that?  What is the purpose?
```



```
 1                      A.   Well, the purpose of a for-profit
 2      corporation rather than a not-for-profit, the
 3      purpose of a for-profit corporation is to maximize
 4      the shareholders' wealth.  And as a very well-
 5      respected economist, Milton Friedman, said, the
 6      goal is -- the social responsibility of business is
 7      to maximize shareholders' wealth.  Minimizing taxes
 8      is one of the ways that you can maximize
 9      shareholders' wealth.
10                      Q.   And how does the goal of tax
11      minimization relate to valuing each entity's assets
12      in a bankruptcy?
13                      A.   It does not.
14                      Q.   Let's turn to slide 7.  Have you
15      identified certain factors that help show what
16      Nortel's transfer pricing arrangements were for tax
17      minimization?
18                      A.   Yes.  The record on this is
19      actually quite extensive in a variety of emails,
20      PowerPoint presentations, among the tax members
21      over a very long period of time.  It was clear that
22      the tax department saw one of its functions as
23      reducing the overall burden of tax on the
24      corporation as a whole, which would be consistent
25      with the goal of shareholder wealth maximization.
```



1                 Q.   And have you given us three

2    references from the record to that effect?

3                 A.   Yes.  You can see these here.  And

4    you can see that the Nortel tax department

5    regularly referred to Canada as a tax haven, which

6    seems very surprising.

7                 Q.   Now, turn to slide 8 and tell us

8    if you agree that Canada was a tax haven.  What do

9    we have on slide 8?

10                A.   Yes, slide 8 explains how Canada

11   could be a tax haven.  And I certainly don't mean

12   to imply that Canada is a tax haven overall, but

13   for Nortel it was.  And the reason is the

14   difference between what economists call a statutory

15   tax rate and the effective tax rate that they pay.

16                The statutory rate is the rate on the

17   books, and you can see that in the first column.

18                I should mention that this PowerPoint

19   was prepared by the tax staff, as you can see, in

20   2002, looking to their 2003 income tax.  You can

21   see the Canadian rate is 34 percent, the American

22   is 39, and then the others are close, with the

23   exception of Ireland that was at 12-1/2.  And I

24   think in this period of time Ireland was widely

25   perceived as a tax haven.



1                    Then the second column talks about the

2     available R&D credits.  And R&D was the major

3     driver behind the Nortel business.  These credits

4     are very important for this particular firm.  And

5     these are called the SR&ED credits, the scientific

6     research and experimental tax credit.  It is a

7     specific Canadian program, S-R-E-D.

8                    In addition, there were provincial tax

9     credits and other incentives that were specifically

10    available related to R&D.

11                   The Canadian here is 23 percent.  The

12    effective reduction in the Canadian tax rate for

13    Nortel was 23 percent.  This would not be for all

14    businesses in Canada, but specifically the more

15    R&D-intensive you were, the more credits you could

16    apply for and take advantage of.  Nortel estimated

17    that reduced its effective rate to 11 percent.

18    Even in years when you made losses, you could carry

19    these credits forward over a period of time.

20                   So if you see here, the effective rate

21    on income declared in Canada is actually less than

22    the Irish rate for Nortel.

23                   Q.   And this slide is from 2002.  Were

24    there any material changes between 2002 and 2008?

25                   A.   Actually, yes, there were.  What



1    happened is the Canadian statutory rate falls
2    almost every year from here on through to 2010.
3    And so the gap between not only the statutory rates
4    but taking into account the R&D credits widens
5    here.  The gap in the statutory rate by I think
6    2010 is eight percentage points, the Canadian rate
7    being below the US rate, and that's before the
8    SR&ED credits.
9              Q.   Now, if we turn to slide 9, you
10   refer to cash to Canada.  And the first point you
11   make is that the transfer pricing policy was
12   structured to move cash to Canada.  What do you
13   rely on for this?
14             A.   Again, a series of emails and
15   PowerPoints among the tax staff here.  And you can
16   see two of these quoted here together with -- both
17   of these by John Doolittle, saying that Nortel
18   needed to move cash into Canada and would like to
19   do this in a tax-efficient manner.  In effect, a
20   dollar of income declared in Canada would have a
21   much less -- a much lower effective rate than a
22   dollar declared in the United States.
23             So the idea behind this was to move
24   cash to Canada for Nortel.
25             Q.   And we see in the first quote that



1    you have given us from Mr. Doolittle that he says

2    "This is exactly the way we designed our transfer

3    pricing .~.~.~ take as much out of the US as we

4    could."

5                    And we talked earlier about tax

6    avoidance, tax minimization.  Would this be within

7    that discussion we were having?

8                    A.   Yes.  Again I make the point that

9    tax avoidance is both legal and it is done by a tax

10   department in good faith, with the idea of reducing

11   the overall tax on the corporation as a whole.  And

12   that contributes to shareholder value.

13                   Q.   And we see in the next quote that

14   Mr. Doolittle is saying this is to the extent the

15   laws permitted it.  Is that consistent with what

16   you are saying?

17                   A.   Absolutely.

18                   Q.   Now, in your report, Exhibit 62 at

19   page 6 -- and we don't have to turn this up -- you

20   use the phrase "intentional skewing" of the

21   transfer pricing policy in NNL's favor.  What did

22   you mean by that?

23                   A.   What I meant was that the tax

24   department -- remember I said transfer pricing is

25   an inexact science, and there is a range of prices



 1   that are acceptable to the tax authorities.  So if

 2   you think of the arm's-length as this (indicating),

 3   there is the opportunity within the boundaries of

 4   the law to reduce one's taxes in good faith.

 5              And what I meant by skewing was the

 6   ability to move to the low tax end of the

 7   acceptable range.  So it is still legal.  It is

 8   still permissible, done in good faith, but there is

 9   because of this room for maneuver, because of the

10   fuzziness, there is the opportunity to do so.  And

11   again, as I said, it is for the purpose of

12   maximizing shareholder wealth in a for-profit

13   corporation.

14              Q.   And at the bottom of slide 9 we

15   see you reference other portions of your reporta,

16   Exhibits 62 and 63.  Will this provide us with more

17   of the Nortel information --

18              A.   Yes, it would.

19              Q.   -- on this point?

20              Let me turn to the third reason of your

21   four reasons, slide 10.  You say that RPSM does not

22   reflect market-based pricing.  And the first point

23   you refer to is comparables.  What is the

24   importance of comparables in transfer pricing?

25              A.   Comparables are actually key to



1    transfer pricing, because the arm's-length

2    standard, the idea is to put controlled parties on

3    a tax parity with uncontrolled parties so they can

4    report their true taxable income.

5            In order to do that you have to see

6    what uncontrolled parties would have done under the

7    same facts and circumstances.  So the purpose for

8    transfer pricing practitioners is to look for these

9    comparables under the same facts and circumstances,

10   doing the same things at the same points in time,

11   then take those prices and use those prices in

12   determining the taxes of the controlled parties.

13           Q.   And for the Nortel nonroutine

14   matters, were they activities, were they able to

15   use comparables?

16           A.   Well, that in some sense was part

17   of the problem for Nortel.  Given the type of

18   business it was in and the type of IP it did, it

19   was very difficult to find comparables for the

20   nonroutine.  As a matter of fact, one of the

21   definitions of a nonroutine intangible is an

22   intangible for which you cannot find comparables.

23           Q.   So then we go to the RPSM.  In

24   your second bullet you say that requires numerous

25   assumptions and transfer pricing methods for the



1   calculation.  And we will come back to that.  But

2   what is the significance of there being numerous

3   assumptions and transfer pricing methods in using

4   an RPSM?

5              A.   Well, I think there are two points

6   here.  The goal, as I said, is to find comparables,

7   and you look for ---you really would like direct

8   comparables at the same transaction level to be as

9   close as you can to market-based pricing.  That is

10  the goal.

11             And the residual profit-split method,

12  particularly for the nonroutine part, can't do that

13  because there are no comparables, so it must back

14  into what the transfer price should be.  It is not

15  a direct measure of market-based pricing.  It is an

16  indirect measure that is backed into.  So that's

17  the first point.  It is a way for market-based

18  pricing because it is backed into getting the

19  transfer price.

20             The second reason is the way the method

21  is calculated can lead to room for compounding

22  errors.

23             Q.   At the bottom bullet you say that

24  although RPSM may be the best method, it could be

25  the least worst.  What do you mean by that?



 1                    A.    What I mean here is that from the
 2    norm of what the arm's-length standard is supposed
 3    to be, we move from the norm, the hypothetical, to
 4    the real world of what policies we have in place
 5    for a real business at a real point in time for
 6    determining its income tax of an ongoing business.
 7    And we have a variety of very practical methods
 8    that are proxies for the norm or the goal of the
 9    arm's-length standard.  And what that means is that
10    while a direct measure is a close measure to
11    market-based pricing, an indirect measure that
12    backs into that has a variety of possible
13    compounding errors will typically be less reliable
14    and that sometimes, if you cannot use the other
15    methods because you don't have the information, you
16    may have to use this method in practice for the
17    firm.
18                    THE CANADIAN COURT:  Dr. Eden, can I
19    ask you a question, please.  When you say the RPSM
20    is sensitive to compounding errors, what do you
21    mean by "compounding errors"?
22                    THE WITNESS:  Thank you, Justice
23    Newbould, for the question.  May I turn to the next
24    slide, because I think that is very helpful in
25    explaining what the compounding -- would that be

 Neeson&Associates    W&F

```
 1    all right?
 2                THE CANADIAN COURT:  Sure.
 3                THE WITNESS:  Okay.  Thank you.  I
 4    thought it might be helpful to explain the
 5    compounding errors issue by looking at the next
 6    slide.  This is a generic residual profit-split
 7    method.  Clearly the Nortel version both for 2001-
 8    2005 and 2006 through 2008 were variations of this.
 9    But each of these are the main steps in the method.
10                And the point I want to bring across is
11    each method involves choices.  And choices made at
12    the top influence you as you move down the list.
13    That's why we call transfer pricing an inexact
14    science.  And that's why Revenue Canada and the CRA
15    and the OECD guidelines say as you get further and
16    further away, you may be less reliable.  You have
17    go lots of choices over the methods, over the
18    assumptions, over the implementation, over the
19    quantification of the numbers.
20                So here you see, first of all, you have
21    to choose the business to which the whole thing
22    applies, how narrow it is.  Once you are done
23    there, you must choose the kinds of profits to
24    which you are going to apply the formula.  Then you
25    have to split into routine and nonroutine
```



```
 1   functions, assets and risks, and decide which is
 2   routine and which is nonroutine by looking at
 3   comparables.  You must argue a method for each of
 4   these and apply that method and do the numbers.
 5             Then you add them all up and you take
 6   it from the total and you get a residual, which
 7   should be positive.  Then you take that residual
 8   and you create an allocation key that is supposed
 9   to split it.  And this is for the nonroutine part,
10   where there are no comparables.
11             So as a result, I think, Justice
12   Newbould, I see much room for compounding,
13   cascading errors in the application of this method
14             BY MS. BLOCK:
15             Q.   Let's turn to slide 12, where you
16   refer to the allocation key.  And you say that the
17   profit generally should be divided based on the
18   value of contributions to the activity.  What does
19   that refer to?
20             A.   The idea behind here in doing the
21   allocation key -- and remember, it is for the
22   nonroutine functions, assets and risks -- you want
23   to figure out what the value of those nonroutine
24   functions, assets and risks, what did they
25   contribute to the business, what did they bring to
```



1    the table, how much value do they create for the

2    firm as a whole.

3                And you can see the statement here

4    under the 482 regulations says this, and the key

5    words here are "based on the relative value of

6    their nonroutine contributions" to the -- when it

7    says "relevant business activity," that was the

8    first decision:  What is the business activity to

9    which we are going to apply this.

10                And so this, again, would be similar

11    across all of these types of -- all of these

12    different governments.  The focus on the allocation

13    key is contribution to value added; in other words,

14    the generated value as measured -- well, I am going

15    ahead of myself.

16                Q.    How does spending on R&D tell you

17    the value you brought to the table?

18                A.    Well, I think it is a poor proxy,

19    and you can see this in the Option 1 I have

20    directly below.  If you want to measure the value

21    of what the nonroutine activities do -- the R&D

22    could be anything:  Marketing, whatever, whatever

23    those nonroutine assets, functions and risks are --

24    the preferred way to do it is to look what

25    arm's-length parties would have done in an open



1    market.  You look for the comparables here.  And

2    that's what Option 1 says.  Use external benchmarks

3    that reflect the fair market value between

4    arm's-length parties in an open market.  In other

5    words, Option 1 is about market-based pricing.  Use

6    market-based pricing to determine the allocation

7    key.

8                    However, it is very difficult to do

9    that.  Part of the reason why it is nonroutine is

10   there aren't any.  So, in effect, the practical

11   takes over because the theoretical is very

12   difficult to do.  And the practical says what can

13   we use as an allocation key in the real world for

14   real businesses at a real point in time.  And in

15   this particular case cost is one of the possible

16   metrics that can be used.

17                    Q.   And what does cost tell you about

18   the value brought to the table?

19                    A.   Well, we know that cost is a poor

20   measure of value.  I can spend a million dollars

21   digging an oil well in Texas and it is a dry hole;

22   right?  So the value is zero and I spent a million

23   dollars.  Or I could spend a million dollars and it

24   is a gusher that is going to result in $10 million

25   worth of oil revenue.  And I can say that because I



1    am used to having an oil well at the end of my

2    street.

3                    Q.    You are a long way from Canada and

4    Mount Allison.

5                    A.    Down in Texas.  So the answer is

6    cost, as I think most of us will agree, is a poor

7    proxy for the value in the open marketplace.

8                    Q.    And is that recognized in your

9    last bullet by the OECD guidelines?

10                   A.    Yes, it is clearly recognized in

11   the OECD guidelines as reducing the reliability of

12   the results.

13                   Q.    And was cost part of the Nortel

14   allocation key for nonroutine functions?

15                   A.    Yes.  Nortel used two different

16   proxies for cost, one in the first period and a

17   variation of it in the second period.

18                   Q.    In your opinion, was the Nortel

19   allocation key appropriate to use to value assets

20   sold or relinquished in the sales on bankruptcy?

21                   A.    No, it was not.

22                   Q.    Let's turn to your fourth reason,

23   slide 13.  You tell us that the RPSM was not

24   accepted by the tax authorities.  Did you review

25   the tax materials in this record?



1          A.    There is extensive tax materials

2     in the record, and I probably didn't review all of

3     it, but I reviewed a large number of documents.

4          Q.    And you referred to criticisms by

5     the tax authorities and eight years of

6     negotiations.  And we are going to come to a time

7     line, but briefly explain what happened.

8          A.    What happened was the Nortel

9     entities had three cost-sharing arrangements in

10    place in the 1990's, and they were due to expire in

11    1999.  And the IRS -- I believe it was the IRS, but

12    the tax authorities said they were not willing to

13    renew these cost-sharing arrangements.  There was

14    an APA, Advance Pricing Agreement, in place at the

15    time, and that was expiring also.

16          And so the Nortel tax group needed to

17    come up with a different transfer pricing method,

18    and they wanted another Advance Pricing Agreement.

19    They approached Horst Frisch to develop a transfer

20    pricing methodology for them.  They applied for an

21    APA, a bilateral APA, in 2002.  And eight years of

22    back-and-forth negotiations took place between the

23    tax authorities and Nortel over that APA.

24          Q.    Let's turn to the time line and

25    see this in more detail at slide 14.  We have the



 1    time line that is the pre-bankruptcy period.  What

 2    do we see on this time line?

 3              A.   Yes.  This time line runs from

 4    2001 to the end of 2008.  And the major documents

 5    between Nortel, the IRS and CRA are here.  And then

 6    at the bottom you can see it says numerous letters,

 7    information, documents and a variety of

 8    correspondence is in the record.

 9              The start date is from when Nortel

10    began applying the first RPSM, which is 2001, and

11    it runs through 2005.  2006 to 2008 is the second

12    RPSM.  Nortel files the APA application in March

13    2002.  About two years later you see a CRA position

14    paper.  There is an IRS position paper two years

15    after that.  And in the middle between the two, the

16    Master Research and Development Agreement, the

17    MRDA, is executed and signed within a window of

18    about six months about the different parties.  And

19    that MRDA is made effective back to January 2001.

20              There is another CRA supplementary

21    position paper in '08.  And then as you can see

22    also in '08 in the same month, Nortel applied for

23    its second APA application for the years 2006

24    forward.

25              Q.   If we turn to slide 16 --



```
 1                    THE CANADIAN COURT:  Can I just ask
 2   you -- before you do that, can I just ask you a
 3   question, Dr. Eden.  We have seen whether you call
 4   it evidence or assertions in this case that the
 5   RPSM was something done at the request of the tax
 6   authorities.  Did you come across any such
 7   evidence?
 8                    THE WITNESS:  I did come across some
 9   evidence that suggested -- my memory may be failing
10   me, but my recollection, it was in emails
11   suggesting that a member of the APA team on the IRS
12   side had recommended the RPSM.  But my memory -- as
13   I said, my memory may not be accurate on that.  But
14   I believe that to be the case, Justice Newbould.
15                    THE CANADIAN COURT:  Thank you.
16                    THE WITNESS:  You are welcome.
17                    BY MS. BLOCK:
18              Q.   Dr. Eden, if I can just follow up
19   on that.  Had there been an indication that the
20   cost-sharing arrangements were not continuing to be
21   in favor by the tax authorities?
22              A.   Yes.  I think what started the
23   process is the tax authorities, CRA and the IRS,
24   thought that the cost-sharing arrangements -- were
25   not willing to renew the cost-sharing arrangements,
```



1    and Nortel itself also found the process of

2    calculating the numbers in all the cost-sharing

3    arrangements somewhat onerous and administratively

4    heavy.

5                    Q.    So if we look at slide 14 --

6    sorry.  Slide --

7                    A.    15?

8                    Q.    Slide 15, we start with the Nortel

9    bankruptcy in January 2009.  What happened to the

10   original 2002 APA application, the one for the

11   years 2001 to 2005?

12                   A.    Well, as you can see, Nortel

13   declares bankruptcy on January 14, and all the way

14   over in February 2010, so more than a year later,

15   that first APA is signed in February 2010.  And as

16   part of that first APA -- so this is for

17   2001-2005 -- that first APA, there was a $2 billion

18   taxable income adjustment, an operating income

19   adjustment, from NNL to NNI.

20                   Q.    And above the line you have got a

21   box that talks about Nortel's analysis of the

22   possible outcome of the IRS audit.  And what did

23   this tell you?

24                   A.    Yes.  This was a proposal looking

25   at what they thought the results of the IRS audit



1    might be from 2001 on.  And the IRS position here

2    was to shift more than 2 billion back from NNL to

3    NNI.

4              Q.   So this is a Nortel analysis that

5    you have referred to here?

6              A.   Yes.

7              Q.   And then when you look down at the

8    bottom right-hand box at the $2 billion settlement,

9    what did that tell you about the tax authorities?

10   I know we don't know the details behind the closed

11   doors, but what did that tell you when you learned

12   of this settlement?

13             A.   When I learned of this settlement,

14   it suggests an overpayment of tax by NNI and an

15   underpayment of tax by NNL, and therefore, in

16   effect, the tax payments that had been made under

17   the RPSM formula from NNI to NNL, more than

18   40 percent of those were reversed and came back

19   from NNL to NNI.

20             So to me it suggested clear evidence

21   that the IRS felt that Nortel had inappropriately

22   shifted income to Canada under the first version of

23   the RPSM 1.

24             Q.   And from your following of APA and

25   settlements, what is the significance of one of



```
 1    this magnitude?

 2              A.    I think a 2 billion adjustment is

 3    a large adjustment.  I think it was something like

 4    40 percent of the money that went north came back

 5    again.  A large amount.

 6              Q.    Now, in the middle of the page at

 7    the bottom you indicate that the CRA requested the

 8    withdrawal of that second APA request, the one from

 9    2006 that you told us was filed in 2008.  What

10    happened there?

11              A.    Yes.  APAs are designed for

12    ongoing businesses for a period of time when the

13    facts and circumstances are not expected to have

14    material changes.  So in filing prior to bankruptcy

15    for a second APA, once the firms had gone into

16    bankruptcy, clearly the functions, assets and risks

17    were going to undergo major material changes.  And

18    the CRA letter says, "Because of this, given the

19    uncertainties, we expect you to have significant

20    change.  Therefore, it would be very difficult for

21    us to work on a second APA."  And the Canada

22    Revenue Agency denied the request.

23              Q.    Now, you have taken us through

24    your reasons why you concluded that the RPSM is not

25    helpful to determine the value of the assets sold
```



1    or relinquished.  Before concluding with you,

2    Dr. Eden, I want to go back to before the RPSM, to

3    the cost-sharing arrangements, and have you briefly

4    address whether there is anything in CSA transfer

5    pricing principles that help us understand the

6    Nortel arrangements and --

7                    A.   Yes.  I actually think there are

8    some things in the Nortel transfer pricing

9    arrangements prior to the MRDA that are helpful to

10   us in understanding the Nortel arrangements.

11                   Q.   So if we turn to slide 16, you

12   refer to the 1997 OECD guidelines concerning CSA.

13   Tell us what is of significance here.

14                   THE CANADIAN COURT:  What is CSA?

15                   THE WITNESS:  Cost-sharing arrangement.

16   And in addition, I should also say the term varies

17   depending upon the jurisdiction.  The US

18   jurisdiction calls it a cost-sharing arrangement.

19   The Canadian one calls it a cost contribution

20   arrangement; the OECD guidelines, which also say

21   cost contribution.

22                   There are slight minor differences, but

23   in effect, I think you can use the terms pretty

24   much interchangeably.

25                   THE CANADIAN COURT:  Thank you.



     1                 BY MS. BLOCK:

     2                 Q.   And before the MRDA, what kind of

     3    arrangement did Nortel have as a transfer pricing

     4    arrangement?

     5                 A.   Well, Nortel had a variety of

     6    cost-sharing arrangements that had been in place

     7    for many years.  The one I think that is most

     8    relevant here is the 1996 one, which I believe

     9    dates back to 1992 and covered the period 1992 to

    10    1999.  This would be the R&D cost-sharing

    11    arrangement.  There were three cost-sharing:  One

    12    for headquarters costs, one for manufacturing, and

    13    this one for R&D.

    14                 So this R&D cost-sharing arrangement

    15    went from 1992 through to '99 and, I think because

    16    the RPSM didn't come in until January '01, also

    17    held through the period 2000 for Nortel.

    18                 Q.   So when we refer to a CSA or a

    19    CCA, that would cover the pre-MRDA arrangement that

    20    Nortel entities had?

    21                 A.   Yes, up to December 2000.

    22                 Q.   So back to the OECD guidelines

    23    dealing with cost-sharing arrangements that would

    24    have applied to Nortel pre-2001, what do these tell

    25    us on Tab 16, slide 16?



1                    A.    This chapter in the OECD

2    guidelines was written in 1997.  The OECD

3    guidelines were issued in '95, this version.  And

4    at the time they said we are still working on the

5    chapter on cost contribution arrangements, and it

6    was finished in 1997.

7                    This particular chapter is similar, I

8    think, to cost-sharing arrangement rules in

9    general, which is the parties come together to

10   develop intangibles.  Each of them puts in costs,

11   each of them bears risks, and each of them shares

12   as a beneficial owner in the development activity.

13                   And you can see this in the first quote

14   under the OECD guidelines.  This is paragraph 8.3.

15   That paragraph 8.3 says each participant in this

16   cost-sharing arrangement is entitled to exploit its

17   interest -- in other words, what comes out of the

18   CSA -- as an effective owner, not as a licensee,

19   doesn't have to pay a royalty or consideration to

20   any other party in the agreement.  We all do the

21   same -- we share the costs, we share the risks, we

22   share the benefits as effective owners.

23                    Q.    In the second quote it talks about

24   there being no need for a royalty payment.  How

25   does that fit in if you are a qualified CSA



1    arrangement?

2              A.    Well, I think the idea behind this

3    is because we all equally share -- we share in what

4    is put in and we share in what is coming out.  What

5    I put in on the table could be looked at as a

6    consideration or receipt of income by the party on

7    the other side.

8              Since it is involving intangibles, if I

9    put money in, if I put a hundred million in as my

10   cost-share, if I put 100 million in as my

11   cost-share and it benefits the party on the other

12   side, it could be seen as taxable income to them,

13   and they might have to declare for purposes of

14   income tax.

15             Under a cost-sharing arrangement, what

16   happens here is we all share the costs, we all

17   share the rewards, and we are done.

18             Q.    And under the Nortel arrangements

19   under its CSA, were royalties paid and withholding

20   taxes charged?

21             A.    No, they were not.

22             Q.    Then if we turn to the next slide,

23   slide 17, you refer to other OECD guideline

24   references.  What do these tell us?

25             A.    What the OECD guidelines tell



1   us -- and I should say, Your Honors, that this is

2   not only in 1997; this is currently in the

3   guidelines as of 2014.  So these rules have been in

4   place from 1997 through 2014.

5           These rules say that ---or these

6   guidelines say -- they are guidelines for all the

7   OECD member countries.  These guidelines say that

8   if you are part of a cost contribution arrangement

9   or cost-sharing arrangement, and as part of that

10  arrangement all you get is make-sell or make-use,

11  make-use licenses coming out of that, this does not

12  meet the requirements of a cost contribution

13  arrangement.

14          In the case of a make-sell license or a

15  make-use license, it would be treated as income to

16  the recipient, taxable.  And the party that put the

17  money on the table and only got a make-use license

18  back, that would be seen as having paid a royalty

19  and could incur withholding taxes in the outgoing

20  jurisdiction.

21          So you can see this here in the first

22  paragraph on here, which is the general paragraph.

23  This is 8.23 is the general paragraph in the OECD

24  guidelines.  And the key word there is, which I

25  have bolded, the key word is "except."  This is the

Neeson&Associates   W&P Wilson & Peiter LTD.

```
 1    exception to the cost-sharing rules.  And the

 2    exception says to the extent you only get a right

 3    to use -- all right? -- and you don't get a

 4    beneficial interest in the intangible property, you

 5    don't get an ownership, an effective ownership in

 6    the IP itself, all you get is a license to use, a

 7    make-use license, this is an exception to the

 8    rules.  And that exception means you don't get the

 9    benefits of the cost-sharing arrangement.

10              Q.   So you would have to pay a royalty

11    and be --

12              A.   You would be treated -- the

13    contribution that you made would be seen as

14    effectively a royalty for the make-use license you

15    got, which would be income to the recipient in this

16    cost-sharing arrangement and a payment made by the

17    contributor and, depending upon the applicable

18    taxes, could be subject to withholding, depending

19    upon the double tax treaties that were in place

20    between the countries at different points in time.

21              So the idea behind here is we come

22    together; we share the costs, we share the risks,

23    we share the rewards.  And that's what a

24    cost-sharing arrangement is supposed to do.

25              Q.   And we see the same reference in
```



1    relation to balancing payment situations.  What is

2    a balancing payment?

3                    A.    Well, the idea behind a

4    cost-sharing arrangement is that the driver here is

5    the reasonably anticipated benefits of the members.

6    So if four of us go into a cost-sharing arrangement

7    together, we have to estimate what our reasonably

8    anticipated benefits are going to be.  And if my

9    benefit is expected to be twice yours, I have to

10   put in twice the amount.  That is made up of what I

11   actually put on the table in my own contribution.

12   And if there is a difference, that is called the

13   balancing payment.

14                    So maybe a simple example would help.

15   If my reasonably anticipated benefits were

16   a million and I put in 200 million directly in my

17   spending, then I have got to make a balancing

18   payment of 800, 800 here, to make it equivalent to

19   my reasonably anticipated benefits.  So the driver

20   is your reasonably anticipated benefits, which it

21   was under the cost-sharing arrangements that Nortel

22   had in place.  They had proxies for reasonably

23   anticipated benefits, and that was the allocation

24   key here.

25                    So what it is saying down below is in



1    these balancing payments that are paid there is an

2    exception, and the exception is if all you get is a

3    make-sell right, then you do not get to enjoy the

4    full benefits of the cost-sharing arrangement under

5    the tax rules.  It is treated as a royalty.

6              Q.   Then on the next slide, slide 18,

7    are there other similar provisions in the OECD

8    guidelines that talk about buy-in and buy-out

9    payments?

10             A.   Yes, there are actually another

11   two, in that if you think about a cost-sharing

12   arrangement, there are three stages in the

13   cost-sharing arrangement.  There are -- when you

14   start the arrangement, some parties may actually

15   bring in intangibles more so than the others.  So

16   you may need a buy-in payment.  Or if you come late

17   to the table and you want to join the cost-sharing

18   arrangement later, you need to buy in and

19   compensate the other participants.

20             The same thing happens when you buy

21   out.  If you want to leave the cost-sharing

22   arrangement, there is a buy-out payment that the

23   others have to make to you when you leave because

24   they are now getting the benefits of your R&D

25   spending.



 1                    So what this is telling you is there is

 2      a general rule how cost-sharing or cost

 3      contribution work, when everybody gets a beneficial

 4      ownership interest in the underlying activity that

 5      the CSA did, but there is an exception, and that

 6      exception happens at all three stages.  It happens

 7      when you buy in, it happens while it is ongoing and

 8      you are making balancing payments, and it happens

 9      when you leave, and that is make-sell rights are

10      not equivalent to beneficial ownership and

11      therefore do not enjoy the same tax benefits as

12      beneficial ownership does.

13                    Q.    Perhaps we can just flip over two

14      slides to slide 20, just dealing with this

15      buy-in/buy-out issue.  And you have provided on

16      slide 20 a reference from an Ernst & Young letter

17      to the IRS concerning buy-out payments and why no

18      buy-out payment was required in the Nortel

19      situation.  What does this tell us?

20                    A.    What Nortel told the tax

21      authorities when the CSA expired is that each of

22      the participants had a fully paid up perpetual

23      non-royalty-based license in its exclusive

24      territory and that those rights would continue

25      afterwards.



```
1                    Q.   And we see Ernst & Young is saying
2    as such, no buy-out payment is necessary.
3                    A.   Yes.
4                    Q.   Because each CSA participant
5    continues to own the rights.
6                    A.   Yes.
7                    Q.   So this means it is not within the
8    exception.  It is within the norm of these OECD
9    rules?
10                   A.   Yes.
11                   Q.   If we can go back to slide 19 and
12   look at what the CRA circular 87-2R says about this
13   same concept, beneficial ownership with CSAs.
14                   A.   Yes.  The information circular
15   87-2R was issued in 1999, so it is two years after
16   the OECD chapter on cost contribution was written.
17   And what it says is -- and again, you see the term
18   "cost contribution arrangement" here, Q meaning
19   qualified.  If you have a qualified cost-sharing
20   arrangement, you do not have to be a legal owner,
21   but you do have to have effective beneficial
22   ownership similar -- the key words are
23   "substantially similar rights, benefits and
24   privileges."  Rights, benefits and privileges as a
25   legal owner, and then in brackets that is
```


Neeson & Associates     W&P

1    considered to be beneficial ownership under the

2    87-2R.

3                    Q.    And the reference below tells us

4    what this 87-2R sets out?

5                    A.    Yes.  This paragraph, paragraphs

6    3-4, are the beginning of the section, and it is at

7    the beginning of the whole of the transfer pricing

8    regulations here, the information circular.  And

9    what it says is that the circular sets out the

10   department's views on transfer pricing, but if you

11   want to go and look for more detail, go look to the

12   OECD guidelines.  And included in this is the cost

13   contribution chapter.

14                   Q.    Then one last reference, if we

15   may, on slide 20.  After you have referred to the

16   letter from E&Y, you reference Article 10 of the

17   R&D CSA.  And what is is that?  You don't have to

18   turn it up.

19                   A.    Yes.  I can't comment on the legal

20   terms involved, but in considering this as a

21   transfer pricing document and considering this in

22   the context of the CSAs, what I see this as saying,

23   that the rights that the cost-sharing participants

24   had at the end of 2000, when the cost-sharing

25   arrangement was over, the same rights that it told



```
 1   the IRS and CRA that it had, that they had these

 2   beneficial, exclusive rights, that these rights

 3   continue through the term of the MRDA.

 4            MS. BLOCK:  Thank you, Dr. Eden.  Those

 5   are all my questions.

 6            THE WITNESS:  Thank you.

 7            MR. ADLER:  Good morning, Your Honors.

 8   I think given the time -- I do have some material

 9   to cover -- it might make sense to take the morning

10   break now, and then I can start fresh after that.

11            THE US COURT:  Are we ready for a

12   break?  I think so.  I think that makes sense.  We

13   will take our 20-minute break now.

14            THE CANADIAN COURT:  That is fine by

15   me.

16            MR. ADLER:  Thank you, Your Honor.

17            THE US COURT:  Stand in recess until

18   ten of.

19   -- RECESS AT 10:27 a.m. --

20   -- UPON RESUMING AT 10:59 a.m. --

21            THE US COURT:  Thank you, all.  Please

22   be seated.  Thank you.

23            MR. ADLER:  Good morning, Judge Gross

24   and Justice Newbould.  May I proceed?

25            THE US COURT:  You certainly may.  Good
```

 Neeson & Associates    W&P Wilson & Peterson Ltd.

```
 1   morning.
 2   CROSS-EXAMINATION BY MR. ADLER:
 3               BY MR. ADLER:
 4               Q.   Good morning, Dr. Eden.  We said
 5   hellO before.  But again, I am Derek Adler for the
 6   Joint Administrators and the EMEA Debtors here.
 7               A.   Nice to see you again, Mr. Adler.
 8               Q.   Nice to see you.
 9               Now, I want to talk a little bit about
10   the web of international principles that apply in
11   the transfer pricing area.  In that area there is
12   actually something that you have called an
13   international tax transfer pricing regime, isn't
14   there?
15               A.   Yes.
16               Q.   And that constitutes a set of what
17   you have called rules of the game for determining
18   transfer pricing issues; is that right?
19               A.   Yes.
20               Q.   I would like to look an article
21   you have written.  This is Trial Exhibit 11422.  If
22   we can pull that up and give out copies in the two
23   courtrooms.
24               And if we could look at page 2 of that
25   document.  Hopefully, it is being handed out.
```



1                  A.   Yes.

2                  MR. ADLER:  Do you have that, Justice

3      Newbould?

4                  THE CANADIAN COURT:  That's all right.

5      I have got it on the screen.  That's all I need.

6                  BY MR. ADLER:

7                  Q.   So on page 2 of that, first of

8      all, do you recognize this article?

9                  A.   I do.

10                 Q.   And you wrote this; is that right?

11                 A.   I did.

12                 Q.   And on page 2 you refer to the

13     OECD's transfer pricing regime, tax transfer

14     pricing regime, as:

15                      "a set of internationally accepted

16                      'rules of the game' which govern the

17                      ways in which OECD member countries tax

18                      the profits of multinational

19                      enterprises (MNEs) that arise from

20                      international transactions.  These

21                      rules of the game deal with two

22                      fundamental issues in international

23                      taxation:

24                      "Jurisdictional issues - which

25                      jurisdiction has the right to tax what



1              transactions?"

2                   And "allocational issues - how are

3              a firm's revenues and expenditures to

4              be allocated among countries for tax

5              purposes?"

6              Is that an accurate description of what

7    you see as the international tax transfer pricing

8    regime and its purposes?

9              A.   Yes.  I can explain the statement

10   if you would like me to do so.

11             Q.   I have a couple of other questions

12   about it.  Is the purpose of it to derive an

13   internationally consistent approach to transfer

14   pricing issues?

15             A.   The OECD's goal behind setting

16   this up, similar to the model tax treaty that the

17   OECD developed, was, yes, to create a framework

18   within which countries would harmonize their

19   regulations, yes, for taxing multinationals.

20             Q.   So it is actually a set of

21   agreements between countries as to how to treat

22   these issues about allocating international income?

23             A.   Not quite.

24             Q.   But there are a series of

25   bilateral treaties that give effect to it, don't



```
 1   they?
 2                A.   Yes.   The way this works is the
 3   OECD has created a model income tax treaty that it
 4   revises from time to time, and a group of experts
 5   work on changing that treaty.  And then each
 6   country bilaterally negotiates with other member
 7   countries how they will apply the rules in
 8   practice.
 9                I think almost all the OECD countries
10   have negotiated tax treaties with each other.
11   There are large numbers of countries, however, that
12   have not signed onto these also.
13                Q.   Any of them major commercial
14   powers?
15                A.   Russia.
16                Q.   Now, one of the purposes of this
17   regime is to prevent tax abuse, underpayment of
18   taxes; is that right?
19                A.   Yes.   The principles behind this
20   are true, as I said, true taxable income and to
21   prevent tax abuse or overtaxation.
22                Q.   Double taxation, prevent double
23   taxation?
24                A.   Over, double.  I see those as
25   synonyms here.
```



```
 1                    Q.    And it is also to ensure a fair

 2    distribution of tax revenues between the various

 3    countries, isn't it?

 4                    A.    Yes.

 5                    Q.    And so in that sense this

 6    international tax transfer pricing regime is really

 7    designed to mediate between the different

 8    governments, isn't it?  I will strike that.

 9                    Each government has a motive to

10    maximize its own tax revenue; isn't that correct?

11                    A.    I think each government is

12    interested in receiving its share of the tax base.

13    The rules that were created under this setup are

14    called the separate entity rules.  Each affiliate

15    stands alone in its own country and is taxable by

16    its national tax authority.

17                    Each tax authority is interested in

18    making sure that the entity in that jurisdiction

19    pays a share of tax that is equivalent to what

20    unrelated parties would have paid under the same

21    facts and circumstances.  That's the point about

22    the true taxable income.

23                    Q.    So the purpose of it is to set up

24    a set of accepted principles for determining true

25    taxable income?
```

Neeson & Associates    W&P WILSON & PETERSON LTD.

```
 1                    A.   Yes, I think that's a fair
 2    statement.
 3                    Q.   And one of the core norms of that
 4    is the arm's-length standard; isn't that right?
 5                    A.   Yes.
 6                    Q.   And having this international
 7    regime serves to prevent conflicts between the
 8    nations, doesn't it?
 9                    A.   I am not sure that it prevents
10    them, but it reduces the incidence.
11                    Q.   Fair enough.  Now, one of the
12    purposes of transfer pricing is to allocate global
13    profits among the entities in a multinational
14    enterprise; is that right?
15                    A.   As I said, it is for -- there are
16    jurisdictional and allocational reasons involved.
17    Jurisdiction is deciding which of the costs and
18    which of the revenues belong in which jurisdiction.
19    And then having decided where they belong, we have
20    to decide how to tax them.
21                    And the worry is two jurisdictions can
22    simultaneously tax the same base, which can lead to
23    double tax.  So it is to prevent the non-taxation,
24    the holes, but also prevent the double taxation.
25                    Q.   And from the perspective of the
```



```
 1   group itself, from a multinational enterprise,

 2   transfer pricing has a number of different

 3   purposes -- isn't that right? -- internal and

 4   external purposes?

 5              A.   Yes.

 6              Q.   And the internal purposes include

 7   efficient allocation of resources; is that correct?

 8              A.   Yes.

 9              Q.   Collecting information from the

10   different entities in the group?

11              A.   Yes.

12              Q.   Motivating the managers in the

13   group?

14              A.   Yes.

15              Q.   The external motivations include

16   things like tax minimization, as you have

17   testified?

18              A.   Within the boundaries of the law

19   and in good faith, yes, I think multinationals in

20   their transfer pricing policies take tax

21   minimization into account.

22              Q.   Taking advantage of tax

23   preferences, as you have mentioned?

24              A.   Yes.

25              Q.   Customs issues that might be
```



 1   different in different countries?

 2                   A.   Yes.  For -- customs taxes are

 3   often a percent of the price, so a transaction

 4   between related parties, that price may determine

 5   the actual tariffs that are paid to different

 6   countries.  So yes, customs duties can also affect

 7   the transfer price.

 8                   Q.   And in addition, you have

 9   mentioned that there is a jurisdictional purpose to

10   transfer pricing and also an allocational purpose.

11   It also has a valuation purpose, doesn't it?

12                   A.   Yes.  The third piece of this is

13   once you have decided which jurisdiction has the

14   right to tax, and you have decided -- so you put

15   the different pieces in different places, and then

16   you decide how to allocate those.  This would be

17   things like, for example, overhead costs; how do

18   you allocate overhead costs when several units,

19   multinationals, share costs.

20                   And the third piece is the intra-firm

21   transactions that go cross-border must be valued,

22   again, to determine the true taxable income of each

23   entity sort of standing on its own bottom in the

24   different jurisdictions.

25                   Q.   Thank you.  And in the context of



1    Nortel, allocating global profits among the various

2    Nortel entities was specifically one of the

3    purposes for adopting the RPSM, wasn't it?

4              A.    The RPSM was adopted in order

5    to -- the answer is yes.

6              Q.    And now, the RPS method, that is,

7    you would agree with me, an accepted transfer

8    pricing method, isn't it?

9              A.    As I have said in my reports, yes,

10   it is one of the listed -- it is definitely one of

11   the listed methods in the IRS and the CRA and the

12   OECD guidelines.  The answer is yes, in Canada,

13   United States.

14             Q.    And depending on the facts and

15   circumstances, it can be the best method in a

16   particular context; isn't that right?

17             A.    I think that I would distinguish

18   here between best method in theory and sort of best

19   method in practice.  As I have shown in my slides

20   today, I think that the RPSM has flaws involved in

21   it, yet there are facts and circumstances,

22   particular situations, where none of the other

23   methods may be able to apply.  In that case it is

24   the best method.

25             Q.    And you haven't suggested any



1    other method that should have been applied by
2    Nortel from 2001 onward; isn't that correct?
3                    A.    I have not.
4                    Q.    And at that time the CSA we had
5    discussed, that had been terminated.  The revenue
6    authorities had said they weren't willing to renew
7    the CSA APAs; is that right?
8                    A.    That is correct.
9                    Q.    And so you have a slide that says
10    that under some circumstances the RPSM can be the
11    least worst transfer pricing method, which reminded
12    me of my assistant, who says, "I am perfect
13    enough."
14                    A.    It is like damning with faint
15    praise.
16                    Q.    But would you agree with me that
17    there are situations where the residual
18    profit-split methodology can be best enough?
19                    A.    Yes.
20                    Q.    Now, it is also the case, isn't
21    it, that the use of relative costs in developing an
22    intangible as a key for allocating residual profits
23    in an RPS method is accepted by both the IRS and
24    the CRA?
25                    A.    Yes.



1              Q.   And that is confirmed in their

2    regulations, isn't it?

3              A.   Yes.

4              Q.   You said before that spending is a

5    poor proxy for the value that is contributed.  You

6    noted that some dollars can lead to a dry hole,

7    some dollars can lead to a gusher.  But isn't it

8    true that when parties get together for a

9    co-development arrangement, they don't necessarily

10   know which holes are going to be dry and which are

11   going to be gushers at the beginning?  Isn't that

12   right?

13             A.   I think when parties come together

14   in a project, there is always some uncertainty

15   involved in that project, so one estimates what one

16   thinks will happen in the future.

17             Q.   And among open-market transactions

18   among independent parties, it is not unusual for

19   different independent entities to form a venture

20   where each of them are going to contribute

21   something, not knowing what the outcome will be,

22   and agree that they are going to share the profits

23   that come from it without regard to the specific

24   value of their contributions; for example, in a

25   joint venture-type arrangement?

 Neeson & Associates    W&F

```
 1                      A.   This is a hypothetical situation
 2   of what unrelated parties might do.  I can see
 3   situations where that might be the case and where
 4   it might not be the case.
 5                      Q.   Now, here in this situation in
 6   your report you have said that each of the
 7   independent entities, which we have also been
 8   calling the RPS entities a lot in this case, that
 9   each of them should be entitled to a share in the
10   proceeds from the sales of Nortel's intellectual
11   property; isn't that right?
12                      A.   I have understood that the purpose
13   of allocation in this case is to determine how the
14   proceeds from the sales should be allocated among
15   the parties, yes.
16                      Q.   And in relation to the Rockstar
17   sale, you have said in particular that each of the
18   independent entities, the RPS entities, is entitled
19   to share in the proceeds of that sale; isn't that
20   right?
21                      A.   Can you show me where in the
22   document I have said that?
23                      Q.   Sure.  It is in your rebuttal
24   report, page 51, paragraph 105.
25                      A.   Page 51?
```

Neeson&Associates   W&F

```
 1                    Q.   Page 51 of your rebuttal report.

 2                    A.   Yes.

 3                    Q.   Which we have marked Exhibit 63,

 4   and we will pull it up on the screen.  It is

 5   paragraph 105, where you say in the second

 6   sentence, "Dr. Cooper is correct that all of the

 7   independent entities -- not just NNL -- are

 8   entitled to share in the proceeds of the Rockstar

 9   sale."

10                    A.   Yes.

11                    Q.   Do you agree with that statement

12   now today?

13                    A.   Yes.  And I would be happy to

14   explain it also, the statement, if you would like

15   me to do so.

16                    Q.   Well, I think I am probably going

17   to get to it.  The reason for that is because each

18   of them invested in the R&D that created that IP;

19   isn't that correct?

20                    A.   Each of them is a co-owner,

21   beneficial owner, of the IP.  As I have explained

22   this morning, under the cost-sharing arrangements,

23   each of the parties at the end of the cost-sharing

24   arrangements, when they expired, were co-owners of

25   the IP.
```



1                    The MRDA, again, looking at it from a

2      transfer pricing perspective, from a transfer

3      pricing perspective, the MRDA says that those

4      rights are continued.  So that each of the five

5      entities has effective beneficial ownership in the

6      IP, and that would include Rockstar.

7                    Q.   And that also results from their

8      ongoing investments in the R&D that created that

9      IP, doesn't it?

10                   A.   I see the approach here as being

11     valuing the rights that were held by each of the

12     entities.  In other words, the purpose of

13     allocation is to value -- the fair market value of

14     what each of the entities has at the end of the day

15     in terms of coming out of the sale proceeds.  I see

16     cost as having some link to that, but as I

17     mentioned earlier, I don't see cost as necessarily

18     a good measure of fair market value.  And the MRDA

19     says parties get the fair market value of their

20     rights.

21                   Q.   Now, you are aware that

22     Dr. Reichert here interprets the MRDA as giving

23     NNL, the Canadian company, a presumptive right to

24     the proceeds of the sale of Nortel's IP.  Are you

25     aware of that position?



```
 1                    A.    I am.
 2                    Q.    And he believes that the
 3    independent entities, the RPS entities, actually
 4    agreed that only NNL would be entitled to the
 5    proceeds of a sale of jointly created IP.  Is that
 6    your understanding?
 7                    A.    I believe that to be the case.
 8    Dr. -- yes.
 9                    Q.    And he believes that the parties
10    actually agreed to this in the MRDA, doesn't he?
11                    A.    He believes that the parties
12    agreed to this in the MRDA.
13                    Q.    And you agree with Dr. Cooper that
14    this interpretation would not be at arm's length;
15    isn't that right?
16                    A.    I believe that Dr. Reichert's
17    interpretation of the rights held by the licensed
18    participants as make-sell rights only without any
19    right to the underlying IP to be contrary to the
20    arm's-length, the arm's-length falling out, as I
21    have said, in terms of the licenses that were held
22    as being equivalent to beneficial ownership.  So
23    that economic ownership here was equivalent --
24    their rights that they held were equivalent to a
25    beneficial owner.
```

Neeson&Associates    W&F

```
 1                    Q.    And you believe that
 2    Dr. Reichert's interpretation of those terms would
 3    actually be economically irrational; isn't that
 4    correct?
 5                    A.    I have said that.
 6                    Q.    And part of the reason for that is
 7    that the independent entities shared all of the
 8    downside risk, and his interpretation would take
 9    away the upside; is that right?
10                    A.    Yes.  In effect, the parties all
11    contributed, took on the risks, took on the costs,
12    had the license rights during the down times,
13    during the hard times, from 2001 until the firm
14    went bankrupt.  And now we have the up times, in
15    some sense the value of the sales.  And at that
16    point in time I would argue it would be
17    economically irrational for the integrated entities
18    to have only shared in the down times and not share
19    in the up times.
20                    Q.    Now, the beneficial ownership
21    rights we have been speaking about, those don't
22    simply stop on the day a company files for
23    bankruptcy protection, do they?
24                    A.    No.
25                    Q.    And the proceeds that are
```

 Neeson&Associates    W&F Wilson & Peyzer Ltd.

```
 1   allocated in this proceeding are not themselves
 2   going to be exempt from taxation; isn't that right?
 3              A.   I have not been asked to look at
 4   this, but I assume that the entities when the
 5   proceeds are distributed, that there may be tax
 6   implications from those proceeds.  I haven't looked
 7   at that issue.
 8              Q.   And there is no special set of tax
 9   rules that applies in the bankruptcy context, is
10   there?
11              A.   I am not a bankruptcy expert, so
12   frankly, I don't know.
13              Q.   Now, you have said before that you
14   are aware or had reviewed documents that stated
15   that the RPS method was actually suggested to
16   Nortel by the revenue authorities; is that correct?
17              A.   I believe that's in the record.
18              Q.   And actually, the MRDA itself says
19   that, doesn't it?  Are you aware that it does?
20              A.   My recollection is that in the
21   whereas preamble to the MRDA, there is a sentence
22   that says something like at the request of the "tax
23   authorities" to look at the RPSM.
24              Q.   And you have reviewed a lot of
25   documents that pertain to Nortel's APA process;
```



```
 1    isn't that correct?
 2                   A.    I have reviewed several documents,
 3    yes.
 4                   Q.    And have you reviewed documents
 5    which indicated that the IRS actually confirmed
 6    that it considered or the APA team considered the
 7    RPS method to be the best method for Nortel?
 8                   A.    In the APA documents, yes, both
 9    the CRA and the IRS see the residual profit-split
10    method as a method that would be applicable to
11    Nortel, on the grounds that where the integrated
12    entities both have intangibles, they both have
13    nonroutine intangibles, and there are no
14    comparables, and the entities are integrated with
15    one another, none of the other methods work.
16                   So part of the problem here is Nortel
17    told the tax authorities that the integrated
18    entities all have valuable intangibles.  So the
19    methods you would normally use -- CPM, for example,
20    the intangibles can be on one side of the table but
21    not the other, so you couldn't use CPM for the
22    nonroutine.  There were no comparables, so you
23    couldn't go to the open market to use what we call
24    a comparable uncontrolled transaction, a CUT.  So
25    you couldn't use a CUT, you couldn't use CPM, you
```



```
 1   have been told you couldn't use a cost-sharing
 2   arrangement.  They didn't want to renew the
 3   cost-sharing arrangements.  The last man standing
 4   is the profit-split method.
 5              Q.   But as a result of that, the APA
 6   team at the IRS actually agreed with Nortel that
 7   the RPS method was the best method for Nortel,
 8   didn't they?
 9              A.   Under the facts and circumstances,
10   yes.
11              Q.   Now, your own objections to the
12   RPS methodology here have to do with the manner in
13   which Nortel applied that method; isn't that
14   correct?
15              A.   Partly.
16              Q.   And how they implemented the RPS
17   method; isn't that correct?
18              A.   Partly.
19              Q.   And in relation to the basis for
20   the $2 billion settlement with the IRS and the CRA,
21   you would agree that the precise basis for that is
22   not known; isn't that right?
23              A.   We do not have the -- in the
24   letter that came from the tax authorities, it did
25   not specify where the $2 billion came from.  The
```



1    letter was in conjunction with the approval of the

2    APA, the 2001-2005 APA, and it is in a section on

3    transfer pricing adjustments.  But we don't know

4    the specifics of what those adjustments were.

5                    Q.    And the negotiations between the

6    IRS and the CRA happened behind closed doors; isn't

7    that right?

8                    A.    Yes.

9                    Q.    They were the result of

10   behind-the-scenes negotiations?

11                   A.    Yes.

12                   Q.    Switching to a different topic,

13   you are aware that useful or economic life of

14   intellectual property is reflected in Nortel's

15   allocation key; isn't that right?

16                   A.    It is important when you are doing

17   a capitalized amortized measure of R&D spend, which

18   was the allocation key 2001-2005, that you have to

19   project what you think this is going to be, so you

20   need to do some estimate of useful life.

21                   Nortel used a 30 percent depreciation

22   or amortization schedule, yes.

23                   Q.    And in your review of Nortel's

24   materials, you found that there was compelling

25   evidence that Nortel's IP actually had a longer



1    economic life than the estimates that were used by

2    the companies; is that correct?

3              A.   The evidence I was speaking to was

4    Dr. Catherine Tucker, who had put in a report on

5    this.  And she is an expert on this issue, not

6    myself.  But my reading of her report suggested

7    that the economic life was significantly longer.

8    Particularly, she talks about S-curves and the

9    foundation building-block patents and that those

10   patents, she talks about going through the phone --

11   I am not talking about the dog bowl example, but

12   the phone example, the G1, G2, G3.  And so the

13   original patents in the original scheme carried

14   through in the various versions, and therefore, the

15   economic life, which is the life over which you can

16   expect to receive income from a patent, could be as

17   long as the life of the patent.

18              Q.   And so as a result, you agree with

19   Dr. Cooper that if R&D expenditures were to be used

20   to allocate the proceeds here, you would have to

21   adjust those numbers; isn't that right?

22              A.   Well, two points.  I am not in

23   favor of using the allocation key under the RPSM

24   for allocating the proceeds.  But I do understand,

25   based on Dr. Tucker's work, that an appropriate



1    amortization schedule would have been a different

2    schedule, particularly for the long-lived,

3    high-value patents.

4                Q.    And in presenting the situation to

5    the IRS and the CRA, you would have to provide

6    complete and accurate information, wouldn't you?

7                A.    Are you speaking in terms of --

8    could you be more specific about the "you"?

9                Q.    Sure.  Well, actually let me step

10   back a minute.

11               So you have said that if expenditures

12   were used to allocate the proceeds of the sales,

13   the RPSM would have to be adjusted to account for

14   the underestimation that Dr. Tucker has seen; is

15   that right?

16               A.    What I have said is I am not in

17   favor of using the allocation key for allocating

18   the proceeds of the sales.  What I have said is for

19   purposes of the RPSM or in general, an application

20   of any allocation key for residual profits, it is

21   important to get the economic life of the IP

22   correct.  And my understanding is Dr. Tucker has

23   opined that the life that was here was too short

24   and should have been longer.

25               Q.    Shifting topics a little bit, I



1    would like to discuss the significance of holding

2    legal title in a transfer pricing arrangement, a

3    legal title to intangibles.  Now, I think you said

4    here today and in your prior reports that under

5    Nortel's transfer pricing arrangements, the five

6    independent entities were the beneficial owners of

7    Nortel's IP; is that correct?

8              A.    Yes.

9              Q.    And you have said that where NNL

10   is the legal owner -- strike that question.

11             Now, from a transfer pricing

12   perspective, holding legal title to an intangible

13   doesn't necessarily give the holder a right to

14   share in the residual profits from exploiting the

15   intangible; isn't that right?

16             A.    As a transfer pricing

17   professional, I view the legal title as almost

18   parking legal title; that there may be some returns

19   that have to be paid to the holder in the form of

20   administrative fees for managing the legal title,

21   but nothing additional over and above beyond that

22   comes from holding legal title, unless you can show

23   economic substance.  What I mean, that the legal

24   title generates functions, assets and risks that

25   have to be taken in account by the parties.  The



 1   OECD guidelines say exactly that, and I say so in

 2   my reports.

 3                Q.   And in Nortel's situation, NNL was

 4   the legal owner of the IP, but economically, all of

 5   the five independent entities were the co-owners of

 6   it; isn't that correct?

 7                A.   Yes.

 8                Q.   And that's because all of the five

 9   independent entities performed the same functions

10   in relation to R&D that created the R&D; isn't that

11   correct?

12                A.   Yes.

13                Q.   So holding legal title did not

14   entitle NNL to receive any greater value from the

15   IP; is that right?

16                A.   It did not from a transfer pricing

17   perspective.

18                MR. ADLER:  Dr. Eden, thank you.

19                THE US COURT:  Thank you, Mr. Adler.

20                THE WITNESS:  Thank you, Mr. Adler.

21                MR. ADLER:  Thank you, Your Honor.

22                THE US COURT:  Good morning,

23   Mr. O'Connor.

24                MR. O'CONNOR:  Good morning, Judge

25   Gross.  Good morning, Justice Newbould.

 Neeson & Associates    W&F

```
 1   CROSS-EXAMINATION BY MR. O'CONNOR:

 2                 BY MR. O'CONNOR:

 3                 Q.   Good morning, Dr. Eden.

 4                 A.   Good morning, Mr. O'Connor.

 5                 Q.   We have not met before, but I am

 6   Brian O'Connor from Willkie Farr, and I represent

 7   the UK pension claimants.  I have a few follow-up

 8   questions for you this morning.

 9                 I think you testified on direct that

10   APAs are designed for ongoing businesses where the

11   facts and circumstances are not expected to change

12   materially; correct?

13                 A.   I did.

14                 Q.   And I assume that means that the

15   sale of the entire business or substantially all of

16   its assets would be a material change in

17   expectations?

18                 A.   Absolutely.

19                 Q.   And I assume also that the

20   insolvency of the entire business would be a

21   material change in expectations?

22                 A.   Absolutely.

23                 Q.   You also said that transfer

24   pricing is for ongoing businesses; correct?

25                 A.   I did.
```

 Neeson & Associates    W&P

```
 1                    Q.   And that transfer pricing is
 2   intended to be a mechanism for calculating taxes
 3   for each jurisdiction in which the business
 4   operates; correct?
 5                    A.   It is intended to have the related
 6   parties pay taxes on the same basis, on a tax
 7   parity I think is the phrase, on a tax parity with
 8   unrelated parties or uncontrolled parties, yes.
 9                    Q.   And minimization of tax is a key
10   motive of transfer pricing?
11                    A.   I think tax minimization is one of
12   the key, one of the key motives for transfer
13   pricing, and was a key motive here in the Nortel
14   situation.
15                    Q.   And if we were to look at a
16   typical income or profit and loss statement for a
17   business, it would start out with net sales?
18                    A.   Yes.
19                    Q.   It would then have the cost of
20   goods sold?
21                    A.   Yes.
22                    Q.   That would give us gross profit;
23   correct?
24                    A.   Yes.
25                    Q.   And then you would have operating
```



1    expenses such as sales and general and

2    administrative?

3                    A.    Yes.

4                    Q.    And if you subtracted that from

5    gross profit, you would have operating profit?

6                    A.    Operating profit.

7                    Q.    Then you could have other income

8    or expenses or gains or losses to arrive at net

9    profit before taxes; correct?

10                   A.    Yes.

11                   Q.    Then you would pay your taxes and

12   you would arrive at net income?

13                   A.    Yes.

14                   Q.    And am I correct that one of the

15   goals of transfer pricing would be to include as

16   much of the expenses as you could to match revenue

17   in order to minimize the amount of taxes that the

18   business would pay as a whole?

19                   A.    That is partially correct.  I

20   think my understanding is that multinationals, say,

21   in two jurisdictions, both are in two

22   jurisdictions, will have to determine their

23   transfer prices for the product going across the

24   border and will take into account both the costs

25   and the revenues in determining that transfer



1    price, yes.

2                    Q.    So it would be in their economic

3    interest to include by way of offset as much of the

4    expenses that were incurred to generate that

5    revenue as would be possible?

6                    A.    In general, the theory says you

7    will move the expenses into the high-tax

8    jurisdiction, where they are deductible, and move

9    the revenue into the low-tax jurisdiction, where it

10   faces a lower tax rate, yes.

11                   Q.    And it certainly wouldn't make any

12   sense to leave the expenses unaccounted for in any

13   jurisdiction from a tax minimization point of view?

14                   A.    I am not sure how you could leave

15   the expenses unaccounted for in any jurisdiction.

16   The firm as a whole must report to tax authorities

17   in all the places where it does business, and it

18   must report both its expenditures and its income.

19                   Q.    On an operating basis?

20                   A.    These are for operating businesses

21   filing their annual corporate income tax, yes.

22                   MR. O'CONNOR:  Thank you, Dr. Eden.  I

23   have no further questions.

24                   THE US COURT:  Thank you, Mr. O'Connor.

25                   Mr. Ruby, we have you here today, too.



```
 1                    MR. RUBY:  We do, though we are going

 2    to try something new today, with the indulgence of

 3    the Court.  Mr. Smith is going to cross-examine

 4    Dr. Eden from Toronto.  Like some others, he had a

 5    graduation last night and couldn't get all the way

 6    to Delaware, so I am told it will take a minute to

 7    press a button.

 8                    THE CANADIAN COURT:  What did he

 9    graduate from?

10                    MR. RUBY:  Your Honor, you are going to

11    have to ask him that.

12                    THE CANADIAN COURT:  Law school?

13                    MR. RUBY:  So if we could just take a

14    moment.  I understand there is a button we need to

15    press to reverse the screen so that the witness and

16    the Courts can see Mr. Smith in Toronto.

17                    THE US COURT:  All right.

18                    MR. RUBY:  And we will be off to the

19    races.

20                    THE US COURT:  Very well.  Is that it

21    or is there more to do?

22                    MR. RUBY:  Well, I can see Mr. Smith.

23    Dr. Eden, can you?

24                    THE WITNESS:  Yes.  I think I am going

25    to have to turn this way.  So I have turned my mic.
```



```
 1   I hope that is going to be okay.

 2              Actually, I can see it here now.  Now I

 3   am going to move my head in three directions.

 4              MR. RUBY:  And, Justice Newbould, you

 5   can hear?

 6              THE CANADIAN COURT:  I can hear and

 7   see.

 8              MR. RUBY:  Terrific.  I won't say I

 9   feel sorry for you.

10              All right.  Thank you, Your Honors.

11              THE US COURT:  You bet.

12              MR. SMITH:  Thank you very much.  Judge

13   Gross, Dr. Eden.

14              THE WITNESS:  Nice to see you,

15   Mr. Smith.

16              MR. SMITH:  Thank you.  You, too.

17              THE US COURT:  That's better.

18   CROSS-EXAMINATION BY MR. SMITH:

19              BY MR. SMITH:

20         Q.   Dr. Eden, I just wanted to take

21   you back for a moment to the scope of the opinion

22   that you were engaged for in this case.  Turning to

23   your initial report of January 24, if you have that

24   there --

25         A.   I do.
```



1                    Q.   And at page 2, paragraph 7, you

2    describe your assignment as one to provide your

3    expert opinion as to whether Nortel's transfer

4    pricing arrangement, as set forth in Schedule A to

5    the MRDA, would be an appropriate basis for valuing

6    the assets and rights sold or relinquished by the

7    debtors; correct?

8                    A.   Correct.

9                    Q.   So just so we are clear, your

10   opinion does not extend to any other aspect of the

11   MRDA other than Schedule A; correct?

12                   A.   Actually, no.  I think I was

13   tasked to look at the transfer pricing policies.  I

14   see the MRDA as a transfer pricing document and

15   would have, therefore, taken into account the

16   provisions that were relevant to transfer pricing.

17              The MRDA I looked at in the context of

18   developing my opinion on whether Nortel's RPSM was

19   an appropriate basis for allocating the proceeds of

20   the bankruptcy sale.

21                   Q.   Right.  So the RPSM as set forth

22   in Schedule A, that's what you are referring to

23   there; right?

24                   A.   Schedule A gives you the mechanics

25   of how the RPSM is to be put in place for Nortel,



1   yes.

2              Q.   And you do not define or state

3   what assumption you are making about what the

4   assets and rights sold or relinquished are;

5   correct?

6              A.   I do not.  I was asked to look --

7   I was asked to assume that the purpose of

8   allocation here was to allocate the rights and the

9   assets that were relinquished or sold by each of

10  the debtors.

11             Q.   Right.  Without defining for

12  purposes of your report the parameters of those

13  rights or assets; correct?

14             A.   Correct.

15             Q.   And, Dr. Eden, I think we can go

16  through this quite quickly, but it is clear you are

17  not a valuation expert in the sense of the

18  valuation of assets as such; correct?

19             A.   In terms of a bankruptcy

20  situation, I am not a valuator of assets.

21             Q.   And other than what you may do in

22  the transfer pricing context, you have no valuation

23  qualifications; correct?

24             A.   As a transfer pricing

25  professional, I am prepared to talk about how one



```
 1   would value functions, assets and risks from a

 2   transfer pricing perspective but not as one would

 3   think about a valuator in a bankruptcy situation.

 4                  Q.   Right.  Thank you.

 5                  And, for example, if a valuator in a

 6   bankruptcy case were to give an opinion that when

 7   you are valuing license rights, for example, you

 8   have to look at a projected income stream, that's

 9   not something you would be qualified to comment on;

10   correct?

11                  A.   I wasn't asked to opine on that.

12                  Q.   And you wouldn't be qualified to;

13   correct?

14                  A.   I have some understanding of the

15   basic methods behind valuation as an economist

16   would normally have an understanding.  But I would

17   not be an expert in assessing, using the rules for

18   bankruptcy, whether the numbers were accurate or

19   not.  I wasn't asked to opine on that.  I haven't

20   done it.

21                  Q.   And you can't comment on whether

22   it would be right or wrong for a valuation expert

23   in this context -- I am sorry?

24                  THE CANADIAN COURT:  Mr. Smith,

25   Dr. Eden made it very clear she is not an expert in
```



1   valuation in bankruptcy cases.  Doesn't this cover

2   all of what you have now been asking?

3               MR. SMITH:  It should.  I thought there

4   was one more subtlety, but that is fine.  Thank

5   you.  Thank you, Justice Newbould.

6               BY MR. SMITH:

7               Q.   And, Dr. Eden, when you give your

8   opinion that the RPSM is not appropriate for the

9   valuation here of the assets and rights sold or

10  relinquished, that, in effect, is a negative

11  opinion.  It is not as if you opine on any

12  alternative or better basis for valuing; correct?

13              A.   That is correct.

14              Q.   And I think one thing we could

15  agree on is that in the world of transfer pricing,

16  Dr. Eden, there is a clear distinction between

17  legal ownership and legal title on the one hand and

18  what we call economic ownership or beneficial

19  ownership for transfer pricing purposes; correct?

20              A.   Correct.

21              Q.   And when we talk about transfer

22  pricing, you can leave it up to the lawyers to

23  argue whether it is relevant or not relevant for

24  purposes of anything in this proceeding, but when

25  we talk about transfer pricing on its own terms, I



```
1    think you would agree with me that the very
2    definition of the arm's-length principle at the
3    core of transfer pricing is self-limiting; correct?
4              A.   I am sorry.  I don't understand
5    the phrase "self-limiting."
6              Q.   Fair enough.  It is self-limiting
7    in the sense that it is on its own terms only the
8    standard agreed to for determining transfer prices
9    for tax purposes; correct?
10             A.   The arm's-length standard was
11   designed originally for tax purposes, and all the
12   methods were done for calculation of corporate
13   income tax.
14             There are slightly different variations
15   on these methods for purposes of determining
16   international trade that apply for customs duties
17   and for valuation and can also be used in rules of
18   origin.  But in the case before us the transfer
19   pricing rules I have looked at are the ones
20   specifically with respect to tax.
21             The RPSM method is only used for
22   corporate income tax purposes.  It is not an even
23   mentioned method in conjunction with any other
24   purpose other than corporate income tax.
25             Q.   All right.  So if we have that
```

Neeson & Associates   W&F

1    sort of box around the arm's-length principle on

2    its own terms, I think there is another situation

3    where we should understand the contours of transfer

4    pricing on its own terms, and that is where we do

5    meet the exceptional situation in transfer pricing

6    for disregarding the terms of the contract.  Even

7    there transfer pricing itself is explicit that it

8    doesn't have the effect of undoing what would

9    otherwise be valid legal provisions for any purpose

10   other than tax; correct?

11              A.    The OECD guidelines are

12   specifically with respect to international tax and

13   say that legal title can be disregarded for

14   purposes of calculating the income tax if economic

15   substance does not adhere for the tax.  This is

16   equivalent under substance does not equal form

17   applied specifically to transfer pricing, but there

18   are substance-does-not-equal-form rules in general

19   in the tax code.

20              Q.    Right.  And even that rule on its

21   own face in transfer pricing says it doesn't have

22   the effect of undoing otherwise valid provisions

23   for nontax purposes; correct?

24              A.    Correct.

25              Q.    Thank you.  Just to turn to



```
 1    another context for a moment, Dr. Eden, in your

 2    report you refer to Nortel's transfer pricing as

 3    being an intentional skewing in Nortel's favor for

 4    tax avoidance reasons.  Do you recall that?

 5                 A.   I do recall that.

 6                 Q.   Now, I just want to be clear what

 7    you are saying there.  We are aware in this case,

 8    of course, that Horst Frisch selected and designed

 9    the RPSM transfer pricing method for Nortel;

10    correct?

11                 A.   Correct.

12                 Q.   Are you saying Horst Frisch

13    intentionally skewed Nortel's transfer pricing --

14                 A.   I am not.

15                 Q.   -- in favor of -- all right.

16                 And to me, Dr. Eden -- and correct me

17    if I am wrong in this context -- but to me when

18    someone says something is skewed, it suggests that

19    it is diverging from the norm, that there is some

20    benchmark or norm out there that should be adhered

21    to and we are skewing away from it.  Is that what

22    you are suggesting here?

23                 A.   No, that's not actually what I

24    meant, Mr. Smith.  What I meant was pushing away to

25    one end or the other of a range.  As I spoke
```



```
 1   earlier this morning, I understood, and I do

 2   understand, that multinationals in minimizing tax,

 3   because transfer pricing is an inexact science and

 4   there is range of acceptable results, as long as

 5   you are within the bounds of what is legally

 6   permissible under the tax rules and you do so in

 7   good faith and you document, it is perfectly legal

 8   to take advantage of the room in the range.  You do

 9   not have to pick the midpoint.  You can push to the

10   low tax end, and that is perfectly legal.

11            And I would say a for-profit business

12   that is interested in maximizing returns to its

13   shareholders would do so.

14            Q.   All right.  No.  That is helpful.

15   I wanted some clarification what you meant by

16   intentional skewing, and I think you have given it

17   to us.

18            And just to be clear, you don't propose

19   here any different norm or benchmark that Nortel

20   should have adhered to either in terms of the

21   method or the actual implementation; correct?

22            A.   I did not -- I do not do that, no.

23            Q.   All right.  And I don't think we

24   need to turn it up, but you would acknowledge that

25   the Horst Frisch mandate here was clear.  It was to
```



 1   recommend the best method for Nortel; correct?

 2              A.   Yes.

 3              Q.   And by definition, that's the

 4   method that generates the most reliable measure of

 5   arm's-length results; correct?

 6              A.   That's a statement in the 482

 7   guidelines, yes.

 8              Q.   If we could just -- if you have

 9   your initial report still there, Dr. Eden, just

10   turn to page -- I am sorry.  Your rebuttal report.

11   I apologize.  If you have that.

12              A.   I do.

13              Q.   Thank you.  Page 4 of paragraph 7

14   at the bottom there.  This is where you state

15   that -- and you are welcome to read it, but this is

16   where you state that essentially Dr. Reichert's

17   view of the limited nature of the licensees'

18   interests is not consistent with the arm's-length

19   principle; right?

20              A.   Yes.

21              Q.   And at paragraph 8 following you

22   say that if Nortel had told the tax authorities the

23   licenses were limited in this manner, the tax

24   authorities would not have accepted that

25   limitation.



```
1                    A.    Yes.

2                    Q.    And you are making no

3    qualifications to those statements today; correct?

4                    A.    No.

5                    Q.    All right.  So just sticking with

6    the first for the moment, that the view that the

7    licensees from a transfer pricing perspective only

8    had a limited interest is not consistent with the

9    arm's-length principle, you would agree that's not

10   an analysis or a conclusion we are allowed to make

11   in transfer pricing based on hindsight evidence;

12   correct?

13                   A.    That is partially correct.  The US

14   regulations actually do allow hindsight in terms of

15   periodic adjustments and look-back, and they do so

16   particularly with high-valued intangibles.  They

17   do -- this is the commensurate with income

18   standard.  That is a look-back.  But in general,

19   the transfer pricing under the US, Canadian, OECD

20   guidelines, is ex ante.  You are supposed to

21   determine what the arm's-length standard would

22   apply at the time the contract was entered into.

23                   Q.    Thank you.  And just staying with

24   this same proposition, Dr. Eden, you don't suggest

25   that you have done any empirical work in terms of
```



1    studying what arm's-length parties actually do for

2    this.  You don't cite any of that in your report;

3    correct?

4              A.   I did not do an empirical work on

5    looking at the transfer pricing of Nortel in this

6    case.  I didn't see it as necessary.

7              Q.   All right.  And you didn't

8    reference or do any kind of calculation with

9    respect to any internal rate of return that the

10   licensees could have expected based on Reichert's

11   conception of their limited rights; correct?

12             A.   I did not evaluate what the

13   internal rate of return would have been for each of

14   the integrated entities in the period of time under

15   this case.

16             Q.   And are you aware, Dr. Eden, that

17   the OECD in its 2013 draft guidance on intangibles

18   explicitly states that arrangements are, in fact,

19   observed where the licensors retain the full right

20   to any enhancement of the licensed intangible that

21   may be developed during the term of the license?

22             A.   This particular paragraph, if my

23   memory serves me correctly, Mr. Smith, is a general

24   statement about who gets the right from the

25   intangibles.  And there is one sentence that says



1    it may all go to the holder of the legal title, and

2    there is another sentence that says it may all go

3    to the licensee.

4              It basically is saying that there is a

5    range of ways that you can allocate the profits,

6    and it depends upon the facts and circumstances.

7              Q.   Right.  And it is talking there,

8    to be clear, about what we see between independent

9    enterprises; correct?  Arm's-length enterprises?

10              A.   Yes, arm's-length parties,

11    depending upon their relative bargaining power,

12    could end at the high end or could end at the low

13    end of the rage.  As economists, we are familiar

14    with the concept of elasticity of the demand and

15    supply curve, and we know that the gap between the

16    demand and the supply curve is split between the

17    licensor and licensee depending upon their relative

18    bargaining power, yes.

19              Q.   All right.  Thank you.  Now, if we

20    go to the second proposition that I took you to, to

21    the effect that had the tax authorities been told

22    of Reichert's limited license interest concept,

23    they would never have accepted that.  Just so we

24    are clear by way of background, Dr. Eden,

25    obviously, your statement there is not based on any



1    statement or information that you obtained from the

2    tax authorities themselves; correct?  It is your

3    speculation; correct?

4                        A.    My assessment here is based on the

5    fact that under the cost-sharing regulations they

6    were told that each of the parties had beneficial

7    ownership equivalent to legal title, that this was

8    more than a product make-sell right.  That's what

9    they told the tax authorities at the expiration of

10   the cost-sharing arrangements.

11                       I believe that had NNI turned around

12   and said to the IRS, "We really only have a product

13   make-sell right," that the IRS would have seen this

14   as a significant reduction in the rights that were

15   held by NNI coming out of these cost-sharing

16   arrangements, and it would have been a subject for

17   discussion.

18                       Q.    When you talk about that alleged

19   communication to the tax authorities, are you

20   referring to the April 26, 2004 IDR response?

21                       A.    You will have to point me to it.

22   My understanding is that there were a variety of

23   communications between Nortel, and in each of these

24   Nortel told the tax authorities that at the end of

25   the cost-sharing arrangements, no buy-outs were



1    necessary, the rights continued.  The whereas

2    clause in the MRDA says those rights continue

3    through the MRDA.

4              My recollection may be -- it may be an

5    E&Y memo to the IRS in addition to that.  But

6    again, I am not in full command of all the

7    thousands of memos and backs and forth that were

8    done.  As I showed in my slides, there were

9    multiple communications between the IRS, CRA and

10   Nortel in this period.

11             Q.    All right.  Let's go to Exhibit

12   21031 for a moment, Dr. Eden.  This is the April

13   26, 2004 letter from E&Y to Tom Ralph.  You are

14   familiar with him; right?

15             A.    Yes.  I have never met him

16   personally, but yes, I know of him.  I know more of

17   Russell Kwiat.

18             Q.    And we can see at the back it was

19   cc'd to what was then call the CCRA and to IR --

20             A.    By David Canale.

21             Q.    Yes.  Now, Dr. Eden, to be clear,

22   this document is nowhere referred to in either of

23   your reports; correct?

24             A.    I believe it may not have been in

25   these reports.  I frankly can't remember.

 Neeson & Associates   W&F

```
 1                 Q.   It is not until your slide
 2    presentation of last night that you referred to
 3    this document; right?
 4                 A.   If you say so, I am sure that's
 5    the case.
 6                 Q.   And if you could turn to the
 7    bottom of page 4, Dr. Eden.
 8                 A.   Bottom of page 4.
 9                 Q.   Yes, the very bottom there, No. 5.
10                 A.   Yes.
11                 Q.   Item 5?
12                 A.   Yes.
13                 Q.   And E&Y here is reiterating the
14    IRS's question or request and says,
15                      "Please describe the legal and tax
16                      consequences of terminating the
17                      cost-sharing arrangement.  For example,
18                      please provide the amount of any
19                      buy-out payments paid or if none were
20                      paid, please explain why not."
21                 A.   Yes.
22                 Q.   And if you go to the answer, the
23    third paragraph of the answer on page 5, beginning
24    under the R&D CSA, do you see that?
25                 A.   Yes.
```



1          Q.    E&Y states that:

2                "Each participant obtained certain

3                rights with respect to its share of the

4                intangibles developed under the CSA."

5          A.    Yes.

6          Q.    "Specifically, a CSA participant

7                obtained a royalty-free license to

8                use the technology developed under

9                the CSA."

10         A.    Yes.

11         Q.    And then it goes on to talk about

12   the lack of a need for a buy-out payment; right?

13         A.    Yes.

14         Q.    There is no suggestion in those

15   wordings to you, is there, that each CSA

16   participant had anything other than a license to

17   use the technology?

18         A.    I agree that the word "use" is the

19   word that is here.  But it basically says that the

20   rights you had under the CSA, you carry those

21   rights out with you.

22         Q.    Right.  Whatever they were;

23   correct?

24         A.    Whatever they were.

25         Q.    Right.  And, Dr. Eden, you



1    referred in your report to an IRS position paper,

2    not in this context.  You referred to it for

3    another purpose.  It is Exhibit 11237.  If someone

4    could please provide Dr. Eden and Judge Gross with

5    that.

6              And, Dr. Eden, if you could, please, to

7    page 32 of that.

8              THE CANADIAN COURT:  It is a letter.

9    What is the date of that?

10             MR. SMITH:  March 22, 2006, Justice

11   Newbould.

12             THE CANADIAN COURT:  It is a letter

13   from?

14             MR. SMITH:  It is an internal memo in

15   the IRS from Tom Ralph and Russell Kwiat.

16             BY MR. SMITH:

17             Q.   And, Dr. Eden, in your analysis of

18   whether the tax authorities would have accepted

19   Dr. Reichert's concept of limited license

20   interests, you did not consider the IRS's

21   discussion on page 32; correct?

22             A.   I did consider it.

23             Q.   Is that in your report anywhere?

24             THE CANADIAN COURT:  Could I just --

25   Mr. Smith, I don't know what you are talking about



```
 1   because -- can you blow it up on the screen so I
 2   can see what you are talking about.
 3                 MR. SMITH:  Oh, I am sorry.  It should
 4   be page 32 at the top, "Nortel's position is that
 5   no buy-out payments are necessary," et cetera.
 6                 BY MR. SMITH:
 7                 Q.   And, Dr. Eden, that is obviously a
 8   recitation of the E&Y answer that we saw; correct?
 9                 A.   The first statement is, yes.
10   Nortel's position is they didn't think they needed
11   to do buy-out payments, that the rights that were
12   held were continued through the MRDA and would be
13   compensated through the allocation key.
14                 Q.   Right.  And that allocation key
15   only applies to operating profits --
16                 A.   The allocation key --
17                 Q.   -- not to --
18                 A.   -- was applied to the residual
19   left after the payment of routine returns.
20                 Q.   Right.  The residual operating
21   profit; correct?
22                 A.   Yes.
23                 Q.   Thank you.  And are you aware,
24   Dr. Eden, that the tax authorities were actually
25   supplied with the MRDA itself?
```

Neeson & Associates    W&F

```
 1                    A.   I believe it was attached as an

 2    appendix with the APA.  Well, it couldn't have

 3    been.  That was 2002.

 4                    I assume you are correct, that they

 5    were given a copy.

 6                    Q.   And you haven't seen in any of

 7    your analysis any questioning by any tax authority

 8    with respect to, for example, the scope of license

 9    provisions in the MRDA; correct?

10                    A.   I think -- again, I am relying on

11    my memory of the record.  My memory of the record

12    is that there were questions asked about the rights

13    that the parties held; for example, such as this

14    E&Y letter, which says the rights you had coming

15    out of the CSA were continued.

16                    The MRDA, as I said, in the whereas

17    clause says those rights continue.  And that would

18    have been the basis behind the discussion where the

19    tax authorities saw what the scope of the rights

20    would be.

21                    Q.   And, Dr. Eden, you are aware that

22    the MRDA expressly provides that if a party leaves

23    the RPSM, it only gets a buy-out of the fair market

24    value of its license rights; correct?

25                    A.   If a party left the MRDA,
```



 1   depending upon how it left, the payments were

 2   different.  It is my recollection that I think it

 3   is the third amendment, yes.  There was an

 4   amendment to the MRDA or an addendum to the MRDA

 5   that said that if a party goes into bankruptcy or

 6   becomes insolvent and has to leave the MRDA, it

 7   gets the fair market value of its license.

 8            Q.   Correct.  And I am also referring

 9   to the provision that if a party leaves the RPSM

10   short of bankruptcy, what it gets, what it is

11   entitled to expressly is the fair market value of

12   its license rights; correct?

13            A.   I am not sure what you mean by

14   "short of bankruptcy."

15            Q.   If it is a continuing operation.

16            THE CANADIAN COURT:  Which provision

17   are you referring to, Mr. Smith?

18            MR. SMITH:  It is Article 11.

19            BY MR. SMITH:

20            Q.   Dr. Eden, if you would like to see

21   it, of course, it is Exhibit 21003.  Perhaps

22   someone could provide you a copy.

23            A.   Yes.  And it would depend, I

24   suspect, on which of the addendums -- oh, here.

25   Thanks:  Perhaps you could point me to the

Neeson&Associates   W&F

1   paragraph.

2            Q.   The specific section I am

3   referring to is on page --

4            THE CANADIAN COURT:  On page 10, (d)?

5            BY MR. SMITH:

6            Q.   On page 10 at the bottom, (d),

7   where it refers to the event of an elective or a

8   forced retirement, a retiring participant's rights

9   in the technology will terminate and all the

10  licenses with respect to the technology will be

11  canceled, and then the retiree is entitled to

12  retirement allocation; right?

13           A.   I am not a lawyer, so I can't

14  interpret this document.  Are you reading under

15  section (c), a defaulting event?

16           THE CANADIAN COURT:  Dr. Eden, all the

17  witnesses have been coached to say that "I am not a

18  lawyer so I can't interpret."  This is legal talk

19  by people, lawyers who seem to think they have got

20  a patch on reading plain English.

21           THE WITNESS:  Well, all right.  In

22  terms of plain English, (d) says in the event of an

23  elective or forced retirement -- and I assume there

24  are definitions of those -- your rights terminate,

25  and all of your exclusive licenses will be

 Neeson & Associates    W&P

1    canceled, and you are entitled to a retirement

2    allocation, it says, immediately payable.  That's

3    what I read the paragraph as saying.

4              BY MR. SMITH:

5              Q.   Right.  Dr. Eden, I am not asking

6    you for an interpretation.  I am asking in the

7    context of your statement to the Court and your

8    evidence that had the tax authorities been told of

9    a restricted scope of the licenses under

10   Dr. Reichert's conception, they would not have

11   accepted it as arm's length.  And if you were to

12   assume, without going through the MRDA, if you were

13   to assume that it provides that a retiring

14   participant only gets the fair market value of its

15   license rights as opposed to any value of ownership

16   in the IP itself, that's clearly something the tax

17   authorities would have taken issue with if they

18   thought it wasn't arm's length; correct?

19             A.   I think that's not quite right.  I

20   think a party exiting with the fair market value of

21   its license -- all right? -- then the fair market

22   value of its license would include what the license

23   included, and the scope of the license would be

24   critical here.

25             My point was to say that a make-sell



```
 1   license, which is a limited scope, a few sticks, a
 2   few sticks is not what I understood the scope of
 3   the license to be under the cost-sharing
 4   arrangements.  It was equivalent to legal title.
 5   It was a full beneficial owner, and that included
 6   not just the make-use rights but the exclusion
 7   rights, as Dr. Tucker mentioned, the inclusion
 8   rights -- in other words, the sublicense rights --
 9   and rights to the underlying IP.
10             Had there not been rights to the
11   underlying IP also, as I have tried to show
12   earlier, the OECD guidelines and the Canadian rules
13   87-2R would not have considered this to be
14   appropriate under the cost-sharing rules.
15             Q.  Well, here we are under the RPSM
16   rules, Dr. Eden.  Let me turn to the discussion you
17   had with Mr. Adler for a moment.  And I don't want
18   to belabor the point, but you refer several times
19   in both your reports to the RPSM being a transfer
20   pricing method of last resort.  And you do that in
21   the present tense; correct?
22             A.  I do.
23             Q.  But it is actually clear,
24   Dr. Eden, that, for example, under the US 482
25   regulations, the old hierarchy under which it was a
```



1    last resort was removed and replaced by the

2    best-method rule; correct?

3                    A.    Correct.

4                    Q.    And in the 2010 OECD guidelines,

5    any previous reference to a hierarchy of methods

6    was dropped; correct?

7                    A.    In effect, yes, the hierarchy --

8    the movement has been to drop the hierarchy, but

9    still a presumption in favor of, where possible, of

10   direct methods, such as CUP for goods or CUT for

11   intangibles.

12                   Q.    Right.  Where possible; right?

13                   A.    Where possible, absolutely.

14                   Q.    Just to book-end this at both ends

15   of the chronological spectrum, if you could go to

16   the CRA circular you have referred to in your

17   report.  It is Exhibit 50295.

18                   A.    This is 87-2R?

19                   Q.    Correct.

20                   A.    Yes.  I don't have it in front of

21   me.  And it is not readable on the screen.

22                   Q.    Okay.  Is there a hard copy in

23   Wilmington?

24                   A.    Thank you very much.

25                   Q.    I apologize.  I have just lost the



1    reference.  If you could go to paragraph 145 on

2    page 15, if you look at the page numbers at the

3    bottom, Dr. Eden.

4                    A.   Yes.

5                    Q.   And again, just to be clear, this

6    is as long ago as 1999; correct?

7                    A.   Correct.

8                    Q.   All right.  And 145 -- this is the

9    statement by the CRA -- says,

10                        "Traditional transaction methods

11                        or the TNMM would probably not be

12                        appropriate. . . ."  So traditional

13                        transaction methods includes the CUT;

14                        correct?

15                   A.   Yes.

16                   Q.   ". . . would not be appropriate

17                        where an intangible property is

18                        highly valuable or unique, such as

19                        a patent resulting from risky and

20                        costly research and development

21                        because of the difficulty in

22                        finding comparable information."

23                        And then it goes on to say at the

24    bottom of that paragraph,

25                        "In such cases, the residual



1                profit-split method may often be the

2                most appropriate method."

3                      And this is specifically under the

4     topic of intangible property; correct?

5                      A.   Yes.   It is referring, as you can

6     see, to the sentence above the one you highlighted;

7     that both parties have valuable, unique intangibles

8     here.   And in a situation where both sides of the

9     table have intangibles and they are nonroutine

10    intangibles, so there are no comparables, you may

11    be backed in, as I have said, into using a

12    profit-split method.

13                     Q.   Right.   And if we go back to the

14    2013 guidance, Dr. Eden, if you still have that --

15                     A.   Do you mean the OECD guidelines?

16                     Q.   Yes, thank you.   Exhibit 21600.

17                     A.   Oh, I don't believe I have the

18    OECD guidelines in front of me, but I will -- yes.

19    This is a draft discussion paper.

20                     Q.   Right.   So we were just looking at

21    a piece from the CRA from 1999.   This is 2013.

22                     A.   Yes.

23                     Q.   And if you could just turn to page

24    40 for a moment, Dr. Eden, paragraph 163.   This is

25    the OECD saying that:



 1                    "The transfer pricing methods most
 2                    likely to prove useful in matters
 3                    involving transfers of one or more
 4                    intangibles are the CUP method and the
 5                    transactional profit-split method.
 6                    Valuation techniques can be useful
 7                    tools.  Supplemental guidance,"
 8                    et cetera.
 9                    So that's the latest statement we have
10        in terms of transfer pricing guidance on the
11        appropriate methods for intangibles; correct?
12                    A.   This is in a section on, you can
13        see on the previous two pages, I guess, on
14        supplemental guidance on the methods where there
15        has been a transfer of intangibles or rights in
16        intangibles, yes.
17                    Q.   All right.  And I just wanted to
18        revisit a moment, Dr. Eden, something you said to
19        my colleague Mr. Adler when he was cross-examining
20        you.  He asked to the effect of if beneficial
21        ownership under the transfer pricing notion simply
22        ends or expires on bankruptcy, and you said it
23        didn't; correct?
24                    A.   I said that the ownership that
25        entities had under the transfer pricing rules is



1    the ownership that they have and would have to be

2    valued at the time, yes.

3            Q.   Well, it is clearly your evidence

4    from what we saw in your slides today, although we

5    didn't see it in your report, but it is your

6    evidence that transfer pricing only applies to

7    ongoing concerns; correct?

8            A.   I said that, yes, the transfer

9    pricing rules were developed with the idea of

10   ongoing, ongoing entities for purposes of

11   determining their corporate income tax.

12           MR. SMITH:  All right.  Dr. Eden, thank

13   you.  Judge Gross, thank you.  Justice Newbould,

14   thank you for your patience.

15           MR. RUBY:  If I can just ask for us to

16   switch the technology back to focus on Delaware,

17   please.

18           THE US COURT:  Yes, thank you,

19   Mr. Ruby.

20           THE CANADIAN COURT:  Just before you do

21   that, I wanted to ask you a question, Dr. Eden, at

22   the end.  So perhaps I will ask you the question

23   now so other lawyers will have a chance to deal

24   with it.

25           Just taking up with what Mr. Smith



 1   said, I had taken you down in your

 2   cross-examination by Mr. Adler to say that the

 3   economic ownership rights do not stop on a

 4   bankruptcy.

 5            THE WITNESS:  Well, perhaps --

 6            THE CANADIAN COURT:  And that's why --

 7            THE WITNESS:  Sorry.

 8            THE CANADIAN COURT:  Assuming that's a

 9   transfer pricing concept, which I think you are

10   speaking of transfer pricing concepts, I wondered

11   why you said that when transfer pricing, you say,

12   doesn't continue after a bankruptcy.

13            THE WITNESS:  Thank you, Justice

14   Newbould, for your question.

15            I think I may have misspoke, actually,

16   here.  As I say, the transfer pricing rules were

17   not set up for bankruptcy.  I don't think they have

18   ever been applied in a bankruptcy situation.  I am

19   not a bankruptcy expert.  So really, I haven't

20   looked at the issue.  I don't know whether the

21   transfer pricing -- what one would do in a

22   situation when a bankruptcy happens.  There is

23   still one entity owns the other entity, but each of

24   the entities is worried about its own creditors,

25   and they are clearly hard-bargaining with one

 Neeson & Associates   W&F

1   another.

2              The rules are for controlled entities.

3   So I guess I think that in this particular

4   situation it is a really interesting question to

5   think about what would happen to the transfer

6   pricing rules in a situation before they are

7   completely split up but they are in the bankruptcy

8   case.

9              I have not considered that, and I

10  really shouldn't -- I would like to retract what I

11  said and say I don't really know.  For purposes of

12  tax --

13             THE CANADIAN COURT:  I will tell you

14  this.  When you answered that question, when you

15  answered that question, I saw a little

16  undecidedness in your --

17             THE WITNESS:  Absolutely.  I apologize

18  for -- I think that this is an interesting topic,

19  but I have not opined on that.  The transfer

20  pricing rules are meant for ongoing businesses.  I

21  am not sure what happens in a bankruptcy case to

22  the transfer pricing rules.

23             THE CANADIAN COURT:  Okay.  Thank you.

24             THE WITNESS:  I have never dealt with

25  it.



```
 1                    MR. ZIGLER:  Good afternoon, Judge
 2   Gross.
 3                    THE US COURT:  Good afternoon.
 4                    MR. ZIGLER:  Good afternoon, Justice
 5   Newbould.
 6   CROSS-EXAMINATION BY MR. ZIGLER:
 7                    BY MR. ZIGLER:
 8                    Q.   Good afternoon, Dr. Eden.
 9                    A.   Nice to see you again, Mr. Zigler
10   her.
11                    Q.   Mark Zigler here for the CCC.  And
12   I have a few questions to ask you.
13                    Were you aware that Nortel ran its
14   business along a line of business matrix, where
15   different lines of business did their own R&D
16   planning and business planning and so on?
17                    A.   I have looked at the matrix
18   structure of Nortel to some extent, yes.  And there
19   were various lines of business that changed over
20   time.  The R&D units partly reported to the lines
21   of business and partly reported or stood alone.
22                    Q.   Whether the R&D was central or
23   through a line of business, whether the other
24   business activities were run, they were not run
25   through the subsidiaries from a business planning
```

Neeson&Associates   W&F

1    point of view; is that correct?

2                    A.   I don't know the answer to that

3    question.

4                    Q.   But in essence, the role of the

5    parent company and the subsidiaries that you have

6    seen is from a transfer pricing perspective only?

7                    A.   I sit here today as both a

8    transfer pricing expert, but I am also, I think,

9    considered to be an expert on multinational

10   enterprises and have many publications in that

11   area.

12                   My understanding is that Nortel was a

13   high-tech firm from a small open economy, Canada;

14   that at one period in time it was one of the

15   largest and biggest telecom companies in the world;

16   that it had multiple R&D centers, most of them in

17   the United States or Canada, but elsewhere; that it

18   was run in a matrix structure, and that the R&D

19   activities were like a network structure, where the

20   individuals worked together.

21                   I have read the functional analyses

22   that were done for the original APA and for the

23   second APA where this discussion of how R&D was

24   conducted -- I understand there was an overall R&D

25   committee.  There were different members from



1    different countries on the R&D committee.

2              Q.   So in that respect, the transfer

3    pricing is something that occurs almost after the

4    fact in terms of how the business planning goes; is

5    that correct?

6              A.   That's not quite correct, I think.

7    I think historically, if one goes back to the

8    '80's, most multinationals did the taxes completely

9    separate from the business, but that now there is

10   more of an integrated nature of taxes being taken

11   into account in the businesses.  I haven't looked

12   at that specifically from the Nortel perspective,

13   though.

14             Q.   All right.  Well, let's turn up

15   paragraph 14, though, of your initial report,

16   please.

17             A.   Yes.

18             Q.   As I understand your thesis -- and

19   it goes back to the question that you were being

20   asked by Justice Newbould and by Mr. Smith -- you

21   are saying at the end of paragraph 14 that in terms

22   of --

23                  "If the goal of allocation here is

24                  to determine the value of assets sold

25                  or relinquished by each selling debtor



```
 1                    so that value can be distributed to
 2                    each debtor's own creditors, then
 3                    resorting to the firm's transfer
 4                    pricing arrangements would be neither
 5                    instructive nor appropriate.  These
 6                    arrangements address entirely different
 7                    policy considerations."
 8              So I take it you are saying as a
 9    transfer pricing expert, what we do in the transfer
10    pricing world should not inform the decision of the
11    bankruptcy expertise of these two Courts.  Is that
12    the gist of your thesis?
13              A.   I think that looking to Nortel's
14    transfer pricing policy would neither be
15    appropriate nor instructive in terms of allocating
16    bankruptcy procedures.
17              Q.   And those transfer pricing
18    arrangements are, in effect, embodied in the
19    transfer pricing agreements that Nortel developed
20    with its subsidiaries, that NNL developed with its
21    various subsidiaries; is that correct?
22              A.   I think that's correct.
23              Q.   So when you refer to the transfer
24    pricing arrangements, you are talking not just
25    about the RPSM schedule to the MRDA but about the
```



1    MRDA itself.  It is a transfer pricing document, is

2    it not?

3                  A.   I see the MRDA as a transfer

4    pricing document, yes.

5                  Q.   So all of its contents with

6    respect to the nature of the licenses, the

7    royalty-free licenses, the nature of the ownership,

8    all of the coming-and-going provisions that you

9    were pointed to, those are all related to transfer

10   pricing and do not inform bankruptcy, in your

11   opinion?

12                 A.   That is not my opinion, actually.

13   I think the MRDA carries over from the old

14   cost-sharing arrangements and has many of the

15   clauses one would see in a license, a typical

16   license agreement.  As a transfer pricing document,

17   it is spelling out how Nortel intended to do its

18   transfer pricing for purposes of the APA.

19                 Q.   Beyond the transfer pricing,

20   though, are you saying it has other functions that

21   have nothing to do with transfer pricing?

22                 A.   I am saying that I really can't

23   opine on that subject of the legal status of the

24   MRDA.  I only looked at the document from a

25   transfer pricing perspective.



1              Q.   And essentially, going back to

2    your thesis, you are saying the transfer pricing

3    world has its own terminologies and provisions and

4    rules, and they should not inform bankruptcy; is

5    that correct?

6              A.   It is a very general statement,

7    but basically, I believe that looking to the

8    existing transfer pricing rules as a way to inform

9    on a very different subject, bankruptcy, is not

10   necessarily instructive or helpful.

11             Q.   And you are offering no opinions

12   as to what should happen in a bankruptcy?

13             A.   I am not.

14             Q.   Right.  So again, just looking

15   briefly at your rebuttal report, when you talk --

16   when you agreed with Dr. Cooper at paragraph 105

17   and you say that he is correct that all of the IEs,

18   not just NNL, are entitled to share in the proceeds

19   of the Rockstar sale, are you offering an opinion

20   in a bankruptcy context there?

21             A.   I was looking at this from a --

22   well, I was looking at this from a perspective of

23   the license rights held by the IEs coming out of

24   the cost-sharing arrangements --

25             Q.   Are you --



```
 1                    A.    -- and as expressed in the MRDA.
 2                    Q.    Are you offering an opinion as to
 3    what should happen in a bankruptcy situation in
 4    paragraph 105?
 5                    A.    I am not offering an opinion as to
 6    how the pie should be divided.  I think what I am
 7    saying is that the pie should include the Rockstar.
 8                    Q.    Well, that is an opinion.
 9                    A.    It is an opinion as to what I
10    understood to be or at least what I understand from
11    a transfer pricing perspective to be the rights.
12    But as I said, I am here as a transfer pricing
13    expert.  I am not a bankruptcy expert, and I don't
14    intend to tell the Court what the Court is to do
15    here in terms of the bankruptcy allocation.
16                    Q.    You are simply -- if I can put it
17    in other terms, if all three of the estates here,
18    for example, are relying on various provisions of a
19    transfer pricing document like the MRDA to inform
20    bankruptcy rights, you are saying they should tread
21    very carefully.  Is that fair?
22                    A.    I think "treading very carefully"
23    is probably a good way to put it.
24                    Q.    Let me move to another question
25    and another point, something that you raised with
```



1    Mr. Adler.  You indicated that you are not

2    offering -- you weren't asked to look at the tax

3    consequences of whatever allocation decisions the

4    Courts could reach in this case --

5                    A.   No, I was not.

6                    Q.   -- is that correct?

7                    And, in fact, you are not suggesting

8    that the tax consequences should in any way govern

9    the decision of the Courts in any way?

10                   A.   I would never presume to tell the

11   Court what it should or shouldn't do.

12                   Q.   You are not offering an opinion on

13   tax consequences should govern a decision here?

14                   A.   I am not.  No, I am not.

15                   Q.   And in fact, as a tax

16   practitioner, you would generally agree with me

17   that in the tax world, tax consequences generally

18   follow the business or legal event.  They don't

19   drive the legal event.  Is that fair?

20                   A.   I am not prepared to opine on

21   that.

22                   Q.   As a tax practitioner, isn't it

23   often that tax consequences are secondary to an

24   event that occurs in a business context, for

25   example?

 Neeson & Associates   W&F

```
 1                    A.   I don't see myself as a, quote
 2    unquote, tax practitioner.
 3                    Q.   Okay.  Well, that's fine.  Let's
 4    look at your demonstrative briefly and the
 5    reference to the CSAs.
 6                    A.   Yes.
 7                    Q.   And I think it is at No. 20 of
 8    your demonstrative.  And you talk about the 1992
 9    CSA.  And I am trying to understand how that flows
10    into your opinion and your thesis on the MRDA, in
11    that the January 1, 1992 CSA -- did you look at
12    that document?
13                    A.   It was -- yes, I received that
14    document.  I believe it was after I filed both my
15    reports.
16                    Q.   And, in fact, it was a bilateral
17    agreement between NNL and NNI?
18                    A.   Yes.
19                    Q.   Or their predecessors actually,
20    NTL and NTI?
21                    A.   Yes.
22                    Q.   And, in fact, the CSAs were all
23    bilateral documents.  They weren't, like the MRDA,
24    a multiparty document.  NNL had an individual
25    cost-sharing agreement with each of the
```



1   subsidiaries with respect to licensing and

2   ownership and research and development?

3               A.   That's my understanding.

4               Q.   And in fact, it had several of

5   them; some for R&D costs and some for other costs?

6               A.   Yes, for headquarters costs and I

7   believe also for what was called inventory, which

8   were the products.

9               Q.   So did you look at any of the

10  other ones besides the one with NNI?

11              A.   I looked at the cost-sharing

12  arrangement -- I think I may have seen the one --

13  actually, what I looked at was the -- I think I

14  briefly looked at the headquarters one.  I looked

15  at arrangements that were done with the LREs, but

16  that would have been -- I think I looked at the

17  cost-sharing arrangement with the LREs also at some

18  point in time.

19              Q.   But did you look at -- the LREs

20  being the other entities -- right? -- NNUK, NN

21  Ireland?  Did you look at those?

22              A.   Frankly, I don't remember.  I

23  think I may have looked at the NNUK one.

24              Q.   And, in fact, we have had evidence

25  in this case that the cost-sharing agreements were,



1    in fact, make-sell type agreements, where licenses

2    were restricted to products.  Was that not the

3    case?

4                    A.    I think you would have to show me

5    that.

6                    Q.    Well, looking at all of them.  In

7    any event, the reference you have on slide 20 to

8    the cost-sharing agreement, that's not -- it is not

9    quite correct that each licensed participant held

10   rights under the 1992 agreement?

11                   A.    My understanding is that the

12   cost-sharing arrangements that were entered into in

13   1996 applied from 1992 through 1999.

14                   Q.    That was the one between NNI and

15   NNL or its predecessors.  I am talking about all

16   the other participants.

17                   A.    Well, you are probably right.  I

18   do not -- I cannot off the top of my head recall

19   the dates that were the dates for the cost-sharing

20   arrangement with NNUK or France.  I simply don't

21   recall the dates.

22                   Q.    And, in fact, that statement in

23   the whereas clause from the MRDA that you cite here

24   is factually incorrect.  It is not true that each

25   licensed participant had any rights under that



1    cost-sharing agreement, because only one licensed

2    participant, NNI, was a party to it with NNL; is

3    that correct?

4                    A.   That statement is out of the MRDA.

5    If it is factually incorrect, then I can't comment

6    on that.

7                    Q.   And did you ever see the words

8    "equitable and beneficial ownership" in that

9    cost-sharing agreement?  I will put it to you they

10   don't appear in the agreement.

11                   THE CANADIAN COURT:  Isn't this just

12   argument, Mr. Zigler, you are engaging in here?

13                   MR. ZIGLER:  I am just trying to

14   understand where the witness is coming from on the

15   CSAs.

16                   THE CANADIAN COURT:  Well --

17                   MR. ZIGLER:  But I will conclude on

18   another point, Your Honor.

19                   BY MR. ZIGLER:

20                   Q.   You told Mr. Adler that your view

21   of the role of NNL, actually the holder of legal

22   title in any type of these licensing and ownership

23   arrangements, was essentially one of parking and

24   only holding administrative functions.  Is that

25   your assessment of what you saw with NNL and the



1    other parties?

2                 A.    My read of the record, that

3    through this time period that the Nortel tax group

4    said that they would put legal title for

5    convenience with Canada.  It often makes sense in

6    multinationals to put legal title in one place so

7    you centralize legal title.

8                 And then the decision is what legal

9    title involves in terms of the activities, the

10   functions, assets and risks.  So legal title could

11   involve significant functions, assets and risks or

12   very limited functions, assets and risks.

13                My understanding is in this situation

14   the functions, assets and risks associated with

15   legal title were quite small.  And I think there is

16   a functional analysis that was part of the APA

17   submission that shows something equivalent to that.

18                Q.    In fact, if the evidence was,

19   leaving aside what was told to the tax authorities,

20   that NNL was involved in obtaining licenses and

21   engaging in third-party licensing agreements with

22   other parties or in acquiring technology through

23   the acquisition of businesses, wouldn't you agree

24   with me that's a little more than an administrative

25   function?



```
 1                    A.   I haven't really -- it is an

 2     interesting hypothetical, but I haven't looked at

 3     it.

 4                    Q.   And if they were involved in

 5     servicing debt that was used to run the operation

 6     and create the R&D, would that be more than an

 7     administrative function?

 8                    A.   I don't see that as a function

 9     associated with legal title.  I see that as the

10     headquarters of the multinational determining debt

11     issues as a separate issue from legal title of the

12     IP.

13                    Q.   We are talking about administering

14     the business and its research and development.

15                    A.   Again, I see that as a separate

16     issue from the legal title on the intellectual

17     property.

18                    MR. ZIGLER:  Thank you.  I have no

19     further questions.

20                    THE US COURT:  Thank you, Mr. Zigler.

21     Any other cross-examination?

22                    All right.

23                    MS. BLOCK:  No redirect.  Thank you

24     very much.

25                    THE US COURT:  Ms. Block, thank you.
```



```
 1                  All right.  Justice Newbould, anything

 2      further from you?

 3                  THE CANADIAN COURT:  No.  Thank you,

 4      Dr. Eden.  What I am wondering about is in the

 5      second edition --

 6                  THE WITNESS:  Yes.

 7                  THE CANADIAN COURT:  -- if you quote

 8      Judge Gross, then perhaps we could -- at that stage

 9      Judge Gross will be a Google scholar.

10                  THE WITNESS:  Absolutely, absolutely.

11      I would be happy to quote you also, Justice

12      Newbould.

13                  THE US COURT:  He is much more

14      quotable.

15                  THE CANADIAN COURT:  Thank you,

16      Dr. Eden.

17                  THE US COURT:  Thank you, Dr. Eden.  We

18      appreciate your testimony.

19                  THE WITNESS:  Thank you.  I am pleased

20      to be here today.

21                  THE US COURT:  You are excused.  Thank

22      you so much.

23                  THE US COURT:  Back to College Station.

24                  THE WITNESS:  Back to College Station.

25                  -- WITNESS EXCUSED --
```



```
 1                    THE CANADIAN COURT:  I take it that
 2   concludes the evidence on the allocation portion of
 3   this trial.
 4                    MR. RUBY:  It does, Your Honors.
 5                    MR. BARRACK:   I wonder, Justice
 6   Newbould, you asked me a question yesterday when I
 7   was examining about substantive versus procedural
 8   when I was in the middle of the examination.  I
 9   wonder if I could respond to it.  On modified
10   universalism.  If you don't want me to, I won't.
11                    THE CANADIAN COURT:  No.  I think that
12   is just part of the argument at the end.
13                    MR. BARRACK:  Pardon?
14                    THE CANADIAN COURT:  No.  I posited it
15   to you is that an issue to be dealt with, and I
16   assume if it is, it is an issue to be dealt with on
17   the argument at the end.  I don't think --
18                    MR. BARRACK:  I didn't have my earpiece
19   in from the team at the time.
20                    THE CANADIAN COURT:  I think it is
21   better left to the end of the case.
22                    MR. BARRACK:  Okay.  I will leave it.
23                    THE CANADIAN COURT:  It was just a
24   question I raised.
25                    THE US COURT:  Mr. Ruby --
```



```
 1                  THE CANADIAN COURT:  I think now we
 2     need to deal -- Judge Gross, we need now to deal
 3     with the request by the Monitor.
 4                  THE US COURT:  Yes.  Is that what you
 5     were rising to address, Mr. Ruby?
 6                  MR. RUBY:  Something else, but I can
 7     wait.
 8                  THE US COURT:  All right.
 9                  THE CANADIAN COURT:  The Monitor has
10     requested in its memorandum of June 19, 2014 that
11     two legal issues be determined.
12                  The Monitor has referred to the claims
13     on bonds where there is a guarantee and the Monitor
14     refers to these as crossover bonds, and has
15     requested that the courts now determine two legal
16     issues.
17                  Firstly, whether the holders of the
18     crossover bonds claims are legally entitled in each
19     jurisdiction to claim or receive any amounts under
20     the relevant indentures, above and beyond the
21     outstanding principle debt and prepetition
22     interest; that is, namely, above and beyond $4.092
23     billion US; and secondly, if determined that the
24     holders of the crossover bonds claims are so
25     entitled, what additional amounts are such holders
```

 Neeson&Associates   W&F

1    entitled to so claim and receive.

2              The request by the Monitor is supported

3    by Nortel Networks UK Pension Trust Limited, the

4    Canadian Creditors Committee, and Wilmington Trust

5    NA.  The Monitor's request is opposed by the US

6    Debtor, by the Unsecured Creditors Committee, by

7    the Ad Hoc Bondholders, by Bank of New York Mellon,

8    and by the Law Debenture Trust Company of New York.

9              I do not intend to deal with all of the

10   arguments pro and con; rather, I will provide brief

11   reasons for my decision, and Judge Gross and I have

12   each agreed, have each come to the same conclusion,

13   and that conclusion is that these two issues raised

14   by the Monitor should now be dealt with.

15             The amount of postpetition interest

16   claimed is of crucial significance.  To the end of

17   2013, it is $1.6 billion, so it is growing beyond

18   that now.  That's to be put in context of the

19   assets in the lockbox of $7.3 billion that is

20   apparently not earning much interest at all.

21             We are not in a position to know with

22   any certainty what effect a decision on this claim

23   will have on settlement discussions.  We are not

24   party to those discussions.  It appears to me that

25   knowing what the position is on the issue, one way



 1   or the other, cannot hurt those discussions.

 2              We are told that further settlement

 3   discussions can be held next week and that is all

 4   to the good.

 5              However, what we propose to order will

 6   not affect the ability of the parties to negotiate

 7   further next week.  Negotiations and compromises

 8   are the stuff of CCAA proceedings.

 9              However, this issue has been known

10   since the Rockstar transaction in 2011 and has not

11   been settled.  It is also the case that three

12   mediations and discussions for a week, a few weeks

13   ago, have all failed.  It is not at all sure that

14   further discussions will achieve a settlement while

15   this issue remains outstanding.

16              I see no prejudice to anyone in having

17   this issue now dealt with.  The longer it festers,

18   the higher the legal fees will undoubtedly be.

19   Legal fees in this case are of huge concern to the

20   courts and to the pensioners and other claimants,

21   and they are hardly minor.

22              If there are going to be appeals, so be

23   it.  That likely would be the case in any event,

24   and if so, the sooner the better.

25              The success or failure of the



1    bondholders' claim for interest will have an

2    important and large effect on the Canadian Estate,

3    and on the claims of the pensioners and of the

4    disability claimants.  The sooner that is decided,

5    the better.

6              In their allocation pleadings, the US

7    interests assert an allocation that will result in

8    the US Estate being solvent and their expert

9    evidence is to that effect.  This, of course, is

10   perhaps a US bankruptcy issue, but I would observe

11   that while allocation issues have yet to be

12   decided, one cannot, at this stage, say that the US

13   Debtors' allocation position will not be accepted.

14             It is not unknown in Canada to have

15   issues decided in CCAA proceedings on claims

16   involving potential issues.  In Re:  Sino Forest

17   Corporation, 2012 ONSC 4377, affirmed 2012 ONCA

18   816, an issue was decided in a class action by

19   shareholders as to whether those claims were equity

20   claims, and whether the auditor's claims for

21   indemnity, if they ultimately were liable, would be

22   equity claims.  It was contended, without success,

23   that the motion was premature and the issue was

24   decided.

25             It is also the case under the Ashmore



1    v. Corporation of Lloyd's principles that this

2    issue can now, and in my view should now, be

3    determined.

4              I would also add it is not at all clear

5    to me why there needs to be any Plan of Compromise

6    in Canada.  The assets have been sold, there is no

7    continuing business of any kind, and liquidating

8    CCAA proceedings are now commonplace.

9              It appears to me to be a straight legal

10   issue.  It would be exceedingly surprising if this

11   issue had not been thoroughly researched by now,

12   and the memoranda that we have received gives some

13   indication that that is so.

14             What we propose is the matter be

15   scheduled for argument in July, at some point after

16   the start of the claims portion of the trial.  We

17   propose July 8, I beg your pardon, July the 11th,

18   it works for both courts.

19             If there is some other time in July

20   acceptable to all the interested parties and there

21   is an issue with July 11th, we will consider that

22   request if it is received this week.

23             My conclusion and Order is that the two

24   issues raised by the Monitor be scheduled for

25   argument on July the 11th, unless otherwise ordered



1   for a different date in July, and that the briefs

2   to be exchanged and filed should be done so no

3   later than July the 8th.  That concludes my

4   remarks.

5            THE US COURT:  Well, I join Justice

6   Newbould in his ruling that we ought to hear the

7   what I will call the interest issues at this time.

8            First let me dispel the concerns that I

9   previously ruled on this issue and determined at

10  that time that the issue was premature for

11  determination and advisory in nature.  As an

12  elderly client used to tell me in her broken

13  English, "What was ain't."

14           And I have now heard or will have

15  heard -- I guess I have now heard really all of the

16  evidence on allocation.  A finding that the United

17  States Estate is solvent is not assured, but I have

18  to observe that the only parties pressing a

19  methodology which would render the US Estate

20  insolvent is really persuading the Court that it

21  should proceed with this discrete legal issue at

22  this time.

23           And while it is certainly true that

24  there are other issues in the case, there is one

25  issue that can be decided and should be decided at



1    this time as this case otherwise continues really

2    without an end in sight.  It is fair to say that

3    the interest issues are ones which will require

4    decision at some point, and this is as good a time

5    as any.

6              So let me observe that my earlier

7    decision not to hear the interest issue did not

8    result in the parties being able to formulate a

9    compromise.  Maybe doing so now will have that

10   beneficial result.

11             As for a concern about appeals and the

12   impact of appeals on the progress of these cases, I

13   really consider that possibility to be virtually

14   nonexistent.  Before anyone would take an appeal on

15   less than all of the issues in this case, in

16   effect, an interlocutory appeal, I would urge them

17   to read the decisions of the Third Circuit.  And I

18   think that the Third Circuit made it clear that

19   this case has to proceed to a conclusion and

20   without interruption.

21             As far as whether this requires

22   analysis as if there were a motion for reargument

23   pending, I consider this really to be more of a

24   matter of case management.  And even if the

25   reargument standard were applicable, I have heard



1    in the past few weeks nothing but new evidence,

2    evidence which I had not considered and which was

3    still in the process of being formulated when I

4    previously ruled that I would not hear the interest

5    issues.

6              The concern that this is not a matter

7    subject to the joint jurisdiction of the Canadian

8    and US Courts is similarly a nonstarter issue.

9    Justice Newbould and I will decide the issues

10   confronting us separately.  But more importantly,

11   while we will do so independently, we will also be

12   acting in the spirit of Chapter 15 cases; that is,

13   with cooperation in scheduling, fair and efficient

14   administration, and for the protection and

15   maximization of debtors' assets.  And that language

16   can be found in a number of cases, including the

17   ABC Learning decision by the Third Circuit.

18              It is true, as the US Debtors posit,

19   that there are other factual and legal issues in

20   these cases.  So why spotlight the interest issue?

21   Because after five and a half years and a fortune

22   in administrative costs, we can and we should.  It

23   may not help the parties, but it will not hurt, and

24   it will bring some semblance of resolution.

25              And I will note that before we can



 1   render our decision on these interest issues,

 2   perhaps the parties can use the $1.6 billion spread

 3   between no interest and interest at the contract

 4   rate to come to some accommodation.

 5            And with that, I would say that we are

 6   prepared to consider any scheduling requests which

 7   would have us hear you in July.  But again, we have

 8   discussed the July 11 date.

 9            Mr. Lowenthal.

10            THE CANADIAN COURT:  July 11 date.

11            THE US COURT:  Yes.

12            THE CANADIAN COURT:  Yes.  And I might

13   just say on that score, Judge Gross, I know there

14   is a telephone conference scheduled for Friday

15   morning at 10:00 to deal with document issues in

16   the Canadian claims case in July.  What I can

17   suggest to the parties is if there is a problem

18   with that July 11 date, perhaps you can alert us

19   and we can take it up at the conference call.  We

20   can have Judge Gross participate to the extent we

21   are dealing with that date --

22            THE US COURT:  Sure.

23            THE CANADIAN COURT:  -- on Friday

24   morning.

25            THE US COURT:  I see Mr. Lowenthal here



1    in the courtroom.  Mr. Lowenthal.

2                MR. LOWENTHAL:  Yes, thank you, Your

3    Honor.  Daniel Lowenthal, Patterson, Belknap

4    Webb & Tyler.  We represent Law Debenture.  And as

5    everyone knows, we are the indenture trustee on the

6    NNCC bonds.

7                Your Honor, Justice Newbould, Judge

8    Gross, I need some clarification, and not to

9    anything that you just said.  I understand it

10   clearly.  But I just want to remind the Courts that

11   this was all triggered initially by a claims

12   objection filed by Wilmington Trust against Law

13   Debenture's claims and Bank of New York's claims.

14   And Wilmington Trust in its claims objection said

15   it was just seeking relief as to whether the

16   Bondholders would be entitled to anything in excess

17   of the federal judgment rate.

18                Now, the question that I need answered

19   is the process that we are about to embark on, is

20   this part and parcel of the Wilmington Trust claim

21   objections, because if so, then as Wilmington Trust

22   mentions in its objections, this would be subject

23   to Rule 3007 of the bankruptcy rules.  That would

24   afford us as the party against whom the objection

25   has been made a certain notice period.

Neeson&Associates    W&F

```
 1                    As Ms. Schweitzer said yesterday,
 2      certain parties holders may be interested in being
 3      heard on this, not just the core parties in this
 4      case.  We would be afforded a 30-day notice period.
 5      We might need to get notice out to those holders.
 6                    In addition, if 3007 applies, then this
 7      is a contested matter pursuant to 9014, and certain
 8      discovery rules and other rules kick in.  And if it
 9      is a claim objection against --
10                    THE CANADIAN COURT:  Well, you know, I
11      am upset that we didn't hear this yesterday.  And I
12      don't know anything about the US rules.  I don't
13      know whether they are binding, whether they can be
14      waived or not.  But to my mind, this should have
15      been -- you are now revisiting our decision.  And I
16      think rather counsel have a responsibility to make
17      it work and not talk about all of this.  That's my
18      view.  But I recognize it is a US issue.
19                    MR. LOWENTHAL:  Yes, exactly, Your
20      Honor.  And this is really more addressed to Judge
21      Gross.  If you think that I should have raised it
22      yesterday, I do apologize.  I did not realize that
23      there was going to be argument, as there was oral
24      argument yesterday, and frankly did not anticipate
25      this.  But again, I apologize if the Court is
```

 Neeson & Associates    W&F WILSON & PETZER LTD.

1    offended.

2              But nevertheless, it remains we are

3    affecting rights of my client and the holders who

4    hold large claims here.  And nevertheless,

5    irrespective, if you think I should have raised it

6    yesterday, I didn't, but I can't forgo those

7    rights.  This is of crucial importance from a

8    process standpoint under US law.  And therefore,

9    and as I was just about to say, we would have the

10   right, for instance, to assert a counterclaim

11   against Wilmington Trust.  And I am not saying that

12   we would, but we have that right to consider that.

13   And that would convert the contested matter into an

14   adversary proceeding.

15             So again, I didn't raise this

16   yesterday, but I hear your ruling now and the

17   schedule that you have imposed upon us.  As a

18   representative, as counsel to the indenture

19   trustee, let alone a core party and a member of a

20   creditors' committee, it is crucial to us that we

21   understand is this part and parcel of the

22   Wilmington Trust claim objection, in which case we

23   will assert our rights, or is this just some other

24   exercise that we are doing and it is not part and

25   parcel of an objection to our claims.

 Neeson&Associates   W&F

```
 1                    THE US COURT:  I hear this, and I think
 2   that Justice Newbould and I both considered this as
 3   in response to the request by the Monitor that we
 4   consider this legal issue.  I would want to give
 5   some thought to your concerns.
 6                    THE CANADIAN COURT:  There is also a
 7   legal issue what claim can be made in Canada.  And
 8   it strikes me -- Judge Gross will have to give some
 9   consideration -- but if you have some counterclaim,
10   that's a counterclaim you will have to make
11   sometime.  But the legal issue we want to deal with
12   here is different.
13                    THE US COURT:  Mr. Zelbo, I want to ask
14   a question of the Debtor.
15                    MR. ZELBO:  Sure.
16                    THE US COURT:  Why is this the Debtor's
17   issue?
18                    MR. ZELBO:  Your Honor, I am going to
19   defer to Mr. Bromley on that.
20                    THE US COURT:  All right.
21                    MR. ZELBO:  I just have one comment.
22   Mr. Bromley is the bankruptcy lawyer.
23                    THE US COURT:  I was just concerned.  I
24   was surprised when I received the statement in
25   opposition to this.
```



```
 1                MR. ZELBO:  You know, I am just the
 2    litigation ringer here.
 3                THE US COURT:  Oh, Mr. Zelbo, you are
 4    more than that, but go on.
 5                MR. ZELBO:  Well, Your Honors, I did
 6    want to say one thing, and then I will defer to
 7    Mr. Bromley, as I do on almost all things.
 8                The issues that are being raised right
 9    now, I just wanted to cut through this and suggest
10    perhaps the following.  The Courts have suggested
11    that we have a call Friday at 10:00.
12                THE US COURT:  Yes.
13                MR. ZELBO:  I think that's a terrific
14    idea.  Why don't the parties try to meet and confer
15    about these issues and find a practical solution to
16    this so that maybe we won't have to take up court
17    time on this.  But I think it is best if the
18    parties just talk about it and try to get through
19    these procedural issues to implement what the
20    Courts want.
21                THE US COURT:  And I will be better
22    prepared to address these procedural issues as
23    well.
24                MR. ZELBO:  So that was the only thing
25    I was going to rise to say.
```



```
 1                    THE US COURT:  All right.  Sit down
 2    safely now.
 3                    MR. ZELBO:  Now Mr. Bromley is coming
 4    up.
 5                    THE US COURT:  Mr. Bromley.  You know,
 6    we have been together five years in this case, over
 7    five years, and as you know, when I ask a question,
 8    it generally is a question, and that's what it is.
 9    I was confused why the Debtor is asserting a
10    position that really is a Bondholder issue.  We
11    have a committee that is two-thirds controlled by
12    the bond issues.  And why the Debtor has come
13    forward at this time.
14                    MR. BROMLEY:  Your Honor, the paper
15    that we filed the other day has probably three main
16    pieces to it.
17                    THE US COURT:  Yes.
18                    MR. BROMLEY:  And the conversation that
19    took place yesterday as well as the briefing, if
20    you will, that went back and forth unfortunately
21    did not focus, I think, on the one thing that drove
22    the Debtors to take the lead on this, which is that
23    we have been through five years of this, and we
24    have started out in the summer of 2010 with
25    informal conversations about allocation.  We
```



1   followed that up with two formal mediations before

2   Judge Blaine Phillips, a formal mediation before

3   Chief Justice Winkler, and we tried again just a

4   couple of weeks ago.  Throughout that, the entirety

5   of that exercise, never once was there a breach of

6   any confidences with respect to those

7   conversations.  I think it is fair to say that

8   those conversations were wide-ranging conversations

9   over a broad set of issues.

10           There is no doubt that Bondholder

11   interest was part and parcel of that.  But we think

12   it was entirely inappropriate and unfortunate that

13   the Monitor chose in the context of a Chambers

14   conference to raise this issue sua sponte without

15   warning and put it four-square before the two

16   Courts as if it was somehow a single issue and

17   somehow something that the US Debtors had ignored.

18           We are faced with approximately

19   $5.3 billion of claims in the United States.

20   4 billion of those claims were created by the

21   Canadian Debtors.  If we did not have the

22   $4 billion of bond debt, the US Debtors would be

23   outrageously solvent, and perhaps the single

24   most -- the single strongest advocate to allocation

25   towards the US Estate would be the Monitor.  But



1    unfortunately, decisions were made.  $4 billion was

2    borrowed, and that $4 billion was generally used to

3    support the Canadian business, to pay Canadian

4    employees, to support Canadian R&D and settle

5    claims against Canadian individuals.  And so to

6    take those issues out of the panoply of issues that

7    we have had and make it public was very disturbing

8    to us, so we felt it was necessary to take a public

9    stand against that.

10            So we stand here today now with one

11    issue identified and dozens of others not.  And

12    frankly, the temptation that we all have on our

13    side of the courtroom is to stand up and say here

14    are the other issues.  We have not done that and we

15    will not do it.  The Courts have decided that we

16    should address these issues.  We are professionals,

17    and we will do that.

18            THE US COURT:  Isn't this helpful to

19    the Debtors, the US Debtors?

20            MR. BROMLEY:  Well, Your Honor, if we

21    were sitting down in a room like we have been for

22    so often, and I have been in every minute of every

23    one of those mediations and every one of those

24    discussions, I would tell you that it doesn't solve

25    the problem.  I wish it would.  I wish it could.



1    But every one of the other issues that we are

2    dealing with, including ones that have been subject

3    to extensive discovery and briefing in this

4    allocation trial, are as front and center in that

5    conversation about how to settle these cases.

6             In some respects, it is an issue

7    between the Bondholders and the Canadian Debtors.

8    But frankly, it is more an issue between the

9    Bondholders and the CCC.  And if folks are to get

10   out of the way, if you will, the Monitor should get

11   out of the way just as much as the US Debtors.  The

12   Monitor is supposed to be a court-appointed

13   officer.  And I am not a Canadian lawyer by any

14   stretch of the imagination, though I wish to be

15   some day.

16            The fact of the matter is that on the

17   one hand we have a group of individuals who are

18   suffering.  I understand that.  They also have a

19   grudge.  There is no question about that.  They

20   were also very unhappy over a long period of time.

21            On the other side we have a group of

22   Bondholders.  We have documents that govern those

23   bonds, documents that bind the US Debtors solely

24   because its parent told them to do it.

25            So here we are.  It is time for us to



```
 1   deal with the issue.  I think we should brief it.

 2   The Courts have told us to do that, and we will all

 3   do it.

 4             One question I have, frankly, for the

 5   Courts, Your Honors, is when will you tell us what

 6   you decide, because while we are instructed to sit

 7   down --

 8             THE CANADIAN COURT:  Once we decide.

 9             MR. BROMLEY:  If we are to sit down and

10   settle, Your Honor, and have conversations, I can

11   tell you without hesitation that this is going to

12   be an obstacle to having any further conversation

13   so long as it is being litigated before you.  Okay?

14   So if we walk back into the room next week, we are

15   not going to get anywhere so long as this is now

16   subject to litigation before the Courts.  And I

17   don't mean appeals.

18             We are sitting here today with this

19   issue in front of us.  Frankly, we are sitting here

20   with the pro rata issue in front of us just as

21   much.

22             THE US COURT:  Sure.

23             MR. BROMLEY:  And why are we -- we will

24   sit down and, you know, we are sick of each other,

25   frankly.  I wish I could say we would be happy to
```



```
1   get together, but we are actually sick of each

2   other and sick of sitting in the room and seeing

3   the same stone faces.  All of us are.  They are

4   sick of my face; I am sick of theirs.

5             THE US COURT:  There are a lot of nice

6   faces.  There are a lot of nice faces in this case.

7             MR. BROMLEY:  There are lovely cases.

8             THE US COURT:  I understand.  And I

9   think you do need a little bit of a break.

10            MR. BROMLEY:  So from our perspective,

11  Your Honor, we actually honestly didn't think that

12  this would push settlement any further, having this

13  decided.  Your Honors have come to an opposite

14  decision.  We respect that.  We don't believe it

15  was appropriate to bring this issue out in the way

16  it was.  There is dozens of other issues, pro rata

17  being one of them.

18            And, you know, if we are going to have

19  this argument in the beginning of July, if you tell

20  us that you are not going to get us a decision

21  until Labor Day, there is not going to be a

22  conversation until Labor Day.  I am just being

23  honest with you.  If you tell us --

24            THE CANADIAN COURT:  I take it,

25  Mr. Bromley, what you are asking us to do is to be
```



1    quick.

2                    MR. BROMLEY:  That would be --

3                    THE US COURT:  Either quick or very

4    slow and decide it with the allocation issue.

5                    MR. BROMLEY:  Well, I mean, that's the

6    other issue, which is that all of these issues are

7    wrapped up into one in many respects, and I would

8    hate to have a situation where there is a decision

9    and we then have a sideshow with respect to whether

10   or not there is appeals and, you know, expedited

11   appeals to the Third Circuit or not, whether or not

12   they are appropriate at this point in time.

13   Believe me, everybody will have different points of

14   view on that no matter how you decide.

15                   It is not -- it is something that I

16   think, frankly, Your Honors, it would be better if

17   we just sat together for -- as Mr. Zelbo said, and

18   talked to you on Friday in terms of scheduling.

19   But, you know --

20                   THE US COURT:  Well, I won't minimize

21   Mr. Lowenthal's concerns.  Obviously, procedural

22   propriety is important.  And I have heard those

23   concerns, and I will certainly give them very

24   careful consideration at this point.

25                   MR. BROMLEY:  Well, I don't know if I



```
 1   have answered your question, Your Honor.

 2                THE US COURT:  You have.  I appreciate

 3   it.  I appreciate it.

 4                You all should know, of course, that

 5   Justice Newbould and I are attempting to be

 6   helpful.

 7                MR. O'CONNOR:  Your Honor, may I just

 8   be heard for one moment?

 9                THE US COURT:  Yes, Mr. O'Connor.

10                MR. O'CONNOR:  Not by way of any

11   reargument.  The Courts have decided what to do.  I

12   would just say in terms of thinking for Friday, we

13   are happy to confer with all the parties, but it

14   seems to me that this is not necessarily a

15   continuation of Wilmington Trust.  It seems to me

16   this is well within the inherent jurisdiction

17   authority of both the Courts to ask the parties to

18   brief an issue which the Courts think would be of

19   assistance to it in deciding the allocation

20   dispute.  And for that reason, I don't particularly

21   see the due process concerns.  But we will confer

22   with counsel.

23                THE US COURT:  Thank you, Mr. O'Connor.

24                I see Ms. Dine coming forward, whose

25   motion it was originally, I guess, or objection.
```



1   Ms. Dine, good afternoon.

2              MR. DINE:  Yes, Your Honor.  Karen

3   Dine, from Katten Muchin Rosenman on behalf of

4   Wilmington Trust.  And I would agree with the last

5   statement that was just made.  I think that you

6   have adjourned essentially the objection and that

7   you could look at this really as a request from the

8   Monitor and a legal issue that could be decided,

9   and after that the objection may be moot or we can

10  otherwise take it up.  But I don't think that it

11  needs to be centered procedurally on Wilmington

12  Trust's objection at this point.

13             THE US COURT:  All right.  Thank you,

14  Ms. Dine.  Thank you for your comments.  All right.

15             THE CANADIAN COURT:  All right.  So I

16  guess then we adjourn --

17             THE US COURT:  I guess we will

18  reconvene Friday.

19             THE CANADIAN COURT:  -- this matter

20  for -- oh, I guess we had discussed timing, Judge

21  Gross, about the oral argument of the allocation

22  trial.

23             MR. RUBY:  Yes, Your Honor.  There were

24  a few housekeeping issues that the parties wanted

25  to bring up with you.  That is one of them, is the



```
1    timing of closing argument, briefing, et cetera.
2              THE US COURT:  You had suggested that
3    we give you a date and you would then sort of back
4    into that.
5              MR. RUBY:  I think that's the general
6    idea.  Obviously, the protocol has certain dates
7    for briefing, but I think we can all be somewhat
8    flexible about that, obviously.  But without
9    knowing the Courts' flexibility, it is a bit hard
10   to plan.
11             THE CANADIAN COURT:  Well, I think
12   Judge Gross can discuss with you right now, we
13   discussed a couple of dates.
14             THE US COURT:  We did.  We discussed a
15   couple of dates.  And I don't want anybody --
16             THE CANADIAN COURT:  July 11.
17             THE US COURT:  -- to get too upset with
18   us.  In September.  Is that along the lines of what
19   the parties themselves were contemplating?
20             MR. RUBY:  Well, the parties, to be
21   fair, have contemplated everything from August
22   through October.
23             THE US COURT:  Okay.
24             MR. RUBY:  The 10th and 11th, I know,
25   for example, Mr. Zarnett is not available.  And
```



```
 1   what we have tried to do is canvass the parties to
 2   ask who actually will be speaking, because
 3   obviously, all the lawyers -- we will never find a
 4   date if we try to canvass them all.
 5              THE US COURT:  Sure.
 6              MR. RUBY:  I don't have particular
 7   dates to propose to you, but --
 8              THE CANADIAN COURT:  Mr. Ruby, what we
 9   were discussing, Judge Gross and I were discussing,
10   were two weeks:  One, I think it starts the 8th of
11   September; and then not the 15th but the 22nd or
12   3rd of September.  The week in which the 11th
13   falls, not the following week, but the week after
14   that.  And if you want to discuss with counsel, I
15   think that's what we were talking about, Judge
16   Gross, were we not?
17              THE US COURT:  And we were thinking two
18   days, if the parties think that is sufficient.
19              I just noticed, Justice Newbould, there
20   is a Jewish holiday the week of the 22nd, so that
21   would be a difficult week for a lot of people,
22   unless we did it the Monday and Tuesday, which we
23   could certainly do.
24              MR. RUBY:  The holiday is the
25   Thursday-Friday.  So I can certainly canvass with
```



1    the parties the 22nd, 23rd, 24.  I don't know if

2    that will work for everybody, but maybe on Friday

3    we can add that to our agenda to get back to you,

4    if that's a problem.

5              MR. ROSENTHAL:  It starts Wednesday,

6    the holiday.

7              THE CANADIAN COURT:  It starts

8    Wednesday?  Well, that should compress the

9    arguments nicely into two days; by 5:00 p.m., I

10   assume.

11             THE US COURT:  He is bad.

12             MR. RUBY:  All right.  So we will let

13   you know if that is a problem after conferring for

14   the first two days of that week.

15             THE US COURT:  And Justice Newbould and

16   I, just to be careful, will also discuss some other

17   dates before Friday.  All right.  Before this call

18   Friday.

19             MR. RUBY:  Thank you, Your Honor.

20             THE US COURT:  What time is that call

21   on Friday, Justice Newbould?

22             THE CANADIAN COURT:  Well, it was going

23   to be 10:00, but we can do it at 9:30 if you want.

24   The 10:00 was to talk about documents.  I am easy.

25   Why don't we do it at 9:30, and then the Canadian



 1   document issue we can deal with at 10:00.

 2           THE US COURT:  Let me see.  Friday

 3   is -- yes, of course, I am available, because this

 4   trial is no longer proceeding.  All right.  9:30

 5   would be fine.

 6           THE CANADIAN COURT:  And if somebody

 7   can set up the conference call for us to phone in.

 8           MR. RUBY:  So related to that, Your

 9   Honors --

10           THE US COURT:  Yes.

11           MR. RUBY:  -- is the beautiful

12   technology we have, we obviously would like to use

13   it for the closings, for the argument of the motion

14   that Your Honors have just ordered.  But to do

15   that, we may need some direction from the Courts to

16   make sure it either stays in place or, you know,

17   minimal disruption.  I don't know if the Courts

18   have a preference.  Particularly, Judge Gross, we

19   have heard in Delaware there may be some

20   arrangements to remove it this weekend.  So if the

21   Courts find it useful --

22           THE US COURT:  There were scheduled

23   arrangements, but that, we can certainly postpone

24   that.  I know it is additional cost.

25           Mr. Abbott maybe knows more than I do.

 Neeson & Associates   W&F

```
 1              MR. ABBOTT:  Your Honor, I know a
 2  little bit more.  Obviously, this courtroom is much
 3  different than it has been for the last eight
 4  years.
 5              THE US COURT:  But it is working
 6  nicely.
 7              MR. ABBOTT:  It is.
 8              THE US COURT:  For other cases, too, I
 9  mean.
10              MR. ABBOTT:  We have a lot of tasks
11  scheduled beginning this Saturday.
12              THE US COURT:  I know.
13              MR. ABBOTT:  There are both
14  infrastructure, wiring and other issues, that would
15  prevent us from doing that, unless the courtroom
16  effectively stays as it is until that argument is
17  scheduled.  You know, for instance, Your Honor, we
18  can't put the benches back in without removing the
19  wiring that is now all over yours floors.
20              THE US COURT:  Right.
21              MR. ABBOTT:  We are happy to leave it
22  that way.  It will add some additional cost.  I
23  think that additional cost relative to what has
24  been spent will be extraordinarily minor.  The
25  issue really is one of Your Honor's desire for your
```



1   courtroom.

2          I think the parties could leave it like

3   this until September.  I need to check a couple of

4   details.  There will be some additional cost, but

5   it is really a matter of Your Honor's courtroom and

6   whether you are willing to life like this until

7   then.

8          THE US COURT:  I am even more flexible

9   than Justice Newbould.  And it is perfectly fine to

10  leave it like this.

11         THE CANADIAN COURT:  Same with me.  It

12  is fine.

13         MR. ABBOTT:  Okay.  We will start

14  changing plans, Your Honor.

15         THE US COURT:  All right.  If you can.

16  And if you run into problems, you will obviously

17  let us know.

18         MR. ABBOTT:  We will, Your Honor.

19         THE US COURT:  All right.  Thank you,

20  Mr. Abbott.

21         MR. RUBY:  Your Honors, just running

22  through some other housekeeping matters, very

23  briefly, the US Debtors have been kind enough to

24  put together for Your Honors the index and a binder

25  that has all the demonstratives in it.  Justice

 Neeson & Associates   W&P

1    Newbould, even if you don't want another set of the
2    paper, I think you will find the index helpful --
3                THE US COURT:  Yes.
4                MR. RUBY:  -- because we have put all
5    the demonstratives with new trial exhibit numbers
6    in the database you have.
7                THE CANADIAN COURT:  Great.
8                THE US COURT:  That will be wonderful.
9                MR. RUBY:  So that should make it
10   easier.  So they can provide that to the Courts,
11   and all the parties have it as well.
12               The second housekeeping matter is you
13   will have noticed that we have five witnesses that,
14   although they didn't testify at trial, their
15   reports are in and their transcripts are in.
16               THE US COURT:  Yes.
17               MR. RUBY:  With the Courts' permission,
18   instead of doing what we did with other witnesses,
19   which was designate portions, we are just going to
20   give the Courts the entire transcripts and save
21   everybody the cost of going back and doing
22   designations.  And the Courts will find either
23   through the post-trial briefing or otherwise the
24   bits that they find interesting.
25               THE US COURT:  Any problem, Justice



 1   Newbould?  It is a little extra work for us, but

 2   that's okay.

 3            THE CANADIAN COURT:  Well, if we have

 4   to do it, we will have to do it.

 5            THE US COURT:  Yes.

 6            MR. RUBY:  Fair enough.  We will try

 7   and direct you to the parts, obviously, that the

 8   parties think are worth reading.

 9            The second to last item is, Justice

10   Newbould, you had asked Mr. Berenblut a question

11   about where you could find in the documents certain

12   discount numbers.  He has provided a letter, so I

13   propose just to send you the letter he prepared

14   with his answer.  It has no argument or anything in

15   it except for references to the documents --

16            THE CANADIAN COURT:  Okay.

17            MR. RUBY:  -- to answer your question.

18            THE US COURT:  That is excellent.

19            MR. RUBY:  And then finally, I think,

20   on the list, Justice Newbould, this is for you

21   again dealing with claims, is we deferred from last

22   week setting a date for a Chambers appointment to

23   talk about the claims portion of the trial.  At

24   this point, Your Honor, if we could choose a date

25   tomorrow or Thursday.  It almost doesn't matter



```
 1   what the date is, as long as we give people some

 2   notice for --

 3            THE CANADIAN COURT:  For the claims,

 4   what the date of the trial was?

 5            MR. RUBY:  No.  To sit down with you,

 6   Your Honor, similar to what we did for the

 7   allocation trial, and work through some of the

 8   operational issues with you.  Again --

 9            THE CANADIAN COURT:  We have got -- all

10   right.  Mr. Ruby, we have got 10:00 scheduled to

11   talk about document issues.  Why don't we just

12   carry on on Friday morning to do that.  Would that

13   work?

14            MR. RUBY:  That would absolutely work.

15   Thank you, Your Honor.

16            THE CANADIAN COURT:  All right.

17            MR. RUBY:  And unless any of my friends

18   here have any other housekeeping issues, I think

19   that is it.  Thank you, Your Honors.

20            THE US COURT:  Thank you.  Let me just

21   add before we all depart that as you have your

22   discussions about formulating a process for the

23   interest issues, if you think of some way that

24   Justice Newbould or I, and/or I may be helpful, we

25   would be pleased to do so.  I know that there are
```



1    limitations obviously to how involved we can be in

2    your settlement discussions, but sometimes just

3    babysitting helps.  And I would be happy to do that

4    if that would be at all useful to you in the

5    context of your discussions.

6              So thank you, all.  It was a very

7    impressive evidentiary hearing.  And I commend all

8    of you.  You got along well.  You presented the

9    evidence well.  I know how hard you worked.  And I

10   hope you will take a little bit of a breather

11   before we come back.  All right.  So we --

12             THE CANADIAN COURT:  I just want to

13   thank counsel.  I also want to provide one piece of

14   information that is a nice piece of information,

15   and that is, during the week off when you folks

16   were unable to settle the case, Andrew Max was able

17   to, with his wife, have a baby.  So he is a new

18   father for the first time.

19             THE US COURT:  That's very nice.  And

20   with that, good afternoon to all of you.  And we

21   will talk on Friday morning at 9:30.  Good day,

22   everyone.

23   -- Whereupon court adjourned at 1:09 p.m.

24

25

 Neeson & Associates   W&P

```
 1                  REPORTERS' CERTIFICATE

 2

 3            I, KIMBERLEY A. NEESON, RPR, CRR, CSR,

 4   CCP, CBC, and LORRAINE B. MARINO, RDR, CRR,

 5   certify;

 6            That the foregoing proceedings were

 7   taken before us at the time and place therein set

 8   forth;

 9            That the entire proceedings of the

10   hearing date were recorded stenographically

11   individually by each of us and were thereafter

12   transcribed;

13            That the foregoing is a true and

14   correct transcript of our shorthand notes so taken,

15   with the exception of the Canadian Court's ruling

16   at pages 5095 through 5100, which was modified by

17   the Canadian Court.

18            Dated this 24th day of June, 2014.

19

20   PER:                     PER:

21

22   Lorraine B. Marino        Kimberley Neeson

23   LORRAINE B. MARINO        KIMBERLEY NEESON

24   WILCOX & FETZER           NEESON & ASSOCIATES

25   WILMINGTON, DE USA        TORONTO, ON
```























































