Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

— and —

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
--------------------------------------------------------------------- x
In re:                                                  :  Chapter 11

Nortel Networks, Inc., *et al*.                         :  Case No. 09-10138 (KG)

                              Debtors.                  :  (Jointly Administered)

--------------------------------------------------------------------- x

**BRIEF OF WILMINGTON TRUST, NATIONAL ASSOCIATION,
AS SUCCESSOR INDENTURE TRUSTEE, ADDRESSING THE INTEREST ISSUES**

Wilmington Trust, National Association, exclusively in its capacity as indenture trustee for the Notes[1] (in such capacity, "Wilmington Trust" or the "Trustee"), by and through its undersigned attorneys, submits this brief in connection with: (1) the determination of whether the Crossover Bondholders (as defined below) are entitled to receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest; and (2) assuming, *arguendo*, they are so entitled, ascertaining what additional amounts the Crossover Bondholders are entitled to claim and receive, and in furtherance thereof, respectfully submits as follows:

## PRELIMINARY STATEMENT

1.      The law is clear that the Crossover Bond Claims (defined below) are *not* entitled to accrue post-petition interest at the contract rate—a rate that would provide them with well over US$1.6 billion in post-petition interest—especially when such an excessive recovery will be at the expense of and/or to the prejudice of other creditors of all of the debtors in these cases (collectively, "Nortel"), whether in the U.S., Canada or other jurisdictions.  In order for the Crossover Bonds to accrue *any* interest at all, one of the Estates would have to found to be solvent.[2]   The Bankruptcy Code[3] expressly limits the accrual of post-petition interest on unsecured claims to the federal judgment rate (the "FJR").

2.      Under applicable U.S. law, unsecured claims are not entitled to post-petition interest where the debtor is insolvent.  Indeed, section 502 of the Bankruptcy Code expressly

---

[1] Nortel Networks Limited 6.875% Notes due 2023, issued pursuant to that certain Indenture, dated as of November 30, 1988 (as amended, supplemented or modified) between Nortel Networks Limited and the Trustee, as successor trustee to The Bank of New York Mellon (formerly known as The Bank of New York) as successor trustee to the Toronto-Dominion Bank Trust Company.

[2] The decisive factor is whether the U.S. Debtors are found to be solvent, not whether any creditors of the U.S. Debtors have received the full allowed amount of their claims, including any recovery from other non-U.S. Debtors. *See, e.g., Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243, 246 (1935).

[3] Capitalized terms used but not defined herein have the meaning ascribed to them in the Allocation Protocol (ECF No. 10565) (the "Allocation Protocol").  Emphasis herein is ours unless otherwise noted.

100804246

excludes claims for unmatured interest.  In the case of a solvent debtor,[4] section 726(a)(5) of the Bankruptcy Code provides that unsecured creditors may receive post-petition interest on their allowed claims "at the legal rate."  The FJR—not the claimant's contract rate of interest or even the relevant state statutory rate—is the rate applied by *every* judge in the Third Circuit and every court nationwide in the past nine (9) years ruling on this issue.  Just as post-judgment interest is permitted at the FJR as compensation to a judgment creditor for the delay in receiving its payment, post-petition interest serves the same purpose: it compensates creditors solely for the delay in receiving payment due to the implementation of the bankruptcy case, a delay felt by every unsecured creditor equally, thus necessitating an equal, federally mandated rate.

3.    Granting the Crossover Bondholders post-petition interest at the contract rate would not only violate the Bankruptcy Code and established legal precedent limiting claims of unsecured creditors of solvent debtors to post-petition interest at the FJR, but also provide the Crossover Bondholders a recovery far in excess of their claims for principal and interest accrued through the Petition Date (as defined below).  Such a result is particularly egregious because interest has been accruing for years  largely because these cases have been mired in litigation over the distribution of sale proceeds that the Core Parties themselves (including the Crossover Bondholders) have been unable to resolve.

4.    The Courts must reject any argument that such a lopsided recovery to the Crossover Bondholders is somehow justified to prevent "equity" from receiving a "windfall."  Any assets remaining after distribution to creditors of the U.S. Debtors will not ultimately be NNL, the equity holder of the U.S. Debtors, but instead would be distributed by NNL to other creditors who loaned money or provided services to the integrated Nortel enterprise as creditors

---

[4] The Trustee does not concede that any U.S. Debtor is, or will be, solvent.

100804246

(the largest portion of which would go to NNI and to the Crossover Bondholders on account of the inter-company claim by NNI against NNL).  (*See* Trial Tr. 3563:8-17, June 6, 2014.)

5.    Accordingly, payment of post-petition interest to the Crossover Bondholders at the contract rates is not only impermissible under the Bankruptcy Code, but would be unjustified on its face, and would, in fact, severely damage Nortel's other unsecured creditors, including Nortel's former employees and pensioners.

6.    Canadian law also precludes the recovery of any post-filing interest.  Subject to the discussion set forth more fully below, the Trustee adopts in its entirety the position of the Monitor as set out in the Factum of the Monitor ("Monitor's Factum") on the Common Bond Claim Issues (as defined in the Monitor's Factum).

### BACKGROUND

7.    On January 14, 2009 (the "Petition Date"), each of the Canadian Debtors, EMEA Debtors and U.S. Debtors (collectively, the "Debtors") commenced insolvency proceedings.[5]

8.    The FJR on the Petition Date was 0.44%.[6]

9.    Certain indenture trustees have filed unsecured claims (the "Crossover Bond Claims") against one or more of the Canadian Debtors and one or more of the U.S. Debtors for amounts owing in respect of guaranteed or "cross-over" bonds issued or guaranteed by certain of the Canadian and U.S. Debtors (the "Crossover Bonds").  Each of the relevant indentures is governed by the laws of the State of New York.

---

[5] Nortel Networks (CALA) Inc. filed for relief on July 14, 2009, which was consolidated and is being jointly administered with the U.S. Debtors' chapter 11 cases for procedural purposes only.  (*See* Order (I) Directing Joint Administration of the Debtors Related Chapter 11 Cases and (II) Granting Related Relief, ECF No. 1098.)

[6]    *See* Federal Reserve Statistical Release, H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/20090112/ (last updated Jan. 12, 2009).  "The case law is uniform in holding that it is the petition date at which the federal judgment rate is determined for purposes of awarding interest under section 726(a)(5)."  *In re Wash. Mut., Inc.*, 461 B.R. 200, 246 (Bankr. D. Del. 2011) (citations omitted), *vacated on other grounds*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

10.     Because the Crossover Bonds constitute obligations of both U.S. and Canadian Debtors, the holders of such Crossover Bonds (collectively, the "Crossover Bondholders") constitute the largest single creditor group of each of the Estates.

11.     The Crossover Bond Claims included a demand against the Estates for, *inter alia*, post-petition interest at contractual rates as high as 10.75% per annum.  The Monitor has calculated that, as of December 31, 2013, post-petition interest on the Crossover Bonds at the contract rates would amount to approximately US$1.6 billion.  If permitted, post-petition interest at the contract rate on the Crossover Bonds accrues at the rate of almost US$1 million per day. (*See* Statement of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund in Support of Determination of Post-Petition Interest Issue (ECF No. 13887) ¶ 5.)

12.     By order dated June 30, 2014, these Courts determined to hear: (1) whether the Crossover Bond Claims are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures, above and beyond the outstanding principal debt and pre-petition interest; and (2) if determined that the Crossover Bondholder Claims are so entitled, what additional amounts the Crossover Bondholders are entitled to so claim and receive.

### DISCUSSION

13.     Section 726(a)(5) of the Bankruptcy Code limits payment of post-petition interest to unsecured creditors in solvent estates to interest "at the legal rate."  11 U.S.C. § 726(a)(5). U.S. Courts have overwhelmingly concluded that Congress' use of the term "the legal rate" "mandates application of the federal interest rate."[7]  *Onink v. Cardelucci (In re Cardelucci)*, 285

---

[7] Unsecured creditors are generally not entitled to recover post-petition interest under the Bankruptcy Code.  *See, e.g., United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372-73 (1988).  The only exception for unsecured creditors is codified in section 726(a)(5), which applies in chapter 11 cases through section 1129(a)(7), otherwise known as the "best interests test," whereby confirmation of a chapter 11 plan requires that

F.3d 1231, 1235 (9th Cir. 2002).  There is no reason under an equitable analysis to depart from established legal precedent, and such departure would, in fact, result in an inequitable reduction in the recoveries of the other creditors of Nortel.

I.      **Post-Petition Interest Is A Form Of Post-Judgment Interest, And Thus Must Be Calculated At The FJR.**

14.      "In bankruptcy, an allowed claim becomes a federal judgment and therefore entitles the holder of the judgment to an award of interest pursuant to federal statute."  *In re Cardelucci*, 285 F.3d at 1235; *see also In re Chiapetta*, 159 B.R. 152, 161 (Bankr. E.D. Pa. 1993) ("[S]ince a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate….").  As damages in bankruptcy are ascertained as of the petition date, "post-petition interest" is the equivalent of post-judgment interest applied in the bankruptcy context.  The rationale for the payment of post-petition, just as for payment of post-judgment, interest is "to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damages and the payment by the defendant."  *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) (citation omitted).  Further, because post-petition interest, just like post-judgment interest, is a federal procedural matter, it must be decided by federal law.  *See, e.g., Hanna v. Plumer*, 380 U.S. 460, 473-74 (1965); *see also In re Wash. Mut., Inc.*, 461 B.R. at 242-43 (citing *In re Cardelucci*, 285 F.3d at 1235) ("[T]he payment of post-judgment interest is procedural by nature and dictated by federal law rather than state law, further supporting use of the federal judgment rate.").

---

each holder of a claim or interest receive at least the amount it would have in a chapter 7 liquidation.  *See* 11 U.S.C. § 1129(a)(7); *In re Wash. Mut., Inc.*, 461 B.R. at 241.

Additionally, the FJR must be compounded annually.  *See* 28 U.S.C. § 1961(b) ("Interest shall be computed daily to the date of payment . . . and shall be compounded annually."); *In re Wash. Mut., Inc.*, 461 B.R. at 247.

100804246

15.     Just as post-judgment interest begins to accumulate at the filing of a court's judgment, post-petition interest is also calculated from the date of the filing of a bankruptcy petition.    An unsecured creditor's entitlement to payment is explicitly governed by the Bankruptcy Code, which provides for such a right *as of the filing of the petition*.    Section 502 of the Bankruptcy Code provides that, absent a timely objection, all claims against the estate are "deemed allowed" *as of the filing of the petition*.    *See* 11 U.S.C. § 502(a); *see also In re Melenyzer*, 143 B.R. 829, 833 (Bankr. W.D. Tex. 1992).    If an objection to a claim is made, the court must determine the amount of the claim *as of the petition date*.    *See* 11 U.S.C. § 502(b)(2); *see also In re Cardelucci*, 285 F.3d at 1235; *In re Country Manor of Kenton, Inc.*, 254 B.R. 179, 182 (Bankr. N.D. Ohio 2000).    Federal bankruptcy law cuts off an unsecured creditor's interests as of the petition date, and thus any recovery by an unsecured creditor accruing post-petition is based upon such federal laws, ***not upon state or contract rights that existed pre-petition***.    *See, e.g., In re Cardelucci*, 285 F.3d at 1235.

### A.     U.S. Courts have Overwhelmingly Applied the FJR to Post-Petition Interest.

16.     Every judge in the Third Circuit to ever award post-petition interest to unsecured creditors under the Bankruptcy Code has followed the majority of courts in holding that the "legal rate" prescribed by section 726(a)(5) is the FJR.    *See, e.g., In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012) (affirming Bankruptcy Court's favor towards application of FJR); *In re Wash. Mut., Inc.*, 461 B.R. at 243-44; *In re Chiapetta*, 159 B.R. at 160.

17.     Former Chief Bankruptcy Judge Mary F. Walrath, sitting in the District of Delaware, when discussing the rate of interest to be applied to post-petition interest in a chapter 11 case, held that "the better view is that the federal judgment rate is the appropriate rate to be applied under section 726(a)(5), rather than the contract rate."    *In re Wash. Mut., Inc.*, 461 B.R.

at 242. Bankruptcy Judge David A. Scholl, sitting in the Eastern District of Pennsylvania, likewise considered the issue in *In re Chiapetta*, and, concurring with Bankruptcy Courts in Texas and Tennessee, held that "the 'legal rate of interest' is the federal judgment rate.'" 159 B.R. at 160. Significantly, both of these judges used these decisions to hold unequivocally that the FJR is the only rate available for post-petition interest and expressly disavow their prior decisions holding that post-petition interest could be analyzed on a case-by-case basis or at the state statutory rate. *See In re Wash. Mut., Inc.*, 461 B.R. at 242 n.35 (citing *In re Coram Healthcare Corp.*, 315 B.R. 321, 346 (Bankr. D. Del. 2004)) ("To the extent I suggested in *Coram* that the federal judgment rate was not required by section 726(a)(5), ***I was wrong***." (emphasis added)) (J. Walrath); *In re Chiapetta*, 159 B.R. at 160 (citing *In re Shaffer Furniture Co.*, 68 B.R. 827 (Bankr. E.D. Pa. 1987)) ("[T]he 'legal rate of interest' is the federal judgment rate, an alternative which was not proposed by any of these parties and, frankly, did not occur to us in deciding *Shaffer Furniture*.") (J. Scholl).

18. Further, in the past nine (9) years, every other court to be confronted with this issue has agreed that the FJR is the "legal rate" under section 726(a)(5). *See In re Garriock*, 373 B.R. 814 (E.D. Va. 2007); *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189 (Bankr. S.D.N.Y. 2012); *In re Smith*, 431 B.R. 607 (Bankr E.D.N.C. 2010); *In re Gulfport Pilots Ass'n, Inc.*, 434 B.R. 380 (Bankr. S.D. Miss. 2010); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007); *In re Best*, 365 B.R. 725 (Bankr. W.D. Ky. 2007).

**B.    Congress's Choice to set Post-Petition Interest at "the Legal Rate" was a Clear Invocation of the FJR.**

19. The principles of statutory interpretation show that post-petition interest under section 726(a)(5) must be calculated at the FJR. Congress specifically chose the language "interest at the legal rate" instead of the original proposed language "interest on claims allowed"

8

when drafting section 726(a)(5).  *See In re Cardelucci*, 285 F.3d at 1234 (citing *Report of the Commission on the Bankruptcy Laws of the United States*, H.R. Doc. No. 93–137, § 4–405(a)(8), (1st Sess. 1973), *reprinted in* Collier App. Pt. 4(c), at 4–679).  Accordingly, Congress intentionally replaced a general statement with a specific statement, implying a singular rate, and one that "typically refers to a statutory rate."  6 COLLIER ON BANKRUPTCY ¶ 726.02[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  That relevant singular, statutory rate can only be the FJR.

20.    If Congress had intended for "the legal rate" to mean "the rate under an agreement," it could have, and would have, used such terms, as it had in other sections of the Bankruptcy Code.  *See, e.g.,* 11 U.S.C. § 506(b) (allowing for, *inter alia*, interest "provided for <u>under the agreement</u>" (emphasis added).)  This rationale, in particular, has supported the application of the FJR for post-petition interest claims in numerous courts across the country. *See In re Wash. Mut., Inc.*, 461 B.R. at 242; *see also In re Cardelucci*, 285 F.3d at 1235; *In re Smith*, 431 B.R. 607; *In re Best*, 365 B.R. 725; *In re Country Manor of Kenton, Inc.*, 254 B.R. 179; *In re Godsey*, 134 B.R. 865 (Bankr. M.D. Tenn. 1991); *In re Laymon*, 117 B.R. 856, 861 (Bankr. W.D. Tex. 1990), *reversed on other grounds*, 958 F.2d 72 (5th Cir. 1992).  To hold otherwise would run counter to the "usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'"  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (citation omitted).

21.    In drafting section 726(a)(5), Congress departed from the pre-Bankruptcy Code rule forbidding awards of post-petition interest.  The pre-Bankruptcy Code reasons for prohibiting post-petition interest were:

> (1) interest payments are penalties or damages assessed against the debtor for his detention of the creditor's money and therefore it

> would be unjust to allow the creditor to recover such penalties or damages from other creditors who were not to blame for the detention; and (2) *the bankruptcy court itself, not the debtor*, detained the money after the petition was filed.

*In re Laymon*, 117 B.R. at 860 (citing *Debentureholders Protective Comm. v. Continental Inv. Corp.*, 679 F.2d 264, 268 (1st Cir. 1982), *cert. denied*, 459 U.S. 894 (1982)).  It is therefore evident that Congress' intent in allowing post-petition interest for solvent estates was to "compensat[e] for the detention of money occasioned by the bankruptcy case itself, a detention visited equally on all creditors of the bankruptcy estate…and a detention not directly related to the pre-petition agreements the debtor struck with its creditors."  *In re Melenyzer*, 143 B.R. at 832-33 (emphasis omitted).  The only rate that would be sure to compensate all creditors equally would be the FJR.

22.    Moreover, to read "the legal rate" as the contract rate would contradict Congress' express provision disallowing claims that had been objected to for "unmatured interest" under section 502(b)(2).  *See* 11 U.S.C. § 502(b)(2); *In re Laymon*, 117 B.R. at 861 ("Finally, the interest contemplated under the creditor's contract is expressly *excluded* from allowance by section 502(b)(2).  Whatever is paid under section 726(a)(5), it is certainly *not* the interest accruing under the prepetition contract."); *In re Country Manor of Kenton, Inc.*, 254 B.R. at 182 ("[A]s a result of §502(b)'s disallowance of 'unmatured interest' for an allowed claim, and § 726(a)'s mandate that a distribution only be made on allowed claims, a creditor's entitlement to postpetition interest under § 726(a)(5) could not be based upon that creditor's pre-bankruptcy contractual agreement to such interest.").

## II.    The Equities of the Case Mandate Application of the FJR.

23.    Not only is the FJR the only measure for the "legal rate" under section 726(a)(5), but application thereof in chapter 11 cases is *required* without consideration of the equities

involved.  As Judge Walrath explained in *In re Washington Mutual, Inc.* in holding that the FJR was the required measure of post-petition interest, "the effect on equity is not an appropriate factor to be considered, and the Court will not consider that."  461 B.R. at 243; *see also In re Cardelucci*, 285 F.3d at 1236 ("'[I]nterest at the legal rate' is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court."); *In re Garriock*, 373 B.R. at 817 ("Even if the Court believed that Congress struck the wrong balance in this case, and did not adequately consider the potential creation of windfalls for solvent debtors, the Court is not at liberty to substitute its policy judgment for that of Congress.").

24.    Nevertheless, to the extent that equities or other factors are considered here, it is the burden of the party seeking implementation of a rate higher than the FJR to prove that sufficient circumstances exist to necessitate such a higher rate.  *See In re W.R. Grace*  475 B.R. at 201 ("The [parties requesting a rate higher than the FJR] have not shown any equitable considerations as to why they would be entitled to a higher interest rate.").  The Crossover Bondholders will not be able to satisfy that substantial burden under the facts at issue in this case.

### A.    Application of the FJR is Equitable as a General Matter, as it Ensures the Equal Treatment of Unsecured Creditors.

25.    As discussed above, post-petition interest is awarded to compensate for the delay caused by the filing of the bankruptcy and is one borne by *every* creditor of the U.S. and Canadian Debtors equally.  The Ninth Circuit has "concluded that the interests of 'fairness, equality, and predictability in the distribution of interests on creditors' claims' as well as the interest in applying federal law to federal bankruptcy cases, required application of the federal judgment rate approach."  *In re Cardelucci*, 285 F.3d at 1234 (citing *In re Beguelin*, 220 B.R. 94,

11

99 (9th Cir. BAP 1998)); *see also In re Laymon*, 117 B.R. at 861 (assigning post-petition interest

at the FJR and noting that awarding interest on unsecured claims at the contract rate "would fly

in the face of equitable distribution of assets").

26.      The FJR establishes an equal rate to ensure equal compensation to unsecured

creditors for their equal treatment.[8]  The FJR "provides [the] court with an 'easily ascertainable,

nationally uniform rate' and increases predictability in the process."  *In re Wash. Mut., Inc.*, 461

B.R. at 243 (quoting *In re Melenyzer*, 143 B.R. at 833); *see also* 6 COLLIER ON BANKRUPTCY

¶ 726.02[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("While some courts have

looked to contract rates or to state law statutory rates, use of those varying rates in a single case

would cause interest distributions to range widely, leading to arbitrary differences in how

different creditors are treated.").  As one court questioned, "[w]ould the use of a New York

judgment rate be appropriate in a New York bankruptcy where the creditor is in Texas and the

contract contains a choice of law clause designating Texas law as controlling?   Under what

theory?" *In re Laymon*, 117 B.R. at 862.

> **B.     Application of the FJR is Equitable under the Circumstances of this Case.**

27.      The Crossover Bondholders will not be able to point to any suffered inequity to

justify departing from the standard application of post-petition interest of the FJR for all creditors

equally.  Nor can they invoke the possibility of a windfall accumulating for a surviving debtor, or

a debtor's equity holders, who knowingly ran the risk of coming last in a bankruptcy in order to

obtain the potential upside of significant gains.  These cases are indisputably liquidations; all

---

[8] Of note is that the FJR is not a static rate independent of market factors.  In a case discussing post-petition interest to be applied to tax claims, one court stated, "[T]he federal judgment rate treats these interests [between both creditors and debtors] more evenly.  Corresponding to the continuous yield fluctuations in Treasury bills, the federal judgment rate produces a reasonable rate of post-petition interest that roughly matches current market rates." *Wasserman v. City of Cambridge*, 151 B.R. 4, 6 (D. Mass. 1993).  Accordingly, the FJR takes into account what a reasonable rate of interest predicated upon delay of payment should be.

assets have been sold.  The only remaining tasks are to determine claims, allocate assets and make distributions to creditors.  Any surplus that remains in the U.S. Estate after distribution of its creditors' claims will be ultimately distributed, not to parties that invested and assumed equity risk in return for some potential equity upside, but to employees, trade creditors, lenders and service providers who are simply creditors seeking to be repaid the obligations owed by Nortel.

28.    By demanding post-petition interest at the contract rate, the Crossover Bondholders are seeking recovery for exponentially more than the principal and interest owed on their bonds as of the Petition Date beyond the unusual benefit of being able to claim on their guarantees and their primary claims.  The question at issue is whether the Crossover Bondholders will be permitted to <u>profit</u> from the numerous, lengthy delays in resolution of these bankruptcy cases <u>at the expense of all of the other stakeholders in Nortel</u>.  If calculated at the contract rate sought by the Crossover Bondholders, post-petition interest has accrued at the rate of almost US$1 million per day of delay, as identified UK Pension Claimants, for a potential total post-petition interest payment in excess of US$1.6 billion.[9]  (*See* Statement of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund in Support of Determination of Post-Petition Interest Issue (ECF No. 13887) ¶ 5.).

29.    Granting the Crossover Bondholders post-petition interest at the contract rate would not only award them an extraordinary profit windfall for the delays in resolving these cases, it would also be patently unfair to the other creditors of the integrated Nortel estates.  The proposed US$1.6 billion payment of post-petition interest would not come out of recovery by an equity holder that assumed equity risk for the potential equity rewards, but it would come out of the recovery of other Nortel creditors, particularly the creditors, including pensioners, of the

---

[9] Such figure was calculated by the Monitor as of December 31, 2013, so the actual claimed amount is even higher.

100804246

Canadian Estate.   (*See* Trial Tr. 3563:8-17, June 6, 2014.)   The employees, pensioners, and pension plans of the NNL, who have been deprived of their payments during the five years of the pendency of these cases, would see their recoveries decrease drastically in order to subsidize an unfair, exorbitant, illegal and unjustified increase of the Crossover Bondholders' recovery.

### III.   Canadian Law Precludes Recovery of any Post-Filing Interest

30.   In Canada, no creditor is entitled to receive more than 100 hundred cents on the dollar including any pre filing interest as provided for in the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended ("BIA"). [BIA, s. 134 "Subject to section 130, a creditor shall in no case receive more than one hundred cents on the dollar and interest as provided by this Act."][10]   Only where there is a surplus after payment of all claims is interest payable under the BIA at the statutory rate of 5% [BIA, s. 143 "Where there is a surplus after payment of the claim….it shall be applied in the payment of interest from the date of bankruptcy at the rate of five percent per annum on all claims proved in the bankruptcy…"].

31.   The *Companies' Creditors Arrangement Act* [R.S.C. 1985, c. C-36, as amended ("CCAA")] does not contain a provision governing the availability of post filing interest.   Where, as here, the CCAA is silent, it is proper to look to the provisions of the BIA to inform how a claim should proceed.   The British Columbia Supreme Court took just such an approach in *Re Agro Pacific Industries Ltd*., reasoning that:

> The CCAA is designed to give breathing room to an insolvent company and during that hiatus the *status quo* should, within reason, remain in place.   In my opinion, the claims of creditors crystallized on April 27, 2000, the day on which a stay order was first granted….[and]…The intention was to treat all claims within a class equally in accordance with normal practice in insolvency proceedings. …[Debtor's] counsel asserted that apart from a case wherein the Plan specifically contemplated post filing date interest or where there is a surplus, conventional

---

[10] The sole exception to this rule, in s. 130, dealing with a secured creditor requiring the trustee in bankruptcy to redeem its security, is inapplicable to this case as all the claims in issue are unsecured.

100804246

insolvency practice does not open claims to recalculation after the date on which they were frozen.  I agree.

[2001 BCSC 708 par. 14 and 16].[11]  Because the CCAA is silent, and the relevant provision of the BIA mandates against post filing interest, no post filing interest should be awarded in this case.

32.      In the case *Century Services Inc. v. Canada (Attorney General),* the Supreme Court of Canada ("SCC") noted that the CCAA and the BIA share the same remedial purpose of avoiding the social and economic costs of liquidating a debtor's assets. [2010] 3 SCR 379 ("*Century Services*").  The SCC recognized that the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutes.  *Id* at [par. 24]. Thus, while the CCAA is silent on what happens if reorganization fails, the BIA scheme of liquidation and distribution necessarily provides the backdrop against which creditors assess their priority in the event of bankruptcy, and its mandate against post filing interest should be followed.  In *Century Services*, the SCC stated that a strange asymmetry would result if differing treatments under the CCAA and the BIA were found to exist, as this would encourage statute shopping, undermine the CCAA's remedial purpose and invite the very social ills that the statute was enacted to avert.  *Id*. at [par. 47] (addressing whether the goods and services tax ("GST") has any special priority under the CCAA and concluding that the priority of the GST claim would be determined by its priority in the BIA such that the deemed trust was inapplicable in the CCAA even though the CCAA, unlike the BIA, was silent on the issue).  There is a fundamental fairness if one set of creditors, otherwise similarly situated, gains a benefit over other creditors in the

---

[11] Although there is *obiter dicta* in a couple of decisions to suggest there is not necessarily an interest stop rule under the CCAA [*Nav Canada v. Wilmington Trust* [2006] SCC 24 ("*Nav Canada*") and *Re Stelco Inc.* [2007] ONCA 483 ("*Stelco*")] those decisions were both rendered before the Supreme Court of Canada decided *Century Services* (discussed above), recognizing the important policy need to harmonize the aspects of insolvency law common to the CCAA and the BIA.

same class simply due to the fact that the proceeding is a CCAA, particularly where, as here, the estate is being liquidated under the CCAA as opposed to being reorganized.  This is a hazard which the SCC in *Century Services* expressly addresses and the courts in this proceeding should protect against as a matter of fundamental equity and fairness.

33.     Finally, the Claims Procedure Order, issued in this case on July 29, 2009 ("CPO"), is consistent with the application of the BIA approach with respect to post-filing interest, in the absence of definitive direction in the CCAA.  CPO Section 3(i) defines "Claim" meaning each of:  (i) any right of any Person…in connection with any indebtedness, liability or obligation *of any kind*…., or (C) **would have been a claim provable in bankruptcy had the Applicants become bankrupt on the Filing Date** [emphasis added].  The CPO's language should be interpreted in a manner consistent with the policy, as the SCC promulgated in *Century Services*, that claims should not be determined differently under the CCAA from their treatment under the BIA.  The CPO, which governs determination of claims in this case, supports the policy that the interest stopped accruing in Canada as of the date the CCAA filing occurred, and post filing interest is therefore not available.

## IV.     Joinder with the Monitor's Factum

34.     Additionally, the Trustee joins, adopts, and incorporates by reference, as if fully set forth herein, in its entirety, the position of the Monitor as set out in the Monitor's Factum on the Common Bond Claim Issues.

**WHEREFORE**, the Trustee respectfully requests that these Courts enter an order:

(a)     In the U.S. Court, holding that, if the U.S. Debtors are found to be solvent, any post-petition interest granted to the Crossover Bondholders be calculated at the federal judgment rate as of the Petition Date (0.44%);

(b)     In the Canadian Court, denying any post-petition interest on any of the

Crossover Bond Claims under the relevant indentures; and

(c)     Granting such other and further relief as is just and proper.

Dated:  July 15, 2014                         **COUSINS CHIPMAN & BROWN, LLP**
        Wilmington, Delaware

                                     _____*/s/ Ann M. Kashishian*_____
                                     Scott D. Cousins (No. 3079)
                                     Mark D. Olivere (No. 4291)
                                     Ann M. Kashishian (No. 5622)
                                     1007 North Orange Street, Suite 1110
                                     Wilmington, Delaware 19801
                                     Telephone:     (302) 295-0191
                                     Facsimile:     (302) 295-0199
                                     Email:         cousins@ccbllp.com
                                                    olivere@ccbllp.com
                                                    kashishian@ccbllp.com

                                     – and –


                                     Craig A. Barbarosh
                                     David A. Crichlow
                                     Karen B. Dine
                                     KATTEN MUCHIN ROSENMAN LLP
                                     575 Madison Avenue
                                     New York, New York 10022-2585
                                     Telephone: (212) 940-8800
                                     Facsimile: (212) 940-8776
                                     Email: craig.barbarosh@kattenlaw.com
                                            david.crichlow@kattenlaw.com
                                            karen.dine@kattenlaw.com

                                     – and –

17

Kenneth Kraft
John Salmas
DENTONS CANADA LLP
77 King Street West, Suite 400
Toronto, Ontario M5K 0A1
Canada
Telephone: (416) 863-4511
Facsimile: (416) 863-4592
Email:  kenneth.kraft@dentons.com
           john.salmas@dentons.com

*Attorneys for Wilmington Trust, National Association, solely in its capacity as Successor Indenture Trustee and not in its individual capacity*

100804246