## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- x
                                     :

*In re*                                  :          Chapter 11
                                       :

Nortel Networks Inc., *et al.*,         :          Case No. 09-10138 (KG)
                                     :

                        Debtors.     :          (Jointly Administered)
                                     :

-------------------------------------------------------- x

**OPENING BRIEF OF THE *AD HOC* GROUP OF BONDHOLDERS, LAW DEBENTURE TRUST COMPANY OF NEW YORK, AS TRUSTEE, AND THE BANK OF NEW YORK MELLON, AS TRUSTEE, WITH RESPECT TO MONITOR'S REQUEST THAT THE COURT DETERMINE BONDHOLDER ENTITLEMENT TO POST-PETITION INTEREST AND ADDITIONAL BONDHOLDER CLAIMS ISSUES UNDER U.S. LAW**

**TABLE OF CONTENTS**

**Page**

I.   PRELIMINARY STATEMENT ................................................................. 2

II.  PROCEDURAL, JURISDICTIONAL, AND DUE PROCESS ARGUMENTS ............. 10

    A.   The Monitor's Request is Jurisdictionally and Procedurally Defective. .............. 10

        i.   The Monitor's Request Was Improper, Procedurally Deficient, and Wholly Unrelated to the Allocation Trial. ............................................... 10

        ii.  The Bondholder Claims Issues That Pertain to Claims Against NNI Are Not Subject to the Joint Jurisdiction of the Courts. .......................... 12

        iii. Neither the Canadian Creditors Nor the UKPC Has Standing to be Heard on the Bondholder Claims Issues in the U.S. Court...................... 13

    B.   A Decision on the Bondholder Claims Issues, As Presented, Would Violate Due Process. ........................................................................ 15

    C.   The Bondholder Claims Issues are Premature and Unripe. .................................. 16

III. SUBSTANTIVE LEGAL ARGUMENTS ...................................................... 20

    A.   Unsecured Creditors are Entitled to Post-Petition Interest and All Other Contractual Entitlements if the U.S. Debtors have Surplus Funds After Payment in Full of All Allowed Claims. ............................................................. 21

        i.   The Best Interests Test Entitles Unsecured Creditors to Receive Post-petition Interest Before Any Amounts Can Be Distributed to Equity Holders. ................................................................................. 21

        ii.  The Fair and Equitable Test Entitles Unsecured Creditors to Receive Post-petition Interest And Any Other Contractual Entitlements Before Any Amounts Can Be Paid to Equity Holders. ....... 23

    B.   If the U.S. Debtors Have Surplus Funds, the Best Interests Test and the Absolute Priority Rule Both Mandate that Unsecured Creditors Receive Payment of Post-petition Interest at the Contract Rate Before NNL Receives Any Distribution On Account of its Residual Equity Interests in NNI. ........................................................................................................... 28

        i.   The Absolute Priority Rule Requires that Unsecured Creditors Receive Payment of Post-Petition Interest at the Contract Rate And Satisfaction in Full of All Other Contractual Entitlements Before

NNL Can Receive Any Distribution On Account of its Residual Equity Interests in NNI. .......................................................................... 29

ii.    The Best Interests Test Requires that Unsecured Creditors Receive Payment of Post-petition Interest at the Contract Rate Before NNL Receives Any Distribution On Account of its Residual Equity Interests in NNI. ...................................................................................... 34

IV.    CONCLUSION ............................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re A&L Properties,*
    96 B.R. 287 (C.D. Cal. 1988) ..................................................................................36, 37

*In re Ace-Texas, Inc.,*
    217 B.R. 719 (Bankr. D. Del. 1998) ................................................................................32

*Ahlers v. Norwest Bank Worthington (In re Ahlers),*
    794 F.2d 388 (8th Cir. 1986) ..........................................................................................24

*Am. Iron & Steel Mfg. Co. v. Seabord Air Line Ry.,*
    233 U.S. 261 (1914)......................................................................................................6, 26

*In re Amatex,*
    755 F.2d 1034 (3rd Cir. 1985) ........................................................................................13

*In re Armstrong World Indus.,*
    432 F.3d at 512 .........................................................................................................26, 29

*Baker v. Gold Seal Liquors, Inc.,*
    417 U.S. 467 (1974)..........................................................................................................25

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,*
    526 U.S. 434 (1999).........................................................................................................26

*In re Beck,*
    128 B.R. 571 (Bankr. E.D. Okla.  1991)........................................................................36

*Bruning v. United States,*
    376 U.S. 358 (1964)......................................................................................................6, 26

*In re Carter,*
    220 B.R. 411 (Bankr. D.N.M. 1998) ..............................................................................36

*Case v. L.A. Lumber Prods. Co.,*
    308 U.S. 106 (1939).....................................................................................................24, 25

*In re Cent. R.R. Co. of N.J.,*
    579 F.2d 804 (3d Cir. 1978)............................................................................................25

*In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.,*
   791 F.2d 524 (7th Cir. 1986) ...................................................................................7, 27

*In re Consol. Operating Partners L.P.,*
   91 B.R. 113 (Bankr. D. Colo. 1988) .....................................................................32

*Consol. Rock Prods. Co. v. DuBois,*
   312 U.S. 510 (1941).........................................................................................26, 29

*In re Coram Healthcare Corp.,*
   315 B.R. 321 (Bankr. D. Del. 2004) .....................................................................33

*Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.,*
   679 F.2d 264 (1st Cir. 1982).................................................................................7

*In re Dow Corning Corp.,*
   244 B.R. 678 (Bankr. E.D. Mich. 1999)...........................................................7, 30

*In re Dow Corning Corp.,*
   456 F.3d 668 (6th Cir. 2006) ..........................................................7, 30, 31, 32

*In re Fast,*
   318 B.R. 183 (Bankr. D. Col. 2004) .....................................................................36

*Gen. Elec. Capital Corp. v. Future Media Prods.,*
   547 F.3d 956 (9th Cir. 2008) ...............................................................................33

*In re Gencarelli,*
   501 F.3d 1 (1st Cir. 2007)...............................................................................7, 32

*In re Global Industrial Technologies, Inc.,*
   645 F.3d 201 (3d Cir.2011)..................................................................................13

*Group of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.,*
   318 U.S. 523 (1943)..............................................................................................25

*Hanna* v. *United States* (*In re Hanna*),
   872 F.2d 829 (8th Cir. 1989) ...............................................................................27

*In re Insilco Techs., Inc.,*
   480 F.3d 212 (3d Cir. 2007)......................................................................6, 26, 29

*In re Integrated Telecom Exp., Inc.,*
   384 F.3d 108 (3d Cir. 2004)................................................................................29

*In re James Wilson Assocs.,*
   965 F.2d (7th Cir. 1992) ......................................................................................13

*Johnson v. Norris*,
    190 F. 459 (5th Cir. 1911) ....................................................................................37

*Kielisch* v. *Educ. Credit Mgmt.* (*In re Kielisch*),
    258 F.3d 315 (4th Cir. 2001) ...........................................................................27

*In re Lehman Bros. Holdings, Inc.*,
    2012 WL 1057952 (Bankr. S.D.N.Y., Mar. 26, 2012) ...........................................13

*In re Lifeco Inv. Grp., Inc.*,
    173 B.R. 478 (Bankr. D. Del. 1994) ................................................................13

*Me. Harbor Props., Inc. v. Mfr.*
    *'s Trust Co.*, 317 U.S. 78 (1942)....................................................................25

*In re New Valley Corp.*,
    168 B.R. 73 (Bankr. D.N.J. 1994) ...................................................................33

*Northern Pacific Ry. Co. v. Boyd*,
    228 U.S. 482 (1913)........................................................................................29

*Norwest Bank Worthington v. Ahlers*,
    485 U.S. 197 (1988)........................................................................................24

*Pittsburgh Mack Sales and Serv. Inc. v. Int'l Union of Operating Eng'rs, Local*
    *Union No. 66*,
    580 F.3d 185 (3d Cir. 2009)..............................................................16, 17, 18, 19

*Protective Comm, for Independent Stockholders for TMT Trailer Ferry, Inc. v.*
    *Anderson*,
    390 U.S. 414 (1968)........................................................................................25

*In re Refco Inc.*,
    505 F.3d 109 (2d Cir. 2007)............................................................................14

*In re Rocha*,
    179 B.R. 305 (Bankr. M.D. Fla. 1995) ............................................................24

*Ruskin v. Griffiths*,
    269 F.2d 827 (2d Cir. 1959)........................................................................27, 32

*In re Schoeneberg*,
    156 B.R. 963 (Bankr. W.D. Tex. 1993).............................................................37

*SEC v. Am. Trailer Rentals Co.*,
    379 U.S. 594 (1965).......................................................................................25

*SEC v. U.S. Realty & Improvement Co.*,
  310 U.S. 434 (1940) ...............................................................................................25

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
  912 F.2d 643 (3d Cir. 1990) .......................................................................16, 17, 19

*In re Terry Ltd. P'ship*,
  27 F.3d 241 (7th Cir. 1994) ..................................................................................32

*In re W.R. Grace & Co., et al.*,
  No. 01-01139 (Bankr. D. Del.) .................................................................... *passim*

*In re Wash. Mut., Inc.*,
  461 B.R. 200 (Bankr. D. Del. 2011) ............................................................ *passim*

**Statutes**

28 U.S.C.A. § 2465(b)(1)(B) ....................................................................................35

11 U.S.C. § 502(b)(2) ...............................................................................................21

11 U.S.C. § 726(a) ...............................................................................22, 34, 35, 36

11 U.S.C. § 1109(b) ..........................................................................................13, 14

11 U.S.C. § 1129(a)(7) .................................................................................. *passim*

11 U.S.C. § 1129(b) ...................................................................................... *passim*

15 U.S.C. § 636(4)(A) ...............................................................................................35

15 U.S.C. § 697(c)(2) ...............................................................................................35

15 U.S.C. § 4303 ......................................................................................................35

21 U.S.C. § 844a(h) .................................................................................................35

22 U.S.C. § 2151t(b) ................................................................................................35

22 U.S.C. § 6082(a)(1)(B) ........................................................................................35

26 U.S.C. § 501(c)(16) .............................................................................................35

26 U.S.C. § 521(b)(2) ...............................................................................................35

28 U.S.C. § 2412(f) ..................................................................................................35

Act of June 7, 1934, Section 77(b), Pub. L. No. 73-296, 48 Stat. 911 .........................24

**TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE:**

The *ad hoc* group of bondholders (the "Bondholder Group"),[1] Law Debenture

Trust Company of New York, as indenture trustee ("Law Debenture"), and The Bank of New

York Mellon, also as indenture trustee ("BNY," and, with Law Debenture, the "Trustees"),

hereby deliver this opening brief in response to the order of the United States Bankruptcy Court

for the District of Delaware (the "U.S. Court") that the parties brief and argue certain issues with

respect to the entitlement of Bondholders to post-petition interest and certain other contractual

entitlements (the "Bondholder Claims Issues"), as requested by the Monitor of the Canadian

Debtors' Estates (the "Monitor") in the Memorandum of the Monitor Regarding Bondholder

Claims Issues, dated June 19, 2014 [D.I. 13880] (the "Monitor's Request").[2]

The Monitor's Request was made during, and purportedly in connection with, the

Allocation Litigation (as defined below) that was conducted jointly by the U.S. Court and the

Ontario Superior Court of Justice (the "Canadian Court" and, together with the U.S. Court, the

"Courts") over the past two months.

The purported connection to the Allocation Litigation was the Monitor's assertion

that resolution of the Bondholder Claims Issues is somehow a "gating issue" to any possible

settlement of that litigation. That assertion, however, was not only a breach of settlement

confidentiality (as the U.S. Court concluded), but also factually incorrect. Unlike the Monitor,

the Bondholder Group and the Trustees will not breach settlement confidentiality. If the Courts

---

[1]     The Bondholder Group consists of entities that hold certain bonds issued or guaranteed by Nortel Networks Corporation ("NNC" and together with its affiliates worldwide, "Nortel"), Nortel Networks Limited "NNL" and together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and together with NNI and certain of its subsidiaries, the "U.S. Debtors").

[2]     This brief does not address the Trustees' entitlement to fees and expenses under their respective Indentures as payment of those amounts is not dependent upon a finding of solvency. The Trustees' rights regarding such fees and expenses are expressly reserved.

want to assess which issues must be resolved in order to facilitate settlement, the Courts have all the information they need from the extensive record in the Allocation Litigation and their interactions with the parties throughout the trial.  Any assessment of settlement dynamics should be based on that information – not on the Monitor's inappropriate attempt to persuade the Courts that a path to settlement exists if the Courts single out the Bondholders and deny them their contractual rights.  As this Court is aware, the issues in these cases are numerous and complex; simply singling out one particular issue and trying to resolve it in isolation is a recipe for wasteful litigation and appeal, not settlement.

## I.    PRELIMINARY STATEMENT

1.    The questions raised in the Monitor's Request are not ripe for adjudication, are presented in a procedurally defective manner, raise issues that can only be decided by each Court separately applying its own law, and are not "gating issues" that will, if resolved, lead to settlement of the Allocation Litigation.

2.    The Monitor has requested that the Court determine that the Bondholders are either: (a) not entitled to post-petition interest, or (b) entitled to post-petition interest, but only at the federal judgment rate.  In order to make either of those determinations now, the Court would have to conclude, in a vacuum, that there are no possible circumstances under which the Bondholders may ever be entitled to post-petition interest at any rate other than the federal judgment rate.  The Monitor has asked the Court to reach that conclusion without knowing how much of the lockbox sale proceeds will be allocated to the U.S. Debtors, without knowing what the eventual chapter 11 plan will provide for regarding post-petition interest, without knowing how creditors will vote on such a plan and whether the Court will be applying the best interests test, the absolute priority rule, the requirements for unimpairment or the compromise standards of Bankruptcy Rule 9019, and without having provided U.S. creditors any of the procedural

safeguards required under the Bankruptcy Code and Bankruptcy Rules in connection with the confirmation of a chapter 11 plan.

3.      The Bondholder Group and the Trustees submit that the Court cannot possibly make such a determination at this time, and that instead the only conclusion that the Court can reach under prevailing law is that, absent Bondholder consent, the Bankruptcy Code not only permits, but indeed requires, payment of post-petition interest to the Bondholders at the applicable contract rate, as well as all other contractual entitlements, before there can be any dividend to NNI's equity holder.

4.      Indeed, if the U.S. Court nonetheless chooses to adjudicate the Bondholder Claims Issues in this context, it must conclude that the Bankruptcy Code compels that *all* of NNI's creditors be paid in full in accordance with their contractual rights before any dividend can be paid to NNI's equity holder.

5.      The issues raised by the Monitor regarding entitlement to post-petition interest are not issues that pertain solely to Bondholders.  Other creditors of NNI may also be entitled to post-petition interest.  To the extent they are, their post-petition interest claims must also be paid in full before any dividend can be paid to equity holders.  The issues raised by the Monitor are defined herein as "Bondholder Claims Issues" because the Monitor has chosen to specifically single out Bondholders, but this Court should understand that the issues pertain to a potentially much broader universe of U.S. creditors as well.

6.      NNI is a Delaware corporation that is the lead debtor in the chapter 11 cases.  The claims against NNI include principal and accrued interest owed by NNI to the holders of various series of bonds that were: (a) issued by NNI's direct and indirect Canadian parent companies, NNL and NNC; and (b) guaranteed by NNI at the behest of NNI's direct corporate parent, NNL.

The claims against NNI also include claims related to certain bonds issued by NNCC (together with NNL and NNC, the "Issuers") and guaranteed by NNL (collectively, with the bonds guaranteed by NNI, the "Guaranteed Bonds").[3]

7.     The evidence that the U.S. Court has already received is uncontroverted.  Without NNI's guarantees, the Issuers would not have had the financial wherewithal to successfully sell the Guaranteed Bonds that were guaranteed by NNI to investors, or at minimum not on the terms, in the amounts, and at the interest rates that became available to the Issuers once NNI's guarantees were included in the package being offered to those investors.  Thus, NNL derived substantial benefits from causing NNI to incur the obligations under the Guaranteed Bonds.

8.     NNL owns 100% of the common stock of NNI.  That common stock is junior in priority in all respects to the rights and claims of NNI's creditors.  In other words, the residual equity interests held by NNL entitle NNL to any value that exists at NNI only *after* NNI has satisfied *all* of the claims of NNI's creditors.

9.     Outside of bankruptcy, the junior-most priority of the common stock is evidenced by, among other things, the fact that NNI's ability to dividend any value to NNL would be restricted by Delaware law that prohibits insolvent corporations from paying dividends.  Once in bankruptcy, this junior-most nature of common stock and the prohibition on distribution of value to equity holders unless and until creditors are paid in full are embodied in the absolute priority rule codified in Bankruptcy Code section 1129(b).

---

[3]     For ease of reference, Schedule A, attached hereto, (i) identifies the various series of Guaranteed Bond-issuances made pursuant to the Governing Indentures (including the 2006 Indenture issued by NNL and guaranteed by NNC and NNI; the 2007 Indenture issued by NNC and guaranteed by NNL and NNI; and the 1996 Indenture issued by NNL and NNCC and guaranteed by NNL); (ii) specifies the terms of the various series of Guaranteed Bond-issuances (including applicable interest rates and aggregate principal amounts); and (iii) reproduces excerpts from the Indentures relating to various guarantee and payment provisions provided for therein.

10.     At its core, the absolute priority rule prohibits any recovery by junior creditors or equity holders unless and until all senior creditors are paid in full, unless the senior creditors voluntarily agree to a lesser recovery.

11.     The Monitor's Request is a blatant attempt to subvert the absolute priority rule. The Monitor requests that the U.S. Court either deny the holders of the Guaranteed Bonds (as well as all other U.S. creditors) any post-petition interest or limit any such post-petition interest to an amount calculated using the federal judgment rate rather than the contractual rate to which the holders of the Guaranteed Bonds are entitled. By the Monitor's own admission, the very purpose of this request is to manufacture a dividend to NNL on account of its equity holdings in NNI by depriving the holders of the Guaranteed Bonds of their right to be paid in full under the absolute priority rule: "[P]otential recoveries from the Canadian Estates may be materially impacted if any excess funds in the US Estate are utilized to pay claims for Post-Petition Interest and Additional Amount Claims instead of flowing back to the Canadian parent company." (Monitor's Request at 3-4.)[4]

12.     This request – that NNL be allowed to divert assets of the U.S. Debtors away from NNI's creditors and into the hands of its shareholder NNL in order to enhance recoveries to NNL's creditors – is directly at odds with both the letter and the spirit of the absolute priority rule. As discussed in detail below, the very foundation of the absolute priority rule is that a debtor cannot be permitted to shortchange creditors while retaining value for equity holders. This is especially true where, as here, the equity holder, NNL, already derived direct and tangible

---

[4]     The UK Pension Claimants (the "UKPC") share the Monitor's desire to create a dividend to NNL by extracting cash from the U.S. Debtors through denial of post-petition interest to U.S. creditors: "Any award of post-petition interest to the Bondholders will reduce the amount of surplus cash in NNI's estate that would otherwise flow to its insolvent parent and shareholder NNL, for distribution to NNL's creditors." *In re Nortel Networks, Inc., et al.*, No. 09-CL-7950 at ¶ 4 (Bankr. Del. June 23, 2014) (Dkt. No. 13887).

economic benefits from NNI's issuance of the guarantees. Having reaped those benefits, NNL now seeks to impair the very guarantees that produced them by eliminating or reducing the right to payment of guaranteed interest obligations and other contractual entitlements.[5]

13.    The Monitor's Request presumes an allocation of sale proceeds among the various Nortel Debtors' estates that provides the U.S. Debtors with more than sufficient funds to pay all of their administrative and prepetition claims in full. In that scenario, the issue would not be whether the recovery of *certain* of the U.S. Debtors' creditors is being diluted by payment of post-petition interest to creditors of equal priority, but whether *all* of the U.S. Debtors' creditors should be deprived of post-petition interest and other contractual entitlements in order to provide a recovery to NNL on account of its equity interests. Such a result would be entirely unwarranted, as courts uniformly recognize that contractual entitlements of creditors, including the right to receive interest, take absolute priority over any distributions on account of residual equity interests:

> [I]f as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid.

*Bruning v. United States*, 376 U.S. 358, 362 n.4 (1964) (quoting *Am. Iron & Steel Mfg. Co. v. Seabord Air Line Ry.*, 233 U.S. 261, 266 (1914)).

> Equity investment brings not a right to payment, but a share of ownership in the debtor's assets—a share that is subject to all of the debtor's payment obligations.

*In re Insilco Techs., Inc.*, 480 F.3d 212, 218 (3d Cir. 2007).

> Let us be perfectly clear. This is a solvent debtor case and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law. When the debtor is solvent, "'the bankruptcy rule is that where there is a *contractual*

---

[5]     The different series of Guaranteed Bonds provide creditors with specific and varying contractual entitlements, including, without limitation, entitlement to make-whole payments, no-call rights, etc. (those features being referred to collectively herein as "contractual entitlements"). A detailed examination of each such contractual entitlement is beyond the scope of this brief. All rights are reserved by the Bondholder Group and the Trustees to assert any contractual entitlements at the appropriate time.

provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision.'"

*In re Gencarelli*, 501 F.3d 1, 7 (1st Cir. 2007) (citing *Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982)).

When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties, and the role that equitable principles play in the allocation of competing interest is significantly reduced. . . . Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have "'free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness.'"

*In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) ("Dow III") (citing *In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th Cir. 1986)).

In this context, the rationale for use of the contract rate of interest is straightforward: ***A debtor with the financial wherewithal to honor its contractual commitments should be required to do so.***

*In re Dow Corning Corp.*, 244 B.R. 678, 695 (Bankr. E.D. Mich. 1999) ("Dow II") (emphasis added).

14.    The Monitor turns a purposefully blind eye to the absolute priority rule, suggesting instead that the *Washington Mutual* case[6] permits circumvention of that rule by capping post-petition interest claims at the federal judgment rate. (Monitor's Request at 3.) The Monitor ignores one simple, but dispositive, fact: in *Washington Mutual*, Judge Walrath was not confronted with the absolute priority rule at all, as that case did not involve an attempt to "cram down" the debtor's reorganization plan under Bankruptcy Code section 1129(b). Instead, that decision was based solely on Judge Walrath's interpretation of the "best interests of creditors" test contained in Bankruptcy Code section 1129(a)(7). As discussed in detail in Section III.B below, while the best interests of creditors test and the absolute priority rule both provide grounds for unsecured creditors to receive post-petition interest, those provisions are entirely independent of one another and require completely different legal analyses. Therefore, while

---

[6]    *In re Wash. Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011).

*Washington Mutual* may be relevant (although certainly not dispositive) to a best interests test

review under section 1129(a)(7), it provides no guidance to an absolute priority rule analysis

under section 1129(b).

15.     The UKPC similarly suggests that the District Court of Delaware's decision in the

*W.R. Grace* case creates "settled case law" in the District of Delaware that any post-petition

interest entitlement can only be paid at the federal judgment rate and not the applicable contract

rate. (Statement of Nortel Networks UK Pension Trust Limited and the Bd. Of the Pension Prot.

Fund in Support of Determination of Post-Petition Interest Issue at ¶ 4, *In re Nortel Networks,*

*Inc., et al.*, No. 09-CL-7950 (Bankr. Del. June 23, 2014), Dkt. No. 13887.)  Like the Monitor, the

UKPC ignores two important details of the *W.R. Grace* decision.

16.     <u>First</u>, as in *Washington Mutual*, the *W.R Grace* decision did not involve a "cram

down" plan.  Accordingly, the *W.R Grace* court neither conducted any analysis of the absolute

priority rule under section 1129(b) nor made any rulings in connection therewith.  In fact, the

court expressly stated that section 1129(b) was not in any way at issue in that case.

17.     <u>Second</u>, the post-petition interest rate that was approved by the court in *W.R.*

*Grace* was actually a "settlement" rate that was below the default rate but ***above*** the non-default

contract rate.  The dispute in *W.R Grace* was not whether post-petition interest should be applied

at the federal judgment rate rather than the contact rate, but instead whether the "settlement" rate

(which was still higher than the contractual non-default rate) should apply rather than the full

default rate.  Based upon its finding that there had been no defaults that would trigger the

application of the default rate, the *W.R. Grace* court approved the settlement rate rather than the

default rate.  Contrary to the assertions of the UKPC, *W.R. Grace* is not at all a case where the

federal judgment rate was applied or imposed by the court, let alone a case that mandates its imposition in *other* cases in Delaware or elsewhere.[7]

18.    In short, when considering whether NNI's creditors are entitled to post-petition interest and any other contractual entitlements, the U.S. Court must undertake analyses of *both* the best interests of creditors test under section 1129(a)(7) *and* the absolute priority rule under section 1129(b). The courts in *Washington Mutual* and *W.R. Grace* did the former, but were not tasked with the latter. Consequently, those decisions simply do not, and cannot, support the assertions of the Monitor and the UKPC that this Court is required, or even permitted, to impose the federal judgment rate in this case. The import of those decisions and, more significantly, the import of decisions where courts actually applied the absolute priority rule, are discussed in detail in Section III.B(i) below.

19.    Finally, the Monitor's Request, and the procedure by which the Courts have agreed to proceed on that request, is fraught with due process and other procedural defects. Any decision by this Court on the questions raised in the Monitor's Request would be similarly defective, as discussed in detail in Section II below. Indeed:

(i)    Only the U.S. Court has jurisdiction to rule on the claims asserted against NNI by NNI's creditors. Creditor claim issues (other than certain intercompany claims) were expressly excluded from the Allocation Protocol [D.I. 10565-1] and are not the subject of the Allocation Trial (as defined below). The Canadian Court has no jurisdiction to rule on, or influence in any way, those issues.

---

[7]    The default rate dispute in *W.R. Grace* was appealed, briefed, and argued to the Third Circuit Court of Appeals. Prior to any ruling from the Third Circuit, the dispute was settled, with the debtor agreeing to pay the lenders approximately 70% of the difference between the above-contract settlement rate and the full default rate. *See* Order Pursuant to Sections 105, 363, 1107, and 1108 of the Bankr. Code and Rules 2002, 6004, 9014, and 9019 of the Fed. Rules of Bankr. Procedure Approving the Settlement Agreement Between W.R. Grace & Co. and the CNA Cos., *In re W.R. Grace & Co., et al.*, No. 01-01139 (D. Del. Dec. 23, 2013, Dkt. No. 31504); Mem. Op. Regarding Objections to Confirmation of First Am. Joint Plan of Reorganization and Recommended Supplemental Findings of Fact and Conclusions of Law, *In re W.R. Grace & Co., et al.*, No. 01-01139 (D. Del. Jan. 17, 2014), Dkt. No. 31604.

(ii)    Only parties in interest in the U.S. chapter 11 cases have standing to be heard on claims issues arising in those cases.  NNL has such standing as the owner of equity interests in NNI.  Parties with only derivative interests in the outcome of the Bondholder Claims Issues in the U.S. cases, including NNL's creditors and the UKPC (which, as described in Section II.A(iii), accepted a cash payment in full and final settlement of its claims against the U.S. Debtors' estates)  are not parties in interest in the U.S. chapter 11 cases and thus have no such standing.

(iii)    Unlike the Allocation Trial, which is an intercompany dispute among the various Nortel Debtors' estates governed by a negotiated protocol, the claims issues raised by the Monitor involve the rights of numerous third parties that are creditors of NNI but that have no involvement with the Allocation Trial.  Any attempt to resolve the claims issues that impact those third parties in a summary proceeding that bears only a tenuous connection to the Allocation Trial and with no appropriate procedural safeguards, necessarily raises due process concerns.

(iv)    The Bondholder Claims Issues are not ripe for adjudication.  It cannot yet be determined whether the U.S. Debtors will have sufficient funds to pay *any* post-petition interest; that fact will only be known once a final, non-appealable allocation determination has been issued.  Moreover, the U.S. Court does not yet have a chapter 11 plan before it to frame the post-petition interest issue.  Will the plan be a consensual plan, such that the Court can focus solely on the best interests of creditors test?  Will the plan be a "cram down" plan that will require the Court to determine whether the absolute priority rule has been satisfied?  Or, like *W.R. Grace*, will the plan propose payment of some sort of "settlement" rate that is more appropriately reviewed through the lens of a compromise under Bankruptcy Rule 9019?

20.    Until the relevant facts are known and the applicable legal framework is established, the issues that the Monitor has requested this Court to resolve simply are not ripe for determination.

## II.    PROCEDURAL, JURISDICTIONAL, AND DUE PROCESS ARGUMENTS

### A.    The Monitor's Request is Jurisdictionally and Procedurally Defective.

#### i.    The Monitor's Request Was Improper, Procedurally Deficient, and Wholly Unrelated to the Allocation Trial.

21.    The U.S. Court's consideration of the Monitor's Request in connection with the trial to determine the allocation of proceeds from the sale of substantially all of Nortel's assets (the "Allocation Litigation" or "Allocation Trial") is procedurally defective.

22.     As an initial matter, as the U.S. Court has recognized, the Monitor's Request arose from its assertion that the Bondholder Claims Issues were a supposed "gating issue" in the parties' settlement discussions and, thus, is a direct product of the Monitor's "breach of the confidentiality of settlement discussion." (Hr'g Tr. 4945:3-6, June 23, 2014; Hr'g Tr. 8:4-8, June 27, 2014.)

23.     Notwithstanding the Monitor's improprieties, the Courts nonetheless asked the Monitor to continue further down that path by submitting a short memorandum describing the Bondholder Claims Issues and the reasons they should be decided by the Courts. The Core Parties, in turn, were given 24 hours to respond, with instruction from the Courts that they were not to include any "argument" in their responses. Other potentially interested parties, such as bondholders that are not members of the Bondholder Group and any other creditors in the chapter 11 cases that might have the right to assert post-petition interest or other similar contractual entitlements, were not given *any* notice of the Monitor's Request or of the subsequent briefing requested by the Courts.

24.     Under this construct, it is not at all clear what the Monitor's Request amounts to as a matter of procedure – it is not a motion; it is not a claim objection; it is not a complaint for declaratory relief. What is clear, however, is that the mere submission of an informal memorandum, with "argument" expressly prohibited by the Courts, cannot possibly put the U.S. Court in a position to properly determine the Bondholder Claims Issues with any procedural or jurisdictional integrity.

25.     In addition, this Court must recognize that the Monitor's Request contemplates a very different proceeding than the Allocation Litigation. The sole subject of the Allocation Litigation is the resolution of intercompany issues between and among Nortel estates. In

11

contrast, the Monitor's Request has significant implications for scores of third party creditors of the U.S. Debtors' estates who are ***not*** parties to the Allocation Litigation. Those creditors are entitled to full due process in connection with any matters that seek to determine or limit their rights to assert claims against the U.S. Debtors' estates. The lack of any recognized procedural structure, the lack of proper notice to all affected parties in interest, and the truncated briefing and hearing schedule established by the Courts in response to the Monitor's Request fail to respect those due process rights.

ii. **The Bondholder Claims Issues That Pertain to Claims Against NNI Are Not Subject to the Joint Jurisdiction of the Courts.**

26. The Bondholder Claims Issues that relate solely to the rights of the holders of claims against NNI are not subject to the joint jurisdiction of the Courts. Accordingly, they are not appropriately the subject of a joint hearing as part of the Allocation Litigation. In fact, creditor claims issues were explicitly carved out of the Allocation Protocol and thus are not properly the subject of the Allocation Trial. (*See* Allocation Protocol [D.I. 10565-1] at ¶ 1.)

27. Furthermore, only the U.S. Court can rule on issues regarding the claims of creditors of the U.S. Debtors' estates, just as only the Canadian Court can rule on issues regarding the claims of creditors of the Canadian Debtors' estates. This fact was memorialized by the Canadian and U.S. Debtors' estates and approved by the Courts in the Cross-Border Claims Protocol, which expressly preserved the Courts' "respective independent jurisdiction over the subject matter of the Chapter 11 Cases and the Canadian Proceedings, respectively." (Cross-Border Protocol on the Resolution of Claims (the "Claims Protocol") [D.I. 3922-3] at ¶ 19.) Thus, even if the Courts determine it appropriate to conduct a joint hearing on the Bondholder Claims Issues, they (and all the parties) must respect the jurisdictional separateness of these issues.

12

28.     The U.S. Court has already recognized that it has exclusive jurisdiction over the

U.S.-based claims.  *See* July 24, 2014 Tr. at 5103:6-10 ("The concern that this is not a matter

subject to the joint jurisdiction of the Canadian and US Courts is similarly a nonstarter issue.

***Justice Newbould and I will decide the issues confronting us separately***." (emphasis added)).

Any joint hearing where those issues are considered must be conducted with this fact clearly in

mind.

      **iii.**    **Neither the Canadian Creditors Nor the UKPC Has Standing to be Heard on the Bondholder Claims Issues in the U.S. Court.**

29.     Because the Bondholder Claims Issues are not at issue in the Allocation

Litigation, being a Core Party to that litigation does not confer standing to be heard on the

Bondholder Claims Issues in the U.S. Court.  Like the Canadian Court and its lack of jurisdiction

over U.S. claims issues, creditors of the Canadian Debtors who do not have any claims against

the U.S. Debtors have no standing to be heard on U.S.-only claims issues.  *See* 11 U.S.C. §

1109(b) ("[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity

security holders' committee, a creditor, an equity security holder, or any indenture trustee, may

raise and may appear and be heard on any issue in a case under this chapter.").

30.     The Third Circuit defines a "party in interest" as "anyone who has a legally

protected interest that could be affected by a bankruptcy proceeding."  *In re Global Industrial*

*Technologies, Inc.*, 645 F.3d 201, 210 (3d Cir.2011) (quoting *In re James Wilson Assocs.*, 965

F.2d, 160, 169 (7th Cir. 1992).  *See also*, *In re Amatex*, 755 F.2d 1034, 1042 (3rd Cir. 1985) (a

"party in interest" is one who "has a sufficient stake in the proceeding so as to require

representation.").  While the definition of a party in interest is broad, it is not without limits.

Party in interest standing under section 1109(b) "does not arise if a party seeks to assert some

right that is purely derivative of another party's rights in the bankruptcy proceeding." *In re Lehman Bros. Holdings, Inc.*, 2012 WL 1057952, *3 (Bankr. S.D.N.Y., Mar. 26, 2012).

31.    Thus, courts have found that a creditor of a debtor's creditor is not a party in interest and does not have standing in the debtor's bankruptcy case in such capacity, even though such creditor may have a substantial financial interest in the outcome of the bankruptcy case. *See, e.g., In re Lifeco Inv. Grp., Inc.*, 173 B.R. 478, 487-88 (Bankr. D. Del. 1994) (finding "no statutory or judicial support to conclude that a creditor of a creditor has standing in a bankruptcy case.").[8]

32.    Notwithstanding the efforts of certain Canadian creditors to tell a different story to the Courts, the Bondholder Claims Issues do ***not*** involve a dispute between U.S. and Canadian creditors. The Bondholder Claims Issues involve a dispute about whether NNL, as the equity holder in NNI, should be allowed to circumvent the absolute priority rule by diverting funds from NNI that would otherwise be available to NNI to satisfy ***its*** obligations to ***its*** creditors. That dispute is between NNI's creditors and NNI's equity holder, NNL. Therefore, although NNL, as NNI's equity holder, has standing to be heard on the Bondholder Claims Issues in the U.S. Court, the Canadian Creditors Committee (the "CCC") and individual Canadian creditors — which are merely creditors of NNI's equity holder— do not. Similarly, the UKPC, which has settled its claims against the U.S. Debtors' estates for an indefeasibly paid amount of cash, now maintains only a derivative interest in the outcome of the Bondholder Claims Issues. As noted, such an interest is insufficient to confer standing in the U.S. Court.

---

[8]       Similarly, investors in a creditor of a debtor are not parties in interest in the debtor's bankruptcy case. *In re Refco Inc.*, 505 F.3d 109, 117 n.10 (2d Cir. 2007) (investors' objection to settlement between estate and the creditor in which they were investors dismissed as investors were not "parties in interest" within the meaning of § 1109(b) because they were not seeking to enforce any rights distinct from those of the creditor).

B.      **A Decision on the Bondholder Claims Issues, As Presented, Would Violate Due Process.**

33.     Any decision rendered by this Court pursuant to the Monitor's Request would be procedurally defective and create serious due process concerns. For example, if the Monitor's Request is to be considered a blanket claim objection to any claims against NNI that might include claims for post-petition interest or other contractual entitlements, then due process requires adherence to, and compliance with, Bankruptcy Rule 3007. That rule provides in relevant part that "[a] copy of the objection with notice of the hearing thereon shall be mailed or otherwise delivered to the claimant, the debtor or debtor in possession, and the trustee *at least 30 days prior to the hearing*." Fed. R. Bankr. P. 3007(a) (emphasis added). Not only was notice of the Monitor's Request insufficient under Bankruptcy Rule 3007, but the Monitor has also never served scores of unsecured creditors whose claims could be directly affected by the resolution of the issues raised in the Monitor's Request.

34.     If the Monitor's Request is not a claim objection but is rather a request for injunctive relief to prevent the payment of post-petition interest, then due process requires that a decision on such request adhere to, and comply with, Part VII of the Bankruptcy Rules concerning adversary proceedings. At the very minimum, adherence to these rules requires the filing of a complaint and compliance with various rules concerning procedural process, as well as proper service on all affected parties. *See* Fed. R. Bankr. P. 7003, 7004.

35.     Perhaps most notably, as discussed in detail in Section III below, in chapter 11 cases, the entitlement of creditors to post-petition interest arises under either section 1129(a)(7) and the best interests of creditors test or section 1129(b) and the absolute priority rule. Both of those provisions are contained in section 1129 of the Bankruptcy Code, which sets forth the requirements for confirming a chapter 11 plan. It therefore is not surprising that most, if not all,

15

reported decisions regarding post-petition interest have arisen in the context of plan confirmation hearings.  As this Court is well aware, the plan confirmation process is governed by a well-established set of procedural requirements regarding notice and a hearing for approval of a disclosure statement, the establishment of plan solicitation and voting procedures, and ultimately notice and a hearing on plan confirmation itself.  *See* Bankr. R. 3016, 3017, 3018.

36.    The deliberate disclosure statement approval and plan confirmation processes are specifically designed to ensure that ***all*** creditors have a full and fair opportunity to review, analyze, and, if necessary, object to the manner in which their rights are being affected by the proposed plan, as well as (if applicable) to vote to accept or reject the plan.  The Monitor's Request should be viewed for what it is – a blatant attempt to avoid all of the carefully crafted procedural and substantive protections for creditors built into the Bankruptcy Code and the Bankruptcy Rules.[9]

## C.    The Bondholder Claims Issues are Premature and Unripe.

37.    A fundamental precept of federal jurisdiction is that "the Constitution prohibits federal courts from deciding issues in which there is no case or controversy, [and] declaratory judgments can be issued only when there is an actual controversy." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990) (citation omitted).  The "case or controversy" requirement is enforced through "several justiciability doctrines that 'cluster about Article III,'" including ripeness and the prohibition on advisory opinions. *Pittsburgh Mack Sales and Serv.*

---

[9]    Additionally, the Monitor's (*sua sponte*) Request itself—that the Courts decide the Bondholder Claims Issues at this juncture in the proceedings—and the process implemented by the Courts to determine whether to grant that Request raise other serious due process concerns.  As noted, the Core Parties were given 24 hours to respond to the Monitor's Request and were specifically asked to do so without argument.  The Courts subsequently held impromptu argument just five days after the Monitor's Request—and even then only for less than 23 minutes in the aggregate. *See* Hr'g Tr. 8:1-8, June 27, 2014.

*Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 19 (3d Cir. 2009)

(citations and internal quotations omitted).

38.     The Third Circuit has set forth a three factor test to determine ripeness: "the

adversity of the interest of the parties, the conclusiveness of the judicial judgment and the

practical help, or utility, of that judgment." *Step-Saver*, 912 F.2d at 647. The Bondholder

Claims Issues are not ripe for adjudication because they fail to meet **any** of the three *Step-Saver*

factors.

39.     The first factor of the ripeness analysis requires that the asserted adversity be

extant, and not contingent on a future event. A potential harm that is contingent on a future

event occurring "will likely not satisfy this prong of the ripeness test." *Pittsburgh Mack*, 580

F.3d at 190 (citations omitted).

40.     The Bondholder Claims Issues fail to meet this standard, as they are contingent on

the occurrence of several future events. To begin with, it is black letter law that post-petition

interest on unsecured claims is only payable where the debtor has sufficient assets to pay

post-petition interest. The U.S. Court recognized this when, eight months ago, it declined to hear

– as unripe – a claims objection filed by Wilmington Trust NA [D.I. 12399] that raised virtually

the exact issues that the Monitor has yet again raised:

> [f]or the reasons stated on the record, the Court is adjourning the Objection
> without date, principally because the Objection would require the Court to issue
> an advisory opinion on an issue which may never arise and, if it does, only at a
> later date and perhaps in a different context. ***The Objection will only be germane
> if the U.S. Debtors are found to be solvent and the solvency issue is far from
> decided.*** Courts do not have the power to render an advisory opinion, *i.e.*, based
> on a contingency and resulting in a contingent declaration. (emphasis added)

Order dated Nov. 15, 2013 regarding the objection filed by Wilmington Trust NA to certain

claims against the U.S. Debtors' estates (the "Prior Interest Order") at 1 (citing *Pittsburgh Mack*,

580 F.3d at 191-93).

41.     This is no less true today.  The U.S. Debtors' ability to obtain funds sufficient to

pay *any* post-petition interest remains entirely dependent on (i) how the "lockbox" sale proceeds

are allocated among the various Nortel Debtors' estates, and (ii) the resolution of all claims

against the U.S. Debtors' estates.  Absent a final determination of these two predicate issues, the

Bondholder Claims Issues are not ripe for adjudication.[10]

42.     Moreover, as discussed in Section III *infra*, the legal standard that this Court must

apply in examining creditors' entitlement to post-petition interest will depend on the type of plan

under which the U.S. Debtors' funds will be distributed.  If the proposed plan is accepted by all

unsecured creditors, the relevant analysis may be limited to the "best interests of creditors" test

contained in Bankruptcy Code section 1129(a)(7).  If the proposed plan is rejected by at least one

class of unsecured creditors, however, the U.S. Court will also need to consider the "fair and

equitable" standard with respect to such class, as required by Bankruptcy Code section 1129(b),

which includes compliance with the absolute priority rule.  Finally, the proposed plan could be

based on a compromise of the post-petition interest issues that would be reviewable under the

entirely different standard of Bankruptcy Rule 9019.  Because it is not known, at this stage, what

the U.S. Debtors' plan will contain, how unsecured creditors will vote on such a plan, and

whether such a plan will be premised on a settlement, the Bondholder Claims Issues are not ripe

for determination.

---

[10]     This Court explained its departure from the Prior Interest Order by noting that the subsequent Allocation
Trial presented "nothing but new evidence, evidence which I had not considered and which was still in the process
of being formulated when I previously ruled that I would not hear the interest issues."  Hr'g Tr. 5103:1-5, June 24,
2014.  While the Bondholder Group believes that the new evidence adduced during the Allocation Trial amply
supports the conclusion that the U.S. Debtors' estates should receive an allocation that is sufficient to pay post-
petition interest (potentially alleviating this Court's prior, solvency-related concern), there still remain—as then—
the significant unknowns described above that are critical for the U.S. Court's determination of the post-petition
interest issues.

43.     The second factor of the ripeness analysis requires the court to "determine whether judicial action at the present time would amount to more than an advisory opinion based upon a hypothetical set of facts." *Pittsburgh Mack*, 580 F.3d at 190.  Put another way, this factor asks whether any order issued by the court would "be sufficiently conclusive to define and clarify the legal rights or relations of the parties." *Step-Saver*, 912 F.2d at 648.

44.     In the instant case, the answer is clearly "no."  An order by the U.S. Court would not change or clarify the parties' legal rights because it would necessarily be based on the U.S. Court's "guess" as to the resolution of a yet-unresolved contingency; that is, whether or not the U.S. Debtors will have surplus funds to distribute to their creditors on account of post-petition interest.  Indeed, several of the Core Parties continue to advocate legal theories that would allocate far less than an amount that would create any such surplus of funds in the U.S. Debtors' estates.  Moreover, even if those parties advocating an insufficient allocation to the U.S. Debtors conclude that they are likely to lose, no party can predict what a future chapter 11 plan might look like such that the contours of the dispute could even be formed.

45.     The third factor of the ripeness analysis requires the court to look to the "practical help, or utility" of a judgment. *Pittsburgh Mack*, 580 F.3d at 191.  A judgment on the Bondholder Claims Issues at this stage will not be of "significant practical help in ending the controversy."

46.     As the U.S. Court previously recognized, the Bondholder Claims Issues are "one of many, many issues" that stand between the parties and a consensual resolution of these cases. (Hr'g Tr. 39:21-22, Nov. 15, 2013.)  Selecting the Bondholder Claims Issues, out of the many legal and factual issues impacting the parties' confidential settlement discussions, is counter-productive and almost certainly will lead to appeals that will disrupt settlement

discussions and further increase the length and cost of these cases. Because a judgment on the

Bondholder Claims Issues at this time will likely hinder, not help, these cases move closer to a

resolution, the Bondholder Claims Issues are not ripe for determination.

## III.    SUBSTANTIVE LEGAL ARGUMENTS

47.    The Monitor's Request asks the U.S. Court to determine the following issues:

i)    whether the holders of the Guaranteed Bonds are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US $4.092 billion); and

ii)    if determined that the holders of the Guaranteed Bonds are so entitled, what additional amounts are such holders entitled to so claim and receive.

Monitor's Request at 2.

48.    In the U.S., the answer to the first question – whether the Bondholders are entitled

to post-petition interest and other contractual entitlements provided for in the applicable

indentures – is straightforward and merely requires application of the distribution "waterfall" that

tracks the priorities established by the U.S. Debtors' capital structure. In short, the Bondholders

will be entitled to receive post-petition interest (and all other contractual entitlements) if the

U.S. Debtors ultimately have more than sufficient funds to pay all allowed administrative and

prepetition claims in full. Any surplus existing after such payment must be paid to the

U.S. Debtors' unsecured creditors until their rights to post-petition interest are satisfied in full.

The applicable Bankruptcy Code provisions and relevant case law establishing this entitlement

are discussed in Section III.A below.

49.    The answer to the Monitor's second question – what amounts in excess of

principal and interest accrued as of the petition date are payable to the Bondholders – is equally

straightforward. Under U.S. law, the Bondholders (and the U.S. Debtors' other unsecured

creditors) are entitled to payment of *all* of their contractual entitlements, including post-petition

interest at the contract rate, before NNL is entitled to *any* distribution on account of its equity interests in NNI.  The applicable Bankruptcy Code provisions and relevant case law establishing this entitlement are discussed in Section III.B below.

A.      **Unsecured Creditors are Entitled to Post-Petition Interest and All Other Contractual Entitlements if the U.S. Debtors have Surplus Funds After Payment in Full of All Allowed Claims.**

50.      The general rule in bankruptcy is that unsecured creditors are not entitled to recover interest on their claims accruing after the filing of the bankruptcy petition.[11]  That rule is subject to two clear statutory exceptions, where post-petition interest not only may, but *must*, be paid to unsecured creditors under either (i) the "best interests of creditors" test under Bankruptcy Code section 1129(a)(7), or (ii)  the "fair and equitable" standard contained in the "cram down" provisions of Bankruptcy Code section 1129(b).

51.      Each of these exceptions is triggered only where a debtor has more than sufficient distributable value to satisfy all administrative and prepetition claims in full.  When such "surplus" value exists, both the "best interests of creditors" test of section 1129(a)(7) and the "fair and equitable" standard of section 1129(b) require that the surplus must be used to pay post-petition interest to unsecured creditors before any amounts can be distributed to equity holders.

i.      **The Best Interests Test Entitles Unsecured Creditors to Receive Post-petition Interest Before Any Amounts Can Be Distributed to Equity Holders.**

52.      Bankruptcy Code section 1129(a)(7) provides that a court may confirm a chapter 11 plan only if each holder of an impaired claim or interest either (i) accepts the plan or (ii) will "retain under the plan . . . property of a value, as of the effective date of the plan, *that is not less than* the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7."  11 U.S.C. § 1129(a)(7) (emphasis added).  In other words, if a creditor does

---

[11]      11 U.S.C. § 502(b)(2)

not accept a proposed chapter 11 plan, that creditor must receive *at least* the same amount that it would have received in a hypothetical liquidation of the debtor under chapter 7 of the Bankruptcy Code.

53.      To determine whether the best interests test has been satisfied – *i.e.*, whether the non-accepting creditor will receive at least as much as it would receive in a chapter 7 liquidation – the court must determine what distributions the creditor would be entitled to under a liquidation of the debtor under chapter 7.

54.      The chapter 7 distribution priorities are established in Bankruptcy Code section 726(a).  Sections 726(a)(5) and (6) provide that, after all administrative and prepetition claims have been paid in full, any remaining property of the estate shall be distributed:

> (5) fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and
>
> (6) sixth, to the debtor.

11 U.S.C. § 726(a)(5), (6).

55.      Accordingly, under the distribution waterfall established by section 726(a), it is clear that the best interests test of section 1129(a)(7) entitles unsecured creditors to be paid post-petition interest before any residual can be distributed  to the debtor or its equity holders.

56.      The best interests test protects each individual dissenting creditor even when the class in which that creditor's claim was placed, as a whole, has voted to accept the plan.  This is a key distinction between the best interests test of section 1129(a)(7) and the fair and equitable standard of section 1129(b).  In contrast to the best interests test, which must be met for *every* single creditor that does not accept the plan, the fair and equitable standard is implicated when a class of claims or interests has voted *as a class* to reject the plan.

57.     This critical distinction is one reason that cases like *Washington Mutual* and *W.R.*

*Grace* do not create any blanket precedent on post-petition interest issues.  In both of those cases,

the plans at issue were *not* cram down plans.  Consequently, the courts were not required to, and

did not, analyze the fair and equitable requirements of section 1129(b).  Instead, the analysis in

both of those cases was limited only to the best interests test of section 1129(a)(7).  In the present

case, there can be no question that the U.S. Court ultimately may be confronted by a plan that is

rejected by the bondholder class.  In that instance, unlike the courts in *Washington Mutual* and

*W.R. Grace*, the U.S. Court will be required to determine whether such plan satisfies the fair and

equitable requirements of section 1129(b).

58.     It should also be noted that, by its express language (*i.e.*, "not less than the

amount that …"), section 1129(a)(7) does not purport to establish  a single specific and

dispositive rate of post-petition interest that must be paid.  Rather, it establishes the ***minimum***

that must be paid to each dissenting creditor, not the ***maximum***.

**ii.      The Fair and Equitable Test Entitles Unsecured Creditors to Receive Post-petition Interest And Any Other Contractual Entitlements Before Any Amounts Can Be Paid to Equity Holders.**

59.     Bankruptcy Code section 1129(b) provides that where a plan has been rejected by

a class of claims or interests, that plan can only be confirmed if it "does not discriminate

unfairly, and is fair and equitable, with respect to" such class.  11 U.S.C. § 1129(b)(1).

60.     The "fair and equitable" standard includes the requirement that

section 1129(b)(2)(B), which codifies the "absolute priority rule," must be satisfied.[12]  The

absolute priority rule requires that "a dissenting class of unsecured creditors . . . be provided for

---

[12]     Section 1129(b)(2)(B) of the Bankruptcy Code provides, in relevant part, that a plan is fair and equitable if: [w]ith respect to a class of unsecured claims – (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . ." 11 U.S.C. § 1129(b)(2)(B).

*in full* before any junior class can receive or retain any property [under a] plan." *Norwest Bank*

*Worthington v. Ahlers*, 485 U.S. 197, 202 (1988) (citing *Ahlers v. Norwest Bank Worthington (In*

*re Ahlers)*, 794 F.2d 388, 401 (8th Cir. 1986) (emphasis added)). *See also In re Rocha*, 179 B.R.

305, 306-07 (Bankr. M.D. Fla. 1995) ("the absolute priority rule, in its simplest terms, requires

that creditors of a debtor in bankruptcy reorganization receive payment of their claims in their

established order of priority, and that they receive payment in full before lesser interests—such

as those of [debtors in possession]—may share in the assets of the reorganized entity") (internal

citations omitted).

61.     The absolute priority rule has its roots in the first corporate bankruptcy

reorganization statute, which Congress passed in 1934.  That statute specified that a plan of

reorganization must be "fair and equitable."  Act of June 7, 1934, Section 77(b), Pub. L. No. 73-

296, 48 Stat.  911, 919.

62.     In 1939, the U.S. Supreme Court interpreted the fair and equitable requirement to

include the absolute priority rule in *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106 (1939).  In

that case, the debtor proposed a plan under which its stockholders would retain a substantial

stake in the reorganized company, while bondholders would be paid substantially less than the

amounts they were owed.  Applying the then-relatively new statutory "fair and equitable" test

but also relying on its earlier common law precedents, the Supreme Court determined that the

"fair and equitable" test incorporated a "rule of full or absolute priority," which required that

"the full value" of the debtor's property be "first applied to claims of [creditors] before the

stockholders are allowed to participate." *Id.* at 120.  In other words, absent a "fresh

contribution" of capital, stockholders are not allowed to benefit from a reorganization unless

creditors are first paid in full. *Id.* at 121. "If that were not the test, then the creditor's rights could be easily diluted by inadequate contributions by stockholders." *Id.* at 122.

63.     Subsequent to *Los Angeles Lumber*, the Supreme Court (and later the Third Circuit) repeatedly reiterated that a plan could not be "fair and equitable" unless all creditors were paid in full before shareholders received any recovery. *See, e.g., SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 452 (1940) (all creditors "are entitled to priority over stockholders to the full extent of their debts and . . . any scaling down of the claims of creditors without some fair compensating advantage to them which is prior to the rights of stockholders is inadmissible"); *Me. Harbor Props., Inc. v. Mfr.'s Trust Co.*, 317 U.S. 78, 87 (1942) (the "fair and equitable" test protects creditors against "dilution . . . by equity interests"); *Group of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 570 (1943) (unless the absolute priority rule is followed, "there will be serious invasions of the rights of senior claimants to the benefit of junior interests," and "[t]he property of one group will be subtly appropriated to pay the claims of another"); *SEC v. Am. Trailer Rentals Co.*, 379 U.S. 594, 611 (1965) ("senior interests are entitled to full priority over junior ones"); *Protective Comm, for Independent Stockholders for TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 441 (1968) ("unsecured creditors are entitled to priority over stockholders to the full extent of their debts"); *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 473 (1974) ("There is a hierarchy of claims, the owner of the equity coming last."); *accord In re Cent. R.R. Co. of N.J.*, 579 F.2d 804, 810 (3d Cir. 1978) (noting that the "fair and equitable" standard has a "long history" and "requires that claimants and creditors of a bankrupt estate of the same class receive the full value of their debts from the property of the debtor before junior creditors and shareholders are paid").

64.    When Congress enacted Chapter 11 of the Bankruptcy Code in 1978, the fair and equitable test, including the absolute priority rule, was expressly codified in section 1129(b)(1). Since that time, courts have repeatedly confirmed that the fair and equitable test now contained in section 1129(b)(1) means the same thing it did when the Supreme Court decided *Los Angeles Lumber*: It "invokes the absolute priority rule, which is a judicial invention that predated the Bankruptcy Code," *In re Armstrong World Indus.*, 432 F.3d at 512, and it "requires that equity holders receive nothing unless all creditors are paid in full." *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 n. 10 (3d Cir. 2007); *see also Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 444 (1999).

65.    Courts have also unequivocally established that the absolute priority rule applies to principal *and interest* on a claim, including post-petition interest. In *Consol. Rock Prods. Co. v. DuBois*, 312 U.S. 510, 527 (1941), the Supreme Court held that a plan violated the absolute priority rule by not providing for payment of interest because "interest is entitled to the same priority as the principal." In *Bruning*, the Supreme Court further articulated its reasoning:

> [I]n case funds are not sufficient to pay claims of equal dignity, the distribution is made only on the basis of the principal of the debt. But that rule did not prevent the running of interest during the Receivership; and if as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid.

*Bruning*, 376 U.S. at 362 n.4 (quoting *Am. Iron & Steel Mfg. Co.*, 233 U.S. at 266)).

66.    Circuit courts have also followed this concept for decades:

> The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full. All of [the debtor's] creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. ***The only competing equities are those of [the debtor's] shareholders, and are weak....***

*      *      *

The fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be. The function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted. ***Hence if the bankrupt is solvent the task for the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights.***

*In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.,* 791 F.2d 524, 527-28 (7th Cir. 1986) (emphasis added) (citation omitted); *see also Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) (holding that stockholders "cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture") (citation omitted).

67.     More recent cases reaffirm this same basic principle under the fair and equitable standard expressly contained in section 1129(b)(1):

[T]he general rule "disallowing" the payment of postpetition interest out of the [assets of the] bankruptcy estate is a rule of administrative convenience and fairness to all creditors . . . [The rule makes it] possible to calculate the amount of claims easily and . . . [assures] that creditors at the bottom rungs of the priority ladder are not prejudiced by the delays inherent in liquidation and distribution of the estate . . . [But] when concerns for administrative convenience and fairness are not present, post-petition interest will be "allowed.". . . Post-petition interest is also payable out of the assets of the bankruptcy estate -- if the debtor ultimately proves to be solvent -- before any sums are returned to the debtor.

*Kielisch* v. *Educ. Credit Mgmt. (In re Kielisch)*, 258 F.3d 315, 321, 322 n.5, 325 (4th Cir. 2001) (quoting *Hanna* v. *United States (In re Hanna)*, 872 F.2d 829, 830-31 (8th Cir. 1989)).

68.     Accordingly, the absolute priority rule mandates that if a class of unsecured claims that has rejected the plan is not "paid in full," including post-petition interest at the contract rate and all other contractual entitlements, no class junior to such dissenting class may receive or retain any property on account of its claims or equity interests.

69.     Thus, under either the best interests test of section 1129(a)(7) or the fair and equitable requirement of section 1129(b), unsecured creditors of the U.S. Debtors' estates will be entitled to payment of post-petition interest and all other contractual entitlements if, and to the extent that, the U.S. Debtors have funds in excess of the amount necessary to pay all administrative and prepetition claims in full.

B.     **If the U.S. Debtors Have Surplus Funds, the Best Interests Test and the Absolute Priority Rule Both Mandate that Unsecured Creditors Receive Payment of Post-petition Interest at the Contract Rate Before NNL Receives Any Distribution On Account of its Residual Equity Interests in NNI.**

70.     The Monitor's first question is whether the bondholders are entitled to receive any amounts above and beyond the outstanding principal amount of their bonds and prepetition interest. The foregoing discussion establishes that, under both sections 1129(a)(7) and 1129(b) of the Bankruptcy Code, such an entitlement exists and will be triggered if the U.S. Debtors end up with funds that are more than sufficient to pay all of their administrative and prepetition claims in full.

71.     The Monitor's second question is what that entitlement covers – *i.e.*, what "additional amounts" may the Bondholders claim above and beyond outstanding principal and prepetition interest under the relevant bond indentures. The answer: in addition to payment of outstanding principal and prepetition interest, the Bondholders are entitled to payment in full of all post-petition interest at the contracted-for rates, plus payment in full of all other applicable contractual entitlements, before NNL can receive any distribution on account of its equity interests in NNI. The applicable Bankruptcy Code provisions and relevant case law establishing this entitlement are discussed below.

i.      **The Absolute Priority Rule Requires that Unsecured Creditors Receive Payment of Post-Petition Interest at the Contract Rate And Satisfaction in Full of All Other Contractual Entitlements Before NNL Can Receive Any Distribution On Account of its Residual Equity Interests in NNI.**

72.     As discussed above, a fundamental underpinning of the absolute priority rule is that a debtor that has induced creditors to enter into contracts and provide consideration, including financing that provided the debtor with capital necessary to fund its ongoing business operations, must satisfy those contractual obligations in full before its equity holders can receive any recovery.

73.     This principle was recognized over one hundred years ago by the Supreme Court in *Northern Pacific Ry. Co. v. Boyd*, 228 U.S. 482 (1913): "Any device, whether by private contract or judicial sale under consent decree, whereby stockholders were preferred before the creditor was invalid." 228 U.S. at 504.

74.     The Supreme Court further articulated its reasoning in *Consolidated Rock*. Noting that "[t]he full and absolute priority rule of *Northern Pacific Ry. Co. . . .* would preclude participation by the equity interests in any of those assets until the bondholders had been made whole," 312 U.S. at 520-21, it held that: "This interest [on the bonds] is entitled to the same priority as the principal." *Id.* at 527. Because the plan would let stockholders recover without paying interest to bondholders, the Supreme Court held the plan violated the absolute priority rule. *Id.*

75.     This bedrock principle of creditor priority over shareholders remains the rule today. *See, e.g., In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005) ("The absolute priority rule was later codified as part of the 'fair and equitable' requirement of . . . § 1129(b)."); *In re Insilco Techs., Inc.*, 480 F.3d 212, 218 (3d Cir. 2007) ("Equity investment brings not a right to payment, but a share of ownership in the debtor's assets—a share that is

subject to all of the debtor's payment obligations."); *In re Integrated Telecom Exp., Inc.*, 384 F.3d 108, 129 (3d Cir. 2004) (recognizing that equity owners should absorb the cost of a business's failure).

76.    The well-established principle that creditors' contractual rights are entitled to absolute priority over any residual rights of equity holders leads to one simple conclusion: unsecured creditors of NNI must be paid all of their bargained-for contractual rights, including post-petition interest at the contract rate, before NNL is entitled to receive anything on account of its equity interests in NNI.

77.    The Monitor and the UKPC have tried to divert the U.S. Court's attention from the unambiguous mandate of the absolute priority rule by suggesting that the *Washington Mutual* and *W.R. Grace* cases somehow require that, notwithstanding the absolute priority rule, the U.S. Court should limit the bondholders' right to receive post-petition interest to interest calculated at the federal judgment rate.  That argument fails because the courts in *Washington Mutual* and *W.R. Grace* did not address post-postpetition interest issues under the fair and equitable requirement of 1129(b).  But other courts have.  The leading cases on this topic are *Dow II* and *Dow III*.

78.    In *Dow II*, the debtor proposed a plan that provided for payment of post-petition interest to unsecured creditors at the federal judgment rate.  Unsecured creditors did not accept the plan, forcing the debtor to seek confirmation under the "cram down" provision of Bankruptcy Code section 1129(b).  The bankruptcy court held that the plan, as proposed, failed to satisfy the fair and equitable requirement of section 1129(b) because payment of post-petition interest at the federal judgment rate - and not the contract rate - was not fair and equitable.  In reaching that conclusion, the bankruptcy court reviewed and relied upon pre-Bankruptcy Code cases regarding

the fair and equitable standard and the absolute priority rule and also analyzed the evolution of

those principles all the way through their ultimate incorporation into the Bankruptcy Code. In

the end, the bankruptcy court's ruling turned on a simple proposition: "In this context, the

rationale for use of the contract rate of interest is straightforward: *A debtor with the financial*

*wherewithal to honor its contractual commitments should be required to do so.*" *Id.* at 695

(emphasis added).

79.    Rather than deny confirmation, the bankruptcy court in *Dow II* "deemed" the plan

to be verbally modified to increase the rate of post-petition interest to the contract rate (based

upon statements on the record by the plan proponents that they were willing to pay whatever rate

was awarded by the court). The plan, as so modified, was then confirmed. Following

confirmation, however, additional litigation (and appeals) ensued when unsecured creditors

interpreted the bankruptcy court's "verbal modification" to impose the "contract rate" to include

any applicable default rate, while the debtors argued that they were only obligated to pay the

non-default rate. That dispute found its way to the Sixth Circuit in *Dow III*, where the court

resoundingly concluded that, in the case of a solvent debtor, the court's primary job is to enforce

the contractual rights of creditors *as written* – including, if applicable, default interest rate

provisions:

> [I]n solvent debtor cases, rather than considering equitable principles, courts have
> generally confined themselves to determining and enforcing whatever pre-petition
> rights a given creditor has against the debtor . . . . When a debtor is solvent, then,
> the *presumption is that a bankruptcy court's role is merely to enforce the*
> *contractual rights of the parties*, and the role that equitable principles play in the
> allocation of competing interest is significantly reduced.

> Based on this application of the absolute priority rule in solvent debtor cases,
> Class 4 argues that we should enforce their rights under the contract, including
> their right to interest awarded at the default rate as set forth in the terms of their
> contract. To do otherwise (i.e., to interpret the amended plan as not requiring the
> payment of default interest), they argue, would violate § 1129(b)'s fair and
> equitable standard. We agree. Default interest rates are intended to transfer some

31

of the risk of default from creditors to the debtor.  By interpreting the plan as
allowing interest only at the non-default rate, the bankruptcy court effectively
transferred that risk back to the Class 4 creditors.  ***Despite the equitable nature of
bankruptcy proceedings, the bankruptcy judge does not have 'free-floating
discretion to redistribute rights in accordance with his personal views of justice
and fairness.'  Rather, absent compelling equitable considerations, when a
debtor is solvent, it is the role of the bankruptcy court to enforce the creditors'
contractual rights.***

456 F.3d at 679 (emphasis added) (citation omitted).

80.      Indeed, courts have even held that "[w]hen the debtor is solvent, the equities

***dictate*** that additional interest be paid to the . . . creditor rather than to the debtor." *In re Consol.*

*Operating Partners L.P.*, 91 B.R. 113, 116 (Bankr. D. Colo.  1988) (emphasis added); *see also*

*Ruskin*, 269 F.2d at 831 (holding that it is "the opposite of equity to allow the [solvent] debtor to

escape the expressly-bargained-for result of its act"); *In re Terry Ltd. P'ship*, 27 F.3d 241, 243

(7th Cir. 1994) (recognizing a "presumption in favor of the contract rate subject to rebuttal based

upon equitable considerations," but that "[c]reditors have a right to bargained-for postpetition

interest and 'bankruptcy judges are not empowered to dissolve rights in the name of equity'")

(citation omitted); *In re Ace-Texas, Inc.*, 217 B.R. 719, 723-24 (Bankr. D. Del. 1998) (awarding

contract default rate of interest after debtor failed to overcome the presumption in favor of the

contract rate).

81.      Other circuits have expressly endorsed the Sixth Circuit's recognition of the

importance of creditors' contract rights. *See UPS Capital Bus.  Credit v. Gencarelli (In re*

*Gencarelli)*, 501 F.3d 1, 7 (1st Cir. 2007) (in awarding secured creditor's claims for prepayment

penalties, the court held:  "Let us be perfectly clear.  This is a solvent debtor case and, as such,

the equities strongly favor holding the debtor to his contractual obligations as long as those

obligations are legally enforceable under applicable non-bankruptcy law." (citing *Dow Corning*,

456 F.3d at 679)); *see also Gen. Elec. Capital Corp. v. Future Media Prods.*, 547 F.3d 956, 961-62 (9th Cir. 2008).

82.     In addition, Judge Walrath recognized the import of *Dow II* when confronted with the issue in *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004).  In that case, an equity committee objected to the payment of post-petition interest to noteholders under a plan, arguing that post-petition interest can be paid *only* at the federal judgment rate.  Judge Walrath expressly rejected that argument:

> The Equity Committee suggests that . . . if we conclude that the Noteholders are entitled to post-petition interest, that it be allowed only at the federal judgment rate.  However, we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11. . . .Thus, we are not persuaded by the Equity Committee that section 1129(b) *requires* the use of federal judgment rate for post-petition interest to be paid under a chapter 11 plan of reorganization.

*In re Coram*, 315 B.R. at 346 (internal cites omitted).

83.     Judge Walrath's conclusion that Congress did not intend to supplant a party's contractual right to interest is correct and, in fact, well documented.  Congress's 1994 amendments to the Bankruptcy Code made crystal clear Congress' intent that the 1978 Bankruptcy Code preserve unsecured creditors' rights to post-petition interest before shareholders could retain their stock.

84.     In 1994, a New Jersey bankruptcy court interpreted Bankruptcy Code section 1124(3) to prohibit post-petition interest.  *See In re New Valley Corp.*, 168 B.R. 73, 77-78 (Bankr. D.N.J. 1994).  To eliminate the risk that *New Valley* would be used to undercut the absolute priority rule, Congress immediately repealed section 1124(3), explaining:

> The words "fair and equitable" are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the Bankruptcy Code.  Specifically, courts have held that where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors'

claims must be paid in full, including postpetition interest, before equity holders
may participate in any recovery.

140 Cong. Rec. H 10768 (Oct. 4, 1994).

85.     Pre-Code cases, legislative history, and cases interpreting Bankruptcy Code

section 1129(b) all point uniformly in the same direction:  The absolute priority rule requires that

the Bondholders be paid all of their post-petition interest at the contract rates (and all other

contractual entitlements) before NNL can receive any dividend on its NNI stock.

ii.     **The Best Interests Test Requires that Unsecured Creditors Receive Payment**
        **of Post-petition Interest at the Contract Rate Before NNL Receives Any**
        **Distribution On Account of its Residual Equity Interests in NNI.**

86.     A plan can only deny the protection afforded by the absolute priority rule to a

class of unsecured creditors if that class votes to accept the plan and thereby affirmatively agrees

to forego such protection.  Even in such a case, however, the plan must still satisfy the best

interests of creditors test—which requires payment of post-petition interest to all eligible

dissenting creditors before any distributions can be made to equity holders.

87.     The best interests test is codified in Bankruptcy Code section 1129(a)(7), which

provides that a court may confirm a chapter 11 plan only if each holder of an impaired claim or

interest either (i) accepts the plan or (ii) will "retain under the plan . . . property of a value, as of

the effective date of the plan, that is not less than the amount that such holder would so receive

or retain if the debtor were liquidated under chapter 7."  11 U.S.C. § 1129(a)(7).

88.     In order to determine what a particular creditor would receive if the debtor were

liquidated under chapter 7, courts look to the distribution waterfall contained in Bankruptcy

Code section 726(a) – and, more specifically on the question of post-petition interest, to

sections 726(a)(5) and (6).  Section 726(a)(5) provides that, in a chapter 7 liquidation, after all

claims are paid in full, the debtor must pay "interest at ***the legal rate*** from the date of the filing

34

of the petition" on any unsecured claims against the estate.  11 U.S.C. § 726(a)(5) (emphasis added).  Section 726(a)(6), in turn, makes clear that property may be distributed to the debtor (*i.e.*, its shareholders) only ***after*** all such interest is paid.

89.     Accordingly, for NNI to comply with the best interests test with respect to the Bondholders, all Bondholders must either accept NNI's chapter 11 plan or such plan must provide for the payment of post-petition interest on the Bondholders' claims at least at "the legal rate" before NNL, as NNI's equity holder, can receive any distributions, as would be the case in a chapter 7 liquidation.

90.     The Bankruptcy Code does not define "the legal rate."  The Monitor essentially has asked the Court to blindly adopt Judge Walrath's decision in *Washington Mutual* that "the legal rate" means the federal judgment rate.  Such an approach, however, would ignore both basic principles of statutory construction and a line of persuasive and well-reasoned case law that holds to the contrary.

91.     As a threshold matter, if Congress intended section 1129(a)(7) to require application of the federal judgment rate, it would have said exactly that.  The U.S. Code contains a number of examples where Congress ***explicitly*** did so.  *See, e.g.*, 15 U.S.C. § 4303(a) - (c); 21 U.S.C. § 844a(h); 22 U.S.C. § 6082(a)(1)(B); 28 U.S.C. § 2412(f); 28 U.S.C.A. § 2465(b)(1)(B).

92.     In contrast, when Congress uses "the legal rate," as it has in a variety of circumstances, it necessarily means something other than the federal judgment rate.  *See, e.g.*, 15 U.S.C. § 636(4)(A); 15 U.S.C. § 697(c)(2); 22 U.S.C. § 2151t(b); 26 U.S.C. § 501(c)(16) and 26 U.S.C. § 521(b)(2).

93.    Congress's express inclusion of references to the federal judgment rate in other parts of the U.S. Code and exclusion of that same language in the Bankruptcy Code must be given meaning.

94.    In addition to the fact that there is no statutory basis for concluding that section 726(a)(5) requires application of the federal judgment rate, numerous courts have rejected use of the federal judgment rate in favor of respecting the clear equitable and/or policy considerations that justify the payment of post-petition interest at bargained-for contract rates. *See, e.g.*, *In re Carter*, 220 B.R. 411, 416-17 (Bankr. D.N.M. 1998) (solvent estate should pay interest at the contract rate); *In re Fast*, 318 B.R. 183, 192 (Bankr. D. Col. 2004) (same)).

95.    For example, in *In re Carter*, the court stated that delaying a creditor its right to its contracted-for interest rate "overlooked the underlying policy of the [Bankruptcy] Code" because it would "result in a windfall to the Debtor in that property would be returned to the Debtor at [the creditors'] expense." 220 B.R. at 416-17; *see also In re Fast*, 318 B.R. at 192 (noting that, in that case, "*all* creditors [were] being paid in full and to allow interest at a rate lower than the rate contracted into by the parties, would reward an unscrupulous and indolent debtor.") (emphasis in original).  Thus, the court held that "if [a] solvent estate produces a sufficient surplus from which to pay interest in full to all claimants at the rates prescribed [in] any underlying agreements, contracts or judgments, then that is the interest rate that should be applied by the Court." 220 B.R. at 417.

96.    Similarly, in *In re Beck*, the court awarded post-petition interest to unsecured creditors of a solvent debtor at the contract rate because "[t]he scale balancing the equities in this matter is overwhelmingly tilted toward restoring the creditor to as near a position as the creditor

would have occupied absent bankruptcy before benefitting the Debtors with surplus funds." 128

B.R. 571, 573 (Bankr. E.D. Okla. 1991).

97.      Finally, in *In re A&L Properties*, the court stated that if any rate other than the

contract rate were applied, the debtor would retain value at the expense of its creditors, and that

the "alteration of a valid, binding, and legal contractual obligation, so that the debtor retains

nonexempt property prior to the payment of its valid debts, is a *legally startling and somewhat*

*appalling result*." 96 B.R. at 289-90 (*citing* Chaim J. Fortgang & Lawrence P. King, The 1978

Bankruptcy Code: *Some Wrong Policy Decisions*, 56 N.Y.U. L. Rev. 1148, 1152 (1981)

(emphasis added)).

98.      Accordingly, the *A&L Properties* court held that "policy considerations dictate

that where a debtor has contracted for a rate of interest, and has sufficient funds to pay the

bargained-for amount, the creditor is entitled to the agreed-upon rate." *Id.* at 290; *see also In re*

*Schoeneberg*, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993) (holding that "when there was a

pre-petition contract between the parties that provided for interest, it is that contract rate which

should be applied") (citing *Johnson v. Norris*, 190 F. 459, 462 (5th Cir. 1911)).

99.      As these courts have recognized, the best interests test of section 1129(a)(7)

shares a common underpinning with the absolute priority rule of section 1129(b) – namely, that it

would be unfair and inequitable to allow a debtor to shortchange its creditors by failing to pay

bargained-for interest rates as a means of manufacturing a dividend for its equity holders.

## IV.    **CONCLUSION**

The Monitor has requested that the Court determine that the Bondholders are

either: (a) not entitled to post-petition interest, or (b) entitled to post-petition interest, but only at

the federal judgment rate.

In order to make either of those determinations, the Court would have to conclude, in a vacuum, that there is no set of circumstances under which the Bondholders may ever be entitled to post-petition interest at the applicable contractual rates of interest.  The Monitor has asked the Court to reach that conclusion without knowing how much of the lockbox sale proceeds will be allocated to the U.S. Debtors, without knowing what the eventual chapter 11 plan will provide for regarding post-petition interest, without knowing how creditors will vote on such a plan and whether the Court will be applying the best interests test, the absolute priority rule, the requirements for unimpairment or the compromise standards of Bankruptcy Rule 9019, and without having provided U.S. creditors any of the procedural safeguards required under the Bankruptcy Code and Bankruptcy Rules in connection with the confirmation of a chapter 11 plan.

The Bondholder Group and the Trustees submit that the Court cannot possibly make such a determination at this time, and that instead the only conclusion that the Court can reach under prevailing law is that, absent Bondholder consent, the Bankruptcy Code not only permits, but indeed requires, payment of post-petition interest to the Bondholders at the applicable contract rate, as well as all other contractual entitlements, before there can be any dividend to NNI's equity holder.

Dated:  July 15, 2014

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4463
Facsimile:  (213) 629-5063

*Attorneys for Ad Hoc Group of Bondholders*

**MORRIS JAMES LLP**

*/s/ Carl N. Kunz, III*
Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone:      (302) 888-6800
Facsimile:       (302) 571-1750
Email: smiller@morrisjames.com
Email: ckunz@morrisjames.com

- and -

Daniel A. Lowenthal
Brian P. Guiney
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:     (212) 336-2000
Facsimile:     (212) 336-2222
Email:  dalowenthal@pbwt.com
         bguiney@pbwt.com

***Attorneys for Law Debenture Trust Company
of New York, as Indenture Trustee***

**VEDDER PRICE P.C.**

*/s/ Michael J. Riela*
Michael J. Riela
1633 Broadway, 47th Floor
New York, NY 10019
Telephone:  212-407-7700
Email:  mriela@vedderprice.com

***Attorneys for The Bank of New York Mellon, as
Indenture Trustee***