Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

– and –

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-10138 (KG) |
| NORTEL NETWORKS INC., *et al.,* | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Reply Deadline: July 22, 2014 4pm. |
| _____ | ) | Hearing Date: July 25, 2014 10am |

**BOOK OF AUTHORITIES OF THE CANADIAN CREDITORS' COMMITTEE**
**(MOTION RE CROSS-OVER BONDS)**
**(RETURNABLE JULY 25, 2014)**

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Ari Kaplan / Jeff Van Bakel
Tel:  416.595.2090
Fax: 416.204.2877

Email:  mzigler@kmlaw.ca
            akaplan@kmlaw.ca
            jvanbakel@kmlaw.ca

Lawyers for the Canadian Former
Employees and Disabled Employees
through their court appointed
Representative


**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON   M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel:    416.214.5213/5206
Fax:   416.214.5413/5400

Email: arthur.jacques@shibleyrighton.com
           thomas.mcrae@shibleyrighton.com

Lawyers for active and transferred
employees of Nortel Canada


**UNIFOR**
Legal Department
205 Placer Court
Toronto, ON  M2H 3H9

Barry Wadsworth
Tel:     416.495.3750
Fax:    416.495.3786

Email: barry.wadsworth@unifor.org

Lawyers for Unifor


**McCARTHY TETRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre 66
Wellington Street West
Toronto, ON  M5K 1E6

R. Paul Steep / Elder C. Marques /
Byron Shaw
Tel:  416.601.7998
Fax: 416.868.0673

Email:  psteep@mccarthy.ca
            emarques@mccarthy.ca
            bdshaw@mccarthy.ca

Lawyers for Monreau Shepell Ltd., as
administrator of the Nortel Canada
registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**

155 Wellington Street West
35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer /
Massimo Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email:  ken.rosenberg@paliareroland.com
          lily.harmer@paliareroland.com
          max.starnino@paliareroland.com

Lawyers for the Superintendent of
Financial Services as Administrator of the
Pension Benefits Guarantee Fund

**DLA PIPER LLP (US)**

1201 North Market Street, Suite 2100
Wilmington, Delaware 19801

Selinda A. Melnik (DE 4032)
Tel:  302.468.5650
Timothy Hoeffner (*admitted pro hac vice*)
Tel:  212..335.4841

Email:  selinda.melnik@dlapiper.com
          timothy.hoeffner@dlapiper.com

Counsel for the Canadian Creditors
Committee

## TABLE OF CONTENTS

1.    *In re Washington Mutual*, 461 B.R. 200 (Bankr. D. Del. 2011)

2.    *In re Humber Ironworks and Shipbuilding Company; Warrant Finance Company's Case*, (1869), 4 L.R. 643 (L.JJ.)

3.    *Canada (Attorney General)* v. *Confederation Life Insurance Co.,* [2001] O.J. No. 2610 (Sup. Ct. J. [Commercial List])

4.    *Century Services Inc.* v. *Canada (A.G.)*, [2010] 3 S.C.R  379

5.    *M. (J.)* v. *Bradley* (2004), 71 O.R. (3d) 171 (CA)

6.    *Wilcher v. City of Wilmington*, 139 F. 3d 366, 372 (3d Cir. 1998)

7.    *In re Washington Mut.*, No. 08-12229 (MFW), 2012 WL 1563880, *19 (Bankr. Del. Feb. 24, 2012)

8.    *In re Tribune Co.*, No. 08-13141 (KJC), 2011 WL 386827, *8 (Bankr. Del. Feb. 3, 2011)

9.    *In re Garriock*, 373 B.R. 814, 816 (Bankr. E.D. Va. 2007)

# TAB 1

Transfer did not even come from the corporation in which MH owned shares, Old Refco; the $4 million came from Old Refco's indirect parent, RGI.

Accordingly, the Trustee's fraudulent transfer claim should be dismissed.

### *The Trustee's Unjust Enrichment Claim*

[10, 11] The Trustee's unjust enrichment claim also should be dismissed. First, the MH LBO–Related Transfer was made pursuant to the SPA, and New York law precludes recovery under unjust enrichment or other quasi contract theories when the subject matter of the dispute is governed by a valid and enforceable contract. *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 587 (2d Cir.2006) (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987)); *Goldman v. Metro. Life Ins. Co.,* 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 841 N.E.2d 742 (2005). Second, as discussed above, RGI's obligation under SPA ¶ 1(c) was lawful and not subject to recharacterization as equity; thus, there was nothing inequitable about RGI's paying it. *See City of Syracuse v. R.A.C. Holding, Inc.,* 258 A.D.2d 905, 906, 685 N.Y.S.2d 381 (4th Dep't 1999) (the "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another"); *see also Beth Isr. Med. Ctr.,* 448 F.3d at 586 ("To prevail on a claim for unjust enrichment in New York a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.") Because the MH LBO–Related Transfer was made for fair consideration, it cannot be said to have been made at the expense of RGI or its creditors.

### *Conclusion*

For the foregoing reasons, MH's motion to dismiss should be granted in full and judgment will be entered dismissing the Trustee's claims against MH. MH shall submit an order and judgment in accordance with this Memorandum of Decision, which shall state that it is a final judgment, provided that if an appellate court concludes otherwise it shall constitute this Court's conclusions of law and recommendation.



### In re WASHINGTON MUTUAL, INC., et al., Debtors.

### No. 08–12229 (MFW).

United States Bankruptcy Court, D. Delaware.

Sept. 13, 2011.

**Background:** Debtors sought confirmation of joint Chapter 11 plan.

**Holdings:** The Bankruptcy Court, Mary F. Walrath, J., held that:

(1) bankruptcy court had jurisdiction to approve global settlement agreement and confirmation of plan incorporating agreement;

(2) court had jurisdiction to consider plan confirmation despite pendency of appeal of prior order determining ownership of assets dealt with by plan;

(3) recent developments did not warrant reconsideration of court's approval of settlement;

(4) plan was proposed in good faith;

(5) proposed plan violated best interests of creditors test by providing for postpetition interest at contract rate;

(6) requiring release as condition of distribution did not violate best interests of creditors test; and

(7) equity committee stated colorable claim for equitable disallowance of noteholders' claims, as required for court to grant committee standing to pursue claim.

Plan confirmation denied; parties directed to mediation.

## 1. Bankruptcy ⟷2045

Bankruptcy court, even though it was non-Article III court, had jurisdiction to approve global settlement agreement, which resolved issues among debtors, buyer of assets of savings and loan association formerly owned by one debtor, Federal Deposit Insurance Corporation (FDIC), in its corporate capacity and as association's receiver, creditors, noteholders, and creditors committee, and to confirm joint Chapter 11 plan incorporating agreement; bankruptcy court approval of settlements was firmly established historical practice, approval of settlement of claims was not ruling on claims' merits, and approval of settlement was particularly within court's core jurisdiction, since it dealt with determination of what was property of estate. U.S.C.A. Const. Art. 3, § 2, cl. 1; 11 U.S.C.A. § 541(a); 28 U.S.C.A. § 1334(e); Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

## 2. Compromise and Settlement ⟷21

Court does not have to have jurisdiction over underlying claims to approve a compromise of them.

## 3. Bankruptcy ⟷2060.1

Bankruptcy courts have exclusive jurisdiction over property of the estate. 28 U.S.C.A. § 1334(e).

## 4. Bankruptcy ⟷2060.1

Bankruptcy court's exclusive jurisdiction over property of the estate includes jurisdiction to decide whether disputed property is, in fact, property of the estate. 11 U.S.C.A. § 541; 28 U.S.C.A. § 1334(e).

## 5. Bankruptcy ⟷2045, 3776.1

Bankruptcy court had jurisdiction to confirm Chapter 11 plan that provided for transfer or sale of trust preferred securities by debtors to bank as part of global settlement agreement incorporated into plan, even though confirmation might render moot appeal by former holders of securities challenging court's earlier determination that they no long had any interest in securities; former holders could have avoided such result by obtaining stay pending appeal, and, in considering plan confirmation, court was not being asked to modify order on appeal, but to enforce that order. 11 U.S.C.A. § 363(m); Fed.Rules Bankr.Proc.Rule 8005, 11 U.S.C.A.

## 6. Bankruptcy ⟷3776.1

Under "divestiture rule," an appeal divests the lower court of any further jurisdiction over the subject of the appeal.

See publication Words and Phrases for other judicial constructions and definitions.

## 7. Bankruptcy ⟷3776.1

Under divestiture rule, as applied in bankruptcy, so long as lower court is not altering appealed order, lower court retains jurisdiction to enforce that order absent stay pending appeal.

## 8. Bankruptcy ⟷3548.1

For Chapter 11 plan to be confirmable, plan had to provide for court approval of debtors' payment of fees of parties, including noteholders and liquidating trustee. 11 U.S.C.A. § 1129(a)(4).

**9. Bankruptcy ⟷3555**

For Chapter 11 plan to be confirmable, liquidating trustee for trust to be created under plan had to be removable at discretion of majority of trust advisory board, and board's composition had to reflect constituents who held liquidating trust interests, such that when creditors were paid in full, their liquidating trust interests had to be canceled and preferred shareholders issued liquidating trust interests.

**10. Courts ⟷99(6)**

Bankruptcy court's prior ruling that global settlement agreement reached in related debtors' Chapter 11 cases was reasonable decided a disputed issue, and thus was the law of the case and would not be reconsidered absent changed facts or law, even though court denied confirmation of proposed plan into which agreement was to be incorporated.

**11. Bankruptcy ⟷2164.1, 3033**

Recent developments in related litigation arising out of seizure and sale of assets of bank formerly owned by Chapter 11 debtor, in which it was determined that claims against assets buyer for its own alleged wrongdoing were not subject to receivership's exclusive claims process under Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), did not warrant reconsideration of bankruptcy court's prior ruling that global settlement agreement between debtors and other parties, including assets buyer and Federal Deposit Insurance Corporation (FDIC), was reasonable, on grounds that business tort claims against buyer were potentially valuable assets being released for no consideration; despite recent decision, likelihood of success on such claims, delay and cost of pursuing them, their complexity, and possible difficulties of collecting all militated in favor of approving settlement.

**12. Bankruptcy ⟷2164.1**

Recent decisional law did not result in any intervening changes in the law or facts sufficient to cause bankruptcy court to reconsider its earlier determination that global settlement agreement which was reached between debtors and other parties and incorporated into proposed Chapter 11 plan was reasonable; decisions were generally consistent with considerations underlying court's reasonableness determination, or did not involve decisions on the merits pertinent to court's evaluation.

**13. Bankruptcy ⟷2163**

To admit an expert's testimony, court must focus on the trilogy of restrictions on expert testimony: qualification, reliability, and fit. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**14. Bankruptcy ⟷2163**

Qualification element of test for admissibility of expert testimony considers the qualifications of the proposed expert in the field in which he is to testify, including his knowledge, skills, and training. Fed. Rules Evid.Rule 702, 28 U.S.C.A.

**15. Bankruptcy ⟷2163**

Reliability element of test for admissibility of expert testimony considers several factors: (1) whether a method consists of a testable hypothesis, (2) whether the method has been subject to peer review, (3) known or potential rate of error, (4) existence and maintenance of standards controlling the technique's operation, (5) whether the method is generally accepted, (6) relationship of the technique to methods which have been established to be reliable, (7) qualifications of the expert witness testifying based on the methodology, and (8) non-judicial uses to which the method has been put. Fed.Rules Evid. Rule 702, 28 U.S.C.A.

**16. Bankruptcy ⚍2163**

Fit element of test for admissibility of expert testimony requires that the evidence must be relevant. Fed.Rules Evid. Rule 702, 28 U.S.C.A.

**17. Bankruptcy ⚍2163**

"Relevant evidence" is evidence that helps the trier of fact to understand the evidence or to determine a fact in issue.

See publication Words and Phrases for other judicial constructions and definitions.

**18. Bankruptcy ⚍3566.1**

Testimony given by equity committee's valuation expert in confirmation hearings for proposed Chapter 11 plan was useful to bankruptcy court, and therefore its exclusion under rule governing admissibility of expert testimony was not warranted; even though expert did not follow normal methodologies for valuing a business, his report was not valuation of reorganized debtor but a critique of valuation done by debtors' expert, and to the extent that expert's opinion was based on hypothetical scenarios that had no basis in the record, court could evaluate and consider likelihood of occurrence of scenarios upon which expert relied in weighing credibility of his testimony about value of reorganized debtor. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**19. Bankruptcy ⚍3566.1**

Equity committee's tax expert had sufficient experience with applicability of particular section of Internal Revenue Code (IRC) to render expert opinion, in Chapter 11 plan confirmation hearings, regarding likelihood that Internal Revenue Service (IRS) would apply that tax statute to disallow some or all of debtors' net operating losses (NOLs), even if expert was not expert on that statute; expert was expert in tax issues relevant to acquisition and merger of corporations, particularly

troubled companies, and, in rendering advice on mergers and acquisitions involving NOLs, had considered tax statute's effect. 26 U.S.C.A. § 269; Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**20. Bankruptcy ⚍3566.1**

Opinion of equity committee's tax expert regarding legal effect of federal tax statute on Chapter 11 debtors' net operating losses (NOLs) and possibility that statute would be invoked under various scenarios that might occur in the future was helpful to bankruptcy court's determination, for plan confirmation purposes, of value of NOLs to reorganized debtor and its stakeholders, and therefore exclusion of expert's testimony was not warranted on grounds that it was impermissible legal opinion. 26 U.S.C.A. § 269.

**21. Bankruptcy ⚍3538**

In valuing net operating losses (NOLs), for purposes of confirming Chapter 11 plan, bankruptcy courts must take into account the risk that the NOLs will be disallowed.

**22. Internal Revenue ⚍3684**

For principal purpose of transaction to be tax avoidance, within meaning of federal tax statute permitting disallowance of deduction, credit, or other allowance where control of corporation is acquired for principal purpose of evading or avoiding federal income tax, purpose of tax evasion or avoidance has to be more significant, more important, or more prominent than any other purpose. 26 U.S.C.A. § 269(a)(1).

**23. Internal Revenue ⚍3684**

A finding of tax avoidance can be made, under federal tax statute permitting disallowance of deduction, credit, or other allowance where control of corporation is acquired for principal purpose of evading or avoiding federal income tax, even if the

change in control was through a foreclosure by a creditor. 26 U.S.C.A. § 269(a)(1).

**24. Bankruptcy ⇐3538, 3548.1**

Principal purpose of transfer of ownership of reorganized debtor under proposed Chapter 11 plan was not avoidance of taxes, warranting bankruptcy court's rejection, in estimating value of debtors' net operating losses (NOLs) in plan confirmation process, of contention that reorganized debtor could not obtain future investments that were more than value of its non-tax assets without having Internal Revenue Service (IRS) conclude that acquisition of stock by creditors under plan violated Internal Revenue Code (IRC); creditors were acquiring stock in reorganized debtor in repayment of debt owed to them, most of new shareholders would receive stock not by election but by default, and electing creditors' decisions to take stock was likely influenced by belief that debtors had undervalued reorganized debtor by viewing it as liquidating company, rather than going concern. 11 U.S.C.A. § 1129(b, d); 26 U.S.C.A. § 269.

**25. Bankruptcy ⇐3538, 3560**

Valuation of assets of liquidating trust to be created under Chapter 11 plan was not required for plan confirmation, despite contention that valuation was necessary to determine whether plan satisfied best interests of creditors test, since, under terms of plan, once creditors received payment in full of their claims, with interest, their interests in trust would be canceled and all further recoveries realized by trust would flow to preferred shareholders, in accordance with priorities of Bankruptcy Code. 11 U.S.C.A. § 1129(a)(7).

**26. Bankruptcy ⇐3558**

To meet good-faith standard for confirmation of Chapter 11 reorganization plan, plan proponent must establish that (1) plan fosters a result consistent with Bankruptcy Code's objectives, (2) plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected, and (3) there was fundamental fairness in dealing with creditors. 11 U.S.C.A. § 1129(a)(3).

**27. Bankruptcy ⇐3558**

Chapter 11 plan was proposed in good faith, as required for plan confirmation, despite alleged improper conduct by certain noteholders during settlement negotiations and plan drafting and review; noteholders' actions appeared to have helped increase debtors' estates, noteholders were only one of several groups of creditors involved in case and their participation did not rise to level of almost total control over debtors, plan treated creditor classes in accordance with priorities of Bankruptcy Code and their contractual subordination rights, and any harm caused by noteholders had or could be remedied by other means than denial of confirmation. 11 U.S.C.A. § 1129(a)(3).

**28. Bankruptcy ⇐3560**

Best interests of creditors test requires that Chapter 11 plan of reorganization provide non-consenting impaired creditors and shareholders with at least as much as they would receive if debtor were liquidating in Chapter 7. 11 U.S.C.A. § 1129(a)(7).

**29. Bankruptcy ⇐3560**

**Interest ⇐31**

Federal judgment rate was appropriate rate applied under Chapter 7 provision entitling unsecured creditors of solvent debtors to postpetition interest before distributions were made to shareholders, and thus to be paid to creditors under Chapter 11 plan pursuant to best interests of creditors test. 11 U.S.C.A. §§ 726(a)(5), 1129(a)(7).

**30. Bankruptcy** ⟷3561

"Absolute priority rule" forbids junior classes of creditors or equity from receiving any distribution until senior creditors are paid in full. 11 U.S.C.A. § 1129(b).

See publication Words and Phrases for other judicial constructions and definitions.

**31. Bankruptcy** ⟷3563.1

Fair and equitable test for Chapter 11 plan confirmation mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution. 11 U.S.C.A. § 1129(b).

**32. Bankruptcy** ⟷2836

General rule is that unsecured creditors are not entitled to recover postpetition interest.

**33. Bankruptcy** ⟷2836

Exception to general rule that unsecured creditors are not entitled to recover postpetition interest applies where debtor is solvent. 11 U.S.C.A. § 726(a)(5, 6).

**34. Courts** ⟷99(6)

Bankruptcy court, in its decision on earlier motion to confirm Chapter 11 plan, did not conclude that contract rate of interest was presumed rate to be applied under Chapter 7 provision allowing unsecured creditors of solvent debtor to recover postpetition interest, and instead left issue undecided due to its belief that it needed to consider equities of the case, and therefore prior decision did not establish the law of the case governing court's determination of appropriate interest rate in considering best interests of creditors test in subsequent plan confirmation proceedings. 11 U.S.C.A. §§ 726(a)(5, 6), 1129(a)(7).

**35. Interest** ⟷31

Effect on equity is not an appropriate factor to be considered in determining proper measure for postpetition interest due to unsecured creditors of solvent debtor under Chapter 7. 11 U.S.C.A. § 726(a)(5, 6).

**36. Bankruptcy** ⟷3560

**Interest** ⟷31

Federal judgment rate of interest applicable as of Chapter 11 debtors' petition filing governed calculation of postpetition interest to be paid to creditors under plan, pursuant to best interests of creditors test. 11 U.S.C.A. §§ 726(a)(5), 1129(a)(7).

**37. Bankruptcy** ⟷3560

**Interest** ⟷31

Unsecured creditors of Chapter 11 debtors, which were entitled to payment of postpetition interest at federal judgment rate of interest in effect on petition date only as a result of application of best interests of creditors test for plan confirmation, and not due to any contractual rights, were entitled only to annual compounding of interest provided for by statute governing federal judgment interest rate. 11 U.S.C.A. §§ 726(a)(5), 1129(a)(7); 28 U.S.C.A. § 1961(b).

**38. Bankruptcy** ⟷3560

**Interest** ⟷31

Proposed Chapter 11 plan that provided for payment of postpetition interest on creditors' claims at contract rate of interest, rather than at federal judgment rate in effect on petition date, compounded annually, violated best interests of creditors test by providing for such creditors to receive more than they would under Chapter 7 litigation, and shareholders to receive less. 11 U.S.C.A. §§ 726(a)(5), 1129(a)(7); 28 U.S.C.A. § 1961(b).

**39. Bankruptcy** ⟷2969, 3560

Under Bankruptcy Code's subordination provisions, subordinated claims of noteholders, which arose from rescission of purchase or sale of security of debtors'

affiliate, were subordinated to all "claims," which included unmatured interest on those claims, and therefore proposed Chapter 11 plan, by providing for senior unsecured creditors to receive postpetition interest on their claims before subordinated claims were paid, did not violate best interests of creditors test on grounds that noteholders would not receive at least as much as they would have received in Chapter 7 liquidation.  11 U.S.C.A. §§ 101(5), 510(b), 726, 1129(a)(7).

**40. Bankruptcy** ⟐2970, 3560
    **Interest** ⟐31, 36(1)

    Subordination provisions in various creditor contracts adequately apprised subordinated creditors that their payments were subordinate to all contractual postpetition interest, even if bankruptcy court allowed none, and so put creditors on notice that they were subordinate to any contractual postpetition interest allowed by court, such that contracts met requirements of rule of explicitness mandating that indenture provide explicit notice to subordinate junior creditors, to the extent that it remained applicable, and provisions of proposed Chapter 11 plan giving effect to subordination provisions, by requiring subordinated creditors to pay senior creditors postpetition interest at contract rate even though debtors were required only to pay interest at federal judgment rate, did not violate Bankruptcy Code.  11 U.S.C.A. § 510(a).

**41. Bankruptcy** ⟐2970

    "Rule of explicitness" provides that, to subordinate junior creditors, indenture must explicitly provide for that outcome.
    See publication Words and Phrases for other judicial constructions and definitions.

**42. Bankruptcy** ⟐3555, 3560

    Provision in proposed Chapter 11 plan that conditioned distributions to creditors and other stakeholders on granting direct release to buyer of assets of debtors' affiliate and other nondebtors did not violate best interests of creditors test; any potential recovery that shareholders could receive, even from liquidating trust, was largely due to global settlement agreement pursuant to which releases were required, settlement was funding payments to creditors that were senior in priority to shareholders and would otherwise hold first priority to liquidating trust assets, and granting of release was voluntary, even though one not granting release would forego any distribution.  11 U.S.C.A. § 1129(a)(7).

**43. Bankruptcy** ⟐3555

    Chapter 11 debtors' proposed payment of $335,000,000 from tax refunds to senior noteholders was reasonable settlement of dispute as to whether noteholders, which asserted claims against debtors for misrepresentations made in connection with senior notes, held legitimate, albeit subordinated, claims against debtors; settlement avoided contentious and expensive securities litigation that could result in significantly larger judgment against debtors.  11 U.S.C.A. § 510(b).

**44. Bankruptcy** ⟐3559

    Proposed Chapter 11 plan could be feasible even if reorganized debtor had more 300 shareholders, and thus satisfied feasibility test for plan confirmation, despite contention that reorganized debtor with more than 300 shareholders would be required to comply with federal securities reporting requirements and that, since debtors had not been complying with requirements during pendency of case, reorganized debtor would be unable to file delinquent reports and audited financial statements, given debtors' asserted compliance with requirements of Securities and Exchange Commission (SEC) staff legal

bulletin indicating that entity in compliance therewith did not have to make certain filings while in Chapter 11 or file "missed" filings upon emergence from bankruptcy.  11 U.S.C.A. § 1129(a)(11).

**45. Bankruptcy ⇐3559**

Feasibility required for Chapter 11 plan confirmation does not require that success be guaranteed, but rather only a reasonable assurance of compliance with plan terms.  11 U.S.C.A. § 1129(a)(11).

**46. Bankruptcy ⇐2970, 3545**

Senior noteholders, having accepted their treatment under proposed Chapter 11 plan overwhelmingly, by more than 99 percent in amount and in number, waived any failure of plan to comply with requirements of subordination agreements.

**47. Bankruptcy ⇐3560, 3561**

Payment under proposed Chapter 11 plan of cash, interests in liquidating trust, or stock of value equal to their claims provided senior noteholders with payment in full of their claims, satisfying absolute priority rule.  11 U.S.C.A. § 1129(b).

**48. Bankruptcy ⇐2155**

For bankruptcy court to grant motion for standing to prosecute claim, court must find that movant stated colorable claim that debtors unjustifiably refused to prosecute.

**49. Bankruptcy ⇐2163**

Party seeking standing to bring action to prosecute claim that debtors have unjustifiably refused to pursue bears burden of proof.

**50. Bankruptcy ⇐2155**

Whether debtors' failure to prosecute claim was unjustified, as required for bankruptcy court to grant party standing to prosecute claim that debtors have unjustifiably refused to pursue, depends upon whether claim is colorable and costs of pursuing claim.

**51. Bankruptcy ⇐2155**

Threshold for stating a colorable claim, as required for party to be granted standing to prosecute claim that debtors have unjustifiably refused to pursue, is low, and mirrors the standard applicable to a motion to dismiss for failure to state a claim.  Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**52. Bankruptcy ⇐2967.5**

To show a valid claim for equitable subordination, three elements are required: (1) engagement in some type of inequitable conduct, (2) the misconduct resulted in injury to the creditors or created an unfair advantage to the defendant, and (3) the equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code.  11 U.S.C.A. § 510(c).

**53. Bankruptcy ⇐2968**

Equitable subordination was not remedy available to Chapter 11 debtors' shareholders for alleged improper actions of settlement noteholders, whose claims could not be subordinated to equity.  11 U.S.C.A. § 510(c).

**54. Bankruptcy ⇐2967.5, 2968**

Equitable subordination statute only permits a creditor's claim to be subordinated to another claim, and not to equity.  11 U.S.C.A. § 510(c).

**55. Bankruptcy ⇐2125, 2921**

To the extent that bankruptcy court equitably disallowed claims of noteholders, based upon noteholders' alleged improper conduct, claims were disallowed regardless of whether indenture trustee actually held them.

**56. Bankruptcy** ⟜**2125, 2921**

Bankruptcy court has authority to disallow claim on equitable grounds in those extreme instances in which it is necessary as a remedy.

**57. Bankruptcy** ⟜**2125, 2155, 2923**

Equity committee in related debtors' Chapter 11 cases stated colorable claim for equitable disallowance of noteholders' claims on grounds that noteholders traded on insider information obtained in settlement negotiations with debtors and buyer of assets of debtors' affiliate, as required for bankruptcy court to grant committee standing to prosecute claim based on debtors' alleged unjustifiable refusal to do so, where committee sufficiently alleged that noteholders received and traded on material nonpublic information, including stances being taken by negotiating parties and probability that settlement would occur, that noteholders became temporary insiders when given such material nonpublic information, that noteholders acted recklessly in their use of material nonpublic information, and that one noteholder traded on misappropriated confidential information. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**58. Securities Regulation** ⟜**60.28(4)**

Under the classical theory of insider trading, § 10(b) and Rule 10b–5 are violated when a corporate insider (1) trades in the securities of his corporation, (2) on the basis of (3) material nonpublic information, (4) in violation of the fiduciary duty owed to his shareholders. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**59. Securities Regulation** ⟜**60.28(5)**

Under the misappropriation theory of insider trading, corporate "outsider" violates § 10(b) and Rule 10b–5 when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information, rather than a duty owed to the persons with whom he trades. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**60. Securities Regulation** ⟜**60.28(11)**

Materiality of nonpublic information is determined, in action for insider trading in violation of § 10(b) and Rule 10b–5, by an objective, reasonable investor test, providing that "material" information is information that would be important to a reasonable investor in making his or her investment decision. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

See publication Words and Phrases for other judicial constructions and definitions.

**61. Securities Regulation** ⟜**60.28(15)**

With regard to information about events such as a potential merger, courts determine materiality in action for insider trading in violation of § 10(b) and Rule 10b–5 based on a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**62. Securities Regulation** ⟜**60.28(15)**

Under test for materiality applied in actions for insider trading in violation of § 10(b) and Rule 10b–5 based on information regarding events such as potential mergers, which balances both indicated probability that event will occur and anticipated magnitude of the event in light of the totality of the company activity, what the magnitude factor measures is not the fact that a proposal was made, but what the result of the proposal would be if

accepted. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**63. Securities Regulation ⚖60.44**

Fact that defendant made unwise or contrary trades does not provide a defense to an insider trading action under § 10(b) and Rule 10b-5. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**64. Securities Regulation ⚖60.28(4)**

Under federal securities laws, "insiders" of a corporation are not limited to officers and directors, but may include "temporary insiders" who have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

See publication Words and Phrases for other judicial constructions and definitions.

**65. Securities Regulation ⚖60.45(1)**

While trades may provide circumstantial evidence of intent or recklessness supporting scienter element of insider trading claim, statute only requires that defendants had knowledge that they were in possession of material nonpublic information; whether or not they profited from such knowledge or actually applied such knowledge in trading is not a required element. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**66. Securities Regulation ⚖60.28(2.1)**

Misappropriation theory provides that insider trading can be found where (1) defendant possessed material, nonpublic information, (2) which he had a duty to keep confidential, and (3) defendant breached his duty by acting on or revealing that information. Securities Exchange

Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**67. Securities Regulation ⚖60.28(5)**

Liability for insider trading attaches under misappropriation theory where tippee traded on misappropriated information when it knew or should have known that it was misappropriated. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**68. Bankruptcy ⚖2127.1, 2155**

In determining whether Chapter 11 debtors refused unjustifiably to pursue colorable claim for equitable disallowance of certain noteholders' claims on grounds of insider trading, as required for bankruptcy court to grant equity committee's motion for standing to prosecute claim, court would direct that parties mediate issue, due to concerns that case would devolve into litigation morass in light of vigor with which noteholders had opposed standing motion. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

————

Mark D. Collins, Esquire, Chun I. Jang, Esquire, Lee E. Kaufman, Esquire, Richards, Layton & Finger, P.A., Wilmington, DE, Brian S. Rosen, Esquire, Marcia L. Goldstein, Esquire, Michael F. Walsh, Esquire, Weil Gotshal & Manges, LLP, New York, NY, for Debtors.

Rafael X. Zahralddin–Aravena, Esquire, Neil R. Lapinski, Esquire, Shelley A. Kinsella, Esquire, Elliott Greenleaf, Wilmington, DE, Peter E. Calamari, Esquire, Michael B. Carlinsky, Esquire, Susheel Kirpalani, Esquire, David Elsberg, Esquire, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, Special Litigation and Conflicts Counsel for Debtors.

Robert S. Brady, Esquire, M. Blake Cleary, Esquire, Jaime N. Luton, Esquire, Young Conaway Stargatt & Taylor, LLP Wilmington, DE, Thomas R. Califano, Esquire, John J. Clark, Jr., Esquire, DLA Piper LLP, New York, NY, for FDIC–Receiver.

Jeffrey M. Schlerf, Esquire, Eric M. Sutty, Esquire, Fox Rothschild LLP, Wilmington, DE, David S. Rosner, Esquire, Adam L. Shiff, Esquire, Paul M. O'Connor, Esquire, Seth A. Moskowitz, Esquire, Kasowitz, Benson, Torres & Friedman LLP, New York, NY, for Washington Mutual, Inc. Noteholders' Group.

David B. Stratton, Esquire, Evelyn J. Meltzer, Esquire, Pepper Hamilton LLP, Wilmington, DE, Fred S. Hodara, Esquire, Robert A. Johnson, Esquire, Akin Gump Strauss Hauer & Feld LLP, New York, NY, for Official Committee of Unsecured Creditors.

Jane M. Leamy, Esquire, Office of the United States Trustee, Wilmington, DE.

Adam G. Landis, Esquire, Matthew B. McGuire, Esquire, Landis, Rath & Cobb, LLP, Wilmington, DE, Robert A. Sacks, Esquire, Stacey R. Friedman, Esquire, Brian D. Glueckstein, Esquire, Sullivan & Cromwell LLP, New York, NY, Brent J. McIntosh, Esquire, Sullivan & Cromwell LLP, Washington, DC, for JP Morgan Chase Bank, N.A.

Bernard G. Conaway, Esquire, Marla Rosoff Eskin, Esquire, Kathleen Campbell Davis, Esquire, Campbell & Levine LLC, Wilmington, DE, Sigmund S. Wissner–Gross, Esquire, Robert J. Stark, Esquire, Katherine S. Bromberg, Esquire, Brown Rudnick LLP, New York, NY, James W. Stoll, Esquire, Jeremy B. Coffey, Esquire, Jennifer M. Recht, Esquire, Ryan S. Moore, Esquire, Daniel J. Brown Esquire, Brown Rudnick LLP, Boston, MA, for TPS Holders.

Mark E. Felger, Esquire, Cozen O'Connor, Wilmington, DE, Co–Counsel for Broadbill Investment Corp.

Paul N. Silverstein, Esquire, Jeremy B. Reckmeyer, Esquire, Andrews Kurth LLP, New York, NY, for Broadbill Investment Corp.

Scott J. Leonhardt, Esquire, Frederick B. Rosner, Esquire, The Rosner Law Group LLC, Wilmington, DE, Arthur Steinberg, Esquire, King & Spalding, Jonathan Hochman, Esquire, Schindler Cohen & Hochman LLP, New York, NY, for Nantahala Capital Partners LP and Blackwell Capital Partners LLC.

David P. Primack, Esquire, Drinker Biddle & Reath LLP, Jay W. Eisenhofer, Esquire, Geoffrey C. Jarvis, Esquire, Christine M. Mackintosh, Grant & Eisenhofer P.A., Wilmington, DE, Jeffrey M. Schwartz, Esquire, Chicago, IL, for WMB Noteholders.

Michael P. Migliore, Esquire, Smith, Katzenstein & Jenkins LLP, Wilmington, DE, Andrew J. Mytelka, Esquire, Frederick E. Black, Esquire, Tara B. Annweiler, Esquire, James M. Roquemore, Esquire, Galveston, TX, for North America National Insurance Company, American National Property and Casualty Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and, National Western Life Insurance Company.

Philip Schnabel (Pro se), Radeberg, Germany, Objector to Confirmation.

Ronald S. Gellert, Esquire, Byra M. Keilson, Esquire, Eckert Seamans Cherin & Mellott, LLC, Wilmington, DE, Matthew Feldman, Esquire, Robin Spigel, Esquire, Willkie Farr & Gallagher LLP, New York, NY, for Truck Insurance Company and Fire Insurance Company.

Edward W. Ciolko, Esquire, Joshua C. Schumacher, Esquire, Barroway Topaz Kessler Meltzer & Check, LLP, Radnor, PA, for Objectors to Confirmation, Robert Alexander & James Lee Reed.

William P. Bowden, Esquire, Gregory A. Taylor, Esquire, Stacy L. Newman, Esquire, Ashby & Geddes, P.A., Wilmington, DE, Stephen D. Susman, Esquire, Seth D. Ard, Esquire, Susman Godfrey, L.L.P., New York, NY, Parker C. Foise, Esquire, Edgar Sargent, Esquire, Justin A. Nelson, Esquire, Susman Godfrey, L.L.P., Seattle, WA, for the Official Committee of Equity Security Holders of Washington Mutual, Inc., et al.

Jeffrey S. Schultz (Pro se), Vice President/Trust Investment Officer, American National Bank, Wichita Falls, TX, Objector to Confirmation.

Nate Thoma (Pro se), Wenonah, NJ, Objector to Confirmation.

Donna L. Harris, Esquire, Pinckney, Harris & Weidinger, LLC, Wilmington, DE, Robert T. Scott, Esquire, Axicon Partners, LLC, New York, NY, for Sonterra Capital Partners and Sonterra Capital LLC.

## OPINION [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court is the request of Washington Mutual, Inc. ("WMI") and WMI Investment Corp. (collectively the "Debtors") for confirmation of the Modified Sixth Amended Joint Plan of Affiliated Debtors (the "Modified Plan"). For the reasons stated below, the Court will deny confirmation of the Modified Plan.

## I.  BACKGROUND

WMI is a bank holding company that formerly owned Washington Mutual Bank ("WMB"). WMB was the nation's largest savings and loan association, having over 2,200 branches and holding $188.3 billion in deposits. Beginning in 2007, revenues and earnings decreased at WMB, causing WMI's asset portfolio to decline in value. By September 2008, in the midst of a global credit crisis, the ratings agencies had significantly downgraded WMI's and WMB's credit ratings. A bank run ensued; over $16 billion in deposits were withdrawn from WMB in a ten-day period beginning September 15, 2008.

On September 25, 2008, WMB's primary regulator, the Office of Thrift Supervision (the "OTS"), seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. The FDIC's takeover of WMB marked the largest bank failure in the nation's history. On the same day, the FDIC sold substantially all of WMB's assets, including the stock of WMB's subsidiary, WMB fsb, to JPMorgan Chase Bank, N.A. ("JPMC") through a Purchase & Assumption Agreement (the "P & A Agreement"). Under the P & A Agreement, JPMC obtained substantially all of the assets of WMB for $1.88 billion plus the assumption of more than $145 billion in deposit and other liabilities of WMB. The FDIC, as the receiver of WMB, retained claims that WMB held against others.

On September 26, 2008, the Debtors filed petitions under chapter 11 of the Bankruptcy Code. Early in the bankruptcy case disputes arose among the Debtors, the FDIC, and JPMC regarding ownership of certain assets and various claims that the parties asserted against each oth-

---

1.  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bank-

ruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

**461 BANKRUPTCY REPORTER**

er. Those disputes (and disputes between the Debtors and other claimants) were the subject of litigation in this Court,[2] as well as in the United States District Court for the District of Columbia (the "DC Court"),[3] and in the Federal Court of Claims.[4]

On March 12, 2010, the parties announced that they had reached a global settlement agreement (the "GSA"). The GSA resolved issues among the Debtors, JPMC, the FDIC in its corporate capacity and as receiver for WMB, certain large creditors (the "Settlement Noteholders"),[5] certain WMB Senior Noteholders, and the Creditors' Committee. The GSA was incorporated into the Sixth Amended Plan which was originally filed on March 26, 2010, and modified on May 21 and October 6, 2010.

Hearings on confirmation of the Sixth Amended Plan, as well as argument on summary judgment motions in the related LTW and TPS Adversaries, were held on December 1–3 and 6–7, 2010. The matter was taken under advisement. In an Opinion and Order dated January 7, 2011, the Court concluded that the GSA was fair and reasonable, but declined to confirm the Debtors' Sixth Amended Plan because of certain deficiencies. *In re Wash. Mut., Inc.,* 442 B.R. 314, 344–45, 365 (Bankr. D.Del.2011) (the "January 7 Opinion"). By separate Opinion and Order, the Court found that certain purported holders of the Trust Preferred Securities (the "TPS") no longer had any interest in the TPS because their interests had been converted to interests in preferred stock of WMI. *In re Wash. Mut., Inc.,* 442 B.R. 297, 304 (Bankr.D.Del.2011). In another Opinion and Order issued that day, the Court held that it was unable to grant WMI's motion for summary judgment in the LTW Adversary, because there are genuine issues of material fact in dispute. *In re Wash. Mut., Inc.,* 442 B.R. 308, 313–14 (Bankr. D.Del.2011). Trial on the LTW Adversary has been scheduled for September 12–14, 2011.

The Sixth Amended Plan and the GSA were modified on March 16 and 25, 2011, in an attempt to address the Court's concerns expressed in the January 7 Opinion. (D 255; D 253.)[6] The Modified Plan is

---

**2.** *See, e.g., Black Horse Capital LP, et al. v. JPMorgan Chase Bank, N.A.,* Bankr.No. 08–12229, Adv. No. 10–51387 (Bankr.D.Del. July 6, 2010) (the "TPS Adversary"); *Broadbill Investment Corp. v. Wash. Mut., Inc.,* Bankr. No. 08–12229, Adv. No. 10–50911 (Bankr. D.Del. Apr. 12, 2010) (the "LTW Adversary"); *Wash. Mut., Inc. v. JPMorgan Chase Bank, N.A.,* Bankr.No. 08–12229, Adv. No. 09–50934 (Bankr.D.Del. Apr. 27, 2009); *JPMorgan Chase Bank, N.A. v. Wash. Mut., Inc.,* Bankr.No. 08–12229, Adv. No. 09–50551 (Bankr.D.Del. Mar. 24, 2009).

**3.** *Am. Nat. Ins. Co. v. JPMorgan Chase & Co.,* 705 F.Supp.2d 17, 21 (D.D.C.2010) (the "ANICO Litigation"); *Wash. Mut., Inc. v. F.D.I.C.,* No. 1:09–cv–00533 (D.D.C. January 7, 2010).

**4.** *Anchor Savings Bank FSB v. United States,* No. 95–039C (Fed.Cl.1995) (hereinafter the "Anchor Litigation"); *American Savings*

*Bank, F.A. v. United States,* No. 92–872C (Fed. Cl.1992) (hereinafter the "American Savings Litigation").

**5.** The Settlement Noteholders are Appaloosa Management, L.P. ("Appaloosa"), Aurelius Capital Management LP ("Aurelius"), Centerbridge Partners, LP ("Centerbridge"), and Owl Creek Asset Management, L.P. ("Owl Creek"), and several of their respective affiliates.

**6.** References to pleadings on the Docket at "D.I. #;" the Transcripts of the hearings are "Tr. date;" the Debtors' trial exhibits are "D #;" the Debtors' demonstrative exhibits are "D Demo #;" the Equity Committee's exhibits are "EC #;" Aurelius' exhibits are "Au #;" the TPS Consortium's exhibits are "TPS #;" the Appaloosa/Owl Creek exhibits are "AOC #;" and the WMI Senior Noteholders' Group exhibits are "WMI NG #."

supported by the Debtors, JPMC, the FDIC, the Creditors' Committee, the WMI Senior Noteholders' Group, the Plaintiffs in the ANICO Litigation, and the Indenture Trustees of the Senior, the Senior Subordinated, and the PIERS [7] (collectively, the "Plan Supporters").[8] The Modified Plan is still opposed by the Equity Committee, the putative holders of the TPS,[9] holders of Litigation Tracking Warrants (the "LTW Holders"), certain WMB Noteholders, Normandy Hill Capital L.P., and several individual shareholders and creditors [10] (collectively, the "Plan Objectors"). Hearings were held on July 13–15 and 18–21, 2011, to consider confirmation of the Modified Plan. Post-hearing briefs were filed by interested parties on August 10, 2011, and oral argument was heard on August 24, 2011. The matter is now ripe for decision.

## II. *JURISDICTION*

Congress has legislated that the Bankruptcy Court has core subject matter jurisdiction over approval of settlements of claims and counterclaims and confirmation of plans of reorganization. 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (C), (K), (L), (M), (N), & (O).

The TPS Consortium contends, however, that the Court cannot enter a final order on confirmation for two reasons. First, the TPS Consortium argues that the Bankruptcy Court lacks jurisdiction to confirm the Modified Plan because to do so the Court must decide the estate's claims against JPMC and the FDIC, over which only an Article III court has jurisdiction. *Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 2609, 180 L.Ed.2d 475 (2011). At the commencement of the confirmation hearings, the TPS holders acknowledged that the Bankruptcy Court had authority to conduct the confirmation hearing but asserted that the Court could not enter a final order. Instead, the TPS Consortium contended that the Bankruptcy Court must present proposed findings of fact and conclusions of law to the District Court, for consideration de novo. 28 U.S.C. § 157(c)(1).

Second, the TPS Consortium argues that the Bankruptcy Court has been divested of jurisdiction over the disputed TPS because the TPS Consortium has appealed the Court's ruling in the TPS Adversary that they no longer have any interest in the TPS but only have an interest in WMI preferred stock. *Wash. Mut.,* 442 B.R. at 304. It contends that, as a result, the Court must order that the TPS be escrowed (and not transferred to JPMC pursuant to the GSA and the Modified Plan) until the District Court rules on the pending appeal.

### A. *Effect of Stern v. Marshall*

The TPS Consortium argues that under the Supreme Court's recent decision in *Stern v. Marshall*, the Bankruptcy Court

---

**7.** The PIERS are Preferred Income Equity Redeemable Securities issued by the Washington Mutual Capital Trust 2001 ("WMCT 2001"). The proceeds received by WMCT 2001 were used to purchase junior subordinated deferrable interest debentures issued by WMI. (*See* WMI NG 7.)

**8.** Many of the Plan Supporters do, however, request certain changes to the Modified Plan, some of which conflict with other requested changes.

**9.** The TPS holders have now divided into two groups, with separate counsel, making separate arguments. They are referred to herein as the TPS Group and the TPS Consortium.

**10.** The individual Plan Objectors include Philipp Schnabel, William Duke, James Berg, Kermit Kubitz, Charles McCurry, and Bettina M. Haper.

does not have jurisdiction over the claims the estate has against JPMC or the FDIC (and does not have jurisdiction to approve any settlement of those claims) because the underlying claims are "the stuff of the traditional actions at common law tried by the courts at Westminster" and must be decided by an Article III court. 131 S.Ct. at 2609 (quoting *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982)). The TPS Consortium argues that *Stern v. Marshall* is directly applicable in this case because the underlying disputes with JPMC and the FDIC are typical of causes of action which only Article III courts can adjudicate, involving state corporate law, tort law, fraudulent conveyance law, as well as federal intellectual property and tort claims. The TPS Consortium argues that this is not a matter within the "particularized area of law" with which bankruptcy courts typically deal and are considered experts at resolving. *Id.* at 2615. It contends that this is so even though Congress has expressly granted core jurisdiction to this Court pursuant to section 157(b)(2). *Id.* at 2608 (holding that bankruptcy court did not have jurisdiction over state law counterclaim to a filed proof of claim despite core jurisdiction designation in 28 U.S.C. § 157(b)(2)(C)).

The Plan Supporters disagree with the TPS Consortium's reading of the *Stern v. Marshall* decision. They note that the Supreme Court itself recognized the narrowness of its ruling. 131 S.Ct. at 2620 (finding that Congress had exceeded Article III's limitation "in one isolated respect" and finding only that the bankruptcy court lacked authority to enter a final judgment on a counterclaim arising under state law which did not need to be resolved in order to rule on the proof of claim). *See also Salander O'Reilly Galleries*, No. 07–30005, 2011 WL 2837494, at *6 (Bankr.S.D.N.Y. July 18, 2011) (concluding that the Su-

preme Court's opinion in *Stern v. Marshall* emphasizes that it is limited to the particular circumstances surrounding the estate's counterclaim in that case).

In *Stern v. Marshall*, the Supreme Court held that to find bankruptcy court jurisdiction the court must consider "whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." 131 S.Ct. at 2618. The concurring opinion also suggested that in instances where there is "a firmly established historical practice" allowing non-Article III judges to make a determination, they should be permitted to continue doing so. *Id.* at 2621 (concurring opinion).

[1] The Court concludes that the *Stern v. Marshall* decision does not support the TPS Consortium's contention that the Court lacks jurisdiction over the GSA or confirmation of the Modified Plan for several reasons.

### 1. *Historical context*

Approval of settlements by bankruptcy courts is "a firmly established historical practice" that stretches back before the enactment of the Bankruptcy Code to the Bankruptcy Act and, therefore, the bankruptcy court may continue to exercise that jurisdiction. *Id.*

Currently, Rule 9019 provides the court with the authority to "approve a compromise or settlement." Fed. R. Bankr.P. 9019(a). Bankruptcy Rule 9019 is the successor to Bankruptcy Rule 919, which provided "on application by the trustee or receiver and after hearing on notice to the creditors … the court may approve a compromise or settlement." Fed. R. Bankr.P. 919(a) (1982) (repealed). *See Magill v. Springfield Marine Bank (In re Heissinger Res. Ltd.)*, 67 B.R. 378, 382 (C.D.Ill.1986) (noting that Bankruptcy

Rule 9019 is similar to Rule 919, "which had been interpreted to give the bankruptcy court broad authority to approve compromises"). Rule 919 was based on section 27 of the Bankruptcy Act which stated that "the receiver or trustee may, with approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate." 11 U.S.C. § 50 (1976) (repealed 1978).

Compromises were routinely approved under the Bankruptcy Act and continue to be approved by bankruptcy courts in the context of almost every bankruptcy case. *See, e.g., Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (holding that "[c]ompromises are 'a normal part of the process of reorganization.' ") (quoting *Case v. L.A. Lumber Prods. Co.,* 308 U.S. 106, 130, 60 S.Ct. 1, 84 L.Ed. 110 (1939)); *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir.1996) ("To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.' . . . Indeed, it is an unusual case in which there is not some litigation that is settled between the representative of the estate and an adverse party.") (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); *In re Okwonna–Felix,* No. 10–31443–H4–3, 2011 WL 3421561, at *4 (Bankr.S.D.Tex. Aug. 3, 2011) (holding that *Stern v. Marshall* does not preclude a bankruptcy court from exercising jurisdiction to consider a settlement which is based "entirely on federal bankruptcy law (both [Rule 9019] and the case law instructing how to apply the Rule)"); *In re Drexel Burnham Lambert Grp., Inc.,* 138 B.R. 723, 758 (Bankr.S.D.N.Y.1992) ("Compromises are favored by the Courts because they allow the estate to avoid the expenses and burdens associated with litigating contested claims.") (citations omitted). *See generally* Reynaldo Anaya Valencia, *The Sanctity of Settlements and the Significance of Court Approval: Discerning Clarity from Bankruptcy Rule 9019,* 78 Or. L. Rev. 425, 431–32 (1999) ("The glue that often holds the bankruptcy process together is the ability of parties to resolve disputes by settlement instead of litigation. If bankruptcy judges had to try a much larger percentage of matters than they currently do, the system would surely bog down. Thus, the sanctity of settlements can hardly be overemphasized.") (footnotes omitted).

Settlements are often included in a plan of reorganization. Valencia, *The Sanctity of Settlements,* 78 Or. L. Rev. at 447. Indeed, section 1123(b)(3)(A) of the Bankruptcy Code expressly states that "a plan may . . . provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). Confirmation of a plan of reorganization is within the bankruptcy court's core jurisdiction. 28 U.S.C. § 157(b)(2)(L). *See also In re AOV Indus., Inc.,* 792 F.2d 1140, 1145–46 (D.C.Cir.1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law. . . . Accordingly, we find that the bankruptcy court had jurisdiction to approve [them].").

2. *Nature of settlement approval*

Second, there is a fundamental difference between approval of a settlement of claims (which the Court is being asked to do here) and a ruling on the merits of the claims. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Epstein,* 516 U.S. 367, 382, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (holding that a Delaware Chancery Court judgment settling shareholders' state and federal claims was entitled to preclusive effect because "[w]hile it is true that the state court

assessed the general worth of the federal claims in determining the fairness of the settlement, such assessment does not amount to a judgment on the merits of the claims.").

**[2]**   As an initial matter, a court does not have to have jurisdiction over the underlying claims in order to approve a compromise of them.  *See, e.g., Matsushita Elec.*, 516 U.S. at 381, 116 S.Ct. 873 (holding that "[w]hile § 27 prohibits state courts from adjudicating claims arising under the Exchange Act, it does not prohibit state courts from approving the release of Exchange Act claims in the settlement of suits over which they have properly exercised jurisdiction, i.e., suits arising under state law or under federal law for which there is concurrent jurisdiction."); *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir.1994) (stating that "[w]hile this rule of law may seem anomalous at first glance, it is widely recognized that courts without jurisdiction to hear certain claims have the power to release those claims as part of a judgment" approving a settlement including "federal courts entering judgments that release state claims that they would not have jurisdictional competency to entertain in the first instance" because "[t]his rule of law serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements") (citations omitted).  *Cf. Musich v. Graham (In re Graham)*, Adv. No. 11–01073, 2011 WL 2694146, at *3 n. 27 (Bankr.D.Colo. July 11, 2011) (analyzing *Stern v. Marshall* decision and concluding that bankruptcy court had statutory and constitutional jurisdiction to determine dischargeability of a criminal/tort claim over which it did not have jurisdiction).

The standards which a court must apply in considering a settlement establish that the court is not rendering a final decision on the merits of the underlying claims being compromised.  *See, e.g., TMT Trailer Ferry*, 390 U.S. at 424, 88 S.Ct. 1157 (finding that a bankruptcy judge should form "an educated *estimate* of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.") (emphasis added); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (7th Cir.1989) (in approving a settlement, the responsibility of the bankruptcy court "is not to decide the numerous questions of law and fact raised ... but rather to canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'") (citations omitted); *In re Martin*, 212 B.R. 316, 319 (8th Cir. BAP 1997) (stating that "it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement.").

The "lowest point in the range of reasonableness" is far from the standard required for an Article III court to enter a final determination on the merits of the claims.  The Court's conclusion in the January 7 Opinion was not a decision on the merits of the underlying claims but merely a determination that the settlement of those claims by the Debtors on the terms of the GSA was reasonable.  *Wash. Mut.*, 442 B.R. at 345.

3.   *Nature of claims compromised*

Third, the approval of the GSA in this case is particularly within the core jurisdiction of the Bankruptcy Court because it deals with a determination of what is property of the estate.  *See* 11 U.S.C. § 541(a) (stating that "[t]he commencement of a

case under ... this title creates an estate [which] is comprised of all the following property, wherever located and by whomever held ... [including] all legal or equitable interests of the debtor in property.").

In this case, the claims which are resolved by the GSA largely relate to who owned specific property: the bank deposits in the name of WMI at WMB and WMB, fsb; the tax refunds due for the consolidated tax group which included WMI and WMB; the TPS; intellectual property; employee related assets (including pension plans and insurance policies); the goodwill litigation that was the subject of the Litigation Tracking Warrants (the "LTWs"); and various other miscellaneous assets. *Wash. Mut.*, 442 B.R. at 330–44.

[3]  It is without question that bankruptcy courts have exclusive jurisdiction over property of the estate. *See* 28 U.S.C. § 1334(e) (stating that the court in which a case under title 11 is commenced or is pending "shall have exclusive jurisdiction—(1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate"). *See also, Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006) (stating that "[c]ritical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property....").

[4]  That jurisdiction includes jurisdiction to decide whether disputed property is, in fact, property of the estate. *See, e.g., Salander O'Reilly Galleries*, 453 B.R. 106, 122–23 (concluding that the bankruptcy court had core jurisdiction to decide priority of estate's and creditor's asserted interests in a piece of art and denying request for arbitration of issue); *Mata v. Eclipse Aerospace, Inc. (In re AE Liquidation, Inc.)*, 435 B.R. 894, 904–05 (Bankr.D.Del. 2010) (holding that the bankruptcy court

had exclusive jurisdiction to determine whether or not disputed aircraft was property of the estate at the time of its sale); *Williams v. McGreevey (In re Touch Am. Holdings, Inc.)*, 401 B.R. 107, 117 (Bankr. D.Del.2009) (stating approvingly that "[v]arious courts have concluded that matters requiring a declaration of whether certain property comes within the definition of 'property of the estate' as set forth in Bankruptcy Code § 541 are core proceedings.").

For all the above reasons, the Court concludes that it has jurisdiction to decide confirmation of the Modified Plan which incorporates the GSA resolving the disputed claims to putative property of the Debtors' estate.

## B.  *Effect of Appeal of TPS Ruling*

[5, 6]  The TPS Consortium argues further that the Court is precluded from confirming the Modified Plan by the Divestiture Rule which provides that an appeal divests the lower court of any further jurisdiction over the subject of the appeal. *See, e.g., Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, 103 S.Ct. 400, 74 L.Ed.2d 225 (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."); *Venen v. Sweet*, 758 F.2d 117, 120–21 (3d Cir. 1985) (" 'Divest' means what it says—the power to act, in all but a limited number of circumstances, has been taken away and placed elsewhere."); *Bialac v. Harsh Inv. Corp. (In re Bialac)*, 694 F.2d 625, 627 (9th Cir.1982) ("Even though a bankruptcy court has wide latitude to reconsider and vacate its own prior decisions, not even a bankruptcy court may vacate or modify an order while on appeal."); *In re Whispering Pines Estates*, 369 B.R. 752, 757 (1st Cir.

BAP 2007) ("It is well established that the filing of a notice of appeal is an event of jurisdictional significance in which a lower court loses jurisdiction over the subject matter involved in the appeal.  The purpose of the general rule is to avoid the confusion of placing the same matter before two courts at the same time and to serve the integrity of the appeal process.") (citations omitted); *In re Demarco*, 258 B.R. 30, 32 (Bankr.M.D.Fla.2000) ("The parties appear to agree that the Court does not have jurisdiction to consider matters which would interfere with the appeal and the jurisdiction of the appellate court, but that the Court does have jurisdiction over, and should proceed with, other aspects of the case."); *In re Strawberry Square Assocs.*, 152 B.R. 699, 701 (Bankr. E.D.N.Y.1993) (noting that "the bankruptcy court [may not] exercise jurisdiction over those issues which, although not themselves on appeal, nevertheless so impact those on appeal as to effectively circumvent the appeal process.").

The TPS Consortium specifically objects to the provisions of the Modified Plan that authorize the transfer of the TPS from the Debtors to JPMC [11] because ownership of the TPS is the subject of the appeal.  The TPS Consortium argues that the Modified Plan must recognize the limits of this Court's ability to deal with the TPS by

providing that the TPS will be held in escrow until the appeal is resolved.

The Plan Supporters disagree with the TPS Consortium's articulation of the Divestiture Rule as applied in bankruptcy cases.  They note that in the bankruptcy context the appeal of one ruling does not mean that the entire bankruptcy case is stayed.  The Bankruptcy Rules make this clear by providing that during an appeal, "the bankruptcy judge may suspend or order the continuation of other proceedings in the case under the Code or make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest."  Fed. R. Bankr.P. 8005. *See also In re Hagel*, 184 B.R. 793, 798–99 (9th Cir. BAP 1995) (holding that Rule 8005 "does not provide that the bankruptcy court must stay all proceedings" but that it has discretion to stay any proceedings).

The Plan Supporters argue that contrary to the suggestion of the TPS Consortium, absent a stay pending appeal,[12] the lower court may take all actions necessary to implement or enforce the order from which an appeal has been taken.  *See, e.g., Hope v. Gen. Fin. Corp. of Ga. (In re Kahihikolo)*, 807 F.2d 1540, 1542–43 (11th Cir.1987) (dismissing appeal as moot because, absent stay pending appeal, the secured lender was free to treat order granting relief from stay as final and sell the

---

**11.** Specifically, the TPS Consortium argues that the Modified Plan provides that the TPS will be transferred pursuant to section 363 to JPMC, which will be a good faith purchaser and entitled to the protections of section 363(m).  (D 255 at §§ 2.1(c)(i) & 38.1(a)(10).)  The Modified Plan also provides that the Debtors, JPMC, and the FDIC will be released from any claims related to the TPS which are held by any third party claiming through the Debtors.  (*Id.* at §§ 2.1(c), 23.2, 43.2, 43.6, 43.7, 43.9 & 43.12;  D 255H at §§ 2.3, 3.2.)

**12.** The Plan Supporters argue that the logical extension of the TPS Consortium's argument

would effectively be to eliminate the need to ask for (or to comply with the requirements of) a stay pending appeal.  They contend that to get a stay pending appeal of the order entered in the TPS Adversary, the TPS Consortium would have to post a supersedeas bond.  Fed. R. Bankr.P. 7062.  10 Collier on Bankruptcy ¶ 8005.03 (2011) ("the procedure mandates that an appellant desiring the stay of a [judgment] determining an interest in property should present to the bankruptcy court a supersedeas bond in an amount adequate to protect the appellee").

collateral); *In re VII Holdings Co.*, 362 B.R. 663, 666 n. 3 (Bankr.D.Del.2007) (holding that "absent a stay pending appeal, [the lower court] may retain jurisdiction 'to decide issues and proceedings different from and collateral to those involved in the appeal....' [and] may also 'enforce the order or judgment appealed.'") (citations omitted); *In re Bd. of Dir. of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 583 (Bankr.S.D.N.Y.2001) (holding that "a bankruptcy court retains jurisdiction, while an appeal is pending and in the absence of a stay, to enforce the [appealed] order or judgment").

The Court agrees with the Plan Supporters. The TPS Consortium's argument that the Divestiture Rule provides that an appeal divests the bankruptcy court of all jurisdiction over the matter is too broad. As explained by the Court in *Whispering Pines*:

As courts have noted, however, a bankruptcy case typically raises a myriad of issues, many totally unrelated and unconnected with the issues involved in any given appeal. The application of a broad rule that a bankruptcy court may not consider any request filed while an appeal is pending has the potential to severely hamper a bankruptcy court's ability to administer its cases in a timely manner.

369 B.R. at 758.

[7] The correct statement of the Divestiture Rule is that so long as the lower court is not altering the appealed order, the lower court retains jurisdiction to enforce it. *See, e.g., In re Dardashti*, No. CC–07–1311, 2008 WL 8444787, at *6 (9th Cir. BAP Feb. 12, 2008) (stating that "when there is no stay pending appeal, the bankruptcy court retains jurisdiction to enforce an order that is on appeal, on condition that in doing so, the bankruptcy court does not significantly alter or expand upon the terms of that order."); *Hagel*, 184 B.R. at 798 ("courts have recognized a distinction between acts undertaken to enforce the judgment which are permissible, and acts which expand upon or alter it, which are prohibited.").

The cases on which the TPS Consortium relies do not change this general rule and are easily distinguishable.[13] In *Whispering Pines*, for example, the lower court modified the order that was on appeal (confirmation of the lender's plan that gave the trustee time to sell the property before the lender could foreclose on it) by granting the lender immediate relief from the stay to foreclose. 369 B.R. at 759. In *Bialac*, the bankruptcy court enjoined the secured lender from foreclosing while the order granting the lender relief from the stay to foreclose was on appeal. 694 F.2d at 627. In both instances, the bankruptcy court was not merely enforcing the appealed order but was modifying it.[14] In *Demarco*, the bankruptcy court acknowledged that it should consider confirmation

**13.** Most of the cases cited by the TPS Consortium merely stand for the proposition that approval of a settlement is a final order for purposes of appeal or has res judicata effect. *See, e.g., United States v. Kellogg (In re West Tex. Mktg. Corp.)*, 12 F.3d 497, 501 (5th Cir. 1994) (concluding that while bankruptcy court approval of settlement was not a final order because no separate order was entered on the docket other than a dismissal of the adversary, the ruling was entitled to res judicata effect); *SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 289 (2d Cir.1992) (finding that order approving settlement agreement, which was contingent on later confirmation of a plan, was final for purposes of appeal); *In re Beaulac*, 294 B.R. 815, 818 (1st Cir. BAP 2003) (considering order approving settlement as final for purposes of appeal).

**14.** The other cases cited by the TPS Consortium are also inapplicable. *See, e.g., Griggs*, 459 U.S. at 61, 103 S.Ct. 400 (holding that notice of appeal filed while motion to alter

of the debtor's chapter 13 plan if it did not interfere with the appeal but declined to do so because it found that confirmation might render the appeal moot.  258 B.R. at 36.

Unlike the Court in *Demarco,* the Court declines to exercise its discretion under Rule 8005 not to consider the Modified Plan simply because it might render moot the TPS Consortium's appeal of the decision in the TPS Adversary.  The TPS Consortium could have avoided this by seeking a stay pending appeal.  To do as the TPS Consortium requests would preclude the Court from dealing with confirmation of any plan of reorganization that implicates the TPS and possibly stall these bankruptcy cases indefinitely.

Further, in considering confirmation of the Modified Plan, the Court is not being asked to modify the order that is on appeal (which held that the Debtors own the TPS).  *Wash. Mut.,* 442 B.R. at 305–06.  Rather, the Court is being asked to enforce its order by approving the Modified Plan that provides for the transfer or sale of the TPS by the Debtors to JPMC as part of the GSA.  Therefore, the Court concludes that it has jurisdiction to consider confirmation of the Modified Plan, including the transfer of the TPS, notwithstanding the pendency of an appeal from its prior order determining that the Debtors own them.  *See, e.g., Kahihikolo,* 807 F.2d at 1542–43; *VII Holdings,* 362 B.R. at 666 n. 3; *Bd. of Dir. of Hopewell Int'l,* 258 B.R. at 583.

## III.  *DISCUSSION*

### A.  *Modifications Made per January 7 Opinion*

The Plan Supporters assert that the Debtors have made corrections to the

Modified Plan to fix all of the deficiencies identified by the Court in its January 7 Opinion.  Specifically, they contend that (1) the release, injunction, and exculpation provisions of the Modified Plan now are limited to releases by the Debtors, (2) the release and exculpation language and parties have been changed to reflect only those the Court felt were entitled to be released or exculpated, and (3) the activities related to the LTWs have been excluded from the exculpation provision.  *Compare Wash. Mut.,* 442 B.R. at 348–56 *with* D 255 at §§ 28.15, 43.5, 43.7, 43.8, 43.9, 43.12.

[8]  The Modified Plan also contains provisions for Court approval of fees to be paid by the Debtors.  *Compare* 442 B.R. at 365 *with* D 255 at §§ 3.2, 32.12 & 43.18.  The LTW Holders complain, however, that the fees of some of the parties (notably the WMB Noteholders and the Liquidating Trustee) are being paid without Court approval.  (D 255 at §§ 21.1, 28.11.)  The Court agrees that Court approval of those fees is also required.  11 U.S.C. § 1129(a)(4).

In addition, the Modified Plan provides that late-filed claims will be paid before post-petition interest is paid on unsecured claims.  *Compare* 442 B.R. at 357 *with* D 255 at § 16.2 & Ex. G. In the Modified Plan, the Debtors also revised the definition of unsecured claims and provided that if the LTW Holders are determined to hold allowed unsecured claims that are not subordinated under section 510, then they will be treated in Class 12.  *Compare* 442 B.R. at 357 *with* D 255 at §§ 1.209 & 25.1.  The Debtors also solicited stock elections from the LTW Holders and other disputed

---

judgment was pending was a nullity); *Venen,* 758 F.2d at 120, 123 (holding that trial court did not have jurisdiction to grant motion for

reconsideration and vacate order that was on appeal).

claims, so that those creditors would have the same rights as others in the event their claims are allowed. *Compare* 442 B.R. at 362 *with* D.I. 7081.

The Debtors did not, however, include in the Modified Plan that smaller PIERS holders would have the same right to participate in the rights offering as the larger PIERS holders. 442 B.R. at 360–61. Instead the rights offering was eliminated. The Debtors explained that this was done because to expand the rights offering to include all PIERS would have resulted in the Reorganized Debtor being a public company, requiring the Debtors to update their filings with the SEC at the cost of millions. (*See* Tr. 2/18/2011 at 80–81.)[15]

**[9]**  Finally, the Modified Plan provides that the Equity Committee will have a representative on the Liquidating Trust board and that there will be a mechanism for removal of the Liquidating Trustee. *Compare* 442 B.R. at 364–65 *with* D 255 at §§ 8.2 & 35.2. However, the Modified Plan provides only for removal of the Liquidating Trustee for fraud, misconduct, or breach of fiduciary duty. (D 255 at § 8.2.) The Court believes that the Liquidating Trustee must be removable at the discretion of a majority of the Trust Advisory Board. In addition, the composition of the Trust Advisory Board must reflect the constituents who hold Liquidating Trust Interests. When creditors are paid in full, their Liquidating Trust Interests will be canceled and preferred shareholders will be issued Liquidating Trust Interests. (Tr. 7/13/2011 at 98; D 255 at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1.) Consequently, the Trust must provide that when creditors lost their Liquidating Trust Interests, the creditors' representatives on the Board will be replaced by representatives selected by equity.

## B.  *Reasonableness of the GSA*

**[10]**  In the January 7 Opinion, the Court concluded that the GSA was reasonable. 442 B.R. at 345. After reviewing all of the claims being resolved in the GSA, the Court was not convinced that the Debtors had a probability of achieving a significantly better result if they were to continue to litigate than they will receive under the GSA considering the claims separately or holistically. *Id.* at 344. The Court further concluded that it is not possible to say that any judgment against JPMC or the FDIC would not face difficulty in collection, especially if it is in the billions of dollars as the Plan Objectors contend. *Id.* In particular, the Court found that the significant counterclaims raised by JPMC and the FDIC against the Debtors (in excess of $54 billion) added to the difficulties of collecting from them. *Id.* The Court also concluded that the complexity of the various litigation and its interrelatedness, favored a settlement. *Id.* at 345.

The Plan Supporters contend that the January 7 Opinion is the law of the case and may not be altered in the absence of an intervening change in the law or new evidence. *See, e.g., Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 169 (3d Cir.1982); *In re AmeriServe Food Distrib., Inc.,* 315 B.R. 24, 36 (Bankr.D.Del. 2004). They contend that no new evidence or intervening change in the law has been presented which merits reconsidering the Court's conclusion that the GSA is reasonable.

---

**15.**  It appears, nonetheless, that because stock is being issued to creditors under the Modified Plan, the Reorganized Debtor may be a public company. The Debtors have now changed their position and contend that they will not be required to update their filings with the SEC. *See infra* Part F.

The TPS Consortium disagrees. It contends that the Court's January 7 Opinion was not a final order on this issue because the Court denied confirmation rather than granting it. *See, e.g., Gander Mountain Co. v. Cabela's, Inc.,* 540 F.3d 827, 830 (8th Cir.2008) (holding that "[a] district court's comments during oral argument do not constitute a final order subject to the law-of-the-case doctrine"); *Cable v. Millennium Digital Media Sys., L.L.C. (In re Broadstripe, L.L.C.),* 435 B.R. 245, 256 (Bankr.D.Del.2010) (holding that ruling by state court on motion to expedite proceeding was not law of the case on the merits of the claim).

The Court finds the TPS Consortium's cases distinguishable and agrees with the Plan Supporters that its ruling on the reasonableness of the GSA rendered as part of the January 7 Opinion is law of the case because it decided a disputed issue. *Cf. Drexel Burnham,* 960 F.2d at 289 (finding that order approving settlement agreement, which was contingent on later confirmation of a plan, was final for purposes of appeal). The Equity Committee agreed that the January 7 Opinion's ruling on reasonableness of the GSA would not be retried. (Tr. 1/20/11 at 51–52.) The Equity Committee does argue, however, that intervening events have occurred which require reconsideration of this Court's decision that the GSA is reasonable.

### 1. *Business tort claims*

[11] On February 16, 2009, certain holders of WMI common stock and debt securities issued by WMI and WMB [16] filed the ANICO Litigation against JPMC in state court in Galveston County, Texas, alleging misconduct by JPMC in connection with the seizure of WMB and the P & A Agreement. (D.I. 6083 at ¶ 23.) On March 25, 2009, the ANICO Litigation was removed and transferred to the DC Court on motion of JPMC and the FDIC Receiver as intervening defendant. (*Id.* at ¶ 24.) On April 13, 2010, the DC Court dismissed the ANICO Litigation finding that under the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), the receivership was the exclusive claims process for claims relating to the sale of WMB. *Am. Nat. Ins. Co. v. JPMorgan Chase & Co.,* 705 F.Supp.2d 17, 21 (D.D.C.2010).

That order was recently reversed on June 24, 2011, by the Court of Appeals for the D.C. Circuit. *Am. Nat'l Ins. Co. v. FDIC,* 642 F.3d 1137, 1142 (D.C.Cir.2011) (holding that because the "suit is against a third-party bank for its own wrongdoing, not against the depository institution for which the FDIC is receiver (i.e., Washington Mutual), their suit is not a claim within the meaning of [FIRREA] and thus is not barred") (citing *Rosa v. Resolution Trust Corp.,* 938 F.2d 383, 394 (3d Cir.1991) (holding that claims for damages against assuming bank for its own acts did not fall within jurisdictional bar because they did not seek payment from assets of the receiver)). As a result, the Plan Objectors contend that the business tort claims which the Debtors have against JPMC are not barred and are potentially valuable assets which are being released for no consideration under the GSA.

The Court disagrees. Despite the recent ANICO decision, the likelihood of success on the Debtors' business tort claims, the delay and cost of pursuing them, their complexity, and the possible difficulties of collecting all militate in favor of approval of the GSA. *See, e.g., TMT Trailer Ferry,*

---

**16.** Since the suit was filed, all claims based on WMI stock or debt have been voluntarily dismissed and the ANICO Plaintiffs currently assert rights only as WMB bondholders. *Am. Nat'l Ins. Co. v. FDIC,* 642 F.3d 1137, 1140 (D.C.Cir.2011).

390 U.S. at 424, 88 S.Ct. 1157; *In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002); *Martin*, 91 F.3d at 393.

With respect to the first factor, even the D.C. Circuit acknowledged that there were "knotty questions" left to be decided in the case, including whether the claims belonged exclusively to the FDIC as the receiver of WMB.[17] *Am. Nat'l Ins.*, 642 F.3d at 1145. The FDIC Receiver further argues that the Debtors did not file any claim in the Receivership action based on the alleged business tort claims and those claims are, therefore, time-barred. *Cf.* 12 U.S.C. § 1464(d)(2)(B) (any claims challenging the appointment of the FDIC as Receiver must be brought against the OTS within 30 days of the appointment).

Even if the Debtors do have an independent business tort claim against JPMC, however, they still face significant obstacles in successfully prosecuting it. Any claim for damages would require that the Debtors prove that they were solvent[18] at the time of the seizure of WMB, a position diametrically opposed to assertions they would need to prove in the preference and fraudulent conveyance claims which are also waived as part of the GSA. The Debtors would also have to establish the facts necessary to win those claims, namely that JPMC fraudulently caused the decline in value of WMB in order to buy it at a discount price.

Further, the difficulties in collecting any judgment against JPMC have not changed since the Court's January 7 Opinion. The GSA resolves not only the Debtors' business tort claims but the many disputed claims which involve a multiplicity of issues raising complex arguments about the intersection of bankruptcy law and the regulation of banks. The Supreme Court's recent decision in *Stern v. Marshall* also makes it likely that, in the absence of a global settlement, the various claims would have to be litigated in numerous state and federal courts, which might result in conflicting decisions. Continuing the litigation on the disputed claims will cause at least a 3–4 year delay in any distribution to creditors, increase post-petition interest and professional fees (which are currently running at the monthly rate of $30 million and $10 million, respectively), and involve complex issues including sovereign immunity (affecting even whether discovery could be taken of the government agents), pre-emption, and jurisdiction.

Given all these factors, the fact that one part of the GSA is now more unsettled than it was does not change the Court's mind about the overall reasonableness of the GSA. In fact, it reinforces the Court's belief that this is precisely the type of multi-faceted, multi-district litigation that calls for a global settlement. The Court, therefore, reaffirms its conclusion that the

---

17. JPMC and the FDIC Receiver contend that any derivative claim that WMI may have for alleged harm to WMB is now owned by the FDIC. 12 U.S.C. § 1821(d)(2)(A)(i) (providing that the FDIC as receiver "succeeds to all rights, titles, powers, and privileges of . . . any stockholder" of the bank). *See also Pareto v. F.D.I.C.*, 139 F.3d 696, 700 (9th Cir.1998) (holding that § 1821(d)(2)(A)(i) vests in the FDIC all rights and powers of a stockholder of a bank to bring a derivative action).

18. The TPS Consortium asks the Court to consider a summary of and excerpts from the

Senate Report issued after an investigation into the WMB collapse, which it contends shows that the Debtors have viable claims against their directors and officers. That Report, however, also noted that the market value of the Debtors was based on misinformation, suggesting that the Debtors might have been insolvent. (D.I. 8312 at Ex. A p. 4.) This would defeat any claim that the Debtors might have on the business tort claims, because the Debtors would have suffered no damages.

GSA provides a reasonable resolution in light of the possible results of the multiple complex litigation, the likely difficulties in collection, the expense inherent in any further delay, and the paramount interests of the stakeholders. 442 B.R. at 345.

2. *Other objections to reasonableness*

Many of the individual shareholders who object to confirmation of the Modified Plan do so based on the assertion that the GSA should not be approved. Some of the objections are based on alleged facts for which no evidence was presented at the confirmation hearings.[19] Those objections must fail for lack of support in the record.

Many of the individual objectors also repeat arguments presented at the confirmation hearing in December which the Court already addressed in its January 7 Opinion. Absent changed facts or law, the Court will not reconsider that decision. *See, e.g., Hayman,* 669 F.2d at 169; *AmeriServe,* 315 B.R. at 36.

[12] The individual objectors do, however, refer to some issues that the Court can consider. Specifically, they reference some recent decisional law that they say the Court should consider in determining reasonableness.

a. *Colonial BancGroup decision*

The first was a decision in the *Colonial BancGroup* case in which the Court found that the FDIC did not have the right to set off claims it had against deposits that the debtor had in its former subsidiary bank that had been seized and sold to another bank. *In re The Colonial BancGroup, Inc.,* Bankr.No. 09–32303, 2011 WL 239201, at *9 (Bankr.M.D.Ala. Jan. 24, 2011). This, they argue, means that the Debtors would have won the fight

over who had title to the deposit accounts in WMI's name at WMB.

The Court does not find, however, that the *Colonial BancGroup* decision alters its conclusion on the reasonableness of the GSA for two reasons. First, that decision did not deal with the claim by the acquiring bank to the deposit accounts but only dealt with the FDIC claim. *Id.* Second, the Court already concluded in the January 7 Opinion that the Debtors had a strong likelihood of success on the merits on their claim of ownership to the deposit accounts. 442 B.R. at 331. The *Colonial BancGroup* decision merely reinforces that conclusion.

b. *Team Financial decision*

The individual objectors also refer the Court to the decision in *Team Financial* in which the Bankruptcy Court held that the debtor, not the FDIC, owned a tax refund received by the debtor for its consolidated tax group which included a bank for which the FDIC was the receiver. *In re Team Fin., Inc.,* Bankr.No. 09–10925, 2010 WL 1730681, at *10 (Bankr.D.Kan. Apr.27, 2010). The *Team Financial* Court held that the FDIC was limited to a pre-petition breach of contract claim under the group's tax sharing agreement. *Id.* at *11.

Again, the Court finds that decision is insufficient to change its mind about the reasonableness of the GSA. In the January 7 Opinion the Court concluded that the Debtors had a fair likelihood of prevailing on the issue of who owned the tax refunds. 442 B.R. at 333. The Court noted, however, that the FDIC asserted a claim under the Tax Sharing Agreement between WMI and WMB to the portion of the tax refund which related to WMB's operating losses. *Id.* Because the estate is solvent and unse-

---

**19.** These include allegations about the value that JPMC received in acquiring WMB. (D.I. 8407, 8408.)

cured creditors are likely to get paid in full, the Court found that the FDIC's claim would entitle it to a substantial recovery and, therefore, the Debtors were not likely to obtain a net recovery which is substantially better than the GSA by litigating that issue. *Id.*

### c. *Deutsche Bank National Trust Co. decision*

The Court is also aware that the DC Court recently denied a motion of the FDIC to dismiss a complaint against it which raised business tort claims arguably similar to the ANICO claims. *Deutsche Bank Nat'l Trust Co. v. FDIC*, 1:09–cv–01656 (D.D.C. Aug. 17, 2011). The Court does not consider this relevant to its consideration of the merits of any claims that the estate may have against the FDIC in this case, however, as the order was not a decision on the merits.

For all the above reasons, the Court concludes that there is not any intervening change in the law or facts to cause it to reconsider its conclusion in the January 7 Opinion that the GSA is reasonable.

### C. *Value Distributed Under the Modified Plan*

Pursuant to the Modified Plan, stock in WMI will be canceled and stock in reorganized WMI (the "Reorganized Debtor") will be issued to creditors who elect to receive stock in lieu of cash payments or interests in the Liquidating Trust, as well as to PIERS for that portion of their claims that are not paid in cash or Liquidating Trust Interests. (Tr. 7/13/2011 at 97–98; D 255 at §§ 6.2, 7.2, 16.2, 18.2, 19.2, 20.2 & 22.2.) The Reorganized Debtor will be vested with miscellaneous assets, the most valuable of which is the stock of a subsidiary of WMI, WM Mortgage Reinsurance Company ("WMMRC"). (Tr. 7/13/2011 at 97–98, 248.) The value of the Reorganized Debtor also includes certain tax attributes, namely net operating losses ("NOLs"). The Debtors' NOLs (including WMB in its tax group) amount to an estimated $17.7 billion in face value for pre–2011 losses, assuming an Effective Date of the Plan of August 31, 2011. (D Demo 1; Tr. 7/13/2011 at 102–03.) The use of the NOLs, however, is subject to the limitations of section 382 of the Internal Revenue Code (the "Tax Code").

The Reorganized Debtor will not be vested with any claims (including claims against directors and officers) of the Debtors. Instead, those claims are vested in the Liquidating Trust, interests in which are being distributed to certain creditor classes. (D 255 at §§ 6.1, 7.1, 16.1, 18.1, 19.1, 20.1, 21.1, 28.3 & 32.1(b).)

According to the stock election results, stock in the Reorganized Debtor will be held as follows: 24 million shares by Senior Noteholders, 13 million shares by Senior Subordinated Noteholders, and 123 million shares by PIERS holders. (D.I. 8108 at 32; Tr. 7/13/2011 at 101.) The shares will be issued at a rate of one share for each dollar of claim exchanged. (D 255 at § 1.167.) Based on the Debtors' valuation of the Reorganized Debtor, the stock, cash, and interests in the Liquidating Trust to be distributed to creditors will result in all creditor classes being paid in full, with the exception of the lowest class, the PIERS. Therefore, the Modified Plan anticipates that there will be no distribution to any shareholders and their interests will be canceled. (D 255 at §§ 23.2, 24.2, 25.1 & 26.1.) In the event that all the creditors do get paid in full, however, Liquidating Trust Interests will be redistributed to the preferred shareholders. (Tr. 7/13/2011 at 98; D 255 at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1.)

The Plan Objectors contend, however, that the Reorganized Debtor has substantial value in excess of the claims of the

creditors that are receiving its stock. The stock in the Reorganized Debtor is not being distributed to anyone other than the creditors. (Tr. 7/13/2011 at 101.) Therefore, the Plan Objectors argue that those creditors are getting more than the amount of their claims in violation of section 1129(b). *See, e.g., In re Exide Techs.,* 303 B.R. 48, 61 (Bankr.D.Del.2003) (holding that section 1129(b) prohibits creditors from receiving more than the full value of their claims before junior classes receive a distribution). Instead, the Plan Objectors argue that the excess value should be given to the other stakeholders, notably the preferred and common shareholders.

The Plan Supporters and the Plan Objectors each presented valuation experts in support of their positions.

### 1. *Daubert Motion*

The Debtors filed a motion to exclude the testimony of both of the Equity Committee's experts: Peter Maxwell, the valuation expert, and Kevin Anderson, the tax expert. The Debtors argue that Maxwell's opinion is not based on accepted methodologies and is based on hypothetical scenarios that have no relevance to this case (namely, that the Reorganized Debtor will raise substantial amounts of debt and equity to develop or acquire additional business in order to utilize more of the NOLs). *See, e.g., Neb. Plastics, Inc. v. Holland Colors Ams., Inc.,* 408 F.3d 410, 416–17 (8th Cir.2005) (although factual basis of expert opinion generally goes to credibility, if the opinion is "so fundamentally unsupported" because it fails to consider relevant facts, then it can offer no assistance to the trier of fact and must be excluded); *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1331 (5th Cir.1996) (expert testimony was properly excluded where it was not based upon facts in the record but on altered facts and speculation designed to bolster a party's position); *Boucher v. U.S.*

*Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (expert testimony should be excluded "if it is speculative or conjectural or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith"); *McMillan v. Weeks Marine, Inc.,* 478 F.Supp.2d 651, 657–59 (D.Del. 2007) (excluding expert testimony as speculative because it was based on unrealistic assumptions); *In re Nellson Nutraceutical, Inc.,* 356 B.R. 364, 373 (Bankr.D.Del. 2006) ("[I]f the factual basis of an expert's opinion is so fundamentally unsupported because the expert fully relies on altered facts and speculation, or fails to consider relevant facts in reaching a conclusion, the expert's opinion can offer no assistance to the trier of fact, and is not admissible on relevance grounds."); *In re Gretz,* Bankr. No. 09–10069, 2011 WL 1048635, at *4 (Bankr.D.Del. Mar. 18, 2011) (rejecting a valuation hypothesizing that an unrenovated property with no rental income was a fully-renovated income-producing property because it was "simply too far removed from the facts on the ground for the Court to be able to confidently rely upon it.").

The Equity Committee responded that even the Debtor's own expert, Steven Zelin, considered and valued the Reorganized Debtor's "corporate opportunity" to acquire or develop new business. It argues that this type of disagreement does not warrant excluding one expert's opinion but merely goes to the credibility of the witnesses. The Equity Committee contends that the Court's gatekeeper function under Rule 702 of the Federal Rules of Evidence and *Daubert* is "not a substitute for testing the assumptions underlying the expert witness' testimony on cross-examination." *Lichtenstein v. Anderson (In re Eastern Continuous Forms, Inc.),* No. Civ. A. 04–629, 2004 WL 2418285, at *4 (E.D.Pa. Oct. 28, 2004). "A party confronted with an adverse expert witness who has sufficient,

though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir.2002). The Equity Committee argues that Rule 702 establishes a "liberal policy of admitting expert testimony which will 'probably aid' the trier of fact." *Knight v. Otis Elevator Co.*, 596 F.2d 84, 87 (3d Cir.1979) (quoting *Universal Athletic Sales Co. v. Am. Gym, Recreational & Athletic Equip. Co.*, 546 F.2d 530, 537 (3d Cir.1976)). Accordingly, the Equity Committee asserts that "doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *In re Japanese Elec. Prods.*, 723 F.2d 238, 278 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[13–17]  To admit an expert's testimony under Rule 702 of the Federal Rules of Evidence, courts must focus on "the trilogy of restrictions on expert testimony: qualification, reliability and fit." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir.2003). The first element considers the qualifications of the proposed expert in the field in which he is to testify, i.e., his "knowledge, skills, and training." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994). The second element considers several factors:

  (1) whether a method consists of a testable hypothesis;

  (2) whether the method has been subject to peer review;

  (3) the known or potential rate of error;

  (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n. 8. The third element requires that the "evidence must first be relevant to be admissible. Relevant evidence is evidence that helps the trier of fact to understand the evidence or to determine a fact in issue." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 n. 12 (3d Cir.2000).

[18]  The Court heard argument and reserved judgment on the *Daubert* motion until the testimony was presented and cross-examination completed, in order to have a better idea of the bases for the experts' qualifications and opinions. After considering that testimony, the Court concludes that the testimony of Maxwell should not be excluded because, although he did not follow normal methodologies for valuing a business, his report was not a valuation of the Reorganized Debtor but simply a critique of the valuation done by the Debtors' expert. To that extent it is helpful to the Court. With respect to the argument that Maxwell's opinion is based on hypothetical scenarios that have no basis in the record, the Court is able to evaluate and consider the likelihood of the occurrence of the various scenarios on which Maxwell relies in considering the credibility of his testimony about the value of the Reorganized Debtor.

[19]  The Debtors also argue that Anderson is not an expert in the field on which he is asked to opine, namely the likelihood that the IRS will use section 269 of the Tax Code to disallow some or all of the NOLs. The Debtors specifically note that Anderson had no experience with cases in which section 269 was a major consideration. (Tr. 7/13/2011 at 132–35.) In addition, the Debtors seek to exclude Anderson's opinion as an impermissible legal opinion. *See, e.g., Berckeley Inv. Grp.*,

*Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("Although Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion.").

With respect to the first issue, the Court found Anderson to be an expert in tax issues relevant to the acquisition and merger of corporations, particularly troubled companies. (Tr. 7/13/2011 at 127–29, 135.) Although the Debtors contend that he is not an expert on section 269 of the Tax Code, the Court finds that too narrow of an area of expertise to expect. Anderson testified that in rendering advice on mergers and acquisitions involving NOLs, he considered section 269, as well as section 382, because the two were both implicated. (*Id.* at 128–29, 132–35.) Thus, although he never issued a "pure" section 269 opinion, he always considered its effect. (*Id.*) Consequently, the Court finds that Anderson had sufficient experience with the applicability of section 269 of the Tax Code to render an opinion.

**[20]** With respect to the second factor, the Court is not being asked to render a decision on the legal issue of whether the use of the NOLs by the Reorganized Debtor will be challenged (and if challenged, will be disallowed). Instead, the issue before the Court is what is the value of the NOLs to the Reorganized Debtor and its stakeholders. This requires not simply a determination of the legal effect of section 269 but also the possibility that it would be invoked under various scenarios which may occur in the future. The Court finds that Anderson's opinion on this issue is helpful to its ultimate determination of those possibilities and their effect on the value of the NOLs. Therefore, the Court will not exclude Anderson's testimony.

### 2. *Value of WMMRC*

#### a. *Value of existing business*

WMMRC is a captive reinsurance company which wrote policies on mortgage loans issued by WMB and other affiliates of the Debtors. (Tr. 7/13/2011 at 97–98, 252.) Since the seizure of WMB, WMMRC has been in run-off: it has not issued any new policies and is simply collecting premiums and paying claims on the existing policies. (*Id.* at 97–98, 251–52.) WMMRC has no independent management, no independent sales force, and no employees. (*Id.* at 251.)

The Debtors' valuation expert, Zelin, testified that in his opinion the value of WMMRC was between $115 and $140 million. (*Id.* at 260; D 341 at 8.) This was based on the Debtors' business and actuarial projections for the run-off of WMMRC's current policies through 2019 (when they will expire). (Tr. 7/13/2011 at 251–59, 262, 277–82; D 340.) Zelin assumed that the Reorganized Debtor would have no other business and that the income generated from the run-off of WMMRC's business would be paid in dividends to investors rather than used to make acquisitions or build new business. (Tr. 7/13/2011 at 308–09.)

The Equity Committee does not disagree with the Debtors' valuation of the existing WMMRC run-off business. In fact, its expert, Maxwell, opined that the value of WMMRC in run-off was in the same range as Zelin's, $129 to $135 million. (Tr. 7/15/2011 at 68–70, 120.)

The only valuation of WMMRC which was done using accepted valuation methodologies was that done by Zelin. The Court recognizes, however, the inclinations of debtors to undervalue themselves and plan objectors to overvalue the company to support their arguments. *See, e.g., Exide*, 303 B.R. at 61 ("The Creditors Committee ar-

gues that the Debtor's expert has under-valued the company and that the Plan will result in paying the Prepetition Lenders more than 100% of their claims to the detriment of the unsecured creditors. The Debtor, on the other hand, argues that the Creditors Committee's expert has over-valued the company and that the Plan is fair and equitable in its treatment of unsecured creditors."). In addition, the Court agrees that there are some flaws in Zelin's analysis.[20] The Court, therefore, finds that the value of the existing business of WMMRC (assuming no new business is generated or acquisitions are made) is at the high end of Zelin's range of value, or $140 million.

### b. *Value of the NOLs*

Although the face amount of the Debtors' NOLs is estimated to be $17.7 billion for pre–2011 losses, the value of the NOLs is limited by several factors. (D Demo 1; Tr. 7/13/2011 at 102–03.) First, section 382 of the Tax Code will limit the Reorganized Debtor's ability to use the NOLs, because under the terms of the Modified Plan there will be a change in ownership of WMI (from the current shareholders to the creditors). (Tr. 7/13/2011 at 102–03, 141–42, 162; D 367 at 4–5.)

A large part of that NOLs will also be lost once WMB ceases to be a member of the tax group, because the bulk of the losses were attributable to WMB's operations. (Tr. 7/13/2011 at 102–03, 162–63.) WMB will cease being a member of the Debtors' tax group upon conclusion of the FDIC's receivership. (*Id.* at 104–05.) Therefore, the Debtors have filed a motion for authority to abandon the stock of WMB before the Effective Date of the Modified Plan, which will result in a $6 billion NOL for 2011 if the Modified Plan is confirmed.[21] (*Id.* at 106, 164–65; D 368 at 4–5.) The portion of the tax loss for 2011 which occurs before the Effective Date is subject to the limitations of section 382 of the Tax Code; the portion after the Effective Date is not. (Tr. 7/13/2011 at 105, 108.) Assuming an Effective Date of August 31, 2011, the Debtors projected a limited NOL of $4 billion and an unlimited NOL of approximately $2 billion for the 2011 losses.[22] (*Id.* at 109–10, 163–64; D 368 at 4–5.) The Equity Committee's expert, Anderson, agreed with the Debtors' decision to take a worthless stock deduc-

---

**20.** Maxwell highlighted some internal inconsistencies and problems with Zelin's analysis: Zelin used the weighted average cost of capital ("WACC") figure from his December 2010 report, although that number has fallen since then by 5 to 10 percentage points, which would have increased the value (Tr. 7/13/2011 at 314–17; Tr. 7/15/2011 at 58); he used a WACC of 13–15% although historical returns on equity for similar businesses are 8 to 12.5% and current returns for insurance companies are 6 to 10% (Tr. 7/13/2011 at 324–32); he gave little weight to the value of precedent transactions (which yielded a value of $145 to $205 million) and accorded most weight to the discounted cash flow analysis (*id.* at 310–11; D 341 at 13, 23).

**21.** The Debtors filed a certificate of no objection to the motion, causing the Court to grant it by order dated July 8, 2011. (D.I. 8104.)

At a status hearing held on August 12, 2011, the Debtors advised that they had withdrawn the certificate of no objection late on the evening of July 5, 2011, when they were advised by the Equity Committee that individual shareholders objected to the motion. (Tr. 8/12/2011 at 15.) However, after reviewing the docket the Debtors were unable to identify any objection to the motion. At the status hearing the Equity Committee advised that it had no objection to the motion, so long as the Debtors did not abandon the stock until after a plan was confirmed. The Debtors agreed and a form of order to that effect was to be filed with the Court. (*Id.* at 21.)

**22.** The later in the year that the Effective Date occurs, the smaller the amount of the unlimited NOL. (Tr. 7/13/2011 at 107–10, 161; D Demo 2.)

tion for the WMB stock. (Tr. 7/13/2011 at 164–65.)

i. *NOLs used by run-off business*

Zelin did attempt to determine the net present value of the NOLs in two components. The first was the value of the NOLs to existing WMMRC if it simply remains in run-off. Based on his valuation of the Reorganized Debtor, Zelin testified that under section 382 the portion of the NOLs which could be used by WMMRC during run-off was approximately $7 million per year. (D Demo 1; Tr. 7/13/2011 at 103–04.) According to Zelin, the present value of the NOLs that could be used by WMMRC is $10 to $20 million. (Tr. 7/13/2011 at 260–61, 275–78, 284–85; D 341 at 8.)

The Plan Objectors do not really dispute this value; they contend only that it is based on WMMRC's current operations and does not take into account the possible future revenues that could be generated. *See, e.g., Consol. Rock Prods. Co. v. Du Bois,* 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982 (1941) (in valuing company court must consider "all facts relevant to future earning capacity and hence to present worth").

Because Maxwell did not do a valuation of the existing business with its NOLs, the Court accepts that the value of the NOLs to the existing WMMRC business is that determined by Zelin or $20 million. (Tr. 7/15/2011 at 36–37.)

ii. *NOLs used by future business*

Zelin also attempted to value the NOLs that might be able to be used in the event of a future acquisition of a profitable business by WMMRC, which he valued at an additional $10 to $25 million. (Tr. 7/13/2011 at 260–61, 275–78, 284–85; D 341 at 8.)

The Plan Objectors argue that the principal defect [23] in Zelin's valuation is that he values the Reorganized Debtor as a liquidating company (rather than as a going concern) and fails to attribute sufficient value to the ability of the Reorganized Debtor to generate new business itself or to use the NOLs through the acquisition of profitable businesses. (Tr. 7/15/2011 at 38.) The Equity Committee's expert, Maxwell, opined that, assuming an initial capital infusion of $140 million, debt of $200 million, and a subsequent second tranche of debt of $160 million, the Reorganized Debtor could have a value (based on a net present value calculation) of $275 million. (*Id.* at 39–50; EC 154 at 7–8, 11.) He also opined that the value could increase with subsequent equity raises or other merger/acquisition opportunities.[24] (Tr. 7/15/2011 at 50–51.)

The Plan Supporters disagree with Maxwell's conclusion and assert that there are many flaws in his analysis.[25] Their pri-

---

**23.** The Equity Committee also had more technical criticisms of this part of the Zelin report: Zelin used a WACC for the future acquisition of 25 to 35%, because it was an unknown, but then did an additional downward adjustment of 33% to reflect the probability that the acquisition will not be effective on day one but will take time to occur. (Tr. 7/13/2011 at 332–34; D 341 at 37.) Maxwell characterized this as double-discounting resulting in an effective rate of 38 to 52% when the correct rate should be 15.8 to 20%. (Tr. 7/15/2011 at 55–56.)

**24.** Maxwell opined that it is possible that the Reorganized Debtor could have additional value of $240 to $420 million but that is premised on raising billions of dollars in additional equity to generate hundreds of millions of dollars in additional income to use the NOLs. (Tr. 7/15/2011 at 84–86; EC 154 at 8.) The Court finds that assumption purely speculative and unrealistic.

**25.** The Debtors' technical criticisms of the Maxwell report included: Maxwell's comparables for the debt to equity ratios were not reinsurance companies (Tr. 7/15/2011 at 91);

mary criticism is that Maxwell did not use typical methodologies to do a conventional valuation of the Reorganized Debtor. (*Id.* at 71–73.) Maxwell admitted this but stated that he was just showing what the possible values are that could be achieved by the Reorganized Debtor if new money was invested or borrowed. The Equity Committee argues that this is not just speculation but was, in fact, what the Settlement Noteholders were expecting to do as evidenced by numerous analyses they performed. (EC 132 & 138.)

The Plan Supporters also contend that Maxwell's assumption that WMMRC will operate as a going concern is faulty. It is not based on the current Modified Plan, any existing business plan, or the known intentions of the future shareholders. (Tr. 7/15/2011 at 74–75, 119.) The Plan Objectors argue that the Debtors have intentionally not done a business plan for WMMRC so that the true value of the Reorganized Debtor as a going concern could not be evaluated. The Plan Supporters respond that it would be presumptuous of the Debtors to prepare a business plan for the Reorganized Debtor and that it will be up to the new owners to decide how it will be run.

Maxwell admitted that to achieve his going concern value, the Reorganized Debtor would have to get new management, hire employees, develop a business plan, get customers and vendors, and acquire hard assets, none of which it currently has. (*Id.* at 75–79, 118.) Maxwell could not give an opinion on whether the Reorganized Debtor could raise the equity or debt needed to realize the values he attributes to the Reorganized Debtor. (*Id.* at

98.) He admitted he did not know of anyone willing to lend or invest in the Reorganized Debtor and stated that his report was just one of a number of possible future scenarios. (*Id.* at 82–84, 88–89; EC 135.) He was also aware that only one third of the rights offering had been subscribed in the Sixth Amended Plan and the Modified Plan does not even have a rights offering. (Tr. 7/15/2011 at 90.) Further, Maxwell does not account for any costs or risks associated with the scenarios he posits. (Tr. 7/13/2011 at 297.) Although Maxwell stated that the cost of equity and debt takes into account some of those risks, he admitted that it did not include the costs and risks of converting a liquidating company with no employees or business into a going concern. (Tr. 7/15/2011 at 149–52.) In addition, Maxwell assumed that the future acquisition will be fully implemented on day one (generating $37 million in income, net of interest expense) but admitted that is not realistic and there would necessarily be time delays before any additional revenue could be generated. (*Id.* at 79–81, 100–01, 124, 126.)

The Court agrees with the Plan Supporters that these are all serious flaws in Maxwell's analysis, which precludes the Court from concluding (as Maxwell opines) that the Reorganized Debtor could have a value in excess of $275 million. However, the Court agrees with Maxwell's critique of Zelin's report that it gives too little value to the possible future earning capacity of the Reorganized Debtor that could be achieved simply by operating as a going concern or merging with a viable company. *See, e.g., Consol. Rock,* 312 U.S. at 526, 61 S.Ct. 675.

---

Maxwell's cost of debt was based on double B rated securities though none of the reinsurance comparables have that good a rating (*id.*); his rate of return is based on going-concern reinsurance companies, not startups

or run-offs (*id.* at 92); Maxwell gave 40% weight to precedent transactions, because he erroneously thought Zelin did, although he normally would not give that much weight to them (*id.* at 131–32).

(1) *Risk of Loss*

The parties also disagree about the effect of the Tax Code on the ability of the Reorganized Debtor to use the NOLs. The Plan Supporters contend that Maxwell does not account at all for any tax risk. (Tr. 7/13/2011 at 297; Tr. 7/15/2011 at 52–53, 107, 119.)  They argue that he ignores the possibility that the IRS will disallow all NOLs under section 269 of the Tax Code. The Plan Objectors, in contrast, contend that Zelin artificially undervalued the Reorganized Debtor because of imaginary tax restrictions.

**[21]** In valuing NOLs, bankruptcy courts must take into account the risk that the NOLs will be disallowed. *See, e.g., In re Jartran, Inc.,* 44 B.R. 331, 380 (Bankr. N.D.Ill.1984) (holding that "the realization of the tax savings [from use of NOLs] is subject to a number of contingencies, including continuation in effect of relevant tax provisions, potential challenge under section 269 of the Internal Revenue Code, and possible recapture of the benefits utilized. Accordingly . . . a substantial discount would be required."). *See generally,* Chaim J. Fortgang & Thomas M. Mayer, *Valuation in Bankruptcy,* 32 UCLA L. Rev. 1061, 1130 (1985) ("Uncertainties in preserving the NOL increase the discount.").

**[22]** Section 269 of the Tax Code states in relevant part that: "If any person or persons acquire . . . control of a corporation, . . . and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax . . . then the Secretary may disallow such deduction, credit, or other allowance." 26 U.S.C. § 269(a)(1).  For the principal purpose of a transaction to be tax avoidance, the purpose of tax evasion or avoidance has to be more significant, more important, or more prominent than any other purpose; it can be one of the purposes but

not the principal purpose. *See, e.g., Scroll, Inc. v. Comm'r,* 447 F.2d 612, 618 (5th Cir.1971) (noting that the "burden of proof on the taxpayer is not an easy one, and when the disputed tax benefits are so disproportionate to the value of the other asserted advantages, that burden may be practically impossible to sustain"); *U.S. Shelter Corp. v. United States,* 13 Cl.Ct. 606, 620 (Cl.Ct.1987) (in considering what is the primary purpose, the court should aggregate all tax avoidance purposes and compare them to the aggregate business purposes) (citing *Bobsee Corp. v. United States,* 411 F.2d 231, 239 (5th Cir.1969)).

**[23]** The Court in *U.S. Shelter* concluded that tax evasion was not the primary purpose of the acquisition even though the acquiror was aware of and interested in using the NOLs, because it found persuasive the testimony that the principal motivations for doing the deal were the business reasons of acquiring a public company and the specific assets of the acquired company.  13 Cl.Ct. at 622–28.  In contrast, the Court in *Scroll* found the principal purpose was tax avoidance where the acquired company was not integrated into the acquiror's business and the tax attributes and value of the tangible assets were significantly more than the price paid.  447 F.2d at 615 n. 4, 618.  A finding of tax avoidance can be made even if the change in control was through a foreclosure by a creditor.  *See, e.g., The Swiss Colony, Inc. v. Comm'r,* 428 F.2d 49, 54 (7th Cir.1970) (upholding Tax Court conclusion that primary purpose of acquisition was tax avoidance even though taxpayer argued that acquisition was accomplished through foreclosure on stock to protect its position as a creditor).

The Plan Supporters presented a tax expert, Richard Reinhold, a tax partner at Wilkie Farr & Gallagher, who testified

that the transfer of stock under the Modified Plan to the creditors was a change of control that could trigger section 269 disallowance of the NOLs. (Tr. 7/13/2011 at 113.) Reinhold opined that in considering the issue of what the principal purpose of the creditors' election to take stock in lieu of cash under the Modified Plan was, the IRS and courts will consider future events that may shed light on the intent of the creditors. (*Id.* at 200; D 404 at 7 n.15.) Those future events would include any additional acquisitions of other companies by the Reorganized Debtor. (Tr. 7/13/2011 at 197.) Reinhold did not testify that the IRS or courts would be more likely to find that tax avoidance was the principal purpose if the amount of capital raised exceeded the non-tax assets' value; he only said that he could not give an opinion that they would not. (*Id.* at 200–01, 224; D 404 at 4–6.) Reinhold opined, however, that if the amount of capital raised is not more than the value of the non-tax assets of the Reorganized Debtor then "the company has quite a good argument that Section 269 will not be brought into play because the principal purpose for the acquisition of shares would not be considered tax avoidance." (Tr. 7/13/2011 at 200; D 404 at 7–9.)

The Equity Committee's expert, Anderson, opined that it was unlikely that section 269 of the Tax Code would apply (resulting in loss of the NOLs) if the Reorganized Debtor acquired additional businesses, because to disallow the NOLs that future acquisition would have to be for the "primary purpose" of tax avoidance. (Tr. 7/13/2011 at 138; D 367 at 15–20; D 370 at 2–5.) He stated that section 269 is rarely used by the IRS because the newer section 382 is more specific in describing instances where NOLs should be disallowed. (Tr. 7/13/2011 at 184.)

Anderson specifically disagreed with Reinhold's opinion that the Reorganized Debtor could not acquire a company whose value was more than the value of Reorganized Debtor (excluding the NOLs) without running afoul of section 269. (*Id.* at 146–47; D 369 at 3.) Instead, Anderson stated that as long as the acquired business had legitimate substantial operations, its acquisition would not result in a loss of the NOLs. (Tr. 7/13/2011 at 142–47; D 367 at 15–17; D 369 at 3–4.) In addition, Anderson opined that there were specific ways in which the Reorganized Debtor could acquire assets and/or stock in the future that would not implicate section 269. (Tr. 7/13/2011 at 149; D 367 at 15–17; D 369 at 3–4.)

The Debtor's expert, Reinhold, did not disagree with Anderson's conclusion that a subsequent acquisition by the Reorganized Debtor was not likely to cause a problem under section 269 or 382. (Tr. 7/13/2011 at 208–11.) However, he noted that his opinion was not addressing the risk that the IRS will challenge any future transfer of ownership under 269 (as Anderson's was), but whether it will challenge the current transfer of ownership to the creditors under the Modified Plan. (*Id.* at 193, 202–03, 208–11; D 404 at 7–9, D 341 at 36.)

Anderson admitted that section 269 could apply to the transfer of stock under the Modified Plan to the creditors and that in determining "principal purpose" courts look at future actions to discern present intention. (Tr. 7/13/2011 at 166–67.) Anderson still felt, however, that it was unlikely that the IRS (or courts) would find that the principal purpose of the transfer of stock in the Reorganized Debtor under the Modified Plan was tax avoidance or evasion. (*Id.* at 147–48, 151–53.)

In evaluating the two conflicting opinions, the Court finds the opinion of Anderson more convincing. The cases

that apply section 269 are fundamentally different from the case at bench. Those cases deal with taxpayers who acquire a company which has a significant NOL and then merge it with their own business in order to shelter their income. *See, e.g., Scroll,* 447 F.2d at 615 (noting that "[o]ne of the most obvious advantages accruing to [the acquiror] as a result of the merger was the possibility . . . of offsetting [the acquired company's] substantial pre-acquisition net operating loss carryover against [the acquiror's] even more substantial post-acquisition profits"); *The Swiss Colony,* 428 F.2d at 52 (tax court had found that "Taxpayer acquired control of [liquidating company] 'for the principal purpose of evading or avoiding Federal income taxes by securing the benefit of net operating loss deductions which it would not otherwise have enjoyed' "); *U.S. Shelter,* 13 Cl. Ct. at 609–10 (noting that section 269 was passed to prevent "the recently developed practice of corporations with large excess profits . . . acquiring corporations with current past, or prospective losses or deductions, . . . for the purpose of reducing [the acquiror's] income and excess profits taxes.") (citing S.Rep. No. 627, 78th Cong., 1st Sess. 58 (1943)).

In this case, the creditors are acquiring the Reorganized Debtor under the Modified Plan not to shelter their own income or to merge it with a company they own. Instead, they are receiving stock in the Reorganized Debtor simply in repayment of debt owed them. Even the situation in *The Swiss Colony* case is distinguishable. In that case, although the Taxpayer had acquired the loss company's stock through foreclosure, it then attempted to use that company's NOL to shelter its own profits. 428 F.2d at 52. That is not being done by the acquiring creditors in this case.

In addition, most of the new shareholders will receive their stock in the Reorganized Debtor not by election but by default. (Tr. 7/14/2011 at 96–97; D 255 at §§ 20.1 & 20.2.) In fact, the bulk of the stock is being distributed to the PIERS, not because they elected to receive it but because they are the lowest creditor class.[26] (D 255 at §§ 20.1 & 20.2.) Thus, the Court concludes that the IRS is unlikely to find that the principal reason that the creditors in this case are receiving stock under the Modified Plan is for tax evasion purposes.

The fact that the Settlement Noteholders (who as holders of PIERS will receive the bulk of the stock under the Modified Plan) performed analyses of the value of the NOLs does not alone suggest that tax evasion was their reason for accepting stock instead of a cash distribution. *See, e.g., In re Federated Dep't Stores, Inc.,* 135 B.R. 962, 970 (Bankr.S.D.Ohio 1992) ("Consideration by corporate officials of the tax ramifications of an acquisition is not, by itself, indicative of tax avoidance but is 'simply intelligent business planning.' ") (citation omitted); *VGS Corp. v. Comm'r,* 68 T.C. 563, 596, 1977 WL 3758 (1977) ("Complicated business transactions do not take place in a vacuum and we find this [consideration of loss carryovers or

---

**26.** Under the Debtors' valuation of the Reorganized Debtor, there is nothing available for equity shareholders, so the fact that stock in the Reorganized Debtor is being given to the creditors is in large part mandated by the absolute priority rule. *See, e.g., Case,* 308 U.S. at 115–16, 60 S.Ct. 1 (stating that absolute priority rule requires that shareholders not receive any distribution under a plan until creditors are paid in full). While the Debtors could have simply liquidated WMMRC and disbursed the proceeds to the creditors rather than the stock, the Debtors stated that the offers they received for WMMRC were too low and that they, therefore, concluded that the creditors would get a higher recovery by allowing WMMRC to finish its runoff. (Tr. 7/14/2011 at 45–47; D 391.)

other tax benefits] to be nothing more than prudent business planning."); *U.S. Shelter*, 13 Cl.Ct. at 625 (holding that "the principal purpose of a transaction does not become tax avoidance merely because the parties were cognizant of and considered the tax consequences."). Further, despite doing those analyzes, three of the Settlement Noteholders testified that they did not elect to take extra stock in lieu of cash distributions. (Tr. 7/18/2011 at 123; Tr. 7/19/2011 at 112–13; Tr. 7/20/2011 at 81.)

In this case given the conservative valuation done by Zelin (which assumes that WMMRC will generate no new business), the Court also finds that the electing creditors' decisions to take stock was likely influenced by a belief that the Debtors undervalued the Reorganized Debtor by viewing it as a liquidating company rather than as a going concern. (Tr. 7/14/2011 at 39–40.) *See, e.g., Exide Techs.*, 303 B.R. at 48, 61 (noting the inclination of debtor to undervalue the reorganized entity).

[24] Given the various reasons for distribution of stock to creditors under the Modified Plan, the Court concludes that the principal purpose of the transfer of ownership of the Reorganized Debtor under the Modified Plan is not the avoidance of taxes. The Court is cognizant of the fact that its opinion on this point is not binding on the IRS. 26 C.F.R. § 1.269–3(e) ("In determining for purposes of section 269 . . . whether an acquisition pursuant to a plan of reorganization in a case under [the Bankruptcy Code] was made for the principal purpose of evasion or avoidance of Federal income tax, . . . any determination by a court under 11 U.S.C. § 1129(d) that the principal purpose of the plan is

not avoidance of taxes is not controlling."). *See also In re Hartman Material Handling Sys., Inc.*, 141 B.R. 802, 811–12 (Bankr.S.D.N.Y.1992) (holding that "[a] confirmation ruling that the principal purpose of a plan is not tax avoidance is significantly different from a § 269 ruling because the two rulings are made pursuant to different 'factual frames of reference' " and noting that the bankruptcy court can only consider facts up to the time of its ruling on confirmation while the IRS can consider facts after confirmation until the deduction is taken). Nonetheless, the Court considers it significant that the IRS has not objected to confirmation of the Modified Plan on the basis that its principal purpose is tax avoidance although it clearly could have. 11 U.S.C. § 1129(d).[27]

For purposes of estimating the value of the NOLs, therefore, the Court cannot accept the Debtors' assertion that the Reorganized Debtor could not obtain future investments that are more than the value of its non-tax assets without having the IRS conclude that the acquisition of stock by creditors under the Modified Plan runs afoul of section 269 of the Tax Code.

*(2) Value adjusted for loss*

In determining the value of the NOLs resulting from any future acquisition, Zelin assumed that any capital raised would be no more than the value of the current WMMRC non-tax assets based on section 269. (Tr. 7/13/2011 at 260–61, 275–78, 284; D 341 at 8.) As a result, he concluded that the value of the NOLs resulting from any additional acquisitions was no more than $10 to $25 million. (Tr. 7/13/2011 at 260–61, 275–78, 284.)

---

**27.** If a governmental unit objected and the Court found that the principal purpose was to avoid taxes, the Modified Plan could not be confirmed. 11 U.S.C. § 1129(d) ("Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes . . . .").

The Court finds that Zelin's valuation is too low, because it was based on the erroneous assumption that the Reorganized Debtor would be restricted by section 269 of the Tax Code in what capital it could raise in the future. However, as noted above, the Court finds that Maxwell's determinations of value are fraught with problems, including the assumption that the Reorganized Debtor will be able to raise debt and equity instantly, even though the Debtors have not obtained exit financing or any new debt or equity commitments. Maxwell's present value of the NOLs also assumes that the Reorganized Debtor will be able to generate instant cash flow from the new debt and equity that has not even been committed yet. As a result, the Court cannot accept Maxwell's determination that the value of the Reorganized Debtor is $275 million.

Based on the two expert opinions, one of which is too conservative and the other of which is too aggressive, the Court concludes that the present value of the NOLs to the Reorganized Debtor is $50 million. This is based on the Court's conclusion that the Reorganized Debtor should be able to raise additional capital and debt over the next twenty years equal to twice the value of its current assets which will be invested in restarting the reinsurance business of WMMRC or acquiring other related businesses. The Court accepts as credible Maxwell's opinion that the reinsurance market is a prime area for new investment given the recent turmoil in the real estate market.[28]

Based on all of the above, the Court concludes that the value of the Reorganized Debtor and its NOLs is $210 million.

### 3. *Value of Liquidating Trust Interests*

[25] In addition to distributions of cash, certain creditors are receiving interests in the Liquidating Trust. (D 255 at §§ 6.1, 7.1, 16.1, 18.1, 19.1, 20.1, 21.1 & 32.1(b).) The Debtors are transferring to the Liquidating Trust all of their interests in any causes of action the estates have, including potential suits against the Debtors' directors and officers. (*Id.* at §§ 28.3 & 43.5.)

The LTW Holders contend, however, that this major component of value that is being distributed to the creditors has been ignored by the Debtors and must be valued in order for the Court to determine whether the Modified Plan meets the best interests of creditors test under section 1129(a)(7).

The Plan Supporters contend that it is not necessary to value the Liquidating Trust Interests because under the Modified Plan's waterfall provisions, once creditors have received payment in full of their claims, with interest, their Liquidating Trust Interests will be canceled and all further recoveries realized by the Liquidating Trust will flow to the preferred shareholders. (*Id.* at §§ 6.3, 7.3, 16.3, 18.3, 19.3, 20.3, 22.1, 22.2, 23.1 & 24.1; Tr. 7/13/2011 at 98.)

The Court agrees with the Plan Supporters that it is not necessary to determine the precise value of the Liquidating Trust assets because whatever they are worth will be distributed to creditors and then to shareholders in accordance with the priorities of the Code.[29]

---

**28.** Maxwell testified that there would be interest in investing in WMMRC because of the current opportunities in the home insurance industry; he cited as an example that Goldman partners had recently raised $600 million to start a new reinsurance business. (Tr. 7/15/2011 at 38, 67, 122.)

**29.** The Court therefore finds it unnecessary to determine what if any value the suits against the Debtors' directors and officers have. (D.I.

### D.  *Good Faith*

Several Plan Objectors, led by the Equity Committee, complain that the Plan cannot be confirmed because it has not been proposed in good faith as a result of the improper conduct of the Settlement Noteholders.  They argue that any prior finding of good faith in the January 7 Opinion should be reconsidered by the Court, based on the newly discovered evidence of the Debtors' and Settlement Noteholders' misconduct.  Fed. R. Bankr.P. 9024(b).

#### 1.  *Conduct of the Settlement Noteholders*

The conduct of the Settlement Noteholders was first raised by a pro se PIERS holder, Mr. Thoma, at the confirmation hearings held in December, 2010.  Although Mr. Thoma sought to introduce what he described as evidence of improper trades by the Settlement Noteholders, the Court refused that request as it was hearsay.  In its January 7 Opinion denying confirmation, however, the Court stated that it was "reluctant to approve any releases of the Settlement Noteholders" as required by the GSA and Sixth Amended Plan in light of Mr. Thoma's allegations of insider trading by the Settlement Noteholders.  *Wash. Mut.*, 442 B.R. at 349.  Following denial of confirmation, both the Settlement Noteholders and the Equity Committee engaged in discovery, which the Court limited to what information the Settlement Noteholders received from the Debtors.[30]  Evidence regarding the conduct of the Settlement Noteholders during the bankruptcy case was presented over the course of four days during the hearings on confirmation of the Modified Plan.  That testimony revealed the following.

The Debtors and JPMC began negotiating a resolution of their disputes about ownership of various assets in March 2009.  (Tr. 7/18/2011 at 55; Tr. 7/21/2011 at 101.)  Those negotiations continued off and on until the announcement that the parties had reached an agreement in principal on March 4, 2010, and the terms were read into the record on March 12, 2010.  (Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 74–75.)  The settlement negotiations included the exchange of term sheets between the Debtors and JPMC reflecting the parties' relative stances on settlement of issues related to the ownership of disputed assets.  (Tr. 7/18/2011 at 67–68; Tr. 7/19/2011 at 130–35.)  Counsel for the Settlement Noteholders, Fried Frank, participated in many of these negotiations, though they were precluded from sharing information with the Settlement Noteholders unless the latter were under confidentiality agreements.  (Tr. 7/18/2011 at 57–59, 116, 119; Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 75; Tr. 7/21/2011 at 136.)

At times during that period, the Settlement Noteholders also participated directly in the negotiations.  (Tr. 7/18/2011 at 55; Tr. 7/21/2011 at 101.)  As a condition to their participation, the Settlement Noteholders entered into confidentiality agreements with the Debtors.  (Tr. 7/20/2011 at 198.)  During the two formal confidentiality periods, the Settlement Noteholders were required to restrict trading of the Debtors' securities or to establish an ethical wall (precluding any confidential information from being used by their traders).  (*Id.*)

The First Confidentiality Period ran from March 9 to May 8, 2009.  (EC 24.)

---

8312 at Ex. A pp. 2–4; Tr. 7/21/2011 at 204–05.)

**30.**  The Court did not permit discovery of any analyses that the Settlement Noteholders did

in determining whether to trade in the Debtors' securities.  The Settlement Noteholders asserted that analysis was privileged and not relevant.

Only Aurelius established an ethical wall during the First Confidentiality Period; the others restricted their trading. (Tr. 7/18/2011 at 55.) Immediately after the First Confidentiality Period, the Settlement Noteholders shared all confidential information they had received from the Debtors with their traders and actively traded in the Debtors' securities. (AOC 18; AOC 54; AOC 62; Au 8.) That information included the amount of a tax refund the Debtors estimated they would receive (in excess of $2 billion), which information the Debtors also made public. (D.I. 970; D 427; Tr. 7/18/2011 at 65, 79, 144; Tr. 7/20/2011 at 232–33.) The Debtors did not, however, make public any of the settlement term sheets or even the fact that settlement negotiations were occurring.

After the conclusion of the First Confidentiality Period, two of the Settlement Noteholders (Appaloosa and Centerbridge) independently approached JPMC in July and August 2009 in an effort to further negotiations. (Tr. 7/20/2011 at 54–55.) Term sheets were exchanged. (EC 14; EC 115; Tr. 7/20/2011 at 57–58, 243; Tr. 7/21/2011 at 32–33.) Appaloosa restricted its trading during these negotiations, while Centerbridge restricted trading only upon receipt of a counter-proposal from JPMC on August 18, 2009. (Tr. 7/20/2011 at 58–59, 130, 244–45.) JPMC withdrew its counter-proposal in early September 2009. (Id. at 58–59, 244–45.)

Negotiations did not resume again until the Second Confidentiality Period, which ran from November 16 to December 31, 2009 (the "Second Confidentiality Period"). (EC 37; EC 117; EC 148; Tr. 7/18/2011 at 105; Tr. 7/19/2011 at 139–40; Tr. 7/21/2011 at 128–29.) During the Second Confidentiality Period, all the Settlement Noteholders restricted trading. (Tr. 7/18/2011 at 104–05; Tr. 7/19/2011 at 140; Tr. 7/20/2011 at 71–72, 246.) Near the end of the Sec-

ond Confidentiality Period, Aurelius asked the Debtors to terminate the confidentiality period a day early. (Tr. 7/18/2011 at 111.) The Debtors agreed and again released to the public the Debtors' estimate of an additional tax refund (in excess of $2 billion) which the Debtors anticipated receiving because of a recent change in the tax laws. (D.I. 2077; D 428; Tr. 7/18/2011 at 105; Tr. 7/19/2011 at 141; Tr. 7/21/2011 at 127–28.) Once again, immediately after the Second Confidentiality Period, the Settlement Noteholders actively traded in the Debtors' securities using information they had received from the Debtors, including the status of settlement negotiations. (AOC 18; AOC 54; AOC 62; Au 8.)

Following the Second Confidentiality Period, the Settlement Noteholders' involvement in negotiations was limited to a meeting with the Debtors in January and a meeting with the Debtors, JPMC, the FDIC, and the WMB Noteholders in February 2010 to discuss a proposed plan of reorganization, how the Debtors' assets would be distributed under a plan (the "Waterfall"), and updates on litigation. (Tr. 7/19/2011 at 62–63, 70; Tr. 7/21/2011 at 130.) One of the Settlement Noteholders, Appaloosa, also participated in a meeting with the Debtors and JPMC on March 1 and thereafter restricted its trading until the terms of the GSA were announced on March 12, 2010. (Tr. 7/20/2011 at 76–77, 96.) After the announcement of the GSA, the Debtors sent the Settlement Noteholders advance drafts of the plan of reorganization, disclosure statement, and Waterfall analyses. (EC 42; EC 34; Tr. 7/20/2011 at 77, 220, 262.) Upon receipt of those drafts, the Settlement Noteholders restricted trading until the documents were publicly filed. (AOC 18; Tr. 7/19/2011 at 77–78; Tr. 7/20/2011 at 77, 262.)

2. *Application of section 1129(a)(3)*

[26, 27] The Bankruptcy Code requires that, to be confirmed, a plan of reorganiza-

IN RE WASHINGTON MUT., INC. 239
Cite as 461 B.R. 200 (Bkrtcy.D.Del. 2011)

tion must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). To meet this standard, the Third Circuit has stated that a plan must "fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir.2000). *See also In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir.1986); *In re Madison Hotel Assocs.*, 749 F.2d 410, 424–25 (7th Cir.1984). To meet this standard, the plan proponent must establish that "(1) [the plan] fosters a result consistent with the Code's objectives . . . , (2) the plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected . . . , and (3) there was fundamental fairness in dealing with the creditors." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr.D.Del.2001). *Accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D.Pa.2007).

The Settlement Noteholders, and the Debtors contend that the conduct of the Settlement Noteholders was in accordance with the terms of the parties' written confidentiality agreements and did not violate any law or duty that the Settlement Noteholders might have had. They contend that the Modified Plan is proposed in good faith and confirmable under section 1129(a)(3).

The Equity Committee objects to confirmation of the Modified Plan [31] asserting that it has not been proposed in good faith because the Settlement Noteholders "dominated" or "hijacked" the settlement negotiations and engaged in inequitable conduct, including trading in the Debtors' securities while in possession of material nonpublic information. The Plan Objectors specifically contend that the Settlement Noteholders used material nonpublic information to acquire a blocking position in the various creditor classes to get a seat at the negotiating table and assure that their claims got paid while nothing was given to the shareholders. *See, e.g., In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr.D.Del.2004) (finding a lack of good faith where pre-petition creditors committee dominated the debtor's affairs resulting in "obvious self-dealing"); *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr.D.Del.2001) (denying confirmation for lack of good faith where debtor's CEO had an undisclosed million dollar consulting agreement with a creditor); *In re Unichem Corp.*, 72 B.R. 95, 100 (Bankr. N.D.Ill.1987) (finding lack of good faith where plan proponent breached fiduciary duties to debtor because "Congress did not intend the objectives and purposes of the Bankruptcy Code to include rewarding an individual for breaching his fiduciary duty").

Based on the record developed, the Court finds that the conduct of the Settlement Noteholders does not mean that the Plan was proposed in bad faith. Despite the allegations of insider trading by the Settlement Noteholders, the Court is unconvinced that their actions had a negative impact on the Plan or tainted the GSA.

Rather, the actions of the Settlement Noteholders appear to have helped increase the Debtors' estates. During the

---

**31.** The Equity Committee has also filed a motion seeking authority to prosecute an action against the Settlement Noteholders for equitable disallowance of their claims. Although the Motion only sought disallowance of the claims of Aurelius and Centerbridge, the Equity Committee's objection to confirmation asserts that equitable disallowance of the claims of all the Settlement Noteholders is warranted. At oral argument, the Equity Committee clarified that it seeks authority to bring such a claim against all four Settlement Noteholders.

First Confidentiality Period, the Settlement Noteholders, together with other creditors, persuaded the Debtors to submit a term sheet to JPMC that was more "aggressive" than the one the Debtors had initially contemplated. (Tr. 7/20/2011 at 50.) In addition, during the July negotiations that Appaloosa and Centerbridge had alone with JPMC, they persuaded JPMC to submit a counter-proposal that increased the share of the tax refunds that JPMC was willing to allocate to the Debtors. (EC 115; Tr. 7/20/2011 at 243.)

The cases cited by the Plan Objectors are distinguishable from the present facts. Both *Coram* and *Unichem* involved inequitable conduct of an executive of the debtor that lead to the conclusion that the debtor's plan was offered in bad faith. *Coram*, 271 B.R. at 234–35; *Unichem*, 72 B.R. at 99–100.

While *ACandS* is closer, the Court finds it distinguishable in important respects. In that case, the Court found that the pre-petition creditors' committee gained control of the debtor to the point where the committee alone made all the important decisions, including taking over the process of reviewing and settling all asbestos claims. 311 B.R. at 40.[32] In addition, the plan and settlement drafted by the committee and proposed by the debtor placed creditors in different classes for no discernible reason, other than the fact that creditors represented by the law firms on the committee were treated as secured creditors entitled to payment in full while other

creditors (with the same illness and manifestations) were treated as unsecured creditors entitled to little or nothing. *Id.* at 43.

While the evidence in this case shows that the Settlement Noteholders participated in the settlement negotiations and plan drafting and review, the Court finds that it falls short of the almost total control exercised by the committee in *ACandS*. The Settlement Noteholders were only one of several groups of creditors involved in this case, including the WMI Noteholders and the WMB Noteholders. Nor does the Modified Plan have the fatal flaw of improper classification and treatment of claims that the *ACandS* plan had. In this case, the creditor classes are treated in accordance with the priorities of the Bankruptcy Code and their contractual subordination rights. If the Settlement Noteholders had improperly dominated the case as in *ACandS*, the Modified Plan would have elevated the treatment of the PIERS class (in which they hold the bulk of their claims); instead the PIERS are receiving the treatment warranted by their subordinated status.

While the Court is not suggesting that the Settlement Noteholders be commended for their actions, the record shows their actions do not support a conclusion that the Modified Plan cannot be confirmed because it has been proposed in bad faith. The harm caused by the Settlement Noteholders has or can be remedied by other means.[33] *See infra* Part H.

---

**32.** The Court in *ACandS* was particularly concerned to learn that while counsel for the debtor was purportedly reviewing and settling claims, in fact that task was subcontracted to a company whose sole principal was a paralegal from the law firm that served as chair of the pre-petition creditors' committee. 311 B.R. at 40. The settlement of claims by that firm appeared to favor creditors represented by the members of the committee. *Id.*

**33.** The Court in its January 7 Opinion held that the Settlement Noteholders were not entitled to releases. 442 B.R. at 349. In addition, the Court held that the Settlement Noteholders' almost exclusive right to participate in the rights offering discriminated against other creditors in the same class. *Id.* at 361. The rights offering has subsequently been removed. (Tr. 2/18/2011 at 80–81.)

E.  *Best Interests of Creditors*

[28]  The Plan Objectors continue to press their arguments that the Modified Plan violates the best interests of creditors test articulated in section 1129(a)(7). That section requires that a plan of reorganization provide non-consenting impaired creditors (and shareholders) with at least as much as they would receive if the debtor was liquidating in chapter 7. 11 U.S.C. § 1129(a)(7). *See, e.g., In re U.S. Wireless Data, Inc.,* 547 F.3d 484, 495 (2d Cir.2008). The Plan Objectors raise many reasons why the Modified Plan does not comply with that section.

1.  *Contract v. federal judgment rate*

a.  *Plan Objectors*

[29–31]  The Plan Objectors contend that the Modified Plan fails to comply with the best interests of creditors test because it provides for the payment of post-petition interest on creditors' claims at their contract rate of interest rather than at the federal judgment rate. This results, they argue, in the creditors receiving more (and the shareholders accordingly receiving less) than they would under a chapter 7 liquidation.[34]

[32, 33]  The general rule is that unsecured creditors are not entitled to recover post-petition interest. *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 372–73, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (holding that only oversecured creditors are entitled to receive post-petition interest under section 506(b)). There is an exception to the general rule, however, when the debtor is solvent. *See*

*Onink v. Cardelucci (In re Cardelucci),* 285 F.3d 1231, 1234 (9th Cir.2002) (finding that when a debtor is solvent, unsecured creditors are entitled to post-petition interest at the "legal rate"). This is so because under a chapter 7 liquidation, where the debtor is solvent, unsecured creditors are entitled to post-petition interest on their claims before shareholders receive any distribution. 11 U.S.C. § 726(a)(5) & (6) (stating that in a chapter 7 case unsecured creditors are entitled to interest at the legal rate from the date of the filing of the petition before any payment can be made to the debtor or equity). *See, e.g., Kitrosser v. The CIT Grp./Factoring, Inc.,* 177 B.R. 458, 469 (S.D.N.Y.1995) ("Although the requirements of Chapter 7 are in general not applicable to Chapter 11 proceedings . . . Section 726 does apply through the requirements of Section 1129."); *In re Premier Entm't Biloxi LLC,* 445 B.R. 582, 644 (Bankr.S.D.Miss.2010) ("Section 726 applies indirectly to chapter 11 cases by virtue of the 'best interests of creditors' test in § 1129, under which distributions proposed under a plan of reorganization under chapter 11 must at least equal the amount that would have been paid in a liquidation under chapter 7.").

The Plan Objectors contend that the majority of courts to address this issue conclude that "the legal rate" due under section 726(a)(5) is the federal judgment rate. *See, e.g., Cardelucci,* 285 F.3d at 1234 (concluding that federal judgment rate, rather than state judgment rate or contract rate, was due on unsecured claims under section 726(a)(5) for purposes of best interests of creditors test); *In re Garriock,* 373 B.R. 814, 816 (E.D.Va.2007)

---

**34.**  This could also conflict with the requirements of the fair and equitable test under section 1129(b). Although that section embodies the absolute priority rule, which forbids junior classes of creditors or equity from receiving any distribution until senior creditors are paid in full, it also mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution. *See, e.g., Exide Techs.,* 303 B.R. at 61 (Bankr.D.Del.2003).

("Having reviewed each line of cases, the Court is persuaded that 'the legal rate' refers to the federal judgment rate, and does not encompass . . . any lawful pre-petition contract rate."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 257 (Bankr. S.D.N.Y.2007) (concluding that "[i]t is by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is the contract rate."); *In re Best*, 365 B.R. 725, 727 (Bankr.W.D.Ky.2007) ("The more recent cases hold that the federal judgment rate is the proper rate of interest under 11 U.S.C. § 726(a)(5)"); *In re Dow Corning Corp.*, 237 B.R. 380, 412 (Bankr.E.D.Mich. 1999) (determining that the phrase "interest at the legal rate" means the federal judgment rate); *In re Chiapetta*, 159 B.R. 152, 161 (Bankr.E.D.Pa.1993) ("[W]e further conclude that, since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate . . . ."); *In re Melenyzer*, 143 B.R. 829, 832–33 (Bankr. W.D.Tex.1992) (concluding that the appropriate rate of interest payable to unsecured creditors pursuant to section 726(a)(5) is the federal judgment rate).

[34]  The Plan Supporters argue, however, that the Court has already decided this issue in the January 7 Opinion and concluded that the contract rate was the presumed rate under section 726(a)(5) unless the equities of the case mandate otherwise. They contend that ruling is the law of the case and cannot be reargued.

The Court disagrees with the Plan Supporters on this point. In the January 7 Opinion, the Court did not conclude that the contract rate was the presumed rate, it merely cited a line of cases that so hold.

442 B.R. at 358. At the same time, however, the Court noted that there is a line of cases that hold that the federal judgment rate is the appropriate rate under section 726(a)(5). *Id.* at 357–58. The Court also noted that it had previously "concluded that *the federal judgment rate was the minimum that must be paid* to unsecured creditors in a solvent debtor case under a plan to meet the best interest of creditors' test, but that the Court had discretion to alter it." *Id.* at 358 (emphasis added) (citing *Coram*, 315 B.R. at 346). The Court, however, did not decide the question in this case, because the Court believed it needed to consider the equities of the case.

Now that all issues have been presented to the Court, the Court concludes that the better view is that the federal judgment rate is the appropriate rate to be applied under section 726(a)(5), rather than the contract rate.[35] The Court's conclusion is supported by many factors.

First, section 726(a)(5) states that interest on unsecured claims shall be paid at "the legal rate" as opposed to "a" legal rate or the contract rate. As the LTW Holders note, where Congress intended that the contract rate of interest apply, it so stated. *See* 11 U.S.C. § 506(b) (stating that if a secured creditor is over-secured, the creditor shall be entitled to "interest on such claim . . . provided for *under the agreement* or State statute under which such claim arose.") (emphasis added). *See also Adelphia Commc'ns*, 368 B.R. at 257; *Dow*, 237 B.R. at 405–06 (holding that use of term "legal" as opposed to "contract" rate mandated conclusion that Congress meant "a rate fixed by statute").

Second, the payment of post-judgment interest is procedural by nature and dictat-

---

**35.** To the extent I suggested in *Coram* that the federal judgment rate was not required by section 726(a)(5), I was wrong. 315 B.R. at

346 (applying federal judgment rate nonetheless because of the equities of the case).

ed by federal law rather than state law, further supporting use of the federal judgment rate. *Cardelucci*, 285 F.3d at 1235 (citing *Hanna v. Plumer*, 380 U.S. 460, 473–74, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965)).

Third, the use of the federal judgment rate promotes two important bankruptcy goals: "fairness among creditors and administrative efficiency." *Cardelucci*, 285 F.3d at 1236. *See also Best*, 365 B.R. at 727 (federal judgment rate provides "an efficient and inexpensive means of calculating the amount of interest to be paid to each creditor"); *Dow*, 237 B.R. at 407 (providing a uniform rate "keeps the bankruptcy estate from being saddled with potentially difficult and time-consuming administrative burdens" of determining what rate is applicable to each creditor's claim); *Melenyzer*, 143 B.R. at 833 (federal judgment rate provides court with an "easily ascertainable, nationally uniform rate" and increases predictability in the process).

The Court finds that the line of cases holding there is a presumption the contract rate applies are distinguishable and/or unpersuasive. *See, e.g., Dow*, 456 F.3d at 676–79 (remanding to bankruptcy court to determine if equities of case permitted allowance of default interest to creditors rather than the contract rate); *In re Southland Corp.*, 160 F.3d 1054, 1059–60 (5th Cir.1998) (determining rate of interest for an over-secured creditor); *In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 529–30 (7th Cir.1986) (in case under railroad reorganization chapter of Bankruptcy Act, court held that creditors were entitled only to contract default rate, not higher market rate, without discussing federal judgment rate).

The Indenture Trustee for the PIERS urges the Court not to be swayed by arguments that equity will receive a recovery if the federal judgment rate is used rather than the contract rate, because that is not a factor which courts should consider. *See, e.g., Urban Communicators PCS LP v. Gabriel Capital, L.P.*, 394 B.R. 325, 340 (S.D.N.Y.2008) (holding that "it is not inequitable to cut down the interest of Debtors' shareholders by interest payments at a default rate to which the Debtors contractually agreed"); *In re Int'l Hydro–Elec. Sys.*, 101 F.Supp. 222, 224 (D.Mass.1951) (holding that "[t]he burden of . . . payment [of post-petition interest on interest] will fall entirely on the interest of the stockholders . . . [who] cannot complain that they are treated inequitably when their interest is cut down by the payment of a sum to which the debenture holders are clearly entitled by the express provisions of the trust indenture.").

[35] The cases cited by the Indenture Trustee are not on point. The *Urban Communicators* Court was considering what was due to an over-secured creditor under section 506(b) rather than what post-petition interest is due to unsecured creditors under section 726(a)(5). 394 B.R. at 333–34. The *Int'l Hydro–Elec.* Court was dealing with the rearrangement of a public utility company under title 15, not a reorganization under title 11. 101 F.Supp. at 223. Nonetheless, the Court agrees that the effect on equity is not an appropriate factor to be considered, and the Court will not consider that. In applying the plain language of the statute, however, the Court concludes that the federal judgment rate is the proper measure for post-petition interest due to the unsecured creditors.

Even if a consideration of the equities was appropriate, after considering the evidence in this case, the Court does not find that the equities support the use of anything other than the federal judgment rate. *Cf. Cardelucci*, 285 F.3d at 1236 (rejecting argument that in cases where all creditors could get paid contract rate of

interest, debtor would be getting a windfall if creditors' interest claims are limited to the federal judgment rate because " 'interest at the legal rate' is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court.").

The Plan Supporters argue, however, that payment of the various contract rates of interest as provided in the Modified Plan is warranted because the distribution scheme is simply a function of the subordination provisions in the various creditors' contracts (the Senior Subordinated Indenture, the CCB–1 Guarantee Agreements, the CCB–2 Guarantee Agreements, the Junior Subordinated Notes Indenture, and the PIERS Guarantee Agreement) which they say mandate that the subordinated creditors pay the senior creditors their claims in full, including contract interest. (*See* WMI NG 1–7.)

The TPS Consortium disputes this contention. It argues that the Debtors are only obligated to pay to each creditor class their allowed claims and interest at the rate required by the Code. To the extent that the creditors have agreements among themselves—for one class to pay over its distribution to another class—it does not impact the obligations of the Debtors. *See, e.g., Bank of Am. N.A. v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St. P'ship),* 246 B.R. 325, 330 (Bankr.N.D.Ill. 2000) (holding that senior creditor could assert its unsecured deficiency claim against subordinated creditor even though it was a non-recourse obligation and could not be collected from the debtor); *First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.),* 134 B.R. 528, 532 (Bankr.S.D.N.Y.1991) (concluding that because creditors were undersecured, senior creditors were entitled to interest only from the distributions due to

subordinated creditors); *In re Smith,* 77 B.R. 624, 627 (Bankr.N.D.Ohio 1987) (holding that subordination agreements between creditors "may not impair the rights of the other creditors" and that "the amount of claims against the Debtor, and the distribution to uninvolved creditors, remain unaffected"). *See also* Patrick Darby, *Southeast and New England Mean New York: The Rule of Explicitness and Post–Bankruptcy Interest on Senior Unsecured Indebtedness,* 38 Cum. L. Rev. 467, 477 (where interest claim is not allowed under Bankruptcy Code, the senior creditor must seek to collect that interest from subordinated creditors).

The Court agrees with the TPS Consortium's argument. The fact that some of the creditors have contractually agreed to pay their distribution to other creditors does not mean that the Debtors are required to make payments to the senior creditors that are more than the Bankruptcy Code allows, while preserving the subordinated creditors' claims against the estate. While the Debtors can, through a plan of reorganization, effectuate the subordination agreements by diverting payments from subordinated creditors to senior creditors, that cannot affect the total claims against the estate, which do not include post-petition interest on any unsecured claim at more than the federal judgment rate. *See, e.g., First Fidelity,* 134 B.R. at 532; *Smith,* 77 B.R. at 627.

   b. *WMI Senior Noteholders' Group*

The WMI Senior Noteholders' Group argues that the best interest of creditors test mandates that the Court award them the *higher* of the federal judgment rate and the contract rate on their floating interest rate bonds. During certain periods throughout the case, the contract rate on the floating interest bonds was actually less than the federal judgment rate. Consequently, the WMI Senior Noteholders'

Group argues that if they are awarded only their contract rate of interest, it would lead to the absurd result of junior creditors getting paid post-petition interest at a higher rate than senior creditors.

This argument is moot because the Court is not awarding anyone post-petition interest at the contract rate. The WMI Senior Noteholders are entitled under section 726(a)(5) only to the federal judgment rate of interest from the Debtors, the same as all other unsecured creditors. To the extent that this results in them getting more or less than their contract rate of interest, it may be a matter between them and the other creditors who are parties to a subordination agreement, but it is irrelevant to the Debtors' obligations under the Bankruptcy Code.

### c.  *General unsecured creditors*

The Creditors' Committee argues that application of the federal judgment rate is inequitable in this case because the only class that is adversely affected by doing so is the class of general unsecured creditors. It cites the Debtors' updated liquidation analysis which shows that, after application of the subordination provisions, the general unsecured creditors are the only ones who will receive less by application of the federal judgment rate than by application of the contract rate. (D 375; Tr. 7/14/2011 at 61–62, 82, 170.)

This is, of course, true in total dollars because none of the general unsecured creditors will be getting a contract rate of interest. (D 375.) However, they will be getting a higher percentage of the post-petition interest to which they are entitled under the federal judgment rate (76%) than under the contract rate (29%), because of the limitation on payment of interest to senior creditors. (*Id.*) Further, it is irrelevant that general unsecured creditors would get more in dollars if the Court were to award contract rates of interest,

because they are simply not entitled to receive that rate under sections 726(a)(5) and 1129(a)(7).

The Creditors' Committee also contends that further delay will be caused by the Court denying confirmation of the Modified Plan because of the need to make further revisions and perhaps re-solicit, which will further erode recoveries for the lower creditor classes. (D 254, D 375; Tr. 7/14/2011 at 43–44, 71–72.)

This of course does not justify ignoring the requirements of the Bankruptcy Code. As the LTW Holders note, further delay might have been avoided by the Debtors if the Modified Plan had simply provided that post-petition interest would be paid to unsecured creditors at whatever rate the Court determined was appropriate.

### 2.  *Date of computation of federal judgment rate*

[36]   The Plan Objectors contend that if the federal judgment rate of interest is paid on creditors' claims, it should not be the rate as of the petition date. They propose calculating it as of different dates largely because shortly after this case was filed, the federal judgment rate fell precipitously from 1.95% to as low as .18% as of June 16, 2011. (EC 301.)

The Equity Committee argues that the post-petition interest rate should be either the rate as of the Effective Date of any confirmed plan or a floating monthly rate. The Equity Committee argues that this is appropriate because the purpose of post-petition interest is to compensate the creditors for the time value of their money and should reflect the different rates applicable during the pendency of the case. *See, e.g., Melenyzer,* 143 B.R. at 833.

The Court rejects this argument, however, because similar arguments have been made to justify using market or contract rates but were rejected. *Id.* at 832–33.

The TPS Consortium argues that the confirmation date is the appropriate date to use because the federal judgment rate is derived from section 1961(a) of title 28 which states that interest shall be paid "from the date of the entry of the judgment." The TPS Consortium argues that none of the claims at issue derive from any judgment and that the most analogous order to a judgment is the confirmation order because it establishes the parties' rights. *See, e.g., In re Am. Preferred Prescription, Inc.,* 255 F.3d 87, 92 (2d Cir. 2001) ("The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a final judgment in an ordinary civil litigation."); *Johnson v. Stemple (In re Stemple),* 361 B.R. 778, 796 (Bankr.E.D.Va.2007) (holding that "orders of confirmation, like myriad orders entered by this Court, are considered final judgments, thus triggering the doctrines of res judicata and/or collateral estoppel.").

The Plan Supporters disagree arguing that, in the event the Court finds that the federal judgment rate is the appropriate rate to be paid for post-petition interest, it should be the rate that was applicable as of the petition date, because it is from that date that the creditors are measuring the loss of the use of their money. *See, e.g., In re Evans,* Bankr.No. 10–80446C, 2010 WL 2976165, at *2 (Bankr.M.D.N.C. July 28, 2010) (holding that the "date on which the applicable federal judgment rate is to be determined for purposes of section 726(a)(5) is the federal judgment rate in effect on the petition date"); *In re Gulfport Pilots Ass'n, Inc.,* 434 B.R. 380, 392–93 (Bankr.S.D.Miss.2010) (stating that if the debtor were solvent, creditor would be entitled to post-petition interest at the federal judgment rate in effect on the petition date); *Best,* 365 B.R. at 727 (holding that the legal rate "mean[s] the federal judgment interest rate at the date the petition is filed"); *Chiapetta,* 159 B.R. at 161 (hold-

ing that "since a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time of the bankruptcy filing"); *Melenyzer,* 143 B.R. at 833 (holding that "for purposes of [section] 726(a)(5), the federal judgment rate selected should be that in effect as of the date of filing, as opposed to the date of distribution. . . . Setting the legal rate of interest as of the date of distribution . . . makes little sense.").

The Court agrees with the Plan Supporters on this point. The statute expressly provides that such interest shall be paid "at the legal rate from the date of the filing of the petition" suggesting that it is the interest rate effective on the petition date that should be used. 11 U.S.C. § 726(a)(5). The case law is uniform in holding that it is the petition date at which the federal judgment rate is determined for purposes of awarding interest under section 726(a)(5). *See, e.g., Evans,* 2010 WL 2976165, at *2; *Gulfport Pilots Ass'n,* 434 B.R. at 393; *Best,* 365 B.R. at 727; *Chiapetta,* 159 B.R. at 161; *Melenyzer,* 143 B.R. at 833.

### 3. *Compounding of interest*

[37] The Modified Plan provides that "interest shall continue to accrue only on the then outstanding and unpaid obligation or liability, including any Post-petition Interest Claim thereon, that is the subject of an Allowed Claim." (D 255 at § 1.151.) The Equity Committee contends that this compounding of interest is not permissible. *See, e.g., Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 165–66, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (holding that interest on interest is not allowable on equitable principles); *Chi., Milwaukee, St. Paul & Pac. R.R.,* 791 F.2d at 532 (denying compounding of interest because it would result in a windfall for the deben-

ture holders); *In re Anderson,* 69 B.R. 105, 109 (9th Cir. BAP 1986) (affirming bankruptcy court's denial of interest on interest); *In re The N.Y., New Haven and Hartford R.R. Co.,* 4 B.R. 758, 799 (D.Conn.1980) (denying interest on interest under the principles articulated in *Vanston* ).

The Debtors respond that compound interest is being paid because that is exactly what the Debtors are obligated to pay under the indentures. (*See, e.g.,* WMI NG 1 at § 5.3.)

The Court rejects the Debtors' argument. Once again, in awarding post-petition interest to creditors in this case, the Court is doing so not because of any contractual right they may have to it. Their contractual right to compound interest has been eliminated (as not "allowed") by section 502(b)(2). Their entitlement to post-petition interest is being granted only as required by the terms of section 726(a)(5), which the Court determines is the federal judgment rate. The latter permits only annual compounding of interest. 28 U.S.C. § 1961(b) (providing that "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually."). *See also Curry v. Am. Int'l Grp., Inc., Plan No. 502,* 579 F.Supp.2d 424, 426 (noting that the federal judgment rate is "compounded annually").

[38]  Because the Court concludes that creditors are only entitled to the payment of interest from the Debtors at the federal judgment interest rate in effect on the petition date, compounded annually, the Court finds that the Modified Plan which provides for payment of the contract rate violates the best interests of creditors test. 11 U.S.C. §§ 726(a)(5) & 1129(a)(7).

4.  *Payment of subordinated claims*

[39]  The WMB Noteholders object to the Modified Plan because it provides that senior unsecured creditors will receive post-petition interest on their claims before the WMB Noteholders' subordinated claims are paid. They contend that this violates the best interests of creditors test because they will not receive at least as much as they would receive under chapter 7 according to the provisions of section 726.

The WMB Noteholders have stipulated that their claims are subordinated to general unsecured claims because they hold claims arising from rescission of a purchase or sale of a security of WMB, an affiliate of the Debtors. 11 U.S.C. § 510(b). Although the distribution scheme in section 726 expressly provides that it is subject to section 510, the WMB Noteholders contend that section 510(b) only subordinates them to "all claims or interests that are senior to or equal the claim or interest represented by such security." *Id.* They argue that because their securities were bonds issued by WMB, i.e. debt, that their claims are only subordinated to the general unsecured claims of the Debtors and not to equity. Although case law is sparse on this issue, they contend that it supports their theory. *See, e.g., In re El Paso Refinery, L.P.,* 244 B.R. 613, 624–25 (Bankr.W.D.Tex.2000) (holding that a subordinated claim is subordinated only to other general unsecured claims of the same type but not to interest unless the subordinated claim is itself a claim for interest).

The Indenture Trustee for the PIERS responds that the Modified Plan properly provides for post-petition interest on unsecured claims before any distribution is due to subordinated creditors such as the WMB Noteholders. The Indenture Trustee for the PIERS notes that section 726 is expressly subject to section 510. 11 U.S.C. § 726(a). *See also, In re Virtual*

*Network, Servs. Corp.,* 902 F.2d 1246, 1249 (7th Cir.1990); *Wash. Mut.,* 442 B.R. at 357; *In re Rago,* 149 B.R. 882, 889 (Bankr. N.D.Ill.1992).

At oral argument, the Indenture Trustee for the PIERS argued that section 510(b) subordinates the WMB Noteholders' claims to all "claims." 11 U.S.C. § 510(b). (Tr. 8/24/2011 at 185–87.) The definition of "claim" includes all "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, *unmatured,* disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* at § 101(5) (emphasis added). The Indenture Trustee for the PIERS contends that this definition includes unmatured (i.e., post-petition) interest. Although section 502(b)(2) provides that "allowed" claims do not include unmatured interest, the subordination in section 510(b) is to "claims" not "allowed claims." *Id.* at § 510(b). In contrast, section 510(c) provides for equitable subordination to "allowed claims" only. *Id.* at § 510(c)(1).

The Court agrees with the argument of the Indenture Trustee for the PIERS. According to the plain language of sections 510 and 726, the WMB Noteholders are subordinated to all "claims," the definition of which includes unmatured interest on those claims. Therefore, the Court concludes that unsecured creditors are entitled to post-petition interest on their claims before any distribution to the WMB Noteholders.

5. *Effect on subordination rights*

[40] The PIERS Holders [36] argue that if the Court determines that the Debtors are only obligated to pay creditors at the federal judgment rate of interest, then that is all the senior creditors are entitled to receive and the subordinated creditors

are not obligated to pay them the difference between what the Debtors pay and their contract rate of interest.

The WMI Senior Noteholders' Group and WMI Senior Noteholders' Indenture Trustee disagree. They contend that the subordination provisions in the various creditors' contracts (the Senior Subordinated Indenture, the CCB–1 Guarantee Agreements, the CCB–2 Guarantee Agreements, the Junior Subordinated Notes Indenture, and the PIERS Guarantee Agreement) mandate that the subordinated creditors pay the senior creditors their claims in full, including contract interest. (WMI NG 1 at § 15.3; WMI NG 2 at § 15.3; WMI NG 3 at § 3(a) & (b); WMI NG 4 at § 15.01; WMI NG 5 at § 3(a) & (b); WMI NG 6 at § 12.2; WMI NG 7 at § 6.1.)

[41] The PIERS Holders contend that the subordination provisions do not require that they pay the senior creditors their full contract rate of interest because it does not explicitly refer to the rate of post-petition interest to which they are subordinate. Therefore, the PIERS Holders contend that the interest they are subordinated to is only the rate the Court determines is appropriate. They rely on the Rule of Explicitness, which provides that in order to subordinate junior creditors the indenture must explicitly provide for that outcome. *See, e.g., In re King Res. Co.,* 528 F.2d 789, 791 (10th Cir.1976) (adopting holdings in *Kingsboro* and *Time Sales* that "where the subordinating provisions are unclear or ambiguous as to whether post-petition interest is to be allowed a senior creditor, the general rule that interest stops on the date of filing of the petition in bankruptcy is to be followed"); *In re Kingsboro Mort. Corp.,* 514 F.2d 400, 401

---

**36.** The PIERS Holders include Normandy Hill Capital L.P. (an individual PIERS holder) and Wells Fargo Bank, NA, the Indenture Trustee for the PIERS.

(2d Cir.1975) (holding that language of subordination agreement requiring payment in full of "all principal and interest on all Senior Debt" was insufficiently express to apply to post-petition interest); *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir.1974) (affirming denial of enforcement of subordination agreement for payment of post-petition interest because the agreement "did not appropriately apprise the debenture note holders that their claims against the bankrupt would be subordinated to [the senior creditor's] demand for post-petition interest").

The WMI Senior Noteholders' Group responds that the Rule of Explicitness no longer applies since passage of the Bankruptcy Code and the enactment of section 510. *See, e.g., In re Bank of New England Corp.*, 364 F.3d 355, 362, 365 (1st Cir.2004) (concluding that "the enactment of section 510(a) [of the Bankruptcy Code] means that the enforcement of subordination provisions is no longer a matter committed to the bankruptcy courts' notions of what may (or may not) be equitable" and therefore the Rule of Explicitness is no longer applicable); *Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1124 (11th Cir.1998) (stating that "we conclude that Congress, by enacting section 510(a) of the Bankruptcy Code, abrogated the pre-Code Rule of Explicitness. As a necessary consequence of this change in bankruptcy law, the Rule of Explicitness can no longer survive as the progeny of the bankruptcy courts' equity powers or as a federal canon of contract construction.").

The Court disagrees with the argument of the WMI Senior Noteholders' Group that the Rule of Explicitness is no longer applicable. While section 510(a) provides

that subordination agreements are enforceable, it states that they are only enforceable "to the same extent that such agreement is enforceable under applicable law." 11 U.S.C. § 510(a). In the *Southeast Banking Corp.* case, the Eleventh Circuit certified to the New York Court of Appeals the question of the applicability of the Rule of Explicitness under New York law.[37] 156 F.3d at 1126. The New York Court of Appeals answered the question in the affirmative, stating that "[i]n accordance with the Rule of Explicitness, New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest demand." *Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.)*, 93 N.Y.2d 178, 186, 688 N.Y.S.2d 484, 710 N.E.2d 1083 (N.Y.1999). As a result, the Eleventh Circuit held that the language of the subordination provision was insufficiently precise on the issue of post-petition interest to satisfy the Rule of Explicitness under New York law. *Chem. Bank v. First Trust of N.Y. (In re Southeast Banking Corp.)*, 179 F.3d 1307, 1310 (11th Cir. 1999). *See also, First Fidelity Bank, N.A. v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528, 534–35 (Bankr. S.D.N.Y.1991) (concluding that the Rule of Explicitness articulated in "*Kingsboro* retains its vitality and remains the controlling law in the Second Circuit" under the Bankruptcy Code and refusing to enforce subordination agreement that would pay post-petition interest to senior creditors because of lack of specificity in the indenture).

The WMI Senior Noteholders' Indenture Trustee further argues, however, that

**37.** The Indentures are governed by New York law. (WMI NG 1 at § 1.12; WMI NG 2 at § 1.12; WMI NG 3 at § 6(a); WMI NG 4 at § 14.05; WMI NG 5 at § 6(a); WMI NG 6 at § 1.11; WMI NG 7 at § 9.4.)

Normandy Hill is relying on a prior version of the Indenture Agreement and does not refer to critical language from the subordination provision. The Indenture Trustee contends that the correct version of the subordination provision requires subordination to Senior Indebtedness, which is defined as "principal of, premium, if any, interest (including all interest accruing subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding)." (WMI NG 7 at 6.) [38]

The Court concludes that the WMI Senior Noteholders' Group and the Senior Noteholders' Indenture Trustee are correct. The subordination provisions adequately apprised the subordinated creditors that their payments were subordinate to *all* contractual post-petition interest, even if the Court allowed *none*. They certainly, therefore, were on notice that they were subordinate to contractual post-petition interest if the Court allowed *some*. Therefore, the Court concludes that to the extent the Rule of Explicitness is still applicable, the indentures at issue in this case meet its requirements.[39] Therefore, the Plan provisions that give effect to the subordination provisions in the indentures and require subordinated creditors to pay senior creditors post-petition interest at the contract rate even though the Debtors are only required to pay interest at the federal judgment rate are not violative of the Bankruptcy Code.[40]

6. *Releases for distributions*

[42] The Equity Committee also objects to confirmation of the Modified Plan because it conditions distributions to creditors and other stakeholders on granting a direct release to JPMC and other non-debtors. (D 255 at §§ 43.2 & 43.6.) The Equity Committee contends that this violates the best interests of creditors test under section 1129(a)(7). *See, e.g., AOV Indus.*, 792 F.2d at 1151 (holding that plan which required a creditor who had a unique direct claim against plan funder to provide a release of plan funder to get a distribution unfairly discriminated against it because majority of creditors had no such claim); *In re Conseco*, 301 B.R. 525, 528 (Bankr.N.D.Ill.2003) (holding that plan provision predicating receipt of distribution on granting third party releases violated best interest of creditors test because creditors could not be held to have voluntarily agreed to a release simply by accepting a distribution).

The Equity Committee argues that under chapter 7, even though preferred shareholders are not projected by the Debtors to receive any distribution, they would still retain their claims against third parties including JPMC. Therefore, be-

**38.** The Indenture Trustee notes that it would have been impossible to give notice to the subordinated creditors of exactly what interest rate they were subordinated to, because the PIERS were issued in 2001 and the Senior Notes were issued between November 2003 and August 2006 with varying rates of interest. (WMI NG 1–7.)

**39.** According to Normandy Hill, however, to hold as the WMI Senior Noteholders' Group argues would penalize the subordinated creditors for the bad acts of the senior creditors. It assumes that the Court can apply the federal judgment interest rate only if it finds that the Settlement Noteholders engaged in improper conduct. Because the Court finds that the federal judgment interest rate is the rate due under section 726(a)(5) without considering the equities of the case, Normandy Hill's argument on this point is moot. (*See supra* Part E1.)

**40.** While the PIERS may receive payment in full of their claims from the Debtors, they may be required to give a part of their distribution to senior creditors. This, however, is simply a result of the terms they accepted when investing in a subordinated note.

cause the preferred shareholders are not getting any consideration under the Plan for their agreement to release JPMC and the others, they should be able to receive a distribution without granting a release to JPMC and the FDIC.

The Plan Supporters disagree. They contend that the releases are a condition to the GSA imposed by JPMC and the FDIC. They argue that the $7 billion in assets which are being used to provide a recovery for creditors is only available because JPMC and the FDIC have agreed to waive their claims of ownership of certain assets and to waive in excess of $54 billion in claims they hold against the estates. They argue that without the GSA, creditors (and shareholders) would get no recovery.

The Court finds that the condition requiring a release in order to receive a distribution does not violate the best interest of creditors test. Any potential recovery which shareholders may receive, even from the Liquidating Trust, is largely due to the GSA which is funding the payments to creditors who are senior in priority to the shareholders and who, in the absence of the GSA, would have first priority to the proceeds of the assets in the Liquidating Trust. In addition, granting a release is purely voluntary. A preferred shareholder who does not wish to give a release does not have to, but will be forgoing any distribution. The cases cited by the Equity Committee do not compel a different result because the release provision in this case is voluntary and is applicable equally to all creditors and shareholders, rather than applicable only to a creditor or shareholder that has a unique direct claim against the released parties. *See, e.g., AOV Indus.,* 792 F.2d at 1151 (finding unequal treatment because one creditor asserted it was being required to release a direct, rather than an indirect, claim against plan funder); *Conseco,* 301 B.R. at 528 (finding

releases which were consensual did not violate the Bankruptcy Code).

### 7. *Use of Liquidating Trust structure*

The LTW Holders argue that the Modified Plan also violates the best interests of creditors test because it provides for the assignment of the estates' causes of action to a Liquidating Trust and the issuance to creditors of interests in the Trust. They contend that by using this mechanism, creditors will be required to pay capital gains tax now on the value of the interests in the Trust that are distributed to them, without any concomitant payment to them of any value for many years until the claims of the estate are litigated to judgment or settled. The LTW Holders argue that in a chapter 7 case they would not have any tax obligations until they actually received a distribution from the estate.

Because the Court is denying confirmation for other reasons, and directing the parties to mediation, the Court suggests that the parties consider a means to avoid negative tax consequences to creditors. *See infra* Part H.

### 8. *Distribution to WMB Senior Noteholders*

[43] The Equity Committee objects to the distribution of $335 million of estate assets to WMB Senior Noteholders (Class 17A) because it asserts that they are not creditors of this estate. It contends that such a distribution provides no benefit to the estate and merely diverts assets that could be used to provide a distribution to legitimate creditors (or shareholders) of the Debtors.

The WMB Noteholders have asserted that they have claims against the Debtors for misrepresentations made by the Debtors in connection with the sale of the WMB Senior Notes. While they admit that such a claim would be subordinated under section 510(b), they contend that it

is nonetheless a legitimate claim against the Debtors. Rather than litigate this issue, the Debtors have agreed (apparently with the urging of the FDIC) to the payment of $335 million from the tax refunds for this class of creditors.

The Court finds that this resolution is a reasonable settlement of the dispute because it will avoid contentious and expensive securities litigation which could result in a significantly larger judgment against the Debtors. *See, e.g., TMT Trailer Ferry,* 390 U.S. at 424, 88 S.Ct. 1157; *In re RFE Indus., Inc.,* 283 F.3d at 165; *Martin,* 91 F.3d at 393.

### F.  *Feasibility*

[44] The Equity Committee argues that if more than 300 creditors elect to receive stock in the Reorganized Debtor,[41] then the Modified Plan will not be feasible. It contends that if the Reorganized Debtor has more than 300 shareholders, it will be required to comply with the reporting requirements of the Securities Exchange Act of 1934. Because the Debtors have not been complying with those requirements during the pendency of the bankruptcy case, the Equity Committee asserts that the Reorganized Debtor would be unable to file the delinquent reports and audited financial reports.

The Debtors do not dispute that it would be cost prohibitive to file the missing financial statements. The Debtors argue, however, that an entity that complies with SEC Staff Legal Bulletin No. 2 (Apr. 15, 1997, § II.c.) is not required to file any 10–Ks or 10–Qs while in chapter 11 nor to file any "missed" 10–Ks or 10–Qs upon emergence. They contend that they have com-

plied with the requirements in the Bulletin. The Debtors note that the SEC has not initiated any enforcement inquiry or suggested that the Debtors' financial reporting was deficient.

[45] The Court finds that the Debtors have presented sufficient evidence that the Modified Plan could be feasible even if the Reorganized Debtor has more than 300 shareholders. Feasibility does not require that success be guaranteed but rather only a "reasonable assurance of compliance with plan terms." *In re Orlando Investors LP,* 103 B.R. 593, 600 (Bankr.E.D.Pa. 1989). *See also In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1166 (5th Cir.1993) ("[I]t is clear that there is a relatively low threshold of proof necessary to satisfy the feasibility requirement."). Based on the foregoing, the Court finds that the Modified Plan meets the feasibility test under section 1129(a)(11).

### G.  *Miscellaneous Other Objections*

### 1.  *WMI Senior Noteholders' Group*

The Modified Plan provides that WMI Senior Noteholders will receive their pro rata share of Creditor Cash and Liquidating Trust Interests totaling their aggregate claims plus post-petition interest. (D 255 at § 6.1.) In addition, to the extent that WMI Senior Noteholders do not get paid in full in cash on the Effective Date, WMI Senior Noteholders were entitled to elect to receive stock in the Reorganized Debtor in lieu of a distribution of cash or Liquidating Trust Interests. (*Id.* at § 6.2.) Approximately $24 million in WMI Senior Noteholders did elect to receive stock in lieu of cash or Liquidating Trust Interests. (D.I. 8108 at 32.)

---

**41.** The Debtors' claims agent could not testify as to the exact number of creditors who will hold stock in the Reorganized Debtor, either by election or default. (Tr. 7/13/2011 at 90–91.) In addition, the Modified Plan provides

the holders of Disputed Claims, including the LTW Holders, the right to elect stock if their claims are allowed, which may not be known for some time. (D 255 at § 27.3.)

The WMI Senior Noteholders' Group and the WMI Senior Noteholders' Indenture Trustee object to the Modified Plan contending it violates the absolute priority rule by providing for a distribution (of cash, stock and interests in the Liquidating Trust) to junior creditors before the Senior Notes are paid in full *in cash*, as mandated by the subordination provisions of the Indentures. (WMI NG 1 at § 15.2; WMI NG 2 at § 15.2; WMI NG 4 at § 15.03; WMI NG 6 at § 12.2(b); WMI NG 7 at § 6.1(c).) *See also In re West-Point Stevens, Inc.*, 600 F.3d 231, 255–56 (2d Cir.2010) (holding that under terms of subordination agreement, senior creditors were entitled to be paid in full in cash before subordinated creditors could receive distribution under plan).

The Court rejects the argument of the WMI Senior Noteholders' Group and the WMI Senior Noteholders' Indenture Trustee. First, the language of the Indentures do not support their argument. For example, section 15.2 of the First Supplemental Indenture for the Senior Debt Securities provides in relevant part that "[i]n the event of ... bankruptcy ... such Senior Debt shall be first paid and satisfied in full before any payment or distribution of any kind or character, whether in cash, property or securities ... shall be made upon the [Junior] Securities...." (WMI NG 1 at § 15.2. *See also*, WMI NG 2 at § 15.2; WMI NG 4 at § 15.03; WMI NG 6 at § 12.2(b).) Those sections merely require that the WMI Senior Noteholders' claims be "paid and satisfied in full" not that they be paid in cash. (*Id.*) The WMI Senior Noteholders are, in fact, being "paid and satisfied in full" under the Modified Plan by the payment to them of a combination of cash and Liquidating Trust Interests and/or, if they so elected, stock in the Reorganized Debtor. They are entitled to no more under the provisions of the Indentures.

Section 6.1(e)(1) of the First Supplemental Indenture relating to the PIERS contains different language but the result is the same. (WMI NG 7 at § 6.1(e)(1).) It provides that "[i]n the event of and during the continuance of any event specified in Section 6.1(a) [which includes a bankruptcy case] unless all Senior Indebtedness is paid in full in cash, or provision shall be made therefor" payments made by the Debtors to the PIERS shall be segregated for the benefit of the Senior Noteholders. (*Id.*) Under the Modified Plan, provision has been made for the payment of the Senior Noteholders from the cash that the Debtors have on hand or from cash distributions from the Liquidating Trust. To the extent that the Senior Noteholders have elected to receive stock in lieu of cash, they have consented to the "provision" for the payment of their claims in that manner.

[46] Second, the Senior Noteholders have accepted their treatment under the Modified Plan overwhelmingly, by more than 99% in amount and in number. (D.I. 8113 at 9; Tr. 7/13/2011 at 65.) Therefore, even if the Modified Plan did not comply with the requirements of the subordination agreements, the Court finds that the Senior Noteholders have waived that failure. *See, e.g., Bartle v. Markson Bros., Inc.*, 314 F.2d 303, 305 (2d Cir.1963) (refusing to reverse bankruptcy referee's finding that plan was in best interests of creditors although it violated subordination agreement because senior creditors had knowingly voted to accept plan that waived their rights). *See also* 4 Collier on Bankruptcy ¶ 510.03[3] (Alan N. Resnick & Henry Sommer eds., 16th ed. 2011) ("If subordination agreements were not waivable under a plan of reorganization acceptable to the senior creditor, the section would prevent just what Congress envisioned: that

senior creditors may compromise with junior creditors in order to confirm a plan.").

[47] Third, the Bankruptcy Code does not require that the WMI Senior Noteholders be paid in cash before junior creditors receive a distribution. *See, e.g., Case,* 308 U.S. at 117, 60 S.Ct. 1 ("In application of this rule of full or absolute priority this Court recognized certain practical considerations and made it clear that such rule did not 'require the impossible, and make it necessary to pay an unsecured creditor in cash as a condition of stockholders retaining an interest in the reorganized company. His interest can be preserved by the issuance, on equitable terms, of income bonds or preferred stock.' ") (quoting *N. Pac. Ry. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931 (1913)). The payment under the Modified Plan of cash, Liquidating Trust Interests, or stock of a value equal to their claims satisfies the absolute priority rule and provides the Senior Noteholders with payment in full of their claims.

### 2. *LTW Holders*

The LTW Holders object to confirmation of the Modified Plan because they contend that the PIERS are improperly treated as creditors rather than as equity. They argue that part of the PIERS claims are based on the accretion of an original issue discount that the claims had because of the value of warrants that were issued in connection with the PIERS.

The Court rejects this argument. The same argument was raised by the LTW Holders in connection with the Sixth Amended Plan. In the January 7 Opinion, the Court found that the PIERS hold preferred stock issued by WMCT 2001 and that WMCT 2001 holds debt of the Debtors. 442 B.R. at 361. Therefore, the Court concluded that unless WMCT 2001 had been merged into the Debtors (as had

several other affiliates), the PIERS claims were debt. *Id.* at 362.

At the confirmation hearings held in connection with the Modified Plan, the Debtors presented evidence that WMCT 2001 did not merge with the Debtors and remains a separate entity. (Tr. 7/14/2011 at 20–33; D 401.) Consequently, it is clear that the PIERS are debt, not equity.

### H. *Equity Committee Standing Motion*

The Equity Committee has recently filed a motion for authority to prosecute an action to equitably subordinate or disallow the Settlement Noteholders' claims. (D.I. 8179.) The parties agreed to present evidence, brief and argue those issues in conjunction with confirmation of the Modified Plan.

[48, 49] In order for the Court to grant the Equity Committee's motion, the Court must find that it has stated a "colorable" claim which the Debtors have unjustifiably refused to prosecute. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery,* 330 F.3d 548, 566–67 (3d Cir.2003). The party seeking standing bears the burden of proof. *G–I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G–1 Holdings, Inc.),* 313 B.R. 612, 629 (Bankr.D.N.J.2004).

[50] The Court finds, through the Debtors' support of the Settlement Noteholders' opposition to the Equity Committee's motion, that the Debtors have refused to pursue the equitable subordination or disallowance claim. Whether that was justified depends on whether the claim is colorable and the costs of pursuing that claim. *See, e.g., In re STN Enters.,* 779 F.2d 901, 905 (2d Cir.1985) (noting that in order to determine whether the refusal to prosecute the claim was unjustified the court must balance the

probability of success against the financial burden the suit would have on the estate).

**[51]** The threshold for stating a colorable claim is low and mirrors the standard applicable to a motion to dismiss for failure to state a claim.[42] *See, e.g., In re Centaur, LLC,* No. 10–10799, 2010 WL 4624910, at *4 (Bankr.D.Del. Nov. 5, 2010) ("In deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim."); *In re Adelphia Commc'n Corp.,* 330 B.R. 364, 376 (Bankr.S.D.N.Y.2005) (noting that the burden of showing a colorable claim is a "relatively easy one").

### 1. *Claim for equitable subordination*

In its objection to confirmation, the Equity Committee contends that there is a viable claim for equitable subordination of the Settlement Noteholders' claims. An individual shareholder raised the same objection. The Settlement Noteholders argued preliminarily that the objection is procedurally defective. *See, e.g., Protarga v. Webb (In re Protarga),* Adv. No. 04–53374, 2004 WL 1906145, at *3 (Bankr.D.Del. Aug. 25, 2004) ("Claims for equitable subordination must be brought as a separate adversary proceeding pursuant to Rule 7001(8)...."). The Equity Committee's motion for authority to bring an ad-

versary action solves that procedural requirement.

**[52, 53]** The Settlement Noteholders and the Creditors' Committee contend, however, that the Equity Committee and shareholders do not have standing to bring an equitable subordination claim based on the requirements of the Constitution because they have suffered no damages which could be remedied by equitable subordination. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (discussing the three elements needed for standing: (1) an injury in fact, which is concrete, particularized and actual or imminent; (2) a causal connection between the injury and the conduct; and (3) a likelihood that the injury will be redressed by a favorable decision). They argue that even if the Settlement Noteholders' claims are subject to equitable subordination,[43] they would simply be subordinated to other creditors' claims and still be paid ahead of equity. *See, e.g., Adelphia Recovery Trust v. Bank of Am., N.A.,* 390 B.R. 80, 99 (S.D.N.Y.2008) (granting motion to dismiss equitable subordination claim by creditors of parent against lenders of subsidiary because "[i]t follows reasonably from the judicial and legislative interpretations of the statute that the 'other creditors' whose welfare is the primary focus of equitable subordination law must be creditors of the same debtor, as a given claim may not be subor-

---

**42.** While the Settlement Noteholders assert that the Court should apply a summary judgment standard because it has considered the extensive evidence presented at the confirmation hearings, the Court declines to do so because it substantially restricted the discovery which the Equity Committee could take on this issue.

**43.** In order to show a valid claim for equitable subordination three elements are required: (1) engagement in some type of inequitable conduct; (2) the misconduct resulted

in injury to the creditors or created an unfair advantage to the defendant; and (3) the equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code. *See, e.g., United States v. Noland,* 517 U.S. 535, 538–39, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996); *Citicorp Venture Cap. Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3d Cir.1998); *In re Mobile Steel Co.,* 563 F.2d 692, 699–700 (5th Cir.1977).

dinated to an equity interest, but only to another claim.").

[54]  The Court agrees with the Settlement Noteholders and the Creditors' Committee that under the plain language of the statute equitable subordination only permits a creditor's claim to be subordinated to another claim and not to equity.  *See* 11 U.S.C. § 510(c) (providing for equitable subordination of "all or part of an allowed claim to all or part of another allowed claim").  Equitable subordination is not a remedy available to (or of much help in redressing any injury to) the shareholders for the Settlement Noteholders' actions.  Therefore, the Court finds that the Equity Committee has failed to state a colorable claim for equitable subordination of the Settlement Noteholders' claims.

2.  *Claim for equitable disallowance*

a.  *Availability of Remedy*

[55]  The Equity Committee contends alternatively that, because of the improper conduct of the Settlement Noteholders in trading on material non-public information, the equitable disallowance of their claims is warranted so that any distribution to which they would be entitled is redistributed to other creditors and ultimately to the shareholders.[44]  *See, e.g., Citicorp*, 160 F.3d at 991 & n. 7 (3d Cir.1998) (affirming equitable subordination of insider's claim to other creditors because of trading on insider information, but not precluding additional remedies such as equitable disallowance and an award of expenses, fees, and other costs caused by insider's con-

duct);  *Adelphia Comm'ns Corp. v. Bank of Am., N.A. (In re Adelphia Comm'ns Corp.)*, 365 B.R. 24, 71–73 (Bankr.S.D.N.Y. 2007) (denying motion to dismiss because equitable disallowance of claims by bankruptcy court remains viable cause of action and equitable subordination is not the exclusive remedy for wrongdoing), *aff'd in relevant part*, 390 B.R. 64, 74–75 (S.D.N.Y. 2008).

The Equity Committee argues that equitable disallowance of the Settlement Noteholders' claims is warranted in this case because they traded on insider information obtained while they participated in settlement negotiations with the Debtor and JPMC. *See Pepper v. Litton*, 308 U.S. 295, 311, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (holding that claim of insider who traded on inside information was properly subordinated on equitable principles).

The Equity Committee contends that the instant case is the "paradigm case of inequitable conduct by a fiduciary." *Citicorp*, 160 F.3d at 987.  Like the creditor in *Citicorp*, the Equity Committee contends that the Settlement Noteholders purchased (and sold) the Debtors' securities with "the benefit of non-public information acquired as a fiduciary" for the "dual purpose of making a profit and influenc[ing] the reorganization in [their] own self-interest." *Id. See also Wolf v. Weinstein*, 372 U.S. 633, 642, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) ("Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the Debtor's stock particularly pernicious.").

---

**44.**  The Indenture Trustee for the PIERS contends that even if the Court equitably disallows the claims of the Settlement Noteholders, the Indenture Trustee as the holder of the claims is still entitled to payment of 100% of those claims.  The Court disagrees.  To the extent the Court disallows those claims, they are disallowed regardless of who holds them.

*Cf. Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 439–45 (S.D.N.Y.2007) (concluding that transferee of a claim could be subject to equitable subordination and disallowance under section 502(d) for conduct of transferor if claim was assigned, though not if it was sold).

The Settlement Noteholders contend initially that equitable disallowance is not a valid remedy under the Bankruptcy Code, because it is not one of the specific exceptions to allowance of a claim articulated in section 502(b). *See, e.g., Travelers Casualty & Surety Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443, 449–50, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007) (holding that Bankruptcy Code does not bar contractual claim for attorneys' fees incurred during bankruptcy case because it was not disallowable under one of the nine exceptions to disallowance under section 502(b)). *See also Mobile Steel,* 563 F.2d at 699 (concluding that "equitable considerations can justify only the subordination of claims, not their disallowance"). The Settlement Noteholders argue that the legislative history of the Code supports this argument, citing a version of the Senate bill that did not get included in the Bankruptcy Code, which would have provided that "the court may disallow, in part or in whole, any claim or interest in accordance with the equities of the case." S. 2266, 95th Cong. § 510(c)(3) (1977).

The Equity Committee responds that both arguments were rejected in the *Adelphia* case. 365 B.R. at 71, *aff'd in relevant part,* 390 B.R. at 74–75. The Bankruptcy Court in *Adelphia* noted that there is other legislative history that expressly states that section 510 "is intended to codify case law, such as *Pepper v. Litton* . . . and is not intended to limit the court's power in any way.'" 365 B.R. at 71 (citing Kenneth N. Klee, *Legislative History of the New Bankruptcy Law,* 28 DePaul L. Rev. 941 (1979), *reprinted in* Collier on Bankruptcy, App. Pt. 4–1495). As a result, the District Court in *Adelphia* concluded that "the Court cannot give any weight to the omission of Section 510(c)(3) of S. 2266 from the Bankruptcy Code, Congress could have decided to do away with equitable disallowance, or it could

have thought specific reference to it was superfluous." 390 B.R. at 76.

In addition, the District Court in *Adelphia* held that the *Travelers* decision did not overturn the *Pepper v. Litton* decision which "fairly read, certainly endorses the practice (in appropriate circumstances) of the equitable disallowance of claims, not on the basis of any statutory language, but as within the equitable powers of a bankruptcy court." *Id.*

[56] Here, the Court agrees with the well-reasoned decisions of the Bankruptcy and District Courts in *Adelphia* and concludes that it does have the authority to disallow a claim on equitable grounds "in those extreme instances—perhaps very rare—where it is necessary as a remedy." *Adelphia,* 365 B.R. at 73. *See also, Citicorp,* 160 F.3d at 991 n. 7 (disagreeing with district court's conclusion that equitable subordination was the exclusive remedy available for inequitable conduct and noting that *Pepper v. Litton* expressly upheld the bankruptcy court's power to disallow or subordinate a claim based on equitable grounds).

The cases cited by the Settlement Noteholders do not foreclose the equitable disallowance of claims albeit under a different analysis. *Cf. Travelers,* 549 U.S. at 449–50, 127 S.Ct. 1199 (holding that "Section 502(b)(1) disallows any claim that is 'unenforceable against the debtor . . . under any agreement or applicable law' . . . [which is] most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy."); *Mobile Steel,* 563 F.2d at 699 n. 10 (concluding that equitable disallowance of claims is not available because it "would add nothing to the protection against unfairness already afforded the bankrupt and its creditors. . . . If the misconduct direct-

ed against the bankrupt is so extreme that disallowance might appear to be warranted, then surely the claim is either invalid or the bankrupt possesses a clear defense against it."). Because the Equity Committee seeks to disallow the claims of the Settlement Noteholders under facts that suggest they violated the securities laws, the Court believes that the Debtors would have a defense to those claims outside of the bankruptcy context as well. *See, e.g., SEC v. Universal Express, Inc.,* 646 F.Supp.2d 552 (S.D.N.Y.2009) ("In addition to its discretion to order disgorgement, a court has the discretion to award prejudgment interest on the amount of disgorgement and to determine the rate at which such interest should be calculated. Awarding prejudgment interest, 'like the remedy of disgorgement itself, is meant to deprive wrongdoers of the fruits of their ill-gotten gains from violating securities laws.' ") (quoting *SEC v. Lorin,* 877 F.Supp. 192, 201 (S.D.N.Y.1995), *aff'd in part and vacated in part,* 76 F.3d 458 (2d Cir.1996)); *SEC v. Haligiannis,* 470 F.Supp.2d 373, 385–86 (S.D.N.Y.2007) (holding that civil monetary penalties can be awarded for securities violations, which "are designed to punish the individual violator and deter future violations of the securities laws," and awarding civil monetary penalties of $15 million, roughly the amount of the defendant's ill-gotten gains).

b.  *Merits of claim*

[57]  In *Pepper v. Litton,* the Supreme Court upheld the equitable disallowance of the claim of an insider who traded on material inside information, concluding that:

He who is in . . . a fiduciary position. . . . cannot utilize his inside information and his strategic position for his own preferment.  He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly.

He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements.

308 U.S. at 311, 60 S.Ct. 238.

The TPS Group contends that, although the Court need not decide that the Settlement Noteholders have violated the securities laws, reference to insider trading cases illustrates the magnitude of the Settlement Noteholders' inequitable conduct.

[58, 59]  The Supreme Court has recognized two theories of insider trading under section 10(b): the "classical theory" and the "misappropriation theory."  *See SEC v. Cuban,* 620 F.3d 551, 553 (5th Cir.2010).  Under the classical theory, section 10(b) and Rule 10b–5 are violated when a corporate insider (i) trades in the securities of his corporation (ii) on the basis of (iii) material nonpublic information (iv) in violation of the fiduciary duty owed to his shareholders.  *See, e.g., U.S. v. O'Hagan,* 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) ("Trading on such information qualifies as a 'deceptive device' under § 10(b) . . . because 'a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation.' ") (citation omitted).  Under the misappropriation theory, by contrast, a corporate "outsider" violates section 10(b) and Rule 10b–5 "when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information" rather than a duty owed to the persons with whom he trades.  *Id.* at 652, 117 S.Ct. 2199.

The Equity Committee and the TPS Group both assert that the Settlement Noteholders' conduct violated the classical

theory of insider trading. In addition, the TPS Group asserts that Centerbridge violated the misappropriation theory.

### i. *Classical theory*

#### (1) *Material nonpublic information*

The Settlement Noteholders argue that they did not trade on any material nonpublic information. Instead, they contend that the only material nonpublic information which they received from the Debtors during the confidentiality periods were the estimated amounts of the Debtors' tax refunds, which were disclosed by the Debtors to the public before the Settlement Noteholders began to trade again.

The Equity Committee and the TPS Group assert that the Settlement Noteholders received additional nonpublic information including the knowledge that a settlement was being discussed and the relative stances the parties were taking in those negotiations. In particular, the Equity Committee and the TPS Group focus on the term sheets exchanged by the parties. According to the Equity Committee, the parties were conceding issues at a time when the public knew only that the Debtors, JPMC, and the FDIC were engaged in contentious litigation.

**[60, 61]** Materiality of nonpublic information is determined by an objective, "reasonable investor" test: "[T]he law defines 'material' information as information that would be important to a reasonable investor in making his or her investment decision." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir.1997). With regard to information on events like a potential merger, courts determine materiality based on a balancing of both the "indicated *probability* that the event will occur and the anticipated *magnitude* of the event in light of the totality of the company activity." *Basic, Inc. v. Levinson*, 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (emphasis added).

**[62]** The parties largely do not dispute that the magnitude of a global settlement with JPMC and the FDIC would be great in this case.[45] *See, e.g., SEC v. Geon Indus., Inc.*, 531 F.2d 39, 47–48 (2d Cir.1976) (stating that "[s]ince a merger in which [a company] is bought out is the most important event that can occur in a small corporation's life, to wit, its death, we think that inside information, as regards a merger of this sort, can become material at an earlier stage than would be the case as regards lesser transactions—and this even though the mortality rate of mergers in such formative stages is doubtless high."). The issue the parties in this case dispute is the probability that a settlement would occur, specifically whether the negotiations were too tentative and the parties were too far apart.

The Debtors and the Settlement Noteholders contend that neither the knowledge of negotiations nor the parties' relative stances during the negotiations were material non-public information because of the extreme distance between the parties' stances and the ebbs and flows of the negotiation process. *See, e.g., Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 244–45 (4th Cir.1988) (holding that "pre-

---

**45.** Owl Creek alone argues that the magnitude factor is not met here because, unlike a merger, settlement proposals are a common and necessary component of bankruptcy cases. The Court agrees that settlement proposals are common, but also notes that statements of interest and merger proposals are just as common and yet may be material.

*Basic,* 485 U.S. at 238–39, 108 S.Ct. 978. What the magnitude factor measures is not the fact that a proposal was made, but what the result of the proposal would be if accepted (i.e. the actual merger or settlement were consummated). *SEC v. Geon Indus., Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976).

liminary, contingent, and speculative" negotiations were immaterial because there was "no agreement as to the price or structure of the deal"); *Filing v. Phipps,* No. 5:07CV1712, 2010 WL 3789539, at *5–6 (N.D.Ohio Sept. 24, 2010) (finding that merger talks were not material where parties had a "get acquainted" meeting and discussed executing a confidentiality agreement); *Levie v. Sears Roebuck & Co.,* 676 F.Supp.2d 680, 688 (N.D.Ill.2009) (finding merger discussions not material where they were preliminary in nature).

According to the Settlement Noteholders, it would have been sheer speculation that JPMC's position on one or more potential settlement terms in March or November 2009 could have provided assurance that JPMC would take that same position in future complex, multi-party, multi-issue negotiations. In the context of such a complex negotiation, the Settlement Noteholders argue that the discussions could only be material once all the parties reached an agreement in principal or at least came extremely close to a deal. (D.I. 8429 at 10.)

The Court disagrees with this statement of materiality. The Supreme Court has explicitly rejected the argument that there is no materiality to discussions until an agreement-in-principle has been reached. *Basic,* 485 U.S. at 237, 108 S.Ct. 978. In addition, the cases cited by the Plan Supporters are distinguishable as they deal only with preliminary discussions. Unlike the cases cited, here the parties executed confidentiality agreements, exchanged a significant amount of information, and engaged in multi-party negotiations for over a year. The discussions went far beyond a mere "get acquainted meeting." *Filing,* 2010 WL 3789539, at *5–6.

The Settlement Noteholders contend that whether a settlement was likely to occur should be evaluated in light of the facts as they existed at the time, not with the benefit of hindsight. *See, e.g., In re General Motors Class E Stock Buyout Sec. Litig.,* 694 F.Supp. 1119, 1127 (D.Del.1988) ("The probability of a transaction occurring must be considered in light of the facts as they then existed, not with the hindsight knowledge that the transaction was or was not completed."). According to the Settlement Noteholders, in this case at the conclusion of both confidentiality periods, the parties felt that the negotiations were dead and, therefore, they were not material.

The Court is not convinced, however, by this contention. *See, e.g., SEC v. Gaspar,* 83 Civ. 3037, 1985 WL 521, at *14 (S.D.N.Y. Apr. 16, 1985) ("The ultimate success of the negotiations is only one factor to consider" in determining materiality). The first set of negotiations ended in March, with the Settlement Noteholders claiming they were a "disaster," yet the Debtors continued to negotiate with JPMC in April. (Tr. 7/20/2011 at 55–56.) In fact, Aurelius and Owl Creek berated the Debtors for conducting settlement talks during that time without them, indicating that the Settlement Noteholders themselves viewed the negotiations as continuing and material. (Tr. 7/18/2011 at 73.)

The contention that settlement negotiations were dead (and therefore not material) is also belied by the actions of Centerbridge and Appaloosa. In July and August 2009 they engaged in their own separate negotiations with JPMC, at which time they both restricted their trading, even though they had not received any other information from the Debtors.[46]

---

**46.** Centerbridge stated that such restrictions were taken only out of "an abundance of

caution" but admitted that an acceptable counterproposal from JPMC might "nudge

The Equity Committee argues that the fact that there was early agreement on several terms of the settlement negotiations made them particularly material. The Settlement Noteholders disagree, asserting that the market already understood the two major components of any deal: that the Debtors were likely to prevail in retaining ownership of the disputed bank deposits and that, as a predicate for a plan, some agreement on the tax refunds would have to be reached between the Debtors and JPMC. *See Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 166 (2d Cir. 1980) (finding that the confirmation of facts that "were fairly obvious to all who followed the stock ... cannot be deemed 'reasonably certain to have a substantial effect on the market price of the security.'").

Again, the Court disagrees. There is no evidence in the record that the market knew that the Debtors would prevail on the disputed bank deposits or that there would be a settlement on the tax refunds. All the public knew was that the Debtors, JPMC, and the FDIC were litigating those issues. In fact, the Court was prepared to issue a decision on the summary judgment motions filed by the parties on the bank deposit issue when the GSA was announced.

The Settlement Noteholders argue further that the probability of a settlement cannot be evaluated based on agreement on a few terms but must be viewed as a whole. Despite the fact that some terms did not change, the Settlement Noteholders note that many terms were constantly changing as later term sheets were exchanged. (Tr. 7/21/2011 at 109.) At one

point, JPMC changed its stance in the negotiations so drastically that the Debtors viewed it as essentially "reset[ting] the bookends" of any potential deal. (EC 16; Tr. 7/18/2011 at 108.) The Settlement Noteholders warn that if disclosure of the constantly changing settlement terms was required, it "would result in endless bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to 'bury the shareholders in an avalanche of trivial information.'" *Taylor*, 857 F.2d at 245.

This same argument was denounced by the Supreme Court when it rejected the "agreement-in-principle" standard for evaluating materiality of merger discussions and applies equally here.

Three rationales have been offered in support of the "agreement-in-principle" test. The first derives from the concern expressed in *TSC Industries [v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) ] that an investor not be overwhelmed by excessively detailed and trivial information, and focuses on the substantial risk that preliminary merger discussions may collapse: because such discussions are inherently tentative, disclosure of their existence itself could mislead investors and foster false optimism.... The first rationale, and the only one connected to the concerns expressed in *TSC Industries*, stands soundly rejected, even by a Court of Appeals that otherwise has accepted the wisdom of the agreement-in-principle test. "It assumes that investors are nitwits, unable to appreciate—even when told—that mergers are risky propositions up until the closing." Disclo-

the negotiations towards the 'materiality' end of the spectrum of the settlement negotiations, in that an acceptable proposal could lead to further fruitful negotiations." (D.I. 8430 at 17–18.) The Court is unconvinced by

this explanation. Centerbridge admits that it determined quickly that JPMC's counter-proposal was inadequate, yet continued to restrict trading until six days after JPMC withdrew its counter-proposal.

sure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress.

*Basic*, 485 U.S. at 237, 108 S.Ct. 978 (quoting *Flamm v. Eberstadt*, 814 F.2d 1169, 1175 (7th Cir.1987)).

The Plan Objectors disagree with the Settlement Noteholders' contention that the settlement negotiations were too tentative to be material. The TPS Group asserts that over the course of negotiations it became clear that a settlement was more probable (as issues were resolved) and that the funds available to the estate were increasing. The Plan Objectors argue that the materiality of the information is evident from the fact that as soon as the Settlement Noteholders were free to trade on that information they did: engaging in what the Equity Committee characterizes as a "buying spree" concentrating on acquiring (at a discount) junior claims because the Settlement Noteholders knew (although the public did not) that the junior creditors were likely to receive a recovery. (AOC 18; AOC 54; AOC 62; Au 8.)

The Equity Committee also asserts that a materiality inference can be drawn from the fact that the Settlement Noteholders requested (and the Debtors granted) a termination of the Second Confidentiality Period a day early, on December 30, 2009, in order to permit them to trade before the end of the year. (Tr. 7/18/2011 at 111.) *See, e.g., Basic*, 485 U.S. at 240 n. 18, 108 S.Ct. 978 ("We recognize that trading (and profit making) by insiders can serve as an indication of materiality."); *United States v. Victor Teicher & Co.*, No. 88 CR. 796, 1990 WL 29697, at *2 (S.D.N.Y. Mar. 9, 1990) (citing the "very fact of [defendant's] trading" as "evidence of the materiality of the information").

The Settlement Noteholders respond that materiality cannot be gleaned from the trades in question, however, because some of the Settlement Noteholders were selling while others were buying or not trading at all. (AOC 18; AOC 54; AOC 62; Au 8.) If the settlement discussions had any materiality, the Settlement Noteholders argue that they would have all traded in the same fashion. They point to Appaloosa and Centerbridge as an example. Both received a summary of the Debtors' April negotiations and JPMC's August counter-offer during their own separate negotiations, yet they engaged in opposite trades after receiving that information. (AOC 54; AOC 62.) In another instance, Aurelius sold PIERS on March 8, 2010, four days before the announcement of the GSA, after which the price of the PIERS skyrocketed. (Au 8.) According to the Settlement Noteholders, if Aurelius possessed material nonpublic information regarding the settlement, it would not have made such an unwise trade.

[63] The fact that the Settlement Noteholders made unwise or contrary trades, however, does not provide a defense to an insider trading action. *See, e.g., SEC v. Thrasher*, 152 F.Supp.2d 291, 301 (S.D.N.Y.2001) (concluding that a tippee is potentially liable for insider trading even if it loses money by trading on false information) (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 318, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985)).

The Court does find it difficult to draw any conclusions from the Settlement Noteholders' trades. The Settlement Noteholders actively traded in the Debtors' securities prior to, and after, the confidentiality periods. It is possible that their trades were based on the publically disclosed information regarding the tax refunds, but because full discovery on the Settlement Noteholders' internal trading decisions has not been permitted to date, the Court is unable to reach any conclusion based on the trades alone.

Based on the evidence presented thus far, however, it appears that the negotiations may have shifted towards the material end of the spectrum and that the Settlement Noteholders traded on that information which was not known to the public. Consequently, the Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders received material nonpublic information. Further discovery would help shed light on how the Settlement Noteholders internally treated the settlement discussions and if they considered them material to their trading decisions.

### (2) Insider status

#### (a) Temporary Insider

**[64]**  Insiders of a corporation are not limited to officers and directors, but may include "temporary insiders" who have "entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes." *Dirks v. SEC*, 463 U.S. 646, 655 n. 14, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). *See also In re Krehl*, 86 F.3d 737, 743 (7th Cir.1996) (holding that "[a]ccess to inside information can be sufficient to confer insider status even where there is no legal right or ability to exercise control over a corporate entity"). The Equity Committee and the TPS Group contend that the Settlement Noteholders became temporary insiders when they were given material non-public information creating a fiduciary duty on their part towards other creditors and shareholders.

The Settlement Noteholders assert that temporary insider status under the securities law is inapplicable to situations where the corporation and the outsider work together toward a goal in which they each have diverse interests and only applies if they are working towards a common goal. *Dirks*, 463 U.S. at 655 n. 14, 103 S.Ct. 3255. According to the Settlement Noteholders, the Supreme Court's use of the phrase "solely for corporate purposes" in *Dirks* was meant to exclude instances where a corporate purpose may be one or even the "primary reason" among others. *Id.* Further, the Settlement Noteholders assert that the Debtors have always been aware that the Settlement Noteholders' purpose for participating in the negotiations was to further their own economic self interest. (Tr. 7/21/2011 at 185, 202.)

The Equity Committee responds that the Debtors only gave the Settlement Noteholders access to the settlement term sheets to further the Debtors' efforts to effectuate a consensual plan of reorganization, which was the common goal of both the Debtors and the Settlement Noteholders. This, it argues, satisfies the common corporate goal required by *Dirks*, 463 U.S. at 655 n. 14, 103 S.Ct. 3255. In addition, the Equity Committee argues that the Settlement Noteholders only obtained the information because they had acquired blocking positions in two subordinated classes of creditors (the senior subordinated notes and the PIERS). It contends that this is sufficient to create a fiduciary duty on their part to those two classes of creditors. *Cf. Rickel & Assocs., Inc. v. Smith (In re Rickel & Assocs., Inc.)*, 272 B.R. 74, 100 (Bankr.S.D.N.Y.2002) (holding that creditors' committee member could not use his position on committee to advance his own personal interest at the expense of the unsecured creditors).

The Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders became temporary insiders of the Debtors when the Debtors gave them confidential information and allowed them to participate in negotiations with JPMC for the shared goal of reaching a settlement that would form the basis of a consensual plan of reorganization.

### (b) Non-statutory insider

Alternatively, the Equity Committee and TPS Group assert that the Settlement Noteholders owed duties as non-statutory insiders under bankruptcy law. *See, e.g., Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385 (S.D.N.Y.1993) (holding that plaintiff stated a claim that creditors' committee assumed a duty to all parties by becoming a joint sponsor and proponent of plan); *In re Wash. Mut., Inc.*, 419 B.R. 271, 278 (Bankr.D.Del.2009) (noting that "members of a class of creditors may, in fact, owe fiduciary duties to other members of the class" when they hold themselves out as representing that class); *Official Comm. of Equity Sec. Holders of Mirant Corp. v. The Wilson Law Firm, P.C. (In re Mirant Corp.)*, 334 B.R. 787, 793 (Bankr.N.D.Tex. 2005) ("[W]hen a party purports to act for the benefit of a class, the party assumes a fiduciary role as to the class."); *Rickel*, 272 B.R. at 100 (noting that creditors' committee member may not use his position to advance his personal interest at the expense of the creditor class); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 298 (Bankr. W.D.Pa.1990) (party who received "a great volume of information that was not available to other creditors, shareholders, and the general public" was a temporary insider). *See generally* Mark J. Krudys, *Insider Trading by Members of Creditors' Committees—Actionable!*, 44 DePaul L. Rev. 99, 142 (1994) (noting that "members of creditor steering committees, like official creditors' committees, appear to come within the temporary insider definition articulated in *Dirks* "); Donald C. Langevoort, 18 Insider Trading Regulation, Enforcement and Prevention § 3:8 (database updated April 2011) ("More recently, the view has been expressed that members of a creditors committee overseeing a reorganization of the issuer would be treated as [temporary] insiders"). *See also In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 396–97 (3d Cir.2009) (holding that parties who do not fit the Bankruptcy Code definition of an insider may nonetheless be insiders if they have a sufficiently close relationship with the debtor to suggest that their transactions were not conducted at arm's length).

The Equity Committee has alleged and presented some evidence that the Settlement Noteholders could be considered insiders of the Debtors because of their status as holders of blocking positions in two classes of the Debtors' debt structure. As such, it could be found that they owed a duty to the other members of those classes to act for their benefit. Therefore, the Court finds that the Equity Committee has stated a colorable claim that the Settlement Noteholders are temporary insiders of the Debtors.

### (3) Knowledge

The Settlement Noteholders assert that there is no evidence that they knowingly or recklessly traded while in possession of material nonpublic information, and, therefore, the required scienter element of an insider trading claim is lacking. *See, e.g., Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1422 (finding that scienter requires a "strong inference" that when trading the defendant "knew or recklessly disregarded" the fact that information in his possession was material). Because the Debtors explicitly agreed to disclose any material nonpublic information at the end of each confidentiality period, the Settlement Noteholders contend that they had no knowledge that the public did not know all material information. The Settlement Noteholders note that the burden was on the Debtors to assure that the disclosures were appropriate. (Au 16; Au 27; EC 24; EC 37; EC 111; EC 117; EC 141; EC 148.) *See also* Richard H. Walker, Div. of Enforcement, Sec. Exch. Comm'n, Regula-

tion FD—An Enforcement Perspective (Nov. 1, 2000), 2000 WL 1635668, at *2 (stating that the regulation "places the responsibility for avoiding selective disclosure, and the risks of engaging in it, squarely on the issuer" of the information).

The Equity Committee responds that good faith reliance on assurances of a third party, such as the source of the information, to disclose all material information to the public cannot be a defense. Such a rule would vitiate the insider trading laws if a third party's assurances, with no further duty of inquiry, automatically insulated a party from insider trading liability. Further, the Equity Committee asserts that there is clear circumstantial evidence (the volume of trades immediately after the confidentiality periods ended) which show that the Settlement Noteholders knowingly traded on the basis of the material, nonpublic information. *See, e.g., SEC v. Heider,* 90 Civ. 4636, 1990 WL 200673, at *4 (S.D.N.Y. Dec. 4, 1990) (allegations that volume of call option purchases spiked prior to merger and that defendants were responsible for a significant portion of that volume supported a "strong inference" of defendant's scienter).

The Settlement Noteholders disagree, asserting that the evidence of their trading does not support an inference of scienter. *Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1424 (declining to infer fraudulent intent from "trading in the normal course of events"). They argue that the trading volume can be attributed to other facts of public record such as the momentum of the tax bill through Congress and the Debtors' estimates of their tax refunds.

[65] While trades may provide circumstantial evidence of intent or recklessness, the statute only requires that the Settlement Noteholders have knowledge that they were in possession of material nonpublic information. Whether or not they profited from such knowledge or actually applied such knowledge in trading is not a required element. *United States v. Teicher,* 987 F.2d 112, 120 (2d Cir.1993) (stating that "[u]nlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain").

In addition the Court does not agree with the Settlement Noteholders' reliance exception to the scienter element of insider trading. The Settlement Noteholders each had strict internal policies prohibiting insider trading. (EC 3; EC 19; EC 103; AOC 16.) The Equity Committee contends that notwithstanding those internal policies, the Settlement Noteholders knowingly traded with knowledge that the Debtors were engaged in global settlement negotiations with JPMC of which the trading public was unaware. The Settlement Noteholders cannot use the Debtor or their own counsel as a shield if they violated those policies.

The Court finds that the Equity Committee has made sufficient allegations and presented enough evidence to state a colorable claim that the Settlement Noteholders acted recklessly in their use of material nonpublic information. *See Goldman v. McMahan, Brafman, Morgan & Co.,* 706 F.Supp. 256, 259 (S.D.N.Y.1989) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases ... be the functional equivalent of recklessness."); *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978) ("Reckless conduct is ... 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' ") (citation omitted).

ii. *Misappropriation theory*

[66, 67] The TPS Group also alleges that Centerbridge is liable under the mis-

appropriation theory which provides that insider trading can be found where "(1) . . . the defendant possessed material, non-public information; (2) which he had a duty to keep confidential; and (3) . . . the defendant breached his duty by acting on or revealing the information in question." *SEC v. Lyon,* 605 F.Supp.2d 531, 541 (S.D.N.Y.2009). Liability attaches where "the tippee traded on the misappropriated information when [it] knew or should have known it was misappropriated." *SEC v. Willis,* 777 F.Supp. 1165, 1169 (S.D.N.Y. 1991).

According to the TPS Group, the Debtors shared information about the April 2009 negotiations with Fried Frank which was under a written confidentiality agreement barring it from sharing information with its clients, unless they were subject to confidentiality agreements of their own. (EC 10; D 408.) Nonetheless, on July 1, 2009, Fried Frank shared summaries of the April negotiations with both Centerbridge and Appaloosa, who were not at the time subject to a confidentiality agreement with the Debtors. (EC 215.) Centerbridge continued to trade, while Appaloosa voluntarily restricted its trading. The TPS Group asserts that, as a result, Fried Frank breached its duty of confidentiality to the Debtors and Centerbridge misappropriated confidential information.

The TPS Group asserts that Centerbridge knew or should have known that the information was restricted and subject to Fried Frank's confidentiality obligations to the Debtors. (Tr. 7/21/2011 at 30–31.) *SEC v. Musella,* 578 F.Supp. 425, 442 (S.D.N.Y.1984) (finding knowledge where the individual was a "sophisticated . . . market professional" who should have inquired about the "underlying circumstances of the tip received").

In addition, the Equity Committee contends that following the Second Confiden-

tiality Period, material information was shared with the Settlement Noteholders by Fried Frank. The Settlement Noteholders contend, however, that although they had discussions and meetings with Fried Frank about the plan of reorganization, they received no material information from Fried Frank about the substance of the negotiations during this period. (Tr. 7/18/2011 at 116, 119; Tr. 7/19/2011 at 144; Tr. 7/20/2011 at 75; Tr. 7/21/2011 at 136.) The Court has substantial doubts about these assertions. Further discovery on this issue would clarify this point.

For all the above reasons, the Court finds that the Equity Committee and the TPS Group have stated a colorable claim that the Settlement Noteholders engaged in insider trading under the classical and misappropriation theories.

The Settlement Noteholders warn that any finding of insider trading will chill the participation of creditors in settlement discussions in bankruptcy cases of public companies. The Court disagrees. There is an easy solution: creditors who want to participate in settlement discussions in which they receive material nonpublic information about the debtor must either restrict their trading or establish an ethical wall between traders and participants in the bankruptcy case. These types of restrictions are common in bankruptcy cases. Members of creditors' committees and equity committees are always subject to these restrictions. *See e.g.,* Adelphia, 368 B.R. at 152 n. 11. The Court does not believe that a requirement to restrict trading or create an ethical wall in exchange for a seat at the negotiating table places an undue burden on creditors who wish to receive confidential information and give their input.

c. *Burden on estate*

**[68]** The Court is required, however, to balance the probability of success on the

claim against the burden on the estate that would result from its prosecution. Judging from the vigor with which the Settlement Noteholders have opposed the Equity Committee's standing motion, the Court is concerned that the case will devolve into a litigation morass. In addition, the Court notes that as the case continues, the potential recoveries for all parties in the case dwindles. Regardless of which parties prevail, they may be disappointed to find their recovery significantly less than expected.

Therefore, before the Equity Committee proceeds with its claim any further, the Court will direct that the parties go to mediation on this issue, as well as the issues that remain an impediment to confirmation of any plan of reorganization in this case. A status hearing to discuss this will be held at the omnibus hearing currently scheduled for October 7, 2011, 11:30 am.

IV.  *CONCLUSION*

For the foregoing reasons, the Court will deny confirmation of the Plan, grant but stay the Equity Committee's standing motion, and direct the parties to proceed to mediation.

An appropriate Order is attached.

### ORDER

**AND NOW** this **13th** day of **SEPTEMBER, 2011,** upon consideration of the Modified Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on March 16, 2011, as modified on March 25, 2011 (the "Modified Plan"), for the reasons articulated in the accompanying Opinion, it is hereby

**ORDERED** that confirmation of the Modified Plan is **DENIED;** and it is further

**ORDERED** that the motion of the Equity Committee for standing to prosecute claim for equitable disallowance is **GRANTED** but **STAYED PENDING MEDIATION;** and it is further

**ORDERED** that a status hearing will be held on October 7, 2011, at 11:30 a.m. to consider the issues to be referred to a mediator in this case.



**In re AMERICAN LAFRANCE,
LLC, Reorganized Debtor.**

**American LaFrance, LLC, Plaintiff,**

**v.**

**RT Jedburg Commerce Park,
LLC, Defendant.**

**Bankruptcy No. 08–10178 (BLS).
Adversary No. 10–51245.**

United States Bankruptcy Court,
D. Delaware.

Nov. 2, 2011.

**Background:** Chapter 11 debtor-lessee brought adversary proceeding to resolve its objection to commercial lessor's $8,000,000 claim.

**Holdings:** Following trial, the Bankruptcy Court, Brendan Linehan Shannon, J., held that:

(1) under Delaware's choice-of-law principles, South Carolina contract law governed interpretation of agreed order between debtor and lessor;

(2) cure provision in agreed order was ambiguous under South Carolina law;

(3) lessor had no claim against debtor under cure provision, even if debtor did

# TAB 2

*In re* HUMBER IRONWORKS AND SHIPBUILDING.
COMPANY.

WARRANT FINANCE COMPANY'S CASE.

*Winding-up—Debts carrying Interest.*

L. M.

1869

*Ane* I.

> In the case of an insolvent company which is being wound up, creditors whose debts carry interest are entitled to dividends only upon what was due for principal and interest at the winding-up, and it is only in the event of there being a surplus that they can have any claim for subsequent interest, in which case the dividends will be treated as applicable, first, in payment of interest, and then in reduction of principal.

THIS was a motion by way of appeal by the official liquidator of the *Humber Ironworks and Shipbuilding Company, Limited,* from a decision of the Master of the Rolls.

The order for winding up this company was made on the 13th of March, 1866. At the date of the order the company was indebted to the *Warrant Finance Company* in the sum of £25,000, which was to carry interest at £20 per cent. from a given day, which did not arrive until after the winding-up order. It was uncertain whether the funds applicable to paythent of debts would be sufficient to pay the capital of the debts. In these circumstances the question as to the interest on the debt of the *Warrant Finance Company* became important, and was brought before the Master of the Rolls. A meeting of the Equity Judges was held to consider the point, but it being found that there was no uniformity in the practice, no resolution was come to. The Master of the Rolls then decided that, in respect of debts carrying interest, dividends should be declared on the sums due for principal and interest calculated up to the time of declaring the dividend, and that the dividend in respect of each such debt should be treated as applicable to the payment of principal and interest *pro rata,* and be attributed accordingly.

•

Mr. *Southgate,* Q,C., and Mr. *Wickens,* for the appeal motion :—

Dividends in the case of an insolvent company ought to be paid only on what is due for principal and interest at the date of the

044                          CHANCERY APPEALS.                    [L. R.

L. JJ.
1869

Wᴀʀ RANT
FI ˣᴬ NCS
110 CᴏNᴛ
CA su.
  44.1••••••

winding-up. This is the rule in bankruptcy, and is the fair and proper rule in the case of an insolvent company. In the cases of *Be State Fire Insurance Company* (1), *In re Herefordshire Banking Company* (2), and *In re East of England Banking Company* (3), question of insolvency arose. We do not dispute that, if there is a surplus, dividends must be applied, first, in payment of interest, and then in reducing the principal, as in the ordinary case where a debt carrying interest is paid by instalments.

Sir *B. Baggallay,* Q.C., and Mr. *Eddis,* for the *Warrant Finance Company :*—

*We* contend that the computation of interest should be carried on, and that dividends should be applied, first, in payment of interest, and then in reducing the principal. This is the rule in Chancery, and ought to be followed here : *Bower v.. Marris* (4). Sect. 170 of the *Companies Act,1862,* treats the rules of Chancery as applicable to winding-up proceedings, and the 74th rule of the Order of the 11th of November, 1862, is to the same effect. *Kellock's Case* (5) and *In re Xeres Wine Company* (6) shew that bankruptcy rules are not to be adopted in the winding up of companies.

Mr. *Westlake,* for other creditors.

Mr. *Southgate,* in reply :—

Sect. 170 of the Act merely relates to the mode of procedure. This is clear from *In re East of England Banking Company* (7), where the 26th rule of the General Order of the 11th of November, 1862, as to interest on simple contract debts, was held to be *ultra vires.*

*Sin C. J.* SELWYN, L.J. :—

We have several times considered this case, for the Judges met together with the view, if possible, of laying down some general rule ; but the result of that meeting was, that as there appeared

(1)        2 H. & M. 722.        (4) Cr. & Ph. 351
(2)        Law Rep. 4 Eq. 250.   (5) Law Rep. 3 Ch. 769.

( 3 )       Ibid. 6 Eq. 308 ; 4 Ch. 14.  (6)
Ibid. (7) Law Rep. 4 Ch.
14.

CHANCERY APPEALS.

to be no uniform practice, no final decision was arrived at, it being thought more advisable to leave the matter to be decided in the ordinary course of judicial proceedings. It is surprising, that after the number of years during which winding-up proceedings have been going on in this Court, and considering that this question must have continually arisen, the point has never yet been, so far as I am aware, the subject of judicial decision. It now comes before us upon the recommendation of the Master of the Rolls, that we may decide, so far as the authority of this Court can decide, what is to be the rule applicable to such cases for the future. It is satisfactory, that in forming that decision we are not fettered by any rule which obliges us to depart from what appears to us to be the justice of the case. The case is, I think, unaffected by any previous decision ; for the cases that were alluded to, *Ifellock's Case (1)* and *In re Xeres Wine Company* (2), proceed upon an entirely different point,  and the effect of the judgment in them was only this : that the right of a creditor having a mortgage-security to proceed upon all his remedies at once was not taken from him by any of the provisions of the *Companies Act.*

   In the present case we have to consider what are the positions of the creditors of the company, when, as here, there are some creditors who have a right to receive interest, and others having debts not bearing interest. In the first place, it appears to me that we must consider the case under two aspects—first, where there is, and next where there is not, a surplus. I apprehend that in whatever manner the payments may have been made, whether originally they may have been made in respect of capital or in respect of interest, still, inasmuch as they have all been paid in process of law, and without any contract or agreement between the parties, the account must, in the event of there being an ulti-mate surplus, be taken as between the company and the creditors in the ordinary way ; that is, in the manner pointed out in *Bower v. Marris* (3), by treating the dividends as ordinary payments on account, and applying each dividend, in the first place, to the pay-ment of the interest due at the date of such dividend, and the surplus (if any) to the reduction of the principal. That disposes

L. JJ.

38G9

WARRANT
FINANCE
COMPANY
CASE

   (1) Law Rep. 3 Ch. 769.                    (2) Law Rep. 3 Ch. 769.
                        (3) Cr. & Ph. 351.

646                              CHANCERY APPEALS.                          [L. R..

L. JJ.        of the question where there is a surplus, as to which there is no-
1869          doubt or difficulty.

'WARRANT       There remains the question when the estate is insolvent. Now,.
COM FirTANcE   it has been very properly admitted, on the part of the
  Appellant. PANY
CASE.          that there can be no question as to any interest due at the time of
              the winding-up. Suppose, at the date of the winding-up there is, a
              creditor having £1000 due to him for principal, and £100 due to him
              for interest. He would prove for £1100 ;And if a dividend of" 10s. in
              the pound were declared, he would be entitled to receive £550,
              because his interest due at the date of the winding-up is' just as much
              a debt as the principal. Suppose, at the same time,. there was a
              creditor with a debt of £1000, which, like that of the-Respondents in
              the present case, carried interest, b'ut had no interest due upon it at
              the time, and a dividend of 10s. in the pound were'

              paid, he would, in my judgment, receive £500. That would be•
              obviously the case if the Court were able to do what it would wish
              to do, namely, to realize all the assets immediately, and distribute-
              them amongst the creditors. It is very difficult to conceive a casein
              which the assets of a company could be thus immediately realized
              and divided ; but suppose they had a simple account at a bank,
              which could be paid the next day, that would be the course of pro-
              ceeding. Justice, I think, requires that that course of proceeding-
              should be followed, and that no person should be prejudiced by
              the-accidental delay which, in consequence of the necessary forms
              and proceedings of the Court, actually takes place in realizing the
              assets; but that, in the case of an insolvent estate, all the money-
              being realized as speedily as possible, should be applied equally
              and rateably in payment of the debts as they existed at the date-of
              the winding-up. I, therefore, think that nothing should be allowed
              for interest after that date. Consequently, in the present case, this
              debt of £25,000, which had no interest due upon it at the date of the
              winding-up, should stand as a debt for that sum,, and for no more ;
              and the creditor should receive dividends on that

              sum and on nothing more ; but of course I have already guarded
              myself from being supposed to say that the Court takes upon itself'
              to alter the rights of the creditors to any further extent, or to,
              deprive them of the right they have to interest at the full rate of £20
              per cent. if and when there is a surplus to pay it. I think the.

tree must lie as it falls; that it must be ascertained what are the
• debts as they exist at the date of the winding-up, and that all
dividends in the case of an insolvent estate must be declared in
respect of the debts so ascertained. Of course, it will be under-
:stood that we are laying down this rule as applicable to all cases
under the recent Act where creditors' actions are stayed.

L. JJ.

1869

WARRANT
FINANCE
COMPANY'S
CASE.

## Sin G. M. G-IFFARD, L.J.

I think it quite clear that the 170th section of the *Companies .Act*
has no reference to the matter before us ; nor can I consider that
anything in *KelloeY s Cam (I)* affects the present question. The
only argument really adduced in favour of computing interest
subsequent to the winding-up is, that it has been the rule which has
been adopted as to dead men's estates. For some reason or other
dead men's estates have been assumed to be solvent, and they have
been wound up on that footing ; but so unjust has that been found,
that it has been necessary to have a positive enactment to give
interest from the date of the decree to simple contract creditors
whose debts do not bear interest. I think, therefore, that the reason
of the thing is rather against the rule which .has been adopted as to
dead men's estates than in favour of it. As to the rule which my
learned brother has laid down, it is the rule in bankruptcy. That
rule was, as has been said, Judge-made law ; ,but it was made after
great consideration, and no doubt because it works with equality
and fairness between the parties; and if we .are to consider
convenience, it is quite clear that, where an estate is insolvent,
convenience is in favour of stopping all the computations at the
date of the winding-up.

For these reasons I am of opinion that dividends ought to be
paid on the debts as they stand at the date of the winding-up ;
for when the estate is insolvent this rule distributes the assets in
the fairest way ; and where the estate is solvent, it works with
• equal fairness, because, as soon as it is ascertained that there
is a
surplus, the creditor whose debt carries interest is remitted to his
rights under his contract; and, on the other hand, a creditor who
.'has not stipulated for interest does not get it. I may add another

(1) Law Rep. 3 Ch. 769.

648                    CHANCERY APPEALS.                    H.

L. JJ.

1869

WARRANT
FINANCE
COMPANY'S
CASE.

reason, that I do not see with what justice interest can be computed in favour of creditors whose debts carry interest, while creditors whose debts do not carry interest are stayed from recovering judgment, and so obtaining a right to interest.

.Solicitors : Messrs. *Flux, Argles, & Rawlins;* Messrs. *Davidson, Carr, & Bannister;* Messrs. *Ashurst, Morris, & Co.*

————

L. JJ.

1869
t r y . d
May 28,

————

### *Ex parte* ROSE. *In re* ROSE.

*Bankruptcy--Jurisdiction, of County Court—Affidavit that Debts do not exceed £300—County Court Bankruptcy Orders,* 1863, *Rule 46—Bankruptcy Act,,* 1861, *s.* 94.

Where a debtor petitions for adjudication of bankruptcy in the County Court it is not necessary that he should wait till he has ascertained with absolute certainty the amount of his debts ; it is sufficient if he makes a. *bona fide* estimate of their probable amount. And if the debts should turn out to exceed £300 the bankruptcy will not be annulled if he took reasonable pains to ascertain their true amount.

Therefore, where a debtor, under the advice of his solicitor, estimated the amount of a bill of costs to which he was liable at £55, and on taxation it proved to be £85, which brought the amount of his debts above £300, it was. *held* that he was not wrong in not waiting for the taxation, and that the bankruptcy ought to be proceeded with in the County Court.

The decision of a County Court Judge annulling a bankruptcy under the 46th rule of the County Court Bankruptcy Orders, 1863, is subject to be reviewed by the Court of Appeal.

THIS was an appeal from an order of Mr. *Skinner,* the Judge of the County Court of *Staffordshire,* annulling the adjudication of bankruptcy of the Appellant *David Bose.*

The Appellant's wife was living separate from him with her father, Mx. *F. Yorke,* who brought an action against the Appellant for her maintenance. The action was tried on the 2nd of April,. 1869, and a verdict was found for the Plaintiff for £225, being for maintenance calculated at 25s. a week. The Plaintiff applied for• and obtained an order for immediate execution.

On the 5th of April the Appellant, fearing that he should bc arrested, consulted his solicitors, who advised him to make himself bankrupt. They also informed him that the costs of the action

# TAB 3

*Indexed as:*
## Canada (Attorney General) v. Confederation Life Insurance Co.

**IN THE MATTER OF Confederation Life Insurance Company
AND IN THE MATTER OF the Insurance Companies Act, S.C. 1991,
as amended
AND IN THE MATTER OF the Winding-Up Act, R.S.C. 1985, c. W-11,
as amended
Between
The Attorney General of Canada, applicant, and
Confederation Life Insurance Company, respondent**

[2001] O.J. No. 2610

[2001] O.T.C. 486

106 A.C.W.S. (3d) 245

Court File No. 97-CL-000543

Ontario Superior Court of Justice
Commercial List

**Blair J.**

Heard: April 5, 2001.
Judgment: June 25, 2001.

(39 paras.)

*Company law -- Winding-up legislation -- Creditors -- Interest on claims, what constitutes -- Discount notes.*

Appeal by two financial institutions, the Chase Manhattan Bank and UBS AG, from a liquidator's decision that partially disallowed their claims regarding the winding-up of Confederation Life Insurance. Chase and UBS purchased discount notes from Confederation prior to the winding-up order. The notes had a total face value of $160 million but did not mature until after the date of the winding-up. The issue was whether the discount portion of the note which was payable after the date of liquidation constituted a future payment of interest for purposes of the winding-up proceeding. If it did, it was unrecoverable by virtue of section 71(1) of the Winding-Up Act. The liquidator disallowed the claim for the portion of the note representing the difference between the face amount

and the discounted price paid by the financial institutions for the notes, on the basis that those portions were effectively payment of interest.

HELD: Appeal dismissed. The liquidator was correct in concluding that the discounted portion of the notes constituted interest due and payable at a date subsequent to the effective date of the winding-up. This interpretation had been recognized by both the Ontario Court of Appeal and the Supreme Court of Canada. As a result, the interest stops rule, which provided that no interest is payable on a debt from the date of the winding-up, applied. The financial institutions were only entitled to claim the amount of the advance plus any portion of the discount which was notionally earned as at the effective date of the winding-up. The remaining portion of the discount was unrecoverable interest.

### Statutes, Regulations and Rules Cited:

Bankruptcy and Insolvency Act, s. 121.

Bills of Exchange Act.

Winding-Up and Restructuring Act, s. 71(1).

Winding-Up Act, s. 71(1), 95.

### Counsel:

Joseph M. Steiner and Edward A. Sellers, for the appellant, The Chase Manhattan Bank.
James Doris and Matthew Milne-Smith, for the appellant, UBS AG.
Graham Smith and Gale Rubenstein, for KPMG Inc., the respondent Liquidator of Confederation Life Insurance Company.

---

**BLAIR J.**:--

Overview

**1**      Two financial institutions - The Chase Manhattan Bank and UBS AG - purchased commercial paper in the form of discount notes from Confederation Life Insurance Company prior to the winding-up order made with respect to that Company on August 12, 1994. The Notes had a total face value of approximately $160 million (Cdn). They did not mature until after the date of the winding-up.

**2**      These appeals raise a relatively narrow point, albeit an interesting and complex one. How are the discount portions of those promissory notes ("the Notes") to be treated in winding-up proceedings for purposes of an unsecured creditor's proof of claim? Is the creditor entitled to claim for the full face amount of the Note, or is the unearned discount portion of it to be treated as post-insolvency interest (in which case it becomes unrecoverable on the basis of what is known in some circles as the "interest stops rule")?

**3**      Chase and UBS[1] filed proofs of claim with the Respondent Liquidator in the full face amount of their Notes. The Liquidator partially disallowed the claims, the disallowed portion representing the difference between the face amount of the Notes and the discounted price paid by the purchaser

for the Notes. The disallowance was based on the theory that those portions of the Notes were effectively payment of interest and that "interest is only payable to the commencement of the liquidation, August 12, 1994".

**4**    Chase and UBS now appeal the partial disallowance of the Liquidator, in accordance with a proof of claims procedure authorized by Order of this Court dated May 5, 2000. Chase claims an additional $494,948.35 to its allowed unsecured claim of $75,492,052. UBS claims an additional $833,477.72 to its allowed unsecured claim of $82,896,000.[2]

**5**    The issue to be determined, then, is whether the discount portion of a bearer note - payable subsequent to the effective date of liquidation - constitutes a future payment of "interest" for purposes of a winding-up proceeding, and is therefore unrecoverable by an unsecured creditor as a claim provable in the proceeding by virtue of the provisions of subsection 71(1) of the Winding-Up Act[3], unless there is a surplus in the estate.

**6**    I have concluded that the answer to that question is "Yes". My reasons for coming to that conclusion follow.

Background

**7**    Counsel filed an Agreed Statement of Facts, and the appeals were argued on that basis. The pertinent facts, in addition to those summarized above, are the following.

**8**    Confederation Life issued the debt instruments before the commencement of the winding-up proceedings on August 12, 1994. They were in the form of promissory notes payable to "Bearer" in the face amount of a fixed sum and on due dates which all post-dated the commencement of the winding-up. The Notes were purchased by Chase and UBS from Confederation Life at discounts from their face amounts.

**9**    Representative samples of the Notes and of the confirmation slips provided to Chase and UBS at the time of purchases were attached to the Agreed Statement. The Notes themselves did not contain any reference to interest or to yield dates. The terms and pricing of each purchase were set out in the confirmation slips.

**10**    It is agreed that commercial instruments similar to the Notes may trade subsequent to their original issuance.

**11**    Confederation Life has made no payments on the Notes, other than through the partial distributions to creditors made by the Liquidator during the course of the winding-up. There is no surplus within the Confederation Life estate, as that term is used in s. 95 of the Winding-Up Act.

Arguments

The Appellants

**12**    On behalf of Chase and UBS, respectively, Mr. Steiner and Mr. Doris argue that the debt owing to their clients by Confederation Life at the date of the winding-up was the full face amount of the Notes, notwithstanding that the amounts were not payable until later dates. They submit that no portion of the face amount of the Notes constitutes interest, and point to the fact that there is no reference to interest or to yield dates on the face of the Notes themselves. They therefore contend that the debt reflected in the Notes is a future debt or future claim which may be the subject of a proof of claim by an unsecured creditor in accordance with subsection 71(1) of the Winding-Up Act.[4] It falls into that category, they say, because it is a claim for a liquidated sum owing by the

debtor (Confederation Life) as at the legally relevant date (the date of the winding-up Order), which by its terms is not payable before that legally relevant date.

**13**     Subsection 71(1), prior to the 1996 amendment, read:

> When the business of a company is being wound up under this Act, all debts payable on a contingency, and all claims against the company, present or future, certain or contingent, and for liquidated or unliquidated damages, are admissible to proof against the company.

**14**     Counsel for the appellants submit, moreover, that Parliament has chosen different ways to deal with the concept of future debts in different insolvency contexts. For example, they point out, section 121 of the Bankruptcy and Insolvency Act[5] provides for the discounting of debts outstanding at the effective date of the bankruptcy, but falling due at a later date at the time when a dividend is paid. Subsection 121(3) of the BIA states:

> A creditor may prove a debt not payable at the date of the bankruptcy and may receive dividends equally with the other creditors, deducting only thereout a rebate of interest at the rate of five per cent per annum computed from the declaration of a dividend to the time when the debt would have become payable according to the terms on which it was contracted.

**15**     Accordingly, where Parliament has specifically chosen not to provide for a discount on the payment of a future debt, the argument goes - as is the case with section 71(1) of the Winding-up Act - the Courts should not impose such a provision on their own.

**16**     Finally, the appellants maintain that to attribute an interest factor into the face value of the Notes in this case would be inconsistent with their status as negotiable instruments under the Bills of Exchange Act[6]. This is so, they contend, because if the position of the Liquidator is accepted the amounts provable in the winding-up will depend not upon the value of the Notes as stated on their face or upon other information on the face of the Notes, but rather on terms set out in the confirmation slips, which do not form part of the Notes. In short, the amount provable would be something different than the amount of the negotiable instrument, thus destroying their effectiveness under the Bills of Exchange Act.

   The Liquidator

**17**     To these arguments, the Liquidator responds that it is necessary to look at the substance and not the form of the transaction, and that in substance and reality the amount of the discount on the Notes is "interest". It meets all the criteria for interest, counsel submits, and to the extent that Canadian and American jurisprudence has considered the matter, the discount portion of commercial paper has been held to be tantamount to interest.

**18**     Therefore, the Liquidator concludes, that portion of the appellants' Notes which represents the difference between the face value of the Notes and what they actually advanced to Confederation Life (plus an attributed additional amount representing a "return" factor accrued or earned prior to the effective date of the winding-up), represents future interest and may not be proved in the winding-up because of the well-recognized "interest stops rule" in insolvency proceedings.

   Law and Analysis

**19**      In spite of the skilful arguments advanced by Mr. Steiner and Mr. Doris on behalf of the appellants, I am in agreement with the Liquidator's position.

**20**      One of the governing principles of insolvency law - including proceedings in a winding-up - is that the assets of the insolvent debtor are to be distributed amongst classes of creditors rateably and equally, as those assets are found at the date of the insolvency. This principle has led to the development of the "interest stops rule", i.e., that no interest is payable on a debt from the date of the winding-up or bankruptcy. As Lord Justice James put it, colourfully, in Re Savin (1872), L.R. 7 Ch. 760 (C.A.), at p. 764:

> I believe, however, that if the question now arose for the first time I should agree with the rule [i.e. the "interest stops rule"], seeing that the theory in bankruptcy is to stop all things at the date of the bankruptcy, and to divide the wreck of the man's property as it stood at that time.

**21**      It is the decision of Lord Justice Selwyn in Re The Humber Iron Works and Shipbuilding Company (1869), 38 L.J. Ch. 712 ("Re Humber Iron Works"), however, which is often cited as the starting point in the analysis. There - in a winding-up context - he said (at pp. 713-714):

> ... Now it has been admitted, very properly, that, as to interest due at the date of the winding-up, there can be no doubt ... because ... interest due at the date of the winding-up is just as much a debt as the principal. ... Justice, I think, requires ... that all the money of an insolvent estate, being realized as speedily as possible, should be applied equally and rateably in payment of the debts as they existed at the date of the winding-up. I think, therefore, that nothing should be allowed for interest from that date. Consequently, in the present case, this debt of GBP 25,000, which had no interest due upon it at the date of the winding-up, should stand as a debt for that sum, and for no more. ... I think that as the tree falls, so it must lie. It must be ascertained what are the debts which existed at the date of the winding-up, and all dividends in the case of an insolvent estate must be declared in respect of the debts so ascertained.

**22**      This common law principle has been applied consistently in Canadian bankruptcy and winding-up proceedings. This is so notwithstanding the language of subsection 71(1) of the Winding-Up Act and section 121 of the BIA, which might be read to the contrary, in my view. The obligation to pay interest on a debt is a claim against the debtor, which exists at the date of the winding-up, but which does not become due or payable until some future date. It represents a future certain claim against the company (Winding-Up Act, s. 71(1)). It could be said to constitute a future debt or liability "to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the bankrupt's discharge by reason of [an] obligation incurred before the day on which the bankrupt becomes bankrupt" (BIA, s. 121(1)). A discounted bill or note which matures after the date of winding-up is open to a similar analysis.

**23**      Yet the "interest stops" principle has always applied to the payment of post-insolvency interest, and the provisions of subsection 71(1) have never been interpreted to trump the common law insolvency "interest stops rule". That this remains the case is clarified, in my view, by the re-worded language of subsection 71(1) as it exists in the present Winding-Up and Restructuring Act[7]. Counsel submit that the effect of the old and the current versions of subsection 71(1) is in substance the

same. The language of the current subsection makes it clear that the "interest stops rule" applies, in my opinion. Subsubsection 71(1) currently states:

> 71.(1)    When the business of a company is being wound up under this Act, all debts and all other claims against the company in existence at the commencement of the winding-up, certain or contingent, matured or not, and liquidated or unliquidated, are admissible to proof against the company and, subject to subsection (2), the amount of any claim admissible to proof is the unpaid debt or other liability of the company outstanding or accrued at the commencement of the winding-up (emphasis added).

**24**    While the payment of post-insolvency interest and the payment of the face value of a discounted promissory note maturing after the date of liquidation may bear the analysis suggested in paragraph 22 above, the interpretation would lead to inconsistent treatment of interest in proofs of claim situations, if the discount portion of a note is truly interest, depending upon whether the payment is characterized as "interest" or as a "discount". I do not think the Winding-Up Act should be interpreted to give rise to such inconsistent treatment, particularly given the long-standing entrenchment of the "interest stops rule" in Canadian jurisprudence.

**25**    Thus, the substance of the issue to be determined by the court is whether the discounted portion of the Confederation Life Notes issued to Chase and UBS constitutes "interest" due or payable at a date subsequent to the effective date of the winding-up. If it is, then the "interest stops" principle must apply, because to hold otherwise would be to hold that a claim for interest which is camouflaged as a "discount" is to be treated differently than other claims for interest. I do not think it would be correct to do so.

**26**    Both the Ontario Court of Appeal and the Supreme Court of Canada have recognized that in reality and substance a discount on a bill of exchange is interest. American jurisprudence has adopted the same analysis.

**27**    Singer v. Goldhar, [1924] 2 D.L.R. 141 (Ont. C.A.), is one such case. It was a foreclosure action. The mortgage in question did not contain any provision respecting interest, but provided for the repayment of a sum as principal which was greater than the sum advanced. At trial, the action was dismissed on the basis that no monies were owing because instalment payments which equalled the total amount of the advance had been made. The difference between the amount advanced and the amount that was said to be the "principal" remained outstanding. This additional amount was held to constitute interest, and the monthly instalments to be a blend of principal and interest. Therefore, the provisions of the Interest Act[8] requiring that the interest rate be shown had been breached. The Court of Appeal upheld the trial judgment. In doing so, Masten J.A. stated (p. 144):

> Now the ordinary meaning of "principal" is the capital sum of money placed out at interest, in other words the sum actually loaned or advanced (See Wharton's Law Lexicon, 12th ed., p. 695). "Interest" when considered in relation to money denotes the return or consideration or compensation for the use or retention by one party of a sum of money or other property belonging to another. 21 Hals. P, 37, para 72.

> The definition in Wharton and other law lexicons is to the like effect. This definition applies as accurately to a lump sum agreed by way of compensation as to periodical payments at a rate per cent.

> I agree with the observation of my brother Orde made during the argument that the present transaction is, in respect to the question of interest, analogous to the discount of a bill of exchange where a fixed sum is payable on a day certain though a smaller sum is advanced by the lender, the difference forming the compensation to the lender for the loan of the money advanced.

> Discount in such a case is defined in Murray's New English Dictionary, vol. 3, pa. 428, as "the interest charged by a banker or bill-discounter for advancing the value of a bill before it is due." On the question whether or not the $1,200 is interest the principle is the same and the conclusion must be that the difference between the $3,500 advanced and the $4,700 to be repaid is interest.

(italics and underlining added)

**28**    Support for the proposition that a "discount" is in essence "interest" is also found in the decision of the Supreme Court of Canada in Attorney-General for Ontario v. Barfried Enterprises Ltd., [1963] S.C.R. 570. There, the Court was dealing with a bonus in a loan and with whether or not the bonus made the whole cost of the loan excessive and was therefore caught by the provisions of The Unconscionable Transactions Relief Act R.S.O. 1960, c. 410. The "whole cost of the loan" was broadly defined to include "interest, discount, subscription, premium, dues, bonus, commission, brokerage fees and charges". Judson J. noted, in reference to these (p. 575):

> The day-to-day accrual of interest seems to me to be an essential characteristic. All the other items mentioned in The Unconscionable Transactions Relief Act except discount lack this characteristic. They are not interest. (underlining added)

**29**    American insolvency jurisprudence is to the same effect. As one author has put it:

> Like Treasury bills, commercial paper is typically a discount security: the investor purchases notes at less than face value and receives the face value at maturity. The difference between the purchase price and the face value, called the discount, is the interest received on the investment. Occasionally, investors request that paper be issued as an interest-bearing note. The investor pays the face value and, at maturity, receives the face value and accrued interest. All commercial paper interest rates are quoted on a discount basis.

> See: Hahn, Thomas K., "Commercial Paper", Chapter 9, Instruments of Money Market (Federal Reserve Bank of Richmond), at p. 107.

**30**    Or, as Judge Lifland of the U.S. Bankruptcy Court for the Southern District of New York observed, in In re Chateaugay, [1990] Bankr. LEXIS 22, at p. 71:

> Unmatured interest is without question not an allowed claim under s. 502(b)(2) of the [U.S. Bankruptcy] Code. The dispute arises when we have the concept of OID [original interest discount] which in economic reality is interest, but not specifically denominated as such. It is therefore determined that semantics should not distort the rationale and purpose of the Code and that, in the fact situation before this Court, unamortized original issue discount on a note or debenture is indeed unmatured interest which is not an allowable claim under Code s. 502(b)(2).

**31**      In my view, the fact that the U.S. Bankruptcy Code has codified the "interest stops rule" in providing that unmatured interest must be disallowed, whereas it is the common law principle which prevails in Canada, makes no difference in the circumstances of this case.

**32**      The appellants' argument that their claims are for the full face amount of the Notes, which just happen to mature at a future date after the winding-up, begs the question of what is the true nature of those claims. They say their claims include no element of interest, but in truth they do. It is relevant to keep in mind that the face value of the Notes was payable on the due date, and not before. Accordingly, their claims are for monies loaned to Confederation Life, plus an amount in excess of the monies advanced to reflect a consideration for the use of the monies advanced to the due date. Such a return, or consideration, is normally called "interest". Accordingly, the unearned portion of it, as at the date of the winding-up, is not recoverable in the liquidation.

**33**      Interest is an important part of what is owing by a debtor. In the case of a money-lender, such as Chase or UBS, it represents the money-lender's return, or profit, on the transaction. In the case of a supplier, that return or profit is built into the price of the product or service supplied, and interest on overdue payment serves simply to maintain the present value of the price on a continuing basis. As noted in Re Humber Iron Works, supra (at p. 713), the "interest due at the date of the winding-up is just as much a debt as the principal."

**34**      Mr. Steiner argued that Chase and UBS are just suppliers of money, and in that sense are in the same position as the supplier of goods or services who supplies on a delayed payment basis but is still entitled to recover the full amount of the price even when the debtor is wound up after delivery but before the payment due date arrives. I do not see it that way, however. The difference is that in the case of the supplier of goods or services on such terms, the product has already been delivered with the return or profit already earned and built into the delivery price at the date of the insolvency. In the case of a money supplier, however, while the product - the monies advanced - has been delivered at the date of the insolvency, the return or profit payable to the money lender for the use of the monies is not earned until the borrower has in fact used the monies to the date of maturity, when repayment is due.

**35**      Thus, in an insolvency, the money lender who makes advances on the basis of discounted commercial paper is only entitled to claim the amount of the advances plus any portion of the discount which may be said to have been notionally earned as at the effective date of the winding-up. The remaining portion of the discount is unrecoverable "interest" by virtue of the "interest stops rule" in insolvency proceedings.

**36**      With respect to the third argument of the appellants, based upon the Bills of Exchange Act, I am not persuaded that resort to bills of exchange law and principles is helpful in the circumstances of this case. The Notes are clearly "notes" within the meaning of the Bills of Exchange Act, but in

my view nothing turns on that point. Assuming that Chase and UBS are holders in due course of the Notes, it is clear that Confederation Life is obligated to pay them the face amount of the Notes, free and clear of any equities between the parties. The question here, however, is whether Chase and UBS are entitled to prove their claim in the liquidation on the basis of those full face amounts, given that the amounts were advanced before the effective date of the winding-up but the face value of the Notes is not payable until after that date. The answer to that question depends upon the nature of the amount now being claimed, as I have explained, and the nature of that amount is "interest".

**37**      Thus, the issue to be determined here is not concerned with the principles of bills of exchange law, but rather with principles of insolvency law.

          Disposition

**38**      The appeals of Chase and UBS from the partial disallowance of the claims by the Liquidator are therefore dismissed.

**39**      If the parties cannot agree with respect to costs, I may be spoken to in that regard.

BLAIR J.

cp/d/qlala


          1 In these Reasons, for the sake of convenience, I shall refer to Confederation Life Insurance Company as "Confederation Life" and to The Chase Manhattan Bank and UBS AG as "Chase" and "UBS", respectively.

          2 These amounts are in Canadian dollars. The Notes themselves were issued in amounts of $1 million or $5 million U.S.

          3 R.S.C. 1985, chapter W-11 ["Winding-Up Act"]

          4 The appeals were argued on the basis that it is the Winding-Up Act, as it existed on the date of the winding-up order and before its amendment and re-naming as the Winding-Up and Restructuring Act by S.C. 1996 c. 6, s. 153, that applies. The proceedings in the Confederation Life insolvency have generally proceeded on this basis. On the view I take of the issues, the outcome of these appeals would be the same whichever version is applied.

          5 R.S.C. 1985, c. B-3, as amended (the "BIA").

          6 R.S.C. 1985, chapter B-4, sections 2, 55(1)(a) and (b), 59(1) and (2), 73(a) and (b), 176(1), 185(a), and 186(1).

          7 Supra, footnote No. 4.

          8 R.S.C. 1906, c. 120

# TAB 4

**Century Services Inc.** *Appellant*

*v.*

**Attorney General of Canada on behalf of Her Majesty The Queen in Right of Canada** *Respondent*

INDEXED AS: CENTURY SERVICES INC. *V.* CANADA (ATTORNEY GENERAL)

**2010 SCC 60**

File No.: 33239.

2010: May 11; 2010: December 16.

Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Bankruptcy and Insolvency — Priorities — Crown applying on eve of bankruptcy of debtor company to have GST monies held in trust paid to Receiver General of Canada — Whether deemed trust in favour of Crown under Excise Tax Act prevails over provisions of Com panies' Creditors Arrangement Act purporting to nullify deemed trusts in favour of Crown — Companies' Credi tors Arrangement Act, R.S.C. 1985, c. C 36, s. 18.3(1) — Excise Tax Act, R.S.C. 1985, c. E 15, s. 222(3).*

*Bankruptcy and insolvency — Procedure — Whether chambers judge had authority to make order partially lifting stay of proceedings to allow debtor company to make assignment in bankruptcy and to stay Crown's right to enforce GST deemed trust — Companies' Credi tors Arrangement Act, R.S.C. 1985, c. C 36, s. 11.*

*Trusts — Express trusts — GST collected but unre mitted to Crown — Judge ordering that GST be held by Monitor in trust account — Whether segregation of Crown's GST claim in Monitor's account created an express trust in favour of Crown.*

**Century Services Inc.** *Appelante*

*c.*

**Procureur général du Canada au nom de Sa Majesté la Reine du chef du Canada** *Intimé*

RÉPERTORIÉ : CENTURY SERVICES INC. *C.* CANADA (PROCUREUR GÉNÉRAL)

**2010 CSC 60**

No du greffe : 33239.

2010 : 11 mai; 2010 : 16 décembre.

Présents : La juge en chef McLachlin et les juges Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein et Cromwell.

EN APPEL DE LA COUR D'APPEL DE LA COLOMBIE BRITANNIQUE

*Faillite et insolvabilité — Priorités — Demande de la Couronne à la société débitrice, la veille de la faillite, sollicitant le paiement au receveur général du Canada de la somme détenue en fiducie au titre de la TPS — La fiducie réputée établie par la Loi sur la taxe d'accise en faveur de la Couronne l'emporte t elle sur les disposi tions de la Loi sur les arrangements avec les créanciers des compagnies censées neutraliser ces fiducies? — Loi sur les arrangements avec les créanciers des compa gnies, L.R.C. 1985, ch. C 36, art. 18.3(1) — Loi sur la taxe d'accise, L.R.C. 1985, ch. E 15, art. 222(3).*

*Faillite et insolvabilité — Procédure — Le juge en cabinet avait il le pouvoir, d'une part, de lever partiel lement la suspension des procédures pour permettre à la compagnie débitrice de faire cession de ses biens en faillite et, d'autre part, de suspendre les mesures prises par la Couronne pour bénéficier de la fiducie réputée se rapportant à la TPS? — Loi sur les arrangements avec les créanciers des compagnies, L.R.C. 1985, ch. C 36, art. 11.*

*Fiducies — Fiducies expresses — Somme perçue au titre de la TPS mais non versée à la Couronne — Ordon nance du juge exigeant que la TPS soit détenue par le contrôleur dans son compte en fiducie — Le fait que le montant de TPS réclamé par la Couronne soit déten séparément dans le compte du contrôleur a t il créé une fiducie expresse en faveur de la Couronne?*

The debtor company commenced proceedings under the *Companies' Creditors Arrangement Act* ("*CCAA*"), obtaining a stay of proceedings to allow it time to reor ganize its financial affairs. One of the debtor com pany's outstanding debts at the commencement of the reorganization was an amount of unremitted Goods and Services Tax ("GST") payable to the Crown. Section 222(3) of the *Excise Tax Act* ("*ETA*") created a deemed trust over unremitted GST, which operated despite any other enactment of Canada except the *Bankruptcy and Insolvency Act* ("*BIA*"). However, s. 18.3(1) of the *CCAA* provided that any statutory deemed trusts in favour of the Crown did not operate under the *CCAA*, subject to certain exceptions, none of which mentioned GST.

Pursuant to an order of the *CCAA* chambers judge, a payment not exceeding $5 million was approved to the debtor company's major secured creditor, Century Services. However, the chambers judge also ordered the debtor company to hold back and segregate in the Monitor's trust account an amount equal to the unre mitted GST pending the outcome of the reorganization. On concluding that reorganization was not possible, the debtor company sought leave of the court to par tially lift the stay of proceedings so it could make an assignment in bankruptcy under the *BIA*. The Crown moved for immediate payment of unremitted GST to the Receiver General. The chambers judge denied the Crown's motion, and allowed the assignment in bank ruptcy. The Court of Appeal allowed the appeal on two grounds. First, it reasoned that once reorganization efforts had failed, the chambers judge was bound under the priority scheme provided by the *ETA* to allow pay ment of unremitted GST to the Crown and had no dis cretion under s. 11 of the *CCAA* to continue the stay against the Crown's claim. Second, the Court of Appeal concluded that by ordering the GST funds segregated in the Monitor's trust account, the chambers judge had created an express trust in favour of the Crown.

*Held* (Abella J. dissenting): The appeal should be allowed.

*Per* McLachlin C.J. and Binnie, LeBel, Deschamps, Charron, Rothstein and Cromwell JJ.: The apparent con flict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA* can be resolved through an interpretation that properly recognizes the history of the *CCAA*, its func tion amidst the body of insolvency legislation enacted by

La compagnie débitrice a déposé une requête sous le régime de la *Loi sur les arrangements avec les créan ciers des compagnies* (<< *LACC* >>) et obtenu la suspension des procédures dans le but de réorganiser ses finances. Parmi les dettes de la compagnie débitrice au début de la réorganisation figurait une somme due à la Couronne, mais non versée encore, au titre de la taxe sur les produits et services (<< TPS >>). Le paragraphe 222(3) de la *Loi sur la taxe d'accise* (<< *LTA* >>) crée une fiducie réputée visant les sommes de TPS non versées. Cette fiducie s'applique malgré tout autre texte législatif du Canada sauf la *Loi sur la faillite et l'insolvabilité* (<< *LFI* >>). Toutefois, le par. 18.3(1) de la *LACC* prévoyait que, sous réserve de certai nes exceptions, dont aucune ne concerne la TPS, les fidu cies réputées établies par la loi en faveur de la Couronne ne s'appliquaient pas sous son régime.

Le juge siégeant en son cabinet chargé d'appliquer la *LACC* a approuvé par ordonnance le paiement à Century Services, le principal créancier garanti du débiteur, d'une somme d'au plus cinq millions de dollars. Toutefois, il a également ordonné à la compagnie débitrice de retenir un montant égal aux sommes de TPS non versées et de le déposer séparément dans le compte en fiducie du contrô leur jusqu'à l'issue de la réorganisation. Ayant conclu que la réorganisation n'était pas possible, la compagnie débitrice a demandé au tribunal de lever partiellement la suspension des procédures pour lui permettre de faire cession de ses biens en vertu de la *LFI*. La Couronne a demandé par requête le paiement immédiat au receveur général des sommes de TPS non versées. Le juge sié geant en son cabinet a rejeté la requête de la Couronne et autorisé la cession des biens. La Cour d'appel a accueilli l'appel pour deux raisons. Premièrement, elle a conclu que, après que la tentative de réorganisation eut échoué, le juge siégeant en son cabinet était tenu, en raison de la priorité établie par la *LTA*, d'autoriser le paiement à la Couronne des sommes qui lui étaient dues au titre de la TPS, et que l'art. 11 de la *LACC* ne lui conférait pas le pouvoir discrétionnaire de maintenir la suspension de la demande de la Couronne. Deuxièmement, la Cour d'ap pel a conclu que, en ordonnant la ségrégation des sommes de TPS dans le compte en fiducie du contrôleur, le juge siégeant en son cabinet avait créé une fiducie expresse en faveur de la Couronne.

*Arrêt* (la juge Abella est dissidente) : Le pourvoi est accueilli.

*La* juge en chef McLachlin et les juges Binnie, LeBel, Deschamps, Charron, Rothstein et Cromwell : Il est pos sible de résoudre le conflit apparent entre le par. 222(3) de la *LTA* et le par. 18.3(1) de la *LACC* en les interpré tant d'une manière qui tienne compte adéquatement de l'historique de la *LACC*, de la fonction de cette loi parmi

Parliament and the principles for interpreting the *CCAA* that have been recognized in the jurisprudence. The his tory of the *CCAA* distinguishes it from the *BIA* because although these statutes share the same remedial purpose of avoiding the social and economic costs of liquidating a debtor's assets, the *CCAA* offers more flexibility and greater judicial discretion than the rules based mecha nism under the *BIA*, making the former more responsive to complex reorganizations. Because the *CCAA* is silent on what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily provides the backdrop against which creditors assess their priority in the event of bankruptcy. The contemporary thrust of leg islative reform has been towards harmonizing aspects of insolvency law common to the *CCAA* and the *BIA*, and one of its important features has been a cutback in Crown priorities. Accordingly, the *CCAA* and the *BIA* both con tain provisions nullifying statutory deemed trusts in favour of the Crown, and both contain explicit excep tions exempting source deductions deemed trusts from this general rule. Meanwhile, both Acts are harmonious in treating other Crown claims as unsecured. No such clear and express language exists in those Acts carving out an exception for GST claims.

When faced with the apparent conflict between s. 222(3) of the *ETA* and s. 18.3(1) of the *CCAA*, courts have been inclined to follow *Ottawa Senators Hockey Club Corp. (Re)* and resolve the conflict in favour of the *ETA*. *Ottawa Senators* should not be followed. Rather, the *CCAA* provides the rule. Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so expressly and elabo rately. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treat ment under the *CCAA* or the *BIA*. The internal logic of the *CCAA* appears to subject a GST deemed trust to the waiver by Parliament of its priority. A strange asymme try would result if differing treatments of GST deemed trusts under the *CCAA* and the *BIA* were found to exist, as this would encourage statute shopping, undermine the *CCAA*'s remedial purpose and invite the very social ills that the statute was enacted to avert. The later in time enactment of the more general s. 222(3) of the *ETA* does not require application of the doctrine of implied repeal to the earlier and more specific s. 18.3(1) of the *CCAA* in the circumstances of this case. In any event,

l'ensemble des textes adoptés par le législateur fédéral en matière d'insolvabilité et des principes d'interprétation de la *LACC* reconnus dans la jurisprudence. L'historique de la *LACC* permet de distinguer celle ci de la *LFI* en ce sens que, bien que ces lois aient pour objet d'éviter les coûts sociaux et économiques liés à la liquidation de l'actif d'un débiteur, la *LACC* offre plus de souplesse et accorde aux tribunaux un plus grand pouvoir discrétion naire que le mécanisme fondé sur des règles de la *LFI*, ce qui rend la première mieux adaptée aux réorganisa tions complexes. Comme la *LACC* ne précise pas ce qui arrive en cas d'échec de la réorganisation, la *LFI* four nit la norme de référence permettant aux créanciers de savoir s'ils ont la priorité dans l'éventualité d'une faillite. Le travail de réforme législative contemporain a prin cipalement visé à harmoniser les aspects communs à la *LACC* et à la *LFI*, et l'une des caractéristiques importan tes de cette réforme est la réduction des priorités dont jouit la Couronne. Par conséquent, la *LACC* et la *LFI* contiennent toutes deux des dispositions neutralisant les fiducies réputées établies en vertu d'un texte législatif en faveur de la Couronne, et toutes deux comportent des exceptions expresses à la règle générale qui concernent les fiducies réputées établies à l'égard des retenues à la source. Par ailleurs, ces deux lois considèrent les autres créances de la Couronne comme des créances non garan ties. Ces lois ne comportent pas de dispositions claires et expresses établissant une exception pour les créances relatives à la TPS.

Les tribunaux appelés à résoudre le conflit appa rent entre le par. 222(3) de la *LTA* et le par. 18.3(1) de la *LACC* ont été enclins à appliquer l'arrêt *Ottawa Senators Hockey Club Corp. (Re)* et à trancher en faveur de la *LTA*. Il ne convient pas de suivre cet arrêt. C'est plutôt la *LACC* qui énonce la règle applicable. Le paragraphe 222(3) de la *LTA* ne révèle aucune intention explicite du législateur d'abroger l'art. 18.3 de la *LACC*. Quand le législateur a voulu protéger certaines créances de la Couronne au moyen de fiducies réputées et voulu que celles ci continuent de s'appliquer en situation d'insol vabilité, il l'a indiqué de manière explicite et minutieuse. En revanche, il n'existe aucune disposition législative expresse permettant de conclure que les créances relati ves à la TPS bénéficient d'un traitement préférentiel sous le régime de la *LACC* ou de la *LFI*. Il semble découler de la logique interne de la *LACC* que la fiducie réputée établie à l'égard de la TPS est visée par la renonciation du législateur à sa priorité. Il y aurait une étrange asymétrie si l'on concluait que la *LACC* ne traite pas les fiducies réputées à l'égard de la TPS de la même manière que la *LFI*, car cela encouragerait les créanciers à recourir à la loi la plus favorable, minerait les objectifs réparateurs de la *LACC* et risquerait de favoriser les maux sociaux que l'édiction de ce texte législatif visait justement à

recent amendments to the *CCAA* in 2005 resulted in s. 18.3 of the Act being renumbered and reformulated, making it the later in time provision. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*. The conflict between the *ETA* and the *CCAA* is more apparent than real.

The exercise of judicial discretion has allowed the *CCAA* to adapt and evolve to meet contemporary business and social needs. As reorganizations become increasingly complex, *CCAA* courts have been called upon to innovate. In determining their jurisdiction to sanction measures in a *CCAA* proceeding, courts should first interpret the provisions of the *CCAA* before turning to their inherent or equitable jurisdiction. Noteworthy in this regard is the expansive interpretation the lan guage of the *CCAA* is capable of supporting. The gen eral language of the *CCAA* should not be read as being restricted by the availability of more specific orders. The requirements of appropriateness, good faith and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. The question is whether the order will usefully further efforts to avoid the social and economic losses result ing from liquidation of an insolvent company, which extends to both the purpose of the order and the means it employs. Here, the chambers judge's order staying the Crown's GST claim was in furtherance of the *CCAA*'s objectives because it blunted the impulse of creditors to interfere in an orderly liquidation and fostered a harmo nious transition from the *CCAA* to the *BIA*, meeting the objective of a single proceeding that is common to both statutes. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of *BIA* proceedings, but no gap exists between the two statutes because they operate in tandem and creditors in both cases look to the *BIA* scheme of distribution to foreshadow how they will fare if the reorganization is unsuccessful. The breadth of the court's discretion under the *CCAA* is sufficient to construct a bridge to liquidation under the *BIA*. Hence, the chambers judge's order was authorized.

prévenir. Le paragraphe 222(3) de la *LTA*, une dispo sition plus récente et générale que le par. 18.3(1) de la *LACC*, n'exige pas l'application de la doctrine de l'abro gation implicite dans les circonstances de la présente affaire. En tout état de cause, par suite des modifications apportées récemment à la *LACC* en 2005, l'art. 18.3 a été reformulé et renuméroté, ce qui en fait la disposition postérieure. Cette constatation confirme que c'est dans la *LACC* qu'est exprimée l'intention du législateur en ce qui a trait aux fiducies réputées visant la TPS. Le conflit entre la *LTA* et la *LACC* est plus apparent que réel.

L'exercice par les tribunaux de leurs pouvoirs discré tionnaires a fait en sorte que la *LACC* a évolué et s'est adaptée aux besoins commerciaux et sociaux contempo rains. Comme les réorganisations deviennent très com plexes, les tribunaux chargés d'appliquer la *LACC* ont été appelés à innover. Les tribunaux doivent d'abord inter préter les dispositions de la *LACC* avant d'invoquer leur compétence inhérente ou leur compétence en equity pour établir leur pouvoir de prendre des mesures dans le cadre d'une procédure fondée sur la *LACC*. À cet égard, il faut souligner que le texte de la *LACC* peut être interprété très largement. La possibilité pour le tribunal de rendre des ordonnances plus spécifiques n'a pas pour effet de restreindre la portée des termes généraux utilisés dans la *LACC*. L'opportunité, la bonne foi et la diligence sont des considérations de base que le tribunal devrait toujours garder à l'esprit lorsqu'il exerce les pouvoirs conférés par la *LACC*. Il s'agit de savoir si l'ordonnance contribuera utilement à la réalisation de l'objectif d'éviter les pertes sociales et économiques résultant de la liquidation d'une compagnie insolvable. Ce critère s'applique non seule ment à l'objectif de l'ordonnance, mais aussi aux moyens utilisés. En l'espèce, l'ordonnance du juge siégeant en son cabinet qui a suspendu l'exécution des mesures de recou vrement de la Couronne à l'égard de la TPS contribuait à la réalisation des objectifs de la *LACC*, parce qu'elle avait pour effet de dissuader les créanciers d'entraver une liqui dation ordonnée et favorisait une transition harmonieuse entre la *LACC* et la *LFI*, répondant ainsi à l'objectif — commun aux deux lois — qui consiste à avoir une seule procédure. Le passage de la *LACC* à la *LFI* peut exiger la levée partielle d'une suspension de procédures ordonnée en vertu de la *LACC*, de façon à permettre l'engagement des procédures fondées sur la *LFI*, mais il n'existe aucun hiatus entre ces lois étant donné qu'elles s'appliquent de concert et que, dans les deux cas, les créanciers examinent le régime de distribution prévu par la *LFI* pour connaître la situation qui serait la leur en cas d'échec de la réorga nisation. L'ampleur du pouvoir discrétionnaire conféré au tribunal par la *LACC* suffit pour établir une passerelle vers une liquidation opérée sous le régime de la *LFI*. Le juge siégeant en son cabinet pouvait donc rendre l'ordon nance qu'il a prononcée.

No express trust was created by the chambers judge's order in this case because there is no certainty of object inferrable from his order. Creation of an express trust requires certainty of intention, subject matter and object. At the time the chambers judge accepted the proposal to segregate the monies in the Monitor's trust account there was no certainty that the Crown would be the beneficiary, or object, of the trust because exactly who might take the money in the final result was in doubt. In any event, no dispute over the money would even arise under the interpretation of s. 18.3(1) of the *CCAA* established above, because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured cred itor for this amount.

*Per* Fish J.: The GST monies collected by the debtor are not subject to a deemed trust or priority in favour of the Crown. In recent years, Parliament has given detailed consideration to the Canadian insolvency scheme but has declined to amend the provisions at issue in this case, a deliberate exercise of legislative discretion. On the other hand, in upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, courts have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In the con text of the Canadian insolvency regime, deemed trusts exist only where there is a statutory provision creat ing the trust and a *CCAA* or *BIA* provision explicitly confirming its effective operation. The *Income Tax Act*, the *Canada Pension Plan* and the *Employment Insurance Act* all contain deemed trust provisions that are strikingly similar to that in s. 222 of the *ETA* but they are all also confirmed in s. 37 of the *CCAA* and in s. 67(3) of the *BIA* in clear and unmistakeable terms. The same is not true of the deemed trust created under the *ETA*. Although Parliament created a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwith standing any contrary federal or provincial legislation, it did not confirm the continued operation of the trust in either the *BIA* or the *CCAA*, reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

L'ordonnance du juge siégeant en son cabinet n'a pas créé de fiducie expresse en l'espèce, car aucune certi tude d'objet ne peut être inférée de cette ordonnance. La création d'une fiducie expresse exige la présence de certitudes quant à l'intention, à la matière et à l'objet. Lorsque le juge siégeant en son cabinet a accepté la proposition que les sommes soient détenues séparément dans le compte en fiducie du contrôleur, il n'existait aucune certitude que la Couronne serait le bénéficiaire ou l'objet de la fiducie, car il y avait un doute quant à la question de savoir qui au juste pourrait toucher l'argent en fin de compte. De toute façon, suivant l'interpréta tion du par. 18.3(1) de la *LACC* dégagée précédemment, aucun différend ne saurait même exister quant à l'ar gent, étant donné que la priorité accordée aux récla mations de la Couronne fondées sur la fiducie réputée visant la TPS ne s'applique pas sous le régime de la *LACC* et que la Couronne est reléguée au rang de créan cier non garanti à l'égard des sommes en question.

*Le* juge Fish : Les sommes perçues par la débitrice au titre de la TPS ne font l'objet d'aucune fiducie réputée ou priorité en faveur de la Couronne. Au cours des derniè res années, le législateur fédéral a procédé à un examen approfondi du régime canadien d'insolvabilité, mais il a refusé de modifier les dispositions qui sont en cause dans la présente affaire. Il s'agit d'un exercice délibéré du pou voir discrétionnaire de légiférer. Par contre, en mainte nant, malgré l'existence des procédures d'insolvabilité, la validité de fiducies réputées créées en vertu de la *LTA*, les tribunaux ont protégé indûment des droits de la Couronne que le Parlement avait lui même choisi de subordonner à d'autres créances prioritaires. Dans le contexte du régime canadien d'insolvabilité, il existe une fiducie réputée uni quement lorsqu'une disposition législative crée la fiducie et qu'une disposition de la *LACC* ou de la *LFI* confirme explicitement l'existence de la fiducie. La *Loi de l'impôt sur le revenu*, le *Régime de pensions du Canada* et la *Loi sur l'assurance emploi* renferment toutes des dispo sitions relatives aux fiducies réputées dont le libellé offre une ressemblance frappante avec celui de l'art. 222 de la *LTA*, mais le maintien en vigueur des fiducies réputées créées en vertu de ces dispositions est confirmé à l'art. 37 de la *LACC* et au par. 67(3) de la *LFI* en termes clairs et explicites. La situation est différente dans le cas de la fiducie réputée créée par la *LTA*. Bien que le législateur crée en faveur de la Couronne une fiducie réputée dans laquelle seront conservées les sommes recueillies au titre de la TPS mais non encore versées, et bien qu'il prétende maintenir cette fiducie en vigueur malgré les disposi tions à l'effet contraire de toute loi fédérale ou provin ciale, il ne confirme pas l'existence de la fiducie dans la *LFI* ou la *LACC*, ce qui témoigne de son intention de laisser la fiducie réputée devenir caduque au moment de l'introduction de la procédure d'insolvabilité.

*Per* Abella J. (dissenting): Section 222(3) of the *ETA* gives priority during *CCAA* proceedings to the Crown's deemed trust in unremitted GST. This provision unequivocally defines its boundaries in the clearest possible terms and excludes only the *BIA* from its legislative grasp. The language used reflects a clear legislative intention that s. 222(3) would prevail if in conflict with any other law except the *BIA*. This is borne out by the fact that following the enactment of s. 222(3), amendments to the *CCAA* were introduced, and despite requests from various constituencies, s. 18.3(1) was not amended to make the priorities in the *CCAA* consistent with those in the *BIA*. This indicates a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

The application of other principles of interpretation reinforces this conclusion. An earlier, specific provision may be overruled by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails. Section 222(3) achieves this through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" other than the *BIA*. Section 18.3(1) of the *CCAA* is thereby rendered inoperative for purposes of s. 222(3). By operation of s. 44(*f*) of the *Interpretation Act*, the transformation of s. 18.3(1) into s. 37(1) after the enactment of s. 222(3) of the *ETA* has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision. This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding up Act*, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes other than the *BIA* and the *Winding up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

*La* juge Abella (dissidente) : Le paragraphe 222(3) de la *LTA* donne préséance, dans le cadre d'une procédure relevant de la *LACC*, à la fiducie réputée qui est établie en faveur de la Couronne à l'égard de la TPS non versée. Cette disposition définit sans équivoque sa portée dans des termes on ne peut plus clairs et n'exclut que la *LFI* de son champ d'application. Les termes employés révèlent l'intention claire du législateur que le par. 222(3) l'emporte en cas de conflit avec toute autre loi sauf la *LFI*. Cette opinion est confortée par le fait que des modifications ont été apportées à la *LACC* après l'édiction du par. 222(3) et que, malgré les demandes des répétées de divers groupes, le par. 18.3(1) n'a pas été modifié pour aligner l'ordre de priorité établi par la *LACC* sur celui de la *LFI*. Cela indique que le législateur a délibérément choisi de soustraire la fiducie réputée établie au par. 222(3) à l'application du par. 18.3(1) de la *LACC*.

Cette conclusion est renforcée par l'application d'autres principes d'interprétation. Une disposition spécifique antérieure peut être supplantée par une loi ultérieure de portée générale si le législateur, par les mots qu'il a employés, a exprimé l'intention de faire prévaloir la loi générale. Le paragraphe 222(3) accomplit cela de par son libellé, lequel précise que la disposition l'emporte sur tout autre texte législatif fédéral, tout texte législatif provincial ou << toute autre règle de droit >> sauf la *LFI*. Le paragraphe 18.3(1) de la *LACC* est par conséquent rendu inopérant aux fins d'application du par. 222(3). Selon l'alinéa 44*f*) de la *Loi d'interprétation*, le fait que le par. 18.3(1) soit devenu le par. 37(1) à la suite de l'édiction du par. 222(3) de la *LTA* n'a aucune incidence sur l'ordre chronologique du point de vue de l'interprétation, et le par. 222(3) de la *LTA* demeure la disposition << postérieure >>. Il s'ensuit que la disposition créant une fiducie réputée que l'on trouve au par. 222(3) de la *LTA* l'emporte sur le par. 18.3(1) dans le cadre d'une procédure fondée sur la *LACC*. Bien que l'art. 11 accorde au tribunal le pouvoir discrétionnaire de rendre des ordonnances malgré les dispositions de la *LFI* et de la *Loi sur les liquidations*, ce pouvoir discrétionnaire demeure assujetti à l'application de toute autre loi fédérale. L'exercice de ce pouvoir discrétionnaire est donc circonscrit par les limites imposées par toute autre loi que la *LFI* et la *Loi sur les liquidations*, et donc par la *LTA*. En l'espèce, le juge siégeant en son cabinet était donc tenu de respecter le régime de priorités établi au par. 222(3) de la *LTA*. Ni le par. 18.3(1), ni l'art. 11 de la *LACC* ne l'autorisaient à en faire abstraction. Par conséquent, il ne pouvait pas refuser la demande présentée par la Couronne en vue de se faire payer la TPS dans le cadre de la procédure introduite en vertu de la *LACC*.

Cases Cited

By Deschamps J.

Overruled: *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; distinguished: *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; referred to: *Reference re Companies' Creditors Arrangement Act*, [1934] S.C.R. 659; *Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny*, 2009 SCC 49, [2009] 3 S.C.R. 286; *Deputy Minister of Revenue v. Rainville*, [1980] 1 S.C.R. 35; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4th) 192; *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), leave to appeal granted, 2010 QCCA 183 (CanLII); *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411; *First Vancouver Finance v. M.N.R.*, 2002 SCC 49, [2002] 2 S.C.R. 720; *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219; *Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513; *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106; *Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282; *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134; *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9; *Air Canada, Re* (2003), 42 C.B.R. (4th) 173; *Air Canada, Re*, 2003 CanLII 49366; *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158; *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118; *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, aff'g (1999), 12 C.B.R. (4th) 144; *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25; *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108.

By Fish J.

Referred to: *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737.

By Abella J. (dissenting)

*Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; *Tele Mobile Co. v. Ontario*, 2008 SCC 12, [2008] 1 S.C.R. 305; *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862; *Attorney General of Canada v. Public Service Staff Relations Board*, [1977] 2 F.C. 663.

Statutes and Regulations Cited

*An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and*

Jurisprudence

Citée par la juge Deschamps

Arrêt renversé : *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; distinction d'avec l'arrêt : *Doré c. Verdun (Ville)*, [1997] 2 R.C.S. 862; arrêts mentionnés : *Reference re Companies' Creditors Arrangement Act*, [1934] R.C.S. 659; *Québec (Revenu) c. Caisse populaire Desjardins de Montmagny*, 2009 CSC 49, [2009] 3 R.C.S. 286; *Sous ministre du Revenu c. Rainville*, [1980] 1 R.C.S. 35; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4th) 192; *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), autorisation d'appel accordée, 2010 QCCA 183 (CanLII); *Banque Royale du Canada c. Sparrow Electric Corp.*, [1997] 1 R.C.S. 411; *First Vancouver Finance c. M.R.N.*, 2002 CSC 49, [2002] 2 R.C.S. 720; *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219; *Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513; *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106; *Elan Corp. c. Comiskey* (1990), 41 O.A.C. 282; *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134; *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9; *Air Canada, Re* (2003), 42 C.B.R. (4th) 173; *Air Canada, Re*, 2003 CanLII 49366; *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158; *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118; *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, conf. (1999), 12 C.B.R. (4th) 144; *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25; *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108.

Citée par le juge Fish

Arrêt mentionné : *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737.

Citée par la juge Abella (dissidente)

*Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737; *Société Télé Mobile Co. c. Ontario*, 2008 CSC 12, [2008] 1 R.C.S. 305; *Doré c. Verdun (Ville)*, [1997] 2 R.C.S. 862; *Procureur général du Canada c. Commission des relations de travail dans la Fonction publique*, [1977] 2 C.F. 663.

Lois et règlements cités

*Loi d'interprétation*, L.R.C. 1985, ch. I 21, art. 2 « texte », 44f).

*the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47, ss. 69, 128, 131.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B 3, ss. 67, 81.1, 81.2, 86 [am. 1992, c. 27, s. 39; 1997, c. 12, s. 73; 2000, c. 30, s. 148; 2005, c. 47, s. 69; 2009, c. 33, s. 25].

*Canada Pension Plan*, R.S.C. 1985, c. C 8, s. 23.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C 36, ss. 11 [am. 2005, c. 47, s. 128], 11.02 [ad. *idem*], 11.09 [ad. *idem*], 11.4 [am. *idem*], 18.3 [ad. 1997, c. 12, s. 125; rep. 2005, c. 47, s. 131], 18.4 [*idem*], 20 [am. 2005, c. 47, s. 131], 21 [ad. 1997, c. 12, s. 126; am. 2005, c. 47, s. 131], s. 37 [ad. 2005, c. 47, s. 131].

*Companies' Creditors Arrangement Act, 1933*, S.C. 1932 33, c. 36 [am. 1952 53, c. 3].

*Employment Insurance Act*, S.C. 1996, c. 23, ss. 86(2), (2.1).

*Excise Tax Act*, R.S.C. 1985, c. E 15, s. 222.

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.), ss. 227(4), (4.1).

*Interpretation Act*, R.S.C. 1985, c. I 21, ss. 2 "enact ment", 44(*f*).

*Winding up Act*, R.S.C. 1985, c. W 11.

Authors Cited

Canada. Advisory Committee on Bankruptcy and Insolvency. *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency*. Ottawa: Minister of Supply and Services Canada, 1986.

Canada. House of Commons. *Minutes of Proceedings and Evidence of the Standing Committee on Con sumer and Corporate Affairs and Government Oper ations*, Issue No. 15, 3rd Sess., 34th Parl., October 3, 1991, 15:15.

Canada. Industry Canada. Marketplace Framework Policy Branch. *Report on the Operation and Admin istration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Corporate and Insolvency Law Policy Directorate, 2002.

Canada. Senate. *Debates of the Senate*, vol. 142, 1st Sess., 38th Parl., November 23, 2005, p. 2147.

Canada. Senate. Standing Committee on Banking, Trade and Commerce. *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*. Ottawa: Senate of Canada, 2003.

Canada. Study Committee on Bankruptcy and Insolvency Legislation. *Bankruptcy and Insolvency: Report of*

*Loi de l'impôt sur le revenu*, L.R.C. 1985, ch. 1 (5ᵉ suppl.), art. 227(4), (4.1).

*Loi édictant la Loi sur le Programme de protection des salariés et modifiant la Loi sur la faillite et l'insolva bilité, la Loi sur les arrangements avec les créanciers des compagnies et d'autres lois en conséquence*, L.C. 2005, ch. 47, art. 69, 128, 131.

*Loi sur l'assurance emploi*, L.C. 1996, ch. 23, art. 86(2), (2.1).

*Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B 3, art. 67, 81.1, 81.2, 86 [mod. 1992, ch. 27, art. 39; 1997, ch. 12, art. 73; 2000, ch. 30, art. 148; 2005, ch. 47, art. 69; 2009, ch. 33, art. 25].

*Loi sur la taxe d'accise*, L.R.C. 1985, ch. E 15, art. 222.

*Loi sur les arrangements avec les créanciers des com pagnies*, L.R.C. 1985, ch. C 36, art. 11 [mod. 2005, ch. 47, art. 128], 11.02 [aj. *idem*], 11.09 [aj. *idem*], 11.4 [mod. *idem*], 18.3 [aj. 1997, ch. 12, art. 125; abr. 2005, ch. 47, art. 131], 18.4 [*idem*], 20 [mod. 2005, ch. 47, art. 131], 21 [aj. 1997, ch. 12, art. 126; mod. 2005, ch. 47, art. 131], 37 [aj. 2005, ch. 47, art. 131].

*Loi sur les arrangements avec les créanciers des compa gnies*, S.C. 1932 33, ch. 36 [mod. 1952 53, ch. 3]. *Loi sur les liquidations*, L.R.C. 1985, ch. W 11.

*Régime de pensions du Canada*, L.R.C. 1985, ch. C 8, art. 23.

Doctrine citée

Canada. Chambre des communes. *Procès verbaux et témoignages du Comité permanent des Consomma teurs et Sociétés et Administration gouvernementale*, fascicule nᵒ 15, 3ᵉ sess., 34ᵉ lég., 3 octobre 1991, 15:15.

Canada. Comité consultatif en matière de faillite et d'in solvabilité. *Propositions d'amendements à la Loi sur la faillite : Rapport du Comité consultatif en matière de faillite et d'insolvabilité*. Ottawa : Ministre des Approvisionnements et Services Canada, 1986.

Canada. Comité d'étude sur la législation en matière de faillite et d'insolvabilité. *Faillite et Insolvabi lité : Rapport du comité d'étude sur la législation en matière de faillite et d'insolvabilité*. Ottawa : Infor mation Canada, 1970.

Canada. Industrie Canada. Direction générale des politiques cadres du marché. *Rapport sur la mise en application de la Loi sur la faillite et l'insolvabilité et de la Loi sur les arrangements avec les créanciers des compagnies*. Ottawa : Direction des politiques du droit corporatif et de l'insolvabilité, 2002.

Canada. Sénat. Comité sénatorial permanent des ban ques et du commerce. *Les débiteurs et les créanciers doivent se partager le fardeau : Examen de la Loi sur la faillite et l'insolvabilité et de la Loi sur les arrange*

the Study Committee on Bankruptcy and Insolvency Legislation. Ottawa: Information Canada, 1970.

Côté, Pierre André. *The Interpretation of Legislation in Canada*, 3rd ed. Scarborough, Ont.: Carswell, 2000.

Côté, Pierre André, avec la collaboration de Stéphane Beaulac et Mathieu Devinat. *Interprétation des lois*, 4e éd. Montréal: Thémis, 2009.

Edwards, Stanley E. "Reorganizations Under the Com panies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587.

Insolvency Institute of Canada and Canadian Associa tion of Insolvency and Restructuring Professionals. Joint Task Force on Business Insolvency Law Reform. *Report* (2002) (online: http://www.cairp.ca/publica tions/submissions to government/law reform/index. php).

Insolvency Institute of Canada and Canadian Associa tion of Insolvency and Restructuring Professionals. Legislative Review Task Force (Commercial). *Report on the Commercial Provisions of Bill C 55* (2005).

Jackson, Georgina R. and Janis Sarra. "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2007*. Toronto: Thomson Carswell, 2008, 41.

Jones, Richard B. "The Evolution of Canadian Restruc turing: Challenges for the Rule of Law", in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2005*. Toronto: Thomson Carswell, 2006, 481.

Lamer, Francis L. *Priority of Crown Claims in Insol vency*. Toronto: Carswell, 1996 (loose leaf updated 2010, release 1).

Morgan, Barbara K. "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bankr. L.J.* 461.

Sarra, Janis. *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations*. Toronto: Uni versity of Toronto Press, 2003.

Sarra, Janis P. *Rescue! The Companies' Creditors Arrangement Act*. Toronto: Thomson Carswell, 2007.

Sullivan, Ruth. *Sullivan on the Construction of Statutes*, 5th ed. Markham, Ont.: LexisNexis, 2008.

Waters, Donovan W. M., Mark R. Gillen and Lionel D. Smith, eds. *Waters' Law of Trusts in Canada*, 3rd ed. Toronto: Thomson Carswell, 2005.

Wood, Roderick J. *Bankruptcy and Insolvency Law*. Toronto: Irwin Law, 2009.

ments avec les créanciers des compagnies. Ottawa: 2003.

Canada. Sénat. *Débats du Sénat*, vol. 142, 1re sess., 38e lég., 23 novembre 2005, p. 2147.

Côté, Pierre André. *The Interpretation of Legislation in Canada*, 3rd ed. Scarborough, Ont.: Carswell, 2000.

Côté, Pierre André, avec la collaboration de Stéphane Beaulac et Mathieu Devinat. *Interprétation des lois*, 4e éd. Montréal: Thémis, 2009.

Edwards, Stanley E. << Reorganizations Under the Com panies' Creditors Arrangement Act >> (1947), 25 *R. du B. can.* 587.

Institut d'insolvabilité du Canada et Association cana dienne des professionnels de l'insolvabilité et de la réorganisation. Joint Task Force on Business Insol vency Law Reform. *Report* (2002) (en ligne: http://www.cairp.ca/publications/submissions to govern ment/law reform/index.php).

Institut d'insolvabilité du Canada et Association cana dienne des professionnels de l'insolvabilité et de la réorganisation. Legislative Review Task Force (Com mercial). *Report on the Commercial Provisions of Bill C 55* (2005).

Jackson, Georgina R. and Janis Sarra. << Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters >>, in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2007*. Toronto: Thomson Carswell, 2008, 41.

Jones, Richard B. << The Evolution of Canadian Restruc turing: Challenges for the Rule of Law >>, in Janis P. Sarra, ed., *Annual Review of Insolvency Law 2005*. Toronto: Thomson Carswell, 2006, 481.

Lamer, Francis L. *Priority of Crown Claims in Insol vency*. Toronto: Carswell, 1996 (loose leaf updated 2010, release 1).

Morgan, Barbara K. << Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy >> (2000), 74 *Am. Bankr. L.J.* 461.

Sarra, Janis. *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations*. Toronto: Uni versity of Toronto Press, 2003.

Sarra, Janis P. *Rescue! The Companies' Creditors Arrangement Act*. Toronto: Thomson Carswell, 2007.

Sullivan, Ruth. *Sullivan on the Construction of Statutes*, 5th ed. Markham, Ont.: LexisNexis, 2008.

Waters, Donovan W. M., Mark R. Gillen and Lionel D. Smith, eds. *Waters' Law of Trusts in Canada*, 3rd ed. Toronto: Thomson Carswell, 2005.

Wood, Roderick J. *Bankruptcy and Insolvency Law*. Toronto: Irwin Law, 2009.

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Tysoe and Smith JJ.A.), 2009 BCCA 205, 98 B.C.L.R. (4th) 242, 270 B.C.A.C. 167, 454 W.A.C. 167, [2009] 12 W.W.R. 684, [2009] G.S.T.C. 79, [2009] B.C.J. No. 918 (QL), 2009 CarswellBC 1195, reversing a judg ment of Brenner C.J.S.C., 2008 BCSC 1805, [2008] G.S.T.C. 221, [2008] B.C.J. No. 2611 (QL), 2008 CarswellBC 2895, dismissing a Crown applica tion for payment of GST monies. Appeal allowed, Abella J. dissenting.

*Mary I. A. Buttery*, *Owen J. James* and *Matthew J. G. Curtis*, for the appellant.

*Gordon Bourgard*, *David Jacyk* and *Michael J. Lema*, for the respondent.

The judgment of McLachlin C.J. and Binnie, LeBel, Deschamps, Charron, Rothstein and Cromwell JJ. was delivered by

[1]    DESCHAMPS J. — For the first time this Court is called upon to directly interpret the provisions of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C 36 ("*CCAA*"). In that respect, two questions are raised. The first requires reconciliation of provisions of the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E 15 ("*ETA*"), which lower courts have held to be in conflict with one another. The second concerns the scope of a court's discretion when supervising reorganization. The relevant statutory provisions are reproduced in the Appendix. On the first question, having considered the evolution of Crown priorities in the context of insolvency and the wording of the various statutes creating Crown priorities, I conclude that it is the *CCAA* and not the *ETA* that provides the rule. On the second question, I conclude that the broad discretionary jurisdiction conferred on the supervising judge must be interpreted having regard to the remedial nature of the *CCAA* and insolvency legislation generally. Consequently, the court had the discretion to partially lift a stay of proceedings to allow the debtor to make an assignment under the *Bankruptcy and Insolvency*

POURVOI contre un arrêt de la Cour d'appel de la Colombie Britannique (les juges Newbury, Tysoe et Smith), 2009 BCCA 205, 98 B.C.L.R. (4th) 242, 270 B.C.A.C. 167, 454 W.A.C. 167, [2009] 12 W.W.R. 684, [2009] G.S.T.C. 79, [2009] B.C.J. No. 918 (QL), 2009 CarswellBC 1195, qui a infirmé une décision du juge en chef Brenner, 2008 BCSC 1805, [2008] G.S.T.C. 221, [2008] B.C.J. No. 2611 (QL), 2008 CarswellBC 2895, qui a rejeté la demande de la Couronne sollicitant le paiement de la TPS. Pourvoi accueilli, la juge Abella est dissidente.

*Mary I. A. Buttery*, *Owen J. James* et *Matthew J. G. Curtis*, pour l'appelante.

*Gordon Bourgard*, *David Jacyk* et *Michael J. Lema*, pour l'intimé.

Version française du jugement de la juge en chef McLachlin et des juges Binnie, LeBel, Deschamps, Charron, Rothstein et Cromwell rendu par

[1]    lA JUGE DESCHAMPS — C'est la première fois que la Cour est appelée à interpréter directement les dispositions de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C 36 (<< *LACC* >>). À cet égard, deux questions sont soulevées. La première requiert la concilia tion d'une disposition de la *LACC* et d'une disposi tion de la *Loi sur la taxe d'accise*, L.R.C. 1985, ch. E 15 (<< *LTA* >>), qui, selon des juridictions inférieu res, sont en conflit l'une avec l'autre. La deuxième concerne la portée du pouvoir discrétionnaire du tribunal qui surveille une réorganisation. Les dis positions législatives pertinentes sont reproduites en annexe. Pour ce qui est de la première question, après avoir examiné l'évolution des priorités de la Couronne en matière d'insolvabilité et le libellé des diverses lois qui établissent ces priorités, j'arrive à la conclusion que c'est la *LACC*, et non la *LTA*, qui énonce la règle applicable. Pour ce qui est de la seconde question, je conclus qu'il faut interpré ter les larges pouvoirs discrétionnaires conférés au juge en tenant compte de la nature réparatrice de la *LACC* et de la législation sur l'insolvabilité en général. Par conséquent, le tribunal avait le pouvoir

*Act*, R.S.C. 1985, c. B 3 ("*BIA*"). I would allow the appeal.

1.  Facts and Decisions of the Courts Below

[2]  Ted LeRoy Trucking Ltd. ("LeRoy Trucking") commenced proceedings under the *CCAA* in the Supreme Court of British Columbia on December 13, 2007, obtaining a stay of proceedings with a view to reorganizing its financial affairs. LeRoy Trucking sold certain redundant assets as authorized by the order.

[3]  Amongst the debts owed by LeRoy Trucking was an amount for Goods and Services Tax ("GST") collected but unremitted to the Crown. The *ETA* creates a deemed trust in favour of the Crown for amounts collected in respect of GST. The deemed trust extends to any property or proceeds held by the person collecting GST and any property of that person held by a secured creditor, requiring that property to be paid to the Crown in priority to all security interests. The *ETA* provides that the deemed trust operates despite any other enactment of Canada except the *BIA*. However, the *CCAA* also provides that subject to certain exceptions, none of which mentions GST, deemed trusts in favour of the Crown do not operate under the *CCAA*. Accordingly, under the *CCAA* the Crown ranks as an unsecured creditor in respect of GST. Nonetheless, at the time LeRoy Trucking commenced *CCAA* proceedings the leading line of jurisprudence held that the *ETA* took precedence over the *CCAA* such that the Crown enjoyed priority for GST claims under the *CCAA*, even though it would have lost that same priority under the *BIA*. The *CCAA* underwent substantial amendments in 2005 in which some of the provisions at issue in this appeal were renumbered and reformulated (S.C. 2005, c. 47). However, these amendments only came into force on September 18, 2009. I will refer to the amended provisions only where relevant.

discrétionnaire de lever partiellement la suspension des procédures pour permettre au débiteur de faire cession de ses biens en vertu de la *Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B 3 (<< *LFI* >>). Je suis d'avis d'accueillir le pourvoi.

1.  Faits et décisions des juridictions inférieures

[2]  Le 13 décembre 2007, Ted LeRoy Trucking Ltd. (<< LeRoy Trucking >>) a déposé une requête sous le régime de la *LACC* devant la Cour suprême de la Colombie Britannique et obtenu la suspension des procédures dans le but de réorganiser ses finances. L'entreprise a vendu certains éléments d'actif excédentaires, comme l'y autorisait l'ordonnance.

[3]  Parmi les dettes de LeRoy Trucking figurait une somme perçue par celle ci au titre de la taxe sur les produits et services (<< TPS >>) mais non versée à la Couronne. La *LTA* crée en faveur de la Couronne une fiducie réputée visant les sommes perçues au titre de la TPS. Cette fiducie réputée s'applique à tout bien ou toute recette détenue par la personne qui perçoit la TPS et à tout bien de cette personne détenu par un créancier garanti, et le produit décou lant de ces biens doit être payé à la Couronne par priorité sur tout droit en garantie. Aux termes de la *LTA*, la fiducie réputée s'applique malgré tout autre texte législatif du Canada sauf la *LFI*. Cependant, la *LACC* prévoit également que, sous réserve de cer taines exceptions, dont aucune ne concerne la TPS, ne s'appliquent pas sous son régime les fiducies réputées qui existent en faveur de la Couronne. Par conséquent, pour ce qui est de la TPS, la Couronne est un créancier non garanti dans le cadre de cette loi. Néanmoins, à l'époque où LeRoy Trucking a débuté ses procédures en vertu de la *LACC*, la juris prudence dominante indiquait que la *LTA* l'empor tait sur la *LACC*, la Couronne jouissant ainsi d'un droit prioritaire à l'égard des créances relatives à la TPS dans le cadre de la *LACC*, malgré le fait qu'elle aurait perdu cette priorité en vertu de la *LFI*. La *LACC* a fait l'objet de modifications substantielles en 2005, et certaines des dispositions en cause dans le présent pourvoi ont alors été renumérotées et refor mulées (L.C. 2005, ch. 47). Mais ces modifications ne sont entrées en vigueur que le 18 septembre 2009. Je ne me reporterai aux dispositions modifiées que lorsqu'il sera utile de le faire.

[4]  On April 29, 2008, Brenner C.J.S.C., in the context of the *CCAA* proceedings, approved a payment not exceeding $5 million, the proceeds of redundant asset sales, to Century Services, the debtor's major secured creditor. LeRoy Trucking proposed to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. In order to maintain the *status quo* while the success of the reorganization was uncertain, Brenner C.J.S.C. agreed to the proposal and ordered that an amount of $305,202.30 be held by the Monitor in its trust account.

[5]  On September 3, 2008, having concluded that reorganization was not possible, LeRoy Trucking sought leave to make an assignment in bankruptcy under the *BIA*. The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. Brenner C.J.S.C. dismissed the latter application. Reasoning that the purpose of segregating the funds with the Monitor was "to facilitate an ultimate payment of the GST monies which were owed pre filing, but only if a viable plan emerged", the failure of such a reorganization, followed by an assignment in bankruptcy, meant the Crown would lose priority under the *BIA* (2008 BCSC 1805, [2008] G.S.T.C. 221).

[6]  The Crown's appeal was allowed by the British Columbia Court of Appeal (2009 BCCA 205, 270 B.C.A.C. 167). Tysoe J.A. for a unanimous court found two independent bases for allowing the Crown's appeal.

[7]  First, the court's authority under s. 11 of the *CCAA* was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and

[4]  Le 29 avril 2008, le juge en chef Brenner de la Cour suprême de la Colombie Britannique, dans le contexte des procédures intentées en vertu de la *LACC*, a approuvé le paiement à Century Services, le principal créancier garanti du débiteur, d'une somme d'au plus cinq millions de dollars, soit le produit de la vente d'éléments d'actif excédentaires. LeRoy Trucking a proposé de retenir un montant égal aux sommes perçues au titre de la TPS mais non versées à la Couronne et de le déposer dans le compte en fiducie du contrôleur jusqu'à ce que l'issue de la réorganisation soit connue. Afin de maintenir le statu quo, en raison du succès incer tain de la réorganisation, le juge en chef Brenner a accepté la proposition et ordonné qu'une somme de 305 202,30 $ soit détenue par le contrôleur dans son compte en fiducie.

[5]  Le 3 septembre 2008, ayant conclu que la réorganisation n'était pas possible, LeRoy Trucking a demandé à la Cour suprême de la Colombie Britannique l'autorisation de faire cession de ses biens en vertu de la *LFI*. Pour sa part, la Couronne a demandé au tribunal d'ordonner le paiement au receveur général du Canada de la somme détenue par le contrôleur au titre de la TPS. Le juge en chef Brenner a rejeté cette dernière demande. Selon lui, comme la détention des fonds dans le compte en fiducie du contrôleur visait à [**TRADUCTIoN**] « faci liter le paiement final des sommes de TPS qui étaient dues avant que l'entreprise ne débute les pro cédures, mais seulement si un plan viable était pro posé », l'impossibilité de procéder à une telle réor ganisation, suivie d'une cession de biens, signifiait que la Couronne perdrait sa priorité sous le régime de la *LFI* (2008 BCSC 1805, [2008] G.S.T.C. 221).

[6]  La Cour d'appel de la Colombie Britannique a accueilli l'appel interjeté par la Couronne (2009 BCCA 205, 270 B.C.A.C. 167). Rédigeant l'arrêt unanime de la cour, le juge Tysoe a invoqué deux raisons distinctes pour y faire droit.

[7]  Premièrement, le juge d'appel Tysoe a conclu que le pouvoir conféré au tribunal par l'art. 11 de la *LACC* n'autorisait pas ce dernier à rejeter la demande de la Couronne sollicitant le paiement immédiat des sommes de TPS faisant l'objet de la fiducie réputée,

that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the *CCAA* and the court was bound under the priority scheme provided by the *ETA* to allow payment to the Crown. In so holding, Tysoe J.A. adopted the reasoning in *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), which found that the *ETA* deemed trust for GST established Crown priority over secured creditors under the *CCAA*.

[8] Second, Tysoe J.A. concluded that by ordering the GST funds segregated in the Monitor's trust account on April 29, 2008, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes. The Court of Appeal therefore ordered that the money held by the Monitor in trust be paid to the Receiver General.

## 2. Issues

[9] This appeal raises three broad issues which are addressed in turn:

(1) Did s. 222(3) of the *ETA* displace s. 18.3(1) of the *CCAA* and give priority to the Crown's *ETA* deemed trust during *CCAA* proceedings as held in *Ottawa Senators*?

(2) Did the court exceed its *CCAA* authority by lifting the stay to allow the debtor to make an assignment in bankruptcy?

(3) Did the court's order of April 29, 2008 requiring segregation of the Crown's GST claim in the Monitor's trust account create an express trust in favour of the Crown in respect of those funds?

après qu'il fut devenu clair que la tentative de réorganisation avait échoué et que la faillite était inévitable. Comme la restructuration n'était plus une possibilité, il ne servait plus à rien, dans le cadre de la *LACC*, de suspendre le paiement à la Couronne des sommes de TPS et le tribunal était tenu, en raison de la priorité établie par la *LTA*, d'en autoriser le versement à la Couronne. Ce faisant, le juge Tysoe a adopté le raisonnement énoncé dans l'arrêt *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), suivant lequel la fiducie réputée que crée la *LTA* à l'égard des sommes dues au titre de la TPS établissait la priorité de la Couronne sur les créanciers garantis dans le cadre de la *LACC*.

[8] Deuxièmement, le juge Tysoe a conclu que, en ordonnant la ségrégation des sommes de TPS dans le compte en fiducie du contrôleur le 29 avril 2008, le tribunal avait créé une fiducie expresse en faveur de la Couronne, et que les sommes visées ne pouvaient être utilisées à quelque autre fin que ce soit. En conséquence, la Cour d'appel a ordonné que les sommes détenues par le contrôleur en fiducie pour la Couronne soient versées au receveur général.

## 2. Questions en litige

[9] Le pourvoi soulève trois grandes questions que j'examinerai à tour de rôle :

(1) Le paragraphe 222(3) de la *LTA* l'emporte-t-il sur le par. 18.3(1) de la *LACC* et donne-t-il priorité à la fiducie réputée qui est établie par la *LTA* en faveur de la Couronne pendant des procédures régies par la *LACC*, comme il a été décidé dans l'arrêt *Ottawa Senators*?

(2) Le tribunal a-t-il outrepassé les pouvoirs qui lui étaient conférés par la *LACC* en levant la suspension des procédures dans le but de permettre au débiteur de faire cession de ses biens?

(3) L'ordonnance du tribunal datée du 29 avril 2008 exigeant que le montant de TPS réclamé par la Couronne soit détenu séparément dans le compte en fiducie du contrôleur a-t-elle créé une fiducie expresse en faveur de la Couronne à l'égard des fonds en question?

3. Analysis

[10]  The first issue concerns Crown priorities in the context of insolvency. As will be seen, the *ETA* provides for a deemed trust in favour of the Crown in respect of GST owed by a debtor "[d]espite . . . any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)" (s. 222(3)), while the *CCAA* stated at the relevant time that "notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be [so] regarded" (s. 18.3(1)). It is difficult to imagine two statutory provisions more apparently in conflict. However, as is often the case, the apparent conflict can be resolved through interpretation.

[11]  In order to properly interpret the provisions, it is necessary to examine the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament, and the principles that have been recognized in the jurisprudence. It will be seen that Crown priorities in the insolvency context have been significantly pared down. The resolution of the second issue is also rooted in the context of the *CCAA*, but its purpose and the manner in which it has been interpreted in the case law are also key. After examining the first two issues in this case, I will address Tysoe J.A.'s conclusion that an express trust in favour of the Crown was created by the court's order of April 29, 2008.

3.1  *Purpose and Scope of Insolvency Law*

[12]  Insolvency is the factual situation that arises when a debtor is unable to pay creditors (see generally, R. J. Wood, *Bankruptcy and Insolvency Law* (2009), at p. 16). Certain legal proceedings become available upon insolvency, which typically allow a debtor to obtain a court order staying its creditors' enforcement actions and attempt to obtain

3. Analyse

[10]    La première question porte sur les priorités de la Couronne dans le contexte de l'insolvabilité. Comme nous le verrons, la *LTA* crée en faveur de la Couronne une fiducie réputée à l'égard de la TPS due par un débiteur « [m]algré [. . .] tout autre texte législatif fédéral (sauf la *Loi sur la faillite et l'in solvabilité*) >> (par. 222(3)), alors que selon la dis position de la *LACC* en vigueur à l'époque, « par dérogation à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler cer tains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme [tel] >> (par. 18.3(1)). Il est difficile d'imaginer deux dispositions législa tives plus contradictoires en apparence. Cependant, comme c'est souvent le cas, le conflit apparent peut être résolu au moyen des principes d'interprétation législative.

[11]    Pour interpréter correctement ces dispositions, il faut examiner l'historique de la *LACC*, la fonction de cette loi parmi l'ensemble des textes adoptés par le législateur fédéral en matière d'insolvabilité et les principes reconnus dans la jurisprudence. Nous verrons que les priorités de la Couronne en matière d'insolvabilité ont été restreintes de façon appré ciable. La réponse à la deuxième question repose aussi sur le contexte de la *LACC*, mais l'objectif de cette loi et l'interprétation qu'en a donnée la juris prudence jouent également un rôle essentiel. Après avoir examiné les deux premières questions soule vées en l'espèce, j'aborderai la conclusion du juge Tysoe selon laquelle l'ordonnance rendue par le tri bunal le 29 avril 2008 a eu pour effet de créer une fiducie expresse en faveur de la Couronne.

3.1  *Objectif et portée du droit relatif à l'insolvabi lité*

[12]    L'insolvabilité est la situation de fait qui se présente quand un débiteur n'est pas en mesure de payer ses créanciers (voir, généralement, R. J. Wood, *Bankruptcy and Insolvency Law* (2009), p. 16). Certaines procédures judiciaires peuvent être inten tées en cas d'insolvabilité. Ainsi, le débiteur peut généralement obtenir une ordonnance judiciaire

a binding compromise with creditors to adjust the payment conditions to something more realistic. Alternatively, the debtor's assets may be liquidated and debts paid from the proceeds according to statutory priority rules. The former is usually referred to as reorganization or restructuring while the latter is termed liquidation.

[13] Canadian commercial insolvency law is not codified in one exhaustive statute. Instead, Parliament has enacted multiple insolvency statutes, the main one being the *BIA*. The *BIA* offers a self contained legal regime providing for both reorganization and liquidation. Although bankruptcy legislation has a long history, the *BIA* itself is a fairly recent statute — it was enacted in 1992. It is characterized by a rules based approach to proceedings. The *BIA* is available to insolvent debtors owing $1000 or more, regardless of whether they are natural or legal persons. It contains mechanisms for debtors to make proposals to their creditors for the adjustment of debts. If a proposal fails, the *BIA* contains a bridge to bankruptcy whereby the debtor's assets are liquidated and the proceeds paid to creditors in accordance with the statutory scheme of distribution.

[14] Access to the *CCAA* is more restrictive. A debtor must be a company with liabilities in excess of $5 million. Unlike the *BIA*, the *CCAA* contains no provisions for liquidation of a debtor's assets if reorganization fails. There are three ways of exiting *CCAA* proceedings. The best outcome is achieved when the stay of proceedings provides the debtor with some breathing space during which solvency is restored and the *CCAA* process terminates without reorganization being needed. The second most desirable outcome occurs when the debtor's compromise or arrangement is accepted by its creditors and the reorganized company emerges from the *CCAA* proceedings as a going concern. Lastly, if the compromise or arrangement fails, either

ayant pour effet de suspendre les mesures d'exécu tion de ses créanciers, puis tenter de conclure avec eux une transaction à caractère exécutoire conte nant des conditions de paiement plus réalistes. Ou alors, les biens du débiteur sont liquidés et ses dettes sont remboursées sur le produit de cette liquidation, selon les règles de priorité établies par la loi. Dans le premier cas, on emploie habituellement les termes de réorganisation ou de restructuration, alors que dans le second, on parle de liquidation.

[13]    Le droit canadien en matière d'insolvabilité commerciale n'est pas codifié dans une seule loi exhaustive. En effet, le législateur a plutôt adopté plusieurs lois sur l'insolvabilité, la principale étant la *LFI*. Cette dernière établit un régime juridique autonome qui concerne à la fois la réorganisation et la liquidation. Bien qu'il existe depuis longtemps des mesures législatives relatives à la faillite, la *LFI* elle même est une loi assez récente — elle a été adoptée en 1992. Ses procédures se caractérisent par une approche fondée sur des règles préétablies. Les débiteurs insolvables — personnes physiques ou personnes morales — qui doivent 1 000 $ ou plus peuvent recourir à la *LFI*. Celle ci comporte des mécanismes permettant au débiteur de présen ter à ses créanciers une proposition de rajustement des dettes. Si la proposition est rejetée, la *LFI* établit la démarche aboutissant à la faillite : les biens du débiteur sont liquidés et le produit de cette liqui dation est versé aux créanciers conformément à la répartition prévue par la loi.

[14]    La possibilité de recourir à la *LACC* est plus restreinte. Le débiteur doit être une compa gnie dont les dettes dépassent cinq millions de dol lars. Contrairement à la *LFI*, la *LACC* ne contient aucune disposition relative à la liquidation de l'ac tif d'un débiteur en cas d'échec de la réorganisa tion. Une procédure engagée sous le régime de la *LACC* peut se terminer de trois façons différen tes. Le scénario idéal survient dans les cas où la suspension des recours donne au débiteur un répit lui permettant de rétablir sa solvabilité et où le processus régi par la *LACC* prend fin sans qu'une réorganisation soit nécessaire. Le deuxième scé nario le plus souhaitable est le cas où la transac tion ou l'arrangement proposé par le débiteur est

the company or its creditors usually seek to have the debtor's assets liquidated under the applicable provisions of the *BIA* or to place the debtor into receivership. As discussed in greater detail below, the key difference between the reorganization regimes under the *BIA* and the *CCAA* is that the latter offers a more flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations.

[15]   As I will discuss at greater length below, the purpose of the *CCAA* — Canada's first reorganization statute — is to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets. Proposals to creditors under the *BIA* serve the same remedial purpose, though this is achieved through a rules based mechanism that offers less flexibility. Where reorganization is impossible, the *BIA* may be employed to provide an orderly mechanism for the distribution of a debtor's assets to satisfy creditor claims according to predetermined priority rules.

[16]   Prior to the enactment of the *CCAA* in 1933 (S.C. 1932 33, c. 36), practice under existing commercial insolvency legislation tended heavily towards the liquidation of a debtor company (J. Sarra, *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations* (2003), at p. 12). The battering visited upon Canadian businesses by the Great Depression and the absence of an effective mechanism for reaching a compromise between debtors and creditors to avoid liquidation required a legislative response. The *CCAA* was innovative as it allowed the insolvent debtor to attempt reorganization under judicial supervision outside the existing insolvency legislation which, once engaged, almost invariably resulted in liquidation (*Reference re Companies' Creditors*

accepté par ses créanciers et où la compagnie réorganisée poursuit ses activités au terme de la procédure engagée en vertu de la *LACC*. Enfin, dans le dernier scénario, la transaction ou l'arrangement échoue et la compagnie ou ses créanciers cherchent habituellement à obtenir la liquidation des biens en vertu des dispositions applicables de la *LFI* ou la mise sous séquestre du débiteur. Comme nous le verrons, la principale différence entre les régimes de réorganisation prévus par la *LFI* et la *LACC* est que le second établit un mécanisme plus souple, dans lequel les tribunaux disposent d'un plus grand pouvoir discrétionnaire, ce qui rend le mécanisme mieux adapté aux réorganisations complexes.

[15]   Comme je vais le préciser davantage plus loin, la *LACC* — la première loi canadienne régissant la réorganisation — a pour objectif de permettre au débiteur de continuer d'exercer ses activités et, dans les cas où cela est possible, d'éviter les coûts sociaux et économiques liés à la liquidation de son actif. Les propositions faites aux créanciers en vertu de la *LFI* répondent au même objectif, mais au moyen d'un mécanisme fondé sur des règles et offrant moins de souplesse. Quand la réorganisation s'avère impossible, les dispositions de la *LFI* peuvent être appliquées pour répartir de manière ordonnée les biens du débiteur entre les créanciers, en fonction des règles de priorité qui y sont établies.

[16]   Avant l'adoption de la *LACC* en 1933 (S.C. 1932 33, ch. 36), la liquidation de la compagnie débitrice constituait la pratique la plus courante en vertu de la législation existante en matière d'insolvabilité commerciale (J. Sarra, *Creditor Rights and the Public Interest : Restructuring Insolvent Corporations* (2003), p. 12). Les ravages de la Grande Dépression sur les entreprises canadiennes et l'absence d'un mécanisme efficace susceptible de permettre aux débiteurs et aux créanciers d'arriver à des compromis afin d'éviter la liquidation commandaient une solution législative. La *LACC* a innové en permettant au débiteur insolvable de tenter une réorganisation sous surveillance judiciaire, hors du cadre de la législation existante en matière d'insolvabilité qui, une fois entrée en jeu,

*Arrangement Act*, [1934] S.C.R. 659, at pp. 660 61; Sarra, *Creditor Rights*, at pp. 12 13).

[17]  Parliament understood when adopting the *CCAA* that liquidation of an insolvent company was harmful for most of those it affected — notably creditors and employees — and that a workout which allowed the company to survive was optimal (Sarra, *Creditor Rights*, at pp. 13 15).

[18]  Early commentary and jurisprudence also endorsed the *CCAA*'s remedial objectives. It recognized that companies retain more value as going concerns while underscoring that intangible losses, such as the evaporation of the companies' goodwill, result from liquidation (S. E. Edwards, "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587, at p. 592). Reorganization serves the public interest by facilitating the survival of companies supplying goods or services crucial to the health of the economy or saving large numbers of jobs (*ibid.*, at p. 593). Insolvency could be so widely felt as to impact stakeholders other than creditors and employees. Variants of these views resonate today, with reorganization justified in terms of rehabilitating companies that are key elements in a complex web of interdependent economic relationships in order to avoid the negative consequences of liquidation.

[19]  The *CCAA* fell into disuse during the next several decades, likely because amendments to the Act in 1953 restricted its use to companies issuing bonds (S.C. 1952 53, c. 3). During the economic downturn of the early 1980s, insolvency lawyers and courts adapting to the resulting wave of insolvencies resurrected the statute and deployed it in response to new economic challenges. Participants in insolvency proceedings grew to recognize and appreciate the statute's distinguishing feature: a grant of broad and flexible authority to the supervising court to make

aboutissait presque invariablement à la liquidation (*Reference re Companies' Creditors Arrangement Act*, [1934] R.C.S. 659, p. 660 661; Sarra, *Creditor Rights*, p. 12 13).

[17]  Le législateur comprenait, lorsqu'il a adopté la *LACC*, que la liquidation d'une compagnie insol vable causait préjudice à la plupart des person nes touchées — notamment les créanciers et les employés — et que la meilleure solution consistait dans un arrangement permettant à la compagnie de survivre (Sarra, *Creditor Rights*, p. 13 15).

[18]  Les premières analyses et décisions judiciai res à cet égard ont également entériné les objectifs réparateurs de la *LACC*. On y reconnaissait que la valeur de la compagnie demeurait plus grande lors que celle ci pouvait poursuivre ses activités, tout en soulignant les pertes intangibles découlant d'une liquidation, par exemple la disparition de la clien tèle (S. E. Edwards, « Reorganizations Under the Companies' Creditors Arrangement Act » (1947), 25 *R. du B. can.* 587, p. 592). La réorganisation sert l'intérêt public en permettant la survie de com pagnies qui fournissent des biens ou des services essentiels à la santé de l'économie ou en préservant un grand nombre d'emplois (*ibid.*, p. 593). Les effets de l'insolvabilité pouvaient même toucher d'autres intéressés que les seuls créanciers et employés. Ces arguments se font entendre encore aujourd'hui sous une forme un peu différente, lorsqu'on justifie la réorganisation par la nécessité de remettre sur pied des compagnies qui constituent des volets essentiels d'un réseau complexe de rapports économiques interdépendants, dans le but d'éviter les effets néga tifs de la liquidation.

[19]  La *LACC* est tombée en désuétude au cours des décennies qui ont suivi, vraisemblablement parce que des modifications apportées en 1953 ont restreint son application aux compagnies émet tant des obligations (S.C. 1952 53, ch. 3). Pendant la récession du début des années 1980, obligés de s'adapter au nombre grandissant d'entreprises en difficulté, les avocats travaillant dans le domaine de l'insolvabilité ainsi que les tribunaux ont redé couvert cette loi et s'en sont servis pour relever les nouveaux défis de l'économie. Les participants aux

the orders necessary to facilitate the reorganization of the debtor and achieve the *CCAA*'s objectives. The manner in which courts have used *CCAA* jurisdiction in increasingly creative and flexible ways is explored in greater detail below.

[20] Efforts to evolve insolvency law were not restricted to the courts during this period. In 1970, a government commissioned panel produced an extensive study recommending sweeping reform but Parliament failed to act (see *Bankruptcy and Insolvency: Report of the Study Committee on Bankruptcy and Insolvency Legislation* (1970)). Another panel of experts produced more limited recommendations in 1986 which eventually resulted in enactment of the *Bankruptcy and Insolvency Act* of 1992 (S.C. 1992, c. 27) (see *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)). Broader provisions for reorganizing insolvent debtors were then included in Canada's bankruptcy statute. Although the 1970 and 1986 reports made no specific recommendations with respect to the *CCAA*, the House of Commons committee studying the *BIA*'s predecessor bill, C 22, seemed to accept expert testimony that the *BIA*'s new reorganization scheme would shortly supplant the *CCAA*, which could then be repealed, with commercial insolvency and bankruptcy being governed by a single statute (*Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, 3rd Sess., 34th Parl., October 3, 1991, at 15:15 15:16).

[21]  In retrospect, this conclusion by the House of Commons committee was out of step with reality. It overlooked the renewed vitality the *CCAA* enjoyed in contemporary practice and the advantage that a

procédures en sont peu à peu venus à reconnaître et à apprécier la caractéristique propre de la loi : l'at tribution, au tribunal chargé de surveiller le proces sus, d'une grande latitude lui permettant de rendre les ordonnances nécessaires pour faciliter la réor ganisation du débiteur et réaliser les objectifs de la *LACC*. Nous verrons plus loin comment les tribu naux ont utilisé de façon de plus en plus souple et créative les pouvoirs qui leur sont conférés par la *LACC*.

[20]  Ce ne sont pas seulement les tribunaux qui se sont employés à faire évoluer le droit de l'insol vabilité pendant cette période. En 1970, un comité constitué par le gouvernement a mené une étude approfondie au terme de laquelle il a recommandé une réforme majeure, mais le législateur n'a rien fait (voir *Faillite et insolvabilité : Rapport du comité d'étude sur la législation en matière de faillite et d'insolvabilité* (1970)). En 1986, un autre comité d'experts a formulé des recommandations de portée plus restreinte, qui ont finalement conduit à l'adop tion de la *Loi sur la faillite et l'insolvabilité* de 1992 (L.C. 1992, ch. 27) (voir *Propositions d'amende ments à la Loi sur la faillite : Rapport du Comité consultatif en matière de faillite et d'insolvabilité* (1986)). Des dispositions à caractère plus général concernant la réorganisation des débiteurs insolva bles ont alors été ajoutées à la loi canadienne relative à la faillite. Malgré l'absence de recommandations spécifiques au sujet de la *LACC* dans les rapports de 1970 et 1986, le comité de la Chambre des commu nes qui s'est penché sur le projet de loi C 22 à l'ori gine de la *LFI* a semblé accepter le témoignage d'un expert selon lequel le nouveau régime de réorgani sation de la *LFI* supplanterait rapidement la *LACC*, laquelle pourrait alors être abrogée et l'insolvabilité commerciale et la faillite seraient ainsi régies par un seul texte législatif (*Procès verbaux et témoi gnages du Comité permanent des Consommateurs et Sociétés et Administration gouvernementale*, fas cicule nº 15, 3ᵉ sess., 34ᵉ lég., 3 octobre 1991, 15:15 15:16).

[21]  En rétrospective, cette conclusion du comité de la Chambre des communes ne correspondait pas à la réalité. Elle ne tenait pas compte de la nouvelle vitalité de la *LACC* dans la pratique contemporaine,

flexible judicially supervised reorganization process presented in the face of increasingly complex reorganizations, when compared to the stricter rules based scheme contained in the *BIA*. The "flexibility of the *CCAA* [was seen as] a great benefit, allowing for creative and effective decisions" (Industry Canada, Marketplace Framework Policy Branch, *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2002), at p. 41). Over the past three decades, resurrection of the *CCAA* has thus been the mainspring of a process through which, one author concludes, "the legal setting for Canadian insolvency restructuring has evolved from a rather blunt instrument to one of the most sophisticated systems in the developed world" (R. B. Jones, "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2005* (2006), 481, at p. 481).

[22] While insolvency proceedings may be governed by different statutory schemes, they share some commonalities. The most prominent of these is the single proceeding model. The nature and purpose of the single proceeding model are described by Professor Wood in *Bankruptcy and Insolvency Law*:

They all provide a collective proceeding that supersedes the usual civil process available to creditors to enforce their claims. The creditors' remedies are collectivized in order to prevent the free for all that would otherwise prevail if creditors were permitted to exercise their remedies. In the absence of a collective process, each creditor is armed with the knowledge that if they do not strike hard and swift to seize the debtor's assets, they will be beat out by other creditors. [pp. 2 3]

The single proceeding model avoids the inefficiency and chaos that would attend insolvency if each creditor initiated proceedings to recover its debt. Grouping all possible actions against the debtor into a single proceeding controlled in a single forum facilitates negotiation with creditors because it places them all on an equal footing,

ni des avantages qu'offrait, en présence de réorganisations de plus en plus complexes, un processus souple de réorganisation sous surveillance judiciaire par rapport au régime plus rigide de la *LFI*, fondé sur des règles préétablies. La << souplesse de la LACC [était considérée comme offrant] de grands avantages car elle permet de prendre des décisions créatives et efficaces >> (Industrie Canada, Direction générale des politiques cadres du marché, *Rapport sur la mise en application de la Loi sur la faillite et l'insolvabilité et de la Loi sur les arrangements avec les créanciers des compagnies* (2002), p. 50). Au cours des trois dernières décennies, la résurrection de la *LACC* a donc été le moteur d'un processus grâce auquel, selon un auteur, [TRADUCTIoN] << le régime juridique canadien de restructuration en cas d'insolvabilité — qui était au départ un instrument plutôt rudimentaire — a évolué pour devenir un des systèmes les plus sophistiqués du monde déve loppé >> (R. B. Jones, << The Evolution of Canadian Restructuring : Challenges for the Rule of Law >>, dans J. P. Sarra, dir., *Annual Review of Insolvency Law 2005* (2006), 481, p. 481).

[22] Si les instances en matière d'insolvabilité peuvent être régies par des régimes législatifs dif férents, elles n'en présentent pas moins certains points communs, dont le plus frappant réside dans le modèle de la procédure unique. Le professeur Wood a décrit ainsi la nature et l'objectif de ce modèle dans *Bankruptcy and Insolvency Law* :

[TRADUCTIoN] Elles prévoient toutes une procédure col lective qui remplace la procédure civile habituelle dont peuvent se prévaloir les créanciers pour faire valoir leurs droits. Les recours des créanciers sont collectivisés afin d'éviter l'anarchie qui régnerait si ceux ci pouvaient exer cer leurs recours individuellement. En l'absence d'un pro cessus collectif, chaque créancier sait que faute d'agir de façon rapide et déterminée pour saisir les biens du débi teur, il sera devancé par les autres créanciers. [p. 2 3]

Le modèle de la procédure unique vise à faire échec à l'inefficacité et au chaos qui résulteraient de l'in solvabilité si chaque créancier engageait sa propre procédure dans le but de recouvrer sa créance. La réunion — en une seule instance relevant d'un même tribunal — de toutes les actions possibles contre le débiteur a pour effet de faciliter la négociation avec

rather than exposing them to the risk that a more aggressive creditor will realize its claims against the debtor's limited assets while the other credi tors attempt a compromise. With a view to achiev ing that purpose, both the *CCAA* and the *BIA* allow a court to order all actions against a debtor to be stayed while a compromise is sought.

[23]  Another point of convergence of the *CCAA* and the *BIA* relates to priorities. Because the *CCAA* is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a *CCAA* reorganization is ultimately unsuccessful. In addition, one of the important features of legislative reform of both statutes since the enactment of the *BIA* in 1992 has been a cutback in Crown priorities (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, ss. 73 and 125; S.C. 2000, c. 30, s. 148; S.C. 2005, c. 47, ss. 69 and 131; S.C. 2009, c. 33, s. 25; see also *Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny*, 2009 SCC 49, [2009] 3 S.C.R. 286; *Deputy Minister of Revenue v. Rainville*, [1980] 1 S.C.R. 35; *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency*).

[24]  With parallel *CCAA* and *BIA* restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation (see *An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta. L.R. (4th) 192, at para. 19).

[25]  Mindful of the historical background of the *CCAA* and *BIA*, I now turn to the first question at issue.

les créanciers en les mettant tous sur le même pied. Cela évite le risque de voir un créancier plus com batif obtenir le paiement de ses créances sur l'actif limité du débiteur pendant que les autres créanciers tentent d'arriver à une transaction. La *LACC* et la *LFI* autorisent toutes deux pour cette raison le tri bunal à ordonner la suspension de toutes les actions intentées contre le débiteur pendant qu'on cherche à conclure une transaction.

[23]  Un autre point de convergence entre la *LACC* et la *LFI* concerne les priorités. Comme la *LACC* ne précise pas ce qui arrive en cas d'échec de la réorganisation, la *LFI* fournit la norme de référence pour ce qui se produira dans une telle situation. De plus, l'une des caractéristiques importantes de la réforme dont ces deux lois ont fait l'objet depuis 1992 est la réduction des priorités de la Couronne (L.C. 1992, ch. 27, art. 39; L.C. 1997, ch. 12, art. 73 et 125; L.C. 2000, ch. 30, art. 148; L.C. 2005, ch. 47, art. 69 et 131; L.C. 2009, ch. 33, art. 25; voir aussi *Québec (Revenu) c. Caisse populaire Desjardins de Montmagny*, 2009 CSC 49, [2009] 3 R.C.S. 286; *Sous ministre du Revenu c. Rainville*, [1980] 1 R.C.S. 35; *Propositions d'amendements à la Loi sur la faillite : Rapport du Comité consultatif en matière de faillite et d'insolvabilité*).

[24]  Comme les régimes de restructuration paral lèles de la *LACC* et de la *LFI* constituent désormais une caractéristique reconnue dans le domaine du droit de l'insolvabilité, le travail de réforme légis lative contemporain a principalement visé à har moniser, dans la mesure du possible, les aspects communs aux deux régimes et à privilégier la réorganisation plutôt que la liquidation (voir la *Loi édictant la Loi sur le Programme de protec tion des salariés et modifiant la Loi sur la faillite et l'insolvabilité, la Loi sur les arrangements avec les créanciers des compagnies et d'autres lois en conséquence*, L.C. 2005, ch. 47; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, 30 Alta L.R. (4th) 192, par. 19).

[25]  Ayant à l'esprit le contexte historique de la *LACC* et de la *LFI*, je vais maintenant aborder la première question en litige.

## 3.2  *GST Deemed Trust Under the CCAA*

[26]   The Court of Appeal proceeded on the basis that the *ETA* precluded the court from staying the Crown's enforcement of the GST deemed trust when partially lifting the stay to allow the debtor to enter bankruptcy. In so doing, it adopted the reasoning in a line of cases culminating in *Ottawa Senators*, which held that an *ETA* deemed trust remains enforceable during *CCAA* reorganization despite language in the *CCAA* that suggests otherwise.

[27]   The Crown relies heavily on the decision of the Ontario Court of Appeal in *Ottawa Senators* and argues that the later in time provision of the *ETA* creating the GST deemed trust trumps the provision of the *CCAA* purporting to nullify most statutory deemed trusts. The Court of Appeal in this case accepted this reasoning but not all provincial courts follow it (see, e.g., *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), leave to appeal granted, 2010 QCCA 183 (CanLII)). Century Services relied, in its written submissions to this Court, on the argument that the court had authority under the *CCAA* to continue the stay against the Crown's claim for unremitted GST. In oral argument, the question of whether *Ottawa Senators* was correctly decided nonetheless arose. After the hearing, the parties were asked to make further written submissions on this point. As appears evident from the reasons of my colleague Abella J., this issue has become prominent before this Court. In those circumstances, this Court needs to determine the correctness of the reasoning in *Ottawa Senators*.

[28]   The policy backdrop to this question involves the Crown's priority as a creditor in insolvency situations which, as I mentioned above, has evolved considerably. Prior to the 1990s, Crown claims

## 3.2  *Fiducie réputée se rapportant à la TPS dans le cadre de la LACC*

[26]   La Cour d'appel a estimé que la *LTA* empêchait le tribunal de suspendre les mesures prises par la Couronne pour bénéficier de la fiducie réputée se rapportant à la TPS, lorsqu'il a partiellement levé la suspension des procédures engagées contre le débiteur afin de permettre à celui ci de faire ces sion de ses biens. Ce faisant, la cour a adopté un raisonnement qui s'insère dans un courant jurispru dentiel dominé par l'arrêt *Ottawa Senators*, suivant lequel il demeure possible de demander le bénéfice d'une fiducie réputée établie par la *LTA* pendant une réorganisation opérée en vertu de la *LACC*, et ce, malgré les dispositions de la *LACC* qui semblent dire le contraire.

[27]   S'appuyant largement sur l'arrêt *Ottawa Senators* de la Cour d'appel de l'Ontario, la Couronne plaide que la disposition postérieure de la *LTA* créant la fiducie réputée visant la TPS l'em porte sur la disposition de la *LACC* censée neutra liser la plupart des fiducies réputées qui sont créées par des dispositions législatives. Si la Cour d'appel a accepté ce raisonnement dans la présente affaire, les tribunaux provinciaux ne l'ont pas tous adopté (voir, p. ex., *Komunik Corp. (Arrangement relatif à)*, 2009 QCCS 6332 (CanLII), autorisation d'appel accordée, 2010 QCCA 183 (CanLII)). Dans ses observations écrites adressées à la Cour, Century Services s'est fondée sur l'argument suivant lequel le tribunal pou vait, en vertu de la *LACC*, maintenir la suspension de la demande de la Couronne visant le paiement de la TPS non versée. Au cours des plaidoiries, la ques tion de savoir si l'arrêt *Ottawa Senators* était bien fondé a néanmoins été soulevée. Après l'audience, la Cour a demandé aux parties de présenter des obser vations écrites supplémentaires à ce sujet. Comme il ressort clairement des motifs de ma collègue la juge Abella, cette question a pris une grande impor tance devant notre Cour. Dans ces circonstances, la Cour doit statuer sur le bien fondé du raisonnement adopté dans l'arrêt *Ottawa Senators*.

[28]   Le contexte général dans lequel s'inscrit cette question concerne l'évolution considérable, signalée plus haut, de la priorité dont jouit la Couronne en tant que créancier en cas d'insolvabilité. Avant les

largely enjoyed priority in insolvency. This was widely seen as unsatisfactory as shown by both the 1970 and 1986 insolvency reform proposals, which recommended that Crown claims receive no preferential treatment. A closely related matter was whether the *CCAA* was binding at all upon the Crown. Amendments to the *CCAA* in 1997 confirmed that it did indeed bind the Crown (see *CCAA*, s. 21, as added by S.C. 1997, c. 12, s. 126).

[29]   Claims of priority by the state in insolvency situations receive different treatment across jurisdictions worldwide. For example, in Germany and Australia, the state is given no priority at all, while the state enjoys wide priority in the United States and France (see B. K. Morgan, "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bankr. L.J.* 461, at p. 500). Canada adopted a middle course through legislative reform of Crown priority initiated in 1992. The Crown retained priority for source deductions of income tax, Employment Insurance ("EI") and Canada Pension Plan ("CPP") premiums, but ranks as an ordinary unsecured creditor for most other claims.

[30]   Parliament has frequently enacted statutory mechanisms to secure Crown claims and permit their enforcement. The two most common are statutory deemed trusts and powers to garnish funds third parties owe the debtor (see F. L. Lamer, *Priority of Crown Claims in Insolvency* (loose leaf), at §2).

[31]   With respect to GST collected, Parliament has enacted a deemed trust. The *ETA* states that every person who collects an amount on account of GST is deemed to hold that amount in trust for the Crown (s. 222(1)). The deemed trust extends to other property of the person collecting the tax equal in value to the amount deemed to be in trust if that amount has not been remitted in accordance with the *ETA*. The deemed trust also extends to property

années 1990, les créances de la Couronne bénéficiaient dans une large mesure d'une priorité en cas d'insolvabilité. Cette situation avantageuse suscitait une grande controverse. Les propositions de réforme du droit de l'insolvabilité de 1970 et de 1986 en témoignent — elles recommandaient que les créances de la Couronne ne fassent l'objet d'aucun traitement préférentiel. Une question connexe se posait : celle de savoir si la Couronne était même assujettie à la *LACC*. Les modifications apportées à la *LACC* en 1997 ont confirmé qu'elle l'était bel et bien (voir *LACC*, art. 21, ajouté par L.C. 1997, ch. 12, art. 126).

[29]   Les revendications de priorité par l'État en cas d'insolvabilité sont abordées de différentes façons selon les pays. Par exemple, en Allemagne et en Australie, l'État ne bénéficie d'aucune priorité, alors qu'aux États Unis et en France il jouit au contraire d'une large priorité (voir B. K. Morgan, << Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy >> (2000), 74 *Am. Bankr. L.J.* 461, p. 500). Le Canada a choisi une voie intermédiaire dans le cadre d'une réforme législative amorcée en 1992 : la Couronne a conservé sa priorité pour les sommes retenues à la source au titre de l'impôt sur le revenu et des cotisations à l'assurance emploi (<< AE >>) et au Régime de pensions du Canada (<< RPC >>), mais elle est un créancier ordinaire non garanti pour la plupart des autres sommes qui lui sont dues.

[30]   Le législateur a fréquemment adopté des mécanismes visant à protéger les créances de la Couronne et à permettre leur exécution. Les deux plus courants sont les fiducies présumées et les pouvoirs de saisie arrêt (voir F. L. Lamer, *Priority of Crown Claims in Insolvency* (feuilles mobiles), §2).

[31]   Pour ce qui est des sommes de TPS perçues, le législateur a établi une fiducie réputée. La *LTA* précise que la personne qui perçoit une somme au titre de la TPS est réputée la détenir en fiducie pour la Couronne (par. 222(1)). La fiducie réputée s'applique aux autres biens de la personne qui perçoit la taxe, pour une valeur égale à la somme réputée détenue en fiducie, si la somme en question n'a pas été versée en conformité avec la *LTA*. La fiducie réputée vise

held by a secured creditor that, but for the security interest, would be property of the person collecting the tax (s. 222(3)).

[32]  Parliament has created similar deemed trusts using almost identical language in respect of source deductions of income tax, EI premiums and CPP premiums (see s. 227(4) of the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), ss. 86(2) and (2.1) of the *Employment Insurance Act*, S.C. 1996, c. 23, and ss. 23(3) and (4) of the *Canada Pension Plan*, R.S.C. 1985, c. C 8). I will refer to income tax, EI and CPP deductions as "source deductions".

[33]  In *Royal Bank of Canada v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411, this Court addressed a priority dispute between a deemed trust for source deductions under the *ITA* and security interests taken under both the *Bank Act*, S.C. 1991, c. 46, and the Alberta *Personal Property Security Act*, S.A. 1988, c. P 4.05 ("*PPSA*"). As then worded, an *ITA* deemed trust over the debtor's property equivalent to the amount owing in respect of income tax became effective at the time of liquidation, receivership, or assignment in bankruptcy. *Sparrow Electric* held that the *ITA* deemed trust could not prevail over the security interests because, being fixed charges, the latter attached as soon as the debtor acquired rights in the property such that the *ITA* deemed trust had no property on which to attach when it subsequently arose. Later, in *First Vancouver Finance v. M.N.R.*, 2002 SCC 49, [2002] 2 S.C.R. 720, this Court observed that Parliament had legislated to strengthen the statutory deemed trust in the *ITA* by deeming it to operate from the moment the deductions were not paid to the Crown as required by the *ITA*, and by granting the Crown priority over all security interests (paras. 27 29) (the "*Sparrow Electric* amendment").

également les biens détenus par un créancier garanti qui, si ce n'était de la sûreté, seraient les biens de la personne qui perçoit la taxe (par. 222(3)).

[32]  Utilisant pratiquement les mêmes termes, le législateur a créé de semblables fiducies réputées à l'égard des retenues à la source relatives à l'impôt sur le revenu et aux cotisations à l'AE et au RPC (voir par. 227(4) de la *Loi de l'impôt sur le revenu*, L.R.C. 1985, ch. 1 (5ᵉ suppl.) (<< *LIR* >>), par. 86(2) et (2.1) de la *Loi sur l'assurance emploi*, L.C. 1996, ch. 23, et par. 23(3) et (4) du *Régime de pensions du Canada*, L.R.C. 1985, ch. C 8). J'emploierai ci après le terme << retenues à la source >> pour désigner les retenues relatives à l'impôt sur le revenu et aux cotisations à l'AE et au RPC.

[33]  Dans *Banque Royale du Canada c. Sparrow Electric Corp.*, [1997] 1 R.C.S. 411, la Cour était saisie d'un litige portant sur la priorité de rang entre, d'une part, une fiducie réputée établie en vertu de la *LIR* à l'égard des retenues à la source, et, d'autre part, des sûretés constituées en vertu de la *Loi sur les banques*, L.C. 1991, ch. 46, et de la loi de l'Alberta intitulée *Personal Property Security Act*, S.A. 1988, ch. P 4.05 (<< *PPSA* »). D'après les dispositions alors en vigueur, une fiducie réputée — établie en vertu de la *LIR* à l'égard des biens du débiteur pour une valeur égale à la somme due au titre de l'impôt sur le revenu — commençait à s'appliquer au moment de la liquidation, de la mise sous séquestre ou de la cession de biens. Dans *Sparrow Electric*, la Cour a conclu que la fiducie réputée de la *LIR* ne pouvait pas l'emporter sur les sûretés, au motif que, comme celles ci constituaient des privilèges fixes grevant les biens dès que le débiteur acquérait des droits sur eux, il n'existait pas de biens susceptibles d'être visés par la fiducie réputée de la *LIR* lorsqu'elle prenait naissance par la suite. Ultérieurement, dans *First Vancouver Finance c. M.R.N.*, 2002 CSC 49, [2002] 2 R.C.S. 720, la Cour a souligné que le législateur était intervenu pour renforcer la fiducie réputée de la *LIR* en précisant qu'elle est réputée s'appliquer dès le moment où les retenues ne sont pas versées à la Couronne conformément aux exigences de la *LIR*, et en donnant à la Couronne la priorité sur toute autre garantie (par. 27 29) (la << modification découlant de l'arrêt *Sparrow Electric* >>).

[34]  The amended text of s. 227(4.1) of the *ITA* and concordant source deductions deemed trusts in the *Canada Pension Plan* and the *Employment Insurance Act* state that the deemed trust operates notwithstanding any other enactment of Canada, except ss. 81.1 and 81.2 of the *BIA*. The *ETA* deemed trust at issue in this case is similarly worded, but it excepts the *BIA* in its entirety. The provision reads as follows:

  222. . . .

              .  .  .

  (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed . . . .

[35]  The Crown submits that the *Sparrow Electric* amendment, added by Parliament to the *ETA* in 2000, was intended to preserve the Crown's priority over collected GST under the *CCAA* while subordinating the Crown to the status of an unsecured creditor in respect of GST only under the *BIA*. This is because the *ETA* provides that the GST deemed trust is effective "despite" any other enactment except the *BIA*.

[36]  The language used in the *ETA* for the GST deemed trust creates an apparent conflict with the *CCAA*, which provides that subject to certain exceptions, property deemed by statute to be held in trust for the Crown shall not be so regarded.

[37]  Through a 1997 amendment to the *CCAA* (S.C. 1997, c. 12, s. 125), Parliament appears to have,

[34]  Selon le texte modifié du par. 227(4.1) de la *LIR* et celui des fiducies réputées correspondantes établies dans le *Régime de pensions du Canada* et la *Loi sur l'assurance emploi* à l'égard des retenues à la source, la fiducie réputée s'applique malgré tout autre texte législatif fédéral sauf les art. 81.1 et 81.2 de la *LFI*. La fiducie réputée de la *LTA* qui est en cause en l'espèce est formulée en des termes sem blables sauf que la limite à son application vise la *LFI* dans son entier. Voici le texte de la disposition pertinente :

  222. . . .

              .  .  .

  (3) Malgré les autres dispositions de la présente loi (sauf le paragraphe (4) du présent article), tout autre texte législatif fédéral (sauf la *Loi sur la faillite et l'insolvabi lité*), tout texte législatif provincial ou toute autre règle de droit, lorsqu'un montant qu'une personne est réputée par le paragraphe (1) détenir en fiducie pour Sa Majesté du chef du Canada n'est pas versé au receveur général ni retiré selon les modalités et dans le délai prévus par la présente partie, les biens de la personne — y compris les biens détenus par ses créanciers garantis qui, en l'ab sence du droit en garantie, seraient ses biens — d'une valeur égale à ce montant sont réputés . . .

[35]  La Couronne soutient que la modification découlant de l'arrêt *Sparrow Electric*, qui a été ajoutée à la *LTA* par le législateur en 2000, visait à maintenir la priorité de Sa Majesté sous le régime de la *LACC* à l'égard du montant de TPS perçu, tout en reléguant celle ci au rang de créancier non garanti à l'égard de ce montant sous le régime de la *LFI* uniquement. De l'avis de la Couronne, il en est ainsi parce que, selon la *LTA*, la fiducie réputée visant la TPS demeure en vigueur « malgré » tout autre texte législatif sauf la *LFI*.

[36]  Les termes utilisés dans la *LTA* pour éta blir la fiducie réputée à l'égard de la TPS créent un conflit apparent avec la *LACC*, laquelle précise que, sous réserve de certaines exceptions, les biens qui sont réputés selon un texte législatif être détenus en fiducie pour la Couronne ne doivent pas être consi dérés comme tels.

[37]  Par une modification apportée à la *LACC* en 1997 (L.C. 1997, ch. 12, art. 125), le législateur

subject to specific exceptions, nullified deemed trusts in favour of the Crown once reorganization proceedings are commenced under the Act. The relevant provision reads:

18.3 (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

This nullification of deemed trusts was continued in further amendments to the *CCAA* (S.C. 2005, c. 47), where s. 18.3(1) was renumbered and reformulated as s. 37(1):

37. (1) Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

[38] An analogous provision exists in the *BIA*, which, subject to the same specific exceptions, nullifies statutory deemed trusts and makes property of the bankrupt that would otherwise be subject to a deemed trust part of the debtor's estate and available to creditors (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, s. 73; *BIA*, s. 67(2)). It is noteworthy that in both the *CCAA* and the *BIA*, the exceptions concern source deductions (*CCAA*, s. 18.3(2); *BIA*, s. 67(3)). The relevant provision of the *CCAA* reads:

18.3 . . .

(2) Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* . . . .

Thus, the Crown's deemed trust and corresponding priority in source deductions remain effective both in reorganization and in bankruptcy.

semble, sous réserve d'exceptions spécifiques, avoir neutralisé les fiducies réputées créées en faveur de la Couronne lorsque des procédures de réorganisa tion sont engagées sous le régime de cette loi. La disposition pertinente, à l'époque le par. 18.3(1), était libellée ainsi :

18.3 (1) Sous réserve du paragraphe (2) et par déroga tion à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme détenu en fiducie pour Sa Majesté si, en l'absence de la disposition législative en question, il ne le serait pas.

Cette neutralisation des fiducies réputées a été main tenue dans des modifications apportées à la *LACC* en 2005 (L.C. 2005, ch. 47), où le par. 18.3(1) a été reformulé et renuméroté, devenant le par. 37(1) :

37. (1) Sous réserve du paragraphe (2) et par déroga tion à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme tel par le seul effet d'une telle disposition.

[38] La *LFI* comporte une disposition analogue, qui — sous réserve des mêmes exceptions spéci fiques — neutralise les fiducies réputées établies en vertu d'un texte législatif et fait en sorte que les biens du failli qui autrement seraient visés par une telle fiducie font partie de l'actif du débiteur et sont à la disposition des créanciers (L.C. 1992, ch. 27, art. 39; L.C. 1997, ch. 12, art. 73; *LFI*, par. 67(2)). Il convient de souligner que, tant dans la *LACC* que dans la *LFI*, les exceptions visent les retenues à la source (*LACC*, par. 18.3(2); *LFI*, par. 67(3)). Voici la disposition pertinente de la *LACC* :

18.3 . . .

(2) Le paragraphe (1) ne s'applique pas à l'égard des montants réputés détenus en fiducie aux termes des para graphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu*, des paragraphes 23(3) ou (4) du *Régime de pensions du Canada* ou des paragraphes 86(2) ou (2.1) de la *Loi sur l'assurance emploi* . . .

Par conséquent, la fiducie réputée établie en faveur de la Couronne et la priorité dont celle ci jouit de ce fait sur les retenues à la source continuent de s'appli quer autant pendant la réorganisation que pendant la faillite.

[39] Meanwhile, in both s. 18.4(1) of the *CCAA* and s. 86(1) of the *BIA*, other Crown claims are treated as unsecured. These provisions, establishing the Crown's status as an unsecured creditor, explicitly exempt statutory deemed trusts in source deductions (*CCAA*, s. 18.4(3); *BIA*, s. 86(3)). The *CCAA* provision reads as follows:

18.4 . . .

. . .

(3) Subsection (1) [Crown ranking as unsecured creditor] does not affect the operation of

(*a*)  subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(*b*) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution . . . .

Therefore, not only does the *CCAA* provide that Crown claims do not enjoy priority over the claims of other creditors (s. 18.3(1)), but the exceptions to this rule (i.e., that Crown priority is maintained for source deductions) are repeatedly stated in the statute.

[40] The apparent conflict in this case is whether the rule in the *CCAA* first enacted as s. 18.3 in 1997, which provides that subject to certain explicit exceptions, statutory deemed trusts are ineffective under the *CCAA*, is overridden by the one in the *ETA* enacted in 2000 stating that GST deemed trusts operate despite any enactment of Canada except the *BIA*. With respect for my colleague Fish J., I do not think the apparent conflict can be resolved by denying it and creating a rule requiring both a statutory provision enacting the deemed trust, and a second statutory provision confirming it. Such a rule is unknown to the law. Courts must recognize

[39] Par ailleurs, les autres créances de la Couronne sont considérées par la *LACC* et la *LFI* comme des créances non garanties (*LACC*, par. 18.4(1); *LFI*, par. 86(1)). Ces dispositions faisant de la Couronne un créancier non garanti comportent une exception expresse concernant les fiducies réputées établies par un texte législatif à l'égard des retenues à la source (*LACC*, par. 18.4(3); *LFI*, par. 86(3)). Voici la disposition de la *LACC* :

18.4 . . .

. . .

(3) Le paragraphe (1) [suivant lequel la Couronne a le rang de créancier non garanti] n'a pas pour effet de porter atteinte à l'application des dispositions suivantes :

*a*)  les paragraphes 224(1.2) et (1.3) de la *Loi de l'impôt sur le revenu*;

*b*) toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation . . .

Par conséquent, non seulement la *LACC* précise que les créances de la Couronne ne bénéficient pas d'une priorité par rapport à celles des autres créanciers (par. 18.3(1)), mais les exceptions à cette règle (maintien de la priorité de la Couronne dans le cas des retenues à la source) sont mentionnées à plusieurs reprises dans la Loi.

[40] Le conflit apparent qui existe dans la présente affaire fait qu'on doit se demander si la règle de la *LTA* adoptée en 2000, selon laquelle les fiducies réputées visant la TPS s'appliquent malgré tout autre texte législatif fédéral sauf la *LFI*, l'emporte sur la règle énoncée dans la *LACC* — qui a d'abord été édictée en 1997 à l'art. 18.3 — suivant laquelle, sous réserve de certaines exceptions explicites, les fiducies réputées établies par une disposition législative sont sans effet dans le cadre de la *LACC*. Avec égards pour l'opinion contraire exprimée par mon collègue le juge Fish, je ne crois pas qu'on puisse résoudre ce conflit apparent

conflicts, apparent or real, and resolve them when possible.

[41] A line of jurisprudence across Canada has resolved the apparent conflict in favour of the *ETA*, thereby maintaining GST deemed trusts under the *CCAA*. *Ottawa Senators*, the leading case, decided the matter by invoking the doctrine of implied repeal to hold that the later in time provision of the *ETA* should take precedence over the *CCAA* (see also *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219 (Alta. Q.B.); *Gauntlet*).

[42] The Ontario Court of Appeal in *Ottawa Senators* rested its conclusion on two considerations. First, it was persuaded that by explicitly mentioning the *BIA* in *ETA* s. 222(3), but not the *CCAA*, Parliament made a deliberate choice. In the words of MacPherson J.A.:

The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

[43] Second, the Ontario Court of Appeal compared the conflict between the *ETA* and the *CCAA* to that before this Court in *Doré v. Verdun (City)*, [1997] 2 S.C.R. 862, and found them to be "identical" (para. 46). It therefore considered *Doré* binding (para. 49). In *Doré*, a limitations provision in the more general and recently enacted *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*"), was held to have repealed a more specific provision of the earlier Quebec *Cities and Towns Act*, R.S.Q., c. C 19, with which it conflicted. By analogy,

en niant son existence et en créant une règle qui exige à la fois une disposition législative établissant la fiducie présumée et une autre la confirmant. Une telle règle est inconnue en droit. Les tribunaux doivent reconnaître les conflits, apparents ou réels, et les résoudre lorsque la chose est possible.

[41] Un courant jurisprudentiel pancanadien a résolu le conflit apparent en faveur de la *LTA*, confirmant ainsi la validité des fiducies réputées à l'égard de la TPS dans le cadre de la *LACC*. Dans l'arrêt déterminant à ce sujet, *Ottawa Senators*, la Cour d'appel de l'Ontario a invoqué la doctrine de l'abrogation implicite et conclu que la disposition postérieure de la *LTA* devait avoir préséance sur la *LACC* (voir aussi *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219 (B.R. Alb.); *Gauntlet*).

[42] Dans *Ottawa Senators*, la Cour d'appel de l'Ontario a fondé sa conclusion sur deux considérations. Premièrement, elle était convaincue qu'en mentionnant explicitement la *LFI* — mais pas la *LACC* — au par. 222(3) de la *LTA*, le législateur a fait un choix délibéré. Je cite le juge MacPherson :

[TRADUCTION] La *LFI* et la *LACC* sont des lois fédérales étroitement liées entre elles. Je ne puis concevoir que le législateur ait pu mentionner expressément la *LFI* à titre d'exception, mais ait involontairement omis de considérer la *LACC* comme une deuxième exception possible. À mon avis, le fait que la *LACC* ne soit pas mentionnée au par. 222(3) de la *LTA* était presque assurément une omission mûrement réfléchie de la part du législateur. [par. 43]

[43] Deuxièmement, la Cour d'appel de l'Ontario a comparé le conflit entre la *LTA* et la *LACC* à celui dont a été saisie la Cour dans *Doré c. Verdun (Ville)*, [1997] 2 R.C.S. 862, et les a jugés [TRADUCTION] << identiques >> (par. 46). Elle s'estimait donc tenue de suivre l'arrêt *Doré* (par. 49). Dans cet arrêt, la Cour a conclu qu'une disposition d'une loi de nature plus générale et récemment adoptée établissant un délai de prescription — le *Code civil du Québec*, L.Q. 1991, ch. 64 (<< *C.c.Q.* >>) — avait eu pour effet d'abroger une disposition plus spécifique

the Ontario Court of Appeal held that the later in time and more general provision, s. 222(3) of the *ETA*, impliedly repealed the more specific and earlier in time provision, s. 18.3(1) of the *CCAA* (paras. 47 49).

[44] Viewing this issue in its entire context, several considerations lead me to conclude that neither the reasoning nor the result in *Ottawa Senators* can stand. While a conflict may exist at the level of the statutes' wording, a purposive and contextual analysis to determine Parliament's true intent yields the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the *CCAA* when it amended the *ETA* in 2000 with the *Sparrow Electric* amendment.

[45] I begin by recalling that Parliament has shown its willingness to move away from asserting priority for Crown claims in insolvency law. Section 18.3(1) of the *CCAA* (subject to the s. 18.3(2) exceptions) provides that the Crown's deemed trusts have no effect under the *CCAA*. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so explicitly and elaborately. For example, s. 18.3(2) of the *CCAA* and s. 67(3) of the *BIA* expressly provide that deemed trusts for source deductions remain effective in insolvency. Parliament has, therefore, clearly carved out exceptions from the general rule that deemed trusts are ineffective in insolvency. The *CCAA* and *BIA* are in harmony, preserving deemed trusts and asserting Crown priority only in respect of source deductions. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. Unlike source deductions, which are clearly and expressly dealt with under both these insolvency statutes, no such clear and express language exists

d'un texte de loi antérieur, la *Loi sur les cités et villes* du Québec, L.R.Q., ch. C 19, avec laquelle elle entrait en conflit. Par analogie, la Cour d'appel de l'Ontario a conclu que le par. 222(3) de la *LTA*, une disposition plus récente et plus générale, abrogeait implicitement la disposition antérieure plus spécifique, à savoir le par. 18.3(1) de la *LACC* (par. 47 49).

[44] En examinant la question dans tout son contexte, je suis amenée à conclure, pour plusieurs raisons, que ni le raisonnement ni le résultat de l'arrêt *Ottawa Senators* ne peuvent être adoptés. Bien qu'il puisse exister un conflit entre le libellé des textes de loi, une analyse téléologique et contextuelle visant à déterminer la véritable intention du législateur conduit à la conclusion que ce dernier ne saurait avoir eu l'intention de redonner la priorité, dans le cadre de la *LACC*, à la fiducie réputée de la Couronne à l'égard de ses créances relatives à la TPS quand il a apporté à la *LTA*, en 2000, la modification découlant de l'arrêt *Sparrow Electric*.

[45] Je rappelle d'abord que le législateur a manifesté sa volonté de mettre un terme à la priorité accordée aux créances de la Couronne dans le cadre du droit de l'insolvabilité. Selon le par. 18.3(1) de la *LACC* (sous réserve des exceptions prévues au par. 18.3(2)), les fiducies réputées de la Couronne n'ont aucun effet sous le régime de cette loi. Quand le législateur a voulu protéger certaines créances de la Couronne au moyen de fiducies réputées et voulu que celles ci continuent de s'appliquer en situation d'insolvabilité, il l'a indiqué de manière explicite et minutieuse. Par exemple, le par. 18.3(2) de la *LACC* et le par. 67(3) de la *LFI* énoncent expressément que les fiducies réputées visant les retenues à la source continuent de produire leurs effets en cas d'insolvabilité. Le législateur a donc clairement établi des exceptions à la règle générale selon laquelle les fiducies réputées n'ont plus d'effet dans un contexte d'insolvabilité. La *LACC* et la *LFI* sont en harmonie : elles préservent les fiducies réputées et établissent la priorité de la Couronne seulement à l'égard des retenues à la source. En revanche, il n'existe aucune disposition législative expresse permettant de conclure que les créances relatives à la

in those Acts carving out an exception for GST claims.

[46]  The internal logic of the *CCAA* also militates against upholding the *ETA* deemed trust for GST. The *CCAA* imposes limits on a suspension by the court of the Crown's rights in respect of source deductions but does not mention the *ETA* (s. 11.4). Since source deductions deemed trusts are granted explicit protection under the *CCAA*, it would be inconsistent to afford a better protection to the *ETA* deemed trust absent explicit language in the *CCAA*. Thus, the logic of the *CCAA* appears to subject the *ETA* deemed trust to the waiver by Parliament of its priority (s. 18.4).

[47]  Moreover, a strange asymmetry would arise if the interpretation giving the *ETA* priority over the *CCAA* urged by the Crown is adopted here: the Crown would retain priority over GST claims during *CCAA* proceedings but not in bankruptcy. As courts have reflected, this can only encourage statute shopping by secured creditors in cases such as this one where the debtor's assets cannot satisfy both the secured creditors' and the Crown's claims (*Gauntlet*, at para. 21). If creditors' claims were better protected by liquidation under the *BIA*, creditors' incentives would lie overwhelmingly with avoiding proceedings under the *CCAA* and not risking a failed reorganization. Giving a key player in any insolvency such skewed incentives against reorganizing under the *CCAA* can only undermine that statute's remedial objectives and risk inviting the very social ills that it was enacted to avert.

TPS bénéficient d'un traitement préférentiel sous le régime de la *LACC* ou de la *LFI*. Alors que les rete nues à la source font l'objet de dispositions expli cites dans ces deux lois concernant l'insolvabilité, celles ci ne comportent pas de dispositions claires et expresses analogues établissant une exception pour les créances relatives à la TPS.

[46]  La logique interne de la *LACC* va également à l'encontre du maintien de la fiducie réputée établie dans la *LTA* à l'égard de la TPS. En effet, la *LACC* impose certaines limites à la suspension par les tri bunaux des droits de la Couronne à l'égard des rete nues à la source, mais elle ne fait pas mention de la *LTA* (art. 11.4). Comme les fiducies réputées visant les retenues à la source sont explicitement proté gées par la *LACC*, il serait incohérent d'accorder une meilleure protection à la fiducie réputée établie par la *LTA* en l'absence de dispositions explicites en ce sens dans la *LACC*. Par conséquent, il semble découler de la logique de la *LACC* que la fiducie réputée établie par la *LTA* est visée par la renoncia tion du législateur à sa priorité (art. 18.4).

[47]  De plus, il y aurait une étrange asymétrie si l'interprétation faisant primer la *LTA* sur la *LACC* préconisée par la Couronne était retenue en l'es pèce : les créances de la Couronne relatives à la TPS conserveraient leur priorité de rang pendant les procédures fondées sur la *LACC*, mais pas en cas de faillite. Comme certains tribunaux l'ont bien vu, cela ne pourrait qu'encourager les créanciers à recourir à la loi la plus favorable dans les cas où, comme en l'espèce, l'actif du débiteur n'est pas suffisant pour permettre à la fois le paiement des créanciers garantis et le paiement des créances de la Couronne (*Gauntlet*, par. 21). Or, si les réclama tions des créanciers étaient mieux protégées par la liquidation sous le régime de la *LFI*, les créanciers seraient très fortement incités à éviter les procédu res prévues par la *LACC* et les risques d'échec d'une réorganisation. Le fait de donner à un acteur clé de telles raisons de s'opposer aux procédures de réor ganisation fondées sur la *LACC* dans toute situation d'insolvabilité ne peut que miner les objectifs répa rateurs de ce texte législatif et risque au contraire de favoriser les maux sociaux que son édiction visait justement à prévenir.

[48] Arguably, the effect of *Ottawa Senators* is mitigated if restructuring is attempted under the *BIA* instead of the *CCAA*, but it is not cured. If *Ottawa Senators* were to be followed, Crown priority over GST would differ depending on whether restructuring took place under the *CCAA* or the *BIA*. The anomaly of this result is made manifest by the fact that it would deprive companies of the option to restructure under the more flexible and responsive *CCAA* regime, which has been the statute of choice for complex reorganizations.

[49] Evidence that Parliament intended different treatments for GST claims in reorganization and bankruptcy is scant, if it exists at all. Section 222(3) of the *ETA* was enacted as part of a wide ranging budget implementation bill in 2000. The summary accompanying that bill does not indicate that Parliament intended to elevate Crown priority over GST claims under the *CCAA* to the same or a higher level than source deductions claims. Indeed, the summary for deemed trusts states only that amendments to existing provisions are aimed at "ensuring that employment insurance premiums and Canada Pension Plan contributions that are required to be remitted by an employer are fully recoverable by the Crown in the case of the bankruptcy of the employer" (Summary to S.C. 2000, c. 30, at p. 4a). The wording of GST deemed trusts resembles that of statutory deemed trusts for source deductions and incorporates the same overriding language and reference to the *BIA*. However, as noted above, Parliament's express intent is that only source deductions deemed trusts remain operative. An exception for the *BIA* in the statutory language establishing the source deductions deemed trusts accomplishes very little, because the explicit language of the *BIA* itself (and the *CCAA*) carves out these source deductions deemed trusts and maintains their effect. It is however noteworthy that no equivalent language maintaining GST deemed trusts exists under either the *BIA* or the *CCAA*.

[48] Peut être l'effet de l'arrêt *Ottawa Senators* est il atténué si la restructuration est tentée en vertu de la *LFI* au lieu de la *LACC*, mais il subsiste néanmoins. Si l'on suivait cet arrêt, la priorité de la créance de la Couronne relative à la TPS différerait selon le régime — *LACC* ou *LFI* — sous lequel la restructuration a lieu. L'anomalie de ce résultat res sort clairement du fait que les compagnies seraient ainsi privées de la possibilité de se restructurer sous le régime plus souple et mieux adapté de la *LACC*, régime privilégié en cas de réorganisations com plexes.

[49] Les indications selon lesquelles le législateur voulait que les créances relatives à la TPS soient trai tées différemment dans les cas de réorganisations et de faillites sont rares, voire inexistantes. Le para graphe 222(3) de la *LTA* a été adopté dans le cadre d'un projet de loi d'exécution du budget de nature générale en 2000. Le sommaire accompagnant ce projet de loi n'indique pas que, dans le cadre de la *LACC*, le législateur entendait élever la priorité de la créance de la Couronne à l'égard de la TPS au même rang que les créances relatives aux retenues à la source ou encore à un rang supérieur à celles ci. En fait, le sommaire mentionne simplement, en ce qui concerne les fiducies réputées, que les modifications apportées aux dispositions existantes visent à « faire en sorte que les cotisations à l'assurance emploi et au Régime de pensions du Canada qu'un employeur est tenu de verser soient pleinement recouvrables par la Couronne en cas de faillite de l'employeur » (Sommaire de la L.C. 2000, ch. 30, p. 4a). Le libellé de la disposition créant une fiducie réputée à l'égard de la TPS ressemble à celui des dispositions créant de telles fiducies relatives aux retenues à la source et il comporte la même formule dérogatoire et la même mention de la *LFI*. Cependant, comme il a été sou ligné précédemment, le législateur a expressément précisé que seules les fiducies réputées visant les rete nues à la source demeurent en vigueur. Une excep tion concernant la *LFI* dans la disposition créant les fiducies réputées à l'égard des retenues à la source est sans grande conséquence, car le texte explicite de la *LFI* elle même (et celui de la *LACC*) établit ces fiducies et maintient leur effet. Il convient toute fois de souligner que ni la *LFI* ni la *LACC* ne com portent de disposition équivalente assurant le main tien en vigueur des fiducies réputées visant la TPS.

[50] It seems more likely that by adopting the same language for creating GST deemed trusts in the *ETA* as it did for deemed trusts for source deductions, and by overlooking the inclusion of an exception for the *CCAA* alongside the *BIA* in s. 222(3) of the *ETA*, Parliament may have inadvertently succumbed to a drafting anomaly. Because of a statutory lacuna in the *ETA*, the GST deemed trust could be seen as remaining effective in the *CCAA*, while ceasing to have any effect under the *BIA*, thus creating an apparent conflict with the wording of the *CCAA*. However, it should be seen for what it is: a facial conflict only, capable of resolution by looking at the broader approach taken to Crown priorities and by giving precedence to the statutory language of s. 18.3 of the *CCAA* in a manner that does not produce an anomalous outcome.

[51] Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. It merely creates an apparent conflict that must be resolved by statutory interpretation. Parliament's intent when it enacted *ETA* s. 222(3) was therefore far from unambiguous. Had it sought to give the Crown a priority for GST claims, it could have done so explicitly as it did for source deductions. Instead, one is left to infer from the language of *ETA* s. 222(3) that the GST deemed trust was intended to be effective under the *CCAA*.

[52] I am not persuaded that the reasoning in *Doré* requires the application of the doctrine of implied repeal in the circumstances of this case. The main issue in *Doré* concerned the impact of the adoption of the *C.C.Q.* on the administrative law rules with respect to municipalities. While Gonthier J. concluded in that case that the limitation provision in art. 2930 *C.C.Q.* had repealed by implication a limitation provision in the *Cities and Towns Act*, he did so on the basis of more than a textual analysis. The conclusion in *Doré* was reached after thorough

[50] Il semble plus probable qu'en adoptant, pour créer dans la *LTA* les fiducies réputées visant la TPS, le même libellé que celui utilisé pour les fiducies réputées visant les retenues à la source, et en omettant d'inclure au par. 222(3) de la *LTA* une exception à l'égard de la *LACC* en plus de celle éta blie pour la *LFI*, le législateur ait par inadvertance commis une anomalie rédactionnelle. En raison d'une lacune législative dans la *LTA*, il serait pos sible de considérer que la fiducie réputée visant la TPS continue de produire ses effets dans le cadre de la *LACC*, tout en cessant de le faire dans le cas de la *LFI*, ce qui entraînerait un conflit apparent avec le libellé de la *LACC*. Il faut cependant voir ce conflit comme il est : un conflit apparent seulement, que l'on peut résoudre en considérant l'approche géné rale adoptée envers les créances prioritaires de la Couronne et en donnant préséance au texte de l'art. 18.3 de la *LACC* d'une manière qui ne produit pas un résultat insolite.

[51] Le paragraphe 222(3) de la *LTA* ne révèle aucune intention explicite du législateur d'abroger l'art. 18.3 de la *LACC*. Il crée simplement un conflit apparent qui doit être résolu par voie d'interpréta tion législative. L'intention du législateur était donc loin d'être dépourvue d'ambiguïté quand il a adopté le par. 222(3) de la *LTA*. S'il avait voulu donner priorité aux créances de la Couronne relatives à la TPS dans le cadre de la *LACC*, il aurait pu le faire de manière aussi explicite qu'il l'a fait pour les rete nues à la source. Or, au lieu de cela, on se trouve réduit à inférer du texte du par. 222(3) de la *LTA* que le législateur entendait que la fiducie réputée visant la TPS produise ses effets dans les procédures fon dées sur la *LACC*.

[52] Je ne suis pas convaincue que le raisonnement adopté dans *Doré* exige l'application de la doctrine de l'abrogation implicite dans les circonstances de la présente affaire. La question principale dans *Doré* était celle de l'impact de l'adoption du *C.c.Q.* sur les règles de droit administratif relatives aux munici palités. Bien que le juge Gonthier ait conclu, dans cet arrêt, que le délai de prescription établi à l'art. 2930 du *C.c.Q.* avait eu pour effet d'abroger impli citement une disposition de la *Loi sur les cités et villes* portant sur la prescription, sa conclusion n'était pas

contextual analysis of both pieces of legislation, including an extensive review of the relevant legislative history (paras. 31 41). Consequently, the circumstances before this Court in *Doré* are far from "identical" to those in the present case, in terms of text, context and legislative history. Accordingly, *Doré* cannot be said to require the automatic application of the rule of repeal by implication.

[53]   A noteworthy indicator of Parliament's overall intent is the fact that in subsequent amendments it has not displaced the rule set out in the *CCAA*. Indeed, as indicated above, the recent amendments to the *CCAA* in 2005 resulted in the rule previously found in s. 18.3 being renumbered and reformulated as s. 37. Thus, to the extent the interpretation allowing the GST deemed trust to remain effective under the *CCAA* depends on *ETA* s. 222(3) having impliedly repealed *CCAA* s. 18.3(1) because it is later in time, we have come full circle. Parliament has renumbered and reformulated the provision of the *CCAA* stating that, subject to exceptions for source deductions, deemed trusts do not survive the *CCAA* proceedings and thus the *CCAA* is now the later in time statute. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*.

[54]   I do not agree with my colleague Abella J. that s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I 21, can be used to interpret the 2005 amendments as having no effect. The new statute can hardly be said to be a mere re enactment of the former statute. Indeed, the *CCAA* underwent a substantial review in 2005. Notably, acting consistently with its goal of treating both the *BIA* and the *CCAA* as sharing the same approach to insolvency, Parliament made parallel amendments to both statutes with respect to corporate proposals. In addition, new provisions were introduced regarding

fondée seulement sur une analyse textuelle. Il a en effet procédé à une analyse contextuelle appro fondie des deux textes, y compris de l'historique législatif pertinent (par. 31 41). Par conséquent, les circonstances du cas dont était saisie la Cour dans *Doré* sont loin d'être « identiques » à celles du pré sent pourvoi, tant sur le plan du texte que sur celui du contexte et de l'historique législatif. On ne peut donc pas dire que l'arrêt *Doré* commande l'appli cation automatique d'une règle d'abrogation impli cite.

[53]   Un bon indice de l'intention générale du légis lateur peut être tiré du fait qu'il n'a pas, dans les modifications subséquentes, écarté la règle énoncée dans la *LACC*. D'ailleurs, par suite des modifica tions apportées à cette loi en 2005, la règle figurant initialement à l'art. 18.3 a, comme nous l'avons vu plus tôt, été reprise sous une formulation différente à l'art. 37. Par conséquent, dans la mesure où l'inter prétation selon laquelle la fiducie réputée visant la TPS demeurerait en vigueur dans le contexte de pro cédures en vertu de la *LACC* repose sur le fait que le par. 222(3) de la *LTA* constitue la disposition pos térieure et a eu pour effet d'abroger implicitement le par. 18.3(1) de la *LACC*, nous revenons au point de départ. Comme le législateur a reformulé et renumé roté la disposition de la *LACC* précisant que, sous réserve des exceptions relatives aux retenues à la source, les fiducies réputées ne survivent pas à l'en gagement de procédures fondées sur la *LACC*, c'est cette loi qui se trouve maintenant à être le texte pos térieur. Cette constatation confirme que c'est dans la *LACC* qu'est exprimée l'intention du législateur en ce qui a trait aux fiducies réputées visant la TPS.

[54]   Je ne suis pas d'accord avec ma collègue la juge Abella pour dire que l'al. 44*f*) de la *Loi d'inter prétation*, L.R.C. 1985, ch. I 21, permet d'interpré ter les modifications de 2005 comme n'ayant aucun effet. La nouvelle loi peut difficilement être consi dérée comme une simple refonte de la loi antérieure. De fait, la *LACC* a fait l'objet d'un examen appro fondi en 2005. En particulier, conformément à son objectif qui consiste à faire concorder l'approche de la *LFI* et celle de la *LACC* à l'égard de l'insolvabilité, le législateur a apporté aux deux textes des modifica tions allant dans le même sens en ce qui concerne les

the treatment of contracts, collective agreements, interim financing and governance agreements. The appointment and role of the Monitor was also clarified. Noteworthy are the limits imposed by *CCAA* s. 11.09 on the court's discretion to make an order staying the Crown's source deductions deemed trusts, which were formerly found in s. 11.4. No mention whatsoever is made of GST deemed trusts (see Summary to S.C. 2005, c. 47). The review went as far as looking at the very expression used to describe the statutory override of deemed trusts. The comments cited by my colleague only emphasize the clear intent of Parliament to maintain its policy that only source deductions deemed trusts survive in *CCAA* proceedings.

[55] In the case at bar, the legislative context informs the determination of Parliament's legislative intent and supports the conclusion that *ETA* s. 222(3) was not intended to narrow the scope of the *CCAA*'s override provision. Viewed in its entire context, the conflict between the *ETA* and the *CCAA* is more apparent than real. I would therefore not follow the reasoning in *Ottawa Senators* and affirm that *CCAA* s. 18.3 remained effective.

[56] My conclusion is reinforced by the purpose of the *CCAA* as part of Canadian remedial insolvency legislation. As this aspect is particularly relevant to the second issue, I will now discuss how courts have interpreted the scope of their discretionary powers in supervising a *CCAA* reorganization and how Parliament has largely endorsed this interpretation. Indeed, the interpretation courts have given to the *CCAA* helps in understanding how the *CCAA* grew to occupy such a prominent role in Canadian insolvency law.

propositions présentées par les entreprises. De plus, de nouvelles dispositions ont été ajoutées au sujet des contrats, des conventions collectives, du financement temporaire et des accords de gouvernance. Des clarifications ont aussi été apportées quant à la nomination et au rôle du contrôleur. Il convient par ailleurs de souligner les limites imposées par l'art. 11.09 de la *LACC* au pouvoir discrétionnaire du tribunal d'ordonner la suspension de l'effet des fiducies réputées créées en faveur de la Couronne relativement aux retenues à la source, limites qui étaient auparavant énoncées à l'art. 11.4. Il n'est fait aucune mention des fiducies réputées visant la TPS (voir le Sommaire de la L.C. 2005, ch. 47). Dans le cadre de cet examen, le législateur est allé jusqu'à se pencher sur les termes mêmes utilisés dans la loi pour écarter l'application des fiducies réputées. Les commentaires cités par ma collègue ne font que souligner l'intention manifeste du législateur de maintenir sa politique générale suivant laquelle seules les fiducies réputées visant les retenues à la source survivent en cas de procédures fondées sur la *LACC*.

[55] En l'espèce, le contexte législatif aide à déterminer l'intention du législateur et conforte la conclusion selon laquelle le par. 222(3) de la *LTA* ne visait pas à restreindre la portée de la disposition de la *LACC* écartant l'application des fiducies réputées. Eu égard au contexte dans son ensemble, le conflit entre la *LTA* et la *LACC* est plus apparent que réel. Je n'adopterais donc pas le raisonnement de l'arrêt *Ottawa Senators* et je confirmerais que l'art. 18.3 de la *LACC* a continué de produire ses effets.

[56] Ma conclusion est renforcée par l'objectif de la *LACC* en tant que composante du régime réparateur instauré la législation canadienne en matière d'insolvabilité. Comme cet aspect est particulièrement pertinent à propos de la deuxième question, je vais maintenant examiner la façon dont les tribunaux ont interprété l'étendue des pouvoirs discrétionnaires dont ils disposent lorsqu'ils surveillent une réorganisation fondée sur la *LACC*, ainsi que la façon dont le législateur a dans une large mesure entériné cette interprétation. L'interprétation de la *LACC* par les tribunaux aide en fait à comprendre comment celle-ci en est venue à jouer un rôle si important dans le droit canadien de l'insolvabilité.

3.3  *Discretionary Power of a Court Supervising a CCAA Reorganization*

[57]  Courts frequently observe that "[t]he *CCAA* is skeletal in nature" and does not "contain a comprehensive code that lays out all that is permitted or barred" (*Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513, at para. 44, *per* Blair J.A.). Accordingly, "[t]he history of CCAA law has been an evolution of judicial interpretation" (*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Ct. (Gen. Div.)), at para. 10, *per* Farley J.).

*[58] CCAA* decisions are often based on discretionary grants ofjurisdiction. The incremental exercise of judicial discretion in commercial courts under conditions one practitioner aptly describes as "the hothouse of real time litigation" has been the primary method by which the *CCAA* has been adapted and has evolved to meet contemporary business and social needs (see Jones, at p. 484).

[59]  Judicial discretion must of course be exercised in furtherance of the *CCAA*'s purposes. The remedial purpose I referred to in the historical overview of the Act is recognized over and over again in the jurisprudence. To cite one early example:

   The legislation is remedial in the purest sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor initi ated termination of ongoing business operations can be avoided while a court supervised attempt to reorganize the financial affairs of the debtor company is made.

(*Elan Corp. v. Comiskey* (1990), 41 O.A.C. 282, at para. 57, *per* Doherty J.A., dissenting)

[60]  Judicial decision making under the *CCAA* takes many forms. A court must first of all provide the conditions under which the debtor can attempt to reorganize. This can be achieved by

3.3  *Pouvoirs discrétionnaires du tribunal chargé de surveiller une réorganisation fondée sur la LACC*

[57]  Les tribunaux font souvent remarquer que [traductIon] << [l]a *LACC* est par nature schémati que >> et ne << contient pas un code complet énonçant tout ce qui est permis et tout ce qui est interdit >> (*Metcalfe & Mansfield Alternative Investments II Corp. (Re)*, 2008 ONCA 587, 92 O.R. (3d) 513, par. 44, le juge Blair). Par conséquent, [traductIon] << [l]'histoire du droit relatif à la LACC correspond à l'évolution de ce droit au fil de son interprétation par les tribunaux >> (*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (C. Ont. (Div. gén.)), par. 10, le juge Farley).

[58]  Les décisions prises en vertu de la *LACC* découlent souvent de l'exercice discrétionnaire de certains pouvoirs. C'est principalement au fil de l'exercice par les juridictions commerciales de leurs pouvoirs discrétionnaires, et ce, dans des condi tions décrites avec justesse par un praticien comme constituant [traductIon] << la pépinière du conten tieux en temps réel >>, que la *LACC* a évolué de façon graduelle et s'est adaptée aux besoins commerciaux et sociaux contemporains (voir Jones, p. 484).

[59]  L'exercice par les tribunaux de leurs pouvoirs discrétionnaires doit évidemment tendre à la réali sation des objectifs de la *LACC*. Le caractère répa rateur dont j'ai fait état dans mon aperçu historique de la Loi a à maintes reprises été reconnu dans la jurisprudence. Voici l'un des premiers exemples :

   [traductIon] La loi est réparatrice au sens le plus pur du terme, en ce qu'elle fournit un moyen d'éviter les effets dévastateurs, — tant sur le plan social qu'économi que — de la faillite ou de l'arrêt des activités d'une entre prise, à l'initiation des créanciers, pendant que des efforts sont déployés, sous la surveillance du tribunal, en vue de réorganiser la situation financière de la compagnie débi trice.

(*Elan Corp. c. Comiskey* (1990), 41 O.A.C. 282, par. 57, le juge Doherty, dissident)

[60]  Le processus décisionnel des tribunaux sous le régime de la *LACC* comporte plusieurs aspects. Le tribunal doit d'abord créer les conditions propres à permettre au débiteur de tenter une réorganisation.

staying enforcement actions by creditors to allow the debtor's business to continue, preserving the *status quo* while the debtor plans the compromise or arrangement to be presented to creditors, and supervising the process and advancing it to the point where it can be determined whether it will succeed (see, e.g., *Chef Ready Foods Ltd. v. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84 (C.A.), at pp. 88 89; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134, at para. 27). In doing so, the court must often be cognizant of the various interests at stake in the reorganization, which can extend beyond those of the debtor and creditors to include employees, directors, shareholders, and even other parties doing business with the insolvent company (see, e.g., *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9, at para. 144, *per* Paperny J. (as she then was); *Air Canada, Re* (2003), 42 C.B.R. (4th) 173 (Ont. S.C.J.), at para. 3; *Air Canada, Re*, 2003 CanLII 49366 (Ont. S.C.J.), at para. 13, *per* Farley J.; Sarra, *Creditor Rights*, at pp. 181 92 and 217 26). In addition, courts must recognize that on occasion the broader public interest will be engaged by aspects of the reorganization and may be a factor against which the decision of whether to allow a particular action will be weighed (see, e.g., *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.), at para. 2, *per* Blair J. (as he then was); Sarra, *Creditor Rights*, at pp. 195 214).

[61] When large companies encounter difficulty, reorganizations become increasingly complex. *CCAA* courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the *CCAA*. Without exhaustively cataloguing the various measures taken under the authority of the *CCAA*, it is useful to refer briefly to a few examples to illustrate the flexibility the statute affords supervising courts.

Il peut à cette fin suspendre les mesures d'exécution prises par les créanciers afin que le débiteur puisse continuer d'exploiter son entreprise, préserver le statu quo pendant que le débiteur prépare la tran saction ou l'arrangement qu'il présentera aux créan ciers et surveiller le processus et le mener jusqu'au point où il sera possible de dire s'il aboutira (voir, p. ex., *Chef Ready Foods Ltd. c. Hongkong Bank of Can.* (1990), 51 B.C.L.R. (2d) 84 (C.A.), p. 88 89; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134, par. 27). Ce faisant, le tribunal doit souvent déterminer les divers intérêts en jeu dans la réorganisation, lesquels peuvent fort bien ne pas se limiter aux seuls intérêts du débiteur et des créan ciers, mais englober aussi ceux des employés, des administrateurs, des actionnaires et même de tiers qui font affaire avec la compagnie insolvable (voir, p. ex., *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9, par. 144, la juge Paperny (maintenant juge de la Cour d'appel); *Air Canada, Re* (2003), 42 C.B.R. (4th) 173 (C.S.J. Ont.), par. 3; *Air Canada, Re*, 2003 CanLII 49366 (C.S.J. Ont.), par. 13, le juge Farley; Sarra, *Creditor Rights*, p. 181 192 et 217 226). En outre, les tribunaux doi vent reconnaître que, à l'occasion, certains aspects de la réorganisation concernent l'intérêt public et qu'il pourrait s'agir d'un facteur devant être pris en compte afin de décider s'il y a lieu d'autoriser une mesure donnée (voir, p. ex., *Canadian Red Cross Society/Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158 (C.S.J. Ont.), par. 2, le juge Blair (maintenant juge de la Cour d'appel); Sarra, *Creditor Rights*, p. 195 214).

[61] Quand de grandes entreprises éprouvent des difficultés, les réorganisations deviennent très com plexes. Les tribunaux chargés d'appliquer la *LACC* ont ainsi été appelés à innover dans l'exercice de leur compétence et ne se sont pas limités à suspendre les procédures engagées contre le débiteur afin de lui permettre de procéder à une réorganisation. On leur a demandé de sanctionner des mesures non expres sément prévues par la *LACC*. Sans dresser la liste complète des diverses mesures qui ont été prises par des tribunaux en vertu de la *LACC*, il est néanmoins utile d'en donner brièvement quelques exemples, pour bien illustrer la marge de manœuvre que la loi accorde à ceux ci.

[62] Perhaps the most creative use of *CCAA* authority has been the increasing willingness of courts to authorize post filing security for debtor in possession financing or super priority charges on the debtor's assets when necessary for the continuation of the debtor's business during the reorganization (see, e.g., *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (Ont. Ct. (Gen. Div.)); *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, aff'g (1999), 12 C.B.R. (4th) 144 (S.C.); and generally, J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), at pp. 93 115). The *CCAA* has also been used to release claims against third parties as part of approving a comprehensive plan of arrangement and compromise, even over the objections of some dissenting creditors (see *Metcalfe & Mansfield*). As well, the appointment of a Monitor to oversee the reorganization was originally a measure taken pursuant to the *CCAA*'s supervisory authority; Parliament responded, making the mechanism mandatory by legislative amendment.

[63] Judicial innovation during *CCAA* proceed ings has not been without controversy. At least two questions it raises are directly relevant to the case at bar: (1) What are the sources of a court's author ity during *CCAA* proceedings? (2) What are the limits of this authority?

[64] The first question concerns the boundary between a court's statutory authority under the *CCAA* and a court's residual authority under its inherent and equitable jurisdiction when supervising a reorganization. In authorizing measures during *CCAA* proceedings, courts have on occasion purported to rely upon their equitable jurisdiction to advance the purposes of the Act or their inherent jurisdiction to fill gaps in the statute. Recent appellate decisions have counselled against

[62] L'utilisation la plus créative des pouvoirs conférés par la *LACC* est sans doute le fait que les tribunaux se montrent de plus en plus disposés à autoriser, après le dépôt des procédures, la consti tution de sûretés pour financer le débiteur demeuré en possession des biens ou encore la constitution de charges super prioritaires grevant l'actif du débiteur lorsque cela est nécessaire pour que ce dernier puisse continuer d'exploiter son entreprise pendant la réorganisation (voir, p. ex., *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (C. Ont. (Div. gén.)); *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96, conf. (1999), 12 C.B.R. (4th) 144 (C.S.); et, d'une manière géné rale, J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), p. 93 115). La *LACC* a aussi été utilisée pour libérer des tiers des actions susceptibles d'être intentées contre eux, dans le cadre de l'approbation d'un plan global d'arran gement et de transaction, malgré les objections de certains créanciers dissidents (voir *Metcalfe & Mansfield*). Au départ, la nomination d'un contrô leur chargé de surveiller la réorganisation était elle aussi une mesure prise en vertu du pouvoir de sur veillance conféré par la *LACC*, mais le législateur est intervenu et a modifié la loi pour rendre cette mesure obligatoire.

[63] L'esprit d'innovation dont ont fait montre les tribunaux pendant des procédures fondées sur la *LACC* n'a toutefois pas été sans susciter de contro verses. Au moins deux des questions que soulève leur approche sont directement pertinentes en l'es pèce : (1) Quelles sont les sources des pouvoirs dont dispose le tribunal pendant les procédures fondées sur la *LACC*? (2) Quelles sont les limites de ces pouvoirs?

[64] La première question porte sur la frontière entre les pouvoirs d'origine législative dont dispose le tribunal en vertu de la *LACC* et les pouvoirs rési duels dont jouit un tribunal en raison de sa com pétence inhérente et de sa compétence en equity, lorsqu'il est question de surveiller une réorganisa tion. Pour justifier certaines mesures autorisées à l'occasion de procédures engagées sous le régime de la *LACC*, les tribunaux ont parfois prétendu se fonder sur leur compétence en equity dans le but

purporting to rely on inherent jurisdiction, holding that the better view is that courts are in most cases simply construing the authority supplied by the *CCAA* itself (see, e.g., *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236, at paras. 45 47, *per* Newbury J.A.; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (C.A.), at paras. 31 33, *per* Blair J.A.).

[65]  I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).

[66]  Having examined the pertinent parts of the *CCAA* and the recent history of the legislation, I accept that in most instances the issuance of an order during *CCAA* proceedings should be considered an exercise in statutory interpretation. Particularly noteworthy in this regard is the expansive interpretation the language of the statute at issue is capable of supporting.

[67]  The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company . . . on the application of any person interested in the

de réaliser les objectifs de la Loi ou sur leur com pétence inhérente afin de combler les lacunes de celle ci. Or, dans de récentes décisions, des cours d'appel ont déconseillé aux tribunaux d'invoquer leur compétence inhérente, concluant qu'il est plus juste de dire que, dans la plupart des cas, les tri bunaux ne font simplement qu'interpréter les pou voirs se trouvant dans la *LACC* elle même (voir, p. ex., *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236, par. 45 47, la juge Newbury; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (C.A.), par. 31 33, le juge Blair).

[65]  Je suis d'accord avec la juge Georgina R. Jackson et la professeure Janis Sarra pour dire que la méthode la plus appropriée est une approche hié rarchisée. Suivant cette approche, les tribunaux procédèrent d'abord à une interprétation des dispo sitions de la *LACC* avant d'invoquer leur compé tence inhérente ou leur compétence en equity pour justifier des mesures prises dans le cadre d'une pro cédure fondée sur la *LACC* (voir G. R. Jackson et J. Sarra, << Selecting the Judicial Tool to get the Job Done : An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters », dans J. P. Sarra, dir., *Annual Review of Insolvency Law 2007* (2008), 41, p. 42). Selon ces auteures, pourvu qu'on lui donne l'in terprétation téléologique et large qui s'impose, la *LACC* permettra dans la plupart des cas de justi fier les mesures nécessaires à la réalisation de ses objectifs (p. 94).

[66]  L'examen des parties pertinentes de la *LACC* et de l'évolution récente de la législation me font adhérer à ce point de vue jurispruden tiel et doctrinal : dans la plupart des cas, la déci sion de rendre une ordonnance durant une procé dure fondée sur la *LACC* relève de l'interprétation législative. D'ailleurs, à cet égard, il faut souligner d'une façon particulière que le texte de loi dont il est question en l'espèce peut être interprété très largement.

[67]  En vertu du pouvoir conféré initialement par la *LACC*, le tribunal pouvait, << chaque fois qu'une demande [était] faite sous le régime de la présente loi à l'égard d'une compagnie, [. . .] sur demande

matter, . . . subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.

[68]   In this regard, though not strictly applica ble to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary author ity of the court under the *CCAA*. Thus, in s. 11 of the *CCAA* as currently enacted, a court may, "sub ject to the restrictions set out in this Act, . . . make any order that it considers appropriate in the cir cumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence.

[69]   The *CCAA* also explicitly provides for certain orders. Both an order made on an initial application and an order on subsequent applications may stay, restrain, or prohibit existing or new proceedings against the debtor. The burden is on the applicant to satisfy the court that the order is appropriate in the circumstances and that the applicant has been acting in good faith and with due diligence (*CCAA*, ss. 11(3), (4) and (6)).

[70]   The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* — avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all

d'un intéressé, [. . .] sous réserve des autres dispo sitions de la présente loi [. . .] rendre l'ordonnance prévue au présent article >> (*LACC*, par. 11(1)). Cette formulation claire était très générale.

[68]   Bien que ces dispositions ne soient pas stric tement applicables en l'espèce, je signale à ce propos que le législateur a, dans des modifications récen tes, apporté au texte du par. 11(1) un changement qui rend plus explicite le pouvoir discrétionnaire conféré au tribunal par la *LACC*. Ainsi, aux termes de l'art. 11 actuel de la *LACC*, le tribunal peut « rendre [. . .] sous réserve des restrictions prévues par la présente loi [. . .] toute ordonnance qu'il estime indiquée >> (L.C. 2005, ch. 47, art. 128). Le législateur semble ainsi avoir jugé opportun de sanctionner l'interpré tation large du pouvoir conféré par la *LACC* qui a été élaborée par la jurisprudence.

[69]   De plus, la *LACC* prévoit explicitement cer taines ordonnances. Tant à la suite d'une demande initiale que d'une demande subséquente, le tribunal peut, par ordonnance, suspendre ou interdire toute procédure contre le débiteur, ou surseoir à sa conti nuation. Il incombe à la personne qui demande une telle ordonnance de convaincre le tribunal qu'elle est indiquée et qu'il a agi et continue d'agir de bonne foi et avec la diligence voulue (*LACC*, par. 11(3), (4) et (6)).

[70]   La possibilité pour le tribunal de rendre des ordonnances plus spécifiques n'a pas pour effet de restreindre la portée des termes généraux utilisés dans la *LACC*. Toutefois, l'opportunité, la bonne foi et la diligence sont des considérations de base que le tribunal devrait toujours garder à l'esprit lorsqu'il exerce les pouvoirs conférés par la *LACC*. Sous le régime de la *LACC*, le tribunal évalue l'opportunité de l'ordonnance demandée en déterminant si elle favorisera la réalisation des objectifs de politique générale qui sous tendent la Loi. Il s'agit donc de savoir si cette ordonnance contribuera utilement à la réalisation de l'objectif réparateur de la *LACC* — à savoir éviter les pertes sociales et économiques résultant de la liquidation d'une compagnie insolva ble. J'ajouterais que le critère de l'opportunité s'ap plique non seulement à l'objectif de l'ordonnance, mais aussi aux moyens utilisés. Les tribunaux

stakeholders are treated as advantageously and fairly as the circumstances permit.

[71]  It is well established that efforts to reorganize under the *CCAA* can be terminated and the stay of proceedings against the debtor lifted if the reorganization is "doomed to failure" (see *Chef Ready*, at p. 88; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25 (B.C.C.A.), at paras. 6-7). However, when an order is sought that does realistically advance the *CCAA*'s purposes, the ability to make it is within the discretion of a *CCAA* court.

[72]  The preceding discussion assists in determining whether the court had authority under the *CCAA* to continue the stay of proceedings against the Crown once it was apparent that reorganization would fail and bankruptcy was the inevitable next step.

[73]  In the Court of Appeal, Tysoe J.A. held that no authority existed under the *CCAA* to continue staying the Crown's enforcement of the GST deemed trust once efforts at reorganization had come to an end. The appellant submits that in so holding, Tysoe J.A. failed to consider the underlying purpose of the *CCAA* and give the statute an appropriately purposive and liberal interpretation under which the order was permissible. The Crown submits that Tysoe J.A. correctly held that the mandatory language of the *ETA* gave the court no option but to permit enforcement of the GST deemed trust when lifting the *CCAA* stay to permit the debtor to make an assignment under the *BIA*. Whether the *ETA* has a mandatory effect in the context of a *CCAA* proceeding has already been discussed. I will now address the question of whether the order was authorized by the *CCAA*.

doivent se rappeler que les chances de succès d'une réorganisation sont meilleures lorsque les participants arrivent à s'entendre et que tous les intéressés sont traités de la façon la plus avantageuse et juste possible dans les circonstances.

[71]  Il est bien établi qu'il est possible de mettre fin aux efforts déployés pour procéder à une réorganisation fondée sur la *LACC* et de lever la suspension des procédures contre le débiteur si la réorganisation est [TRADUCTION] « vouée à l'échec » (voir *Chef Ready*, p. 88; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25 (C.A.C. B.), par. 6-7). Cependant, quand l'ordonnance demandée contribue vraiment à la réalisation des objectifs de la *LACC*, le pouvoir discrétionnaire dont dispose le tribunal en vertu de cette loi l'habilite à rendre à cette ordonnance.

[72]  L'analyse qui précède est utile pour répondre à la question de savoir si le tribunal avait, en vertu de la *LACC*, le pouvoir de maintenir la suspension des procédures à l'encontre de la Couronne, une fois qu'il est devenu évident que la réorganisation échouerait et que la faillite était inévitable.

[73]  En Cour d'appel, le juge Tysoe a conclu que la *LACC* n'habilitait pas le tribunal à maintenir la suspension des mesures d'exécution de la Couronne à l'égard de la fiducie réputée visant la TPS après l'arrêt des efforts de réorganisation. Selon l'appelante, en tirant cette conclusion, le juge Tysoe a omis de tenir compte de l'objectif fondamental de la *LACC* et n'a pas donné à ce texte l'interprétation téléologique et large qu'il convient de lui donner et qui autorise le prononcé d'une telle ordonnance. La Couronne soutient que le juge Tysoe a conclu à bon droit que les termes impératifs de la *LTA* ne laissaient au tribunal d'autre choix que d'autoriser les mesures d'exécution à l'endroit de la fiducie réputée visant la TPS lorsqu'il a levé la suspension de procédures qui avait été ordonnée en application de la *LACC* afin de permettre au débiteur de faire cession de ses biens en vertu de la *LFI*. J'ai déjà traité de la question de savoir si la *LTA* a un effet contraignant dans une procédure fondée sur la *LACC*. Je vais maintenant traiter de la question de savoir si l'ordonnance était autorisée par la *LACC*.

[74]  It is beyond dispute that the *CCAA* imposes no explicit temporal limitations upon proceedings commenced under the Act that would prohibit ordering a continuation of the stay of the Crown's GST claims while lifting the general stay of proceedings temporarily to allow the debtor to make an assignment in bankruptcy.

[75]  The question remains whether the order advanced the underlying purpose of the *CCAA*. The Court of Appeal held that it did not because the reorganization efforts had come to an end and the *CCAA* was accordingly spent. I disagree.

[76]  There is no doubt that had reorganization been commenced under the *BIA* instead of the *CCAA*, the Crown's deemed trust priority for the GST funds would have been lost. Similarly, the Crown does not dispute that under the scheme of distribution in bankruptcy under the *BIA* the deemed trust for GST ceases to have effect. Thus, after reorganization under the *CCAA* failed, creditors would have had a strong incentive to seek immediate bankruptcy and distribution of the debtor's assets under the *BIA*. In order to conclude that the discretion does not extend to partially lifting the stay in order to allow for an assignment in bankruptcy, one would have to assume a gap between the *CCAA* and the *BIA* proceedings. Brenner C.J.S.C.'s order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the *CCAA*. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the *CCAA*'s objectives to the extent that it allowed a bridge between the *CCAA* and *BIA* proceedings. This interpretation of the tribunal's discretionary power is buttressed by s. 20 of the *CCAA*. That section provides that the *CCAA* "may be applied together with the provisions of any Act of Parliament . . . that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them", such as

[74]  Il n'est pas contesté que la *LACC* n'assujettit les procédures engagées sous son régime à aucune limite temporelle explicite qui interdirait au tribunal d'ordonner le maintien de la suspension des procédures engagées par la Couronne pour recouvrer la TPS, tout en levant temporairement la suspension générale des procédures prononcée pour permettre au débiteur de faire cession de ses biens.

[75]  Il reste à se demander si l'ordonnance contribuait à la réalisation de l'objectif fondamental de la *LACC*. La Cour d'appel a conclu que non, parce que les efforts de réorganisation avaient pris fin et que, par conséquent, la *LACC* n'était plus d'aucune utilité. Je ne partage pas cette conclusion.

[76]  Il ne fait aucun doute que si la réorganisation avait été entreprise sous le régime de la *LFI* plutôt qu'en vertu de la *LACC*, la Couronne aurait perdu la priorité que lui confère la fiducie réputée visant la TPS. De même, la Couronne ne conteste pas que, selon le plan de répartition prévu par la *LFI* en cas de faillite, cette fiducie réputée cesse de produire ses effets. Par conséquent, après l'échec de la réorganisation tentée sous le régime de la *LACC*, les créanciers auraient eu toutes les raisons de solliciter la mise en faillite immédiate du débiteur et la répartition de ses biens en vertu de la *LFI*. Pour pouvoir conclure que le pouvoir discrétionnaire dont dispose le tribunal ne l'autorise pas à lever partiellement la suspension des procédures afin de permettre la cession des biens, il faudrait présumer l'existence d'un hiatus entre la procédure fondée sur la *LACC* et celle fondée sur la *LFI*. L'ordonnance du juge en chef Brenner suspendant l'exécution des mesures de recouvrement de la Couronne à l'égard de la TPS faisait en sorte que les créanciers ne soient pas désavantagés par la tentative de réorganisation fondée sur la *LACC*. Cette ordonnance avait pour effet de dissuader les créanciers d'entraver une liquidation ordonnée et, de ce fait, elle contribuait à la réalisation des objectifs de la *LACC*, dans la mesure où elle établit une passerelle entre les procédures régies par la *LACC* d'une part et celles régies par la *LFI* d'autre part. Cette interprétation du pouvoir discrétionnaire du tribunal se trouve renforcée par

the *BIA*. Section 20 clearly indicates the intention of Parliament for the *CCAA* to operate *in tandem* with other insolvency legislation, such as the *BIA*.

[77]   The *CCAA* creates conditions for preserving the *status quo* while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all. Because the alternative to reorganization is often bankruptcy, participants will measure the impact of a reorganization against the position they would enjoy in liquidation. In the case at bar, the order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that is common to both statutes.

[78]   Tysoe J.A. therefore erred in my view by treating the *CCAA* and the *BIA* as distinct regimes subject to a temporal gap between the two, rather than as forming part of an integrated body of insolvency law. Parliament's decision to maintain two statutory schemes for reorganization, the *BIA* and the *CCAA*, reflects the reality that reorganizations of differing complexity require different legal mechanisms. By contrast, only one statutory scheme has been found to be needed to liquidate a bankrupt debtor's estate. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA* to allow commencement of the *BIA* proceedings. However, as Laskin J.A. for the Ontario Court of Appeal noted in a similar competition between secured creditors and the Ontario Superintendent of Financial Services seeking to enforce a deemed trust, "[t]he two statutes are related" and no "gap" exists between the two statutes which would allow the enforcement of property interests at the conclusion of *CCAA* proceedings that would be

l'art. 20 de la *LACC*, qui précise que les disposi tions de la Loi << peuvent être appliquées conjoin tement avec celles de toute loi fédérale [. . .] auto risant ou prévoyant l'homologation de transactions ou arrangements entre une compagnie et ses actionnaires ou une catégorie de ces derniers », par exemple la *LFI*. L'article 20 indique clairement que le législateur entend voir la *LACC* être appliquée *de concert* avec les autres lois concernant l'insol vabilité, telle la *LFI*.

[77]   La *LACC* établit les conditions qui permet tent de préserver le statu quo pendant qu'on tente de trouver un terrain d'entente entre les intéres sés en vue d'une réorganisation qui soit juste pour tout le monde. Étant donné que, souvent, la seule autre solution est la faillite, les participants éva luent l'impact d'une réorganisation en regard de la situation qui serait la leur en cas de liquidation. En l'espèce, l'ordonnance favorisait une transition harmonieuse entre la réorganisation et la liquida tion, tout en répondant à l'objectif — commun aux deux lois — qui consiste à avoir une seule procé dure collective.

[78]   À mon avis, le juge d'appel Tysoe a donc commis une erreur en considérant la *LACC* et la *LFI* comme des régimes distincts, séparés par un hiatus temporel, plutôt que comme deux lois fai sant partie d'un ensemble intégré de règles du droit de l'insolvabilité. La décision du législateur de conserver deux régimes législatifs en matière de réorganisation, la *LFI* et la *LACC*, reflète le fait bien réel que des réorganisations de complexité différente requièrent des mécanismes légaux dif férents. En revanche, un seul régime législatif est jugé nécessaire pour la liquidation de l'actif d'un débiteur en faillite. Le passage de la *LACC* à la *LFI* peut exiger la levée partielle d'une suspension de procédures ordonnée en vertu de la *LACC*, de façon à permettre l'engagement des procédures fondées sur la *LFI*. Toutefois, comme l'a signalé le juge Laskin de la Cour d'appel de l'Ontario dans un litige semblable opposant des créanciers garantis et le Surintendant des services financiers de l'Ontario qui invoquait le bénéfice d'une fidu cie réputée, [TRADUCTIoN] << [l]es deux lois sont

lost in bankruptcy (***Ivaco Inc. (Re)*** (2006), 83 O.R. (3d) 108, at paras. 62 63).

[79]  The Crown's priority in claims pursuant to source deductions deemed trusts does not undermine this conclusion. Source deductions deemed trusts survive under both the ***CCAA*** and the ***BIA***. Accordingly, creditors' incentives to prefer one Act over another will not be affected. While a court has a broad discretion to stay source deductions deemed trusts in the ***CCAA*** context, this discretion is nevertheless subject to specific limitations applicable only to source deductions deemed trusts (***CCAA***, s. 11.4). Thus, if ***CCAA*** reorganization fails (e.g., either the creditors or the court refuse a proposed reorganization), the Crown can immediately assert its claim in unremitted source deductions. But this should not be understood to affect a seamless transition into bankruptcy or create any "gap" between the ***CCAA*** and the ***BIA*** for the simple reason that, regardless of what statute the reorganization had been commenced under, creditors' claims in both instances would have been subject to the priority of the Crown's source deductions deemed trust.

[80]  Source deductions deemed trusts aside, the comprehensive and exhaustive mechanism under the ***BIA*** must control the distribution of the debtor's assets once liquidation is inevitable. Indeed, an orderly transition to liquidation is mandatory under the ***BIA*** where a proposal is rejected by creditors. The ***CCAA*** is silent on the transition into liquidation but the breadth of the court's discretion under the Act is sufficient to construct a bridge to liquidation under the ***BIA***. The court must do so in a manner that does not subvert the scheme of distribution under the ***BIA***. Transition

liées >> et il n'existe entre elles aucun << hiatus >> qui permettrait d'obtenir l'exécution, à l'issue de pro cédures engagées sous le régime de la *LACC*, de droits de propriété qui seraient perdus en cas de faillite (***Ivaco Inc. (Re)*** (2006), 83 O.R. (3d) 108, par. 62 63).

[79]    La priorité accordée aux réclamations de la Couronne fondées sur une fiducie réputée visant des retenues à la source n'affaiblit en rien cette conclusion. Comme ces fiducies réputées survivent tant sous le régime de la *LACC* que sous celui de la *LFI*, ce facteur n'a aucune incidence sur l'intérêt que pourraient avoir les créanciers à préférer une loi plutôt que l'autre. S'il est vrai que le tribunal agissant en vertu de la *LACC* dispose d'une grande latitude pour suspendre les réclamations fondées sur des fiducies réputées visant des retenues à la source, cette latitude n'en demeure pas moins soumise à des limitations particulières, applicables uniquement à ces fiducies réputées (*LACC*, art. 11.4). Par consé quent, si la réorganisation tentée sous le régime de la *LACC* échoue (p. ex. parce que le tribunal ou les créanciers refusent une proposition de réorganisa tion), la Couronne peut immédiatement présenter sa réclamation à l'égard des retenues à la source non versées. Mais il ne faut pas en conclure que cela compromet le passage harmonieux au régime de faillite ou crée le moindre << hiatus >> entre la *LACC* et la *LFI*, car le fait est que, peu importe la loi en vertu de laquelle la réorganisation a été amorcée, les réclamations des créanciers auraient dans les deux cas été subordonnées à la priorité de la fiducie réputée de la Couronne à l'égard des rete nues à la source.

[80]    Abstraction faite des fiducies réputées visant les retenues à la source, c'est le mécanisme complet et exhaustif prévu par la *LFI* qui doit régir la répartition des biens du débiteur une fois que la liquidation est devenue inévitable. De fait, une transition ordonnée aux procédures de liquidation est obligatoire sous le régime de la *LFI* lorsqu'une proposition est rejetée par les créanciers. La *LACC* est muette à l'égard de cette transition, mais l'am pleur du pouvoir discrétionnaire conféré au tribu nal par cette loi est suffisante pour établir une pas serelle vers une liquidation opérée sous le régime

to liquidation requires partially lifting the *CCAA* stay to commence proceedings under the *BIA*. This necessary partial lifting of the stay should not trigger a race to the courthouse in an effort to obtain priority unavailable under the *BIA*.

[81] I therefore conclude that Brenner C.J.S.C. had the authority under the *CCAA* to lift the stay to allow entry into liquidation.

3.4 *Express Trust*

[82] The last issue in this case is whether Brenner C.J.S.C. created an express trust in favour of the Crown when he ordered on April 29, 2008, that proceeds from the sale of LeRoy Trucking's assets equal to the amount of unremitted GST be held back in the Monitor's trust account until the results of the reorganization were known. Tysoe J.A. in the Court of Appeal concluded as an alternative ground for allowing the Crown's appeal that it was the beneficiary of an express trust. I disagree.

[83] Creation of an express trust requires the presence of three certainties: intention, subject matter, and object. Express or "true trusts" arise from the acts and intentions of the settlor and are distinguishable from other trusts arising by operation of law (see D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005), at pp. 28 29, especially fn. 42).

[84] Here, there is no certainty to the object (i.e. the beneficiary) inferrable from the court's order of April 29, 2008 sufficient to support an express trust.

de la *LFI*. Ce faisant, le tribunal doit veiller à ne pas perturber le plan de répartition établi par la *LFI*. La transition au régime de liquidation néces site la levée partielle de la suspension des procédu res ordonnée en vertu de la *LACC*, afin de permet tre l'introduction de procédures en vertu de la *LFI*. Il ne faudrait pas que cette indispensable levée partielle de la suspension des procédures provoque une ruée des créanciers vers le palais de justice pour l'obtention d'une priorité inexistante sous le régime de la *LFI*.

[81] Je conclus donc que le juge en chef Brenner avait, en vertu de la *LACC*, le pouvoir de lever la suspension des procédures afin de permettre la transition au régime de liquidation.

3.4 *Fiducie expresse*

[82] La dernière question à trancher en l'espèce est celle de savoir si le juge en chef Brenner a créé une fiducie expresse en faveur de la Couronne quand il a ordonné, le 29 avril 2008, que le produit de la vente des biens de LeRoy Trucking — jusqu'à concurrence des sommes de TPS non remises — soit détenu dans le compte en fiducie du contrô leur jusqu'à ce que l'issue de la réorganisation soit connue. Un autre motif invoqué par le juge Tysoe de la Cour d'appel pour accueillir l'appel interjeté par la Couronne était que, selon lui, celle ci était effec tivement la bénéficiaire d'une fiducie expresse. Je ne peux souscrire à cette conclusion.

[83] La création d'une fiducie expresse exige la présence de trois certitudes : certitude d'intention, certitude de matière et certitude d'objet. Les fidu cies expresses ou « fiducies au sens strict » décou lent des actes et des intentions du constituant et se distinguent des autres fiducies découlant de l'effet de la loi (voir D. W. M. Waters, M. R. Gillen et L. D. Smith, dir., *Waters' Law of Trusts in Canada* (3$^e$ éd. 2005), p. 28 29, particulièrement la note en bas de page 42).

[84] En l'espèce, il n'existe aucune certitude d'ob jet (c. à d. relative au bénéficiaire) pouvant être inférée de l'ordonnance prononcée le 29 avril 2008 par le tribunal et suffisante pour donner naissance à une fiducie expresse.

[85] At the time of the order, there was a dispute between Century Services and the Crown over part of the proceeds from the sale of the debtor's assets. The court's solution was to accept LeRoy Trucking's proposal to segregate those monies until that dispute could be resolved. Thus, there was no certainty that the Crown would actually be the beneficiary, or object, of the trust.

[86] The fact that the location chosen to segregate those monies was the Monitor's trust account has no independent effect such that it would overcome the lack of a clear beneficiary. In any event, under the interpretation of *CCAA* s. 18.3(1) established above, no such priority dispute would even arise because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount. However, Brenner C.J.S.C. may well have been proceeding on the basis that, in accordance with *Ottawa Senators*, the Crown's GST claim would remain effective if reorganization was successful, which would not be the case if transition to the liquidation process of the *BIA* was allowed. An amount equivalent to that claim would accordingly be set aside pending the outcome of reorganization.

[87] Thus, uncertainty surrounding the outcome of the *CCAA* restructuring eliminates the existence of any certainty to permanently vest in the Crown a beneficial interest in the funds. That much is clear from the oral reasons of Brenner C.J.S.C. on April 29, 2008, when he said: "Given the fact that [*CCAA* proceedings] are known to fail and filings in bankruptcy result, it seems to me that maintaining the status quo in the case at bar supports the proposal to have the monitor hold these funds in trust." Exactly who might take the money in the final result was therefore evidently in doubt. Brenner C.J.S.C.'s subsequent order of September 3, 2008 denying the Crown's application to enforce the trust once it was clear

[85] Au moment où l'ordonnance a été rendue, il y avait un différend entre Century Services et la Couronne au sujet d'une partie du produit de la vente des biens du débiteur. La solution retenue par le tribunal a consisté à accepter, selon la proposition de LeRoy Trucking, que la somme en question soit détenue séparément jusqu'à ce que le différend puisse être réglé. Par conséquent, il n'existait aucune certitude que la Couronne serait véritablement le bénéficiaire ou l'objet de la fiducie.

[86] Le fait que le compte choisi pour conserver séparément la somme en question était le compte en fiducie du contrôleur n'a pas à lui seul un effet tel qu'il suppléerait à l'absence d'un bénéficiaire certain. De toute façon, suivant l'interprétation du par. 18.3(1) de la *LACC* dégagée précédemment, aucun différend ne saurait même exister quant à la priorité de rang, étant donné que la priorité accordée aux réclamations de la Couronne fondées sur la fiducie réputée visant la TPS ne s'applique pas sous le régime de la *LACC* et que la Couronne est reléguée au rang de créancier non garanti à l'égard des sommes en question. Cependant, il se peut fort bien que le juge en chef Brenner ait estimé que, conformément à l'arrêt *Ottawa Senators*, la créance de la Couronne à l'égard de la TPS demeurerait effective si la réorganisation aboutissait, ce qui ne serait pas le cas si le passage au processus de liquidation régi par la *LFI* était autorisé. Une somme équivalente à cette créance serait ainsi mise de côté jusqu'à ce que le résultat de la réorganisation soit connu.

[87] Par conséquent, l'incertitude entourant l'issue de la restructuration tentée sous le régime de la *LACC* exclut l'existence d'une certitude permettant de conférer de manière permanente à la Couronne un intérêt bénéficiaire sur la somme en question. Cela ressort clairement des motifs exposés de vive voix par le juge en chef Brenner le 29 avril 2008, lorsqu'il a dit : [**TRADUCTIoN**] « Comme il est notoire que [des procédures fondées sur la *LACC*] peuvent échouer et que cela entraîne des faillites, le maintien du statu quo en l'espèce me semble militer en faveur de l'acceptation de la proposition d'ordonner au contrôleur de détenir ces fonds en fiducie. » Il y avait donc manifestement un doute quant à la question de savoir qui au juste pourrait toucher l'argent

that bankruptcy was inevitable, confirms the absence of a clear beneficiary required to ground an express trust.

#### 4. Conclusion

[88]  I conclude that Brenner C.J.S.C. had the discretion under the *CCAA* to continue the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to permit LeRoy Trucking to make an assignment in bankruptcy. My conclusion that s. 18.3(1) of the *CCAA* nullified the GST deemed trust while proceedings under that Act were pending confirms that the discretionary jurisdiction under s. 11 utilized by the court was not limited by the Crown's asserted GST priority, because there is no such priority under the *CCAA*.

[89]  For these reasons, I would allow the appeal and declare that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada is not subject to deemed trust or priority in favour of the Crown. Nor is this amount subject to an express trust. Costs are awarded for this appeal and the appeal in the court below.

The following are the reasons delivered by

**FISH J.** —

### I

[90]  I am in general agreement with the reasons of Justice Deschamps and would dispose of the appeal as she suggests.

[91]  More particularly, I share my colleague's interpretation of the scope of the judge's discretion under s. 11 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C 36 ("*CCAA*").

en fin de compte. L'ordonnance ultérieure du juge en chef Brenner — dans laquelle ce dernier a rejeté, le 3 septembre 2008, la demande de la Couronne sollicitant le bénéfice de la fiducie présumée après qu'il fut devenu évident que la faillite était inévitable — confirme l'absence du bénéficiaire certain sans lequel il ne saurait y avoir de fiducie expresse.

#### 4. Conclusion

[88]  Je conclus que le juge en chef Brenner avait, en vertu de la *LACC*, le pouvoir discrétionnaire de maintenir la suspension de la demande de la Couronne sollicitant le bénéfice de la fiducie réputée visant la TPS, tout en levant par ailleurs la suspension des procédures de manière à permettre à LeRoy Trucking de faire cession de ses biens. Ma conclusion selon laquelle le par. 18.3(1) de la *LACC* neutralisait la fiducie réputée visant la TPS pendant la durée des procédures fondées sur cette loi confirme que les pouvoirs discrétionnaires exercés par le tribunal en vertu de l'art. 11 n'étaient pas limités par la priorité invoquée par la Couronne au titre de la TPS, puisqu'il n'existe aucune priorité de la sorte sous le régime de la *LACC*.

[89]  Pour ces motifs, je suis d'avis d'accueillir le pourvoi et de déclarer que la somme de 305 202,30 $ perçue par LeRoy Trucking au titre de la TPS mais non encore versée au receveur général du Canada ne fait l'objet d'aucune fiducie réputée ou priorité en faveur de la Couronne. Cette somme ne fait pas non plus l'objet d'une fiducie expresse. Les dépens sont accordés à l'égard du présent pourvoi et de l'appel interjeté devant la juridiction inférieure.

Version française des motifs rendus par

**IE JUGE FISH** —

### I

[90]  Je souscris dans l'ensemble aux motifs de la juge Deschamps et je disposerais du pourvoi comme elle le propose.

[91]  Plus particulièrement, je me rallie à son interprétation de la portée du pouvoir discrétionnaire conféré au juge par l'art. 11 de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C.

And I share my colleague's conclusion that Brenner C.J.S.C. did not create an express trust in favour of the Crown when he segregated GST funds into the Monitor's trust account (2008 BCSC 1805, [2008] G.S.T.C. 221).

[92]  I nonetheless feel bound to add brief reasons of my own regarding the interaction between the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E 15 ("*ETA*").

[93]  In upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), and its progeny have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In my respectful view, a clearly marked departure from that jurisprudential approach is warranted in this case.

[94]  Justice Deschamps develops important historical and policy reasons in support of this position and I have nothing to add in that regard. I do wish, however, to explain why a comparative analysis of related statutory provisions adds support to our shared conclusion.

[95]  Parliament has in recent years given detailed consideration to the Canadian insolvency scheme. It has declined to amend the provisions at issue in this case. Ours is not to wonder why, but rather to treat Parliament's preservation of the relevant provisions as a deliberate exercise of the legislative discretion that is Parliament's alone. With respect, I reject any suggestion that we should instead characterize the apparent conflict between s. 18.3(1) (now s. 37(1)) of the *CCAA* and s. 222 of the *ETA* as a drafting anomaly or statutory lacuna properly subject to judicial correction or repair.

1985, ch. C 36 (<< *LACC* >>). Je partage en outre sa conclusion suivant laquelle le juge en chef Brenner n'a pas créé de fiducie expresse en faveur de la Couronne en ordonnant que les sommes recueillies au titre de la TPS soient détenues séparément dans le compte en fiducie du contrôleur (2008 BCSC 1805, [2008] G.S.T.C. 221).

[92]  J'estime néanmoins devoir ajouter de brefs motifs qui me sont propres au sujet de l'interaction entre la *LACC* et la *Loi sur la taxe d'accise*, L.R.C. 1985, ch. E 15 (<< *LTA* >>).

[93]  En maintenant, malgré l'existence des procédures d'insolvabilité, la validité de fiducies réputées créées en vertu de la *LTA*, l'arrêt *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), et les décisions rendues dans sa foulée ont eu pour effet de protéger indûment des droits de la Couronne que le Parlement avait lui même choisi de subordonner à d'autres créances prioritaires. À mon avis, il convient en l'espèce de rompre nettement avec ce courant jurisprudentiel.

[94]  La juge Deschamps expose d'importantes raisons d'ordre historique et d'intérêt général à l'appui de cette position et je n'ai rien à ajouter à cet égard. Je tiens toutefois à expliquer pourquoi une analyse comparative de certaines dispositions législatives connexes vient renforcer la conclusion à laquelle ma collègue et moi même en arrivons.

[95]  Au cours des dernières années, le législa teur fédéral a procédé à un examen approfondi du régime canadien d'insolvabilité. Il a refusé de modifier les dispositions qui sont en cause dans la présente affaire. Il ne nous appartient pas de nous interroger sur les raisons de ce choix. Nous devons plutôt considérer la décision du législateur de main tenir en vigueur les dispositions en question comme un exercice délibéré du pouvoir discrétionnaire de légiférer, pouvoir qui est exclusivement le sien. Avec égards, je rejette le point de vue suivant lequel nous devrions plutôt qualifier l'apparente contradic tion entre le par. 18.3(1) (maintenant le par. 37(1)) de la *LACC* et l'art. 222 de la *LTA* d'anomalie rédac tionnelle ou de lacune législative susceptible d'être corrigée par un tribunal.

I I

[96]  In the context of the Canadian insolvency regime, a deemed trust will be found to exist only where two complementary elements co exist: first, a statutory provision *creating* the trust; and second, a *CCAA* or *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B 3 ("*BIA*") provision *confirming* — or explicitly preserving — its effective operation.

[97]  This interpretation is reflected in three federal statutes. Each contains a deemed trust provision framed in terms strikingly similar to the wording of s. 222 of the *ETA*.

[98]  The first is the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), where s. 227(4) *creates* a deemed trust:

   (4) Every person who deducts or withholds an amount under this Act is deemed, notwithstanding any security interest (as defined in subsection 224(1.3)) in the amount so deducted or withheld, to hold the amount separate and apart from the property of the person and from property held by any secured creditor (as defined in subsection 224(1.3)) of that person that but for the security interest would be property of the person, in trust for Her Majesty and for payment to Her Majesty in the manner and at the time provided under this Act. [Here and below, the emphasis is of course my own.]

[99]  In the next subsection, Parliament has taken care to make clear that this trust is unaffected by federal or provincial legislation to the contrary:

   (4.1) Notwithstanding any other provision of this Act, the *Bankruptcy and Insolvency Act* (except sections 81.1 and 81.2 of that Act), any other enactment of Canada, any enactment of a province or any other law, where at any time an amount deemed by subsection 227(4) to be held by a person in trust for Her Majesty is not paid to Her Majesty in the manner and at the time provided under this Act, property of the person . . . equal in value to the amount so deemed to be held in trust is deemed

   (*a*)  to be held, from the time the amount was deducted or withheld by the person, separate and

I I

[96]  Dans le contexte du régime canadien d'insol vabilité, on conclut à l'existence d'une fiducie répu tée uniquement lorsque deux éléments complémen taires sont réunis : en premier lieu, une disposition législative qui *crée* la fiducie et, en second lieu, une disposition de la *LACC* ou de la *Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B 3 (<< *LFI* >>) qui *confirme* l'existence de la fiducie ou la maintient explicitement en vigueur.

[97]  Cette interprétation se retrouve dans trois lois fédérales, qui renferment toutes une disposition relative aux fiducies réputées dont le libellé offre une ressemblance frappante avec celui de l'art. 222 de la *LTA*.

[98]  La première est la *Loi de l'impôt sur le revenu*, L.R.C. 1985, ch. 1 (5$^e$ suppl.) (<< *LIR* >>), dont le par. 227(4) *crée* une fiducie réputée :

   (4) Toute personne qui déduit ou retient un montant en vertu de la présente loi est réputée, malgré toute autre garantie au sens du paragraphe 224(1.3) le concernant, le détenir en fiducie pour Sa Majesté, séparé de ses propres biens et des biens détenus par son créancier garanti au sens de ce paragraphe qui, en l'absence de la garantie, seraient ceux de la personne, et en vue de le verser à Sa Majesté selon les modalités et dans le délai prévus par la présente loi. [Dans la présente citation et dans celles qui suivent, les soulignements sont évidemment de moi.]

[99]  Dans le paragraphe suivant, le législateur prend la peine de bien préciser que toute disposition législative fédérale ou provinciale à l'effet contraire n'a aucune incidence sur la fiducie ainsi consti tuée :

   (4.1) Malgré les autres dispositions de la présente loi, la *Loi sur la faillite et l'insolvabilité* (sauf ses articles 81.1 et 81.2), tout autre texte législatif fédéral ou provin cial ou toute règle de droit, en cas de non versement à Sa Majesté, selon les modalités et dans le délai prévus par la présente loi, d'un montant qu'une personne est réputée par le paragraphe (4) détenir en fiducie pour Sa Majesté, les biens de la personne [. . .] d'une valeur égale à ce montant sont réputés :

   *a*)  être détenus en fiducie pour Sa Majesté, à comp ter du moment où le montant est déduit ou retenu,

apart from the property of the person, <u>in trust for Her Majesty</u> whether or not the property is subject to such a security interest, . . .

.   .   .

. . . and the proceeds of such property shall be paid to the Receiver General in priority to all such security interests.

[100] The continued operation of this deemed trust is expressly *confirmed* in s. 18.3 of the *CCAA*:

    **18.3** (1) <u>Subject to subsection (2),</u> notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

    (2) <u>Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act,*</u> subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* . . . .

[101] The operation of the *ITA* deemed trust is also confirmed in s. 67 of the *BIA*:

    (2) <u>Subject to subsection (3),</u> notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

    (3) <u>Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act,*</u> subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* . . . .

[102] Thus, Parliament has first *created* and then *confirmed the continued operation of* the Crown's *ITA* deemed trust under *both* the *CCAA* and the *BIA* regimes.

séparés des propres biens de la personne, qu'ils soient ou non assujettis à une telle garantie;

.   .   .

. . . et le produit découlant de ces biens est payé au rece veur général par priorité sur une telle garantie.

[100] Le maintien en vigueur de cette fiducie réputée est expressément *confirmé* à l'art. 18.3 de la *LACC* :

    **18.3** (1) <u>Sous réserve du paragraphe (2)</u> et par déroga tion à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme détenu en fiducie pour Sa Majesté si, en l'absence de la disposition législative en question, il ne le serait pas.

    (2) <u>Le paragraphe (1) ne s'applique pas à l'égard des montants réputés détenus en fiducie aux termes des para graphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu,*</u> des paragraphes 23(3) ou (4) du *Régime de pensions du Canada* ou des paragraphes 86(2) ou (2.1) de la *Loi sur l'assurance emploi* . . .

[101] L'application de la fiducie réputée prévue par la *LIR* est également confirmée par l'art. 67 de la *LFI* :

    (2) <u>Sous réserve du paragraphe (3)</u> et par dérogation à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens du failli ne peut, pour l'application de l'alinéa (1)*a*), être considéré comme détenu en fiducie pour Sa Majesté si, en l'absence de la disposition législative en question, il ne le serait pas.

    (3) <u>Le paragraphe (2) ne s'applique pas à l'égard des montants réputés détenus en fiducie aux termes des para graphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu,*</u> des paragraphes 23(3) ou (4) du *Régime de pensions du Canada* ou des paragraphes 86(2) ou (2.1) de la *Loi sur l'assurance emploi* . . .

[102] Par conséquent, le législateur a *créé*, puis *confirmé le maintien en vigueur* de la fiducie répu tée établie par la *LIR* en faveur de Sa Majesté *tant* sous le régime de la *LACC que* sous celui de la *LFI*.

[103]   The second federal statute for which this scheme holds true is the *Canada Pension Plan*, R.S.C. 1985, c. C 8 ("*CPP*"). At s. 23, Parliament creates a deemed trust in favour of the Crown and specifies that it exists despite all contrary provisions in any other Canadian statute. Finally, and in almost identical terms, the *Employment Insurance Act*, S.C. 1996, c. 23 ("*EIA*"), creates a deemed trust in favour of the Crown: see ss. 86(2) and (2.1).

[104]   As we have seen, the survival of the deemed trusts created under these provisions of the *ITA*, the *CPP* and the *EIA* is confirmed in s. 18.3(2) of the *CCAA* and in s. 67(3) of the *BIA*. In all three cases, Parliament's intent to enforce the Crown's deemed trust through insolvency proceedings is expressed in clear and unmistakable terms.

[105]   The same is not true with regard to the deemed trust created under the *ETA*. Although Parliament creates a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it does not *confirm* the trust — or expressly provide for its continued operation — in either the *BIA* or the *CCAA*. The second of the two mandatory elements I have mentioned is thus absent reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

[106]   The language of the relevant *ETA* provisions is identical in substance to that of the *ITA*, *CPP*, and *EIA* provisions:

222. (1) Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II <u>is deemed,</u> for all purposes and despite any security interest in the amount, <u>to hold the amount in trust for Her Majesty</u> in right of Canada, <u>separate and apart</u> from the property of the person and from property held by any secured creditor of the person that, but for a

[103]   La deuxième loi fédérale où l'on retrouve ce mécanisme est le *Régime de pensions du Canada*, L.R.C. 1985, ch. C 8 (<< *RPC* >>). À l'article 23, le législateur crée une fiducie réputée en faveur de la Couronne et précise qu'elle existe malgré les dispositions contraires de toute autre loi fédérale. Enfin, la *Loi sur l'assurance emploi*, L.C. 1996, ch. 23 (<< *LAE* >>), crée dans des termes quasi identiques, une fiducie réputée en faveur de la Couronne : voir les par. 86(2) et (2.1).

[104]   Comme nous l'avons vu, le maintien en vigueur des fiducies réputées créées en vertu de ces dispositions de la *LIR*, du *RPC* et de la *LAE* est confirmé au par. 18.3(2) de la *LACC* et au par. 67(3) de la *LFI*. Dans les trois cas, le législateur a exprimé en termes clairs et explicites sa volonté de voir la fiducie réputée établie en faveur de la Couronne produire ses effets pendant le déroulement de la procédure d'insolvabilité.

[105]   La situation est différente dans le cas de la fiducie réputée créée par la *LTA*. Bien que le législateur crée en faveur de la Couronne une fiducie réputée dans laquelle seront conservées les sommes recueillies au titre de la TPS mais non encore ver sées, et bien qu'il prétende maintenir cette fiducie en vigueur malgré les dispositions à l'effet contraire de toute loi fédérale ou provinciale, il ne *confirme* pas l'existence de la fiducie — ni ne prévoit expres sément le maintien en vigueur de celle ci — dans la *LFI* ou dans la *LACC*. Le second des deux élé ments obligatoires que j'ai mentionnés fait donc défaut, ce qui témoigne de l'intention du légis lateur de laisser la fiducie réputée devenir cadu que au moment de l'introduction de la procédure d'insolvabilité.

[106]   Le texte des dispositions en cause de la *LTA* est substantiellement identique à celui des dispositions de la *LIR*, du *RPC* et de la *LAE* :

222. (1) La personne qui perçoit un montant au titre de la taxe prévue à la section II <u>est réputée,</u> à toutes fins utiles et malgré tout droit en garantie le concernant, le <u>détenir en fiducie pour Sa Majesté du chef du Canada, séparé</u> de ses propres biens et des biens détenus par ses créanciers garantis qui, en l'absence du droit en garan tie, seraient ceux de la personne, jusqu'à ce qu'il soit

security interest, would be property of the person, until the amount is remitted to the Receiver General or with drawn under subsection (2).

. . .

(3) <u>Despite</u> any other provision of this Act (except subsection (4)), <u>any other enactment of Canada (except the *Bankruptcy and Insolvency Act)*,</u> any enactment of a province or any other law, <u>if at any time an amount deemed</u> by subsection (1) <u>to be held</u> by a person <u>in trust for Her Majesty is not remitted</u> to the Receiver General or withdrawn in the manner and at the time provided under this Part, <u>property of the person</u> and property held by any secured creditor of the person that, but for a security interest, would be property of the person, <u>equal in value to the amount so deemed to be held in trust, is deemed</u>

(*a*) <u>to be held,</u> from the time the amount was col lected by the person, <u>in trust for Her Majesty,</u> separate and apart from the property of the person, whether or not the property is subject to a security interest, . . .

. . .

. . . and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

[107]  Yet no provision of the *CCAA* provides for the continuation of this deemed trust after the *CCAA* is brought into play.

[108]  In short, Parliament has imposed *two* explicit conditions, or "building blocks", for survival under the *CCAA* of deemed trusts created by the *ITA*, *CPP*, and *EIA*. Had Parliament intended to likewise preserve under the *CCAA* deemed trusts created by the *ETA*, it would have included in the *CCAA* the sort of confirmatory provision that explicitly preserves other deemed trusts.

[109]  With respect, unlike Tysoe J.A., I do not find it "inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception" (2009 BCCA 205, 98 B.C.L.R. (4th) 242, at para. 37). *All* of the deemed trust

versé au receveur général ou retiré en application du paragraphe (2).

. . .

(3)  <u>Malgré</u> les autres dispositions de la présente loi (sauf le paragraphe (4) du présent article), <u>tout autre texte législatif fédéral (sauf la *Loi sur la faillite et l'insolvabi lité)*,</u> tout texte législatif provincial ou toute autre règle de droit, <u>lorsqu'un montant qu'une personne est réputée par</u> le paragraphe (1) <u>détenir en fiducie pour Sa Majesté du chef du Canada n'est pas versé</u> au receveur général ni retiré selon les modalités et dans le délai prévus par la présente partie, <u>les biens de la personne</u> — y compris les biens détenus par ses créanciers garantis qui, en l'ab sence du droit en garantie, seraient ses biens — <u>d'une valeur égale à ce montant sont réputés :</u>

*a*)  <u>être détenus en fiducie pour Sa Majesté du chef du Canada,</u> à compter du moment où le montant est perçu par la personne, séparés des propres biens de la personne, qu'ils soient ou non assujettis à un droit en garantie;

. . .

. . . et le produit découlant de ces biens est payé au rece veur général par priorité sur tout droit en garantie.

[107]  Pourtant, aucune disposition de la *LACC* ne prévoit le maintien en vigueur de la fiducie réputée une fois que la *LACC* entre en jeu.

[108]  En résumé, le législateur a imposé *deux* conditions explicites — ou << composantes de base >> — devant être réunies pour que survivent, sous le régime de la *LACC*, les fiducies réputées qui ont été établies par la *LIR*, le *RPC* et la *LAE*. S'il avait voulu préserver de la même façon, sous le régime de la *LACC*, les fiducies réputées qui sont établies par la *LTA*, il aurait inséré dans la *LACC* le type de disposition confirmatoire qui maintient explicitement en vigueur d'autres fiducies réputées.

[109]  Avec égards pour l'opinion contraire expri mée par le juge Tysoe de la Cour d'appel, je ne trouve pas [**TRADUCTIoN**] << inconceivable que le législateur, lorsqu'il a adopté la version actuelle du par. 222(3) de la *LTA*, ait désigné expressément la *LFI* comme une exception sans envisager que la *LACC* puisse constituer une deuxième exception >> (2009 BCCA

provisions excerpted above make explicit reference to the *BIA*. Section 222 of the *ETA* does not break the pattern. Given the near identical wording of the four deemed trust provisions, it would have been surprising indeed had Parliament not addressed the *BIA* at all in the *ETA*.

[110] Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings. Accordingly, s. 222 mentions the *BIA* so as to *exclude* it from its ambit — rather than to *include* it, as do the *ITA*, the *CPP*, and the *EIA*.

[111] Conversely, I note that *none* of these statutes mentions the *CCAA* expressly. Their specific reference to the *BIA* has no bearing on their interaction with the *CCAA*. Again, it is the confirmatory provisions *in the insolvency statutes* that determine whether a given deemed trust will subsist during insolvency proceedings.

[112] Finally, I believe that chambers judges should not segregate GST monies into the Monitor's trust account during *CCAA* proceedings, as was done in this case. The result of Justice Deschamps's reasoning is that GST claims become unsecured under the *CCAA*. Parliament has deliberately chosen to nullify certain Crown super priorities during insolvency; this is one such instance.

III

[113] For these reasons, like Justice Deschamps, I would allow the appeal with costs in this Court and in the courts below and order that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada

205, 98 B.C.L.R. (4th) 242, par. 37). *Toutes* les dispositions établissant des fiducies réputées qui sont reproduites ci dessus font explicitement mention de la *LFI*. L'article 222 de la *LTA* ne rompt pas avec ce modèle. Compte tenu du libellé presque identi que des quatre dispositions établissant une fiducie réputée, il aurait d'ailleurs été étonnant que le légis lateur ne fasse aucune mention de la *LFI* dans la *LTA*.

[110]   L'intention du législateur était manifeste ment de rendre inopérantes les fiducies réputées visant la TPS dès l'introduction d'une procédure d'insolvabilité. Par conséquent, l'art. 222 mentionne la *LFI* de manière à l'*exclure* de son champ d'ap plication — et non de l'y *inclure*, comme le font la *LIR*, le *RPC* et la *LAE*.

[111]   En revanche, je constate qu'*aucune* de ces lois ne mentionne expressément la *LACC*. La men tion explicite de la *LFI* dans ces textes n'a aucune incidence sur leur interaction avec la *LACC*. Là encore, ce sont les dispositions confirmatoires que l'on trouve *dans les lois sur l'insolvabilité* qui déter minent si une fiducie réputée continuera d'exister durant une procédure d'insolvabilité.

[112]   Enfin, j'estime que les juges siégeant en leur cabinet ne devraient pas, comme cela s'est produit en l'espèce, ordonner que les sommes perçues au titre de la TPS soient détenues séparément dans le compte en fiducie du contrôleur pendant le dérou lement d'une procédure fondée sur la *LACC*. Il résulte du raisonnement de la juge Deschamps que les réclamations de TPS deviennent des créances non garanties sous le régime de la *LACC*. Le légis lateur a délibérément décidé de supprimer certai nes superpriorités accordées à la Couronne pendant l'insolvabilité; nous sommes en présence de l'un de ces cas.

III

[113]   Pour les motifs qui précèdent, je suis d'avis, à l'instar de la juge Deschamps, d'accueillir le pour voi avec dépens devant notre Cour et devant les juri dictions inférieures, et d'ordonner que la somme de 305 202,30 $ — qui a été perçue par LeRoy Trucking

be subject to no deemed trust or priority in favour of the Crown.

The following are the reasons delivered by

[114]    **ABELLA J.** (dissenting) — The central issue in this appeal is whether s. 222 of the *Excise Tax Act*, R.S.C. 1985, c. E 15 ("*ETA*"), and specifically s. 222(3), gives priority during *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C 36 ("*CCAA*"), proceedings to the Crown's deemed trust in unremitted GST. I agree with Tysoe J.A. that it does. It follows, in my respectful view, that a court's discretion under s. 11 of the *CCAA* is circumscribed accordingly.

[115]    Section 11[1] of the *CCAA* stated:

**11.** (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding up Act*, where an application is made under this Act in respect of a com pany, the court, on the application of any person inter ested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

To decide the scope of the court's discretion under s. 11, it is necessary to first determine the priority issue. Section 222(3), the provision of the *ETA* at issue in this case, states:

---------------------

1 Section 11 was amended, effective September 18, 2009, and now states:

**11.** Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding up and Restructur ing Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

au titre de la TPS mais n'a pas encore été versée au receveur général du Canada — ne fasse l'objet d'aucune fiducie réputée ou priorité en faveur de la Couronne.

Version française des motifs rendus par

[114]    **LA JUGE ABELLA** (dissidente) — La ques tion qui est au cœur du présent pourvoi est celle de savoir si l'art. 222 de la *Loi sur la taxe d'accise*, L.R.C. 1985, ch. E 15 (<< *LTA* >>), et plus particu lièrement le par. 222(3), donnent préséance, dans le cadre d'une procédure relevant de la *Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C 36 (<< *LACC* >>), à la fiducie répu tée qui est établie en faveur de la Couronne à l'égard de la TPS non versée. À l'instar du juge Tysoe de la Cour d'appel, j'estime que tel est le cas. Il s'ensuit, à mon avis, que le pouvoir discrétionnaire conféré au tribunal par l'art. 11 de la *LACC* est circonscrit en conséquence.

[115]    L'article 11[1] de la *LACC* disposait :

**11.** (1) Malgré toute disposition de la *Loi sur la faillite et l'insolvabilité* ou de la *Loi sur les liquidations*, chaque fois qu'une demande est faite sous le régime de la présente loi à l'égard d'une compagnie, le tribunal, sur demande d'un intéressé, peut, sous réserve des autres dispositions de la présente loi et avec ou sans avis, rendre l'ordon nance prévue au présent article.

Pour être en mesure de déterminer la portée du pou voir discrétionnaire conféré au tribunal par l'art. 11, il est nécessaire de trancher d'abord la ques tion de la priorité. Le paragraphe 222(3), la dispo sition de la *LTA* en cause en l'espèce, prévoit ce qui suit :

---------------------

1 L'article 11 a été modifié et le texte modifié, qui est entré en vigueur le 18 septembre 2009, est rédigé ainsi :

**11.** Malgré toute disposition de la *Loi sur la faillite et l'insolvabilité* ou de la *Loi sur les liqui dations et les restructurations*, le tribunal peut, dans le cas de toute demande sous le régime de la présente loi à l'égard d'une compagnie débitrice, rendre, sur demande d'un intéressé, mais sous réserve des restrictions prévues par la présente loi et avec ou sans avis, toute ordonnance qu'il estime indiquée.

(3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act),* any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

(a)   to be held, from the time the amount was col lected by the person, in trust for Her Majesty, sep arate and apart from the property of the person, whether or not the property is subject to a security interest, and

(b)   to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

[116] Century Services argued that the *CCAA*'s general override provision, s. 18.3(1), prevailed, and that the deeming provisions in s. 222 of the *ETA* were, accordingly, inapplicable during *CCAA* proceedings. Section 18.3(1) states:

18.3 (1) . . . [N]otwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

[117] As MacPherson J.A. correctly observed in *Ottawa Senators Hockey Club Corp.* *(Re)* (2005), 73 O.R. (3d) 737 (C.A.), s. 222(3) of the *ETA* is in "clear conflict" with s. 18.3(1) of the *CCAA* (para. 31). Resolving the conflict between the two provisions is, essentially, what seems to me to be a relatively uncomplicated exercise in statutory

(3) Malgré les autres dispositions de la présente loi (sauf le paragraphe (4) du présent article), tout autre texte législatif fédéral (sauf la *Loi sur la faillite et l'insolvabi lité)*, tout texte législatif provincial ou toute autre règle de droit, lorsqu'un montant qu'une personne est réputée par le paragraphe (1) détenir en fiducie pour Sa Majesté du chef du Canada n'est pas versé au receveur général ni retiré selon les modalités et dans le délai prévus par la présente partie, les biens de la personne — y compris les biens détenus par ses créanciers garantis qui, en l'ab sence du droit en garantie, seraient ses biens — d'une valeur égale à ce montant sont réputés :

a)   être détenus en fiducie pour Sa Majesté du chef du Canada, à compter du moment où le montant est perçu par la personne, séparés des propres biens de la personne, qu'ils soient ou non assujettis à un droit en garantie;

b)   ne pas faire partie du patrimoine ou des biens de la personne à compter du moment où le montant est perçu, que ces biens aient été ou non tenus séparés de ses propres biens ou de son patrimoine et qu'ils soient ou non assujettis à un droit en garantie.

Ces biens sont des biens dans lesquels Sa Majesté du chef du Canada a un droit de bénéficiaire malgré tout autre droit en garantie sur ces biens ou sur le produit en décou lant, et le produit découlant de ces biens est payé au rece veur général par priorité sur tout droit en garantie.

[116] Selon Century Services, la disposition déro gatoire générale de la *LACC*, le par. 18.3(1), l'em portait, et les dispositions déterminatives à l'art. 222 de la *LTA* étaient par conséquent inapplicables dans le cadre d'une procédure fondée sur la *LACC*. Le paragraphe 18.3(1) dispose :

18.3 (1) . . . [P]ar dérogation à toute disposition légis lative fédérale ou provinciale ayant pour effet d'assimi ler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme détenu en fiducie pour Sa Majesté si, en l'absence de la disposition législative en question, il ne le serait pas.

[117] Ainsi que l'a fait observer le juge d'appel MacPherson, dans l'arrêt *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737 (C.A.), le par. 222(3) de la *LTA* [**TRADUCTIoN**] « entre nette ment en conflit » avec le par. 18.3(1) de la *LACC* (par. 31). Essentiellement, la résolution du conflit entre ces deux dispositions requiert à mon sens une

interpretation: Does the language reflect a clear legislative intention? In my view it does. The deemed trust provision, s. 222(3) of the *ETA*, has unambiguous language stating that it operates notwithstanding any law except the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B 3 ("*BIA*").

[118] By expressly excluding only one statute from its legislative grasp, and by unequivocally stating that it applies despite any other law anywhere in Canada *except* the *BIA*, s. 222(3) has defined its boundaries in the clearest possible terms. I am in complete agreement with the following comments of MacPherson J.A. in *Ottawa Senators*:

The legislative intent of s. 222(3) of the *ETA* is clear. If there is a conflict with "any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)", s. 222(3) prevails. In these words Parliament did two things: it decided that s. 222(3) should trump all other federal laws and, importantly, it addressed the topic of exceptions to its trumping decision and identi fied a single exception, the *Bankruptcy and Insolvency Act* . . . . The *BIA* and the *CCAA* are closely related fed eral statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but acci dentally fail to consider *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

[119] MacPherson J.A.'s view that the failure to exempt the *CCAA* from the operation of the *ETA* is a reflection of a clear legislative intention, is borne out by how the *CCAA* was subsequently changed after s. 18.3(1) was enacted in 1997. In 2000, when s. 222(3) of the *ETA* came into force, amendments were also introduced to the *CCAA*. Section 18.3(1) was not amended.

[120] The failure to amend s. 18.3(1) is notable because its effect was to protect the legislative *status quo*, notwithstanding repeated requests from

opération relativement simple d'interprétation des lois : Est ce que les termes employés révèlent une intention claire du législateur? À mon avis, c'est le cas. Le texte de la disposition créant une fiducie réputée, soit le par. 222(3) de la *LTA*, précise sans ambiguïté que cette disposition s'applique malgré toute autre règle de droit sauf la *Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B 3 (<< *LFI* >>).

[118] En excluant explicitement une seule loi du champ d'application du par. 222(3) et en déclarant de façon non équivoque qu'il s'applique malgré toute autre loi ou règle de droit au Canada *sauf* la *LFI*, le législateur a défini la portée de cette dis position dans des termes on ne peut plus clairs. Je souscris sans réserve aux propos suivants du juge d'appel MacPherson dans l'arrêt *Ottawa Senators* :

[TRADUCTIoN] L'intention du législateur au par. 222(3) de la *LTA* est claire. En cas de conflit avec << tout autre texte législatif fédéral (sauf la *Loi sur la faillite et l'insolvabilité*) >>, c'est le par. 222(3) qui l'emporte. En employant ces mots, le législateur fédéral a fait deux choses : il a décidé que le par. 222(3) devait l'emporter sur tout autre texte législatif fédéral et, fait important, il a abordé la question des exceptions à cette préséance en en mentionnant une seule, la *Loi sur la faillite et l'insol vabilité* [. . .] La *LFI* et la *LACC* sont des lois fédérales étroitement liées entre elles. Je ne puis concevoir que le législateur ait pu mentionner expressément la *LFI* à titre d'exception, mais ait involontairement omis de considé rer la *LACC* comme une deuxième exception possible. À mon avis, le fait que la *LACC* ne soit pas mentionnée au par. 222(3) de la *LTA* était presque assurément une omission mûrement réfléchie de la part du législateur. [par. 43]

[119] L'opinion du juge d'appel MacPherson sui vant laquelle le fait que la *LACC* n'ait pas été sous traite à l'application de la *LTA* témoigne d'une intention claire du législateur est confortée par la façon dont la *LACC* a par la suite été modifiée après l'édiction du par. 18.3(1) en 1997. En 2000, lors que le par. 222(3) de la *LTA* est entré en vigueur, des modifications ont également été apportées à la *LACC*, mais le par. 18.3(1) de cette loi n'a pas été modifié.

[120] L'absence de modification du par. 18.3(1) vaut d'être soulignée, car elle a eu pour effet de maintenir le statu quo législatif, malgré les

various constituencies that s. 18.3(1) be amended to make the priorities in the *CCAA* consistent with those in the *BIA*. In 2002, for example, when Industry Canada conducted a review of the *BIA* and the *CCAA*, the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals recommended that the priority regime under the *BIA* be extended to the *CCAA* (Joint Task Force on Business Insolvency Law Reform, *Report* (March 15, 2002), Sch. B, proposal 71). The same recommendations were made by the Standing Senate Committee on Banking, Trade and Commerce in its 2003 report, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*; by the Legislative Review Task Force (Commercial) of the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals in its 2005 *Report on the Commercial Provisions of Bill C 55*; and in 2007 by the Insolvency Institute of Canada in a submission to the Standing Senate Committee on Banking, Trade and Commerce commenting on reforms then under consideration.

[121] Yet the *BIA* remains the only exempted statute under s. 222(3) of the *ETA*. Even after the 2005 decision in *Ottawa Senators* which confirmed that the *ETA* took precedence over the *CCAA*, there was no responsive legislative revision. I see this lack of response as relevant in this case, as it was in *Tele Mobile Co. v. Ontario*, 2008 SCC 12, [2008] 1 S.C.R. 305, where this Court stated:

  While it cannot be said that legislative silence is necessarily determinative of legislative intention, in this case the silence is Parliament's answer to the con sistent urging of Telus and other affected businesses and organizations that there be express language in the legislation to ensure that businesses can be reimbursed for the reasonable costs of complying with evidence gathering orders. I see the legislative history as reflect ing Parliament's intention that compensation not be paid for compliance with production orders. [para. 42]

demandes répétées de divers groupes qui sou haitaient que cette disposition soit modifiée pour aligner l'ordre de priorité établi par la *LACC* sur celui de la *LFI*. En 2002, par exemple, lorsque Industrie Canada a procédé à l'examen de la *LFI* et de la *LACC*, l'Institut d'insolvabilité du Canada et l'Association canadienne des professionnels de l'insolvabilité et de la réorganisation ont recom mandé que les règles de la *LFI* en matière de prio rité soient étendues à la *LACC* (Joint Task Force on Business Insolvency Law Reform, *Report* (15 mars 2002), ann. B, proposition 71). Ces recommanda tions ont été reprises en 2003 par le Comité séna torial permanent des banques et du commerce dans son rapport intitulé *Les débiteurs et les créanciers doivent se partager le fardeau : Examen de la Loi sur la faillite et l'insolvabilité et de la Loi sur les arrangements avec les créanciers des compagnies*, ainsi qu'en 2005 par le Legislative Review Task Force (Commercial) de l'Institut d'insolvabilité du Canada et de l'Association canadienne des profes sionnels de l'insolvabilité *et de la* réorganisation dans son *Report on the Commercial Provisions of Bill C 55*, et en 2007 par l'Institut d'insolvabilité du Canada dans un mémoire soumis au Comité séna torial permanent des banques et du commerce au sujet de réformes alors envisagées.

[121] La *LFI* demeure néanmoins la seule loi soustraite à l'application du par. 222(3) de la *LTA*. Même à la suite de l'arrêt rendu en 2005 dans l'af faire *Ottawa Senators*, qui a confirmé que la *LTA* l'emportait sur la *LACC*, le législateur n'est pas intervenu. Cette absence de réaction de sa part me paraît tout aussi pertinente en l'espèce que dans l'ar rêt *Société Télé Mobile c. Ontario*, 2008 CSC 12, [2008] 1 R.C.S. 305, où la Cour a déclaré ceci :

  Le silence du législateur n'est pas nécessairement déterminant quant à son intention, mais en l'espèce, il répond à la demande pressante de Telus et des autres entreprises et organisations intéressées que la loi pré voie expressément la possibilité d'un remboursement des frais raisonnables engagés pour communiquer des éléments de preuve conformément à une ordonnance. L'historique législatif confirme selon moi que le légis lateur n'a pas voulu qu'une indemnité soit versée pour l'obtempération à une ordonnance de communication. [par. 42]

[122] All this leads to a clear inference of a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

[123] Nor do I see any "policy" justification for interfering, through interpretation, with this clarity of legislative intention. I can do no better by way of explaining why I think the policy argument cannot succeed in this case, than to repeat the words of Tysoe J.A. who said:

  I do not dispute that there are valid policy reasons for encouraging insolvent companies to attempt to restructure their affairs so that their business can continue with as little disruption to employees and other stakeholders as possible. It is appropriate for the courts to take such policy considerations into account, but only if it is in connection with a matter that has not been considered by Parliament. Here, Parliament must be taken to have weighed policy considerations when it enacted the amendments to the *CCAA* and *ETA* described above. As Mr. Justice MacPherson observed at para. 43 of *Ottawa Senators*, it is inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception. I also make the observation that the 1992 set of amendments to the *BIA* enabled proposals to be binding on secured creditors and, while there is more flexibility under the *CCAA*, it is possible for an insolvent company to attempt to restructure under the auspices of the *BIA*. [para. 37]

[124] Despite my view that the clarity of the language in s. 222(3) is dispositive, it is also my view that even the application of other principles of interpretation reinforces this conclusion. In their submissions, the parties raised the following as being particularly relevant: the Crown relied on the principle that the statute which is "later in time" prevails; and Century Services based its argument on the principle that the general provision gives way to the specific (*generalia specialibus non derogant*).

[122] Tout ce qui précède permet clairement d'inférer que le législateur a délibérément choisi de soustraire la fiducie réputée établie au par. 222(3) à l'application du par. 18.3(1) de la *LACC*.

[123] Je ne vois pas non plus de << considération de politique générale >> qui justifierait d'aller à l'en contre, par voie d'interprétation législative, de l'in tention aussi clairement exprimée par le législateur. Je ne saurais expliquer mieux que ne l'a fait le juge d'appel Tysoe les raisons pour lesquelles l'argument invoquant des considérations de politique géné rale ne peut, selon moi, être retenu en l'espèce. Je vais donc reprendre à mon compte ses propos à ce sujet :

  [TRADUCTIoN] Je ne conteste pas qu'il existe des rai sons de politique générale valables qui justifient d'inciter les entreprises insolvables à tenter de se restructurer de façon à pouvoir continuer à exercer leurs activités avec le moins de perturbations possibles pour leurs employés et pour les autres intéressés. Les tribunaux peuvent légitimement tenir compte de telles considérations de politique générale, mais seulement si elles ont trait à une question que le législateur n'a pas examinée. Or, dans le cas qui nous occupe, il y a lieu de présumer que le législateur a tenu compte de considérations de politique géné rale lorsqu'il a adopté les modifications susmentionnées à la *LACC* et à la *LTA*. Comme le juge MacPherson le fait observer au par. 43 de l'arrêt *Ottawa Senators*, il est inconcevable que le législateur, lorsqu'il a adopté la ver sion actuelle du par. 222(3) de la *LTA*, ait désigné express sément la *LFI* comme une exception sans envisager que la *LACC* puisse constituer une deuxième exception. Je signale par ailleurs que les modifications apportées en 1992 à la *LFI* ont permis de rendre les propositions concordataires opposables aux créanciers garantis et que, malgré la plus grande souplesse de la *LACC*, il est possi ble pour une compagnie insolvable de se restructurer sous le régime de la *LFI*. [par. 37]

[124] Bien que je sois d'avis que la clarté des termes employés au par. 222(3) tranche la question, j'estime également que cette conclusion est même renforcée par l'application d'autres principes d'interprétation. Dans leurs observations, les parties indiquent que les principes suivants étaient, selon elles, particuliè rement pertinents : la Couronne a invoqué le prin cipe voulant que la loi << postérieure >> l'emporte; Century Services a fondé son argumentation sur le principe de la préséance de la loi spécifique sur la loi générale (*generalia specialibus non derogant*).

[125]    The "later in time" principle gives priority to a more recent statute, based on the theory that the legislature is presumed to be aware of the content of existing legislation. If a new enactment is inconsistent with a prior one, therefore, the legislature is presumed to have intended to derogate from the earlier provisions (Ruth Sullivan, *Sullivan on the Construction of Statutes* (5th ed. 2008), at pp. 346 47; Pierre André Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 358).

[126]    The exception to this presumptive displace ment of pre existing inconsistent legislation, is the *generalia specialibus non derogant* principle that "[a] more recent, general provision will not be con strued as affecting an earlier, special provision" (Côté, at p. 359). Like a Russian Doll, there is also an exception within this exception, namely, that an earlier, specific provision may in fact be "over ruled" by a subsequent general statute if the legis lature indicates, through its language, an intention that the general provision prevails (*Doré v. Verdun (City)*, [1997] 2 S.C.R. 862).

[127]    The primary purpose of these interpretive principles is to assist in the performance of the task of determining the intention of the legislature. This was confirmed by MacPherson J.A. in *Ottawa Senators*, at para. 42:

   . . . the overarching rule of statutory interpretation is that statutory provisions should be interpreted to give effect to the intention of the legislature in enact ing the law. This primary rule takes precedence over all maxims or canons or aids relating to statutory interpre tation, including the maxim that the specific prevails over the general (*generalia specialibus non derogant*). As expressed by Hudson J. in *Canada v. Williams*, [1944] S.C.R. 226, . . . at p. 239 . . . :

   The maxim *generalia specialibus non derogant* is relied on as a rule which should dispose of the question, but the maxim is not a rule of law but a rule of construction and bows to the intention of the

[125]    Le principe de la préséance de la << loi pos térieure >> accorde la priorité à la loi la plus récente, au motif que le législateur est présumé connaître le contenu des lois alors en vigueur. Si, dans la loi nouvelle, le législateur adopte une règle inconcilia ble avec une règle préexistante, on conclura qu'il a entendu déroger à celle ci (Ruth Sullivan, *Sullivan on the Construction of Statutes* (5e éd. 2008), p. 346 347; Pierre André Côté, *The Interpretation of Legislation in Canada* (3e éd. 2000), p. 358).

[126]    L'exception à cette supplantation présumée des dispositions législatives préexistantes incompa tibles réside dans le principe exprimé par la maxime *generalia specialibus non derogant* selon laquelle une disposition générale plus récente n'est pas répu tée déroger à une loi spéciale antérieure (Côté, p. 359). Comme dans le jeu des poupées russes, cette exception comporte elle même une exception. En effet, une disposition spécifique antérieure peut dans les faits être << supplantée >> par une loi ulté rieure de portée générale si le législateur, par les mots qu'il a employés, a exprimé l'intention de faire prévaloir la loi générale (*Doré c. Verdun (Ville)*, [1997] 2 R.C.S. 862).

[127]    Ces principes d'interprétation visent princi palement à faciliter la détermination de l'intention du législateur, comme l'a confirmé le juge d'ap pel MacPherson dans l'arrêt *Ottawa Senators*, au par. 42 :

   [TRADUCTIoN] . . . en matière d'interprétation des lois, la règle cardinale est la suivante : les dispositions législatives doivent être interprétées de manière à donner effet à l'intention du législateur lorsqu'il a adopté la loi. Cette règle fondamentale l'emporte sur toutes les maximes, outils ou canons d'interprétation législa tive, y compris la maxime suivant laquelle le particu lier l'emporte sur le général (*generalia specialibus non derogant*). Comme l'a expliqué le juge Hudson dans l'arrêt *Canada c. Williams*, [1944] R.C.S. 226, [. . .] à la p. 239 . . . :

   On invoque la maxime *generalia specialibus non derogant* comme une règle qui devrait trancher la question. Or cette maxime, qui n'est pas une règle de droit mais un principe d'interprétation, cède le pas

legislature, if such intention can reasonably be gathered from all of the relevant legislation.

(See also Côté, at p. 358, and Pierre Andre Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at para. 1335.)

[128]  I accept the Crown's argument that the "later in time" principle is conclusive in this case. Since s. 222(3) of the *ETA* was enacted in 2000 and s. 18.3(1) of the *CCAA* was introduced in 1997, s. 222(3) is, on its face, the later provision. This chronological victory can be displaced, as Century Services argues, if it is shown that the more recent provision, s. 222(3) of the *ETA*, is a general one, in which case the earlier, specific provision, s. 18.3(1), prevails (*generalia specialibus non derogant*). But, as previously explained, the prior specific provision does not take precedence if the subsequent general provision appears to "overrule" it. This, it seems to me, is precisely what s. 222(3) achieves through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA*. Section 18.3(1) of the *CCAA* is thereby rendered inoperative for purposes of s. 222(3).

[129]  It is true that when the *CCAA* was amended in 2005,[2] s. 18.3(1) was re enacted as s. 37(1) (S.C. 2005, c. 47, s. 131). Deschamps J. suggests that this makes s. 37(1) the new, "later in time" provision. With respect, her observation is refuted by the operation of s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I 21, which expressly deals with the (non) effect of re enacting, without significant substantive changes, a repealed provision (see *Attorney General of Canada v. Public Service Staff Relations Board*, [1977] 2 F.C. 663, dealing with the predecessor provision to s. 44(*f*)). It directs that new enactments not be construed as

devant l'intention du législateur, s'il est raisonnablement possible de la dégager de l'ensemble des dispositions législatives pertinentes.

(Voir aussi Côté, p. 358, et Pierre André Côté, avec la collaboration de S. Beaulac et M. Devinat, *Interprétation des lois* (4e éd. 2009), par. 1335.)

[128]  J'accepte l'argument de la Couronne suivant lequel le principe de la loi << postérieure >> est déterminant en l'espèce. Comme le par. 222(3) de la *LTA* a été édicté en 2000 et que le par. 18.3(1) de la *LACC* a été adopté en 1997, le par. 222(3) est, de toute évidence, la disposition postérieure. Cette victoire chronologique peut être neutralisée si, comme le soutient Century Services, on démontre que la disposition la plus récente, le par. 222(3) de la *LTA*, est une disposition générale, auquel cas c'est la disposition particulière antérieure, le par. 18.3(1), qui l'emporte (*generalia specialibus non derogant*). Mais, comme nous l'avons vu, la disposition particulière antérieure n'a pas préséance si la disposition générale ultérieure paraît la << supplanter >>. C'est précisément, à mon sens, ce qu'ac complit le par. 222(3) de par son libellé, lequel précise que la disposition l'emporte sur tout autre texte législatif fédéral, tout texte législatif provincial ou << toute autre règle de droit >> *sauf la LFI*. Le paragraphe 18.3(1) de la *LACC* est par conséquent rendu inopérant aux fins d'application du par. 222(3).

[129]  Il est vrai que, lorsque la *LACC* a été modifiée en 2005[2], le par. 18.3(1) a été remplacé par le par. 37(1) (L.C. 2005, ch. 47, art. 131). Selon la juge Deschamps, le par. 37(1) est devenu, de ce fait, la disposition << postérieure >>. Avec égards pour l'opinion exprimée par ma collègue, cette observation est réfutée par l'al. 44(*f*) de la *Loi d'interprétation*, L.R.C. 1985, ch. I 21, qui décrit expressément l'effet (inexistant) qu'a le remplacement — sans modifications notables sur le fond — d'un texte antérieur qui a été abrogé (voir *Procureur général du Canada c. Commission des relations de travail dans la Fonction publique*, [1977] 2 C.F. 663, qui portait sur

---

2 The amendments did not come into force until September 18, 2009.

2 Les modifications ne sont entrées en vigueur que le 18 septembre 2009.

"new law" unless they differ in substance from the repealed provision:

44. Where an enactment, in this section called the "former enactment", is repealed and another enactment, in this section called the "new enactment", is substi tuted therefor,

. . .

(*f*) <u>except to the extent that the provisions of the new enactment are not in substance the same as those of the former enactment, the new enactment shall not be held to operate as new law,</u> but shall be construed and have effect as a consolidation and as declaratory of the law as contained in the former enactment;

Section 2 of the *Interpretation Act* defines an "enactment" as "an Act or regulation or <u>any por tion of an Act or regulation".</u>

[130]    Section 37(1) of the current *CCAA* is almost identical to s. 18.3(1). These provisions are set out for ease of comparison, with the differences between them underlined:

37. (1) Subject to subsection (2), <u>despite</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as <u>being</u> held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

18.3 (1) Subject to subsection (2), <u>notwithstanding</u> any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

[131]    The application of s. 44(*f*) of the *Interpretation Act* simply confirms the government's clearly expressed intent, found in Industry Canada's clause by clause review of Bill C 55, where s. 37(1) was identified as "a technical amendment to re order the provisions of this Act". During second reading, the Hon. Bill Rompkey, then the Deputy Leader of the Government in the

la disposition qui a précédé l'al. 44*f*)). Cet alinéa précise que le nouveau texte ne doit pas être consi déré de << droit nouveau >>, sauf dans la mesure où il diffère au fond du texte abrogé :

44. En cas d'abrogation et de remplacement, les règles suivantes s'appliquent :

. . .

*f*) sauf dans la mesure où les deux textes diffèrent au fond, le nouveau texte n'est pas réputé de droit nou veau, sa teneur étant censée constituer une refonte et une clarification des règles de droit du texte anté rieur;

Le mot << texte >> est défini ainsi à l'art. 2 de la *Loi d'interprétation* : << Tout ou partie d'une loi ou d'un règlement. >>

[130]    Le paragraphe 37(1) de la *LACC* actuelle est pratiquement identique quant au fond au par. 18.3(1). Pour faciliter la comparaison de ces deux dispositions, je les ai reproduites ci après :

37. (1) Sous réserve du paragraphe (2) et par déroga tion à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme tel par le seul effet d'une telle disposition.

18.3 (1) Sous réserve du paragraphe (2) et par déroga tion à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme détenu en fiducie pour Sa Majesté si, en l'absence de la disposition législative en question, il ne le serait pas.

[131]    L'application de l'al. 44*f*) de la *Loi d'inter prétation* vient tout simplement confirmer l'inten tion clairement exprimée par le législateur, qu'a indiquée Industrie Canada dans l'analyse du Projet de loi C 55, où le par. 37(1) était qualifié de << modi fication d'ordre technique concernant le réaména gement des dispositions de la présente loi >>. Par ailleurs, durant la deuxième lecture du projet de loi

Senate, confirmed that s. 37(1) represented only a technical change:

> On a technical note relating to the treatment of deemed trusts for taxes, the bill [*sic*] makes no changes to the underlying policy intent, despite the fact that in the case of a restructuring under the CCAA, sections of the act [*sic*] were repealed and substituted with renumbered versions due to the extensive reworking of the CCAA.

(*Debates of the Senate*, vol. 142, 1st Sess., 38th Parl., November 23, 2005, at p. 2147)

[132] Had the substance of s. 18.3(1) altered in any material way when it was replaced by s. 37(1), I would share Deschamps J.'s view that it should be considered a new provision. But since s. 18.3(1) and s. 37(1) are the same in substance, the transformation of s. 18.3(1) into s. 37(1) has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision (Sullivan, at p. 347).

[133] This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. The question then is how that priority affects the discretion of a court under s. 11 of the *CCAA*.

[134] While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding up Act*, R.S.C. 1985, c. W 11, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request

au Sénat, l'honorable Bill Rompkey, qui était alors leader adjoint du gouvernement au Sénat, a confirmé que le par. 37(1) représentait seulement une modification d'ordre technique :

> Sur une note administrative, je signale que, dans le cas du traitement de fiducies présumées aux fins d'impôt, le projet de loi ne modifie aucunement l'intention qui sous tend la politique, alors que dans le cas d'une restructuration aux termes de la LACC, des articles de la loi ont été abrogés et remplacés par des versions portant de nouveaux numéros lors de la mise à jour exhaustive de la LACC.

(*Débats du Sénat*, vol. 142, 1re sess., 38e lég., 23 novembre 2005, p. 2147)

[132] Si le par. 18.3(1) avait fait l'objet de modifications notables sur le fond lorsqu'il a été remplacé par le par. 37(1), je me rangerais à l'avis de la juge Deschamps qu'il doit être considéré comme un texte de droit nouveau. Mais comme les par. 18.3(1) et 37(1) ne diffèrent pas sur le fond, le fait que le par. 18.3(1) soit devenu le par. 37(1) n'a aucune incidence sur l'ordre chronologique du point de vue de l'interprétation, et le par. 222(3) de la *LTA* demeure la disposition « postérieure » (Sullivan, p. 347).

[133] Il s'ensuit que la disposition créant une fiducie réputée que l'on trouve au par. 222(3) de la *LTA* l'emporte sur le par. 18.3(1) dans le cadre d'une procédure fondée sur la *LACC*. La question qui se pose alors est celle de savoir quelle est l'incidence de cette préséance sur le pouvoir discrétionnaire conféré au tribunal par l'art. 11 de la *LACC*.

[134] Bien que l'art. 11 accorde au tribunal le pouvoir discrétionnaire de rendre des ordonnances malgré les dispositions de la *LFI* et de la *Loi sur les liquidations*, L.R.C. 1985, ch. W 11, ce pouvoir discrétionnaire demeure assujetti à l'application de toute autre loi fédérale. L'exercice de ce pouvoir discrétionnaire est donc circonscrit par les limites imposées par toute *autre* loi que la *LFI* et la *Loi sur les liquidations*, et donc par la *LTA*. En l'espèce, le juge siégeant en son cabinet était donc tenu de respecter le régime de priorités établi au par. 222(3) de la *LTA*. Ni le par. 18.3(1) ni l'art. 11 de la *LACC* ne l'autorisaient en faire abstraction. Par conséquent,

for payment of the GST funds during the *CCAA* proceedings.

[135]    Given this conclusion, it is unnecessary to consider whether there was an express trust.

[136]    I would dismiss the appeal.

## APPENDIX

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C 36 (as at December 13, 2007)

**11.** (1) [Powers of court] Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

.   .   .

(3) [Initial application court orders] A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

(a)   staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b)   restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c)   prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

(4) [Other than initial application court orders] A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

il ne pouvait pas refuser la demande présentée par la Couronne en vue de se faire payer la TPS dans le cadre de la procédure introduite en vertu de la *LACC*.

[135]    Vu cette conclusion, il n'est pas nécessaire d'examiner la question de savoir s'il existait une fiducie expresse en l'espèce.

[136]    Je rejetterais le présent pourvoi.

## ANNEXE

*Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C 36 (en date du 13 décembre 2007)

**11.** (1) [Pouvoir du tribunal] Malgré toute disposition de la *Loi sur la faillite et l'insolvabilité* ou de la *Loi sur les liquidations*, chaque fois qu'une demande est faite sous le régime de la présente loi à l'égard d'une compa gnie, le tribunal, sur demande d'un intéressé, peut, sous réserve des autres dispositions de la présente loi et avec ou sans avis, rendre l'ordonnance prévue au présent arti cle.

.   .   .

(3) [Demande initiale — ordonnances] Dans le cas d'une demande initiale visant une compagnie, le tribunal peut, par ordonnance, aux conditions qu'il peut imposer et pour une période maximale de trente jours :

a)   suspendre, jusqu'à ce qu'il rende une nouvelle ordonnance à l'effet contraire, les procédures inten tées contre la compagnie au titre des lois mentionnées au paragraphe (1), ou qui pourraient l'être;

b)   surseoir, jusqu'à ce qu'il rende une nouvelle ordonnance à l'effet contraire, au cours de toute action, poursuite ou autre procédure contre la compa gnie;

c)   interdire, jusqu'à ce qu'il rende une nouvelle ordonnance à l'effet contraire, d'intenter ou de conti nuer toute action, poursuite ou autre procédure contre la compagnie.

(4) [Autres demandes — ordonnances] Dans le cas d'une demande, autre qu'une demande initiale, visant une compagnie, le tribunal peut, par ordonnance, aux conditions qu'il peut imposer et pour la période qu'il estime indiquée :

(a)  staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsec tion (1);

(b)  restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c)  prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

.  .  .

(6) [Burden of proof on application] The court shall not make an order under subsection (3) or (4) unless

(a)  the applicant satisfies the court that circum stances exist that make such an order appropriate; and

(b)  in the case of an order under subsection (4), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

**11.4** (1) [Her Majesty affected] An order made under section 11 may provide that

(*a*) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to sub section 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employ ment Insurance Act*, and of any related interest, pen alties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for such period as the court considers appropriate but ending not later than

(i)   the expiration of the order,

(ii)  the refusal of a proposed compromise by the creditors or the court,

(iii) six months following the court sanction of a compromise or arrangement,

a)  suspendre, jusqu'à ce qu'il rende une nouvelle ordonnance à l'effet contraire, les procédures inten tées contre la compagnie au titre des lois mentionnées au paragraphe (1), ou qui pourraient l'être;

b)  surseoir, jusqu'à ce qu'il rende une nouvelle ordonnance à l'effet contraire, au cours de toute action, poursuite ou autre procédure contre la compa gnie;

c)  interdire, jusqu'à ce qu'il rende une nouvelle ordonnance à l'effet contraire, d'intenter ou de conti nuer toute action, poursuite ou autre procédure contre la compagnie.

.  .  .

(6) [Preuve] Le tribunal ne rend l'ordonnance visée aux paragraphes (3) ou (4) que si :

a)  le demandeur le convainc qu'il serait indiqué de rendre une telle ordonnance;

b)  dans le cas de l'ordonnance visée au paragraphe (4), le demandeur le convainc en outre qu'il a agi — et continue d'agir — de bonne foi et avec toute la dili gence voulue.

**11.4** (1) [Suspension des procédures] Le tribunal peut ordonner :

*a*) la suspension de l'exercice par Sa Majesté du chef du Canada des droits que lui confère le para graphe 224(1.2) de la *Loi de l'impôt sur le revenu* ou toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie à ce paragraphe et qui prévoit la perception d'une cotisa tion, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patro nale, au sens de la *Loi sur l'assurance emploi*, et des intérêts, pénalités ou autres montants y afférents, à l'égard d'une compagnie lorsque celle ci est un débi teur fiscal visé à ce paragraphe ou à cette disposition, pour une période se terminant au plus tard :

(i)   à l'expiration de l'ordonnance rendue en application de l'article 11,

(ii)  au moment du rejet, par le tribunal ou les créanciers, de la transaction proposée,

(iii) six mois après que le tribunal a homologué la transaction ou l'arrangement,

(iv)  the default by the company on any term of a compromise or arrangement, or

(v)  the performance of a compromise or arrangement in respect of the company; and

(*b*) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company where the company is a debtor under that legislation and the provision has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i)  has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)  is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for such period as the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) may apply.

(2) [When order ceases to be in effect] An order referred to in subsection (1) ceases to be in effect if

(*a*) the company defaults on payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i)  subsection 224(1.2) of the *Income Tax Act*,

(ii)  any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium,

*b*) la suspension de l'exercice par Sa Majesté du chef d'une province, pour une période se terminant au plus tard au moment visé à celui des sous alinéas *a*)(i) à (v) qui, le cas échéant, est applicable, des droits que lui confère toute disposition législative de cette province à l'égard d'une compagnie, lorsque celle ci est un débiteur visé par la loi provinciale et qu'il s'agit d'une disposition dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, dans la mesure où elle prévoit la perception d'une somme, et des intérêts, pénalités ou autres montants y afférents, qui :

(i)  soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'impôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(ii)  soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est << une province instituant un régime général de pensions >> au sens du paragra phe 3(1) de cette loi et si la loi provinciale institue un << régime provincial de pensions >> au sens de ce paragraphe.

(2) [Cessation] L'ordonnance cesse d'être en vigueur dans les cas suivants :

*a*)  la compagnie manque à ses obligations de paie ment pour un montant qui devient dû à Sa Majesté après l'ordonnance et qui pourrait faire l'objet d'une demande aux termes d'une des dispositions suivan tes :

(i)  le paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*,

(ii)  toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou

as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) under any provision of provincial legisla tion that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related inter est, penalties or other amounts, where the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the prov ince is a "province providing a comprehen sive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provin cial pension plan" as defined in that subsec tion; or

(*b*) any other creditor is or becomes entitled to real ize a security on any property that could be claimed by Her Majesty in exercising rights under

(i)   subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that sub section, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(A) has been withheld or deducted by a person from a payment to another person

d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, et des intérêts, pénalités ou autres montants y afférents,

(iii) toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, dans la mesure où elle prévoit la perception d'une somme, et des intérêts, pénalités ou autres montants y afférents, qui :

(A) soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'im pôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(B) soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est << une province instituant un régime général de pensions >> au sens du para graphe 3(1) de cette loi et si la loi provinciale institue un << régime provincial de pensions >> au sens de ce paragraphe;

*b*)   un autre créancier a ou acquiert le droit de réaliser sa garantie sur un bien qui pourrait être réclamé par Sa Majesté dans l'exercice des droits que lui confère l'une des dispositions suivantes :

(i)   le paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*,

(ii) toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, et des intérêts, pénalités ou autres montants y afférents,

(iii) toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, dans la mesure où elle prévoit la perception d'une somme, et des intérêts, pénalités ou autres montants y afférents, qui :

(A) soit a été retenue par une personne sur un paiement effectué à une autre personne,

and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the prov ince is a "province providing a comprehen sive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provin cial pension plan" as defined in that subsec tion.

(3) [Operation of similar legislation] An order made under section 11, other than an order referred to in sub section (1) of this section, does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to sub section 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pen sion plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legis lation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same

ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'im pôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(B) soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est << une province instituant un régime général de pensions >> au sens du para graphe 3(1) de cette loi et si la loi provinciale institue un << régime provincial de pensions >> au sens de ce paragraphe.

(3) [Effet] Les ordonnances du tribunal, autres que celles rendues au titre du paragraphe (1), n'ont pas pour effet de porter atteinte à l'application des dispositions suivantes :

a) les paragraphes 224(1.2) et (1.3) de la *Loi de l'im pôt sur le revenu*;

b) toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui ren voie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, et des intérêts, pénalités ou autres montants y afférents;

c) toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, dans la mesure où elle prévoit la percep tion d'une somme, et des intérêts, pénalités ou autres montants y afférents, qui :

(i) soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'impôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(ii) soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est << une province instituant un régime général de pensions >> au sens du para graphe 3(1) de cette loi et si la loi provinciale institue un << régime provincial de pensions >> au sens de ce paragraphe.

Pour l'application de l'alinéa *c*), la disposition législative provinciale en question est réputée avoir, à l'encontre de tout créancier et malgré tout texte législatif fédéral ou

effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**18.3** (1) [Deemed trusts] Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

(a)   that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b)   the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

provincial et toute règle de droit, la même portée et le même effet que le paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* quant à la somme visée au sous alinéa *c*)(i), ou que le paragraphe 23(2) du *Régime de pensions du Canada* quant à la somme visée au sous alinéa *c*)(ii), et quant aux intérêts, pénalités ou autres montants y afférents, quelle que soit la garantie dont bénéficie le créancier.

**18.3** (1) [Fiducies présumées] Sous réserve du paragraphe (2) et par dérogation à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme détenu en fiducie pour Sa Majesté si, en l'absence de la disposition législative en question, il ne le serait pas.

(2) [Exceptions] Le paragraphe (1) ne s'applique pas à l'égard des montants réputés détenus en fiducie aux termes des paragraphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu*, des paragraphes 23(3) ou (4) du *Régime de pensions du Canada* ou des paragraphes 86(2) ou (2.1) de la *Loi sur l'assurance emploi* (chacun étant appelé << disposition fédérale >> au présent paragraphe) ou à l'égard des montants réputés détenus en fiducie aux termes de toute loi d'une province créant une fiducie présumée dans le seul but d'assurer à Sa Majesté du chef de cette province la remise de sommes déduites ou retenues aux termes d'une loi de cette province, dans la mesure où, dans ce dernier cas, se réalise l'une des conditions suivantes :

a)   la loi de cette province prévoit un impôt semblable, de par sa nature, à celui prévu par la *Loi de l'impôt sur le revenu*, et les sommes déduites ou retenues aux termes de la loi de cette province sont de même nature que celles visées aux paragraphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu*;

b)   cette province est << une province instituant un régime général de pensions >> au sens du paragraphe 3(1) du *Régime de pensions du Canada*, la loi de cette province institue un << régime provincial de pensions >> au sens de ce paragraphe, et les sommes déduites ou retenues aux termes de la loi de cette province sont de même nature que celles visées aux paragraphes 23(3) ou (4) du *Régime de pensions du Canada*.

Pour l'application du présent paragraphe, toute disposition de la loi provinciale qui crée une fiducie présumée est réputée avoir, à l'encontre de tout créancier du failli et malgré tout texte législatif fédéral ou provincial et toute règle de droit, la même portée et le même effet que la disposition fédérale correspondante, quelle que soit la garantie dont bénéficie le créancier.

**18.4** (1) [Status of Crown claims] In relation to a pro ceeding under this Act, all claims, including secured claims, of Her Majesty in right of Canada or a province or any body under an enactment respecting workers' compensation, in this section and in section 18.5 called a "workers' compensation body", rank as unsecured claims.

. . .

(3) [Operation of similar legislation] Subsection (1) does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to sub section 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pen sion plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legis lation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and

**18.4** (1) [Réclamations de la Couronne] Dans le cadre de procédures intentées sous le régime de la présente loi, toutes les réclamations de Sa Majesté du chef du Canada ou d'une province ou d'un organisme compétent au titre d'une loi sur les accidents du travail, y compris les récla mations garanties, prennent rang comme réclamations non garanties.

. . .

(3) [Effet] Le paragraphe (1) n'a pas pour effet de porter atteinte à l'application des dispositions suivantes :

a) les paragraphes 224(1.2) et (1.3) de la *Loi de l'im pôt sur le revenu*;

b) toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui ren voie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, et des intérêts, pénalités ou autres montants y afférents;

c) toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, dans la mesure où elle prévoit la percep tion d'une somme, et des intérêts, pénalités ou autres montants y afférents, qui :

(i) soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'impôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(ii) soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est << une province instituant un régime général de pensions >> au sens du paragra phe 3(1) de cette loi et si la loi provinciale institue un << régime provincial de pensions >> au sens de ce paragraphe.

Pour l'application de l'alinéa c), la disposition législative provinciale en question est réputée avoir, à l'encontre de tout créancier et malgré tout texte législatif fédéral ou provincial et toute règle de droit, la même portée et le même effet que le paragraphe 224(1.2) de la *Loi de l'im pôt sur le revenu* quant à la somme visée au sous alinéa c)(i), ou que le paragraphe 23(2) du *Régime de pensions du Canada* quant à la somme visée au sous alinéa c)(ii),

in respect of any related interest, penalties or other amounts.

**20.** [Act to be applied conjointly with other Acts] The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province, that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C 36 (as at September 18, 2009)

**11.** [General power of court] Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

**11.02** (1) [Stays, etc. — initial application] A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the court considers necessary, which period may not be more than 30 days,

(a)  staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding up and Restructuring Act*;

(b)  restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c)  prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

(2) [Stays, etc. — other than initial application] A court may, on an application in respect of a debtor company other than an initial application, make an order, on any terms that it may impose,

(*a*) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in paragraph (1)(*a*);

et quant aux intérêts, pénalités ou autres montants y afférents, quelle que soit la garantie dont bénéficie le créancier.

**20.** [La loi peut être appliquée conjointement avec d'autres lois] Les dispositions de la présente loi peuvent être appliquées conjointement avec celles de toute loi fédérale ou provinciale, autorisant ou prévoyant l'homologation de transactions ou arrangements entre une compagnie et ses actionnaires ou une catégorie de ces derniers.

*Loi sur les arrangements avec les créanciers des compagnies*, L.R.C. 1985, ch. C 36 (en date du 18 septembre 2009)

**11.** [Pouvoir général du tribunal] Malgré toute disposition de la *Loi sur la faillite et l'insolvabilité* ou de la *Loi sur les liquidations et les restructurations*, le tribunal peut, dans le cas de toute demande sous le régime de la présente loi à l'égard d'une compagnie débitrice, rendre, sur demande d'un intéressé, mais sous réserve des restrictions prévues par la présente loi et avec ou sans avis, toute ordonnance qu'il estime indiquée.

**11.02** (1) [Suspension : demande initiale] Dans le cas d'une demande initiale visant une compagnie débitrice, le tribunal peut, par ordonnance, aux conditions qu'il peut imposer et pour la période maximale de trente jours qu'il estime nécessaire :

a)  suspendre, jusqu'à nouvel ordre, toute procédure qui est ou pourrait être intentée contre la compagnie sous le régime de la *Loi sur la faillite et l'insolvabilité* ou de la *Loi sur les liquidations et les restructurations*;

b)  surseoir, jusqu'à nouvel ordre, à la continuation de toute action, poursuite ou autre procédure contre la compagnie;

c)  interdire, jusqu'à nouvel ordre, l'introduction de toute action, poursuite ou autre procédure contre la compagnie.

(2) [Suspension : demandes autres qu'initiales] Dans le cas d'une demande, autre qu'une demande initiale, visant une compagnie débitrice, le tribunal peut, par ordonnance, aux conditions qu'il peut imposer et pour la période qu'il estime nécessaire :

a)  suspendre, jusqu'à nouvel ordre, toute procédure qui est ou pourrait être intentée contre la compagnie sous le régime des lois mentionnées à l'alinéa (1)*a*);

CENTURY SERVICES INC. *c.* CANADA (P.G.)

(b)   restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c)   prohibiting, until otherwise ordered by the court, the commencement of any action, suit or pro ceeding against the company.

(3) [Burden of proof on application] The court shall not make the order unless

(a)   the applicant satisfies the court that circum stances exist that make the order appropriate; and

(b)   in the case of an order under subsection (2), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

.    .    .

**11.09** (1) [Stay — Her Majesty] An order made under section 11.02 may provide that

(*a*) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to sub section 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employ ment Insurance Act*, and of any related interest, pen alties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for the period that the court considers appropriate but ending not later than

(i)   the expiry of the order,

(ii)   the refusal of a proposed compromise by the creditors or the court,

(iii)   six months following the court sanction of a compromise or an arrangement,

(iv)   the default by the company on any term of a compromise or an arrangement, or

(v)   the performance of a compromise or an arrangement in respect of the company; and

(*b*) Her Majesty in right of a province may not exer cise rights under any provision of provincial legisla tion in respect of the company if the company is a debtor under that legislation and the provision has a purpose similar to subsection 224(1.2) of the *Income*

b)   surseoir, jusqu'à nouvel ordre, à la continuation de toute action, poursuite ou autre procédure contre la compagnie;

c)   interdire, jusqu'à nouvel ordre, l'introduction de toute action, poursuite ou autre procédure contre la compagnie.

(3) [Preuve] Le tribunal ne rend l'ordonnance que si :

a)   le demandeur le convainc que la mesure est opportune;

b)   dans le cas de l'ordonnance visée au paragra phe (2), le demandeur le convainc en outre qu'il a agi et continue d'agir de bonne foi et avec la diligence voulue.

.    .    .

**11.09** (1) [Suspension des procédures : Sa Majesté] L'ordonnance prévue à l'article 11.02 peut avoir pour effet de suspendre :

a)   l'exercice par Sa Majesté du chef du Canada des droits que lui confère le paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* ou toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie à ce paragraphe et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, ainsi que des intérêts, pénalités et autres charges afférents, à l'égard d'une compagnie qui est un débiteur fiscal visé à ce para graphe ou à cette disposition, pour la période se ter minant au plus tard :

(i)   à l'expiration de l'ordonnance,

(ii)   au moment du rejet, par le tribunal ou les créanciers, de la transaction proposée,

(iii)   six mois après que le tribunal a homologué la transaction ou l'arrangement,

(iv)   au moment de tout défaut d'exécution de la transaction ou de l'arrangement,

(v)   au moment de l'exécution intégrale de la transaction ou de l'arrangement;

b)   l'exercice par Sa Majesté du chef d'une province, pour la période que le tribunal estime indiquée et se terminant au plus tard au moment visé à celui des sous alinéas a)(i) à (v) qui, le cas échéant, est appli cable, des droits que lui confère toute disposition

*Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pen sion plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legis lation establishes a "provincial pension plan" as defined in that subsection,

for the period that the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) that may apply.

(2) [When order ceases to be in effect] The portions of an order made under section 11.02 that affect the exercise of rights of Her Majesty referred to in para graph (1)(*a*) or (*b*) cease to be in effect if

(*a*) the company defaults on the payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i) subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that sub section, to the extent that it provides for the

législative de cette province à l'égard d'une compa gnie qui est un débiteur visé par la loi provinciale, s'il s'agit d'une disposition dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, et qui pré voit la perception d'une somme, ainsi que des intérêts, pénalités et autres charges afférents, laquelle :

(i) soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'impôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(ii) soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est une province instituant un régime général de pensions au sens du paragraphe 3(1) de cette loi et si la loi provinciale institue un régime provincial de pensions au sens de ce paragraphe.

(2) [Cessation d'effet] Les passages de l'ordonnance qui suspendent l'exercice des droits de Sa Majesté visés aux alinéas (1)*a*) ou *b*) cessent d'avoir effet dans les cas suivants :

*a*)    la compagnie manque à ses obligations de paie ment à l'égard de toute somme qui devient due à Sa Majesté après le prononcé de l'ordonnance et qui pourrait faire l'objet d'une demande aux termes d'une des dispositions suivantes :

(i) le paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*,

(ii) toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, ainsi que des intérêts, péna lités et autres charges afférents,

(iii) toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, et qui prévoit la

CENTURY SERVICES INC. *c.* CANADA (P.G.)

collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the prov ince is a "province providing a comprehen sive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provin cial pension plan" as defined in that subsec tion; or

(*b*) any other creditor is or becomes entitled to real ize a security on any property that could be claimed by Her Majesty in exercising rights under

(i) subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that sub section, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the prov ince is a "province providing a comprehen sive pension plan" as defined in subsection

perception d'une somme, ainsi que des intérêts, pénalités et autres charges afférents, laquelle :

(A) soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'im pôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(B) soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est une province instituant un régime général de pensions au sens du para graphe 3(1) de cette loi et si la loi provinciale institue un régime provincial de pensions au sens de ce paragraphe;

*b*)   un autre créancier a ou acquiert le droit de réaliser sa garantie sur un bien qui pourrait être réclamé par Sa Majesté dans l'exercice des droits que lui confère l'une des dispositions suivantes :

(i)   le paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*,

(ii)   toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, ainsi que des intérêts, péna lités et autres charges afférents,

(iii)   toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, et qui prévoit la percep tion d'une somme, ainsi que des intérêts, pénali tés et autres charges afférents, laquelle :

(A)   soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'im pôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(B)   soit est de même nature qu'une coti sation prévue par le *Régime de pensions du Canada*, si la province est une province ins tituant un régime général de pensions au sens

3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

(3) [Operation of similar legislation] An order made under section 11.02, other than the portions of that order that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*), does not affect the operation of

(a)  subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b)  any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(c)  any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(i)  has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii)  is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

du paragraphe 3(1) de cette loi et si la loi provinciale institue un régime provincial de pensions au sens de ce paragraphe.

(3) [Effet] L'ordonnance prévue à l'article 11.02, à l'exception des passages de celle ci qui suspendent l'exercice des droits de Sa Majesté visés aux alinéas (1)*a*) ou *b*), n'a pas pour effet de porter atteinte à l'application des dispositions suivantes :

a)  les paragraphes 224(1.2) et (1.3) de la *Loi de l'impôt sur le revenu*;

b)  toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, ainsi que des intérêts, pénalités et autres charges afférents;

c)  toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, et qui prévoit la perception d'une somme, ainsi que des intérêts, pénalités et autres charges afférents, laquelle :

(i)  soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'impôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(ii)  soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est une province instituant un régime général de pensions au sens du paragraphe 3(1) de cette loi et si la loi provinciale institue un régime provincial de pensions au sens de ce paragraphe.

Pour l'application de l'alinéa c), la disposition législative provinciale en question est réputée avoir, à l'encontre de tout créancier et malgré tout texte législatif fédéral ou provincial et toute autre règle de droit, la même portée et le même effet que le paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* quant à la somme visée au sous alinéa c)(i), ou que le paragraphe 23(2) du *Régime de pensions du Canada* quant à la somme visée au sous alinéa c)(ii), et quant aux intérêts, pénalités et autres charges afférents, quelle que soit la garantie dont bénéficie le créancier.

37. (1) [Deemed trusts] Subject to subsection (2), despite any provision in federal or provincial legisla tion that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) [Exceptions] Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, sub section 23(3) or (4) of the *Canada Pension Plan* or sub section 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "fed eral provision"), nor does it apply in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province if

(a) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a compre hensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or with held under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

*Excise Tax Act*, R.S.C. 1985, c. E 15 (as at December 13, 2007)

222. (1) [Trust for amounts collected] Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II is deemed, for all purposes and despite any security interest in the amount, to hold the amount in trust for Her Majesty in right of Canada, separate and apart from the property of the person and from property held by any secured

37. (1) [Fiducies présumées] Sous réserve du para graphe (2) et par dérogation à toute disposition législa tive fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens de la compagnie débitrice ne peut être considéré comme tel par le seul effet d'une telle disposition.

(2) [Exceptions] Le paragraphe (1) ne s'applique pas à l'égard des sommes réputées détenues en fiducie aux termes des paragraphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu*, des paragraphes 23(3) ou (4) du *Régime de pensions du Canada* ou des paragraphes 86(2) ou (2.1) de la *Loi sur l'assurance emploi* (chacun étant appelé « disposition fédérale » au présent paragraphe) ou à l'égard des sommes réputées détenues en fiducie aux termes de toute loi d'une province créant une fiducie pré sumée dans le seul but d'assurer à Sa Majesté du chef de cette province la remise de sommes déduites ou retenues aux termes d'une loi de cette province, si, dans ce dernier cas, se réalise l'une des conditions suivantes :

a) la loi de cette province prévoit un impôt sembla ble, de par sa nature, à celui prévu par la *Loi de l'im pôt sur le revenu*, et les sommes déduites ou retenues au titre de cette loi provinciale sont de même nature que celles visées aux paragraphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu*;

b) cette province est une province instituant un régime général de pensions au sens du paragraphe 3(1) du *Régime de pensions du Canada*, la loi de cette province institue un régime provincial de pensions au sens de ce paragraphe, et les sommes déduites ou retenues au titre de cette loi provinciale sont de même nature que celles visées aux paragraphes 23(3) ou (4) du *Régime de pensions du Canada*.

Pour l'application du présent paragraphe, toute disposi tion de la loi provinciale qui crée une fiducie présumée est réputée avoir, à l'encontre de tout créancier de la com pagnie et malgré tout texte législatif fédéral ou provin cial et toute règle de droit, la même portée et le même effet que la disposition fédérale correspondante, quelle que soit la garantie dont bénéficie le créancier.

*Loi sur la taxe d'accise*, L.R.C. 1985, ch. E 15 (en date du 13 décembre 2007)

222. (1) [Montants perçus détenus en fiducie] La per sonne qui perçoit un montant au titre de la taxe prévue à la section II est réputée, à toutes fins utiles et malgré tout droit en garantie le concernant, le détenir en fiducie pour Sa Majesté du chef du Canada, séparé de ses pro pres biens et des biens détenus par ses créanciers garantis qui, en l'absence du droit en garantie, seraient ceux de la

creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

(1.1) [Amounts collected before bankruptcy] Subsection (1) does not apply, at or after the time a person becomes a bankrupt (within the meaning of the *Bankruptcy and Insolvency Act*), to any amounts that, before that time, were collected or became collectible by the person as or on account of tax under Division II.

. . .

(3) [Extension of trust] Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

(a) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

(b) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B 3 (as at December 13, 2007)

67. (1) [Property of bankrupt] The property of a bankrupt divisible among his creditors shall not comprise

personne, jusqu'à ce qu'il soit versé au receveur général ou retiré en application du paragraphe (2).

(1.1) [Montants perçus avant la faillite] Le paragraphe (1) ne s'applique pas, à compter du moment de la faillite d'un failli, au sens de la *Loi sur la faillite et l'insolvabilité*, aux montants perçus ou devenus percevables par lui avant la faillite au titre de la taxe prévue à la section II.

. . .

(3) [Non versement ou non retrait] Malgré les autres dispositions de la présente loi (sauf le paragraphe (4) du présent article), tout autre texte législatif fédéral (sauf la *Loi sur la faillite et l'insolvabilité*), tout texte législatif provincial ou toute autre règle de droit, lorsqu'un montant qu'une personne est réputée par le paragraphe (1) détenir en fiducie pour Sa Majesté du chef du Canada n'est pas versé au receveur général ni retiré selon les modalités et dans le délai prévus par la présente partie, les biens de la personne — y compris les biens détenus par ses créanciers garantis qui, en l'absence du droit en garantie, seraient ses biens — d'une valeur égale à ce montant sont réputés :

a) être détenus en fiducie pour Sa Majesté du chef du Canada, à compter du moment où le montant est perçu par la personne, séparés des propres biens de la personne, qu'ils soient ou non assujettis à un droit en garantie;

b) ne pas faire partie du patrimoine ou des biens de la personne à compter du moment où le montant est perçu, que ces biens aient été ou non tenus séparés de ses propres biens ou de son patrimoine et qu'ils soient ou non assujettis à un droit en garantie.

Ces biens sont des biens dans lesquels Sa Majesté du chef du Canada a un droit de bénéficiaire malgré tout autre droit en garantie sur ces biens ou sur le produit en découlant, et le produit découlant de ces biens est payé au receveur général par priorité sur tout droit en garantie.

*Loi sur la faillite et l'insolvabilité*, L.R.C. 1985, ch. B 3 (en date du 13 décembre 2007)

67. (1) [Biens du failli] Les biens d'un failli, constituant le patrimoine attribué à ses créanciers, ne comprennent pas les biens suivants :

(a) property held by the bankrupt in trust for any other person,

(b) any property that as against the bankrupt is exempt from execution or seizure under any laws applicable in the province within which the property is situated and within which the bankrupt resides, or

(*b*.1) such goods and services tax credit payments and prescribed payments relating to the essential needs of an individual as are made in prescribed circumstances and are not property referred to in paragraph (*a*) or (*b*),

but it shall comprise

(c) all property wherever situated of the bankrupt at the date of his bankruptcy or that may be acquired by or devolve on him before his discharge, and

(d) such powers in or over or in respect of the property as might have been exercised by the bankrupt for his own benefit.

(2) [Deemed trusts] Subject to subsection (3), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

(3) [Exceptions] Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

(*a*) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

*a*) les biens détenus par le failli en fiducie pour toute autre personne;

*b*) les biens qui, à l'encontre du failli, sont exempts d'exécution ou de saisie sous le régime des lois applicables dans la province dans laquelle sont situés ces biens et où réside le failli;

*b*.1) dans les circonstances prescrites, les paiements au titre de crédits de la taxe sur les produits et services et les paiements prescrits qui sont faits à des personnes physiques relativement à leurs besoins essentiels et qui ne sont pas visés aux alinéas *a*) et *b*),

mais ils comprennent :

*c*) tous les biens, où qu'ils soient situés, qui appartiennent au failli à la date de la faillite, ou qu'il peut acquérir ou qui peuvent lui être dévolus avant sa libération;

*d*) les pouvoirs sur des biens ou à leur égard, qui auraient pu être exercés par le failli pour son propre bénéfice.

(2) [Fiducies présumées] Sous réserve du paragraphe (3) et par dérogation à toute disposition législative fédérale ou provinciale ayant pour effet d'assimiler certains biens à des biens détenus en fiducie pour Sa Majesté, aucun des biens du failli ne peut, pour l'application de l'alinéa (1)*a*), être considéré comme détenu en fiducie pour Sa Majesté si, en l'absence de la disposition législative en question, il ne le serait pas.

(3) [Exceptions] Le paragraphe (2) ne s'applique pas à l'égard des montants réputés détenus en fiducie aux termes des paragraphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu*, des paragraphes 23(3) ou (4) du *Régime de pensions du Canada* ou des paragraphes 86(2) ou (2.1) de la *Loi sur l'assurance emploi* (chacun étant appelé « disposition fédérale » au présent paragraphe) ou à l'égard des montants réputés détenus en fiducie aux termes de toute loi d'une province créant une fiducie présumée dans le seul but d'assurer à Sa Majesté du chef de cette province la remise de sommes déduites ou retenues aux termes d'une loi de cette province, dans la mesure où, dans ce dernier cas, se réalise l'une des conditions suivantes :

*a*) la loi de cette province prévoit un impôt semblable, de par sa nature, à celui prévu par la *Loi de l'impôt sur le revenu*, et les sommes déduites ou retenues aux termes de la loi de cette province sont de même nature que celles visées aux paragraphes 227(4) ou (4.1) de la *Loi de l'impôt sur le revenu*;

(*b*) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**86.** (1) [Status of Crown claims] In relation to a bankruptcy or proposal, all provable claims, including secured claims, of Her Majesty in right of Canada or a province or of any body under an Act respecting workers' compensation, in this section and in section 87 called a "workers' compensation body", rank as unsecured claims.

.  .  .

(3) [Exceptions] Subsection (1) does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*;

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts; or

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

*b*) cette province est « une province instituant un régime général de pensions » au sens du paragraphe 3(1) du *Régime de pensions du Canada*, la loi de cette province institue un « régime provincial de pensions » au sens de ce paragraphe, et les sommes déduites ou retenues aux termes de la loi de cette province sont de même nature que celles visées aux paragraphes 23(3) ou (4) du *Régime de pensions du Canada*.

Pour l'application du présent paragraphe, toute disposition de la loi provinciale qui crée une fiducie présumée est réputée avoir, à l'encontre de tout créancier du failli et malgré tout texte législatif fédéral ou provincial et toute règle de droit, la même portée et le même effet que la disposition fédérale correspondante, quelle que soit la garantie dont bénéficie le créancier.

**86.** (1) [Réclamations de la Couronne] Dans le cadre d'une faillite ou d'une proposition, les réclamations prouvables — y compris les réclamations garanties — de Sa Majesté du chef du Canada ou d'une province ou d'un organisme compétent au titre d'une loi sur les accidents du travail prennent rang comme réclamations non garanties.

.  .  .

(3) [Effet] Le paragraphe (1) n'a pas pour effet de porter atteinte à l'application des dispositions suivantes :

a) les paragraphes 224(1.2) et (1.3) de la *Loi de l'impôt sur le revenu*;

b) toute disposition du *Régime de pensions du Canada* ou de la *Loi sur l'assurance emploi* qui renvoie au paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu* et qui prévoit la perception d'une cotisation, au sens du *Régime de pensions du Canada*, ou d'une cotisation ouvrière ou d'une cotisation patronale, au sens de la *Loi sur l'assurance emploi*, et des intérêts, pénalités ou autres montants y afférents;

c) toute disposition législative provinciale dont l'objet est semblable à celui du paragraphe 224(1.2) de la *Loi de l'impôt sur le revenu*, ou qui renvoie à ce paragraphe, dans la mesure où elle prévoit la perception d'une somme, et des intérêts, pénalités ou autres montants y afférents, qui :

(i) soit a été retenue par une personne sur un paiement effectué à une autre personne, ou déduite d'un tel paiement, et se rapporte à un impôt semblable, de par sa nature, à l'impôt sur le revenu auquel les particuliers sont assujettis en vertu de la *Loi de l'impôt sur le revenu*,

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pen sion plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legis lation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsec tion 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

*Appeal allowed with costs,* ABELLA J. *dissent ing.*

*Solicitors for the appellant: Fraser Milner Casgrain, Vancouver.*

*Solicitor for the respondent: Attorney General of Canada, Vancouver.*

(ii) soit est de même nature qu'une cotisation prévue par le *Régime de pensions du Canada*, si la province est << une province instituant un régime général de pensions >> au sens du paragra phe 3(1) de cette loi et si la loi provinciale institue un << régime provincial de pensions >> au sens de ce paragraphe.

Pour l'application de l'alinéa *c*), la disposition législative provinciale en question est réputée avoir, à l'encontre de tout créancier et malgré tout texte législatif fédéral ou provincial et toute règle de droit, la même portée et le même effet que le paragraphe 224(1.2) de la *Loi de l'im pôt sur le revenu* quant à la somme visée au sous alinéa *c*)(i), ou que le paragraphe 23(2) du *Régime de pensions du Canada* quant à la somme visée au sous alinéa *c*)(ii), et quant aux intérêts, pénalités ou autres montants y affé rents, quelle que soit la garantie dont bénéficie le créan cier.

*Pourvoi accueilli avec dépens, la juge* ABELLA *est dissidente.*

*Procureurs de l'appelante : Fraser Milner Casgrain, Vancouver.*

*Procureur de l'intimé : Procureur général du Canada, Vancouver.*

# TAB 5

J.M. et al. v. W.B. et al.

[Indexed as: M. (J.) v. B. (W.)]


71 O.R. (3d) 171
[2004] O.J. No. 2312
Docket Nos. C39867, C39881 and C39899


Court of Appeal for Ontario
Rosenberg, Goudge and Cronk JJ.A.
June 3, 2004


 Negligence -- Apportionment of fault -- Pierringer agreement
-- Superior Court has jurisdiction under s. 1 of Negligence Act
to apportion fault or neglect in multi-party tort claim against
persons who were originally named as party defendants but who,
as result of pre-trial settlement, will not be parties to
action at time of trial -- Negligence Act, R.S.O. 1990, c. N.1,
s. 1.

 In 1997, the plaintiffs claimed damages for sexual assaults
alleged to have been perpetrated by the defendants WB and EM.
They sued the defendant Dr. Kerr, who was allegedly the
physician for several of the plaintiffs and for WB, for
negligence and breach of fiduciary duty. The plaintiffs sued
other defendants for negligence and breach of fiduciary duty,
and they sued the defendants the Salvation Army and the Orange
Lodge as being vicariously liable. After the action was
commenced, the claims of several plaintiffs were discontinued
or dismissed on consent.

 In September 2002, the remaining plaintiffs entered into a
partial settlement agreement with all the defendants save for
WB, EM and Dr. Kerr (the "Non-Settling Defendants"). Under the
settlement agreements, modelled on a type of settlement known
as a "Pierringer agreement", the plaintiffs settled their

claims against the Settling Defendants and agreed to limit
their claims against the Non-Settling Defendants. The
settlement included the plaintiffs' agreement to restrict their
claims against the Non-Settling Defendants to only their
several, rather than joint and several, liability. The
agreements contained an indemnity clause. The indemnity clause
stated that:

  The [plaintiffs] restrict their claim to whatever the non-
 settling defendants may be directly liable for and as such
 non-settling defendants cannot be jointly liable with the
 settling defendants. The clause means non-settling defendants
 have no basis to seek contribution, indemnity, relief over by
 way of equitable subrogation, declaratory relief or otherwise
 against the [Settling Defendants].

 On September 26, 2002, Mtivier R.S.J. granted an order
approving the agreements, to the extent that they affected the
interests of minors, and dismissed the plaintiffs' action as
against the Settling Defendants, without costs.

 With the death of WB and EM and the default of several other
defendants, the only remaining Non-Settling Defendant was Dr.
Kerr. Given the terms of [page172] the agreements and the
granting of the dismissal order, Dr. Kerr was concerned that
the trial judge might lack jurisdiction to determine the
degree, if any, in which the fault or neglect of the Settling
Defendants caused or contributed to the plaintiffs' injuries
and damages. Kerr was concerned that he could be deprived of
his right to obtain an apportionment of liability against the
Settling Defendants. He moved to have the dismissal order set
aside and for leave to amend his pleading to assert cross-
claims against the Settling Defendants. To address the
jurisdictional issue raised by Dr. Kerr, the parties agreed to
submit a special case for the opinion of the court under Rule
22 of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194. The
parties agreed that the terms of the agreements required that
Dr. Kerr should have the opportunity and right, if so advised,
to obtain an adjudication at trial as to whether the neglect of
one or more of the Settling Defendants caused or contributed to
the damages alleged.

2004 CanLII 8541 (ON CA)

On the special case, concluding that he was bound by the
Court of Appeal's judgment in Martin v. Listowel Memorial
Hospital, Forget J. held that the Superior Court of Justice did
not have jurisdiction to apportion fault or neglect against the
Settling Parties because, at the time of the trial, they would
not be parties to the action. The plaintiffs and some of the
Settling Defendants appealed.

 Held, the appeal should be allowed.

 In the circumstances of this case, the Superior Court has the
jurisdiction to determine whether and to what extent any fault
or neglect of the Settling Defendants caused or contributed to
the damages alleged by the plaintiffs, although the Settling
Defendants will not be parties to the action at the trial. The
Martin judgment was not dispositive of the jurisdictional
question and the case was distinguishable.

 Neither the reasoning in Martin nor the language of s. 1 of
the Negligence Act, which provides for the apportionment of
liability where damages are caused or contributed to by the
fault or neglect of two or more persons, precluded the
apportionment of fault or neglect at trial to one or more of
the Settling Defendants. First, there was no indication in s. 1
of the Negligence Act of a legislative intention to limit the
jurisdiction of the Superior Court in the apportionment of
liability in negligence cases. Second, the facts in Martin were
different because unlike the case at bar, the person against
whom negligence was to be alleged had no opportunity to respond
directly to the plaintiffs' allegations of negligence against
her, or to their claims for relief. In contrast, in this case,
the Settling Defendants were sued and had an opportunity to
resist any potential findings of fault or negligence against
them. Third, Martin was also distinguishable from the immediate
case in that the settlement agreement was secret and not
disclosed to the other defendants or to the court.

 Fourth, the reasoning in Martin concerning the apportionment
of liability was premised on the view that the word "persons"
in s. 1 of the Act is intended to refer to persons sued in the

2004 CanLII 8541 (ON CA)

litigation. There is no "absent" tortfeasor in the immediate case. Rather, the Settling Defendants are "sued persons" in the appellants' action. Accordingly, although the Settling Defendants will not be participants at trial, a trial apportionment of liability against them is consistent with the reasoning in Martin. Fifth, the decision in Martin was distinguishable on another, critical ground. The interpretive result in Martin was driven by important policy considerations that do not apply here. The court was concerned that a finding of a degree of fault in respect of a non-party could have significant consequences for other defendants under s. 1 of the Act. If a portion of the fault were attributed to a [page173] non-party, or to a party at fault but with a legal defence such as a limitation defence, the defendants who are liable to the plaintiff would be left with no one from whom they could recover that portion of the claim. This concern was met by the type of Pierringer settlement agreement employed by the appellants and Settling Defendants.

 By the terms of the Agreements and their amended pleading, the appellants have acknowledged and agreed that they will hold the Non-Settling Defendants accountable for their several liability only. As well, the Settling Defendants have agreed that the trial judge may apportion fault or negligence against them, although they will not take part in the trial. Finally, Dr. Kerr should be free to take the position at trial that his exposure to any shortfall in the appellants' recovery of damages occasioned by the insolvency of another Non-Settling Defendant should be reduced by a proportion related to the fault of the Settling Defendants. On the basis of all these factors, the purpose of s. 1 of the Act was not undermined by the agreements and no question of potential unfairness or prejudice to any of the parties will arise from the implementation of the part of the settlements that contemplate the apportionment of fault or neglect at trial to the Settling Defendants.


Cases referred to

 80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd., [1972]

2 O.R. 280, 25 D.L.R. (3d) 386 (C.A.); Amoco Canada Petroleum
Co. v. Propak Systems Ltd., [2001] A.J. No. 600, 2001 ABCA 110,
200 D.L.R. (4th) 667, [2001] 6 W.W.R. 628, 91 Alta. L.R. (3d)
13, 281 A.R. 185, 4 C.P.C. (5th) 20 (C.A.); British Columbia
Ferry Corp. v. T & N plc, [1995] B.C.J. No. 2116, [1996] 4
W.W.R. 161, 65 B.C.A.C. 118, 16 B.C.L.R. (3d) 115, 27 C.C.L.T.
(2d) 287 (C.A.); Cook v. Ip (1985), 52 O.R. (2d) 289, 22
D.L.R. (4th) 1, 5 C.P.C. (2d) 81 (C.A.) [Leave to appeal to
S.C.C. dismissed (1986), 55 O.R. (2d) 288]; Kelvin Energy Ltd.
v. Lee, [1992] 3 S.C.R. 235, 97 D.L.R. (4th) 616, 143 N.R. 191
(sub nom. Loewen Ondaatje McCutcheon & Co. v. Sparling);
Martin v. Listowel Memorial Hospital (2000), 51 O.R. (3d) 384,
192 D.L.R. (4th) 250, 48 C.P.C. (4th) 195 (C.A.); Maxfield v.
Llewellyn, [1961] 3 All E.R. 95, 1 W.L.R. 1119, 105 Sol. Jo.
550 (C.A.); Ontario New Home Warranty Program v. Chevron
Chemical Co. (1999), 46 O.R. (3d) 130, 37 C.P.C. (4th) 175
(S.C.J.); Pierringer v. Hoger, 124 N.W.2d 106 (Wis. S.C.
1963); Sparling v. Southam Inc. (1988), 66 O.R. (2d) 225, 41
B.L.R. 22 (H.C.J.); Wells v. McBrine (1988), 33 B.C.L.R. (2d)
86, 54 D.L.R. (4th) 708, [1989] 2 W.W.R. 695, 47 C.C.L.T. 94
(C.A.)

Statutes referred to

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 11

Negligence Act, R.S.O. 1990, c. N.1, ss. 1, 4

Rules and regulations referred to

Rules of Civil Procedure, R.R.O. 1990, Reg. 194, Rule 22

Authorities referred to

Ontario Law Reform Commission, Report on Contribution Among
 Wrongdoers and Contributory Negligence (Toronto: Ministry of
 the Attorney General, 1988)

 APPEAL from an order of Forget J. of the Superior Court of
Justice, dated March 17, 2003, on a motion for determination of

a special case under Rule 22 of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194. [page174]


 Peter J. Cronyn, for J.M. et al.

 M. Philip Tunley, for the Governing Council of the Salvation Army, Victor Greenwood, Lillian Greenwood, the Estate of Cyril Fisher, Doug Hiltz and Harold Peckford, and as Agent for respondent, Vera Burrows.

 P. David McCutcheon and Kate Broer, for The Grand Orange Lodge of British America.

 Paul A. Millican, for Dr. Archibald Kerr.


 The judgment of the court was delivered by

 CRONK J.A.: --

2004 CanLII 8541 (ON CA)

### I. INTRODUCTION

 [1] The sole issue in these proceedings is whether the Superior Court of Justice has jurisdiction under s. 1 of the Negligence Act, R.S.O. 1990, c. N.1 (the "Act") to apportion fault or neglect in a multi-party tort action against persons who were originally named as party defendants but who, as a result of pre-trial settlements, will not be parties to the action at the time of trial.

 [2] Twenty individual plaintiffs commenced this action in January 1997, claiming damages for historical sexual abuses and assaults that they allege were perpetrated upon 14 of them, when they were children, by the defendants [W.B.] and [E.M.]. They also allege that there may be other victims of similar tortious conduct by these defendants, apart from any of the plaintiffs. As well, they claim that the remaining defendants breached duties owed to the plaintiffs by failing to take steps that would have prevented the alleged abusive and assaultive activities of [W.B.] and [E.M.], or by permitting such

activities to occur.

[3] The incidents in question are alleged to have occurred between 1960 and 1991, thus spanning a period of about 31 years. As a result, several of the defendants are now elderly or in poor health.

[4] After the commencement of the action, the following events transpired:

(i) [W.B], [E.M], and one other defendant died;

(ii) the claims of several plaintiffs were discontinued or dismissed on consent;

(iii) some of the defendants defaulted in defending the action; [page175]

(iv) the defendant, Dr. Archibald Kerr, defended the action and cross-claimed against some of his co-defendants, seeking contribution and indemnity from them and reserving his right to cross-claim against other co-defendants following discoveries; and

(v) third party claims were initiated by the defendant, The Governing Council of the Salvation Army, and Kerr against two individuals: the mother of some of the plaintiffs, who was married first to [W.B.] and subsequently to [E.M.], and a second individual who the plaintiffs assert was a witness to some of the abuse involving children other than the plaintiffs.

[5] By September 2002, those plaintiffs who remained involved in the litigation had each entered into partial settlement agreements (the "Agreements") with all the defendants (the "Settling Defendants") save for [W.B], [E.M.] and Kerr (the "Non-Settling Defendants"). Under the Agreements, the plaintiffs settled their claims against the Settling Defendants and agreed to limit their claims against the Non-Settling Defendants.

2004 CanLII 8541 (ON CA)

[6] On September 26, 2002, Mtivier R.S.J. of the Superior
Court of Justice granted an order approving the Agreements, to
the extent that they affected the interests of minors, and
dismissing the plaintiffs' action as against the Settling
Defendants, without costs.

[7] As a result of all these events, Kerr became the only
remaining Non-Settling Defendant active in the action.

[8] Prior to the dismissal order, Kerr and the Settling
Defendants reserved their respective rights to bring cross-
claims against each other at any time during the action.
Although Kerr was aware that the plaintiffs were negotiating
the Agreements, and was provided with copies of two of the
Agreements after they were executed, he did not receive notice
of the plaintiffs' dismissal motion before Mtivier R.S.J.

[9] Given the terms of the Agreements and the granting of the
dismissal order, Kerr was concerned that the judge who presided
over the trial might lack jurisdiction to determine the degree,
if any, in which the fault or neglect of the Settling
Defendants caused or contributed to the plaintiffs' alleged
injuries and damages. Kerr feared that, by virtue of the
dismissal order, he could be deprived of his right to obtain
such an apportionment of liability, if any, against the
Settling Defendants.

[10] Accordingly, Kerr moved to set aside the dismissal order
and for leave to amend his pleading to assert cross-claims
against the Settling Defendants. [page176]

[11] In response to Kerr's motion, the Settling Defendants
amended their statement of claim, on consent, to refer to the
Agreements and some of their essential terms. They also agreed
that, if requested by Kerr or the plaintiffs, they would
consent to being examined for discovery.

[12] To address the jurisdictional issue raised by Kerr and
the ability of the court to give full effect to the terms of
the Agreements at trial, the parties also agreed to adjourn
parts of Kerr's motion and to submit a special case for the

opinion of the court under Rule 22 of the Rules of Civil
Procedure, R.R.O. 1990, Reg. 194. With the concurrence of all
parties, the following question was posed for the opinion of
the court:

  Does the Court have the jurisdiction to determine whether any
  fault or neglect of the Settling Defendants or any of them
  caused or contributed to the damages alleged by the
  plaintiffs, and the degree of any such contribution, if the
  Settling Defendants are not parties to the action at the time
  of trial, in circumstances where the Settling Defendants have
  entered into Partial Settlement Agreements with the
  plaintiffs, and consent to the Court so determining the fault
  or neglect of the Settling Defendants?

 [13] The special case was heard by Forget J. of the Superior
Court of Justice on February 18, 2003. By order dated March 17,
2003, he held that the Superior Court of Justice did not have
jurisdiction to apportion fault or neglect at trial against the
Settling Defendants who, by then, would not be parties to the
action.

 [14] The plaintiffs and some of the Settling Defendants now
jointly appeal from that decision. Although three separate
appeals were initiated, the appeals were consolidated and heard
together by this court. For ease of reference, I refer
throughout the balance of these reasons to the plaintiffs as
the appellants.

 [15] For the reasons that follow, I conclude that the
Superior Court of Justice has jurisdiction, in the
circumstances of this case, to determine whether and to what
extent any fault or neglect of the Settling Defendants caused
or contributed to the damages alleged by the appellants,
although the Settling Defendants will not be parties to the
action at trial. Accordingly, I would allow the appeals.

                    II. ADDITIONAL FACTS

 [16] The appellants allege in their statement of claim, among
other matters, that [W.B.] was a senior soldier, employee and

2004 CanLII 8541 (ON CA)

agent of the Salvation Army and a member of The Grand Orange
Lodge of British America at the time of his alleged tortious
conduct. Similarly, they assert that [E.M.] was a member,
employee [page177] and officer of the Orange Lodge at the time
of the alleged sexual abuses and assaults. The appellants claim
that, while active as supervisors or participants in a variety
of Salvation Army or Orange Lodge youth activities, [W.B.] and
[E.M.] sexually, emotionally and physically abused numerous
children, including 14 of the appellants, at several locations,
some of which were controlled or owned by the Salvation Army or
the Orange Lodge.

 [17] The appellants seek damages against [W.B.] and [E.M.]
for assault and battery and intentional infliction of nervous
shock rising from their alleged paedophiliac activities. As
against the Settling Defendants and Kerr, the latter of whom
was allegedly the physician to several of the appellants and
[W.B.], the appellants claim damages for negligence and
breach of fiduciary duty. They also assert that either or both
of the Salvation Army and the Orange Lodge are vicariously
liable for the damages claimed in respect of the individual
conduct of [W.B.], [E.M.] and various of the Settling
Defendants.

 [18] By September 2002, all the appellants who continued as
participants in the action had entered into Agreements with the
Settling Defendants. The terms of the Agreements are identical
and modelled on a type of settlement agreement known as a
Pierringer agreement, as described in the Wisconsin case of
Pierringer v. Hoger, 124 N.W.2d 106 (Wis. S.C. 1963).

 [19] The parties indicated in the special case that the
Agreements are intended, in part, "to permit the Settling
Defendants to exit the action by settling their claims with the
plaintiffs, and by attempting to eliminate any joint liability
the Settling Defendants might be found to have with the
remaining defendants".

 [20] The Agreements each provide:

(i) that the settlement and payment contemplated thereunder are

2004 CanLII 8541 (ON CA)

not to be taken as an admission of liability on the part of
the Settling Defendants;

(ii) that the action will be dismissed as against the Settling
    Defendants, on consent and without costs;

(iii) that the appellants will use their best efforts to cause
    any cross-claims against the Settling Defendants to be
    similarly dismissed, without costs, "in order to fully and
    finally conclude all litigation arising from the matters
    pleaded" in the action against the Settling Defendants;

(iv) a full and final release by the appellants in favour of
    the Settling Defendants; [page178]

(v) that the appellants will indemnify and hold harmless the
    Settling Defendants from any cross-claim or third party
    claim, and any other proceeding or claim arising from the
    issues and allegations in the action; and

(vi) for the disclosure of the Agreement, including the
    settlement amount provided thereunder, to the trial court,
    on certain conditions.

[21] The indemnity provision contained in each of the
Agreements states:

The [appellants] restrict their claim to whatever the non-
settling defendants may be directly liable for and as such
non-settling defendants cannot be jointly liable with the
settling defendants. This clause means non-settling
defendants have no basis to seek contribution, indemnity,
relief over by way of equitable subrogation, declaratory
relief or otherwise against the [Settling Defendants].

[22] In February 2003, after the dismissal of the appellants'
claims against the Settling Defendants, the appellants amended
their statement of claim, on consent, to reflect the
compromises of their claims detailed in the Agreements. The
amended version of their pleading states:

2004 CanLII 8541 (ON CA)

89. The Plaintiffs have agreed with the Settling Defendants
    that they shall limit their claims against the Non-
    settling Defendants to claims for damages, costs and
    interest attributable only to the Non-settling
    Defendants' several share of liability to the
    Plaintiffs and joint liability to one another, if any,
    such that the Plaintiffs' recovery shall be limited to
    recovering the damages, costs and interest attributable
    to the Non-settling Defendants' several share of
    liability, or joint share of liability among them,
    proven against them at trial.

90. For greater certainty, the Plaintiffs shall have no
    claim directly or indirectly against the Settling
    Defendants and the Plaintiffs shall limit their claims
    against the Non-settling Defendants so as to exclude
    any cross-claim or third party claim made against or
    which could be made against the Settling Defendants
    arising from the issues in this action.

91. The Plaintiffs admit that the Court at any trial of this
    matter has and shall have full authority to adjudicate
    upon the apportionment of liability, if any, between
    all Defendants named in this Statement of Claim,
    including the Settling Defendants, whether or not the
    Settling Defendants remain as parties by cross-claim or
    third party claim in this action.

(Emphasis added)

The Non-Settling Defendants are defined in the appellants'
amended pleading to mean [W.B.], [E.M.] and Kerr. [page179]

 [23] All parties agree that the terms of the Agreements
require that Kerr should have the opportunity and right, if so
advised, to obtain an adjudication at trial as to whether the
neglect or fault of one or more of the Settling Defendants
caused or contributed to the damages alleged by the appellants.
Indeed, it is common ground that the trial judge who presides
over the trial of the action will be required to determine the
degree to which the Settling Defendants are at fault or

2004 CanLII 8541 (ON CA)

negligent in order to give effect to the Agreements.

[24] The parties, including Kerr, also agree that if the appeals are allowed, the factual and legal issues in dispute will be reduced, costs savings for all parties will be realized, and no prejudice will be caused to any party.

[25] Kerr, therefore, does not oppose the dismissal of the appellants' claims against the Settling Defendants so long as he is not deprived of his right to seek to limit his potential liability, if any, by having the Settling Defendants' share of liability adjudicated at trial. Kerr's proposed cross-claims against the Settling Defendants are intended to preserve his access to such an apportionment. However, if the Settling Defendants are required to remain in the action as defendants to cross-claims brought by Kerr, the substance of their settlement bargain with the appellants will be threatened and, potentially, lost entirely.

III. MOTIONS JUDGE'S DECISION

[26] In his reasons dated March 17, 2003, the motions judge implicitly acknowledged that the active parties to this action either agreed to, or did not oppose, the terms of settlement contained in the Agreements. He also recognized that the parties consented to the jurisdiction of the Superior Court of Justice to apportion liability at trial as against the Settling Defendants.

[27] The motions judge held that the proposed apportionment of liability to the Settling Defendants, "[did] not pose a risk of prejudice to any of the persons involved in the present proceedings . . .".

[28] However, the motions judge also reviewed the decision in Martin v. Listowel Memorial Hospital (2000), 51 O.R. (3d) 384, 192 D.L.R. (4th) 250 (C.A.), in which this court stated in obiter that a court could only apportion degrees of fault under s. 1 of the Act to a defendant who was a party to the applicable proceedings. Primarily on the basis of that case, the motions judge concluded that the Superior Court of Justice

2004 CanLII 8541 (ON CA)

lacked the asserted jurisdiction to apportion fault or neglect
to the Settling Defendants at trial. [page180]

                        IV.  ANALYSIS

(1) Pierringer Settlement Agreements

 [29] In recent years, Pierringer settlement agreements have
been increasingly utilized in Canada in a variety of litigation
settings. In Amoco Canada Petroleum Co. v. Propak Systems Ltd.
(2001), 200 D.L.R. (4th) 667, [2001] A.J. No. 600 (C.A.), at
pp. 673-74 D.L.R., the Alberta Court of Appeal outlined the
factors leading to their emergent use:

  Now past is the day when "settlement agreement" can be
 understood to refer solely to the final resolution of all
 outstanding issues between all parties to a lawsuit,
 effectively bringing the suit to an end. In the last several
 years, in response to increasingly complex and commensurately
 dilatory and costly litigation, a new generation of
 settlement agreements has been cautiously adopted by the
 litigation bar.

  The new settlement agreements, which include such
 exotically named species as the Mary Carter agreement and the
 Pierringer agreement, endeavour to attain a more limited
 objective: rather than trying to resolve all outstanding
 issues among all parties, a difficult task in complicated
 suits, they aim to manage proactively the risk associated
 with litigation. In short, contracting litigants prefer the
 certainty of settlement to the uncertainty and expense of a
 trial and the possibility of an undesirable outcome. This
 "risk-management" objective is accomplished by settling
 issues of liability between some but not all of the parties,
 thereby reducing the number of issues in dispute, simplifying
 the action, and expediting the suit. Ancillary benefits
 include a reduction in the financial and opportunity costs
 associated with complex, protracted litigation, as well as
 savings of court time and resources.

[30] The court in Amoco described a Pierringer settlement

2004 CanLII 8541 (ON CA)

agreement in this way (at p. 671 D.L.R.):

  Such agreements permit some parties to withdraw from the
  litigation, leaving the remaining defendants responsible only
  for the loss they actually caused, with no joint liability.
  As the non-settling defendants are responsible only for their
  proportionate share of the loss, a Pierringer agreement can
  properly be characterized as a "proportionate share
  settlement agreement".

 [31] Pierringer agreements, however, are not free from
settlement complications. As observed by the court in Amoco (at
pp. 674-75 D.L.R.):

 As a result of third party proceedings, settling defendants
 are almost always subject to claims for contribution and
 indemnity from non-settling defendants for the amount of the
 plaintiff's loss alleged to be attributable to the fault of
 the settling defendants. Before the settling defendants can
 be released from the suit, some provision must be made to
 satisfy these claims.

   This obstacle is overcome by including an indemnity clause
 in which the plaintiff covenants to indemnify the settling
 defendants for any portion of the damages that a court may
 determine to be attributable to their fault and for which the
 non-settling defendants would otherwise be liable due to the
 principle of joint and several liability. Alternatively, the
 plaintiff may covenant not [page181] to pursue the non-
 settling defendants for that portion of the liability that
 a court may determine to be attributable to the fault of the
 settling defendants. . . . [I]n either case the goal of the
 proportionate share settlement agreement is to limit the
 liability of the non-settling party to its several liability.

 [32] The Agreements in this case, as I have said, contain
both an indemnity clause in favour of the Settling Defendants
and an agreement by the appellants to restrict their claims
against the Non-Settling Defendants to only those defendants'
several, rather than joint and several, shares of liability. In
respect of the Non-Settling Defendants, therefore, the

Agreements effectively represent a contractual "opting-out" by
the appellants of the joint liability provision set out in s. 1
of the Act, save for joint liability, if any, among the Non-
Settling Defendants.

(2) Implementation of the Agreements in this Case

[33] The parties who appeal from the motions judge's decision
challenge it on three main grounds. First, they argue that
there is nothing in the reasoning of this court in Martin,
supra, or under the Act, that operates in the circumstances of
this case to preclude the requested liability apportionment at
trial against the Settling Defendants. Second, they maintain
that the motions judge's decision is contrary to the decisions
of other courts in Canada, which have endorsed the
implementation of Pierringer settlement agreements. Finally,
they assert that the motions judge's decision is also contrary
to the settled policy of Canadian courts to encourage
settlement. I will address each of these submissions in turn.

   (i) Lack of legal impediment to the asserted jurisdiction
       of the Superior Court

[34] In Ontario, the implications of a Pierringer settlement
agreement for the apportionment of liability at trial must be
assessed in light of s. 1 of the Act. That section reads:

   1. Where damages have been caused or contributed to by the
   fault or neglect of two or more persons, the court shall
   determine the degree in which each of such persons is at
   fault or negligent, and, where two or more persons are found
   at fault or negligent, they are jointly and severally liable
   to the person suffering loss or damage for such fault or
   negligence, but as between themselves, in the absence of any
   contract express or implied, each is liable to make
   contribution and indemnify each other in the degree in which
   they are respectively found to be at fault or negligent.

[35] The terms of s. 1 of the Act are mandatory. They require
the court, in a negligence action involving two or more
tortfeasors, to [page182] "determine the degree in which each

2004 CanLII 8541 (ON CA)

of such persons is at fault or negligent" (emphasis added). In contrast to other sections of the Act, in which express reference is made to the "parties" to an action, s. 1 refers to the apportionment of fault or neglect among "persons" found to have caused or contributed to the damages established at a trial. Thus, Ontario courts have been required to determine whether the word "persons", as used in s. 1, includes persons who are not parties to the negligence action in which damages are proven.

[36] In Martin, this court considered the scope of s. 1 of the Act. In that case, the infant plaintiff suffered serious brain damage at birth due to the negligence of two doctors and a nurse and the lack of adequate training of ambulance attendants by the hospital where the infant plaintiff was born. The infant plaintiff and his family members sued the doctors, the ambulance attendants and the hospital in negligence. They did not sue the nurse, who was added as a third party by the doctors. A pre-trial settlement was reached between the plaintiffs and the doctors, with the result that the doctors did not participate at trial. The terms of the settlement agreement were not disclosed to the other defendants, or to the court.

[37] The trial judge in Martin held that the doctors, the nurse and the hospital were negligent and that the hospital was also vicariously liable for the nurse's negligence. He made no finding of negligence against the ambulance attendants. In addition, although he made express findings of negligence against the nurse, he did not determine the degree of her fault. He ultimately concluded that he was unable to determine the respective degrees of fault of those defendants whom he found to be negligent. In his view, the nurse, who was not a named defendant in the main action, was not a "party" to the litigation and the nurse and the hospital could not be held separately negligent.

[38] Section 4 of the Act provides: "If it is not practicable to determine the respective degree of fault or negligence as between any parties to an action, such parties shall be deemed to be equally at fault or negligent." In reliance on s. 4 of

2004 CanLII 8541 (ON CA)

the Act, the trial judge in Martin apportioned negligence in
equal shares among the hospital and the two doctors, thereby
essentially treating the doctors as if they were still parties
to the action. He then granted judgment in favour of the
plaintiffs against the hospital for one-third of the
plaintiffs' total damages but, in recognition of the pre-trial
settlement with the doctors, directed that no judgment should
issue in favour of the hospital against the doctors. [page183]

[39] On appeal to this court, it was argued that the trial
judge's apportionment of liability based on s. 4 of the Act was
in error. In the alternative, the plaintiffs submitted that s.
1 of the Act required the trial judge to determine the degree
of fault of the nurse.

[40] The plaintiffs' appeal was successful on the grounds
that the trial judge erred by applying s. 4 of the Act in
circumstances where the degrees of fault of the hospital and
the two doctors could be determined, and by failing to
correctly apportion liability between the hospital and the
nurse. In the latter respect, this court held that the degree
of fault of vicariously responsible defendants should be
apportioned in order to reflect the contributions of each of
the persons for whom the responsible defendants are vicariously
liable. Accordingly, contrary to the holding of the trial
judge, the apportionment of fault to the hospital should have
reflected both its direct negligence and its vicarious
liability for the nurse's negligence. To arrive at that
apportionment, it was necessary that the nurse's degree of
fault be determined to establish the degree of fault for which
the hospital was vicariously liable.

[41] In commenting on the plaintiffs' alternative argument
regarding s. 1 of the Act, the court considered the import of
the word "persons" as used in that section (at para. 31):

  The trial judge fully considered [the nurse's] involvement
 in the birth of the plaintiff Steven Martin, and made several
 findings of negligence against her, concluding that her
 negligence materially contributed to the damage he suffered.
 However, he did not go on to determine her degree of fault

2004 CanLII 8541 (ON CA)

because he did not consider her to be a party to the action. The plaintiffs submit that because s. 1 refers to persons and not parties, he should have done so, even if she was not a party.

We would not give effect to that submission. There is no basis in s. 1 or anywhere in the Act for a judge to attribute a portion of fault to a non-party. Furthermore, although s. 1 refers to "persons", in any particular action its effect is to impose joint and several liability to the plaintiff only on defendants found at fault or negligent, and not on any other person.

The use of the word "persons" in the section, where "parties" is used elsewhere in the Act, has led to the suggestion that the section is intended to apply to anyone at fault. However, the authorities which have considered the issue have consistently held that the section does not allow the court to apportion any degree of fault to a non-party. Furthermore, this interpretation is consistent with the proper operation of the Act.

(Emphasis added)

[42] The motions judge appears to have regarded Martin as dispositive of the jurisdictional question posed by the parties on the special case. I disagree. With respect, I am of the view that neither the reasoning in Martin nor the language of s. 1 of the [page184] Act precludes the apportionment of fault or neglect at trial to one or more of the Settling Defendants. I reach that conclusion for the following reasons.

[43] First, the Superior Court of Justice enjoys a wide jurisdiction under s. 11 of the Courts of Justice Act, R.S.O. 1990, c. C.43 that encompasses, "all the jurisdiction, power and authority historically exercised by courts of common law and equity in England and Ontario". This jurisdiction cannot be displaced absent clear and unequivocal statutory language: see 80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd., [1972] 2 O.R. 280, 25 D.L.R. (3d) 386 (C.A.) at p. 282 O.R.; and Cook v. Ip (1985), 52 O.R. (2d) 289, 22 D.L.R. (4th) 1 (C.A.) at p. 296

O.R., leave to appeal to S.C.C. refused (1986), 55 O.R. (2d) 288.

[44] There is no express indication in s. 1 of the Act of a legislative intention to limit the jurisdiction of the Superior Court of Justice in the apportionment of liability in negligence cases. To the contrary, s. 1 of the Act is a substantive law provision that confirms the jurisdiction of the Superior Court to apportion liability among concurrent tortfeasors: see Martin at para. 48.

[45] Second, the facts in Martin are markedly different from the facts in this case. In Martin, the nurse was never sued by the plaintiffs and, thus, had never been a party to the main action. Accordingly, she had no opportunity to respond directly to the plaintiffs' allegations of negligence against her, or to their claims for relief. As between the plaintiffs and the nurse, the nurse was a stranger to the action.

[46] In contrast, in this case, the Settling Defendants were sued by the appellants and defended the action. They are aware of the allegations made by the appellants and had an opportunity to resist any potential findings of fault or negligence against them. Similarly, from the outset of the litigation, the appellants were aware of the involvement of the Settling Defendants and, knowing this, chose to voluntarily compromise their claims against them under the Agreements. In those important respects, the Settling Defendants are in a position analogous to that of the doctors, rather than to that of the nurse, in Martin.

[47] It is significant that findings of negligence and an apportionment of fault were made against the doctors in Martin, although they took no part in the trial. It is unclear from the reported decision in Martin whether the doctors consented to such an apportionment, notwithstanding the settlement entered into by them with the plaintiffs. The trial judge indicated in Martin that, had the nurse been a named defendant, he would have assigned equal fault to each of the two doctors, the nurse and the hospital. That apportionment of degrees of fault was ultimately [page185] accepted by this court, without any

2004 CanLII 8541 (ON CA)

suggestion that the trial judge erred by apportioning liability
to the doctors.

[48] Third, Martin is also distinguishable from this case on
another fundamental factual basis. In Martin, the settlement
agreements entered into by the defendant doctors were secret,
and were not disclosed to the other defendants or to the
courts. In contrast, the parties to the Agreements here have
agreed to the disclosure of the Agreements to the trial court
and copies of two of the Agreements have been provided to Kerr,
the single remaining active defendant. Thus, consideration of
the fairness of the settlement with the Settling Defendants,
insofar as it relates to minors, was possible by the court
prior to the approval of the settlement by Mtivier R.S.J. and
it is open to the judge at trial to assess the impact of the
settlement on the Non-Settling Defendants and Settling
Defendants alike.

[49] Fourth, the court emphasized in Martin at para. 34 that
the purpose of the joint and several liability provision
contained in s. 1 of the Act is, "to facilitate full recovery
of the loss for the plaintiff, while at the same time providing
a mechanism for each of those who contributed to the loss to
share the financial responsibility in the proportions of their
respective degrees of fault". In the same paragraph of its
reasons, the court also said that, to accomplish this primary
objective: "The effect of s. 1 of the Negligence Act is to make
all persons sued who caused or contributed to the damage
suffered by the plaintiff jointly and severally liable to the
plaintiff for the damage" (emphasis added). See also the
court's comments in Martin at para. 41 concerning Maxfield v.
Llewellyn, [1961] 3 All E.R. 95, 1 W.L.R. 1119 (C.A.).

[50] Thus, the reasoning in Martin concerning the
apportionment of liability against the nurse and the doctors
was premised on the view that the word "persons" in s. 1 of the
Act is intended to refer to persons sued in the litigation. For
that reason, the determination of the degree of fault or
neglect of the doctors, who had been sued by the plaintiffs,
was permissible, whereas such a determination regarding the
nurse, who had not been sued by the plaintiffs, was not.

2004 CanLII 8541 (ON CA)

[51] It is noteworthy, in this regard, that the court in Martin expressly agreed at para. 47 with the recommendation of the Ontario Law Reform Commission in its 1988 Report on Contribution Among Wrongdoers and Contributory Negligence (Toronto: Ministry of the Attorney General, 1988) at p. 187, that no degree of fault should be apportioned under s. 1 of the Act to an "absent concurrent wrongdoer". As well, the court in Martin stated at para. 48 with reference to s. 1 of the Act: [page186]

It is the only section of the Act which imposes liability, as opposed to apportioning fault. The section is substantive, not procedural. Therefore, when applying the section to any specific action, it is understood that joint and several liability to the plaintiff can and will attach only to a party defendant, although others who may also have been at fault could potentially have been found jointly and severally liable had they been sued by the plaintiff. Because procedurally the section only affects defendants, under this section the court is to apportion degrees of fault only to defendants.

(Emphasis added)

[52] There is no "absent" tortfeasor in this case. Rather, the Settling Defendants are "sued persons" in the appellants' action. Accordingly, although the Settling Defendants will not be participants at trial, a trial apportionment of liability against them is consistent with the reasoning in Martin.

[53] Fifth, the decision in Martin is distinguishable on another, critical ground. The interpretive result in Martin was driven by important policy considerations that do not apply here. The court was concerned in Martin that a finding of a degree of fault in respect of a non-party could have significant consequences for other defendants under s. 1 of the Act. The court stated (at para. 36):

If the fault is apportioned only among the parties, then if there is a non-party who may also have been at fault and

2004 CanLII 8541 (ON CA)

contributed to the damage, a larger percentage of the whole
loss may be attributed to each party, so that the entire loss
is divided for indemnity purposes, and no gap is left. But if
a portion of the fault were attributed to a non-party, or to
a party at fault but with a legal defence such as a
limitation defence, the defendants who are liable to the
plaintiff would be left with no one from whom they could
recover that portion of the claim.

(Emphasis added)

[54] This concern is met by the type of Pierringer settlement
agreement employed by the appellants and Settling Defendants.
By the terms of the Agreements and their amended pleading, the
appellants have acknowledged and agreed that they will hold the
Non-Settling Defendants accountable for their several liability
only. As well, the Settling Defendants have agreed that the
trial judge may apportion fault or negligence against them,
although they will not take part in the trial.

[55] By reason of these concessions, no risk of a "gap" in
liability arises, in the sense described in Martin, from the
potential apportionment of liability at trial to the Settling
Defendants. As I have said, there is no absent or unknown
tortfeasor in the case at bar, and the appellants have
contractually limited their claims as against both the Settling
Defendants and the Non-Settling Defendants. As a result, if the
Agreements are given effect at trial, any Non-Settling
Defendant against whom fault or neglect [page187] is found will
not be exposed to the risk of an apportionment to them of a
larger percentage of the appellants' total loss, based on joint
liability with the Settling Defendants, than would otherwise
occur, based on their own direct fault.

[56] Finally, Kerr advances an additional compelling reason
to support a liability apportionment at trial against the
Settling Defendants. He asserts that there is a real risk that
none of the Non-Settling Defendants, except himself, will have
the financial means to satisfy any judgment granted against
them. He therefore submits that he may be exposed under the
operation of s. 1 of the Act to the risk of paying damages in

excess of any several shares of damages that might be apportioned against him, because he will be jointly liable under s. 1 for the several liability of any impecunious Non-Settling Defendant. As a result, Kerr wishes to be free to take the position at trial that his exposure to any shortfall in the appellants' recovery of damages occasioned by the insolvency of another Non-Settling Defendant should be reduced by a proportion related to the fault of the Settling Defendants.

[57] Assuming, without deciding, that this argument is available under Ontario law, Kerr will be unable to advance this submission at trial if the trial judge lacks the authority to determine the degree in which the Settling Defendants are at fault or negligent, if at all.

[58] On the basis of all these factors, it is my view that the purpose of s. 1 of the Act is not undermined by the Agreements and no question of potential unfairness or prejudice to any of the parties will arise from the implementation of the part of the settlements that contemplates the apportionment of fault or neglect at trial to the Settling Defendants.

[59] In my view, the reasoning in Martin does not mean that persons who have been sued by a plaintiff and who, therefore, are not strangers to the action, invariably cannot be subject to an apportionment of liability at trial under s. 1 of the Act if they become non-parties to the plaintiff's action by reason of a pre-trial settlement. To the contrary, in my opinion, when a named party defendant invokes the jurisdiction of the court by defending claims of negligence brought against it, and thereafter relinquishes its right to pursue its defence of those claims by voluntarily entering into a pre-trial settlement, that party is a "person" against whom an apportionment of liability may properly be made where, as here, no question of unfairness or prejudice will arise. Such an apportionment, in my opinion, comports with the interpretation of the substance of s. 1 of the Act that was articulated by this court in Martin. In this case, the [page188] absence of unfairness or prejudice is indicated by the fact that the parties active in the litigation consent to, or do not oppose,

2004 CanLII 8541 (ON CA)

an apportionment at trial of fault or neglect, if any, to the Settling Defendants.

(ii) Experience in other provinces with Pierringer agreements

[60] The parties also argue that the motions judge's decision is contrary to the developed experience in other provinces concerning the implementation of Pierringer settlement agreements. They point out that the implementation of settlement agreements of the Pierringer type has been approved by the appellate courts of Alberta and British Columbia, even in the absence of the consent, or the non-opposition, of all parties: see Amoco, supra, and British Columbia Ferry Corp. v. T & N plc, [1995] B.C.J. No. 2116, 27 C.C.L.T. (2d) 287 (C.A.). See also, concerning the assessment of fault against non-parties, Wells v. McBrine (1988), 33 B.C.L.R. (2d) 86, 54 D.L.R. (4th) 708 (C.A.) and the discussion regarding that case by this court in Martin at para. 43.

[61] The motions judge correctly concluded that such decisions should be approached with caution by Ontario courts because the statutory regimes governing the apportionment of negligence vary from province to province. Simply stated, the impact in another province of a Pierringer settlement agreement on the rights of non-settling parties to a lawsuit may have no relevance in Ontario because the applicable statutory regime and the procedural rules of court that govern the forum in which the lawsuit was commenced may be fundamentally different from those that apply in Ontario.

[62] In my view, however, the Amoco decision and similar cases are instructive in this respect: they essentially emphasize that the interests of the administration of justice are not facilitated by requiring the involvement at trial of a litigant for purely procedural purposes where this can be avoided without unfairness or prejudice to the parties. I endorse this proposition.

[63] As observed by this court in Martin at para. 27:

2004 CanLII 8541 (ON CA)

With litigation becoming more and more expensive and numerous
initiatives being taken to reduce the cost of litigation, it
would be counterproductive to interpret the Negligence Act as
requiring the addition of unnecessary parties, purely for
form, in order to obtain a fair and proper apportionment of
fault.

This statement in Martin was concerned with the suggestion by
the trial judge in that case, a suggestion rejected by this
court, that persons for whom a defendant may be found to be
vicariously liable must be added as third parties in order to
support a [page189] finding of vicarious liability against the
named defendant. Nonetheless, it underscores the desirability
of avoiding the joinder or involvement in litigation, for
purely procedural or technical purposes, of persons who are not
otherwise necessary parties.

[64] The conclusion that I have reached regarding the proper
interpretation of s. 1 of the Act and the decision in Martin
avoids this result. I again underscore, as argued by some of
the Settling Defendants in these proceedings, that the
"persons" against whom a finding of contributory fault or
neglect is sought in this case (the Settling Defendants), are
persons who had proper notice of the appellants' allegations
and a full opportunity to respond to them. They voluntarily
elected to terminate their involvement in the litigation on
terms that contemplate that the Non-Settling Defendants will
continue to have the right to seek a trial apportionment of the
Settling Defendants' degree of contributory responsibility, if
any, despite the absence of the Settling Defendants at trial.
Moreover, they have agreed to be discovered, should discovery
of them be sought by the appellants or Kerr. Thus, there is no
suggestion in this case of potential procedural unfairness to
the Non-Settling Defendants. Finally, all active parties to
this litigation either consent, or do not object, to the
apportionment of liability at trial as against the Settling
Defendants. These factors obviate any need for the Settling
Defendants to remain involved in the litigation as passive or
active litigants.

 (iii) Public interest in promoting settlement

[65] Finally, there is an additional, and powerful, reason to support the implementation of the Agreements in this case: the overriding public interest in encouraging the pre-trial settlement of civil cases. This laudatory objective has long been recognized by Canadian courts as fundamental to the proper administration of civil justice: see for example, Sparling v. Southam Inc. (1988), 66 O.R. (2d) 225, 41 B.L.R. 22 (H.C.J.) at p. 230 O.R., referred to with approval by the Supreme Court of Canada in Kelvin Energy Ltd. v. Lee, [1992] 3 S.C.R. 235, 97 D.L.R. (4th) 616 at para. 48; and Ontario New Home Warranty Program v. Chevron Chemical Co. (1989), 46 O.R. (3d) 130, 37 C.P.C. (4th) 175 (S.C.J.) at p. 147 O.R. Furthermore, the promotion of settlement is especially salutary in complex, costly, multi-party litigation. As observed in Amoco at p. 677 D.L.R.:

 In these days of spiralling litigation costs, increasingly
 complex cases and scarce judicial resources, settlement is
 critical to the administration of justice.

[66] The negotiated settlement between the appellants and the Settling Defendants, as recorded in the Agreements and reflected [page190] in the appellants' amended pleading, is in the public interest and the interests of all active parties to the litigation. The implementation of the Agreements, which necessitates an apportionment of liability at trial against the Settling Defendants, will result in the participation of fewer parties at trial and will shorten the duration of the trial. This, in turn, will reduce the legal costs of the parties and permit the efficient use of judicial and court resources. As well, and importantly, the implementation of the Agreements is in the interests of all the defendants to the action. The interests of the Settling Defendants are furthered by the release contained in the Agreements and the potential liability of the Non-Settling Defendants is significantly limited under the bargain made by the appellants.

[67] I conclude that Pierringer settlement agreements, of the type employed in this case, should be supported in circumstances where, as here, the fairness of the settlement is

2004 CanLII 8541 (ON CA)

unchallenged and prejudice arising from the full implementation
of the settlement has not been alleged or shown. Cases of this
kind cannot be rendered "unsettleable", for all practical
purposes, without just and substantive cause. Such cause does
not arise in the case at bar.

(iv) Other relevant factors

 [68] I wish to comment upon two additional and related
considerations arising in these proceedings. Kerr argued before
this court that the trial judge in this action would be faced
with a most difficult, if not impossible, task if required to
determine the Non-Settling Defendants' several share of
liability without being in a position to make the same
determination concerning the responsibility, if any, of the
Settling Defendants for the appellants' losses.
Correspondingly, he asserted that the determination of his
share of liability without regard to the Settling Defendants'
contributory responsibility would be manifestly unfair.

 [69] I agree with both of these submissions. The appellants'
allegations, if proven, will make Kerr, the other Non-Settling
Defendants and the Settling Defendants concurrent tortfeasors.
The liability of the Non-Settling Defendants, however, will be
limited to their several liability, and their joint liability
with each other, in accordance with the contractual concessions
made by the appellants in the Agreements. In these
circumstances, it is difficult to conceive how the several
liability of the Non-Settling Defendants could properly and
justly be determined by the trial judge without regard to the
proportionate fault or neglect of the Settling Defendants.
[page191]

 [70] In some ways, this is analogous to the apportionment of
vicarious liability addressed in Martin. In that case, as I
have said, this court held that the hospital's total liability,
including its vicarious liability, could not be justly
determined without a determination of the degree of fault of
the negligent nurse. Similarly, fairness requires that Kerr's
several share of fault or neglect not be determined in a
vacuum, without consideration of the several liability of all

2004 CanLII 8541 (ON CA)

other proven tortfeasors. Were it otherwise, Kerr could be exposed at trial to the potential risk of being required to pay damages to the appellants for part of the Settling Defendants' several shares of liability, claims to which, as Kerr properly points out, have been compromised and released by the appellants under the Agreements.

## V. DISPOSITION

 [71] For the reasons given, I would allow the appeals, set aside the order of the motions judge, and answer the question posed on the special case as follows: the Superior Court has jurisdiction, in the circumstances of this case, to determine whether and to what extent any fault or neglect of the Settling Defendants caused or contributed to the damages alleged by the appellants, although the Settling Defendants will not be parties to the action at trial. As acknowledged by the parties, this is not an appropriate case for an award of costs.

Appeal allowed.

# TAB 6

its discretion in finding that an award of one million dollars for Wilburn's physical and psychiatric disorders is excessive.

## CONCLUSION

The district court erred in excluding the opinion testimony of lay witnesses. A judgment as a matter of law must be reversed if the insufficiency of the evidence is attributable to the district court's evidentiary rulings.

The district court properly granted the motion for a new trial on liability, however, for a different reason than asserted by the district court. Expert testimony was not required to establish whether Captain Hearn was negligent in the disconnection of the Samson line; rather, this was only one of several theories alleged by Wilburn. The failure to utilize special verdicts regarding the basis for the jury's findings precludes us from determining whether this was the theory adopted by the jury in reaching its verdict. Similarly, several theories of unseaworthiness were alleged. Because at least one of the theories of unseaworthiness was beyond the common knowledge of the jury, the use of a general verdict makes it impossible for us to decide which theory of liability persuaded the jury. Accordingly, we must affirm the order granting a new trial.

The evidence was also sufficient to withstand a motion for a judgment as a matter of law on the question whether Wilburn's injuries limited his future earning capacity because of his fear of performing the duties of a barge captain on a coastwise voyage during a storm. We conclude, however, that the district court did not abuse its discretion in granting a motion for a new trial because the jury's award of one million dollars for lost future earnings far exceeded the difference between the pay of an AB tankerman and that of a barge captain.

The record also supports the district court's exercise of its discretion to grant a motion for a new trial regarding the award of one million dollars to compensate Wilburn for his physical and psychological injuries. This amount appears to be excessive in light of the fact that his physical injuries do not preclude him from performing his duties as an AB tankerman and his psychological condition has significantly improved.

Upon remand, the district court is directed to enter an order vacating the judgment as a matter of law on the issue of liability and the demand for damages for lost future earnings.

AFFIRMED in part, REVERSED in part, with directions.



Beverly **WILCHER**; Sharon Smith; Michael Danylo; Cornelius Skinner, on behalf of themselves and all others similarly situated; The Wilmington Fire Fighters Association, Local 1590, Appellants,

v.

**CITY OF WILMINGTON**; James A. Sills, in his official capacity as Mayor of the City of Wilmington; James T. Wilmore, Sr., individually and in his official capacity as Chief of Fire for the City of Wilmington; Clifton E. Armstead, individually and in his official capacity as Deputy Chief of Fire for the City of Wilmington; S.A. Wayne Crosse, in his official capacity as Director of Personnel for the City of Wilmington; William J. Yanonis, individually and in his official capacity as Deputy Director of Personnel for the City of Wilmington,

SODAT–Delaware, Inc., Third–Party Defendant.

No. 96–7276.

United States Court of Appeals, Third Circuit.

Argued Jan. 28, 1997.

Decided March 17, 1998.

Firefighters brought class action against city and city officials under § 1983 and Dela-

ware invasion-of-privacy law, challenging drug testing policy requiring firefighters to give urine specimens under direct supervision of monitor. City brought third-party claim against private corporation which performed drug screening, and corporation cross-claimed against city and officials. The United States District Court for the District of Delaware, Joseph J. Farnan, J., entered judgment for city and officials, 891 F.Supp. 993, and denied firefighters' motion for reargument and new trial, 924 F.Supp. 613. Firefighters appealed. The Court of Appeals, Roth, Circuit Judge, held that: (1) city and firefighters did not reach enforceable agreement that city would discontinue its use of direct-observation procedure; (2) direct-observation method was reasonable under Fourth Amendment; (3) firefighters waived right to jury trial on Fourth Amendment claim; and (4) District Court's finding that drug-testing method was reasonable under Fourth Amendment did not preclude finding that it was invasion of privacy under Delaware law.

Order accordingly.

**1. Federal Courts** ⟜13.5

Issue of whether drug testing method violated firefighters' collective bargaining agreement (CBA) with city was not rendered moot by city's agreement to at least temporarily discontinue using method; city explicitly reserved its right to use method in the future, and city never conceded impermissibility of method under CBA.

**2. Labor Relations** ⟜416.8

Issue of whether drug testing method violated firefighters' collective bargaining agreement (CBA) with city was not properly before district court; firefighters never raised CBA in pleadings, and firefighters had not yet exhausted their administrative remedies, such as arbitration.

**3. Compromise and Settlement** ⟜2

As general rule, Court of Appeals encourages attempts to settle disagreements outside litigative context.

**4. Compromise and Settlement** ⟜11

Settlement agreement is contract and is interpreted according to local law.

**5. Compromise and Settlement** ⟜21

District court may enter injunctive relief on party's behalf to enforce settlement agreement when it determines that one of the parties has failed to perform its obligations.

**6. Injunction** ⟜1

Power to grant or deny injunction is firmly within discretion of district court.

**7. Compromise and Settlement** ⟜5(1)

Under Delaware law, city and firefighters did not reach enforceable agreement that city would discontinue its use of private drug-screening corporation's drug testing procedure requiring firefighters to give urine specimens under direct supervision of monitor, where, although parties agreed in principle at pre-trial teleconference to stipulation permanently halting procedure, they did not discuss details of agreement; teleconference represented but one step of complex negotiation between city, firefighters, and corporation.

**8. Contracts** ⟜14

Under Delaware law, criterion for deciding whether contract exists is intention of parties, evidenced by their objective conduct and manifestations.

**9. Contracts** ⟜14

Under Delaware law, parties' subjective intent in irrelevant to whether contract exists.

**10. Contracts** ⟜14

Court's inquiry, in determining whether contract exists under Delaware law, is whether reasonable person would, based upon objective manifestation of assent and all surrounding circumstances, conclude that parties intended to be bound by contract.

**11. Contracts** ⟜15

Test for determining whether contract exists under Delaware law is not simple or mechanical; negotiations typically proceed over time with agreements on some points being reached along the way towards com-

pleted negotiation, and it is when all of the terms that parties themselves regard as important have been negotiated that contract is formed.

## 12. Searches and Seizures ⟺78

Drug testing policy requiring city firefighters to give urine specimens under direct supervision of monitor was reasonable, where monitors refrained from looking at firefighters' genitalia; firefighters's expectation of privacy was diminished due to regulation of their industry and safety concerns, direct observation served government's interest in preventing cheating, it did not significantly intrude on male firefighters' privacy, and, although it significantly intruded on privacy of female firefighters, it was carried out in appropriate and professional manner. U.S.C.A. Const.Amend. 4.

## 13. Federal Courts ⟺755

Reasonableness of search under Fourth Amendment is issue of law over which Court of Appeals exercises plenary review. U.S.C.A. Const.Amend. 4.

## 14. Searches and Seizures ⟺14

Government's collection and testing of employee's urine constitutes "search" under Fourth Amendment. U.S.C.A. Const. Amend. 4.

See publication Words and Phrases for other judicial constructions and definitions.

## 15. Searches and Seizures ⟺24

Although, ordinarily, Constitution requires government to obtain warrant supported by probable cause to search person or his or her property, there are several exceptions to warrant and probable cause requirements. U.S.C.A. Const.Amend. 4.

## 16. Searches and Seizures ⟺23

Under "special needs" analysis, government need not show probable cause or even individualized suspicion for its search, but instead must prove that its search meets general test of reasonableness; under this standard, constitutionality of a particular search is judged by balancing its intrusion on individual's Fourth Amendment interests against its promotion of legitimate governmental interests. U.S.C.A. Const.Amend. 4.

## 17. Searches and Seizures ⟺23

In judging whether search is reasonable, so as to meet "special needs" standard, factors considered are: (1) nature of privacy interest upon which search intrudes; (2) extent to which search intrudes on privacy; and (3) nature and immediacy of governmental concern at issue, and efficacy of means employed by government for meeting that concern. U.S.C.A. Const.Amend. 4.

## 18. Searches and Seizures ⟺26

Expectation of privacy must be legitimate as measured by objective standards for search to satisfy "special needs" constitutionality standard. U.S.C.A. Const.Amend. 4.

## 19. Searches and Seizures ⟺26

Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as legitimate. U.S.C.A. Const.Amend. 4.

## 20. Searches and Seizures ⟺26

Extensive regulation of industry may diminish employee's expectation of privacy, for purposes of determining whether search is reasonable under "special needs" standard. U.S.C.A. Const.Amend. 4.

## 21. Searches and Seizures ⟺26

Safety concerns associated with a particular type of employment, especially those concerns that are well-known to prospective employees, diminish employee's expectation of privacy, for purposes of determining whether search is reasonable under "special needs" standard. U.S.C.A. Const.Amend. 4.

## 22. Searches and Seizures ⟺201

Although reasonableness of search is legal question, the particular character of that search is factual matter. U.S.C.A. Const. Amend. 4.

## 23. Federal Courts ⟺850.1

Trial judge's factual finding is reversible only if clearly erroneous.

## 24. Civil Rights ⟺242(3)

In action challenging drug testing as unreasonable under Fourth Amendment, trial court's factual finding, that drug-testing

monitors directly observed urine collection process in general rather than intentionally observing firefighters' genitalia, was not clearly erroneous in light of nature of testimony from drug-testing corporation's employees, which trial judge chose to credit. U.S.C.A. Const.Amend. 4.

**25. Searches and Seizures ⟜26**

"Compelling interest" does not have same meaning in context of determining whether government has compelling interest in conducting search as it does in other areas of constitutional law; phrase describes interest which appears important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy. U.S.C.A. Const.Amend. 4.

> See publication Words and Phrases for other judicial constructions and definitions.

**26. Searches and Seizures ⟜23**

That there exists less intrusive method of achieving government's goal is not relevant to analysis of whether search is reasonable under Fourth Amendment. U.S.C.A. Const.Amend. 4.

**27. Jury ⟜28(5)**

Firefighters waived their right to jury trial of their claim that city's drug-testing procedure was unreasonable under Fourth Amendment when, after district court expressed its intention to dismiss jurors because there remained no liability questions for them to decide, the sole concern expressed by firefighters' attorney was that district court preserve damages issue for jury trial in future. U.S.C.A. Const.Amend. 4; Fed.Rules Civ.Proc.Rule 39(a), 28 U.S.C.A.

**28. Searches and Seizures ⟜23**
**    Torts ⟜8.5(4)**

Fourth Amendment "reasonableness" standard differed from common law "reasonable person" standard, and district court's finding that city's drug-testing method for city firefighters was reasonable under

Fourth Amendment thus did not preclude finding that drug-testing method was invasion of privacy under Delaware law. U.S.C.A. Const.Amend. 4; Restatement (Second) of Torts § 652B.

**29. Torts ⟜8.5(2)**

Under Restatement (Second) of Torts, as adopted by Delaware law, plaintiffs can prove common law invasion of privacy if they show that defendants intentionally intruded on plaintiffs' physical solitude or private affairs or concerns in such manner that reasonable person would find highly offensive. Restatement (Second) of Torts § 652B.

**30. Constitutional Law ⟜18**

State may provide its citizens with greater protection of their individual rights than does federal constitution.

**31. Federal Courts ⟜374**

District court cannot, a fortiori, apply federal standard of law to cause of action grounded in the common law of state in which it sits.

———————

Teresa C. Fariss (Argued), Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Appellants.

John W. Morgan (Argued), City of Wilmington Law Department, Wilmington, DE, for Appellees.

Bruce C. Herron (Argued), Sawyer, Akin & Herron, Wilmington, DE, for Third–Party Defendant.

Before: BECKER, Chief Judge, and ROTH, Circuit Judges, and ORLOFSKY,[1] District Judge.

## OPINION OF THE COURT

ROTH, Circuit Judge:

In this appeal, we are asked to determine whether the City of Wilmington's method of testing firefighters for drug use violates their rights under the Fourth Amendment. We will affirm the district court's conclusion that

———————

1. Honorable Stephen M. Orlofsky, United States District Court Judge for the District of New Jersey, sitting by designation.

it does not. Nevertheless, we will remand the case for reconsideration of the state law invasion of privacy claim.

Beverly Wilcher, Sharon Smith, Michael Danylo and Cornelius Skinner are Wilmington firefighters. Along with the Wilmington Fire Fighters Association (WFFA), they brought this class action on behalf of all firefighters in the city. The defendants are the City of Wilmington, Mayor Sills (in his official capacity), James T. Wilmore (individually and in his capacity as Fire Chief), Clifton Armstead (individually and in his official capacity as Deputy Fire Chief), Wayne Crosse (in his official capacity as Director of Personnel for Wilmington), and William Yanonis (individually and in his official capacity as Deputy Director of Personnel). In addition, the firefighters sued SODAT–Delaware, Inc., the drug testing company that performs the tests for the City of Wilmington. The firefighters sought injunctive relief and damages under 42 U.S.C. § 1983 and damages for "invasion of privacy" under the state's tort law.

The district court granted summary judgment in favor of the individual defendants on the ground that they were entitled to qualified immunity and in favor of the SODAT defendants on the ground that SODAT was not a state actor. The district court then held a three-day trial. Two days into the trial, the plaintiffs apprised the district court of this Court's statement in *Bolden v. SEP-TA,* 953 F.2d 807, 822–23 n. 23 (3d Cir.1991), that reasonableness under the Fourth Amendment was an issue of law. Concluding that there were no remaining factual issues for the jury to decide, the district court, with the plaintiffs' acquiescence, dismissed the jury. The court then decided against the plaintiffs on the merits of their Fourth

Amendment claim. *See Wilcher v. City of Wilmington,* 891 F.Supp. 993 (D.Del.1995). The district court also concluded that plaintiffs could not prevail on their state law invasion of privacy claim. The district court eventually elaborated on its findings in a memorandum opinion rejecting the plaintiffs' motion for reargument and for a new trial. *See Wilcher v. City of Wilmington,* 924 F.Supp. 613 (D.Del.1996).

[1, 2]  The firefighters have appealed on several grounds. First, they cite as error the district court's failure to enter an injunction permanently prohibiting the City from using the direct observation method in its urine collecting, despite the fact that during a pre-trial teleconference the City had tentatively agreed to such an arrangement. Second, they dispute the district court's conclusion that direct observation of urine collection is reasonable under the Fourth Amendment. Third, they appeal the district court's determinations regarding qualified immunity and state action. Fourth, they urge that, in denying the plaintiffs a jury trial, the district court misapplied our decision in *Bolden.* Finally, the plaintiffs contend that the district court committed error when it presumed that the reasonableness standard under the Fourth Amendment of the Constitution was equivalent to the reasonable person standard under Delaware tort law.[2]

We will reject all the plaintiffs' grounds for appeal except for the fifth one. The district court did not abuse its discretion when it denied plaintiffs' motion for injunctive relief, following the City's rejection of the tentative agreement. In addition, we agree with the district court that a drug testing monitor's presence in the same room with the firefighter during the collection of that firefighter's

---

2.  The plaintiffs also contend that the district court should not have determined that SODAT's drug testing method was not in violation of the firefighters' Collective Bargaining Agreement with the City. *See Wilcher,* at 17–19 (June 30, 1996 Memorandum). According to the plaintiffs, this issue was moot by the close of the trial because the City had agreed at least temporarily to discontinue using the method. Because the City has explicitly reserved its right to use this procedure in the future, we do not agree that this issue is "moot." Moreover, the City has never

conceded the impermissibility of SODAT's drug testing procedure under the Collective Bargaining Agreement with the firefighters. Nevertheless, we agree that this issue should not have been decided by the district court. The plaintiffs never raised the Collective Bargaining Agreement in the pleadings. Moreover, when the case was tried, plaintiffs had not yet exhausted their administrative remedies, such as arbitration. Therefore, the issue was not properly before the district court, and we will vacate the district court's ruling on it.

urine does not, by itself, constitute an unreasonable search under the Fourth Amendment. As for the plaintiffs' jury trial right, we agree that the district court misread our decision in *Bolden* when it concluded that no factual determinations remained for the jury. Nevertheless, we will not reverse the district court's dismissal of the jury because the plaintiffs clearly acquiesced in this action and thereby waived their jury right under Rule 39(a) of the Federal Rules of Civil Procedure.

However, despite our affirmance of the district court's constitutional analysis, we will remand this case for further proceedings because we believe the court erred in presuming the equivalence of the "reasonableness" inquiry under the Fourth Amendment and the "reasonable person" standard under the common law in an invasion of privacy claim.

## I. FACTS

In July 1990, the City and the Wilmington Fire Fighters Association (the firefighters' union) agreed in a Collective Bargaining Agreement that firefighters would be subject to random drug testing through urinalysis in order to ensure that members of the Fire Department were drug free. Prior to January 1994, the City had employed a procedure whereby a randomly selected firefighter was notified he would be tested when he arrived at the station to begin his shift. A battalion chief would then stay with the firefighter and take him to Occupational Health Services at the Medical Center of Delaware ("Occupational Health") where the test was performed. There, the battalion leader would conduct the firefighter to a "dry room" to produce the urine specimen. The sink in the dry room did not contain water and the toilet bowl contained blue dye to prevent cheating by dilution. The firefighters provided their urine specimens in private; no observer was present in the dry room. Occupational Health's method of collecting urine in this manner followed the guidelines of the National Institute of Drug Abuse.

In November 1993, in an attempt to reduce the cost of random drug testing, the City solicited bids from drug testing facilities. The City did not specifically request a procedure which included visual observation of urine collection. SODAT, a private drug-testing company in Delaware with a primary focus on outpatient drug-counseling, submitted a proposal under which fire-fighters would produce the urine sample "under the direct supervision of counselor/authorized personnel." The City accepted SODAT's bid.

In January 1994, SODAT began drug testing the City's firefighters. The parties have given substantially different descriptions of how the SODAT employees carried out this procedure. The male firefighters, for example, claim that the SODAT monitor looked over the firefighter's shoulder at his genitals while he urinated. SODAT, on the other hand, claims that the monitors stood to the back or the right of the firefighters but did not directly observe their genitalia.

Although SODAT employees are directed to observe the urine collection process by looking in the firefighter's general direction as he or she commences urination, the monitors are neither directed nor expected to focus on the firefighter's genitals. At trial, the SODAT monitors maintained that they had acted within the company's guidelines.

After hearing this testimony, the district court accepted SODAT's portrayal of the monitoring process as accurate. "An examination of the SODAT testing program, both in terms of its design and intent, and more specifically in its execution, demonstrates that no element of the program was intended to invade the privacy of a firefighter in an overly intrusive manner." *Wilcher*, 924 F.Supp. at 617. The district court further stated, "Although [the collection process] may have involved some observation of the genitalia area generally, this observation was only a byproduct of the general observation of the donor." *Id.* at 618. In its earlier memorandum, the district court had also stated:

> On the evidence submitted by the parties, the Court finds that the direct supervision procedure employed by SODAT did not in principal or in fact involve the direct observation of the genital area of the person providing the urine sample.... [SODAT's procedure] does not direct that the SO-

DAT employee undertake to observe the genital area of the individual providing the sample. It only requires supervision during the collection process.

*Wilcher,* 891 F.Supp. at 998. The district court further concluded, "The Court is convinced that the testimony concerning the position of the SODAT employee during the specimen collection is corroborated and demonstrates that genital observation was not the purpose nor the practice of the SODAT policy." *Id.*

Soon after SODAT began testing firefighters, the Deputy Fire Chief was informed of the firefighters' complaints about SODAT's testing method. The City did not, however, request that SODAT stop using the direct observation procedure. The firefighters' union, the Wilmington Fire Fighters Association, filed a first step grievance with the City of Wilmington protesting the direct observation procedure. The Deputy Chief denied this grievance. The WFFA filed a second step grievance, which was denied on February 17, 1994. The WFFA then filed a Notice of Arbitration. The plaintiffs filed suit on March 18, 1994, against the City and the individual defendants. The City impleaded SODAT, and the plaintiffs amended their complaint to include SODAT as a defendant. In an Order and Stipulation filed on April 15, 1994, the parties agreed that the City should direct SODAT to refrain from using direct observation of urination while this case was pending.

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343. We now have jurisdiction under 28 U.S.C. § 1291.

## II. THE "TENTATIVE AGREEMENT"

Before we proceed with our analysis of the constitutional issue, we will address the plaintiffs' contention that the district court erred in not permanently enjoining the City from using SODAT's direct observation method of drug testing. We find no such error.

On April 15, 1994, the parties filed a Stipulation and Order temporarily enjoining the City from further use of the direct observa-

tion method during the pendency of this case. On June 16, the parties participated with the district court in a teleconference, during which the City expressed its willingness to refrain permanently from using the direct observation method. At the end of the teleconference, SODAT's counsel stated that she would draft a stipulation and order to that effect and send it around to the other parties for their signature.

Despite this tentative agreement, the plaintiffs and the City of Wilmington were unable to arrive at an accord on the terms of the stipulation. The City therefore refused to sign it. The plaintiffs then filed a motion with the district court for an order permanently enjoining the City and SODAT from further use of the direct observation method of urine collection. The district court denied this motion without opinion on March 31, 1995. The plaintiffs argue that this denial was error, as the City defendants had reneged on their agreement in bad faith. The defendants reply that the oral agreement was only tentative.

[3–6] As a general rule, we encourage attempts to settle disagreements outside the litigative context. A settlement agreement is a contract and is interpreted according to local law. *See Pennwalt Corp. v. Plough, Inc.,* 676 F.2d 77, 79 (3d Cir.1982). A district court may enter injunctive relief on a party's behalf to enforce a settlement agreement when it determines that one of the parties has failed to perform its obligations. *See Read v. Baker,* 438 F.Supp. 732, 735 (D.Del. 1977), *citing Petty v. General Accident Fire & Life Assurance Corp.,* 365 F.2d 419, 421 (3d Cir.1966). The power to grant or deny an injunction, however, is firmly within the discretion of the district court. *See Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir.1993).

[7–11] According to the City, the district court did not abuse its discretion by denying the injunction because the parties had produced no more than a tentative agreement, unenforceable by law. We agree. Under Delaware law, the criteria for deciding whether a contract exists is the intention of the parties, evidenced by their objective con-

duct and manifestations. *See Industrial America, Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del.1971). The parties' subjective intent is irrelevant. *Id.* Rather, the court's inquiry is "whether a reasonable man would, based upon the 'objective manifestation of assent' and all of the surrounding circumstances, conclude that the parties intended to be bound by contract." *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1101 (Del.Ch.1986). As Chancellor Allen has noted,

This is not a simple or mechanical test to apply. Negotiations typically proceed over time with agreements on some points being reached along the way towards a completed negotiation. *It is when all of the terms that the parties themselves regard as important have been negotiated that a contract is formed.*

*Leeds*, 521 A.2d at 1101 (emphasis added). The Chancellor further stated, "Until it is reasonable to conclude ... that all of the points that the parties themselves regard as essential have been expressly or ... implicitly resolved, the parties have not finished their negotiations and have not formed a contract." *Id.*, at 1102.

These basic principles of contract law lead us to conclude that the district court committed no abuse of discretion in denying injunctive relief. Although the parties agreed in principle at the pre-trial teleconference to a stipulation permanently halting the direct observation procedure, they did not discuss the details of the agreement. Thus, we cannot say that all the essential terms were resolved before or during the teleconference. The teleconference represented but one step of a complex negotiation between three parties (the firefighters, the City, and SODAT). The record indicates that the City made a good faith effort to work with the plaintiffs to draft a stipulation acceptable to everyone. Unfortunately, the parties never reached that stage. This failure, however, does not represent a breach of contract. Accordingly, we will affirm the district court's denial of the permanent injunction.

## III. THE CONSTITUTIONALITY OF DIRECT OBSERVATION

[12, 13] The gravamen of the plaintiffs' complaint is that the direct observation method of urine collection violates the firefighters' right under the Fourth Amendment, as incorporated by the Fourteenth Amendment, to be free from unreasonable searches and seizures. The district court held that the direct observation method, as executed by SODAT, did not constitute an "unreasonable" search. Because the reasonableness of a search under the Fourth Amendment is an issue of law, we exercise plenary review. *See Bolden*, 953 F.2d at 822–23 n. 23; *Dykes v. SEPTA*, 68 F.3d 1564, 1568 (3d Cir.1995).

[14–17] The Fourth Amendment guarantees the "right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. Amend. IV. It is well established that the government's collection and testing of an employee's urine constitutes a "search" under the Fourth Amendment. *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639 (1989); *Treasury Employees v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390–91, 103 L.Ed.2d 685 (1989). Ordinarily, the Constitution requires the government to obtain a warrant supported by probable cause to search a person or his property. There are, however, several well-established exceptions to the warrant and probable cause requirements. The Supreme Court has explained:

[O]ur cases establish that where a Fourth Amendment intrusion serves special government needs, beyond the normal need for law enforcement, it is necessary to balance the individual's privacy expectations against the Government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context.

*Von Raab*, 489 U.S. at 665–66, 109 S.Ct. at 1390–91. *See also Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987); *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). Under the "special needs" analysis, the government need not show probable cause or even individualized suspicion for its search. Instead, it must

prove that its search meets a general test of "reasonableness." Under this standard, the constitutionality of a particular search " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " *Skinner*, 489 U.S. at 619, 109 S.Ct. at 1414 (*quoting Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). In particular, the Supreme Court's jurisprudence directs us to consider three factors when judging the constitutionality of employee drug tests: (1) the nature of the privacy interest upon which the search intrudes; (2) the extent to which the search intrudes on the employee's privacy; and (3) the nature and immediacy of the governmental concern at issue, and the efficacy of the means employed by the government for meeting that concern. *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

The firefighters do not dispute the reasonableness of compulsory drug testing *per se*. To the contrary, the firefighters have agreed to drug testing in their Collective Bargaining Agreement with the City. Rather, the plaintiffs challenge the City's method of testing, which entails visual observation of the firefighters as they provide their urine samples. This issue has been described as "distinct and clearly severable from those that govern reasonable suspicion testing generally". *National Treasury Employees Union v. Yeutter*, 918 F.2d 968, 975 (D.C.Cir.1990). For this reason, we apply the Fourth Amendment's reasonableness test solely to the direct observation method utilized by SODAT and not to the broader issue of compulsory drug testing. *See id.*[3]

### A. The Nature of the Firefighters' Privacy Interest

[18, 19]  "Reasonableness" entails a three pronged inquiry. First, a court examines the individual's privacy interest upon which the search at issue allegedly intrudes. *See Vernonia*, 515 U.S. at 653–55, 115 S.Ct. at 2391 (1995). This expectation of privacy must be

legitimate as measured by objective standards. "The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.' " *Id.*

The district court properly concluded that firefighters enjoy only a diminished expectation of privacy. "Because they are in a highly regulated industry, and because they had consented to random testing in their collective bargaining agreement, the firefighters had a reduced privacy interest." *Wilcher*, 924 F.Supp. at 618. Plaintiffs now argue on appeal that the firefighting industry is not "highly regulated" and that the firefighters therefore did not have a diminished expectation of privacy.

[20, 21]  Plaintiffs' argument lacks merit. Even though extensive regulation of an industry may diminish an employee's expectation of privacy, *see Policemen's Benevolent Ass'n, Local 318 v. Township of Washington*, 850 F.2d 133 (3d Cir.1988) (police department described as "highly regulated"); *Shoemaker v. Handel*, 795 F.2d 1136 (3d Cir.1986) (upholding law requiring jockeys to submit to breathalyzer and random urinalysis testing), we have never held that regulation alone is the sole factor that determines the scope of an employee's expectation of privacy. It is also the safety concerns associated with a particular type of employment—especially those concerns that are well-known to prospective employees—which diminish an employee's expectation of privacy. Supreme Court precedent demonstrates this principle. In *National Treasury Employees v. Von Raab*, the Court held that a government employee's expectation of privacy depended in part on the nature of his employment and whether it posed an attendant threat to public safety. *See* 489 U.S. at 672, 109 S.Ct. at 1394. Upholding the drug testing of customs officials, the Court explained:

We think Customs employees who are directly involved in the interdiction of illegal drugs or who are required to carry firearms in the line of duty likewise have a diminished expectation of privacy in re-

---

3.  Because it is the method of testing, rather than the fact of testing, which is at issue, we do not find that appellants' post-argument citation to

*Chandler v. Miller*, —— U.S. ——, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), is helpful to our considerations here.

spect to the intrusions occasioned by a urine test.  Unlike most private citizens or government employees in general, employees involved in drug interdiction reasonably should expect effective inquiry into their fitness and probity....  *Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep ... personal information that bears directly on their fitness.* *Id.* (emphasis added).  Customs officials enjoyed a reduced expectation of privacy because of the sensitive nature of their duties and of the information they received.  We have held that railway employees also enjoy a diminished expectation of privacy because of the safety concerns associated with those who operate trains.  *See e.g. Transport Workers' Union, Local 234 v. SEPTA,* 884 F.2d 709, 712 (3d Cir.1988) (random testing of rail operators upheld because of "great human loss" they can cause prior to detection of drug problem).

Certainly, a firefighter with a drug problem poses as great a threat to public safety as does a customs official or a rail operator. A firefighter whose drug use is undetected is a source of danger both to his colleagues and to the community at large.  In addition, the firefighter puts himself at great risk of harm. Since the perils associated with firefighting are well known, we have no trouble concluding that firefighters enjoy a diminished expectation of privacy.  Our inquiry, however, does not end here, as we must balance the firefighters' diminished interest with the character of the search at issue and with the concerns that have propelled that search.

B. *The Character of the Search*

The second factor we must consider is the character of the government's search and the extent to which it intrudes on the employee's privacy.  The Supreme Court has held that the degree of intrusion "depends upon the manner in which production of the urine sample is monitored." *Vernonia,* 515 U.S. at 658, 115 S.Ct. at 2393.  Before we judge the intrusiveness of SODAT's drug testing meth-

od, however, we must first determine what that method actually entails.

At trial and on appeal, both the plaintiffs and the SODAT employees have presented highly divergent pictures of the urine collection process.  The firefighters claim that monitors looked at their genitalia as they urinated.  SODAT and its employees, on the other hand, steadfastly maintain that they did not focus on the firefighters' genitalia during the urine collection process.  Instead, they claim that they looked in the firefighters' general direction to ensure that no tampering was taking place during the production of the urine specimen.

[22–24] Based on the evidence before it, the trial court concluded that SODAT's drug testing procedure involved only the monitors' direct observation of the urine collection process in general and not the intentional observation of the firefighters' genitalia. *Wilcher,* 924 F.Supp. at 617–18.  We accept as accurate the district court's finding of fact concerning the nature of the urine collection process employed by SODAT.  Although the reasonableness of a search is a legal question, the particular *character* of that search is a factual matter.  *Cf. O'Connor v. Ortega,* 480 U.S. 709, 726–729, 107 S.Ct. 1492, 1502–04, 94 L.Ed.2d 714 (factual dispute regarding character of search precluded lower court's grant of summary judgment on Fourth Amendment issue).  As such, the trial judge's factual finding regarding the character of SODAT's drug testing procedure is reversible only if it is clearly erroneous. *See Marco v. Accent Pub. Co., Inc.,* 969 F.2d 1547, 1548 (3d Cir.1992).  In light of the nature of the testimony from the SODAT employees, which the trial judge chose to credit, we cannot say that the district court's finding was clearly erroneous.[4]  Consequently, we will adopt the district court's description of the SODAT procedure as one which entails only incidental observation of a firefighters' genitals.

Having adopted the district court's description of the SODAT drug-testing procedure, we must concede that the direct ob-

---

4. In addition, we note the concession of plaintiffs' attorney at oral argument that she was not

seeking reversal of the trial court's factual findings.

servation method represents a significant intrusion on the privacy of any government employee. Urination has been regarded traditionally by our society as a matter "shielded by great privacy." *Skinner,* 489 U.S. at 626, 109 S.Ct. at 1418. Few cases have dealt with the issue of the specific method used by the government to test its employees for drugs. In *Vernonia School District 47J v. Acton,* the Supreme Court upheld the constitutionality of a mandatory random drug testing program that a school district employed to reduce drug use among its student athletes. The Court described the *Vernonia* drug testing procedure in the following manner:

> The student to be tested completes a specimen control form which bears an assigned number..... The student then enters an empty locker room accompanied by an adult monitor of the same sex. Each boy selected produces a sample at a urinal, remaining fully clothed with his back to the monitor, who stands approximately 12 to 15 feet behind the student. Monitors may (though do not always) watch the student while he produces the sample, and they listen for normal sounds of urination. Girls produce samples in an enclosed bathroom stall, so that they can be heard but not observed.

*Vernonia,* 515 U.S. at 650, 115 S.Ct. at 2389. The Supreme Court concluded that this method of testing was not unreasonable under the Fourth Amendment. "Under such conditions, the privacy interests compromised by the process of obtaining the urine sample are in our view negligible." *Vernonia,* 515 U.S. at 658, 115 S.Ct. at 2393.

Relying on *Vernonia,* the district court stated, "The Court finds the SODAT collection method no more intrusive on the firefighters' privacy than was the high school's drug testing program found to be constitutional in [*Vernonia* ]" *Wilcher,* 924 F.Supp. at 618. The district court further concluded,

"The presence of monitors in the bathrooms with firefighters is similar to the presence of the monitors in *Vernonia,* and even though the monitors may have stood closer than those in *Vernonia,* this close proximity was a result of the collection facilities, in this case a bathroom as opposed to a locker room, and not a more intrusive method." *Wilcher,* 924 F.Supp. at 619.

We agree with the district court insofar as its analogy to *Vernonia* applies to male firefighters. In a world where men frequently urinate at exposed urinals in public restrooms, it is difficult to characterize SODAT's procedure as a significant intrusion on the male firefighters' privacy.[5] Plaintiffs fail to demonstrate how the presence of a monitor in a boys locker room while a student athlete urinates differs significantly from the presence of a monitor in a bathroom while an adult firefighter urinates. Both monitors stand behind the individual providing the urine specimen. Similarly, as the district court found, both monitors observe only the collection process generally and not the particular individual's genitalia. The only difference is the distance between the monitor and the person producing the specimen. We cannot conclude that this difference by itself justifies a determination that SODAT procedure is unreasonable.[6]

We must admit that we are more cautious about the reasonableness of the direct observation method as it applies to female firefighters. We simply cannot characterize the presence of a monitor in a bathroom while a female urinates as an ordinary aspect of daily life. Indeed, *Vernonia* noted with approval the fact that female student athletes provided urine behind a stall as monitors stood outside listening. *Vernonia,* 515 U.S. at 657–58, 115 S.Ct. at 2393. Nevertheless, nothing in *Vernonia* suggests that the presence of a female monitor in a bathroom when an adult female firefighter provides a urine specimen

---

**5.** *See also Dimeo v. Griffin,* 943 F.2d 679, 682 (7th Cir.1991) (noting that "[u]rination is generally a private activity in our culture, though, for most men, not highly private.")

**6.** We note that our conclusion might differ had the district court accepted the firefighters' testimony that SODAT's monitors looked over fire-

fighters' shoulders as they provided their urine specimens. Similarly, we would be much more concerned with a procedure's intrusion on privacy if it required the monitor to stand in front of the firefighter, or if it demanded the direct observation of the firefighter's genitalia.

is *per se* unconstitutional under the Fourth Amendment. Moreover, the facts of this case suggest that SODAT took substantial measures to minimize the intrusion of privacy to female firefighters caused by the direct observation procedure. The district court found that the female monitors stood to the side of the female firefighters and that the monitors did not look at the firefighters' genitalia as they urinated, but rather in their general direction. *Wilcher*, 924 F.Supp. at 617–18. Finally, SODAT provided a nurse-practitioner as a monitor for plaintiff Wilcher when she expressed discomfort with her first female monitor. Thus, although we find SODAT's intrusion of the female firefighters' privacy to be significant, we nevertheless agree with the defendants that SODAT has carried out its testing procedure in an appropriate and professional manner.

## C. *The Governmental Concern*

[25, 26] The third and final component of the "reasonableness" test under the Fourth Amendment is the government's interest, which must be compelling. With regard to this prong, the Supreme Court has observed:

> It is a mistake . . . to think that the phrase 'compelling state interest,' in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a compelling state interest here? Rather, the phrase describes an interest which appears important enough to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy.

*Vernonia*, 515 U.S. at 661, 115 S.Ct. at 2394–95. Thus, "compelling interest" does not have the same meaning in this context as it does in other areas of constitutional law. Moreover, the fact that there exists a less intrusive method of achieving the government's goal is not relevant to the Court's reasonableness analysis under the Fourth Amendment. *Vernonia*, 515 U.S. at 663–65, 115 S.Ct. at 2396. *See also Skinner*, 489 U.S. at 629 n. 9, 109 S.Ct. at 1420 n. 9;

*Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983).

In this case, we do not review the constitutionality of drug-testing *per se*, but rather, the procedure by which firefighters are tested. According to the City and to SODAT, visual observation is necessary to prevent cheating. At trial, the defendants' expert, Dr. Closson, testified that visual monitoring is necessary to catch employees who attempt to fool the test by substituting someone else's urine or adding a chemical adulterant to their own urine.

On appeal, the plaintiffs argue that cheating can be detected by testing the urine's temperature since substitutes make the specimen colder than it should be. According to Dr. Closson, a forensic toxicologist, cheaters still can avoid detection by warming substitute urine through a heating pack hidden on their body, or by keeping the urine close to their body so that it takes on the body's temperature. Closson further maintained that direct observation was the most accurate collection method for ensuring the integrity of a urine sample. Finally, Closson testified that direct observation procedures are used by the New York City Police Department, the New York City Department of Corrections, and several other New York agencies.

Like the district court, we find the defendants' expert testimony persuasive. Cheating is a significant concern. The City understandably wishes to take as many steps as possible to eliminate potential violations of the drug testing program. The plaintiffs argue that the cheating described by Dr. Closson is unlikely, as Wilmington firefighters do not receive notice that they are to be tested until the day of the test, and they remain in the company of a superior officer from the moment they are notified of the test until the time that they actually provide their urine specimen. Although this argument is strong, it does not prove that the incidences of cheating, described by Dr. Closson, are impossible or even implausible. Although such cheating calls for fairly sophisticated equipment, it is possible for a firefighter with a drug problem to carry a catheter or an artificial bladder taped to his body on the days following drug use, just in case he is

tested on that day. Indeed, Dr. Closson stated that cheating has been known to take place within the New York agencies, which use the direct observation method.

Under Supreme Court jurisprudence, the City of Wilmington need not wait for a cheating problem to develop in order to justify its use of direct observation. In *Von Raab*, for example, Justice Scalia noted that the Supreme Court upheld random mandatory drug testing of customs officials, even though there existed no evidence of a history of drug abuse among those government employees. *See Von Raab*, 489 U.S. at 679, 109 S.Ct. at 1397–98 (Scalia, dissenting). Moreover, the fact that there exists a less intrusive method of achieving the government's goal is not relevant to the Court's Fourth Amendment analysis. *Skinner*, 489 U.S. at 629 n. 9, 109 S.Ct. at 1420 n. 9; *Illinois v. Lafayette*, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983).

Finally, we do not agree with the plaintiffs' argument that SODAT renders its direct observation procedure ineffective (and thereby unnecessary) by directing monitors not to look at the firefighters' genitals. Certainly, the mere presence of a monitor in the room where the firefighter is urinating deters a would-be-cheater from substituting or adulterating his own urine sample. Thus, we must agree with the district court that the direct observation procedure serves the government's interest of preventing cheating on drug tests.

Because we find that SODAT's direct observation method, as described in the district court's findings of fact, meets the three elements of the Fourth Amendment reasonableness test, we hold that the plaintiffs' Fourth Amendment rights have not been violated.[7] The City's significant interest in preserving the integrity of its firefighters' drug tests outweighs their expectations of privacy. With regard to the male firefighters, the

conditions created by SODAT do not differ significantly from the conditions present in an ordinary public restroom. As for the female firefighters, we note the district court's finding that SODAT has taken several steps to minimize the potentially intrusive effects of having a person present in the same room during the collection of a female firefighter's urine. So long as SODAT's monitors refrain from looking at the firefighters' genitalia, its direct observation procedure remains within the boundaries of a constitutional search. Accordingly, the district court did not err when it ruled in the defendants' favor on the issue of constitutionality under the Fourth Amendment.[8]

## IV. WAIVER OF JURY TRIAL

[27] Two days into the trial, the plaintiffs brought to the district court's attention our statement in *Bolden v. SEPTA* that reasonableness under the Fourth Amendment was an issue to be decided by the judge. *See Bolden*, 953 F.2d at 822. Based on its reading of *Bolden*, the district court, with plaintiffs' agreement, dismissed the jury. Plaintiffs now claim that this was error and that the district court violated their right to a jury trial. We reject this argument as lacking merit. Although plaintiffs had a right to a jury trial, they waived that right when they acquiesced in the district court's dismissal of the jury.

Rule 39(a) of the Federal Rules of Civil Procedure states:

When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury unless (1) *the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury or* (2) *the*

---

7. We note that the D.C. Circuit has come to the opposite conclusion with regard to this issue. *See Piroglu v. T.R. Coleman*, 25 F.3d 1098 (D.C.Cir.1994); *National Treas. Employees v. Yeutter*, 918 F.2d 968 (D.C.Cir.1990). These cases, however, were decided prior to the Supreme Court's decision in *Vernonia*.

8. Because we affirm the district court's disposition of plaintiffs' Fourth Amendment claim, we need not review either the district court's determination that SODAT was not a state actor, or its conclusion that the City defendants, as sued in their individual capacities, were entitled to qualified immunity.

court upon motion or its own initiative finds that a right of trial by jury of some or all of those issues does not exist under the Constitution or statutes of the United States.

Fed.R.Civ.P. 39(a) (emphasis added). This Court has stated that once a party makes a timely demand for a jury trial, that party subsequently waives that right when it participates in a bench trial without objection. *See Cooper v. Loper*, 923 F.2d 1045, 1049 (3d Cir.1991). Numerous courts have adopted this position. *See generally* 5 James Wm. Moore et al., *Moore's Federal Practice*, ¶ 39.03 n. 5–6 (2d ed.1988) (consent can be inferred from conduct of parties or counsel). *See also Royal American Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011 (2d Cir. 1989) (plaintiff waived right to jury trial in securities action by participating in bench trial without objection); *Pope v. Savings Bank of Puget Sound*, 850 F.2d 1345, 1355 (9th Cir.1988) (counsel's agreement with court's announced intent to dismiss jury, as well as actual knowledge that jury was being discharged, constituted waiver of jury trial right under Rule 39(a)).

Based on these principles, we find that the plaintiffs waived their jury trial right under Rule 39(a). On the third day of trial, the plaintiffs' attorneys submitted a letter to the district court notifying it that under *Bolden* the issue of reasonableness under the Fourth Amendment was a legal issue for the court. In response to this letter, the trial judge stated his intention to dismiss the jurors because there remained no liability questions for them to decide. The plaintiffs' counsel objected to this course of action only insofar as damages were concerned. The court agreed that, should the plaintiffs prevail on any of the liability questions, he would either

recall the jury or assemble a new one to hear evidence relating to damages.

Based on the dialogue between the district judge and the plaintiffs' attorney, we conclude the plaintiffs waived their jury trial right under Rule 39(a). The sole concern of the plaintiffs' attorney was that the trial court preserve the damages issue for a jury trial in the future. She did not argue that the plaintiffs were entitled to a jury on the invasion of privacy claims. Nor did she argue that the plaintiffs were entitled to a jury verdict on the factual aspects of their Fourth Amendment claim (such as whether the SO-DAT employees actually looked at the firefighters' genitals while they urinated). Hence, whatever rights the plaintiffs had, their counsel waived when she explicitly agreed with the district court's decision to dismiss the jury.[9]

V. FOURTH AMENDMENT "REASON-ABLENESS" VS. THE STATE LAW "REASONABLE PERSON" STANDARD

[28, 29] Finally, we will reverse the district court's ruling insofar as it equated the Fourth Amendment "reasonableness" standard with the much different common law "reasonable person" standard. Invasion of privacy is a tort claim under state law. Delaware adopted the Restatement of Tort's definition of this claim in *Barbieri v. News-Journal Co.*, 189 A.2d 773, 774 (Del.1963). Under the Restatement, plaintiffs can prove a common law invasion of privacy if they show that defendants intentionally intruded on the firefighters' physical solitude or private affairs or concerns in such a manner that a reasonable person would find "highly offensive." (*Restatement (Second) of Torts*, § 652B (1977)). *See also Barker v. Huang*, 610 A.2d 1341, 1350 (Del.1992).

---

**9.** Although the plaintiffs waived their jury trial rights, we nevertheless note that the district court misapplied our statement in *Bolden* when it concluded that there were no factual issues for the jury to decide. The fact that reasonableness under the Fourth Amendment is a legal issue does not make *all* issues under the Fourth Amendment legal in nature.

For example, in *Dykes v. SEPTA*, 68 F.3d 1564, 1568 (3d Cir.1995), we addressed a claim that SEPTA had violated its own drug-testing policy

by testing the plaintiff without reasonable suspicion. Reiterating our statement in *Bolden*, we held that the specific question of whether SEPTA had reasonable suspicion to test the plaintiff (i.e. evidence that he might be using drugs) was factual. *See* 68 F.3d at 1567. Thus, our statement in *Bolden* applied only to the ultimate determination of whether SODAT's drug testing procedure qualified as "reasonable" under the Fourth Amendment, not to any determination of the factual elements of that procedure.

The district court concluded that since it had ruled against plaintiffs on their constitutional claim, it could not possibly find in their favor on their state law invasion of privacy claim. "Even assuming that the monitors intruded upon the firefighters' solitude, the Court has determined that the collection procedures used by SODAT were reasonable under constitutional principles." *Wilcher*, 924 F.Supp. at 619.

**[30, 31]** The district court's assumption that "reasonableness" under the Fourth Amendment is analogous to a "reasonable person" standard under state common law is erroneous. A state may provide its citizens with greater protection of their individual rights than does the federal constitution. For example, in *Kelley v. Schlumberger Technology Corp.*, 849 F.2d 41 (1st Cir.1988), the court struck down a drug testing procedure because it violated the state constitution. Moreover, it is beyond argument that a district court cannot, *a fortiori*, apply a federal standard of law to a cause of action grounded in the common law of the state in which it sits. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). Hence, the trial court incorrectly concluded, as a matter of law, that a reasonable Delawarean could not find the drug testing procedure "highly offensive," simply because the test might have passed muster under the Fourth Amendment.[10] We will therefore remand this issue to the district court to determine whether the "reasonable person" standard under Delaware common law would find the practices employed by SODAT "highly offensive."[11]

---

10. The district court also dismissed the plaintiffs' invasion of privacy claims because, "the 'intrusion into physical solitude' claimed by the Plaintiffs resulting from the direct observation method was consented to by written contract." *Wilcher*, 924 F.Supp. at 619. We find the court's statement on this matter puzzling, as the court has cited no portion of the Collective Bargaining Agreement in which the firefighters actually *consented* to such a method of drug testing.

11. We know of no Delaware case that has discussed or been presented with this issue. We do not predict at this juncture what the Delaware Supreme Court would do if presented with this issue. *Cf. Epstein Family Partnership v. Kmart*

## VI. CONCLUSION

Based on the foregoing discussion, we will affirm the district court's ruling on the plaintiffs' constitutional claim. So long, at least, as the SODAT employees continue to employ the safeguards discussed in Part III, their direct observation method does not violate the Fourth Amendment.

In addition, we will affirm the district court's dismissal of the jury because the plaintiffs waived their jury trial right when they acquiesced on the record to the dismissal. Moreover, as we note in footnote 1, we will vacate the district court's holding that SODAT's drug testing procedure was permissible under the Collective Bargaining Agreement. Finally, we will vacate the dismissal of the state law invasion of privacy claim and remand this case to the district court for reconsideration of the state law issues.



**Lewis W. WETZEL, Appellant,**

**v.**

**Rose TUCKER, Individually and in her capacity as a Luzerne Co. Commissioner; Frank P. Crossin, Individually and in his capacity as Luzerne Co. Commissioner; Peter S. Butera, Individually and in his capacity as a Director of the Northeastern PA Hospital and Edu-**

*Corp.*, 13 F.3d 762, 765 (3d Cir.1994) (if state court has not ruled on issue, federal district court must predict how it would decide issue). Moreover, the fact that direct observation method passes muster under the Fourth Amendment certainly may be raised by the City and SODAT in defense of the invasion of privacy claim. We simply hold that a federal district court cannot presume that a state's common law tort standard and a constitutional balancing test would reach the same result when applied to the same set of facts. The reasonableness of a procedure under the Fourth Amendment may be *relevant* to the inquiry under state law, but it is not necessarily dispositive of the state law claim.

# TAB 7

Westlaw.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

H

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
D. Delaware.
In re WASHINGTON MUTUAL, INC., et al.,[FN1]
Debtors.

> FN1. The Debtors in these chapter 11 cases
> along with the last four digits of each Debt-
> or's federal tax identification number are: (i)
> Washington Mutual, Inc. (3725); and (ii)
> WMI Investment Corp. (5395). The Debtors'
> principal offices are located at 1201 Third
> Avenue, Suite 3000, Seattle, Washington
> 98101.

No. 08–12229 (MFW).
Feb. 24, 2012.

*FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND ORDER CONFIRMING THE SEVENTH
AMENDED JOINT PLAN OF AFFILIATED
DEBTORS PURSUANT TO CHAPTER 11 OF THE
UNITED STATES BANKRUPTCY CODE*

MARY F. WALRATH, Bankruptcy Judge.

**\*1** Washington Mutual, Inc. and WMI Investment
Corp., as debtors and debtors in possession (collec-
tively, the "*Debtors*"), having proposed and filed with
the United States Bankruptcy Court for the District of
Delaware (the "Court") the *Seventh Amended Joint
Plan of Affiliated Debtors Pursuant to Chapter 11 of
the United States Bankruptcy Code,* dated December
12, 2011 [D.I. 9178] (the "*Filed Plan*"), as has been
and may be further modified, including, without lim-
itation, pursuant to that certain (1) Modification of
Seventh Amended Joint Plan of Affiliated Debtors
Pursuant to Chapter 11 of the United States Bank-
ruptcy Code, dated January 9, 2012 [D.I. 9365] (the

"*First Plan Modification* "). (2) Second Modification
of Seventh Amended Joint Plan of Affiliated Debtors
Pursuant to Chapter 11 of the United States Bank-
ruptcy Code, dated January 12, 2012 [D.I. 9400] (the
"*Second Plan Modification* "), and (3) Third Modifi-
cation of Seventh Amended Joint Plan of Affiliated
Debtors Pursuant to Chapter 11 of the United States
Bankruptcy Code, dated February 16, 2012 [D.I.
9697] (the "*Third Plan Modification* " and, together
with the First Plan Modification and the Second Plan
Modification, the "*Plan Modifications* " and, collec-
tively with the Filed Plan, the "*Plan* ")[FN2]; and the
Court having entered, pursuant to, *inter alia,* section
1125 of the Bankruptcy Code and Bankruptcy Rule
3017(b), after due notice and a hearing, an order, dated
January 13, 2012 [D.I. 9414] (the "*Disclosure State-
ment Order* "), approving the Disclosure Statement,
establishing procedures for the solicitation, voting,
and tabulation of votes on and elections with respect to
the Plan, approving the forms of ballots, master bal-
lots, and election forms used in connection therewith,
and scheduling the Confirmation Hearing; and the
Court having entered (i) an Opinion with respect to the
Sixth Amended Plan [D.I. 6528] (the "*January
Opinion* ") and a related Order [D.I. 6529] (the
"*January Order* "); and the Court having entered an
Opinion with respect to the Modified Sixth Amended
Plan [D.I. 8612] (the "*September Opinion* ") and a
related order [D.I. 8613] (the "*September Order* ");
and the following documents having been filed by the
Debtors in support of or in connection with confirma-
tion of the Plan:

> FN2. Capitalized terms used but not defined
> herein shall have the meanings ascribed to
> them in the Plan, the Disclosure Statement
> Order, or the Confirmation Brief (each as
> defined herein), as applicable. A composite
> copy of the Filed Plan and Plan Modifica-
> tions is annexed hereto as *Exhibit A.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

(a) the *Notice of Election of Treatment of Priority Tax Claims,* dated February 13, 2012 [D.I. 9656];

(b) the Plan Supplement;

(c) the Cure Notice;

(d) the Service Affidavits;

(e) the Voting Certifications;

(f) the Goulding Declaration;

(g) *Memorandum of Law in Support of Confirmation of the Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code,* dated February 13, 2012 [D.I. 9665] (the "*Confirmation Brief* "); and

(h) *Stipulation and Agreement Among the Debtors, the TPS Group, the TPS Consortium, the Equity Committee, and JPMorgan Chase Bank, N.A. With Respect to the Debtors' Seventh Amended Plan* [D.I. 9705] (the "*TPS Stipulation* ");

**\*2** and responses or statements in support of the Plan having been filed by the Creditors' Committee [D.I. 9666], the Equity Committee [D.I. 9657], JPMC [D.I. 9660], and Law Debenture Trust Company of New York [D.I. 9654]; and objections to confirmation having been interposed by certain parties, as reflected on the docket of the Chapter 11 Cases and/or on the record of the Confirmation Hearing; and each of the objections having been resolved, overruled, or withdrawn at, prior to, or subsequent to the Confirmation Hearing; and the Court having held the Confirmation Hearing commencing on February 16, 2012; and the appearances of all interested parties having been noted in the record of the Confirmation Hearing; and after full

consideration of the record of the Chapter 11 Cases, including, without limitation, motions, applications and orders in the Chapter 11 Cases, the foregoing documents, and the evidence admitted and arguments of counsel made at the Confirmation Hearing; and after due deliberation and good and sufficient cause appearing therefor; the Court hereby FINDS, DETERMINES, AND CONCLUDES as follows:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. *Findings and Conclusions.* The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Order and the Plan.

B. *Jurisdiction.* This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Confirmation of the Plan and approval of the Global Settlement Agreement are core proceedings pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C. *Judicial Notice.* The Court takes judicial notice of the dockets of the Chapter 11 Cases, the appellate court dockets of any and all appeals filed from any orders entered or opinions issued by the Court in the Chapter 11 Cases, and the following litigations and adversary proceedings: *JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc., et al.,* Adversary Pro. No. 09–50551(MFW) (the "*JPMC Action* "); *Washington*

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

*Mutual, Inc., et al. v. JPMorgan Chase Bank. N.A.,* Adversary Pro. No. 09–50934(MFW) (the "*Turnover Action* "); *Official Commit tee of Equity Security Holders v. Washington Mutual. Inc.,* Adversary Pro. No. 10–50731(MFW) (the "*Equity Committee Adversary Proceeding* "); *Willingham, et al v. Washington Mutual Inc., et al.,* Adv. Pro. No. 10–51297(MFW) (the "*Equity Committee Action to Compel* "); *Broadbill Investment Corp., et al. v. Washington Mutual, Inc.,* Adversary Pro. No. 10–50911(MFW) (the "*Dime Warrant Litigation* ") and *Black Horse Capital Master Fund Ltd., et al. v. Washington Mutual. Inc., et al.,* Adv. Pro. No. 10–51387(MFW) (the "*TPS Action* "), each of which is maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases and such adversary proceedings.

**\*3  D.** *Burden of Proof.* The Debtors have the burden of proving the elements of section 1129 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules by a preponderance of the evidence. With respect to each Debtor and each element of section 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors have met their burden.

**The Chapter 11 Cases**

E. *Chapter 11 Petitions.* On September 26, 2008, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. [D.I. 1, 6] The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In accordance with this Court's Order, dated October 3, 2008 [D.I. 25], the Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). Conf DX 569—Goulding Decl. 17.

F. *Statutory Committees.* On October 15, 2008,

the United States Trustee for the District of Delaware (the "*U.S. Trustee* ") appointed the Creditors' Committee [D.I. 78]. On January 11, 2010, the U.S. Trustee appointed the Equity Committee [D .I. 2130]. Membership on each of the Creditors' Committee and the Equity Committee have been modified or reconstituted from time to time. No trustee has been appointed in the Chapter 11 Cases.

G. By order, dated September 13, 2010 [D.I. 5416], the Bankruptcy Court approved that certain *Stipulation Authorizing the Official Committee of Unsecured Creditors to Bring Certain Causes of Action on Behalf of Debtors' Estate* [D.I. 5410] (the "*UCC Stipulation* "). Pursuant to the UCC Stipulation, during the Debtors' Chapter 11 Cases, the Creditors' Committee was vested with the right to make demands in connection with, commence, litigate, settle or otherwise abandon certain "Assigned Avoidance Actions" (as defined in the UCC Stipulation), including "causes of action related by a factual or transaction nexus to" the Transfers (as defined in the UCC Stipulation). The "Assigned Avoidance Actions" include, without limitation, (i) avoidance actions under chapter 5 of the Bankruptcy Code and other applicable law, and (ii) causes of action (whether for breach of fiduciary duty, corporate waste or otherwise) against current and former officers and directors of WMI and its subsidiaries relating to transfers from WMI to affiliates (including WMB) before the Petition Date. During the pendency of the Chapter 11 Cases, pursuant to the UCC Stipulation, the Creditors' Committee asserted claims and made demands with respect to the Assigned Avoidance Actions. Pursuant to the Plan, any and all Assigned Avoidance Actions not settled or resolved under the Plan are vested in the Liquidating Trust for prosecution by the Liquidating Trustee.

H. *Sixth Amended Plan.* On October 6, 2010, the Debtors filed the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 6, 2010 [D.I. 5548] (as subsequently modified, the "*Sixth Amended*

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Plan* "). Conf DX 2—Sixth Amended Plan; Conf DX 569—Goulding Decl. ¶ 12. The Sixth Amended Plan was premised on the implementation of that certain Amended and Restated Settlement Agreement, dated as of October 6, 2010, by and among the Debtors, JPMC, the FDIC, the Creditors' Committee, and certain creditor constituencies resolving certain claims and causes of action among such parties (the "*Initial Global Settlement Agreement* "). Conf DX 2H—Initial Global Settlement Agreement; Conf DX 569—Goulding Decl. ¶ 12.

**\*4** I. *December Confirmation Hearing.* This Court held a hearing to consider confirmation of the Sixth Amended Plan on December 2, 3, 6 and 7, 2010 (the "*December Confirmation Hearing* "). Upon the conclusion of the December Confirmation Hearing, on January 7, 2011, this Court issued the January Opinion and January Order, which, among other things, found that (i) the Initial Global Settlement Agreement, the integral foundation of the Sixth Amended Plan, and the transactions completed therein, are fair, reasonable, and in the best interests of the Debtors' creditors and the Debtors' chapter 11 estates, Conf DX 265—January Opinion at 2, 60, and (ii) certain modifications to the Sixth Amended Plan, if made, would enable the Sixth Amended Plan to be confirmed. *Id.* at 2. In conjunction with its determination that the Initial Global Settlement should be approved, this Court concluded that (i) the Debtors are not likely to achieve a significantly better result if they were to continue to litigate the claims resolved pursuant to the Initial Global Settlement Agreement, (ii) there are difficulties inherent in collecting on account of the Debtors' potential claims against JPMC and the FDIC Receiver, (iii) the claims resolved pursuant to the Initial Global Settlement Agreement are complex and would be expensive and would cause delay to litigate, and (iv) the Initial Global Settlement Agreement provides a reasonable return in light of the possible results of the litigation resolved by such agreement. *Id.* at 56–60. This Court specifically noted that, "[a]lthough equity interest holders are not likely to get a recovery, the

Court is not convinced that continued litigation, against JPMC and/or the FDIC would change that result." *Id.* at 66–67.

J. On January 7, 2011, this Court entered an opinion concerning the TPS Action wherein this Court granted the defendants' motions for summary judgment and found, among other things, that the Conditional Exchange was automatic and occurred on September 26, 2008 [Adv. Proc. 10–51387, D.I. 179] (the "*TPS Summary Judgment Opinion* "). Conf DX 267—TPS Summary Judgment Opinion. Thus, this Court determined that the prior holders of the Trust Preferred Securities now hold Depositary Shares (as defined in the TPS Summary Judgment Opinion) representing REIT Series, which comprise certain related series of WMI Preferred Shares (as defined in the TPS Summary Judgment Opinion). *Id.* at 13.

K. *Appeals from the January Opinion and TPS Summary Judgment Opinion.* On January 19, 2011, the Equity Committee filed a notice of appeal of that portion of the January Opinion finding that the Initial Global Settlement Agreement satisfies the requisite standards for approval [D.I. 6575]. This action, styled as *Official Commit* tee *of Equity Security Holders v. Washington Mutual, Inc., et al.,* Civil Action No. 11–158 (the "*January Equity Committee Appeal* "), is pending in the United States District Court for the District of Delaware (the "*Delaware District Court* ") as of the date hereof, as, by order, dated February 8, 2011 [D.I. 6703], the Court denied the Equity Committee's motion for a direct appeal to the United States Court of Appeals for the Third Circuit.

**\*5** L. On January 14, 2011, certain of the plaintiffs in the TPS Action filed a notice of appeal of the TPS Summary Judgment Opinion to the Delaware District Court [Adv. Proc. 10–51387, D.I. 182] (the "*TPS Appeal* "). As of the date hereof, the TPS Appeal is pending in the Delaware District Court as Case No. 1:11–cv–00124–GMS. The parties have completed briefing, and the plaintiffs in the TPS Action have

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

requested oral argument [TPS Appeal, D.I. 42]. The Delaware District Court has not yet ruled on this request. On January 15, 2012, the plaintiffs in the TPS Action filed with the Delaware District Court an emergency motion for a stay of the hearing on confirmation of the Plan [TPS Appeal, D.I. 44] and a motion for writ of mandamus [TPS Appeal, D.I. 46], as well as an emergency motion to expedite the hearings on such motions. The Delaware District Court denied all three motions by order, dated January 19, 2012 [TPS Appeal, D.I. 52]. On January 30, 2012, the plaintiffs in the TPS Action filed a notice of appeal from such order [TPS Appeal, D.I. 55], as well as a request for certification of a direct appeal to the United States Circuit Court for the Third Circuit (the "*Third Circuit* " [TPS Appeal, D.I. 55]. Notwithstanding the fact that the Delaware District Court did not grant the motion for direct certification, the plaintiffs in the TPS Action then filed motions in the Third Circuit seeking to stay the Confirmation Hearing, for a writ of mandamus, and for expedited review of such requests. By order, dated February 10, 2012, the Third Circuit denied such requests.

M. *Global Settlement Agreement.* On February 7, 2011, WMI, WMI Investment Corp., JPMC, the FDIC Receiver, FDIC Corporate, and the Creditors' Committee, all of whom were parties to the Initial Global Settlement Agreement, entered into the Second Amended and Restated Settlement Agreement (as amended, the "*Global Settlement Agreement* "). Conf DX 255H, 402, 422—Global Settlement Agreement (as amended). The Global Settlement Agreement incorporates the terms of and mirrors the Initial Global Settlement Agreement, except that it excludes certain creditors who previously were parties to the Initial Global Settlement Agreement and certain non-economic provisions were amended to conform to certain plan-related modifications and in accordance with the January Opinion. *See id.*

N. *Modified Sixth Amended Plan.* On February 8, 2011, the Debtors filed the Modified Sixth Amended

Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated February 7, 2011 [D.I. 6696] (as subsequently modified, the "*Modified Sixth Amended Plan* "), as well as a corresponding disclosure statement [D.I. 7081] (the "*Supplemental Disclosure Statement* "). Conf DX 255—Modified Sixth Amended Plan; Conf DX 253—Supplemental Disclosure Statement. Similar to the Sixth Amended Plan, the Modified Sixth Amended Plan was premised on the Global Settlement Agreement. Conf DX 374—Goulding Deck Supporting Modified Sixth Plan ¶ 19. In addition, the Modified Sixth Amended Plan incorporated modifications consistent with the January Opinion. *Id.* Like the Sixth Amended Plan, the Modified Sixth Amended Plan provided for the Debtors' reorganization, with WMMRC remaining as Reorganized WMI's sole operating entity. *Id.* ¶ 27. WMMRC is a captive reinsurance company that entered into mortgage reinsurance agreements based on mortgage insurance policies on mortgage loans issued by WMB and other affiliates of the Debtors. *Id.;* Conf DX 442—September Opinion at 43. Since the seizure of WMB, WMMRC has operated on a runoff basis in that it has not issued any new policies and is simply collecting premiums and paying claims on the existing policies, *Id.*

**\*6** O. *The July Confirmation Hearing and the Equity Committee's Standing Motion.* Commencing on July 13, 2011 and concluding on July 21, 2011, this Court held a hearing to consider, among other things, confirmation of the Modified Sixth Amended Plan (the "*July Confirmation Hearing* "). On July 12, 2011, on the eve of the July Confirmation Hearing, the Equity Committee filed, under seal, a motion seeking authority to prosecute, on the Debtors' behalf, an action to equitably disallow or, in the alternative, to equitably subordinate certain Claims [D.I. 8179] (the "*Standing Motion* "). At the July Confirmation Hearing, counsel for the Equity Committee requested that the Court take into account the evidence adduced at the July Confirmation Hearing in connection with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

deciding the Standing Motion. During closing arguments at the July Confirmation Hearing, several parties presented argument on the Standing Motion. In addition, on August 10, 2011, the Debtors, the Creditors' Committee, and certain other parties filed objections to the Standing Motion.

P. *September Opinion and Order.* On September 13, 2011, this Court issued the September Opinion and entered the September Order that, among other things (i) found that this Court has jurisdiction to approve the Global Settlement Agreement [September Opinion at 16, 22–23]; (ii) reaffirmed its conclusion that the settlements underlying the Initial Global Settlement Agreement, which were at that time embodied in the Global Settlement Agreement, and all the transactions contemplated therein are fair and reasonable [*id.* at 26, 35, 101]; (iii) ordered that this Court's ruling with respect to the Global Settlement Agreement constitutes the "law of the case" [*id.* at 27]; (iv) overruled objections that the Modified Sixth Amended Plan was not proposed in good faith [*id.* at 73]; and (v) denied confirmation of the Modified Sixth Amended Plan, but identified certain modifications that, if incorporated, would permit confirmation thereof. The September Opinion also granted the Standing Motion with respect to certain equitable disallowance claims, but stayed all proceedings related to the Standing Motion and directed certain parties to participate in mediation (the "*Mediation* ") to explore a possible settlement of the Standing Motion and any issues that remained an impediment to confirmation of a plan of reorganization. *Id.* at 138.

Q. *Valuation.* Pursuant to the September Opinion, and on the basis of the evidence presented at the July Confirmation Hearing, this Court determined that "the value of the existing business of WMMRC (assuming no new business is generated or acquisitions are made) is ... $140 million." Conf DX 442—September Opinion at 45. In addition, this Court determined that Reorganized WMI's total enterprise value is $210 million, taking into account the value of net operating losses ("*NOLs* ") potentially available to Reorganized WMI, including both "the value of the NOLs to the existing WMMRC business" (which the Court determined had a value of $20 million) and the value of "the NOLs that might be able to be used in the event of a future acquisition of a profitable business" (which this Court determined had a value of $50 million). Conf DX 442—September Opinion at 47, 62. This Court's finding as to the value of the NOLs that might be able to be used in the event of a future acquisition of a profitable business was "based on the Court's conclusion that the Reorganized Debtor should be able to raise additional capital and debt over the next twenty years equal to twice the value of its current assets which will be invested in restarting the reinsurance business of WMMRC or acquiring other related businesses." Conf DX 442—September Opinion at 62.

**\*7** R. *Appeals from the September Opinion and September Order.* Several parties filed notices of appeal (the "*September Appeals* ") from the September Opinion and September Order: (i) AAOC,[FN3] with (a) Aurelius [D.I. 8670] filing individually and (b) Appaloosa, Owl Creek and Centerbridge filing jointly [D.I. 8673]; (ii) the Creditors' Committee [D.I. 8726]; (in) the Debtors [D.I. 8785]; (iv) the Equity Committee, which filed a conditional notice of cross-appeal [D.I. 8791]; (v) the WMB Noteholders [D.I. 8679]; (vi) Normandy Hill Capital L.P. ("*Normandy Hill* ") [D.I. 8671]; and (vii) Wells Fargo [D.I. 8771] (collectively, the "*September Appellants* ").

FN3. "AAOC" means each of (a) Appaloosa Management L.P., Appaloosa Investment L.P.I, Palomino Fund Ltd., Thoroughbred Fund, L.P., and Thoroughbred Master Ltd. (collectively, "*Appaloosa* "), (b) Aurelius Capital Management, LP, Aurelius Capital Partners, LP and Aurelius Investment, LLC (collectively, "*Aurelius* "). (c) Owl Creek Asset Management, L.P., Owl Creek I, L.P., Owl Creek II, L.P., Owl Creek Overseas

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Fund, Ltd., Owl Creek Socially Responsible Investment Fund, Ltd., Owl Creek Asia I, L.P., Owl Creek Asia II, L.P., and Owl Creek Asia Master Fund, Ltd. (collectively, "*Owl Creek*"), and (d) Centerbridge Partners, L.P., Centerbridge Special Credit Partners, L.P., Centerbridge Credit Partners, L.P., and Centerbridge Credit Partners Master, L.P. (collectively, "*Centerbridge*") and any other Affiliates of the funds listed in (a) through (d) above that own or, during the Chapter 11 Cases, owned securities issued by and/or have direct or indirect Claims against WMI.

S. *Mediation.* By order, dated October 10, 2011 [D.I, 8780], this Court appointed the Honorable Raymond Lyons, United States Bankruptcy Judge, as mediator (the "*Mediator*"), and directed the following parties to participate in the Mediation: (i) the Debtors, (ii) the Creditors' Committee, (iii) the Equity Committee, (iv) Aurelius, (v) Appaloosa, (vi) Centerbridge, (vii) Owl Creek, (viii) the TPS Consortium and the TPS Group, (ix) the WMB Noteholders, (x) Normandy Hill, (xi) The Bank of New York Mellon Trust Company, N.A., ("*BNY Mellon*"), in its capacity as Indenture Trustee for the Senior Notes, and (xii) the WMI Noteholders Group (as such term is used in the September Opinion) (collectively, the "*Mediation Parties*"); *provided, however,* that Normandy Hill and BNY Mellon were not required to attend the Mediation,

T. The Mediation commenced on October 19, 2011. At status conferences held on November 7, 2011, and on December 8, 2011, this Court granted the Mediator's request for additional time to continue the Mediation. As a result of the Mediation, discussions among the Debtors, the Creditors' Committee, the Equity Committee, Aurelius, Appaloosa, Owl Creek, Centerbridge, and other Creditor constituencies culminated in certain modifications to the Modified Sixth Amended Plan, which are embodied in the Plan and which resolve, among other things, certain

plan-related issues and objections, as well as the Standing Motion,

U. *The Plan.* The Debtors filed the Plan and Disclosure Statement on December 12, 2011. Like the Modified Sixth Amended Plan, the Plan is premised upon and incorporates the terms of the Global Settlement Agreement, which, as discussed above, this Court has already determined, pursuant to both the January Opinion and the September Opinion, to be fair, reasonable and in the best interests of the Debtors' estates. Conf DX 265—January Opinion at 60; Conf DX 442—September Opinion at 26, 35, 101. In addition, as was the case pursuant to the Modified Sixth Amended Plan, pursuant to the Plan, WMI will reorganize around its sole remaining active subsidiary, WMMRC, a mortgage reinsurance company currently operating on a runoff basis. Conf DX 569–Goulding Decl. ¶ 54. However, the Plan incorporates modifications thereto made after the Mediation to resolve the Standing Motion and certain plan-related issues and objections, as well as additional modifications that the Court determined, pursuant to the September Opinion, were required for the Modified Sixth Amended Plan to satisfy the confirmation requirements set forth in the Bankruptcy Code. Conf DX 569—Goulding Decl. ¶¶ 15, 19.

**\*8** V. *The Plan and Related Documents Are Consistent With the September Opinion.* Consistent with the September Opinion, (i) the Plan provides that Postpetition Interest Claims are (a) calculated using the federal judgment rate determined as of the Petition Date (1.95%), and (b) compounded annually; (ii) the form of Liquidating Trust Agreement filed with the Plan Supplement provides that the Liquidating Trustee may be removed by a majority vote of the members of the Trust Advisory Board; (iii) the provisions of the Plan and Liquidating Trust Agreement ensure that the Trust Advisory Board will adequately represent the constituencies of the Liquidating Trust at any given time [FN4]; (iv) the Plan provides that "[t]he individual(s) serving as or comprising the Liquidating Trustee

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, *the payment of which shall be subject to the approval of the court* " (emphasis added); and (v) the Plan provides that fees paid pursuant to Section 41.18 of the Plan must be approved by the Court. *See* Conf DX 442—September Opinion at 24–25, 77–78, 89–90; Conf DX 432A—Plan §§ 1.231; 1.169; 27.12; 41.18; Conf DX 434—Liquidating Trust Agreement §§ 4.1, 6.4, 7.7, 8.2. Accordingly the Plan incorporates modifications resolving each of the areas of concern raised by the Court in the September Opinion.

> FN4. Specifically, the Trust Advisory Board will have an oversight function with respect to the Liquidating Trust and, initially, shall be comprised of ten (10) members, four (4) members solely selected by the Creditors' Committee, four (4) members selected solely by the Equity Committee, one (1) member selected by the Creditors' Committee and approved by the Equity Committee, which approval shall not be unreasonably withheld, and one (1) member selected by HoldCo Advisors, LLC serving in a non-voting *ex officio* capacity,. Conf DX 432A—Plan § 1.231. The composition of the Trust Advisory Board may change only in accordance with the provisions of the Liquidating Trust Agreement *Id.*

W. *The Compromise and Settlement Embodied in the Plan is Fair, Reasonable and in the Best Interests of the Debtors' Estates.* The Plan is the result of extensive arms' length negotiations among the Debtors, the Creditors' Committee, the Equity Committee, and significant Creditor constituencies, Conf DX 569—Goulding Decl. ¶ 33, and, among other things, resolves the Standing Motion and has the full support of the Equity Committee. Conf DX 432—Disclosure Statement at 10. Pursuant to the Plan, all of the September Appeals will be deemed withdrawn, with prejudice, and the Equity Committee will cause the

withdrawal and dismissal, with prejudice, of the January Equity Committee Appeal, the Equity Committee Adversary Proceeding, and Equity Committee Action to Compel. *Id.;* Conf DX 432A—Plan §§ 33.1;41.17.

X. Any attempt to confirm a chapter 11 plan without the compromises and settlements embodied in the Plan would have invited significant confirmation objections by the Equity Committee, among others, including with respect to issues related to the Standing Motion and the effect that such disputes would have with respect to distributions pursuant to any such plan. Conf DX 432—Disclosure Statement at 10. Without addressing the merits, it is beyond doubt that such issues were likely to lead to further contested confirmation hearings, significant delays in confirmation of a plan, and erosion of Creditor distributions. *Id.; see also* Hr'g Tr. 10/6/1183:19–23.

Y. The detrimental effects of further delay in confirmation and consummation of a plan in the Chapter 11 Cases cannot be underestimated. Conf DX 432—Disclosure Statement at 10. As delay in consummation of a plan would have been accompanied by a continued accrual of interest and fees in significant amounts and the attendant depletion of estate assets and increase in total Claims, further delay would have significantly eroded recoveries for the Debtors' junior-most Creditors and stakeholders. *Id.* Unlike the Modified Sixth Amended Plan, the Plan resolves many of the objections and issues that have been or could be raised, regardless of the merits. *Id.* Furthermore, as a result of the compromises and settlements, Reorganized WMI will receive the Senior Notes Release Consideration and the Senior Subordinated Notes Release Consideration in the aggregate amount of $75 million, access to the Credit Facility to be provided by certain members of AAOC, and, to the extent available, Runoff Proceeds having a face value of $10 million, subject to the priority scheme set forth in the documents governing the Runoff Notes, as well as certain potential Litigation Proceeds. *Id.; see also* Notice of Lenders Under the Credit Facility [D.I.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

9671]. Thus, it was a reasonable exercise of business judgment for the Debtors to conclude that the Plan was more likely to result in an expeditious exit from bankruptcy and prevent further deterioration of Creditors' recoveries than any alternative plan. Conf DX 432—Disclosure Statement at 10. The Court finds that the compromises and settlements embodied in the Plan are fair, reasonable, in the best interests of the Debtors' estates and above the lowest level of the range of reasonableness.

**The Solicitation Process**

**\*9** Z. *Adequacy of Disclosure Statement.* Pursuant to the Disclosure Statement Order, entered on January 13, 2012, this Court approved the Disclosure Statement and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and authorized the Debtors to solicit acceptances and rejections of the Plan, as well as certain elections with respect thereto. Conf DX 432B—Disclosure Statement Order. Prior to the transmission of the Disclosure Statement, the Debtors did not solicit acceptances of the Plan by any holder of Claims or Equity Interests. *See* Conf DX 569—Goulding Decl. ¶ 30.

AA. *Solicitation and Notice.* As described in the Voting Certifications, the (i) Disclosure Statement Order, (ii) Confirmation Hearing Notice, (iii) Disclosure Statement (which includes as an exhibit a copy of the Plan), (iv) Ballots, (v) Election Forms, and (vi) Notices of Non–Voting Status (collectively, the "*Solicitation Packages*") were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and the Disclosure Statement Order. *See* Conf DX 570—Klamser Decl. ¶ 11–22; Conf DX 571—Sharp Decl. ¶¶ 11–21; Conf DX 18—Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19—Sharp Decl. for the Sixth Amended Plan ¶ 3.

BB. On January 25, 2012, the Debtors caused the

posting with the Depository Trust Company of a communication to holders of PIERS Claims in Class 16 from Whitebox Advisors, LLC, who had issued an earlier communication to holders of PIERS Claims in Class 16, which earlier communication was included in the Solicitation Packages pursuant to the Procedures Order. Conf DX 571—Sharp Decl. ¶ 19. The second communication of Whitebox Advisors, LLC was served on Class 16 and posted at *www.kccllc.net/wamu. Id.;* Class 16 Letter Service Affidavit.

CC. The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) notice of the Ballot Date: (i) were adequate and sufficient under the circumstances of these Chapter 11 Cases; (ii) provided adequate and sufficient notice of the Ballot Date, the deadline for objecting to confirmation of the Plan, the method of voting, and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims and Equity Interests with a reasonable period of time to make an informed decision to accept or reject the Plan and to make certain elections provided thereunder; (iv) were in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in these Chapter 11 Cases. *See* Service Affidavits; Conf DX 570—Klamser Decl. ¶¶ 11–22; Conf DX 571—Sharp Decl ¶¶ 11–21; Conf DX 18—Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19–Sharp Decl. for the Sixth Amended Plan ¶ 3.

**\*10** DD. With respect to holders of Equity Interests, efforts to ensure that (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) notice of the Ballot Date to such holders gave such holders a reasonable period of time to make an informed decision to accept or reject the Plan and to make certain elections provided thereunder went above and beyond what was required.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

For example, the Disclosure Statement Order, as modified on the record of the Confirmation Hearing, provides that holders of Preferred Equity Interests and Common Equity Interests have until March 7, 2012 to submit elections with respect to the releases set forth in Section 41.6 of the Plan, notwithstanding that the Ballot Date was February 9, 2012 for all holders of Claims and Equity Interests other than holders of Dime Warrants, for whom the Ballot Date is February 29, 2012. Conf DX 431—Disclosure Statement Order ¶¶ 46–47. In addition, on January 13, 2012, the Equity Committee issued a press release recommending that all foreign Equity Interest holders immediately contact their Voting Nominees to request that the Voting Nominee immediately contact KCC to request electronic receipt of the Solicitation Packages and instructions on how to properly process responses. *See* Conf DX 540—Equity Committee Press Release to Foreign Shareholders, dated January 13, 2012 (the "*Foreign Shareholders Press Release* "). The Foreign Shareholders Press Release further (1) provided that all ballots must be returned to the applicable Voting Nominee, not KCC, (2) provided notice of the Ballot Date, (3) provided notice of the February 28, 2012 deadline for submission of elections with respect to the releases set forth in Section 41.6 of the Plan for holders of Preferred Equity Interests and Common Equity Interests (which deadline was subsequently extended, by the Debtors on the record of the Confirmation Hearing, to March 7, 2012), and (4) encouraged holders to avoid delay in returning Ballots. *Id.* The Debtors' efforts in this regard were largely successful, as 96.46% (by dollar amount) of holders of Senior Note Claims, 99.71% (by dollar amount) of holders of Senior Subordinated Notes Claims, 97.22% (by dollar amount) of holders of PIERS, 87.26% (by dollar amount of liquidation preference) of holders of Preferred Equity Interests, and 63.70% (by number of shares) of holders of Common Equity Interests voted on the Plan.

EE. No other or further notice with respect to the Plan or the Confirmation Hearing is required. Based upon the foregoing, the Debtors, the Creditors' Committee, the Equity Committee, and each of their respective successors, predecessors, control persons, members, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, members, managers, shareholders, partners, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the Local Bankruptcy Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of acceptances to the Plan or elections thereunder and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 41.8 of the Plan. Conf. DX 432A—Plan § 41.8.

**\*11** FF. *Voting.* As evidenced by the Voting Certifications, votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the order approving the disclosure statement for the Sixth Amended Plan (the "*Prior Disclosure Statement Order* "), the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules. *See* Conf DX 570—Klamser Decl. ¶¶ 3, 11–24; Conf DX

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

571—Sharp Decl. ¶¶ 3, 9, 11–24; Conf DX 18—Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19—Sharp Decl. for the Sixth Amended Plan ¶ 3.

GG. *Plan Elections.* As set forth in the Voting Certifications, elections made by holders of Claims and Equity Interests pursuant to the Plan were and continue to be solicited, tabulated, and implemented fairly, in good faith, and in a manner consistent with the Plan, the Prior Disclosure Statement Order, the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. *See* Conf DX 570—Klamser Decl. ¶ 11–24, 31–33; Conf DX 571—Sharp Decl ¶ 11–24, 31–35; Conf DX 18—Klamser Decl. for the Sixth Amended Plan ¶ 36; Conf DX 19—Sharp Decl. for the Sixth Amended Plan ¶ 36.

HH. *Plan Supplement.* All materials contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required. *See* Service Affidavits; Conf DX 434—Plan Supplement.

### Compliance with the Requirements of Section 1129 of the Bankruptcy Code

II. *Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).* As required by Bankruptcy Rule 3016, the Plan is dated and identifies the Debtors as proponents. Conf DX 432A—Plan at 1, 108. In addition, the Plan contains provisions consistent with the requirements of sections 1122 and 1123 of the Bankruptcy Code;

(1) *Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).* With the exception of Administrative Expense Claims and Priority Tax Claims, which need not be classified, Article IV of the Plan classifies twenty-three (23) Classes of Claims and Equity In-

terests. Conf DX 432A—Plan Art. IV. The Claims or Equity Interests in each Class are substantially similar to the other Claims or Equity Interests, as the case may be, in each such Class. Conf DX 569—Goulding Decl. ¶ 29. All the Preferred Equity Interests in Class 19 are substantially similar notwithstanding differences in the liquidation preferences on a per share basis between various of the series of Preferred Equity Interests because, among other things, (i) each series of the Preferred Equity Interests is a separately designated series of a single class of WMI preferred stock, and (ii) each of the series of Preferred Equity Interests ranks on parity with each of the others in terms of those aspects of such interests affecting their legal status in relation to the Debtors' assets, namely, their equal standing with respect to priority of payment in the event of a liquidation. *See Order Denying Motion of the Consortium of Trust Preferred Security Holders to Determine Propriety of Proposed Classification of Interests Subject to Treatment Under Class of the Plan of Liquidation,* dated January 11, 2012 [D.I. 9398]; Hr'g Tr. 1/11/2012 at 94:3–11 (denying motion for reclassification filed by certain Trust Preferred Securities holders on the basis that such holders have "the exact same [rights] as the other[ ][holders of Preferred Equity Interests," but stating that "the liquidation preference has to be accounted for, used as the calculation for determining the votes in that class").

**\*12** (2) To the extent that Unsecured Claims or Equity Interests of equal priority are placed in different Classes pursuant to the Plan, valid business, factual, and/or legal reasons exist for such separate classification, and such classification does not unfairly discriminate between holders of Claims and Equity Interests. Conf DX 569—Goulding Decl. ¶ 29. Specifically, with respect to the separate classification of Unsecured Claims of equal priority:

(i) The Claims in each of Classes 2, 3 and 16 relate to notes issued by WMI, but such notes arose from different debentures, each with slightly different legal rights, including, among other things, in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

ter-creditor contractual subordination provisions.

(ii) The Claims in Classes 4 through 11 are for liabilities related to certain assets transferred to JPMC pursuant to the P & A Agreement, or to be transferred to JPMC pursuant to the Global Settlement Agreement and, accordingly, JPMC has agreed to satisfy such Claims.

(iii) The Claims in Classes 14 and 15 relate to guarantees issued by WMI of funded indebtedness of WMB and are governed by slightly different underlying documentation (both as compared to other Unsecured Claims as well as compared to one another).

(iv) The Claims in Classes 17A and 17B relate to funded indebtedness of WMB, with respect to which such holders asserted related Claims against WMI. The Claims in Class 17A are contractually senior to the Claims in Class 17B, and the Claims in Class 17B represent only derivative, and not direct, Claims against the Debtors.

*See* Conf DX 569—Goulding Decl. ¶ 29. With respect to the separate classification of Equity Interests of equal priority:

(i) Although the Dime Warrants and Common Equity Interests in Classes 21 and 22, respectively, represent common stock interests, the Dime Warrants arise from a different, unrelated issuance of securities. Moreover, unlike holders of Common Equity Interests, voting by and distributions to Dime Warrants holders are governed by the LTW Stipulation. Pursuant to the LTW Stipulation, unlike holders of Common Equity Interests, holders of Dime Warrants will receive certain distributions as holders of Allowed General Unsecured Claims and Allowed Subordinated Claims in addition to certain distributions as holders of Allowed Equity Interests.

*See id.;* Conf DX 567—LTW Settlement Ap-

proval Order. In addition to the above justifications, such separate classification does not unfairly discriminate between holders of similar Claims and Equity Interests. *See* Conf DX 569—Goulding Decl. ¶ 29. Moreover, the definition and classification of Convenience Claims in Class 13 is reasonable and necessary for administrative convenience. *Id.*

(3) *Unimpaired Classes Specified (11 U.S.C. § 1123(a)(2)).* Class 1 (Priority Non–Tax Claims), Class 4 (WMI Medical Plan Claims), and Class 7 (Qualified Plan Claims) (collectively, the "*Unimpaired Classes*") are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code. Conf DX 432A—Plan § 31.1; Conf DX 569—Goulding Decl. ¶ 29.

**\*13** (4) *Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).* Articles VI, VII, IX, X, and XII through XXVI and Section 30.1 of the Plan designate Class 2 (Senior Notes Claims), Class 3 (Senior Subordinated Notes Claims), Class 5 (JPMC Rabbi Trust/Policy Claims), Class 6 (Other Benefit Plan Claims), Class 8 (WMB Vendor Claims), Class 9 (Visa Claims), Class 10 (Bond Claims), Class 11 (WMI Vendor Claims), Class 12 (General Unsecured Claims), Class 12A (Late–Filed Claims), Class 13 (Convenience Claims), Class 14 (CCB–1 Guarantees Claims), Class 15 (CCB–2 Guarantees Claims), Class 16 (PIERS Claims), Class 17A (WMB Senior Notes Claims), Class 17B (WMB Subordinated Notes Claims), Class 18 (Subordinated Claims), Class 19 (Preferred Equity Interests), Class 21 (Dime Warrants), and Class 22 (Common Equity Interests) (collectively, the "*Impaired Classes*") as impaired within the meaning of section 1124 of the Bankruptcy Code and clearly specify the treatment of the Claims and Equity Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code. Conf DX 432A—Plan Arts. VI, VII, IX, X, XII through XXVI, § 31.1; Conf DX 569—Goulding Decl. ¶ 23.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

(5) *No Discrimination (11 U.S.C. § 1123(a)(4)).* Pursuant to the Plan, the treatment of each Claim against or Equity Interest in the Debtors, in each respective Class, is the same as the treatment of every other Claim or Equity Interest in such Class, except to the extent that a particular holder has elected different treatment (and, even in such circumstances, each holder was offered the very same election), thereby satisfying section 1123(a)(4) of the Bankruptcy Code. *See* Conf DX 569—Goulding Decl. ¶ 29. This does not violate section 1123(a)(4), as any applicable elections (*i.e.,* Runoff Notes Election and Reorganized Common Stock Election), consistent with the January Opinion, have been made available, as applicable, to all holders within a Class, including holders of Disputed Claims and Dime Warrants. *See* Conf DX 265—January Opinion at 101. All members of each Class, including holders of Disputed Claims as of the Effective Date that subsequently become Allowed Claims and holders of Dime Warrants will receive the same ultimate percentage recovery on account of their Claims, irrespective of whether they elected (if applicable) to receive Runoff Notes or Reorganized Common Stock. *See* Conf DX 432A—Plan §§ 6.2, 7.2, 16.1, 18.2, 19.2, 20.2; Conf DX 569—Goulding Decl. ¶ 29.

(6) In addition, holders of Claims and Equity Interests were provided with the opportunity to elect not to grant the releases set forth in Section 41.6 of the Plan (in which case, such non-releasing holders are not entitled to receive a distribution). *See* Conf DX 432A—Plan § 41.6; Conf DX 569—Goulding Decl. ¶ 29. To the extent that holders of REIT Series elected to grant the releases in connection with the Sixth Amended Plan, such holders also are entitled to receive a distribution from JPMC. *See* Conf DX 432A—Plan § 2.1(h); Conf DX 255H, 402, 422–Global Settlement Agreement (as amended) § 2.24; Conf DX 431—Disclosure Statement Order at 12; *see also* Conf DX 265—January Opinion at 102–103 (approving the treatment of the REIT Series over objection that such treatment was discriminatory

as to other holders of Preferred Equity Interests and finding that "[t]o the extent that the REIT Holders are receiving anything more than other preferred shareholders, they are receiving it directly from JPMC in exchange for the releases").

**\*14** (7) *Implementation of the Plan (11 U.S.C. § 1123(a)(5)).* The Plan and the various documents and agreements set forth in the Plan Supplement and other related documents provide adequate and proper means for implementation of the Plan, including (a) the creation of a Liquidating Trust pursuant to Article XXVII of the Plan, (b) the transfer of certain property of the Debtors' estates to JPMC, the FDIC Receiver, and the Liquidating Trust, as set forth more fully in the Plan and Global Settlement Agreement, (c) the distribution and/or issuance, as the case may be, of Cash, Reorganized Common Stock, Runoff Notes and Liquidating Trust Interests, as set forth in Articles XXXI and XXXII of the Plan, (d) the prompt release of the tax refunds from the JPMC Escrow Account, the Washington Mutual Escrow Account, and the FDIC Escrow Account in accordance with and as defined in Section 2.4 of the Global Settlement Agreement, (e) the retention by the Reorganized Debtors of all remaining property of the Debtors' estates, (f) the cancellation of all documents, agreements, and instruments evidencing Claims against or Equity Interests in the Debtors, except as provided in the Plan, (g) the surrender of all instruments or notes, pursuant to Section 32.6 of the Plan, (h) the curing of defaults with respect to assumed executory contracts and leases, pursuant to Article XXXIV of the Plan, (i) the entry by the Reorganized Debtors and the lenders thereto into the Credit Facility and all Financing Documents (as defined below), and (j) to the extent applicable, the adoption and filing of the Reorganized Debtors Certificates of Incorporation and the Reorganized Debtors By–Laws, as set forth in Article XL of the Plan and the Plan Supplement. *See* Conf DX 432A—Plan Arts. XXVII, XXXI, XXXII, XXXIV, XL; Plan §§ 32.4, 32.6; Conf DX 434—Liquidating Trust Agreement §§ 1.1, 1.3; Conf DX 569—Goulding Decl. ¶ 29; Conf

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

DX 434—Plan Supplement; Conf DX 492—Cure Notice. Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

(8) *Prohibition of Issuance of Non–Voting Securities (11 U.S.C. § 1123(a)(6))*. Article XL of the Plan provides that, as of the Effective Date of the Plan, the articles of incorporation and by-laws of the Debtors shall be amended and restated to provide substantially as set forth in the Reorganized Debtors Certificates of Incorporation and the Reorganized Debtors By–Laws, which, as set forth in the forms of such documents included with the Plan Supplement, prohibit the issuance of nonvoting equity securities, thereby satisfying section 1123(a)(6) of the Bankruptcy Code. Conf DX 432A—Plan Art. XL; Conf DX 569—Goulding Decl. ¶ 29. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

(9) *Designation of Directors and Officers (11 U.S.C. § 1123(a)(7))*. Section 40.4 of the Plan provides that, on the Effective Date, the board of directors of each of the Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity Committee (subject to the provisions of the TPS Stipulation) and one (1) member selected by the lenders party to the Credit Facility. *See* Conf DX 432A—Plan § 40.4; Conf DX 569—Goulding Decl. ¶ 29; Conf DX 434—Plan Supplement, Ex. E (naming the proposed directors). Pursuant to Section 40.5 of the Plan, the boards of directors of the Reorganized Debtors shall elect officers of the Reorganized Debtors as of or after the Effective Date. *See* Conf DX 432A—Plan § 40.5; Conf DX 569—Goulding Decl. ¶ 29. Such provisions are consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

**\*15** (10) *Impairment/Unimpairment of Classes of Claims and Equity Interests (11 U.S.C. § 1123(b)(1))*. Claims in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A, 13, 14, 15, 16, 17A, 17B and 18, and Equity Interests in Classes 19, 21 and 22 are impaired by the Plan. Claims in Classes 1, 4 and 7 are not impaired by the Plan. *See* Conf DX 432A—Plan Arts. V–XXV, § 30.1; Conf DX 569—Goulding Decl. ¶ 29. Accordingly, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

(11) *Assumption and Rejection (11 U.S.C. § 1123(b)(2))*. Section 34.1 of the Plan provides that, on the Effective Date, all prepetition executory contracts and unexpired leases that exist between one or both of the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors, except for any executory contract or unexpired lease that (i) has been assumed, assumed and assigned, or rejected pursuant to an order of the Court entered prior to the Effective Date or (ii) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, including, without limitation, any executory contract or unexpired lease sold, accepted or transferred to one of the JPMC Entities pursuant to the terms of the Global Settlement Agreement. *See* Conf DX 432A—Plan § 34.1; Conf DX 434D—Plan Supplement at Ex. D [D.I. 9488]. Pursuant to the Cure Notice, the Debtors provided notice of any defaults to be cured with respect to each agreement to be assumed or assumed and assigned by the Debtors. Conf DX 492–Cure Notice. Specifically, there are no defaults to be cured with respect to the contracts to be assigned to JPMC. Conf DX 492—Cure Notice. As a significant national bank with over $2 trillion in assets, JPMC, as assignee of certain of the contracts to be transferred, is financially sound and able to provide adequate assurances of future performance under such contracts. Moreover, based upon the relative value to the Debtors post-Effective Date of the agreements that JPMC will obtain pursuant to the Plan, transfer of such contracts is within the Debtors' reasonable business judgment, is warranted and is in the best interests of their chapter 11 estates. Accordingly, the Plan is con-

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

sistent with section 1123(b)(2) of the Bankruptcy Code.

(12) *Settlement/Retention of Claims or Interests (11 U.S.C. § 1123(b)(3)).* The Plan is premised upon the Global Settlement Agreement, which is integral to the Plan and settles and compromises certain Claims and Causes of Action among the Debtors, the JPMC Entities, and the FDIC, and which settlement this Court has determined is fair and reasonable and is in the best interests of all creditors and above the lowest range of reasonableness. *See* Conf DX 265—January Opinion at 2; Conf DX 441—September Opinion at 31–32; Conf DX 255H, 402, 422–Global Settlement Agreement (as amended); Conf DX 569—Goulding Decl. ¶ 29, Section 41.11 of the Plan provides that, except as provided in the Plan, nothing contained in the Plan or this Order shall be deemed to limit, abridge or otherwise affect the rights of the Reorganized Debtors, the Creditors' Committee, the Liquidating Trustee, the JPMC Entities, the FDIC Receiver, or FDIC Corporate to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them. Conf DX 432A—Plan § 41.11; Conf DX 569—Goulding Decl. ¶ 29. The Debtors' estates are retaining certain claims and causes of action against Persons other than the JPMC Entities pursuant to Section 28.1 of the Plan and the UCC Stipulation, and the Liquidating Trustee or the Creditors' Committee, as applicable, shall have the right and power to litigate any Claim or Cause of Action that constitutes an Asset of the Debtors and their estates that is not otherwise settled or released pursuant to the Plan or the Global Settlement Agreement, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors thereafter. *See* Conf DX 432A—Plan § 28.1; Conf DX 434—Liquidating Trust Agreement §§ 1.5, 9.6; Conf DX 569—Goulding Decl. ¶ 29. These provisions are consistent with section 1123(b)(3) of

the Bankruptcy Code and are in the best interests of the Debtors' estates and within the range of reasonableness.

**\*16** (13) *Sale of Assets (11 U.S.C. § 1123(b)(4)).* Although, pursuant to the Plan and Global Settlement Agreement, the Debtors are selling, transferring and assigning certain assets to the JPMC Entities pursuant to sections 363 and 365 of the Bankruptcy Code, such sale, transfer, and assignment does not constitute a sale of all or substantially all of the Debtors' property. Conf DX 569—Goulding Decl. ¶ 29; Opinion, dated Jan. 3, 2012 [Adv. No. 10–50911, D.I. 312] at 26 (stating that the Global Settlement Agreement "is not a sale of substantially all the assets of WMI.")

(14) *Modification of Rights (11 U.S.C. § 1123(b)(5)).* The Plan modifies the rights of holders of Claims in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A, 13, 14, 15, 16, 17A, 17B, and 18, and Equity Interests in Classes 19, 21, and 22. The Plan also leaves unaffected the rights of holders of Claims in Classes 1, 4 and 7. Conf DX 432A—Plan Arts. V–XXV; Conf DX 569—Goulding Decl. ¶ 29.

(15) *Additional Plan Provisions (11 U.S.C. § 1123(b)(6)).* The Plan contains release, injunction and exculpation provisions in Article XLI of the Plan—including releases by the Debtors, the third party releases set forth in Section 41.6 of the Plan, consensual releases by holders of Claims and Equity Interests (to the extent they affirmatively elect to grant such releases and are entitled to receive a distribution pursuant to the Plan), and a customary exculpation provision (which provision is consistent with the January Opinion). Conf DX 432A—Plan Art. XLI. Such provisions are consistent with the January Opinion, are an integral component of the complex compromises underlying the Plan, the Global Settlement Agreement, and the compromise and settlement related to the Mediation that is incorporated in the Plan, are necessary for the Debtors' reorganization and the realization of value for stakeholders, are the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

product of extensive arm's-length negotiations, were necessary to the formation of consensus to support the Global Settlement Agreement and the Plan, and are, in light of the foregoing, appropriate. *See, e.g.,* Conf DX 265—January Opinion at 58–60. In addition, the third party releases set forth in Section 41.6 of the Plan are consensual and only are binding against consenting Entities who receive a distribution from the Debtors' estates. Conf DX 432A—Plan § 41.6. Furthermore, the exculpation provision in Section 41.8 of the Plan is limited to a qualified immunity for acts of negligence, does not relieve any party of liability for gross negligence or willful misconduct, and provides exculpation only to the Debtors, the estates' professionals, the Creditors' Committee and the Equity Committee and their respective members and professionals, and the Debtors' directors and officers. *Id.* § 41.8. Accordingly, the Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

(16) *Vacatur.* Article XXXVI of the Plan notes several conditions precedent to the confirmation of the plan, including, among other things, the condition that this Court vacate, for all purposes, (a) the September Order to the extent it relates to the Standing Motion, and (b) those portions of the September Opinion that relate to the Standing Motion, namely, (i) Section III(H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73. *See* Conf DX 432A—Plan § 36.1(a)(11).

**\*17** (a) Pursuant to Federal Rule of Civil Procedure 60(b), "on motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for, among other things, "any ... reason that justifies relief," FED. R. CIV. PRO, 60(b), including, for example, when "exceptional circumstances" warrant vacatur because "the negative effects of vacating [the] case are relatively minor and the positive effects substantial." *See, e.g., McKinney v. Philadelphia Hous. Auth.,* 2010 WL

2510382, at \*1 (E.D.Pa. June 16, 2010). The Third Circuit has advised that, when a party seeks vacatur of an order on appeal, several steps should be followed. First, the requesting party should seek relief from the trial court pursuant to Rule 60(b). Second, if the trial court "is inclined to grant the motion or intends to grant the motion ... it should certify its inclination or its intention to the appellate court which can then entertain a motion to remand the case. Once remanded, the ... [trial] court will have the power to grant the motion, but not before." *Venen v. Sweet,* 758 F.2d 117, 123 (3d Cir.1985); *see also* FED.R.CIV.P. 62.1 (providing procedures for remand to resolve a motion that a court states it would grant or states raised a substantial issue); FED. R.APP. P. 12.1 (same).[FN5]

> FN5. *See also Freedom Wireless, Inc., v. Boston Commc'ns Group, Inc.,* 2006 WL 4451477 (D.Mass. Oct.11, 2006) (granting motion to vacate after (i) movant filed Rule 60(b) motion with the district court; (ii) the district court stated its inclination to grant the motion if jurisdiction was reestablished; and (iii) the court of appeals granted a motion to remand); *Tommy Hilfiger Licensing, Inc. v. Costco Cos.,* 2002 WL 31654958, at \*3 (S.D.N.Y. Nov.25, 2002) ("[T]he Court finds that the requested 60(b) relief is merited ... [but] this Court does not actually grant vacatur at this time, but instead hereby advises the Second Circuit of its intention to grant such relief if the case is remanded for that purpose."); *In re Fairchild Aircraft Corp.,* 220 B.R. 909, 910 (Bankr.W.D.Tex.1998) (bankruptcy court vacated its prior appealed decision, following remand from the district court).

(b) On January 9, 2012, the Debtors filed the *Motion of Washington Mutual, Inc., and WMI Investment Corp. for an Order Pursuant to Bankruptcy Rule 9024, Federal Rule of Civil Procedure 60(b) and Section 105(a) of the Bankruptcy Code, to Vacate, in*

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

*Part, the September Opinion and the September Order, as a Condition of Mediated Settlement Embodied in the Plan* [D.I. 9358] (the "*Vacatur Motion* "), and, by order, dated January 25, 2012, the Court granted the Vacatur Motion and the relief requested therein [D .I. 9481]. Thereafter, pursuant to that certain *Order Granting Appellants' Joint Emergency Motion for Immediate, Limited Remand of Their Respective Pending Appeals to Enable the court to Vacate, In Part, Its September 13, 2011 Order and Opinion in Conjunction with Confirmation Proceedings on the Debtors' Plan,* dated February 9, 2012, the Delaware District Court remanded the September Appeals to this Court to enable the Court to vacate (a) the September Order to the extent it relates to the Standing Motion, and (b) those portions of the September Opinion relating to the Standing Motion, namely, (i) Section III(H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73.

(c) Under the circumstances, the Court finds that exceptional circumstances exist, such that partial vacatur of the September Opinion and September Order, as a condition of the compromise and settlement embodied in the Plan, is warranted. Specifically, as discussed in detail elsewhere herein, the Court has determined that the compromise and settlement incorporated in the Plan after the Mediation is fair, reasonable and in the best interests of the Debtors' estates. *See supra* ¶¶ W–Y, Furthermore, pursuant to this Order, the Court has confirmed the Plan. *See infra* ¶ 1.

**\*18** (d) Pursuant to the settlements and compromises by and among the Debtors, the Creditors' Committee, the Equity Committee, and certain significant Creditor constituencies, which settlements and compromises are embodied in the Plan, (i) the shareholders of WMI will receive substantially all of the equity of Reorganized WMI, *see* Conf DX 432A—Plan, §§ 23.1, 24.1, 25.1, (ii) Reorganized WMI will receive the Senior Notes Release Consid-

eration and the Senior Subordinated Notes Release Consideration in the aggregate amount of $75 million, access to the $125 million Credit Facility to be provided by certain members of AAOC, and, to the extent available, Runoff Proceeds having a face value of $10 million, subject to the priority scheme set forth in the documents governing the Runoff Notes, as well as certain potential Litigation Proceeds, (iii) granting partial vacatur of the September Order and September Opinion in furtherance of the settlement embodied in the Plan, and in conjunction with consideration of confirmation of the Plan, will enable the distribution of more than $7 billion in value to the Debtors' stakeholders, *see* Conf DX 569—Goulding Decl. ¶¶ 22, 25, (iv) absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement, *see* Conf DX 569—Goulding Decl. ¶¶ 22, 25, which would mean the loss of billions of dollars in recoveries and the recommencement of litigation that the Court has already determined to be "the precise type of multi-faceted litigation that cries out for settlement" due to the multiplicity of issues, the complexity of the various arguments, and the significant risks associated with litigation of the multitude of claims asserted therein, *see* Conf DX 265—January Opinion at 59, (v) if the Settlement is not consummated, recoveries for holders of Allowed PIERS Claims and, thereafter, for holders of Allowed CCB–1 Guarantees Claims and Allowed CCB–2 Guarantees Claims will evaporate, due to the additional incurrence of expenses and the ongoing accrual of postpetition interest, Conf DX 569—Goulding Decl. ¶ 23, (vi) absent vacatur, the eight separate appeals of the September Opinion will proceed in at least one appellate court, if not more, which appellate process could last for years, imposing significant costs on the parties and the judicial system, Conf DX 569—Goulding Decl. ¶ 23, (vii) if the requested relief is denied, the Settlement will be void and litigation over the Standing Motion, which could last for years, will continue, Conf DX 569—Goulding Decl. ¶ 23; Conf DX 441—September Opinion at 138, (viii) the portions of the September Order and Sep-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

tember Opinion that the Motion seeks to vacate are fact-specific, unique to this bankruptcy, and are non-binding on other courts, Hr'g Tr. 1/25/11 48:13–49:22, (ix) vacating in part the September Order and September Opinion in furtherance of the Settlement will avoid further protracted litigation in this Court, in the Delaware District Court, and in the Third Circuit, Conf DX 569—Goulding Decl. ¶ 24, and (x) the Settlement resolves a complex, multi-party action and will conserve the resources of this Court and potentially other courts, and similarly conserve the time, money, and resources of the Debtors, the Creditors' Committee, the Equity Committee, and AAOC—all in Furtherance of the public interest, Conf DX 569—Goulding Decl. ¶ 24.

**\*19** (e) This Court finds that there is "a strong public policy in bankruptcy cases to encourage settlement." *See* 1/25/2012 Tr. at 49:23–24. Here, this policy counsels in favor of granting the request for partial vacatur, especially in the context of the complex and contentious procedural history of this bankruptcy, the historic context in which it arose, and in light of the multitude of disputes that have arisen over the three year history of the Chapter 11 Cases, the vast majority of which are consensually resolved pursuant to the Plan. Moreover, the Court's determination, pursuant to the September Opinion and September Order, that the Equity Committee has standing to pursue certain equitable disallowance claims was merely a preliminary ruling. In contrast to a ruling on the merits based upon a fully developed factual record after a full trial and discovery, the precedential value of the portions of the September Opinion and September Order that are related to the Standing Motion therefore is not high. On the other hand, the resolution of the Chapter 11 Cases pursuant to the Plan and the compromises and settlements embodied therein preserves estate resources, conserves judicial resources, and ensures that billions of dollars in distributions can be made to creditors and holders of equity interests who have waited over three years for any recovery. This Court thus concludes that the Debtors have

demonstrated the presence of "exceptional circumstances" warranting the requested vacatur and that the requested vacatur will serve the public interest.

JJ. *Sale of Exempt Property (11 U.S.C. § 1123(c))*. The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1123(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. Conf DX 569—Goulding Decl. ¶ 29.

KK. *Cure of Defaults (11 U.S.C. § 1123(d))*. Section 34.4 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. Conf DX 432A—Plan § 34.4. All cure amounts are set forth in the Cure Notice, and were determined in accordance with the underlying agreements and applicable bankruptcy and nonbankruptcy law. Conf DX 5–69—Goulding Decl. ¶ 29; Conf DX 492—Cure Notice. No party has objected to the Cure Notice. Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

LL. *Plan Proponents' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))*. Except as otherwise provided for or permitted by orders of the Court, the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Prior Disclosure Statement Order (with respect to Class 17A and, with respect to certain elections, holders of REIT Series), and the Disclosure Statement Order (with respect to all other Classes) in transmitting the Solicitation Packages and in tabulating the votes and elections with respect to the Plan. Conf DX 5B–Prior Disclosure Statement Order; Conf DX 570—Klamser Decl. ¶ 11–22; Conf DX 571–Sharp Decl. ¶ 11–21; Conf DX 18—Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19—Sharp Deck for the Sixth Amended Plan ¶ 3. Accordingly, the Plan complies with section 1129(a)(2) of the Bankruptcy Code.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

**\*20** MM. *Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).* Pursuant to the January Opinion and the September Opinion, the Court determined that both the Sixth Amended Plan and Modified Sixth Amended Plan were proposed in good faith. Conf DX 265—January Opinion at 106; Conf DX 441—September Opinion at 73. The Plan (including the Global Settlement Agreement and all other agreements, documents and instruments necessary to effectuate the Plan) is the result of extensive arm's-length negotiations among, and with substantial input from, a large number of independent parties and their respective professionals, including during and as a result of the Mediation. Conf DX 569—Goulding Decl. ¶ 19. Moreover, because the major provisions of the Modified Sixth Amended Plan are incorporated into the Plan, this Court's good faith determinations in the January Opinion and September Opinion apply equally to the Plan. *See* Conf DX 569—Goulding Decl. ¶ 32. The Plan achieves a reorganization of the Debtors, provides for a distribution to holders of Equity Interests, and properly distributes value to Creditors based upon their respective priorities, including through the enforcement of certain parties' contractual subordination rights and implementation of parties' elections with respect to distributions, Conf DX 569—Goulding Decl. ¶ 34. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates, and to maximize distributions to all creditors. Conf DX 569—Goulding Decl. ¶ 31.

NN. The Court further finds that the financial accommodations to be extended pursuant to the Financing Documents are being extended by the lenders thereunder in good faith, for legitimate business purposes, and are reasonable. In addition, despite efforts by the Debtors in accordance with Section 32.11 of the Plan, (i) the Debtors did not receive any other bona fide financing proposals with respect to the Reorganized Debtors, and (ii) two (2) parties contacted the Debtors regarding the Credit Facility, which parties

were referred to the Equity Committee, and the Equity Committee declined to move forward with such parties. Moreover, the Credit Facility has been negotiated in good faith and among independent parties.

OO. *Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).* Pursuant to the interim compensation procedures previously approved by this Court and established in these Chapter 11 Cases pursuant to section 331 of the Bankruptcy Code,[FN6] all payments made or to be made by the Debtors to their retained professionals for services rendered and expenses incurred in or in connection with these Chapter 11 Cases, or in connection with the Plan and incidental to these Chapter 11 Cases, have been or will be authorized and approved by this Court, subject to final review for reasonableness in these Chapter 11 Cases pursuant to section 330 of the Bankruptcy Code. As set forth in Section 3.2 of the Plan, all Entities awarded compensation or reimbursement of expenses by the court in accordance with section 328, 330, or 331 of the Bankruptcy Code, or entitled to priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, will have ninety (90) days following the Effective Date to submit final fee applications. Conf DX 432A—Plan § 3.2. In addition, consistent with the determination set forth in the September Opinion, the Plan provides that fees and expenses of the Liquidating Trustee, other Trustees and certain creditors' professionals listed in Section 41.18 of the Plan must be approved by the court as reasonable before being paid by the Debtors. *See* Conf DX 441—September Opinion at 23–24; Conf DX 432A—Plan §§ 27.12, 41.18; Conf DX 434A—Liquidating Trust Agreement §§ 4.1, 6.2(d), 6.4(1), 6.5(k), 6.6(b) and (c), 6.8(b), 7.7; Conf DX 569—Goulding Decl. ¶ 35.

FN6. *Amended Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals,* dated November 17, 2008 [D.I. 302].

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

**\*21** PP. *Directors. Officers, and Insiders (11 U.S.C. § 1129(a)(5))* . The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. Section 40.4 of the Plan provides that the boards of directors of each of the Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity Committee (subject to the terms of the TPS Stipulation) and one (1) member selected by the lenders party to the Credit Facility. Conf DX 432A—Plan § 40.4. The Equity Committee has currently selected, as members of the Reorganized Debtors' boards of directors, (i) Michael Willingham, (ii) Mark Holiday, (iii) Diane Glossman and (iv) Timothy Graham. The member selected by the lenders party to the Credit Facility is Gene Davis. Pursuant to Section 40.5 of the Plan, the boards of directors of the Reorganized Debtors shall elect officers of the Reorganized Debtors as of or after the Effective Date. Conf DX 432A—Plan § 40.5. Each director and officer will serve in accordance with the terms and subject to the conditions of the Reorganized Debtors' Certificates of Incorporation, the Reorganized Debtors' By–Laws, and other relevant organizational documents, each as applicable.

QQ. The ten (10) initial members of the Trust Advisory Board shall (a) consist of (i) four (4) members selected solely by the Creditors' Committee (subject to the terms of the *Stipulation and Agreement Between the Debtors and Tricadia Capital Management, LLC With Respect to the Debtors' Seventh Amended Plan,* dated February 12, 2012), (ii) four (4) members selected solely by the Equity Committee (subject to the terms of the TPS Stipulation), (iii) one (1) member selected by the Creditors' Committee and approved by the Equity Committee, which approval shall not be unreasonably withheld, and (iv) one (1) member selected by HoldCo Advisors, L.P. serving in a non-voting *ex officio* capacity, and (b) have an oversight function with respect to the Liquidating Trust, the composition of which may change only in accordance with the provisions of the Liquidating

Trust Agreement. Currently, (i) Wells Fargo Bank, N.A., Arnold Kastenbaum, Mayur Lakhani, and Marc Kirschner have been selected as the Creditors' Committee's designees to the Trust Advisory Board; (ii) Joel Klein, Michael Willingham, and the Honorable Douglas Southard have been selected as the Equity Committee's designees to the Trust Advisory Board; (iii) Matthew Cantor has been selected as the joint designee to the Trust Advisory Board; and (iv) William Kosturos has been named the Liquidating Trustee. Conf DX 434—Liquidating Trust Agreement §§ 1.4, 6.1. Further, Misha Zaitzeff, a principal of HoldCo Advisors, L.P. shall be appointed as an *ex officio* member to the Trust Advisory Board (with limited rights). *See Stipulation and Agreement Resolving Objection of HoldCo Advisors, L.P, to the Debtors' Plan,* dated February 12, 2012 [D.I. 9683, Ex. 1]. If, prior to the Effective Date, the Equity Committee and Creditors' Committee designate additional or substitute persons than those listed above to serve as one or more of such parties' nominees, such committee shall file a notice thereof with this Court. In addition, pursuant to Section 8.2 of the Form of Liquidating Trust Agreement that was filed as part of the Plan Supplement, the Liquidating Trustee may be removed by a majority vote of the members of the Trust Advisory Board.

**\*22** RR. To address the concern of the Court that the composition of the Trust Advisory Board should change once creditors have been paid in full, the Trust Advisory Board members solely appointed by the Creditors' Committee are subject to replacement on a staggered basis as and when all Allowed Claims approach satisfaction in full.

SS. *No Rate Changes (11 U.S.C. § 1129(a)(6)).* The Plan does not provide for rate changes by any of the Reorganized Debtors. Thus, section 1129(a)(6) of the Bankruptcy Code is not applicable in these Chapter 11 Cases. *See* Conf DX 569—Goulding Decl. ¶ 39.

**_Converting to Chapter 7 Would Result in Delay._**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

***Added Costs, and Loss of Value***

TT. *Best Interest of Creditors (11 U.S.C. § 1129(a)(7)).* Recoveries pursuant to the Plan are equal to or in excess of those that would be available if the Debtors were liquidated pursuant to chapter 7 and, therefore, the Plan satisfies the "best interests" test set forth in section 1129(a)(7) of the Bankruptcy Code.

UU. Section 1129(a)(7) is satisfied as to each holder of a Claim in an unimpaired class of Claims, as they are deemed to have accepted the Plan. As to the remaining Creditors, the Debtors' Liquidation Analysis demonstrates that each of the Debtors' creditors will receive at least as much, if not more, value under the Plan than it would receive in a hypothetical chapter 7 liquidation. Conf DX 569—Goulding Decl. ¶¶ 40–46. Under either scenario, holders of claims in Class 17B receive nothing. *Id.* ¶¶ 30, 45.

VV. In a chapter 7 liquidation, assuming a chapter 7 trustee is able to consummate a settlement of the issues resolved by the Global Settlement Agreement on the same terms and conditions as the Debtors, the cash available for distribution to creditors would consist mainly of the proceeds from the Global Settlement Agreement. Conf DX 569—Goulding Decl. ¶ 42. The Debtors' Liquidation Analysis assumes that the Global Settlement Agreement would still exist in a chapter 7 liquidation because, without consummation of a similar global settlement on similar terms as the Global Settlement Agreement or, in the alternative, litigating to finality each issue related to distribution of assets (which would take a substantial amount of time), a chapter 7 trustee would be unable to resolve all claims in these estates or make significant distributions. *Id.* As this Court has noted, however, the Debtors can provide no assurance that a global settlement agreement will be reached in the Chapter 7 Cases. *See* Conf DX 265—January Opinion at 95–96. Without the Global Settlement Agreement, an additional $54 billion in claims would have to be considered. *See id.* This Court has concluded that, under a scenario where no similar global settlement agreement

is consummated, the recovery under the Chapter 7 Cases would be less than the recovery under the Chapter 11 Cases. *See id.*

WW. Cash distributions in a chapter 7 liquidation, however, would be delayed and significantly reduced by the costs and expenses of a chapter 7 liquidation, including fees payable to the chapter 7 trustee and its professional advisors, who would need to engage in a substantial amount of work to become familiar with the many complex legal and factual issues in the Debtors' bankruptcy cases. Conf DX 265—Goulding Decl. ¶ 43. This could "stall" the cases for a prolonged period of time while these new parties familiarize themselves with the background and status of the cases. *Id.* Given the complexities of these chapter 11 cases and the underlying assets and Claims, and after considering the time it took the Equity Committee upon formation to bring itself "up-to-speed" regarding the complex issues involved in the Chapter 11 Cases, a chapter 7 trustee and its professionals likely would require at least 2 to 4 months to familiarize themselves with the Debtors' estates and their assets (the "*Start-up Time* "). *Id.* After the Start-up Time, the actual liquidation of the Debtors would continue for an additional estimated 2 to 4 months. *Id.* A conversion of these cases would result in an increase of $3 million in operational expenses and $37 million in professional fees, in addition to an estimated $37 million chapter 7 trustee transaction fee. *Id.;* Conf DX 432C—Disclosure Statement, Ex. C at vi-vii.

**\*23** XX. In addition to the foregoing, in a chapter 7 liquidation, a chapter 7 trustee would be forced to sell WMMRC quickly. Conf DX 569—Goulding Decl. ¶ 44, Thus, creditors would suffer diminished recoveries because a "fire-sale" liquidation of WMMRC would substantially reduce the potential value of this asset, as compared to the value to be generated by reorganizing around this entity. *Id.* Moreover, third parties may be inclined to submit lower bids to a chapter 7 trustee knowing that the asset must be sold at any price. *Id.* In any event, a chapter 7

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

liquidation would not permit WMMRC or any other entity to utilize the WMI tax group's large NOLs on a go forward basis to any significant extent. *Id.*

YY. Aside from the additional fees and expenses, and the reduction in available proceeds from a sale of WMMRC, any such delay would impact the recoveries of junior creditors subject to contractual subordination provisions who are obligated to "pay-up" to senior creditors until such senior creditors' claims are paid in full, including postpetition interest at the contract rate that would continue to accrue. *Id.* ¶ 45. Accordingly, after contractual subordination, holders of PIERS Claims, CCB–1 Guarantee Claims, CCB–2 Guarantee Claims, Subordinated Claims, Preferred Equity Interests, and Common Equity Interests would recover *nothing* in a chapter 7 liquidation. *Id.* Such creditors and equity holders will thus recover substantially more value under the proposed Plan than they would through a chapter 7 liquidation. *Id .*

ZZ. Based upon the foregoing, if these chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code, there likely would be a several month delay in returns to creditors to conduct a liquidation that would result in the reduced estimated liquidation proceeds set forth in the Liquidation Analysis, as compared with the certainty and timing of distributions under the Plan. *Id.* ¶ 46. For some Creditors, such as holders of Allowed Senior Notes Claims, this would result in the same value recovered with respect to such holders' Allowed Claims, but only after a significant delay. *Id.* For holders of Allowed Senior Subordinated Notes Claims and Allowed General Unsecured Claims (as well as holders of Allowed Senior Notes Claims with respect to such holders' Claims for postpetition interest), however, this would mean a smaller recovery than that which is projected pursuant to the Plan. *Id.; see also* Conf DX 432C—Disclosure Statement, Ex. C at v. For holders of PIERS Claims, CCB–1 Guarantee Claims, CCB–2 Guarantee Claims, Subordinated Claims, Preferred Equity Interests, and Common Equity Interests,

however, chapter 7 liquidation would mean that such holders' recoveries would evaporate completely. Conf DX 569—Goulding Decl. ¶ 46. Moreover, and as discussed above, there is no guarantee that a chapter 7 trustee would be able to consummate a global settlement on the same terms and conditions as the Debtors.[FN7] *Id.;* Conf DX 265—January Opinion at 95–96. If this did not occur, the recoveries for creditors in all Classes could drop precipitously. Conf DX 569—Goulding Decl. ¶ 46. The Court further notes that, even after the Senior Notes Release Consideration and Senior Subordinated Notes Release Consideration are taken into account, holders of Allowed Senior Notes Claims and Allowed Senior Subordinated Notes Claims still fare the same or better pursuant to the Plan than they would in a chapter 7 liquidation. *Id.* at n. 20. Accordingly, this Court finds the Plan satisfies section 1129(a)(7) of the Bankruptcy Code notwithstanding the payment pursuant to the Plan to Reorganized WMT of a small percentage of their recoveries by holders of Allowed Senior Notes Claims and Allowed Senior Subordinated Notes Claims.

> FN7. Additionally, Class 17A may see their recoveries disappear if a chapter 7 trustee withdraws its support for the settlement with the holders of WMB Senior Notes, and the WMB Senior Notes Claims are disallowed.

**\*24** AAA. Based upon the foregoing, recoveries pursuant to the Plan are greater than what estimated recoveries would be pursuant to a chapter 7 liquidation (except with respect to Classes receiving no distribution pursuant to the Plan, which would receive no distribution in either scenario).

BBB. *Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).* As set forth in the Voting Certifications, holders of Claims in Classes 2, 3, 5, 6, 10, 11, 12, 12A, 13, 14, 15, 16 17A, 18, 19, and 22 voted to accept the Plan. *See* Conf DX 570—Klamser Decl. ¶ 25. Conf DX 571—Sharp Decl. ¶ 24; Conf DX 18—Klamser

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Decl. for the Sixth Amended Plan ¶ 29. Pursuant to the LTW Settlement Approval Order, votes on behalf of holders of interests in Class 21 were deemed cast in support of acceptance of the Plan. Conf DX—Goulding Decl. ¶ 28 n. 9. However, because the distribution to the class of holders is through Classes 12, 18, and 22, such votes were cast in Classes 12, 18, and 22. *Id.* Pursuant to the TPS Stipulation, votes on behalf of holders of Equity Interests held by the TPS Funds (as defined in the TPS Stipulation) were deemed cast in support of acceptance of the Plan. *See Stipulation and Agreement Among the Debtors, the TPS Group, the TPS Consortium, the Equity Committee, and JPMorgan Chase Bank, N.A. With Respect to the Debtors' Seventh Amended Plan* [D.I.9705]. The Plan therefore satisfies section 1129(a)(8) of the Bankruptcy Code with respect to Classes 2, 3, 5, 6, 10, 11, 12, 12A, 13, 14, 15, 16, 17A, 18, 19and22. FN8 With respect to the other Classes, the Plan is confirmable because the Plan satisfies section 1129(b)(2) of the Bankruptcy Code. As such, section 1129(a)(8) is satisfied.

> FN8. Class 8 contains no claims, and thus, no votes were cast on behalf of this class.

CCC. *Treatment of Administrative Expense Claims, Priority Non–Tax Claims, and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).* The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code. Section 3.1 of the Plan provides that, on the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim becomes an Allowed Claim, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim. Conf DX 432A—Plan § 3.1. Section 5.1 of the Plan provides that, unless otherwise mutually agreed upon by the holder of an Allowed Priority Non–Tax Claim and the Debtors, on the later of (i) the Effective Date and (ii) the date such Allowed Priority Non–Tax Claim becomes an Allowed Priority Non–Tax Claim, or as

soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Priority Non–Tax Claim, in Cash, the full amount of such Allowed Priority Non–Tax Claim. Conf DX 255—Plan § 5.1. Pursuant to Section 3.3 of the Plan, and as set forth in the Priority Tax Claim Election Notice, each holder of an Allowed Priority Tax Claim shall receive, in satisfaction, release, and exchange of such holder's Allowed Priority Tax Claim, payment in full, in Cash, on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such claim becomes an Allowed Claim, and to the extent that payment is made after the Effective Date, together with interest accrued thereon at the applicable non-bankruptcy rate as of the calendar month in which this Order is entered. Conf DX 432A—Plan § 3.3; Conf DX 574—Priority Tax Claim Election Notice; Conf DX 569—Goulding Decl. ¶¶ 48–51.

**\*25** DDD. *Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).* Fifteen (15) impaired Classes entitled to vote affirmatively accepted the Plan, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy Code. *See* Conf DX 570—Klamser Decl. ¶ 25; Conf DX 571—Sharp Decl. ¶ 24; Conf DX 18—Klamser Decl. for the Sixth Amended Plan ¶ 29.

EEE. *Feasibility (11 U.S.C. § 1129(a)(11)).* Pursuant to the September Opinion, and based on the evidence presented at the hearing on confirmation of the Modified Sixth Amended Plan, the Court determined that the value of WMMRC's existing portfolio is $140 million and that, if it is assumed that Reorganized WMI raises new capital and acquires new businesses, the value of the NOLs that are potentially available to Reorganized WMI is $70 million. Conf DX 441—September Opinion at 43–45, 62. Pursuant to the Plan, in addition to owning WMMRC and having the potential ability to apply the NOLs against its future taxable income, (*see* Conf DX 432A—Plan § 1.192; Conf DX 432–Disclosure Statement at 221),

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Reorganized WMI will have unrestricted access to cash, as of the Effective Date, in the form of the $75 million Senior Notes Release Consideration and Senior Subordinated Notes Release Consideration that will be paid to Reorganized WMI by holders of Allowed Senior Notes Claims and Allowed Senior Subordinated Notes Claims. Conf DX 432A—Plan §§ 6.1, 7.1; Conf DX 569—Goulding Decl. ¶ 56. Further, certain members of AAOC will provide Reorganized WMI a senior secured multi-draw term Credit Facility, in the aggregate original principal amount of $125 million, to be used by Reorganized WMI to finance working capital and general corporate purposes, as well as certain permitted acquisitions and originations, all subject to the terms and conditions of the Credit Agreement and the Financing Documents (as defined below). *See* Conf DX 569—Goulding Decl. ¶ 22.

FFF. As of the Effective Date, the Reorganized Debtors' assets will exceed its liabilities. *See* Conf DX 569—Goulding Decl. ¶ 57. Upon such date, Reorganized WMI will have only two sources of significant liability—loan loss reserves associated with the WMMRC Trusts and the Runoff Notes. *Id.* ¶ 55. The loan loss reserves are limited to the assets available within each of the WMMRC Trusts. *Id.;* Conf DX 432—Disclosure Statement § IV.A.6. Pursuant to the Plan, Reorganized WMI will issue Runoff Notes in the aggregate original principal amount of One Hundred Forty Million Dollars ($140,000,000.00) (subject to reduction as a result of the Reorganized Common Stock Elections, as discussed in Disclosure Statement). Conf DX 569—Goulding Decl. ¶ 55. Such Runoff Notes are, except for the limited circumstances set forth in the governing indentures, non-recourse to the Reorganized Debtors and may only be satisfied by the Runoff Proceeds. *Id.* Except for the limited circumstances set forth in the governing indentures, Reorganized WMI has no obligation to satisfy any deficiency if the Runoff Proceeds prove to be insufficient to fully repay the RunoffNotes. *Id.* The only other source of liability for Reorganized WMI relates to Reorganized WMI's obligation to be a public re-

porting company. *Id* .

**\*26** GGG. Additional sources of income for Reorganized WMI will potentially become available as well, including (i) an additional $10 million, as well as interest accrued thereon at a rate of thirteen percent (13%) per annum, in the form of a portion of the Runoff Proceeds, to the extent available and in accordance with the relative priorities thereto as set forth in the documents governing the Runoff Notes,[FN9] (ii) certain potential Litigation Proceeds, and (iii) all distributions of Runoff Proceeds after all amounts due on the RunoffNotes have been paid in full, solely to the extent any such additional distributions are available. Conf DX 569—Goulding Decl. ¶ 56.

FN9. Pursuant to the Plan, any eligible Creditor that elected to or that is otherwise entitled to receive Runoff Notes in lieu of Creditor Cash has the right to make a further election (a "*Reorganized Common Stock Election* ") to receive Reorganized Common Stock in lieu of (among other things) some or all of such Runoff Notes. To the extent any such holder makes such a Reorganized Common Stock Election, such holder's share of the Runoff Notes to which the Reorganized Common Stock Election was effective will not be issued, thereby reducing the aggregate amount of Runoff Notes outstanding and, subject to the relative priorities set forth in the documents governing the Runoff Notes, Reorganized WMI will retain (and will not transfer to the Liquidating Trust) Runoff Proceeds in an amount equal to the payments of principal and interest that would have been due on the Runoff Notes to which the Reorganized Common Stock Election was effective. In the event that holders of Claims with rights to make Reorganized Common Stock Elections decline to tender Runoff Notes in the original principal amount necessary to reach the Runoff

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Threshold, Section 31.14(d) of the Plan deems AAOC to have made certain elections as set forth more fully therein to ensure that the Runoff Threshold is reached.

HHH. In light of the excess of their Effective Date assets over their liabilities, their potential additional sources of funding, and the general non-recourse nature of the Runoff Notes described above, the Court concludes that the Reorganized Debtors will be able to pay their liabilities as they become due. For example, the Reorganized Debtors' assets are more than adequate to cover the anticipated public reporting costs, as is demonstrated by the Debtors' post-Effective Date financial projections, which show that Reorganized WMI will have a cash balance of Seventy–Four Million Eleven Thousand Dollars ($74,011,000.00) in the final year of such projections. Conf DX 432—Disclosure Statement at 210; Conf DX 569—Goulding Decl. ¶ 51. Accordingly, this Court concludes that confirmation of the Plan is not likely to be followed by the eventual liquidation of either of the Reorganized Debtors. Rather, the Reorganized Debtors will have sufficient funds to continue to manage their assets and satisfy their liabilities.

III. In addition, this Court concludes that the Debtors have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. In particular, pursuant to the provisions of the Plan and the Liquidating Trust Agreement, it is clear that the Liquidating Trust will have sufficient funds to manage the Liquidating Trust, maintain the Liquidating Trust assets, and make payments to the Liquidating Trust Beneficiaries. Conf DX 432A—Plan § 27.10; Conf DX 434A—Liquidating Trust Agreement § 1.3. The Liquidating Trust will consist of the Liquidating Trust Assets (as defined in the Plan), which include, among other things, the cash necessary to fund the Liquidating Trust. *See id.* § 1.4; Conf DX 432A—Plan §§ 1.140, 27.3.

JJJ. *Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)).* Pursuant to Section 41.14 of the Plan, all fees currently payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Code, have been or will be paid on or before the Effective Date, thereafter as and when they become due, or otherwise pursuant to an agreement between the Reorganized Debtors and the United States Department Justice, Office of the United States Trustee, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code. *See* Conf DX 432A—Plan § 41.14; Conf DX 569—Goulding Decl. ¶ 59.

**\*27** KKK. *Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).* Pursuant to Section 34.7 of the Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors, and the Liquidating Trustee, as the case may be, shall (a) continue to perform any and all of their administrative obligations under the Benefit Plans and (b) continue to make any required minimum funding and insurance premium payments, until such time as the Debtors or the Liquidating Trustee, as the case may be, decides to transfer or terminate any such Benefit Plan in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law. Conf DX 432A—Plan § 34.7; Conf DX 569—Goulding Decl. ¶ 60. Thus, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

LLL. *No Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).* The Debtors are not subject to any domestic support obligations. Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. *See* Conf DX 569—Goulding Decl. ¶ 61.

MMM. *Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15)).* The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and,

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. *See* Conf DX 569—Goulding Decl. ¶ 62.

NNN. *No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16)).* The Debtors are each a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. *See* Conf DX 569—Goulding Decl. ¶ 63.

OOO. *No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).* Class 9 (Visa Claims) voted to reject the Plan.[FN10] Conf DX 569—Goulding Decl. ¶ 64; Conf DX 570—Klamser Decl. ¶ 25; Conf DX 571—Sharp Decl. ¶ 24; Conf DX 19—Sharp Decl. for Sixth Amended Plan ¶ 30. Accordingly, the "cram down" requirements of section 1129(b) of the Bankruptcy Code must be satisfied with respect to Class 9.

FN10. Class 17B is not receiving any distribution pursuant to the Plan. Conf DX 569—Goulding Decl. ¶ 64. In light of that fact, the Disclosure Statement Order provided that Class 17B was deemed to reject the Plan. Conf DX 432B—Disclosure Statement Order ¶ M. However, it must be noted that there are no Claims in Class 17B because any such Claims are derivative in nature and belong to the FDIC, and the Debtors are providing a distribution on account thereof to the FDIC Receiver pursuant to the Global Settlement Agreement. Conf DX 569—Goulding Decl. ¶ 65. Because there are no Allowed Claims in Class 17B—indeed no Claims at all—it does not matter that Classes junior to such Class may receive or retain property on account of the Claims or Equity Interests classified therein. *Id.* ¶ 66 n. 27.

PPP. Based upon the evidence proffered, adduced, and presented by the Debtors and supporters of the Plan at the Confirmation Hearing, the Plan does not discriminate unfairly and is fair and equitable with respect to Class 9, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code. With respect to Class 9, except to the extent waived, no holder of a Claim or Equity Interest junior to each of the Claims classified in Class 9 will receive or retain any property pursuant to the Plan, unless and until such Classes are paid in full. *See* Conf DX 569—Goulding Decl. ¶ 66. Specifically, Class 9 is being paid in full so holders of Claims junior to Class 9 may receive distributions pursuant to the Plan. *Id.*

QQQ. The Plan provides for payment of Allowed Claims and, if appropriate, Postpetition Interest Claims on account of Allowed Claims. *Id.* ¶ 67. Distributions to claimants will be made in Cash, Liquidating Trust Interests that represent the right to receive future Cash distributions from the Liquidating Trust and, in certain circumstances, Runoff Notes and/or Reorganized Common Stock. *Id.* No Class is projected to recover more than one hundred percent (100%) on account of the Claims or Equity Interests, as the case may be, classified in each Class. *See* Conf DX 432C—Disclosure Statement, Ex. C at 4–5.

**\*28** RRR. No holder of a Claim or Equity Interest will receive more value than such respective Claim or Equity Interest (based on liquidation preference amount). Conf DX 569—Goulding Decl. ¶ 68.

SSS. *Only One Plan (11 U.S.C. § 1129(c)).* Other than with respect to prior plans of reorganization filed in these cases, namely, the Sixth Amended Plan and Modified Sixth Amended Plan, the Plan is the only plan filed in each of these cases. Conf DX 569—Goulding Decl. ¶ 69. Accordingly, section 1129(c) is inapplicable in these Chapter 11 Cases.

TTT. *Principal Purpose of the Plan (11 U.S.C. §*

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

*1129(d))*. The principal purpose of the Plan is not the
avoidance of taxes or the application of section 5 of
the Securities Act of 1933, and no governmental unit
has objected to confirmation of the Plan on any such
grounds. *Id.* ¶ 70. The Plan, therefore, satisfies the
requirements of section 1129(d) of the Bankruptcy
Code.

    UUU. *Not a Small Business Case (11 U.S.C. §
1129(e))*. The Chapter 11 Cases are not "small busi-
ness cases" as defined in the Bankruptcy Code. *Id.* ¶
71. Accordingly, section 1129(e) of the Bankruptcy
Code is inapplicable in these Chapter 11 Cases.

    VVV. *Satisfaction of Confirmation Require-
ments.* Based upon the foregoing, the Plan satisfies the
requirements for confirmation set forth in section
1129 of the Bankruptcy Code.

    WWW. *Implementation.* All documents neces-
sary to implement the Plan, including those contained
in the Plan Supplement and the Global Settlement
Agreement, and all other relevant and necessary
documents have been negotiated in good faith and at
arm's length and shall, upon completion of documen-
tation and execution, be valid, binding, and enforce-
able agreements and not be in conflict with any federal
or state law. Without limiting the generality of the
foregoing, the Debtors, prior to the Effective Date, and
Reorganized WMI, from and after the Effective Date,
are authorized to enter into the Credit Facility sub-
stantially on the terms set forth in the Plan and Plan
Supplement. The execution, delivery, or performance
by the Debtors or Reorganized Debtors, as the case
may be, of the Credit Facility and any documents in
connection with the Credit Facility, including any
guarantees and security documents (together, the
"*Financing Documents* "), and the granting of all
Liens and security interests thereunder, and compli-
ance by the Debtors or Reorganized Debtors, as the
case may be, with the terms thereof, is hereby au-
thorized by, and will not conflict with, the terms of the
Plan or the Confirmation Order.

    XXX. *Good Faith.* The Debtors will be acting in
good faith if they proceed to (i) consummate the Plan
and the agreements, settlements, transactions, and
transfers contemplated thereby, including, without
limitation, the Global Settlement Agreement, and (ii)
take the actions authorized and directed by this Order.

    YYY. *Liquidating Trust.* Entry into the Liqui-
dating Trust Agreement is in the best interests of the
Debtors, the Debtors' estates, and creditors and hold-
ers of Equity Interests. The establishment of the Liq-
uidating Trust, the selection of William C. Kosturos to
serve as the Liquidating Trustee, and the form of the
proposed Liquidating Trust Agreement (as it may be
modified or amended) is appropriate and in the best
interests of creditors and holders of Equity Interests.
The Liquidating Trust Agreement shall, upon execu-
tion, be valid, binding, and enforceable in accordance
with its terms.

    **\*29** ZZZ. *Preservation of Causes of Action.* It is
in the best interests of the Debtors, their Creditors, and
Equity Interest holders, that all Causes of Action,
other than those expressly released pursuant to the
Plan and the Global Settlement Agreement, be re-
tained by the Liquidating Trust, as set forth in the
Plan.

    AAAA. *Retention of Jurisdiction.* This Court may
properly and, upon the Effective Date shall, consistent
with Article XXXVIII of the Plan, retain exclusive
jurisdiction over all matters arising out of, and related
to, the Chapter 11 Cases, including, without limita-
tion, all Causes of Action not otherwise released
pursuant to the Plan and the matters set forth in Article
XXXVIII of the Plan and section 1142 of the Bank-
ruptcy Code. Conf DX 432A—Plan, Art. XXXVIII.

**Modifications of the Plan**
    BBBB. *Plan Modifications.* The Plan, as modi-
fied by the Plan Modifications, is consistent with and

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

meets the requirements of section 1127 of the Bankruptcy Code because such modifications were filed prior to the solicitation of votes and elections on the Plan.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

### *ORDER*

1. *Confirmation of the Plan.* The Plan and each of its provisions, as modified pursuant to the Plan Modifications and any revisions made at or subsequent to the Confirmation Hearing as set forth in this Order, including the Plan Supplement, and as may be modified pursuant to section 1127 of the Bankruptcy Code, shall be, and hereby are, CONFIRMED pursuant to section 1129 of the Bankruptcy Code. The documents contained in the Plan Supplement are authorized and approved. The terms of the Plan, as modified by the Plan Modifications and revisions made at or subsequent to the Confirmation Hearing, as set forth in this Order as well as in the revised composite copy attached hereto as *Exhibit A.* and including the Global Settlement Agreement and the Plan Supplement, as has and may be amended, are incorporated by reference into and are an integral part of this Order.

2. *Compromise of Controversies.* For the reasons stated herein and in the January Opinion and September Opinion, the provisions of the Plan and the Global Settlement Agreement constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the Global Settlement Agreement and the compromise and settlement incorporated into the Plan after the Mediation, and the entry of this Order constitutes approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and sections 105(a), 363, and 365 of the Bankruptcy Code. To the extent provided in the Plan and the Global Settlement Agreement, on the Effective Date, such compromises

and settlements shall be binding upon the Debtors, the other parties to the Global Settlement Agreement, all Creditors, all holders of Equity Interests, and other Entities.

**\*30** 3. *Global Settlement Agreement Approved.* The Court (a) approves the Global Settlement Agreement as a good faith compromise that is fair and reasonable and in the estates' best interests and integral to the Plan, (b) hereby reaffirms its prior approval of the Global Settlement Agreement as set forth in the January Opinion and September Opinion and, (c) subject to the provisions of decretal paragraph 11 hereof, upon the Effective Date, authorizes and directs the consummation of the Global Settlement Agreement by all parties thereto.

4. *Plan Settlement Approved.* The Court hereby approves the compromises and settlements embodied in the Plan after and as a result of the Mediation as fair, reasonable, and in the estates' best interests and, upon the effectiveness of the Plan, authorizes and directs the consummation thereof.

5. *Objections.* All Objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the Plan and the Global Settlement Agreement shall be and hereby are, OVERRULED and DENIED in their entirety. All withdrawn objections are deemed withdrawn with prejudice.

6. *Equity Committee Actions and Appeals Deemed Withdrawn, With Prejudice.* As soon as practicable after the Effective Date, the Equity Committee shall take any and all actions necessary to cause the withdrawal, with prejudice, of each of the Equity Committee Adversary Proceeding, the Equity Committee Action to Compel, the January Equity Committee Appeal, and the Equity Committee's cross-appeal from the September Opinion and September Order, as well as any other proceeding or action instituted by the Equity Committee with respect

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

to the Debtors or the Global Settlement Agreement, including any appeals.

7. *September Appeals.* As soon as practicable after the Effective Date, each of (i) AAOC, with (a) Aurelius filing individually and (b) Appaloosa, Owl Creek and Centerbridge filing jointly, (ii) the Creditors' Committee, (iii) the Debtors, (iv) the WMB Noteholders, (v) Normandy Hill, and (vi) Wells Fargo Bank, National Association, solely in its capacity as the PIERS Trustee shall take any and all actions necessary to cause the withdrawal, with prejudice, of such Entities' appeals from the September Opinion and September Order.

8. *Treatment of Preferred Equity Interests.* Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of a Preferred Equity Interest, including, without limitation, each holder of a REIT Series, shall be entitled to receive such holder's Pro Rata Share of seventy-five percent (75%) of (a) subject to the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b) and 20.2(b) of the Plan, the Reorganized Common Stock, and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed.

**\*31** 9. *Treatment of Common Equity Interests.* Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of Common Equity Interests shall be entitled to receive such holder's Pro Rata Share of twenty-five percent (25%) of (a) subject to (i) the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b), and 20.2(b) of the Plan and (ii) the rights of holders of Dime Warrants pursuant to the LTW Stipulation, the Reorganized Common Stock, and (b) in the event that all Allowed Claims and

Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed.

10. *Partial Vacatur of September Opinion and September Order.* The Court hereby vacates, for all purposes, (a) the September Order to the extent it relates to the Standing Motion, and (b) those portions of the September Opinion that relate to the Standing Motion, namely, (i) Section III(H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73. All official and unofficial publishers of the September Opinion and/or September Order are hereby advised that such portions of the September Opinion and the September Order have been vacated and should be removed from any publication and/or computer database.

11. *Execution of Certain Documents.* Prior to the Effective Date, the Debtors and any and all other parties to such documents shall execute and take all other actions necessary to effect and execute the documents necessary to implement the Plan and the Global Settlement Agreement, including, without limitation, the Credit Facility and all related documents, and shall take any and all steps necessary, if any, to reflect or effectuate, as the case may be, the transfer of the Trust Preferred Securities to WMI and then to WMB, and to reflect JPMC as the sole legal, equitable and beneficial owner of the Trust Preferred Securities in accordance with Section 2 .3 of the Global Settlement Agreement and in conformity with applicable law. In accordance with Section 2.3 of the Global Settlement Agreement, with respect to matters related to the Trust Preferred Securities, all persons and entities shall be authorized and directed to take instructions solely from JPMC or its designee with respect to those items as to which the owner is entitled to give instructions, any and all persons and entities shall be authorized and directed to take necessary,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

proper or advisable actions and all other actions reasonably requested or instructed by JPMC to record, reflect, transfer, vest, assign, convey, and maintain, as necessary, that a transfer of the Trust Preferred Securities was made to WMI (and subsequently by WMI to JPMC) and that JPMC is the sole legal, equitable, and beneficial owner of the Trust Preferred Securities as transferee of WMI, including, without limitation, by: (i) causing the applicable trustees, registrars, paying agents, depositary, and transfer agents to amend their records (including the securities registers of each Issuing Trust) to reflect a transfer of the Trust Preferred Securities to WMI and then to WMB, and to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; (ii) causing the trustees and boards of directors of the Issuing Trusts to take all necessary, proper and advisable action to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; and (iii) amending any agreements, articles, or declarations to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities.

**\*32** 12. *Implementation of the Plan.* subject to the provisions of decretal paragraph 11 hereof, on and after the Effective Date, the Debtors, the Reorganized Debtors, and the Liquidating Trust are authorized to (i) execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements, including, without limitation, those contained in the Plan Supplement and the Global Settlement Agreement, and including, without limitation, Section 2.3 of the Global Settlement Agreement, (ii) make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Global Settlement Agreement, and (iii) take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan and the Global Settlement Agreement, including, among other things, all such actions delineated in Article XXXII of the Plan. On the Effective Date, the appropriate officers or representatives of the Debtors,

the Reorganized Debtors and the Liquidating Trust, as the case may be, and members of the boards of directors of the same (including, without limitation, the Trust Advisory Board), are authorized and empowered to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the Plan and the Global Settlement Agreement, and make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Global Settlement Agreement, in the name of and on behalf of the Debtors and their estates, the Reorganized Debtors and the Liquidating Trust, as applicable. Except as otherwise provided in the Plan, the Prior Disclosure Statement Order, or the Disclosure Statement Order (including, without limitation, with respect to holders of WMB Senior Notes), the record date for determining the holders of Allowed Claims and Equity Interests entitled to receive distributions pursuant to the Plan shall be the Effective Date. Without limiting the generality of the foregoing, and without further action by the Bankruptcy Court or any other party, the Debtors and the Reorganized Debtors are authorized and empowered pursuant to Section 1142 of the Bankruptcy Code to (a) execute, deliver and consummate the Credit Facility and the Financing Documents, (b) perform and comply with all of the terms, conditions, and obligations of and under the Credit Facility and the Financing Documents, (c) take all other actions and execute, deliver, record, and file all other such agreements, documents, instruments, mortgages, deeds of trust, financing statements, releases, applications, registration statements, reports and changes, additions, or modifications thereto in connection with the consummation of the transactions contemplated by the Credit Facility and the Financing Documents and the performance thereof, including, without limitation, the making of such filings or the recording of any security interests, as may be required under such documents, (d) grant valid, binding, enforceable, and perfected security interests and Liens upon all of the collateral specified in the Credit Facil-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

ity and the Financing Documents in accordance with the terms thereof, and (e) pay all fees, costs, and expenses under the Credit Facility and Financing Documents. The financial accommodations to be extended pursuant to the Credit Facility and the other Financing Documents are being extended, and shall be deemed to have been extended by the lenders thereunder, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable nonbankruptcy law. Any person or entity that has asserted mortgages, deeds of trust, Liens, security interests, financing statements, lis pendens or other documents or agreements evidencing claims on or interests in property of the Debtors, as may have been recorded or may otherwise exist, is authorized and directed to execute termination statements, instruments of satisfaction or discharge, or releases of all such claims or interests which such person or entity has with respect to property of the Debtors; if any such person or entity shall not have delivered to the Debtors or the Reorganized Debtors, in proper form for filing or recording and executed by the appropriate party(ies), such termination statements, instruments of satisfaction or discharge, or releases of all such claims or interests which such person or entity has with respect to the property of the Debtors, then the Reorganized Debtors are hereby authorized and directed to execute and file or record any and all such statements, instruments, discharges, releases and other documents, and take any and all other actions as may be necessary on behalf of such person or entity asserting a claim or interests in the Debtors' property.

**\*33** 13. *No Action.* Pursuant to section 1142(b) of the Bankruptcy Code, no action of the respective directors or stockholders of the Debtors shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and the Global Settlement Agreement, and any contract, instrument, or other

document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan and the Global Settlement Agreement, including, without limitation, the Plan Supplement.

14. *Credit Facility.* The financial accommodations to be extended pursuant to the Financing Documents shall not be subject to recharacterization for any purposes whatsoever. Each party to the Credit Facility may rely on the provisions of this Order in closing the Credit Facility.

15. *Binding Effect.* On or after entry of this Order, and subject to the occurrence of the Effective Date, except to the extent otherwise provided in the Plan or this Order, the provisions of the Plan shall bind the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, all holders of Claims and Equity Interests of the Debtors (irrespective of whether such Claims or Equity Interests are impaired pursuant to the Plan or whether the holders of such Claims or Equity Interests accepted, rejected, or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in these Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.

16. *Free and Clear.* Except as otherwise provided in the Plan, in this Order, in the Credit Facility or in the Financing Documents, from and after the Effective Date, (i) pursuant to sections 363, 1123, and 1141(c) of the Bankruptcy Code, the Plan Contribution Assets to be transferred to the JPMC Entities and the FDIC Receiver, respectively, pursuant to the Global Settlement Agreement shall be transferred to such Entities, free and clear of all Claims, liens, encumbrances, charges, and other interests of any Entity, including, but not limited to, creditors and equity security holders of the Debtors, except for any claim that is an Allowed JPMC Assumed Liability Claim, (ii) the Liquidating Trust Assets shall be transferred to the Liquidating

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Trust, free and clear of all Claims, liens, encumbrances, charges, and other interests of creditors and equity security holders of the Debtors, and (iii) the Reorganized Debtors shall be vested with all property of the estates not otherwise transferred pursuant to the terms of the Plan and the Global Settlement Agreement, free and clear of all Claims, liens, encumbrances, charges and other interests of creditors and equity security holders of the Debtors. Each of the transfers of property of the Debtors, their estates, the Reorganized Debtors, or the Liquidating Trust, as the case may be, pursuant to the Plan (a) are or shall be deemed to be legal, valid and effective transfers of property, (b) shall not constitute, or be construed to be, avoidable transfers pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (c) shall not subject the Debtors, the Reorganized Debtors, the Liquidating Trustee, or the Liquidating Trust, as the case may be, to any liability by reason of such transfer pursuant to the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, any law affecting successor or transferee liability. From and after the Effective Date, the Reorganized Debtors may operate each of their businesses and use, acquire, or dispose of assets free of any restriction imposed by the Bankruptcy Code, the Court, or the United States Trustee.

**\*34** 17. *Exhibit "U" Contracts.* All right, title and interest in the contracts listed on Exhibit "U" to the Global Settlement Agreement and all of the assets acquired thereunder are deemed to have been the assets of WMB and sold to the Acquisition JPMC Entities pursuant to the Purchase and Assumption Agreement and, effective as of the Effective Date, the WMI Entities shall be deemed to have waived any and all claims and rights to such contracts and all of the assets acquired thereunder.

18. *Intellectual Property.* All of the WMI Entities' right, title and interest in and to the intellectual property listed on Exhibit "W" to the Global Settlement Agreement shall be deemed to have been sold, trans-

ferred and assigned by the WMI Entities to JPMC or its designee on the Effective Date, free and clear of any liens, Claims, interests and encumbrances of any Person, other than the liens, Claims, interests and encumbrances, if any, of JPMC. All right, title and interest in and to the intellectual property listed on Exhibit "X" to the Global Settlement Agreement was sold to the Acquisition JPMC Entities pursuant to the Purchase and Assumption Agreement. All right, title and interest in and to the intellectual property listed on Exhibit "Y" to the Global Settlement Agreement was and remains assets of the WMI Entities. All of the WMI Entities' right, title and interest, if any, in and to trademarks, patents, domain names and copyrighted materials (whether or not the subject of registration) that were used by WMB by license or otherwise, or were available for WMB's use, prior to the Petition Date, but are not listed on Exhibit "W" or "Y" to the Global Settlement Agreement shall be deemed to have been sold, transferred, and assigned by the WMI Entities to JPMC or its designee on the Effective Date.

19. *Issuance of Liquidating Trust Interests, Runoff Notes, and Reorganized Common Stock.* The Debtors, the Reorganized Debtors and the Liquidating Trustee, as applicable, are authorized, without the need for any further corporate action and without any further action by holders of Claims or Equity Interests, to execute the Liquidating Trust Agreement and to take all other necessary steps to establish the Liquidating Trust and the Liquidating Trust Interests therein for the benefit of the Liquidating Trust Beneficiaries. In addition, Reorganized WMI is authorized, without the need for any further corporate action and without any further action by holders of Claims or Equity Interests, to issue the Runoff Notes and Reorganized Common Stock and such notes and stock shall be, upon execution and delivery, legal, valid, and binding obligations, enforceable against Reorganized WMI in accordance with their terms.

20. *Compliance with Section 1123(a)(6) of the Bankruptcy Code.* The Reorganized Debtors Certifi-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

cates of Incorporation and the Reorganized Debtors By-laws (together, the "*Organizational Documents*"), and the terms governing the issuance of the stock of Reorganized WMI, comply in all respects with section 1123(a)(6) of the Bankruptcy Code, and are hereby approved. The adoption and filing of the Organizational Documents are hereby authorized, ratified, and approved. The Debtors have complied in all respects, to the extent necessary, with section 1123(a)(6) of the Bankruptcy Code.

**\*35** 21. *Boards of Directors of Reorganized Debtors.* As of the Effective Date, the board of directors of each of the Debtors, as constituted immediately prior to the Effective Date, are hereby removed and Michael Willingham, Mark Holliday, Diane Glossman, Timothy Graham, and Gene Davis are hereby appointed as directors of the Reorganized Debtors, to serve until their resignation or removal pursuant to the terms and provisions of the Organizational Documents; *provided, however,* that the first annual election of the boards of directors shall take place no later than fifteen (15) months after the Effective Date. At such time as the Equity Committee has designated its two (2) remaining selections for the boards of directors of the Reorganized Debtors, a notice thereof shall be filed with this Court. In the event that, during the period from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the boards of directors of the Reorganized Debtors, the Equity Committee and the lenders party to the Credit Facility, as the case may be, shall choose a respective substitute and the Debtors shall file a notice thereof with the Bankruptcy Court, and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with Section 40.4 of the Plan, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing.

22. *Exemption from Securities Law.* The issuance of Runoff Notes, Reorganized Common Stock, and

the Liquidating Trust Interests, and any subsequent sale, resale, transfer, or other distribution of any such securities shall be exempt from any federal or state securities laws registration requirements, including section 5 of the Securities Act, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

23. *Cancellation of Existing Securities and Agreements.* Pursuant to Section 32.4 of the Plan, and except as otherwise provided in the Plan, any document, agreement, or instrument evidencing any Claim or Equity Interest shall be deemed automatically cancelled and terminated on the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and any and all obligations or liabilities of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests shall be discharged; *provided, however,* that the foregoing cancellation of securities, documents, agreements or instruments shall not apply to (a) the securities related to the WMB Senior Notes or the WMB Subordinated Notes and (b) any security, document, agreement or instrument related to a Disputed Claim or Disputed Equity Interest until a Final Order resolving any such Disputed Claim or Disputed Equity Interest, as applicable, is entered; and, *provided, further,* that, during the pendency of any such dispute, and except as provided in the Plan with respect to Postpetition Interest Claims, the Debtors shall not accrue or incur any additional liability or obligation with respect thereto; and, *provided, further,* that the Indentures and Guarantee Agreements shall continue in effect for the limited purposes of (i) allowing the Trustees to make distributions pursuant to the Plan and to perform such other necessary functions with respect thereto, (ii) permitting the Trustees to maintain and assert any right or Lien for reasonable fees, costs, expenses and indemnities under the Indentures and Guarantee Agreements, (iii) effectuating the applicable subordination provisions of such documents, (iv) enabling the beneficial holders of the securities to receive distributions and (v) enabling the Trustees to make applications in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

accordance with Section 31.12 of the Plan; and, *provided, further,* that, except as otherwise provided in the Plan, nothing in the Plan shall impair, affect, or adversely affect the related transactions and the rights of the parties thereto. Notwithstanding any of the foregoing, nothing contained in the Plan shall be deemed to impair, waive or extinguish any rights of the Trustees with respect to any rights contained in the respective Indentures or Guarantee Agreements; *provided, however,* that, upon payment in full of the respective Trustee Claims and Trustee Distribution Expenses in accordance with the Plan, the rights of the Trustees to seek payment from or assert claims against the Debtors for amounts owed under the respective Indentures or Guarantee Agreements shall be discharged as provided in the Plan.

**\*36** 24. *Surrender of Instruments.* Except to the extent evidenced by electronic entry, as a condition of receiving any distribution pursuant to the Plan, each holder of a certificated instrument (other than with respect to WMI Preferred Equity Interests or WMI Common Equity Interests) or note must surrender such instrument or note to the appropriate Trustee, agent, or the Disbursing Agent or its designee. Any holder of such instrument or note that fails to (i) surrender such instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity or similar affidavit reasonably satisfactory to the appropriate Trustee, agent, or the Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to have forfeited all rights, interests and Claims and may not participate in any distribution pursuant to the Plan, Any distribution so forfeited shall become the property of the Disbursing Agent for distribution to holders of Allowed Claims and Equity Interests in accordance with the terms and provisions of the Plan.

25. *Liquidating Trust.* On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors or the Reorganized Debtors, as applicable, and the Liquidating Trustee. In addition,

the parties shall, without any additional or further Court authority, take all other steps necessary to establish the Liquidating Trust and the Liquidating Trust Interests therein. In the event of any conflict between the terms of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern. The Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes. The Liquidating Trust Assets shall be transferred to the Liquidating Trust in accordance with the provisions of the Plan, the Liquidating Trust Agreement, and this Order. Pursuant to the Liquidating Trust Agreement, William C. Kosturos is hereby appointed as "Managing Trustee" and CSC Trust Company of Delaware is hereby appointed as "Resident Trustee" of the Liquidating Trust.

26. *Assumption or Rejection of Contracts and Leases.* Pursuant to Section 34.1 of the Plan, except as otherwise provided herein, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have rejected each prepetition executory contract and unexpired lease to which they are a party, pursuant to section 365 of the Bankruptcy Code, unless such contract or lease (i) was assumed, assumed and assigned, or rejected pursuant to an order of the Court entered prior to the Effective Date, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties, (iii) is the subject of a motion to assume or assume and assign filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be assumed or assumed and assigned on the Schedule to the Plan Supplement, including, without limitation, any executory contract or unexpired lease sold, accepted, or transferred to one of the JPMC Entities pursuant to the terms of the Global Settlement Agreement. This Order shall con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

stitute an order of the Court pursuant to sections 365 and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

**\*37** 27. *Objection to Cure Amounts; Rejection Damage Claims.* Any dispute regarding (i) the amount of any cure payment, (ii) the ability to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (iii) any other matter pertaining to assumption had to have been filed and served within twenty (20) days of the date of service of the Cure Notice. No party filed any such objection. If the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors and the Liquidating Trust, unless a proof of Claim is filed with the Court and served upon attorneys for the Debtors or the Liquidating Trustee, as the case may be, on or before thirty (30) days after the latest to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Court authorizing rejection of such executory contract or unexpired lease,

28. *Payment of Cure Amounts.* Any monetary amount required as a cure payment with respect to each prepetition executory contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as the parties to such executory contracts or unexpired leases and the Debtors, otherwise may agree.

29. *Non–Release of Certain Obligations.* Notwithstanding anything contained in the Global Settlement Agreement or the Plan to the contrary, nothing

is intended to release, nor shall it have the effect of releasing, (a) the WMI Releasees (as defined in the Global Settlement Agreement), the JPMC Releasees (as defined in the Global Settlement Agreement), or the FDIC Parties from the performance of their obligations in accordance with the Global Settlement Agreement and the agreements set forth on Schedules 3.1(b) and 3.2 to the Global Settlement Agreement and (b) any Releasee (as defined in the Global Settlement Agreement) or any Person, including, without limitation, the United States of America, from any claims and causes of action asserted or that could be asserted in either the American Savings Litigation or the Anchor Litigation, nor is it intended to assign, nor shall it have the effect of assigning, any claims or causes of action asserted or that could be asserted in either the American Savings Litigation or the Anchor Litigation, but only to provide for the disposition of the proceeds, if any, arising from such litigation. In addition, as set forth in and consistent with Section 3.8 of the Global Settlement Agreement, nothing in the Global Settlement Agreement, the Plan, or this Order shall waive, release, acquit or discharge, nor shall anything in the Global Settlement Agreement, the Plan, or this Order be construed to waive, release, acquit or discharge the rights and obligations of JPMC and the FDIC Parties pursuant to the Purchase and Assumption Agreement, including, without limitation, any right to assert that liabilities remain with the FDIC Parties or seek indemnification in accordance with the provisions of Section 12.1 of the Purchase and Assumption Agreement or dispute the assertion of liabilities or the entitlement to indemnification; *provided, however,* that the Global Settlement Agreement shall affect and be binding upon JPMC and the FDIC Parties to the extent it resolves any and all claims among JPMC and the FDIC Parties to the assets and consideration paid, sold, assigned and transferred to the JPMC Entities and the FDIC Parties pursuant to the Global Settlement Agreement and the Purchase and Assumption Agreement.

**\*38** 30. *Setoff.* Except as otherwise provided in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

the Plan, the Disbursing Agent may, pursuant to applicable bankruptcy and nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Allowed Claim), the Claims, rights, and Causes of Action of any nature the Debtors, the Reorganized Debtors, or the Liquidating Trust may hold against the holder of such Allowed Claim; *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Reorganized Debtors, or Liquidating Trust of any such Claims, rights, and Causes of Action.

31. *Delivery of Distributions.* Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in Section 31.5 of the Plan and herein, distributions and deliveries to holders of Allowed Claims or Equity Interests shall be made at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim or Equity Interests filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; *provided, however,* that initial distributions of Creditor Cash by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB–1 Guarantees Claims, Allowed CCB–2 Guarantees Claims, and Allowed PIERS Claims as applicable, shall be made to the appropriate Trustee (or such Trustee's designee) under the respective governing documents for such obligations. Each such Trustee (or such Trustee's designee) shall, in turn, in accordance with the Plan, distribute and deliver Creditor Cash, as applicable, to those holders in whose name Senior Notes, Senior Subordinated Notes, CCB–1 Common Securities, CCB–1 Preferred Securities, CCB–2 Common Securities, CCB–2 Preferred Securities, PIERS Common Securities (subject to Section 37 below), and PIERS Preferred Securities

representing Allowed Claims are registered, in the applicable Trustees' books and records, on the Distribution Record Date, in the manner provided for in the applicable Indenture and other governing documents. The Trustees may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to contra-CUSIP positions and escrow positions set up by the Debtors or their agents with the DTC, and the Trustees shall close and terminate the original CUSIPS after making initial distributions of Creditor Cash and shall have no further distribution obligations thereafter. The Trustees shall not be required to give any bond or surety or other security for the performance of their duties, unless otherwise ordered by the Court. The Trustees shall only be required to make the distributions and deliveries described in this decretal paragraph and shall be only required to make such distributions and deliveries in accordance with the terms of this Order and the Plan, and shall have no liability for actions taken in accordance with this Order, the Plan or in reliance upon information provided to the Trustees in accordance with this Order, the Plan or in connection with distributions to be made hereunder and thereunder, except for liabilities resulting from their own gross negligence or willful misconduct. Initial distributions of Runoff Notes, Reorganized Common Stock and Liquidating Trust Interests by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB–1 Guarantees Claims, Allowed CCB–2 Guarantees Claims, Allowed General Unsecured Claims, Allowed Late–Filed Claims, Allowed PIERS Claims, Allowed WMB Senior Notes Claims, Accepting Non–Filing WMB Senior Note Holders, Allowed Subordinated Claims, Allowed Preferred Equity Interests, Allowed Dime Warrants and Allowed Common Equity Interests, as and to the extent applicable, will be made by the Disbursing Agent directly to such holders, upon consent of the applicable Trustee, which consent shall not be unreasonably withheld. Subsequent distributions to such holders, as and to the extent applicable, that have identified

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

themselves to the Liquidating Trustee, to the extent the Liquidating Trustee deems appropriate, will be the responsibility of the Liquidating Trustee as Disbursing Agent. Notwithstanding the foregoing, all distributions are subject to the Lien and priority rights of the Trustees. The Debtors, their agents and servicers, the Disbursing Agent and the Trustees shall have no obligation to recognize any transfer of Senior Notes Claims, Senior Notes, Senior Subordinated Notes Claims, Senior Subordinated Notes, CCB–1 Guarantees Claims, CCB–1 Guarantees, CCB–1 Common Securities, CCB–1 Preferred Securities, CCB–2 Guarantees Claims, CCB–2 Guarantees, CCB–2 Common Securities, CCB–2 Preferred Securities, General Unsecured Claims, Late–Filed Claims PIERS Claims, PIERS Common Securities, PIERS Preferred Securities, Preferred Equity Interests, Dime Warrants and Common Equity Interests occurring after the Distribution Record Date, or any transfer of WMB Senior Notes or WMB Senior Notes Claims occurring after October 25, 2010; *provided, however,* that the Liquidating Trustee shall recognize transfers of Liquidating Trust Interests in accordance with the Plan and the Liquidating Trust Agreement, which provide that a Liquidating Trust Interest is not transferable or assignable by a Liquidating Trust Beneficiary except by will, intestate succession or operation of law.

**\*39** 32. *Distributions to Holders of Dime Warrants.* The Distributions on account of the Allowed LTW Claims (as defined in that certain *Stipulation and Agreement Between the Debtors and Class Representatives of the LTW Holders Resolving Adversary Proceeding and the LTW Proofs of Claim,* dated January 10, 2012 (the "*LTW Stipulation* ")) shall be made in accordance with the LTW Stipulation. After reimbursement of fees and expenses allowed by the Court, the balance of the distribution on account of the Allowed LTW Claims (as defined in the LTW Stipulation) shall be made on a pro rata basis to those holders of Dime Warrants who execute and deliver the release required pursuant to in Section 41.6 of the Plan on or prior to February 29, 2012.

33. *Disbursing Agent.* Pursuant to Section 1.89 of the Plan, the Disbursing Agent shall be (a) the Reorganized Debtors or the Reorganized Debtors' designee, with respect to the initial distribution of (i) Cash pursuant to Article III of the Plan to holders of Allowed Administrative Expense Claims and, to the extent applicable, Allowed Priority Tax Claims as of the Effective Date; (ii) Cash to holders of Allowed Priority Non–Tax Claims as of the Effective Date; (iii) Cash to holders of Allowed Convenience Claims, Allowed WMI Claims, Allowed Trustee Claims and the fees and expenses owed to certain Creditors' professionals pursuant to Section 41.18 of the Plan (to the extent approved by the Court as reasonable), in each case as of the Effective Date; (iv) Creditor Cash pursuant to Section 31.1 of the Plan; and (v) RunoffNotes, Liquidating Trust Interests and Reorganized Common Stock to or for the benefit of holders of Allowed Claims and Equity Interests, as applicable, the Reorganized Debtors or the Reorganized Debtors' designee, and (b) the Liquidating Trustee or any Entity in its capacity as a disbursing agent, with respect to all other distributions. The Disbursing Agent also shall, at the election of JPMC, make the distribution to each Releasing REIT Trust Holder set forth in Article XXIII of the Plan Cash or stock transferred by JPMC to the Disbursing Agent for that purpose. In its role as Disbursing Agent, the Reorganized Debtors shall hold Cash, Creditor Cash, Runoff Notes, Reorganized Common Stock, and Liquidating Trust Interests as agent only, and shall not have any ownership interest in such cash, stock or interests.

34. *"Pro Rata Share" for Holders of Claims Subordinated to the Level of Equity Interests.* For purposes of calculating Pro Rata Share of distributions for holders of Claims, the share count for such holders shall be determined by dividing the amount of an Allowed Claim by the per share price of WMI common stock as of the close of business on the day immediately preceding the Petition Date.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

35. *Tax Withholdings by Liquidating Trustee.* The Liquidating Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests. All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Liquidating Trustee deems necessary to effectuate the Plan, this Order, and the Liquidating Trust Agreement. In order to receive distributions under the Plan, all holders of Liquidating Trust Interests (including, without limitation, (i) holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB–1 Guarantees Claims, Allowed CCB–2 Guarantees Claims, Allowed General Unsecured Claims, Allowed Late–Filed Claims, Allowed PIERS Claims, Allowed WMB Senior Notes Claims, Allowed Preferred Equity Interests, Allowed Common Equity Interests and holders of Dime Warrants and (ii) Accepting Non–Filing WMB Senior Note Holders, who, in each case, deliver a release in accordance with the provisions of Section 41.6 of the Plan shall be required to identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Liquidating Trustee for these purposes. This identification requirement generally applies to all holders, including those who hold their securities in street name. The Liquidating Trustee may refuse to make a distribution to any holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion, and until such infor-

mation is delivered, and may treat such holder's Liquidating Trust Interests as disputed; *provided, however,* that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the Liquidating Trustee shall make such distribution to which the holder of the Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, *provided, further,* that, if such information is not furnished to the Liquidating Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Liquidating Trust Interest; and, *provided, further* that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Liquidating Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee for such liability (to the extent such amounts were actually distributed to such holder).

**\*40** 36. *Distributions to Holders of Allowed WMB Senior Notes Claims and Accepting Non–Filing WMB Senior Note Holders.* Pursuant to Sections 21.1(a) and (b) of the Plan, amounts distributed to holders of Allowed WMB Senior Notes Claims and Accepting Non–Filing WMB Senior Note Holders shall not be credited against or otherwise reduce such holders' claims against the Receivership solely for purposes of determining the holder's relative participation in distributions (unless and until the holder has recovered, in the aggregate, through distributions pursuant to the Plan and from the Receivership, the full amount of its claim); *provided, however,* that no holder of a WMB Senior Note shall be entitled to receive, in the aggregate from distributions from the Debtors and the Receivership, more than the amount owed with respect to such WMB Senior Note. Pursuant to the Plan and the Plan Support Agreement, payments made by the Debtors pursuant to Sections 21.1(a) and (b) of the Plan shall be treated as payments made on account of the WMB Senior Notes held by holders of Allowed WMB Senior Notes Claims and Accepting

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Non–Filing WMB Senior Note Holders, and shall reduce the principal amount of such notes (and thus the maximum recovery permitted against the Receivership).

37. *Distributions on Account of PIERS Common Securities.* Pursuant to Section 20.1 of the Plan, the beneficial holder of the PIERS Common Securities shall receive its Pro Rata Share of Creditor Cash and Liquidating Trust Interests; *provided, however,* that any distribution on account of the PIERS Common Securities of Creditor Cash and Cash on account of Liquidating Trust Interests shall be redistributed to Entities who hold PIERS Preferred Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities' Allowed PIERS Claims and Postpetition Interest Claims have been satisfied in accordance with the terms and provisions of the PIERS Trust Agreement, and the beneficial holder of the PIERS Common Securities shall be deemed to have waived its right to receive any distribution in excess of such amount.

38. *Distributions on Account of CCB–1 Common Securities.* Pursuant to Section 18.1 of the Plan, the beneficial holder of the CCB–1 Common Securities shall receive its Pro Rata Share of Creditor Cash and Liquidating Trust Interests; *provided, however,* that any distribution on account of the CCB–1 Common Securities of Creditor Cash and Cash on account of Liquidating Trust Interests shall be redistributed to Entities who hold CCB–1 Preferred Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities' Allowed CCB–1 Guarantees Claims and Postpetition Interest Claims have been satisfied in accordance with the terms and provisions of the CCB Trust Agreements.

39. *Distributions on Account of CCB–2 Common Securities.* Pursuant to Section 19.1 of the Plan, the beneficial holder of the CCB–2 Common Securities shall receive its Pro Rata Share of Creditor Cash and Liquidating Trust Interests; *provided, however,* that

any distribution on account of the CCB–2 Common Securities of Creditor Cash and Cash on account of Liquidating Trust Interests shall be redistributed to Entities who hold CCB–2 Preferred Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities' Allowed CCB–2 Guarantees Claims and Postpetition Interest Claims have been satisfied in accordance with the terms and provisions of the CCB Trust Agreements.

**\*41** 40. *Disputed Claims Holdback.* The holdback for Disputed Claims provided for in Section 26.3 of the Plan and the terms thereof are hereby approved in their entirety; *provided, however,* that the Debtors and the Liquidating Trustee are not obligated to hold back or reserve any Creditor Cash, Cash, Liquidating Trust Interests, Runoff Notes, Reorganized Common Stock, or other currency on account of Claims that JPMC is obligated to pay pursuant to the Global Settlement Agreement, including, without limitation, (a) Claims in Classes 4 through 10, which will be paid or funded by JPMC (to the extent provided in the Plan), or (b) Claims in Class 11, which will be paid from the Vendor Escrow; and, *provided, further,* that the Debtors and the Liquidating Trustee are not obligated to hold back or reserve any Creditor Cash, Cash, Liquidating Trust Interests, Runoff Notes, Reorganized Common Stock or other currency on account of any tax claim for which monies have been set aside in the Refund Escrow Account (as defined in the Global Settlement Agreement) for potential payment.

41. *Disputed Equity Escrow.* From and after the Effective Date, until such time, or from time to time, as each Disputed Equity Interest has been compromised and settled or allowed or disallowed by Final Order of the Bankruptcy Court, there shall be held in the Disputed Equity Escrow by the Liquidating Trustee, as escrow agent, for the benefit of each holder of a Disputed Equity Interest, Reorganized Common Stock and any dividends, gains or income attributable in respect of such Reorganized Common Stock, in an amount equal to the Pro Rata Share of distributions

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

that would have been made to the holder of such Disputed Equity Interest if it were an Allowed Equity Interest. To the extent that the Liquidating Trustee retains any such Reorganized Common Stock, until such time as such stock is distributed, the Liquidating Trustee shall exercise voting or consent rights with respect to such stock; *provided, however,* that the Liquidating Trustee shall be obligated to vote or consent, as the case may be, as to such stock in the same proportion as all other holders of issued and distributed Reorganized Common Stock have voted or consented, in each case on an issue-by-issue basis. Apart from the Liquidating Trustee serving as escrow agent, the Disputed Equity Escrow shall be separate and distinct from the Liquidating Trust (and the Liquidating Trust Claims Reserve), and the assets therein shall not comprise part of the Liquidating Trust Assets. At such time as any other Disputed Equity Interest becomes, in whole or in part, an Allowed Equity Interest, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any dividends, gains or income attributable thereto. To the extent a Disputed Equity Interest is disallowed, in whole or in part, the Liquidating Trustee, as escrow agent, shall distribute to the holders of Common Equity Interests entitled to receive a distribution in accordance with the provisions of Sections 24.1 and 25.1 of the Plan, on a pro rata basis, the shares of Reorganized Common Stock, together with any dividends, gains or income attributable thereto, allocable to such Disputed Equity Interest, to the extent of such disallowance.

**\*42** 42. *Reserve Pending Delivery of Third Party Release by Holders of Claims.* Notwithstanding anything contained in the Plan to the contrary, in the event that a holder of a Claim entitled to a distribution thereunder failed to execute and deliver prior to the Ballot Date the third party release required in accordance with the provisions of Section 41.6 of the Plan (other than (a) holders that affirmatively elect to opt out of granting the releases provided in Section

41.6 and (b) of Claims in Class 17A and Non–Filing WMB Senior Note Holders), (i) from and after the Effective Date, the Disbursing Agent or the Liquidating Trustee, as the case may be, shall reserve amounts of Creditor Cash and Liquidating Trust Interests (but not Runoff Notes), as the case may be, otherwise to be distributed to such holder,[FN11] (ii) provided that a third party release is not executed and delivered by such holder to the Liquidating Trustee prior to the three (3), six (6) and nine (9) month anniversary of the Effective Date, on or prior to the fifth (5th) Business Day following any such date, the Liquidating Trustee shall serve a notice (together with a form of release) upon such holder, either directly or indirectly through such holder's nominee, informing such holder of such reserved distribution and the requirement of such holder to execute and deliver such third party release to the Liquidating Trustee prior to delivery of such reserved distribution, and (iii) in the event that, on or prior to the one (I) year anniversary of the Effective Date, such holder fails to execute and deliver such third party release to the Liquidating Trustee, then, the Liquidating Trustee shall be deemed authorized to permanently remove such holder and its corresponding Claim from the Liquidating Trustee's books and records and any consideration held for distribution on account of such Allowed Claim shall revert to the Liquidating Trustee for redistribution to holders of Liquidating Trust Interests in accordance with the terms and provisions of the Plan and hereof. Without in any way limiting the foregoing, any release election, whether submitted in accordance with this Section 31.6(c) of the Plan or otherwise, submitted during the period between the Ballot Date and the Effective Date shall not be recognized and shall be deemed null and void. In the event that a holder of a Claim seeks to receive and execute a release form in accordance with this provision at any time from and after the Effective Date, but other than pursuant to the periodic notices to be distributed as set forth above, then such holder may, following the Effective Date, submit a request, in writing, to the Liquidating Trustee to receive a release form, and the appropriate trustee

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

will send such form to such requesting holder on or prior to the fifth (5th) Business Day following the date such trustee receives such request; *provided, however,* that under no circumstances shall requests for such release form from holders of Claims in Class 17A and Non–Filing WMB Senior Note Holders be honored by the Liquidating Trustee.

> FN11. With respect to Claims in Classes 2, 3, and 16 relating to debt securities, holders of such securities as of the cancellation date of such securities (*i.e.:* the Effective Date).

**\*43** 43. *Deadline for Submission of Third Party Releases by Holders of Equity Interests and Dime Warrants.* Holders of Preferred Equity Interests and Common Equity Interests that do not submit elections with respect to the releases set forth in Section 41.6 of the Plan on or prior to March 7, 2012 will not receive a distribution pursuant to the Plan. Holders of Dime Warrants that do not submit elections with respect to the releases set forth in Section 41.6 of the Plan on or prior to February 29, 2012 will not receive a distribution pursuant to the Plan.

44. *Claims of Subordination.* Except as specifically provided in the Plan, to the fullest extent permitted by applicable law, on the latest to occur of (i) the Effective Date, (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Cases, and (iii) the final distribution made to holders of Allowed Claims in accordance with Article XXXI of the Plan, all Claims and Equity Interests, and all rights and claims between or among holders of Claims and Equity Interests relating in any manner whatsoever to Claims or Equity Interests, based upon any contractual, equitable or legal subordination and/or subrogation rights, will be terminated and discharged in the manner provided in the Plan, and all such Claims, Equity Interests and rights so based, and all such contractual, equitable and legal subordination and/or subrogation rights to which any Entity may be entitled will be irrevocably waived. To the fullest extent per-

mitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under this Plan will not be subject to levy, garnishment, attachment or like legal process by any holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination and/or subrogation rights, so that, notwithstanding any such contractual, equitable or legal subordination and/or subrogation rights, each holder of a Claim or Equity Interest shall have and receive the benefit of the rights and distributions set forth in this Plan.

45. *No Amendments to Proofs of Claim.* As of the commencement of the Confirmation Hearing, a proof of Claim may not be filed or amended without the authority of the Court. Notwithstanding that the Court may permit the filing or amendment of such a proof of Claim, the Debtors are not required to reserve Liquidating Trust Assets to pay or otherwise satisfy any such Claims.

46. *Conditions to Effective Date.* The Plan shall not become effective unless and until the conditions set forth in Section 37.1 of the Plan have been satisfied or waived pursuant to Section 37.2 of the Plan. For the avoidance of doubt, no waiver of the conditions precedent to the Effective Date shall have occurred without the consent of the Creditors' Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate, and AAOC.

47. *Administrative Claim Bar Date.* The last day to file proof of Administrative Expense Claims shall be ninety (90) days after the Effective Date, after which date, any proof of Administrative Expense Claim not filed with this Court shall be deemed forever barred and the Debtors, the Reorganized Debtors, and the Liquidating Trust shall have no obligation with respect thereto; *provided, however,* that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim shall have been incurred (i) in accordance with an order of this Court or (ii) with the consent of the Debtors and in

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

the ordinary course of the Debtors' operations.

**\*44** 48. *Professional Compensation and Reimbursement Claims.* Except as provided in Section 41.18 of the Plan, all Entities awarded compensation or reimbursement of expenses by the Bankruptcy Court in accordance with sections 328, 330, or 331 of the Bankruptcy Code or entitled to priorities established pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall be paid in full, in Cash, in the amounts allowed by the Bankruptcy Court (i) on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order or (ii) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Disbursing Agent; *provided, however,* that, except as provided herein, each professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the Administrative Claim Bar Date. Except as otherwise ordered by the Court, the Disbursing Agent is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Court approval.

49. *Objections to Final Fee Applications.* All objections to any Final Fee Application shall be filed with the Court, together with proof of service thereof, and served upon the applicant, the Debtors, the U.S. Trustee, the Creditors' Committee, the Equity Committee, and parties entitled to receive notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, so as to be received not later than 4:00 p.m., prevailing Eastern Time, on the date that is fifteen (15) days prior to the Final Fee Hearing.

50. *Assumption of Blackstone Engagement Letter by Liquidating Trustee in Certain Circumstances.* From and after the Effective Date, the Reorganized Debtors shall remain bound by that certain engagement letter, dated April 20, 2010, by and among Blackstone Advisory Partners L.P. ("*Blackstone* ") and the Debtors (including that certain indemnification agreement, dated April 9, 2010), as amended by that certain supplemental engagement letter, dated November 3, 2010 (collectively, the "*Engagement Letter* ").

51. *Administrative Expenses.* Administrative expenses incurred by the Debtors or the Reorganized Debtors after the Effective Date, including Claims for professionals' fees and expenses, shall not be subject to an application and may be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business and without further Court approval.

52. *Discharge.* As of the Effective Date, the confirmation of the Plan shall effectuate the following:

a. Except as expressly provided in Section 41.6 of the Plan or this Order, all distributions and rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Equity Interests or other rights of a holder of an equity security or other ownership interest. Upon the Effective Date, the

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

Debtors and the Reorganized Debtors shall (i) be deemed discharged under section 1141(d)(1)(A) of the Bankruptcy Code and released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests or other rights of a holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan, and (ii) terminate and cancel all rights of any equity security holder in any of the Debtors and all Equity Interests.

**\*45** b. Except as provided in Sections 41.6 and 41.12 of the Plan or in this Order, all Entities shall be precluded from asserting against any and each of the Debtors and the Reorganized Debtors, and any and each of their respective assets, property and estates, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Equity Interests or other rights of a holder of an equity security or other ownership interest. In accordance with the forego-

ing, except as expressly provided in the Plan or this Order, this Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests, or other rights of a holder of an equity interest and termination of all rights of any such holder in any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void and extinguish any judgment obtained against any of the Debtors or the Reorganized Debtors, and their respective assets, property and estates at any time, to the extent such judgment is related to a discharged Claim, debt or liability or terminated right of any holder of any Equity Interest in any of the Debtors. As of the Effective Date, and in consideration for the value provided under the Global Settlement Agreement to effectuate the Plan, each holder of a Claim or Equity Interest in any Class under the Plan shall be and hereby is deemed to release and forever waive and discharge as against each and any of the Debtors and the Reorganized Debtors, and their respective assets, property and estates, all such Claims and Equity Interests.

c. Except as expressly provided in Sections 41.6 and 41.12 of the Plan or this Order, in furtherance of the foregoing and for good and valuable consideration, and except for the JPMC Assumed Liabilities, Allowed WMB Vendor Claims, and Allowed WMI Vendor Claims, to the extent provided in the Global Settlement Agreement, none of the JPMC Entities or any of their Related Persons shall have any liability for, and the Debtors, on behalf of themselves, their respective estates and their present Affiliates (other than WMB and its subsidiaries), hereby release the JPMC Entities and each of their Related Persons from liability for, any and all Claims that (i) are or were property of the Debtors, their respective estates, or their present Affiliates (other than WMB and its subsidiaries), and (ii) were or could have

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

been brought in any of the Related Actions.

**\*46** 53. *Releases by the Debtors, the Creditors' Commit tee and the Equity Committee.*

a. *Released Parties.* Except as otherwise expressly provided in the Plan, this Order, or the Global Settlement Agreement, on the Effective Date, for good and valuable consideration, each of the Debtors and the Reorganized Debtors on its own behalf and as representative of its respective estate, the Disbursing Agent and each of the Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, the Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to the Debtors taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees; *provided, however,* that the foregoing release shall not extend to acts of gross negligence or willful misconduct (other than with respect to the JPMC Entities and their respective Related Persons).

b. *Release of AAOC, Holders of Allowed Senior Notes Claims, Holders of Allowed Senior Subordinated Notes Claims, Holders of CCB–1 Guarantees Claims, Holders of CCB–2 Guarantees Claims and Holders of Allowed PIERS Claims.* On the Effective

Date, for good and valuable consideration, each of the Debtors and the Reorganized Debtors, on its own behalf and as representative of its respective estate, the Disbursing Agent and each of the Debtors' Related Persons, the Creditors' Committee and the Equity Committee, without giving any legitimacy or merit to any of the allegations raised or asserted with respect to AAOC, holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims and holders of Allowed PIERS Claims during the Chapter 11 Cases, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge (1) the AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB Releasees, and each of their respective officers, directors, agents, employees and, solely in their capacity as counsel with respect to the Debtors' Chapter 11 Cases, attorneys from any and all Estate Claims that the Debtors, the Creditors' Committee and the Equity Committee, have or may have or claim to have, now or in the future, against (1) the AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB Releasees, and each of their respective officers, directors, agents, employees and, solely in their capacity as counsel with respect to the Debtors' Chapter 11 Cases, attorneys.

**\*47** 54. *Releases by Holders of Claims.*

a. *Global Third Party Releases.* On the Effective Date, for good and valuable consideration, and to the fullest extent permissible under applicable law, each Entity (Creditor or holder of an Equity Interest) that (i) has held, currently holds or may hold a Released Claim or any Released Third Party Causes of Action, (ii) is entitled to receive, directly or indirectly, a distribution or satisfaction of its Claim or Equity Interest pursuant to the Plan, and (iii) elects,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

by not checking or checking the appropriate box on its Ballot or election form, as the case may be, to grant the releases set forth in Section 41.6 of the Plan, on their own behalf and on behalf of anyone claiming through them, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge (1) each and all of the Released Parties from any and all Released Claims and/or any claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged in the Actions or in the Texas Litigation, or that could have been alleged in respect of the foregoing or other similar proceeding, including, without limitation, any such claim demand, right, liability, or cause of action for indemnification, contribution or any other basis in law or equity for damages, costs or fees incurred by the releasors therein arising directly or indirectly from or otherwise relating thereto and (2) each of (a) the AAOC Releasees, (b) the Senior Notes Claims Releasees, (c) the Senior Subordinated Notes Claims Releasees, (d) the PIERS Claims Releasees and (e) the CCB Releasees from any and all Released Third Party Causes of Action; ***provided, however, that each Entity that has elected not to grant the releases set forth in Section 41.6 of the Plan, including, without limitation, any Entity that fails to execute and deliver a release following notice in accordance with the provisions of Section 31.6(c) of the Plan, shall not be entitled to, and shall not receive, any payment, distribution or other satisfaction of its claim pursuant to the Plan;*** and, *provided, further,* that, notwithstanding anything contained in Section 41.6(a) of the Plan to the contrary, the release set forth in Section 41.6(a)(1) of the Plan shall not extend to acts of gross negligence or willful misconduct of any Released Parties (other than with respect to the JPMC Entities and their respective Related Persons); and, *provided, further,* that, notwithstanding the foregoing, solely for purposes of Section 41.6(a) of the Plan, "Released Parties" shall not include Related Persons other than (i) Related Persons of the JPMC

Entities and (ii) Related Persons of the FDIC Receiver and FDIC Corporate.

    b. *Limited Governmental Exceptions.* Nothing contained in the Plan or this Order shall (1)(i) release, or is intended to release, any non-Debtor, including any non-Debtor Entity that may be a Released Party or a Related Person, in connection with any legal action or claim brought by the United States Securities and Exchange Commission or (ii) prejudice the rights of any such non-Debtor Entity to defend or otherwise contest any such legal action or claim, (2)(i) to the extent that (A) the Pension Plans are terminated from and after the Effective Date and (B) the Pension Plans are underfunded as of the Effective Date, release, or is intended to release, any non-Debtor, including any non-Debtor Entity that may be a Released Party or a Related Person, from any liability as a fiduciary of the Pension Plans, under any law, government policy or regulatory provision, (ii) enjoin or preclude the Pension Benefit Guaranty Corporation from enforcing such liability against such non-Debtor Entity during the applicable statute of limitations period set forth in 29 U.S.C. § 1303 following any such termination, or (iii) prejudice the rights of any such non-Debtor Entity to defend or otherwise contest any such legal action or claim, and (3)(i) release the claims held by the California Franchise Tax Board or the Oregon Department of Revenue (together, the "*State Taxing Agencies*"), including rights of setoff and recoupment with respect to claims against or among two or more non-Debtor Entities, against any non-Debtor and, notwithstanding any other provision of the Plan or this Order, the State Taxing Agencies shall not be enjoined from pursuing any such claims and (ii) prejudice the rights of any such non-Debtor to defend or otherwise contest any such legal action or claim, or the rights and obligations as between JPMC and the FDIC pursuant to the P & A Agreement with respect to any such legal action or claim.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

**\*48** c. *BKK Liabilities.* Nothing in the Plan or this Order is intended to, nor shall it, release any non-Debtor or non-Debtor Entity that may be a Released Party or a Related Person, in connection with any legal action or claim brought by CDTSC or the BKK Group relating to the BKK Site that is the subject of the BKK Litigation; *provided, however,* that nothing contained in Section 41.6(c) of the Plan is intended, nor shall it be construed, to (1) constitute evidence of or any support for an argument that any such non-Debtors have any such liabilities, or (2) create any liability on behalf of the Liquidating Trust. For the avoidance of doubt, nothing herein shall affect the releases or other terms of the BKK Settlement Agreement, which provisions shall control over any contrary provision in this Order, the Plan or the Global Settlement Agreement.

d. *Securities Litigations.* Nothing in the Plan, this Order or the Global Settlement Agreement with respect to the releases, exculpations, injunctions or similar provisions is intended to, nor shall it, release, enjoin or impact in any way the prosecution of the claims asserted, or to be asserted, against any non-Debtor or nonDebtor Entity in the Securities Litigations, including, but not limited to, the defendants named in the Securities Litigations (the "*Securities Litigations Carve–Out* "), nor will any potential distribution on account of the relevant proofs of claim filed by lead plaintiffs in the Securities Litigations and/or which have been withdrawn without prejudice (subject to all parties' rights with respect to the relevant proofs of claim in accordance with and subject to the terms of the Bankruptcy Court-approved stipulations) be forfeited by virtue of the Securities Litigations Carve–Out. Subject to further order of the Court, in accordance with the terms and provisions of Section 26.3 of the Plan, the Debtors shall treat that certain Proof of Claim filed by the Class Representatives, Policemen's Annuity and Benefit Fund of the City of Chicago, Boilermaker National Annuity Trust and Doral Bank

Puerto Rico, on behalf of the class in *Boilermaker National Annuity Trust Fund, on Behalf of Itself and All Others Similarly Situated v. WAMU Mortgage Pass–Through Certificates, Series ARI, et al.,* Case No. C09–0037 (MJP) (W.D.Wash.), dated January 26, 2012 and assigned Proof of Claim number 4069 (the "*MBS Plaintiffs' Claim* "), as a Disputed Claim in Class 12 of the Plan and reserve distributions in connection therewith as if an Allowed Claim in the amount of Four Hundred Thirty–Five Million Dollars ($435,000,000.00); *provided, however,* that this reserve is without prejudice to any party's right to argue that the MBS Plaintiffs' Claim is invalid on any ground or shall be treated in a different class for distribution purposes.

e. *Tranquility.* Pending the effective date of that certain Stipulation and Agreement Between the Debtors and Tranquility Master Fund, Ltd. (A) Resolving Amended Proof of Claim Number 3925 and (B) Allowing Claims for Voting Purposes, dated February 16, 2012 [D.I. 9698], the following language, which was deleted pursuant to the Third Plan Modification, shall be deemed reinserted in Section 41.6(e) of the Plan, and is hereby approved and deemed effective:

**\*49** Nothing contained herein or in the Confirmation Order with respect to releases, exculpations, injunctions or similar provisions is intended to, nor shall it, affect, impact, impair, modify, or limit or otherwise be used to contest the Tranquility Claim, or Tranquility's ability to receive distributions on account of the Tranquility Claim; *provided, however,* that the Debtors' ability to contest whether any subsequent amendments or modifications to the Tranquility Claim were properly filed and relate to the Tranquility Claim are expressly reserved.

f. *Truck and Fire.* Notwithstanding anything contained herein or in the Plan or in the Verification Form (as defined in the order approving the Supplemental Disclosure Statement [D.I, 7081] ), with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

respect to the Claims of Truck Insurance Exchange ("*Truck* ") and Fire Insurance Exchange ("*Fire* ") asserted against the Debtors and the Debtors' chapter 11 estates (collectively, the "*Truck/Fire Claims* "), including, without limitation, those Claims included in Classes 17A and 17B of the Plan, (a) the release and injunction provisions of the Plan and this Order are intended to, and shall release only, all Claims of Truck and Fire against any Released Parties arising from or relating to the Truck/Fire Claims, other than any claims, counterclaims or defenses under or relating to any policies of insurance, and (b) the release and injunction provisions of the Plan and this Order are not intended to, and shall not release, any claims of Truck, Fire or any Affiliate of Truck or Fire against (i) a non-Debtor as an investor in securities issued by any such non-Debtor Entity, (ii) WMB, (iii) the Receivership or (iv) the FDIC Receiver solely with respect to the Receivership.

g. *Texas Litigation.* Nothing in the Plan or this Order with respect to the releases, exculpations, injunctions or similar provisions is intended to, nor shall it, release, enjoin or restrain the prosecution of direct claims, if any, asserted, or that could have been asserted, in the Texas Litigation against any non-Debtor Entity; *provided, however,* that the foregoing is without prejudice to the rights of any such non-Debtor Entity to contest, upon notice and a hearing, the validity, merits and ownership of or standing to assert any such direct claims; and, *provided, further,* that this Court is not making, either pursuant to the Plan or this Order, a determination as to which Entity, including, without limitation, the Debtors, owns the claims asserted, or that could have been asserted, in the Texas Litigation; and, *provided, further,* that any and all direct claims against the Debtors and derivative claims of the Debtors, if any, that have been or could have been asserted against any Released Party in the Texas Litigation shall, upon the Effective Date, be released, discharged and enjoined.

h. In addition to, and not in any way limiting the foregoing, each holder of an Allowed WMB Senior Notes Claim and each Accepting Non–Filing WMB Senior Notes Holder shall be deemed to have released the Debtors, the Reorganized Debtors, and each of their respective Related Persons from any and all direct and derivative claims arising from or related to such holder's WMB Senior Notes, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holder's WMB Senior Notes (including, without limitation, any Section 510(b) Subordinated WMB Notes Claims that such holder may have).

**\*50** i. *Waiver of Section 1542:* **All persons providing releases pursuant to the provisions of Section 41.6 of the Plan are hereby deemed to have expressly and voluntarily waived Section 1542 of the California Civil Code, or any similar, comparable or equivalent provision of the statutory or non-statutory law of California or any other jurisdiction. Section 1542 provides:**

**A general release does not extend to claims under which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

55. *Release and Exculpation Provisions.* All release and exculpation provisions, including, but not limited to, those contained in Article XLIII of the Plan, are approved and shall be effective and binding on all Entities, to the extent provided herein.

56. ***Injunctions and Stays.***

a. ***Injunctions on Claims.* Except as otherwise expressly provided in Sections 41.6 and 41.12 of the Plan, this Order or such other order of this**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))

Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or Equity Interests or other right of equity interest that is terminated or cancelled pursuant to the Plan or the Global Settlement Agreement, or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 of the Plan, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan against any of the Released Parties or any of their respective assets, property or estates, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets, property or estates on account of any Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets, property or estates on account of any Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets, property or estates, with respect to any such Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan; *provided, however,* that such injunction shall not preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, *provided, further,* that, except in connection with a properly filed proof of Claim, the foregoing proviso does not permit the United States of America, any State or any of their respective police or regulatory agencies from obtaining any monetary recovery, including fines, restitution or forfeiture, from any of the Released Parties, including, without limitation, the Debtors, the Debtors in Possession or the Reorganized Debtors, or any of their respective assets, property or estates, with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power; and, *provided, further* that, subject to Section 3.8 of the Global Settlement Agreement, such injunction shall not preclude the JPMC Entities, the Receivership, the FDIC Receiver and the FDIC Corporate from pursuing any and all claims against each other or any other defenses thereto pursuant to the Purchase and Assumption Agreement. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets, property and estates.

**\*51** b. *Injunction Related to Releases.* As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim, an Estate Claim, any Released Third Party Cause of Action or an Equity Interest that is released pursuant to Sections 41.5 and 41 .6 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

**taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims, Estate Claims, Released Third Party Causes of Action or such Equity Interests: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Sections 41.5 and 41.6 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the the Plan or this Order.**

57. *Exculpation.* The Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity Committee, and each of their respective professionals shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Chapter 11 Cases (including any actions taken by the Creditors' Committee or the Equity Committee after the Effective Date), the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements

contained therein, the Disclosure Statement and the Supplemental Disclosure Statement related thereto, the Global Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Global Settlement Agreement; *provided, however,* that the foregoing provisions, set forth in Section 41.8 of the Plan, shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct. Nothing in Section 41.8 of the Plan shall prejudice the right of any of the Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity Committee, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

**\*52 58. *Bar Order.* To the limited extent provided in Section 41.6 of the Plan and decretal paragraph 54 of this Order, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, the Debtors' Claims, the JPMC Claims, the FDIC Claim, the Purchase and Assumption Agreement (other than any rights or claims the JPMC Entities, the Receivership, the FDIC Receiver or the FDIC Corporate may have under the Purchase and Assumption Agreement),**

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

confirmation and consummation of the Plan, the negotiation and consummation of the Global Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Related Actions, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the Related Actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

59. *Deemed Consent.* By submitting a Ballot or election form and receiving a distribution under or any benefit pursuant to this Plan and not electing to withhold consent to the releases of the applicable Released Parties and the Entities set forth in Section 41 .6 of the Plan, or by order of this Court, each holder of a Claim or Equity Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 41.6 of the Plan.

**60. *Supplemental Injunction.* Notwithstanding anything contained herein or in the Plan to the contrary, except to the limited extent provided in Section 41.6 of the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims or Equity Interests against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the**

**Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims or Equity Interests arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:**

**\*53** (a) **Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim or Equity Interest against any of the Released Parties or the assets or property of any Released Party;**

(b) **Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;**

(c) **Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;**

(d) **Except as otherwise expressly provided in the Plan, this Order, or the Global Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect *to* any such Released Claim or Eq-**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

uity Interest; and

(e) **Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, this, or the Global Settlement Agreement relating to such Released Claim or Equity Interest;**

*provided, however,* that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code and, *provided, further,* that the supplemental injunction provided pursuant to the terms of this Section 41.12 shall not preclude any current or former officers or directors of WMI from asserting any setoff or recoupment rights against any judgment or other obligation due to the Debtors, the Debtors' estates, or the Liquidating Trust or against the property of the Debtors or the Debtors' estates, to the extent such individuals have such rights pursuant to applicable non-bankruptcy law.

61. *Term of Existing Injunctions or Stays.* Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362, or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until entry of an order in accordance with Section 41.23 of the Plan or such other Final Order of the Court; *provided, however,* that the terms of the Stock Trading Order shall remain in full force and effect forever, including, without limitation, with respect to any violation thereof on or before the Effective Date,

62. *Prosecution of Claims.* Except as settled and released herein, from and after the Effective Date, the Liquidating Trustee, subject to the oversight and consent rights of the Trust Advisory Board, the Litigation Subcommittee, and the Bankruptcy Court, and

subject to the terms of this Order, the Plan, and the Liquidating Trust Agreement, shall have the right and power to litigate, and the Liquidating Trust shall be vested with, any Claim or Cause of Action that constituted an Asset of the Debtors and their estates, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors or the Liquidating Trust thereafter, to a Final Order, and the Liquidating Trustee may compromise and settle such claims, upon approval of the Court.

**\*54** 63. Nothing in this Order, the Plan or the Global Settlement Agreement shall be deemed or construed to release, waive or abandon any demands, claims or causes of action of the Debtors and their estates against present and former officers and directors of the Debtors for actions occurring prior to the Petition Date (collectively, "*D & O Claims* "). By virtue of the UCC Stipulation and the *Order* thereon [Docket No. 5416], the Creditors' Committee was authorized to prosecute claims or causes of action related by a factual or transaction nexus to the Transfers (as defined in the UCC Stipulation) and, in accordance therewith, the Creditors' Committee asserted D & O Claims pursuant to the authority granted it by the referenced *Stipulation* and *Order.* Any D & O Claims that the Creditors' Committee previously was authorized to prosecute shall be vested in the Liquidating Trust for prosecution by the Liquidating Trustee as if any such D & O Claims had continued to have been asserted by the Creditors' Committee, and nothing in such transfer or vesting shall waive or diminish the rights to pursue any such D & O Claims. With respect to the D & O Claims and any other any demands, claims or causes of action of the Debtors and their estates vested in the Liquidating Trust and over which the Liquidating Trustee shall have the right and power to litigate, the Liquidating Trust shall succeed to and constitute the assignee of all rights, powers and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

privileges that, before the Effective Date of the Plan, could be exercised by the Creditors' Committee, any representative of the estates, and any comparable authority, including a trustee or examiner with expanded powers. Any D & O Claims and any other demands, claims or causes of action of the Debtors and their estates, which are hereby vested in the Liquidating Trust shall be brought by the Liquidating Trustee on behalf of the Liquidating Trust.

64. The Liquidating Trustee is appointed as trustee pursuant to Bankruptcy Code § 1123(a)(7) and, with respect to the D & O Claims and any other any demands, claims or causes of action of the Debtors and their estates vested in the Liquidating Trust, shall have all rights, powers and privileges as if such Liquidating Trustee had been appointed trustee in the Chapter 11 Cases.

65. *Indemnification and Reimbursement Obligations.* For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be deemed rejected as of the Effective Date and such parties' rights to assert rejection damage claims, if any, shall be governed by Section 34.5 of the Plan and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

66. *Intercompany Claims.* Intercompany Claims shall be extinguished, unless otherwise agreed or resolved between the parties to a given Intercompany Claim, resolved by the Global Settlement Agreement or released by operation of the Plan. Any such transaction may be effected without any further action by the stockholders of any of the Debtors or the Debtors in Possession. To the extent that any Intercompany Claim is extinguished in accordance with this provision, Kurtzman Carson Consultants LLC, the Debtors' Court-retained claims agent, may take such action as

is necessary to reflect such extinguishment on the Debtors' claims registry.

**\*55** 67. *Benefit Plans.* Notwithstanding anything contained in the Plan to the contrary, the Debtors and the Liquidating Trustee, as the case may be, are authorized, but not required, to terminate all Benefit Plans, in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law, at such time as determined by the Debtors or the Liquidating Trustee, as the case may be, in their sole discretion; *provided, however,* that, until the transfer or termination of any Benefit Plan, the Debtors, the Liquidating Trustee, and the Reorganized Debtors, as the case may be, shall (a) continue to perform any and all of their administrative obligations thereunder and (b) with respect to Benefit Plans subject to Title IV of ERISA, continue to make any required minimum funding contributions and pay applicable Pension Benefit Guaranty Corporation insurance premiums; and, *provided, further,* that, upon termination thereof, the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, shall provide administrative services in connection with the operation and wind down of the Benefit Plans; and, *provided, further,* that the continuation of any Benefit Plan by the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, from and after the Confirmation Date, including, without limitation, the provision of administrative services in connection with the operation and wind down of such Benefit Plan, shall not constitute an assumption of such Benefit Plans in accordance with section 365 of the Bankruptcy Code; and, *provided, further,* that the failure to perform any obligation under the Benefit Plans or to provide administrative services in connection with the wind down of the Benefit Plans shall be without prejudice to (i) any Entity to assert such failure gives rise to an Administrative Expense Claim and (ii) the Debtors or the Liquidating Trustee to contest the assertion thereof. For the avoidance of doubt, the foregoing shall not apply to any employee benefit or welfare plan to be

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

maintained by the Reorganized Debtors or the Liqui-
dating Trustee, as the case may be, in the ordinary
course of business after the Effective Date for the
benefit of employees actively employed by the Re-
organized Debtors or the Liquidating Trustee.

68. *Termination of Vendor Stipulation.* On the
Effective Date, that certain Stipulation By and Be-
tween Debtors and JPMorgan Chase Bank, N.A.
Concerning Certain Contracts, dated October 16,
2008, approved by the Court pursuant to the Order
Approving Stipulation By and Between the Debtors
and JPMorgan Chase Bank. N.A. Concerning Certain
Vendor Contracts, dated December 30, 2008 (the
"*Confidentiality Order* "), shall be terminated and
deemed of no further force and effect, except as spe-
cifically provided in Section 2.14 of the Global Set-
tlement Agreement; *provided, however,* that notwith-
standing anything to the contrary in this Order or the
Plan or the Confidentiality Order, the Debtors, the
Creditors' Committee, and their respective Repre-
sentatives (as such term is used in the Confidentiality
Order) shall continue, in accordance with the obliga-
tions described in the Confidentiality Order and the
Debtors' undertakings on the record of the hearing to
consider approval of the stipulation, to protect "Con-
fidential Information" provided in connection with a
"Vendor Claim" or "Vendor Contracts," as those
terms are defined in the Confidentiality Order, until
final resolution of any objection to a Vendor Claim,
including any appeal thereof. Upon such a final reso-
lution, and as set forth in the Confidentiality Order, the
Debtors, the Creditors' Committee, and their respec-
tive Representatives shall return to JPMC or destroy,
and certify such destruction, the Vendor Contract and
any other Confidential Information pertaining to such
Vendor Claim.

**\*56** 69. *D & O Policies.* Notwithstanding any-
thing contained in the Plan or this Order to the con-
trary, neither the Plan nor this Order shall be deemed
to invalidate or otherwise affect coverage under the
Debtors' director and officer liability insurance poli-

cies which were acquired in connection with WMI's
indemnification obligations to its officers and direc-
tors (the "*D & O Policies* "), the obligations of the
insurers pursuant to the D & O Policies, or the rights
of the insureds thereunder.

70. *IAA/JPMC.* Pursuant to Section 2.20(a) of the
Global Settlement Agreement, that certain Infor-
mation Access Agreement dated November 21, 2008,
between the Debtors and JPMC, as amended (the
"*IAA/JPMC* "). shall be deemed amended under its
current terms to provide for the extension of the term
set forth therein to the entry of an order of the Court
closing the Chapter 11 Cases; *provided, however,* that
such extension shall be solely for the limited purposes
of providing the Debtors, or their successors in inter-
est, as the case may be, with access to documents
reasonably necessary (1) to comply with pending or
future requests in any litigation or governmental in-
vestigation, (2) in connection with any objection by
the Debtors, or their successors in interest, as the case
may be, to any claim in the Chapter 11 Cases, so long
as such objection is interposed on or prior to Decem-
ber 31, 2012, and (3) with respect to the Debtors'
administration and resolution of all Pre–2009 Group
Tax (as defined in the Global Settlement Agreement)
matters in accordance with the terms and provisions of
the Global Settlement Agreement. Notwithstanding
the foregoing, rather than extending the expiration of
the IAA/JPMC in accordance with Section 2.20(a) of
the Global Settlement Agreement (as set forth above),
JPMC, at its sole option, discretion and expense, may
elect to make available for inspection and copying by
WMI any or all of the books and records to which
WMI has access under the IAA/JPMC, including all
electronic records, through and up to twelve (12)
months following the Effective Date of the Global
Settlement Agreement. If so elected, WMI and JPMC
shall agree on a third party provider which, subject to
confidentiality limitations, shall have such access as
may reasonably be required to copy the records (in-
cluding electronic records and backup tapes) desig-
nated by WMI, and JPMC shall be relieved of any

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

further obligations or undertaking to the WMI Entities with respect thereto.

71. *IAA/FDIC.* Pursuant to Section 2.20(b) of the Global Settlement Agreement, that certain letter agreement, dated November 19, 2008, between the Debtors, the Creditors' Committee and the FDIC Receiver, as may be amended, shall be deemed amended under its current terms to provide for an expiration upon the earlier to occur of (a) entry of an order of this Court closing the Chapter 11 Cases and (b) the closing of the Receivership.

72. *Compliance with Tax Requirements.* Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations and, if any party issuing any instrument or making any distribution pursuant to the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W–8 or Form W–9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution,

**\*57** 73. *Exemption from Transfer Taxes.* Pursuant to sections 106, 1141 and 1146(a) of the Bankruptcy Code, the issuance, transfer and exchange of assets, notes or equity securities pursuant to or in connection with the Plan or the Global Settlement Agreement, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer pursuant to, in furtherance of, or in connection with the Plan or the Global Settlement Agreement, including, without limitation, the Runoff Notes, the Credit Facility, the Reorganized Common Stock, the Trust Preferred Securities, and any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated pursuant to the Plan or the Global Settlement Agreement shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar Tax. All state and local government officials and agents shall forego the collection of any such Tax or governmental assessment and shall accept for filing and recordation any instrument or other document issued or transferred pursuant to the Plan, without the payment of any such Tax or government assessment.

74. *Dissolution of the Creditors' Committee.* On the first (1st) Business Day thirty (30) days following the Effective Date, and provided that payments to holders of Unsecured Claims have been made in accordance with Article XXXI of the Plan, the Creditors' Committee shall be dissolved, and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection there-

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

with; *provided, however,* that the Creditors' Commit-
tee may, at its own discretion, continue or resume its
duties arising from or relating to (i) any pending liti-
gation or contested matter to which the Creditors'
Committee is a party, (ii) the MBS Plaintiffs' Claim
(iii) any appeal filed regarding confirmation of the
Plan, (iv) obligations arising under confidentiality
agreements, joint interest agreements, and protective
orders, if any, entered during the Chapter 11 Cases
that remain in fall force and effect according to their
terms, (v) applications for fees and expenses of
members of the Creditors' Committee and requests for
compensation and reimbursement of expenses pur-
suant to section 503(b) of the Bankruptcy Code for
making a substantial contribution in any of the Chap-
ter 11 Cases, and (vi) motions, appeals or other liti-
gation seeking the enforcement of the provisions of
the Plan and the transactions contemplated hereunder
or in the Confirmation Order; and, *provided, further,*
that the Liquidating Trust shall continue to compen-
sate the Creditors' Committee's attorneys, financial
advisors, and other agents, if any, for any such
post-Effective Date activities or those identified Sec-
tion 33.1 of the Plan; and, *provided, further,* that, in
the event that (a) the Creditors' Committee elects to
continue or resume any or all of the enumerated duties
set forth in Section 33.1 of the Plan or this Confirma-
tion Order and (b) all then-appointed members of the
Creditors' Committee subsequently resign, (i) the
United States Trustee may appoint such Persons as the
United States Trustee deems appropriate to represent
the interests of the Creditors' Committee and (ii) if no
such Persons are appointed, then, only with respect to
this second proviso to this paragraph 74, (y) all right,
title and interest of the Creditors' Committee in any
and all tolling agreements entered into by the Credi-
tors' Committee, for itself or on behalf of the Debtors
and their estates, on the one hand, and a potential
defendant, on the other hand, shall be deemed as-
signed to the Liquidating Trust and the Liquidating
Trustee and the Liquidating Trust and the Liquidating
Trustee shall be entitled to the benefits therein, in-
cluding, without limitation, timing with respect to the

commencement of any litigation, as if the Liquidating
Trust and the Liquidating Trustee were a party to any
such tolling agreement, and (z) in its sole and absolute
discretion, the Liquidating Trustee may, and, if it
chooses to, shall, accede to the position of the Credi-
tors' Committee in prospective or then-pending litiga-
tions or contested matters, as the case may be. Without
limiting the foregoing, on the Effective Date, the
Creditors' Committee shall take any and all action as is
necessary to cause the withdrawal and dismissal, with
prejudice, of the appeal taken by the Creditors'
Committee from the September Opinion.

**\*58** 75. [Intentionally omitted.]

76. *Dissolution of Equity Committee.* On the Ef-
fective Date, other than with respect to its duties and
obligations set forth herein or in the Plan, the Equity
Committee shall be dissolved and the members
thereof shall be released and discharged of and from
all further authority, duties, responsibilities, and ob-
ligations related to and arising from and in connection
with the Chapter 11 Cases, and the retention or em-
ployment of the Equity Committee's attorneys, finan-
cial advisors, and other agents, if any, shall terminate
other than for purposes of filing and prosecuting ap-
plications for final allowances of compensation for
professional services rendered and reimbursement of
expenses incurred in connection therewith; *provided,
however,* that, in the event that (a) a timely appeal is
taken from the Confirmation Order and (b) such ap-
peal remains pending, the Equity Committee shall be
dissolved on the earlier to occur of (1) dismissal or
withdrawal of such appeal and (2) a determination, by
Final Order, as to the merits of such appeal and; *pro-
vided, further* that, in the event of any such appeal
from the Confirmation Order, the Liquidating Trust
shall pay the reasonable fees and expenses of the Eq-
uity Committee in connection with any such appeal,
subject to approval by the Bankruptcy Court. Without
limiting the foregoing, on the Effective Date, the Eq-
uity Committee shall take any and all action as is
necessary to cause the withdrawal and dismissal, with

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

prejudice, of (x) the Equity Committee Adversary Proceeding, (y) the Equity Committee Action to Compel and (z) the appeals taken by the Equity Committee from (i) the January Opinion and (ii) the September Opinion.

77. *Payment of Statutory Fees.* All fees payable pursuant to section 1930 of title 28 of the United States Code and, if applicable, any interest payable pursuant to section 3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be obligations and liabilities of the Liquidating Trust and shall be paid on the Effective Date or thereafter as and when they become due or otherwise pursuant to an agreement between the Debtors and the United States Department of Justice, Office of the United States Trustee, until such time as the Chapter 11 Cases shall be closed in accordance with the provisions of Section 41.23 of the Plan.

78. *Payment of Fees and Expenses of Certain Creditors.* Within ninety (90) days of the Effective Date, (i) Fried, Frank, Harris, Shriver & Jacobson LLP, (ii) Blank Rome LLP, (iii) White & Case LLP, (iv) Kasowitz, Benson, Torres & Friedman LLP, (v) Zolfo Cooper LLC, (vi) Kramer, Levin, Naftalis & Frankel LLP, (vii) Halperin Battaglia Raicht LLP, (viii) Kilpatrick Townsend & Stockton LLP, (ix) Brown Rudnick LLP, (x) Arkin Kaplan Rice LLP, (xi) Campbell & Levine, LLC, (xii) Mesirow Financial Consulting, LLC, (xiii) Schnader Harrison Segal & Lewis LLP, and (xiv) in accordance with Section 21.1(a) of the Plan, Wilmer Cutler Pickering Hale & Dorr LLP, Pachulski Stang Ziehl & Jones LLP, and Boies, Schiller & Flexner LLP, to the extent any clients with respect to the foregoing professionals seek reimbursement for the payment of fees and expenses incurred, shall file with this Court an application (for purposes of reviewing the reasonableness of the amounts requested therein), together with detailed invoices annexed thereto, requesting payment for reasonable fees and expenses incurred during the period from the Petition Date through and including

the Effective Date, in connection with the Chapter 11 Cases, the Global Settlement Agreement, the Plan or the transactions contemplated herein or therein (including, without limitation, investigating, negotiating, documenting, and completing such transactions and enforcing, attempting to enforce, and preserving any right or remedy contemplated under the Global Settlement Agreement and in the Chapter 11 Cases). All objections to any such fee applications shall be filed with the Court, together with proof of service thereof, and served upon the applicant, the Debtors, the U.S. Trustee, the Creditors' Committee, and parties entitled to receive notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, so as to be received not later than 4:00 p.m., prevailing Eastern Time, on the date that is fifteen (15) days prior to the final hearing with respect to such fees. Within ten (10) Business Days of the entry of a Final Order by this Court approving the payment thereof, in whole or in part, the Disbursing Agent shall pay such fees and expenses so approved.

**\*59** 79. *Securities Litigations Documents.* On the Effective Date, the Debtors shall not transfer any documents, in electronic form or otherwise, to the Reorganized Debtors that relate to the claims, defenses and allegations in the Securities Litigations. All such documents will be transferred to the Liquidating Trust on the Effective Date and shall be thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement; *provided, however,* that, in the event that any documents are required for the operations of the Reorganized Debtors and are transferred to the Reorganized Debtors, copies of any such documents shall be transferred to the Liquidating Trust on the Effective Date and thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement.

80. *Documents Requested by the Reorganized Debtors.* Upon receipt of a written request from the Reorganized Debtors, at any time within the two years following the Effective Date, the Liquidating Trust, JPMC or the FDIC Receiver, as applicable, shall make

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

available for inspection and copying (at the expense of the Reorganized Debtors) such documents or information, in either written or electronic form, as is reasonably requested by the Reorganized Debtors, that the Reorganized Debtors may require in order to comply with U.S. federal and state governmental regulations, including, but not limited to, Federal and state tax, insurance or securities laws, rules, or regulations, and that is not protected by the attorney-client privilege or any other legal protection for confidential dealings and communications; *provided, however,* nothing herein shall constitute an obligation of, or undertaking by, the Liquidating Trust, JPMC or the FDIC Receiver, as the case may be, to create documents or information, or to retain documents or information other than in the ordinary course of business in order to make such documents or information available to the Reorganized Debtors or the Liquidating Trust as contemplated hereby.

81. *Documents and Instruments.* Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan, the Global Settlement Agreement, and this Order.

82. *Reversal/Stay/Modification/Vacatur of Order.* Except as otherwise provided in this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors, the Reorganized Debtors, the Liquidating Trust, or the JPMC Entities, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective

date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Order, the Global Settlement Agreement and the Plan. To the extent not specifically reversed, modified, vacated, or stayed by an order of this Court, all existing orders entered in these Chapter 11 Cases remain in full force and effect.

**\*60** 83. *Retention of Jurisdiction.* Notwithstanding the entry of this Order or the occurrence of the Effective Date, subject to Article XXXVIII of the Plan and except as otherwise provided in the Plan or herein, pursuant to sections 105 and 1142 of the Bankruptcy Code, this Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases to the fullest extent as is legally permissible, including, but not limited to, jurisdiction over the matters set forth in Article XXXVIII of the Plan.

84. *Conflicts Among Order, Plan and Global Settlement Agreement* . The provisions of the Plan, this Order, and the Global Settlement Agreement shall be construed in a manner consistent with each other so as to effect the purpose of each; *provided, however* that in the event of any inconsistency between the Global Settlement Agreement, the Plan or this Order, the documents shall control in the following order of priority: (i) this Order, (ii) the Global Settlement Agreement, and (iii) the Plan; *provided, however,* that, in the event of any inconsistency between these documents with respect to the releases provided in Section 41.6 of the Plan, the documents shall control in the following order of priority: (i) this Order, (ii) the Plan, and (iii) the Global Settlement Agreement; and *provided, further,* however, that nothing herein is intended to nor shall be construed to modify the economic terms of the Plan.

85. *Modifications.* Without need for further order or authorization of the Court and subject to any limitations set forth in the Plan (including consent rights) and any stipulation approved by this Court in connec-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)
**(Cite as: 2012 WL 1563880 (Bkrtcy.D.Del.))**

tion with the Plan, the Debtors, the Reorganized Debtors, or the Liquidating Trust are authorized and empowered to make any and all modifications to the Plan, any and all documents included as part of the Plan Supplement, and any other document that is necessary to effectuate the Plan that does not materially modify the terms of such documents and are consistent with the Plan.

86. *Provisions of Plan and Order Nonseverable and Mutually Dependent.* The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

87. *Governing Law.* Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law therein shall be applicable to such Exhibit), the rights, duties and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws.

88. *Applicable Nonbankruptcy Law.* Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Plan and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

***61** 89. *Waiver of Filings.* Any requirement pursuant to section 521 of the Bankrutpcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court of the Office of the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived as to any such list, schedule, or statement not filed as of the Effective Date.

90. *Police Powers.* Nothing contained in the Plan or this Order shall preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their statutory, police or regulatory powers.

91. *Notice of Order.* In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order and the occurrence of the Effective Date, substantially in the form attached as *Exhibit B* hereto, to all parties who hold a Claim or Equity Interest in these Chapter 11 Cases, as well as the Creditors' Committee, Equity Committee, the U.S. Trustee, any party filing a notice pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal Revenue Service, and the United States attorney for the District of Delaware. Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Order.

92. *Substantial Consummation.* On the Effective Date, the Plan shall be deemed to be substantially consummated pursuant to sections 1101 and 1127 of the Bankruptcy Code.

93. *No Waiver.* The failure to specifically include any particular provision of the Plan in this Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

Bkrtcy.D.Del.,2012.
In re Washington Mut., Inc.
Slip Copy, 2012 WL 1563880 (Bkrtcy.D.Del.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 8



Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

**H**

United States Bankruptcy Court,
D. Delaware.
In re TRIBUNE COMPANY, et. al[FN1], Debtors.

> FN1. The chapter 11 case filed by Tribune
> Media Services, Inc. (Bky. Case No.
> 08–13236) is being jointly administered with
> the Tribune Company bankruptcy case and
> 109 additional affiliated debtors pursuant to
> the Order dated December 10, 2008 (main
> case docket no. 43) (collectively, the "Debt-
> ors" or "Tribune"). An additional Debtor,
> Tribune CNLBC, LLC (f/k/a Chicago Na-
> tional League Ball Club, LLC) commenced a
> chapter 11 case on October 12, 2009 as one
> of the steps necessary to complete a transac-
> tion involving the Chicago Cubs and certain
> related assets. In all, the Debtors now com-
> prise 111 entities.

No. 08–13141 (KJC).
Feb. 3, 2011.

Bryan Krakauer, Sidley, Austin, Brown & Wood LLP,
James F. Conlan, Sidley Austin LLP, Patrick Theo-
dore Garvey, Johnson & Bell, Ltd, Stephen Novack,
Novack and Macey LLP, Chicago, IL, Carl D. Neff,
Ciardi Ciardi & Astin, J. Kate Stickles, Norman L.
Pernick, Patrick J. Reilley, Cole, Schotz, Meisel,
Forman & Leonard, John H. Strock, III, Fox Roth-
schild LLP, Robert S. Brady, Young, Conaway,
Stargatt & Taylor, Wilmington, DE, Edward Cerasia,
II, Seyfarth Shaw LLP, Jared D. Zajac, McDermott
Will & Emery LLP, New York, NY, Michael A.
Henry, Gross, McGinley, Labarre & Eaton, LLP,
Allentown, PA, for Debtors.

***MEMORANDUM AND ORDER***[FN2]

> FN2. This Memorandum constitutes the
> findings of fact and conclusions of law as
> required by Fed.R.Bankr.P. 7052. This Court
> has jurisdiction over this matter pursuant to
> 28 U.S.C. § 1334(b) and § 157(a). This is a
> core proceeding pursuant to 28 U.S.C.
> 157(b)(1) and (b)(2)(A) and (L).

KEVIN J. CAREY, United States Bankruptcy Judge.
**\*1** Currently before the Court is a discovery
dispute among parties who are proponents of com-
peting plans of reorganization. On January 14, 2011,
the Noteholder Plan Proponents [FN3] filed a Motion to
Compel Production of Documents and Information
from the Debtor/Committee/Lender Plan Proponents
and Other Parties, or, Alternatively For an Order of
Preclusion Respecting Certain Issues (the "Motion to
Compel")(D.I.7527). On January 19, 2011, the Debt-
or/Committee/Lender Plan Proponents [FN4] filed an
objection to the Motion to Compel (D.I.7552). A
hearing to consider the Motion to Compel was held on
January 24, 2011.

> FN3. The Noteholder Plan Proponents are
> those parties who are proponents of the Joint
> Plan of Reorganization for Tribune Company
> and Its Subsidiaries Proposed by Aurelius
> Capital Management, LP, on Behalf of Its
> Managed Entities ("Aurelius"), Deutsche
> Bank Trust Company Americas, in Its Ca-
> pacity as Successor Indenture Trustee for
> Certain Series of Senior Notes ("Deutsche
> Bank"), Law Debenture Trust Company of
> New York, in Its Capacity as Successor In-
> denture Trustee for Certain Series of Senior
> Notes ("Law Debenture"), and Wilmington
> Trust Company, in Its Capacity as Successor
> Indenture Trustee for the PHONES Notes

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

("Wilmington Trust")(D.I.7073)(the "Note-holder Plan").

FN4. The Debtor/Committee/Lender Plan Proponents are those parties who are proponents of the First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") (D.I.7136)(the "DCL Plan").

*BACKGROUND*FN5

FN5. Most of the Background is taken from the Joint Disclosure Statement (D.I.7134), approved by order dated December 9, 2010 (D.I.7126), as amended by order dated December 16, 2010 (D.I.7215).

On December 8, 2008, Tribune Company and certain of its subsidiaries (the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*). On April 12, 2010, the Debtors filed a proposed plan (the "April 2010 Plan") that sought to implement the terms of a settlement agreement regarding certain LBO–Related Causes of Action.FN6 A confirmation hearing for the April 2010 Plan was scheduled for August 16, 2010.

FN6. The "LBO–Related Causes of Action" is defined in the DCL Plan as meaning "any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal or equitable remedies against any Person arising from the leveraged buy-out of Tribune that

occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

By order dated April 20, 2010, the Bankruptcy Court entered an Agreed Order Directing the Appointment of an Examiner (the "Examiner Order"). On May 10, 2010, the Bankruptcy Court approved the U.S. Trustee's application appointing Kenneth N. Klee as examiner (the "Examiner"). On May 11, 2010, the Bankruptcy Court entered an order approving the Examiner's proposed work and expense plan and modifying the Examiner Order. The Examiner's principal duties were to:

(1) Evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the leveraged buy-out of Tribune that occurred in 2007 [defined as the LBO–Related Causes of Action] which may be asserted against any entity which may bear liability, including without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's board of directors, the Debtors' lenders and the Debtors' advisors, said potential claims and causes of action including, but not being limited to, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and equitable subordination, and to evaluate the potential defenses asserted by the Parties to such potential claims and causes of action;

(2) evaluate whether Wilmington Trust Company

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))

violated the automatic stay under 11 U.S.C. § 362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages, and Constructive Trust; and

(3) evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JP Morgan Chase Bank, N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order.

The Examiner conducted in-person meetings with the parties and invited the parties to share their views in writing on the issues to be considered by him. The Examiner was assisted, in addition to counsel, by a financial advisor who developed a financial analysis of issues presented, including issues concerning solvency, unreasonably small capital, the flow of funds, and matters pertaining to intercompany claims.

*2 On July 26, 2010, the Examiner filed a report containing the results of his investigation. By Order dated August 3, 2010, the Court ordered the unsealing of the Examiner's Report, with exhibits and transcripts.FN7 The Examiner did not reach definitive conclusions regarding the issues considered in the Report, but suggested a range of potential outcomes.FN8 After the Examiner's Report was filed, the April 2010 Plan and the settlement it embodied were abandoned.

> FN7. The Examiner's Report (volumes 1 through 4) were docketed as D.I.s 5247, 5248, 5249, and 5250. The exhibits were docketed as D.I .s 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447, 5449, 5451, 5453, 5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, and 5480.

> FN8. Specifically, the Examiner framed his conclusions about the merits of various

claims using the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

The Debtors' exclusive period within which to file a chapter 11 plan and solicit acceptances, as extended by court order, expired on August 8, 2010. After the Examiner's Report was filed and the settlement in the April 2010 Plan was abandoned, interested parties continued to negotiate, but failed to reach any consensus. Thereafter, the Debtors asked the Bankruptcy Court to appoint a mediator.

On September 1, 2010, I appointed my colleague, the Honorable Kevin Gross, as a mediator (the "Mediator") to conduct non-binding mediation concerning the terms of a plan of reorganization, including appropriate resolution of the LBO–Related Causes of Action (the "Mediation"). The parties to the Mediation included (i) the Debtors, (ii) the Creditors' Committee, (iii) Angelo Gordon, (iv) the Credit Agreement Lenders, (v) the Step One Credit Agreement Lenders, (vi) Wells Fargo Bank, N.A. (vii) Law Debenture Trust Company of New York ("Law Debenture"), (viii) Deutsche Bank Trust Company Americas, (ix) Centerbridge Credit Advisors, LLC, (x) Aurelius, (xi) EGI–TRB LLC, and (xii) Wilmington Trust Company (collectively, the "Mediation Parties"). On September 20, 2010, each of the Mediation Parties submitted to the Mediator a statement setting forth such Mediation Party's position respecting the structure and economic substance of an acceptable plan of reorganization.

The Mediation began on September 26, 2010, and the Mediation Parties continued settlement discussions on September 27, 2010. On September 28, 2010, the Mediator filed a report which, among other things, reported a settlement agreement between the Debtors, on the one hand, and Angelo Gordon and Oaktree, on the other. The Mediator continued settlement discussions with certain parties. On October 12, 2010, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

Mediator filed the Mediator's Second Report which included the terms of an expanded settlement among the Debtors, the Committee, Oaktree, Angelo Gordon, and JP Morgan (the "October Term Sheet").

Pursuant to the deadlines set forth in the Bankruptcy Court's Order dated October 18, 2010 (D.I.6022), four competing plans of reorganization were filed: (i) the Debtor/Committee/Lender Plan, (ii) the Noteholder Plan, (iii) the Bridge Lender Plan,[FN9] and (iv) the Step One Credit Lender Plan. [FN10] The Step One Credit Lender Plan was withdrawn on December 14, 2010 (D.I.7190). Pursuant to the procedures set forth in the Order dated December 9, 2010 (D.I.7126), as amended by Order dated December 16, 2010 (D.I.7215), the three competing plans were distributed for solicitation and voting.

> FN9. The Bridge Lender Plan is the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (D.I.7089)(as the same may be amended from time to time, the "Bridge Lender Plan").

> FN10. The Step One Lender Plan is the First Amended Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (D.I.6683).

**\*3** On December 20, 2010, the Bankruptcy Court entered the Discovery and Scheduling Order for Confirmation (the "Case Management Order" or "CMO"). The parties commenced discovery, which was quickly followed by a number of discovery disputes. Through various "meet and confer" conferences, the parties resolved many of these disputes. However, when they reached an impasse on certain discovery matters, the parties sent letters to the Court, as called for in the CMO. After a teleconference held on January 10, 2011, the Court directed the parties to file discovery motions on or before January 14, 2011, with replies due by January 19, 2011. Seven discovery motions were filed, and a hearing to consider them was held on January 24, 2011. The parties are continuing efforts to resolve some of the discovery issues, and some motions have been continued to February 8, 2011. Even so, new disputes continue to arise.

At the January 24, 2011 hearing, the Court heard argument regarding the Motion to Compel, and took the matter under advisement.

*DISCUSSION*

The Noteholder Plan Proponents (the "Noteholders") are seeking production of documents from the DCL Plan Proponents about the proposed settlement of the LBO–Related Causes of Action embodied in the DCL Plan. To test the arms-length nature and good faith of the settlement negotiations, the Noteholders are seeking documents and communications regarding the parties' discussions concerning the merits of the LBO–Related Causes of Action, specifically in connection with negotiations concerning the DCL Plan, the April 2010 Plan, and any other negotiations during the bankruptcy case.

The parties met and conferred in an attempt to limit the scope of the Noteholders' discovery requests and the objections thereto, but three main objections to discovery remain:

(1) objections to producing documents protected by a common interest privilege,

(2) objections to producing documents protected by the Mediation Order, Local Bankruptcy Rule 9019–5(d), and Fed.R.Evid. 408, and

(3) objections to producing documents for the period December 8, 2008 (the petition date) through

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

December 15, 2009 (the date of the Document Depository Order).[FN11]

> [FN11]. The Document Depository Order (D.I.2858) authorized the Debtors to establish and maintain a centralized document depository program to store certain documents produced to the Committee in connection with the Committee's investigation and analysis of the LBO–Related Causes of Action.

(1) *Community of Interest (or Common Interest) Privilege*[FN12]

> [FN12]. In *Teleglobe,* the Court distinguished between "common interest" (i.e., when multiple clients hire the same counsel to represent them on a matter of common interest), and "community of interest" (i.e., when clients with separate attorneys share otherwise privileged information in order to coordinate their legal activities). *In re Teleglobe Commc'n Corp.,* 493 F.3d 345, 359 (3d Cir.2007). While the matter before me falls into the "community of interest" category, the parties, here, as well as many courts, refer to the multiple attorney situation as "common interest" privilege.

The Noteholders argue that the common interest privilege cannot apply in connection with the settlement and DCL Plan because the parties have no common legal interests. The Debtors' and Committee's interests are in maximizing the estate, and the Lenders' interest is in paying as little as possible to resolve the LBO-related claims.

The DCL Plan Proponents argue in response that "parties to a settlement or proponents of a plan of reorganization share a common legal interest in gaining court approval of the plan and settlement pursuant to section 1129 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure."

In *Leslie Controls,* Judge Sontchi discussed the common interest privilege as follows:

> **\*4** The common interest doctrine "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." [ *Teleglobe,* 493 F.3d at 364.] It expands the reach of the attorney-client privilege and the work product doctrine by providing that, under certain circumstances, the sharing of privileged communications with third parties does not constitute a waiver of the privilege. Thus, the doctrine is only applicable if an underlying privilege has been established. [ *Louisiana Mun. Police Emp. Ret. Sys. v. Sealed Air Corp.,* 253 F.R.D. 300, 309 (D.N.J.2008).]

> **The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege was not otherwise waived.** [ *In re Mortg. & Realty Trust,* 212 B.R. 649, 653 (Bankr.C.D.Cal.1997).]

> ....

> [T]he doctrine is not limited to communications among co-defendants to ongoing litigation. Indeed, "pending litigation is not necessary to invoke the common interest [doctrine] [ *Id.* ] ... Rather, the common interest doctrine "applies whenever the communication is made in order to facilitate the rendition of legal services to each of the clients involved in the conference." [ *Id .* ]

> The common interest of the parties must be "at least

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))

a substantially similar legal interest." [ *Teleglobe,* 493 F.3d at 365]. Nonetheless, the parties need not be in complete accord:

> The common interest privilege does not require a complete unity of interests among the participants. The privilege applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects. The privilege applies even where a lawsuit is foreseeable in the future between co-defendants. [ *Mortg. & Realty Trust,* 212 B.R. at 653.]

When the interests of the parties diverge to some extent the common interest doctrine applies "only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests ... lose any privilege." [ *In re Rivastigmine Patent Litig.,* 2005 WL 2319005, *4 (S.D.N.Y. Sept.22, 2005).]

   *In re Leslie Controls, Inc.,* 437 B.R. 493, 496–98 (Bankr.D.Del.2010)(emphasis added).

   Even though the DCL Plan Proponents' interests are not completely in accord, they share the common legal interest of obtaining approval of their settlement and confirmation of the DCL Plan, thereby resolving the legal disputes between and among them. *See also Teleglobe,* 493 F.3d at 365–66 ("[I]t is sufficient to recognize that members of the community of interest must share at least a substantially similar legal interest.... In the community of interest context, ... because the clients have separate attorneys, courts can afford to relax the degree to which clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer."). Accordingly, the community of interest privilege can apply to parties whose interests are not totally in accord.

*5 The Third Circuit has held that parties engaged in a merger negotiation may share a common interest. *Teleglobe,* 493 F.3d at 364 (noting that the common interest doctrine applies in civil and criminal litigation, and even in purely transactional contexts)). *See also Sealed Air,* 253 F.R.D. at 310 (parties engaged in a transaction may anticipate future claims that they share an interest in defending against, which can form the basis of a common interest privilege). Common interests must be determined on a case by case basis. In *Leslie Controls,* Judge Sontchi held that parties who shared information regarding "preserving and maximizing insurance available to pay asbestos claims" during the plan negotiation process shared the common interest of maximizing the asset pool. *Leslie Controls,* 437 B.R. at 502. I am satisfied that, based upon the chronology of events which took place in connection with the mediation, a community of interests was established.

(A) *Date the community of interest privilege began*

   The question of when a community of interest privilege arose remains. The DCL Plan Proponents argue that a common interest among the Debtors, Committee, and lenders arose on October 12, 2010, when the mediator filed the October Term Sheet. The Debtors, Oaktree and Angelo Gordon also assert that their common interest began as early as September 27, 2010, when they agreed to resolve the LBO–Related Causes of Action and became proponents of a joint plan, pursuant to the Mediator's filing of the first Term Sheet on that date.

   The Noteholders argue that no common interest privilege could arise until November 23, 2010, when the DCL Plan was actually filed with the Court. The Noteholders argue that the Term Sheet filings do not establish the emergence of a common interest because the parties continued to negotiate and certain terms changed. For example, they argue that the October Term Sheet relied on a Distributable Enterprise Value ("DEV") of $6.1 billion, while the final DCL Plan refers to a DEV of $6.75 billion. The DCL Plan Pro-

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

ponents respond by stating that DEV was not a material negotiated term, and was changed (ironically, they say) to address objections of the Noteholders.

Once the DCL Plan Proponents agreed upon material terms of a settlement, it is reasonable to conclude that the parties might share privileged information in furtherance of their common interest of obtaining approval of the settlement through confirmation of the plan. I conclude that the date the Mediator's Term Sheets were filed—October 12, 2010 for all DCL Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo Gordon group—constitute dates upon which the respective parties' community of interest privilege arose.[FN13]

> **FN13.** Of course, this does not mean that every communication between the DCL Plan Proponents occurring after those dates is privileged. Any party asserting privilege first must demonstrate that the communication at issue is subject to an underlying attorney-client or work product privilege, and that sharing the communication with the common interest parties meets the three-part test adopted by Judge Sontchi in *Leslie Controls* from the *Mortg. & Realty Trust* decision: (i) the communication was made by separate parties in the course of a matter of common interest, (ii) the communication was designed to further that effort, and (iii) the privilege was not otherwise waived.

(B) *Dispute concerning specific documents covered by the community of interest privilege*

The Noteholders and the DCL Plan Proponents also disagree about the scope of communications that are covered by the community of interest privilege. In particular, the Noteholders argue that "common interest communications" should include only communications that were written or made by lawyers,[FN14] citing *Teleglobe* in support of this view:

> **FN14.** The Noteholders' proposed definition of what might be protected "Common Interest Communications" is as follows:
>
> > "Common Interest Communications" means oral, written or electronic communications, draft pleadings, briefs, plans, disclosure statements or correspondence exchanged between counsel and/or non-testifying financial advisors to two or more different parties within a Common Interest Relationship and not disclosed or provided to any Person outside the Common Interest Relationship *provided, however,* that qualifying communications shall not lose their status as Common Interest Communications merely because clients of such outside counsel received any such written or electronic communications, or listened to or were told of any such oral communications. Common Interest Communications do not include written, electronic or oral communications by persons other than outside counsel or non-testifying financial advisors for different parties, or written, electronic or oral communications internal to any one party or any one financial advisor.
>
> Revised Proposed Common Interest Stipulation and Order (D.I.7587).

**\*6** First, to be eligible for continued protection, the communication must be shared with the *attorney* of the member of the community of interest. *Cf. Ramada Inns, Inc. v. Dow Jones & Co. ., 523 A.2d 968, 972 (Del.Super.Ct.1986)*(emphasizing that the relevant Delaware evidentiary rule protects communications disclosed to an attorney). Sharing the communication directly with a member may destroy the privilege.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

*Teleglobe,* 493 F.3d at 364 (emphasis in original). The DCL Plan Proponents point out that the *Teleglobe* Court itself notes that this language is dicta. [FN15]

> FN15. *See Teleglobe,* 493 F.3d at 363 n. 18 stating that the issue before the court involved clients of the same attorneys, not clients with separate counsel, and therefore the community of interest analysis may seem "surplusage." However, because the lower court erroneously ruled that the parties before it were in a community of interest, the Third Circuit Court explained how the community of interest and co-client privilege differ. *Id.* This guidance is helpful.

The *Teleglobe* Court also considered the "plain text" of a Delaware rule of evidence in its community of interest analysis. Delaware Rule of Evidence 502(b)(3) recognizes that a client has a privilege to protect from disclosure confidential communications "made for the purpose of facilitating the rendition of professional legal services to the client by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest." *See Rembrandt Tech. LP v. Harris Corp.,* 2009 Del.Super. LEXIS 46, *25, 2009 WL 402332 (Feb. 12, 2009),* in which the Delaware Superior Court determined that "separately represented clients sharing a common legal interest may, at least in certain situations and under the close supervision of counsel, communicate directly with one another regarding that shared interest ." *Id.* at *30. The *Rembrandt* Court further decided that "the privilege may be extended to communications among the community of interest if

the communications relate to that common interest." *Id.* at *31.

The community of interest doctrine applies only if the underlying communication was subject to the attorney-client privilege or the work product doctrine. The attorney-client privilege "protects communications between attorneys and clients from compelled disclosure" and applies to a communication that satisfies the following elements: (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. *Teleglobe,* 493 F.3d at 359 *citing* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000). "Privileged persons" include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* "When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege." *WebXchange, Inc. v. Dell Inc.,* 264 F.R.D. 123, 126 (D.Del.2010) *quoting Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991).

The Third Circuit has adopted a two-part test for ascertaining whether a document is protected by the work product doctrine: (1) the first inquiry is the "reasonable anticipation test," which requires that the court determine whether "litigation could reasonably have been anticipated" (2) the second inquiry is whether the document were prepared "primarily for the purpose of litigation (i.e., documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work product doctrine. *Sealed Air,* 253 F.R.D. at 306–07.

The DCL Plan Proponents argue that the Noteholders' proposal to limit "common interest communications" to those prepared by lawyers limits artificially the community of interest privilege and would needlessly increase legal costs by requiring parties to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))

funnel all communications through their attorneys. They contend that the appropriate inquiry is whether the subject matter of the communication at issue would be protected by the attorney-client or work product privilege but for its disclosure to a party with the common interest.[FN16] I agree. The Noteholders' proposal to limit common interest communications to attorney-prepared communications is too restrictive. The DCL Plan Proponents will have the opportunity to assert (and, ultimately demonstrate, if challenged) that requested communications fall within the community of interest privilege.

> FN16. The DCL Plan Proponents propose the following language for the definition of "Common Interest Communications" in the proposed Common Interest Stipulation:
>
> > "Common Interest Communications" means oral, written or electronic communications, draft pleadings, briefs, plans, disclosure statements or other correspondence exchanged solely between parties within a Common Interest Relationship that, if only exchanged between or among a single party, its counsel and/or advisors, would have been protected from discovery by any applicable attorney-client privileges or work product protections.
>
> DCL Plan Proponents Objection, D.I. 7552, Ex.3.

2. *Whether the DCL Plan Proponents must either (i) waive protections of the Mediation Order and Local Rule 9019–5(d), or (ii) be precluded from introducing any evidence regarding the mediation, including the Mediator's endorsement of the settlement or arguing that the DCL Plan was the result of arm's length bargaining*

**\*7** The Noteholders assert that they are seeking documents and communications related to the Media-

tion to assess (and challenge) the alleged arms-length nature of the settlement negotiations for the LBO–Related Causes of Action, and the degree to which the Debtors and Committee acted in good faith as estate fiduciaries to maximize recoveries for non-LBO lenders. The Noteholders argue that the DCL Plan Proponents put such discovery "in issue" by arguing that the proposed settlement is fair because it is the product of a mediation conducted by a judge.[FN17] In other words, the Noteholders argue, it is not fair to allow the DCL Plan Proponents to use the Mediation Order as a sword and a shield. *See Westinghouse,* 951 F.2d at 1426 n. 12 ("If a partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject.").

> FN17. I suppose it is conceivable that *who* conducted a mediation may, under some presently unknowable circumstances, be relevant to a determination of whether a settlement should be approved. I have the deepest respect for my colleague, who willingly undertook this challenging mediation, but I am aware of nothing in the record before me which informs me that this factor should be accorded any special weight. Whether a settlement should be approved or a plan confirmed must rest upon the application of standards articulated in the Bankruptcy Code and by controlling decisional law.

The DCL Plan Proponents respond that they have offered to waive part of the protections of the Mediation Order [FN18] by proposing that only the following documents or communications be protected from discovery:

> FN18. The Mediation Order provides that:

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

7. All: (a) discussions among the Mediation Parties relating to the Mediation, including discussions with or in the presence of the Mediator, (b) Mediation Statements, Ownership Statements and any other documents or information provided to the Mediator or the Mediation parties in the course of the Mediation, (c) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the Mediation, and (d) communications between the Mediator and the Examiner or the Examiner's Professionals are strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding, and no person or party participating in the Mediation, including counsel for any Mediation Party or any other party, shall in any way disclose to any non-party or to any court, including without limitation in any pleading or other submission to any court, any such discussion, Mediation Statement, Ownership Statement, other document or information, correspondence, resolution, offer or counteroffer which may be made or provided in connection with the Mediation. Except with the express consent of the affected Mediation party, the Mediator shall not share with any Mediation Party any other Mediation Party's Mediation Statement or Ownership Statement.

D.I. 5591, ¶ 7.

1. written or oral communications between a "Mediation Party" and Judge Gross;

2. written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day (i.e., a day when Judge Gross convened a Mediation Session between two or more Mediation Parties)

3. written or oral communications reflecting the substance of any discussion between or among Mediation Parties on a Mediation Day or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

4. written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation

The DCL Plan Proponents argue that this proposal provides adequate discovery to the Noteholders to assess whether the settlement was at arms-length, while preserving the confidentiality of the Mediation because it permits discovery of (i) communications relating to negotiation and abandonment of the April Plan, (ii) communications prior to the mediation, and (iii) most communications between the Mediation Parties that occurred outside the presence of the Mediator on a day that is not a Mediation Day. It also allows discovery into the Mediation *process,* but protects the *substance* of the Mediation discussions.

In *Dent v. Westinghouse,* 2010 WL 56054 (E.D.Pa. Jan.4, 2010), Magistrate Judge Hey discussed the "crossroads" of Fed.R.Civ.P. 26 (which allows discovery of relevant information, even if that information is not admissible at trial, as long as it appears reasonably calculated to lead to admissible evidence) and Fed.R.Evid. 408 (providing that information regarding settlements and negotiations is inadmissible if offered to prove liability for, or invalidity of, the amount of a claim). The *Dent* Court joined judges in this circuit who require a party requesting discovery about a settlement to make a particularized showing that the evidence related to settlement is relevant and calculated to lead to the discovery of admissible evidence. *Id.* at * 1.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

**\*8** There is a strong policy in promoting full and frank discussions during a mediation. Courts have recognized that confidentiality is essential to the mediation process:

> Absent the mediation privilege, parties and their counsel would be reluctant to lay their cards on the table so that a neutral assessment of the relative strengths and weaknesses of their opposing positions could be made. Assuming they would even agree to participate in the mediation process absent confidentiality, participants would necessarily "feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute." The effectiveness of mediation would be destroyed, thereby threatening the well established public needs of encouraging settlement and reducing court dockets.

*Sheldone v. Pennsylvania Turnpike Comm'n,* 104 F.Supp.2d 511, 514 (W.D.Pa.2000) (citations omitted) *quoting Lake Utopia Paper Ltd. v. Connelly Containers, Inc.,* 608, 928, 930 (2d Cir.1979). This policy is also reflected in Local Delaware Bankruptcy Rule 9019–5(d).[FN19]

> FN19. Local Bankruptcy Rule 9019–5(d) provides, in pertinent part:

> > (d) *Confidentiality of Mediation Proceedings.*

> > (i) *Protection of Information Disclosed at Mediation.* The mediator and the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation. No person may rely on or in-

troduce as evidence in any arbitral, judicial or other proceeding, evidence pertaining to any aspect of the mediation effort, including but not limited to: (A) views expressed or suggestions made by a party with respect to a possible settlement of the dispute; (B) the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator; (C) proposals made or views expressed by the mediator; (D) statement or admissions made by a party in the course of the mediation; and (E) documents prepared for the purpose of, in the course of, or pursuant to the mediation. In addition, without limiting the foregoing, Rule 408 of the Federal Rules of Evidence, any applicable federal or state statute, rule, common law or judicial precedent relating to the privileged nature of settlement discussions, mediations or other alternative dispute resolution procedures shall apply. Information otherwise discoverable or admissible in evidence does not become exempt from discovery, or inadmissible in evidence merely by being used by a party in the mediation.

....

(iv) *Preservation of Privileges.* The disclosure by a party of privileged information to the mediator does not waive or otherwise adversely affect the privileged nature of the information.

The Noteholders agree, as they must, that discussions with the Mediator are confidential, but complain that barring discovery of communications between Mediation Parties on a Mediation Day might protect discussions by Mediation Parties who are not actively participating in the Mediation that day, which would be discoverable if held on a non-Mediation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

Day. The DCL Plan Proponents' proposal to limit the protected Mediation communications generally strikes an appropriate balance between allowing discovery of potentially relevant information and protecting the confidentiality of the mediation.

This chapter 11 case is complex, involving a large, national media company, administration of which has been full of acrimony among the various constituents. The central disputes surround challenges to an $8 billion prepetition leveraged buyout. This particular mediation involved twelve parties consisting of multiple interests owed collectively billions of dollars of debt, falling into different tranches among the various Debtors. In balancing these vastly competing interests, I conclude that the DCL Plan Proponents' proposal is reasonable, but further conclude that it is appropriate to adjust it slightly and protect those "written or oral communication between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day" (*see* # 2 of the DCL Plan Proponents proposal, *supra),* but only if the communications are between Mediation Parties who were present at the Mediation or were participating in the Mediation off-site. The protections afforded by the Mediation Order, Fed.R.Evid. 408, and Local Rule 9019–5 will otherwise remain.

3. *Whether the reasonable "start date" for discovery requests is the Petition Date (December 8, 2008) or the date of the Document Depository Order (December 15, 2009)?*

**\*9** The Noteholders believe that they should be able to reach back to the petition date to discover information relevant to their opposition to confirmation of the DCL Plan. The Noteholders offer examples of hypothetical emails that may have occurred between parties prior to December 15, 2009, but would not be produced just because of the proposed "random" start date. FN20 The Noteholders argue that it is possible that in the immediate wake of Tribune's business failure, key persons involved in the transac-

tions might have assessed what went wrong or engaged in some degree of finger-pointing. Further, the Committee's investigation began in Spring 2009, months before the proposed December 15, 2009 start date. Because approval of the LBO settlement is part of plan confirmation, the Noteholders claim they are entitled to discovery of all potential settlement discussions during the chapter 11 case.

> FN20. On December 15, 2009, the Court entered the Document Depository Order (D.I.2858) which authorized the Debtors to establish and maintain a centralized document depository related to the LBO–Related causes of action and provided that written and oral communications between "Negotiating Parties" regarding the leveraged ESOP Transactions "shall be deemed confidential" and may not be used or disclosed except in connection with settlement discussions and may not be introduced at any trial or hearing. Following entry of that order, the Debtors and a number of parties participated in negotiations which resulted in a proposed settlement embodied in the April 2010 Plan.

The DCL Plan Proponents argue that December 15, 2009 is a reasonable and logical discovery start date because most of the events relevant to the negotiation and settlement of the LBO–Related Causes of Action occurred *after* the Court entered the Document Depository Order. The DCL Plan Proponents argue that this date is even earlier than what might also be considered a reasonable discovery start date of September 2010—which is when negotiations for the current DCL Plan began after the Examiner's Report and the Mediation. They also argue that using December 15, 2009 will help to limit the costs of an already massive document production. Finally, the DCL parties argue, persuasively, that discovery regarding the merits of the LBO–Related Claims is "well trodden ground" that has been investigated by and comprehensively addressed by the Examiner.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

"Discovery of relevant, nonprivileged ... [information] is limited if the party from whom discovery is sought establishes that it is unreasonably cumulative or duplicative or that the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed.R.Civ.P. 26(b)(2)(B)." *Helmert v. Butterball, LLC,* 2010 WL 2179180, *3 (E.D.Ark.2010).

On balance, the proposed discovery start date of December 15, 2009 will allow discovery regarding LBO settlements, while limiting the burden and expense of completing discovery within the time frame provided by the CMO. The Noteholders have not demonstrated that an earlier discovery start date is likely to yield admissible, relevant information needed to litigate approval of the proposed settlement and plan confirmation.

### EPILOGUE

Lest this decision be read too broadly, I add a cautionary note: A determination involving whether a community of interest privilege applies is an intensely fact-and-circumstance-driven exercise. The balancing of tensions which arise during the search for truth may, depending upon the particular circumstances involved, fall either way. Guided by Circuit precedent, other persuasive decisional law, applicable local rule, and orders governing mediation, I have decided that the matter before me involves circumstances warranting a determination that a community of interest privilege may be invoked by co-proponents of a plan. This is not to say that parties who are co-proponents of a plan or parties who reach settlements arising from mediation are always entitled to assert this privilege. Neither should it be said that the privilege can never be invoked unless the circumstances involve the proposal of a joint plan or a settlement resulting from mediation.

### ORDER

**\*10** Upon consideration of the Motion to Compel

and the objection thereto, and for the reasons set forth above, it is hereby ORDERED that the Motion to Compel is GRANTED, in part, and DENIED, in part, as follows:

(A) The DCL Plan Proponents may assert a community of interest privilege for privileged communications that were shared among the community of interest parties in furtherance of their common interest beginning on October 12, 2010 for all DCL Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo Gordon group;

(B) The following are protected from discovery:

(i) written or oral communications between a "Mediation Party" and Judge Gross;

(ii) written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged by Mediation Parties who were present at the Mediation or were participating in the Mediation off-site on any Mediation Day (i.e., a day when Judge Gross convened a Mediation Session between two or more Mediation Parties);

(iii) written or oral communications reflecting the substance of any discussion between or among Mediation Parties who were present at the Mediation or participating in the Mediation off-site on a Mediation Day, or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

(iv) written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation;

(C) The Noteholder Plan Proponents may seek discovery of information for the period of time beginning December 15, 2009; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84
**(Cite as: 2011 WL 386827 (Bkrtcy.D.Del.))**

(D) All other relief requested in the Motion to Compel is **DENIED.**DP: Norman L. Pernick, Esquire FN21

FN21. Counsel shall serve copies of this Memorandum and Order on all interested parties and file a Certificate of Service with the Court.

Bkrtcy.D.Del.,2011.
In re Tribune Co.
Not Reported in B.R., 2011 WL 386827 (Bkrtcy.D.Del.), 54 Bankr.Ct.Dec. 84

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Tab 9

**814**                    **373 BANKRUPTCY REPORTER**

to be discharged pursuant to 11 U.S.C. § 523(a)(8) and will enter an order granting judgment in favor of the Plaintiff.

This constitutes the Court's findings of fact and conclusions of law.



In re Lucy Ann GARRIOCK, Debtor.

**Branch Banking & Trust Co., Appellant,**

**v.**

**W. Clarkson McDow, Jr., U.S. Trustee for Region 4, Appellee.**

**Civil Action No. 3:06cv559.**

United States District Court, E.D. Virginia, Richmond Division.

Aug. 17, 2007.

**Background:** After it became clear, during the course of the bankruptcy proceedings, that debtor's estate was solvent, Chapter 7 trustee proposed to make postpetition interest payments to creditor at the federal judgment rate. Creditor objected. The Bankruptcy Court overruled the objection and entered an order approving the use of the federal judgment rate. Creditor appealed.

**Holding:** The District Court, Payne, Senior District Judge, held that "the legal rate" of interest owed to claimants under the section of the Bankruptcy Code governing distribution of property of the Chapter 7 estate refers to the federal judgment rate, and does not encompass any lawful prepetition contract rate.

Affirmed.

**1. Bankruptcy ⟐2836**

Unsecured creditors generally may not recover postpetition interest on their allowed claims. 11 U.S.C.A. § 502(b)(2).

**2. Bankruptcy ⟐2836**

**Interest ⟐31**

Although unsecured creditors generally may not recover postpetition interest on their allowed claims, where a Chapter 7 estate's assets exceed claims, a creditor is entitled to interest at the legal rate from the date of the filing of the petition. 11 U.S.C.A. §§ 502(b)(2), 726(a)(5).

**3. Interest ⟐31, 36(1)**

Under the section of the Bankruptcy Code governing distribution of property of the Chapter 7 estate, "the legal rate" of interest owed to claimants refers to the federal judgment rate, and does not encompass any lawful prepetition contract rate. 11 U.S.C.A. § 726(a)(5); 28 U.S.C.A. § 1961.

See publication Words and Phrases for other judicial constructions and definitions.

**4. Bankruptcy ⟐2835.1**

Interest does not survive the debt from which it stemmed; if the debt was extinguished by virtue of the debtor's bankruptcy, so was any interest relating to it.

**5. Constitutional Law ⟐2488**

Federal district court is not at liberty to substitute its policy judgment for that of Congress.

———

Marvin Alan Rosman, Rosman & Hart, Richmond, VA, for Debtor.

## MEMORANDUM OPINION

PAYNE, Senior District Judge.

Appellant Branch Banking & Trust Co. ("BB & T") appeals the bankruptcy court's application of the federal judgment rate, as defined by 28 U.S.C. § 1961(a), to an award of post-petition interest pursuant to 11 U.S.C. § 726(a)(5). For the reasons set forth below, the judgment of the bankruptcy court is AFFIRMED.

## BACKGROUND

On January 9, 2004, Lucy Ann Garriock filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* Garriock's case was later converted to a case under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 701, *et seq.*, and the United States appointed a Chapter 7 trustee to administer Garriock's estate. BB & T held four unsecured claims against the estate, totaling $122,515.91. It became clear during the course of the bankruptcy proceedings that Garriock's estate was solvent, so the Chapter 7 trustee proposed to make post-petition interest payments, under 11 U.S.C. § 726(a)(5), to BB & T at the federal judgment rate set forth in 28 U.S.C. § 1961(a). BB & T objected to receiving interest at the federal judgment rate and argued that it should receive interest at the rate established by its pre-petition contract with Garriock. During a hearing on June 28, 2006, the bankruptcy court overruled BB & T's objection, and, on July 18, 2006, entered an order approving the use of the federal judgment rate. BB & T appeals the July 18, 2006 order. The sole issue on appeal is whether "the legal rate" of interest owed to claimants under 11 U.S.C. § 726(a)(5) refers only to the federal judgment rate or whether it encompasses pre-petition contracts between a claimant and the debtor.

## DISCUSSION

The Court has jurisdiction over this appeal under 28 U.S.C. § 158(a). The parties agree that this appeal involves a question of law which is reviewed *de novo.* *In re Merry–Go–Round Enter., Inc.,* 400 F.3d 219, 224 (4th Cir.2005).

[1, 2] As a general rule, unsecured creditors may not recover post-petition interest on their allowed claims. 11 U.S.C. § 502(b)(2) (2000). However, where an estate's assets exceed claims, as is the case here, a creditor is entitled to "interest at the legal rate from the date of the filing of the petition." 11 U.S.C. § 726(a)(5) (2000). The Bankruptcy Code does not define "the legal rate," and the parties dispute its meaning. BB & T contends that "the legal rate" in this case is the pre-petition contract rate between BB & T and Garriock. The United States Trustee, on the other hand, contends that "the legal rate" refers in all cases to the statutory interest rate provided by 28 U.S.C. § 1961(a).

[3] Courts have divided on this question. Some courts have applied a pre-petition contract rate in cases similar to this one. *See, e.g., In re Fast,* 318 B.R. 183 (Bankr.D.Colo.2004); *In re Carter,* 220 B.R. 411 (Bankr.D.N.M.1998); *In re Schoeneberg,* 156 B.R. 963 (Bankr. W.D.Tex.1993); *In re Beck,* 128 B.R. 571 (Bankr.E.D.Okla.1991). Other courts, and at least one leading commentator, have determined that "the legal rate" under 11 U.S.C. § 726(a)(5) is the federal judgment rate provided by 28 U.S.C. § 1961(a). *See, e.g., In re Cardelucci,* 285 F.3d 1231 (9th Cir.2002); *In re Country Manor of Kenton, Inc.,* 254 B.R. 179 (Bankr.N.D.Ohio 2000); *In re Chiapetta,* 159 B.R. 152 (Bankr.E.D.Pa.1993); *In re Melenyzer,* 143 B.R. 829 (Bankr.W.D.Tex.1992); *In re Godsey,* 134 B.R. 865 (Bankr.M.D.Tenn. 1991); 6 *Collier on Bankruptcy* ¶ 726.02[5]

**816**          **373 BANKRUPTCY REPORTER**

(15th ed. rev.2006) ("The reference in the statute to the 'legal rate' suggests that Congress envisioned a single rate, probably the federal statutory rate for interest on judgments set by 28 U.S.C. § 1961."). Having reviewed each line of cases, the Court is persuaded that "the legal rate" refers to the federal judgment rate, and does not encompass, as BB & T contends, any lawful pre-petition contract rate.

As the Ninth Circuit explains in *In re Cardelucci*, "principles of statutory interpretation lend strong support to the conclusion that Congress intended 'interest at the legal rate' in 11 U.S.C. § 726(a)(5) to mean interest at the federal statutory rate pursuant to 28 U.S.C. § 1961(a)." 285 F.3d at 1234. For example, in drafting § 726(a)(5), Congress inserted the phrase "interest at the legal rate" in place of the originally-proposed "interest on claims allowed." *Id.* (citations omitted). Although Congress apparently did not explain why it made that change, it is significant that Congress replaced general language with what the Ninth Circuit described as more "specific phrasing." *Id.* The narrow meaning of that "specific phrasing" is indicated by the use of the definite article "the" instead of the indefinite "a" or "an." *Id.* By awarding interest at "the legal rate," rather than at "a legal rate," Congress signaled that a single source should be used to calculate post-petition interest. *Id.* (citing *United States v. Kanasco, Ltd.*, 123 F.3d 209, 211 (4th Cir.1997); *Black's Law Dictionary* 1477 (6th ed.1990)). Courts have properly determined that sin-

gle source to be statutory because "the commonly understood meaning of 'at the legal rate' at the time the Bankruptcy Code was enacted was a rate fixed by statute." [1] *Id.* at 1234–35 (citing *Inv. Serv. Co. v. Allied Equities Corp.*, 519 F.2d 508, 511 (9th Cir.1975); *In re Dow Corning Corp.*, 237 B.R. 380, 402 (Bankr.E.D.Mich. 1999)).

[4] The proper statutory source for "the legal rate" is 28 U.S.C. § 1961(a), which establishes the federal judgment rate. Indeed, the award of post-petition interest is "analogous to an award of post-judgment interest." *Id.* at 1235; *see also In re Chiapetta*, 159 B.R. at 160–61; *In re Melenyzer*, 143 B.R. at 833. As the Ninth Circuit explains, "[a]s of the date of the filing of the petition, creditors hold a claim, similar to a federal judgment, against the estate, the payment of which is only dependent upon the completion of the bankruptcy process." *In re Cardelucci*, 285 F.3d at 1235. Because of delays inherent in completing the bankruptcy process, § 726(a)(5) awards post-petition interest to compensate creditors for the cost of those delays. *In re Melenyzer*, 143 B.R. at 833. The cost of delay affects all creditors equally, and the federal judgment rate accurately reflects the time value of each creditor's claims.[2] *See In re Godsey*, 134 B.R. at 867.

[5] Courts which eschew this analysis and, instead, choose to apply a pre-petition contract rate, do so to avoid creating a

---

1. Moreover, had Congress intended, in § 726(a)(5), to refer to state law or to the language of pre-petition contracts, it certainly knew how to do so. *See In re Godsey*, 134 B.R. at 866. Indeed, other portions of the Bankruptcy Code explicitly instruct courts to consider state law or preexisting contract language. *Id.*

2. Any pre-petition contract rates are irrelevant because "[i]nterest does not survive the debt from which it stemmed; if the debt was extinguished, so was any interest relating to it." 4 *Collier on Bankruptcy* ¶ 502.03[3][c] (15th ed. rev.2007). Debt is "extinguished" on the petition date, so it is not surprising that § 726(a)(5) explicitly awards all creditors a common "interest at the legal rate from the date of the filing of the petition."

windfall for a solvent debtor. *See, e.g., In re Fast*, 318 B.R. at 190; *In re Carter*, 220 B.R. at 416–17; *In re Beck*, 128 B.R. at 573. That motivation is understandable, particularly in light of a court's obligation, under *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 165, 67 S.Ct. 237, 91 L.Ed. 162 (1946), to consider the equities in each particular case. *See In re Fast*, 318 B.R. at 192; *In re Beck*, 128 B.R. at 573. However, *Vanston* was concerned not only with the equities "between creditors and debtors," but also with the equities "between creditor and creditor," and Congress' decision to award interest at a uniform "legal rate" quite clearly promotes the equal treatment of similarly situated creditors.[3] *See In re Cardelucci*, 285 F.3d at 1235. Even if the Court believed that Congress struck the wrong balance in this case, and did not adequately consider the potential creation of windfalls for solvent debtors, the Court is not at liberty to substitute its policy judgment for that of Congress. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"). Nor, given the statutory interpretation analysis set forth above, is the Court free to interpret "the legal rate" in different ways depending on "the specific factual circumstances before the court." *In re Cardelucci*, 285 F.3d at 1236 (citing *In re Thompson*, 16 F.3d 576, 581 (4th Cir.1994)). Thus, even though application of the federal judgment rate will, on the facts of this case, create a windfall for Garriock, that injustice, such as it is, must be remedied by Congress.

**3.** It may also reflect other policy considerations, such as administrative efficiency and the conservation of judicial resources. *See In*

For the reasons set forth above, the Court holds that "the legal rate" in 11 U.S.C. § 726(a)(5) is the federal judgment rate established by 28 U.S.C. § 1961(a).

### CONCLUSION

Because the bankruptcy court properly determined "the legal rate" under 11 U.S.C. § 726(a)(5) to be the federal judgment rate established by 28 U.S.C. § 1961(a), the judgment of the bankruptcy court is AFFIRMED.

The Clerk of the Court is directed to send a copy of this Opinion to all counsel of record.

It is so ORDERED.



### In re RENAISSANCE STONE WORKS, L.L.C., Debtor.

#### No. 06–49090.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Aug. 28, 2007.

**Background:** Following entry of order providing for abandonment to creditor of Chapter 7 estate's interest in claims that were purportedly shareholder derivative claims belonging to debtor-limited liability company (LLC) and were being asserted by creditor in adversary proceeding in bankruptcy case of debtor's majority member, show cause order identifying apparent problems with abandonment order was en-

*re Cardelucci*, 285 F.3d at 1236 (citing *In re Beguelin*, 220 B.R. 94, 101 (9th Cir. BAP 1998)).

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

| |
|---|
| ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br>PROCEEDING COMMENCED AT<br>TORONTO |
| **BOOK OF AUTHORITIES OF THE CCC** |
| **KOSKIE MINSKY LLP**<br>20 Queen St. W., Suite 900<br>Toronto, ON  M5H 3R3<br>Mark Zigler / Ari Kaplan / Jeff Van Bakel<br>Tel: 416.595.2090 / Fax: 416.204.2877<br>Lawyers for The Canadian Former Employees and Disabled<br>Employees through their court appointed Representative<br><br>**UNIFOR**<br>205 Placer Court,<br>Toronto, ON  M2H 3H9<br>Barry Wadsworth<br>Tel: 416.495.3750 / Fax: 416.495.3786<br>Lawyers for Unifor<br><br>**SHIBLEY RIGHTON LLP**<br>**w/ NELLIGAN O'BRIEN PAYNE LLP**<br>250 University Avenue, Suite 700<br>Toronto, ON   M5H 3E5<br>Arthur O. Jacques/ Thomas McRae/ Co-Counsel: Janice Payne / Steve Levitt<br>Tel:      416.214.5213/5206 / Fax:      416.214.5413/5400<br>Lawyers for active and transferred employees of Nortel Canada<br><br>**MCCARTHY TETRAULT**<br>TD Bank Tower, Suite 5300, 66 Wellington Street West<br>Toronto, ON  M5K 1E6<br>R. Paul Steep / Elder C. Marques / Byron Shaw<br>Tel: 416.601.7998 / Fax: 416.868.0673<br>Lawyers for Morneau Shepell Ltd., as administrator of<br>the Nortel Canada registered pension plans<br><br>**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**<br>155 Wellington Street West, 35th Floor<br>Toronto ON  M5V 3H1<br>Ken Rosenberg / Lily Harmer / Massimo Starnino<br>Tel: 416.646.4300 / Fax: 416.646.4301<br>Lawyers for the Superintendent of Financial Services as<br>Administrator of the Pension Benefits Guarantee Fund |