**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**FACTUM OF THE MONITOR, ON BEHALF OF ITSELF**
**AND THE CANADIAN DEBTORS**

**(Joint Hearing Returnable July 25, 2014)**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Graham D. Smith**  LSUC#: 26377D
gsmith@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

**TO:  THE CORE PARTIES SERVICE LIST**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**FACTUM OF THE MONITOR, ON BEHALF OF ITSELF
AND THE CANADIAN DEBTORS**

**(Joint Hearing Returnable July 25, 2014)**

**PART I - INTRODUCTION**

1.      Ernst & Young Inc., in its capacity as monitor (the "**Monitor**") of Nortel Networks
        Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel
        Networks Global Corporation, Nortel Networks International Corporation and Nortel
        Networks Technology Corporation (collectively, the "**Canadian Debtors**"), files this
        factum on behalf of itself and the Canadian Debtors.

2.      The Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**") and the United States Bankruptcy Court for the District of Delaware (the "**Delaware Court**") have ordered a joint hearing to determine the following legal issues:

    (a)    whether the holders (the "**Crossover Bondholders**") of the Crossover Bond Claims (defined below) are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US$4.092 billion); and

    (b)    if it is determined that the Crossover Bondholders are so entitled, what additional amounts are such holders entitled to so claim and receive,

(collectively, the "**Common Bond Claim Issues**").

3.      The following are the Monitor's submissions on the Canadian law relevant to the Common Bond Claim Issues.

## PART II - OVERVIEW

4.      The common law principle that interest stops at the commencement of a bankruptcy or winding-up is an entrenched part of Canadian insolvency law. It is a corollary of the well-established common law principle that assets of an insolvent estate should be distributed rateably to pay debts as they exist at the date of the insolvency. The principles are rooted in notions of fundamental fairness among creditors whose enforcement rights are all stayed at the date of an insolvency filing and who, therefore, should be neither advantaged nor prejudiced by delays in distribution.

5.      The most recent Supreme Court of Canada jurisprudence (*Century Services* and *Indalex*) mandates an approach to the CCAA which sees it as part of Canada's integrated insolvency regime and favours an interpretation of the CCAA that gives creditors analogous entitlements to those which would apply in bankruptcy.  Following that approach, the interest stops rule should apply to a liquidating CCAA such as this one, absent an approved plan or consensual arrangement providing otherwise.  This is so for three reasons:

(a)      A liquidating CCAA is sufficiently analogous to a bankruptcy or winding up that the same reasons and rationale for the interest stops rule are applicable;

(b)      No provision in the CCAA ousts the common law principle; and

(c)      Nothing in pre–*Century Services* or *Indalex* case law requires a different result, especially when those cases are construed in light of *Century Services* and *Indalex*.

**PART III - SUMMARY OF FACTS**

6.      The Canadian Debtors filed for and were granted protection by the Ontario Court under the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended to January 14, 2009 (the "**CCAA**") on January 14, 2009 (the "**Petition Date**").  On the same date, various Nortel US entities ("**US Debtors**") filed petitions to commence proceedings in the Delaware Court under Chapter 11 of the US Bankruptcy Code.

7.      In the Ontario Court's Initial Order dated January 14, 2009 (subject to certain exceptions which are not material in this context) the Canadian Debtors were directed, until further Order of the Ontario Court, to make no payments of principal, interest thereon or otherwise on account of amounts owing by the Canadian Debtors to any of their creditors as of the

4

Petition Date unless such payments have been approved by the Monitor. Further, all proceedings and enforcement processes, and all rights and remedies of any person against the Canadian Debtors were stayed absent consent of the Canadian Debtors or leave of the Court. These provisions remain in effect.

> Fifth Amended and Restated Initial Order dated January 14, 2009, Morawetz J. at paras. 10, 14, 15, Monitor's Book of Authorities, Tab 1.

8.    By June 19, 2009, when Nortel issued a news release announcing its intention to sell its businesses, it was acknowledged that there would not be a going concern restructuring of Nortel, in the sense of one which would see the Canadian Debtors emerge as operating entities. Rather there would be a liquidation involving the sales of Nortel's various business lines and remaining assets.

> Nortel Networks Corporation, News Release, "Nortel to Sell CDMA Business and LTE Assets; Company Advancing in its Discussions With External Parties to Sell Other Businesses" dated June 19, 2009 (TR49799).

9.    The Canadian proceedings have been considered by the Ontario Court to be a liquidating CCAA.

> *Re Nortel Networks Corp.* (2009), 55 C.B.R. (5th) 229 (Ont. Sup. Ct. J. [Commercial List]) [*Nortel 2009*], as referred to by G.B. Morawetz J. in *Re Nortel Networks Corp.*, 2012 ONSC 1213, 88 C.B.R. (5th) 111 at para. 135, Monitor's Book of Authorities Tabs 2 and 3.

10.    Prior to the Petition Date, Nortel had issued various series of unsecured, *pari passu* notes, under three separate indentures, which were either issued or guaranteed by at least one US Debtor and at least one Canadian Debtor (the "**Crossover Bonds**").

11.    Under claims procedures approved in both the US proceedings and the Canadian proceedings, the relevant indenture trustees filed claims (collectively, the "**Crossover**

**Bond Claims**") against each of the US Estate and the Canadian Estate, which included liquidated claims for principal and interest accrued under the Crossover Bonds to the Petition Date, totalling approximately US$4.092 billion.  The Crossover Bond Claims also included unliquidated claims for additional amounts and additional interest claimed to be due under the relevant indentures, including for post-petition interest, fees and expenses (collectively, "**Post-Petition Interest and Additional Amounts Claims**").  The Monitor calculates that, of the Post-Petition Interest and Additional Amounts Claims, the post-petition interest portion alone amounts to approximately US$1.6 billion as of December 31, 2013.  A chart summarizing the claims under each indenture is attached hereto as Appendix "A".  Copies of the Crossover Bond Claims filed in the Canadian Estate are set out in the "Compendium of Crossover Bond Claims into Canada" to be filed by the Monitor.

12.   These CCAA proceedings have included processes for the determination of claim entitlements.  As the Courts have heard during the allocation phase of the hearing, certain claims against the Canadian Debtors have been accepted (the NNI Claim of $2 billion, and the EMEA Claim resulting from the recent settlement).  Others are in the process of being determined (the UKPC Claim); still others are expected to be determined in the future.

13.   The Crossover Bond Claims in the Canadian Proceedings have been filed pursuant to a Claims Procedure Order of the Ontario Court dated July 30, 2009.  It contemplated that the Claims filed under it would be finally determined in accordance with further procedures to be authorized, including by a further "Claims Resolution Order".

Amended and Restated Claims Procedure Order dated July 30, 2009, Morawetz J.
at paras. 2, 8, 16, 17, Monitor's Book of Authorities, Tab 4.

14.  By Order dated September 16, 2010 (the "**Claims Resolution Order**"), the Ontario Court, among other things, authorized procedures to determine Claims "for all purposes".

> Claims Resolution Order dated September 16, 2010, Morawetz J. at paras. 5, 14, 16, Monitor's Book of Authorities, Tab 5.

15.  The determinations in respect of the Common Bond Claim Issues now directed by the Courts is consistent with the approach taken in this CCAA proceeding, whereby entitlements are determined in respect of creditor Claims.

## PART IV - CANADIAN LAW

### *The "Pari Passu Rule" and the "Interest Stops Rule" in Liquidating Insolvency Proceedings*

16.  It is a well-established and fundamental common law principle of insolvency law that the assets of an insolvent estate should be applied rateably in payment of the insolvent's debts as these debts stood as at the date of the insolvency (the "*Pari Passu* **Rule**"). Claims for principal and interest are thus provable to the date of insolvency. The corollary – recognized as a distinct rule – is that interest stops at the date of the insolvency. This is commonly known as the 'interest stops rule'.

> *Shoppers Trust Co. (Liquidator of) v. Shoppers Trust Co.* (2005), 74 O.R. (3d) 652 at paras. 24-25 (C.A.) [*Shoppers*], Monitor's Book of Authorities, Tab 6.

17.  The Ontario Court of Appeal has defined the interest stops rule (in the context of a winding-up of an insolvent entity) as follows:

> At common law, interest on provable claims stops as at the commencement of the winding-up. No interest is payable on claims from that date forward, unless there is a surplus in the estate. In the event of a surplus, post-liquidation interest is payable first on debts in respect of which there is a right to interest prior to the liquidation date.

*Shoppers* at para. 25, n 6, Monitor's Book of Authorities, Tab 6.

18.    The interest stops rule applies in insolvency generally, not just in winding-up, where a

liquidation is involved.

> One of the governing principles of insolvency law - including proceedings in a
> winding-up - is that the assets of the insolvent debtor are to be distributed amongst
> classes of creditors rateably and equally, as those assets are found at the date of
> the insolvency. This principle has led to the development of the "interest stops
> rule", i.e., that no interest is payable on a debt from the date of the winding-up or
> bankruptcy. As Lord Justice James put it, colourfully, in *Re Savin* (1872), L.R. 7
> Ch. 760 (C.A.), at p. 764:
>
> > I believe, however, that if the question now arose for the first
> > time I should agree with the rule [i.e., the "interest stops rule"],
> > seeing that the theory in bankruptcy is to stop all things at the
> > date of the bankruptcy, and to divide the wreck of the man's
> > property as it stood at that time.
>
> It is the decision of Lord Justice Selwyn in *Re The Humber Iron Works and
> Shipbuilding Company* (1869), 38 L.J. Ch. 712 ("*Re Humber Iron Works*"),
> however, which is often cited as the starting point in the analysis. There - in a
> winding-up context - he said (at pp. 713-714):
>
> > ... Now it has been admitted, very properly, that, as to interest
> > due at the date of the winding-up, there can be no doubt ...
> > because ... interest due at the date of the winding-up is just as
> > much a debt as the principal. ... Justice, I think, requires ... that
> > all the money of an insolvent estate, being realized as speedily
> > as possible, should be applied equally and rateably in payment
> > of the debts as they existed at the date of the winding-up. I
> > think, therefore, that nothing should be allowed for interest
> > from that date. ... I think that as the tree falls, so it must lie. It
> > must be ascertained what are the debts which existed at the date
> > of the winding-up, and all dividends in the case of an insolvent
> > estate must be declared in respect of the debts so ascertained.
>
> *Canada (Attorney General) v. Confederation Life Insurance Co.*, [2001] O.J. No.
> 2610 at paras. 20–21 (Sup. Ct. J. [Commercial List]) [*Confederation Life*],
> Monitor's Book of Authorities, Tab 7.
>
> *In re Humber Ironworks and Shipbuilding Company* (1869), L.R. 4 Ch. App. 643
> at 643-44, 646-47 [*Humber Ironworks*], Monitor's Book of Authorities, Tab 8.
>
> *Shoppers* at paras. 24-25, Monitor's Book of Authorities, Tab 6.

19.    The common law principle that interest stops on insolvency has been consistently applied

in both Canadian bankruptcy proceedings under the *Bankruptcy and Insolvency Act* and its

predecessors (collectively, the "**BIA**") and winding-up proceedings under the *Winding-up and Restructuring Act* and its predecessors (collectively, the "**WURA**"), despite neither Act containing a provision to that effect. Indeed, the rule is so entrenched that in *Confederation Life* Blair J. noted that the provisions in both Acts which describe the claims that can be made thereunder might otherwise have been read to *permit* post-filing interest, but even these are not treated as trumping the common law insolvency interest stops rule:[1]

> This common law principle has been applied consistently in Canadian bankruptcy and winding-up proceedings. This is so notwithstanding the language of subsection 71(1) of the Winding-Up Act and section 121 of the BIA, which might be read to the contrary, in my view. [...]
>
> Yet the "interest stops rule" principle has always applied to the payment of post-insolvency interest, and the provisions of subsection 71(1) have never been interpreted to trump the common law insolvency "interest stops rule". That this remains the case is clarified, in my view, by the re-worded language of subsection 71(1) as it exists in the present Winding-Up and Restructuring Act.
>
> *Confederation Life* at paras. 22–23, Monitor's Book of Authorities, Tab 7.

---

[1]   Section 71(1) of the WURA provides:

> 71.(1) When the business of a company is being wound up under this Act, all debts and all other claims against the company in existence at the commencement of the winding-up, certain or contingent, matured or not, and liquidated or unliquidated, are admissible to proof against the company and, subject to subsection (2), the amount of any claim admissible to proof is the unpaid debt or other liability of the company outstanding or accrued at the commencement of the winding-up.
>
> WURA, section 71(1).

Section 121 (1) of the BIA provides:

> 121. (1) All debts and liabilities, present or future, to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the bankrupt's discharge by reason of any obligation incurred before the day on which the bankrupt becomes bankrupt shall be deemed to be claims provable in proceedings under this Act.
>
> BIA, section 121(1).

20.   The interest stops rule has been codified in the United States Bankruptcy Code. Canadian law views the common law principle as essentially its equivalent. Blair J. commented on this in *Confederation Life*:

> In my view, the fact that the U.S. Bankruptcy Code has codified the "interest stops rule" in providing that unmatured interest must be disallowed, whereas it is the common law principle which prevails in Canada, makes no difference in the circumstances of this case.
>
> *Confederation Life* at para. 31, Monitor's Book of Authorities, Tab 7.

### The Rationale for the Interest Stops Rule

21.   The reason for the interest stops rule is fundamental fairness. An insolvency filing stays creditor enforcement. Accordingly, it is unfair to permit creditors with a contractual right to receive a payment on account of interest, and thus compensation for the delay in receipt of payment, while other creditors, who have been equally delayed in payment by virtue of the insolvency, receive no compensation. As the Chancery Appeals Court held in *Humber Ironworks*:

> I do not see with what justice interest can be computed in favour of creditors whose debts carry interest, while creditors whose debts do not carry interest are stayed from recovering judgment, and so obtaining a right to interest.
>
> *Humber Ironworks* at p. 648, Monitor's Book of Authorities, Tab 8.

22.   Even in the rare case where there is a *surplus* in the estate from which post-filing interest could be paid, it has been recognized that it would be an absurd result if one group of claimants received a payment of interest greater than that which would be received by another group. Such a result "would be a denial of the interests of fairness, equality and predictability among creditors ...." In a BIA proceeding in which there is a surplus, all claims bear interest at the same rate. In a WURA proceeding in which there is a surplus,

the surplus is to be applied in payment of interest at the same rate on all claims. These provisions in effect respect the *pari passu* rule by treating claimants equally and by not prejudicing some by the delay while advantaging others.

> *Canada (Attorney General) v. Reliance Insurance Co.*, [2009] O.J. No. 3037 at para. 60 (Sup. Ct. J. [Commercial List]), Monitor's Book of Authorities, Tab 9.

> *BIA*, section 143.
> *WURA*, section 95(2).

### *The CCAA*

**(i)    The CCAA is to be construed and applied consistently with the rest of Canada's insolvency regime**

23.    Canada's three insolvency statutes – the BIA, the WURA and the CCAA – are statutes *in pari materia* (enacted by the same legislature and relating to the same subject). The courts look to one to inform the interpretation of another.

> *Canada (Attorney General) v. Reliance Insurance Co.* (2008), 40 C.B.R. (5th) 292 at para. 26 (Ont. Sup. Ct. J. [Commercial List]), (holding that the law of set-off in all three statutes should be interpreted in the same manner and not in isolation one from the other), Monitor's Book of Authorities, Tab 10.

> *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 2000 ABQB 440, 269 A.R. 49 at para. 25, (holding that the interpretation of "claims" under the BIA informs what a claim is under the WURA), Monitor's Book of Authorities, Tab 11.

24.    In its seminal 2010 decision in *Century Services*, the Supreme Court of Canada held that the CCAA and the BIA should be considered as parts of Canada's *integrated* insolvency regime. "[T]he BIA scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a CCAA reorganization is ultimately unsuccessful." Thus, interpretations should be avoided which give creditors incentives, such as different priorities, to prefer BIA liquidation over the CCAA. Such interpretations would not be

11

consistent with Parliament's "goal of treating both the BIA and the CCAA as sharing the same approach to insolvency." One effect of this is that BIA priorities may, in analogous situations, inform what the appropriate priorities are under the CCAA.

> *Re Ted Leroy Trucking [Century Services] Ltd.*, 2010 SCC 60 at paras. 23, 47, 54, [2010] 3 S.C.R. 379 *[Century Services]*, Monitor's Book of Authorities, Tab 12.

25.    In its 2013 decision in *Indalex* the Supreme Court confirmed that although there is no automatic or exact parallel application of every BIA priority to the situation under the CCAA "the courts will favour an interpretation of the *CCAA* that affords creditors analogous entitlements" to what they would receive under the BIA.

> *Re Indalex Ltd.*, 2013 SCC 6, [2013] 1 S.C.R. 271 at para. 51 *[Indalex]*, Monitor's Book of Authorities, Tab 13.

26.    This approach is consistent with the Ontario Court of Appeal's earlier decision in *Ivaco*, *supra*, where the Court noted:

> The federal insolvency regime includes the CCAA and the BIA. The two statutes are related...The CCAA and the BIA create a complementary and inter-related scheme for dealing with the property of insolvent companies...
>
> *Re Ivaco Inc.* (2006), 83 O.R. (3d) 108 at paras. 62, 64 (C.A.) *[Ivaco]*, Monitor's Book of Authorities, Tab 14.

27.    The manner in which BIA priorities and entitlements inform those in the CCAA is context specific. In *Century Services*, an alleged Crown priority that would not subsist in bankruptcy was also held not to apply in the CCAA. Statutory provisions which conflicted in their wording were interpreted so that the priorities under both Acts would be the same and thus to avoid providing incentives for creditors to prefer the BIA. In *Indalex*, a majority of the Court held that although a provincially created deemed trust would not

12

apply in bankruptcy it did while the company operated under the CCAA, which lacked the express provisions to override it that the BIA contained.  As the Court noted there:

> Provincial legislation defines the priorities to which creditors are entitled until that legislation is ousted by Parliament.  Parliament did not expressly apply all bankruptcy priorities either to *CCAA* proceedings or to proposals under the *BIA*.

> *Indalex* at para. 51, Monitor's Book of Authorities, Tab 13.

> *Century Services* at paras. 35-47, Monitor's Book of Authorities, Tab 12.

28.     Two overriding considerations arise out of *Century Services* and *Indalex* relevant to whether the interest stops rule should apply in a CCAA proceeding.  First, if interest runs in favour of some creditors but not others under the CCAA, but stops for all under the BIA, creditors who would not receive interest in the CCAA would be "better protected by liquidation under the *BIA* (and such) creditors' incentives would lie overwhelmingly with avoiding proceedings under the *CCAA*...(which would) undermine that statute's remedial objectives...."  Second, where possible, the courts should favour interpretations which provide "analogous entitlements" under the CCAA and BIA.  The common law *pari passu* rule and interest stops rule are principles that can provide such analogous entitlements irrespective of the particular statutory regime a liquidating insolvency is administered under.

> *Century Services* at para. 47, Monitor's Book of Authorities, Tab 12.

> *Indalex* at para. 51, Monitor's Book of Authorities, Tab 13.

13

**(ii)      The CCAA does not expressly purport to displace the interest stops rule**

29.      Viewing the CCAA in light of the principles in *Century Services* and *Indalex*, it is important that the CCAA does not purport to displace the common law interest stops principle.  One of the strongest presumptions in statutory interpretation is that Parliament is not to be taken to have intended to oust pre-existing common law unless such an interpretation is indicated by very express and clear words to that effect or it is impossible to give sense to the words in an enactment without concluding that their intent is to supplant the common law.

> *Canada (Attorney General) v. Security Home Mortgage Corp.*, 2003 ABQB 588
> at para. 38, 231 D.L.R. (4th) 353, citing *Goodyear Tire & Rubber Co. of Canada
> v. T. Eaton Co.*, [1956] S.C.R. 610 at 614, Monitor's Book of Authorities, Tab 15.

30.      Moreover, it has been held that if the rights of a particular group of claimants are to be given greater priority than is set out in the federal legislative regime under the CCAA and the BIA, it is Parliament, and not the courts, that must do so.

> *Ivaco* at para. 69, Monitor's Book of Authorities, Tab 14.

31.      The CCAA does not contain any express provision that purports to displace the common law *pari passu* rule or its corollary, the interest stops rule.  Nor is it impossible to give sense to the words of the CCAA without concluding that their intent is to supplant these fundamental rules.

14

**(iii)    Different types of CCAA proceedings – the Liquidating CCAA**

32.    The CCAA is generally described as a statute that promotes reorganizations in the hope that the company can re-emerge and carry on business.  Thus, it has been noted that it "contains no provisions for liquidation of a debtor's assets if the reorganization fails."

> *Century Services* at para. 14, Monitor's Book of Authorities, Tab 12.

33.    Yet it has been authoritatively recognized that the CCAA is a "flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations."  As part of that flexibility, the liquidating CCAA has been accepted as a mode by which jobs may be protected, although the debtor may not continue as employer, and stakeholder recoveries may be enhanced by keeping the business together and selling it or parts of it as a going (or a number of) going concern(s), taking advantage of the flexibility and judicial discretion the CCAA offers in that regard.

> *Century Services* at para. 15, Monitor's Book of Authorities, Tab 12.
>
> *Indalex* at para. 51, Monitor's Book of Authorities, Tab 13.
>
> *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 at para. 7 (Ont. Gen. Div. [Commercial List]), Monitor's Book of Authorities, Tab 16.
>
> *Re Timminco Ltd.*, 2012 ONSC 506, 85 C.B.R. (5th) 169 at paras. 49-50, Monitor's Book of Authorities, Tab 17.
>
> *Grant Forest Products Inc. v. GE Canada Leasing Services Co.*, 2013 ONSC 5933, 6 C.B.R. (6th) 1 at paras. 114-15, Monitor's Book of Authorities, Tab 18.
>
> *Nortel 2009* at paras. 31-40, 47-49, 54, Monitor's Book of Authorities, Tab 2.

34.    A liquidating CCAA is analogous to a BIA or WURA insolvency liquidation in the following fundamental respects:

(a)     a company may only file under the CCAA when it is insolvent (CCAA, s. 3(1) and definition of "debtor company" in s. 2).    Similarly, the BIA is applicable to insolvent companies (BIA, s. 49(1)) as is the WURA (WURA, s. 10(c));[2]

(b)     when a company files for CCAA protection, creditor enforcement may be stayed (CCAA, s. 11(3) and 11(4)), as it is under BIA (s. 69.3) and under WURA (s. 17);

(c)     at the end of the day in a liquidating CCAA, like a liquidation under the BIA or WURA, what is left is a pot of money for distribution to creditors all of whom have been stayed in enforcement.

**(iv)    The Effect of The Type of CCAA Proceeding on Interest Issues**

35.    The distinction between liquidating CCAAs and other types is important because the law appears to recognize that where an insolvency statute is in fact applied to effect a restructuring, in the sense of allowing the debtor to emerge and carry on business rather than to effect a liquidation, the interest stops rule may not automatically apply.    For example, under the BIA – a statute historically and commonly used for liquidations – there is provision for proposals to effect an operating restructuring.    Where the insolvent is in an operating proposal and not a liquidation, the interest stops rule may not be applied.    This appears to be because if the nature of the proceeding is not a liquidation the reason for applying the interest stops rule may not exist.

---

[2]    Additional grounds for a winding-up order are set out in s. 10 and s. 10.1 of the WURA that may not require insolvency in certain circumstances.

36.     This is illustrated in *Re Abacus*, where the Alberta Court of Appeal, considering whether a court asked to approve a BIA proposal has the power to freeze interest, distinguished between proposals involving an ongoing concern and those involving a liquidation:

> In my view, the interest rule, which might make sense in one context, might make no sense at all in another.  Proposals can include ongoing commercial activity by the debtor, not a sell-off.  They might permit insolvent persons to hold creditors at bay and continue in business.  That amounts to the opposite of a brief freeze to divide the 'wreck of a man's property.'  I therefore would not extend an interest freeze, automatically and necessarily, to all proposals.

> *Abacus Cities Ltd. (Trustee of) v. AMIC Mortgage Investment Corp.* (1992), 125 A.R. 45 at para. 26 (C.A.), Monitor's Book of Authorities, Tab 19.

**(v)     Pre *Century Services/Indalex* case law considering post-filing interest in the CCAA**

37.     In *Re Agro Pacific*, a 2001 case of a liquidating CCAA proceeding, the British Columbia Supreme Court was faced squarely with the argument that a creditor was entitled to post-filing interest.  The Court noted that even though the definition of "claim" under the CCAA may not itself constitute a statutory bar to post-filing interest, the intent of the CCAA is to make claims subject to the same concepts as in a bankruptcy, and it held that the basic principles of both the CCAA and the BIA should be complimentary whenever possible.  The Court accordingly held, that apart from the case where a plan specifically contemplated post-filing interest or where there was a surplus, conventional insolvency practice does not open claims to recalculation after the date on which they are frozen (the filing date).

> *Re Agro Pacific Industries Ltd.*, 2001 BCSC 708, 2001 CarswellBC 1112 at paras. 2, 10-16 [*Agro Pacific*], Monitor's Book of Authorities, Tab 20.

38.     In 2006, the statements referred to above from *Agro Pacific* were relied on by the Quebec Superior Court  - in a different context - to overturn a provision in interim CCAA financing

by a creditor that called for interest on a pre-filing loan by that same creditor to continue to be paid.

> *Re Groupe de scieries G.D.S. inc.*, 2006 QCCS 5698, J.E. 2007-299 at paras 11, 98-106 (leave to appeal granted on other issues), Monitor's Book of Authorities, Tab 21.

39.     Without referring to *Agro Pacific*, three other cases have referred to post-filing interest in a CCAA context: (i) the Supreme Court of Canada's 2006 decision in *Canada 3000*, (ii) the Ontario Court of Appeal's decision in *Re Stelco Inc.* and (iii) the Superior Court of Justice's decision in *Canwest*.    None of these decisions were decided since *Century Services* or *Indalex*, and thus in light of the interpretive principles noted in those cases. None considered the case of a liquidating CCAA proceeding.

> *NAV Canada c. Wilmington Trust Co.*, 2006 SCC 24, [2006] 1 S.C.R. 865 [*Canada 3000*], Monitor's Book of Authorities, Tab 22.
>
> *Re Stelco Inc.*, 2007 ONCA 483, [2007] O.J. No. 2533 [*Stelco*], Monitor's Book of Authorities, Tab 23.
>
> *Re Canwest Global Communications Corp.*, 2010 ONSC 4209, 70 C.B.R. (5th) 1 [*Canwest*], Monitor's Book of Authorities, Tab 24.

40.     In *Canada 3000*, two airlines initially filed for protection under the CCAA as going concerns but were placed into bankruptcy just three days later and the CCAA proceedings were terminated.   Disputes subsequently arose over competing rights between airports and providers of navigation services, on the one hand, and owners of the aircraft, on the other. In 98 paragraphs of Reasons, the Supreme Court mentioned the effect of the CCAA filing on interest during the three days between the CCAA filing and the bankruptcy within a total of two sentences.   Binnie J. commented:

> While a *CCAA* filing does not stop the accrual of interest, the unpaid charges remain an unsecured claim provable against the bankrupt airline. The claim does

not accrue interest after the bankruptcy: ss. 121 and 122 of the *Bankruptcy and Insolvency Act*.

*Canada 3000* at para. 96, Monitor's Book of Authorities, Tab 22.

41.    *Canada 3000* contains no other discussion concerning post-filing interest, no discussion of the common law interest stops rule, and no discussion of a rationale for different treatment of post-filing interest under a liquidating CCAA proceeding from that under the BIA or the WURA.  There is no suggestion that the CCAA filing in that case, in effect for three days, was intended to be a liquidating CCAA.

42.    Accordingly, the statement in *Canada 3000* ought not to be taken as a blanket statement that interest always accrues in a CCAA proceeding, regardless of the nature of the CCAA proceeding.  Rather, the statement must be viewed in the context in which it was made.  As the Supreme Court of Canada has noted:

> [E]very judgment has to be read in light of the facts the Court was dealing with….

> The notion that each phrase of a judgment of this Court should be treated as if enacted in a statute is not supported by the cases and is inconsistent with the basic fundamental principle that the common law develops by experience.

> *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609 at paras. 52, 57. Monitor's Book of Authorities, Tab 25.

43.    The Ontario Court of Appeal in *Stelco* appears to have construed the comment by Binnie J. in *Canada 3000* as addressing a failed CCAA proceeding that was converted to a BIA proceeding, noting that when *that* happens claims "could include" post-CCAA filing claims.  In *Indalex*, a CCAA proceeding in which a company sells assets under the CCAA, i.e., a liquidating CCAA, was distinguished from one "in which a failed arrangement forced a company into liquidation under the *BIA*."

*Stelco* at para. 68, Monitor's Book of Authorities, Tab 23.

*Indalex* at para. 51, Monitor's Book of Authorities, Tab 13.

44.     *Stelco* involved a full-fledged operating CCAA reorganization culminating in a final plan of compromise and arrangement: it was not a liquidating CCAA proceeding. The sanctioned plan did not provide for distributions in respect of post-petition interest. As among senior unsecured debtholders, subordinated (junior) noteholders and ordinary unsecured creditors, the plan treated all in the same class and *pro rata* distributions were calculated on the basis that no post-filing interest was allowed. That global result was not challenged.

*Stelco* at para. 57, Monitor's Book of Authorities, Tab 23.

45.     The issue of post-filing interest in *Stelco* was litigated only after the plan had been successfully implemented and the debtor had emerged from CCAA protection. The litigation arose because the *pro rata* distributions otherwise payable to the junior noteholders under the plan had been paid into a trust pending resolution of a dispute about *subordination* rights of the senior debtholders, which rights were expressly preserved by the plan, as against the junior noteholders. The senior debtholders claimed that out of the funds paid to the trust they should receive amounts, including interest on the senior debt to the date of repayment, so that they would be paid in full before any payment could be received by the junior noteholders. This right of senior debtholders to full payment before the junior noteholders could receive anything was a contractual subordination right directly between the senior and junior noteholders, and was preserved by the CCAA plan.

*Stelco* at para. 59, Monitor's Book of Authorities, Tab 23.

46.     The Court interpreted the subordination rights preserved in the plan to require full payment of principal and interest on the senior debt, including post-filing interest, before the junior debt could be paid.  The Court did not accept the junior noteholders' argument that the CCAA definition of 'claim' (as a debt provable in bankruptcy) *ipso facto* precluded the senior debtholders from receiving interest in that circumstance.  It held that the definition of 'claim' in the CCAA was about voting and not a constraint on the amount of payment, and that the Stelco plan *itself*, which governed payment, contemplated the continued accrual of interest to senior debtholders after the CCAA filing date in their contest with the junior noteholders.  The Court held that there was not an interest stops rule that precluded *that* result.

> *Stelco* paras. 65-70, Monitor's Book of Authorities, Tab 23.

47.     The Court's decision in *Stelco* was derived from the terms of negotiated inter-creditor agreements in the note indenture and the plan.  There is nothing about the common law interest stops rule that precludes one creditor from being held to its agreement to subordinate its realization to that of another creditor including foregoing its right to payment until the creditor with priority receives principal and interest.

48.     Although the Court in *Stelco* referenced Binnie J.'s comment in *Canada 3000*, and stated "there is no persuasive authority that supports an Interest Stops Rules in a CCAA proceeding," the Court was not dealing with a liquidating CCAA context and did not engage in any analysis of the rule or its rationale in that context.  Further, the Court noted (para. 69) that CCAA plans "can and *sometimes* do provide for payments in excess of claims filed in the CCAA proceedings" (emphasis added).  The Court thus recognized that

a CCAA claim does not *ipso facto* include post-filing interest. If the Court had intended to hold that post-filing interest necessarily ran in all CCAA claims, the statements in paragraphs 68 and 69 of *Stelco* would not have been necessary (indeed, they are inconsistent with any such holding).

49.   *Stelco* did not address the situation where there are no agreements among creditors that one group is to receive principal and interest before the other receives anything. In Nortel, the Crossover Bondholders do not have any such agreements with other creditors.

50.   The decisions in *Canada 3000* and *Stelco* must now be construed in light of the clear recognition in *Century Services* and *Indalex* of the integrated nature of the BIA and the CCAA, the striving for analogous entitlements under each and the adoption by the Supreme Court (in *Century Services*) of the holding by the Ontario Court of Appeal (in *Ivaco*) that at least where statutory provisions do not mandate a contrary result the CCAA should be interpreted so that *no* gap exists that would allow the enforcement of property interests at the conclusion of CCAA proceedings that would be lost in a bankruptcy.

> *Century Services* at para. 78, Monitor's Book of Authorities, Tab 12.

51.   *Canwest* – another pre-*Century Services* and *Indalex* case – involved a going-concern restructuring. A plan that involved some payment of post-filing interest to certain creditors had been approved by the requisite majorities of creditors. The Court sanctioned the plan taking into account that (i) the payment was not oppressive to other creditors; and (ii) those receiving post-filing interest had provided liquidity and continued support to allow for a going concern restructuring. The case illustrates that, as the Court of Appeal said in *Stelco*, an amount in excess of a claim (in other words, an amount plus interest) may be paid in a

plan which has the appropriate consents. *Canwest* does not address, let alone purport to oust, the interest stops rule in the context of a liquidating CCAA proceeding, or speak to entitlements to amounts in excess of principal and pre-petition interest in that context.[3]

> *Canwest* at paras. 22, 24, Monitor's Book of Authorities, Tab 24.

## *Conclusion Regarding the Interest Stops Rule in a Liquidating CCAA*

52.    In order to determine that the Crossover Bondholders have a post-filing interest entitlement if the Canadian Estate is not solvent and in the absence of a consensual plan providing that they should receive interest, the Court would have to find:

(a)    that the common law interest stops rule, and its underlying rationale, do not apply to a liquidating CCAA as they would to a liquidation by winding-up or bankruptcy;

(b)    the Crossover Bondholders should have post-filing interest at the expense of creditors otherwise ranking equally with them, who themselves have been delayed in realizing on their claims, and with whom they have no inter-creditor agreements; and

(c)    pre-*Century Services/Indalex* authorities should be construed as requiring the result that the interest stops rule is inapplicable even in a liquidating CCAA, despite their fact-specific contexts and the dictates of the Supreme Court of Canada in *Century Services* and *Indalex*.

---

[3]    Post *Indalex* orders have been made contemplating post-filing interest as a term of a stay extension where appropriate consents have been present: *Re Crystallex International Corporation* - Court File No. CV-11-9532-00CL (Ontario Superior Court of Justice) June 5, 2013, Monitor's Book of Authorities, Tab 26.

53.   It is respectfully submitted that these conclusions cannot be justified.  When what is involved is a liquidating CCAA proceeding, it shares enough essential characteristics with a BIA liquidation or a winding-up under the WURA that all of the premises for the common law interest stops rule and its underlying rationale are applicable.  To find an entitlement to post-filing interest in the Crossover Bondholders (and none in other creditors) would necessarily lead to incongruent results under exactly analogous situations, the type of anomaly that the law's recognition of the integrated insolvency regime should prevent.

### *Claims for Additional Amounts*

54.   The analysis above with respect to post-filing interest applies to any damages or other amounts claimed by the Crossover Bondholders that are in fact a proxy for post-petition interest.

> *Confederation Life* at para. 25, Monitor's Book of Authorities, Tab 7.

55.   Similarly, to the extent that the Post-Petition Interest and Additional Amounts Claims include claims for "Make-Whole" payments for early redemption or any other additional payments, the *Pari Passu Rule* would apply to prevent recovery above the amount of the principal and pre-petition interest on the Crossover Bonds.

## PART V - RELIEF REQUESTED

56.   Creditors in a CCAA proceeding may receive interest under an approved consensual plan or arrangement that provides for post-filing interest.  But at present there is no approved plan, nor is there necessarily a requirement for one in a liquidating CCAA proceeding.

24

Accordingly, the answer to the Common Bond Claim Issues in Canada is that Crossover Bondholders are not legally entitled at this time to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US$4.092 billion).

**ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 15th day of July, 2014.

Benjamin Zarnett (LSUC#: 17247M)

Jay A. Carfagnini (LSUC#: 22293T)

Graham Smith (LSUC#: 26377D)

Joseph Pasquariello (LSUC#: 38390C)

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Graham Smith**  LSUC#: 26377D
gsmith@goodmans.ca
**Joseph Pasquariello**  LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

## APPENDIX "A"

## NORTEL – CLAIMS FILED BY INDENTURE TRUSTEES
## UNDER GUARANTEED/CROSSOVER INDENTURES

| Indenture[4] | Amount of Claim[5] | Principal Debtor/ Issuer/Jurisdiction | Guarantors/Jurisdiction |
|---|---|---|---|
| Indenture dated as of July 5, 2006 (as supplemented as of July 5, 2006, May 1, 2007 and May 28, 2008) US $1B LIBOR + 4.25% due 2011; US $550M 10.125% due 2013; US $1.125B 10.75% due 2016 | US $2,785,241,840.28 (principal and pre-filing interest) plus other amounts to be quantified later | Nortel Networks Limited (Canada) | Jointly and severally: Nortel Networks Corporation (Canada); and Nortel Networks Inc. (U.S.) |
| Indenture dated as of March 28, 2007 US $575M 1.75% due 2012; US $575M 2.125% due 2014 | US $1,155,508,420.14 (principal and pre-filing interest) plus other amounts to be quantified later | Nortel Networks Corporation (Canada) | Jointly and severally: Nortel Networks Limited (Canada); and Nortel Networks Inc. (U.S.) |
| Indenture dated as of February 15, 1996 US $150M 7.875% due 2026 | US $150,986,875.00 (principal and pre-filing interest) plus other amounts to be quantified later | Nortel Networks Capital Corporation (U.S.) | Nortel Networks Limited (Canada) |

---

[4]    All indentures are governed by New York law.  Each of the Nortel obligors are CCAA Debtors or Chapter 11 Debtors, as the case may be.

[5]    All claims are unsecured.  In all cases, claims in the same amount have been filed against the principal debtor and each guarantor.

## SCHEDULE "A"

## LIST OF AUTHORITIES

1.  Fifth Amended and Restated Initial Order dated January 14, 2009, Morawetz J.

2.  *Re Nortel Networks Corp.* (2009), 55 C.B.R. (5th) 229 (Ont. Sup. Ct. J. [Commercial List]).

3.  *Re Nortel Networks Corp.*, 2012 ONSC 1213, 88 C.B.R. (5th) 111.

4.  Amended and Restated Claims Procedure Order dated July 30, 2009, Morawetz J.

5.  Claims Resolution Order dated September 16, 2010, Morawetz J.

6.  *Shoppers Trust Co. (Liquidator of) v. Shoppers Trust Co.* (2005), 74 O.R. (3d) 652 (C.A.).

7.  *Canada (Attorney General) v. Confederation Life Insurance Co.*, [2001] O.J. No. 2610 (Sup. Ct. J. [Commercial List]).

8.  *In re Humber Ironworks and Shipbuilding Company* (1869), L.R. 4 Ch. App. 643.

9.  *Canada (Attorney General) v. Reliance Insurance Co.*, [2009] O.J. No. 3037 (Sup. Ct. J. [Commercial List]).

10. *Canada (Attorney General) v. Reliance Insurance Co.* (2008), 40 C.B.R. (5th) 292 (Ont. Sup. Ct. J. [Commercial List]).

11. *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 2000 ABQB 440, 269 A.R. 49.

12. *Re Ted Leroy Trucking [Century Services] Ltd.*, 2010 SCC 60, [2010] 3 S.C.R. 379.

13. *Re Indalex Ltd.*, 2013 SCC 6, [2013] 1 S.C.R. 271.

14. *Re Ivaco Inc.* (2006), 83 O.R. (3d) 108 (C.A.).

15. *Canada (Attorney General) v. Security Home Mortgage Corp.*, 2003 ABQB 588, 231 D.L.R. (4th) 353.

16. *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]).

17. *Re Timminco Ltd.*, 2012 ONSC 506, 85 C.B.R. (5th) 169.

18. *Grant Forest Products Inc. v. GE Canada Leasing Services Co.*, 2013 ONSC 5933, 6 C.B.R. (6th) 1.

19. *Abacus Cities Ltd. (Trustee of) v. AMIC Mortgage Investment Corp.* (1992), 125 A.R. 45 (C.A.).

20. *Re Agro Pacific Industries Ltd.*, 2001 BCSC 708, 2001 CarswellBC 1112.

21. *Re Groupe de scieries G.D.S. inc.,* 2006 QCCS 5698, J.E. 2007-299.

22. *NAV Canada c. Wilmington Trust Co.*, 2006 SCC 24, [2006] 1 S.C.R. 865.

23. *Re Stelco Inc.*, 2007 ONCA 483, [2007] O.J. No. 2533.

24. *Re Canwest Global Communications Corp.*, 2010 ONSC 4209, 70 C.B.R. (5th) 1.

25. *R. v. Henry*, 2005 SCC 76, [2005] 3 S.C.R. 609.

26. Stay Extension and Standstill Order dated June 5, 2013 *Re Crystallex International Corporation.*

## SCHEDULE "B"

## TEXT OF STATUTES, REGULATIONS & BY - LAWS

*Winding-up and Restructuring Act*, R.S.C. 1985, c. W-11, ss. 10, 10.1, 17, 71(1), 95(2)

### Cases where winding-up order may be made

10.  A court may make a winding-up order in respect of a company

    (a)    where the period, if any, fixed for the duration of the company by the Act, charter or instrument of incorporation of the company has expired, or where an event, if any, has occurred, on the occurrence of which it is provided by the Act, charter or instrument of incorporation that the company is to be dissolved;

    (b)    if the company at a special meeting of shareholders — or, if the company is a federal credit union, at a special meeting of members or shareholders — called for the purpose has passed a resolution requiring the company to be wound up;

    (c)    when the company is insolvent;

    (d)    when the capital stock of the company is impaired to the extent of twenty-five per cent thereof, and when it is shown to the satisfaction of the court that the lost capital will not likely be restored within one year; or

    (e)    when the court is of opinion that for any other reason it is just and equitable that the company should be wound up.

### Other winding-up circumstances

10.1  Where the Superintendent has taken control of a financial institution or of the assets of a financial institution pursuant to paragraph 648(1)(b) of the *Bank Act*, paragraph 442(1)(b) of the *Cooperative Credit Associations Act*, paragraph 679(1)(b) of the *Insurance Companies Act* or paragraph 510(1)(b) of the *Trust and Loan Companies Act* or, in the case of an authorized foreign bank, has taken control of its assets pursuant to paragraph 619(1)(b) of the *Bank Act* or, in the case of a foreign insurance company, has taken control of its assets under subparagraph 679(1)(b)(i) or (ii) of the *Insurance Companies Act*, a court may make a winding-up order in respect of the financial institution, authorized foreign bank or insurance business in Canada of the foreign insurance company if the court is of the opinion that for any reason it is just and equitable that the financial institution, authorized foreign bank or insurance business in Canada of the foreign insurance company should be wound up or if, in the case of

2

(a)    a bank to which the *Bank Act* applies, the control was taken on a ground referred to in paragraph 648(1.1)(a), (c), (e) or (f) of that Act;

(a.1)   an authorized foreign bank, control of its assets was taken on a ground referred to in paragraph 619(2)(a), (b), (d) or (f) of the *Bank Act*;

(b)    a company to which the *Trust and Loan Companies Act* applies, the control was taken on a ground referred to in paragraph 510(1.1)(a), (c), (e) or (f) of that Act;

(c)    an insurance company to which the *Insurance Companies Act* applies, other than a foreign insurance company, the control was taken on a ground referred to in paragraph 679(1.1)(a), (c), (e) or (f) of that Act;

(d)    a foreign insurance company to which the *Insurance Companies Act* applies, the control of its assets was taken on a ground referred to in paragraph 679(1.2)(a), (c) or (e) of that Act; or

(e)    an association to which the *Cooperative Credit Associations Act* applies, the control was taken on a ground referred to in paragraph 442(1.1)(a), (c), (e) or (f) of that Act.

**Actions against company may be stayed**

17.   A court may, on the application of a company, or of any creditor, contributory, liquidator or petitioner for the winding-up order, at any time after the presentation of a petition for the order and before making the order, restrain further proceedings in any action, suit or proceeding against the company, on such terms as the court thinks fit.

**What debts may be proved**

71. (1) When the business of a company is being wound up under this Act, all debts and all other claims against the company in existence at the commencement of the winding-up, certain or contingent, matured or not, and liquidated or unliquidated, are admissible to proof against the company and, subject to subsection (2), the amount of any claim admissible to proof is the unpaid debt or other liability of the company outstanding or accrued at the commencement of the winding-up.

**Interest from commencement of winding-up**

95. (2) Any surplus referred to in subsection (1) shall first be applied in payment of interest from the commencement of the winding-up at the rate of five per cent per annum on all claims proved in the winding-up and according to their priority.

*Bankruptcy and Insolvency Act*, R.S.C. 1985, C. B-3, ss. 49(1), 69.3, 121(1), 143

### Assignment for general benefit of creditors

49. (1)  An insolvent person or, if deceased, the executor or administrator of their estate or the liquidator of the succession, with the leave of the court, may make an assignment of all the insolvent person's property for the general benefit of the insolvent person's creditors.

### Limitation

69. (3)  A stay provided by paragraph (1)(c) or (d) does not apply, or terminates, in respect of Her Majesty in right of Canada and every province if

    (a)    the insolvent person defaults on payment of any amount that becomes due to Her Majesty after the filing of the notice of intention and could be subject to a demand under

        (i)    subsection 224(1.2) of the *Income Tax Act*,

        (ii)    any provision of the Canada Pension Plan or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the Canada Pension Plan, an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, or a premium under Part VII.1 of that Act, and of any related interest, penalties or other amounts, or

        (iii)    any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

           (A)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

           (B)    is of the same nature as a contribution under the Canada Pension Plan if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the Canada Pension Plan and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

    (b)    any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising Her rights under

4

(i)     subsection 224(1.2) of the *Income Tax Act*,

(ii)    any provision of the Canada Pension Plan or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the Canada Pension Plan, an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, or a premium under Part VII.1 of that Act, and of any related interest, penalties or other amounts, or

(iii)   any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

     (A)    has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

     (B)    is of the same nature as a contribution under the Canada Pension Plan if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the Canada Pension Plan and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

**Claims provable**

121. (1) All debts and liabilities, present or future, to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the bankrupt's discharge by reason of any obligation incurred before the day on which the bankrupt becomes bankrupt shall be deemed to be claims provable in proceedings under this Act.

**Interest from date of bankruptcy**

143. Where there is a surplus after payment of the claims as provided in sections 136 to 142, it shall be applied in payment of interest from the date of the bankruptcy at the rate of five per cent per annum on all claims proved in the bankruptcy and according to their priority.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, ss. 2, 3(1), 11(3), 11(4) (as amended to January 14, 2009)

**Definitions**

2.  In this Act,

"debtor company" means any company that

(a)     is bankrupt or insolvent,

(b)     has committed an act of bankruptcy within the meaning of the *Bankruptcy and Insolvency Act* or is deemed insolvent within the meaning of the *Winding-up and Restructuring Act*, whether or not proceedings in respect of the company have been taken under either of those Acts,

(c)     has made an authorized assignment or against which a bankruptcy order has been made under the *Bankruptcy and Insolvency Act*, or

(d)     is in the course of being wound up under the *Winding-up and Restructuring Act* because the company is insolvent;

**Application**

3. (1)  This Act applies in respect of a debtor company or affiliated debtor companies where the total of claims, within the meaning of section 12, against the debtor company or affiliated debtor companies exceeds five million dollars.

**Initial application court orders**

11.(3)  A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

(a)     staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b)     restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c)     prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

6

**Other than initial application court orders**

11.(4)  A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

    (a)    staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

    (b)    restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

    (c)    prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding Commenced at Toronto

**FACTUM**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC #:17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC #: 22293T
jcarfagnini@goodmans.ca
**Graham D. Smith**  LSUC#: 26377D
gsmith@goodmans.ca
**Joseph Pasquariello** LSUC #: 38390C
jpasquariello@goodmans.ca

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor