**Court File No.: 09-CL-7950**

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL
CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL
NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

- and -

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**AMENDED BRIEF OF THE UK PENSION CLAIMANTS REGARDING
POST-PETITION INTEREST ISSUES**

---

[1]    The U.S. Debtors in the U.S. chapter 11 cases, along with the last four digits of each U.S. Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**ISSUES PRESENTED**

1.      The U.S. and Canadian courts (the "**Courts**") have invited submissions from the Core Parties[2] in this proceeding in respect of a determination of the following issues:[3]

(1)      whether the holders of the crossover bonds[4] claims are legally entitled in each jurisdiction to claim or receive any [interest] amounts[5] under the relevant indentures, above and beyond the outstanding principal debt and pre-petition interest; and

(2)      if determined that the holders of the crossover bonds claims are so entitled [to interest], what additional amounts are such holders entitled to so claim and receive (collectively, the "**Post-petition Interest Issues**").

2.      The Board of the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, the "**UK Pension Claimants**") have filed an allocation pleading in this proceeding and have submitted fact and expert evidence in the Allocation Litigation in support of a Pro Rata Distribution

---

[2]      As defined in the Allocation Protocol (defined below).

[3]      Scheduling Order Re: Interest Issues, dated as of June 30, 2014 [U.S. D.I. 13910], at ¶ 1; *see also* Day 21 Allocation Trial Transcript (June 24, 2014) at 5096:17 – 5097:1.

[4]      As used herein, the "**Crossover Bonds**" refers to the bonds with both Canadian Debtors (NNC and/or NNL) and U.S. Debtors (NNI or Nortel Networks Capital Corp.) as obligors thereon, and "**Bondholders**" refers to the holders of the Crossover Bonds.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Allocation Pre-Trial Brief of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund, dated May 2, 2014 [U.S. D.I. 13550] (the "**UKPC Allocation Pre-Trial Brief**").

[5]      The UK Pension Claimants understand that the Courts have only requested briefing with respect to the Bondholders' entitlement to post-petition interest, and not the Bondholders' entitlement, if any, to post-petition fees, expenses or other amounts.  With respect to post-petition fees and expenses, by agreement with the Monitor, the Bondholders Group's professional fees and expenses are being paid by the Canadian estates with a partial right of reimbursement from the U.S. estates.  It is the UK Pension Claimants' understanding, however, that under the Bondholder Funding Letter, dated June 23, 2011, the final determination regarding the Bondholders' entitlement to such fees and expenses remains subject to determination by the Canadian Court.  Furthermore, to the extent the Bondholders seek reimbursement of their post-petition fees and expenses from the U.S. estates, the question under U.S. law will hinge on facts not currently before the Courts – specifically, whether Bondholders have made a "substantial contribution" in the case and whether such amounts are for the Bondholders' "actual, necessary expenses" or the "reasonable compensation for professional services" of their counsel or accountants.  *See* 11 U.S.C. §§ 503(b)(3)(D), (b)(4).  Accordingly, the UK Pension Claimants reserve their rights with respect to these issues.

Model.  If ultimately accepted by the Courts, such resolution of the Allocation Litigation may render any decision on the Post-petition Interest Issues unnecessary.  The UK Pension Claimants submit this brief without prejudice to their Allocation Position advocating for a Pro Rata Distribution, in the event a territorial allocation is made which has the effect of rendering one or more of the U.S. estates solvent.

## PRELIMINARY STATEMENT

3.       After a lengthy joint trial, the Courts have now heard all of the fact and expert testimony in the Allocation Litigation.  The evidence establishes beyond dispute that, prior to its insolvency, the Nortel Group operated as a highly integrated multinational enterprise, pursuant to which the Nortel entities contributed to the business operations and the creation of the assets belonging to "One Nortel."  Assets were not ring-fenced by geography or legal entity and business lines operated across geographic boundaries and legal entities.

4.       As a result of the Nortel entities' respective insolvency proceedings and the sale of the Nortel Group's worldwide assets, the $7.3 billion in sale proceeds in the Lockbox is available to be allocated for the benefit of the Nortel Group's creditors.  It is the creditors of the estates who have the ultimate economic interest in the Lockbox Funds.  The Court's rulings on the Allocation Litigation will have a crucial impact on creditor recoveries around the globe including those of the Nortel Group's former employees, pensioners, and trade creditors.  The same is true for the Courts' rulings on the Post-petition Interest Issues in the event of a territorial-based allocation of the Lockbox Funds which has the effect of rendering the U.S. estates solvent.  This is not just about Bondholder recoveries – the impact of the decision will be felt by all other unsecured creditors as well.

5.       For example, if:

(i)       the U.S. estates (specifically, NNI or NNCC) are solvent;

(ii)     the Courts determine that the Bondholders are entitled to post-petition interest on their claim against the U.S. Debtors; and

(iii)    the Courts further determine that the appropriate rate of interest is the contract rate, as opposed to the federal judgment rate,

then the Bondholders could receive in excess of approximately $1.6 billion in post-petition interest, or over one-fifth of the entire $7.3 billion in Lockbox Funds for post-petition interest on the Crossover Bonds alone.  Similarly, the determination of whether the Bondholders have a right to assert a claim for post-filing interest under Canadian law has the potential to shift creditor recoveries significantly.  Due to the zero-sum nature of creditor distributions in insolvency, awarding enhanced recoveries to the Bondholders imposes a direct cost to the Nortel Group's other unsecured creditors.

6.      The UK Pension Claimants submit that the Pro Rata Distribution Model proposed by the UK Pension Claimants and the Canadian Creditors' Committee (the "**CCC**") is the allocation theory best supported by the uncontroverted evidence of the Nortel Group's actual operations prior to insolvency.  If the Courts apply the Pro Rata Distribution Model in its purest form, then the answers to the Post-petition Interest Issues will be simple: no creditors would be entitled to post-petition interest because none of the relevant estates would be solvent.[6]  This outcome is further supported by application of the "Hotchpot Rule," a long-recognized substantive rule of international insolvency law that has been incorporated in Section 1532 of title 11 of the United States Code (the "**Bankruptcy Code**"), Section 60 of the

---

[6]      In that case, any risk of delay resulting from an interlocutory appeal of the Post-petition Interest Issues would also be rendered moot.

*Companies' Creditors Arrangement Act*[7] ("**CCAA**") and Article 32 of the UNCITRAL Model Law on Cross-Border Insolvency,[8] as discussed below.[9]

7.      If, however, the Courts ultimately allocate the Lockbox Funds according to a territorial allocation methodology, then unsecured creditors (such as the Bondholders) would only be able to seek post-petition interest on their claims against a U.S. Debtor to the extent such debtor was solvent and could pay all of its unsecured creditors in full.[10]  Moreover, even if post-petition interest was applicable, under settled law in the District of Delaware, as well as persuasive authority from other U.S. courts, post-petition interest on the Crossover Bonds would be capped at the federal judgment rate as of the petition date (i.e., at the rate of 0.44% compounded annually).  As of June 30, 2014, this amount was in excess of $90 million.

8.      With respect to the Canadian estates, the Bondholders' claim would be provable only with respect to pre-filing principal and interest; any post-filing interest would be prohibited under the "interest stops" rule embodied in the *Bankruptcy and Insolvency Act* (Canada)[11] (the "**BIA**"), the relevant provisions of which are incorporated into the claims process in this proceeding and pursuant to the CCAA.  As under U.S. law, the only circumstance where post-filing interest might be payable under the BIA is if the Canadian estates were solvent, which is a circumstance that could not occur under any of the allocation theories proposed by the Core Parties.

---

[7]      RSC 1985, c. C-36.

[8]      *Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law*, GA Res. 52/158, UNGAOR, 52d Sess., Annex I, UN Doc. A/52/17 (1997).

[9]      See discussion below starting at paragraph 21 and footnote 21.

[10]      In the U.S., solvency would be determined on an individual debtor-by-debtor basis, unless the U.S. Debtors are substantively consolidated (which has neither been confirmed nor denied by the U.S. Debtors to date).

[11]      RSC 1985, c. B-3.

## BACKGROUND

### Procedural History

9.      On January 14, 2009 (the "**Petition Date**"), Nortel Networks Inc. ("**NNI**") and certain of its affiliates, as debtors and debtors in possession (collectively, with NNI, the "**U.S. Debtors**"[12]), filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (collectively, the "**U.S. Proceedings**").

10.     Also on the Petition Date, Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**") and certain of their Canadian affiliates (collectively, with NNC and NNL, the "**Canadian Debtors**") filed an application with the Ontario Superior Court of Justice under the CCAA seeking relief from their creditors (collectively, the "**Canadian Proceedings**").

11.     On the Petition Date, Nortel Networks UK Limited and several other entities in the European, Middle East and Africa region ("**EMEA**") commenced insolvency administration proceedings in the UK Court, with secondary proceedings being undertaken in France.

12.     On the Petition Date, the Canadian Court entered an order recognizing the U.S. Proceedings as a foreign proceeding under Section 18.6 of the CCAA.  On February 27, 2009, based on a petition filed by Ernst & Young, Inc., as court-appointed Monitor in the Canadian Proceedings (the "**Monitor**"), the U.S. Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

---

[12]      One of the U.S. Debtors, Nortel Networks (CALA) Inc., filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009.

13.     On January 26, 2009, the Office of the United States Trustee for the District of Delaware appointed an Official Committee of Unsecured Creditors (the "**Committee**") pursuant to Section 1102(a)(1) of the Bankruptcy Code.

14.     An ad hoc group of bondholders (the "**Bondholder Group**") holding Crossover Bond claims against certain of the U.S. and Canadian Debtors was also organized.

**Bond Claims**

15.     The indenture trustees for the Crossover Bonds filed proofs of claim in the U.S. Proceeding and Canadian Proceeding (collectively, the "**Bond Claims**").  In summary, the Bond Claims assert claims totaling approximately $4.092 billion, representing principal and accrued, unpaid pre-petition interest. Contractual interest rates on the Bond Claims range from 1.75% to 10.75% per annum.[13]

**The Cross-Border Claims Protocol**

16.     On September 16, 2010, the Courts approved a cross-border protocol (the "**Cross-Border Claims Protocol**"), which established procedures for the resolution of "Overlapping Claims" and "Same-Creditor Claims" (each, as defined therein) in the U.S. and Canadian Proceedings.  The Cross-Border Claims

---

[13]     With one exception, the primary or secondary obligors for each series of Crossover Bonds are NNL, NNC and/or NNI.  Under the 7.875% bonds due 2026, the primary and second obligors are Nortel Networks Capital Corp. and NNL, respectively.  The proof of claim filed in the U.S. Proceeding with respect to the 7.875% bonds due 2026 comprise only $151.0 million of the total $4.092 billion claims that have been filed with respect to the Crossover Bonds.  More detailed information about the Bond Claims – including the applicable indentures, contract rates of interest, claim amounts, primary obligor/issuer (and jurisdiction of insolvency proceeding) and secondary obligor(s) (and jurisdiction) – is set forth on Schedule "A" to the Monitor's Submission re: Bondholder Claims Issues, dated June 19, 2014 [U.S. D.I. 13880].

Protocol supplements the procedures established in the U.S. Bar Date Order [U.S. D.I. 1280] and the Canadian Claims Procedure Order.[14]

17.    The Bond Claims, which includes the Bondholders' claim for post-petition interest, is an "Overlapping Claim" as defined in the Cross-Border Claims Protocol.[15]

18.    Pursuant to Section 17(e) of the Cross-Border Claims Protocol, the Courts can determine the Bond Claims (and therefore any applicable post-petition interest thereon, whether separately or otherwise) through a joint hearing if the Monitor/Canadian Debtors and U.S. Debtors cannot agree on the allowance, stipulation or settlement of the Bond Claims.[16]  In addition, Section 12(d) of the Cross-Border Insolvency Protocol provides "[t]he U.S. Court and the Canadian Court may conduct joint hearings (each, a "**Joint Hearing**") with respect to any cross-border matter … where both the

---

[14]    The Canadian Claims Procedures Order was issued by the Canadian Court on July 30, 2009 and by Amended and Restated Claims Procedures Order dated October 7, 2009.  The Canadian Claims Procedure Order provides that "a Claim shall not be a proven Claim unless and until the claim has been allowed or otherwise finally determined in accordance with the claims dispute and resolution procedures to be set out in the Claims Resolution Order and the Cross Border Claims Protocol."  Canadian Claims Procedure Order ¶ 16.

[15]    Specifically, Section 11 of the Cross-Border Claims Protocol provides, in relevant part:

"For the purposes of this Claims Protocol, an **'Overlapping Claim'** is a claim or portion thereof that (i) has been filed in both the Canadian Proceedings and the Chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) arises from the same underlying claim, action, liability, property, agreement, lease, debt or transaction. For the avoidance of doubt, the definition of Overlapping Claims shall include, but not be limited to, any (i) guarantee and indemnity claims where the direct claim is filed against a debtor in one jurisdiction and the guarantee or indemnity claim is filed against a debtor in the other jurisdiction…."

*See also* Section 17 (addressing the resolution of Overlapping Claims, including the Bond Claims).  In addition, Section 14 identifies all of the Bond Claims as "Bond Claims" under the Cross-Border Claims Protocol:

"For purposes of this Claims Protocol, a 'Bond Claim' is any claim arising from or related to the Bondholder Trust Indenture (as defined in the Canadian Bar Order), including claims filed by the indenture trustees."

[16]    Specifically, Section 17(e) of the Cross-Border Claims Protocol provides:

"If the Monitor and the Canadian Debtors, on the one hand, or the U.S. Debtors, on the other hand, proposes to allow, stipulate or settle the Bond Claims (the 'Settlement') and, after consulting with the other party with respect to such Settlement as provided in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16), the party not proposing such Settlement does not agree with such Settlement, such party may request that the hearing to allow the Bond Claims in the Settlement be a joint hearing."

U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, <u>to, among other things, facilitate</u> or coordinate proper and efficient conduct of the Insolvency Proceedings or <u>the resolution of any particular issue in the Insolvency Proceedings.</u>[17] [underlining added]   Accordingly, the Courts have the authority to consider the Post-petition Interest Issues on the Bond Claims in a Joint Hearing. [18]

19.      The resolution of an Overlapping Claim – which includes the Bond Claims – is expressly subject to "any applicable limitations on distributions to which a creditor may be allowed to recover for its claim."[19]  The Hotchpot Rule, discussed further below, is just one such limitation on recoveries that is relevant to the Courts' consideration of the Post-petition Interest Issues.

<b>ARGUMENT</b>

**A.  Under The Pro Rata Distribution Model, No Creditors Would Be Entitled To Post-Petition Interest.**

20.      Under the Pro Rata Distribution Model advanced by the UK Pension Claimants and CCC, no creditors would be entitled to post-petition interest, inasmuch as none of the debtors' estates would be solvent.  Lockbox Funds would be allocated to each estate in an amount that would enable allowed

---

[17]      Cross-Border Insolvency Protocol, initially approved by the Canadian and U.S. Courts on January 14 and 15, 2009, respectively, and subsequently approved in amended form by the U.S. and Canadian Courts on June 29 and 30, 2009, respectively [U.S. D.I. 54, 990] (as amended, the "**Cross-Border Insolvency Protocol**).

[18]      The U.S. Court's statements on June 24, 2012 make it clear that the Post-petition Interest Issue is being considered in the context of the allocation determination, in respect of which the UK Pension Claimants are a Core Party.

[19]      Cross-Border Claims Protocol, § 25.

unsecured creditors of each estate to receive the same percentage recovery.[20]  Rather than allowing the creditors of any one estate (in this case, the U.S. estate) to recover 100% or more on their claims while creditors of the other estates (in this case, the Canadian and EMEA estates) receive much smaller distributions, the equitable distribution scheme embodied in the Pro Rata Distribution Model most accurately reflects the nature of the assets that were sold and the integrated manner in which "One Nortel" operated, including the manner in which assets were created and liabilities incurred.

**B. Application Of The Hotchpot Rule Likewise Militates Against The Payment Of Post-Petition Interest On Any Claim In Respect Of A Single Pool Of Assets.**

21.     Section 25 of the Cross-Border Claims Protocol specifically provides that the rights and defenses of the parties regarding the resolution (i.e., allowance or provability) of Overlapping Claims, like the Bond Claims, are "*subject to any applicable limitations on distributions to which a creditor may be allowed to recover for its claim*."

22.     One such legal limitation on the recoveries of a creditor in an international insolvency is the Hotchpot Rule – a longstanding principle of common law recognized in England, Canada and the U.S., which has been codified in Section 1532 of the Bankruptcy Code[21] and Section 60 of the CCAA in

---

[20]     While there are a number of ways in which the Pro Rata Distribution Model could be implemented, the UK Pension Claimants set forth a proposed mechanism under Appendix "A" to the UKPC Allocation Pre-Trial Brief. Although the UK Pension Claimants believe the best approach to the Pro Rata Distribution Model would limit unsecured creditors with multiple claims to a single recovery, as described in the UKPC Allocation Pre-Trial Brief, the Pro Rata Distribution Model could also be implemented in a way that permitted unsecured creditors with multiple claims to be paid distributions on each of their claims rather than being limited to a single recovery in a primary jurisdiction.  However, no estate would be solvent (i.e., other single-claim creditors would not be paid 100%), and no post-petition interest would be payable under this approach.

[21]     Prior to adoption of chapter 15 of the Bankruptcy Code in 2005, the Hotchpot Rule was codified under former Section 508(a).

Section 1532 of the Bankruptcy Code provides:

> **Rule of Payment in Concurrent Proceedings**
>
> Without prejudice to secured claims or rights *in rem*, a creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment for the same claim in a case under any other chapter of this title [such as, e.g., chapter 11] regarding the debtor, so

adopting Article 32 of the UNCITRAL Model Law which has been accepted in more than 20 countries to date.

23.    In a nutshell, the Hotchpot Rule requires a creditor who has received a payment in respect of its claim in a foreign insolvency proceeding to account for such distribution (or "contribute to the hotchpot") before receiving any recovery on its claim in a domestic proceeding regarding the debtor.  The purpose of the Hotchpot Rule is to ensure that such creditors do not recover proportionally more than similarly situated creditors who have only a single source of payment.[22]  This clear restriction on the substantive rights of creditors in an international insolvency has been codified in each of Canada and the U.S., and is reflected through the language of the Cross Border Claims Protocol in this proceeding.

24.    Although the Hotchpot Rule is typically invoked in cases where claims are asserted by a creditor in multiple, concurrent insolvency proceedings against the same debtor where assets and proceeds

---

long as the payment to other creditors of the same class is proportionately less than the payment the creditor has already received.

Section 60 of the CCAA provides:

**Credit for recovery in other jurisdictions**

60. (1) In making a compromise or an arrangement of a debtor company, the following shall be taken into account in the distribution of dividends to the company's creditors in Canada as if they were a part of that distribution:

(a) the amount that a creditor receives or is entitled to receive outside Canada by way of a dividend in a foreign proceeding in respect of the company; and

(b) the value of any property of the company that the creditor acquires outside Canada on account of a provable claim of the creditor or that the creditor acquires outside Canada by way of a transfer that, if it were subject to this Act, would be a preference over other creditors or a transfer at undervalue.

**Restriction**

(2) Despite subsection (1), the creditor is not entitled to receive a dividend from the distribution in Canada until every other creditor who has a claim of equal rank in the order of priority established under this Act has received a dividend whose amount is the same percentage of that other creditor's claim as the aggregate of the amount referred to in paragraph (1)(a) and the value referred to in paragraph (1)(b) is of that creditor's claim.

[22]    *See In re Pollmann*, 156 F. 221, 222-23 (S.D.N.Y. 1907) (concluding that the Hotchpot Rule and the power to void preferential payments produces the same result, and serve to further the exercise of the court's equitable powers by preventing "the destruction of equality" among creditors).

available for distribution are separate and distinct in each jurisdiction,[23] the rule applies in the Nortel proceeding when dealing with one single pool of assets and an Overlapping Claim that: "(i) has been filed in both the Canadian Proceedings and the chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) arises from the same underlying claim, action, liability, property, agreement, lease, debt or transaction ... including ... where the direct claim is filed against a debtor in one jurisdiction and the guarantee or indemnity claim is filed against a debtor in the other jurisdiction...."[24]

25.    Here, regardless of which allocation methodology is adopted by the Courts, creditors will all recover from the same, single pot of commingled assets, which consist of proceeds from the sale of assets that were created, used and ultimately sold collaboratively by the Nortel Group in a fully integrated, global business.  Applying the Hotchpot Rule, the Lockbox Funds represent a <u>single indistinguishable pool of assets</u> from which a double-recovery should not be permitted unless creditors of the same class (i.e., other unsecured creditors claiming in the global bankruptcy proceeding) receive a distribution that is proportionately similar.  As such, no post-petition interest should be payable on any claim unless all unsecured creditors are paid in full, which would not be the case under any allocation theory advanced by the core parties.

26.    While the Hotchpot Rule will not be uniformly available in all cases involving separate legal entities with direct and guarantee claims asserted by the same parties, it is appropriate to apply it in cases

---

[23]    *See Ex parte WILSON. In re DOUGLAS.* (1872) L.R. 7 Ch.App. 490. In this case, the debtor carried on business in England and Brazil under two different firms. The debtor filed for bankruptcy protection and his assets in Brazil were administered under Brazilian bankruptcy law. After receiving a dividend in the Brazilian bankruptcy proceeding, certain Brazilian creditors filed claims in the English bankruptcy proceedings. The English Court of Appeal held that, despite the fact that the debtor carried on business under two separate firms in two jurisdictions, the debtor's bankruptcy really only involved one estate (*i.e.*, one pool of assets) which was partially administered in England and Brazil. Accordingly, based on the long-standing principle that a creditor cannot make a second recovery from the same estate, the Court ruled that the Brazilian creditors could not make a second recovery in England until all other creditors of the bankrupt's estate had received the same proportional recovery on their claims (the Hotchpot Rule).

[24]    Cross-Border Claims Protocol, § 11 (definition of "**Overlapping Claims**").

involving highly integrated debtors where the underlying assets available to satisfy creditor claims are in fact from one source, and represent joint assets prior to bankruptcy or assets in which both debtors have an interest.

**C.   Under The U.S. Bankruptcy Code, Unsecured Creditors Are Not Entitled To Post-Petition Interest Unless The Estate Is Solvent, In Which Case The Applicable Interest Rate Is "The Legal Rate."**

27.      Pursuant to Section 502(b)(2) of the U.S. Bankruptcy Code, unsecured creditors are generally prohibited from recovering "unmatured interest" in the form of post-petition interest.[25]  *See, e.g., In re Del Mission Ltd.*, 998 F.2d 756, 758 (9th Cir. 1993).

28.      However, where an estate is solvent, post-petition interest is expressly permissible under the U.S. Bankruptcy Code.  Section 726(a)(5) of the U.S. Bankruptcy Code provides that, after all other priority claims and unsecured claims have been paid in full (i.e., if the estates are solvent), distributions will be made in "payment of interest [on such claims] <u>at the legal rate from the date of the filing of the petition</u>." 11 U.S.C. § 726(a)(5) (emphasis added).  Although Section 726 is set forth in chapter 7, the chapter of the U.S. Bankruptcy Code that applies in liquidation cases, it is made applicable to chapter 11 cases through the "best interests" test under Section 1129(a)(7).  *See In re Washington Mutual Inc.*, 442 B.R. 314, 356 (Bankr. D. Del. 2011) ("**Washington Mutual I**"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 256 (Bankr. S.D.N.Y. 2007).

29.      As to the date from which post-petition interest accrues, Section 726(a)(5) expressly provides that post-petition interest, if awarded, accrues "from the date of the filing of the petition" — i.e., the Petition Date, January 14, 2009.

---

[25]      Although the term "unmatured interest" is not defined in the Bankruptcy Code, courts have held that interest is unmatured when it has not yet been earned as of the petition date.  *See In re U.S. Lines, Inc.*, 199 B.R. 476, 481 (Bankr. S.D.N.Y. 1996).

**D. The "Legal Rate" Of Post-Petition Interest Payable In A Solvent Estate Case Is The Federal Judgment Rate And Not The Contract Rate.**

30.     Although Section 726(a)(5) provides that post-petition interest will be payable at the "legal rate," that term is not defined in the Bankruptcy Code.  "The majority approach taken by most courts today is the federal judgment rate approach" under which the "legal rate" is the federal judgment rate established by 28 U.S.C. § 1961, the federal statute governing the accrual of post-judgment interest.  *In re W.R. Grace & Co.*, 475 B.R. 34, 200 (D. Del. 2012); *see also In re Best*, 365 B.R. 725, 727 (Bankr. W.D. Ky. 2007) ("The more recent cases hold that the federal judgment rate is the proper rate of interest under 11 U.S.C. § 726(a)(5)").

31.     Three cases in this district have addressed the issue, and each has held that the applicable rate of post-petition interest is the federal judgment rate.  *See W.R. Grace*, 475 B.R. at 201 (dicta); *In re Washington Mutual, Inc.*, 461 B.R. 200, 244-47 (Bankr. D. Del. 2011) ("**Washington Mutual II**"), *vacated, in part, on other grounds*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012);[26] *In re Coram Healthcare Corp.*, 315 B.R. 321, 346 (Bankr. D. Del. 2004).[27]

**a. Congress Intended The Federal Judgment Rate To Apply When It Referred To "The Legal Rate" In Section 726(a)(5).**

32.     Application of the federal judgment rate is supported by Section 726(a)(5)'s reference to "the legal rate," which reflects Congress' intent that a uniform federal statutory rate of interest apply, as opposed to variable contractual rates of interest.  *Washington Mutual II*, 461 B.R. at 242 ("[S]ection 726(a)(5) states that interest on unsecured claims shall be paid at 'the legal rate' as opposed to 'a' legal rate or the contract rate…. [W]here Congress intended that the contract rate apply, it so stated.") (citing 11 U.S.C. § 506(b) (stating that if a secured creditor is over-secured, the creditor shall be entitled to

---

[26]     Although portions of the *Washington Mutual II* decision were vacated upon the request of certain parties as a condition to settlement, the portions of the decision related to the Post-petition Interest Issues were not affected.

[27]     Judge Walrath has stated that the reasoning in *Washington Mutual II* regarding the Post-Petition Interest Issues should control over *Coram*.  *Washington Mutual II*, 461 B.R. at 242 n.35.

"interest on such claim … provided for <u>under the agreement</u> or State statute under which such claim arose."); *Adelphia Commc'ns*, 368 B.R. at 257 ("[i]t is by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate.") (internal citations and quotations omitted); *In re Dow Corning Corp.*, 237 B.R. 380, 405-06 (Bankr. E.D. Mich. 1999)).

33.     This interpretation is further supported by the fact that Section 726(a)(5), as originally drafted, had referred instead to "interest on claims allowed," which, Congress had explained, meant that "[t]he rate of interest is to be determined by <u>other applicable law</u>" – a broadly understood term that could encompass contractual rates.  REPORT OF THE COMM'N ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. Doc. No. 93-137, 93d Cong., 1st Sess. (1973), at § 4-405 (emphasis added).  It is telling that Congress ultimately replaced its original formulation with the phrase "the legal rate of interest" because courts contemporaneously understood the term "legal rate" to refer to a rate fixed by statute. *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1234-35 (9th Cir. 2002), *cert denied*, 537 U.S. 1072 (2002); *In re Dow Corning Corp.*, 237 B.R. 380, 412 (Bankr. E.D. Mich. 1999).  Moreover, the phrase "the legal rate" refers to the federal statutory rate, not simply to "a statutory rate."  *Washington Mutual II*, 461 B.R. at 243 ("[T]he payment of post-judgment interest is procedural by nature and dictated by federal law rather than state law, further supporting the use of the federal judgment rate.").

### b. Application Of The Federal Judgment Rate Furthers The Purposes Of The Bankruptcy Code.

34.     Awarding post-petition interest at the federal judgment rate also furthers federal bankruptcy policy by providing an appropriate level of compensation to creditors in accordance with other federal law.  Courts have reasoned that the federal judgment rate is appropriate because an allowed claim is the equivalent of a money judgment.  Accordingly, because the purpose of Section 726 is to compensate creditors for the delay between the petition date and the time of payment, which is akin to the purpose served by post-judgment interest, application of the federal judgment rate is appropriate.  *Cardelucci*, 285

F.3d at 1235; *Dow Corning*, 237 B.R. at 405-06.  Application of the federal judgment rate promotes the uniformity and predictability of federal law.  *In re Melenyzer*, 143 B.R. 829, 832-33 (Bankr. W.D. Tex. 1992) (federal judgment rate provides court with an "easily ascertainable, nationally uniform rate" and increases predictability in the process).

35.     Use of the federal judgment rate also furthers the U.S. Bankruptcy Code's goals of promoting fairness and equality among creditors, and eases the administration of the case.  *Washington Mutual II*, 461 B.R. at 243 ("[T]he use of the federal judgment rate promotes two important bankruptcy goals: 'fairness among creditors and administrative efficiency.'"); *Cardelucci*, 285 F.3d at 1234-36; *Best*, 365 B.R. at 727 (federal judgment rate provides an "efficient and inexpensive means of calculating the amount of interest to be paid to each creditor"); *Dow*, 237 B.R. at 407 (providing a uniform rate "keeps the bankruptcy estate from being saddled with potentially difficult and time-consuming administrative burdens" of determining the rate applicable to each claim); *In re Garriock*, 373 B.R. 814, 816 (E.D. Va. 2007); *In re Country Manor of Kenton, Inc.*, 254 B.R. 179, 182 (Bankr. N.D. Ohio 2000).

*36.*     In the present case, application of the contract rate would be administratively burdensome.  If the Courts were to determine that the U.S. estates were solvent, all unsecured creditors – not only the Crossover Bonds – would be entitled to post-petition interest.  11 U.S.C. § 726(a)(5) (referring to "payment of interest … on any claim" enumerated under the prior sections, including unsecured claims).  Application of the contract rate would require an examination of the underlying documents for each contract-based claim (subject to any further arguments that such rates are inapplicable, for example, because they are usurious, supplanted by statute or otherwise illegal).  For claims where no rate was contracted for, a multitude of federal

and state laws would need to be canvassed in order to ascertain the applicable rates.  *See In re Beguelin*, 220 B.R. 94, 101 (9th Cir. BAP 1998).[28]

37.    In the present case, where over 7,000 claims[29] have been filed in the U.S. Proceedings, an individualized determination of each creditor's post-petition interest claim would impose an immense administrative burden on the estates.  With Crossover Bond interest rates as high as 10.75% per annum,[30] awarding post-petition interest at the contract rate would undermine the Bankruptcy Code's goal of ensuring the equality of distributions to similarly situated creditors.  *See Cardelucci*, 285 F.3d at 1235-36 (stating "[a]n overriding policy consideration in an award of interest to a creditor is the balancing of equity among the creditors.") (citing *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 165 (1946) ("It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor.")).

---

[28]    In *Beguelin*, the court noted:

> Use of the federal judgment rate for all creditors in a case provides bankruptcy trustees with an efficient and inexpensive means of calculating the amount of interest to be paid to each creditor. It is not hard to imagine the administrative nightmare that bankruptcy trustees would otherwise face if they were required to calculate a different interest rate, based on a different source of interest rate for each creditor .... the burden of requiring a trustee to apply different rates of interest according to the rate provided under contract is a compelling reason not to have to rely on various state legal interest rates. The logistical difficulties and expense involved in doing so would be particularly burdensome in those cases that involve a large number of creditors from multiple jurisdictions.

220 B.R. at 101.

[29]    Proposed Disclosure Statement for the Joint Chapter 11 Plan of Nortel Networks Inc. and Its Affiliated Debtors, dated September 3, 2010 [U.S. D.I. 3874] ("As of June 30, 2010, approximately 7,316 proofs of claim (including only once those proofs of claim filed against more than one Debtor) had been filed against the Debtors, asserting in the aggregate approximately $27.1 billion, as well as unliquidated amounts.").

[30]    To add further complexity to this issue, some Crossover Bonds provide for interest to be calculated based on LIBOR, which will only serve to increase the administrative burden and undermine uniform treatment of creditors.

38.    Lastly, the prospect of accruing post-petition interest at above-market interest rates (like those provided by many of the Crossover Bonds) on an investment that is, effectively, fully collateralized with little risk of principal depreciation, could have the perverse effect of discouraging settlement or an efficient litigated resolution of the cases, since creditors would have no better opportunities to reinvest distributions on their claims in today's market.

> **c.    Even If The Equities Were Relevant To The Award Of Interest (Which They Are Not), The Equities Here Support Application Of No More Than The Federal Judgment Rate.**

39.    Payment of post-petition interest at the federal judgment rate is required by the plain text of Section 726(a)(5), leaving the courts with no discretion to award a higher rate based on equitable considerations.  *See Washington Mutual II*, 461 B.R. at 242 (court rejected that "it needed to consider the equities of the case," concluding instead that "the better view" is that federal judgment rate is the appropriate rate under Section 726(a)(5));[31] *Cardelucci*, 285 F.3d at 1236 (rejecting equitable arguments that the debtor would be receiving a windfall with the federal judgment rate where assets were sufficient to pay all creditors the contract rate of interest because "'interest at the legal rate' is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court.").

40.    However, even if equitable considerations were relevant to the analysis – which they are not – the facts and circumstances here do not merit a departure from the statutory requirement that federal judgment rate be awarded in the event the U.S. estates prove to be solvent:

> (i)    First, the Courts are not faced here with a circumstance where awarding the federal
>
> judgment rate would provide a "windfall" to equity, thereby "reward[ing] an

---

[31]    Judge Walrath went on to clarify in a footnote that, to the extent *Coram Healthcare* suggested "that the federal judgment rate was not <u>required</u> by section 726(a)(5)," the decision was "wrong." *Washington Mutual II*, 461 B.R. at 242 n.35 (emphasis added).

unscrupulous and indolent debtor." *See In re Fast*, 318 B.R. 183, 192 (Bankr. D. Colo. 2004); *Best*, 365 B.R. at 727.  Awarding the Crossover Bonds the higher contract rate would merely serve to harm other creditors.  *Id.* at 727-28 (considering equities between creditor and creditor and creditor and debtor).  Every dollar paid to the Crossover Bonds for post-petition interest at the higher contract rate would impose a direct cost on the creditors of the Canadian Debtors who would receive a correspondingly smaller recovery by way of the Canadian Debtors' recovery as equity, even though they are, for all intents and purposes, similarly situated to one another.  These include former employees, pensioners and trade creditors (Crossover Bonds will even benefit at the expense of other bonds whose obligors were limited to one or more of the Canadian Debtors).

(ii)     Second, under the Interim Funding and Settlement Agreement (the "**IFSA**"), the parties agreed to escrow the Lockbox Funds in a non-interest bearing account. The Bondholders were extensively involved in the negotiation of the IFSA and voiced their full approval of its terms at the hearing to approve it.  By depositing the funds in a non-interest bearing account, the parties and the Bondholders collectively agreed to forego a market rate investment return in exchange for protection from the risk of a loss of principal during the Allocation Litigation.  The Bondholders should not now be heard to argue that they should be compensated with contract rate post-petition interest, thereby eroding the recovery to all creditors of the Canadian Debtors, who are entitled to receive the value of the U.S. Debtors' equity.

(iii)    Third, the Bondholders, most of whom purchased their claims on the secondary market, and therefore were not initial holders who purchased their claims at par, cannot justifiably claim that they expected to receive post-petition interest at the contract rate in the face of countervailing authority.  To the extent the Bondholders, as a class, purchased their

claims at a blended purchase price below par, payment of such claims in full with post-petition interest, even at the modest federal judgment rate, while creditors of other estates stand to receive much smaller distributions, strikes the appropriate balance between the interests of the Bondholders and the other creditors in the case. *See Cardelucci*, 285 F.3d at 1235-36.

(iv)    Fourth, the administrative burden of determining the applicable interest rates for each of the allowed U.S. claims will only add to the mounting professional fees and delay in these cases.

### E.   As A Matter Of Canadian Law, Provable Claims Do Not Include Post-Filing Interest.

41.    With respect to the Bond Claim against the Canadian estates, the relevant question is whether, under the CCAA, the quantum of a creditor's claim includes post-filing interest.  In short, since the "interest stops rule" embodied in the BIA excludes post-filing interest from the provable amount of the Bond Claim, and the plain text of the CCAA and the Claims Order in this proceeding adopt the concept of provable claims under the BIA, the quantum of the Bondholders' provable claim should not include post-filing interest.

42.    The CCAA adopts the concept of provable claims under the BIA without restriction. Specifically, under Section 2(1) of the CCAA, a "claim" is defined as "any indebtedness, liability or obligation of any kind that would be <u>a claim provable within the meaning of Section 2 of the *Bankruptcy and Insolvency Act*</u>."  Therefore, what constitutes a claim for the purposes of the CCAA is determined pursuant to the rules set forth in the BIA.

43.    Under the BIA, the sections governing the provability of claims establish the so-called "Interest Stops Rule."  Pursuant to the Interest Stops Rule, claims for interest are provable only up to the date of the bankruptcy.  Specifically, Section 121(1) of the BIA provides, in relevant part, that "[a]ll debts and

liabilities, present or future, to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the bankrupt's discharge by reason of any obligation incurred before the day on which the bankrupt becomes bankrupt shall be deemed to be claims provable in proceedings under this Act."[32]  Moreover, Section 122(2) of the BIA provides that "[i]f interest on any debt or sum certain is provable under this Act but the rate of interest has not been agreed on, the creditor may prove interest at a rate not exceeding five per cent per annum to the date of the bankruptcy...."[33]

44.     Section 143 sets forth a narrow exception for the payment of post-filing interest, akin to the Bankruptcy Code, where the estate is solvent:

> **Section 143.  Interest from date of bankruptcy** – Where there is a surplus after payment of the claims as provided in sections 136 to 142 [i.e., all secured, preferred and unsecured creditors are paid in full], it shall be applied in payment of interest from the date of the bankruptcy at the rate of five per cent per annum on all claims proved in the bankruptcy and according to their priority.[34]

---

[32]     BIA § 121(1) (emphasis added); *see also Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 21 C.B.R. (3d) 12, 1993 CarswellAlta 423 (Q.B.) (the division of the bankrupt's property is carried out as if frozen in time at the date of bankruptcy, and no interest accrues after that date).

        Section 121(3) of the BIA, pursuant to which a creditor may prove for a debt not yet due at the date of bankruptcy and receive a dividend with other creditors, does not militate a different result.  Under the canon of statutory interpretation that specific statutory language will trump conflicting general language, the BIA's express and specific treatment of the question of interest under Sections 122(2), 143 and other sections overrides section 121(3)'s general treatment of debts presently owing but payable in the future (or *debitum in praesenti, solvendum in futuro*).

[33]     BIA § 122(2) (emphasis added); *see also* Houlden, Morawetz, & Sarra, eds., *The 2014 Annotated Bankruptcy and Insolvency Act* (Toronto: Thomson Carswell, 2014), at G§45 - Interest on Claims of Creditors (Under s. 122(2), interest is in a proper case provable only to the date of bankruptcy and not thereafter); *Re Garvin (Theo) Ltd.* (1969), 1 Ch. 624, [1967] 3 All E.R. 497 (Where a sum is payable pursuant to a written instrument at the end of a fixed period, interest can be proved from the date the debt or sum was payable to the date of bankruptcy at 5%, notwithstanding that the instrument made no provision for interest after the due date).

[34]     BIA § 143 (emphasis added); see also BIA § 134; *Re Belleville Milling Co.* (1930), 12 C.B.R. 505, 1930 CarswellOnt 49 (S.C.) appeal dismissed (1931), 12 C.B.R. 510, 1931 CarswellOnt 31 (S.C.) (no interest can be claimed after the date of bankruptcy unless there is a surplus after payment of claims of creditors).

In the present case, however, there is no dispute that the Canadian estates could not be solvent under any of the proposed allocation schemes.

45.     Like the BIA, the applicable date for determining when the quantum of a claim will be measured in a CCAA insolvency proceeding such as the Canadian Proceedings is the date when the CCAA was commenced.   Section 19(1)(b) of the CCAA, which establishes the date applicable for determining whether a claim in a CCAA proceeding may be dealt with by compromise or arrangement, mirrors the language in Section 121 of the BIA regarding the date applicable for determining whether a claim is provable.   Under Section 19(1)(b) of the CCAA, the applicable date for determining whether a claim may be dealt with in a CCAA proceeding is determined to be the earlier of the commencement of proceedings under the CCAA and "the date of the initial bankruptcy event" under the BIA.[35]   The "date of the initial bankruptcy event" is defined under Section 2 of the BIA as being the earliest of a number of events, including the commencement of proceedings under the CCAA, which would be the applicable date in the

---

[35]     Specifically, section 19 of the CCAA provides:

19. (1) **Claims that may be dealt with by a compromise or arrangement** - Subject to subsection (2), the only claims that may be dealt with by a compromise or arrangement in respect of a debtor company are

(a) claims that relate to debts or liabilities, present or future, to which the company is subject on the earlier of

(i) the day on which proceedings commenced under this Act, and

(ii) if the company filed a notice of intention under section 50.4 of the Bankruptcy and Insolvency Act or commenced proceedings under this Act with the consent of inspectors referred to in section 116 of the *Bankruptcy and Insolvency Act*, the date of the initial bankruptcy event within the meaning of section 2 of that Act; and

(b) claims that relate to debts or liabilities, present or future, to which the company may become subject before the compromise or arrangement is sanctioned by reason of any obligation incurred by the company before the earlier of the days referred to in subparagraphs (a)(i) and (ii).

case of the Canadian Debtors here.  Accordingly, the commencement of the Canadian Proceedings under

the CCAA will be the applicable date for determining the quantum of the Bond Claims.[36]

46.     This conclusion is further supported by the Claims Procedure Order that was issued by the

Canadian Court on July 30, 2009.  Under the Claims Procedure Order, "Claim" and "Pre-Filing Claim"

are defined as follows:

> "Claim" means any right of any Person against the Applicants, or any of them, in
> connection with any indebtedness, liability or obligation of any kind of the Applicants, or
> any of them, whether liquidated, unliquidated, fixed, contingent, matured, unmatured,
> disputed, undisputed, legal, equitable, secured, unsecured, present, future, known or
> unknown, by guarantee, surety or otherwise and whether or not such right is executor in
> nature, including the right or ability of any Person to advance a claim for contribution or
> indemnity or otherwise with respect to any matter, action, cause or chose in action,
> whether existing at present or commenced in the future, which indebtedness, liability or
> obligation (A) is based in whole or in part on facts existing prior to the Filing Date, (B)
> relates to a time period prior to the Filing Date, or (C) would have been a claim provable
> in bankruptcy had the Applicants become bankrupt on the Filing Date (each, a "Pre-filing
> Claim", and collectively, the "Pre-filing Claims").[37]

Accordingly, the claims procedure implemented in the Canadian Proceeding determines Claims as if the

Applicants had become bankrupt on the Filing Date (i.e., commencement of the CCAA proceedings on

January 14, 2009), such that the Filing Date is, for all intents and purposes, the Date of Bankruptcy.

Therefore, the bondholders have been on notice since at least July 30, 2009 that the claims process for the

CCAA proceeding in Nortel results in an "Interest Stops Rule" as at January 14, 2009.

---

[36]     Likewise, if the Canadian Proceedings were converted into a BIA proceeding, the fact that Nortel's "initial
bankruptcy event" would be its CCAA filing militates in favor of the conclusion that its "date of bankruptcy" for
determining the quantum of provable claims would also be its CCAA filing and not the date on which its bankruptcy
order would have been entered.  The logical conclusion of this argument is that if Nortel's CCAA proceeding is
converted into a BIA proceeding for the purpose of distribution, the Bond Claims should not include interest after
the CCAA filing.

[37]     Claims Procedure Order dated July 30, 2009 at para. 3(i)(i) (emphasis added).

47.     A number of cases, including those decided by the Supreme Court of Canada, have held that the CCAA and BIA operate harmoniously and should be interpreted as such.[38]   This leads to the logical position that the treatment of applicable interest on the Bondholders' Claims and the quantum of the Bondholders' Claims should be the same under the CCAA and BIA.

48.     Any court decision that produces a different result (distinguished from situations where by contractual agreement of the parties,[39] including under a Plan, the parties may agree otherwise) would create a disincentive to companies seeking to restructure under the CCAA, and drive parties to ensure

---

[38]     For example, in *Re Ted Leroy Trucking [Century Services] Ltd.*, 2010 SCC 60, 2010 CarswellBC 3419 the Supreme Court of Canada stated:

> "With parallel CCAA and BIA restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation….
>
> "The CCAA creates conditions for preserving the status quo while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all. Because the alternative to reorganization is often bankruptcy, participants will measure the impact of a reorganization against the position they would enjoy in liquidation. In the case at bar, the order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that is common to both statutes.
>
> "Tysoe J.A. therefore erred in my view by treating the CCAA and the BIA as distinct regimes subject to a temporal gap between the two, rather than as forming part of an integrated body of insolvency law. Parliament's decision to maintain two statutory schemes for reorganization, the BIA and the CCAA, reflects the reality that reorganizations of differing complexity require different legal mechanisms. ….The transition from the CCAA to the BIA may require the partial lifting of a stay of proceedings under the CCAA to allow commencement of the BIA proceedings. However, as Laskin J.A. for the Ontario Court of Appeal noted in a similar competition between secured creditors and the Ontario Superintendent of Financial Services seeking to enforce a deemed trust, '[t]he two statutes are related' and no 'gap' exists between the two statutes which would allow the enforcement of property interests at the conclusion of CCAA proceedings that would be lost in bankruptcy."

*Id.* at ¶¶ 24, 77, 78 (emphases added).

[39]     For example, creditors are free to agree on subordination provisions amongst themselves that provide for senior creditors to receive post-filing interest at the expense of junior creditors.  *See Re Stelco*, 2007 ONCA 483, 2007 CarswellOnt 4108 at paras. 56-70 (final plan provided for payment of principal and interest only to filing date but preserved senior debtholders' rights, under subordination agreement, to seek larger share of distributions held in trust for senior and junior debtholders under plan).   As a private contract between third parties, this does not, in itself, turn on whether post-filing claims against the debtor would be permitted in a CCAA or BIA proceeding.  In any case, this is not, of course, the situation implicated here.

certainty with an "Interest Stops Rule" through a more immediate bankruptcy.  The Courts have identified the danger of interpreting the CCAA and BIA in such a way that it favours bankruptcy over restructuring.

49.      Accordingly, the quantum of the Bond Claim should be calculated for purposes of the CCAA proceeding solely based on principal and pre-filing interest through to the CCAA filing date, and any post-filing interest should be prohibited under the "interest stops" rule embodied in the BIA, as incorporated by the CCAA.

## CONCLUSION

50.      If the Courts adopt the Pro Rata Distribution Model in the Allocation Litigation, the Post-petition Interest Issues become moot, as no creditor would be entitled to post-petition interest.  Likewise, application of the Hotchpot Rule, a longstanding substantive international insolvency principle, to the Nortel case militates against allowing Bondholders to receive multiple recoveries against the same pool of assets, resulting, again, in no post-petition interest being payable.

51.      Even if the Courts were to apply a territorial allocation methodology, post-petition interest would only be payable under U.S. law in the event the U.S. Debtors were solvent, and even then only at the federal judgment rate, not the contract rate.

52.      Under Canadian law, post-filing interest would, likewise, only be payable in the event a surplus were to exist after payment of all other claims.  Moreover, under Canadian law the quantum of a creditor's claim should include interest only through the filing date and not thereafter.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 16th day of July, 2014.


July 15, 2014                                    _____

*/s/ Michael Shakra*

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario, M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Michael Shakra** (LSUC# 64604K)

Tel:    416-304-1616
Fax:    416-304-1313

*/s/ Justin R. Alberto*

**Bayard, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899, U.S.A.

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)

Tel:    302-655-5000
Fax:    302-658-6395
Email:  cdavis@bayardlaw.com
        jalberto@bayardlaw.com

*/s/ Brian E. O'Connor*

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099, U.S.A

**Brian E. O'Connor**
**Sameer Advani**
**Weston T. Eguchi**
**Andrew Hanrahan**

Tel:    212-728-8000
Fax:    212-728-8111

# SCHEDULE "A"

## Relevant Statutes

### <u>CANADA</u>

*Companies Creditors' Arrangement Act*, RSC 1985, c. C-36

**Interpretation**

2.(1) In this Act,

"claim"

"claim" means any indebtedness, liability or obligation of any kind that would be a claim provable within the meaning of section 2 of the Bankruptcy and Insolvency Act;

**Miscellaneous Provisions**

*Credit for recovery in other jurisdictions*

60. (1) In making a compromise or an arrangement of a debtor company, the following shall be taken into account in the distribution of dividends to the company's creditors in Canada as if they were a part of that distribution:

(a) the amount that a creditor receives or is entitled to receive outside Canada by way of a dividend in a foreign proceeding in respect of the company; and

(b) the value of any property of the company that the creditor acquires outside Canada on account of a provable claim of the creditor or that the creditor acquires outside Canada by way of a transfer that, if it were subject to this Act, would be a preference over other creditors or a transfer at undervalue.

*Restriction*

(2) Despite subsection (1), the creditor is not entitled to receive a dividend from the distribution in Canada until every other creditor who has a claim of equal rank in the order of priority established under this Act has received a dividend whose amount is the same percentage of that other creditor's claim as the aggregate of the amount referred to in paragraph (1)(a) and the value referred to in paragraph (1)(b) is of that creditor's claim.

*Bankruptcy and Insolvency Act* (Canada), RSC 1985, c. B-3

## Section 2

## Interpretation

"claim provable in bankruptcy", "provable claim" or "claim provable"

"claim provable in bankruptcy", "provable claim" or "claim provable" includes any claim or liability provable in proceedings under this Act by a creditor;

[...]

"date of the initial bankruptcy event"

"date of the initial bankruptcy event", in respect of a person, means the earliest of the day on which any one of the following is made, filed or commenced, as the case may be:

(a) an assignment by or in respect of the person,

(b) a proposal by or in respect of the person,

(c) a notice of intention by the person,

(d) the first application for a bankruptcy order against the person, in any case

(i) referred to in paragraph 50.4(8)(a) or 57(a) or subsection 61(2), or

(ii) in which a notice of intention to make a proposal has been filed under section 50.4 or a proposal has been filed under section 62 in respect of the person and the person files an assignment before the court has approved the proposal,

(e) the application in respect of which a bankruptcy order is made, in the case of an application other than one referred to in paragraph (d), or

(f) proceedings under the *Companies' Creditors Arrangement Act*;

[...]

## Claims provable

121. (1) All debts and liabilities, present or future, to which the bankrupt is subject on the day on which the bankrupt becomes bankrupt or to which the bankrupt may become subject before the

bankrupt's discharge by reason of any obligation incurred before the day on which the bankrupt becomes bankrupt shall be deemed to be claims provable in proceedings under this Act.

**Contingent and unliquidated claims**

(2) The determination whether a contingent or unliquidated claim is a provable claim and the valuation of such a claim shall be made in accordance with section 135.

**Debts payable at a future time**

(3) A creditor may prove a debt not payable at the date of the bankruptcy and may receive dividends equally with the other creditors, deducting only thereout a rebate of interest at the rate of five per cent per annum computed from the declaration of a dividend to the time when the debt would have become payable according to the terms on which it was contracted.

**Family support claims**

(4) A claim in respect of a debt or liability referred to in paragraph 178(1)(b) or (c) payable under an order or agreement made before the date of the initial bankruptcy event in respect of the bankrupt and at a time when the spouse, former spouse, former common-law partner or child was living apart from the bankrupt, whether the order or agreement provides for periodic amounts or lump sum amounts, is a claim provable under this Act.

**Claims provable in bankruptcy following proposal**

122. (1) The claims of creditors under a proposal are, in the event of the debtor subsequently becoming bankrupt, provable in the bankruptcy for the full amount of the claims less any dividends paid thereon pursuant to the proposal.

**Interest**

(2) If interest on any debt or sum certain is provable under this Act but the rate of interest has not been agreed on, the creditor may prove interest at a rate not exceeding five per cent per annum to the date of the bankruptcy from the time the debt or sum was payable, if evidenced by a written document, or, if not so evidenced, from the time notice has been given the debtor of the interest claimed.

**UNITED STATES**

**EXCERPTS FROM THE UNITED STATES BANKRUPTCY CODE**

### § 502. Allowance of claims or interests

**(a)** A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

**(b)** Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--

> **(1)** such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

> **(2)** such claim is for unmatured interest;

> **(3)** if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

> **(4)** if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

> **(5)** such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;

> **(6)** if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--

>> **(A)** the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--

>>> **(i)** the date of the filing of the petition; and

4

          **(ii)** the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

        **(B)** any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

   **(7)** if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds--

        **(A)** the compensation provided by such contract, without acceleration, for one year following the earlier of--

          **(i)** the date of the filing of the petition; or

          **(ii)** the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

        **(B)** any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

   **(8)** such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

   **(9)** proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure, except that a claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide, and except that in a case under chapter 13, a claim of a governmental unit for a tax with respect to a return filed under section 1308 shall be timely if the claim is filed on or before the date that is 60 days after the date on which such return was filed as required.

**(c)** There shall be estimated for purpose of allowance under this section--

   **(1)** any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

   **(2)** any right to payment arising from a right to an equitable remedy for breach of performance.

**(d)** Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

**(e)(1)** Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that--

      **(A)** such creditor's claim against the estate is disallowed;

      **(B)** such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; or

      **(C)** such entity asserts a right of subrogation to the rights of such creditor under section 509 of this title.

      **(2)** A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition.

**(f)** In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

**(g)(1)** A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

      **(2)** A claim for damages calculated in accordance with section 562 shall be allowed under subsection (a), (b), or (c), or disallowed under subsection (d) or (e), as if such claim had arisen before the date of the filing of the petition.

**(h)** A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed

under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

**(i)** A claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(8) of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

**(j)** A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder. This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

**(k)(1)** The court, on the motion of the debtor and after a hearing, may reduce a claim filed under this section based in whole on an unsecured consumer debt by not more than 20 percent of the claim, if--

    **(A)** the claim was filed by a creditor who unreasonably refused to negotiate a reasonable alternative repayment schedule proposed on behalf of the debtor by an approved nonprofit budget and credit counseling agency described in section 111;

    **(B)** the offer of the debtor under subparagraph (A)--

        **(i)** was made at least 60 days before the date of the filing of the petition; and

        **(ii)** provided for payment of at least 60 percent of the amount of the debt over a period not to exceed the repayment period of the loan, or a reasonable extension thereof; and

    **(C)** no part of the debt under the alternative repayment schedule is nondischargeable.

    **(2)** The debtor shall have the burden of proving, by clear and convincing evidence, that--

      **(A)** the creditor unreasonably refused to consider the debtor's proposal; and

      **(B)** the proposed alternative repayment schedule was made prior to expiration of the 60-day period specified in paragraph (1)(B)(i).

## § 506. Determination of secured status

**(a)(1)** An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

      **(2)** If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

**(b)** To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

**(c)** The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

**(d)** To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

      **(1)** such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

      **(2)** such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

## § 726. Distribution of property of the estate

**(a)** Except as provided in section 510 of this title, property of the estate shall be distributed--

    **(1)** first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed under section 501 of this title or tardily filed on or before the earlier of--

        **(A)** the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or

        **(B)** the date on which the trustee commences final distribution under this section;

    **(2)** second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is--

        **(A)** timely filed under section 501(a) of this title;

        **(B)** timely filed under section 501(b) or 501(c) of this title; or

        **(C)** tardily filed under section 501(a) of this title, if--

            **(i)** the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and

            **(ii)** proof of such claim is filed in time to permit payment of such claim;

    **(3)** third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph (2)(C) of this subsection;

    **(4)** fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;

**(5)** fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and

**(6)** sixth, to the debtor.

**(b)** Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), (7), (8), (9), or (10) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under section 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this title incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.

**(c)** Notwithstanding subsections (a) and (b) of this section, if there is property of the kind specified in section 541(a)(2) of this title, or proceeds of such property, in the estate, such property or proceeds shall be segregated from other property of the estate, and such property or proceeds and other property of the estate shall be distributed as follows:

**(1)** Claims allowed under section 503 of this title shall be paid either from property of the kind specified in section 541(a)(2) of this title, or from other property of the estate, as the interest of justice requires.

**(2)** Allowed claims, other than claims allowed under section 503 of this title, shall be paid in the order specified in subsection (a) of this section, and, with respect to claims of a kind specified in a particular paragraph of section 507 of this title or subsection (a) of this section, in the following order and manner:

**(A)** First, community claims against the debtor or the debtor's spouse shall be paid from property of the kind specified in section 541(a)(2) of this title, except to the extent that such property is solely liable for debts of the debtor.

**(B)** Second, to the extent that community claims against the debtor are not paid under subparagraph (A) of this paragraph, such community claims shall be paid from property of the kind specified in section 541(a)(2) of this title that is solely liable for debts of the debtor.

**(C)** Third, to the extent that all claims against the debtor including community claims against the debtor are not paid under subparagraph (A) or (B) of this paragraph such claims shall be paid from property of the estate other than property of the kind specified in section 541(a)(2) of this title.

**(D)** Fourth, to the extent that community claims against the debtor or the debtor's spouse are not paid under subparagraph (A), (B), or (C) of this paragraph, such claims shall be paid from all remaining property of the estate.

## § 1129. Confirmation of plan

**(a)** The court shall confirm a plan only if all of the following requirements are met:

**(1)** The plan complies with the applicable provisions of this title.

**(2)** The proponent of the plan complies with the applicable provisions of this title.

**(3)** The plan has been proposed in good faith and not by any means forbidden by law.

**(4)** Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

**(5)(A)(i)** The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

**(ii)** the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

**(B)** the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

**(6)** Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

**(7)** With respect to each impaired class of claims or interests--

**(A)** each holder of a claim or interest of such class--

**(i)** has accepted the plan; or

**(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount

12

that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

       **(B)** if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

  **(8)** With respect to each class of claims or interests--

       **(A)** such class has accepted the plan; or

       **(B)** such class is not impaired under the plan.

  **(9)** Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

       **(A)** with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

       **(B)** with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive--

           **(i)** if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

           **(ii)** if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

       **(C)** with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash--

           **(i)** of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

           **(ii)** over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

(14) If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

(15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

14

(16) All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides--

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims--

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection

15

(a)(14) of this section.

      **(C)** With respect to a class of interests--

        **(i)** the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

        **(ii)** the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

**(c)** Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

**(d)** Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

**(e)** In a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section 1121(e) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3).

---

### § 1532. Rule of payment in concurrent proceedings

Without prejudice to secured claims or rights in rem, a creditor who has received payment with respect to its claim in a foreign proceeding pursuant to a law relating to insolvency may not receive a payment for the same claim in a case under any other chapter of this title regarding the debtor, so long as the payment to other creditors of the same class is proportionately less than the payment the creditor has already received.

**SCHEDULE "B"**

**Relevant Caselaw**

| No. | Case |
|---|---|
| 1. | *Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law*, GA Res. 52/158, UNGAOR, 52d Sess., Annex I, UN Doc. A/52/17 (1997) |
| 2. | *In re Pollmann*, 156 F. 221(S.D.N.Y. 1907) |
| 3. | *Ex parte Wilson. In re Douglas.* (1872) L.R. 7 Ch.App. 490 |
| 4. | *In re Del Mission Ltd.*, 998 F.2d 756 (9th Cir. 1993) |
| 5. | *In re Washington Mutual Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011) |
| 6. | *In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) |
| 7. | *In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012) |
| 8. | *In re Best*, 365 B.R. 725 (Bankr. W.D. Ky. 2007) |
| 9. | *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011), *vacated, in part, on other grounds*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) |
| 10. | *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) |
| 11. | *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999)) |
| 12. | *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231 (9th Cir. 2002), *cert denied*, 537 U.S. 1072 (2002) |
| 13. | *In re Melenyzer*, 143 B.R. 829 (Bankr. W.D. Tex. 1992) |
| 14. | *In re Garriock*, 373 B.R. 814 (E.D. Va. 2007) |
| 15. | *In re Country Manor of Kenton, Inc.*, 254 B.R. 179 (Bankr. N.D. Ohio 2000) |
| 16. | *In re Beguelin*, 220 B.R. 94 (9th Cir. BAP 1998) |
| 17. | *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946) |
| 18. | *In re Fast*, 318 B.R. 183 (Bankr. D. Colo. 2004) |
| 19. | *Canada Deposit Insurance Corp. v. Canadian Commercial Bank*, 21 C.B.R. (3d) 12, 1993 CarswellAlta 423 (Q.B.) |

| | |
|---|---|
| 20. | Houlden, Morawetz, & Sarra, eds., *The 2014 Annotated Bankruptcy and Insolvency Act* (Toronto: Thomson Carswell, 2014) |
| 21. | *Re Garvin (Theo) Ltd.* (1969), 1 Ch. 624, [1967] 3 All E.R. 497 |
| 22. | *Re Belleville Milling Co.* (1930), 12 C.B.R. 505,  1930 CarswellOnt 49 (S.C.) appeal dismissed (1931), 12 C.B.R. 510, 1931 CarswellOnt 31 (S.C.) |
| 23. | *Re Ted Leroy Trucking [Century Services] Ltd.*, 2010 SCC 60, 2010 CarswellBC 3419 |
| 24. | *Re Stelco*, 2007 ONCA 483,  2007 CarswellOnt 4108 |
| 25. | *In re U.S. Lines, Inc.*, 199 B.R. 476, 481 (Bankr. S.D.N.Y. 1996) |