Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

- and -

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**RESPONDING BRIEF OF THE UK PENSION CLAIMANTS**
**REGARDING POST-PETITION INTEREST ISSUES**

---

[1] The U.S. Debtors in the U.S. chapter 11 cases, along with the last four digits of each U.S. Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

1.      The UK Pension Claimants[2] ("**UKPC**") submit this brief in response to the briefs filed by the U.S. Debtors [U.S. D.I. 14031] and the Official Committee of Unsecured Creditors of the U.S. Debtors (the **"Committee"**) [U.S. D.I. 14024] and the separate briefs filed by the Ad Hoc Group of Bondholders (the **"Bondholders"**) in respect of their claim for post-petition interest under Canadian law (the "**Bondholders' Canadian Brief**") and U.S. law (the "**Bondholders' U.S. Brief**") [U.S. D.I. 14025].

## U.S. LAW ARGUMENTS

### A.      The "Legal Rate" Under Section 726(a)(5) Of The Bankruptcy Code Is The Federal Judgment Rate

2.      As demonstrated in our opening brief, recent court decisions have consistently interpreted "the legal rate" in section 726(a)(5) of the Bankruptcy Code as referencing the federal judgment rate contained in 28 U.S.C. §1961.  (*See* UKPC Opening Br. at 14.)  As the Ninth Circuit has held, that interpretation is supported by the fact that "[t]he commonly understood meaning of 'at the legal rate' at the time the Bankruptcy Code was enacted was a rate fixed by statute." *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1234-35 (9th Cir. 2002).

3.      Even in the non-bankruptcy context, courts across the country have "commonly referred" to the federal judgment rate under 28 U.S.C. §1961 "as the legal rate." *City Nat'l Bank v. Tress*, No. 7:11-CV-73, 2012 WL 4005463, at *3 (W.D. Va. Sept. 11, 2012) (holding, in a diversity case, that "interest on the judgment after the date of the entry of this order shall be the legal rate" pursuant to 28 U.S.C. §1961); *see also United States v. Richardson*, No. 3:13-CV-674-J-32JRK, 2014 WL 116607, at *3 (M.D. Fla. Jan. 13, 2014) (awarding "post-judgment interest from the

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Brief of the UK Pension Claimants Regarding Post-Petition Interest Issues, dated July 15, 2014 [U.S. D.I. 14039] (the "**UKPC Opening Brief**").

date of judgment at the legal rate established by 28 U.S.C. § 1961"); *Hosier v. Citigroup Global Markets, Inc.*, 858 F. Supp. 2d 1206, 1209 (D. Colo. 2012) (interpreting rule in FINRA Code of Arbitration requiring post-judgment interest to be computed at "the legal rate" as requiring application of federal judgment rate under section 1961); *United States v. Dunnigan*, No. 09-CV-529-JPG, 2010 WL 1610516, at *1 (S.D. Ill. Apr. 21, 2010) ("[P]ost-judgment interest will accrue at the legal rate pursuant to 28 U.S.C. § 1961 until the notes are paid in full.").

4.      There is simply no support for the argument advanced by the Committee and Bondholders that Congress's use of "legal rate" in other statutes demonstrates that those words mean something "other than the Federal Judgment Rate" under section 726(a)(5) of the Bankruptcy Code.  (Committee Br. at 17-18; Bondholders' U.S. Br. at 35.)  Quite the opposite, each of the examples cited by those parties refer to interest rates established by a governmental entity by statute or regulation and, therefore, support the conclusion that section 726(a)(5)'s use of "legal rate" must also refer to a statutory rate.  *See* 15 U.S.C. § 636(a)(4)(A) (referring to a "rate prescribed by the [Small Business] Administration"); 15 U.S.C. § 697(c)(2) (referring to the "rate which is established by the Administrator of the Small Business Administration under the authority of this section"); 22 U.S.C. § 2151t(b) (referring to a rate determined by a foreign country); 26 U.S.C. § 501(c)(16) (referring to "the legal rate of interest in the State of incorporation"); 26 U.S.C. § 521(b)(2) (same).   Court decisions in the Third Circuit and elsewhere are in accord.  *See Devex Corp. v. Gen. Motors Corp.*, 749 F.2d 1020, 1023 (3d Cir. 1984) (referring to Delaware statutory rate as "the legal rate" under prior version of 28 U.S.C. § 1961 which provided for post-judgment interest at the rate allowed by state law) *cert denied sub nom Technograph, Inc. v. Gen. Motors Corp.*, 474 U.S. 819 (1985); *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 414 (5th Cir. 2011) (describing state pre-judgment interest rate as the

"statutory or 'legal rate'"); *In re Dow Corning Corp.*, 237 B.R. 380, 401-02 (Bankr. E.D. Mich. 1999) ("For over 100 years courts have consistently used the term to mean a rate of interest fixed by statute.") (citing cases).   In all events, it is clear that none of the statutes cited by the Committee and Bondholders uses "legal rate" to refer to a ***contractual*** rate of interest.

5.      The payment of post-petition interest on claims at the federal judgment rate is also consistent with cases that have treated the allowance of a claim as the equivalent of the entry of a final judgment.  *See EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 625 (2d Cir. 2007) (bankruptcy court order allowing an uncontested proof of claim constitutes a final judgment for res judicata purposes); *Bank of Lafayette v. Badouin (In re Badouin)*, 981 F.2d 736, 742 (5th Cir. 1993) (holding that an order allowing a proof of claim is a final judgment); *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 529-30 (9th Cir. 1998) (regardless of whether a separate order is entered, by virtue of section 502(a)'s deemed allowance provisions, "a bankruptcy court's allowance or disallowance of a claim is a final judgment"); *In re Chiapetta*, 159 B.R. 152, 161 (Bankr. E.D. Pa. 1993) ("[S]ince a claim is like a judgment entered at the time of the bankruptcy filing, the applicable rate should be the federal judgment rate in effect at the time [of filing].").   Outside of bankruptcy, federal courts routinely apply the federal post-judgment interest rate – and not the contract rate – to a judgment entered on a loan.  *See, e.g.*, *Dunnigan*, 2010 WL 1610516, at *1-2 (relating to loans advanced by bank); *United States v. Wiley*, No. 10–cv–2106, 2011 WL 513180, at *3 (E.D.N.Y. Nov. 10, 2011) (relating to promissory note on student loan).

6.      In short, basic principles of statutory construction and a wealth of case law both in the bankruptcy context and otherwise make clear that the federal judgment rate is the "legal rate"

applicable to any award of post-petition interest that may be payable to unsecured creditors of the U.S. Debtors in this case.

**B.     Payment Of Post-Petition Interest In This Case, If Any, At The Federal Judgment Rate Would Not Violate The Absolute Priority Rule Or The "Fair and Equitable" Requirement Under Section 1129(b)**

7.     The Committee and Bondholders maintain that under the absolute priority rule, a dissenting class of unsecured creditors must be paid in "full" before junior classes may receive plan distributions. (*See* Committee Br. at 11; Bondholders' U.S. Br. at 23-24.)  However, both parties conspicuously avoid the fact that the plain text of section 1129(b) expressly and unambiguously prescribes what it means to be paid in "full" for the purposes of the absolute priority rule.

8.     As the Third Circuit has cautioned, "[b]ecause the absolute priority rule is now codified as part of the Bankruptcy Code," interpretation must "begin by looking at the plain language of the statute" and employing "standard principles of statutory construction."  *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (rejecting the "flexible interpretation of the absolute priority rule based on its legislative history and historical context" advanced by appellants).  "If the meaning is plain, … no further inquiry" will be made "unless the literal application of the statute will end in a result that conflicts with Congress's intentions."  *Id.*

9.     Here, the absolute priority rule codified in section 1129(b)(2)(B) of the Bankruptcy Code requires:

> "(B) With respect to a class of unsecured claims—
>
>> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the **allowed amount** of such claim; or

> (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property….

11 U.S.C. § 1129(b)(2)(B) (emphasis added).

10.    Under section 502, the "allowed amount" of a claim is determined "as of the filing of the date of the petition" and expressly **excludes** "unmatured interest."   11 U.S.C. § 502(b)(2). Therefore, under the express terms of section 1129(b)(2)(B), a plan does not violate the "fair and equitable" requirement by failing to provide post-petition interest.[3]

11.    This precise statutory interpretation has been applied by courts to reject the very argument that the Committee and Bondholders advance – including by the District of Delaware in *In re W.R. Grace & Co.*:

> "[T]he Bank Lenders will be paid the full amount of their allowed claims. ***Allowed claims do not include claims for unmatured, post-petition interest.*** As such, the Bank Lenders' allowed claims only consist of the principal and interest that was due as of the Petition Date. The Joint Plan will pay the Bank Lenders this amount in full prior to the shareholders receiving value under the Plan. The absolute priority rule is therefore not called into question under these circumstances."

475 B.R. 34, 201-02 (D. Del. 2012) (emphasis added).[4]

12.    Moreover, notwithstanding the Committee's and Bondholders' assertions to the contrary, the plain meaning of section 1129(b)(2)(B) contemplates when a plan may be deemed "fair and equitable" notwithstanding that value is paid to equity.  If a chapter 11 plan cannot satisfy clause

---

[3]  The text of section 726(a)(5) itself provides further support for the clear distinction drawn in the Bankruptcy Code between the "allowed" amount of a claim and post-petition interest that is paid "on" such claims: subsections (2) through (4) of section 726(a) first require the payment of "allowed" claims; only after such claims have been paid does subsection (5) provide for the payment of interest "on" such allowed claims.  Thus, post-petition interest does not comprise part of an unsecured creditor's "allowed claim."

[4]  Accordingly, the Bondholders' assertion that "the W.R. Grace court neither conducted any analysis of the absolute priority rule under section 1129(b) nor made any rulings in connection therewith" is demonstrably wrong.  *See* Bondholder U.S. Br. at 8.

(ii) of section 1129(b)(2)(B) because the plan provides a "holder of … interests" (i.e., equity) with value, the plan could still be confirmed as "fair and equitable" as long as each dissenting class of senior creditors was provided the allowed amount of their claims under clause (i) – *i.e.*, if it is a solvent debtor case.

13.    The plain meaning of section 1129(b)(2)(B) is controlling under settled principles of statutory interpretation in this Circuit.  In any event, neither the Committee nor the Bondholders have pointed to anything in the legislative history that conflicts with its text.  *Armstrong*, 432 F.3d at 512.  To the contrary, the legislative history is clear that the elements of section 1129(b) codify the absolute priority rule and that payment in "full" under the absolute priority rule only requires payment of the allowed amount of an unsecured creditor's claim.[5]  In light of this, Congress made it clear that "the Court **must** confirm the plan notwithstanding the dissent of a class of impaired unsecured claims if the plan provides for such claims to receive property with a present value **equal to the allowed amount of the claims.**"[6]  This is consistent with Congress's recognition – in excluding unmatured interest from a creditor's allowed claim under section 502(b)(2) – that the allowed amount of the claim represents the value of a creditor's claim discounted to present value due to the automatic acceleration that occurs by operation of the

---

[5]  H.R. Rep. No. 95-595, at 413 (1977) *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6369 ("The court may confirm over the dissent of a class of unsecured claims, including priority claims, only if the members of the class are unimpaired, if they will receive under the plan property of a value equal to the **allowed** amount of their unsecured claims, or if no class junior will share under the plan.  That is, if the class is impaired, then they must be paid in full or, if paid less than in full, then no class junior may receive anything under the plan.  **This codifies the absolute priority rule** from the dissenting class on down." (emphases added)).

[6]  124 Cong. Rec. H 11089, at *6476 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards) (emphasis added).

filing of the petition.[7]

14.    Notwithstanding the plain statutory language under sections 502(b), 726(a)(5) and 1129(b)(2)(B), the Committee and Bondholders assert that post-petition interest is nevertheless payable at the contract rate relying almost exclusively on pre-Code case law.  (*See* Committee Br. at 13-14; Bondholders' U.S. Br. at 23-27.)  Specifically, they argue that the absolute priority rule codified under section 1129(b)(2) should be read only as a partial codification of the rule as reflected in pre-Code case law which, they assert, uniformly required payment of post-petition interest at the contract rate in a solvent debtor case.

15.    This argument fails for several reasons.  First, the Supreme Court has taken pains to clarify that its decisions do "not rely on a pale presumption" of "continuity with pre-Code practice" and, in fact, has repeatedly rejected the use of pre-Code practice as a means of interpreting a Bankruptcy Code provision unless the language of the Bankruptcy Code is "demonstrably at odds with the intention of the drafters."  *See, e.g.*, *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 244-45 (1989) (in the context of post-petition interest on secured claims, minimizing the importance of the pre-Code exceptions, like the solvency exception, to the prohibition on payment of post-petition interest); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 10 (2000).[8]  Here, the language of the Bankruptcy Code is clear

---

[7]  H.R. Rep. 95-595, at 353 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6309 ("Section 502(b) thus contains two principles of present law. First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph. Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor. One unarticulated reason for this is that the discounting factor for claims after the commencement of the case is equivalent to contractual interest rate on the claim. Thus, this paragraph does not cause disallowance of claims that have not been discounted to a present value because of the irrebutable presumption that the discounting rate and the contractual interest rate (even a zero interest rate) are equivalent.")

[8]  Pre-Code practice serves, at best, as a "tool of construction" to aid in the understanding of the Bankruptcy Code's language, and cannot be used to overcome that language or serve as an "extratextual supplement." *Hartford Underwriters*, 530 U.S. at 10.

and needs no clarification or supplementation: the addition of sections 502(b)(2) and 1129(b)(2) – neither of which were in the prior Bankruptcy Act – clearly provide the entire standard for applying the absolute priority rule.[9]

16.    Furthermore, nothing in the legislative history suggests that enforcing the absolute priority rule according to the plain text of sections 1129(b)(2)(B) and 502(b)(2) "conflicts with" Congressional intent.[10]  *Armstrong*, 432 F.3d at 512; *Ron Pair*, 489 U.S. at 245.  If anything,

---

[9] The Committee and the Bondholders contend that the absolute priority rule codified under Section 1129(b)(2)(B) should only be read to apply in an insolvent debtor case – even though nothing on its face so limits it  – and that an enhanced version of the absolute priority rule should be read into the statute based on pre-Code practice.  The Supreme Courts' discussion in *Ron Pair* of the pre-Code exceptions to the general prohibition of post-petition interest and the role that these exceptions should play in the face of clear statutory language is controlling here:

> **All the exceptions to the denial of postpetition interest are not rigid doctrinal categories.** Rather, they are **flexible guidelines** which have been developed by the courts in the exercise of their equitable powers in insolvency proceedings. None of the cases cited by the Court of Appeals states that the doctrine does anything more than provide a bankruptcy court with guidance in the exercise of its equitable powers. **As such, there is no reason to think that Congress, in enacting a contrary standard, would have felt the need expressly to repudiate it. The contrary view, which is the view we adopt today, is more consistent with Congress' stated intent, in enacting the Code, to "codif[y] creditors' rights more clearly than the case law** ... [by] defin[ing] the protections to which a secured creditor is entitled, and the means through which the court may grant that protection." Report, at 4–5 (emphasis added). Whether or not Congress took notice of the pre-Code standard, it acted with sufficient clarity in enacting the statute.

*Ron Pair*, 489 U.S. at 248-49 (internal quotations and citations omitted) (emphasis added).

[10]   Rather than focus on the legislative history that accompanied the Bankruptcy Code's enactment in 1978, the Bondholders and the Committee rely on legislative history expressed in connection with the 1994 amendments – 16 years after sections 502(b)(2), 506(b), 726(a)(5) and 1129(b)(2) were enacted – to the impairment provisions under section 1124.  (Bondholder U.S. Br. at 33-34; Committee Br. at 13.)  Remarks made sixteen years after passage of the relevant statutory sections here, in the context of amendments to an unrelated section of the Code, are of little relevance.  *See, e.g.*, *PBGC v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("[S]ubsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress.") (quotations omitted); *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102, 132 (1974) ("[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage.  Such statements report only the personal views of these legislators, since the statements were (made) after the passage of the Act.") (citations and quotations omitted).

Two points are worth noting.  First, the 1994 legislative statements do not address what rate of interest unsecured creditors of a solvent debtor should be entitled to receive, whether it is contract rate or the "legal rate".  Second, although Congress deleted the impairment provision under section 1124(3), it left the language of section 1129(b)(2)(B)(i) intact even though it contained similar language.

rather than suggesting continuity with the pre-Code practice, the legislative history indicates that Congress purposefully "depart[ed]" from the absolute priority rule as previously reflected in pre-Code law.[11]

17.    Furthermore, even if the Bankruptcy Code were ambiguous and pre-Code practice were instructive (neither of which is the case), pre-Code law provided, as the Committee concedes, that an award of post-petition interest for unsecured creditors of a solvent debtor required a balancing of equitable considerations. *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 165 (1946) ("It is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor."); *In re Time Sales Fin. Corp.*, 491 F.2d 841, 844 (3d Cir. 1974) (refusal to allow post-petition interest did not constitute abuse of discretion with regard to exercise of court's equitable powers). Here, as previously demonstrated in the opening briefs submitted by the UKPC, the Monitor, Wilmington Trust and the CCC, the equities in this case militate against application of the higher contract rate. (*See* UKPC Opening

---

The logical consequence of these two points supports the conclusion that the Bankruptcy Code's overall intent is that post-petition interest is payable only at the "legal rate." Prior to the 1994 amendments, section 1124(3) created the possibility that unsecured creditors of a solvent estate could be treated disparately under chapters 7 and 11, receiving post-petition interest in a chapter 7 case but not in a chapter 11 case. *See* Seth D. Gould, UNSECURED CREDITORS' ENTITLEMENT TO POSTPETITION INTEREST IN SOLVENT DEBTOR BANKRUPTCY: THE CODE'S SILENT ABROGATION OF A PRE-CODE DOCTRINE, 37 Wayne L. Rev. 1849, 1871 (Summer 1991). By removing former section 1124(3), Congress ensured that creditors would receive all of the protections of section 1129, including the "best interests" test through which they would be entitled to interest at the "legal rate," just as they would have been entitled under chapter 7. Although Congress could have also expanded creditors' post-petition interest rights to provide them with even greater rights under section 1129(b)(2)(B) if it had wanted, it declined to do so, choosing instead to leave the language of section 1129(b)(2)(B)(i) intact. Since Congress chose to delete similar language under section 1124(3) on the basis that such language foreclosed any possibility of post-petition interest, the fact that Congress left section 1129(b)(2)(B)(i) intact makes it clear that sections 1129(a)(7) and 726(a)(5) were intended to provide the sole basis for payment of post-petition interest in a solvent debtor case. Among other purposes, this ensures that unsecured creditors' rights to post-petition interest remain uniform under both chapters 7 and 11.

[11]  H.R. Rep. 95-595, at 414 (1978) ("The test to be applied by the court is set forth in the various paragraphs of section 1129(b). **The elements of the test are new, departing from both the absolute priority rule and the best interests of creditors tests found under the Bankruptcy Act.**") (emphasis added); *see also id.* at 353 (quoted *supra* note 7).

- 10 -

Br. at 18-20; Monitor's Br. at 11-14; Wilmington Trust Br. at 12-14; CCC Br. at 7).

18.     The "'basic federal rule' in bankruptcy is that state law governs the substance of claims"
subject to "any qualifying or contrary provisions of the Bankruptcy Code" or where a "federal
interest requires a different result." *See Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec.
Co.*, 549 U.S. 443, 450-51 (2007).   Although the Committee acknowledges this basic rule, it
ignores the fact that section 502(b)(2) expressly disallows post-petition interest.   (*See* Committee
Br. at 8-9).   It then cites to the Supreme Court's decision in *Travelers* to support its assertion that
creditors are entitled to post-petition interest at the contract rate, when in fact *Travelers* mandates
the Court to reach the opposite conclusion.   In concluding that the attorneys' fees at issue in the
case should have been determined according to state law (rather than a judge-made equitable
principle), the Supreme Court assessed whether the claim had been specifically implicated in one
of the nine exceptions under section 502(b) – including, section 502(b)(2), which governs post-
petition interest.   *Id.* at 449-50; *see also id.* at 452 ("Consistent with our prior statements
regarding creditors' entitlements in bankruptcy, we generally presume that claims enforceable
under applicable state law will be allowed in bankruptcy unless they are expressly disallowed.
*See* 11 U.S.C. § 502(b)." (internal citations omitted)).

19.     The Committee's and Bondholders' attempt to craft an entirely new rule that would
entitle "all creditors . . . to the benefit of their full contractual rights, whatever they may be"
when a debtor is solvent (*see* Committee Br. at 2 n. 4, 23; Bondholders' U.S. Br. at 30) proves
too much.   Once a debtor files its bankruptcy petition, a creditor's post-petition entitlements are
determined by its rights under the Bankruptcy Code." *W.R. Grace*, 475 B.R. at 161 (citing *In re
PPI Enters.(U.S.), Inc.*, 324 F.3d 197, 205 (2003)).   This is particularly true in respect of a
creditor's right to post-petition interest.   *Vanston*, 329 U.S. at 163 ("When and under what

circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law."). Clearly, when Congress wanted to respect post-petition rights under a contract, it knew how to do so – including in the post-petition interest context. *See, e.g.*, 11 U.S.C. §§ 506(b); 726(a)(5).

20.     Indeed, the Bankruptcy Code is rife with examples where a creditor's post-petition rights are specifically circumscribed notwithstanding the terms of any governing contract that may exist. *See, e.g.*, 11 U.S.C. §§ 502(b)(6) (capping lessor damages from termination of lease); 502(b)(7) (capping employee damages from termination of employment contract); 503(b)(1)(A) (requiring administrative expenses be "actual, necessary costs and expenses of preserving the estate"); 503(b)(3) (creditor seeking reimbursement of expenses must demonstrate that they are "actual, necessary expenses . . . incurred . . . in making a substantial contribution"). If the Committee and the Bondholders are correct, it would open the floodgates – not only for a separate determination of the applicable rate of interest on every claim that has been filed against the estate – but also every contractual right that has been abrogated by operation of the Bankruptcy Code (just as the entitlement to post-petition interest has been abrogated by sections 502(b)(2) and 725(a)(5)).

## C.     The UKPC Have Standing

21.     The challenges to the UKPC's standing are similarly without merit. (Bondholders' U.S. Br. at 13-14; U.S. Debtors Br. at 3-4.) The U.S. Court already made it clear that the Post-petition Interest Issues are being considered in the context of the Allocation Litigation. (*See* June 24,

2014 Hr'g Tr. at 5101:14-5102:5; 5103:6-17; 5116:3-4.)[12]   The Allocation Protocol, initially approved by the Canadian and U.S. Court on April 3, 2013, and attached to the U.S. and Canadian orders dated May 17, 2013 [U.S. D.I. 9947, 10565], expressly provides that the UK Pension Claimants are a "Core Party" (as defined therein) and "shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol…."   Allocation Protocol, § 2.   In addition, the Allocation Protocol also provides that "[t]here shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation."   Under the Allocation Protocol, "Allocation Protocol Hearings" are the hearings regarding "the allocation of the Sale Proceeds among the Selling Debtors."   *Id.*   Accordingly, any challenge to the UKPC's standing to be heard on the Post-petition Interest Issues as they pertain to the U.S. Debtors is entirely baseless.

22.     Moreover, as the UKPC and others have amply demonstrated, the resolution of these issues will be integral to the Courts' understanding of the potential recoveries to the creditors of the various Nortel estates and the allocation percentages that would result (after turnover of amounts to NNL on account of its equity interests in the U.S. Debtors), thereby informing the Courts' determination of which allocation methodology may be most appropriate.[13]   In addition to aiding the Allocation Litigation, the Courts have both acknowledged that a determination of the Post-petition Interest Issues may facilitate settlement discussions between the Core Parties to the Allocation Litigation.   (June 24, 2014 Hr'g Tr. at 5097:21-5098:15; 5102:6-10; 5103:25-5104:4.)

---

[12]  Indeed, in response to a question from counsel for Law Debenture Trust Company of New York, the U.S. Court confirmed that the resolution of the Post-petition Interest Issues was "separate and apart" from the objection to the Bondholders' claims previously filed by Wilmington Trust.  (June 27, 2014 Hr'g Tr. at 16:2-4.)

[13]  Statement of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund in Support of Determination of Post-petition Interest Issue, dated June 23, 2014 [U.S. D.I. 13887].

## CANADIAN LAW ARGUMENTS

23.    This responding brief will address only the following issues from a Canadian law perspective:

    (a)    Canada's two main federal insolvency statutes are consistent, harmonious and no gap exists that should lead to a different result on the issue before the Court;

    (b)    unsecured claims in an insolvency proceeding do not give rise to "property rights" or a proprietary interest of the type suggested by the Bondholders;

    (c)    distributions in a liquidating CCAA can be made to creditors by court Order outside of a formal Plan of Arrangement.  Accordingly, the issue before the Court does not depend upon the terms of a future Plan that may be negotiated, and can be determined now; and

    (d)    the supervising court in a CCAA proceeding has wide discretion to make any Order that it considers appropriate, which power does not exclude a determination of this issue on any basis that the court deems "appropriate".

### A.    Interplay between BIA and CCAA

24.    The Bondholders argue that because the BIA contains an express statutory "Interest Stops Rule"[14] and the CCAA does not, the Legislature must have intended that post-filing interest is an absolute right that is recognized and enforceable in a CCAA proceeding.  This argument fails to understand the inherent structural – not functional – differences between the two statutes.

---

[14] Section 143 of the BIA.

25.     The BIA is comprised of over 285 sections.  By contrast, until very recently, the CCAA contained only 22 sections.[15]  While the BIA employs a rules-based approach to proceedings, the CCAA provides a more flexible mechanism which affords greater judicial discretion.[16] However, this mere structural difference between the BIA and the CCAA in no way indicates that the rules applicable to interest on unsecured claims under the BIA cannot and should not be imported into a liquidating CCAA.

26.     An express statutory prohibition under the CCAA, such as exists under the BIA, would preclude the ability of the Court to approve or sanction any negotiated Plan of Arrangement or settlement that included the payment of post-filing interest where all unsecured indebtedness was not repaid in full.  That would not be in keeping with the flexible nature of the statute, the parameters afforded to insolvent debtors and the Court's discretion in supervising restructurings under the CCAA.  However, the absence of an express statutory *prohibition* does not equate to the recognition of a *right* to recover post-filing interest, particularly in circumstances of a liquidating CCAA proceeding.

27.     It is widely recognized that Canada's two federal insolvency statutes are complementary and operate in tandem.  This reality reflects one insolvency regime encompassing two statutes operating within a harmonized framework, as endorsed by the Supreme Court of Canada.[17]  The contemporary thrust of recent legislative reform has been towards harmonizing aspects of

---

[15] The CCAA in effect at the commencement of Nortel's CCAA proceeding comprised 22 sections.  In September 2009, the CCAA was amended to include a total of 63 sections.

[16] *Re Ted Leroy Trucking [Century Services] Ltd*., 2010 SCC 60, 2010 CarswellBC 3419, at paras. 13-15 [*Re Century Services*].

[17] *Ibid* at para. 22.

insolvency law common to the two statutory schemes to the extent that it is possible.[18]  Parallel CCAA and BIA restructuring schemes are now an accepted feature of the insolvency law landscape.[19]  Because the CCAA is silent about what happens if a reorganization fails, the BIA scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a CCAA reorganization is ultimately unsuccessful.[20]

28.      If the Bondholders' position on post-filing interest is correct – *i.e.*, that there are different statutory entitlements under the BIA and the CCAA for the same unsecured claim (as opposed to what may be available by consent, including under a negotiated Plan of Arrangement, or specific priorities that may apply within or outside of bankruptcy) – this would be contrary to the harmonized approach endorsed by the Supreme Court of Canada.[21]  There is no issue of different priorities triggered by statute or otherwise – the Bond Claims are unsecured under the BIA and CCAA.

### B.      Unsecured Debt Claims Are Not "Property Rights"

29.      The Bondholders argue that "*[a]bsent express statutory authority, there is no ability to interfere with or compromise the bondholders' contractual entitlements...*"[22] and repeatedly refer to their entitlement to post-filing interest as a "property right".[23]  However, none of the

---

[18] *Ibid* at paras. 22-24.

[19] *Ibid* at para. 24.

[20] *Ibid* at para. 23.

[21] *Ibid* at para. 24.

[22] Bondholders' Canadian Brief, at para. 5.

[23] Bondholders' Canadian Brief, at paras. 6, 7, 9.

authorities cited by the Bondholders in support of these arguments involved mere unsecured debt claims.[24]

30.     A claim against a debtor company does not, in and of itself, create property rights. Unlike perfected secured creditors who have a proprietary interest over the collateral against which their security interest is registered, an unsecured creditor has a monetary claim against the estate of insolvent debtor and the potential to receive a distribution from that estate with all other unsecured creditors.

31.     An unsecured debt claim against any of the Nortel estates does not give rise to a "property right" or propriety interest.  The Bondholders have not cited any authority to support the tenuous argument that an unsecured claim against the estate of an insolvent debtor creates a "property right" or a proprietary interest that should not be interfered with by the Court.  Indeed, a recent ruling from the Ontario Court of Appeal clearly supports the proposition that an unsecured claim against an insolvent debtor *does not* give rise to a "property right" or proprietary interest.[25]

---

[24] In *Royal Bank of Canada v. Sparrow Electric Corp*, [1997] 1 S.C.R. 411, the "property right" considered by the Court  was a perfected security interest in a debtor's property.  In *Morguard Properties Ltd. v. Winnipeg (City)*, [1983] S.C.R. 493, the "right" considered by the Court was a taxpayer's right to have its property reassessed with respect to municipal taxation.  In *Greater Toronto Airports Authority v. International Lease Finance Corp.,* (2004) 69 O.R. (3d) 1 (C.A.), the "private property right" considered by the Court was the statutory ability to apply for court authorization to seize aircraft leased to an insolvent debtor.

[25] In *Thibodeau v. Thibodeau*, 2011 ONCA 110, 2011 CarswellOnt 686, at para. 43, the Ontario Court of Appeal held that an order for a matrimonial equalization payment – which was an unsecured claim in the payor spouse's bankruptcy – did "not create "property rights" in the payee spouse – equitable, securitized, or otherwise."

**C.  Distributions to Creditors Can Be Made Outside of a Plan of Arrangement, Settlement or Bankruptcy**

32.  The Bondholders argue that the CCAA "*contains no independent distribution mechanism as a replacement for, or alternative to, bankruptcy under the BIA*"[26] and does not authorize a Court to dictate or order other distributions.[27]  Accordingly, the Bondholders assert that there are only three possible mechanisms for distributions to creditors in a liquidating CCAA:[28] (i) a Plan of Arrangement under the CCAA; (ii) a consensual settlement; or (iii) a distribution by a trustee in bankruptcy under the BIA.  This statement is simply incorrect and is not supported by practice.

33.  As recently articulated by the Supreme Court of Canada:

> Unlike the BIA, the CCAA contains no provisions for liquidation of a debtor's assets if reorganization fails.  There are three ways of exiting CCAA proceedings.  The best outcome is achieved when the stay of proceedings provides the debtor with some breathing space during which solvency is restored and the CCAA process terminates without reorganization being needed.  The second most desirable outcome occurs when the debtor's compromise or arrangement is accepted by its creditors and the reorganized company emerges from the CCAA proceedings as a going concern.  Lastly, if the compromise or arrangement fails, either the company or its creditors usually seek to have the debtor's assets liquidation under the applicable provisions of the BIA or to place the debtor into receivership.  As discussed in greater detail below, the key difference between the reorganization regimes under the BIA and the CCAA is that the latter offers a more flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations.[29]

34.  Five years into this proceeding, with all assets sold and no ongoing or future operations, there will be no terms to "negotiate" in connection with any Plan of Arrangement.  Following the

---

[26] Bondholders' Canadian Brief, para. 14.

[27] Bondholders' Canadian Brief, para. 24.

[28] It is to be noted that in two of the three scenarios pressed upon the Court by the Bondholders, the Bondholders would have a veto, either by virtue of the size of their claim or by simply not consenting to any settlement.

[29] *Re Century Services*, *supra* note 16 at para. 14.

Allocation Litigation, and regardless of the allocation method adopted by the Courts, there will be a limited (and ever-decreasing) amount of cash to distribute, based upon legal priorities and ordinary *pro rata*, *pari passu* principles of distribution to creditors.

35.     The UKPC wholeheartedly agree with the Bondholders that: "*It is a fundamental tenet of insolvency law that all debts shall be paid pari passu and all unsecured creditors receive equal treatment*."[30]   The UKPC also appreciate the Bondholders' confirmation that the treatment of claims of unsecured creditors must be consistent with *pro rata* principles.[31]   A finding that the Bondholders do not have a right to post-filing interest on an unsecured claim under the CCAA (absent agreement, including pursuant to a Plan) does not offend any *pro rata* or *pari passu* principles.

36.     All creditors of the Canadian estate are unsecured and will be entitled to a *pro rata* distribution based on the amount of their claims, *pari passu* with all other unsecured creditors.[32]

37.     A distribution within the Canadian estate can be achieved in a number of ways, none of which provide a vote to any creditor, particularly one with an overwhelmingly large claim sufficient to dictate the result:

    i.     by a trustee in bankruptcy under the BIA;

    ii.    through an Order for distribution within the CCAA proceeding outside of a formal Plan; or

---

[30] Bondholders' Canadian Brief, para 26.

[31] Bondholders' Canadian Brief, para. 25.

[32] *See Re. Nortel Networks Corp.*, 50 C.B.R. (5th) 77, 2009 CarswellOnt 146 at para. 22, where Morawetz J. stated: "The Applicants do not have any senior secured obligations. Other than leased equipment, capital leases, sale lease arrangements related to the real estate properties and certain letters of credit which are cash collateralized, the remainder of their obligations are apparently unsecured obligations".

iii.     by a receiver appointed by the Court pursuant to section 101 of the *Courts of Justice Act* (Ontario)[33] and section 243(2)(b)(ii) of the BIA, either in place of the role of Monitor or as a dual role of Monitor and Receiver.

38.     Each of these potential future roles was specifically contemplated and included in the Initial Order in this proceeding, pursuant to which Ernst & Young Inc. could act in such capacity in the future.[34]

39.     In each of the above scenarios, the claims process and all Orders made in connection therewith in this CCAA proceeding would be deemed by court Order to apply to all aspects of the claims filed, bar dates imposed and any distributions available to creditors, as is customary in Canadian insolvency proceedings.  No gap would exist, no further claims process would be implemented, and distributions would be made based on the existing Orders in effect.  It is simply not the case, as the Bondholders appear to have incorrectly assumed, that distributions in Canada can only be made in circumstances where they will have the ability to negotiate for and obtain their perceived entitlements, to the disadvantage of other unsecured creditors.

### D.     General Power of Court To Make Any Order That It Considers Appropriate

40.     Pursuant to section 11 of the CCAA, the Court is given broad discretionary power, on notice to any other person as it may see fit, to make any order that it considers appropriate in the circumstances.  Accordingly, the Court overseeing this CCAA proceeding has the power to issue any order on post-filing interest that it considers appropriate in the circumstances of this case.

---

[33] *Courts of Justice Act*, RSO 1990, c C.43.

[34] Paragraph 57 of the Initial Order granted by the Canadian Court on January 14, 2009 as amended and restated, provides as follows:  "THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, receiver, receiver and manager or a trustee in bankruptcy of the Applicants, the Business or the Property."

41.     In considering the circumstances that are appropriate in making any order, the Court can have regard to whether the implementation of that order would create an inconsistency with other statutes or case law that has developed in Canada.

42.     The CCAA proceedings involving the Canadian Debtors and the Chapter 11 proceedings of the US Debtors (recognized by Court Order pursuant to the CCAA) are administered pursuant to a Cross Border Insolvency Protocol[35].   The claims asserted by the Bondholders have been defined as "Overlapping Claims" under the Cross Border Claims Protocol and other Orders of the Courts.[36]   Section 44(c) of the CCAA[37] provides that one of its purposes is: "*the fair and efficient administration of cross-border insolvencies that protects the interests of creditors and other interested persons, and those of debtor companies*."

43.     Section 61(2) of the CCAA[38] states that nothing in Part IV (relating to Cross-Border Insolvencies) prevents the Court from refusing to do something that would be contrary to public policy.[39]   The Bondholders are requesting that the Court read into the CCAA a provision that would create a right to post-filing interest in a liquidating CCAA.   If they succeed in that request, it would create a different treatment of the same unsecured claim under the BIA and in a liquidating CCAA.   In view of statements made by the Supreme Court of Canada in various

---

[35] Annexed as Schedule "A" to the Initial Order of the Canadian Court dated January 14, 2009, as amended and restated.

[36] Cross-Border Claims Protocol, approved by Order of the Canadian Court on September 10, 2010.

[37] Enacted September 2009 but giving effect to the common law position and principles of comity adopted in Canada prior to that date.

[38] Section 61(2) of the CCAA under the heading "Miscellaneous Provisions".

[39] *Ibid.*

recent cases on the harmonization of Canada's insolvency statutes, and the "single proceeding" model endorsed by that Court, such a result would be contrary to public policy.[40]

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 22th day of July, 2014.

July 22, 2014                          */s/ D.J. Miller*

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West, Suite 3200
Toronto, Ontario, M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
**John Finnigan** (LSUC # 24040L)
**D. J. Miller** (LSUC# 34393P)
**Andrea McEwan** (LSUC# 53781P)
**Michael Shakra** (LSUC# 64604K)

Tel:    416-304-1616
Fax:    416-304-1313

---

[40] The CCAA and BIA are statutes *in pari materia* (pertaining to the same subject matter).  It is a well known cannon of statutory interpretation that statutes which are in *pari materia* should be interpreted in light of each other since they have a common purpose or object. Moreover, as noted by the CED 4th (online), *Interpretation of Statues*, Common Law Rules (III.3.(n)(i)) at §156: "different Acts that are *in pari materia*… may be taken and construed as one system and as explanatory of one another."

The Supreme Court of Canada has expressly supported the proposition that the BIA and CCAA should be read harmoniously and that read in tandem, the two statutes form one integrated insolvency regime. See *Re Century Services* at paras. 23, 47 and 54. See *Re Indalex Limited*, 2013 SCC 6, 2013 CarswellOnt 733 at para. 51 where the Court stated: "the courts will favour an interpretation of the CCAA that affords creditors analogous entitlements [to what they would receive under the BIA]". See also *Re Ivaco Inc.* (2006), 83 O.R. (3d) 108, 2006 CarswellOnt 6292 at paras. 62 and 64 where the Ontario Court of Appeal noted: "The federal insolvency regime includes the CCAA and the BIA. The two statutes are related… The CCAA and the BIA create a complimentary and inter-related scheme for dealing with the property of insolvency companies…."

/s/ Justin Alberto

**Bayard, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899, U.S.A.

**Charlene D. Davis** (No. 2336)
**Justin Alberto** (No. 5126)

Tel:    302-655-5000
Fax:    302-658-6395
Email: cdavis@bayardlaw.com
          jalberto@bayardlaw.com

*/s/ Brian E. O'Connor*

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099, U.S.A

**Brian E. O'Connor**
**Sameer Advani**
**Weston T. Eguchi**
**Andrew Hanrahan**

Tel:    212-728-8000
Fax:    212-728-8111

SCHEDULE "A"

**Relevant Statutes**

<u>**CANADA**</u>

*Courts of Justice Act*, RSO 1990, c C.43

**INTERLOCUTORY ORDERS**

**Injunctions and receivers**

**101**.(1)  In the Superior Court of Justice, an interlocutory injunction or mandatory order may be granted or a receiver or receiver and manager may be appointed by an interlocutory order, where it appears to a judge of the court to be just or convenient to do so. R.S.O. 1990, c. C.43, s. 101 (1); 1994, c. 12, s. 40; 1996, c. 25, s. 9 (17).

**Terms**

(2) An order under subsection (1) may include such terms as are considered just. R.S.O. 1990, c. C.43, s. 101 (2).

\*\*\*

*Companies Creditors' Arrangement Act*, RSC 1985, c. C-36

**General power of court**

**11.**      Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

[...]

**PART IV**
**CROSS-BORDER INSOLVENCIES**

**Purpose**

**44.**      The purpose of this Part is to provide mechanisms for dealing with cases of cross-border insolvencies and to promote

(a) cooperation between the courts and other competent authorities in Canada with those of foreign jurisdictions in cases of cross-border insolvencies;

(b) greater legal certainty for trade and investment;

**(c)** the fair and efficient administration of cross-border insolvencies that protects the interests of creditors and other interested persons, and those of debtor companies;

(d) the protection and the maximization of the value of debtor company's property; and

(e) the rescue of financially troubled businesses to protect investment and preserve employment.

[...]

## MISCELLANEOUS PROVISIONS

**Court not prevented from applying certain rules**

**61.(1)** Nothing in this Part prevents the court, on the application of a foreign represent-ative or any other interested person, from applying any legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives that are not inconsistent with the provisions of this Act.

**Public policy exception**

**(2)** Nothing in this Part prevents the court from refusing to do something that would be contrary to public policy.

*** *

*Bankruptcy and Insolvency Act* (Canada), RSC 1985, c. B-3

**Interest from date of bankruptcy**

**143.** Where there is a surplus after payment of the claims as provided in sections 136 to 142, it shall be applied in payment of interest from the date of the bankruptcy at the rate of five per cent per annum on all claims proved in the bankruptcy and according to their priority.

[...]

## PART XI
## SECURED CREDITORS AND RECEIVERS

**243. [...] Definition of "receiver"**

**(2)** Subject to subsections (3) and (4), in this Part, "receiver" means a person who

    (a)       is appointed under subsection (1); or

(b)     is appointed to take or takes possession or control — of all or substantially all of the inventory, accounts receivable or other property of an insolvent person or bankrupt that was acquired for or used in relation to a business carried on by the insolvent person or bankrupt — under

(i)      an agreement under which property becomes subject to a security (in this Part referred to as a "security agreement"), or

a court order made under another Act of Parliament, or an Act of a legislature of a province, that provides for or authorizes the appointment of a receiver or receiver-manager.

**UNITED STATES**

## BANKRUPTCY CODE

### § 502. Allowance of claims or interests

**(a)** A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

**(b)** Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that--

   **(1)** such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

   **(2)** such claim is for unmatured interest;

   **(3)** if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

   **(4)** if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

   **(5)** such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;

   **(6)** if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds--

      **(A)** the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of--

         **(i)** the date of the filing of the petition; and

         **(ii)** the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

      **(B)** any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

**(7)** if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds--

    **(A)** the compensation provided by such contract, without acceleration, for one year following the earlier of--

        **(i)** the date of the filing of the petition; or

        **(ii)** the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

    **(B)** any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

**(8)** such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

**(9)** proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726(a) of this title or under the Federal Rules of Bankruptcy Procedure, except that a claim of a governmental unit shall be timely filed if it is filed before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide, and except that in a case under chapter 13, a claim of a governmental unit for a tax with respect to a return filed under section 1308 shall be timely if the claim is filed on or before the date that is 60 days after the date on which such return was filed as required.

**(c)** There shall be estimated for purpose of allowance under this section--

    **(1)** any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

    **(2)** any right to payment arising from a right to an equitable remedy for breach of performance.

**(d)** Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

**(e)(1)** Notwithstanding subsections (a), (b), and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that--

    **(A)** such creditor's claim against the estate is disallowed;

(**B**) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; or

(**C**) such entity asserts a right of subrogation to the rights of such creditor under section 509 of this title.

(**2**) A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition.

(**f**) In an involuntary case, a claim arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee and the order for relief shall be determined as of the date such claim arises, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(**g**)(**1**) A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(**2**) A claim for damages calculated in accordance with section 562 shall be allowed under subsection (a), (b), or (c), or disallowed under subsection (d) or (e), as if such claim had arisen before the date of the filing of the petition.

(**h**) A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(**i**) A claim that does not arise until after the commencement of the case for a tax entitled to priority under section 507(a)(8) of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

(**j**) A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. Reconsideration of a claim under this subsection does not affect the validity of any payment or transfer from the estate made to a holder of an allowed claim on account of such allowed claim that is not reconsidered, but if a reconsidered claim is allowed and is of the same class as such holder's claim, such holder may not receive any additional payment or transfer from the estate on account of such holder's allowed claim until the holder of such reconsidered and allowed claim receives payment on account of such claim proportionate in value to that already received by such other holder. This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.

- 6 -

**(k)(1)** The court, on the motion of the debtor and after a hearing, may reduce a claim filed under this section based in whole on an unsecured consumer debt by not more than 20 percent of the claim, if--

    **(A)** the claim was filed by a creditor who unreasonably refused to negotiate a reasonable alternative repayment schedule proposed on behalf of the debtor by an approved nonprofit budget and credit counseling agency described in section 111;

    **(B)** the offer of the debtor under subparagraph (A)--

        **(i)** was made at least 60 days before the date of the filing of the petition; and

        **(ii)** provided for payment of at least 60 percent of the amount of the debt over a period not to exceed the repayment period of the loan, or a reasonable extension thereof; and

    **(C)** no part of the debt under the alternative repayment schedule is nondischargeable.

  **(2)** The debtor shall have the burden of proving, by clear and convincing evidence, that--

    **(A)** the creditor unreasonably refused to consider the debtor's proposal; and

    **(B)** the proposed alternative repayment schedule was made prior to expiration of the 60-day period specified in paragraph (1)(B)(i).

---

## § 503. Allowance of administrative expenses

**(a)** An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.

**(b)** After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including--

  **(1)(A)** the actual, necessary costs and expenses of preserving the estate including--

    **(i)** wages, salaries, and commissions for services rendered after the commencement of the case; and

    **(ii)** wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title;

- 7 -

(B) any tax--

(i) incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title; or

(ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case;

(C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph; and

(D) notwithstanding the requirements of subsection (a), a governmental unit shall not be required to file a request for the payment of an expense described in subparagraph (B) or (C), as a condition of its being an allowed administrative expense;

(2) compensation and reimbursement awarded under section 330(a) of this title;

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by--

(A) a creditor that files a petition under section 303 of this title;

(B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

(C) a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

(E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or

(F) a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

(5) reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title;

**(6)** the fees and mileage payable under chapter 119 of title 28;

**(7)** with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6);

**(8)** the actual, necessary costs and expenses of closing a health care business incurred by a trustee or by a Federal agency (as defined in section 551(1) of title 5) or a department or agency of a State or political subdivision thereof, including any cost or expense incurred--

    **(A)** in disposing of patient records in accordance with section 351; or

    **(B)** in connection with transferring patients from the health care business that is in the process of being closed to another health care business; and

**(9)** the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business.

**(c)** Notwithstanding subsection (b), there shall neither be allowed, nor paid--

    **(1)** a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that--

        **(A)** the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

        **(B)** the services provided by the person are essential to the survival of the business; and

        **(C)** either--

            **(i)** the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

            **(ii)** if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

    **(2)** a severance payment to an insider of the debtor, unless--

(A) the payment is part of a program that is generally applicable to all full-time employees; and

(B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

## § 506. Determination of secured status

(a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

(1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

(2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

- 10 -

## § 726. Distribution of property of the estate

**(a)** Except as provided in section 510 of this title, property of the estate shall be distributed--

    **(1)** first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed under section 501 of this title or tardily filed on or before the earlier of--

        **(A)** the date that is 10 days after the mailing to creditors of the summary of the trustee's final report; or

        **(B)** the date on which the trustee commences final distribution under this section;

    **(2)** second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is--

        **(A)** timely filed under section 501(a) of this title;

        **(B)** timely filed under section 501(b) or 501(c) of this title; or

        **(C)** tardily filed under section 501(a) of this title, if--

            **(i)** the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and

            **(ii)** proof of such claim is filed in time to permit payment of such claim;

    **(3)** third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph (2)(C) of this subsection;

    **(4)** fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;

    **(5)** fifth, in payment of interest at the legal rate from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and

    **(6)** sixth, to the debtor.

**(b)** Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), (7), (8), (9), or (10) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under section 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this title incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.

**(c)** Notwithstanding subsections (a) and (b) of this section, if there is property of the kind specified in section 541(a)(2) of this title, or proceeds of such property, in the estate, such property or proceeds shall be segregated from other property of the estate, and such property or proceeds and other property of the estate shall be distributed as follows:

   **(1)** Claims allowed under section 503 of this title shall be paid either from property of the kind specified in section 541(a)(2) of this title, or from other property of the estate, as the interest of justice requires.

   **(2)** Allowed claims, other than claims allowed under section 503 of this title, shall be paid in the order specified in subsection (a) of this section, and, with respect to claims of a kind specified in a particular paragraph of section 507 of this title or subsection (a) of this section, in the following order and manner:

      **(A)** First, community claims against the debtor or the debtor's spouse shall be paid from property of the kind specified in section 541(a)(2) of this title, except to the extent that such property is solely liable for debts of the debtor.

      **(B)** Second, to the extent that community claims against the debtor are not paid under subparagraph (A) of this paragraph, such community claims shall be paid from property of the kind specified in section 541(a)(2) of this title that is solely liable for debts of the debtor.

      **(C)** Third, to the extent that all claims against the debtor including community claims against the debtor are not paid under subparagraph (A) or (B) of this paragraph such claims shall be paid from property of the estate other than property of the kind specified in section 541(a)(2) of this title.

      **(D)** Fourth, to the extent that community claims against the debtor or the debtor's spouse are not paid under subparagraph (A), (B), or (C) of this paragraph, such claims shall be paid from all remaining property of the estate.

---

## § 1129. Confirmation of plan

**(a)** The court shall confirm a plan only if all of the following requirements are met:

- 12 -

**(1)** The plan complies with the applicable provisions of this title.

**(2)** The proponent of the plan complies with the applicable provisions of this title.

**(3)** The plan has been proposed in good faith and not by any means forbidden by law.

**(4)** Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

**(5)(A)(i)** The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

**(ii)** the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

**(B)** the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

**(6)** Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

**(7)** With respect to each impaired class of claims or interests--

**(A)** each holder of a claim or interest of such class--

**(i)** has accepted the plan; or

**(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

**(B)** if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

**(8)** With respect to each class of claims or interests--

- 13 -

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive--

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash--

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

- 14 -

liquidation or reorganization is proposed in the plan.

**(12)** All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

**(13)** The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

**(14)** If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

**(15)** In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--

**(A)** the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

**(B)** the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

**(16)** All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

**(b)(1)** Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**(2)** For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

**(A)** With respect to a class of secured claims, the plan provides--

**(i)(I)** that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

- 15 -

**(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

**(ii)** for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

**(iii)** for the realization by such holders of the indubitable equivalent of such claims.

**(B)** With respect to a class of unsecured claims--

**(i)** the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

**(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

**(C)** With respect to a class of interests--

**(i)** the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

**(ii)** the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

**(c)** Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

**(d)** Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

**(e)** In a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section 1121(e) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3).

# OTHER STATUTES

**15 U.S.C. § 636(a)(4)(A)**

**§ 636. Additional powers**

…

(4) Interest rates and prepayment charges

(A) Interest rates

Notwithstanding the provisions of the constitution of any State or the laws of any State limiting the rate or amount of interest which may be charged, taken, received, or reserved, the maximum legal rate of interest on any financing made on a deferred basis pursuant to this subsection shall not exceed a rate prescribed by the Administration, and the rate of interest for the Administration's share of any direct or immediate participation loan shall not exceed the current average market yield on outstanding marketable obligations of the United States with remaining periods to maturity comparable to the average maturities of such loans and adjusted to the nearest one-eighth of 1 per centum, and an additional amount as determined by the Administration, but not to exceed 1 per centum per annum: Provided, That for those loans to assist any public or private organization for the handicapped or to assist any handicapped individual as provided in paragraph (10) of this subsection, the interest rate shall be 3 per centum per annum.

---

**15 U.S.C. § 697(c)(2)**

**§ 697. Development company debentures**

…

(c) Commercial loan interest rate

…

(2) Notwithstanding the provisions of the constitution or laws of any State limiting the rate or amount of interest which may be charged, taken, received, or reserved, the maximum legal rate of interest on any commercial loan which funds any portion of the cost of the project financed pursuant to this section or section 697a of this title which is not funded by a debenture guaranteed under this section shall be a rate which is established by the Administrator of the Small Business Administration under the authority of this section.

---

**22 U.S.C. § 2151t(b)**

**§ 2151t. Development assistance authority**

…

(b) Authority of President to make loans; terms and conditions

The President is authorized to make loans payable as to principal and interest in United States dollars on such terms and conditions as he may determine, in order to promote the economic development of countries and areas, with emphasis upon assisting long-range plans and programs designed to develop economic resources and increase productive capacities. The President shall determine the interest payable on any loan. In making loans under this part, the President shall consider the economic circumstances of the borrower and other relevant factors, including the capacity of the recipient country to repay the loan at a reasonable rate of interest, except that loans may not be made at a rate of interest of less than 3 per centum per annum commencing not later than ten years following the date on which the funds are initially made available under the loan, during which ten-year period the rate of interest shall not be lower than 2 per centum per annum, nor higher than the applicable legal rate of interest of the country in which the loan is made.

---

**26 U.S.C. § 501(c)(16)**

**§ 501. Exemption from tax on corporations, certain trusts, etc.**

…

(16) Corporations organized by an association subject to part IV of this subchapter or members thereof, for the purpose of financing the ordinary crop operations of such members or other producers, and operated in conjunction with such association. Exemption shall not be denied any such corporation because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal rate of interest in the State of incorporation or 8 percent per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the corporation, on dissolution or otherwise, beyond the fixed dividends) is owned by such association, or members thereof; nor shall exemption be denied any such corporation because there is accumulated and maintained by it a reserve required by State law or a reasonable reserve for any necessary purpose.

---

**26 U.S.C. § 521(b)(2)**

**§ 521. Exemption of farmers' cooperatives from tax**

…

(2) Organizations having capital stock.--Exemption shall not be denied any such association because it has capital stock, if the dividend rate of such stock is fixed at not to exceed the legal

rate of interest in the State of incorporation or 8 percent per annum, whichever is greater, on the value of the consideration for which the stock was issued, and if substantially all such stock (other than nonvoting preferred stock, the owners of which are not entitled or permitted to participate, directly or indirectly, in the profits of the association, upon dissolution or otherwise, beyond the fixed dividends) is owned by producers who market their products or purchase their supplies and equipment through the association.

---

**28 U.S.C. §1961**

**§ 1961. Interest**

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. [FN1] the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

(c)(1) This section shall not apply in any judgment of any court with respect to any internal revenue tax case. Interest shall be allowed in such cases at the underpayment rate or overpayment rate (whichever is appropriate) established under section 6621 of the Internal Revenue Code of 1986.

(2) Except as otherwise provided in paragraph (1) of this subsection, interest shall be allowed on all final judgments against the United States in the United States Court of Appeals for the Federal circuit, at the rate provided in subsection (a) and as provided in subsection (b).

(3) Interest shall be allowed, computed, and paid on judgments of the United States Court of Federal Claims only as provided in paragraph (1) of this subsection or in any other provision of law.

(4) This section shall not be construed to affect the interest on any judgment of any court not specified in this section.

- 20 -

### SCHEDULE "B"

### Relevant Case Law

| No. | Case |
|-----|------|
| | **U.S. LAW** |
| 1. | *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231 (9th Cir. 2002) |
| 2. | *City Nat'l Bank v. Tress*, No. 7:11-CV-73, 2012 WL 4005463 (W.D. Va. Sept. 11, 2012) |
| 3. | *United States v. Richardson*, No. 3:13-CV-674-J-32JRK, 2014 WL 116607 (M.D. Fla. Jan. 13, 2014) |
| 4. | *Hosier v. Citigroup Global Markets, Inc.*, 858 F. Supp. 2d 1206 (D. Colo. 2012) |
| 5. | *United States v. Dunnigan*, No. 09-CV-529-JPG, 2010 WL 1610516 (S.D. Ill. Apr. 21, 2010) |
| 6. | *Devex Corp. v. Gen. Motors Corp.*, 749 F.2d 1020 (3d Cir. 1984) |
| 7. | *Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410 (5th Cir. 2011) |
| 8. | *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999)) |
| 9. | *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621 (2d Cir. 2007) |
| 10. | *Bank of Lafayette v. Badouin (In re Badouin)*, 981 F.2d 736 (5th Cir. 1993) |
| 11. | *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525 (9th Cir. 1998) |
| 12. | *In re Chiapetta*, 159 B.R. 152 (Bankr. E.D. Pa. 1993) |
| 13. | *United States v. Wiley*, No. 10–cv–2106, 2011 WL 513180 (E.D.N.Y. Nov. 10, 2011) |
| 14. | *In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005) |
| 15. | *In re W.R. Grace & Co.*, 475 B.R. 34 (D. Del. 2012) |
| 16. | *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) |
| 17. | *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000) |
| 18. | *PBGC v. LTV Corp.*, 496 U.S. 633 (1990) |
| 19. | *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102 (1974) |
| 20. | Seth D. Gould, *Unsecured Creditors' Entitlement to Postpetition Interest in Solvent Debtor Bankruptcy: the Code's Silent Abrogation of a Pre-Code Doctrine*, 37 Wayne L. Rev. 1849 (Summer 1991) |

| 21. | *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946) |
| 22. | *In re Time Sales Fin. Corp.*, 491 F.2d 841 (3d Cir. 1974) |
| 23. | *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007) |
| 24. | *In re PPI Enterprises (U.S.), Inc.,* 324 F. 3d 197 (2003) |
| | **CANADIAN LAW** |
| 25. | *Re Ted Leroy Trucking [Century Services] Ltd.*, 2010 SCC 60, 2010 CarswellBC 3419 |
| 26. | *Royal Bank of Canada v. Sparrow Electric Corp*, [1997] 1 S.C.R. 411 |
| 27. | *Morguard Properties Ltd. v. Winnipeg (City)*, [1983] S.C.R. 493 |
| 28. | *Greater Toronto Airports Authority v. International Lease Finance Corp. [Re Canada 3000 Inc.]* (2004) 69 O.R. (3d) 1 (C.A.), 2004 CarswellOnt 149 |
| 29. | *Thibodeau v. Thibodeau*, 2011 ONCA 110, 2011 CarswellOnt 686 |
| 30. | *Re Indalex Limited*, 2013 SCC 6, 2013 CarswellOnt 733 |
| 31. | *Re. Nortel Networks Corp.,* 50 C.B.R. (5th) 77, 2009 CarswellOnt 146 |
| 32. | CED 4th (online), *Interpretation of Statues*, Common Law Rules (III.3.(n)(i)) |
| 33. | *Re Ivaco Inc.* (2006), 83 O.R. (3d) 108, 2006 CarswellOnt 6292 |