## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------  x
                                                        :
In re                                                   :        Chapter 11
                                                        :
Nortel Networks Inc., et al.,                           :        Case No. 09-10138 (KG)
                                                        :
                                    Debtors.            :        (Jointly Administered)
                                                        :
------------------------------------------------------  x
```

**RESPONSE OF THE *AD HOC* GROUP OF BONDHOLDERS, LAW DEBENTURE TRUST COMPANY OF NEW YORK, AS TRUSTEE, AND THE BANK OF NEW YORK MELLON, AS TRUSTEE, TO THE OPENING BRIEFS OF THE MONITOR AND CANADIAN DEBTORS, U.K. PENSION CLAIMANTS, CANADIAN CREDITORS COMMITTEE, AND WILMINGTON TRUST REGARDING BONDHOLDER ENTITLEMENT TO POST-PETITION INTEREST AND ADDITIONAL BONDHOLDER CLAIMS ISSUES UNDER U.S. LAW**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................. 1

II. PROCEDURAL ISSUES ..................................................................... 4

    A.  The U.S. Court Must Reject All Inferences that the Bondholder Claims Issues are "Gating Issues" to Settlement and that the Bondholders are to Blame for the Parties' Failure to Resolve Allocation. ........................................... 4

    B.  The U.S. Court Can Only Decide the Bondholder Claims Issues in Favor of the Canadian Parties *as a Matter of Law* if the U.S. Court Concludes that there are No Circumstances Under Which an Unsecured Creditor can *Ever* Receive Post-Petition Interest at any Rate Other than the Federal Judgment Rate.................................................................................... 6

    C.  The Monitor is Seeking Declaratory Relief Without Any Attempt to Comply with Part VII of the Bankruptcy Rules and Based Entirely Upon Contingent (and Uncertain) Future Events. ........................................ 8

    D.  The CCC, the UKPC, and WT Do Not Have Standing to be Heard on the Bondholder Claims Issues in the U.S. Court. ...................................... 10

III. SUBSTANTIVE ISSUES ................................................................... 11

    A.  The Canadian Parties Once Again are Trying to Effect Global Substantive Consolidation as a Means to Evade a True Allocation. ......................... 11

    B.  There is No "Windfall" to the Bondholders if the U.S. Debtors are Using Their Own Funds to Pay Their Own Obligations to Their Own Creditors.......... 14

    C.  The Law in Delaware Regarding Post-Petition Interest is Far From "Settled" and Clearly Does Not Limit Post-petition Interest to the Federal Judgment Rate as a Matter of Law. .................................................. 15

        i.  As a Threshold Matter, *W.R. Grace*, *Washington Mutual* and *Coram* are Not Binding on the U.S. Court................................ 15

        ii.  The Canadian Parties Cannot Be Allowed to Use Sections 502(b)(2) and 1129(a)(7) as Swords for Equity Rather than Shields for Creditors. ........................................................................ 16

        iii.  The *Coram* and *W.R. Grace* Decisions Both Directly Contradict the Canadian Parties' Assertion that the Federal Judgment Rate Serves as a Cap on Post-Petition Interest as a Matter of Law. ................ 18

iv.     Even *Washington Mutual* Does Not Support the Canadian Parties'
        Assertion that the Federal Judgment Rate Serves as a Cap on Post-
        Petition Interest for All Purposes. ............................................................. 20

D.      WT Completely Misstates the State of the Case Law, Both In and Out of
        Delaware. ......................................................................................................... 21

E.      Where Funds are Available to Pay Post-Petition Interest, the Fair and
        Equitable Test and Absolute Priority Rule Require Such Payment Before
        Any Dividend Can be Paid to Equity Holders. ....................................................... 26

F.      The Equitable Considerations Advanced by the Canadian Parties Cannot
        Overcome the Strong Presumption for Payment of Contract Rates of
        Interest When Funds are Available. ....................................................................... 30

        i.      To the Extent Equitable Considerations are Relevant, the Burden is
                on the Canadian Parties To Overcome a Strong Presumption In
                Favor of the Contract Rates of Interest. .................................................... 30

        ii.     The Equitable Considerations Advanced by the Canadian Parties
                are Nothing More than Another Plea for Global Substantive
                Consolidation or the Disregard of Corporate Separateness Between
                the Canadian Debtors and the U.S. Debtors. ............................................. 32

        iii.    The UKPC's Argument that Administrative Convenience Requires
                Imposition of the Federal Judgment Rate is Absurd Under These
                Circumstances. .......................................................................................... 33

        iv.     Equitable Considerations Cannot Be Used to Elevate NNL's
                Equity Interests Above the Contractual Entitlements of Creditors
                of the U.S. Debtors. ................................................................................... 34

IV.     CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.,*
368 B.R. 140 (Bankr. S.D.N.Y. 2007)................................................................24, 25

*In re Allegheny Int'l, Inc.,*
118 B.R. 282 (Bankr. W.D. Pa. 1990) ......................................................................22

*In re Best,*
365 B.R. 725 (Bankr. W.D. Ky. 2007) .....................................................................25

*Bruning v. U.S.,*
376 U.S. 358 (1964).............................................................................................17, 21

*Case v. L.A. Lumber Prods. Co.,*
308 U.S. 106 (1939).............................................................................................27, 30

*In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.,*
791 F.2d 524 (7th Cir. 1986) ..........................................................................17, 30, 31

*In re Chiapetta,*
159 B.R. 152 (Banrk. E.D. Pa. 1993) ................................................................21, 22

*In re Combustion Engineering, Inc.,*
391 F.3d 190 (3d Cir. 2004)......................................................................................35

*In re Coram Healthcare Corp.,*
315 B.R. 321 (D. Del. 2004).............................................................................. *passim*

*In re D & F Constr. Inc.,*
865 F.2d 673 (5th Cir. 1989) ....................................................................................29

*In re Dow Corning Corp.,*
244 B.R. 678 (Bankr. E.D. Mich. 1999) ..................................................................33

*In re Fast,*
318 B.R. 183 (Bankr. D. Colo. 2004) .................................................................23, 25

*Federal Savings & Loan Ins. Corp. v. Moneymaker (In re A&L Properties),*
96 B.R. 287 (C.D. Ca. 1988)....................................................................................21

*In re Foamex Intern., Inc.,*
491 B.R. 100 (Bankr. D. Del. 2013) ........................................................................16

*In re Gulfport Pilots Ass'n, Inc.*,
    434 B.R. 380 (Bankr. S.D. Miss. 2010)........................................................24, 25

*Hanna* v. *United States* (*In re Hanna*),
    872 F.2d 829 (8th Cir. 1989) ........................................................17

*In re KAR Dev. Assocs., L.P.*,
    180 B.R. 629 (D. Kan. 1995) ........................................................16

*Kielisch* v. *Educ. Credit Mgmt.* (*In re Kielisch*),
    258 F.3d 315 (4th Cir. 2001) ........................................................17

*Krys v. Official Comm. of Unsecured Creditors* (*In re Refco Inc.*),
    505 F.3d 109 (2d Cir. 2007)........................................................34

*Law v. Siegel*,
    134 S. Ct. 1188 (2014)........................................................35

*In re Madison 92nd St. Assocs. LLC*,
    472 B.R. 189 (Bankr. S.D.N.Y. 2012)........................................................23, 24

*In re Morristown & E. R. Co.*,
    885 F.2d 98 (3d Cir. 1989)........................................................35

*Official Comm. of Unsecured Creditors v. Dow Chem. Corp.* (*In re Dow Corning Corp.*),
    456 F.3d 668 (6th Cir. 2006) ........................................................ *passim*

*In re Overseas Shipholding Group, Inc.*,
    Case No. 12-20000 (PJW) (Bankr. D. Del. July 18, 2014)........................................................26

*Ruskin v. Griffiths*,
    269 F.2d 827 (2d Cir. 1959)........................................................17, 31, 34

*In re Schaffer Furniture Co.*,
    68 B.R. 827 (Bankr. E.D. Pa. 1987) ........................................................21

*In re Schoenberg*,
    156 B.R. 963 (Bankr. W.D. Tex. 1993)........................................................21

*In re Smith*,
    431 B.R. 607 (Bankr. E.D.N.C. 2010)........................................................24, 25

*Threadgill v. Armstrong World Indus., Inc.*,
    928 F.2d 1366 (3d Cir. 1991)........................................................16, 27

*Till v. SCS Credit Corp.*,
    541 U.S. 465 (2004)........................................................24

*United States v. Pepperman,*
    976 F.2d 123 (3d Cir. 1992) ........................................................................35

*UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli),*
    501 F.3d 1 (1st Cir. 2007) ..........................................................................17

*In re W.R. Grace & Co.,*
    475 B.R. 34 (Bankr. D. Del. 2012) ........................................................ *passim*

*In re Wash. Mut., Inc.,*
    461 B.R. 200 (D. Del. 2011) ..........................................................................8

*In re Winters,*
    99 B.R. 658 (Bankr. W.D. Pa. 1989) ..........................................................29

**Statutes**

11 U.S.C. § 102(3) ..........................................................................................29

11 U.S.C. § 105(a) ..........................................................................................35

11 U.S.C. § 345(b) ............................................................................................6

11 U.S.C. § 502(b)(2) ............................................................................. *passim*

11 U.S.C. § 506(b) ..........................................................................................23

11 U.S.C. § 726(a)(5) ............................................................................. *passim*

11 U.S.C. § 1129(a)(7) ........................................................................... *passim*

11 U.S.C. § 1129(b) ............................................................................... *passim*

11 U.S.C. § 1129(b)(2) ....................................................................................29

11 U.S.C. § 1129(b)(2)(B) .........................................................................28, 29

11 U.S.C. § 1129(b)(2)(B)(i) ..........................................................................29

**Other Authorities**

140 Cong. Rec. HI 0768 (Oct. 4, 1994) ........................................................28

**TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE:**

The Bondholder Group,[1] Law Debenture, and BNY hereby deliver this brief in response to the opening briefs of (i) the Monitor,[2] (ii) the UKPC, (iii) the CCC, and (iv) Wilmington Trust, National Association ("WT") (collectively, the "Canadian Parties")[3] regarding the Bondholder Claims Issues under U.S. law.

## I.   PRELIMINARY STATEMENT

1.      The Bondholders have for some time been the target of what appears to be a coordinated public relations campaign by certain creditors in Canada.  The Bondholder Group has previously avoided such practices, believing that the Courts would prefer that the parties focus their energies on resolving these cases rather than name-calling and finger pointing.  Unfortunately, the Monitor, joined by the CCC, the UKPC and WT, apparently has decided to bring that campaign directly into the courtroom – first by persuading the Courts of the falsehood that the Bondholders' demands for post-petition interest were creating a settlement "logjam", and now by filing opening briefs that suggest that the Bondholders are somehow responsible for the parties' collective inability to resolve these cases.

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Opening Brief of the *Ad Hoc* Group of Bondholders, Law Debenture Trust Company of New York, as Trustee, and The Bank of New York Mellon, as Trustee, With Respect to Monitor's Request that the Court Determine Bondholder Entitlement to Post-Petition Interest and Additional Bondholder Claims Issues Under U.S. Law [D.I. 14025] (the "Bondholder Brief").

[2]      Although the Monitor and the Canadian Debtors continue to hold themselves out as separate entities, the practical reality is that the Canadian Debtors have been controlled by the Monitor pursuant to the Monitor's Expansion of Power Order issued by the Canadian Court on October 3, 2012 upon the resignation of the respective boards of directors of the Canadian Debtors.  Since that time, the Monitor has acted as the representative of, and advocate for, the Canadian Debtors in inter-estate matters, including during the Allocation Litigation. Despite the Monitor's ostensible role as an independent court officer and fiduciary with broad obligations to act neutrally and in the best interests of all parties in intra-estate matters, it has allied itself and the Canadian Debtors for purposes of this and other intra-estate, inter-creditor issues with one group of creditors, namely the CCC.  Accordingly, the defined term "Monitor" is intended to include both the Monitor and the Canadian Debtors.

[3]      While it may seem counterintuitive to include the UKPC as a Canadian Party, the UKPC has no remaining interest in the U.S. chapter 11 cases and has clearly positioned itself (at least in this dispute) as a creditor of the Canadian estates that is seeking to maximize the amount of value available to the Canadian estates.

2.      Those accusations are dead wrong.  The Courts well know that the Bondholder Group has played an instrumental and constructive role throughout these cases.  For example, the Canadian Debtors and the Monitor sought and received the assistance of the Bondholder Group, as a key cross-over creditor, in obtaining much-needed funding for the Canadian estates from the U.S. estates early in these cases.  In addition, the Bondholder Group's involvement in the asset sales, and particularly its strong support for an alternative "IPCo" path in the intellectual property sale process, facilitated several very successful auctions.  The record is also replete with instances where the Bondholder Group encouraged both the parties and the Courts to move expeditiously toward a resolution of these proceedings.  The Bondholder Group has time and again raised its voice to oppose additional extensions of the Allocation Litigation timetable, to reduce the unnecessary time and expense of unneeded discovery and depositions and to ask that the Monitor finally get to the task of resolving Canadian claims.

3.      Contrary to the false innuendo in the opening briefs of the Canadian Parties, the record in these cases establishes one undeniable fact:  no other party has been a stronger or more frequent advocate for a prompt resolution of these cases than the Bondholder Group.

4.      Even without their smear campaign on the Bondholders, the approach taken by the Canadian Parties in their opening briefs is astonishing.  Over the past 18 months, the Courts and the parties have devoted massive amounts of time, energy, and dollars creating a litigation protocol for and then litigating one question:  how much of the lockbox proceeds are owned by each of the Canadian Debtors, the U.S. Debtors and the EMEA Debtors?  Incredibly, the Canadian Parties now seek to undermine that entire exercise by arguing that, regardless of the ownership determination that will be the result of the Allocation Litigation, the Courts should refuse to allow the U.S. Debtors to use *their own money* to satisfy *their own direct contractual*

*obligations* to U.S. creditors and instead require them to dividend those funds to NNL so that NNL can satisfy *its* obligations to *its* Canadian creditors.

5.      This remarkable proposition raises the following questions: if the Courts were going to appropriate a potentially significant portion of the U.S. Debtors' allocation of the lockbox proceeds to force a dividend of those funds to NNL, in total disregard for NNI's remaining contractual obligations, what was the point of the Allocation Litigation? Did the Courts undertake the Allocation Litigation to determine how much of the proceeds belong to the U.S. Debtors, only to then tell the U.S. Debtors that they had to immediately forfeit those funds to NNL and its creditors? This proposed "re-allocation" of the initial allocation being advocated by the Canadian Parties would make a mockery of the Allocation Litigation that was so painstakingly undertaken by the Courts.

6.      In addition, the Monitor plays yet another new card before the Courts. Never once during the Allocation Litigation did the Monitor or the Canadian Debtors suggest that the corporate separateness of NNL and NNI should be disregarded. To the contrary, corporate separateness is a fundamental premise of their allocation position – that the Canadian Debtors own the intellectual property portfolio that was sold in the Rockstar sale and therefore are entitled to all of the proceeds of that sale. Yet in their opening brief in the instant proceeding, the Monitor now baldly asserts that NNI must serve as a funding source for payments to NNL's creditors.

7.      Although the Monitor cites no legal principle to support such a complete erosion of the corporate separation between NNI and NNL, one thing is certain: if the Monitor were to prevail in the Allocation Litigation on its intellectual property ownership theory, the Canadian Parties no doubt would become the loudest defender of NNL's corporate separateness and would

fight at all cost against the very same blurring of the lines between NNL and NNI that they advocate for here.

8.     Aside from all of the evasiveness and gamesmanship of the Monitor, the Canadian Parties' opening briefs do nothing to dispel the fundamentally flawed process the Monitor has persuaded the Courts to engage in with respect to the Bondholder Claims Issues. The simple truth is that the U.S. Court has no basis in law, in fact, or in equity to grant the extraordinary declaratory relief requested by the Monitor.  The cases relied upon so heavily by the Canadian Parties simply do not stand for the proposition that, as a matter of law and regardless of case or plan-specific circumstances, post-petition interest can *never* be paid at any rate other than the federal judgment rate.  Each of these issues are addressed in detail below.

## II.  PROCEDURAL ISSUES

**A.     The U.S. Court Must Reject All Inferences that the Bondholder Claims Issues are "Gating Issues" to Settlement and that the Bondholders are to Blame for the Parties' Failure to Resolve Allocation.**

9.     The Monitor has steered the Courts down this current path by breaching settlement confidentiality in an effort to convince the Courts that the Bondholder Claims Issues are "gating issues" to any settlement of the Allocation Litigation.  The CCC has now joined in, suggesting that the Bondholders are "more inclined to 'watch the clock' and therefore disinclined to engage in challenging settlement discussions and mediations." (Written Submissions of the Canadian Creditors' Committee [D.I. 14032] (the "CCC Brief") at 4.)

10.     As the U.S. Debtors have noted, this attempt by the Monitor, and now the CCC, to sway the Courts with insinuations as to how parties have conducted themselves in settlement discussions is entirely inappropriate.  The Bondholder Group and Trustees cannot respond without likewise disregarding settlement confidentiality – something the Bondholder Group and Trustees will not do.  The U.S. Court cannot allow the Monitor and the CCC to play this game,

where they try to color the Court's perception of settlement dynamics while tying the hands of other parties who are not willing to compromise the integrity of their confidentiality obligations to respond in kind. Instead, the U.S. Court must simply refuse to consider or draw any inferences whatsoever from the improper and misleading allusions made by the Monitor and the CCC.

11.     Even where the Canadian Parties' intimations do not infringe on settlement confidentiality, the U.S. Court must reject those assertions for a separate reason. There are many obvious and fundamental procedural ambiguities arising from the U.S. Court's willingness to conduct a hearing on the Monitor's Request, but one thing is clear: the Monitor and the other Canadian Parties have repeatedly advised the Courts that the Bondholder Claims Issues are discrete, straightforward "legal issues" that the Courts can resolve now, presumably without any factual determinations. As a result, the Courts ordered a truncated schedule for the briefing and hearing on the Bondholder Claims Issues that provided for no discovery and no submission of any evidence whatsoever. If the Courts are truly being presented with purely legal issues, as the Monitor has suggested, then the Canadian Parties should not be permitted to infuse their legal arguments with factual allegations that are highly disputed and entirely unsubstantiated.

12.     Perhaps the most absurd example of the Canadian Parties' attempts to inject disputed "facts" into what are allegedly purely legal briefs is the UKPC's argument that the Bondholders are somehow responsible for the lockbox proceeds being placed in non-interest bearing escrow accounts. (Amended Brief of the UK Pension Claimants Regarding Post-Petition Interest Issues [D.I. 14039] (the "UKPC Brief") at 19.) This proposition is manifestly false and absurd on its face. Why would the Bondholders ever want the source of their recovery to be smaller, not larger, under any circumstance? And how could the Bondholders ever have

exercised the degree of control that would have been required for them to drive such a decision?

If the UKPC seriously contends that the Courts should take into account such examples when

considering the Bondholder Claims Issues, then the U.S. Court should look to reliable factual

evidence and make plausible inferences, not rely on nonsensical innuendo from the Canadian

Parties.[4]

**B.     The U.S. Court Can Only Decide the Bondholder Claims Issues in Favor of the Canadian Parties *as a Matter of Law* if the U.S. Court Concludes that there are No Circumstances Under Which an Unsecured Creditor can *Ever* Receive Post-Petition Interest at any Rate Other than the Federal Judgment Rate.**

13.     The Monitor's Request frames the Bondholder Claims Issues as "legal issues."

(Monitor's Request at 2.)  Based on that characterization, the Courts imposed a schedule of two

rounds of legal briefing, followed by a hearing where legal argument will be presented.  There

will be no discovery, no evidentiary submissions, and no evidentiary hearing on these issues.

Clearly, the Monitor has requested that the Courts rule on the Bondholder Claims Issues strictly

as a matter of law.

14.     The Monitor's specific request is that the U.S. Court "declar[e] that, if the US

Debtors prove to be solvent, post-petition interest, if payable on allowed Crossover Bond Claims,

will be limited to the federal judgment rate for the week ending January 9, 2009, compounded

annually."  (Opening Brief of the Monitor and the Canadian Debtors Regarding Post-Petition

Interest and Related Issues [D.I. 14023] (the "Monitor's Brief") at 16.)

15.     For the U.S. Court to grant the requested declaration *as a matter of law and in a*

*complete factual and procedural vacuum*, the U.S. Court must conclude that the Monitor has

established that no circumstances could possibly exist under which unsecured creditors of the

---

[4]      As the U.S. Court will recall, it was the U.S. Trustee, and not Bondholders, that objected to the U.S.
Debtors' request for a final waiver of section 345(b), which would have permitted the deposit of sales proceeds in
higher yield accounts.  *See* Acting United States Trustee's Objection to Debtors' Request for Final Waiver of the
Requirements of 11 U.S.C. § 345(b) [D.I. 2354].

U.S. Debtors would ever be entitled to the payment of post-petition interest at a rate other than the federal judgment rate in effect as of the petition date. No basis exists for the U.S. Court to reach such a conclusion.

16.     Pre-Bankruptcy Code case law is replete with examples of cases in which courts have found that the payment of post-petition interest at contract rates higher than the federal judgment rate is permissible – and a number of courts have indicated that it may be not only permissible but *required*. (Bondholder Brief at 24, 25, 29.) Cases decided under the Bankruptcy Code have followed suit. (*See id.* at 26, 27, 30-33.) The ruling that the Monitor has requested of the U.S. Court would run directly contrary to those cases.

17.     Two of the Delaware cases that the Canadian Parties hold so dear – *W.R. Grace* and *Coram* – directly contradict the relief requested by the Monitor. In *W.R. Grace*, the court did *not* hold that the federal judgment rate serves as an upper limit on post-petition interest. To the contrary, the post-petition interest rate that was approved in that case exceeded not only the federal judgment rate, but the non-default contract rate as well. In fact, when the parties ultimately settled the matter while the appeal to the Third Circuit was pending, the debtors agreed to pay *even more* post-petition interest, over and above the settlement rate.

18.     In *Coram*, Judge Walrath roundly rejected the exact same argument that the Canadian Parties are making here. In that case, an equity committee argued, as the Canadian Parties argue here, that any right to post-petition interest for unsecured creditors must be limited to the federal judgment rate. Judge Walrath summarily discarded that argument:

> The Equity Committee suggests that . . . if we conclude that the Noteholders are entitled to post-petition interest, that it be allowed only at the federal judgment rate. *However, we are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances . . . . Thus, we are not persuaded by the Equity Committee that section 1129(b) requires the use of federal judgment rate for post-petition interest to be paid under a chapter 11*

*plan of reorganization.* Instead, we conclude that the specific facts of each case will determine what rate of interest is "fair and equitable."

*In re Coram Healthcare Corp.*, 315 B.R. 321, 346 (D. Del. 2004) (emphasis added) (internal cites omitted).

19.    In an effort to sidestep *Coram*, the Canadian Parties point to footnote 35 in Judge Walrath's subsequent opinion in *Washington Mutual*, where she stated "To the extent I suggested in *Coram* that the federal judgment rate was not required by section 726(a)(5), I was wrong." *In re Wash. Mut., Inc.*, 461 B.R. 200, 242, n.35 (D. Del. 2011).  That footnote, however, was not a sweeping disavowal of *Coram*, but rather only retracts mere *dicta* in *Coram* regarding section 726(a)(5) because the holding in *Coram* was based on section 1129(b), not section 726(a)(5).  So in footnote 35 in *Washington Mutual*, Judge Walrath was retracting her section 726(a)(5) *dicta*, not her section 1129(b) *holding*, from *Coram*.  Thus, the *Coram* holding that section 1129(b) does not *require* the use of the federal judgment rate still stands.

**C.    The Monitor is Seeking Declaratory Relief Without Any Attempt to Comply with Part VII of the Bankruptcy Rules and Based Entirely Upon Contingent (and Uncertain) Future Events.**

20.    In the Conclusion of its opening brief, the Monitor makes clear that the relief it is seeking is both declaratory in nature and based upon contingent future events:

> [T]he Monitor and the Canadian Debtors respectfully request that the Court enter an order (i) *declaring* that, *if* the US Debtors prove not to be solvent, then no post-petition interest shall be payable on allowed Crossover Bond Claims, (ii) *declaring* that, *if* the US Debtors prove to be solvent, post-petition interest, if payable on the Crossover Bond Claims, will be limited to the federal judgment rate for the week ending January 9. 2009, compounded annually, (iii) *declaring* that no additional amounts would be payable in connection with the prepayment or early redemption of the Bonds . . . .

(Monitor's Brief at 16-17 (emphasis added).)

21.     The Monitor appears to be seeking declaratory relief against all holders of Crossover Bond Claims.  Due process requires that any decision by the Court on such a request adhere to, and comply with, Part VII of the Bankruptcy Rules concerning adversary proceedings. The Monitor has made no effort whatsoever to do so.

22.     The conditional nature of the requested relief also illustrates the fact that what the Monitor is seeking is an advisory opinion.  If the U.S. Court were to enter the order requested by the Monitor, that order would sit dormant, awaiting a final outcome from the Allocation Litigation, a resolution of the entire U.S. claims pool and confirmation of a chapter 11 plan.  The U.S. Court should not, and cannot properly, issue such an advisory opinion without knowing how much of the lockbox sale proceeds will be allocated to the U.S. Debtors, what the eventual chapter 11 plan will provide regarding post-petition interest, how creditors will vote on such a plan and whether the U.S. Court will be applying the best interests test, the absolute priority rule, the requirements for unimpairment or the compromise standards of Bankruptcy Rule 9019, and without having provided U.S. creditors any of the procedural safeguards required in connection with the confirmation of a chapter 11 plan.

23.     The U.S. Debtors also highlight the premature nature of the Monitor's request:

> *In the US, the Bondholder Group's ultimate entitlement to distributions will depend on the terms of the chapter 11 plans* confirmed in the US Debtors' cases.  Accordingly, any order entered regarding the Interest Issues should make clear that no determinations are being made with respect to other matters in the US Debtors' cases or relating to the chapter 11 plans that ultimately may be confirmed in their cases . . .

(U.S. Debtors' Submission on the Interest Issues [D.I. 14019] at 5.)

24.     The U.S. Debtors reiterate one of the major themes from the Bondholder Brief: unsecured creditors' entitlement to post-petition interest can only be determined in the context of a chapter 11 plan.  Without a specific plan on file, this exercise by the Courts is nothing more

than a hypothetical consideration of possible scenarios, not a live legal issue that can be decided by a court.

**D.    The CCC, the UKPC, and WT Do Not Have Standing to be Heard on the Bondholder Claims Issues in the U.S. Court.**

25.    The CCC, UKPC, and WT are *not* creditors of the U.S. Debtors' estates. Notwithstanding this undisputed fact, each have filed opening briefs in the U.S. proceedings in response to the Monitor's Request.  None are parties in interest in U.S.-only claims issues and, as such, each lack standing to be heard regarding the Bondholders Claims Issues.  It plainly would be improper for the U.S. Court to consider any argument made by the parties that do not have standing to be heard in this matter.

26.    The CCC, WT, and UKPC all rely on their financial interest in NNL's recovery from the U.S. Debtors' estates to assert standing in the U.S. PPI Dispute.  As discussed in the Bondholder Brief, however, courts in this jurisdiction have consistently held that a creditor of a debtor's creditor is not a "party in interest" and therefore does not have standing in the debtor's bankruptcy, even if they ultimately may have a derivative financial interest in the outcome of the debtor's bankruptcy case.  (*See* Bondholder Brief ¶¶ 30-31.)

27.    It is clear and undisputed based on the record in these chapter 11 cases that both the CCC and WT are only creditors of the Canadian Debtors.  Neither is a creditor of the U.S. Debtors.  Indeed, in previous filings, the CCC has defined itself as an "ad hoc group of officially authorized representatives of employee and employee benefits creditors asserting direct claims *solely against the Canadian parent and certain Canadian affiliates*."[5]  The CCC has not asserted any direct claims against any of the U.S. Debtors.  (*See* DLA Amended 2019 Statement

---

[5]    Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of DLA Piper LLP (US), dated June 5, 2013 [D.I. 10761] ("DLA Amended 2019 Statement") at 1 (emphasis added); *see also* Allocation Protocol, Appendix A (defining the CCC as an "ad hoc committee of major creditors having claims *only against the Canadian Debtors*.") (emphasis added).

at 1-3.)  Similarly, WT is the successor indenture trustee for the 6.875% Notes due 2023, issued by NNL (the "NNL Notes"), a Canadian Debtor.  None of the U.S. Debtors have any obligations, direct or indirect, in respect of the NNL Notes, and, in fact, none have been alleged.  Accordingly, neither WT nor the CCC has standing in the chapter 11 cases.

28.     Like the CCC and WT, the UKPC is a creditor of only the Canadian Debtors.  The UKPC previously asserted claims against the U.S. Debtors, but when those claims were settled over seven months ago, the UKPC agreed to "release and forever discharge the US Interests . . . from any and all liability" in respect of its claims in exchange for an indefeasible cash payment from the U.S. Debtors.  (Agreement Settling US Claims Litigation, § 4.4 [D.I. 12618-3].)  Thus, the UKPC is no longer a creditor of the U.S. Debtors and no longer has standing in the chapter 11 cases.

### III.    SUBSTANTIVE ISSUES

**A.     The Canadian Parties Once Again are Trying to Effect Global Substantive Consolidation as a Means to Evade a True Allocation.**

29.     The Canadian Parties' opening briefs expose the Monitor's true intent when it asked the Courts to hear the Bondholder Claims Issues:  to try and take a second bite at the allocation apple before the Courts can even rule on the merits of the recently-concluded Allocation Trial.  Worse yet, the positions taken by the Canadian Parties make a mockery of the Allocation Litigation.  In essence, the Canadian Parties are telling the Courts that allocation is irrelevant, because funds that are allocated to the U.S. Debtors must be appropriated to pay creditors of the Canadian estates rather than the U.S. Debtors' own creditors.  There is no point in allocating funds to the U.S. Debtors when the U.S. Debtors will then be denied the right to use those funds to satisfy their own contractual obligations.

30.    This argument echoes the global substantive consolidation (or pro rata distribution) theory that several of the Canadian Parties have already advanced in the Allocation Litigation.  If the Courts are going to entertain that theory – *i.e.*, that legal separateness of the Nortel entities should be disregarded, that the lockbox proceeds represent a "common pool", and that all unsecured creditors, regardless of actual *legal* rights against *specific* debtors, are somehow "similarly situated" and have equal access to that common pool – they have a full evidentiary record on which to base their rulings in the Allocation Litigation.  The Canadian Parties should not be permitted to re-litigate those issues now.

31.    Furthermore, although the Monitor did not advocate for global substantive consolidation during the Allocation Trial, it has changed course and jumped onto that bandwagon here.  Never before having been heard to call for the disregard of corporate separateness, the Monitor now proclaims that "this is effectively an inter-creditor dispute where fairness and equity dictate the application of a uniform interest rate that does not provide a greater recovery to one group of constituents in the Proceedings at the expense of all others" and that "the diversion of available funds to pay post-petition interest . . . would come at the expense of creditors in the Canadian Proceedings."  (Monitor's Brief at 14.)

32.    The Monitor misses the mark with this argument in at least two regards.  *First*, this is *not* an inter-creditor dispute between similarly situated creditors.  The creditors of the Canadian estates are *not* creditors of the U.S. Debtors, and thus are *not* similarly situated and do *not* have any entitlement to proceeds that ultimately are allocated to the U.S. Debtors.  The only Canadian stakeholder in the U.S. cases is NNL, and NNL is *neither* similarly situated *nor* equally ranking with the U.S. Debtors' unsecured creditors.  NNL's residual equity interests are just that, residual.  They are indubitably junior to the claims of unsecured creditors with respect

to the assets of the U.S. Debtors, and there is no basis for ignoring what are indisputable priorities among the U.S. Debtors' stakeholders.

33.    *Second*, the Monitor's reference to the "diversion of available funds to pay post-petition interest" is an egregious mischaracterization.  The "available funds" in this context would be funds belonging to the U.S. Debtors (as determined by the Courts in the Allocation Litigation), and the "diversion" of those funds would actually be the U.S. Debtors' use of *its own* funds to pay *its own* creditors.  It is the Monitor that seeks to improperly divert the funds of the U.S. Debtors' estate, not the reverse.

34.    The UKPC likewise tries to take this opportunity to re-argue its allocation theories regarding a "pro rata distribution model" and application of the "hotchpot rule."  The Courts have already heard the UKPC's views on those issues in the Allocation Litigation and presumably will hear them again in post-trial brief – that lockbox proceeds should be allocated in a manner that ignores ownership and instead reverse engineers allocation to try to arrive at pro rata distributions to all creditors, regardless of debtor, or alternatively that the separate Nortel estates should all be treated as a single "hotchpot" without regard for legal separateness.[6]  The Courts already have a full evidentiary record on which to form their views.  The UKPC's attempt to litigate those issues as part of this proceeding should be rejected.

35.    WT attacks the corporate separateness of NNI and NNL in a slightly different, but equally unjustified, manner.  WT essentially argues that NNL should be disregarded entirely, because any dividend to NNL will simply be passed on to NNL's creditors.  (Brief of Wilmington Trust, National Association, as Successor Indenture Trustee, Addressing the Interest

---

[6]    The UKPC openly acknowledges that the hotchpot rule is invoked when there are multiple, concurrent insolvency proceedings against a single debtor, rather than multiple proceedings involving multiple, legally separate debtors.  Thus, the UKPC's incorrect invocation of the hotchpot rule is just another, back-door way for the UKPC to advocate for global substantive consolidation.

Issues [D.I. 14021] (the "WT Brief") at 3.)  WT seeks to remove NNL from the discussion in this

fashion in order to sidestep the fact that what the Canadian Parties are proposing is that NNL, as

equity holder, receive a dividend as a direct result of denying NNI's creditors their contractual

entitlements.  This is exactly the type of "windfall to equity" that courts roundly denounce.

(Bondholder Brief at 36, 37.)

36.    Not surprisingly, the CCC also seeks to take yet one more bite at the same apple,

repeatedly arguing that the Courts must act to "balance[e] the interests of all stakeholders" and

"avoid preferring one set of creditors over another."  (CCC Brief at 7.)  This argument wrongly

presumes that all "stakeholders" are similarly situated and that all "sets of creditors" have the

same ranking in the same capital structure.  The CCC, UKPC, and WT are creditors of the

Canadian estates but are not "stakeholders" of the U.S. Debtors in any respect.  Likewise, while

creditors of the U.S. estates have claims against the U.S. estates, they are not "stakeholders" of

the Canadian Debtors in any respect (other than the Bondholders and any other "crossover"

creditors).  And, as previously noted, NNL is the junior-most "stakeholder" of the U.S. Debtors.

That plain corporate reality creates an indisputable distribution waterfall that militates against the

CCC's notion that all creditors are similarly situated and equal ranking "stakeholders" when it

comes to the assets of the U.S. Debtors.

**B.    There is No "Windfall" to the Bondholders if the U.S. Debtors are Using Their Own Funds to Pay Their Own Obligations to Their Own Creditors.**

37.    Finally, a common fallacy that runs through the opening briefs of the Canadian

Parties is that the Bondholders' receipt of post-petition interest will somehow constitute a

"windfall" to the Bondholders that will come "at the expense" of creditors of the Canadian

estates.  That fallacy hinges on the notions that:  (i) the Bondholders for some reason ***are not***

entitled to the benefits of the contractual bargains they entered into with the U.S. Debtors; and

(ii) creditors of the Canadian estates somehow *are* entitled to the U.S. Debtors' assets that are somehow being misappropriated by the Bondholders.  This argument turns the facts on their head.

38.    The reality is that funds to pay post-petition interest will become available only if the U.S. Debtors end up with more than sufficient funds to pay all of their allowed priority and prepetition claims in full.  The determinant of whether such surplus funds will exist will be the Courts' decision on how much of the lockbox proceeds are owned by the U.S. Debtors.  If the Courts determine that the U.S. Debtors "own" those funds, that amount of proceeds will be released from the lockbox and will become undisputed assets of the U.S. Debtors.  If the U.S. Debtors use those funds to pay post-petition interest, that will simply be an act whereby the U.S. Debtors are using *their own assets* to satisfy *their own contractual obligations* to *their own creditors*.

39.    Thus, the U.S. Debtors' payment of post-petition interest to the Bondholders will not be a "windfall" to the Bondholders; it will be the satisfaction of a bargained-for contractual entitlement.  Clearly, then, such a result does not come "at the expense" of creditors of the Canadian estates, because the funds in question were already determined by the Courts not to have been the Canadian Debtors' property to begin with.

**C.    The Law in Delaware Regarding Post-Petition Interest is Far From "Settled" and Clearly Does Not Limit Post-petition Interest to the Federal Judgment Rate as a Matter of Law.**

**i.    As a Threshold Matter, *W.R. Grace*, *Washington Mutual* and *Coram* are Not Binding on the U.S. Court.**

40.    The Canadian Parties repeatedly suggest that the case law in Delaware is "settled" in that post-petition interest can only be paid at the federal judgment rate, citing to the *Washington Mutual*, *W.R. Grace* and *Coram* decisions.  As discussed below, those three

decisions do not "settle" that proposition in the least. Furthermore, and as a threshold matter, it is important to note that none of those decisions are binding on this Court, because judges are not bound by the decision of another judge sitting in the same district. *See Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371, n. 7 (3d Cir. 1991).

41.    The Third Circuit has noted that "there is no such thing as 'the law of the district.'" *Id.* at 1371. Even where two courts in the same district are presented with the same facts, "[t]he doctrine of *stare decisis* does not compel one district court judge to follow the decision of another." *Id.* at 1371 (citations omitted). Because district court decisions "do not bind other district judges within the same district, they are not binding on bankruptcy courts either." *In re KAR Dev. Assocs., L.P.*, 180 B.R. 629, 640 (D. Kan. 1995); *see also In re Foamex Int'l, Inc.*, 491 B.R. 100, 106 (Bankr. D. Del. 2013) (Gross, J.) (noting that courts have found that bankruptcy courts are free to disagree with prior decisions of their district court determining the same issue of state law).

### ii.    The Canadian Parties Cannot Be Allowed to Use Sections 502(b)(2) and 1129(a)(7) as Swords for Equity Rather than Shields for Creditors.

42.    In a perversion of the Bankruptcy Code, the Monitor seeks to use the creditor protections of sections 502(b)(2) and 1129(a)(7) as vehicles to divert value away from creditors and into the hands of a junior equity holder.

43.    Although section 502(b)(2) provides only that claims for "unmatured interest" as of the petition date are not allowed, the Monitor construes that provision as "embodying a general bankruptcy policy that disfavors the payment of post-petition interest." (Monitor's Brief at 4.) The Monitor ignores, however, that the Supreme Court has held that one of the "basic reasons for the rule denying post-petition interest . . . [is] the avoidance of unfairness as between

competing creditors" when creditors are not being paid in full. *Bruning v. U.S.*, 376 U.S. 358, 362 (1964).

44.     This justification for prohibiting the payment of post-petition interest disappears when the debtor is solvent. As succinctly stated by the Seventh Circuit, "[t]he only good reason for refusing to give a creditor in reorganization all that he bargained for . . . ***is to help other creditors***, the debtor's assets being insufficient to pay all creditors in full." *In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 527 (7th Cir. 1986) (emphasis added). Accordingly, when the debtor is solvent and intercreditor fairness concerns are not present, "post-petition interest will be 'allowed' . . . and payable out of the assets of the bankruptcy estate . . . ***before any sums are returned to the debtor***." *Kielisch* v. *Educ. Credit Mgmt. (In re Kielisch)*, 258 F.3d 315, 322 n.5 (4th Cir. 2001) (quoting *Hanna* v. *United States (In re Hanna)*, 872 F.2d 829, 830-31 (8th Cir. 1989)) (emphasis added).[7]

45.     Section 502(b)(2) is an intercreditor protection that is designed to protect ***unsecured creditors*** from the risk of "collateral damage." *See UPS Capital Bus. Credit v. Gencarelli (In re Gencarelli)*, 501 F.3d 1, 7 n.3 (1st Cir. 2007). That protection is no longer necessary when a debtor is solvent, nor is it available to an equity holder like NNL for use as a sword to carve out a recovery for itself while denying senior-ranking creditors their contractual rights to post-petition interest.

46.     The Monitor similarly turns the best interests test of section 1129(a)(7) on its head, arguing that paying unsecured creditors post-petition interest at any rate greater than the federal judgment rate will violate the best interests test with respect to NNL's equity interests because it will deprive NNL of a dividend that it would receive if post-petition interest were not

---

[7]     *See also Ruskin v. Griffiths*, 269 F.2d 827, 830 (2d Cir. 1959) ("we hold that the Supreme Court did not intend that the principle [behind the denial of default interest,] enunciated by it in Vanston, in a contest between creditors, should be applied to a contest between a debtor's creditor and its stockholders").

paid.  (*See* Monitor's Brief at 7-8.)  In addition to turning NNI's capital structure upside down, the Monitor's position is refuted by one simple fact:  the best interests test of section 1129(a)(7) only applies to "impaired" classes of claims or interests.  As long as NNL retains all of its legal rights relating to its residual equity interests – *i.e.*, the right to recover whatever value remains *after* all of NNI's creditor obligations are fully satisfied – NNL will not be impaired and therefore will not be entitled to invoke the best interests test of section 1129(a)(7).

> iii.    The *Coram* and *W.R. Grace* Decisions Both Directly Contradict the Canadian Parties' Assertion that the Federal Judgment Rate Serves as a Cap on Post-Petition Interest as a Matter of Law.

47.    *Coram* and *W.R. Grace* do not hold that unsecured creditors can never receive post-petition interest at any rate other than the federal judgment rate.  In *Coram*, Judge Walrath expressly rejected that very argument.  In *W.R. Grace*, the court unequivocally approved a rate of interest that exceeded not only the federal judgment rate, but also the non-default contract rate. Thus, *Coram* and *W.R. Grace* both *directly contradict* the relief advocated by the Canadian Parties here.

48.    In *Coram*, Judge Walrath could not have been more clear in rejecting the exact same argument that the Canadian Parties are making here:

> *[W]e are not convinced that Congress intended to supplant a party's contractual right to interest in all circumstances under chapter 11 . . . . Thus, we are not persuaded by the Equity Committee that section 1129(b) requires the use of federal judgment rate for post-petition interest to be paid under a chapter 11 plan of reorganization.*

*In re Coram*, 315 B.R. at 346 (internal cites omitted) (emphasis added).[8]

49.    With respect to *W.R. Grace*, the Canadian Parties would have the U.S. Court accept *dicta* from that decision as the ultimate holding.  Even worse, the Canadian Parties do not

---

[8]    As discussed in section II.B *supra*, footnote 35 in Judge Walrath's subsequent opinion in *Washington Mutual* regarding section 726(a)(5) does not undercut her holding regarding section 1129(b) in any respect.

even accurately report the *dicta* on which they so heavily rely.  While the court in *W.R. Grace*

recognized that other courts have applied the federal judgment rate under section 1129(a)(7),

nothing in that decision suggests that, as a matter of law, post-petition interest can only be

calculated using the federal judgment in all contexts and under all circumstances.  To the

contrary, at least two aspects of the *W.R. Grace* decision lead to the exact opposite conclusion.

50.      First and foremost, the court confirmed a plan that provided for a post-petition

interest rate that clearly exceeded the federal judgment rate:  "[T]he Bank Lenders will actually

receive a rate – 6.09% converting to a floating adjusted rate tied to the Prime – that is higher than

the federal judgment rate."  *In re W.R. Grace & Co.*, 475 B.R. 34, 201 (Bankr. D. Del. 2012).

There is no way the court could have confirmed that plan and approved that rate while also

somehow imposing the federal judgment rate as a cap on post-petition interest.

51.      Second, the court surveyed case law from other jurisdictions on section

1129(a)(7) and section 726(a)(5) and identified three different approaches that courts have

followed to determine what "the legal rate" means for purposes of calculating post-petition

interest:  the state law approach, the use of a specific state statute to set the rate, and the federal

judgment rate approach.  The court observed that the federal judgment approach is the "majority

approach taken by most courts today", but then also noted that:  (i) "the Third Circuit has not

addressed the issue;" and (ii) "[i]n any event, it does not matter which of the three would

properly apply here . . . ."  *W.R. Grace*, 475 B.R. at 200-01.  Again, the court could not possibly

have ***held*** that the federal judgment rate approach governs while at the same time concluding that

resolution of that issue ***did not even matter*** in that case.

52.      What happened in the aftermath of the *W.R. Grace* decision is also notable.

When the parties ultimately settled the matter while the appeal to the Third Circuit was pending,

the debtors agreed to pay *even more* post-petition interest, over and above the settlement rate, in a settlement that was also subsequently approved by the bankruptcy court.

> **iv.    Even *Washington Mutual* Does Not Support the Canadian Parties' Assertion that the Federal Judgment Rate Serves as a Cap on Post-Petition Interest for All Purposes.**

53.     *Washington Mutual* is the only one of the Delaware cases in which the court actually held that the federal judgment rate is the appropriate rate to be applied to calculate post-petition interest.[9] Even that decision, however, has limits that fall far short of the Canadian Parties' contention that it creates a blanket prohibition on payment of post-petition interest at any rate above the federal judgment rate.

54.     Judge Walrath's adoption of the federal judgment rate approach in *Washington Mutual* was very narrowly circumscribed. She was neither confronted with, nor did she address, the fair and equitable requirements of section 1129(b). She made no pronouncements that her interpretation of section 726(a)(5) created the sort of blanket limitation that the Canadian Parties seek on the payment of post-petition interest for any other purposes or in any other possible contexts. Rather, her analysis in that case was confined to a review of the best interests test of section 1129(a)(7) and consisted entirely of her interpretation of the language of section 726(a)(5).

55.     Many other courts have undertaken a similar analysis, however, and have reached the opposite conclusion. (Bondholder Brief at 34-37.) This is because Judge Walrath's conclusion that the federal judgment rate is the only possible post-petition rate of interest available under section 726(a)(5) was based on a flawed statutory interpretation. Other courts

---

[9]     While the rate that was approved in *Coram* was the federal judgment rate, the court's approval was based on the "peculiar facts" of the case and the court's conclusion that specific inequitable conduct by the noteholders in that case warranted denial of the contract rate and imposition of the federal judgment rate instead. *In re Coram*, 315 B.R. at 346-47. The decision was not that the federal judgment rate was required as a matter of law, but rather that, under the facts of that case, use of the federal judgment rate was fair and equitable. *Id.*

have interpreted the "legal rate" requirement of section 726(a)(5) to mean various things, including the applicable contract rate. *See, e.g., Federal Savings & Loan Ins. Corp. v. Moneymaker (In re A&L Properties)*, 96 B.R. 287, 290 (C.D. Ca. 1988); *In re Schoenberg*, 156 B.R. 963, 972 (Bankr. W.D. Tex. 1993); *In re Schaffer Furniture Co.*, 68 B.R. 827 (Bankr. E.D. Pa. 1987).

56.     As the Supreme Court has stated, the "basic reason" for denying post-petition interest in the case of an insolvent bankruptcy estate is the risk that the estate may be diminished "in favor of high interest creditors at the expense of other creditors." *Bruning*, 376 U.S. at 363. In other words, the Supreme Court has acknowledged that creditors may be entitled to different rates of interest, depending on their legal circumstances.  Indeed, if all unsecured creditors were only entitled to a uniform rate of post-petition interest (*e.g.*, the federal judgment rate), there would be no reason for section 502(b)(2)'s prohibition on post-petition interest; all post-petition interest would accrue in direct proportion to prepetition claims, and the accrual of such interest would therefore have no impact whatsoever on the *pro rata* entitlements of unsecured creditors.

**D.     WT Completely Misstates the State of the Case Law, Both In and Out of Delaware.**

57.     As demonstrated above, the Canadian Parties collectively attempt to stretch the recent Delaware cases well beyond their limited holdings.  WT goes even further, making a series of remarkable misstatements about the state of the law on post-petition interest.

58.     WT states that: "[e]very judge in the Third Circuit to ever award post-petition interest to unsecured creditors under the Bankruptcy Code has followed the majority of courts in holding that the 'legal rate' prescribed by section 726(a)(5) is the FJR." (WT Brief at 7.)  To support this statement, WT cites to three cases:  *W.R. Grace*, *Washington Mutual* and *In re Chiapetta*.

59.    WT's citation to *W.R. Grace* is wrong.  In that case, the court approved an interest rate that exceeded not only the federal judgment rate, but also the non-default contract rate. WT's statement also completely ignores *Coram*.  While the court in that case ultimately did impose the federal judgment rate, it did so after expressly ***rejecting*** the argument that the federal judgment rate must be applied in all circumstances.  Moreover, WT ignores the decision in *In re Allegheny Int'l, Inc.*, where the court confirmed a plan that incorporated a settlement providing for the payment of post-petition interest to unsecured creditors at a rate that approached the contract rate.  118 B.R. 282, 314-15 (Bankr. W.D. Pa. 1990)

60.    Accordingly, although WT would have the U.S. Court believe that an overwhelming consensus exists among judges in the Third Circuit in their adoption of the federal judgment rate, that simply is not the case.  Of the grand total of five cases on point in the Third Circuit, two cases have held that the federal judgment rate is the rate mandated by section 726(a)(5) (*Washington Mutual* and *Chiapetta*) and three have not (*W.R. Grace*, *Coram*, and *Allegheny*).  And of the two that have, both were decided under section 1129(a)(7) and did not address in any way the fair and equitable requirements of section 1129(b).

61.    Expanding its analysis beyond the Third Circuit, WT goes on to claim that "in the past nine (9) years, every other court to be confronted with this issue has agreed that the FJR is the 'legal rate' under section 726(a)(5)."  (WT Brief at 8.)  This statement suffers from similar inaccuracies.

62.    First, this statement completely ignores *Dow III*, which was decided in 2006. In that case, the 6th Circuit stated:  "[w]e conclude, like the other courts to have considered this issue, that there is a presumption that default interest should be paid to unsecured claim holders

in a solvent debtor case." *Official Comm. of Unsecured Creditors v. Dow Chem. Corp.* (*In re Dow Corning Corp.*), 456 F.3d 668, 679 (6th Cir. 2006).

63.     As discussed in detail in the Bondholder Group's and Trustees' opening brief, *Dow III* was decided under the fair and equitable test of section 1129(b), not the best interests test of section 1129(a)(7).  Because WT couched its statement in terms of decisions rendered under section 726(a)(5), its exclusion of *Dow III* was technically accurate.  That does not mean, however, that the U.S. Court should overlook the fact that *Dow III* was decided within the nine-year period selected by WT and stands, as Circuit-level authority, for the exact ***opposite*** proposition that WT advances.

64.     WT's selection of a nine-year window is not coincidental.  If WT were to reach back one additional year to include 2004, it would not then be able to ignore *In re Fast*, 318 B.R. 183, 192 (Bankr. D. Colo. 2004).  In that case, the court noted that "*all* creditors [were] being paid in full and to allow interest at a rate lower than the rate contracted into by the parties, would reward an unscrupulous and indolent debtor." (emphasis in original).

65.     Even within its carefully selected nine-year window, however, WT has to painfully contort several decisions to try to arrive at a meaningful tally of federal judgment rate cases.  Indeed, five of the six cases cited by WT in paragraph 18 of its opening brief as examples of cases mandating application of the federal judgment rate do not uphold that proposition in any meaningful way – and certainly not as a matter of law.

66.     For example, WT cites to *In re Madison 92nd St. Assocs. LLC*, 472 B.R. 189 (Bankr. S.D.N.Y. 2012) as a case where the court held that the federal judgment rate is the "legal rate" under section 726(a)(5).  WT could not be more wrong.  Section 726(a)(5) was not even at issue in that case; rather, it was a case under section 506(b).  Even so, the opinion contains

reasoning that is instructive here:  ***In the case of contracts, courts nevertheless have very***

***limited discretion to deviate from the interest rate imposed under the contract. (citation***

***omitted) . . . The debtor bears the burden of rebutting the presumptive 'contract rate.'***"

*Madison 92nd St.*, 472 B.R. at 198-99 (emphasis added).  Clearly, this case does not support

imposition of the federal judgment rate as a matter of law.

67.     WT next cites *In re Smith*, 431 B.R. 607 (Bankr.  E.D.N.C. 2010), a chapter 13

case where a solvent debtor proposed a chapter 13 plan that proposed to pay post-petition interest

to unsecured creditors at the federal judgment rate.  In opposition, the trustee sought to pay

creditors at a rate calculated using the approach articulated in *Till v. SCS Credit Corp.*, 541 U.S.

465 (2004).  The court there did accept the federal judgment rate rather than the *Till* rate, but

given the chapter 13 context and the nature of the dispute in that case, WT's reliance on *Smith* is

questionable at best.

68.     WT's next offers *In re Gulfport Pilots Ass'n, Inc.*, 434 B.R. 380 (Bankr. S.D.

Miss. 2010).  With this citation, WT once again misconstrues *dicta* as a holding.  Although the

court interjects its view that the federal judgment rate is the appropriate rate under section

726(a)(5), it does so only after recognizing that ***the unsecured creditor's "claim for post-petition***

***interest is premature***" because the chapter 7 trustee had not yet actually recovered anything on

the fraudulent conveyance action that might ultimately render the estate solvent.  *Gulfport Pilots*,

434 B.R. at 392 (emphasis added).  Thus, the court never actually decided the issue for which

WT is citing it.

69.     WT's citation to *In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y.

2007) suffers from the very same infirmity – that is, the court never even got to the issue that WT

cites it as resolving.  Having approved a settlement of the post-petition interest rate dispute,

24

Judge Gerber specifically noted that "*I don't need to decide the interest entitlement issue.*"
*Adelphia*, 368 B.R at 257 (emphasis added).

70.     Finally, WT cites to *In re Best*, 365 B.R. 725 (Bankr. W.D. Ky. 2007). *Best* was a
chapter 7 case where the court elected to apply the federal judgment rate as a way to avoid
"disparate treatment of similarly situated creditors," not because it concluded that the federal
judgment rate was mandated as a matter of law. *Best*, 365 B.R. at 727.  In fact, in discussing
possible approaches to determining the correct rate for post-petition interest, the court in *Best*
specifically noted that "these are not hard and fast rules, but are flexible." *Id.* at 365 B.R. at 727.
Most notably, the court settled on the federal judgment rate only after concluding that doing so
would not result in a windfall to the debtor.  "*There could be circumstances where a*
*mechanical application of the federal judgment rate would result in a windfall for some*
*solvent debtor.  This will not occur in this case.*" *Id.* at 365 B.R. at 727-28 (emphasis added).

71.     Therefore, the final tally on WT's collection of the case law is that only three of
eight cited cases (*Washington Mutual, Garriock* and the chapter 13 case, *Smith*) actually held
that section 726(a)(5) requires application of the federal judgment rate – and those cases were
limited to the section 726(a)(5) context and do not speak to the requirements of section 1129(b).
Of the other five, three actually contradict WT's arguments (*W.R. Grace, Madison 92nd Street*
*Assocs., Best*) and two expressly do not decide the issue at all (*Gulfport Pilots* and *Adelphia*).
Finally, WT ignores four other cases that are also contrary to the Canadian Parties' position –
*Coram* and *Dow III* (ignored by WT because they are section 1129(b) cases rather than section
1129(a)(7)), *Fast* (excluded by WT because it is ten years old rather than nine), and *Allegheny*.

72.     Indeed, WT's statement is wrong even if it changed the timeframe from nine
years to nine days.  On July 18, 2014, Judge Walsh of the Bankruptcy Court for the District of

Delaware confirmed a plan in the *In re Overseas Shipholding Group, Inc.* ("*In re OSG*")

bankruptcy case.[10] Judge Walsh concluded that the OSG plan, sponsored by holders of its equity

securities in a now solvent estate, "fairly and reasonably provides" for payment at the full

contractual rate for all unsecured creditors, including bondholders. *OSG* Plan Confirmation

Order at 30. The only disputed issue in that case as at the time of the confirmation hearing was

whether certain bondholders were entitled to collect "interest on interest" pursuant to the express

terms of their contract– not whether they were entitled to the full contract rate of interest from

the petition date. *See id.* at 64. Although the OSG plan was a consensual plan, if the maximum

interest rate in cases in which creditors are paid in full were the Federal Judgment Rate as a

matter of "settled law", then the confirmed plan would never have even been proposed by the

equity holders.

73. With this scorecard, the Canadian Parties cannot seriously contend that the case

law is in any way settled, in Delaware or anywhere else.

**E.     Where Funds are Available to Pay Post-Petition Interest, the Fair and Equitable Test and Absolute Priority Rule Require Such Payment Before Any Dividend Can be Paid to Equity Holders.**

74. The Canadian Parties work hard to try to focus the U.S. Court's attention solely

on the most narrow component of any discussion on post-petition interest – i.e., what "the legal

rate" means in section 726(a)(5). The reason for doing so is obvious:  looking at the issue more

broadly brings section 1129(b) and the fair and equitable test into the picture – which in turn

requires consideration of the line of cases discussed in the Bondholder Brief that chart the

---

[10]     Findings of Fact, Conclusions of Law, and Order Confirming First Amended Joint Plan of Reorganization of Overseas Shipbuilding Group, Inc., *et al.*, Under Chapter 11 of the Bankruptcy Code, *In re Overseas Shipholding Group, Inc.*, Case No. 12-20000 (PJW) (Bankr. D. Del. July 18, 2014) [D.I. 3653] (the "*OSG Plan Confirmation Order*").

evolution of the absolute priority rule, from the U.S. Supreme Court's 1939 decision in *Case v. L.A. Lumber Prods. Co.* through modern-day Third Circuit cases such as *Armstrong* and *Insilco*.

75.    The Monitor summarily rejects that entire line of cases, dismissively referring to the "*so-called* 'absolute priority rule'" and arguing that any court that would permit the payment of post-petition interest based upon the absolute priority rule would be "creat[ing] an additional exception [to section 502(b)(2)] *out of whole cloth.*" (Monitor's Brief at 8, 10 (emphasis added).)  The Monitor argues instead that the fair and equitable test "merely requires that with respect to a class of unsecured claims each holder of a claim in such class be paid the allowed amount of its claim.  The claim is, of course, determined as of the petition date and therefore the allowed amount of such claim excludes any post-petition interest." (Monitor's Brief at 8-9.)

76.    This argument defies Supreme Court and Circuit level law, Congressional legislative history and common sense.  The Bondholder Brief sets forth in detail the history of the development of the absolute priority rule.  (Bondholder Brief at 23-28.)  That discussion establishes the thrust of the absolute priority rule in a case where funds become available to pay amounts in excess of all allowed prepetition claims, which was most succinctly stated by the Sixth Circuit in *Dow III*: "[i]n order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, *including postpetition interest*, before equity holders may participate in any recovery." *Dow III*, 456 F.3d at 678 (emphasis added) (citation omitted).

77.    The Congressional Record in connection with Congress' 1994 repeal of former section 1124(3) contains a very similar construction of the fair and equitable standard of section 1129(b):

> The words "fair and equitable" are terms of art that have a well established meaning under the case law of the Bankruptcy Act as well as under the

> Bankruptcy Code. Specifically, courts have held that where an estate is
> solvent, in order for a plan to be fair and equitable, unsecured and
> undersecured creditors' claims must be paid in full, ***including postpetition
> interest***, before equity holders may participate in any recovery.

140 Cong. Rec. H10,768 (Oct. 4, 1994) (emphasis added).

78.     But the Monitor somehow comes to the very ***opposite*** conclusion that "the

absolute priority rule does ***not*** provide for the payment of post-petition interest." (Monitor's

Brief at 9 (emphasis added).) The Monitor reaches this conclusion by focusing solely on the

language of section 1129(b)(2)(B)(i), which provides that one element of the fair and equitable

standard with respect to a class of unsecured creditors is that each holder of a claim in such class

will receive or retain property of a value equal to the "allowed amount" of its claim. The

Monitor then argues that the "allowed amount" of an unsecured claim is measured as of the

petition date and therefore cannot include any amount of post-petition interest – so that a plan

can be fair and equitable as long as it pays the allowed prepetition claim, without any payment of

post-petition interest. (Monitor's Brief at 9.)

79.     This argument fails for several reasons. First, it completely ignores cases such as

*Dow III* that have recognized that the rationale behind the section 502(b)(2) disallowance of

unmatured interest claims is an intercreditor protection for when a debtor is insolvent. When the

debtor has sufficient funds to pay all prepetition claims in full, a different result is required.

Second, it also ignores the documented Congressional intent behind the repeal of section

1124(3); that is, that section 502(b)(2) cannot be used as a sword to deprive creditors of their

rights to post-petition interest when doing so would provide a windfall to equity. Third, the

Monitor relies heavily on *W.R. Grace* to support their interpretation that the fair and equitable

test does not require payment of post-petition interest. *W.R. Grace*, however, was a case where

(i) post-petition interest ***was*** approved and paid, and (ii) the plan did not cram down the lenders

under section 1129(b), so the fair and equitable test was not even implicated.  The Monitor thus

argues that this Court should apply the fair and equitable test to prohibit the payment of post-

petition interest by relying on a case that did ***not*** apply the fair and equitable test and did not

prohibit, but rather ***permitted***, the payment of post-petition interest.

80.     The final flaw in the Monitor's argument is that it is based on the premise that the

fair and equitable test is somehow limited to the express terms of section 1129(b)(2)(B).  That

premise, however, is false because it necessarily assumes that satisfaction of the requirements of

section 1129(b)(2)(B) is coextensive with the broader fair and equitable standard.  That

assumption is not correct.

81.     Section 1129(b)'s requirement that a plan be fair and equitable "includes" the

condition that "each holder of a claim of such class receive or retain on account of such claim

property of a value, as of the effective date of the plan, equal to the *allowed amount* of such

claim."  11 U.S.C. § 1129(b)(2)(B)(i).  Bankruptcy Code section 102(3) makes clear that the

word "includes" – wherever it appears – is "not limiting."  11 U.S.C. § 102(3).  The word's

presence in section 1129(b)(2) (reciting that the fair and equitable requirement "includes" the

condition that principal claims be paid) states a necessary, but not a sufficient, condition to a plan

being found to be "fair and equitable."  *See In re D & F Constr. Inc.*, 865 F.2d 673, 675 (5th Cir.

1989) ("[T]echnical compliance with all the requirements in section 1129(b)(2) does not assure

that the plan is 'fair and equitable.'"); *In re Winters*, 99 B.R. 658, 663 (Bankr. W.D. Pa. 1989).

Thus, section 1129(b)(2)(B) is a component, but not the entirety, of the fair and equitable

requirement.

82.     The unusual "solvent debtor" scenario is precisely the kind of situation where the

fair and equitable requirement demands more than just technical compliance with section

1129(b)(2)(B)(i).  As recognized by the court in *Dow III*:  "[t]he legislative history of the

Bankruptcy Code makes clear that equitable considerations operate differently when the debtor is

solvent."  *Dow III*, 456 F.3d at 678.  Indeed, as Judge Posner of the 7th Circuit has stated, this is

because:

> [t]he function of equitable considerations in a bankruptcy proceeding is to
> guide the division of a pie that is too small to allow each creditor to get the
> slice for which he originally contracted.  Hence *if the bankrupt is solvent*
> the task for the bankruptcy court is simply *to enforce creditors' rights
> according to the tenor of the contracts that created those rights*.

*Chi., Milwaukee*, 791 F.2d 524, 527 (7th Cir. 1986) (emphasis added); *see also* Bondholder Brief

at 23-34.

83.     Far from creating new law "out of whole cloth," the absolute priority rule, and its

prohibition on recoveries by equity holders before creditors are paid in full, reaches all the way

back to *Case v. L.A. Lumber Prods. Co.* and remains in full force today under the fair and

equitable requirement of Bankruptcy Code section 1129(b).

**F.      The Equitable Considerations Advanced by the Canadian Parties Cannot Overcome
the Strong Presumption for Payment of Contract Rates of Interest When Funds are
Available.**

**i.      To the Extent Equitable Considerations are Relevant, the Burden is on the
Canadian Parties To Overcome a Strong Presumption In Favor of the
Contract Rates of Interest.**

84.     Given the procedural quagmire that the Monitor has created, it is not at all clear

whether, or to what extent, the U.S. Court should consider equitable considerations when

analyzing the Monitor's Request.  The Monitor has posed its questions as purely "legal

questions" and has created a process under which the U.S. Court will not have any evidence to

consider.  In the absence of any evidentiary record, it is difficult to fathom how the U.S. Court

can take equitable considerations into account.  In addition, because the Canadian Parties argue

that the only thing the U.S. Court needs to do is analyze the meaning of section 726(a)(5) (as

incorporated in section 1129(a)(7)), they assert that the U.S. Court need not consider equitable

factors.

85.     On the other hand, analysis under section 1129(b) by its very terms necessitates

an assessment of whether a plan is "fair and equitable." This would seem to imply at least some

level of review of equitable considerations.

86.     Further, even if equitable considerations could be considered, *Dow III* provides

some helpful guidance on this point:

> **[*I*]n solvent debtor cases, rather than considering equitable principles,
> courts have generally confined themselves to determining and enforcing
> whatever pre-petition rights a given creditor has against the debtor**. *See,
> e.g., Chicago*, 791 F.2d at 528; *Ruskin v. Griffiths*, 269 F.2d 827, 831 (2d
> Cir. 1959) (holding that the equitable rules governing contests between
> creditors do not apply in the context of a contest between a debtor's
> creditor and the debtor or its stockholders).

*Dow III*, 456 F.3d at 678 (emphasis added).

87.     Thus, in cases where prepetition claims are being paid in full and the contest for

any surplus funds is a dispute between a debtor's creditors and its equity holders, "[d]espite the

equitable nature of bankruptcy proceedings, the bankruptcy judge does not have 'free-floating

discretion to redistribute rights in accordance with his personal views of justice and fairness.' . . .

Rather, absent compelling equitable considerations, when a debtor is solvent, it is the role of the

bankruptcy court to enforce the creditors' contractual rights." *Id.* at 679.

88.     *Dow III* thus clarifies two issues for the U.S. Court: (i) the U.S. Court should not

engage in any detailed examination of equitable factors, but rather should limit itself to enforcing

creditors' contractual rights against the U.S. Debtors; and (ii) any party desiring to overcome this

presumption bears the burden of establishing "compelling equitable considerations." *Id.*

89.     The Monitor tries to turn that burden upside down, asserting (without any

authority whatsoever) that the Bondholders bear the burden of establishing equitable

considerations to justify payment of post-petition interest at a rate higher than the federal

judgment rate. This unsubstantiated proposition runs directly contrary not only to *Dow III*, but

also to all of the other cases that recognize that if a debtor is (or becomes) "solvent", then the

presumption is that contractual rights will be enforced ahead of any recovery for equity. (*See*

Bondholder Brief at 29-34.) The burden here clearly rests with the Canadian Parties to establish

compelling equitable considerations for depriving the Bondholders of their contractual

entitlements. The Canadian Parties cannot satisfy this burden.

> **ii.    The Equitable Considerations Advanced by the Canadian Parties are Nothing More than Another Plea for Global Substantive Consolidation or the Disregard of Corporate Separateness Between the Canadian Debtors and the U.S. Debtors.**

90.    The equitable considerations cited by the Monitor consist of nothing more than

the assertion that post-petition interest should not be paid to the Bondholders so that those funds

can instead be used to pay creditors of the Canadian estate. Once again, the Monitor

characterizes the situation as "effectively an inter-creditor dispute" where all creditors should be

treated similarly.

91.    As discussed above, the notion that this is an inter-creditor dispute between

similarly situated creditors is a fallacy. The U.S. Debtors are *not* the Canadian Debtors, and the

creditors of the Canadian estates (other than the Bondholders) by and large do *not* have claims

against the U.S. Debtors. The plain reality of the Nortel legal and capital structure is that the

unsecured creditors in different jurisdictions are *not* similarly situated and therefore are *not*

necessarily entitled to similar recoveries. There is nothing even remotely equitable about forcing

the U.S. Debtors to forego satisfaction of their own contractual obligations in order to pay claims

against the Canadian Debtors that they have no legal obligation to pay.

iii.    **The UKPC's Argument that Administrative Convenience Requires Imposition of the Federal Judgment Rate is Absurd Under These Circumstances.**

92.    In a last ditch effort to overcome the inadequacy of its legal arguments, the UKPC invokes equity in support of its assertion that the determination of the applicable interest rates to claims against the U.S. Debtors' estates poses an insurmountable administrative burden that will somehow lead to increased costs.  (*See* UKPC Brief at 20.)  This assertion is meritless for three reasons.

93.    First, the Monitor's Request is targeted specifically at Bondholders and their contractual entitlements.  With respect to the interest rates applicable to each series of bonds, they are clearly set forth in the applicable indentures and plead by the Indenture Trustees in their proofs of claim.  (Monitor's Request at 2; TR40041, Attachment to Proof of Claim ¶ 8; TR40042, Attachment to Proof of Claim ¶ 8; TR43729 at LDTCNY0000282; *see also* Bondholder Brief, Schedule A.)

94.    Second, even if the U.S. Court were tasked with determining the rate of interest applicable to the claims of *all* unsecured creditors of the U.S. Debtors' estates, there are billions of dollars at stake—surely an amount that is more than sufficient to warrant the exercise of parsing each such creditor's contractual rights.

95.    Finally, the cost of determining applicable interest rates in these cases is more than justified when viewed in comparison to the amount of the U.S. Debtors funds that would otherwise be forfeited to NNL.  As the court in *Dow II* recognized, merely raising the specter of administrative burden, as the UKPC has done here, should not carry the day.  *In re Dow Corning Corp.*, 244 B.R. 678, 685 (Bankr. E.D. Mich. 1999) ("*Dow II*") ("there is a price for 'simplicity,' as a creditor's contract rights may at least arguably be compromised by application of the federal judgment rate.")

### iv. Equitable Considerations Cannot Be Used to Elevate NNL's Equity Interests Above the Contractual Entitlements of Creditors of the U.S. Debtors.

96.     Ultimately the Canadian Parties' argument that the U.S. Court should impose an historically low federal judgment rate based on equitable considerations boils down to this: the Canadian Parties want the U.S. Court to deprive U.S. creditors of their contractual entitlements in order to provide NNL with a dividend on its equity interests that it can then use to subsidize the recoveries of Canadian creditors. This is not an "equitable consideration" – it is a request that the U.S. Court affirmatively disregard the fair and equitable requirement of Bankruptcy Code section 1129(b) for the benefit of parties that are not even parties in interest in these chapter 11 cases.

97.     In *Dow III*, the Sixth Circuit expressly recognized the limitations on the court's equitable powers, especially when dealing with a "solvent" debtor: "[d]espite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have 'free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." *Dow III*, 456 F.3d at 679.

98.     In *Ruskin*, the Second Circuit similarly recognized that the equitable rules governing contests between creditors do not apply in the context of a contest between a debtor's creditor and the debtor or its stockholders. 269 F.2d at 831. The Second Circuit has more recently reinforced that maxim:

> Bankruptcy courts are primarily courts of equity, but they are not empowered to address *any* equitable claim tangentially related to the bankruptcy proceeding. Bankruptcy court is a forum where creditors and debtors can settle their disputes *with each other*. Any internal dispute between a creditor and that creditor's investors belongs elsewhere.

*Krys v. Official Comm. of Unsecured Creditors (In re Refco Inc.)*, 505 F.3d 109, 118 (2d Cir. 2007) (emphasis in original).

99.    This comports with recent authority from the Supreme Court, which held that the equitable powers of the bankruptcy courts may only be exercised within the limits of the Bankruptcy Code, as well as numerous Third Circuit decisions. *Law v. Siegel*, 134 S. Ct. 1188, 1194-95 (2014) (citation omitted); *In re Combustion Engineering, Inc.*, 391 F.3d 190, 236-237 (3d Cir. 2004) ("[t]he general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself").[11]

100.    In short, the U.S. Court does not have the equitable power to grant the Canadian Parties' request that the U.S. Court shortchange creditors of the U.S. Debtors by deploying an artificially low interest rate in order to permit NNL to receive a dividend that it can then use to pay its creditors. The relief requested would require a disregard of the fair and equitable test and of the corporate separateness between the U.S. Debtors and the Canadian Debtors that this Court should not, and indeed cannot, countenance.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, if the U.S. Court decides to ignore the myriad procedural, jurisdictional, and due process issues presented by the Monitor's Request and rule on the Bondholder Claims Issues, the U.S. Court should conclude that Bondholders are entitled to receive post-petition interest, and all other contractual entitlements, in accordance with the applicable indentures, before any surplus funds allocated to the U.S. Debtors' estates are paid to equity holders.

---

[11]    *See also United States v. Pepperman*, 976 F.2d 123 (3d Cir. 1992) ("section 105 does not 'give the court the power to create substantive rights that would otherwise be unavailable under the Code'" (citation omitted)); *In re Morristown & E. R. Co.*, 885 F.2d 98, 100-01 (3d Cir. 1989) ("[s]ection 105(a) gives the court general equitable powers, but only insofar as those powers are applied in a manner consistent with the [Bankruptcy] Code").

Dated:  July 22, 2014

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4463
Facsimile:  (213) 629-5063

*Attorneys for Ad Hoc Group of Bondholders*

MORRIS JAMES LLP

/s/ Stephen M. Miller
Stephen M. Miller (No. 2610)
Carl N. Kunz, III (No. 3201)
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone:     (302) 888-6800
Facsimile:     (302) 571-1750
Email: smiller@morrisjames.com
Email: ckunz@morrisjames.com

36

- and -

Daniel A. Lowenthal
Brian P. Guiney
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:     (212) 336-2000
Facsimile:     (212) 336-2222
Email:  dalowenthal@pbwt.com
          bguiney@pbwt.com

*Attorneys for Law Debenture Trust Company*
*  of New York, as Indenture Trustee*

**VEDDER PRICE P.C.**

*/s/ Michael J. Riela*
Michael J. Riela
1633 Broadway, 47th Floor
New York, NY 10019
Telephone:  212-407-7700
Email:  mriela@vedderprice.com

*Attorneys for The Bank of New York Mellon, as*
*Indenture Trustee*