## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

## REPLY BRIEF OF THE MONITOR AND THE CANADIAN DEBTORS
## REGARDING POST-PETITION INTEREST AND RELATED ISSUES

**BUCHANAN INGERSOLL**
**& ROONEY PC**
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

**ALLEN & OVERY LLP**
Ken Coleman
Daniel J. Guyder
John W. Kibler
1221 Avenue of the Americas
New York, New York 10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
daniel.guyder@allenovery.com
john.kibler@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor*
*and Foreign Representative of the Canadian Debtors*

Dated: July 22, 2014

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567); and Nortel Networks (CALA) Inc. (4226).

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...........................................................................................................iii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 3

    A.    If the US Debtors Are Solvent, the Rate of Post-Petition Interest Payable to Unsecured Creditors in these Liquidating Cases Is Limited to the Federal Judgment Rate .......................................................................................... 3

        i.    State Law Does Not Govern Where the Bankruptcy Code Expressly Provides For a Different Result........................................................ 3

        ii.    "The Legal Rate" in Section 726(a)(5) Means the Federal Judgment Rate.................................................................................................... 4

               a.    The Federal Judgment Rate Is Mandated by Basic Principles of Statutory Interpretation ...................................................... 4

               b.    The Use of the Federal Judgment Rate Is Supported by Bankruptcy Policies of Fairness and Efficiency.................................. 7

               c.    The Federal Judgment Rate is Appropriate because Congress Chose to Treat an Allowed Claim as a Judgment................. 7

        iii.    Section 1129(b) of the Bankruptcy Code Does Not Provide for Interest at All, Much Less Require Payment of Post-Petition Interest at a Rate Above the Federal Judgment Rate ...................................... 9

               a.    The Absolute Priority Rule Does Not Provide a Basis for Post-Petition Interest Above the Federal Judgment Rate..................... 9

               b.    Equitable Considerations Do Not Provide a Basis for Post-Petition Interest above the Federal Judgment Rate ............................ 12

    B.    Bondholders Are Not Entitled to Prepayment Consideration or Damages in Excess of Principal and Accrued Pre-Petition Interest on the Bonds ................... 20

        i.    Law Debenture is Not Entitled to Damages for Breach of the "No-Call Provision"............................................................................................ 20

        ii.    No Bondholder Has a Claim under the Support Agreement......................... 22

    C.    The Court Has Already Considered and Rejected the Crossover Bondholders' Jurisdictional and Procedural Arguments and There Is No Basis at this Time to Reconsider that Determination................................................. 22

i

i.     The Crossover Bond Claim Issues Are Ripe for Determination Now ......................................................................................................... 24

ii.    Deciding the Crossover Bond Claim Issues Raises No Due Process Concerns ....................................................................................................... 26

iii.   Confidentiality .............................................................................................. 29

CONCLUSION ....................................................................................................................... 31

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967), *overruled on other grounds,* 430 U.S. 99 (1977)................................24

*American Iron & Steel Mfg. Co. v. Seaboard Air Line Railway*,
  233 U.S. 261 (1914)............................................................................................................14

*Baker v. Gold Seal Liquors, Inc.*,
  417 U.S. 467 (1974)............................................................................................................14

*Bank of Am. Nat'l. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1998)........................................................................................................9, 14

*Beguelin v. Volcano Vision (In re Beguelin)*,
  220 B.R. 94 (9th Cir. B.A.P 1998)......................................................................................7

*Bruning v. United States*,
  376 U.S. 358 (1964)............................................................................................................14

*Butner v. United States*,
  440 U.S. 48 (1979)................................................................................................................3

*Califano v. Sanders*,
  430 U.S. 99 (1977)..............................................................................................................24

*Canal Corp. v. Finnman (In re Johnson)*,
  960 F.2d 396 (4th Cir. 1992) ..............................................................................................8

*Case v. Los Angeles Lumber Prods. Co.*,
  308 U.S. 106 (1939)............................................................................................................14

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)..............................................................................................................28

*Consol. Rock Prods. Co. v. Du Bois*,
  312 U.S. 510 (1941)............................................................................................................14

*Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship*,
  193 B.R. 769 (W.D. Va. 1996) ..........................................................................................21

*Davis v. Elliot Mgmt. Corp. (In re Lehman Brothers Holdings Inc.)*,
  508 B.R. 283 (S.D.N.Y. 2014)............................................................................................13

*Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*,
   679 F.2d 264 (1st Cir. 1982) ................................................................................14

*Empire Trust Co. v. Equitable Office Bldg. Corp.*,
   167 F.2d 346 (2d Cir. 1948) .................................................................................14

*GE Capital Corp. v. Future Media Prods.*,
   547 F.3d 956 (9th Cir. 2008) ...............................................................................14

*Grp. of Institutional Investors v. Chicago, M., S. P. & P. R. Co.*,
   318 U.S. 523 (1943) .............................................................................................14

*HSBC Bank USA v. Calpine Corp.*,
   07 Civ. 3088 (GBD), 2010 U.S. Dist. LEXIS 96792 (S.D.N.Y. Sept. 14, 2010) ..............20, 21

*Hanna v. Plumer*,
   380 U.S. 460 (1965) ...............................................................................................7

*In re Ace-Texas, Inc.*,
   217 B.R. 719 (Bankr. D. Del. 1998) ...................................................................14

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................5, 7

*In re Ahlers*,
   794 F.2d 388 (8th Cir. 1986) ...............................................................................14

*In re Allegheny Int'l, Inc.*,
   118 B.R. 282 (Bankr. W.D. Pa. 1990) ...............................................................14

*In re Armstrong World Indus.*,
   432 F.3d 507 (3d Cir. 2005) ...........................................................................14, 17

*In re Caribbean Petro. Corp.*,
   444 B.R. 263 (Bankr. D. Del. 2010) ...................................................................25

*In re Cent. R. R. Co.*,
   579 F.2d 804 (3d Cir. 1978) ...............................................................................14

*In re Chiapetta*,
   159 B.R. 152 (Bankr. E.D. Pa. 1993) ...................................................................8

*In re Chicago, M. S. P. & P. R. Co.*,
   791 F.2d 524 (7th Cir. 1986) ...............................................................................14

*In re Consol. Operating Partners L.P.*,
    91 B.R. 113 (Bankr. D. Colo. 1988) ...................................................................14

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) ..................................................................14

*In re Dow Corning Corp. ("Dow I")*,
    237 B.R. 380 (Bankr. E.D. Mich. 1999) ..............................................................5

*In re Dow Corning Corp. ("Dow II")*,
    244 B.R. 696 (Bankr. E.D. Mich. 1999) ...................................................... passim

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ...................................................................16

*In re Fresco Plastics Corp.*,
    996 F.2d 152 (7th Cir. 1993) ...........................................................................13

*In re Gencarelli*,
    501 F.3d 1 (1st Cir. 2007) ...............................................................................14

*In re Hanna*,
    872 F.2d 829 (8th Cir. 1989) ...........................................................................14

*In re Insilco Techs., Inc.*,
    480 F.3d 212 (3d Cir. 2007)............................................................................14

*In re Integrated Telecom Express, Inc.*,
    384 F.3d 108 (3d Cir. 2004)............................................................................14

*In re Johnson*,
    236 B.R. 510 (D.D.C. 1999) ...........................................................................28

*In re Manchester Gas Storage, Inc.*,
    309 B.R. 354 (Bankr. N.D. Okla. 2004) .....................................................10, 11

*In re Melenyzer*,
    143 B.R. 829 (Bankr. W.D. Tex. 1992).............................................................8

*In re Midway Games, Inc.*,
    428 B.R. 327 (Bankr. D. Del. 2010) ................................................................25

*In re Penn Cent. Transp. Co.*,
    596 F.2d 1155 (3d Cir. 1979).........................................................................11

*In re Peregrine Sys., Inc.*,
 311 B.R. 679 (D. Del., 2004) ............................................................................................28

*In re Powermate Holding Corp.*,
 394 B.R. 765 (Bankr. D. Del. 2008) .................................................................................25

*In re Realty Assocs. Sec. Corp.*,
 163 F.2d 387 (2d Cir. 1947) ..............................................................................................14

*In re Rocha*,
 179 B.R. 305 (Bankr. M.D. Fla. 1995) ............................................................................14

*In re Simmons*,
 765 F.2d 547 (5th Cir. 1985) ...............................................................................................8

*In re Solutia Inc.*,
 379 B.R. 473 (Bankr. S.D.N.Y. 2007) ..............................................................................21

*In re Terry Ltd. P'ship*,
 27 F.3d 241 (7th Cir. 1994) ..............................................................................................14

*In re Thompson*,
 16 F.3d 576 (4th Cir. 1994) .................................................................................................7

*In re U.S. Truck Co. Holdings*,
 Case No. 99-59972-WS, 2000 Bankr. LEXIS 1376 (Bankr. E.D. Mich. Sept. 29,
 2000) .....................................................................................................................................7

*In re W.R. Grace & Co.*,
 475 B.R. 34 (D. Del. 2012) ..................................................................................................4

*In re Walsh Constr., Inc.*,
 669 F.2d 1325 (9th Cir. 1982) .............................................................................................4

*In re Washington Mutual, Inc.*,
 461 B.R. 200 (Bankr. D. Del. 2011), *vacated on other grounds*, 2012 Bankr. LEXIS
 895 (Bankr. D. Del. Feb. 23, 2012) ............................................................................ passim

*Johnson v. Norris*,
 190 F. 459 (5th Cir. 1911) ................................................................................................14

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
 494 U.S. 827 (1990)..............................................................................................................8

*Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch)*,
 258 F.3d 315 (4th Cir. 2001) ............................................................................................14

*Marine Harbor Props., Inc. v. Mfrs. Trust Co.*,
   317 U.S. 78 (1942).................................................................................................14

*Myers v. Martin (In re Martin)*, ,
   91 F.3d 398 (3d Cir. 1996)..................................................................................25

*New York v. Saper*,
   336 U.S. 328 (1949)...............................................................................................3

*Nortex Trading Corp. v. Newfield*,
   311 F.2d 163 (2d Cir. 1962)..................................................................................8

*Northern P. R. Co. v. Boyd*,
   228 U.S. 482 (1913).............................................................................................14

*Norwest Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988).........................................................................................9, 14

*Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.).*
*("Dow III")*,
   456 F.3d 668 (6th Cir. 2006) ...................................................................... passim

*Onink v. Cardelucci (In re Cardelucci)*,
   285 F.3d 1231 (9th Cir. 2002) ......................................................................5, 6, 7

*Pittsburgh Mack Sales & Serv. v. Int'l Union of Operating Eng'rs, Local Union No. 66*,
   580 F.3d 185 (3d Cir. 2009)................................................................................24

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*,
   390 U.S. 414 (1968).............................................................................................14

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   132 S. Ct. 2065 (2012)........................................................................................13

*Republic of Philippines v. Westinghouse Elec.*
   43 F.3d 65 (3d Cir. 1994)....................................................................................28

*Ruskin v. Griffiths*,
   269 F.2d 827 (2d Cir. 1959)................................................................................14

*Russello v. United States*,
   464 U.S. 16 (1983)............................................................................................5, 6

*SEC v. Am. Trailer Rentals Co.*,
   379 U.S. 594 (1965).............................................................................................14

*SEC v. U.S. Realty & Improvement Co.*,
   310 U.S. 434 (1940)...............................................................................................14

*Sexton v. Dreyfus*,
   219 U.S. 339 (1911).................................................................................................3

*Solow v. PPI Enters.(U.S.) (In re PPIE Enters. (U.S.)), Inc.*,
   324 F.3d 197 (3d Cir. 2003)..................................................................................13

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)................................................................................................13

*Travelers Cas. & Sur. Co. of Am. v. PG&E*,
   549 U.S. 443 (2007)...........................................................................................4, 8

*United States v. Bass*,
   271 F.2d 129 (9th Cir. 1959) .................................................................................4

*United States v. Sanford (In re Sanford)*
   979 F.2d 1511 (11th Cir. 1992) .............................................................................8

*U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*,
   485 B.R. 279 (Bankr. S.D.N.Y. 2013)................................................................20

*Vanston Bondholders Protective Comm. v. Green*,
   329 U.S. 156 (1946)..............................................................................................14

*Will v. Northwestern Univ. (In re Nutraquest, Inc.)*,
   434 F.3d 639 (3d Cir. 2006)..................................................................................25

## RULES AND STATUTES

11 U.S.C. § 105(a) .........................................................................................................28

11 U.S.C. § 502(b) .....................................................................................................8, 11

11 U.S.C. § 502(b)(1) ......................................................................................................4

11 U.S.C. § 502(b)(2) ............................................................................................. passim

11 U.S.C. § 503(b) .........................................................................................................13

11 U.S.C. § 506(b) ................................................................................................. passim

11 U.S.C. § 510(c) .........................................................................................................14

11 U.S.C. § 523(a)(1) ............................................................................................14

11 U.S.C. § 523(a)(8) ............................................................................................14

11 U.S.C. § 621 ....................................................................................................11

11 U.S.C. § 726 ....................................................................................................11

11 U.S.C. § 726(a)(5) ..................................................................................... passim

11 U.S.C. § 766 ....................................................................................................11

11 U.S.C. § 1123(b)(6) ..........................................................................................13

11 U.S.C. § 1129(a)(7) ................................................................................... passim

11 U.S.C. § 1129(b) ....................................................................................... passim

11 U.S.C. § 1129(b)(2) ....................................................................................12, 17

11 U.S.C. § 1129(b)(2)(B)(i) ..................................................................................10

11 U.S.C. § 1129(b)(2)(B)(ii) .................................................................................10

15 U.S.C. § 636(4)(A) .............................................................................................6

15 U.S.C. § 697(c)(2) ..............................................................................................6

22 U.S.C. § 2152(b) ................................................................................................6

26 U.S.C. § 501(c)(16) ............................................................................................6

26 U.S.C. § 521(b)(2) ..............................................................................................6

28 U.S.C. § 157 ....................................................................................................27

28 U.S.C. § 1961 ..............................................................................................4, 6

28 U.S.C. § 1961(a) ................................................................................................5

Del. Bankr. L.R. 9019-5(d)(i) ................................................................................30

Fed. R. Bankr. P. 2002 ..........................................................................................23

Fed. R. Bankr. P. 3007 ..........................................................................................27

Fed. R. Bankr. P. 7001 ................................................................................................27

Fed. R. Bankr. P. 9006 ................................................................................................27

Fed. R. Bankr. P. 9007 ................................................................................................27

Fed. R. Bankr. P. 9019 ................................................................................................25

Fed. R. Evidence 408 .................................................................................................30

## OTHER AUTHORITIES

Alexander F. Porter, *Postpetition Interest on Unsecured Claims in the Case of a Solvent Debtor: Toward a More Consistent Statutory Regime,* 81 S. CAL. L. REV. 1341 (2003) ........................................................................................................................18

Carmen H. Lonstein & Steven A. Domanowski, *Payment of Post-Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM. BANKR. INST. L. REV. 421 (2004) ...........................................................................................18

David P. Simonds, *Sixth Circuit Finds Default in Dow Corning's Argument*, Akin Gump Strauss Hauer & Feld LLP Bankr. Update (Dec. 2006), *at* http://cdn.akingump.com/images/content/1/1/v4/1187/928.pdf. ............................................17

Report of the Committee on the Judiciary, House of Representatives, to Accompany H.R. 8200, H.R. Rep. No. 95-595, 95th Cong., (1st Sess. 1977), *reprinted in* Collier App. Pt. 4(d)(i) ......................................................................................................11, 12

Report of the Committee on the Judiciary, Senate, to Accompany S. 2266, S. No. 95-989, 95th Cong., (2d Sess. 1978), *reprinted in* Collier App. Pt. 4(e)(i) .........................................20

Ernst & Young Inc., the monitor (the "**Monitor**") and foreign representative of Nortel Networks Corporation ("**NNC**"), Nortel Networks Limited ("**NNL**"), and certain of their direct and indirect subsidiaries (collectively, the "**Canadian Debtors**") in proceedings (the "**Canadian Proceedings**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), pending before the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**"), files this reply in further support of its opening brief (the "**Opening Brief**") concerning issues of post-petition interest and certain other claims in the above-captioned proceedings (the "**US Proceedings,**" and, together with the Canadian Proceedings, the "**Proceedings**"), and in reply to the opening briefs submitted by (i) the Official Committee of Unsecured Creditors (the "**Committee**"), (ii) Law Debenture Trust Company of New York ("**Law Debenture**"), (iii) the *ad hoc* group of bondholders, Law Debenture, and the Bank of New York Mellon (the "**Ad Hoc Bondholder Group**"),[2] and (iv) Solus Alternative Asset Management LP and Macquarie Capital (USA) Inc. ("**Solus/Macquarie**," and, together with the Committee and the Ad Hoc Bondholder Group, the "**Crossover Bondholders**").[3]

## PRELIMINARY STATEMENT

In seventy pages of briefing, the Crossover Bondholders' arguments boil down to two core propositions:

First, that the vast weight of authority on sections 726(a)(5) and 1129(a)(7) is simply wrong. The Crossover Bondholders ask this Court to disregard the clear majority view over the past decade—the view adopted by every court in this Circuit—holding that section 726(a)(5) of the Bankruptcy Code only provides for the payment of post-petition interest at the federal

---

[2]    Two of the three members of the Committee are members of the Ad Hoc Bondholder Group—Law Debenture and the Bank of New York Mellon.  The third member is the Pension Benefit Guaranty Corp.

[3]    Capitalized terms used but not defined herein shall have the meanings given to them in the Opening Brief.

judgment rate in a solvent debtor case. Because the Bankruptcy Code abrogates all non-bankruptcy law rights to post-petition interest and provides for such interest in limited, carefully circumscribed circumstances and amounts, this section governs the payment of post-petition interest to unsecured creditors in all circumstances and there is no basis to disregard its plain language. In arguing for more, the Crossover Bondholders do little more than rehash the same arguments that were considered and rejected by the clear majority of courts, and this Court should similarly decline their invitation to deviate from the plain statutory language of the Bankruptcy Code.

Second, that in these liquidating cases—which are functionally identical to cases under chapter 7—it would not be "fair and equitable" if unsecured creditors were to receive a recovery that is identical to what they would receive—in fact, what they would be *required* to receive—under chapter 7. The Crossover Bondholders advance this argument despite the fact that nothing in the Bankruptcy Code, including section 1129(b), and no case authority, including their oft-cited *Dow Corning* case from another circuit, requires any payment above this amount. Recognizing that their position has no basis in the text of the Bankruptcy Code and the actual right to post-petition interest the statute provides to unsecured creditors, the Crossover Bondholders are forced to retreat to a patchwork of cases decided under the repealed Bankruptcy Act and other sections of the Bankruptcy Code, such as section 506(b), that have no relevance to the issues before this Court.

Indeed, the Crossover Bondholders clearly wish to further delay the consideration of these issues—a delay during which post-petition interest would continue to accrue—as evidenced by their improper attempt to re-litigate the same due process and ripeness arguments

that this Court has already considered and rejected.  The Court should disregard this tactic and decide these issues on their merits.

## ARGUMENT

**A.    If the US Debtors Are Solvent, the Rate of Post-Petition Interest Payable to Unsecured Creditors in these Liquidating Cases Is Limited to the Federal Judgment Rate**

      i.      State Law Does Not Govern Where the Bankruptcy Code Expressly Provides For a Different Result

1.    Under the United States Supreme Court's decision in *Butner*, state law governs the determination of a party's property rights unless the Bankruptcy Code explicitly provides otherwise or "a federal interest requires a different result."  *Butner v. United States*, 440 U.S. 48, 55 (1979).  Citing to this principle, the Committee argues that "[n]either the Bankruptcy Code nor any other applicable federal or state law has even impliedly, let alone expressly, abrogated the rights of an unsecured creditor to receive post-petition interest at the contract rate" and states that it is "unaware of any other federal law which would impact or govern a creditor's entitlement to post-petition interest at the contract rate."  Committee Brief at 9-10.  However, the Committee ignores that the Bankruptcy Code *does* explicitly address the issue of post-petition interest.  The Bankruptcy Code need not specifically abrogate the right of an unsecured creditor to receive post-petition interest at the *contract* rate because section 502(b)(2) already abrogates the non-bankruptcy rights of all creditors to receive post-petition interest at *any* rate.  11 U.S.C. § 502(b)(2).[4]

2.    By contrast, the Bankruptcy Act of 1898 (the "**Bankruptcy Act**"), the predecessor of the Bankruptcy Code, was silent on the issue of post-petition interest.  Both the

---

[4]      Indeed, it has always been a fundamental rule of bankruptcy law that interest stops accruing at bankruptcy, overriding the ordinary result under applicable non-bankruptcy law.  *See New York v. Saper*, 336 U.S. 328, 330 (1949) ("More than forty years ago Mr. Justice Holmes wrote for this Court that the rule stopping interest at bankruptcy had then been followed for more than a century and a half.") (citing *Sexton v. Dreyfus*, 219 U.S. 339 (1911)).

general rule against the payment of post-petition interest in bankruptcy and the exceptions thereto were equitable creations of the courts. *See New York v. Saper*, 336 U.S. at 330 ("Our present statute contains no provision expressly repudiating [the rule stopping interest at bankruptcy] or allowing an exception in favor of tax claims."); *In re Walsh Constr., Inc.*, 669 F.2d 1325, 1330 (9th Cir. 1982) ("An award of post-petition interest may be allowed in three exceptional cases [under the Bankruptcy Act]: (1) where the alleged bankrupt proves solvent, (2) where the 'collateral produces income after filing of the petition,' and (3) where the collateral 'is sufficient to pay interest as well as the principal of the claim.'") (quoting *United States v. Bass*, 271 F.2d 129, 130 (9th Cir. 1959)). Since the Bankruptcy Code replaced the Bankruptcy Act in 1978, however, these pre-Bankruptcy Code equitable doctrines are no longer relevant because all exceptions to the rule against post-petition interest are now expressly articulated in the Bankruptcy Code in sections 506(b) and 726(a)(5), with the latter being made applicable in chapter 11 cases by section 1129(a)(7). It is these provisions and their plain terms, not cases construing the repealed Bankruptcy Act, that govern the payment of post-petition interest in cases today under the Bankruptcy Code.[5]

    ii.    <u>"The Legal Rate" in Section 726(a)(5) Means the Federal Judgment Rate</u>

        a.    *The Federal Judgment Rate Is Mandated by Basic Principles of Statutory Interpretation*

    3.    The clear majority of courts hold that "the legal rate" in section 726(a)(5) of the Bankruptcy Code means the federal judgment rate specified by 28 U.S.C. § 1961. *See, e.g., In re*

---

[5]    The Supreme Court's decision in *Travelers* is not relevant because the disputed claim in that case—relating to attorneys' fees—was not expressly disallowed under any provision of the Bankruptcy Code. *Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450 (2007) (observing that sections 502(b)(2)-(8) of the Bankruptcy Code did not apply). Moreover, *Travelers* is a case about the application of section 502(b)(1), which expressly asks a court to consider whether a claim is unenforceable "under any agreement or applicable law." *Id.* There is no such mandate in sections 502(b)(2) or 726(a)(5).

*W.R. Grace & Co.*, 475 B.R. 34, 200 (D. Del. 2012); *In re Washington Mutual, Inc.*, 461 B.R. 200, 242 (Bankr. D. Del. 2011), *vacated on other grounds*, 2012 Bankr. LEXIS 895 *1 (Bankr. D. Del. Feb. 23, 2012); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 257 (Bankr. S.D.N.Y. 2007) (observing that "[i]t is by far the better view, in my opinion, that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate"); *Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231, 1234 (9th Cir. 2002) ("The definite article 'the' instead of the indefinite 'a' or 'an' indicates that Congress meant for a single source to be used to calculate post-petition interest").

4.      This result is supported by basic principles of statutory interpretation and fundamental bankruptcy policy, and the meaning of a statute's language cannot vary with the facts and circumstances.  *See In re Dow Corning Corp.*, 237 B.R. 380, 409 (Bankr. E.D. Mich. 1999) ("*Dow I*") ("[T]his Court is duty-bound, equitable concerns notwithstanding, to apply 'interest at the legal rate' in accordance with its most plausible meaning—the rate of interest fixed by 28 U.S.C. § 1961(a).").

5.      The Crossover Bondholders' arguments to the contrary are not compelling.  As a threshold matter, the Committee's selective quotation of the Supreme Court's decision in *Russello v. United States* is misleading because it omits language that is critical to understanding its relevance.  Committee Brief at 17.  If quoted in full, what *Russello* actually provides is that "[[w]here] Congress includes particular language in one section of a statute but omits it in another *section of the same Act*, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (emphasis added).  Thus, while the Crossover Bondholders would have the Court compare language across the entire United States Code, as they urge through their inclusion of a

5

list of irrelevant non-Bankruptcy Code statutes, *Russello* directs the Court to examine the inclusion or exclusion of particular language *within a single statute*. *Id.* Here, that statute is the Bankruptcy Code, and applied correctly, *Russello* supports the conclusion that "the legal rate" in section 726(a)(5) does not refer to rates established by contract or applicable State law. If Congress intended another result, it could have said so, and indeed did say so in section 506(b), which only addresses *secured* claims. *In re Washington Mutual, Inc.*, 461 B.R. at 242 (citing section 506(b) and noting "where Congress intended that the contract rate of interest apply, it so stated.").

6.      Even if one were to look beyond the Bankruptcy Code for guidance, the non-bankruptcy statutes cited by the Crossover Bondholders, which use the phrase "legal rate," are either irrelevant or further support reading section 726(a)(5) to require application of the federal judgment rate. Committee Brief at 18-19; Ad Hoc Bondholder Group Brief at 35. Two of these statutes reference "the *maximum* legal rate" rather than "the legal rate" and are irrelevant because they plainly describe interest rate caps, not the rates themselves. *See* 15 U.S.C. §§ 636(4)(A) and 697(c)(2) (emphasis added). The other statutes cited by the Crossover Bondholders demonstrate that Congress is perfectly capable of qualifying "the legal rate" with additional language where it does not intend for the standard federal judgment rate to apply. *See* 22 U.S.C. § 2152t(b) (referencing "the *applicable* legal rate of interest *of the country in which the loan is made*") (emphasis added); 26 U.S.C. §§ 501(c)(16), 521(b)(2) (referencing "the legal rate of interest *in the State of incorporation*") (emphasis added). Thus, the statutes cited by the Crossover Bondholders further support the view that the unqualified reference to "the legal rate" in section 726(a)(5) points to the federal judgment rate under 28 U.S.C. § 1961.

      b.    *The Use of the Federal Judgment Rate Is Supported by Bankruptcy Policies of Fairness and Efficiency*

7.    The use of the federal judgment rate promotes important bankruptcy goals, including "fairness among creditors and administrative efficiency." *In re Cardelucci*, 285 F.3d at 1236.  Courts that have correctly read "the legal rate" to mean the federal judgment rate have concluded that a key policy rationale for using a single uniform rate is to eliminate the enormous challenges that would face bankruptcy trustees if they were forced to calculate post-petition interest owing to a myriad of creditors on a creditor-by-creditor basis.  *See, e.g.*, *Beguelin v. Volcano Vision (In re Beguelin)*, 220 B.R. 94, 101 (9th Cir. B.A.P 1998) ("It is not hard to imagine the administrative nightmare that bankruptcy trustees would otherwise face if they were required to calculate a different interest rate, based on a different source of interest rate, for each creditor.").  This is consistent with the underlying policy of the Bankruptcy Code, which is "to promote the expeditious and efficient administration of bankruptcy cases." *See, e.g.*, *In re Adelphia Communs. Corp.*, 368 B.R. at 278; *In re U.S. Truck Co. Holdings*, Case No. 99-59972-WS, 2000 Bankr. LEXIS 1376, at *29-30 (Bankr. E.D. Mich. Sept. 29, 2000) (finding administration of "the bankruptcy estate in an efficient and prompt manner" to constitute a fundamental policy objective of the Bankruptcy Code).  This fundamental policy objective cannot be abrogated on a case-by-case basis, as suggested by the Committee.  Committee Brief at 2.  *See In re Cardelucci*, 285 F.3d at 1236 (citing *In re Thompson*, 16 F.3d 576, 581 (4th Cir. 1994)) ("'interest at the legal rate' is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court.")

      c.    *The Federal Judgment Rate Is Appropriate because Congress Chose to Treat an Allowed Claim as a Judgment*

8.    The federal judgment rate is also appropriate because post-petition interest is, like post-judgment interest, procedural in nature and dictated by federal law.  *See In re Cardelucci*,

285 F.3d at 1235 (citing *Hanna v. Plumer*, 380 U.S. 460, 473-74 (1965)); *In re Washington Mutual*, 461 B.R. at 242-43 ("[T]he payment of post-judgment interest is procedural by nature and dictated by federal law rather than state law, further supporting use of the federal judgment rate."). The Committee's argument that this violates the general rule, as stated in *Travelers*, that "the substance of claims is governed by applicable non-Bankruptcy law" is not correct because it conflates the substance—or basis—of a claim with the process of determining and allowing that claim in a bankruptcy proceeding. *Travelers*, 549 U.S. at 450-51.

9.    Filing a claim in bankruptcy is analogous to filing a complaint in a civil action. *In re Simmons*, 765 F.2d 547, 552 (5th Cir. 1985) (citing *Nortex Trading Corp. v. Newfield*, 311 F.2d 163 (2d Cir. 1962)). To determine whether a claim should be allowed, a court necessarily first examines the substance of that claim to determine whether the creditor has asserted a valid right to payment under applicable non-bankruptcy law. *See Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 404 (4th Cir. 1992) (noting that "the existence of a claim is controlled by state law"); *United States v. Sanford (In re Sanford)*, 979 F.2d 1511, 1513 (11th Cir. 1992) (considering whether tax claims "would be enforceable against debtor outside of bankruptcy"). After this threshold inquiry is satisfied, the court then determines whether any element of that claim is disallowed under any subsection of section 502(b), such as section 502(b)(2) and its express abrogation of all non-bankruptcy rights to claim post-petition interest. The final result of this process—an allowed claim—is akin to a federal judgment that entitles the holder to interest pursuant to federal statute where appropriate. *See In re Chiapetta*, 159 B.R. 152, 160-61 (Bankr. E.D. Pa. 1993) (*citing In re Melenyzer*, 143 B.R. 829 (Bankr. W.D. Tex. 1992)). Specifically, post-petition interest is paid on such allowed claim in order to compensate a creditor for delays in payment, much like post-judgment interest is intended to "compensate the successful plaintiff

for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835-36 (1990) (internal quotations omitted).

    iii.    Section 1129(b) of the Bankruptcy Code Does Not Provide for Interest at All, Much Less Require Payment of Post-Petition Interest at a Rate Above the Federal Judgment Rate

        a.    *The Absolute Priority Rule Does Not Provide a Basis for Post-Petition Interest Above the Federal Judgment Rate*

10.    The Crossover Bondholders argue that section 1129(b) of the Bankruptcy Code incorporates the pre-Bankruptcy Code formulation of the "absolute priority rule," and that in a cramdown scenario that section requires the payment of a contractual rate of interest to non-accepting classes of unsecured creditors of a solvent estate. This is simply not correct.

11.    First, the Ad Hoc Bondholder Group spends a great deal of time discussing the history behind the pre-Bankruptcy Code iteration of the absolute priority rule, but remarkably little time discussing the only currently relevant formulation of the rule—the language of section 1129(b) itself.[6] Notably, it fails to acknowledge that this formulation is not a wholesale adoption

---

[6]    In the entirety of the Ad Hoc Bondholder Group's 40-page brief, the only actual quotation of section 1129(b) is in a single footnote. Ad Hoc Bondholder Brief at 23-24. However, when purporting to describe the statute, the Ad Hoc Bondholder Group uses a quote from *Norwest Bank v. Ahlers* that creditors need to be provided for "in full," without disclosing to this Court that *Ahlers* was an insolvent debtor case concerning the rights of secured creditors in which the Supreme Court confronted the narrow issue of whether the absolute priority rule is violated where a debtor retains an equity interest but undertakes to make "money or money's worth" future contributions to the reorganized enterprise. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 203 (1988). *Ahlers* says nothing at all about interest. Nor does *Ahlers* say anything about the application of the absolute priority rule in a solvent debtor case, let alone the interest rate payable where post-petition interest is recoverable by unsecured creditors.

The Committee at least initially describes section 1129(b) accurately, noting that:

[. . .] for a plan to be 'fair and equitable' with respect to unsecured creditors, each holder of an unsecured claim must receive the allowed amount of its claim before the holder of a junior claim or equity interest receives any distributions.

Committee Brief at 4. However, nowhere does the Committee acknowledge that pursuant to section 502(b)(2) of the Bankruptcy Code, an unsecured creditor's allowed claim *cannot* include post-petition interest.

of the mélange of pre-Bankruptcy Code formulations of the absolute priority rule. *See Bank of Am. Nat'l. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 448 (1998) (noting that "the Code does not codify any authoritative pre-Bankruptcy Code version of the absolute priority rule"). Section 1129(b) does not even mention, much less require, the payment of post-petition interest and is satisfied by its express terms where each holder of a claim in a non-accepting class of unsecured creditors receives the "allowed amount" of such claim (*i.e.*, principal plus interest to the petition date). Under section 502(b)(2), such allowed amount does *not* include post-petition interest. As such, the myriad of cases cited by the Ad Hoc Bondholder Group under the repealed Bankruptcy Act, in which different courts articulated their own now-obsolete versions of the absolute priority rule, are simply irrelevant to this case. With respect to unsecured creditors of the US Debtors, the appropriate inquiry under section 1129(b) is whether the express provisions of section 1129(b)(2)(B)(i) and (ii) are met—*i.e.*, whether unsecured creditors are paid the full amount of their allowed unsecured claims, exclusive of post-petition interest on such claims.

12. Second, the Crossover Bondholders' appeal to pre-Bankruptcy Code authority is misguided because the Bankruptcy Act neither prohibited the accrual of post-petition interest nor provided for its payment. *See In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 384 (Bankr. N.D. Okla. 2004) ("Prior to the enactment of the Bankruptcy Code, the accrual of postpetition interest was not prohibited by statute as it is under the Code's regime . . . . Rather, it was a matter of federal common law and equity . . . ."). Express statutory rights to post-petition interest did not exist and the judicial ability to create such rights on the basis of equitable considerations derived from the fact that the rule against post-petition interest was itself an invention of equity. The explicit codification of these principles in sections 502(b)(2), 506(b), and 726(a)(5) of the

Bankruptcy Code rendered them matters of statute, to be applied as written, rather than matters of fluid principles of equity that could be adapted to different circumstances.  As the *Manchester Gas* court explained:

> [t]he Code specifically adopted parts of the pre-Bankruptcy Code jurisprudence concerning postpetition interest in Sections 502(b) and (b)(2), 506(b), and 726. Congress eliminated the subjectivity of pre-Bankruptcy Code discretion and specifically prohibited allowance of postpetition interest by enacting Section 502(b) and specifically mandated allowance of such interest in enacting 506(b) and 726(a)(5).  The concept that postpetition interest is a matter of the bankruptcy court's equitable discretion has been superseded by statute.

309 B.R. at 385.  Such codification, and the vast weight of case law holding that section 726(a)(5) mandates the federal judgment rate, renders consideration of pre-Bankruptcy Code cases unnecessary and inappropriate.

13.     The Crossover Bondholders' reliance on Bankruptcy Act cases is all the more inappropriate because Chapter X of the Bankruptcy Act, the reorganization chapter, did not have a "best interests" test and confirmation only required that a plan be "fair and equitable."  11 U.S.C. § 621 (1976).  The concept of the "best interests" test is instead derived from Chapter XI, the arrangements chapter of the Bankruptcy Act, which provided that "[t]he court shall confirm an arrangement if satisfied that . . . it is for the best interests of the creditors and is feasible."  11 U.S.C. § 766 (1976).  Because Chapter XI only concerned the restructuring of unsecured claims, however, its formulation of the "best interests" test did not reference the interests of equity.  *In re Penn Cent. Transp. Co.*, 596 F.2d 1155, 1168 (3d Cir. 1979) ("Shareholder approval [of an arrangement] is not required because an arrangement under Chapter XI may not deal with the rights of shareholders.").  This test was extended to equity for the first time when Congress enacted the Bankruptcy Code.  *See* Report of the Committee on the Judiciary, House of Representatives, to Accompany H.R. 8200, H.R. Rep. No. 95-595, 95th Cong., (1st Sess. 1977),

*reprinted in* Collier App. Pt. 4(d)(i), at App. Pt. 4-1563 ("[1129(a)(7)] incorporates the former 'best interest of creditors' test found in chapter 11, but spells out precisely what is intended. With respect to each class, the holders of the claims or interests of that class must receive or retain under the plan on account of those claims or interest property of a value, as of the effective date of the plan, that is not less than the amount that they would receive or retain if the debtor were liquidated under chapter 7 on the effective date of the plan.").  Thus, the Bankruptcy Code requires that the modern absolute priority rule be construed in conjunction with a formulation of the "best interests" test that simply did not apply in the pre-Bankruptcy Code era when the cases cited by the Crossover Bondholders were decided.  Read together, these two provisions dictate that the federal judgment rate is the maximum rate of post-petition interest that could be payable under the Bankruptcy Code in these liquidating cases.

> b.      *Equitable Considerations Do Not Provide a Basis for Post-Petition Interest above the Federal Judgment Rate*

14.      The only potential basis for grafting additional requirements onto section 1129(b) beyond those explicitly set forth in the statute is that section 1129(b) provides that "the condition that a plan be fair and equitable with respect to a class *includes* the following requirements," and that the word "includes" permits the Court to consider additional requirements for confirmation of a plan.  11 U.S.C. § 1129(b)(2) (emphasis added).  However, the flexibility this creates cannot be used to eliminate or alter statutory requirements expressly imposed by Congress.  Given that the Bankruptcy Code already has an express exception to the rule against post-petition interest for unsecured creditors—section 726(a)(5)—this Court should not read "includes" as an

invitation to rewrite the statute to infer additional exceptions to section 502(b), especially where doing so would directly contravene the requirements of section 726(a)(5).[7]

15.     The use of "includes" in section 1129(b) merely allows the Court to consider other factors to determine whether a plan is "fair and equitable."   It does not, as the Crossover Bondholders suggest, mean that this Court can ignore the express provisions of the Bankruptcy Code.   Indeed, section 1123(b)(6) of the Bankruptcy Code provides that a plan may not include provisions inconsistent with other provisions of the Bankruptcy Code,  and "does not authorize plan provisions that override, undermine, or rewrite relevant Bankruptcy Code provisions." *Davis v. Elliot Mgmt. Corp. (In re Lehman Bros. Holdings Inc.)*, 508 B.R. 283, 288 (S.D.N.Y. 2014) (holding that where section 503(b) uses the word "includes," it cannot be read to override express provisions of the Bankruptcy Code).   As the *Lehman* court observed, the Bankruptcy Code "cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences."   *Id.* at 294 (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2070-71 (2012)).

16.     The Crossover Bondholders cannot point to a single authority that provides support for the proposition that section 1129(b) *requires* the payment of post-petition interest at a contract rate.   Taking away all of the cases cited by the Crossover Bondholders under the repealed Bankruptcy Act,[8] the cases quoting section 506(b), which does not apply to unsecured

---

[7]     *See TRW Inc. v. Andre*ws, 534 U.S. 19, 28 (2001); *In re Fresco Plastics Corp.*, 996 F.2d 152, 156 (7th Cir. 1993); ("[t]he problem with the plea for an equitable exception to the general rule of § 502(b)(2) is that the exceptions to that rule are expressly stated in the Bankruptcy Code").  *But see Solow v. PPI Enters. (U.S.) (In re PPI Enters.(U.S.))*, 324 F.3d 197, 206 n. 14 (3d Cir. 2003) (noting in *dicta* that an impaired creditor can be entitled to post-petition interest under section 1129(b)).   The Crossover Bondholders rely on *PPIE* for the uncontroversial proposition that unsecured creditors are entitled to post-petition interest in a solvent debtor case.   This is not disputed.   However, *PPIE* did not decide what rate of interest is payable in a solvent debtor case.

[8]     *American Iron & Steel Mfg. Co. v. Seaboard Air Line Railway*, 233 U.S. 261 (1914); *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467 (1974); *Bruning v. United States*, 376 U.S. 358 (1964); *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106 (1939); *In re Cent. R. R. Co.*, 579 F.2d 804 (3d Cir. 1978); *In re Chicago, M. S. P. & P.*

creditors,[9] and cases that do not actually address post-petition interest at all or are otherwise not relevant,[10] the Crossover Bondholders are left with only *one* bankruptcy case that addresses a court's *discretion* to allow post-petition interest on unsecured claims under section 1129(b)—the decisions of the Bankruptcy Court for the Eastern District of Michigan and the Sixth Circuit in the Dow Corning bankruptcy. *See In re Dow Corning Corp.*, 244 B.R. 696 (Bankr. E.D. Mich. 1999) ("*Dow II*"); *Official Comm. of Unsecured Creditors v. Dow Chem. Corp. (In re Dow Corning Corp.)*, 456 F.3d 668 (6th Cir. 2006) ("*Dow III*").

17.    In *Dow II*, the Bankruptcy Court held that post-petition interest could be awarded to unsecured creditors at the contract rate under section 1129(b). *Dow II*, 244 B.R. at 696. On appeal, the Sixth Circuit held that equitable considerations may justify the payment of post-petition interest at the contract default rate to unsecured creditors. That was the full extent of its

---

*R. Co.*, 791 F.2d 524 (7th Cir. 1986); *Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510 (1941); *Debentureholders Protective Committee of Continental Inv. Corp. v. Continental Inv. Corp.*, 679 F.2d 264 (1st Cir. 1982); *Empire Trust Co. v. Equitable Office Bldg. Corp.*, 167 F.2d 346 (2d Cir. 1948); *Group of Institutional Investors v. Chicago, M., S. P. & P. R. Co.*, 318 U.S. 523 (1943); *Johnson v. Norris*, 190 F. 459 (5th Cir. 1911); *Marine Harbor Props., Inc. v. Mfrs. Trust Co.*, 317 U.S. 78 (1942); *Northern P. R. Co. v. Boyd*, 228 U.S. 482 (1913); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414 (1968); *In re Realty Associates Sec. Corp.*, 163 F.2d 387 (2d Cir. 1947); *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959); *SEC v. Am. Trailer Rentals Co.*, 379 U.S. 594 (1965); *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434 (1940); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156 (1946).

[9]    *In re Ace-Texas, Inc.*, 217 B.R. 719 (Bankr. D. Del. 1998); *In re Consolidated Operating Partners L.P.*, 91 B.R. 113 (Bankr. D. Colo. 1988); *GE Capital Corp. v. Future Media Prods.*, 547 F.3d 956 (9th Cir. 2008); *In re Gencarelli*, 501 F.3d 1 (1st Cir. 2007); *In re Terry Ltd. P'ship*, 27 F.3d 241, 242 (7th Cir. 1994).

[10]    *In re Ahlers*, 794 F.2d 388 (8th Cir. 1986) (does not address post-petition interest to unsecured creditors at all); *In re Armstrong World Indus.*, 432 F.3d 507 (3d Cir. 2005) (same); *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434 (1999) (same); *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) (*dicta*, and questioned by *Washington Mutual*); *In re Hanna*, 872 F.2d 829 (8th Cir. 1989) (case involved payment of post-petition interest on unpaid federal and state income taxes  under section § 523(a)(1)); *In re Insilco Techs., Inc.*, 480 F.3d 212 (3d Cir. 2007) (does not address post-petition interest payable to unsecured creditors but discusses impact on equity through recharacterization and equitable subordination under §510(c)); *In re Integrated Telecom Express, Inc.*, 384 F.3d 108 (3d Cir. 2004) (does not address payment of post-petition interest to unsecured creditors but involves dismissal for filing petition in bad faith); *Kielisch v. Educ. Credit Mgmt. Corp. (In re Kielisch)*, 258 F.3d 315 (4th Cir. 2001) (case involves distinguishable facts relating to post-petition interest on student loans under § 523(a)(8)); *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197 (1988) (does not address whether payment of post-petition interest to unsecured creditors is required to satisfy absolutely priority rule); *In re Rocha*, 179 B.R. 305 (Bankr. M.D. Fla. 1995) (same); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 314-15 (Bankr. W.D. Pa. 1990) (considering, without deciding, possible interest rate for the purpose of settlement approval).

holding, and it remanded the case for further development of the record in order to determine if such a rate was appropriate in the circumstances. *Dow III*, 456 F. 3d at 680. The results in *Dow* might make sense based on the facts and circumstances before those courts, but the decisions are not based on sound principles of statutory construction and have no application to the case at hand.

18.     First, none of the *Dow* decisions is controlling authority in this District.

19.     Second, the *Dow II* court concluded that section 1129(a)(7) established a "minimum payment requirement" under which "the creditor of a solvent chapter 11 estate must receive postpetition interest at a rate which is at least equal to the federal statutory rate," and, on this basis, further concluded—wrongly—that there was space to award post-petition interest at the contract rate under 1129(b). *Dow II*, 244 B.R. at 686. However, the court's reading of section 1129(a)(7) was incomplete because the court focused only on that provision's guarantee of a minimum recovery to unsecured creditors under a proposed reorganization as compared to a liquidation under chapter 7, while ignoring that section 1129(a)(7) also expressly extends the same protections to junior non-accepting classes, including equity. In other words, the *Dow II* court failed to recognize that the section 726(a)(5) waterfall, made applicable in chapter 11 cases by section 1129(a)(7), also mandates a baseline recovery for shareholders such that excess distributions to pay post-petition interest to unsecured creditors above the legal rate would contravene that waterfall and violate the best interests test. *See In re Washington Mutual*, 461 B.R. at 247 (finding that a plan "which provides for payment of the contract rate violates the best interests of creditors test."). On appeal, the *Dow III* court considered only the narrower question of default rate interest above the contract rate provided in the plan, as amended by the decision in

15

*Dow II*, so the Sixth Circuit did not consider section 726(a)(5) at all before remanding to the lower court for consideration of the equities. *Dow III*, 456 F.3d at 674.

20.    This failure may have been driven by the fact that the proponents of the Dow Corning plan conceded, even as the post-petition interest dispute was pending, that they "'agreed that the Plan will pay whatever [rate of interest] we have to pay once the Courts have determined' the rate which is appropriate." *Dow II*, 244 B.R. at 696 (noting that "[t]he Proponents made only a half-hearted effort to persuade the Court that use of the statutory interest rate is fair."). As such, the *Dow II* court deemed the plan "verbally amended" to provide contract rate interest in accordance with its decision. *Id.* Put another way, there was no true junior dissenting class of creditors or interests in the *Dow* cases, so the courts neither properly considered the rights of junior creditors or interests nor provided assurance that creditors with a higher priority would only receive interest at the legal rate pursuant to § 1129(a)(7). *See In re Washington Mutual*, 461 B.R. at 241 (observing that payment of interest above the federal judgment rate "could conflict with the requirements of the fair and equitable test under section 1129(b)" because in addition to limiting recovery by junior classes until senior classes are paid, "it also mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution.") (citing *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003)).

21.    The *Dow II* court's flawed statutory construction and logic is glaring in contrast to Bankruptcy Judge Mary Walrath's plain reading of sections 726(a)(5) and 1129(a)(7) and rejection of those few cases that have fueled litigation by unsecured creditors to obtain contract rate interest based on a purported presumption in favor of a higher rate above the federal judgment rate, finding that "the line of cases [including the Sixth Circuit's decision in *Dow III*]

holding there is a presumption the contract rate applies are distinguishable and/or unpersuasive."
*In re Washington Mutual*, 461 B.R. at 243.[11]

22.    Moreover, neither *Dow II* nor *Dow III* holds that section 1129(b) creates an automatic entitlement to contract-rate interest in a solvent debtor case.   Rather, all that these cases recognize, and the Crossover Bondholders ignore, is that the absolute priority rule of pre-Bankruptcy Code practice has been restated, in its entirety, and is relevant only as set forth in the "fair and equitable" test of section 1129(b).   *See In re Armstrong World Indus, Inc.*, 432 F.3d 507, 512 (3d Cir. 2005) (noting that the absolute priority rule was incorporated as "part of the 'fair and equitable' requirement of § 1129(b)(2)").   Thus, even if the Court is inclined to follow the faulty reasoning of *Dow II* and *Dow III*, under those cases payment of post-petition interest pursuant to section 1129(b) requires a balancing of the equities.   The *Dow II* court held "that the phrase 'fair and equitable' is as broad as it sounds" and that a court is entitled to consider whether a plan is fair and equitable in a broad sense.   *Dow II*, 244 B.R. at 694 (citations omitted). In that regard, the *Dow* cases arose from very different facts that raised very different equitable concerns compared to these liquidating cases.   The completely different facts and equities at issue in the *Dow* and Nortel bankruptcies render the logic of *Dow II* and *Dow III* inapposite to these cases.

---

[11]    Counsel for the Committee, Akin Gump, has identified the moral hazard created by the flawed reasoning in *Dow*:

> The Dow Corning ruling may make solvent debtor cases highly profitable for unsecured  lenders if its holding is adopted in other circuits.  Applying the Dow Corning rule, unsecured lenders to solvent debtors will reap the benefits of high default interest rates during bankruptcy cases that can last for many years.

*See* David P. Simonds, *Sixth Circuit Finds Default in Dow Corning's Argument*, Akin Gump Strauss Hauer & Feld LLP Bankr. Update (Dec. 2006) at 7, http://cdn.akingump.com/images/content/1/1/v4/1187/928.pdf.

23.     In *Dow*, the debtor was fully solvent at filing, at all times during the case, and at confirmation.  The debtor proposed a plan under which existing equity holders—who were not themselves debtors, but were in fact, highly solvent—would retain their interests in a reorganized, ongoing business.[12]    By contrast, the US Proceedings are functionally indistinguishable from chapter 7 proceedings, as substantially all assets have been liquidated to cash and there is no prospect of a rehabilitated ongoing business emerging from bankruptcy.  The solvency of the US Debtors only became a real possibility late in the process, after the closing of the sale of the residual patents in 2011, and well after 2009 when the Nortel group announced its intention to liquidate rather than reorganize.  NNL, the US Debtors' sole shareholder, is not likely solvent under any scenario and its creditors are likely to recover materially less than the principal amount of their claims.

24.     In a chapter 11 reorganization case such as *Dow*, where the debtor will emerge from bankruptcy as a reorganized company, the best interests test can be easily satisfied as to equity—even with the payment of post-petition interest to unsecured classes at the contract rate—because the comparison made in those circumstances is between (i) the debtor's value as a

---

[12]     The Sixth Circuit noted that the circumstances of the *Dow* bankruptcy were unique and the primary purpose of the case "was to enable prompt and uniform settlement of the numerous breast-implant-related lawsuits pending against Dow Corning at the time of the petition." *Dow III*, 456 F.3d 668, 671 (6th Cir. 2006).  The rulings in *Dow II* and *Dow III* were met with criticism at the time, with one commentator concluding that the courts essentially adopted a balancing-of-the-equities approach taken from pre-Bankruptcy Code practice under the Bankruptcy Act that has since been replaced by the modern absolute priority rule embodied in the fair and equitable test of 1129(b) and that has been rejected by other courts. *See* Carmen H. Lonstein & Steven A. Domanowski, *Payment of Post-Petition Interest to Unsecured Creditors: Federal Judgment Rate Versus Contract Rate*, 12 AM. BANKR. INST. L. REV. 421, 437 (2004).  At least one commentator has suggested that the unsupportable conclusion reached by the Bankruptcy Court and Sixth Circuit in the *Dow* case may have been motivated by a desire to prevent abuse of the chapter 11 process by a highly solvent debtor looking to manipulate its filing to achieve an unneeded and unmerited write-down of existing liabilities. *See* Alexander F. Porter, *Postpetition Interest on Unsecured Claims in the Case of a Solvent Debtor: Toward a More Consistent Statutory Regime*, 81 S. CAL. L. REV. 1341, 1350 (2003) ("It appears that the courts thought it was unfair that a debtor was using the bankruptcy process to pay interest to its creditors at a lower rate.  In order to remedy the situation, the courts read a previously nonexistent requirement of postpetition interest into the fair and equitable standard of § 1129(b)").

going concern and (ii) the debtor's value in liquidation.  Because going-concern value of a reorganizing entity is typically much higher than its liquidation value, the difference between the two valuations—which is retained by equity—provides a cushion with which a debtor can pay interest to unsecured creditors at a higher rate and still provide equity interest holders with more value than they would receive under chapter 7.

25.     However, in a chapter 11 liquidation case, there is no such future value and thus no cushion, so the comparison required by 1129(a)(7) is a fiction: any post-petition interest paid to unsecured creditors under a chapter 11 plan in excess of the federal judgment rate is necessarily a dollar-for-dollar reduction in what equity interest holders would receive in the same case under chapter 7.  Nothing in section 1129(b) requires this result, and in the case of a liquidating chapter 11 such as this, the appropriate rate of interest must be found in the only section of Bankruptcy Code that provides for the payment of post-petition interest to unsecured creditors in a solvent debtor case: section 726(a)(5).  Further, it is self-evident that it is "fair and equitable" for this Court to approve the payment of the same rate of interest to unsecured creditors in these liquidating cases that would be mandatory if the cases were converted to cases under chapter 7.  There is simply no authority for the proposition that the chapter 7 waterfall is either unfair or inequitable.  Moreover, because NNL is itself a debtor in the Canadian Proceedings, any cash distribution from NNI will inure to the benefit of pensioners, former employees, trade creditors, the Crossover Bondholders, and other bondholders in the Canadian Proceedings.

26.     Accordingly, based on the Bankruptcy Code and the established case authority of this District, post-petition interest on the allowed Crossover Bond Claims must be limited in these liquidating cases to the federal judgment rate in effect on the Petition Date.  These cases

are not meaningfully distinguishable from chapter 7 liquidations, and in contrast *are* meaningfully distinguishable from non-liquidating chapter 11 reorganization cases.  As such, distributions to creditors should not strip available funds from the US Debtors' estates at the expense of Canadian creditors in violation of fundamental bankruptcy protections, as recognized in *Washington Mutual* and other cases and as memorialized in the Bankruptcy Code.

**B.     Bondholders Are Not Entitled to Prepayment Consideration or Damages in Excess of Principal and Accrued Pre-Petition Interest on the Bonds**

   i.     Law Debenture is Not Entitled to Damages for Breach of the "No-Call Provision"

27.     Law Debenture concedes, as it must, that the No-Call Provision is not specifically enforceable in bankruptcy.  Law Debenture Brief at 3.  However, it is no longer possible for the No-Call Provision to be breached because NNCC's bankruptcy filing accelerated the Law Debenture Crossover Bonds by operation of law, thereby maturing the debt and rendering prepayment impossible.  *See U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 290 n.7 (Bankr. S.D.N.Y. 2013) ("[T]he filing of a bankruptcy petition—even without specific contractual language—acts to accelerate all of a debtor's obligations by operation of law."); *HSBC Bank USA v. Calpine Corp.*, 07 Civ. 3088 (GBD) 2010 U.S. Dist. LEXIS 96792 at *10-13 (S.D.N.Y. Sept. 14, 2010) ("Debtor's repayment of the notes also did not occur prior to maturity, because accelerated debts are mature."); Report of the Committee on the Judiciary, Senate, to Accompany S. 2266, S. No. 95-989, 95th Cong., (2d Sess. 1978), *reprinted* in Collier App. Pt. 4(e)(i) at App. Pt. 4-2004 ("Section 502(b) thus contains two principles of present law.  First, interest stops accruing at the date of the filing of the petition, because any claim for unmatured interest is disallowed under this paragraph.  Second, bankruptcy operates as the acceleration of the principal amount of all claims against the debtor.").  Moreover, the Global Security for the Law Debenture Crossover Bonds does not

provide for the payment of damages in connection with a breach of the No-Call Provision, and the Court should decline to create such a right where it does not otherwise exist. *See In re Solutia Inc.*, 379 B.R. 473, 485 n. 7 (Bankr. S.D.N.Y. 2007) ("[T]he court cannot supply what is absent."); *Calpine Corp.*, 2010 U.S. Dist. LEXIS 96792 at *15-16 ("While Trustee may not recover expectation damages for Debtor's repayment of the notes despite the no-call provisions, the notes could have provided for the payment of premiums in the event of payment pursuant to acceleration . . . . Without such a provision, however, no damages are recoverable after acceleration."); *Cont'l Sec. Corp. v. Shenandoah Nursing Home P'ship.*, 193 B.R. 769, 777 (W.D. Va. 1996) ("Thus, the present note contains no formula, nor any specific figure, for calculating damages stemming from prepayment. . . . In essence, the lockout provision, completely uncoupled from some sort of damages provision, is not specific enough to be enforced by this court.").

28.    The policy reasons that make such provisions unenforceable in the first place—including the general bankruptcy goals of facilitating debt restructurings and promoting fairness among all stakeholders—militate against the payment of damages for the breach of those provisions.  Otherwise, notwithstanding section 502(b)(2) and the longstanding rule against claims for post-petition interest in bankruptcy, any creditor can guarantee itself a right to all unmatured interest that would be payable over the full life of a loan by simply inserting a clause that prohibits prepayment.  Moreover, because such right would be the equivalent of common law expectation damages, such claim could potentially form a part of that creditor's allowed claim.  Punishing a debtor for restructuring its debts in bankruptcy in this manner is completely contrary to public policy and should not be tolerated.  *Calpine Corp.*, 2010 U.S. Dist. LEXIS 96792 at *12 ("Because Debtor's bankruptcy filing rendered the no-call provision in the notes

unenforceable and liability cannot be incurred pursuant to an unenforceable contractual provision, Debtor did not incur any liability for repaying the notes.").

  ii. <u>No Bondholder Has a Claim under the Support Agreement</u>

  29. Law Debenture and Solus/Macquarie have asserted that claims against NNCC will be affected by the disposition of NNCC's purported claims against NNI concerning that certain Support Agreement between NNI and NNCC dated as of February 15, 1996 (the "**Support Agreement**").  The Monitor does not read these statements to assert claims in the name of Law Debenture or Solus/Macquarie on behalf of holders of the 7.875% Crossover Bond Claims against NNI in respect of the Support Agreement, as none of them is party to the Support Agreement, which is a bilateral agreement between NNCC and NNI.  In any case, Law Debenture did not file a proof of claim against NNI for any such claims before the September 30, 2009, general claims bar date in the US Proceedings.  Moreover, the Support Agreement by its terms expressly provides that NNI shall bear no liability for NNCC's obligations, and the Support Agreement is not itself a guaranty of any NNCC obligation.  Support Agreement at ¶ 3, Exhibit A to the Solus/Macquarie Joinder.  The Monitor and the Canadian Debtors reserve all rights, defenses, arguments, and objections of any kind whatsoever with respect to any claim or claims arising against NNI from the Support Agreement.

**C.** **The Court Has Already Considered and Rejected the Crossover Bondholders' Jurisdictional and Procedural Arguments and There Is No Basis at this Time to Reconsider that Determination**

  30. The Crossover Bondholders argue that the Court does not have the authority to render a decision on the Crossover Bond Claim Issues at this time.  The Court has already considered briefing from the Crossover Bondholders and others on the question of ripeness to consider the Crossover Bond Claim Issues and the Court's authority to provide guidance on that

issue now in the interest of achieving an orderly and expeditious disposition of these cases.[13]

Having reviewed those briefs, the Court rejected the Crossover Bondholders' procedural and

jurisdictional arguments, concluding that:

> while it is certainly true that there are other issues in the case, there is one issue that can be decided and should be decided at this time as this case otherwise continues really without an end in sight.  It is fair to say that the interest issues are ones which will require a decision at some point, and this is as good a time as any.

Hr'g Tr. 5101-2, June 24, 2014.  The Court also specifically observed that its decision to hear

argument on the Crossover Bond Claim Issues at this time was "more of a matter of case

management" and that as such it need not consider the Monitor's request to address such issues

as if the Monitor had made a motion for reconsideration or re-argument of the Court's prior

decision in respect of the *Objection of Wilmington Trust, N.A., as Trustee, to Claims of the Bank

of New York Mellon, as Trustee, and Law Debenture Trust Company of New York, as Trustee*

[Dkt. No. 12116] (the "**Wilmington Trust Objection**").  *Id.*  A week later, at a telephonic

hearing, the Court considered further oral argument from the Crossover Bondholders in which

they expressed their concerns with the proposed expedited time frame for consideration of the

Crossover Bond Claim Issues.  Hr'g Tr. at 9, June 27, 2014.  In response to those concerns the

Court agreed to a further seven-day extension of the time to brief the Crossover Bond Claim

Issues and granted the Crossover Bondholders' request for the opportunity to submit reply briefs.

Pursuant to the Court's scheduling order, the parties' initial briefs and reply briefs on the

Crossover Bond Claim Issues were to be served on the Core Parties list maintained in connection

---

[13]    *See Nortel Canadian and US Insolvency Proceedings—Bondholder Claims Issues* [Dkt. No. 13880]; *Memorandum of the US Parties Regarding Interest Issues* [Dkt. No. 13883]; *Reply Memorandum of the Monitor to the Memorandum of the US Parties Regarding Bondholder Claims Issues* [Dkt. No. 13886]; *Statement of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund in Support of the Determination of Post-Petition Interest Issue* [Dkt. No. 13887].

with the allocation litigation *and* on those parties that have requested service pursuant to Federal Rule of Bankruptcy Procedure 2002. *Scheduling Order Re: Interest Issues* [Dkt. No. 13910].

31.     In short, this Court has already heard and rejected the Crossover Bondholders' arguments on the supposed procedural and jurisdictional issues. The Court has determined that it is just and proper to hear argument on the merits of the Crossover Bond Claim Issues at this time. Even if the Court determines to reconsider these arguments, the Court's first conclusion should control—the Court has full authority to decide the Crossover Bond Claim Issues at this time, such issues are ripe for determination now, and doing so will provide needed guidance from the Court to allow parties to understand likely recoveries in these liquidating cases.

       i.      <u>The Crossover Bond Claim Issues Are Ripe for Determination Now</u>

32.     As the Court has already determined, the Crossover Bond Claim Issues are ripe for determination now. The ripeness analysis mandated by the United States Supreme Court and the Third Circuit Court of Appeals considers both the amenability of an issue to judicial resolution and the practical utility to the parties of a declaration of their rights (or hardship of proceeding in the face of uncertainty). *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 190-91 (3d Cir. 2009). That test is satisfied here because the issues are purely legal, the parties are adverse in interest, and the resolution will be of assistance to the parties by providing greater clarity about distributions from the US and Canadian estates.

33.     As this Court has repeatedly recognized, the presence of some element of contingency[14] does not negate ripeness where, "[w]ithout a determination of the [issue], the

---

[14]     Notably, the Proofs of Claim filed by indenture trustee BNY do not frame the interest claims against NNI as contingent, but rather assert non-contingent unliquidated claims. Proof of Claim 3971 ("In addition to any and all

[parties] will be frustrated in their efforts to proceed any further in their bankruptcy, to formulate a plan as well as to negotiate with creditors." *In re Powermate Holding Corp.*, 394 B.R. 765, 770 (Bankr. D. Del. 2008) (Gross, J.); *see also In re Midway Games, Inc.*, 428 B.R. 327, 332 (Bankr. D. Del. 2010) (Gross, J.); *In re Caribbean Petro. Corp.*, 444 B.R. 263, 267 (Bankr. D. Del. 2010) (Gross, J.). Absent some change in circumstances, there is a great risk that the parties will continue to expend resources litigating allocation in this Court and the appellate courts. Until the parties know the resolution of the Crossover Bond Claim Issues and the ultimate outcomes, these cases are more likely to continue with no final allocation decisions for years to come while the parties exhaust their appeals and further deplete the assets of the estates.

34.    The Crossover Bondholders also argue that because the specific context in which the Crossover Bond Claim Issues might arise is not yet known, the issue of what rate of interest is payable on account of the Crossover Bond Claims is not ripe. This argument is another red herring intended to distract the Court from the narrow question that the Monitor is asking the Court to determine. In the circumstances of these liquidating cases, where there is no prospect of reorganization, the federal judgment rate is the only appropriate rate of interest in any scenario where post-petition interest is determined to be payable, or proposed to be paid, on account of allowed unsecured claims.[15]    Under any scenario—plan, settlement, or otherwise—absent

---

other amounts due and owing by NNI as guarantor under the Indenture and Notes . . . a claim in an unliquidated amount for the continuing postpetition [] accrual of interest (including interest upon the overdue installments of interest)."); Proof of Claim 3972 (same).

[15]    The Crossover Bondholders suggest that in some scenarios the Court may be called upon to apply the standards made applicable to settlements by Bankruptcy Rule 9019. Ad Hoc Bondholder Brief at 2. Even in the context of a 9019 settlement, the Court would need to apply the Third Circuit's *Martin* factors to determine the appropriateness of settlement of a discrete question of law that has now been briefed by the parties and that is highly amenable to resolution by the Court. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). A Rule 9019 analysis should not be used to obscure the obviously pure legal nature of the central question. The Monitor reserves all rights with respect to whether a settlement of the Crossover Bond Claim Issues that, in the event the US Debtors are solvent, pays holders of the Crossover Bond Claims a rate of post-petition interest that is greater than the federal judgment rate would be appropriate under *Martin* and other controlling case law in this Circuit. *See, e.g., Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d Cir. 2006) (holding that satisfaction of the

consent of all parties, the result mandated by the Bankruptcy Code and established case authority in this District is that any post-petition interest must be paid at the federal judgement rate as of the petition date. The Monitor respectfully submits that the asserted contingences therefore present no meaningful barrier for the Court's determination of this narrow issue at this time.

ii.     <u>Deciding the Crossover Bond Claim Issues Raises No Due Process Concerns</u>

35. Proceeding to brief and argue the Crossover Bond Claim Issues now also presents no due process concerns. As the Court has recognized, the Crossover Bond Claim Issues are far from unknown to either the Core Parties to the allocation litigation, or creditors of NNI more generally. It is undisputed that the potential availability of post-petition interest to the Crossover Bondholders has been a live and significant issue since the successful conclusion of the Rockstar transaction in 2011. The importance of the issue was also noticed to all parties as a result of the filing of the Wilmington Trust Objection in October 2013. Further, in light of concerns related to the timing of briefing and argument on the Crossover Bond Claim Issues, the Court extended the schedule for briefing to give parities a full 15 days to prepare initial briefs. At the request of the Ad Hoc Bondholder Group, the Court also agreed to a further extension of the schedule to provide another seven days to allow for a round of reply papers. Argument on the Crossover Bond Claim Issues was scheduled 25 days from the date of the Court's scheduling order, and a full 30 days from the date the Court made its bench ruling that it would hear argument. The Crossover Bondholders and the larger creditor body of the US Debtors have also been served with initial briefs as required by the Court in its scheduling order, and thus been provided with the notice that this Court has determined is required in the circumstances. As Bankruptcy Rule

---

*Martin* factors does not end an inquiry and that a bankruptcy court must also determine whether a settlement is "fair and equitable" and that attention must be paid to "the fairness of the settlement to other persons, *i.e.*, the parties who did not settle."). However, the mere possibility of settlement does not change the fact that the Crossover Bond Claim Issues are susceptible to determination now by the Court, and that making that determination now would materially advance these cases.

9007 makes clear, the Court has the discretion to determine the form and manner of notice. The Court has done so, and there is nothing in Bankruptcy Rule 9006 that limits the Court's discretion in establishing the timeline for determining these issues.

36.     The Crossover Bondholders' contention that the Court must blindly follow the procedural requirements of Bankruptcy Rule 3007 or Part VII of the Bankruptcy Rules is equally without merit. The proceeding to decide the Crossover Bond Claim Issues presents the Court with an opportunity to rule on a discrete legal issue that has the potential to materially move the allocation dispute towards resolution by providing needed guidance in these cases. The briefing on the Crossover Bond Claim Issues at the direction of this Court cannot be deemed to be a claims objection, nor is this a request by the Monitor for injunctive or declaratory relief with respect to any of the forms of relief labeled "adversary proceedings" under Bankruptcy Rule 7001. The Court has correctly determined that the Crossover Bond Claim Issues represent discrete issues of law that if resolved may materially move these cases forward. As such, the Court has requested that the parties brief and argue the Crossover Bond Claim Issues, and the parties have now responded to that request.

37.     There is nothing procedurally or jurisdictionally improper with the means selected by the Court to consider the Crossover Bond Claim Issues. While the Crossover Bondholders question the jurisdiction of the Court on ripeness grounds, they do not, and cannot, argue that the Court is not fully capable of resolving the Crossover Bond Claims Issues on a final basis. The question of what entitlement the Crossover Bondholders have to post-petition interest is indisputably a "core" bankruptcy matter under 28 U.S.C. § 157, and the Court has full authority to hear and decide the issue. Further, the Bankruptcy Code and other applicable law makes clear

27

that this Court has the discretion to determine the manner in which it is most appropriate to determine the Crossover Bond Claim Issues in the circumstances.

38.     The Court's discretion to determine the manner in which it will decide the Crossover Bond Claim Issues is embodied in the broad authority inherent to all federal courts and specifically granted by section 105(a) of the Bankruptcy Code.  All federal courts, including bankruptcy courts, have the inherent authority to "manage [their] own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (internal citation and quotation omitted). The Third Circuit in *Republic of Philippines v. Westinghouse Elec.*, citing to the Supreme Court's decision in *Chambers*, has confirmed that "it has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed within a Court, because they are necessary to the exercise of all others." 43 F.3d 65, 73 (3d Cir. 1994) (internal citation and quotation omitted) (upholding the authority of the District Court to impose appropriate sanctions even absent an explicit statutory basis).  This Court's authority to direct an "expeditious disposition" of the Crossover Bond Claim Issues is part and parcel of the Court's inherent authority to manage these cases.  Section 105(a) of the Bankruptcy Code codifies this inherent authority of the bankruptcy court.  Under 11 U.S.C. § 105(a), bankruptcy courts may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Section 105(a) of the Bankruptcy Code "specifically codifies what are traditionally called 'inherent powers' to give the bankruptcy courts the necessary ability to manage the cases on their docket."  *In re Peregrine Sys., Inc.*, 311 B.R. 679, 690 (D. Del. 2004).  These powers "provide courts with 'the necessary authority to manage the arguments and conduct of parties to ensure judicial efficiency and to do justice.'"  *Id.* (citing *In re Johnson*, 236 B.R. 510, 521

(D.D.C. 1999)).  As such, this Court has both implicit and explicit authority to determine the manner in which it will decide the Crossover Bond Claim Issues in these cases and the Crossover Bondholders' arguments to the contrary should be rejected.

      iii.    <u>Confidentiality</u>

    39.    The fact that a central issue in these liquidating cases is the entitlement to post-petition interest on the Crossover Bonds is neither a new issue to the parties nor a recent disclosure to the Court.  Rather, Wilmington Trust made perfectly clear to the Court last October in the Wilmington Trust Objection the centrality of the matter as a gating issue, the resolution of which could help the parties bridge their differences.  Specifically, Wilmington Trust noted that its objection was premised "on a single, simple legal determination based on settled precedent in this district. . . . [that] [t]he Federal Judgment Rate is the 'legal rate' used to calculate the amount of postpetition interest payable to unsecured creditors of a solvent estate."  Wilmington Trust Objection at 1.  Nor is the import of the timing of resolution of the issue a recent disclosure to the Court, as Wilmington Trust plainly indicated that a "prompt ruling on this Objection is critical."  *Id.*  Wilmington Trust further highlighted the gating nature of the issue in noting: "[b]y ruling now to disallow post-petition interest on the Claims in excess of interest calculated at the Federal Judgment Rate, this Court will establish the upper boundary for recoveries to unsecured creditors in the US Proceedings and effectively end the Allocation Dispute (as defined below) as between the U.S. and Canadian estates, thereby saving the estates untold delay and countless million in needless, additional administrative expense claims." *Id*. at 2.

    40.    The Monitor respects this Court's statements regarding the serious matter of confidentiality and that the Court did not wish to hear argument on the issue.  Hr'g Tr. 8, June 27, 2014.  Because other parties—ignoring the Court's comment that the Court did not wish to open this matter to argument—have misused or misrepresented the issue in their opening briefs

on the Crossover Bond Claim Issues, the Monitor responds here simply to note three key facts that it would have raised had it been permitted to do so during the June 27 status conference. First, the Monitor did not disclose the substance of any party's position on the interest issue, and did not disclose any party's position or communication from the confidential mediations. This is in stark contrast to the efforts of the US Debtors, and parties aligned with the US Debtors, throughout the allocation trial to put at issue the positions taken (or not taken) by the Monitor in the confidential mediations and settlement discussions preceding the trial. Accordingly, the recent identification of the issue by the Monitor did not breach the confidentiality requirements under Local Bankruptcy Rule 9019-5(d)(i) with regard to settlement discussions, as the Monitor merely noted the issue rather than stating the substance of the parties' positions on the matter. Second, in response to the Court's questioning of the parties' ability to move forward their dialogue toward a consensual resolution, the Monitor noted the issue (as Wilmington Trust had in its public filings with the Court some eight months earlier), pointed to the centrality of resolution of the matter to the parties' ability to bridge the allocation dispute (as Wilmington Trust did in its objection), and identified the scope of the issue (disclosing only the simple mathematical calculation of interest that is available from the public filings). Third, the Monitor did not seek to put into evidence, in violation of Federal Rule of Evidence 408, the substance of the parties' communications from the confidential mediations—again in contrast to the evidence put in at trial regarding the parties' positions taken during the confidential mediation process. Hr'g Tr. 1458-1463, May 21, 2014. In sum, the identification of the issue by the Monitor was never intended to breach the confidentiality of settlement discussions and should have no effect on the prompt resolution of the Crossover Bond Claim Issues.

## CONCLUSION

WHEREFORE, the Monitor and the Canadian Debtors respectfully request that the Court enter an order (i) declaring that, if the US Debtors prove to be insolvent, no post-petition interest shall be payable on allowed Crossover Bond Claims, (ii) declaring that, if the US Debtors prove to be solvent, post-petition interest, if payable on allowed Crossover Bond Claims, will be limited to the federal judgment rate for the week ending January 9, 2009, compounded annually, (iii) declaring that no additional amounts would be payable to the Crossover Bondholders in connection with the Support Agreement, or the prepayment or early redemption of the Bonds under the terms of the relevant Indentures, and (iv) granting such other and further relief as deemed just and proper.

[*Intentionally left blank*]

Dated: July 22, 2014
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

/s/   Mary F. Caloway
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**
Ken Coleman
Daniel J. Guyder
John Kibler
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
daniel.guyder@allenovery.com
john.kibler@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*