Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

— and —

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE
------------------------------------------------------------------ x
In re:                                                            :    Chapter 11

Nortel Networks, Inc., et al.                                     :    Case No. 09-10138 (KG)

                            Debtors.                              :    (Jointly Administered)

------------------------------------------------------------------ x

**REPLY BRIEF OF WILMINGTON TRUST, NATIONAL ASSOCIATION,
AS SUCCESSOR INDENTURE TRUSTEE, ADDRESSING THE INTEREST ISSUES**

100843448

Wilmington Trust, National Association, exclusively in its capacity as indenture trustee for the Notes[1] (in such capacity, "Wilmington Trust" or the "Trustee"), by and through its undersigned attorneys, submits this reply brief in support of the *Brief of Wilmington Trust, National Association, as Successor Indenture Trustee, Addressing the Interest Issues* (the "Trustee's Brief"), and in furtherance thereof, and in reply to (i) Memorandum of Law of the Official Committee of Unsecured Creditors (the "UCC") Regarding Entitlement of US Creditors to Postpetition Interest (the "UCC Brief"), and (ii) Opening Brief of the *Ad Hoc* Group of Bondholders (the "Ad Hoc Bondholders"), Law Debenture Trust Company of New York, as Trustee and The Bank of New York Mellon, as Trustee (the "Ad Hoc Bondholder Brief") (the supporters of the UCC Brief and the Ad Hoc Bondholder Brief, the "U.S. Unsecured Creditors"), respectfully submits as follows:

**PRELIMINARY STATEMENT**

1. The briefs of the U.S. Unsecured Creditors are thinly-veiled attempts to distract these Courts from the only relevant legal question: the rate of post-petition interest the U.S. Unsecured Creditors should receive in the event that the liquidating U.S. Estate is determined to be solvent. The U.S. Unsecured Creditors' argument for the awarding of post-petition interest at the contract rate ignores the sound rationale of every recent case interpreting the Bankruptcy Code, and instead relies on case law that either applies the Bankruptcy *Act* or bases its holding upon such outdated cases. The UCC effectively requests that these Courts eschew current jurisprudence for a set of laws that has not been in effect for thirty-six (36) years. Further, like the U.S. Unsecured Creditors themselves, the cases on which they primarily rely ignore sections 502(b))(2) and 726 of the Bankruptcy Code, which explicitly prohibit unmatured interest on

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Trustee's Brief (as defined below). Emphasis herein is ours unless otherwise noted.

2

unsecured claims except in the case of a solvent debtor, in which case interest can accrue and be paid at the legal rate.

2.  The U.S. Unsecured Creditors attempt to construct a basis for the payment of post-petition interest at their contract rates in these liquidations by asserting that the absolute priority rule and the best interests test support their efforts to receive more than that to which they are legally entitled to receive under the express provisions of the Bankruptcy Code. However, in doing so, they conveniently ignore that the "allowed amount" of a claim is ascertained by reference to Bankruptcy Code section 502. Thus, in the first instance, the determination of their legal entitlement is a matter of statutory prescription and not equitable determination. The Trustee agrees that the allowed amount of a claim is calculated based upon contractual rights, which should not be disturbed. However, the allowed amount of a claim is calculated *as of the petition date*, and does not include "unmatured interest." 11 U.S.C. § 502(b)(2). The absolute priority test does not operate to protect creditors who have received the full amount of their *allowed* claims. Indeed, it mandates that the unsecured creditors cannot receive more than their claims as allowed under the Bankruptcy Code.

3.  Accordingly, in this liquidation, if the U.S. Estate is found to be solvent,[2] the U.S. Unsecured Creditors will receive the allowed amount of their claims, as calculated on the petition date, *in full*, along with post-petition interest at the FJR. Once such a payment is made, every test in section 1129, including the best interest test and the absolute priority rule, will be satisfied. By demanding post-petition interest that would *exceed* the FJR, the U.S. Unsecured

---

[2] For purposes of this brief, the Trustee is assuming the U.S. Estate will be solvent, as the U.S. Unsecured Creditors are entitled to no post-petition interest should the U.S. Estate prove to be insolvent. The Trustee notes that, given the information available to date, it appears that the U.S. Estate will be solvent only if at least 60% of the sale proceeds are allocated to the U.S. Estate. Absent an allocation of at least that amount, no post-petition interest is permitted to accrue at any rate.

Creditors are, in fact, urging these Courts to violate the absolute priority rule by awarding them with more than that to which they are entitled—to the detriment of all other creditors.

4.     To further confuse the issues before these Courts, the U.S. Unsecured Creditors argue that certain Core Parties, including the Trustee, lack standing to address the Interest Issues. The U.S. Unsecured Creditors are wrong. Third Circuit jurisprudence makes clear that the requirements under section 1109 for standing are broad, allowing for any party that could be affected by the bankruptcy to be heard. *See, e.g., In re Global Indus. Tech., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011). In fact, the District Court for the District of Delaware has expressly stated that a creditor of an equity holder of the debtor may be granted standing where it is at risk of injury. *See Unofficial Comm. of Zero Coupon Noteholders v. Grand Union Co.*, 179 B.R. 56, 59 (D. Del. 1995). There is no question that the Interest Issues have a direct monetary impact on the recovery of all of the Core Parties, including the Trustee.

5.     Finally, Law Debenture's threatened claims based on the alleged no-call provision and Support Agreement are likewise without merit. It is well-settled that a no-call provision has no effect upon bankruptcy. Further, even if the provision had an effect upon bankruptcy, the only possible damages for its breach would be unmatured interest, which is expressly prohibited by the Bankruptcy Code. And without a liquidated damages provision, there is no legal basis for Law Debenture to credibly assert a claim for damages predicated on such a breach of an unenforceable provision. Additionally, Law Debenture has no rights with respect to the Support Agreement, to which it is not even a party. The Support Agreement is merely a covenant from a parent to a subsidiary that explicitly provides it is not a guarantee by NNI of any obligations owing by NNCC, the issuer of Law Debenture's notes.

## ARGUMENT

I. **The FJR is the Required Post-Petition Interest Rate in Solvent Debtor Cases, and Satisfies the Absolute Priority Rule; it is the Contract Rate that Violates the Rule.**

    A. **The U.S. Unsecured Creditors Fail to Rebut the Trustee's Argument that the Required Interest Rate is the FJR.**

6. The U.S. Unsecured Creditors are correct in arguing that, *if* the U.S. Estate is solvent, the claims of the U.S. Unsecured Creditors are entitled to post-petition interest. But the U.S. Unsecured Creditors erroneously assert, and fail to provide persuasive legal support for, their self-serving notion that such claims are entitled to interest at their contract rates. The Trustee requests that the U.S. Court follow every recent case that applies the Bankruptcy *Code* and rule that post-petition interest, if available at all, will accrue at the FJR. The U.S. Court should reject all arguments supported by cases applying the Bankruptcy *Act*, or arguments relying on purported policy measures expressed in the Bankruptcy Act.[3] (*See* UCC Brief § II(C)). The Bankruptcy Code is clear and explicit in its prohibition on including post-petition interest as part of an allowed claim. *See* 11 U.S.C. § 502(b)(2). The only exception the Bankruptcy Code contains to allow unsecured creditors to receive post-petition interest on their allowed claims occurs when the estate is solvent. *See* 11 U.S.C. § 726(a)(5); *In re W.R. Grace & Co.*, 475 B.R. 34, 159 n.132 (D. Del. 2012).

---

[3] The UCC Brief asserts that Congress was equally swayed by a pre-Bankruptcy Code case, when it provides that Congress "favorably cited [*Consolidated Rock Products Co. v. DuBois*, 312 U.S. 510 (1941)]" in legislative history regarding section 1123(3). (UCC Brief at 14). However, Congress cited such pre-Code law only for the proposition that "where an estate is solvent, in order for a plan to be fair and equitable, unsecured and undersecured creditors' claims must be paid in full, including postpetition interest, before equity holders may participate in any recovery." H.R. Rep. No. 103-835, at 48 (1994). That proposition is not in dispute, and nowhere in such legislative history does Congress cite *DuBois* for the actual rate to be applied thereto.

5

7.      The only modern line of cases cited in the U.S. Unsecured Creditors' argument for application of the contract rate is the *Dow* line of cases from the Sixth Circuit.[4] (*See* UCC Brief at 11-12; Ad Hoc Bondholder Brief ¶¶ 78-83.) Notably, the Sixth Circuit in *Dow III* did not itself rule on what interest rate was appropriate to apply, leaving that determination to the Bankruptcy Court. *See Dow III*, 456 F.3d at 680. Moreover, the Sixth Circuit entirely failed to consider the section 502 prohibition against awards of unmatured interest in its analysis, or the requirement that the allowed amount of a claim be calculated as of the petition date, *see Dow III*, 456 F.3d at 674-80, which is likely why its reasoning has not been followed in any case in the Bankruptcy Courts in the District of Delaware addressing the post-judgment interest issue. The Sixth Circuit cited a mere six cases to support its presumption that the contract rate should apply to post-petition interest on unsecured claims where the debtor is solvent. It is evident upon reviewing the cases that formulated the basis of *Dow III* with respect to post-petition interest that they are entirely inapplicable here, as they either: (a) relate to section 506(b), which, by its terms, governs post-petition interest for only <u>oversecured</u> creditors, not unsecured creditors like the U.S. Unsecured Creditors, including the Ad Hoc Bondholders;[5] or (b) apply the Bankruptcy Act, not the Bankruptcy Code.[6]

8.      The *Dow* line of case law has failed to find support in the Third Circuit. While the U.S. Unsecured Creditors boldly and prominently suggest to this Court that Judge Walrath

---

[4] The *Dow* line of case law includes *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999) ("*Dow I*"); *In re Dow Corning Corp.*, 244 B.R. 678 (Bankr. E.D. Mich. 1999) ("*Dow II*"); and *Official Committee of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668 (6th Cir. 2006) ("*Dow III*").

[5] *See In re Southland Corp.*, 160 F.3d 1054, 1059-60 (5th Cir. 1998) (applying section 506(b) to oversecured claim); *In re Consol. Operating Partners L.P.*, 91 B.R. 113, 116 (Bankr. D. Colo. 1988) (discussing interest on secured claims).

[6] *See In re Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, 525 (7th Cir. 1986) (railroad petitioned for reorganization under section 77 of the Bankruptcy Act); *Debentureholders Protective Comm. v. Continental Inv. Corp.*, 679 F.2d 264, 265 (1st Cir. 1982) (proceedings held under chapter X of the Bankruptcy Act); *Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 514 (1941) (interpreting section 77B of the Bankruptcy Act); *Ruskin v. Griffiths*, 269 F.2d 827, 831 (2d Cir. 1959) (petition filed under Chapter XI of the Bankruptcy Act).

100843448

"recognized the import of *Dow II*" (Ad Hoc Bondholder Brief ¶ 82 (citing *In re Coram Healthcare Corp.*, 315 B.R. 321, 346 (Bankr. D. Del. 2004)), they fail to note that Judge Walrath subsequently, and expressly, rejected any notion that the "legal rate" of interest as permitted under section 726(a)(5) means anything but the FJR. In *Washington Mutual*, Judge Walrath specifically stated that "the line of cases holding there is a presumption the contract rate applies are distinguishable and/or unpersuasive." *In re Wash. Mut., Inc.*, 461 B.R. at 243 (discussing, and dismissing, *Dow* and two other Circuit Court decisions). To ensure that her ruling was fully understood, and that there would be no confusion based on her prior statements in *Coram*, Judge Walrath added: "To the extent I suggested in *Coram* that the federal judgment rate was not required by section 726(a)(5), *I was wrong*." *Id.* at 242 n.35 (citing *In re Coram Healthcare Corp.*, 315 B.R. at 346). The U.S. Unsecured Creditors are, likewise, wrong.

        **B.**    **The U.S. Unsecured Creditors' Reliance on the Absolute Priority Rule is Inapposite, as Granting Interest at the Contract Rate Would, in Fact, Violate the Rule.**

9. The U.S. Unsecured Creditors are correct in stating that the allowed amount of an unsecured claim is derived from contractual rights (to the extent such rights exist). However, they attempt to obfuscate the fact that their rights turn on the "allowed amount" of a claim, which is calculated only until the petition date. *See In re W.R. Grace & Co.*, 475 B.R. at 201 (citations omitted) ("[Section] 502(b) of the Bankruptcy Code precludes unmatured (*i.e.*, post-petition) interest from becoming part of a creditor's allowed claim because interest stops accruing on claims at the date of the filing of the bankruptcy petition"). The U.S. Unsecured Creditors strikingly fail to discuss section 502(b)(2)'s unambiguous preclusion of unmatured interest from an unsecured creditor's allowed claim. As courts in the Third Circuit have held: "[i]t is well-established that when a debtor files for bankruptcy, the accrual of interest on its loans is suspended, and any subsequent claims brought by unsecured creditors for the amount of this

'unmatured interest' is prohibited under § 502(b) of the Bankruptcy Code." *Id.* at 159 (citing 11 U.S.C. § 502(b); *In re United Artists Theatre Co.*, 406 B.R. 643, 651 (Bankr. D. Del. 2009)). Any interest that might accrue after the petition date is calculated at "the legal rate" prescribed by section 726(a)(5), but is not part of the "allowed claim" itself. 11 U.S.C. § 726(a)(5).

10. In arguing that the absolute priority rule requires that creditors be paid post-petition interest at their contract rates, the U.S. Unsecured Creditors conflate the concept of "impairment" with whether a creditor is paid less than its "allowed amount."[7] A creditor is "impaired," as determined by section 1124 of the Code, "unless, with respect to each claim or interest of such class, the plan ... leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). The impairment itself does not invoke rights to additional compensation under the "fair and equitable" test, because that test is satisfied when an impaired class of creditors would receive "deferred cash payments totaling at least the allowed amount of such claim." *See* 11 U.S.C. § 1129(b)(2)(B)(i). As the Court in *In re W.R. Grace & Co.* held, "[i]n the context of equity, the absolute priority rule has been interpreted to mean that unsecured creditors must be paid the full amount of their allowed claims before equity can retain value under the plan." 475 B.R. at 201 (citations omitted). Accordingly, any discussion of section 1124 is entirely irrelevant; the only consideration is whether the claims of the U.S. Unsecured Creditors would receive their allowed amount of their pre-petition claims.

11. Contrary to the Ad Hoc Bondholders' assertion that the reasoning in the recent Third Circuit decisions applying the FJR to post-petition interest rate claims is inapplicable to

---

[7] In fact, in the legislative history of section 1124 of the Bankruptcy Code, Congress acknowledged that a class of claims may be impaired, yet still recover the full allowed amount of their claims. H.R. Rep. No. 103-835, at 48 (1994) (stating that, in the context of a solvent debtor's plan that does not provide for payment of any post-petition interest to unsecured creditors, "if a plan proposed to pay a class of claims in cash in the full allowed amount of the claims, the class would be impaired, entitling creditors to vote for or against the plan of reorganization.").

this case, because the recent decisions did not consider the absolute priority rule—and their specific suggestion that: "the courts [in *W.R. Grace* and *Washington Mutual*] were not required to, and did not, analyze the fair and equitable requirements of section 1129(b)" (Ad Hoc Bondholder Brief ¶ 57)—both courts did, in fact, consider the absolute priority rule. Under the header entitled "The Absolute Priority Rule Objections," the court in *W.R. Grace* unequivocally stated:

> The Court finds no such violation [of the absolute priority rule] for several reasons. . . . [T]he [parties demanding post-petition interest] will be paid the full amount of their allowed claims. Allowed claims do not include claims for unmatured, post-petition interest. As such, [such parties'] allowed claims only consist of the principal and interest that was due as of the Petition Date. The Joint Plan will pay [such party] this amount in full prior to the shareholders receiving value under the Plan. *The absolute priority rule is therefore not called into question under these circumstances.*"

475 B.R. at 201-02.

12. Recognizing that an argument that post-petition interest at the FJR would violate absolute priority was untenable, Judge Walrath, in *In re Wash. Mut., Inc.*, relegated her discussion of the rule to a footnote. She noted that, "[a]lthough [section 1129(b)] embodies the absolute priority rule, which forbids junior classes of creditors or equity from receiving any distribution until senior creditors are paid in full, *it also mandates that senior creditors not receive more than 100% of their claim before junior classes receive a distribution.*" 461 B.R. at 241 n.34 (citing *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003)). Judge Walrath's admonition that the absolute priority rule may not be used to permit senior creditors to receive an amount in excess of their allowed claims to the detriment of junior classes is directly applicable here, where the claims of the U.S. Unsecured Creditors are seeking post-petition interest at the contract rate, far in excess of their entitlement under the Bankruptcy Code.

9

13.     Despite the U.S. Unsecured Creditors' arguments to the contrary, providing for post-petition interest on the claims of the U.S. Unsecured Creditors at the FJR satisfies not only the absolute priority rule under section 1129(b), but also every possible relevant provision of the Bankruptcy Code, including the best interests test under section 1129(a).[8]  In fact, it is application of the contract rate that would be in violation of the absolute priority rule, as that rate would provide many of the U.S. Unsecured Creditors with a far greater recovery than that to which they are entitled, at the expense of all of Nortel's other creditors.

II.     **The Trustee Must be Heard on the Interest Issues, as the Trustee is a "Party in Interest" under the Bankruptcy Code.**

14.     The U.S. Unsecured Creditors' arguments that the Trustee lacks standing to be heard on these issues is contradicted by the Courts in this case, as well as the case law established in the Third Circuit. As a matter of law of the case, the issue of the Trustee's (along with other Canadian parties') standing has been discussed repeatedly to these Courts. (*See generally* Trial Tr. 5096:12-5114:3, June 24, 2014.) The issue with respect to whether post-petition interest accrues and at what rate has come up in the context of the Allocation Proceedings in which the Trustee is a Core Party. The Trustee has been an active participant in these Cases, seeking to protect the rights of its constituents, and denying it standing now would cause the Trustee great prejudice and harm.[9]

---

[8] It is also important to remember that these cases are now effectively liquidations remaining in Chapter 11 for administrative convenience and to save costs. Even if the Ad Hoc Bondholders are not willing to vote in favor of a Chapter 11 Plan (*see* Ad Hoc Bondholder Brief ¶ 57), there is no question that the U.S. Debtors could prepare a plan, even with a recovery to NNL, that would satisfy all the requirements of 1129(b) or the distributions could ultimately be done through a Chapter 7. In either event, the unsecured creditors will only be entitled to interest, if at all, at the FJR.

[9] Further, at the time the Cross-Border Protocol was entered into, The Bank of New York Mellon ("BNYM") was serving as indenture trustee for the Notes, and Wilmington Trust did not replace BNYM until April 3, 2012 pursuant to an Agreement of Resignation, Appointment and Acceptance entered into by and among NNL, BNYM and Wilmington Trust.

100843448

15. Standing under the Bankruptcy Code is dictated by section 1109(b), which provides a list of "parties in interest" who might be heard in court. *See* 11 U.S.C. § 1109(b). While the Trustee may not fit precisely into any of those categories, it is well understood in the Third Circuit that "[t]he list of potential parties in interest in § 1109(b) is not exclusive. On the contrary, that section 'has been construed to create a broad right of participation in Chapter 11 cases.'" *In re Global Indus. Tech., Inc.*, 645 F.3d at 210 (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 n.21 (3d Cir. 2004)). The Third Circuit, in fact, has adopted the Seventh Circuit's test for standing, defining a "party in interest" as "anyone who has a legally protected interest that *could be* affected by a bankruptcy proceeding." *Id.* at 210-11 (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992)).

16. The Trustee, as a creditor of the equity holder of the U.S. Debtors, is clearly a "party in interest." In *Grand Union*, the district court reversed the bankruptcy court's order denying standing to holders of notes issued by the parent of the debtor. That court stated, "to obtain an opportunity to appear and be heard, the bondholders need not show they are a creditor or equity holder of the debtor, or that they have some direct claim to [the debtor's] assets. Rather, they need only show a sufficient stake to require representation." 179 B.R. at 59. The court identified such a sufficient stake where the recovery to noteholders of the parent of the debtor in *Grand Union* would be greatly diminished by the terms of the proposed plan. *See id.* Here, like in *Grand Union*, a ruling that the claims of the U.S. Unsecured Creditors may recover post-petition interest at the contract rate would directly result in the diminution of the recovery of all creditors of NNL, including the Trustee; in fact, the post-petition interest on the Crossover Bond Claims alone is presently accruing at the daily rate of almost US$1 million, which would otherwise be distributed to NNL and, ultimately, NNL's creditors, including the Trustee.

11

17.    Denying the Trustee standing to speak on this issue would go against the very goals of the broad nature of section 1109(b), as described by the Third Circuit:

> Interpreting the 'party in interest' requirement as an additional obstacle to bankruptcy standing would frustrate the purpose of § 1109(b), which was intended to 'confer[ ] broad standing at the trial level,' *In re PWS Holding Corp.*, 228 F.3d 224, 249 (3d Cir. 2000), and to 'continue[ ] in [the] tradition" of "encourag[ing] and promot[ing] greater participation in reorganization cases,' [*In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir.1985)].

*In re Global Indus. Tech., Inc.*, 645 F.3d at 211. "Without a contrary signal from Congress, we will not read a provision that confers a broad right of participation to be a restriction on access to bankruptcy proceedings." *Id.* at 211 n.25. If the Trustee is denied standing on the Interest Issues, it *will* be injured by being denied any opportunity to be heard, where no other party is protecting its interests.[10]

### III.    Law Debenture's Supplemental Claims Have No Merit.

18.    Law Debenture's Supplemental Brief serves as a further distraction from the relevant issues. *First*, Law Debenture's Supplemental Brief asserts a right to claims based on the alleged "no-call provision" of a Prospectus Supplement related to its Indenture (the "Prospectus Supplement"[11]). Any no-call provision is unenforceable in bankruptcy, as the Monitor discusses at length in the Opening Brief of the Monitor and the Canadian Debtors Regarding Post-Petition Interest and Related Issues (the "Monitor U.S. Brief"). (Monitor U.S. Brief ¶¶ 24-26.) The Trustee joins, adopts and incorporates by reference, as if fully set forth herein, in its entirety, the position of the Monitor as set forth in paragraphs 24-26 of the Monitor U.S. Brief. Once the U.S.

---

[10] *Cf.* 11 U.S.C. § 502(a) (providing "party in interest" includes "creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title"). In analogous reasoning under chapter 7 liquidations, Congress expressly noted that "creditors of the partner must have standing to object to claims against the partnership and the partnership level because *no opportunity will be afforded at the partner's level for such objection*." 124 Cong. Rec. H 11,093 (1978); S 17,410 (1978).

[11] (*See* Ex. TR43730, at LDTCNY0000506.)

100843448

Debtors filed for bankruptcy, the no-call provision ceased to have any effect. *See, e.g., HSBC Bank USA, Nat'l Ass'n v. Calpine Corp.*, 2010 WL 3835200, at *3 (S.D.N.Y. Sept. 15, 2010).

19.  Further, Law Debenture has no basis for a claim even if it could be argued that there was a breach. The only possible claim for damages for breach of a no-call provisions is the payment of unmatured interest. Claims for unmatured interest are expressly prohibited by section 502(b)(2) of the Bankruptcy Code. Additionally, the Prospectus Supplement contains no provision for liquidated damages upon a breach of the no-call provision. (*See generally* Ex. TR 43730, at LDTCNY0000504-509.) While a liquidated damages provision is no guarantee of a claim for damages, and in this case would still not provide a basis for damages because of section 502(b)(2) of the Bankruptcy Code, the utter lack of any provision on which to claim calculable damages, results in no damages being recoverable whatsoever in the context of a bankruptcy case. *See Calpine Corp.*, 2010 WL 3835200, at *4-5. Additionally, there is no provision of the Bankruptcy Code giving rise to a post-petition claim based upon a breach of a no-call provision, unlike section 726(a)(5) with respect to post-petition interest. Accordingly, Law Debenture's claim for damages based upon a breach of a no-call provision fails as a matter of law.

20.  *Second*, Law Debenture's reliance on the Support Agreement[12] is similarly unavailing. Law Debenture cites no authority or basis for its threatened claim for a breach of a term in a contract to which it is not a party. In fact, the Support Agreement explicitly provides that it does not constitute a guarantee of NNI for any obligations:

> This Agreement does not constitute a guarantee by [NNI] of the payment of any indebtedness, obligation or other liability of any kind or character whatsoever incurred by [NNCC], nor shall any action taken by [NNI] or [NNCC] pursuant to

---

[12] (*See* Ex. TR43730, at LDTCNY0000518-519.)

13

the terms of this Agreement be deemed to create or constitute a guarantee by [NNI] of the payment of any such indebtedness, obligation or other liability.

(Support Agreement ¶ 3.)[13]

### IV.     Joinder with the Monitor

21.     Additionally, the Trustee joins, adopts, and incorporates by reference, as if fully set forth herein, in its entirety, the position of the Monitor as set out in the Responding Factum of the Monitor, on Behalf of Itself and the Canadian Debtors.

**WHEREFORE**, the Trustee respectfully requests that these Courts enter an order:

(a)     In the U.S. Court, holding that, if the U.S. Debtors are found to be solvent, any post-petition interest granted to the U.S. Unsecured Creditors be calculated at the federal judgment rate as of the Petition Date (0.44%);

(b)     In the Canadian Court, denying any post-petition interest on any of the Crossover Bond Claims under the relevant indentures; and

(c)     Granting such other and further relief as is just and proper.

Dated:  July 22, 2014
        Wilmington, Delaware

**COUSINS CHIPMAN & BROWN, LLP**

  /s/ Ann M. Kashishian
Scott D. Cousins (No. 3079)
Mark D. Olivere (No. 4291)
Ann M. Kashishian (No. 5622)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:   (302) 295-0191
Facsimile:   (302) 295-0199
Email:       cousins@ccbllp.com
             olivere@ccbllp.com
             kashishian@ccbllp.com

---

[13] The Trustee notes that the issues presented with respect to post-petition interest are legal in nature. To the extent there are any factual issues involving the determination of the application of any no-call provision, the Support Agreement or otherwise, the Trustee reserves any and all rights it has with respect thereto, including but not limited to its rights to further brief and be heard on such issues.

14

– and –

Craig A. Barbarosh
David A. Crichlow
Karen B. Dine
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776
Email: craig.barbarosh@kattenlaw.com
      david.crichlow@kattenlaw.com
      karen.dine@kattenlaw.com

– and –

Kenneth Kraft
John Salmas
DENTONS CANADA LLP
77 King Street West, Suite 400
Toronto, Ontario M5K 0A1
Canada
Telephone: (416) 863-4511
Facsimile: (416) 863-4592
Email: kenneth.kraft@dentons.com
      john.salmas@dentons.com

*Attorneys for Wilmington Trust, National Association, solely in its capacity as Successor Indenture Trustee and not in its individual capacity*

100843448