**Exhibit A**

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. c-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### RESPONDING FACTUM OF THE MONITOR, ON BEHALF OF ITSELF AND THE CANADIAN DEBTORS

### (Joint Hearing Returnable July 25, 2014)

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Graham D. Smith**  LSUC#: 26377D
gsmith@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

**TO:  THE CORE PARTIES SERVICE LIST**

Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**RESPONDING FACTUM OF THE MONITOR, ON BEHALF**
**OF ITSELF AND THE CANADIAN DEBTORS**

**(Joint Hearing Returnable July 25, 2014)**

**PART I - INTRODUCTION**

1.      The following are the Monitor's response submissions to certain propositions put forward
by the *Ad Hoc* Group of Bondholders, The Bank of New York Mellon and Law Debenture
Trust Company of New York Crossover Bondholders (collectively, the "**Crossover
Bondholders**") relevant to the Common Bond Claim Issues under Canadian law.

**PART II - RESPONSE TO SUBMISSIONS OF THE CROSSOVER BONDHOLDERS**

2.      The Crossover Bondholders' submissions may broadly be grouped into two categories:
submissions about the merits of the question of post-filing interest entitlement, and
submissions which seek to avoid the Court answering the question.

3.    The Court has already ordered that the Common Bond Claim Issues be determined, and the arguments of the Crossover Bondholders that the Court should not do so are in contumelious disregard of the Court's direction.  Those submissions are therefore dealt with below (para. 21).    First, the Monitor addresses the submissions the Crossover Bondholders make about the merits.

4.    The submissions of the Crossover Bondholders that they are entitled to post-filing interest ignore:

    (a)    the proper interpretive approach to the CCAA laid down by the Supreme Court in *Century Services* and *Indalex*, the nature of a liquidating CCAA, and the effect of those matters on the proper approach to the Common Bond Claim Issues in general and the statements in *Canada 3000* and *Stelco* in particular;

    (b)    the nature of the *pari passu* rule and interest stops rule as common law principles; and

    (c)    the direct relationship between the interest stops rule and the *pari passu* rule notwithstanding that the Crossover Bondholders expressly accept the *pari passu* rule as applicable.

**(A)    Failure to Advert to the Approach to the CCAA Mandated by Century Services and Indalex – Especially for a Liquidating CCAA**

5.    Nowhere in the submissions of the Crossover Bondholders is there any reference to the principle, laid down by *Century Services* and *Indalex*, that the BIA and CCAA are to be considered parts of an integrated insolvency scheme, that the court will favour

3

interpretations that give creditors analogous entitlements under the CCAA and BIA, and will avoid interpretations that give creditors incentives to prefer BIA processes. Nor is there reference to the characteristics of liquidating CCAAs and the proper analogous entitlements they give rise to. Those failures make the Crossover Bondholders' analysis faulty. The manner in which the proper consideration of these matters impacts on the Common Bond Claim Issues and the correct interpretation of *Canada 3000* and *Stelco* is set out in the Monitor's initial Factum.

**(B)** ***The Interest Stops Rule is a Common Law Principle***

6.      The Crossover Bondholders' submission that the approach to post-filing interest in a CCAA proceeding is to be contrasted with the approach taken in a BIA proceeding because the CCAA "does not contain any provision remotely capable of being characterized as an "interest stops" principle" misconstrues the nature of the interest stops rule. So does their related submission about the presumption that contractual rights continue unless a statute says otherwise.

> Factum of the Crossover Bondholders at paras. 5-17.

7.      The principle that interest stops on insolvency is a common law principle that has been consistently applied in both Canadian bankruptcy proceedings under the BIA and its predecessors, and in winding-up proceedings under the *Winding-up and Restructuring Act* and its predecessors, despite neither Act containing an express provision to that effect. As stated in paragraph 19 of the Monitor's initial Factum, the interest stops rule is so entrenched at common law that Blair J., in *Confederation Life*, noted that the provisions in both those Acts which describe the claims that can be made thereunder might otherwise

4

have been read to *permit* post-filing interest, but instead are to be interpreted as not trumping the common law insolvency interest stops rule. And, in *Shoppers Trust*, the Court of Appeal noted that the common law principles predated the legislation itself.

> Monitor's Factum at para. 19.

> *Canada (Attorney General) v. Confederation Life Insurance Co.,* [2001] O.J. No. 2610 at paras. 22-23 (Sup. Ct. J. [Commercial List]) [*Confederation Life*], Monitor's Book of Authorities, Tab 7.

> *Shoppers Trust Co. (Liquidator of) v. Shoppers Trust Co.* (2005), 74 O.R. (3d) 652 at para. 26 (C.A.) [*Shoppers Trust*], Monitor's Book of Authorities, Tab 6.

8.    Given that the interest stops rule is rooted in a persistent non-trumped common law principle, the absence of a provision one way or the other about it in the CCAA hurts, rather than helps, the Crossover Bondholders' position because Parliament is presumed to intend *not* to change the common law. See the discussion in paragraph 29 of the Monitor's initial Factum.

> Monitor's Factum at para. 29.

9.    Moreover, the common law principle is in relation to a matter of federal jurisdiction, namely insolvency law. It is a judge-made working out of the implications of insolvency. There is no question that the presumption against interference with property and contract rights is overcome by the long-recognized necessary implication of such powers in the insolvency area.

> [T]he courts early recognized that the federal power over bankruptcy and insolvency could not be effective if it did not authorize substantial modifications of the ordinary rights of property and contract.

Peter W. Hogg, *Constitutional Law of Canada*, 5th ed. Supplemented (Toronto: Carswell, 2007) (loose-leaf updated 2008, release 1), vol. 1, ch. 25 at § 25.5(a), Monitor's Supplemental Book of Authorities, Tab 1.

**(C)    *The Interest Stops Rule is a Necessary Element of the Pari Passu Rule Which the Crossover Bondholders Accept***

10.    The Crossover Bondholders concede that it is a fundamental tenet of insolvency law that all debts shall be paid *pari passu* and all unsecured creditors receive equal treatment. They cite the Supreme Court's decision in *Gingras* in support of this. However, they ignore the implications of their own submission.

Factum of the Crossover Bondholders at paras. 26-27.

*Gingras Automobile Ltee (Re)*, [1962] S.C.R. 676 [*Gingras*], Crossover Bondholders' Book of Authorities, Tab 23.

11.    First, the "interest stops rule" is, as pointed out by the Monitor in paragraphs 16-22 of its initial Factum, a corollary to the *pari passu* principle. That is, the purpose of the interest stops rule is *pari passu* distribution based on the insolvent's debts *as they existed at the date of the insolvency*. It ensures, and its very rationale is, the equal treatment of creditors. Acceptance of the applicability of the *pari passu* rule and equal treatment of creditors in a CCAA insolvency, as the Crossover Bondholders' submission does, necessarily entails acceptance of the interest stops rule.

Monitor's Factum at paras. 16-22.

*Shoppers Trust* at paras. 24-26, Monitor's Book of Authorities, Tab 6.

*In re Humber Ironworks and Shipbuilding Company* (1869), L.R. 4 Ch. App. 643 at 643-44, 646-47 [*Humber Ironworks*], Monitor's Book of Authorities, Tab 8.

6

> *Canada (Attorney General) v. Reliance Insurance Co.*, [2009] O.J. No. 3037 at
> para. 60 (Sup. Ct. J. [Commercial List]), Monitor's Book of Authorities, Tab 9.

12.     Second, the Supreme Court's decision in *Gingras*, cited by the Crossover Bondholders to support their submission that "[i]t is a fundamental tenet of insolvency law that all debts shall be paid *pari passu* and all unsecured creditors receive equal treatment" was a bankruptcy case.   The use of it for a proposition applicable beyond bankruptcy to insolvency generally is consistent with the view that the principles applied in bankruptcy apply in the CCAA where analogous.  Just as in bankruptcy the *pari passu* rule is honoured by stopping post-filing interest, the same should therefore apply in a liquidating CCAA.

> Factum of the Crossover Bondholders at paras. 26-27.

> *Gingras* at paras. 1 and 7, Crossover Bondholders' Book of Authorities, Tab 23.

### *(D)    Claims Must be Determined Whether or Not a Plan is Present*

13.     The Crossover Bondholders submit that the determination of claim amounts under the CCAA is simply to establish relativity among the creditors as at a specific date to allow for voting of their relative claims.  Essentially, they submit that while creditors' claims can be compromised under the CCAA and (citing *Stelco*) creditors can receive payments in excess of their claims, they say claim entitlements cannot be determined.  Their submissions miss the point.  In many CCAA proceedings, and especially in this one, claim entitlements are determined.  The allowance of the NNI claim, the Claims Procedure and Resolution Orders, the employee compensation claims, the EMEA claims process and settlement and the ongoing UKPC claims trial are all intended to determine claim entitlements.  The

simple fact is that one cannot know whether a claim is being compromised, or if a creditor is receiving more than its claim, unless the claim entitlement is determined.

> Factum of the Crossover Bondholders at para. 14.

> Re Stelco Inc., 2007 ONCA 483, [2007] O.J. No. 2533 [Stelco], Monitor's Book of Authorities, Tab 23.

> Compensation Claims Procedure Order dated October 6, 2011, Morawetz J. at paras. 11, 13, 25, Monitor's Supplemental Book of Authorities, Tab 2.

> One Hundred and Fourth Report of the Monitor dated March 14, 2014 at paras. 32-34, Crossover Bondholders' Book of Authorities, Tab 15.

14.    This is not the only CCAA case in which claim entitlements are determined.  The Supreme Court of Canada in *Indalex* had no difficulty with determining the entitlements of the pension parties despite the absence of any plan.   And in *Calpine*, to which the Crossover Bondholders refer in paragraph 23 of their Factum, the Court acknowledged that further claims would be determined absent a plan:

> Factum of the Crossover Bondholders at para. 23.

> The GSA resolves these issues and allows the process to move forward *with a view to dealing with the remainder of the issues* in an orderly and efficient way and *with the expectation that this insolvency can be concluded with the determination and payment of virtually all claims by year-end.* (Emphasis added.)

> Re Calpine Energy Ltd., 2007 ABQB 504 at para. 79 [Calpine], leave to appeal refused, 2007 ABCA 266, Crossover Bondholders' Book of Authorities, Tab 19.

> Re Indalex Ltd., 2013 SCC 6, [2013] 1 S.C.R. 271 [Indalex], Monitor's Book of Authorities, Tab 13.

*(E)*    ***There Has Been No Predetermination That Post-Filing Interest Would Be Allowed or Had to Await a Plan***

15.    The Crossover Bondholders allege that Nortel represented that claims for post-filing interest on the bonds would be allowable claims.  One such allegation is made in para. 3 of their Factum:

> The Canadian debtors and the bondholders entered into binding contracts that provide for the bondholders to obtain the payment of interest, which entitlement is not terminated by a CCAA filing. This was confirmed in the publicly filed financial statements of Nortel Networks Limited of November 17, 2011, well over two years after Nortel had announced its plans to sell all of its businesses, and after all of its business lines, including the residual IP, had been sold: *'Nortel has continued to accrue interest on its $1,000 floating rate notes that matured on July 15, 2011 on the basis that it expects such interest to be an allowable claim.'* (Emphasis added.)

> Factum of the Crossover Bondholders at para. 3.

16.    The quoted statement from Nortel's publicly filed financial statements is taken out of context.  It is drawn from page 12 of the November 17, 2011 Unaudited Condensed Consolidated Financial Statements for the Three and Nine Months Ended September 30, 2011.  The entire paragraph from which the Crossover Bondholders quoted is:

> *Contractual Interest Expense on Outstanding Long-Term Debt*

> During the three and nine months ended September 30, 2011, Nortel has continued to accrue for interest expense of $77 and $225, respectively (three and nine months ended September 30, 2010 - $71 and $206, respectively) in its normal course of operations related to debt issued by NNC and NNL in Canada *until it obtains a claims determination order that adjudicates the claims*. During the pendency of the Creditor Protection Proceedings Nortel generally has not and *does not expect to make payments to satisfy any of the interest obligations of the Debtors. Nortel has continued to accrue interest on its $1,000 floating rate notes that matured on July 15,*

*2011 on the basis that it expects such interest to be an allowable claim.* (Emphasis added.)

17.    It is clear from the entire paragraph that it did not represent a final, or any determination of entitlements since, (i) it was not a determination, let alone by the Monitor who has the authority to oversee the claims procedures, (ii) it expressly contemplated that there will be claims determinations and adjudications that may lead to different results, and (iii) Nortel's very next filed Financial Statements, being the Audited statements for the year ended December 31, 2011, replaced the sentence the Crossover Bondholders rely on as follows:

> *Contractual Interest Expense on Outstanding Long-Term Debt*
>
> During the year ended December 31, 2011, Nortel has continued to accrue for interest expense of $302 ($277 for the year ended December 31, 2010) in its normal course of operations related to debt issued by NNL in Canada *until it obtains a claims determination order that adjudicates the claims.* During the pendency of the Creditor Protection Proceedings Nortel generally has not and does not expect to make payments to satisfy any of the interest obligations of the Debtors. Nortel has continued to accrue interest on its $1,000 floating rate notes that matured on July 15, 2011 *until it obtains a claims determination order that adjudicates the claim.* (At p. 21; emphasis added.)

18.    The Crossover Bondholders also assert that, as recently as March 14, 2014, the Monitor represented to the Court that it was working towards a plan of arrangement and believed the Applicants were progressing towards such a Plan, but the implication from this is the opposite of that the Crossover Bondholders contend for.

> Factum of the Crossover Bondholders at para. 32.

19.     Paragraph 78 of the 104th Report in its entirety states:

> The Monitor has and continues to assist the Applicants in their efforts to efficiently realize maximum value from their remaining assets, advance the interests of the Canadian estate in the Allocation Protocol Litigation, wind down their corporate, operational and IT infrastructure and conduct the claims processes for the purpose of preparing a plan of arrangement.  As previously discussed, the joint hearings to resolve the Allocation Protocol Litigation are to commence on May 12, 2014.  During the period leading up to the joint hearings, the Applicants and Monitor will be focusing a significant amount of time, effort and resources on this litigation and related discovery processes.  Furthermore, the trials relating to the Allocation Protocol Litigation, including post trial submissions and rebuttal submissions, will likely extend into September 2014. An extension of the Stay Period is required to permit these and other restructuring efforts to continue such that resolution of these matters can be concluded and the Applicants can progress to a plan of arrangement and distributions to their creditors.   The Monitor believes the Applicants are working diligently and in good faith and continue to progress towards such a plan.

20.     The paragraph clearly shows the resolution of claims needs to take place to allow progress to a plan and to distribution.  The Crossover Bondholders put the cart before the horse.

*(F)*     ***The Crossover Bondholders' Re-Arguments That the Matter Should Not Be Heard Ought to be Summarily Rejected***

21.     The Crossover Bondholders argue in both their U.S. and Canadian filings that the Common Bond Claim Issues are not properly before the Courts, citing breach of settlement privilege and various personalized attacks on the Monitor and "its allies."  These contentions fly in the face of the Courts having asked for and heard argument on whether the Common Bond Claim Issues should be determined, and having decided they should be.  The Monitor's response is more fully set out in the Reply Brief filed in the Delaware Court, paras. 30 to 40, and incorporated herein *mutatis mutandis.*

11

## PART III -    CONCLUSION

22.    The Monitor respectfully requests the relief as set out in its initial Factum, para. 56.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 22nd day of July, 2014.


*Goodmans LLP*

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Graham Smith**  LSUC#: 26377D
gsmith@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

## SCHEDULE "A"

## LIST OF AUTHORITIES

1. Peter W. Hogg, *Constitutional Law of Canada*, 5th ed. Supplemented (Toronto: Carswell, 2007) (loose-leaf updated 2008, release 1), vol. 1.

2. Compensation Claims Procedure Order dated October 6, 2011, Morawetz J.

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding Commenced at Toronto

**RESPONDING FACTUM**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

**Benjamin Zarnett** LSUC #:17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini** LSUC #: 22293T
jcarfagnini@goodmans.ca
**Graham D. Smith** LSUC#: 26377D
gsmith@goodmans.ca
**Joseph Pasquariello** LSUC #: 38390C
jpasquariello@goodmans.ca

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor