## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- X
                            :

*In re*                            :       Chapter 11
                            :

Nortel Networks Inc., *et al.*,[1]         :       Case No. 09-10138 (KG)
                            :

                 Debtors.         :       Jointly Administered
                            :

                            :       **Hearing Date: [TBD]**
                            :       **Objections Due: [TBD]**

---------------------------------------------------------- X

## DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 APPROVING SETTLEMENT AGREEMENT BY AND AMONG NORTEL NETWORKS INC., THE SUPPORTING BONDHOLDERS, AND THE BANK OF NEW YORK MELLON WITH RESPECT TO THE NNI POST-PETITION INTEREST DISPUTE AND RELATED ISSUES

Nortel Networks Inc. ("NNI"), and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors") hereby move this Court (the "Motion") for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 502,

726(a)(5), 1124, 1129(a)(7), and 1129(b) of title 11 of the United States Code (the "Bankruptcy

Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(a) authorizing and approving the entry of NNI into the Agreement Settling the NNI Post-

Petition Interest Dispute and Related Matters dated July 24, 2014 attached hereto as Exhibit B

(the "Settlement Agreement") and entered into by and among (i) NNI, (ii) those bondholders

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

who are signatories to the Settlement Agreement (the "Supporting Bondholders"), and (iii) the

Bank of New York Mellon (the "Indenture Trustee" and together with NNI and the Supporting

Bondholders, the "Parties") and (b) granting them such other and further relief as the Court

deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors, by this Motion, request the approval of a settlement that would

resolve complex and substantial issues regarding the rights of holders of the vast majority of

Crossover Bond Claims[2] filed against the Debtors to receive post-petition interest in

consideration of their allowed claims against NNI.  As a result of the compromises embodied in

the Settlement Agreement, the Debtors, the Bondholder Group (as defined below), the

Supporting Bondholders and the Indenture Trustee have reached agreements that resolve these

issues by capping, at a fixed amount, the amounts that the holders of Crossover Bonds

representing more than 95% of the outstanding principal amount of all Crossover Bonds would

be entitled to receive in respect of post-petition interest (and any other contractual entitlements in

excess of principal and prepetition interest amounts).[3]  These compromises, which were

vigorously negotiated by the Parties, provide additional certainty to the Debtors' creditors and

other parties in interest, while appropriately leaving other matters -- such as the rights of other

creditors to seek payment of post-petition interest -- to be resolved in connection with the claims

resolution process and the process of proposing and confirming a chapter 11 plan for each of

---

[2]      The "Crossover Bond Claims" are those claims filed against the Debtors that relate to the "Crossover Bonds", which consist of those bonds governed by the Indenture dated as of July 5, 2006, as supplemented as of July 5, 2006, May 1, 2007, and May 28, 2008 (US $1B LIBOR + 4.25% due 2011; US $550M 10.125% due 2013; and US $1.125B 10.75% due 2016); and the Indenture dated as of March 28, 2007 (US $575M 1.75% due 2012 and US $575M 2.125% due 2014); and the Indenture dated as of February 15, 1996 (US $150M 7.875% due 2026)(the "7.875% Notes").

[3]      The fixed rate 7.875% senior notes issued by Nortel Networks Capital Corporation and guaranteed by NNL in an aggregate principal amount of $150 million due 2026 pursuant to the Indenture dated as of February 15, 1996 are not subject to this settlement.

these Debtors, when the rights and interests of all unsecured creditors can be considered and the remainder of the plan terms are known.  By striking this balance, the Debtors are proposing a settlement that will streamline their cases, and promote the efficient administration of their estates.

2.      The Settlement Agreement is intended to bind all holders of the Crossover Bonds and the Indenture Trustee in respect of such bonds, and all other parties-in-interest in these cases in respect of the resolution of litigation over the proper amounts of postpetition interest and related contractual entitlements owed in respect of such Crossover Bonds.  Such a global resolution would resolve an issue that could otherwise significantly delay the confirmation of the Debtors' chapter 11 plan or the ultimate distribution of plan proceeds to the Debtors' creditors due to prolonged litigation, possibly including multiple rounds of appeals.  The Settlement Agreement provides marked benefits by bringing certainty to the Debtors' estates with respect to the treatment of Bondholder entitlements to post-petition interest, removing the alleged distraction caused by this issue for certain parties, and thereby enabling the Debtors to focus on exploring a final resolution of the allocation of the various sale proceeds with the other parties to that litigation.

## JURISDICTION

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware (the "District Court") dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The statutory bases for the relief requested herein are sections 105(a), 502, 726(a)(5), 1124, 1129(a)(7), and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

## FACTUAL BACKGROUND

A.     **Procedural Background**

5.     On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc. ("NN CALA"),[4] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"), which cases are consolidated for procedural purposes only (the "Chapter 11 Cases"). The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

7.     On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[5] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings") and a monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

---

[4]     NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[5]     The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

the Canadian Court.  Also on the Petition Date, the High Court of Justice in England and Wales

(the "English Court") placed nineteen of Nortel's European affiliates, including Nortel Networks

UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa

(collectively, the "EMEA Debtors"),[6] into administration (the "UK Proceedings") under the

control of court-appointed administrators and foreign representatives (the "Joint

Administrators").  On July 29, 2011, NNOCL commenced a creditors' voluntary liquidation,

represented by Kerry Trigg (the "Liquidator").

       8.      On May 28, 2009, NNSA commenced secondary insolvency proceedings within

the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on

Insolvency Proceedings in the Republic of France  (the "French Secondary Proceedings," and

together with the Chapter 11 Cases, the Canadian Proceedings and the U.K. Proceedings, the

"Insolvency Proceedings") pursuant to which a liquidator, Maître Cosme Rogeau (the "French

Liquidator"), and an administrator were appointed by the Commercial Court of Versailles,

France (the "French Court") (Docket No. 2009P00492) for NNSA.  NTF is in voluntary

liquidation and the French Liquidator has been appointed Liquidateur amiable of NTF.

      **B.**      **The Allocation Dispute And The Mediation Process**

       9.      Soon after the commencement of the Insolvency Proceedings, the various

companies comprising the Nortel Group pursued an orderly and coordinated sale of certain of

Nortel's businesses and assets.  In furtherance of these efforts, the Debtors, the Canadian Debtors

and certain of the EMEA Debtors entered into the Interim Funding and Settlement Agreement,

---

[6]      The EMEA Debtors include the following entities:  NNUK, Nortel Networks S.A. ("NNSA"), Nortel
Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel
Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks
B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel
Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

dated as of June 9, 2009 (the "IFSA").[7]  Following a joint hearing on June 29, 2009, the IFSA

was approved by this Court [D.I. 993] and the Canadian Court.  Among other things, the parties

to the IFSA agreed not to condition the sale of Nortel's businesses and assets on a prior

agreement among the selling parties regarding the allocation of the ultimate sale proceeds (plus

accrued interest, the "Sale Proceeds") from the relevant sale transaction and to hold all Sale

Proceeds in escrow accounts until an allocation methodology is agreed upon or resolved pursuant

to the IFSA.  See IFSA, ¶¶ 12(a), (b).  With this framework in place, from 2009 to 2011, Nortel

conducted an extensive series of court-approved sale transactions generating in excess of $7.3

billion in net Sale Proceeds.

    10.    Over the last several years, the Debtors, the Canadian Debtors, the EMEA

Debtors, the Joint Administrators, the Committee, the Bondholder Group, the UK Pension

Parties and other key constituencies (the "Core Parties") have engaged in comprehensive

settlement discussions with respect to the allocation of the Sale Proceeds and the potential

resolution of claims filed by the EMEA Parties and the UK Pension Parties, including three

formal rounds of mediation.

    11.    After the third failed mediation in January 2013, certain of the Core Parties sought

relief from the Court and the Canadian Court to approve litigation procedures to govern the

allocation disputes and the claims filed by the EMEA Parties and the UK Pension Parties against

the Debtors and the Canadian Debtors.  On April 3, 2013, this Court issued an order and opinion

granting the Debtors' motion for approval of binding procedures and an expedited schedule for

the cross-border resolution of the dispute concerning the allocation of the Sale Proceeds (the

"Allocation Dispute"), denying the Joint Administrators' cross-motion to compel arbitration (the

---

[7]    See Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an
Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

"Cross-Motion") and directing the Core Parties to continue negotiation of an allocation protocol

consistent with the Court's opinion [D.I.s 9946, 9947] (the "US Allocation Dispute Order").

Additionally, the U.S. Allocation Dispute Order scheduled joint hearings to determine the

allocation of the Sales Proceeds (the "Allocation Trial"), the EMEA Claims and the UK Pension

Claims, each as described below, to commence on January 6, 2014.  The Canadian Court issued

a parallel order and endorsement on March 8, 2013 and April 3, 2013 respectively (the

"Canadian Allocation Endorsements").[8]

> 12.    The Joint Administrators pursued appeals of the US Allocation Dispute Order and

the Canadian Allocation Endorsements in the applicable jurisdictions.  On April 17, 2013, the

Joint Administrators, on behalf of the EMEA Debtors, appealed as of right the order denying

their Cross-Motion to compel arbitration [D.I. 10166] (the "US Appeal").[9]  On December 6,

2013, the United States Court of Appeals for the Third Circuit issued an opinion affirming this

Court's denial of the Cross-Motion (the "Third Circuit Decision").[10]

> 13.    In Canada, the Joint Administrators filed a motion for leave to appeal the

Canadian Allocation Dispute Endorsements with the Ontario Court of Appeal,[11] which was

denied on June 20, 2013 [D.I. 11256-1].  Subsequently, the Joint Administrators filed a motion

for leave to appeal the denial of the Canadian Cross-Motion to compel arbitration in the Supreme

---

[8]    See Exhibits C and D to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I. 10414].

[9]    The Joint Administrators, on behalf of the EMEA Debtors, also sought leave from the Court to appeal the portion of the US Allocation Dispute Order regarding approval of an allocation protocol [D.I. 10244] (the "Interlocutory Appeal").  After this Court refused the Joint Administrators' request to certify the Interlocutory Appeal [D.I. 10407], the Joint Administrators sought leave with respect to the Interlocutory Appeal from the Third Circuit and the District Court, both of which denied the Joint Administrators' motions for leave.  See In re Nortel Networks Inc., No 13-8055 (3d Cir. June 13, 2013); Order Denying Motion for Leave to Appeal from Order Approving Allocation Protocol, ECF No. 31, In re Nortel Networks Inc. et al., C.A. No. 13-757(LPS) (D. Del. July 23, 2013).

[10]    See In re Nortel Networks Inc., et al., No. 13-2739 (3d Cir. Dec. 6, 2013).

[11]    See Exhibit E to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I. 10414].

Court of Canada (the "<u>Canadian Motion for Leave</u>").  The Canadian Motion for Leave remains

pending in the Supreme Court of Canada.

14.      On May 12, 2014, the parties commenced the Allocation Trial before this Court

and the Canadian Court (collectively, the "<u>Courts</u>"). The evidentiary portion of the Allocation

Trial concluded on June 24, 2014.

C.      **<u>The Crossover Bond Claims</u>**

15.      Pursuant to the Indenture dated as of July 5, 2006 (the "<u>2006 Indenture</u>"),[12] NNL

issued multiple series of senior notes guaranteed by NNC and NNI, including two series of fixed

rate 10.75% senior notes in the aggregate principal amounts of $450 million and $675 million

due 2016 (together, the "<u>10.75% Notes</u>"), a series of fixed rate 10.125% senior notes in the

aggregate principal amount of $550 million due 2013 (the "<u>10.125% Notes</u>"), and a series of

floating rate senior notes in the aggregate principal amount of $1 billion due 2011 (the "<u>Floating

Rate Notes</u>" and, together with the 10.75% Notes and the 10.125% Notes, the "<u>2006 Indenture

Notes</u>").  On September 25, 2009, The Bank of New York Mellon, under the 2006 Indenture,

filed a timely proof of claim on behalf of the holders of the 2006 Indenture Notes preserving,

among others, their claim for "an unliquidated amount for the continuing post-petition (a) accrual

of interest (including interest upon the overdue installments of interest) . . . ."[13]

16.      Pursuant to the Indenture dated as of March 28, 2007 (the "<u>2007 Indenture</u>"),

NNC issued 2.125% convertible senior notes due 2014 (the "<u>2.125% Notes</u>") in an aggregate

principal amount of $575 million and 1.75% convertible senior notes due 2012 (the "<u>1.75%

Notes</u>" and, together with the 2.125% Notes, the "<u>2007 Indenture Notes</u>" and, together with the

---

[12]      Supplemented by the First Supplemental Indenture, dated July 5, 2006, the Second Supplemental Indenture dated May 1, 2007, and the Third Supplemental Indenture dated May 28, 2008 (collectively the "<u>2006 Supplemental Indentures</u>").

[13]      <u>See</u> Attachment to Claim No. 3972 ¶ 8.

2006 Indenture Notes, the "Guaranteed Bonds", and the holders of such Guaranteed Bonds, the

"Bondholders") in an aggregate principal amount of $575 million.  The 2007 Indenture Notes are

each guaranteed by NNI and NNL.  On September 25, 2009, The Bank of New York Mellon,

under the 2007 Indenture, filed a timely proof of claim on behalf of the holders of the 2007

Indenture Notes for, among others, "a claim in an unliquidated amount for the continuing post-

petition (a) accrual of interest (including interest upon the overdue installments of interest). . .

."[14]

### D.    The Post-Petition Interest Dispute

17.    While the Allocation Trial remains pending, and the ultimate amount of sale

proceeds that will be allocated to the US Debtors is unknown, the Monitor and certain other

entities have been pushing for a determination of the Bondholders' entitlement to post-petition

interest in the US Debtors' cases (the "PPI Dispute"), claiming certainty on this issue will further

a consensual resolution of the Allocation Trial.

18.    On October 25, 2013, Wilmington Trust filed an objection to the two proofs of

claim filed by The Bank of New York Mellon and the proof of claim filed by Law Debenture

Trust Company [D.I. 12116] (the "Wilmington Objection"), requesting that the Court disallow

post-petition interest on such claims in excess of interest calculated at the Federal Judgment

Rate.  On November 15, 2013 this Court issued an order adjourning the Objection, holding that

"the Objection would require the Court to issue an advisory opinion on an issue which may never

arise" and that "[c]ourts do not have the power to render an advisory opinion," concluding that

"the issue will only be germane if the U.S. Debtors are found to be solvent and the solvency

issue is far from decided."[15]

---

[14]    See Attachment to Claim No. 3971 ¶ 8.
[15]    See Order dated Nov. 15, 2013 regarding the Wilmington Objection, [ECF No. 12399], at 1.

19.     Five weeks into the Allocation Trial, the Monitor submitted the Memorandum of the Monitor Regarding Bondholder Claims Issues, dated June 19, 2014 [D.I. 13880] (the "Monitor's Request"), to request that the Canadian Court and this Court determine several issues regarding the entitlement of bondholders to post-petition interest.  The Debtors, the Committee and the Bondholder Group opposed such relief on the basis that, while details couldn't be provided due to the confidentiality of settlement discussions, such issues were not causing a logjam on resolution of the allocation issues, and because such issues were more properly resolved only after the resolution of the allocation litigation and only in connection with a chapter 11 plan process.  On June 30, 2014, the Court issued an order establishing a schedule for briefing and argument on two issues regarding post-petition interest: "(1) whether the holders of the crossover bonds claims are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures, above and beyond the outstanding principal debt and prepetition interest; and (2) if determined that the holders of the crossover bonds claims are so entitled, what additional amounts are such holders entitled to so claim and receive."[16]  The Canadian Court similarly ordered that such matters be briefed as they relate to the Canadian Debtors' cases.

20.     Certain parties to the Allocation Litigation exchanged opening briefs with respect to the PPI Dispute on July 15, 2014, and response briefs were filed on July 22, 2014.  The briefs advance divergent and competing positions.  Depending on the resolution of the PPI Dispute, distributions to the U.S. Debtors' creditors could be materially different.  The PPI Dispute requires the determination of separate and distinct legal issues in the United States (the "US PPI Dispute") and Canada (the "Canada PPI Dispute") that are subject to the applicable law and

---

[16]     See Scheduling Order Re: Interest Issues, June 30, 2014, [D.I. 13910].

procedures in each jurisdiction and must be decided independently. In addition, it is highly

likely that appeals will follow any rulings that are issued on the PPI Dispute in either of the

jurisdictions.

E.    **Summary Of The Proposed Settlement Agreement**

21.    In the context of the pending PPI Dispute, the Debtors, the Indenture Trustee, and

the Bondholder Group, of which the Supporting Bondholders are members, engaged in

discussions and negotiations to explore whether a consensual resolution of the US PPI Dispute

could be reached. The Parties also have consulted with the Committee regarding the Settlement

Agreement and provided the Monitor with notice of a potential agreement in respect of the PPI

Dispute. After vigorous negotiations, the Parties were able to reach the primary terms of a

settlement finally resolving the US PPI Dispute in respect of the Guaranteed Bonds, which

represent more than 95% of the bonds underlying the Crossover Bond Claims by principal

amount[17], subject to the terms of the Settlement Agreement. The Settlement Agreement

embodies that agreement, as ultimately formalized and memorialized by the Parties, including

the following terms:[18]

- Post-petition Interest.

    o Distribution of PPI Settlement Amount: Subject to Section 4.2 of the
      Settlement Agreement, in the event that NNI at any time has more than
      sufficient funds to pay all of its allowed administrative, priority, secured and
      general unsecured claims in full, holders of Guaranteed Bonds shall be
      entitled to payment from NNI of PPI in the PPI Settlement Amount and shall
      be paid PPI from such funds available for such distributions (together with
      any other creditors of NNI entitled to payments of PPI) in accordance with a
      confirmed chapter 11 plan until the PPI Settlement Amount is paid in full.

---

[17]    The sole series of Crossover Bond Claims not subject to this settlement is the 7.875% Notes.

[18]    This discussion is intended as a summary of the terms of the Settlement Agreement. To the extent that the summary and the terms of the Settlement Agreement are inconsistent, the terms of the Settlement Agreement shall control. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

- o The "PPI Settlement Amount" shall be an amount equal to (a) $876 million plus (b) an additional amount, equal to 3.50% per annum times the then outstanding principal balance of the Guaranteed Bonds, up to a maximum amount of $134 million, which additional amount shall accrue on the unpaid and outstanding principal balance of the Guaranteed Bonds that remains unpaid and outstanding during the time of accrual for the period from July 1, 2014 until the earlier of (x) June 30, 2015 or (y) the date of the final distribution in respect of the Guaranteed Bonds.  For the avoidance of doubt, absent any distribution, the cap of $1.01 billion will be reached on June 30, 2015.

- Allowance of Bondholder Claims: The Bondholder claims shall be allowed in the amounts listed on Schedule A to the Settlement Agreement, which amount constitutes an aggregate of $3,934,521,442 allowed against NNI.

- Contractual Entitlements: Nothing in the Settlement Agreement shall constitute a settlement, release, waiver or discharge of any of the contractual entitlements asserted by the Indenture Trustee with respect to the Guaranteed Bonds, including, without limitation, entitlement to make-whole payments, and, except as expressly provided in the Settlement Agreement, different methods of calculating any post-petition amounts or rates ("Contractual Entitlements"), other than the agreements with respect to the total PPI Settlement Amount contained in Section 2 of the Settlement Agreement and the establishment of the amount of the allowed claims to which the Indenture Trustee and Bondholders are entitled to as against NNI, as provided in Section 3.1 of the Settlement Agreement and Schedule A thereto.  All such Contractual Entitlements are expressly reserved by the Bondholders and the Indenture Trustee; *provided*, *however*, that to the extent that any Bondholder or the Indenture Trustee is determined to be entitled to any Contractual Entitlement against NNI (whether by order of this Court or a settlement or plan approved by this Court) (i) the sole source of funds available for distributions on behalf of such allowed Contractual Entitlement shall be funds available to make distributions to the Bondholders under Section 2.1 hereof, and (ii) such allowed Contractual Entitlements shall be subject to and not added to the limitation on the total PPI Settlement Amount as defined in Section 2 of the Settlement Agreement.  For the avoidance of doubt, any Contractual Entitlement of the Indenture Trustee to payment or reimbursement of fees and expenses, if any, due it in accordance with the applicable Indenture shall not be included in the PPI Settlement Amount; *provided*, *however* that the US Debtors reserve all rights and defenses in respect of any such claim for reimbursement of fees and expenses by the Indenture Trustee, and generally with respect to any other such Guaranteed Bond claim asserted by either the Indenture Trustee or the Bondholders.

- Full and Final Settlement of NNI PPI Dispute and Guaranteed Bond Claims: The Settlement Agreement is intended to be a full and final settlement of (i) the US PPI Dispute with respect to the Guaranteed Bonds currently pending before this Court and all of the related submissions and requests for relief, and (ii) the allowed claims for outstanding principal obligations and accrued prepetition interest obligations (each as

set forth on Schedule A to the Settlement Agreement), and any entitlement to PPI (calculated pursuant to Section 2.1 of the Settlement Agreement) arising under the Guaranteed Bonds.  For the avoidance of doubt, any additional amounts claimed by and allowed in favor of the Indenture Trustee or any Bondholders in respect of Guaranteed Bonds as against NNI, if any, shall only be eligible for allowance or the right to receive distributions in accordance with Section 2.3 of the Settlement Agreement.  Nothing in the Settlement Agreement is or shall be deemed to be a settlement of the Canada PPI Dispute or any part thereof or otherwise a settlement of any claim of the Indenture Trustee or any Bondholder against any of the Canadian Debtors' estates.

- Reimbursement of Costs:  The Indenture Trustee and other Covered Persons (as defined in the Settlement Agreement) shall have the right to seek reimbursement of certain costs and amounts, up to an aggregate amount of $6 million, from NNI, which payments shall constitute an advance against any distributions to which the Bondholders are entitled, as more fully described in Section 7.4 of the Settlement Agreement.

- Reservations of Rights.
  - Allocation Litigation: Nothing in the Settlement Agreement shall constitute a release or waiver or discharge of (i) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute; (ii) any claim, right or entitlement of any Party to Sale Proceeds in the Allocation Dispute; or (iii) any aspect of the Canada PPI Dispute or any other matter pending now or in the future in the Canadian Debtors' cases.

  - Unsecured Creditors other than the Bondholders: Nothing in the Settlement Agreement shall constitute a settlement, release or waiver or discharge of the ability of any unsecured creditor of the US Debtors' estates (other than the Bondholders) to assert a claim for PPI against the Debtors at the contract rate (if any) applicable to such creditor's claims or any alternative theories; *provided, however*, that if there are insufficient funds available to pay PPI to all unsecured creditors of the US Debtors' estates entitled to such amounts, then, solely for purposes of determining any allocation of available PPI among such creditors, the holders of the Guaranteed Bonds shall be deemed to have a claim for PPI equal to the amount of post-petition interest that would have accrued at the applicable contract rate of PPI set forth in the applicable indentures for each of the Guaranteed Bonds.  The Settlement Agreement does not settle the manner in which any funds available for distribution shall be allocated among the creditors of the applicable US Debtors in the event that less than the full amount of PPI can be paid to all creditors owed such amounts, which shall be determined by later agreement of the parties.

- Effective Date; Court Approval:  The Settlement Agreement shall become effective only upon the entry of an order approving the Settlement Agreement (the "Approval Order").  In the event that this Court does not enter the Approval Order by September

30, 2014, any Party may terminate Settlement Agreement by notice in writing to the other Parties.  The Settlement Agreement and Approval Order are intended to be binding on all parties in interest in the Debtors' Chapter 11 Cases.

## RELIEF REQUESTED

22.     By this Motion, the Debtors seek, pursuant to sections 105(a), 502, 726(a)(5), 1124, 1129(a)(7), and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 9019, entry of an order (i) authorizing the Debtor Parties' entry into and approving the Settlement Agreement (the "Settlement Order") and (ii) granting them such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

23.     The relief requested in this Motion is authorized by sections 105(a), 502, 726(a)(5), 1124, 1129(a)(7), and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

24.     Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Citing this authority, the Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy."  In re Martin, 91 F.3d at 393 (second alteration in original) (internal quotation marks omitted) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy").  Courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court.  See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

14

25.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'" In re Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968).  The court need not be convinced that the settlement is the best possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.  Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." Travelers Cas. & Sur. Co., 2008 WL 821088, at *5 (citing Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.), 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at 330.

26.     The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"):  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

27.     The Settlement Agreement squarely satisfies each of the requirements under Bankruptcy Rule 9019.  The Settlement Agreement is proposed in the Debtors' business judgment as a good faith means to avoid the costs, uncertainty and distraction associated with continuing what will likely be a contentious and time-consuming litigation of the US PPI

Dispute.  The Settlement Agreement should be approved as a compromise that is in the best interests of the Debtors, their estates, their creditors and other stakeholders.

28.     The Settlement Agreement will resolve the US PPI Dispute in respect of the Guaranteed Bonds by establishing the maximum amount of distributions holders of Guaranteed Bonds could receive with respect to post-petition interest and certain other contractual claims, assuming sufficient funds exist in the applicable Debtors' cases to make such distributions. These agreements provide the Parties and other parties in interest with certainty in respect of such claims removing a potential impediment to the final resolution of the Chapter 11 Cases. The Parties have demonstrated throughout the Allocation Dispute their willingness to litigate disputes to conclusion absent a settlement; however, various parties have suggested that the issue of the bondholders' entitlements to post-petition interest could be litigated and appealed in a manner that could significantly delay confirmation of the Debtors' chapter 11 plan(s), and the Monitor has suggested that the resolution of this issue would advance their ability to resolve the allocation process.  While the Debtors do not agree that the cherry-picking of issues to litigate against certain of the Core Parties will advance the consensual allocation of Sale Proceeds or that this issue has created a particular logjam, the further litigation of these issues carries with it inherent uncertainties, material delays and costs to several parties with no guarantee that a better result for the Debtors or their creditors could be achieved through further litigation than the terms of the proposed settlement.

29.     As demonstrated by the extensive briefing on the US PPI Dispute by various parties, the various parties have identified ample authority that they argue supports their position, and establishes that these matters could be fairly settled at a wide range of outcomes.  The Debtors believe that there is a significant risk of an outcome of the US PPI Dispute that would

result in a greater amount of entitlement to PPI than the capped amount agreed to in the

Settlement Agreement.  The Debtors therefore submit that the maximum level of post-petition

interest distributions as embodied in the Settlement Agreement represents a reasonable

compromise of the dispute that is well within the range of likely outcomes of the US PPI

Dispute, and in any event far more favorable to the Debtors (and the other parties in interest in

their cases) than the lowest point in the range of reasonableness.  Such amount is particularly

reasonable given that it is to serve as a cap on any entitlements of the Bondholders and Indenture

Trustee to not only post-petition interest but also any other Contractual Entitlements that might

be asserted by the Bondholders or Indenture Trustee (other than the allowed claim amounts

indicated in Schedule A to the Settlement Agreement), other than any direct claims the Indenture

Trustee may have with respect to its fees and costs.[19]  Such amount shall be the sole source of

funds available for distributions from the Debtors to the Bondholders.  In so doing, the

Settlement Agreement resolves the US PPI Dispute with respect to 95% of the Crossover Bonds

by principal amount, providing the certainty requested by the Monitor's Request in respect of

that dispute and obviating the need for costly further litigation on this issue.  The Settlement

Agreement also leaves for another day, in the plan context, resolution of other creditors'

entitlement to post-petition interest, and the manner in which available funds would be

distributed among the various creditors who may be entitled to receive such payments.

        30.      In the event that the Settlement Agreement is not approved, the Bondholders and

Indenture Trustee will continue to pursue their right to receive post-petition interest at contract

rates, which could result in a costly and protracted appeals process with no assurance as to how

the courts will ultimately rule on the various litigation issues at stake or the length of time such

---

[19]        The Debtors do not admit any liability for such fees and costs and reserve all rights and defenses with
respect to any such claim that may be made in the future.

proceedings will consume.  By contrast, the settlement of the US PPI Dispute with respect to the

Guaranteed Bonds in accordance with the terms of the Settlement Agreement fairly balances the

various parties' likelihood of success on the merits and eliminates any risk regarding the ultimate

resolution of these disputes.  Resolving such uncertainty is particularly important here to avoid

saddling the Parties with further legal fees and costs related to the US PPI Dispute and to

simplify the issues that have been suggested to be impeding resolution of the Allocation Dispute

as the Debtors remain committed to pursuing a final resolution of those matters.  The Settlement

Agreement also advances the interests of the Indenture Trustee and Supporting Bondholders by

providing for an agreed-upon maximum amount of post-petition interest in the event that NNI

has more than sufficient funds to pay all of its administrative, priority, secured, general

unsecured and prepetition claims in full, such that these parties will be able to determine the

value of post-petition interest with greater certainty.

       31.     Finally, the Settlement Agreement was vigorously negotiated and is the result of

arm's-length settlement discussions.  The Settlement Agreement fully and finally resolves the

US PPI Dispute with respect to the Guaranteed Bonds in an amount that is fair and reasonable

given the benefits of reaching a final settlement and the balancing of all the various risks and

considerations, and the full release of other claims the Parties may hold against each other.

## NOTICE

       32.     Notice of the Motion has been given via electronic transmission, first class mail,

hand delivery or overnight mail to (i) the Core Parties; (ii) the U.S. Trustee; (iii) the Parties; (iv)

all creditors and interest holders who have filed claims or have scheduled claims against the

Debtors that have not been disallowed[20]; and (v) the general service list established in these

---

[20]     Such creditors and interest holders will receive service of a notice of the filing of this Motion in lieu of
receiving copies of the Motion and Settlement Agreement.  As indicated in the notice being provided, the Motion

chapter 11 cases.  Accordingly, the Debtors submit that under the circumstances no other or

further notice is necessary.

## NO PRIOR REQUEST

33.    No prior request for the relief sought herein has been made to this or any other

court.

---

and Settlement Agreement is available for download from the website of the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC ("Epiq") at http://chapter11.epiqsystems.com/nortel, or upon telephonic or e-mail request to Epiq (646) 282-2400 or nortel@epiqsystems.com.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached as <u>Exhibit A</u> hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated:  July 24, 2014
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*